**IN THE UNITED STATES DISTRIC COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 18-CV-2342 |
| | ) | |
| v. | ) | Honorable Mary M. Rowland |
| | ) | |
| REYNALDO GUEVARA, ET. AL. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION TO COMPEL THE CITY'S PRODUCTION OF AREA FIVE**
**HOMICIDE FILES FROM 1987 THROUGH 1995**

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES............................................................................................... ii

INTRODUCTION................................................................................................................ 1

BACKGROUND.................................................................................................................. 2

    A.  The Shootings of Torrence and Kevin Wiley ("the Wiley Brothers")............................. 3

    B.  Indiscriminate Arrests of Latin King Members Efrain Cruz and Francisco
        Veras That Resulted in Alleged Identifications Never Disclosed to the Defense........... 3

    C.  Plaintiff's Arrest on an Unrelated Matter on July 15, 1990 and Alleged Oral
        Statements Allegedly Memorialized in GPRS But Never Produced to the
        Criminal Justice System............................................................................................... 5

    D.  Plaintiff's Arrest for the Wiley Brother's Murders....................................................... 7

    E.  *Monell* Discovery Requests.......................................................................................... 7

    ARGUMENT

      I.  Area Five Homicide Files Are Relevant to Multiple *Monell* Theories Raised
        in Plaintiff's Complaint, and the City Is Not Unduly Burdened By Producing
        Files Between 1987 and 1995 Where It Has Already Been Ordered to Produce
        a Majority of those Homicide Files (1989-1995) in other cases................................... 8

        A.  The Scope of *Monell* Discovery Is Often Broad Given the Onerous Burden
           of Proof................................................................................................................... 9

        B.  The Requested Area Five Homicide Files Are Relevant to Multiple *Monell*
           Theories and Proportional to the Needs of the Case.............................................. 10

           1. Suppression of Evidence...................................................................................... 11

        C.  Manipulation/Coercion of Witnesses and Fabrication of Evidence..................... 13

        D.  *Coerced Confession*............................................................................................. 15

    CONCLUSION.................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Awalt v. Marketti,* No. 11 C 6142, 2012 U.S. Dist. LEXIS 49182 (N.D. Ill. Apr. 9, 2012) .................. 10

*Bouto v. Guevara, et al.,* 19 CV 2441 (N.D. Ill.) (Cox, J.) ..................................................... 8, 9, 10

*City of Canton v. Harris,* 489 U.S. 378 (1989) ....................................................................... 9

*Deleon v. Guevara, et. al.,* 18-cv-01028 ............................................................................ 15

*Dixon v. County of Cook,* 819 F. 3d 343  (7th Cir. 2016) ........................................................ 9

*Elrod v. City of Chicago,; Medina v. City of Chicago,* 100 F. Supp. 2d 893 (N.D. Ill. 2000) ......................... 10

*Fields v. City of Chicago,* No. 10 CV 1168 (N.D. Ill.) ......................................................... 9, 10, 12

*Gomez v. Guevara, et al.,* 18 CV 3335 (N.D. Ill.) (Kocoras, J.) .............................................. 8, 10

*Montanez, v. Guevara, et al,* 2017-cv-04560 .......................................................................... 14

*Padilla v. City of Chi.,* No. 06 C 5462, 2011 U.S. Dist. LEXIS 92476 (N.D. Ill. Aug 18, 2011) ........... 10

*Palmer v. Marion County,* 327 F. d 588 (7th Cir. 2003) ........................................................ 10

*People v. Selma Butler,* 95-CR-33909 ............................................................................... 15

*Pittman ex rel. Hamilton v. County of Madison,* 746 F. 3d 766 (7th Cir. 2014) ............................. 10

*Reyes, et ano. v. Guevara, et al.,* 18 CV 1028l 18 CV 2312 (N.D. Ill.) (Seeger & Harjani, JJ.) .... 8, 9, 10, 12

*Rivera v. Guevara, et al.,* 12 CV 4428 (N.D. Ill) ......................................................... 9, 10, 12, 15

*Ruiz-Cortez v. City of Chicago,* 931 F. 3d 592 (7th Cir. 2019) ............................................... 9

*Serrano v. Guevara, et al,* 2017-cv-02869 ......................................................................... 14

*Sierra v. Guevara, et al.,* 18 CV 3029 (N.D. Ill.) (Lee & Weisman, JJ.) ................................. 8, 9, 10

**RULES**

Fed. R. Civ. P. 26 .................................................................................................. 11

Fed. R. Civ. P. 72 ................................................................................................ 8, 10

Plaintiff, Jose Juan Maysonet, Jr., by and through his attorneys Jennifer Bonjean, Ashley Cohen and Steven Greenberg, respectfully file this motion to compel the City of Chicago to produce Area Five Homicide Files from 1987 through 1995.

## INTRODUCTION

Plaintiff, Jose Juan Maysonet, Jr., was wrongly convicted and sentenced to natural life in prison for the 1990 murders of Torrence and Kevin Wiley – crimes he did not commit. On November 15, 2017, the State of Illinois dismissed the charges against Plaintiff after *all* of the defendant officers in this case represented through their counsel that they would invoke their Fifth Amendment right to remain silent if called to testify at any retrial. Plaintiff was released after 27 years of wrongful incarceration. Plaintiff's Petition for a Certificate of Innocence is currently pending in the Circuit Court of Cook County.

Plaintiff is among dozens of men who have suffered the same fate in cases investigated by the Chicago Police Department, including 20 men who have recently been exonerated after being framed by Defendant Reynaldo Guevara and his Area Five colleagues. Collectively, these men lost two centuries of their lives.

Ignoring the astounding number of exonerations of young men from the same community, arrested and prosecuted by the *same* crew of Area Five detectives, the City attempts to minimize the clear pattern that has emerged. The City denies even the possibility that these wrongful convictions had anything to do with the wide-spread practices of the department. The evidence tells a different story. Indeed, evidence developed in these proceedings and numerous other criminal and civil litigations shows that these Area Five wrongful convictions are not isolated incidences of misfortune – or even the acts of a single rouge officer. Rather, the policies and practices of the Chicago police department are the moving force behind the Chicago police department's coordinated effort to frame Hispanic men in the Humboldt Park community in the 1990s.

Having failed to successfully prevent discovery altogether into the practices of the department that led to Plaintiff's wrongful conviction and the wrongful convictions of dozens of similarly situated men, the City now resists producing discovery relevant to Plaintiff's *Monell* claims, namely Area Five homicide files – most of which have already been ordered to be produced in other pending *Guevara* cases. As set out in detail below, Plaintiff's request for Area Five homicide files between 1987 and 1995 is relevant to a number of theories of municipal liability and will not cause the City any undue burden since the City has already been ordered to produce Area Five homicide files between the years 1989 through 1998 in other Area Five/Guevara cases currently pending in this District. Accordingly, Plaintiff respectfully moves to compel this Court to order the City to produce all Area Five Homicide files for the time period beginning in 1987 and through 1995.[1]

## BACKGROUND

In 1990, Plaintiff was 19 years old and a member of the Latin Kings street gang. He first met gang crimes officers Defendant Guevara, and now-incarcerated, officer Joseph Miedzianowski[2] together raided Plaintiff's home looking for narcotics. (Dkt. No. 136 at ¶27). The raid did not unearth any drugs but Guevara told Plaintiff at that time that

---

[1] During a meet and confer conference, the City argued that no homicide files could possibly be relevant for any period of time that post-dated the investigation that led to Plaintiff's arrest in 1990. Plaintiff disagrees to the extent that many of the Constitutional violations raised in this case (and in most wrongful conviction cases – *i.e. Brady* claims, Due Process fabrication of evidence claims, and even coerced confession claims) do not even become constitutional claims until the evidence is introduced at trial. Since Plaintiff was not tried and convicted until 1995, the City's homicide files for a period of time that preceded the investigation and charging of Plaintiff (1987-1990) *through* the date on which Plaintiff was convicted is the relevant time period.

[2] As set forth in the parties' Status Report filed on February 18, 2021, Plaintiff reserved the right and intends to file a motion to compel materials from the City related to internal investigations and a lawsuit involving Joseph Miedzianowski. Plaintiff will file that motion upon completion of his deposition scheduled to occur on April 16, 2021 . Plaintiff believes that this Court's decision on the motion will benefit from sworn testimony of Plaintiff rather than relying solely on the allegations contained in his Complaint.

they knew Plaintiff was selling narcotics and that there was a "price" to pay for selling drugs in the neighborhood. *Id.* Plaintiff eventually entered into an arrangement where he paid Guevara so-called protection money so that Plaintiff could deal drugs without police interference. (*Id.* at ¶32).

Plaintiff stopped making protection payments to Guevara in late 1989 after they had a dispute over a case involving Plaintiff's friend Santiago Sanchez (also a Latin King) who Plaintiff believed had been unjustly charged with a case by Area Five detectives. (*Id.* at ¶ 33). Sanchez committed suicide on May 21, 1990, and Plaintiff vowed not to "work" with Guevara any longer. (*Id.* at ¶ 36). After Plaintiff stopped making payments to Guevara, the two men had a heated argument during which Guevara vowed to "hook up" Plaintiff, that is, falsely charge Plaintiff with a serious crime that would result in a lengthy prison sentence. (*Id.* at ¶¶ 33-34, 36).

### A.    The Shootings of Torrence and Kevin Wiley ("the Wiley Brothers")

On May 25, 1990, Torrence and Kevin Wiley, two African-American men, were shot down on North Avenue shortly after midnight. (*Id.* at ¶ 38). The men were in their mid-20s with no known ties to gang and/or narcotics activity despite the fact that the location of the shooting was allegedly Latin King territory. *Id.* There were no eyewitnesses to the shooting, but two women who lived on the block heard an argument between two Black males just before the shooting. (*Id.* at ¶ 39). The argument did not appear to be related to drug or gang activity, and the voices were speaking in English - not Spanish nor English with a Puerto Rican accent. *Id.*

At the time of shooting shortly after midnight, Plaintiff was at home mourning the death of his friend Santiago Sanchez who was buried that morning on May 25, 1990. (*Id.* at ¶ 46). Indeed, Sanchez's death was a memorable moment for the community and particularly those associated with the Latin Kings.

### B.    Indiscriminate Arrests of Latin King Members Efrain Cruz and Francisco Veras that Resulted in Alleged Identifications Were Never Disclosed to the Defense.

Because the shooting occurred in so-called Latin King territory, Area Five detectives began arbitrarily arresting Latin Kings with an eye toward framing one or more of them, notwithstanding that no evidence suggested that the shooting was gang-motivated apart from it having occurred on a block with gang activity (like nearly every block in Humboldt Park in the 1990s). (*Id.* at ¶¶ 40-41). Two Latin King members, Francisco Veras and Efrain Cruz were arrested by detective Guevara and another Area Five detective; they were transported to Area Five and placed in interrogation rooms. (*Id.* at ¶¶ 42-43; Ex. A – Efrain Cruz Affidavit; Ex. B – Francisco Veras Affidavit). Both men were placed in a line-up with four other Hispanic men. (Ex. A at ¶19; Ex. B at ¶15). Both men were asked to step forward at different times which prompted a knock on the viewing window. (Ex. A at ¶¶ 21-22; Ex. B at ¶16) The men interpreted the knock to mean they had been identified. *Id.*

While detained at Area Five, Veras and Cruz were questioned by Defendant Guevara and other detectives. (Ex. A at ¶ 14; Ex. B at ¶ 14). The detectives showed the men photos of the scene and began feeding Veras and Cruz a story about how the shooting happened. (Ex. A at ¶ 15; Ex. B at ¶ 19). Guevara told Veras that they had witnesses to the shooting who said that Veras was the shooter, Efrain was the look-out and that Jeffrey Watts was the get-away driver. (Ex. B at ¶ 20.) Consistent with the practice and tactics employed by Chicago police detectives, Guevara told Veras that if he made a statement against Cruz and identified him as a shooter and that he should do it before Cruz agreed to make a statement and identify Veras as the shooter. (Ex. B at ¶ 21.)

Detective Guevara and his Area Five detectives employed the same tactics with Cruz. They showed Cruz photos of the deceased and the crime scene, and then Guevara and his partner told Cruz that they were going to charge him, Veras (a.k.a "Cisco") and "Black Jeffrey" (Jeffrey Watts) and "Fro." (Ex. A at ¶ 16) Cruz was again told that witnesses had identified him and that his best option was to sign a statement to minimize his own culpability. (*Id.* at ¶ 16). Cruz recalls that a woman, who he believed was a state's attorney, came into the interrogation room and told Cruz that

she was going to charge him and asked if he wanted to make a statement. (*Id.* at ¶¶ 25-26). Cruz declared his innocence. (*Id.* at ¶ 27).

While in custody, Cruz and Veras realized that they had an air-tight alibi for the time of the shooting. (Dkt. 136 at ¶ 44) Cruz and Veras were both arrested and detained at the 14th District on the evening of May 24, 1990 during a sweep that CPD on North Avenue. (Ex. A at ¶ 9; Ex. B at ¶ 8). They were not released until the following morning, long after the murders. (Ex. B at ¶ 12). It was not unusual to conduct sweeps of gang members from time to time where they were arrested for petty offenses like mob action or disorderly conduct. (Ex. B at ¶ 9) After disclosing the alibi to the detectives, Veras and Cruz were promptly released from custody. (Dkt. 136 at ¶ 46).

The investigative file is devoid of any supplemental reports, line-up reports or general progress reports ("GPRS") reflecting that Cruz and Veras were ever detained, questioned, or placed in any line-ups in connection with the Wiley brothers' murder investigation. All of the Defendants, with the exception of Defendant Halvorsen, have been deposed in this case and no Defendant can explain why there are no reports memorializing the investigative actions taken with Cruz and Veras. For his part, Defendant Guevara exercised his Fifth Amendment right to remain silent in response to all questions about whether he withheld information from the State and Plaintiff's criminal attorney about the identifications of Vera and Cruz. Defendant Halvorsen is now deceased but when he was questioned about this incident under oath, he also invoked his Fifth Amendment right to remain silent.

C.     **Plaintiff's Arrest on an Unrelated Matter on July 15, 1990 and Alleged Oral Statements Allegedly Memorialized in GPRS But Never Produced to the Criminal Justice System**

On July 15, 1990, Plaintiff was arrested by Defendant Paulnitsky in connection with a drive-by shooting and brought to Area Five where he was interrogated by Defendant Mingey. (Dkt. 136 at ¶47). He was later charged with attempted murder in connection with the July 15, 1990 incident. (*Id.*

at ¶ 49). Because Plaintiff was a Spanish-speaker, Defendant Montilla, a property crimes detective, served as an interpreter for the interview. (*Id.* at ¶ 49). Mingey questioned Plaintiff about the Wiley brothers' murders and whether he had any involvement. *Id.* Plaintiff denied any involvement and provided an alibi for his whereabouts during the early morning hours of May 25, 1990 – namely he was at home mourning the death of his good friend whose visitation he had attended the night before and whose funeral was the morning of May 25, 1990. *Id.*

In contrast, Defendant Mingey reported (in a report that was prepared a month later) that Plaintiff admitted to having knowledge of the murders and that on the night of the murders, three Latin Kings came to his house to get a .9mm pistol. No general progress reports corroborate Mingey's claim that Plaintiff admitted to providing the weapon for the murders. Indeed, the first time Plaintiff's allegedly inculpatory statement is memorialized anywhere is in the closed/open report authored by Defendant Halvorsen a month later *after* Plaintiff's arrest for the Wiley Brother's murders. Defendant Mingey insists that he *would* have prepared a GPR or some type of report memorializing his conversation with Plaintiff. The record reflects that no GPRs were *ever* produced to the Cook County State's Attorney.

Similarly, Defendant Mingey questioned Plaintiff on August 1, 1990 at the Cook County Jail along with interpreter Defendant Montilla. (*Id.* at ¶ 53). Plaintiff denied any involvement in the crime and told the Defendants to call his attorney. (*Id.* at ¶54).

In contrast, Mingey claims that Maysonet confessed his involvement in the crime. However, no GPRs have been produced that corroborate that Plaintiff admitted his involvement in the double murder. Mingey contends that he would have prepared the GPRs or directed someone else to do so and those GPRs would be placed in the investigative file. No GPRS related to Mingey and Montilla's interviews with Maysonet on July 15, 1990 and August 1, 1990 are in the Cook County State's

Attorney file and no prosecutor, lawyer, or any other police officer recalls ever seeing such GPRs. (*Id.* at ¶ 89).

### D. Plaintiff's Arrest for the Wiley Brothers' Murders

Plaintiff was released on bail August 16, 1990 in connection with the attempted murder charges. (*Id.* at ¶55). Plaintiff was arrested for the Wiley brothers' murders on August 22, 1990, despite the fact that no witness implicated him in the crime and no physical evidence connected him to the crime. (*Id.* At. ¶ 59). Once at Area Five, Plaintiff was physically abused and threatened for nearly 24 hours by Defendant Guevara in order to force him to make a statement incriminating himself in the murders of two men he did not know, had never met, and had never seen. (*Id.* at ¶91). After 20 hours in custody, Plaintiff agreed to give a court-reported statement that was transcribed in English even though Plaintiff spoke Spanish. (*Id.* at ¶ 74).

Defendant Montilla also obtained a handwritten statement from Plaintiff's live-in girlfriend at the time, Rosa Bello, who claimed that she had seen Plaintiff and the three co-defendants retrieve a gun from their apartment shortly before the shooting. (*Id.* at ¶ 83.) Bello did not testify at Plaintiff's trial and later admitted that detectives threatened to "take her kids away" if she did not cooperate and sign the statement. (*Id.* at ¶ 86)

Plaintiff was convicted for the Wiley brothers' murders, based entirely on his alleged oral statements and court-reported confession. (*Id.* at ¶ 101) No eyewitnesses to the crime were ever identified by name in the police reports and no physical evidence corroborated Plaintiff's alleged admissions or purported involvement in the crime. ((*Id.* at ¶ 5)

### E. *Monell* Discovery Requests

In Plaintiff's Fourth Request to Produce, Plaintiff requested, *inter alia,* all homicide files for the Chicago police department between the years 1983 and 2000. The City objected on the grounds that the request was overly broad, unduly burdensome, not proportional to the needs of the case,

and was irrelevant, in any event. (Exhibit C) Taking the City's burdensome arguments to heart, Plaintiff attempted to reach a compromise on the homicide files request, narrowing that request to a five year period that largely covered the span of time for which the City was already ordered to produce Area Five files in other cases. The City refused to compromise. Plaintiff now seek this Court to compel the City to produce Area Five homicide files for the years of 1987 through 1995. In other words, Plaintiff seeks an order compelling the City to produce the same Area Five homicide files that have been ordered in other cases in addition to files from 1987 and 1988.

## ARGUMENT

**I. Area Five Homicide Files Are Relevant to Multiple *Monell* Theories Raised in Plaintiff's Complaint, and the City Is Not Unduly Burdened By Producing Files Between 1987 and 1995 Where It Has Already Been Ordered to Produce a Majority of those Homicide Files (1989-1995) in other cases.**

At the outset, *Monell* discovery is already underway in four other Area Five cases involving largely the same players and theories of municipal liability as alleged in this case. *See, e.g., Reyes, et ano. v. Guevara, et al.,* 18 CV 1028l 18 CV 2312 (N.D. Ill.) (Seeger & Harjani, JJ.); *Sierra v. Guevara, et al.,* 18 CV 3029 (N.D. Ill.) (Lee & Weisman, JJ.); *Bouto v. Guevara, et al.*, 19 CV 2441 (N.D. Ill.) (Cox, J.) and *Gomez v. Guevara, et al.,* 18 CV 3335 (N.D. Ill.) (Kocoras, J.) The City has already been ordered to produce Area Five Homicide files for the following cases: (Ex. D - *Reyes* – 1995 through 1998);[3] (Ex. G - *Sierra* – 1991 through 1995); (Ex. F - *Bouto* – 1989 through 1993).[4] The Court has not yet ruled on the scope of discovery in *Gomez*.

---

[3] The City lodged a Rule 72 objection to Magistrate Judge's Harjani's Order on the production of Homicide files. District Court Judge Seeger overruled the City's objections and affirmed Magistrate Judge Harjani's decision ordering the production f Area 5 homicide files from the years 1995 through 1998. (Ex. D - Judge Harjani's Decision; Ex. E - Judge Seeger's decision)

[4] The City has lodged a Rule 72 Objection to Magistrate Judge Cox's decision ordering the City to produce Area Five homicide files between 1989 and 1993 that is currently pending before District Court Judge Kness. (Ex. F)

Plaintiff Maysonet now seeks an order compelling the City to produce Homicide files from 1987 through 1995,[5] only two years in addition to what the City must already produce in other cases. Despite the central relevance of these homicide files, the City persists in its objection to produce Area Five homicide files for any span of time. This position is unreasonable where numerous cases are currently pending in this court in which the plaintiffs have credibly alleged that Detective Guevara and his co-conspirators at Area Five framed innocent people using a variety of techniques and tactics condoned by the City, and courts have routinely ordered the City to produce Area Five homicide files. *Reyes, Sierra, Bouto, supra.* Furthermore, in two recent cases, the exact type of evidence that Plaintiff seeks here has resulted in federal jury verdicts that the City's policies and customs caused the violations of citizens' constitutional rights. *Rivera v. Guevara, et al.,* 12 CV 4428 (N.D. Ill); *Fields v. City of Chicago,* No. 10 CV 1168 (N.D. Ill.) The Seventh Circuit recently affirmed the jury's *Monell* verdict in *Fields,* holding that the district court's restrictive limitation on *Monell* discovery early in the case justified a new trial on the *Monell* claims, and concluding that *Monell* discovery identical to the type Plaintiff seeks here supported the jury's finding of municipal liability.

### A. The Scope of *Monell* Discovery Is Often Broad Given the Onerous Burden of Proof.

Under *Monell,* a municipality cannot be held vicariously liable under section 1983. *Ruiz-Cortez v. City of Chicago,* 931 F. 3d 592, 598 (7th Cir. 2019). To hold the City liable, Plaintiff must show that its "official policy, widespread custom**,** or action by an official with policy-making authority was the 'moving force' behind his constitutional injury." *Dixon v. County of Cook,* 819 F. 3d 343, 348 (7th Cir. 2016) *quoting City of Canton v. Harris,* 489 U.S. 378, 379 (1989). This evidentiary burden is especially severe in a case like this one, where Plaintiff must rely in part on evidence of a widespread custom to

---

[5] According to CPD Annual Reports, 224 homicides occurred in Area Five in 1987 and 1988. Thus, the City is being asked to produce a relatively modest number of homicide files *in addition* to those files already ordered to be produced between the years 1989-1995.

establish municipal liability. *See Palmer v. Marion County,* 327 F. d 588, 596 (7th Cir. 2003) ("[P]roof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference."); *see also Pittman ex rel. Hamilton v. County of Madison,* 746 F. 3d 766, 780 (7th Cir. 2014) (holding that three suicides in a county jail did not constitute sufficient evidence of a widespread custom of failing to prevent suicides).

In light of this heavy burden, *Monell* discovery is routinely more complex, time-consuming, and costly than discovery against individuals. *See, e.g., Elrod v. City of Chicago,; Medina v. City of Chicago,* 100 F. Supp. 2d 893, 895 (N.D. Ill. 2000). Quite often it involves the production of many files and documents relevant to establishing widespread customs. *See, e.g., Awalt v. Marketti,* No. 11 C 6142, 2012 U.S. Dist. LEXIS 49182 (N.D. Ill. Apr. 9, 2012) (ordering the production of voluminous medical files because plaintiff's *Monell* theory required her to "prove more than just one, or two, or eve three instances of inadequate medical care") *Padilla v. City of Chi.,* No. 06 C 5462, 2011 U.S. Dist. LEXIS 92476 (N.D. Ill. Aug 18, 2011), (holding that Magistrate Judge committed clear error by refusing to order the disclosure of five years of City-wide police misconduct reports). Recently, District Court Judge Seeger overruled the City's Rule 72 objection that complained about the Magistrate Judge's decision ordering the City to produce homicide filed from 1995 through 1998, observing that although the requests are sweeping both in number of cases and volume of pages, the "ruling was not out of line within the scope of discovery in similar *Monell*-related cases in this district (e.g. *Fields* and *Rivera*)." (Ex. E)

Here, Plaintiff is only seeking two years of additional homicide files beyond what the City has already been ordered to produce. Compared to the normal course of *Monell* discovery in major civil-rights cases, Plaintiff's request is unusually narrow. *See, e.g., Reyes, Gomez, Bouto, Sierra.*

**B.** **The Requested Area Five Homicide Files Are Relevant to Multiple *Monell* Theories and Proportional to the Needs of the Case**

The City will not produce *any* Area Five homicide files absent a court order, contending that Plaintiff's request is overbroad and irrelevant. Homicide files are a fundamental foundation of all of the *Monell* theories asserted in this case and other *Guevara* cases. The *Monell* theories allege that the City's policies and customs corrupted the murder investigations in Area Five and the resulting criminal prosecutions. The homicide files are the key documents that relate to the Area Five investigations and reflect the police version of what transpired during those investigations, thus they are essential to assessing any *Monell* theory that alleges a systematic defect in homicide investigations. That alone justifies the production of the homicide files under the liberal discovery standard set out in Fed. R. Civ. P. 26. Put differently, if the Area Five homicide files were not produced, Plaintiff would be deprived of virtually all documents in the City's possession relevant to their *Monell* claims, and it would be impossible for the claim to proceed.

Critically, courts in this District deciding this issue specific to the so-called *Guevara* cases agree. Even District Court Judge Seeger who expressed healthy skepticism about the ultimate relevance and admissibility of unrelated homicide files, concluded that those issues should be tabled for another day. (Ex. E) In affirming Judge Harjawi's order, the court wrote, "[t]oday, the issue is discovery. The Magistrate Judge carefully considered the issue and concluded that the Order struck the right balance, after considering relevance and proportionality." *Id.*

In contrast to the overwhelming authority that has developed on this issue, the City contends that Plaintiff must make a greater showing of the relevance of the homicide files to justify their production. The City attempts to impose a non-existent requirement that Plaintiff must identify certain evidence through individual discovery before pursuing *Monell*. No authority supports this claim, but even if there was, Plaintiff has established a strong nexus between the Area Five homicide files and the *Monell* theories in this case:

     1.    **Suppression of Evidence**

One of Plaintiff's *Monell* theories alleges systematic suppression of evidence. It is important to be clear that there are multiple due process *Monell* theories that relate to the suppression of evidence, and the Area Five homicide files are relevant to these theories in different respects. For example, there is the "street files" theory, tried in *Rivera and Fields,* which holds that the City police caused the routine suppression of investigative files in homicide cases – regardless of whether any individual defendant committed investigative misconduct – so that prosecutors and defense attorneys in the criminal justice system did not receive pertinent investigation information. But in addition, Plaintiff advances a *Monell* theory that investigative information was routinely suppressed because it was *not* recorded in the homicide files, such that even if the complete file had been turned over, a due possession violation would result. The Area Five homicide files are relevant to proving both theories. As Judge Harjani explained in *Reyes,* the homicide filed can be "(1) examined themselves and (2) compared to other files concerning the same investigation and prosecution" to determine whether evidence was suppressed during particular homicide investigation. (Ex. D at 8)

Specifically, a homicide file on its face will contain evidence probative of whether investigative materials were disclosed to the criminal justice system. By way of illustration, in *Rivera* the homicide file contained a number of GPRs but the investigative file inventory included with the file reflected the some GPRs created on key dates and logged into the file shortly thereafter had gone missing. The homicide files can be compared not only to the CCSAO files but also defense counsel files, and the City's permanent retention file which reports the official account of a criminal defendant's guilt in a homicide case. Again, in *Rivera,* the jury saw that the materials suppressed in the homicide file told a much different story about alternative suspects and the sole eyewitness who identified Mr. Rivera than the official account contained in the permanent retention file.

Although Plaintiff should not be required at this juncture to *prove* that evidence was suppressed in this case to justify *Monell* discovery, Plaintiff has already demonstrated that evidence

12

was suppressed in his case. Just by way of example, *all* investigative conduct related to Francisco Veras and Efrain Cruz was concealed from defendant at his criminal trial; including but not limited to evidence that: (1) there were apparently eyewitnesses to the crime who can confirm the identity of the perpetrator; (2) Veras and Cruz were placed in line-ups and allegedly identified as the offenders: and (3) physical evidence implicated Veras and Cruz, and (4) Veras and Cruz were fed a story by Guevara and urged to implicate each other and other parties in a crime they could not have committed. Indeed, all the investigative activity related to Veras and Cruz tends to impeach Guevara and his fellow detectives and amounts to exculpatory evidence that was undeniably concealed from the defense. Whether Veras and Cruz were legitimate suspects (unlikely) or whether Guevara attempted to first frame them (probable), the result is the same. Plaintiff was materially prejudiced by the suppression of that investigative conduct.

Relatedly, it appears that GPRs reflecting Plaintiff's denials of having any involvement or knowledge about the shooting were concealed from the defense. Defendant Mingey testified that he interviewed Plaintiff twice before Plaintiff's arrest for the Wiley Brothers' murders on August 22, 1990. Mingey claims that Plaintiff made inculpatory statements but no GPR or report corroborates this clam. At his deposition, Mingey was insistent that he *would have* completed a GPR. Plaintiff concedes that Mingey and Montilla interviewed him twice before his arrest (once on July 15, 1990, and once on August 1, 1990) but that on *both* occasions Plaintiff made exculpatory statements, presented his alibi to the officers, and denied having knowledge about the murders. Mingey's GPRs which he swears he authored should reflect Plaintiff's statements which were exculpatory. Those GPRs were concealed and never produced to the prosecution or defense counsel.

Reviewing homicide files for internal inconsistencies and comparing those files to other files, including the CCSAO's files, defense counsel's files, permanent retention files will allow Plaintiff to show that Area Five detectives *routinely* and consistent with the *de facto* policies of the department

concealed exculpatory evidence from the criminal justice process. The fact that they accomplished that through different methods is of no moment, since the end result is the suppression of exculpatory evidence and a Due Process violation.

### C.    Manipulation/Coercion of Witnesses and Fabrication of Evidence

Another *Monell* theory raised by Plaintiff is that City of Chicago maintained policies and practices that involved manipulating or coercing witnesses to falsely implicate defendants in crimes and/or to make false identifications of defendants. Another way that Area Five detectives routinely fabricated evidence against suspects was by attributing *false* oral admissions to the defendant. The defendants in this case did all of the above in their quest to wrongly prosecute Plaintiff.

Homicide files can, on their face, reveal evidence of this type of fabrication in various ways. Plaintiff's case is a perfect example. Here, Defendants claim that Plaintiff made two oral statements implicating himself in the murders, the second of which amounted to a confession. Neither of them were memorialized in any GPR or contemporaneously prepared narrative report. The absence of any note corroborating the officers' belated claim of an oral confession a month before Plaintiff's arrest leads to the very reasonable inference that the oral statements attributed to Plaintiff were fabricated after the fact (probably to justify Plaintiff's illegal arrest). No reasonable jurist would believe that seasoned detectives and his supervisor would simply fail to memorialize a confession to a double murder. This example demonstrates how a homicide file on its face can reveal fabricated evidence.

Similarly, in *Serrano v. Guevara, et al,* 2017-cv-02869 and *Montanez, v. Guevara, et al,* 2017-cv-04560, the homicide file revealed that detective Guevara ran the criminal histories/rap sheets of the three individuals who were eventually framed for the murder of Rodrigo Vargas in 1993 long before any evidence suggested their involvement in the crime. The fact that Guevara pulled rap sheets of three individuals, at the exact same time, before there was a whisper of their involvement in the case suggests, in and of itself, that detectives intended to fabricate a case against the defendants. Indeed,

14

the City of Chicago through its counsel Sidley & Austin made the exact same observation in the memo they prepared.

Fabricated evidence is also revealed through examination of homicide files when witnesses' statements documented in police reports are contradicted by other typed police reports officer notes, or even forensic evidence. [6] This occurred in one of the homicide files produced as part of *Monell* discovery in *Rivera,* in that case, the homicide file contained two versions of the same lineup report, each one reaching a different conclusion about what happened in the line-up. *Deleon v. Guevara, et. al.*, 18-cv-01028 at Dkt. 186-10 at 48-49 (discussing the case of Demetrius Johnson)

Homicide files can also reveal evidence of fabrication through targeted investigation. Plaintiff's counsel has reviewed enough homicide files in the course of their collective 50-plus years careers that some homicide investigations are open and shut; others reflect good police work or a good break, and others reek. For those latter cases, a few key witnesses often stand out. Talking to those witnesses as part of an investigation can reveal the suppression of alternative suspects and other investigative leads, and fabricated police reports omitting the information above and telling a different story about the witness's knowledge.

### D. *Coerced Confession.*

Finally, homicide files can be important to developing evidence of a City-wide policy or custom of coercing confessions. There are a number of suspects and witnesses who, over the years,

---

[6] Just way of example, in one actual innocence case handled by undersigned counsel (that did not involve Area Five detectives but rather Area One detectives), the homicide file showed that a juvenile witness allegedly told investigating detectives that he witnessed the defendants beat the victim to death with a crowbar. The forensic evidence showed that the victim died of stab wounds and had not been beaten at all. *People v. Selma Butler,* 95-CR-33909. This type of inherent contradiction strongly suggested that the juvenile witness's statement was not only a lie but was likely the product of police manipulation or coercion. This example is offered simply to show the innumerable ways in which homicide files, without comparison to other files, can reveal *de facto* practices of the department.

have alleged that they were beaten or coerced into confession by Guevara and other Area Five personnel. Many of them are identified in Plaintiff's complaint and in their discovery requests. The City, of course, has not conceded merit of those claims, and in most of those cases the underlying homicide files are not available to Plaintiffs. But those homicide files will contain arrest reports indicating when the individual was arrested, and when they gave a statement, corroborating allegations about the length of an interrogation, the participants in the interrogation, whether the interrogation was conducted in English or another language, and so on. They will also contain copies of handwritten confessions. A facial review those documents can reveal forged signatures, and information the was fed to the suspect. Comparing the confession against other documents in the file can reveal that certain information contained in the confession had been learned by police earlier in the investigation, or that nonpublic information learned later contradicts information in the confession. Plaintiff's attorneys have encountered numerous such cases. Some confessions stand out; in those cases, a conversation with the suspect could reveal evidence of abuse and other coercion.

In sum, the Area Five homicide files are unquestionably relevant to Plaintiff's *Monell* theories. Indeed, these files are relevant in multiple other cases involving Area Five detectives. Production of these files is of little burden to the City in light of the fact that the City has already been ordered to produce the vast majority of files in other *Guevara* cases.

## CONCLUSION

Plaintiff respectfully requests that the City be ordered to produce Area Five homicide files between the years 1987 through 1995.

RESPECTFULLY SUBMITTED:

/s/ Jennifer Bonjean

16