Exhibit 1

1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4    THOMAS SIERRA,                    )
                                       )
5             Plaintiff,               )
                                       )
6        vs.                           )  No. 18 C 3029
                                       )
7    REYNALDO GUEVARA, et al.,         )  Chicago, Illinois
                                       )  November 14, 2019
8             Defendants.              )  11:04 A.M.

9            TRANSCRIPT OF PROCEEDINGS - Motion
        BEFORE THE HONORABLE M. DAVID WEISMAN, Magistrate Judge
10

    APPEARANCES:
11

    For the Plaintiff:      LOEVY & LOEVY
12                          311 North Aberdeen Street
                            Third Floor
13                          Chicago, Illinois  60607
                            BY:  MR. STEVEN EDWARDS ART
14                               MR. ANAND SWAMINATHAN

15   For Defendant Guevara:  LEINENWEBER BARONI & DAFFADA, LLC
                            120 North LaSalle Street
16                          Suite 2000
                            Chicago, Illinois  60602
17                          BY:  MR. THOMAS MORE LEINENWEBER

18
                            TRANSCRIBED BY:
19
                    PAMELA S. WARREN, CSR, RPR
20                    1751 West Howard Street
                              Ste 183
21                  Chicago, Illinois  60626
                         (312) 823-0001
22                      PSWCSR@gmail.com

23   **NOTE:  Please notify of correct speaker identification.
    FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS
24   UNINTELLIGIBLE.**

25

1   **APPEARANCES:   Continued**

2   For Defendant Halvorsen,    THE SOTOS LAW FIRM, P.C
    Wojcik, McMurray,           141 West Jackson Boulevard
3   Figueroa, Mingey, and       Suite 1240A
    Biebel:                     Chicago, Illinois  60604
4                               BY:  MR. JOSH MICHAEL ENGQUIST

5   For Defendant City:         ROCK FUSCO & CONNELLY, LLC
                                321 North Clark Street
6                               Suite 2200
                                Chicago, Illinois  60654
7                               BY:  MS. EILEEN ELLEN ROSEN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings held in open court:)

2         THE CLERK:  18 C 3029, Sierra versus Guevara, et al.

3      (Discussion off the record.)

4      (Whereupon the Court turned his attention to other matters

5  on his call.)

6         THE COURT:  Then we're going to recall Sierra.

7         THE CLERK:  18 C 3029, Sierra versus Guevara, et al.

8         MR. ART:  Good morning, your Honor.  Steve Art for

9  Mr. Sierra.

10        MR. SWAMINATHAN:  Anand Swaminathan for Mr. Sierra.

11        MR. ENGQUIST:  Good morning again, your Honor.  Josh

12  Engquist.  This time also on behalf of -- this time on behalf

13  of actually (unintelligible) officers, which would be

14  Guevara -- I'm sorry.  He has Guevara.

15        I have Halvorsen, Figueroa, Mingey, Biebel, Wojcik,

16  and McMurray.

17        MS. ROSEN:  Good morning, your Honor.  Eileen Rosen on

18  behalf of the defendant City of Chicago.  It is easy for me.

19      (Laughter.)

20        MR. LEINENWEBER:  Good morning again, Judge.  Tom

21  Leinenweber on behalf of Mr. Guevara.

22        THE COURT:  Okay.

23        MR. ENGQUIST:  Having them back to back is really

24  hard, your Honor.

25        THE COURT:  You have no idea.

1          MS. ROSEN:  Oh, I'm sure we do.

2      (Laughter.)

3          THE COURT:  All right.  So thank you for your

4  briefing.  The one issue I'm trying to grapple with is the CRs.

5  I'll tell you what I am thinking about on the homicide files.

6          So with the CRs -- and I know Judge Harjani had the

7  same concern -- is the statistical approach, doing -- and not

8  agreeing that it would be a statistically significant sampling.

9          How can you take that position and then still want to

10  minimize the production?

11          MS. ROSEN:  So from the city's perspective, Judge, it

12  is not in any of the cases, where this is an issue, clear to us

13  precisely how they intend to use whatever CR files they end up

14  obtaining in whatever cases.  We don't know precisely whether

15  or not there is going to be a review of the files individually

16  and some expert will opine that the investigations are

17  incomplete, insufficient, unreasonable based on -- tick off the

18  reasons.

19          We don't know if they're simply going to rely on some

20  analysis regarding the numbers of complaints versus the number

21  of sustained complaints versus the amount of discipline that's

22  meted out based on certain amounts -- certain types of

23  complaints.  We don't know if they're going to break it down by

24  category of complaints.  So all excessive force cases, this is

25  the breakdown.  So we just don't know.

1    Different plaintiffs in our -- in other cases with

2    lesser amounts of CR files have done different things.  And, to

3    be quite honest, in the context of the Guevara cases, because,

4    you know, plaintiffs like to analogize them all, and there is

5    some analogy in that regard, we have never done this.

6    Rivera did not embark on this type of discovery.  The

7    CRs at issue in the Rivera case were simply the defendant

8    police officers's CRs.  Plaintiffs didn't ask for an -- that's

9    not to say that they can't ask for it now.  I'm just saying the

10   city doesn't have experience to know what these arguments are

11   going to be.  And so since we don't know what the arguments are

12   going to be, we can't agree to any kind of sample because we

13   don't know what we're faced with.  And so that's really the

14   city's position.

15   And plaintiff -- and it is our view that, you know,

16   presumably they're discussing whatever issues they intend to

17   pursue.  It is not in a vacuum.  It is not like they have never

18   seen CR files before.  It is not like they have never seen

19   Guevara's CR files before.  They have Guevara's.  They have

20   Halvorsen's.  They have all of the defendants in this case and

21   for whatever cases the -- Loevy & Loevy are involved in, all of

22   the defendants that are not Guevara, they are not Halvorsen in

23   the other cases.

24   So they have a sense of what types of complaints were

25   being made against those particular police officers, what those

1  theories are.  Presumably they are talking with experts about

2  whatever these theories are.  And so they have never said, we

3  need five years or we need three years or we need whatever,

4  pick the number, because our expert says X or our -- or

5  our -- you know, we can't do the analysis we need to do because

6  we're being told we have to have this number.

7          So from the city's perspective if you're -- we're

8  just arbitrarily picking five years or seven years or three

9  years, what -- it feels very arbitrary.  You know, so that's

10 the city's basic position on that.

11         THE COURT:  Okay.  So what I hear from you, Ms. Rosen,

12 is a good faith explanation as to why you have taken the

13 position you have.  It doesn't -- that position though doesn't

14 help give a good sound basis to limit to like every fifth CR

15 for the reasons -- I mean, you're articulating a good faith

16 argument for sure, but that same good faith argument flies in

17 the face of using every fifth CR.  So --

18         MS. ROSEN:  Sure.  And it could be every three.  But

19 if we're operating in a vacuum because we're just all throwing

20 out arbitrary numbers and arbitrary years, then the city's

21 position is okay, well, let's look to proportionality.  You

22 know, plaintiff is not saying, I have to have -- they're not

23 saying, I have to have a certain number of years.  They're not

24 saying, I have to have a certain number of files.  They're not

25 saying, I have to have a certain number of certain categories

7

1    of complaints.  They're just saying we have picked this number,

2    and we're willing to narrow it if you will stipulate.  But

3    there is a proportionality.

4          Monell doesn't eliminate proportionality --

5          THE COURT:  No, it doesn't.

6          MS. ROSEN:  -- from the equation.  And what we know,

7    based on what happened in Hood and Washington, which is, quite

8    frankly, not a Guevara case, but the only case that the city is

9    aware of certainly in recent vintage where they have been

10   ordered to produce years of files, that we're up over 1000 CR

11   files, we're not at the expert -- we don't have expert

12   disclosures in that case, so we don't know, we don't even have

13   a glimmer of how they intend to use them.  And so -- and we're

14   not hearing from the plaintiff, I need this because I want to

15   prove that.  And I am told that in order to, you know, to prove

16   what I want to prove, I need to have that, then we're looking

17   at proportionality and saying, well, you know, why a thousand?

18   Why over a thousand CR files?

19         When in, you know, other cases, quite frankly, you

20   know, this discovery isn't brand new.  And while it has never

21   been done on the Guevara cases, certainly plaintiffs, Loevy &

22   Loevy, has done this type of discovery in the past in the

23   context of other types of cases.  And, you know, to my

24   recollection, and this isn't -- I'm not saying this is all of

25   the universe, but just my recollection and my experience with

1    it is, you know, they have -- they've hired experts.  They have

2    provided opinion testimony both on the quality of the

3    investigations being done by whatever the entity is that's

4    doing the administrative investigation, and they have -- they

5    have done a statistical analysis based on sustained rates

6    either globally or broken down.  And we're dealing with like a

7    hundred or 150 CR files.

8              And so, you know, without hearing some explanation,

9    yeah, sure, one in five is just as arbitrary as seven years,

10   but, you know, at that point our calculation is based on

11   proportionality.  So --

12             THE COURT:  All right.

13             MR. ART:  Could we respond to this point?

14             THE COURT:  Sure.

15             MR. ART:  So all of the points that are being made

16   about what we're going to find out from those files, we're

17   going to look at all of the things that Ms. Rosen just

18   identified, we're going to examine each investigation in

19   detail, and we're also going to draw a database on the entire

20   set of files as a whole.  None of that has to do with sampling

21   though.  Sampling is --

22             THE COURT:  No, no.  I think sampling is not open for

23   discussion because of the reasons Ms. Rosen just said.  So it

24   certainly -- I just was trying to understand where the city was

25   coming from to say, we're offering sampling, but we can't agree

1    that the sample we offer will be sufficient.

2              So now I'm looking at, you know, proportionality in

3    the sense of Area 5.  Are we limited to Area 5, time frame, and

4    other types of things?

5              So I know Judge Harjani did three years, right?

6              MR. ART:  Four, '95 to '98.

7              So on the question of proportionality now, if we're

8    just talking about what the whole set of files is, a number of

9    points.  First, a thousand files, which in our view we don't

10   know the --

11             THE COURT:  Well, let me say something else about

12   numbers.  So I don't care what the numbers -- I shouldn't say I

13   don't care.  I think I have a sense of what the numbers will

14   be.  I think everyone I'm looking at has a sense of what the

15   numbers will be.  And if our sense of what those numbers are is

16   correct, I don't care about the numbers because it is not like

17   we're dealing with Podunk, Illinois, Police Department.  And if

18   I say four years from your whole department, we may end up with

19   2 CRs.

20             MR. ART:  Right.

21             THE COURT:  We know that's not what's going to happen.

22             So what I think matters is time frame, you know,

23   before and after the incident, how much time before and how

24   much time after.  And then geographic region, so to speak, Area

25   5 or greater.

1          And my guess is we'll end up with a few hundred to

2    north of a thousand, and -- but that -- wherever we are on that

3    that's what's going to be generating it.  Unless, for some odd

4    reason, when we resolve those two parameters, you end up with a

5    number that is so small we all would agree you wouldn't be able

6    to do anything with it.

7          MR. ART:  Right.

8          THE COURT:  I just don't think that's going to happen.

9          MR. ART:  Right.  So what we're requesting is Area 5

10   only.

11         THE COURT:  Uh-huh.

12         MR. ART:  Because we think that we can gather data

13   from publicly available sources about how that compares to

14   other areas to do that kind of comparison.

15         THE COURT:  You're thinking like I'm thinking.  Keep

16   going.

17         MR. ART:  We're asking for the years 1989 to 1995.

18   And that decision, both with respect to CRs and homicide files,

19   is our best analysis --

20         THE COURT:  Let's do CRs first because --

21         MR. ART:  Okay.

22         THE COURT:  -- homicide files I have a whole different

23   view on.

24         MR. ART:  So if you look at the failure to train and

25   failure to supervise Supreme Court cases, Connick (phonetic),

1  Brown, you look at the Seventh Circuit cases, they're all

2  saying you didn't provide enough of a pattern over a

3  longer -- long enough period of time in the correct

4  geographical scope.

5          THE COURT:  And remind me where the -- when the

6  incident at issue here occurred.

7          MR. ART:  So the arrest is in 1995.  So what we're

8  asking for --

9          THE COURT:  And the investigation was 1995.

10          MR. ART:  Correct, your Honor.

11          THE COURT:  Okay.

12          MR. ART:  So we're asking for the seven years prior.

13          THE COURT:  Okay.

14          MR. ART:  Right.

15          And there are plenty of cases that hold that after --

16  you know, after incident evidence is relevant to Monell.  But

17  what we're going to try to do is show that the failure to

18  discipline officers at Area 5 in this time frame caused this to

19  occur.  And it is true that we did not do that in Rivera, and

20  summary judgment was granted to the city on this very theory

21  because we did not show that the practice was widespread

22  enough.

23          So that's our concern.  And we think in terms of

24  agreement in terms of making proposals to the city, that seven

25  years is the sort of most limited time frame that we can agree

```
 1    to.
 2            Our -- we think that Judge Harjani's order in the
 3    Solache and Reyes cases of 1995, '6, '7, '8, probably
 4    encompasses most of the CRs at issue here.  Because we're not
 5    asking for the CRs during a particular time frame, we're asking
 6    for the CRs for the detectives who worked at Area 5, all of
 7    their CRs, for the folks who worked there during that
 8    particular time frame.
 9            THE COURT:  Oh, okay.
10            MR. ART:  And the --
11            THE COURT:  Hold on.  So you're saying you want all
12    detectives in Area 5 from '89 to '95, all of their CRs?
13            MR. ART:  And the reason that we need that is because
14    it --
15            THE COURT:  Whoa, whoa, whoa.
16            MR. ART:  Yes.
17            THE COURT:  That was a question.  So the answer is
18    yes.
19            MR. ART:  Yes, your Honor.
20            THE COURT:  Okay.  You can stand back up and stop with
21    your slouch because that's not happening.
22            MR. ART:  Sorry.
23            THE COURT:  So you're telling me is that if you have a
24    detective who started on the job in '95 and retired in, let's
25    say, I don't know, 2012, you would want their CRs up through
```

1    2012?

2              MR. ART:  Right, your Honor.  And detective --

3              THE COURT:  How -- how --

4              MR. ART:  So the reason is to show how the city

5    disciplines somebody who is the subject of repeated complaints

6    over time.  We can't limit the time frame to a particular time

7    period.  We need to know who the officers with many, many

8    repeat complaints are versus the officers who actually only

9    have a few.  And there is a sort of wide diversity of the

10   number of the complaints that officers receive.

11             THE COURT:  Okay.  That's not going to happen.  If you

12   want that, then you can ask for a CR history of detectives from

13   a time period up through their retirement maybe, and then you

14   can maybe point to one or four detectives who have a long

15   series of CRs, and maybe we'll talk about that.

16             MR. ART:  Okay.

17             THE COURT:  But we're not -- we're not doing that.  So

18   you can take that off your Christmas wish list.  That's not

19   happening.

20             MS. ROSEN:  And to be clear, Judge, it is absolutely

21   not the city's understanding that that's what was ordered in

22   Solache.

23             THE COURT:  I didn't understand --

24             MS. ROSEN:  Yeah.  So --

25             THE COURT:  I did not understand that to be.

1    MS. ROSEN:  It was the time frame.  Limited to the CRs
2    within that time frame.
3        THE COURT:  Okay.
4        MS. ROSEN:  Yes.  So -- and that's --
5        THE COURT:  That's --
6        MS. ROSEN:  -- not your problem, but --
7        THE COURT:  Yeah.  Yeah, I did -- I don't think that's
8    what I understood Judge Harjani to rule.  But I haven't read
9    that opinion in a few weeks, so maybe -- maybe I missed that
10   nuance.
11       Okay.  So that's fine.  That's off.  That's good.
12   We're just narrowing it down.
13       So time frame, '89 to '95.  And the CRs that were
14   opened in that time period.  Not closed, but opened.
15       Is that what you are looking for?
16       MR. ART:  I mean, what we're looking for is what we
17   have just described because it solves these problems.
18       THE COURT:  So you're not getting that --
19       MR. ART:  Right.
20       THE COURT:  -- so now you know --
21       MR. ART:  Right.
22       THE COURT:  -- like this is an iterative process.
23       MR. ART:  Right.
24       THE COURT:  So do you want the ones that were opened
25   in that time frame or closed in that time frame?

15

1          MR. ART:  We need to know the result of the CR to make
2     any useful analysis about it.  So I suppose we would take
3     closed rather than opened because it is not clear that the ones
4     that are opened in that time frame will also be closed in that
5     time frame.
6          THE COURT:  Right.  So I'm asking, that's what you
7     want, you want the ones that were closed in that time period.
8          MR. ART:  Yes, your Honor.
9          THE COURT:  Okay.  Can the city produce a list -- can
10    it find CRs based on the date it was closed as opposed to date
11    that it was opened?
12         MS. ROSEN:  I believe that we can.
13         THE COURT:  Okay.
14         MS. ROSEN:  So coming in to today, it was my
15    understanding that what we were looking for were complaints
16    that were registered within the time frame.  So a complaint
17    that was made --
18         THE COURT:  Yeah.
19         MS. ROSEN:  -- complaints that were made January 1st,
20    1989, or whatever the year is, through complaints -- whether
21    they are were opened or closed.  If we're now changing it to
22    closed, fine.  And I am pretty sure I can figure that out.
23         THE COURT:  Okay.
24         MR. ART:  But --
25         MS. ROSEN:  If I can't, I'll let you know.  But I'm

1    pretty sure that I can.

2         MR. ART:  Let me clarify that.  I think that -- we are

3    comfortable -- that is how we would have -- we would want to do

4    it.  We would say, anything that is opened in this period, you

5    would give it to us.  But they wouldn't be cutting it off -- if

6    you give us '89 to '95.  CRs opened in 1994, it doesn't close

7    until 1996 because some of these do take a long time --

8         THE COURT:  Right.

9         MR. ART:  -- they would be giving us that if we

10   chose -- if we picked the open ones, right?

11        THE COURT:  Right.

12        MR. ART:  That's my understanding.

13        If that's the understanding, then that's what we want

14   is the -- I thought you were saying it would only be -- you

15   wouldn't get them unless they closed in that period.

16        THE COURT:  Well, that's what you just said you

17   wanted.  That's why I was asking.

18        MR. ART:  Because we thought you were saying if we

19   picked -- if we had an open one that opened in 1994 and if it

20   closed in 1996, then we wouldn't get it because it wouldn't be

21   in this period.

22        So I think we had a little bit of a misunderstanding

23   of your position.

24        THE COURT:  Are you changing your mind?  You want them

25   opened.

1    MR. ART:  If it is opened in this period, even if it

2    closes after this period, that's what we would like.

3    THE COURT:  Okay.

4    MR. ART:  And it sounds like that you're saying you

5    know the system can do --

6    MS. ROSEN:  So, yes, if the -- so to be clear, I think

7    what we're asking for right now is all complaints that were

8    registered.  If we're looking at the '89 to '95 time frame,

9    which obviously the city would prefer less, but if we're

10   looking at that time frame, by way of example, all complaints

11   that were registered, meaning complaints that were made between

12   January 1st, 1989, and December 31st, 1995, irrespective of

13   outcome --

14   THE COURT:  Correct.  And irrespective of when it

15   closed.

16   MS. ROSEN:  Yes.

17   THE COURT:  Okay.  So we're talking about opened

18   between January 1, '89, and 12-31-95.

19   Now I think we have been through this before, but I

20   just want the record and this hearing to be complete on this

21   point.  There is no way for the city to definitively say this

22   CR dealt with these type of alleged misconduct.

23   MS. ROSEN:  Without a manual review, that's correct.

24   THE COURT:  And you would prefer --

25   MS. ROSEN:  Because it prioritize -- because the

1    computers prioritize --

2           THE COURT:  Whatever --

3           MS. ROSEN:  -- certain complaint categories.

4           THE COURT:  Right.  So --

5           MS. ROSEN:  Yes.

6           THE COURT:  -- if excessive force may be higher, but

7    the -- for your purposes, coerced confession or untruthful

8    testimony would be more important to what you're trying to

9    prove here.

10          And the city does not want to take on the burden of

11   doing a dive through based on these parameters to look at that,

12   those that deal with the issues at hand here.

13          MS. ROSEN:  I don't believe there is any way to do

14   that short of, at least, reviewing the face sheets on every

15   single CR.  I can confirm that.  I mean, their computer

16   programming changes all of the time.

17          THE COURT:  To me it is a burden issue.

18          MS. ROSEN:  So if there is -- sure.

19          THE COURT:  So to me --

20          MS. ROSEN:  So if there are complaint categories, I

21   suppose -- here's how I'll answer that question.  If plaintiff

22   can provide a list of complaint categories they're looking for

23   that they would be satisfied with, so that we could eliminate

24   for, you know, ones that don't matter to them, then I'm happy

25   to confirm what our capabilities are on that.  But I don't know

1    if that's something they're willing to do, so --

2         MR. ART:  We agree with everything the city said about

3    the problem of categorizing these by the (unintelligible)

4    sheet.  As your Honor said, sometimes in theory your

5    allegation, as far as we're concerned, is what it is coded as,

6    and there are many others in the complaint.  That's one

7    obstacle.

8         And the second is that the coding categories that the

9    city uses don't really line up with the sort of different

10   Monell theories that we have in this case.  And so it is hard

11   to use those categories just in general to say this is the type

12   of misconduct in this case.

13        THE COURT:  Okay.  So the first issue I think is

14   easily resolved, if the city wants to take this on, and that is

15   instead of producing and redacting and all those other things,

16   they could say, we'll have someone look at the CR itself and

17   figure out what the complaints are, and determine if they

18   relate to what you're looking for.  So that's -- I think that

19   is a doable thing.  But it is a matter of how you want to

20   manage resources on the defendants's side.

21        MR. ART:  That's already been -- but that's already

22   been in the conferral that we have had, and the city has

23   indicated they are not interested in doing that.

24        MS. ROSEN:  Well --

25        THE COURT:  That's fine.  I'm just offering --

1  because -- but the second issue, which is the categorization,

2  I'm not as familiar with.  So based on your firm's experience,

3  you're saying the categories used by CPD wouldn't -- they don't

4  have nice, neat categories that would fit in to what you're

5  looking for.

6          MR. ART:  Right.

7          THE COURT:  Ms. Rosen, do you agree with that?

8          MS. ROSEN:  Yeah.  Well, sort of.  I mean, if we're

9  doing -- if we are -- if the city is prepared to undertake the

10 review of the file -- if plaintiff is willing to give us a list

11 of the types of allegations of misconduct that they are

12 interested in, and the city is willing to do that review, then

13 we wouldn't focus -- the review wouldn't focus on is it an 05

14 A --

15         THE COURT:  Right.

16         MS. ROSEN:  -- or 07 C.  It would be plaintiff -- or

17 the complainant says that this happened to him during the

18 course of whatever, and figure out -- I mean, whether or not it

19 fits within those categories.

20         I suppose the other option might be -- although I'd

21 have to figure out whether or not -- figure out the logistics

22 of this would be to obtain face sheets for all of these CR

23 files, without production of all of these CR files, produce all

24 the face sheets and let plaintiff identify specifically what

25 CRs they want.

1          You know, I mean, for example, you know, I don't know

2     because I don't know what these CRs are going to look like in

3     the (unintelligible) if we're looking at, you know, 20, 30, 40,

4     50, 60.  I think it is about -- I can't remember exactly right

5     now standing here, but it might be close to a hundred

6     detectives in that general time frame.  But, like,

7     theoretically, you know, there could be, you know, you would

8     searched my car or -- you know, things that don't impact lineup

9     procedures, coercion, the things that they're saying that

10     they're looking for.

11          But I just throw that out there sort of spur of the

12     moment, so --

13          THE COURT:  Okay.  So I think one thing we need to

14     figure out, Ms. Rosen, from your client, is are they willing to

15     do a manual search based on categories of allegations.  And I

16     don't mean categories like computer codes, but your description

17     of allegations that you would like to look at.  Because if

18     there is a willingness to do that, I'm open to doing that.

19          MR. ART:  I -- we appreciate that, your Honor.  We

20     will note one other challenge because we have gone further down

21     this road in other cases in holding that conversation.  In this

22     case the conversation has been, the city is not willing to do

23     that.  I understand you're giving her a chance to maybe see if

24     they have a different view about that.

25          The next challenge is that still doesn't get us to

1   where we need to be because in other cases we have said, okay,
2   even if we're going to have that conversation, which we're
3   willing to potentially have, and we're willing to have in that
4   case, here are the kinds of things we want to see, we need a
5   stipulation that you're not going to say that by -- that we
6   have a cherry picked set.  Right?

7           So in this case what we said is, you have now told us
8   the system is unreliable for how to collect these things.  The
9   process by which you're going to have to collect them is going
10  to be subjective.  Once you tell me that, I am wide open for
11  you to attack me and say, a-ha, whatever you do with these is a
12  cherry picked set and has all these reliability problems so it
13  is not statistically valid.  So I need you to stipulate along
14  with that.

15          So we're going to be back a little bit in that same
16  box even as we answer this question.

17          THE COURT:  I don't know -- I'm not as persuaded by
18  that because I don't know what expert could say it is not
19  statistically valid.  These are seven years's worth of records
20  for a particular area of all allegations of the nature that you
21  are saying caused this constitutional violation.  So if the
22  world -- if the universe is 20 cases and no one was
23  disciplined, that's the world.  I don't know -- it is not even
24  a sampling because sampling is where you're saying, I am
25  getting only some but not all.

23

1      MR. ART:  I -- but, yeah, your Honor, I -- it is

2   definitely not the same sort of random samples, you know,

3   secondary expert issue.  But our -- we find in these cases is

4   the expert on the defense side will come back and say, you are

5   looking at just a particular type of case, and that does not

6   represent the city's policy and practice because in all these

7   other cases the rates are much higher of discipline, they are

8   sustained on appeal at a higher frequency.  And so that's the

9   concern is that we leave ourselves open to an expert

10  substantively coming back and saying, no, that doesn't account

11  for the city's entire dealing with complaint registers and

12  officers, and it doesn't describe our practice or discipline.

13      THE COURT:  It would -- it would not describe, it

14  would be absolute evidence of their practice with regards to

15  false testimony and suggestive lineup and evidence gathering.

16  It would be absolute evidence of it.

17      MR. ART:  Except that what we have seen them say in

18  these cases is that has an inherent problem because that

19  category ends up stuffing in these kind of things --

20      THE COURT:  And so that would --

21      MR. ART:  -- and ignoring these other things, and,

22  therefore, it is not representative of CPD's policies and

23  practices.

24      THE COURT:  And you're worried that on a Daubert

25  challenge you would lose that.

1    MR. ART:  We have.  I mean, so the example is Connick

2  where they say, here's ten examples of Brady violations and the

3  Supreme Court -- or actually the Fifth Circuit in that case

4  says, that's not representative of the practice of the entire

5  office, the prosecutor's office there, in terms of dealing with

6  evidence production, that's just one particular type of

7  complaint.  So that's the concern.

8    You know, our preference is to have the entire set

9  always because of that concern.

10    THE COURT:  Wait, wait.  I'm -- but Connick dealt with

11  a policy and practice of procedure, of -- involving due

12  process, right?  Disclosure of exculpatory evidence.

13    MR. ART:  Correct.

14    THE COURT:  As I understand your theory on this

15  particular issue is failure to discipline.

16    MR. ART:  Well, failure to train and discipline as --

17    THE COURT:  Okay.

18    MR. ART:  -- reflected in this (unintelligible).

19    THE COURT:  Okay.  So -- but the CRs have nothing to

20  do with training, it has to do with discipline, right?

21    MR. ART:  Right.  And I think the city's --

22    THE COURT:  So I'm not seeing the connection there.

23  Because when I say this is the absolute evidence, I mean that.

24  If you said, I am -- presuming everything went right, you would

25  have every CR that dealt with an allegation that you think

1    caused the constitutional violation that happened.

2           MR. ART:  Right.

3           THE COURT:  And so if -- if, for example -- again, I

4    don't think this will be, but maybe I'm wrong.  If, for

5    example, when we get through this time period issue and we

6    narrow it and we -- Area 5, and there is only four complaints,

7    and those four complaints were all not sustained, and someone

8    said, your expert said, ah, this proves our theory, and the

9    other expert that the city gets presumably would say, these

10   were all fine.  And some Judge may say, this isn't sufficient

11   to show a practice or policy, if there were only four

12   complaints and, you know, those were not -- that is

13   insufficient to show a practice and policy.

14          MR. ART:  Yes.

15          THE COURT:  That's the whole point.

16          MR. ART:  Right.

17          THE COURT:  That means you lose because you don't have

18   a substantive claim --

19          MR. ART:  No, I --

20          THE COURT:  -- versus -- versus, let's say, there is

21   400 of them, and no one was ever disciplined for 400 of them.

22   I cannot craft discovery with the -- with the worry that

23   someone won't get that if there were 400 complaints all of the

24   same kind and no one got disciplined.  Not that you're right

25   and they're wrong or vice versa, but that someone would say,

1    that's an insufficient universe of information because it would

2    be the absolute information.  It would be all of the ones that

3    happened during that time period and nothing was disciplined.

4           MR. ART:  It is difficult for me to argue against that

5    because that's precisely the position we'll be taking -- we

6    would be taking.  But as a matter of anticipating what the

7    defense argument is and advocating for the maximum number set

8    of files --

9           THE COURT:  Okay.  That's fine.  I appreciate where

10   you're coming from.

11          MR. ART:  -- we are concerned that they would have an

12   argument on the defense side.

13          THE COURT:  Okay.

14          MR. ART:  Based on the files that were received in

15   discovery --

16          THE COURT:  Okay.

17          MR. ART:  -- and not the merits of what is seen in

18   those files.

19          THE COURT:  But, again, do you really have a realistic

20   concern?  And it is a fair question to ask because your firm is

21   very well steeped in this area.  So do you really have a

22   realistic concern that you would have an insufficient universe?

23          MR. ART:  I -- so as we are doing the trial -- the

24   hypothetical trial of this case, my concern is we put our

25   expert on to say exactly what your Honor has just described --

1          THE COURT:  Are you using the word realistic concern?

2   My realistic concern.

3          MR. ART:  Yes.

4          THE COURT:  Okay.

5          MR. ART:  Absolutely, your Honor.

6          THE COURT:  Go ahead.

7          MR. ART:  So there is a difference between the trial

8   where we have all of the files, and the question is what did

9   those files all show.  And the trial where there is a -- that

10  debate going on, which your Honor, I think, has outlined

11  absolutely correctly.  And then a defense expert on the stand

12  saying, but they didn't even look at all of the other ways that

13  we do discipline of officers.  And that is critical to the

14  question of whether the city had a widespread practice and a

15  failure to train and discipline across Area 5, across the city,

16  during the relevant time period.  I would like to avoid the

17  latter --

18          THE COURT:  Fair enough.

19          Ms. Rosen, put that on your list to talk with your

20  client about.

21          MS. ROSEN:  Which is -- well, let me just address that

22  latter point --

23          THE COURT:  Okay.  Or maybe you know the answer.

24          MS. ROSEN:  So the issue of we do other things to

25  address discipline, other than what's found in whether you look

1     at simply a coerced confession set of CR files versus the

2     entire universe of CR files, yes, we do have other evidence

3     about things we do about discipline that we always, mostly,

4     usually rely upon.  That doesn't --

5                THE COURT:  Okay.  So let me stop you right there.

6                MS. ROSEN:  Yeah.

7                THE COURT:  If that's true, what Ms. Rosen is saying,

8     which I presume it to be true because she's telling me that,

9     how would having more CRs solve that argument?

10               MR. ART:  Well, so -- that the -- I'm not -- so if

11    we're talking about just the production of CR files --

12               THE COURT:  No, no.  You used the example of we do

13    other things other than the CRs.

14               MR. ART:  I am talking --

15               THE COURT:  And so Ms. Rosen is saying that's

16    true -- we would be saying that.  We would be saying we do

17    other things than CRs.  So even if I gave you all the CRs,

18    Ms. Rosen and her little quiver is going to pull out that arrow

19    and say, we have got this.  So -- and you know it.  She's

20    telling you that.  So now you can craft your discovery to

21    address what are these other things --

22               MR. ART:  Right.

23               THE COURT:  -- and send an interrogatory over tomorrow

24    to ask her that.

25               MR. ART:  So let me be more precise focusing just on

29

 1    the CRs.

 2            The concern is if CRs from particular categories are

 3    produced, that two experts will have a debate about what

 4    those -- that category shows.

 5            But then the expert on the defense side will say,

 6    there were 600 categories of CRs that you guys didn't even get

 7    and analyze, and what those would have shown is that the city

 8    does discipline its officers in this regular routine way.  And

 9    so your sample of just the coerced confession, false

10    identification, fabricated evidence, lying at trial doesn't

11    represent their whole practice.  Putting to the side that, yes,

12    there is other evidence that the parties will contend with --

13    outside of these CR files about discipline, 30(b)(6) witnesses,

14    you know, written policies --

15            THE COURT:  Right.

16            MR. ART:  -- that sort of thing.

17            So the concern is about what happens if there are gaps

18    in the CR files and opening up another expert debate about what

19    those gaps mean.  That's our concern.

20            We understand the Court's point for -- you know, I

21    think we have to advocate for a complete set to avoid that kind

22    of expert debate.

23            THE COURT:  Okay.

24            Ms. Rosen, would you put on your list to talk with

25    your client about their view on the issue of -- as far as the

1  CR issues alone?

2         MS. ROSEN:  Uh-huh.

3         THE COURT:  If the department would argue our, you

4  know, our use of discipline related to excessive force, related

5  to traffic accidents, related to unprofessional conduct would

6  be used to argue that whatever is done in that context would

7  impact -- would be a means of addressing the due process type

8  violations that plaintiff's claim is based on.

9         MS. ROSEN:  Okay.

10        THE COURT:  Because if your client is like, yeah, we

11 -- if -- you know, if we have 400 CRs related to due process-

12 type violations, none of which are sustained, if your client

13 says, I want to be able to argue that -- but we do sustain

14 driving ones and we do sustain poor language ones and

15 occasionally we'll sustain an excessive force one, and that

16 should discourage the conduct that they're complaining about

17 here, the due process conduct, then I want to know that because

18 that might inform the scope of discovery on the CR issue.

19        MS. ROSEN:  Gotcha.

20        THE COURT:  All right.  Then anything else on that?

21        So we're -- we have got Area 5.  We're -- we're

22 talking about whether that's all of -- all of them or not.  We

23 know that they were open in the time period.

24        And then the last issue I want to talk about on CRs is

25 the time period itself.  Okay.  So why seven years?

1         Is it -- if the answer is because I -- the same reason

2  I just told you about two minutes ago, I'm advocating for the

3  largest swath of information I can get.

4         MR. ART:  So the reason is, as we read the Seventh

5  Circuit cases and the Supreme Court cases, which admittedly are

6  not very clear about what time frame you need to establish this

7  over, most of them deal with time frames two, three, four

8  years, and most of them say, that's not sufficient to support

9  your claim.  So we are reading that case law.  We're coming up

10  with the best good faith estimate of what we think is the

11  minimum amount required, and we are putting that in our motion.

12         And to the extent that we are going to lose that

13  debate here in the district court, we would like to be able to

14  raise the issue that the reason that we didn't show a practice

15  along a greater period of time was a ruling on discovery and

16  not a choice that the plaintiff made.

17         THE COURT:  Makes all the sense in the world.

18         Ms. Rosen, what's your view on that?

19         MS. ROSEN:  On their -- their strategy?  I don't know

20  that their -- that the case law is as -- I mean, they have

21  conceded it is not clear so I get that.

22         But the -- to say that, you know, the case law is not

23  clear about whether or not two years or three years is good

24  enough, and then say you need seven, there is a disconnect.

25         THE COURT:  That's fair.  On your list with your

32

1   client, can you see if five years of discovery were ordered

2   whether they would waive any claim that that's an insufficient

3   time period to show a practice or policy?

4          MS. ROSEN:  Okay.

5          THE COURT:  All right.  So that's that issue.

6          Next are the homicide files.  So the issue with the

7   homicide files is that there is -- I feel like we are avoiding

8   an iterative process altogether here because there are cases

9   that you're aware of, you being plaintiff's firm, are aware of

10  where things didn't go right, where things went awry.  And I'm

11  not sure why we can't build off of those cases to say we want

12  those homicide files.  And then see if, based on those homicide

13  files, there are other cases that would be relevant to proving

14  that there -- the constitutional violation that your client

15  allegedly suffered is a product of a policy.

16         In other words, you're saying, I want all the homicide

17  files, and then I'll figure out which ones relate to what I am

18  trying to prove.  And to the defendants's point of view, I

19  think, it -- it partly is, you know, they haven't really

20  connected all the violations they're alleging, all the policy

21  violations they're alleging to the injury, this -- this

22  plaintiff suffered, which is a good argument to make before the

23  district court.  But that went nowhere, right?

24         I mean --

25         MS. ROSEN:  What -- and what do you mean it didn't go

1    nowhere?

2         THE COURT:  Well --

3         MS. ROSEN:  On -- on what point?

4         THE COURT:  To bifurcate discovery altogether.

5         MS. ROSEN:  Well, but I think that's a different

6    issue.  So bifurcation -- the bifurcation motion was a -- at

7    plaintiff's request and demand, filed very early in the case,

8    before any of the discovery was even begun because they wanted

9    the issue teed up, so we did that.

10        Now we have progressed with discovery, and we have

11   sort of fine tuned -- I mean, you know, if you look at the

12   Monell claims across the board, across -- just look at the

13   Guevara cases, it is all the same.  But the factual

14   circumstances are -- of every case are the same.

15        You know, by way of example, which is the example we

16   point out in the -- in our various briefs is that, you know,

17   Solache and Reyes is a case -- the one that's in front of Judge

18   Harjani -- is a case where they're claiming coerced

19   confessions.  There is no coerced confession in this case, so

20   why would we be looking through anything for coerced

21   confessions?

22        You can't -- Mr. Sierra can't possibly say that he's

23   going to pursue a Monell claim on coerced confessions and say

24   the city has a bad policy.  Even if he were able to prove it,

25   it is -- you know, it is Heller.  It is quite beside the point.

1    Coerced confessions has nothing to do with his claims.  His

2    claims are centered around the factual allegations in his

3    complaint.

4         And, you know, if we go back to the beginning on

5    homicide file discovery, you know, it -- in recent times, if we

6    will look at Fields, if we look at Rivera, plaintiff arguably

7    -- obviously the city had a different point of view and the

8    city ultimately lost at trial.  But plaintiff arguably at that

9    point could identify, you know, documents that he claimed he

10   didn't receive during his criminal case.

11        THE COURT:  Right.  Right.

12        MS. ROSEN:  And so that sort of was the stepping board

13   to all of this discovery.

14        And so -- and, quite frankly, the theories about

15   coerced confessions, fabrication, lineup issues --

16        THE COURT:  Suggested lineup.

17        MS. ROSEN:  -- lineup issues were pursued in Rivera,

18   but the -- but the district court on the motion, a Rule 50

19   motion and on post-trial motion said, that claim didn't go to

20   the jury.  So -- so that, you know -- that discovery was done,

21   but not -- but ultimately wasn't tied to the case.

22        So it is sort of a long way of saying that the city's

23   point of this is not -- you know, bifurcation has like

24   efficiency reasons and all of that.  It wasn't zeroed in,

25   certainly not when we filed that way back when, on the

1    particular discovery being sought in this case and the reasons

2    it is being sought in this case.

3         It is our view that now that we're here and we're

4    doing Monell discovery, the Judge that's managing discovery

5    still has the power to tailor it to the particular facts of the

6    case.  Monell doesn't change that.  It still has to be, you

7    know, we wouldn't be doing Monell discovery on shootings.  It

8    is not -- you know, and whether or not police officers, you

9    know, what their -- the policies are with respect to police-

10   involved shootings.  That -- it is really no different.  And so

11   they haven't articulated or reasoned why we need to go through

12   all of these investigative files for whatever they seem to

13   think they're looking for.

14        And, quite frankly, on this whole issue about

15   fabrication, which is the issue here in this case, and lineups,

16   you know, they have had this -- Loevy & Loevy, not Sierra, but

17   Loevy & Loevy have had the 138 files that were produced in

18   Rivera and the 500 or so files that were produced in Fields,

19   and they're not coming here and saying, oh, you know, we want

20   to be able to use these files because we have identified

21   fabrication.  And they have had these files for years.

22        So to embark on, here's some more files that we can

23   mine and try and figure out theories that might support

24   something in this case is fishing.  And Monell doesn't give you

25   fishing, you know.  It still needs to be tethered.

1    And there is no reasonable explanation for -- even if

2    you were to take it that, okay, fabrication.  So we're going to

3    look at a bunch of homicide files.  The report is going to be

4    like stamp, this one is fabricated.  I mean, like I just don't

5    understand how we're going from that discovery to their Monell

6    claim.

7    And as you pointed out, you know, they have identified

8    cases where things have gone wrong.  You know, the Demetrius

9    Johnson example that I think has been -- is in -- a part of

10   this briefing, but we have been doing a lot of briefing in the

11   various cases, so I am not 100 percent sure as I'm standing

12   here, although I can look.  You know, Demetrius Johnson is a

13   case that came out of Rivera discovery.

14   So in Rivera we produced 138 files.  Mr. Johnson was a

15   criminal defendant whose file was part of that discovery.

16   Plaintiff's expert relied on the Johnson file to draw opinions

17   about his comparison between the investigative file and the

18   records division file.  He made whatever conclusions he made

19   about that.

20   But in the context of all of this discovery, the

21   parties, through subpoena, obtained what was left of the

22   criminal -- of the CCSAO file, the Cook County State Attorney's

23   file, and what was left of the public defender's file.  And it

24   -- they were incomplete.  There was not a single police report

25   in either file.

1          So there is no way that Mr. Johnson could say, for

2    example, if he were the plaintiff or even plaintiff's expert,

3    because he didn't say it, that, oh, I know that a particular

4    report or this -- the focus on that case is a lineup report.

5    This lineup report was withheld because we don't know what was

6    produced.  Right?

7          So Mr. Johnson has now filed a petition in the Cook

8    County State Attorney's Office to get his conviction

9    overturned.  You know, two days ago his conviction was

10   overturned.  Although the State's Attorney's Office is saying

11   they are going to retry him.

12         And -- and the arguments that were made in the

13   criminal court were that the documents were withheld.  When

14   they are making the arguments here though, they're saying, no,

15   that's evidence of fabrication because they know they can't

16   sustain the burden of proof on that when we know the files

17   don't exist.

18         So now we have switched that to, we have two lineup

19   reports.  We, because they are inconsistent, in our view, on

20   their face, that's evidence of fabrication.  Well, that's not

21   the end of the story.  And to think that we're going to pluck

22   through hundreds and hundreds of homicide files to do this, I

23   mean, the reality is, the point that the Court made about you

24   have identified cases where things have gone wrong should be

25   the starting point, that's a valid point.  And actually the

38

1   starting point should be what happened in the criminal cases
2   where there is all this -- this doesn't start and fall with
3   investigative files.
4          What happened -- we have got, you know, what,
5   thousands and thousands and thousands of homicide, murder
6   trials from this era, you know, if you take the whole, let's
7   say, decade.  Well, where were -- well, why not go through
8   the -- if you are really interested in going through the files
9   to come up with some pattern and practice about fabrication or
10  any of the other due process theories, go look and see what
11  happened in those cases.  Where is their motion practice on the
12  fabrication?  What do witnesses say about fabrication?  What
13  did Judge's rule?  What did a jury find?
14         I mean, that's where you're going to get that kind of
15  evidence.
16         Looking through these raw files is not going to tell
17  us anything.  You know, you can look at a file and be like,
18  okay, well, this -- you know, this report seems kind of odd to
19  me.  Well, then what?
20         So it just seems to me there is a disconnect between
21  this set of information to prove these kind of claims.  And it
22  is different than it was in Rivera and in Fields because there
23  you could tie it to these -- the reports that were missing,
24  here are the CC -- here's the CCSAO file, here's the criminal
25  defense file.  We can say the documents aren't in there.  The

1    city said, well, how do we know they are complete?  And we had

2    whatever defense is.  But at least it was tethered.  Here it

3    feels like it is just untethered.

4         THE COURT:  All right.

5         MR. ART:  So a lot of those arguments are arguments on

6    the merits that got presented at the trials in Fields and

7    Rivera and were rejected by juries, and certainly were rejected

8    by judges, in advance of that in terms of what evidence got to

9    juries, and certainly why were objected before that at the

10   discovery stage.

11        Fields was a case about suppression of documents in

12   files largely.  But those files also showed a failure to train

13   and supervise.  They also showed fabrications.

14        Rivera was a case where the reason that we discovered

15   the homicide files was to analyze eyewitness identification

16   procedures in those files.  It was not on this document

17   suppression theory in the first place.

18        So I think a lot of what Ms. Rosen is talking about

19   has to do with the underlying merits of these claims.  In terms

20   of how closely our theories are tied to what happened in Thomas

21   Sierra's case, of course, we're not pursuing a coerced

22   confession theory in this case.  He never confessed to

23   anything.  We're pursuing a claim that eyewitness

24   identifications were manipulated, and that manipulation was the

25   thing this occurred citywide.  It occurred citywide in cases

1    where folks who could not have made an identification --

2            THE COURT:  Well, aren't you really arguing the city

3    allowed this to happen, and that's what caused the injury to

4    your client?

5            MR. ART:  We're -- what we're charged with proving

6    for most of these theories is a widespread practice.  Right?

7    So whether that is the city didn't have express policies in

8    place, didn't discipline, that supervisors with policymaking

9    authority allowed this to happen under their watch, what we

10   have to establish is it was happening.  And not just that we

11   can identify between two dozen and four dozen cases where

12   really bad things happened, but on the question of how

13   eyewitness identifications were documented, for example.

14           The issue in Rivera.  We need to show that the

15   practice across all homicide investigations was deficient.

16   Right?

17           It is not enough for us to say, here are 17 cases

18   where it happened because the city is going to say that says

19   nothing about our practices, which is the thing that we have to

20   prove.

21           And so what Dr. Wells did in the Rivera case was show

22   that across all of these different files there were zero cases

23   where a filler had been identified in a lineup, and it had been

24   recorded as such in a police report.  Right?  And what he also

25   observed is that the rate of positive --

41

1          THE COURT:  Well, wait.  So I don't know that case as

2    well as you do.  Did the -- did your expert, Dr. Wells, say,

3    and that is a highly unlikely thing to happen?

4          MR. ART:  Exactly.

5          THE COURT:  Okay.

6          MR. ART:  So the theory -- one of his theories was

7    that the social science and controlled studies shows that you

8    get a filler identification 23 to 5 percent of the time --

9          THE COURT:  Okay.

10         MR. ART:  -- and so this is impossible.

11         A corollary of that conclusion was that the rate of

12   positive identifications was approximately double what you see,

13   you know, in normal field studies in other police departments

14   around the country.  And to show -- so to show that that

15   extremely high rate of positive identifications was a practice

16   of the city, we can't just point to Sierra's case and Rivera's

17   case and the other ones that, yes, your Honor is right, we know

18   about, we have to show that it happened across all of these

19   investigations, which is why we're asking for all the files.

20         On the eyewitness identification theories, on the

21   fabrication theories on the different suppression theories, on

22   failure to train theories, all of these homicide files are the

23   city's only evidence of what happened during their

24   investigation.  So to the extent that we, as the plaintiff, are

25   saying, the City of Chicago during this time period in Area 5

42

```
 1    had a widespread practice of doing X, whichever thing that X
 2    is --
 3              THE COURT:  Well, that's part of the problem.  What
 4    are your Xs?
 5              MR. ART:  So our Xs are --
 6              THE COURT:  So eyewitness identification.
 7              MR. ART:  There is widespread manipulation of
 8    eyewitness identifications.  And that happens in -- in our
 9    brief we set out three ways that that happens.  One is that
10    there are improper identification procedures where the fillers,
11    for example, all look different in lineup.  Where the -- you
12    know, a showup occurs.  Where somebody is told who to pick.
13              And it is your position that whatever the sort of
14    particular defect in a case is, they are all evidence of a
15    widespread practice of allowing the manipulation of eyewitness
16    identification.  So that's part one of manipulation.
17              Part two is, there are a lot of cases where folks are
18    making identifications of witnesses weeks after the facts,
19    months after the facts.  When they witnessed the crime from,
20    you know, 150 plus feet away, right?  So there is objective
21    evidence in these files themselves that no human being could
22    have -- you know, and it doesn't say, you know, I got this guy
23    to identify someone even though they were 250 feet away.  What
24    it says is, witness so and so was by the store.  That's
25    Rivera's case (unintelligible) Ramirez case.  Made the
```

1    identification.  But the store is 190 feet away.

2         You know, and when you take the jury out in the

3    hallway of the courtroom, and they look at 190 feet, they go,

4    oh, my God, no one could view that.

5         So there is lots of evidence in the file that the

6    identifications could have actually been impossible.

7         Sierra's case is a good example.  Sierra, it's night.

8    There is a tinted -- there's tinted windows rolled up in the

9    car.  They are moving the whole time.  The eyewitnesses are

10   ducking.  They tell the first responding officers Latino male,

11   no further description.

12        THE COURT:  I'm asking your theories, so --

13        MR. ART:  Yeah.  So that's -- so the second theory is

14   the identification --

15        THE COURT:  I feel like I'm getting a little short

16   story here.  Just tell me your theories.

17        MR. ART:  Okay.  So --

18        THE COURT:  So manipulation of eyewitness

19   identification.

20        MR. ART:  Right.  Which is improper identification

21   procedures.  Identifications that are impossible.  And the

22   third part of that is non-reporting and improper documentation

23   of eyewitness identification procedures.

24        THE COURT:  Okay.  So just so you know, before you

25   told me your three ones were show -- there were improper

44

1    showups, someone directed someone to pick someone else up --

2    out, and then there were poor lineup fillers.

3           MR. ART:  Okay.  So --

4           THE COURT:  So that is kind of what I am trying to get

5    away from, which is we are just saying anything and everything

6    out there, that's our theory.

7           MR. ART:  I --

8           THE COURT:  And so that's -- now I'm hearing three

9    different theories.  So tell me what those -- under your

10   sub-theory -- under your subcategory of manipulation of

11   eyewitness identification, what are the -- how did that happen?

12          MR. ART:  So there are three theories.  And I'm sorry

13   I talked about examples of them as I was going along.

14          THE COURT:  Okay.

15          MR. ART:  So theory number one, improper

16   identification procedures.

17          THE COURT:  Okay.

18          MR. ART:  Theory number two, impossible

19   identifications, where the witness could not have seen the

20   thing they then identified.

21          THE COURT:  Okay.

22          MR. ART:  Theory number three, non-reporting or

23   improper reporting of the procedure.

24          THE COURT:  Okay.  I think I understand that.

25          Okay.  What's your other theory?

1      MR. ART:  Fabrication of evidence.  Largely police

2 reports in the files that say the thing happened that never

3 happened.

4      THE COURT:  Okay.

5      MR. ART:  Third is suppression of that as we -- I hope

6 we explained in our briefs encompasses two theories.  One is

7 the street files theory that the city has focused on, which is

8 there were documents in File A that didn't get in File B.

9      And the second is there was evidence in the case that

10 was never documented in the file at all.

11      THE COURT:  Exculpatory evidence.

12      MR. ART:  Right.  Exculpatory evidence.

13      And then the fourth and final theory of -- Monell

14 theory that we're pursuing in this case is failure to train and

15 supervise.  In other words, the things that you see in the

16 files show that whatever the city's written policies were, that

17 was not what was happening in practice.  And that's from Fields

18 and Rivera.  The sort of principal example of that is, you

19 know, the file --

20      THE COURT:  Okay.  And so you want to use these

21 homicide files to have someone like Dr. Wells look through them

22 and say, statistically speaking these things could not have

23 happened with the positive results for prosecution as often as

24 they did.  It is not that they couldn't have, it is highly

25 unlikely that they could have happened that way.

1          Is that what you want these files for?

2          MR. ART:  That is just one example of the way that

3     they are -- yield probative evidence of a practice.

4          Another is, for example, Brasfield's reports in both

5     Fields and Rivera where he says, you know, in X number of

6     files, particularly pertinent investigative steps are not even

7     being documented.  In another X percentage they are not being

8     transmitted to the Criminal Justice System.  That shows me

9     something about evidence suppression, but it also shows me that

10    there was a failure to train and supervise.

11         THE COURT:  Okay.

12         MR. ART:  So that's another example.

13         And I would submit that on each of the theories and

14    sub-theories I just outlined, the homicide files are the

15    principal piece of evidence that allows us to show what was

16    happening in these investigations.  We know that from Rivera.

17    We know that from Fields.  If the city doesn't produce them,

18    then there is no evidence.  And, yes, we have to do other

19    discovery.

20         You know, in the Johnson case, we have to look at the

21    criminal case file.  The criminal case file shows that the Cook

22    County State's Attorneys who prosecuted that case only had one

23    of the two reports, and that -- that report that they were

24    holding in court was fabricated because the other one said this

25    eyewitness identification didn't happen at all.

1    So, yeah, you have to look at other evidence in order

2  to perfect the claim, but whether it is a claim of suppression

3  or fabrication, the homicide file is the principal piece of

4  evidence in the possession of the City of Chicago that has to

5  do with these Monell theories that we have described.  If that

6  evidence isn't produced in this case, then the city is not

7  participating in Monell discovery.

8    THE COURT:  All right.  But that's what you want to

9  use the files for.

10    MR. ART:  Yes, your Honor.

11    THE COURT:  Okay.  So this issue about redacting

12  people's names does not seem to be at issue at all.  We can do

13  that in the homicide files.

14    MR. ART:  Well, so the homicide files can be produced

15  on a protective order, and there is --

16    THE COURT:  But that -- that's -- but that -- this

17  is -- you know, I'm trying to manage discovery.  And the reason

18  these cases aren't well managed is because people don't

19  understand what you will do with the files.

20    So if you're -- if the names are redacted, then you

21  won't be out interviewing witnesses.  You're going to use this

22  for your expert, which is fine.  That's what you just told me

23  you want to use it for.

24    MR. ART:  I mean, we --

25    THE COURT:  And that will -- that will help limit

48

1    discovery in this case.  That's what I am trying to figure out.

2    Because if that's what you want to use it for, I'm inclined to

3    let you get the homicide files.  But they are going to be

4    redacted with all the witnesses and all the things that

5    normally happen when people get their hands on stuff like this

6    and they just want to dig in and see are there other cases out

7    there where we can prove something bad happened.  But that's

8    why I asked you why you wanted it.

9              MR. ART:  Right.  I mean, our experts won't be able to

10   do anything with the files without, for example, the names of

11   the witnesses.

12             THE COURT:  They absolutely will.  You just told me

13   they would.  Because you would say that there were positive

14   identifications in a high -- a much higher percentage than you

15   normally would see.  There was not negative identifications in

16   a lot lower percentage than I normally see -- than I would

17   normally expect to see.

18             MR. ART:  Right.

19             THE COURT:  So that's based on the investigation

20   itself.

21             MR. ART:  Correct.

22             THE COURT:  Which is absolutely fine.  That's I

23   understand what you want to use it for.

24             MR. ART:  Right.  So that --

25             THE COURT:  Okay.  That's fine.

1      MR. ART:  So that --

2      THE COURT:  So I think --

3      MR. ART:  -- won't work at --

4      THE COURT:  -- I'm inclined to let the -- to let you

5 get the homicide files, but they will be heavily redacted.

6      MR. ART:  But can I maybe respond to that point?

7      THE COURT:  No.  That's why I asked you all these

8 questions.

9      MR. ART:  Well, let me use the example that the Court

10 just offered of the rate of identifications.  And a lineup

11 report in one of these files lists the six people that are in

12 the lineup and then it says, X person was picked.  And it -- if

13 all the names are redacted, you can't tell if it was a positive

14 identification, a negative identification, no identification.

15      THE COURT:  Well, you would know because if it is the

16 homicide file with defendant Charlie Smith, and Charlie Smith

17 was picked, then you know the right person was picked.  I

18 don't -- I mean, you just told me how your expert uses this

19 information.  And I'm going to let your expert use this

20 information for that very purpose.  And you just told me that's

21 why you want the information.

22      MR. ART:  I mean, I guess --

23      THE COURT:  So you're going to get the information to

24 be able to be used that way.

25      MR. ART:  But, your Honor, our experts won't be able

1     to decipher what the information in the homicide files is if

2     all of the witness names are redacted.  It will be impossible.

3          THE COURT:  Well, if that comes to pass, then you file

4     a motion, and we'll get some stuff unredacted.  But what you're

5     looking for is not -- you know, the city is paying a

6     potentially house of horror.  You're saying you want to use it

7     for something different.  You want to use it so your expert can

8     look and say, these percentages, how these things came out, is

9     off the wall when you look at national statistics.  In 1

10    percent of the cases, Chicago Police Department has a homicide

11    file where the person picked out the wrong person.  And I know

12    nationally speaking -- you know, I'm an expert in this area,

13    usually you see 25 to 30 percent where someone with an

14    investigation picks out the wrong person.  CPD has a 1 percent

15    rate or a 5 percent rate, whatever it is.  But statistically

16    much less than you would expect to find.  That suggests to me

17    that there is manipulation of eyewitness identification.

18    That's why I asked you what you want to use it for.

19          MR. ART:  Right.

20          THE COURT:  You don't need to know the names of people

21    that they didn't pick out.

22          MR. ART:  Perhaps I'm not being clear enough.  You do

23    need to know the names of people in order to get the data that

24    the Court is talking about on that one theory of eyewitness

25    identifications.  Because you cannot read the lineup reports

1    that are produced if the names are redacted and make any

2    determination about what type of identification happened in

3    that particular procedure.

4          So in the Rivera case we got 138 files.  There are 999

5    identifications.  A third of the files are redacted, all the

6    names based on the Juvenile Court Act.  For those files we

7    can't make any determinations.  Our expert can't make any

8    determination about who the witnesses were -- because sometimes

9    there are three witnesses viewing the lineup, who the

10   participants in the lineup were, which witness picked which

11   participant.  So you cannot get that underlying data.  And I

12   would add to that --

13         THE COURT:  Okay.  Why do you need to know who the

14   witness is who made the lineup identification?

15         MR. ART:  But -- so you need to know who is standing

16   in the lineup to be able to tell who is the suspect and who is

17   the filler.  And then you need to know who the witnesses are so

18   that in the report after it lists who the fillers and the

19   suspects are, you can tell who is picking what witness.  Right?

20   Because a lot of these reports multiple people are picking, you

21   know, witness one and two, and you don't know who the suspect

22   is, and you don't know who the witness is without looking at

23   the rest of the file.

24         THE COURT:  You just said that you need this for

25   statistics to say that -- let's say it is Mayor Rahm Emanuel

1   who picks out the murder suspect.  What difference does that

2   make if it is the right person or if it is never the wrong

3   person?

4           MR. ART:  But --

5           THE COURT:  What difference does it make?

6           MR. ART:  Because you can't answer the question that's

7   the premise who picked who when all the names are redacted.

8           THE COURT:  But you just told me what you needed it

9   for was not for who picked who, it is to show that

10  statistically these results are not normal.

11          MR. ART:  Right.  So the lineup report -- maybe this

12  will help clarify.  The lineup report doesn't say positive

13  identification, two witnesses.  Negative identification --

14          THE COURT:  Well, of course it couldn't.

15          MR. ART:  Right.  So you need to be able to look at

16  the report and the names of people who are standing in the

17  lineup as fillers versus suspects.  You need to look at the

18  names of the witnesses to determine who picked who.  You can't

19  tell it in a redacted file.  And perhaps it would be helpful to

20  submit supplemental briefing on that point.

21          THE COURT:  No, I -- what I think you want is the

22  whole file.  And you'll figure out what you're going to do with

23  the whole files.  That's what I think -- because I just spent a

24  good half hour asking you what you wanted this for.  And

25  it honestly does not matter who picks out the right or wrong

53

1   person.  What matters for what you just told me you needed it

2   for is was the right or wrong person picked out.  That's what

3   matters.

4           MR. ART:  Okay.  So that was one of many theories of

5   relevance.  So, for example, fabricated evidence.  Right?  In

6   Rivera's case of -- of a police report filled out at the end of

7   the investigation says, we went to the victim while the victim

8   was in the hospital and he selected Rivera.  Right?  It turned

9   out that the victim was in a coma at that period of time we

10  could determine --

11          THE COURT:  I saw that.  That's --

12          MR. ART:  -- based on the record.

13          THE COURT:  That is a good fact in a case.

14          MR. ART:  But you cannot make that determination on a

15  redacted file where everyone's names are redacted.  You would

16  never be able --

17          THE COURT:  But that's not what you --

18          MR. ART:  -- to tell that.

19          THE COURT:  You did not tell me that we want to go

20  through these files and reinvestigate each of these

21  investigations.  That's not what you said you wanted it for.

22          MR. ART:  If --

23          THE COURT:  You said you wanted it for your expert to

24  say, these percentages, these trends are -- they are not

25  consistent with what I, as a -- I assume Dr. Wells is a

1   criminologist, sociologist, someone in that area of, you know,

2   discipline -- what I know to be the norm -- the average trend

3   around the country.  That's great evidence.  That makes all the

4   sense in the world to me that that's what you are trying to do.

5          MR. ART:  Right.  So --

6          THE COURT:  But that is different from, I now want to

7   pull a bunch of homicide files and then go reinterview everyone

8   to see if 15 years later they have changed their mind.

9          MR. ART:  Well, I don't think we're suggesting that it

10  is about people changing their mind.  I think what we're saying

11  is there are multiple theories of Monell relevance that these

12  homicide files can be used to show a widespread practice.  One

13  of them has to do with the statistical rate of positive

14  identifications versus filler identifications.

15         Another one has to do with whether the Chicago Police

16  Department is getting witnesses on a regular basis to identify

17  people that they could never have even seen in the first place.

18         Another one is whether they are documenting

19  identification procedures as they actually happened or as they

20  are imagined after the fact.

21         Another one is are -- is evidence being fabricated in

22  the form of police reports regularly in these cases?  And we

23  think that with these homicide files, which is not a --

24         THE COURT:  How -- this is -- how could anyone manage

25  discovery like that?  How many homicide files do you think

1    you're going to be getting?

2            MR. ART:  Six hundred.

3            THE COURT:  Okay.  So you're going to go through and

4    then say, I'm going to do discovery on 600 homicides.  That's

5    what you're suggesting to me.  And I'm saying that's not going

6    to happen.

7            MR. SWAMINATHAN:  Well, we're not saying that, Judge.

8            THE COURT:  That is.  That is because you will -- if

9    there is a police report in there that says, I picked someone

10   out, even though they were 300 feet away, they have very poor

11   vision, it was nighttime, and it was raining and all the street

12   lights in the area were off, but he still picked that person

13   out, you're not going to find that report.  Right?  That -- we

14   all know realistically the police report is not going to say

15   that.

16           What you're -- what it sounds to me what you hope to

17   do is go find someone who says, these are the conditions that

18   were under, and that was never reported in the police report.

19   Which I agree with you is a problem -- I 100 percent agree with

20   you that's a problem.  Discovery becomes completely

21   unimaginable if that's what's going to happen.  That's why I

22   gave you half an hour to explain to me what you want to use it

23   for.  And that tells me we don't need to have all this other

24   information.

25           You're looking at raw statistics, which is fine.

1    That's a great way to go.  And that -- if you were going to get

2    Monell discovery to go along with your substantive case,

3    someone, and maybe it will be me, someone needs to manage this

4    in a way that those things can happen together.  And the only

5    way for those things to happen together with some modicum of

6    control is to say, what are you going to use this information

7    for?

8           And if you had said to me, we want to go reinterview

9    600 homicide witnesses and people in lineups for 600 homicides,

10   I would have said that's not going to happen.  And that's not

11   what you told me.  You told me something very different.  We

12   want to look at statistics.  And if -- if the redaction that

13   the city uses interferes with the ability to do what you just

14   explained to me is statistically speaking, come back and we'll

15   re-look at that.

16          MR. SWAMINATHAN:  I can -- because we have done the

17   analysis in looking at these files to understand how we and an

18   expert can try to make sense of these files in order to reach

19   conclusions, it is -- there is absolutely no way we can do that

20   with a redacted file.

21          Now there is two points.  One is you are correct, my

22   colleague has identified a number of different theories for

23   which we want to use these fails.  Several of those theories

24   can be proved purely statistically based purely on the homicide

25   files.  Even for just those theories, like the Dr. Wells theory

1    about filler identifications.  Even for that theory, what my

2    colleague is pointing out is when we went through, and our

3    expert creates this spreadsheet of data that he uses, he says,

4    I have to be able to characterize it as a positive ID of a

5    suspect, negative ID of a suspect, filler ID.  I have to do it

6    for who the suspects are and who the non-suspects are.

7         There are multiple -- sometimes there are multiple

8    suspects in a lineup.  So even if one person is a suspect in a

9    lineup, your client or the criminal defendant is a suspect in a

10   lineup, sometimes there is another person who also is a suspect

11   in the lineup, those determinations can't be made -- you're

12   right, I don't care that the guy's name is Rahm Emanuel or his

13   name is Joe Schmo, but I have to know that when I see the name

14   Rahm Emanuel or Joe Schmo elsewhere in that file that I know

15   that we're talking about the same person so that I can figure

16   out if he is the -- the suspect or the non-suspect -- suspect

17   number one, suspect number two, filler number one, filler

18   number two.

19        I need to know -- I need that content to be able to

20   figure out, even if I don't care, but ultimately his name is

21   Mike or Bob.

22        THE COURT:  How does that end up at trial?

23        MR. ART:  So in Dr. Well's case it ended up with a

24   large chart that says, here's exactly what happened in every

25   single identification procedure listed in these 138 files of

1   the 999.  The date of the procedure, how many witnesses were

2   viewing each lineup, how many fillers were in each lineup, how

3   many suspects were in each lineup, how many suspects identifi-

4   -- suspect identifications, non-identifications, filler

5   identifications occurred.  How it was reported.

6          And then we present that information to the jury for

7   that particular Monell theory.  And then he opines about how

8   that compares to the rest of society.

9          THE COURT:  Okay.

10         MR. SWAMINATHAN:  Expert --

11         THE COURT:  So I don't know why you need the names for

12  people.

13         MR. ART:  Because you can't generate that chart

14  without the names.

15         THE COURT:  Well -- okay.

16         MR. ART:  And I think, your Honor, I -- if we could

17  submit --

18         THE COURT:  When is discovery cutoff in this case?

19         MR. ART:  I don't think we currently have one.

20         MS. ROSEN:  Yeah, we don't have one.

21         THE COURT:  So if I set a six-month discovery cutoff,

22  why not -- what if I said, city, how long is it going to take

23  you to get the CR files or the homicide files produced,

24  unredacted, and I give you six months?  Or, I don't know, 90

25  days.  Somewhere between 90 days and six months and -- hard

1    date.  No one gets to move beyond that.

2              MR. ART:  We do it.

3              THE COURT:  What -- what would you end up doing with

4    it?

5              MR. ART:  We would do exactly that.  Our police

6    practices expert would come in, and he also is the next expert

7    who has to look at these documents, and he -- what he will do

8    what he did in Jacques Rivera and in Fields, he'll say, I look

9    at each of the homicide files.  You figure out what are the

10   types of conduct that I am seeing occur.

11             One, there is only one version of events in these

12   police reports.  They are not like -- in these homicide files.

13   They are not like homicide files that I see across the country.

14   They tell one chapter of a story, not the whole story because

15   the story always goes from crime directly to charges against

16   the suspect.  But criminal investigations have multiple plot

17   lines.  You go in different directions.  I don't see any of

18   that in these files.  Some -- some are dead bang open and

19   closed cases, yes.  I should see some of those.

20             But why do I see that?  Why do I see no case where

21   there are other threads?  That's not how homicides work in my

22   experience as an expert.  So I am able to say that what they

23   are choosing to document, based on my actual review as an

24   expert of these files, shows me they are doing something

25   improper in these files.  That's one conclusion that he

1   reaches.

2          Another conclusion he reaches is he says, ah, I'm

3   looking at these files, and I'm seeing specific pieces of

4   information that are in these files, yes, that aren't being

5   disclosed to the criminal justice process.  And, by the way,

6   those pieces of paper matter because that witness had --

7          THE COURT:  Okay.

8          MR. ART:  -- this important role in the case, and so

9   that was exculpatory.  I can't even tell you if the piece of

10   information that's not disclosed is exculpatory if I don't know

11   the context in which that document involving that person in

12   that file exists.

13          THE COURT:  How many homicide cases at the State's

14   Attorney's Office do you think are problematic that have

15   resulted in -- can you identify a number?  Twenty, 25, what is

16   the number?

17          MR. ART:  Of what type of cases?

18          THE COURT:  Where there have been a certificate of

19   innocence issued related to this -- this group of homicide

20   files you're looking for.

21          MR. ART:  In Area 5?

22          THE COURT:  Yeah.

23          MR. ART:  I mean, there have -- so there have been 20

24   murder convictions reversed.

25          THE COURT:  Okay.

```
 1              MR. ART:  I think there are five.

 2              THE COURT:  Have you looked at the State's

 3   Attorney's -- do you have the files from the State's Attorney's

 4   Office?

 5              MR. ART:  Yes.

 6              THE COURT:  Okay.

 7              MS. ROSEN:  We don't have -- actually I'm not sure we

 8   have them in all of the cases.

 9              MR. ART:  In a lot of them we do.

10              THE COURT:  Okay.  How many of them do you have the

11   State's Attorney's Office file in, the complete State's

12   Attorney's Office file?

13              MR. ART:  Probably three quarters as an estimation.

14              THE COURT:  Okay.  For the issue of what gets over to

15   the State's Attorney's Office, why not just start with those.

16              MR. ART:  If the city would say that's representative

17   of our policies and practices, we would have absolutely --

18              THE COURT:  But if you don't have other -- so why not

19   start with those and see if there is an issue there.

20              MR. ART:  There is.  And there is an issue in a high

21   percentage of these cases --

22              THE COURT:  Okay.

23              MR. ART:  -- and that's our contention.  In a lot of

24   them evidence is suppressed.  In a lot of them evidence is

25   fabricated.  In a lot of them there are unconstitutional
```

1  eyewitness identification procedures.

2          THE COURT:  I just want to make sure when you're

3  saying evidence is suppressed, you're not saying a Judge

4  suppressed the evidence, you're saying the police department

5  did not transmit evidence from their file to the State's

6  Attorney's Office.

7          MR. ART:  The latter certainly.  And then, in addition

8  to that, information pertinent to the investigation never made

9  it into the homicide file.

10          MS. ROSEN:  So that -- that is -- the police officer

11  discovered exculpatory evidence and didn't write it down.  Now

12  how we're going to glean that from a review of files --

13          THE COURT:  That part I don't understand.

14          MS. ROSEN:  -- I don't understand at all.

15          THE COURT:  I do understand that if there are -- and

16  this is, of course, at cross purposes with what you're saying,

17  which is there is exculpatory evidence in the police

18  department's homicide file that did not get to the State's

19  Attorney's Office.

20          MR. ART:  Correct.

21          THE COURT:  So that is at cross purposes with -- I'm

22  not saying -- you know, we're in discovery, so you can figure

23  out what you want to do.

24          That is at cross purposes with what you have just been

25  telling me, which is there is never that kind of evidence in

1    the file and there should be.

2            MR. ART:  No.  No, I don't think so at all.  So

3    sometimes information is gathered.  It is put in a police file.

4    The police file is not transmitted.

5            And in Fields we showed that was a result of

6    individual file suppression and also because what's called the

7    subpoena service unit at the Chicago Police Department doesn't

8    have any policies about how files are transmitted to

9    prosecutors.  That's one scenario.

10           Another is the investigator who is going along because

11   of their training, learns a piece of exculpatory information,

12   and never puts it in the file.

13           THE COURT:  But --

14           MR. ART:  They are not --

15           THE COURT:  I understand that one.

16           MR. ART:  Yeah.

17           THE COURT:  That's a theory, I think, I understand

18   that you're saying happens.

19           MR. ART:  Yeah.

20           THE COURT:  The one I don't understand is you're

21   saying, no, actually when they do get something exculpatory,

22   they do put it in the file, but then they don't send it to the

23   State's Attorney's Office.

24           MR. ART:  Both things happened, and they are not

25   mutually --

1    THE COURT:  I'm not saying they can't.

2    MR. ART:  -- exclusive.

3    THE COURT:  I don't -- I don't think they are

4  mutually exclusive.  Is mutually exclusive to say, those

5  reports aren't generated, exculpatory reports aren't generated,

6  because if they are not generated, then there is no evidence

7  that is not sent over to the police department.

8    But it sounds to me you're saying, sometimes they are

9  generated, sometimes they are not generated, sometimes they are

10  sent over -- I'm sorry -- all reports are sent over except for

11  the ones that are exculpatory.

12    MR. ART:  The point is well taken.  Right.

13    THE COURT:  So those seem to be in conflict with -- to

14  me.

15    As far as -- let's do an iterative process.  As far as

16  the homicide files, with complete -- where you think there has

17  been a certificate -- where there has been a certificate of

18  innocence, do we have a universe of those?

19    MR. ART:  Well, so that I think there are probably

20  three or four certificates of innocence in Area 5 cases so far.

21    THE COURT:  Okay.  And the State's Attorney's Office

22  has files on those?

23    MR. ART:  Yeah.

24    THE COURT:  Complete files?

25    MS. ROSEN:  Standing here now, it is -- in -- I

1    believe in most of them.  I can tell you that in all of the

2    pending filed Guevara cases, so if we take -- excluding Rivera

3    -- there has not been any report that is contained within the

4    investigative file that is not identified in this -- already

5    identified in the CCSAO.

6            THE COURT:  State's Attorney's Office, okay.

7            MS. ROSEN:  So -- but I don't know if we have CCSAO

8    files for all of the cases yet.  I just can't keep track of

9    where we are in the discovery.

10           THE COURT:  Here's what I am proposing --

11           MR. ENGQUIST:  Some of the new ones we don't have.

12           THE COURT:  Here's what I am proposing on that aspect.

13   So as an iterative process is identify the certificate of

14   innocence files that come -- certificate of innocence cases

15   that come out of Area 5 during this time frame.  The city will

16   produce its file, if the State's Attorney's Office has its

17   file, and then compare them.

18           MR. ART:  So we have those already.

19           THE COURT:  Okay.  And then can you tell me where

20   there is a police report that did not end up in the State's

21   Attorney's Office file?

22           MR. ART:  Well, so it is not a certificate of

23   innocence case, but that happened in Rivera, that happened in

24   the Johnson case.  And there were reports that would literally

25   have contradicted the entire theory of prosecution that weren't

66

1    produced.

2           And so in the whole set of 20 murder convictions where

3    Guevara was involved in the investigation that had been

4    reversed, two of them, 10 percent, have absolutely no question

5    suppressed evidence.  Which even if that was the number that

6    bore out over all of these investigations, it would prove an

7    unconstitutional practice.

8           THE COURT:  That would be a problem.

9           Do you agree with that, Ms. Rosen?

10          MS. ROSEN:  I -- no.  I agree that --

11          THE COURT:  Not the problem part.  Do you agree that

12   his raw numbers, 10 percent of the cases --

13          MS. ROSEN:  Well, so with respect to Rivera, the

14   criminal defense attorney file as it existed today contained no

15   documents from the investigative file.  It had some

16   sub-reports, which led the city to argue that we didn't think

17   it was -- that the defense attorney file, as it existed today,

18   was in the same condition as it was during the time of the

19   criminal prosecution.  And the Cook County State's Attorney's

20   Office could not find its file.  So there was no way to go to

21   the Cook County State's Attorney file to find out because what

22   was produced --

23          THE COURT:  Okay.

24          MS. ROSEN:  Yeah.  So that was the factual

25   underpinning of the, quote unquote, street file claim in

1   Rivera, and that's --

2           THE COURT:  Do you agree with that?  If there is no

3   State's Attorney's Office file to check, what they got versus

4   what the defense attorney got?

5           MR. ART:  No.  I mean, what we are doing here is

6   having the same debate we had in front of the jury in Rivera --

7           MS. ROSEN:  But --

8           MR. ART:  -- where -- maybe I'm misunderstanding.

9           MS. ROSEN:  The CC -- are you saying we had a trial

10  file from the Cook County State's Attorney's Office?  We did

11  not.

12          MR. ART:  I mean, we had a large file from the State's

13  Attorney's Office.

14          MS. ROSEN:  It is absolutely not the trial file.

15  Darren O'Brien testified that it was not the trial file, and it

16  was a recreated file that he put together during the post-

17  conviction proceeding.

18          MR. ART:  I mean, so, your Honor, the State's

19  Attorneys put together a file that it produced to us in the

20  litigation that included some, but not all, of the reports.

21  And some of them appeared to have come post-conviction.

22          THE COURT:  Okay.

23          MR. ART:  The criminal --

24          THE COURT:  That answers the question.  That's fine.

25  So you don't have a State's Attorney's file -- a complete

1    State's Attorney's Office file to compare what they got from

2    the city versus what they may have produced to defense counsel.

3              MR. ART:  I mean, no, we wouldn't accept that.

4              THE COURT:  And --

5              MR. ART:  We took the opposite position in the trial.

6              THE COURT:  I understand that.  But I'm trying to

7    manage discovery.

8              MR. ART:  Okay.

9              THE COURT:  And so you're -- one of the reasons you

10   want to get all these homicide files is to show that we would

11   be able to show this pattern, right?  That these -- these --

12   these reports that contain evidence that would be indicative of

13   innocence are not transmitted to the State's Attorney's Office.

14             MR. ART:  That's one of the theories, yes.

15             THE COURT:  Okay.  You will also have the theory that

16   reports that would contain otherwise exculpatory information

17   are not generated at all.

18             MR. ART:  Correct.

19             THE COURT:  Okay.  And we acknowledge that those are

20   in tension with each other.  To say that those type of

21   exculpatory reports are never generated would be --

22             MR. SWAMINATHAN:  It is just that we're never using

23   that kind of binary language, Judge.  We're saying, police go

24   out on the street and they do a bunch of stuff and they learn a

25   bunch of exculpatory stuff.  Sometimes they don't even

69

1    create -- not always -- sometimes they don't even create the

2    exculpatory report about that stuff.

3          THE COURT:  I understand that.

4          MR. SWAMINATHAN:  And then other times they create the

5    exculpatory report, and they don't disclose it to the criminal

6    defense attorney.

7          THE COURT:  Okay.

8          MR. SWAMINATHAN:  There is multiple steps -- it is one

9    process.  (Unintelligible) doesn't get criminal defense.  One

10   theory.  The breakdown occurs at multiple steps in the process.

11         THE COURT:  I understand that, and I'm -- those are

12   all going to the merits of your case.  I'm trying to understand

13   how to manage discovery.  And you're saying you want 600

14   homicide files to prove these multiple theories.  And I'm not

15   inclined to make that production happen unless it is really

16   that production would solve all our Monell discovery issues,

17   which I thought is where we were going.  Because if it is just

18   a statistical analysis, then we can do a bunch of redaction,

19   there wouldn't be a lot of extraneous -- I won't call it

20   extraneous to mean it is not useful -- but resulting discovery

21   from the files themselves.  Because if you get the homicide

22   files, the next time it will be February, it will be colder

23   outside, there will be more snow, and you'll be saying, now we

24   need to -- time to go interview all these people.

25         And that -- I'm just trying to manage discovery.  I

1   thought I had a very clear statement from your co-counsel as to

2   what you were going to use this information for, and I was

3   ready to give you exactly what you wanted with redacted

4   information.

5          Now you have changed course on me, and so that's a

6   problem.  So now you're not going to get the 600 files.  So now

7   we have got to do an iterative process to see if further

8   discovery is meritorious.  And so we're going to start with for

9   the issue of production of exculpatory reports a universe of

10  files where you know there is a State's Attorney's Office file

11  and there is a homicide file.  And we can compare and see are

12  there any where we know there is a complete State's Attorney's

13  Office file and some exculpatory report did not end up over at

14  the State Attorney's Office.

15         You tell me what cases you want to be able to do that

16  on.

17         MR. ART:  The problem that we have with us saying

18  here's the cases we'd like to do it on is whatever that set of

19  cases is, whether it is the Guevara cases where COIs have been

20  granted, whether it is the Guevara cases where a murder

21  conviction has been reversed, whether it is just Guevara cases

22  in Area 5, if there was a stipulation that that was

23  sufficient --

24         THE COURT:  No.  Do you understand the term iterative

25  process?

1      MR. ART:  Yes, your Honor, absolutely.

2      THE COURT:  What does that mean to you?

3      MR. ART:  It means that we're going to start with one

4  small set of files --

5      THE COURT:  Yes.

6      MR. ART:  -- and go from there.

7      THE COURT:  Yeah.  And so then if you say, hey, Judge,

8  here's 10 percent of the cases we have picked out that show our

9  theory has some legs to it, now we're down the road of an

10  iterative process.

11      MR. ART:  Okay.

12      THE COURT:  If you give me these ten cases and that

13  theory isn't proven, we're done.

14      MR. ART:  Okay.  So our --

15      THE COURT:  That's the only way, if we're going to

16  have Monell discovery going on before we even know if that

17  policy exists and therefore -- and caused the injury, it is the

18  only way to manage it.

19      ==I hope other judges have to deal with this issue the==

20  ==way we're dealing with it here because they will realize that==

21  ==you can't just give full rein and expect this to be managed in==

22  ==a normal year, year and a half process to get a case ready.==

23      So tell me what ten cases you want to use as your --

24  beginning of your iterative process.

25      MR. ART:  I would say it would be the 20 murder cases

1    -- and I know you just said 10 -- but the 20 murder cases where

2    Detective Guevara was involved and the murder conviction has

3    been reversed.

4            THE COURT:  Do you know if the -- how many of

5    those -- well, maybe we can use that and just say if there is a

6    complete State's Attorney's Office file.

7            MR. SWAMINATHAN:  We would also say we should get the

8    criminal defense file and the State's Attorney's file.

9            MS. ROSEN:  Well --

10           MR. ART:  There is a complete Cook County State's

11   Attorney's file, as far as I know, for all of those cases in

12   the possession of our office or we can get it relatively

13   quickly.

14           MS. ROSEN:  I don't know the answer to that question

15   as I stand here now.  I know we have, in some of the cases in

16   discovery, we have some production from the Cook County State

17   Attorney's Office.  I know in other -- like Solache, Reyes, I

18   know we have the Cook County State's Attorney's Office file and

19   the investigator file and the CCSAO file match.  So, you

20   know -- so but I can't -- I don't have that inventory.

21           THE COURT:  That's a great place to start.  The 20

22   cases involving defendant Guevara that resulted in reversal.

23   You send over a full copy of the State's Attorney's Office file

24   to defendant -- to Ms. Rosen.

25           You represent the city, correct?

73

```
 1              MS. ROSEN:  Yes.

 2              THE COURT:  To Ms. Rosen.

 3              And then she will send over the homicide file from

 4   those cases.  Okay?

 5              How much time do you need to get those over?  How much

 6   time would you need to send over the homicide file?

 7              MR. ART:  A week for us.

 8              MS. ROSEN:  I don't --

 9              MR. ENGQUIST:  You have to identify them first.

10              MS. ROSEN:  Yeah, I have to find them.  And the -- so

11   it is going to need to be that week, that first week in

12   December.

13              THE COURT:  Okay.  And can you tell her the list

14   you're going to send over?

15              MR. ART:  Yeah.  I mean, we're litigating all

16   these -- most of these cases.

17              THE COURT:  Yeah, I was going to say, yeah, that is

18   probably a dumb question.  Okay.

19              MS. ROSEN:  Well, I actually don't have -- there is

20   some that have been -- wait.  Is the parameter where the

21   conviction has been overturned?

22              THE COURT:  Yeah.

23              MS. ROSEN:  Right.  That's the parameter?

24              THE COURT:  Yeah.

25              MS. ROSEN:  Have they all been filed other than --
```

1      MR. SWAMINATHAN:  There will be some that we don't

2  have --

3      THE COURT:  That's all right.  Just whatever it is.

4      MS. ROSEN:  Yeah.

5      THE COURT:  So plaintiff to send over the State's

6  Attorney's Office file.

7      And you're sure it is 20, correct?

8      MR. ART:  Correct.

9      THE COURT:  Okay.  By November 22nd.

10      In light of the holiday, the city will produce their

11  complete homicide investigative file December 6th.

12      MR. ART:  Your Honor, may I raise the issue of other

13  files that will likely be necessary to conduct this analysis?

14      THE COURT:  Well, you can.  We're going to -- we're

15  not done talking.  We're just -- I'm trying to get -- so

16  that -- that comparison should give at least what went over the

17  State's Attorney's Office that may have been exculpatory -- or

18  that is in the police file that may have been exculpatory that

19  (unintelligible) the State's Attorney's Office.

20      The next issue is the identification issues

21  themselves.  Okay?  And from those I am trying to

22  understand -- we could go beyond the Guevara stuff because

23  those don't seem limited to Guevara, correct?

24      MR. ART:  Right.  We would certainly -- and I think

25  part of the struggle that I am having is -- in the iterative

1    process, I want to make clear that if we show in the Guevara

2    cases it is 10 percent, we're not going anywhere as an

3    evidentiary matter.  Right?  Because the city will be able to

4    say, that's just in the Guevara cases.  You haven't established

5    a widespread practice.  Game over.  That's essentially what we

6    lost at summary judgment in the Rivera case.  So we need to be

7    able to show ultimately that this was happening across an

8    entire area and time period whatever it is.  So --

9             THE COURT:  If you showed me of the 20 that there were

10   two where there is clearly an exculpatory report that didn't

11   make it over to the State's Attorney's Office --

12            MR. ART:  Yeah.

13            THE COURT:  -- you would be along -- the iterative

14   process would be working in your --

15            MR. ART:  Gotcha.

16            THE COURT:  -- favor.

17            MR. ART:  Okay.  I just want to make clear that --

18            THE COURT:  Yeah.

19            MR. ART:  Okay.  For eyewitness identification issues,

20   the three subparts of those issues that I identified, I think

21   the homicide file, the criminal defense file, and the court

22   file, will allow us to show that in the same 20 cases.  And I

23   bet in that category it is 20 to 40 percent of the cases have

24   very serious problems with eyewitness identifications.

25            THE COURT:  That -- this -- that is a part -- I mean,

1  to the extent you're litigating all the Guevara stuff, you can

2  use whatever you're getting in the other cases here to show

3  that process.

4          MR. ART:  Okay.

5          THE COURT:  But that's not what I have got in front of

6  me.  I mean, today I'm -- we're talking about, you know, a

7  statistical analysis, and you need 600 homicide files.

8          MR. ART:  I mean, I'm understanding the Court's

9  iterative approach.  And I guess what I am saying is we can

10 show it on our eyewitness theories, on our fabrication

11 theories, on our suppression theories, and our failure to train

12 theories using this universe of 20 cases to show that we're not

13 on some, you know --

14         THE COURT:  The problem with that though is now you're

15 picking the 20 where you know there is a problem.  And so that

16 is -- that's not a policy and practice, that is a bad officer.

17 Potentially.  It could be a part of a policy and practice for

18 sure, but that's doing the reverse.

19         MR. ART:  Absolutely.

20         THE COURT:  So --

21         MR. ART:  Right.

22         THE COURT:  -- that's not going to work.  So --

23         MR. ART:  Well, our position is we need to be able to

24 show this across the entire set of files for some time period

25 and some --

1    THE COURT:  I understand that.  But to use those 20

2    and say, oh, now we're showing with -- where we -- you know,

3    I'm not going to prejudge this, but I'm going to use your

4    argument, we know we have a bad officer, so we know we're going

5    to be able to show problems with these 20, and now give us the

6    whole universe that's -- I suppose it is a form of an iterative

7    process, but it is stacked against -- it is stacked in your

8    favor.

9    MR. ART:  So in terms of designing what the next sort

10   of larger set of files would be to get the -- you know, how

11   often is this actually happening?  Is it a bad officer or is it

12   happening in all of the investigations?  I'm not sure how to

13   grow the set except to say we would do one year at Area 5 or --

14   THE COURT:  Yeah.  I'm just not convinced that I am

15   going to give you the ability to investigate every homicide

16   that was investigated by Area 5 by the police department.

17   MR. SWAMINATHAN:  I mean, and I will note if you're --

18   THE COURT:  And that is -- it seems to me that is what

19   you're asking to do.

20   MR. ART:  I mean, what we have is two jury verdicts,

21   multiple cases of proven misconduct which give us the good

22   faith basis to allege that, you know, these 20 wrongful

23   convictions, and probably more, were not the product of just a

24   bad officer, they were the product of a system of lawlessness

25   at Area 5 in a particular time period.  And we have articulated

1    what the very specific Monell theories are.

2          We're not saying, gosh, these investigation were all

3    bad, and we're going to try to figure out why they were bad.

4    We're talking about particular ways in which material evidence

5    was suppressed, was fabricated, eyewitness identification

6    procedures went bad.  This is not -- this is not a shot in the

7    dark.  This is -- this is based on litigation in other cases

8    where we have proven to a jury that the city had these

9    practices in place.  And it is based on, you know -- this is

10   not the false arrest claim where we're saying, you know, give

11   us everything that the Chicago Police Department has.

12   This -- this is a case where someone was wrongly convicted and

13   spent 20 years in prison.  And there is a pronounced pattern of

14   wrongful convictions coming out of that area at that particular

15   point in time.

16         The only evidence that we can ask the city for to help

17   prove up those Monell theories is the homicide files.  Without

18   those, we got nowhere to start.

19         So it -- I guess I would submit this is the rare case

20   where it does make sense to order the production of a quantity

21   of homicide files just as Judge Harjani did in the Reyes and

22   Solache case.

23         MR. SWAMINATHAN:  Just as Judge Gottschall did, just

24   as Judge Kennelly did.  We're not starting with a blank slate

25   on the issue of a fishing expedition here, Judge.  We're

1    starting the exact opposite place.

2          MS. ROSEN:  Well, actually though, Judge, in the other

3    cases -- I'll set Judge Harjani to the side.  In Fields and

4    Rivera, it was confined to the street files claim, and then

5    there was this lineup theory that sort of started the road down

6    getting investigative files and -- but the reality is that

7    there was a -- and it was focused on raw statistics about

8    filler picks and how many filler picks were documented.  But

9    the reality is that there was no allegation in the case that

10   the eyewitness picked a filler.  The eyewitness came to court

11   and testified via video that he -- every identification

12   procedure he -- he participated in he picked Mr. Rivera.  And

13   ultimately Judge Gottschall on a Rule 50 and on the post-trial

14   motion said that there was no lineup theory that went to the

15   jury.  So that fell flat.

16         And you're right, that if they're really just looking

17   at these statistics on how often -- I don't even understand how

18   it applies to this case, quite frankly, because factually we

19   have one witness who said -- who is documented as having picked

20   out Mr. Sierra.  And we have another witness -- two witnesses

21   who originally identify him.

22         One witness by the time they get to trial flips and

23   says, no, I didn't, it was Guevara's fault, he made we do it.

24         The second witness stood on his identification.  And

25   to this day he is standing on his identification.

1          And the one that flipped is it still flipped.

2          So I don't know what filler -- our filler rate has to

3  do with that exactly, so -- but if that's where they want to go

4  because they want to figure out filler rates, then there is no

5  reason not to do the redaction as you proposed.

6          But what is actually -- it's why we're talking

7  about -- how would you possibly do fabrication, figure out

8  fabrication from reviewing the files, without reinvestigating

9  whatever number of files.

10         THE COURT:  Yeah.

11         MS. ROSEN:  There is just no way to do it.

12         THE COURT:  I don't think there is.

13         MR. SWAMINATHAN:  I mean, I'll give you an example of

14  exactly how we did it.

15         THE COURT:  It doesn't matter.  We're going to -- I'm

16  going to pick a number of homicide -- I will issue an order

17  that gives a parameter of homicide investigation files, and

18  then -- for a time period.  And then I'm going to give you 90

19  days to do any factual discovery you want to do on it.

20         MS. ROSEN:  Well, so the problem though, Judge, is

21  that -- so then the city is going to be left with doing what

22  with them?  They're going to go and they're going to interview

23  whoever the heck they're going to interview, and then they're

24  going to come up with however many people they get to flip to

25  say that this happened bad and that happened bad and this

1    happened bad, and then the city -- how is the city going to

2    deal with that?  Like the --

3              THE COURT:  Then you'll have -- you will be able to

4    depose those people and say, what made you change your mind?

5              MS. ROSEN:  Well, then we're going to want to know --

6    put on rebuttal evidence to say that they're flipping is -- not

7    just what made you change your mind, but we're going to call in

8    all these detectives that were not Guevara to say, oh, I am the

9    one that did it or whatever.  Like, I don't know because it

10   is going to be case by case on a file by file.  But it doesn't

11   rise and fall with a -- the production of files, and then

12   plaintiffs identifying or never identifying, right?  They are

13   going -- let's say they just going to go out there and they are

14   going to interview people.  And at some point they are going to

15   amend their disclosures and add whoever they are going to.  And

16   then they're going to get their expert to do whatever.  And

17   we're going to be in the dark about it.

18             And then here we are -- and left with no tools, no way

19   to cross these people or to do the deeper dive in the case.

20   You're going to have -- they're going to go and get a witness

21   and to say, oh, no, I didn't make that ID, it was fabricated.

22   Or I'm going to want the criminal trial transcript.  I'm going

23   to know what that witness said at trial.  I want to know like

24   what -- like that's where this all leads.  Like there is no way

25   to get at this without doing what we do in discovery in every

1     single one of these cases on the underlying case.  There is

2     just no way to do it.

3          And limiting them to 90 days to get it done, then --

4     ultimately is going to -- is going to prejudice the city

5     because the city is going to be left with the inability to

6     fight it in the way it needs to be fought.  Because if I am

7     going to fight a homicide investigation from 20 years ago when

8     some witness is, you know, uncovered that now is going to

9     change their story, I need to know what their story was in the

10    first instance.

11         MR. SWAMINATHAN:  So, your Honor, the problem with the

12    city's argument --

13         THE COURT:  Well, hold on.

14         Ms. Rosen, how would the city be prejudiced if the

15    plaintiffs had 90 days to supplement their disclosures so they

16    would -- and it would be a firm date.  They would have to

17    identify people who would, you know, support whatever their

18    theory is.  And it would have to be a good faith

19    supplementation, not just going through the homicide files and

20    just listing every person they could find on there.

21         And then the city had 90 days -- I would give the city

22    even more time, since, you know, you would need to presumably

23    track some people down and do the depositions, which is harder,

24    to do discovery on those supplemented individuals.

25         MS. ROSEN:  Well, sure.  You were talking about

83

```
 1   closing discovery in 90 days.

 2          THE COURT:  Yeah.  No, no, I --

 3          MS. ROSEN:  Yeah.

 4          THE COURT:  Well, you made me think that through,

 5   so --

 6          MS. ROSEN:  Okay.  So, I mean, no, I still think that

 7   this is a fool's errand.  I think we're going to be bogged down

 8   in doing this for two years.  This is --

 9          THE COURT:  Not if I hold them to 90 days and you to a

10   period of time more than 90 days, let's say, 120, 150, to do

11   the depositions so you -- on day 91 --

12          MS. ROSEN:  I mean, I can tell you from experience in

13   the Rivera case, you know, just obtaining for the 138 files

14   in -- for obtaining the subset of files that the CCSAO still

15   had today, which was something around the 40 percent, so of

16   that 138 they only had about 40 percent of those files today.

17   It took us nine months for them to make that production because

18   they don't have the manpower to do it.  And now I'm hearing it

19   is going to be worse.

20          So it is not just like what's the -- you know, it

21   brings in this -- and, quite frankly, the Cook County Public

22   Defender's Office, we now on -- on the case -- on cases we

23   currently have we're simply getting a -- requesting the public

24   defender file for the underlying case.  So we're not talking

25   about Monell.  One public defender file.
```

1    What happens is six months go by, and then we get this

2    automated generated email from the Cook County Public

3    Defender's Office saying, we haven't heard from you in six

4    months bugging us about this request, and so in our experience

5    usually that means you don't really want it.  So do you really

6    want it because now we'll start looking.

7         So it is that -- you know, you're talking about public

8    sector entities that just don't have the resources.

9         THE COURT:  All right.

10        MS. ROSEN:  Yeah.

11        THE COURT:  Here's what we're going to do.  I'm going

12   to figure out a range of homicide files that you'll get.  And

13   there will be no redactions.  But you are not able to interview

14   any of the witnesses, any of that stuff.

15        You're -- what you have said to me, and your position

16   has changed repeatedly today, but that you can't really

17   decipher the homicide files without having the names there.

18   But your discovery will be limited to the statistical

19   analysis -- statistical-type analysis that you described.

20        So, you know, to the extent that there is a fake or

21   false identification or any misconduct by the police,

22   that's -- you're going to be able to use this evidence -- your

23   expert will be able to use this evidence in its full.  We will

24   have to talk about how that looks, you know, later because, I

25   don't know, people have certain privacy interests.  The city

1  may have, as citizens of the city, that they are like, we don't
2  want all that information out there in the public realm.  But
3  you cannot go -- you cannot use this information to identify
4  actual witnesses.  It is simply for statistical analysis, for
5  the analysis that you described earlier on.
6           MR. ART:  That will only go to one of our Monell
7  theories.
8           THE COURT:  No, it won't.
9           MR. ART:  It will only go to the eyewitness
10  identification theory about the rate of identification.  It
11  will not solve the file suppression, the evidence suppression.
12           THE COURT:  Well, file suppression you have that
13  avenue.
14           MR. ART:  So we can subpoena files from --
15           THE COURT:  No, no, no, you're going to -- if you can
16  show from the Guevara stuff that those --
17           MR. ART:  Okay.
18           THE COURT:  -- that stuff did not get over to the
19  State's Attorney's Office, that avenue is still alive.
20           MR. ART:  From the 20 cases.
21           THE COURT:  Yeah.
22           MR. ART:  Okay.
23           MR. SWAMINATHAN:  And if we understand -- if I
24  understand correctly, you're saying don't -- you cannot go talk
25  to witnesses.  We can reach whatever conclusions we can reach

1    within the confines of the police files, what you're saying

2    with regard to these other theories.

3            THE COURT:  You can use it for statistical analysis as

4    was originally explained by the expert.  You're saying that by

5    redaction your expert is going to be handicapped.

6            I get your point.  There may not be ways to actually

7    -- you know, I don't know how the redaction would look, how

8    that would impact.  But at the end of the day, your expert

9    would have access to the report.  They will have the -- your

10   expert will have access to the same report.  And if your theory

11   is we're going to prove it based on statistics, that's great.

12           I'm glad we had the conversation.  I'm sorry it took

13   this long.  But now we have a path forward.

14           And so I'm not going to be hearing in February, oh, I

15   need more time to go find this witness because we think she was

16   influenced to make an identification that wasn't appropriate.

17   Because that's -- unless it is in this case, that's not going

18   to matter.  What will matter, of course, is your expert saying,

19   there is never -- we never found a conflicting identification

20   in any of these homicide files, and statistically speaking I

21   find that to be very odd.

22           MR. ART:  Right.  But in this case there were

23   fabrications of evidence.

24           THE COURT:  So in this case as to this -- the

25   substance of this case, I'm not saying anything about what you

1    can do about this case.  I'm saying you cannot use homicide

2    files to create ongoing discovery where you're trying to find

3    other people, interview other people, add other people to your

4    Rule 26 disclosures so we have to get all those people deposed,

5    all that stuff.  You're going to use it for what you originally

6    told me you're going to use it for, and it won't be redacted.

7         MR. ART:  So to be clear, when I describe the

8    statistical analysis, I was describing Dr. Wells's analysis

9    about eyewitness identifications.  I did not say that the

10   statistical analysis can be used to prove all Monell theories

11   in this case.  I want that to be perfectly clear.  For

12   fabrication --

13        THE COURT:  Well, the transcript will show what the

14   transcript will show.  I asked you what you were going to use

15   the information for, and you told me that's what we wanted to

16   use it for.

17        MR. ART:  I said -- we have to show to prove this

18   claim that there was a -- that over --

19        THE COURT:  Look, we have had -- you have had more

20   than your fair time.  Okay?  I have discretion to manage

21   discovery.  You are getting the -- I'm going to decide the

22   scope of the homicide files you're getting.  They won't be

23   redacted.  You can use them for the -- for expert analysis

24   only.

25        MR. ART:  Are we allowed to get other files by

88

1    subpoena?

2              THE COURT:  What do you mean by other files?

3              MR. ART:  So, for example, the fabrication that's at

4    issue in the Sierra case, this report that says both

5    eyewitnesses identified this car, right?  You know, they say

6    neither of us identified the car.  One of them says it at

7    trial.  So we can get the court transcript and show --

8              THE COURT:  For this case?

9              MR. ART:  Yes.

10             THE COURT:  Absolutely.

11             MS. ROSEN:  No, no, no, he's saying --

12             MR. ART:  No, no, no, I'm saying --

13             MS. ROSEN:  -- for all the --

14             MR. ART:  -- that is an example of how we --

15             THE COURT:  No, no.

16             MR. ART:  -- show --

17             THE COURT:  No.

18             MR. ART:  Okay.  I mean, that is going to prevent us

19   from proving our fabrication theory, our suppression theory,

20   and our failure to train and supervise theory.  Those Monell

21   theories are going to be dead on arrival with this kind of

22   restriction.

23             THE COURT:  I asked you what you were going to use it

24   for.  You told me what you were going to use it for.  You can

25   now use it for what you told me what you were going to use it

1    for.

2          MR. ART:  Your Honor, I -- we were much broader in our

3    briefs, and I was much broader in my explanation.  I did not

4    say that our -- all of our theories can be limited to one

5    expert statistical analysis looking at the homicide files.  I

6    want that to be clear.

7          THE COURT:  I am -- there is no way to handle Monell

8    discovery in a case like this if there are not proper

9    limitations.

10         MR. ART:  I mean, it happened --

11         THE COURT:  You are getting all the homicide -- I

12    don't know that you are getting all the ones you're asking for,

13    but you're going to get a big chunk of homicide files that your

14    expert can plow through and say, this looks weird to me.

15         What you are not going to be able to do is go and

16    reinterview, reinvestigate hundreds, if not -- well, it is not

17    hopefully thousands -- but hundreds of homicide

18    files -- homicide investigations that happened 10, 15, 20 years

19    ago to prove that there is a policy and practice that caused

20    the constitutional violation.  Because in my mind that type of

21    discovery is -- is as likely to create its own set of problems,

22    what people remember, who can be found, all of those things,

23    which makes discovery unending.

24         And so when a district court says, I'm not going to

25    bifurcate discovery, and they allow the cart and the horse to

1    go equally along, not one pulling the other, this is what we

2    have to deal with.  Because we'll be here in five years, and

3    then you're going to be rightfully complaining that you have a

4    client who had -- deserves his day in court, and it is going to

5    be five years from now, and it hasn't happened.  And it will

6    probably not even be close to being -- having happened.

7         So you're getting what you want.  You're getting the

8    homicide files.  You cannot use them for everything that you

9    want to use them for.  And it is, quite frankly, counsel,

10   exactly what you told me you wanted to use it for.  And that to

11   me seems to be a reasonable way to manage discovery in these

12   kind of cases.  And an unreasonable way would be to allow you

13   to get those files and then go reinvestigate, reinterview,

14   recreate homicide cases that are decades old.

15        MR. ART:  Understood.

16        THE COURT:  All right.

17        MS. ROSEN:  Can I get just one point of clarification

18   on redactions?

19        THE COURT:  Uh-huh.

20        MS. ROSEN:  As was pointed out earlier in a different

21   case, we do redact juvenile information.

22        THE COURT:  Juvenile is fine.  If that creates a

23   problem, just file a motion, and we can -- well, don't do that.

24   First talk to Ms. Rosen.  And if you can't get it resolved,

25   file a motion, we can get that figured out.

1          MS. ROSEN:  Thanks, Judge.

2          MR. LEINENWEBER:  Thank you, your Honor.

3          THE COURT:  Thank you.

4          I want to have a status so I can get the order out to

5 make sure that's done.  But could we -- I would like to do it

6 after Thanksgiving.

7          MR. ART:  Your Honor, can I raise one non-Monell

8 issue?

9          THE COURT:  Sure.

10          MR. ART:  We were before your Honor, and the witness

11 Alberto Rodriguez had requested an attorney, and you instructed

12 us to contact him together.

13          THE COURT:  Okay.

14          MR. ART:  We did that.  We contacted him by phone.  He

15 said he would still like an attorney, but neither he nor his

16 family can afford an attorney.  He's incarcerated in a federal

17 prison.

18          And I guess we're looking for the Court's guidance on

19 how to proceed given that he would like an attorney but cannot

20 afford one himself.

21          THE COURT:  Remind me his role in this.

22          MR. ART:  So he's one of the two eyewitnesses that we

23 have been discussing.

24          THE COURT:  Okay.

25          MR. ENGQUIST:  He's the eyewitness --

1    MS. ROSEN:  He's the eyewitness who is standing on his

2  identification.

3    MR. LEINENWEBER:  He's in federal prison, your Honor.

4    THE COURT:  I don't have a ready answer for that.

5  Give me his name again.

6    MR. ART:  Alberto Rodriguez.

7    THE COURT:  Okay.  And, Ms. Rosen, do you agree that

8  that's what he said, he wanted an attorney and couldn't afford

9  one?

10    MS. ROSEN:  Yeah.  But he apparently had a

11  conversation with plaintiff's counsel, and that -- and

12  indicated to them originally that he wanted to get a lawyer.

13  And then we asked -- we raised it with the Court some time ago,

14  and you ordered that any future conversations happen with all

15  parties present.

16    We called him.  He told us he wasn't able to find a

17  lawyer.  He would still like one.  He doesn't want to be

18  bothered with any of this, it was a long time ago, and he

19  stands on his prior testimony, and why isn't that good enough.

20    THE COURT:  Okay.  And, Mr. Engquist and

21  Mr. Leinenweber, you agree that that's what he conveyed?

22    MR. ENGQUIST:  Yes.

23    MR. LEINENWEBER:  Yes, your Honor.

24    THE COURT:  Okay.  I'll think about that.

25    MR. ENGQUIST:  What we talked about before also, your

1   Honor, is that we had a joint phone call to him to let him know

2   that we're coming to do the deposition and just get it done,

3   just like any other witness at that point.  There is

4   no -- there is no real issue here that we would -- where the

5   Court would need to be coming in and giving an attorney.  But

6   that would, of course, be up to you.

7           But other than that, we could just go forward, just

8   let him know we're coming, and just go into it.

9           THE COURT:  Did he tell you when you talked to him

10  that he was -- or in this joint call, do you agree he said that

11  he was standing by his testimony at the criminal trial?

12          MR. ART:  I mean, not exactly.  He said, I have given

13  this statement over and over again, and I don't understand why

14  that is not enough.

15          Right?

16          Our --

17          THE COURT:  Okay.  That's what he said.

18          MR. ART:  Yeah.  But our position is the statement

19  that he gave in his 2009 deposition is, I couldn't identify the

20  shooter.  And I told Guevara that that was not the car when he

21  asked me to identify it.  The report -- so there is a factual

22  dispute about what his past testimony is.

23          THE COURT:  Did he -- okay.  And then we're done.

24          Did he express any concern that he would face criminal

25  penalty for anything he would say during a deposition?

1    MR. ART:  He mainly expressed concern for his safety.

2    THE COURT:  Okay.

3    MR. ENGQUIST:  But I did not hear anything else.

4    MS. ROSEN:  Yeah, he just said safety because we would

5  all be coming to prison.

6    THE COURT:  Okay.

7    MR. ENGQUIST:  That's the only concern he mentioned

8  during our joint phone call.  I can't speak to the other one,

9  we weren't involved, was that he was concerned about his

10  safety.

11    THE COURT:  Okay.  All right.  I'll figure that one

12  out.  I don't have a ready answer still.

13    MR. ART:  Thank you, your Honor.

14    THE COURT:  All right.  December 4th, 9:15.

15    And the issue as to the 20 Guevara files, those are

16  still going to get produced to the extent there are matching

17  Cook County State's Attorney's Office files.

18    MS. ROSEN:  Thank you.

19    MR. ART:  Thank you, Judge.

20    THE COURT:  Thank you.

21    MR. LEINENWEBER:  Thanks, Judge.

22    (Which concluded the proceedings.)

23

24

25

95

```
1

2                              CERTIFICATE

3          I certify that the foregoing is a correct transcript

4    from the digital recording of proceedings in the above-entitled

5    matter to the best of my ability, given the limitation of using

6    a digital-recording system.

7

8

9    /s/ Pamela S. Warren                November 21, 2019
     Official Court Reporter                    Date
10   United States District Court
     Northern District of Illinois
11   Eastern Division

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# Exhibit 2



1000 Dean Street, Suite 422
Brooklyn, New York 11238

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

**BONJEAN**
LAW GROUP, PLLC

August 18, 2019

Eileen Ellen Rosen
Rock Fusco & Connelly, LLC
321 N. Clark St., Ste. 2200
Chicago, IL 60654

**RE:** *Maysonet v. Guevara, et al.,* 18 CV 2342

Dear Ms. Rosen:

I write to follow-up on our August 7, 2019 telephone conversation and to memorialize Plaintiff's proposal as it relates to the production of materials relevant to his *Monell* theories of liability.

Specifically, Plaintiff seeks *all* Area Five homicide files between the years 1987 through 1992. This modified request should cure the City's concerns that Plaintiff's requests are not proportionate to the needs of the case. As to relevance, these files are relevant to a number of theories of *Monell* liability, including Plaintiff's claim that the City systematically suppressed evidence prior to and during the criminal prosecutions of defendants, including the Plaintiff. More to the point, Plaintiff contends that the City engaged in practice of suppressing street files, and did so, in the instant case. To date, I have seen no evidence that a complete street file was produced to Plaintiff prior to, during, or after his criminal prosecution. As you know, the City was found liable in *Fields* and *Rivera* for routinely suppressing street files during the same time frame as the instant case. Relatedly, Plaintiff alleges that investigative information was suppressed, because Area Five detectives routinely failed to record material information in homicide files. We have already produced evidence that this practice was utilized in the instant case. Clearly, Area Five homicide file are the primary source of information essential to proving that this practice was widespread and customary.

Additionally, homicide file are important to developing Plaintiff's *Monell* theory that the City had a widespread policy of coercing confessions. As you know, there are a number of suspects and witnesses who have alleged that they were beaten and coerced into confessing by Guevara and other Area Five personnel – these individuals are identified in Plaintiff's complaint and Rule. 26(a) disclosures. The requested homicide files would contain evidence supporting these allegations of coercion, including information about the length and circumstances of the interrogations. Furthermore, Plaintiff intends to embark on a fine-tuned investigation designed to uncover additional evidence of coerced confessions, particularly in cases where there is no reliable corroborative evidence. The homicide files are necessary to identifying those cases.



1000 Dean Street, Suite 422
Brooklyn, New York 11238

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

**BONJEAN**
LAW GROUP, PLLC

To the extent the City contends that the request is burdensome, Plaintiff reminds you that the City produced Area Five homicide files for the same period in the *Rivera v. Guevara, et al.,* 12 CV 4428 case. I believe you stated during our conversation that the production in *Rivera* was limited to cases involving identification procedures. Even if this is true, the City is not overly-burdened by production of the remaining or withheld homicide files. The vast majority of homicide investigations involve some type of identification procedure. Thus, it is fair to assume that the remaining homicide investigations to be produced within this time frame are fairly minimal.

On the issue of Plaintiff's request for CR files, Plaintiff proposes that the City produce all CR files for *all* police personnel who worked in the districts of Area Five between 1986 through 1990. According to the Invisible Institute's Citizen's Police Data Projects there were 795 CRs in all of the Districts within Area Five in 2002. Assuming those numbers are commensurate with the number of CRs between 1986 and 1990, the total number of CR requests is less than 4500. Plaintiff is open to compromise and would agree on the production of far less CRs if the City concedes that whatever number is agreed upon constitutes a statistically sound sample.

Finally, the City has objected to producing photographs of the defendant officers as they appeared in and around 1990. Plaintiff alerts the City to a recent case in which the circuit court found that photographs of police officers are subject to production under FOIA. *See, Warden v. Superintendant of the Chicago Police Dept., et al.,* 16 CH 07064. There, the circuit court rejected the argument that production of the photos would be a violation of the officers' privacy interests. While not dispositive of the issue here, the decision certainly is instructive. Accordingly, Plaintiff demands the production of photographs of the defendant officers as they appeared in and around 1990.

Please let us know as soon as possible whether the City intends to move to bifurcate *Monell* discovery, and if not, whether the City agrees to Plaintiff's proposal as outlined here.

Sincerely,

/s/JENNIFER BONJEAN

CC:  All Counsel

# Exhibit 3



467 Saint Johns Place
Brooklyn, New York 11238

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

**BONJEAN**
LAW GROUP, PLLC

January 30, 2021

Ms. Eileen Rosen
Rock Fusco & Connelly, LLC
321 N. Clark St., Ste. 2200
Chicago, IL. 60654

RE:   *Maysonet v. Guevara, et al.*, 18 CV 2342

Dear Ms. Rosen:

Please accept this letter in follow-up to our telephone conversation on January 21, 2021 related to the scope of *Monell* discovery and the City's Responses to Plaintiff's Fourth Request for Production. My goal is to summarize our conversation and propose some compromises to advance *Monell* discovery without litigation. As you know, we owe Judge Rowland a status report on February 1, 2021 regarding outstanding discovery disputes related to *Monell* so hopefully this letter will move us forward to identifying those disputes that can be resolved between the parties and those that will require motion practice.

**First,** per your suggestion we have reviewed the index of Chicago police policies from 1993 and have identified those policies which we believe are relevant or could lead to relevant evidence both as to Plaintiff's *Monell* claims and to his claims against the individual defendant officers. We have prepared a separate document identifying all policies we are seeking. If you have any objection to the identified policies, please advise and we would be happy to explain our basis for seeking said policy. Once we review the policies, we may follow up with requests to determine whether the policy was in effect in 1990 since the underlying investigation took place in this case in 1990, not 1993.

**Second,** in an effort to narrow the scope of training materials we seek, Plaintiff requests that the City produce all syllabi, calendars, and written training materials for the following courses between 1970 and 1995:

- In-service detective homicide seminar for the years
- Pre-Service Detective Training Program
- Gang loitering
- Gang and Narcotics Loitering
- Gang crimes division in-service training
- Courtrrom demeanor: credibility
- Eyewitness identification



467 Saint Johns Place
Brooklyn, New York 11238

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

**BONJEAN**
LAW GROUP, PLLC

- Fundamentals of criminal investigation
- Pre-Service Sergeants Training Program
- Operational Training Program

**Third,** in the spirit of cooperation, Plaintiff amends his request for homicide files to include CPD Area Five homicide investigation files from the years 1988 through 1992. As you know from Plaintiff's Complaint, Plaintiff alleges that his conviction was a product of a number of unconstitutional policies and practices of Area Five detectives, including: (1) coercing false inculpatory statements from suspects (*e.g.,* Maysonet and his co-defendants court-reported and handwritten statements and Maysonet's alleged oral statements): (2) coercing false statements from witnesses (*e.g.,* coerced false statement from Rosa Bello); (3) suppression of exculpatory evidence either by failing to document investigave conduct that tended to be favorable to the target(s) of the investigation or by concealing reports reflecting exculpatory material (*e.g.,* statements from Efrain Cruz, Francisco Veras, identifications of Cruz and Veras; evidence that Guevara was shaking down suspects and forcing Maysonet to pay protection money); and (4) testifying falsely about alleged oral statements made by defendants (*e.g.,* Montilla testified falsely that Maysonet made inculpatory false statements). These allegations are not unique to this case but were one of the many unconstitutional practices of Area Five detectives that were regularly used to frame men from Humboldt Park for crimes they did not commit.

Plaintiff believes, like several courts considering this issue, that five years of homicide files strikes the right balance between Plaintiff's need for the discovery and the burden production imposes on the City. Furthermore, at least a good portion of homicide files from this time period were produced in the *Rivera* case and Judge Weismann ordered the City to produce homicide files in *Sierra* from 1991- 1995 which overlaps to some degree with Plaintiff's request here.

**Fourth,** Plaintiff narrows his request for CR files to all CRs initiated against Area Five detectives between 1988 and 1992. Plaintiff would be willing to consider a random sampling of CRs if the City would stipulate that the sample is representative of its policies and practices but if the City refuses to do that, Plaintiff must insist on production of all CR files for that period of time. For the reasons we discussed, Plaintiff would be amenable to narrowing the production to certain cateogories of CRs but that approach is not workable since the City does not accurately or reliably categorize its CR files in a manner that permits easy identification of relevant misconduct.



467 Saint Johns Place
Brooklyn, New York 11238

Tel: 718.875.1850
Fax: 718.230.0582

www.bonjeanlaw.com

**BONJEAN**
LAW GROUP, PLLC

     **Fifth,** as for Plaintiff's request for material related to Joseph Miedzianowski, Plaintiff understands that the City is conducting a diligent search to locate documents that reflect Guevara and Miedzianowski's execution of a search warrant in the late 1980s at the home of Plaintiff. Apart from this specific request, Plaintiff maintains that Reynaldo Guevara and Joseph Miedzianowski were co-conspirators in a criminal enterprise that involved shaking-down drug-dealers, extorting gang members, and allowing gang members to buy their way out of trouble. Indeed, Plaintiff met Guevara when he and Joseph Miedzianowski were involved in such activities. Accordingly, Plaintiff's requests as set forth in Requests 11-16 are legitimate. Undersigned counsel is willing to engage in another meet and conference to discuss this category of documents.

     Please advise whether you have some time on Monday to discuss the foregoing so that we can meet Judge Rowland's deadline.

     Regards,

     /s/JENNIFER BONJEAN

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|---|---|
| S88-9 | • Access and Review Procedures, Criminal History Records<br>• Arrest Information, Criminal History<br>• Criminal History Records<br>• IR Record |
| S88-30 | • Active criminal<br>• Criminal, Active<br>• Computerized Records on Active Criminals<br>• Information Report (Active Criminal)<br>• Records, Computerized |
| G93-3-5 | • Admonishments, CR Numbers<br>• CR Number, DUI Incidents<br>• CR Numbers, Alcohol and Drug Use Incidents<br>• CR Numbers, Investigation by Outside Police Agency<br>• CR Numbers, Verbal Abuse<br>• Verbal Abuse, CR Investigation |
| G84-7-6 | Administrative, Leave of Absence |
| G92-4 | • Anti-Gang Loitering Ordinance<br>• Criminal Street Gang<br>• Gang Arrest Information Formset<br>• Gang Information File<br>• Gang membership, Criteria for Establishing<br>• Loitering |
| S92-7 | Anti-Gang Loitering Ordinance Seminar |
| G87-7 | • Arrest (Interrogations, Field and Custodial)<br>• Frisk, Stop and (Interrogations, Field and Custodial)<br>• Interrogations: Field and Custodial |
| S88-4 | • Arrest Information, Computerized Criminal History<br>• Computerized Criminal History (CCH) |
| G91-11 | • Arrestee, Handcuffing<br>• Arrestee, Restraining<br>• Handcuffing Arrestees<br>• Restraining Arrestees |
| G92-5 | • Arrest Procedures<br>• Arrest Report<br>• Arrestee, Movement Of (Processing Persons Under Department Control) |

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|---|---|
| | • Arrestee, Photographing (Processing Persons Under Department Control) |
| | • Arrestee, Release Without Charging (Processing Persons Under Department Control) |
| | • Arrestees, Fingerprinting (Processing Persons Under Department Control) |
| | • Arrestee, Juvenile (Processing Persons Under Department Control) |
| | • Arrestee, Requiring Hospitalization (Processing Persons Under Department Control) |
| | • Booking Officer (Processing Persons Under Department Control) |
| | • Criminal History Sheet |
| | • Desk Sergeant (Processing Persons Under Department Control) |
| | • Documents, Court (Processing Persons Under Department Control) |
| | • Movement of Arrestee (Processing Persons Under Department Control) |
| | • Photographing Arrestee (Processing Persons Under Department Control) |
| | • Processing Persons Under Department Control |
| G82-13 | Arrestees, Transporting of |
| G88-19 | • Arrests, Felony, Approval by Felony Review |
| | • Felony Review by Assistant State's Attorney |
| | •Warrants, Approval by Felony Review |
| G86-6 | Arrests, Multiple, Processing |
| G83-14 | • Arrests, Warrant Procedure (Non-Traffic) |
| | • Non-Traffic Arrest Warrant Procedure |
| N91-46 | Assignment Codes |
| G83-13 | • Beat book, Field Reporting Manual |
| | • Beat File, Station |
| | • Field Reporting Manual/Beat Book |
| G92-8 | • Beat Maps, District and |
| | • Districts, Police and Area Centers |
| | • Maps, Beat and District |
| S92-14-1 | • Case and Supplementary Report Distribution/Specific Responsibilities |
| | • Case Reports, General Offense |
| | • Case Reports, Hospitalization |
| | • Case Reports, Lost and Found |
| | • Case Reports, Missing/Founds Person |
| | • Case Reports, Supplementary |
| | • Specific Responsibilities, Area Special Desk |
| | • Specific Responsibilities, Bureau of Investigative Services |

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|---|---|
| | • Specific Responsibilities, Designated Reviewing Supervisors in Units without Review Offices<br>• Specific Responsibilities, Desk Sergeant<br>• Specific Responsibilities, Detective Division Investigative Units<br>• Specific Responsibilities, Records Processing Section, Records Division<br>• Specific Responsibilities, District Review Office<br>• Supplementary Report Distribution of |
| S92-14 | • Case Report Transfer List<br>• Distribution of Case and Supplementary Reports<br>• Reports, Distribution of Case<br>• Supplementary Reports, Distribution of |
| S87-20 | • Case Reports, Dissemination of Information<br>• Official Reports |
| S89-25 | • Case Reports, RD Numbers<br>• Records Division Numbers, Assignment and Processing of<br>• Reports, Assignments of RD Numbers |
| G87-6 | • Civil Suits involving Department Member<br>• Guidelines for Disseminating Information in Civil and/or Criminal Legal • Actions and in Civil Suits<br>• Subpoena of Department Member<br>• Witness Statements by Department Member |
| S91-20 | Claims Against the City, Damage |
| G93-3-4 | • Command Channel Review, CR Numbers<br>• Complaint Review Panel, CR Numbers<br>• CR Numbers, Command Channel Review<br>• CR Numbers, Complaint Review Panel<br>• CR Numbers, Police Board Review<br>• CR Numbers, Reporting and Review<br>• CR Numbers, Summary Report<br>• Police Board Review, CR Numbers<br>• Summary Report, CR Numbers |
| G89-1-4 | Command Members, Sworn Supervisors and Probationary Polices Officers, Processing Grievances and |
| G90-8 | • Command Structure, Department<br>• Department Organization for Command<br>• Order of Succession, Command Structure |

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|-----------|-------|
| G86-4 | • Commanders, District |
| G93-3 | • Complaint and Disciplinary Procedures<br>• CR Numbers (General Information)<br>• Disciplinary Procedures |
| G93-3-7 | • Complaint Review Panel, Summary Punishment<br>• Summary Punishment |
| G93-3-3 | • Conduct of the Investigation<br>• CR Numbers, Extension of Investigation<br>• CR Numbers, Immediate Suspension<br>• CR Numbers, Investigation of<br>• CR Numbers, Termination of Investigation<br>• Investigation of CR Numbers |
| G93-3-2 | • CR Numbers, Obtaining<br>• Internal Affairs Division<br>• OPS<br>• Specific Responsibilities |
| G93-3-6 | • CR Numbers, Suspension/Options<br>• Expungement of CR Records |
| S89-2 | • Crime Scene Processing<br>• Line-Up, Photographing by ET |
| G84-3 | Crime Scene Processing |
| G86-3 | • Detective, Assignment to<br>• Gang Crime Specialist, Assignment to, |
| G85-7 | • Directives, Written<br>• Orders, Department |
| S88-29 | • Disciplinary History, Review of<br>• Personnel Records, Review of |
| S92-14-4 | • Distribution of Extra Copies of Case and Supplementary Reports<br>• Reports, Distribution of Case (Extra Copies)<br>• Reports, Distribution of Supplementary (Extra Copies) |

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|---|---|
| S82-25 | Evaluation Review Board, Probationary Police Officer |
| S92-6 | • Felony Review by State's Attorney's Office<br>• Search Warrant Data Report<br>• Search Warrants |
| G80-18 | • Force, Non-Deadly, Guidelines<br>• Reasonable Force |
| G86-8 | • Force, Use of |
| S89-4 | • Forms Management |
| S87-10 | • Forms Retention Schedule, Department<br>• Index, Department Record<br>• Purging, Department Records<br>• Records Disposal (Destruction) Procedures<br>• Records Management<br>• Records, Department, Purging |
| S91-16 | • Freedom of Information<br>• Records Index, Department<br>• Records, Public<br>• Request, Freedom of Information |
| S86-3 | Gang Control Program |
| G89-3 | • Gang Crime Section, Notifications, Preliminary Investigations<br>• Investigations, Preliminary<br>• Notifications, B.I.S., Preliminary Investigations<br>• Preliminary Investigations |
| G88-15-2D | Handcuffs/Restraining Devices |
| G88-18 | • Identification, Line-Up<br>• Lineup Procedures<br>• Photograph, Line-Up |
| G88-13 | • Incident, Miscellaneous Exception Report<br>• Miscellaneous Incident Reporting Procedures |
| G92-1 | Individual Rights |

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|---|---|
| G92-1-1 | • Individual Rights and the Law<br>• Unlawful Arrest/Unreasonable Search and Seizure |
| G90-3 | Information Report System |
| G87-1 | Information Resource Management System |
| G93-3-1 | • Interrogation, Department Member<br>• Polygraph, Department Member |
| S84-9 | IR Photos |
| G89-9 | • LEADS Computer System (Stop Orders)<br>• NCIC Computer System (Stop Orders)<br>• Record Stop Order<br>• Stop Orders |
| G84-7-7 | Miscellaneous Personnel Actions |
| G90-8-3 | Organization and Functions of the Bureau of Investigative Services |
| G90-8-2A | Organization and Functions of the Bureau of Operational Services |
| G90-8-1 | Organization and Functions of the Office of the Superintendent |
| S87-13 | Organizations, Police and Ethnic |
| N93-2 | Performance Ratings – Sworn Members |
| S89-26 | Performance Ratings – Sworn Members |
| G92-1-3 | Personnel Practices |
| G92-6 | Police Districts and Area Centers |
| S92-15 | Preliminary Investigations |
| S89-13 | Records/Players – Tape, Disc, etc, (Prohibition) |
| G93-3-34 | Reporting and Review Procedures |
| S83-21 | Reports, Call Back Program |
| S86-15 | Requirements for Department Reports |

*Maysonet v. Guevara, et. al.,* **18 CV 2342**

| POLICY #: | NAME: |
|---|---|
| S92-14-3 | • Reports, Supplementary Case<br>• Specific Responsibilities, Designated Reviewing Supervisors in Units without Review Offices<br>• Specific Responsibilities, Desk Sergeants<br>• Specific Responsibilities, District Review Office<br>• Specific Responsibilities, Organized Crime Division<br>• Specific Responsibilities, Records Processing Section, Records Division |
| S79-30 | • Request to Hold and Review Recording Tapes<br>• Tapes, Communication – Holding/Reviewing |
| G88-15-1 | Responsibilities and Procedures |
| G83-1 | Responsibilities of Sergeants Assigned to Field Activities |
| N87-43 | Rules and Regulations, Delayed Implementation |
| G91-9 | Rumor Central |
| G88-11 | Search, Arrestees |
| S92-14-2 | • Specific Responsibilities, Desk Sergeant<br>• Specific Responsibilities, District Review Office<br>• Specific Responsibilities, Records Processing Section, Records Division<br>• Specific Responsibilities, Units other than Districts |
| G90-1 | Training Bulletins |

Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THOMAS SIERRA,            )
                                 )       **No. 18 C 3029**
          **Plaintiff,**      )
                                 )       **Magistrate Judge M. David Weisman**
            **v.**                  )
                                 )
REYNALDO GUEVARA, et al.,    )
                                 )
         **Defendants.**     )

## ORDER

This case is before the Court on plaintiff's motion to compel *Monell* discovery. For the reasons set forth below, the Court grants in part and denies in part the motion [138].

### Discussion

Plaintiff spent twenty-two years in prison for a 1995 murder he did not commit. He alleges that the City had various practices that make it responsible under *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978) for his wrongful arrest, conviction, and imprisonment. Specifically, plaintiff alleges that the City allowed officers to manipulate identification procedures and fabricate and suppress evidence and failed to provide them with adequate training, supervision, and discipline to ensure that their actions were constitutional. To prove these claims, plaintiff seeks: (1) the files of every homicide that was investigated in Chicago Police Department Area Five from 1989-95; and (2) every complaint register file ("CR") ever lodged against every detective who worked in Area Five from 1989-95.

**Homicide Files**

Plaintiff argues that the homicide files are relevant to all of his policy claims, as comparators to other CPD files and the files of the Cook County State's Attorney's Office ("CCSAO's"), as fodder for expert analysis, and as a springboard for re-investigation of the cases to uncover other instances of unconstitutional conduct. Plaintiff says, for example, that the identification-manipulation, evidence-suppression, and failure-to-train claims may be proven by: (1) determining whether the homicide files "demonstrate non-compliance with policy and the absence of investigative materials;" (2) "compari[ng] . . . the homicide files to the CPD's permanent retention files, to demonstrate that the official version of an investigation included in the latter files was different than that included in the former" (Exs. Supp. Mot. Compel, Ex. A, Harjani Order, ECF 139-1 at 12); (3) comparing the homicide files to the corresponding files in the possession of the CCSAO; and (4) expert analysis of the identification rates evidenced by the files. As argued by plaintiff during the motion hearing, these means of proof can be accomplished through comparison of documents produced during various stages of the underlying criminal proceedings, and by expert analysis of the reported outcomes of the CPD investigations as compared to expected results based on academic and professional studies (*e.g.* the number of non-

identifications and (presumably) misidentifications reported by CPD compared to national studies, etc.). To prove a policy or practice led to the violation of plaintiff's rights, plaintiff must have access to enough other homicide investigations to demonstrate that any violation of his constitutional rights was part of a larger practice. Plaintiff has explained a means by which the requested information, despite the burdens of production, is sufficiently important for him to access and review in an effort to prove his case. The fact that plaintiff has no other ready means of gathering this type of information and his *Monell* claim raises questions that are important not only to him but to the public-at-large also justifies the burden involved in the discovery requested. In short, the importance of the information sought, the parties' relative access to the information sought, and the importance of the litigation as a whole justify the burden associated with the production of the homicide files (as narrowed *infra*). *See generally* Fed. R. Civ. P. 26(b)(1).

The City has no objection to plaintiff's comparing homicide files to CCSAO's files[1] or using them as a basis for expert analysis. However, it objects to plaintiff's stated plan to re-investigate the homicide cases to determine, for example, whether the CPD accurately recorded witness statements. The City argues that allowing plaintiff to re-investigate the homicide cases would be unduly burdensome and disproportionate to the needs of the case.[2]

The Court agrees. The City estimated in another case that there were 600 Area Five homicide files for the period 1992-98, and it would take the City eleven months to produce them. (*See* Pl.'s Resp., ECF 148 at 17.) Presumably, the number of files, and the time to produce them, for the seven-year period at issue here would be roughly the same. Once those files were produced, it would take plaintiff years to determine which cases to re-investigate, attempt to locate the relevant witnesses and police officers and interview or depose them, track down any defense files and obtain relevant hearing and trial transcripts for cases twenty to twenty-five years old. The information gathered through this proposed discovery would be compromised by the organic limitations of significantly elapsed time, failing memories, lost tangible items and witnesses, and the like. At the end of that process, plaintiff would supplement his Rule 26 disclosures with dozens of "witnesses" who plaintiff believes would support his *Monell* claim, and then the City would have to repeat the process to develop rebuttal evidence. And what would be the end result of this enormous investment of time and resources? The dubious recollections of witnesses to twenty-year-old events and the years-long postponement of plaintiff's day in court. Because the burden associated with this aspect of plaintiff's proposed discovery far outweighs the potential benefit of any discovery plaintiff might garner from re-investigating the crimes documented in the Area Five homicide files, the Court bars plaintiff from doing so.

---

[1] In fact, the City argues that it should only have to produce homicide files for which the CCSAO has a corresponding file because, the City says, the only way plaintiff can prove that it failed to produce exculpatory material is by comparing the homicide file to the CCSAO file. While that is one way plaintiff could try to prove this claim, he could also do so by showing, for example, that a homicide file does not match the CPD's permanent retention file or that materials are missing from a file that an expert would expect to see there. In short, because comparing homicide files to CCSAO files is not the only way plaintiff can prove his evidence-suppression claim, homicide file production will not be limited to cases in which the CCSAO has a corresponding file.

[2] The City does not seem to contest that the homicide files are relevant to plaintiff's evidence-suppression claim but contends that the claim is not viable because plaintiff has not identified any evidence that was not produced to him. This, however, is an argument on the merits of the case, which is not this Court's province. Alternatively, this argument could be viewed as a way to structure discovery, supporting a bifurcated discovery approach.

2

That leaves the issue of appropriate time frame for the homicide files to be produced for the purposes identified above. This case arises from a murder that occurred and was investigated in 1995. The Court is mindful that plaintiff's burden of proving a pattern or practice is a heavy one, and thus he will need the files for some extended period of time. *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014) ("[T]he fact that the jail experienced thirty-six suicide attempts and three successful suicides—standing alone—[is not proof] that the jail's policies are inadequate."); *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented . . . ."). But plaintiff does not explain what, if anything, is significant about the period 1989-95 or why he or his experts need seven years of data as opposed to some lesser amount. (*See* Pl.'s Resp., ECF 148 at 12.) The Court believes production of five years of files, from 1991-95, strikes the right balance between plaintiff's need for the discovery and the burden production imposes on the City.[3]

**CR Files**

The City does not seem to dispute the relevance of the CR files to plaintiff's *Monell* claims but argues that it should only have to produce CRs for every fifth detective assigned to Area Five from 1992-95 because producing all CRs for all detectives who worked in Area Five during the period 1989-95, as plaintiff requests, would be unduly burdensome. The Court agrees that producing all CRs lodged at any time against every detective who worked in Area Five from 1989-95 would be unduly burdensome and not proportional to the needs of the case. But the City does not explain how it came up with the one-out-of-five approach or why that approach is reasonable.

Plaintiff might be amenable to the production of some kind of sample of CRs, if the City would stipulate that the sample "is representative of its policies and customs" (Mot. Compel, ECF 138 at 14), but the City refuses to do that. Given the City's failure to explain the genesis of its approach or agree that any sample it produces is representative, the sample approach is not viable. Moreover, as discussed at the motion hearing, the Court would be amenable to limiting production of CR's to those CR's related to the issues presented in this litigation, as opposed to *every* CR for every detective in Area 5. However, as explained by the City's counsel, the CPD does not categorize its CRs in a way that would enable it to identify CRs limited to the type of misconduct alleged in this matter. Thus, to effectively limit CR production to a more focused subset, the City would need to manually review each CR and determine whether or not the CR touches on alleged relevant misconduct. That review process would present a burden that the City is equally unwilling to accept. Thus, the Court is persuaded that wholesale production of a relevant timeframe of CRs from Area 5 Detective Division is appropriate.

---

[3] The Court is not persuaded that the *Monell* claims "add[] zero additional relief or monetary value to [plaintiff's] case." (City's Resp., ECF 147 at 11.) As plaintiff notes "success on th[e] *Monell* theory is possible without succeeding on other legal claims," or "the City might be found liable for violating constitutional rights while individual Defendants enjoy qualified immunity." (Pl.'s Resp., ECF 148 at 12.)

As with the homicide files, the Court believes production of all CRs opened from 1991-95 against Area Five detectives strikes the right balance between plaintiff's need for *Monell* evidence and the burden production of that evidence imposes on the City.

**SO ORDERED.**                    **ENTERED:  December 3, 2019**

M. David Weisman
_____
**M. David Weisman**
**United States Magistrate Judge**

4

Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6.3.3
### Eastern Division

Arturo DeLeon–Reyes

                      Plaintiff,

v.

                                          Case No.: 1:18–cv–01028

                                          Honorable Steven C. Seeger

JoAnn Halvorsen, et al.

                      Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, December 18, 2020:

        MINUTE entry before the Honorable Sunil R. Harjani: The Court has reviewed the parties' joint status report [DeLeon 289] as well as Judge Seeger's order [DeLeon 390]. The Court enters the following interim dates and orders as a result: (1) the Court orders that the production of the 1995 homicide files be completed by 1/15/21, which is the same production date as in the Sierra case; (2) the Court orders that the 1996, 1997 and 1998 homicide files shall be produced on a rolling basis and completed by 5/31/21. The Court has considered the competing positions and believes that a timeframe of approximately 5.5 months is sufficient based on experiences in other cases; (3) the Court will accept and enter Plaintiff's offer to pay for the costs of a third–party vendor, which will presumably expedite the production of the files on a rolling basis. Given the need for a privilege review, Plaintiff's proposed production date of April 1, 2021 is unrealistic, but Defendant 9;s proposed timeframe in June can also be shortened to May 2021; (4) Defendant shall also provide a list of the RD numbers for the homicide case files by 1/22/21 and the parties should forthwith issue subpoena for the companion files to avoid unnecessary delay; (5) the Court will not at this time engage in any limitations on further Monell discovery without further elaboration on the exact discovery needed and full briefing, however, all counsel should be aware of the district judge's minute entry of 11/30/20, Judge Weisman's opinion in Sierra, and this Court's own opinion in Prince v Kato, 18 cv 2952 [Doc 205] in considering what additional Monell discovery is needed besides what has been granted already, and through status reports, the Court will manage the extent of discovery that can be taken and that must be completed by 12/31/21; (6) the parties' joint status report list a number of depositions that need to be scheduled and taken, and the parties shall immediately start scheduling the depositions listed on page 5 and 6 of the status report and those deposition should be taken remotely; as for the depositions that the parties wish to take in–person listed at the end of page 6, the Court will regroup with the parties on this matter at a later time. However, the parties should note that it is the Court's intention that all non–Monell discovery be completed by June 2021 so that the parties can focus on any needed Monell discovery through the end of the year. The parties have one year to take all remaining discovery and the Court fully intends to ensure that all fact and Monell discovery is completed by then, and thus the parties should make every effort to move this case along. Finally, the status hearing set for 12/30/20 is stricken and reset to 1/28/21 at 9:15 a.m. A status report with an update on discovery, and a listing of

all deponents discussed herein with firm dates for their depositions is due by 1/25/21.
Mailed notice(lxs, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of
Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was
generated by CM/ECF, the automated docketing system used to maintain the civil and
criminal dockets of this District. If a minute order or other document is enclosed, please
refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our
web site at ***www.ilnd.uscourts.gov***.