**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR., | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Judge Mary M. Rowland |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| EPPLEN, FERNANDO MONTILLA, ROLAND | ) | JURY DEMAND |
| PAULNITSKY, FRANK DIFRANCO, CITY OF | ) | |
| CHICAGO, and COOK COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS HALVORSEN, MINGEY, MONTILLA AND PAULNITSKY'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
<u>FOR PARTIAL SUMMARY JUDGMENT</u>**

Defendants JoAnn Halvorsen, as Special Representative for Ernest Halvorsen, deceased, Edward Mingey, Fernando Montilla and Roland Paulnitsky ("Movants")[1], by their attorneys The Sotos Law Firm, P.C., for their memorandum of law in support of their motion for partial[2] summary judgment state:

---

[1] Maysonet agreed to dismiss, and this Court subsequently dismissed, all claims against Lee Epplen with prejudice. (Dkt. 342.)

[2] As noted below, Montilla is not moving on Maysonet's claims for coercion or fabrication of Maysonet's statements.

Dated: July 15, 2024                    Respectfully submitted,

                                        /s/ Josh M. Engquist
                                        Josh M. Engquist, Attorney No. 06242849
                                        Special Assistant Corporation Counsel
                                        *One of the Attorneys for Individual Defendants*

James G. Sotos
Josh M. Engquist
Caroline P. Golden
David A. Brueggen
Jeffrey R. Kivetz
Kyle T. Christie
Allison L. Romelfanger
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
630-735-3300
jengquist@jsotoslaw.com

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................................1

SUMMARY OF MATERIAL FACTS....................................................................2

LEGAL STANDARD..............................................................................................6

ARGUMENT ...........................................................................................................6

    I.    Halvorsen, Mingey and Paulnitsky are Entitled to Summary Judgment on Maysonet's Coerced Confession Claim (Count I)....................................................................6

        a.    There is no evidence establishing that Halvorsen, Mingey, and Paulnitsky coerced Maysonet's statements ............................................................7

        b.    Maysonet's Fourteenth Amendment substantive due process claim is time-barred.9

    II.    Maysonet Lacks Evidence to Support his Fabrication Claim (Counts I and II) ...............10

        a.    Halvorsen, Paulnitsky and Mingey are entitled to summary judgment on Maysonet's fabrication claim.................................................................... 10-11

            i.    Halvorsen and Paulnitsky were not involved in any of Maysonet's interviews for the Wiley murders ...............................................11

            ii.    Mingey did not fabricate any evidence pertaining to Maysonet's inculpatory statements or confession ........................................11

        b.    A fabrication claim premised solely on testimony is not viable ...........................12

        c.    Rosa Bello's testimony was not fabricated or used at Maysonet's trial ...............13

        d.    Maysonet's codefendants statements were not used at his trial.............................13

        e.    Maysonet's contention that Halvorsen fabricated a report fails ...........................14

    III.    Maysonet Lacks Sufficient Evidence to Support his *Brady* Claim (Count II) .................15

        a.    Maysonet's July 15 and August 1, 1990, statements were not suppressed...........17

        b.    No reports about Maysonet's July 15 and August 1 interviews were suppressed ...........................................................................................18

**TABLE OF CONTENTS**
**-Continued-**

PAGE

    c.  Although not a viable *Brady* claim, the supposed "tactics" used when questioning Bello were also not suppressed or material ...........................................................19

    d.  The identification of two Latin Kings for the Wiley murders was not Suppressed ..................................................................................................................21

    e.  *Brady* does not require police officers to create exculpatory evidence by disclosing their alleged prior misconduct ................................................................22

IV.  Maysonet's Federal and State Malicious Prosecution Claim (Counts IV and VIII) Fail as a Matter or Law ...............................................................................................................23

    a.  Mingey did not play any role in Maysonet's prosecution .....................................24

    b.  Probable cause defeats Maysonet's malicious prosecution claims .......................24

        i.  Movants are alternatively entitled to qualified immunity .........................27

    c.  Paulnitsky and Halvorsen did not act maliciously ...............................................28

    d.  Maysonet's inability to show that his conviction was terminated in a manner indicative of innocence defeats his Illinois malicious prosecution claim .............29

V.  Movants Except Montilla are Entitled to Summary Judgment on Maysonet's Failure to Intervene Claim (Count V) .................................................................................................30

    a.  Maysonet cannot establish that Halvorsen, Mingey and Paulnitsky had an opportunity to intervene in his coerced and fabricated confession claims ...........31

    b.  There is no failure to intervene liability without a constitutional violation ..........32

    c.  A failure to intervene claim violates Section 1983's bar against vicarious liability .................................................................................................................32

VI.  Maysonet's Conspiracy Claims Fail Against All Movants but Montilla ..........................33

VII.  All Movants Except Montilla are Entitled to Summary Judgment on Maysonet's Intentional Infliction of Emotional Distress ("IIED") Claim .............................................34

    a.  The IIED claim based on Paulnitsky's Alleged battery unrelated to Maysonet's confession is time barred ....................................................................................34

iv

**TABLE OF CONTENTS**
**-Continued-**

PAGE

b.  Maysonet's IIED claim fails where his underlying claims against Movants fail ...............................................................................................................35

CONCLUSION...............................................................................................................35

## TABLE OF AUTHORITIES

**CASES**                                                      **PAGE**

*Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706 (7th Cir. 2013) .............................................27, 28

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ......................................................30

*Amundsen v. Chicago Park Dist.,* 218 F.3d 712 (7th Cir. 2000) .................................................33

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019).......................................................16

*Ashafa v. City of Chicago,* 146 F.3d 459 (7th Cir. 1998) ..............................................................9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................32

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017).........................................................20

*Boseman v. Upper Providence Twp.,* 680 F. App'x 65 (3d Cir. 2017)........................................15

*Boyd v. City of Chicago,* 225 F.Supp.3d 708 (N.D. Ill. 2016)....................................................22

*Boyd v. Nichols*, No. 12 C 1256-TWP-TAB, 2022 WL 2209951 (S.D. Ind. June 21, 2022).....16

*Brady v. Maryland,* 373 U.S. 83 (1963) ...............................................................................15,16

*Bridewell v. Eberlie,* 730 F.3d 672 (7th Cir. 2013) ....................................................................35

*Bridgeforth v. City of Glenwood*, No. 18 C 7150, 2020 WL 1922907
(N.D. Ill. April 21, 2020) ............................................................................................................18

*Briscoe v. Lahue,* 460 U.S. 325 (1983)........................................................................................12

*Brown v. City of Chicago,* 633 F.Supp.3d 1122 (N.D. Ill. 2022) .........................................11, 12

*Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972)................................................................................33

*Cairel v. Alderden,* 821 F.3d 823 (7th Cir. 2016) ........................................................................6

*Camm v. Faith,* 937 F.3d 1096 (7th Cir. 2019)...........................................................................24

# TABLE OF AUTHORITIES
## -Continued-

**CASES**                                                                                          **PAGE**

*Carvajal v. Dominguez,* 542 F.3d 561 (7th Cir. 2008) .............................................................17

*Chaney-Snell v. Young,* No. 22-1990/1992, 2024 WL 1616406 (6th Cir. Apr. 15, 2024) .........32

*Colbert v. City of Chicago,* 851 F.3d 649 (7th Cir. 2017) ................................................7, 16, 21

*Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019) .......................................10, 14, 24, 25

*Colorado v. Connelly,* 479 U.S. 157 (1986) ............................................................................6

*Cooney v. Casaday,* 746 F.Supp.2d 973 (N.D. Ill. 2010) ...........................................................35

*Cusick v. Gualandri,* 573 F. Supp. 3d 1256 (N.D. Ill. 2021) ...............................................24, 28

*de Lima Silva v. Wisconsin Dep't of Corrections,* 917 F.3d 546 (7th Cir. 2019).........................7

*Estate of Hollstein v. City of Zion,* No. 17 C 00112, 2019 WL 1619976
(N.D. Ill. Apr. 16, 2019) .........................................................................................................34

*Fleming v. Livingston Cnty., Ill.,* 674 F.3d 874 (7th Cir. 2012) .................................................28

*Garcia v. Posewitz,* 79 F.4th 874 (7th Cir. 2023) .......................................................................24

*Gauger v. Hendle,* 349 F.3d 354 (7th Cir. 2003).................................................................17, 18

*Gonzalez v. Entress*, 133 F.3d 551 (7th Cir. 1998)................................................................9, 10

*Heidelberg v. Manias,* No. 18 C 01161, 2024 WL 1316206 (C.D. Ill. Mar. 27, 2024) .......32, 33

*Henning v. O'Leary,* 477 F.3d 492 (7th Cir. 2007)....................................................................34

*Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009) ...........9, 18

*Hill v. Cook Cnty.,* 463 F. Supp. 3d 820 (N.D. Ill. 2020) ...........................................................24

**TABLE OF AUTHORITIES**
**-Continued-**

<u>**CASES**</u>                                                                                    <u>**PAGE**</u>

*Hobley v. Burge,* No. 03 C 3678, 2004 WL 2658075 (N.D. Ill. Oct. 13, 2004) ......................35

*Holland v. City of Chicago,* 643 F.3d 248 (7th Cir. 2011) ..................................................22, 23

*Humphrey v. City of Anderson,* No. 19 C 00764, 2021 WL 4477806
(S.D. Ind. Sept. 30, 2021) ..........................................................................................................13

*Hunter v Bryant,* 502 U.S. 224 (1991) ....................................................................................28

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930 (7th Cir. 2012)…………………34

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) .............................................................34

*Jackson v. City of Chicago,* No. 20 C 5886, 2024 WL 1142015 (N.D. Ill. Mar. 15, 2024) .......20

*Jackson v. Wojcik,* No. 23 C 2027, 2024 WL 2209192 (N.D. Ill. May 14, 2024) ...............23, 24

*Jakes v. Boudreau,* No. 19 C 2204, 2023 WL 3585629 (N.D. Ill. May 22, 2023) ....................11

*Johnson v. Dossey*, 878 F. Supp. 2d 905 (N.D. Ill. 2012) ..........................................................33

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) .............................................................34

*Jones v. York,* 34 F.4th 550 (7th Cir. 2022) ..............................................................................12

*Kidwell v. Eisenhauer,* 679 F.3d 957 (7th Cir. 2012) ..................................................................6

*Krol v. Kennedy,* 818 F. App'x 547 (7th Cir. 2020) ..................................................................27

*Kromeich v. City of Chicago,* 630 N.E.2d 913 (Ill. App. 1994) .................................................26

*Logan v. Wilkins,* 644 F.3d 577 (7th Cir. 2011) ..........................................................................9

*Mack v. City of Chicago,* No. 19 C 4001, 2023 WL 4744791 (N.D. Ill. July 25, 2023) .............6

*Martinez v. City of Chicago,* 900 F.3d 838 (7th Cir. 2018)........................................................23

*McCombs v. Crivolio,* No. 1-18-1252, 2019 WL 3717999 (Ill. App. Aug. 5, 2019) ................34

*McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) ...........................................................26

**TABLE OF AUTHORITIES**
**-Continued-**

**CASES**                                                                                                    **PAGE**

*Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) ................................32

*Moore v. Burge,* 771 F.3d 444 (7th Cir. 2014) ...........................................................9

*Moore v. City of Chicago*, 209 F. Supp. 3d 1016 (N.D. Ill. 2016) ............................................31

*Moran v. Calumet City,* 54 F.4th 483 (7th Cir. 2022) ....................................................13, 16, 19

*Mosley v. City of Chicago,* No. 06 C 6314, 2009 WL 3097211 (N.D. Ill., Sept. 22, 2009) ......27

*Mustafa v. City of Chicago,* 442 F.3d 544 (7th Cir. 2006) ....................................................24

*Mwangangi v. Nielsen,* 48 F.4th 816 (7th Cir. 2022) .................................................32

*Northfield Ins. v. City of Waukegan,* 701 F.3d 1124 (7th Cir. 2012) ........................................30

*Olson v. Cross,* No. 18 C 2523, 2024 WL 361200 (N.D. Ill. Jan. 30, 2024) ...........................10

*Patrick v. City of Chicago,* 974 F.3d 824 (7th Cir. 2020)................................................10, 13, 14

*People v. Coleman,* 794 N.E.2d 275 (Ill. 2002)................................................22, 23

*People v. Martinez,* 637 N.E.2d 447 (1994) ...........................................................27

*Petty v. City of Chicago,* 754 F.3d 416 (7th Cir. 2014) ............................................14

*Powell v. City of Berwyn,* 68 F. Supp. 3d 929 (N.D. Ill. 2014) ...............................................31

*Rehberg v. Paulk,* 566 U.S. 356 (2012) ................................................12

*Reuter v. Mastercard Intern.,* 921 N.E.2d 1205 (Ill. App. 2010) ...............................................33

*REXA, Inc. v. Chester,* 42 F.4th 652 (7th Cir. 2022) ................................................9

*Roberts v. Broski,* 186 F.3d 990 (7th Cir. 1999)................................................6

*Rosado v. Gonzalez*, 832 F.3d 714 (7th Cir. 2016) ................................................32

*Sanchez v. City of Chicago,* 700 F.3d 919 (7th Cir. 2012) .......................................................31

*Saunders-El v. Rohde,* 778 F.3d 556 (7th Cir. 2015)................................................20, 23

**TABLE OF AUTHORITIES**
-Continued-

<u>CASES</u>                                                                                                    <u>PAGE</u>

*Smith v. Gomez,* 550 F.3d 613 (7th Cir. 2008) .........................................................33

*Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006 (7th Cir. 2006).........................18

*Swearnigen–El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852 (7th Cir. 2010)...........34

*Swick v. Liautaud,* 662 N.E.2d 1238 (Ill. 1996) .......................................................29

*Thompson v. Clark,* 142 S. Ct. 1332 (2022) .............................................................23

*Trout v. Frega,* 926 F. Supp. 117 (N.D. Ill. 1996) .....................................................9

*U.S. ex. rel. Porter v. Rednour,* No. 10 C 3081, 2012 WL 3101710
(N.D. Ill. July 30, 2012).............................................................................................27

*U.S. v. Bonner,* 302 F.3d 776 (7th Cir. 2002) ....................................................20, 23

*U.S. v. Mancias*, 350 F.3d 800 (8th Cir. 2003).........................................................25

*U.S. v. Parks*, 100 F.3d 1300 (7th Cir. 1996). .........................................................16

*U.S. v. Warren,* 454 F.3d 752 (7th Cir. 2006) ..........................................................19

*U.S. v. White,* 970 F.2d 328 (7th Cir. 1992). ...........................................................23

*U.S. v. Williams,* 627 F.3d 247 (7th Cir. 2010)........................................................25

*Waldridge v. American Hoechst Corp.,* 24 F.3d 918 (7th Cir. 1994).........................6

*Walker v. City of Chicago*, 559 F. Supp. 3d 747 (N.D. Ill. 2021) ............................35

*Washington v. City of Chicago,* 98 F.4th 860 (7th Cir. 2024) ..................................25

*Washington v. Summerville,* 127 F.3d 552 (7th Cir. 1997)..................................29, 30

*Watson v. DeTella,* 122 F.3d 450 (7th Cir. 1997) ......................................................8

*Wheeler v. Piazza,* 364 F. Supp. 3d 870 (N.D. Ill. 2019) .........................................33

*Wolf-Lillie v. Sonquist,* 699 F.2d 864 (7th Cir. 1983).................................................7

**TABLE OF AUTHORITIES**
**-Continued-**

**CASES**                                                                                                    **PAGE**

*Woods v. Vill. of Bellwood,* No. 19 C 1214, 2020 WL 6894660 (N.D. Ill. Nov. 24, 2020) .......29

*Zambrano v. City of Joliet,* No. 21 C 4496, 2024 WL 532175 (N.D. Ill. Feb. 9, 2024)........14,15

**STATUTES**                                                                                                 **PAGE**

720 ILCS 5/5-2(c)....................................................................................................................25

745 ILCS 10/8-101(a)............................................................................................................35

**OTHER AUTHORITIES**                                                                                        **PAGE**

Fed. R. Civ. P. 56(a) ................................................................................................................6

## INTRODUCTION

Before an impartial court reporter and a prosecutor, Maysonet—like his two Latin King codefendants—confessed that he and his fellow Latin Kings murdered Torrence and Kevin Wiley as they waited for a bus on his gang's turf. Maysonet was photographed after signing his statement, underwent a routine medical inspection when he was booked at the Cook County Jail (CCJ), testified at a hearing to suppress his confession, and went to trial with the opportunity to cross-examine the officers and prosecutor who obtained his confession. Yet, no independent evidence corroborates the claims that he advances against Movants that he was physically coerced into falsely confessing.

Decades after he and his two co-defendants were convicted for the Wiley murders, Maysonet brings this lawsuit asserting that Defendant Guevara beat him throughout the night to force his confession that he contends Guevara and Montilla fabricated. On that claim, a factual dispute requires a trial. Accordingly, Montilla is not moving on Maysonet's coerced and fabricated confession claims.

But Maysonet attempts to cast a far wider net by roping in the remaining Movants on his confession claims. Further, his attempts to advance fabrication and suppression of evidence claims, as well as federal and state malicious prosecution claims against all Movants falls short of creating any material issues of fact for trial. Maysonet has no evidence that any Movant other than Montilla fabricated any evidence that was used at Maysonet's trial or suppressed any material evidence. And his probable-cause-based claims—federal and state malicious prosecution—fail because statements from Maysonet's fellow Latin Kings and his long-time girlfriend implicating him in the murders established probable cause for his prosecution, independent of his confession.

Because of that, Movants, except Montilla, are entitled to summary judgment on all Maysonet's claims. And Montilla is entitled to summary judgment on all Maysonet's claims except his contention that Montilla coerced and fabricated Maysonet's statements and the corresponding derivative claims. At its core, this is a confession case, and that is what the trial of this case should concern.

## SUMMARY OF MATERIAL FACTS

Shortly before 1:00 AM on May 25, 1990, Torrence and Kevin Wiley were shot and killed near a bus stop in the area of 3428 West North Avenue in Chicago, an area controlled by the Latin Kings street gang. (SOF, ¶¶ 28, 36.) CPD detectives located no eyewitnesses but recovered four 9mm cartridge cases north of the bodies and south of the alley parallel to North Avenue. (SOF, ¶¶ 30, 32.)

A few weeks later, on July 3, another shooting occurred nearby where three rival gang members to the Latin Kings were shot non-fatally. (SOF, ¶¶ 26, 41.) Police recovered three 9mm cartridge cases on the scene, and interviewed witnesses and the victims who identified Maysonet, a Latin King member from the area, as the offender. (SOF, ¶¶ 41, 42.) On July 15, Maysonet was arrested and interviewed at Area 5 for the July 3 shooting. (SOF, ¶ 44.)

While at the Area, Sergeant Mingey, with the assistance of Spanish speaking Detective Montilla, questioned Maysonet[1] about his knowledge of the Wiley murders because of the proximity of the July 3 shooting to the Wiley murders and the commonality of the caliber of the gun used in both cases. (SOF, ¶ 47.) According to Mingey and Montilla, Maysonet stated that three fellow Latin Kings came to his house on the night of the Wiley murders and were looking for a 9mm that Maysonet was keeping but gave no further information. (*Id*.)

---

[1] Maysonet alleges he spoke little to no English in 1990. (SOF, ¶ 13.)

2

After being charged with the July 3 shooting, Maysonet was held at Cook County Jail ("CCJ"). (SOF, ¶ 48.) On August 1, Mingey and Montilla went to the CCJ to follow up with Maysonet about the Wiley murders. (*Id.*) During this interview, Maysonet executed an attorney waiver form and with Montilla translating, according to detectives, told Mingey and Montilla that he was present for the shooting of the Wiley brothers but that he did not do the actual shooting. (SOF, ¶¶ 48, 49.) Maysonet subsequently bonded out of jail on or about August 14, 1990. (SOF, ¶ 50.)

On the afternoon of August 22, while at the courthouse, Detective Paulnitsky saw Maysonet, who was present for an assignment of a judge for his July 3 shooting case, detained him, and transferred him to Area 5. (SOF, ¶¶ 50, 51.) At Area 5, according to detectives, Detective Montilla spoke with Maysonet again about the Wiley murders, but Maysonet would not provide any additional information. (SOF, ¶ 53.) Later that evening and into the early morning hours of August 23, Detective Guevara interviewed Maysonet alone. (SOF, ¶¶54-57, 59, 61, 118, 121, 125-26.) Maysonet claims during this time that Guevara physically abused him, causing him to falsely confess that he was involved in the Wiley murders. (SOF, ¶¶56-57, 59, 61.)

That same evening, detectives spoke to Maysonet's girlfriend, Rosa Bello ("Bello"), who confirmed that in the late evening hours on May 24, 1990, she was at home with Maysonet when "Lluvia" (Alfredo Gonzalez), "Fro" (Christopher Gossens), and "Tino" (Justino Cruz), came by and asked Maysonet for the gun.[2] (SOF, ¶¶ 63, 64.) Bello explained that she saw a 9mm gun that was given to Lluvia before all four Latin Kings—Lluvia, Fro, Tino and Maysonet—left the apartment. (SOF, ¶ 64.)

---

[2] Movants refer to Maysonet's Latin King codefendants by their nicknames throughout the Memorandum because Maysonet and his codefendants themselves, the evidence in the record, such as statements and deposition testimonies, and Maysonet's Amended Complaint all refer to them by their nicknames.

3

In the early morning hours of August 23, Detectives contacted the Cook County State's Attorney's Office ("CCSAO") felony review unit and also located and detained Lluvia. (SOF, ¶¶ 58, 60, 71.) Cook County Assistant State's Attorney Jennifer Borowitz ("ASA Borowitz"), and later, Defendant Cook County Assistant State's Attorney Frank DiFranco ("ASA DiFranco"), responded to Area 5 and interviewed Maysonet. (SOF, ¶¶ 58 ,60, 65.) ASA DiFranco took a statement from Maysonet at approximately 9:28 AM, that was transcribed by court-reporter Joseph Szybist, ("Szybist"), wherein he confessed to his involvement in the Wiley murders. (SOF, ¶ 65.) ASA DiFranco also took a handwritten statement from Bello that confirmed what she told detectives earlier. (SOF, ¶¶ 63, 64, 72.) At about 6:00 PM on August 23, ASA DiFranco approved charges against Maysonet for the first-degree murders of Kevin and Torrence Wiley. (SOF, ¶ 73.)

Subsequently, Detectives Guevara and Halvorson interviewed Lluvia, but what happened during this interview is disputed. (SOF, ¶ 74.) ASA Borowitz took a statement from Lluvia on August 24, at approximately 2:00 AM, where Lluvia identified Maysonet as the shooter, which was transcribed by court-reporter Janet Lupa.[3] (SOF, ¶ 76.)

That same morning, Tino was located and brought to Area 5 where he was interviewed, according to detectives, by Detectives Robert Smitka and Richard Schak. (SOF, ¶ 80.) Detectives Smitka and Schak reported that Tino admitted that he went to Maysonet's apartment with Lluvia and Fro to get a gun and then Maysonet drove them to an alley north of North Avenue where Lluvia shot the Wiley brothers. (SOF, ¶ 81.) Cook County Assistant State's Attorney John Perkaus ("ASA Perkaus") interviewed Tino and then took a handwritten statement from him in which he reiterated his statements to detectives. (*Id.*)

---

[3] Lluvia admits to giving this statement but claims it was coerced by Guevara and/or Halvorsen. (SOF, ¶ 76.)

The last suspected offender, Fro, was arrested on November 23, 1990, and interviewed by Detectives Jerome Bogucki and Ray Schalk, and separately by Cook County Assistant State's Attorney Richard Cenar ("ASA Cenar"). (SOF, ¶ 83.) During these interviews, Fro denied any knowledge of or involvement in the murders and was released without charges. (*Id*.)

Maysonet, Lluvia, and Tino were all indicted for the Wiley murders. (SOF, ¶ 85.) In March 1992, Tino entered into a plea agreement with the CCSAO to plead guilty to First-Degree Murder with a recommendation to the court by the CCSAO that Tino receive a 22-year prison sentence in exchange for his testimony against Lluvia and Fro. (SOF, ¶¶ 86, 98.) On March 26, 1992, Lluvia's case proceeded to trial, where Tino and Bello testified consistent with their prior statements to police and prosecutors. (SOF, ¶¶ 87, 88.) Lluvia testified in his defense and testified, consistent with his court-reported statement, that Maysonet was the shooter. (SOF, ¶ 89.) A jury found Lluvia guilty of the Wiley murders. (SOF, ¶ 90.)

Based on Tino's cooperation with the State, Fro was subsequently arrested for the Wiley murders, and Fro was indicted and Maysonet was reindicted for First Degree Murder on May 5, 1992. (SOF, ¶¶ 86, 91, 92.) Prior to his trial, Maysonet moved to suppress his confession, arguing in part, it was the product of physical coercion. (SOF, ¶¶ 93, 94.) His motion was denied, and he proceeded to trial in August of 1995. (SOF, ¶¶ 97, 99.) Neither Tino nor Bello testified at Maysonet's trial, and none of Maysonet's co-defendants' statements were admitted at trial. (SOF, ¶¶ 100-06.) Rather, Montilla, Guevara, and ASA DiFranco testified regarding Maysonet's statements, and a jury found Maysonet guilty of First-Degree Murder. (SOF, ¶¶ 101-03, 107.)

In 2016, during post-conviction proceedings, the CCSAO agreed to vacate Maysonet's conviction because his criminal defense lawyer at trial, Rick Beuke, had a *per se* conflict of interest due to Beuke's representation of Guevara in unrelated matters at that time. (SOF, ¶ 109.)

Maysonet's case was pending retrial in 2017 when the State dismissed the charges because they no longer believed they had enough evidence to meet their burden of proof. (SOF, ¶¶ 110-11.)

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment is warranted when a non-movant cannot establish an element of his claim. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). Where the plaintiff bears the burden of proof, he must identify *evidence* that would permit a jury to find in his favor. *Roberts v. Broski*, 186 F.3d 990, 995 (7th Cir. 1999) (citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).

## ARGUMENT

### I. Halvorsen, Mingey, and Paulnitsky are Entitled to Summary Judgment on Maysonet's Coerced Confession Claim (Count I)[4]

Maysonet asserts a coerced confession claim under the Fifth and Fourteenth Amendments. (Dkt. 136, Am. Compl., ¶¶ 163–65.) "To bring a successful Fifth Amendment coerced confession claim, [Maysonet] must show (1) that his confession was involuntary and coerced, and (2) that his confession was used against him in a criminal case." *Mack v. City of Chi.*, No. 19 CV 4001, 2023 WL 4744791, at *15 (N.D. Ill. July 25, 2023) (citation and internal quotation marks omitted). In that regard, coercive conduct is a required predicate to the finding that a confession is not voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

In contrast, Maysonet's Fourteenth Amendment substantive due process claim assesses whether interrogation tactics "shock the conscience." *Cairel* v. *Alderden*, 821 F.3d 823, 833 (7th

---

[4] Maysonet comingles his coercion and fabrication allegations regarding his confession under Count I, however, the two claims are analyzed separately because the applicable law is distinct, so Movants address Maysonet's coerced confession claim in § I and his fabricated confession claim in § II.

Cir. 2016). Maysonet's Fifth and Fourteenth Amendment claims cannot survive against Halvorsen, Mingey, and Paulnitsky because they were not involved in Maysonet's interrogation *at all*, and Maysonet's Fourteenth Amendment claim is time barred as to all Movants.

> **a. There is no evidence establishing that Halvorsen, Mingey, and Paulnitsky coerced Maysonet's statements.**

"Section 1983 creates a cause of action based on personal liability and predicated upon fault." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). Halvorsen, Mingey, and Paulnitsky cannot be liable under Section 1983 unless Maysonet shows they personally caused or participated in the alleged constitutional deprivation. *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). Participation in an investigation alone is not enough to establish personal involvement in the purported misconduct. *See, e.g.*, *de Lima Silva v. Wisconsin Dep't of Corr.*, 917 F.3d 546, 564 (7th Cir. 2019) (finding no personal involvement of defendants who participated in an investigation but were not involved in the decision to discharge plaintiff).

The below chart demonstrates that Halvorsen, Mingey, and Paulnitsky were not involved in coercing Maysonet's confession:

| Maysonet's Interactions with Defendants | | |
|---|---|---|
| **Date** | **Time** | **Event** |
| **July 15** | N/A | Mingey and Montilla interview Maysonet at Area 5 about the Wileys' murders following his arrest on an unrelated shooting. (SOF, ¶ 47.) |
| **August 1** | N/A | Mingey and Montilla interview Maysonet at CCJ. (SOF, ¶¶ 48-49.) |
| **August 22** | N/A | Paulnitsky detains Maysonet at courthouse. (SOF, ¶¶ 50-51.) |
| **August 22** | 11:30 AM | Montilla interacts with Maysonet after being brought to Area 5 from courthouse. (SOF, ¶ 53.) |
| **August 22** | N/A | Maysonet alleges Paulnitsky grabs and pushes him after he pointed at Paulnitsky. (SOF, ¶ 53.) |
| **August 22-23** | 5:00 PM | Guevara questions Maysonet alone during which he alleges for the first time that he was physically coerced and threatened by Guevara. (SOF, ¶¶ 54-56.) |
| **August 23** | 4:30 AM | Montilla present when Guevara and ASA Borowitz interview Maysonet. (SOF, ¶ 58.) |
| **August 23** | 6:30 AM | Montilla present when Guevara and ASA DiFranco interview Maysonet. (SOF, ¶ 60.) |

| August 23 | 7:10 AM | Montilla present when Guevara and ASA DiFranco interview Maysonet a second time. (SOF, ¶ 60.) |
| August 23 | 9:28 AM | Montilla present with ASA DiFranco for Maysonet's Court reported statement. (SOF, ¶ 65.) |
| August 23 | N/A | Montilla, Paulnitsky, and ASA DiFranco leave Area 5 with Maysonet and go to the scene.[5] (SOF, ¶ 70.) |

Maysonet's alleged coerced confession occurred during his interviews with *only* Guevara at Area 5 on August 22 into the early hours of August 23, 1990. Indeed, Maysonet testified that the *only* detective that used physical force against him during an interview was Guevara at a time when no other detective was present. (SOF, ¶ 62.) And there is no evidence that Halvorsen, Mingey, and Paulnitsky were aware of *any* misconduct during Guevara's questioning. (SOF, ¶¶ 121,125-26.) In addition, Maysonet's own testimony establishes that Halvorsen, Mingey, and Paulnitsky did not make any threats, false promises of leniency, or use other deceptive interrogation tactics to get him to talk. (SOF, ¶¶ 62, 121,125-26.)

While Maysonet asserts that shortly after being detained at Area 5—hours before Guevara began his interrogation—Paulnitsky grabbed him by the throat and hit him, Maysonet never claimed this altercation caused his confession. Rather, Maysonet explains this confrontation happened after he pointed at Paulnitsky and Paulnitsky told Maysonet not to talk about him. (SOF, ¶ 53.) Thus, this unrelated incident is of no significance because it was not done during an interview or used to force him to confess. *See Watson v. DeTella*, 122 F.3d 450, 454 (7th Cir. 1997) (affirming denial of habeas based on claim of involuntary confession where kick from officer did not occur "during some sort of interrogation or in an effort to force him to confess").

In sum, there is no evidence that Halvorsen, Mingey, and Paulnitsky were involved in coercing Maysonet's confession, therefore, they are entitled to judgment as a matter of law as to

---

[5] Maysonet alleges that he never went to the scene with ASA DiFranco, Montilla and Paulnitsky, thus, there are no allegations that anyone used force or threatened him at the scene. (SOF, ¶ 70.)

Maysonet's Fifth Amendment coerced confession claim in Count I. *See, e.g.*, *Hill v. City of Chi.*, No. 06 C 6772, 2009 WL 174994, at *5 (N.D. Ill. Jan. 26, 2009) (finding certain defendants not involved in Fifth Amendment deprivation where undisputed evidence revealed that they had no interaction or contact with plaintiff during his interrogation). And Movants' mere presence at Area 5, without more, fails to rise to the level necessary for Maysonet's claims against them to survive. *Trout v. Frega*, 926 F. Supp. 117, 121 (N.D. Ill. 1996) (mere presence of officers on scene not enough for liability). Any inference to the contrary would be "manifestly unreasonable," and this Court should "decline to draw it for purposes of summary judgment." *REXA, Inc. v. Chester*, 42 F.4th 652, 666 (7th Cir. 2022).

### b. Maysonet's Fourteenth Amendment substantive due process claim is time-barred.

The statute of limitations for Section 1983 claims is two years. *Ashafa v. City of Chi.*, 146 F.3d 459, 461 (7th Cir. 1998). Section 1983 claims accrue when the plaintiff knows or should know his rights were violated. *Logan v. Wilkins*, 644 F.3d 577, 581–82 (7th Cir. 2011).

A Fourteenth Amendment claim that is based solely on injuries received from "out-of-court events…accrue as soon as the constitutional violation occurs. That's because misconduct by the police does not (at least, need not) imply the invalidity of any particular conviction." *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014). Misconduct during an interrogation is immediately actionable regardless of whether the statement is used in criminal proceedings. *See, e.g.*, *id.*; *Gonzalez v. Entress*, 133 F.3d 551, 555 (7th Cir. 1998). Thus, a Fourteenth Amendment coerced confession claim "is actionable whether or not a suspect confesses, and whether or not any statement is used in evidence at trial" because the *Heck* bar does not apply. *Id.*

Here, the alleged coercive techniques occurred during Guevara's interrogations of Maysonet on August 22–23, 1990. (SOF, ¶¶ 56, 59, 60, 62.) Because Maysonet was aware that his rights had been violated when the alleged improper interrogation tactics were used, his cause

of action accrued at that time. *Gonzalez*, 133 F.3d at 555. And simply claiming that detectives used improper tactics during his interrogation, in and of itself, does not imply the invalidity of his conviction, and thus *Heck* would not apply. *See Olson v. Cross*, No. 18 CV 2523, 2024 WL 361200, at *14 (N.D. Ill. Jan. 30, 2024) (finding plaintiff's substantive due process claim for damages from the harm he experienced from defendants' use of force to coerce him into confessing accrued at the time of the alleged conduct). Thus, he had until August 23, 1992, to bring this claim related to improper conduct during his interrogation. *See id.* But Maysonet did not file suit until 2018—twenty-six years too late—barring his claim against all Movants.

## II.    **Maysonet Lacks Evidence to Support his Fabrication Claim (Counts I and II)**

"The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *See Patrick v. City of Chi.*, 974 F.3d 824, 835 (7th Cir. 2020). To prevail on his fabrication of evidence claim, Maysonet must demonstrate that (1) each Movant knowingly manufactured false evidence, (2) the evidence was introduced at trial, and (3) it was material to the outcome of the trial. *Id.* "This is a high bar to clear" because Maysonet "must prove not only that" evidence "was false but that [Movants] 'manufactured' it." *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019).

Maysonet advances four fabrication contentions. He alleges that Movants: (1) fabricated his July 15, August 1, and August 22-23 statements (Count I); (2) falsely testified at criminal pretrial proceedings (Count II); (3) fabricated testimony from Rosa Bello (Count II); and (4) falsified police reports (Count II). (SOF, ¶¶132, 136, 138.) Each theory fails against Movants as set forth below.[6]

### a.    **Halvorsen, Paulnitsky, and Mingey are entitled to summary judgment on**

---

[6] As noted above, Montilla is not moving for summary judgment on the claim that he allegedly fabricated Maysonet's statements/confession.

**Maysonet's fabrication claim.**

Maysonet claims that the statements attributed to him during his July 15, August 1, and August 22–23 interviews were fabricated. He fails to establish, however, that Halvorsen, Paulnitsky, and Mingey had a role in creating those allegedly fabricated statements.

### i. Halvorsen and Paulnitsky were not involved in any of Maysonet's interviews for the Wiley murders.

To establish liability under Section 1983, Maysonet must show that each officer deliberately and knowingly manufactured evidence that he knew was false. *Jakes v. Boudreau*, 2023 WL 3585629, at *10 (N.D. Ill., May 22, 2023). Paulnitsky and Halvorsen were not present for, or otherwise involved in, any of Maysonet's interviews at Area 5 or the CCJ, where he was alleged to have provided inculpatory statements. (SOF, ¶¶ 47, 48-49, 124-26.) Not to mention, Maysonet alleges he only spoke Spanish, and neither Halvorsen nor Paulnitsky were Spanish speakers. (SOF, ¶¶ 7, 9, 13.) Thus, Maysonet fails to establish Paulnitsky or Halvorsen had any personal involvement, let alone the ability to participate, in the alleged fabrication of his inculpatory statements or his confession. *See Brown v. City of Chi.*, 633 F. Supp. 3d 1122, 1157 (N.D. Ill. 2022) (holding the plaintiff "must show that each of [the defendants] personally participated in manufacturing the handwritten confession, meaning they deliberately and knowingly created the false evidence.").

### ii. Mingey did not fabricate any evidence pertaining to Maysonet's inculpatory statements or confession.

Mingey was present *only* for Maysonet's July 15 and August 1 interviews with Montilla. (SOF, ¶¶ 47-49, 120-21.) Importantly, Maysonet spoke Spanish during these interviews, and Mingey did not speak Spanish and would therefore have to rely on Montilla's[7] representations as to what Maysonet said during these interviews. (SOF, ¶¶ 19,47-49,117,120.) Even so, Mingey

---

[7] Montilla was a Spanish-speaker. (SOF at ¶ 8.)

did not create any evidence that attributed these purportedly false statements to Maysonet. (SOF, ¶ 123.) Mingey did not prepare any reports documenting Maysonet's disputed statements and did not testify as to any of Maysonet's disputed statements. (*Id*.) Thus, Mingey could not have deprived Maysonet of a fair trial because beside the fact that he did not manufacture any evidence regarding his interviews with Maysonet that were used at his trial, it would have been impossible for Mingey to know what Maysonet said during these interviews. *See Brown*, 633 F.Supp.3d at 1159 ("Brown's evidence-fabrication claim regarding these reports fails because these reports were not used against him at trial."); *see also Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022) (fabricated confession claim requires the admission of fabricated reports at trial).

**b. A fabrication claim premised solely on testimony is not viable.**

Maysonet contends that Paulnitsky and Halvorsen provided false testimony pertaining to his statements at his grand jury and pretrial proceedings. (SOF, ¶ 138.) Initially, this claim fails because Paulnitsky and Halvorsen are entitled to absolute immunity for their testimony. In *Briscoe v. Lahue*, the Court held "all witnesses—police officers as well as lay witnesses—are absolutely immune from civil liability based on their testimony in judicial proceedings." 460 U.S. 325, 328 (1983). The Court reaffirmed *Briscoe* in *Rehberg v. Paulk*, holding that absolute immunity applies to law enforcement and lay witnesses alike, regardless of whether the witness is characterized as a "complaining witness" or alleged to have conspired with others to present fabricated testimony. 566 U.S. 356, 359, 369 (2012). Under *Briscoe* and *Rehberg*, Paulnitsky and Halvorsen are absolutely immune from civil liability for their testimony.

But even if there was no immunity, only Guevara and Montilla testified at Maysonet's trial—the other Movants did not. (SOF, ¶¶100-06.) While Halvorsen and Paulnitsky testified at separate grand juries, and Paulnitsky testified at Maysonet's Motion to Quash Arrest hearing, (SOF, ¶¶ 85, 92, 96), any allegedly false testimony at such proceedings does not support a

12

fabrication claim because Maysonet must show the fabricated evidence was used at his *trial*. *Moran v. Calumet City*, 54 F.4th 483, 499 (7th Cir. 2022) (rejecting analogous fabrication claim because "the detectives' pretrial testimony—was not introduced at the trial, it could not have influenced the jury's verdict."). Thus, Maysonet's false pretrial testimony fabrication claim fails.

### c. Rosa Bello's testimony was not fabricated or used at Maysonet's trial.

Maysonet contends Movants fabricated evidence from Rosa Bello, his former girlfriend, implicating him in the Wiley murders. Initially, while Bello testified against Maysonet's codefendant, Lluvia, consistent with her signed statement, she did not testify at Maysonet's criminal trial, nor was her handwritten statement used or introduced at his trial, a prerequisite for Maysonet's claim to succeed. (SOF, ¶¶ 87, 100-06.) *Patrick*, 974 F.3d at 835.

Moreover, Bello was deposed in this matter and affirmed that her statements to police, and in-court testimony during Lluvia's trial was truthful. (SOF, ¶¶ 64, 87.) This testimony unequivocally defeats Maysonet's effort to claim the evidence was fabricated. *Humphrey v. City of Anderson*, 19-cv-00764-JRS-TAB, 2021 WL 4477806, at *6 (S.D. Ind. Sept. 30, 2021) (holding no fabrication where witness "testified unequivocally, 'No'" when asked if police told him what to say).

### d. Maysonet's codefendants statements were not used at his trial.

Maysonet also alleges that Guevara coerced false statements from his codefendants, Lluvia and Tino. (SOF, ¶ 136.) But this claim fails against Movants for two reasons. First, Mingey, Paulnitsky and Montilla were not involved in either Lluvia's or Tino's statements. (SOF, ¶¶ 74-75, 80-81). Thus, his claim fails because Mingey, Paulnitsky and Montilla were not personally involved in this alleged fabrication.

The claim also fails because the co-defendants' statements were not introduced at or used against Maysonet at his trial. Like Bello, neither Lluvia nor Tino testified at Maysonet's trial, nor

were any of their statements introduced at trial, which is a prerequisite for Maysonet's claim to succeed. (SOF, ¶¶ 100-06); *see also Patrick*, 974 F.3d at 835. As such, Maysonet's fabrication claim fails as a matter of law against Movants.

> **e. Maysonet's contention that Halvorsen fabricated a report fails.**

Maysonet also contends Halvorsen's August 23, 1990, Supplemental Report documents the following "knowingly false information:" (1) Maysonet's statements to Mingey and Montilla on July 15; (2) Maysonet's statements to Mingey and Montilla on August 1; (3) Maysonet's statements to Guevara on August 22; and (4) that Maysonet drove with Montilla, Paulnitsky, and ASA DiFranco to the crime scene after providing his court-reported statement to "corroborate" his confession. (SOF, ¶¶ 70, 132, 138.) Maysonet cannot prevail on this claim against Halvorsen because he cannot point to any evidence that Halvorsen deliberately falsified.

The "hallmark of a fabrication case" is that the officer "created evidence that [he] knew to be false." *Petty v. City of Chi.*, 754 F.3d 416, 423 (7th Cir. 2014). To succeed, Maysonet must show that Halvorsen "knew—*with certainty*—[that the evidence] was false." *Coleman*, 925 F.3d at 344. This is a demanding standard because "'[d]eliberately' falsifying information means serving up a lie, on purpose." *Zambrano v. City of Joliet*, No. 21-cv-4496, 2024 WL 532175, at *8 (N.D. Ill. Feb. 9, 2024). Against this backdrop, and based on the paucity of evidence, no reasonable jury could find that Halvorsen knowingly and deliberately falsified his report.

Halvorsen was not involved in, nor present for *any* questioning of Maysonet *at any time*. (SOF, ¶ 126.) Because he did not participate, Halvorsen had to rely only on what other officers told him about statements made by Maysonet when drafting his report. (SOF, ¶¶ 126-27.) Critically, the mere fact that Halvorsen drafted the report is insufficient to establish that he knew, with certainty, that the report contained false information. Accordingly, Maysonet cannot create an issue of fact on Halvorsen's intent by simply claiming the report "contained inaccurate

14

information" and "[f]raming the issue as 'He Said/She Said'" because that "misses the point." *Zambrano*, 2024 WL 532175 at *9. "The question is the intent of the officer, not the accuracy of the officer's report," so Maysonet needs evidence that Halvorsen's knowingly falsified the report, which he lacks. *See id.* (citing *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 70 (3d Cir. 2017). The record contains no evidence that could support a reasonable inference that Halvorsen deliberately falsified the report. Without that evidence, Maysonet's claim must fail.

### III. Maysonet Lacks Sufficient Evidence to Support his *Brady* Claim (Count III)

Maysonet advances five contentions under *Brady*[8] by Movants:

1. Movants suppressed details of Mingey and Montilla's conversations with Maysonet on July 15 at Area 5 and August 1 at the CCJ. (SOF, ¶¶ 132-33.)

2. Movants suppressed reports documenting Mingey and Montilla's conversations with Maysonet on July 15 and August 1. (SOF, ¶¶ 133,135.)

3. Movants suppressed the "tactics . . . used to secure a false statement from [Rosa] Bello." (SOF, ¶¶ 135, 137.)

4. Movants suppressed the arrests and interrogations of King and Cisco. (SOF, ¶ 135.)

5. Movants suppressed "their own misconduct in other cases." (SOF, ¶ 135.)

As an initial matter, while Maysonet lumps all Movants into *Brady* theories No. 1-4, the evidence shows Paulnitsky and Halvorsen were not involved in the July 15 or August 1 interviews with Maysonet regarding the Wiley murders. (SOF, ¶¶ 44-49.) Further, there is no evidence Mingey, Montilla or Paulnitsky were involved in the arrests or interrogations of Cisco and King, and Mingey, Paulnitsky and Halvorsen were not involved in questioning Rosa Bello. (SOF at ¶¶ 37-40, 63, 65.) Thus, these Movants were not aware of this alleged evidence and there is no evidence they were personally involved in suppressing this alleged evidence. Thus,

---

[8] *Brady v. Maryland*, 373 U.S. 83 (1963).

these Movants are entitled to summary judgment on Count III.[9] *Colbert*, 851 F.3d at 657

("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional

deprivation."). Even so, these theories would fail against them for the same reasons argued

below.

To prevail under *Brady*, Maysonet must show "[1] the evidence in question was favorable

to him, [2] the police 'suppressed' the favorable evidence, and [3] prejudice ensued because the

suppressed evidence was material." *Anderson v. City of Rockford*, 932 F.3d 494, 504 (7th Cir.

2019) (brackets inserted). Because this is a civil claim, Maysonet must also show that the

defendant responsible for the suppression "acted intentionally or at least recklessly in failing to

turn…over" the evidence. *Moran*, 54 F.4th at 493.

It is Maysonet's burden at summary judgment to produce evidence to support all four

elements of this claim. *Boyd v. Nichols,* No. 20-CV-01256-TWP-TAB, 2022 WL 2209951, at *9

(S.D. Ind. June 21, 2022), *appeal dismissed*, No. 22-2130, 2022 WL 18028352 (7th Cir. Nov. 22,

2022) ("To avoid summary judgment, [plaintiff] must present evidence from which a jury could

reasonably conclude that the Defendants withheld material, exculpatory evidence."). After all, a

*Brady* claim cannot be based on speculation. *U.S. v. Parks,* 100 F.3d 1300, 1307 (7th Cir.1996).

To prove suppression, Maysonet must point to evidence that Movants intentionally

withheld evidence from prosecutors that was not "otherwise available to the defendant through

the exercise of reasonable diligence." *Moran*, 54 F.4th at 492 (citations omitted) (holding *Brady*

"extends to police officers, insofar as they must turn over potentially exculpatory evidence…to

the prosecution."). To prove materiality, Maysonet must point to evidence that there was a

---

[9] Maysonet contends that Defendant Guevara suppressed his coercion of false confessions from Lluvia and Tino, but Movants do not address that contention here because it is not asserted against them. (SOF, ¶136.) To the extent Maysonet shifts at summary judgment to now allege this theory against Movants, the same argument for Bello, *infra* at § III(c), would apply.

reasonable probability his trial would have resolved differently if the evidence was disclosed. *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008).

For the *Brady* contentions where Maysonet accused a Movant, they fail, as described further below, because he cannot show suppression, materiality, or involvement. What's more, Maysonet does not point to any specific document or piece of physical evidence that he claims Movants failed to disclose. Rather, his *Brady* claim is built on his speculative theory that Movants were not honest about their accounts of various conversations and events, and if they had been, their reports would have reflected Maysonet's version of events. Since they did not, Maysonet claims that the "evidence" was suppressed. But as demonstrated below, Maysonet's ambitious effort to create *Brady* claims for trial fails under the law on every level.

### a. Maysonet's July 15 and August 1, 1990, statements were not suppressed.

Maysonet contends that Montilla and Mingey suppressed from prosecutors the truthful contents of their conversations with him on July 15 at Area 5 and August 1 at the CCJ. (SOF, ¶¶ 132-33.) Specifically, Maysonet asserts Mingey and Montilla did not disclose that Maysonet did not make the "incriminating statements" that were "attributed to him in the [fabricated] supplemental report," nor did they "disclose to the defense that [Maysonet] had denied involvement and knowledge about the murder and had provided defendant Mingey with an alibi." (SOF, ¶ 132.)

Maysonet's admitted presence during each of these conversations bars his claim. In *Gauger v. Hendle*, the Seventh Circuit rejected a *Brady* claim identical to Maysonet's where the plaintiff argued that *Brady* "required the detectives to give truthful versions of [the plaintiff's] statements at the interrogation to the prosecutors to be forwarded to his counsel at his criminal trial." 349 F.3d 354, 360 (7th Cir. 2003). The court held that the evidence was not suppressed because the plaintiff "knew what he had said at the interrogation." *Id.* Indeed, the Seventh Circuit

17

rejected the "proposed extension of *Brady*" finding it "difficult even to understand" because it "implies that the state has a duty not merely to ***disclose*** but also to ***create*** truthful exculpatory evidence." *Id.* (emphasis added).

Like *Gauger*, Maysonet knew what he said or did not say when Montilla and Mingey questioned him. Thus, his proposed *Brady* claim fails because Maysonet cannot prove suppression. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028 (7th Cir. 2006) ("The failure of [defendants] to disclose the coercive circumstances of [plaintiff's] confession does not, however, state a viable *Brady* claim."); *see also Bridgeforth v. City of Glenwood*, No. 18 C 7150, 2020 WL 1922907, at *7 (N.D. Ill. April 21, 2020) (rejecting an analogous *Brady* claim).

**b.  No reports about Maysonet's July 15 and August 1 interviews were suppressed.**

Halvorsen's August 23 Supplemental Report documented the July 15 and August 1 interviews of Maysonet, which was disclosed to Maysonet. (SOF, ¶¶ 47, 49, 131.) Maysonet, however, now claims that Mingey and Montilla created *other* reports regarding the July 15 and August 1 interviews and suppressed these reports. Though there is no evidence that Mingey and Montilla prepared reports of the July 15 and August 1 interviews, Maysonet confusingly argues that "to the extent" Mingey and Montilla "claim they did" memorialize these statements, "they withheld this evidence." (SOF, ¶ 133.) This contention is entirely speculative.

Initially, for the same reasons argued above, *supra* at III(a), this contention does not create a viable *Brady* claim. There is no evidence Mingey or Montilla ever wrote down the details of those interviews in any notes or reports, and they have never claimed that they did. (SOF, ¶¶ 47, 49.) *See Hill*, 2009 WL 174994, at *4 ("Hill's mere speculation that a RAMIS report and report concerning Turner may have existed, however, cannot be the basis for his *Brady* claim."). Even if they did exist, Maysonet cannot establish that any such reports were exculpatory because he can only speculate to their contents which is insufficient to overcome

18

summary judgment. *See id.* ("assuming that the . . . reports did exist, it is unclear how this evidence would be exculpatory or impeaching.") (citing *U.S. v. Warren*, 454 F.3d 752, 759 (7th Cir. 2006) (rejecting *Brady* claim because plaintiff was unable to point to any specific evidence withheld).

### c. Although not a viable *Brady* claim, the supposed "tactics" used when questioning Bello were also not suppressed or material.

Maysonet contends that Montilla and ASA Defendant DiFranco suppressed the "tactics . . . used to secure a false statement from Ms. Bello." (SOF, ¶ 137.) Specifically, Maysonet claims that Montilla and ASA DiFranco suppressed that they "threatened to take [Bello's] kids from her" if she did not cooperate. (*Id.*) Initially, as discussed *supra* at II(c), Bello's statement was not false, so Maysonet is contending that Montilla and ASA DiFranco suppressed a tactic they used to obtain Bello's *truthful* statement, which is obviously not a viable claim and should end the inquiry into this claim.

Regardless, this *Brady* contention falls flat because the tactic was not suppressed. When deposed, Bello testified that in 1990, she was at Area 5, brought to a room, and questioned by a prosecutor and a "police officer." (SOF, ¶ 63.) Bello "told them that [Maysonet] just asked me to give him what was wrapped in the plastic, and him and his friends left." (SOF, ¶¶ 63,64.) According to Bello, after stating this, the prosecutor—not the officer—responded by saying, "I don't believe you," and informed Bello, "[w]e can take your kids away if you're not telling the truth." (SOF, ¶ 63.) This comment did not affect Bello because she "did tell the truth," so she replied to the prosecutor "[d]o what you need to do." (*Id.*)

Critically, it was the ASA DiFranco who allegedly used the tactic, not Montilla, so Maysonet cannot show suppression because a *Brady* claim fails against the police if the exculpatory evidence is turned over to the prosecution. *Moran*, 54 F.4th at 492. Further, even if this tactic was "suppressed," it was immaterial because there was no reasonable probability that

the trial would have resolved differently if this tactic was disclosed. Bello never testified against Maysonet, (SOF, ¶¶ 100-06), so these "tactics" were not admissible to impeach her. *U.S. v. Bonner*, 302 F.3d 776, 784–85 (7th Cir. 2002) ("one may not contradict for the sake of contradiction; the evidence must have . . . an independent ground for admission.").

Finally, this contention fails because Maysonet is simply recasting his claim that Movants fabricated Bello's statement as a *Brady* claim by claiming Montilla did not disclose ASA DiFranco's alleged wrongdoing when questioning Bello. In *Saunders-El v. Rohde*, the Seventh Circuit addressed "dual-pronged [due process claims where the plaintiff] alleges both that the fabrication of evidence violated his constitutional rights and, separately, that the police officers' failure to admit their misdeeds to the prosecution amounts to a withholding of exculpatory evidence in violation of *Brady*." 778 F.3d 556, 561 (7th Cir. 2015). The court rejected the plaintiff's *Brady* claim because "*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Id.* at 562.

Like *Saunders-El*, Maysonet "seeks to charge [Movants] with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of *evidence* to the prosecution." *See id.* (emphasis in original); *see also Jackson v. City of Chi.*, No. 20 C 5886, 2024 WL 1142015, at *12 (N.D. Ill. Mar. 15, 2024) (holding the plaintiff cannot recast his fabrication claim under *Brady* where he "does not identify a specific piece of evidence that was concealed," but argues the defendant "should have admitted they lied"). Simply, this contention is a non-starter under *Brady*.[10]

**d. The identification of two Latin Kings for the Wiley murders was not suppressed.**

---

[10] While *Avery v. City of Milwaukee* recognizes a *Brady* claim premised on the failure to disclose improper tactics utilized to coerce a testifying witness's statement for the purposes of impeachment, as stated above, Bello did not testify against Maysonet, so *Avery* does not apply. 847 F.3d 433, 443 (7th Cir. 2017).

Maysonet contends that Halvorsen suppressed the fact that he and Guevara attempted to implicate two of Maysonet's fellow Latin Kings, Francisco "Cisco" Veras and Efrain "King" Cruz (Tino's brother), in the Wiley murders. (SOF, ¶¶ 37,135.) Decades after the Wiley homicide investigation, Veras testified for the first time in this civil matter that in June 1990 Guevara and "his partner" arrested him and Efrain for the Wiley murders, brought them to Area 5, and placed them in a lineup. (SOF, ¶¶ 37-40) After the lineup, an unknown officer informed Veras that Maysonet and Bello identified him and Efrain as the offenders. (SOF, ¶ 40.) But Veras and Efrain denied involvement and were released because they were in custody on the night of the Wiley murders. (*Id.*)

This *Brady* contention fails against Halvorsen for two reasons. <u>First</u>, Maysonet cannot show that Halvorsen was personally involved. *See Colbert*, 851 F.3d at 657. Veras could only identify Guevara as placing himself and Efrain in lineups and holding them for questioning. (SOF, ¶¶ 37-40.) And any contention that Veras's statement that Guevara was with "his partner" does not identify Halvorsen. Guevara was not a detective at the time Veras and Efrain were allegedly picked up in June 1990, and Halvorsen did not begin working with Guevara until Guevara made detective in August of 1990. (SOF, ¶¶ 6, 37.) Veras was able to describe Guevara's partner only as "a white man, probably late forties maybe," and he responded, "No" when asked, "Does the name Earnest Halvorsen ring a bell to you?" (SOF, ¶ 38.) Thus, it is purely speculative to assume that "Guevara's partner" was Halvorsen.

<u>Second</u>, this information was not suppressed because it was known to Maysonet and available to his counsel through the exercise of reasonable diligence. Maysonet conceded during his deposition that he knew of this information. He testified that when Guevara was questioning him on August 24, 1990, he "wanted me to involve some other people" in the Wiley murders, so "[t]he first name that I involve, it was Cisco [Veras], Jeffery, and Efrain [Cruz]." (SOF, ¶ 61.)

21

According to Maysonet, he later heard from Guevara that Guevara "went and looked for them," but that "those guys, they was arrested that day when the crime happened." (SOF, ¶ 61.)

Maysonet's court-reported statement specifically mentioned that Veras and Efrain, along with Lluvia, Fro, and Tino, came to his house after the murders and that Veras put a gun to his head and threatened to kill him if he talked. (SOF, ¶ 95.) Maysonet's criminal defense attorney, Beuke, testified that this part of Maysonet's confession was a relevant "part of the strategy to use… in order to explain why [Maysonet] may have said certain things, that they had threatened to kill him . . . his own fellow gang members." (*Id.*) So, when Beuke spoke with Maysonet about his court-reported statement Veras and Efrain were an obvious point of inquiry. *See Boyd v. City of Chi.*, 225 F.Supp.3d 708, 723 (N.D. Ill. 2016) (holding that there was no *Brady* claim where plaintiff's attorney could have interviewed witness about her observations and interactions with police).

Ultimately, Maysonet and Beuke were aware of these witnesses and it was Beuke's "responsibility to probe the witnesses and investigate [his] versions of the relevant evidence." *Holland v. City of Chi.*, 643 F.3d 248, 256 (7th Cir. 2011). Thus, his *Brady* theory fails.

### e.  *Brady* does not require police officers to create exculpatory evidence by disclosing their alleged prior misconduct.

Maysonet's final *Brady* theory—that Movants suppressed "their own misconduct in other cases"—also fails. (SOF, ¶ 135.)

To start, Maysonet does not even identify the prior misconduct evidence that Movants allegedly concealed. Instead, his Complaint lists only two cases in which criminal defendants **alleged** that Halvorsen coerced their confession, (Am. Compl., ¶¶ 140, 146, 151–52), while citing none for the remaining Movants. (*See generally id.*, ¶¶ 106–58.) But a mere allegation from a criminal defendant in a separate proceeding who did not testify against Maysonet at his trial is not *Brady* material because it is inadmissible impeachment evidence. *People v. Coleman*,

794 N.E.2d 275, 287 (Ill. 2002) (affirming prior cases that held "[m]ere evidence of a civil suit against an officer charging some breach of duty unrelated to the defendant's case is not admissible to impeach the officer.") (citation omitted); *see also Bonner*, 302 F.3d at 784–85 ("the evidence must have . . . an independent ground for admission.").

Further, this contention impermissibly extends *Brady* well beyond its intended purpose. If recognized, it would require police to create evidence by documenting every disputed allegation made by criminal defendants against them and disclose them in every case in which charges are brought. Seventh Circuit "case law makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El*, 778 F.3d at 562. Simply, *Brady* "does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case." *U.S. v. White*, 970 F.2d 328, 337 (7th Cir. 1992).

## IV. Maysonet's Federal and State Malicious Prosecution Claims (Counts IV and VIII) Fail as a Matter of Law

To sustain a Fourth Amendment malicious prosecution claim, Maysonet must show "that the prosecution was instituted without probable cause, that the motive in bringing the charge(s) was 'malicious,' and that the prosecution terminated in favor of the accused." *Jackson v. Wojcik*, No. 23 C 2027, 2024 WL 2209192, at *5 (N.D. Ill. May 14, 2024) (internal quotation marks omitted) (citing *Thompson v. Clark*, 596 U.S. 36, 43–44 (2022)). Similarly, to prove an Illinois malicious prosecution claim, Maysonet must show: "(1) [he] was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Martinez v. City of Chi.*, 900 F.3d 838, 849 (7th Cir. 2018). For malicious prosecution claims, probable cause is analyzed at the time of charging. *Holland v. City of Chi.*, 643 F.3d 248, 254 (7th Cir. 2011).

23

### a. Mingey did not play any role in Maysonet's prosecution.

The "commencement or continuance of a prosecution" element of Maysonet's state law malicious prosecution claim requires a defendant to have played a "significant role" in the criminal prosecution. *Hill v. Cook Cnty.*, 463 F. Supp. 3d 820, 845 (N.D. Ill. 2020) (citations omitted). Similarly, as to the federal malicious prosecution claims, a plaintiff must demonstrate, at a minimum, that a particular defendant caused the pre-trial seizure by instituting the prosecution. *See Jackson*, 2024 WL 2209192, at *5 (N.D. Ill. May 14, 2024) (dismissing a defendant where the complaint failed to allege how he instituted criminal charges).

Maysonet has no evidence that Mingey played *any* role in his criminal prosecution. There is no evidence that he was involved in the decision to charge Maysonet, signed criminal complaints, provided *any* information to prosecutors, or testified in any criminal proceedings. (SOF, ¶ 123); *see Cusick v. Gualandri*, 573 F. Supp. 3d 1256, 1271 (N.D. Ill. 2021) (the significant role determination includes individuals who "engaged in wrongful or bad-faith conduct that was instrumental in the commencement or continuation of the criminal prosecution.") (citations omitted). Without any involvement in the prosecution, there can be no liability against Mingey on Counts IV and VIII.

### b. Probable cause defeats Maysonet's malicious prosecution claims.

Probable cause is an absolute bar to both a Fourth Amendment and a state law malicious prosecution claim. *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006). Probable cause is a fluid concept that is based on the totality of the circumstances. *Garcia v. Posewitz*, 79 F.4th 874, 879–80 (7th Cir. 2023); *Coleman*, 925 F.3d at 350. If facts exist within the officer's knowledge, and of which the officer had "reasonably trustworthy information," which would warrant a "prudent" officer to believe the arrestee violated the law, then probable cause exits. *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019). An officer need not have firsthand knowledge of

facts that show probable cause so long as he reasonably relied on information he received from other officers. *U.S. v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010).

Here, Maysonet was first indicted for the First-Degree Murder of the Wiley brothers by a grand jury on September 27, 1990, (SOF, ¶ 85), and was subsequently reindicted on April 29, 1992, and thus these are relevant times for which probable cause is assessed. (SOF, ¶ 92); *U.S. v. Mancias*, 350 F.3d 800, 807 (8th Cir. 2003) (indictment supersedes previous proceedings for purposes of determining probable cause).

Under both indictments, Maysonet was charged with First-Degree Murder of the Wiley brothers. (SOF, ¶¶ 85, 92.) Under the theory of accountability, Maysonet could be legally responsible for the murders "when either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense." (SOF, ¶ 99); Ill. Rev. Stat., Ch. 38, par. 5-2(C).[11]

Considering the evidence known to Movants without Maysonet's allegedly falsified confession, probable cause existed for First-Degree Murder under a theory of accountability at the time Maysonet was indicted. The indictments against Maysonet are prima facie evidence of probable cause. *Coleman*, 925 F.3d at 351 ([A]n indictment is prima facie evidence of probable cause.") This presumption is rebuttable if the plaintiff shows: "that the officer who sought the [indictment] knowingly or intentionally or with a reckless disregard for the truth, made false statements to the judicial officer . . ." *Washington v. City of Chicago*, 98 F.4th 860, 870 (7th Cir. 2024).

---

[11] This statute corresponds to 720 ILCS 5/5-2(c).

Maysonet cannot show that either Halvorsen or Paulnitsky[12] "knowingly or intentionally or with reckless disregard for the truth," made false statements at the time Maysonet was initially indicted or when he was reindicted.  (SOF, ¶ 138.) At the grand jury proceedings, Halvorsen and Paulnitsky were the sole witnesses for the State. (SOF, ¶¶ 85, 92.) They testified generally that the police investigation revealed (1) that Torrence and Kevin Wiley were fatally shot in the area of 3428 West North Avenue at approximately 1:00 a.m. on May 25, 1990; (2) Maysonet drove the other defendants to and from the crime scene; and (3) Maysonet "supplied the murder weapon." (SOF, ¶¶ 85, 92.)[13]

Here, clearly the first fact – the time and place of the fatal shooting of the Wiley brothers – is undisputed.  (SOF, ¶ 28.) And it is undisputed that the area of the shooting was Latin Kings territory, specifically Maysonet's set of the Latin Kings. (SOF, ¶ 36.) Further, Bello gave a statement that Maysonet supplied a 9mm[14] to Lluvia, Fro and Tino on the night of the murders, and that Maysonet then left with Lluvia, Fro and Tino. (SOF, ¶¶ 64, 72, 87.) She reiterated this statement under oath at Llvuia's trial, on March 26, 1992, prior to Maysonet's reindictment on May 5, 1992, despite the multiple threats Latin Kings members made to her life. (SOF, ¶¶ 87, 92, 115-16.) Bello maintains this testimony was truthful even today. (SOF, ¶87.) Furthermore, Tino gave a handwritten statement to ASA Perkaus, in the presence of Detective Schak, stating that

---

[12] Halvorsen testified at Maysonet's first grand jury proceedings and Paulnitsky testified at Maysonet's second grand jury proceedings. (SOF, ¶¶ 85, 92.)

[13] Halvorsen also testified that Maysonet, Lluvia and Tino planned to shoot the Wiley brothers. (SOF, ¶ 85.)

[14] It was also illegal for Maysonet to have possessed and given the gun to Lluvia, Tino and Fro. *See McDonald v. City of Chicago*, 561 U.S. 742, 750–51, (2010) (explaining that it was illegal to possess an unregistered gun in Chicago); *see also Kromeich v. City of Chicago*, 630 N.E.2d 913, 915 (Ill. App. 1994) ("No person within the City of Chicago, shall possess, harbor, have under his control, transfer, offer for sale, sell, give, deliver, or accept any firearm unless such person is the holder of a valid registration certificate of such firearm.").

Maysonet provided the 9mm, drove the other defendants to the crime scene, waited in the car, and drove the other defendants away from the crime scene. (SOF, ¶ 81.) Tino reiterated this statement under oath at Lluvia's trial and prior to Maysonet's reindictment. (SOF, ¶¶ 88, 92.)

While Maysonet now claims Tino's statement was fabricated by Guevara through physical coercion, there is no evidence any Movant was involved in fabricating Tino's statement or otherwise had any knowledge of its alleged fabrication. (SOF, ¶¶ 80-81, 136.) Therefore, Movants necessarily had to rely on information from other detectives and prosecutors regarding the content of Tino's statements. Not to mention, Tino testified ***consistent*** with his statement at Lluvia's trial and pled guilty to the Wiley murders, which conviction remains valid today. (SOF, ¶¶ 4 ,88, 98.) Thus, Bello's and Tino's statements are sufficient for probable cause on a theory of accountability. *See People v. Martinez*, 637 N.E.2d 447, 453 (1994) ("Defendant aided and abetted in the plan to murder Turner when he gave Ramos a telephone number which Ramos was to call in the event Ramos could not locate a gun.") *See also Krol v. Kennedy*, 818 F. App'x 547, 549–50 (7th Cir. 2020) (affirming denial of habeas corpus on first-degree murder charges under analogous fact pattern); *U.S. ex. rel. Porter v. Rednour*, No. 10 C 3081, 2012 WL 3101710, at *3 (N.D. Ill. July 30, 2012) ("Hearsay is admissible to establish probable cause when it might not be admissible to prove guilt."); *Mosley v. City of Chi*., No. 06 C 6314, 2009 WL 3097211, at *9 (N.D. Ill., Sept. 22, 2009) (considering co-defendants statements in finding probable cause existed for Mosley's arrest and prosecution).

### i. Movants are alternatively entitled to qualified immunity.

Alternatively, Movants are entitled to qualified immunity on Maysonet's federal Fourth Amendment claim on the basis of arguable probable cause. "Arguable probable cause" protects an officer who reasonably but mistakenly believes that probable cause exists. *Abbott*, 705 F.3d at 714–15. It is established when a "reasonable police officer in the same circumstances and with

the same knowledge and possessing the same knowledge" as the defendant "*could* have reasonably believed that probable cause existed in light of well-established law." *Fleming v. Livingston Cnty.*, 674 F.3d 874, 880 (7th Cir. 2012). As such, qualified immunity "gives ample room for mistaken judgment" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v Bryant*, 502 U.S. 224, 229 (1991) (citations omitted).

In sum, a prosecution and ensuing detention supported by "arguable probable cause" is constitutional. *Abbott*, 705 F.3d at 715. As explained above, given the circumstances known to Movants, a reasonable officer "*could* have reasonably believed that probable cause existed," even if mistaken, because the Movants possessed objectively reliable information from Bello and Tino that directly implicated Maysonet in the murders, and there is no evidence that they were aware of any facts that would have cast doubt on those statements. *Supra* § IV(b). In sum, there was no clearly established law informing Movants that this evidence at the time of Maysonet's indictment was insufficient to establish probable cause, thus, qualified immunity bars this claim.

### c. Paulnitsky and Halvorsen did not act maliciously.

Maysonet's malicious prosecution claims suffers another hurdle: he must show the Movants acted maliciously. Here, there is no evidence Halvorsen or Paulnitsky acted maliciously when they testified in any grand jury proceedings, or when Paulnitsky testified at Maysonet's Motion to Quash Arrest hearing because, as discussed *supra* § I(a), II(a)(i), they were not involved in any interviews with Maysonet, did not speak Spanish and would not have been able to communicate with Maysonet, and thus necessarily relied on information they received from other officers that they reasonably believed to be true.[15] *See Cusick*, 573 F. Supp. 3d at 1271. (malicious prosecution involves those individuals who "engaged in wrongful or bad-faith

---

[15] Paulnitsky was additionally not involved in any interviews of Lluvia, Tino, Fro or Bello, and Halvorsen was not involved in any interviews of Tino, Fro or Bello. (SOF ¶¶ 63-64, 71, 72, 74-75, 80-81, 83, 124.)

conduct that was instrumental in the commencement or continuation of the criminal prosecution.")

### d. Maysonet's inability to show that his conviction was terminated in a manner indicative of innocence defeats his Illinois malicious prosecution claim.

Summary judgment is also appropriate on Maysonet's Illinois malicious prosecution claim because he cannot establish that his criminal case was resolved in a manner indicative of his innocence. *See Woods v. Vill. of Bellwood*, No. 19-cv-01214, 2020 WL 6894660, at \*14 (N.D. Ill. Nov. 24, 2020) (citing *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997) ("a plaintiff cannot predicate his malicious prosecution action on underlying criminal proceedings which were terminated in a manner not indicative of the innocence of the accused.")). It is not enough to show that the prosecution dismissed the charges. *Id.* at \*14. The Illinois Supreme Court has explained that "[o]nly when a plaintiff establishes that the *nolle prosequi* was entered for reasons consistent with his innocence does the plaintiff meet his burden of proof" because "[o]therwise, every time criminal charges are *nol-prossed*, a civil malicious prosecution action could result." *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996).

Maysonet cannot show that his criminal case terminated in a matter indicative of his innocence as opposed to being premised on concerns about the admissibility or viability of the evidence against him. Specifically, Maysonet's conviction was vacated and he was granted a new trial because his attorney labored under a *per se* conflict of interest. (SOF, ¶¶ 109-110.) Subsequently, the State's Attorney *nollied* all charges against Maysonet after several Defendants indicated they would not testify. (SOF, ¶ 111.) In dismissing the case, ASA Eric Sussman made it abundantly clear that the CCSAO did not conclude Maysonet was innocent, but rather, the CCSAO could not meet its burden of proof due to the unavailability of key witnesses:

> As Your Honor knows, **the State's Attorney's Office has consistently maintained and continues to maintain that Mr. Maysonet is guilty of the murder of the Wiley brothers consistent with the jury's verdict in August of 1995.** The State also

maintains as you've seen through the pleadings that Mr. Maysonet's numerous statements were not the result of any abuse or improper police misconduct. Nevertheless, we have been advised over the last several days, including just now, by counsel for the former police detectives that each detective will invoke their 5th Amendment right not to incriminate themselves and will refuse to testify. Without the cooperation and the testimony of the Chicago police detectives, the State is unable to meet our burden at this hearing or at the underlying case. So, it is with deep regret and sadness for the families of the victims in this case that we request that the Court nolle the case against the defendant, Mr. Maysonet.

(SOF, ¶ 111.)

Dismissal of a case triggered by a key witness's inability or refusal to testify is not considered a termination indicative of innocence. *Summerville*, 127 F.3d at 557–58 (holding that a *nolle prosequi* which occurred after an investigating police officer indicated that he would invoke the Fifth Amendment if called to testify as a result of an investigation into other misconduct, was not a disposition indicative of innocence). *See also Northfield Ins. v. City of Waukegan*, 701 F.3d 1124, 1132 (7th Cir. 2012) (holding a *nolle prosequi* order is not indicative of innocence if state abandoned case because key witness was unavailable).

Thus, the undisputed evidence compels only one conclusion—Maysonet's criminal case was not terminated in a manner indicative of innocence. Maysonet cannot, therefore, meet his burden of proof on his Illinois malicious prosecution claim (Count VIII).

## V. Movants Except Montilla are Entitled to Summary Judgment on Maysonet's Failure to Intervene Claim (Count V)

Maysonet's failure to intervene claim alleges that Movants knew about the unconstitutional actions of other Defendants, had an opportunity to intervene, and failed to do so. (Dkt. 136, Am. Compl., ¶ 205.) To prevail, Maysonet must establish the officer's presence for the alleged constitutional violation and that the officer had a realistic opportunity to intervene to prevent the violation. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). All Movants are entitled to summary judgment on Maysonet's failure to intervene claim because: (1) there is no evidence that any Movant (other than Montilla) was present for, or had reason to

know that Maysonet's constitutional rights were being violated, and thus lacked a realistic opportunity to intervene; (2) a failure to intervene claim cannot exist without an underlying constitutional violation; and (3) such a claim is not legally cognizable as it violates Section 1983's bar on vicarious liability.

### a. Maysonet cannot establish that Halvorsen, Mingey, and Paulnitsky had an opportunity to intervene in his coerced and fabricated confession claims.[16]

Multiple courts in this district have concluded that "[p]olice officers who were not present on the scene cannot be held liable for failing to intervene in another officer's unconstitutional acts." *Moore v. City of Chi.*, 209 F. Supp. 3d 1016, 1033 (N.D. Ill. 2016); *Powell v. City of Berwyn*, 68 F. Supp. 3d 929, 942 (N.D. Ill. 2014) (same). As argued above, Halvorsen, Mingey, and Paulnitsky were not present for Guevara's questioning of Maysonet, nor is there evidence that Movants heard Guevara threaten Maysonet or that they otherwise became aware of such improper conduct. As such, it necessarily follows that these Movants had no ability to intervene in any alleged coercive interrogation. *See Sanchez v. City of Chi.*, 700 F.3d 919, 928 (7th Cir. 2012) (explaining failure to intervene requires knowledge of the wrongdoing and ability to stop it).

Any contention that these Movants failed to intervene in Guevara and Montilla's purported fabrication of Maysonet's inculpatory statements similarly fails. Halvorsen and Paulnitsky were not present for *any* interview with Maysonet at Area 5 or at the CCJ, so they did not know the contents of what was said. (SOF, ¶¶ 47-48 ,125-27.) Thus, they had no knowledge of any alleged fabrication, so they had no opportunity intervene. And Mingey, while present for the July 15 and August 1 interviews only, cannot be tied to any alleged fabrication because

---

[16] Montilla is not moving on Maysonet's failure to intervene in Guevara's alleged coercion and fabrication of his statements considering there is a disputed fact based on Maysonet's testimony about statements he made to Montilla.

Maysonet spoke Spanish and Mingey did not speak or understand Spanish, and did not participate in the creation of the allegedly fabricated report that documented these interviews. (SOF, ¶¶ 120-123, 126.) Indeed, Mingey had no investigative role in this investigation after the August 1 interview. (SOF, ¶ 122.)

### b. There is no failure to intervene liability without a constitutional violation.

"In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Rosado v. Gonzalez*, 832 F.3d 714, 719 (7th Cir. 2016). Because Maysonet's failure to intervene claim is derivative of his substantive constitutional claims as set forth above, where those claims fail against all Defendants, so, too, does his derivative failure to intervene claims.

### c. A failure to intervene claim violates Section 1983's bar against vicarious liability.

Movants are aware of how frequently failure to intervene claims are raised, recognized, and litigated in Section 1983 litigation. Recently, courts have begun to question the viability of such a theory of liability. In a resent concurrence, Judge Easterbrook noted that "'[f]ailure to intervene' sounds like vicarious liability," which would of course be untenable, as "[t]he Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability." *Mwangangi v. Nielsen*, 48 F.4th 816, 834 (7th Cir. 2022) (Easterbrook, J., concurring) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). And just a few months ago, the Sixth Circuit echoed Judge Easterbrook's sentiments in *Chaney-Snell v. Young*, No. 22-1990, 2024 WL 1616406 (6th Cir. Apr. 15, 2024), noting that its case law left the source of a failure to intervene theory unclear and stating, "[p]erhaps one day we will have to identify the source of this failure to intervene claim." *Id*. at *16; *accord Heidelberg v. Manias,* No. 18-cv-01161, 2024 WL 1316206, at *25 (C.D. Ill.

Mar. 27, 2024) (describing argument that there is no constitutional support for a failure-to-intervene claim as "compelling").

Movants recognize that this Court is bound to follow the Seventh Circuit's current jurisprudence recognizing such a claim, (*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)) but raise the argument for the express purpose of preserving it for appeal.

## VI.    Maysonet's Conspiracy Claims Fail Against All Movants but Montilla

Maysonet also brings claims against Movants for Section 1983 conspiracy (Count V) and state law civil conspiracy (Count IX). Both claims are derivative of Maysonet's constitutional and state law claims, respectively. Thus, to the extent Maysonet's underlying claims fail against all Defendants, so too do his derivative conspiracy claims. *See, e.g.*, *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (stating conspiracy is not an independent basis of liability in Section 1983 actions); *see also Johnson v. Dossey*, 878 F. Supp. 2d 905, 918 (N.D. Ill. 2012) (finding plaintiff needed to show a genuine issue of material fact exists as to one or more of the underlying state law torts for her state conspiracy claim to survive).

The conspiracy claims also fail against Halvorsen, Mingey and Paulnitsky because Maysonet lacks evidence to establish an agreement to deprive Maysonet of his rights. To meet his burden, Maysonet must show "(1) an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Wheeler v. Piazza*, 364 F. Supp. 3d 870, 880 (N.D. Ill. 2019). "A conspiracy claim cannot survive summary judgment if the allegations are vague, conclusory and include no overt acts reasonably related to the promotion of the alleged conspiracy." *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000); *Reuter v. Mastercard Intern.*, 921 N.E.2d 1205, 1217 (Ill. App. 2010). Conclusory allegations that a defendant agreed with others to achieve some illicit purpose are inadequate to establish civil

conspiracy. *See McCombs v. Crivolio*, No. 1-18-1252, 2019 WL 3717999, ¶44 (Ill. App. Aug. 5, 2019) (plaintiff needed *facts* to support conspiracy claim).

Here, there is no evidence that Halvorsen, Mingey, or Paulnitsky formed an agreement with anyone to coerce or fabricate Maysonet's confession, or to otherwise falsely implicate him in a crime. *See Estate of Hollstein v. City of Zion*, No. 17 C 00112, 2019 WL 1619976, at *3 (N.D. Ill. Apr. 16, 2019) ("[I]t is still up to the [p]laintiff to provide admissible evidence that brings the defense's facts into dispute.") (citing *see Henning v. O'Leary*, 477 F.3d 492, 496 (7th Cir. 2007)).

For the same reasons discussed above, Halvorsen, Paulnitsky and Mingey were either uninvolved in Maysonet's interviews, were unable to communicate with Maysonet and thus would rely on Spanish speaking officers, or were otherwise unaware of any alleged unconstitutional actions on behalf of Guevara or Montilla. (SOF, ¶¶ 7, 9, 10, 13, 120-22, 124-27.) As such, Maysonet cannot establish that Movants understood the "general objectives of the scheme" and agreed to further those objectives. *See Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012); *see also Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988). As the record is devoid of any such evidence, Movants are entitled to summary judgment on Maysonet's conspiracy claims.

## VII. All Movants Except Montilla are Entitled to Summary Judgment on Maysonet's Intentional Infliction of Emotional Distress ("IIED") Claim

To prove IIED under Illinois law, Maysonet must show that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe distress." *Swearnigen–El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 864 (7th Cir. 2010).

### a. The IIED claim based on Paulnitsky's alleged battery unrelated to Maysonet's confession is time barred.

In Illinois, a IIED claim arising out of an arrest and prosecution *accrues on the date of arrest.*[17] *Bridewell v. Eberlie*, 730 F.3d 672, 678 (7th Cir. 2013) (emphasis added). It is subject to a one-year statute of limitations under the Illinois Tort Immunity Act. 745 ILCS 10/8-101(a). Here, Maysonet's IIED claim fails as to Paulnitsky's alleged battery on August 22 when he grabbed and hit Maysonet, and "threatened to 'bust' his face if [Maysonet] ever spoke about him in Spanish again" because it was not *Heck* barred, thus it is twenty-seven years too late. *See Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075, at *9 (N.D. Ill. Oct. 13, 2004) (holding that an IIED claim based on excessive force accrued at the time the alleged force was used); *see also Walker v. City of Chi.*, 559 F.Supp.3d 747, 750 (N.D. Ill. 2021) (same).

**b. Maysonet's IIED claim fails where his underlying claims against Movants fail.**

Maysonet's IIED claim is based upon the same conduct that allegedly violated his constitutional rights. Where his underlying claims fail against any Movant, so too does his IIED claim as to that Movant, as Maysonet cannot demonstrate the "extreme and outrageous" conduct necessary to support such a claim. *See Cooney v. Casaday*, 746 F.Supp.2d 973, 977–78 (N.D. Ill. 2010) (plaintiff's IIED claim fails when premised on alleged constitutional violations that fail). Accordingly, summary judgment is appropriate for Halvorsen, Mingey, and Paulnitsky on Maysonet's IIED claim (Count X).

**CONCLUSION**

For the foregoing reasons, Movants request that the Court enter summary judgment in their favor on all claims and against Maysonet, except for the Fifth Amendment Coercion Claim (Count I) and Fabrication claim based on Maysonet's admission and confession (Count II) against Montilla and related derivative claims against Montilla based on those alleged violations.

---

[17] The contention that the prosecution was a 'continuing wrong' for purposes of the statute of limitations has been specifically rejected by the Seventh Circuit. *Bridewell*, 730 F.3d at 678. (stating that "the idea that failing to reverse the ongoing effects of a tort restarts the period of limitations has no support in Illinois law – or in federal law either.").

Dated: July 15, 2024

Respectfully submitted,

/s/ Josh M. Enquist
Josh M. Enquist, Attorney No. 06242849
Special Assistant Corporation Counsel
*One of the Attorneys for Individual Defendants*

James G. Sotos
Josh M. Enquist
Caroline P. Golden
David A. Brueggen
Jeffrey R. Kivetz
Kyle T. Christie
Allison L. Romelfanger
Special Assistant Corporation Counsel
THE SOTOS LAW FIRM, P.C.
141 W. Jackson, Suite 1240A
Chicago, Illinois 60604
630-735-3300
jengquist@jsotoslaw.com

## CERTIFICATE OF SERVICE

I, Josh M. Engquist, certify under penalty of perjury pursuant to 28 U.S.C.A. § 1746 that the foregoing is true and correct, that on **Monday, July 15, 2024,** I electronically filed the foregoing **Defendants Halvorsen, Mingey, Montilla and Paulnitsky's Memorandum of Law in Support of Their Motion for Partial Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record on the below Service List.

*Attorneys for Plaintiff:*

Jennifer A. Bonjean
Ashley B. Cohen
303 Van Brunt Street, 1st Floor
Brooklyn, NY 11231
(718) 875-1850
jennifer@bonjeanlaw.com
ashley@bonjeanlaw.com

Steven A. Greenberg
Greenberg Trial Lawyers
53 W. Jackson, Suite 315
Chicago, IL 60604
(312)879-9500
steve@greenergcd.com

*Attorneys for Defendant DiFranco:*

Michael Stephenson
James Lydon
Robert Shannon
Michael F. Iasparro
Stephen Mehr
Hinshaw & Culbertson LLP
151 N. Franklin, Suite 2500
Chicago, Illinois 60606
(312) 704-3000
mstephenson@hinshawlaw.com
jlydon@hinshawlaw.com
rshannon@hinshawlaw.com
miasparro@hinshawlaw.com
smehr@hinshawlaw.com

*Attorneys for Defendant Guevara:*

Steven Blair Borkan
Timothy P Scahill
Borkan & Scahill, Ltd.
20 South Clark Street
Suite 1700
Chicago, IL 60603
(312) 580-1030
sborkan@borkanscahill.com
tscahill@borkanscahill.com

*Attorneys for City of Chicago:*

Eileen E. Rosen
Catherine M. Barber
Theresa B. Carney
Austin G. Rahe
Patrick Moran
Stacy Benjamin
Lauren Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com
cbarber@rfclaw.com
tcarney@rfclaw.com
arahe@rfclaw.com
pmoran@rfclaw.com
sbenjamin@rfclaw.com
lferrise@rfclaw.com

*Attorneys for Cook County:*

Kenneth S. Ulrich
W. Kyle Walther
Goldberg Kohn, Ltd.
550 E. Monroe, Suite 3300
Chicago, IL 60603
Kenneth.ulrich@goldbergkohn.com
Kyle.walther@goldbergkohn.com

/s/ Josh M. Engquist

Josh M. Engquist