**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18-cv-02342 |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Honorable Mary M. Rowland |
| | ) | Magistrate Judge Maria Valdez |
| | ) | |
| REYNALDO GUEVARA, et. al | ) | |
| Defendants, | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
<u>CITY OF CHICAGO'S MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

LEGAL STANDARD.................................................................................................................. 2

ARGUMENT ............................................................................................................................... 3

I.   IF SUMMARY JUDGMENT IS GRANTED IN FAVOR OF DEFENDANT OFFICERS,
     IT SHOULD ALSO BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFF'S
     *MONELL* CLAIM. ............................................................................................................ 5

II.  PLAINTIFF'S "STREET FILES" AND *BRADY* VIOLATION *MONELL* THEORIES
     FAIL AS A MATTER OF LAW. ........................................................................................ 6

     A.   History of "street files" in the *Jones* and *Palmer* litigation. ........................................ 7

     B.   CPD's written policies regarding recordkeeping. ........................................................ 10

     C.   There is no evidence of a widespread practice of suppressing or withholding
          exculpatory evidence. ................................................................................................... 12

     1.   Tiderington's reliance on spreadsheets that he did not prepare and cannot manipulate
          render his opinions without foundation and unreliable................................................. 12

     2.   Tiderington concedes it would not be "humanly possible" to become familiar with
          each of the investigations and, therefore, he cannot establish the City had a policy and
          practice of maintaining and concealing exculpatory evidence in clandestine "street
          files."............................................................................................................................... 15

     3.   Tiderington's concession that he did not review CCSAO files renders his opinion on a
          theory that CPD had a policy and practice of maintaining and concealing exculpatory
          evidence in clandestine "street files" irrelevant........................................................... 17

     4.   If CPD disclosed all of its investigative documents for a case to the CCSAO, and the
          CCSAO did not, in turn, disclose those documents to the criminal defense attorney,
          the fault would be with the CCSAO not CPD. Yet Tiderington has no idea whether
          any of the documents he claims were not turned over, were in fact given to the
          prosecutor by CPD, so his opinion that documents were systematically withheld lacks
          a valid basis. Tiderington's haphazard statistically insignificant review of 64 CCPDO
          files does not establish that any material was withheld. ............................................... 18

     D.   Tiderington's "failure to document," "failure to train," and "tunnel vision" opinions
          are not supported by any data in his Report. ................................................................. 20

III. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE
     TO DISCIPLINE *MONELL* THEORY.......................................................................... 22

     A.   Dr. Shane's opinion that CPD supervisors knew or should have known that
          complaints against Defendant Officers were accruing in a manner that signaled the
          need for intervention is based on his review of Defendant Officers CR files from
          1980-2008. ..................................................................................................................... 23

     B.   Shane's reliance on 40 CR files from a twenty-nine year period of time is insufficient
          to establish a citywide practice. .................................................................................... 25

C.    Dr. Shane's general observations from 40 CR files as a basis to conclude that CPD's accountability systems were "broadly ineffective" suffers from the same deficiencies and does not amount to evidence of a widespread practice. ....................................... 27

V.  PLAINTIFF FAILED TO IDENTIFY ANY EVIDENCE FROM WHICH A JURY COULD REASONABLY CONCLUDE THAT A CITY POLICY RATHER THAN ISOLATED INDIVIDUAL ACTION WAS THE CAUSE OF A CONSTITUTIONAL INJURY OR THAT ANY CITY POLICY WAS THE MOVING FORCE BEHIND A CONSTITUTIONAL INJURY. ....................................................................................... 27

VI. SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFFS' DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* AND IDEMNIFICATION. ................................................................................................. 29

CONCLUSION.................................................................................................................. 30

## **CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................ 2, 3

*Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728 (7th Cir. 1994) ............................. 3

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) ...................................................... 17

*Bohanon v. City of Indianapolis*, No. 20-3125, 2022 WL 3585003 (7th Cir. Aug. 22, 2022) ..... 28

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) .......................................... 21

*Bryant v. Whalen*, 759 F. Supp. 410 (N.D. Ill. 1991) ....................................................... 26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................. 3

*Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017) .................................................. 28

*Connick v. Thompson* 563 U.S. 51 (2011) ................................................................... 25

*Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) ............. 22

*First Midwest Bank v. City of Chicago*, 988 F.3d 978 (7th Cir. 2021) ...................................... 6

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ....................................................... 19

*Gill v. City of Milwaukee*, 850 F.3d 335 (7th Cir. 2017) .................................................... 4

*Green v. Whiteco Indus.*, 17 F.3d 199 (7th Cir. 1994) ....................................................... 3

*Grieveson v. Anderson*, 538 F.3d 763 (7th Cir. 2008) ....................................................... 4

*Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014) ............................................................... 5

*Ienco v. City of Chicago*, 286 F.3d 994 (7th Cir. 2002) ..................................................... 3

*Jackson v. Marion County*, 66 F.3d 151 (7th Cir. 1995) ..................................................... 4

*Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986) ..................................................... 4

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ............................................. 7, 8, 10

*JPM, Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270 (7th Cir. 1996) .................................. 2

*LaPorta v. City of Chicago*, 277 F. Supp. 3d 969 (N.D. Ill. 2017) ......................................... 26

*McTigue v. City of Chicago*, 60 F.3d 381 (7th Cir. 1995) ................................................. 3, 4

*Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152 (N.D. Ill. Mar. 12, 2024) .......... 18

*Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658 (1978) ....................................... 1

*Montano v. City of Chicago*, 535 F.3d 558 (7th Cir. 2008) ............................................. 5, 28

*Moran v. Calumet City*, 54 F.4th 483 (7th Cir. 2022) ...................................................... 29

*Ortiz v. John O. Butler, Co.*, 94 F.3d 1121 (7th Cir. 1996) ................................................. 3

*Othman v. City of Chicago*, No. 11 C 05777, 2014 WL 6566357 (N.D. Ill. Nov. 20, 2014) ........ 5

*Ovadal v. City of Madison*, 416 F.3d 531 (7th Cir. 2005) ......................................... 3, 22, 28

*Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ............................................ 7, 8, 9

iv

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987)................................................. 7, 9, 10

*Porter v. Whitehall Labs., Inc.*, 9 F.3d 607 (7th Cir. 1993)............................................ 17

*Richards v. Combined Ins. Co. of America*, 55 F.3d 247 (7th Cir. 1995)..................................... 3

*Rivera v. Guevara*, 319 F. Supp. 3d 1004 (N.D. Ill. 2018)................................................. 26, 28

*Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194 (7th Cir. 1985)............................................ 4

*Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659 (7th Cir. 2005) .................. 2, 3

*Rossi v. City of Chicago*, 790 F.3d 729 (7th Cir. 2015)............................................. 3

*Rowe v. Gibson*, 798 F.3d 622 (7th Cir. 2015) ............................................ 19

*Ruiz-Cortez v. City of Chi.*, 931 F.3d 592 (7th Cir. 2019) ........................................ 28

*Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768 (N.D. Ill. Oct. 26, 2016).......... 16

*Sallenger v. City of Springfield, Ill.*, 630 F.3d 499 (7th Cir. 2010) ............................... 4

*Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417 (N.D. Ill. June 11, 2015)5, 21, 26

*Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003)....................................... 16

*Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990) .................................... 4

*Soller v. Moore*, 84 F.3d 964 (7th Cir. 1996) ................................... 16

*Thomas v. Cook County Sheriff's Department*, 604 F.3d 293 (7th Cir. 2009)..................... 6, 22

*Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006)..................................... 16

*U.S. v. Hall*, 165 F.3d 1095 (7th Cir. 1999)................................... 17

*U.S. v. Mamah*, 332 F.3d 475 (7th Cir. 2003)................................... 17

*Wragg v. Vill. of Thornton*, 604 F.3d 464 (7th Cir. 2010) ............................ 4

## **RULES**

Fed. R. Civ. P. 56(1)(a)........................................................ 2

Defendant City of Chicago (the "City"), by and through its undersigned counsel, pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, submits the following Memorandum of Law in support of its Motion for Summary Judgment on Plaintiff *Monell* claim (Count VII).

## INTRODUCTION

This case arises out of Plaintiff's alleged wrongful conviction for the 1990 double murder of Torrence and Kevin Wiley. (Dkt. 136, Am. Compl., ¶¶ 1, 38). In Count VII, Plaintiff seeks to hold the City liable pursuant to *Monell v. New York City Dep't. of Soc. Servs.,* 436 U.S. 658 (1978). (Dkt. 136, ¶¶ 209-231), alleging his injuries were directly and proximately caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago. (Dkt. 136, at ¶¶ 209-231). Pursuant to a stipulation between the parties, (Dkt. 347), as well as Plaintiff's response to the City's written discovery, Plaintiff is limiting his *Monell* claim to the following theories: that as a matter of widespread municipal policies and practices: (1) Chicago police officers systemically suppressed exculpatory and/or impeaching material by a) intentionally secreting discoverable reports, memos and other information in clandestine files that were maintained solely at the police department and were withheld from the State's Attorney's Office ("CCSAO") and from criminal defendants, and were routinely destroyed at the close of the investigation, rather than being maintained as part of the "official file" and b) through purposefully not recording or documenting impeaching or exculpatory material and/or destroying exculpatory evidence (Dkt. 136, at ¶ 214; SOF ¶¶ 1-3, 7); (2) the Chicago Police Department ("CPD") failed to train detectives on how to document, maintain, and preserve impeaching or exculpatory material and how to conduct investigations free from tunnel vision (SOF ¶¶ 1- 2, 4, 7); (3) that CPD operated a dysfunctional and sham disciplinary system; (SOF ¶¶ 1-2, 5, 7); and (4) that CPD failed to supervise and discipline CPD officers who engaged in

investigative misconduct (SOF ¶¶ 1- 2, 6-7).

Plaintiff was asked in written discovery to "identify all evidence known to him that establishes why "the identified City's policies were unconstitutional. (SOF ¶ 7). With respect to theories (1) and (2) Plaintiff referenced the expert disclosure of his disclosed expert Thomas Tiderington and the materials upon which he relied. Regarding theories (3) and (4), Plaintiff referenced the expert disclosure of his disclosed expert Dr. Jon Shane and the materials upon which he relied. (*Id.*). However, Plaintiff's experts have adduced no evidence to prove any of these allegations, much less that any City policy resulted in a violation of Plaintiff's constitutional rights. Therefore, the City is entitled to summary judgment as a matter of law on Plaintiff's *Monell* claim.

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(1)(a). By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). While the court construes all facts and reasonable inferences in the light most favorable to the non-moving party, only factual disputes that might affect the outcome of the suit under the governing law will preclude summary judgment. *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 272 (7th Cir. 1996); *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, Plaintiff must offer more than a mere scintilla of evidence. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). "If the evidence is merely colorable or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Moreover, Plaintiff cannot prevail by simply resting on the pleadings or simple speculation and conjecture. *Whitmore's Auto. Servs.*, 424 F.3d at 669; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). To the contrary, as the party who bears the burden of proof, Plaintiff must affirmatively demonstrate the presence of a genuine issue of material fact that requires a trial to resolve. *Id.* If the moving party does not have the ultimate burden of proof on a claim, it suffices for the movant to direct the Court to the lack of evidence as an element of that claim. *Green v. Whiteco Indus.*, 17 F.3d 199, 201 (7th Cir. 1994). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler, Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996) (citing *Richards v. Combined Ins. Co. of America*, 55 F.3d 247, 251 (7th Cir. 1995)).

## ARGUMENT

To establish § 1983 municipal liability, Plaintiff must show that "'(1) he suffered a deprivation of a federal right; (2) as a result of either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority for the City; which (3) was the proximate cause of his injury.'" *Ovadal v. City of Madison*, 416 F.3d 531, 535 (7th Cir. 2005) (quoting *Ienco v. City of Chicago*, 286 F.3d 994, 998 (7th Cir. 2002)).

Municipal liability lies where a constitutional violation is caused by one of the following: (1) an express policy (2) a well-settled widespread practice or (3) the act of a final policy maker. *See McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995) (quoting *Baxter by Baxter v. Vigo County School Corp.*, 26 F.3d 728, 734-35 (7th Cir. 1994)); s*ee also, e.g., Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). Here, Plaintiff does not claim any express policy or

act of a final policymaker caused him injury. (SOF ¶¶ 1-2, 8). Rather, Plaintiff's *Monell* claim seeks to attach liability under a "widespread practice" theory.

To assert a *Monell* claim based on a "widespread practice" theory, as Plaintiff does here, he must establish a pattern of similar deprivations that are so "permanent, well-settled, and widespread as to constitute custom or usage" with the force of law. *Wragg v. Vill. of Thornton*, 604 F.3d 464, 468 (7th Cir. 2010); *McTigue*, 60 F.3d at 382. Put another way, a plaintiff proceeding under a "widespread practice" theory must establish that the specific violations relied upon as pattern evidence are genuinely attributable to a *de facto* policy rather than mere isolated incidents. *Jackson v. Marion County*, 66 F.3d 151, 152 (7th Cir. 1995); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (requiring "examples of other…police officers taking actions similar to those complained of here"). A custom "implies a habitual practice or a course of action that characteristically is repeated under the circumstances." *Sims v. Mulcahy*, 902 F.2d 524, 542 (7th Cir. 1990) (quoting *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986)). Further, it is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. *Id.* (citing *Rodgers v. Lincoln Towing Serv., Inc.,* 771 F.2d 194, 202 (7th Cir. 1985)). Plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision. *Id.* at 543; *see also Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) ("what is needed is evidence that there is a true policy at issue, not a random event").

Only if the plaintiff can prove a constitutional violation, is he entitled to prove the City's policy caused it. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 505 (7th Cir. 2010) (jury's conclusive verdict on the underlying constitutional claim means no *Monell* liability). Furthermore,

even if a plaintiff establishes an injury, that, alone, would be insufficient to prove a *Monell* claim. *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015); *Othman v. City of Chicago*, No. 11 C 05777, 2014 WL 6566357, at *5 (N.D. Ill. Nov. 20, 2014); *see also Hahn v. Walsh*, 762 F.3d 617, 637 (7th Cir. 2014). Under any theory, the plaintiff must demonstrate that the City was "deliberately indifferent" to the "known or obvious consequences" of the alleged policy. *See, e.g., Brown*, 520 U.S. at 407 (citing *Harris*, 489 U.S. at 388); *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008). Additionally, the plaintiff must demonstrate the existence of a direct causal link between the municipal policy and the constitutional injury. *Harris*, 489 U.S. at 385; *Brown,* 520 U.S. at 400.

## I.   IF SUMMARY JUDGMENT IS GRANTED IN FAVOR OF DEFENDANT OFFICERS, IT SHOULD ALSO BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFF'S *MONELL* CLAIM.

Defendant Officers bring a Motion for Partial Summary Judgment ("DOs MSJ") (incorporated fully herein), seeking summary judgment. (*See generally* Def. Officers' Mem. Law Supp. Mot. Partial Summ. J. ("DOs MSJ")).  As it relates to Plaintiff's *Monell* "street files" theory, Defendant Officers establish that Plaintiff cannot show that any alleged *Brady* materials existed and were concealed and/or destroyed and/or that any such materials were exculpatory. (*Id.*).

Specifically, Plaintiff alleges that Defendant Officers withheld documentation of Mingey and Montilla's conversations with Plaintiff on July 15 and August 1.  (*See* DOs MSJ.)  As Defendant Officers explain, Plaintiff cannot show that these materials existed and were withheld or destroyed.  (*Id.*). In fact, Defendant Officers make clear that Plaintiff cannot establish any *Brady* violation here. (*Id.*).  Moreover, there is no evidence that a "street file" existed in this case. The CCSAO file for the prosecution of the Wiley Brothers's murder contains GPRs from the Investigative File.  (SOF ¶ 98).

For these reasons, and those explained in DO's MSJ, Plaintiff lacks sufficient evidence to support his *Brady* theories. As such, Plaintiff cannot prove that he suffered a constitutional violation. As a fundamental principle, if no constitutional violation occurred, the alleged City policies are "quite beside the point." *Heller*, 475 U.S. at 799; *see also Matthews,* 675 F.3d at 709 (finding no constitutional violation, so therefore no municipal liability).

Moreover, consistent with the post-*Jones/Palmer* policies, the record here establishes that the Investigative File was produced to the CCSAO. There are GPRs in the CCSAO file in this case. (SOF ¶ 98). The Investigative file is the only source from which to obtain GPRs. (SOF ¶¶ 11, 17, 45). Accordingly, the evidence here establishes that the Investigative file was produced.

Without an underlying constitutional violation against Defendant Officers, i.e., the violation of a federal right, Plaintiff cannot proceed with a *Monell* claim on the same basis because doing so would create an inconsistent verdict. *First Midwest Bank v. City of Chicago,* 988 F.3d 978, 987 (7th Cir. 2021) (reiterating that municipality cannot be held liable under *Monell* if such a finding would create an inconsistent verdict); *see also, Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 305 (7th Cir. 2009). Further, even if Plaintiff can establish a genuine issue of material fact regarding his *Brady* theory against Defendant Officers, as set forth more fully below, the City is entitled to judgment as a matter of law because he cannot establish his widespread practice theory.

## II. PLAINTIFF'S "STREET FILES" AND *BRADY* VIOLATION *MONELL* THEORIES FAIL AS A MATTER OF LAW.

Plaintiff alleges that CPD, as a matter of widespread practice, systemically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in clandestine files that were maintained solely at the police department and were withheld from the CCSAO and from criminal defendants, and were routinely destroyed at

the close of the investigation, rather than being maintained as part of the official file – the so-called "street files" theory, (Dkt. 136, ¶ 214), and that as a matter of widespread practice CPD suppressed exculpatory and/or impeaching material through purposefully not recording or documenting impeaching or exculpatory material and/or destroying exculpatory evidence. (SOF, ¶ 3). Finally, Plaintiff claims CPD failed to train detectives on how to document, maintain, and preserve impeaching or exculpatory material and how to conduct investigations free from tunnel vision.

Although Plaintiff retained an expert to support these theories, he has failed to identify sufficient evidence for a reasonable jury to find that the City had these *de facto* policies. Therefore, the City is entitled to summary judgment on these *Monell* theories.

A.    History of "street files" in the *Jones* and *Palmer* litigation.

Plaintiff and his expert purport to draw a similarity between speculative claims that Plainitff did not receive documents memorializing his conversations with Defendants Mingey and Montilla on July 15 and August 1 to the file that was subject of the litigation in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). Accordingly, *Jones*, as well as Seventh Circuit's subsequent decisions in *Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ("*Palmer I*") and *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ("*Palmer II*") provide necessary background for Plaintiff's claim.

In *Jones*, the plaintiff alleged that CPD and the individual officers withheld exculpatory evidence from him in a "street file" during his 1981 prosecution. *Jones*, 865 F.2d at 995. During the investigation, information regarding problems with the victim's identification of Jones were memorialized and placed into the file, termed a "street file,"[1] that contained the detectives' notes.

---

[1] The label at the time for the file sometimes maintained at a particular Area by detectives conducting a violent crime field investigation differed from Area to Area. *See Palmer I*, 755 F. 2d at 566. Such files were variously referred to as a street file, a working file, a running file, etc. *Id.* For purposes of this motion, the City will refer to the file in *Jones* as a "street file."

*Id.* at 989-90. In 1981, notes were not labeled, as they are now, with a Record Division ("RD") number unique to each investigation. *Palmer I*, 755 F.2d at 566. Instead, CPD required detectives to document all information pertinent to an investigation in case or supplementary reports. *Id.* Pursuant to that policy, the detective also memorialized the exculpatory information in a supplementary report which was rewritten by another detective, excluding the exculpatory information. *Jones*, 856 F.2d at 991. Thus, because of the other detective's wrongdoing, the documentation only existed in the "street file," which was not disclosed to Jones. *Id.* at 996.

In analyzing the City's liability in *Jones*, the Seventh Circuit found that because CPD maintained detective notes and memoranda without an RD number, and the supplementary report was destroyed, CPD's record keeping practices, specifically the maintenance of "street files," left a source of exculpatory information unavailable to Jones. *Id* at 995. The Court held that there was sufficient evidence for the jury to conclude that the policy of maintaining "street files" created the *opportunity* for the constitutional violation in *Jones* to occur. *Id.* at 995-96. Critically, the Court did not find that CPD's practice of maintaining "street files" was designed to conceal exculpatory information. To the contrary, the detective intended the exculpatory evidence to be known – that is why he documented it, both in his memorandum and in a supplementary report. *Id*. at 991.

In 1982, as a result of the *Jones* criminal prosecution, the *Palmer* plaintiffs brought a class action lawsuit against the City challenging the constitutionality of CPD's alleged practice of concealing exculpatory material collected in criminal investigations in the department's informal "street files." *Palmer I*, 755 F.2d at 564-65. Specifically, the plaintiffs sought a preliminary injunction to "(a) prevent the defendants from continuing their alleged practice of withholding exculpatory evidence contained in 'street files;' and (b) preserve all existing 'street files.'" *Id.* at 566. While the District Court granted the preliminary injunction, the Seventh Circuit overruled it,

8

finding that neither of the two classes of plaintiffs, those convicted of a felony ("subclass A") or those awaiting trial for felony charges in Cook County Circuit Court ("subclass B"), presented any evidence of an actual constitutional violation.[2] *Id.* at 571.

Still, to address the class plaintiffs' accusation that they could not establish a constitutional violation if the evidence was in the hands of CPD, the *Palmer I* Court granted the plaintiffs' request to preserve all "street files" for the subclass A plaintiffs. *Palmer I*, 755 F.2d, at 572.[3] Those plaintiffs were permitted to inspect over 300 "street files" for exculpatory evidence. *Palmer II*, 806 F.2d, at 1317. Notwithstanding their search of each file, the *Palmer* plaintiffs failed to uncover even one piece of undisclosed exculpatory evidence. *Id.* at 1324 ("their claim depends on there being exculpatory material in the 'street files' – and there isn't any.").

Nevertheless, after failing to uncover any exculpatory evidence, class counsel filed a petition for attorneys' fees pursuant to Section 1988. *Palmer II*, 806 F.2d at 1316. The District Court granted the petition, but the Seventh Circuit in *Palmer II* again reversed, emphasizing that the class-plaintiffs did not prevail. *Id.* at 1321, 24. While recognizing that the District Court initially granted the preliminary injunction, the Seventh Circuit explained that "this court threw it out." *Id.* at 1320. Plaintiffs' only success was in obtaining a discovery order directing the City to retain its "street files" such that convicted class members could inspect them for exculpatory information. *Id.* at 1321. The Court observed, however, that such an order "is worthless if discovery turns up nothing; indeed, it is worse than worthless because then the party has incurred an expense without obtaining any benefit from it," making clear that despite being afforded the

---

[2] The Court also warned that "the Federal courts have no business whatsoever, meddling in or attempting to control the daily maintenance and administration of the CPD and the Cook County State's Attorney's Office, *absent a clear and defined constitutional violation.*" *Id.* at 562, 578 (emphasis added).
[3] This preservation order was characterized by the Court in *Palmer II* as "in the nature of a discovery order." *Palmer II*, 806 F.2d at 1321.

opportunity to review each file, the plaintiffs were unable to find anything to substantiate their allegations, stating "they went on a fishing expedition, and the pond was empty." *Id.*

Here, Plaintiff developed no evidence that any documents were withheld. But even if Plaintiff could point to a disputed fact as to this point, the record developed establishes that the Investigative File in relation to the Wiley brothers' murder was in the possession of the CCSAO because the CCSAO file contained GPRs (which are only maintained in the investigative file) and Plaintiff developed no evidence that a widespread "street files" practice resulting in concealed material exculpatory evidence persisted after 1983.

**B.    CPD's written policies regarding recordkeeping.**

The "street files" practice was never found to be *per se* unconstitutional and no individual other than Jones was found to have suffered a constitutional violation as a result. Nonetheless, CPD reviewed its recordkeeping practices and issued directives and mandated training to routinize record keeping in homicides and guard against the potential that material information would be discarded or otherwise not part of the information available. (SOF ¶¶ 9-19); *Jones*, 856 F.2d at 991, 995-96; *Palmer II*, 806 F.2d at 1316, 1324. CPD issued, in 1983, seven years before the investigation at issue in this case, Detective Division Special Order 83-1 ("S.O. 83-1"), which made clear that CPD's policy is to "conduct all criminal investigations in an impartial and objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised...." (SOF ¶ 14). S.O. 83-1 expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any materials that may tend to show his possible innocence or aid in his defense is preserved." (SOF ¶ 15).

S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated or received by any detective during the course of such investigation." (SOF ¶ 16). S.O. 83-1 instructed that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney, and the assigned Department members with a comprehensive account of the subject criminal case." (*Id.*).

To standardize note taking, CPD created the General Progress Report ("GPR"), a preprinted form for detectives to use to take notes. (*Id.*). Detectives use GPRs to document "handwritten notes and memoranda including inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (*Id.*). To address the specific concern identified in *Jones*, each preprinted GPR has a designated place for the RD number, such that all handwritten notes for any investigation are tracked together. (*Id.*). In accordance with S.O. 83-1, GPRs are not maintained in CPDs RD File but are maintained in the Investigative File. (SOF ¶¶ 11, 17, 45).

An RD File, often referred to as a "permanent retention file," contains the original case report, as well as all supplementary reports. (SOF ¶ 10). For homicide cases, CPD maintains both the Investigative File and the RD file permanently. (SOF ¶¶ 10, 14-19). By design, the RD/permanent retention files do not contain detectives' notes. (SOF ¶¶ 11, 17, 45). Therefore, according to CPD's express policies, the Investigative File should provide all parties to the criminal proceeding a comprehensive account of the investigation, including exculpatory information. (SOF ¶ 17).

11

**C.** **There is no evidence of a widespread practice of suppressing or withholding exculpatory evidence.**

Even if Plaintiff could show a genuine issue of material fact as to any Defendant Officer concealing *Brady* material, Plaintiff cannot demonstrate that the City had notice of a widespread practice of failing to document investigative information or suppressing or withholding exculpatory evidence, or that the City's practices caused his claimed constitutional injuries.

Plaintiff's *Monell* theory related to the City's recordkeeping practices and report writing rests entirely on Plaintiff's expert, Thomas Tiderington, who the City argues should barred from testifying for the reasons stated in Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Thomas J. Tiderington ("Tiderington *Daubert* Motion"), incorporated herein. (*See generally* Def. City's Mot. Bar Tiderington). But even if the Court allowed Tiderington to testify, Plaintiff's *Monell* claim still fails as a matter of law. Tiderington does not establish a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files." His opinions regarding the City's report writing and recordkeeping practices are thin and rely exclusively on speculation. Additionally, Plaintiff's theory suffers from a failure to establish a causal link between Plaintiff's alleged constitutional violations and this particular *Monell* theory. *Harris*, 489 U.S. at 385; *Brown,* 520 U.S. at 400.

**1.** **Tiderington's reliance on spreadsheets that he did not prepare and cannot manipulate render his opinions without foundation and unreliable.**

Plaintiff retained Thomas Tiderington to provide opinion testimony on Plaintiff's *Monell* claim, as well as the police investigation in this case. (SOF ¶ 25). He was also retained to provide opinion testimony in five other cases involving Defendant Guevara: *Sierra v. Guevara*, 18 CV 3029 (N.D. Ill.), *Iglesias v. Guevara*, 19 CV 6508 (N.D. Ill.)*, Solache/Reyes*, 18 CV 2312/18 CV

1028 (N.D. Ill.)*, Johnson v. Guevara.*, 20 CV 4156 (N.D. Ill.), and *Gomez v. Guevara*, 18 CV 3335 (N.D. Ill.). His reports in all the cases are nearly identical. (SOF ¶ 26).[4]

Tiderington's report relies on the accuracy of the spreadsheets (Attachments E and F of his report), which purport to gather data from the 1991-1998 homicide files. (SOF ¶¶ 34, 39), created and provided to him by plaintiff's counsel (Loevy & Loevy) in *Solache/Reyes* and *Sierra.* (SOF ¶ 33). Attachment E covered the time period 1995-1998 and also included information purportedly gathered from a small subset of criminal defense files ("*Solache/Reyes* spreadsheet"). (SOF ¶¶ 34, 39). Attachment F covered the time period 1991-1995 ("*Sierra* spreadsheet"). While Tiderington's report (at page 10) describes the Attachments as "Spreadsheet of my data analysis," Tiderington admits he was not involved in the creation of the spreadsheets, including deciding how to categorize or code entries, thereby rendering any conclusions he draws from his so-called "data analysis" or the spreadsheets devoid of any evidentiary meaning. (SOF ¶¶ 36-37).[5]

"Where an expert based [his] opinion on information supplied by another, the [courts] must focus on the reliability of the expert's foundation." *Black & Decker v. Bosch Tools*, No. 04 C 7955, 2006 WL 5156873 at *1 (N.D. Ill. Sept. 8, 2006) (citing *Loeffel Steel Prods. v. Delta Brands*, 372 F. Supp. 2d 1104, 1119 (N.D. Ill. 2005)). Expert opinions based on facts and material prepared by the party's lawyer are not reliable. *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. Nov. 3, 2008) ("This conclusion follows from a number of separate but related principles, perhaps the most critical of which is the partisan role lawyers play in our adversary system.").

---

[4] For purposes of this motion, because Tiderington's reports are nearly identical, any reference to "report" in this motion, refers to his *Maysonet* report unless otherwise noted.

[5] For instance, Tiderington admitted that he did not know how the coders determined that the inventory sheets (discussed below) were incomplete. (SOF ¶ 37). And while he was also provided with the files from which the information set forth in the spreadsheet was purportedly derived, as explained *infra* at 14 and 16, he conceded that he only "spot-checked" the files. (SOF ¶¶ 37, 46-47).

Here, Tiderington was provided with the spreadsheets only in "hard copy large pages," and if he received it electronically, it was only in pdf format, (he cannot recall if he received it in Excel, but regardless, he did not manipulate the data and the calculations from the data are not his) which included nearly 10,000 separate cells of data. (SOF ¶¶ 38-40). Specifically, the *Solache/Reyes* spreadsheet (for the years 1995-1998) is 53 pages long and contains 349 rows and 28 columns of data for a total of 9,772 separate cells of data. (SOF ¶ 39). The *Sierra* spreadsheet (for the years 1991-1995) is 69 pages long and contains 496 rows and 17 columns of data for a total of 8,432 separate cells of data. (SOF ¶ 40). The spreadsheets contain no statistical analysis, do not provide percentages or even a tally of the totals for each of the separate cells of data. (*Id.*). Tiderington's report purports to draw statistical conclusions or to tally certain data, which he terms his "findings," on datapoints from the spreadsheets. (*See* Def. City's Mot. Bar Tiderington). For example, in his report, he states "For the period from 1995-1998: I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete." (SOF ¶ 37). Yet, he conceded that he, "Certainly [] didn't look at 277 [files], but that's something that was spot-checked and is reflected in the spreadsheet." (*Id.*). Without access to versions of the spreadsheets that permit manipulation, such as an excel spreadsheet where data can be sorted and filtered, Tiderington simply could not have determined **himself** that there were 277 files identified in the column that purported to tally the number of files with "incomplete inventory sheets," thus it is simply incredulous to believe that Tiderington conducted this analysis. Moreover, if he did not review all the files himself, and does not know how the coders determined that the inventory sheet was incomplete, then how can he reliably "find" that the inventory sheets were in fact "incomplete," regardless of the tally. The same problems exist with respect to his other

"findings" on the other datapoints. A more detailed discussion of this fatal flaw is addressed in the Tiderington *Daubert* Motion, incorporated herein. (*See* Def. City's Mot. Bar Tiderington).

> **2. Tiderington concedes it would not be "humanly possible" to become familiar with each of the investigations and, therefore, he cannot establish the City had a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files."**

Tiderington relied upon the spreadsheets and his haphazard review of the files to conclude that the City's written policies did not adequately address the *Jones* and *Palmer* "street files" problem. (SOF ¶¶ 68, 71-72). However, his analysis of those materials falls woefully short of establishing a practice of maintaining "clandestine files" still existed in 1990 or that CPD had a practice of withholding any information whatsoever let alone exculpatory evidence. Moreover, the additional files he reviewed in this case (the 1987-1990 files), which was confined to determining whether the investigative files were missing GPRs, (SOF ¶¶ 43-44), do not cure the deficiencies in his analysis.

Tiderington understands the phrase "street file" to mean files used by detectives that were not considered a formal file required to be turned over to the prosecution and/or defense. (SOF ¶ 69). Tiderington defines the phrase "unofficial documents," as "perhaps the street files [referring to the *Jones* and *Palmer* cases] or documents that officers believe are personal information versus [sic] and information that perhaps they keep in their desk and not in either the investigative file or permanent file." (SOF ¶ 64). In contrast, Tiderington recognizes that Investigative Files are formal files required to be turned over by CPD to the prosecution and/or defense, (SOF ¶ 70), dooming any attempt to equate Investigative Files to street files, as well as his opinion that the policies enacted by CPD did not adequately address the "street files problem." (SOF ¶ 68).

First, he maintains that CPD's policies were not being complied with. (SOF ¶ 72). This opinion is irrelevant because the violation of police policies is "immaterial" to the question of

15

whether a federal constitutional violation has been established. *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]his court has consistently held that '42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or [] departmental regulations and police practices.'") (citing *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003); *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 526 (7th Cir. 2001); *Soller v. Moore*, 84 F.3d 964, 969 (7th Cir. 1996)). Even Tiderington concedes that, for example, handwritten notes that are not written on GPRs that are included in the investigative file does not constitute a violation of a criminal defendant's rights. (SOF ¶ 66). Regardless, all his conclusions regarding compliance with CPD's policies are drawn from the spreadsheet and, as set forth above, and in the Tiderington *Daubert* Motion, are without foundation and unreliable. (*See* Def. City's Mot. Bar Tiderington).

Second, Tiderington concludes that criminal defense files show that "important investigative materials" are regularly withheld. (SOF ¶ 73). However, he admits that he did not review every file and merely "spot-checked" some of them, nor did he utilize "any great methodology" in deciding which files to spend more time with. (SOF ¶¶ 46-49). Tiderington concedes it would not "have been humanly possible" to become familiar with each of the investigations that underlie the hundreds of files he reviewed because each of the files contained "many, many pages." (SOF ¶ 50). Thus his opinions cannot be used to support the *Monell* claim because of the lack of any substantial review and analysis of the files that he purportedly relies on to draw his conclusions. Tiderington's failure to properly evaluate the data prevents any reliable link between those files and his conclusions. *See Ruiz-Cortez v. City of Chicago*, 11 C 1420, 2016 WL 6270768, at *26-27 (N.D. Ill. Oct. 26, 2016) (expert's misalignment of data makes link between fact and conclusions too tenuous to accept expert's opinion); *U.S. v. Mamah*, 332 F.3d

16

475, 478 (7th Cir. 2003) (there must be "some link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support").

Any conclusions he draws from the spreadsheets or his cursory review of the files are pure speculation and, regardless, do not establish a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files." The Court should not admit "opinion evidence that is based on subjective belief or unsupported speculation." *U.S. v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999) (quoting *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir. 1993)).

Moreover, Tiderington's concession that Investigative Files are formal files that are turned over by CPD eliminates the possibility that the City's policies and practices regarding Investigative Files are the equivalent of the pre-1983 policies and practices regarding street files. (SOF ¶ 70). And the additional analysis he did here to determine whether GPRs existed in the 1987-1990 files to draw that conclusion is based on pure speculation. (SOF ¶¶ 43-44). And, more importantly, he concedes that he did not review any Cook County State's Attorney's Office files (hereinafter, "CCSAO files") or Cook County Public Defender's Office (hereinafter, "CCPDO files") files related to those CPD files. (SOF ¶ 59). Accordingly, Tiderington's analysis does not support Plaintiff's *Monell* "street files" theory.

### 3. Tiderington's concession that he did not review CCSAO files renders his opinion on a theory that CPD had a policy and practice of maintaining and concealing exculpatory evidence in clandestine "street files" irrelevant.

The purpose of Tiderington's opinion is to demonstrate that CPD had a policy and practice of withholding documents, leading to *Brady* violations. However, CPD's *Brady* duty is fulfilled when CPD provides exculpatory documents to the prosecutor or defense counsel. *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015) ("police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's

17

responsibility to turn the evidence over to defense counsel"); *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (*Brady* requires police to disclose exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation); *Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152, at *8 (N.D. Ill. Mar. 12, 2024) (Police must disclose exculpatory evidence to the prosecutor so that they can disclose the evidence to the defendant).

Therefore, it is necessary to know what documents the defense and prosecutor had to evaluate whether CPD had actually withheld documents in violation of *Brady*. Tiderington concedes, however, that he *never* reviewed any of the files from the CCSAO that corresponded to the CPD files he examined to determine if any of the materials that he claims were not produced to the CCPDO were contained within the CCSAO files. (SOF ¶ 59).

> **4. If CPD disclosed all of its investigative documents for a case to the CCSAO, and the CCSAO did not, in turn, disclose those documents to the criminal defense attorney, the fault would be with the CCSAO not CPD. Yet Tiderington has no idea whether any of the documents he claims were not turned over, were in fact given to the prosecutor by CPD, so his opinion that documents were systematically withheld lacks a valid basis. Tiderington's haphazard statistically insignificant review of 64 CCPDO files does not establish that any material was withheld.**

Plaintiff cannot dispute the fact that if CPD disclosed the investigative documents for a case to the CCSAO and the CCSAO did not, in turn, disclose those documents in criminal discovery, the fault does not lie with CPD. Yet, Tiderington does not know whether any documents he claims were not turned over were in fact given to the prosecutors by CPD. Tiderington opines that CPD routinely withheld materials but bases his opinion on whether exculpatory investigative materials are regularly withheld from criminal defendants on only 64 criminal defense files from the CCPDO files associated with the 1995-1998 investigative files and RD Files. (SOF ¶ 57). As explained belos, this is a statistically insufficient data set to yield any meaningful conclusions. Further, his review is clearly insufficient to draw any reliable conclusions

because he admitted that he only personally reviewed 10 out of the 64 sets of companion files, (SOF ¶ 82), and, more importantly, did not determine if the information in the Investigative File that he concluded was withheld was exculpatory. (SOF ¶ 51). His conclusion lacks the requisite support and amounts to nothing more than referencing case files and his own *ipse dixit* that information was not disclosed. *Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015)(opinion evidence "that is connected to existing data only by the *ipse dixit* of the expert" should be disregarded) (quoting *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Without tethering his conclusions that information was withheld within the meaning of *Brady* to the actual case files that necessarily inform the analysis, Tiderington's opinions are simply irrelevant and must be disregarded.

Tiderington purports to have drawn conclusions based upon the review (by the unknown coders) of 64 CCPDO files associated with the Investigative and RD files from 1995-1998. This is less than half the number of files that plaintiffs' Solache and Reyes' consulting expert, Dr. Allison Harris, opined would be necessary to draw statistically significant conclusions. (*Reyes v. Guevara, et al.*, 18 cv 1028, Dkt. 469, Aff. Dr. Harris).[6] In ordering the production of the CCDPO Files, Magistrate Judge Harjani concluded that the production of 132 files would ensure a statistically significant result, and that the likely benefit substantially outweighed the marginal burden placed upon the CCPDO. (Dkt. 471, Mem. Op. & Order, at 15). The court further noted that "[t]here is

---

[6] To obtain CCPDO files from the 1995-1998 time period to compare to CPDs files, plaintiffs Solache and Reyes were ordered to obtain from their consulting/pre-disclosed expert the number of CCPDO files in a sample set that would be sufficient for a statistical analysis and provide it to the court, (*Reyes*, Dkt. 434, Minute Entry), so that Magistrate Judge Harjani could decide the Cook County Public Defender's Motion to Quash or Modify Subpoena ("Motion to Quash") (*Reyes*, Dkt. 424, CCPD's Mot. Quash Subpoena). Dr. Harris indicated that "To obtain a sample with a confidence level of 95% and a margin of error of 5%, a random selection of 132 files would be required." (*Reyes*, Dkt. 469 at ¶ 13). Accordingly, the court granted in part and denied in part the Motion to Quash based, in large part, on the opinions of Dr. Harris, ordering the production of 132 CCPDO files. (*See Reyes,* Dkt. 471, Mem. Op. & Order for a full discussion of the court's analysis).

nothing in the record to indicate that a much smaller sample of files would achieve a sufficiently reliable result to infer a widespread pattern or practice and withstand a potential *Daubert* challenge to Plaintiffs' expert's methodology." (*Id.*). Accordingly, based on both the court and Dr. Harris' conclusions, the 64 CCPDO[7] files Tiderington relied on for the sample size fall far short of the 132 files that would be sufficient to produce an acceptable level of certainty.

### D. Tiderington's "failure to document," "failure to train," and "tunnel vision" opinions are not supported by any data in his Report.

Tiderington opines that CPD had a policy and practice of 1) failing to document information learned in homicide investigations, 2) failing to train detectives how to document, maintain and preserve impeaching and exculpatory material, and 3) tunnel vision. However, Tiderginton lacks any data to support these opinions and any data he does rely on is certainly not sufficient to establish a widespread practice of "failing to document," "failing to train" or "tunnel vision." Instead, Tiderington uses these phrases to create a causal link between the purported investigative deficiencies and the constitutional harm Plaintiff purports to have suffered, which, like his other opinions, falls woefully short.

With respect to his "failure to document" opinion, Tiderington's report references the phrase "failure to document" only three times, two times in connection with his opinions related to the underlying investigation in this case. (SOF ¶ 61). The report's reference to the phrase "failure to document" in his opinions addressing CPD's policies and practices uses the phrase "failure to document" in the heading only. (SOF ¶ 61). As explained more fully in the Tiderington *Daubert* Motion, this opinion is based solely on Tiderington's own say so and is based on speculation. But

---

[7] Moreover, the CCPDO acknowledges that when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later. (*Velez v. Dart*, 18 CV 8144, Dkt. 256, at 4, attached as Ex. 1).

even if his analysis was not fatally flawed, the examples from the underlying investigation are insufficient to establish a *Monell* widespread practice claim. *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015) (Plaintiff must present proof of a series of constitutional violations – as well as specific facts regarding the violations – rather than isolated acts of misconduct.). And, despite the heading's promise in his policy opinion, he cites no evidence to support a "failure to document" theory. (SOF ¶¶ 61-62). Similarly, regarding his "tunnel vision" opinion, Tiderington references "tunnel vision" six times in his report, five times in connection with his opinions related to the underlying investigation in this case. (SOF ¶ 96). Again, his reliance on examples from the underlying investigation are insufficient to establish a widespread practice. *Saucedo,* 2015 WL 3643417, at *4. The one reference to "tunnel vision" in his opinions related to CPD's policies and practices states that the use of a single, centralized repository is "one of the critical ways that detectives avoid "tunnel vision." (SOF ¶ 96). There is no data in his report to support either of these opinions, and the information he relies on is insufficient as a matter of law. (SOF ¶ 97).

Finally, Tiderington's failure to train opinion rests solely on the training he claims occurred after S.O. 83-1 was implemented and ignores any training that occurred after the implementation of 1986 directive or the 1988 SOP. (SOF ¶¶ 91-92). Tiderington's report does not address in anyway the roll call training, the new detective training or the pre-detective training provided after the later directives were implemented. (SOF ¶¶ 93-95). Reliance solely on events that pre-date Plaintiff's arrest by seven years is too remote in time to support this *Monell* theory. *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1148-50 (N.D. Ill. 2022) (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis). Finally, Tiderington fails to connect these purported deficiencies to Plaintiff's purported

constitutional violations, and this absence of a causal link prevents Plaintiff from drawing an inference that any of these policies "[were] the proximate cause of his injury." *Ovadal*, 416 F.3d at 535.

> E. **Tideriington's opinions do not establish notice to the City or causation.**

Lastly, Tiderington's opinions fall woefully short of establishing the requisite notice and causation for *Monell* liability to attach. Plaintiff's burden is to present evidence that proves the City was deliberately indifferent to the constitutional rights of the criminal defendants. *See Brown*, 520 U.S. at 411 ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision"); *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993) (before municipal liability can attach, the municipality must be on notice of the deficiency and have a high degree of culpability). Quite obviously, if Plaintiff cannot establish evidence of one constitutional violation, and Tiderington provides none from his analysis of the spreadsheets or his haphazard review of the files, they fall woefully short of proving a *pattern* of violations necessary to establish their widespread practice claims. *Thomas,* 604 F.3d at 303 (while there is "no clear consensus as to how frequently such conduct must occur to impose *Monell* liability," it is clear "it must be more than one instance, or even three").

Tiderington does not establish Plaintiff's *Monell* theory based on an alleged widespread practice of file suppression, failing to document, failing to train or tunnel vision. Accordingly, Plaintiff's claim cannot survive summary judgment.

## III. THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO DISCIPLINE *MONELL* THEORY.

Plaintiff also alleges in his *Monell* claim that his constitutional injuries were caused by CPD's "dysfunctional and sham disciplinary system" and CPD's failure to supervise and discipline

CPD officers who engaged in investigative misconduct, relying entirely on his disclosed expert, Dr. Jon Shane. (SOF ¶¶ 1-2, 5-7). Dr. Shane's opinions fare no better than Tiderington's and Dr. Shane should be barred from testifying for the reasons stated in Defendant City of Chicago's *Daubert* Motion to Bar Opinions of Dr. Jon Shane ("Shane *Daubert* Motion"), incorporated herein. (*See generally* Def. City's Mot. Bar Shane). However, even if the Court permitted Dr. Shane to testify, Plaintiff's claim still fails because Dr. Shane does not establish that the City had a widespread practice of failing to supervise or discipline its officers or that its disciplinary system was otherwise deficient. Because Plaintiff cannot establish any constitutionally deficient policy or practice of the City, the City is entitled to judgment as a matter of law.

> **A.** **Dr. Shane's opinion that CPD supervisors knew or should have known that complaints against Defendant Officers were accruing in a manner that signaled the need for intervention is based on his review of Defendant Officers CR files from 1980-2008.**

Dr. Shane's opinion that CPD "supervisory staff knew or should have known that complaints against the defendant officers were accruing in a manner that signaled a need for intervention and should have taken supervisory measures to stop the behavior and correct the deficiencies consistent with their agency policies," is based on his review of Defendant Officers' CR files from 1980-2008 and does not differentiate between CRs initiated prior to Plaintiff's 1990 arrest and those initiated after his arrest and/or conviction. (SOF ¶ 100, 106-107, 113). Any CR files initiated after Plaintiff's arrest are too remote to establish a practice pursuant to *Monell*. *Velez,* 2023 WL 6388231, at *23; s*ee also Brown*, 633 F. Supp. 3d at 1148, 1150 (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis).[8]

---

[8] Importantly, Dr. Shane opines that the City's written policies on discipline were consistent with industry standards in effect at the time, and he did not compare CPD's policies to any other police departments. (SOF ¶ 105).

In fact, a review of Defendant Officers' CRs show that by the time of Plaintiff's arrest in August 1990 (DO's SOF at ¶¶3, 44), Defendant Guevara had 4 CRs initiated against him, two of which were sustained; Defendants Halvorsen, Mingey, Epplen, and Montilla each had 1 CR, none of which were sustained; and Defendant Paulnitsky had 6 CRs, none of which were sustained. (SOF ¶¶ 128-142). Dr. Shane's failure to compare officer disciplinary histories in anyway, and the relatively few CR files accrued by Defendant Officers before Plaintiff's 1990 arrest, does not support Dr. Shane's conclusion that Defendant Officers were "accruing [complaints] in a manner that signaled a need for intervention." Moreover, despite acknowledging that law enforcement agencies have a duty to identify officers who have a disproportionate number of complaints against them, and to find these patterns you must compare similarly situated officers, which are officers in the same division, (SOF ¶ 127), Dr. Shane did not conduct that analysis. (SOF ¶ 127)

Finally, a myopic focus on Defendant Officers' alleged conduct would impermissibly conflate the question of their conduct with the question of whether a genuine widespread practice existed within CPD during 1990. This would run afoul of the Supreme Court's admonition that courts should not convert *Monell* claims into *respondeat superior* liability. *Brown*, 520 U.S. at 403. As the Seventh Circuit commented, "[T]he gravamen [of a *Monell* claim] is not individual misconduct by police officers…but *widespread practice* that permeates a critical mass of an institutional body." *Rivera*, 319 F. Supp. 3d at 1071 (quoting *Rossi*, 790 F.3d at 737). "In other words, *Monell* claims focus on institutional behavior." *Rossi*, 790 F.3d at 737. A limited focus on CR files of Defendant Officers defeats Plaintiff's claim because "a practice may not be widespread if it took place two, three or four other times." *Black v. City of Chicago*, 18-cv-6518, 2022 WL 425586, at *5 (N.D. Ill. Feb. 11, 2022) (citing *Palmer v. Marion County*, 327 F.3d 588, 595-96 (7th Cir. 2003)); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002); *Grieveson*, 538 F.3d

at 773-75. Although "there is no clear consensus as to how frequently [conduct] must occur to impose *Monell* liability," a plaintiff still must demonstrate "that there is a policy at issue rather than a random event." *Thomas*, 604 F.3d at 303. The alleged misconduct must go beyond "individual misconduct by police officers (that is covered elsewhere under § 1983) [to] a *widespread practice* that permeates a critical mass of an institutional body." *Rossi*, 790 F.3d at 737 (emphasis in original); *see also Bryant*, 759 F. Supp. at 412 ("Statistics of unsustained complaints of excessive force, without any evidence that those complaints had merit, will simply not suffice to establish municipal liability under § 1983"). Plaintiff thus falls short of his burden to demonstrate a widespread practice by the City of failing to discipline its officers such that it amounts to a *de facto* policy. *Connick v. Thompson* 563 U.S. 51, 61 (2011).

**B.    Shane's reliance on 40 CR files from a twenty-nine year period of time is insufficient to establish a citywide practice.**

Based solely on his analysis of 40 CR files from a twenty-nine year period of time (1980-2008), Dr. Shane opined that a pattern of complaints emerged against Chicago police officers generally between 1980 and 2008 such that CPD "should have taken measures to stop the behavior and correct the deficiencies." (SOF ¶ 104, 106-110). But he had no reliable basis to make this conclusion.

Dr. Shane's report sets forth no standards to ensure that the sample size he reviewed was statistically significant and he conceded that he did not test the 40 CR files that make up his dataset for statistical significance. (SOF ¶ 110). Moreover, Dr. Shane did not conduct an inferential analysis (defined as the "ability to draw inferences from a sample to the wider population") to reach his opinions. (SOF ¶ 111). From 1980 to 2008 there were 271,350 total CR files initiated against police officers within the CPD. (SOF ¶ 112). Not only does Dr. Shane fail to ensure that his sample was statistically significant but by the standards identified by Dr. Harris, Dr. Shane's

review is insufficient to establish the City's practices. (*Reyes*, Dkt. 469, Aff. Dr. Harris, at ¶ 10-13).

Moreover, his Report is devoid of any analysis that draws the conclusion that misconduct occurred and went unaddressed. (SOF ¶ 109). Shane's conclusions regarding purported deficiencies in the CR investigations does not create a genuine issue of fact that officer misconduct was so widespread across CPD that it amounted to a *de facto* policy of failing to discipline. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1071 (N.D. Ill. 2018) (granting summary judgment on a failure to discipline *Monell* theory where expert "offer[ed] no sufficient methodological basis for his opinion that [defendant officer] engaged in misconduct, that the City mishandled or failed to discipline him in response to complaints lodged against him, or misconduct about which City officials knew."); *Saucedo*, 2015 WL 3643417, at *4 (statistics on the numbers of CRs filed against a particular officer without any evidence that those investigations were faulty, flawed, or unfair is "insufficient to support a *Monell* claim."); *see also Bryant v. Whalen*, 759 F. Supp. 410, 424 (N.D. Ill. 1991) (evidence of unsustained complaints, "without any evidence that those complaints had merit," insufficient to establish municipal liability under *Monell*). Given that Dr. Shane could not say a single outcome was wrong, his opinion does not support that there was a dysfunctional disciplinary system.

"Typically, experts in this area offer an analysis of the CR files they have reviewed and why they think the investigator erred." *Rivera*, 319 F. Supp. 3d at 1070 (N.D. Ill. 2018); *see also LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 988 (N.D. Ill. 2017). Yet, Plaintiff's expert was unable to render such an opinion. Accordingly, summary judgment should be granted in favor of the City on Plaintiff's *Monell* claims based on an alleged widespread practice of failing to discipline CPD officers.

**C.   Dr. Shane's general observations from 40 CR files as a basis to conclude that CPD's accountability systems were "broadly ineffective" suffers from the same deficiencies and does not amount to evidence of a widespread practice.**

Dr. Shane, based solely on his review of the same 40 CR files, provides "general observations" as a basis to criticize CPD's accountability systems from 1980 to 2008 claiming they "were broadly ineffective for detecting misconduct, and holding officers accountable when they violate the law or CPD policy." (SOF ¶ 114). For all of the reasons set forth above, the sample size upon which Dr. Shane relies is insufficient to draw any conclusions about CPD's policies and practices.

Additionally, by "broadly ineffective for detecting misconduct," Dr. Shane means "there was no evidence [in the 40 CR files] I saw that the police department was using the system that they had in place." (SOF ¶ 115). Thus, each of the ten general observations is, by Dr. Shane's own admission, derived solely from the CR files, yet his Report is devoid of any basis to conclude that that the evidence he is looking for is maintained by CPD in CR files.

Finally, "general observations" without a concomitant determination that the outcome would have been different is inefficient to establish a widespread practice. *Rivera,* 1070-71. Accordingly, Plaintiff's claim cannot survive summary judgment.

**V.    PLAINTIFF FAILED TO IDENTIFY ANY EVIDENCE FROM WHICH A JURY COULD REASONABLY CONCLUDE THAT A CITY POLICY RATHER THAN ISOLATED INDIVIDUAL ACTION WAS THE CAUSE OF A CONSTITUTIONAL INJURY OR THAT ANY CITY POLICY WAS THE MOVING FORCE BEHIND A CONSTITUTIONAL INJURY.**

An independent basis for the Court to grant summary judgment on Plaintiff's *Monell* claim is that Plaintiff has not developed evidence that it was a City policy, as opposed to individual action by Defendant Officers, which was the moving force behind any constitutional injury. This is true regardless of the *Monell* theory under which Plaintiff may attempt to proceed. Any time a

27

plaintiff brings a *Monell* claim based on an alleged widespread practice, he must meet rigorous causation standards by showing that the City was "deliberately indifferent" to the "known or obvious consequences" of the alleged widespread practice. *Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."); *Dixon*, 819 F.3d at 348-49; *Montano*, 535 F.3d at 570; *Bohanon v. City of Indianapolis*, No. 20-3125, 2022 WL 3585003, at *10-11 (7th Cir. Aug. 22, 2022) (reversing Plaintiff's jury verdict on *Monell* after finding no evidence of municipal fault or causation where written policy was constitutional).

Based on the above, Plaintiff cannot establish that any injury he suffered from his alleged *Brady* claim was caused by the City's policy, and Plaintiff cannot prove that any widespread practice of withholding *Brady* evidence "caused the [constitutional] violation, [nor that] the custom or policy must be 'the moving force behind it." *Rivera*, 319 F. Supp. 3d at 1056 (quoting *Colbert v. City of Chicago*, 851 F.3d 649, 660 (7th Cir. 2017)). Similarly, Plaintiff failed to show any statistically significant or meaningful deficiency in the City's disciplinary system. Accordingly, Plaintiff cannot prove any municipal action caused his injury. *See Ruiz-Cortez v. City of Chi.*, 931 F.3d 592, 599 (7th Cir. 2019) (finding no evidence alleged policy caused plaintiff's injury where evidence indicated officer was motivated by his own decision to engage in a drug conspiracy).

This absence of a causal link prevents Plaintiff from drawing an inference that the City's recordkeeping and disclosure policies, or its supervision and discipline policies "[were] the proximate cause of his injury." *Ovadal*, 416 F.3d at 535. Specifically, Plaintiff cannot attribute his allegations that Defendant Officers suppressed details of Mingey and Montilla's conversations with Maysonet on July 15 and August 1 and suppressed reports documenting those conversations,

that Montilla and ASA DiFranco suppressed the tactics they used to secure a witness statement from Rosa Bello, that Guevara and Halvorsen falsely told two Latin Kings that they had been identified as the offenders and that Defendant Officers suppressed Halvorsen and Mingey's history of coercing inculpatory statements from suspects to any of his widespread practice theories. Likewise, Plaintiff cannot establish a lack of training or supervision was the "moving force" that caused his constitutional deprivation. *See Dixon*, 819 F.3d at 348. The facts do not show that City "policymakers were aware of, and acquiesced in, a pattern of constitutional violations" which is required to hold a municipality liable for failure to train. *See Harris*, 489 U.S. at 397. Here, as detailed above, there is no evidence of a widespread practice by CPD officers of failing to disclose exculpatory information or a failure to discipline and supervise which policymakers could have been aware of and condoned. Therefore, there is no evidence of City policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct...." *Brown*, 520 U.S. at 40. Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim.

## VI.   SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE CITY ON PLAINTIFFS' DERIVATIVE CLAIMS – *RESPONDEAT SUPERIOR* AND IDEMNIFICATION.

Plaintiff also brings *respondeat superior* and indemnification claims against the City. "[C]laims…for respondeat superior and indemnity" against a municipal entity "are derivative liability claims that depend on [Plaintiffs] prevailing against at least one of the individual defendants." *Moran v. Calumet City*, 54 F.4th 483, 500 (7th Cir. 2022). "Because the individual defendants are entitled to summary judgment in their favor, the claims against [the City] must fail as well." *Id*. *Respondeat superior* liability is also limited to state-law claims, so to the extent the state law claims against the officers are dismissed, so is the *respondeat superior* claims.

## CONCLUSION

For the foregoing reasons, the City respectfully requests this Honorable Court grant its motion for summary judgment in its entirety and against the Plaintiff.

Dated: July 15, 2024                    Respectfully Submitted,

                    /s/ Eileen E. Rosen
                    Eileen E. Rosen
                    Special Assistant Corporation Counsel
                    *One of the Attorneys for City of Chicago*

                    Eileen E. Rosen
                    Catherine M. Barber
                    Theresa B. Carney
                    Austin G. Rahe
                    Lauren M. Ferrise
                    Jessica L. Zehner
                    ROCK FUSCO & CONNELLY, LLC
                    333 W. Wacker Dr., 19th Floor
                    Chicago, IL 60606
                    (312) 494-1000
                    erosen@rfclaw.com