**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Jose Juan Maysonet, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-CV-2342 |
| | ) | |
| Reynaldo Guevara, et. al. | ) | District Judge Mary M. Rowland |
| | ) | Magistrate Judge Keri L. Holleb |
| Defendants. | ) | Hotaling |

**DEFENDANT CITY OF CHICAGO'S**
**LOCAL RULE 56.1(a)(3) STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant City of Chicago, by its undersigned attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submits this Statement of Material Facts in Support of Its Motion for Summary Judgment.

**PLAINTIFF'S *MONELL* CLAIM**

1.      Plaintiff pursues the following theories in support of his *Monell* claim: (1) the Chicago Police Department ("CPD") maintained a policy, custom or practice of systemically suppressing, concealing, and/or withholding exculpatory and/or impeaching material; (2) CPD failed to train detectives on how to document, maintain, and preserve impeaching or exculpatory material and/or how to conduct investigations free from tunnel vision; (3) CPD operated a dysfunctional, sham and deficient disciplinary, internal affairs and/or police accountability system; and, (4) CPD failed to supervise, monitor and/or discipline CPD officers who engaged in misconduct.  (Ex. 1, Stipulation on *Monell* Theories at Trial (Dkt. 347)).

2.      Plaintiff identifies his theories, and the evidence he has developed in support of each of his theories in his discovery responses.  (Ex. 2, Plaintiff's Responses to Defendant City of Chicago's First Set of Interrogatories to Plaintiff, ¶¶ 1-3).

3.      Plaintiff's suppression of exculpatory evidence *Monell* theory is that "CPD engaged a policy, custom and/or practice of suppressing exculpatory and/or impeaching material through various methods, including by purposefully not recording or documenting impeaching or exculpatory evidence and/or destroying exculpatory evidence".  (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶ 1).

4.      Plaintiff's failure to train *Monell* theory is "the failure to train detectives on how to document, maintain, and preserve impeaching and exculpatory material and conduct investigations free from tunnel vision".  (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶ 1).

5.      Plaintiff's dysfunctional disciplinary system *Monell* theory is that "CPD operated a dysfunctional and sham disciplinary system".  (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶ 1).

6.      Plaintiff's failure to supervisor and discipline *Monell* theory is that "CPD fail[ed] to supervise and discipline Chicago Police Officers, like Defendant Guevara and Paulnitsky who engage in investigative misconduct of all types."  (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶ 1).

7.      Plaintiff was asked in written discovery to "identify all evidence known to Plaintiff that establishes why" the City's policies on evidence disclosure, training, discipline, and supervision were unconstitutional.  (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶¶ 2-5). Plaintiff responded by incorporating the expert report of his disclosed expert, Thomas Tiderington regarding Plaintiff's *Monell* theories on evidence suppression and failure to train.  Plaintiff also

responded by incorporating the expert report of his disclosed expert, Dr. Jon Shane, regarding Plaintiff's *Monell* theories on the disciplinary system and the failure to supervise. (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶¶ 2-5). Plaintiff further responded by referring to "Rule 30(b)(6) depositions and all CPD written policies referenced in those Rule 30(b)(6) depositions and by Plaintiffs' experts." (Ex. 2, Plaintiff's Responses to the City's First ROGs, ¶¶ 2-5).

8.    Plaintiff did not identify any specific written policies that he maintained were unconstitutional or identify any person with final policymaking authority whose deliberate act caused Plaintiff's alleged constitutional injury. (Ex. 2, Plaintiff's Responses to the City's First ROGs, generally).

## THE CITY'S POLICIES AND PRACTICES

### *Policies regarding the creation, maintenance and production of police report*

9.    The "R.D." number is the Records Division number, which is assigned to each case that has been referred to the detective area for investigation. The number is assigned in a numerical sequence. (Ex. 3, Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill., 13-CV-03963 (part I dated 7/29/14), at 113:16-24).

10.   The Records Division File ("RD File") would contain the General Offense Case Report, and any and all supplemental reports that are created. This file is physically maintained in the Records Division. This file is sometimes referred to as the "Permanent Retention File" as that stamp is affixed to each page of the file by Records Division personnel for records maintained by the Records Division that are required to be kept permanently, such as homicide files or other files that do not have a statute of limitations. (Ex. 4, Deposition of James Hickey, *Rivera v. Guevara,* N.D. Ill, 12-CV-4428 (part II dated 6/10/14), at 189:21-190:2; 192:2-20; 194:6-7; Ex. 5,

Deposition of City's Rule 30(b)(6) witness, Commander Eric Winstrom, in consolidated cases of *Solache v. Guevara,* N.D. Ill., 18-CV-2312, and *DeLeon-Reyes v. Guevara,* N.D. Ill., 18-CV-1028 (hereinafter "Solache/Reyes") dated 12/17/21, at 176:22-177:8).

11.     The RD File's historical mission was to preserve the original case report and any original supplementary reports generated with that RD number.  It was never intended to include miscellaneous police reports, such as notes (or subsequent to 1982, General Progress Reports ("GPRs")).  (Ex. 4, Hickey Dep in *Rivera* (part II dated 6/10/14), at 192:2-20; Ex. 5, Winstrom Dep in *Solache/Reyes* dated 12/17/21, at 176:22-177:8).

12.     Prior to 1982, CPD maintained what were commonly referred to as "working files" but also known as "running files" or "street files" which were manila folders which normally contained photocopies of reports, criminal history statements, photographs, mugshots and memorandums requesting assistance on investigations.  (Ex. 3, Hickey Dep in *Kluppelberg* (part I dated 7/29/14), at 106:3-22).

13.     Detective Division Notice 82-2 ("DDN 82-2"), was issued on April 20, 1982, and formally identified the "working files, street files, running files" as "Investigative Files" and mandated their preservation.  "Investigative Files" were defined as "any document or group of documents the subject of which relates to criminal incidents and which are maintained and stored under Detective Division control within a unit."  DDN 82-2 did not cover documents that were not maintained or stored under the control of the Detective Division.  (Ex. 6, Detective Division Notice 82-2, RFC-Maysonet 48320, at ¶ II; Ex. 7, Deposition of James Hickey in *Rivera* (part I dated 5/6/14)*,* at 80:19-81:10).

14.     Detective Division Special Order 83-1 ("S.O. 83-1"), issued on January 13, 1983, made clear that CPD's policy was to "conduct all criminal investigations in an impartial and

objective manner and to maintain the integrity of its investigative files to ensure that the due process rights of the accused [were] not compromised []." (Ex. 8, S.O. 83-1, RFC-Maysonet 49080-81, at ¶ III).

15.     S.O. 83-1 was "designed to institutionalize the control of all [Detective Division] violent crime field investigation documents and files, which previously may have been referred to as working files, running files, or detective's personal files and notes[]" and expressly mandated that "detectives will preserve and record information and materials obtained in the course of the investigation to assure not only that information and materials indicating the possible guilt of the accused are preserved, but also that any information and materials that may tend to show his possible innocence or aid in his defense is preserved." (Ex. 8, S.O. 83-1, RFC-Maysonet 49080-81, at ¶ I, III).

16.     S.O. 83-1 defined the Investigative File as a "criminal case file pertaining to a violent crime field investigation which contains official Department reports, notes, memoranda and miscellaneous documents generated by or received by any detective during the course of such investigation." S.O. 83-1 instructed that the Investigative File "is designed to provide all parties engaged in a criminal proceeding including the judge, State's Attorney, Defense Attorney and the assigned Department members with a comprehensive account of the subject criminal case." (Ex. 8, S.O. 83-1, RFC-Maysonet 49081, at ¶ IV.A; Ex. 3, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 169:20-170:1).

17.     S.O. 83-1 mandated that the Investigative File be maintained in the "Investigative File Case Folder," specifically described as "an 8 ½" x 11" case folder complete with two (2) two-hole metal punch fasteners designed to secure all documents relating to the subject criminal case." The Investigative File is also required to contain an Investigative File Inventory Sheet that lists

each document contained within the file. To standardize note taking, CPD created GPRs, which are preprinted forms that detectives use to take notes. Detectives use GPRs to document "handwritten notes and memoranda (the investigative work-product) including: inter-watch memoranda (whether handwritten or typewritten), witness or suspect interview notes, on-scene canvass notes, and any other handwritten personal notes normally generated by investigating detectives during the course of a violent crime field investigation." (Ex. 8, SO 83-1, RFC-Maysonet 49081-82, at ¶¶ IV.B, IV.D, IV.E; Ex. 3, Hickey Dep from *Kluppelberg* (part I dated 7/29/14), at 170:7-9).

18. Detective Division Special Order 83-2 ("S.O. 83-2"), issued May 2, 1983, was issued to improve on the procedures set forth in S.O. 83-1 where possible, and was specifically "designed to institutionalize the control of all violent crimes field investigation documents and files, which previously may have been referred to as Street files, working files, running files, or detectives personal files and notes." The language of S.O. 83-2 reinforced CPD's long standing, though unwritten, policy that everyone has an obligation to pass on information. (Ex. 9, SO 83-2, NF-L 8746, at ¶ I; Ex. 3, Deposition of James Hickey, *Kluppelberg v. Burge,* N.D. Ill. 13-CV-03963, at 233:21-234:3).

19. Detective Division Special Order 86-3 ("S.O. 86-3"), issued May 19, 1986, was issued to further clarify the directions to the Detective Division regarding the creation and maintenance of Investigative Files, mandating "periodic, unscheduled inspections of the subject files be completed to ensure compliance." (Ex. 10, S.O. 86-3, RFC-Maysonet 49090, at ¶ VI).

### *Policies regarding the Complaint and Disciplinary Process*

20. In January 1993, CPD issued G.O. 93-3 regarding "Complaint and Disciplinary Procedures." (Ex. 11, CPD General Order 93-3, RFC-Maysonet 14457-14536). G.O. 93-3

required all members to comply with Department Rules and Regulations, directives and orders. (*Id.*). G.O 93-3 further stated that "prompt, thorough investigations will be conducted into allegations of misconduct []" and went on to set forth the rights, responsibilities and procedures for conducting investigations relative to disciplinary matters. (*Id.*).

21. In the 1987-1990 time period, complaints can be made to CPD's Office of Professional Standards ("OPS"), Internal Affairs Division ("IAD"), or a supervisor and that complaint would be assigned a CR number by OPS who did the intake at that time. (Ex. 12, Deposition of Lt. Robert Flores, one of the City's Federal Rule of Civil Procedure 30(b)(6) witnesses dated 10/17/22 (hereinafter "Flores Dep"), at 27:14-28:8). Every complaint received a complaint register number, irrespective of whether the complaint seemed frivolous and each complaint would also be given a category code describing the allegation of misconduct. (*Id.*; Ex. 13, Complaint Category Tables, RFC- Maysonet 50214-15).

22. In March 1983, CPD issued G.O. 83-3 titled "Personnel Concerns." (Ex. 14, CPD General Order 83-3, RFC-Maysonet 48432-35). This policy established the Personal Concerns Program for Department members, which sought "early identification of members who engage in conduct which is contrary to the goals of the Department." (*Id.*). This policy was in place until November 1997. (*Id.*).

23. G.O. 83-3 also created the "Behavioral Alert System" which sought to "identify Department members whose behavior indicates that future disciplinary or performance problems may result unless correct action [was] taken." (Ex. 14, CPD General Order 83-3, RFC-Maysonet 48432-35).

24. G.O. 83-3 included seven "performance data" that CPD considered to be behavioral alert indicators, including 1) all excessive force complaints; 2) complaint and disciplinary history;

3) repeated incidents of medical roll use; 4) repeated instances of minor transgressions within a twelve month period; 5) a significant reduction in a member's performance; 6) poor Department traffic safety record; and 7) significant deviations from the member's normal behavior.  (Ex. 14, CPD General Order 83-3, RFC-Maysonet 48432-35).

### PLAINTIFF'S *MONELL* EXPERT, THOMAS TIDERINGTON

25.     Plaintiff retained Thomas Tiderington to provide opinion testimony on Plaintiff's *Monell* claim as well as the police investigation in this case.  (Ex. 15, Tiderington Report in *Maysonet*, p. 2).

26.     Tiderington has been retained to provide opinion testimony in six cases involving defendant Guevara, *Solache/Reyes*, *Iglesias, Sierra, Gomez, Johnson* and this case, but only three, *Solache/Reyes*, *Sierra*, and *Iglesias*, before he was retained in this case.  (Ex. 15, Tiderington Report in *Maysonet*, p. 11; Ex. 16, Tiderington Deposition from *Maysonet* dated 4/28/23, 300:17-301:20, 311:2-14).  His opinions, in each of the cases with respect to each Plaintiff's *Monell* claim, are nearly identical to his opinions in this case and rely upon the same materials.  (*Id.*).

27.     In the first case in which he was retained, *Solache/Reyes*, Tiderington billed 78 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiffs' *Monell* claims as well as his opinions related to the police investigation in that case.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 362:11-18).  Tiderington estimates that he also had approximately 40 to 50 hours unbilled time in connection with the work he did in preparation of that report that he did not keep track of.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 362:19-363:4).  Tiderington further estimates that he spent another 15 to 20 hours reviewing materials in preparation for his deposition in the *Solache/Reyes* case.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 363:5-8).

28.     In *Sierra*, the second case in which he was retained, Tiderington billed 65.75 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case.  (Ex. 18, Tiderington Deposition from *Sierra* dated 12/8/22, 105:17-20; Ex. 19, Tiderington Invoice from *Sierra* dated 9/18/22, TIDERINGTON 002475-76).

29.     In the third case in which he was retained, *Iglesias*, Tiderington billed 58.15 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in that case.  (Ex. 20, Tiderington Deposition from *Iglesias* dated 2/13/23, 20:23-22:10; Ex. 21, Tiderington Invoice from *Iglesias* dated 11/19/22).

30.     In the fourth case in which he was retained, this case, Tiderington billed 87.65 hours in connection with the work he did in preparation of that report, which included both his opinions related to Plaintiff's *Monell* claim as well as his opinions related to the police investigation in this case.  (Ex. 16, Tiderington Deposition from *Maysonet* dated 4/28/23, 89:7-10; Ex. 22, Tiderington Invoice from *Maysonet* dated 1/18/23).  Of the 87.65 hours Tiderington billed in this case 22.55 were spent reviewing the 1987-1990 files he was provided in this case.  (Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 306:1-307:13; Ex. 22, Tiderington Invoice from *Maysonet* dated 1/18/23).

### Tiderington's opinions related to Plaintiff's Monell claim

31.     According to Tiderington, as it relates to Plaintiff's *Monell* claim, "I was asked to assess… whether Chicago Police Department's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in

homicide cases, were at the time adequate and consistent with acceptable police practices around the country." (Ex. 15, Tiderington Report in *Maysonet*, p. 2).

32. Regarding CPD's policies and practices concerning the documentation and disclosure of documents and information learned during homicide investigations, Tiderington has two global criticisms. (Ex. 15, Tiderington Report, p. 33; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 415:10-416:7; Ex. 16, Tiderington Dep in *Maysonet* dated 4/28/23, 300:17-301:6). The first is what he describes as a routine failure to document information. (*Id.*). The second is a routine failure to disclose the documents and information learned. (*Id.*).

33. Tiderington prepared a report in this case which relied on the accuracy of the spreadsheets created and provided to him by Plaintiff's counsel, Loevy & Loevy, in the *Solache/Reyes* cases and in the *Sierra* case, based on information gathered from investigative files and records division files (sometimes referred to as "RD Files" or "permanent retention files") (also collectively referred to as "homicide files") from homicides that were investigated by Area 5 detectives of the Chicago Police Department ("CPD") from 1991-1998. (Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 361:2-5, 364:12-21; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 388:20-24; Ex. 18 Tiderington Dep from *Sierra* dated 12/8/2022, 367:12-368:1).

### *Data provided to Tiderington by Plaintiff's counsel*

34. Tiderington was first provided a spreadsheet based on information gathered from the homicide files from homicides investigated by Area 5 detectives of CPD from 1995-1998 in the *Solache/Reyes* case. (Ex. 15, Tiderington Report, Attachment E; Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 317:13-22). He was then provided a spreadsheet based on information gathered from the homicide files from homicides investigated by Area 5 detectives of CPD from

1991-1995 in *Sierra*. (Ex. 15, Tiderington Report, Attachment F; Ex. 16, Tiderington Dep in *Maysonet* dated 4/28/31, 360:14-361:5, 364:12-21).

35.    Both the *Solache/Reyes* spreadsheet and the *Sierra*[1] spreadsheet are attachments to Tiderington's report in this case, Attachments E and F respectively. (Ex. 15, Tiderington Report, p. 10 and Attachments E and F).

36.    Tiderington does not know exactly who or how many people worked on the spreadsheet and was not involved in the decision-making or creation of the spreadsheet. (Ex. 16, Tiderington Dep in *Maysonet*, 364:16-365:3; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 389:1-23).

37.    In his report, Tiderington states, "For the period from 1995-1998: I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete. He testified that he "didn't look at 277 [files], [to determine if the inventory sheets were complete] but that's something that was spot-checked and is reflected in the spreadsheet." Tiderington does not know how the coders determined that the inventory sheets were incomplete. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 503:13-504:1; Ex. 15, Tiderington Report in *Maysonet*, Attachment F, column titled "Are significant documents missing from Investigative File Inventory").

38.    Tiderington received the spreadsheets in "hard copy large pages," and if he received it electronically, it was only in PDF format. (Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 234:12-24). Tiderington could not remember if he received the spreadsheets in excel format, but

---

[1] Tiderington's report erroneously refers to the 1991-1995 spreadsheet as the spreadsheet he was provided in this case when in fact it was the spreadsheet provided to him by Loevy & Loevy in the *Sierra* case which he incorporated in this report. (Ex. 15, Tiderington Report, Attachment F (title of documents reads: *Sierra v. City of Chicago, Guevara, et al.*, 1991-1995 Summary of Homicide Files).

he stated he did not manipulate the data and he did not do his own calculation. (Ex. 18, Tiderington Dep from *Sierra* dated 12/8/22, 284:11-285:9; 286:15-20).

39.     The *Solache/Reyes* spreadsheet (for the years 1995-1998) is 53 pages long and contains 349 rows and 28 columns of data for a total of 9772 separate cells of data. (Ex. 15, Tiderington Report, Attachment E).

40.     The *Sierra* spreadsheet used for this case (for the years 1991-1995), is 69 pages long and contains 496 rows and 17 columns of data for a total of 8,432 separate cells of data. (Ex. 15, Tiderington Report, Attachment F; Ex. 16, Tiderington Dep in *Maysonet* dated 4/28/23, 358:4-11).

41.     The spreadsheets, and Tiderington's opinions, are based on 475 investigative files and 496 RD Files ranging from 1991-1995, and 344 investigative files and 341 RD Files ranging from 1995-1998, and Tiderington does not know how many of those files from 1995 overlap. (Ex. 15, Tiderington Report, pp. 55-56; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 513:21-514:1; Ex. 7, Tiderington Dep from *Johnson* dated 9/20/23, 237:21-239:7).

42.     Tiderington was also provided the investigative files and the RD files that the spreadsheets are based on. (Ex. 15, Tiderington Report, Attachment B; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 389:24-390:21; Ex. 18, Tiderington Dep from *Sierra* dated 12/8/22, 307:14-16).

43.     In this case, Tiderington was provided investigative files from 1987 until 1990 which he reviewed to determine the number of GPRs that were contained in these files. Tiderington includes two charts in his report which detail his findings. (Ex. 15, Tiderington Report pp. 51-54; Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 303:15-304:10).

44.     Tiderington concluded that since some of the investigative files he reviewed did not contain GPRs, these cases must have street files without any other evidence of files existing elsewhere.  (Ex. 15, Tiderington Report p. 53; Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 338:3-339:14).  Tiderington testified that, "there had to be something.  There had to be some documentation that was not contained within the investigative file that I reviewed, because how else would the detectives been able to remember phone numbers, addresses, dates of birth, all that specific information.  And there were some cases that they were complicated homicides with multiple witnesses."  (Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 338:16-339:3).  Tiderington concluded that, "it's only logical to conclude that there had to have been some other folder, file kept elsewhere that contained that information.  How else would the detective been able to document this stuff if there wasn't information contained elsewhere?"  (Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 339:9-14).

45.     There are no GPRs in RD files by design.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 515:12-23).

46.     Of the 344 investigative files he was provided in *Solache/Reyes*, he "spot-checked several of them" but he does not know if he has an exact number, he "probably looked at every one of the files, but some in greater detail than the others" meaning he "skimmed through each of the files."  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 401:10-402:7).

47.     Of the 475 investigative files he was provided in *Sierra* case, he "did spot checks on probably 30 or 40 cases."  (Ex. 18, Tiderington Deposition from *Sierra* dated 12/8/22, 285:11-19).

48.     Tiderington did not utilize "any great methodology" in the *Solache/Reyes* case deciding which files to spend more time with – "if something caught [his] interest, or … if it was

something unusual, [he] spent more time on that." (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 403:1-8).

49.     In Tiderington's review of the *Solache/Reyes* files, there was no "specific reason or rhyme or methodology in determining whether [Tiderington was] going to look at one file in greater detail than the other, but [his] goal was not to become familiar with each of the 300 files." (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:14-19).

50.     He doesn't "think it would have been humanly possible" to become familiar with each of the investigations that underlie the 344 files he reviewed because each of the files contained "many, many pages," sometimes hundreds of pages. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 404:20-405:7).

51.     Tiderington believes anything in an investigative file can be exculpatory but did not do any analysis of the information in the file that led him to conclude the information was exculpatory. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 527:21-528-9).

52.     The 344 investigative files that provide the basis for the spreadsheet in *Solache/Reyes* (1995 to 1998) are 55,474 pages in total. (Ex. 23, Tiderington Report in *Sierra*, Attachment B, ¶ 64).

53.     The 341 RD files that provide the basis for the spreadsheet in *Solache/Reyes* are 24,422 pages in total. (Ex. 23, Tiderington Report in *Sierra*, Attachment B, ¶ 64).

54.     Tiderington skimmed through all of the 341 RD files he was provided in *Solache/Reyes* and took a closer look at 15 to 20 of them. (Ex. 6, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 514:2-11).

55.     The 475 investigative files that provide the basis for the spreadsheet in *Sierra* (1991 to 1995) are 74,607 pages in total. (Ex. 23, Tiderington Report in *Sierra*, Attachment B ¶ 68).

56.     The 496 RD files that provide the basis for the spreadsheet in *Sierra* are 27,603 pages in total.  (Ex. 23, Tiderington Report in *Sierra*, Attachment B ¶ 67).

57.     In addition, Tiderington based his opinion on whether CPD had a pattern and practice of not disclosing material exculpatory evidence to criminal defendants on 64 criminal defense files from the Cook County Public Defender's Office (hereinafter "CCPDO files") associated with the 1995-1998 investigative files and RD Files.  (Ex. 5, Tiderington Report in *Maysonet*, p. 59-61; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 596:9-599:21).

58.     Tiderington thinks he went through each of the CCPDO files but did not review in detail every document that was contained in the files.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 406:11-18).

59.     Tiderington never reviewed any files from the Cook County State's Attorney's Office (hereinafter "CCSAO files") that corresponded with any of the investigative files and RD Files from 1991-1998 to determine if any of the materials that Tiderington claims were not in the CCPDO files were contained within the CCSAO files (other than perhaps six cases provided to him in this case), even though the CCSAO files were produced in this case.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 658:7-24; Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 309:15-310:3).   Tiderington also never reviewed any CCSAO or CCPDO files in connection with the 1987-1990 files analyzed at page 52 of his Report in this case.  (Ex. 16, Tiderington Dep from *Maysonet* dated 4/28/23, 319:9-320:3).

60.     Tiderington learned the corresponding CCSAO files from the 1995-1998 files had been previously produced to Plaintiffs Solache and Reyes.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 659:12-660:6).

***Failure to document***

61.     Tiderington references "failure to document" three times in his report, two times in connection with his opinions related to the underlying investigation in this case.  (Ex. 15, Tiderington Report in *Maysonet*, pp. 28-29, 33).  Tiderington's reference to "failure to document" in his opinions related to CPD's policies and practices uses the phrase "failure to document" in the heading only.  (Ex. 15, Tiderington Report in *Maysonet*, p. 33).

62.     Tiderington's Report does not identify data that establishes a routine failure to document.  (Ex. 15, Tiderington Report, generally).

***Street files***

63.     His opinion that "All relevant information in unofficial documents is not transcribed in official reports" is based on his inference that "unofficial documents" must exist because there are no notes in files he believes should contain notes.  (Ex. 15, Tiderington Report in *Maysonet*, pp. 57-59; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 509:23-513:1).

64.     Tiderington defines "unofficial documents" as "perhaps the street files [referring to the *Jones* case] or documents that officers believe are personal information versus [sic] and information that perhaps they keep in their desk and not in either the investigative file or permanent file."  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, at 511:3-11).

65.     In his review, he has never seen those files or "unofficial documents."  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 513:7-20).

66.     In Tiderington's opinion, handwritten notes that are not written on GPRs that are included in the investigative file does not constitute a violation of a criminal defendant's constitutional rights.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 491:2-17).

67. Tiderington's criticism of the use of handwritten notes not on GPRs is limited to whether CPDs policies were being followed.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 491:17-20).

68. Tiderington opines that the City's policies were inadequate to address the street files problem.  (Ex. 15, Tiderington Report in *Maysonet*, p. 55).

69. Tiderington's understanding of the phrase "street file" are files that were used that were not considered a formal file that would have to be turned over to prosecuting attorneys or criminal defendants.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 438:21-439:6).

70. Investigative files are considered formal files that are to be turned over by the CPD to prosecuting attorneys or criminal defendants.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 439:7-441:2).

71. Tiderington's opinion that CPDs policies were inadequate to address the street files problem is based on his review of 344 separate Area 5 homicide investigations for the period 1995-1998 and 475 separate Area 5 homicide investigations for the period 1991-1995 that are documented in the investigative files and RD files produced.  (Ex. 15, Tiderington Report in *Maysonet*, p. 55-56).

72. He concluded that the street files problem still existed because he concluded CPDs policies were not being complied with.  (Ex. 15, Tiderington Report in *Maysonet*, p. 55-58).

73. He also concluded based on the files that criminal defense files show that "important investigative materials" are regularly withheld.  (Ex. 15, Tiderington Report in *Maysonet*, p. 59).

74. Tiderington's Report does not identify any investigative files that were completely missing from a criminal defense file (other than from files that he eliminated from his analysis

because the criminal defense file was incomplete). (Ex. 15, Tiderington Report, generally; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 441:6-22, 442:7-14, 598:1-599:13).

### *Failure to disclose*

75.     There are redacted documents contained in the CCPDO files, including redactions of full pages, and Tiderington's report assumes that the redacted documents are not police documents, but he also agrees that information relevant to his analysis could have been redacted. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 599:22-601:10, 607:14-613:6, 616:14-617:4).

76.     Tiderington was told by Plaintiffs' counsel in *Solache/Reyes* that police reports were not redacted from the CCPDO files. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 607:14-608:1).

77.     Tiderington agrees that some of the CCPDO files were missing entire investigative files, otherwise contained no police documents or so few that he treated the files as being incomplete, and that some of the files may not be complete because they were likely transferred to private criminal defense attorneys. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 441:6-22; 598:1-599:13).

78.     Tiderington agrees "that if the materials or the majority of materials that [he has] identified as being withheld because [he] didn't find them in the [CCPDO] files, if they, in fact, are there and redacted for some reason, then, obviously, that would change [his] opinions[.]" (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 612:22-613:6).

79.     Tiderington has no understanding of where or how the CCPDO maintained their 1995-1998 files. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 613:7-16).

80.     Tiderington states "My comparison of the investigative files to corresponding defense files revealed that every one of the criminal defense files are missing documents that were contained in the corresponding police investigative files."  (Ex. 15, Tiderington Report in *Maysonet*, p. 62; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22,601:11-18).

81.     There were 64 CCPDO files that had corresponding CPD investigative files ("companion files").  Tiderington did not personally compare page by page the 64 CCPDO files to the companion files; he "spot-checked several cases, and it was consistent with what the analysis was." (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 601:19-601:7).

82.     Tiderington personally compared under 10 of the 64 sets of companion files.  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 603:4-8).

83.     If Tiderington had reviewed the CCSAO files that corresponded with the investigative files, RD files, and CCPDO files, and "found out that the materials [he] identified in [his] report as being withheld [were] actually contained in the Cook County State's Attorney's files" he agrees that it "would have been proper and reasonable conduct on the part of the investigators."  (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18).

84.     Tiderington provides five cases that he claims are "[e]xamples of relevant information in police files that was withheld from criminal defendants but should have been disclosed," which he also describes as "examples from the comparison of the defense attorney files and the corresponding police investigative files that demonstrate that the information withheld from criminal defendants included investigative material that should have been disclosed."  (Ex. 15, Tiderington Report, pp. 63-66).

85.     Tiderington identified some of the examples of CCPDO files which were missing documents from the investigative files on his own and some were pointed out to him by Plaintiff's

counsel, but he cannot identify which cases were pointed out by Plaintiff's counsel for closer review. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 663:1-24).

86.     Tiderington testified that when he says "withheld," he means generally that criminal defendants did not receive them. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 592:24-593:10).

87.     In one example in his report, the Kim Mathis case, Tiderington alleges that Terry Mathis, the criminal defendant's sister, being a potential witness to the crime was not disclosed, yet Tiderington conceded at his deposition that the public defender's file shows that "the defense attorney was in contact with the criminal defendant's sister." (Ex. 15, Tiderington Report, pp. 63-64; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 591:7-13; 591:24-592:9). Defendants' *Monell* expert, Bernard "Bernie" Murray, agrees that the public defender's file contains an extensive diary of the public defender's interviews with Terry Mathis. (Ex. 24, Bernie Murray's Expert Report in *Maysonet*, p. 18-19).

88.     In another example in Tiderington's report, the Ardell Clemons case, Tiderington alleges that "[t]he investigative file includes several documents that could have been relevant to the defense but were not in the public defender's file," and more specifically that there were documents of potential alternative suspects that were not in the CCPDO file, yet concedes that he did not review the CCSAO file to determine if those documents were contained in it and ignored other documents from the file that the criminal defendant had called CPD and admitted to the crime and also subsequently confessed to the officers in Key West, Florida. (Ex. 15, Tiderington Report, p. 64; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 660:7-18, 660:23-662:8). Defendants' expert Murray found the documents Tiderington alleged were missing in the CCSAO

file, specifically a GPR located at CCSAO 53045 [sic] and the lease at CCSAO 53426. (Ex. 24, Murray Report in *Maysonet*, p. 19; Ex. 50, GPR, CCSAO 53316; Ex. 51, Lease, CCSAO 53426).

89.     In yet another example in his report, the Oscar Soto case, Tiderington alleges that GPRs from the investigative file are not in the CCPDO file and that arrest reports of two alternative suspects that were also suspects in another case, but were not identified in the lineup in the Soto case, were in the investigative file but not the CCPDO file. Yet, Tiderington agrees that the CCPDO file contains two supplementary reports related to those two suspects and he does not know what is contained in the redacted pages of documents in the CCPDO file. (Ex. 15, Tiderington Report, pp. 64-65; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 669:24-672:11, 671:3-11). Murray states that the public defender's file for the Soto case is incomplete because the CPD files were 158 pages, and the produced public defender's file contains only 112 pages, 47 of which are redacted, 28 of which are photographs, 2 are blank, 2 are copies of envelops, and 33 pages are subpoenas. (Ex. 24, Murray Report in *Maysonet*, p. 19-20).

90.     In another example in his report, the Guy Rainey case, Tiderington alleges detectives did not disclose all of the names and mugshots they obtained of potential suspects when detectives requested numerous photographs of individuals with the documented nickname "Little", but Tiderington admits that he only assumed that the alleged mugshots of individuals nicknamed "Little" were compiled to conduct photo arrays. In the same file, Tiderington alleges that detectives did not disclose a handwritten note in the investigative file with Donnie Morris' name on it that says "Kevin Haas pull file to see if he is still wanted" because alternative suspects should be disclosed. Yet, Tiderington agrees that Kevin Haas was a detective at Area 5 in charge of record keeping investigative files and was not a suspect, and that Donnie Morris was not a suspect as documents in the file show that it was disclosed that Donnie Morris was with his nephew, Cedric

Morris, when Cedric Morris was shot. (Ex. 15, Tiderington Report, pp. 65-66; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 672:11-23, 673:2-674:17, 674:22-677:4).

**Training**

91. Tiderington's Report states that there was inadequate training and monitoring/auditing to ensure compliance with the special orders, referencing Special Order 83-1. (Ex. 15, Tiderington Report in *Maysonet*, pp. 50-51; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:1-10).

92. Tiderington's report does not address any training that was done after CPD issued the 1986 directive or the 1988 SOP. (Ex. 15, Tiderington Report, pp. 50-51; Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:11-483-23).

93. The only information Tiderington has about training that was done on the 1986 directive or the 1988 SOP is based on his memory of the testimony of James Hickey and Eric Winstrom, two of the City's Rule 30(b)(6) witnesses. (Ex. 17, Tiderington Dep from *Solache/Reyes* dated 10/6/22, 482:10-485:10).

94. Hickey testified that detectives, youth officers, sergeants, lieutenants, and exempt commanding officers in the Bureau of Investigative Services were provided training on the 1982, 1983 and 1986 police orders establishing investigative files. (Ex. 25, Hickey Dep in *Rivera* N.D. Ill, 12-CV-4428 (part I dated 5/6/14), 54:12-55:7, 56:1-7).

95. Winstrom testified that detectives were trained on the SOPs, and more specifically that they were required to report all substantive or relevant information learned in an investigation, and notetaking. (Ex. 5, Winstrom Dep dated 12/17/21, 130:12-131:18; 145:13-21). Detectives also received role call training when 86-3 became effective for 5 or 7 straight days, which advised them of the order and its contents. (Ex. 5, Winstrom Dep, 152:3-24). New detectives received

training on the 86-3 police and SOPs in pre-detective training, including the purpose of notes, the circumstances in which they needed to take notes, that notetaking was a useful tool that could help them write accurate reports, that they should never destroy their notes, the information to include in supplementary reports for violent crimes cases, including homicides. (Ex. 5, Winstrom Dep, 152:25-154:14; 166:7-168:18).

### Tunnel vision

96.     Tiderington references the term "tunnel vision" six times in his report, including using the term five times in connection with his opinions related to the underlying investigation in this case. (Ex. 15, Tiderington Report in *Maysonet*, pp. 4, 21). Tiderington's reference to "tunnel vision" in his opinions related to CPD's policies and practices states that a single, centralized repository is "one of the critical ways that detectives avoid tunnel vision." (Ex. 15, Tiderington Report in *Maysonet*, pp. 35-37).

97.     Tiderington's Report does not identify data that establishes "tunnel vision". (Ex. 15, Tiderington Report).

### The Files in this case

98.     In the CCSAO file for the prosecution of the Wiley Brothers' murder, there are GPRs from the criminal investigation. (Ex. 26, CCSAO 874-881).

## PLAINTIFF'S *MONELL* EXPERT, DR. JON M. SHANE

99.     Plaintiff retained Dr. Jon M. Shane to provide opinion testimony on Plaintiff's *Monell* claim, specifically, Plaintiff's theory that CPD failed to supervise and discipline problem officers. (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 1, 11-12).

100.    Dr. Shane reaches two global opinions: his first opinion is that CPD failed to supervise its personnel consistent with accepted industry practices when complaints against the

Defendant Officers were generated. (Ex. 27, Dr. Shane's Report dated 1/13/23, p. 11; Ex. 28, Dr. Shane's deposition dated 3/10/23, 58:24-59:5).

101.    Regarding his first opinion, Dr. Shane states: "The Chicago Police Department supervisory staff knew or should have known that complaints against the defendant officers were accruing in a manner that signaled a need for intervention and should have taken supervisory measures to stop the behavior and correct the deficiencies consistent with their agency policies." (Ex. 27, Dr. Shane's Report dated 1/13/23, p. 11).

102.    Dr. Shane's opinion that CPD supervisory staff knew or should have known complaints were accruing in a manner that signaled the need for intervention refers to all CPD supervisors throughout the chain of command city-wide, and is not limited to Area 5 supervisors. (Ex. 28, Dr. Shane's deposition dated 3/10/23, 77:4-78:6; 79:14-19).

103.    Dr. Shane's second opinion is that a pattern of complaints emerged against Chicago police officers between 1980 and 2008.  (Ex. 27, Dr. Shane's Report dated 1/13/23, p. 12; Ex. 28, Dr. Shane's deposition dated 3/10/23, 59:7-9).

104.    Regarding his second opinion, Dr. Shane states:

The Chicago Police Department supervisory staff knew or should have known that clear patterns of personnel complaints were emerging across various years and different types of offenses against the defendant and non-defendant officers and should have taken measures to stop the behavior and correct the deficiencies. Overall, the data reveal that the Chicago Police Department's accountability systems (i.e., early warning systems, supervision and personnel investigations) are broadly ineffective for detecting misconduct, and holding officers accountable when they violate the law or CPD policy.  These observations impair the CPD's ability to describe and count internal personnel complaints and do not follow accepted policy standards for complete and thorough investigations.

(Ex. 27, Dr. Shane's Report dated 1/13/23, p. 12)

105.     Dr. Shane opines that the City's written policies on discipline were consistent with industry standards in effect at the time, and he did not compare CPD's policies to any other police departments.  (Ex. 28, Dr. Shane's deposition dated 3/10/23, 82:1-83:4, 194:15-17).

106.     Dr. Shane's analysis was based on a dataset of 146 Complaint Register ("CR") files of both Defendant Officers and non-defendant detectives from CPD's Area 5 Violent Crimes Detective Division ranging from 1980 to 2008, which includes a total of 746 allegations contained within the 146 CR files.  (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 14, 48; Ex. 28, Dr. Shane's deposition dated 3/10/23, 78:7-79:13; 85:12-14; 85:24-86:5).

107.     Of the 146 CR files Dr. Shane relies on, 80 of the CR files were complaints against Defendant Officers accumulated from 1980-2008 and 66 of the CR files were complaints against non-defendant detectives from CPD's Area 5 Violent Crimes Detective Division for the years 1987-1990.  (Ex. 27, Dr. Shane's Report dated 1/13/23, p. 14; Ex. 28, Dr. Shane's deposition dated 3/10/23, 104:14-105:13). Defendant Officers were CPD officers for the following lengths of time: Paulnitsky from 1968 to 2008 (40 years); Mingey from 1966 to 2003 (37 years); Montilla from 1976 to 2007 (31 years); Guevara from 1976 to 2005 (29 years); and Halvorsen from 1972 to 2010 (38 years).  (Ex. 52, Paulnitsky Dep, 104:15-25; 339:21-340:2; Ex. 53, Mingey's Personnel File, at RFC-Maysonet 1080, 1084-85; Ex. 54, Montilla Dep, 20:19-21; 75:25-76:7; Ex. 55, Guevera's Personnel File, at RFC-Maysonet 1235-37; Ex. 56, Halvorsen Personnel File, RFC-Maysonet 1375, 1397-1400).

108.     Of the 146 CR files Dr. Shane was provided, he randomly selected 40 CR files "to ensure accurate and objective results" of the administrative investigations, and the data regarding these 40 CR investigations are compiled in Table 4 and 5 of Dr. Shane's Report.  (Ex. 27, Dr.

Shane's Report dated 1/13/23, pp. 13, 39-43; Ex. 29, Dr. Shane's deposition dated 5/26/23, 131:13-132:8; Ex. 30, Jeff Noble's Report dated 10/23/23, p. 8).

109.    Of the 40 CR file investigations that form the basis of Dr. Shane's opinions, Dr. Shane opines that all but one of the investigations had deficiencies, but he does not conclude that the determination made in any of the CR files was erroneous or that misconduct actually occurred. (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 39-43).

110.    Dr. Shane did not test the 40 CR files for statistical significance.  (Ex. 29, Dr. Shane's deposition dated 5/26/23, 132:24-133:5).

111.    Dr. Shane did not conduct an inferential analysis (the "ability to draw inferences from a sample to the wider population") to reach his opinions.  (Ex. 28, Dr. Shane's deposition dated 3/10/23, 89:13-18).

112.    From 1980 to 2008 there were 271,350 total CRs initiated against police officers within the Chicago Police Department city-wide.  (Ex. 28, Dr. Shane's deposition dated 3/10/23, 86:6-88:8; *see* CPD Annual Reports, https://home.chicagopolice.org/statistics-data/statistical-reports/annual-reports/).

113.    Dr. Shane analyzed CR files for Defendant Officers from 1980-2008 but did not separate the CR files for Defendant Officers that were initiated prior to Plaintiff's arrest and/or conviction.  (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 57-63).

114.    Dr. Shane provides "general observations" from his review of the 40 CR files, stating that CPD's accountability systems in place ("i.e., early warning, supervision, and personnel investigations") from 1980 to 2008 "were broadly ineffective for detecting misconduct, and holding officers accountable when they violate the law or CPD policy."  (Ex. 27, Dr. Shane's Report dated 1/13/23, p. 23; Ex. 29, Dr. Shane's deposition dated 5/26/23, 167:21-168:14).

115.    By "broadly ineffective for detecting misconduct," Dr. Shane means "there was no evidence [in the 40 CR files] I saw that the police department was using the system that they had in place." (Ex. 29, Dr. Shane's deposition dated 5/26/23, 168:15-18). Dr. Shane's report provides no basis that states that this information would be maintained in individual CR files. (Ex. 28, Dr. Shane's Report dated 1/13/23, generally).

116.    Dr. Shane draws the following "general observations" that the CR data reveals that the CPD' accountability systems were ineffective: (i) the CR files do not clearly classify complaints as "administrative " or "criminal"; (ii) CPD's policy on the internal affairs function is replete with permissive language that allows for incomplete and poor-quality investigations; (iii) CPD's policy failed to define, quantify and address repeated minor infractions; (iv) CPD did not typically investigate CRs against a defined customary standard such as identifying a specific rule name and number or the specific policy name and number; (v) that sustained criminal CRs were treated as administrative CRs; (vi) that there is no evidence officers submit reports accounting for their actions separately without conferring with each other beforehand; (vii) that assault allegations are investigated as policy violations; (viii) that CPD's classification of data was too fragmented, thus not following consistent convention; (ix) that the correction action taken by CPD was not necessary documented; (x) CPD did not centralize CR data and prematurely purged data from personnel histories while the officer was still an active employee. (Ex. 29, Dr. Shane's deposition dated 5/26/23, 171:5-174:9; Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 23-38).

117.    Dr. Shane states that his conclusion that CPD did not refer criminal complaints like assaults to the Cook County State's Attorney's Office is based upon his expectation to see documents from the CCSAO in the 40 CR files reviewed, and that if he didn't see a document

from the prosecutor's office in the CR file, he concluded there is no evidence that a criminal investigation occurred. (Ex. 29, Dr. Shane's deposition dated 5/26/23, 185:8-186:14; 207:13-19).

118.    The issue of whether all allegations of a possible criminal nature should be referred to the prosecutor's office was considered in the 2012 community of practice of Internal Affairs managers where leaders of Internal Affairs divisions of the 12 largest agencies in the country met to discuss internal affairs standards, stating: "Questions arise whether complaints of excessive or unnecessary force must always be dealt with as a criminal complaint. A suggestion for a resolution of the question is that a complaint that alleges or suggests that an officer's use of force was willfully, intentionally, recklessly, or knowingly excessive or unreasonable should be classified and investigated as a criminal complaint. Some agencies have negotiated agreements over what complaints need to be prosecuted or presented to prosecutors for a decision on prosecution. It is recommended that each agency establish an explicitly codified protocol for the presentation of cases for potential prosecution. Any doubt or uncertainty with respect to a criminal classification should be resolved in consultation with the District Attorney or other local prosecutor." (Ex. 30, Noble Report dated 10/23/23, pp. 50-51 (¶¶66, 70) (*citing* Ex. 31, STANDARDS AND GUIDELINES FOR INTERNAL AFFAIRS: Recommendations from a Community of Practice (2012), at p. 22)).

119.    Dr. Shane agrees that each CR is given a designated complaint category for the initial main complaint based on CPD's Complaint Category Tables, which provide broad categories. (Ex. 28, Dr. Shane's deposition dated 3/10/23, 96:13-97:16).

***Early Warning System***

120.    Dr. Shane also opines that CPD's early warning system in place, the Personnel Concerns Program, was ineffective because "[n]ot withstanding CPD's General Order 83-3,

there's no evidence in discovery that [CPD] supervised the defendant officers by identifying and monitoring their behavior through either an electronic or paper-based system of agency records, despite the fact that they knew or should have known that complaints were accruing and then subsequently initiating and ensuring corrective action was taken." (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 15-16; Ex. 29, Dr. Shane's deposition dated 5/26/23, 157:19-159:5).

121.    Dr. Shane states that there was no evidence that CPD was using the early warning systems they had in place to detect misconduct and hold officers accountable from 1980 to 2008 because he would have expected to see in discovery (specifically in CR files and disciplinary histories), evidence of supervisors intervening, personnel reassigned, referrals the Personnel Concerns Program. (Ex. 29, Dr. Shane's deposition dated 5/26/23, 168:2-169:17).

122.    Dr. Shane did not review any officer disciplinary histories. (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 70-82).

123.    Dr. Shane states that there is no evidence in discovery that establishes that CPD supervised Defendant Officers by identifying them for enrollment in the Personnel Concerns Program ("PCP"). (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 70-82).

124.    Dr. Shanes' Report does not identify any Defendant Officer that met criteria for CPD's PCP. (Ex. 27, Dr. Shane's Report dated 1/13/23, generally).

125.    Dr. Shane states that there is no evidence in discovery that establishes 1) performance evaluations occurred as required by CPD policy; 2) CPD is prohibited from initiating a criminal charge for a sustained complaint for assault; 3) CPD defined, quantified or addressed repeated minor infractions consistent with Department policy, including referrals to PCP; 4) CPD internal affairs used classification rules or data definitions and there is no mention of the complaint classification in the CPD General Orders or Directives supplied in discovery; 5) CPD under took

any system-wide review or changes in response to complaint patterns; 6) CPD under took any management analysis of culture, supervision, or policy relating to "the observed patterns" in the data; 7) Sergeant Epplen submitted any performance evaluations for Defendant Officers; 8) CPD took corrective measures to disrupt patterns, practices or trends of inappropriate behavior; 9) OPS and Internal Affairs communicated, shared records, archived records or coordinated their investigations; 10) the Superintendent held any commanders responsible for their subordinates' conduct; 11) CPD took any managerial action to mitigate personnel complaints. (Ex. 27, Dr. Shane's Report dated 1/13/23, pp. 17, 24, 28, 32, 35, 36, 61, 66-69).

126.    In *Monell* discovery in this case, Plaintiff did not request any documents or statistics related to items 1) - 11) in the preceding paragraph, other than generally asking for policies related to discipline, Defendant Officers' CR files and the 1987-1990 CR files for the non-defendant officers.  (Ex. 32, Plaintiff's Fourth Request for Production of Documents to the City, ¶¶1-13, 19; Ex. 33, Plaintiff's First Request for Production of Documents to the City, ¶¶49-50).

127.    Dr. Shane states that law enforcement agencies have a duty to identify officers who have a disproportionate number of complaints against them, and to find these patterns you must compare similarly situated officers, which are officers in the same division of CPD.  (Ex. 29, Dr. Shane dep dated 5/26/23, 160:15-162:23).  Dr. Shane does not conduct that evaluation in his report. (Ex. 27, Dr. Shane's Report dated 1/13/23, generally).

**Defendant Officers' CR Files that pre-date Plaintiff's August 1990 arrest**

128.    The 1980-2008 CRs for Defendant Officers show that by the time of Plaintiff's arrest in August 1990, Defendant Guevara had four CRs initiated against him, Defendant Halvorsen had one CR initiated against him, Defendant Mingey had one CR initiated against him, Defendant Epplen had one CR initiated against him, Defendant Montilla had one CR initiated

against him, and Defendant Paulnitsky had six CRs initiated against him. (Ex. 34, CR File 152902; Ex. 35, CR File 150473; Ex. 36, CR File 168160, Ex. 37, CR File 152612; Ex. 38, CR File 157627; Ex. 39, CR File 123850; Ex. 40, CR File 146819; Ex. 41, CR File 163692; Ex. 42, CR File 152507, Ex. 43, CR File 155500, Ex. 44, CR File 170855; Ex. 45, CR File 171220, Ex. 46, CR File 171841, Ex. 47, CR File 172123).

129.   In 1986, three allegations in CR No. 152902 against Defendant Guevara were sustained after an investigation by the City's Office of Professional Standards (OPS) for failing to make a proper notification that he was the victim of a battery, releasing a prisoner without proper authorization, and making a false statement, resulting in a two-day suspension without pay.  The allegations that Guevara failed to make a proper notification that he was the victim of a battery and that he released a prisoner without proper authorization were made by a supervisor.  (Ex. 34, CR File 152902, at RFC-Maysonet 1935-37).

130.   In 1986, two allegations in CR No. 150473 against Defendant Guevara for excessive force and verbal abuse were sustained, resulting in OPS recommending a 5-day suspension.  Although the Chief Administrator for OPS did not uphold the sustained CR for excessive force, he did for verbal abuse, and Defendant Guevara was reprimanded.  (Ex. 35, CR File 150473, at Maysonet 1702-05).

131.   In 1989, two allegations in CR No. 168160 against Defendant Guevara for warrantless search and failure to identify as a police officer resulted in findings of exonerated and not sustained, respectively, following an investigation by OPS.  (Ex. 36, CR File 168160, at RFC-Maysonet 2071, 2076).

132.    In 1986, two allegations in CR No. 152612 against Defendant Guevara for excessive force were not sustained following an investigation by OPS.  (Ex. 37, CR File 152612, at RFC-Maysonet 1890-91).

133.    In 1987, one allegation in CR No. 152507 against Defendant Paulnitsky for an off-duty assault was not sustained following an investigation by OPS, and the complainant was arrested for battery of Paulnitsky.  (Ex. 42, CR File 152507, at RFC-Maysonet 1859-63).

134.    In 1987, one allegation in CR No. 155500 against Defendant Paulnitsky for taking a suspect in for questioning, leaving his three minor children unattended at home was not sustained following an investigation by OPS.  (Ex. 43, CR File 155500, at RFC-Maysonet 1991-93).

135.    In 1989, one allegation in CR No. 170855 against Defendant Paulnitsky for excessive force was not sustained following an investigation by OPS.  (Ex. 44, CR File 170855, at RFC-Maysonet 2116-17).

136.    In 1990, one allegation in CR No. 171220 against Defendant Paulnitsky for a warrantless search was not sustained following an investigation by OPS.  (Ex. 45, CR File 171220, at RFC-Maysonet 2218-19; Ex. 48, Officer Disciplinary History, at RFC-Maysonet 993).

137.    In 1990, seven allegations in CR No. 171841 against Defendant Paulnitsky for excessive force, harassment, and verbal threats were unfounded following an investigation by OPS.  (Ex. 46, CR File 171841, at RFC-Maysonet 2256-59).

138.    In 1990, one allegation in CR. No. 172123 against Defendant Paulnitsky for acting in a disrespectful or abusive manner was not sustained following an investigation by OPS.  (Ex. 47, CR File 172123, at RFC-Maysonet 2526-27).

139.     Defendant Mingey had one CR initiated against him prior to Plaintiff's August 1990 arrest that was unfounded following an investigation by OPS.  (Ex. 39, CR File 123850; Ex. 48, Mingey's Disciplinary History, at RFC-Maysonet 989).

140.     On November 24, 1987, one allegation in CR. No. 157627 against Defendant Halvorsen for excessive force was not sustained following an investigation by OPS.  (Ex. 38, CR File 157627, at RFC-Maysonet 2016).

141.     On September 27, 1985, CR No. 146819 initiated against Defendant Epplen as the result of a civil suit being filed by an incarcerated complainant was unfounded following an investigation by OPS.  (Ex. 40, CR File 146819, at RFC-Maysonet 1810-11).

142.     In 1988, one allegation in CR No. 163692 against Defendant Montilla for excessive force was not sustained following an investigation by OPS.  (Ex. 41, CR File 163692, at RFC-Maysonet 2039-40).

DATED: July 15, 2024                    Respectfully Submitted,

                                        DEFENDANT CITY OF CHICAGO

                                         By: */s/ Eileen E. Rosen*

                                        *Special Assistant Corporation Counsel*
                                        *for Defendant City of Chicago*
                                        Eileen E. Rosen
                                        Catherine M. Barber
                                        Austin G. Rahe
                                        Theresa Berousek Carney
                                        ROCK FUSCO & CONNELLY, LLC
                                        333 W. Wacker, 19th Floor
                                        Chicago, Illinois 60606
                                        (312) 494-1000
                                        erosen@rfclaw.com