# Exhibit 3

**Page 1**

```
                                                          1

           IN THE UNITED STATES DISTRICT COURT

             NORTHERN DISTRICT OF ILLINOIS

                    EASTERN DIVISION


JAMES KLUPPELBERG            )
                            )
          Plaintiff,         )
                            )
    vs.                      )  No.13 CV 03963
                            )
JON BURGE, LEONARD ROLSTON   )
#11935, JOHN SCHMITZ #14634, )
WILLIAM FOLEY #8108, WILLIAM )
KELLY #3644, DETECTIVE URBON )
#15400, THOMAS PTAK #6029,   )
MICHAEL DUFFIN #13596, GEORGE)
JENKINS #11828, DETECTIVE    )
NELSON #16164, DETECTIVE VEGA)
#3464, DETECTIVE W. MICEK    )
#4645, DETECTIVE GUEST       )
#10600, DETECTIVE L. TUIDER  )
#5648, FRANCES BURNS, WILLIAM)
ALLETTO, as-of-yet UNKNOWN   )
EMPLOYEES OF THE CITY OF     )
CHICAGO and THE CITY OF      )
CHICAGO,                     )
                            )
          Defendants.        )


         The deposition of JAMES HICKEY
taken under oath at 311 North Aberdeen Street,
Suite 100, Chicago, Illinois, at 11:50 a.m. on
Tuesday, July 29, 2014 pursuant to the Rules of
the United States District Court, Northern
District of Illinois, before Jamye Giamarusti,
C.S.R. No. 084.004183 in and for the County of
Cook and State of Illinois, pursuant to Notice.
```

**Page 2**

```
                                                          2

 1   APPEARANCES:

 2

 3        LOEVY & LOEVY, by

 4        MS. ROSHNA KEEN

 5        312 North May, Suite 100

 6        Chicago, Illinois  60607

 7             Appeared on behalf of the Plaintiff;

 8

 9        THE SOTOS LAW FIRM, P.C., by

10        MR. JEFFREY R. KIVETZ

11        550 East Devon, Suite 150

12        Itasca, Illinois  60143

13             Appeared on behalf of the

14             Individually named Defendants;

15

16        JONES DAY, by

17        MR. CHAKA M. PATTERSON

18        77 West Wacker Drive, Suite 3500

19        Chicago, Illinois  60601

20             Appeared on behalf of the Defendant,

21             The City of Chicago.

22

23             * * * * *

24
```

**Page 3**

```
                                                          3

 1             (WHEREUPON, Deposition Exhibit

 2             No. 1 was marked for

 3             identification.)

 4             (Witness sworn.)

 5        JAMES HICKEY,

 6   called as a witness herein, having been first

 7   duly sworn, was examined and testified as

 8   follows:

 9                  EXAMINATION

10   BY MS. KEEN:

11        Q.   Good morning.

12        A.   Good morning.

13        Q.   My name is Roshna Keen, and I

14   represent the plaintiff, James Kluppelberg in

15   this matter.

16             Could you please state and spell

17   your name?

18        A.   James K. Hickey, H-I-C-K-E-Y.

19        Q.   Are you currently employed?

20        A.   I am.

21        Q.   By whom?

22        A.   Chicago Police Department.

23        Q.   What is your rank at the CPD?

24        A.   My title is assistant director.
```

**Page 4**

```
                                                          4

 1        Q.   Of any particular unit?

 2        A.   Of Research and Development Division.

 3        Q.   How long have you held that position,

 4   sir, as the Director of R&D?

 5        A.   I first had it in 1999.  And two or

 6   three years later, I left for other

 7   assignments, and I returned in 2008.  So, I've

 8   had it twice.  And this time it's been for the

 9   last six years.

10        Q.   Before we go any further, I want to

11   show you what's been marked as Exhibit 1.

12             This is the copy of the Notice of

13   Rule 30(b)(6) Deposition pursuant to which we

14   have convened here today.

15             Can you let me know when you

16   finished reviewing it, please.

17        A.   I have previously looked at this

18   document, yes.

19        Q.   Are you here today to testify as the

20   Rule 30(b)(6) representative of the City of

21   Chicago on the topics that are contained in

22   this notice?

23        A.   For topics one through five.

24        Q.   Are you saying that you're not going
```

5

1    to be testifying about topic six in the notice?
2         MR. PATTERSON:  That's correct.
3         MS. KEEN:  My understanding from your
4    e-mail was that he was going to be testifying
5    as to one through six.
6         MR. PATTERSON:  No.  I said one
7    through five.  I'm certain of it.  I said one
8    through five, and we were evaluating six
9    through eight.
10        MS. KEEN:  Okay.  What is your
11   position today on six through eight?
12        MR. PATTERSON:  We are looking for
13   somebody to testify on the first half of six,
14   and we are still evaluating what to do about
15   the second half of six, seven and eight.
16   BY MS. KEEN:
17        Q.   So, let me ask you this question, sir.
18             Have you made any efforts to look
19   for documents that are responsive to any
20   discovery requests that were issued in this
21   litigation?
22        MR. PATTERSON:  Objection.  He's not
23   here to testify about six.
24        MS. KEEN:  Well, if he, just in an

6

1    individual capacity as an employee of the
2    police department, did take steps to obtain any
3    documents that were produced in this
4    litigation, then I want to ask him about that.
5             And if what you're saying is I
6    would have to do that not in his capacity as a
7    30(b)(6) witness, but just independently, then
8    I guess I can do that at the end.
9             But in order to even know that, I
10   have to ask him the predicate question of
11   whether he took any steps.  I don't want him to
12   have to come back twice, and I assume you don't
13   either.
14        MR. PATTERSON:  No, I don't.  So,
15   let's do this.  If you want to ask him about
16   that in his individual capacity, that's fine.
17        MS. KEEN:  Well, the question of
18   whether he looked for everything, I mean, as
19   just a human being who took the steps to look
20   for something.  That's what I'm asking about
21   first.
22             If he did, then I would ask him
23   about his efforts individually, not as a
24   representative of the city.  Do you understand

7

1    what I'm saying?
2         MR. PATTERSON:  Yeah.  Okay.  That's
3    fine.  Go ahead.
4    BY MS. KEEN:
5         Q.   Is it Mr. Hickey or Officer Hickey?
6         A.   James.
7         Q.   That's easy.
8              James, did you take any steps to
9    look for documents for the purpose of providing
10   them to the attorneys in this Kluppelberg
11   litigation?
12        A.   And I'm speaking as an individual.
13        Q.   Right.  On that question.
14        A.   Regarding the Ramos case -- no,
15   Research and Development does not maintain
16   information regarding specific criminal
17   investigations or death investigations and we
18   don't have anything to do with filing cabinets,
19   where they are maintained, or where they are
20   located.
21        Q.   How about any of the policy documents
22   that were produced in this case?  Did you go
23   out and pull any policy documents?
24        A.   I oversaw some gathering of some

8

1    documents that were requested.
2         Q.   Okay.  For this Kluppelberg case?
3         A.   Yes.
4         Q.   And around when did you oversee that
5    process?
6         A.   In the last few months.  I don't know.
7         MS. KEEN:  Okay.  So, I think maybe
8    the easiest way to do it is at the conclusion
9    of the 30(b)(6) deposition, I'll ask him about
10   whatever steps he took, you know, to oversee or
11   directly obtain documents for this case.
12        MR. PATTERSON:  Well, I would object
13   to that.  I think it's fair to ask him
14   personally what steps he took.
15        MS. KEEN:  Right.
16        MR. PATTERSON:  But not what steps he
17   oversaw because I think that bleeds into
18   Topic 6, and he is not the person to testify on
19   Topic 6.
20             Like I said, we will definitely
21   produce somebody on the part of 6 that requests
22   what steps were taken to produce documents in
23   this case, but Jim Hickey is not that person.
24        MS. KEEN:  Okay.  My position is we

**Page 9**

```
1    get to ask him about what he did.
2           MR. PATTERSON:  Yes.  I agree with
3    that.
4           MS. KEEN:  And if he oversaw by
5    talking to somebody, that's what he did.
6           MR. PATTERSON:  Okay.  That's fine.
7    I'm not going to make a big deal out of it.
8    That's fine.
9           MS. KEEN:  We can always talk further
10   about that at a break because that's going to
11   be at the end anyway.
12          MR. PATTERSON:  Okay.  That's fine.
13          MS. KEEN:  Okay.
14   BY MS. KEEN:
15      Q.   So, your understanding is that you're
16   here to testify on behalf of the City of
17   Chicago as to topics 1 through 5 of this
18   notice, correct?
19      A.   Correct.
20      Q.   Now, there is a typo in my notice.
21          In topic No. 2, it relates to
22   Area 3 Violent Crimes.  And at the very last
23   sentence of that topic it says:
24          "This request includes but is not
```

**Page 10**

```
1    limited to the use, storage, location and
2    preservation of police reports, memos, notes,
3    witness statements, worksheets, general offense
4    reports, general progress reports,
5    supplementary reports, lineup reports, evidence
6    logs, inventory reports, and any other means of
7    reporting information learned during an arson
8    investigation?"
9           Do you see that?
10      A.   Yes, I do.
11      Q.   It should say Violent Crimes
12   Investigation.
13      A.   The last word should be Violent
14   Crimes?
15      Q.   Rather than arson, it should say
16   Violent Crimes.
17      A.   Okay.
18      Q.   With that correction, are you still
19   the representative the 30(b)(6) representative
20   for the city on Topic 2?
21          MR. PATTERSON:  With the exception of
22   line-up reports, he is.
23          THE WITNESS:  Yes.
24
```

**Page 11**

```
1    BY MS. KEEN:
2       Q.   So, the entirety of Topic 2 as it
3    relates to Violent Crimes with the exception of
4    line-up reports, correct?
5           MR. PATTERSON:  Yes.  Oh, sorry.
6           MS. KEEN:  No, that's okay.
7    BY MS. KEEN:
8       Q.   And that's your understanding as well?
9       A.   Yes, ma'am.
10      Q.   And then the same correction needs to
11   be made to topic four.  I apologize.  I
12   realized this last night.
13          Because topic four relates to
14   Area 3, the word arson should be replaced with
15   Area 3 Investigations.
16          MR. PATTERSON:  In topic four?
17          MS. KEEN:  Yeah.
18   BY MS. KEEN:
19      Q.   With that correction, are you the
20   representative of the City on the entirety of
21   topic four?
22      A.   Yes.
23      Q.   Did you review any documents to
24   prepare for your deposition?
```

**Page 12**

```
1       A.   I did.
2       Q.   Tell me what documents you reviewed.
3       A.   Let's see.  Prior depositions I've
4    given.  I think it was -- no -- in the Fields
5    testimony.
6       Q.   From the trial?
7       A.   From the trial.  I did look at the
8    death investigation that turned into a homicide
9    investigation.
10      Q.   You mean for this case?
11      A.   Yes, ma'am.  I looked at a couple of
12   annual police reports.
13      Q.   What was the relevance of those annual
14   police reports?
15      A.   I was trying to refresh my memory
16   regarding the volume of crimes, violent crime
17   field investigations that were assigned to
18   Area 3 in 1984.
19      Q.   Based on your review of those reports,
20   what was your impression of the volume of
21   crime?
22      A.   It's pretty busy.  There was no
23   surprises.
24      Q.   What else did you look at, if
```

13

```
1   anything?
2       A.   That's about all.
3       Q.   Did you review any special orders?
4       A.   Oh, I'm sorry.  Yeah.  The Detective
5   Division Special Orders on the topic of
6   investigative files, but didn't look at them
7   very hard because I'm pretty familiar with the
8   topic.
9       Q.   You wrote some of them, correct?
10      A.   I wrote all of them -- not all of
11  them.  But, yes, I have written some of them.
12      Q.   If you are able to recall, sir, which
13  special orders specifically did you review?
14      A.   Detective Division Notice 82-2,
15  Detective Division Special Order 83-1, as well
16  as 83-2, and one special order Detective
17  Division Special Order from 1986, and I forgot
18  the number on it.
19      Q.   Did you review any memoranda regarding
20  the subject of files and reports?
21      A.   Yes.  I did look at memoranda that
22  were generated on the subject of surveying the
23  violent crime areas and recommendations and
24  discussions that were ongoing that were reduced
```

14

```
1   to a form of a memoranda, several memorandum.
2       Q.   Is it your understanding that all of
3   the documents you reviewed to prepare for
4   today's deposition have been produced in this
5   litigation?
6       A.   Yes.
7       Q.   And that's a question for you or your
8   attorney.  I just want to make sure that if
9   you've looked at something, that I have a copy
10  of it as well.
11      MR. PATTERSON:  Yeah.  Everything that
12  he reviewed has been produced.
13      MS. KEEN:  Okay.  Great.
14  BY MS. KEEN:
15      Q.   Anything else you reviewed?
16      A.   I think that was it.
17      Q.   Okay.  And part of what I'm going to
18  get your help with today is just identifying
19  the different documents, who wrote them, when
20  were they written, that kind of stuff.
21      A.   Okay.
22      Q.   I know you've given some deposition
23  testimony in other cases, correct?
24      A.   Correct.
```

15

```
1       Q.   On some similar subjects to what are
2   contained in our notice here.
3            What other cases have you given
4   deposition testimony in on the subject of
5   reports or file keeping within the police
6   department?
7       A.   Evans case, Rivera, Fields.  I'm
8   starting to lose track to be honest with you.
9            I probably have given depositions
10  on the subject of investigative files to
11  multiple attorneys, Peoples Law Office and
12  others.
13      Q.   You gave testimony at the Palmer
14  hearing, correct?
15      A.   Right.  Early '80s, right.
16      Q.   As you sit here today, do you recall
17  giving that testimony?
18      A.   Right.  It was Judge Shader's
19  courtroom, Milton Shader.
20      Q.   Did you review any transcripts from
21  your Palmer testimony any time recently?
22      A.   Not for this.
23      Q.   Okay.  Have you testified?
24      A.   I mean, for the other ones, I looked
```

16

```
1   at it, but I -- not for this one.
2       Q.   You gave the Rivera deposition
3   somewhat recently, correct?
4       A.   Correct.
5       Q.   And the Fields deposition as well was,
6   relatively speaking, recently, correct?
7       A.   Correct.
8       Q.   In the last year or two or couple of
9   years?
10      A.   Last few months.
11      Q.   Last few months.  Okay.
12      MR. PATTERSON:  Let me just interject.
13  To be clear, Roshna, I think the Fields
14  testimony at trial was given in the last couple
15  months.
16      MS. KEEN:  Okay.
17      MR. PATTERSON:  The Fields deposition
18  was like maybe 2012.
19      MS. KEEN:  Okay.
20      MR. PATTERSON:  2011, 2012, something
21  like that.
22      THE WITNESS:  Thank you.
23  BY MS. KEEN:
24      Q.   So, let's return back to your career
```

17

```
1   with the department.  I know you've been with
2   them a long time.  I just want you to briefly
3   walk me through the various posts you had.
4       A.   Sure.  I started the Chicago Police
5   Department in June 1971.  After the training
6   academy, I was assigned to the Englewood
7   community, 61st and Racine.  I spent a couple
8   years there and was assigned to work as a
9   police officer in the juvenile court where I
10  worked until about 1975.
11           And in 1975, I began working for
12  the Special Investigations Unit of the Youth
13  Division, which concentrated its investigations
14  on child pornography and school narcotics.
15      Q.   What rank did you have if you were in
16  the Special Investigations Unit?
17      A.   I was police officer at that time.
18      Q.   Was Special Investigations within --
19      A.   Within the Youth Division.
20      Q.   And what was the Youth Division
21  within?
22      A.   The Bureau of Investigative Services.
23      Q.   So, was that, like, a specialized unit
24  within the Bureau of Investigative Services?
```

18

```
1       A.   Yes, it was.
2       Q.   Okay.
3       A.   In August 1977, I was appointed to
4   detective -- appointed as a detective, and I
5   was assigned to Area 1 Homicide and Sex Unit
6   that worked out of 51st and Wentworth and was
7   responsible for crimes which occurred south of
8   the Chicago River to 75th Street, Dan Ryan to
9   the Lake.
10           After that, about 19 -- late
11  1980, I was assigned to detective headquarters.
12      Q.   What did that mean that you were
13  assigned to detective headquarters in terms of
14  your responsibilities?
15      A.   My responsibilities changed
16  dramatically from that of a field detective to
17  that of a detective working downtown at the
18  headquarters building.  I worked for the Chief
19  of Detectives.
20      Q.   Who was the chief at that time?
21      A.   William Hanhardt, H-A-N-H-A-R-D-T.
22      Q.   What were your responsibilities for
23  the Chief of Detectives?
24      A.   In the morning, I would come in early
```

19

```
1   and review all the major crimes which occurred
2   citywide and then brief the chief in the
3   morning.
4       Q.   What documents were you looking at to
5   permit you to review all the major crimes that
6   had occurred citywide?
7       A.   There was a requirement that each of
8   the then six areas in Bomb & Arson would create
9   a 24-hour log.  And each day on each of the
10  three watches or shifts, the supervisor in
11  charge would have to simply summarize the
12  highlights of major investigations that had
13  just occurred or developments, major
14  developments on other cases.
15      Q.   What was the log called?
16      A.   Detective area, 24-hour log, something
17  similar to that.
18      Q.   Was it ever called the Major Incident
19  Log?
20      A.   That's it.  Yeah.  Major Incident Log.
21  That's it.  24-hour log.
22      Q.   Just so that I am clear, do you recall
23  what it looks like?
24      A.   Sure.  It had two columns.  On the top
```

20

```
1   of it, it had the normal unit identifier.  And
2   on the left-hand column, it had the hours for
3   the shift.  And in the right-hand column, there
4   was space, free entry, where the supervisor had
5   to write the event, describe the event, usually
6   in less than a paragraph, and so on and so
7   forth.
8            For each of the watches at the
9   end of 24 hours, usually at 5:00 o'clock in the
10  morning, they were hand-carried down to
11  headquarters.
12           We're talking about an era before
13  the fax machine.  Hard to imagine, I know.
14  But, yes.
15      Q.   I have worked at places where they
16  have interoffice mail envelopes, so I'm
17  picturing something like that.  It was
18  hand-carried to the Chief of Detectives office?
19      A.   Right.
20      Q.   Where was the Chief's office located
21  at that time?
22      A.   1121 South State Street on the 5th
23  floor at the headquarters building.
24      Q.   At that time, what other unit or areas
```

21

```
1   were in 1121 South State Street?
2       A.   All the major leadership was there,
3   including the Superintendent of Police.
4       Q.   When you said that the supervisor in
5   charge had to fill out the Major Incident Log,
6   are you referring to the sergeant supervising
7   each shift?
8       A.   Correct.
9       Q.   Did lieutenants or captains or
10  commanders have any responsibility in filling
11  out that list?
12      A.   Lieutenants tended not to fill it out
13  unless there was no sergeant around. There
14  were no captains assigned to the Detective
15  Division in this era. And commanders didn't do
16  it.
17      Q.   How long did you work for the Chief of
18  Detectives after starting in the late '80s?
19      A.   Oh, about three years.
20      Q.   So, what you're describing for me now
21  is your daily routine from about late '80 to
22  sometime in '83?
23      A.   Yes. And that was simply my morning
24  activities.
```

22

```
1       Q.   Okay.  What is your understanding as
2   to whether copies of the Major Incident Log
3   remained at some point in time?
4       A.   Okay.  Now, we've shifted from the
5   Major Incident Log to the Major Incident
6   Worksheet, or no?
7       Q.   No.  We're not talking about that yet.
8       A.   Okay.
9       Q.   I know that exists.  I have questions
10  about that, but I'm still talking about this
11  24-hour log.
12      A.   Okay.  The original was sent downtown,
13  a copy went to the deputy chief, a copy went to
14  the area commander, a copy stayed with the area
15  Violent Crimes Unit.
16      Q.   What if we're talking about
17  Bomb & Arson?
18      A.   They submitted their own and a copy
19  went to the -- the original went to the chief,
20  a copy went to the deputy chief, a copy went to
21  their commander, and I presume they had an
22  office copy.
23      Q.   Why do you presume that?
24      A.   It's a document that sometimes is
```

23

```
1   informative, especially for one that has been
2   off for the last two days.  They can come in
3   and see what happened.
4       Q.   Okay.  As of the three years that you
5   were first working in the Chief of Detectives
6   office, what was the retention schedule for the
7   Major Incident Log?
8       A.   I believe it was one year.
9       Q.   Was it one year for all of the copies,
10  or did some copies stick around longer than
11  this?
12      A.   It's the original.  You really can't
13  control, you know, copies of copies.  It speaks
14  to the original and any copies.
15      Q.   Are you saying that the police
16  department's policy was to purge all Major
17  Incident Logs after one year of their
18  existence?
19      A.   Yes.
20      Q.   Were Major Incident Logs or copies of
21  the logs ever placed in individual police files
22  relating to a specific case?
23      A.   I don't believe so.  Could they have
24  been?  Yes, they could have been.  It was not
```

24

```
1   viewed as pertinent to the subject
2   investigation.
3            It's simply a summary to inform
4   the leadership of events that occurred.  And
5   there are more than -- frequently more than one
6   event per page.
7       Q.   Okay.  So, you're saying it wasn't --
8   well, let me -- I guess let me give you an
9   example and that may -- your answer may be the
10  same and that's fine, but I'll just ask you.
11           If the Major Incident Log
12  contained references to three different
13  homicides that had all occurred within a span
14  of a 24-hour period within the same district,
15  would you expect to see a copy of that Major
16  Incident Log placed into either the permanent
17  retention file or let's call -- let me re-ask
18  that.
19           Would you expect to see in a case
20  where a Major Incident Log had referenced three
21  different homicides that had all occurred
22  within the same 24-hour period in the same
23  geographic area placed into either the RD file
24  or the unit file for each of the three
```

25

1   homicides?
2           MR. PATTERSON:  Objection, foundation,
3   incomplete hypothetical.
4           MS. KEEN:  Just so that we're clear,
5   I'm talking about this time period of '80 to
6   '83 when you were working in the Chief of
7   Detectives.
8           MR. PATTERSON:  Same objection.
9           THE WITNESS:  I would not expect it to
10  be placed in individual files.
11  BY MS. KEEN:
12      Q.  Okay.  For the reasons that you stated
13  a moment ago?
14      A.  It's a management information sheet,
15  and it was not part of the individual
16  investigation.
17      Q.  Have you ever seen a copy of a Major
18  Incident Log in a unit file?
19          MR. PATTERSON:  Objection, foundation.
20          MS. KEEN:  Just so that I understand,
21  what's the foundation objection?
22          MR. PATTERSON:  You haven't
23  established that there are unit files, what
24  they are, what they contain, et cetera.

26

1           MS. KEEN:  Okay.  I guess I'm --
2   that's fine.  That's such a --
3           MR. PATTERSON:  Where they're kept.
4           MS. KEEN:  Because of his position,
5   you know, his extensive experience on the
6   subject, which we can get into, but I'm sure
7   he's going to be asked questions in his
8   position as the designee on these topics.
9           I'm going to ask him about
10  whether he's ever seen something occur, you
11  know, in the course of his career.  I'll define
12  unit file, and you can let me know if that
13  addresses your concern.
14  BY MS. KEEN:
15      Q.  Let me take a step back.
16          Have you ever seen a Major
17  Incident Log placed into any police file
18  relating to a specific police investigation?
19      A.  I can't recall there being such an
20  event.  There may have been.  I just can't
21  recall.
22      Q.  Okay.  So, other than reviewing the
23  24-hour log, or Major Incident Log, what were
24  your responsibilities?

27

1       A.  Attached to these 24-hour logs,
2   sometimes were supplemental reports, sometimes
3   there were Major Incident Worksheets.
4       Q.  What is a supplemental report?
5       A.  A supplemental report is a -- was at
6   that time a form set, a paper document.  And it
7   was the investigation that was submitted by
8   detectives or others that was pertinent to an
9   already reported crime.
10          And just to clarify, I did not
11  get the originals, but only photocopies of
12  those.
13      Q.  Did the Chief of Detectives office get
14  a copy of every Major Incident Worksheet that
15  was prepared?
16      A.  No.
17      Q.  Just ones that were attached to the
18  Major Incident Logs?
19      A.  Correct.
20      Q.  In what circumstances would the Major
21  Incident Worksheet get submitted to the Chief
22  of Detectives as opposed to not submitting it?
23      A.  In the opinion of the supervisor who
24  prepared it.

28

1       Q.  Who prepared the log?
2       A.  The log, would make a judgment call,
3   perhaps the Chief would like to know more about
4   this particular event.
5       Q.  At that time, in other words, from the
6   late '80s to sometime in '83, when you left,
7   was there a requirement that any particular
8   police reports or police documents were
9   supposed to be submitted to the Chief of
10  Detectives other than the Major Incident Log?
11      A.  No.
12      Q.  So, that was the only document that
13  the various areas or specialized units were
14  supposed to submit to the Chief of Detectives
15  as far as --
16      A.  Supplemental reports.  I mean, they
17  would give it, but not all supplemental
18  reports.
19      Q.  Can you explain what you mean by that?
20  Or, just tell me more about that.
21      A.  Well, when you do 100,000 case
22  reports, not all of them have the same level of
23  interest.  Some crimes simply may be more
24  serious in nature.  There's a difference

29

1   between a stalking case and a murder case.
2           And the leadership of the police
3   department tended to want to know more about
4   the more serious crimes that occurred.  And
5   sometimes the detailed information was -- has
6   been submitted on a supplementary report.  And
7   they were simply provided a copy.
8       Q.   Okay.  So, I guess there's two
9   categories of information.  There's one
10  category of information which was, as a matter
11  of course, required to be submitted to the
12  Chief's office.
13          And then it sounds like there was
14  a second category of information that the chief
15  would request on a case-by-case basis; is that
16  accurate?
17      A.   I would say no.  I would say most of
18  these additional documents were determined by
19  those that created the area log.  If they had
20  it, they would attach it.
21          So, it wasn't so much a request
22  from the Chief, nor was it a requirement from
23  the Chief.
24      Q.   But the practice was to submit --

30

1   well, what was the practice in terms of
2   submitting supplemental reports from an area or
3   specialized unit to the Chief of Detectives?
4       A.   When they thought the Chief would be
5   interested and when they thought the -- if the
6   case report was done, the supplementary report
7   was completed.
8           Most of the time the
9   supplementary report is done hours after the
10  investigation is completed.  So, there's a lag,
11  you know.  The paperwork is the last thing
12  done.
13      Q.   So, you're saying based on the lag,
14  it's unlikely that the supplementary report
15  would have even been completed by the time the
16  Major Incident Log was sent to the Chief?
17      A.   Correct.
18      Q.   But in those cases where there was a
19  supplemental report prepared and it was of a
20  crime or alleged crime that the supervisor
21  thought would be of interest to the Chief,
22  you're saying the practice department-wide was
23  to submit that supplementary report to the
24  Chief; is that accurate?

31

1       A.   If it was available, and if the
2   individual supervisor determined he was going
3   to send it.  There was no requirement to.
4       Q.   What about handwritten notes during
5   this '80 to '83 period?  What did you tend to
6   see as far as handwritten notes being sent to
7   the Chief's office?
8       A.   None.
9       Q.   You never saw handwritten notes
10  attached to a supp report?
11          MR. PATTERSON:  Objection, asked and
12  answered.
13          MS. KEEN:  You can answer.
14          THE WITNESS:  No.
15  BY MS. KEEN:
16      Q.   Was there a prohibition against
17  submitting handwritten notes to the Chief's
18  office?
19          I don't mean that to be cute at
20  all.  I'm just saying in terms of the filing
21  system.
22      A.   We were silent on the issue.
23      Q.   Okay.  I'm sure you had numerous other
24  responsibilities working at the Chief's office,

32

1   can you just go over what the remaining
2   responsibilities were that you had?
3       A.   Very simply stated, they tended to be
4   special projects.
5       Q.   What were some of the special projects
6   you had done?
7       A.   Crime statistics.  It was certainly a
8   considerably large one.  The veracity of our
9   crime statistics.  Sometimes we get challenged.
10  And investigative files certainly took up a lot
11  of my time.  And some things as mundane as
12  personnel evaluation, what methods should we
13  use by detective supervisors.
14      Q.   At some point in time, the department
15  began dealing with a street files problem,
16  correct?
17          MR. PATTERSON:  Objection, foundation.
18  BY MS. KEEN:
19      Q.   In the '80s, the department had to
20  deal with the accusation that there was a
21  street files problem, correct?
22          MR. PATTERSON:  Objection, foundation.
23  BY MS. KEEN:
24      Q.   You can answer.

33

```
1       A.   Yes.
2       Q.   And you were one of the people that
3   began the task of looking at street files,
4   correct?
5       A.   At the direction of my supervisors.
6       Q.   In connection with that work on street
7   files, you ended up drafting several special
8   orders, correct?
9            MR. PATTERSON:  Objection, foundation.
10           THE WITNESS:  Correct.
11  BY MS. KEEN:
12      Q.   Were you doing all that work on the
13  street files project while you were at the
14  Chief's office in the position you just
15  described to me?
16      A.   Yes.
17      Q.   Okay.  So, that was the investigative
18  file special project you were talking about?
19      A.   Yes.
20      Q.   That's obviously going to be the
21  subject of some of our -- at least some of our
22  questions today, but let me go to your
23  chronology and get that finished.
24      A.   Sure.
```

34

```
1       Q.   After you left the Chief of
2   Detectives, where did you go next?
3       A.   I went to the crime laboratory in
4   1983.  I stayed in the crime lab until probably
5   '87, during which time I made sergeant and
6   lieutenant.
7            When I made lieutenant in 1987, I
8   was reassigned to the Englewood community.
9       Q.   What area was that?
10      A.   This is 61st and Racine.
11      Q.   Was there an area number?
12      A.   No.  007 is the unit number for the
13  Englewood District.
14      Q.   Okay.  So, you were a lieutenant
15  detective, or no?
16      A.   No, no.  They're separate.  Detective
17  is one title; sergeant is another title;
18  lieutenant is a third title.
19           So, in '87, I made lieutenant,
20  went to Englewood.  And really shortly
21  thereafter, probably six months later, I was
22  reassigned to work for the Chief of Patrol.
23      Q.   Okay.  What year would that be?
24      A.   It's still '87.
```

35

```
1       Q.   What were your -- going to the
2   Englewood District when you were lieutenant,
3   just briefly, what were your duties there?
4       A.   Mostly I was a field lieutenant, and I
5   was the fill-in watch commander.
6       Q.   Did you have occasion to investigate
7   crimes while you were a lieutenant in the
8   Englewood District?
9       A.   Oversee.  Patrol is responsible for
10  the preliminary investigation of all crimes and
11  detectives have to follow-up to those reported
12  crimes.
13      Q.   Who were you supervising as the
14  lieutenant in Englewood?
15      A.   Those people in blue shirts and the
16  white shirt sergeants.
17      Q.   Okay.  So, you didn't have any
18  supervisory responsibility over the detectives
19  at that point?
20      A.   No, I did not.
21      Q.   And just briefly, what were you doing
22  in the crime lab?
23      A.   I was administrative sergeant.  I did
24  a lot of budget work and a little crime scene
```

36

```
1   processing.
2       Q.   Did you have occasion to do any actual
3   casework, in other words, investigation of
4   specific crimes while you were in the crime
5   lab?
6       A.   No.  I went to a few crime scenes.
7   But, no.  My job was mostly administrative.
8       Q.   In '87, when you went to the Chief of
9   Patrol, you said?
10      A.   Yes, ma'am.
11      Q.   What was your title then?
12      A.   Lieutenant.
13      Q.   Oh, you stated lieutenant.
14           Okay.  What did you have to do as
15  lieutenant?
16      A.   I did the budget, I made the
17  personnel -- I drafted the personnel movement.
18  We move a lot of people in the Patrol Division.
19  And participated in the planning and the set-up
20  for special events, including those major
21  festivals, such as Puerto Rican Festival,
22  Bud Billiken, et cetera, and any protests that
23  may have arisen, abortion clinics at the time.
24  Those that required some type of special
```

37

```
1   response.
2        Q.   Did you have occasion to oversee a
3   patrol officer's initial investigation into an
4   alleged crime when you were in the Chief of
5   Patrol?
6        A.   No.
7        Q.   Where did you go after that?
8        A.   I went to create -- assist in the
9   creation of a new unit, the Airport Law
10  Enforcement Section.
11            Up until that time, O'Hare
12  Airport was part of the 16th District and
13  midway was part of the 8th District on the
14  southwest side.  And the 1st District had
15  administrative control over Meigs Field, which
16  was previously on the lakefront near McCormick
17  Place.
18            At that time, it became a unified
19  command, and it was separated from the
20  districts.  I was in charge of creating a new
21  unit at Midway and at then Meigs Field for
22  just -- oversee, you know, police officers and
23  work with the Department of Aviation.
24       Q.   Okay.  And you completed that
```

38

```
1   successfully?
2        A.   Yes.  And then my next assignment
3   was -- I was directed to create another new
4   unit called the Random Drug Testing Unit.
5            Random Drug Testing tests police
6   officers on an unannounced basis.  It is a
7   program that is pretty much verified by the
8   integrity of the police officers.  By that I
9   mean, we catch very few police officers who
10  have abused narcotics.
11       Q.   Who asked you to work on the Airport
12  Section and the Random Drug Testing, was that
13  directly from the superintendent?
14       A.   No.  The second one was.  The Random
15  Drug Testing was from the superintendent.  The
16  other one was from the first deputy
17  superintendent.
18       Q.   Is that person the next in command
19  after superintendent?
20       A.   Yes.
21       Q.   I'm sorry.  What did you say?  That
22  was the first deputy?
23       A.   First deputy.
24       Q.   Do you know how it came about that you
```

39

```
1   got tapped to create these two projects?
2        A.   I was considered a strong writer,
3   organizer, and I think the superintendent liked
4   my involvement in some other activities and he
5   just -- I had no choice.  It was not something
6   I volunteered for.
7        Q.   What did you do after the Random Drug
8   Testing Unit?
9        A.   I was assigned to work for a deputy
10  superintendent of the Bureau of Investigative
11  Services.
12       Q.   And at this point in time, what year
13  are we talking?
14       A.   Probably '90 or '91.
15       Q.   Did the organizational structure of
16  the Bureau of Investigative Services change at
17  any point between when you started with the
18  department and when you started working for the
19  deputy superintendent of the Bureau of
20  Investigative Services?
21       A.   It did.  It used to only have the
22  Detective Division and the Youth Division.  And
23  somewhere along the line, the organization
24  changed and it added Organized Crime Division
```

40

```
1   in the Superintendent Brzeczek era, early
2   1980s.
3        Q.   Is Organized Crime gang crimes?
4        A.   That is one of the subsidiaries,
5   right.
6        Q.   Of Organized Crime?
7        A.   Narcotics, gangs are the two primary.
8   Vice, vice control.
9        Q.   So, organized crime was added
10  during Brzeczek --
11       A.   Common spelling.  I don't know.
12       Q.   No, no.  I can give it to you later.
13  I never know how to pronounce it to be honest.
14       A.   Brzeczek.
15       Q.   But, in any event, that addition was
16  made when?
17       A.   1981, '82.
18       Q.   You're saying that became part of the
19  Detective Division?
20       A.   No.  The Bureau of Investigative
21  Services grew from two divisions of Detective
22  Division and the Youth Division and picked up a
23  third division called Organized Crime.
24       Q.   Once that picked up the third division
```

41

```
 1   of Organized Crime, did it change at all prior
 2   to or until up you began working for the deputy
 3   superintendent of the Bureau of Investigative
 4   Services?
 5        A.   Did what change?
 6        Q.   The organizational structure of the
 7   Bureau of Investigative Services.
 8        A.   That was the only change I could think
 9   of.
10        Q.   Now, where does Bomb & Arson fit?  And
11   I have a chart here somewhere.  I mean, if you
12   need to look at one, let me know.
13        A.   No.  In the Detective Division.
14        Q.   Okay.  So, Bomb & Arson has always
15   been in the Detective Division?
16        A.   During this era, yes.
17        Q.   When did that change?
18        A.   Under Superintendent Jody Weis, a few
19   years ago.  And then it has since been returned
20   to the Bureau of Detectives since that time.
21        Q.   But for all of the '70s, '80s and
22   '90s, obviously only once Bomb & Arson was
23   created?
24        A.   Right.
```

42

```
 1        Q.   But for as long as Bomb & Arson
 2   existed -- although, I guess, let me back up.
 3             Do you recall the year that
 4   Bomb & Arson was created?
 5        A.   I don't recall the exact year.  Either
 6   the late '80s or late 1980, '81, in that time
 7   era.
 8        Q.   From when Bomb & Arson was created
 9   until the 2000s when Superintendant Weis made a
10   change, Bomb & Arson was always part of the
11   Detective Division, correct?
12        A.   Yes, ma'am.
13        Q.   And the Detective Division was always
14   part of the Bureau of Investigative Services?
15        A.   Correct.
16        Q.   Now, there are a number of areas,
17   correct, in the department?
18        A.   Yes.
19        Q.   And each area in the '80s had a
20   Violent Crimes Section, correct?
21        A.   The Violent Crimes format was created
22   in January, 1981.  So, from 1961 to 1981, there
23   was a crime specific format.  Each of the
24   detective areas each had their own homicide
```

43

```
 1   unit, robbery unit, general assignment unit,
 2   burglary unit, auto theft.
 3             And their bosses -- they each had
 4   a separate supervisor, and that supervisor was
 5   downtown at the headquarters building.
 6             In January of 1981, it, the
 7   Detective Division, moved to a geographic
 8   centered model where the areas did not
 9   specialize so much in individual crimes, but in
10   community crimes.  All the crimes that occurred
11   in a certain geographical area.
12             And each of the detective areas
13   at that time were broken into three sub units;
14   Violent Crimes, Property Crimes, and Youth
15   Crimes.
16        Q.   This was the '81 change?
17        A.   Correct.
18        Q.   So, the detectives working in Violent
19   Crimes within an area were considered part of
20   the Detective Division?
21        A.   Correct.
22        Q.   Just by going back to the change where
23   you added Organized Crime to the Bureau of
24   Investigative Services.
```

44

```
 1        MR. PATTERSON:  And just so the record
 2   is clear, not him, but when the Chicago Police
 3   Department did that?
 4        MS. KEEN:  Right.  Sorry.
 5        THE WITNESS:  Beyond my pay rate.
 6   BY MS. KEEN:
 7        Q.   That was unintended.  I meant when the
 8   City added the Organized Crime Section, who was
 9   working those cases prior to the formal
10   creation of Organized Crime?
11             Was it going back to this crime
12   specific format you were talking about where it
13   was area detectives that was dealing with the
14   Narcotics, Vice, Gangs?
15        A.   You're losing me.  Who was working
16   what cases?
17        Q.   So, you said that in '80 or '81 when
18   the area detectives changed their model and now
19   went from a crime specific format to actually
20   having Violent Crimes, Property and Youth, it
21   sounds like around that same time is when the
22   Bureau of Investigative Services created a
23   third division which is Organized Crime; is
24   that correct?
```

45

1    A.   Yes.
2    Q.   So, what I was wondering is, who was
3  working the Narcotics, Vice, Gang Crimes prior
4  to the creation of the Organized Crime
5  Division --
6    A.   Oh, there had been a Narcotics Section
7  prior to that and a Vice Section prior to that.
8           I'm a little fuzzy as to when the
9  Gangs Unit were created.  I don't know if we
10 had one before then.
11   Q.   But it's your understanding that as to
12 all of the topics -- strike that.
13          It's your understanding that area
14 detectives were investigating Narcotics, Vice,
15 and Gang Crimes issues before --
16   A.   No.
17   Q.   Oh.  So, which set of detectives were
18 dealing with those three areas before the
19 Organized Crime Unit was created?
20   A.   The detectives are primarily
21 responsible for Part 1, UCR Crimes, Uniform
22 Crime Report category crimes.  And they are
23 responsible for others, but not so much.
24          Part 1, just so we get a sense of

46

1  what their investigative jurisdiction is,
2  homicide, rape, robbery, burglary, assault,
3  auto theft and in 1979, they added arson, which
4  probably explains when Bomb & Arson came in.
5           So, traditional crimes, these
6  other crimes, Narcotics and Vice, have all been
7  a specialty unit of enforcement and not part of
8  the Bureau of Detectives.
9    Q.   When you say Bureau of Detectives, are
10 you referring to the current name for what used
11 to be Detective Division?
12   A.   Yes, yes.  That's the current name.
13   Q.   And you don't know what the deal was
14 with the gangs; is that right?
15   A.   No, I don't.  I would have to do some
16 research on that.
17   Q.   But you know that once the Organized
18 Crime Unit was created, those detectives dealt
19 with Gang Crimes?
20   A.   Right.  They weren't detectives.
21   Q.   Oh, they weren't?
22   A.   No.  In the Organized Crime, Organized
23 Crime had no detectives.  They had police
24 officers and they had gang specialists, and the

47

1  normal sergeants and lieutenants.
2           Detectives only worked in the
3  Detective Division, and youth officers at that
4  time only worked in Youth Units.
5    Q.   Also not detectives?
6    A.   Same pay, but different title.
7    Q.   So, who was investigating arson before
8  Bomb & Arson?
9    A.   I don't positively know.  I don't
10 know.  I would say it would be one of the
11 Part 2 crimes.
12          There is a category of crimes in
13 the Uniform Crime Reporting Program that are
14 not Part 1, those eight or nine crimes that I
15 just described, but are Part 2 crimes that are
16 serious, but a little lesser in volume.
17          For instance, kidnappings,
18 arsons.
19   Q.   I see what you're saying.
20        MR. PATTERSON:  Roshna, just to be
21 clear, because I think we perhaps got a little
22 bit far afield.
23          There was a lot of questions on
24 the creation of the Gang Unit, Organized Crime,

48

1  Narcotics, and so on.
2           Were you asking those questions
3  in his capacity as the Chicago Police
4  Department or in his individual capacity?
5        MS. KEEN:  Yeah, I mean, I think that,
6  you know, especially your objection on
7  foundation, I'm trying to understand what the
8  organizational structure is and establish what
9  his familiarity was with the organizational
10 structure, where documents and reports were to
11 go.
12          This is really just foundational.
13 I was actually going to turn to another subject
14 now.
15        MR. PATTERSON:  Okay.  That's fine.
16 BY MS. KEEN:
17   Q.   I guess the last question is, what was
18 the command structure in the Bureau of
19 Investigative Services?
20   A.   The Bureau of Investigative
21 Services --
22   Q.   I'm sorry.  My question relates to the
23 1980s time period.
24   A.   Okay.

49

```
1    Q.   Was it the same throughout the 80s?
2    A.   For this time period.
3    Q.   Okay.  Because if it wasn't, I can
4  break it up.
5    A.   No.  It was a tad different in
6  January 1980 -- January 1981 on through '88,
7  anyhow, the Bureau of Investigative Services
8  was headed by a deputy superintendent.
9            The Detective Division, which
10 reported to the Bureau of Investigative
11 Services was headed by a chief.
12           The Organized Crime Division was
13 headed also by a chief and the Youth Division
14 was headed by a commander.
15   Q.   So, when you worked in the Chief of
16 Detective Division, you reported to the Chief
17 of Detectives, correct?
18   A.   Correct.
19   Q.   And he in turn reported to the deputy
20 superintendent of Bureau of Investigative
21 Services?
22   A.   Yes.
23   Q.   And who did the deputy superintendent
24 of BIS, just to use fewer words, report to?
```

50

```
1    A.   The Superintendent of Police.
2    Q.   Within the Detective Division, what
3  was the command structure?
4    A.   Reporting to the Chief of Detectives
5  were three deputy chiefs.  One deputy chief was
6  in charge of the south areas, the second deputy
7  chief was in charge of the north areas, and the
8  third deputy chief was in charge of Special
9  Activities.  And it included Bomb & Arson.
10   Q.   Okay.  So, I've heard the terms Area
11 North and Area Central --
12   A.   That's it.
13   Q.   -- and Area South.
14           Is that what you're talking about
15 in here?
16   A.   No.
17   Q.   Okay.  Those are different?
18   A.   Similar, but not the same.
19   Q.   Can you explain.
20   A.   Field Group North and Field Group
21 South were the existing terms.  Each was
22 composed of three separate detective areas.
23   Q.   I got you.
24           MR. PATTERSON:  And, Roshna, just so
```

51

```
1  the record is clear, what time frame?
2  BY MS. KEEN:
3    Q.   January '81 until, you know, the
4  period of -- at least the end of '88, let's
5  say.  Is that your understanding, too?
6    A.   Yes.
7    Q.   Okay.
8    A.   Then there was the Special Activities
9  Group that was in charge of Bomb & Arson, and I
10 am forgetting who else reported to them.
11 Financial Crimes, and I'm at a loss at the
12 moment.
13   Q.   Okay.  What's the deal with Field
14 Group A and B?  Because I've seen that in the
15 documents.
16   A.   Same.  A was south; B was north.
17   Q.   So, when you said that there
18 were three deputy chiefs reporting to the
19 Chief, one was Area South, one was Area North.
20           That's the same way of saying one
21 was Field Group South or Field Group B?
22   A.   South was the original term in 1981,
23 and somewhere over the years it morphed into A
24 and B.
```

52

```
1    Q.   But north was A and south was B?
2    A.   North was B; south was A.  I believe.
3  I don't know.
4    Q.   You're not sure about that?
5    A.   I'm not sure.  A or B.
6    Q.   Okay.  Who at that time reported to
7  the deputy chief?
8    A.   Detective commanders.  Each of the six
9  detective areas was led by a commander, and the
10 Bomb & Arson Section was led by a commander.
11   Q.   Detective commander, or is it the same
12 thing?
13   A.   Detective.  Commander is a commander.
14   Q.   And then who reported to the
15 commander?
16   A.   Lieutenants, Violent Crimes
17 lieutenant, Property Crimes lieutenant, Youth
18 lieutenant in the detective areas.
19   Q.   And Bomb & Arson detectives?
20   A.   There was a lieutenant or two, and
21 they had technical titles of explosive
22 technicians.  They had various pay grades.
23   Q.   But the command structure that you've
24 described is the same for Bomb & Arson at this
```

53

```
 1  time period?
 2        A.    Yes.
 3        Q.    And then below lieutenant was
 4  sergeant?
 5        A.    Sergeant.
 6        Q.    And then followed by detective?
 7        A.    Correct.
 8        Q.    In the case of Bomb & Arson, I'm aware
 9  from other depositions in this case, there's,
10  you know, arson detectives, and then there's
11  explosive technicians?
12        A.    Right.
13        Q.    Now, within Bomb & Arson were there
14  people called office detectives or
15  administrative detectives that you're aware of
16  working in this '80s time period?
17        A.    I was not aware of that title.  I
18  don't think you'll find it in the literature or
19  directives.
20        Q.    What's the title?
21        A.    It's probably a description of a
22  detective assigned to perform administrative
23  duties.
24        Q.    What was the name of the people who
```

54

```
 1  were in charge of filing inside Bomb & Arson?
 2  What was their title or rank?
 3        A.    Detective.
 4        Q.    So, there were certain detectives who
 5  had no case investigative obligations and were
 6  only required to handle administrative work; is
 7  that correct?
 8        A.    Correct.
 9        Q.    At any given time, did Bomb & Arson
10  have any such administrative detectives who
11  were there?
12        A.    I don't know.
13        Q.    What about supervisors of those
14  administrative detectives I'm calling them,
15  were there any, and if so, what was their rank?
16        A.    On each watch or shift there tended to
17  be one, sometimes two sergeants who supervised
18  both the working detectives, street detectives,
19  and those performing administrative duties.
20        Q.    For purposes of this deposition, is it
21  okay with you if I call them field detectives
22  and administrative detectives, or what
23  nomenclature would you prefer?
24        A.    Field gets a little confusing because
```

55

```
 1  we have a term of art and you'll probably look
 2  them up later.
 3        Q.    Okay.
 4        A.    Just detectives assigned to
 5  investigate crimes.
 6        Q.    Okay.  As opposed to --
 7        A.    And administrative personnel.
 8        Q.    Okay.  Before you went to the Chief's
 9  office, you were a detective at Area 1,
10  correct?
11        A.    Correct.
12        Q.    What kinds of work did you do as an
13  Area 1 detective?
14        A.    I was a homicide and sex detective.
15  In addition, we investigated -- I investigated
16  aggravated batteries and simple assaults.
17              Even though the title of the unit
18  said homicide and sex, there were other crimes
19  that we investigated, the personal crimes.
20        Q.    I see.
21        A.    With the exception of robbery.
22        Q.    Did you attend detective training
23  prior to working as a detective in Area 1?
24        A.    I did.
```

56

```
 1        Q.    How many cases would you say you
 2  investigated when you were an Area 1 detective?
 3        A.    I don't know.  Because Area 1 was such
 4  a high volume unit, I think it was the second
 5  busiest of the six areas.
 6              And because homicides tend to
 7  occur afternoons, and I was working afternoons,
 8  I probably had a homicide once every ten days.
 9              In addition, every day that I
10  came into work, I received one or two other
11  assignments, whether it be a shooting or a
12  stalking or whatever it might be.
13        Q.    Do you think you worked on thousands
14  of cases while you were --
15        A.    Probably.
16        Q.    I'm just asking you this so that I
17  know the answer, but I'm guessing the answer is
18  no.
19              Have you ever been the subject of
20  any disciplinary proceedings while you were at
21  the department other than for, like, being late
22  for work or something?
23        A.    No.
24        Q.    All right.  Now, turning to --
```

57

1    A.   I mean, I received at least one
2  complaint, but no disciplinary.
3    Q.   When was that complaint?
4    A.   12 years ago.
5    Q.   Briefly what was the nature of the
6  complaint?
7    A.   Did I speak to a subordinate about
8  someone else's CR investigation.
9    Q.   All right.  So, turning to the subject
10 of some of the memos and special orders that
11 you prepared.  I just want to --
12       MR. PATTERSON:  Would this be a good
13 time to take a short break?
14       MS. KEEN:  Any time you want.
15       MR. PATTERSON:  Is that okay?
16       MS. KEEN:  Yes.
17            (WHEREUPON, a short break was
18             taken.)
19       MS. KEEN:  Back on the record.
20 BY MS. KEEN:
21   Q.   When you were an Area 1 detective you
22 had occasion to prepare police reports,
23 correct?
24   A.   Yes, ma'am.

58

1    Q.   What kinds of police reports were
2  available to you as a detective that you filled
3  out regarding a police investigation you were
4  doing?
5         And just so that the record is
6  clear, I think the date range we're talking is
7  from '77 until you started at the Chief of
8  Detectives office in late '80s.
9    A.   Sure.  There was an original case
10 report.  I could fill that out.  I could fill
11 out a supplementary report and those were
12 department forms.  There was a variety of
13 non-department forms used to facilitate the
14 taking of notes.
15        Usually they had the word major
16 crime or major something on the title, but that
17 was not a CPD form.
18        It was just something someone or
19 a group of people had devised over the years to
20 help them record notes.
21   Q.   Generally speaking, was there a
22 process by which CPD would issue a form?  In
23 other words, would that have to come out of a
24 certain part of the department?

59

1    A.   Right.  All forms of the Chicago
2  Police Department are created in Research and
3  Development.  They are each assigned a unique
4  number, usually in the bottom left-hand corner
5  of the page, and it also has the date that they
6  were created or revised.
7    Q.   Was it unusual for a non-department
8  issued form to become used by area detectives?
9        MR. PATTERSON:  Objection, foundation.
10       MS. KEEN:  That was a bad question.
11 BY MS. KEEN:
12   Q.   I guess what I mean is, were there
13 other instances besides this major form -- I'm
14 going to ask you more details about that major
15 form, but were there other instances where a
16 need would arise, and so people working in the
17 department would take it upon themselves to
18 create a form that they could use on a regular
19 basis?
20   A.   I've seen forms created for
21 administrative purposes, where they're trying
22 to count something or keep track of something.
23 Yes, there are other occasions.
24   Q.   So, the major form you were talking

60

1  about, are you -- is Major Incident Worksheet
2  one of the major forms you were referring to?
3    A.   No, but I have knowledge about when it
4  became an official form.
5    Q.   When it became an official form, what
6  was it called?
7    A.   A Major Incident Worksheet.
8    Q.   What was the process of going from
9  unofficial to official?
10   A.   All we have to do is make the request,
11 strangely enough, and put it through the chain,
12 make sure it gets -- chain as in chain of
13 command, show your supervisor, they sign off on
14 a request for a new form.
15        We have a form to request a new
16 form.  And when it's approved, it goes to the
17 Records Division to be edited, some suggestions
18 made, perhaps you want certain boxes larger
19 than others.  And after it's made, it goes to
20 the print shop for printing and distribution.
21   Q.   So, even an individual detective could
22 fill out a form requesting a form?
23   A.   If it gets approved by their
24 supervisor, yes.

61

```
1      Q.  Who was behind the creation of the
2   formal sheet called Major Incident Worksheet?
3      A.  I was.
4      Q.  What was your reason -- or strike
5   that.
6            When did you create something
7   called a Major Incident Worksheet?
8      A.  In late 1980, I was part of a special
9   projects group that was working on the
10  reorganization of the Detective Division into
11  this geographical model.
12           And one of the things I thought
13  there was a need for was more standardization,
14  and a better product.  I took the best of the
15  existing forms that I could find and created a
16  standardized form.
17     Q.  Where did you call your sample of
18  forms from, from various areas?
19        MR. PATTERSON:  Objection, foundation.
20        THE WITNESS:  I don't recall from the
21  various areas.  I just seen a few over the
22  years, picked them up and looked at them.  Most
23  had the same information.
24
```

62

```
1   BY MS. KEEN:
2      Q.  So, are you saying that you noticed
3   that detectives across the department were
4   starting to come up with their own similar
5   looking forms to use in the course of recording
6   investigation about crimes?
7      A.  In the Detective Division, yes.
8      Q.  What did these forms have in common in
9   terms of what they looked like?
10     A.  8.5-by-11 pieces of paper with a lot
11  of boxes, pre-identified by those things which
12  most frequently come up in the course of a
13  criminal investigation; the victim's name,
14  address, whether or not there was a gun
15  involved, a place for the serial number, a car,
16  what type of car, VIN number, Vehicle
17  Identification Number, personnel assigned to
18  the crime scene by other units, who was there?
19  Items like that.
20     Q.  How about blank space?  Would you
21  frequently see a blank space on there for
22  people to write down their thoughts?
23     A.  No.  Mostly it was just filled with
24  boxes.  Again, it was really for the purpose of
```

63

```
1   recording those things.  You're not real likely
2   to remember in a couple of hours.
3      Q.  What about descriptions, witness
4   descriptions?  Were there boxes for witness
5   descriptions that you ever saw?
6      A.  No.
7      Q.  So, one of the things you did as part
8   of the special project was to create
9   standardized reporting processes; is that
10  correct?
11     A.  No.  Special projects, I do whatever
12  the bosses told me to, but I was part of this
13  group for the reorganization of the Detective
14  Division.  But along the way, we had to change
15  various forms.
16     Q.  Okay.
17     A.  Existing forms and think of --
18  anticipate what some needs might be.
19     Q.  So, let me just back up, so that I
20  guess I understand.
21           Was the reorganization of the
22  Detective Division project separate from the
23  special project you had described earlier
24  involving investigative files?
```

64

```
1      A.  Separate.
2      Q.  They were separate.  Okay.
3      A.  It preceded it.
4      Q.  What started first?
5      A.  The reorganization.
6      Q.  Tell me what was the genesis of that
7   reorganization project?
8      A.  The Superintendent of Police and the
9   Chief of Detectives had decided for a new
10  model.
11     Q.  And this was in '80?
12     A.  '80, right.
13     Q.  Because it was after you got to the
14  Chief of Detectives?
15     A.  It was just about the same time.
16     Q.  And what was their reason for wanting
17  a new model?
18     A.  It wasn't explained to me.  It was
19  best practices.  I heard that a few times.
20     Q.  What was your understanding though as
21  you were working on a project as to why a
22  change needed to be made?
23        MR. PATTERSON:  Objection, form,
24  foundation.
```

65

```
1   BY MS. KEEN:
2       Q.   And I'm asking based on the totality
3   of your conversations with people, your
4   personal experience working on the project.
5       A.   I think there was a genuine effort to
6   make the Detective Division more responsive to
7   the communities in which we worked, you know,
8   more accountability, more geographical
9   accountability, moving away from
10  overspecialization.
11      Q.   What do you mean by
12  overspecialization?
13      A.   Again, those units that I previously
14  identified, the Homicide and Sex Unit, the
15  Robbery Unit, the Burglary Unit, the Auto Theft
16  Unit, it goes on.
17           Oh, I'm here to report a crime;
18  oh, you got to go next door.
19      Q.   So, it was taking out some of the
20  over-compartmentalization and making it more
21  community based; is that fair?
22           MR. PATTERSON:  Objection.
23  BY MS. KEEN:
24      Q.   Is that fair to say?
```

66

```
1       A.   It's one of the benefits of the
2   geographic model.
3       Q.   What changes did you make to -- strike
4   that.
5            Who was part of the
6   reorganization group?
7       A.   The Chief of Detectives, the deputy
8   chiefs.
9       Q.   Of what?
10      A.   Deputy chiefs of detectives, and there
11  was an individual who formerly was of the
12  Detective Division, but had been moved to the
13  Personnel Division, a commander by the name of
14  Joseph Beasley.  He was involved in it as well.
15  And there were some, you know, lieutenants and
16  sergeants.  It was a pretty large undertaking.
17      Q.   Were there people in the Patrol
18  Division involved with this group?
19      A.   Not as much, no.
20      Q.   Were there people involved from the
21  Youth Division?
22      A.   They had to be affected.  I don't
23  remember their participation as much.
24      Q.   Why did they have to affected?
```

67

```
1       A.   Well, they were part of the Bureau of
2   Investigative Services, and they work out of
3   the same building.  It was a pretty natural
4   fit.
5       Q.   So, was this really a reorganization
6   of the Bureau of Investigative Services, or was
7   it really just relating to the Detective
8   Division?
9       A.   That's a good question.
10           I only worked on that which
11  pertained to the Detective Division.  The
12  Bureau of Organized Crime had just been
13  created, so they weren't going to remodel it.
14           I don't remember much about the
15  Youth Division.  Again, it was beyond my
16  assignment.
17      Q.   But it was your sense that at least
18  some members of the Bureau of Investigative
19  Services outside of the Detective Division were
20  at least involved in the discussions, correct?
21      A.   They knew what was going on.
22  Certainly, the deputy superintendent and the
23  Bureau of Investigative Services was involved.
24      Q.   Okay.  And so other than the
```

68

```
1   structural change you described wherein it went
2   from crime specific assignments to the Area 3
3   Violent Crimes, Property --
4       A.   And Youth.
5       Q.   -- and Youth, were there any other
6   changes that the department made in connection
7   with this reorganization project?
8       A.   I'm sure we changed forms that needed
9   to be changed.
10      Q.   Do you remember which forms you looked
11  at?
12      A.   Well, one of them was the -- I call it
13  the 24-hour log, but the Major Incident
14  Worksheet.
15           Prior to that, each of the crime
16  specific sections used to create their own
17  24-hour report, the homicide report, the
18  robbery report, the burglary report, so on and
19  so forth.  And this did away with that and put
20  it on one form.
21      Q.   I guess I didn't appreciate that.
22           So, how was it supposed to be
23  created then?  Was it the Area 3 supervisor who
24  did it for all the crimes that occurred within
```

69

```
1    Area 3 in that shift?
2         MR. PATTERSON:  Objection, vague.
3         THE WITNESS:  If we're talking about
4    the Major Incident Worksheet.
5         MS. KEEN:  Yes.
6         THE WITNESS:  I'm sorry.  The
7    area 24-hour report.  I know that's not the
8    official name.
9    BY MS. KEEN:
10        Q.   I think we discussed earlier that it
11   was called the Major Incident Log?
12        A.   Right.  The one with the columns on
13   it.
14        Q.   Right.
15        A.   The area incident log previously had
16   been separate 24-hour reports from the crime
17   specific sections.
18        Q.   Right.  And then what did it change
19   to?
20        A.   And then it became an area specific
21   with the exception of Bomb & Arson, which
22   created its own.
23        Q.   So, in the area specific format, in
24   other words, post-change, what information
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

70

```
1    would a supervisor put on the Major Incident
2    Log regarding any given shift?
3         MR. PATTERSON:  Objection, foundation.
4         MS. KEEN:  But this is the 30(b)(6)
5    witness on the topic of creation of forms.
6         MR. PATTERSON:  Yeah.  You haven't
7    established that a supervisor did anything with
8    the forms.
9         MS. KEEN:  He testified at length that
10   it was a supervisor who filled out the form.
11        MR. PATTERSON:  Same objection.
12        MS. KEEN:  Well, I mean, if we're
13   going to have to lay a foundation every time we
14   talk about the same topic, it's going to be way
15   long.  But if you're asking me to do that, then
16   I reserve the right to go way past seven hours.
17   BY MS. KEEN:
18        Q.   Okay.  Is it your testimony, sir, and
19   I apologize for asking you again, that it was
20   supervisors who filled out the Major Incident
21   Log?
22        A.   Yes.
23        Q.   When -- and this is both
24   pre-reorganization of the Detective Division
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

71

```
1    and post-reorganization of the Detective
2    Division, correct?
3         A.   In the pre-world, the one I was most
4    familiar with, was the homicide report because
5    I worked in a homicide unit.
6              When we would have a homicide or
7    a major violent type of crime, we, the
8    supervisor in the area, in each of the areas,
9    would call downtown to the Homicide Section and
10   say:  Hello, Pat Conway, I would like to speak
11   to you and tell you about something new that
12   occurred.
13             That person would take the notes
14   down and create a log, a running log all day
15   long.
16             And in the morning, we finished
17   the report from what happened the night before
18   simply by recording the information from the
19   telephone calls.
20             In the January 1981 post on, it
21   was removed from downtown, no more telephone
22   calls.  It was simply -- the responsibility was
23   given to the area supervisor to record what
24   happened of a major incident in the last eight
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

72

```
1    hours for their shift.
2              And at the end of a 24-hour
3    period it was hand-carried downtown.
4         Q.   How would the supervisor go about
5    selecting which of the many crimes that had
6    occurred on his watch to put on the Major
7    Incident Log?
8         A.   All the homicides got on there.  Some
9    but not all of the death investigations made
10   it.
11        Q.   What was the dividing -- strike that.
12             How did you determine death
13   investigations?
14        A.   If there was something curious about
15   it, something that may be of interest.
16        Q.   This case involves deaths caused by a
17   fire.  At the time that the fire was set, it
18   was unknown whether or not the fire was arson.
19             So, in that are scenario, would
20   you expect the area supervisor to have recorded
21   information about the deaths on the Major
22   Incident Log?
23        A.   Yes.
24        MR. PATTERSON:  Objection, foundation,
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

73

```
1    form.
2              MS. KEEN:  What's the foundation
3    objection?
4              MR. PATTERSON:  You haven't given
5    him -- well, first of all, you said this case.
6    You haven't identified which case.  We got at
7    least three fires associated with this case.
8              MS. KEEN:  But only one caused the
9    deaths, right?
10             MR. PATTERSON:  And then you didn't
11   give any facts related to whichever of the
12   three fires you're discussing.
13             MS. KEEN:  Well, there's only one fire
14   that caused deaths, correct?
15             MR. PATTERSON:  Well, how about we use
16   an address, that will be helpful, and a date,
17   since we have those, right?
18             MS. KEEN:  But, you know -- I mean, I
19   appreciate that, but if the witness is clear
20   about what I'm talking about, then these are
21   just objections for a grievance sake.
22             MR. PATTERSON:  No, they're not,
23   because this would not be admissible at trial.
24             MS. KEEN:  It would be admissible.
```

74

```
1              MR. PATTERSON:  It would not because
2    you haven't laid the foundation.
3              MS. KEEN:  It would only be
4    inadmissible if you made a sustained foundation
5    objection.
6              MR. PATTERSON:  Right.  And that's why
7    I need to put it on the record because if you
8    want to introduce this testimony at trial,
9    Judge Lefkow will then make a ruling on the
10   foundation objection.
11             MS. KEEN:  That's fine.  We will go
12   through this painstakingly and state what is
13   obvious to all of us.
14   BY MS. KEEN:
15        Q.   There is a fire that occurred at
16   4448 South Hermitage, that's the subject of
17   this case, correct?
18        A.   Yes.
19        Q.   You were aware that this case involves
20   a fire on Hermitage, correct?
21        A.   Yes.
22        Q.   And you're aware that the fire
23   resulted in the deaths of a mother and her five
24   children, correct?
```

75

```
1         A.   Yes.
2         Q.   Okay.  So, for purposes of this
3    deposition, if it's okay with you, I'll call
4    that the Hermitage fire; is that okay?
5         A.   Okay.
6         Q.   Would you have expected something
7    about the Hermitage fire to be written on a
8    Major Incident Log by an area supervisor?
9         A.   Yes.
10        Q.   Why?
11        A.   Multiple deaths.
12        Q.   Would you have expected something
13   about the Hermitage fire to have been written
14   on the Major Incident Log by the Bomb & Arson
15   supervisor?
16             MR. PATTERSON:  Objection, vague.
17             THE WITNESS:  Yes.
18   BY MS. KEEN:
19        Q.   Would you have expected the fact that
20   a fire had occurred on Hermitage and was under
21   investigation by Bomb & Arson to be recorded on
22   the Major Incident Log by a Bomb & Arson
23   supervisor?
24        A.   Yes.
```

76

```
1         Q.   And why would you expect that?
2         A.   The Bomb & Arson Unit and the area
3    detective have two separate but related
4    responsibilities.
5              One is to conduct a -- the
6    detective area is to conduct a death
7    investigation, whereas the Bomb & Arson
8    detectives are responsible to determine the
9    cause and origin of the fire.
10        Q.   And, therefore, are you testifying
11   that you would expect both units to have
12   created a summary of the incident on the Major
13   Incident Log?
14        A.   I don't know if it would be a summary
15   so much as a -- certainly a high level summary.
16   Okay.  Address, what's known, who from the fire
17   department responded, one house, two house,
18   three houses, how many dead, ages of the
19   deceased.
20        Q.   Okay.  Now, going back to the forms
21   that were modified as part of the
22   reorganization project, when you said that --
23   sorry.  I just need to remind myself.
24             Are you saying that you also
```

77

1  created a separate document called a Major
2  Incident Worksheet as distinct from the Major
3  Incident Log?
4      A.  Yes.
5      Q.  And that's the document that -- well,
6  the predecessor to that was the document that
7  various detectives were using informally to
8  record crime scene information that would have
9  been hard to recall several hours later,
10 correct?
11     A.  They weren't all using it.  Some
12 elected to.  Others just used the old-fashioned
13 blank piece of paper.
14     Q.  So, what other forms did you change or
15 create as part of the reorganization?
16         MR. PATTERSON:  I'm sorry.  Roshna,
17 I'm not trying to be difficult.  But you keep
18 saying you, are you asking him from his
19 personal knowledge, or are you asking him as a
20 representative of the City in the Chicago
21 Police Department.
22         MS. KEEN:  All of this deposition
23 unless otherwise noted is in his capacity as a
24 30(b)(6) witness.

78

1  BY MS. KEEN:
2      Q.  So, I will rephrase the question to
3  say what other forms did the City change?
4      A.  I don't know what the name of the form
5  was.  But certainly crime statistics is,
6  believe it or not, it was pretty much a hand
7  count back in this era.
8          A crime would come in as one
9  thing, let's say, a robbery, and then it's
10 reclassified to a theft, or maybe unfounded.
11 And we would -- there would be someone in the
12 areas who had to count all of these.  And there
13 was a form to facilitate the counting of crime.
14         So many crimes came in, so many
15 were reclassified to something else, to another
16 type of crime, some were unfounded, how many of
17 these cases do we make arrests.
18         So we had forms.  It would just
19 make it easier to read than a narrative.
20     Q.  Did you or anyone working on behalf of
21 the City create any forms regarding substantive
22 information about a case as part of this
23 reorganization effort?
24         MR. PATTERSON:  Objection, vague.

79

1  BY MS. KEEN:
2      Q.  And by substantive, I mean,
3  information that would help solve the crime?
4      A.  No.
5      Q.  So, none of the forms regarding
6  detectives' mental impressions about the crime
7  that they were investigating were altered or
8  created during this reorganization project; is
9  that correct?
10     A.  He never had a form to capture
11 detectives' mental impressions.  I mean, I'm at
12 a loss there.
13     Q.  So, the two forms that you had
14 available to you that were department issued
15 when you were a homicide detective were the
16 general case report?
17     A.  Very good.
18     Q.  And the supplementary report, right?
19     A.  Yes.  And there's a variety of general
20 offense case reports, but you're very close.
21     Q.  The general case report is one
22 that beat officers might fill out as well,
23 correct?
24     A.  Right.  For the sake of argument,

80

1  let's call it -- not argument -- information,
2  the original case report.
3      Q.  The original case report.
4      A.  The original case report and
5  supplementary case reports.
6      Q.  Now, was the original case report
7  something that detectives might prepare?
8      A.  In certain circumstances.
9      Q.  What circumstances?
10     A.  In the event of a double crime, a bank
11 robber just commits the bank robbery, he aims
12 the gun at the police officer, the police
13 officer kills the bank robber.  Those are two
14 different crimes.  One is the bank robbery, and
15 the second is the justifiable murder.
16         So, the beat officer in all
17 likelihood would have prepared the bank robbery
18 one, and the second one, even though they're
19 the same place and the same time, you know, our
20 protocol suggested that -- or required that two
21 different reports be made.
22     Q.  So, in the justifiable homicide --
23     A.  And to do that, every report starts
24 with an original report.  So, sometimes the

81

1  detectives created original reports.
2      Q.   In the case of supplementary reports,
3  who used those forms, detectives, beat
4  officers, both?
5      A.   Both.
6      Q.   This is now while you were a homicide
7  detective, in other words, pre-reorganization.
8           Why did detectives use
9  supplementary reports?
10     A.   Well, we don't want -- first of all,
11 we want to find all reports that are created
12 and there's a common denominator between an
13 original report and the supplementary report.
14          And believe it or not, it may not
15 even be the victim's name because that might
16 change when you learn more information.
17          So, the common denominator is the
18 case identifier, the number, the records
19 division number.  We call it the RD number.
20     Q.   And so supp reports were, at least
21 from the department's perspective, ways of
22 recording information that could then be filed
23 with the correct RD number, correct?
24     A.   Absolutely.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

82

1      Q.   Okay.  What kinds of information were
2  detectives supposed to create -- strike that.
3           What kind of information were
4  detectives supposed to record in supp reports
5  pre-'81?
6      A.   Anything that was new to the
7  investigation that was not originally reported
8  on the original case report.  It can be
9  additional information, new information.
10     Q.   Were there any general or special
11 orders that related to the use of supp reports
12 prior to 1981?
13          MR. PATTERSON:  Objection, form.
14 BY MS. KEEN:
15     Q.   Let me start with the general orders.
16          Were there any general orders
17 that related to the use of supp reports prior
18 to '81?
19     A.   No.
20     Q.   How about special orders?
21     A.   No.  Well, we had a general order on
22 the subject of preliminary investigations, but
23 mostly the instructions on how to fill it out
24 were found on the cover of the booklet.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

83

1          We would have 25 or 30 blank
2  original case reports and then the cover of
3  this packet of forms was Box 1, victim's name,
4  instructions.  Box 2, put last name first, you
5  know, first name second.  Those type of
6  instructions.
7      Q.   What about for the supplementary
8  report?
9      A.   I don't recall instructions so much.
10 But on the subject of supplementary reports,
11 something everyone must appreciate is that any
12 sworn member of the Chicago Police Department
13 can write a supplementary report on any crime,
14 you know, so long as their supervisor signs off
15 on it, it is an official report that will be
16 retained.
17     Q.   Did you ever have occasion to fill out
18 supp reports when you were an Area 1 detective?
19     A.   Every day.
20     Q.   And that's probably true of the other
21 Area 1 detectives as well, correct?
22          MR. PATTERSON:  Objection, form.
23          THE WITNESS:  Correct.
24 BY MS. KEEN:

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

84

1      Q.   What kind of information did
2  detectives tend to put on supplementary reports
3  regarding an investigation of a serious crime
4  prior to '81?
5          MR. PATTERSON:  Objection, form.
6          THE WITNESS:  The information did not
7  change.  I mean, it's information which is
8  pertinent to the investigation.
9  BY MS. KEEN:
10     Q.   You said that detectives took notes in
11 a variety of ways prior to '81, correct?
12     A.   Prior to '83.
13     Q.   Prior to '83.  Okay.  And prior to
14 '83, what kinds of pieces of paper would
15 detectives take notes on?
16     A.   Blank pieces, lined paper.
17     Q.   No particular form that was designed
18 for notetaking, correct?
19     A.   No.
20     Q.   And detectives need to take notes in
21 the course of their work on a serious
22 investigation, right?
23          MR. PATTERSON:  Objection, form.
24          MS. KEEN:  Let me rephrase that.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

85

BY MS. KEEN:

Q.   Taking notes is part of the job of being a detective, correct?

A.   Recording information, taking notes. I don't know how one can conduct a complex investigation without some notetaking.

Q.   Why is that?

A.   It's simply too hard to remember everyone's contact, telephone information, date of birth, their address, their zip code, their middle name, whatever that might be pertinent to the investigation.

Q.   Notes were also used pre-'83 to record mental impressions of a detective, correct?

MR. PATTERSON:  Objection, vague.

THE WITNESS:  I don't recall notes or anyone being required to write down mental impressions.

BY MS. KEEN:

Q.   Okay.  Sorry.  I'm not asking about what was required.  I'm just asking about the kinds of documents that detectives created in the course of an investigation pre-'83.  And we had talked a little bit about notes.  And I'm

86

just trying to understand the kinds of things that detectives would take notes about pre-'83.

A.   It's the same thing they would take notes on post-'83.

Did they use an exclamation point after somebody's comment recording a note? They might have had their own style of notetaking or maybe an asterisk next to something they thought more important.  But it's of a personal nature how you take your notes.

Q.   So, there was variety in terms of the kinds of notes that detectives would create regarding an investigation correct?

MR. PATTERSON:  Objection.

BY MS. KEEN:

Q.   You can answer.

A.   Of course.

Q.   And is it fair to say that detectives -- at least some detectives who were working on complex investigations would write down thoughts or impressions they had about the case in the form of notes?

A.   No.  I don't think we wrote down

87

impressions.  The notes were to facilitate report writing.

Q.   So, you're saying that detectives didn't write down notes about their impressions of the case?

MR. PATTERSON:  Objection, asked and answered.

THE WITNESS:  That almost sounds like a diary, you know.  I think so-and-so was mean to me.  I don't know.  I mean, that's -- record what they say.  You might put a question mark down on it, like, this doesn't sound right. But I don't recall anyone writing down an impression.  I think he's lying.

BY MS. KEEN:

Q.   I think I understand what you're saying.  Would detectives write down -- strike that.

Would detectives create notes about what a witness told them in the course of an investigation?

A.   Yes.  Frequently, but not all the time.

Q.   Frequently, but not all the time.

88

And what was one of the reasons that notes were created regarding witness interviews?

MR. PATTERSON:  Objection, asked and answered.

THE WITNESS:  So, they could recall later when they wrote their report more accurately what the witness actually said.

BY MS. KEEN:

Q.   And you're saying that sometimes a detective may indicate something about what the witness said in his own personal shorthand, say, an exclamation point or asterisk or something like that, but that would be the extent of his reflecting his personal impressions in his notes; is that right?

MR. PATTERSON:  Objection, asked and answered.

THE WITNESS:  Yes.

BY MS. KEEN:

Q.   In addition to writing down what witnesses said -- strike that.

Would detectives take notes regarding names of suspects that they felt

89

```
 1   should be investigated in connection with a
 2   crime?
 3           MR. PATTERSON:  Objection, asked and
 4   answered.
 5           MS. KEEN:  Actually, I haven't asked
 6   that.
 7           THE WITNESS:  Could you repeat that
 8   question, please?
 9   BY MS. KEEN:
10      Q.  Would detectives write down names of
11   suspects that they believed should be
12   investigated in connection with a particular
13   crime?
14           MR. PATTERSON:  Same objection.
15   BY MS. KEEN:
16      Q.  You can answer.
17      A.  Certainly, they can write down names.
18   Are they required to?  I suppose no is the
19   answer, but why wouldn't you.
20      Q.  Right.  And so what kinds of
21   information based on your experience throughout
22   the department and also as a homicide
23   detective, what kinds of information did
24   detectives tend to write down about suspects in
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

90

```
 1   their notes?
 2      A.  It starts with, do you know who did
 3   it?  A name is preferred.  Physical description
 4   is a near second.  Nicknames.  What kind of car
 5   do they drive?  Have you seen them before?
 6   Have you seen them with someone you know
 7   before?  Anything that might connect the
 8   information to the suspect.
 9      Q.  What about if a suspect allegedly made
10   a statement incriminating himself in the crime
11   that's being investigated, would something
12   about the fact of that statement or the content
13   of that statement be jotted down in the notes
14   based on your experience?
15           MR. PATTERSON:  Objection, incomplete
16   hypothetical.
17           THE WITNESS:  Is someone telling the
18   detectives they said this, or is this something
19   the detective heard?
20   BY MS. KEEN:
21      Q.  Yeah.  I'm sorry.  I was just kind of
22   working from your scenario, but I'll give you
23   one.
24           If a detective learns that there
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

91

```
 1   is a suspect out there and a suspect may have
 2   made statements incriminating himself in the
 3   crime, would you expect to see the detective
 4   make a note of not just the suspect's identity,
 5   but also the fact that the suspect may have
 6   made an incriminating statement?
 7           MR. PATTERSON:  Objection, form,
 8   incomplete hypothetical.
 9   BY MS. KEEN:
10      Q.  You can answer.
11      A.  If they believe the person who is
12   telling them this -- again, I don't know from
13   the example if it is something the detective is
14   talking to the suspect, or if it's being
15   relayed to the detective.
16      Q.  In the first category, or the first
17   scenario, the detective is talking to the
18   suspect, and the suspect makes a statement
19   that's incriminating.
20      A.  Sure.
21      Q.  Would you expect the detective to take
22   notes reflecting that incriminating statement?
23           MR. PATTERSON:  Objection, asked and
24   answered.
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

92

```
 1   BY MS. KEEN:
 2      Q.  Go ahead.
 3      A.  It's part of the story, I think.
 4      Q.  So, yes?
 5      A.  Yes.
 6      Q.  What if the detective learned
 7   information through a witness interview about
 8   the identity of a possible suspect and the
 9   witness relayed that the suspect had made
10   incriminating statements?
11           Would you expect the detective to
12   create notes reflecting not just the identity
13   of the suspect, but also the fact of the
14   incriminating statement?
15           MR. PATTERSON:  Objection, vague,
16   incomplete hypothetical.
17           And, Roshna, again, I'm not
18   trying to be difficult, but you asked him would
19   you expect.  Is that, would the Chicago Police
20   Department expect?
21           MS. KEEN:  Yes.  In all cases, I'm
22   asking him.  And I mean --
23           MR. PATTERSON:  Okay.  I don't want to
24   disrupt your flow.  So, just so the record is
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

93

1  clear, unless you say otherwise, if you ask him
2  a "you" question, you're talking the global you
3  as in "you, the Chicago Police Department."
4         MS. KEEN:  Yes.
5         MR. PATTERSON:  Okay.  Fair enough.
6         THE WITNESS:  Sorry.  And the question
7  on the floor is?
8  BY MS. KEEN:
9     Q.  So, if you were talking to a witness
10 and the witness gave you information about a
11 suspect and said that the suspect may have made
12 an incriminating statement, would you expect
13 notes reflecting the incriminating statement?
14        MR. PATTERSON:  Same objections.
15        THE WITNESS:  Yes, if.  And my
16 qualifier there is, if I believe the witness.
17 I believe the witness is not crazy, you know.
18 If there's something credible, a better word,
19 credible.
20        But I think it would happen.  I
21 mean, you're helping me here.  I mean, someone
22 is helping me with information that will help
23 me resolve the case potentially.  So, yes.
24        MS. KEEN:  Okay.  Can we go off the

94

1  record for a minute?
2              (WHEREUPON, a short break was
3               taken for lunch.)
4         MS. KEEN:  Back on the record.
5  BY MS. KEEN:
6     Q.  Was there any requirement prior to
7  1983 that notes that a detective created had to
8  be submitted to a supervisor?
9     A.  No.
10    Q.  Was there any requirement that a
11 detective's notes had to be submitted to
12 anybody?
13    A.  No.
14    Q.  Generally speaking, what happened to a
15 detective's notes prior to 1983?
16    A.  The detective kept the notes until
17 such time as they prepared the supplementary
18 report, at which time they destroyed their
19 notes, threw them in the garbage can or
20 whatever, including myself.
21    Q.  And doing so was not in violation of
22 any existing policy at the time, correct?
23    A.  Correct.
24    Q.  Whose job was it to make sure that all

95

1  of the relevant information from the notes made
2  their way into the supp report?
3     A.  The detectives.
4     Q.  Was there any written directives in
5  existence prior to '83, whether it be a special
6  order or general order that discussed the
7  process of migrating information from a note
8  into a supp report?
9         MR. PATTERSON:  Objection, compound.
10        THE WITNESS:  Not directives, but
11 training.
12 BY MS. KEEN:
13    Q.  Okay.  Was there any written
14 material -- I'm going to re-ask the question
15 just to fix it.
16        Were there any written statements
17 of policy pre-'83 that required a detective
18 to -- sorry.
19        Were there any written statements
20 of policy pre-'83 that dealt with the subject
21 of recording information from a detective's
22 notes into a police report that actually gets
23 submitted to somebody?
24    A.  No.

96

1     Q.  Now, you said there was some training
2  pre-'83 on the subject?
3     A.  Correct.
4     Q.  When was the training on that subject
5  offered to detectives?
6     A.  Pre-service training is for detectives
7  and specifically it's impressed upon
8  detectives.  They are supposed to preserve
9  information, which is both good and bad for the
10 prosecution.  I mean, it's their requirement to
11 find out the truth.  It's their obligation.
12    Q.  So, you're saying that pre-'83, there
13 was training on the subject of recording all
14 relevant information about an investigation?
15    A.  No.  I said not recording information.
16 I said to find out the truth.
17    Q.  Was there any training on the subject
18 of a detective or other officer's obligation to
19 record information relevant to a case on a
20 document that actually gets submitted for file?
21        MR. PATTERSON:  Objection, foundation,
22 form.
23        THE WITNESS:  The detective is
24 expected and was trained on his obligation to

97

```
 1   record information, which is pertinent and
 2   relevant to the investigation.  Not everything,
 3   but that which is relevant, that which is
 4   important.
 5   BY MS. KEEN:
 6        Q.   Prior to 1983, when did detectives
 7   receive the training you've just described?
 8        A.   Prior to their assignment as a
 9   detective.
10        Q.   So, in the detective training program?
11        A.   Right.  Pre-service, detective
12   training.  Usually it's about four weeks long,
13   and it was before their assignment to an
14   investigative unit.
15        Q.   Were detectives trained specifically
16   on the subject of putting relevant information
17   into a supp report?
18        A.   It's almost presumed that that which
19   you put in a case report or a supplementary
20   report is relevant.
21             I mean, were they trained?  As a
22   police officer and, again, as a detective,
23   they're trained as to the forms and the
24   narrative.
```

98

```
 1             And in the detective training,
 2   they were given formats, recommended formats.
 3             Why?  To make sure that you
 4   address certain factors, date, time, location,
 5   perhaps even the weather if it's pertinent,
 6   personnel responded.
 7             There was a definite -- as a
 8   matter of fact we called it the format, the
 9   format report.
10             Be as thorough as you can and
11   make sure you try to answer the who, what, and
12   where questions.
13        Q.   Was the format as you call it in place
14   prior to 1983?
15        A.   Yes.
16        Q.   So, even when you were a homicide
17   detective, you were doing supp reports
18   according to the format that you received
19   training on?
20        A.   Even back in the day.
21        Q.   Okay.  Was there training provided to
22   the detectives on the format, or is that
23   something they just figured out on the job?
24        A.   Oh, it was training.  We were given
```

99

```
 1   samples.
 2        Q.   In that training, was it told to
 3   detectives that they had to put all information
 4   relevant to the case in the report and that
 5   they had an obligation to do so?
 6             MR. PATTERSON:  Objection, compound.
 7   BY MS. KEEN:
 8        Q.   In that training, was it told to
 9   detectives that they had to put all relevant
10   information in that report?
11        A.   Put relevant information in there.
12   What is relevant, of course, is oftentimes
13   subject to honest debate.  I don't want to get
14   caught up in this all relevant.  But if it's
15   relevant, yes, it should be recorded.
16             If it's pertinent and relevant to
17   the investigation, to the person, to the
18   accused, to the suspect's guilt or innocence,
19   it should be recorded.
20        Q.   During the training, were detectives
21   informed that they were obligated to
22   preserve -- strike that.
23             During the detective training,
24   were detectives informed that they were
```

100

```
 1   obligated to record all relevant information?
 2        A.   Yes.
 3        Q.   This is pre-'83, correct?
 4        A.   Right.  Brady vs. Maryland was what
 5   year?
 6        Q.   '63.
 7        A.   Yeah.  So, yes.  That was part of the
 8   training?
 9        Q.   Was that the training provided not
10   only just to detectives but also to beat
11   officers?
12        A.   Yes.
13        Q.   At some point, the City became aware
14   that in some cases, all relevant information
15   was not being submitted for inclusion in the
16   official police file regarding an
17   investigation, correct?
18        A.   In some investigations, correct.
19        Q.   When did you personally first become
20   aware of the practice of withholding relevant
21   information from the police file that gets
22   turned over to the State's Attorney?
23             MR. PATTERSON:  Objection.  So,
24   Roshna, just help me out.  You now asked him
```

101

```
 1    when he personally became aware.  So, is this
 2    now a personal question versus a Chicago Police
 3    Department question?
 4         MS. KEEN:  It's just exactly what I
 5    meant it as.  I'm just asking this witness'
 6    personal knowledge, when did he personally
 7    first become aware.
 8         MR. PATTERSON:  Okay.  So, my
 9    objection is that the witness has been asked a
10    personal knowledge question and, therefore, is
11    not answering it in capacity as the Chicago
12    Police Department.
13         Go ahead, Jim.
14         THE WITNESS:  I am not personally
15    aware it has ever been the practice.
16         You asked me if it was the
17    practice not to include relevant information in
18    investigations.  I mean, our policy and our
19    practice is to include information, which is
20    relevant.
21         Are there and have there been
22    occasions when some relevant information didn't
23    make it into investigations?  Yes.
24    BY MS. KEEN:
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

102

```
 1         Q.   When did the City first become aware
 2    that not all -- strike that.
 3              When did the City first become
 4    aware that there were occasions when detectives
 5    or other investigators for the police
 6    department were not disclosing all relevant
 7    information through the channels that would
 8    allow that information to get into the hands of
 9    the prosecutor or the defense attorney?
10         MR. PATTERSON:  Objection, form.
11         THE WITNESS:  The one case that I
12    certainly can remember is a case of George
13    Jones.  And there was a detective by the name
14    of Frank Laverty who submitted a memoranda
15    which appeared to be relevant, yet did not make
16    it into the department supplementary report.
17    So, that's an example of such a case.
18    BY MS. KEEN:
19         Q.   Is it your testimony that the Laverty
20    memorandum was the first memoranda that the
21    City became aware of that was withheld from an
22    official police report that made it into the
23    Permanent Retention Records Division file?
24         MR. PATTERSON:  Objection, foundation,
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

103

```
 1    mischaracterizes testimony.
 2    BY MS. KEEN:
 3         Q.   All right.  Do you have knowledge of
 4    when the City became aware of the fact that on
 5    some occasions relevant information was not
 6    becoming part of the official police file?
 7         MR. PATTERSON:  Objection, asked and
 8    answered.
 9         THE WITNESS:  The George Jones
10    investigation was the first time I was aware
11    that the City was aware of a potentially
12    difficult aspect of investigations.
13    BY MS. KEEN:
14         Q.   What was the potentially difficult
15    aspect?
16         A.   That not all relevant information made
17    it into a supplementary report.  And the City,
18    the police department, caused a review of its
19    practices at that time.
20         Q.   In the specific case of the Laverty
21    memo, did Frank Laverty create a memo that had
22    relevant information in it?
23         A.   Yeah.  I recall he did.
24         Q.   And do you know what's your
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

104

```
 1    understanding as to -- strike that.
 2              What was the allegation as to why
 3    his memorandum wasn't part of the official
 4    police file?
 5         A.   Are you asking me if I know why that
 6    memo did not get included in the official file?
 7         Q.   Yeah.
 8         A.   I understand that it was held at the
 9    level of the area commander, detective
10    commander.
11         Q.   Who was the detective commander at the
12    time?
13         A.   Milton Deas, D-E-A-S, I believe.
14         MR. PATTERSON:  That's right.
15    BY MS. KEEN:
16         Q.   If things had worked as they were
17    supposed to, how would the information
18    contained in that memo have been made a part of
19    the official file?
20         A.   As I said previously, anyone in the
21    Chicago Police Department who has relevant
22    information to add to the investigation not
23    only has the right, but has the obligation to
24    record this on a supplementary report.  And if
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

105

```
1   this report is approved, it goes and becomes
2   part of the Records Division file.
3            What was the second part of your
4   question?
5       Q.  I think that answered it.
6            So, it's not so much that his
7   memo necessarily had to be part of the file,
8   but that a supplementary report reflecting the
9   relevant parts of the memo had to be created
10  and put in the official file, is that how it
11  was supposed to work?
12      A.  Yes.
13      Q.  And in the case of the Laverty memo,
14  the deputy commander --
15      A.  No.  He was a detective commander.
16      Q.  Detective commander held onto the memo
17  and didn't ensure that a supplementary report
18  was created about it, correct?
19          MR. PATTERSON:  Objection, foundation.
20          THE WITNESS:  I understand that he
21  held the memo and it did not become at that
22  time part of the supplementary report or any
23  supplementary report.
24  BY MS. KEEN:
```

106

```
1       Q.  Okay.  I'm going to ask you a few
2   questions about working files prior to '83.
3            So, what are working files in
4   this pre-'83 time period?
5       A.  A working file was known by a few
6   names, running file, working file, street file.
7   It was nothing more than a manila folder which
8   normally contained photocopies of perhaps the
9   original report, perhaps one, two, or all of
10  the supplementary reports, perhaps a rap sheet,
11  criminal history record of someone that they
12  have interviewed or suspected, perhaps some
13  crime scene photographs, mugshots of suspects
14  or people they are looking for to interview.
15           This working file could also
16  contain inter-watch memoranda, memoranda
17  written by one team of detectives to another
18  team of detectives on another watch asking them
19  to do something.  Could you, for example,
20  re-canvas that building?  Could you take a
21  certain person down to the polygraph for
22  examination?
23      Q.  Go talk to a witness?
24      A.  Talk to a witness, talk to a witness
```

107

```
1   again.  There was no format.
2            A working file is more likely to
3   exist when there are multiple teams of
4   detectives working on the same case.
5       Q.  Multiple teams within the police
6   department?
7       A.  Within the detective area.
8       Q.  Within an area?
9       A.  Right.
10      Q.  Were memoranda created by a single
11  detective who wanted the detective taking over
12  the case on the next shift to do certain
13  things?
14      A.  That's what I discovered most often
15  that was the case.
16      Q.  Some of the investigations that area
17  detectives did were complex and required
18  multiple shifts to be solved, correct?
19      A.  Correct.
20      Q.  And so it was the practice of the
21  department to assign a detective from each
22  shift to work the case?
23      A.  Normally not midnights.
24      Q.  You don't want to knock on people's
```

108

```
1   doors at night?
2       A.  Right.  They get irritated.
3       Q.  So, with the exception of the midnight
4   shift?
5       A.  Right.  But even on midnights, if it's
6   important enough or hot enough, it will go
7   24 hours a day.
8            Those cases, when they first come
9   in, they are worked pretty heavily, but a few
10  days later, there's normally a new case that
11  has come in and that gets a higher priority.
12      Q.  What other types of documents would
13  you see -- or strike that.
14           What other types of documents
15  might be contained in a working file?
16      A.  There might be a medical examiner's
17  report, but not all that often.  You would find
18  information in there and documents in there
19  that they thought was needed by the detective
20  on the street in their cars instead of having
21  to call the office and say:
22           What was the address of the
23  second witness?  I knew it was somewhere on
24  Western.  The longest street in Chicago.  Tell
```

109

```
 1   me the address.
 2           But those items which were not
 3   really all that important you probably wouldn't
 4   find in there.
 5           For instance, I said the medical
 6   examiner's report might be in there, but
 7   frankly, how important is that to the working
 8   detective who's really more interested in
 9   finding the next witness or searching for the
10   suspect as opposed to the cause of death.  I
11   don't care if he was stabbed or shot.  He's
12   dead.
13   Q.   I understand what you mean.
14   A.   But, you know, can I use it in the
15   next eight hours?  Do I need it in the next
16   eight hours?  If so, can I make copy of it?
17   Q.   Can I use it to solve the case?
18   A.   Right.
19   Q.   That's the kind of information that
20   would go in a working file?
21   A.   Yes.
22   Q.   And the genesis of the working file
23   practice, was that something that -- I mean,
24   how did it come about?
```

110

```
 1   A.   Out of need.  You can't go in -- a
 2   working detective prefers not going into work
 3   every day and making a copy of the same report,
 4   of the same case that he worked on yesterday.
 5           Anything new in the case?  I
 6   don't want to see the address.  I just want to
 7   see the narrative.  People have different
 8   unusual approaches.  I just want to see what
 9   so-and-so said.  Make me a copy of Page 3.
10   Q.   You're saying that's an example of how
11   a document would come into the working file?
12   A.   Right.  Did you photocopy something?
13   Q.   Okay.  And that was going to be my
14   next question.  Not to get too bogged down in
15   details, but how does a detective get a working
16   file?
17           So, for example, in the team of
18   detectives example that you had, let's say
19   there's two Area 3 detectives working on a
20   case.
21           Would you have expected pre-'83
22   for each of the two area detectives to have his
23   own working file or would they share one?
24   A.   Share one.
```

111

```
 1   Q.   And who would hold the area file?
 2   A.   Put it on the car seat in between
 3   them.
 4   Q.   And how would people from a preceding
 5   or a subsequent shift get information into that
 6   actual working file?
 7   A.   It may be a hand-to-hand trade at the
 8   end of the watch.
 9           Anybody working on the case that
10   I was working on today?  I'm working on it.
11   Okay.  Here's what I have.
12           Oh, by the way, some of the
13   communications can be oral as well and probably
14   most of them were.
15           I went out there, I couldn't find
16   anybody on that canvas.  Nobody answered the
17   door.  Okay.
18           Not everything was written
19   either.  Was it important?  I suppose.  But it
20   didn't get written down.
21   Q.   Would you ever expect the receiving
22   detective, in other words, the one picking up
23   the new shift to write down, jot down a summary
24   of what the preceding detective told him --
```

112

```
 1   A.   No.
 2   Q.   -- as a note?
 3   A.   No.  Imagine the situation when you're
 4   coming in on days when no one worked on the
 5   case on midnights.  You look around and say, I
 6   don't want to make a copy of that entire office
 7   file.
 8           Oh, on top of the coat rack?
 9   What was the homicide victim's name?  Jones.
10   Okay.  This one says Jones.  Oh, it has the
11   same the RD number.  I'll take that, see if
12   there's anything interesting.
13   Q.   And the "that" in your sentence was
14   the file that existed within the unit or the
15   area, correct?
16   A.   Before we called it investigative
17   file, the running file in response to your
18   question.  There was no formal place to keep
19   it.  Sometimes it was left on a table;
20   sometimes it was left on a coat rack; out in
21   the open in the working area of the detectives.
22   Q.   Separate from the working files and
23   still pre-'83, did the area or unit have a more
24   official file for a particular investigation?
```

113

1   A. Right.

2   Q. Wait. You're saying -- did you

3 answer?

4   A. I said yes.

5   Q. Okay.

6   A. Again, paper driven world. And the

7 Records Division would literally make three or

8 four copies, maybe more, four or five copies,

9 and each day, a couple of times a day, would

10 send them to the Area Investigative Unit.

11     The Area Investigative Unit would

12 give one copy to their case management. We're

13 talking about all cases now. Then there would

14 be one file, whether it was a Property Crime or

15 a Violent Crime, which would be RD number

16 based. The Records Division number sequence

17 file.

18   Q. That was one of the questions I had to

19 ask you. I couldn't figure out what that was.

20     So, the unit RD numerical

21 sequence number?

22   A. Right. It's simply all the cases that

23 had been referred to that detective area for

24 investigation.

114

1   Q. So, was that the predecessor to the

2 investigative file?

3   A. No. I mean, it was always the -- this

4 RD file was the primary file. It was the file

5 that you would go to if you wanted information.

6     However, because homicides and

7 death investigations receive more attention

8 than just a shooting, they receive more

9 investigative time, frequently the detective

10 areas would pull those more serious crimes and

11 put them in their own filing cabinet drawer

12 right alongside it, still inside the office.

13   Q. So, you're saying, in a -- let's call

14 it a serious homicide.

15   A. Right.

16   Q. Because all homicides are serious, but

17 this is high profile. I've read the term

18 "heater case" here. Let's say it's a heater

19 case.

20     Are you saying that in a heater

21 case the detective might actually pull the unit

22 RD numerical sequence number file and put it in

23 a different file cabinet that he had more

24 readily access to?

115

1   MR. PATTERSON: Objection, form.

2   THE WITNESS: The detective wouldn't

3 do it, whatever person was assigned to the

4 clerical unit, maintained the RD sequence file.

5 That same clerical unit personnel also made a

6 copy. They called it the homicide drawer, the

7 death investigation drawer, the justifiable

8 homicide drawer. And, again, those were the

9 drawers most often used.

10 BY MS. KEEN:

11   Q. I see. So, it would be a copy of the

12 contents of the unit RD file, not the actual

13 unit RD file that would go into the homicide

14 drawer, correct?

15   A. The RD file normally would just

16 maintain the original report and maybe a supp

17 report, but in the homicide drawer is

18 everything that was sent to the area of

19 investigative responsibility on that homicide.

20     For instance, you might receive

21 something from the crime laboratory evaluating

22 the latent fingerprints that were recovered, or

23 the crime lab may send photographs.

24     And that would go into the

116

1 homicide drawer. I don't know what else to

2 say.

3   Q. So, then in that scenario, a copy of

4 the crime lab or fingerprint report would not

5 also be placed in the unit RD numerical

6 sequence number?

7   A. Right. Again, it's about thickness of

8 the file.

9   Q. So, unit RD file is really just a slim

10 file to identify that there is a case number

11 open?

12   A. Right.

13   Q. It's got this number, and here's one

14 or two reports on it?

15   A. Right.

16   Q. The every day use, the meaty file is

17 the one that would have been in the homicide

18 drawer or other appropriate drawer?

19   A. Right.

20   Q. And how did the meaty file in the

21 homicide drawer relate to the working file? Is

22 it the same file, or is it the copy of a same

23 file?

24   MR. PATTERSON: Objection, vague,

117

```
1    compound.
2            THE WITNESS:  It's not the same file.
3    It is sometimes photocopies of selected
4    portions.
5    BY MS. KEEN:
6        Q.   Which is, the working file or the
7    homicide drawer file?
8        A.   The working file would be copies of
9    select information and the homicide -- excuse
10   me.  The working file might also contain
11   something that's not in the homicide drawer,
12   and that might be a victim's telephone book.
13           You know, back in the day when
14   they still had paper, you would find a personal
15   telephone book.  Not knowing what it means, but
16   the person's name may come up during the course
17   of the investigation.  Look him up.  Maybe
18   you'll get lucky and get a good address or
19   phone number.
20       Q.   Wait.  Are you -- who's telephone book
21   was it?
22       A.   It might be the victim's.
23       Q.   Oh, you mean something that was
24   recovered --
```

118

```
1        A.   At the scene.
2        Q.   And that might be in the working file?
3        A.   Yes.
4        Q.   Because it might have names of people
5    she knew, people -- I don't know why I made the
6    victim a female, but...
7        A.   Right.
8        Q.   So, what other kinds of things would
9    be in the working file but you might not see in
10   the homicide drawer file?
11           MR. PATTERSON:  Objection, foundation.
12           THE WITNESS:  It might be forms.
13   BY MS. KEEN:
14       Q.   Let me just back up.
15           In the time period of pre-'83,
16   what types of documents would you -- strike
17   that.
18           In the pre-1973 period, what
19   types of documents might exist in the working
20   file that a detective used that wouldn't also
21   be seen in the file that was kept in the drawer
22   in the area or unit?
23       A.   It might be a form, one particular
24   form.  You know, we're a large organization and
```

119

```
1    we have forms for personnel like detectives who
2    are requesting mugshots, you know, from graphic
3    artists.
4            I would like a picture of the
5    next door neighbor or the suspect.  I also
6    would like the rap sheet of the victim.  I
7    would like to see who he previously was
8    arrested or who she was previously arrested
9    with.
10           It --
11       Q.   What about handwritten -- or, sorry.
12       A.   It's just items that are generated in
13   the course of having to do business.  Some of
14   it might be receipts, you know, requests.
15       Q.   Some are original evidence that a
16   detective might have gathered on the shift?
17       A.   If it raised to the level of evidence,
18   it should have been inventoried.  When you
19   truly don't know its significance, like that
20   phone book, the victim's phone book, that might
21   have simply been placed in the working file.
22       Q.   There was no such thing as an
23   investigative file according to the police
24   department pre-'83, correct?
```

120

```
1        A.   We did not recognize that term until
2    1983.  But, frankly, we had a problem with that
3    term, and I think that was part of our issue in
4    1983.  There was a lack of common nomenclature
5    to describe what may exist in certain cases.
6        Q.   And that's what I want to go to.  I
7    just want to quickly ask you, would you tend to
8    see -- strike that.
9            Would Major Incident
10   Worksheets -- or, actually, strike that.
11           Was the predecessor to the Major
12   Incident Worksheets, in other words, was the
13   form the detectives used kept in working files?
14           MR. PATTERSON:  Objection, asked and
15   answered.
16   BY MS. KEEN:
17       Q.   Go ahead.
18       A.   They could.
19       Q.   The unit RD numerical sequence number
20   is different from the RD numbered file that the
21   Records Division kept over at the headquarters,
22   correct?
23       A.   They mirrored each very closely, but
24   the detective one was a photocopy.  The Records
```

121

1   Division had the original general offense case,
2   the original supplementary reports.
3        Q.   Now, you said that the working files
4   filled a need, that there was a need for the
5   working files.
6            If I understand you correctly,
7   one of the needs of a working file was to relay
8   information among different detectives who were
9   both working on the same case, correct?
10       A.   Correct.
11       Q.   I'm trying to figure out a clear way
12  to distill my thoughts.
13            So, would you expect to see
14  working files shared between detectives in
15  different units?  So, for example, in this
16  case, you have Area 3 folks working on one as
17  aspect of this fire death at Hermitage, and
18  then you have Bomb & Arson working on another
19  aspect of this fire and death.
20            Would you expect to see the
21  working file exchanged between the Area 3 and
22  the Bomb & Arson detectives pre-'83?
23       MR. PATTERSON:  Objection, foundation,
24  form, incomplete hypothetical.

122

1        THE WITNESS:  First of all, there
2   would not have to be a working file.  I mean,
3   it doesn't have to be one.
4   BY MS. KEEN:
5        Q.   I understand.
6        A.   But, no, because they are physically
7   at two different locations.  Information should
8   be shared, detectives and all police officers
9   have that same obligation.
10            If I have some information on a
11  case that you're working, I am supposed to
12  notify your unit.
13            We have means of doing that.  It
14  could be perhaps submitted in an information
15  report; pick up the telephone.  Pass the
16  information on.
17       Q.   So, it's really the primary use you
18  would -- strike that.
19            The primary -- or strike that.
20            The majority of the instances in
21  which working files were used were in cases in
22  which there were different investigators within
23  the same unit working the same case, correct?
24       MR. PATTERSON:  Objection, form,

123

1   foundation.
2        MS. KEEN:  Go ahead.
3        THE WITNESS:  It's more of an
4   intramural than intra-department.
5   BY MS. KEEN:
6        Q.   So, in other words, is it fair to say
7   that --
8        A.   Same unit is the answer, yes.
9        Q.   So, is it fair to say that you would
10  tend to see working files used to exchange
11  information between investigators within the
12  same unit?
13       A.   Yes.
14       Q.   So that the need for working files
15  existed whenever you had people investigating a
16  serious crime; is that fair to say?
17       MR. PATTERSON:  Objection, form.
18  BY MS. KEEN:
19       Q.   You can answer.
20       A.   A serious crime with multiple teams of
21  detectives assigned to it, over a period of
22  time.  If it's resolved in the first 24 hours,
23  you may not see an investigative file, even if
24  it was a serious crime.

124

1        Q.   So, if an investigation is ongoing and
2   it's taking several days to complete and,
3   therefore, there are multiple different
4   detectives, or investigators I guess is a
5   better word, working on that same
6   investigation, would you have expected to see a
7   working file in that scenario pre-'83?
8        MR. PATTERSON:  Objection, form,
9   foundation, speculation, incomplete
10  hypothetical.
11       MS. KEEN:  I'll just keep refining my
12  question until it passes muster.
13  BY MS. KEEN:
14       Q.   And I'm not trying to be confusing
15  here.  I'm just saying in an example -- talking
16  about working files and the kinds of instances
17  where there was a need for working files and
18  you would tend to see working files being used
19  pre-'83?
20            Is it your understanding that
21  working files were used to exchange information
22  in cases in which there were multiple
23  investigators investigating the same case over
24  the span of multiple shifts?

125

```
1         MR. PATTERSON:  Same objections.
2         THE WITNESS:  Yes.  But this
3  subsequent team, or the team that's picking up
4  the investigation is under no obligation to
5  pick up or find a working file.
6              It could simply -- this person's
7  preferred style may be looking at something
8  neater and going to the office file and making
9  a copy for himself of what he needs.
10 BY MS. KEEN:
11        Q.   Okay.  So, I understand your
12 clarification is that there was no requirement
13 to have working files in the first place,
14 correct?
15        A.   Correct.
16        Q.   And there was certainly no obligation
17 for a detective to consult the working file,
18 correct?
19        A.   Correct.
20        Q.   Or to keep a working file?
21        A.   Correct.
22        Q.   So, I'm asking about what your
23 understanding is as to what those instances in
24 which working files were used?
```

126

```
1         A.   Yes.
2         Q.   In cases where cases working files --
3  strike that.
4              Is it your understanding that
5  working files were generally used, not always,
6  but frequently when -- or strike that.
7              Was it your understanding that in
8  at least some cases in which there was an
9  ongoing investigation involving multiple shifts
10 and multiple investigators, that a working file
11 was kept?
12        MR. PATTERSON:  Objection, foundation,
13 speculation, incomplete hypothetical.
14        MS. KEEN:  What are your objections to
15 foundation and speculation given that he's a
16 30(b)(6) witness?
17        MR. PATTERSON:  My objection is you've
18 got a lot of somes, generalities.  And it seems
19 like the -- the right question seems to be that
20 as a 30(b)(6) witness, he can testify to what
21 the policy, practice and procedure of the
22 Chicago Police Department was at that time.
23        MS. KEEN:  That's what I'm asking,
24 What was the practice?
```

127

```
1         MR. PATTERSON:  That's not what you
2  asked him.  Let's read the question back.
3              (WHEREUPON, said Record was read
4              as requested.)
5         MS. KEEN:  That's a perfectly normal
6  question based on this fact, yes.
7              I mean, if you're going to
8  object, then we can't have a 30(b)(6)
9  deposition.
10        MR. PATTERSON:  It's your call,
11 Roshna.
12        MS. KEEN:  No.
13        MR. PATTERSON:  I'm lodging the
14 objection for Judge Lefkow.
15        MS. KEEN:  If you're going to keep
16 objecting, then we're going to call the judge
17 now.  Because you're not letting me take a
18 30(b)(6) deposition.
19        MR. PATTERSON:  Let's call her and
20 read that question and see what she thinks
21 about that question.
22        MS. KEEN:  Fine.  Tell me when you're
23 ready.  And read it back to him so he's really
24 clear.
```

128

```
1              You want to call the judge on
2  this?
3         MR. PATTERSON:  You said you wanted to
4  call the judge.  I'm making an objection.
5         MS. KEEN:  You're not letting me
6  ask --
7         MR. PATTERSON:  He's going to still
8  answer the question, right?
9         MS. KEEN:  Hold on.  This is a
10 30(b)(6) witness.  So, these objections matter.
11             You've been making a lot of
12 foundation objections, more so than I've ever
13 seen in a 30(b)(6) deposition, given that
14 you've presented him as the City's
15 representative.
16             So, I actually think it's
17 inappropriate to be making so many foundation
18 objections.  But let's take this specific
19 question here.
20             I ask him whether he has seen in
21 at least some cases the practice of working
22 files in a particular scenario.
23             If you're going to --
24        MR. PATTERSON:  That is not what you
```

129

1  asked him. Let's read the question back.
2      MS. KEEN: Why don't you tell me what
3  is infirm about the question so that I can --
4      MR. PATTERSON: I told you. You
5  have -- you asked -- you said some general --
6      MS. KEEN: No, no. I struck the
7  general.
8      MR. PATTERSON: Okay. Let's read the
9  question back so I can understand it.
10             (WHEREUPON, said Record was read as
11                 requested.)
12     MS. KEEN: I think that question is
13  fine.
14     MR. PATTERSON: Okay. If you think
15  you're fine, then you should go forward.
16     MR. KIVETZ: For the record, you think
17  the question is fine. He's made his objection.
18  You keep going on.
19     MR. PATTERSON: You keep going.
20     MS. KEEN: No, I can't risk --
21     MR. KIVETZ: -- move forward.
22     MS. KEEN: No. Because I can't --
23  this may be his trial testimony.
24             I mean, so what is your -- are

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

130

1  you still launching your objection?
2             I know that that question is a
3  little muddled because I started over a few
4  times. But now having heard the final aeration
5  of the question, and I can read it again, do
6  you have an objection?
7      MR. PATTERSON: Yeah. I still have
8  the same objection because you are asking him
9  as a 30(b)(6) witness an incomplete
10  hypothetical. You're asking him to speculate.
11  He's already testified that it was not official
12  policy to have working files, nobody was
13  required to have working files. Some
14  detectives had working files; others preferred
15  to communicate orally.
16             So, to then say, well, working
17  files were used here and there and elsewhere,
18  it's -- you're asking the City to speculate --
19  you're asking the City to react to an
20  incomplete hypothetical or an incomplete
21  example.
22             But if you think the question is
23  okay, then you should go forward. He's going
24  to answer the question. I'm not instructing

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

131

1  him not to answer.
2      MS. KEEN: You can't just protect
3  yourself by throwing an objection out there
4  just in case it sticks. That's not
5  appropriate.
6      MR. PATTERSON: Roshna, you can go --
7  he's going to answer the question.
8      MS. KEEN: I know what I'm allowed to
9  do. You know that I know what I'm allowed to
10  do.
11     MR. PATTERSON: So, then why we having
12  this conversation? I'm just putting an
13  objection on the record.
14     MS. KEEN: I'm giving you an
15  opportunity to explain your objection for the
16  record so that I can cure if there's a
17  deficiencies.
18     MR. PATTERSON: I've explained it.
19     MS. KEEN: So, is your objection
20  foundation or form or all of the above?
21     MR. PATTERSON: It is foundation and
22  form.
23     MS. KEEN: Are you saying that this
24  witness is the representative on Topic 3,

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

132

1  which, for the record is:
2             "The use, creation, contents of,
3  storage, location, movement and preservation of
4  investigative files kept by and/or at the
5  Chicago Police Department, Bomb & Arson Unit,
6  including but not limited to so-called
7  permanent retention files, area files, official
8  files, unit files, working files street files,
9  running files, clipboard files and Seraphine
10  reports."
11             That's just one topic. Is he
12  your witness on that topic?
13     MR. PATTERSON: Yes, he is. But he's
14  still entitled to questions that have
15  foundation and that are in proper form.
16     MS. KEEN: What is the lack of
17  foundation objection?
18     MR. PATTERSON: The lack of foundation
19  is you have not established with this witness
20  when working files are used, what they're used
21  for, when he would expect to see them, etc.
22     MS. KEEN: I have been asking him
23  about -- if that's your objection, I'm fine.
24  BY MS. KEEN:

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

133

1    Q.  Go ahead.  I'll read you back the
2  question.  You can answer.
3    A.  Yes.
4    Q.  Okay.  Sorry about that long pause.
5        MR. KIVETZ:  Just so the record is
6  clear, his entire objections remain on the
7  record.  You're still choosing to continue to
8  go forward; is that correct?
9        MS. KEEN:  Of course.
10       MR. KIVETZ:  Okay.  Well, there was
11 other objections before you said, oh, well if
12 that's the reason for you objection --
13       MR. PATTERSON:  You just asked about
14 the foundation objection.
15       MR. KIVETZ:  That's correct.  You've
16 only determined one thing and decided to move
17 on.  I just wanted to make sure his entire
18 objection is preserved before we move forward
19 and continue to go forward.
20       MS. KEEN:  I didn't go in there and
21 delete the transcript.
22       MR. KIVETZ:  Okay.  Great.  Well, then
23 you --
24       MS. KEEN:  You know what?  What is

134

1  your form objection?
2        MR. PATTERSON:  The form objection is
3  it's speculative, it's vague, and it's
4  compound.  Because you're asking him to
5  speculate as to what any individual detective's
6  practice is.  And he's already said that as the
7  Chicago Police Department, we don't require
8  working files, we don't, you know -- some
9  officers -- some detectives use them, some
10 didn't.
11       It was a personal style thing.
12 You can communicate orally.  So, he can't sit
13 here and say, oh, this was the standard way to
14 do things or this is the standard situation --
15       MS. KEEN:  No.  That's not what I
16 asked him.
17       MR. PATTERSON:  You did.  Read back
18 the question.
19       MS. KEEN:  I said in at least some
20 cases.
21       Do you know what you're doing?
22 You're actually doing an objection to me being
23 able to ask a 30(b)(6) witness these questions.
24       That's the implication of what

135

1  you just said.  What you have purported to
2  present and said multiple times in court today
3  in front of Judge Valdez that you're producing
4  someone to answer all of these questions.
5        But at every turn I attempt to
6  ask this witness who knows, is extremely
7  knowledgeable -- the cat is out of the bag.
8  There's all these memos.  No one is pretending
9  that there weren't working files pre-'83.  I'm
10 just trying to ask him about them.
11       You're saying --
12       MR. PATTERSON:  And I'm saying that
13 he's entitled to --
14       MS. KEEN:  Let me finish.
15       MR. PATTERSON:  -- a question that has
16 foundation --
17       MS. KEEN:  Let me finish.
18       MR. PATTERSON:  -- and a question that
19 is in proper form.
20       MS. KEEN:  No.  Stop.  Stop
21 interrupting me on the record.  Stop
22 interrupting me on the record.
23       My -- I mean, that's actually
24 quite rude.

136

1        What I was getting ready to
2  finish saying was that you -- I have asked for
3  somebody on working files on whether they
4  exist, how were they used.
5        This individual is extremely
6  knowledgeable and, therefore, I think quite
7  rightly you have identified him as your
8  30(b)(6) witness.
9        I have asked him in certain --
10 you know, based on his testimony about why
11 working files were needed, why they were used,
12 the kinds of things that they contained, who
13 would hand-off working files.
14       Based on all of that, I asked if
15 he would expect to see in at least some cases
16 fitting the following criteria that working
17 files were used.
18       You've objected as speculative
19 and lacks foundation.  And that's not well
20 taken.
21       Now, I don't really know if you
22 are trying to prevent me from being able to
23 conduct my 30(b)(6) deposition, or you're
24 saying no, I don't get to ask him questions

137

1   because I'm going to say they're hypothetical
2   even though they're actually corporate
3   representative testimony questions.
4           Then I don't want -- do we call
5   the judge?  You could revisit your objection,
6   or we can file a motion and say you're not
7   really in good faith allowing me to do this
8   30(b)(6) dep.
9           So, what is your position at this
10  point?
11          MR. PATTERSON:  My position is that my
12  objection is on the record.  He's going to
13  answer the question.  We should move forward.
14          MS. KEEN:  I am going to reserve the
15  right, once the transcript is available, to, if
16  I think I need to, file a motion for protective
17  order and reconvene your dep to be able to ask
18  some of these questions without inappropriate
19  objections so that I don't have to -- I mean,
20  because otherwise this is dragging on and on.
21          With each question, you're making
22  foundation objections, speculation objections,
23  and I just don't think that's the way to go.
24          So, I'll go forward now.  And I

138

1   know you're not going to agree to that, but I'm
2   just making it known for the record that that's
3   my intention to take with the transcript and
4   maybe have to go into court on.
5           MR. PATTERSON:  I absolutely object.
6           MR. KIVETZ:  And so do the individual
7   defendants.
8           MS. KEEN:  Okay.  Somewhere in there
9   was my question.
10          THE COURT REPORTER:  Do you want it
11  read back?
12          MS. KEEN:  No.  I think I know it.
13  BY MS. KEEN:
14      Q.  Go ahead.  You remember my question?
15      A.  Yes.
16      Q.  The answer is yes, you would expect to
17  see working files.  Okay.  Thank you.
18          So, that's true for multiple
19  teams of investigators whether they be
20  Bomb & Arson or Area 3 -- or area detectives,
21  correct?
22      A.  The situation that you described is
23  somehow being a very important case, more
24  important than others, worked on by multiple

139

1   watches.  It's more likely than not that a
2   working file might be used.
3       Q.  Okay.  And your answer is true for
4   investigators in Bomb & Arson?
5       A.  I did not work in Bomb & Arson.  So, I
6   am hesitant to speak to that, but it makes
7   sense.
8       Q.  In other words, the reasons for
9   keeping a working file as you described them,
10  existed just the same for Bomb & Arson
11  investigators as for area investigators,
12  correct?
13      A.  Correct.
14      Q.  And while you do not specifically work
15  in Bomb & Arson, do you have any reason to
16  believe that investigators in other specialized
17  units, not just within the areas, were not
18  keeping working files?
19          MR. PATTERSON:  Objection, vague.
20  BY MS. KEEN:
21      Q.  Go ahead.
22      A.  Detectives.  We're talking about
23  detectives within the Detective Division.  I
24  have reason to believe that they may have used

140

1   some form of a working file.
2       Q.  Everybody -- or all units within the
3   Detective Division?
4       A.  Right.
5       Q.  Okay.  The reason I am shying away
6   from the word detective is because there are
7   people within the Bomb & Arson Unit that aren't
8   detectives, but are still investigators.
9           For example, the explosive
10  technicians, right?
11      A.  Okay.  But --
12      Q.  I guess what I'm asking is putting
13  aside whether or not they were a detective or
14  in the Detective Division, do you believe that
15  investigators in the department working on an
16  investigation of importance that stand in
17  multiple shifts may have used working files?
18      A.  No.
19      Q.  Okay.
20      A.  The only thing that I've ever seen is
21  detective's notes, memoranda being placed in a
22  folder.  You're talking other units.  You're
23  talking public transportation, airport, you
24  know, narcotics, gangs, youths.  I mean,

141

```
 1   there's a lot of units.
 2       Q.   Do you have personal knowledge of
 3   whether or not there was a working files
 4   practice in the Bomb & Arson Unit at any point
 5   in time since it was created?
 6       MR. PATTERSON:  Objection, calls for
 7   personal knowledge.  Just so the record is
 8   clear, he's not testifying as to the Chicago
 9   Police Department.
10       THE WITNESS:  When I conducted
11   training for the detectives, not only were the
12   detective area personnel present, but Youth
13   Division was there, and detectives and
14   explosive technicians from the Bomb & Arson
15   Unit were in this training.
16            So, at least from '83 on, they
17   were using investigative files.
18   BY MS. KEEN:
19       Q.   Training regarding the new special
20   orders that were ruled out?
21       A.   Correct.
22       Q.   So, who all was in attendance at the
23   training?  Let me back up.
24            Was there one training or were
```

142

```
 1   there multiple trainings on the use of
 2   investigative files?
 3       A.   There were multiple trainings.  At
 4   that time, there were probably a thousand
 5   members in the Bureau of Investigative
 6   Services, Youth Division, and Detective
 7   Division.
 8       Q.   I think there was a --
 9       A.   Organized Crime was not part of it at
10   that point.
11       Q.   Was not part of a Bureau of
12   Investigative Services?
13       A.   It was part of Investigative Services,
14   but they were not required for investigative
15   files.
16       Q.   Oh, okay.
17            So, they weren't at the training?
18       A.   No, they were not.
19       Q.   But Bomb & Arson were at the
20   trainings?
21       A.   Yes.
22       Q.   Okay.
23       A.   And it was multiple sessions in
24   three-hour blocks.  And it started in January,
```

143

```
 1   1983, and went on probably for a couple of
 2   months.  And I, myself conducted all of the
 3   training.
 4       MS. KEEN:  Sorry.  I'm a little
 5   unorganized.  We've got about 200 documents
 6   from the City, which I have tried to organize
 7   on-site here.
 8       MR. PATTERSON:  For the record then,
 9   we were never asked to move or reschedule the
10   deposition.
11   BY MS. KEEN:
12       Q.   Okay.  Well, let's just get into the
13   documents we have here and you can help me
14   figure them out.
15            So, as a result of this Laverty
16   memo business, there was departmental -- there
17   was some reaction to it, right, in the
18   department?
19       A.   Correct.
20       Q.   What was the first thing that happened
21   in reaction to the Laverty memo?
22       A.   There was a meeting of exempt members
23   of the police department -- excuse me, exempt
24   members of the Detective Division of the police
```

144

```
 1   department to discuss the issue and to
 2   determine what, if anything, it means.
 3            And as part of that -- or from
 4   that meeting, there were some site visits.  And
 5   also from this meeting, it was apparent that
 6   there was a lack of common understanding as to
 7   the terminology being used to describe the
 8   working files, street files, et cetera.
 9       Q.   Okay.  And was this meeting held
10   before or after the Brzeczek teletype?
11       A.   Before.
12       Q.   Who was present at the meeting?
13       A.   Exempt members, the detective area
14   commanders, the detective deputy chiefs, the
15   Chief of Detectives, the deputy superintendent
16   of the Bureau of Investigative Services.
17       Q.   Was the commander of Bomb & Arson
18   present?
19       A.   He was a detective commander.  I don't
20   know if he was invited to the initial meeting
21   or not.
22       Q.   Were there any documents created that
23   reflected when the meeting was held?
24       A.   No.
```

145

```
 1         Q.  Are there any documents that were
 2    created out of this -- strike that.
 3              Were there any documents that
 4    memorialized what was discussed at the meeting?
 5         A.  I think some of the documents that I
 6    may have prepared afterwards make reference to
 7    it, but the site visits were done within
 8    24 hours of this meeting.
 9              So, if you find a memo on a site
10    visit, assume a day or two before is when this
11    exempt meeting occurred.
12         Q.  Okay.  So, I'm going to start showing
13    you some documents and you can tell me if
14    they're the right --
15                   (WHEREUPON, Deposition Exhibit
16                    No. 2 was marked for
17                    identification.)
18    BY MS. KEEN:
19         Q.   I'm handing you Exhibit No. 2, which
20    is P 2457 through P 2461.  What is this
21    document?
22         A.   This document is -- it was co-authored
23    by Sergeant Tom Brady and Sergeant John Tolley.
24    They worked directly for the deputy chiefs of
```

146

```
 1    the Field Group South and the Field Group North
 2    detective areas.
 3              It was the first attempt to
 4    summarize site visits that had been made and to
 5    identify a couple alternative strategies as to
 6    what should be done or could be done.
 7         Q.  Does this document refresh your
 8    recollection -- strike that.
 9              This document appeared to be
10    undated, correct?
11         A.  I would say it's the result of
12    photocopies that have run off the date in the
13    top right-hand corner where it normally is, but
14    these documents are undated.
15              But this is exactly the document
16    I was referring to that was done within a day
17    or two of the original exempt meeting.
18         Q.  Okay.  And I'm going to show you what
19    I'm marking as Exhibit No. 3.
20                   (WHEREUPON, Deposition Exhibit
21                    No. 3 was marked for
22                    identification.)
23    BY MS. KEEN:
24         Q.  This is P 2464 and 2465.
```

147

```
 1         A.   Right.
 2         Q.   Is this another summary of -- what is
 3    this document?
 4         A.   This document is not a site survey,
 5    nor did it attempt to be a site survey of the
 6    different units.
 7              What it is is a meeting of those
 8    who were in charge of the Violent Crime Units
 9    in the different areas, areas 1 through 6.
10              And I don't know why the two
11    other sergeants were there, Thomas Sadler and
12    Robert Becker.
13              Robert Becker was from Research
14    and Development.
15              Sergeant Sadler may have been
16    from the Bureau of Investigative Services, and
17    myself.
18              But this was the meeting in which
19    was a follow-up to the exempt meeting.  It was
20    a follow-up to the site surveys.
21              It was a meeting at which the
22    Violent Crime Unit commanding officers were
23    called in, and we discussed the issue and
24    specifically included whether or not more
```

148

```
 1    should have been written on supplementary
 2    reports.
 3         Q.   Okay.  I'm going to ask you about the
 4    content of that shortly.  I just want to first
 5    understand all of the documents.
 6         A.   Okay.
 7                   (WHEREUPON, Deposition Exhibit
 8                    No. 4 was marked for
 9                    identification.)
10    BY MS. KEEN:
11         Q.   Then, of course, Exhibit 4 is the
12    teletype that came out in response to the TRO,
13    correct?
14         A.   Correct.  I believe it was Judge
15    McMillen issued the TRO on this one.
16         Q.   As a result of the Laverty memo,
17    correct?
18         A.   The Area 2 case, right.
19         Q.   Okay.  So, this teletype came after
20    the site visit, correct?
21         A.   Correct.
22         Q.   Now, there's a series of documents
23    that are dated all on April 21st, 1982.
24         A.   Okay.
```

149

```
 1                (WHEREUPON, Deposition Exhibit
 2             No. 5 was marked for
 3             identification.)
 4   BY MS. KEEN:
 5       Q.   I'm going to show you Exhibit 5, which
 6   is CITY-KLUP 3022.
 7             Are you familiar with this
 8   document?
 9       A.   I have seen it before.
10       Q.   Can you just explain what this
11   document is?
12       A.   This document is from John Hinchy, a
13   Deputy Chief in charge of the Special
14   Activities Group.  And it's in the subject of
15   file control, but it references the newly
16   issued Detective Division Notice, 82-2.
17             It seems to reiterate the
18   superintendent of police's instructions that
19   all police department investigative files known
20   as office unit or working files and sometimes
21   referred to as street or running files will be
22   kept intact.
23       Q.   What was the Special Activities Group?
24       A.   Again, there were three deputy chiefs.
```

150

```
 1   Two of them were the geographical areas, north
 2   and south, and this was the Special Activities
 3   Group.  The Bomb & Arson Unit was part of the
 4   Special Activities Group.
 5       Q.   And we weren't able to recall the
 6   other one, right?
 7       A.   Yeah.  Financial Crimes was one, and
 8   my memory is shaky.
 9       Q.   It's been a while.
10             What was the reason for needing
11   to do an additional memorandum after the
12   Detective Division notice came out?
13       A.   I know of none.  Reinforcement.
14       Q.   Reinforcement?
15       A.   This deputy chief's preferred
16   managerial style.
17       Q.   I see.  So, it wasn't from someone
18   higher up than him directing him to reinforce
19   the requirement through additional memorandum,
20   correct?
21       A.   Correct.
22       Q.   What was your -- strike that.
23             How, if at all, did the section
24   commanders of -- strike that.
```

151

```
 1             How, if at all, did anyone who
 2   supervised the detectives within -- strike
 3   that.
 4             I'm just going to continue
 5   soldiering on with organizing the documents and
 6   we'll go over it that way.
 7             So 82-2 came out before the
 8   teletype?
 9       A.   I doubt it.  It probably was after, an
10   hour or two after.
11       Q.   Oh, okay.
12             (WHEREUPON, Deposition Exhibit
13             No. 6 was marked for
14             identification.)
15   BY MS. KEEN:
16       Q.   I'm showing you Exhibit No. 6.  It is
17   Plaintiff 2455 through 2456.
18             What is this document?
19       A.   This document is dated the 21st of
20   April, 1982.  It is a memorandum from John
21   Stibich the Commander of Area 3 Detective
22   Division.  The subject is Working Files.
23             It has a couple subtitles,
24   questions, all three questions:
```

152

```
 1             Should working files be kept?
 2             What should be included in the
 3   working files?
 4             What should be done with the
 5   working files?
 6             It's three topics, and
 7   recommendations or reasonings were made to
 8   support the area commander's thoughts on these
 9   subjects.
10       Q.   So, why did Commander Stibich want to
11   provide the Acting Chief with his
12   recommendations on the subject of Working
13   Files?
14       A.   Each of the detective areas submitted
15   a similar report.  I don't know what caused
16   them to do it.  I suspect it was an oral
17   instruction from the Chief.
18       Q.   How, if at all, does this relate to
19   the document we marked as Exhibit 2, which were
20   also -- it looks like some -- oh, I'm sorry.
21             That really was just a summary of
22   the site visit, right?
23       A.   Right.
24
```

153

```
1              (WHEREUPON, Deposition Exhibit
2              No. 7 was marked for
3              identification.)
4   BY MS. KEEN:
5       Q.   Exhibit 7 is Plaintiff 2882 to 2885,
6   and I don't know if these are actually part of
7   the same document.
8       A.   The John Stibich memo in Exhibit 7,
9   and the William --
10          MR. PATTERSON:  6.
11          THE WITNESS:  I'm sorry.  Exhibit 6.
12  And the William Murphy Commander report and the
13  Milton Deas Commander report in Exhibit 7 seem
14  to be written to respond to the same question
15  or instruction from the Chief.
16  BY MS. KEEN:
17      Q.   Tell me what's actually happening and
18  what you think should be done.
19      A.   Right.  We had a problem with
20  terminology.
21      Q.   Now, when you did your audit, was that
22  before or after the site survey and memos you
23  prepared?
24      A.   I was part of the original site
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

154

```
1   survey.  I believe I went to -- well, I don't
2   know what -- I went to Area 3 for sure.
3   There's a report around here somewhere.
4              And when I came back, these two
5   sergeants wrote this summary report.  And there
6   was some frustration with that because
7   different people, different detectives and
8   sergeants went to different areas.
9              And after all is said and done,
10  they sent me out to the areas that I hadn't
11  been to so one person could see the same thing
12  at each of the areas.  And you come back at
13  least using the same language to describe what
14  it is they saw.
15      Q.   So, that audit as it's been called was
16  done after the initial site survey?
17      A.   Well, the first one was done on day
18  one by myself.  I did two of the areas.
19      Q.   Okay.
20      A.   And then the summary report.  And then
21  I did a site survey of all four, the remaining
22  four areas.
23
24
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

155

```
1              (WHEREUPON, Deposition Exhibit
2              No. 8 was marked for
3              identification.)
4   BY MS. KEEN:
5       Q.   Let me show you what I've marked as
6   Exhibit 8.  2462 to Plaintiff's 2463.
7              What is this document?
8       A.   This is a memo that's entitled:
9   "Discrepancies Between Detective Area Unit
10  Files and the Records Division Reports of the
11  Same Records Division Number."
12             It's a page and a half -- it's a
13  page and a third memo written by myself.  It is
14  undated, but it talks about my site visits to
15  each of the six areas and the sampling of
16  working files, et cetera, that I conducted.
17      Q.   When did you prepare this memo?
18      A.   Immediately upon having gone over the
19  course of a couple of days.  I don't know if it
20  was two or three days.
21      Q.   Was this a memorialization of that
22  first visit of two or the last visit of --
23      A.   This is of all the areas.
24      Q.   So, after you had done your final
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

156

```
1   audit, you prepared this report?
2       A.   Correct.
3              MR. PATTERSON:  Objection to the term
4   audit.
5              THE WITNESS:  In the report, I
6   actually use the word sampling.  And there is
7   still another document around here that gives
8   some explicit examples of some of my findings.
9   BY MS. KEEN:
10      Q.   Okay.  So, I'll call it a sampling.
11             So, was Exhibit 8 created after
12  you completed that final sampling of files?
13      A.   Yes.
14             (WHEREUPON, Deposition Exhibit
15             No. 9 was marked for
16             identification.)
17  BY MS. KEEN:
18      Q.   Okay.  Exhibit 9 is Plaintiffs 2466 to
19  2467.  What is this document?
20      A.   This is an unsigned memo, which I had
21  prepared on the subject of Elimination Of Unit
22  Cleared/Closed Homicide Cases.
23             It discussed my interactions with
24  each of the detective areas and what they
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

157

1  thought about the informal communication of the
2  working files. It talks about discrepancies
3  that existed between the running files and the
4  RD files, the Records Division file.
5       Q. One of the solutions that you're
6  exploring in this document eliminating the unit
7  file, correct?
8            MR. PATTERSON: Take your time. Read
9  the whole thing if you need to.
10           MS. KEEN: Please.
11           THE WITNESS: All right. Okay.
12           Paragraph 3 of the memo talks
13  about a possible solution that would terminate
14  the issue of discrepancy is simply not to keep
15  cleared/closed homicide files in the Violent
16  Crimes Units.
17           It suggested the possibility of
18  sending them directly to their Records
19  Division. End of Paragraph 3.
20  BY MS. KEEN:
21       Q. Do you believe that you prepared this
22  memo in '82 around the time that you were
23  preparing the other document?
24       A. Yes.

158

1       Q. What was your reason that you --
2  strike that.
3            It appears from earlier in the
4  memo that you were concerned that there would
5  always be discrepancies between the areas unit
6  file and the file in the Records Division,
7  correct?
8       A. Correct. One of my observations is
9  that part of the problem was the physical
10  location of files on the same case. And no
11  matter how well we monitored the placement of
12  information into these files, given time and
13  given volume, they're not going to all
14  perfectly match one another.
15           I'm asking the question in a
16  rhetorical manner. Maybe we should move the
17  cleared/closed cases out of the detective area
18  and perhaps send them for safekeeping in the
19  Records Division.
20       Q. Now, why were cleared/closed files --
21  strike that.
22           Let me just back up and ask you,
23  what does cleared/closed mean?
24       A. The detective has the responsibility

159

1  for case classification. For all the crimes
2  that they investigate, there's one of seven, I
3  think there's seven dispositions.
4            One is that the case is cleared.
5  We know who did it.
6            Closed means everyone responsible
7  for that crime has been arrested. If three
8  people were responsible, it's cleared and
9  closed.
10           If the case is cleared and open,
11  we know who did it, they're being prosecuted,
12  but only one of the three responsible people
13  has been arrested. So, we're still sort of
14  working on it. It's still open.
15           And then there are other
16  classifications of unfounded, suspended,
17  clearly exceptionally. Something bars us from
18  arresting or prosecuting the individual.
19           The State's Attorney won't
20  approve charges, the offender died, or the
21  offender has moved to a country without
22  extradition treaty, an agreement with the
23  United States. So, those are the types of
24  dispositions.

160

1            Cleared/closed means resolved and
2  everyone responsible has been arrested.
3       Q. At what point in the investigation --
4  or strike that.
5            When you were doing the sampling
6  of cleared/closed cases in these areas, what
7  stages were the investigations at for the files
8  you looked at? Were they cleared/closed at
9  that point, or were they still being worked on?
10      A. All of the above.
11      Q. So, this memo deals specifically with
12  cleared/closed, right?
13      A. Sure.
14      Q. So, can you explain why there would be
15  a discrepancy between the unit file for a
16  cleared/closed case and the Records Division
17  file for that same case?
18      A. There may well be a memo. Memos
19  didn't make it to the Records Division file.
20      Q. Did do this sampling after 82-2 was
21  issued?
22      A. No. Before.
23      Q. Did you do any sampling after 82-2 was
24  issued?

161

1    A.    No.

2    Q.    Has the City undertaken any sampling

3  of any kind to determine whether relevant

4  information is being withheld from the official

5  file for a case after 82-2 Special Order was

6  issued?

7        MR. PATTERSON:  Objection, form,

8  foundation.

9        THE WITNESS:  It is a function of

10  supervision to review the work of their

11  subordinates and make sure the files are

12  maintained properly.  But you're speaking to

13  something rather deep here.  Relevance.  If

14  something relevant may not have made it.

15             That's pretty high bar, you

16  know.  I would have to look pretty close.

17             In 82-2, we still did not have

18  General Progress Reports.  And up until there

19  was -- we still didn't have to keep our notes

20  either.

21             So, as a supervisor, I would say,

22  Everything relevant in there?  Yes.  Everything

23  that needs to be in there is in there.  Okay.

24             How do you do that?  How do you

162

1  sample something like that?  I mean, it's a

2  challenge.

3  BY MS. KEEN:

4    Q.    Right.  How would you even go about

5  checking that everything relevant from a note

6  went into a supp report without an individual

7  review of each supp report and corresponding

8  note, correct?

9        MR. PATTERSON:  Objection, form,

10  foundation.

11  BY MS. KEEN:

12    Q.    Is that what your point was?

13    A.    Right.

14    Q.    So, let me take a step back and just

15  ask you, you did a sampling wherein you

16  compared the contents of the areas

17  cleared/closed file with the Records Division

18  file for that same case, correct?

19    A.    I didn't sample the Records Division.

20  I know exactly what's in the Records Division

21  file.  The original general offense case

22  report, the original supplementary reports,

23  plural.  Nothing else.

24    Q.    So, what documents did you look at to

163

1  prepare Exhibit 9?

2    A.    I went to the areas and I looked at

3  those documents that I found that were called

4  running files, street files, working files and

5  saw that in some of these files, there was

6  miscellaneous documents, sometimes to-froms,

7  subject reports, that I know were not in the

8  Records Division file.

9    Q.    And you knew that because that

10  information was not in the supplementary

11  reports, correct?

12    A.    No.  The memos were never placed in

13  the Records Division file without even reading

14  the report; or the memo, I would know, it's not

15  the same.

16    Q.    Right.

17    A.    Now, did the substance of that get in

18  there?  I don't know.

19    Q.    I believe that you testified in Palmer

20  that one of the things that you observed in the

21  course of your work on this issue was that

22  information that was in a document in the

23  working files sometimes didn't make it into the

24  supplementary reports, even though that

164

1  information was relevant, correct?

2        MR. PATTERSON:  Objection, improper

3  impeachment.

4  BY MS. KEEN:

5    Q.    I'm not attempting to impeach you.

6  I'm just asking you a question about whether

7  you recall giving that testimony.

8    A.    I believe my comment was oftentimes,

9  sometimes, substantive investigative activity

10  never made it into the official report.

11             For instance, the clearing of

12  suspect A and all the work that went in to even

13  find suspect A.

14             In some instances, there were

15  examples of two reports in a file; the original

16  and the closing arrest report.  And they're

17  separated by ten days.  And one wonders what

18  happened in that ten days.

19    Q.    Right.  And so you would see cases

20  where there was some documentation regarding

21  the work that had been done in the intervening

22  ten days that wasn't made part of the permanent

23  retention file, correct?  Or, the Records

24  Division file, I should call it.

165

1    A.   Correct.

2    Q.   So, you became aware of a practice in

3  some instances of substantive information about

4  a case investigation not being put into the

5  supplemental report, correct?

6    A.   Correct.  It wasn't wrong in and of

7  itself but it also raised questions.  How did

8  you get to suspect B?  How did that story

9  develop?

10    Q.   So, let's take the example of the

11  suspect A being a suspect and then being

12  eliminated.

13    A.   Right.

14    Q.   Can you tell me -- I mean, how often

15  did you see something like that happening, if

16  you can recall?

17    A.   I have no idea to put it in terms of

18  numbers.  But genuine, substantive, good

19  detective efforts were going undocumented as

20  part of the investigative story line.

21    Q.   In that example, the identity of

22  another suspect that had been ruled out by that

23  detective was completely omitted from the

24  official police reports, correct?

166

1    A.   Correct.

2    Q.   So, say, there was some evidence to

3  later rule that suspect back in, how would that

4  information -- let me re-ask the question.

5         Unless that suspect later

6  became -- unless the suspect who was ruled out

7  later became a suspect again, that suspect's

8  identity would never be disclosed via official

9  police reports for that investigation, correct?

10    A.   Pre-1983, correct.

11    Q.   After the special order 82-2 was

12  issued, did you do sampling of any kind on the

13  subject of files?

14    A.   No.  I had a lot of conversations, a

15  lot of meetings, but no complete effort to

16  sample again.

17    Q.   Did anybody on behalf of the

18  department do any sampling of actual files

19  after the special order 82-2 came out?

20    A.   I'm not aware of any.

21    Q.   Is that something you would have been

22  aware of given your role in the project?

23    A.   Had it been done at the direction of

24  the Chief, I would have heard about it, I would

167

1  have known about it.  But there's nothing to

2  prohibit anyone below that to order one of

3  their subordinates to do further sampling, and

4  I would not have known about it.

5    Q.   Did the department take any steps to

6  find out if the working file practice had

7  actually stopped at any time after Special

8  Order 82-2 was issued?

9    A.   Well, we saw Deputy Chief Hinchy's

10  effort to reinforce the message.

11    Q.   That the day after the order, right?

12    A.   Right.  Right.

13    Q.   I'm just asking the question, because

14  I don't know the answer.

15         Did the City of Chicago Police

16  Department or anyone within the department take

17  any steps to determine whether the working

18  files practice had actually stopped as a result

19  of the efforts the department had taken to

20  issue a Special Order on the subject in '82?

21    MR. PATTERSON:  Objection, asked and

22  answered.

23    THE WITNESS:  All the files that were

24  intact should remain intact as of the temporary

168

1  restraining order.  And the issuance of an

2  order by the superintendent.

3         Then came the gray area.  What

4  about my personal notes?  They don't mean that,

5  do they?  Well, neither the temporary

6  restraining order nor the superintendent's

7  direction made mention of personal notes.

8         And there was discussion -- well,

9  it couldn't possibly mean notes, because they

10  didn't say notes.

11         They must be referring to those

12  memoranda and those to do lists.

13         We'll keep them, just as they

14  were.  But if there was a genuine, sincere,

15  what do you think he means, what do they mean

16  about notes?

17  BY MS. KEEN:

18    Q.   And so what was done about that

19  confusion?

20    A.   We had meetings and then we had -- oh,

21  then we went to court.  Milton Shader's

22  courtroom, and Superintendent Brzeczek

23  clarified his standing.  And he said anything

24  generated in the course of an investigation,

169

1   notes, even if they're written on the back of a
2   notebook should be preserved.
3           Notes?  Yes, notes.  That was our
4   marching orders to change and clarify what to
5   do with personal notes.  They're the
6   work-product related to the investigation.
7       Q.   So, it sounds like in response to the
8   practice of working files and this Laverty memo
9   lawsuit, the department responded by issuing
10  its Special Order and then these substance
11  special orders regarding the use of
12  investigative files, correct?
13      A.   Well, the first one is 82-2,
14  Department Notice 82-2.  Preserve those things.
15  We still didn't have a name for them.  Preserve
16  them.  You know what I'm talking about.
17          Later, after the hearing in
18  federal court, it was clear that the
19  superintendent is announcing a new policy.
20      Q.   This is 83-1?
21      A.   83-1.
22      Q.   And then 83-1 spelled out the filing
23  system and created some names for the file and
24  associated ancillary documents, correct?

170

1       A.   Correct.
2       Q.   And then there were some subsequent
3   orders, which I'll mark at this point, that
4   related to the same subject of investigative
5   files and those ancillary documents, correct?
6       A.   Correct.
7       Q.   And then the GPR form was created as
8   well, correct?
9       A.   As part and parcel of 83-1.
10      Q.   Did the department take any other
11  steps to ensure that all of the information in
12  working files was getting produced to -- let me
13  ask that question.
14          Other than the special orders
15  that I just talked about regarding
16  investigative files, did the department take
17  any steps to ensure that working files were
18  being kept intact and not being destroyed?
19      A.   We go back to the supervisory
20  responsibility.  The Superintendent of Police
21  has issued his policy.  The Chief of Detectives
22  has issued a division level order.  It's to be
23  followed.
24          Now, I'm not aware of what you're

171

1   suggesting, what City-wide uniform action items
2   were there.  I imagine there was a lot of
3   action items done at the commander, lieutenant,
4   sergeant level.  Give me a general progress
5   report with your supp.
6           I know you didn't write that supp
7   using your imagination.  Really?  Yes.  We
8   never used to.  Right.  We never used to.  But
9   do it now.  It was a change of a mindset.
10      Q.   The mindset was that -- the earlier
11  mindset was this very familiar practice of not
12  turning over notes, right?
13      A.   Correct.
14      Q.   And keeping information working files
15  that didn't get made part of the Records
16  Division file, correct?
17      A.   Not keeping.  Okay.  There was no
18  uniform practice of getting rid of running
19  files, street files, working files.  Some might
20  just take the entire file and throw it in the
21  garbage.
22      Q.   Right.  I just mean of not submitting
23  information from the working files in the
24  permanent file, into the Records Division file,

172

1   that was a mindset that existed before January
2   of '82, correct?
3       A.   Correct.  Before '83.
4       Q.   Before '83.
5           So, I guess all I'm asking is
6   other than direct supervisors to the extent
7   they may have taken steps that you're not
8   personally aware of, did the department
9   management or command staff take any steps to
10  determine whether the working file practice had
11  actually changed as a result of the Special
12  Orders?
13      A.   We had a training program.  There was
14  the 1986 Detective Division Special Order
15  issued by George McMahon, which for the first
16  time introduces the word in Section 6, I
17  believe, audit.
18          Exempt commanding officers will
19  audit these records, these investigative files.
20  But I think that is after the fact.
21          I'm not backing down from the
22  fact that supervisors made sure that the
23  Superintendent of Police's direction and the
24  Chief of Detective's direction were being

173

1  followed.
2      Q.   I appreciate that.  I'm just trying to
3  understand if anything was done besides that.
4  And I think the answer is, there was some
5  initial training to explain the new rules of
6  83-1, correct?
7      A.   Correct.
8      Q.   And then there was a special order in
9  '86 correct?
10     A.   Correct.
11     Q.   Other than that, you're not aware of
12 any steps taken by anyone at the management
13 level in the department to make sure that the
14 working files practice had ceased, correct?
15     A.   Right.
16     Q.   Now, as far as whether sergeant
17 supervisors, in other words, front line or
18 first line supervisors, if you will, were
19 actually making sure that the Laverty problem
20 didn't happen again and that relevant
21 information wasn't being kept from the official
22 police reports, what steps are you aware of did
23 these front line supervisors take?
24     A.   The front line supervisor had to sign

174

1  off on the general progress report.  In the
2  bottom right-hand corner of the general
3  progress report is the supervisor's name and
4  signature.
5          But you know what's interesting
6  about that, and it's different from original
7  case reports and supplementary case reports.
8          An original case report and in
9  supplementary case reports, it says approved.
10 On the general offense case report, it says
11 received.
12         MR. PATTERSON:  The general offense
13 case report or general progress report?
14         THE WITNESS:  General progress report.
15 Excuse me.  Thank you for that clarification.
16 The general progress report says received.
17 BY MS. KEEN:
18     Q.   What's the reason for the difference?
19     A.   I remember there being a discussion
20 when I created the form.  You can't expect
21 someone to read someone's chicken scratch of
22 handwriting and, who knows, personal codes.  I
23 don't know how people leave their notes.  To
24 read them with the same intensity as you do the

175

1  supplementary report.
2          So, if I were to really place
3  responsibility, I would place responsibility on
4  that individual detective to ensure that that
5  which is relevant, that which is important to
6  the case makes it to the supplementary report.
7      Q.   So, if a GPR did not have a
8  supervisor's signature on this, does that mean
9  that the GPR was never turned into a
10 supervisor?
11     A.   That's a very good assumption.
12     Q.   Are you aware of any reason why a
13 supervisor would receive a GPR but not sign the
14 GPR?
15     A.   No.  We're very good at signing
16 things.  Reading has its challenges, but we're
17 very good at signing.
18     Q.   I appreciate that.
19         Let me make sure I know what all
20 these other documents are quickly.
21         MR. PATTERSON:  Would this be a good
22 time for a break?
23         MS. KEEN:  You know when would be a
24 great time for a break?  If you give me -- I'll

176

1  try to do it quickly in five minutes.
2          As soon as I mark these, then I'm
3  going to organize them during the break.
4          MR. PATTERSON:  Okay.  Sure.
5          (WHEREUPON, Deposition Exhibit
6              No. 10 was marked for
7              identification.)
8  BY MS. KEEN:
9      Q.   This is Exhibit 10 and it's
10 Plaintiff's 2468 through 2471.  Can you tell me
11 what this document is and who wrote it?
12     A.   This is a document on the subject of
13 To-From Subject Memorandums, sic, s-i-c.
14         I now know that the plural of
15 memorandum is "a."  I didn't know that in 1983
16 when I wrote this.  So, I apologize.
17     Q.   You said in 1983?
18     A.   1982.  I'm sorry.
19     Q.   Do you remember when in '82?
20     A.   It's probably April.  Obviously, it's
21 undated, but it's written very close after the
22 time the site visits were conducted.
23     Q.   Okay.  And I'm sorry.  I didn't mean
24 to interrupt you.

---

**177**

1  A.  It was my way of thinking something
2  out and sharing my thoughts in writing.
3  Q.  Who did you share this document with?
4  A.  The Chief of Detectives.
5  Q.  Anybody else?
6  A.  The Deputy Chiefs of Detectives.
7  Q.  Anybody else?
8  A.  Those are the ones I know received it.
9  Q.  I forgot to ask you that about
10  Exhibit 9.  Who did you give Exhibit 9 to?
11  A.  The same people.
12  Q.  Chief of Detectives?
13  A.  And the Deputy Chiefs.
14  Q.  All right.
15  A.  At issue here, it's a discussion of
16  what to do with to-from subject reports and
17  points out the irony that, by our own
18  directives, we have the requirement to generate
19  memoranda on certain types of investigations.
20  Q.  Right.
21  A.  And ask the question, you know, on the
22  last page, should these items become part of
23  the Records Division?  Should these To-From
24  Subject Reports become part of the Records

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

---

**178**

1  Division?
2  (WHEREUPON, Deposition Exhibit
3  No. 11 was marked for
4  identification.)
5  BY MS. KEEN:
6  Q.  So, this is Exhibit No. 11.  It's
7  really badly Bates stamped.  This is
8  Plaintiff's, I believe, 6307, 6308, 6309 and
9  6310, all the way through 6312.
10  But just so that the record is
11  clear in case I got that Bates numbers wrong,
12  it's hard to read, it's a document entitled
13  Chapter 18 Investigative Files.
14  What is this document, sir?
15  A.  This is Chapter 18 of the Detective
16  Division Standard Operating Procedures.
17  Q.  What year is this from?
18  A.  1988.
19  Q.  Did you write this?
20  A.  I did not.
21  Q.  Who wrote this?
22  A.  The Chief of Detectives was John
23  Townsend.  I don't know who drafted it for him.
24  But you will see that it closely mirrors the

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

---

**179**

1  previous Detective Division Special Orders from
2  1983.  In any organization, there is at
3  different times, different schools of thought.
4  In one era they say write special
5  orders on special topics.  Someone else says
6  let's put it all in one place, a couple of
7  years later.  Let's create a manual, a standard
8  operating procedure.
9  Frankly, I'm against standard
10  operating procedures because when you revise
11  them, you have to go into page -- Chapter 18,
12  Page 3, revise Paragraph 2.  It gets very messy
13  and usually it's bound and you rip pages out
14  and you try to insert something on a three-ring
15  notebook as opposed to stand alone topics,
16  which are smaller in size.
17  Q.  Right.
18  A.  But in this era, it was the decision
19  of the Detective Division Chief to have one
20  large bound set of Standard Operating
21  Procedures.
22  Q.  Do you have a copy of the '83 Standard
23  Operating Procedures for the Detective
24  Division?

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

---

**180**

1  A.  There wasn't one.  And that's my
2  point.
3  Q.  Oh, you're saying it was -- okay.
4  Because I was just thinking to myself, I hadn't
5  seen that.
6  A.  Right.
7  Q.  You're saying it was the Special
8  Orders?
9  A.  Special Orders were the governing
10  document.
11  Q.  So, this is the first time it got
12  integrated into this larger document?
13  A.  Right.
14  (WHEREUPON, Deposition Exhibit
15  No. 12 was marked for
16  identification.)
17  BY MS. KEEN:
18  Q.  And I think the last one of this batch
19  is Exhibit 12, which is CITY-KLUP 3140 through
20  3164.  And there's several documents in here.
21  I don't know if I incorrectly
22  combined multiple unrelated documents.  Maybe
23  you can -- oh, yeah, I did.  Sorry.
24  So, I guess the first three pages

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

181

1   of this exhibit are one document, right?

2      A.   Correct.

3      Q.   So, let's actually make Exhibit 12B

4   CITY-KLUPP 3140, 41 and 42.

5      A.   Okay.  What are you calling that one?

6      Q.   The first three pages are Exhibit 12.

7      A.   Okay.

8      Q.   What is this document?

9      A.   This document is one of my earliest

10  attempts to articulate what I thought our

11  procedures should be.

12     Q.   So, did this precede the Special Order

13  82-2?

14     A.   Yes.

15     Q.   Okay.

16     A.   You know what?  I don't know if it

17  preceded the April 1, but it certainly preceded

18  the January, 1983.

19     Q.   Who did you send this to?

20     A.   Again, the Chief of Detectives for

21  sure.  And this probably went also to the

22  Deputy Superintendent Bureau of Investigative

23  Services.

24     Q.   Was the Patrol Division ever involved

182

1   in any of these discussions about the whole

2   investigative file and working file issue?

3      A.   No.

4      Q.   The next in this batch that I handed

5   you is actually not -- you can just put that to

6   the side.  I don't need to ask you about it.

7      MR. PATTERSON:  Which one are we

8   putting to the side?  3143.

9      MS. KEEN:  Yes.  Sorry.  These are

10  some of the new documents.  I think I

11  accidentally had these all stapled together.

12  BY MS. KEEN:

13     Q.   Can you just tell me which documents

14  go together?  So, there's a memo on 3144?

15     A.   3144 is a stand alone directive.

16         (WHEREUPON, Deposition Exhibit

17           No. 13 was marked for

18           identification.)

19

20  BY MS. KEEN:

21     Q.   Let's mark that one as 13.

22     A.   This next one, if it is to be

23  Exhibit 14, I think should start with this

24  Investigative File Case Folder on 3148.  That

183

1   should be the first document.

2      Q.   Okay.

3      A.   That should be the first document.

4      Q.   Okay.

5      MR. PATTERSON:  So, Jim, would 3148

6   comes first then immediately followed by 3145?

7      MS. KEEN:  We can go off the record.

8         (WHEREUPON, a discussion was held

9           off the Record.)

10        (WHEREUPON, a short break was

11           taken.)

12        (WHEREUPON, Deposition Exhibit

13           No. 14 was marked for

14           identification.)

15      MS. KEEN:  Back on the record.

16  BY MS. KEEN:

17     Q.   You testified earlier, I believe, that

18  the first meeting within the police department

19  involving --

20      MR. KIVETZ:  I'm sorry.  Can we go off

21  the record for a second.

22         (WHEREUPON, a discussion was held

23           off the Record.)

24  BY MS. KEEN:

184

1      Q.   Before the break, sir, I had asked you

2   some questions about the initial meeting among

3   the command staff regarding the Laverty memo

4   and the potential problem of working files.

5      Do you recall those questions?

6      A.   I do.

7      Q.   And you said that there was a meeting

8   of the Chief of the Detective Division, as well

9   as all of the area commanders, correct?

10      Correct.

11     Q.   So, at the time there was six areas?

12     A.   Correct.

13     Q.   And then subordinate to the area

14  commanders were the area chiefs, correct?

15     A.   No.

16     Q.   I got that backwards.

17     A.   It's chief, deputy chief, and

18  commanders going top to bottom.

19     Q.   So, at this meeting was the Chief of

20  the Detective Division, as well as the area

21  chiefs of all six areas, correct?

22     A.   Three deputy chiefs.

23     Q.   Three deputy chiefs.  We've been over

24  this.  Right.  Okay.  Sorry.

185

1     So, there's the Chief, the three
2 deputy chiefs the six area commanders.
3     A.   Right.
4     Q.   And then was there anyone of a lower
5 rank than commander at this meeting?
6     A.   I don't believe there was.  There was
7 one other higher and that's Deputy
8 Superintendent of Investigative Services.
9     Q.   Right.  And you don't recall whether a
10 specific presence from Bomb & Arson was there,
11 correct?
12     A.   I would tend to think not because at
13 first blush this was viewed as an Area Violent
14 Crime issue and not larger than that.
15     Q.   Do you have an independent
16 recollection today as to whether someone from
17 Bomb & Arson was there or not at this initial
18 meeting?
19     A.   I do not.
20     Q.   So, it's possible, but you're not
21 sure?
22     A.   It's possible, and I don't know.
23     Q.   Do you recall what month this meeting
24 was held in 1982?

186

1     A.   It was probably April, but I don't
2 know.
3     Q.   Now, you said generally what the topic
4 of the meeting was.  What was the discussion?
5 What was the substance of the discussion at the
6 meeting?
7     A.   I wasn't there.  As it was relayed to
8 me, they were talking about the Laverty
9 memorandum and the question of other files.
10 And at that point, I'm told it became a
11 confusing topic because no one agreed upon
12 terminology.
13     Q.   When you say other files, you mean
14 whether there were other similar Laverty memo
15 types out there?
16     A.   No.  Just whether or not there were
17 working files, street files, running files.
18     Q.   Okay.  Around this time, what was the
19 confusion over nomenclature?
20     A.   The term.  I mean, one person would
21 call it a personal file, someone else would
22 call it a running file, someone else said, no,
23 no.  I think you mean street files.  I think
24 you mean working file.

187

1     They're all talking around one
2 another trying to describe what possibly is an
3 issue.  And then, of course, it was an
4 agreement that there should be a site survey.
5     Q.   Okay.  Was it your understanding that
6 while the different names might have been used
7 within the different areas, they all had a
8 practice of keeping what you have described or
9 defined as working files?
10     A.   A practice of using, not always
11 keeping.
12     Q.   Okay.  Right.  Fair enough.  In fact,
13 sometimes not keeping?
14     A.   Right.
15     Q.   They all had a practice of using
16 working files but they might have called it
17 something other than working files, correct?
18     A.   Correct.
19     Q.   Okay.  And how far back did the
20 working file practice go among police folks
21 doing investigations?
22     A.   I don't know.  When I arrived at
23 Area 1 Homicide in August, 1977, it was there.
24     Q.   When you were homicide detective, were

188

1 you aware of the possibly that important
2 information from the working files would not
3 make it into the official file or official
4 police report for a particular investigation?
5     A.   I never gave it much thought.  I mean,
6 I was just worried about my investigation and
7 my notes, taking the best notes I could to make
8 the best report I could.
9     Q.   You never personally engaged in the
10 practice of keeping important information about
11 the case out of the supplementary report, I
12 would assume, correct?
13     A.   I have left memos for other watch
14 personnel, but nothing I thought should have
15 been included in a supplemental report.
16     Q.   And you made an effort to include
17 everything relevant to a case in the
18 supplemental report as you understood the term
19 relevant?
20     A.   I think most people did.  The practice
21 is mostly favorable and good.  Yes.
22     Q.   So, it's mostly favorable and good,
23 but it had the -- there was the opportunity for
24 mishandling of information if one wanted to

189

```
1   mishandle; is that fair to say?
2           MR. PATTERSON:  Objection, vague.
3           THE WITNESS:  I think there is -- in
4   files, there needs to be some discipline, some
5   commonality of investigation.  I think if
6   everyone had their own file on every
7   investigation, it would become very confusing.
8   We would become less efficient.
9   BY MS. KEEN:
10      Q.   It's not just confusing and efficient,
11  but it sounds like the practice of working
12  files created the opportunity for the
13  occasional person to actually withhold evidence
14  that was relevant to an investigation?
15          MR. PATTERSON:  Objection, foundation.
16  BY MS. KEEN:
17      Q.   I mean, isn't that what happened in
18  the Laverty case?
19      A.   To this moment, I don't know why Frank
20  Laverty did not put it on a supplementary
21  report and dare the supervisor to sign it.
22  That was his right.  That was his duty.
23          Why put it on a piece of paper?
24  If you believe this is part of the
```

190

```
1   investigation, include it in your supplementary
2   report.
3           Almost anything that's in a
4   supplementary report that's not true can be
5   discounted.  You know, it may be troublesome
6   for a day or two, but it may require further
7   leg work to prove or disprove this suspect A.
8       Q.   Right.  But when going to your point
9   about Laverty not putting the information in
10  the supp report, my understanding of our
11  discussion earlier about the process of putting
12  information into a supp report was that you saw
13  cases where substantive information about the
14  investigation wasn't being put in the supp
15  report?
16      A.   Substantive activity, investigative
17  activity was not included.  And needlessly, in
18  my opinion, not included.
19      Q.   But doesn't that just speak to the
20  fact that it was the mindset of detectives to
21  use these memos and turn the memos in as
22  opposed to bothering to create supp reports
23  that contained all of the information in the
24  memos?
```

191

```
1       A.   No.  Most of the report writing was on
2   supps.  I mean, sometimes we get a
3   misunderstanding of these memoranda.  The
4   memoranda tended to be to-do lists.  I want you
5   to, you know, communication to the next watch
6   even if it's eight hours from now.
7       Q.   To-do lists have sort of a pedestrian
8   sound to them, but to-do lists can be quite
9   important for a homicide investigation,
10  correct?
11      A.   Certainly.
12      Q.   So, to-do lists could include the name
13  of suspects that need to be interviewed,
14  correct?
15      A.   You could say I want you to
16  re-interview someone.  I don't like his looks,
17  you know.  Somebody is not telling us the
18  straight story.  That's why I would like you to
19  re-interview this person.  Tell me what you
20  think.
21      Q.   Given that at least some detectives
22  were of the mindset that they didn't put
23  information that was germane to the case into a
24  supp report if it was already written in a
```

192

```
1   memo, was there an opportunity for important
2   information to be withheld from the official
3   police reports that got disclosed to
4   prosecutors and criminal defense attorneys?
5           MR. PATTERSON:  Objection, form,
6   foundation.
7           THE WITNESS:  Opportunity sounds like
8   something we want to do or taking advantage of
9   the moment.  I agree with the thought that
10  important parts of an investigation and
11  sometimes even relevant parts of an
12  investigation may not have been included in a
13  supplementary report, but I think to say that
14  it gives certain detectives the opportunity to
15  withhold, I mean, that's down right sinister,
16  and I don't think the average person is like
17  that.
18  BY MS. KEEN:
19      Q.   Fair enough.
20          I guess maybe I should have said
21  it creates the potential, whether deliberate or
22  not, for information to not make it from a
23  detective's personal notes or memos into an
24  official police report?
```

193

1    A.   I like that.

2    Q.   Okay.  Thank you.

3         So, then as a result of the

4  meeting, what happened?  What happened next on

5  this project?  And by project, I mean, the

6  problem of figuring out whether there was a

7  street files problem and what to do about it?

8    A.   Day one after the meeting, I don't

9  know the date, individuals detectives and

10 sergeants went to the individual six areas and

11 came back and reported their findings.  And

12 those two sergeants wrote a summary report.

13        The summary report still did not

14 satisfy the Chief of Detectives who said, you

15 know, I don't like reports.  They're written by

16 two.  I want one report written by one person

17 who has seen everything and may be able to

18 better evaluate.

19        And I was assigned to be that

20 person, and I made some observations.  And then

21 for the weeks that went on after that, it was

22 what do you want to do about it?

23   Q.   Okay.  So, starting with the first two

24 detectives, that's the Exhibit 2 document we've

194

1  already looked at, correct?

2    A.   Correct.

3    Q.   And just looking at that briefly as

4  far as the content of the memo, Page 2 talks

5  about a memo board?

6    A.   Right.

7    Q.   And in the case of Area 3, it talks

8  about a hot board.  What was the hot board?

9    A.   Probably the same thing just a

10 different name.  It's a clipboard normally,

11 two-hole punched sitting on the supervisor's

12 desk with copies of case reports, supplementary

13 reports, memos, and Area 3 says, additional

14 bits of information are stapled to the original

15 report.

16        I, for the life of me, can't

17 remember what the additional bits of

18 information might be.

19   Q.   It goes on to say, perhaps this is

20 enlightening:  "This is a duplication of the

21 street file."

22   A.   Right.  It might be a to-do list, it

23 might be a memo.  Even telephone messages are

24 included in an investigative file or street

195

1  file.  That's something I failed to mention

2  earlier.

3         Hickey, you got a message from

4  someone who doesn't wish to be identified, but

5  he says the guy with the red hood is the one

6  you're looking for.  Okay.  Thank you.

7  Whatever it might be.

8    Q.   Would that have been a phone message

9  slip?

10   A.   Literally.

11   Q.   And that would have been stuck in the

12 working file?

13   A.   Right.

14   Q.   So, there was information being

15 exchanged informally among detectives on a

16 day-to-day basis?

17   A.   Right.

18   Q.   And that's normal of any police

19 department I would assume, right?

20   A.   Or simply call this number.  I don't

21 have a clue what it's about, but here's this.

22 Oh, yeah.  I remember giving you my business

23 card.  Thanks for calling.

24   Q.   Now, at the time that there was --

196

1  sorry.  Let me just strike that and go back to

2  this.

3         Now, it then talks about street

4  files, also called running files in Area 3 and

5  unit file in Area 4; do you see that?

6    A.   Yes, I do.

7    Q.   And it says that areas using "street

8  files" keep various notes, memos and bits of

9  information on the case in these files, which

10 are used to communicate steps taken, steps to

11 be taken and personal opinions of one detective

12 to another, do you see that?

13   A.   I do.

14   Q.   And was that your experience as well

15 in terms of understanding what street files

16 were?

17   A.   Personal opinions.  I agree with the

18 first couple.  Rare is the instance.  When

19 someone says, I have a personal opinion that

20 the motive is robbery and not sex.

21   Q.   Do you believe that the authors of

22 this memo had a good faith basis for describing

23 street files in the way that they just did in

24 that paragraph?

197

```
1           MR. PATTERSON:  Objection, form.
2           THE WITNESS:  The authors compiled
3    this report based on information provided to
4    them by others.
5    BY MS. KEEN:
6        Q.   And this report was actually prepared
7    as a direct result of a decision made at that
8    meeting to go out and do a survey, correct?
9        A.   Correct.
10       Q.   And so they were intending to report
11   back -- or excuse me.  Their assignment was to
12   report back accurately about what they were
13   seeing as the actual practice of working files
14   in the various areas, correct?
15       A.   Correct.
16       Q.   So, do you have -- I mean, I guess --
17   you're saying you haven't seen documents
18   reflecting personal opinions of one detective
19   to another, but you have no reason to dispute
20   that they observed that, correct?
21       A.   I do not.
22       Q.   But you agree with the remainder of
23   this definition of street files?
24       A.   Yes, I do.
```

198

```
1        Q.   And it also says that the street file
2    was maintained for the lifespan of the
3    investigation.
4                  Was that your understanding as
5    well?
6        A.   Lifespan of the investigation means
7    until the time of arrest.  That was the term of
8    art, you know.  Not forever.
9        Q.   Was that your understanding as well?
10       A.   Yes.  Disposed of by the detective
11   making the cleared/closing report.
12       Q.   Right.  Now, at the bottom here, it
13   just says Violent Crime Units under the street
14   files heading?
15       A.   Yes.
16       Q.   What's the significance of that.
17       A.   I don't know.
18       Q.   Were there working files kept --
19       A.   I would say, as I look at this memo
20   further, it is under the heading of street
21   files.  They're utilized in each area, they're
22   maintained by detectives, they're maintained
23   until the case is closed, and it looks like
24   they're maintained in Violent Crimes Units.
```

199

```
1        Q.   Was that your understanding as well?
2        A.   Yes.
3        Q.   Now, it goes on to propose some
4    methods of addressing the problem, correct?
5        A.   There are some -- there are two
6    alternative approaches to resolve it, yes.
7        Q.   And those were just recommendations by
8    the authors, correct?
9        A.   Correct.
10       Q.   What happened -- and I know you've
11   talked generally about it, but after they came
12   back, you had -- excuse me.
13                  After these two authors, in other
14   words, Brady and Tolley reported their
15   findings, the superintendent or the Chief of
16   Detectives --
17       A.   Chief of Detectives.
18       Q.   -- wanted the same person to do the
19   whole survey, correct?
20       A.   Right.
21       Q.   And so what conversation did you have
22   with the Chief about that?
23           MR. PATTERSON:  Objection, foundation.
24   BY MS. KEEN:
```

200

```
1        Q.   Did you have a conversation with the
2    Chief about that?
3        A.   I did.
4        Q.   Was anyone else present?
5        A.   I don't recall.  I'm sure someone was
6    around, but I don't recall who may have been
7    there, but I was directed to go to each of the
8    areas.
9        Q.   Were you told to go anywhere besides
10   each of the six areas?
11       A.   Not at this time, no.
12       Q.   At some point were you?
13       A.   I recall going to the Youth Division,
14   but I went to other places as well.
15       Q.   Where?
16       A.   I went to the FBI to see how they
17   maintained investigation files.
18       Q.   Within the department, did you go to
19   Bomb & Arson?
20       A.   I don't recall.  Certainly not
21   initially.
22       Q.   Organized Crime?
23       A.   No.
24       Q.   You don't recall or you did not go?
```

201

```
 1        A.   I don't recall.  Sorry.  I mean, the
 2   conversations went on for months, and I
 3   remember vividly the site surveys at the very
 4   beginning.
 5        Q.   And then when does the teletype
 6   happen?  After you finish all of your site
 7   surveys?
 8        A.   It happened immediately after the
 9   temporary restraining order was issued.
10        Q.   I'm just trying to put together --
11        A.   A timeline.
12        Q.   -- my own timeline.
13        MR. KIVETZ:  You're referring to
14   Exhibit 3, correct?
15        MS. KEEN:  Exhibit 4.  Thank you.
16   BY MS. KEEN:
17        Q.   Was the teletype, which we marked as
18   Exhibit 4, before or after Brady and Tolley did
19   a survey?
20        A.   It was after.
21        Q.   Where is your summary of your survey?
22        A.   I don't know.  I saw it yesterday, but
23   I don't see it here.  Let's take a look.
24        MR. PATTERSON:  It's 8 or 9.
```

202

```
 1        THE WITNESS:  8 would be the best --
 2   yeah, because 8 on Page 2 talks about a
 3   sampling by area.
 4   BY MS. KEEN:
 5        Q.   Were there any documents you looked at
 6   yesterday that I haven't provided you with?
 7        A.   No.  This -- yeah, there was one.
 8   There was one.  It had some RD numbers and by
 9   area.
10        MS. KEEN:  Do you remember what Bates
11   number that is?
12        MR. PATTERSON:  Let me try to find it.
13        THE WITNESS:  It would have been in
14   the smaller notebook.
15        MS. KEEN:  Let's go off the record.
16             (WHEREUPON, a discussion was held
17              off the Record.)
18   BY MS. KEEN:
19        Q.   I guess in the meantime, I can ask you
20   about Exhibit 8 and Exhibit 9.
21        So, Exhibit 9 was one of the
22   memos summarizing your sampling?
23        A.   Okay.
24        Q.   Is that right?
```

203

```
 1        A.   That's correct.
 2        Q.   Okay.  When you said that in Page 2
 3   that the Detective Division Violent Crimes Unit
 4   needs to both improve its file maintenance
 5   procedures and upgrade the quality of written
 6   Major Incident Worksheets and memoranda, what
 7   did you mean by upgrade the quality of written
 8   Major Incident Worksheets and memoranda?
 9        A.   I thought they were not as
10   professionally written as they should be.
11   Sometimes they used slang, sometimes there was
12   a character assassination of victim or
13   offender.
14             It was almost street vernacular
15   sometimes.  Other times it was professionally
16   done, but it wasn't as well done or
17   professional as it should be.
18        Q.   Okay.  And based on a review of your
19   memo, it appears that you determined that there
20   were discrepancies wherein information in the
21   unit file of a particular area was not also
22   contained in the Records Division file for that
23   case, correct?
24        A.   Correct.
```

204

```
 1        Q.   Okay.  And then --
 2        MS. KEEN:  Did you find the --
 3        MR. PATTERSON:  I think the only thing
 4   that we haven't seen so far, I think, is the
 5   Special Orders.
 6        MS. KEEN:  Is that what you were you
 7   talking about?
 8        THE WITNESS:  No.  There's a document
 9   that I looked at yesterday.  I probably have
10   it.  Not with me unfortunately.  I'll let you
11   know if I can't find it.  And, I mean, I'll
12   bring it.
13        MR. PATTERSON:  Let's not get into it
14   on the record.  Maybe we'll take a short break.
15   You can describe it if it's not coming to mind.
16        THE WITNESS:  Okay.
17   BY MS. KEEN:
18        Q.   So, as a result of your sampling --
19   well, it seems, like, you were doing sampling
20   not all in one fell swoop, but you were sort of
21   doing it over the span of multiple days; is
22   that right?
23        A.   Multiple days, but not seven days.  It
24   was more of a rush, two or three days.
```

205

```
1    Q.   And then what happened after you were
2    done with the sampling?  Who did you talk to
3    about it?
4    A.   The Chief of Detectives.
5    Q.   Did you talk to anyone higher than the
6    Chief of Detectives in the Bureau of
7    Investigative Services?
8    A.   I don't know if the deputy was
9    present.  Again, this is fact-finding.
10   Q.   You were doing fact-finding?
11   A.   Right.  Of our existing practices and
12   realizing that not everyone not only doesn't
13   call them by the same names, but there's
14   different levels of quality of report writing.
15   Q.   When you reported your findings to the
16   Chief of Detectives, was he concerned by what
17   you were telling him with regard to the
18   discrepancies between the files?
19        MR. PATTERSON:  Objection as to
20   testifying to someone else's knowledge.
21        THE WITNESS:  The department was
22   concerned, so therefore he was.
23   BY MS. KEEN:
24   Q.   What makes you think the department
```

206

```
1    was concerned?
2    A.   By the number of meetings, the
3    high-level nature of the meetings, involvement
4    of Department of Law.
5    Q.   How did the Department of Law get
6    involved?
7    A.   They represent the City in temporary
8    retraining orders.  The hiring of special
9    outside counsel.  Hopkins & Sutter on Madison
10   Street.
11   Q.   How many meetings would you say in the
12   spring, you know, from January until -- or
13   strike that.
14        How many meetings would you say
15   you had in '82 and '83 with command staff about
16   the working files issue?
17   A.   I don't know.  Many.
18   Q.   More than 10?
19   A.   Yes.
20   Q.   More than 50?
21   A.   Probably not.
22   Q.   25?
23   A.   On different days, 25 different days,
24   the topic was certainly discussed.
```

207

```
1    Q.   And at all of these meetings, it
2    always with the Chief of the Detective
3    Division?
4    A.   If he wasn't present, he was involved;
5    met with our legal affairs from the Chicago
6    Police Department, met with Department of Law
7    counsel, met with outside.  This had our full
8    attention.
9    Q.   It was a big deal?
10   A.   Yes.
11   Q.   Was there any attempt to look outside
12   the Detective Division and figure out whether
13   you had a department-wide problem, or was
14   everyone really just looking only at the
15   Detective Division?  And by Detective Division,
16   I'm including Bomb & Arson.
17        MR. PATTERSON:  Objection, compound.
18        MS. KEEN:  Let me re-ask that.
19   BY MS. KEEN:
20   Q.   Did the department make any effort to
21   look at whether they had a working files
22   problem outside of the Detective Division?
23   A.   No.  The issue was brought to us
24   framed in terms of a Detective Division issue.
```

208

```
1    And I raised it, but frankly it remained a
2    Detective Division level problem.
3    Q.   When you say you raised it, what do
4    you mean?
5    A.   At one point in one of these memos, I
6    said perhaps our Research and Development and
7    Auditing Internal Controls Division may get
8    involved or should get involved in the future,
9    because they may have department-wide
10   implications.
11   Q.   So, you were concerned that the street
12   files practice was not limited to the Detective
13   Division folks; is that correct?
14   A.   No.  But I realized that we have so
15   many people, so many units writing reports.  I
16   think I was as much concerned about our Records
17   Division practices, you know, shouldn't there
18   be a more whole statistic.
19        And then you realize it's a
20   difficult topic to put -- it's certainly a
21   challenge to put everything in one filing
22   cabinet.
23   Q.   When you conveyed this idea that maybe
24   we should look at the whole department or maybe
```

209

1  there is department-wide ramifications of these
2  practices, what response did you receive from
3  the higher ups?
4      A.   I don't remember any response to it.
5  But after all is said and done, I was a
6  detective working in the Detective Division.  I
7  worked on that which we could resolve.
8      Q.   Okay.  So, the teletype comes out.  Is
9  the teletype the first official directive to
10 police employees regarding the working files?
11     A.   Yes, it is.  That goes out in the name
12 of the superintendant.  We directed from the
13 police department, yes.
14     Q.   And it's sent to supervisor, correct?
15 That's the To line.
16     A.   I'd have to look at it.
17         MR. PATTERSON:  Exhibit 4.
18         THE WITNESS:  Oh, I see.
19 BY MS. KEEN:
20     Q.   So I was looking at the teletype, and
21 it says To: Supervisor.
22     A.   Right.  I can explain that.
23         Given the technology of the
24 era --

210

1      Q.   Oh, I get it.  It was the supervisor
2  at the teletype room?
3      A.   Right.
4      Q.   So, it's actually addressed to all the
5  commanding officers?
6      A.   Correct.
7      Q.   And who were the commanding officers
8  this was directed to?
9      A.   Officers are all those unit commanding
10 officers.  It's rather vague in general.  It
11 means to everyone.
12     Q.   Department-wide?
13     A.   It does.  It does say that.
14     Q.   So, this teletype went to all the
15 supervisors in the entire Chicago Police
16 Department?
17     A.   The teletype was state of art.  It was
18 our best and fastest means to get a message to
19 all units in the police department.  There was
20 a teletype machine in every unit in the police
21 department.  And we didn't have e-mail, we
22 didn't have fax machines.  This was the way.
23     Q.   So, this went to all supervisors in
24 the whole department?

211

1      A.   It did.  Yes, it did.
2      Q.   Then following the teletype is when
3  Hinchy sent a reinforcing memo to the Special
4  Activities Group?
5      A.   Correct.
6      Q.   We looked at that, Exhibit 5?
7      A.   Yes, ma'am.
8         (WHEREUPON, Deposition Exhibit
9         No. 15 was marked for
10        identification.)
11 BY MS. KEEN:
12     Q.   Now, take a look at Exhibit 15.  This
13 is Detective Division Notice 82-2.
14        Oh, you know, I looked at the
15 date on here actually.
16     A.   Yeah, the day before.
17     Q.   And this looks like it came out the
18 day before the teletype; is that right?
19     A.   That is correct.
20     Q.   In any event, this was the first --
21 so, this was actually the first written
22 directive on the subject of working files?
23     A.   Right.  But as the title document
24 tells us, it goes to the Detective Division.

212

1      Q.   Right.  It didn't go to anyone besides
2  the Detective Division?
3      A.   Right.
4      Q.   So, 82-2, would you say it created an
5  official term called Unit Investigative File?
6      A.   It says it defines it and it does.
7  Yes, it does.
8      Q.   Okay.  And it sounds like the thrust
9  of the order is that all Unit Investigative
10 Files that currently exist had to be preserved
11 intact, correct?
12     A.   Yes.
13     Q.   And it then said that it was the
14 Detective Division Unit supervisor's
15 responsibility to monitor the removal,
16 destruction or alteration of any such files,
17 correct?
18     A.   Correct.
19     Q.   There was nothing in 82-2 that
20 required detectives to keep notes that were not
21 in the unit files, correct?
22     A.   Correct.
23     Q.   And it also did not at this time
24 require detectives to submit their notes for

213

1   inclusion in the Unit Investigative File,
2   correct?
3       A.   Correct.
4       Q.   What was -- did you do any sampling --
5   I know I asked you this before, but having now
6   looked at the date of this Special Order 82-2,
7   did you do any -- strike that.
8           Did the City do any sampling or
9   auditing of any kind regarding contents of
10  files after 82-2 was issued?
11      A.   Nothing that I'm aware of from the
12  Chief of Detectives.  Individual commanders may
13  have.
14      Q.   If they did, it was of their own
15  volition, correct?
16      A.   Correct.
17      Q.   Following the issuance of 82-2, you
18  have some memoranda coming in, some various
19  folks about the working files issue, correct?
20      A.   Correct.
21      Q.   So, if you would, sir, turn to
22  Exhibit 6, again.  Exhibit 6, I think, is a
23  two-page document, correct?
24      A.   Yes, it is.

214

1       Q.   2455 to 2456.
2           Here you have Commander Stibich
3   who ran Area 3 Detective Division providing
4   memorandum on working files, correct?
5       A.   Correct.
6       Q.   Now, it says that working files are
7   useful for a number of reasons, right?
8       A.   Yes.
9       Q.   Do you agree with Commander Stibich
10  that working files were useful for the purposes
11  of inner-office correspondence?
12      A.   Yes.
13      Q.   Did you agree that working files were
14  useful as a form for different detectives to
15  give their representative viewpoints, opinions,
16  conjectures, suppositions, and "gut feelings"
17  regarding a specific investigation?
18      A.   I disagreed with him.
19      Q.   So, you disagreed in your experience
20  using working files as a homicide detective,
21  correct?
22      A.   I disagreed as to whether it should be
23  a forum.  I mean, this is not a chat room.
24  This is not an early chat room.  This is --

215

1       Q.   I understand your point, and I get it.
2   Let me clarify.
3           You agree with him that it was at
4   least in some cases used as such a forum even
5   though you may disagree that it should have
6   been used as a forum; fair to say?
7       A.   Fair.
8       Q.   And you also agree with Stibich that
9   working files were being used to document the
10  credibility of witnesses and/or suspects?
11      A.   Yes.  Sometimes there was evaluations,
12  assessments again of who they thought to be
13  more credible than others.
14      Q.   Now, it also says that working files
15  were useful as a means of eliminating witnesses
16  and/or suspects.  Do you see that?  This is on
17  Page 2.
18      A.   Yes, I do.
19      Q.   And you agree with Stibich's
20  assessment?
21          MR. PATTERSON:  I'm just quickly going
22  to lodge an objection to the form of the
23  question, you agree.
24          If you're asking if the witness

216

1   agrees, I'm assuming that is in his individual
2   capacity, not as the Chicago Police Department.
3           MS. KEEN:  Well, I guess as to that
4   question, I will rephrase it.  I didn't hear an
5   objection to the preceding question.
6           MR. PATTERSON:  No, that's fine.
7   BY MS. KEEN:
8       Q.   Staying in your corporate capacity as
9   a 30(b)(6) representative, is it your
10  understanding that one use of working files was
11  as a means of eliminating witnesses and/or
12  suspects?
13      A.   It sometimes was used as that.  And I
14  thought it should not have been, that more
15  substantive investigations, part of the
16  investigations, even if it led to a dead end,
17  should be part of the investigation story.
18      Q.   Should be in the supp report?
19      A.   Yes.
20      Q.   Okay.  Understood.
21          So, talking about what working
22  files are being used for, they were also being
23  used as a listing of leads undertaken,
24  sometimes false, correct?

217

1      A.   Correct.
2      Q.   We've talked about that.
3           I mean, is there -- sorry.
4           We're working files -- is it
5  your understanding, as well as Stibich's, as he
6  has in his memo here, that working files would
7  contain a listing of information, which later
8  proved to be erroneous or was given to
9  detectives for self-serving purposes?
10          MR. KIVETZ:  I want to interject here,
11 and I apologize.  But I just want to make sure
12 that we're still staying in his corporate
13 capacity.
14          MS. KEEN:  Yes.
15          MR. KIVETZ:  Because you've gone now
16 back and forth.  So, I wanted to make sure.
17 So, these questions are continuing forward
18 are solely to his corporate capacity; is that
19 correct?
20          MS. KEEN:  Yeah.  I'm saying what's
21 his position.
22 BY MS. KEEN:
23     Q.   Is that accurate, what Stibich wrote
24 in this memo?  I can ask it that way.

218

1      A.   It was my observations.  I did not see
2  a lot of this.  I saw some of this.
3  Information that later proves to be erroneous
4  can be disproven through a second supplementary
5  report.
6      Q.   So, I think where we're getting caught
7  up is in what should have been done versus what
8  was being done.
9           I understand your position that
10 supplementary reports were, in your view and
11 the City's policy, the appropriate place for
12 these kinds of things; in other words, leads,
13 opinions, and things to be memorialized,
14 correct?
15     A.   Correct.
16     Q.   I'm asking you something different,
17 which is, Stibich makes a statement here that
18 working files were used or could be used for,
19 among other things, containing a listing of
20 information which later proves to be erroneous
21 or was given to detectives for self-serving
22 purposes.
23          Do you dispute that statement in
24 Stibich's memo or do you accept it as true?

219

1           MR. PATTERSON:  In your corporate
2  capacity, correct?
3           THE WITNESS:  It sometimes was used
4  for this purpose.  I think overall that this
5  listing, this entire listing gives the
6  misimpression of the extent to which these
7  memos were being prepared.
8           I mean, it suggests that there
9  was a lot of them on every case.  And it's
10 simply not the case.
11 BY MS. KEEN:
12     Q.   Well, then to be fair, the best person
13 to know how often working files was being used
14 would have been the commander of that area,
15 correct?
16     A.   Correct.
17     Q.   And someone from a different area or
18 from another office altogether would be more
19 removed from the day-to-day filing and report
20 writing practices of that area; fair to say?
21     A.   That is fair.
22     Q.   Now, I mean, this memo to me suggests
23 that the practice of working files in the area,
24 or at least some of the areas, was somewhat

220

1  entrenched; do you agree?
2      A.   It was a citywide practice and it was
3  used on a regular basis.  Entrenched -- there
4  are probably some who just didn't write
5  anything, just only wrote supps, just their
6  personal notes and supps.  That's all.
7      Q.   So, was there some pushback or
8  resistance to 82-2 after it got issued?
9           MR. PATTERSON:  Objection, vague.
10          MS. KEEN:  Let me be more specific.
11 BY MS. KEEN:
12     Q.   Did anyone from the commander all the
13 way down to the street detective vocalize
14 displeasure with the thrust of the 82-2 Special
15 Order?
16     A.   I think the intent of the preservation
17 order was understood.  You know, preserve.
18 It's pretty clear.  Keep intact.  It's pretty
19 clear.
20          I think where the questions came
21 were in the follow-up.  You don't mean my
22 notes?  That's my personal property.  And it
23 was a genuine misunderstanding of whether or
24 not notes should be included.  But as far as

221

```
 1    memoranda, like Laverty's, everybody knew what
 2    that was.
 3         Q.   So, I guess what I'm saying is, it's
 4    sounds like the requirement was clear, but was
 5    there resistance to it?  In other words, was
 6    there this expression of I don't like having to
 7    preserve these documents?
 8         A.   It was discussed at all of the coffee
 9    tables.  It was the subject of staff meetings.
10    It was the subject of roll call training.  I'm
11    sure there were some who voiced their opinions,
12    but it matters not.  This was a decision of the
13    court.
14         Q.   So, why was 83-1 promulgated despite
15    the fact that 82-2 had come out?  How did that
16    83-1 come about?
17         A.   83-1 is a better document.  It
18    explains procedures.  It is a step-by-step
19    process as to how we were going to implement
20    our new policy expressed by the superintendent
21    which said we were going to save all of our
22    notes.
23              The 82-2 was not very workable.
24    One common control log book was signed every
```

222

```
 1    time you took a file in and out.
 2         Q.   So, how did -- so, what were the
 3    requirements -- actually, hold on.  Let's take
 4    a break.
 5              (WHEREUPON, a short break was
 6              taken.)
 7    BY MS. KEEN:
 8         Q.   We were on Exhibit 8, I believe.  So,
 9    there's a paragraph here about this Major
10    Incident Worksheets.
11         A.   Yes.
12         Q.   At this point in time, was the actual
13    Major Incident Worksheet form being used?
14         A.   Yes.
15         Q.   It states that it contains a lot of
16    information -- or strike that.
17              It states that it contains
18    remarks which could "well serve to undermine
19    the prosecution of the case."  Do you see that?
20         A.   Yes, I do.
21         Q.   Can you explain what you meant by
22    that?
23         A.   I said the form, the Major Incident
24    Worksheet, 8.5-by-11 on page -- on the front
```

223

```
 1    side of it is nothing but boxes to be filled in
 2    of information, most frequently asked types of
 3    information.
 4              On the back side we would take a
 5    typewriter, roll it in our typewriter and type
 6    up a brief summary.  I went to the crime scene,
 7    the victim was gone.  She was taken to the
 8    hospital.  Can't talk to her.  She's
 9    unconscious.  She looks bad.  By the way, I
10    pulled her rap sheet.  She looks like a whore.
11              You know, whatever it might be.
12    I mean, provide the information, but in a
13    somewhat callous manner, unprofessional.
14         Q.   On the back of a Major Incident
15    Worksheets?
16         A.   Yes.
17         Q.   And that's something you observed when
18    you were doing the sampling?
19         A.   It's some of the cases.
20         Q.   So, 83-1, again, it covered everybody
21    within the Detective Division, correct?
22         A.   Correct.
23         Q.   And did anyone outside of the
24    Detective Division receive -- or strike that.
```

224

```
 1              Was anyone outside of the
 2    Detective Division governed by 83-1?
 3         A.   No.
 4         Q.   Were there any comparable orders for
 5    outside of the Detective Division that has the
 6    same thrust as 83-1?
 7         A.   No.
 8         Q.   83-1 covered Bomb & Arson as of
 9    January 13, 1983, correct?
10         A.   Correct.
11         Q.   I had a couple of questions about it.
12              It adds in some requirements that
13    82-2 did not have, correct?
14         A.   There's a couple differences.
15              MR. PATTERSON:  Roshna, have you
16    passed out 83-1?
17              MS. KEEN:  Oh, sorry.  No.
18              (WHEREUPON, Deposition Exhibit
19              No. 16 was marked for
20              identification.)
21    BY MS. KEEN:
22         Q.   Exhibit 16 is Plaintiff's 2472 to
23    2476.  One thing that 83-1 does is it actually
24    explains why it's relevant and so important to
```

225

```
1   preserve all information obtained in the course
2   of a Violent Crime Field Investigation,
3   correct?
4       A.   Correct.
5       Q.   And I don't believe that was in 82-2,
6   correct?
7       A.   Oh, no.  No, it was not.
8       Q.   Another thing it does is it actually
9   creates an affirmative requirement to submit
10  handwritten notes, correct?
11      A.   Correct.
12      Q.   And that is a new requirement that was
13  not present in 82-2?
14      A.   Right.  82-2 was to implement -- to
15  make sure that we were implementing and doing
16  what we could so the temporary restraining
17  order would be respected.
18      Q.   Got you.
19      A.   I mean, it was a quick and dirty
20  document.
21      Q.   Right.
22      A.   But it came out quickly.
23      Q.   Okay.  So, who is the unit commanding
24  officer that puts responsibility for file
```

226

```
1   keeping and maintenance of the investigative
2   file basically on the commanding officer?
3       A.   Where are you referring?
4       Q.   If you go to Plaintiff 2475,
5   Subsection VC.  I mean, Roman Numeral V,
6   Subsection C.
7       A.   Right.  That's the lieutenant in
8   charge of the Violent Crimes Unit.
9       Q.   The lieutenant?
10      A.   Right.
11      Q.   And then if you flip back to the
12  preceding page, it says supervisors were
13  required to ensure that an Investigative File
14  Case Folder was initiated for each violent
15  crime investigation which culminated with the
16  arrest of the offender and the approval of
17  felony charges, correct?
18      A.   Where are you in this?
19      Q.   Roman Numeral V, Subsection A(2).
20      A.   Okay.  That is correct.
21      Q.   And why was that responsibility placed
22  with the supervisor?
23      A.   They wanted to make sure that any of
24  these cases that are going the felony route
```

227

```
1   have one prepared even if there wasn't one
2   prepared earlier.  So, just assigning
3   accountability for this clerical function.
4       Q.   Okay.  In Subsection 4 of that same
5   section, it talks about cases where there is no
6   Investigative File Case Folder.
7       A.   Right.
8       Q.   Can you just explain briefly why you
9   would have someone submitting a supplementary
10  report where there was no Investigative File
11  Case Folder?
12      A.   Sure.  These are the lesser crimes.
13  It might be a simple battery.  And it's
14  certainly not being worked on by all three
15  watches.  It's a minor investigation.
16      Q.   Okay.  So, you would expect if
17  Bomb & Arson was working on an arson
18  investigation wherein the fire had caused
19  multiple deaths, that based on 83-1, an
20  Investigative File Case Folder would have been
21  initiated?
22      A.   Yes.
23      Q.   Immediately, correct?
24      A.   Correct.
```

228

```
1           (WHEREUPON, Deposition Exhibit
2            No. 17 was marked for
3            identification.)
4   BY MS.  KEEN:
5       Q.   Now, I'm going to ask you about
6   83-2, because it looks like almost five months
7   later, you revised 83-1, correct?
8       A.   The Chief of Detectives issued a new
9   one, and I drafted it, correct.
10      Q.   Okay.  Right.  So, here, sir, is
11  Exhibit 17.  So, 17 is CITY-KLUP 3149 through
12  3153.  Can you tell me -- strike that.
13           What was your understanding as to
14  why a revised special order was being
15  requested?
16      A.   Tighten up on the procedures and
17  actually improve it where possible.
18      Q.   What feedback was the Chief of
19  Detectives getting after 83-1 was issued
20  regarding compliance with that Special Order?
21      A.   I don't know all the feedback he got,
22  but one of the improvements was the
23  introduction of the 2K instructions for the --
24  the introduction of the Investigative File
```

229

```
1    Control Card.
2                It's really nothing more than a
3    fancy library card.  It allowed for the removal
4    of these investigative files while still
5    maintaining some accountability for them.
6        Q.   Whose idea was this control card?
7        A.   I don't know who actually came up with
8    it, but i designed the form.
9        Q.   It's fair to say that some feedback
10   was getting to the Chief following issuance of
11   83-1 that caused him to believe that a perhaps
12   more strict or at least revised special order
13   was warranted; is that correct?
14       A.   Stronger.  At this time, there's a lot
15   of communication going on between the
16   Department of Law, the outside counsel and the
17   Plaintiff's Counsel, and there was a lot of
18   communication.
19               And, okay, we can do this, we can
20   do that.  We weren't trying to duck it.  We're
21   trying to tighten it and make it better.
22       Q.   Right.  And that's why I was asking
23   because it seems like -- what I wanted to know
24   was, was there a determination by the higher
```

230

```
1    ups that 83-1 didn't go far enough, and that's
2    why we needed to add some provisions in 83-2?
3        A.   No.  I think it's more tweaking.
4        Q.   Sir, there was some substantive
5    changes in 83-2, and I want to ask you about
6    that.
7                One is -- if you go to Page 3 of
8    the document, under Subsection Roman Numeral
9    VB(1).
10       A.   Yes.  We seem to have inserted a new
11   one, a new No. 1.
12       Q.   Yeah.  And it actually requires
13   detectives to create records reflecting all
14   relevant information, correct?
15       A.   To take and maintain complete notes of
16   all relevant --
17       Q.   Where are you?
18       A.   Second Line, No. 1.
19       Q.   Right.
20       A.   Take and maintain complete notes of
21   all relevant matters.
22       Q.   And earlier in that section, it says
23   "record and preserve all relevant information
24   as fully and accurately as possible."
```

231

```
1                Do you see that?
2        A.   Yes.
3        Q.   So, was the intent of this order to
4    actually mandate that detectives start taking
5    and creating notes that reflected relevant
6    information they were gathering in the course
7    of their investigation?
8        A.   I don't think the emphasis was on
9    creating more notes.
10       Q.   It was to create documents that
11   reflected the relevant information they were
12   gathering, whether it be in a note or in
13   another document, correct?
14           MR. PATTERSON:  Take your time.  Read
15   the whole paragraph.
16           THE WITNESS:  Roman Numeral VB(1) is a
17   new statement that was not in 83-1.
18   BY MS. KEEN:
19       Q.   And what did Roman Numeral VB(1) mean?
20       A.   It says -- I can read it.
21       Q.   Yeah.
22       A.   Detectives are required to, record and
23   preserve all relevant information as fully and
24   accurately as possibly -- possible.  It's
```

232

```
1    misspelled, mistyped.
2                Take and maintain complete notes
3    of all relevant matters during the course of
4    their investigation.  This requirement is
5    intended to serve the purposes of department
6    directives to assure that only -- to assure
7    something only that information and materials
8    indicating -- not only.  That's the word.
9    That's the word.  Okay.
10               To assure not only that
11   information and materials indicating the
12   possible guilt of the accused are preserved,
13   but also that the accused may ultimately be
14   granted access to any information and materials
15   that may tend to show his possible innocence or
16   aid in his defense.
17       Q.   So, the one purpose of Special Order
18   83-2 was to create this new affirmative
19   requirement to create records containing
20   relevant information?
21           MR. PATTERSON:  Objection, asked and
22   answered.
23           THE WITNESS:  I would say that this
24   language was suggested to us by someone,
```

233

```
 1   whether it be legal counsel, or whoever, I
 2   don't know.  But we put it in there.
 3   BY MS. KEEN:
 4       Q.   And this went out, right?  83-2
 5   actually was issued?
 6       A.   Absolutely.
 7       Q.   And it governed all members of the
 8   Detective Division as of May 2nd, 1983,
 9   correct?
10       A.   Correct.
11       Q.   There's another paragraph I wanted to
12   ask you about on the next page.  And it says on
13   Paragraph 6, "Any detective who has or receives
14   information relating to a Violent Crimes field
15   investigation not assigned to him will properly
16   forward the information to the assigned
17   detective for investigation and inclusion in
18   the Investigative File Case Folder."
19            Do you see that?
20       A.   I do.
21       Q.   Why was that paragraph necessary?
22       A.   It reinforces our longstanding, but
23   unwritten policy that everyone has an
24   obligation to pass on information.
```

234

```
 1            I mean, it's not just one person.
 2   We are all part of this team called the Chicago
 3   Police Department.
 4       Q.   I mean, would it happen at times that
 5   a detective working a case would obtain
 6   information that could have been relevant to
 7   another case?
 8       A.   I would be surprised if it didn't.
 9       Q.   So, based on your experience and
10   knowledge of how things worked in the
11   department, that happened, right, where
12   detectives would work a case and learn
13   something about another case, correct?
14       A.   Certainly.  I'm investigating a
15   violent crime and someone wants to tell me
16   about a narcotics.  Thank you.
17       Q.   Or, how about I'm investigating a
18   crime, the person I suspect may have done this
19   other crime that Detective Joe over there is
20   investigating?
21       A.   Sure.
22       Q.   Did that scenario happen?
23            MR. PATTERSON:  Objection, incomplete
24   hypothetical.
```

235

```
 1   BY MS. KEEN:
 2       Q.   Well, anyway, I think you answered
 3   that question.
 4            Was this Paragraph No. 6 designed
 5   to obligate detectives in that scenario to
 6   disclose information they learned in their
 7   investigation to the detective assigned to the
 8   investigation about which of that information
 9   was relevant?
10            MR. PATTERSON:  Objection, vague.
11            THE WITNESS:  I'll answer it.  And
12   I'll say all detectives have the
13   responsibility, even though they're not
14   assigned to a particular case, to forward
15   information that they have received.
16   BY MS. KEEN:
17       Q.   Now, even though this says Violent
18   Crimes Field Investigation, were Bomb & Arson
19   detectives governed by this requirement that if
20   a Bomb & Arson detective obtained information
21   in the course of his Bomb & Arson investigation
22   that was relevant to another Bomb & Arson
23   investigation, that the first Bomb & Arson
24   detective would have to disclose that
```

236

```
 1   information to the detective assigned to the
 2   other investigation?
 3            MR. PATTERSON:  Objection, form.
 4            MS. KEEN:  Let me re-ask because
 5   that's an important question.
 6   BY MS. KEEN:
 7       Q.   Just extrapolating from what you said
 8   a moment ago.
 9            If a Bomb & Arson detective
10   received information that related to a
11   Bomb & Arson investigation that another
12   detective was assigned to, was the first
13   Bomb & Arson detective obligated under Special
14   Order 83-2 to turn that information over to the
15   detective assigned to the Bomb & Arson
16   investigation?
17       A.   Yes.
18       Q.   Was the first Bomb & Arson
19   investigator, in other words, the one who
20   received the information, required to create a
21   document memorializing the information he had
22   learned for purposes of providing it to the
23   detective assigned to the case?
24       A.   I believe he could use his discretion
```

237

1  and simply communicate that to the individual.
2      Q.   Now, when the receiving detective got
3  the information, in other words, the detective
4  assigned to that Bomb & Arson investigation,
5  when that assigned detective got the
6  information, was he obligated to put that
7  information if it was relevant into a
8  supplementary report pursuant to Special Order
9  83-2?
10     A.   Yes, if it was relevant.  He may have
11 already disproved that information.
12              Yeah.  Thanks.  We already
13 checked that out.  Thank you very much.
14     Q.   Okay.
15     A.   So, at that point, there's no need to
16 document.
17     Q.   Although, in the vain of eliminating
18 possible suspects and running down leads, was
19 it the policy of the department to require
20 eliminated suspects to be identified in supp
21 reports?
22     A.   It was not.
23     Q.   As of 83-2?
24     A.   If a suspect was seriously considered

238

1  and was ruled out through investigative
2  activity, there should be some mention of it.
3      Q.   In the supp report?
4      A.   Correct.
5      Q.   Okay.  Does 83-2 say anything about
6  what's supposed to go into a supplementary
7  report?
8           MR. PATTERSON:  Why don't you review
9  it.
10          THE WITNESS:  No, it does not.  It
11 talks about placing it in the Investigative
12 Case Folder.
13 BY MS. KEEN:
14     Q.   Given that the department was aware
15 that information of substance about cases
16 wasn't going into supplementary reports prior
17 to the temporary restraining order, why didn't
18 the department prepare a special order that
19 told detectives to start putting that
20 information in their supplementary reports if
21 they weren't already doing so?
22     A.   I'm sorry.  My mind is starting to
23 wander.  Can you repeat that.
24          MS. KEEN:  Can you just read that

239

1  back.
2              (WHEREUPON, said Record was read
3               as requested.)
4        THE WITNESS:  Not every bit of
5  information merits inclusion in the
6  supplementary report.  Otherwise, it would be a
7  recording.
8           The detectives have discretion to
9  put down the most relevant parts of their
10 investigation.
11 BY MS. KEEN:
12     Q.   And I understand and I accept actually
13 the premise that the average run of the mill
14 detective was doing his best to record
15 information, you know, in an accurate and
16 comprehensive way.
17          I'm talking about the scenarios
18 that you saw that you testified about at the
19 Palmer hearing wherein some detectives weren't
20 putting information of substance, or important
21 information in the supp report.
22          And my question to you is given
23 that the department is aware that that was
24 happening, and they have this Palmer litigation

240

1  and they're revising their Special Orders, why
2  didn't they create some written directive that
3  said you got to put all this information into
4  your supp reports?  You can't keep leaving it
5  out.
6           MR. PATTERSON:  Objection, asked and
7  answered, form.
8           THE WITNESS:  You know, sometimes
9  there were competing needs.  One of the reasons
10 detectives use the back side of a Major
11 Incident Worksheet to describe the narrative is
12 because the supervisor is telling him to go
13 home because it's overtime.
14          And writing a supplementary
15 report takes longer than cranking out a one
16 paragraph synopsis.  And you come into work two
17 days after your days off and you kind of go,
18 well, it wasn't so important.
19 BY MS. KEEN:
20     Q.   So, the department felt that it would
21 be too overinclusive or onerous to create a
22 special order requiring -- ensuring that there
23 weren't these gaps in the supplementary
24 reports?

**241**

1    A.   I don't know why we didn't hammer home
2  writing more supplementary reports.  But to
3  have a supplementary report requirement for
4  every day you work on every case, you're going
5  to get a lot of saw nothing, it rained a lot,
6  and no one was home.
7    Q.   What about just saying a supplementary
8  report has to contain all relevant
9  information that's pertinent to the --
10   A.   We have that.
11   Q.   So, where is that?  What's that order?
12   A.   If you have additional information,
13  it's not an order.  That's the purpose of a
14  supplementary report.  If you have something
15  important, relevant to add to the
16  investigation, please share it.
17   Q.   Were there any changes from 1983,
18  January, onwards -- or strike that.
19        Were there any changes from
20  January, 1982, onwards to any of the written
21  orders that dealt in whole or in part with
22  supplementary reports?
23   A.   I'm not aware of any.
24   Q.   Okay.  Can I ask you one last

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

**242**

1  question.
2        This one document because it's
3  related, and I just don't want to -- this is a
4  previously marked Exhibit 13 so you have it.
5  It should be pretty quick.
6        Take a minute and let me know
7  when you're done?
8    A.   I know what this is.
9    Q.   What is this document?
10   A.   This is simply a memo from the Chief
11  of Detectives to the deputy chiefs and exempt
12  members of the Detective Division and to the
13  unit commanding officers of the Detective
14  Division on the subject of investigative files
15  and telling them there's a new order out and
16  the order applies to Violent Crime Field
17  Investigation, but also to all nonviolent
18  felony crimes assigned to field investigation.
19        In other words, a major safe
20  burglary, s-a-f-e, a property crime, a credit
21  card, a major one that's going to result in
22  felony charges -- or, excuse me, a field
23  investigation.
24   Q.   Because it specifically says

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

**243**

1  Bomb & Arson Section in there, I was wondering
2  if that was a change from the scope of 83-1?
3    A.   No.  I'll tell you why.  In another
4  document here, Bomb & Arson was specifically
5  brought in for the January, 1983 training.  So,
6  I thought the same thing when I looked at it.
7  And I said, oh, no, they were part of the
8  training originally.  So, they were part of
9  this from the beginning.
10   Q.   So, did this apply -- well, did this
11  apply to the Organized Crime Unit?
12   A.   No, it does not.
13   Q.   It then says a separate directive for
14  nonviolent felony crimes assigned to a field
15  investigation that's forthcoming.  What does
16  that mean?
17   A.   I don't know.  For nonviolent -- I
18  don't know.
19   Q.   Are you aware of a separate directive
20  for Bomb & Arson and other nonviolent felony
21  crimes regarding the subject of an
22  investigative files?
23   A.   No, I'm not.
24        MS. KEEN:  Okay.  I think we're going

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

**244**

1  to conclude now.
2        (Whereupon, the deposition was
3        concluded to July 31, 2014.)
4        -0-o-o-

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

245

```
 1   STATE OF ILLINOIS   )
 2                       )  SS:
 3   COUNTY OF C O O K   )
 4          The within and foregoing deposition
 5   of the aforementioned witness was taken before
 6   Jamye Giamarusti, C.S.R, at the place, date and
 7   time aforementioned.
 8          There were present during the taking
 9   of the deposition the previously named counsel.
10          The said witness was first duly sworn
11   and was then examined upon oral interrogatories;
12   the questions and answers were reported in
13   shorthand by the undersigned and transcribed
14   via computer-aided transcription.
15          The within and foregoing is a true,
16   accurate and complete record of all of the
17   questions asked of and answers made by the
18   aforementioned witness at the time and place
19   hereinabove referred to.
20          The signature of the witness was not
21   waived and the deposition was submitted
22   pursuant to Rules 207 and 211 (d) of the Rules
23   of the Supreme Court of Illinois to the
24   deponent per copy of the attached letter.
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

246

```
 1          The undersigned is not interested in
 2   the within case, nor of kin or counsel to any
 3   of the parties.
 4          Witness my official signature in and
 5   for Cook County, Illinois on this September 2,
 6   2014.
 7
 8
 9   Jamye Giamarusti
10   C.S.R. No. 084.004183
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

247

```
 1          C O R R E C T I O N   P A G E
 2          I made the following changes for the
 3   following reasons:
 4   PAGE LINE   CHANGE:
 5   ____ ____ _____
 6               REASON: _____
 7   ____ ____ _____
 8               REASON: _____
 9   ____ ____ _____
10               REASON: _____
11   ____ ____ _____
12               REASON: _____
13   ____ ____ _____
14               REASON: _____
15   ____ ____ _____
16               REASON: _____
17   ____ ____ _____
18               REASON: _____
19   ____ ____ _____
20               REASON: _____
21   ____ ____ _____
22               REASON:
23
24   (Signed)_____
25
26   SIEBERT & ASSOCIATES COURT REPORTERS, INC.
         (773) 851-7779 cmsreporters@comcast.net
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

248

```
 1          WITNESS CERTIFICATION
 2
 3
 4          I hereby certify that I have
 5   read the foregoing transcript of my deposition
 6   consisting of Pages 1 through 252, inclusive.
 7   Subject to the changes set forth on the
 8   preceding pages, the foregoing is a true and
 9   correct transcript of my deposition taken
10   on July 29, 2014.
11
12
13          (Signed) _____
14
15
16
17   SUBSCRIBED AND SWORN TO
18   Before me this _____ day of
19   _____, 2014.
20
21   _____
22   Notary Public
23
24   SIEBERT & ASSOCIATES COURT REPORTERS, INC.
        (773) 851-7779 cmsreporters@comcast.net
```

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net

249

```
 1    SIEBERT & ASSOCIATES COURT REPORTERS, INC.
 2              3768 North Oleander Avenue
 3                 Chicago, IL  60634
 4
 5    September 2, 2014
 6
 7    JONES DAY, by
 8    Mr. Chaka M. Patterson
 9    77 West Wacker Drive
10    Chicago, Illinois 60601
11    Re:  Kluppelberg vs. The City of Chicago, et al.
12         Dep:  JAMES HICKEY
13
14    Dear Mr. Patterson:
15         The deposition testimony given on
16    July 29, 2014 in the above captioned case has
17    been transcribed, and inasmuch as signature was
18    not waived, this is to advise that the
19    deposition will be available in our office for
20    30 days for reading and signing.
21         If you choose to read and sign the
22    deposition at our offices, please call the
23    undersigned for an appointment.  Our office
24    hours are from 9:00 a.m. to 4:00 p.m., Monday
25
26         SIEBERT & ASSOCIATES COURT REPORTERS, INC.
              (773) 851-7779 cmsreporters@comcast.net
```

250

```
 1    thru Friday.
 2         If you choose to make other
 3    arrangements for the reading and signing of the
 4    deposition, please advise us of the
 5    arrangements you have made in writing with 30
 6    days from the date of this letter.
 7
 8              Sincerely yours,
 9
10
11              Carol Siebert-LaMonica
12    CC: Ms. Roshna Keen (Original)
13        Mr. Chaka Patterson (copy)
14        Ms. Elizabeth Ekl (copy)
15
16
17
18
19
20
21
22
23    SIEBERT & ASSOCIATES COURT REPORTERS, INC.
24       (773) 851-7779 cmsreporters@comcast.net
```

251

```
 1                    I N D E X
 2    Witness:
      Examination
 3
 4     JAMES HICKEY
 5
            By Ms.  Keen                       3
 6
 7            E X H I B I T S
 8    Number                              Page
 9
            No. 1                           3
10          No. 2
                                          145
11          No. 3
                                          146
12          No. 4
                                          148
13          No. 5
                                          149
14          No. 6
                                          151
15          No. 7
                                          153
16          No. 8
                                          155
17          No. 9
                                          156
18          No. 10
                                          176
19          No. 11
                                          178
20          No. 12
                                          180
21          No. 13
                                          182
22          No. 14
                                          183
23          No. 15
                                          211
24          No. 16
                                          224
25
26    SIEBERT & ASSOCIATES COURT REPORTERS, INC.
            (773) 851-7779 cmsreporters@comcast.net
```



252

```
 1       No. 17
                                     228
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    SIEBERT & ASSOCIATES COURT REPORTERS, INC.
24       (773) 851-7779 cmsreporters@comcast.net
25
26
```

## Page 253

A
A(2) 226:19
a.m 1:18 249:24
Aberdeen 1:18
able 13:12
134:23 136:22
137:17 150:5
193:17
abortion 36:23
absolutely
81:24 138:5
233:6
abused 38:10
academy 17:6
accept 218:24
239:12
access 114:24
232:14
accidentally
182:11
accountability
65:8,9 227:3
229:5
accurate 29:16
30:24 217:23
239:15 245:16
accurately 88:8
197:12 230:24
231:24
accusation
32:20
accused 99:18
232:12,13
Acting 152:11
action 171:1,3
activities 21:24
39:4 50:9 51:8
149:14,23
150:2,4 211:4
activity 164:9
190:16,17
238:2
actual 36:2
111:6 115:12
166:18 197:13
222:12

add 104:22
230:2 241:15
added 39:24
40:9 43:23
44:8 46:3
addition 40:15
115:5 56:9
88:21
additional
29:18 82:9
150:11,19
194:13,17
241:12
address 62:14
73:16 76:16
85:10 98:4
108:22 109:1
110:6 117:18
addressed 210:4
addresses 26:13
addressing
199:4
adds 224:12
administrative
35:23 36:7
37:15 53:15
53:22 54:6,10
54:14,19,22
55:7 59:21
admissible
73:23,24
advantage
192:8
advise 249:18
250:4
aeration 130:4
affairs 207:5
affirmative
225:9 232:18
afield 47:22
aforementioned
245:5,7,18
afternoons 56:7
56:7
ages 76:18
aggravated

55:16
age 25:13 41:19
57:4 236:8
agree 9:2 138:1
192:9 196:17
197:22 214:9
214:13 215:3
215:8,19,23
220:1
agreed 186:11
agreement
159:22 187:4
agrees 216:1
ahead 7:3 92:2
101:13 120:17
123:2 133:1
138:14 139:21
aim 232:16
aims 80:11
airport 37:9,12
al 249:11
allegation 104:2
alleged 20:20
37:4
allegedly 90:9
ALLETTO
1:13
allow 102:8
allowed 131:8,9
229:3
allowing 137:7
alongside
114:12
altered 79:7
alternative
146:5 199:6
altogether
219:18
ancillary 169:24
170:5
and/or 132:4
215:10,16
216:11

announcing
169:19
annual 12:12,13
answer 24:9
31:13 32:24
56:17,17
86:17 89:16
89:19 91:10
98:11 113:3
123:8,19
128:8 130:24
131:1,7 133:2
135:4 137:13
138:16 139:3
161:7 167:14
235:11
answered 31:12
87:7 88:5,18
89:4 91:24
103:8 105:5
111:16 120:15
167:22 232:22
235:2 240:7
answering
101:11
answers 245:12
245:17
anticipate 63:18
anybody 94:12
111:9,16
166:17 177:5
177:7
anyway 9:11
apologize 11:11
70:19 176:16
217:11
apparent 144:5
APPEARAN...
2:1
appeared 2:7,13
22:8 202:15
146:9
appears 158:3
203:19
applies 242:16

apply 243:10,11
appointed 18:3
159:7,13
160:2
appointment
249:23
appreciate
68:21 73:19
83:11 173:2
175:18
approaches
110:8 199:6
appropriate
116:18 131:5
218:11
approval
226:16
approve 159:20
approved 60:16
60:23 105:1
174:9
April 148:23
151:20 176:20
181:17 186:1
area 9:22 111:4
132:8 134:8
areas 13:23 19:8
20:24 28:13
42:16,24 43:8
43:12 45:18
50:6,7,22 52:9
52:18 56:5
61:18,21 71:8
78:12 114:10
139:17 146:2
147:9,9 150:1
152:14 154:8
154:10,12,18
154:22 155:15
155:23 156:24
158:5 160:6
162:16 163:2
184:11,21
187:7 193:10
196:7 197:14
200:8,10
219:24
argument 79:2
80:1
arise 36:23
arrangements
250:3,5
arrest 164:16

## Page 254

113:10,11,23
115:18 118:22
121:16,21
132:7 138:20
138:20 139:11
141:12 144:13
148:18 151:21
152:8 154:2
155:9 158:17
168:3 184:9
184:13,14,20
185:2,13
187:23 194:7
194:13 196:4
196:5 198:21
202:3,9
203:21 214:3
219:14,17,20
219:24 231:2
areas 13:23 19:8
20:24 28:13
42:16,24 43:8
43:12 45:18
50:6,7,22 52:9
52:18 56:5
61:18,21 71:8
78:12 114:10
139:17 146:2
147:9,9 150:1
152:14 154:8
154:10,12,18
154:22 155:15
155:23 156:24
158:5 160:6
162:16 163:2
184:11,21
187:7 193:10
196:7 197:14
200:8,10
219:24
argument 79:2
80:1
arise 36:23
arrangements
250:3,5
arrest 164:16

198:7 226:16
arrested 119:8,8
159:7,13
160:2
160:9,16
103:7 120:14
127:2 129:1,5
133:13 134:16
136:2,9,14
143:9 167:21
163:3 167:5
223:2 232:21
240:6 245:17
asking 6:20
48:2 56:16
65:2 70:15,19
77:18,19
85:21
92:22 101:5
104:5 106:18
125:22 126:23
128:3 130:18
130:19 132:22
134:4 140:12
158:15 164:6
165:4 167:23
205:6,10 216:1
215:24 218:16
229:22
aspect 103:12
103:15 121:17
121:19
assassination
203:12
assault 46:2
assaults 55:16
assessment
215:20
assessments
215:5
assign 107:21
assigned 12:17
17:6,8 18:5,11
18:13 21:14
39:9 53:22
55:4 59:3
62:17 115:3
123:21 193:19

87:6 88:4,17
89:3,5 91:23
92:18 100:24
101:9,16
103:7 120:14
127:2 129:1,5
133:13 134:16
136:2,9,14
143:9 167:21
163:3 167:5
223:2 232:21
240:6 245:17
asking 6:20
48:2 56:16
65:2 70:15,19
77:18,19
85:21
92:22 101:5
104:5 106:18
125:22 126:23
128:3 130:18
130:19 132:22
134:4 140:12
158:15 164:6
165:4 167:23
205:6,10 216:1
215:24 218:16
229:22
aspect 103:12
103:15 121:17
121:19
assassination
203:12
assault 46:2
assaults 55:16
assessment
215:20
assessments
215:5
assign 107:21
assigned 12:17
17:6,8 18:5,11
18:13 21:14
39:9 53:22
55:4 59:3
62:17 115:3
123:21 193:19

233:15,16
235:7,14
236:1,12,15
236:23 237:4
242:23 248:18
243:14
assigning 227:2
assignment 38:2
43:1 67:16
97:8,13
197:11
assignments 4:7
36:11 68:2
assist 3:8
assistant 3:24
associated 73:7
53:8,10,13
86:22 90:21
92:22 101:5
104:5 106:18
125:22 126:23
ASSOCIATES
247:25 248:23
249:1,25
250:23 251:25
252:7 253:14
assume 6:12
145:10 188:12
197:11
assuming 216:1
assumption
175:11
assure 232:6,6
232:10
asterisk 86:8
88:13
attach 29:20
attached 27:1
27:17 31:10
245:24
attempt 135:5
156:17 157:1
attempting
164:5
attempts 181:10
attend 55:22
attendance
141:22
attention 114:7

207:8
attorney 14:8
100:22 102:9
159:19
attorneys 7:10
15:11 192:4
audit 153:21
154:15 156:1
156:4 172:17
172:24 182:19
auditing 208:7
213:9
August 18:3
187:23
authors 196:21
197:2 199:8
199:13
auto 43:2 46:3
65:15
available 31:1
58:2 79:14
137:15 249:19
Avenue 249:2
average 192:16
239:13
Aviation 37:23
aware 53:8,15
53:17 74:19
74:22 100:13
100:20 101:1
101:7,15
102:1,4,21
103:4,10,11
105:22 166:20
166:22 170:24
172:8 173:11
173:22 175:12
188:1 213:11
238:14 239:23
241:23 243:19

B
B 51:14,16,21
51:24 52:1,2,5
165:8 251:7
back 6:12 16:24
26:15 42:2

## Page 255

43:22 44:11
57:19 63:19
76:20 78:7
94:4 98:20
117:13 118:14
127:2,23
129:1,9 133:1
133:17 138:11
141:23 154:4
154:12 158:22
162:14 166:3
169:1 170:19
183:15 187:19
193:11 196:1
197:11,12
199:22 217:16
223:4,14
226:11 239:1
240:10
backing 172:21
backwards
184:16
bad 59:10 96:9
223:9
badly 178:7
bag 135:7
bank 80:10,11
80:13,14,17
bar 161:15
bars 139:21
based 12:19
30:13 65:2,21
89:21 90:14
113:16,16
136:10,14
197:3 203:18
basically 226:2
basis 29:15 38:6
59:19 195:16
229:21
beginning 44:5
67:15
big 9:7 207:9
Billiken 36:22
Bishop 85:10
bothering
190:22

battery 227:13
Beasley 66:14
beat 79:22
80:16 81:3
100:10
Becker 147:12
147:13
becoming 103:6
began 17:11
32:15 33:3
41:2
beginning 201:4
243:9
behalf 2:7,13,20
9:16 78:20
166:17
believe 23:8,23
52:2 78:6
52:17,19,24
53:8,13 54:1,9
47:8 50:9 51:9
52:10,19,24
53:8,13 54:1,9
69:21 75:14
75:21,22 76:2
76:7 121:18
121:22 132:5
138:20 139:4
139:5,10,15
140:7 141:4
141:14 142:19
144:17 150:3
200:19 207:16
224:8 227:17
235:18,20,21
235:22,23
236:9,11,13
236:15,18
238:21 244:23
243:20

bit 47:22 85:24
239:4
bits 194:14,17
196:8
blank 62:20,21
84:16
bleeds 8:17
blank 62:17
blue 35:15
blush 185:13
board 194:5,8,8
Bomb 19:8
22:17 41:10
41:14,22 42:1
42:4,8,10 46:4
47:8 50:9 51:9
52:10,19,24
53:8,13 54:1,9
69:21 75:14
75:21,22 76:2
76:7 121:18
121:22 132:5
138:20 139:4
139:5,10,15
140:7 141:4
141:14 142:19
144:17 150:3
200:19 207:16
224:8 227:17
book 117:12,15
117:20 119:20
119:20 121:24
booklet 82:24
bosses 43:12
book

bottom 59:4
174:2 184:18
198:12
bound 179:13
179:20
Box 83:3,4
boxes 60:18
62:11,24 63:4
84:16
Brady 100:4
145:23 199:14
201:18
break 9:10 49:4
57:13,17 94:2
175:22,24
176:3 183:10
184:1 204:14
222:4,5
brief 19:2 223:6
briefly 17:2
35:3,21 57:5
194:3 227:8
brilliant 76:21
broke 150:2
broken 43:13
brought 207:23
243:5
Brzeczek 40:1
40:10,14
440:10 168:22
Bud 36:22
budget 35:24
36:16
building 18:18
20:23 43:5
67:3 106:20
60:6 61:2,7
237:3 243:1,4
243:23,24

144:16 147:16
181:22 205:6
182:21 245:18
BURGE 41:7
burglary 43:2
46:2 60:15
68:18 242:20
BURNS 1:13
busiest 56:5
business 119:13
143:16 195:22
busy 12:22

C
C 226:6 245:3
247:1,1
C.S.R 1:20
245:6 246:10
cabinet 114:11
114:23 208:22
cabinets 7:18
call 24:17 28:2
54:21 61:17
68:17 71:9
75:3 80:1
81:19 98:13
106:21 107:12
120:18 113:11
128:1,4 137:4
128:18 130:2
156:10 164:24
186:21,22
195:20 205:13
221:10 249:22
called 3:16 19:15
19:18 38:4
40:23 53:14
44:9,16 56:1
56:14 78:17
59:16 61:19
92:21 100:14
226:24 208:20
227:14 234:14
CERTIFICA...
248:1
certify 248:4
cetera 25:24
126:2,8
128:21 134:20
155:16
calls 60:11,12
158:17 160:6
60:12
casework 36:3

## Page 256

canvas 111:16
capacity 6:1,6
6:16 48:3,4
77:23 101:11
216:2,8
217:13,18
219:2
captains 21:9
21:14
captioned
249:16
capture 79:10
car 62:15,16
90:4 111:2
card 195:23
229:1,3,6
242:21
care 109:11
career 16:24
26:21,24
Carol 250:10
cars 108:20
carted 173:22
case 7:14,22 8:2
8:11,23 12:10
15:7 23:22
24:19 28:21
29:1,1 30:2
53:8,9 54:5
58:9 72:16
73:5,6,7 74:17
74:19 78:22
79:16,20,21
80:2,3,4,5,6
81:2,18 82:8
83:2 86:23
87:5 93:23
96:19 97:19
99:4 102:11
102:12,17
103:20 105:13
107:7,12,15,15
108:22 108:10
109:17 110:4
110:5,20
111:19 112:5
112:13 114:18

114:19,21
116:10 121:1
121:9,16
121:16,18
123:13 148:18
142:10 143:9
145:22 158:18
158:10 159:1
160:16,17
162:21 165:4
168:10 174:5
174:13 175:6
178:11 182:24
184:3,14 188:3
188:11,17
191:11 192:10
194:7,12
197:14 198:23
200:23 206:22
219:10 222:19
226:14 227:6
227:11,20
233:18 234:5
234:7,12,13
235:14 236:23
237:3 239:15
242:1 243:5,6
246:2 249:16
case-by-case
221:8
cases 14:23 15:5
19:14 23:15,15
19:18 188:23
191:11 200:20
206:24 208:20
227:14 234:14

cat 135:7
catch 38:9
categories 29:0
category 29:10
29:14 45:22
47:12 91:16
caught 99:14
218:6
cause 76:9
109:10
caused 72:16
73:8,14
84:7 169:4
171:9 243:2
247:4
CC 250:12
caused 173:14
227:18 229:11
centered 43:8
Central 50:11
241:17,19
247:2 248:7
channels 102:7
Chapter 178:13
178:15 179:11
certainly 32:7
32:10 67:22
76:15 78:5
87:17 102:12
125:16 181:17
181:22 186:18
186:24 187:10
206:24 208:20
227:14 234:14

challenges
175:16
change 39:16
41:1,5,8,17
42:10 43:16
47:12 91:16
64:22 68:1
69:18 77:14
78:3 81:16
84:7 169:4
171:9 243:2
247:4
changed 18:15
39:24 44:18
34:1,22 36:8
37:4 49:11,13
59:24 49:1
50:5,7,8 51:19
52:7 58:7 64:9
64:14 66:7
changeds 102:7
Chapter 178:13
178:15 179:11
181:4,8,17,24
charge 19:11
21:5 37:20
50:6,7,8 51:19
52:7 58:7 64:9
64:14 66:7
148:13 226:8
charges 159:20
226:17 242:22
chart 41:11
chart 214:23,24
checked 237:13
checking 162:5
Chicago 1:14,15
1:18 2:6,19,21
chief's 20:20
29:12 31:17
31:24 33:14
chiefs 12:24,24
184:8,17,17
184:19 185:1
193:14 199:15
199:17,22
200:2 205:4,6
205:16 207:2
213:12 228:8
228:18 229:10
242:10
chief 18:18,20
178:15 179:11

cetera 25:24
126:2,8
128:21 134:20
155:16
calls 60:11,12
Chaka 2:17
249:8 250:13
challenge 162:2
208:21
challenged 32:9

167:15 207:5
210:15 216:2
234:2 249:3
249:10,11
chicken 174:21
chief 18:18,20
18:23 19:2
20:18 21:17
22:13,19,20
23:5 25:6
27:13,21 28:3
28:9,14 29:14
29:22,23 30:3
30:4,16,21,24
34:1,22 36:8
37:4 49:11,13
59:24 49:1
50:5,7,8 51:19
52:7 58:7 64:9
64:14 66:7
148:13 226:8
charges 159:20
226:17 242:22
chart 41:11
chart 214:23,24
checked 237:13
checking 162:5
Chicago 1:14,15
1:18 2:6,19,21
chief's 20:20
29:12 31:17
31:24 33:14
chiefs 12:24,24
184:8,17,17
184:19 185:1
193:14 199:15
199:17,22
200:2 205:4,6
205:16 207:2
213:12 228:8
228:18 229:10
242:10

## Page 257

185:2 242:11
**child** 17:14
**children** 74:24
**choice** 39:5
**choose** 249:21
250:2
**choosing** 133:7
**chronology**
33:23
**circumstances**
27:20 80:8,9
**city** 1:14,14
2:21 4:20 6:24
9:16 10:20
11:20 44:8
77:20 78:3,21
100:13 102:1
102:3,21
103:4,11,17
130:18,19
143:6 161:2
167:15 206:7
213:8 249:11
**City's** 128:14
218:11
**CITY-KLUP**
149:6 180:19
228:11
**CITY-KLUPP**
181:4
**City-wide** 171:1
**citywide** 19:2,6
220:2
**clarification**
125:12 174:15
**clarified** 168:23
**clarify** 27:10
169:4 215:2
**classification**
159:1
**classifications**
159:16
**clear** 16:13
19:22 25:4
44:2 47:21
51:1 58:6

73:19 93:1
121:11 127:24
133:6 141:8
169:18 178:11
220:18,19
221:4
**cleared** 159:4,8
159:10
**cleared/closed**
156:22 157:15
158:17,20,23
160:1,6,8,12
160:16 162:17
**cleared/closing**
198:11
**clearing** 164:11
**clearly** 159:17
**clerical** 115:4,5
227:3
**clinics** 36:23
**clipboard** 132:9
194:10
**close** 79:20
161:16 176:21
**closed** 159:6,9
198:23
**closely** 120:23
178:24
**closing** 164:16
**clue** 195:21
**cmsreporters...**
247:24 248:24
249:26 250:24
251:26 252:24
**co-authored**
145:22
**coat** 112:8,20
**code** 85:10
**codes** 174:22
**coffee** 221:8
**column** 20:2,3
**columns** 19:24
69:12
**combined**
180:22
**come** 6:12 18:24

23:2 58:23
62:4,12 78:8
108:8,11
109:24 110:11
117:16 154:12
221:15,16
240:16
**comes** 183:6
209:8
**coming** 112:4
204:15 213:18
**command** 37:19
38:18 48:18
50:3 52:23
60:13 172:9
184:3 206:15
**commander**
22:14,21 35:5
49:14 52:9,10
52:11,13,13
52:15 66:13
104:9,10,11
105:14,15,16
144:17,19
151:21 152:10
153:12,13
171:3 185:5
214:2,9
219:14 220:12
**commanders**
21:10,15 52:8
144:14 150:24
184:9,14,18
185:2 213:12
**commanding**
147:22 172:18
210:5,7,9
225:23 226:2
242:13
**comment** 86:6
**comments** 80:11
**common** 40:11
62:8 81:12,17

120:4 144:6
221:24
**commonality**
189:5
**communicate**
130:15 134:12
196:10 237:1
**communication**
157:1 191:5
229:15,18
**communicati...**
111:13
**communities**
6:17
**community**
17:7 34:8
43:10 65:21
**comparable**
224:4
**compared**
140:11
**competing**
240:9
**compiled** 197:2
**complaint** 57:2
57:3,6
**complete** 124:2
166:15 230:15
230:20 232:2
245:16
**completed** 30:7
30:10,15
37:24 156:12
**completely**
165:23
**complex** 85:5
86:21 107:17
**compliance**
226:20
**composed** 50:22
**compound** 95:9
99:6 117:1
134:4 207:17

245:14
**concentrated**
17:1,18
**concern** 26:13
17:21
**concerned**
158:4 205:16
201:22 206:1
208:11,16
**conclude** 244:1
**concluded**
244:3
**conclusion** 8:8
**conduct** 76:5,6
85:5 136:23
**conducted**
141:10 143:2
**conducting**
155:16 176:22
**confusing** 54:24
**connect** 69:14
166:1
**conjectures**
17:20
**collision**
168:19 186:19
**conjectures**
14:4,5,21
196:24 217:1
212:17,18,21
222:22 213:2
213:3,15,16
213:19,20,23
214:4,5,21
216:24 217:1
217:19 218:14
218:15 219:2
219:15,16
223:21,22
224:9,10,13
225:3,4,6,10
225:11 226:17
226:20 227:23
227:24 228:7

245:14
**concentrated**
17:1,18
**concern** 26:13
17:21
**concerned**
158:4 205:16
201:22 206:1
208:11,16
**conclude** 244:1
**concluded**
244:3
**conclusion** 8:8
**conduct** 76:5,6
85:5 136:23
**conducted**
141:10 143:2
**conducting**
155:16 176:22
**confusing** 54:24
**connect** 69:14
166:1
**connection** 33:6
68:6 89:1,12
**considerably**
32:8
**considered** 39:2
43:19 237:24
**consisting** 248:6
**consult** 125:17
**contact** 85:9
**contains** 25:24
106:16 117:10
217:7 241:8
**contained** 4:21
248:9
**containing**
218:19 232:19
**contains** 222:15
222:17

## Page 258

**content** 90:12
148:4 194:4
**contents** 115:12
132:2 162:16
213:9
**continue** 133:7
133:19 151:4
**continuing**
217:17
**control** 23:13
37:15 40:8
149:15 221:24
229:1,6
**Controls** 208:7
**convened** 4:14
**conversation**
131:12 199:21
200:1
**conversations**
65:3 166:14
201:2
**conveyed**
208:23
**Conway** 71:10
**Cook** 1:21
246:5
**copies** 22:2 23:9
23:10,13,13
23:14,20
113:8,8 117:8
194:12
**cop** 4:12 149:9
22:13,13,14
22:18,20,20
62:2,7 178:21
**copy** 4:12 149:9
22:13,13,14
22:18,20,20

216:8 217:12
217:18 219:1
264:5:2 9:18
9:19 11:4 13:9
14:23,24
15:14 16:3,4,6
16:7 21:8
27:19 30:17
32:16,21 33:4
33:8,10 42:11
42:15,17,20
43:17,21
44:24 49:17
49:23 51:11
52:4 57:8,18
57:19 60:9
65:18 73:16
74:17,20,24
77:10 79:9,23
81:23,23
82:13,15,16
82:22,24 83:1
83:6,12 84:1,8
84:11,18,23
84:11,18,23
84:18,22,23
85:14 86:14
94:22,23 96:3
100:3,17,18
105:18 107:18
115:19 112:9
117:6,18 118:4
118:15 119:22
120:22 121:9
122:11,12,23
125:14,15,18
125:19,21
122:20 227:23
227:24 228:7

169:12,24
170:1,5,6,8
171:13,16
172:2,3 173:6
173:7,9,10,14
181:2 184:9
184:10,12,14
184:17,18
188:12 191:10
191:14 194:1
194:2 197:8,9
197:14,15,20
199:4,8,9,19
200:14 203:1
203:23,24
208:13 209:14
210:6 211:5
211:19 212:11
212:17,18,21
213:2,15,16
213:19,20,23
214:4,5,21
216:24 217:1
217:19 218:14
218:15 219:2
219:15,16
223:21,22
224:9,10,13
225:3,4,6,10
225:11 226:17
226:20 227:23
227:24 228:7
228:9 229:1,8
229:11 230:13
230:14 231:13
231:19 233:9
233:9,10
234:13 238:4

162:7
**counsel** 206:9
207:7 229:16
240:15 246:2
**count** 59:22
78:7,12
**counting** 78:13
**country** 159:21
**County** 1:20
162:4 197:17
**couple** 12:11
162:8,14 17:7
63:2 113:9
143:1 146:5
151:23 155:19
194:6 196:18
224:11,14
**course** 26:11
29:21 61:22
84:21 85:23
86:18 87:20
99:12 117:6
113:22 183:9
148:11 155:19
163:21 168:24
181:7 185:22
186:21 187:20
188:19 189:2
221:13 245:23
249:1,23
250:23 251:25
251:2,4
**courtroom**
15:19 168:22
244:10 45:4
70:5 132:2
**credibility**
215:10
**credible** 93:18
93:19 215:13
**credit** 242:20

**CR** 57:8
**cranking**
240:15
**crazy** 93:17
**create** 19:8 37:8
38:3 39:1
56:14 71:4,9
71:14 77:15
78:21 82:2
86:13 87:19
92:12 103:21
179:7 190:22
230:13 231:10
232:18,19
236:20 240:2
240:21
**creates** 29:19
41:23 42:4,8
42:21 44:22
45:9,19 46:18
59:2,6,20
61:15 67:13
81:23 69:22
76:12 77:1
79:8 81:1,11
85:22 88:2
94:7 105:9,18
107:10 141:5
144:22 145:2
156:11 169:23
170:7 174:20
189:12 212:4
**creating** 37:20
231:5,9
**creation** 37:9
44:10 45:4
47:24 61:1
70:5 132:2

## Page 259

**crime** 12:16,21
13:23 27:9
30:20,20 32:7
32:9 34:3,4
35:22,24 36:4
36:6 37:4
39:24 40:3,6,9
40:23 41:1
42:23 43:23
44:8,10,11,19
44:23 45:4,19
45:22 46:18
46:23
47:13,24
49:12 58:16
62:18 65:17
67:12 68:2,15
69:16 71:7
77:8 78:5,8,13
78:16 79:3,6
80:10 83:13
84:3 89:2,13
90:10 91:3
106:13 113:14
113:15 115:21
115:23 116:4
123:16,20,24
142:9 147:8
147:22 159:7
185:14 198:13
200:22 223:6
225:2 226:15
234:15,18,19
242:16,20
243:21
**crimes** 9:22
10:11,14,16
11:3 12:16
18:7 19:1,5
22:15 23:6,23
29:4 35:7,10
35:12 36:4
40:3 42:20,21
43:9,10,10,14
43:14,15,19
44:20 45:3,15

45:21,22 46:5
46:6,19 47:11
47:12,14,15
51:11 52:16
52:17 55:5,18
55:19 62:6
68:3,24 72:5
78:14 80:14
114:10 150:7
157:16 159:1
198:24 203:3
226:8 227:12
233:14 235:18
242:18 243:14
243:21
**criminal** 7:16
62:13 106:11
192:4
**criteria** 136:16
**culminated**
226:15
**cure** 131:16
**curious** 72:14
**current** 46:10
46:12
**currently** 3:19
212:10
**cute** 31:19
**CV** 1:6

— **D** —
**d** 245:22 251:1
**D-E-A-S** 104:13
**daily** 21:21
**Dan** 18:8
**dare** 189:21
**date** 58:6 59:5
73:16 85:9
98:4 146:12
193:9 211:15
213:6 245:6
250:6
**dated** 148:23
151:19
224:2 216:19
56:9 71:14
83:19 98:20

108:7 110:3
113:9,9
116:16 117:13
145:10 146:16
154:17 167:11
190:6 193:8
211:16,18
241:24 248:18
249:7
**day-to-day**
196:15 219:19
**days** 23:2 56:8
108:10 112:4
124:2 155:19
155:20 164:17
164:18,22
204:21,23,23
204:24 206:23
206:23 240:17
240:17 249:20
**dead** 76:18
109:12 216:16
**deal** 9:7 32:20
46:13 51:13
207:9
**dealing** 32:15
44:13 45:18
**deals** 160:11
**dealt** 46:18
95:20 241:21
**Dear** 249:14
**Deas** 104:13
153:13
**death** 7:17 12:8
72:9,12 76:6
83:12 89:22
92:20 93:3
101:3,12
102:6,16
103:18 104:21
107:6,21
119:24 126:22
132:5 134:7
140:5 141:19
143:18,21,23
133:16

**decision** 179:18
197:7 221:12
**deep** 161:13
**Defendant** 2:20
**defendants** 1:16
2:14 138:7
**defense** 102:9
192:4 232:16
**deficiencies**
131:17
**define** 26:11
**defined** 187:9
**defines** 212:6
**definite** 98:7
**definitely** 8:20
**definition**
197:23
**delete** 133:21
**deliberate**
192:21
**denominator**
81:12,17
**deny** 137:8,17
249:12
**department**
3:22 6:2 15:6
17:1,3 29:3
32:14,19
37:23 39:18
42:17 44:3
48:4 56:21
58:12,24 59:2
59:17 62:3
68:6 76:17
77:21 79:14
83:18 85:5,8
87:10 89:20,24
109:20,21
147:8 170:22
175:4 178:15
203:9 231:9
238:12 241:12
243:15 245:20

166:18 167:5
167:16,16,19
169:9,14
170:10,16
172:8 173:13
183:18 195:19
200:18 205:21
205:24 206:4
206:5 207:6,6
207:20 208:24
209:13 210:16
210:19,21,24
216:2 229:16
232:5 234:3
234:11 237:19
238:4 249:18
239:23 240:20
**department's**
23:16 81:21
**department-...**
30:22 207:13
208:9 209:1
210:2 212:1
**departmental**
143:16
**deponent**
245:24
**deposition** 1:17
3:1 4:13 8:9
11:24 14:4,22
15:4 16:2,5,17
37:23 39:18
42:17 44:3
48:4 56:21
58:12,24 59:2
59:17 62:3
68:6 76:17
77:21 79:14
83:18 85:5,8
87:10 89:20,24
109:20,21
147:8 170:22
175:4 178:15
203:9 231:9
238:12 241:12
243:15 245:20

## Page 260

249:19,22
250:4
**depositions** 12:3
15:9 53:9
**deputy** 22:13,20
38:16,22,23
39:9,19 41:2
49:8,19,23
50:5,5,6,8
51:18 52:7
66:7,10 67:22
105:14 144:14
144:15 145:24
149:13,24
150:15 167:9
177:6,13
181:22 184:17
184:22,23
185:2,7 205:8
55:24 56:2
**describe** 20:5
120:5 144:7
154:13 187:2
204:15 240:11
**described** 33:15
47:15 52:24
63:23 68:1
97:7 138:24
139:9 187:8
**describing**
21:20 196:22
**description**
53:21 90:3
94:16 95:17
63:3,4,5
**designed** 84:17
229:8 235:4
229:11 235:4
**designee** 36:8
**desk** 194:12
**despite** 221:14
**destroyed** 94:18
170:18
**destruction**
212:6
**detailed** 29:5
**details** 59:14

110:15
**detective** 1:9,10
120:24 125:17
139:23 140:3
140:6,13,14
141:12 142:6
143:24 144:13
144:14,19
146:2 149:16
150:12 151:21
152:14 155:9
156:24 158:17
158:24 165:19
165:20 167:11
175:4 178:15
179:1,19,21
184:8 187:3
187:18,22
193:1 207:2
200:9 207:2
201:15,16
207:10,13
211:13,24
212:2,14
214:3,20
220:13 222:11
222:23 224:5
224:9 233:9
233:13,17
234:5,18
235:7,20,24
236:1,9,12,13
236:15,23
237:2,7,13
237:23 242:12
**detective's**
94:11,15
106:6 129:23
124:19 139:23
**detectives** 18:19
18:23 20:18
21:18 23:3
26:18,19
25:7 27:8,13

18:20 119:16
120:24 125:17
139:23 140:3
140:6,13,14
141:12 142:6
143:24 144:13
144:14,19
146:2 149:16
150:12 151:21
152:14 155:9
156:24 158:17
158:24 165:19
165:20 167:11
175:4 178:15
179:1,19,21
184:8 187:3
187:18,22
193:1 207:2
200:9 207:2
201:15,16
207:10,13
211:13,24
212:2,14
214:3,20
220:13 222:11
222:23 224:5
224:9 233:9
233:13,17
234:5,18
235:7,20,24
236:1,9,12,13
236:15,23
237:2,7,13
237:23 242:12
183:24 196:11
197:18 198:10
203:3 207:2
207:10,13
211:13,24
212:2,14
214:3,20
220:13 222:11
222:23 224:5
213:21

27:22 28:10
28:14 30:3
34:2 35:11,18
41:20 43:18
44:13,18
45:14,17,20
46:8,9,18,20
46:23 47:2,5,7
54:10,14,18
54:18,21,23
58:4,8 59:19
62:3 64:9,14
66:7,10 76:8
77:7 80:7 81:1
81:3,8 82:2,4
83:21 84:2,10
84:18 85:7,14
86:7 87:11,19
90:13,20 91:1
93:6 96:5,6,8
96:13,19 97:5
100:10 102:4
107:4,17
110:18,19,22
112:21 119:1
120:11 120:12
121:14 122:18
122:20 123:18
122:23 123:21
123:23 124:9
124:4 130:14
139:22,23
**development**
4:2 7:15 59:3
147:14 208:6
**developments**
19:13,14
**devised** 58:19
**diary** 87:9
**died** 159:20
**difference** 28:24
174:18
**differences**
23:14
**different** 14:19
24:1,21 47:6
49:5 50:17
60:4,22 70:1
110:7 114:23
120:20 121:8

192:14 193:9
193:24
195:15 198:22
199:16,17
199:18 205:6
212:20,24
213:12 214:14
217:9 218:21
242:13
**detectives' 79:6
79:11
**determination**
219:22
**determine**
72:12 76:8
146:2 161:3
167:17 172:10
**determined**
29:18 31:2
133:16 203:19
**develop** 165:9
**Development**
4:2 7:15 59:3
147:14 208:6
**developments**
19:13,14
**devised** 58:19
**diary** 87:9
**died** 159:20
**difference** 28:24
174:18
**differences**
23:14
**different** 14:19
24:1,21 47:6
49:5 50:17
60:4,22 70:1
110:7 114:23
120:20 121:8

121:15 122:7
122:22 124:3
147:6,9 154:7
154:7,8 174:6
179:3,3 187:6
187:7 194:10
205:14 206:23
206:23 214:14
218:16 219:17
**direct** 172:6 197:7
**directed** 38:3 200:7 209:12 210:8
**directing** 150:18
**direction** 33:5 166:23 168:7 172:23,24
**directive** 182:15 209:9 211:22 240:2 243:13 243:19
**directives** 53:19 95:4,10 177:18 232:6
**directly** 8:11 38:13 145:24 157:18
**director** 3:24 4:4
**dirty** 225:19
**disagree** 215:5
**disagreed** 214:18,19,22
**disciplinary** 56:20 57:2
**discipline** 189:4
**disclose** 235:6 235:24
**disclosed** 166:8 192:3
**disclosing** 102:6
**discounted** 190:5
**discovered** 107:14
**discovery** 5:20
**discrepancies** 159:7 157:2 158:5 203:20 205:18
**discrepancy** 157:14 160:15
**discretion** 236:24 239:8
**discuss** 144:11
**discussed** 69:10 95:6 145:4 147:23 156:23 206:24 221:8
**discussing** 73:12
**discussion** 168:8 174:19 177:15 183:8 182:22 186:4 186:5 190:11 202:16
**discussions** 13:24 67:20 182:1
**displeasure** 220:14
**Disposed** 198:10
**dispositions** 99:3,24
**disprove** 190:7
**disproved** 237:11
**disproven** 218:4
**dispute** 197:19 218:23
**disrupt** 92:24
**distill** 121:12
**distinct** 77:2
**distribution** 60:20
**district** 1:1,2,19 1:20 24:14 34:13 35:2,8 37:12,13,14
**districts** 37:20
**dividing** 72:11
**division** 1:3,4,2 13:5,14,15,17 17:13,19,20 36:19 39:22,24 39:22,22,24 40:19,22,22 40:23,24 41:13,15 42:11,13 43:7 43:20 44:23 45:5 46:11 47:3 49:9,12 49:13,16 50:2 60:17 61:10 62:7 63:14,22 65:6 66:12,13 66:18,21 67:8 67:11,15,19 70:24 71:2 81:19 102:23 105:2 113:7 113:16 120:21 121:1 139:23 140:3,14 141:13 142:6 142:7 143:24 146:16 150:12 151:22 155:10 159:13 166:4 159:18 160:16 169:19 160:21 181:24 184:8 184:20 200:13 203:3,22 207:3,12,15 207:15,22,24 208:2,7,13,17 209:6 211:13 211:24 212:2 212:14 214:3 223:21,24 224:2,5 233:8 242:12,14
**divisions** 40:21
**document** 4:18 22:24 27:6 28:12 77:1,5,6 96:20 110:11 145:21,22 146:7,9,15 147:3,4 149:8 149:11,12 152:18,19 155:7 156:7 156:19 157:6 157:23 163:22 176:11,12 177:3 178:12 178:14 180:10 180:12 181:1 181:8,9 183:1 183:3 193:24 204:8 211:23 213:23 215:9 221:17 225:20 230:8 231:13 236:21 237:16 242:2,9 243:4
**documents** 5:19 6:3 7:9,21,23 8:1,11,22 11:23 13:2 14:3,19 19:4 28:8 29:18 31:11 118:10,21
85:22 108:12 108:14,18 118:16,19 143:5,13 144:22 145:1 145:13 146:14 148:5 148:22 151:5 162:24 163:3 163:6 169:24 170:5 175:20 180:20,22 182:10,13 183:1,19 184:8 197:17 202:5 221:7 231:10
**doing** 33:12 35:21 58:4 94:21 98:17 122:13 134:21 134:22 160:5 137:21 204:19 204:21 205:10 222:11 228:15 222:18 235:15 238:21 239:14
**door** 65:18 111:17 119:5
**doors** 108:1
**double** 80:10
**doubt** 115:9
**downtown** 18:17 22:12 43:5 71:9,21 72:3
**drafted** 36:17 179:23 228:9
**drafting** 33:7
**dragging** 138:17
**dramatically** 18:16
**drawer** 114:11 115:6,7,8,14 115:17 116:1 116:18,18,21 117:7,11 118:10,21

**drawers** 115:9
**drive** 2:18 90:5 249:9
**driven** 113:6
**Drug** 38:4,5,12 38:15 39:7
**duck** 229:20
**DUFFIN** 1:10
**duly** 3:7 245:10
**duplication** 194:20
**duties** 35:3 53:23 54:19
**duty** 189:22

**E**

**E** 247:1,1 251:1 251:7
**e-mail** 5:4 210:21
**earlier** 63:23 69:10 158:3 171:10 183:17 190:11 195:2 227:2 230:22
**earliest** 181:9
**early** 15:15 18:24 40:1 214:24
**easier** 78:19
**easiest** 8:8
**East** 2:11
**EASTERN** 1:3
**easy** 7:7
**edified** 60:17
**efficient** 189:8 189:10
**efforts** 65:5 78:23 166:15 167:10 188:16 207:20
**eight** 5:9,11,15 47:14 71:24 109:15,16 191:6
**either** 6:13 24:16,23 42:5 111:19 161:20
**EkI** 250:14
**elected** 77:12
**eliminated** 165:12 237:20
**eliminating** 157:6 215:15 216:11 237:17
**Elimination** 156:21
**Elizabeth** 154:1
**else's** 57:8 205:20
**emphasis** 231:8
**employed** 3:19
**employee** 6:1
**employees** 1:14 209:10
**ended** 33:7
**enforcement** 215:11
**engaged** 188:9
**Englewood** 17:6 34:8,13,20 35:2,8,14
**enlightening** 194:20
**ensure** 105:17 170:11,17 175:4 226:13
**ensuring** 240:22
**entire** 2:16 133:6,17 171:20 210:15 219:5
**entirety** 11:2,20
**entitled** 132:14 135:13 155:8 178:12
**entrenched** 243:11
**entry** 20:4
**envelopes** 20:16
**era** 20:12 21:15 40:1 41:16 42:7 78:7 179:4,18 209:24
**erroneous** 217:8 178:23
**especially** 23:1 48:6
**establish** 48:8
**established** 25:23 70:7 132:19
**et** 25:24 36:22 144:8 155:16 249:11
**evaluate** 193:18
**evaluating** 5:8 5:14 115:21
**evaluation** 32:12
**evaluations** 215:11
**Evans** 15:7
**event** 20:5,5 24:6 26:20 28:4 40:15 80:10 211:20 242:11
**events** 24:4 36:20
**everybody** 140:2 221:1 223:20
**everyone's** 85:9
**evidence** 10:5 119:15,17 166:2 189:13
**exact** 42:5
**exactly** 101:4 146:15 162:20 178:8 251:2
**examination** 106:2 251:2
**examined** 3:7 245:11
**examiner's** 108:16 109:6
**example** 24:9 91:13 102:17 106:19 110:10 110:17,18 120:15 124:3 130:21 140:9 165:10,21
**examples** 156:8 164:15
**exceeds** 122:1
**exception** 10:21 11:3 55:21 136:4 212:10
**excited** 42:2
**exchange** 123:10 124:21
**exchanged** 121:21 195:15
**exclamation** 86:5 88:13
**excuse** 117:9 143:23 174:15 197:11 199:12
**exempt** 143:22 143:23 144:13 144:22 145:17 147:19 172:18 242:11
**exhibit** 3:1 4:11 145:15,19 146:19,20 148:7,11 149:1,2 151:12,16 152:19 153:1 153:5,8,11,13 155:1,6 156:11,14,18 163:1 176:5,9 177:10,10 178:2,6 180:14,19 187:1,3 182:16,23 183:12 193:24
201:14,15,18 202:20,20,21 209:17 211:6 211:8,12 213:22,22 222:8 224:18 224:22 228:1
**exist** 107:3 118:19 120:5 136:4 212:10
**exited** 42:2 112:14 123:15 130:3 137:4 172:1
**existence** 23:18 95:5
**existing** 50:21 61:15 63:17 94:22 205:11
**exists** 223:2
**expect** 24:15,19 25:9 72:20 76:1,11 91:3 91:21 92:11 92:19,20 93:12 111:21 121:13,20 132:21 136:15 138:6 174:20 140:16 141:4 174:24 198:14 214:19 234:9
**explain** 28:19 50:19 131:15 149:10 160:14 173:5 209:22 222:21 227:8
**explained** 64:18 131:18

**explains** 46:4 221:18 224:24
**explicit** 156:8
**exploring** 157:6
**explosive** 52:21 53:11 140:9 141:14
**expressed** 221:20
**expression** 221:6
**extensive** 26:5
**extent** 88:15 172:6 219:6
**extradition** 159:22
**extrapolating** 236:7
**extremely** 135:6 136:5

**F**

**facilitate** 58:13 78:13 87:1
**fact** 75:19 90:12 91:5 92:13 98:8 103:4 127:6 172:20 172:22 187:12 190:20 221:15
**fact-finding** 205:9,10
**factors** 98:4
**facts** 73:11
**failed** 195:1
**fair** 8:13 65:21 65:24 66:19 93:5 123:6,9 123:16 187:12 189:1 192:19 215:6,7 219:12,20,21 229:9
**faith** 137:7 196:22
**false** 216:24
**familiar** 13:7 71:4 149:7 171:11
**familiarity** 48:9
**fancy** 229:3
**far** 28:15 31:6 47:22 173:16 187:19 194:4 204:4 220:24 230:1
**fastest** 210:18
**favorable** 188:21,22
**fax** 20:13 210:22
**FBI** 200:16
**fear** 149:8
**feedback** 228:18,21 229:9
**feelings** 214:16
**fell** 204:20
**felony** 226:17
**female** 118:6
**Festival** 36:21
**festivals** 36:21
**fewer** 49:24
**field** 12:17 18:16 35:4 37:15,21 50:20,20 51:13,21,21 54:21,24 146:1,1 225:2 233:14 235:18 242:16,18,22 243:14
**Fields** 12:4 15:7 16:5,13,17
**figure** 113:19 121:11 143:14 207:12
**figured** 98:23
**figuring** 193:6
**file** 15:5 24:17 24:23,24 26:17 33:18 96:20 100:16 100:21 102:23 103:6 104:4,6 104:19 105:2 105:7,10 106:5,6,6,6,15 107:2 108:15 109:20,22 110:11,16,23 110:14,16,17 112:14,17,17 114:4,4,4,22 114:23 115:4 115:12,13,15 116:8,9,10,16 116:20,21,23 116:23 117:2 116:23 117:7 117:6,7,8,10 117:16,17,18 118:2,9,10,20 118:21 119:21 119:23 120:20 120:24 121:1 121:3,5,14 121:15,21 121:23 122:3 122:10,11,12 122:19,24 123:3,7,13
182:2,2,24 186:21,22,24 187:20 188:3 189:6 194:21 194:24 195:1 195:12 196:5 196:20 210:17 198:1 203:4 203:21,22 212:5 213:1 221:22 225:24 226:2,13 227:6,16,20 228:24 233:18
**file-based** 81:22
**files** 13:6,20 15:10 23:21 25:10,23 32:10,15,21 33:3,7,13 63:24 106:2,3 176:1 228:6
**filed** 58:2 62:23 70:10,20 121:4 223:1
163:4,4,4,5,23 166:13,18 167:18,23 169:8,12 170:5,12,16 170:17 171:14 171:19,19,19 172:10,19,19 173:14 178:13 184:4 186:9 186:13,17,17 186:17,17,22 187:19,23 188:2 189:4 189:12,17 192:6,8 193:4 196:23 197:12 200:7,17 205:6 207:17 208:24 209:22 210:1 213:20 219:8 219:9 222:1 225:6 229:2 236:18 245:10
**filing** 21:10

**final** 130:4 155:24 156:12
**Financial** 51:11 150:7
**find** 53:18 61:15 81:11 96:11 96:16 108:17 109:4 111:15 117:14 125:5 145:9 164:13 167:6 202:12 204:2,11
**finding** 109:9
**findings** 156:8 193:11 199:15 199:17
**fine** 6:16 7:3 9:6 9:8,12 24:10 26:2 48:15 74:11 127:22 129:13,15,17 132:23 216:6
**fingerprint** 116:4
**fingerprints** 53:7
**finish** 135:14,17 136:2 201:6
**finished** 4:16 33:23 71:16 74:20,22 75:4 75:7,13,20 77:5,11,20 78:13
**firm** 2:9
**first** 3:6 4:5
102:1,3,20 103:10 108:8 122:1 123:22 125:13 143:20 146:3 148:3 154:17 155:22 169:13 172:15 173:18 180:11 180:24 181:6 183:1,3,6,18 185:13 193:23 204:2,11
**fit** 4:11,10 67:4
**fitting** 136:16
**five** 4:23 5:7,8 74:23 113:8 176:1 228:6
**fixed** 53:6
**fix's** 95:15
**flip** 226:11
**flow** 92:24
**folder** 106:7
**following** 136:16 211:2 213:17 229:10 247:2,3
**follow-up** 35:11 147:19,20
**followed** 53:6 170:23 173:1 183:6
**foregoing** 245:4
248:8
**forever** 198:8
**forgetting** 51:10
**forgot** 13:17 177:9
**form** 14:1 27:6 58:17,22 59:8 59:13,15,18 59:24 60:4,5 60:14,15,16 60:22,22 61:16 64:23 68:20 70:10 73:1 78:4,13 79:10 82:13 83:22 84:5,17 84:23 86:23 91:7 96:22 102:10 114:1 118:23,24 120:13 121:24 122:24 123:17 124:8 131:20 131:22 132:15 134:1,2 135:19 140:1 161:7 162:9 170:7 174:20 175:19 176:2 192:5 197:1 214:1,4,21,22 222:13,23 224:3,13,23 228:8 236:3 240:7
**formal** 44:9 61:2 112:18
**format** 42:21,23 44:12,19 69:23 98:8,9 98:13,18,22 107:1
**formed** 53:6
**formerly** 66:1,1
**forms** 58:12,13 115:8,11
68:8,10 70:5,8 76:20 77:14 78:3,18,21 79:5,13 81:3 83:3 97:23 118:12 119:1 119:4 120:9,21 121:15 124:15 129:2 130:23 133:8,18,19 135:4 137:14 137:23 146:14 138:12,14,16 217:13 220:5 223:15
**forum** 214:23 215:4,6
**forward** 129:15 129:21 130:23 133:8,18,19 135:4 137:14 137:23 146:14
**found** 82:24 163:3
**foundation** 25:2 25:19,21 32:17,22 33:9 48:7 59:9 61:19 64:24 70:3,13 72:24 73:2 74:2,4,10 96:21 102:24 105:19 118:11 122:3,23 124:9 126:12 126:15 128:12 128:17 131:23 132:17,18 133:18,19 135:16 141:18 143:23 144:1 169:22 208:21 219:1 220:5 223:15
**frame** 51:1
**framed** 207:24
**FRANCES** 1:13
**Frank** 102:14 103:21 189:19
**frankly** 109:7 120:2 179:9 208:1
**free** 20:4
**frequently** 24:5 62:12,21 87:22,24 114:9 126:6 122:22
**Friday** 250:1
**front** 135:3 137:23 223:24 224:22
**frustration** 154:6
**full** 207:17
**fully** 230:24 231:23
**function** 161:9 227:3
**further** 4:10 9:9 167:6 190:20 198:20
**future** 208:8
**fuzzy** 45:8

**G**

**G** 247:1
**gang** 40:3 45:3 45:15 46:19 46:24 47:24
**gangs** 40:7 44:14 45:9 46:14 140:24
**gaps** 240:23
**garbage** 94:19 171:21
**gathered** 119:16
**gathering** 72:4 231:6,12
**general** 10:3,4 43:1 79:16,19

Page 265

| | | | |
|---|---|---|---|
| 79:21 82:10 | 16:14 54:9 | 209:11 211:24 | 133:22 175:24 |
| 82:15,16,21 | 70:2 71:23 | going 4:24 5:4 | grew 40:21 |
| 95:6 121:1 | 73:4 98:2,24 | 9:7,10 14:17 | grievance 73:21 |
| 129:5,7 | 126:15 128:13 | 26:7,9 31:2 | group 50:20,20 |
| 161:18 162:21 | 158:2,13 | 33:20 35:1 | 51:9,14,21,21 |
| 171:4 174:1,2 | 166:22 191:21 | 43:22 44:11 | 58:19 61:9 |
| 174:10,12,13 | 209:23 217:8 | 48:13 59:14 | 63:13 66:6,18 |
| 174:14,16 | 218:21 238:14 | 60:8 67:13,21 | 146:1,1 |
| 210:10 | 239:22 249:15 | 70:13,14 | 149:14,23 |
| generalities | gives 156:7 | 76:20 95:14 | 150:3,4 211:4 |
| 126:18 | 192:14 219:5 | 106:1 110:2 | 211:4,22,23 |
| generally 58:21 | giving 15:17 | 110:13 125:8 | 226:1 29:8 42:2 |
| 94:14 126:5 | 131:14 164:17 | 127:7,15,16 | 48:17 59:12 |
| 186:3 199:11 | global 93:2 | 128:7,23 | 63:20 68:21 |
| generate 177:18 | go 4:10 7:3,22 | 129:18,19 | 124:4 140:12 |
| generated 13:22 | 32:1 33:22 | 130:23 131:7 | 172:5 180:24 |
| 119:12 168:24 | 34:2 37:7 | 137:1,12,14 | 192:20 197:16 |
| genesis 64:6 | 48:11 65:18 | 138:1 145:12 | 202:19 216:3 |
| 109:22 | 70:16 72:4 | 146:18 148:3 | 221:3 |
| genuine 65:5 | 74:11 92:2 | 149:5 151:4 | guessing 56:17 |
| 165:18 168:14 | 93:24 101:13 | 158:13 165:19 | GUEST 1:12 |
| 220:23 | 106:23 108:6 | 176:3 184:18 | guilt 99:18 |
| geographic | 109:20 110:1 | 190:8 200:13 | 232:12 |
| 24:23 43:7 | 114:5 115:13 | 215:21 221:19 | gun 62:14 80:12 |
| 66:2 | 115:24 120:6 | 221:21 226:24 | gut 214:16 |
| geographical | 120:17 123:2 | 228:5 229:15 | guy 195:5 |
| 43:11 61:11 | 129:15 130:23 | 238:16 241:4 | |
| George 1:10 | 131:6 133:1,8 | 242:21 243:24 | **H** |
| 102:12 103:9 | 133:19,20 | good 3:11,12 | H 251:7 |
| 172:15 | 137:23,24 | 57:12 67:9 | H-A-N-H-A-... |
| germane 191:23 | 138:4,14 | 79:17 96:9 | 18:21 |
| getting 136:1 | 139:21 151:6 | 117:18 137:7 | H-I-C-K-E-Y |
| 170:12 171:18 | 162:4 170:19 | 165:18 175:11 | 3:18 |
| 218:6 228:19 | 179:21 187:14 | 175:15,17,21 | half 5:13,15 |
| 229:10 | 183:7,20 | 188:21,22 | 155:12 |
| Giamarusti | 187:20 196:1 | hammer 241:1 | hand 78:6 |
| 1:20 245:6 | 197:8 200:7,9 | hand 78:6 | 114:18,20 |
| 246:9 | 197:8 200:7,9 | hand-carried | handy 108:9 |
| give 24:8 28:17 | 202:15 212:1 | 20:10,18 72:3 | held 4:3 104:8 |
| 40:12 73:11 | 226:4 230:1,7 | hand-off 136:13 | 105:16,21 |
| 90:22 113:12 | 230:8 240:12 | hand-to-hand | 144:9,23 |
| 171:4 175:24 | 240:17 | 111:7 | 183:8,22 |
| 177:10 214:15 | goes 60:16,19 | handed 182:4 | 185:24 202:16 |
| given 12:4 | 65:16 105:1 | handing 145:19 | Hello 71:10 |
| 14:22 15:3,9 | 194:19 199:3 | handle 54:6 | help 14:18 |
| | | hands 102:8 | 58:20 79:3 |
| | | handwriting | |

Page 266

| | | | |
|---|---|---|---|
| 93:22 100:24 | 118:10 156:22 | identified 65:14 | 240:18 241:15 | 20:24 |
| 143:13 | 157:15 187:23 | 73:6 136:7 | 249:12 | includes 9:24 |
| helpful 73:16 | 187:24 191:9 | 220:20 | impressed 96:7 | including 21:3 |
| helping 93:21 | 194:5 | identifier 20:1 | impression | 36:20 94:20 |
| 93:22 | homicides 24:13 | 81:18 | 12:20 87:14 | 132:6 207:16 |
| hereinabove | 24:21 25:1 | identify 116:10 | impressions | inclusion |
| 245:19 | 56:6 72:8 | 146:5 | 79:6,11 85:14 | 100:15 213:1 |
| Hermitage | 114:6,16 | identifying | 85:18 86:22 | 233:17 239:5 |
| 74:16,20 75:4 | honest 15:8 | 14:18 | 87:1,4 88:16 | inclusive 248:6 |
| 75:7,13,20 | 40:13 99:13 | identity 91:4 | improper 164:2 | incomplete 25:3 |
| 121:17 | hood 195:5 | 92:8,12 | improve 203:4 | 90:15 91:8 |
| hesitant 139:6 | Hopkins 206:9 | 165:21 166:8 | 228:17 | 92:16 121:24 |
| Hickey 1:17 3:5 | hospital 223:8 | 194:8 | improvements | 124:9 126:13 |
| 3:18 7:5,5 | hot 108:6 194:8 | hour 151:10 | 74:4 | 130:9,20,20 |
| 8:23 195:3 | 194:8 | house 29:4 | inadmissible | 234:23 |
| 249:12 251:3 | hours 20:2 | 2:19 245:1,23 | 7:4 | incorrectly |
| high 56:4 76:15 | 21:4 24:5 | 246:5 249:10 | inappropriate | 160:2 |
| 114:17 161:15 | 30:9 63:2 | house 29:4 | 128:17 137:18 | incriminating |
| high-level 206:3 | 70:16 72:1 | inadmissible | inasmuch | 90:10 91:2,6 |
| higher 108:11 | 77:9 108:7 | 7:4 | 74:21 | 91:19,22 |
| 109:15,16 | 109:15,16 | imagine 20:13 | incident 19:18 | 92:10,14 |
| 205:5 209:3 | 123:22 145:8 | 112:3 171:2 | 19:20 21:5 | 93:12,13 |
| 229:24 | 191:6 249:24 | immediately | 22:2,5,5 23:7 | independent |
| highlights 19:12 | hoping 76:17,17 | 155:18 183:6 | 23:17,20 | 17:8 145:15 |
| Hinchy 149:12 | house 76:18 | 201:8 227:23 | 24:11,16,20 | 145:15 |
| 211:3 | human 6:19 | impeach 160:15 | 25:18 26:17 | independently |
| Hinchy's 167:9 | hypothetical | impeachment | 26:23 27:3,14 | 6:7 |
| hiring 206:8 | 164:3 | 164:3 | 27:21 28:10 | indicate 58:11 |
| history 106:11 | imperfect 86:9 | implement | 28:10,30:16 | indicating |
| 91:8 92:16 | 97:4 108:6 | 221:19 225:14 | 60:1,7 61:2,7 | 232:8,11 |
| hold 111:1 | 109:3,7 | implementing | 68:13 69:4,11 | individual 6:1 |
| 128:9 222:3 | 111:19 138:23 | 145:20 163:1 | 69:15 70:1,20 | 6:16 7:12 |
| home 240:13 | 138:24 175:5 | implication | 71:24 72:7,22 | 23:21 25:10 |
| 241:1,6 | 155:3 156:16 | 134:24 | 75:8,14,22 | 25:15 31:2 |
| homicide 12:8 | 176:7 178:4 | implications | 76:12,13 77:2 | 43:9 48:4 |
| 18:5 42:24 | 181:8,20 | 208:10 | 77:3 120:9,12 | 60:21 66:11 |
| 46:2 55:14,18 | 191:9 192:1 | **I** | 203:6,8 | 134:5 136:5 |
| 56:8 65:14 | 192:10 224:24 | idea 165:17 | 222:10,13,23 | 138:6 159:18 |
| 68:17 71:4,5,6 | 236:5 239:20 | 203:23 229:6 | 223:14 240:11 | 162:6 175:4 |
| 71:9 79:15 | | identification | include 101:17 | 193:10 213:12 |
| 80:22 81:6 | | 3:3 62:17 | 101:19 188:16 | 216:1 237:1 |
| 89:22 98:16 | | 145:17 146:22 | 190:1 191:12 | individually |
| 112:9 114:14 | | 149:8 149:3 | 192:10 242:24 | 2:14 6:23 |
| 115:6,8,13,17 | | 151:14 153:3 | | individuals |
| 115:19 116:1 | | 156:15 166:15 | | 193:9 |
| 116:17,21 | | 176:7 178:4 | | inform 129:3 |
| 117:7,9,11 | | 181:14 211:10 | | inform 24:3 |
| | | 224:20 228:3 | | |

Page 267

| | | | | |
|---|---|---|---|---|
| informal 157:1 | 225:1 230:14 | 82:23 83:4,6,9 | intramural | 198:6 200:17 |
| informally 77:7 | 230:23 231:6 | 149:18 228:23 | 123:4 | 214:17 216:17 |
| 195:15 | 231:11,23 | intact 149:22 | introduce 74:8 | 225:2 226:15 |
| information | 232:7,11,14 | 167:24,24 | introduces | 227:15,18 |
| 7:16 10:7 | 232:20 233:14 | 170:18 212:11 | 172:16 | 231:7 232:4 |
| 25:14 29:5,9 | 233:16,24 | 220:18 | introduction | 233:15,17 |
| 29:10,14 | 234:6 235:6,8 | integrated | 228:23,24 | 235:7,8,18,21 |
| 61:23 69:24 | 235:15,20 | 180:12 | 119:18 | 235:23 236:2 |
| 71:18 72:21 | 236:1,10,14 | integrity 38:8 | inventory 10:6 | 237:4 239:10 |
| 77:8 78:22 | 236:20,21 | intended 232:5 | investigate 35:6 | 241:16 242:17 |
| 79:3 80:1 | 237:3,6,7,11 | intending | 55:5 159:2 | 242:18,23 |
| 81:16,22 82:1 | 238:15,20 | 197:10 | investigated | 243:15 |
| 82:3,9,9 84:1 | 239:5,15,20 | intensity 174:24 | 243:23 | investigations |
| 84:6,7 85:4,9 | 239:21 240:3 | intent 220:16 | 55:15,15,19 | 7:17,17 11:15 |
| 89:21,23 90:8 | 241:4,23 | 221:3,5 | 56:2 89:1,12 | 12:17 17:12 |
| 92:7 93:10,22 | informative | intention 138:3 | 90:11 | 17:13,16,18 |
| 95:1,7,21 96:9 | 23:1 | inter-watch | investigating | 19:12 72:9,13 |
| 96:14,15,19 | informed 99:21 | 106:16 | 45:14 47:7 | 82:22 86:21 |
| 97:1,16 99:3 | 99:24 | interactions | 79:7 123:15 | 100:18 101:18 |
| 99:10,11 | initial 37:3 | 156:23 | 124:23 234:14 | 101:20 103:14 |
| 100:1,14,21 | 144:20 154:16 | interest 28:23 | 234:17,20 | 107:18 114:7 |
| 101:17,19,22 | 173:5 184:2 | 30:21 72:15 | investigation | investigative |
| 102:7,8 103:5 | 185:17 | interested 30:5 | 108:8,12 118:9 | 13:6 15:10 |
| 103:16,22 | initially 200:21 | 109:8 246:1 | 114:2 25:16 | 17:22,24 |
| 104:17,22 | initiated 226:14 | interesting | 118:23 216:10 | 32:10 33:17 |
| 108:18 109:19 | 227:2 | 112:12 174:5 | investigative | 39:10,16,20 |
| 111:5 114:5 | inner-office | interject 16:12 | 13:6 15:10 | 40:20 41:3,7 |
| 117:9 121:8 | 214:11 | 217:10 | 17:22,24 | 42:14 43:24 |
| 122:7,10,14 | innocence 99:18 | Internal 208:17 | 32:10 33:17 | 44:22 46:1 |
| 122:16 123:11 | 232:15 | interoffice | 39:10,16,20 | 94:17 100:4 |
| 124:21 158:12 | insert 179:14 | 20:16 | 40:20 41:3,7 | 148:10 186:23 |
| 161:4 163:10 | inserted 230:10 | interrogatories | 42:14 43:24 | 143:4,11 |
| 163:22 164:1 | inside 54:1 | 64:9 47:2 | 44:22 46:1 | 145:18 146:23 |
| 165:3 166:4 | 114:12 | interrupt | 94:17 100:4 | 147:3 158:19 |
| 170:11 171:14 | instance 47:17 | 176:24 | 148:10 186:23 | 187:6,8,10,13 |
| 171:23 173:21 | 109:5 115:20 | interrupting | 143:4,11 | 188:10 226:1 |
| 188:2,10,24 | 164:11 196:18 | 177:12,16 | 145:18 146:23 | |
| 190:9,12,13 | 188:22 196:18 | intervening | 147:3 158:19 | |
| 190:23 191:23 | instances 59:13 | 164:21 | 187:6,8,10,13 | |
| 192:2,22 | 59:15 122:20 | interview 92:7 | 188:10 226:1 | |
| 194:14,18 | 124:16 125:23 | 106:14 | | |
| 195:14 196:9 | 164:14 165:3 | interviewed | | |
| 197:3 203:20 | 130:24 | 169:6 188:4,6 | | |
| 217:7 218:3 | instruction | 189:5,7,14 | | |
| 218:20 222:16 | 152:17 153:15 | interviews 88:3 | | |
| 223:2,3,12 | 123:4 | 192:12 198:3 | | |

Page 268

| | | | | |
|---|---|---|---|---|
| 164:9 165:20 | 207:23,24 | 102:13 103:9 | 83:24 84:9,24 | 189:16 192:18 |
| 169:12 170:4 | 213:19 | 112:9,10 | 85:1,19 86:16 | 197:5 199:24 |
| 170:16 172:19 | issued 5:20 59:8 | 249:7 | 87:15 88:9,20 | 201:15,16 |
| 178:13 181:22 | 79:14 148:15 | Joseph 66:14 | 89:5,9,15 | 202:4,10,15 |
| 182:2,24 | 149:16 160:21 | put 11:23 | 90:20 91:9 | 202:18 204:2 |
| 185:8 190:16 | 160:24 161:6 | jotted 90:13 | 92:1,21 93:4,8 | 204:6,17 |
| 194:24 205:7 | 166:12 167:8 | judge 15:18 | 93:24 94:4,5 | 205:23 207:18 |
| 212:5,9 213:1 | 170:21,22 | 74:9 127:14 | 95:12 97:5 | 207:19 209:19 |
| 213:16 | 172:15 201:9 | 127:16 128:1 | 99:7 101:4,24 | 211:1,2 216:3 |
| 220:7,18,23 | 213:10 220:8 | 128:4 135:3 | 102:18 103:4,8 | 216:7 217:14 |
| 228:24 229:4 | 228:8,19 | 137:5 148:14 | 103:13 104:15 | 217:20,22 |
| 233:18 238:1 | 233:5 | 233:5 | 105:24 109:10 | 219:11 220:10 |
| 238:11 242:14 | issue 6:9 244:11 | judgment 28:2 | 110:21 116:12 | 220:11 222:7 |
| 243:22 | 244:20 | July 1:19 244:3 | 117:5 118:11 | 224:17,21 |
| investigator | investigators | 248:10 249:16 | 120:16 122:4 | 228:4 231:18 |
| 24:9 | 102:5 122:22 | issuing 169:9 | 123:5,18 | 233:3 235:1 |
| investigators | 123:11 124:4 | Itasca 2:12 | 124:11,13 | 235:16 236:4 |
| 102:5 122:22 | 124:23 126:10 | June 17:5 | 125:10 126:14 | 236:6 238:13 |
| 123:11 124:4 | 138:9 139:4 | investigation | 126:23 127:5 | 238:24 239:11 |
| 124:23 126:10 | 139:19 139:4 | 46:1 | 128:9 129:23 | 240:19 243:24 |
| 138:9 139:4 | justifiable 80:15 | justifiable 80:15 | 129:6,12,20 | keep 59:22 |
| 139:19 | 80:22 115:7 | juvenile 17:9 | 129:6,12,20 | 77:17 112:18 |
| investigator | 115:9 | | 131:12 132:5 | 123:16 124:20 |
| 24:9 | **J** | | 132:21 133:20 | 125:19 129:18 |
| | James 1:4,17 | **K** | 133:9,20,24 | 127:19 157:14 |
| | 3:5,14,18 7:6 | K 3:18 245:3 | 134:6,17 | 162:14 167:10 |
| | 7:8 249:12 | Keen 2:4 3:10 | 134:15,19 | 173:21 198:18 |
| | 251:3 | 3:13 5:3,10,16 | 135:14,17,20 | |
| | Jamye 1:20 | 5:24 6:17 7:4 | 139:20 141:18 | |
| | 245:6 246:9 | 8:7,15 24:9 9:4 | 143:4,11 | |
| | January 42:22 | 9:9,13,14 11:1 | 145:18 146:23 | |
| | 201:8 | 11:6,7,17,18 | 147:3 158:19 | |
| | Jeanette 91:11 | 14:13,14 | 138:12,13 | |
| | involves 72:16 | 16:16,19,23 | 139:20 141:18 | |
| | 74:19 | 18:11,20 25:4 | 143:4,11 | |
| | involving 63:24 | 26:1,4,14 | 145:18 146:23 | |
| | 126:9 183:19 | 31:13,14 | 148:5 148:16,23 | |
| | irony 177:17 | 33:11 44:4,6 | 149:13 151:14 | |
| | irritated 108:2 | 48:5,16 51:2 | 155:19 156:4 | |
| | issuance 168:1 | 57:14,16,19 | 156:9,17 | |
| | 213:17 229:10 | 57:20 59:10 | 158:21 160:1 | |
| | issue 34:2 | 59:11 62:1 | 162:3,11 | |
| | 58:22 120:3 | 64:4 168:17 | 164:4 168:17 | |
| | 144:1 147:23 | 174:17 175:23 | 174:17 175:23 | |
| | 157:14 163:21 | 176:8 178:5 | 176:8 178:5 | |
| | 167:20 177:15 | 180:17 182:9 | 180:17 182:9 | |
| | 182:2 185:14 | 183:7 185:16 | 183:7 185:16 | |
| | JON 1:7 | 187:2 190:6 | 187:2 190:6 | |
| | Jones 2:16 | 191:1 82:14 | 191:1 82:14 | |
| | | 183:21 206:16 | 79:1 82:14 | |

84:1 90:4,21
109:19 161:3
166:12 213:9
240:17
kinds 55:12
58:1 82:1
84:14 85:22
86:1,13 89:20
89:23 118:8
124:16 136:12
218:12
KIVETZ 2:10
129:16,21
135:3,10,15
133:22 138:6
183:20 201:13
217:10,15
Klupperberg
1:4 3:14 7:10
8:2 249:11
knew 67:21
108:23 118:5
163:9 221:1
knock 107:24
know 4:15 6:9
8:6,10 14:22
17:1 20:13
22:9 23:13
26:5,11,12
28:3 29:3
30:11 37:22
38:24 40:11
40:13 41:12
45:9 46:13,17
47:9,10 48:6
51:3 52:3
53:10 54:12
56:3,17 65:7
66:15 69:7
73:18 76:14
78:4 80:19
83:6 85:5
87:9,10 90:2,6
91:12 93:17
103:24 104:5
109:14 116:1

117:13 118:5
118:24 119:2
119:14,19
130:2 131:8,9
133:9 133:24
134:8,21
136:10,21
138:1,12
140:24 144:20
147:10 150:13
152:15 153:6
154:2 155:19
156:15,16,22
163:7,14,18
167:14 169:16
171:6 174:5
174:23 175:19
175:23 176:14
176:15 177:8
177:21 178:23
180:21 181:16
181:16 185:22
186:2 187:22
189:19 190:5
191:5,17
193:9,15
198:8,17
199:10 201:22
204:11 205:8
206:12,17
208:17 211:14
213:5 219:13
220:17 223:11
228:21 229:7
229:23 233:2
239:15 240:8
241:1 242:6,8
243:17,18
knowing 117:15
knowledge 60:3
77:19 101:6
101:10 103:3
141:2,7
205:20 234:10
knowledgeable

135:7 136:6
known 76:16
190:7 192:18
149:19 167:1
167:4
knows 135:6
174:22

**L**

L 1:12
lab 34:4 35:22
36:5 115:23
116:4
laboratory 34:3
115:21
lack 120:4
132:16,18
144:6
lacks 136:19
172:14
Lefkow 74:9
117:14
left 4:6 28:6
34:1 112:19
112:20 158:3
led 52:9,10
216:16
leg 190:7
legal 207:5
233:1
length 70:9
LEONARD 1:7
lesser 47:16
227:12
let's 6:15 12:3
16:24 24:17
51:4 78:9 80:1
110:18 114:13
114:18 127:2
127:19 128:18
129:1,8
143:12 165:10
179:6,7 181:3
182:21 201:23
202:15 204:13
letter 245:24
250:6
letting 127:17
128:5

207:6 229:16
lawsuit 169:9
lay 70:13
leadership 21:2
24:4 29:2
leads 216:23
218:12 231:18
learn 81:16
234:12
learns 90:24
leaving 240:4
led 52:9,10
216:16
Lefkow 74:9
117:14
left 4:6 28:6
34:1 112:19
legal 207:5
233:1
length 70:9
LEONARD 1:7
lesser 47:16
227:12
letter 115:22
lineup 70:12
launching 130:1
Laverty 102:14
102:19 103:20
103:21 105:13
143:15,21
148:16 169:8
179:6,7 181:3
182:21 201:23
202:15 204:13
Laverty's 221:1
Law 2:9 15:11
37:9 206:4,5

level 28:22
76:15 104:9
119:17 170:22
177:14 173:13
208:2
levels 205:14
library 229:3
lieutenant 34:6
34:7,14,18,19
35:2,4,7,14
36:12,13,15
52:17,17,18
52:20 53:3
171:3 226:7,9
lieutenants 21:9
21:12 47:1
52:16 66:15
life 194:16
lifespan 198:2,6
liked 39:3
likelihood 80:17
limited 10:1
132:6 208:12
line 29:7
lineup 11:4
lined 34:16
lineup 10:5
list 21:11
194:22
listing 216:23
217:7 218:19
219:5,5
lists 168:12
169:18 196:1
literally 113:7
195:10
literature 53:18
litigation 5:21
6:14 7:11 14:5
239:24
little 35:24 45:8

47:16,21
54:24 85:24
130:3 143:4
located 7:20
20:20
location 10:1
98:4 132:3
158:10
locations 122:7
lodge 215:22
lodging 127:13
LOEVY 2:3,3
log 19:9,15,16
19:19,20,21
21:5 22:2,5,11
23:7 24:11,16
24:20 25:18
26:17,23,23
28:1,2,10
29:19 30:16
68:13 69:11
69:15 70:2,21
71:14,14 72:7
72:22 75:8,14
75:22 76:13
77:3 221:24
logs 10:6 23:17
22:21 23:21
27:18
long 4:3 17:2
21:17 42:1
70:15 71:15
83:14 97:12
133:4
longer 23:10
240:15
longest 108:24
longstanding
233:22
look 5:16 6:19
7:9 12:7,24
13:6,21 41:12
55:1 112:5
117:17 161:16
162:24 198:19
202:13 207:11

207:21 208:24
209:16 211:12
looked 4:17
6:18 12:11
14:9 15:24
61:22 62:9
68:10 160:8
163:2 194:1
202:5 204:9
211:6,14
213:6 243:6
looking 5:12
19:4 33:3 62:5
106:14 125:7
194:3 195:6
205:21 216:22
216:16
looks 9:23
155:20 191:16
218:7 239:24
lose 15:8
losing 44:15
72:22 75:14
lot 32:10 35:24
36:18 47:23
58:16 59:13
59:14,24 60:1
60:2,7 61:2,7
68:13 69:4,11
70:1,20 71:7
71:24 72:6,21
75:8,14,22
76:12 77:1,2
120:9,11
lower 185:4
lucky 117:18
lunch 94:3
lying 87:14

**M**

M 2:17 249:8
ma'am 11:9
12:11 36:10
42:12 57:24
211:7
machine 20:13
210:20
machines

210:22
Madison 206:9
mail 20:16
main 20:15
maintain 7:15
115:16 230:15
230:20 232:2
maintained
7:19 115:4
161:12 198:2
211:6,14
213:6 243:6
maintaining
229:5
maintenance
203:4 226:1
major 19:1,5,12
19:13,18,20
21:2,5 22:2,5
22:5 23:7,16
23:20 24:11
24:15,20
25:17 26:16
26:23 27:3,14
27:18,20
28:10 30:16
36:20 58:15
58:16 59:13
59:14,24 60:1
60:2,7 61:2,7
70:1,20 71:7
71:24 72:6,21
75:8,14,22
76:12 77:1,2
120:9,11
203:6,8 222:9
222:13,23
224:10 240:10
242:19,21
majority 122:20
making 65:20
103:3 125:8
128:4,11,17
137:21 138:2
173:19 198:11
management

25:14 113:12
172:9 173:12
managerial
manner 158:16
manila 106:7
manner 158:16
223:13
manual 179:7
marching 169:4
mark 87:11
170:3 176:2
178:3
marked 3:2
4:11 145:16
146:21 148:8
149:2 151:13
152:19 153:2
155:2,5
156:15 176:6
178:3 180:15
182:17 183:13
201:17 211:9
224:22 230:2
242:4
marking 146:19
Maryland 104:3
59:14,24 60:1
60:2 125:6,24
material 95:14
materials 232:7
232:11,14
matter 3:15
match 39:9
29:10 98:8
128:10 158:11
matters 221:12
230:21 232:3
McCormick
McMahon
172:15
McMillen
116:20
medical 108:16
116:6
meeting 143:22
144:4,5,9,12
144:20,23

38:9 41:11
48:5 57:1
59:12 65:11
70:12 73:18
79:2,11 84:7
87:9,10 92:22
93:21,21
96:10 97:21
101:18 109:13
109:23 114:3
117:23 122:2
127:7 129:24
135:23 137:19
140:24 158:23
162:1 165:14
168:4,9,15
171:22 175:8
176:23 186:13
188:5 189:17
191:2 192:15
193:5 197:16
201:3 203:7
204:11 208:4
214:23 217:3
219:8,22
220:21 223:12
225:19 226:5
231:19 234:1
234:4 243:16
means 10:6
117:15 122:13
144:2 159:6
160:1 168:15
198:6 210:11
210:18 215:16
meant 44:7
101:5 222:21
measly 116:16
116:20
medical 108:16
116:6
meeting 143:22
144:4,5,9,12
144:20,23

145:4,8,11
146:17 147:7
147:18,19,21
183:18 184:2
184:7,19
185:5,18,23
186:3 193:4,9
193:8 197:8
meetings 166:15
168:20 206:2
206:3,11,14
207:21 221:9
Meigs 37:15,22
member 83:12
members 67:18
142:5 143:22
143:24 144:13
233:7 242:12
memo 103:21
103:21 104:6
104:18 105:7
105:9,13,16
105:21 143:16
143:21 145:9
148:16 153:8
153:17,18,17
156:20 157:12
157:22 158:4
160:11,18
163:14 169:8
182:14 184:3
186:14 192:1
194:4,5,23
196:22 199:19
203:19 211:3
217:6,24
218:24 219:22
242:10
memoranda
13:19,21 14:1
102:14,20
106:16,16
107:10 140:21
191:17 193:19
191:3,4 203:6
203:8 213:18

221:1
memorandum
14:1 102:20
104:3 150:11
150:19 151:20
176:15 186:9
214:4
Memorandums
176:13
memorialization
155:21
memorialized
145:4 218:13
memorializing
236:21
memory 12:15
150:8
memos 10:2
57:10 135:8
153:22 160:18
163:12 188:13
190:21,21,24
196:8 202:22
208:5 219:7
mental 79:6,11
85:14,17
mention 168:7
195:1 238:2
merits 239:5
message 167:10
195:3,8
210:18
messages
194:23
messy 179:12
met 207:5,6,7
methods 32:12
199:4
MICEK 1:11
MICHAEL
1:10
middle 85:11
midnight 108:3
midnights
107:23 108:5

112:5
midway 37:13
37:21
migrating 95:7
mind 239:13
Milton 15:19
15:14
109:13 153:13
168:21
mind 204:15
238:22
mindset 171:9
171:10,11
172:1 190:20
190:22
minor 227:15
minute 94:1
242:6
minutes 176:1
mirrored
120:23
mirrors 178:24
miscellaneous
163:6
mischaracteriz...
103:1
mishandle
189:1
mishandling
188:24
misimpression
176:2
misspelled
123:5
mistyped 232:1
misunderstan...
191:23 220:2
204:23 227:19
model 43:8
44:18 61:11
64:10,17 66:2
modified 76:21
moment 25:13
51:12 189:19
192:9 236:9
Monday 230:9
monitor 212:15
monitored

158:11
month 185:23
months 8:6
16:10,11,15
34:21 143:2
201:2 228:6
morning 3:11
3:12 18:24
19:3 20:10
21:23 71:16
229:11
morphed 51:23
mother 74:23
motion 13:16,6
106:6 118:4
169:23 187:6
205:13
move 196:20
move 36:18
129:2 133:16
133:18 137:13
143:9 158:16
moved 43:7
66:12 159:21
movement
36:17 132:3
moving 65:9
modified 130:3
mugshots
106:13 119:2
multiple 15:11
75:11 107:3,5
107:18 123:20
124:3,22,24
126:9,10
135:2 138:18
138:24 140:17
142:1,3,23
180:22 204:21
204:23 227:19
myself 34:1
80:15
Murphy 153:12
muster 124:12

**N**

N 247:1 251:1
name 3:13,17
46:10,12
53:24 62:13

66:13 69:8
78:4 81:15
83:3,4,5 85:11
90:3 102:13
112:9 117:16
169:15 174:3
191:18 194:6
209:11
named 2:14
245:9
names 88:24
89:10,17
106:6 118:4
169:23 187:6
205:13
narcotics 17:14
38:10 40:7
44:14 45:3,6
45:14 46:6
48:1 140:24
234:16
narrative 78:19
97:24 110:7
186:6
natural 67:3
nature 28:24
57:5 86:10
105:7
necessary
233:21
need 41:12
59:16 61:13
74:7 76:23
84:20 109:15
110:1 121:4,4
120:12 124:18
needed 75:21
153:21 157:24

needing 150:10
needlessly
190:17
needs 11:10
63:18 121:7
125:9 161:23
189:4 203:4
240:9
negligent 119:5
neither 168:5
NELSON 1:11
never 31:9
40:13 79:10
143:9 163:12
164:10 166:8
171:8,8 175:9
188:5,9
new 37:9,20
38:3 60:14,15
64:9,17 71:11
82:6,9 108:10
110:5 111:23
141:19 169:19
175:5 182:10
221:20 225:12
228:8 230:10
230:11 231:17
232:18 242:15
newly 149:15
Nicknames 90:4
night 11:12
71:17 108:1
No.13 1:6
nomenclature
54:23 120:4
186:19
non-departm...
58:13 59:7
nonviolent
242:17 243:14
note 8:9,11
102:14,20
106:16,16
106:16,16

107:23 108:10
115:15 146:13
194:10
north 1:18 2:5
50:7,11,20
51:16,19 52:1
52:2 146:1
150:1 249:2
Northern 1:2,19
Notary 248:22
note 86:6 91:4
95:7 112:2
162:5,8
231:12
notebook 169:2
179:15 202:14
noted 77:23
notes 10:2 31:4
31:6,9,17
101:18 103:18
115:11 195:20
202:11 206:2
214:7 251:8
numbered
120:20
numbers 165:18
178:11 202:8
226:19 230:8
231:16,19
numerical
113:20 114:22
116:5 120:19
numerous 31:23

notice 1:21 4:12
4:22 5:1 9:18
9:20 13:14
15:2 149:16
150:12 169:14
211:13
noticed 62:1
notify 122:12
number 13:18
34:11,12
42:16 59:4
62:15,16,17
81:18,19,19
81:23 112:11
95:9 96:21
97:8 112:13
113:15,16,21
114:2,12,16
116:16,16
116:10,13
121:2 122:23
122:24 123:1
124:20 125:9
128:4 129:17
130:1,6,8
131:3,13,15
132:4 135:22
135:23 136:20
136:21 137:13
138:10,12,18

32:22 33:9
48:6 59:9
61:19 64:23
65:20 69:2
70:3,11 72:24
73:3 74:5,10
237:6
82:13 83:22
84:5,23 85:15
86:15 87:6
88:4,17 89:3
89:14 90:15
91:7,23 92:15
95:9 96:21
97:8 112:13
116:1 122:13
134:2,14,16
137:5,12
139:19 141:6
156:2 162:2
167:21 180:2
180:8 181:16
181:24 197:9
202:24 203:17
204:14 221:23
222:4 223:17
224:4
obtained 225:1
235:20
obvious 74:13
obviously 33:20
41:22 176:20
occasion 35:6
36:2 37:2
occasional
189:13
occasions 59:23
101:22 102:4
103:5
occur 26:10
56:7
occurred 18:7
19:1,6,13 24:4
24:13,21 29:4
43:10 68:24
71:12 72:6
74:15 75:20
145:11
offender 159:20
226:20
offense 10:3

133:6,11
137:19,22,22
obligate 235:5
obligated 99:21
100:1 236:13
237:6
obligation 96:11
96:18,24 99:5
122:3,22,23
125:4,16
233:24
obligations 54:5
observations
158:8 193:20
218:1
observed
163:20 197:20
223:17
obtain 6:2 8:11
234:5

**O**

O 245:3,3 247:1
247:1
o'clock 20:9
O'Hare 37:11
oath 1:18
object 8:12
127:8 138:5
objected 136:18
objecting 127:16
objection 5:22
25:2,8,19,21
31:11 32:17

## Page 273

79:20 121:1
162:21 174:10
174:12
offered 96:5
office 15:11
20:18,20
22:22 23:6
27:13 29:12
31:7,18,24
33:14 53:14
55:9 58:8
108:21 112:6
114:12 125:8
149:20 219:18
249:19,23
officer 7:5 17:9
17:17 80:12
80:13,16
97:22 225:24
226:2
officer's 37:3
96:18
officers 37:22
36:8,9 46:24
47:3 79:22
81:4 100:11
122:8 134:9
147:22 172:18
210:5,7,9,10
242:13
offices 249:22
official 60:4,5,9
69:8 83:15
100:16 102:22
103:6 104:3,6
104:19 105:10
112:24 130:11
132:7 161:4
164:10 165:24
166:8 173:21
188:3,3 192:2
192:24 209:9
212:5 246:4
oftentimes
99:12 164:8
oh 11:5 13:4

21:19 36:13
45:6,17 46:21
65:17,18
98:24 111:12
112:8,10
117:23 133:11
134:13 142:16
151:11 152:20
168:20 180:3
180:23 195:22
209:18 210:1
211:14 224:17
225:7 243:7
okay 5:10 7:2
8:2,7,24 9:6
9:12,13 10:17
11:6 14:13,17
14:21 15:23
16:16,16,19
18:2 22:1,4,8
22:12 23:4
24:7 25:12
26:1,22 29:8
31:23 33:17
34:14,23
35:17 36:14
37:24 41:14
48:15,24 49:3
50:10,17 51:7
51:13,17 52:6
54:21 55:3,6,8
57:15 63:16
64:2 67:24
70:18 75:2,3,4
75:6 76:16,20
76:21 78:4,13
85:20 92:23
93:5,8 95:13
98:21 101:8
106:1 110:13
111:11,17
112:10 113:5
125:11 129:8
129:14 130:23
133:4,10,22
138:8,17

139:3 140:5
140:11,19
142:16,22
143:12 144:9
145:12 146:18
148:3,6,19,24
151:11 154:19
156:10,18
157:11 161:23
163:17 176:4
176:23 180:3
181:5,7,15
183:2,4
184:24 186:18
187:5,12,19
193:2,23
195:6 202:23
203:2,18
204:1,16
209:8 212:8
216:20 225:23
226:20 227:4
227:16 228:5
228:10 229:19
232:9 237:14
238:5 241:24
243:24
old-fashioned
77:12
Oleander 249:2
omitted 165:23
on-site 143:5
once 40:24
41:22 46:17
56:8 137:15
238:17,18
240:22 241:11
241:13 242:15
242:16
onerous 240:21
ones 15:24
27:17 177:8
ongoing 13:24
124:1 126:9
onwards 241:18
241:20
open 112:21
116:11 159:10
159:14
operating

178:16 179:8
179:10,20,23
204:5 206:8
224:4 240:1
225:20
opinion 27:23
190:18 196:19
opinions 196:11
196:17 197:18
214:15 218:13
221:11
opportunity
39:15 41:6
48:8,9
organize 143:6
176:3
organized 39:24
40:3,6,9,23
41:1 43:23
44:8,10,23
45:4,19 46:17
46:22,22
47:24 49:12
67:12 142:9
200:22 243:11
organizer 39:3
organizing
151:5
origin 76:9
original 22:12
22:19 23:12
23:14 51:22
58:9 80:2,3,4
80:6,24 81:1
81:13 82:8
83:2 106:9
106:18,19
249:14 250:13
originally 82:7
243:8
outside 27:11
67:19
206:9 207:7
207:11,22
223:23 224:1

## Page 274

224:5 229:16
over-compart...
65:20
overall 219:4
overinclusive
240:21
oversaw 7:24
8:17 9:4
oversee 8:4,10
35:9 37:2,22
overspecializa...
65:10,12
overtime 240:13

**P**

P 145:20,20
146:24 247:1
P,C 2:9
p.m 249:24
packet 83:3
page 24:6 59:5
110:9 155:12
155:13 177:22
179:11,12
194:4 202:2
203:2 215:17
179:12,19
211:21 197:24
203:21 247:2
247:24 231:4
234:11 247:1
243:8
pages 179:13
180:24 181:6
248:6,8
painstakingly
74:12
Palmer 15:13
15:21 163:19
239:19,24
paper 27:6
62:10 77:13
84:14,16
113:6 117:14
189:23
paperwork
30:11
paragraph 20:6
157:12,19
179:12 196:24

222:9 231:15
233:11,13,21
234:6 240:16
parcel 170:9
part 8:21 14:17
25:15 37:12
37:13 40:18
42:10,14
43:19 45:21
45:24 46:7
47:11,14,15
48:23 49:3
50:11,21 51:6
52:6,12,22
6:14 7:2 8:12
8:16 9:2,6,12
10:21 11:5,16
14:11 16:12
16:17,20 25:2
25:8,19,22
26:3 31:11
32:17,22 33:9
44:1 47:20
48:15 50:24
57:12,15 59:9
61:19 64:23
65:22 69:2
70:3,6,11
72:24 73:4,10
73:15,22 74:1
74:6 75:16
77:16 78:24
82:13 83:22
84:5,23 85:15
86:15 87:6
87:14 89:13
89:14 90:15
91:7,23 92:15
92:23 93:5,14
95:9 96:21
99:6 100:23
101:8 102:10
102:24 103:7
104:14 105:19
115:1 116:24
118:11 120:14
121:23 122:24
123:17 124:8
125:1 126:12
126:17 127:1
127:10,13,19

passed 224:16
passes 124:12
Pat 71:10
patrol 34:22
35:9 36:9,18
181:24
Patterson 2:17
5:2,6,12,22
6:14 7:8 8:12
8:16 9:2,6,12
10:21 11:5,16
14:11 16:12
16:17,20 25:2
25:8,19,22
26:3 31:11
pause 133:4
pay 44:5 47:6
52:22
pedestrian
191:7
people 13:2
35:15 36:18
53:14,24
58:19 59:16
62:22 65:3
66:17,20
66:24 74:14
111:4 118:4,5
135:24 148:7
149:2,8,14,19
130:7 131:6
131:11,18,21
132:13,18
133:13 134:2
134:17 135:12
135:15,18
137:11 138:5
139:19 141:6
143:8 153:10
153:17 155:6
156:1,9,16,19
159:13 161:6
161:16 162:18
164:10 165:6
165:24 166:7
167:13 169:1

177:11 188:20
208:15
People's 107:24
Peoples 1:15
perfectly 127:5
158:14
perform 53:22
performing
54:19
period 24:14,22
25:5 31:5
48:23 49:2
51:4 53:1,16
72:3 106:4
116:15,18
121:23
permanent
24:16 102:23
132:7 164:22
171:24
permit 19:5
person 8:18,23
38:18 71:13
91:19 99:17
106:21 115:3
154:11 186:20
189:13 191:19
192:16 193:16
193:20 199:18
219:12 234:1
234:18
person's 117:16
125:6
personal 55:19
65:4 77:19
86:10 88:12
88:15 101:2,6
110:24 113:4
134:11 141:2
141:7 168:4,7
169:5 174:22
186:21 192:23
196:1,17,19
197:18 220:6
220:22
personally 8:14

## Page 275

100:19 101:1
101:6,14
172:8 188:9
personnel 32:12
36:17,17 55:7
62:17 66:13
98:6 115:5
119:1 141:12
188:14
perspective
81:21
pertained 67:11
pertinent 24:1
27:8 84:8
85:11 97:1
98:5 99:16
241:9
phone 117:19
119:20,20
195:8
photocopies
27:11 106:8
117:3 146:12
photocopy
110:12 120:24
photographs
106:13 115:23
physical 90:3
158:9
pick 122:15
125:15
picked 40:22,24
61:22
picking 111:22
125:3
picture 119:4
picturing 20:17
piece 77:13
189:23
pieces 62:10
84:14,16
place 37:17
62:15 80:19
98:13 112:18
125:13 175:2

175:3 179:6
218:11 245:6
245:18
placed 23:21
24:16,23
25:10 26:17
116:5 119:21
140:21 163:12
188:14
placement
158:11
places 20:15
200:14
placing 238:11
plaintiff 1:5 2:7
3:14 15:17
153:5 226:4
Plaintiff's 155:6
176:10 178:8
224:22 229:17
Plaintiffs
156:18
planning 36:19
please 3:16 4:16
89:8 157:10
241:16 249:22
250:4
plural 162:23
176:14
point 22:3 32:14
35:19 39:12
39:17 86:5
88:13 100:13
137:10 141:4
142:10 160:3
160:9 162:12
169:23 175:6
175:17,4,9,17
231:3 235:21
243:19
points 177:17
police 3:22 6:2
10:2 12:12,14
15:17,9,4,9,17
21:3 23:15,21

26:17,18 28:8
28:8 29:2
37:22 38:5,8,9
44:2 46:23
48:3 50:1
57:22 58:1,3
59:2 64:8
77:21 80:12
80:12 83:12
92:19 93:3
95:22 97:22
100:16,21
101:2,12
102:5,22
103:6,18
104:4,21
107:5 119:23
122:8 126:22
132:5 134:7
141:9 143:23
143:24 149:19
161:2 166:9
167:15 170:20
173:22 180:18
187:20 188:4
192:3,24
195:18 207:6
209:10,13
210:15,19,20
210:16,19,20
211:20 212:4
216:23,23,24
218:22 219:9
220:3 221:10
230:24 231:24
232:12,15
237:18
policy 7:21,23
22:13 23:6
23:16 94:22
95:17,20
101:18 126:21
130:16 160:9
167:6,18
169:8 171:11
171:18 172:10
173:14 187:8
187:10,15,20
188:10,20
189:11 197:13
208:12 219:23
220:2
polygraph
106:21
pornography
17:14
portions 117:4
position 4:3

5:11 8:24 26:4
26:8 33:14
137:9,11
217:21 218:9
positively 47:9
possibility
157:17
possible 92:8
157:15 35:20
185:22 228:17
possibly 168:9
Pre-1973 118:18
Pre-1983
116:10
pre-identified
62:11
pre-reorganiz...
70:24 81:7
Pre-service 96:6
97:11
pre-world 71:3
prearranged
96:6 146:17
preceded 64:3
181:17,17
preceding 111:4
111:24 216:5
226:12 248:8
predecessor
77:6 114:1
120:11
predicate 6:10
prefer 54:23
preferred 90:3
125:7 130:14
preliminary
35:10 82:22
prejudice 239:13
prepare 11:24
14:3 57:22
80:7 155:17
163:1 238:18

## Page 276

27:24 28:1
30:19 57:11
80:17 94:17
145:6 153:23
156:1,21
157:21 197:6
219:7 227:1,2
preparing
157:23
presence 185:10
present 135:2
141:12 144:12
144:18 200:4
205:9 207:4
225:13 245:8
presented
128:14
preservation
10:2 132:3
220:16
preserve 96:3
99:22 169:14
169:15 220:17
221:7 225:1
230:23 231:23
preserved
186:1 194:9
212:10 232:12
presume 22:21
22:24
presumed 97:18
pretending
135:8
pretty 12:22
13:7 38:7
66:16 67:3
78:6 108:9
161:15,16
220:18,18
242:5
prevent 136:22
previous 179:1
previously 4:17
37:16 65:13
69:15 104:20
71:8,9 242:4

245:9
primarily 45:20
primary 45:7
primer 96:3
114:4 122:17
122:19
157:21 197:6
printing 60:20
prior 12:3 41:1
157:13 185:20
185:22 235:8
186:22,22
204:9 206:21
220:4
problem 32:15
163:19 167:2
168:4 179:12
193:6 191:17
202:3 207:13,13
223:20 247:2
procedure
126:21 179:8
178:16 179:10
179:21,23
221:18 228:16
proceeding
216:4
proceedings
250:2
process 8:5
58:22 60:8

95:7 190:11
221:19
processes 63:9
processing 36:1
produce 8:21,22
produced 6:3
7:22 14:4,12
170:12
producing
135:3
product 61:14
professional
203:17
professionally
203:10,15
profile 114:17
program 38:7
47:13 97:10
172:13
progress 10:4
161:18 171:4
174:1,3,13,14
187:22,22
prohibit 167:2
prohibition
31:16
project 33:13
33:18 63:8,22
63:23 64:7,21
65:4 68:7
project 131:2
projects 10:23
11:1,14 63:21
properly 161:12
223:15
property 43:14
44:20 52:17

68:3 113:14
220:22 242:20
propose 199:3
prosecuted
159:1
prosecuting
159:18
prosecution
96:10 222:19
prosecutor
102:9
prosecutors
192:4
protect 131:2
protective
114:24
protects 36:22
protocol 80:20
prove 190:7
proved 217:8
proves 218:3,20
provide 152:11
223:2
provided 29:7
98:21 100:9
197:3 202:6
providing 7:9
214:3 236:22
provisions
242:5

214:10 217:9
216:22
236:22
pursuant 1:19
1:21 4:13
237:8 245:22
220:2
pushback 220:7
put 60:11 68:19
70:1 72:6 74:7
83:4 84:2
87:11 97:19
91:3,11
105:10 111:2
114:11,22
164:5,17
179:6 182:5
189:20,23
190:1 238:19
239:20

**Q**

qualifier 93:16
quality 203:5,7
203:14
question 5:17
6:10,17 7:13
14:7 48:17,22
59:10 60:9
78:2 87:11
89:8 93:2,6
101:10 105:4
110:14 112:18
127:2,6 128:8
128:19,23
129:7 130:2

## Page 277

130:5,22,24 131:7 133:2 134:18 135:15 135:18 137:13 137:21 138:9 138:14 153:14 158:15 164:6 166:4 167:13 170:13 177:21 186:9 215:23 216:4,5 235:3 236:5 239:22 242:1
questions 22:9 26:7 33:22 47:23 48:2 98:12 106:2 113:18 132:14 134:23 135:4 136:24 137:3 137:18 151:24 151:24 165:7 184:2,5 217:17 220:20 224:11 245:12 245:17
quick 225:19 242:5
quickly 120:7 175:20 176:1 215:21 225:22
quite 135:24 136:6 191:8

**R**
R 2:10 247:1,1
R&D 4:4
Racine 17:17 34:10
rack 112:8,20
raised 241:5
raised 119:17 165:7 208:1,3
ramifications 209:1
Ramos 7:14
ran 214:3

Random 38:4,5 38:12,14 39:7
range 58:6
rank 3:23 17:15 54:2,15 185:5
rap 106:10 119:6 223:10
rape 46:2
Rare 196:18
rate 44:5
RD 24:23 81:19 81:23 112:11 113:15,20 114:4,22 115:4,12,13 115:15 116:5 116:9 120:19 120:20 157:4 202:8
re-ask 24:17
re-canvas 106:20
re-interview 191:16,19
react 130:19
reaction 143:17 143:21
read 78:19 114:17 127:2 127:3,20,23 129:1,8,10 130:5 133:1 134:17 138:11 157:8 174:21 174:24 178:12 231:14,20 238:24 239:2 248:5 249:21
readily 114:24
reading 163:13 175:16 249:20 250:3
ready 127:23 136:1

real 63:1
realize 208:19
realized 11:12 208:14
realizing 205:12
really 23:12 34:20 48:12 62:24 67:5,7 109:3,8 116:9 123:7 137:7 152:21 171:7 175:2 178:7 207:14 229:2
reason 61:4 64:16 133:12 139:15,24 140:5 150:10 158:1 174:18 175:12 197:19 177:20,22 247:14,16,18 247:20,22
reasonings 152:7
reasons 25:12 88:1 139:8 234:7 240:9 247:3
reassigned 34:8 34:22
recall 13:12 15:16 19:22 26:19,21 42:3 42:5 61:20 77:9 83:9 85:6 87:13 88:6 103:23 105:16 106:2 200:24 201:1
receipts 119:14
receive 97:7 114:7,8

115:20 175:13 209:2 223:24
received 56:10 57:1 98:18 174:11,16 177:8 235:15
receives 233:13
receiving 111:21 237:2
reclassified 78:10,15
recognize 120:1
recollection 146:8 185:16
recommendat... 153:23 152:7 152:12 199:7
recommended 98:2
reconvene 137:17
record 44:1 51:1 57:19 58:5,20 71:23 74:7 77:8 82:4 85:13 87:10 92:24 94:1,4 96:19 97:1 100:1 104:24 106:11 127:3 129:10,16 131:13,16 132:1 133:5,7 137:12 138:2 141:7 143:8 146:16 168:11 201:13 226:3
refined 124:11
reflected 144:23 231:5,11
reflecting 88:15 91:22 92:12 93:13 105:8
recorded 72:20 75:21 99:15

99:19
recording 62:5 63:1 71:18 81:22 85:4 86:6 95:21 96:13,15 237:7
records 60:17 81:18 102:23 105:2 113:7 113:16 120:21 120:24 155:10 155:11 157:4 157:18 158:6 158:19 160:16 160:19 162:17 162:9 163:20 163:8,13 164:23 171:15 171:24 172:19 177:23,24 203:22 208:16 230:13 232:19
recovered 115:22 117:24
red 195:5
reduced 13:24
reference 145:6
referenced 24:20
references 24:12 149:15
referred 113:23 149:21 245:19
refine 62:21
refined 16:10 146:10 161:1
refining 124:11
reflected 144:23 231:5,11
refresh 12:15

## Page 278

146:7
regard 205:17
regarding 7:14 7:16 12:16 13:19 58:3 70:2 78:21 79:5 84:3 86:14 88:2,24 100:16 141:19 164:20 169:11 170:15 184:3 209:10 213:9 214:17 228:20 241:8,15
regular 59:18 220:3
reinforce 235:22 237:7 237:10 239:9 241:8,15
Reinforcement 150:13,14
reinforces 233:22
reinforcing 197:22
reiterate 149:17
relate 116:21 152:18
related 73:11 76:3 82:11,17 169:6 170:4 236:10 242:3
relates 9:21 11:3,13 48:22
relating 23:22 26:18 67:7 233:14
relatively 16:6
relay 121:7
relayed 91:15 92:9 186:7
relevance 12:13 161:13
relevant 95:1 96:14,19 97:2 97:3,16,20 99:4,9,11,12

99:14,15,16 100:1,14,20 102:6,15 104:21 105:9 105:14 114:24 162:5 164:1 173:20 175:5 188:17,19 224:24 230:14 230:16,21,23 231:6,11,23 232:3,20 234:6 235:9 237:10 239:9 241:8,15
remain 133:6
remains 12:1 154:21
remanded 12:18
remember 63:2 66:23 67:14 68:17 109:6 100:13 115:16 115:17 116:4 122:15 152:15 153:12,13 154:3,5,20 156:1,5 162:6 162:7,22 163:14 164:10 164:16 165:5 171:5 174:1,3 174:8,10,13 175:1,4 183:4 188:8,11,15 188:18 189:21 190:2,4,10,12

76:22 77:15 78:23 79:8
repeat 99:7 238:23
rephrase 78:2 84:24 216:4 198:11 205:14
report 27:4,5 29:6 30:6,6,9 30:14,19,23 31:10 45:22 49:24 58:10 58:11 65:17 68:17,17,18 68:18 69:7 71:4,17 79:16 79:18,21 80:2 80:3,4,6,23,24 81:13,13 82:8 83:8,13,15 87:2 88:7 94:18 95:2,8 95:22 97:17 99:4,10
remainder 197:22
remind 76:23
remodel 65:13
remove 71:21 72:19
reorganization 61:10 63:13
remark 82:21 218:20,22
reopen 7:18 192:0,4,10,12

190:15 191:1 191:24 192:13 192:24 193:12 193:13,16 194:15 195:17 197:6,10,12 198:11 205:14 216:18 218:5 219:12 227:10 237:8 238:3,7 239:6,21 240:15 241:3 241:8,14
reported 27:9 35:11 49:10 49:16,19 51:10 52:6,14 82:7 193:11 204:9 205:15 245:12
REPORTER 138:10
REPORTERS 247:25 248:3 249:1,25 250:23 251:25 252:23
reporting 10:7 47:13 50:4 51:18 63:9
reports 10:2,4,4 10:5,6,22 11:4 12:12,14 11:19 12:24 15:5 27:2 28:8 28:16,18,22 30:2 48:10 57:22 58:1 66:21 67:9 69:16 79:20 80:5,21 81:1,2 81:9,11,20 89:14 94:7 83:2,10,18 84:2 98:17 106:10 116:14 190:2,4,10,12

148:2 155:10 161:18 162:22 163:7,11,24 164:15 165:24 166:9 173:21 177:16,24 177:7,9 190:22 192:3 193:15 194:12 194:13 208:15 218:14 218:10 218:10 237:21 238:16,20 240:4,24 246:7,12,22
represent 3:14 206:7
representative 4:20 6:24 10:19,19 11:20 77:20 128:1,13,24 137:3 214:15 216:9
request 9:2 29:15,21 60:10,14,15
requested 8:1 127:4 129:11 236:15 239:3
requesting 60:22 119:2
requests 5:20 8:21 119:14
require 134:7 190:6 212:24 237:19
required 29:11 36:24 54:6 190:2,4,10,12
requirement 197:28:7

## Page 279

29:22 31:3 94:6,10 96:10 125:12 150:19 177:18 221:4 225:9,12 232:4,19 235:19 241:3
requirements 222:3 224:12
requires 230:12
requiring 240:22
reschedule 143:9
research 4:2 7:15 46:16 59:2 147:13 208:6
reserve 70:16 137:14
resistance 220:8 221:5
resolve 93:23 199:6 209:7
resolved 123:12 160:1
respect 225:17
respond 133:14
responded 76:17 98:6 169:9
response 37:1 112:17 148:12 169:7 209:2,4
responsibilities 11:16,21,22 26:24 31:24 32:2 76:4
responsibility 21:10 35:18 71:22 115:19 158:24 170:20 175:3,3 212:15 225:24 226:21 235:13

responsible 18:7 35:9 45:21,23 76:8 159:6,8 159:12 160:2
responsive 5:19 6:6,9
restraining 168:1,6 201:9 225:16 238:17
result 143:15 146:11 148:16 167:18 172:11 193:3 197:7 204:18 242:21
resulted 74:23
retained 83:16
retention 23:6 24:17 102:23 132:7 164:23
retraining 206:8
return 16:24 119:18 122:5 124:11 145:3
review 11:23 13:19 15:20 19:1,5 103:18 161:10 162:7 203:18 238:8
reviewed 12:2 14:3,12,15
reviewing 4:16 26:22
revise 179:10,12
revised 59:6
revising 240:1
revisit 137:5
rhetorical 116:16
Rican 36:21
rid 171:18
right 7:13 8:15 15:15,15,18

20:19 40:5 41:24 44:4 46:14,20 53:12 56:24 57:9 59:1 64:12 69:12 69:14,18 70:16 73:9,17 74:6 79:18,24 84:22 87:12 88:16 89:20 97:11 100:4 103:3 104:14 104:23 107:9 108:2,5 109:18 110:12 113:1,22 114:12,15 116:7,12,15 116:19 118:7 120:19 128:8 127:18 145:14 146:14 148:15 148:18 150:6 152:22,23 153:19 157:11 160:12 162:4 162:13 163:16 164:5 166:13 167:11,12,14 171:8,12,22 173:15 177:14 173:17 180:6 181:1 184:24 185:11 187:24 188:18 189:23 189:15 190:24 194:20 205:12 205:17 205:21 210:3 211:18

211:23 212:1 212:3 214:7 225:14,21 226:7,10 227:7 228:10 229:22 230:19 233:4 234:11
right-hand 20:3 132:12 149:21 157:3 163:4 171:18 186:17 186:22 196:4 237:18
rights 129:20 218:16,18
rush 204:24
Ryan 18:8

**S**
S 251:7
s-a-f-e 242:20
s-i-c 176:13
Sadler 147:11 147:15
safe 242:19
safekeeping 158:18
sake 73:21 79:24
sample 61:17 162:1,19 166:16
samples 99:1
sampling 155:15 156:6 156:12 160:5,20,23 161:2 162:15 162:18 163:2 163:7 202:18 204:19 205:2 213:8,8,18 223:18
satisfy 193:14
save 221:21
saw 31:9 63:3 154:14 163:5 167:9 190:12 201:22 218:2

rules 1:19 173:5 245:22,22
ruling 74:9
run 146:12 239:13
running 71:14 106:6 112:17 132:9 149:21 157:3 163:4 171:18 186:17 186:22 196:4 237:18

## Page 280

239:18 241:5
saying 4:24 6:5 7:1 23:15 24:7 30:13,22 31:20 40:18 47:19 51:20 62:2 76:24 77:18 87:3,17 88:10 96:12 110:10 113:2 114:13,20 124:15 131:23 135:11,12 136:2,24 180:3,7 197:17 217:20 221:3 241:7
says 9:23 112:10 174:9 174:10,16 179:5 194:13 195:5 196:7 196:19 198:1 198:13 209:21 212:6 214:6 215:14 226:12 230:22 231:20 231:23 242:24 242:24 243:13
scenario 72:19 90:22 91:17 116:3 124:7 122:8 234:22 235:5
scenarios 239:17
scene 35:24 62:18 77:8 106:13 118:1 118:11 121:22 119:5 131:24 165:18 178:24 211:3 235:1
scheduling 195:17,19
SCHMITZ 1:8
school 17:14
schools 179:3
scope 243:2

scratch 174:21
searching 109:9
seat 111:2
second 5:15 29:14 38:14 50:6 56:4 80:15,18 83:5 90:4 105:3 section 37:10 38:12 42:20 44:8 45:6,7 52:10 71:9 selecting 72:5 self-serving 243:11 113:10 115:23 158:18 181:19 send 31:3 113:10 115:23 135:11,12 136:2,24 180:3,7 190:5,24 sends 45:24 67:17 139:7 sent 22:12 30:16 31:6 115:18 154:10 209:14 211:3 sentence 9:23 112:13 separate 34:16 43:4 50:22 63:22 64:1,2 69:16 76:3 77:1 112:22 243:13,19 separated 37:19 164:17 September 246:5 249:5 sequence 113:16,21 114:22 115:4 116:6 120:19 Seraphine 132:9 sergeant 21:6 21:13 34:5,17 35:23 53:4,5 145:23,23 147:15 171:4 173:16 sergeants 35:16 47:1 54:17 66:16 147:11

128:20 140:20 149:9 180:5 193:17 197:17 204:4 select 117:9 selected 117:3 selecting 72:5 self-serving 243:11 section 37:10 38:12 42:20 serve 222:18 222:23 Services 17:22 17:24 39:11 39:16,20 40:17,4,17 42:14 43:24 44:22 48:19 48:21 49:7,11 49:21 67:2,6 67:19,23 session 14:22 123:16,20,24 seriously 237:24 serve 222:18 222:23 set 27:6 45:17 72:17 179:20 248:7 set-up 56:19 seven 5:15 70:16 159:2,3 204:23 sex 18:5 15:14 55:18 65:14 196:20 Shader 15:19 Shader's 15:18 168:21 shaky 150:8 share 110:23,24 177:3 241:16 shared 121:14 122:9 sharing 177:2 sheet 25:14 61:2

106:10 119:6
193:10,12
shift 20:3 21:7
54:16 69:1
70:2 72:1
107:12,22
108:4 111:5
111:23 119:16
shifted 22:4
shifts 19:10
107:18 124:24
shirt 35:16
shirts 35:15
shooting 56:11
114:8
shop 60:20
short 57:13,17
94:2 183:10
204:14 222:5
shorthand
88:12 245:13
shortly 34:20
44:18
shot 109:11
show 4:11 60:13
146:18 149:5
155:5 232:15
showing 145:12
111:16
shying 140:5
sic 176:13
side 37:14 182:6
240:23 237:18
240:10
SIEBERT
247:25 248:23
249:1,25
250:23 251:25
252:23
shown 20:10
sign 60:13
173:24 175:13
182:1 249:2,21
signature 174:4

Page 281

175:8 245:20
246:4 249:17
signed 221:24
247:24 248:13
significance
119:19 198:16
signing 175:15
175:17 249:20
250:3
signs 83:14
silent 31:22
similar 15:1
19:17 50:18
62:4 152:15
186:14
simple 55:16
227:13
simply 19:11
21:23 24:3
28:23 29:7
32:3 71:18,22
85:8 113:22
119:21 125:6
157:16 192:20
219:10 237:1
242:10
sincere 168:14
Sincerely 250:8
single 107:10
sinister 192:15
sir 4:4 5:17
13:12 70:18
178:14 184:1
213:21 228:10
230:4
sit 15:16 134:12
site 144:4 145:7
145:9 146:4
147:4,5,20
148:20 152:22
153:22,24
154:16,21
155:14 176:22
187:4 201:3,6
sitting 194:11
situation 112:3

134:14 138:22
six 4:9 5:1,5,8
5:11,13,15,23
19:8 34:21
52:8 56:5
155:15 184:11
184:21 185:2
193:10 200:10
size 179:16
slang 203:11
slim 116:9
slip 195:9
smaller 179:16
202:14
so-and-so 87:9
110:9
so-called 132:6
soldiering 151:5
solely 217:18
solution 157:13
solutions 157:5
solve 79:3
109:17
solved 107:18
somebody 5:13
8:21 9:5 95:23
136:3 191:17
somebody's
86:6
someone's
174:21
somes 126:18
somewhat 16:3
219:24 223:13
soon 176:2
sorry 11:5 13:4
38:21 44:4
48:22 69:6
76:23 77:16
85:20 90:21
93:6 95:18
119:1 133:4
143:4 152:20
154:18 165:1
168:1 176:1
176:23 180:23
182:4 203:16

184:24 196:1
201:1 217:3
224:17 238:22
sort 159:13
191:7 204:20
248:9
sounds 29:13
44:21 87:8
169:7 189:11
192:7 212:8
221:4
south 18:7
20:22 21:1
50:6,13,21
51:16,19,21
51:22 52:1,2
74:16 146:1
150:2
southwest 37:14
space 20:4
62:20,21
span 24:13
124:24 204:21
speak 57:7
71:10 139:6
190:19
speaking 7:12
16:6 58:21
94:14 161:12
speaks 23:13
special 13:3,5
13:13,15,16
13:17 17:6,7
17:16,18 32:4
32:5 33:7,18
50:24
speculate
130:10,18
134:5
speculation
124:9 126:13
126:15 137:22
speculative
134:3 136:18
spell 8:16
spelled 169:22
spelling 40:11
spent 17:7

spring 206:12
196:4
SS 245:2
stabbed 109:11
staff 172:9
stage 160:7
stalking 29:1
56:12
stamped 178:7
stand 140:16
179:15 182:15
standard
134:13,14
178:16 179:7
179:9,20,22
standardization
61:3
standardized
61:16 63:9
start 82:15
145:12 182:23
231:24 238:19
started 17:4
39:17,18 58:7
64:4 130:3
142:24
starting 15:8
21:18 62:4
219:3 220:23
starts 80:23
90:2
state 1:21 3:16
20:22 21:1
74:12 210:17
245:1
State's 100:22
159:19
stated 25:12
32:3 36:13
statement 90:10
90:12,13 91:6
91:18,22

Page 282

92:14 93:12
93:13 218:17
218:23 231:17
statements 10:3
91:2 92:10
95:16,19
states 1:1,19
159:23 222:15
222:17
statistic 208:18
statistics 32:7,9
78:5
stayed 22:14
34:4
staying 216:8
217:12
step-by-step
221:18
steps 6:2,11,19
7:8 8:10,14,16
8:22 167:5,17
170:11,17
172:7,9
173:12,22
196:10,10
Stibich 151:21
152:10 153:8
214:2,9 215:8
217:23 218:17
Stibich's 215:19
217:5 218:24
stick 23:10
sticks 131:4
Stop 135:20,20
135:21
stopped 167:7
167:18
storage 10:1
132:3
story 92:3 165:8
165:20 191:18
216:17
straight 191:18
strangely 60:11

strategies 146:5
street 1:18 18:8
sub 43:13
subject 13:20
13:22 15:4,10
24:1 26:6
33:21 48:13
56:19 57:9
74:16 82:22
83:10 95:20
96:2,4,13,17
97:16 99:13
149:14 151:22
152:12 156:21
163:7 166:13
167:20 170:4
176:12,13
177:16,24
211:22 221:9
221:10 242:14
243:21 248:7
subjects 15:1
159:9
submit 28:14
29:24 30:23
212:24 225:9
submitted 22:18
27:7,21 28:9
29:6,11 94:8
96:20 100:15
102:14 122:14
152:14 245:21
submitting
27:22 30:2
31:17 171:22
227:9
subordinate
57:7 184:13
subordinates
161:11 167:3
SUBSCRIBED
248:11
Subsection
226:5,6,19
227:4 230:8
subsequent

111:5 125:3
170:2
subsidiaries
40:4
substance
163:17 169:10
163:23 169:10
239:20
substantive
78:21 79:2
164:9 165:3
165:18 190:13
190:16 216:15
subtitles 151:23
subtitle
86:13
suggested 80:20
157:17 232:24
suggesting
171:1
suggestions
60:17
suggests 219:8
7:18,23 24:1
Suite 1:18 2:5
2:11,18
summarize
19:11 146:4
summarizing
202:22
summary 24:3
76:12,14,15
111:23 147:2
152:21 154:5
154:20 193:12
193:13 201:21
subordinate
57:7 184:13
subordinates
161:11 167:3
superintendent
248:17
superior 42:9
209:12
superiors
21:3 38:13,15
38:17,19 39:3
39:10,19 40:1
41:3,18 49:8
49:20,23 50:1

64:8 67:22
144:15 149:18
168:2,22
169:19 170:20
172:23 181:22
185:8 199:15
221:20
superintende...
168:6
supervised
54:17 151:2
supervising
21:6 35:13
supervision
10:2
supervisor
20:4 21:9,10
21:4 27:23
30:20 31:2
43:4,4 60:13
60:24 68:23
70:1,7,10 71:8
71:23 72:4,20
75:23,24
supervisor's
174:3 175:8
194:11 212:14
supervisors
32:13 33:5
54:13 70:20
172:6,22
173:17,18,23
210:15,23
226:12
supervisory
18:18 19:19
19:20 21:18,22
33:10
supp 31:10
81:20 82:4,11
82:17 83:18
95:2,8 97:17

Page 283

98:17 115:16
162:6,7 171:5
171:6 190:10
190:12,14,22
191:24 216:18
237:20 238:3
239:21 240:4
supplemental
27:2,4,5 28:16
28:17 30:2,19
165:5 188:15
165:7 188:15
188:11
supplementary
105:9 166:2
30:9,14,23
58:11 79:18
80:5 81:2,9,13
83:7,10,13
84:2 94:17
97:19 102:16
103:17 104:24
105:8,17,22
105:23 106:10
121:2 148:1
162:22 163:10
163:24 174:7
174:9 175:1,6
188:11 189:20
190:1,4
192:13 194:12
218:4,10
227:9 237:8
238:6,16,20
239:6 240:14
240:23 241:2
241:3,7,14,22
support 152:8
suppose 89:18
111:19
supposed 28:9
28:14 68:22
82:2,4 96:8
104:17 105:11
121:11 238:6
suppositions
214:16

supps 191:2
220:5,6
Supreme
245:23
sure 14:8 17:4
19:24 26:6
31:23 33:24
52:4,5 58:9
60:12 68:8
91:20 94:24
98:3,11
133:17 154:2
160:13 161:11
172:22 173:13
173:19 175:19
176:4 181:21
185:21 200:5
217:11,16
221:11 225:15
226:23 227:12
234:21
surprised 234:8
surprises 12:23
survey 147:4,5
153:22 154:1
176:24 182:8
187:4 197:8
199:19 201:19
200:23
surveying 13:12
surveys 147:20
201:3,7
suspect 90:8,9
91:1,1,5,14,18
91:18 92:8,9
92:13 93:11
93:14 109:10
165:10 167:5
167:16 170:10
172:9 173:23
174:23 201:23
222:3 225:9
230:15,20
231:14 232:2
taken 1:18 8:22
57:18 94:3
136:20 167:19

suspected
106:12
suspects 88:24
89:11,24
106:13 191:13
215:10,16
216:12 237:18
237:20
suspended
159:16
sustained 74:4
Sutter 206:9
swoop 204:20
sworn 3:4,7
83:12 245:10
248:17
synopsis 240:16
synthesis 32:1
169:23

T
T 247:1 251:7
table 112:19
tables 212:19
tad 49:5
take 6:2 7:8
26:15 57:13
59:17 71:13
84:15,20 86:2
86:3,10 88:23
91:21 106:20
112:11 127:17
128:18 130:1
157:8 162:14
165:10 167:5
167:16 170:10
172:9 173:23
174:23 201:23
222:3 225:9
230:15,20
231:14 232:2
taken 1:18 8:22
57:18 94:3
136:20 167:19

172:7 173:12
183:11 196:10
196:11 222:6
223:7 245:5
248:9
takes 240:15
talk 9:9 70:14
106:23,24,24
205:1,5 223:6
talked 85:24
170:15 199:11
217:2
talking 9:5
20:12 22:7,10
22:16 25:5
33:18 39:13
44:12 50:14
58:6 59:24
69:3 73:20
91:14,17 93:2
93:9 113:13
124:15 139:22
140:22,23
169:16 186:8
187:1 204:7
216:21 239:17
235:13 243:3
telephone 71:19
71:21 85:9

117:12,15,20
122:15 194:23
telltype 144:10
148:12,19
151:8 201:5
201:17 209:8
209:9,20
210:2,14,17
210:20 211:2
211:18
tell 12:2 28:10
64:6 71:11
108:24 127:22
129:2 145:13
153:17 165:14
176:10 182:13
191:19 228:12
234:1 243:3
telling 90:17
91:12 191:17
205:7 240:12
tells 21:24
temporary
167:24 168:5
201:9 206:7
225:16 238:17
ten 56:8 164:17
164:22 165:24
166:6 167:14
168:4
tenant 4:24
36:1 47:6
tend 31:5 56:6
84:2 89:24
120:7 123:10
124:18 185:12
186:8 189:21
204:24 227:14
terms 195:23
237:12
three-hour
142:24
three-ring
179:14
throw 94:19
throwing 131:3
thrust 212:8
243:24
thumb 47:6
tickets 52:21
140:10 141:14
technology
209:23
terminate
157:13
terminology
144:7 153:20

Page 284

186:12
terms 18:13
30:1 31:20
50:10,21 62:9
86:12 165:17
196:15 207:24
testified 3:7
15:23 70:9
116:13 140:9
183:17 239:18
testify 4:19 5:13
5:23 8:18 9:16
126:20
testifying 5:1,4
76:10 141:8
205:20
testimony 12:5
14:23 15:4,13
15:17,21
16:14 70:18
74:8 102:19
103:1 129:23
136:10 137:3
164:7 249:15
Testing 38:4,5
38:12,15 39:8
tests 38:5
Thank 16:22
138:17 174:15
193:2 195:6
201:15 234:16
234:13
Thanks 195:23
237:12
theft 43:2 46:3
65:15 78:10
thickness 116:7
thing 30:11
52:12 78:9
86:3 119:22
133:16 134:11
140:20 143:20
154:11 157:9
194:9 204:3
224:23 225:8
243:6

things 32:11
61:12 62:11
63:1,7 86:1
104:16 107:13
118:8 134:14
136:12 163:20
172:8 181:21
182:12,13,19
182:20 189:6
191:22
thinking 177:1
180:4
thinks 127:20
third 34:18
40:23,24

44:23 50:8
155:13
Thomas 1:9
147:11
thorough 98:10
thought 30:4,5
30:21 61:12
86:9 108:19
157:1 179:3
181:10 188:5
188:14 192:9
203:9 215:12
216:14 243:6
thoughts 62:22
86:22 121:12
152:8 177:2
thousand 142:4
thousands
92:3 92:20
93:16
three 4:6 19:10
21:19 23:4
24:12,20,24
43:13 45:18
50:5 22:11 18
73:7,12 76:18
113:7 149:24
151:24 152:6
185:18 195:24
198:7 200:11
212:23 222:1
222:12 229:14
232:22 233:11

25:5 27:6 28:5
30:8,15 32:11
32:14 34:5
36:2 37:1
41:20 42:6
43:13 44:21
47:4 48:23
49:2 51:1 52:6
53:1,16 54:9
57:13,14
64:15 70:13
72:17 80:19
84:7,3,24
91:15 92:10
96:12 100:10
100:19 104:12
105:22 106:4
114:9 118:15
123:22 126:22
132:8 137:2
140:5 141:4
146:13 151:24
157:8,22
167:24 168:9
180:11 184:11
185:16 186:10
186:18 195:24
198:7 200:1
212:23 222:1
222:12 229:14
232:22 233:11
timeline 201:11
201:12
times 64:19
113:9 130:4
135:2 179:3
203:15 234:4
title 3:24 34:17
today 1:11,9
title 3:24 34:17
53:17,20 54:2
55:17 58:16
96:1,4,6,13,17
97:7,10,12
title 52:21
titles 52:21

191:12 194:22
to-from 176:13
177:16,23
to-from 14:1,9
5:11 14:18
15:16 33:22
111:10 135:2
135:16 175:21
told 63:12 87:20
99:2,8 111:24
129:4 186:10
200:9 238:19
Tolley 145:23
194:10,13
Tom 145:23
top 19:24 112:8
146:13 184:18
topic 5:1 8:18
8:19 9:21,23
10:20 11:2,11
11:18,16,20
13:5,8 70:5,14
131:24 132:11
132:12 186:3
186:11 206:24
208:20
topics 4:21,23
9:17 24:6
45:12 152:6
179:5,15
totality 65:2
Townsend
178:10
track 15:8 99:22
trade 111:7
traditional 46:5
trained 96:24
97:15,21,23
training 17:5
96:14,6,15,17
97:7,10,12
98:11,19,24
99:2,18,20,23
99:2,8,20,23

## Page 285

100:8,9
141:11,15,19
141:23,24
142:17 143:3
172:13 173:5
221:10 243:5
243:8
trainings 142:1
142:3,20
transcribed
245:13 249:17
transcript
133:21 137:15
138:3 248:5,9
transcription
245:14
transcripts
15:20
transportation
140:23
treaty 159:22
trial 12:6,7
16:14 73:23
tried 143:6
TRO 148:12,15
troublesome
190:5
true 83:20
138:18 139:3
190:4 218:24
245:15 248:8
truly 119:19
truth 96:11,16
try 98:11 176:1
179:14 202:12
trying 12:15
48:7 59:21
77:17 86:1
92:18 121:11
124:14 135:10
136:22 173:2
187:2 201:10
229:20,21
Tuesday 1:19
TUIER 1:12

turn 48:13
49:19 135:5
190:21 213:21
236:14
turned 12:8
100:22 175:9
turning 56:24
57:9 171:12
tweaking 230:3
twice 4:8 6:12
two 4:5 16:8
19:24 23:2
29:8 39:1 40:7
40:21 52:20
54:17 56:10
76:3,17 79:13
80:13,20
106:9 110:19
110:22 116:14
122:5 125:11
129:8 148:5
146:17 147:10
150:1 151:10
154:4,18
155:20,22
164:15 190:6
193:12,16,23
199:5,13
204:6 204:10
204-hole 194:11
two-page
213:23
type 36:24
62:16 71:7
78:16 83:5
223:5
types 108:12,14
118:16,19
129:23 177:19
186:15 223:2
typewriter
223:5,5
typo 9:20

unannounced
38:6
unconscious
223:9
undated 146:10
146:14 155:14
176:21
undermine
222:18
undersigned
245:13 246:1
249:23
understand
6:24 25:20
48:7 63:20
86:1 87:16
104:8 105:20
109:13 121:6
122:5 125:11
129:8 148:5
understanding
5:3 9:15 11:8
14:2 22:1
45:11,13 51:5
64:20 104:1
124:20 125:23
126:4,7 144:6
187:5 190:10
196:15 198:4
198:9 199:1
216:10 217:5
228:13
understood
188:18 216:20
220:17
undertaken
161:2 216:23
undertaking
66:16
undocumented
165:19
**U**
UCR 45:21
ultimately
232:13

78:10,16
159:16
unified 37:18
uniform 45:21
47:13 171:1
171:18
unintended
44:7
unique 59:3
unit 4:1 17:12
17:16,23 18:5
20:1,24 22:15
24:24 25:18
25:23 26:12
30:3 34:12
37:9,21 38:4,4
39:8 43:1,1,1
43:2 45:9,19
46:7,18 47:24
55:17 56:4
65:14,15,15
65:16 71:5
76:2 97:14
112:14,23
113:10,11,20
114:21 115:4
115:5,12,13
116:5,9
118:22 120:19
122:12,23
123:8,12
132:5,8 140:7
141:4,15
147:22 149:20
150:3 155:9
156:21 157:6
158:5 160:15
196:5 203:3
201:21 210:9
210:20 212:5
212:9,14,21
213:1 225:23
226:8 242:13
243:11
United 1:1,19
2:9

units 28:13
43:13 47:4
62:18 65:13
161:24 173:3
173:16 178:2
178:18 188:13
197:16 208:15
210:19
unknown 1:13
72:18
unofficial 60:9
unorganized
143:5
unprofessional
223:3
unrelated
180:22
unsigned
156:20
unsworn 7:7
110:8
unwritten
233:15
upgrade 203:5
203:7
ups 209:3 230:1
URBON 1:9
use 10:1 32:13
49:24 59:18
62:5 73:15
81:8 82:11,17
86:5 109:14
109:17 116:16
116:17 141:3
143:1 154:1,2
158:9 162:16
174:3 193:13
193:24 217:2
used 247:7,10
214:14 215:15
usually 20:5,9
54:9 55:1
58:15 59:4
97:12 179:13
utilized 198:21

## Page 286

**V**
V 226:5,19
vague 69:2
75:16 78:24
85:15 92:15
116:24 134:3
139:19 189:2
210:10 220:9
235:10
vain 237:17
Valdez 135:3
variety 58:12
79:19 84:11
86:12
various 17:3
28:13 52:22
61:18,21
63:15 77:7
196:8 197:14
213:18
VB(1) 230:9
231:16,19
VC 226:5
VEGA 1:11
Vehicle 62:16
veracity 32:18
verified 38:7
vernacular
203:14
versus 101:2
218:7
vice 40:8,8
44:14 45:3,7
45:14 46:6
victim 118:6
119:6 203:12
223:7
victim's 62:13
81:15 83:3
112:9 117:12
view 218:10
viewed 24:1
185:13
viewpoints
214:15

violation 94:21
violent 9:22
10:11,13,16
11:3 12:16
13:23 22:15
42:20,21
110:2,8
92:23 99:13
239:16
ways 81:21
84:11
we'll 151:6
168:13 204:14
we're 20:12
22:7,16 25:4
58:6 69:3
70:12 113:12
118:24 127:16
129:2 156:22
216:6 229:20
243:24
we've 22:4
143:5 184:23
193:24 217:2
193:21
Weis 41:18 42:9
went 22:13,13
22:19,19,20
22:20 34:3,20
85:16 87:8,20
88:2,6,8,12,19
89:7 90:17
92:7,9 93:6,9
93:10,15,16
93:17 95:10
96:23 101:9
101:14 102:11
103:9 105:20
106:23,24,24
108:23 109:9
115:2 117:2
118:12 122:1
123:3 125:2
128:16 129:12
130:24 149:3
16:24 67:13

VIN 62:16
vivid 91:19
vividly 201:3
vocalize 220:13
voiced 221:11
volition 213:15
volume 12:16
150:17 164:22
165:6 173:21
180:1 186:7
190:14 203:16
207:4 227:1
238:16 240:18
wattch 35:5
54:16 72:6
106:18 111:8
188:13 191:5
200:14,16
200:21 210:14
20:8 139:1
227:15
way 8:8 51:20
63:14 70:14
70:16 95:2
111:12 121:11
461:21 673:13

6:11,15 14:8
17:2 29:3
57:21,14
60:18 74:8
81:10,11
127:22
vocalize 220:13
218:24
voiced 221:11
214:3
waited 27:24
vice 40:8,8
64:18 104:3
55:6 227:6
56:4 158:3
46:21 67:13

134:13 137:23
151:6 177:1
178:9 196:23
210:22 217:24
220:23 223:9
239:16
ways 81:21
84:11
we'll 151:6
168:13 204:14
we're 20:12
22:7,16 25:4
58:6 69:3
70:12 113:12
118:24 127:16
129:2 156:22
216:6 229:20
243:24
we've 22:4
143:5 184:23
193:24 217:2
193:21
**W**
W 1:11
Wacker 2:18
249:9
Wait 113:2
117:20
waived 245:21
249:4
wander 238:23
want 4:10 6:4

77:11 135:9
142:17 150:5
229:20 238:21
239:19 240:23
West 2:18 249:9
Western 108:24
whichever
73:11
white 35:16
168:13 204:14
William 1:8,8
1:13 18:21
153:9,12
with 195:4
withheld 102:21
161:4 192:2
witness 3:4,6
6:7 10:3,23
16:22 25:9
31:14 33:10
44:5 61:20
63:3,4 69:3,6
70:5 73:19
83:23 84:6
85:16 87:8,20
88:2,6,8,12,19
89:7 90:17
92:7,9 93:6,9
93:10,15,16
96:23 101:9
101:14 102:11
103:9 105:20
106:23,24
124:12 133:2
134:12 132:10
161:1

## Page 287

132:19 134:23
135:6 136:8
141:10 153:11
156:5 157:11
161:9 167:23
174:14 189:3
192:7 197:2
202:1,13
204:8,16
205:21 209:18
215:24 219:3
231:16 232:23
235:11 238:10
239:4 240:8
245:5,10,18
245:20 246:4
248:1 251:2
witness' 101:5
witnesses 88:22
215:10,15
216:11
wondering 45:2
243:1
wonders 164:17
word 10:13
11:14 58:15
93:18 124:5
140:6 156:6
172:16 232:8
232:9
words 28:5 36:3
49:24 58:23
69:24 81:7
111:22 120:12
123:6 139:8
173:17 199:14
218:12 221:5
236:19 237:3
242:19
work 17:3 21:17
33:6,12 34:22
35:24 37:23
38:11 39:9
54:6 55:12
56:10,22 67:2
84:21 105:11

107:22 110:2
139:5,14
161:10 163:21
164:12,21
190:7 234:12
240:16 241:4
work-product
169:6
workable
221:23
worked 17:10
18:6,18 20:15
47:2,4 49:15
56:13 65:7
67:10 71:5
104:16 108:9
110:4 112:4
138:24 145:24
160:9 209:7
227:14 234:10
working 17:11
18:17 23:5
25:6 31:24
39:18 41:2
43:18 44:9,15
45:3 53:16
54:18 55:23
56:7 59:16
81:9 84:22
87:20 188:22
189:1 195:12
193:15 213:19
220:4

122:23 123:10
124:7,16,17
124:18,21
125:5,13,17
125:20,24
126:2,5,10
128:21 130:12
130:13,14,16
132:8,20
134:8 135:9
136:3,11,13
136:16 138:17
139:2,9,18
140:1,15,17
141:3 144:8
149:20 151:22
152:1,3,5,12
155:16 157:2
159:14 163:4
163:23 167:6
167:17 169:8
170:12,17
171:14,19,23
172:10 173:14
178:2 184:22
186:17,24
187:20 188:2
189:11 195:12
193:18 198:18
206:16 207:21
210:16,19
211:22 213:19
214:4,6,10,13
214:20 215:9
216:12 217:6
216:21 218:9
218:18 221:20
227:3,9
227:16 228:1

222:24 240:11
worksheets 10:3
27:3 120:10
120:12 203:6
203:8 222:10
223:15
world 113:6
worried 188:6
write 20:5 62:22
100:7 103:23
104:7 130:7
150:7 180:23
195:22 202:2
202:7 211:16
217:20 230:12
231:21 237:12
year 16:8 23:8,9
23:17 34:23
39:12 42:3,5
100:5 178:17
years 4:6,9 16:9
17:8 21:19
23:44 41:19
51:23 57:4
58:19 61:22
71:20 82:12
123:22 145:8
24-hour 19:16,19
19:21 20:1
19:24,22
26:23 27:1
50:1
62:13,17 69:7
69:16 72:2
73:10 74:6
76:3,6 79:13
writing 87:2,13
23:44 41:19
53:21 57:4
58:6 58:19
51:23 57:4
72:2 73:10
75:12 74:6

X 251:1,7
**Y**
yeah 7:2 11:17
13:4 14:11
19:20 48:5
76:9 90:1
100:7 103:23
104:7 130:7
150:7 180:23
195:22 202:2
202:7 211:16
217:20 230:12
231:21 237:12
247:16
year 16:8 23:8,9
23:17 34:23
39:12 42:3,5
100:5 178:17
179:7
yesterday 110:4
201:22 202:6
204:9
youth 17:12,19
17:20 39:22
40:22 43:14
44:20 47:3,4
49:13 52:17
64:2,9 67:15
68:4,5 141:12
142:6 200:13
youths 140:24
**Z**
zip 85:10
**0**
0-o-0- 244:4
007 34:12
63963 1:6
084.004183 1:20
246:10

## Page 288

**1**
1 3:2 4:11 9:17
18:15 45:21,24
47:14 55:9,13
55:23 56:2,3
57:21 83:3,18
83:21 147:9
181:17 187:23
230:11,18
248:6 251:9
10 176:6,9
206:18 211:18
100 1:18 2:5
100,000 26:21
106001 1:12
10630 1:22
1081 128:13
13 182:17,21
224:9 242:4
251:21
13596 1:10
14 182:23
183:1,3 251:22
145 251:10
14634 1:8
148 251:12
149 251:13
15 57:4 180:15
180:19 181:6
251:20
15th 148:17
181 40:17
42:22,22 43:6
49:6 51:22
71:20 82:12
1983 14:4 94:7
94:15 97:6
98:14 120:2,4
176:17 179:2
185:6 241:20
14 182:23
183:13 251:22

12:1 47:11,15
83:4 145:16
145:19 148:18
152:19 179:12
193:24 194:4
202:2 203:2
215:17 246:5
249:5 251:10
180 251:20
182 251:21
183 251:22
19 176:10
1961 42:22
1971 17:5
1975 17:10,11
1977 18:3
182:7
1979 46:3
1980 181:42:6
49:6 51:22
1980s 40:2
48:23
1981 40:17
42:22,22 43:6
49:6 51:22
1982 148:23
151:20 176:18
185:24 241:20
14 182:23
183:13 251:22
1984 12:18
1986 13:17
172:14
1987 34:7
1988 178:18
1999 4:5
1st 37:14

2472 224:22
2475 226:4
2476 224:23
25 83:1 206:22
236:8
252 248:6
2882 153:5
2885 153:5
29 1:19 248:10
249:16
2K 228:23
2nd 233:8
**3**
3 9:22 11:14,15
12:18 68:2,23
69:1 110:9,19
121:16,21
131:24 138:20
146:21,23
152:19 177:3
194:13 196:4
201:14 214:3
230:7 251:5,9
**4**
4 148:8,11
196:5 201:15
201:18 209:17
227:4 251:12
4:00 249:24
41 181:4
42 181:4
44488 74:16
248:5
**5**
5 9:17 149:2,5
211:6 251:13
5:00 20:9
50 206:20
5438 51:18
550 2:11
5488 1:11
5th 224:22

3148 182:24
183:5
3419 228:11
3200 2:18
3164 180:20
3464 1:11
3500 2:18
3644 1:9
3768 249:27
**4**
4 148:8,11
196:5 201:15
201:18 209:17
227:4 251:12
4:00 249:24
41 181:4
42 181:4
44488 74:16
248:5
**5**
5 9:17 149:2,5
211:6 251:13
5:00 20:9
50 206:20
550 2:11
5488 1:11
5th 224:22
**6**
6 8:18,19,21
147:9 151:13
151:19 152:10
153:11 172:16
213:22,22
223:23 224:5
232:1,3 235:4
**6**
60143 2:12
6029 1:9
60601 2:19
61st 17:7 34:10
63 100:6
3022 149:6
31 124:4:3
311 1:18
312 2:5
3148 180:19
3149 228:11
3181 1:8,13
3140 228:11
3143 182:8
3144 182:14,15
3145 183:6

**6307** 178:8
**6308** 178:8
**6309** 178:8
**6310** 178:9
**6312** 178:9

---
**7**
**7** 153:2,5,8,13
251:15
**70s** 41:21
**75th** 18:8
**77** 2:18 58:7
249:9
**773** 247:26
248:24 249:26
250:24 251:26
252:24

---
**8**
**8** 155:2,6
156:11 201:24
202:1,2,20
222:8 251:16
**8.5-by-11** 62:10
222:24
**80** 21:21 25:5
31:5 44:17
64:11,12
**80s** 15:15 21:18
28:6 32:19
41:21 42:6,19
49:1 53:16
58:8
**81** 42:6 43:16
44:17 51:3
82:18 84:4,11
**8108** 1:8
**82** 40:17 157:22
167:20 172:2
176:19 206:15
**82-2** 13:14
149:16 151:7
160:20,23
161:5,17
166:11,19
167:8 169:13
169:14 181:13

211:13 212:4
212:19 213:6
213:10,17
220:8,14
221:15,23
224:13 225:5
225:13,14
**83** 21:22 25:6
28:6 31:5
84:12,13,14
95:5 106:2
141:16 172:3
172:4 179:22
206:15
**83-1** 13:15
169:20,21,22
170:9 173:6
221:14,16,17
223:20 224:2
224:6,8,16,23
227:19 228:7
228:19 229:11
230:1 231:17
243:2
**83-2** 13:16
228:6 230:2,5
232:18 233:4
236:14 237:9
237:23 238:5
**851-7779**
247:26 248:24
249:26 250:24
251:26 252:24
**86** 173:9
**87** 34:5,19,24
36:8
**88** 49:6 51:4
**8th** 37:13

---
**9**
**9** 156:15,18
163:1 177:10
177:10 201:24
202:20,21
251:17
**9:00** 249:24
**90** 39:14

**90s** 41:22
**91** 39:14