# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
JACQUES RIVERA,          )
        Plaintiff,    )
    -vs-           ) 2012 CV 4428
REYNALDO GUEVARA, ET AL.,   )
        Defendants.   )

The continued deposition of JAMES HICKEY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before KIMBERLY J. KARAS, a notary public within and for the County of Cook and State of Illinois, at 375 East Chicago Avenue, 8th Floor, Chicago, Illinois, on the 10th day of June, 2014, commencing at the hour of 10:16 o'clock a.m. and terminating at the hour of 4:07 o'clock p.m.

Reported by: Kimberly J. Karas
License No.: 084-003548

127

APPEARANCES:

RODERICK AND SOLANGE MacARTHUR JUSTICE
CENTER, by
MR. LOCKE BOWMAN
Northwestern University School of Law
357 East Chicago Avenue
8th Floor
Chicago, Illinois  60611
(312) 503-1336
ereana-hart@law.northwestern.edu
l-bowman@law.northwestern.edu
    and
LOEVY & LOEVY, by
MR. STEVE ART
MR. RUSSELL AINSWORTH
312 North May
Suite 100
Chicago, Illinois  60607
(312) 243-5900
art@loevy.com
    Representing the Plaintiff;

128

APPEARANCES CONTD:

ROCK, FUSCO & CONNELLY, LLC, by
MS. EILEEN ROSEN
321 North Clark Street
Suite 2200
Chicago, Illinois  60654
(312) 494-1000
erosen@rockfuscoconnelly.com
    Representing the City of Chicago;

THE SOTOS LAW FIRM, P.C., by
MS. ELIZABETH A. EKL
MR. JEFFREY N. GIVEN
550 East Devon
Suite 150
Itasca, Illinois  60143
(630) 735-3300
eekl@jsotoslaw.com
jgiven@jsotoslaw.com
    Representing named Defendant Chicago
    Police Officers.

129

I N D E X
WITNESS                    EXAMINATION
JAMES HICKEY
By Mr. Bowman (continued)      131
By Ms. Rosen              279
By Mr. Bowman (Further)       291

E X H I B I T S
NUMBER                    IDENTIFICATION
Hickey Exhibit
No. 7        133
No. 8        133
No. 9        164
No. 10       164
No. 11       167
No. 12       200
No. 13       215
No. 14       223
No. 15       225
No. 16       228
No. 17       245
No. 18       250
No. 19       255
No. 20       276

130

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1          (Whereupon, the witness
2          was duly sworn.)
3       JAMES HICKEY,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6          CONTINUED EXAMINATION
7   BY MR. BOWMAN:
8       Q.  Mr. Hickey, have you looked at any
9   documents since the last session of your deposition
10  that we had in May?
11      A.  I have.
12      Q.  Can you tell me what you looked at?
13      A.  The transcript from my deposition.
14      Q.  Okay.  Anything else?
15      A.  A gang crimes activity report.
16      Q.  Which one?
17      A.  1983 version I believe.  And I think there
18  was a 1993 version.
19      Q.  Okay.  And was this just a blank format?
20      A.  Yes, it was.
21      Q.  Okay.  So there was a 1983 and a 1993
22  version that you looked at?
23      A.  Right, they're about ten years apart.
24      Q.  Did you happen to bring those with you?

                                                    131

1       MS. ROSEN:  Oh, I don't care.
2          They're just a blank form, right.
3       THE WITNESS:  Yes.
4       MR. BOWMAN:  All right.
5       MS. ROSEN:  We will mark them.
6       THE WITNESS:  This is the '83.
7       MR. BOWMAN:  Yeah.
8   BY MR. BOWMAN:
9       Q.  Thank you for handing me these two
10  documents.
11         What I'm going to do is mark for
12  identification as Exhibit 7 to your deposition the
13  version of the gang specialist daily activity
14  summary that was created in 1983.  And as Exhibit 8
15  the version that went on-line in 1993.
16         (Whereupon, Hickey Deposition
17         Exhibit No. 7 and No. 8 were marked
18         for identification.)
19      MR. ART:  And, Locke, for the record Exhibit 7
20  is Bates stamped.
21      MS. ROSEN:  You have it?
22      MR. ART:  Yes.
23      MS. ROSEN:  Oh, all right.
24      MR. ART:  RFC20172.  And Exhibit 8 is Bates

                                                    133

1       A.  I did.
2       Q.  May I see them?
3       MS. ROSEN:  They were produced yesterday.
4       MR. BOWMAN:  Oh, they were.
5       MR. ART:  Oh, really.
6       MS. ROSEN:  Well, you asked for them.
7       MR. BOWMAN:  There's a lot of e-mails, Eileen.
8       MS. ROSEN:  They were part of the production
9   response from yesterday.
10      MR. ART:  Oh, yeah, yeah, we saw that for sure.
11      MR. BOWMAN:  Well, if you have them.
12      MS. ROSEN:  That's fine.  I'm just saying you
13  guys asked for them and I actually thought it was
14  convenient that they were -- the production was due
15  the day before the dep.
16      MR. ART:  That was convenient.
17      MS. ROSEN:  Yep.
18         This is obviously the un-Bates stamped
19  version.
20      MR. BOWMAN:  Right.
21      MS. ROSEN:  We can figure out what that is at a
22  break or something.
23      MR. BOWMAN:  Sure.  Do you mind if I mark
24  these.

                                                    132

1   stamped RFC20173.
2       MR. BOWMAN:  Great.
3          And this is -- and the Bates numbers that
4   Mr. Art just read off were from yesterday's
5   production of these two documents.
6   BY MR. BOWMAN:
7       Q.  So I don't have extra copies.  I don't
8   think I'm going to need to read over your shoulder
9   but we'll see.
10         Let's look first at Exhibit 7 which -- why
11  don't you begin by just telling us what that is?
12      A.  This is an 8 and a half by 11 lined
13  report.  The title of it of which is the gang
14  specialist daily activity summary.  And it has a
15  CPD form number of 21.382.  And it was created in
16  December 1983.
17      Q.  And you can tell that by the -- by the
18  numbers that appear in parentheses in the lower
19  left-hand corner --
20      A.  That's correct.
21      Q.  -- portion of the page?
22         Can you tell me what the process was --
23  and let me ask you a foundational question first.
24  I'm assuming you had no personal role in the

                                                    134

2 (Pages 131 to 134)

1  creation of Exhibit 7?
2      A.  I did not.
3      Q.  Can you tell me generically what the
4  process was for the creation of this form?
5      A.  In the Chicago Police Department all forms
6  are created in a central location and they are
7  assigned a form number.  Functionally this activity
8  takes place in the Research and Development
9  Division.  And as a result we have a historical
10  listing of the forms that we have officially
11  created over the years.  It also includes printing
12  records and things of that nature.
13      Q.  So you were able to locate this by just
14  going back to the list and looking for the activity
15  summary form for gang crimes?
16      A.  Correct.
17      Q.  This I'm assuming is an official form of
18  the Chicago Police Department?
19      A.  It is.
20      Q.  The document when it is completed by a
21  gang crimes specialist becomes the property of the
22  police department?
23      A.  That's correct.
24      Q.  And the expectation is that it will be

135

1  filed and kept in the ordinary course of business
2  in the Chicago Police Department?
3      A.  For whatever the form retention calls for.
4      Q.  Okay.  Now, since you've brought that up
5  let me get a little bit ahead of myself and follow
6  you along.  Is there a way to determine the form
7  retention period that applies with respect to this
8  particular form?
9      A.  There would be a way.  It would be to go
10  back to R and D and find out what the retention
11  form -- or what the retention period was for this
12  form.
13      Q.  Okay.
14      A.  For every form there is an established
15  retention form -- retention period, excuse me.
16      Q.  All right.  What, if you know, was the
17  procedure for filing and retaining these particular
18  forms when they had been completed by gang crimes
19  specialists?
20      A.  I do not know the specific filing for this
21  form but it is an activity report.  Probably didn't
22  go beyond the unit level.
23      Q.  Meaning that your informed belief is that
24  this particular form when it was submitted by an

136

1  officer at the conclusion of a tour of duty would
2  be filed and maintained in that officer's unit?
3      A.  Correct.
4      Q.  And that would be in this -- in the case
5  of gang crimes it would be a field unit?
6      A.  Yes, sir.
7      Q.  Okay.  And then the expectation of the
8  police department is that the form having been
9  filled out and submitted, approved by the
10  supervisor would then be kept and maintained in
11  that unit for whatever period of time was called
12  for with respect to this particular form?
13      A.  Yes, sir.
14      Q.  And then what would happen at the -- at
15  the end of that time period?
16      A.  There's established procedures to destroy
17  any form in the Chicago Police Department.
18      Q.  Is there ever any process of transferring
19  the contents of forms onto microfiche or current
20  parlance putting it -- scanning it in to retain it
21  or a permanent basis?
22      A.  I am not --
23      MS. ROSEN:  This form or forms generally.
24      MR. BOWMAN:  Forms generally.

137

1      THE WITNESS:  The only form I know that we
2  microfiche I think are traffic crash reports.
3  Nothing else.
4  BY MR. BOWMAN:
5      Q.  All right.  So when these things are
6  destroyed they're gone.  They're just destroyed and
7  there contents of them are not available to anyone
8  anymore?
9      A.  Correct.
10      Q.  All right.  Is there any accompanying this
11  form at the time of its creation is there any set
12  of instructions, rules, procedures with respect to
13  how to fill it out?
14      A.  There is no directive but there is
15  description on the form itself as to how it should
16  be used.
17      Q.  Okay.  Why don't you just read that into
18  the -- into the record?
19      A.  About a third way down on the report
20  itself there's a description that reads as
21  follows:  Activity, colon, briefly describe the
22  nature of any investigation either assigned or
23  self-initiated including arrest and other activity,
24  period.  This is not an investigative report and

138

3 (Pages 135 to 138)

1  will not include information normally contained on
2  official department reporting documents, period.
3  Attach copies of any initiated reports and submit
4  to the supervisor at the conclusion of the tour of
5  duty.
6      Q.   Okay.
7      A.   End.
8      Q.   So the testimony that we've heard from
9  others is that -- that informally on the street the
10 understanding was that -- that this activity report
11 which was colloquially known as a humper would --
12 would provide supervisors with a complete record of
13 the way an individual gang crimes specialist had
14 spent his eight hour tour of duty every day, is
15 that consistent with the instruction that you've
16 just read?
17     MS. ROSEN:  Objection form, misstates the prior
18 testimony.
19     THE WITNESS:  I don't think it was ever
20 intended to record every activity they performed
21 but a summary, a broad summary.
22 BY MR. BOWMAN:
23     Q.   Sure.  So with that correction I'm right?
24     A.   Yes.  Yes, sir.

139

1      Q.   Okay.  Now, the form was modified in 1993
2  and you have Exhibit 8 in front of you as well.
3  Can you, first of all, tell me when Exhibit --
4  well, why don't you just tell me what Exhibit 8 is?
5      A.   The title of this report even though it
6  has the same number, i.e., CPD-21.382 was revised
7  in February 1993 and also had a revised title.
8  Instead of saying gang specialist daily activity
9  summary it said daily assignment and activity
10 report special functions group patrol division.  So
11 anyone working in that organizational subunit would
12 be filling that out not just gang crimes
13 specialist.
14     Q.   Would gang crimes specialists also fill
15 out Exhibit 8?
16     A.   Yes, they would if they were part of that
17 group in 1993.
18     Q.   And you were able to determine the
19 identity of the form number as between Exhibit 7
20 and 8 as well as the time that Exhibit 8 was
21 initiated again by looking in the lower left-hand
22 portion of the document?
23     A.   Yes, sir.
24     Q.   Why was the form revised?

140

1      A.   I have no personal knowledge.  My looking
2  at it is that it was broadened from one reporting
3  unit, i.e., the gang crimes section to a broader
4  group of units for their use, the special functions
5  group.
6      Q.   You need to help me out because I'm --
7      A.   Sure.
8      Q.   -- looking upside down at it.
9          Is there any change in the instructions
10 for completing the form?
11     A.   It's verbatim the same is for the
12 instructions.  This is not -- okay, there's the
13 second sentence where as it used to say this is not
14 an investigative report and will not include
15 information normally contained on official
16 department reporting documents now reads this is
17 not a case report and will not include information
18 normally contained on official department reporting
19 documents.  So a minor change in words.
20     Q.   Do you have any understanding as to the
21 reason for that change?
22     A.   No, I don't.  No.
23     Q.   Other than that is -- are there any other
24 changes of substance?

141

1      A.   For some reason there was a -- in the
2  later version of the form there was a daily
3  performance checkbox presumably filled out by the
4  supervisor to describe the activity as of the
5  officers submitting the report on a continuum
6  ranging from poor to outstanding.  And there is a
7  comments space which was provided.  Again intended
8  for the supervisors use.
9      Q.   All right.  And once again do you know the
10 reason for providing that format for the supervisor
11 to use?
12     A.   I do not know the exact reason.  It looks
13 as if they wanted to evaluate the officers as often
14 as possible.
15     Q.   Do you know whether Exhibit 8 remains in
16 use in the patrol division today?
17     A.   I do not.  I do not.
18     Q.   Okay.  Is there a way to find out?
19     MS. ROSEN:  Objection relevance.
20     THE WITNESS:  I will -- I can check our
21 Research and Development historical form records
22 and current existing forms to see if this form
23 number continues or if it has been revised since
24 then.

142

4 (Pages 139 to 142)

BY MR. BOWMAN:

Q.   Okay.  So, in other words, you could just -- you would just go back into the same records source and you can determine if there had been a superseding version at some time or if there had been a distinction of the form that would also be noted?

A.   Many times the form is officially rescinded and sometimes it languishes.

Q.   Okay.  All right.  So -- thanks for that explanation.

We were discussing what you had reviewed in the period since your last testimony here.  Is there anything in addition to these two forms and the transcript of your deposition?

A.   No, sir.

Q.   When you reviewed the transcript of your deposition did you find any substantive inaccuracies or erroneous statements in your testimony.  And I know that there are typographical errors in the -- in the transcript that we have a procedure for dealing with that, I'm asking for substantive issues.

A.   None jumped out at me.

143

Q.   Okay.  So you --

A.   I mean, there may be some concerns about my wording or phrasing that I might not be personally satisfied with but I can't think of it at this moment.

Q.   You stand by your answers?

A.   Yes, sir.

Q.   Okay.  So I wanted to focus with you for a few minutes on the period of time when you served as assistant director of the Records Division.  And I think you weren't completely confident of the years.  But I want to make sure that I've done the best job that I can of asking you to specify when you served in that position.

A.   Early 2000s.  I'm sorry, again I don't know the exact time frame.

Q.   Well, I may have miss -- misread it or misunderstood.  I had the impression from your testimony that it was around 1997 that you were --

A.   No, because I was still lieutenant through 1999.

Q.   So it was early in the -- in the first decade of this --

A.   Yes, sir.

144

Q.   -- Century.

Early 2000s?

A.   Sounds rather historical.

Q.   And what -- for how long were you in the position of assistant director of the Records Division?

A.   Probably two and a half years.  I don't think it was three but it might have been.

Q.   And in addition to yourself were there any other assistant directors?

A.   No, there was not.

Q.   Okay.  So the duties of the assistant director generally speaking would have been to be the hands-on implementor of the directors intentions for the supervision and functioning of the department?

MS. ROSEN:  Objection, form.

THE WITNESS:  For the Records Division, correct.

BY MR. BOWMAN:

Q.   For the Records Division.

And you indicated that an individual named James Piper was the director --

A.   He was.

145

Q.   -- under whom you served?

And was that for the entire two and a half year period?

A.   He left toward the end of it, probably the last six months of it.

Q.   Who succeeded him?

A.   It was left vacant.

Q.   So in the six month period you functioned as the de facto director?

A.   Correct.

Q.   Now, you testified about something called the subpoena service unit?

A.   Yes, sir.

Q.   Okay.  That was under your jurisdiction as assistant director of the Records Division for your two and a half year term?

A.   Yes, sir.

Q.   And can you explain to me to the extent it's possible what the organizational chart of the Records Division was and where the subpoena service unit fit in that chart?

A.   Certainly.  The Records Division consisted of multiple units, subunits.  One was the identification section.  Two was the records

146

5 (Pages 143 to 146)

1 processing section. Three was the gun registration
2 unit. Four was freedom of information inquiries.
3 Five was the subpoena service unit. I may have
4 missed a unit but it's most -- that's the bulk of
5 it.
6     Q. And the chain of command I am assuming but
7 correct me if I'm wrong would be that there would
8 be the director, immediately below the director in
9 the chain would be the assistant director, and then
10 there would be section or unit heads all of whom
11 reported to you as assistant director and then
12 indirectly through you to the director, fair?
13     A. Correct.
14     Q. Okay. What was the title of the person
15 who was directly responsible for the -- for the
16 subpoena services unit?
17     A. A sergeant.
18     Q. So it simply would be a sergeant. Was he
19 chief or?
20     A. No, just sergeant.
21     Q. Just sergeant.
22         And then I believe you indicated in your
23 testimony that there were unsworn personnel who
24 actually performed the functions of responding to

147

1     Q. Bureau of Administrative Services is of
2 course separate from the Bureau of Investigative
3 Services in which the detectives are situated?
4     A. Yes, sir.
5     Q. And also different from the -- the bureau
6 in which the patrol officers, the patrol division
7 is situated?
8     A. Correct.
9     Q. And where do the -- just for my benefit
10 since I might as well ask it, where was the patrol
11 division in the --
12     A. Operational services.
13     Q. Operational services, okay.
14         All right. Now, we looked last time at
15 this -- and it was Exhibit 1 for identification.
16 I've got -- I will just hand you this. I'm going
17 to hand you a set of the six exhibits we marked
18 last time. I may or may not need you to refer to
19 them.
20         But I do want you to look at Exhibit 1
21 which is the Rule 30(b)(6) notice of deposition,
22 it's at the top of the stack I just handed you and
23 refer you to Page 2 of Exhibit 1.
24         Our understanding is that you have been

149

1 subpoenas and other requests for information?
2     A. There were unsworn -- mostly unsworn but I
3 do remember at least one sworn member.
4     Q. And what was the title of these folks?
5     A. They had various clerical titles,
6 different pays. But their function was fulfilling
7 the subpoena. They did not have a common title.
8     Q. So there would be like --
9     A. Clerk 3.
10     Q. Clerk 3, clerk 4, whatever?
11     A. Right. Right.
12     Q. But you generically refer to these as
13 clerks?
14     A. Correct.
15     Q. All right. Did you say there were five or
16 six of them?
17     A. I think four or five might be more
18 accurate.
19     Q. All right. And then the Records Division
20 -- and I'm just dunderheaded about this so bear
21 with me. The Records Division is part of the
22 bureau within the police department?
23     A. It was part of the Bureau of
24 Administrative Services at that time.

148

1 designated to speak for the City of Chicago with
2 respect to the City's written and unwritten
3 policies, practices, and customs in effect from
4 1980 to 1990 relating to several topics including
5 Subparagraph F which reads responding to subpoenas
6 from criminal defendants requesting records
7 concerning a homicide investigation and there's
8 more language after that but that's the essence of
9 it. And it's -- you're aware of that designation
10 and you believe that you're -- you're qualified to
11 do that?
12     A. I am aware and I do believe.
13     Q. Okay. Now, you provided -- and the record
14 is not completely clear about this. You provided
15 some testimony in our first deposition or the first
16 session of your deposition regarding the operations
17 on the ground of the subpoena services unit as it
18 -- as it operated when you were in charge in the
19 early 2000s. And I know that with respect to some
20 questions I asked you of your testimony would be
21 accurate as a description of the functioning of the
22 unit in the 1980's but I may not have been
23 completely clear.
24         Is there -- here comes my question. Is

150

6 (Pages 147 to 150)

1   there as you sit here today any specific change in
2   the nature of the operation, any difference in the
3   processing of subpoenas, and other requests for
4   information as between the way the unit functioned
5   in the 1980's and the way it functioned under your
6   command in the early 2000s?
7       A. Yes.
8       Q. Okay. Can you tell me as completely as
9   possible what changes there were?
10       A. First of all, I think my last deposition
11   with you or the earlier part of this deposition on
12   a prior date was not as informative on this topic
13   as I would like it to have been. So I would like
14   -- it's one of the areas that I was not pleased
15   with my explanation as I reviewed my transcripts.
16       We've always kept records. Always, i.e.,
17   certainly during this time period. The primary
18   difference between the 1980's and the present is
19   that those subpoenas received today are more
20   electronically processed. There is a database
21   which was created in the year 2005. And it has
22   those data fields that you might anticipate. You
23   know, the defendant's name and all the numerical
24   identifiers associated with the case.

                                  151

1       And it also spells out many of the Chicago
2   Police Department units that normally receive
3   requests, routinely receive requests from the
4   subpoena unit directing them to search their files
5   for records which have been subpoenaed.
6       And the clarification I'd like to make is
7   that in the paper world there was a similar but not
8   the same attempt to document the receipt and the
9   servicing of subpoenas.
10       In the pre-electronic world the police
11   department recorded many activities in what would
12   almost be the equivalent of a -- we call them a CO
13   book, a commanding officer's book. It's a leather
14   bound book oversized in nature more of the physical
15   size of a legal pad but thicker. And the pages are
16   not detachable. And what they did was create their
17   own columns and entered many of the same data
18   fields that are in the electronic application
19   today. And again it was organized by date. I
20   don't know if it was organized by date but
21   certainly a key feature was the date that it was
22   due in court. So that was -- I don't think I made
23   that clear enough in our earlier conversations.
24       Q. Okay. When you were the commanding

                                  152

1   officer of the subpoena services unit in the early
2   2000's had the unit transitioned into the digital
3   world or were you still functioning on paper?
4       A. In regards to subpoena processing paper is
5   the answer.
6       Q. Okay. So as -- between your experience as
7   the commanding officer in I think we've now
8   established the period between 2000 and 2005,
9   right?
10       A. Yes.
11       Q. In that period of time did the unit to the
12   best of your information function any differently
13   than it did in the 1980's?
14       A. I don't know how it could have.
15       Q. Okay. So to the best of your information
16   and understanding the answers that you gave last
17   time, you know, is clarified just now in your
18   answer a moment ago are accurate with respect to
19   the functioning of the unit in the 1980's?
20       A. Yes, sir.
21       Q. All right. Do you have a specific
22   recollection of a commanding officer's book being
23   in use in the subpoena services unit during your
24   tenure there?

                                  153

1       A. I do.
2       Q. Okay. And who is the keeper of that book?
3       A. Those in the subpoena unit. It was a
4   dynamic type of book and when it got filled you
5   went on to the next one.
6       Q. And were they kept?
7       A. Yes.
8       Q. Where were they kept?
9       A. I don't know if it was in the record's
10   division headquarters or in the warehouse but they
11   were kept.
12       Q. Okay. And what about the commanding
13   officer's books from the 1980's would it be a
14   fool's errand to go look for those?
15       MR. BOWMAN: You want to object to the form of
16   the question.
17       MS. ROSEN: I'd like to object to the form of
18   that.
19       MR. BOWMAN: I'll rephrase it.
20   BY MR. BOWMAN:
21       Q. Would it be possible to find the
22   commanding officer's book from 19 -- from some
23   period say 1988 or 1990 for the subpoena services
24   unit?

                                  154

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1    A.   I personally believe it may exist.
2    Q.   Where -- where would it -- what would be
3  the process to look for it based on your knowledge
4  and understanding?
5    A.   It would possibly be in the records
6  warehouse under the control of the records
7  division.
8    Q.   Okay.  And if you were to -- and I'm not
9  suggesting it's of any interest of yours to find
10  it.  But if you were looking for it and you were
11  to, you know, pick up the phone or write an e-mail
12  or whatever to the person in the records division
13  who you would be asking to look for it how would
14  you describe this thing, this book?
15    MS. ROSEN:  I'm going to just object to the
16  form of the question in the context of you're
17  referring to this book in the singular -- like
18  there might be a book over 1988 and I'm not sure
19  you've established that foundation so.
20    MR. BOWMAN:  Oh, sure.
21  BY MR. BOWMAN:
22    Q.   No, I'm -- I'm understanding your
23  testimony that there would be -- for any year would
24  there be multiple books?

155

1    A.   There may be.
2    Q.   Okay.  Depending on how many subpoenas and
3  how big the book was and how fast they got filled
4  up?
5    A.   Right.
6    Q.   Okay.  So if you were looking for the book
7  or books that were in use in the period of time
8  we're talking about in this case how would you
9  describe the books?
10    A.   Asking for that book in which the subpoena
11  service unit documented the receipt and service of
12  subpoenas.
13    Q.   All right.  And this was colloquially
14  referred to as the commanding officer's book or the
15  CO book?
16    A.   I use that to describe it physically
17  because that same book was used in the patrol
18  division by every watch in the City to make
19  announcements, you know.  So it was -- it's a means
20  of communication.  They simply used that same
21  product.  I don't know what the commodity
22  description is for this large book.
23    Q.   Got it.
24    Now, you believe that in this book the

156

1  personnel in the subpoena services unit would
2  record the particular case in which there had been
3  a subpoena or a request for documents, yes?
4    A.   Yes, sir.
5    Q.   And they would record the date on which
6  that request was due in court?
7    A.   That certainly was a key date for them.
8    Q.   Okay.  And what else would be recorded
9  based on your experience in this book, if anything?
10    A.   I -- I don't know what the actual columns
11  on the piece of paper were.  It certainly -- the RD
12  is presumed to be there, defendant's name.
13    Q.   RD, defendant's name.  Any description of
14  the nature of the request?
15    A.   I don't know.  I presume the requester.
16    MS. ROSEN:  The name of the requester.
17    THE WITNESS:  The name of the requester.
18  BY MR. BOWMAN:
19    Q.   Would that be a lawyer's name or just a
20  reference to defense request?
21    A.   I don't know.  I don't know.
22    Q.   Okay.  And then we talked about the -- the
23  due date.  Can you state with confidence whether
24  any other information was recorded in this book on

157

1  a regular basis?
2    A.   No, I can't.  I would be speculating.
3    Q.   Do you know whether any improvements were
4  made to streamline -- to make more efficient, to
5  make more transparent, any improvements of any
6  nature were made in the functioning of the subpoena
7  services unit in the period between 1990 and when
8  you took command in the early 2000's?
9    MS. ROSEN:  I'm going to object to the form.
10    THE WITNESS:  I am not aware of any until the
11  later time of 2005.
12  BY MR. BOWMAN:
13    Q.   Referring to the -- to the creation of
14  electronic data?
15    A.   Correct.
16    Q.   Was there a particular point in 2005 when
17  the subpoena services unit went on-line?
18    A.   I don't know the date.  I talked to the
19  programmer and said it was 2005.
20    Q.   So you did some investigation --
21    A.   I did.
22    Q.   -- in between --
23    A.   Right.
24    Q.   -- to find this information?

158

8 (Pages 155 to 158)

1    Who did you talk with about this?
2    A.  Oh, I -- Alfansa, I don't know his last
3 name.
4    Q.  Who was the person and I -- I think I'm
5 looking for a title rather than a name.
6    Who was the person in charge of setting
7 the policy to be followed by the subpoena services
8 unit in the 1980's?
9    MS. ROSEN:  I'm going to object to the form of
10 the question and foundation.
11    THE WITNESS:  Obviously the day-to-day SOP
12 would be established by the director of the records
13 division.  If there were any other directives it
14 may come from what was then the executive assistant
15 to the superintendent now referred to as the
16 general counsel, the lawyer.
17    But I -- I can't think of anything that
18 they might have directed.
19 BY MR. BOWMAN:
20    Q.  Would it be a fair statement to say that
21 the policy was set and implemented by the director
22 of the Records Division?
23    MS. ROSEN:  Object to the form of the question.
24    THE WITNESS:  It's the director of the Records

159

1    the -- if you know, in the late 1980's through --
2 let me start over.
3    From 1988 to 1991, if you know, who was
4 the director of the Records Division at the Chicago
5 Police Department?
6    A.  I don't know.  I'm -- I would be guessing.
7    Q.  What informal unwritten safeguards,
8 policies, procedures existed in the 1980's --
9 strike that.  Let me start over.
10    In the period between 1988 and 1991 what
11 informal safeguards, procedures, policies existed
12 to ensure that when a subpoena or informal request
13 for documentation relating to a particular case
14 came in that all responsive documentation including
15 exculpatory information was provided in response to
16 the request?
17    MS. ROSEN:  Objection, form.
18    THE WITNESS:  The personnel assigned to the
19 subpoena processing unit, subpoena service unit,
20 received on-the-job training.  For the time period
21 in question certainly the topic of investigative
22 files had become common -- common terminology.  So
23 the -- those handling the request would give the
24 requester, prosecutor, or defense attorney the

161

1 Division's responsibility so yes.
2 BY MR. BOWMAN:
3    Q.  My last question referred to the
4 operations of the subpoena services unit, you
5 understood that, right?
6    A.  I did.
7    Q.  Now, in the 1980's what policies, safe
8 checks, procedures existed first in writing to
9 ensure that when a request came in either by a
10 subpoena or by an informal request from an
11 Assistant State's Attorney, when the request came
12 in in a particular case that all of the necessary
13 information including exculpatory information was
14 provided by the subpoena services unit in response
15 to that request?
16    MS. ROSEN:  Can you read back the question.
17    (Whereupon, the record was read
18          as requested.)
19    MS. ROSEN:  Object to the form.
20    THE WITNESS:  At this time I can't think of any
21 directives that were written specifically to
22 address this matter.
23 BY MR. BOWMAN:
24    Q.  Before I forget let me ask you this, in

160

1 information that they asked for.  And also strive
2 to, you know, add some value.  I mean, these are
3 humans performing a clerical task and they don't
4 want to do it a second time, they don't want to do
5 it again next week.  So they would use the
6 knowledge that they have gathered.  Oh, if you're
7 looking for a traffic crash record make sure -- you
8 know, they didn't ask for it but send it to the
9 traffic record section they may something as well.
10 So it's an artful -- it's both technical and an art
11 form.  I'm trying to read and understand what it is
12 you're requesting.
13    Q.  So if I understand your answer correctly
14 what you're saying is that the -- that the training
15 that personnel received was not formal, right?
16    A.  Right.
17    Q.  If we were to look in the Chicago Police
18 Department for any training course records, any
19 manuals, any written procedures, any general
20 orders, anything of that nature relating to this
21 issue of how to respond to subpoenas and other
22 requests to ensure that exculpatory information was
23 provided in the period from '88 to '91 we wouldn't
24 find anything?

162

9 (Pages 159 to 162)

1    MS. ROSEN:  Object to the form of the question.
2    THE WITNESS:  I don't think you would.
3    BY MR. BOWMAN:
4    Q.  It was purely a matter of a clerk being
5    assigned a file and having had experience with
6    similar assignments of that nature?
7    A.  They also had a resource of a sergeant to
8    ask for direction when they were confused or unable
9    to understand a subpoena request.
10   Q.  Okay.  And that's it?
11   MS. ROSEN:  Object to the form of the question.
12   THE WITNESS:  They could probably ask the
13   assistant director of records as well for some
14   help.
15   BY MR. BOWMAN:
16   Q.  Right, they probably could.  But I mean
17   realistically in your experience I mean that wasn't
18   part of your job duties, right, to help deal with
19   individual subpoenas in cases, right?
20   A.  Correct.
21   Q.  And in your experience the assistant
22   director didn't get asked those kinds of questions
23   except in the most unusual circumstances, fair?
24   A.  Fair.

163

1    Q.  You don't have any reason to believe it
2    was any different in the period in question '88
3    through '91, right?
4    A.  I do not.
5    MR. BOWMAN:  All right.  Now, I want to mark
6    for identification as Exhibits 9 and 10.
7    (Whereupon, Hickey Deposition
8    Exhibit No. 9 and No. 10 were marked
9    for identification.)
10   BY MR. BOWMAN:
11   Q.  All right.  Let me just explain for the
12   record what I've handed you, Mr. Hickey.
13   Exhibit 9 is a copy that we made at the
14   conclusion of the first session of your deposition
15   of the folder that you indicated was the permanent
16   retention file relating to a particular RD Number
17   K371955 which happens to be the RD Number for the
18   investigation into the murder of an individual
19   named Felix Valentin, did I get that right?
20   A.  Yes, sir.
21   Q.  And then you don't know this and I'm just
22   making a representation for the record.  And I'm
23   not asking you to believe anything that I say as
24   far as the way I describe this file, okay,

164

1    Mr. Hickey.  But I'm going to tell you what I've
2    marked for the record as well.
3    Exhibit 10 bears Bates Numbers RFC 00507
4    through 535.
5    A.  Do I have that in front of me.
6    Q.  Yeah, you do.
7    A.  Which one.
8    Q.  I marked it for identification as Exhibit
9    10 to your deposition.
10   A.  Okay.
11   Q.  And it is a set of supplementary reports,
12   a general offense case report, an arrest report,
13   and some criminal history information.  The
14   supplementary reports have the same base number
15   that I just read with respect to Exhibit 9.
16   MS. ROSEN:  Have the same Bates number.
17   MR. BOWMAN:  I'm sorry, the same Records
18   Division number as does the general offense case
19   report.
20   MS. ROSEN:  Okay.
21   BY MR. BOWMAN:
22   Q.  And the documents within Exhibit 10 came
23   from the file of the lawyer a gentleman by the name
24   of Ken Wadas who represented the man I represent

165

1    Jacques Rivera in his criminal case that resulted
2    in his conviction for the Felix Valentin murder.
3    And I'm going to further represent to you
4    that Mr. Wadas has testified under oath that
5    Exhibit 10, this set of documents here, are the
6    entirety of what he ever received in response to
7    his discovery requests in the criminal case?
8    MS. ROSEN:  I object to the form of the
9    question.
10   MR. BOWMAN:  It's actually not a question, it's
11   just a representation.
12   MS. ROSEN:  Okay.  Well, I'm going to object to
13   the representation as misstating the record.
14   But you can go ahead and -- go ahead and
15   finish your question.
16   MR. BOWMAN:  Okay.  Can I -- I don't want it to
17   -- if it's -- if you want to tell me how it's
18   inaccurate and I may actually agree with you and
19   acknowledge it.  What's wrong about what I said.
20   MS. ROSEN:  Well, I don't think that you've
21   summarized Judge Wadas's testimony entirely
22   accurate.
23   MR. BOWMAN:  In what respect.
24   MS. ROSEN:  I don't think he said that these --

166

10 (Pages 163 to 166)

1  that this is the sum total of -- I don't remember
2  what words you used but I think he said to the best
3  of his knowledge the file we received for him was
4  complete.  However, we know that that can't
5  possibly be true based on the receipt that he --
6  that was prepared by somebody at Northwestern in
7  2002 so.
8      MR. BOWMAN:  Okay.  Well, all right.  I think
9  we'll just -- I think we'll just agree to disagree
10  and I would stand by the representation that I
11  made.
12  BY MR. BOWMAN:
13     Q.  Okay.  That these are all the police
14  reports in Mr. Wadas's file and he said that in his
15  -- in his deposition under oath that these are all
16  the police reports he ever got.
17     Now, I think I should mark another file
18  for identification so that you will have it for
19  reference.
20     MR. BOWMAN:  And this is going to be Exhibit
21  11.
22         (Whereupon, Hickey Deposition
23          Exhibit No. 11 was marked for
24          identification.)

167

1  BY MR. BOWMAN:
2      Q.  The document -- the set of documents that
3  I just handed you marked for identification as
4  Exhibit 11 to your deposition bear Bates Numbers
5  WRON 0001 through 69.
6      And then make a representation to you also
7  with respect to Exhibit 11 this is the
8  investigative file at least according to Detective
9  Wronkowski who testified under oath in a deposition
10  in this case relating to the same RD Number and
11  relating to the investigation of the homicide of
12  Felix Valentin.
13     And without getting into the weeds of
14  detail as you just thumbed through Exhibit 11 you
15  will see that Exhibit 11 contains police records
16  that are not contained in Exhibit 9, right?
17     A.  Right.
18     Q.  I mean, we don't need for purposes today
19  to make an exhaustive list but just among other
20  things there are some general progress reports in
21  Exhibit 11 that aren't in Exhibit 9, right?
22     A.  Correct.
23     Q.  Okay.  And then indeed if you looked at
24  Exhibit 10 the Wadas file you will see that the

168

1  general progress reports are not there either?
2      A.  Correct.
3      Q.  Right, you've already checked that.
4      And the -- and there are other materials
5  in Exhibit 11 that also weren't in the Wadas file
6  as well in addition to the PR's, right?
7      A.  Yes.
8      Q.  Now, I want to just ask you to take a
9  closer look at one of the supplementary reports in
10  Exhibit Number 9.  And I'm going to direct your
11  attention specifically to the page that bears Bates
12  Number Hickey 0007.  Which is the first page of a
13  supplementary report that appears to have been
14  signed by a detective named Gillian McLaughlin,
15  you're on that page, right?
16     A.  I am.
17     Q.  Now, there is -- if you turn the page
18  upside down there is a stamp that appears at the
19  bottom pretty much in the center of the document
20  that says 30 August, right, do you see that?
21     A.  Yeah.
22     Q.  Okay.  Let's look at a different document
23  that's probably not the best --
24     MS. ROSEN:  He wasn't looking at the right

169

1  place.
2      THE WITNESS:  I'm sorry.  I do see 30 and it
3  looks like August.  I don't know what -- probably
4  the year but I don't know what it -- I can't read
5  it.
6  BY MR. BOWMAN:
7      Q.  Why don't we look -- since it comes up
8  more clearly why don't we look at Page 11.  And
9  turn Page 11 upside down and you'll see a similar
10  stamp, right?
11     A.  Yes, sir.
12     Q.  31 August, 1988.  And then it looks like
13  1621 which may be 4:21 for those of us in the
14  civilian world, possible?
15     A.  Or it could mean 1621 hours.
16     Q.  Right, that's what I was thinking, 4:21.
17     MS. ROSEN:  4:21 p.m.
18     THE WITNESS:  I'm sorry, yes.  I'm sorry, yes.
19  BY MR. BOWMAN:
20     Q.  So you're not familiar with 4:21 any more
21  than I'm familiar with 1621, right?
22     A.  Correct.
23     Q.  Okay.  So it's -- it's a very precise
24  record of the receipt somewhere of this document.

170

11 (Pages 167 to 170)

1 Can you explain what -- what that stamp is and
2 where and how it's put on?
3     A.  I cannot.  I -- I think it's a reasonable
4 inference that it's the receipt that it was date
5 stamped upon arrival at the records processing
6 section of the Records Division.
7     Q.  Okay.  And what is the basis on which you
8 make that reasonable assumption?
9     A.  The Chicago Police Department likes
10 receipting documents.  I sent it, no, you didn't.
11 The usual clerical exchanges.
12     Q.  Okay.  If you look through Exhibit 9 at
13 this set of supplementary reports and other
14 documents you can see that pretty much every page
15 has got a similar stamp on it, right?
16     A.  Not every page -- oh, no.  09 does not.
17     Q.  Right, 09 doesn't for some reason.  Maybe
18 just a clerical error, sir?
19     A.  Yes, sir.
20     Q.  Other than that it appears to be there,
21 right?
22     A.  Yes, it does.
23     Q.  Now, if you compare Exhibit 9 with the
24 Wadas documents, Exhibit 10, look at Bates Number

171

1 507 on the top that matches Hickey Page 7, I think.
2     MS. ROSEN:  Matches.
3     MR. BOWMAN:  507 is the first page in Exhibit
4 10.
5     THE COURT:  Okay, thank you.
6     MS. ROSEN:  And when you say matches you mean
7 it's the same report.
8     MR. BOWMAN:  I mean, it appears to be the same
9 document.
10     MS. ROSEN:  Well, I'm going to object to the
11 form of the question.
12     MR. BOWMAN:  Right.
13     MS. ROSEN:  Because it can't be the same
14 document.  If you mean a copy --
15     MR. BOWMAN:  It's copies of the same document.
16     MS. ROSEN:  Right.
17 BY MR. BOWMAN:
18     Q.  And to state the question more precisely
19 does it not appear to you that the -- the first
20 three pages of Exhibit 10 are a copy of Pages 7
21 through 9 of your Exhibit 9 minus the permanent
22 retention file stamp?
23     A.  They're similar but not the same.  And
24 what I see different and I don't know the

172

1 explanation for is the supervisor's signature which
2 happens to have a date stamp below it, they're
3 different.
4     Q.  Really.
5     A.  If I'm looking at the same document.
6     Q.  Are you comparing Page 507 the first page
7 of Exhibit 10 with Hickey Page 7 within Exhibit --
8     A.  Oh, I'm looking at Hickey 10, I'm sorry.
9     MS. ROSEN:  He's looking at the wrong one, I'm
10 sorry.
11     THE WITNESS:  Yes, they are the same.  It's a
12 photocopy minus the permanent retention stamp.
13 BY MR. BOWMAN:
14     Q.  And the reason I'm lead to believe
15 personally that they're the same is if you look at
16 Page 508 within Exhibit 10 the Wadas documents and
17 you see very faintly the date stamp at the bottom
18 of the page that appears at the bottom of Page 8 of
19 the permanent retention file, right?
20     A.  Yes, sir.
21     Q.  And then if you turn to Page 9 of the
22 permanent retention file the date stamp is missing
23 and indeed it's also missing on the next page from
24 the Wadas documents, right?

173

1     A.  Right.
2     Q.  So it appears that somebody has copied and
3 provided to Mr. Wadas documents from the permanent
4 retention file, right?
5     A.  Yes, sir.
6     Q.  There are of course documents in the
7 permanent retention file that Mr. Wadas did not
8 receive, right?
9     MS. ROSEN:  Object to the form of the question,
10 foundation.
11     MS. EKL:  Objection.
12 BY MR. BOWMAN:
13     Q.  There are, of course, documents in the
14 permanent retention file that are not in Exhibit
15 10, right?
16     A.  I have not cataloged but there appears to
17 be differences.
18     Q.  And, for example, there's an investigative
19 file summary Pages 27 and 28?
20     A.  Correct.
21     Q.  And 29 and 30 that's in the permanent
22 retention file Exhibit 9 and not in Exhibit 10,
23 right?
24     A.  Yes, sir.

174

1    Q.  Now, were there circumstances in which a
2  clerk in the subpoena services unit would make a
3  copy of the documents in the permanent retention
4  file and provide those to defense counsel and not
5  make a copy of documents in the area file and
6  provide -- and fail to provide the investigative
7  file to defense counsel?
8    MS. ROSEN:  Object to the form of the question.
9  BY MR. BOWMAN:
10    Q.  In addition to this case?
11    MS. ROSEN:  Objection to the form of the
12  question, foundation.
13    MS. EKL:  Same.
14    THE WITNESS:  No, because those in the subpoena
15  service unit didn't actually fill the request
16  themselves.  They were the middle men.  They were
17  the gathers -- they made requests of these subunits
18  including a subunit of the Records Division where
19  the permanent retention cases were stored.
20  BY MR. BOWMAN:
21    Q.  Right.
22    A.  So they themselves did not make copies.
23    Q.  Oh, sure, I mean --
24    A.  That was your question.

175

1    Q.  Yes.
2        But you recognize that the danger exists
3  given the complete absence of written policies, the
4  lack of formal training, that the danger exists
5  that individual clerks would fail in their function
6  of gathering records causing a defense lawyer to
7  get just the permanent retention file in some cases
8  and not the investigative file, you recognize that
9  danger exists, right?
10    MS. ROSEN:  Object to the form of the question,
11  argumentative, foundation.
12    THE WITNESS:  I recognize in any paper
13  gathering system there is room for human error.
14  BY MR. BOWMAN:
15    Q.  Right.
16    A.  Certainly nothing by design.  You know,
17  it's -- if something is missing or has not been
18  stamped the most likely suspect is human error.
19    Q.  Right.
20        And what audits have ever been done at any
21  point in time by the Chicago Police Department to
22  evaluate the completeness of the records that were
23  gathered in response to subpoenas and other
24  requests by the subpoena services unit?

176

1    A.  I am not aware of any but interestingly
2  enough there is almost built-in a self service
3  audit by the requester.  I'm aware of cases in
4  which someone said I don't think that's all and
5  we've gone back and looked and found something.
6    Q.  But that's not my question, Mr. Hickey.
7    A.  Yeah, okay.
8    Q.  I mean, it's one thing to say look it's
9  the responsibility of the defense lawyer to figure
10  this out.  But what I'm asking is within the police
11  department is your answer correct that -- that to
12  the best of your knowledge and understanding there
13  has never been an audit of the functioning of the
14  subpoena services unit that has evaluated whether
15  that unit is in fact providing all responsive
16  documents in response to subpoenas --
17    MS. ROSEN:  Object to the form.
18  BY MR. BOWMAN:
19    Q.  -- and other requests for information in
20  particular cases?
21    MS. ROSEN:  Object to the form of the question.
22    THE WITNESS:  I am unaware of any formal audit.
23  Supervision of those personnel is a responsibility
24  of the supervisor who are in charge of them to see

177

1  if they're fulfilling their mission properly.
2  BY MR. BOWMAN:
3    Q.  Well, when you were --
4    A.  But everyday supervisor's function.
5    Q.  Okay.  Well, when you were the supervisor
6  of the subpoena services unit what actions did you
7  take to ensure in particular cases that the
8  subpoena services unit was, in fact, providing all
9  responsive documents including exculpatory
10  documents in response to individual subpoena and
11  other requests for information in cases?
12    MS. ROSEN:  Object to the form of the question.
13    THE WITNESS:  I directed no special audit.
14  BY MR. BOWMAN:
15    Q.  Okay.  Have -- to your knowledge has any
16  clerk or sergeant within the subpoena services unit
17  ever been subject to discipline of any kind for
18  negligence or other failure to provide all
19  responsive documents in response to subpoenas or
20  other requests for information?
21    MS. ROSEN:  Object to the form of the question,
22  foundation.
23    THE WITNESS:  I'm not aware of any discipline
24  regarding these personnel.  The sergeant in charge

178

13 (Pages 175 to 178)

1  of the unit was an attorney. I -- he's a pretty
2  good person. I'm not aware of any.
3  BY MR. BOWMAN:
4      Q.  Who was the sergeant in charge of the unit
5  under your supervision?
6      A.  Sergeant Riley. Riley.
7      Q.  First name?
8      A.  Challenge. Fred. Fred, I think -- no, I
9  don't know, I'm sorry. I'm embarrassed. Please
10  don't show him.
11      Q.  How long had Riley been in that position
12  at the point when you came in as assistant director
13  of the Records Division?
14      A.  Oh, probably seven or eight years.
15      Q.  Do you know who was the sergeant -- I may
16  have asked this but maybe not. Do you know who the
17  sergeant was in charge of the subpoena services
18  unit in the period from 1988 to 1991?
19      A.  I don't. I would speculate.
20      Q.  I'm going to ask for your speculation?
21      A.  Okay, Sergeant Cronin comes to mind. He
22  was the sergeant in records.
23      Q.  What was Sergeant -- what is Sergeant
24  Cronin's first name?

179

1      A.  Don't know but he had red hair.
2      Q.  Irish guy.
3      A.  I don't know.
4      Q.  Do you know if Sergeant Cronin is still
5  living?
6      A.  I do not.
7      Q.  Okay.
8  MS. ROSEN: Can we take a break.
9  MR. BOWMAN: Sure.
10      (Whereupon, a short break was
11      taken.)
12  BY MR. BOWMAN:
13      Q.  So you pointed out, Mr. Hickey, that the
14  responsibility for completeness in responding to
15  subpoenas and other requests resides not just with
16  the subpoena service unit but also with the person
17  or persons within the various units of the police
18  department who actually maintained the documents
19  and I want to ask you a few questions about that.
20      First, in 1988 through 1991 is it -- is it
21  accurate that the Records Division file and the
22  subpoena services unit were both located at 11th
23  and State?
24      A.  Yes.

180

1      Q.  And what was the procedure in that period
2  of time for the permanent retention file to be
3  submitted to the subpoena services unit as part of
4  the request fulfillment process, how did that
5  happen?
6  MS. ROSEN: Objection, form, foundation.
7  MR. BOWMAN: As to the form I'll second that
8  objection. Let me try again.
9  BY MR. BOWMAN:
10      Q.  In the period 1988 to 1991 who -- and I'm
11  not looking for a name, I'm looking for a position,
12  within the Records Division was responsible for
13  locating and copying or otherwise making available
14  to the subpoena services unit a particular
15  permanent retention file from the case in response
16  to a subpoena or other request for information?
17  MS. ROSEN: Object to the form. And just so --
18  for purposes of clarification are you talking only
19  about permanent retention files.
20  MR. BOWMAN: Yes.
21  MS. ROSEN: Not other crimes, right.
22  MR. BOWMAN: Not other crimes.
23  MS. ROSEN: Correct. Because not all crimes
24  are permanent retention.

181

1  MR. BOWMAN: Yes, my question is limited to
2  permanent retention files, yes.
3  MS. ROSEN: Okay.
4  THE WITNESS: I don't know. I mean the
5  supervisor in charge of the --
6  BY MR. BOWMAN:
7      Q.  File room?
8      A.  File room.
9      Q.  But the procedure would be that the
10  subpoena service unit would do what, send out some
11  kind of a form?
12      A.  Right. Normally they made photocopies of
13  the subpoena, circled what was asked for. If it
14  was to the crime lab and they wanted crime scene
15  photos they would circle photos.
16      Q.  Let's talk about the permanent retention
17  files since that was my question.
18      A.  Okay.
19      Q.  What would the subpoena service unit do to
20  obtain the permanent retention file?
21      A.  Send a photocopy to that subunit within
22  the Records Division that maintained control over
23  the master file.
24      Q.  When you say a copy you mean a copy of the

182

14 (Pages 179 to 182)

1 subpoena or other request, right?
2    A.   Correct.
3    Q.   Okay.  And that was a matter of just
4 forwarding a request upstairs or downstairs?
5    A.   Correct.
6    Q.   At 11th and State at that time?
7    A.   Yes, sir.
8    Q.   All right.  And then whoever gets that
9 circled copy of the subpoena is then responsible
10 for pulling the file, copying it, and sending it
11 back to the subpoena service unit?
12    A.   Yes, sir.
13    Q.   Okay.  So now let's talk about the --
14 about the investigative file in the area, what's
15 the procedure there?
16    A.   This same subpoena would be photocopied
17 and again the words investigative file would be
18 circled or highlighted and it would be sent to the
19 investigative area in the -- within the Detective
20 Division.
21    Q.   And again by job title can you tell me the
22 person responsible for receiving the copy of the
23 subpoena or other request and comply?
24    MS. ROSEN:  The person at the area.

183

1    MR. BOWMAN:  Yes.
2    THE WITNESS:  The lieutenant in charge of
3 violent crimes is the one who by definition has
4 direct administrative control over the
5 investigative files so that would be the person.
6 But, frankly, I don't know as I previously have
7 indicated if on a daily basis they sent it to the
8 clerk, Susan, John, or George if their working
9 relationship was that close, I just don't know.
10    Q.   All right.  In this period from 1988 to
11 1991 was there a separate warehouse for files or
12 contrary wise were all of the files in the custody
13 of the Records Division maintained at 11th and
14 State?
15    MS. ROSEN:  Object to the form of the question.
16    THE WITNESS:  I'm sorry, what year was this.
17 BY MR. BOWMAN:
18    Q.   '88 to '91?
19    A.   The investigative files that were at
20 records were stored in records and those that were
21 not were maintained --
22    Q.   Right.
23    A.   -- at the area.
24    Q.   And actually it wasn't a trick question.

184

1 I'm just -- just trying to figure out whether the
2 files in -- for whatever reason had either had
3 migrated to the custody of the Records Division,
4 whether those files were all physically kept at
5 11th and State or whether in this period of time
6 '88 to '91 there was an off-site warehouse where
7 some of the files were stored?
8    A.   I don't know.  I'm sorry to say I don't
9 know.
10    Q.   Okay.  And you've answered my question
11 with respect to the permanent retention file with
12 respect to the investigative file about the process
13 for actually gathering the paper.  And I'm assuming
14 that your answer would be essentially the same for
15 gathering any evidence tech materials, any property
16 receipts, any ballistics testing results or any
17 kind of other documents that might reside within
18 the jurisdiction of other units of the police
19 department, basically the same?
20    A.   Yes, sir.
21    Q.   Now, do you know of any rule, policy,
22 procedure, directive, any kind of formal document
23 of any kind that governed the -- and guided the
24 responsibilities of the clerks or other officials

185

1 in the Records Division, at the areas, in other
2 places of the police department where documents
3 resided to clarify the procedures to be followed
4 and to ensure that all responsive documents
5 including exculpatory material were provided in
6 response to subpoenas or other requests for
7 documentation?
8    A.   I'm not aware of any written policy.  I am
9 only aware of the training that all the members of
10 the Detective Division received on this subject of
11 investigative files which is they at least would
12 know what should be in there.
13    Q.   Well, right.  And when you say that are
14 you referring to the training that detectives
15 received in the aftermath of the George Jones
16 problem?
17    MS. ROSEN:  Object to the form of the question.
18    THE WITNESS:  Yes, sir.
19 BY MR. BOWMAN:
20    Q.   Anything else?
21    A.   No.
22    Q.   Are you aware of any reviews, audits, or
23 other processes of any kind that were employed by
24 the police department at any time to audit or

186

15 (Pages 183 to 186)

1   otherwise evaluate whether, in fact, all responsive
2   documents were being provided by the clerks or
3   other officials in the Records Division, the areas,
4   and other places in the police department?
5      A.  I am not.
6      Q.  Are you aware of anyone in the police
7   department ever having been disciplined for
8   negligence or other failure to provide responsive
9   documents?
10      A.  I am not.
11      Q.  I wanted to ask you a specific question
12   about Exhibit 9.  It does have this red stamp
13   permanent retention file on many of the documents.
14      When was that stamp placed on permanent
15   retention file records?
16      A.  I do not know the time it was placed.
17      Q.  Is there --
18      MS. ROSEN:  On this particular record or
19   generally.
20      MR. BOWMAN:  Generally.
21   BY MR. BOWMAN:
22      Q.  I'm asking generally speaking.
23      A.  I do not know.  What I do know is
24   that permanent retention files were integrated with

187

1   the run of the mill files until a point in time
2   years later and then they were called out and
3   separated.
4      Q.  Can you identify that point in time?
5      A.  Normally seven years later.
6      Q.  I see.  So this particular case was
7   investigated -- and I'm referring to Exhibit 9.
8   This particular case was an event that occurred in
9   August of 1988, right?
10      A.  Yes, sir.
11      Q.  So are you saying that -- that the
12   procedure was that the permanent retention file
13   designation was made seven years later in 1995?
14      A.  No, I'm not.  Like I say I don't know when
15   the actual stamp was placed on it.  It could be on
16   the day it was received, I just don't know.  But it
17   was separated from the other RD master file of all
18   the reports in the police department seven years.
19   So in this case it would be in January of 2006
20   there would have been a reduction of the routine
21   case reports.
22      MR. BOWMAN:  Can I have that answer read back.
23      (Whereupon, the record was read
24      as requested.)

188

1   BY MR. BOWMAN:
2      Q.  Okay.  Now I'm confused.
3      A.  Okay.
4      Q.  We have received information in this -- in
5   discovery in this case that in 1988 the year of
6   this particular investigation the police department
7   did not use the term permanent retention file, is
8   that consistent with your understanding?
9      A.  No.
10      Q.  Is that inaccurate?
11      A.  That is inaccurate.
12      Q.  Okay.  What was the process of calling out
13   or reducing and designating as a permanent
14   retention file, this is not clear to me, I didn't
15   understand your answer?
16      A.  The case reports of the Chicago Police
17   Department are numerically numbered -- sequentially
18   numbered.  And there is no attempt to categorize
19   them by mundane or very important.  It's the number
20   that drives the file.
21      Q.  Right.  And to be clear just for the
22   record those files that are permanently retained
23   are homicide investigations and perhaps a few
24   others?

189

1      A.  Homicides and other crimes without
2   statutes of limitations.  Treason.
3      Q.  Okay.
4      A.  I don't think we get a lot but nonetheless
5   it would qualify.
6      Q.  So you were saying that the initial filing
7   in 1988 through 1991 in the Records Division was
8   just simply number by number as the files came in?
9      A.  Correct.
10      Q.  Okay.  But then subsequent to the initial
11   filing there would be a process by which -- or
12   there was a process by which the police department
13   segregated those files that were for permanent
14   retention from those that were -- you know, again
15   where there was statute of limitations -- statutes
16   of limitation and not a need to retain the material
17   permanently?
18      A.  That is correct.
19      Q.  And you say that happened in 2006?
20      A.  Sometime after the 7th year was completed.
21   They didn't go each day to do this.  It was kind of
22   a January activity for all cases that would have
23   expired had their seven years expired the year
24   before.

190

16 (Pages 187 to 190)

1    Q.   All right.   Now -- and I realize you don't
2  have knowledge of this but at least one possibility
3  is that the permanent retention file stamp would be
4  placed on the -- on the permanently retained
5  documents at that seven year point, I mean, that's
6  possible?
7    A.   I suspect it was earlier than that.
8    Q.   And why do you suspect that?
9    A.   We tend to mark things as they come in and
10  -- but I'll stand by my earlier answer, I don't
11  know.   I don't know.
12    Q.   We just -- is there any kind of a written
13  policy that would govern when that stamp gets put
14  on?
15    A.   No.   And look at this particular case, it
16  comes in as an aggravated battery.
17    Q.   Right.
18    A.   Not as a permanent retention case.
19    Q.   Right.
20    A.   The individuals dies sometime later.   So
21  at the first moment this radio call card of a man
22  shot doesn't mean it's permanent retention.   So
23  it's subsequent but I don't know when.   It might be
24  at the first classification that -- of the incident

191

1  is now permanent retention or a homicide.
2    Q.   Okay.   Now, explain to me, if you could,
3  in 1988, this is post Jones, post Palmer, after the
4  83-6 order has gone on-line?   What is the process
5  by which certain reports from the file go to the
6  Records Division and other reports remain at the
7  area?
8    MS. ROSEN:   Object to the form of the question.
9  BY MR. BOWMAN:
10    Q.   Do you understand my question?
11    A.   I do.   The Records Division historical
12  mission is to preserve the original case report and
13  any supplementary reports generated with that RD
14  number.   Never in its design since 1961 has it been
15  the place where miscellaneous police reports are
16  kept physically in the same filing cabinet.   We go
17  no further to look than, you know, forensic
18  services, evidence technician reports.
19    Q.   General progress reports?
20    A.   General progress reports after 1983.
21    So there was -- there's been a historical
22  precedence not to put everything in one place.
23    Q.   Okay.   And now if I understand the
24  situation correctly at the present time the Records

192

1  Division does maintain custody of two separate
2  files, the Records Division file which is the
3  stripped down original case report plus the
4  supplementary reports plus the arrest report and
5  the -- at least in Exhibit 9 also the file
6  inventory, that's kept in one place.   And then the
7  Records Division keeps in a second place the
8  investigative files after they're cleared and
9  closed?
10    MS. ROSEN:   I'm going to object to the form of
11  the question.   Because I don't believe actually --
12  you included an arrest report and I don't believe
13  that's accurate.
14    MR. BOWMAN:   You're right.   So let me ask the
15  question again.
16  BY MR. BOWMAN:
17    Q.   The Records Division at the present time
18  stores the paired down Records Division file with
19  the original -- I'm sorry, with the general offense
20  case report and the supplementary reports in a --
21  for want of a better term a small folder and then
22  separately the Records Division also keeps the
23  investigative file after the case has been cleared
24  and closed at least in theory, right?

193

1    MS. ROSEN:   I'm going to object one more time
2  to form specifically with your use of the word
3  paired down.
4    MR. BOWMAN:   Okay.   I'll stand on the question.
5    MS. ROSEN:   Okay.
6    THE WITNESS:   We'll call that the master file
7  is kept by the Records Division.   The official case
8  report is prepared by the beat officer and/or
9  anyone else who has submitted a supplementary
10  report, yes, sir.
11  BY MR. BOWMAN:
12    Q.   Okay.   And so there are two different
13  locations within the Records Division?
14    A.   And even more if you want to add the
15  arrest report, right.
16    Q.   And the arrest report would be kept in a
17  third place?
18    A.   Correct.
19    Q.   At the present time?
20    A.   Now they're in a computer now.   So are
21  they -- they're digitally separated but in the same
22  computer.   They're accessed in a decentralized
23  manner today.
24    Q.   Okay.   So -- and I think that, you know,

194

17 (Pages 191 to 194)

1  this is an historical case.
2  A. Right.
3  Q. So let's leave out digital and just talk
4  about pre-2005 and I think we will be covered for
5  present purposes?
6  A. Yes, sir.
7  Q. And so with that clarification my question
8  is -- I've accurately stated it?
9  A. Yes, sir.
10  Q. All right.
11  MR. BOWMAN: Let's go off the record for a
12  minute.
13        (Whereupon, a discussion was
14        had off the record.)
15        (Whereupon, a lunch break was
16        taken.)
17  BY MR. BOWMAN:
18  Q. I think this is probably clear from what
19  you've said already but I want to make sure that
20  this is accurate. The investigator obviously has
21  certain responsibilities with respect to his
22  documentation of an investigation, right?
23  MS. ROSEN: Object to the form of the question.
24  MR. BOWMAN: I mean, I'm just - that's just a

195

1  foundational question.
2  MS. ROSEN: I'm still objecting to the form of
3  the question.
4  THE WITNESS: I'm confused as I was previously
5  asked about investigator. Are we generally
6  speaking anyone who investigate anything or a
7  detective.
8  BY MR. BOWMAN:
9  Q. Generally speaking anybody who
10  investigates anything. An evidence technician has
11  responsibilities to document what he does?
12  A. Sure.
13  Q. A detective has responsibilities to
14  document his work --
15  A. Right.
16  Q. -- and so forth, right?
17  A. Correct.
18  Q. Obvious point.
19      Now, in terms of transmitting the
20  documentation to a request or response to a
21  subpoena or other request that responsibility
22  resides with the subpoena services unit and the
23  clerks or other officials who are in that chain of
24  responsibility that you've testified about already,

196

1  right?
2  A. Yes, sir.
3  Q. It does not reside with the investigating
4  officer?
5  A. Right, Mr. Bowman.
6  Q. All right. I asked you in the earlier
7  session of your deposition about the -- about the
8  role of the State's Attorney in requesting
9  information. In your experience when you were in
10  charge of the subpoena services unit in the early
11  2000's was it your understanding that the State's
12  Attorney's Office from time to time would submit a
13  form requesting the documents relating to a case?
14  A. When we last spoke I was not sure of my
15  answer. I've talked to the subpoena unit since
16  then and I've come to learn that more often than
17  not the request from the prosecutor comes in the
18  form of a subpoena as opposed to this informal last
19  minute phone call. I'm not ruling out such last
20  minute phone call request but more often than not
21  it's through the normal subpoena process.
22  Q. Is there -- and are you aware of occasions
23  in which the State's Attorney's Office would
24  request the documents by form as opposed to by

197

1  formal subpoena?
2  A. I have no independent knowledge of a
3  worksheet or a form that they used.
4  Q. But in any event whether the request comes
5  from the State's Attorneys by subpoena or otherwise
6  whether the request comes on the other hand from
7  the defense side in the criminal process the
8  responsibilities of the police department are the
9  same, right?
10  A. Absolutely.
11  Q. And the requests are treated the same way?
12  A. They are.
13  Q. And the obligation to provide the
14  exculptory material is the same, right?
15  A. It is.
16  Q. In your answers this morning you mentioned
17  that there is -- I think you used the term an
18  external corrective process in the form of defense
19  lawyer requests for additional information?
20  A. Or prosecutor. If someone believes that
21  something else exists, you know, they might be
22  disappointed in what we provide them and they pick
23  up the phone and ask are you sure.
24  Q. Is there something else?

198

18 (Pages 195 to 198)

1    A.   Is there possibly something else.  What
2  about the crime scene diagram or whatever it might
3  be.
4    Q.   And in your experience as the head of --
5  I'm sorry, I'll start over.
6        In your experience as the assistant
7  director in the Records Division were you aware of
8  circumstances from time to time where defense
9  lawyers, prosecutors would pick up the phone and
10 make complaints in the form of I think there must
11 be something that I haven't gotten.
12   MS. ROSEN:  Object to the form.
13   THE WITNESS:  I am.
14 BY MR. BOWMAN:
15   Q.   And would it be your informed belief that
16 that likely also happened in the period from 1988
17 -- in the 1980's?
18   A.   I don't know why it wouldn't, yes.
19   Q.   It's -- I don't want to suggest that it's
20 regular but it's something that happens not
21 infrequently?
22   A.   Yes, sir.
23   Q.   Okay.  And your answer would be the same
24 for the 1980's it happens not infrequently?

199

1    A.   Correct.
2        If I could clarify that, not infrequently,
3  it happens -- it happens, I don't know how often.
4    Q.   But it's certainly something that you've
5  made note of through the years?
6    A.   Yes, sir.
7    Q.   All right.  We left off last time at which
8  I mean in May talking about the process that you
9  went through in 1982 to evaluate and audit
10 investigative record keeping, you remember that
11 line of questioning generally, right?
12   A.   I do.
13   Q.   Let me hand you something that I've marked
14 for identification as Exhibit 12.
15         (Whereupon, Hickey Deposition
16          Exhibit No. 12 was marked for
17          identification.)
18 BY MR. BOWMAN:
19   Q.   It says Memo 3 at the top.  And just below
20 that it says violent crime unit commanding officers
21 meeting, 27 April, 1982.  What is Exhibit 12?
22   A.   I'm sorry, it's a minutes of a meeting, so
23 to speak, of a meeting that occurred in the
24 detective Area 5 conference room dated the 27th of

200

1  April, 1982.  It was prepared by myself.
2    Q.   The -- and it appears to me from the list
3  of those present that there were representatives of
4  each of the areas on hand?
5    A.   Correct.
6    Q.   Who are these people on the list of being
7  present.  From Area 1 it was Sergeant Michael
8  Hencke?
9    A.   Hencke.
10       Area 2, Lieutenant John Burge.  Area 3,
11 Lieutenant Joseph Curtin.  Area 4, Lieutenant John
12 Regan, R-e-g-a-n.  Area 5, Lieutenant Paul Minogue.
13 Area 6, Lieutenant August Locallo.  And a couple of
14 sergeants, Thomas Sadler and Bob Becker and myself
15 Detective James Hickey.
16   Q.   And what was the purpose of this meeting?
17   A.   To talk about a plan from this day forward
18 what would be appropriate to put into an
19 investigative file.
20   Q.   Now the first paragraph reads the issue of
21 working files was thoroughly discussed.  What --
22 what do you mean when you say working files?
23   A.   Working files were those documents that
24 were placed in a folder.  Normally available to all

201

1  three watches within a unit.  It almost became a
2  common file.  Usually it was the name of the victim
3  on the exterior and documents were placed in there.
4  Over this period of time there was some confusion
5  as to what the term of reference should be.
6    Q.   All right.  Whether these -- whether these
7  should be called street files, personnel files,
8  working files, or unofficial files or given some
9  other name?
10   A.   Correct.
11   Q.   But the idea was that by whatever name
12 these were files that were not formalized and
13 provided to the participants in the criminal
14 justice system when a case was filed, right, that's
15 what you're talking about?
16   A.   Yes, sir.
17   Q.   And I wanted to - so then is it accurate
18 for me to assume based on the next sentence in your
19 memo that -- that this meeting early on there was
20 kind of a round table where the representatives
21 from each of the six -- at the time the six
22 detective areas provided a summary of practices in
23 their particular location?
24   A.   I don't think it was a meeting in which

202

19 (Pages 199 to 202)

1 the areas presented. But where a message was being
2 sent as to what should be some limits on the use of
3 interoffice or inter watch memoranda.
4    Q.  And who was delivering that message?
5    A.  I was.
6    Q.  Okay.  What was the role of Sadler and
7 Becker in the meeting?
8    A.  You know, I can't remember Tom Sadler's
9 role.  Sergeant Bob Becker was from Research and
10 Development.  I don't know where Sadler --
11    Q.  Those guys were with you at the meeting?
12    A.  They were.  The others were all from
13 violent crime units in the detective areas.
14    Q.  And, you know, for example Burge shows up
15 from Area 2 and he's there because he's the -- what
16 the person in charge of Area 2 or the person
17 capable of speaking on behalf of Area 2?
18    A.  Right, violent crimes.
19    Q.  And you write all present were in
20 agreement that the Detective Division has probably
21 abused its use of memorandums, i.e., too much
22 material which could and should be placed in the
23 supplementary case report was not making it to
24 supplementary case reports?

203

1    A.  Correct.
2    Q.  Explain that?
3    A.  In a criminal investigation successful
4 clearance of a case is always -- it's not always a
5 straight line.  And on day one we may think a
6 certain person is responsible but only later learn
7 that person has an alibi or was out of the country
8 or has a twin brother or whatever the case might be
9 but we've ruled that individual out.  And we go on
10 to suspect two or lead two.  The person with the
11 red hood is now our focus.
12    But too often in my opinion as a detective
13 back in 1982 we did not memorialize that first
14 branch of the investigation.  It turns out that the
15 real offender was the person in the red hood and
16 that person was identified and prosecuted.  But
17 when the -- the final or any of the supplementary
18 reports were prepared that aspect of the story was
19 not included in the investigation.  So it isn't
20 wrong but it's -- it's not a complete retelling of
21 the investigation.
22    Q.  All right.  And Mr. Hickey you and I have
23 had this debate before.  But since it's come up
24 again I can't resist the opportunity to try one

204

1 more time.
2    Will you acknowledge the point that
3 depending on the circumstances of a particular case
4 that the failed lead or the circumstance that
5 you're describing could be exculptory, even highly
6 exculptory if it turns out that the police
7 department has ultimately selected and charged the
8 wrong person?
9    MS. ROSEN:  I'm going to object to that form of
10 that question on multiple levels.
11    THE WITNESS:  In my prior responses to you on
12 this same subject, same theme, I've indicated that
13 we have ruled them out, that person, subject A for
14 a very good reason or series of reasons.  So what
15 is exculptory about that, they didn't do it, you
16 know.
17 BY MR. BOWMAN:
18    Q.  Well, in my question I'm -- I'm -- I mean,
19 you realize, Mr. Hickey, it has happened that the
20 police department has charged the wrong guy, right?
21    MS. ROSEN:  Object to the form of the question.
22    THE WITNESS:  I fully --
23    MS. ROSEN:  In what circumstance, every?
24    MR. BOWMAN:  From time to time over the course

205

1 of time on actually scores of occasions.
2    MS. ROSEN:  I'm going to object to the form of
3 that question.
4    THE WITNESS:  I fully appreciate that people
5 not responsible for crime have been found guilty by
6 the criminal justice system.
7 BY MR. BOWMAN:
8    Q.  Including in cases that were investigated
9 by the Chicago Police Department?
10    A.  Including cases investigated by the
11 Chicago Police Department.
12    Q.  Okay.  So in those circumstances the
13 official record presumably on the face evidence
14 shows good and sufficient reason to include that
15 person as the perpetrator of the crime, right?
16    MS. ROSEN:  Object to the form of the question,
17 calls for speculation, incomplete hypothetical.
18    THE WITNESS:  I -- could you repeat that
19 please.
20 BY MR. BOWMAN:
21    Q.  In cases like the kind that -- in cases of
22 this kind which you've acknowledged do exist the --
23 the official file on the face of it shows good and
24 sufficient reason to find the individual committed

206

20 (Pages 203 to 206)

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1  the crime, right, even though he didn't.
2     MS. ROSEN:  Object to --
3     THE WITNESS:  Enough for probable cause, right.
4  BY MR. BOWMAN:
5     Q.  Right.  Enough for charging, right?
6     A.  Correct.
7     Q.  And sometimes conviction, right?
8     MS. ROSEN:  Object to the form of the question,
9  incomplete hypothetical.
10        And don't try and write over my objection,
11  okay.
12     MR. BOWMAN:  I'm sorry.
13     THE WITNESS:  Yes.
14  BY MR. BOWMAN:
15     Q.  Yes.  And, I mean, George Jones is an
16  example of that, right?
17     MS. ROSEN:  Object to the form of the question.
18     THE WITNESS:  George Jones was found not
19  guilty.
20  BY MR. BOWMAN:
21     Q.  Yes.  And George Jones was also charged
22  based on an official file that on the face of it
23  appeared to contain all the information needed to
24  support probable cause that he committed the

207

1  offense, right?
2     A.  That is correct.
3     Q.  And the problem was that there was
4  actually a memorandum that substantially undercut
5  that, right?
6     MS. ROSEN:  Object to the form of the question
7  and asked and answered at his first deposition and
8  now it's bordering on argumentative.
9        Because as you suggest you and Mr. Hickey
10  have had this debate time and time again and so.
11     THE WITNESS:  It's been so many years I -- at
12  this day and hour I don't know what was in the
13  Laverty memo about the particulars of the details
14  of the George Jones case other than he suggested
15  someone else.  And, yes, that part is true.
16  BY MR. BOWMAN:
17     Q.  All right.  But, in any event, how you
18  characterize it whether you say it's exculptory or
19  not exculptory there wasn't any doubt at this
20  meeting on April 27, 1982 that memorandums that had
21  material in them that weren't in the supp reports
22  existed on a widespread basis?
23     A.  On a basis that we thought was
24  unacceptable.  We -- we wanted a more complete

208

1  memorialization of the investigation.
2     Q.  Right.  And whatever your memory and
3  however you characterize it this was all prompted
4  by the George Jones case?
5     MS. ROSEN:  Object to the form of the question.
6  BY MR. BOWMAN:
7     Q.  Right?
8     A.  Yes, sir.
9     Q.  And you'll agree with me I assume that as
10  a general proposition it is not the responsibility
11  of the police investigator or the officials
12  producing records from the police department to
13  make their own determination of whether something
14  is or isn't exculptory the responsibility is to
15  produce the stuff, right, without regard to
16  exculptory or not, let the chips fall where they
17  may --
18     MS. EKL:  Objection.
19  BY MR. BOWMAN:
20     Q.  -- fair summary?
21     A.  No, I disagree.  I think any investigating
22  officer must during the course of an investigation
23  use their discretion and error on the side of being
24  conservative but the -- the information -- not all

209

1  the information garnered in the course of an
2  investigation is important and certainly not
3  exculptory.  But that which they believe is
4  important should be saved.
5     Q.  Speaking on behalf of the Chicago Police
6  Department is it your testimony that an individual
7  police officer does and should have the discretion
8  to make a determination of whether something is or
9  isn't important and/or exculptory in deciding
10  whether to include it in the file?
11     MS. ROSEN:  Object to the form, compound,
12  incomplete hypothetical.
13     THE WITNESS:  Yes, I believe detectives and
14  investigating personnel require the discretion.
15  That the ability to differentiate between routine
16  and important.
17  BY MR. BOWMAN:
18     Q.  Okay.  And do they -- do they get to make
19  the call on whether something is exculptory or not?
20     MS. ROSEN:  Object to the form of the question.
21     THE WITNESS:  The detectives don't record in
22  their notes or remember the conversations they have
23  with people, interviews, with exculptory
24  categorizations.  You know, it's -- the story is

210

21 (Pages 207 to 210)

1 told by a witness, it's a story is told by an
2 interviewee. I think only later sometimes you
3 appreciate whether it's exculptory or not.
4     Q. All right. So is it the investigator's
5 call as to whether to put the record of that
6 interview in the file or not?
7     A. Yes.
8     Q. Based on his judgment as to whether it may
9 or may not be exculptory?
10     A. Yes.
11     MS. ROSEN: Object to the form of the question.
12 BY MR. BOWMAN:
13     Q. Does the police department -- did the
14 police department in 1988 through 1991 have any
15 policy or procedure to inform detectives of their
16 -- actually to inform investigators of any stride
17 of their responsibilities in connection with
18 including material in the -- in the file?
19     A. Detectives and virtually all sworn members
20 through their initial training when they come on
21 the police department and through their specialized
22 training later depending upon their title are
23 trained on, you know, Mary versus -- Brady versus
24 Maryland and the exculptory material but the

211

1 importance of truth to preserve the truthfulness of
2 the story whether it helps or hurts a particular
3 prosecution. It's our obligation.
4     Q. All right. You refer in the third
5 paragraph of Exhibit 12 to something called a unit
6 file. Will you tell me what that is or what that
7 was as of April 1982?
8     A. The unit file at this particular time was
9 the RD file the -- that which is kept in the
10 interoffice with all the other cases that are
11 assigned to that investigative unit. The
12 difference being with the investigative file or the
13 working file they were not maintained physically in
14 the unit file.
15     Q. Okay. So, first of all, let me ask you
16 this, does the unit file continue to exist after
17 the promulgation of 83 --
18     A. You mean the investigative file.
19     Q. No, my question is about the unit file.
20 Does it continue to exist after the promulgation of
21 83-1?
22     MS. ROSEN: For what kind of case.
23     MR. BOWMAN: For any kind of case.
24     THE WITNESS: It does but it now includes the

212

1 investigative file.
2 BY MR. BOWMAN:
3     Q. Okay. What in addition to the
4 investigative file does the unit file include?
5     A. What in addition to the investigative
6 file -- nothing.
7     Q. Okay. So is the investigative file the
8 new name for the unit file after 83-1?
9     A. For these type of cases, yes.
10     Q. And when you say these kind of cases what
11 do you mean?
12     A. Homicides -- homicides, police shootings,
13 things of that nature that which would be kept a
14 long time.
15     Q. All right. So the so-called permanent
16 retention cases?
17     A. Yes, sir.
18     Q. All right. Before we leave Exhibit 12
19 there's a sentence I wanted to ask you about, each
20 unit commanding officer was further of the opinion
21 that memorandums should have but a relatively brief
22 retention period, only a few days.
23     So this point of view is attributable to
24 Hencke, Burge, Curtin, Regan, Minogue, and Locallo?

213

1     A. Where is that in the --
2     Q. It's in Paragraph 2.
3     A. Okay.
4     Q. Last sentence in Paragraph 2.
5     A. Yes, it was a collective or majority, I
6 can't remember if there was minority opinions or
7 not.
8     Q. Well, it says each unit commanding
9 officer?
10     A. Okay.
11     Q. So does that indicate that there was
12 unanimity on this idea?
13     A. The wording seems to suggest, yes.
14     Q. And were you delivering any messages with
15 respect to the retention period for memos in this
16 meeting?
17     A. Not regarding retention periods, no.
18     Q. Did any unit commanding officer to
19 your recollection explain the reason for his
20 opinion that the memo should be tossed after a few
21 days?
22     MS. ROSEN: Object to the form of the question.
23     THE WITNESS: I have no recollection of that
24 topic at that meeting in 1982.

214

22 (Pages 211 to 214)

BY MR. BOWMAN:

Q. All right. Let's take a look at another memo that I'm going to mark for identification as Exhibit 13.

(Whereupon, Hickey Deposition Exhibit No. 13 was marked for identification.)

BY MR. BOWMAN:

Q. Could you tell us what this is please?

A. This is a memorandum authored by two sergeants Thomas Brady and John Tolley.

Q. One is from Field Group South and one is from Field Group North?

A. Right. That just for your own information were the two major subgroups that oversaw the six areas. And it is as simple as you think it is, north and south.

Q. Three in the north and three in the south?

A. Yes, sir.

Q. And did you receive Exhibit 13 at about the time that it was created?

A. I did although I don't see a date on here but yes.

Q. And this was part of your process of --

215

part of your process of inventorying or auditing the practices that were in existence in the -- in the period more or less immediately following the George Jones case?

A. Yes, sir.

Q. And without belaboring it the finding was that every area had different systems that were quirky to the area but there tended to be a procedure by which informal communications be they memos, street files, memo boards, or whatnot were being retained outside of the official filing system?

A. Yes, it identified the commonalities, the similarities, and the differences in the practices in the six areas.

Q. Right. And it identifies different kinds of files. First of all, there's the RD file, the numerical sequence file, and that's -- that's the paired down version at records central at 11th and State at the time, right?

MS. ROSEN: Object to the form of the question.

THE WITNESS: This is the copy of the report that was sent to the investigative area by the Records Division.

216

BY MR. BOWMAN:

Q. Sent to the -- oh, and kept at the area?

A. Right.

Q. Okay. And then what is the MO file?

A. Modus operandi. Some of the areas had -- you know, what was their style of committing a particular crime, with a knife, with a gun, with a candlestick in the ballroom.

Q. Okay. And then unit files was limited to just open homicides and cleared homicides?

A. I think the -- what that basically is telling us is some of the units segregated their homicides from their numerical sequence files. They just physically moved them to another drawer.

Q. Okay. Now, this memo board, explain that?

A. Memo board is a two-hole punch board sturdy in composition. Probably two to three inch clip on the top of it. Easy to open, easy to put documents on it. It may contain major incident worksheets, copies of major incident worksheets or the originals, and/or any memo that someone has written on a particular case to another watch. It's kind of advising the supervisor on duty not only what has happened in the last 24 hours or so

217

or the last couple of days when they were off, the status of maybe a developing case.

Q. And the memo board is the kind of thing that can be picked up and carried with by the investigator who is working on the case on his tour of duty?

A. No, this pretty much stayed on the supervisor's desk. It was the ready reference.

Q. The ready reference for anybody with an interest in the case?

A. Right. What's new.

Q. Including the new shift when there was a change of shift and the investigation was passed from one set of hands to the next?

A. Correct.

Q. And including supervisors?

A. Especially supervisors.

Q. All right. And this is something that as of this point in 1982 was in use at Area 5 among other places?

A. Yes, sir.

Q. All right. And then street files it says here utilized by each area with the exception of Area 4.

218

23 (Pages 215 to 218)

1    A.  That's the comment of these two reporting
2  sergeants, that was their opinion.
3    Q.  Okay.  And did you have a reason to
4  disagree with that?
5    A.  I thought the running files were in all
6  the areas.
7    Q.  Including Area 4?
8    A.  Yes.
9    Q.  And the idea was that this street file was
10 something that unlike the memo board it actually
11 did go out on the street with the investigators was
12 passed from hand to hand during the course of the
13 investigation and then was disposed of when the
14 case had been -- had -- the investigation had been
15 completed?
16   A.  Sometimes not disposed of but accurate all
17 the other things you just said.
18   Q.  And in George Jones is an example of a
19 case which it was not disposed of?
20   A.  Correct.
21   Q.  And the court file, what is that?
22   A.  That's just a completed -- it's not -- I
23 didn't view it as a separate file.  But it looks
24 like in their findings at three areas used it --

219

1  two violent crime areas, one in 5, and one in
2  property crimes in Area 6 used a filing -- had a
3  filing practice which made it a little bit easier
4  for the detectives who were going to court.  They
5  would simply pull out the file with the RD Number
6  and presumably there was nothing new in it.  It's a
7  case as it was at the time of closing.
8    Q.  Just a thing you can take to court with
9  you?
10   A.  Right.
11   Q.  Now, the authors of this memo identify a
12 problem and they say at present the main component
13 of a street file is the memorandum sheet or memo
14 which often contains opinions, conclusions, and
15 investigative direction of the detectives assigned
16 to the case.
17     Additionally the street files contained
18 other cases, supplementary reports pertaining to
19 non-related cases which were utilized in suspect
20 elimination and identification.  Detectives will
21 also insert into the street file victim's personal
22 papers such as telephone books, driver's license,
23 or photos of the victim or suspects.  Personal
24 notes of the detective used to compile the

220

1  investigation and also insert it into the street
2  file.
3      And that is consistent with your findings
4  and your understanding as a result of the work that
5  you did in the aftermath of George Jones in 1982?
6    A.  Yes, Mr. Bowman.
7    Q.  And then the next paragraph here says at
8  present these memos, notes, non-related case
9  reports, and victim's personal papers are subject
10 to disclosure to defense attorneys if they are
11 maintained by the investigative unit --
12 investigating unit.  And the point here is that
13 these things if they're maintained need to be
14 turned over to the defense?
15   A.  Correct.
16   Q.  And is this a problem?
17 MS. ROSEN:  Object to the form of the question.
18 BY MR. BOWMAN:
19   Q.  Was this a problem in 1982?
20 MS. ROSEN:  Object to the form of the question.
21 THE WITNESS:  It's -- it's a lack of -- it's a
22 problem insofar that it spoke to our nonuniformity
23 in practice.  You know, some would save more than
24 others.  You know, I'd get a rap sheet for someone

221

1  I once was considered as subject A, suspect A.  I
2  ruled them out.  That guy's rap sheet is still in
3  the file.  It's messy.  And after a time you may
4  not even know why it's there.  I mean, you just --
5  there's not even an assurance that what was in a
6  street file was actually related to that particular
7  investigation.  It became a catchall.
8      So it was problematic insofar that we were
9  struggling to establish more uniformity.
10 BY MR. BOWMAN:
11   Q.  Right.  And it would be fair to say that
12 you were also working to establish safeguards and
13 assurances that materials relating to investigation
14 were turned over without exception, right?
15   A.  Correct.
16   Q.  And that wasn't happening in 1982, right?
17 MS. ROSEN:  Object to the form of the question.
18 THE WITNESS:  In 1982 we did not keep nor was
19 there any policy to keep personal notes or
20 memoranda.  It was not considered part of the file
21 until 1983 when Superintendent Brzeczek said it
22 should be.
23 BY MR. BOWMAN:
24   Q.  And the issue that's addressed in this

222

24 (Pages 219 to 222)

1  memorandum and there are various alternatives to --
2  that are discussed here is how to address that
3  problem, what to do about it?
4      A.  Yes, sir.
5      Q.  I'll mark for identification as Exhibit 14
6  an updated memorandum.
7          (Whereupon, Hickey Deposition
8          Exhibit No. 14 was marked for
9          identification.)
10 BY MR. BOWMAN:
11     Q.  With the caption elimination with unit
12 cleared closed homicide cases.  There's no
13 indication of the author of this.
14         The first question is did you write this?
15     A.  I don't know.  I have admitted to a lot up
16 to now, I just don't -- I don't know if this is one
17 that I wrote.
18     Q.  So --
19     A.  I'm looking for some buzz words that I
20 might have used.
21     Q.  Well, why don't you continue your review
22 and see if your recollection is refreshed by
23 carefully reading it over.
24     A.  Okay.  I cannot say with certainty that I

223

1  wrote this but it sounds like me.
2      Q.  For what purpose was it written, if you
3  know?
4      A.  I think it's a part of the -- the thought
5  process of what we should do.  How do we maintain
6  -- how do we get a institutionalized control.  I
7  think it's -- it's almost expor -- how do you say
8  that word, exporanous (sic).
9      Q.  Extemporaneous.
10     A.  Extemporaneous, thank you.
11     Q.  It was just you were putting down --
12     A.  My thoughts.
13     Q.  -- on paper your thoughts including
14 concerns about discrepancies between what's in the
15 memos and what's in the official files and so
16 forth?
17     A.  Yes, sir, it looked like a self
18 examination.
19     Q.  Okay.  And will you acknowledge that --
20 that your description in Exhibit 14 of the state of
21 affairs as it existed in 1982 based on your
22 investigation is accurate?
23     A.  I do.
24     Q.  Now, who received this?

224

1      A.  It may -- I was working for the chief of
2  detectives, he saw the documents that I wrote on
3  this subject.  But it clearly is not a formal
4  report, it's --
5      Q.  And so this was Thomas Lyons?
6      A.  No, this was William Hanhardt.
7      Q.  William Hanhardt.  And you can say that
8  William Hanhardt received this memo?
9      A.  He saw everything else I wrote on this
10 subject and I worked for him so.
11     Q.  And I think that Hanhardt is spelled
12 H-a-n-h-a-r-d-t, is that right?
13     A.  Correct.
14     Q.  Okay.  Let's mark this as Exhibit 15.
15         (Whereupon, Hickey Deposition
16         Exhibit No. 15 was marked for
17         identification.)
18 BY MR. BOWMAN:
19     Q.  Tell me what Exhibit 15 is please?
20     A.  This is another stream of consciousness
21 memos by myself thinking or recognizing that not
22 everything made it to the department's records
23 division file.  I think we've struggled with this
24 issue for a long time.  A decentralized record

225

1  keeping practice.
2      Q.  Okay.  And specifically with respect to
3  memos the issue was are they kept, are they not
4  kept, right?
5      A.  Correct.
6      Q.  And by memos we're referring to -- to
7  those memorandums that are prepared in the course
8  of an investigation not on an official format that
9  are -- that at least in 1982 were not making it
10 into the departmental files?
11     A.  That and we would even have review of
12 police shootings for instance done by the highest
13 ranking member in the police department whoever is
14 on the street at the time.  And they would write a
15 to/from subject report about whether or not in
16 their opinion the officer developed followed the
17 policies of a Chicago Police Department.  But even
18 that report didn't make it to the Records Division.
19 And the thought was, well, that's an administrative
20 report.
21     Q.  Right.
22     A.  You know, and again --
23     Q.  So one issue was do you keep such
24 documents and if so for what period, right?

226

25 (Pages 223 to 226)

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1          Yes?
2      A.  Yes, right.
3      Q.  And another issue was do you file such
4  documents in some recognizable retrievable way
5  within the official records of the department?
6      A.  Correct.
7      Q.  Now, were -- first of all, was there
8  subsequent to your authorship of these notes in
9  Exhibit 15 was there a change in policy whereby
10  memos were required to be retained and I
11  say memos I mean as we've defined that term
12  previously?
13      A.  Yes, in 1983 we established the -- we did
14  not prohibit memos but then required them to be
15  placed on general progress reports.
16      Q.  Okay.  And kept in the official file?
17      A.  And kept in the investigative file.
18      Q.  Did Exhibit 15 find its way also to Chief
19  Hanhardt?
20      A.  Yes.
21      MS. ROSEN:  Let's go off the record for just a
22  minute.
23          (Whereupon, a discussion was
24          had off the record.)

227

1  BY MR. BOWMAN:
2      Q.  Let's mark for identification as Exhibit
3  16.
4          (Whereupon, Hickey Deposition
5          Exhibit No. 16 was marked for
6          identification.)
7  BY MR. BOWMAN:
8      Q.  Detective Division Special Order 83-1.
9      All right.  So I wanted to ask --
10  obviously, I mean, let's be clear on the record,
11  this is a document that you authored, 83-1?
12      A.  I drafted it and it was signed by the
13  chief of detectives.
14      Q.  And that was Mr. Hanhardt?
15      A.  Mr. Hanhardt.  And the document was
16  actually typed by Patricia Johnson secretary to
17  William Hanhardt.
18      Q.  And I wanted to ask you a couple of
19  questions about wording.
20      A.  Let me clarify, I drafted it.  I didn't
21  draft it in a vacuum.  This is a major issue to the
22  police department.  There had already been a court
23  appearance or two.  Plaintiff's attorney were
24  involved.  And I think we had a real sense of give

228

1  and take on certain words -- the use of certain
2  words.  So I drafted it but in consultation with
3  many.
4      Q.  This, of course, is a special order
5  applicable open to the Detective Division, right?
6      A.  Yes, sir.
7      Q.  And I think you've commented on this
8  already but in terms of investigators such as gang
9  crime specialists who were within the patrol
10  division this order did not apply to them?
11      A.  It did not.
12      Q.  Was any effort made by anyone within the
13  Chicago Police Department to address the issues of
14  file maintenance and preservation.  Specifically
15  the maintenance and preservation of notes and
16  informal memos by investigators in the patrol
17  division such as gang crime specialists that
18  paralleled Exhibit 16?
19      A.  I'm not aware of any.
20      Q.  I mean, is there somebody else who would
21  know of such a thing?
22      A.  I don't think so.
23      Q.  Okay.  Is there any reason why these
24  issues were not addressed with respect to the gang

229

1  crime specialists and other patrol division
2  investigators?
3      A.  In the organization of the Chicago Police
4  Department it's the Detective Division that has
5  responsibility for follow-up criminal investigation
6  and the classification of crimes.  So it was mostly
7  viewed as a detective matter.
8      Q.  Well, in January of 1983 when Exhibit 16
9  was issued was it generally known within the police
10  department that, in fact, gang crime specialists
11  were engaging in the follow-up investigation of
12  crimes either in collaboration with the detectives
13  or on their own?
14      MS. ROSEN:  Object to the form of the question,
15  foundation.
16      THE WITNESS:  Most of the gang crimes work was
17  dabbling in narcotics and shootings and -- the
18  emphasis was more on gangs than it was an
19  individual case.
20  BY MR. BOWMAN:
21      Q.  Would it surprise you to learn that gang
22  crimes investigators participated with detectives
23  in the investigation of the Felix Valentin case
24  that brings us here today?

230

26 (Pages 227 to 230)

1    MS. ROSEN:  Object to the form of the question.
2    THE WITNESS:  I'm happy to learn that.  I mean,
3  I -- yes.
4  BY MR. BOWMAN:
5    Q.  Well, is that surprising for you to hear?
6    A.  No.
7    Q.  Right.  And the reason it's not surprising
8  is because you and others in the police department
9  knew as a general matter in 1983 and thereafter
10 that gang crimes specialists in addition to their
11 other work also sometimes participated in criminal
12 investigations and follow-up, right?
13   MS. ROSEN:  Object to the form of the question.
14   THE WITNESS:  Again organizationally we
15 assigned all follow-up responsibilities to the
16 Detective Division.  But certainly any assistance
17 they could offer to help resolve a criminal
18 investigation was accepted.  Whether it's by the
19 public transportation section or gang investigation
20 section or whatever speciality unit there may be.
21 BY MR. BOWMAN:
22   Q.  My question is in practice from time to
23 time gang crimes investigators assisted and
24 participated in follow-up investigations of serious

231

1  crimes --
2    MS. ROSEN:  Object to the form of the question.
3    MS. EKL:  And foundation.
4  BY MR. BOWMAN:
5    Q.  -- right?
6    A.  They are knowledgeable and they assisted,
7  yes.
8    Q.  Other than what you've testified to
9  already is there any other reason why a similar --
10 a directive similar to Special Order 83-1 was not
11 promulgated for the benefit of persons in a patrol
12 division who might have occasion to participate in
13 follow-up investigations of crime?
14   A.  There is nothing issued but we already
15 have a reporting mechanism called a supplementary
16 report.
17   Q.  I'd appreciate it if you could listen to
18 my question and attempt to answer it to the best of
19 your ability.
20   And I'll ask the court reporter to read it
21 back again and ask if you can answer that question,
22 yes or no.
23   (Whereupon, the record was read
24   as requested.)

232

1    MS. ROSEN:  That's not a yes or no question.
2  Is there another reason, he gave you the other
3  reason.  So I don't think the way you've now
4  recapped it.
5    MR. BOWMAN:  You know, I don't think that's an
6  objection --
7    MS. ROSEN:  Okay.
8    MR. BOWMAN:  -- really.
9    I'm going to restate the question.  If you
10 can do it yes or no I would appreciate it.  If you
11 can't I'll accept that and we'll move on.
12 BY MR. BOWMAN:
13   Q.  Other than what you've said already is
14 there any other reason yes or no why the police
15 department elected not to promulgate an order
16 similar to 83-1 for the benefit of personnel in
17 patrol who might have occasion to participate in
18 follow-up investigations?
19   A.  It was -- I know of no other reason.  I
20 worked in the Detective Division.  My focus was
21 working only in the Detective Division.  Maybe if I
22 had worked in Research and Development at time I
23 could have made an argument for a broader
24 directive.  I -- fix what you can control.

233

1    Q.  All right.  Turn to Page 3 of Exhibit 16.
2  Section 5, responsibilities of procedures,
3  Subsection A concerns the initiation of the
4  investigative filed case folder in certain kinds of
5  cases as distinguished from other kinds of cases,
6  you see that?
7    A.  Yes, sir.
8    Q.  To be clear in -- in the more serious
9  cases including homicides, batteries likely result
10 in death, rapes, the investigative file case folder
11 is initiated immediately under this order, right?
12   A.  Yes, sir.
13   Q.  On the other hand in other violent crime
14 investigations not on the list of serious cases the
15 investigative case file folder is -- I'm sorry, the
16 investigative file case folder is initiated only at
17 the time of arrest?
18   A.  Yes, sir, Number 2, right.
19   Q.  Now, can you, first of all, explain to me
20 the reasons for that distension?
21   A.  Frankly, it's a clerical consideration.
22 You know, given the thousands of RD numbered cases
23 that are referred to the investigative area for
24 follow-up we didn't want them to have to literally

234

27 (Pages 231 to 234)

1    and figuratively physically create this awkward
2    file.
3          Again this thing was not neat.  It had two
4    prongs.  It had a miscellaneous document
5    repository.  But previously was one or two pieces
6    of paper now became an eighth of an inch and
7    sometimes a half an inch and two inches.  It got
8    messy and the clerks didn't like it.
9          But -- so we thought it through and said
10   when do we really need them, it's for those cases
11   that are -- for which may lead to these important
12   cases described in A-1 and those which eventually
13   have felony charges approved.
14   Q.   There may be any number of investigations
15   that don't result in an arrest at all?
16   A.   Our clearance rate is not perhaps what it
17   should be.  So kind of an efficiency aspect to
18   this.
19   Q.   Okay.  Suppose as happened in this case
20   that a matter starts out as a battery or an
21   aggravated battery such that it would fall under
22   Paragraph 2.  I mean, that's what happened -- is
23   that your understanding of what happened here?
24   A.   It is.

235

1    MS. ROSEN:  Object to the form of the question.
2    BY MR. BOWMAN:
3    Q.   It is?  Is that a yes?
4    A.   Yes.
5    Q.   And then the victim dies and then it falls
6    in Paragraph 1 as a homicide case.
7          What would be the procedure in that
8    circumstance for changing the -- changing the
9    protocol with respect to the creation of the file
10   folder?
11   A.   There is no difference.  Physically
12   someone has to assemble an investigative file
13   folder.
14   Q.   I've asked a bad question.
15          At what time in this circumstance would
16   the investigative case file be created?
17   A.   When that clerical person in charge of the
18   office probably working days realizes this is a
19   serious shooting likely to result in death or they
20   wait until the medical examiner's office calls and
21   says we got one here that's a delayed death.
22   Q.   All right.  So in this particular matter
23   there is a period between I think it's the 25th of
24   August, 1988 and September 15 or thereabouts when

236

1    the individual dies.  And so it's for some portion
2    of that span of time there would not be an
3    investigative case folder in the circumstances
4    assuming that the procedures that you envisioned in
5    this form were followed?
6    MS. ROSEN:  Object to form, foundation,
7    misstates the record.
8    MR. BOWMAN:  In what respect.
9    MS. ROSEN:  In what respect is you actually
10   have the folder and you've seen the original,
11   you've seen that it was created actually initially
12   so that's my objection.
13   BY MR. BOWMAN:
14   Q.   Well, so you have a different
15   understanding from what counsel just said?
16   A.   The requirements to utilize the general
17   progress report remain constant.
18   Q.   No, no, that's not my question.  I get
19   that.
20   A.   Okay.
21   Q.   And I'm not trying to suggest anything
22   else.  I'm just trying to get an understanding of
23   -- I'm trying to clarify whether there was in a
24   circumstance like this assuming that policy was

237

1    followed a gap, if you will, a period of time
2    during which the case was being investigated but
3    there was no investigative case file folder?
4    MS. ROSEN:  And just for point of clarification
5    it says batteries likely to result in death, it's
6    part of the --
7    MR. BOWMAN:  I'm not arguing with you, Eileen.
8    I'm not interested in having an argument with you
9    about it.
10   MS. ROSEN:  Well, you're interested in
11   obscuring the record.
12   THE WITNESS:  There could well be a gap.
13   BY MR. BOWMAN:
14   Q.   And what happens to the documents in that
15   gap period?
16   MS. ROSEN:  Objection, form, foundation,
17   misstates the evidence.
18   MS. EKL:  Calls for speculation.
19   BY MR. BOWMAN:
20   Q.   Well, I don't mean to be asking you to
21   speculate.  And, I mean, you must have thought of
22   this in some cases the case file folder is not
23   going to be created until the time of the arrest.
24   Where do the documents -- what's the repository for

238

28 (Pages 235 to 238)

1 the documents under CPD policy in that period of
2 time?
3     A.  As in any other follow-up investigation --
4 believe it or not all these criminal investigations
5 are assigned to one individual detective.  There's
6 only one detective of record.  Even though I have a
7 partner it's -- I'm the assigned detective.  And if
8 something comes in of pertinence to that case they
9 would say Hickey this is one of your cases.  It's a
10 handout somebody got shot a while ago, how he's
11 doing.  I don't know, I guess I'll have to call,
12 you know, see if he's living.  I don't mean to be
13 facetious.  But it was the individual detectives.
14 If anything important came in it should be sent to
15 their direction -- or sent -- given to them for
16 their attention and inclusion in the investigative
17 file.
18     Q.  All right.  So what I'm -- should the file
19 ever come into existence, right?
20     A.  Correct.
21     MS. ROSEN:  Object to the form.
22 BY MR. BOWMAN:
23     Q.  Okay.  So, in other words, in the case of
24 a violent crime that did not fall within the

239

1 parameters of Section Roman IV A-1 of 83-1 the
2 investigative documents that were generated in the
3 -- in the case would be in the possession of the
4 assigned detectives until such time as an official
5 investigative file was created?
6     A.  Yes, sir.
7     MS. ROSEN:  Objection, form.
8 BY MR. BOWMAN:
9     Q.  Now, let me go ahead and see if I can get
10 an understanding of what is upsetting Eileen.
11     Why don't we have a look at Exhibit 11
12 again which you should have in your pile.
13     Do you have it?
14     A.  Number 11.
15     Q.  All right.  If you look at Page 5 you'll
16 see that it is a copy of a file jacket from what
17 has been represented to us to be an investigative
18 file for the Felix Valentin matter, okay.  You see
19 that?
20     A.  Yes, sir.
21     Q.  There is an RD Number on the little file
22 tab, there's the victim's name, and then there's a
23 space where the crime has been typed in and I want
24 to -- and it's been crossed out, right?

240

1     A.  Yes, sir.
2     Q.  And it's possible that somebody could
3 figure out that agg batt had been written in under
4 the crossed out portion, right?
5     A.  Yes, sir.
6     Q.  And then homicide is written in, correct?
7     A.  Yes, sir.
8     Q.  Okay.  Now, then -- and I think that the
9 -- that the record is --
10     MS. ROSEN:  He has the file here.
11     MR. BOWMAN:  Oh, you have the original file
12 here.
13     MS. ROSEN:  Uh-huh.
14     MR. BOWMAN:  Okay.  So let's look at the
15 original file.
16 BY MR. BOWMAN:
17     Q.  And we can look and see the -- you've just
18 handed me the original of Exhibit 11.  And what we
19 can see is that the exhibit in front of us at Page
20 1 contains a copy of a file designation that has
21 been scotch taped over the file designation that
22 we've just been looking at on Page 4 of the
23 exhibit, right?
24     MS. EKL:  No, 5.

241

1     MS. ROSEN:  Page 5.
2     MR. BOWMAN:  5, sorry.
3     MS. ROSEN:  Page 5 of the exhibit.  Just so
4 we're clear it's the label.  So there's a label --
5     MR. BOWMAN:  It's actually the label on the
6 file jacket.
7     MS. ROSEN:  Here.  I'm sorry.  So there's a
8 label and then there's a label -- another label
9 over it and it's scotch taped.  And the first label
10 is photocopied is WRON 5 and the top label is at
11 Exhibit WRON 1.
12     THE WITNESS:  Yes, sir.
13 BY MR. BOWMAN:
14     Q.  Is there any way that you with reference
15 to policy can interpret when this file jacket was
16 created initially with respect to this matter?
17     A.  No, there is not.
18     Q.  All right.  Let's turn to Page 5.  And we
19 talked about this before.  But in the final section
20 -- I'm actually back on exhibit -- I'm back on
21 Exhibit 16 now.  Last page.
22     The rules with respect to file retention
23 are set out in this section, right?
24     A.  Yes, sir.

242

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1    Q.   And with the exception of homicides every
2   cleared felony file is purged at the time of final
3   court disposition, is that the policy?
4    A.   You asked for felonies?
5    Q.   Right.
6    A.   Three years but it's suspended.  Suspended
7   three years.  I don't see something -- oh, cleared
8   felony, I'm sorry.  Yes, cleared felony until final
9   court disposition, yes, sir.
10   Q.   And then purged?
11   A.   Yes, sir.
12   Q.   Meaning destroyed?
13   A.   Yes, sir.
14   Q.   And then homicides the cleared closed
15  homicides following final court disposition get the
16  investigative file then gets forwarded to the
17  records division for permanent retention, right?
18   A.   Correct.
19   Q.   And in the case both of unsolved homicides
20  and cleared open homicides the procedure was for
21  them to remain only for ten years in the unit of
22  investigation and then at the completion of that
23  ten year period they should be forwarded to Records
24  Division for permanent retention?

243

1    A.   Yes, sir.
2    Q.   All right.  And that was your expectation
3   going forward, right?
4    A.   Yes, sir.
5    Q.   Okay.  All right.  Following the
6   promulgation of Detective Division as Special Order
7   83-1 what auditing process monitoring process or
8   other oversight was conducted from the top down to
9   ensure that these new requirements with respect to
10  the preservation and filing and maintenance of
11  memos and notes was actually being followed?
12   A.   I know of no special audit procedures that
13  were implemented.  But for every directive and even
14  for things that we don't have directives it's a
15  function of a supervisor, it's a responsibility
16  ever supervisors to make sure that the employees,
17  the members of the Chicago Police Department are
18  doing their job and following the department
19  directives.
20   Q.   Sure, I understand that.  And my question
21  is -- is -- let me clarify my use of the term top
22  down.
23       What mechanisms of a formal nature did the
24  chief of detectives use following the

244

1   implementation of 83-1 at any point to ensure that
2   these new directives were actually being followed?
3    A.   I think in 1986 a subsequent chief to
4   Hanhardt, William -- or George McMahon inserted an
5   audit procedure or requirement and identified that
6   command staff members should be conducting these
7   audits --
8    Q.   Okay.
9    A.   -- or inspections of these files.
10   Q.   And did that, in fact, happen to your
11  knowledge?
12   A.   I have no knowledge that it did or did
13  not.
14   Q.   Okay.  Let's have a look at what I'll mark
15  for identification as Hickey Exhibit 17.
16          (Whereupon, Hickey Deposition
17          Exhibit No. 17 was marked for
18          identification.)
19  BY MR. BOWMAN:
20   Q.   If you could identify what Exhibit 17 is?
21   A.   This also is a Detective Division Special
22  Order Numbered 86-3 on the subject of investigative
23  files.  It rescinds previously issued Detective
24  Division directives on the same topic.

245

1    Q.   Right.  Did you have any -- including
2   83-1?
3    A.   Including 83 --
4    MS. ROSEN:  Actually it doesn't say.
5    THE WITNESS:  It says 2 here.
6    MR. BOWMAN:  83-2.
7    THE WITNESS:  But we've been known occasionally
8   to make clerical errors.
9   BY MR. BOWMAN:
10   Q.   The intention was to rescind 83-1, right?
11   A.   I believe so.
12   Q.   All right.  Well, we won't trouble
13  ourselves with that.
14   A.   Yes.
15   Q.   Now, did you have any role in creating
16  86-3?
17   A.   I did not.
18   Q.   Speaking on behalf of the Chicago Police
19  Department if I were to pose the same series of
20  questions regarding why this applied only to the
21  Detective Division and not to the investigators
22  within the Patrol Division who might have occasion
23  to participate in investigative follow-up would
24  your answers be the same as they were with respect

246

30 (Pages 243 to 246)

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

1  to 83-1?
2      A.  Yes, sir.
3      Q.  When you testified a few minutes ago that
4  George McMahon, Chief of the Detective Division,
5  implemented a process of inspection and command
6  staff review of files were you referring to Section
7  6 on page -- on the final page of Exhibit 17?
8      A.  I was.
9      Q.  Is there anything else?
10     A.  No, it looks pretty much the same.
11     Q.  Is -- other than that it's basically the
12 same order, right?
13     A.  Yes, sir.
14     Q.  And what I intended to ask by my question
15 is is there any other directive or policy or
16 procedure of a formal nature of any kind that
17 anybody in the Chicago Police Department has done
18 at any time since 83-1 was promulgated other than
19 this particular provision of Exhibit 17 to ensure
20 that the requirements with respect to file
21 maintenance and the like that are set out in 83-1
22 are in fact adhered to?
23     A.  I am not aware of any.
24     Q.  Okay.  Are you aware of any documentation

247

1  that exists anywhere within the police department
2  documenting that the conduct of periodic
3  unscheduled inspections that are called for under
4  Section 6 of the 86 order?
5      MS. ROSEN:  I'm sorry.
6      THE WITNESS:  What was the lead into that.
7      MS. ROSEN:  Yeah, you lost me.
8      MR. BOWMAN:  Yeah, I lost myself too.  Let me
9  try that again.
10     THE WITNESS:  Okay.
11 BY MR. BOWMAN:
12     Q.  Are you aware of any documentation in the
13 Chicago Police Department memorializing inspections
14 that were actually conducted as --
15     A.  I'm aware that there is -- there was a
16 report which could be used to document this.  We
17 had a report form kept by Research and Development.
18 It was called exempt off hours inspections.  And
19 they were required to go into their area of
20 responsibility whether it be a district or a
21 detective area and to say what they did and found.
22 You know, is the parking lot okay.  Are -- you
23 know, fire extinguishers working.  Is everyone at
24 work.  You know, are things being done properly.

248

1  So that might be a vehicle, a means by which they
2  could communicate any -- anything which was not
3  being followed or anything that needed attention.
4  I'm just -- you asked me if there was and that's
5  the only thing that comes to mind.
6      Q.  Well, that's the reward you get for asking
7  an unclear question.
8      A.  Right.
9      Q.  Let me try it again.
10     A.  Try it again.
11     Q.  I'm wanting to know if you know of any
12 document that exists showing that in fact somebody
13 has actually done the specific kind of inspection
14 that is supposedly required by Subsection 6 of
15 Detective Division order 86-3?
16     MS. ROSEN:  Object to the form.
17     THE WITNESS:  I am not aware of any.
18 BY MR. BOWMAN:
19     Q.  We've been provided with a copy of Chapter
20 18 of a Detective Division manual that it's my
21 understanding was put on-line at some point in
22 1988.
23         I'm marking coincidentally as Exhibit 18 a
24 copy of this particular chapter of the manual.  At

249

1  least that's my understanding of what that is.
2          (Whereupon, Hickey Deposition
3          Exhibit No. 18 was marked for
4          identification.)
5      THE WITNESS:  I am familiar with this chapter.
6  BY MR. BOWMAN:
7      Q.  You're familiar with this chapter?
8      A.  I am.  It's --
9      Q.  Did I accurately describe the document?
10     A.  Close.  It is a standard operating
11 procedure of the Detective Division and it was
12 never put on-line, it was a paper based --
13     Q.  Oh, sure.
14     A.  -- hard book.
15     Q.  Yeah, and I was speaking colloquially?
16     A.  Yes.
17     Q.  When I use the term going on-line I meant
18 -- I meant when it --
19     A.  Became effective.
20     Q.  -- became effective?
21         And that's your understanding of the
22 document?
23     A.  Yes, sir.
24     Q.  And without going through this is it your

250

31 (Pages 247 to 250)

1  understanding that Exhibit 18 basically says the
2  same thing as the prior exhibit the 86-3 order?
3      A.  It does.
4      Q.  No substantive changes of any kind, right?
5      A.  Correct.
6      MR. BOWMAN:  Okay.  We're going to take a break
7  at this point in time.
8      MS. ROSEN:  Okay.
9  BY MR. BOWMAN:
10     Q.  Mr. Hickey, you indicated that you made
11  some inquiry of personnel in the police department
12  about the way in which Assistant State's Attorneys
13  would request information in the course of a case.
14          Did you -- since the first session of your
15  deposition make inquiry in the police department --
16  and you've also talked about the -- also talked
17  about the format for the activity reports.
18          Other than those two things did you make
19  any other inquiries in the police department in
20  order to prepare yourself for your testimony?
21     A.  No, sir.
22     Q.  You testified earlier this afternoon that
23  from time to time and you -- I think we agreed that
24  it was something that happened if not frequently

251

1  then at least from time to time that there would be
2  follow-up inquiries and complaints from
3  participants in the criminal justice system
4  indicating that the subpoena service unit had not,
5  in fact, provided all the documentation that they
6  had been expecting in response to a request for
7  information, right?
8      MS. ROSEN:  Object to the form.
9      THE WITNESS:  Yes, sir.
10  BY MR. BOWMAN:
11     Q.  And when these matters came to your
12  attention from time to time what, if anything,
13  apart from providing the information in the
14  individual case did you do to follow-up in terms of
15  implementing corrective action or the like?
16     A.  I didn't find any individual case that
17  rose to the level of a pattern or practice.  In
18  those cases --
19     Q.  No, no, no.
20     A.  No.  What I didn't -- I tried to resolve
21  the case at hand.
22     Q.  Okay.  And I understand that.  And apart
23  from resolving the case at hand did you at any
24  point ever take any kind of corrective action in

252

1  terms of having a meeting, suggesting some kind of
2  a procedure, or policy corrective?
3      A.  I don't recall anything.
4      Q.  Are you aware of anyone in the police
5  department ever having done such a thing in
6  response to complaints that the full materials were
7  not provided in a particular case?
8      A.  No.  There have been meetings over the
9  years -- I'm sorry.  Conversations over the years
10  about investigative files, you know.  I mean, I --
11     Q.  What do you mean by that?
12     A.  When are they given, you know, do they
13  have to be explicitly asked for, you know, it's --
14     Q.  What conversations are you recalling?
15     A.  I just remember general conversations with
16  both subpoena unit personnel and detectives
17  wondering -- well, asking a question does this
18  include.  Does this include everything on
19  everything.  If someone doesn't ask for it how far
20  do we have to go giving them extra.
21     Q.  Okay.  And are these -- are these
22  conversations conversations that you recall taking
23  place in the early 2000s when you were in charge in
24  the Records Division?

253

1      A.  Yes.
2      Q.  Specifically whether the investigative
3  file had to be turned over or not?
4      A.  I do remember some conversations on that
5  subject, yes.
6      Q.  Now, when these questions arose and when
7  complaints in particular cases arose to your
8  knowledge at any time has there ever been a
9  transmission of these issues up the chain of
10  command to the deputy superintendent in charge of
11  the Bureau of Administrative Services?
12     MS. ROSEN:  Object to the form of the question.
13     THE WITNESS:  No.
14  BY MR. BOWMAN:
15     Q.  Okay.  Is there a formalized mechanism
16  whereby that could have been brought through the
17  chain of command?
18     A.  To administration or legal affairs, yes.
19     Q.  But it was not done?
20     A.  Not that I'm aware of.
21     Q.  All right.  Let's turn to the subject of
22  lineups.
23          You understand that you've been designated
24  to speak for the department with respect to

254

32 (Pages 251 to 254)

1 policies, procedures, and practices concerning the
2 conduct of lineups in the period of time that's at
3 interest in this case in late 1980's, right?
4    A. Yes, sir.
5    Q. And are you familiar with the departmental
6 policies with respect to the conduct of lineups in
7 that particular period of time?
8    A. I am.
9    Q. Let me hand you what I'll mark for
10 identification as Exhibit 19.
11        (Whereupon, Hickey Deposition
12        Exhibit No. 19 was marked for
13        identification.)
14 BY MR. BOWMAN:
15    Q. A copy of the Chicago Police Department
16 general order with the Number 83-5. It's subject
17 is lineup procedures. You're familiar with this
18 document?
19    A. I am.
20    Q. It's our understanding that this
21 particular general order was in force in the period
22 of time between August 30 and September 15 when one
23 or more lineups may or may not have been conducted
24 in the Felix Valentin murder investigation, is that

255

1 consistent with your understanding?
2    A. Yes, Mr. Bowman.
3    Q. Are you personally familiar with the
4 circumstances that lead to the promulgation of
5 General Order 83-5?
6    A. I am not.
7    Q. You'll see that on the first page of the
8 order there is a series of requirements or
9 expectations of departmental personnel with respect
10 to the conduct of lineups, right?
11    A. Yes, sir.
12    Q. For example, in 2-A on Page 1 of Exhibit
13 19 the departmental personnel are advised that it
14 is appropriate to compel a person to participate in
15 a lineup against his wishes, right?
16    A. Yes.
17    Q. And then the general order also covers the
18 issue of whether or not the person participating in
19 the lineup is entitled to have counsel present,
20 right, depending on the period, the point in the
21 criminal process at which a lineup occurs, right?
22    A. That's correct.
23    Q. And there's also some discussion about the
24 importance of keeping the victim or the witnesses

256

1 separate from the lineup participants prior to the
2 lineup, right?
3    A. Yes, sir.
4    Q. And there are rules and requirements
5 regarding what may be asked of suspects during a
6 lineup, right?
7        You can't ask for their addresses for
8 example, right?
9    A. I don't see that one but is it in here.
10    Q. No, I thought it was.
11    MS. ROSEN: Subparagraph F.
12 BY MR. BOWMAN:
13    Q. Any previous arrests of any person or the
14 fact that any person in the lineup has been
15 arrested as a suspect will not be mentioned to
16 victims or witnesses, right?
17    A. Correct.
18    Q. And this is as a general matter designed
19 to improve the integrity of a lineup process,
20 right?
21    A. Yes, sir.
22    MS. ROSEN: Just for clarification you had
23 asked about addresses and that's the second
24 sentence of Paragraph F, you didn't read that.

257

1 That was your original question.
2    MR. BOWMAN: And thank you for that
3 clarification.
4 BY MR. BOWMAN:
5    Q. Also suspects are not to be asked for
6 their addresses in the presence of the victims or
7 the witnesses, right?
8    A. Yes, sir.
9    Q. Also, to -- I mean, made possibly for
10 reasons of personal privacy or safety, right?
11    A. Yes, sir.
12    Q. Okay. Now -- and then the general order
13 goes on to talk about the composition of lineups,
14 right?
15    A. Yes, sir.
16    Q. Specifically the need for some similarity
17 between the -- the participants in the lineup to
18 the extent that can be arranged for them?
19    A. Yes, sir.
20    Q. And there is also a requirement here it
21 says police officer should not be used unless other
22 alternatives have been exhausted, do you see that?
23    A. Yes, sir.
24    Q. And what are the other alternatives to the

258

33 (Pages 255 to 258)

1    use of police officers as fillers in the lineups?
2         A.   Mostly we use people who are already in
3    our lockups.  But there are certain districts,
4    neighborhoods of the city who -- lockups
5    interestingly enough are not filled with equally or
6    similarly described individuals.  And we can ask
7    for volunteers from the community, go to a local
8    restaurant and ask for the wait staff.
9         Q.   And that sometimes happens?
10        A.   Yes, it does.
11        Q.   And that sometimes happened in the 1980's,
12   right?
13        A.   Yes, sir.
14        Q.   Now, all of these requirements that are
15   set forth in the general order indicate that there
16   was in 1983 at the time this was promulgated a
17   process of review and evaluation of which the
18   Chicago Police Department lineup practices, is that
19   a fair summary?
20        A.   I don't know if it's evaluation.  But
21   setting forth expectations about the procedures.
22        Q.   And what is the reason why those
23   expectations were set forth at this particular
24   time?

259

1         A.   It's all about fairness, it's -- you
2    want --
3         Q.   I understand that the point is to be fair
4    to the greatest extent possible that -- and my
5    question was poorly phrased.
6         Is there any particular circumstance or
7    event that prompted the department to review and
8    evaluate lineup procedures in 1983 and to clarify
9    for the benefit of departmental personnel how to be
10   fair?
11        A.   I am not aware of the actual reason this
12   was issued.
13        Q.   Okay.  But it does appear that -- let me
14   ask you this, who has policy making authority
15   within the Chicago Police Department with respect
16   to the manner in which lineups are conducted?
17        MS. ROSEN:  Object to the form.
18        THE WITNESS:  Policy is issued by the
19   superintendent of police.  We've tagged the members
20   of the Bureau of Detectives with the functional
21   responsibility to conduct lineups.
22        BY MR. BOWMAN:
23        Q.   So in other words the policy making
24   authority resides with the superintendent but in

260

1    practice that authority has been delegated to the
2    chief of detectives?
3         A.   Yes, sir.
4         Q.   And that was the case in 1988?
5         A.   '83, yes, sir.  Oh, in '88?
6         Q.   I'm asking in '88?
7         A.   I'm sorry, yes.
8         Q.   And that was the case in 1983?
9         A.   Yes, sir.
10        Q.   All right.  Now, I want to focus with you
11   on Subsection H which relates to the photographing
12   of lineups.  And the policy as I understand it
13   draws a distension between whether the suspect has
14   been identified or not with respect to the
15   requirement that a photograph record be made of the
16   lineup?
17        A.   Yes, sir.
18        Q.   Okay.  What is the reason for that
19   distinction?
20        A.   To preserve the lineup maybe not in real
21   time but as close as possible.  And without wasting
22   the evidence technician's time on coming in on all
23   lineups.
24        Q.   Okay.  So to be clear if a witness or a

261

1    victim were to come in to the police station in
2    1988 when this policy was in effect and select a
3    filler from the participants in the lineup no
4    photographic record would be made of that
5    transaction?
6         A.   That's correct.
7         Q.   And is there any -- and the reason is is
8    that the selection of the filler is not evidence
9    that needs to be preserved?
10        A.   It's -- it's not going to court.  It's --
11   we're not going to be using it against anyone.
12        Q.   Right.  Speaking on behalf of the Chicago
13   Police Department will you agree with the
14   proposition that when a witness selects a filler
15   from a lineup that the witness's selection of the
16   filler as opposed to the suspect is exculptory?
17        MS. ROSEN:  Object to the form of the question.
18        THE WITNESS:  In -- today in retrospect I think
19   the selection of a filler should be noted as part
20   of the story.
21        BY MR. BOWMAN:
22        Q.   Would you agree that it's exculptory?
23        MS. ROSEN:  Object to the form of the question.
24        THE WITNESS:  It could be.

262

34 (Pages 259 to 262)

BY MR. BOWMAN:
Q.   Okay.  Now, the -- separate from photographs Subsection J of Exhibit 19 lists requirements relating to the documentation of lineups, right?
A.   Yes, sir.
Q.   And one question that I had is the supplementary report that's referred to here is this a speciality format at lineup report or is it something different?
A.   No, it's just an average department supplementary report.
Q.   Okay.  There are sometimes supplementary reports that start out with a phrase like this is a lineup report, is that -- is that what's --
A.   I think that's usually included in the narrative on this report.  This is a standard supplementary report.
Q.   Okay.  So the officer is required to document the date, time, and location of the lineup, right?
A.   Yes, sir.
Q.   And the name of those participating in the lineup and so on, right?

263

A.   Yes, sir.
Q.   And then Subparagraph 6 says that the report is to document the names of persons identified in the lineup?
A.   Yes.
Q.   Okay.  What happens under this policy if the -- if the witness is unable to make an identification?
A.   It's simply a listing of those that participated.  There is no one identified.
Q.   Okay.  Well, is the -- does this policy provide any guidance to the participants in the -- to the police participants in the lineup process as to how they should document the absence of an identification?
A.   No, but it's I suppose presumed that you would say no one was selected or no -- the suspect was not selected.
Q.   Suppose the -- suppose the witness identifies a filler as opposed to the suspect.  Under this report what is the obligation of the member of the department?
MS. ROSEN:  Under this order you mean.
MR. BOWMAN:  I'm sorry, under this order,

264

right.
THE WITNESS:  I would say the clearest direction it's in Subsection H which -- which results in the identification of a suspect by definition the filler is a non-suspect, you know.
BY MR. BOWMAN:
Q.   So this would be the member of the department then would -- would in his report indicate that there was not an identification?
A.   There was not an identification of the suspect.
Q.   That would be the way that would be recorded?
A.   At that time in 1988.
Q.   Okay.  And that was -- speaking on behalf of the Chicago Police Department that was the -- the procedure in practice that was followed in 1988?
A.   Yes, sir.
Q.   All right.  Now, the document here does not provide the members of the department who conduct lineups with guidance as to what they should say or not say to the witness after the -- after the witness has made an identification, is

265

that right?
A.   It is silent on that matter.
Q.   Okay.  And the report -- I'm sorry, I keep saying report.
The general order does not provide a requirement that the person or officers administering the lineup be unaware of the identity of the offender, right?
A.   That's correct.
Q.   And it does not provide a requirement that the administrators of the lineup be -- I'm sorry, I'm losing my train of thought.  It's been a long day.
MS. ROSEN:  You lost me there too.
BY MR. BOWMAN:
Q.   It doesn't require the administrators of the lineup to inform the witness that the offender may or may not be in the lineup, correct?
A.   That is correct.
Q.   Okay.  Now, with respect to the practice in 1988 are you aware whether or not members of the Chicago Police Department as a matter of practice inform suspects -- I'm sorry, inform witnesses that the suspect might not be in the lineup?

266

1    A.   We were silent on the issue.
2    Q.   Okay.  Are you aware as a matter of
3  practice whether in 1988 the administrators of the
4  lineup were unaware of who the suspect was?
5    A.   I would say they mostly were aware of --
6    Q.   As a matter of practice they were aware?
7    A.   Right.  Right.
8    Q.   The opposite in other words?
9    A.   Yes, sir.
10    Q.   And are you aware as a matter of practice
11  in 1988 whether administrators of a lineup
12  refrained in 1988 from confirming for the witness's
13  benefit the accuracy of an identification of those
14  cases where the suspect was selected?
15    A.   You're asking me if the person -- if the
16  detective conducting the lineup told the person
17  viewing the lineup that, yes, you picked the right
18  person.
19    Q.   Yes.  That generally happened in 1988,
20  isn't that correct?
21    A.   I think that happens more often than not.
22  A big smile on their face or whatever.
23    Q.   As a matter of practice?
24    A.   Right, yes, sir.

267

1    MR. BOWMAN:  Okay.  I'm sorry, but I need to
2  take another break.  Sorry.
3       (Whereupon, a short break was
4        taken.)
5  BY MR. BOWMAN:
6    Q.   I just have a few more questions for you.
7       Are you familiar with an Area 5 detective
8  by the name of Serafini?
9    A.   There's a couple Serafinis.  One is a
10  present employee.  And I presume his father was an
11  Area 4 detective.  Not in the -- I'm not familiar
12  with the person but I am familiar with the fact
13  that he is credited with designing a note taking --
14  not advice.  He diagrammed, he created, he drafted
15  a one-page note taking report.  It was not an
16  official police report, it's just something that
17  made his life better.  So he could record in the
18  same place, in the same manner, the same repetitive
19  information that comes up.  The firearm serial
20  number, the vin on the automobile, you know, people
21  you have canvassed, victim's name.  And that form
22  he is credited with creating became widespread in
23  use.  And back in the day when the only forms of
24  duplication was by the photocopy machine.  I'm

268

1  pretty sure I used that and other variations of it
2  when I created the original major incident
3  worksheet in January 1981 when we reorganized the
4  Detective Division.
5       Yes, I am.
6    Q.   Well, that's what I wanted to hear.
7       And this is called the Serafini report.
8    A.   Yes.
9    Q.   All right.  And --
10    A.   Ancestral heritage.
11    Q.   And to be clear despite its widespread
12  usage the Serafini report was not an official
13  Chicago Police report?
14    A.   It was not.
15    Q.   Another question that I wanted you to
16  clarify, if you could, and I've -- I've asked you
17  about this before but I haven't -- I haven't been
18  as clear about it as I should have been.
19       Where -- in the organizational chart can
20  you describe for me where organizationally the gang
21  crimes unit was located over time beginning, if you
22  could, at a point prior to 1988 and going forward
23  from there?
24    A.   In the Richard Brzeczek administration

269

1  which ended in 1983 he first moved the gang crimes
2  section from the Special Functions Division and
3  created an entire bureau called Special Functions
4  Bureau.
5    Q.   What was in the Special Functions Bureau
6  in addition to the gang crimes unit?
7    A.   The then task force their equivalent of a
8  special operations group, the mobile type of force
9  that was deployed at different parts of the city.
10  I can't remember if public housing was or the
11  airport.  There was specialized units with highly
12  specialized missions.
13    Q.   So this -- this special --
14    A.   Special Functions Division became a
15  bureau --
16    Q.   Okay.
17    A.   -- in the late Jane Byrne administration,
18  Richard Brzeczek administration.
19    Q.   Okay.  And that was prior to Brzeczek's
20  departure in 1983?
21    A.   Yes, it was.
22    Q.   All right.  And going forward from the
23  point when Brzeczek put gang crimes and other
24  functions in the Special Functions Bureau how long

270

36 (Pages 267 to 270)

1  did -- how long did it remain that way?
2      A.  I would be speculating but a few years.
3  And then that entire bureau was reduced from a
4  bureau and returned to the Patrol Bureau, the
5  bureau -- Patrol Division.
6      Q.  And when did that take place?
7      A.  Probably with Leroy Martin which was the
8  successor superintendent.
9      Q.  Well, actually Fred Rice was in there?
10     A.  I'm sorry, did I say Leroy Martin.  Fred
11  Rice.
12     Q.  So Fred Rice ended the Special Functions
13  Bureau and moved all of those special functions
14  into patrol?
15     A.  Back into patrol.
16     Q.  All right.  And what year did he do that
17  approximately?
18     A.  It would be early 80's, Harold Washington
19  administration, '83 to '87.
20     Q.  I asked you a number of questions earlier
21  in the deposition about gang crimes and other
22  investigators and my questions assumed that at the
23  point in 1983 when the 83-1 Detective Division
24  special order was implemented that gang crimes was

271

1      Q.  Has it become -- is it still known as gang
2  crimes?
3      A.  No, they created two units out of it, one
4  is gang enforcement and one is gang investigations.
5      Q.  When did that happen?
6      A.  This was Garry McCarthy's administration.
7  So within the last three years.  And probably three
8  years ago, it happened right away.
9      Q.  All right.  Now -- and I have the
10  same questions for you with respect to the
11  physical location of the gang crimes officers.
12  Starting back at the time that Brzeczek moved
13  gang crimes into a Special Functions Bureau prior
14  to his departure in 1983 where was gang crimes
15  located?
16     A.  It was decentralized.  If my memory serves
17  me correct and I think it does, it was in three
18  locations, north, south, and west.  You know, we
19  had five detectives -- excuse me, six detective
20  areas at the time.  But I'm pretty sure we only had
21  three gang crimes units.  And then it became
22  centralized.  It's --
23     Q.  At what point did it become centralized?
24     A.  I'd have to look at organizational charts.

273

1  in the Patrol Division.  Your answers wouldn't
2  change if, in fact, it was in the Special Functions
3  Bureau at that particular point in time, would
4  they?
5      A.  They would not.
6      Q.  Okay.  And then how long after
7  Superintendent Rice made that change in the '83 to
8  '87 period did gang crimes stay in the Patrol
9  Bureau?
10     A.  I'd say probably to Phil Cline's era and
11  then it went to Organized Crime Bureau.
12     Q.  And organized crime was its own bureau?
13     A.  Yes.
14     Q.  And what else was in organized crime other
15  than gang crimes?
16     A.  Narcotics, vice, and licensing.
17     Q.  And in terms of the year can you specify
18  when Cline made that organizational change?
19     A.  No, I cannot.  It was early in his
20  administration and -- I'm sorry.
21     Q.  Okay.  And then subsequent to that has
22  there been any relocation of gang crimes?
23     A.  No, it's -- it remains in organized crime
24  today.

272

1  Our organizational charts tend to be month --
2  issued months after the change actually occurs.
3  I'm sorry, I --
4      Q.  Okay.  Where are -- what documents would
5  show where they were located?
6      A.  Our organization for command, general
7  orders maintained by Research and Development.
8      Q.  All right.  And has gang crimes remained
9  decentralized?
10     A.  It has broken into two units and they are
11  -- they have headquarters at Homan Square on the
12  west side.  I don't think they have any satellite
13  offices.  I think -- for operational purposes I
14  think sometimes they meet and pull out of
15  Englewood.  But I don't think they have a permanent
16  home.  I should know that one but, I'm sorry, I
17  don't.
18     Q.  All right.  After gang crimes was moved
19  from Maxwell Street do you know where the files
20  from that unit went?
21     MS. ROSEN:  Object to the form, foundation.
22     THE WITNESS:  I do not.
23  BY MR. BOWMAN:
24     Q.  Do you know where they are today?

274

37 (Pages 271 to 274)

1    MS. ROSEN:  Objection, form, foundation,
2  assumes facts not in evidence.
3    THE WITNESS:  I don't know -- you know, form --
4  where -- what files you're referring to.  But
5  they're administrative files, any files.
6  BY MR. BOWMAN:
7    Q.  To be clear I'm referring to the files
8  from investigations that gang crimes might have
9  participated in?
10    MS. ROSEN:  Object to the form of the question,
11  foundation.
12    MS. EKL:  Assumes facts not in evidence.
13    THE WITNESS:  Any unit that is in the business
14  of creation of files should maintain files and
15  there's a procedure to destroy them.  And if you
16  can't keep them in your unit you send them to the
17  Records Division.  And the Records Division may in
18  fact have boxes of files that are marked gang or
19  gang crimes.  Gang crimes north, south, or west
20  back by their unit number.  Whatever their
21  organizational unit number was and it's changed
22  over the years too.
23  BY MR. BOWMAN:
24    Q.  Will you agree with the proposition

275

1  generally speaking that gang crimes was a unit
2  within the police department that was in the
3  business of generating reports of documents?
4    MS. ROSEN:  Object to the form of the question.
5    THE WITNESS:  They're a field and they create
6  and utilize all the reports general offense case
7  reports, supplementary reports, any -- yes, they
8  create reports.
9  BY MR. BOWMAN:
10    Q.  Are you familiar with the phrase negative
11  identification used to document the results of a
12  lineup procedure?
13    A.  I am not.  I think it's subject to
14  interpretation.  A negative identification, I don't
15  know what it means.
16    Q.  Well, it's just it's a -- it's a phrase
17  that we've seen on some reports over the years
18  that's why I asked the question?
19    A.  Its meaning is not apparent to me.
20    Q.  Okay.  I wanted to show you what I'll mark
21  for identification as Exhibit 20.
22      (Whereupon, Hickey Deposition
23        Exhibit No. 20 was marked for
24        identification.)

276

1  BY MR. BOWMAN:
2    Q.  This is a general order on lineup
3  procedures bearing Number 88-18.  I'm showing an
4  effective date of September 24, 1988, I've marked
5  it as Exhibit 20.
6      And you'll agree with me that this is very
7  similar to Exhibit 19, right?
8    A.  It's very similar.
9    Q.  And I think the -- you'll see that in
10  Paragraph 3 there is a new Number 9 which requires
11  as part of the documentation of a lineup that any
12  additional information with unusual circumstances
13  occurring during the lineup and it gives some
14  examples that those unusual circumstances be
15  recorded as part of the report, you see where I am?
16    A.  No, I don't.  Where are you?
17    Q.  At the bottom of the second page of
18  Exhibit 20.  Maybe it was in Exhibit 19 and my
19  notes are wrong in which case I will just withdraw
20  the question.
21    MS. ROSEN:  It's any comments made by counsel
22  is that what you said?
23    MR. BOWMAN:  No, Number 9, any additional
24  information or unusual circumstances occurring.

277

1    THE WITNESS:  I'm sorry.
2    MR. BOWMAN:  Yes.
3    THE WITNESS:  I see that and what's the
4  question.
5  BY MR. BOWMAN:
6    Q.  I think that's the -- the only change of
7  substance between these two general orders, right?
8    A.  Yes, sir.  Just for your own information
9  at that time when we introduced new material we
10  tried to highlight it with that vertical line.
11    Q.  Right.
12    A.  So it would be one of three changes.
13    Q.  Right.  And do you know why that was --
14  why that change was made?
15    A.  No, I do not.
16    Q.  Was there any review or -- of policies and
17  procedures, any triggering event that caused this
18  change?
19    A.  I don't know.  But in the bottom left of
20  the report where it says 87-114.
21    Q.  Yes.
22    A.  You got me -- I'm calling it a report now
23  also.  It's a -- of the general order.  That's the
24  task to create this order or make the changes.

278

38 (Pages 275 to 278)

1    Now if I were to locate this task file I
2  might see and I might not why someone wanted it
3  revised.  And sometimes directives are simply
4  revised because a certain length of time has
5  passed.  And there's been legal mandates and
6  changes.
7    Q.  So someone could go back and look in the
8  folder for task file 87-114 and possibly find an
9  answer to my question?
10   A.  You might find the smoking gun as to --
11 and you might not.
12   Q.  Got it.
13   MR. BOWMAN:  I don't have any further questions
14 for you, Mr. Hickey.  I appreciate your patience
15 with me today and in May.
16   THE WITNESS:  Thank you, Mr. Bowman.
17   MS. ROSEN:  I have a couple questions for him
18 just to follow-up.
19         EXAMINATION
20 BY MS. ROSEN:
21   Q.  Let's take a look at what was marked as
22 Exhibit Number 16 which is Special Order 83-1.
23   A.  Okay.
24   Q.  And if we look at Section 5 A-1 you were

279

1  asked questions about the creation of the
2  investigative file case folder?
3    A.  Yes, ma'am.
4    Q.  And then it -- in Subsection C there's a
5  reference to one of the circumstances where an
6  investigative file case folder should be initiated
7  at the outset would be in connection with the
8  battery likely to result in death, correct?
9    A.  Correct.
10   Q.  Okay.  And the case that brings us here
11 today the aggravated battery and then death of
12 Felix Valentin.  I'm going to show you what was
13 previously marked as Exhibit Number 9 and direct
14 your attention to the Bates stamp page Hickey 00026
15 which is a copy of the protocol from the ME's
16 office.  And can you see there at the bottom that
17 indicates how many gunshot wounds the victim
18 received in the course of this event, do you see
19 that there?
20   A.  I do.  It indicates -- this report
21 indicates there were 11 gunshot wounds to the
22 victim.
23   Q.  And would that be the type of battery that
24 would likely result in a death that would trigger

280

1  Section 5 A-1 and the opening of an investigative
2  case file folder at the outset of the case?
3    A.  Yes, it would.  Especially noting that
4  these were all torso shots.
5    Q.  And you're noting the torso shots from the
6  photo that's in the exhibit, correct?
7    A.  Correct.
8    Q.  Okay.
9    MR. AINSWORTH:  In the drawing?
10   MS. ROSEN:  The drawing, yes, sorry.  The
11 drawing.
12 BY MR. BOWMAN:
13   Q.  The drawing at -- in Exhibit 9 on Hickey
14 0026.
15   A.  Yes, ma'am.
16   Q.  Okay.  And then with respect to the
17 Serafini report did you say that that was something
18 along with other things that you utilized to create
19 a report that you participated in the preparation
20 of in 1981?
21   A.  Right, January of 1981.
22   Q.  And so then is it safe to assume that that
23 -- upon the creation of the report you were talking
24 about that that Serafini report was no longer in

281

1  use?
2    A.  It was no longer -- we encouraged the
3  officers or detectives to use the official major
4  incident worksheet to gather their notes.
5    Q.  Okay.  And then could you just explain so
6  it's clear when an incident occurs, there's an
7  event, let's take an aggravated battery, can you
8  describe how the official reporting for the Chicago
9  Police Department begins?
10   A.  The assigned beat officers from the Patrol
11 District in which it occurs respond, conduct a
12 preliminary investigation, and record their
13 findings on a general offense case report
14 describing an aggravated battery as in this case.
15 They complete their usually handwritten report at
16 this -- in this particular era.  Give it to their
17 supervising sergeant.  The sergeant approves of it.
18 The report is then turned in at the district
19 station.  District station clerical staff breaks it
20 up.  Sends the original to the Records Division
21 specifically the Records Processing Division.  They
22 actually had a specific colored vinyl pouch just to
23 place all these reports in each watch, each day and
24 send it to the Records Division.  And the copy of

282

1  which -- the pink copy of which was kept in the
2  district review office for their information.  The
3  records processing section within the Records
4  Division which received the original report then
5  began to duplicate it and sent photocopies to the
6  assigned bureau or, excuse me, Detective Division
7  area.  And in the -- honestly, you know, I'm always
8  surprised how many copies they needed.  It was four
9  or five copies per each case.  You know, one for
10 the file, one for the supervisor, one for the
11 detective, you know, they're multiple copies.
12     Q.  Let me ask you just -- you talked about
13 breaking apart the form.  So we're talking circa
14 1988 the general offense case report was that some
15 kind of form set?
16     A.  It is a form set.
17     Q.  And when you say break it apart what do
18 you mean?
19     A.  Literally, physically detach it from a --
20 it was a -- originally at that time it was -- we
21 still had carbon paper and -- you know.
22     Q.  Okay.  So then today did you bring with
23 you again the original of the file that's marked
24 permanent retention the RD file that's kept at the

283

1  Records Division?
2     A.  I did.
3     Q.  And so if we look at the photocopy that's
4  been made an exhibit here today, Exhibit Number 9,
5  and we look at Bates stamped Hickey 0003, if you
6  pull -- look at the original of that --
7     A.  Okay.
8     Q.  -- in the file that you have is that the
9  general offense case report that you're talking
10 about?
11     A.  It is.
12     Q.  And the original of that is that a
13 two-sided document?
14     A.  Yes.
15     Q.  Okay.  And if you look at the -- there's
16 some stamps on it, if you take a look at the stamps
17 specifically that say extra copy forwarded on the
18 document, can you explain what that means?
19     A.  Extra copy, sometimes more the -- more
20 than the assigned investigative unit may be
21 interested or have need for information that's
22 contained in a report.  If the incident occurred on
23 Park District property we might send a copy to
24 someone in the Park District on the security side.

284

1  If they broke a lamppost we might send a copy to
2  the Department of Revenue or Finance.  Again people
3  who have logical needs to know about certain
4  events.
5     Q.  Okay.  And so then the original of that
6  document once it gets sent to records that's where
7  it remains until the end of time in a case that's
8  permanently retained, correct?
9     A.  That is correct.
10    Q.  Okay.  Then are -- there are also
11 supplementary reports, correct?
12    A.  There are.
13    Q.  Okay.  And is there just one form of
14 supplementary reports or are there multiple forms
15 of supplementary report utilized by the Chicago
16 Police Department?
17    A.  For this time period up to 1984 there were
18 two -- excuse me, two types of report, the original
19 general offense case report and second would be the
20 supplementary report.
21        Then in February 1984 we came up with a
22 second type of supplementary report and it used the
23 same CPD number as the -- the normal supplementary
24 report.  But the critical difference is a line

285

1  right above the -- the narrative portion which
2  talks about the status.  And that's intended --
3  this second type of supplementary report was
4  intended as the report and the title says for BIS
5  personnel only.
6     Q.  And who are BIS personnel?
7     A.  Bureau of Investigative Services personnel
8  only, the Detective Division and the Youth
9  Division.  They are the ones who had the authority
10 to clear, close, unfound, suspend a case, whatever
11 the status might be.  They give it its final case
12 disposition.
13    Q.  Okay.  And then if we take a look at again
14 Exhibit Number 9 if you go to what we've marked as
15 Hickey 0012 which would be the --
16    A.  I have it.
17    Q.  Okay.  And now is that the same type of
18 supplementary report or is that a different
19 supplementary report, a different form?
20    A.  That is a different form.  This is CPD
21 11.411-A.  The BIS supplementary report is CPD
22 11.411-B.  And this one is intended for general
23 audience use.
24    Q.  Okay.  So in this -- the particular one

286

40 (Pages 283 to 286)

1  we're looking at this one is prepared by some
2  officers out of 14th District tac. So that's the
3  type of supplemental report that a tactical officer
4  would use?
5      A. For an existing crime that was already
6  reported, right.
7      Q. Okay. And when a tactical officer
8  prepares a supplementary report do you know the
9  procedure that follows once the report is filled
10  out and how that paperwork gets distributed?
11     A. They would, first of all, fill out the A
12  version, the general use version, the supplementary
13  report. And it too would be approved by their
14  supervisor. And at their unit they would break it
15  up physically because this was a form set. Break
16  it up and send the original to the records
17  processing section. Which would again make copies
18  and disseminate it to the area of investigative
19  responsibilities.
20     Q. And you're looking at the original file
21  again and so that supplementary report of the
22  Letrich report that we were just talking would
23  which is Bates stamped Hickey 0012 is contained in
24  that file --

287

1      A. It is.
2      Q. -- correct?
3         Now going back to the supplementary report
4  for the Bureau of Investigative Personnel can you
5  describe in 1988 was that form a form set?
6      A. It was not. It actually was a -- good, I
7  had to look. A one-page report. And it was on a
8  pad of paper, it was 100 per pad.
9      Q. Okay.
10     A. It didn't have a backside.
11     Q. Okay. And so when the detectives prepared
12  that report the original of that --
13     A. It was not a form set, excuse me.
14     Q. Okay. And so when a detective prepared a
15  supplementary report can you describe the process
16  by which that report would get distributed?
17     A. Detective would --
18  MR. AINSWORTH: Which number are you?
19  MR. BOWMAN: B.
20  THE WITNESS: It would be the B form.
21  MS. ROSEN: The B form.
22     I was speaking generally, yeah.
23  MR. AINSWORTH: Got you.
24  THE WITNESS: The creating detective would

288

1  write the report, have his supervisor sign off, and
2  the supervisor would send the original to the
3  records processing section. And I never asked this
4  but I suppose they already -- they would send us a
5  copy back of what we already sent them but that
6  doesn't make much sense. But a rule is a rule.
7  Yes.
8  BY MS. ROSEN:
9      Q. Okay. And then with respect to -- if you
10  have to take one more look at -- there's another
11  one of these supp reports -- well, let me back up
12  for a second. The BIS version on CPD 11.411-B,
13  that form, is that for detective use only?
14     A. It is.
15     Q. Okay. And then if we go -- if you look at
16  what -- in Exhibit 9 what's Bates stamped Hickey
17  00017 which is at the bottom signed by Gang
18  Specialist Gawrys.
19     A. Gawrys, I'm sorry, yes.
20     Q. Okay. So which form is that one, is that
21  the BIS form or the other one?
22     A. This is the general use supplementary
23  report CPD 11.411-A.
24     Q. And so the process that you described with

289

1  respect to a tactical officers use of a
2  supplementary report does that apply equally to a
3  gang specialist use of that same form supplementary
4  report?
5      A. The process is exactly the same.
6      Q. And so each of those originals of the
7  general offense case report and the supplementary
8  report that we've been talking about get sent
9  almost contemporaneous with their completion to the
10  Records Division, is that correct?
11     A. Right, they're a few hours separating
12  their arrival versus delivery.
13     Q. Okay. And then do you know what's the --
14  looking at Pages 1 and 2 which are the front and
15  back side of Hickey 00001 and 00002 of Exhibit
16  Number 9, do you know what that is?
17     A. This is the radio call card. Officially
18  it's known as the radio dispatch card. It was
19  filled out by the call taker at the 911 center.
20     Q. So this predates obviously the computer
21  age of call taking?
22     A. Yes, this is the original call, the
23  original description of the call.
24     Q. Okay. So this is actually the person at

290

41 (Pages 287 to 290)

1    the 911 center taking the call filling this card
2    out and then they have to send that to the records
3    division, is that how that works?
4    A. Yes, they do.
5    Q. Oh, I want to go back to what was
6    previously marked as Hickey Exhibits Number 7 and
7    Number 8. Which are the 1983 and 1993 versions of
8    the activity reports. Is there any place on that
9    report for an RD number?
10    A. There is no data field or space for a
11    Records Division number.
12    Q. Do you know why that is?
13    A. Because this is not a supplementary
14    report, this is an activity report -- activity
15    summary.
16    MS. ROSEN: That's all I have.
17    MS. EKL: I have nothing.
18    MR. BOWMAN: I just had one follow-up question,
19    possibly more, depending on Mr. Ainsworth's
20    counsel.
21           FURTHER EXAMINATION
22    BY MR. BOWMAN:
23    Q. You testified I believe that the major
24    incident worksheet supplanted the Serafini report?

291

1    A. Yes.
2    Q. And the major incident worksheet was also
3    not a report that as a routine matter was included
4    in the investigative file prior -- at any time,
5    right?
6    A. Prior in 1983 it was simply a note taking
7    document.
8    Q. Right. And what about subsequent to 1983,
9    I may have asked you this already?
10    A. If it was generated it should be retained.
11    Q. And where would it be retained?
12    A. In the investigative file if there was an
13    investigative file.
14    Q. And -- okay. And in 1983 or in 1982 in
15    the course of your investigation of the use of the
16    major incident worksheets you determined and made
17    some notes to the effect that the form often
18    contained ill-considered comments of detectives
19    possibly disparaging victims or otherwise recording
20    information that would be potentially useful to the
21    defense in cross-examination, right?
22    MS. ROSEN: Object to the form.
23    THE WITNESS: I think I said something -- just
24    the opposite. I mean, those comments but possibly

292

1    negative to the prosecution, I think that's how I
2    framed it. Meaning the same.
3    Q. Meaning the same, right.
4    MR. BOWMAN: Okay. I'm done.
5    MS. ROSEN: Okay.
6    Yes, reserved.
7         (FURTHER DEPONENT SAITH NAUGHT.)

293

1        IN THE UNITED STATES DISTRICT COURT
2         NORTHERN DISTRICT OF ILLINOIS
3           EASTERN DIVISION
4    JACQUES RIVERA,      )
5        Plaintiff,   )
6      -vs-        ) No. 12 CV 4428
7    REYNALDO GUEVARA, ET AL.,  )
8        Defendants.  )
9    This is to certify that I have read the
10    transcripts of my deposition taken in the
11    above-entitled cause by KIMBERLY J. KARAS,
12    Certified Shorthand Reporter, on May 6, 2014 and
13    June 10, 2014, and that the foregoing transcripts
14    accurately states the questions asked and the
15    answers given by me as they now appear.
16
17
18    _____
19         JAMES HICKEY
20    SUBSCRIBED AND SWORN TO
21    before me this _____, day
22    of _____ 2014.
23    _____
24      Notary Public

294

42 (Pages 291 to 294)

1   STATE OF ILLINOIS  )
2                      ) SS:
3   COUNTY OF C O O K  )
4        I, KIMBERLY J. KARAS, a notary public
5   within and for the County of Cook County and State
6   of Illinois, do hereby certify that heretofore,
7   to-wit, on May 6, 2014 and June 10, 2014,
8   personally appeared before me, at 750 North Lake
9   Shore Drive, 8th Floor, Chicago, Illinois, JAMES
10  HICKEY, in a cause now pending and undermined in
11  the United States District Court of Illinois,
12  wherein JACQUES RIVERA is the Plaintiff, and
13  REYNALDO GUEVARA, et al., are the Defendants.
14       I further certify that the said JAMES
15  HICKEY was first duly sworn to testify the truth,
16  the whole truth and nothing but the truth in the
17  cause aforesaid; that the testimony then given by
18  said witness was reported stenographically by me in
19  the presence of the said witness, and afterwards
20  reduced to typewriting by Computer-Aided
21  Transcription, and the foregoing is a true and
22  correct transcript of the testimony so given by
23  said witness as aforesaid.
24       I further certify that the signature to

295

1            McCorkle Litigation Services
2            200 N. LaSalle Street Suite 2900
2            Chicago, Illinois 60601-1014
3
4   June 16, 2014
5   MS. EILEEN ROSEN
    ROCK, FUSCO & CONNELLY
6   321 North Clark Street, Suite 2200
    Chicago, Illinois  60654
7
8   IN RE:  Rivera vs Guevara, et al.
    COURT NUMBER: 12 CV 4428
9   DATE TAKEN:  May 6, 2014 and June 10, 2014
    DEPONENT:  James Hickey
10  Dear Ms. Rosen,
11  Enclosed is the deposition transcript for the
    aforementioned deponent in the above-entitled
12  cause. Also enclosed are additional signature
    pages, if applicable, and errata sheets.
13
    Per your agreement to secure signature, please
14  submit the transcript to the deponent for review
    and signature.  All changes or corrections must be
15  made on the errata sheets, not on the transcript
    itself.  All errata sheets should be signed and all
16  signature pages need to be signed and notarized.
17  After the deponent has completed the above, please
    return all signature pages and errata sheets to me
18  at the above address, and I will handle
    distribution to the respective parties.
19
    If you have any questions, please call me at the
20  phone number below.
21
22  Sincerely,
23  Margaret Setina
    Court Reporter Present:
    Signature Department      Kimberly J. Karas
24

297

1   the foregoing deposition was reserved by counsel
2   for the respective parties.
3        I further certify that the taking of this
4   deposition was pursuant to notice and that there
5   were present at the deposition the attorneys
6   hereinbefore mentioned.
7        I further certify that I am not counsel
8   for nor in any way related to the parties to this
9   suit, nor am I in any way interested in the outcome
10  thereof.
11       IN TESTIMONY WHEREOF:  I have hereunto set
12  my hand and affixed my notarial seal this 15th day
13  of June, 2014.
14
15
16
17
18       *Kimberly J. Karas*
19  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20  LIC. NO. 084-003548
21
22
23
24

296

43 (Pages 295 to 297)