# Exhibit 5

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


ARTURO DeLEON-REYES,
Plaintiff                          CASE NO. 1:18-CV-1028


V.                                 Hon. Steven C. Seeger
                                   District Judge



REYNALDO GUEVARA, ET AL.,
Defendants                         Hon. Sunil R. Harjani
                                   Magistrate Judge

-------------------------------------------------------

GABRIEL SOLACHE,
Plaintiff                          CASE NO. 1:18-CV-2312


V.                                 Hon. Steven Seeger
                                   District Judge



CITY OF CHICAGO, ET AL.,
Defendants                         Hon. Sunil K. Harjani,
                                   Magistrate Judge








DEPONENT:  COMMANDER ERIC WINSTROM, 30(b)(6)
DATE:      DECEMBER 17, 2021
REPORTER:  VICTORIA JADICK

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

2

```
 1                         APPEARANCES
 2
 3    ON BEHALF OF THE PLAINTIFF, ARTURO DELEON REYES:
 4    Anand Swaminathan
 5    Loevy & Loevy
 6    311 North Aberdeen Street
 7    Chicago, Illinois 60607
 8    Telephone No.: (312) 243-5900
 9    E-mail: anand@loevy.com
10    (Appeared via videoconference)
11
12    ON BEHALF OF THE PLAINTIFF, GABRIEL SOLACHE:
13    Jan Susler
14    People's Law Office
15    1180 North Milwaukee Avenue
16    Third Floor
17    Chicago, Illinois 60642
18    Telephone No.: (773) 235-0070
19    E-mail: jsusler@peopleslawoffice.com
20    (Appeared via videoconference)
21
22
23
24
25
```

---

4

```
 1                  APPEARANCES (CONTINUED)
 2
 3    ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:
 4    Theresa Carney
 5    Eileen Rosen
 6    Katie Barber
 7    Jessica Zehner
 8    Rock Fusco & Connelly, LLC
 9    321 North Clark Street
10    Suite 2200
11    Chicago, Illinois 60654
12    Telephone No.: (312) 494-1000
13    E-mail: tcarney@rfclaw.com
14           erosen@rfclaw.com
15           cbarber@rfclaw.com
16           jzehner@rfclaw.com
17    (Appeared via videoconference)
18
19
20
21
22
23
24
25
```

---

3

```
 1                  APPEARANCES (CONTINUED)
 2
 3    ON BEHALF OF THE DEFENDANTS, DETECTIVES HALVORSEN,
 4    DICKINSON, RUTHERFORD, STANKUS, NAUJOKAS KARALOW,
 5    HARVEY, TREVINO, MINGEY, BIEBEL:
 6    Caroline Golden
 7    Josh Engquist
 8    The Sotos Law Firm
 9    141 West Jackson Boulevard
10    Suite 1240A
11    Chicago, Illinois 60604
12    Telephone No.: (630) 735-3300
13    Facsimile No.: (630) 735-3303
14    E-mail: jengquist@sotoslaw.com
15           cgolden@jsotoslaw.com
16    (Appeared via videoconference)
17
18
19
20
21
22
23
24
25
```

---

5

```
 1                  APPEARANCES (CONTINUED)
 2
 3    ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
 4    Megan K. McGrath
 5    Leinenweber Baroni & Daffada, LLC
 6    120 North Lasalle Street
 7    Suite 200
 8    Chicago, Illinois 60602
 9    Telephone No.: (866) 786-3705
10    E-mail: mkm@ilsq.com
11    (Appeared via videoconference)
12
13    ON BEHALF OF THE DEFENDANTS, ASSISTANT STATES ATTORNEYS
14    O'MALLEY, VARGA, BRUALDI, WEHRLE:
15    Brette Bensinger
16    Hinshaw & Culbertson, LLP
17    151 North Franklin Street
18    Suite 2500
19    Chicago, Illinois 60606
20    Telephone No.: (312) 704-3000
21    E-mail: bbensinger@hinshawlaw.com
22    (Appeared via videoconference)
23
24
25
```

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

6

APPEARANCES (CONTINUED)

ON BEHALF OF THE DEFENDANT, DAVID NAVARRO:
Dan Burns
Reiter Burns LLP
311 South Wacker Drive
Suite 5200
Chicago, Illinois 60606
Telephone No.: (312) 982-0090
E-mail: dburns@reiterburns.com
(Appeared via videoconference)

---

8

STIPULATION

The video deposition of COMMANDER ERIC WINSTROM,
30(b)(6) was taken at KENTUCKIANA COURT REPORTERS, 30
SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO, ILLINOIS 60606,
via videoconference in which all participants attended
remotely, on FRIDAY the 17th day of DECEMBER, 2021 at
approximately 10:52 a.m. CST; said video deposition was
taken pursuant to the FEDERAL Rules of Civil Procedure.
The oath in this matter was sworn remotely pursuant to
FRCP 30.

It is agreed that VICTORIA JADICK, being a Notary Public
and Court Reporter, may swear the witness and that the
reading and signing of the completed transcript by the
witness is not waived.

---

7

INDEX

Page
PROCEEDINGS                                          9
DIRECT EXAMINATION BY MR. SWAMINATHAN               11

EXHIBITS
Exhibit                                            Page
1 - Amended Notice of Deposition           28
2 - Detective Special Division Order 86-3      44
3 - Standard operating Procedure           122
4 - Training Document                  165
5 - Detective Division Training Lesson Plan  168
6 - Homicide Data Format                 169
7 - Cleared exceptionally and Street Files   170
8 - Memo dated January 13, 1983            172
9 - Preservice Detective In-Service Training 173
    Manual
10 - General Order 87-7                 210
11 - Violent Crimes Practicum           266
12 - Department Special Order Foreign      271
    Nationals and Aliens

---

9

PROCEEDINGS

COURT REPORTER: We are now on the record.
Will all parties present -- parties, except for the
witness, please state your appearance, how you are
attending, and your location?
MR. SWAMINATHAN: I'm Anand Swaminathan for
Plaintiff Arturo Deleon Reyes from Chicago.
MS. SUSLER: Jan Susler on behalf of plaintiff
Gabriel Solache by Zoom from Chicago.
MS. ROSEN: Eileen Rosen on behalf of
defendant, city of Chicago, along with Katie Barber
and Theresa Carney all from Chicago.
MS. GOLDEN: Caroline Golden -- oh, sorry.
Go ahead.
MR. BURNS: Good morning. Dan Burns on behalf
of Defendant David Navarro from Zoom in Chicago.
MS. GOLDEN: Caroline Golden by Zoom from
Chicago for the individual officer defendants.
MS. BENSINGER: Brette Bensinger on behalf of
the individual state's attorney defendants.
In Chicago, on Zoom.
MR. SWAMINATHAN: Is Megan McGrath joining or
is somebody from Leinenweber's firm?
MS. ROSEN: Are they not on yet?
MR. SWAMINATHAN: I don't see them.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

10

1    MS. SUSLER:  I'll text her.
2    MS. ROSEN:  Oh, she didn't have the link.
3  We just -- give us one minute.
4    COURT REPORTER:  Mr. Swaminathan, do you want
5  to go off the record and then we restart when Ms.
6  McGrath joins us?
7    MR. SWAMINATHAN:  If counsel thinks we can go
8  ahead and get started, given we've got hard stop I
9  think we probably can.  But let me let counsel weigh
10  in.
11    MS. ROSEN:  Yeah, let's just go.
12    MR. SWAMINATHAN:  Okay.  Okay.  Let's go then.
13  Okay.
14    COURT REPORTER:  Apologies one moment.  All
15  right.  Okay.  And Mr. Winstrom, would you please
16  state your full name for the record, please?
17    THE WITNESS:  Eric Winstrom.
18    COURT REPORTER:  And would you please hold your
19  driver's license up to the camera, sir?  And wait
20  until it is focused.  Perfect.  Thanks, sir.  You
21  may put that away.  Do all parties present agree
22  that the witness is in fact, Mr. Eric Winstrom?
23    MR. SWAMINATHAN:  For Plaintiff Reyes, so
24  stipulated.
25    MS. SUSLER:  Yes.  So stipulated for Solache.

---

11

1    MR. BURNS:  So stipulated for Navarro.
2    MS. BENSINGER:  So stipulated for the or --
3  assistant state's attorneys.
4    MS. GOLDEN:  So stipulated for Guevara.
5    COURT REPORTER:  Mr. Winstrom, would you please
6  raise your right hand?  Do you solemnly swear or
7  affirm that the testimony you're about to give will
8  be the truth, the whole truth and, but the truth?
9    THE WITNESS:  I do.
10    COURT REPORTER:  Thank you, sir.  Counsel, you
11  may proceed.
12          DIRECT EXAMINATION
13  BY MR. SWAMINATHAN:
14    Q    All right.  Thank you.  Sir, you're a
15  commander in the Chicago Police Department?
16    A    Yes.
17    Q    Okay.  Right.  And I will -- if I refer to you
18  as Commander Winstrom or, or Mr. Winstrom, are those
19  both respect -- respectful ways to -- to refer to you,
20  sir?
21    A    So is Eric.
22    Q    Well I need a --
23    A    I said yes and so is Eric.
24    Q    Okay.  All right.  Thank you.  I'll try to
25  show you the respect you deserve and use one of those

---

12

1  too.  But I appreciate that.  My apologies starting a
2  little late here today.  I hate to waste your time.  My
3  kids are wild animals.  That's all.  That's all I will
4  say, but -- but thank you.  And my apologies.
5  Okay, please state and spell your name for the record,
6  sir.
7    A    Eric Winstrom.  W-I-N-S-T-R-O-M.
8    Q    And where are you currently employed?
9    A    City of Chicago Police Department.
10    Q    Okay.  And you're a commander?
11    A    That is correct.
12    Q    And can you tell us what unit or area or
13  assignment you have as a commander at the Chicago Police
14  Department?
15    A    Yes, I am the commander of Area Five
16  detectives.
17    Q    And for how long have you held that position?
18    A    I've been the commander of Area Five
19  detectives since February of 2020.
20    Q    Okay.  Have you ever given a deposition
21  before?
22    A    I have.
23    Q    And how many times have you been deposed?
24    A    Approximately 12.
25    Q    And how many of those were -- strike that.

---

13

1  Were all 12 of those -- were all approximately 12
2  instances in your capacity as a law enforcement officer?
3    A    Yes.
4    Q    Have you ever been deposed in your personal
5  life, putting aside your work as a Chicago police
6  officer?
7    A    No.
8    Q    Okay.  In how many of those 12 depositions
9  were in your capacity as a commander of detectives in
10  Area Five?
11    A    I believe six.
12    MS. ROSEN:  I have a belated form of objection.
13    Q    Sir, you understand that today you're here to
14  testify as a designee of the city of Chicago pursuant to
15  a Rule 30(b)(6) notice, correct?
16    A    Yes.
17    Q    Have you provided a testimony as a designee
18  the city of Chicago for Rule 30(b)(6) purposes in the
19  past?
20    A    Yes.
21    Q    In how many instances?
22    A    I think -- maybe seven.
23    Q    Oh, you cut off for a moment there, did you
24  say seven?
25    A    Approximately seven?  It could be six.  It

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

---

**14**

1 could be eight, could be seven.
2     Q   And in those instances, did you testify on the
3 same topics that you, you'll be testifying about today?
4     A   I have never provided 30(b)(6) testimony on
5 topics related to translation or arrest of foreign
6 nationals.  The other topics have come up in previous
7 30(b)(6)'s.
8     Q   Okay.  All right.  I, I appreciate that you
9 have been deposed before and that you have been deposed
10 -- as a 30(b)(6) witness.  Let me just go through a
11 couple ground rules anyway, just so we're clear on them,
12 okay?
13     A   Yes.
14     Q   Okay.  This is obviously a question and answer
15 session.  I'm asking you questions.  You're answering
16 them to the best of your ability and we have a court
17 reporter laying it down.  So please make sure that you
18 let me finish my question before you answer, okay?
19     A   Yes.
20     Q   And likewise, I will let you finish your
21 answer before I ask my next question.  And if I
22 mistakenly believe you have finished your answer and
23 I've cut you off, just tell me and I'll let you finish
24 your answer, okay?
25     A   Okay.

**15**

1     Q   There will be times in the deposition where
2 you, where you will know where my question's going. Just
3 let me finish my question before you, before you answer,
4 okay?
5     A   Okay.
6     Q   If I ask you a question and you don't
7 understand the question, please tell me, and I will
8 rephrase.  Is that fair?
9     A   That is fair.
10     Q   Okay.  And similarly, if you answer my
11 question, I'll assume you understood my question.  Also
12 fair?
13     A   That is also fair.
14     Q   Okay.  We'll take a break anytime you need,
15 just let us know and we can do that.  Just please answer
16 any pending question before we take a break, okay?
17     A   Understood.
18     Q   All right.  Are you -- medication that would
19 prevent -- from being able to provide accurate and
20 truthful testimony today?  Are you taking any
21 medications that would prevent you from being able to
22 understand my questions and answer them?
23     A   No.
24     Q   Do you have any medical issues that would
25 prevent you from understanding my questions and

**16**

1 answering them?
2     A   No.
3     Q   Do you have any medical issues that would
4 prevent you from providing accurate, truthful testimony
5 today?
6     A   No.
7     Q   I don't want to spend a lot of time on your
8 background, but I want to just do me the kindness of
9 walking me through your history with the Chicago Police
10 Department.  When you joined the department and the
11 positions you've held.
12     A   Sure.  Joined the Chicago Police Department in
13 August of 2000.  I was the patrolman in the 2nd district
14 and the 13th district.  I left the Chicago Police
15 Department for one year in October of 2002 I believe.
16 And returned in November 2000 -- October of 2003. During
17 that time, I was briefly a detective for the Morris
18 County Sheriff's -- I mean, I'm sorry, Morris County
19 Prosecutor's Office in Morris County, New Jersey. When I
20 returned to the Chicago Police Department, I taught law
21 at the Chicago police recruits.  I then was transferred
22 to the 13th district, from the 13th district in December
23 of 2005.  I was promoted to detective where I was
24 assigned to Area One detective division, as both a
25 robbery detective and a special victims unit detective.

**17**

1 I was then promoted to Sergeant in July of 2008, where I
2 went to -- was assigned to the 25th district.  In
3 October of 2010, I returned to the detective division as
4 a Sergeant in Area One every oversight office.  So that
5 would include homicide, violent crimes, robbery, and
6 special victims at various times.  So that was in --
7     Q   Sorry, did you, the area one -- you were a
8 Sergeant over detectives at Area One in October 2010?
9     A   That is correct.
10     Q   Okay.  Keep going.  Sorry.
11     A   For the year 2013, I was Sergeant and
12 commanding officer of the special investigations unit.
13 Special investigations unit is a citywide unit, which
14 investigate -- investigates all child sex crimes in the
15 city.  2014, I was assigned to legal affairs where I was
16 -- governmental affairs section liaison with Mayor
17 Emmanuel's office.  2015, I was promoted to legal
18 officer two, where I took over as -- in charge of the
19 discovery unit and became an advisor -- superintendent.
20 In 2017 --
21     Q   Hold on for a second there, you became a legal
22 officer two over the discovery unit, and advisor to who
23 did you say?
24     A   Superintendent of police, who at the time was
25 Garry McCarthy.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

18

1    Q   Uh-huh.
2    A   February of 2017, I was promoted to Lieutenant
3  and I was assigned to the 18th district.  In October of
4  2017, I was reassigned as a Lieutenant to the office of
5  reform management, create that unit -- which it was
6  created to both negotiate and implement the impending
7  consent decree with the Attorney General's office.  2018
8  I took over as Head of Policy for the research and
9  development division as a Lieutenant.  In November 2019,
10  I became a captain of the 9th district.  That brings us
11  to February of 2020 when I was promoted to commander of
12  Area Five detectives.
13    Q   Okay.  Thank you for walking me through that.
14  The 9th district.  What area is that in?
15    A   The 9th district is located in the Bridgeport
16  neighborhood at 35th and Halstead.
17    Q   And is there -- what detective division is --
18  has authority or is assigned in that area?
19    A   That is covered by Area One at this time.
20    Q   And the -- when you were in the 18th district,
21  what detective division area covered that district?
22    A   When I was in the 18th district, it was
23  covered by the Area Central detectives, which at the
24  time was -- so -- this one I could cover by Area Five
25  while I was assigned there.

---

19

1    Q   And in the 13th district of what, what
2  detective division area covered that district?
3    A   13th district was covered by Area Four.  When
4  I was assigned there.
5    COURT REPORTER:  I'm sorry to interrupt,
6  Counsel.  My audio just cut out.  Right as he was
7  explaining that he was in the -- that he covered
8  Area One.  My apologies.
9    MR. SWAMINATHAN:  What's the last thing you
10  have written down?  I thought you said you, you
11  have.  Yeah.  What is the last thing you have?
12    COURT REPORTER:  Yes, sir.  It said that's what
13  area he had been -- had authorized and assigned to.
14  And he said that he covered here.  Let me one
15  moment, please.  I will do a playback.  Apologies,
16  Counsel.
17    (REPORTER PLAYS BACK REQUESTED TESTIMONY)
18  BY MR. SWAMINATHAN:
19    Q   Okay.  All right.  When you were -- so I'm
20  going to have to ask a couple questions over again
21  there, Commander.  When you were in the 25th district,
22  what area covered over that district?
23    A   Area Five.
24    Q   And when you were in the 13th district, what
25  area covered that district?

---

20

1    A   Area Four.
2    Q   Okay.  Your position teaching law in the
3  academy.  When you came back from your time in Morris
4  City, New Jersey.  Can you tell us what law you were
5  teaching in the academy?
6    A   Mostly criminal law.
7    Q   And what's -- sorry, go ahead.
8    A   I also taught jurisdiction and constitutional
9  law, and I also taught patrol procedures as needed.
10    Q   Okay.  Do you have a legal degree?
11    A   I do.
12    Q   And where did you attend law school?
13    A   Brooklyn Law School in Brooklyn, New York.
14    Q   Okay.  I lived very close to Brooklyn Law
15  School for some years.  What year did you graduate?
16    A   2000.
17    Q   You said 2000?
18    A   Yes.
19    Q   Okay.  And where'd you go to college?
20    A   Rutgers University.
21    Q   And when did you graduate?
22    A   1997.
23    Q   Did you go straight to law school?
24    A   I did.
25    Q   And when you say you taught criminal law at

---

21

1  the academy, what subjects of criminal law did you
2  teach?
3    A   Mostly the class was focused on the proper
4  charging of cases.  So because it's a basic recruit
5  class, we would go over the elements to a variety of
6  crimes, mostly referenced in the Illinois compiled
7  statutes.
8    Q   Did you teach about Brady obligations?
9    A   I don't specifically remember teaching about
10  Brady obligations.  However, I had -- I shared teaching
11  responsibility with two other instructors and I did
12  occasionally use lesson plans and taught their
13  constitutional law class and it may have been in the
14  curriculum at the time.  It would depend on what classes
15  I covered, but I don't have any independent recollection
16  of it.
17    Q   And between you and the other two instructors,
18  was information about Brady obligations taught at the
19  academy?
20    A   Yes.
21    Q   Did you teach about Miranda warnings at the
22  academy?
23    A   Yes.
24    Q   Did you provide any law related teaching with
25  regard to interrogations of suspects?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

**22**

1      A   I don't recall that I taught those classes.
2 The subject of interviews and interrogations was taught
3 at the police academy during that time.
4      Q   Okay -- all right. When you went to Legal
5 Affairs as a government liaison -- strike that. All
6 right. Is there a subpoena service unit in the Chicago
7 Police Department currently?
8      A   Yes.
9      Q   And what group or area or division is that
10 within?
11      A   A Subpoena unit is organized under the Records
12 division.
13      Q   Okay. Did you ever have any command or
14 authority over that unit?
15      A   I interacted with them, but I did not command
16 them.
17      Q   In what positions that you held with Chicago
18 Police Department did you interact with the Subpoena
19 Service Unit?
20      A   While I was in charge of discovery,
21 occasionally our duties mingled. We had some of the
22 same issues. So the discovery unit handled almost all
23 civil litigation. The unit would sometimes get
24 subpoenas related to civil cases. So we -- I -- I also
25 worked with them because at the time we were both

---

**23**

1 upgrading our software to Sub UA (phonetic). So we
2 shared a lot of the same interests.
3      Q   Okay. So if I understand you correctly, you
4 said while you were in the Discovery unit, the Discovery
5 unit handled discovery and civil cases and the Subpoena
6 Service Unit handled discovery and criminal cases, is
7 that correct?
8      A   Yes. More or less, yes. Generally speaking,
9 yes. There's some crossover.
10      Q   Okay. And when you say there's some
11 crossover, in what way with their crossover?
12      A   For example, if an internal affairs request
13 for an open investigation comes in for a criminal case,
14 it would not immediately be filled. It would go to
15 legal affairs first to examine. If a subpoena came in
16 that the city intended to fight for a lack of a better
17 word, it would go to legal affairs to review.
18      Q   Okay. And so with regard to subpoenas from
19 prosecutors or criminal defense attorneys, those were
20 primarily handled by the Subpoena Service Unit, correct?
21      A   Yes.
22      Q   And informal requests from prosecutors or
23 criminal defense attorneys were handled by the Subpoena
24 Service Unit, correct?
25      A   Did you say informal requests?

---

**24**

1      Q   Yes. Informal requests, you know, a phone
2 call or some other request other than a subpoena for
3 files would be addressed by the Subpoena Service Unit,
4 if it came from prosecutors or defense attorneys; is
5 that correct?
6      A   No.
7      Q   Okay. How would those be handled?
8      A   Subpoena unit handles subpoena requests. So
9 it would be a physical piece of paper. Now it can be an
10 electronic request. During the relevant time period, it
11 would be a piece of paper. An informal request, for
12 example, if something's needed at court, if the state's
13 attorney has a relationship with a detective that -- or
14 if there's some sort of emergency that they need the
15 detective there and to bring the file right away, that
16 would be an interaction between not the Subpoena unit,
17 but the State's attorney and the detective.
18      Q   And so, did you have any involvement -- strike
19 that. You indicated that in your role in Legal Affairs
20 in -- strike that. In your role, as in the Discovery
21 unit in '20 -- approximately 2015 and on, you had
22 interactions with the Subpoena Service Unit, correct?
23      A   Yes.
24      Q   Did you have interactions or work with the
25 Subpoena Service Unit in any prior positions?

---

**25**

1      A   We, for example, when I was the head of the
2 Special Investigations Unit, I was in charge of
3 operations and administrations. And so on a regular
4 basis, I would receive subpoena requests for information
5 from the Subpoena unit that I would fill and return to
6 them.
7      Q   Okay. And when you say you would get those
8 requests that this is when you, this was in your
9 position as a Sergeant over the SIU unit?
10      A   Correct.
11      Q   Okay. And so you -- would you personally be
12 involved in fulfilling those subpoena requests?
13      A   Correct.
14      Q   Okay. And did you have any prior interactions
15 with the Subpoena Service Unit prior to 2013 when you
16 were a Sergeant in the Special Investigations Unit?
17      A   Not that I can recall.
18      Q   Okay. All right. Fair to say, sir, you
19 worked in several different areas of the Chicago Police
20 Department? What I say by areas, I mean, locations
21 within the Chicago Police Department?
22      A   That is fair to say.
23      Q   Okay. Fair to say that you have some
24 understanding of the practices across different
25 districts and areas of the Chicago Police Department?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

26

1    A   That is also fair to say.
2    Q   Okay.  In any of your positions with the
3  Chicago Police Department, did you ever train
4  detectives?
5    A   Yes.
6    Q   In what positions did you train detectives?
7    A   I was the commanding officer of the Special
8  Investigations Unit.  I trained pre-service detectives
9  in child abuse investigations and criminal sexual
10 assault against children investigations, as well as the
11 supervisor in Area One and in special investigations.  I
12 trained my subordinates in roll call training as well as
13 on the job training.
14   Q   And did you train detectives in any of your
15 prior positions before that?
16   A   I did not.
17   Q   All right.  I'm just going to pull up the
18 notice of amended notice of 30(b)(6) deposition.  Give
19 one moment.  All right, sir.  Are you able to -- are you
20 able to see this document on my screen?
21   A   Yes.
22   Q   Entitled Amended Notice of Rule 30(b)(6)
23 Deposition.  Yes?
24   A   Yes.
25   Q   Okay.  I have marked this document is Exhibit

---

27

1  1.  Its title is Amended notice of Rule 30(b)(6)
2  deposition of city of Chicago.  It is eight pages and
3  I'm just sort of scrolling through the pages here.
4  Sir, you've seen this documente in advance of today's
5  deposition?
6        (EXHIBIT 1 MARKED FOR IDENTIFICATION)
7    A   Yes.
8    Q   Okay.  And this 30(b)(6) notice identifies
9  various topics, and topic -- I'm not going to read the
10 topics, but sir, are you here to provide binding
11 testimony on behalf of the city today on topic 1A in
12 this notice?
13       MS. ROSEN:  I object to the form and your use
14 of the word, finding the rule is what the rule is
15 and Commander Winstrom is going to be providing
16 30(b)(6) testimony.
17   A   Yes.
18   Q   And sir, are you prepared to provide binding
19 testimony today on behalf the city, Chicago with regard
20 to topic 1B?
21       MS. ROSEN:  Same objection.
22   A   Yes.
23   Q   Are you prepared to provide by any testimony
24 on behalf of the city of Chicago with regard to topic
25 1D?

---

28

1        MS. ROSEN:  Objection.
2    A   Yes.
3    Q   Are you prepared to provide by any testimony
4  on behalf of the city of Chicago with regard to topic
5  1E?
6        MS. ROSEN:  Same objection.
7    A   Yes.
8    Q   Are you prepared to provide binding testimony
9  on behalf of the city of Chicago with regard to topic
10 1F?
11       MS. ROSEN:  Same objection.
12   A   Yes.
13   Q   Are you prepared to provide binding testimony
14 on behalf the city of Chicago with regard the topic 2A?
15       MS. ROSEN:  And I'm just going to have a
16 standing objection to all these questions with
17 respect to paragraph two.
18   Q   Thank you.  Sir, are you prepared to provide
19 binding testimony today with -- on behalf of the city of
20 Chicago with regard to topic 2B?
21   A   Yes.
22   Q   Are you prepared to provide binding testimony
23 on behalf of the city of Chicago with regard to topic
24 2D?
25   A   Yes.

---

29

1    Q   And are you prepared to provide binding
2  testimony on behalf of the city of Chicago today with
3  regard to topic 2E?
4    A   Yes.
5    Q   Are you prepared to provide binding testimony
6  behalf the city of Chicago with regard to topic 2F?
7    A   Yes.
8    Q   And are you prepared provide binding testimony
9  on behalf of the city of Chicago with regard to topic
10 2G?
11   A   Yes.
12   Q   Okay, sir, can you tell me what you did to
13 prepare for today's deposition?
14   A   I met with my lawyers.  I reviewed some orders
15 from the relevant time period.  I reviewed some training
16 material from the relevant time period, my accumulative
17 knowledge of my 20 plus years on the Chicago Police
18 Department.  And I did speak to one individual also.
19   Q   All right.  Putting aside your conversation
20 with lawyers, who is that individual you met with?
21   A   I spoke briefly to Bonita Lee.
22   Q   Who is Bonita Lee?
23   A   Bonita is a civilian who works in research and
24 development and is one of the longest serving members of
25 the police department.  And for -- that I use for older

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

---

30

1  orders, make sure that I didn't miss orders for
2  preparation for this.
3      Q   Okay.  Were you involved -- and I'm sorry, go
4  ahead.
5      A   Didi just confirmed the knowledge that I
6  already had.
7      Q   Okay.  Did you learn any new information from
8  Bonita Lee?
9      A   No.
10     Q   And if I understand correctly, your
11 conversation with Bonita Lee was to make sure that you
12 had identified all of the relevant policies and training
13 documents.  Is that correct?
14     A   Policies, yes.
15     Q   Okay.
16     A   She is not a -- a resource that I used for
17 training.
18     Q   Okay.  Were you involved in the production of
19 -- strike that.  Were you involved in identifying the
20 documents to be -- strike that.  Were you involved in
21 identifying the policies to be produced in this case?
22     MS. ROSEN:  Object and instruct him not to
23 answer, I think that invades attorney client.
24     MR. SWAMINATHAN:  I'm not asking for the
25 content of any communications.  I'm just asking him

---

31

1  if he was -- had a role in identifying documents to
2  be produced in discovery.
3      MS. ROSEN:  I still have an objection to that
4  based on attorney-client and attorney work product.
5  Instruct him not the answer.
6  BY MR. SWAMINATHAN:
7      Q   I think that that's an inappropriate use of
8  work product privilege, but -- and attorney-client
9  privilege, but we'll come back to it, sir.  Have you
10 reviewed policies that were produced in this case?
11     A   Yes.
12     Q   Okay.  In your role with the Chicago Police
13 Department, do you have involvement in the production of
14 policies in discovery, in civil cases?
15     MS. ROSEN:  Objection, form.
16     A   Since I have worked in legal affairs, I have
17 been involved in the production of this.
18     Q   Okay.  When you spoke with Bonita Lee, were
19 you aware of what policies were being produced in this
20 case?
21     A   I don't think I was.
22     Q   When you spoke with Bonita Lee, did you ask
23 her if there were any additional policies you should be
24 aware of?
25     A   What I asked Bonita Lee is that I -- I told

---

32

1  her that my understanding of our interpreter policy was
2  that it didn't come to be until 2009, and I wanted to
3  make sure because prior to that time frame, the -- our
4  database isn't electronic, it's on paper, and I wanted
5  to make sure that I had that right.  So I was going off
6  memory and I wanted to make sure my memory was correct.
7  And she confirmed that my memory was correct.
8      Q   Okay.  So she confirmed -- strike that.  So
9  it's your understanding that there was no CPD policy
10 with regard to interpreters until 2009; is that correct?
11     A   There's nothing on point.  Interpreters
12 may have been mentioned at some point in time, there's a
13 -- a mention of how to get a sign language interpreter.
14 But as far as this case, there's nothing on point that
15 an order, which would be responsive to this, came about
16 in 2009.
17     Q   Okay.  And when you say that would be
18 responsive to this, what you're referring to is --
19 strike that.  Prior to 2009, there was no specific
20 policy addressing the use of interpreters in interviews
21 and interrogations of witnesses and suspects.  Is that
22 correct?
23     A   Correct.
24     Q   Okay.  All right.  How many meetings did you
25 have with Counsel in preparation for today's deposition?

---

33

1      A   I believe I met with them three times.
2      Q   And how many total hours approximately would
3  you say you spent preparing with Counsel?
4      A   I would have to estimate nine.
5      Q   Okay.  And did you spend any additional hours
6  preparing with Counsel over the phone?
7      A   (No verbal response.)
8      Q   Your answer cut out there, sir.
9      A   The answer is no.
10     Q   Thank you.  In those meetings with Counsel,
11 did you review any documents?
12     A   Yes.
13     Q   And tell me what documents you reviewed.
14     A   We reviewed the notice, which is currently on
15 the screen.  We reviewed some training materials.  We
16 reviewed the detective division SOPs in this time frame.
17 I believe they're dated 1988.  We reviewed the detective
18 division special orders, which preceded the detective
19 division SOPs.  And we looked at some general orders
20 and/or special orders.  I can't remember how they were
21 all classified, but on interviews and interrogations.
22     Q   Other than the -- oh, I'm sorry, go ahead. Did
23 you have more to say?
24     A   That's all -- that's all I can think of at
25 this time.  Oh, I'm -- I'm sorry.  We also reviewed the

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

34

1  rules and regulations.
2      Q   Did you review any --
3      A   Just other files in the department.
4      Q   Did you review any of the files or documents
5  related to the underlying homicide investigation in this
6  case?
7      A   Yes, I did.  Yes.  I left that one out.  Yes,
8  we did review the investigative file.
9      Q   Okay.  In your review of the investigative
10  file, did you find any violations or deviations from
11  policy?
12      MS. ROSEN:  Object to the form.
13      A   I'm -- well -- the short answer is no.
14  However, I did not do as thorough of a job looking at
15  that file as I would have if I was -- as a supervisor
16  looking to see if it was in compliance.  I didn't study
17  the file as I generally would for that specific
18  question.
19      Q   Okay.  Did you review any transcripts of prior
20  depositions?
21      A   Oh, yes, I did.  Which I read -- I read a
22  transcript from Jim Hickey, I heard from the Chicago
23  Police Department.  In fact, I think I read two
24  transcripts from Jim Hickey.  One of them was in the
25  Jacques Rivera case.  And the other one may have been in

35

1  the Jacques Rivera case as well.  I don't -- I don't
2  remember.
3      Q   Did you review a transcript of Mr. Hickey from
4  the Nathson Fields case at all?
5      A   I am familiar with that case, just because of
6  my time in Legal Affairs, but I don't -- I don't think
7  that I did, but it's possible that I did.  I thought
8  they were both Jacques Rivera, but I'm not sure.
9      Q   The transcripts that you reviewed from -- of
10  Mr. Hickey, did you have any disagreement with any of
11  the testimony when he provided his -- in those
12  transcripts you reviewed?
13      MS. ROSEN:  Object to the form.
14      A   I can't recall off the top of my head anything
15  I -- I disagreed on him with, it's possible I did.
16      Q   Okay.  Sitting here today, when -- can you say
17  there's anything you read in those transcripts for
18  Mr. Hickey that you would say you disagree with?
19      A   Not that I can remember, but I -- yes, not
20  that I can remember.
21      Q   When you reviewed those transcripts for
22  Mr. Hickey, did you make any note to yourself indicating
23  that you had a disagreement with anything that you had
24  read in his testimony?
25      A   No.

36

1      Q   Okay.  Did you review the transcripts of any
2  other of 30(b)(6) witnesses -- strike that.  Did you
3  review any defendant transcripts of an individual named
4  Karen Sullivan?
5      A   I -- I had Karen Sullivan's deposition for a
6  case.  I had reviewed that deposition for a previous
7  case.  I don't think I deeply went into that for that,
8  but I am familiar with her deposition as well.
9      Q   So you reviewed Karen Sullivan's deposition in
10  the past; is that correct?
11      A   I had four previous 30(b)(6) testimony.
12      Q   Okay.  And when you've reviewed Karen
13  Sullivan's deposition testimony in the past, did you
14  have any disagreement with her prior deposition?
15      MS. ROSEN:  Object to the form.
16      A   Not that I can remember.
17      Q   And is one of the deposition transcripts of
18  Karen Sullivan that you've reviewed from her testimony
19  in the Nathson Fields' case?
20      A   It could be, but I don't know.
21      Q   Okay.
22      MS. ROSEN:  I'm going to -- object to the form.
23  And are you sure she testified in Fields?
24      MR. SWAMINATHAN:  I believe so.
25      MS. ROSEN:  Objection.

37

1  BY MR. SWAMINATHAN:
2      Q   Mr. Winstrom, have you reviewed -- prior to
3  your recent review of two transcripts from Mr. Hickey,
4  have you previously reviewed any deposition testimony
5  for Mr. Hickey?
6      A   I believe I have.
7      Q   Okay.  And in those prior instances, did you
8  review additional transcripts of Mr. Hickey other than
9  just the two that you reviewed recently?
10      A   It's possible, but if I have, I don't
11  remember.
12      Q   Okay.  In any of the prior instances and --
13  how many total times do you think you've reviewed
14  testimony of Mr. Hickey?
15      A   Deposition in maybe two previous depositions.
16      Q   You cut out there.  Sorry, could you repeat
17  that?
18      A   Possibly two other depositions.
19      Q   Okay.  So you reviewed two other depositions
20  of Mr. Hickey.
21      A   In preparation for two other depositions, I
22  may have read transcript of Jim Hickey.
23      Q   Got it.  And in either of those instances,
24  when you reviewed transcripts of Mr. Hickey, did you
25  identify any areas in which you disagreed with his

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

38

1   testimony?
2       MS. ROSEN:  Objection, form.
3       A   Not that I can remember.
4       Q   Okay.  Have you reviewed any of your prior
5   30(b)(6) deposition testimony?
6       A   I actually have not for the purpose of this
7   case.  I have reviewed previous testimony for previous
8   depositions.
9       Q   Okay.  So each time you have previously
10  testified as a 30(b)(6) deponent for the City of
11  Chicago, have you subsequently reviewed that testimony?
12      MS. ROSEN:  Object to the form.
13      A   Correct, like to prepare an errata sheet? Yes.
14      Q   Okay.  And in any of those instances, when you
15  reviewed your deposition testimony in preparing your
16  errata sheet, did you identify any testimony that you
17  believed you had gotten wrong or incorrect?
18      MS. ROSEN:  Object to the form.
19      A   I don't believe it was any testimony I believe
20  I had gotten wrong, but I did see some mistakes in
21  inscribing.
22      Q   Okay.  In other words, there was --
23      A   It was possible that I misspoke as well.
24      Q   Okay.  In those instances, did you then
25  correct those errors in the errata sheet?  Did you find

---

39

1   any instances when you provided testimony in those prior
2   cases where you found that your substantive testimony
3   about the City of Chicago's policies, practices or
4   training was incorrect or false?
5       MS. ROSEN:  Objection, form.
6       A   Not that I can remember.
7       Q   Do you stand by your testimony in those prior
8   depositions?
9       MS. ROSEN:  Objection, form.
10      A   Yes.
11      Q   Okay.  You said you reviewed orders in
12  preparation for today's deposition, correct?
13      A   Correct.
14      Q   And other than the orders that were produced
15  in this case you reviewed in preparation for today's
16  deposition, are you aware of any other orders of the
17  Chicago Police Department that are relevant to the
18  topics you're testifying about today?
19      A   No.
20      Q   And other than the training materials that you
21  reviewed, and were produced in this case, are you aware
22  of any other training materials that are relevant to, to
23  the topics you were testifying about today?  Topics 1
24  and 2.
25      MS. ROSEN:  Objection, form, foundation.

---

40

1       Q   Oh, okay.  And would it be fair to say -- so
2   strike that.  So your testimony today, sir, would it be
3   fair to say, it is based in part on your review of
4   Chicago Police Department orders and training materials?
5       A   Yes.  That is fair to say.
6       Q   And would you say your testimony today is
7   based in part as well on your cumulative experience and
8   knowledge as a Chicago Police Officer?
9       A   That is correct.
10      Q   Okay.  And would it be fair to say that you
11  have also done additional work to prepare on on these
12  topics for prior depositions?
13      A   I have prepared for prior depositions, yes.
14      Q   Okay.  And have you prepared for prior
15  depositions with regard to these same topics?
16      MS. ROSEN:  Objection, form, misstates his
17      prior testimony.
18      A   I have prepared -- I have never prepared for
19  testimony about translation or the arrest of a foreign
20  national.
21      Q   Okay.  Thank you for that.  So, other than the
22  -- the topic of interviews and interrogations of foreign
23  nationals, each of the other topics in topic 1 and topic
24  2 are topics in which you have previously prepared to
25  also provide testimony for the City of Chicago, correct?

---

41

1       A   I don't know that I have prepared to testify
2   about our CPD unit practices, but I believe it has come
3   up in the past.
4       Q   Okay.  And with regard to the other topics in
5   topic 1 and topic 2, you have engaged in preparations
6   for those topics, correct?
7       A   That is correct.
8       Q   Okay.  And did those preparations for prior
9   depositions with regard to some of the topics in topics
10  1 and 2, did you also speak to other people to help you
11  get prepared?
12      A   Yes.
13      Q   Okay.  And do you feel, sitting here today,
14  based on the documents you reviewed and your experience
15  and your preparations, that you are in a position to
16  provide testimony on behalf of the City of Chicago on
17  topics 1 and 2?
18      A   Yes.
19      Q   Okay.  I want to ask you about CPD
20  documentation and file keeping preservation policies
21  with regard to documentation in investigations.  And
22  let's focus obviously on homicide investigations, given
23  that that is the relevant subject in this case -- are
24  you -- you with me?  We'll focus on homicide
25  investigations?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

42

```
1        A   I am with you.
2        Q   Okay.  With regard to documentation in
3   homicide investigations, is it correct to say that there
4   were specific policies that applied to that subject
5   matter.
6        A   Yes.
7        Q   And there were policies that applied in the
8   period from 1986 through 1998 with regard to
9   documentation, correct?
10       A   Yes.
11       Q   Okay.  Going to pull up a file -- see that --
12  here -- one moment.  Are you able to see my screen, sir?
13       A   Yes.
14       Q   Okay.  And you -- are you able to see the
15  document I'm showing on the screen, Detective Division
16  Special Order 86-3?
17       A   Yes.
18       Q   Okay.
19           MS. ROSEN:  Can you, Anand, can you give us the
20  Bates range, which you didn't share advance.
21           MR. SWAMINATHAN:  I'm going to do that right
22  now.  So for the record, I have -- I am now sharing
23  my screen to show the document we've marked as
24  Exhibit 2, its title is Detective Division Special
25  Order 86-3.  And the Bates range for this document
```

43

```
1   is RFC Saloche Reyes 117535 through 117537.
2           (EXHIBIT 2 MARKED FOR IDENTIFICATION)
3   BY MR. SWAMINATHAN:
4        Q   Sir, you reviewed this document in preparation
5   for today's deposition, correct?
6        A   Correct.
7        Q   And is it fair to say that this was the
8   detective division's policy that applied to
9   documentation in homicide investigations in the period
10  from 1986 through 1998?
11          MS. ROSEN:  Objection, form foundation.
12       A   Most of this is nearly identical to the 1988
13  Detective Division SOPs.  However, when the '88 SOPs
14  went to -- went into effect, they would've rescinded
15  this specific policy.
16       Q   Okay.  Thank you.  So this 86-3 policy that
17  I'm showing you, Exhibit 2, was rescinded and replaced
18  by Special Orders in 1988, correct?
19          MS. ROSEN:  Objection form foundation.
20       A   They were actually SOPs.  This is a -- a
21  detective division Special Order.  They were replaced by
22  detective division Standard Operating Procedures.
23       Q   Thank you.  So this detective division
24  Standard Operating Procedures went into place in 1988,
25  correct?
```

44

```
1        A   Yes.
2        Q   And there was a SOP specifically with regard
3   to documentation for homicide investigations, correct?
4        A   Yes.
5        Q   And that, SOP enacted in 1988 was in effect
6   through 1998, correct?
7        A   It was to revise that, I believe, in 1992.
8   However, the substance is nearly identical on this
9   topic.
10       Q   Were -- are there any substantive changes from
11  what is written in Special Division Order 86-3 in the
12  period from nine -- from this order being enacted
13  through 1998?
14          MS. ROSEN:  Objection, form.
15       A   I would have to look at them side by side.  And
16  -- well, unless you have a specific section of this and
17  then ask me if they're the same.
18       Q   Did you review the SOP from 1988 in
19  preparation of today's deposition?
20       A   Yes.
21       Q   Are you -- and did you review this?  You said
22  -- you had indicated you reviewed this Special Order
23  86-3 as well, correct?
24       A   Yes.
25       Q   Did you notice any changes substantively
```

45

```
1   between the two policies?
2           MS. ROSEN:  Objection, form.
3        A   There is a difference in wording.  There may
4   be something substantive procedurally that I didn't pick
5   up on, the overall policy theme is the same.
6        Q   Okay.  Other than some wording changes, are
7   you aware of anything that changed in terms of the
8   policy that applied to how detectives were to conduct
9   their documentation?
10          MS. ROSEN:  Objection, form.
11       A   I would have to compare these side by side to
12  look at exactly what changed procedurally.  In general,
13  the policy remains the same throughout the whole time,
14  like sections through the policy is the same.
15       Q   Okay.  And in -- and then in the period from
16  this policy being enacted 86-3, through 1998, would you
17  say that procedurally the policy was the same -- it was
18  the same with regard to documentation of homicide
19  investigations throughout?
20          MS. ROSEN:  Objection, form.
21       A   It was very similar.  However, procedurally,
22  orders like this contain things such as citations to CPD
23  forms, which may change over a period of time.  So they
24  would be different.  They may be renamed over a period
25  of time.  There may be some other procedural step that's
```

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

46

1  changed.  I would have to look at them side by side, but
2  the overall policy is the same.
3      Q   Okay.  All right.  This Special Order 86-3,
4  did it apply to specific areas of the Chicago -- of the
5  detective division or did it apply across all areas?
6      A   This applied to the entire detective division.
7      Q   Okay.  So that would be city-wide?
8      A   City-wide, as far as the detective division
9  goes.  Yes.
10     Q   Thank you.  And is that also true of the 1988
11 Special -- or SOPs?
12     A   That is correct.
13     Q   Okay.  Were there -- in the period from 1986
14 through 1998, were there ever any Special Orders or SOPs
15 that -- that were applicable only to specific areas?
16     A   During that time period, areas could have had
17 unit level SOPs, however, they could not conflict with
18 this order.
19     Q   Okay.  So in the period from 1986 through
20 1998, is it correct that the policies with regard to
21 documentation of homicide investigations were the same
22 across all detective division areas?
23     A   Correct.
24     Q   Okay.  And are you aware of any unit level
25 policies with regard to documentation that were

---

47

1  different at different detective division areas?
2      A   No.  Any detective division area that wanted
3  to have their own SOP would have to be a clerical issue,
4  not in -- not in conflict with this would -- for
5  example, keep files in room A instead of room B,
6  something like that.  None of their unit level
7  directives could conflict from detectives division
8  policy.
9      Q   And you cut out for a moment, none of their
10 unit level policies could conflict with the over -- with
11 these detective division Special Orders and SOPs, is
12 that correct?
13     A   That is correct.
14     Q   And to the extent the unit levels could have
15 their own orders within their units, are you aware of
16 any detective division areas period from 1986 through
17 1998, having any unit level orders with regard to
18 documentation?
19     A   No.
20     Q   Okay.  And so would it be fair to say, sir,
21 that the policies with regard to documentation of
22 homicide investigations in the period from 1986 through
23 1988 -- '98, was the same across all detective division
24 areas?
25     A   It would be fair to say, as long as you're

---

48

1  saying the policy is in like the policy stated in
2  section 2 here.  There could be differences in, like, as
3  I mentioned, clerical level procedures, however, the --
4  this active Division Special Order applied to all areas.
5  So the -- the information in this is continued across
6  the city.
7      Q   And -- and to the extent there could be
8  clerical differences at any given area, you're not aware
9  of even those clerical level unit orders at all with
10 regard to this documentation policy, correct?
11     A   Correct.
12     Q   Okay.  Other than this Detective Division
13 Special Order 86-3, and in the -- strike that.  In the
14 period that this policy was in effect, are you aware of
15 any other detective division policies that applied to
16 the documentation of homicide investigation?
17     A   This is the one that is most on point far as
18 investigative files.  If you look at all of the DDSOs,
19 it's possible that some of them touch on documentation
20 in a way that is not as on point as this.  I mean, when
21 you discuss crime lab report or something like that, it
22 touches on investigative files overall, but specific to
23 investigative files, this is the wholly authority on the
24 subject.
25     Q   Okay.  And so, for example, there's a policy

---

49

1  with regard to the conduct of lineups and that policy
2  requires documentation under certain circumstances,
3  correct?
4      A   That is correct.
5      Q   Okay.  So that policy would refer to potential
6  documentation under certain circumstances, but that's
7  not an overall policy with regard to documentation in
8  homicide investigations there.
9      A   That is correct.
10     Q   The only policy overall with regard to
11 documentation and homicide investigations is the
12 Detective Division Special Order on investigative files
13 like this 86-3 order.  Correct?
14     A   I would word it a little differently.  So the
15 only policy that's not the documentation of homicides,
16 because there's a lot of policies which touch on
17 documentation, but this is the policy on investigative
18 files.
19     Q   Okay.  And is -- are there any other policies
20 that talk about the documentation that should be taken
21 in a homicide investigation other than this one,
22 acknowledging that this one refers to investigative
23 file?
24     A   Sure.  Well, for example, the orders on
25 interviews and interrogation have requirements to

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

50

1    document certain things that wouldn't necessarily be in
2    a homicide, but if the homicide involved an interview
3    and interrogation, the detective would look to that
4    order to guide the documentation. And of course that
5    documentation would end up in a homicide file. So there
6    are other orders that touch on -- on these subjects.
7        Q   Are there any other Detective Division Special
8    Orders that talk about the maintenance of investigative
9    files, other than this one?
10       A   I don't believe so. No. No.
11       Q   Are there any other Detective Division Special
12   Orders that talk about the disclosure of information in
13   -- learned in homicide investigations, to the criminal
14   justice system, other than this one?
15       MS. ROSEN:  Object to the form.
16       A   This is definitely the one most on point, it's
17   possible there is some procedural section of
18   another order which indicates transmittal or where a
19   form has to go. So I won't say that this is the only
20   one, but this is the one most on point on that subject.
21       Q   Are you aware of any other policy that makes
22   reference to the disclosure of investigative material
23   from a homicide investigation, other than this one?
24       MS. ROSEN:  Object to the form. You're saying
25       investigative material, you broadened it beyond file

---

51

1    -- investigative files, right?
2        MR. SWAMINATHAN:  Yeah. But -- let's -- I
3        didn't mean to, so let's -- I don't mean to talk
4        about something different, so like I can clarify the
5        question.
6    BY MR. SWAMINATHAN:
7        Q   Sir, are you aware of any Detective Division
8    Special Order that applies to the disclosure of
9    investigative docu -- investigative records or files
10   other than this one?
11       MS. ROSEN:  Objection, form.
12       A   This is the most on point. It's possible that
13   in that SOP, as, as they talk about other subjects,
14   there's information directing where documents need to
15   go. But as far as the overall complete file, this is
16   the most on point.
17       Q   Okay. And to the extent you say that it's
18   possible that there's some other reference, you're not
19   able to identify any specific instance in which there's
20   such a reference; is that correct? Is that correct?
21       A   Not without looking at the SOPs.
22       Q   Okay. And in terms of -- strike that. To the
23   extent the city of Chicago put in place some policies to
24   guide detectives and their commanders with regard to the
25   disclosure of information and investigative files, this

---

52

1    was the policy that is intended to do that, correct?
2        A   You are correct.
3        Q   Okay. And then the subsequent version of this
4    policy in the SOPs was also the policy intended to
5    provide that guidance to detectives and their
6    supervisors, correct?
7        A   That is also correct.
8        Q   Sir, would you agree that documentation is a
9    critical aspect of a homicide investigation?
10       A   Yes.
11       Q   And why is documentation critical to a
12   homicide investigation?
13       A   Documentation -- it further -- through the
14   criminal justice process.
15       Q   You cut out there, I'm sorry. In the middle
16   of your answer.
17       A   Documentation of a homicide investigation is
18   required to move the case through the criminal justice
19   process.
20       Q   Okay. And why is that documentation required?
21       MS. ROSEN:  Object to the form.
22       A   Documentation is required for court. It's
23   required to be organized, for the detective. It's kind
24   of an existential question. So I could probably write
25   an essay on it, but it is very important.

---

53

1        Q   There's lots of reasons why it's important,
2    correct?
3        A   Yes.
4        Q   It's also important as a means of
5    communication with fellow detectives and supervisors,
6    correct?
7        A   Well, I will agree that it's a -- a tool for
8    the supervisor to supervise as well. Communication with
9    other detectives, that would be on a case by case basis.
10       Q   Okay. One of the reasons -- strike that.
11   Would you agree that one of the reasons that
12   documentation is critical is as a memory aid, correct?
13       A   It can be helpful as a memory aid, that is
14   correct.
15       Q   During your time as a detective, did you take
16   notes?
17       A   I did.
18       Q   And did you view notes as a critical aspect of
19   your work?
20       A   Again, it's on a case by case basis. There
21   were cases that I investigated that I did not take notes
22   and there were cases that I investigated that I took
23   many notes.
24       Q   And why did you -- and why did you take notes
25   as a detective?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

54

1     A   For inclusion in documentation for the future,
2   to help me aid in creating my closing sup report, so
3   that I wouldn't forget things.  To write down things
4   such as phone numbers, that I couldn't memorize.  Host
5   of reasons to.
6     Q   And so did you use notes as a memory aid to
7   assist in your documentation of investigations as a
8   detective?
9     A   There are times that I did that.
10    Q   Okay.  And did you expect detectives that you
11  supervised, when you were in your supervisory
12  capacities, to use notes as an aid to assist them in
13  preparing thorough and accurate reports?
14    A   I did not require my detectives to take notes.
15  If they sounded helpful in a specific investigation,
16  they were expected to do so.  But as I said, there are
17  cases that I worked on that I took no notes and there
18  were cases that I took lots of notes.
19    Q   And what were the kind of -- oh, go ahead.
20    A   And my subordinates, the same.
21    Q   Okay.  What were the kind of circumstances in
22  which you found that you could write thorough and
23  accurate reports without the need for any notes?
24    A   Again, a case by case basis.  Sometimes it
25  would be that the case was a simple case, for example, a

55

1   retail theft, that I thought I could keep the whole case
2   in my head.  Other times it was a complex case.  However,
3   it was extremely memorable that the -- the incident that
4   I was not taking the notes for, and I knew that I could
5   recall it thoroughly.  And then other times I would know
6   that I was going to be close enough to a computer that I
7   wouldn't have to take notes, I could report it in a
8   supplementary report instead of note taking.
9     Q   So you guys actually go directly to a computer
10  and type it up quickly?
11    A   I don't know how quickly, but if it -- if it
12  was something that I thought that I could recall until I
13  got to the computer, then I wouldn't necessarily take
14  notes.  Every case is different, I would say.
15    Q   Okay.  Would you agree, sir, that a case
16  doesn't end with the arrest, but instead continues
17  through a criminal -- potential criminal prosecution and
18  trial?
19    A   I would -- I would like to say I agree,
20  because it seems like a simple thing to agree to, but I
21  guess it depends on what you mean by case.
22    Q   Okay, fair enough.  Actually --
23        MS. ROSEN:  Sorry.  Sorry to interrupt, but
24  Carrie lost the zoom feed, so could we pause?
25        MR. SWAMINATHAN:  Why don't we just -- why

56

1   don't we take a quick five minute break anyway and
2   then we can use the bathroom and all that.
3         MS. ROSEN:  Okay, great.
4         COURT REPORTER:  Off the record.
5         (OFF THE RECORD)
6         COURT REPORTER:  We are back on the record.
7   BY MR. SWAMINATHAN:
8     Q   All right, Commander.  Fair to say that
9   detectives would often use their reports and notes as an
10  aid to prepare for testimony at trials?
11    A   Yes.
12    Q   Okay.  And so documentation was critical to
13  being able to remember facts, to be able to testify in
14  criminal trials, correct?
15        MS. ROSEN:  Objection, form.
16    A   Again, that's a case by case basis.  There
17  were cases that I worked on that I could tell you, that
18  just stuck in my memory, that I could tell you
19  everything that happened on them.  And I did so at
20  probable cause hearings without having to -- to review
21  paperwork.  Sometimes paperwork is very helpful to
22  review -- to refresh recollection, and sometimes it's
23  not necessary, but that would be just a case by case.
24    Q   Okay.  Would you agree that overall
25  documentation is critical to one re -- strike that.

57

1   Would you agree that one reason documentation is
2   critical is as a memory aid for use at trial?
3     A   Again for it -- it -- that is often the case.
4     Q   Okay.  And you don't know in advance whether
5   you're going to need the assistance of documentation,
6   you know, a year later or whenever trial occurs.  So you
7   -- you got a document and you may or may not end up
8   needing it there.
9     A   Again, as I said, there are cases that I've
10  worked on that are seared into my memory that I could
11  testify on today as I did 15 years ago.  But it's a case
12  by case.
13    Q   Were detectives trained that their own
14  accurate documentation was critical as a memory aid to
15  help testify truthfully at trial?
16        MS. ROSEN:  Objection, form.
17    A   They were trained that.
18    Q   Okay.  Would you agree that another reason
19  that documentation is critical is because it is a method
20  of communication to supervisors?
21    A   I would rephrase that.  As having been a
22  supervisor, it's not necessarily when I hear a method of
23  communication, it's a way that my subordinate is telling
24  me, "Hey, I need something.  This is what's going on." I
25  would reword that if I was writing that document to say

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

58

1  that it can be, but it's also helpful for a supervisor
2  to supervise using the documentation.
3      Q   Right.  I mean -- go ahead.
4      A   And you can see what your detective did in the
5  case.
6      Q   Okay.  So in other words, documentation is
7  critical because it allows the sergeants and other
8  supervisors to keep abreast of the progress of homicide
9  investigations, correct?
10     A   Well, again, that's a case by case basis.  I've
11 worked homicides that's in custody the same -- minutes
12 after the homicide, and there's no time to document and
13 your supervising without any document whatsoever.
14 However, when there is documentation and you're not -- I
15 mean, you're not actually witnessing or supervising the
16 individual, it is a tool.  Documentation is a tool to
17 supervise your subordinates, yes.
18     Q   Okay.  And was it the case that it was the
19 expectation of sergeants that as a general matter,
20 detectives were using documentation as a tool to keep
21 the sergeants and supervisors abreast of their progress
22 in investigations?
23         MS. ROSEN:  Objection, form.
24     A   So was your question, is it generally the
25 case?

---

59

1      Q   Yes.  Is it generally the case that the
2  expectations of sergeants and other supervisors that
3  detectives would use documentation as a tool to keep
4  those supervisors abreast of their progress?
5      A   Yeah.
6         MS. ROSEN:  Objection.  I have an objection to
7      the form of that question.
8      A   So to clarify, I would say when it is
9  appropriate, yes because you're talking about keeping me
10 up to date on an investigation.  There might not be a
11 keeping me up to date.  I had a murder a week ago that I
12 knew the status and it was charged.
13     Q   Were detectives trained as a general matter
14 that documentation was critical to allow sergeants and
15 supervisors to stay abreast of the progress of
16 investigations?
17         MS. ROSEN:  Object to form.
18     A   Yes.
19     Q   Okay.  Another reason that documentation is
20 critical is that is because you don't always know what
21 information is going to turn out to be important in
22 solving a crime, correct?
23     A   That is sometimes the case.
24     Q   Okay.  And would you agree that in
25 investigations, including homicide investigations,

---

60

1  information that may not seem all that important at one
2  point can prove to be very important down the road?
3         MS. ROSEN:  Object to the form.
4      A   That is also sometimes the case.
5      Q   Okay.  And is that one of the reasons that it
6  was important to document as thoroughly as possible the
7  information a lawyer would learn during an
8  investigation?
9         MS. ROSEN:  Object to form and foundation.
10     A   So the question is -- can you repeat the
11 question?
12     Q   Yes.  The fact that information that may not
13 seem important today may become important down the road
14 in an investigation.  Is that one of the reasons that it
15 is important to document as thoroughly as possible the
16 information learned during an investigation?
17         MS. ROSEN:  I have the same objections, form
18     and foundation.
19     A   It could be.  I would say again, that's a case
20 by case basis as to what the facts are of the specific
21 murder.
22     Q   Was it a requirement that detectives record
23 information that supports their case against a
24 particular suspect or subject?
25         MS. ROSEN:  Object to form.

---

61

1      A   I think that's fair to say.
2      Q   And was it a requirement that detectives
3  record information if it supports a case against a
4  different subject or suspect?
5         MS. ROSEN:  Object to form and foundation.
6      A   If that's the case, I think that's also fair
7  to say.
8      Q   Okay.  And was it a requirement that
9  detectives record information if it undermines the case
10 against particular suspect or subject?
11         MS. ROSEN:  Object to form, foundation, and
12     incomplete hypothetical.
13     A   Yeah.  I would have to hear specifically what
14 it is you're referring to, but if you're just simply
15 making a question of, if they're required to include
16 exculpatory information, then the answer is yes.
17     Q   Okay.  The detectives were required to
18 document exculpatory information, correct?
19     A   Correct.
20     Q   And why was it important to do that?
21     A   For fairness or protecting the individual's
22 rights.
23     Q   When you say "Their rights," you're referring
24 to their constitutional rights, correct?
25     A   That is correct.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

62

1    Q    Detectives, were they trained that part of
2  their role is not just to close cases, but to actually
3  get to the truth?
4    A    That is correct.
5    Q    Were detectives trained about tunnel vision
6  and about avoiding television?
7    A    That is correct.
8    Q    And what were they trained about the subject
9  of tunnel vision?
10   A    Training is to keep an open mind in your
11  investigation.
12   Q    And what training or guidance is provided to
13  detectives about things they should be doing to avoid
14  tunnel vision in an investigation?
15   A    As far as specific training curriculum, that
16  includes that information, I can't recall exactly what
17  was said. I do remember the overall theme being to keep
18  an open mind.
19   Q    Okay. And were detectives trained to document
20  all of the various leads and directions that an
21  investigation goes?
22       MS. ROSEN:  Object to form and foundation.
23   A    So you have to be careful because detectives
24  are trained to document relevant information, so that's
25  what's important to be documented.

63

1    Q    Right. And if the detectives get a lead
2  pointing towards a person, that's something that is
3  relevant and should be documented, correct?
4        MS. ROSEN:  Object to form and foundation.
5    A    If it's determined to be relevant, it should
6  be documented.
7    Q    Okay. So the detective had the ability --
8  strike that. The detectives had the ability to say,
9  "Well, sure, that's a lead that somebody has given me,
10  but I don't like it, or I don't agree with it, or I
11  don't think it's relevant," and then they could choose
12  not to document it. Is that right?
13       MS. ROSEN:  Object to form. Mischaracterizes
14  his testimony.
15   A    I think that's a very cynical way of changing
16  what I said, but I would say that detectives are
17  required to include relevant information. Just because
18  you have a lead does not mean that necessarily it is a
19  relevant lead.
20       You've got an anonymous tip that a space alien
21  killed Eric Winstrom, I wouldn't say that that should be
22  documented.
23   Q    Okay.
24   A    If I got an anonymous tip that Eric Winstrom
25  is the killer, and I found out that Eric Winston has

64

1  been in the morgue for a year, it's definitely a case by
2  case basis. So that's why the question is not a hard
3  rule of if you get a lead, put it in. It's detectives
4  look at the case, what's relevant, put it in the case.
5  If there's exculpatory information, that's required to
6  be in the case.
7    Q    All right. If audit makes a call and says,
8  Detective Winstrom was kidnapped by space aliens, is
9  that relevant information because even if it doesn't
10  tell us anything about Eric Winstrom, it tells us
11  something about the credibility of audit?
12   A    And it could be. It very well could be, which
13  is why I'm saying it's a case by case basis.
14   Q    Okay. So detectives on a case by case basis
15  could determine whether or not a lead was worthy of
16  being documented, included in investigative files? Is
17  that fair?
18       MS. ROSEN:  Objection, form.
19   A    I will say the detectives were required to
20  include relevant information. So if you're asking
21  whether a detective determines what is relevant and what
22  is not, I suppose that would be fair to say.
23   Q    Okay. So detectives determine what
24  information is relevant or not, correct?
25       MS. ROSEN:  Object to form.

65

1    A    That is part of their job.
2    Q    Okay. And detectives were required to
3  document the information they deemed relevant, correct?
4    A    That is correct.
5    Q    And with regard to the subject of leads,
6  detectives would make a determination of whether or not
7  that particular lead was relevant or not, correct?
8    A    On a case by case basis.
9    Q    And based on that determination, they would
10  decide whether or not to document that lead, correct?
11       MS. ROSEN:  Object to form.
12   A    I think we went too far. On a case by case
13  basis, they would make what determination to decide
14  whether to document a lead?
15   Q    Detectives would make a case by case
16  determination whether a they considered a lead relevant
17  and then whether they would, therefore, document it,
18  correct?
19   A    If a lead is relevant, it needs to be
20  documented.
21   Q    And if a detective had the authority to, if
22  they so deemed, they could find a lead to be not
23  relevant and then not document it under policy, correct?
24   A    If a detective -- well, see, you have to be
25  careful here because really it's not really a lead then,

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

66

1 it's just not relevant. It is deemed not relevant it's
2 not a lead. So instead of mixing words, I'd just like
3 to stick on that if it's a relevant fact, it should be
4 documented. We require relevant information to be
5 documented.
6     Q   Okay. So maybe I should try to understand
7 what relevance means a little bit better. So
8 information that has to do with this investigation, this
9 crime, is that information that's considered relevant
10 and to be documented?
11         MS. ROSEN: Objection, form.
12     A   So it's a case by case basis. If I'm a
13 detective and I'm documenting a homicide and I get out
14 at the scene, I might document that the weather is 45
15 degrees, that the wind is blowing. I'm not going to
16 document that I stepped out with my leg first and then
17 my right leg and then I blinked twice. I mean, you can
18 document all day long. What we require of detectives is
19 to document what's relevant in an investigation.
20     Q   Okay. If detectives get information, which
21 would point to a potential alternate suspect to the
22 person that they've been currently investigating, is
23 that something that is to be documented?
24     A   If they received information that actually
25 there could be an alternate subject, and that's

67

1 legitimate information, and it's a legitimate
2 possibility, then of course it should be documented.
3     Q   Okay. And detectives had the authority under
4 the policy to say if they got some information about an
5 alternate suspect, they could determine whether they
6 considered that to be legitimate information or not
7 before deciding whether to document it, fair?
8     A   What's fair to say is that they are required
9 to document relevant material, so there's no policy,
10 which says if a subject is identified, you get to
11 determine whether or not, if it's relevant, it needs to
12 be documented.
13     Q   Okay. And what training were detectives
14 provided about what constitutes relevant information in
15 this investigation?
16     A   The overall training for detectives, of
17 course, starts with their recruit training, which,
18 during this time period, was anywhere from four to six
19 months, and it's basic police work training. Prior to
20 becoming a detective who had several years, at least,
21 minimum, of being a patrol officer. So with the recruit
22 training during that time as a patrol officer, you are
23 exposed to, in the City of Chicago, many, many crime
24 scenes, many crimes, you witness first-hand the criminal
25 justice process in the court system, you work on scenes

68

1 with detectives, and you get an understanding of cases
2 and an understanding of, even just a basic
3 understanding, of a homicide of the basics of an
4 investigation. You then go to pre-service detective
5 training, which during this time was four to six weeks,
6 where you get more in depth training on how to
7 investigate cases. During that investigation, for
8 example, homicide investigation, where you learn the
9 sorts of evidence that's available to you, what's
10 important to collect. And then the detectives go into
11 the detective area and their partners, usually with a
12 more experienced detective. They would go through a
13 short period of training where they're paired with a
14 senior detective and then throughout their career, as a
15 detective, they learn by doing. I, myself, started out
16 as a burglary detective, which is a more simple crime,
17 so as you get better at that, you move on to more
18 serious crimes. And the homicide detectives, by the
19 time they reach that position, have all those years of
20 experience in investigating cases to determine what's
21 relevant and what's not relevant.
22     Q   For sergeants supervising homicide detectives,
23 was it the expectation that they would be tracking the
24 progress of homicide investigations?
25     A   Generally speaking, yes.

69

1     Q   And those communications -- strike that.
2 And the process of keeping track of the progress of
3 homicide investigations, that was done in part orally in
4 communications directly with the detectives, correct?
5     A   Correct.
6         MS. ROSEN: Form.
7     Q   It was also done through review of the reports
8 and other documents being generated by the detectives,
9 correct?
10     A   On a case by case basis, that is correct.
11     Q   And would supervisors, sergeants, and other
12 supervisors participate, in giving detectives guidance
13 on what additional investigative steps should be taken
14 during the course of an investigation?
15         MS. ROSEN: Object to foundation.
16     A   On a case by case basis, supervisor's often
17 coach and mentor detectives, but it depends on the case.
18     Q   In fact, one of the overall responsibilities
19 of sergeants and supervisors was to ensure that homicide
20 investigations were being pursued thoroughly, correct?
21         MS. ROSEN: Object to foundation and form.
22     A   I guess I'm uncomfortable with the term,
23 "pursued thoroughly," but I would say part of the
24 requirements of a supervisor is to ensure that a
25 homicide is properly investigated.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

70

1  Q   And part of that is to understand what
2  investigative steps have been taken and what additional
3  investigative steps could or should be taken, correct?
4  A   Those are things that a supervisor who was
5  reviewing their subordinate's activity definitely look
6  towards.
7  Q   Okay.  And so it was important for homicide
8  detectives to document the investigative steps that they
9  took during an investigation, correct?
10  MS. ROSEN:  Object to form.
11  A   As a general statement, that seems correct,
12  but it doesn't necessarily apply to every investigative
13  step you would take.  You don't document every single
14  thing you're doing, as I described earlier, so it's the
15  important things, the things that are going to be needed
16  for court you would want to document.
17  Q   So what was the detectives' trained about the
18  kind of investigative steps they would take that they
19  could document versus the ones they didn't have to
20  document?
21  A   Detectives were trained that they were to
22  document relevant investigative steps that were taken.
23  They were -- (Inaudible) and trained (Inaudible) -- and
24  I knocked on doors, I talked to everyone, and nobody saw
25  anything, it's possible I wouldn't document that.  So if

---

71

1  it's something relevant, it should be documented.
2  Q   Okay.  So under the policies and training for
3  detectives, they could interview somebody and if that
4  person indicated that they didn't see it, or don't have
5  any information, that wouldn't have to be documented,
6  correct?
7  A   On a case by case basis, and it would depend
8  because the example that you're giving sounds like that
9  information may be relevant.  If it's relevant, it
10  should be included.  If it turns out that you
11  interviewed an individual on this block because he
12  thought a murder took place there, and then you realized
13  that the body had been moved, it's possible that it's
14  not relevant.  So it would depend on the specifics of
15  the case.
16  COURT REPORTER:  And Counsel, I'm sorry to
17  interrupt, but my internet cut out once again.  I do
18  apologize.
19  MR. SWAMINATHAN:  Okay.  Is there something we
20  can do?  So, I mean, where did we leave off?  Do you
21  know?
22  COURT REPORTER:  Yes, sir.  I can play back the
23  last thing I heard, and I do apologize, but it's
24  because of the bad weather where I am.
25  MR. SWAMINATHAN:  Okay.

---

72

1  COURT REPORTER:  Give me one moment, sir, and
2  I'll do a playback.  I don't believe I was gone for
3  very long.
4  (REPORTER PLAYS BACK REQUESTED TESTIMONY)
5  COURT REPORTER:  That is the last I had, sir.
6  MR. SWAMINATHAN:  All right.  Let me see where
7  I got to go back to, and while I do that, I got to
8  go get my computer charger.  So just give me one
9  second here.
10  COURT REPORTER:  Okay.
11  BY MR. SWAMINATHAN:
12  Q   I think the question that we missed and I will
13  re-ask.  So we try to have it on the record is so
14  detectives were trained that under the policies, if they
15  spoke to a witness who indicated that they had
16  information about the crime, or indicated that they do
17  not have information about the crime, detectives could
18  determine whether that information was relevant and
19  needed to be documented, correct?
20  MS. ROSEN:  Object to form.
21  A   If the detective spoke to someone who stated
22  they had information related to a crime, I would say
23  that would likely be relevant unless, as I suggested,
24  there were 30 or 40 other individuals who gave the same
25  information and it wasn't necessary.  It's really on a

---

73

1  case by case basis.  And again, if they spoke to someone
2  who did not have information to a crime, it's possible
3  that would be very relevant if they were standing right
4  next to the individual who got murdered, and they said,
5  "No, I didn't see Mr. Winstrom get murdered even though
6  I was standing there," then it would be probably very
7  relevant to document it.  But again, it would be a case
8  by case basis because it's possible that I speak to
9  someone in a murder investigation that I determined it
10  was a complete mistake on my part, waste of time,
11  irrelevant to the investigation, and it wouldn't be
12  necessary to document.  So it's a definitely a case by
13  case basis for these.
14  Q   If somebody was in the area where the crime
15  occurred, or was in a position to be able to see the
16  crime, it doesn't -- it isn't able to provide any
17  information.  Why are you saying that that could be
18  potentially important or relevant information to be
19  documented?
20  A   You're saying is the example I said that if
21  someone's standing next to me and saw it?
22  Q   Exactly.
23  A   Well, if they're standing next to me, it's
24  likely that they saw or heard something and that they're
25  not telling truth.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

74

1    Q    And so it's important that you document that?
2    A    In my scenario, if I was murdered and there
3  was someone standing next to me, I would expect the
4  person standing next to me, that interview to be
5  documented, yes.
6    Q    People who were in a position to be
7  eyewitnesses or potential eyewitnesses to a murder, is
8  the expectation that those interviews of those
9  individuals be documented?
10   A    Generally speaking, eyewitnesses to a murder
11  are very important to document.
12   Q    Okay.  Would you agree that another reason to
13  have an accurate documentation is critical is because
14  police records can become evidence used by the
15  prosecution and defense?
16   A    I agree.
17   Q    And were detectives trained that they should
18  thoroughly and accurately document their investigative
19  steps, knowing that it could become evidence at trial?
20       MS. ROSEN:  Object to form.
21   A    Yes.
22   Q    Okay.  Consistent with all of the above, was
23  it CPD policy that detectives should document their
24  progress through a homicide investigation?
25       MS. ROSEN:  Object to form.

---

75

1    Q    Were detectives trained -- I'm sorry.
2  Go ahead.
3    A    Yes.
4    Q    And was the policy that an overall
5  investigative file should provide a reader with guidance
6  about the various steps that the detectives took to
7  solve that crime detective form?
8        MS. ROSEN:  Object to form.
9    A    That was the expectation.
10   Q    And was the expectation that a reader of an
11  investigative file, a homicide case, would be able to
12  see the various directions that that homicide
13  investigation took over the course of its life?
14       MS. ROSEN:  Object to form, foundation.
15   A    That's a confusing question.
16   Q    Was it the expectation that a reader of an
17  investigative file would know what all of the leads were
18  that were pursued in that investigation?
19       MS. ROSEN:  Object to form and foundation.
20   A    I'm going to have to go back and say it would
21  be an expectation that you would document the relevant
22  information to that investigation.  So, as I said, if
23  you thought that Eric Winstrom was a the killer and Eric
24  Winstrom has been in the morgue for a year, it wouldn't
25  surprise me if you didn't include "At first, I thought

---

76

1  that Eric Winston was a killer."
2    Q    Putting aside this sort of hypothetical, I'm
3  asking about is leads that are actually pursued in an
4  investigation.
5    A    Right, sure, and same answer because you may
6  have gone out and looked and followed up and sent
7  somebody to Eric Winstrom's house, and they said,
8  "Oh no, he's been dead for a year."  So it's really a
9  case by case situation.  If you determine that something
10  isn't relevant, I would not necessarily expect it to be
11  in there.
12   Q    Okay.  So with regard to the question of
13  whether an investigative file should provide information
14  about all of the leads that were pursued in an
15  investigation, the answer is it's a case by case basis,
16  maybe, maybe not.  Is that correct?
17       MS. ROSEN:  Object to form, mischaracterizes
18       his testimony.
19   A    No.  The answer is relevant leads should be
20  included.
21   Q    Okay.  Anybody who is interrogated as a
22  suspect in a homicide investigation, should you see that
23  in the investigative file?
24       MS. ROSEN:  Objection, form.
25   A    If there are -- now, are you talking about a

---

77

1  custodial interrogation?
2    Q    Let's start there.  Any custodial
3  interrogations during the homicide investigation should
4  be documented, correct?
5    A    During this relevant period of time, I would
6  expect, if a person was placed in custody and/or part of
7  our electronic system.  During this period of time, if a
8  person had been arrested for a murder and determined not
9  to be the offender, I would agree that that should be
10  documented.
11   Q    Okay.  So anybody who was the subject of a
12  custodial interrogation in that homicide investigation,
13  that interrogation should be documented during the
14  relevant period from 1986 through 1998, correct?
15       MS. ROSEN:  Object to form.
16   Q    Go ahead.
17   A    Most likely, yes.  And that now you're kind of
18  going off of detective procedure and going to general
19  processing persons under department control procedures,
20  which when you arrest an individual, it should be
21  documented.
22   Q    Okay.  The substance of any interview,
23  somebody treated as a suspect in a homicide
24  investigation should be documented in the investigative
25  file; is that correct?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

78

1     MS. ROSEN:  Object to form, foundation.
2  Leading.
3     A   Again, if you arrest an individual in a
4  homicide investigation and determine that that
5  individual arrested, the information is irrelevant, I
6  don't know how much as a detective I would put in, if
7  anything.  But if your question is when you arrest an
8  individual, should that be documented?  It most likely
9  should be documented.
10     Q   So if an individual is brought to an
11  interrogation room or interview room in the detective
12  division area and questioned about a murder, whether or
13  not that needs to be documented is a case by case
14  decision.  Do I have that right?
15     A   It needs to -- well, if by case by case, you
16  mean if it's relevant because if it's relevant, it
17  should be documented.
18     Q   Okay.  And the detective could determine
19  whether or not they thought the information that the
20  witness was giving them in an interview room in a
21  homicide investigation was relevant or not relevant,
22  correct?
23     MS. ROSEN:  Objection, form.
24     A   The detective investigating the murder is
25  making a determination about the relevancy.  Is that

---

79

1  what your question is?
2     Q   I'm asking detectives had the option of
3  determining that information provided by somebody
4  interviewed, in an interview room, in the division area,
5  in a murder case, they could determine if they so chose
6  that it was not relevant and didn't need to be
7  documented, correct?
8     MS. ROSEN:  Objection, form.
9     A   No.  They are required to document relevant
10  information.  There's not a choice to be made.  They are
11  required to.
12     Q   Okay.  And so somebody who they have decided
13  to bring into an interview room at the detective
14  division area and question about a murder is relevant
15  information in a homicide investigation, correct?
16     MS. ROSEN:  Objection, form.
17     A   That obviously depends on the answers to the
18  questions asked.  It's possible that the first question
19  answered is, "I was on a plane during the time of this
20  incident," and you realize that you are clearly not the
21  offender.  I have brought you in erroneously.  So it's
22  possible that that is not relevant information.
23     Q   And a detective could then determine that that
24  interview, that individual in an interview room about a
25  murder didn't need to be documented, correct?

---

80

1     A   In the scenario that I described, where it was
2  determined that Eric Winstrom definitely could not
3  humanly have done this incident, I don't know that that
4  would be determined to be relevant.  It still possibly
5  could be.  But in my scenario, I wouldn't be surprised
6  to not document that because I wouldn't be -- I wouldn't
7  expect that to be considered relevant information.
8     Q   Okay.  Thank you for that.  And that was
9  consistent with detective division policy practice and
10  training, correct?
11     A   Correct.
12     Q   Were detectives trained that they should
13  document eyewitness descriptions of suspects or could
14  they choose not to do that?
15     MS. ROSEN:  Object to the form.
16     A   Again, this is a case by case basis.
17  Generally, that information is very important.  However,
18  there are some times that that information is not so
19  important, or there's times that you would not document
20  that.
21     Q   Were detectives trained that they were
22  required to document eyewitness statements about whether
23  or not they could make an identification of a
24  perpetrator, or could they choose not to document that?
25     MS. GOLDEN:  Object to foundation.

---

81

1     A   The question is on training, sir?
2     Q   Yes.
3     A   Detectives were trained that that could be
4  very important information to acquire.
5     Q   Were detectives trained that they should ask
6  eyewitnesses to provide descriptions of suspects?
7     MS. ROSEN:  Objection, form.
8     MS. GOLDEN:  Well, I'm going to object to the
9  line of questioning.  We don't have -- I think
10  you're conducting discovery in this case for another
11  case, and so I think that -- well, I object to that.
12     MR. SWAMINATHAN:  Go ahead.  You can answer.
13     MS. GOLDEN:  I'm sorry, what did you say?
14  BY MR. SWAMINATHAN:
15     Q   Go ahead, Commander.
16     A   So the question is, are detectives trained to
17  document eyewitness --
18     Q   That's what I'm getting to, but I'm breaking
19  it into its two pieces.  So the first question is, were
20  detectives trained to ask eyewitnesses if they could
21  provide descriptions of suspects?
22     A   Are you asking if they could or to, because I
23  think that's a fair component here.
24     Q   I'll ask it again so it's clear.  Were
25  detectives trained that they should ask eyewitnesses if

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

82

1   they could provide a description of a suspect?
2       A   Right.  Generally speaking, an eyewitness
3   description of a suspect is important information and a
4   detective would have been trained that that is an
5   important piece of evidence to obtain.
6       Q   Okay.  And I think you started answering my
7   next question.  Were detectives trained that they should
8   document any eyewitness descriptions of suspects?
9       A   Detectives were trained to document all
10  relevant information so that in your scenario would
11  likely be relevant information.  And should --
12      Q   Okay.  And should be what?  You cut out there
13  at the end.
14      A   It should be documented if it is relevant
15  information.
16      Q   And putting aside the extraordinary, unusual,
17  rare circumstance, that is the information that should
18  be deemed relevant and documented, correct?
19      MS. GOLDEN:  Object to form.
20      A   And by that you mean eyewitness description of
21  the offender?    Q   Yes.
22      A   Generally speaking, that information should be
23  documented.
24      Q   Okay, and that's the phrase, I think generally
25  speaking, I think is a useful phrase for me to use so

83

1   that I'm not intending to force you account for every
2   possible unusual circumstance.  I'll try to do that in
3   my questions.  Same basic concept.  Let me ask you: were
4   detectives trained that eyewitness state -- strike that.
5   Were detectives trained to ask eyewitnesses about
6   whether or not they could make an identification of a
7   perpetrator?
8       A   I don't know that they were trained whether or
9   not they could, I think the training would probably be,
10  "Can you describe the individual?"  So, I think that
11  would be more specific.  Yeah, but eyewitnesses will be
12  asked to provide a description of the offender if they
13  are able to.
14      Q   Okay, and then I'm saying if the next step is
15  -- were detectives also trained that they should find
16  out from that individual whether that person believes
17  basically that they had a good view of the offender to
18  be able to identify them or not?
19      A   Again I can't say that that's exactly what
20  they were trained to do.  That's an interesting
21  question, but I think the training would be to try and
22  obtain information that's very specific.  You know, were
23  you -- how far away were you?  Was your view obstructed?
24  That's something that you definitely learn as a
25  detective to ask for, but I don't know that the

84

1   training, like pre-service training they would say that
2   it's -- ask them what your vision is and things like
3   that.
4       Q   Okay.  If a witness -- strike that.  If an
5   eyewitness provided a statement about whether or not
6   they'd be able to make an identification of the
7   perpetrator, is that information, generally speaking,
8   that was to be documented?
9       MS. GOLDEN:  Object to the scope.
10      A   Generally speaking, that sounds like relevant
11  information that should be documented.
12      Q   Okay.  Were detectives trained that generally
13  speaking, they should document any interviews of the
14  suspect?
15      A   Generally speaking, a suspect document -- a
16  suspect interview?
17      Q   Yes.
18      A   Whether it's a custodial interview of an
19  individual we already discussed should be documented, a
20  relevant suspect should be documented.
21      Q   Okay.  And were detectives trained that any
22  interviews in the field of a potential suspect should be
23  documented, generally speaking?
24      MS. GOLDEN:  Object to form.
25      A   Well, now you're talking about -- now you're

85

1   talking about potential suspects.  So I would say not
2   necessarily, because unless you've got the murder
3   solved, everyone's a potential suspect and what you're
4   doing is you're seeking to document relevant
5   information.
6       Q   Were detectives trained that they should
7   document any inculpatory statements by suspects?
8       MS. GOLDEN:  Objection, form.
9       A   If it seemed -- if it seemed relevant.  I
10  mean, if the -- you're talking about an admission and a
11  confession, those certainly would be relevant.  I'm not
12  sure, you'd have to give me more of the scenario for me
13  to make a determination.
14      Q   If an individual provided an inculpatory
15  statement but it was totally far-fetched, impossible,
16  for example.  Is that something that was to be
17  documented or was a case-by-case determination?
18      A   Definitely a case-by-case determination.
19      Q   And so detectives in that instance could
20  essentially decide whether or not they felt they should
21  document the information being provided by that suspect?
22      A   So this is not -- to be clear, not a feeling.
23  It's not an opinion.  Our detectives were required to
24  document relevant information and they're very well
25  trained at this point in their career to determine what

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

86

1 is or is not relevant.  So that's what needs to be
2 documented.
3      Q    If ultimately, it turns out that detectives
4 pursue a certain suspect, and somebody else who they had
5 previously pursued is obviously not the person they
6 believe has committed the crime, does that make the
7 evidence that they developed against the alternate
8 suspect less relevant?
9      A    Which one is the alternate suspect?  The one
10 that's the --
11     Q    Yeah, let's --
12     A    True killer?
13     Q    Yeah, let's do that -- let's do it a better
14 way.  It's a good question.  So, let's say the
15 detectives ultimately determine that the person who
16 committed the crime is suspect A.  With me so far?
17     A    I am.
18     Q    And previously in the investigation, they had
19 for a period of time believed that suspect B was the
20 perpetrator of the crime.  Still with me?
21     A    Yes.
22     Q    Okay.  If ultimately the detectives determined
23 at the end of the investigation that suspect A committed
24 the crime, does it make the evidence and information
25 they learned pointing to suspect B less relevant?

87

1      MS. ROSEN:  Objection, form.
2      A    Well, I mean it certainly could if it -- it
3 probably wasn't -- it may not have been actually
4 relevant at all.
5      Q    And so, ultimately that information related to
6 suspect B wouldn't necessarily need to be documented
7 because it turned out it wasn't all that relevant,
8 correct?
9      MS. ROSEN:  Objection, form.
10     A    If it was not relevant, it not necessarily
11 would have been documented.
12     Q    Okay, and the fact that the information
13 pointing to suspect B turned out to be incorrect, that
14 could make that information not relevant and not need to
15 be documented.  Fair?
16     A    Non-relevant information does not necessarily
17 need to be documented.
18     Q    Okay, and non -- and the fact that the
19 information turned out to be inaccurate or point to the
20 wrong suspect could make it not relevant, fair?
21     MS. GOLDEN:  Form.
22     MS. ROSEN:  Form.
23     A    That would depend.  I mean, we got to get into
24 specifics, so it's not necessarily what makes it not
25 relevant.  It would depend on what the entire facts of

88

1 the case are.
2      Q    Okay, so -- but just generally speaking.  If
3 ultimately the detectives charged suspect A, and earlier
4 in the investigation they pursued meaningfully suspect
5 B, generally speaking was that pursuit of suspect B to
6 be documented or not documented?
7      MS. GOLDEN:  Foundation
8      MS. ROSEN:  Objection, form.  And quite
9 frankly, I'm not following.  You know, I'm giving
10 you some leeway here because the 30(b)(6) notice is
11 on documentation generally, but this is very
12 factually specific in a way that's not relevant to
13 Solache Reyes so, obviously I'm going to allow him
14 to answer the questions, but I'm just lodging that
15 objection at this.
16     Q    Go ahead.
17     A    So, that's an interesting question.  And what
18 you -- I mean, the most common example of that is when -
19 - a media case where a wife goes missing.  Media case
20 where a wife goes missing, statistically, the husband,
21 boyfriend, whatever, a Drew Peterson situation,
22 statistically, when you have nothing else to go on,
23 you're saying, okay, I'm going to look at the wife. Now,
24 if you determine shortly thereafter, she was abducted by
25 a stranger and murdered, et cetera, how much do you

89

1 document?  So we thought that it was the husband who was
2 on the news holding a prayer vigil the night before,
3 because that's what they always do in these cases where
4 they actually murder their wife.  You would document
5 what's relevant, whether you would spend the first ten
6 pages of your case report saying, "We first thought it
7 was Eric Winstrom because we look at husbands first."  I
8 wouldn't put that in my report at all.
9      Q    Okay.  That information eliminating somebody
10 as the suspect, was that to be documented or was that
11 case-by-case information?
12     A    It would be documented if it was helpful and
13 relevant.
14     Q    Okay.  So, were detectives trained that
15 information that allowed the detectives to determine
16 that somebody who's then a potential suspect could be
17 eliminated as a suspect.  Was that information that they
18 were trained to document, generally speaking?
19     MS. GOLDEN:  Form.
20     MS. ROSEN:  Form.
21     A    And again, it's a case-by-case basis.  These
22 cases are so detailed and confusing that if you wanted
23 to lay out a specific murder case for me, I could go
24 through and tell you what's appropriate and what's not,
25 but I can't make a blanket statement like that.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

90

1  Q   Okay.  Would you agree that information -- any
2  tips or other information that provides information
3  about a potential alternate suspect to the person who's
4  charged is potential exculpatory information in a
5  homicide investigation?
6     MS. ROSEN:  Objection, form.
7  A   I would agree only that it could be.
8  Q   Okay.  And it's --
9  A   We get anonymous tips all the time that are
10 deemed not relevant at all, but then we sometimes get
11 tips that are relevant.  So again, it's a case-by-case
12 basis.
13 Q   So alternate tips pointing to -- strike that.
14 Anonymous tips pointing to alternate suspects are
15 sometimes documented and sometimes not documented,
16 correct?
17    MS. ROSEN:  Objection, form.
18 A   Correct.
19 Q   Okay.  Any time photos were shown to a
20 witness, was that to be documented?
21    MS. ROSEN:  Objection, form.
22 A   Depends on what you mean by photos.
23 Q   Photos of suspects, or photos of individuals
24 who were potentially the people involved in the crime.
25 When photos are shown to somebody with the purpose of

91

1  having them try to identify that individual as being
2  potentially involved, was that to be documented?
3     MS. ROSEN:  Objection, form.
4  A   Okay, so during the time period, are you
5  specifically talking about a photo array or a photo
6  lineup?
7  Q   Any type of photo identification procedure.
8  So, let's start with photo arrays.  If an individual is
9  -- strike that.  If a witness is shown a photo of
10 somebody and asked if that person was involved in the
11 crime as part of a photo array, was that to be
12 documented?
13 A   During the time period, photo arrays were to
14 be documented.  Yes.
15 Q   Okay.  And if that photo array ultimately
16 resulted in no identification, it was still to be
17 documented, correct?
18 A   Documented in that -- that it was shown.  Since
19 it was negative, it would just be mentioned as a
20 negative.
21 Q   And if there was documentation -- strike that.
22 If a single photo is shown to a witness and the
23 individuals asked if that single photo was a person
24 involved, was that to be documented?
25    A   Now, that you're again getting into something

92

1  that would be very case-specific.  If it's a photo of a
2  known person, that necessarily would be documented.  If
3  you're asking me what my wife looks like, and you show
4  me a picture of her and say, "Is this her?", that's not
5  necessarily something that would be documented.  If
6  you're showing a single photo to an individual saying,
7  "Is this the person that killed somebody?", then you
8  probably have a flawed not suggestive identification
9  procedure.  So there's a lot of issues with that.  So,
10 struggling with why you would be showing a photo.  If
11 again, if this scenario that you're talking about was
12 deemed to be relevant in the case, then it should be
13 documented.
14 Q   Okay.  Now, if I look at a homicide -- strike
15 that.  If I look at an investigative file, should I see
16 documentation of all the individuals that were suspects
17 in the investigation?
18    MS. ROSEN:  Objection, form.
19 A   If you look at a homicide file, you should see
20 all individuals that were determined at the conclusion
21 of the case to be suspects and offenders.  If you're
22 talking about, when the case started we thought maybe it
23 was person A, B, C and D, and through investigations
24 determined it was person C, you wouldn't -- like my
25 example with the husband and wife scenario, you wouldn't

93

1  necessarily see that much documentation or any
2  documentation at all about your -- your original
3  theories on the case aren't something that we train or
4  expect detectives to really include in their final
5  reports.
6  Q   Should I see documentation of the basis for --
7  strike that.  If you look at the homicide file, should
8  you see documentation of the basis for arrest of any
9  suspect?
10 A   If you look at an investigative file, you
11 should see the probable cause for the arrest of the
12 individual.
13 Q   Okay.  If you look at the investigative file
14 on homicide, should you see documentation of the basis
15 for seeking charges?
16 A   You should -- that would also be included in
17 the investigative file.
18 Q   And if you look at a homicide file, generally
19 speaking, should you see documentation of the
20 investigative steps that were taken in that case?
21    MS. ROSEN:  Objection, form.
22    MS. GOLDEN:  Form.
23 A   If you look at an investigative file, the
24 supplementary report would and other reports would
25 generally contain the steps taken to get to probable

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

94

1  cause and to get to charging.
2      Q    And if you look at an investigative file,
3  generally speaking, should it include documentation of
4  investigative steps that may not have ultimately led to
5  charges against this particular individual?
6          MS. ROSEN:  Form.
7      A    Are you talking about the individual that was
8  eventually arrested?
9      Q    Yeah, exactly.
10     A    So if they were arrested for, say, murder and
11  robbery, but you determined that robbery wasn't the
12  motive and why you're not charging them with robbery?
13     Q    I didn't mean that like that.  That's not what
14  I meant.  I'm going to ask a better question, my
15  apologies.  Generally speaking, should you see
16  documentation of the investigative steps that were
17  taken, that were pursued with regard to somebody who
18  didn't end up being the person who was charged?
19         MS. ROSEN:  Objection, form.
20     A    Oh, and again, not necessarily.  Like the
21  example I gave you about the husband and wife scenario,
22  I could have spent three days figuring that Eric was the
23  real killer, but once I realize that Eric's not the real
24  killer, I'm not going to document too much about that.
25     Q    Okay.  What was the policy regarding what

95

1  information must go into a supplementary report?
2      A    Depends on what supplementary report you're
3  talking about.  Are you talking about the clear to close
4  supplementary report?
5      Q    So, you're saying through different types of
6  supplementary reports, there's different obligations in
7  terms of what must go into it.  Is that fair?
8      A    Correct.
9      Q    Okay.  If you conduct a lineup, there's a
10  particular type of sup report for that, correct?
11     A    Correct.
12     Q    And so there was particular documentation that
13  was to be included in lineup supplementary reports,
14  fair?
15     A    Correct.
16     Q    Okay, and with regard -- there was a scene
17  supplementary report that's to be created in homicide
18  investigations, correct?
19     A    During this time there was most likely a scene
20  sup, yes.
21     Q    And there was a clear, closed report as
22  another type of supplementary report created during this
23  time period, correct?
24     A    Clear, closed report was used for when all
25  offenders in a case were charged.

96

1      Q    As a general matter with regard to
2  supplementary reports, understanding there's different
3  types of supplementary reports, what was the policy with
4  regard to what information was supposed to go into
5  supplementary reports documenting a homicide
6  investigation?
7      A    Well, there's quite a few.  So the general
8  offense case report is the initial report that's
9  documented the original incident.  It's where the first
10  UCR code is documented, it's where the record's division
11  number is recorded, and that, that gives a preliminary summary
12  of the events.  So moving forward from that, on a
13  homicide you might have patrol supplementary reports,
14  which if a patrol officer takes some steps, they would
15  be included in the patrol supplementary report.  You
16  might have a lineup.  There might be a lineup report
17  that needs to go in there.  You might not solve the case
18  for a couple years, which would mean that there might be
19  a few progress reports just updating the case as to what
20  steps or what new evidence has been discovered.  And
21  then finally, assuming that the case was reached to a
22  complete conclusion with a clear, closed arrest and
23  prosecution case report, that last case report would
24  include the steps leading up to the charging.
25     Q    In terms of the policy that applied with

97

1  regard to what information should go into supplementary
2  reports, is the policy that applied to that subject
3  matter special order 86-3 and its subsequent SOP
4  iteration?
5      A    I would have to scroll down to see how much is
6  in supplementary report.  It would be further down --
7  might not be the best order on this subject.
8      Q    So that's my question.  Is there any other
9  order -- strike that.  Is there any other detective
10  division special order about what information is
11  supposed to go into supplementary reports?
12     A    If you just scroll down so I can see the
13  contents of C to see what the detectives are required --
14  I mean, it doesn't specifically say what to put in the
15  supplementary report.  This is more about what to put
16  into the file as a whole.  So the specifics of what to
17  put in the supplementary report, would've been a subject
18  of training.  I am not positive whether if we look to
19  the SOPs, if there's more specific -- what to include in
20  the supplementary report, but I know that it was trained
21  on for several hours.
22     Q    Okay.  So, looking -- I guess the first point
23  is the special order 86-3 does not provide specific
24  guidance about what information is supposed to go into
25  supplementary reports, agreed?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

98

1    A   Well, you could argue that CT One that
2  requires relevant information be fully and accurately
3  reported as possible during the course of the
4  investigation would be on point, because the detective's
5  primary use of reporting is the supplementary report.
6  Now granted, during this time there was also general
7  progress reports, so it doesn't -- I mean, it does not
8  specifically say supplementary reports, but again, I
9  know it was a subject of training.  It's possible
10 there's something more on point in the SOPs if I was to
11 look through all of them, I didn't bring anything with
12 me today.
13    Q   Okay.  I'm going to pull up the SOP next so
14 we'll go to that in one moment.  With regard to 86-3,
15 this document does not provide specific guidance about
16 what information is to go into supplementary reports.  Do
17 you agree?
18    MS. GOLDEN:  Object to form.
19    A   Well, I tend to disagree just because overall
20 C1 requires what it requires and you have two choices as
21 a detective really, the sup report and the GPR report.
22 So it's got to get in there one way or the other, but it
23 doesn't specifically use the word supplemental report,
24 you see.
25    Q   Okay.  But if basically under this policy

99

1  though it was required that the information learned
2  during the homicide investigation is to be documented
3  fully and accurately either in a supplementary report or
4  in general progress reports, fair?
5    A   In relevant information, fair.
6    Q   Does this policy provide any guidance about
7  what information is to be treated as relevant and not
8  relevant?
9    A   This policy just says relevant information,
10 no.
11    Q   Okay.  And does -- is there any other policy
12 that you're aware of that provides guidance to
13 detectives about what information they're to include in
14 supplementary reports?
15    MS. GOLDEN:  So then what he just testified to
16 about possibly the SOP?
17    MR. SWAMINATHAN:  I was thinking about outside,
18 like before the SOP comes into existence, we're
19 going to do the SOP next.  So let me ask it again.
20 BY MR. SWAMINATHAN:
21    Q   So, in the period which this policy was
22 active, approximately 1986 to part of 1988, okay?  In
23 that period, other than this document, is there any
24 other policy that applies or provides guidance to
25 detectives about what information is to be included in

100

1  supplementary reports?
2    A   So I suspect that there is more information in
3  the SOPs, which as you pointed out was 1988.  If I had
4  made a determination by looking at that, that it did
5  exist, I would expect there to be a precursor, a
6  previous DDSO as well.  I'm not aware of it, but what
7  happened in 1988 when they created the SOPs was they
8  merged these DDSOs into the SOPs.  So it is possible it
9  exists.  Sitting here today, I couldn't tell you either
10 way.
11    Q   Okay.  And are you in a period that this
12 policy was in effect?  Was there any other document that
13 provided guidance -- strike that.  Was there any other
14 policy in the period from 1986 to 1988, when this
15 special order was active, that provided guidance to
16 detectives about what constituted relevant information?
17    A   Oh, the other DDSOs would have that because
18 there's plenty of information available in the SOPs as
19 far as investigations go.  And if you wanted to get more
20 specific, it would be the training.  But I suspect that
21 if you took the DDSOs as a whole, you would see plenty
22 of information which would guide a detective to
23 understand what was expected as relevant.  I don't know
24 that the specific words, "This is what's relevant,"
25 is spelled out.

101

1    Q   Okay.  Let's take a look at this order.  This
2  order applied to the -- strike that.  This order,
3  special order 86-3, that we're looking at, Exhibit 2 to
4  this deposition, applied to homicide investigations,
5  correct?
6    A   Correct.
7    Q   Okay.  Under this policy, detectives were
8  required to document both exculpatory and inculpatory
9  information, correct?
10    A   Correct.
11    Q   Okay.  Under this policy, detectives were
12 required to record and preserve information obtained by
13 any detective department member during the course of the
14 investigation, correct?
15    A   Are you reading directly from this?
16    Q   Yes.  So the policy specifically says it is
17 the policy of the Chicago Police Department to record
18 and preserve information obtained by any department
19 member during the course of an investigation, correct?
20    A   Yes, I do that.
21    Q   And what was the expectation of this policy
22 that detectives would record?  In other words, document
23 the information that they learned during the course of
24 an investigation?
25    MS. GOLDEN:  Object to form.  And the record

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

---

102

1  should reflect that you've marked the exhibit and
2  are showing it to the witness.
3       MR. SWAMINATHAN:  Okay.
4  BY MR. SWAMINATHAN:
5       Q  Go ahead.
6       A  The question is, does it state here?  Is the
7  policy of the Chicago Police Department to record and
8  preserve information obtained by any department member
9  during the course of an investigation?
10      Q  So let ask you a different question.  When
11  this document says to record information, it's referring
12  to documenting the information, right?
13      MS. GOLDEN:  Object to form.
14      Q  Go ahead.
15      A  Correct.
16      MR. SWAMINATHAN:  What was the objection to
17  form there, Carrie?
18      MS. GOLDEN:  Because you're just trying to get
19  him to say that one word means the same as another.
20  That's my objection.
21  BY MR. SWAMINATHAN:
22      Q  Okay.  And this policy document indicates --
23  strike that.  This policy document provides guidance to
24  detectives that documenting both inculpatory and
25  exculpatory information is necessary to ensure the due

---

103

1  process rights of accused, correct?
2       A  Yes.
3       Q  And this document provides guidance to
4  detectives -- strike that.  This policy provides
5  specific guidance to detectives that documenting the
6  information they learned during an investigation is
7  necessary to protecting the rights of the accused,
8  correct?
9       MS. GOLDEN:  Object to form.
10      Q  Go ahead.
11      A  Correct.
12      Q  Okay.  And under this policy, in order to
13  protect the rights of accused individuals, it was a
14  requirement that detectives actually document the
15  information they learned during the course of their
16  investigation.  Even if it might be exculpatory
17  information, correct?
18      MS. GOLDEN:  Object to form and foundation.
19      A  You are to document exculpatory information.
20  It's not even an if, that you're expected to document
21  it.
22      Q  And alternate suspects do you agree, could be
23  exculpatory information?
24      MS. GOLDEN:  Object to form.
25      MS. ROSEN:  Could be -- you broke up, you said

---

104

1  could be, right?
2       MR. SWAMINATHAN:  An alternate suspect could
3  be.
4  BY MR. SWAMINATHAN:
5       Q  And what are the circumstances in which an
6  alternate suspect would not be exculpatory information?
7       A  When they were determined not to actually be a
8  relevant subject -- suspect.
9       Q  And what are the circumstances in which an
10  alternate suspect could be determined to not be a
11  relevant suspect?
12      A  When the result of your investigation
13  indicates that the individual is not a relevant suspect.
14      Q  Right.  This document identifies -- strike
15  that.  It defines a series of different types of files
16  and other documents, correct?
17      A  It does.
18      Q  Okay.  And it identifies a file called an
19  investigative file, which essentially is to be a
20  repository for the reports and notes and other
21  information learned -- gathered by the detective
22  division, correct?
23      A  Yes.
24      Q  Okay.  And was the idea that the investigative
25  file was to be the file that was to be ultimately

---

105

1  provided to criminal defense attorneys and prosecutors?
2       A  Yes.
3       Q  Okay.  And this document provides some
4  information about a document called an inventory sheet.
5  You see that?
6       A  Yes.
7       Q  Okay.  What is the purpose of the inventory
8  sheet?
9       A  I guess it has several purposes, but let me
10  just make sure the purpose isn't defined here.  I mean,
11  the purpose as they define it, to identify and record
12  each document that is placed in the file.  It's like a
13  table of contents for the investigative file.
14      Q  And this policy expressly requires that the
15  inventory sheet be forwarded to the Records Division,
16  correct?
17      A  Yes, I don't see it on here but I know that
18  that was our practice.  Oh, yes, it does.  Okay, yes.
19  That is correct.
20      Q  Okay, I'm just going to -- you want me to make
21  it a little bigger here?
22      A  I see it.
23      Q  You see it?  Okay.  And this policy expressly
24  requires that the inventory sheet be provided to the
25  Records Division and made available to the states

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

106

1  attorney's office, and the courts, and defense counsel,
2  correct?
3      A   Well, it's sent to the Records Division and
4  it's to ensure -- it's not that the sheet is to be made
5  available to the state attorney, it's to ensure the
6  entirety of the file is made available.
7      Q   Okay.  And is there any indication in this
8  document that provides specific direction that the
9  entire investigative file is to be copied and turned
10 over to prosecutors and criminal defenders?
11     A   I don't think that that would be included
12 here.  I don't know that it is included here, I'd have
13 to read it again.  I don't believe that it states those
14 words.
15     Q   Okay.  So is this document --
16     A   Let me clarify.  This isn't where that would
17 take place.  It wouldn't say in this -- it's not
18 complete the investigative file and send it here.  That's
19 not the role of this document.
20     Q   Okay.  Is there some document that -- is there
21 some other policy document that says, copy the entire
22 investigative file and distribute this file in response
23 to subpoenas?
24     A   Policy document?  Not that I'm aware of, no.
25     Q   Okay.  Is there any -- strike that.  Is there

---

107

1  any directive or other written instruction that is
2  provided to detectives that says copy the entire
3  investigative file and turn it over in response to a
4  subpoena?
5      A   Yes.  And that would be the actual contents of
6  the subpoena.  They would actually physically get a copy
7  of the subpoena, which they would --
8      Q   Anything else other than the subpoena that
9  would provide that direction?
10     A   During this time period, not that I am aware
11 of, no.
12     Q   Okay.  So no internal policy or practice
13 document that provides specific instruction to copy the
14 entire investigative file and produce it to the
15 prosecutor?
16     A   Not that I'm aware of.  This order does make
17 mention of turning over all exculpatory info, or
18 including all exculpatory information, but it doesn't
19 specifically say, "Photocopy both pages and send it
20 here."
21     Q   There is no internal policy document that says
22 the detectives copy the entire investigative file and
23 produce it in response to a subpoena, correct?
24     A   Not during this time.  No.
25     Q   Okay, but.  Okay.  Looking at page 2, it

---

108

1  indicates here -- let me just highlight this so you can
2  see where I am looking.  It says "notes, memoranda, and
3  other documents gathered, and all other cases will be
4  submitted by the detective and be fixed to the copy
5  of the case report in the unit RD numerical sequence
6  file."  What is the unit RD numerical sequence file?
7      A   Well -- so in homicides, we would just call it
8  an investigative file.  Or other cases, for example,
9  robberies, burglaries, aggravated batteries, et cetera,
10 they would not be kept -- kept with the homicide.  They
11 would be kept in just a sequential file by RD number.
12 So, all that -- all unit RD numerical sequence file is
13 what we would call the file cabinets, which hold the --
14 all the investigative reports.
15     Q   Okay.  In the period from 1986 to 1998, there
16 were files detective division that were referred to as
17 unit files.  Correct?
18     MS. ROSEN:  Right.  Say that again?  You broke
19 up, Anand.
20     Q   Right.  There were files in this period from
21 1986 to 1998 that were kept in the detective division
22 that were referred to as unit files, correct?
23     MS. ROSEN:  Objection, form.
24     A   So, just to me, this case is really confusing.
25 I will tell you what I am talking about investigative

---

109

1  files, investigative files.  So, unit RD numerical
2  sequence -- sequence file.  During this time period and
3  still to this day, generally speaking homicides were --
4  were kept in a separate file system, then everything
5  other than homicides.  So, when we speak of unit RD
6  numerical sequence file, we mean the file cabinets that
7  hold everything other than homicides.  However, those
8  files are still investigative files.  The homicide files
9  are still investigative files.  Yeah.  You said during
10 this time period, there were -- there was something
11 called unit files and that I'd have to have you explain
12 to me what it is that -- that -- that you are defining
13 that as before I -- I'd agree that something like that
14 exists.
15     Q   Yeah.  So let me let ask you other than
16 investigative files, putting those to the side.
17     A   Sure.
18     Q   Within the detective division areas, was there
19 also some set of files that were referred to as unit
20 files?
21     A   Unit files?  So that's not what this is,
22 that's not what -- what this is saying.  And, there is
23 not -- like -- I don't -- if you asked me at the time if
24 I was in area five at the time in 1986 to '98.  Say,
25 hey, where is the unit file?  I guess I would assume

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

110

1   that you were talking about the investigative file, but
2   there is not like a split file system.
3       Q   Okay --
4       A   And --
5       Q   Go ahead.  So we can refer to the homicide
6   investigation at the detective division area.  Is there
7   any file that is kept with regard to that homicide
8   investigation other than the investigative file?
9       A   So there could be -- so the investigative
10  files are repository for all the original notes, all the
11  -- you know -- the case report.  Everything --
12  everything needs to end up in that investigative file.
13  So, that is the file.  If -- if you are talking about,
14  could there be copies of that information someplace
15  else?  And, in a folder, if the detectives had to go
16  out, if the detective and his partner working on a
17  homicide were going to interview a witness and I needed
18  some documents from the file to aid me and witness in --
19  in conducting that interview, it is possible that I
20  would take some copies with me.  So it is possible there
21  is copies of the information running around, but it is
22  important to that the everything original needs to end
23  up in that investigative file.
24      Q   In the period from 1986 to 1998, were there
25  also files in the detective division referred to as area

111

1   files?
2       A   You would have to define what an area file is.
3       Q   That -- that's what I'm asking.  Is there,
4   were there, another type of document that was being kept
5   called an area file?
6       A   No, I think it's probably what you are
7   referring is to the investigative file.
8       Q   Okay.  Putting inside the question of what is
9   in detective division with regard to that specific
10  homicide investigation.  Because I understand you saying
11  that the originals of everything related to the homicide
12  investigation should be in the investigative file,
13  correct?
14      A   And I won't say everything because there is
15  other -- you know -- there is forensic documents.  You
16  might not have the negative to pictures in there and
17  things like that.  You might not have some of the crime
18  scene processing stuff.
19      Q   So, that's fair, and we will come back to that
20  point in a little bit.  I guess my question is just, are
21  there unit files kept in the areas that may not even be
22  related to homicide investigation documents?  That might
23  be personnel documents, or daily tracking documents or
24  anything else like that?
25      A   Sure.  Like administrative files and stuff

112

1   like that.  Yeah, absolutely.
2       Q   Okay.  And, in that overall category of non-
3   homicide investigative files, but we will call them
4   administrative files.  Were there files that were
5   referred to as unit files or area files on those topics?
6       MS. ROSEN:  On what topics?
7       Q   Essentially, anything in the administrative
8   file.  I guess what I am trying to understand is I know
9   there to be -- I have heard these terms, right?  Unit
10  files, area files, and I've heard the term investigative
11  file.  And so what I am trying to understand is what I
12  have heard, those terms like unit files or area files,
13  are those referring exclusively to investigative files
14  or are there other documents that are also kept in the
15  detective division that are sometimes referred to as
16  unit files or area files?  Then I want to understand
17  what the contents are of those things, but that is --
18  that is the context of what I am asking here, okay?  So
19  I will ask the question again, cause I just -- I want to
20  be totally clear about what I am asking.
21      MS. ROSEN:  Sure.
22  BY MR. SWAMINATHAN:
23      Q   So, were there documents that were kept in the
24  detective divisions, potentially administrative
25  documents or otherwise, that were referred to as unit

113

1   files in this period?
2       A   During this period every unit -- true unit
3   would have its own personnel files.  Those would be
4   called unit files.  There is a human resources personnel
5   file and a unit level personnel file, which during this
6   period, if you received a complimentary letter through
7   the mail or something, you would throw it in there.  You
8   know, now it's all automated, that is as far as any unit
9   files.  Now I -- as I explained to you here that their
10  termination unit RD numerical sequence file is just a
11  fancy way of explaining that for the non-homicide files
12  we literally kept them in numerical order in file
13  cabinets.  But, the investigative file -- for homicide,
14  the investigative file is that file.  And like I said,
15  that doesn't mean that some copies of some of the
16  documents in that file could not exist.  However, we --
17  the final investigative file is the -- that is a
18  repository for the whole file.
19      Q   Okay.  So to the -- there were unit files in
20  the detective division area, but those were not files
21  containing investigative information.  They were files
22  containing personnel information.  Is that right?
23      A   Yes.  Because the proper term for these is not
24  unit files.  Some, maybe in the past somebody would have
25  referred to them as unit file.  I don't know why, but I

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

**114**

1  would refer to this as the investigative file.  And that
2  is the official name for the investigative file.
3      Q    Okay.  And the unit file would contain
4  information about combinations or discipline for
5  officers; is that correct?
6      A    Correct.
7      Q    And then, was there something that was an
8  administrative file of some kind in the detective
9  division areas in this time period referred to as an
10  area file?
11     A    I am not -- I am not familiar with that term.
12  Like, as how it's used.  I could see somebody calling
13  the investigative file an area file, but it's not the
14  term that I would ever use.
15     Q    Okay.  All right.  Let us go back to this
16  special order.  This detective division special order
17  indicates that under the detective division unit
18  commanding officers obligations, it indicates that one
19  of their obligations is to ensure that all notes,
20  memoranda and miscellaneous documents of potential
21  evidentiary value are retained in the unit files or area
22  files.  Right?  Sorry.  Are the investigative files,
23  correct?
24     A    Correct.
25     Q    Okay.  In other words, just to clear up the

---

**115**

1  terminology, one of the obligations, the commanding
2  officers and the detective division units to ensure
3  that all of the notes, and memoranda, and other
4  documents were being kept in the investigative files,
5  correct?
6      A    Correct.
7      Q    And that was to include all information that
8  was a potential evidentiary value, correct?
9      A    So, evidentiary value.  That is what this
10  says.
11     Q    Okay, and potential -- and documents that
12  could be of potential -- and so this policy is not
13  specific to a detective's determination of what is
14  relevant or not relevant.  But in fact, what they were
15  required to document they include in the investigative
16  file is everything that that was potentially relevant is
17  that fair?
18         MS. ROSEN: Objection. Form. Back to this
19  policy.
20     A    And I would -- I would simply said that it's -
21  - I believe that if something is of potential
22  evidentiary value, then it's relevant.
23     Q    Okay.
24     A    I do not -- I do not think there is a conflict
25  there.

---

**116**

1      Q    Okay.  And so you would agree that anything
2  that is a potential evidentiary value in the case should
3  be documented.
4      A    I would agree that that that's relevant and
5  should be documented.
6      Q    Okay.
7         MS. ROSEN:  Layer objection to form.
8      Q    Okay.  And then looking here at the detective
9  division, looking at the bottom of this page here,
10  section 4C this provides instruction in terms of the
11  requirements with regard to documentation for
12  detectives, correct?
13     A    Correct.
14     Q    Okay.  And other than this -- sorry, this is
15  the primary set of policies that provide guidance to
16  detectives about what information needs to be documented
17  and preserved in the investigative files for their
18  investigations, correct?
19     A    Correct.
20     Q    Okay.  And this -- this policy indicates that
21  detectives, we talked about this, are required to
22  basically record essentially document and preserve all
23  of the relevant information they learned during the
24  course of their investigation, correct?
25     A    Record and preserve relevant information.

---

**117**

1      Q    Okay.
2      A    As fully and accurately as possible.
3      Q    Thank you.  And then it identifies various
4  types of documents that they are to use to record and
5  document the relevant information, correct?
6      A    It does identify -- well, it doesn't
7  necessarily document what they use.  It documents what
8  needs to go in the file.  They use some of these, some
9  of them are not used by detectives.
10     Q    Okay.  And essentially indicates that all of
11  these various sources of information on which
12  information is documented need to get into the
13  investigative file, correct?
14         MS. GOLDEN:  Objection, form.
15     A    That is correct.
16     Q    And it indicates it provides specific
17  instruction to detectives that they should be thorough
18  and accurate in terms of what they document and
19  preserve, correct?
20         MS. ROSEN:  Objection, form.
21     A    I want to see -- any chance you could point me
22  to the wording?
23     Q    Oh, I think I am looking at that first
24  sentence again.  It says fully and accurately.
25     A    Fully and accurately.  Yes.  Yes.  I did not

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

---

**118**

1  see --
2     Q  My point, so same that this consists of what
3  we talked about the training was to be thorough and
4  accurate in documenting the investigation, correct?
5     MS. ROSEN:  Objection, form.
6     A  Yes.
7     Q  Okay.  The training was to be thorough and
8  accurate in writing your supplementary report, correct?
9     MS. ROSEN:  Objection.  Form.
10     A  Thorough and accurate in writing your in -- in
11  yes -- well, that is true.
12     Q  Okay.  And then it -- this doc -- this policy
13  provided specific construction to detectives that
14  ultimately they are to submit all handwritten notes and
15  investigative documents to their unit supervisors or
16  inclusion ultimately in the investigative file, correct?
17     A  That is correct.
18     Q  And then page 3 of this document essentially
19  provides guidance about the retention of material,
20  correct?
21     A  I see that section five has file retention as
22  the subject.
23     Q  And then there is a, there is a last section
24  here, section six that says inspection.  The inspection
25  -- the instructions contained in this directive will be

---

**119**

1  strictly adhered to exec -- exempt members of the
2  detective division will conduct periodic unscheduled
3  inspections of the subject files to ensure compliance.
4  Do you see that?
5     A  I do.
6     Q  Okay.  And what was done in with regard to
7  section six of this policy regarding inspection to
8  satisfy that requirement?
9     A  During this time, detective areas were, as
10  they are now.  Supervised by a commander.  Commander is
11  an exempt rank and commanders were expected to
12  physically inspect a random sample of cases to ensure
13  that this policy was adhered to.
14     Q  Okay.  And do you have any personal knowledge
15  of that?
16     MS. ROSEN:  Objection, form.
17     A  I was in grammar school at the time so I was -
18  - I do not.
19     Q  Okay.  In the period from 1986 to 1988, has
20  anybody provided you with any in -- in preparation for
21  this deposition, were you provided with any information
22  indicating that periodic unscheduled inspections of
23  subject files occurred?
24     A  I did learn that that happened at some point
25  in time.

---

**120**

1     Q  Who did you learn that from?
2     A  I believe I learned it from my lawyer.  So, I
3  don't know if I'm not supposed to tell you that, but I
4  just did.
5     Q  Okay.  So we -- we will put that aside.
6  Putting aside any conversations you have had with
7  Counsel.  Have you learned of any information indicating
8  to you that inspections occurred in the period from 1986
9  to 1988?
10     A  No.  And I did not seek out the answer to that
11  question.
12     Q  Have you -- have -- are you aware of any
13  documentation reflecting the performance of any audits
14  or inspections pursuant to section six of this policy?
15     A  No.
16     Q  Have you seen any of audit reports, reflecting
17  audits?
18     A  I have not seen them.  I didn't look for them
19  either.
20     Q  Are you aware of any such audit reports
21  existing with regard to inspection of investigative
22  files?
23     A  I am not aware of it.  As I said, I did not
24  look.
25     Q  Putting aside whether you looked, have you

---

**121**

1  come to learn at any point in your time as a -- as a
2  police -- Chicago police officer, that there are any
3  audit reports for the period from 1986 to 1998, with
4  regard to the investigative file inspections?
5     A  Putting aside the fact that I have not looked,
6  no.
7     Q  Okay.  So you are not aware of any audit
8  report, with regards to the investigative files from
9  1986 to 1998?  Fair?
10     A  Audits that took place during that time?  That
11  is correct.
12     Q  Okay.  And you -- are you aware of any
13  documents reflecting any training that was provided to
14  commanders or other supervisors to conduct audits of
15  investigative files?
16     A  No.
17     Q  Okay.  Are you aware of any correspondence or
18  other communications that reflect audits that occurred
19  in the period from 1986 to 1998 of investigative files?
20     A  No.
21     Q  Right.  Let us look at the 1988 SLP and then
22  why don't we take a -- take a break after that?  Can
23  people go that long?  A little bit longer.
24     MS. ROSEN:  Okay.  Well, yeah.
25     Q  Commander that is okay you said?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

122

1    A   Yep.
2    Q   All right.  Going to mark this first.  Are you
3  able to see on my screen, this detective division
4  standard operating procedure document?
5    A   Yes.
6    Q   Okay.  And for the record I have, I marked as
7  Exhibit 3, the document entitled, 'Detective Division
8  Standing Operating Procedures.'  It is Bates stamped
9  RFC.  Selection date is 117553 through 117587.  Okay.
10 Did you read this document in preparation for today's
11 deposition?
12       (EXHIBIT 3 MARKED FOR IDENTIFICATION)
13   A   Yes.
14   Q   Okay.  And these were standard operating
15 procedures that were in place beginning in 1988,
16 correct?
17   A   Correct.
18   Q   And they applied to the detective divisions,
19 correct?
20   A   Correct.
21   Q   And how long did these policies apply?
22   A   I think they ended in -- they were revised
23 again in 2002, I believe.
24   Q   Okay.
25   A   Maybe 2003.

---

123

1    Q   Okay.  In the period from 1988 when this went
2  into effect through 1998, were these -- did this
3  document contain the policies that applied to detectives
4  in the areas?
5    A   Yes.
6    Q   Okay.  And all of the special -- all that were
7  formerly special orders to the extent they were
8  incorporated, were incorporated into these standard
9  operating procedures, correct?
10   A   The detective division special orders.  Yes.
11   Q   So there are no other policy documents
12 that apply specifically to detectives other than these
13 then -- other than this standard operating procedure,
14 Exhibit 3 in the period from 1988 to 1998, correct?
15       MS. ROSEN:  Oh, Objection, form.  Misstates
16    prior testimony about the 1992 outlook.
17   Q   Okay.  So let me ask a little differently,
18 possibly a good point.  So other than the standing
19 standard operating procedures that were in effect for
20 the period from 19 -- 1988 through 1998, were there any
21 other policy documents applying specifically to
22 detectives in that period?
23   A   Not on the subject that I am testifying on.
24   Q   Okay.  And there was a lot --
25   A   Go ahead.

---

124

1    Q   Go ahead.  I didn't mean to cut you off.
2    A   There were other -- there were general orders
3  and special orders of the department, which had
4  information just for their detective division, but not
5  on these subjects.
6    Q   Okay.  The -- I lost my train of thought,
7  okay.  Sorry.  In 1992, this standard operating
8  procedure was updated, correct?
9    A   Correct.
10   Q   Were there any substantive changes in terms of
11 detective division policies that applied to the
12 detective division in that 1992 revision that you are
13 aware of?
14   A   Oh boy.  Yeah.  Yes.  And I cannot remember.  I
15 believe there was a subject that was added, but it was
16 not one of these -- was not any of the issues that I am
17 testifying about today.
18   Q   You foreshadowed my next question.  So, with
19 regard to the topics for this deposition in the case --
20 topics, 1A.  Strike that.  For the topics in categories
21 1 and 2 of our deposition notice in this case, there are
22 no changes between the standard operating procedures in
23 1988 to the revision in 1992, correct?
24   A   Correct.
25   Q   So the standard operating procedures with

---

125

1  regard to the topics in 1 and 2 of our amended notice of
2  Rule 30(b)(6) deposition were the same for the period
3  from 1988 through 1998, correct?
4    A   Yes.
5    Q   Okay.  Now I am going to go to chapter 18 of
6  this.  Okay.  I'm looking at chapter 18 of this Exhibit
7  3, which is RFC selection date 117582.  And it -- the
8  title of this chapter is investigative files.  Do you
9  see that that's there?
10   A   Yes.
11   Q   Okay.  So this is the policy with regard to
12 note taking and documentation applicable to detectives
13 in the period from 1990 -- 1988 to 1998, correct?
14   A   While it's investigative files, I believe note
15 taking, I don't know if note taking is specifically
16 stated here, but notes are talked about in here.  This
17 is the policy for the -- like putting together the
18 investigative file and what needs to be in it.
19   Q   Okay.  So this is, and maybe another way to
20 put it is --this chapter 18 in the SOP that we're
21 looking at now, this is what the special order 86-3
22 turned into, correct?
23   A   That is correct.
24   Q   And would you agree with me that looking at
25 the policy here, it is basically the same policy as what

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

126

1  is contained in 86-3?
2      A   I agree.
3      Q   And it provides the same guidance about the
4  various types of documents that are to be preserved
5  during the course of a homicide investigation.  Do you
6  agree?
7      A   I do agree.
8      Q   Okay.  And as with the prior version 86-3, it
9  indicates that detective members will quote, "Preserve
10 and record information and materials obtained, including
11 that, which might aid in the defense of the queues."
12 That's the same guidance provided in 86-3, correct?
13     A   Correct.
14     Q   Okay.  And ultimately this policy in the SOP
15 indicates that the information learned during the
16 homicide investigation is to be documented and preserved
17 in the investigative file, correct?
18     A   I don't know that it uses the -- those words.
19 It -- it tells you what information should be included
20 in the file.
21     Q   And nothing changes in this policy in terms of
22 what is to be documented, do you agree?
23     A   Right.  I don't think there's a substantive
24 change.
25     Q   Okay.  And nothing changes in terms of what is

127

1  to be preserved in this policy, correct?
2      A   You are Correct.
3      Q   Okay.  And the various -- this document
4  identifies, defines various types of documents,
5  including the investigative file, investigative file
6  case folder, and so on.  Do you agree with me this
7  document doesn't change from 86-3 with regard to the
8  various types of documents and files that are to be used
9  in a homicide investigation?
10     A   I agree.
11     Q   Okay.  And then this document, just like 86-3
12 provides guidance to various members of detective
13 division about their responsibilities with regard to
14 investigative files, correct?
15     A   Correct.
16     Q   Okay.  And would you agree that the guidance
17 that's provided in this -- strike that.  Would you agree
18 that the responsibilities that are identified in this
19 SOP are the same as the responsibilities identified in
20 86-3?
21     A   Yes.
22     Q   Okay.  So there are no changes in terms of the
23 responsibilities of detective division commanding
24 officers, supervisors, and detectives between 86-3 and
25 this policy, correct?

128

1      A   Correct.
2          MS. ROSEN:  Form.
3      Q   And -- and the requirements of what detectives
4  are required to document and to preserve.  Those all
5  remain the same in this SOP from 86-3, correct?
6      A   Correct.
7      Q   Okay.  There are no changes in terms of what
8  information detectives are required to document and
9  preserve from 86-3 to this policy, correct?
10     A   Correct.
11     Q   And you're not aware of any substantive
12 changes from the 86-3 policy to this policy, correct?
13     A   Correct.
14     Q   Okay.  And you agree consi -- just as the old
15 pile -- strike that.  Same with 86-3, this document
16 doesn't provide specific instruction to detectives to
17 copy the entire investigative file and produce it to
18 prosecutors and criminal defendants, correct?
19     A   It does not include those specific
20 instructions.
21     Q   Okay.  It does provide specific instruction to
22 copy the investigative file inventory and send it to the
23 reference division, correct?
24     A   Correct.
25     Q   Okay.  And I think we already covered this,

129

1  but during the period that this -- the special standard
2  operating procedures were in effect from 1988 to 1998,
3  you're not aware of any other internal policy document
4  of the Chicago Police Department that instructed
5  detectives to copy the entire investigative file and
6  produce it to prosecutors and criminal defendants,
7  correct?
8          MS. ROSEN:  Objection, form.
9      A   The only thing they would get was, which was
10 internal, was the internal communication of the subpoena
11 indicating what was required as a subpoena.
12     Q   Okay.  So other than the subpoena itself and -
13 - and whatever was correspondence was sent with the
14 subpoena, there's no internal policy or directive
15 instructing the detectives to copy the entire
16 investigative file to produce it, correct?
17     A   (No verbal response.)
18     A   We lost your answer.
19     A   That is correct.
20     Q   Okay.  All right now let's -- I think we can
21 let me just check if anything else on this policy, and
22 then we'll take a break.  Looking at the last page.  I
23 think we covered this, but looking again at the last
24 page of this chapter 18 RFC 117587, there's again, the
25 inspection section.  You're not aware of any audits or

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

130

1 inspections that occurred in the period from 1988 to
2 1998, correct?
3     A  I am still unaware.
4     Q  Okay. All right. Okay. I'm looking at
5 chapter eight of this document, which begins on 117566,
6 and this identifies the procedures required of all
7 detectives. You see that?
8     A  Yes.
9     Q  Okay. And it talks about obviously the
10 functions of a detective and their role, correct?
11     A  Yes.
12     Q  Okay. And were detectives trained on these
13 standard operating procedures?
14     A  Yes.
15     Q  Okay. And so they were trained to -- strike
16 that. These standard operating procedures were they
17 provided to the detectives?
18     A  Yes.
19     Q  Okay. And then in addition to having copies
20 of these directives, were they expected to read them?
21     A  So, these new detectives, the answer is yes.
22 If you were an existing detectives when this rolled out,
23 you were still provided a copy of it. You would've been
24 trained as aspects of it change.
25     Q  Okay. And then in addition to that -- oh,

---

131

1 strike that. Anybody who came new to the detective
2 division would be specifically trained on the contents
3 of these standard operating procedures, correct?
4     A  It would've been provided this and the
5 contents of it would also have been trained on.
6     Q  Okay. And then this section looking at page
7 803 -- oh see, this is RFC 117568. It indicates that
8 one of the responsibilities of detectives was to prepare
9 supplementary reports, correct?
10     A  Yes.
11     Q  Okay. And it indicates that under this policy
12 -- strike that. Under this policy detectives are
13 required to report all substantive information learned
14 in the investigation, correct?
15     A  Correct.
16     Q  Okay. And what is meant by the term
17 substantive information in this policy?
18     A  Relevant.
19     Q  Okay. And were detectives provided any
20 training on what was meant by the term substantive
21 information?
22     A  I don't know that they were trained on the
23 meaning of that word.
24     Q  Okay. Were they trained to understand this
25 policy to mean that they were to determine what

---

132

1 information was relevant and then document that relevant
2 information?
3     A  Yes. This is, you're asking me about this
4 specific policy. The subject of supplementary report
5 writing is several hours in pre-service training, so
6 there would've been in-depth discussions on what should
7 and should not be documented in the supplementary report
8 in that training.
9     Q  Okay. And was there a policy on how soon
10 after events occurred that supplementary reports were to
11 be created?
12     A  There is.
13     Q  And what was the problem --
14     A  Yes, there was.
15     Q  Go ahead. What was the -- what is the policy
16 guidance in the period from 1986 to 1998 about how soon
17 after events that supplementary reports are to be
18 created?
19     A  Sure. Well, it depends on the crime. So,
20 during this time period, supplemental reports were
21 expected within ten days. However, for a case such as a
22 homicide, that requirement would've been met with a
23 scene sup. So, the detective was expected usually to
24 produce a sup that day before they'd go home. 24 hours
25 or 36 hours, they would drop their first initial

---

133

1 supplementary report. So, the ten-day -- oh, it's right
2 here. I should have just read it. The ten -- as you
3 see in L, to submit to the watch commander within ten
4 days of receiving the assignment a complete package of
5 reports. So, that is for what we would call a handout.
6 If I was assigned a burglary that happened the day
7 before, as I came to work, I'm expected to act upon that
8 investigation and provide a sup within ten days. A
9 homicide investigation is different. You wouldn't
10 follow this set of guidelines for this ten days. You
11 would expect a scene report as soon as possible.
12     Q  Okay. So, for homicide, it's not written in
13 the policy, but the practice was that a scene report
14 should be prepared even faster in a homicide
15 investigation?
16     A  Correct.
17     Q  Okay. And with regard to homicides, scene
18 reports were to be created even faster, but overall this
19 policy still applied, which is that within 10 days you
20 were to submit supplementary reports and general
21 progress reports and notes that had been prepared so
22 far. Is that correct?
23     A  That is not correct.
24     Q  Okay.
25     A  Again --

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

134

1    Q    Yeah, go ahead.
2    A    Again, this would be appropriate for the file
3  or for a handout for a in-custody retail theft felony
4  upgrade.  For a homicide, this is not applicable.  Most
5  detectives would submit, for example, general progress
6  reports towards the end or at the end of their
7  investigation.  They might need them to reference.  They
8  might need them to help create the final report, which
9  could at times be quite lengthy.  So, this is definitely
10  on point for other investigations, but not for a
11  homicide investigation.
12    Q    Okay.  So, for homicide investigations, the
13  practice was typically to keep the general progress
14  reports or notes with the detective until the
15  investigation was completed, correct?
16    A    That would be the practice, not necessarily
17  so.  You could turn the progress reports in at any time
18  to be submitted to be held in the investigative file,
19  but it depends on if there was some utility in keeping
20  them.  As with homicide investigations, sometimes
21  there's a lot of notes.  Sometimes there's not a lot of
22  notes, but it would be a case-by-case basis.
23    Q    Okay.  And that was a practice that was
24  applicable to homicide detectives in terms of when they
25  would choose to turn in their notes, correct?

135

1    A    That is correct.
2    Q    Okay.  And there was no -- there's no policy
3  document that indicates that the policy's different with
4  regard to homicide detectives.  That was just a
5  difference in practice.  Is that correct?
6    A    Yes, it's not just a difference in practice,
7  it's a difference in practicality because if you're
8  talking a regular burglary report, even a robbery
9  report, any supervisor can review it, and understand it,
10  and comprehend it, and sign off on it.  Homicide
11  investigations are much more in-depth, so you would want
12  a homicide sergeant to review everything, sort of in
13  total.  You wouldn't want us to submit your GPRs to the
14  Sergeant Winstrom when your sergeant is Sergeant Swami-
15  Nathan, because you would have a better understanding of
16  what's going in.  So, this, although it doesn't say so
17  here, these requirements, those reporting requirements
18  are for other than homicide investigations.
19    Q    Okay.  And the requirement that applied to
20  detectives -- sorry.  The policy document says that
21  investigative steps that result in information learned
22  that needs to be documented, that should be documented
23  and submitted within ten days, correct?
24    A    All right.  Where are you reading?
25    Q    I'm talking about that same thing.  So, if we

136

1  look at -- where were we looking at here?  Yeah, here we
2  are.
3    A    So, can you scroll up to 8.3 just to see what
4  the title is?  Because I believe it's
5    Q    Conducting a field investigation.
6    A    Conducting a field investigation.  Yeah, okay.
7  All right.
8    Q    Okay.  So, when it said under the policy, once
9  a certain investigative step is taken and information is
10  learned that it's substantive or relevant, that's to be
11  documented in ten days.  That's the policy, correct?
12    MS. ROSEN:  Objection from.
13    A    Where -- I don't see that it says that.
14    Q    That's what I'm saying.  Doesn't this say --
15  doesn't this policy say here that -- where did we just
16  look at the ten-day requirement?  Okay.  L says, "Submit
17  to the watch supervisor within ten days of receiving the
18  assignment a complete packet of reports that includes
19  the following," right?  So, this policy says that within
20  ten days of performing the -- or doing the investigative
21  work, the policy is you're to submit the supplementary
22  report and related other reports.  Is that correct?
23    A    So --
24    MS. GOLDEN:  Object to form.
25    A    So, this is within ten days not of completing

137

1  some stuff.  This is ten days of completing the
2  assignment.  You may do -- you may submit a sup before
3  then.  This -- the expectation of this is within ten
4  days.  Generally, if you're given an assignment, you'll
5  be able to submit all this together.
6    Q    Okay.
7    A    Obviously, it wouldn't hold true for a
8  homicide investigation, but it would for a burglary,
9  most armed robberies, most any other thing.
10    Q    So, this is saying within ten days of when you
11  get assigned the matter you're to have submitted the
12  supplementary report and related documents?
13    A    That is correct.
14    Q    Okay.  And then looking at 8.7, this section
15  is reporting the results of an investigation.
16    A    Right.
17    Q    This indicates that on completion of the
18  investigation, but at no later than ten days after being
19  assigned a case, the detective will submit to the
20  supervisor the original case report, supplementary
21  report, and so on.
22    A    Okay.
23    Q    So, this portion of the policy requires that
24  detectives submit their supplementary reports within ten
25  days of completing those investigative steps, correct?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

138

1        MS. GOLDEN: Form.
2        MS. ROSEN: Objection. Form.
3    A   This is when the case is complete, so it's
4  completion of investigation. So, when you're closing
5  out your case, say I had a burglar, I made the arrest,
6  it's expected that I complete all of the paperwork
7  within ten days. And again, this does not hold true for
8  homicide investigations, which oftentimes the paperwork
9  could go -- could not be completed for weeks or even
10 months later. The expectation during this time, and
11 even to today in modern times, is that this paperwork
12 for homicide investigations be completed when
13 practicable, but the drop-dead date is when it is needed
14 for court.
15   Q   Okay.
16   A   So, when the court proceedings start, when
17 it's subject to subpoena discovery, that's when it
18 absolutely has to be completed by then.
19   Q   You just described to me was the practice with
20 regard to homicide investigation, correct?
21   A   Right. And again, I will concede that is not
22 how -- that doesn't compile this as written, but that's
23 been the practice since '86, and it's the practice
24 today.
25   Q   Okay. So, let me clarify those two points.

---

139

1  So, with regard to the policy, the policy was that
2  within ten days of completing the investigation with
3  charges the report should be submitted, correct?
4    A   I would argue that the understanding of, even
5  since I became a detective in 2005, was that this policy
6  does not apply. This particular policy does not apply
7  to homicides because it's not practical. And so, I
8  would say if you asked any detective, they would say the
9  same thing.
10   Q   Okay. So, the policy for non-homicide cases
11 was that detectives were required to submit the reports,
12 supplementary reports, and any related reports within
13 ten days of closing the case, correct?
14   A   Correct.
15       MS. GOLDEN: Object to form.
16   Q   And then for homicide cases, the practice was
17 different, correct?
18       MS. ROSEN: Object to the form.
19   A   For homicide cases, the detectives are
20 required to have their paperwork completed by the time
21 the paperwork is required for court purposes.
22   Q   Okay. Okay. And that difference in practice
23 is not documented in any policy, correct?
24       MS. ROSEN: Objection. Form.
25   A   It is not.

---

140

1    Q   Okay. I think we can take a little pause
2  right there. It's 1:00. Do we want to take like 20, 30
3  minutes from lunch? Mr. Winstrom, you want some grab
4  some lunch? However long you think you need.
5    A   Yes, please.
6    Q   Okay. You want -- is 30 minutes enough time?
7        MS. ROSEN: If that's -- if you're going to
8  have enough time -- if we take a 30-minute break and
9  you still think you're on track for being done at
10 5:00, 5:30, then that's fine.
11       MR. SWAMINATHAN: I think I'm on track, but I
12 would -- can we shoot for -- well, let's take --
13 I'll think we'll be fine if we take 30 minutes.
14 Let's keep it to 30. So, 1:30 we'll come back?
15       COURT REPORTER: Okay. We're going off the
16 record.
17       (OFF THE RECORD)
18       COURT REPORTER: We are back on record.
19 BY MR. SWAMINATHAN:
20   Q   Okay. Commander Winstrom, I want to go back
21 to the subject of supplementary reports for a moment. In
22 writing supplementary reports, were detectives expected
23 to write supplementary reports of their own work?
24   A   Well, that depends. The supplementary reports
25 could be what other people did or what they did.

---

141

1    Q   Okay. So, a detective could -- if a detective
2  did not conduct an -- let's say there's going to be
3  documentation of an interview that was done with a
4  witness. Okay? Could a detective write a supplementary
5  report for that interview if they were not one of the
6  detectives who participated in the interview?
7    A   They could potentially. Sure.
8    Q   Okay. So, that was accepted under the policy?
9    A   That is correct.
10   Q   And was that a common practice?
11   A   I don't know how common it was, but it
12 certainly wouldn't be against policy to do that.
13   Q   Okay.
14       MS. GOLDEN: I delay an objection to form.
15   Q   Were detectives trained that they could write
16 reports for interviews or other investigative steps
17 taken by other detectives?
18       MS. ROSEN: Object to form.
19   A   You said write reports. Is that correct?
20   Q   Yeah, write reports.
21   A   Yeah. Yeah. Certainly. Yeah.
22   Q   Okay. And in your mind, does it pose any risk
23 for one detective to write supplementary report about
24 somebody else's work?
25   A   My own opinion?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

142

1        MS. ROSEN:  Objection.  Form.
2        A    Yeah.  No, it depends on the circumstances.  I
3    mean, a lot of times detectives will write a GPR and
4    provide the GPR to the detective that's doing the report
5    writing, so they don't do any reports.  Or a lot of
6    times they'll say, "Hey, can you go knock on the door?"
7    And you just walk back in and say, "I knocked on the
8    door.  There's nobody home."  "Okay.  I'll put it on my
9    report."  So --
10       Q    Let's use the example of somebody being
11   interviewed, and so substantive information is going to
12   be reported about the interview of somebody.  Okay?  In
13   that circumstance, does it pose a risk for the
14   detectives -- for a detective to write, to document what
15   a witness said in an interview if a different detective
16   conducted the interview?
17       MS. ROSEN:  Objection.  Form.
18       A    So, there's no rule.  There's no rule to
19   taking contemporaneous notes while you're interviewing
20   an individual.  And it's at the discretion of the
21   detective, what they're comfortable with.  Sometimes
22   taking notes during an interview isn't the appropriate
23   thing to do, so whether that detective then told the
24   individual who's writing the report, the content of the
25   interview, or whether they wrote it down themselves is

143

1    just a -- could the interview have been eight hours long
2    and contained so much meaningful material that I'll get
3    it right, but you know, it would've made more sense to
4    write it down?  Potentially, but it would just depend on
5    the circumstances of the individual case.
6        Q    Generally speaking, would you agree that if
7    one detective writes a report of what a witness said in
8    an interview that that detective didn't participate in
9    it poses risks in terms of the ability of writing a
10   thorough and accurate report?
11       MS. ROSEN:  Objection.  Form.
12       A    I wouldn't call that a risk necessarily.  It's
13   just -- I mean, we -- not only detective work.  Police
14   officers have common knowledge sharing all the time like
15   when I have a -- be on a lookout for a red car.  I don't
16   know anything about the red car.  All I know is another
17   detective, another officer in another jurisdiction said
18   that this red car is involved in something.  So, it's
19   something that's very common to share information like
20   that, and it would be on a case-by-case basis, as I
21   said.  If it was a very in-depth interview that required
22   -- or that a conversation?  Hypothetically, but it's
23   just hypothetical.
24       Q    Would you agree that it's harder to write a
25   thorough and accurate report of an interview you didn't

144

1    conduct or participate in?
2        MS. ROSEN:  Objection.  Form.
3        A    I would only agree if the circumstances
4    dictated that it to be so.  It's very possible that you
5    can go interview someone, come out, and say, "Hey, Eric,
6    this is what happened," and I can write a complete and
7    thorough and accurate report about it.
8        Q    And the more detailed the interview, the
9    harder that would be, correct?
10       MS. ROSEN:  Form.
11       A    Potentially.
12       Q    And if a detective writes a supplementary
13   report about investigative work conducted by a different
14   detective, should the supplementary report be clear that
15   it was the other detective who conducted that step?
16       MS. GOLDEN:  Form and foundation.
17       Q    Go ahead.
18       A    If it's an important part of the narrative of
19   the case, sure.  If it's something that's insignificant,
20   it might not be.
21       Q    In other words, the supplementary reports
22   should -- supplementary reports are supposed to document
23   the investigation in chronological order, correct?
24       MS. ROSEN:  Object to form.  Withdraw the
25   objection.

145

1        Q    Go ahead.
2        A    They're supposed to document the investigation
3    in a clear order.  Whether or not that's chronological,
4    not all reports are done chronologically.
5        Q    Okay.  And supplementary reports should
6    identify who did the work, correct?
7        MS. GOLDEN:  Object to foundation.
8        A    Where that is an important aspect of the
9    report, then -- if it's an important aspect of the
10   report, it should be documented.  But these are all
11   hypothetical, so I'd have to talk about the actual
12   report to determine whether or not it's appropriate.
13       Q    Okay.  In it period from 1986 to 1998, I think
14   you indicated that detectives were trained on note-
15   taking.  Correct?
16       A    Detectives were trained.  Note-taking was part
17   of pre-service training.  Immediately prior to '86,
18   there was an in-service class.  Not immediately prior.  I
19   think in 1983, there was an in-service class once the
20   department introduced general progress reports, and so
21   that was something that existed from 1980.
22       Q    Okay.  When you say 1983 there was in-service
23   training, what do you mean by that?
24       A    So, sometimes changes are made in the police
25   department, it's something small and insignificant that

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

146

1   can just be told at roll call or handed out in a new
2   revised order. But sometimes there's major changes,
3   such as when recently we changed our entire use of force
4   policy. And back in the early '80s, we changed how we
5   documented homicide investigations or investigations, in
6   general, so that we retained all notes. Introduced to
7   something called the GPR, which is a general progress
8   report, which was just a one-page note-taking kind of
9   blank form that you could jot notes down. And because
10  it was a major change and something that the department
11  was concerned about, they held a in-service training for
12  all current detectives during that time. Similarly to
13  how they addressed our use of force changes recently.
14  And they had every detective come down headquarters for
15  half a day for a class to discuss it. So, this time
16  period is past when that happened, but since that
17  happened, the use of GPRs has been part of training for
18  detectives.
19      Q   Okay. So, after those changes in 1983, all
20  the detectives were required, including current
21  detectives, to come to the headquarters for training
22  sessions, correct?
23          MS. ROSEN: Object to the form.
24      A   Correct.
25      Q   And what the contents of that training?

147

1       A   I believe it was a three-hour training. It
2   was split with Legal Affairs and with the Bureau of
3   Detective's administrative office. That's it,
4   generally, put into effect.
5       Q   Okay. Did it include training on what
6   information should be included in those reports?
7       A   I -- you know, they say it did. I think the
8   goal of the training was to ensure that the change that
9   was put into effect was that all notes are retained in
10  investigative files and not the substance of those
11  reports.
12      Q   I see. So, training was focused on the use of
13  general progress reports and retaining general progress
14  reports, correct?
15      A   Correct.
16      Q   Okay. In terms of what information should be
17  put into notes, that was not part of the training,
18  correct?
19      A   It may have been. It was, I believe, a three-
20  hour block, and since the report itself was new, I'm
21  sure it was described, "Hey, this is what you can use it
22  for." But note-taking was never -- I mean, note-taking
23  was not a new thing that was being introduced. Notes
24  had been taken probably for decades or a hundred years
25  before.

148

1       Q   The -- what information was to go into
2   supplementary reports, that was not part of the
3   training, was it?
4       A   Correct.
5       Q   Okay. And was it part of the training that
6   detectives were required to document all of the
7   information they learned during the investigation?
8       A   I'm sorry.
9           MS. GOLDEN: Form.
10      A   Just to be clear -- I'm sorry, and just to be
11  clear, the previous question was in reference to that
12  specific 1983 training, correct?
13      Q   Correct.
14      A   Yeah. The 1983 training was not about
15  supplementary reports. It was just about note-taking.
16      Q   Okay. And then in the trainign, did it
17  provide any guidance to detectives about what they
18  should consider relevant or not relevant information?
19      A   I don't believe so.
20      Q   Okay. Did it provide any guidance to
21  detectives that they should document all the information
22  they learned during an investigation?
23          MS. GOLDEN: Object to form.
24          MS. ROSEN: In the notes?
25          MR. SWAMINATHAN: No, period.

149

1   BY MR. SWAMINATHAN:
2       Q   Did -- strike that. Was part of the training
3   instruction to the detectives that they should document
4   everything they learned during the investigation?
5       A   I don't believe so, but I haven't -- I don't
6   believe so.
7       Q   Okay. Have you seen any documents -- were
8   there any documents handed out in that training?
9       A   I believe that the department notice would've
10  been handed out in that training, which I have seen. I
11  think it's dated -- I don't know if it's an '82 series
12  or an '83 series. So, when we do things like that we
13  generally train with the policy at the same time, so the
14  policy would've been handed out, and would've been
15  reviewed, and discussed at the -- so, unless those
16  topics were included in the policy, I don't think it
17  would've been a topic of special.
18      Q   Other than the policy itself and the notice --
19  that was a notice of the superintendent, right? Is that
20  what you're referring to, the notice?
21      A   It may have been signed by the superintendent.
22  It may have been signed by the chief of detectives. You
23  know what? It probably was signed by the sup.
24      Q   Okay. So, other than that -- what did you
25  call it? I'm forgetting the name. Directive? What was

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

150

1    it called?
2        A    Department notice.
3        Q    Department notice.  I'm sorry.  Other than the
4    department notice and the policy document itself, was
5    anything else, any other documents used in that or
6    handed out in that trading?
7        A    Oh, boy.  I believe that the DPR itself was
8    handed out as an example, as it was a new form.  And I
9    don't believe there was anything else, but it may be
10   Legal Affairs handed out case law.  I don't know.  I
11   wish I would've been there.
12       Q    Have you seen any documents indicating that
13   anything was handed out other than, example, GPR, the
14   policy itself, and the department notice?
15       A    No.
16       Q    In that -- strike that.  In that training,
17   what were detectives told about -- were they trained on
18   what the purpose of notes were?
19       MS. ROSEN:  Are you talking about -- just so
20   that we're clear here.  Are you talking about the
21   training that occurred in '82 and '83, or are you
22   talking about the training that occurred post '86?
23       MR. SWAMINATHAN:  Yeah, that's -- I'm starting
24   with the '82 and '83 just -- i'm going to move to
25   the

151

1    '86.
2    BY MR. SWAMINATHAN:
3        Q    So, in that '82, '83 training, was there any
4    training given about what the purpose was of those GPRs
5    or notes?
6        A    Yes.  The whole training was about coming up
7    with a somewhat uniform way of note-taking because the
8    department had moved away from destroying notes and put
9    a policy in place that required retaining notes in the
10   investigative file.
11       Q    Okay.  So, after the '82, '83 training, was
12   there any subsequent in-service training with regard to
13   the investigative files policy?
14       A    After that training, the detectives who were
15   trained on it likely wouldn't have received another in-
16   service training like that.  As new detectives were
17   promoted, they would've received training on the use of
18   GPRs and retaining notes and investigative files in
19   their service detective training.
20       Q    After Special Order 86-3 had come out, was
21   there any in-service training?
22       A    Not that I'm aware of in the form that it --
23   in the same form that it took place as in having all
24   detectives come down to headquarters.
25       Q    Okay.  Go ahead.  Let me ask a question.  I

152

1    think you just said it.  What training, if any, was
2    given on 86-3 when it came -- when it went into effect?
3        MS. ROSEN:  Objection, form.
4        A    86-3, if you were already a detective,
5    would've been presented to you in a hard copy form at
6    the area and discussed at roll calls, and any changes
7    that were in place from 86-3 and its predecessor
8    would've been addressed.
9        Q    When you say discussed at roll call, what do
10   you mean?
11       A    Every day when detectives report for work,
12   they have to report to a supervisor, usually a Sergeant.
13   That Sergeant has, at the time, used what was called a
14   commanding officer book, a CO book, with important notes
15   of the day and includes such things as who has court.
16   And they would check attendance, and then if there was
17   anything that required addressing at roll call, any --
18   an order like that would come over with the knowledge
19   that it was to be read for seven straight days or five
20   straight days, so the Sergeant would say there's a new
21   revision to whatever it was revising.  "There's a new
22   order.  DDSO 86-3.  This is the change in it.  If
23   anybody has any questions, let me know."  That's roll
24   call training.
25       Q    Okay.  Once the new 1980 -- strike that.  After

153

1    -- between the -- strike that.  In the period from 1986
2    to 1998, for new detectives, they would get training on
3    the 86-3 policy over the subsequent standard operating
4    procedure during their sort of pre-detective training.
5    Correct?
6        A    Correct.
7        Q    Okay.  What -- in those trainings, in that
8    period from 1986 to 1998, what were detectives trained
9    was the purpose of notes?
10       A    Well, the purpose of notes, I'm sure if I had
11   the training to review, there's probably an actual quote
12   of what the purpose of notes is, but I don't have
13   memorized what the training would have been.  So, if you
14   asked me today what the purpose of notes was for
15   training, I would have to imagine something myself.
16       Q    Okay.  So, you don't -- as you sit here today,
17   you're not able to say what training detectives were
18   given on the purpose of note-taking?
19       A    Correct.
20       Q    Okay.  Were they given training about what are
21   the circumstances in which they need to take notes?
22       A    Yes.
23       Q    And were they trained were the type
24   circumstances to take notes?
25       A    Well, the training was it's a very useful tool

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

154

1 and that it can be extremely helpful in your
2 investigation.
3     Q   Were detectives trained that it was a tool
4 that could help them write their own accurate reports?
5     A   Certainly.
6     Q   Were detectives trained that it was a tool
7 they should use to write their own accurate reports?
8     A   I would stick with the word could.
9     Q   Okay.
10     A   Sometimes they -- if it was useful and a good
11 utility to them, they should.  But it depends on the
12 detective and on the specifics of --
13     Q   That they should never destroy their notes?
14     A   Correct.
15         MS. GOLDEN:  We have a belated objection to
16 foundation.
17         COURT REPORTER:  And I'm sorry to --
18     Q   Over the course of your career, would you say
19 you worked with or supervised potentially of hundreds of
20 detectives?  Okay.
21     A   Yeah.
22     Q   In -- over the course of your career, have you
23 worked with any detectives who did not ever take notes?
24         MS. GOLDEN:  Object the foundation.
25         COURT REPORTER:  I'm sorry, Counsel.  I did not

155

1 hear your witness's response.  Could you say that
2 again, sir?
3         MR. SWAMINATHAN:  I don't think he answered
4 yet.  I think he was thinking.
5         COURT REPORTER:  Oh, I'm sorry then.
6         THE WITNESS:  I did not answer.
7         COURT REPORTER:  My apologies.  I -- that's on
8 me.  Apologies.
9 BY MR. SWAMINATHAN:
10     A   I may have -- I guess I would answer it's
11 possible, but there -- I've worked with many detectives
12 who took a lot of notes and some who took next to no
13 notes.  I don't know if I could say for 100 percent
14 certain that few detectives ever wrote notes.
15     Q   So, sitting here today, you cannot say, "I can
16 recall any detective I ever worked with or supervised
17 who just never took notes."  Is that fair?
18         MS. GOLDEN:  Object to foundation
19         MS. ROSEN:  I'm going to object to beyond the
20 scope, also the 30(b)(6) notice.
21     A   Yeah.  It obviously would depend on what
22 they're spending their time doing.
23     Q   Sorry.  You said -- I don't think I understood
24 the answer.  Was that -- is that yes?  You -- let me ask
25 it again.  And I'll lead with a different question.

156

1 Sorry.  So, sitting here today you're --j are you able
2 to identify any detective you can recall from your
3 career who just had a policy of never taking notes?
4         MS. GOLDEN:  Object to foundation.
5     A   Yeah.  It's possible, but I can't think of any
6 by name.  I mean, it's -- as a supervisor, you get
7 reports to approve and many of the reports have GPRs
8 attached to them.  Many of the reports don't have GPRs
9 attached to them, so depending on if I had kept a
10 record, I guess I could make that determination, but
11 it's not something that would be easy to speculate.
12     Q   You said you took notes when you were a
13 detective, correct?
14     A   I did.
15     Q   You had partners while you were a detective,
16 correct?
17     A   I did.
18     Q   Your partners, did they all take notes?
19         MS. ROSEN:  I'm going to again object.  Beyond
20 the scope of the 30(b)(6) notice.  Commander
21 Winstrom's personal experiences are not relevant to
22 the topics that he's been designated for by the city
23 of Chicago line of inquiry.  Definitely not policy-
24 oriented at all.
25     A   I worked with detectives who would take notes,

157

1 and then I worked on detectives who would rely on others
2 to take notes, and I worked on detectives who shied away
3 from taking notes at all.
4     Q   Okay.  And the detectives who shied away from
5 taking notes, would you say that any of those detectives
6 were individuals who never took notes?
7     A   I don't know that -- I don't believe I could
8 possibly say for certain that a detective never took
9 notes.  At some point in time, there's probably going to
10 be a reason because you have to be really good at
11 memorizing numbers for -- a lot of times you'll need
12 birth dates and things like that.  I think it would
13 probably illogical to think.  However, when people work
14 in pairs, a lot of times one gets the default note-taker
15 role, so.
16     Q   Okay.  Do you remember the -- strike that.  Did
17 you work -- strike that.  During your time as a
18 detective partnership where neither detective took
19 notes?  The detective's other partner.
20         MS. ROSEN:  Objection.  Beyond the scope.
21         MR. SWAMINATHAN:  All right.
22         COURT REPORTER:  I'm sorry.  Counsel, could you
23 repeat that question again, please?
24 BY MR. SWAMINATHAN:
25     Q   Yeah.  I'll ask again then I'm going to move

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

158

1   on. So, during your time as a detective and as a
2   supervisor of -- do you recall any detective
3   partnerships where neither partner took notes?
4       MS. ROSEN: Objection. Beyond the scope.
5       MS. GOLDEN: And foundation.
6       A   And you're talking about through their whole
7   time? No. Not just for one particular instance, right?
8       Q   Yeah. Okay. Did you get the answer?
9       MS. ROSEN: And let me -- oh, sorry.
10      COURT REPORTER: Yes. Sorry, did I --
11      MS. ROSEN: Can we just take one minute? I
12  need to plug in my computer.
13      MR. SWAMINATHAN: Yeah.
14      MS. ROSEN: Okay. One second.
15      MR. SWAMINATHAN: The court reporter, did you
16  get the answer? No?
17      COURT REPORTER: Yes, sir. I got -- I believe
18  I did. Let me do it one more time. Said during the
19  whole time -- I'll do a playback before we go back
20  on, but I had -- I believe I got it. I've got you
21  on audio. Can you all hear me?
22      MR. SWAMINATHAN: Yeah.
23      COURT REPORTER: Perfect. Okay. Sorry about
24  that. All righty.
25      MS. ROSEN: Sorry about that, thanks.

---

159

1       MR. SWAMINATHAN: Okay. We're ready to keep
2   going?
3       MS. ROSEN: Yep.
4   BY MR. SWAMINATHAN:
5       Q   Okay. Sir, you were talking about some policy
6   changes and training the trading that took in 1983.
7   You've -- fair to say that that policy change and the
8   training that occurred, stemmed from events that
9   occurred in 1981, the case of George Jones?
10      A   It had to do with Jones. I think there was
11  another case, maybe Palmer.
12      Q   Palmer? Okay. And you saw in the amended
13  notice of 30(b)(6) deposition, you saw that some of the
14  -- one of the topics here today is that Jones Palmer
15  litigation and the policy changes that that came from
16  it, correct?
17      A   Yes.
18      Q   Okay. And so with regard to the Jones Palmer
19  litigation, would you agree that the issues that arose
20  in 1981 and 1982 related to the notes and file keeping,
21  were issues that were made aware to the top officials in
22  the Chicago Police Department?
23      A   Yes.
24      Q   It was addressed all the way up to the
25  superintendent level, correct?

---

160

1       A   Correct.
2       Q   Was addressed with the chief of detectives,
3   correct?
4       A   Correct.
5       Q   Superintendent and chief of detectives were
6   involved in the policy making around the issues that
7   came up in 1981 and 1982 related to notes and file
8   keeping, correct?
9       A   Correct.
10      Q   Okay. And in fact, the superintendent
11  testified in the Jones Palmer litigation, correct?
12      A   Correct.
13      Q   Okay. And ultimately it was the
14  superintendent and chief of detectives who were involved
15  in the ultimate policies that were put in place in 1983
16  related to investigative files, correct?
17      A   Correct.
18      Q   And they were involved in the setting of those
19  policies in 1983 that continued in the form of the
20  1986-3 [sic] special order and subsequently the standard
21  operating procedures, correct?
22      A   Correct.
23      Q   Okay. And the policies around ensuring that
24  investigative files were being disclosed -- the policies
25  around ensuring that notes were being retained at around

---

161

1   file keeping as set forth in those 86-3 and standard
2   operating procedures. Those are policies that have
3   continued to be on the radar of the superintendent and
4   senior officials of the detective division, through 1986
5   through 1998; is that true?
6       MS. ROSEN: Objection to the form.
7       A   I can -- I mean, I guess I can't speak to the
8   other superintendents, but I could say that the policy
9   stays in effect.
10      Q   Okay. And the policies provided specific
11  instruction for -- strike that. The policy, would you
12  agree, from 1986 through 1998 related to investigative
13  files, claim specific requirements at the commander
14  level, for responsibilities that they had with regard to
15  those issues, correct?
16      A   Correct.
17      Q   And was it the responsibility of the
18  commanders to report to the chief of detective?
19      A   At this period of time, the commanders
20  reported, I believe to a field group, deputy chief.
21      Q   Okay. And then from there, who did they
22  report to?
23      A   Field group deputy chief would've reported to
24  the chief of detective.
25      Q   And chief of detectives reported to the

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

162

1 superintendent?
2 A Chief of detective likely reported to the
3 deputy superintendent of administrative services at the
4 time.
5 Q Okay. Yeah. If -- in cases during the time
6 period from 1986 to 1998, if there were instances in
7 which it was learned that information had not been
8 turned over to the criminal justice system, essentially,
9 if there had been a Brady violation. Is that
10 information that would get to the commanders?
11 MS. GOLDEN: Object to form.
12 A So during this time period, if there was a
13 Brady violation would that information, get to the
14 commanders?
15 Q Yep.
16 A It would.
17 Q And if that occurred -- I'm sorry. If that
18 occurred, would the expectation that in cases where that
19 occurred, detectives would be -- detectives involved in
20 the case or that occurred would be communicating that
21 information off the chain?
22 MS. ROSEN: Object to the form.
23 A Yeah, I guess as you're saying if they were in
24 court and the judge told them, "Hey, this is Brady
25 violation." Were they expected to go back and tell

163

1 somebody?
2 Q Yeah. In other words if it gets -- in a case
3 where a detective was, you know, the lead detective
4 involved in the investigation and you know, obviously
5 works with the prosecutors in the criminal prosecution,
6 right? And their job is to come to trial and prepare to
7 testify in that case right? And if ultimately it turns
8 out the case is dismissed or some other problem, or you
9 know, otherwise there's an acquittal or whatever it is,
10 that result from a Brady violation then that would be
11 known to the detective, right?
12 MS. GOLDEN: Object to form.
13 MS. ROSEN: Foundation. What's the foundation
14 for that? That it would be --
15 Q So let me ask in a different way. If the
16 detective -- in a case where a detective involved and
17 there's a Brady violation. Okay? The added information
18 that detective might learn because they're involved in
19 the investigation itself, right?
20 MS. ROSEN: Objection. Form.
21 A You mean at court, like they would be told at
22 court there was a -- I mean, if they were told at court,
23 they'd be told at court, just being a part in an
24 investigation, I don't know that they would become aware
25 of it.

164

1 Q Detectives would work -- in a criminal
2 prosecution once there's been charges, detectives work
3 and communicate regularly with the prosecutors involved
4 in those prosecutions, correct?
5 MS. ROSEN: Objection, form. Foundation.
6 A Prosecution is moving forward unless there's
7 a, you know, an immediate plea, if it's actually moving
8 to trial at some point in time, detectives would be
9 involved.
10 Q Okay. And so prosecutor communicate directly
11 with the detectives who are involved in an investigation
12 that's being prosecuted, correct?
13 MS. GOLDEN: Objection. Form.
14 A The detectives may or may not communicate
15 directly with the prosecutor. Now, if it's to the point
16 where it's actually going to trial and they're expected
17 to testify, they would likely be called the 26 and Cal
18 notified within a court notification. And it would
19 appear in 26 and Cal and likely interact prosecutor at
20 some point in time prior to testifying.
21 Q And so that's another mechanism by which --
22 they might hear from the prosecutor if the judge ruled
23 that there's been a Brady violation case, correct?
24 MS. ROSEN: Objection, form. Foundation. Calls
25 for speculation. Also, I think beyond the scope of

165

1 the 36 notice.
2 BY MR. SWAMINATHAN:
3 A So I would say it's possible.
4 Q In -- where a detective learned that a case
5 has been suspended or has been, otherwise there ruled as
6 a Brady violation, with that information detectives were
7 expected to pass up the chain to their sergeants and
8 other supervisors?
9 A It would depend on the certain circumstances.
10 We are required by rule 22 to disclose. If you're
11 saying, if there's some allegation of actual misconduct,
12 our members are required to report misconduct. I don't
13 know if there's violation, that's accidental or a
14 technicality or something, if that would necessarily get
15 around, or if either the prosecutor would've pulled
16 away, this would definitely depend on actual specifics
17 of the case we're talking about.
18 Q Let's see. Would that been on the screen
19 here. Let me check.
20 MS. ROSEN: We're up to four?
21 MR. SWAMINATHAN: I think we're up to four.
22 Yeah.
23 COURT REPORTER: We are at four.
24 BY MR. SWAMINATHAN:
25 Q I'm showing you a document marked as Exhibit

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

166

1    4, Bates stamp RFC Solache Reyes 118094 through 118096.
2    And at the top it says, Chicago police training division
3    course lesson plan. Sir, is this one of the documents
4    you reviewed in preparation for today's deposition?
5         (EXHIBIT 4 MARKED FOR IDENTIFICATION)
6    A    I've seen this before.
7    Q    Okay. This is a essentially a document that
8    was used in the training of detectives, correct?
9    A    Correct. If possible -- would it be possible
10   to make it a little bigger?
11   Q    Yep. That big enough or a little bigger?
12   A    Yeah. That's okay. I'm familiar with this.
13   Q    Okay. And in this training that was provided
14   to detectives, with regard to application of the
15   standard operating procedures around investigative
16   files.
17        MS. ROSEN: Object to the form. Flip through
18        the rest of it, so we can see what it is.
19        MS. GOLDEN: Did you say investigative files or
20        staff reports?
21   BY MR. SWAMINATHAN:
22   Q    Oh, I said investigative files, but I did mean
23   staff reports. So is this the policy -- strike that. Is
24   this -- was this training -- maybe a better one. This
25   training it references the detective division SOPs. Do

---

167

1    you see that?
2    A    Yes.
3    Q    Okay. So what detective division SOPs was
4    this training supposed to be about?
5    A    What number it is would have to flip through,
6    but I can tell you what the training's about.
7    Q    Okay. So tell what the training is about.
8    A    Okay. So it's a violent crimes format. So
9    when you lead a case as a detective, for example, let's
10   say it's a unsolved retail theft, somebody ran out the
11   door with a pack of toilet paper. It's a low level
12   crime. You are expected to investigate it, but you're
13   not expected to produce a lengthy report because it's
14   probably not needed. So this is for violent crime
15   format. And format is a term that we use to describe
16   when a detective is going to document in the narrative,
17   certain things, for example, daytime location of
18   offense, victim, property, evidence suspect. So there's
19   different formats, for different crimes. An arson
20   format, a missing person format would be different than
21   a homicide format. So this is a violent crimes format,
22   which could be used for a shooting, potentially a murder
23   and others. And that's what this is teaching, what
24   needs to be included and why you need to do a full
25   format for certain crimes.

---

168

1    Q    Okay. But this ultimately -- this training is
2    ultimately with regard to the supplementary report
3    writing to violent crimes cases. Correct?
4    A    Correct.
5    Q    Okay. And that includes homicides, correct?
6    A    Correct.
7    Q    Okay. And this -- what is the period of time
8    which this training was given? Strike that. I guess
9    the other easy way to maybe consistent with this 36
10   notice is, was this training in Exhibit 4, training that
11   was provided to detectives in the period from 1986 to
12   1998?
13   A    Yes. This is. If not this exact training,
14   something similar.
15   Q    Okay. And this training is training that
16   would apply to homicide investigations and report
17   writing homicide investigations, correct?
18   A    Yes.
19   Q    Okay. Showing you a document, marked as
20   Exhibit 5. This is RFC Solache Reyes 117714 through
21   117723. Its title is, detective division training,
22   lesson plan, supplementary report writing. You see
23   that, sir?
24        (EXHIBIT 5 MARKED FOR IDENTIFICATION)
25   A    I do.

---

169

1    Q    Okay. And is this training that was provided
2    to detectives at a period from 1986 to 1998?
3    A    Yes.
4    Q    Okay. And when is this training provided? Is
5    it part of the pre-training for detectives or is it a --
6    is it something that's done as part of their sort of
7    ongoing training? When is it provided?
8    A    In pre-service detective training.
9    Q    Were there other -- was there other training
10   that was given with regard to supplementary report
11   writing other than this one, in that pre-service
12   training?
13        MS. ROSEN: Object to the form.
14   A    Other than this one, the one before. I mean,
15   supplementary report writing is discussed several ways.
16   They would've, for example, when they're taught about
17   missing persons, they would've an opportunity as a
18   practical to write a missing persons report. When
19   they're taught about burglaries, they'd have an
20   opportunity to write a burglary supplemental report. So
21   supplemental report writing is something that is
22   addressed many different days of pre-service.
23   Q    Showing you a document I marked Exhibit 6,
24   this is RFC Solache Reyes 117964 through 117972. And
25   the title is, homicide data format. Sir, is this

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

---

170

1  training that was provided to homicide detectives from
2  the years 1986 to 1998?
3          (EXHIBIT 6 MARKED FOR IDENTIFICATION)
4      A   It's -- so this is an example of a format. I
5  don't know if it necessarily would've been -- let me
6  see. I think this is the actual very long procedure. So
7  that's the actual format. It might have been discussed
8  with the other format, but less of a training and more
9  of the actual tool you would use. So you would -- this
10 is more of a material of reference that you would use
11 when you're actually filling out the format. You look to
12 that to fill in the boxes were appropriate.
13     Q   This was part of -- this was part of the
14 training, a tool or a handout that was part of the
15 training. Is that right?
16     A   Right. It may have just been provided as you
17 kind of, here you go. It's not -- it's just because
18 it's self-explanatory. It's not -- they wouldn't
19 necessarily have to go in and talk about, let's talk
20 about the sibling interviews, you know and stuff. So
21 it's more of, "Hey, here's a tool for you to use when
22 you're reporting on homicide."
23     Q   Showing you a document marked as Exhibit 7,
24 RFC Solache Reyes 118000 through 118006. Titled -- the
25 title, it just says, cleared exceptionally and street

---

171

1  files. Are you familiar with this document?
2          (EXHIBIT 7 MARKED FOR IDENTIFICATION)
3      A   I have reviewed it.
4      Q   Okay. And the first part of this talks about
5  exceptionally clear cases, that's not relevant to our
6  discussion. I will skip that. Part three of this
7  document, starting on RFC Solache Reyes 118004 talks
8  about street files. Do you see that?
9      A   Yes.
10     Q   A says, "show the Peter Carl film," what is
11 that?
12     A   I am unfamiliar with that.
13     Q   This document, was this part of detective
14 division training in some way?
15     A   It was. This was used as guidelines for the
16 instructor. This is actual instructor materials.
17     Q   Okay.
18     A   So you wouldn't say show the Peter Carl film.
19 He would look at this and be like, "Oh, this is where I
20 show the Peter Carl film."
21     Q   Okay. So this is sort of a -- does it provide
22 some sort of roadmap for what the instructor is teaching
23 in the training?
24     A   Correct.
25     Q   Okay. And when was this the training or was

---

172

1  the instruction was given about these files? Where was
2  it occurring? Was it the 1983 training? Was it the
3  subsequent in-service training or? I mean, that in-
4  service training or was it subsequent, you know, pre-
5  detective training? When is this -- when was this used?
6      A   This curriculum is from post 1983. Pre-
7  service detective training.
8      Q   Okay. So this was what sort of got
9  incorporated into the pre-service detective training
10 after the incident training that occurred in 1983,
11 correct?
12     A   That is correct.
13     Q   Okay. And this information was part of the
14 training throughout the period from 1986 through 1998,
15 correct?
16     A   Correct.
17     Q   Okay. I'm showing you a document I have
18 marked as Exhibit 8. This is RFC Solache Reyes 118090
19 through 118093. And the title is -- it's a memo that
20 says, "to the director of the training division from the
21 commanding officer" and it references in-service
22 detective division investigating file training program
23 and dated January 13, 1983. Do you see that, sir?
24         (EXHIBIT 8 MARKED FOR IDENTIFICATION)
25     A   Yes.

---

173

1      Q   Can you tell us, is this a training that was
2  provided to detectives with regard to investigate files?
3      A   Yes. Yes. This is the in-service training
4  from 1983 that I referenced, that all active detectives
5  were required to attend in-person.
6      Q   Okay. So this is the training that was done
7  in 1983 when the detectives all came to headquarters
8  based on the Jones Palmer case, correct?
9      A   That is correct.
10         MR. SWAMINATHAN: I am pulling up a document.
11 We're up to nine, right?
12         COURT REPORTER: Yes, sir. We are.
13 BY MR. SWAMINATHAN:
14     Q   Right. I'm showing you document that marked
15 Exhibit 9, it's Bates stamp RFC Solache Reyes 117962
16 through 118398. I'm just going to ask you for one specific
17 piece of this, but can you tell us what this document
18 is?
19         (EXHIBIT 9 MARKED FOR IDENTIFICATION)
20     A   This is more training material used in
21 in-service training, to teach case reporting to
22 detectives. Pre-service detectives.
23     Q   This is pre-service detective in-service
24 training, correct?
25     A   Yes.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

174

1    Q    And is the training that was provided in the
2  series from 1986 to 1998, correct?
3    A    That is correct.
4    Q    All right.  Up to 118076, necessary changes to
5  proposal is implemented.  And then it has a section on
6  concerns and resolution.  You see that?
7    A    I do.
8    Q    What is this session about?
9    A    I have no idea.
10    Q    Okay.  What is, this next page 118078?
11    A    You scroll to the top there.
12    Q    Concerns and resolution and it says
13  operational effectiveness and efficiency.
14    A    Yeah.  This -- so this material, which
15  would've been -- it was located within all the training
16  material that I located for a previous case.  And so
17  it's grouped in there, but I don't know what this has to
18  do with the training material and.
19    Q    Okay.  And do you have any understanding of
20  whether this -- do you know, whether this is something
21  that was included as part of the actual training for
22  detectives in pre-service training?
23    A    No, I'm certain it wasn't because this all has
24  to do with workflow of paperwork at the time, mostly in
25  district law enforcement.  So it doesn't really pertain

175

1  to detective operations.
2    Q    Okay.  And does this pertain to by the work of
3  the subpoena service units at all?
4    A    I suppose it could touch it -- it could touch
5  on it, but this isn't -- it pertains to records, which
6  during this time everything was paper.  So literally
7  almost any report that you did pertained to records and
8  the subpoena unit was organized under records made --
9  you know.  Partly for efficiency because they were
10  there, they easily could obtain the records because they
11  were in the same unit, but it wasn't -- you know, this
12  isn't specific to the subpoena unit.  This is just
13  moving reports around the police department, as far as I
14  can tell.
15    MR. SWAMINATHAN:  Okay.  I have a couple of
16  pages on my end that did not print, so I need to
17  print those.  Let me take a five minute break
18  anyway.  And I'll be right back.
19    COURT REPORTER:  Okay.  We are going off the
20  record.
21    (OFF THE RECORD)
22  BY MR. SWAMINATHAN:
23    Q    Okay.  Commander, under the orders regarding -
24  - strike that.  Under the policies in place regarding
25  investigative files, for 1986 through 1998, under the

176

1  policy by design, there were documents related to
2  homicide investigations that were in different places,
3  correct?
4    A    In -- now you said in as far as the policy or
5  do you mean in practical matters different documents are
6  located in different units?
7    Q    Yeah.  I think understand your confusion so
8  let me try to clear up.  So in that period from 1986 to
9  1998, was it the case that documents related to a given
10  homicide investigation were housed these different
11  places within the police department?
12    A    Yes.
13    Q    Okay.  So some of the investigate -- some of
14  the documents related to a homicide investigation were
15  in the investigative file itself at the area, which
16  we've talked about, right?
17    A    Yes.
18    Q    And then additionally documents related to the
19  same homicide investigation.  There were some items in
20  the record division, correct?
21    A    That is true.
22    Q    In what file were the records division?
23    A    The records division, they would maintain the
24  RD file.  What the RD file would contain -- would be
25  copies of the general defense case report, which would

177

1  also be in the investigative file.  The detective
2  division supplementary reports.  Likely the crime scene
3  processing report, but it would not have the GPR or
4  notes in it though.  So, but
5    Q    So by design there were documents that would
6  be the investigative file that are not in the record
7  file, correct?
8    A    That's correct.
9    Q    And another name for the records division file
10  or RD file is permanent retention file.  Correct?
11    A    I have heard of it referred to that.  I've
12  probably have referred to it myself.
13    Q    And is it also the case that there are
14  documents that would be in the permanent retention file
15  that may not be in the investigation file?
16    A    Probably the only example of that would be the
17  -- no, crime scene processing report would be in there
18  too.  So I don't think that there'd be anything in the
19  RD file that wouldn't be in the investigative file.
20    Q    Other than the RD file and the investigative
21  file, what are other places where that needs to be for a
22  single homicide investigation?
23    A    Well, depending on the facts of the case,
24  there could be something -- for example, if a car got
25  towed, there could be a something in the auto pound

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

178

1   section.  There could be forensics -- they have
2   documents regarding evidence and also photographic, like
3   negatives.  If possible, if the -- if there's a police
4   officer offender, there could be a prepared file too.
5   And most of the stuff is in the investigative file, but
6   depending on the specifics of cases, you see where you
7   would look.
8      Q   Okay.  Photos, you said, could be the forensic
9   division; is that correct?
10     A   Yes.  And during this time period, it may have
11  changed names.  It might be the crime lab.  It might be
12  the crime processing unit, but it would probably be
13  off-site there.  Yeah.  The least if there was a
14  homicide there would probably be negatives, stored
15  there.  Even if pictures would be stored in the --
16     Q   You cut out at the, if the pictures would be
17  stored in the
18     A   Even if the pictures were in the investigative
19  file, the negatives wouldn't be in there, the negatives
20  would be housed at the photo lab over in the forensic
21  section.
22     Q   Okay.  Now, is it the case that pictures were
23  always in the investigative file or was it the case that
24  sometimes you have to get those from the forensic
25  division or whatever name you called it then?

179

1         MS. ROSEN:  Objection, form.  Say as to what
2   you're referencing, when you say.
3      A   Yeah, I would be hesitant to say that they
4   were always in the investigative file, but generally
5   speaking by the time -- if it was going to court,
6   generally speaking by the time.
7         COURT REPORTER:  I'm sorry.  Counsel, did the
8   witness cut out for you as well?  I'm sorry,
9   Counsel. One moment, please.  Bear with me.  I
10  apologize.  Okay. Counsel, I didn't catch the
11  witness' last statement made on the record.  You cut
12  out for a second.
13        MR. SWAMINATHAN:  I think he asked about --
14        COURT REPORTER:  Good.  I think he said last
15  that he was hesitant and that was the last word I
16  captured.
17        MR. SWAMINATHAN:  Okay.
18        MS. ROSEN:  And what was the question?
19  BY MR. SWAMINATHAN:
20     Q   The question was where was the -- strike that.
21  Crime scene photos, the originals of those were in the
22  forensic division.  Is that correct?
23     A   Okay.  And the negatives would be in the
24  forensic division, the photos themselves, if they
25  printed off one copy or two copies, they may have a copy

180

1   there.  But it generally would be included.  The thing I
2   said I was hesitant to say, was, always in the
3   investigative file.  Depending on the timing and at the
4   time things weren't digital.  So it wasn't an
5   instantaneous thing.  It was actually the development
6   lab that did it, so.  But generally speaking the photos
7   as well would be in the investigative file.
8         MS. GOLDEN:  Excuse me, excuse me.  One second.
9   I would like to lay an objection to form and
10  foundation.  I just didn't want to interrupt the
11  witness.
12     Q   And there were photos that are at the line-up
13  taken.  Would those be in the forensics division?
14        MS. GOLDEN:  Object to foundation.
15     A   Now we're talking about the line-up in a
16  homicide investigation, correct?
17     Q   Yes.
18     A   Okay.  So those would all -- so the negatives
19  would be in the forensics division and it's likely that
20  a copy of the pictures would be included in the file. As
21  I said, it was a slower process at the time so I would
22  be hesitant to say always, but normally they would be
23  made available for court.
24     Q   And if you wanted to make sure that you would
25  receive all of the photos, whether they're crime scene

181

1   photos, line-up photos, or otherwise, for a case you
2   would need to make sure you get them from the forensics
3   division, correct?
4         MS. GOLDEN:  Object to form and foundation.
5      A   Okay.  Well, there's other ways to ensure that
6   the case -- if you were familiar with the case you could
7   -- and if it was the state that was looking to get them,
8   they could talk to the detective or just look at the
9   report and look at the report and determine, "Hey, what
10  photographs were taken?" and maybe they'd be able to
11  tell that they had them all.  But you certainly could
12  request them under that RD number.  "Give me all photos
13  from front," and you could get them that way, as well.
14  That's not the only way to get them.
15     Q   And if there were arrest reports related to
16  the investigation, the homicide investigation, where
17  would those be?
18        MS. ROSEN:  Objection to form.
19     A   The arrest report would actually be located in
20  several different places, one of which would be the
21  investigative file, one of which would be the court,
22  because you would send the arrest report with the body
23  to court.  One of which would be in the records division
24  because a copy will go to the records division.  And I
25  feel like I'm missing one, but it would definitely be --

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

182

1   well, the definite one is definitely would be in court
2   with the body.  It would likely be in the investigative
3   file and the records division has a permanent copy of
4   every arrest report really ever made.
5        Q   And if you wanted to get specialized units
6   that were involved in the investigation, where would
7   those files be?
8        A   Generally, if they were pertinent to the case,
9   they would also be included in the investigative file.
10  I'm trying to think of an investigative unit that might
11  have something pertinent that wouldn't be.  Maybe if you
12  got the marine unit to do something.  I mean, as a
13  detective, generally speaking, if it's -- you would put
14  it in the investigative file, but I guess if it was
15  something technical like the helicopter or the marine
16  unit, potentially, depending on the case.  If I had a
17  case in front of me with some quirky aspects to it, I
18  might be able to tell you where else to look.
19       Q   If there was an arson unit, for example, was
20  involved, you maybe get files you do not consider
21  before, right?
22       A   Correct.
23           MS. ROSEN:  Objection to form and I'm thinking
24  beyond scope of the 30(b)(6).
25       A   That's a good example because arson is a UCR

---

183

1   that's sent from the UCR hierarchy rule, so that
2   requires a separate report altogether, so that would --
3   yeah, that would also be a place I would look for that
4   in such a case.
5        Q   And if gang crime officers were involved there
6   could be documents relating to the gang crimes unit,
7   right?
8        A   Correct.
9            MS. GOLDEN:  Objection to form and foundation.
10           MS. ROSEN:  And beyond the scope of this
11  30(b)(6).  That's specifically negotiated out of
12  this 30(b)(6), though.
13       A   So gang crimes is a different type of
14  scenario.  For example, I have many teams that work for
15  me now and they work for me, so it depends on what year
16  you're talking about, who they were organized under, and
17  what the function was at the time.  Their documents
18  could go directly into the file.  So I'd have to know
19  more about the circumstances.
20       Q   And from 1996 to 1998, would those always be
21  in the investigative files?
22           MS. GOLDEN:  Same objections.
23           MS. ROSEN:  And same, it's beyond the scope of
24  the 30(b)(6) notice and he's not prepared to answer
25  these questions.

---

184

1        A   Same answer, I don't know.
2        Q   Okay.  In terms of the youth investigators,
3   would they have documents in their own set of files?
4            MS. GOLDEN:  Object to foundation.
5        A   Not for homicide, if that's the question.
6   Youth investigations was organized during this period of
7   time under the bureau of detectives, so there wouldn't
8   be a separate -- they wouldn't like maintain a separate
9   parallel file or anything like that.
10       Q   Okay.  If you had a case where -- strike that.
11  If you have a case where there's parallel investigations
12  related to the arson investigations so, for example in
13  the homicide case there's a file and there was the
14  kidnapping component, correct?
15       A   I --
16           MS. GOLDEN:  Object to form.
17       Q   And I believe the kidnapping might have had
18  its own RD number for some period of time.  Did you see
19  that in the file?
20           MS. ROSEN:  Objection to form and misstates the
21  record.  That's not at all what is related here.
22       A   I recall seeing a couple of MRAIs and I saw --
23  I didn't know -- you know, it's my fault that I didn't
24  see that the UCR was kidnapping.  I thought it was a
25  missing person's report.  Either way, once the

---

185

1   individuals were located, that would've been merged into
2   the homicide file.  There wouldn't be like something,
3   like, you know, ongoing investigation for the kidnapping
4   or the missing, the MRAI was wrapped into it too.  It
5   all became one investigation.
6        Q   When you say MRAI, what are you referring to?
7        A   Sorry.  A Minor Requiring Authority
8   Intervention.  Authoritative intervention is a form that
9   we use when a child is taken into custody by the police
10  department and needs to be placed like overnight, either
11  with DCFS or some other safe home.  And those are
12  completed by, usually by youth officers so --
13       Q   And what was the process for -- strike that.
14  In terms of producing documents to the criminal justice
15  system from an outside investigation, what was the
16  process for doing that?
17       A   Okay, so there's --
18       Q   Moving forward and from 1986 to 1998.
19       A   Okay, and we're talking about a murder.
20           MR. SWAMINATHAN:  Okay, yeah.
21           MS. ROSEN:  Yeah.  We're getting feedback, too.
22           THE WITNESS:  How about now?
23  BY MR. SWAMINATHAN:
24       Q   Okay.  Gone now.  Okay.  In the period from
25  1986 to 1998 for homicide investigations, what was the

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

186

1   process by which documents from the homicide
2   investigation would get disclosed to the criminal
3   justice system?
4       A    Two ways.  The first way is through the
5   subpoena process, which I can describe to you.
6   Essentially, the subpoena gets delivered to police
7   headquarters.  It gets delivered to the subpoena unit.
8   Subpoena unit examines it, makes a determination what
9   unit would have response of record.  Send it through the
10  police mail to that unit, which is required to fulfill
11  the request and send it back to the subpoena unit.  And
12  then the subpoena unit sends the completed subpoena
13  returnable to the court, not to the requester.  And then
14  the second process is oftentimes state's attorneys would
15  request detectives to bring the files to court with them
16  so that they could make photo copies in a more efficient
17  manner.
18      Q    So basically in this period there was a formal
19  process using subpoenas and an informal process of the
20  prosecutor reaching out to detectives, right?
21          MS. ROSEN:  Object to the form.
22      A    I would say they're both formal.  Even to this
23  day, it's -- although it could have been made to be
24  informal, they're an officer of the court, it's part of
25  the criminal justice system, we, in fact, oftentimes

187

1   will make it a formal court notification that Detective
2   Winstrom is to report to the courtroom, whatever, with
3   the file because the state's attorney requested.  So
4   we'll comply with that if they request it.  I would say
5   it is -- they're both formal.
6       Q    Okay.  Did the process of disclosing the
7   documents from a homicide investigation to the criminal
8   justice system change at all in the period from 1986 to
9   1998?
10      A    No.
11      Q    Okay.  And so throughout the period from 1986
12  to 1998, the policies we're going to be talking about
13  here remained the same, correct?
14      A    Correct.
15      Q    And the process remained the same, correct?
16      A    Correct.
17      Q    All right.  So when -- let's start with the
18  subpoena, the formal -- let's start again.  When a
19  subpoena would come into the -- you said into the
20  records division, correct?  When it would be taken to
21  headquarters, sorry.
22      A    If it's delivered to headquarters, it's as
23  simple as if an attorney or a process server walks off
24  the street and tries to hand it to the front desk.
25  They'll say that there's the subpoena window over there

188

1   and they can drop it off and that's how it gets started.
2   Still to this day, that's how it works.
3       Q    But you had said it goes through that.  It's
4   called a subpoena service unit.  Is that right?
5       A    Well, today we just call it the subpoena unit,
6   but it was probably called subpoena services at the
7   time.
8       Q    Okay.  And then the individuals -- and then
9   who are the individuals who are responsible for then
10  taking that subpoena and getting the documents gathered?
11      A    There's a group of anywhere from six to eight
12  individuals who act as clerks.  Over the years, it would
13  be a mix of civilians and sworn and they would be
14  supervised by one or two sergeants assigned to the
15  records section.
16      Q    The clerks -- if the clerks are civilians, I
17  take it that means that they are not people who had
18  previously served as Chicago police officers in any
19  capacity, correct?
20      A    Most likely that is correct.
21      Q    Okay.  And in the period from 1986 to 1998,
22  was it civilians who were working as clerks in the
23  subpoena unit, or were there also sworn officers?
24      A    It was a mix.
25      Q    Okay, and then the individuals who were in

189

1   that unit -- the person that would be assigned a
2   specific subpoena would be the individual responsible
3   for gathering the material.  Is that correct?
4       A    That is correct.
5       Q    Okay.  And then what was the process for them
6   to then go about gathering the materials that exist in
7   the various places for the homicide investigation?
8       A    The process is for the individual to read the
9   subpoena and to make a determination by the contents of
10  the subpoena of where that subpoena should be delivered
11  to via police mail, to obtain the records needed, and
12  put it in police mail and send it off.
13      Q    So the decision on where to go to gather the
14  records would be made by the subpoena clerk, correct?
15      A    Exactly.
16      Q    And the clerk would make the determination
17  about where they needed to gather materials from by
18  reading the subpoena itself.  Is that right?
19      A    That is correct.
20      Q    Okay.  And then would they rely on any other
21  information in terms of determining where they needed to
22  gather materials from?
23      A    Information from, at a minimum, that general
24  classification report, would be available to them.  So
25  for example, if it was a very vague subpoena that just

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

190

1  said any and all records from RD Adam Adam 123456,
2  that's a very vague request.  However, because they work
3  in the records unit, the actual record of that RD number
4  is available to them so they could then look and see,
5  you know, for example, "Oh, that's a traffic crash
6  report.  I know I have to send it to major accidents,"
7  or whatever.  Or, they could see it's a homicide report,
8  so send it to the detective division.  Regular places
9  that they would send it to.  The more specific the
10  subpoena is the simpler it would be, and if it's a very
11  specific subpoena, they wouldn't have to go through that
12  process.
13      Q    Okay.  So would you agree that in your
14  experience in homicide cases, in particular, the
15  subpoenas that would come in were typically sort of
16  broad subpoenas saying, "Give me all of the documents
17  related to this homicide investigation"?
18      MS. ROSEN:  Objection, form.
19      A    I would say the opposite because generally the
20  attorneys dealing with homicides are more experienced
21  attorneys who deal with the Chicago Police Department on
22  a regular basis.  So in my experience, those are the
23  easier ones to get because they know exactly what
24  they're looking for and they ask exactly what they want.
25      Q    Okay.

191

1      A    And it would be more likely the personal
2  injuries attorneys who aren't used to dealing with the
3  police department who would send a subpoena over just
4  for an RD number, any and all records, kind of thing.
5      Q    So when you have a subpoena in a homicide
6  investigation, the subpoena clerk, when they get that,
7  is making the determination of where to get a record
8  based on the face of what's requested on subpoena, and
9  you're saying they might additionally be able to get a
10  general classification report to help them determine
11  where they need to get the documents from, correct?
12      A    And if there's any gray to it, that general
13  classification report is available to them and it's
14  possible because they do maintain the RD file, if it's
15  an advanced homicide investigation, that there's sup
16  reports that have been completed on that so you would
17  have more of the RD file to look at even further if it
18  was helpful.
19      Q    So was that part of the process?  Were they
20  told that they're supposed to look at the permanent
21  retention files already filed before they --
22      A    That's where the -- that's where the RD, the
23  general classification form would be.  They're used to
24  dealing with are the ones, the permanent retention ones,
25  the homicides which stay forever.  You know, you can't

192

1  find a retail theft case report from 1989 if you go look
2  for it now because they don't exist.
3      Q    Okay.  SO let me take a step back.  So for the
4  subpoena clerks who are responding to a subpoena in a
5  homicide file, in a homicide case, first, is there a
6  policy that -- a policy document that sets forth the
7  policies around responding to those subpoenas?
8      A    No.
9      Q    And then for those subpoena clerks in
10  responding to a subpoena in a homicide investigation,
11  were there any directives or written orders in place?
12      A    Not that I'm aware of.  There could have been
13  unit level, you know, something tacked on the wall or
14  something to help direct them, but not that I discovered
15  or have access to.
16      Q    Okay.  Are you aware of any guidelines or
17  instructions that were provided to subpoena clerks in
18  any written form?
19      A    No.
20      Q    Are you aware of any checklists that were
21  provided to the subpoena clerks to assist them in
22  gathering documents?  I don't think we had the answer.
23      A    No.
24      Q    Okay.  Are you aware of any training materials
25  that were provided to the subpoena clerks to assist them

193

1  in responding to subpoenas in homicide investigations?
2      A    No.
3      Q    Are you aware of any indexes of all the
4  various file locations that were provided to the
5  subpoena clerks for purposes of responding to homicide
6  investigation subpoenas?
7      MS. ROSEN:  Objection, form.
8      A    They would've had the department organization
9  command which comes out every year, so if you're asking
10  is there an index with every unit in the police
11  department, yes, there is.
12      Q    All right.  But, okay.  Were there any special
13  forms that listed for the subpoena clerks all the places
14  where records were kept for a given case?
15      A    Not that I'm aware of.
16      Q    Okay.  Was there any database that listed all
17  the places where records were kept for a given case?
18      A    Again, not that I'm aware of, and that's --
19  we're not talking before the computer age.
20      Q    All right.  Was there any list or form that
21  listed all the places where documents were housed for
22  homicide investigations available to the subpoena
23  clerks?
24      A    There may have been, but I don't have a copy
25  of it if there was.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

194

1    Q   You were not aware of any, correct?
2    A   Right.
3    Q   Okay.  Now once -- you indicate -- were
4  subpoena clerks expected to gather the relevant
5  retention file in any homicide cases where they got a
6  subpoena?
7        MS. ROSEN:  Objection to form, vague, subpoena
8  request.
9    A   If the subpoenas was for the RD file, I
10  suppose they would but if it's that early in the
11  process, I mean I suppose they could have gotten a
12  subpoena for the RD file, but I would think that the
13  investigative file would probably be more appropriate.
14  It's, I guess, it depends on the subpoena order, that's
15  my answer.
16    Q   Okay.  And if the subpoena clerk was getting a
17  subpoena for all of the reports and notes and files for
18  a given homicide investigation, was the subpoena clerk
19  expected to gather the permanent retention file?
20    A   If the subpoena clerk determined that there
21  was something in the permanent retention file that
22  wasn't in the investigative file on return, I suppose,
23  but otherwise it would just be two copies of that same
24  small packet.
25    Q   So the subpoena clerks, their process, was

---

195

1  unless they were specifically requested the RD file,
2  they would be -- they would be requesting the
3  investigative file, not the RD file.  Is that right?
4    A   Exactly right.
5        MS. GOLDEN:  Can we take a brief pause here so
6  the court reporter can let Josh in?
7        MR. SWAMINATHAN:  Yeah.
8        MS. ROSEN:  Okay.
9        MS. GOLDEN:  Oh, great.
10  BY MR. SWAMINATHAN:
11    Q   Okay.  If the -- okay.  And then when the
12  subpoena clerk -- would the subpoena clerk send out the
13  request -- okay, if you got this subpoena for all the
14  reports and notes and everything else related to the
15  homicide investigation, other than gathering the
16  investigative file, was there any other place the
17  subpoena clerk was expected to send the request to?
18        MS. ROSEN:  Objection, form.  Vague.
19    A   If they got -- if the subpoena was for the
20  investigative file, they would send it to the
21  investigative unit.
22    Q   Okay.  If the subpoena was for all the reports
23  and notes in the case, where would they send it?
24        MS. ROSEN:  Objection, form.
25    A   Yeah.  That would depend on what the case was.

---

196

1    Q   Again, homicide investigation.
2    A   Okay, well a homicide, now you're sending it
3  to the -- you're sending it for the investigative file,
4  getting any and all report for a homicide, they very
5  well may then send out, you know, as many as seven other
6  copies of the subpoena to the regular places which would
7  be forensics -- yeah.  See there's a lot of other places
8  like you could send it to.  If it's for the defense
9  attorney, they might want, you know, policies and
10  procedures or something to see if a mistake was made, so
11  now you're talking what's relevant, what's not relevant.
12  That's going to go to have to go to research and
13  development, so it really depends on what basis, and for
14  a homicide is difficult, but you know you're going to
15  get the investigative file and whatever forensics has.
16    Q   Okay.  So the subpoena clerk would essentially
17  make an assessment based on the face of what the
18  subpoena requests.  Might not have to make requests to
19  additional departments other than the investigative
20  file, correct?
21    A   Well, as far as the RD file, as well, to help
22  guide them.  But if it's not, you know, and if it's
23  early on in the stage -- so it really depends on what
24  that subpoena says, what the case is.  Yeah, that's my
25  answer.

---

197

1        MR. SWAMINATHAN:  And then --
2        COURT REPORTER:  Counsel, I'm sorry.  If I
3  could have him repeat his answer just one more time.
4  He cut out briefly on me.
5        THE WITNESS:  It depends on what the subpoena
6  says and depends on what's in the RD file, and I
7  think I said that's it.  That's my answer.
8        COURT REPORTER:  Thank you, sir.
9        THE WITNESS:  Sure.
10  BY MR. SWAMINATHAN:
11    Q   Okay.  So once the request goes out to the
12  detective division for the investigative file, does the
13  subpoena clerk send any kind of -- do they just send the
14  subpoena or do they send any specific instructions?
15    A   Usually they just send the subpoena and the
16  subpoena -- yeah, it's the same process as it was for
17  decades.  So, well, I shouldn't say that because now
18  it's more automated with Sub UA, but as early as 10
19  years ago in police mail you received the subpoena, you
20  read the subpoena, you make photocopies, you put it back
21  in the envelope and you send it back to subpoena unit.
22  So we get it, a routine thing, hundreds, if not
23  thousands, every day, we do them.
24    Q   When the subpoena -- so you got a subpoena
25  that eventually gets to the detective division, who does

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

**198**

1  go to in the detective division, yes, both on homicide
2  cases in 1986 and 1998.
3      A   During that period of time, it would've gone
4  to the commander's office.  They would've opened it up,
5  saw that it was for a homicide and handed it to the --
6  usually a detective is responsible for homicide file
7  keeping, and it would've been that detective who's
8  responsible for the maintenance of the homicide file
9  that would be responsible for filling these subpoenas.
10 Again, it's a very common thing so they're used to it.
11 Still in effect to this day.
12     Q   So the person who is actually collecting the
13 investigative files and gathering those documents is a
14 detective within the detective division in that area,
15 correct?
16     A   That's correct.
17     Q   Okay.  And you said -- is it a detective who's
18 typically like an office detective who's just like a
19 file -- who's handling like files, like a desk job, or
20 is it usually a detective who's actually involved in the
21 investigation?
22     A   No, it is not a detective involved in the
23 investigation.  It's the first.  It's a detective who
24 generally is a detective who's towards the end of their
25 career, who's trying to wind down their career without

---

**199**

1  getting too much court under their thing, so we utilize
2  them because of their expertise to be a file clerk.
3      Q   And how does that detective clerk gather the
4  materials necessary to be produced?
5      A   When a homicide happens?  No, well, I should
6  say this.  That same detective who's responsible for
7  filling the subpoenas, it's also the detective who's
8  responsible for creating the homicide file.  Homicide
9  files, unlike some other investigative files, are not
10 created by the investigative detective.  That detective
11 turns their reports into the supervisor, but it's
12 another individual who's actually maintaining and
13 creating the physical file, punching the holes,
14 assembling it, you know, filling out the inventory sheet
15 and all that.  And that same individual is the
16 individual who fills the subpoena.
17     Q   Okay.  And so that individual basically just
18 grabs the investigative file from wherever it's sitting
19 in the area, correct?
20         MS. ROSEN:  Objection, form.
21     A   That individual is the one who files it and
22 they take it out of filing and make a copy and refile
23 it.
24     Q   Okay.  And where are the files sitting in the
25 detective division area?  Are they sitting with the

---

**200**

1  detective, the detective who investigated the case
2  themselves, or are they sitting in some other central
3  place?
4      A   So they're sitting in the central place where
5  the homicide files are kept.  So in this case, this --
6  well, in this time period in area five, probably in the
7  homicide office, so not on the floor but in one of the
8  offices with a door.
9      Q   Where a sergeant would sit or somebody else,
10 or a supervisor.
11     A   Exactly.
12     Q   So basically the process was that once the
13 subpoena came to the detective who was serving in the
14 clerical role, that person would basically go to the
15 file cabinet in the supervisor's office and grab the
16 investigative file.
17     A   That's right.  That person actually likely
18 worked in that same office with the sergeant as well.
19     Q   Okay.  And then they would copy that file and
20 send it back to the subpoena unit, correct?
21     A   That's it.
22     Q   That's the process.
23     A   That's the magic.
24     Q   Okay.  So the process by which the subpoenas
25 were responded to in '86, '98 that you have now

---

**201**

1  described for us, that was the same across all areas,
2  correct?
3      A   That is correct.
4      Q   So there are no differences in the process for
5  gathering the documents to be produced in response to a
6  homicide case subpoena between the areas, correct?
7      A   Process is the same.  The only difference is
8  the people.
9      Q   Okay.  And then the detective at the detective
10 division who gathered the file, you indicated that
11 person pulled the investigative file and copied it.  So
12 what instructions, if any, are they given about what
13 portion of the investigative file should be copied?
14     A   Well, their instructions are simply to follow
15 the rule of law which is whatever the subpoena says.
16 It's a court document so you're getting an order from
17 the court.  So if the subpoena says, "Give me a copy of
18 the clerical arrest and prosecution case report," that's
19 what they get.  Generally for these type of
20 investigations, it would be a subpoena for the
21 investigative file, so you're being ordered by the court
22 to copy the whole file and send it in.
23     Q   Okay.  And so was there -- other than the face
24 of the subpoena, was there any instruction or directive
25 to the clerk about what part of the investigative file

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

202

1 to be copied?
2      MS. ROSEN:  Objection, form.
3      A   Not that I'm aware of, but as I said, this is
4 a -- it was an extremely common thing, happened on a
5 daily basis so -- maybe not for homicides, but a, you
6 know, daily basis throughout the city so, yeah,
7 obviously they were getting it right on a regular basis,
8 I guess.
9      Q   Is there any part of the process that requires
10 the clerk to check in with the detectives who were
11 actually leading that investigation to make sure
12 that all the documents are in the investigative file?
13      A   The only thing something like that would
14 happen is -- now you're saying just as a random check or
15 are you saying if there was a problem?
16      Q   Well, I'm saying as part of the process.  Like
17 was it part of the process they were supposed to check
18 in with the detective --
19      A   Well, they send the subpoena, the detective
20 reads the subpoena and complies with the subpoena and
21 sends it back.  That's the process.
22      Q   So in the routine course, the detectives who
23 were involved in that underlying homicide investigation
24 are not at all involved in the process of responding to
25 subpoenas, correct?

203

1      A   No.  I mean, I could see a situation where,
2 you know, the subpoena comes in the same day that the
3 detective was ordered to bring the file to the judge's
4 chamber or something like that, so it could be.  But in
5 general, it's not their responsibility to fulfill those
6 subpoenas.
7      Q   Were there any policy documents that gave
8 instruction to the detective in a clerical capacity
9 about what documents should be copied from the
10 investigative files in a subpoena?
11      A   No.
12      Q   Just in the subpoena, itself, you said.
13      A   That is correct.
14      Q   No policy document, correct?
15      A   No, I mean unless you want to say that the
16 policy governing -- you know, all the policies that
17 we've discussed that say that it's important to turn
18 over exculpatory material, but specific to the
19 fulfillment of the subpoena, the subpoena is the
20 controlling document.
21      Q   And so if there's a subpoena request for the
22 entire investigative file, the expectation's that the
23 entire file is being sent over to the prosecution,
24 correct?
25      A   That is correct.

204

1      Q   And the expectation is that detectives in the
2 area are not picking and choosing which documents to
3 send over, correct?
4      A   That is correct.
5      Q   Okay.  And so the expectation is that the
6 prosecutor will have all of the documents that are in
7 the investigative file up to that point in time,
8 correct?
9      A   That is correct.
10      Q   Even if those documents are -- is there any
11 process in which there can be a determination of whether
12 the documents in the investigative file is really all
13 that important or relevant?
14      A   No.  Whatever the subpoena says, that's what
15 you do.
16      Q   Okay.  And if it says the entire investigative
17 file, can you pick out the administrative material that
18 doesn't seem like it's investigative in nature?
19      A   If it's -- well, I mean, it depends.  I don't
20 know what you mean by administrative material.
21      Q   Like for example, inventory sheets.  Not
22 really the actual investigative documents.  The
23 inventory sheet or inventory file control cards.  Could
24 those things be skipped?
25      A   Well, the inventory file control card isn't

205

1 really part of the investigative file by definition.  It
2 would not be because when you take the file out, you put
3 the card in.  So you could take the whole file.  You
4 wouldn't make a copy of that to take with you so the
5 control card, I don't know.  As far as the kind of the
6 table of contents that exists, I would expect that to be
7 copied.
8      Q   Okay.  If there things in the file -- go
9 ahead.
10      A   I was going to -- I said the table of
11 contents, but that's just how I talk.  I apologize.  I
12 meant the inventory listing.
13      Q   Understood.  Sometimes in homicide files
14 there's things like a homicide file checklist sometimes,
15 and sometimes there's court attendance sheets and those
16 kinds of things.  You've seen that before, correct?
17      A   Well, and even subpoenas that come for the
18 file usually a copy is left in the file, and if you
19 subsequently subpoena the file, you're going to get a
20 copy of the last subpoena, too.
21      Q   In other words --
22      A   So including that sort of thing, yeah.  Just
23 as far as the control file, it's not -- you know, that
24 I'm struggling with, but generally speaking you'd copy
25 everything.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

206

1    Q   Okay.  And so if the request comes in for the
2  entire investigative file, the expectation is that
3  you're copying everything in that file, whether it's
4  administrative in nature or investigative, correct?
5    MS. ROSEN:  Objection, form.
6    A   Generally speaking, that's true.  And so,
7  yeah, I'll just say generally speaking, that's true.
8    Q   Okay.  Was there any written document
9  instructing that detectives who were responding to
10 subpoenas to copy and produce the entire investigator
11 file when those were requested?
12   A   The subpoena, itself.
13   Q   Anything else?
14   A   Not that I'm aware of.
15   Q   Was there any document that instructed the
16 subpoena detectives -- strike that.  Was there any
17 document that instructed the detectives responding to
18 subpoenas to check in with the lead detective on the
19 case to make sure that they've got all the documents for
20 that investigation?
21   A   I'm not aware of such a document.
22   Q   Okay.  Was there any formal training provided
23 to the detectives who are responsible for responding to
24 subpoenas?
25   A   If by formal training you mean training with a

207

1  written curriculum or some sort of in-service training,
2  no.  However, anybody that's assigned to that spot gets
3  on-the-job training before they can do it.  It's a
4  clerical task and you wouldn't know how to do it unless
5  you were trained, so they have to be trained to do it.
6    Q   Was there any expectation that the detective
7  who's responding to subpoenas to the area, reach out to
8  other departments to see if -- to gather documents that
9  they might have?
10   A   That would be unlikely unless there's
11 something in the subpoena which would indicate that
12 that's something they should do, but that's really a
13 function of the subpoena unit.
14   Q   Okay.  So that was not the responsibility of
15 the detectives to gather files from other divisions.  It
16 was just to gather what was at the area in the
17 investigative file.
18   A   Unless the subpoena specifically directed
19 otherwise, that's correct.
20   Q   Are you aware of any audits that were done to
21 see if the material that was in the investigative files
22 was getting to the prosecution and criminal defense?
23   MS. ROSEN:  Object to form.
24   A   I mean that's an interesting question --
25 you're talking about some sort of scientific audit.  I'm

208

1  not aware, but I would think -- not I would think, but
2  it is a self-regulating system that's in place.  You
3  have thousands and thousands of cases going out every
4  year that get in the hands of prosecutors and defense
5  attorneys.  So it's self-regulating in a way that if
6  something's missing, it could be easily discovered to be
7  brought to the attention of us.
8    Q   Something could be missing and nobody would
9  every worry about it because they didn't know it?
10   MS. ROSEN:  Objection to form and foundation.
11   Calls for speculation.
12   A   Is it possible?  Yes, it's possible.
13   Q   Putting aside the question of self-regulating,
14 you're knowing that there's the possibility of self-
15 regulation in terms of whether or not documents are
16 being investigated or getting to the criminal justice
17 system, correct?
18   A   You know what, you broke up, I didn't hear you
19 for a second there.
20   Q   Let me ask again.  Let me ask a better
21 question anyway.  Are you aware of any actual audits
22 that were done to ensure that the entire investigative
23 file was getting to the criminal justice system?
24   MS. ROSEN:  Object to form.
25   A   I'm aware that we had an inspection division,

209

1  a court inspector, I'm not aware of any specific
2  auditing as you describe.  But I'll --
3    Q   Are you aware of any of the inspection group
4  that you're referring to, are you aware of them ever
5  doing an inspection where they checked, random checked
6  the file to make sure that the subpoena you had was
7  receiving all of the documents of the investigative
8  file?
9    A   I am not aware of such an inspection.
10   Q   Are you aware of any audit or inspection to
11 ensure that all the documents related to homicide
12 investigations were being produced in response to
13 subpoenas for all of the homicide files?
14   MS. ROSEN:  Objection to form.
15   A   Not by a CPD unit if that's what you mean.
16   Q   Are you aware of any audits or inspections
17 within CPD to ensure that all documents that exist in
18 different places within CPD were being gathered and
19 produced in criminal investigations?
20   MS. ROSEN:  Objection to form.
21   A   Not an audit and inspection by CPD for that
22 purpose.
23   Q   Are you aware of any instances in which there
24 was ever any discipline for failing to produce
25 responsive documents in response to a subpoena?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

210

1     A    I'm -- I did not --
2         MS. GOLDEN:  Object to form.
3     A    -- catch that question.
4         MS. GOLDEN:  Outside the 30(b)(6).  Can we just
5     take a quick pause.  I'm going to leave the
6     deposition and Josh Engquist will be appearing for
7     the individual plaintiffs for the balance of the
8     deposition.
9         MR. SWAMINATHAN:  Do you want to take a five
10    minute break?
11        MS. GOLDEN:  We don't need to, Josh is here.  If
12    you want to take a break for other reasons, it's up
13    to you.
14        MR. SWAMINATHAN:  I --
15        MS. GOLDEN:  What did you say?
16        MR. SWAMINATHAN:  Everyone's ready to keep
17    going.  Fine if we keep going?
18        MS. GOLDEN:  No, we're fine.
19        MR. SWAMINATHAN:  All right.
20        MS. GOLDEN:  Thank you, Commander.
21        MR. SWAMINATHAN:  Thank you.
22    BY MR. SWAMINATHAN:
23        Q    All right, let's turn to the topic of
24    interviews and interrogation.  We're going to do 10.  I'm
25    going to show you a document we've marked as Exhibit 10.

211

1     It's been Bates stamped RP Reyes 1117350 through
2     1117354.  And it's titled General Order 87-7
3     Interrogations Field and Custodial.  Do you see that,
4     sir?
5         (EXHIBIT 10 MARKED FOR IDENTIFICATION)
6     A    Yes.
7     Q    Okay.  Was this the policy that was in place
8     in the period from 1987 through 1998 with regard to
9     interrogations?
10    A    Yes.  This was a general order on subject.  I
11    believe there's also a section in the detective division
12    SOPs that are also on point.
13    Q    This policy document, was there a prior
14    version of this document that was in effect prior to
15    1987 and put into effect?
16    A    82-3, yes.  Published in 1982.
17    Q    Okay.  And in terms of -- did this document,
18    for purposes for detectives conducting interrogation,
19    was this policy applicable to them throughout the period
20    from '86 -- '87 through 1998?
21    A    Yes.
22    Q    Then the instructions that are contained in
23    these SOPs beginning in 1998, were those also applicable
24    to them with regard to interrogations?
25    A    Yes.

212

1     Q    And so actually there were two sets of
2     policies that applied with regard to interrogations of
3     suspects in the period from 1987 to 1998?
4     A    Right.  The general order covers all
5     department employees and the DD to SOP covers just the
6     detective division.
7     Q    Okay.  This general order, I think you just
8     indicated, applied across for all different types of
9     officers, not just detectives, right?
10    A    That is correct.
11    Q    And in this general order, did it apply to
12    specific areas or did it apply department-wide?
13    A    Department-wide.  Every member of the police
14    department that it was applicable.
15    Q    Okay.  Were there any policies regarding
16    interrogation that were specific to specific areas?
17    A    No.
18    Q    Were there any differences in the policies
19    that applied to the different detective divisions with
20    regard to interrogation?
21    A    There were no differences between areas, no.
22    Q    Were there any differences in terms of the
23    expectations about how interrogations were to be
24    conducted between the different areas?
25    A    No.

213

1     Q    Were there any differences in terms of dos and
2     don'ts about what was prohibited and what was acceptable
3     conduct in interrogations between the different areas?
4     A    No.
5     Q    Is it the case the detectives -- strike that.
6     Wouldn't detectives sometime move from one detective
7     division to another over the course of their career?
8     A    Yes.
9     Q    And I think I misspoke.  But move from
10    different, move in different areas of the detective
11    division, correct?
12    A    Transfer you mean, yes.  Yes, that is correct.
13    Q    And -- strike that.  As detectives moved from
14    area to area, the policy that applied to them stayed the
15    same, felt like the same, correct?
16    A    On this subject, absolutely.
17    Q    And with the right interrogation, in terms of
18    training, what training were detectives provided with
19    regard to interrogations from the period 1996 to 1998?
20    A    Detectives received several hours of interview
21    and interrogation training in their crew training when
22    they were hired.  They then received several hours in
23    their pre-service training before being promoted to
24    detective.  Then, of course, after being made detective,
25    they received on-the-job training as they actually took

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

214

1    part in custodial interviews.
2        Q    So there was both pre-service training for
3    detectives and subsequently on-the-job training for
4    detectives regarding interrogation; is that right?
5        A    That is correct.
6        Q    Okay.  What were detectives trained on about
7    the conduct of interrogation in their pre-service
8    detective training?
9        A    Well, they received several hours.  So it
10   would be difficult for me to answer it in one sentence.
11   But they discussed Miranda, conditions being held that
12   any discussions or admissions had to be knowing,
13   voluntary, intelligent to be admissible, the treatment
14   of individuals.  So there was a whole list of things --
15   all the things you would think would involving custodial
16   interrogation.
17       Q    Was there any training on how to go about
18   conducting the interrogation?
19       A    At various times throughout this relevant time
20   period there were different interrogation techniques
21   that were discussed in class.  It wasn't taught as a
22   policy.  For example, it wasn't taught that this is the
23   re-technique, this is what you should do.  The
24   techniques of interrogation were brought up as
25   discussions to see that the detectives had various

215

1    options and what worked best for them in their style to
2    connect with people for communication.
3        Q    So as part of the detectives pre-service
4    detective training, were detectives trained under re-
5    technique?
6        A    When I located all of the training material in
7    reference to interviews and interrogation, there was a
8    mention of the re-technique in there.  I'm not aware
9    that the re-technique was discussed in training.  It may
10   have been discussed, as well as other techniques, I'm
11   not positive.
12       Q    Were techniques for interrogation taught as
13   part of the detective pre-service training?
14       A    Yes, I found specific -- yes, there was
15   specific curriculum.  And I am aware that techniques
16   such as rationalization, projection and minimization,
17   minimalization were taught as part of the curriculum.
18       Q    And can you explain -- you said
19   rationalization, projection, and minimization; is that
20   correct?
21       A    Yes.  Both minimalization --
22       Q    Wait, I just want to be sure.  You said, do I
23   have that right, rationalization, projection and
24   minimization?
25       A    That is correct.

216

1        Q    Okay.  Any other technique other than those?
2        A    There were other techniques discussed, such as
3    the re-technique, or referenced I should say, which --
4    but as far as the curriculum, which I'm aware of, I
5    don't know for certain what other techniques were
6    discussed?
7        Q    Okay.  And what is the technique of
8    rationalization?
9        A    Rationalization is so that an individual that
10   you are in a custodial interview with, doesn't feel that
11   you're being judgmental and may better off open up to
12   you as far as telling the truth about what they did.  It
13   helps them rationalize, for example, say that you
14   understand that they must have been angry and that's why
15   they killed this person, something like that.  Just as
16   an example.
17       Q    And what is projection?
18       A    Projection is simply blaming somebody else.
19   Helping that -- altogether blaming somebody else, but
20   saying you and me robbed a store and you shot somebody.
21   Well, your co-offender, he's a real bad guy, you're not
22   a bad guy, you just did a bad thing, something like
23   that.  Just examples.
24       Q    So the idea of projection is to sort of help
25   them lay the blame somewhere else?

217

1        MS. ROSEN:  Objection, form.
2        A    The whole idea is -- not appear, for most of
3    these, is to not appear to be judgmental to allow them
4    to have a lay of the land, to tell the truth without
5    losing all of their self-respect.
6        Q    And what about minimization?  What is that
7    technique?
8        A    The same thing.  For example, I'm
9    interrogating someone who shot someone in the leg and I
10   say, "Shoot them in the head," to try to make them feel
11   better about telling me the truth that they shot the
12   individual in the leg.  Those were techniques that were
13   discussed in training curriculum.
14       Q    And then you said there's a reference to the
15   re-teching, what is the re-teching?
16       A    Well, when I was going through the training
17   material that we found, I don't think it was
18   specifically laid out as a curriculum item, but the re-
19   technique, it may change some of those rationalization,
20   projection, minimization.  But I believe the re-
21   technique starts out with a strong statement from the
22   detectives that they know that the individual that
23   they're talking to is guilty.  And that's really a
24   technique that's never -- it's never been lifestyle or
25   anything that I found effective and I don't know any

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

218

1    detectives that would agree. I don't know how helpful
2    it was or how much it was used, but I know that it was
3    somewhat well-known in police popular culture to have
4    been something popular so I thought. In the documents
5    that I found, I saw it mentioned, which is why I'm
6    bringing it up, but I don't know to what extent it was
7    included in curriculum during this time period.
8        Q   I see. And you said in your experience it was
9    something that you didn't use.
10       A   Correct.
11       Q   I wasn't clear what you said about other
12   detectives. You said that it was your belief that other
13   detectives also --
14       A   Right. Detectives that I work with and made
15   it -- it's a stylistic thing. Everyone can connect with
16   other humans in different ways. I've never found that
17   sort of attitude helpful, and the people that I've
18   worked with agree, it's always been better for me to
19   just talk to people. People do well when talked to.
20   Just different styles. Some people may react better to
21   walking in and telling them, "I know that you killed
22   somebody," and some people they just want to sit around
23   and have me be nice to them before they talk to me. It's
24   style.
25       Q   Then subsequent to the in-service training --

219

1    strike that. Any other techniques that you've seen
2    referenced or indicated as being taught as far as the
3    detective pre-service training?
4        A   Not I can recall off the top of my head,
5    again, it wasn't that long, it might have been four
6    hours, interviews and interrogations, and quite of bit
7    of it, as you can see, would be training on the order
8    such as this and the SOPs. More legal information
9    techniques.
10       Q   Was there training in the initial detective
11   pre-service training about prohibited techniques?
12       A   Right, yes, sure.
13       Q   What training was provided about prohibited
14   techniques?
15       A   Well, for example, in the pre-service
16   training, this order would've been handed out and gone
17   through and taught on and this order has prohibitive
18   techniques in it. As well, the curriculum itself
19   essentially said don't beat people, don't hit people.
20   You're not allowed to threaten people. Just basic
21   stuff.
22       Q   The curricula itself specifically said don't
23   hit people, don't physically abuse people, that kind of
24   thing?
25       A   Right.

220

1        Q   Since we're referencing the order itself, I
2    think you're referring to, let's see if I've got this
3    right, I think on page 3 of this document, RSD 1117352,
4    in Section, let's see, Section starts on page 4. It's
5    entitled "Custodial Interrogation Advising the
6    Individual of His Rights."
7        A   I see that.
8        Q   Then looking at page 3 of the document, on G,
9    is that the portion that you were referring to about the
10   order's instructions about what was prohibited
11   techniques?
12       A   That is correct. There may be one other
13   statement in here as well. But G is a perfect example
14   of that. "Any circumstances of lengthy incommunicado
15   custody, deception, promises, suggestion of benefits,
16   other forms of psychological pressure." Yes. I believe
17   also when it refers to providing Miranda warnings,
18   there's something else about threats. I believe there's
19   another statement in here about threats, but I'd have to
20   look through it. This is what I was talking to as well.
21       Q   Okay.
22       A   I feel like there's something more in here.
23   There's another statement about you can still question a
24   person in the presence of their lawyer, but you're not
25   allowed to threaten them or something like that. There's

221

1    some threat mentioned somewhere else, but this, I
2    believe, is the main section I was referring to.
3        Q   Right. I'm not seeing a policy. All right,
4    so under the policies applicable in the period from 1986
5    through 1998 --
6        A   Sorry, 10(C) also. "Any indication that the
7    person was tricked, threatened, or cajoled into a waiver
8    of their rights," is another example.
9        Q   Let's see here, you said you were going to
10   10(C)?
11       A   That is correct.
12       Q   I see, okay. So 9(G) and 10(C) in this order
13   both identify specific prohibitions in terms of
14   techniques that can be used during interrogation,
15   correct?
16       A   That is correct. And if I had the order in
17   front of me, I could go through it. Like I said,
18   there's that one other about if they're with their
19   attorney, but those maybe -- essentially, the idea is no
20   threats, no coercion. You see no form of physical or
21   psychological pressure may be exerted in 11(D).
22       Q   Okay. So 11(D) is another point that may have
23   gone over, correct?
24       A   Yes.
25       Q   And we'll just work backwards since we're

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

222

1  looking at 11(D). But under the Chicago Police
2  Department orders, it appeared from 1986 to 1998 any
3  form of physical pressure was prohibited, correct?
4      A  Correct.
5      Q  And under CPD policies in that time period,
6  any form of psychological pressure was prohibited,
7  correct?
8      A  "Physical or psychological pressure. May no
9  form of physical or psychological pressure," whatever
10  that means, right?
11     Q  So --
12     A  And that means coercion, threatening.
13     Q  So I think we were talking over each other.
14  I'll ask you the question. What training were
15  detectives provided about what sources or what types of
16  psychological pressure were prohibited?
17     A  Coercion, threats.
18     Q  And then looking back at 10(C), it indicates
19  that -- so in the period from 1986 to 1998, officers,
20  including detectives, were prohibited from using threats
21  in interrogations, correct?
22     A  That is correct.
23     Q  And they were prohibited from using -- they
24  were prohibited from trying to trick the defendant
25  during the course of an interrogation, correct?

223

1      A  Well, not necessarily. The wording of this is
2  actually, "You can't trick someone into waiving their
3  rights." So that would go to knowing, voluntary
4  intelligence test for voluntary waived Miranda. Trickery
5  and lying is not expressly prohibited in an
6  interrogation itself, but certainly would be to -- you
7  can't trick them into waive their Miranda rights.
8      Q  You can't use trickery, threat, or threats to
9  try to get somebody to waive Miranda rights under CPD
10  policy, correct?
11     A  That is correct.
12     Q  Okay. Then going back to 9(G), that does
13  layout prohibition with regard to the interrogation
14  itself, correct?
15     A  That is correct.
16     Q  And under CPD policy, it was prohibited to
17  hold people for lengthy periods of custody
18  incommunicado, correct?
19     A  Correct.
20     Q  And what was the training on what was
21  considered to be a lengthy period of custody
22  incommunicado?
23     A  That is an excellent question and I'm trying
24  to think if -- unfortunately, that's a very good
25  question and I can't think off the top of my head

224

1  thinking through that -- I mean I'm sure I could come up
2  with an answer that sounds great, but thinking back to
3  the curriculum, I would have to go through the
4  curriculum to find out what specific references were
5  made to timelines. It would probably be a cop out to
6  say 48 hours, but incommunicado custody is obviously
7  more complex than that.
8      Q  Okay. And so is there any express statement
9  in the training material, that you recall, that sets
10  forth the amount of time that was considered a lengthy
11  custodial interrogation?
12     A  I don't know. I don't know that a specific
13  time was set out. I know that it's referenced so that
14  any -- the longer period of time it's going to go to the
15  voluntariness of the confession, if a confession is
16  obtained. It's something that will be taken into
17  account to determine voluntariness of the statement.
18     Q  Okay. And ultimately the policy, however --
19  so putting aside the question exactly how long it would
20  become a prohibited interrogation, that wasn't set forth
21  in the order itself, correct?
22     A  Correct.
23     Q  And so far as you're aware, there's no set
24  amount of time that's set forth in the training
25  materials, correct?

225

1      A  That is correct.
2      Q  But the training did essentially -- strike
3  that. The policy and the training essentially accept
4  the idea that the longer the interrogation goes, the
5  more likely that the person being questioned may not be
6  offering statements voluntarily, correct?
7          MS. ROSEN: Objection to the form of the
8  question.
9      A  And I wouldn't necessarily say it's the longer
10  the interrogation goes. This specifically refers to an
11  incommunicado custody. So if the person wants to spend
12  eight hours telling me how they murdered someone, that
13  might not be bad at all. That might be absolutely fine.
14  This specifically just refers to, for example, I want to
15  make a phone call, and, no, you have to sit there kind
16  of thing.
17     Q  And incommunicado here doesn't mean any human
18  being. The detectives are coming in and out, it's still
19  incommunicado meaning not with an attorney or family
20  member so on, correct?
21     A  It's like being incommunicado, yes, I don't
22  think you can say that because this individual spoke to
23  detectives that that would be incommunicado.
24     Q  All right. And so the policy contemplates the
25  idea that the longer you hold somebody without being

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

---

226

1  able to communicate with attorneys or family members or
2  others, that they become more susceptible to any
3  voluntary confession, correct?
4      MS. ROSEN: Object to form.
5      A   I would say that the policy contemplates that
6  the longer held incommunicado, the more likely that it
7  will invalidate the confession, if one is given.
8      Q   Okay. And then the policy prohibits the use
9  of deception in interrogation, correct?
10     A   Well, it doesn't prohibit it, it just says,
11  "That any circumstances of deception will invalidate the
12  acceptability of anything the person questioned states
13  or writes," so that's less clear.
14     Q   Okay. So that's what I'm asking you. Does
15  the policy prohibit the use of deception? Or does it
16  say you can use deception, but it may have a risk that
17  you're not going to be able to use the confession?
18     MS. ROSEN: I'm sorry, point of clarification.
19  Can you direct me to the point in the order where
20  it's talking about deception?
21     MR. SWAMINATHAN: I'm looking at 1(G). Looking
22  here.
23     MS. ROSEN: And then can you give us the
24  heading on that part of the --
25     MR. SWAMINATHAN: Can we pull this up? This is

---

227

1  the section on Custodial Interrogation. The limited
2  scope of person and then a section says "Custodial
3  Interrogation Advising the Individual of His
4  Rights." Then there's an A under there and that went
5  to C, D, E,
6  F, G.
7      MS. ROSEN: Thank you.
8      A   I see where it says deception and I see how
9  it's worded. I think it's poorly worded because, again,
10  we're trained lying is not prohibited. Deception here,
11  I think, means something more than lying. I think it
12  means deceiving them in an unconstitutional way. I see
13  the word as it's written, but the training, and I
14  believe even the detective division SOP is different.
15  It's always been the fact that some lies are prohibited,
16  some lies are not prohibited.
17  BY MR. SWAMINATHAN:
18     Q   Okay. So what are the types of lies that
19  detectives are trained -- strike that. What were the
20  types of lies or deception that detectives were trained
21  or prohibited?
22     A   A lie that would be prohibited would be a lie
23  that would tend to elicit an untrue response from an
24  individual. For example, I can think of lies that are
25  allowed a lot easier than I can think of lies that are

---

228

1  not allowed. A lie that would be allowed is something
2  like there's a surveillance camera there, so I'm going
3  to watch the surveillance camera. No. If the
4  individual knew that there was a surveillance camera
5  there, if the individual believed that lie, it wouldn't
6  encourage them to tell a lie in response, if that makes
7  sense. A lie that would probably be not allowed is
8  you're going to get -- I don't know. Everyone I think
9  of is also a threat.
10     Q   Things like you're going to get the electric
11  chair, these types of lies would be improper?
12     A   That would be improper.
13     Q   And it would be improper -- that would also be
14  a form of threat, which is also prohibited under the
15  order, correct?
16     A   That is correct. Not to say that you can't
17  always factually inform someone of the possible
18  consequences of their criminal conduct when that's not
19  exactly a threat.
20     Q   Okay. So what's the difference between
21  telling somebody that they could be locked up for a very
22  long time? At what point does it become a threat?
23     A   Well, a threat would be like, "You better
24  confess, otherwise, I'm going to make sure you get the
25  chair," that sounds more like a threat. But telling

---

229

1  you, "Hey, look, if you did commit this murder, there's
2  a chance you're going to do life in prison." It
3  wouldn't necessarily be a threat depending on the
4  situation. It'd be the truth.
5      Q   Okay. And, similarly, in a murder case if you
6  said, "If you don't confess, you're going to get life in
7  prison." Is that considered a threat in that
8  circumstance, or is that the truth, if you can say it?
9      A   Well, if it was true, it might not be a
10  threat. But the way you're phrasing it it sounds more
11  like a threat to get a confession, like a deal. "If you
12  just confess, you'll be out in five. If you don't
13  confess, I'm going to make sure you spend life in
14  prison." That sounds to me more like a threat and would
15  be prohibited.
16     Q   Okay. And then promises are also prohibited,
17  correct?
18     A   Right. It's here, it's nothing like, "Why
19  don't you just confess to me and I'll let you go home
20  tonight." That's the sort of thing that's prohibited.
21  Or, "I promise I'll get you a low bond and you can do
22  just a short period of time." Those sorts of things,
23  again, are the sort of things that would elicit a false
24  response and they are prohibited.
25     Q   And when you say would elicit a false

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

230

1  response, what do you mean?
2      A    You never want to encourage someone to lie to
3  you.  The whole goal of an interview is to get to the
4  truth.  The whole goal of a custodial interview is not
5  to get a confession to get to the truth.  So the second
6  you start with a threat or a promise or something like
7  that, you've deviated from the best practice of how to
8  elicit the truth.
9      Q    So one of the things detectives were trained
10  on was that the use of threats and promises can cause
11  people to lie to you?
12     A    Correct.
13     Q    And this -- strike that.  So put another way,
14  detectives were trained that one of the reasons promises
15  and threats were prohibited is because it could cause
16  people to give you false information, correct?
17     A    Correct.
18
19
20     Q    And is one of the reasons that threats and
21  promises are prohibited because they can cause people
22  to lie and just tell you whatever they think you want to
23  hear?
24     A    Correct.
25     Q    And were detectives trained on the phenomena

231

1  of false confession?
2      A    Detectives were trained on false confessions.
3      Q    And what were they trained on with regard to
4  false confessions that appeared from 1986 to 1998?
5      A    The curriculum contained information such as
6  this, such as no threats, no promises.  It showed
7  constitutional rights of the individual are respected
8  because if you don't, there's a potential for a false --
9  that was the training.
10     Q    Okay.  And what kind of guides were detectives
11  provided about things they should do to avoid the risk
12  of false confession?
13     A    Follow the policies and procedures set out for
14  them.
15     Q    In other words, don't use threats and
16  promises, and promises of benefits, and so on?
17     A    Exactly right.
18     Q    Okay.  Were they -- were detectives trained
19  that they shouldn't feed the facts of the crime to
20  suspects during interrogation?
21     A    So that is a more case by case basis.  I
22  understand the question.  It's a very good question, but
23  it's not an easy question to answer because depending on
24  the circumstances of the investigation, it is possible
25  that some non-public facts may be helpful during the

232

1  interview process.  Feed an individual the entire set of
2  circumstances, and then ask them to, you know, confess
3  and repeat them back to me.  It could be problematic,
4  but again, it's a case by case basis where it may be
5  beneficial for you to use a few non-public facts to let
6  the person know how much you know, that you know a
7  little bit more than they think they do to get the case
8  on the right track.  So, it depends on the circumstances
9  of the specific interview.
10     Q    Okay.  Would it be fair so say that detectives
11  were trained that there may be circumstances when it
12  might be useful to share some limited set of non-public
13  facts?
14     A    That is a reasonable thing to say.
15     Q    And were detectives trained that they should
16  not share all of the facts of the non-public facts that
17  they know about the crime.
18     A    Yes.  Under very limited circumstances, would
19  that be appropriate.  It could be appropriate under
20  certain circumstances, but very limited.  So in general,
21  the training would be, it's not appropriate to share all
22  of the non-public facts.
23     Q    And were detectives trained that one of the
24  things that they're supposed to be doing during the
25  course of this interrogation is not only trying to

233

1  obtain a confession, but try to assess whether the
2  confession you're getting is the truth?
3      A    Yeah.  That's fair to say.
4      Q    In other words, they were --
5      A    In fact I would -- in fact, I have to disagree
6  with you because I don't think the detectives were
7  trained that they're supposed to get the confession.  The
8  detectives were trained they're supposed to get the
9  truth.
10     Q    Okay.  Thank you.
11     A    As far as not inconsistent with what you said
12  that we agree.
13     Q    Okay.  That's fair.  So in other words, to put
14  it in your words, detectives were trained that when they
15  were getting statements, including inculpatory
16  statements from a suspect during an interrogation, they
17  should be assessing those statements to see if they were
18  in fact the truth.
19     A    So just to be clear, since we're in a
20  deposition, it's not that during the actual interview
21  they're going to be assessing.  You know, it's possible
22  that they take the statement, they confer, they discuss
23  with other investigators to try and corroborate.  But
24  the goal is to listen to the statement and if there are
25  other ways to corroborate it, yes, that's true.  But

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

234

1   it's not necessarily during, in real time that they have
2   to stop it, go outside and check with, you know, the
3   evidence guy or whatever. So --
4        Q   Got it. But part of the point is once they --
5   at some point in the process of these interrogations,
6   part of the process is to assess whether what the person
7   has said that's inculpatory matches up with the
8   information you know about the actual crime. Correct?
9        A   Right. It would be very rare that your
10  investigation would end with a confession.
11       Q   Because there would be subsequent steps that
12  the detective would be taking.
13       A   Right.
14       Q   One of which is to see if the statement that's
15  been given can be corroborated by the evidence and other
16  information, non-public information?
17       A   That is correct. Unless you have every aspect
18  of the case memorized you'd probably still have to go
19  over some stuff before you're done.
20       Q   And then -- then so the -- so it's a -- with
21  the case that in order for detectives to be able to make
22  that kind of assessment about the truthfulness of the
23  statement given by the suspect, that they could not --
24  you wouldn't share all of the facts of the crime?
25       A   Again, if you're talking about during an

235

1   interrogation, it may be helpful to share some non-
2   public facts. Generally speaking, it's not appropriate
3   to share all non-public facts and then have the person
4   say, "Hey, is this what you did? Yes or no?" And then
5   and call that the end of it. It's under limited
6   circumstances. It may be necessary to share all non-
7   public facts, but generally speaking, you would to want
8   elicit some facts from them.
9        Q   Now, after -- as you indicated, after an
10  interrogation was complete, you know, that wasn't the
11  last step that there were these additional steps to
12  occur. One of the things you mentioned was seeing if
13  the statement could be corroborated by other evidence.
14  What other steps would be taken after the interrogation?
15       A   Confer with a partner, run by -- if they
16  weren't in the interview, just run by the results of the
17  interview with them. See if, you know, maybe you're --
18  "Is there a different angle and I'm missing something?"
19  It's just -- if appropriate, you might want to, again,
20  you might know your case, or it might be a fairly
21  straightforward case that you don't need to do all this
22  stuff. But, it might be that you would review evidence
23  again, might want to review with the evidence, the crime
24  scene report or something. There might be something
25  else. But it's possible you have the case so locked

236

1   down that you're ready. I mean, it's -- especially if
2   you work quite a bit on the case, you might already know
3   -- have it all in your head. So --
4        Q   And what about in cases -- sorry, go ahead.
5        A   I said case by case basis.
6        Q   And what about in cases involving co-
7   defendants? If you get a statement from one person,
8   what are the kind of subsequent steps detectives were
9   expected to take?
10       A   Again, that's on a case by case basis, but if
11  you've got two people in -- I mean, if you've got them
12  in custody, now you have -- obviously you're having two
13  different interviews. So, it's important to hear what
14  one person says. There might be something that's
15  corroborated, but case by case basis.
16       Q   And was there an understanding that when you
17  got all the people you'll -- one of the expectations was
18  after a statement, detectives would then be talking to
19  each other to see if the statements that are coming from
20  each of these people are similar?
21       A   That's a reasonable thing to assume.
22       Q   Okay. That's a step detective's should be
23  engaged in, trying to compare the various statements to
24  see if they actually match up? That might be part of
25  assessing the truthfulness of the statements?

237

1        A   It could be. I mean, eventually the lead
2   detective is going to have to write a final report. So
3   it's the lead detective will have to put all this
4   together to make sure it makes sense.
5        Q   Okay. During the course of interrogation,
6   what is -- well not during the course of the
7   interrogation itself, but in terms of documentation of
8   the interrogation. What is the expectation of
9   detectives in regards to what they document about their
10  interrogation suspect?
11       A   The expectations are that the detective
12  documents what's necessary for that detective. So for
13  example, I said before, the use of GPRs. Use GPRs in
14  real time contemporaneously while they're having an
15  interview. And some won't even take a notepad in with
16  them because they, for example, they don't want to break
17  the report that the film by taking notes. So as far as
18  note taking goes, it's whatever works for the detective.
19  Eventually you are going to have to get the results of
20  the interview or custodial interview interrogation on
21  paper in some form.
22       Q   Okay. So the interrogation's got to get
23  documented. It may be in notes, but it may just be in a
24  report; is that fair?
25       A   It -- right. Assuming it's relevant as we've

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

238

1    -- as I've already said.  I assume you're talking about
2    the person that's getting charged.  Yes.
3        Q   Got it.  Exactly.  I thought with the person
4    that gets charged, there's going to be documentation of
5    any interrogation to that individual, correct?
6        A   Yes.  And I should clarify, for example, I
7    know this isn't the type of ERI, but if, for example,
8    our sex cases, which are all recorded, we would -- there
9    are times when you say, "See videotapes for the complete
10   story."  And you would just write a tiny brief summary
11   of it.  So it's somehow it's got to get recorded.
12       Q   And back in the period from '90 -- from '86 to
13   1998, you agree, they were not recording interrogating
14   at that time?
15       A   We -- we were not.  Occasionally state
16   attorneys would have a court reporter, which would
17   create a recording.
18       Q   Okay.  And then, what was the role of the
19   detectives in coordinating with the state's attorneys in
20   terms of obtaining statements?
21       A   Prior to obtaining charges, if you were
22   seeking charges on homicide investigation, you would
23   contact felony review.  They're available 24 hours.  You
24   would inform them that you had an individual in custody
25   for a murder.  They would send out a felony review

239

1    assistant, and you would coordinate with them.  At that
2    point in time you defer to them whether they want to do
3    a handwritten statement, which is the state's attorney
4    actually writing down the statement of the individual,
5    either a witness or a suspect giving a statement.  Like
6    I said, they had the opportunity, sometimes they would
7    bring a court reporter out with them.  And so -- but it
8    would really be their show.
9        Q   Okay.  In terms of whether a handwritten
10   statement would be done or a court reported statement,
11   were those decisions that were -- would be decided by
12   the state's attorney?
13       A   Correct.
14       Q   And I guess, I just add one more.  The
15   decision of whether or not to take a statement, is that
16   a decision that's decided by the state's attorney?
17       A   Well, either the state's attorney --
18       MR. BURNS:  Objection, foundation.
19       A   Either the state's attorney or the individual
20   in custody.  If they refused to provide a statement,
21   then you're done.
22       Q   Understood.  But the states, they would
23   decipher if whether they want to be able to get a
24   statement from the witness, correct?
25       A   Correct.

240

1        MS. BENSINGER:  Objection, foundation.
2        Q   And then if the state's attorney decided they
3    want to get a statement, obviously if the witness
4    refused to do it, then there wouldn't be a statement.
5    Correct?
6        A   Correct.
7        COURT REPORTER:  I'm --
8        Q   And if the state's attorney, if the witness
9    willing to do the statement, the state's attorney would
10   determine whether they wanted to do a handwritten
11   statement or a court reported statement.  Is that
12   correct?
13       MS. BENSINGER:  Objection, foundation.  Former.
14       A   Correct.
15       COURT REPORTER:  I'm sorry.  This is the court
16   reporter.
17       THE WITNESS:  And then --
18       COURT REPORTER:  May I ask who objected the
19   last couple of times?  I didn't recognize who that
20   was.
21       MS. ROSEN:  It was Brette.
22       MS. BENSINGER:  Yeah, it was me.
23       COURT REPORTER:  Yes, ma'am.  And the gentleman
24   who objected earlier?
25       MR. BURNS:  Me, Dan Burns.

241

1        COURT REPORTER:  Thank you, sir.  Sorry,
2    Counsel.  You may proceed.
3        MS. ROSEN:  And where we are, is it good if we
4    could take a short break.
5        MR. SWAMINATHAN:  Do you want to do it now?
6        MS. ROSEN:  If that works for you, it's fine.
7        MR. SWAMINATHAN:  I mean, we can, we can do it
8    right now.
9        COURT REPORTER:  Okay.  We are going off the
10   record.
11       (OFF THE RECORD)
12       COURT REPORTER:  We are back on record.
13   BY MR. SWAMINATHAN:
14       Q   And to continue where we left off.  And it's
15   related to the hand-off.  It's illegal after that, by
16   that point.  What was the detective's role in terms of
17   supporting the state attorneys, you know, in cases where
18   they've called felony review after obtaining a
19   confession or a inculpatory statement?
20       MS. ROSEN:  Objection, form.
21       A   So --
22       MS. BENSINGER:  Objection, foundation.
23       A   So state attorneys would arrive, and they
24   would inform the detective during this time frame what
25   procedures would be required to move forward with

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

242

1  charging.  And the detective would try to get whatever
2  those items were done, whether it was interview a
3  witness, or a suspect, or some other piece of evidence
4  that needed to be worked up.  Or you know, track down
5  somebody else.  So they would let us know what was left
6  for them to move forward with charging.  And we would
7  just do what we could to comply with that, to get to the
8  point where it was charged.
9      Q   If in the example of a homicide investigation
10  where you've got an inculpatory statement from a
11  suspect, when the state's attorney shows up is the
12  expectation that the detective shares the information
13  about what they've learned over the course of their
14  investigation with the state's attorney?
15      A   That is correct.
16      Q   Okay.  And the detective would share with the
17  state's attorney, whatever information they got from the
18  suspect in the form of a confession or inculpatory
19  statement, correct?
20      A   Yeah.  That's -- I mean, that's a very
21  reasonable thing to say.  It depends on sometimes two
22  state's attorneys will come out.  It depends on the
23  case.  But generally speaking in an average run of the
24  mill homicide case, if there's such a thing, that
25  state's attorney arrives and you give them a breakdown,

243

1  "This is what's happening.  I've got Eric Winstrom in
2  custody.  We talked to him, this is what he said."
3      Q   Okay.  And then in terms of the, "This is what
4  he said."  That can be done orally.  Correct?
5      A   Right.  Yeah.
6      Q   And if there's notes, or a report that's been
7  written about it, you'd provide those written materials.
8  Is that correct?
9      A   Yeah, sure.  If they want it, absolutely.
10      Q   Okay.  And then the state's attorneys would
11  then be making decisions at that point about whether
12  they wanted to interview the person, due to get a
13  statement, those kinds of things, correct?
14          MR. BURNS:  Objection, foundation.
15      A   Correct.
16          MS. BENSINGER:  Joint.
17      Q   Okay.  Now the detective sharing information
18  with the state's attorney, would they have any
19  involvement in subsequently working with the state's
20  attorney to obtain any handwritten statements?  And I am
21  focusing on handwritten statements as opposed to court
22  reported statements, because that's what we have in this
23  case.  So I'm going to focus on handwritten statements.
24          MS. BENSINGER:  I'm going to object to form.
25      Q   All right.  Let me -- I'll ask a question, and

244

1  you can have an objection.  I'll just notice an
2  objection to form for my question.  What involvement
3  were the detectives authorized and trained to have in
4  terms of supporting the state's attorney in any
5  handwritten statement?
6          MS. ROSEN:  So, I'm going to object at this
7  point, because I think that you are -- have moved
8  beyond the scope of the 30(b)(6) notice, unless I'm
9  missing something.
10          MR. SWAMINATHAN:  This is related to the --
11  this is part of the interrogation, because we have a
12  whole section on interrogation.
13          MS. ROSEN:  So you think that communications
14  with the state's attorney and what -- how they --
15  what information they provide is under the label of
16  interrogation?
17          MR. SWAMINATHAN:  Well I'm trying to indicate
18  who you've got a confession, and we're talking about
19  their path to taking the information from their
20  interrogation.  What are they doing with it?  That's
21  what I'm asking about.
22          MS. ROSEN:  Okay.  Well, I have an objection,
23  but he can go ahead and answer.  But, we'll see how
24  far you're going to go.  Because at some point, I
25  might cut it off.

245

1      A   So the process then is if the state attorney
2  indicates that they would like to create a handwritten
3  with the individual in custody.  Generally they're going
4  to want at least one detective in there with them, for
5  safety and because the detective usually has already
6  established a rapport.  So they will join the -- at
7  least one detective would then join the state's attorney
8  in the interview room to, I said to complete the
9  handwritten, but it's not the detective who would
10  generally be writing it out, it would be the state.
11  BY MR. SWAMINATHAN:
12      Q   And typically --
13          MS. BENSINGER:  I'm just going to -- a belated
14  objection on foundation.
15      Q   The handwritten statement, I think you just
16  indicated, were typically written by the state's
17  attorney, not the detectives, correct?
18      A   Correct.
19      Q   And the detective's knowledge of what they'd
20  learned during the course of their interrogations, is
21  that information that they were permitted to share
22  during the course of any subsequent interviews with the
23  state's attorney of the suspect?
24      A   You -- okay.  So, it's the knowledge that the
25  detective gained in -- during the investigation, can

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

246

1   they give it to the state's attorney?  Is that --
2       Q   I -- sort of, but I think I'm asking four
3   questions.  So in other words, once the detective's in
4   the room with the state's attorney, are they allowed to
5   share information from their prior interrogation, "Hey,
6   you know, suspect so and so, you said this to me
7   earlier.  You said that to me earlier."  That kind of
8   information?
9           MS. ROSEN:  Objection, form.
10      A   I mean, whether they were allowed to I could
11  see a potential, like, a conversation taking place.
12  Like, however the -- so the content of the information
13  provided to the detective in the initial interview
14  would've been told to the state's attorney.  When they
15  get in there, I could see where, because the rapport had
16  been established with the detective that the detective
17  saying something like, "Share, you know, tell them what
18  you told me."  Kind of thing.  I guess it would be a
19  case by case basis.  It's possible that if they said,
20  "Hey, why don't you tell them about the, you know, he
21  shot that guy in the head."  That I guess there's
22  nothing wrong with it.  So would it be permitted?  I
23  suppose so, but would it be practical?  I don't know.
24      Q   In cases where detectives have conducted
25  interrogation and obtained confession, and then a

247

1   handwritten statement is taken, in your experience would
2   detectives sometimes participate in preparing the
3   handwritten statement outside the room with the
4   prosecutor away from the suspect?
5           MS. ROSEN:  Objection, form.
6       A   Not in my experience.  No.
7       Q   In other words, the handwritten statements
8   you're saying were typically written out at what point?
9       A   Typically, they're written out in the room.
10      Q   Okay.  The role -- what is the role of
11  supervisors of detectives in terms of -- so I'm stepping
12  away from the handwritten statement question.  I'm just
13  sort of moving back to sort of interrogations, and the
14  technique and process for interrogation.  So
15  transitioning, what is the responsibility of supervisors
16  with regard to the conduct of interrogation by
17  detectives?
18      A   Supervisors have a responsibility to monitor
19  the actions of their subordinates on a day to day basis.
20  And it's a very specific question as to what role they
21  have in interrogations.  They may have no role in the
22  actual interrogation.  What they have a role in is
23  making sure that their subordinate is present for work.
24  They would check in with them, monitor the status of
25  their cases.  See things like, "Did you call the state's

248

1   attorney?"  If they need to.  Make sure it's going in
2   the right direction.  And then after the case report is
3   completed, say post interrogation, they would review the
4   --
5           MS. ROSEN:  Did we lose the court reporter?
6           THE WITNESS:  Are we still on the record?
7           MR. SWAMINATHAN:  I think her phone is on
8   still, but she could be off -- are you back,
9   Victoria?
10          COURT REPORTER:  I've been here the whole time.
11          MR. SWAMINATHAN:  Okay.
12          COURT REPORTER:  Thank you.
13          MR. BURNS:  So that the -- Jan is now the --
14  that's why I think for that.
15          MS. ROSEN:  It says Jan is now the host.  So I
16  just was just --
17          MS. SUSLER:  Yeah, I'm -- I'm here, but I don't
18  know anything about hosting.
19          MR. SWAMINATHAN:  Well, Jan, you're now a host.
20  I expect, I expect treats and stuff.
21          MS. ROSEN:  Charcutier board would be good too.
22          MR. SWAMINATHAN:  Yeah, that would be nice at
23  about this hour.
24  BY MR. SWAMINATHAN:
25      Q   All right Captain go -- all right Commander.

249

1   Go ahead please.  I'm sorry.  Commander.  Please go
2   ahead.
3       A   No problem.  Captains made more over time.  So
4   I -- oh, okay.  So the supervisors then would review, as
5   far as interviews and interrogations go, they'd review
6   the report that was done, the supplemental report.  And
7   that would give them some insight in what happened
8   during the interrogation.  So to say that they supervise
9   is accurate.  To say that they supervise during the
10  interrogation, it would be unusual for a Sergeant to
11  kind of peek his head in during an interrogation, unless
12  you know that something was wrong, somebody yelled or
13  something.  So the actual interrogation itself, you're
14  not necessarily going to see a Sergeant there, unless
15  the detective wants the Sergeant in there for, you know,
16  for assistance or for a different perspective or
17  something, or if there's a better rapport.  So
18      Q   Okay.  So there's no -- in terms of during the
19  interrogation, there was no specific role or requirement
20  for the Sergeant or supervisor to be as involved in the
21  interrogation or moderate the interrogation in any way?
22  Is that fair?
23      A   That is fair.  Now you are, as a supervisor
24  monitoring the status of who's up in the area, what
25  civilians are on your floor.  So as far as that, but

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

250

1 actually the what's going on in the interrogation
2 itself, no there's no -- there's no expectation that a
3 Sergeant would be that involved.
4     Q   Okay.  And typically -- strike that.  The
5 interrogation rooms themselves, did they have --
6 typically have like a window or something you could look
7 out through, even those interrogation rooms?
8     A   Interrogation rooms did have a window.  Whether
9 that window was covered or not, would depend on what,
10 you know, what the status is, sometimes it's -- yeah --
11     Q   Okay.  So, you anticipated my next question.
12 So, the interrogation rooms in the area deliberately had
13 a window on them, correct?
14     A   They do.  Yes.  Yeah.  So you can look in
15 without opening the door, it's a safety concern.
16     Q   Okay.  In other words, and that I was going to
17 add next.  So that window is there in primarily as a
18 safety concern, so that you have the ability to look in
19 and check on a person who's in that room.  Correct?
20     A   Without being surprised.  You don't want to
21 open up, you know, the person could be ready to pounce
22 on you or something.  So, you can easily look in, make
23 sure they're okay.  Make sure that they're not in a
24 position to commit a battery against you.  Right.
25     Q   Okay.  So that window is there both in terms

251

1 of safety of the person in the room and sort of security
2 and safety for the officer?
3     A   Exactly right, yes, sir.
4     Q   Thank you.  And then you made a reference to
5 this idea that sometime those windows to the
6 interrogation rooms would be covered, correct?
7     A   Yes.  You could.  You could cover it if you
8 wanted that privacy.
9     Q   Okay.  And what were the circumstances in
10 which detectives would cover that window?
11     A   Well, for example, you know, the areas aren't,
12 they're -- some of them are bigger than others, Area
13 Five, where this took place isn't huge.  So, you would
14 want it if you had a suspect in custody and you also had
15 victims walking around the floor.  So you wouldn't want
16 that if the suspect could be on their feet, you know,
17 staring out the window when there's a potential witness
18 or a victim walking by.
19     Q   So it was not uncommon to have a paper over
20 the window into an interrogation room, correct?
21     A   Correct.
22     Q   Okay.  And if somebody was walking by, saw
23 paper over window, that would be sufficiently common
24 that that wouldn't raise any red flags, correct?
25     A   Correct.

252

1         COURT REPORTER:  And Counsel, just to let you
2 know, I may be appearing to go in and out of the
3 room for some reason, but I assure you, I am still
4 here via my phone and I'm hearing everything.
5         MR. SWAMINATHAN:  Okay, good.
6         COURT REPORTER:  Thank you, sir.
7 BY MR. SWAMINATHAN:
8     Q   Okay.  One other question related to
9 documentation of interrogation during the course of
10 interrogation, you might often have somebody, you know,
11 you may come in, in and out at different times and
12 conduct an interrogation over sort of multiple sessions,
13 right?  Coming in and out of the room, is that fair?
14     A   Sessions is an interesting way to put it.  But
15 I could see that you, having a conversation with an
16 individual, leaving and coming back.  Yes.
17     Q   And there was no rules or policies around how
18 often you could, you know, go in and go out, have
19 different conversations with the witness.  Correct?
20     A   Well, as we've discussed earlier, you know,
21 the length of their stay, that ends up going to the
22 voluntariness of any statements.  So there will be
23 concerns with length, but as far as, you know, going in,
24 going out and talking to the state's attorney, going
25 back in with the state's attorney, that's very common.

253

1     Q   Okay.  In terms of a person who's being
2 charged, in terms of documentation of the various
3 conversations with the individual, is the expectation
4 that for somebody who's being charged each of the
5 conversations is to be documented in the supplementary
6 reports?
7     A   The expectation, not to the point that it's so
8 specific that, "Eric walked in at 10:15, and then walked
9 out at 10:30, and walked in at 10:45."  The expectation
10 is that the relevant portions of that were recorded.  If
11 there's some -- something out of the ordinary that
12 happens, it should be documented, that's important.  You
13 know, that -- it should be documented, but I would not
14 go so far as to say that every time I walk in and out of
15 an interview room, that that information needs to be
16 documented.
17     Q   It's to the extent the interred person is
18 providing information, either denying involvement in the
19 crime, or acknowledging some information about the
20 crime.  Each of those instances in which they're
21 providing that substantive information, was that to be
22 documented?
23         MR. BURNS:  Objection, form.
24         MS. BENSINGER:  I'm going to object to the
25 form.  Doc -- pursuant to the Chicago Police

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

254

1  Department, or what is the, kind of, premise of the
2  question?
3       MR. SWAMINATHAN:  Who -- sorry.  Who is that? I
4  can't --
5       MS. BENSINGER:  Oh, it's Brette, it's Brette
6  Bensinger.
7       MR. SWAMINATHAN:  What is the premise of the
8  question?
9       MS. BENSINGER:  Yes.  I think initially you had
10  mentioned like for charging decisions to be made.
11      MR. SWAMINATHAN:  No, we're not talking at all
12  about the prosecutor portion at all right now.
13  We're talking exclusively about the detective's
14  interrogation into the documentation.
15      MS. BENSINGER:  Okay, thank you.
16  BY MR. SWAMINATHAN:
17      Q    Yeah.  So, go ahead.  Now that it's clear.
18      A    Oh boy.  Okay, I -- okay, so
19      Q    Let me ask differently.  I'm sorry.  Do you
20  want me to ask it a little differently?
21      A    Yeah, I kind of forgot.
22      MR. SWAMINATHAN:  Yeah, if there's a particular
23  fact.  You know, you've got a fact pattern, like you
24  go in and you talk to a witness, and they deny
25  involvement the first time you go talk to them.

255

1  Fair? Where it's definitely --
2       MR. BURNS:  Object to form the question.
3  BY MR. SWAMINATHAN:
4       Q    Yeah.  So you may have a scenario where a
5  detective goes in and talks to a witness, and the first
6  time they go in the person denies any involvement in the
7  crime.  You with me so far?
8       A    I'm with you.
9       Q    Okay.  And then you might go in later and they
10  might actually tell you some information admitting some
11  actual involvement in the crime.  With me?
12      A    With you.
13      Q    Okay.  Now in that example, so far, is the
14  expectation that the detective will document both the
15  initial statement denying involvement, and the
16  subsequent conversation in which they've now said
17  something inculpatory?
18      A    No, not necessarily.
19      Q    Okay.  So if --
20      A    If it --
21      Q    Go ahead.
22      A    If it was something helpful, if they provided
23  an alibi the first time or something, and it was
24  something that's important and relevant, you might
25  document that.  If it's just, "I walked in and Eric

256

1  Winstrom says, 'I didn't do it.' Then I come back 10
2  minutes later, I walked in Eric Winstrom says, 'Okay,
3  I'll tell you the truth.  I did it.'" That first
4  statement may never make it into a report.  You know,
5  not that relevant, I'd say.
6       Q    Okay.  And what about changes in a person's
7  story over time?  So, what if you go in and interview
8  them, and they're telling you one story, and then the
9  story changes to something dramatically different, you
10  know, hours and hours or a day later?  Do those both --
11  any of those earlier versions of the story have to be
12  documented?
13      A    So to say they have to be documented, I would
14  fall short of that.  To say if it's helpful to document
15  them, it could.  Like I said, especially if an initiate
16  needs -- initially an alibi was given and said I was
17  someplace else.  Like, if it's relevant information
18  that's important to the narrative of the story, I would
19  definitely include it.  But to say it has to be, I would
20  have to look at the actual specifics of the case to say
21  whether or not it should be.
22      Q    So there is no expectation that detectives
23  document, you know, changes in stories from suspects
24  through the court of interrogation.  Is that true?
25      MS. ROSEN:  Object to form.

257

1       A    Only if it's helpful or necessary to help tell
2  the truthful story.
3       Q    So what is the circumstances in which it would
4  be necessary to tell it?
5       MS. ROSEN:  Objection, form.
6       Q    For example, if you broke an alibi and you
7  said that, "You know, I didn't do it because I was at my
8  mom's house."  And then I subsequently went and
9  interviewed the mom and she said, "Absolutely not true.
10  Eric was not there he was, you know, at his friend's
11  house who was subsequently murdered."  You would --
12  necessary to document that sort of inform --
13      A    Okay, I mean --
14      Q    Go ahead.
15      A    So, in --
16      Q    As far as -- sorry, go ahead.  Go ahead.
17      A    Okay.  As far as just walking in and saying,
18  "You know, I didn't do it, I didn't do it." ten times in
19  a row, and then say, "Okay, I did it."  I would not
20  expect the detective to document, "Eric Winstrom said
21  ten times in a row that he didn't do it.  Then I walked
22  back in and he said he did it."  So case by case basis.
23  So
24      Q    Now going back to the subject of false
25  confessions, that we talked about earlier.  You

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

258

1   indicated that detectives got training on the phenomenon
2   of false confessions. Did detectives get training on
3   the susceptibility of certain types of individuals to
4   commit false -- to falsely confess?
5       A   There was training on that subject, yes. To
6   the specifics, I think I may have mentioned, youth, like
7   maybe intoxication. I would have to really review the
8   material. But I know that was a subject in the
9   curriculum.
10      Q   All right. So I think you, again,
11  anticipated. Say, anticipated my question. So
12  detectives got training on the susceptibility -- strike
13  that. Detectives got training that -- on the idea that
14  juveniles in particular could be more susceptible to
15  giving false confessions. Correct?
16      A   I believe that that was in the training.
17      Q   Okay. And detectives were trained -- were
18  detectives trained that people who were mentally
19  impaired, or intoxicated, may also be more susceptible
20  to false confessions?
21      A   Yes.
22      Q   And were detectives trained that people whose
23  -- were from foreign countries and foreign language
24  speakers, didn't understand English, could be more
25  susceptible to false confessions?

259

1       A   I don't think that was included in the
2   training. If it -- I mean, it's possible that it was,
3   but it doesn't seem logical to follow. So I would have
4   to review the training to make that determination.
5       Q   What training were detectives given about --
6   strike that. I think you said earlier that there was no
7   policy in place in the period from 1986 to 1998
8   regarding the use of interpreters, correct?
9       A   Correct.
10      Q   Okay. And that there was no policy in place
11  in the period from 1986 to 1998 regarding interrogation,
12  specifically of people who are non-English speakers,
13  correct?
14      A   Correct.
15      Q   Okay. Now what about training? Was there any
16  training for detectives about the interrogation of
17  individuals who are non-English speakers?
18      A   I -- I don't believe there was a training
19  curriculum about that subject. So, I will say that
20  training definitely took place, on the job training. As
21  we have, you know, a lot of foreign speakers in this
22  city.
23      Q   Was on the job training one of the critical
24  forms of training in particular, with regards to the
25  idea of issue of interrogations and how to conduct

260

1   interrogations?
2       MS. BENSINGER: Objection, form.
3       A   Well, I would say one of them over the basics
4   of interviews, interrogation, as I said, are both used.
5   You started the academy with the constitutional issues,
6   and the pre-service training, but you wouldn't take a
7   brand new detective out of detective school and say,
8   "Okay, get in there, and there's somebody in custody for
9   a murder, go get a confession out of them." You would
10  pair that individual up and you'd start with custodial
11  interviews, burglars, and robbers before you -- or, pair
12  you up with a seasoned detective that sort of on the job
13  training is vital.
14      Q   Okay. So would you say that, on the job
15  training was an important part of training detectives to
16  conduct interrogation?
17      A   Yes.
18      COURT REPORTER: I'm sorry, Ms. Bensinger was
19  that you who objected earlier? Or was that Ms. --
20      MR. BURNS: It was --
21      COURT REPORTER: Ms. Rosen?
22      MR. BURNS: I think it was Brette, yeah, who
23  objected earlier.
24      COURT REPORTER: Thank you.
25  BY MR. SWAMINATHAN:

261

1       Q   Okay. Were detectives given training on the
2   use of polygraph tests in the course of -- as an
3   interrogation or interview technique?
4       A   They were. They were trained in pre-service
5   detective training. The polygraphs were an option that
6   they could use. It was a tool that they could use.
7       Q   And what were they trained about what the use
8   of polygraphs testing was in the context of the
9   interviews interrogation?
10      A   Training was that polygraphs were inadmissible
11  to criminal court. However, they could be useful as an
12  investigative tool, if it suited your needs to gain the
13  cooperation of the subject.
14      Q   Okay. And what were they trained on? What
15  was the way in which they -- a polygraph test could be
16  used as a tool to assist in getting information from a
17  suspect?
18      A   Well, although not admissible in court,
19  polygraphs are -- they're somewhat reliable, more than
20  50 percent reliable. So detectives were taught that
21  they were a tool to be used to see if an individual was
22  telling the truth, for example, to help exclude possible
23  a suspect or to utilize for a suspect. If they failed,
24  it to indicate to that suspect that they did in fact
25  fail it, and sometimes that would encourage a further

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

262

1  conversation that would elicit the truth from an
2  individual.
3     Q   And were detectives also permitted to use
4  rumors or lies about polygraph test results in order to
5  try to get cooperation from witness?
6     A   I would --
7        MS. ROSEN: I'm going to object at this point.
8  Beyond the scope. But you can go ahead.
9     A   In my opinion, that would a -- for example,
10 you failed the polygraph, but you actually passed the
11 polygraph? I would say that that would be a lie, which
12 would be prohibited by our orders. It would be a bad
13 idea.
14    Q   Okay. With regard to -- for non-English
15 speakers, were there any policies in place around who
16 could be used as translators or interpreters for those
17 interrogations?
18    A   There was no written policy.
19    Q   Was there any -- were there any practices that
20 were followed in that area?
21    A   Yes. The practices at the time were attempt
22 to use a sworn police officer, for the reason being that
23 the individual who translated would likely be required
24 to testify in court, depending on the circumstances. If
25 you were unable to find a -- if it was a uncommon

263

1  language that was spoken, from 1986 to 1998, operations
2  come in, had a 24 hour line that they kept a list of
3  interpreters that could be used, of city authorized
4  interpreters. And yeah, that was the practice to first
5  look internally and, then, if nothing else worked out,
6  you could call operations command to have an interpreter
7  assigned.
8     Q   Okay. So the priority was to try to -- the
9  practice was to ideally get somebody who was within the
10 department first, correct?
11    A   Correct.
12    Q   And then was there any practice in terms of
13 trying to avoid having somebody who was within the same
14 department, or group, or just deliberately try to have
15 somebody who was in the same department or group or
16 anything that in that area?
17       MS. ROSEN: Objection, form.
18    A   Did you have practice or policy?
19    Q   I think you -- we already talked about policy.
20 I think there's no policy. So just talking about prep.
21    A   Okay. So the practice would've been -- for
22 efficiency. So for example, this case took place in
23 area five, so you would seek an area five detective. If
24 that didn't pan out, you would probably look to the 25th
25 district, which is attached to Area Five, and then move

264

1  outward from there. So the practice was for efficiency.
2     Q   Was there any concern about using -- having
3  people service translators who were part of the same
4  investigative team?
5     A   No.
6     Q   Was there a practice of using youth officers
7  to be brought into assist an homicide investigation
8  translator?
9     A   So, as I described it, I said the area and
10 then the 25th district, so youth officers were part of
11 the area. So during this, for example, this was a
12 homicide investigation, they'd probably first looked to
13 see if there were any Spanish speakers in the homicide
14 team. If there was not that the youth detectives were
15 in the same -- they were literally on the same floor. So
16 they would -- that would be the next closest group. They
17 share office space with them so that would be a proper
18 next best choice.
19    Q   In terms of the practices around
20 interrogation, was it -- was there a -- was the typical
21 practice to have detectives interrogate suspects on
22 their own or usually with partners?
23    A   That's a case by case basis. There's nothing
24 prohibited interrogation on their own. Oftentimes, if
25 it's a safety issue, there would be two individuals. But

265

1  sometimes, either there's not a safety issue or there's
2  a rapport issue that an individual wants to talk to you
3  but not to me. So there's nothing to prohibit the one-
4  on-one interview, even custodial interview of the
5  subject.
6     Q   What training were you provided about when or
7  whether they should go in by themselves or with a
8  partner?
9     A   So training about officer safety is ingrained
10 from the first season police academy. And so that's the
11 primary concern is that there's not a safety issue. And
12 so that's step one. And then step two, as I said, is
13 training that whatever works. Kind of like note taking,
14 if it works better, to me, if the individual wants to talk to
15 you, but not to me, it's appropriate for you to do it.
16 So it's just on a case by case basis, whatever works
17 best for the specific situation is what they're trained.
18    Q   Getting a document here. One second. Right.
19 Pulling up the SOP we looked at earlier. This is
20 Exhibit 3 in deposition.
21       MS. ROSEN: And I'm handing him a hard copy of
22    that, just because it's easier on his eye.
23       MR. SWAMINATHAN: Yep. I'm looking at page 815
24    of the document RD 117580.
25       MS. ROSEN: I am there.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)

266

1   BY MR. SWAMINATHAN:
2       Q    So that -- at the bottom of that page is a
3   section that begins 8.11 admissions, confessions, and
4   written statements.  You see that?
5       A    Yes.
6       Q    And it continues through the next page,
7   correct?
8       A    Yes.
9       Q    Okay.  So that section has to do with its
10  detective division, SOP, regarding information to be
11  documented by detectives with regard to admission and
12  confessions, correct?
13      A    Yes.
14      Q    Okay.  Now, Guy [sic], you referenced earlier
15  that there was detective admission SOPs that had to do
16  with the subject of interrogations.  Is this the section
17  you're referring to?
18      A    Yes.
19      Q    Okay.  You're not -- are you -- you're not
20  aware of any other sections of the SOP that have to do
21  with interrogations of suspects, correct?
22      A    No.
23      Q    Okay.  I have the next.  I'm going to exhibit
24  11.
25          MS. ROSEN:  Yep.

267

1           MR. BURNS:  We are.
2           MR. SWAMINATHAN:  All right.  I'm showing you a
3   document.  We'll mark as Exhibit 11 -- well, I have
4   marked as exhibit 11.  It is RFC Reyes 118427
5   through
6   118432.
7          (EXHIBIT 11 MARKED FOR IDENTIFICATION)
8   BY MR. SWAMINATHAN:
9       Q    And first page of this document is entitled
10  Violent Crimes Practicum, Part One.  Do you see that?
11      A    I do.
12      Q    Okay.  Is this a training that was provided to
13  detectives?
14      A    This was a training.  Yes, a practical
15  training since they had the chance to write a -- it
16  looks like an armed robbery case report.
17      Q    Okay.  And this training was provided as what
18  part of the detective training?  Was it in-service?  Was
19  it part of their pre-service detective training?  What
20  was it?
21      A    This was not in-service.  This was part of
22  their pre-service detective training.
23      Q    All right.  And this goes through some example
24  interviews; is that correct?
25      A    Yes, it does.  As I recall it.

268

1       Q    Right.  And in terms of the conduct of
2   interrogations of suspects, one thing I noticed is that
3   this -- these interviews largely seem to involve the
4   detectives asking open-ended questions.  Do you see
5   that?
6       A    Say that again?  You said it generally has
7   them asking open-ended questions?
8       A    Yes.
9       A    Okay.
10      Q    You agree?  You see that?  "Tell me what
11  happened.  Go on."
12      A    That is an open-ended question.  Yep.
13  "Why the video store?"  Yep.  "Go on."  Yeah, I see
14  that.
15      Q    Yeah.  Page 4.  Looking at page 4,
16  "then what happened?"  So on.  So in this -- these
17  training materials, I see that there's a -- the
18  training, at least examples here, focused on the use of
19  open-ended questions.  Was that a technique that
20  detectives were taught to use in their training and
21  interrogation?
22      A    Okay.  Well just -- and just to be clear, so
23  this -- these practicums-
24      Q    This isn't a training on how to interview
25  someone.  This is a training on report writing.

269

1       A    So you would go through this practicum and
2   then you would have the form set of writing this up
3   report and fill it out.  However, I do agree that this
4   includes open-ended questions, and I agree that open-
5   ended questions we're trained as a good tool as part of
6   basic interrogation or interview techniques.
7       Q    Okay.  Were detectives trained that it was the
8   best practice to try to use open-ended questions if
9   possible?
10      A    Well, "if possible," is the important thing to
11  say there, because there are times that it is
12  appropriate to flat out ask very specific questions.  So
13  it depends on the circumstances of the case and the
14  individual you're speaking to.
15      Q    Okay.  And so would it be a fair summary and
16  only a summary to say detectives were trained to try to
17  use open-ended questions if you could, at least as a
18  starting point?
19      A    That's fair.
20      Q    Okay.  And was one of the -- one of the things
21  that detectives were trained on, especially in relation
22  to feeding facts, the idea that when you ask more
23  leading questions, you can -- that can be a way in which
24  you may be feeding facts to somebody?
25          MS. ROSEN:  Objection, form.

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

270

1    A    I don't know that that was specifically
2    trained, but it is true that, in general, you are not to
3    feed facts, feed not public facts, unless it's helpful
4    for specific purpose in your investigation.  But
5    generally speaking, we don't feed not public facts
6    unless it's for a reason.
7    Q    All right.  In terms of interrogations of, not
8    just non-English speakers, but people who were foreign
9    nationals, from different countries, were there any
10   policies in place in the period from 1986 to 1998?
11   A    During that time period, the general order, I
12   think it's called Foreign Nationals or Interactions With
13   Foreign Nationals, was in place.  The general, the
14   overall theme of the policy is dealing with consular
15   officials and diplomats.  It does reference foreign
16   nationals as people with allegiance to another country,
17   permanent allegiance to another country, I believe.
18   However, it also prohibits Chicago Police Department
19   members, as we are still today in inquiring, about a
20   person's status.  So if you look at the order -- I don't
21   have it in front of me, but the overall theme is that if
22   you're presented with diplomatic credentials, or if
23   you're informed that the person's a foreign national or
24   a consular official, that there's certain processes that
25   need to be, there it is.

271

1         MR. SWAMINATHAN:  Okay.  Let me just -- let me
2    just mark -- I forgot to mark it.  Hold on, put it
3    back up.  I'm showing you a document I've marked as
4    Exhibit 12.  This is RFC 118448 through 118454.  And
5    the title is "Department Special Order 84-7, Subject
6    Foreign Nationals and Aliens."
7         (EXHIBIT 12 MARKED FOR IDENTIFICATION)
8    BY MR. SWAMINATHAN:
9    Q    Have you -- you've seen this order before,
10   correct, sir?
11   A    I have.  Do you mind making it a little bit
12   bigger?
13   Q    And is this a policy document you were just
14   referring to a moment ago with regard to foreign
15   nationals?
16   A    Yes.
17   Q    Okay.  All right.  So there was a -- and this
18   is -- this has department special order.  Is this
19   applicable to detectives or all the officers?
20   A    All officers.
21   Q    And this policy document contains some
22   guidance about how to handle people who are from
23   different foreign nationals, correct?
24   A    Yes.
25   Q    And that would include people who are

272

1    citizens, but essentially of different countries,
2    correct?  Not -- non-US citizen.
3    A    Correct?  Well, it defines foreign national as
4    any person owing permanent allegiance to a foreign
5    state.
6    Q    For purposes of a detective trying to
7    understand what that means, if somebody essentially is a
8    non-US citizen, are they to understand they're a foreign
9    national under this policy?
10   A    A non-US citizen owing permanent allegiance to
11   a foreign state.  Yeah, I assume that's probably true.
12   Q    Okay.  And so fair to say that the training
13   would've been that this policy applies where you're
14   talking about somebody who's not a US citizen and not
15   claiming to be a legal current resident or otherwise?
16        MS. ROSEN:  Objection, form.  Foundation.
17   Misstates the document.
18   A    Yeah.  So the basis of this policy and is like
19   -- see, this wasn't trained to be a tool to be used for
20   undocumented immigrants or day to day interactions with
21   police.  This policy was used as tool for consular
22   officials diplomat responses to consulate.  I understand
23   that the policy itself contains language which talks
24   about foreign nationals, which could include
25   undocumented immigrants.  Some however, in practice and

273

1    in training, officers were trained not to make inquiries
2    on documentation status.  So during the time period in
3    question, there were thousands, if not tens of thousands
4    or more people that would technically be considered
5    foreign nationals.  However, the training and the
6    practice during this time was not to call the consulate
7    of the countries that they're from, unless they produce
8    some in indication of allegiance to a foreign country, a
9    passport, some sort of diplomatic paperwork.
10   Q    Okay.  So step one is this -- as a matter of
11   practice, the police officers were taught that they were
12   not to ask individuals for their documentation status in
13   the United States, correct?
14   A    Correct.
15   Q    Now, to the extent the detectives learned that
16   a person was a citizen of a different country, then this
17   policy would apply, correct?
18   A    Theoretically, but as I said, the training on
19   the policy was only surrounding diplomatic officials,
20   consular officials, people that provided you with
21   indication that they were -- a visa or a passport.  So
22   I'm not sure in practice, if any detectives having, even
23   if they were familiar with this would expect that this -
24   - like I said, we've had tens of thousands, if not more,
25   probably hundreds of thousands of arrests in this time

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

---

274

1  period where this would come into play, if it was
2  interpreted in such a way that any foreign national we
3  should call their consulate and I -- because of how this
4  was trained on, it -- that those calls did not get made.
5      Q   Okay.  So let's just break that down a little
6  bit.  Okay.  So I'm looking at, this is page 11854, page
7  3 of the policy.  Section C talks about the arrest of
8  foreign nationals, correct?
9      A   Correct.
10     Q   This is the section you were talking about,
11 where there is some reference, at least in the policy,
12 to what you do when you arrest somebody who is a citizen
13 of a different country, correct?
14     A   Yes.
15     Q   And the -- at least, just starting with the
16 policy, the policy says that when somebody was a citizen
17 of a foreign country is arrested or detained, a
18 determination should first be made to see that is a
19 factor that they are of a foreign country.  And if so,
20 not notify the consular post immediately.  Correct?
21     A   Well, I want to clarify it says foreign
22 national, not a citizen of a foreign country.
23     Q   And then we said earlier, the definition of
24 what constitutes foreign national would include somebody
25 who's a citizen of a different country, correct?

---

275

1      A   Probably not a dual.
2      MS. ROSEN:  Object to form.
3      A   Probably not a dual citizen.  Yeah.  I assume
4  it would, but it's not as clear to me.
5      Q   Okay.  And then if it is a determination that
6  somebody is a foreign national, under the policy, the --
7  a consular -- a communication to the consulate office to
8  be made, correct?
9      A   That is what this policy says.  Yes.
10     Q   Okay.  Now, as a practical matter, as a matter
11 of -- strike that.  As a matter of practice, is it fair
12 to say that this policy in section C regarding the
13 arrest of foreign nationals was not followed in
14 practice?
15     A   It is fair to say that this was not followed.
16     Q   Okay.  And in terms of the training of Chicago
17 police officers, is it fair to say the training was that
18 this policy in section C was not to be followed?
19     A   With the caveat that it was to be followed
20 under the circumstances that the individual provided you
21 indication that they were a foreign national.
22     Q   And the policy, as you described it -- the
23 policy written here was in place in the period from 1986
24 to 1998, correct?
25     A   Correct.

---

276

1      Q   And the practice you just described, about
2  applying the policy only to people who were actual
3  diplomatics or dignitaries, was also the practice for
4  the period from 1986 to 1998, correct?
5      A   Correct.
6      Q   Okay.  And the policy and practice that you
7  just described applied across the entire city, not just
8  the specific areas, correct?
9      A   That is correct.
10     Q   Okay.  Why don't we take a five minute break?
11 I'm getting close to the end here.  Real quick.  Okay.
12 Thanks.
13     COURT REPORTER:  Okay.  We're going off the
14 record.
15     (OFF THE RECORD)
16     COURT REPORTER:  We are back on the record.
17 BY MR. SWAMINATHAN:
18     Q   Just the last couple of questions I have.  So
19 I want to go back to the subject of the length of
20 interrogation again.  I won't pull up the policy again.
21 But you recall, we talked about a port for the policies?
22 I talked about, I think it was, lengthy interrogation
23 incommunicado.  I think something like that.  You recall
24 what I'm referring to as the policy?
25     A   Yes.

---

277

1      Q   Okay.  So my question for you is with regard
2  to the role of supervisors.  Did supervisors have any
3  role in keeping an eye on how long individuals were kept
4  in custody?
5      A   Yes.  So supervisors --
6      Q   Go ahead.
7      A   As I may have already testified, supervisors,
8  although they may not stick their head in during an
9  interrogation, they have a responsibility to generally
10 know who is -- what civilians are on the floor and that
11 would include the status of the individuals, how long
12 they've been there, et cetera.
13     Q   So when somebody was going -- was being taken
14 into an interrogation room, the expectation was that
15 sergeants would be told who's coming up to the floor and
16 what their -- who they are and why they're in the
17 interrogation room?
18     A   That is correct.
19     Q   And so then, obviously, they would know when
20 that person -- when somebody is out -- no longer on the
21 -- no longer civilian on the floor.  Correct?
22     A   Correct.
23     Q   And so was there some expectation that
24 supervisors would be keeping track of how long people
25 were in these interrogation rooms in the area?

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021 30(b)(6)

278

1    A    Correct.
2        MR. SWAMINATHAN:  I have nothing else, Jan.
3    Anybody else have any questions other than Jan
4    Susler?
5        MS. SUSLER:  No.  No, I don't have any
6    questions.  Thanks, Commander.
7        MR. SWAMINATHAN:  Anyone else?
8        COURT REPORTER:  I'll take that as --
9        MR. SWAMINATHAN:  We've got nobody.
10        COURT REPORTER:  I'll take that as a no.
11    In that case --
12        MR. SWAMINATHAN:  I think we're -- Commander,
13    thank you very much for your time.
14        COURT REPORTER:  Ms. Rosen -- conclude.
15    Oh, I'm sorry.  Yes.  Ms. Rosen.  You would like to
16    read and sign?
17        MS. ROSEN:  We would like to.  Yeah, we are
18    reserving signature.  Yeah.
19        COURT REPORTER:  Yes, ma'am.  This concludes
20    the deposition.  We are going off the record.
21        (DEPOSITION CONCLUDED AT 6:09 P.M.)
22
23
24
25

279

1    CERTIFICATE OF REPORTER
2
3    I do hereby certify that the witness in the foregoing
4    transcript was taken on the date, and at the time and
5    place set out on the Title page hereof by me after first
6    being duly sworn to testify the truth, the whole truth,
7    and nothing but the truth; and that the said matter was
8    recorded by me and then reduced to typewritten form
9    under my direction, and constitutes a true record of the
10    transcript as taken, all to the best of my skills and
11    ability. I certify that I am not a relative or employee
12    of either counsel, and that I am in no way interested
13    financially, directly or indirectly, in this action.
14
15
16
17
18
19
20
21
22    VICTORIA JADICK,
23    COURT REPORTER / NOTARY
24    COMMISSION EXPIRES ON: 01/28/2023
25    SUBMITTED ON: 01/04/2022