# Exhibit 12

# In The Matter Of:

*Maysonet v.*
*Guevara*

---

*Robert Flores*
*October 17, 2022*

---



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION
               NO. 18-CV 02342
3

4

5
   JOSE JUAN MAYSONET JR.,              )
6        Plaintiff,                     )
7        v.                             )   DEPOSITION UPON
                                        )   ORAL EXAMINATION
8  REYNALDO GUEVARA, ERNEST             )        OF
   HALVORSEN, EDWARD                    )   ROBERT FLORES
9  MINGEY, LEE EPPLEN,                  )   VIA VIDEOCONFERENCE
   FERNANDO MONTILLA,                   )
10 ROLAND PAULNITSKY, FRANK             )
   DIFRANCO, CITY OF                    )
11 CHICAGO, and COOK                    )
   COUNTY,                              )
12                                      )
13       Defendants.                    )

14

15

16           T R A N S C R I P T  of the stenographic
17 notes of AUDREY ZABAWA, a Certified Court Reporter
18 of the State of New Jersey, Certificate No.
19 XI01410, taken via videoconference, on Monday,
20 October 17, 2022, commencing at 1:03 p.m.
21

22

23

24

25
```

Page 2

```
1  A P P E A R A N C E S :
2  BONJEAN LAW GROUP, PLLC
   750 Lexington Avenue, 9th Floor
3  New York, New York 10222
   718.875.1850
4  jennifer@bonjeanlaw.com
   ashley@bonjeanlaw.com
5  BY:  JENNIFER BONJEAN, ESQ.
        ASHLEY COHEN, ESQ.
6  Counsel for Plaintiff

7  LEINENWEBER, BARONI & DAFFADA, LLC
   120 North LaSalle Street, Suite 200
8  Chicago, Illinois 60602
   312.380.6635
9  michael@ilesg.com
   BY:  MICHAEL SCHALKA, ESQ.
10 Counsel for Defendant Reynaldo Guevara

11 THE SOTOS LAW FIRM, P.C.
   141 West Jackson Boulevard, Suite 1240A
12 Chicago, Illinois 60604
   312.735.3303
13 dbrueggen@jsotoslaw.com
   BY:  DAVID BRUEGGEN, ESQ.
14 Counsel for Defendants Ernest Halvorsen, Edward
   Mingey, Lee Epplen, Fernando Montilla, and Roland
15 Paulnitsky

16 ROCK, FUSCO & CONNELLY, LLC
   312 North Clark Street
17 Chicago, Illinois 60654
   312.494.1000
18 tcarney@rfclaw.com
   BY:  THERESA BEROUSEK CARNEY, ESQ.
19 Counsel for Defendant City of Chicago

20 HINSHAW & CULBERTSON LLP
   151 North Franklin Street, Suite 2500
21 Chicago, Illinois 60606
   312.704.3127
22 smehr@hinshawlaw.com
   BY:  STEPHEN MEHR, ESQ.
23 Counsel for Defendant Frank DiFranco

24

25
```

Page 3

```
1                I N D E X

2  WITNESS       DIRECT    CROSS    REDIRECT   RECROSS

3  Robert FLORES

4  Ms. Bonjean       5                144

5  Ms. Carney                 144

6

7

8  NOTE:  Exhibits marked digitally.
          (Attached herewith.)
9

10             E X H I B I T S

11 NUMBER     DESCRIPTION              FOR IDENT.

12
   Flores-1, Notice of a Rule 30(B)(6)     7
13 Deposition

14 Flores-2, General Order 93-3           14

15 Flores-3, General Order 82-14          26

16 Flores-4, Reynaldo Guevara complaint   79
   register, five pages
17
   Flores-5, document entitled, Complaint 82
18 Category Tables

19 Flores-6, General Order 83-1          101

20 Flores-7, General Order 83-3          113

21

22

23

24

25
```

Page 4

Flores - Direct/Bonjean

```
1  R O B E R T   F L O R E S, called as a witness,
2  having been first duly sworn, testified as
3  follows:
4     DIRECT EXAMINATION BY MS. BONJEAN:
5  Q.  Good afternoon -- yeah, I guess it's
6  good afternoon -- Lieutenant Flores.  My name is
7  Jennifer Bonjean.  That's B-O-N-J-E-A-N.  And I,
8  along with my colleague Ashley Cohen, who is on
9  this Zoom, represent the plaintiff in this matter,
10 Jose Juan Maysonet Junior, and we are here today to
11 take your deposition as a 30(b)(6) designee.
12    MS. BONJEAN: But before we get
13 started, I'm going to ask that all the parties
14 place their appearances on the record.  Okay?
15    MS. CARNEY: Theresa Kearny, on
16 behalf of the defendant City of Chicago as well as
17 the witness.
18    MR. BRUEGGEN: Dave Brueggen, on
19 behalf of Defendant Officers Halvorsen, Mingey,
20 Montilla, Paulnitsky, and Epplen.
21    MR. MEHR: Stephen Mehr, on behalf of
22 Defendant Frank DiFranco.
23    MR. SCHALKA: Michael Schalka, on
24 behalf of Defendant Guevara.
25
```

Maysonet v.
Guevara

| Flores - Direct/Bonjean | Page 5 |
| --- | --- |

1     BY MS. BONJEAN:
2  Q.  Okay.  Lieutenant Flores, have you
3  ever had your deposition taken before?
4  A.  Yes.
5  Q.  Can you approximate how many times
6  for me?
7  A.  Approximately eight to ten times.
8  Q.  Okay.  So you are a bit of a pro.
9  I'm just going to go over some guidelines so that
10  we're on the same page.  Okay?
11  A.  Okay.
12  Q.  We'll do an abbreviated version.
13  Obviously, if you don't understand one of my
14  questions, will you please let me know, and I'll
15  try to reframe until we can get on the same page.
16  Okay?
17  A.  Okay.
18  Q.  And I'm going to assume you
19  understood a question if you answer it; is that
20  fair?
21  A.  Yes.
22  Q.  Okay.  If you need to take a break,
23  let me know.  I just ask if there's a question
24  pending, you answer that question before we go
25  ahead and take a break.  All right?

| Flores - Direct/Bonjean | Page 6 |
| --- | --- |

1  A.  Yes.
2  Q.  And I will do my very best not to
3  interrupt your answers, and I would ask that you do
4  your very best to not interrupt my question even if
5  you think you know where I am going with it.  Okay?
6  A.  Okay.
7  Q.  All right.  And, sir, today you are
8  testifying as a designee for the City of Chicago
9  what we call a 30(b)(6) designee.  Do you
10  understand that?
11  A.  Yes.
12  Q.  Okay.  And do you understand what
13  your role is here today?
14  A.  Yes.
15  Q.  Okay.  Did you have an opportunity to
16  look at the 30(b)(6) deposition notice that was
17  issued by plaintiff to the City of Chicago?
18  A.  Yes.
19  Q.  What I'm going to ask you to -- do
20  you have it in front of you?
21     MS. BONJEAN: Or shall we put it on
22  up on the screen, Theresa?
23     MS. CARNEY: For what it's worth,
24  that is one thing I have here for him.
25     MS. BONJEAN: Okay.  Perfect.

| Flores - Direct/Bonjean | Page 7 |
| --- | --- |

1     MS. CARNEY: So he has a copy of that
2  in front of him.
3     MS. BONJEAN: Okay.  Great.
4     (Flores-1, Notice of a Rule 30(B)(6)
5  Deposition, marked for identification.)
6  Q.  So, Lieutenant Flores, I am going to
7  hand you what I have marked as, we'll call it
8  Flores-1, if you don't mind, and it indicates that
9  it is a Notice of a Rule 30(B)(6) Deposition on the
10  City of Chicago.  Do you see that?
11  A.  Yes.
12  Q.  And as you can probably tell, there
13  are various subject matters that are identified on
14  this notice that the plaintiff is interested in
15  pursuing, but I believe you're here to speak to a
16  couple of the subject matters, not all of them; am
17  I right?
18  A.  That's correct.
19  Q.  Can you tell me which subject matters
20  you are prepared to testify about as a designee of
21  the City of Chicago?
22  A.  I believe it was two --
23  Q.  Two and five; is that right?  It's
24  not a test.  Two, five and -- two and five; is that
25  right?

| Flores - Direct/Bonjean | Page 8 |
| --- | --- |

1  A.  Yes.
2  Q.  Okay.  I just want to make sure that
3  we are on the same page.
4     Lieutenant Flores, can you just tell
5  me a little bit about -- obviously, you're not a
6  fact witness.  I'm not going to get too much into
7  who you are specifically, but can you tell me are
8  you currently an active Chicago police officer?
9  A.  Yes.
10  Q.  And I see that you have the rank of
11  lieutenant; is that right?
12  A.  Correct.
13  Q.  And are you currently assigned in any
14  particular division of the City of Chicago's police
15  department?
16  A.  Yes.
17  Q.  And what is that?
18  A.  Currently assigned to the Bureau of
19  Internal Affairs.
20  Q.  How long have you been assigned to
21  the Bureau of Internal Affairs?
22  A.  Approximately ten months.
23  Q.  Have you ever done a tour or a
24  assignment with the Bureau of Internal Affairs
25  previously?

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 9

1  A.  No.
2  Q.  Okay.  And how long have you been a
3  Chicago police officer?
4  A.  About 28 years.
5  Q.  So what year did you get sworn in as
6  a Chicago police officer?
7  A.  September 1994.
8  Q.  Okay.  And you understand, sir, that
9  we are going to be asking questions today regarding
10  the time period that apparently precedes your
11  employment with the Chicago Police Department;
12  right?
13  A.  Yes.
14  Q.  Okay.  And I assume you feel prepared
15  to answer questions about that time period to the
16  best of your ability; right?
17  A.  Correct, yes.
18  Q.  What's your understanding of the time
19  period that you're going to be speaking to today?
20  A.  1985 to 1990, with some to 1995.
21  Q.  Right.  I just wanted to make sure
22  that we are on the same page.  All right.  So when
23  I ask you questions, obviously, I'm talking about
24  the general time period you just mentioned, 1985 to
25  1990.  Perhaps it may go past that at some point.

---

Flores - Direct/Bonjean                                   Page 10

1  I will do my best to make it clear.  You can assume
2  that's the time frame I'm talking about if I'm
3  asking a question, but there may be -- if I'm going
4  to give you a different time frame for some reason
5  just as a point of comparison, I'll let you know.
6  Okay?
7  A.  Okay.
8      MS. CARNEY: Jennifer, I don't mean
9  to interrupt.  The notice is '87.  Obviously, a
10  couple years here or there.
11      MS. BONJEAN: Right, right.  You're
12  right.
13  Q.  Lieutenant Flores --
14      MS. BONJEAN: And I'm not trying to
15  widen that time frame.
16      MS. CARNEY: I know.
17  Q.  Just so you are aware, the notice
18  indicates from 1987 through 1990, and -- yeah, I
19  think for your purposes, that's pretty much all you
20  need to be concerned with.  Okay?
21  A.  Okay.
22  Q.  So that means if I'm asking a
23  question, that's sort of the general time frame I'm
24  looking at unless I specify otherwise for some
25  reason.  Okay?

---

Flores - Direct/Bonjean                                   Page 11

1  A.  Okay.
2  Q.  Okay.  So let's start with, again, in
3  the time frame of between 1987 and 1990,
4  Lieutenant, did the Chicago Police Department have
5  a division that handled civilian complaints of
6  misconduct against Chicago police personnel?
7  A.  Yes.
8  Q.  And what name or names did those
9  division or divisions have during that time period?
10  A.  It was the Office of Professional Standards
11  and the Internal Affairs Division.
12  Q.  And are those division sometimes
13  known as either OPS or IAD?
14  A.  Yes.
15  Q.  And is there a corollary today for
16  OPS and IAD?
17  A.  Yes.
18  Q.  And what are those called, just so I
19  know?
20  A.  Currently, it's the Bureau of Internal
21  Affairs, and the former OPS is Civilian Office of
22  Police Accountability.
23  Q.  Going back to the time of 1987 to
24  1990, the Office of Professional Standards, what
25  was the function of OPS, or the Office of

---

Flores - Direct/Bonjean                                   Page 12

1  Professional Standards?
2  A.  Their purpose was to investigate specific
3  allegations made against department members
4  concerning excessive force, domestic issues, and
5  officer-involved weapons discharge incidents.
6  Q.  Is that just an example of the types
7  of claims that OPS would investigate?  That's not a
8  full accounting, I assume; correct?
9  A.  Correct.
10  Q.  Is it fair to say OPS investigated
11  civilian complaints?
12  A.  Well, both the Internal Affairs Division
13  and OPS investigated civilian complaints.  It
14  depended on what the allegation was.
15  Q.  Okay.  So was there a policy that
16  existed at the time that differentiated between
17  what type of complaint OPS would be tasked with
18  investigating versus what the Internal Affairs
19  Division would be tasked with investigating?
20  A.  Yes.
21  Q.  And can you tell me what that order
22  or policy was?
23  A.  It was a department general order.  I
24  believe it was 85, and I don't recall the exact
25  number, Complaint and Disciplinary Procedures.

---

Maysonet v.
Guevara

| Flores - Direct/Bonjean | Page 13 |
| --- | --- |

1  Q.   And what was the function of the
2  Internal Affairs Division?
3  A.   Basically investigating the allegations of
4  misconduct against a department member, any
5  allegation that the Officer of Professional
6  Standards was not investigating.
7  Q.   Okay.  And can you summarize for me
8  what the difference was between OPS and IAD?
9  A.   OPS were civilian investigators.  They were
10  led by a civilian chief administrator, and they
11  reported directly to the superintendent on
12  specific subject matter allegations, as opposed to
13  the Internal Affairs Division also reported
14  directly to the superintendent, but they
15  investigated other allegations that OPS didn't
16  and, I guess, minor operational violations.
17  Q.   Okay.  Just do you have -- I assume
18  you don't have the general orders in front of you?
19  A.   No.
20  Q.   Okay.  So I'm going to have you look
21  at --
22       MS. BONJEAN: Ashley, if you could
23  pull up, and we're going to mark it as Flores-2,
24  General Order, I think it's 93-3, Ashley.  It's
25  called Complaint and Disciplinary Procedures, and

| Flores - Direct/Bonjean | Page 14 |
| --- | --- |

1  there's appears to be -- it's a large document,
2  Ash, and if you can go to the addendum two.  Yes.
3  It's basically RFC-Maysonet 14461.
4       (Flores-2, General Order 93-3, marked
5  for identification.)
6  Q.   Okay.  Lieutenant Flores, what I have
7  done is I'm marking this whole PDF, which was
8  provided to us by the City of Chicago, as -- it's
9  an 80-page document, which is a collection of what
10  appear to be a general order and the addendums to
11  them that relate to Complaint and Disciplinary
12  Procedures.  First of all, does this document look
13  familiar to you?
14  A.   Yes.
15  Q.   Okay.  Have you had an opportunity to
16  review it at some point prior to your deposition
17  here today?
18  A.   Yes.
19  Q.   Obviously, I don't expect you to have
20  memorized it, but I do have some questions that I'd
21  like to ask.
22       MS. BONJEAN: So if we go to the next
23  page, the next page, Ashley.
24  Q.   It indicates Office of Professional
25  Standards here.  Do you see that?

| Flores - Direct/Bonjean | Page 15 |
| --- | --- |

1  A.   Yes.
2  Q.   Okay.  Does this reflect, this
3  subsection B, essentially what the Office of
4  Professional Standards how it was designed to
5  function?
6  A.   Yes.
7  Q.   All right.  And it does say that,
8  "The Office of Professional Standards is a
9  component of the personnel staff of the
10  superintendent which investigates complaints of
11  excessive force and other matters as directed by
12  the superintendent."  Do you see that?
13  A.   Yes.
14  Q.   And it says it was directed by the
15  superintendent.  What does that mean exactly?
16  A.   I'm sorry.  What was that?
17  Q.   It indicates that, "OPS investigates
18  complaints of excessive force and other matters as
19  directed by the superintendent."
20       What is meant by, to the best of your
21  understanding, that statement, "matters as directed
22  by the superintendent"?
23  A.   The superintendent could -- if it's for a
24  specific case, he could determine that OPS should
25  investigate it as opposed to the Internal Affairs

| Flores - Direct/Bonjean | Page 16 |
| --- | --- |

1  Division.
2  Q.   Okay.  So is it your testimony that
3  it was the superintendent's job essentially to
4  determine whether or not OPS would investigate a
5  complaint or IAD?
6       MS. CARNEY: Objection to form.
7  Misstates the testimony.
8  A.   No.  Just for specific cases, if it's
9  brought to the superintendent's attention, and he
10  wanted it investigated by OPS, he was permitted to
11  do so under the order.
12  Q.   Okay.  And if it wasn't the
13  superintendent who was making that determination,
14  what was the process by which it was determined
15  whether a complaint would be investigated by OPS or
16  IAD?
17  A.   Well, OPS did the intake.  If it fell
18  within their subject matter investigations, they
19  essentially -- they kept the investigation in
20  their office.  Otherwise, it was forwarded to the
21  Bureau of Internal Affairs.
22  Q.   Right.  And I'm trying to get a sense
23  of what was the jurisdiction essentially of OPS
24  versus IAD.  I see excessive force would stay with
25  OPS, but what about other types of allegations?

Maysonet v.
Guevara

| Flores - Direct/Bonjean | Page 17 |
|---|---|

1　How was that determined?
2　A.　Like I said, a weapons discharged by a
3　member.　A use of force by a member was
4　investigated by OPS.　If a department member was
5　involved in a domestic violence situation, that
6　was investigated by OPS.
7　Q.　You're giving me examples, which I
8　appreciate, but what I -- obviously, there's, you
9　know, a whole range of different types of
10　complaints that could come to the attention of the
11　Chicago Police Department, I would think, from a
12　police officer lied, he was disrespectful,
13　excessive force.　Yes, a domestic violence
14　complaint.　It could be he stole something from me.
15　It could be he drove his car too fast.　It could be
16　he didn't have his uniform in proper form.　It
17　could be -- you know, it's kind of countless the
18　types of complaints that could come through the
19　door.　So I'm wondering what the guiding principles
20　were for deciding how it stayed with OPS versus
21　IAD, and maybe there's a document somewhere, but if
22　you could elaborate on that, that's what I'm
23　looking for?
24　A.　Well, when they did the intake, whatever
25　the allegation was, OPS determined whether they

| Flores - Direct/Bonjean | Page 18 |
|---|---|

1　investigated it.
2　Q.　Well, what was the criteria by which
3　OPS decided whether they were keeping it or whether
4　they were saying this is something for IAD?
5　A.　Whatever the complaint was, what the
6　allegation was, that's the criteria they used.
7　Q.　Right.　So, again, is there a list
8　somewhere where, okay, it's this complaint, we keep
9　it, versus it's a different type of complaint, we
10　send it to IAD?
11　A.　Guidance in the directive.　I don't know if
12　OPS had a list, but they did the intake, and
13　that's where the complaints started.
14　Q.　Right.　I understand where it
15　started.　I'm trying to understand why there are
16　two departments.　One functioned in one way, and
17　one functioned in another, and I'm not really clear
18　on why there was an OPS versus an IAD.　And, you
19　know, I have my ideas, but I don't want to put
20　words in your mouth.　So I'm trying to understand
21　what the respective function was of these two
22　different offices?
23　A.　I mean, I don't know when they were
24　established, but other than OPS could be somewhat
25　independent of the police chain of command to do

| Flores - Direct/Bonjean | Page 19 |
|---|---|

1　their investigation.
2　Q.　Right.　Because it was civilian
3　investigators; is that right?
4　A.　Yes.
5　Q.　Okay.　So I'll ask it this way.　Who,
6　as in what types of individuals, investigated
7　complaints that were referred to IAD?
8　A.　Internal Affairs was comprised of sworn
9　members.
10　Q.　And why would some -- why would some
11　complaints be better investigated by sworn
12　personnel versus civilian personnel?
13　A.　I don't know if it would be better
14　investigated.　Just to give it more independence.
15　Q.　Okay.　Why?　Why?
16　A.　If it was determined that that was
17　necessary or just a better overall handling of the
18　allegations of the complaint.
19　Q.　If a police officer was accused of a
20　crime, who handled that?
21　A.　Criminal offenses is Internal Affairs.
22　Q.　Why?
23　A.　I don't know why.　It was just determined
24　that they would.
25　Q.　Do you know what the policy was

| Flores - Direct/Bonjean | Page 20 |
|---|---|

1　behind that determination?
2　A.　No.　It would have to go back when OPS was
3　created separate from Internal Affairs why it was
4　determined.　I don't know though.
5　Q.　Okay.　What about complaints brought
6　by civilians that could be a crime but also just
7　also would be a potential administrative violation,
8　how did those get handled?
9　A.　My understanding is they would go to the
10　Internal Affairs Division.
11　Q.　So, for instance, excessive force
12　could be a crime; right?
13　A.　Could be, yes.
14　Q.　So you've told me though that
15　excessive force was handled by OPS; right?
16　A.　Yes.
17　Q.　So was it just specific types of
18　crimes that were handled by IAD, or like how did
19　that determination get made since, you know, we can
20　agree that excessive force could be a crime?　It
21　may not be, but could be.
22　A.　I believe it was -- the criteria was for
23　excessive force any type of bodily injury, bodily
24　harm, bodily contact.　Physical.
25　Q.　Right.　And then that would go to

Maysonet v.
Guevara

| Flores - Direct/Bonjean | Page 21 |
| --- | --- |

1 IAD?
2 A. No, that would stay with OPS.
3 Q. Okay. So you're not really able to
4 explain to me how it was determined that certain
5 complaints would remain with OPS versus go to IAD?
6 It doesn't sounds like there was any rule of thumb
7 about that?
8     MS. CARNEY: Objection to form.
9 Misstates his testimony. You can answer.
10 A. Just the overarching subject matter of the
11 allegation.
12 Q. Right. I know you keep repeating
13 that. That's just general. That's a general
14 response, but -- I understand that it was the
15 subject matter of the investigation. But what
16 about the subject matter of the investigation made
17 it more appropriate to stay with OPS versus IAD?
18 A. Made it more appropriate? I don't know. I
19 think it was just determined to.
20 Q. So what -- let's talk hypothetically
21 then since you're unable to provide me with either
22 a policy or a -- a policy or a guiding principle
23 that instructed whether certain complaints were
24 investigated by OPS versus IAD. If an individual
25 alleged that a police officer lied, okay, and made

| Flores - Direct/Bonjean | Page 22 |
| --- | --- |

1 a false police report or gave false testimony,
2 something of that nature, who would handle that
3 investigation? Office of Professional Standards or
4 IAD?
5 A. IAD.
6 Q. And why is that?
7 A. It goes back to the allegation is -- does
8 not fall into the categories that OPS
9 investigated.
10 Q. Okay. Great. So you just said
11 there's categories that OPS investigates?
12 A. Yes.
13 Q. What are the categories?
14 A. The same thing I just said. Excessive
15 force.
16 Q. Anything else?
17 A. Domestic violence.
18 Q. Let's slow down. You said excessive
19 force. Domestic violence. What else?
20 A. Weapons discharge incidents.
21 Q. Weapons discharge incidents.
22 Anything else that OPS investigated?
23 A. Anything with -- involved a death of a
24 civilian, a prisoner.
25 Q. Anything else?

| Flores - Direct/Bonjean | Page 23 |
| --- | --- |

1 A. I believe that was it.
2 Q. Okay. So excessive force, domestic
3 violence incidents, weapons discharge incidents,
4 anything involving a death of a civilian is what
5 OPS would investigate; is that correct?
6 A. Yes.
7 Q. Okay. And other civilian complaints
8 that did not fall into those categories would be
9 investigated by the Internal Affairs Division; is
10 that right?
11 A. Yes.
12 Q. Now, when a individual wanted to
13 lodge a complaint against a police officer back in
14 1987 to 1990, what were the ways in which they
15 could do that?
16 A. They could go directly to OPS and make a
17 complaint. They could go to any department
18 supervisor and make a complaint. And I believe
19 they could go to IAD, Internal Affairs, and make a
20 complaint.
21 Q. So a civilian could make complaint
22 with OPS or IAD, but also any supervisor in the
23 department would have to take a complaint if there
24 was a complaint made against a police officer; is
25 that what I'm hearing?

| Flores - Direct/Bonjean | Page 24 |
| --- | --- |

1 A. Yes.
2 Q. So if somebody walked into a police
3 station, for instance, they could make a complaint
4 with any white shirt there; is that right?
5 A. Yes.
6     MS. CARNEY: Jennifer, for what it's
7 worth, I have 93-3 here in hard copy. That might
8 make things a little bit easier since it's such a
9 big document. I'm going to give that to him, if
10 that's okay?
11     MS. BONJEAN: That would be great.
12 Thank you so much.
13 Q. Lieutenant Flores, can you flip
14 through this paper copy real quick, and let me know
15 when you have done so, and I just want you to
16 identify it for me for the purposes of the record.
17 A. Okay. I'm done looking through it.
18 Q. Okay. And does this document that
19 we've marked already as Flores-2, is this the
20 Complaint and Disciplinary Procedures that were in
21 effect -- well, the effective date was January of
22 1993?
23 A. Yes.
24 Q. Okay. Do you know whether this order
25 was in effect between 1987 and 1990?

| Flores - Direct/Bonjean                           Page 25 |
|---|

1   A.   This particular general order was not in
2   effect.
3   Q.   Okay.  Do you know how this order is
4   different from the 1987 to the 1990 order?
5   A.   It's -- the predecessor order is very
6   similar to this one.  There must be minor changes
7   that were made when the previous order was
8   rescinded and this was enacted.
9        MS. BONJEAN: Yeah, I mean -- I don't
10  know -- maybe I'm missing something. Theresa, did
11  we ever get the actual order that was in effect
12  during the relevant period of time?
13       MS. CARNEY: Yeah, it's 82-14.  It's
14  Bates stamped RFC-Maysonet 0483894.
15       MS. BONJEAN: What is it?
16       MS. CARNEY: 82-14.  I have it for
17  him.
18       MS. BONJEAN: Let's take a two-minute
19  break.
20       (Break taken.)
21  Q.   Lieutenant Flores, I'm going to have
22  you look at another document which is identified as
23  General Order Number 82-14 with an effective date
24  of October 15th, 1982.  The subject matter is
25  Complaint and Disciplinary Procedures.  Do you see

| Flores - Direct/Bonjean                           Page 26 |
|---|

1   that?
2   A.   Yes.
3        MS. BONJEAN: And we'll mark this as
4   Flores, I guess, 3.
5        (Flores-3, General Order 82-14,
6   marked for identification.)
7   Q.   Is this the predecessor to what we
8   marked as Flores-2?
9   A.   Predecessor to 93-3, yes.
10  Q.   Okay.  All right.  And I have it has
11  Bates stamped RFC-Maysonet 48356 through 43893.  Is
12  that what you're looking at, sir?
13       MS. CARNEY: We have 48394.
14       MS. BONJEAN: 48394?
15       MS. CARNEY: Yeah.
16       MS. COHEN: I'm sure it's just a
17  duplicate of the same thing.
18       MS. CARNEY: It is 82-14.
19       MS. BONJEAN: I don't know, I think
20  it was produced to us twice or something, but
21  that's fine.  We'll double-check and add it just
22  to make sure at some point, but we can move ahead.
23       MS. COHEN: Why don't I share it just
24  to make sure it's the same one.  Just look at it.
25  This is 82-14.

| Flores - Direct/Bonjean                           Page 27 |
|---|

1        MS. CARNEY: Yeah, that's the one he
2   has in front of him.
3        THE WITNESS: Yes.
4   Q.   Okay.  Lieutenant, I think I had
5   asked you some questions about the roles of the
6   Internal Affairs Division versus OPS, and I think
7   that is covered by the addendum number two to
8   General Order 82-14.  It talks about OPS and
9   Internal Affairs.  I assume that even though we
10  were looking at the General Order 93-3 that your
11  answers to those questions remain the same; is that
12  right?
13  A.   Yes.
14  Q.   I want to first ask you some
15  questions about the complaint and disciplinary
16  process.  First the complaint process.  You talked
17  about how complaints can come in through OPS or IAD
18  or any supervisor in the department.
19       When a civilian wants to lodge a
20  complaint, can you bring me through the process of
21  what happens after a civilian wants to lodge a
22  complaint against an officer?
23  A.   Well, it would start by bringing it to the
24  attention again of OPS, IAD, or a department
25  member.  OPS, or IAD, or a department member would

| Flores - Direct/Bonjean                           Page 28 |
|---|

1   contact OPS to issue a complaint register number,
2   a file number.  That would be given to the
3   complainant.  And that would be the number
4   attached to the complaint.  At that point, OPS did
5   the intake.  If they were going to investigate it,
6   then they handled the investigation.  Otherwise,
7   they refer to the Internal Affairs Division for
8   investigation.
9   Q.   Let me stop you right there.  A
10  complaint register number was generated with every
11  complaint; is that correct?
12  A.   Yes.
13  Q.   Okay.  And that's irrespective of
14  what the complaint involved, the subject matter of
15  the complaint, whether it seemed frivolous or not,
16  a complaint register number was always generated;
17  is that right?
18  A.   Yes.
19  Q.   And then that complaint register
20  number is provided to the complainant.  Is it
21  provided to the complainant immediately, or how did
22  that process work?
23  A.   Typically, immediately you can give them
24  the number.  At the time, I believe OPS would send
25  by US mail, if they had an address, a letter,

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 29

1    informing them that a complaint was received, it
2    would be under this number, and please cooperate,
3    and it will be investigated.
4    Q.   How was the complaint register number
5    generated? Where did it come from?
6    A.   OPS.
7    Q.   Right. But was it -- was there a
8    computerized system? How did it work in this time
9    period of 1987 and 1990? Was there a log? How did
10   the complaint register number actually get
11   assigned?
12   A.   I don't know if it was computerized. I
13   know they did have a logbook where they wrote down
14   the next number.
15   Q.   And you don't know whether that was
16   manually or electronically done?
17   A.   As far as I know, it was manually.
18   Q.   And you're talking about between 1987
19   and 1990; right?
20   A.   Yes.
21   Q.   And was it just sequential, like,
22   "Okay. We get a complaint today from John Doe.
23   We're going to the next complaint number"?
24   A.   Yes.
25   Q.   And then there were notifications

---

Flores - Direct/Bonjean                                    Page 30

1    made; is that correct?
2    A.   There were what made? I couldn't hear you.
3    Q.   Notifications?
4    A.   Well, not a notification, but they would
5    start the communication with the complainant.
6    Q.   Right. And what do you mean by that?
7    What happened then?
8    A.   When the complainant made the complaint,
9    they would ask information from the complainant.
10   Name, address, phone number, et cetera. And when
11   they'd get the complaint, the first thing to be is
12   send out a formal letter typically by US mail
13   stating that it's been received, or acknowledging
14   it, it will be investigated, and they'll be
15   contacted, and please cooperate.
16   Q.   Okay. That's what I meant. So there
17   was a formal letter that was sent out to the
18   complainant acknowledging receipt of their
19   complaint; is that right?
20   A.   Yes.
21   Q.   All right. And, typically, it was
22   OPS that would decide which division would handle
23   the investigation; is that right?
24   A.   Yes.
25   Q.   And I'm assuming that once a

---

Flores - Direct/Bonjean                                    Page 31

1    complaint was made, it was the policy of the
2    Chicago Police Department to conduct an
3    investigation into that complaint; correct?
4    A.   Yes.
5    Q.   Were there ever any circumstances
6    where a officer's supervisor would be tasked with
7    investigating a complaint?
8    A.   Yes.
9    Q.   And so under what circumstances would
10   the target of an investigation, or the target of a
11   complaint, be investigated by his or her own
12   supervisor?
13   A.   Well, when OPS referred it to the Internal
14   Affairs Division, if Internal Affairs Division
15   would assign some two units for investigation.
16   Q.   Go ahead. I'm sorry. I didn't mean
17   to cut you off.
18   A.   I don't recall what the criteria used was
19   for whether it would go into that unit or stood
20   within the Internal Affairs Division.
21   Q.   Well, generally speaking, what types
22   of cases would be investigated by a officer who is
23   the subject of a complaint's supervisor?
24   A.   More administrative type allegation. What
25   else?

---

Flores - Direct/Bonjean                                    Page 32

1    Q.   What about demeanor complaints?
2    A.   Demeanor? I don't understand what that
3    means.
4    Q.   Demeanor?
5    A.   Yeah.
6    Q.   Is there a category just like, you
7    know, he spoke nasty to me, a police officer was
8    not nice to me?
9    A.   Um, unless it was an allegation of verbal
10   abuse. But verbal abuse, I believe, was kept by
11   OPS.
12   Q.   Okay. You didn't tell me that one
13   earlier when I asked you about the categories.
14   A.   I believe OPS kept verbal abuse.
15   Q.   Okay. Okay. Sir, I mean, I'm just
16   trying to get the -- you gave me four categories
17   earlier. Excessive force, DV, weapons discharge,
18   death of a civilian. Now you've indicated verbal
19   abuse is among them; right? Is there a list
20   somewhere of which categories were with OPS and
21   which ones weren't?
22   A.   Well, the overall category is use of force.
23   Verbal abuse is on the use of force -- verbal
24   direction, verbal is on the use of force paradigm,
25   and verbal abuse would be essentially excessive.

---

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 33

1  Q.  Okay.  So that's what I was looking
2  for earlier.  Essentially, OPS would handle those
3  civilian complaints that involved use of force --
4  that might be on the use of force continuum; right?
5  A.  Correct.
6  Q.  And that could range from verbal
7  commands all the way up to a police-related
8  shooting; right?
9  A.  Yes.
10  Q.  And domestic violence was put in
11  there because it's force; is that right?
12  A.  It's still the use of force.  It's
13  excessive and family related.
14  Q.  Also could be a crime, but I guess
15  I'm -- I guess I see the logic of that.  Anything
16  else that comes to mind that would help me
17  understand sort of what the, again, guiding
18  principles were for why OPS investigated some
19  civilian complaints versus different civilian
20  complaints?
21  A.  Yeah, I think the only is the use of force
22  allegations.  They tend to investigate them.
23  Q.  That helps.  If somebody made a
24  complaint that an officer stole my drugs or, you
25  know, stole my money, that's squarely in the

---

Flores - Direct/Bonjean                                    Page 34

1  Internal Affairs Division's domain; is that fair?
2  A.  Yes.
3  Q.  Now, we talked about complaint
4  register numbers.  Were there additional numbers
5  assigned to an investigation that was conducted by
6  Internal Affairs?
7  A.  No.
8  Q.  Okay.  So whether it was handled by
9  OPS or IAD, it always had a complaint register
10  number?  That's the number that allowed you to
11  identify the complaint; is that right?
12  A.  Yes.
13  Q.  Now, going back to the investigative
14  process, after a complainant was formally advised
15  that their complaint was received and that an
16  investigation would be undertaken, were there
17  notifications made to the targets of that
18  investigation, assuming they were known?
19  A.  Not notifications.  Just they were notified
20  when to come give a statement.
21  Q.  But was there a process by which
22  police officers were told, "You are the subject of
23  a complaint.  This is the complaint register
24  number.  We're doing an investigation"?
25  A.  No, I don't believe so, no.

---

Flores - Direct/Bonjean                                    Page 35

1  Q.  Okay.  Well, at some point they must
2  be advised that they are the subject of an Internal
3  Affairs investigation or an OPS investigation;
4  right?
5  A.  Oh, yes, at some point during the
6  investigation, yes.
7  Q.  So take me through the investigative
8  process after it is -- after the complainant is
9  told, "We're going to do an investigation," what
10  would happen next?
11  A.  Typically, the complainant would be asked
12  to schedule a meeting interview to get all the
13  details of their complaint.  Once that's done, any
14  additional witnesses, whether it be civilian or
15  department members, could, and probably were,
16  interviewed.  An investigator could gather what
17  documentary or other evidence there was for the
18  investigation, and typically the accused member
19  was the last person, after the investigator has
20  everything else to know what to ask them what the
21  allegations are, then they would give their
22  statement.
23  Q.  Okay.  So let's back up for a minute.
24  First of all, who was responsible back in this time
25  period of 1987 to 1990 for conducting an -- well,

---

Flores - Direct/Bonjean                                    Page 36

1  let's talk about OPS.  I know we said they were
2  civilians.  These are OPS civilian investigators;
3  is that right?
4  A.  Yes.
5  Q.  Where did they come from?  Who were
6  they?
7  A.  They are hired by the city.  I don't know
8  what the criteria was for the qualifications, but
9  they were hired for this specific purpose, to
10  conduct these investigations.
11  Q.  Were they -- where did you find them?
12  Like are these, you know, just your average guy
13  down the street, or are these educators?  Are these
14  people with certain credentials?  How was it
15  determined of whether someone was qualified to be
16  an OPS investigator, if you know?
17  A.  Well, it was the city hiring policy,
18  whatever job description was created for this
19  position.  They would check the qualifications.
20  Maybe go through the hiring process like any other
21  city employment, and if they fit the criteria,
22  they'd be hired.
23  Q.  Okay.  Let's talk about IAD
24  investigators.  These were Chicago police officers
25  assigned to the IAD; is that right?

---

| Flores - Direct/Bonjean | Page 37 |
|---|---|

1 A. Yes.
2 Q. And did IAD investigators usually
3 have -- were they -- what was their rank usually,
4 if you know?
5 A. About half of them were police officers,
6 and the other half were sergeants.
7 Q. Do you know if police officers were
8 trained to conduct the Internal Affairs
9 investigations?
10 A. Yes.
11 Q. And who was responsible for
12 conducting the training for police officers or
13 sergeants, I guess, who were going to be
14 responsible for conducting Internal Affairs
15 investigations?
16 A. Well, the Internal Affairs Division was
17 responsible for making sure they were trained, and
18 then they were sent to the training division for
19 the actual training.
20 Q. And the training division of the
21 Chicago Police Department had a specific curriculum
22 for training individuals or personnel who were
23 going to be conducting Internal Affairs
24 investigations; is that correct?
25 A. I don't know if they had a specific

| Flores - Direct/Bonjean | Page 38 |
|---|---|

1 curriculum, but they gave them training on
2 investigations. A large part of that was probably
3 the detective division. Detective training.
4 Q. Right. Because an Internal Affairs
5 investigation would be conducted like any other
6 investigation, I assume; is that fair?
7 A. Yes. Yes, conduct of investigation, yes.
8 Q. And I assume investigators that were
9 assigned OPS also had to go through a training
10 process as well; is that correct?
11 A. Yes.
12 Q. Was there a time in which -- again,
13 going to this time period, was there a time frame
14 in which an investigation had to be completed?
15 A. I believe in this time period, it -- it had
16 to be completed within 30 days, or an extension
17 request had to be submitted.
18 Q. Okay. Now, I know addendum number
19 three to the order 82-14, which I think it's on
20 page five of the packet in front of you, if you can
21 look at it --
22 MS. CARNEY: You said addendum number
23 three?
24 MS. BONJEAN: Yes.
25 Q. It's called Conduct of the

| Flores - Direct/Bonjean | Page 39 |
|---|---|

1 Investigation?
2 A. Yes.
3 Q. Okay. This addendum to General Order
4 82-14, addendum number three, does this set forth,
5 I guess, in broad strokes how the investigation
6 should be conducted once Internal Affairs or OPS
7 complaint is lodged by an individual?
8 A. Yes.
9 Q. Okay. Were there any -- as far as
10 you know, back during this time period, or I guess
11 just not as far as you know, but I'll ask it
12 directly. During 1987 to 1990, were there any
13 other materials that Internal Affairs investigators
14 or OPS investigators would rely on apart from this
15 general order or addendums thereto to guide them in
16 how to conduct an Internal Affairs investigation or
17 OPS investigation?
18 A. Not to my knowledge, no.
19 Q. So when you say, you know, it was
20 typical that you would obviously interview the
21 complainant; right?
22 A. Yes.
23 Q. Okay. Is that written somewhere, or
24 is that just, you know, something that someone was
25 trained to do? Do you understand my question?

| Flores - Direct/Bonjean | Page 40 |
|---|---|

1 A. Yeah, I believe it's in the directive.
2 Q. Okay. When you say directive, what
3 are you referencing?
4 A. The same one you had, addendum number
5 three.
6 Q. So the directive to the best of your
7 knowledge did require an interview of the
8 complainant; correct?
9 A. Yes.
10 Q. All right. And do you know what the
11 process was if the complainant could not be located
12 or if there was no good phone number? I mean, that
13 happens sometimes; right?
14 A. Yes, it happens a lot.
15 Q. And do you know whether or not there
16 were any criteria -- strike that.
17 Do you know whether or not the
18 investigator was obligated to make repeat efforts
19 to try to find a complainant or get a statement
20 from a complainant?
21 A. They had to make several attempts.
22 Q. Okay.
23 A. Either telephonically or by mail.
24 Q. What about obtaining, for instance
25 potential video footage, for instance, if there's a

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 41

1  complaint lodged against a police officer that
2  occurred in a area where there might be video
3  footage of the event, was that part of the
4  investigation -- was that a requirement of the
5  investigation to try to attempt to get any relevant
6  video footage?
7  A.  Yes.  It's gathering the evidence, yes.
8  Q.  So if a complainant said, you know,
9  "This happened right outside, you know, this
10 location, this grocery store, and I know they have
11 video cameras right there," an investigator was
12 expected to go obtain video footage; is that fair?
13 A.  Yes.
14 Q.  All right.  And possible witnesses
15 should be interviewed as well as part of a
16 competent Internal Affairs investigation or OPS
17 investigation; is that right?
18 A.  Yes.
19 Q.  And that would include both civilian
20 witnesses as well as other police personnel
21 witnesses; right?
22 A.  Yes.
23 Q.  How was it determined whether --
24 strike that.
25     How was it determined how an

---

Flores - Direct/Bonjean                                    Page 42

1  individual would be interviewed, either just an
2  oral interview or video or, you know, recorded in
3  some way?  Those are different options.  Was there
4  a policy or practice either in the directive or
5  just in practice that the department followed?
6  A.  Back then I don't believe we had video.  It
7  was all written statements.
8  Q.  And written statements were done in
9  what manner?  Like, how did a written statement
10 come to be?
11    MS. CARNEY: Objection to form.  Are
12 you talking about complainant or the accused
13 members, just for clarification?
14 Q.  Yeah, I haven't gotten to the accused
15 member yet.  First right now I'm talking about
16 either complainants or witnesses, how were their
17 statements memorialized?  And if it's different for
18 each, let me know.
19 A.  It could be a formal question and answer
20 from the investigator to the complainant witness
21 or in summary type statement.
22 Q.  And question and answer would be
23 essentially typed-out or written-out question,
24 answer on paper; is that right?
25 A.  Yes, everything was on paper.

---

Flores - Direct/Bonjean                                    Page 43

1  Q.  And then also if you were summarizing
2  a statement from a witness or a complainant, it
3  would be like in narrative form; correct?
4  A.  Yes.
5  Q.  And were there certain forms that
6  were used for memorializing the statements of
7  witnesses?
8  A.  Certain forms?  I don't believe so, no.
9  Q.  Okay.  Okay.  So some paper was used
10 somewhere to memorialize the witnesses' statements,
11 I assume; right?
12 A.  Yes.
13 Q.  What about photographs, what if
14 somebody complained of an excessive force and the
15 person either had photographs, or there was a
16 belief that perhaps there were injuries that were
17 worthy of photographing, what was the practice or
18 policy of the department on that issue?
19 A.  If they had photographs, it would be part
20 of gathering the evidence requesting either what
21 they had or copies of what they have.  We also had
22 department photographers who we could request
23 photos be taken.
24 Q.  When you say department, Internal
25 Affairs had an actual department that people who

---

Flores - Direct/Bonjean                                    Page 44

1  would go photograph, if necessary?
2  A.  No.  I mean Chicago Police Department.
3  Q.  I see.  Okay.  So the Internal
4  Affairs Division or OPS had resources in the
5  department to delegate to either photograph
6  injuries as an example; is that right?
7  A.  To request for it, yes.
8  Q.  What about a scene?  You know, we --
9  as part of our investigation, obviously, the
10 department whether -- really any criminal
11 investigation you might get photographs of a scene;
12 right?
13 A.  Yes.
14 Q.  Was there a tool that an Internal
15 Affairs investigator or OPS investigator could use
16 as well to have someone from the department get
17 photographs of a scene where an alleged act of
18 misconduct took place?
19 A.  Yes.
20 Q.  Were there expectations as it relates
21 to memorializing the investigation itself?  Like,
22 today I did this as part of the investigation, and
23 today I did this as part of the investigation, and
24 you have either a running log or reports?  Was
25 there anything along those lines that an

---

Maysonet v.
Guevara

1    investigator was expected to maintain to
2    memorialize his or her investigation?
3    A.  Yes.
4    Q.  Did they have a name, or what was it
5    called, or was it just, you know, you have to
6    memorialize it?
7    A.  Besides going through the process of they
8    document what they're doing, I believe it was
9    called a case log, or something equivalent like
10   that, where they put what they're doing as they do
11   it.
12   Q.  So it was supposed to be sort of a
13   contemporaneous memorialization of what they were
14   doing to investigate this complaint; is that fair?
15   A.  Yes.
16   Q.  I think you mentioned that sort of
17   the last step in an investigation was to talk to or
18   interview the accused in the complaint; is that
19   right?
20   A.  Yes.
21   Q.  Okay.  We discussed that an
22   investigator after being assigned to conduct an
23   investigation would certainly interview the
24   complainant, witnesses, gather evidence.  They
25   would memorialize their investigation along the

1    way.  Anything else you can think of that an
2    investigator was expected to do as part of an
3    Internal Affairs or OPS investigation prior to
4    interviewing the accused?
5    A.  Not that I can think of, no.
6    Q.  All right.  And then the final step
7    in an investigation was to interview the accused;
8    is that correct?
9    A.  Typically, yes.
10   Q.  Okay.  Prior to an interview of the
11   accused officer, was the officer provided with any
12   information about what he or she has been accused
13   of?
14   A.  Yes.
15   Q.  Okay.  And how was that done?
16   A.  When they were notified they had to get a
17   statement, they were given their -- a notification
18   of charges and allegations.
19   Q.  Anything else they were provided with
20   prior to having to sit for or give a statement?
21   A.  I think -- call it a right to a union
22   representation or counsel and their administrative
23   rights.
24   Q.  And summarize for me what the
25   administrative rights were that an accused officer

1    enjoyed in the context of an Internal Affairs
2    investigation?
3    A.  Basically, the rights that are enumerated
4    in their collective bargaining agreement that we
5    put in the policy that they would be interviewed.
6    They were -- it wouldn't be done -- like, if they
7    are midnight officers, we would try to accommodate
8    their work schedule, on-duty hours.  They have a
9    right to their union rep present.  That's all I
10   can think of right now.
11   Q.  Did they have the right to decline an
12   interview?
13   A.  No.
14   Q.  What were the consequences for
15   declining an interview?
16   A.  They would be given a direct order to give
17   a statement, and if they refused that, that would
18   be a separate allegation, refusal of a direct
19   order.
20   Q.  Okay.  Did they have a right to
21   private counsel, or was it just the union
22   representative that they had the right to?
23        MS. CARNEY: Objection to form.
24   Foundation.
25   A.  I believe either one.

1    Q.  So they could bring -- they could
2    bring their own attorney if they wanted to; is that
3    right?
4    A.  Yes.
5    Q.  And would that attorney be able to
6    participate, or were they just sort of there to
7    observe?
8    A.  Oh, no, they could participate and give
9    advice to their client.
10   Q.  They can participate in the
11   interview?
12   A.  No, just giving advice to their client.
13   Q.  Oh, giving advice to their client.
14   Okay.  Was the officer -- strike that.
15        Between 1987 and 1990 during the
16   Internal Affairs or OPS process, was a target
17   officer or an accused officer provided with any of
18   the investigative materials that were developed
19   during the investigation of the charge prior to
20   giving a statement?
21   A.  No.
22   Q.  So, for instance, if a complainant
23   made a statement and witnesses made a statement,
24   were officers provided with those statements before
25   they were interviewed?

Flores - Direct/Bonjean                                              Page 49

1 A.  No.
2 Q.  What were the different ways in which
3 an officer who was accused in an investigation was
4 able to provide a statement?
5 A.  Similar to a complainant.  It could be
6 answer specific questions or do a written report,
7 which essentially would be a narrative format.
8 Q.  So let me back up one second.  With
9 complainants, were there always or routinely
10 interviews, like in-person interviews, or were
11 sometimes a written complaint was sufficient for
12 the purposes of the investigation?
13 A.  Well, for a complainant, if I'm
14 understanding you, there was an interview, yes.
15 Q.  So that's what I was -- yeah, I
16 should have made that clearer earlier.  A complaint
17 could be made initially, I'm guessing, in a
18 written, this is what happened to me, they fill out
19 a form, and then an investigation proceeds.  But as
20 part of the investigation, the complainant would be
21 interviewed in person; is that correct?
22 A.  Yes.
23 Q.  Now, with the accused, it sounds like
24 an in-person interview was one scenario in which an
25 accused would be interviewed as part of the

Flores - Direct/Bonjean                                              Page 50

1 investigation?
2 A.  Yes.
3 Q.  And were there scenarios where they
4 were just asked to provide a written report based
5 on the allegation?
6 A.  Yes.
7 Q.  Okay.  So they obviously would have
8 to know what the allegation is in some detail in
9 order to respond when they're asked to file a
10 report to respond; right?
11 A.  Yes.
12 Q.  Any other options for making a
13 statement in connection with an Internal Affairs
14 investigation for the accused?
15 A.  The accused member could be sent specific
16 questions to answer.
17 Q.  Like an interrogatory or --
18 A.  Yes.
19 Q.  And how was it determined which
20 process would be followed when it came to taking
21 statements from an accused officer?
22 A.  The investigator would determine it based
23 on, let's say, how many questions would need to be
24 answered.
25 Q.  Was the subject matter of the

Flores - Direct/Bonjean                                              Page 51

1 complaint a consideration in determining whether an
2 officer would be required to submit to an in-person
3 interview versus answering questions or writing a
4 narrative report?
5 A.  It could be a consideration.
6 Q.  Do you know whether there were any,
7 again, like guiding principles or rules that had to
8 be followed by an investigator when determining how
9 they would take a statement from an accused
10 officer?
11 A.  No, not -- no, just complete the
12 investigation, get the answers they needed.
13 Q.  Okay.  Do you know -- are you able to
14 estimate how often an in-person interview was
15 required or sought during an investigation during
16 this time period for the accused?
17 A.  No, I don't know.
18 Q.  Okay.  Moving on.  After an interview
19 was conducted or an officer provided a statement in
20 connection with an allegation, what was the next
21 step in an Internal Affairs or OPS investigation?
22 And if it's different, let me know how it would be
23 different.
24 A.  Well, if the investigator had determined if
25 he or she had enough to come to a conclusion

Flores - Direct/Bonjean                                              Page 52

1 whether the allegation kind of did, in fact,
2 occur.  If they can come to a conclusion, then
3 they did a summary report and made their
4 conclusion.
5 Q.  Okay.  In the Conduct of
6 Investigation, addendum 3A, I guess, or 3 --
7 there's a 3, and there's a 3A.  I'd like you to
8 look at 3A, if you don't mind, because I think that
9 was in effect at the time of this case.
10 A.  Okay.
11 Q.  Roman Numeral II, subsection C, and
12 then number 3, which is, "Interrogate the Accused
13 Member."  Do you see where I'm at?
14 A.  Yes.
15 Q.  It says, "Taking written"  -- well,
16 I'm not going to read the whole thing, but the
17 first sentence talks about, "Interrogate the
18 accused member, remaining cognizant of the member's
19 rights as defined in Addendum 1 of this order and
20 the General Order entitled, Interrogations, Field
21 and Custodial."  The general order dealing with
22 Interrogations, Field and Custodial, that is a
23 general order, that's an order that is applicable
24 both in criminal investigations or in Internal
25 Affairs investigations; is that right?

Flores - Direct/Bonjean                                    Page 53

1  A.  Yes.
2  Q.  That's what is referenced there;
3  fair?
4  A.  Yes.
5  Q.  "And other members who have knowledge
6  of alleged conduct taking written statements when
7  necessary."  I read that to mean that it was not
8  always necessary to take written statements from
9  the accused; is that correct?  Or am I getting that
10  wrong?
11  A.  I don't read it that way.
12  Q.  Okay.
13  A.  I read it take a written statement from
14  other members who have knowledge.
15  Q.  So you read it as taking written
16  statements from other members who have knowledge;
17  is that right?
18  A.  Yes.
19  Q.  Okay.  And then it says, "If the
20  allegation is such that a recommendation for
21  separation is unlikely, the statement may be in the
22  form of reports from the members.  If the
23  allegation is such that the case is likely to
24  result in a recommendation for separation, the
25  statement of the accused member will be in the

Flores - Direct/Bonjean                                    Page 54

1  question-and-answer form."  Do you see that?
2  A.  Yes.
3  Q.  And are you saying that this is only
4  applicable as to witnesses or members who have
5  knowledge?
6  A.  No, that part is applicable to the accused
7  member.
8  Q.  Okay.  So it says there if it looks
9  like this guy might be fired, the statement should
10  be in a question-and-answer form; is that right?
11  A.  Yes.
12  Q.  And if it doesn't look like he's
13  going to be fired, or it's not serious enough to
14  warrant separation from the department, it could be
15  in the form of a report; right?
16  A.  Yes.
17  Q.  It doesn't really discuss in-person
18  interviews; am I correct?
19      MS. CARNEY: Objection to form.
20  A.  Correct.
21  Q.  And then subsection 4, it says, "If
22  necessary, require an accused member both to submit
23  a to/from subject, and to answer questions which
24  specifically, directly, and narrowly relate to the
25  alleged misconduct or to the performance of his

Flores - Direct/Bonjean                                    Page 55

1  official duties."  Do you see that?
2  A.  Yes.
3  Q.  And so it's saying, if necessary, he
4  or she should do both, a to/from report, plus be
5  given questions and provide answers; right?
6  A.  Yes.
7  Q.  Again, I don't know, maybe you can
8  point me to it -- it does not -- this policy, at
9  least in written form, doesn't suggest that it's
10  required, or even routine, for an accused officer
11  to be interviewed in person; am I right?
12  A.  Well, again, taking the statement could be
13  done in person.  It doesn't have to be sent to
14  them and then you get it back later.  It could be
15  call him in and have him do it in front of you.
16  Q.  Right, but the written policy doesn't
17  suggest that there's, again, any requirement that
18  that be done, or even really reference that process
19  here; am I right?
20      MS. CARNEY: Objection to form.
21  A.  Yeah, it doesn't reference in person.
22  Q.  Okay.  It seems like the default way
23  of getting a statement is either through a
24  narrative report or through a written
25  question-and-answer format?  That's how I read the

Flores - Direct/Bonjean                                    Page 56

1  policy.  Do you disagree?
2      MS. CARNEY: Objection to form.
3  Misstates the testimony.
4  A.  Can you repeat that, please?
5  Q.  The way I read the policy, and feel
6  free to point me to any language that suggests
7  otherwise, is that the routine way of getting a
8  statement from an accused officer was either
9  through a written narrative form like a report or
10  through a written question-and-answer format?
11  A.  Yes.
12  Q.  What if the allegation is serious
13  enough to suggest that it could warrant a criminal
14  prosecution, was there a process by which that was
15  handled?
16  A.  Yes.
17  Q.  Explain that in summary, if you
18  would, to me?
19  A.  Basically, if it looks like potentially
20  criminal, the Cook County State's Attorney's
21  office would be consulted.
22  Q.  Was there a specific policy that
23  indicated or directed when that should happen or
24  how those determinations should be made?
25  A.  I don't know if there was a written

Maysonet v.
Guevara

| Flores - Direct/Bonjean | Page 57 |
| --- | --- |

1  specific policy but just the process they
2  followed.
3  Q.  Right.  But, like, you know,
4  sometimes those things are not so cut and dry.
5  Something -- a complaint could be handled
6  administratively.  It could be a crime.  It could
7  be both.  So when did the Cook County State's
8  Attorney's office, or any prosecuting agency, have
9  to be informed?
10  A.  When it was determined by Internal Affairs
11  or OPS that it possibly should, or potentially
12  could, be criminally prosecuted.
13  Q.  All right.  But, again, that's -- so,
14  well, strike that.
15      So Internal Affairs would decide when
16  a matter should be referred to the Cook County
17  State's Attorney's office; it was their
18  determination to make?
19  A.  If they were investigating it, yes.
20  Q.  And did the Cook County State's
21  Attorney's office -- or I guess it's not just Cook
22  County, but -- yeah, I guess it would be just Cook
23  County, but did they have any -- strike that.
24      Let me ask it this way.  Were there
25  any guidelines, policies, or even informal

| Flores - Direct/Bonjean | Page 58 |
| --- | --- |

1  practices that Internal Affairs followed for making
2  a determination about whether or not there had to
3  be a notification made to the prosecutor's office?
4  A.  That I'm not sure.
5  Q.  All right.
6      MS. CARNEY: When you have a good
7  transition, could we have a quick break to grab
8  some water and use the restroom?
9      MS. BONJEAN: Sure.  We can do that
10  right now.
11      (Break taken.)
12  Q.  Lieutenant, let me get back to where
13  I was.
14      MS. BONJEAN: Can you read back the
15  last question I asked, Audrey?
16      (Record read back as follows:
17      (QUESTION: Were there any
18  guidelines, policies, or even informal practices
19  that Internal Affairs followed for making a
20  determination about whether or not there had to be
21  a notification made to the prosecutor's office?
22      (ANSWER: That I'm not sure.)
23  Q.  Let me ask it a little differently.
24  How did cases get prosecuted when it was, you know,
25  again, an appropriate case, like, I don't know --

| Flores - Direct/Bonjean | Page 59 |
| --- | --- |

1  that's a terrible question.  But, again, to the
2  best of your knowledge, it was basically Internal
3  Affairs saying, you know, "We need to get the
4  prosecutor's office engaged in this investigation";
5  is that right?
6  A.  I guess that's one way.  State's attorneys
7  could be doing their own investigation.
8  Q.  Right, but how would they -- what, if
9  -- you know, what if someone made a complaint, how
10  would they know to get involved?  Like, that's the
11  part I'm missing.
12  A.  Well, if the person made the complaint to
13  the Chicago Police Department, we would have to
14  contact them and notify them.  If the person made
15  a complaint to them, then they could be
16  investigating.
17  Q.  Yeah, but I mean people don't usually
18  go to prosecutor's to make complaints.  What if
19  someone says, "An officer raped me," and they bring
20  it to OPS?
21  A.  There would be a criminal investigation.
22  Q.  Okay.  And then that would -- who
23  would conduct the criminal investigation?
24  A.  The area detectives.
25  Q.  Would there be a simultaneous

| Flores - Direct/Bonjean | Page 60 |
| --- | --- |

1  investigation by IAD or OPS?  I guess that's a use
2  of force, but...
3  A.  There would be an investigation.  It might
4  not occur simultaneously.
5  Q.  Okay.  I assume a IAD or OPS
6  investigation would give way to a criminal
7  investigation?
8  A.  Yes.
9  Q.  Okay.  So if it's actually being
10  investigated by, you know, detectives, area
11  detectives, that would make sense of how a
12  prosecuting office would get involved.  What if
13  it's not sort of that obvious, what would happen
14  during the course of an Internal Affairs
15  investigation if it came to light that an officer
16  had committed what appeared to be some type of
17  crime, what was the process for either initiating a
18  criminal investigation and/or getting the
19  prosecuting office involved?
20  A.  I don't know if it's addressed in the
21  directive actually.  I don't know what the process
22  was.
23  Q.  Okay.  All right.  So after an
24  accused member provides the statement, however it
25  is provided, what was the next step in the

Maysonet v.
Guevara

1 investigative process?
2 A. If the investigator determined that a
3 finding could be made on the investigation, then
4 he would proceed to doing his or her summary
5 report.
6 Q. When you say if the investigator made
7 a determination that, you know, a conclusion could
8 be made -- or repeat that again.  I want to make
9 sure I get it right.
10 A. A finding.
11 Q. A finding.  That's right.  So how
12 would an investigator determine whether a finding
13 could be made, like what dictated that decision?
14 A. If there was sufficient evidence to either
15 prove or disprove the allegation.
16 Q. Okay.  And what if there was not
17 sufficient evidence to prove or disprove an
18 allegation, what happened then?
19 A. The investigator would have to determine
20 whether they needed to do more investigation,
21 either new witnesses, new evidence, or they would
22 have to close it out based on that finding that it
23 can't be proven or disproven.
24 Q. And that would be a not sustained
25 determination?

1 A. Yes.
2 Q. Okay.  So assuming an investigator
3 has exhausted all areas of investigation, what were
4 the possible findings that could be made at the
5 conclusion of an OPS or Internal Affairs
6 investigation?
7 A. Four possible.  It could be sustained,
8 which means there was sufficient evidence to prove
9 the allegation occurred.  It could be not
10 sustained, which means you can't prove or disprove
11 the allegation.  It could be exonerated, which
12 means the allegation as stated did occur, but the
13 officer was justified in taking those actions.
14 And the last category is unfounded, which means
15 the allegations as stated did not occur.
16 Q. And what was the standard of proof by
17 which the evidence was measured in making these
18 determinations?
19 A. It was a preponderance standard.
20 Q. So slightly more evidence on one side
21 or the other; right?
22 A. I'm sorry.  What was that?
23 Q. Slightly more evidence, like just a
24 feather more evidence on one side or the other; is
25 that right?

1 A. Correct.
2 Q. And if it's not sustained, that means
3 that it was perfectly even; correct?
4 A. More or less, yes.
5 Q. And once one of these determinations
6 were made in the mind of an investigator, what was
7 the process that he or she had to follow in terms
8 of memorializing the conclusion of the
9 investigation, or finding of the investigation?
10 A. To close the investigation, they'd have to
11 do a summary report.
12 Q. And what is a summary report?
13 A. It summarizes their entire investigation
14 and what their conclusion is.
15 Q. And then was that submitted to any
16 supervisor for review?
17 A. Yes.
18 Q. How far up the chain did it go?
19 A. Within Internal Affairs or OPS, two to
20 three -- typically two, sometimes three, levels.
21 Q. Why would some go two, some go three?
22 Was there is a reason why some had to get
23 additional approvals?
24 A. No.  I'm not really sure how OPS, their
25 chain of command, was at the time.

1 Q. So the investigator would then
2 provide -- would have to submit the summary report
3 and conclusions to a sergeant in Internal Affairs;
4 is that correct?
5 A. To their immediate supervisor, yes.
6 Q. Okay.  So that could be a sergeant or
7 a lieutenant, I suppose; right?
8 A. Right.
9 Q. And then would it actually be signed
10 off on by the head of Internal Affairs or the
11 commanding officer of the Internal Affairs
12 Division?
13 A. Typically, yes.
14 Q. Did it sometimes go beyond the
15 commanding officer of IAD?
16 A. If it was sustained, yes.
17 Q. Right.  So if it was not sustained,
18 where would it typically end, the review process?
19 A. With the -- I think it was the assistant
20 deputy superintendent of Internal Affairs.
21 Q. The assistant deputy superintendent
22 of Internal Affairs?
23 A. Just the highest ranking person of Internal
24 Affairs.
25 Q. And if it was sustained, where would

---

Flores - Direct/Bonjean                                      Page 65

1  it go for further review process?
2  A.  Well, the superintendent makes the final
3  decision on sustained cases.
4  Q.  Okay.  So once a report and
5  conclusion is completed, and if there is a
6  conclusion that the complaint should be sustained,
7  it would be reviewed by the immediate supervisor,
8  and then ultimately by the, I think you said,
9  assistant deputy superintendent of Internal
10 Affairs; is that fair?
11 A.  Yes.
12 Q.  And then it would be submitted to the
13 superintendent himself or herself -- I guess it's
14 only a himself -- but himself; right?
15 A.  Eventually it would get to the
16 superintendent, yes.
17 Q.  Okay.  And when a summary report was
18 completed with its conclusions, did it also have
19 disciplinary recommendations associated with it?
20 A.  Yes.
21 Q.  And what were the possibilities,
22 what's the different possibilities for a
23 recommendation for discipline?
24 A.  It ranges from violation noted, no
25 discipline, to reprimand, to a suspension, to

---

Flores - Direct/Bonjean                                      Page 66

1  separation.
2  Q.  Okay.  And were there minor
3  suspensions and major suspensions?  Like, were
4  those -- like, a certain amount of days' suspension
5  would qualify as a major suspension versus, you
6  know, a lesser amount, or were those distinctions
7  not made?
8  A.  They are not made.
9  Q.  Okay.  All right.  And through the
10 review process, might it be that a higher-ranking
11 officer may say, "Yeah, I agree with the sustained
12 finding, but I think the recommendation for
13 discipline is not appropriate either because it's
14 too harsh or not harsh enough"?
15 A.  Yes, absolutely.
16 Q.  Okay.  And then ultimately who was
17 responsible back in 1987 to 1990 for determining
18 whether -- my first question is -- whether a
19 complaint would actually be sustained?
20 A.  It would be the superintendent of police.
21 Q.  And who was ultimately responsible
22 for determining what the discipline would be for a
23 sustained complaint?
24 A.  The superintendent.
25 Q.  Do you know what the sustained rates

---

Flores - Direct/Bonjean                                      Page 67

1  were for, I'll call it, OPS investigations between
2  1987 and 1990 in the City of Chicago's police
3  department?
4      MS. CARNEY: Objection.  Foundation.
5  You can answer.
6  A.  No, I do not.
7  Q.  Do you know whether that data was
8  maintained by the City of Chicago?
9  A.  I do not.
10 Q.  So as you sit here today, you can't
11 tell me what percentage of allegations were
12 sustained by OPS between 1987 and 1990?
13     MS. CARNEY: Objection.  Form.  You
14 can answer.
15 A.  No, I cannot say.
16 Q.  And what about the Internal Affairs
17 Division, are you able to indicate for the record
18 what the sustained rate was for allegations that
19 were investigated by IAD during the relevant time
20 period?
21     MS. CARNEY: Objection to foundation.
22 And I'm just going to lodge an objection that
23 these questions go outside the scope of the
24 30(b)(6) notice, but if you know, you can answer.
25     MS. BONJEAN: I don't know that

---

Flores - Direct/Bonjean                                      Page 68

1  they're outside the scope.  I think I disagree
2  with that.
3  Q.  But go ahead.
4  A.  No, I do not know.
5  Q.  Do you know whether the City of
6  Chicago maintained data between 1987 and 1990 as it
7  relates to sustained rates of allegations?
8      MS. CARNEY: Objection.  Foundation.
9  Beyond the scope.  You can answer.
10 A.  I don't know.
11 Q.  Well, part of the 30(b)(6) notice
12 addresses the efforts the City of Chicago made to
13 identify, investigate, and prevent failures of its
14 employees to comply with the policies or
15 procedures; right?
16 A.  Yes.
17 Q.  Okay.  Did the department maintain
18 statistics as a means by which to identify,
19 investigate, or prevent failures as it relates to
20 the Chicago Police Department's employees and
21 compliance with policies or procedures?
22     MS. CARNEY: Objection to form.
23 Foundation.  Beyond the scope.  You can answer if
24 you know.
25 A.  I don't know.

---

| Flores - Direct/Bonjean | Page 69 |
| --- | --- |

1    MS. BONJEAN: Okay. I mean, Theresa,
2  I don't know how, like, that's not -- how that's
3  not within the scope of 30(b)(6).
4    MS. CARNEY: My objection is beyond
5  the scope to the statistics. If it's the policies
6  and procedures, that's one thing. The statistical
7  analysis and the sustained rate, we would say it's
8  a separate 30(b)(6) and a separate witness, which
9  we can talk about, but this witness is not
10  prepared based on this notice to talk about
11  statistics and sustained rates. That's where my
12  objection is. I'm not saying that it's not
13  something we can talk about if that's what you're
14  looking for. That's just not what this witness is
15  prepared to testify about.
16    MS. BONJEAN: Okay. Fair enough. We
17  don't have to go too far down this road if he's
18  not prepared to talk about statistics, but I was,
19  you know, asking specifically -- he is supposed to
20  be prepared to identify efforts, by the City of
21  Chicago to identify, investigate, and prevent
22  failures, if any, with its employees' compliance
23  with policies.
24  Q.  And my question is as part of those
25  efforts, was data maintained, either in statistical

| Flores - Direct/Bonjean | Page 70 |
| --- | --- |

1  form or any form, as a tool to identify any
2  problems that may exist in Chicago police
3  personnel? And is it your testimony that you can't
4  answer that question for me?
5  A.  Yes, concerning data, I don't know.
6  Q.  What efforts did the City of Chicago
7  make to identify, investigate, or prevent failures,
8  if any, by its employees to comply with its
9  policies and procedures?
10  A.  As stated in the directives, if avenues two
11  filed complaints against officers, OPS, IAD, any
12  supervisor, we give them the obligation, the
13  supervisors, to immediately lodge a complaint
14  register number. They have no discretion whether
15  to get it or not. It would be investigated, and
16  then discipline where we deem it appropriate.
17  Q.  Apart from having an Internal Affairs
18  function whereby you investigate complaints, did
19  the City of Chicago make any other efforts to
20  identify, investigate, or prevent failures by
21  Chicago Police Department employees in connection
22  with their compliance with the policies or
23  procedures?
24  A.  I don't know. Not to my knowledge. It's
25  daily operations.

| Flores - Direct/Bonjean | Page 71 |
| --- | --- |

1  Q.  I just want to make sure that you're
2  testimony is clear on that because you are kind of
3  saying two things. So I'll repeat the question one
4  more time. You've identified that one effort that
5  the Chicago Police Department made -- strike that.
6  One effort that the City of Chicago made to
7  identify, investigate, or prevent failures of its
8  employees to comply with policies and procedures
9  was to create an Internal Affairs function whereby
10  complaints are investigated; is that right?
11  A.  Yes.
12  Q.  And if those complaints resulted in
13  sustained complaints, you had a disciplinary
14  function that resulted in disciplining officers;
15  correct?
16  A.  Yes.
17  Q.  Apart from the Internal Affairs
18  investigative function and the disciplinary
19  function that you've identified, were there any
20  other efforts that the City of Chicago made between
21  the years 1987 and 1990 that were made, again, to
22  identify, investigate, or prevent failures in
23  connection with employees' compliance with policies
24  or procedures of the department?
25  A.  Well, the only thing I can think of is our

| Flores - Direct/Bonjean | Page 72 |
| --- | --- |

1  policies on personal concerns, behavior
2  intervention.
3  Q.  Personal concerns, and what was the
4  other one?
5  A.  Personal Concerns Program and Behavioral
6  Interventional Program.
7  Q.  And are you -- are you referring to
8  those interchangeably, or are those different
9  programs? Behavioral Interventional Program,
10  Personal Concerns. Are they all part of the same
11  umbrella, or what are those?
12  A.  They're different programs under the human
13  resource umbrella.
14  Q.  Um-hum. And these were programs
15  identified to -- strike that.
16    These are programs that were designed
17  to identify at-risk officers?
18  A.  I couldn't hear the last part.
19  Q.  These were programs that were
20  designed to identify at-risk officers; correct?
21    MS. CARNEY: Object to form. You can
22  answer.
23  A.  Yes, help identify them.
24  Q.  Okay. So I'm going to get to that in
25  a second. But apart from that effort that you just

Maysonet v.
Guevara

1 identified that I'm going to get back to because I
2 don't want to get off track, are you saying that
3 you are not aware of the department maintaining
4 data to allow it to identify or prevent failures by
5 its employees, or you don't know? Like, what is
6 your position?
7     MR. BRUEGGEN: Object to form.
8 A. I don't know if they maintain the data.
9 Q. So you don't know as you sit here
10 today, and you've not been sufficiently -- you're
11 not sufficiently prepared to answer whether or not
12 the City of Chicago maintained Internal Affairs
13 data; is that what you're telling me?
14     MR. BRUEGGEN: Object to form.
15 A. Yes.
16     MS. BONJEAN: Okay. So I don't know
17 how you could think that's not part of the scope
18 of this 30(b)(6), but we will address it. But I
19 want to make a record.
20 Q. Do you know if there are any policies
21 or procedures that -- strike that.
22     Do you know if there are any written
23 policies, procedures, orders, directives, whatever
24 name you want to give it, issued by the Chicago
25 Police Department that relate to maintaining data

1 of Internal Affairs outcomes during the period of
2 1987 to 1990?
3     MS. CARNEY: Objection to form.
4 Outside the scope. You can answer if you know.
5 A. I don't know.
6 Q. So you don't even know if there's any
7 policies that address whether or not the department
8 had maintained data?
9 A. Correct.
10 Q. Do you maintain data now?
11     MS. CARNEY: Objection. Form.
12 Outside the scope. You can answer.
13 A. I believe so. I believe the department
14 puts out an annual report.
15 Q. Okay. So you do put out an annual
16 report of sustained rates; right?
17 A. Yes.
18 Q. And are you saying you don't know
19 whether the department put out annual reports of
20 sustained rates between 1987 and 1990?
21 A. Correct.
22 Q. And if you wanted to find that out,
23 how would you find that out?
24 A. I believe the annual reports come out of
25 the research and development division, so they

1 would have to be contacted to see if the ones go
2 back that far.
3 Q. Okay. Before I get back to Personal
4 Concerns and Behavioral -- what it's called --
5 Behavioral -- what was the term you gave that
6 again? I'm blanking.
7 A. Behavioral Intervention.
8 Q. -- Behavioral Intervention Programs,
9 I want to continue through the Internal Affairs
10 process, the investigative process that we've been
11 discussing. So if an officer has a sustained
12 complaint, and a summary report is generated where
13 there's a sustained as to a particular, you know,
14 allegation, okay, were there scenarios during this
15 time period where a higher-ranking officer could
16 say, "Okay, I think it should be sustained for
17 something else, not what you've actually" -- like a
18 lesser offense or something less serious? Did that
19 ever happen?
20 A. Yes.
21 Q. And when in the process would an
22 officer be apprised or informed of the outcome of
23 an Internal Affairs investigation, meaning was it
24 after the summary report was prepared or after it
25 went up through at the review process?

1 A. After the head of the IAD made a decision,
2 it goes through command channel review. I don't
3 know, I'm trying to think if it would go -- I
4 believe at that point he would be apprised of the
5 outcome of the investigation.
6 Q. Were there other responses to an
7 investigation that would not constitute discipline,
8 meaning could there be remedial training, a
9 reassignment, that type of response, to a sustained
10 complaint?
11 A. It would be in addition to discipline if
12 additional training was needed or something like
13 that, but there would be discipline.
14 Q. So all sustained complaints require
15 some form of discipline; is that right?
16 A. Yes.
17 Q. And that could be something as minor
18 as, you know, "Bad boy, you got a violation," some
19 type of negative disciplinary action; right?
20 A. Correct.
21 Q. And that might also be accompanied by
22 remedial training, reassignment, something of that
23 nature?
24 A. It could be, yes.
25 Q. It could be, but not necessarily;

Flores - Direct/Bonjean                                    Page 77

1  correct?
2  A.  Correct.
3  Q.  And I'm assuming all discipline goes
4  into an officer's personnel file; is that correct?
5  A.  Yes.
6  Q.  Does it also go into their training
7  file, or is it all part and parcel of the same
8  file?
9  A.  It would not go into their training file.
10 Q.  It would go into their personnel
11 file; right?
12 A.  The final conclusion, yes.
13 Q.  Did each officer have, like, an
14 Internal Affairs record as well?
15     MS. CARNEY: Object to form.  You can
16 answer.
17 A.  Not by officer, no.
18 Q.  So we know that, for instance,
19 Internal -- strike that.  We know that officers
20 have complaint register histories; right?
21 A.  Yes.
22 Q.  Did they have complaint register
23 history files as well?
24 A.  Yes, each one.
25 Q.  Each complaint register had a file;

Flores - Direct/Bonjean                                    Page 78

1  right?
2  A.  Yes.
3  Q.  But were there files -- so you can go
4  and pull a file for a complaint register based on
5  the number, the complaint register number; right?
6  A.  Yes.
7  Q.  Could you actually go pull -- could
8  Internal Affairs pull a file for an officer by name
9  and star number that would include all of the
10 Internal Affairs files or summary reports that had
11 been generated as part of his experiences with
12 Internal Affairs?
13 A.  A file, no.
14 Q.  So if I wanted to get Reynaldo
15 Guevara's, all of his Internal Affairs
16 investigation files, right, or you wanted to get
17 it, whoever wanted to get it, you would actually
18 have to just pull each complaint register file
19 rather than go to one file with, you know, this is
20 Ray Guevara's file, and we have all of his
21 complaint registers here; is that right?
22 A.  That's correct.
23 Q.  Now, the complaint -- I'm sorry.
24 There is a complaint register history for each
25 officer; correct?  Like, it's a log that has their

Flores - Direct/Bonjean                                    Page 79

1  -- I'll show it to you in a minute.
2     MS. BONJEAN: Ashley, do you have --
3  let's mark one up.
4     MS. COHEN: I have it here.
5     MS. BONJEAN: Let's mark one up.
6     MS. COHEN: Which one?  I'm sorry,
7  Jenny.  Which complaint register?
8     MS. BONJEAN: Let's look at Rey
9  Guevara's.
10    MS. COHEN: Okay.
11    MS. BONJEAN: We will mark it as --
12 are we on Flores-4?
13    MS. COHEN: Yeah, we are on 4.
14    (Flores-4, Reynaldo Guevara complaint
15 register, five pages, marked for identification.)
16 Q.  Okay.  So I'm going to have you look
17 at this, if you would.  It's a five-page document,
18 Lieutenant.  And it indicates at the top, Pre-2000
19 Mainframe Complaint Register History.  Do you see
20 that?
21 A.  Yes.
22 Q.  And then it has dates underneath it
23 that's January 1st, 1967, to December 31st, 1999.
24 Do you see that?
25 A.  Yes.

Flores - Direct/Bonjean                                    Page 80

1  Q.  Okay.  Can you tell me what that
2  means?
3  A.  Sorry.  What what means?
4  Q.  What those words that I just read to
5  you mean?  What does it reflect?  What does it
6  mean?  If somebody is reading it, what does it
7  mean?
8  A.  This would be the list of his complaints
9  made against Reynaldo Guevara pre-2000 but
10 January 1967 to December 31st, 1999.
11 Q.  When it says mainframe, what does
12 that mean?
13 A.  That was a computer system that the Chicago
14 Police Department had that stored all our
15 information.
16 Q.  What information?  All the
17 information of the department, Internal Affairs
18 information, what information?
19 A.  Essentially, it was all the department
20 information that was computerized was all in what
21 they called the mainframe, and then each -- human
22 resources had access to certain parts of it.
23 Internal Affairs had access to certain parts of
24 it.  I'm assuming that the training division had
25 access.  But for Internal Affairs we had access to

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 81

1   the discipline part of it.
2   Q.   Okay.  And it looks like -- it
3   reflects his name and employee number.  Is that
4   like a star number?
5   A.   Employee number is your city employee
6   number separate from your star number.  Sort of a
7   payroll number.
8   Q.   Unit is -- what does the unit number
9   reflect?
10  A.   The unit he's assigned to typically at the
11  time this report is generated or --
12  Q.   And then it has the date that he
13  became a Chicago police officer?  Appointment date,
14  I assume?
15  A.   Yes.
16  Q.   All right.  And then it looks like
17  there's a CR number in the left-hand column, and
18  then there's a complaint category with some type of
19  number that's associated -- number and letter
20  that's associated with that complaint category?
21  A.   Yes.
22  Q.   What is that though?  I don't
23  understand.  What is this 01A, 10J?  What are
24  those?
25  A.   Those are category codes they used to

---

Flores - Direct/Bonjean                                    Page 82

1   categorize the type of allegation that's being
2   made.
3   Q.   Okay.  It looks like, like the
4   miscellaneous category has different codes?
5   A.   The categories were numbered, and then they
6   were broken down by lettered, and almost all of
7   them had a final one that says miscellaneous like
8   a catchall.
9   Q.   Right.  But even the miscellaneous
10  have different codes?  You see, like, these two
11  miscellaneouses are 10Z, and one of them is 05H?
12  A.   Correct.
13       MS. BONJEAN: Hold on one second.  I
14  think you all just sent me this code -- Ashley, I
15  think we got an email.  I don't know who sent it.
16  Yeah, that's it.  Okay.  We'll mark this as, I
17  guess, Flores-5?  Is that what we're on?
18       MS. COHEN: Yeah, we're at 5.
19       (Flores-5, document entitled,
20  Complaint Category Tables, marked for
21  identification.)
22  Q.   Lieutenant, do you see the document
23  that is entitled, Complaint Category Tables?
24  A.   Yes.
25  Q.   Okay.  And is this the categories

---

Flores - Direct/Bonjean                                    Page 83

1   with the codes that were used to categorize
2   Internal Affairs complaints?
3   A.   Yes.
4        MS. BONJEAN: If you could go up a
5   little bit.
6   Q.   So a 10Z miscellaneous.
7        MS. BONJEAN: Could you go to the
8   miscellaneous part?  That's what I wanted to look
9   at.  Okay.  Next page, I think.
10       MS. COHEN: I'm so confused.  You
11  said miscellaneous?
12       MS. BONJEAN: There's a miscellaneous
13  category.  Okay.  Stop.  Group 10.  Here we are.
14  Q.   Operation personnel violations.
15  There could be a miscellaneous operation personnel
16  violation, and that's why it would say 10Z; is that
17  right?
18  A.   Yes.  Essentially, it doesn't fall into the
19  other categories.
20  Q.   And then you could have miscellaneous
21  excessive force, which would be 05H; is that right?
22  A.   Yes.
23  Q.   And do you know what would be a
24  miscellaneous excessive force?
25  A.   No, I can't think of that off the top of my

---

Flores - Direct/Bonjean                                    Page 84

1   head.
2   Q.   So it looks like there's these
3   complaint categories, and every complaint category
4   has a miscellaneous in there; right?
5   A.   Yes.
6   Q.   All right.  But if we could back to
7   using Guevara's as an example, why does the
8   complaint category say miscellaneous?  Well, so I
9   guess you have to know what 10Z means, the
10  operations and personnel violations, or whatever;
11  right?
12  A.   Category 10 is that, yes.
13  Q.   So then we know -- if you know 05H is
14  excessive force, you would know this is an
15  excessive force complaint; correct?
16  A.   Correct.
17  Q.   But if you don't know what these
18  codes relate to, we don't know -- we know a
19  subcategory but not the actual overarching category
20  unless you know what the codes stand for; fair?
21  A.   Yes.
22  Q.   Like, this doesn't really mean much
23  to, for instance, a civilian who is looking at
24  this, no arrest, you don't know what that means;
25  right?

---

Flores - Direct/Bonjean                                    Page 85

1   A.   Probably not.
2   Q.   Unless you know what 5D means, you
3   don't really know what the allegation involves;
4   correct?
5   A.   Correct.
6   Q.   And you certainly don't know what
7   miscellaneous would mean if you don't know what 10Z
8   is; correct?
9   A.   Yes.
10  Q.   All right.  An incident is when the
11  incident allegedly happened, when the complaint was
12  allegedly made is in the next column, and when the
13  investigation was closed, and then the final
14  finding; right?
15  A.   Yes.
16  Q.   And NS is not sustained; EX is
17  exonerated; sustained is SU; and unfounded is UN;
18  fair?
19  A.   Yes.
20       MS. BONJEAN: Could we go to the next
21  page.
22  Q.   And then here we have the complaint
23  history for the same officer.  It looks like you're
24  using a different program starting in January of
25  2000, which is CRMS.  What does that stand for?

Flores - Direct/Bonjean                                    Page 86

1   A.   It's a different computer, Complaint
2   Register Management System.  So it was a different
3   system in the mainframe trying to improve on
4   retention, search capabilities.
5   Q.   Okay.  But, again, it looks like it's
6   organized pretty similarly with the complaint
7   number, complaint register number, all the way to
8   the left; correct?
9   A.   Yes.
10  Q.   And then the category of the
11  complaint; correct?
12  A.   Yes.
13  Q.   Which is designated by a code.  And
14  then there's like a subcategory, right, that is
15  written out here?
16  A.   Yes.
17  Q.   And then also what -- what the final
18  outcome of it was, what the final -- I'm sorry.
19  Strike that.
20       It looks like there's columns here
21  that relate to how the complaint is ultimately
22  categorized, finally categorized; is that right?
23  A.   Yes.
24  Q.   And that's because at some point that
25  could change; correct?  It could initially be

Flores - Direct/Bonjean                                    Page 87

1   categorized as one thing, but through the
2   investigation process, or even at the end of the
3   investigation process, be categorized as something
4   else; is that right?
5   A.   Yes.
6   Q.   And then there's the incident date,
7   complaint date, closed date, final finding, and
8   then final penalty; correct?
9   A.   Yes.
10  Q.   And there's codes for what 600 means?
11  A.   Yes.
12       MS. BONJEAN: Okay.  Go ahead,
13  Ashley, to the next.  Keep going, if you would.
14  Q.   What is this we're looking at right
15  this second, which is page four of this document?
16  A.   It appears to be a printout of the
17  officer's summary punishment history.
18  Q.   And where is that information
19  maintained?
20  A.   Now it is maintained in CLEAR system, a
21  different computer system.
22  Q.   It's called the CLEAR system?  What
23  is the CLEAR system?
24  A.   The letters in CLEAR stand for something.
25  I don't recall what, but it's the computer system

Flores - Direct/Bonjean                                    Page 88

1   that the Chicago Police Department uses now.
2   Q.   And what type of information does it
3   maintain?  I think you just said it maintains
4   someone's disciplinary history?
5   A.   CLEAR maintains everything.
6   Q.   Okay.
7   A.   Law enforcement, crime strategies,
8   everything.  And then it's broken down into
9   subsets.
10       MS. BONJEAN: Can you keep going,
11  Ash.  Go back the other way, if you would.
12  Q.   So I want to ask you a question as it
13  relates to Reynaldo Guevara.
14       MS. BONJEAN: If you could go back to
15  page three, Ashley, please.
16  Q.   What is this five-year employee
17  complaint register history?  This is these last
18  five years?
19  A.   Yeah, this is his last five years.  I
20  believe it's from the date the report was run.
21  Q.   What do you mean by that?  I don't
22  know that I understand what that means.
23  A.   The five-year complaint history was used
24  because pursuant to our collective bargaining
25  agreement, for disciplinary imposed we can only

Maysonet v.
Guevara

---

1  look at the last five years of discipline.
2  Q.   And who could only look at five years
3  of discipline?
4  A.   The police department.
5  Q.   You mean when determining how to
6  discipline someone?
7  A.   When determining a penalty, yes.
8  Q.   So when someone gets a sustained
9  complaint, and there's a penalty being determined,
10  looking at their past history is something that may
11  be taken into consideration, but pursuant to the
12  collective bargaining agreement, the supervisors,
13  or I guess the superintendent ultimately, can look
14  at only the last five years of the disciplinary
15  history?
16  A.   Yes.
17  Q.   Can they -- in determining -- well, I
18  don't want to talk about what's happening right now
19  in current times, but between 1987 and 1990, in
20  determining a penalty for a sustained complaint,
21  could the superintendent who ultimately signed off
22  on these things look at a complaint history in
23  determining the appropriate penalty irrespective of
24  whether those complaints were sustained or not
25  sustained?

---

1  A.   I'm sorry.  You have to repeat that
2  question.
3  Q.   Sure.  So an individual like Rey
4  Guevara gets a sustained complaint, and now it's a
5  matter of determining what the appropriate penalty
6  is that the superintendent is going to ultimately
7  approve or, you know, sign off on.  I'm assuming
8  there are a number of factors that may be looked at
9  to determine what the appropriate penalty is;
10  right?
11  A.   Yes.
12  Q.   And one of those could be just sort
13  of the seriousness of offense; fair?
14  A.   Yes.
15  Q.   And his past disciplinary history
16  might be something that can be reviewed; correct?
17  A.   Yes.
18  Q.   Again, we're talking 1987 and 1990.
19  What about just his complaint history, irrespective
20  of whether a complaint was sustained and ultimately
21  led to discipline, just the complaint history of
22  allegations?
23  A.   No, they were not considered.
24       MS. BONJEAN: Okay.  Keep going, Ash.
25  I'm sorry.  Page two.

---

1  Q.   Do you have any reason to believe
2  that the complaint history reflected here for Rey
3  Guevara from January 1st, 2000, to March 20, 2019,
4  is complete, meaning it's comprehensive, it
5  reflects all of the complaints he received?
6  A.   I believe it does, yes.
7  Q.   Any reason to believe it is not
8  complete?
9  A.   No.
10  Q.   And same for the complaint register
11  history for the time frame reflected on page one of
12  this document, 67 to '99?
13  A.   Yes.
14  Q.   At what point -- I know there is an
15  appeals process by which an officer can challenge a
16  sustained complaint; right?
17  A.   Yes.
18  Q.   Is a police officer permitted to
19  have -- again, during the time frame 1987 to 1990,
20  were police officers permitted to have
21  representation, legal representation, in
22  challenging a sustained complaint?
23  A.   Yeah, I believe they were.
24  Q.   And so what was the process by which
25  an officer could challenge a sustained complaint?

---

1  What was the first thing they had to do?
2  A.   Oh, when they received a penalty, they
3  filed a grievance under the collective bargaining
4  agreement.
5  Q.   Okay.  And then what would happen
6  next?
7  A.   It would be determined through the
8  grievance process by an arbitrator what the final
9  conclusion was.
10  Q.   And when you say an arbitrator and
11  the final conclusion, elaborate on what the
12  arbitrator was, who he was, and what you mean by
13  the final conclusion?
14  A.   When a grievance is filed, the union that
15  represents the officer, they select an arbitrator,
16  and they have -- I don't know how it works -- some
17  type of hearing in front of the arbitrator, or the
18  trier of the fact, and then he would decide on the
19  finding and the penalty.
20  Q.   So, ultimately, if there was a
21  sustained complaint, there was a even more robust
22  process by which he could challenge that in some
23  type of hearing; correct?
24  A.   The grievance was his challenge.
25  Q.   Right.  And that could actually go to

---

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 93

1   a hearing, it sounds like a hearing where there
2   would be finders of fact, or triers of fact, as to
3   the underlying allegation and whether or not it
4   should have been sustained; right?
5   A.   Correct.
6   Q.   And whether or not the penalty was
7   appropriate; correct?
8   A.   Yes.
9   Q.   And then there would also sometimes
10  be settlements that would be reached; right?
11  A.   Yeah, I believe so.
12  Q.   So a police officer could, you know,
13  have a sustained complaint, challenge it, and
14  ultimately there could be a settlement reached
15  wherein it was either not sustained, or where it
16  was sustained of something, a lesser category, or
17  the penalty could be changed or modified in some
18  way through a settlement process between the city
19  and his representative or lawyer; right?
20  A.   Yes.
21  Q.   And the ultimate outcome of that
22  would presumably be reflected in this final
23  finding; right?
24  A.   It should be, yes.
25  Q.   Was a officer permitted to challenge

---

Flores - Direct/Bonjean                                    Page 94

1   through a grievance any sustained finding no matter
2   how minor the discipline was, or did it have to be
3   like a major or like a suspension, or was it really
4   just any type of sustained finding?
5   A.   The use of the grievance was only for a
6   sustained finding where the penalty is less than
7   separation.
8   Q.   Okay.  But anything less than
9   separation, you could use a grievance; correct?
10  A.   Yes.
11  Q.   And then separation, I'm assuming
12  there was a different process?
13  A.   Correct.
14  Q.   Can you just -- I don't want to get
15  into too much detail because I don't want to take
16  too much of our time there, but just for the
17  purposes of getting an overview at a high level,
18  what was the process when separation was the
19  outcome?
20  A.   If the superintendent recommended a
21  separation, charges were filed at the Chicago
22  Police Board for a full evidentiary hearing.
23  Q.   Now, if I'm not mistaken, independent
24  of the Internal Affairs process, or function,
25  supervisors or sergeants had an obligation to

---

Flores - Direct/Bonjean                                    Page 95

1   supervise and discipline their subordinates; is
2   that right?
3   A.   Recommend discipline, yes, supervisors
4   obviously, yes.
5   Q.   So when you say recommend discipline,
6   let's say a supervisor, you know, sees an officer
7   who is being lazy every day, can they directly
8   discipline the officer, or do they have to go
9   through some mechanism -- do they have to write
10  them up, or how did that process work?
11  A.   The supervisor could do a couple of things.
12  They could do what we call an admonishment.
13  Basically just verbally telling the officer what
14  the issues were, what the problem is.  They could
15  do a formal counseling session report, which is
16  not discipline.  It's just putting in writing out
17  any issues.  They could initiate summary
18  punishment, the SPAR process, which they recommend
19  discipline, or they could initiate a complaint
20  register number.
21  Q.   Got it.  Okay.  So a supervisor
22  obviously can initiate a complaint register, and if
23  a complaint is coming from outside by a civilian,
24  they would be obligated to do so; right?
25  A.   Yes.

---

Flores - Direct/Bonjean                                    Page 96

1   Q.   But putting that aside, which I think
2   we discussed, there are other forms of discipline
3   or remedial types of actions that a supervisor can
4   take if he himself observes certain conduct that
5   justifies that type of response; did I get that
6   right?
7   A.   Yes.
8   Q.   So one thing they could do, a
9   supervisor could do, is admonish a subordinate for
10  XY&Z, right, for -- I don't know -- for their
11  appearance doesn't look great, something along
12  those lines; right?
13  A.   Correct.
14  Q.   And would that admonishment be
15  recorded somewhere, like noted in like a negative
16  report, or is it just, you know, informal?
17  A.   Very informal.  If it was written anywhere,
18  I don't know where it would be.  Just give a
19  verbal notice if there was a problem.
20  Q.   But as far as you know, there was no
21  requirement that the supervisor memorialize the
22  fact, "I gave Officer John Doe a verbal
23  admonishment because he was wearing a dirty uniform
24  today"?
25  A.   Correct, there was no requirement.

---

---

Flores - Direct/Bonjean                                      Page 97

1  Q.  Okay.  And then the other category
2  you said is a formal -- I can't read my
3  handwriting.  What was one of the other
4  alternatives?  A formal --
5  A.  Counseling session report.
6  Q.  Formal counseling session.  Okay.  A
7  formal counseling session, which is not discipline,
8  but have a subordinate who's maybe going through
9  some personal issues that looks like he's having
10  some problems, showing up late for work, what have
11  you, and maybe the supervisor thinks it's
12  appropriate or would be helpful to have this guy go
13  for a counseling session; is that right?
14  A.  No, the supervisor would do the counseling
15  session.
16  Q.  Oh, got it.  Okay.  And this was true
17  in 1987 and 1990; right?
18  A.  Yes.
19  Q.  So a supervisor identifies some
20  issues with the subordinate and says, you know, "We
21  need to have a sit-down and talk about what's going
22  with you"?  Is that kind of what would go on?  Why
23  don't you tell me what goes on, went on, in a
24  formal counseling session?
25  A.  Essentially that.  There was some

---

Flores - Direct/Bonjean                                      Page 98

1  deficiency noticed.  So the supervisor would sit
2  down with the subordinate.  They would discuss
3  whatever issue it was, and then the supervisor
4  would put it in writing.
5  Q.  So a counseling session would be put
6  in writing; correct?
7  A.  Yes.
8  Q.  And would it be maintained in an
9  officer's file somewhere?
10  A.  Yes, it was supposed to be maintained for
11  one year in his file.
12  Q.  In a personnel file?
13  A.  Yes.
14  Q.  And then there's also something known
15  as summary punishment.  What is that?
16  A.  It's in the directive for what we call less
17  serious transgressions where it's just put as
18  needed.  The supervisor would initiate summary
19  punishment, which is just tell him what the issue
20  was, what correction had to be taken, and what the
21  punishment would be.  The punishment at maximum
22  would be a three-day suspension, but it would
23  start with a reprimand, and it would be given to
24  the officer.
25  Q.  And it's not something that would go

---

Flores - Direct/Bonjean                                      Page 99

1  through the complaint register process, this is
2  separate; right?
3  A.  Correct.
4  Q.  But it is memorialized, it sounds
5  like, somewhere?
6  A.  Yes, in the summary punishment form.
7  Q.  And that would go in the personnel
8  file as well?
9  A.  It would go in the discipline file.
10  Q.  Or a discipline file.  Are discipline
11  files and personnel files separate from each other?
12  A.  For the Chicago Police Department they are,
13  yes.
14  Q.  Were they in 1987 and 1990?
15  A.  Yes.
16  Q.  So if a lawyer said, "I want the
17  officer's personnel file," and they got the
18  personnel file, it wouldn't necessarily contain his
19  history of discipline?
20  A.  No.  Typically, that's contained, if
21  discipline was imposed, a suspension notification.
22  Q.  Right.  So the personnel file might
23  have some paperwork that would reflect that someone
24  was suspended because it would reflect their pay, I
25  would assume; right?

---

Flores - Direct/Bonjean                                      Page 100

1  A.  Yes.
2  Q.  But a discipline file would have more
3  information about why that person was suspended and
4  for what reasons and, you know, the basis for the
5  suspension; correct?
6  A.  Correct.
7  Q.  Can a supervisor order remedial
8  training of one of his subordinates without, again,
9  without initiating a CR or even writing him up on a
10  summary punishment type process?
11  A.  He could recommend additional training,
12  yes.
13  Q.  So an officer -- I don't know --
14  during the execution of a search warrant doesn't do
15  something that, you know, that maybe dangerous
16  to one of his colleagues, doesn't result in
17  anything serious, but, you know, it's something
18  that's identified as, "Oh, you need some" -- I
19  don't know -- "remedial training on the tactics of
20  effectuating a search warrant," could the
21  supervisor recommend that without disciplining the
22  officer?
23  A.  Yes.
24  Q.  And would that go in a discipline --
25  would there -- would that be recorded anywhere, or

---

Flores - Direct/Bonjean                                     Page 101

1  is that just something more informal?
2  A.  Probably more informal.
3  Q.  But if the training occurred, it
4  would be in his training file, I would assume?
5  A.  It should be, yes.
6  Q.  Okay.  Are you familiar with the
7  General Order 83-1 that deals with the subject
8  matter responsibilities of sergeants assigned to
9  field activities?  I can pull it up if you're not.
10      MS. BONJEAN: Ashley, it's 83-1.
11  RFC-Maysonet 14167.  We'll mark it as Flores-6, I
12  think is what we are on.
13      MS. COHEN: You said 83-1, Jenny?
14      MS. BONJEAN: 83-1.  And it's
15  RFC-Maysonet starts at 014167.
16      (Flores-6, General Order 83-1, marked
17      for identification.)
18  Q.  Lieutenant, I'm going to have you
19  look at what we've marked as Flores-6.  It's
20  General Order 83-1.  It deals with responsibilities
21  of sergeants assigned to field activities.  I just
22  want to go to the second page of that, and at Roman
23  Numeral V, it does indicate that sergeants do have
24  a disciplinary function; is that right?
25  A.  Yes.

Flores - Direct/Bonjean                                     Page 102

1  Q.  Okay.
2      MS. BONJEAN: Go to Roman Numeral II,
3  Ashley.
4  Q.  It says right here the
5  responsibilities and duties of field sergeant
6  include personnel management, patrol activity, and
7  discipline, and administrative.  But discipline is
8  identified as one of the categories of sergeant's
9  who are assigned to field activities
10  responsibilities; correct?
11  A.  Yes.
12  Q.  And this was for the time period --
13  well, this was in effect as of 1983; right?
14  A.  Yes.
15  Q.  No reason to believe it wasn't in
16  effect in 1990?
17  A.  No -- on the face, no.
18  Q.  All right.  I'd like to go back --
19      MS. COHEN: Jenny, are you done with
20  this?
21      MS. BONJEAN: Yeah, you could take
22  that down.  Thanks.
23  Q.  So in the 30(b)(6) notice, subsection
24  two that you have spoken about, which I think we've
25  covered, you know, a good bit of it, where it is,

Flores - Direct/Bonjean                                     Page 103

1  "Actions taken to review, investigate, analyze,
2  uncover, prevent, or determine the prevalence of
3  any misconduct, deficiency, shortcomings, or other
4  problems, if any, relating to any policies."  Do
5  you see that?
6  A.  Yes.
7  Q.  Okay.  So we have discussed certainly
8  there's an investigative function or action that
9  can be taken when CRs are lodged.  In 1987 to 1990,
10  are you aware of any actions that existed in the
11  Chicago Police Department that were designed to
12  analyze the prevalence of misconduct by its
13  officers, or deficiencies, or shortcomings, or any
14  other problems?
15  A.  No, I'm not aware of any.
16  Q.  What about any actions taken to
17  prevent any misconduct, deficiency, shortcomings,
18  or other problems relating to policies or practices
19  of the department?
20  A.  Again, I'm not aware of any.
21  Q.  What about any actions taken by the
22  department to determine the prevalence of any
23  misconduct, deficiencies, shortcomings, or other
24  problems relating to the policies or practices that
25  we've identified?

Flores - Direct/Bonjean                                     Page 104

1  A.  No, I'm not aware of any.
2  Q.  All right.  You did mention earlier
3  that there were some programs in place that you
4  referenced as personnel concerns or personal -- I
5  think personal concerns?
6  A.  Yes, personal.
7  Q.  Okay.  And then the Behavioral
8  Intervention Program; right?
9  A.  Yes.
10  Q.  Any others that you can think of that
11  are in that sort of category, if that makes sense?
12  I don't know if it does.
13  A.  In that category, no, I can't think of any.
14  Q.  Okay.  So I think I asked you
15  earlier, Personal Concerns, I think you said was
16  sort of an arm of human resources?
17  A.  Yes.
18  Q.  And was this program in place between
19  1987 and 1990?
20  A.  Yes.
21  Q.  And what was the purpose of the
22  program?
23  A.  To identify officers that were having
24  discipline issues, medical role type of issues,
25  any type of issues that may be affecting their

Maysonet v.
Guevara

---

Flores - Direct/Bonjean         Page 105

1  work performance, to give them a program with
2  structure so that they would be assigned a
3  sergeant to strongly monitor them during the
4  course of their duties.
5  Q.  Was there a general order, directive,
6  or policy of the department that set forth the
7  purpose/goals of this program and how it operated?
8  A.  I believe there was.  There is one now.  I
9  don't know if back then it was just operated out
10 of human resources -- or the personnel division or
11 if they had the directive back then.
12 Q.  Okay.  How did someone get
13 delegated -- strike that.  How did someone get --
14 how did someone get designated, is the word I'm
15 looking for, to participate in this program?
16 A.  A recommendation would have to be made
17 either by their supervisor to their commander, or
18 the medical role had been -- medical services
19 administrator, director of human resources.  It
20 was delineated -- there was like certain
21 individuals within the department, if it was
22 brought to their attention that a member could
23 benefit from this, they would recommend placement
24 in the program, and a decision would be made by
25 the director of the personnel division.

---

Flores - Direct/Bonjean         Page 106

1  Q.  So apart from a supervisor
2  recommending placement in the Personal Concerns
3  Program, how else could an officer be recommended
4  to this program?
5  A.  If they had a certain number of what we
6  call medical occurrences, if they had a certain
7  number of sustained disciplinary files, if they
8  had a certain number of -- it would be
9  medical-related accidents.  I am trying to think
10 of what else.
11 Q.  So it sounds like -- I'm sorry.  Go
12 ahead.  Finish your answer.
13 A.  Also, a certain number -- within a certain
14 time period, a certain number of complaints made
15 within a certain time period.
16 Q.  Okay.  So it sounds to me, and
17 correct me if I'm wrong, that there was certain
18 data points that could trigger a recommendation to
19 the Personal Concerns Program, right?
20 A.  Yes.
21 Q.  So we discussed one way is a
22 supervisor could recommend that someone would
23 benefit from this program; correct?
24 A.  Yes.
25 Q.  And then if someone was missing a

---

Flores - Direct/Bonjean         Page 107

1  number of days for medical purposes, that could be
2  a trigger that would make someone be recommended
3  for the program; correct?
4  A.  Yes.
5  Q.  What about absences, is that
6  something that might do it as well?
7  A.  It could.  Yeah, it could.
8  Q.  You said sustained disciplinary
9  findings might be a trigger as well for
10 participation in the Personal Concerns Program; is
11 that fair?
12 A.  Yes.
13 Q.  And then also complaints within a
14 certain time period, numbers of complaints within a
15 certain time period; correct?
16 A.  Correct.
17 Q.  And between 1987 and 1990, do you
18 know whether or what the number of, let's say,
19 complaints an officer would have to receive within
20 a particular time period in order to trigger a
21 recommendation for the Personnel Concerns Program?
22 A.  I do not know.
23 Q.  Do you know if there's, again, if
24 there was a written policy anywhere that helped
25 personnel determine whether or not someone was

---

Flores - Direct/Bonjean         Page 108

1  appropriate for this program?
2  A.  There is one now.  I would have to check
3  the history on that directive if it went back that
4  far.
5  Q.  And I'm sorry, the program, was it
6  called Personal Concerns; right?
7  A.  Yes.
8  Q.  And who ran it?  Who was responsible
9  for operating this Personal Concerns Program?
10 A.  The personnel division.
11 Q.  Personnel division.  And what were
12 the tools that the personnel division could use for
13 addressing the personal concerns that an officer
14 may have or that are had for the officer after he
15 or she is recommended to the program?
16 A.  Wherever the officer was assigned, they
17 designated one supervisor to essentially monitor
18 the officer on a day-to-day basis, strictly
19 monitor him.
20 Q.  So the Personal Concerns Program was
21 used as a way to monitor officers who may have
22 triggered some red flags for the department; is
23 that fair?
24     MS. CARNEY: Objection to form.  You
25 can answer.

---

Maysonet v.
Guevara

---

Flores - Direct/Bonjean      Page 109

1   A.   Yes, areas of concern.
2   Q.   Right. I said red flags, but that's
3   fine, we'll call it areas of concern. And it would
4   be a more intensive type of supervision where he
5   would have a supervisor he would have to sort of
6   check in with every day; is that how it operated?
7   A.   Yeah, typically multiple times during the
8   tour of duty.
9   Q.   Okay. Was reassignment one of the
10   tools that the personnel division could use if
11   someone was recommended to the Personal Concerns
12   Program?
13   A.   I don't recall that as part of the program,
14   but I guess it could have been.
15   Q.   To the best of your knowledge, the
16   program was primarily just an enhanced level of
17   monitoring of an officer who had areas of concern,
18   at least according to their chain of command;
19   right?
20   A.   Yes.
21   Q.   And it was not discipline, it was --
22   it was, again, a sort of an intervention of type;
23   right?
24   A.   Correct, it was not discipline.
25   Q.   Back in 1987 to 1990, officers who

---

Flores - Direct/Bonjean      Page 110

1   were recommended to the program, this Personal
2   Concerns Program, did their participation in the
3   program get memorialized anywhere or -- well, let's
4   just start there. Did it get memorialized
5   anywhere?
6   A.   I don't know. It should have been, but I
7   don't know.
8   Q.   Like, for instance, would it be in
9   their personnel file, that this officer was
10   referred to the Personal Concerns Program because
11   he was missing work for medical reasons that
12   exceeded expectations, and he was assigned to this
13   supervisor, you know, anything like that?
14   A.   I don't know. It would have to depend if
15   there was a formal directive on it because that
16   would state how it was documented. Otherwise, if
17   it was just in practice, I don't know.
18   Q.   So are you saying as you sit here
19   today as the designee for the city for this time
20   period, you don't know whether an officer's
21   participation in the Personal Concerns Program was
22   documented anywhere?
23       MS. CARNEY: Objection to form.
24   Misstates his testimony. You can answer.
25   A.   It was documented, but I don't know where

---

Flores - Direct/Bonjean      Page 111

1   they retained it or if they retained it.
2   Q.   Okay. So if I want to know, as an
3   example, whether Roland Paulnitsky ever
4   participated in the Personal Concerns Program, was
5   ever referred and then participated, how could I
6   find that out, and, you know, again, during the
7   time period of the late '80s to early '90s, where
8   would I find that information out as a lawyer who
9   is interested?
10   A.   If it exists, it would be in the personnel
11   division.
12   Q.   Okay. When you say the division, you
13   mean his file in the division?
14   A.   Yeah, you would refer to his file. We call
15   it human resource now. Back then it was the
16   personnel division.
17   Q.   Okay. Again, you're saying a
18   division. I want to know specifically is there a
19   file, a human resources file that it would be in?
20   A.   Yes.
21   Q.   If it was going to be anywhere, it
22   would be in his human resources file; correct?
23   A.   Yes.
24   Q.   Or personnel file, if they called it
25   that back then; right?

---

Flores - Direct/Bonjean      Page 112

1   A.   Correct.
2   Q.   So at least you would have some note
3   of it in his personnel file that he participated in
4   this program?
5   A.   Yes.
6   Q.   And do you know back in 1987 to 1990
7   whether the supervisor would give updates or
8   reviews or, you know, he's doing good, he's doing
9   better, or something along those lines?
10   A.   They do now. So going back at that time
11   frame, if there was a formal directive on the
12   issue, it would be consistent that he would have
13   to do that.
14       MS. BONJEAN: Theresa, can you help
15   me out here? Is there a directive from that time
16   on this issue?
17       MS. CARNEY: Yes, it was produced.
18   It's 83-3.
19       MS. BONJEAN: Let me see. Maybe I
20   have it out here already.
21       MS. CARNEY: My Bates stamp for it is
22   RFC-Maysonet 048432.
23       MS. BONJEAN: 048 you said?
24       MS. CARNEY: Yes.
25       MS. BONJEAN: 032?

---

---

Flores - Direct/Bonjean                                          Page 113

1      MS. CARNEY: 048432.
2      MS. BONJEAN: Got it.  Oh, here we
3  go.
4      MS. COHEN: You said 04 -- I'm
5  sorry -- I missed the last three numbers.
6      MS. BONJEAN: Okay.  048432.
7      MS. CARNEY: Do you want to take a
8  quick break?  I can print it here.
9      MS. BONJEAN: Yes, perfect.  Let's
10  take a two-minute break.
11      (Break taken.)
12      (Flores-7, General Order 83-3, marked
13  for identification.)
14  Q.  Do you have a paper copy there,
15  Lieutenant?
16  A.  Yes, I do.
17  Q.  Okay.  So I'm going to have you
18  identify as Flores-7 a general order that appears
19  to be General Order 83-3?
20  A.  Yes.
21  Q.  And it's called Personnel Concerns?
22  A.  Yes.
23  Q.  All right.  And this should help us
24  so I'm not having you guess at things.  And it's
25  Bates stamped 48432 through 48435; right?

---

Flores - Direct/Bonjean                                          Page 114

1      MS. CARNEY: The bottom numbers on
2  the page.
3  A.  48432 on mine, yes.
4      MS. CARNEY: Yes.
5  Q.  Okay.  Great.  So we've been
6  discussing a little bit, and I've been asking
7  questions about, this Personal Concerns Program.
8  Does this now clarify for you whether or not there
9  was actually a directive in place between 1987 to
10  1990?
11  A.  Yes.
12  Q.  And there was, it looks like;
13  correct?
14  A.  Correct.
15  Q.  And it looks like it was rescinded
16  and replaced in 1997 based on the stamp there; is
17  that correct?
18  A.  Yes.
19  Q.  All right.  So it provides some
20  definitions here for personnel concerns, and I want
21  to go through these a little bit because I think we
22  touched on parts of it, but I'd rather go through
23  it a little more uniformly, if you don't mind.  The
24  first subsection is A, which talks about a
25  Behavioral Alert System.  Do you see that?

---

Flores - Direct/Bonjean                                          Page 115

1  A.  Yes.
2  Q.  And that relates to a, "Systematic
3  review of the department member's behavior pattern
4  to alert supervisors to the need for intervention."
5  Did I get that correctly?
6  A.  Yes.
7  Q.  And tell me how the Behavioral Alert
8  System differed from the Personnel Concerns Program
9  that we've been talking about, if it did in any
10  way, or is the Behavioral Alert System what was
11  triggered in order for someone to be admitted into
12  the Personal Concerns Program?
13  A.  The Behavioral Alert System was less
14  formal, less stringent supervisory instruction.
15  Kind of the first step if the criteria was met for
16  somebody to be supervised.  They take corrective
17  action not being disciplined.  Personal Concerns
18  is more formal, more structured.  Typically, a
19  member was in the Behavioral Alert System and then
20  was put in the Personal Concerns because that's
21  tried to be the first step.
22  Q.  Before we get any further, do you
23  know whether there was a directive specific to the
24  Behavioral Alert System?
25  A.  It's all incorporated in this directive.

---

Flores - Direct/Bonjean                                          Page 116

1  In '97 they broke it off in two directives.
2  Q.  Okay.  So I wanted to make sure.  It
3  appears to be Roman Numeral Number V, the
4  Behavioral Alert System; right?
5  A.  Yes.
6  Q.  Okay.  And it states that the purpose
7  of the Behavioral Alert System is, again, to
8  identify members of the department whose behavior
9  indicates that future discipline or performance
10  problems could result absent corrective action
11  and -- well, first, it said that that's one of the
12  purposes; right?
13  A.  Yes.
14  Q.  And then it also discusses
15  standardizing -- a system -- or standardize a
16  system for documenting and maintaining records of
17  corrective action taken; correct?
18  A.  Yes.
19  Q.  And there are indicators that are
20  identified from performance data that might, I
21  guess, trigger someone's -- trigger a member's --
22  trigger the Behavioral Alert System; fair?
23  A.  Yes.
24  Q.  And I think some of them may have
25  been touched on, but excessive force complaints was

---

Maysonet v.
Guevara

1   one of those categories of data that could trigger
2   this alert system?
3   A.   Yes.
4   Q.   And the complaint and disciplinary
5   history was another; right?
6   A.   Yes.
7   Q.   And then repeated incidences of
8   medical role used?  You mentioned that earlier;
9   right?
10  A.   Yes.
11  Q.   And so in looking at this policy, how
12  was the data that is identified here -- let's talk
13  about the most relevant for our purposes, the first
14  two categories, excessive force complaints and
15  complaint and disciplinary history.  How was that
16  data examined for determining whether or not
17  someone had triggered this alert system such that
18  it made the department identify them as members who
19  may have performance problems in the future?
20  A.   How was the data collected?
21  Q.   I mean, I don't -- this is pretty
22  general.  It sounds like the purpose of this alert
23  system was to identify officers who may have future
24  disciplinary problems in the future; right?
25  A.   Correct.

1   Q.   And the purpose of identifying those
2   officers is to take corrective action before they
3   were disciplined and before they did harm to the
4   community; correct?
5   A.   Yes.
6   Q.   And then it has these categories of
7   -- it has these categories of data that would make
8   someone appropriate for intervention is the way I
9   would put it; right?
10  A.   Yes.
11  Q.   So yeah, how -- that's all I can tell
12  though from this.  How did it operate in real
13  terms, like in real life?
14  A.   The units who had this information,
15  excessive force complaints, would be OPS;
16  complaint of discipline, IAD; medical role use,
17  medical services; the traffic safety records,
18  that's the traffic division -- traffic safety
19  division I mean.  They would be aware of it
20  because it comes to them to be addressed.  If they
21  see -- essentially, if they see a person's name
22  repeatedly, or an indicator, they would notify the
23  commanding officer of exempt rank of the member to
24  make a determination if the commander or the
25  commanding officer thought it was a one-time

1   incident, or it was a problem but not a pattern of
2   problems, or maybe it's a pattern, so the
3   commander could address it by recommending
4   placement in the program.
5   Q.   And the program then would be the
6   Personnel Concerns Program?
7   A.   Yes.  Either one.
8   Q.   Well, what's the other one?
9   A.   The Behavioral Alert System.
10  Q.   So that's actually a program too?  I
11  guess I'm trying to understand.
12  A.   Yes.  It's a subset -- yeah, subset of the
13  Personal Concerns.  It does the same thing, but I
14  would say it's not on a smaller scale, but there's
15  less indicators.
16  Q.   So it was a steppingstone essentially
17  to the Personnel Concerns Program?  If corrective
18  action didn't seem to be working, it might get
19  stepped up to the Personnel Concerns Program?
20  A.   Correct, it could be.
21  Q.   Okay.  And specific to the Behavioral
22  Alert System, who was in charge of administering
23  that?
24  A.   The personnel division.
25  Q.   And in practice would that -- it

1   would still ultimately trickle down to supervisors
2   it sounds like; right?
3   A.   Yes.
4   Q.   So I could see Roman Numeral VII that
5   if a person is identified and has such indicators
6   that would justify this corrective action, there's
7   certain things that would happen, one of them being
8   there was a review of all relevant unit records
9   concerning the member's past work performance and
10  disciplinary history; right?
11  A.   Correct.
12  Q.   Who would do that?  Was that the
13  watch and unit commanders or --
14  A.   Either one.  I mean, the unit commander
15  could designate the watch commander.  If the watch
16  commander is aware and the officer is on his
17  watch, he could do it.
18  Q.   And then the member would have to
19  consult with unit survivors concerning his or her
20  behavior, it looks like; right?
21  A.   Correct.
22  Q.   There would be, it looks like, some
23  type of counseling function almost where they would
24  have to speak with -- I don't know -- there might
25  be different resources available, counseling,

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                Page 121

1  et cetera?
2  A.  Yes.
3  Q.  All right.  It does indicate that
4  there would have to be a written record of whatever
5  meeting took place?
6  A.  Yes.
7  Q.  And maintained by the unit commander
8  for a year; is that right?
9  A.  It says for one year, yes.
10 Q.  What would happen after that one
11 year, would it be destroyed as part of the -- would
12 it be maintained elsewhere, or would it just be
13 destroyed?
14 A.  I believe it would be destroyed.  It would
15 be purged from the record.
16 Q.  Purged; right?
17 A.  Yes.
18 Q.  All right.  And it says there also
19 that if there's a recurrence of a Behavioral Alert
20 System indicator within a 12-month period, there
21 would be a repeat of certain steps, it looks like;
22 right?
23 A.  Yes.
24 Q.  Okay.  So how -- I'm trying to
25 understand how in practice this happened.  So if I

---

Flores - Direct/Bonjean                                Page 122

1  understand you correctly, how someone could be
2  indicated was fairly informal; is that right?
3  A.  Yes.
4  Q.  So if a supervisor is, like, oh, he's
5  getting a lot of excessive -- or I guess if the
6  Internal Affairs Division sees that someone is
7  getting a lot of Internal Affairs complaints in a
8  year period or something, or I guess OPS, or
9  something, was that how it would happen?  They
10 might say, oh, he should be referred, or she should
11 be referred; we're not sustaining them, but there's
12 enough that, you know, corrective action might be
13 warranted?
14 A.  Correct.  It would be brought to the
15 attention of the unit commander that this may be
16 an issue he needs to attend to.
17 Q.  And is the alert itself done in
18 written form?
19 A.  Typically, yes.
20 Q.  And do you know what that looked like
21 back in 1987 to 1990?  Was it --
22 A.  It was definitely a to/from subject report.
23 Q.  And it would be to whoever the unit
24 commander was from whoever had identified that
25 certain indicators were present; is that fair?

---

Flores - Direct/Bonjean                                Page 123

1  A.  Yes.
2  Q.  So any number of individuals in the
3  chain of command could find the indicators present?
4  It sounds like it was fairly informal.  Like it
5  could be someone's supervisor; it could be someone
6  in OPS; it could be -- I don't know -- probably
7  other options as well, but is that correct?
8  A.  Yes.
9      MR. BRUEGGEN: Object to form.
10 Q.  Was the data actually -- I know I
11 asked you this earlier, but was there ever apart
12 from, you know, someone noticing that someone is
13 getting a lot of Internal Affairs complaints, or
14 OPS complaints, was there an actual review of the
15 complaint history during like a 12-month calendar
16 year to say, oh, this guy, you know, these officers
17 seem to be accruing, you know, a disproportionate
18 number of Internal Affairs complaints, particularly
19 in this one category, we're gonna -- we're gonna
20 initiate an alert, a behavioral alert, for him or
21 her?
22      MR. BRUEGGEN: Object to form.
23 A.  There was not a review as far as I know.
24 Q.  Okay.  So for an individual to
25 receive an alert, it really just was somebody

---

Flores - Direct/Bonjean                                Page 124

1  noticing it sort of casually; is that fair?
2      MS. CARNEY: Objection to form.
3  A.  Yes, somebody noticing a name, or whatever
4  the case might be, that this member's name keeps
5  coming up.
6  Q.  There was no formal review process,
7  it sounds like, that any division conducted to
8  determine whether or not these patterns existed;
9  right?
10     MR. BRUEGGEN: Object to form.
11 A.  Correct.
12 Q.  Is there a formal process now?
13 A.  I believe there is, yes.
14 Q.  So this policy refers to performance
15 data, the following performance data, all excessive
16 force complaints.  So there obviously was a source
17 of data for excessive force complaints that was
18 accessible back in 1987, and even as early as 1983;
19 right?
20 A.  Yes.
21 Q.  But what you're saying is that data
22 as far as you know, or that data, wasn't as part of
23 a policy or practice reviewed on an annual or
24 semiannual basis, or anything of that nature, to
25 determine whether certain officers should be

---

Flores - Direct/Bonjean      Page 125

1  alerted or receive alerts for behavior; right?
2  A.  Correct.
3  Q.  And the same, I assume, is true that
4  the data for complaint and disciplinary history --
5  let's first just talk about complaint history.
6  Data for complaint history was gathered, obviously,
7  because people were making complaints, and there
8  were investigations being conducted; correct?
9  A.  Yes.
10  Q.  That data was available to be
11  examined in a formal way; right?
12  A.  Yes.
13  Q.  But as I understand it, back in 1987
14  to 1990, there was not a formal review of that data
15  for determining whether or not a member should
16  receive a behavioral alert; right?
17  A.  Correct.
18  Q.  And it was really sort of up to
19  supervisors and/or other personnel who happen to
20  observe or notice that a police officer was
21  struggling in some way to informally recommend that
22  they receive a behavioral alert; right?
23      MR. BRUEGGEN: Object to form.
24  A.  Correct, or those who had this information,
25  those units.

Flores - Direct/Bonjean      Page 126

1  Q.  Right, the units that had the
2  information.  So what unit would have the excessive
3  force complaint information?
4  A.  OPS.
5  Q.  So someone from that unit if they
6  noticed that there were, or happened to notice that
7  there was a number of excessive force complaints
8  for Officer John Doe, that would be a basis for
9  saying there should be a behavioral alert for this
10  officer; right?
11  A.  Correct.
12  Q.  But as far as you know, OPS didn't
13  conduct a regular or formal review of excessive
14  force complaint data in making determinations of
15  whether an officer should have a behavioral alert;
16  correct?
17  A.  As far as I know, yes, correct.
18  Q.  As far as you know; correct?  Right?
19  A.  Correct.
20  Q.  And I guess OPS and IAD would also
21  have been in control of this data related to
22  complaint and disciplinary history; right?
23  A.  Yes.
24  Q.  And the personnel department would
25  also probably be in control of at least the

Flores - Direct/Bonjean      Page 127

1  disciplinary history?
2  A.  In this time frame, I don't think so, no.
3  Q.  Any other departments that would have
4  been in control of the disciplinary histories of a
5  member of the department?
6  A.  No.
7  Q.  Okay.  Then we were discussing the
8  Personnel Concerns Program, which sounds like it
9  was a more formalized program that was available at
10  the time; is that right?
11  A.  The Personal Concerns, yes.
12  Q.  Which is described here as, "An
13  intensive supervision of department members who
14  have been designated as personnel concerns."  Makes
15  sense, right.  Okay.
16      How did a member get designated as
17  someone who had personnel concerns?  I think you
18  talked about one way is for supervisors saying he
19  or she is someone who should be designated as
20  someone who has personnel concerns and should go
21  into this program.  That would be one way; right?
22  A.  Yes.
23  Q.  And if I read this correctly, it
24  seems as if someone who has been indicated in the
25  Behavioral Alert System that happens multiple

Flores - Direct/Bonjean      Page 128

1  times, they might then be someone who is designated
2  as someone with personnel concerns; right?
3  A.  Yes.
4  Q.  Any other ways that someone could get
5  put into the Personnel Concerns Program?
6  A.  If they're in the Behavioral Alert Program
7  and they're not improving or responding, they need
8  more structure.
9  Q.  Like if they're still accruing a
10  bunch of use of force or excessive force
11  complaints; right?
12  A.  Yes.
13  Q.  Fair to say that the Personnel
14  Concerns Program is more intensive than the
15  Behavioral Alert System Program; right?
16  A.  Yes.
17  Q.  Any other manner in which someone
18  might get placed into the Personnel Concerns
19  Program other than what we discussed?
20  A.  No.
21  Q.  And this placement in the Personnel
22  Concerns Program would have been documented in some
23  form or fashion; correct?
24  A.  Yes.
25  Q.  And do you know how long that was

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 129

1   maintained in -- let's see -- how long that would
2   be maintained in their files?
3   A.   According to the directive, one year from
4   the date of the last entry.
5   Q.   And then it would be purged?
6   A.   Yes.
7   Q.   So if I'm looking at a particular
8   detective today in 2022, okay, like one of the
9   detectives who is being sued in this case, okay,
10  like I'll use Roland Paulnitsky as an example
11  because he has a fairly lengthy complaint history,
12  if he had been indicated for the Behavioral Alert
13  Program or System, as an example, and he completed
14  it, I would have no way of knowing that information
15  because it wouldn't be memorialized in his file, or
16  it wouldn't be in his file to this day; correct?
17  A.   Correct.
18  Q.   And the same would be for the
19  Personnel Concerns Program, if he was recommended
20  to the Personnel Concerns Program and participated
21  in the Personnel Concerns Program, that information
22  as of 2022, because he's retired, certainly would
23  have been purged from his file; correct?
24  A.   Yes.
25  Q.   So as you sit here today, you're not

---

Flores - Direct/Bonjean                                    Page 130

1   able to, as a lieutenant assigned to the Internal
2   Affairs Bureau, go back and determine whether or
3   not any detectives or officers who either were part
4   of the Behavioral Alert System or part of the
5   Personnel Concerns Program who now retired, you
6   have no way of going to find out that information;
7   right?
8   A.   Correct.
9   Q.   And as far as you know, there's no
10  way for the city to actually go back and find out
11  whether a Detective Guevara who's been retired for
12  many years, or Detective Paulnitsky who's been
13  retired for a number of years at this point, were
14  ever part of these programs; right?
15  A.   Right, correct.
16  Q.   And that's because if they were part
17  of the program, whatever documentation that existed
18  at one time was purged from their files; right?
19  A.   Yes.
20  Q.   Okay.  Thank you.  At some point this
21  data that might trigger a behavioral alert such as
22  complaint history or excessive force complaints,
23  there was an effort to monitor that in an
24  electronic form; correct?
25  A.   I'm sorry.  Could you repeat that?

---

Flores - Direct/Bonjean                                    Page 131

1   Q.   Yeah.  At some point the Chicago
2   Police Department started analyzing this data
3   electronically?  I'm talking specific -- well, for
4   example, excessive force or complaint histories;
5   right?
6   A.   From '87 to '90?
7   Q.   I mean, I don't know when it
8   happened.  When did it happen?  I said at some
9   point they started looking at it electronically?
10  A.   Yes, I believe so.
11  Q.   Do you know when that happened?
12  A.   No, not exactly.
13  Q.   Okay.  You're confident in saying it
14  wasn't though prior to 1990?
15  A.   I'm fairly confident it was not prior to
16  1990.
17  Q.   And do you know whether prior to 1990
18  -- I think you answered it, but let me just ask one
19  more time -- whether the data, it was there, but it
20  wasn't organized in -- strike that.
21       Prior to 1990, the data was there,
22  but it wasn't being reviewed with an eye towards
23  specifically for alerting for behavior or patterns;
24  correct?
25       MR. BRUEGGEN: Objection.  Asked and

---

Flores - Direct/Bonjean                                    Page 132

1   answered.  Go ahead.
2   A.   Correct.
3   Q.   I'm sorry.  Did you answer that?
4   A.   Yes, correct.
5   Q.   Okay.  Are you familiar with the
6   Chicago Police Department's efforts at using
7   software called BrainMaker?
8   A.   I'm not familiar with them using that, no.
9   Q.   Ever heard of it?
10  A.   BrainMaker program, yes.
11  Q.   Do you know if the -- so you're
12  saying you don't know if the city ever used it?
13  A.   As far as I know, they never did.
14  Q.   Do you know whether they explored
15  using it?
16  A.   I believe at one time it was considered.
17  Q.   Um-hum.  Do you know whether there
18  was an effort to -- like, was it just tested out
19  or, do you know anything -- I mean, if you don't,
20  you don't.  But was there ever an effort to test it
21  out or try to use it?
22  A.   I don't know.
23  Q.   Do you know when the first automated
24  early warning system existed within the Chicago
25  Police Department?

---

Maysonet v.
Guevara

---

Flores - Direct/Bonjean                                    Page 133

1      MR. BRUEGGEN: Object to form.
2  A.  No. Definitely later than the time period
3    at hand, but I don't know.
4  Q.  Do you know whether or not the
5    Chicago Police Department back during this precise
6    time period like 1988 through 1990, or early '90s,
7    did do any examination of disciplinary or
8    performance records of sworn personnel?
9      MR. BRUEGGEN: Object to form.
10  Vague.
11  A.  Am I aware of any? No.
12  Q.  And I don't mean just like excessive
13    force history or performance history, but other
14    performance indicators, it could be that as well.
15    You're not aware of any type of formal type of
16    analysis during this time period conducted by the
17    department?
18  A.  No, I'm not aware of any.
19  Q.  Okay. During 1987 and 1990, how
20    often were police officers -- how often did they
21    receive performance evaluations, if you know?
22  A.  I believe it was annually.
23  Q.  And were performance evaluations used
24    in any way to, I guess, analyze, you know, or
25    prevent, you know, or try to determine whether

---

Flores - Direct/Bonjean                                    Page 134

1    there was deficiency, shortcomings, or failures to
2    comply with policies in sort of a formal way, if
3    that makes sense? I can rephrase if I'm not making
4    sense?
5      MR. BRUEGGEN: Object to form.
6  A.  Please rephrase it.
7  Q.  Sure. So were performance
8    evaluations used in any formal way for determining
9    whether or not somebody should be in the Behavioral
10    Alert System or the Personnel Concerns Program?
11  A.  Yeah, that could be one of the indicators.
12  Q.  Okay. And how might that, how might
13    that be an indicator? Give me an example of how a
14    performance evaluation could lead to a member being
15    either placed in the Behavioral Alert System or the
16    Personnel Concerns Program?
17  A.  One of the indicators is -- or two of them
18    --
19      (Reporter requested clarification.)
20  A.  There's two indicators. One of them is a
21    significant reduction in a member's performance,
22    and the other is a significant deviation from a
23    member's normal behavior. When the performance
24    review is done by the supervisor, that is the
25    opportune moment for that to be brought to the

---

Flores - Direct/Bonjean                                    Page 135

1    supervisor's attention that there may be an issue
2    here in the member's performance.
3  Q.  And who is responsible for doing the
4    performance evaluation, the annual performance
5    evaluation of a police officer?
6  A.  It was typically assigned to the --
7    typically assigned to the supervisor who had most
8    contact with the member on his watch and his unit,
9    wherever he was, he was the one that actually sat,
10    wrote it out and sat down with the member to go
11    over it.
12  Q.  Okay. And then I assume it also went
13    through up the chain of command at a certain point
14    as well?
15  A.  Yes, to the watch commander and then the
16    unit commander.
17  Q.  And were performance evaluations
18    maintained in the personnel files of the officers
19    for a period of time?
20  A.  They were maintained in the personnel
21    division. I don't know if they were in the --
22    actually the files were maintained separately.
23  Q.  You may not know this, and it's
24    probably outside the scope, but if you'll indulge
25    me, do you know if they were maintained for the

---

Flores - Direct/Bonjean                                    Page 136

1    entirety of a member's career or for just a period
2    of time?
3  A.  I don't know their retention.
4  Q.  Okay. In terms of discipline of a
5    police officer, discipline that's actually meted
6    out, to the best of your knowledge, was that
7    maintained in a personnel file -- or is that
8    maintained in a personnel file for the entirety of
9    a member's career?
10  A.  CR files themselves are maintained for the
11    member's career, which the disciplinary history,
12    complaint history would simultaneously be
13    maintained.
14  Q.  But what about -- so if someone
15    actually gets disciplined that comes from a
16    complaint register investigation, and they actually
17    receive discipline, and that discipline then
18    becomes part of their, I'm calling it a personnel
19    file or an HR file -- I don't know what you want to
20    call it -- or maybe their discipline file -- I
21    guess that's a separate thing we discussed; right?
22  A.  Yes.
23  Q.  Do you know if at some point it can
24    be purged from a discipline file?
25  A.  To my knowledge it cannot be.

---

Maysonet v.
Guevara

| Flores - Direct/Bonjean | Page 137 |
|---|---|

1  Q.  Okay.  So if a Rey Guevara or a
2  Roland Paulnitsky, or any of the defendants in this
3  case just as an example, received a discipline
4  sometime prior to 1990, but they -- I don't know --
5  retired in 2001 or 2015, or whatever the situation
6  may be, that discipline should still be in their
7  discipline file; correct?
8  A.  Yes.
9  Q.  You've be in the department, what,
10  you said 20-how-many years?
11  A.  28 years.
12  Q.  Okay.  I'm not asking about your own
13  discipline, but if you had discipline -- I'm going
14  to assume you did not -- but if you had discipline
15  from your first year as a police officer, it would
16  still be in your disciplinary file to the best of
17  your understanding; right?
18  A.  Yes.
19  Q.  And your complaint history register
20  would reflect all of your complaint history cases
21  going back to the beginning of your career, it
22  doesn't get purged off that history log; correct?
23  A.  Correct.
24     MS. BONJEAN: All right.  Theresa,
25  let's take a couple-minute break.  I may be just

| Flores - Direct/Bonjean | Page 138 |
|---|---|

1  about finished.
2     MS. CARNEY: Okay.
3     MS. BONJEAN: But let me review my
4  notes real quick if you don't mind.
5     (Break taken.)
6     MS. BONJEAN: I have just a couple
7  follow-up questions if you indulge me and then
8  we'll be finished.
9  Q.  Lieutenant, you testified as part of
10  the Behavioral Alert System and the Personnel
11  Concerns Program back, again, during the relevant
12  time period that we're discussing, when someone
13  either alerted or was placed in the Personal
14  Concerns Program, there would be some documentation
15  at that time that was generated; right?
16  A.  Yes.
17  Q.  Okay.  And as I understand it, at
18  least according to the directive, that that
19  documentation would be maintained in the officer's,
20  I guess their personnel file, for lack of a better
21  word, for a period of a year and then purged?
22  A.  Yes.
23  Q.  And would that include any
24  documentation that, for instance, referenced the
25  corrective action that might be recommended to a

| Flores - Direct/Bonjean | Page 139 |
|---|---|

1  police officer who was participating in Personnel
2  Concerns Program?
3  A.  Can you repeat that?
4  Q.  Sure.  So, for instance, there are
5  certain responsibilities for a Personnel Concerns
6  supervisor as an example; right?
7  A.  Yes.
8  Q.  And I am assuming that part of the
9  responsibilities of a Personnel Concerns supervisor
10  would be to memorialize what he was doing to
11  discharge his obligations as a Personnel Concerns
12  supervisor; right?
13  A.  Yes.
14  Q.  So if he's recommending counseling or
15  doing weekly meetings or referring for training or
16  whatever, all the tools that could be used, he
17  would also be memorializing that in some form or
18  fashion during the time that the member of the
19  department is participating in the Personnel
20  Concerns Program; right?
21  A.  Yes.
22  Q.  And assuming this officer does not
23  receive any additional problems during this
24  one-year period, is it the case that any sort of
25  record of whatever action was taken in connection

| Flores - Direct/Bonjean | Page 140 |
|---|---|

1  with his participation in the program would be
2  purged from his record after a year?
3  A.  Yes.
4  Q.  So there would be no way to know that
5  he participated in the Personnel Concerns Program
6  unless it was determined that he continued to need
7  to be a part of it; right?
8  A.  Correct.
9  Q.  So if a police officer participated
10  in the Personnel Concerns Program in 1987, and then
11  did everything that he or she was supposed to do, a
12  year went by, any record of that was purged, but
13  then started alerting again for some indicator
14  three years later, the supervisor wouldn't be able
15  to go back and look and see, oh, you know, he or
16  she already participated in the Personnel Concerns
17  Program; right?
18  A.  Correct.
19  Q.  I mean unless they disclosed it, I
20  guess, but I mean apart from that, there would be
21  no record of it; right?
22  A.  Correct.
23  Q.  So it's almost as if after a year
24  that if they improve, they kind of get a fresh
25  slate; is that a fair way to say it?

Flores - Direct/Bonjean                                          Page 141

1  A.  Yes.
2  Q.  And as far as you know, the only
3  documentation that sort of sticks with a police
4  officer throughout the course of his career are --
5  well, their complaint register history including
6  the investigative files; right?
7  A.  Yes.
8  Q.  And then also their actual discipline
9  history if they received discipline; right?
10  A.  Yes.
11  Q.  Anything else that sticks with an
12  officer throughout the course of his career as far
13  as you know that reflects on their behavioral
14  performance?
15  A.  If they maintain the performance
16  evaluation.  I don't know if they do though.
17  Q.  Okay.  So it's possible that
18  performance evaluations are maintained for the
19  course of a officer's career, maybe not, but you
20  don't know for sure about that; right?
21  A.  Correct.
22  Q.  Do officers receive negative or
23  positive performance notices as well in addition to
24  performance evaluations, or did they?
25      MR. BRUEGGEN: Object to form.

Flores - Direct/Bonjean                                          Page 142

1  A.  In this time frame, it was just a
2  performance evaluation, and those could be
3  positive or negative.
4  Q.  Right.  Just as a point of
5  comparison, and I know, again, you're not here for
6  the current time period, but this is more just to
7  put something in focus for me, today if someone, if
8  a member of the department engaged in some type of
9  conduct that a supervisor thought was inconsistent
10  with the policies of the department but didn't
11  justify initiating a complaint register file, could
12  they issue a negative performance notice for
13  something specific?
14  A.  Yes.
15  Q.  Okay.  And it wouldn't necessarily
16  come with discipline, I assume; correct?
17  A.  It would not be discipline, no.
18  Q.  Right.  Anything that ultimately gets
19  disciplined has to go through the CR process;
20  right?
21  A.  Or the SPAR process.  Summary punishment.
22  Q.  Right.  That's right.  We talked
23  about that.  When did summary punishment process
24  become a tool for supervisors to use?  Was it in
25  existence back then?

Flores - Direct/Bonjean                                          Page 143

1  A.  I believe it's in the directive 82-5,
2  whatever that number was.
3  Q.  And summary punishment discipline, is
4  that something that would be maintained somewhere,
5  either in the discipline file, I guess, of a member
6  for the entirety of his career, or is that
7  something that can be purged?
8  A.  I believe now it's entirety.  Back then I
9  think it was purged after a time period.
10  Q.  And do you know what that time period
11  was, or is?
12  A.  No, I don't.
13  Q.  So if someone did get a summary
14  punishment type of discipline back in 1987 or '88,
15  it would be made part of their disciplinary file
16  but would be eventually eligible -- or would be
17  purged from their file to the best of your
18  understanding; correct?
19      MS. CARNEY: Objection to form.
20  A.  Correct.
21      MS. BONJEAN: All right.  I have
22  nothing further, Lieutenant.  Thank you for your
23  time.
24      THE WITNESS: Thank you.
25      MS. CARNEY: I just have a brief

Flores - Redirect/Bonjean                                        Page 144

1  follow-up.  Dave, do you have anything before I
2  go?
3      MR. BRUEGGEN: I do not have any
4  questions for you, Lieutenant.  Thank you.
5      CROSS-EXAMINATION BY MS. CARNEY:
6  Q.  Lieutenant, and this has been gone
7  over pretty extensively, but I just want to make
8  sure we're clear.  When you were discussing or
9  answering questions regarding the disciplinary
10  file, what are you talking about?
11  A.  A CR file.  If a member's name been accused
12  in the file, we are talking about a CR file.
13  Q.  Just to be clear, is there a file
14  that would say Rey Guevara Discipline and contain
15  every single one of the CR files that have been
16  initiated against him in one place?
17  A.  No.
18      MS. CARNEY: Okay.  That's all I
19  have.
20      MS. BONJEAN: All right.  I just want
21  to make sure I'm understanding too.
22      REDIRECT EXAMINATION BY MS. BONJEAN:
23  Q.  So when you say discipline file or a
24  disciplinary file, you're talking about a CR file;
25  is that right?

| Flores - Redirect/Bonjean | Page 145 |
| --- | --- |

1 A.  Yes.
2 Q.  Now, if an officer does get
3 disciplined as a result of a CR investigation,
4 obviously -- or maybe I shouldn't say obviously --
5 but the discipline he received would be
6 memorialized in that discipline file, I assume;
7 right?
8 A.  In the CR file, yes.  It would probably be
9 the last attachment.
10 Q.  Where else would it be memorialized?
11 A.  On the officer's disciplinary history; and
12 if he was suspended, his payroll history.
13 Q.  Okay.  So the only way an officer's
14 disciplinary history, if he has one, would be found
15 in any place other than the complaint register file
16 would be is if it resulted in a suspension because
17 then it would impact what his check would be;
18 correct?
19 A.  Correct.
20 Q.  So if an officer received, let's say,
21 a discipline of -- you know, it didn't result in a
22 suspension, a discipline other than suspension;
23 right?
24 A.  Yes.
25 Q.  Would that be notated or memorialized

| Flores - Redirect/Bonjean | Page 146 |
| --- | --- |

1 in any place other than the complaint register
2 file?
3 A.  On his discipline history.
4 Q.  You mean the card or the log?
5 A.  The printout, the log that we looked at
6 earlier.
7 Q.  So it would be on the register, the
8 complaint history register; right?  The log?
9 A.  Yes.
10 Q.  It would actually be in the file
11 itself that resulted in the discipline; right?
12 A.  Yes.
13 Q.  And, again, if it's not suspension
14 related, it wouldn't be anywhere else; is that what
15 you're telling me?
16 A.  I don't believe it would be, no.
17 Q.  So if you just pulled the guy's
18 personnel file, you wouldn't see -- the only type
19 of discipline you might see in his personnel file
20 would be discipline that resulted in a suspension
21 because it would have impacted his pay; right?
22 A.  Possibly, yes.
23 Q.  Okay.  So if someone wanted to
24 understand or see a full picture of one police
25 officer's disciplinary history, okay, they would

| Flores - Redirect/Bonjean | Page 147 |
| --- | --- |

1 first need to look at the log -- basically they'd
2 have to look at his complaint register log; right?
3 A.  Yes.
4 Q.  And then from there they would have
5 to pull his complaint register files to see the
6 discipline that he received; correct?
7 A.  Correct, yes.
8 Q.  But there's no file that's maintained
9 officer by officer that tells us this is this
10 officer's disciplinary history every time he's been
11 reprimanded, suspended, you know, whatever other
12 types of discipline may result; correct?
13 A.  Correct, there is no file like that.
14 Q.  Okay.  Thank you.  Hold on one
15 second.  And that was true back in 1987 and 1990;
16 right?
17 A.  Yes.
18    MS. BONJEAN: All right.  Thank you
19 so much.  Nothing further.
20    MS. CARNEY: I'm done.  I assume
21 everybody else is as well?
22    MR. BRUEGGEN: I'm good.
23    MR. MEHR: Nothing from DiFranco.
24    MR. SCHALKO: Nothing from Guevara.
25    MS. CARNEY: Audrey, we will reserve.

| Flores - Redirect/Bonjean | Page 148 |
| --- | --- |

1    MS. BONJEAN: Audrey, I need a copy
2 of this.
3    (Concluded at 5:23 p.m.)

**Maysonet v.**
**Guevara**

Page 149

```
1              CERTIFICATE OF OFFICER

2

3        I CERTIFY that the foregoing is a true and

4   accurate transcript of the testimony and

5   proceedings as reported stenographically by me at

6   the time, place and on the date as hereinbefore

7   set forth.

8

9        I DO FURTHER CERTIFY that I am neither a

10  relative nor employee nor attorney or counsel of

11  any of the parties to this action, and that I am

12  neither a relative nor employee of such attorney

13  or counsel, and that I am not financially

14  interested in the action.

15

16

17

18        AUDREY ZABAWA, C.C.R.
          Certificate No. XI01410
19

20

21

22

23

24

25
```

Page 150

```
1
2        I, ROBERT FLORES, have read the foregoing

3   transcript and hereby certify that it is a true

4   and accurate transcript of my testimony.

5

6

7               ROBERT FLORES

8

9

10

11  Sworn and subscribed to before me

12  this    day of          , 2022.

13

14

15

16  A Notary Public of the

17  State of                    .

18  My Commission Expires:

19

20

21

22

23

24

25
```