Exhibit 16

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION

3   JOSE JUAN MAYSONET, JR.,   )
                               )
4          Plaintiff,    )
                               )
5       vs.            )   No. 18 CV 2342
                               )
6   REYNALDO GUEVARA, et al.,   )
                               )
7          Defendants.   )

8

9        The video-recorded videoconference

10  deposition of THOMAS TIDERINGTON, taken pursuant to

11  the Federal Rules of Civil Procedure, before

12  Katie K. Elliott, Certified Shorthand Reporter

13  No. 084-004537, via Zoom, on Friday,

14  April 28, 2023, commencing at 10:11 a.m. pursuant

15  to notice.

16     APPEARANCES:

17        BONJEAN LAW GROUP, by
          MS. JENNIFER BONJEAN
18        MS. ASHLEY COHEN
          (750 Lexington Avenue, 9th Floor
19         New York, New York 10022
          718.875.1850
20         jennifer@bonjeanlaw.com
          ashley@bonjeanlaw.com)
21             -and-
          STEVEN A. GREENBERG, LTD., by
22         MR. STEVEN A. GREENBERG
          (53 West Jackson Boulevard, Suite 1260
23         Chicago, Illinois  60604
          312.879.9500
24         steve@greenbergcd.com)
           appeared on behalf of the plaintiff;

Page 2

```
1   APPEARANCES: (Cont'd)
2      THE SOTOS LAW FIRM, by
       MR. DAVID A. BRUEGGEN
3        (141 West Jackson Boulevard, Suite 1240A
         Chicago, Illinois 60604
4        312.494.1000
         dbrueggen@jsotoslaw.com)
5        appeared on behalf of the City of
         Chicago police officer defendants;
6
       ROCK FUSCO & CONNELLY, LLC, by
7      MS. THERESA B. CARNEY
       (333 West Wacker Drive, 19th Floor
8        Chicago, Illinois 60606
         312.494.1000
9        tcarney@rfclaw.com)
         appeared on behalf of the defendant
10       City of Chicago;
11     LEINENWEBER BARONI & DAFFADA, LLC, by
       MR. MICHAEL J. SCHALKA
12       (120 North LaSalle Drive, Suite 2000
         Chicago, Illinois 60602
13       312.380.6635
         mjs@ilesq.com)
14       appeared on behalf of the defendant
         Reynaldo Guevara;
15
       HINSHAW & CULBERTSON, by
16     MR. ROBERT T. SHANNON
       (151 North Franklin Street, Suite 2500
17       Chicago, Illinois 60606
         312.704.3000
18       rshannon@hinshawlaw.com)
         appeared on behalf of the defendant
19       Frank DiFranco.
20   ALSO PRESENT:
21     Ms. Rachel Welling, Certified Legal
       Videographer, Urlaub Bowen & Associates.
22
             * * * * * * *
23
24
```

Page 3

```
1           I N D E X
2
    Witness:                    Page
3
    THOMAS TIDERINGTON
4
       Examination by:
5
       Mr. Brueggen................  6
6      Ms. Carney................. 300
7
8         E X H I B I T S
9   No.  Description      Marked/Referenced
10   1  Expert Report - Tiderington - With
        Attachments........................ 16
11   2  Attachment D - Curriculum Vitae of
        Deponent........................... 28
12   3  Attachment A - Listing of Testimony
        and Publications................... 36
13   4  Attachment B - Materials Reviewed...... 76
     5  Attachment C - Rate of Compensation.... 86
14   6  Invoice............................. 24
     7  Expert Report - Tiderington - Without
15      Attachments........................ 90
     8  Investigative File................. 120
16   9  GPR - CCSAO 874..................... 191
     10 Statement of Rosa Bello............. 230
17   11 Photograph......................... 246
     12 File marked J384177................ 343
18   13 File marked RDJ 384177............. 345
19
        (Exhibits attached/scanned.)
20
21           - - -
22
23
24
```

Page 4

```
1       THE LEGAL VIDEOGRAPHER: This is the
2   beginning of media unit 1, and we are now on the
3   video record at 10:11 a.m.
4           This is the videotaped video
5   conference deposition of Thomas Tiderington being
6   taken on April 28, 2023. This deposition is being
7   taken on behalf of the defendants in the matter of
8   Jose Juan Maysonet, Jr., versus Reynaldo Guevara,
9   et al. The case number is 18 CV 2342 filed in the
10  United States District Court for the Northern
11  District of Illinois, Eastern Division.
12          My name is Rachel Welling, certified
13  legal videographer, representing Urlaub Bowen &
14  Associates with offices at 20 North Clark Street,
15  Suite 600, Chicago, Illinois. The court reporter
16  today is Katie Elliott, also of Urlaub Bowen &
17  Associates.
18          Counsel, please identify yourselves
19  for the video record and the parties which you
20  represent.
21      MS. BONJEAN: Good morning. I represent
22  plaintiff Jose Maysonet. This is Jennifer Bonjean.
23      MS. COHEN: Ashley Cohen is also present on
24  behalf of Mr. Maysonet.
```

Page 5

```
1       MR. BRUEGGEN: Steve, did you want to
2   introduce yourself?
3       MS. BONJEAN: Oh, he's not here now.
4       MR. BRUEGGEN: Okay. It still shows him up
5   on the screen. Okay.
6       MS. BONJEAN: Oh, it does? Oh, maybe he's in
7   the other room, okay. He has it on his background
8   noise probably.
9           But I will put on the record that
10  Mr. Greenberg is in a different office and may or
11  may not be popping in it appears during the course
12  of the deposition.
13      MR. BRUEGGEN: Good morning, Mr. Tiderington.
14  My name is Dave Brueggen, and I represent
15  defendants Montilla, Paulnitsky, Epplen, Mingey,
16  and Halvorsen.
17      THE WITNESS: Good morning.
18      MS. CARNEY: Theresa Carney on behalf of the
19  City of Chicago.
20          And, Jennifer, we lost your screen.
21  I didn't know if you wanted -- you signed off. Did
22  you mean to do that?
23      MS. BONJEAN: I'm happy to keep it on me.
24      MS. CARNEY: No, it's fine. I didn't know if
```

THOMAS TIDERINGTON, 04/28/2023                                    Page 6..9

Page 6

1 you meant to do that. I know we're having some ...
2     MS. BONJEAN: No, I took it down just because
3 I'm so close to this one, but if you want it on me,
4 I can put it on.
5     MS. CARNEY: It's up to Dave. I have no
6 issues.
7     MR. BRUEGGEN: No, I don't have any issues
8 with that, Jennifer.
9     MS. BONJEAN: Okay, let me know.
10     MR. SHANNON: And Bob Shannon on behalf of
11 defendant DiFranco.
12     MR. SCHALKA: Also Michael Schalka on behalf
13 of defendant Guevara.
14     THE LEGAL VIDEOGRAPHER: Will the court
15 reporter please swear in the witness.
16     (Witness sworn.)
17     THOMAS TIDERINGTON
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20     EXAMINATION
21 BY MR. BRUEGGEN:
22     Q. Good morning, Mr. Tiderington. How are
23 you today?
24     A. I'm fine, thank you.

Page 7

1     Q. And before we get started, you're in
2 Chicago.
3     And who else is present in the room
4 with you?
5     A. Counsel Jennifer and Ashley.
6     Q. And if anybody else joins you, if you
7 could please just let me know. I think I see the
8 door, so I don't think it will be an issue.
9     And I want to talk -- what hard
10 copies of documents do you have with you in front
11 of you?
12     A. The only thing I have in front of me is
13 my report.
14     Q. Okay. And since we're doing this via
15 Zoom, I'd just ask if you refer to any documents,
16 either hard copies or if you look on your computer,
17 you just let us know what you're looking at so that
18 we know what you're looking at, okay?
19     A. I will, yes.
20     Q. And, sir, you've given depositions
21 before via Zoom?
22     A. I have.
23     Q. And so you're familiar with if you
24 could please wait until I finish my question before

Page 8

1 you pose an answer, okay?
2     A. I will.
3     Q. And likewise, I'll wait until you're
4 done answering before I pose a new question.
5     MR. GREENBERG: His case is supposed to be up
6 this morning actually.
7     (Background interruption.)
8     MR. BRUEGGEN: Jennifer, can you tell Steve
9 he's unmuted.
10     (Discussion off the record.)
11     MS. BONJEAN: Nobody could hear that last
12 question, Dave, so you might want to start over.
13 BY MR. BRUEGGEN:
14     Q. No problem. I was just talking about
15 just kind of the rules and taking turns speaking.
16     Mr. Tiderington, you're familiar
17 with that, right?
18     A. I am.
19     Q. Okay. I'll be posing questions today.
20 If at any time you don't understand my question or
21 don't hear it because of technical problems or need
22 me to rephrase it, just let me know and I'll do
23 that, okay?
24     A. That's fine. Thank you.

Page 9

1     Q. And I'm sure you know if at any time
2 you need a break, that's not a problem. We'll take
3 a break. We'll probably be here for some time.
4 But just if you could answer any pending questions
5 before we take a break, okay?
6     A. I will.
7     Q. And, sir, you're an expert on behalf of
8 Mr. Jose Juan Maysonet?
9     A. That's correct.
10     Q. And can you tell me what you understand
11 your role to be as an expert on behalf of
12 Mr. Maysonet.
13     A. I -- I was asked to look at the case
14 documents and offer an opinion as far as the police
15 investigation and also whether or not the
16 disclosure of the investigative files was
17 appropriate.
18     Q. And, sir, you've been an expert witness
19 before, right?
20     A. I have.
21     Q. How many cases have you consulted on as
22 an expert?
23     MS. BONJEAN: I'm going to object to the form
24 of that question. He can answer.

THOMAS TIDERINGTON, 04/28/2023

Page 10

1    THE WITNESS: I don't know the exact number,
2    but I would say 40 or 50 cases.
3    BY MR. BRUEGGEN:
4        Q.    When you're doing your expert
5    consultation reviews, do you try to be very
6    thorough in your review?
7        A.    I do, yes.
8        Q.    Do you try to be detail oriented?
9        A.    To the extent that I can, yes.
10       Q.    And that would carry over from your
11   time as a police officer, right?
12       A.    That's correct.
13       Q.    Details are important?
14       A.    They can be, yes.
15       Q.    In preparing reports, do you try to be
16   precise?
17       A.    Certainly.
18       Q.    And, sir, I had the benefit of having
19   seen some of your previous testimony, which will
20   short circuit some of the background stuff -- we
21   can kind of jump right through that -- but you have
22   a fair amount of experience with depositions, right?
23       A.    I have, yes.
24       Q.    And I think you mentioned that when you

Page 11

1    were practicing -- strike that.
2            I think you mentioned when you were
3    in Florida working as a police officer that is a
4    state where there's depositions in criminal cases?
5        A.    There are, yes.
6        Q.    And so you've given thousands of
7    depositions?
8        A.    I don't know the exact number, but a
9    lot of depositions, yes.
10       Q.    And do you have a general idea of how
11   many depositions you've given as an expert?
12       A.    I would say no more than -- well, as
13   a -- as a civil expert, I mean, I've been qualified
14   as an expert on criminal cases.  But in -- as an
15   expert in this type of work, I would -- I think
16   somewhere around 10; 8 to 10 possibly.
17       Q.    Sir, when you're preparing for a
18   deposition, do you try to focus on the heart of the
19   matter and understand the facts?
20       MS. BONJEAN:  Objection, form.
21       THE WITNESS:  I review the documents, and
22   certainly I try to understand what occurred, yes.
23   BY MR. BRUEGGEN:
24       Q.    And you want to be able to answer any

Page 12

1    questions posed to you; is that accurate?
2        A.    Certainly.
3        Q.    When you're doing your review of
4    documents, do you prepare notes?
5        A.    Sometimes I do.
6        Q.    And what dictates whether you would
7    prepare notes or not prepare notes when doing a
8    review?
9        A.    I guess the case.  I know oftentimes I
10   have notes that I would create questions that I
11   would ask the attorneys that retained me.  I also
12   when I'm -- depending on the case, oftentimes as
13   I'm reviewing notes, I also draft my report at the
14   same time.
15       Q.    And so depending on the case, does that
16   depend on the amount of materials in a case or the
17   complexity of a case?  I'm just trying to figure
18   out where you might take notes.
19       A.    All of those things would factor into
20   how I would conduct my review of the material, yes.
21       Q.    In this case, did you create any notes
22   in reviewing materials?
23       A.    I did.
24       Q.    And did you disclose those notes?

Page 13

1        A.    Well, the notes that I created were
2    questions that I had for the attorneys.
3        Q.    And what types of questions did you
4    have for the attorneys?  Were they factually based?
5        MS. BONJEAN:  I'm going to object.  This is
6    work product, so I'm going to object and instruct
7    him not to answer.
8        MR. BRUEGGEN:  And I appreciate that,
9    Jennifer.
10   BY MR. BRUEGGEN:
11       Q.    And what I'm trying to get at is:  Did
12   you ask the attorneys about whether certain facts
13   existed or did not exist?
14       MS. BONJEAN:  Okay.  And I'm going to object
15   on work product privilege, and I'm going to
16   instruct the witness not to answer.
17   BY MR. BRUEGGEN:
18       Q.    And again, I'm just looking for the
19   facts that the attorneys provided to you in
20   conversations with them.
21       MS. BONJEAN:  That's -- A, that's not what
22   you asked.  You switched the question now.  But I'm
23   going to object to any conversations that we had
24   concerning his preparation of this report on work

THOMAS TIDERINGTON, 04/28/2023                                    Page 14..17

Page 14

1 product privilege grounds.
2     MR. BRUEGGEN: Okay.
3     MS. BONJEAN: Instruct him not to answer.
4 BY MR. BRUEGGEN:
5     Q.   And, sir, I trust you're going to
6 follow Ms. Bonjean's advice and not answer those
7 questions?
8     A.   That's correct.
9     Q.   Okay, and that's fine.
10        So can you tell me did -- in talking
11 to Ms. Bonjean or Ms. Cohen, did they provide you
12 any facts? Give you facts?
13     MS. BONJEAN: I'm going to object to the form
14 of that question, the foundation of that question.
15        I also think you're asking for --
16 I'm not sure I understand the question also. I
17 mean, I don't want -- if he can answer it without
18 disclosing work product, I'm fine with that, but I
19 don't -- so at this moment, I'm still going to
20 invoke the work product privilege.
21 BY MR. BRUEGGEN:
22     Q.   And, sir, do you understand my
23 question, or would you like me to rephrase?
24     A.   I think I understand.

Page 15

1     Q.   Okay. And are you going to follow
2 Ms. Bonjean's advice and not answer that question?
3     A.   I think I can -- they did not provide
4 me facts.
5     Q.   So other than -- they provided you a
6 bunch of materials for you to review, right?
7     A.   That's correct.
8     Q.   And other than that, they did not
9 provide any facts orally in conversations?
10     MS. BONJEAN: I'm going to object. Again,
11 you're asking for an answer that could implicate
12 work product, questions/answers between me and the
13 expert.
14        But I think he answered the question
15 to the extent that you're asking whether we
16 provided him with facts that aren't in the record.
17 BY MR. BRUEGGEN:
18     Q.   Sir, going back to the materials that
19 you received, in reviewing them, did you make any
20 notes in any margins on any of those materials?
21     A.   No, I did not.
22     Q.   Did you underline or highlight any
23 parts of those records that you reviewed?
24     A.   I don't think I did. I reviewed most

Page 16

1 of them in a digital format, so I don't -- I'd have
2 to go back and look, but I don't think I did.
3     Q.   And you mentioned that you did create
4 notes of questions for the attorney. And I don't
5 want to know what -- what those questions were, but
6 you -- am I correct you created questions that you
7 wanted to talk to Ms. Bonjean about?
8     A.   That's correct.
9     Q.   And, sir, just to clarify, those
10 questions you had for Ms. Bonjean, did -- were
11 those questions about your understanding of facts?
12     A.   No.
13     MS. BONJEAN: Sorry.
14     THE WITNESS: Oh, sorry.
15     MS. BONJEAN: I'm going to -- I'm going to
16 object to the -- again, you're asking him to reveal
17 the questions he asked me or had for me. So I'm
18 going to object on work product grounds and
19 instruct him not to answer. But I think he did
20 anyway, so ...
21        (Deposition Exhibit No. 1,
22         Witness Tiderington, was marked
23         for identification 04/28/2023.)
24

Page 17

1 BY MR. BRUEGGEN:
2     Q.   And, sir, what we're going to do today
3 is I'm going to mark as Exhibit 1 your complete
4 report, and let me share my screen and I'll put it
5 up there just so you can see it.
6        Do you see my screen, sir?
7     A.   I do.
8     Q.   And this is 913-page document. You can
9 see right up here. Can you see my cursor?
10     A.   I do.
11     Q.   And do you need me to scroll through
12 all 913 pages, or do you -- can we just agree that
13 this is your report with my representation that it
14 is?
15     A.   It appears to be, yes.
16     Q.   Okay, thank you.
17        And you said you have a copy of
18 that -- a hard copy of that available to you if you
19 need to look at it.
20     A.   Not all 900 pages. I have --
21        (Simultaneous cross-talk.)
22     MS. COHEN: We do have one set.
23     THE WITNESS: Oh, apparently we do it have.
24

THOMAS TIDERINGTON, 04/28/2023                    Page 18..21

Page 18

BY MR. BRUEGGEN:
2    Q.   And, sir, of that 913 pages, do you
3 recall about 78 of that pages were your actual
4 opinions in this case?
5    A.   That sounds about right, yes.
6    Q.   And the rest of that were attachments
7 and other materials; is that correct?
8    A.   That is correct.
9    Q.   Are all the opinions that you
10 formulated in this case expressed in your report?
11    MS. BONJEAN:  Objection to the form and
12 foundation of that question.
13    THE WITNESS:  Yes.
14 BY MR. BRUEGGEN:
15    Q.   You didn't hold back any opinions from
16 your report that you plan to testify about?
17    MS. BONJEAN:  Objection, form, foundation.
18    THE WITNESS:  No.
19 BY MR. BRUEGGEN:
20    Q.   In your report, are your opinions
21 specific as to individual defendants?
22    A.   I'm sorry.  Could you ask that again?
23    Q.   Yeah.
24        In your report, are your opinions

Page 19

1 specific as to individual defendants?
2    MS. BONJEAN:  I'm going to object to the form
3 and foundation of that question.
4        You can answer if you understand.
5    THE WITNESS:  I think they are.  I believe
6 they are, yes.
7 BY MR. BRUEGGEN:
8    Q.   And, sir, just to make sure, you've had
9 a chance to review your report in preparation for
10 today?
11    A.   I have.
12    Q.   And can you provide me an overview of
13 what you are opining that Detective Montilla did
14 that was improper?
15    MS. BONJEAN:  I'm going to object to the form
16 and foundation of that question.
17    THE WITNESS:  Well, when you say an overview,
18 without obviously reviewing my report for specific
19 details.  But as far as overall, he was a -- in
20 reviewing the file, I did not see any place where
21 he documented his investigative efforts in this
22 case.  I think that was improper.
23 BY MR. BRUEGGEN:
24    Q.   Anything else as you sit here today

Page 20

1 about what Detective Montilla did that was improper?
2    MS. BONJEAN:  I'm going to object to the form
3 and foundation.
4    THE WITNESS:  I'm sure there's other things
5 as we go through the report.  But if we're taking
6 the 10,000 foot view, that's from my perspective of
7 the inappropriate investigative effort on his part.
8 BY MR. BRUEGGEN:
9    Q.   And, sir, as we go through it,
10 obviously if there's other things you want to talk
11 about, please bring them up.  But right now, I'm
12 just working on what you recall your viewpoint
13 right now.
14        How about Detective Paulnitsky?  Can
15 you give me a general overview of what he did that
16 you believe was inappropriate?
17    A.   I believe there's a -- at least in my
18 mind in viewing the investigative file, whether or
19 not he properly documented his encounter with
20 Mr. Maysonet and ultimately his arrest of
21 Mr. Maysonet.
22    Q.   Anything else as you sit here right now
23 that you can recall?
24    A.   Again, as you pointed out, it's a

Page 21

1 78-page report, and I'm sure there's more details.
2 If -- if -- again, the same would hold true:  Once
3 we go through the report, I'm sure I can provide
4 additional specifics.
5    Q.   What about Sergeant Mingey?  Same
6 question:  General overview of what Sergeant Mingey
7 did that you believe was inappropriate.
8    A.   What he did or perhaps what he didn't
9 do.  I don't believe he documented his
10 investigative efforts whatsoever.  I have a lot of
11 questions about his interviews with Mr. Maysonet,
12 the overall supervision of this investigation are
13 all things that I have questions about.
14    Q.   And what do you mean by you have
15 questions about?
16    A.   Well, offered opinions about.
17    Q.   Okay.  Got you.
18        What about Sergeant Epplen?  Can you
19 give us an overview of what your thoughts -- or
20 what he did or did not do that was inappropriate?
21    A.   I believe the sergeant approved -- I
22 don't know if he approved all of these reports, but
23 many of the reports.  And I -- I believe in -- if
24 he was supervising these officers, there's a lot of

THOMAS TIDERINGTON, 04/28/2023                          Page 22..25

Page 22

1 things that he should have questioned that I did
2 not see in the investigative file as to his
3 approval of the investigative -- investigative
4 effort of these officers.
5      Q.   And then same question: General
6 overview of what you believe that Detective
7 Halvorsen did or did not do that was inappropriate.
8      A.   Well, I think, again without looking
9 through specific details of my report, one of the
10 big things that strikes me is he refused to answer
11 any questions about this investigation afterwards.
12 I believe he invoked the Fifth and refused to
13 answer questions.
14          The documentation in the -- in the
15 investigative files is lacking.  I have not seen
16 any GPRs or notes of the efforts or the work that
17 he did on this case.  I believe that's
18 inappropriate.
19      Q.   And you're aware that he was the
20 drafter of the sup report?
21      A.   I'm -- that's my understanding, yes.
22      Q.   So when you say he didn't do any
23 documenting, it's other than that sup report you
24 did not see anything else?  Is that what you're

Page 23

1 talking about?
2      A.   Well, when reading his report, there's
3 things that he noted in his report but he doesn't
4 explain who provided that information to him, how
5 it was provided, how he learned the information.
6          So essentially, he drafted a report
7 on the behalf of other officers that -- and there's
8 no way to determine how information was
9 communicated to him.
10      Q.   Sir, finally, Detective Guevara, can
11 you give us an overview of your opinions on what
12 Detective Guevara did or did not do that was
13 inappropriate?
14      A.   Again, more of the same, lack of
15 documentation.  I believe that there were several
16 interviews that were conducted of witnesses in
17 which there was no documentation.
18          If I guess the jury credits the
19 testimony of Maysonet and others, the actions of
20 Guevara certainly were improper.  Many of the
21 actions in this investigation were improper.
22      Q.   Sir, switching gears, I want to talk
23 about your preparation for the deposition today.
24 Okay, sir?

Page 24

1      A.   Yes.
2      Q.   And just to skip ahead, we received a
3 bill that billed through basically the date of your
4 report, okay?
5      A.   That's correct.
6      Q.   Since you submitted your report, have
7 you billed any additional hours in this case?
8      A.   I don't think I did.  Could I -- could
9 I look at the invoices?
10          (Deposition Exhibit No. 6,
11          Witness Tiderington, was marked
12          for identification 04/28/2023.)
13 BY MR. BRUEGGEN:
14      Q.   Yeah, sir.  I'll tell you what.  Let me
15 show you what we'll mark as Exhibit 6.  I'll put it
16 up on the screen.  It's the only invoice we
17 received.
18          And you can look at that just to
19 orient yourself to my question, okay?  Hold on sec,
20 sir.  And we'll mark this as Exhibit 6, okay?
21      MS. COHEN:  There's three copies there.
22 There's only one page.
23      MS. BONJEAN:  We have it.  We have a paper
24 copy, Dave.

Page 25

1      MR. BRUEGGEN:  You have a hard copy?
2      MS. BONJEAN:  Yeah.
3 BY MR. BRUEGGEN:
4      Q.   All right, sir.  If you could just
5 confirm the hard copy you're looking at is the same
6 as what's on the screen?
7      A.   Yes, it is.
8      Q.   Okay, great.  I'll stop sharing.  Now
9 you can look at that.
10          And, sir, again, this invoice bills
11 through January 13, 2023.  Do you see that as the
12 last dated entry?
13      A.   I do.
14      Q.   And so I'm focusing on what you've done
15 since January 13, 2023, how much time you've put
16 forth towards this case, okay?
17      A.   I don't know exactly.  I can estimate,
18 you know, perhaps another six to ten hours.  I -- I
19 believe I did a supplemental report or amendment to
20 my report.
21      Q.   Sir, in addition to that six to ten
22 hours, does that include preparation for this
23 deposition?
24      A.   It would, yes.

THOMAS TIDERINGTON, 04/28/2023                    Page 26..29

Page 26

1     Q.   So since January 13, 2023, you've put
2  an additional six to ten hours, which includes the
3  supplementation and the preparation for your
4  deposition; is that right?
5     A.   That's correct.  Roughly.  I would have
6  to go back and I could perhaps do that on a break
7  if you want more details.
8     Q.   I appreciate that.
9          Can you tell me what you did
10 specifically to prepare for the deposition today.
11    A.   Primarily reviewed the documents that
12 were provided to me, was primarily what I did to
13 review for -- or to prepare for the deposition.
14    Q.   Did you also review your report?
15    A.   I did.
16    Q.   And the documents that were provided to
17 you, did you review all of them, or were there
18 specific documents you reviewed to prepare for the
19 deposition?
20    A.   I don't know that I pre -- or I didn't
21 look at obviously all of the documents.  I looked
22 at various documents that were provided.
23    Q.   And can you tell us what documents
24 specifically you reviewed in preparation for your

Page 27

1  deposition?
2     A.   You know, I don't know that I can do
3  that.  Some of it was reading the case file while I
4  was on a flight here to Chicago.  There's -- it
5  would be difficult for me to point out specifically
6  as to which documents I actually reviewed in
7  preparation.
8     Q.   And do you recall --
9     A.   Other than the investigative files, I
10 do recall specifically that I reviewed those.
11    Q.   In preparation for your report, did you
12 meet with Ms. Bonjean or Ms. Cohen?
13    MS. BONJEAN:  Do you mean deposition or
14 report?
15    MR. BRUEGGEN:  I'm sorry.  Did I say report?
16 BY MR. BRUEGGEN:
17    Q.   In preparation for your deposition, did
18 you meet with Ms. Bonjean or Ms. Cohen?
19    A.   I did.
20    Q.   And can you tell me how many times did
21 you meet with them?
22    A.   Just once.
23    Q.   When was that?
24    A.   Yesterday.

Page 28

1     Q.   For how long did you meet with
2  Ms. Bonjean and Ms. Cohen?
3     A.   Not too long.  Probably an hour and a
4  half, maybe a couple hours.
5     Q.   And is that roughly hour and a half to
6  a couple-hour meeting with Ms. Bonjean and
7  Ms. Cohen included in the six to ten hours that you
8  talked to us about earlier?
9     A.   I think so.  It would be.
10    Q.   And, sir, after your preparation for
11 this deposition, did you feel adequately prepared
12 to come in here and answer the questions?
13    MS. BONJEAN:  Objection, form.
14    THE WITNESS:  Certainly, but not necessarily
15 by memory without reviewing certain things.
16        I certainly can't recite, you know,
17 probably 10,000 pages of documents.  But I
18 certainly know where I can look to find any --
19 perhaps any of the answers or any of the answers to
20 any questions you might have.
21        (Deposition Exhibit No. 2,
22         Witness Tiderington, was marked
23         for identification 04/28/2023.)
24

Page 29

1  BY MR. BRUEGGEN:
2     Q.   All right.  Sir, and I want to switch
3  gears now and talk about -- and we'll mark this as
4  Exhibit 2.  And I'm going to represent to you it's
5  Attachment D to your report, and it's your CV.
6          So let me share my file.  And again,
7  if you have a hard copy and want to look at that,
8  feel free.
9     MS. BONJEAN:  We got it.
10    THE WITNESS:  That's Mike --
11    MS. BONJEAN:  Oh, wrong --
12    MR. BRUEGGEN:  Jennifer and Ashley, this is
13 Attachment D to his report, which is his CV.
14    MS. COHEN:  Sorry.  Here's D.
15 BY MR. BRUEGGEN:
16    Q.   And, sir, do you have a copy of your CV
17 in front of you?
18    A.   I do.
19    Q.   Okay.  Do I need to show it up on the
20 screen, or can I take it down?
21    A.   No, you -- I have the hard copy.
22    Q.   And, sir, let me start by asking:  Is
23 there anything that needs to be updated in this CV?
24    A.   It says current chief of police of over

THOMAS TIDERINGTON, 04/28/2023                              Page 30..33

Page 30

1 42 years. I retired last year. I think that
2 should be updated.
3         And I can't see anything else that
4 would need to be updated at this point.
5     Q.   Okay. Sir, directing you to -- there's
6 page numbers at the bottom, page 96.
7         Do you see under Law Enforcement
8 Experience? It says --
9     A.   I do.
10    Q.   -- Plymouth Township Police Department
11 2001 to the present?
12    A.   That needs to be updated, doesn't it.
13    Q.   And that would be -- you said you
14 retired last year, so 2022?
15    A.   June of 2022, yes.
16    Q.   Since retiring, what have you been
17 doing for employment or income?
18    A.   What have I been doing?
19    Q.   Yes.
20    A.   Well, I mean, as far as employment, I
21 have taken on a number of expert witness cases.
22    Q.   Any other things you are doing
23 currently for employment?
24    A.   Other than, again, expert witness and

Page 31

1 case consulting, no.
2     Q.   And, sir, if we could look at the next
3 page, page 97, I just want to briefly touch on your
4 education.
5     A.   Yes.
6     Q.   Do you have any additional education to
7 update this CV?
8     A.   No.
9     Q.   And you note that you went to the
10 University of Louisville, Southern Police Institute
11 for Command Officers Development Course; is that
12 correct?
13    A.   That's correct.
14    Q.   And did you get a certificate?
15    A.   I did.
16    Q.   And can you tell me how long that
17 course was?
18    A.   I think it was like -- I don't know how
19 many hours, but it was over a three- or four-month
20 period of time.
21    Q.   When did you receive that certificate,
22 sir?
23    A.   I'm not sure. I think I went in maybe
24 1995.

Page 32

1     Q.   So it was --
2     A.   I can't remember the exact date. I
3 guess I could provide it to you. It seemed to me
4 it was like 1995, '96, I think, time period.
5     Q.   No problem, sir. And I'm just trying
6 to place it within your career.
7         So it would have been at the time
8 you were at the Fort Lauderdale Police Department?
9     A.   Oh, it was, yes.
10    Q.   And what is the Southern Police
11 Institute?
12    A.   It's similar to -- again, if you know
13 what the FBI academy is, the National Academy, it's
14 a -- it's a -- it's a training primarily for police
15 chiefs. And it's a -- again, a pretty
16 comprehensive training program designed for command
17 officers.
18    Q.   And is that a reputable institution?
19    MS. BONJEAN: Objection to form of that
20 question.
21    THE WITNESS: I guess I'd have -- I don't
22 know what reputable -- I'm assuming it is based on
23 what we paid them for the training.
24

Page 33

1 BY MR. BRUEGGEN:
2     Q.   And was that your decision to go to
3 that training, or was that something that was
4 required because of your position at Fort
5 Lauderdale police?
6     A.   I think it was a combination of both.
7 It was either as a command officer I was either --
8 I either had to attend the FBI academy, the
9 National Academy, or this was a -- an alternate
10 training course that was available to command
11 officers.
12    Q.   Sir, in your practice now as a
13 consultant, do you believe the Southern Police
14 Institute is a good institution?
15    MS. BONJEAN: Objection to the form of that
16 question.
17    THE WITNESS: I'm not sure how you define
18 "good."
19    MS. BONJEAN: And are you talking -- also to
20 foundation of that question.
21 BY MR. BRUEGGEN:
22    Q.   And, sir, let me see if I can rephrase
23 it.
24         Do you teach at the Southern Police

THOMAS TIDERINGTON, 04/28/2023                    Page 34..37

Page 34

1  Institute?
2      A.   I do not.
3      Q.   Have you ever been asked to teach there?
4      A.   I don't think so, no.
5      Q.   If they asked you to teach there, would
6  you?
7      MS. BONJEAN:  Again, objection to the form of
8  that question, speculative.
9      THE WITNESS:  I -- again, depends on what
10 they asked me to teach.  I don't have a reason why
11 I would not.
12 BY MR. BRUEGGEN:
13     Q.   And you also have --
14     MS. BONJEAN:  Oh, Dave?  I'm sorry, Dave, I
15 didn't mean to interrupt.  I just want to -- you
16 know there's a supplemental report too, right?
17     MR. BRUEGGEN:  I believe so.
18     MS. BONJEAN:  Okay.  I just wanted to make
19 sure, because you didn't mention it earlier, and I
20 just wanted to make sure you --
21     MS. COHEN:  I didn't see it on the exhibits.
22     MS. BONJEAN:  And you didn't have it in the
23 exhibits.  I just wanted to make sure you have it.
24     MR. BRUEGGEN:  I'll tell you what.  Can we go

Page 35

1  off the record real quick?
2      MS. BONJEAN:  Sure.
3      THE LEGAL VIDEOGRAPHER:  We're off the video
4  record at 10:44 a.m.
5          (Brief pause.)
6      THE LEGAL VIDEOGRAPHER:  We are back on the
7  video record at 10:45 a.m.
8  BY MR. BRUEGGEN:
9      Q.   And, Mr. Tiderington, last question on
10 your CV.
11          You have Recent Professional
12 Activities as a section starting on page 99.  Do
13 you see that?
14     A.   I do.
15     Q.   Any additions to that since you created
16 this CV?
17     A.   Well, I guess recent wasn't in 2018, so
18 maybe that's not recent anymore.  So I should, as
19 you pointed out, probably update the CV.
20     Q.   Sir, just to clarify, are you still the
21 board of director or chairman of the Western Wayne
22 Criminal Investigations?
23     A.   No.
24     Q.   When would that have ended?

Page 36

1      A.   When I retired.
2      Q.   And same question for the Western Wayne
3  Special Operations Team?  Are you still the board
4  of director or chairman of that?
5      A.   No, no.  Those were all assignments
6  while I was still working as a police chief.
7      Q.   And how about your professional
8  affiliations?  Are you still affiliated with all of
9  those organizations?
10     A.   I'm sorry.  What -- which page are you?
11     Q.   This is the last page, page 100.  It
12 says Professional Affiliations?
13     MS. BONJEAN:  I'm going to object to the form
14 of that question, but go ahead.
15     THE WITNESS:  Not all of those.  Some of
16 them, my membership continues or I'm in the process
17 of renewing my membership as a retired police chief.
18          (Deposition Exhibit No. 3,
19           Witness Tiderington, was marked
20           for identification 04/28/2023.)
21 BY MR. BRUEGGEN:
22     Q.   Sir, moving on, I'd like to show you
23 what we'll mark as Exhibit 3, and this is
24 Attachment A of your report.  Let me share my

Page 37

1  screen, and if you have a hard copy there, feel
2  free to use that.
3      A.   Yes.  I have the hard copy there.
4      Q.   Okay.  And I won't leave this up here,
5  but is it the same document that I have showing up
6  on my screen that's the last entry is January 2023 --
7      A.   Yes.
8      Q.   Sir, this is in reverse chronological
9  order, right?
10     A.   It is, yes.
11     Q.   The most recent is up at the top, right?
12     A.   Correct.
13     Q.   And so the title of that document is
14 testimony and publications.  Do you see that?  On
15 Attachment A, it says, Listing of Testimony of
16 Publications right below Attachment A on page 79?
17     A.   Yes.
18     Q.   And, sir, I did not see any
19 publications on here.
20     A.   That's correct.  There are none.
21     Q.   Do you have any publications?
22     A.   No.
23     Q.   And, sir, this Attachment A to your
24 report is a listing of testimony.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 04/28/2023                    Page 38..41

Page 38
1        Are there any additional testimony
2 since January of 2023?
3    A.   There are, yes.
4    Q.   And can you tell us what those are to
5 the best of your recollection?
6    A.   You know, I would rather give you an
7 updated list because I don't want to leave
8 something out.
9        I know I was involved in a trial.
10 Last month in Fort Lauderdale, I testified in a
11 trial.  There's been depositions.
12        So if it's all right with you, I
13 would like to provide an updated document for you.
14    Q.   That is not a problem, sir, but I am
15 just going to ask some brief questions.
16        The trial in Fort Lauderdale, were
17 you an expert witness in that trial?
18    A.   I was.
19    Q.   Were you for the defense or the
20 plaintiffs?
21    A.   That would have been for the defense.
22    Q.   And can you give me a general idea what
23 that case was about?
24    A.   It was a case where Walmart was being

Page 39
1 sued by a customer who claimed to have been
2 physically assaulted and beaten based on racial
3 profiling, and I was hired by the attorneys
4 that are -- that were defending Walmart.
5    Q.   Did that involve any police actions in
6 that case?
7    A.   It did.
8    Q.   And were you providing --
9    A.   Well --
10    Q.   Go ahead.
11    A.   I'm sorry.
12    Q.   I can't hear you, sir.
13    MR. BRUEGGEN:  Jennifer, I can't -- I can't
14 hear the answer.
15    THE WITNESS:  Dave, I'm sorry.  I couldn't
16 hear you, Dave.
17    MS. BONJEAN:  We lost sound.
18 BY MR. BRUEGGEN:
19    Q.   I couldn't hear your answer that you
20 just provided, sir.  You were -- it looked like you
21 were talking.  Your lips were moving, but I
22 couldn't hear.  And I don't know if we had a
23 technical glitch.  That's probably why you couldn't
24 hear me.

Page 40
1    A.   Can you hear me now?
2    Q.   I can, sir.  Thank you.
3    A.   So the law enforcement agency was not
4 being sued, but there -- there was action on the
5 part of the police officers.  So it was a lawsuit
6 involving Walmart with the police department being
7 perhaps a witness to the incident.
8    Q.   And, sir, were you providing any
9 opinions on behalf of the police, or just on behalf
10 of Walmart employees?
11    A.   My opinions were based on my law
12 enforcement experience in dealing with businesses
13 that had encounters such as these, such as what
14 Walmart -- you know, shoplifting type situations.
15    Q.   Thank you, sir.
16        And again, if you could get us that
17 updated list that tells the other depositions you
18 might have given in the meantime.
19        Any other trials between January and
20 the present?
21    A.   I'm sorry.  Any other files?
22    MS. BONJEAN:  Trials.
23 BY MR. BRUEGGEN:
24    Q.   Any other trials, other than the

Page 41
1 Walmart one --
2    A.   No.
3    Q.   -- in Fort Lauderdale?
4    A.   No.  There may have been a deposition
5 or two is -- that I'll have to clarify or update
6 with you.
7    Q.   And, sir, as I mentioned before, I had
8 the benefit of seeing some of your other
9 depositions so I won't spend a lot of time on your
10 background, but I do want to touch upon it?
11    A.   Okay.
12    Q.   So it's my understanding that you
13 worked in the organized crime division in Fort
14 Lauderdale for quite some time?
15    A.   I did.
16    Q.   I think at some point changed names to
17 special investigations; is that right?
18    A.   That's correct.
19    Q.   Was your role -- does your role
20 basically stay the same as far as you're focused on
21 organized crimes as opposed to something else that
22 might be a special investigation?
23    MS. BONJEAN:  Objection, form.
24    THE WITNESS:  Well, the function of the unit

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 04/28/2023                    Page 42..45

Page 42

1 never changed.  Only the name changed, if that
2 makes sense.
3 BY MR. BRUEGGEN:
4     Q.   Yes, that's the answer I was looking
5 for, but it was a poorly worded question.  I
6 appreciate that.
7          What types of organized crime did
8 you deal with when you were working in that unit?
9     A.   Primarily unorganized organized crime,
10 if that makes sense.
11    Q.   I'm going to ask you to explain what is
12 unorganized organized crime, sir.
13    A.   Yeah.  Again, it implies that organized
14 crime means the Mafia.  But in reality, it meant
15 any type of criminal organizations that were
16 committing serious crimes, not only in Fort
17 Lauderdale but throughout South Florida.
18    Q.   And can you give us some ideas of what
19 types of criminal organizations those were that you
20 would investigate.
21    A.   A wide range of different types of
22 organizations, Colombian cartels, the traditional
23 Mafia as it's known, Jamaican Haitian organized
24 crime, all types of drug trafficking.

Page 43

1     Q.   And when you say "traditional Mafia,"
2 is that like the Italian Mafia that people think of?
3     A.   That's correct.
4     Q.   And then cartels, those would be drug
5 cartels from South America and Mexico and stuff
6 like that?
7     A.   That's correct.  Jamaica.
8     Q.   And then the Jamaican organized crime,
9 I'm not familiar with that.
10         Is that a cartel, or is that a --
11    A.   Well --
12    Q.   How would you clarify that?
13    MS. BONJEAN:  Objection --
14    THE WITNESS:  Sorry.
15    MS. BONJEAN:  Objection to the form.
16         Go ahead.  You can answer.
17    THE WITNESS:  It would be drug trafficking
18 involving Jamaican organized groups of drug
19 traffickers.
20 BY MR. BRUEGGEN:
21    Q.   And would it be the same for the
22 Haitian?
23    A.   That's correct.
24    Q.   Any other groups, unorganized organized

Page 44

1 crime that you dealt with?
2     A.   I'm sure they were, but those types
3 of inves -- or those types of groups are what we,
4 the special investigation division investigated.
5     Q.   Did you investigate any types of street
6 gangs?
7     A.   We did.
8     Q.   And which street gangs did you
9 investigate?
10    A.   Specifically, I can't tell you exactly
11 what gangs they were, but gangs associated with the
12 various criminal elements that I described.
13    Q.   So it would be gangs associated with
14 those other organizations you told us about?
15    A.   Correct.
16    Q.   And how were they associated with those
17 other organizations, if you can explain?
18    A.   Well, I don't know if there's a
19 difference between gangs and cartels, so I think
20 we're talking about the same thing.
21    Q.   And, sir, so do you believe that a
22 street gang is the same thing as a cartel?
23    MS. BONJEAN:  Objection to form, foundation
24 to that question also.

Page 45

1     THE WITNESS:  It could be.
2          Or I guess I could describe it a
3 different way.  Some of the cartels are often
4 referred to as gangs.
5 BY MR. BRUEGGEN:
6     Q.   And when I use the term "street gang,"
7 do you understand what I mean by like a street gang?
8     A.   No, I --
9     MS. BONJEAN:  Object --
10    THE WITNESS:  I'm sorry.
11    MS. BONJEAN:  Objection to the form of that
12 question.
13    THE WITNESS:  No, I guess I'd ask you to
14 define your -- you know, everybody obviously has a
15 different definition.  So I guess I would have to
16 ask you to define your definition or explain your
17 definition as to what you're referring to in terms
18 of street gangs.
19 BY MR. BRUEGGEN:
20    Q.   And, sir, when I use street gangs, I'm
21 referring to the gangs that are referenced in the
22 materials that you reviewed, like the Latin Kings.
23         Are you familiar with that gang?
24    MS. BONJEAN:  Objection to the form of

THOMAS TIDERINGTON, 04/28/2023                    Page 46..49

Page 46

1  that -- the form and foundation of that question.
2        Go ahead.
3     THE WITNESS: I am.
4  BY MR. BRUEGGEN:
5     Q.  And how are you familiar with the Latin
6  Kings?
7     A.  Through my review of material
8  associated with these types of cases.
9     Q.  And when you say "these types of
10 cases," are there other cases besides
11 Mr. Maysonet's case where you've reviewed materials
12 on Latin Kings?
13    A.  I believe so, yes.
14    Q.  What about when you worked in Fort
15 Lauderdale doing these organized crime? Were there
16 any cases that you had that involved the Latin
17 Kings?
18    A.  Not based out of South Florida, no.
19    Q.  Are there Latin Kings in South Florida?
20 Do you know, sir?
21    A.  Not that I know of.
22        Well, I know there aren't Chicago
23 Latin Kings in Florida, unless they're there on --
24 and again, I don't mean to be glib, unless they

Page 47

1  were there on Spring Break or vacation.
2        But no, I don't know that they have
3  an international -- gang units in the various
4  cities throughout the country. I think it was
5  specific to the Chicago area is my understanding.
6     Q.  Sir, after being with Fort Lauderdale,
7  you then moved and became the chief for the -- is
8  it Plymouth Township?
9     A.  That's correct.
10    Q.  Did Plymouth Township have any gangs?
11    A.  No.
12    Q.  How big is Plymouth Township?
13    A.  The res -- approximately 30,000
14 residents.
15    Q.  And where is that located? Would that
16 be considered a suburb of any metro area?
17    A.  I'm sorry. Suburb of Detroit. Just --
18 it's just outside of Detroit by -- maybe 10 miles
19 outside east -- or west of Detroit.
20    Q.  Sir, in your report, I didn't notice
21 any opinions about Latin Kings or gang activity; is
22 that accurate?
23    MS. BONJEAN: I'm going to object to the form
24 of that question, foundation. About them?

Page 48

1        You can answer.
2     MR. BRUEGGEN: Okay. Jennifer, I appreciate
3  that. If he needs it rephrased, I can rephrase it.
4     THE WITNESS: I'm sorry. Could you ask that
5  again, please?
6  BY MR. BRUEGGEN:
7     Q.  And again, sir, other than the fact
8  that the -- Mr. Maysonet and some other
9  codefendants were Latin King members, did you focus
10 on the Latin Kings in any other way?
11    MS. BONJEAN: Objection, form.
12    THE WITNESS: When you say "focus," the only
13 thing I did was review the information that was
14 provided to me. If there was more information
15 about Latin Kings, I would have reviewed it.
16        I mean, I didn't do anything
17 proactively to investigate the Latin Kings.
18 BY MR. BRUEGGEN:
19    Q.  I appreciate that answer, sir.
20        And so the fact that they were Latin
21 Kings is kind of background information in the
22 context of your review of the materials and
23 opinions?
24    MS. BONJEAN: Objection, form.

Page 49

1     THE WITNESS: It was again material that I
2  considered based on what was provided to me.
3  BY MR. BRUEGGEN:
4     Q.  In your opinions, was the gang aspect a
5  major influence?
6     MS. BONJEAN: I'm going to object to the form
7  of that. It's also an incomplete question.
8        You can answer.
9     THE WITNESS: Well, when you say "major,"
10 again I don't know what you mean by that.
11        It was -- it's certainly part of the
12 material that I reviewed. It certainly wasn't the
13 sole basis for any opinion that I offered.
14 BY MR. BRUEGGEN:
15    Q.  Did the fact that Mr. Maysonet and his
16 codefendants were gang members, did that impact any
17 opinions you came to?
18    MS. BONJEAN: Objection to the form of that
19 question.
20    THE WITNESS: No, not -- I mean, impact it ...
21        It was material that I considered,
22 but I don't know that it would have changed my
23 opinion one way or the other whether they were gang
24 members or whether they were not gang members. Or

THOMAS TIDERINGTON, 04/28/2023                                    Page 50..53

Page 50

1 whether they were associated with another gang
2 other than the Latin Kings or -- it was just
3 background and reference material that was provided.
4 BY MR. BRUEGGEN:
5     Q.   Sir, when you worked for Fort
6 Lauderdale, you weren't a homicide detective,
7 right?  Were not a homicide detective?
8     A.   I was not a homicide detective, per se.
9     Q.   You were I believe an organized crime
10 detective, right?
11    A.   I was a -- well, special investigations
12 detective for the first part of my career.  I then
13 was a supervisor in that unit, in the investigative
14 unit.  And then ultimately, I was in charge of the
15 division.
16    Q.   And I think in some of your other
17 depositions you explained that you would work on
18 homicide investigations in your role as a special
19 investigation investigator, alongside a homicide
20 detective.
21         Did I understand that correctly?
22    A.   That -- that's correct.
23    Q.   And I think you said most of those
24 homicides you investigated were drug related?

Page 51

1     A.   Drug or gang related, yes; cartel
2 related.
3     Q.   And so it could be a drug deal that
4 went bad where somebody was killed?  Is that the
5 type of investigation you would have done?
6     A.   I -- those are types of cases I have
7 worked, yes.
8     Q.   Or a case where you had rival drug
9 dealers killing each other?
10    MS. BONJEAN:  Objection, form, irrelevant,
11 speculation.
12         But go ahead.  You can answer.
13    THE WITNESS:  That were -- that was the type
14 of homicides that were occurring in Fort Lauderdale
15 and South Florida at the time, amongst other
16 homicides.
17 BY MR. BRUEGGEN:
18    Q.   And, sir, in South Florida at the time,
19 was there a major drug trafficking operation?
20    A.   There was major drug trafficking, yes.
21    Q.   And you would investigate that
22 vis-à-vis your involvement as an investigator for
23 the special operations?  Or special -- sorry --
24 special investigations?

Page 52

1     A.   That was part of my assignment, yes.
2     Q.   When you worked as a detective, did you
3 always take notes?
4     A.   Always.  What -- in -- I'm not sure
5 what that means.
6     Q.   Okay, fair enough.
7         Sir, when you were working as -- and
8 if I say "detective," would that be the correct
9 term for what you did for the special
10 investigations unit?
11    A.   Yes, but there's, again, various time
12 periods.  So we're really talking from -- because I
13 was assigned to the special investigations
14 organized crime division from probably 1982 to --
15 until my time of retirement in 2001.  And so I had
16 a variety of different assignments there.
17         So my assignment changed based on
18 the rank that I had at the time or, you know,
19 various time period -- during the various time
20 periods.
21    Q.   All right.  And so I just want to focus
22 on the time that you were a detective.
23         Would that be the right term?  When
24 you were a detective I think you told us was it '95

Page 53

1 or '96?
2     A.   No, that would have been early '80s.
3     Q.   Oh, sorry, okay.
4     A.   I think I got promoted to sergeant
5 probably in 1985 or '86.
6     Q.   So let's focus on the time before you
7 were promoted to a sergeant when you were a
8 detective or investigator for special
9 investigations.  Okay, sir?
10    A.   Okay.
11    Q.   When you were a detective working on
12 special investigations and you did any
13 investigative task, did you take contemporaneous
14 notes?
15    A.   There were times I would -- I did of
16 course.
17    Q.   And does that mean there were times
18 that you did not?
19    A.   There would have been, sure.
20    Q.   And was there any rhyme or reason as to
21 why you would or would not take notes during an
22 investigative task?
23    A.   Well, it depended on what kind of case
24 we were working, whether the -- whether we created

THOMAS TIDERINGTON, 04/28/2023                        Page 54..57

Page 54

1 a police report, a supplemental report. Kind of --
2 question's kind of broad.
3             There were times where we would
4 perhaps meet with a confidential informant who
5 would provide intelligence information, notes would
6 be taken, and then that information would be
7 documented in supplemental reports.
8             So it's -- I think you used the word
9 did I always take notes.
10             It's difficult to answer that
11 question.
12    Q.   Fair enough, sir.
13             And in that example you just
14 provided where you would meet with a confidential
15 informant, you said notes would be taken; is that
16 correct?
17    A.   Again, it depends on what the
18 circumstances of meeting with the informant.  I
19 can't say every time I met with an informant I took
20 notes.
21    Q.   And when you did meet with a
22 confidential informant and took notes, would those
23 notes be put into the file?
24    A.   I guess it would depend.

Page 55

1    Q.   And what would it depend on, sir?
2    A.   What the department policy was at the
3 time.
4    Q.   And do you remember back when you were
5 a detective with Fort Lauderdale and the special
6 investigations what the policy was?
7    MS. BONJEAN:  I'm going to object to the
8 foundation of that question.
9    THE WITNESS:  I don't remember specifically.
10 Again, in the early '80s, it -- certainly, policies
11 changed throughout my 20 some years with them.
12 BY MR. BRUEGGEN:
13    Q.   Sir, in your career, was there a time
14 where you would take notes, create an official
15 report, and then destroy your notes?
16    A.   I guess it depends on what time period
17 you're talking about and what notes were taken and
18 what was -- what was the case that we were working
19 at the time.
20             I can tell you any homicide
21 investigation that I had ever been involved with, I
22 don't remember ever destroying any notes that I
23 would have taken.
24    Q.   But in other investigations, you may

Page 56

1 have destroyed your notes after creating a police
2 report?
3    A.   Well, again, I can't think of specific
4 incidents -- incidents in which I would have
5 intentionally destroyed notes or whether they would
6 have been placed into a case file or what the
7 policy was at the time.
8             I can assure you that whatever the
9 policy was, it was -- I would follow the department
10 policy and the direction from the prosecutor's
11 office at the time.
12    Q.   Now, again focusing just on the time
13 you were a detective for special investigations, do
14 you remember whether there was a policy that
15 required detectives to take notes?
16    A.   I don't recall that there was a
17 specific policy.
18    Q.   Did you have a practice when you were a
19 detective as to whether you would take notes or not?
20    MS. BONJEAN:  I'm going to object to the form
21 of that question.  I assume you're still talking
22 during the time period of the '80s, but so -- but
23 I'm going to object to the form.
24

Page 57

1 BY MR. BRUEGGEN:
2    Q.   Yeah.  Sir, let me rephrase it just to
3 address that.
4             When you were a detective for
5 special investigations, which was during the '80s,
6 did you have a practice whether you would take
7 handwritten notes during investigations?
8    A.   I think any investigator would have
9 taken handwritten notes.  So of course the answer
10 is yes.
11    Q.   And so in everything you did, would you
12 take handwritten notes, or would it depend on the
13 witness you might be talking to or the confidential
14 informant you might be talking to?
15    MS. BONJEAN:  Objection to the form of that
16 question.
17    THE WITNESS:  Well, yeah.  And I know you're
18 not doing it intentionally, but you know, when you
19 use "every" and "always," you know, in a 20-plus
20 44-year career, I can't say what happened at every
21 single incident or instance.
22             I can tell you that it was my
23 practice to abide by my department policies and
24 procedures, which I did.

THOMAS TIDERINGTON, 04/28/2023                                Page 58..61

Page 58

1        I think -- again, to answer your
2  question, I don't recall whether Lauderdale ever
3  had a policy specifically addressing taking notes
4  and what to do with those, other than officers were
5  required to prepare supplemental reports
6  documenting their investigative activity.
7        So that's primarily what -- that's
8  what -- what was done where the officers would
9  be -- it would be impermissible for an officer to
10 tell another officer, Hey, just put this in your
11 report.  This is what -- what I did.
12       Our policy -- Lauderdale's policy
13 was that the individual officer would have had to
14 have done a supplemental report detailing his or
15 her investigative efforts.
16 BY MR. BRUEGGEN:
17   Q.   And so in a situation where you had
18 multiple detectives working on things doing
19 investigative efforts, would each detective do
20 their own separate report, or could there be a
21 consolidated report?
22   A.   Well, again, it's difficult to be
23 precise as to the question you're asking and how I
24 interpret what you're asking.

Page 59

1    MS. BONJEAN:  I'm going to object to the form
2  of that question, but go ahead.  You can answer.
3  BY MR. BRUEGGEN:
4    Q.   And again, sir, like I said, if my
5  question is confusing or unclear, please just let
6  me know and I can rephrase it, okay?
7    A.   No, no, I can.
8        And the difficulty in answering the
9  question is I think you have a different intent in
10 asking the question, and my response may not be
11 responsive to your question, if that makes sense.
12       That was a terrible -- that was a
13 terrible statement too, so we're -- we're sharing.
14   Q.   We've both had a rough morning.  It's
15 okay.
16       I appreciate that, and again, if
17 it's not responsive, I will follow up.  You know,
18 again, if it's a poor question and leads to a poor
19 answer, I understand and I will follow up.  So
20 please just let me know if you don't understand.
21       So again, my question was you told
22 us that at Fort Lauderdale each officer was
23 responsible for basically creating a report of
24 their investigative tasks.

Page 60

1        Did I understand that correctly?
2    A.   That's correct.
3    Q.   And so if you had multiple officers
4  working on the same case on the same day, would
5  each officer prepare their own report, or were you
6  allowed under the policies of Fort Lauderdale to
7  prepare one comprehensive report including all the
8  officers?
9    A.   Again, if all the officers were working
10 on one case and if all of the officers were in a --
11 one room with a witness who was providing a
12 statement, it would have been permissible and
13 appropriate for one officer to take down those
14 notes and to produce a police report.
15       If you had six officers, everybody
16 going out and doing different things in an
17 investigation where one set of officers went out
18 and interviewed Mrs. Smith, it would have been
19 their responsibility to prepare a supplemental
20 report detailing their specific actions.
21       It would have been impermissible,
22 not only in Fort Lauderdale but other agencies that
23 I've worked for or participated in investigations,
24 for the officer to come back and say, Hey,

Page 61

1  Detective Such and Such, this is what happened,
2  just put that in your report.
3        To me, it makes no sense whatsoever,
4  and I think it's a deviation of acceptable police
5  standards and practices.
6    Q.   Sir, when you were a detective with
7  special investigations, I believe you told us, but
8  did you work with confidential street sources?
9    A.   I did.
10   Q.   And would that be different than a
11 confidential informant, or do you consider it the
12 same thing?
13   A.   Well, again, departments call them
14 different things.
15       If it was a confidential informant
16 that was providing information on a regular basis
17 and was a documented informant, we would refer to
18 them as confidential informants.
19       A confidential source might be the
20 garbage man that picks up the garbage and saw drugs
21 in the trash bin and provided that information,
22 called up and said, Hey, I was picking up the
23 garbage and I saw a scale or residue in here, and
24 you know, I think they're selling drugs.

THOMAS TIDERINGTON, 04/28/2023                                      Page 62..65

Page 62

1        So you know, a citizen oftentimes
2 would be referred to as confidential source.  And
3 I'm trying to distinguish between the two.
4    Q.    I appreciate that.
5        What about somebody who might be
6 involved in the criminal element who was a
7 confidential source telling you about something
8 that might be going on?
9    MS. BONJEAN:  Objection, form.
10 BY MR. BRUEGGEN:
11    Q.    And I appreciate that.  Let me see if I
12 can rephrase that, make it a little more specific.
13        What about -- I know you worked with
14 organized crime.  What about when you were a
15 detective where you had someone who was involved in
16 organized crime who told you about something else
17 that was going on in the organized crime network?
18 Would that person be a confidential source?
19    A.    I guess --
20    MS. BONJEAN:  Hold on.  I'm sorry.  I'm going
21 to object.  That's an incomplete hypothetical.
22        You can answer if you can.
23    THE WITNESS:  Again, it would depend on what
24 information that person provided, how detailed the

Page 63

1 information was, whether or not that source was
2 going to be compensated for the information.
3        I -- I guess there's a whole litany
4 of things and decisions that would have to be made
5 before we determine -- again, if we're going to pay
6 a -- if we're going to pay an individual for
7 information, then there's a process that we have to
8 use in order to document the informant and
9 determine the informant's motive behind providing
10 the information.
11        So I'm not sure what -- I'm not sure
12 if I answered your question.  But if I did -- if I
13 did not, please let me know.
14 BY MR. BRUEGGEN:
15    Q.    No, that was very helpful, and I think
16 it will help me focus.
17        I'm focusing on the nonpaid, you
18 know, confidential source of information that might
19 be also involved in the criminal element.  Not just
20 a regular citizen, okay?
21    A.    Okay.  And your question about a
22 nonpaid source of information is what?
23    Q.    I'm asking:  If you have a nonpaid
24 source of information, would you take notes

Page 64

1 including that source's name and include those in
2 your police file?
3    A.    Again, it depends on what that person
4 told us.  And again, it's difficult to answer these
5 questions because they're really hypotheticals that
6 are not really specific.
7        If -- if we had a non-informant call
8 up and say, John Gotti's coming in on Tuesday, and
9 provides no other information, would I expect that
10 there would be notes from a detective about that
11 phone call or a supplement?  You know, again, if
12 that same source provided addresses, phone numbers,
13 plane, flight information, hotel reservation
14 information, I would expect that that information
15 would have been detailed in a supplemental report.
16        And depending on which era that
17 we're talking about, those notes would have been
18 kept perhaps in a confidential informant file or
19 the investigative file.
20    Q.    And, sir, you just said which era we're
21 talking about.
22        Can you tell me what you meant by
23 which era we're talking about?
24    A.    There was a period of time where I was

Page 65

1 a group supervisor in charge of the South Florida
2 DEA task force.  And DEA had another policy for
3 preparing reports.
4    Q.    Okay, I appreciate it.
5        So when you referenced "era," it was
6 based on your personal experience which era in your
7 career.
8    A.    Well -- and again, the policies and
9 procedures at the time and the agency that I worked
10 for, the policies and practices and procedures.
11    Q.    Sir, in your practice as a detective
12 for special investigations, did you ever receive a
13 tip from a confidential source that was not paid?
14    MS. BONJEAN:  Objection, speculative and also
15 incomplete hypothetical.
16        You can answer.
17    THE WITNESS:  I -- I'm sure I did, yes.
18 BY MR. BRUEGGEN:
19    Q.    And when you got that information,
20 would that -- would you vet that tip or try to
21 corroborate that tip?
22    A.    Again, it depends on what the tip was,
23 how relevant it was to the work that I was doing at
24 the time.

THOMAS TIDERINGTON, 04/28/2023                          Page 66..69

Page 66

1        But I think the answer to your
2  question is if -- if information is provided to law
3  enforcement agencies, I think it's -- and again,
4  you know, I don't know specifically the details of
5  what you're asking, but it would be our
6  responsibility to corroborate, and I think you used
7  the word "vet" the information before we took
8  investigative action.
9      Q.   All right.  Sir, moving on in your
10  career, after you were a detective in special
11  investigations, you then became a sergeant of
12  special investigations; is that right?
13      A.   I did.
14      Q.   And I appreciate that there were other
15  stops along the way, brief stops, right?
16      A.   That's correct.
17      Q.   When you were a sergeant in special
18  investigations, was there a policy about taking
19  notes for your detectives?
20      MS. BONJEAN:  Objection, form.
21      THE WITNESS:  Again, I think I answered this
22  earlier.  I don't recall that Lauderdale ever had a
23  specific policy about taking notes.  Certainly we
24  didn't have the problems that -- obviously that the

Page 67

1  Chicago Police Department had in that respect.
2        So I -- I don't know that there was
3  ever a specific policy, other than the general
4  policy where the officer was required to document
5  their investigative efforts by doing supplemental
6  reports.
7  BY MR. BRUEGGEN:
8      Q.   And, sir, when you were a sergeant in
9  that special investigations division, if an officer
10  took notes, was he required to put those in the
11  file?
12      MS. BONJEAN:  Objection, foundation.
13      THE WITNESS:  Again, I -- during -- I'm
14  thinking back to 1985, or I -- I don't recall if
15  there was a specific policy that required that.  I
16  think that was the practice that our detectives had
17  at that time.
18  BY MR. BRUEGGEN:
19      Q.   And I -- I think you touched on it.  I
20  just want to make sure I understand.
21        In Fort Lauderdale when you were a
22  sergeant, there was a policy that if a detective
23  did an investigative task, they needed to complete
24  a report on that, right?

Page 68

1      A.   That's correct.
2      Q.   And did you have any time parameters on
3  when that report needed to be completed?
4      MS. BONJEAN:  Objection to the form.
5        If you understand.
6      THE WITNESS:  Again, it -- it would depend on
7  the investigation.  I can tell you I don't know
8  specifically what the policy said, but it was a
9  practice that the officers would prepare the
10  reports, typically before going home at the end of
11  their shift.
12  BY MR. BRUEGGEN:
13      Q.   And so the practice is an officer would
14  do an investigative task and then prepare the
15  report before they went home for the shift?  Am I
16  understanding you correctly?
17      A.   Or as soon as -- as soon as practical.
18  You know, there -- certainly if it was an overtime
19  situation and the officer was going to be back to
20  work the next day, it would be permissible for that
21  officer to prepare the report the following day.
22        But certainly if we're comparing it
23  to this case where a report was done two or three
24  months afterwards, that would not -- that would

Page 69

1  have been a violation of our department policies
2  back then.
3      Q.   And so your department policy did have
4  some time frame on it?
5      A.   I -- I don't remember specifically.
6  I -- I don't know that I can recite the policy.
7      Q.   Okay.  So --
8      MS. BONJEAN:  And objection, I'm going to
9  just -- objection as to -- you're talking about
10  written policy?
11      MR. BRUEGGEN:  Yes.
12      MS. BONJEAN:  Okay.  Objection to the form of
13  that question.
14  BY MR. BRUEGGEN:
15      Q.   And, sir, I --
16      A.   I think -- I'm sorry.  Not to
17  interrupt, but I think I testified as far as what
18  the practice was.  And I -- I can't say as we sit
19  here today whether or not there was a specific
20  written policy.
21        And there may certainly have been
22  and, you know, I don't know if there's a way for me
23  to go back and look, but to refresh my memories
24  about policies in the 1980s.

THOMAS TIDERINGTON, 04/28/2023                    Page 70..73

Page 70

1          But I'm quite confident that there
2 was some type of policy that provided guidance on
3 this issue.
4     Q.   All right, sir.  Let's move to the next
5 era of your career when you were the chief at
6 Plymouth Township.  Okay, sir?
7     A.   That wasn't the next era, but yes.  You
8 skipped 20 years, but go ahead.
9     Q.   I'm sorry.  What happened during those
10 20 years?
11    A.   Not much.
12    Q.   I know you were tasked to the DEA,
13 right?
14    A.   I was.
15    Q.   And what were the years of that?
16    A.   That would have been roughly '90 to '95.
17    Q.   After that, what did you do?
18    A.   I got promoted to captain, and I was --
19 I was for a short period of time a what is
20 classified as the captain in charge of the
21 administrative bureaus within the police
22 department, involved in the accreditation process
23 and oversaw the research and planning divisions.
24          And then a short time after that, I

Page 71

1 was assigned back to the special investigations
2 division as the commander in charge of the division.
3     Q.   And what year were you the commander in
4 charge of the division of the special
5 investigations division?
6     A.   Oh, geez.  That would have been I think
7 probably '97, '98 until I retired in 2001.
8     Q.   When you were the commander, do you
9 recall any written policies about when reports
10 needed to be created?
11    MS. BONJEAN:  Objection, form.
12    THE WITNESS:  I don't recall.  Again, I'm
13 sure there were, but I don't recall specifically as
14 we sit here today.
15 BY MR. BRUEGGEN:
16    Q.   And when you were the commander, do you
17 recall any policies about whether handwritten notes
18 needed to be taken?
19    MS. BONJEAN:  Objection to the form.
20    THE WITNESS:  Needed to be taken when?
21 BY MR. BRUEGGEN:
22    Q.   While performing an investigative task.
23    A.   Well, again, I don't know that there's
24 ever a policy that says you have to take notes.

Page 72

1 But if you're going to not take notes and it's
2 relevant, then it has to be documented in your
3 police report.
4     Q.   What about was there a policy -- when
5 you were the commander, was there a policy that if
6 someone took notes those notes needed to be placed
7 in the file?
8     A.   I think by the -- and again, I don't
9 know if there was a specific policy.  I know there
10 was a practice that they -- that the notes would be
11 kept in the investigative file, yes.
12    Q.   And at any time when you were working
13 in the special investigations unit, was there ever
14 a practice to create reports and then destroy your
15 handwritten notes?
16    A.   Not that I know of.
17    Q.   And you, yourself, never did that,
18 right?
19    A.   I can't think of an instance in which I
20 did that, no.
21    Q.   And now moving on to the next era after
22 being commander.  I apologize for that.  I did skip
23 many years, so ...
24          The next era you were the chief of

Page 73

1 Plymouth Township, and again, this was about 2001
2 until just last year, right?
3     A.   That's correct.
4     Q.   So 21 years you were the chief there?
5     A.   Yes.
6     Q.   Did you guys have a written policy on
7 when reports needed to be prepared?
8     MS. BONJEAN:  Objection, form.
9     THE WITNESS:  We did have a policy, or we do
10 have a policy.  I don't know specifically what it
11 says at this point.
12 BY MR. BRUEGGEN:
13    Q.   And as the chief, were you involved in
14 creating that policy?
15    A.   I was involved in creating all the
16 policies.
17    Q.   So you would have created the policy on
18 when reports needed to be created?
19    A.   When you say "when," I don't know if
20 the report -- again, whether or not the policy
21 specifically says that the -- I take that back.
22          I mean, I -- you know, I know
23 there's policies, and I don't recall specifically
24 what they say.  I could certainly obtain those

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 04/28/2023                                    Page 74..77

Page 74

1 policies, provide those to you, but I don't know
2 specifically what they say in terms -- I know what
3 the practice is, and I know what the intent of the
4 policies are.
5     Q.   And --
6     A.   The --
7     Q.   Go ahead.
8     A.   I'm sorry.
9          The intents -- again, the exact
10 wording, I -- I don't know, I don't recall as we
11 sit here.
12         But the intent is that the officer
13 has to document their investigative actions
14 immediately or beyond the -- before the end of
15 their shift is the practice, and I believe that's
16 what the policy dictates as well.
17    Q.   And were there any exceptions to that
18 policy of having to create your report before the
19 end of the shift?
20    MS. BONJEAN:  Objection to form, incomplete
21 hypothetical.
22    THE WITNESS:  There's always exceptions to
23 everything.  But -- but the policy and the practice
24 was that the officers would complete their reports.

Page 75

1          I can think of situations like
2 accident reports, complicated accident reports,
3 where the policy is that the officer has to
4 complete them following their -- or before the
5 completion of their shift or -- or shortly
6 thereafter when practical I think is the wording.
7 BY MR. BRUEGGEN:
8    Q.   What about at Plymouth Township?  Did
9 you have any policies on taking handwritten notes?
10   MS. BONJEAN:  Objection to the form.
11   THE WITNESS:  I would have to go back and
12 look.  I don't recall if we do or not.  I ...
13 BY MR. BRUEGGEN:
14   Q.   As you sit here today, do you recall a
15 requirement that officers had to take handwritten
16 notes?
17   A.   No, I don't -- I don't know of any
18 police department that has a policy that requires
19 an officer to take handwritten notes.  I think it's
20 a practice.  I think it's what we train our
21 officers to do.
22        I don't know that I've seen any
23 department policy that specifically tells the
24 officer that he must take notes.  I think the

Page 76

1 policies state that the officers have to document
2 their investigative actions in a police report.
3        And let me -- let me just add.  I --
4 the exception is the Chicago Police Department, who
5 again had a policy requiring their officers to take
6 notes and had a specific form in which the notes
7 were to be taken.  That's different than what I've
8 seen in other police departments.
9    Q.   Okay.  So is it your understanding that
10 CPD -- or strike that.
11        Is it your belief that CPD required
12 officers to take handwritten notes?
13   A.   No, that's not what I said.
14   Q.   Thank you for the clarification.
15        (Deposition Exhibit No. 4,
16         Witness Tiderington, was marked
17         for identification 04/28/2023.)
18 BY MR. BRUEGGEN:
19   Q.   Moving on, I'd like to show you what
20 we'll mark as Exhibit 4, and this is going to be
21 Attachment B to your report?
22   MS. BONJEAN:  Which one, Dave?  Which one?
23   MR. BRUEGGEN:  It's attachment B, the
24 materials reviewed.

Page 77

1   MS. BONJEAN:  B?
2   MR. BRUEGGEN:  B as in boy.
3   MS. BONJEAN:  Okay.  Hold on.  Ashley left.
4        All right.
5 BY MR. BRUEGGEN:
6    Q.   Sir, I've put it up on the screen, and
7 I think you have a hard copy there that you can
8 reference.
9   THE WITNESS:  Just the top part.
10   MS. BONJEAN:  Okay.  I have the -- just the
11 first page --
12   THE WITNESS:  Yeah, yeah, the summary.
13   MS. BONJEAN:  There we go.
14   THE WITNESS:  That's it.
15   MS. BONJEAN:  Hold on.
16 BY MR. BRUEGGEN:
17   Q.   Sir, do you have a hard copy of the
18 exhibit I'm showing you up on the screen,
19 Attachment B to your report that runs eight pages
20 from 82 to 89?
21   A.   I do.
22   Q.   Okay.  And can you work off the hard
23 copy, or you want me to leave it up on the screen?
24   A.   I can see the hard copy.

THOMAS TIDERINGTON, 04/28/2023                    Page 78..81

Page 78

1    Q.   Does this exhibit list all the
2 materials you reviewed to prepare your report in
3 this case?
4    A.   I believe it does, perhaps with the
5 exception of some material that was provided to me
6 that I used to prepare my supplemental or my
7 amendment to the report.
8    Q.   And, sir, just -- I want to make sure I
9 understand this Attachment B exhibit.
10        It appears that there's different
11 kinds of sections in this with bold headings?  Am I
12 interpreting this correctly?
13   A.   Yes.
14   Q.   And the first section under -- notes
15 Materials reviewed as of 1/4/23.
16        Do you see that, sir?
17   A.   I do.
18   Q.   And that lists 58 documents?
19   A.   That's correct.
20   Q.   And those were documents related to the
21 underlying case that you reviewed to prepare your
22 opinions; is that right?
23   A.   That's correct.
24   Q.   And then below that, it says, File

Page 79

1 Comparison Files -- do you see that -- and they're
2 noted 59 to 62?
3    A.   That's correct.
4    Q.   And are these files from other
5 investigations that you reviewed?
6    A.   They are, yes.
7    Q.   And then below that, it says,
8 Additional materials, including matters previously
9 reviewed in "Inglesias" cases?  Do you see that,
10 sir?
11   A.   I do.
12   Q.   And does that list the materials you
13 reviewed when you were an expert in the Inglesias
14 case?
15   A.   That's correct.
16   Q.   And then also right below that, it
17 says, File Comparison Files?  Do you see that on
18 page 86?
19   A.   I do.
20   Q.   And again, are those police records you
21 reviewed that were not related specifically to the
22 Inglesias case?
23   A.   That's correct.
24   Q.   And then would it be the same thing

Page 80

1 with the Sierra case or Reyes versus Guevara and
2 Sierra case that you have on page 87 --
3    A.   Yes.
4    Q.   -- through 89?
5    A.   Yes.
6    Q.   And, sir, looking at -- if I could
7 direct you back to page 84, you list a bunch of
8 depositions that you reviewed?
9    A.   That's correct.
10   Q.   Did you read these depositions cover to
11 cover?
12   A.   At one -- at some point I did, yes.
13   Q.   And those depositions that you
14 reviewed, did they contain the deposition exhibits
15 attached to them?
16   MS. BONJEAN:  I'm going to object to the form
17 of that question and the foundation of that
18 question.
19   THE WITNESS:  I don't know if they all did or
20 some of them did.  I -- I don't know as we sit
21 here.  I believe some of them did or may --
22 possibly all of them did or -- I don't recall.
23 BY MR. BRUEGGEN:
24   Q.   Let me ask this:  Do you recall

Page 81

1 reviewing a deposition, seeing a reference to an
2 exhibit, but not being able to find that exhibit?
3    A.   I don't know if it was in the materials
4 I reviewed for this case or other cases.
5        But to answer your question, in some
6 of the Chicago cases that I have been involved
7 with, there have been reference to -- references to
8 exhibits that were not contained in the deposition
9 that was provided, but I don't remember
10 specifically which ones.
11   Q.   Fair enough, sir.
12   A.   And, Dave, whenever's a good time for a
13 5- or 10-minute break.  Whenever -- whenever you're
14 at a good point.
15   Q.   Yeah, I mean --
16   A.   You want to minute finish this, that's
17 fine, and then we'll take a break.
18   Q.   Yeah, if we could just finish going
19 through the materials reviewed and then we'll take
20 a break.  Hopefully, it will just be another 5 to
21 10 minutes.  Is that okay, sir?  If you need to
22 take a break, we can though.
23   A.   No.  Perfect, thanks.
24   Q.   And, sir, looking specifically at

THOMAS TIDERINGTON, 04/28/2023                                    Page 82..85

Page 82

1 what's noted as document 53 and 54 on page 84, do
2 you see those?  The deposition of Edward Mingey in
3 Serrano/Guevara and the deposition of Ernest
4 Halvorsen in Serrano v. Guevara?  Do you see those,
5 sir?
6     A.   I do.
7     Q.   And those were the depositions where
8 Mr. Mingey and Mr. Halvorsen asserted they're Fifth
9 Amendment rights; is that correct?
10    A.   I don't know.  I'd have to go back and
11 look at those depositions.  But if that's what
12 you're representing to me, I would not dispute that.
13    Q.   And earlier when we talked about
14 Mr. Halvorsen and what, you know, he potentially
15 did wrong, I think you noted that he had asserted
16 his Fifth Amendment rights?  Do you recall that as
17 a concern of yours?
18    A.   I believe he did, yes.
19    Q.   And, sir, did you get an opportunity to
20 read the deposition that either Mr. Mingey or
21 Mr. Halvorsen gave in the Serrano versus Guevara
22 case where they provided testimony?
23    A.   In -- I'm sorry.  In which case?
24    Q.   In -- the same case.  And I tell you

Page 83

1 what.  Strike that.  Let me ask a better question.
2        Are you aware that both Mr. Mingey
3 and Mr. Halvorsen have stopped invoking their Fifth
4 Amendment rights?
5     MS. BONJEAN:  I'm going to object to the
6 form.  That misstates actually the evidence as it
7 relates to Mr. Maysonet's case as to Halvorsen.
8     THE WITNESS:  Again, I don't know
9 specifically, but -- but I have reviewed
10 information where they have answered questions
11 after having invoked their -- their right.
12 BY MR. BRUEGGEN:
13    Q.   And, sir, back to the complete list, in
14 preparing your report in the Maysonet case, did you
15 re-review all the documents from the Inglesias
16 case, the Sierra case, and the Reyes case?
17    MS. BONJEAN:  Objection, form.
18    THE WITNESS:  I don't think I went back there
19 and re-reviewed.  I think -- no, I don't believe I
20 did that.  There may have been things that I've
21 gone back or confirmed or looked at, but I don't
22 believe I went back and reviewed all of this
23 material for a second or third time.
24

Page 84

1 BY MR. BRUEGGEN:
2     Q.   Were there any documents you requested
3 that you were not provided?
4     MS. BONJEAN:  Objection to the foundation of
5 that question.
6     THE WITNESS:  No, not that I can think of.
7 BY MR. BRUEGGEN:
8     Q.   Did you review the COI, certificate of
9 innocence opinion in Mr. Maysonet's case?
10    MS. BONJEAN:  Objection to the -- let me --
11 the opinion?
12    MR. BRUEGGEN:  Yeah.  And the Court's ruling
13 that was a transcript.
14       Let me rephrase the question.  I
15 appreciate that.  It's imprecise to a non-attorney.
16 BY MR. BRUEGGEN:
17    Q.   Sir, did you read a transcript of a
18 court ruling on Mr. Maysonet's certificate of
19 innocence proceeding?
20    A.   I don't know if I did or not.  I don't
21 recall.
22    Q.   And if you had read it, would it be
23 listed amongst your items here?
24    A.   It should have been or would have been,

Page 85

1 yeah, perhaps.
2     Q.   And, sir, if you could just pause after
3 this because I don't know if we'll get an
4 objection, but did Ms. Bonjean or Ms. Cohen or any
5 of Mr. Maysonet's attorneys ask you to make any
6 assumptions in preparing your report?
7     MS. BONJEAN:  I'm going to -- I am going to
8 object on the form of that question, but you can
9 answer it.
10    THE WITNESS:  No.
11    MR. BRUEGGEN:  All right, sir.  I think this
12 is a good time for a break, so why don't we take a
13 break.  How long would you like?  5 --
14    THE WITNESS:  5 minutes.
15    MR. BRUEGGEN:  5 is fine?  Okay.
16    THE LEGAL VIDEOGRAPHER:  We are off the video
17 record at 11:40 a.m.
18       (Recess taken.)
19    THE LEGAL VIDEOGRAPHER:  We are back on the
20 video record at 11:51 a.m.
21       (Deposition Exhibit No. 5,
22        Witness Tiderington, was marked
23        for identification 04/28/2023.)
24

THOMAS TIDERINGTON, 04/28/2023                                    Page 86..89

Page 86

1 BY MR. BRUEGGEN:
2      Q.   Mr. Tiderington, I wanted to move and
3 show you what we'll mark as Exhibits 5 and 6.
4            6 is your invoice; Exhibit 5 is
5 going to be Attachment C which is your fee
6 schedule.  So let me put that up on the screen so
7 if you can get those documents, the hard copies,
8 available.
9      A.   Okay.
10     Q.   Sir, up on the screen, you should see
11 what's marked as Exhibit 5, which is Attachment C,
12 Rate of Compensation, to your report?
13     A.   I do.
14     Q.   Okay.  And I'm going to stop sharing,
15 but I did want to ask:  Has your fee schedule
16 changed in relation to new cases?
17     MS. BONJEAN:  Objection to form, foundation.
18     THE WITNESS:  To new cases, yes.
19 BY MR. BRUEGGEN:
20     Q.   Okay.  So you're charging more now for
21 cases that are coming in; is that correct?
22     A.   I am.
23     Q.   Okay.  And what are your current fee
24 schedule numbers?

Page 87

1      A.   $400 an hour.
2      Q.   And again, in this case, you would be
3 providing all your services under this fee
4 schedule, right?
5      A.   That is -- that is correct, yes.
6      Q.   And so we could set that aside.
7            And if you want to look at your
8 invoice now, Exhibit 6, which I know we brought up
9 earlier.  I'll put it up on the screen just to make
10 sure we're on the same page.
11           Sir, is this document up on the
12 screen, is this the document you're looking at?
13     A.   Yes.
14     Q.   Sir, did you start your work in this
15 case around August of 2022?
16     A.   I believe so, yes.
17     Q.   And we know your report was submitted
18 in January -- actually January 13, 2023, right?
19     A.   I believe so.
20     Q.   And we already talked about that all
21 the billing on this encapsulates your review of
22 materials and drafting of the report; is that
23 correct?
24     A.   That's correct.

Page 88

1      Q.   And, sir, I wanted to direct your
2 attention, and let me put Exhibit 6 back up on the
3 screen so I could point to it.  I think it would be
4 readily apparent, but I just want to make sure that
5 there's no confusion.
6            There's entries right here starting
7 on 12/13?
8      A.   Yep, yes.
9      Q.   Do you see these entries that all say,
10 Review and analysis of INV, slash, RDF files, 1997
11 to 1990?
12     A.   That's correct.
13     Q.   And, sir, is this work that was done on
14 reviewing files that were not related to the
15 Maysonet case?
16     MS. BONJEAN:  Objection to the form, but ...
17 BY MR. BRUEGGEN:
18     Q.   And I -- let me make sure I clarify
19 that.
20           I appreciate all your work is done
21 for the Maysonet case, but are these -- this work,
22 was this reviewing files that were not the Maysonet
23 file?
24     A.   That's correct, yes, sir.

Page 89

1      Q.   And I added this up.  It's somewhere
2 around 22 hours or so?
3      A.   I believe so.  I don't -- never added
4 it up, but if that's what it adds up to be, I would
5 not dispute that.
6      Q.   Fair enough.
7            So your total hours were 87.65?  Do
8 you see that down here?
9      A.   I do see that, yes.
10     Q.   Okay.  And so if we take out roughly
11 22, that drops you down to about 65 hours and
12 change; is that correct?
13     A.   That's correct.
14     Q.   So is it fair to say that you spent
15 about 65 hours for your review of the materials and
16 drafting of your report?
17     A.   That sounds about right, yes.
18     Q.   And I think you told us you read every
19 deposition from cover to cover?
20     A.   I don't know if that's what I said.
21     Q.   If that's what you said, that's what
22 you said, right?  But what was said earlier was --
23     A.   Sir, I -- I reviewed the -- all the
24 depositions that were provided.

THOMAS TIDERINGTON, 04/28/2023                                    Page 90..93

Page 90

1          Did I read every page in the
2  deposition?  I believe I did.  I don't know if I
3  read the indexes.  I don't know if I read the
4  beginning parts.
5          I -- I reviewed all of the
6  depositions.
7      Q.   Okay, fair enough.
8          And you reviewed all the documents
9  that are -- were listed in the materials.  The
10 police reports, the Cook County State's Attorney
11 documents; is that correct?
12     A.   I did.
13     Q.   And you were able to review all of that
14 in 65 hours and draft an 87-page report?
15     A.   That's correct.
16         (Deposition Exhibit No. 7,
17          Witness Tiderington, was marked
18          for identification 04/28/2023.)
19 BY MR. BRUEGGEN:
20     Q.   Sir, moving on, I'd like to show you
21 what we'll mark as Exhibit 7.
22         And for the record, Exhibit 7 is
23 just a copy of your opinions without the
24 attachments, okay?

Page 91

1      A.   Okay.
2      Q.   And I'm just doing that so it's a
3  smaller document, and let me just share my screen,
4  make sure you have this.
5          Again, it's page 1 through --
6  through 78, okay?
7      A.   Yes.  I --
8      Q.   You have a copy of that, sir?
9      A.   I do.
10     Q.   Okay.  And so feel free to refer to
11 that, and I will direct you to that, because I just
12 want to talk about some of your opinions.
13         And if we start on the very first
14 page, the introduction, you have -- right after
15 that first sentence, you have a 1 and a 2?  Do you
16 see those?
17     A.   I do.
18     Q.   And is this the two overarching topics
19 for your opinions?  One is about the investigation
20 of Maysonet, and the other one is about the City?
21     A.   That's correct.
22     Q.   And then you note:  I have reached
23 conclusions on both of these.
24         And would it be easier for me to

Page 92

1  share my screen and highlight where I'm looking at
2  in the report?  Would that make things easier for
3  you, sir?
4      A.   Perhaps it would.
5      Q.   Let me do that.
6      A.   I guess it depends -- I guess it
7  depends on what questions you ask, but ...
8      Q.   Fair enough.
9          Well, you don't need to see my face
10 asking the questions.  We can have the report up
11 there and you can review the report in front of you.
12         So in this paragraph that says,
13 First, as a result, you note, the investigation
14 conducted in this case grossly deviated from
15 generally accepted practices.
16         And I just wanted to ask:  What do
17 you mean by "grossly deviated"?
18     A.   What I mean by that is that the actions
19 of the investigative officers were far beyond what
20 I would consider to be best practices or even
21 marginal practices within police departments that
22 I'm familiar with.
23     Q.   And what -- what do you mean by
24 "marginal practices"?

Page 93

1      A.   Well, I -- I guess some of the
2  practices of the Chicago Police Department in the
3  cases that I reviewed, if you were a teacher and
4  you were grading their performance, it would be a
5  D minus or failing marks.
6          Other departments that I've -- that
7  I'm familiar with may have policies and practices
8  that aren't what I consider necessarily to be the
9  best practices, but they're still passable and
10 they're still sufficient.
11         So when I say grossly deviated, I --
12 I believe it describes it accurately.
13     Q.   Sir, moving along in your report, and
14 this is at page 4, and there's a paragraph with a 5
15 in front of it?
16     A.   Yes.
17     Q.   And you note, Detectives failed to
18 properly document the chronological progress of the
19 investigation, and permanent retention of
20 investigative files are devoid of any handwritten
21 notes from any of the detectives involved in this
22 case.
23         Do you see that, sir?
24     A.   I do.

THOMAS TIDERINGTON, 04/28/2023                                    Page 94..97

Page 94

1     Q.   And, sir, you reviewed the Cook County
2  State's Attorney's records, right?
3     A.   I -- I did, yes.
4     Q.   And you saw that there were actually
5  handwritten notes that were created about this
6  investigation, right?
7     A.   I believe there were, yes.
8          Well, there were some notes; limited
9  notes, yes.
10    Q.   Yes.
11         But there were handwritten notes for
12 this investigation, right?
13    A.   In the Cook County prosecutor's file,
14 yes.
15    Q.   And you appreciate those handwritten
16 notes would have come from the police because
17 that's who created the notes, right?
18    A.   It appears that they did, yes.
19    Q.   And so did you understand that the file
20 that was produced as the investigative file today
21 some 32 years later was not the way the file
22 existed back in 1990?
23    MS. BONJEAN:  Objection to the form, assumes
24 facts not in evidence.

Page 95

1     THE WITNESS:  I -- I would have no way of
2  knowing that.  I can't think of any legitimate law
3  enforcement reason why the files would have been --
4  or part of the files would have been purged and
5  other information kept in there.  So it doesn't --
6  to me, there's no logical explanation for taking
7  some of the information out of these files.  If
8  they were going to maintain them, why would the
9  entire file not be maintained?  It made no sense.
10 BY MR. BRUEGGEN:
11    Q.   And I appreciate that, sir, but my
12 question is slightly different is:  You understand
13 that the file that you looked at that is noted as
14 the investigative file, the file that existed back
15 in 1990 would have included those handwritten
16 documents that were in the correct -- in the Cook
17 County State's Attorney's record, right?
18    MS. BONJEAN:  Objection to the form,
19 speculation.
20    THE WITNESS:  I -- again, I don't know where
21 the Cook County prosecutor's office got that
22 information from.
23         I guess it would be logical -- using
24 your hypothetical, it'd be logical that they came

Page 96

1  from the police files.  But again, we don't have
2  any way of knowing that.  And as I also testified,
3  it makes no sense why -- who would -- well, I know
4  you're not here to answer my questions, but why
5  would those -- and I'm asking -- or one of the
6  questions I considered, why would anybody remove
7  part of the information from these files.  It makes
8  no sense to me.
9  BY MR. BRUEGGEN:
10    Q.   And, sir, again, back in 1990, they
11 were all paper files.  Did you understand that at
12 CPD?
13    MS. BONJEAN:  Objection, form.
14    THE WITNESS:  I -- all the information that
15 I've received about these cases have been hard
16 copies, yes.
17 BY MR. BRUEGGEN:
18    Q.   And so in 32 years, is it possible that
19 certain pages have gone missing from a hard copy
20 file?
21    MS. BONJEAN:  Objection, form, foundation,
22 incomplete hypothetical.
23         You can answer.
24    THE WITNESS:  I guess it would be possible.

Page 97

1          Is it correct?  Is it appropriate?
2  My answer would be no.
3          If the Chicago Police Department is
4  going to maintain these homicide files, if they
5  were or are required to maintain these files based
6  on record retention and policies, it would be a
7  deviation of acceptable police practices and
8  standards for these records not to have been
9  maintained in there.
10         So either they were inappropriately
11 removed, which is a violation of the policies,
12 which Chicago should have secured these files to
13 make sure that the records would have been
14 maintained properly, or perhaps they were never
15 placed in those files.
16         And again, that's part of the
17 problem with many of these cases.  There's
18 mysteries that you typically would not see in most
19 investigative files of this nature.
20 BY MR. BRUEGGEN:
21    Q.   And, sir, did you review those
22 handwritten notes from the state's attorney that
23 were created by police officers?
24    A.   Well, when you say created by police

THOMAS TIDERINGTON, 04/28/2023                    Page 98..101

Page 98

1 officers, some of them had no reference as to who
2 created them, I think is -- I mean, we'll have to
3 pull them up and go through them.
4        But without refreshing my memory, I
5 believe there were some GPRs that had no indication
6 as to who wrote them.  To your point, some other --
7 other GPRs that were contained did have the
8 officers names in them, yes.
9        None of the detectives, none of the
10 defendant detectives -- I don't believe any of the
11 defendant detectives did any GPRs or took any notes
12 that were in the files that were provided to me,
13 the investigative files or the record -- permanent
14 record retention files.
15    Q.   And, sir, what I'm getting at is:  Do
16 you believe that those GPRs -- strike that.  Let me
17 take a step back.
18        Do you know what a GPR is?
19    A.   I do.
20    Q.   What is a GPR?
21    A.   Well, it's a record that the Chicago
22 Police Department created because of all the
23 deficiencies.  From my understanding, they
24 determined there were significant deficiencies in

Page 99

1 providing exculpatory and Brady material to the
2 prosecutor and to the defense.
3        And this was a response by the
4 Chicago Police Department management to attempt to
5 create some of the deficiencies that were noted by
6 various judges and courts and also by -- apparently
7 by the management of the Chicago Police Department.
8    Q.   So a GPR is just a formalized document
9 for handwritten notes -- or strike that -- a
10 formalized form to use for handwritten notes by
11 detectives; is that fair?
12    A.   That's my understanding of what the
13 purpose behind the GPR and the policy is, yes.
14    Q.   And so the GPRs that were filed in the
15 state's file, do you believe those were
16 not created by the Chicago police officers?
17    MS. BONJEAN:  Objection, asked and answered,
18 but you can answer again.
19    THE WITNESS:  Well, as I just testified, I
20 believe that there's some -- I mean, some of the
21 GPRs in there -- and I guess it would be -- if you
22 could pull those up, I guess we could look through
23 those, and I think I could give you a more succinct
24 answer, more specific answer as to what my opinion

Page 100

1 was on the GPRs that you're asking me questions
2 about now.
3 BY MR. BRUEGGEN:
4    Q.   And what my -- the whole point of this
5 is you say that the investigative file is devoid of
6 any handwritten notes in your opinion here.  I have
7 it up on the screen.
8        And I just want to appreciate
9 whether you're saying that the GPRs that were in
10 the state's attorney's file you don't believe were
11 ever part of CPD's files.
12    MS. BONJEAN:  Objection, form, misstates his
13 testimony, and it's -- and it's asked and answered.
14        But go ahead.
15    THE WITNESS:  No, no.  And again, I -- I know
16 you don't need me to read to you, but what I said
17 in my report was that the detective failed to
18 properly document the chronological progress of the
19 investigation, and the permanent retention and
20 investigative files that were provided to me for my
21 review did not have any written notes from the
22 detectives in this case.
23        I summarized that paragraph.  But
24 what I was referencing were the investigative files

Page 101

1 and the permanent retention files.
2 BY MR. BRUEGGEN:
3    Q.   And you mean as produced to you today,
4 right?
5    MS. BONJEAN:  Objection.  As opposed to who?
6 BY MR. BRUEGGEN:
7    Q.   Okay.  Let me -- let me withdraw that
8 question, and let me see if I can ...
9        What I'm trying to figure out is are
10 you opining that there were never any handwritten
11 notes in the investigative file as it existed in
12 1990?
13    MS. BONJEAN:  Objection.  You're asking him
14 to speculate.
15    MR. BRUEGGEN:  I'm asking what his opinion is.
16    MS. BONJEAN:  Objection, speculation.
17    THE WITNESS:  Well, based on my experience
18 and my review, and I have looked at and I've done
19 audits of -- of investigative files that are years
20 old, I cannot think of a legitimate law enforcement
21 reason why certain documents would be in a
22 permanent -- in the permanent retention file or the
23 investigative file, why documents would have been
24 removed from these files.

THOMAS TIDERINGTON, 04/28/2023        Page 102..105

Page 102

1 I recognize the prosecutor somehow
2 received GPRs that appear to be written by the
3 initial responding officers to this crime, but I
4 have no way of knowing whether or not those were
5 ever in the permanent retention file, or if they
6 were ever in the investigative files, if I
7 understand your question correctly.
8 BY MR. BRUEGGEN:
9     Q. Yeah. I -- I think you've told us what
10 your opinion is. Thank you for that, sir.
11     And then at times you note (audio
12 interruption) about Mr. Maysonet speaking Spanish
13 throughout your report. Do you --
14     A. I'm sorry?
15     Q. You note that Mr. Maysonet was speaking
16 Spanish, do you agree with that, throughout your
17 report?
18     That's a poor question. Let me
19 withdraw it.
20     In your report, you note
21 Mr. Maysonet spoke Spanish, right?
22     A. Well, in my report, I document various
23 interviews in which interpreters were used by the
24 Chicago Police Department to interview Mr.

Page 103

1 Maysonet. So that led me to conclude that if
2 interpreters were being used to interview him, that
3 the officers felt that his English-speaking ability
4 was insufficient to answer the questions without
5 the use of an interpreter.
6     Q. And, sir, in your practice when you
7 were in Fort Lauderdale, I trust at times in
8 investigations you had to use interpreters?
9     A. Sí.
10     Q. Okay. And were there occasions where
11 you would use an interpreter with a witness
12 initially because the witness or suspect said they
13 didn't speak English, and then later on, you
14 learned they did speak English?
15     MS. BONJEAN: Objection, incomplete
16 hypothetical.
17     THE WITNESS: I -- I'm sure there were. I
18 can't think of a specific incident.
19 BY MR. BRUEGGEN:
20     Q. And in this case, you saw obviously
21 testimony and documentation that Mr. Maysonet was
22 speaking English, right?
23     A. That he was speaking English?
24     Q. Yes.

Page 104

1     MS. BONJEAN: Objection, form.
2     Go ahead.
3     THE WITNESS: I guess when though? I mean,
4 when he was being interviewed initially? When he
5 was -- depositions years later? I -- I don't know
6 the time period that you're asking about.
7 BY MR. BRUEGGEN:
8     Q. Fair enough. So let's go with the
9 low-hanging fruit.
10     When he gave his statement, you saw
11 testimony that he gave his statement in English,
12 right?
13     MS. BONJEAN: Okay. I'm going to object to
14 the foundation of that question, Dave. And I mean,
15 when you say "statement," are you talking about the
16 court reported statement? You know, I don't know
17 exactly ...
18     MR. BRUEGGEN: Yes. Let me rephrase.
19 BY MR. BRUEGGEN:
20     Q. When he gave his court reported
21 statement back in 1990, you saw it was typed up in
22 English, right?
23     A. Well, I saw that it was typed up in
24 English, but I don't -- I think that's a -- there's

Page 105

1 a dispute of the facts there. I don't know that --
2 I understand that those are disputed facts.
3     Q. And I appreciate that, and I'm just --
4 I want to talk about those disputed facts now.
5 Okay, sir?
6     A. Sure.
7     Q. And you saw testimony from people who
8 were present at that court reported statement that
9 Mr. Maysonet gave back in 1990 that said he was
10 speaking English, right?
11     MS. BONJEAN: Objection to the form.
12     THE WITNESS: You know, I'd have to refresh
13 my memory on that. I -- I don't recall
14 specifically who was there, but I seem to think
15 that the translator was in the room as well.
16 BY MR. BRUEGGEN:
17     Q. And when you say "the translator,"
18 who's that?
19     A. The detec -- Detective Montilla.
20     Q. And, sir, did you read Detective
21 Montilla's deposition?
22     A. I'm sure I did.
23     Q. And did you pay particular attention to
24 Mr. Maysonet's court reported statement that he

THOMAS TIDERINGTON, 04/28/2023                     Page 106..109

Page 106

1  gave back in 1990?
2      MS. BONJEAN: Objection to the form.
3      THE WITNESS: I'm sorry. In the detective's
4  deposition, did I pay attention to Maysonet's
5  testimony?
6  BY MR. BRUEGGEN:
7      Q.  Okay. Let me take a step back.
8          You're familiar Mr. Maysonet gave a
9  court reported statement, right?
10     A.  Yes. A non tape-recorded, non-recorded
11 statement, yes.
12     Q.  And --
13     A.  I'm sorry. To a court reporter.
14 That's what we're speaking of right now?
15     Q.  Correct. In 1990.
16     A.  Okay.
17     Q.  We've already talked about that was
18 typed up in English, right?
19     A.  That's my understanding, yes.
20     Q.  And Mr. Maysonet has testified that he
21 did give a court reported statement, right?
22     A.  He -- he did I believe, yes.
23     Q.  Mr. Maysonet says that he gave the
24 court reported statement speaking Spanish, right?

Page 107

1      A.  Speaking Spanish?
2      Q.  Yes.
3      A.  I think that was his testimony.
4          And again, I mean, I -- I know we're
5  kind of playing a memory game here. If there's
6  specific details that you could point to, but --
7  but I -- if that's what you're representing, I'm
8  not disputing that. But if -- you know, we could
9  certainly -- whatever it says in the deposition
10 would be what I considered based on my opinion.
11     Q.  And you app --
12         (Simultaneous cross-talk.)
13     Q.  And you appreciate that court reported
14 statement is a very important piece of evidence in
15 this whole criminal investigation, right?
16     A.  I do, yes.
17     Q.  And so that would have been in your
18 mind when you were reviewing documents, right?
19     A.  I --
20     MS. BONJEAN: Objection to the form.
21     THE WITNESS: I'm sorry. When I was
22 reviewing documents, was that what I was thinking
23 about? Is that what you're asking?
24

Page 108

1  BY MR. BRUEGGEN:
2      Q.  No.
3          When you were reviewing documents,
4  in your mind, you would have known that
5  Mr. Maysonet provided a court reported statement
6  that was typed up, right?
7      MS. BONJEAN: Objection to the form.
8          I think he testified he knew about
9  it, so I don't know what else you're asking him.
10     THE WITNESS: Yes, it was part of -- part of
11 the record that I reviewed. I'm sorry. I ...
12 BY MR. BRUEGGEN:
13     Q.  And, sir, all I'm trying --
14         (Simultaneous cross-talk.)
15     A.  But it was also part of -- I also
16 reviewed the part of the record where the sergeant
17 interviewed him and took a Spanish-speaking
18 translator with him and -- on more than one
19 occasion, so ...
20     Q.  Okay, sir. So when you were
21 reviewing --
22         (Simultaneous cross-talk.)
23     A.  It was my --
24     Q.  I'm sorry. Go ahead.

Page 109

1      A.  No, I'm sorry. There wasn't a question
2  pending. Go ahead.
3      Q.  When you were reviewing the documents,
4  you were aware that there was some question about
5  whether Mr. Maysonet was able to speak English,
6  right? That was an important issue?
7      MS. BONJEAN: Objection to the form.
8          Important to whom? Form,
9  foundation. I mean ...
10     THE WITNESS: Well, it was one of the issues.
11 And again, I determined that it was a disputed
12 fact, so I don't know that I assigned a great deal
13 of credibility to that.
14 BY MR. BRUEGGEN:
15     Q.  Did you assign any credibility to that?
16     MS. BONJEAN: Ob -- hold on. Objection to
17 the form. What's -- to the "that"? I'm going to
18 object to the form of the question, "to that."
19 BY MR. BRUEGGEN:
20     Q.  And, sir, do you understand my
21 question? I was just basically responding to what
22 you had in your answer.
23         You said I didn't prescribe very
24 much credibility to that, or something along those

THOMAS TIDERINGTON, 04/28/2023                     Page 110..113

Page 110

1 lines.
2     A.   Yeah, I'm not sure I said that.  I
3 reviewed the information.  And oftentimes -- and --
4 and really, you've identified one of the major
5 problems that I have when I'm looking at these
6 files.
7          The -- the files are so incomplete
8 and the documentation of events is so incomplete
9 that it's difficult for anybody to look at these
10 investigative files and figure out what actually
11 happened.
12         I would have expected -- and -- and
13 again, it's a deviation from acceptable police
14 standards -- that interpreter in the room in my
15 opinion should have produced a document stating why
16 he was there, why he participated in the interview,
17 whether or not he translated it at all.
18         So you've identified -- and the
19 frustration that we're having here trying to figure
20 out what occurred is because of the deficiencies in
21 the documentation by the police department.
22    Q.   And, sir, there has been deposition
23 testimony though that does provide facts about what
24 happened, right?

Page 111

1     MS. BONJEAN:  Objection to the form.
2     THE WITNESS:  Well, we're talking about two
3 different things.  We're talking about depositions
4 after the fact, and I was asked to look at from a
5 police practices expert who has audited
6 investigative files in the past and have approved
7 police reports and whether or not the police
8 practices deviated from acceptable standards.
9          And if it was cleared up in
10 depositions many years later is not -- is still
11 inappropriate.  The investigative file should give
12 somebody the ability to read through the file and
13 go from Point -- or from A to Z and coherently
14 figure out what occurred.
15          In this case -- and I don't -- can't
16 put words in your mouth, but the fact that we can't
17 figure out what happened is part of the -- part and
18 parcel of the problem.
19 BY MR. BRUEGGEN:
20    Q.   And, sir, maybe my question is
21 confusing.  But I'm just focusing on just the one
22 issue of the statement that was taken.  And you've
23 already pointed out there's a question about
24 whether he gave it in English or Spanish, okay?

Page 112

1     A.   Well, I don't think you can just look
2 at it as one issue.  I think the issue has to be
3 looked at it from the totality of the
4 circumstances, meaning you read the statement.  But
5 then you also know from reading another part of the
6 supplemental report that a translator was used to
7 interview Maysonet in jail.
8          You know, so you can't just look at
9 that and -- and not question, well, if he couldn't
10 speak English when Sergeant Mingey interviewed him,
11 how could he speak English during this interview?
12    Q.   And --
13          (Simultaneous cross-talk.)
14    A.   So -- I'm sorry.  It's an unanswered
15 question.
16    Q.   No, I appreciate what you're saying.
17          And we talked about before how
18 you've had the experience where some suspects may
19 pretend not to be able to speak any English when
20 they're being interviewed and then subsequently it
21 comes out that they can speak English, right?
22    MS. BONJEAN:  Okay, objection.  He -- he did
23 not answer it that way.  That's misstating his
24 testimony.

Page 113

1          And are you asking him to make
2 credibility resolutions right now?  Because I don't
3 understand this line of questioning.
4     MR. BRUEGGEN:  I'm not asking for
5 credibility.  I am just merely trying to set up the
6 fact as we know them.
7     MS. BONJEAN:  Okay, objection.  This is asked
8 and answered.  He identified it as a credibility
9 dispute.  He's not here to make credibility
10 determinations if that's what you're asking him to
11 do.
12          But you can answer to the best of
13 your ability again.
14    THE WITNESS:  Well, again, I also considered
15 the fact that the translator was asked to sit in on
16 the court reported conversation.  There were
17 several other interviews, as I understand it, of
18 Maysonet.
19          So was he speaking English during
20 those other undocumented interviews?  Was he
21 speaking English?  All of those factors should have
22 been documented in the police report.  And if they
23 were, that would have allowed me to answer your
24 question more fully.

THOMAS TIDERINGTON, 04/28/2023                          Page 114..117

Page 114

1    You know, it didn't just go from
2  Maysonet being brought in to him giving a court
3  reported statement.  There were a lot of
4  interaction or appears to be a lot of interaction
5  with him that was undocumented and unexplained.
6      I would also suggest if you read the
7  transcript -- transcripts closely.  And again, I --
8  if you could pull that up and perhaps I could
9  refresh my memory, but there were no indications --
10  you know, it didn't -- you know, do you understand
11  the question?  Do you -- it -- to me, it was
12  unclear as to -- and it was a very brief interview
13  as well.
14      So again, I didn't assign
15  credibility.  I noted that it was in English, and I
16  also noted that the other interviews, apparently
17  the sergeant felt that Maysonet did not speak
18  English and required a translator.  Not only a
19  translator.  They needed to get a detective from
20  another unit to accompany him.
21      So I guess the bottom line is, had
22  the sergeant, had the detective properly documented
23  their actions, we would not be having this
24  difficulty here trying to figure out what happened.

Page 115

1  BY MR. BRUEGGEN:
2      Q.   Okay.  And so moving on to your report,
3  at No. 7, you say, CPD investigators applied tunnel
4  vision to obtain evidence they needed to implicate
5  Maysonet, their pre-chosen suspect.
6          Do you see that, sir?
7      A.   I do.
8      Q.   And can you tell me which CPD
9  investigators that's referring to?
10      A.   I believe the defendants in this case.
11      Q.   So all CPD defendants had tunnel vision?
12      A.   Well, they -- all of them had a part in
13  this investigation, yes.
14      Q.   And I appreciate that all of them had a
15  part in this investigation and their defendants,
16  but you say they applied tunnel vision.
17          I want to know specifically which
18  defendants applied tunnel vision, if you can tell
19  me.
20      MS. BONJEAN:  Objection, asked and answered.
21          You can answer again.
22      THE WITNESS:  Well, I'm -- again, I would
23  probably want to go through the police report with
24  you.  But from the 10,000 foot perspective, you had

Page 116

1  sergeants -- at least two sergeants in this
2  police -- in this investigation that my
3  understanding of the role of a supervisor is to
4  make sure that the investigation is done correctly
5  and properly.  And that, you know, as you've just
6  pointed out, there was a police report that I think
7  was deficient, because it did -- as you said, you
8  know, this may have been a situation where Maysonet
9  claimed he didn't speak English, and now all the
10  sudden he gave a statement in English.  I would
11  have thought that the detective sergeant would have
12  returned the report to the investigator to have him
13  clarify this.
14      So I believe the sergeants were
15  deficient in their oversight in this investigation.
16  Sergeant Mingey didn't even -- he claims that there
17  was a confession provided by Maysonet to him, but
18  he never even documented this confession.  I would
19  think that that would be pretty important
20  information, not -- not only a detective would have
21  documented, but a sergeant would have documented.
22  BY MR. BRUEGGEN:
23      Q.   Sir, now let me ask the question that I
24  should have asked first is:  What is tunnel vision?

Page 117

1  How do you define tunnel vision as you're using it
2  in your report?
3      A.   I guess I define it is that -- and
4  it's -- I've seen it in many of the cases that I've
5  looked at is they focus -- when I say "they," the
6  investigators focused on one individual or perhaps
7  codefendants, and didn't -- didn't necessarily
8  follow the investigation where it might take them,
9  but a lot of the cases that I've looked at, the
10  investigation reads more as a charging document
11  than an -- more than an investigation.
12      An investigation documents, you
13  know, one witness may say something that
14  contradicts what another witness may say.  In many
15  of these cases, it is -- you know, there's -- it's
16  a straight line with -- with no curves in it in
17  terms of who they believe the guilty person was.
18      Q.   And, sir, the last line of that says:
19  Many of the investigative interviews of Maysonet
20  while he was in custody were not documented in GPRs
21  or a supplemental report.
22          Do you see that?
23      A.   I do.
24      Q.   And I'm just trying to understand this.

THOMAS TIDERINGTON, 04/28/2023                    Page 118..121

Page 118

1        Is it your position that if an
2 investigator interviews or interrogates a suspect,
3 leaves, and comes back and interviews or
4 interrogates a suspect again, that they should
5 create two reports?
6        MS. BONJEAN:  Objection to the form of that
7 question and relevance to the facts of this case,
8 but go ahead.
9        THE WITNESS:  No.  But in this case, there
10 wasn't even one report done of multiple interviews
11 of Maysonet.  And I don't consider -- I don't
12 consider the final statement to the state attorney
13 or to the prosecutor as a summary of what was said
14 in four, five, or six other interviews.
15        I don't think it's logical or
16 believable to think that the first interview was
17 identical to the same interview that was
18 transcribed by the court reporter.  It's illogical
19 to conclude that.
20        Did he deny it initially?  Did he
21 offer an alibi initially?  What were his words?
22 And -- and again, this case like other -- unlike
23 other cases where there's perhaps tangible
24 evidence, relied solely on the dubious words of

Page 119

1 gang members or codefendants in this case.
2        So it was more important to document
3 these words if that was the sum and total substance
4 of the evidence that was going to be used against
5 these individuals.
6 BY MR. BRUEGGEN:
7    Q.   Okay.  Sir, and so I think you
8 appreciated what I was asking, and I thank you for
9 that answer.
10        Are you saying that the sup report
11 that Detective Halvorsen prepared did not document
12 the interviews appropriately --
13    A.   Well --
14    Q.   -- or was not appropriate to document
15 the interviews?
16    A.   Can we look at that and look at that
17 point?  I -- I want to be specific.  If we're -- if
18 you only want me to answer from a 10,000 foot view,
19 I can answer that, but ...
20    Q.   No, that's fine.  If you want to look
21 at that, let me share, and we'll mark that as
22 Exhibit 8, which is the investigative file.
23
24

Page 120

1        (Deposition Exhibit No. 8,
2        Witness Tiderington, was marked
3        for identification 04/28/2023.)
4    MS. BONJEAN:  You want us to get the
5 investigative file?
6    MR. BRUEGGEN:  Yeah, if you could, and I can
7 tell you the page.  I'm trying to pull it up myself.
8    MS. BONJEAN:  All right.
9    MR. BRUEGGEN:  It's at page 47 I believe.
10        Yes, starting at page 47.
11    THE WITNESS:  Yeah.
12 BY MR. BRUEGGEN:
13    Q.   And, sir, let me put it up on the
14 screen, make sure we're looking at the same page.
15    A.   Okay.
16    Q.   Is this -- I'm asking you to look at
17 page 47.  This is the sup report that I'm referring
18 to that Detective Halvorsen prepared.  Is that the
19 document you're looking at?
20    A.   Is that what he -- well, again, how do
21 I know he prepared that?
22    Q.   Okay.  That -- well, his name is on
23 there, so he is one of the preparing officers; is
24 that fair?

Page 121

1    A.   Right.  And it appears that it was
2 approved by a sergeant, and this was a report that
3 was prepared on August 23, 1990.
4    Q.   Correct.  And in the bottom right-hand
5 corner, it says RFC-Maysonet 47?
6    A.   Correct.
7    Q.   And it's an eight-page document.  Goes
8 through RFC-Maysonet 54, okay?
9    A.   I see that, yes.
10    Q.   Okay.  And if we go to -- and this is
11 specifically related to -- strike that.
12        On page 50, there's -- the third
13 full paragraph, it talks about an interview of
14 Mr. Maysonet by Mingey and Montilla.
15        Do you see that, sir?
16    A.   Yes, where Detective Montilla speaks
17 Spanish, yes.
18    Q.   Okay.  And so this is documentation of
19 that interview, right?
20    A.   Well, not by the detectives that
21 conducted the interview.  Apparently I didn't see
22 their name on as preparing this report.  It
23 appears -- and again, that's I think a deviation of
24 acceptable police standards for the officer to not

THOMAS TIDERINGTON, 04/28/2023                                    Page 122..125

Page 122

1  have documented this in the police report.
2        How did he -- and again, I know
3  you're not here to answer my questions, but how was
4  this information communicated to the person that
5  wrote the report?
6        I don't even know who actually wrote
7  the report.  There were several signatures on the
8  report.  And I -- I understand that Chicago claims
9  that the person's whose name appears first on the
10  line is the person that authored the report, but
11  that seems to be somewhat unusual.
12        So again, I -- I know I kind of went
13  off on a tangent, so I -- I'm sorry.  Could I --
14  did I answer your question?  If not, if you could
15  please re -- re-ask that.  And I apologize.
16   Q.   Not exactly.  My -- my question was
17  simply:  Does this document that there was an
18  interview of Mr. Maysonet on July 15, 1990, by
19  Sergeant Mingey and Montilla?
20   A.   Right.  But the report wasn't written
21  on July 15th.  I mean, I think we all agree on
22  that.  It was written some -- one month later,
23  perhaps.
24   Q.   Yeah, no, I -- I appreciate that.

Page 123

1        But I'm just asking if this
2  documents that interview.
3   A.   Well, I don't know if it document -- it
4  didn't properly document it.  There's no way
5  anybody could argue -- well, I guess you could, but
6  no -- it's a deviation of acceptable police
7  standards to have a person that was not part of the
8  event document something a month and a half later
9  and say that this was what happened without, you
10  know, explaining, No. 1, how that was communicated
11  to the officer that authored the report.
12        Certainly in the departments that
13  I'm experienced with and have -- have been involved
14  with, this never would have happened.  That
15  sergeant would have been required to document this
16  interview in a supplemental report, and the
17  translator would have been required to document his
18  investigative actions as well.
19   Q.   Okay.  And again, setting aside what
20  you just told us, the fact that that interview
21  occurred is documented in this report, right?
22   A.   Not properly, no.  I -- I guess
23  we're --
24   Q.   But sir, sir, listen to my question.

Page 124

1        The fact that it occurred was
2  documented.  I'm not -- again, I said setting aside
3  everything you told us about, whether it was proper
4  or improper, it is actually documented, right?
5   A.   Well, I would agree that it was
6  documented by a detective that was not part of the
7  investigation, had no idea what actually occurred
8  there, and I would not consider that to be
9  documentation that this is what occurred on
10  July 15th between Sergeant Mingey and the
11  detectives.  So I do not think it's documentation
12  of -- of the interview.
13        Certainly it might be Detective
14  Halvorsen's description of what he thought happened
15  there, but I don't know that there's any
16  documentation that this is what occurred there.
17   Q.   Okay.  So it notes July 15th, but we
18  don't know if that's accurate or not because the
19  persons who were involved on July 15th didn't draft
20  the report.  Is that what you're saying?
21   A.   Didn't print out the report?
22   Q.   Didn't draft the report.
23   A.   I think that's -- I think that's a very
24  logical conclusion that you drew.

Page 125

1   Q.   Okay.  But again, there is notation
2  that on July 15th there was this communication, and
3  Mr. Maysonet has admitted that he did meet with
4  Sergeant Mingey and Mr. Montilla on July 15th,
5  right?
6   A.   In his deposition, I -- I don't know --
7  I think Maysonet did acknowledge that they came to
8  the jail, so I -- I do believe that there's
9  documentation confirming that Mr. Maysonet said
10  that he met with these detectives, yes.
11   Q.   And, sir, just to clarify, if you look
12  right below this, it's the August 1st visit that
13  was at the jail.  This July 15th is at Area Five at
14  the detective division.
15   A.   Yeah, I --
16        (Simultaneous cross-talk.)
17   Q.   I'm sorry --
18   A.   -- yes.  Yes.
19   Q.   So but do you recall that Mr. Maysonet
20  basically admitted that he did talk to Sergeant
21  Mingey and Detective Montilla on July 15th of 1990?
22   A.   I believe -- and again, I'd have to
23  review that, but I do believe that that's what he
24  said.

THOMAS TIDERINGTON, 04/28/2023                          Page 126..129

Page 126

1    But I also believe he said he
2 spoke -- he spoke Spanish to them, I think it's
3 what he testified to.
4    Q.   And again, sir, I'm just going -- it's
5 a very simple fact.  Just the fact that -- the fact
6 that this meeting occurred on July 15th is agreed
7 by Mr. Maysonet and it's noted here in the police
8 report, right?
9    MS. BONJEAN:  I'm going to object to -- are
10 you talking about just the mere fact of a meeting?
11    MR. BRUEGGEN:  Yeah, that there was a
12 discussion.  That's -- that was the question.  That
13 simple.
14    THE WITNESS:  I understand Maysonet testified
15 that he did meet with these officers on two
16 occasions.
17 BY MR. BRUEGGEN:
18    Q.   All right.  And so obviously what
19 occurred during that meeting is the dispute, right?
20    A.   Well, the documentation -- the doc --
21 the lack of documentation is the opinion that I
22 offered, yes.
23    Q.   Yes.  But I'm saying, and I believe you
24 have this in your report, is there's -- there's two

Page 127

1 things -- there's two sides to this story.  There's
2 the police report side that says what happened and
3 what Mingey and Montilla testified about, and then
4 there's Mr. Maysonet's side to the story, right?
5 Two competing stories.
6    MS. BONJEAN:  Objection to the -- objection
7 to the form of that question.
8    THE WITNESS:  And again, I'm not trying to be
9 difficult.  I'm just trying to be precise in my
10 answers to what my interpretation of your question.
11    I don't know if they're disputing
12 what happened during this meeting.  I -- I think my
13 opinion more related to the fact that there was not
14 proper documentation of this meeting.
15    So I don't know -- I'd have to look
16 at the depo to see if there's a factual dispute as
17 to what occurred during these two meetings.  But
18 the opinion that I offered was -- and this is why
19 we're debating and arguing about this right now, is
20 because there is no documentation by the detectives
21 that participated as to what occurred.
22 BY MR. BRUEGGEN:
23    Q.   Okay.  And I am going to assume, but we
24 could talk about it, that you would take the same

Page 128

1 position as to the documentation right below that
2 about the August 1st meeting at the Cook County
3 Jail; am I correct?
4    A.   You are correct that there was no
5 supplemental reports done by either of the --
6 either of the officers that participated in this
7 interview.
8    Q.   Okay.  But my -- my statement was that
9 you're -- let me -- let me just do it.  Sorry.
10    A.   That's all right.  I know it's
11 complicated.
12    Q.   I'm trying -- I appreciate you're being
13 very precise, and I'm trying to be precise.
14    So I think you explained that you
15 take issue with the documentation of this
16 August 1st meeting as it's documented in the sup
17 report.
18    MS. BONJEAN:  Objection to the form, but go
19 ahead.
20    THE WITNESS:  The -- the lack of
21 documentation by the investigators that
22 participated, as well as the information provided
23 by the author of the report, whoever it was,
24 whether it was Halvorsen or somebody else, as to

Page 129

1 how the information was communicated to him.
2    If it was communicated to him by
3 virtue of notes taken by the sergeant or the
4 detective that translated, according to Chicago PD
5 policy at the time, those notes would have been
6 required to be preserved, and they should have been
7 completed based on the policy on the GPR, and then
8 incorporated into the police report.
9    So none of those things happened.
10 I -- I don't know which violation there was, but
11 there was many violations based on just the review
12 of these two paragraphs.
13 BY MR. BRUEGGEN:
14    Q.   Okay, sir.  And I just want to make
15 sure I understand.
16    We talked about earlier about where
17 you have multiple detectives who are all working
18 together, they can do a joint report, even if they
19 might have had slightly different roles as long as
20 it's being done together?
21    MS. BONJEAN:  Ob --
22 BY MR. BRUEGGEN:
23    Q.   Do you remember that questioning, or
24 no?

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 04/28/2023                              Page 130..133

Page 130

1    A.   That's -- no, that's not what I had
2  testified to at all.
3         And I said if they simply were -- if
4  you have five detectives in a -- and this is a
5  hypothetical.
6         If you have five detectives in a
7  room interviewing an English speaking witness and
8  one detective documented that interview I believe
9  would be appropriate.
10        If you have six detectives working
11 on a case and two are interviewing Mrs. Smith and
12 the other two are interviewing Mr. Jones, it would
13 be inappropriate for one person to -- who was not
14 present during those conversations, to document in
15 a police report what was said during these
16 interviews.
17   Q.   Okay.  So you could not have multiple
18 authors in the same police report if they had done
19 different investigative tasks.  Is that what you're
20 saying?
21   A.   I think -- if I understand your
22 question, I think police practices require the
23 investigator to document their activity.  And I --
24 it's not this farfetched or histor -- it's just

Page 131

1  common sense.
2         And even if you look at the officers
3  that responded initially, and in what many of these
4  cases that I've looked at, the officers, the patrol
5  officers that responded initially to these crimes,
6  they document what they did.  They document that, I
7  spoke to Mr. Smith or Mrs. Jones, here's her
8  address, and this is what -- what she said to me.
9         They don't pass that information --
10 or at least on the cases that I've looked at, they
11 don't pass that information on to one officer who
12 then documents for all.  You know, these notes are
13 taken as they're -- as the interview is taking
14 place, and I -- I believe that those notes are
15 important to the investigation.  Or should be --
16        (Simultaneous cross-talk.)
17   Q.   All right.
18   A.   -- important to the investigation.
19   Q.   And, sir --
20   A.   I'm sorry.  And lastly, I -- I know, I
21 just want to close this point.
22        The other point is this interview
23 apparently occurred on July 15th, the one that
24 you're suggesting in the -- was documented in the

Page 132

1  police department by Halvorsen, but the report
2  wasn't written until August 24th.  I would also
3  find that to be a deviation of acceptable police
4  practices.
5         You have to conclude -- if this
6  interview occurred on July 15th, 1990, where was --
7  were there notes of this interview?  How did
8  Halvorsen know to write this on August 24th?
9         I've also noted that the GPRs that
10 were contained in the prosecutor file did not
11 mention or reference any of these events that took
12 place here.
13        So even if -- again, I -- I know I'm
14 going back to the question that you asked earlier.
15 I guess you suggested that the GPRs were somehow
16 purged from the file, but there was no GPRs or
17 notes about these interviews that I reviewed that
18 came from the prosecutor's file, which caused me to
19 conclude that there was no documentation of these
20 events.
21   Q.   Okay, sir.  But you've already said
22 there was documentation of these events.  You just
23 think it was not proper, right?  Or did I
24 misunderstand your further testimony?

Page 133

1    A.   I don't believe they're -- I mean, can
2  I go home tonight and tell my son what happened and
3  he documents this interview and says, This is what
4  occurred?
5         You know, maybe it's a placeholder.
6  Maybe there's a mark on a calendar that this
7  occurred.  But there -- there certainly -- and that
8  was a terrible example, but there's no -- no
9  logical reason for these officers, these
10 investigators, Mingey and the translator, not to
11 have completed a supplemental report detailing what
12 happened.
13        I mean, this was -- apparently he
14 confessed to a murder.  I believe that's pretty
15 important stuff that should have been documented by
16 the officer that heard the confession.
17        Halvorsen simply -- I don't consider
18 this to be documentation of the event.  He had no
19 way of knowing this.
20   Q.   Okay.  So I just want to make sure I
21 understand the deviations.
22        One, it was not documented at the
23 time?  Is that one of the deviations you're
24 pointing out for the -- let's focus on just the

THOMAS TIDERINGTON, 04/28/2023                     Page 134..137

Page 134

1 July 15, 1990. Is that one of the deviations
2 you're pointing out?
3      A.    That's correct.
4      Q.    Two, it was not documented by one of
5 the people who participated in the interview on
6 August 15th of 1990.
7      A.    That's fair, yes.
8      Q.    And, Three, there's no indication that
9 one of the people who participated in the
10 interviews provided this information to whoever
11 drafted this sup report.
12     A.    That's correct.
13     Q.    Any other deviations for just the
14 July 15, 1990? And I don't want you to repeat them
15 all, sir. I'm really looking trying to just make
16 sure I understand this kind of --
17          (Simultaneous cross-talk.)
18     A.    No, I --
19     MS. BONJEAN: Okay. Objection to the form of
20 that question, but you can answer.
21     THE WITNESS: I think -- for those two
22 paragraphs, I think it -- based on the questions
23 you asked, I think I've fully explained what --
24 what my opinions were relating to the documentation

Page 135

1 or the lack of documentation of these interviews,
2 yes.
3 BY MR. BRUEGGEN:
4      Q.    Thank you, sir.
5          If we could go back to your report,
6 and I'll put this back up so I can show you the
7 page.
8     MS. BONJEAN: His report?
9     MR. BRUEGGEN: Yeah, his report.
10    THE WITNESS: I got it.
11    MS. BONJEAN: You got it?
12    THE WITNESS: I'm assuming we're going to
13 back to the police report, so I'll keep that handy.
14 BY MR. BRUEGGEN:
15     Q.    Yeah, sir, I imagine we'll probably
16 bounce back and forth since you'll want to look at
17 the police report, which is perfectly fine, you
18 know, as we address your opinions in your report,
19 okay?
20     A.    Yes.
21     Q.    And so in paragraph 8, you note,
22 Investigative -- investigative actions that could
23 have been taken to develop leads about who was
24 responsible for the murders in the weeks and months

Page 136

1 after the murders were not followed up on, and
2 statements that were allegedly obtained from the
3 plaintiff and other witnesses were not tested
4 against known or otherwise corroborated through
5 further investigation.
6      Q.    Do you see that, sir?
7      A.    I do.
8      Q.    And I just want to make sure I fully
9 understand.
10          What invest -- when you say
11 investigative actions, are you referring to stuff
12 separate and apart from Mr. Maysonet?
13     MS. BONJEAN: Objection to the form, but you
14 can answer if you understand.
15     THE WITNESS: Well, I think I -- I understand
16 your question. Again, I think it's an
17 investigator's duty and responsibility if they're
18 going to charge an individual, they have to
19 consider the evidence that they have against the
20 individuals.
21          And in this particular case, there
22 was -- I did not see any investigative effort to
23 try to corroborate the statements of witnesses. I
24 saw no investigative effort to try to find what I

Page 137

1 call tangible evidence, the murder weapon, the
2 vehicle that was used.
3          I -- one of the key witnesses in
4 this case, one of the sisters, I -- I refer to her
5 as one of the sisters, they never even went out and
6 interviewed her. I think they talked with her on
7 the telephone.
8          So there were many things that I
9 believe were deficient in terms of what I would
10 have expected a reasonable investigator to have
11 done in this case, including -- and if they
12 believed Maysonet was the person that was
13 responsible, I would have had my detectives go over
14 and do a search warrant on Maysonet's home to look
15 for ammunition, to look for evidence that he was
16 responsible for this murder.
17          I would have had my investigators
18 locate the owner of the vehicle. I think he was
19 identified by some of the codefendants. I have not
20 seen any evidence in the file that indicates that
21 the vehicle was ever impounded, located, searched
22 for forensic evidence.
23          So there were many things that I
24 believe should have been done to corroborate the

THOMAS TIDERINGTON, 04/28/2023                    Page 138..141

Page 138

1 words -- perhaps the alleged words of the witnesses
2 that were essentially testifying against each
3 other.  And this was a case where everybody was
4 pointing the finger at somebody else, and there was
5 no tangible or corroborative -- corroborative proof
6 as to who actually did this crime.
7 BY MR. BRUEGGEN:
8     Q.   All right, sir, and now I want to try
9 to focus you on -- in on, investigative actions
10 that could have been taken to develop leads.  Just
11 that part.
12          And so this is prior to Mr. Maysonet
13 coming on the radar, what investigative actions
14 are -- or strike that.
15          Are you referencing investigative
16 actions that could have been taken prior to
17 Mr. Maysonet coming on the radar of the police or
18 known to the police?
19     MS. BONJEAN:  Objection to the -- to the form
20 of that question.  I don't even know what "coming
21 on the radar" means.
22          But if you do, you can answer.
23     THE WITNESS:  Well, I -- again, there was
24 a -- a couple different things.

Page 139

1          I believe that the witnesses, the
2 sister should have been obviously interviewed in
3 face-to-face interviews about this double homicide.
4          Once the investigators determined
5 that there were suspects, I believe there was
6 investigative actions that they should have taken
7 that would have either proved that they did it, or
8 perhaps proved that they did not commit these
9 crimes.
10 BY MR. BRUEGGEN:
11     Q.   Okay.  And, sir, I just want to make
12 sure that I understand.
13          Do you believe any of the defendants
14 were initially involved in this investigation in
15 the month of May in 1990?
16     MS. BONJEAN:  Objection to the form of the
17 question.
18     THE WITNESS:  I'm sorry.  Do I believe that
19 they were known or suspected of the crime in May
20 of -- shortly after the shooting I think is what
21 you're asking, right?
22 BY MR. BRUEGGEN:
23     Q.   I -- I'm sorry.  I shouldn't have used
24 the word "defendants."

Page 140

1          What I -- what I'm trying to find
2 out is you're talking about, you know, what could
3 have been done to further this investigation
4 shortly after it happened.
5          And I'm trying to make sure, do you
6 believe that any of the defendant officers in this
7 case were involved in the investigation of this
8 case in May of 1990?
9     MS. BONJEAN:  Okay.  I'm going to object to
10 the form of that question to the -- you can answer.
11     THE WITNESS:  I think I understand what
12 you're asking.
13          I don't believe that they were
14 involved until after -- and I can go back and look,
15 but I think the initial involvement began when
16 Sergeant Mingey said there was some type of
17 connection between another shooting.
18          So I think to answer your question,
19 I don't believe -- I could be wrong on this.  I
20 don't believe that any of the defendants were
21 involved prior to Mingey's theory that -- that the
22 shooting was connected to another shooting.
23 BY MR. BRUEGGEN:
24     Q.   Okay.  And so when you were talking

Page 141

1 about the interview of, and you call them the two
2 sisters -- I believe they're related in some way,
3 but I don't recall which way -- not being
4 interviewed in person.
5          You're not saying that was something
6 that one of the defendant officers in this case did
7 inappropriately, right?
8     A.   Well, at some point when the officers
9 decided they were going to charge Maysonet and the
10 others, yeah, they should have gone out, they
11 should have looked at the initial police reports,
12 they should have re-interviewed witnesses that had
13 spoken to the police on this night.
14          So yeah, it would have been a
15 deviation of acceptable police standards for the
16 charging officers not to have gone out and -- and
17 met with and re-interviewed the sisters who were
18 really the only uninterested witnesses in this
19 entire case.
20     Q.   And again, you read the reports about
21 the sisters where neither of them were an
22 eyewitness.  You understood that, right?
23     A.   I'm sorry?  That what?
24     Q.   Neither of the two sisters, as you

THOMAS TIDERINGTON, 04/28/2023                                 Page 142..145

Page 142

1  reference them, were eyewitnesses, right?
2       A.   No, I understand.  But I also
3  understand that they had valuable information.
4  They overheard arguing.  They described various
5  voices.  They heard different names being used.
6           So they were the best -- at least in
7  my opinion, the best source of evidence that the
8  investigators had and that information should have
9  been fully vetted.
10      Q.   And prior to the July 15th meeting
11 between Sergeant Mingey and Mr. Montilla and
12 Mr. Maysonet, what other investigative -- are you
13 saying other investigative tasks should have been
14 undertaken --
15           (Simultaneous cross-talk.)
16      MS. BONJEAN:  Objection, foundation.
17 BY MR. BRUEGGEN:
18      Q.   -- prior to that July -- prior to that
19 to July 15th meeting?
20      A.   Well, I don't know what else was being
21 done because there is no documentation as to what
22 was being done from the 15th up until Mingey had
23 this hunch that the case was involved.  So the
24 investigative record is -- is incomplete in terms

Page 143

1  with what else the investigators were doing.
2           If -- I guess I assume nothing was
3  being done because there is no documentation, but I
4  would think that if there was a double murder that
5  the investigators would have been out there doing
6  what they could do and they would have documented
7  their investigative efforts.
8           So my conclusion on that was either
9  they did nothing, which I believe would be a
10 deviation from acceptable police standards, or they
11 were trying to identify who committed these murders
12 by going out and knocking on doors, interviewing
13 witnesses, looking at gang books, talking to gang
14 members.
15           If they were doing this and they
16 failed to document it, document their actions, that
17 would also have been a deviation from acceptable
18 police practices and standards.
19           And whenever we get to a point where
20 we can take another 5 minutes and --
21      Q.   Yeah.  Why don't we take another
22 5 minutes right now.  Again, whenever you need a
23 break, sir, just let me know.  If there's an area I
24 just kind of want to finish up because just we want

Page 144

1  to knock it out, maybe I'll ask for a little
2  longer, but we can take a break right now.
3       A.   All right.
4       MS. BONJEAN:  We're going to do 5?
5       MR. BRUEGGEN:  Yes.
6       MS. BONJEAN:  Do you want to take a lunch
7  break at some point?
8       THE WITNESS:  I don't know.  Dave, I mean,
9  since I'm so cooperative, what time do you think
10 we're going to get done here today?
11      MR. BRUEGGEN:  It's probably going to take
12 the full -- you know, I don't know if it will take
13 the full time, but it probably will because I know
14 there will be other attorneys that may have some
15 questions for you, sir.  So if you want to take a
16 lunch break, we can do that.  You want to take just
17 a longer break for a snack or something, whatever
18 you want to do.
19      MS. BONJEAN:  I think we want to try to push
20 through.
21           How much time do we have on the
22 record?
23      THE LEGAL VIDEOGRAPHER:  Let me go ahead and
24 take us off the record.

Page 145

1           We're off the video record at
2  12:57 p.m.
3           (Recess taken.)
4       THE LEGAL VIDEOGRAPHER:  We are back on the
5  video record at 1:07 p.m.
6  BY MR. BRUEGGEN:
7       Q.   All right, sir.  Moving on in your
8  report, you have an opinion that:  Defendants used
9  intentionally and willfully manufactured and
10 falsified evidence.
11           And I could direct you to the top of
12 page 5.  I can show you on the screen, if that
13 would help.
14      A.   I can see that.
15      Q.   Okay.  And I wanted to ask you:  What
16 is the falsified evidence in this case that you're
17 referencing?
18      A.   Well, obviously both Guevara and
19 Halvorsen have not denied that the -- that
20 Maysonet's claims that he was coerced and tricked
21 and physically assaulted in order to tell the
22 officers what he believes they wanted to hear.  And
23 if the jury credits Maysonet's testimony, that that
24 certainly would have been a deviation from

THOMAS TIDERINGTON, 04/28/2023                         Page 146..149

Page 146

1  acceptable police standards and practices.
2       Q.   And so let me make sure I understand
3  you.
4            Are you saying the falsified
5  evidence is Maysonet's confession?  Is that what
6  you're implying?
7       A.   If -- again, if the jury credits
8  Maysonet's testimony that -- that he did not --
9  that he was coerced into providing this confession,
10 certainly.
11      Q.   Any other falsified evidence that
12 you're referencing in this line?
13      A.   There may have been others.  Again, I
14 would have to review the -- the report, and
15 certainly I'll keep it on the back of my mind.  But
16 that's what I come -- comes to my mind at this
17 point.
18      Q.   Okay.  And so to be fair, you're not
19 saying there was falsified evidence.  Your opinion
20 is if Maysonet is believed, there was falsified
21 evidence used, right?
22      A.   That's fair, yes.
23      Q.   And if Maysonet is not believed, then
24 there was no falsified evidence.

Page 147

1       MS. BONJEAN:  Objection, form, speculation.
2       THE WITNESS:  I would have to think about
3  that question.  If Maysonet was believed, that
4  means there was no false -- I'd have -- if we can
5  come back to that question, I have to think about
6  that.
7  BY MR. BRUEGGEN:
8       Q.   That -- that's not a problem, sir, and
9  let me just re-ask it to keep it in mind.  But if
10 you can answer, answer.
11           So basically if Maysonet's story
12 about being beaten up in the police department by
13 Guevara and forced to provide a false confession,
14 if the jury disregards that, is there any other
15 falsified evidence?
16      A.   Well, yeah.  There's other witnesses.
17 Frederico, I believe -- or maybe I don't have his
18 name correct.  But he I believe has testified that
19 he was in a lineup and that he was identified in a
20 lineup as part of this investigation.  I've seen no
21 document.  And that Guevara told him that he was
22 picked out in the lineup.
23           So if that was true and that was not
24 documented, I think it would be a deviation of

Page 148

1  acceptable police practices.  And likewise, that
2  that would have been, you know, highly
3  inappropriate for him to not have documented an
4  individual that may have been identified in a
5  lineup.
6       Q.   Okay, sir.  And again, I was focused on
7  falsified evidence.  And obviously if they made up
8  the lineup but they didn't document it, they're not
9  really falsifying evidence.  They're just making it
10 up for purposes of talking to a suspect, right?
11 That's not falsifying evidence, or is it?
12      MS. BONJEAN:  Objection to the form of the
13 question.  Objection to the form of the question.
14           Are you talking about evidence that
15 was intro -- false evidence that was introduced at
16 trial or just -- I mean, it's not a clear question.
17 BY MR. BRUEGGEN:
18      Q.   No.  And again, sir, I'm just focusing
19 on your report where you said "falsified evidence."
20           And so maybe the question should be
21 posed to you is:  What are you talking about when
22 you say "falsified evidence"?
23      A.   Well, if -- if there was a lineup and
24 somebody was selected out of that lineup and that

Page 149

1  information was not documented any way and then
2  they charged Maysonet with the crime and knowing
3  that another suspect had been identified, certainly
4  that would -- you know, all of this information
5  would be false.
6            I mean, if they knew that somebody
7  else had been identified as the shooter in this
8  case and they went forward with -- with the
9  information, which of course Maysonet disputes,
10 certainly that would be a form of falsifying police
11 reports.
12      Q.   Okay.  So and then next, you say
13 "manipulated witnesses."
14           And I just wondered if you could
15 list which manip -- which witnesses were
16 manipulated.
17      A.   Well, I think the codefendants,
18 Maysonet and the other defendants that were charged
19 certainly were in my opinion manipulated.
20           One was told that the other one
21 identified him as the shooter.  If the jury credits
22 the testimony of Maysonet that if he testified that
23 he was going to be allowed to leave or if he -- if
24 he gave a confession that they would not charge

THOMAS TIDERINGTON, 04/28/2023                    Page 150..153

Page 150

1 them, I think that is inappropriate.
2        Perhaps there's other things that
3 I -- as we go through the report that I can think
4 of as well.
5    Q.   No.  I appreciate that, sir.
6        I was actually just looking for the
7 names of the witnesses that you are noting were
8 manipulated as you state in this sentence in your
9 report.
10   A.   Well, I also believe that Rosa -- it's
11 unclear -- when I say manipulated, it's unclear as
12 to what exactly she told the officers.  I have not
13 seen any notes or GPRs indicating specifically what
14 was asked of her or what she responded and what
15 answers she responded to what questions were asked.
16       If you look at her statement,
17 apparently a month and a half or two months later,
18 according to the police report -- and again, I'm --
19 danger area here because I'm paraphrasing what I
20 recall.  I mean, it -- I mean, I -- the caveat is
21 that if we could go and I can look at it
22 specifically, I can provide additional details.
23       But essentially, the statement says
24 that on a particular date, you know, these Fro and

Page 151

1 Gonzalez or whoever the other codefendants were
2 came to the house and got a 9-millimeter.
3        Well, it occurred to me -- my
4 question would be how would she have remembered
5 specifically that date and that time a month and a
6 half later.  So there's a lot of questions that I
7 have about her testimony or her statements to the
8 police regarding what she saw or didn't see.
9    Q.   Okay.  And let me just clarify.
10       When you say "manipulated
11 witnesses," are you saying the police manipulated
12 the witness to say what they wanted the witness to
13 say, or the police manipulated what the witness
14 said in the report?
15   A.   I would say probably a combination of
16 both.  We don't know what was said.
17       Again, you've identified another
18 problem that I find in reviewing this case file
19 because there are no contemporaneous notes of what
20 was said the first time that Rosa was interviewed.
21 I don't even think it indicates who interviewed
22 her, to tell you the truth, if I -- if I remember
23 correctly.
24       So we don't know what was actually

Page 152

1 said.  We don't know how much -- how much
2 information was provided to her before Halvorsen
3 wrote -- wrote the information in his report.
4    Q.   But we do have a handwritten statement
5 that she signed, right?  Do you recall that?  You
6 just talked about it?
7    MS. BONJEAN:  Objection to the form of that
8 question, but go ahead.
9    THE WITNESS:  She wrote a handwritten
10 statement?
11 BY MR. BRUEGGEN:
12   Q.   No, it was a handwritten statement that
13 was written that she signed.  So the state's
14 attorney wrote it and she signed it?
15   MS. BONJEAN:  Objection to the form of that
16 question, assumes facts not in evidence.
17       You can answer.
18   THE WITNESS:  That also occurred to me to be
19 highly unusual.
20       And in most witnesses that I'm
21 familiar with in cases that I've been involved
22 with, if you're going to take a handwritten
23 statement from a witness, the witness typically
24 handwrites the statement out.

Page 153

1        I don't need to -- if I was the
2 investigator in this case or the supervisor in this
3 case, I don't need to have a handwritten statement
4 from the prosecutor.  I want a handwritten
5 statement from the witness.
6        And -- and again, I believe that
7 that is the deviation from acceptable police
8 practices and standards as well.
9 BY MR. BRUEGGEN:
10   Q.   Okay.  So you're saying that it would
11 be a deviation from police practices for a police
12 officer to write the statement and then have the
13 witness read it and sign off that it's true and
14 accurate?
15   A.   Well, it makes no sense.  Why -- why
16 wouldn't you have the witness write out her
17 statement?  I mean, this is -- this is a question
18 that pondered -- that I pondered when I reviewed --
19 or when I review this.
20       And in most police departments that
21 I'm familiar with, certainly we -- on a homicide
22 murder investigation, even by 1990, we would be
23 tape recording these conversations, and there would
24 be no dispute as to what the witness said.

THOMAS TIDERINGTON, 04/28/2023                     Page 154..157

Page 154

1 Certainly they could have went up to the Radio
2 Shack for 1999 and bought a tape recorder and
3 captured, quote, this best evidence.
4          And really when you have a case
5 where there's not tangible evidence -- murder
6 weapon, clothing, forensics -- the only evidence
7 that you have is testimony.  That becomes the --
8 that becomes the most meaningful evidence, so it's
9 important.  Every word of what a witness says, in
10 my view, is extremely important if you're going to
11 rely solely on -- on evidence that's -- that's not
12 tangible evidence.
13          So they had the ability to tape
14 record these conversations back in 1990.  And if
15 they weren't going to tape record them, certainly I
16 think it would have been best practice for them to
17 have the witness in their own words write out the
18 handwritten statement.
19          It's -- it's in my view highly
20 unusual to handwrite a statement out and then tell
21 the witness to sign it.
22     Q.   Okay.  Sir, and now just to clarify, is
23 it highly unusual, or is it a deviation from
24 accepted practice?  Because you've said both now --

Page 155

1          (Simultaneous cross-talk.)
2     A.   I think they're both --
3     Q.   -- and I just want to make sure --
4     A.   I don't know if there's a difference.
5     Q.   Okay, I got you.
6          So question for you:  Back in 19 --
7 late 1980s, early 1990s when you were the sergeant
8 at the special investigations, did you guys tape
9 record or video record all interviews?
10     MS. BONJEAN:  Objection to form.
11     THE WITNESS:  When you say "all interviews,"
12 probably not all interviews.  But certainly
13 important -- a case such as this, certainly.
14 BY MR. BRUEGGEN:
15     Q.   So in all murder cases, any time you
16 were interviewing a suspect, you would have an
17 audio recording or a video recording?
18     MS. BONJEAN:  A suspect?
19 BY MR. BRUEGGEN:
20     Q.   Yeah, I'm limiting it just to
21 interviewing a suspect.
22     A.   Well, when you say "all," I -- I hate
23 to answer questions on all.  But it was a -- it was
24 an acceptable practice and was standard practice by

Page 156

1 1990.
2     Q.   Okay.  So maybe not all, but the
3 majority of all investigations that you were a part
4 of of homicides, you would audio record or video
5 record any important witness or suspect.
6     MS. BONJEAN:  Objection to the form,
7 speculative, and an incomplete hypothetical.
8     THE WITNESS:  Certainly there -- certainly
9 there would be exceptions, but it would be our
10 practice to record conversations, yes.  And I think
11 that was an acceptable practice back in the -- in
12 the '90s.  And certainly the technology was
13 available to us.
14          Even by 1990, we had interview rooms
15 that had the ability to record conversations as
16 well as video that could record them.
17 BY MR. BRUEGGEN:
18     Q.   Okay.  So at the Fort Lauderdale Police
19 Department, you had interview rooms that had video
20 cameras set up to record interactions?
21     MS. BONJEAN:  Objection, misstates his
22 testimony, and also lack of foundation.
23     THE WITNESS:  And again, we're -- by -- by
24 1990, yes, we were recording conversations.  And I

Page 157

1 don't know if it was as formal as we are today in
2 terms of the equipment and technology, but we
3 certainly had the ability to capture evidence by
4 tape recording the information as well as video
5 tape recorded it.
6 BY MR. BRUEGGEN:
7     Q.   Okay.  And was there a policy in place
8 at the Fort Lauderdale Police Department in -- just
9 concerning 1990 about audio or video recording
10 interrogations or interviews?
11     MS. BONJEAN:  Objection to the form.
12     THE WITNESS:  I don't know if there was a
13 policy in place by then or not.  I guess I'm
14 speaking of a practice, and I -- I believe there
15 was a policy because we had to account for how we
16 were going to -- most of the -- most of the tape
17 recordings were placed into evidence as I recall.
18 BY MR. BRUEGGEN:
19     Q.   And these tape recordings you're
20 talking about, is this just like the handheld
21 Dictaphone that would be set on the table while
22 talking to someone?
23     A.   Initially, yes.
24     Q.   And when was initially?

THOMAS TIDERINGTON, 04/28/2023                           Page 158..161

Page 158

1    A.   You know, again, I -- I know we -- you
2  know, we were tape recording conversations in the
3  early '80s.  It was not that unusual for us to tape
4  record conversations.  And I believe over time, it
5  evolved into a more formalized practice of tape
6  recording and capturing evidence.
7          That's really what we do as
8  investigators; we capture evidence.  And the words
9  of a suspect are -- is probably the best evidence
10  that you can capture.
11         So the question I would ask and the
12  teaching that I've done and when I instruct police
13  officers I would say, Why wouldn't you want to
14  capture the best evidence?
15         And the best evidence perhaps is the
16  defendant testi -- not testifying but providing new
17  information.  And essentially, if you have a case
18  where you're not going to find -- have the murder
19  weapon or you're not going to have an eyewitness,
20  certainly the best evidence is going to be the
21  words of the suspect.
22    Q.   Okay.  And, sir, if we can just move on
23  in your report at paragraph 10?
24    A.   Yes.

Page 159

1    Q.   You're talking about, a vehicle
2  suspected to have been used in a double murder
3  should be located immediately, stopped, and a
4  warrant should be obtained to search and impound
5  the vehicle.
6          Do you see that?
7    A.   I do.
8    Q.   Okay.  And in this investigation, what
9  was the basis for the belief that a certain vehicle
10  was used in the double homicide?
11    A.   Well, the basis was the information --
12  and again, we don't have supplemental reports to
13  rely on.  We don't have notes.  We don't have any
14  details in the investigative file, so it's hard to
15  conclude.  I had to make some assumptions.
16         The assumptions or the information
17  about the vehicle came from some of the
18  codefendants, the defendants that were suspected of
19  committing this homicide.
20    Q.   Okay.  And so when that information
21  came about, that it was a blue car and I think
22  there was a make even, your belief is that the
23  police should have stopped that car and gotten a
24  warrant to search that car?

Page 160

1    A.   Well, I think there was more
2  information than it being a blue car.  I think they
3  had information about who owned the vehicle, and
4  that it was a vehicle that was owned by another
5  gang member, perhaps a father of a gang member.  So
6  they had information about who owned that vehicle.
7          And I -- I can look at the report,
8  but I don't recall what the name was, but it's
9  documented in the -- in the report.  And it struck
10  me as to -- you know, I mean, it's very glaring why
11  they would not have tried to find forensic evidence
12  in that vehicle.
13         I don't -- I haven't even seen any
14  evidence that they went out and interviewed the
15  owner of the vehicle.
16    Q.   Okay.  So -- and again, I appreciate --
17  you're basically saying that the vehicle was
18  identified because they knew the owner and they
19  knew the type and the make and stuff like that, so
20  they could have stopped it, right?
21    MS. BONJEAN:  Objection to the form of that
22  question.  Stop it?
23  BY MR. BRUEGGEN:
24    Q.   Could have stopped it and then sought a

Page 161

1  warrant to look at it, right?
2    A.   Well, again, I -- in looking at the
3  investigative file, there -- I have not seen any
4  evidence that there was any investigative effort by
5  the part of the detectives to identify who operated
6  that vehicle or any effort to find it by conducting
7  surveillance of the owner, knocking on the door of
8  the owner, asking the interview -- or interviewing
9  the owner of the vehicle to find out who was using
10  the car during this time period.
11         So I -- again, you know, it's one of
12  these investigative mysteries, as I call it.  Why
13  didn't they do any of this?
14         I mean, that's something that would
15  have been pretty standard in any type of a criminal
16  investigation of this nature where a vehicle was
17  used in conjunction with a double homicide.
18  Certainly that would have been an investigative
19  goal to find the vehicle and to impound it and
20  search it for evidence.
21    Q.   And, sir, when -- do you know how long
22  it was after the shooting that they learned about
23  this vehicle?
24    A.   How long?

THOMAS TIDERINGTON, 04/28/2023                    Page 162..165

Page 162

1    Q.   I'm asking if you know.
2    A.   Oh, we don't know that.
3         Again, there's no reports indicating
4  any type of investigative work from the day of the
5  shooting until -- I don't know, what was it -- a
6  month afterwards or several weeks afterwards.  So
7  we don't know exactly when this information came
8  about.  Maybe they had it sooner.  I don't know.
9         And I guess there would be one
10 theory where they didn't learn about the vehicle
11 until they began interviewing the suspects.  And if
12 that was the case, it still would have been
13 appropriate for them to go out -- even if it was a
14 year later, to go out and find that vehicle and to
15 search it.
16        Why -- again, I know you're not here
17 to answer my questions, but why would they not have
18 gone out and seized the vehicle is what I would
19 have asked myself or I would have required of the
20 officers.
21   Q.   Okay.  So the time that's passed from
22 the date of the incident until when you actually
23 did the search of the vehicle doesn't matter in
24 your mind?

Page 163

1    MS. BONJEAN:  Objection to the form,
2  misstates his testimony.
3    Also, Steve is in the room.
4    You can answer.
5    THE WITNESS:  Well, I think -- I think it is
6  important.  But even if that vehicle was found a
7  year later, it would have been acceptable police
8  practices for them to go out and look at the
9  vehicle and search it.
10        How do we know, you know, that some
11 ammunition wasn't found in between the seats?  How
12 do we know that clothing wasn't left in the
13 vehicle?
14        So I guess to your point it wasn't
15 six months, it wasn't a year, there weren't
16 multiple ownership, transfer of ownership in this
17 vehicle.  It was a relatively close period of time
18 after the shooting that they learned about the
19 vehicle.
20        When I say relatively short, several
21 weeks, which is not a long time when you're looking
22 for tangible evidence of a double murder.
23 BY MR. BRUEGGEN:
24   Q.   And, sir, I just want to provide you

Page 164

1  some dates.
2         So the murder happened May -- right
3  around May 25th, and the evidence of the vehicle
4  comes out right around August 22nd, 23rd?  So about
5  three months later, okay?
6         With that in mind, you said it's
7  acceptable to stop the vehicle and get a warrant to
8  search it, right?
9    MS. BONJEAN:  Objection, misstates his
10 testimony.  Misstates his testimony, form.
11        You can answer.
12   THE WITNESS:  Well, certainly.  The
13 investigation, if you would, heated up with the
14 identification of these suspects by Sergeant
15 Mingey.
16        So when that information was
17 developed, they learned of a vehicle.  And to
18 suggest -- and I don't know if this is what you're
19 suggesting, but if it is, to suggest that it was
20 too long of a time for the officers to have gone
21 out and knocked on the door and talked with the
22 owner of the vehicle, interviewed the owner, I
23 would also suggest -- and -- and again, I'm not a
24 lawyer here, and I'm not telling you -- I'm not

Page 165

1  suggesting that what a judge would have signed or
2  did not sign.  But I certainly would have presented
3  a search warrant affidavit to a judge in order to
4  seize that vehicle and to search it for evidence of
5  a -- of a double homicide.
6         Whether it was three months or three
7  years later, I still would have looked at that
8  vehicle.
9  BY MR. BRUEGGEN:
10   Q.   Okay.  And is it your opinion that the
11 failure to look at that vehicle, regardless of the
12 time, was a deviation of the standard of police
13 practices?
14   A.   Well, that.  And also not only looking
15 at the vehicle, interviewing the owner of the
16 vehicle to find out who was operating the vehicle
17 during this time period.  It doesn't matter if it
18 was three months.
19        To your point, maybe the car had
20 been detailed and maybe the car had been sold, but
21 I still would have expected the detectives to have
22 gone out and interviewed the owner of the vehicle
23 to try -- in an attempt to corroborate who may have
24 been using that vehicle during that time period.

THOMAS TIDERINGTON, 04/28/2023                          Page 166..169

Page 166

1        How do we know that the murder
2 suspects didn't come back and confide in that owner
3 of the vehicle, Hey, you better sell this car
4 because we just killed two guys and they might be
5 looking for it.
6        So of course, that -- it's a
7 deviation of acceptable police practices to not
8 have gone out and interviewed the owner of a
9 vehicle that was used in a double homicide. And it
10 was highly unusual.
11     Q.  And, sir, earlier you said you may have
12 made some assumptions in assessing the vehicle, and
13 I just want to know what those assumptions were.
14     A.  Well, I don't know if -- maybe
15 "assumption" was not -- not the correct word to
16 use. I forget exactly what context I used that in.
17        Again, you'd have to read that back.
18 I don't -- I don't remember -- I remember saying
19 the word, but I don't remember the context in which
20 I used that word.
21     Q.  Sir, moving on in your report, I wanted
22 to look at the next page, page 6.
23        And in this, you've basically
24 included some parts from one of the CPD training

Page 167

1 materials you looked at, right?
2     A.  That's correct.
3     Q.  And I trust that you've read that whole
4 section on the training materials?
5     A.  I read the section that was provided,
6 yes.
7     Q.  Okay. And then you cherry-picked these
8 two quotes out to include in your report?
9     A.  I used those quotes in the report, yes.
10     Q.  And you recall that the actual section
11 of the training was longer, right, than just these
12 two pieces?
13     A.  Certainly.
14     Q.  Okay. And again, you chose to pull
15 these two pieces out and not include everything
16 from that training, right?
17     MS. BONJEAN: Objection --
18     THE WITNESS: Well --
19     MS. BONJEAN: -- to the form, but go ahead.
20 You can answer.
21     THE WITNESS: Well, I'd have to look at the
22 entire document again. But certainly, I think any
23 reasonably trained police officer that has
24 conducted interrogations would be surprised to see

Page 168

1 these type of training, this type of training
2 material in a -- in a police department's training
3 of their investigators.
4        If I could read it, The ability --
5 the ability do -- and again, there's typos and I
6 make a lot of typos too. But, The ability do -- to
7 get the suspect to make incriminating statements is
8 the sign of effective detective. Detective must
9 develop a number of interviewing techniques. No
10 one technique will work with everyone.
11        I think that's highly unusual and
12 something that I would not have expected the
13 Chicago Police Department to endorse as -- in their
14 training material.
15 BY MR. BRUEGGEN:
16     Q.  And, sir, when you worked as a
17 detective in special investigations, did you ever
18 get suspects to confess?
19     A.  Guilty ones, yes.
20     Q.  Okay. And at the time when they
21 confessed, how did you know they were guilty?
22     MS. BONJEAN: Objection to the form,
23 misstates what his testimony was, but -- and you're
24 assuming -- that's like, How often do you beat your

Page 169

1 wife, question, but go ahead. You can answer.
2     THE WITNESS: Well, again, I -- thinking of
3 all the cases that I've been involved with, I don't
4 know of any case -- any case that I solely relied
5 on the statements of -- I guess the word dubious
6 individuals to charge somebody with a serious
7 felony.
8        What was always my investigative
9 goal is the statement is only one step in the
10 investigative process. If -- if a witness
11 confessed to a crime, I would still not consider
12 that to be the end of the investigation. I would
13 still go out and look for that vehicle that was
14 used in that homicide and talk to that owner and
15 send my detectives out to corroborate these
16 confessions.
17        So the guilty -- a confession is --
18 in many cases or in many situations is the -- the
19 beginning of an investigation and not necessarily
20 the end of the investigation.
21 BY MR. BRUEGGEN:
22     Q.  Sir, moving on to the next page, the
23 last paragraph, you talk about supervisors -- right
24 here.

THOMAS TIDERINGTON, 04/28/2023                    Page 170..173

Page 170

1        I don't have it up on the screen.
2  That would help if I actually put it up on the
3  screen. I'm sorry.
4        It says: Supervisors must probe
5  investigator about possible inconsistent evidence
6  and encourage additional investigation, and must
7  also conduct risk-assessment evaluations of cases.
8        You see that, sir?
9    A.  I do.
10   Q.  And I just want to make sure I
11 understand: What is a risk assessment evaluation?
12   A.  Well, it's clear what -- I mean, again,
13 in my mind as -- as a police chief or somebody that
14 has done audits of criminal files, is to determine
15 whether or not the information contained in an
16 investigative file is sufficient to ensure that the
17 person that we're charging with the crime is the
18 one that actually committed the crime.  So that's
19 what I mean by risk assessment.
20       I teach in many of my training
21 classes that, you know, police officers don't want
22 to put the wrong person in jail.  We want to make
23 sure that the right person is put in jail.  Not the
24 one that we can easily convict with a crime.

Page 171

1        So you know, I -- I teach the
2  standards should not necessarily be just probable
3  cause to arrest, but the investigation should
4  establish without a reasonable doubt that person
5  committed the crime.
6        I know it's not the legal standard,
7  but that's certainly what I teach officers, and
8  that's always been my personal standard.
9    Q.  And, sir, just so I understand, and
10 when you worked at Fort Lauderdale, could police
11 officers charge somebody with a crime, or did they
12 need to get the state's attorney's approval to
13 bring charges?
14   A.  No.  And that's a good point.  I mean,
15 I wanted to -- thank you for allowing me to clarify
16 that.
17       The charging document would have
18 come from the state attorney's office, but
19 certainly, a law enforcement officer, the
20 investigator has a -- has a significant say in
21 who's going to be charged and what evidence there
22 is against that person.
23   Q.  And did you need to get the state's
24 attorney's approval for those charges in Florida --

Page 172

1  let's start with just Florida -- before those
2  charges could be brought?
3    A.  Well -- yes.
4    Q.  Okay.  And what about in Michigan?  Is
5  it the same thing that you need to get the state's
6  attorney's approval for charges before the charges
7  are brought?
8    A.  Yes.
9    Q.  Okay.  So again, and let me make sure I
10 understand.
11       So when you were a detective in
12 Florida, you would investigate it, gather all your
13 evidence, and then you would present it to the
14 state's attorney for them to approve charges?
15   A.  That would be the process, yes.
16   Q.  And in that -- would there be times
17 when the state's attorney would ask you to do
18 additional investigation?
19   A.  I'm sorry.
20   MS. BONJEAN:  Yeah, sorry.
21       (Background interruption.)
22   MR. BRUEGGEN:  Hold on.  What -- is there
23 talk going on over there, sir, like amongst --
24   MS. BONJEAN:  Ashley --

Page 173

1    MR. BRUEGGEN:  -- the attorneys?
2    MS. BONJEAN:  -- and Steve were -- Ashley and
3  Steve are whispering about something unrelated,
4  probably lunch, and it was distracting.  So I
5  have -- I've reprimanded them.  If they want to
6  talk, they can leave the room.  Otherwise, they
7  need to be quiet.  Go ahead.
8    THE WITNESS:  It was related to a ham
9  sandwich with mustard or mayonnaise.
10       (Discussion off the record.)
11   MS. BONJEAN:  Okay.  Go ahead.
12   THE WITNESS:  I'm sorry, Dave.
13 BY MR. BRUEGGEN:
14   Q.  Do you remember my question, or no?
15   A.  No.
16   Q.  I said:  Were there times when you
17 worked as a detective in Florida where you would
18 gather all your evidence, take it to the state's
19 attorney, and the state's attorney would tell you
20 to continue to investigate before they can approve
21 charges?
22   A.  Yes, that would be common.
23   Q.  And alternatively, a state's attorney
24 could tell you, You don't have enough evidence for

THOMAS TIDERINGTON, 04/28/2023                    Page 174..177

Page 174

1 charges, right?
2     A.    That would be common as well.
3     Q.    And then the last option is the state's
4 attorney says, Yes, you have sufficient evidence
5 for charges, right?
6     A.    Yes.
7     Q.    And when the state's attorney told you
8 you had sufficient evidence for charging, did you
9 continue to investigate that crime?
10    A.    Absolutely.
11    Q.    And when would your investigation stop?
12    A.    When we exhausted all of our
13 investigative leads and methods.
14          You know, I just want to make sure
15 that we understand is that the state attorney is
16 not in charge of a police department.  Certainly,
17 they have influence over the direction of a
18 criminal case and whether it be charged or not be
19 charged.
20          But in my experience, law
21 enforcement officers are -- are not under the
22 direction of the state attorney, and the
23 investigative decisions that are made are decisions
24 that are left up to the police department, of

Page 175

1 course with the advice and direction of the State's
2 Attorney's Office.
3          But I don't know of any case that
4 I'm familiar with in which the state attorney
5 office told us to stop investigating a crime, you
6 have enough information.  You continue your
7 investigation until there's -- until you're
8 confident that there's no other evidence out there.
9     Q.    Sir, back on your report, you note,
10 Without assessment tools or checklists and
11 experienced supervisors' input.
12          And I wanted to ask you:  What are
13 assessment tools?
14    A.    I'm sorry?
15    Q.    In your report, if you look on the
16 screen, sir, I have it highlighted.
17    A.    Oh, I'm sorry.
18    Q.    It says:  Without assessment tools or
19 checklists and experienced supervisors' input, it
20 can be impossible to recognize red flags when they
21 arise in a case.
22          I just want to ask:  What are
23 assessment tools?
24    A.    Well, many police departments have an

Page 176

1 auditing process or staff inspection process in
2 which on a quarterly basis or yearly basis or
3 bi-yearly basis where an inspection unit will come
4 in and will randomly select a number of cases.  And
5 they will go through the case, kind of like what
6 I'm doing as an expert witness.  They'll evaluate
7 the information and determine whether or not
8 policies and procedures are being followed,
9 properly being followed, whether all of the
10 required reports are contained within the
11 investigative file, and typically a checklist is
12 used to make these types of evaluations, or as I
13 call them, staff inspections.
14    Q.    And so, sir, would it be the detectives
15 that would be using the checklist as they're doing
16 the investigation, or is this only for the review
17 process?
18    A.    Well, some departments do have an
19 investigative checklist.  I can think of the
20 Los Angeles police department murder book as it's
21 called, and there's a checklist.
22          I think I've read someplace, and
23 perhaps it wasn't in this case, but I believe
24 Chicago used it -- some type of a checklist

Page 177

1 document or attempted to use it at one point.  But
2 many departments will have investigative checklists
3 and -- as part of an investigative file.
4          What I'm speaking to here primarily
5 concerns the staff inspections of these
6 investigative files, which by the way, of all the
7 files that I've looked at through Chicago, I've
8 never seen an audit report or any type of staff
9 inspection to ensure that policies were being
10 followed, and pro -- and that the case files
11 were -- contained everything that needed to be
12 contained with them based on their own policies.
13          That's just a side note.
14    Q.    Sir, moving on in your report when we
15 get to page 9, you talk about your methodology.
16 And I have it up on the screen to make sure we're
17 on the same page.
18    A.    Okay.
19    Q.    And what do you mean by your
20 methodology?  What is the purpose of this section?
21    A.    Well, what I mean by that is the
22 process that I used to review the investigative
23 files is essentially the same process that I've
24 used throughout my career as a command officer or

THOMAS TIDERINGTON, 04/28/2023                              Page 178..181

Page 178

1  as a chief of police on how I evaluated whether or
2  not my investigators were abiding by policies and
3  practices and procedures and the evaluation and the
4  staff inspection of the work product.
5          So when I take cases on like this, I
6  kind of assume that I'm -- I probably shouldn't use
7  the word "assume" -- but I kind of look at myself
8  as the police chief and put it in a perspective, if
9  I was in charge of this particular investigation,
10 what would I determine -- or what would I determine
11 in terms of the quality of the case file and the
12 investigation.
13         So I look at it from the perspective
14 of a law enforcement manager, I guess.
15     Q.   And you note in your methodology
16 that -- you point out credibility issues, but
17 you're not assessing credibility; is that accurate?
18     MS. BONJEAN:  Objection to the form.
19 BY MR. BRUEGGEN:
20     Q.   And let me rephrase it, because I guess
21 "point out credibility issues" is probably not good.
22         You point out that there might be an
23 issue of credibility, whether you believe story A
24 or story B, right?

Page 179

1      A.   I think that's accurate, yes.
2      Q.   But you in your opinions, you're not
3  taking a position:  I believe this story, or, I
4  believe this story, right?
5      A.   That's correct.  I do not do that.
6      Q.   You're trying to aid the jury so that
7  whichever facts they want to believe, you give them
8  some type of help to assess the case.
9      MS. BONJEAN:  I'm going to object to the form
10 of that.
11     THE WITNESS:  I'm -- some kind of help.
12         I -- I assess the work of the
13 officers and determine whether it is consistent
14 with my understanding of acceptable police
15 practices and standards.
16         So I -- I think that's a yes if I
17 understood your question.
18 BY MR. BRUEGGEN:
19     Q.   And do you do it under both sets of
20 facts where there's a contradiction?
21     A.   Again, this is a hypothetical.  You --
22 you can't point to something specific that I can
23 provide --
24     Q.   I -- I --

Page 180

1      A.   -- a more specific --
2          (Simultaneous cross-talk.)
3      Q.   I can point you back to the question I
4  asked earlier, and now I'm bringing it back, you've
5  had a little more time, is if the jury does not
6  believe Mr. Maysonet's testimony about being
7  beaten, does your opinion change that there was no
8  falsified evidence as to Mr. Maysonet being beaten?
9      A.   Well, that would be the jury's decision
10 on that, yeah.  I -- I can only point out the
11 facts, and the jury would make that credibility
12 decision.  I -- I'm not trying to make a
13 credibility decision on here.
14     Q.   And so as far as, again, specifically
15 Mr. Maysonet's statement, if the jury didn't
16 believe that he was beaten to give a statement,
17 would you provide an opinion as to whether the
18 statement was appropriately obtained?
19     A.   Well, you say -- and again, I -- I know
20 you're not asking me to assess your questions, but
21 we failed to talk about whether it was in English
22 or whether it was in Spanish, whether he was
23 beaten.  And you only used one element and asked me
24 about one element on whether or not if the jury

Page 181

1  concluded that he was not beaten, that means his
2  statement was true, I -- I think is where I'm
3  confused at in terms of the question that you asked.
4      Q.   Okay.  And, sir, getting back to your
5  report, at the bottom of the page before the note,
6  you talk about IACP and CALEA?  Do you see that?
7      A.   I do.
8      Q.   And, sir, when you're doing your review
9  like you said, as if you were a command staff, I
10 trust you're not using hindsight.  You're using the
11 policies or procedures that existed at the time and
12 the generally accepted police practices from the
13 time?
14     A.   I guess we'd have to specific -- I
15 mean, specifically what -- I'm trying to think
16 through my 67 pages to figure out how to answer
17 that question.
18         Can you be any more specific as to
19 what you're asking?
20     Q.   Yeah.  And maybe we take a step back.
21         You'll agree that some of the
22 generally accepted police practices that CALEA has
23 put out have changed over time, right?
24     A.   Well, policies have changed over time,

THOMAS TIDERINGTON, 04/28/2023                    Page 182..185

Page 182

1  yes.
2      Q.   Yeah, but I'm specifically talking
3  about CALEA and IACP and those types of
4  organizations that provide guidance for creating
5  policies.
6      A.   Correct.
7      Q.   Their recommendations have changed over
8  time, right?
9      A.   Well, not all of them.  Some of them
10 hold true when my grandfather was a police officer
11 in 1927.
12          But some of them have changed over
13 time, yes.
14     Q.   And what I'm asking you is:  When you
15 do your assessment, do you use what was acceptable
16 at the time?
17     A.   Oh, yes.  I'm sorry, yes, if -- if I
18 have that information.  And I certainly --
19     Q.   So --
20     A.   I certainly can speak to that because
21 I've been a police officer in various capacities
22 from 1978 on.
23     Q.   And so in assessing this case, you
24 would have used whatever the acceptable police

Page 183

1  practices was as of 1990; is that right?
2      A.   If they were known to me, yes.
3      Q.   Okay, sir.  I'm going to move to one
4  last section, and then I'd ask if we can take
5  another quick 5-minute break or if you need more,
6  you can have more, but right on page 10?
7      A.   Yes.
8      Q.   This paragraph, you use some words in
9  here?  Reasonable, reckless, you have in quotes,
10 that you say that you used in your practice as a
11 police chief and sergeant and captain.
12          Am I understanding you correctly?
13     A.   That's correct.
14     Q.   And I just wanted to ask:  Can you
15 explain to me how you would have used deliberate
16 indifference in training or teaching police
17 officers without it being related to the
18 constitutional standard?
19     MS. BONJEAN:  I'm sorry.  Can you repeat that
20 question?
21 BY MR. BRUEGGEN:
22     Q.   Yeah.  And I guess what my
23 understanding is you're saying that you used these
24 words in your practice and experience, right, sir?

Page 184

1      A.   I have, yes.
2      Q.   And --
3      MS. BONJEAN:  And specifically, I'm sorry,
4  you're talking -- got it, all right.  Go ahead.
5      MR. BRUEGGEN:  I can highlight his words.
6  I'm stepping back, Jennifer, to make sure it's
7  clear.
8  BY MR. BRUEGGEN:
9      Q.   And you said you're not trying to use
10 legal words.  These are words that you otherwise
11 used, right?
12     A.   Some more frequently than others, yes.
13     Q.   And so what I'm trying to figure out is
14 in what context did you use "deliberate
15 indifference" as a police officer or sergeant,
16 captain, or chief?
17     A.   I don't know if I can give you a spe --
18 specific example of that.  I'm sure I've used it in
19 the past.  I've reviewed various -- I'm certainly
20 not a lawyer, but I've reviewed case law.  I --
21 some of my training classes from years ago, I
22 remember having slides, PowerPoint presentations in
23 cases that were decided by courts, and the -- these
24 words were often used in -- in the decisions.

Page 185

1          You know, I -- I would certainly say
2  that the most often used word in terms of my
3  training and talking with officers is
4  reasonableness, perhaps more than deliberate
5  indifference.
6      Q.   And, sir, what I'm trying to get at is:
7  Is there a crime that has an element of deliberate
8  indifference?
9      MS. BONJEAN:  Objection to the form of that
10 question.  A crime that has deliberate
11 indifference?
12     MR. BRUEGGEN:  That has an element of
13 deliberate indifference.
14     MS. BONJEAN:  Okay.  I'm going to object.  It
15 calls for a legal conclusion, and -- yeah.
16     THE WITNESS:  Yeah, I -- I wouldn't know that.
17 BY MR. BRUEGGEN:
18     Q.   Okay.  And, sir, am I understanding you
19 correctly that when you used the term "deliberate
20 indifference," it was in relation to basically
21 court opinions and stuff like that in teachings of
22 how courts might have come down?
23     A.   Yeah.  I'm thinking back on when I
24 would -- I -- I don't have any specific memory of

THOMAS TIDERINGTON, 04/28/2023                    Page 186..189

Page 186

1 using those words. I -- I think I'm giving you
2 some examples of where I may have used it in some
3 of my training.
4          I mean, it's not a word that is
5 unheard of in the police community. Certainly
6 officers have heard this word. It's -- it's a
7 legal term. I'm not suggesting that I'm using it
8 as a lawyer or trying to define it as a lawyer.
9     Q.   Okay. Sir, and do you mind in a couple
10 minute a break, or do you want to go a little
11 longer and then we can take a break? I'm just
12 trying to space them out so that you get a break
13 when you need it.
14      MS. BONJEAN: Okay. We're going to have --
15 as soon as -- could we go a little longer until our
16 lunch arrives? Then we'll take like maybe a
17 10-minute, 15-minute break or whatever.
18      MR. BRUEGGEN: Yeah, that's fine.
19          (Discussion off the record.)
20      MS. BONJEAN: It is here. So let's take --
21 want to take 15 minutes?
22      THE WITNESS: Yeah.
23      MS. BONJEAN: Okay. It is here. We'll take
24 15 minutes. How about that?

Page 187

1      MR. BRUEGGEN: So about 2:10 or so? Does
2 that sound good?
3      MS. BONJEAN: Sure.
4      MR. BRUEGGEN: All right. Thank you.
5      THE LEGAL VIDEOGRAPHER: We're off the video
6 record at 1:54 p.m.
7          (Recess taken.)
8      THE LEGAL VIDEOGRAPHER: We are back on the
9 video record at 2:18 p.m.
10 BY MR. BRUEGGEN:
11     Q.   All right, Mr. Tiderington. Let's get
12 back at it.
13          So if I could direct you to your
14 report, I want to direct you to page 11 of your
15 report, and let me show it up on the screen real
16 quick.
17          Do you see my screen, sir?
18     A.   I do.
19     Q.   And I wanted to direct you to this
20 sentence: North Avenue is a busy street and serves
21 as a boundary between Garfield Park and Humboldt
22 Park.
23          Do you see that, sir?
24     A.   I do see that.

Page 188

1     Q.   Can you tell me what the basis is for
2 that statement?
3     A.   That's my understanding. I don't
4 know --
5     Q.   Okay.
6     A.   -- if I got that from the complaint, if
7 I got that from other police reports or
8 depositions. I -- I'm not sure.
9          I notice I didn't reference it, but
10 if it's not accurate and you can show me that it's
11 not accurate and it's not a busy street, I'd be
12 happy to amend my report.
13     Q.   Not a problem, sir.
14          And then I wanted to ask about the
15 next question. You say: It is considered to be
16 Latin territory.
17          Can you tell me what "it" refers to?
18 Does it refer to North Avenue, Garfield Park, or
19 Humboldt Park?
20     A.   I -- I don't know, and I think I -- I
21 referenced that I'd have to look at the -- the
22 police report to be certain.
23     Q.   Okay.
24     A.   I mean, I -- I don't have any

Page 189

1 independent knowledge that that is, you know, other
2 than material that I've reviewed. I didn't go out
3 and do my own gang investigation or assessment, if
4 that's what is being asked.
5     Q.   Yes, sir. I'm just trying to figure
6 out where that information came from. If it came
7 from the reports, that's fine, so --
8     A.   I believe -- I believe it came from the
9 reports, yes.
10     Q.   Okay. Moving on to the next page, you
11 have this first paragraph that talks about GPR, one
12 of the GPRs that you saw on the state's attorney's
13 record, right?
14     A.   I'm sorry?
15     Q.   This first paragraph on the next page,
16 on page 12. Sorry, sir.
17     A.   Yes.
18     Q.   Talks about an author -- a GPR authored
19 by a detective who responded to the scene shortly
20 after the shooting was found in the prosecution's
21 file and noted Lulu Dog, 1925 West Drake.
22          Do you see that, sir?
23     A.   I do.
24     Q.   And then you note that it was void of

Page 190

1 any details or explanation regarding the seemingly
2 important and relevant information.
3          And I wanted to ask: Why is it
4 important or relevant information?
5     A.   Well, again, you pointed out another
6 investigative mystery that we have.
7          I guess that if the officer
8 documented that in a GPR, which it was on a GPR,
9 I'd have to pull it up, but I would assume that
10 there was some relevance in why he documented that.
11 I believe that it was later determined that it was
12 a relative of the deceased, but I don't believe it
13 was ever explained in the police report as required
14 by their policy.
15    Q.   Okay.  So if it was -- and I'll tell
16 you what.  Why don't we look at the actual GPR.  I
17 think that would make things easier.
18          Right, sir?  Do you agree?
19    A.   Yes.
20    Q.   Okay.
21    A.   And I don't know if I -- I'm sorry.
22 Yeah, pull that up again.
23
24

Page 191

1          (Deposition Exhibit No. 9,
2          Witness Tiderington, was marked
3          for identification 04/28/2023.)
4 BY MR. BRUEGGEN:
5     Q.   Let me share my screen.  And we can
6 mark this as Exhibit "8."  And for the record, this
7 is CCSAO 874.
8     MS. BONJEAN:  I don't see it.
9     MR. BRUEGGEN:  I'm putting it up right now.
10 Give me a second.
11    MS. BONJEAN:  Okay.
12 BY MR. BRUEGGEN:
13    Q.   All right, sir.  Do you see a document
14 up on the screen?
15    A.   I do.
16    MR. BRUEGGEN:  And, Jennifer, are you able to
17 see this as well?
18    MS. BONJEAN:  I am.
19 BY MR. BRUEGGEN:
20    Q.   Okay.  And, sir, I believe this is what
21 you're talking about where it says Lulu, then what
22 appears to be a phone number, and then 1925 North
23 Drake?
24    A.   Right, yes.

Page 192

1     Q.   And then on that same page, you have
2 Kevin Wiley and Jolanda Wiley, notes on them, right?
3     A.   I -- I see notes, yes.
4     Q.   And then did you see a sup -- a
5 supplementary report regarding this GPR that had
6 similar information?
7     MS. BONJEAN:  Objection to the form.
8     THE WITNESS:  Yeah, but to go back to your
9 earlier question, you had asked about the
10 importance of it.
11          It was obviously documented, but I
12 believe the sisters -- and I don't recall which one
13 without reviewing the record -- mentioned that the
14 two brothers were arguing or used the word "Lulu
15 Dog" or there was some reference I believe by the
16 witnesses.
17          So when you asked about the
18 importance, that would have been, you know, based
19 on what the witness statements said or what the
20 witnesses testified to were provided to the police
21 I believe would have been important.
22 BY MR. BRUEGGEN:
23    Q.   Okay.  So it would have been important
24 for the police to figure out who Lulu is, because

Page 193

1 that person was referenced in the gentlemen's
2 discussion before they were murdered, right?
3     A.   I think that's accurate, yes.
4     Q.   Okay.  And did you ever determine who
5 Lulu is?
6     A.   Have I?
7     Q.   Yes.
8     A.   Well, not from the GPR, of course,
9 because there's -- it doesn't even say who recorded
10 this.  I -- I believe this is a deviation from the
11 Chicago Police Department policies and procedures.
12 They -- there's no reference to it in terms of who
13 wrote this GPR.  There may be a reference in a
14 supplemental report, but I -- I don't recall
15 specifically if there was.
16    Q.   Sir, I want to show you -- and this is
17 Exhibit 8, which is the investigative file.  I want
18 to show you a document in there.
19    A.   Okay.
20    Q.   Give me a second.
21          That's page 64 in there.  Let me
22 pull it up.
23    A.   I'm going to look at that if you don't
24 mind.

THOMAS TIDERINGTON, 04/28/2023                    Page 194..197

Page 194

1    Q.   Yeah, it's --
2         (Simultaneous cross-talk.)
3    Q.   -- pages 63 and 64, RFC 63 and 64?
4    A.   Yes.
5    Q.   And, sir, do you see this is a
6    supplementary report, interviews of Richard Wiley,
7    Zearl Wiley, Jolanda Wiley, and Sandra Montoya?
8    A.   Yes.
9    Q.   And again, that other document we just
10   looked at, the GPR indicated that Jolanda Wiley and
11   Richard Wiley had been -- there were notes on them,
12   right?
13        MS. BONJEAN:  Objection to the form.
14        THE WITNESS:  I'm not sure that's what it
15   said in the -- in the GPR, but ...
16   BY MR. BRUEGGEN:
17   Q.   Well, there were notes about them.  You
18   see Kevin Wiley, it has information; Jolanda Wiley.
19        And this is again Exhibit 9 now.
20   A.   Yes, yes, I do.
21   Q.   Okay.  And so then if we go to the sup
22   report, you could see there's more information
23   about Richard Wiley.  Let's just compare the GPR.
24        Do you need -- compare the GPR.  It

Page 195

1    says 1224 South State, unemployed laborer.  And if
2    we look at the sup report, it says Richard Wiley,
3    "44" North Drake, unemployed laborer.
4         So different information but
5    similar, right?
6    A.   Yes.
7         Well, go back to the GPR.  I -- I
8    think it's -- one other thing I noticed about this
9    GPR is in the report it lists the phone numbers for
10   each of them.  And if that wasn't contained in the
11   GPR, how did the officer that authored this
12   report -- did he memorize the numbers?  How was he
13   able to write these numbers in the report where
14   there's no indication that they were obtained in
15   the GPR is one of the things that occurred to me
16   when I was reviewing and comparing this to what is
17   in the report.
18   Q.   And I appreciate that, but right now,
19   I'm just asking about again Lulu Dog.
20        And we saw in the GPR it says Lulu
21   Dog, and it has an address of 1925 North Drake, and
22   again some numbers which could be a phone number;
23   and then on the sup report, we have Jolanda Wiley
24   who also lives at 1925 North Drake, right?

Page 196

1    A.   Yes.
2    Q.   And I think you even alluded to it.
3    You believe Lulu Dog might be a relative of the
4    victims.
5         MS. BONJEAN:  Objection to the form.  I think
6    it's -- I'm going to object to the form.  I think
7    he said -- I'll let you answer that, but I object
8    to the form of that question.
9    BY MR. BRUEGGEN:
10   Q.   And, sir, again, I think when I first
11   asked about that, I think you said we've since
12   learned that it could be a relative of the deceased.
13   A.   I said, yeah, without -- again, this is
14   somewhat refreshing my memory.
15        But I'm sorry.  You can go on with
16   your question.  I think I can clarify that as we
17   go.  I don't --
18        MS. BONJEAN:  If you know.
19        THE WITNESS:  I don't see any indication that
20   Lulu is explained.  I mean, I recognize the address
21   is the same, but there's no explanation as far as
22   Lulu Dog or who Lulu Dog is.
23        I could have been mistaken when I
24   said it was a relative.  Again, I don't know.  And

Page 197

1    once again, you identified another investigative
2    mystery, as I call it -- thank you -- in terms of
3    unexplained information that's contained someplace
4    in the case file and then mysteriously documented
5    in the police report without being able to close
6    the circle on how the information came about.
7    BY MR. BRUEGGEN:
8    Q.   And, sir, so accepting that Lulu might
9    be Jolanda Wiley, as they have the same address,
10   would that cut off that as an investigative lead
11   that needed to be pursued?
12        MS. BONJEAN:  Objection to the form.
13        Are you asking him to assume those
14   things?
15        MR. BRUEGGEN:  Yes.
16        MS. BONJEAN:  Oh, okay.  So I'm going to
17   object, that's an incomplete hypothetical, lots of
18   assumptions there.  But if you can respond, go
19   ahead.
20        THE WITNESS:  Well, I don't know that by
21   reading this police report that I concluded or if
22   there's any way to conclude that Jolanda Wiley is
23   Lulu Dog.
24        You would have thought that if they

THOMAS TIDERINGTON, 04/28/2023                        Page 198..201

Page 198

1  did interview her, they knew -- when I say
2  "they" -- the officers knew that this name was
3  mentioned by the deceased, there would have been
4  some kind of clarification and further
5  documentation in the police report about who Lulu
6  Dog was.
7          And then perhaps we would not be
8  having this discussion, because we would have known
9  who Lulu Dog was because it was properly documented
10 in the police report.
11 BY MR. BRUEGGEN:
12     Q.  Okay.  Sir, now can you answer my
13 question of:  Accepting that Lulu Dog is Jolanda
14 Wiley, and we looked at the sup report that says
15 Jolanda Wiley was interviewed, would there be any
16 further investigation required of Lulu?
17     A.  Well, you're asking me to accept a
18 hypothetical.
19          If -- just so I understand the
20 hypothetical, if they determine that Jolanda was
21 Lulu Dog, should they have done any more
22 investigation?  Yeah, I think they should have.
23 They should have --
24     Q.  And you're changing my question.

Page 199

1          Any more investigation of Lulu Dog
2  or of Lulu.
3      A.  Well, yeah.  Yes, certainly.
4          I mean, why did the officer write
5  that in the GPR?  It would be -- if I was the
6  supervisor reviewing this case and looked at a GPR
7  that had no signature, no date, no time, and then
8  there was the word "Lulu Dog" at the top, I think
9  it's the responsibility of the supervisor, the case
10 agent to determine the relevance or lack of
11 relevance of who Lulu Dog is and what the
12 conversation between the two deceased brothers were
13 as identified by the two sisters, who are really --
14 I call them eyewitnesses, but they were essentially
15 I guess ear witnesses, heard -- heard the
16 discussion.
17          So yeah, I don't think that this --
18 even in your hypothetical, I don't think a
19 reasonable investigator could have concluded that
20 this was well explained and that it didn't warrant
21 additional probing.
22     Q.  And, sir, I don't think you're
23 understanding my question, and that's my fault
24 because I need to ask a question that you

Page 200

1  understand.
2          And I'm asking you to accept as fact
3  that Lulu is a nickname for Jolanda Wiley.
4      A.  Okay.
5      Q.  Okay?  Accepting that as fact and that
6  police did talk to Jolanda Wiley, was there any
7  further investigation -- investigative actions that
8  needed to be done on Lulu?  Not documentation.
9  Investigative action.
10     A.  Yes.
11     Q.  And what was that, sir?
12     A.  I think the investigators, using your
13 hypothetical or your conclusion that Wiley --
14 Jolanda Wiley was Lulu Dog, they should have went
15 out and questioned her about what her -- her
16 knowledge about what her brothers were -- or
17 whoever -- what her brothers were doing there, why
18 they would have been arguing and using her name
19 during this argument, so ...
20          And I'm -- I guess I don't like the
21 word -- to use the word "assumption," but I'm
22 assuming the investigators did ask those questions,
23 but they perhaps did not properly document it.  And
24 if they didn't ask the questions, I think they

Page 201

1  should have.
2      Q.  Sir, from reviewing the document and
3  the sup report, you saw that Jolanda was the older
4  sister of the two victims, right?
5      A.  You know, I -- if you're telling me --
6  yes, if you're saying that that's -- stated that
7  her brother Torrence came to her house, yes.
8      Q.  And so if the brothers were talking
9  about -- and again, listening to what the sisters
10 said about what they heard the night of the
11 shooting, if they were saying stuff about Lulu
12 being mad at them for being out late and Lulu is
13 the older sister, is that surprising to you?
14     MS. BONJEAN:  I'm -- I'm going to object.
15 Where does it say Lulu's older sister?  Because
16 you -- you're making an assumption that you're
17 asking -- asking all these questions about, but
18 that is not anywhere in any report.
19     MR. BRUEGGEN:  And, Jennifer, I appreciate
20 the objection, but please don't coach the witness.
21 He doesn't need it.  He can tell me if it's wrong.
22 If I misstate the record, let me know.
23     MS. BONJEAN:  Objection to this incomplete,
24 erroneous hypothetical.

THOMAS TIDERINGTON, 04/28/2023                                Page 202..205

Page 202

1    THE WITNESS:  I guess I don't fully
2 understand what you're asking.
3         I know you're asking me to assume
4 that the officers determined that Jolanda Wiley was
5 Lulu Dog.  I mean, if you don't mind, if I can just
6 make sure I understand.
7         I -- is that what you're asking me
8 to assume in this question?
9 BY MR. BRUEGGEN:
10    Q.  Yes, yes.
11         Accepting that and with your
12 knowledge of having reviewed the documents about
13 what the Wiley brothers were talking about Lulu on
14 the night of the shooting, does that surprise you
15 that the brothers were saying that their older
16 sister would be mad at them?
17    A.  I -- I haven't seen any evidence that
18 that's what they were saying.  I don't -- I haven't
19 seen that as documentation as of what the sisters
20 heard.
21         I don't think that that was given to
22 the police or provided to the police that they were
23 upset that their older sister was going to be mad
24 because they were late coming home.  I -- I don't

Page 203

1 recall reading that.
2    Q.  Okay.  And again, you know what, maybe
3 I'm not being clear.
4         But so you're saying that even if
5 you accept that Jolanda and Lulu are the same
6 person, there needed to be further investigation of
7 Lulu, other than just talking to her.
8    MS. BONJEAN:  Objection, misstates his
9 testimony, but ...
10    THE WITNESS:  Well, and again, I'm trying,
11 Dave.  I'm not trying to be difficult, but I guess
12 what also needed to be documented -- all right.  So
13 the officer writes in the GPR about Lulu Dog, and
14 that information came from one of the ear witnesses
15 to the shooting.  And there was no other reference
16 to that in -- in terms of the GPR or in this file
17 that I -- that I reviewed.
18         So again, chronologically, the
19 officer should have explained how they determined
20 who Lulu Dog was, who was mentioned by the
21 witnesses who heard the arguments and mentioned the
22 name Lulu Dog.  That needed -- in my view, it
23 needed to be vetted and figured out.
24         And if it's as simple as you

Page 204

1 explained, that hypothetically the officers found
2 out that it was an older sister and that they
3 were -- I don't know how they would have concluded
4 or who they got that information that they were
5 arguing about coming home late, because who could
6 that have come from?  I mean, the only witnesses
7 were the two sisters, and I don't think that they
8 provided that detail.
9         So I guess it's difficult for me to
10 answer your question.
11 BY MR. BRUEGGEN:
12    Q.  Okay.  Sir, going back to your report,
13 the next paragraph on page 12.  And I can show you
14 this.
15    A.  Okay.
16    Q.  And this is all about the forensic
17 investigation that was done at the scene; is that
18 correct?
19    A.  I'm sorry.  Crime scene technicians?
20    Q.  Yes.
21    A.  Yes.
22    Q.  And so this is the initial forensics.
23         And so what leads were there for the
24 police to follow after speaking to the siblings of

Page 205

1 the deceased and with this forensic evidence at
2 that point?
3    MS. BONJEAN:  Objection to the foundation of
4 that question.
5    THE WITNESS:  Well, I guess I'm assuming that
6 they submitted the ballistic evidence to the lab
7 for comparison of other known suitable comparisons.
8 I'm assuming they did that.  I -- I don't recall
9 in -- in the police report, I don't know the time
10 period that they did that.
11         I know there was a point in time --
12 and I don't think this is your question, and I -- I
13 can expect that you're going to tell me it wasn't
14 your question.  But there was a point in time when
15 Sergeant Mingey determined there was a connection
16 between the two weapons, or the forensic evidence
17 in the two different shootings.
18         It struck me as inconsistent with
19 acceptable police practices for Sergeant Mingey not
20 to have asked the lab to do the comparison of these
21 two cartridges or -- or cases, cartridges that were
22 found at the scene of both shootings.
23         If he would have done that, he would
24 have known that there was no connection between the

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 04/28/2023                    Page 206..209

Page 206

1 weapons used for these -- for the two shootings.
2 BY MR. BRUEGGEN:
3      Q.  Okay.  That --
4           (Simultaneous cross-talk.)
5      A.  That wasn't -- that wasn't your
6 question, was it?
7      Q.  Not -- not exactly, but I always
8 appreciate the information.
9           So if you look at the following
10 paragraph, you talk about, further substantive
11 proactive investigative steps.
12          And that's what my question was is:
13 Based on the forensic evidence at the time in the
14 couple days after the shooting, what further
15 proactive investigative steps were available?
16     MS. BONJEAN:  Objection to the form of that
17 question.
18          And are you asking him to speculate?
19 I'm -- I'm confused by that question.
20     MR. BRUEGGEN:  I am just asking him to let me
21 know based on his experience as a police officer
22 and having reviewed the file if there were any
23 investigative steps or leads that existed in the
24 several days -- after several days of investigation.

Page 207

1      MS. BONJEAN:  Objection, form of that
2 question and foundation of that question, and
3 you're asking him to speculate.
4           He wasn't there, you know, right?
5 BY MR. BRUEGGEN:
6      Q.  Sir, do you understand my question?
7      A.  I -- I think so.
8      Q.  Okay.
9      A.  I -- I think your -- your question, if
10 I understand it, is after the shooting, what else
11 could the officers have done that they weren't
12 doing, I think if I understand your question.
13          Oftentimes, there are crimes in
14 which there are no witnesses, there are no forensic
15 evidence, and the only thing left for an officer to
16 do is to engage the resources from other units
17 within the police department, other gang experts
18 perhaps that have informants, to have the word put
19 out on the street that the -- that the department
20 is looking for the suspects who committed the
21 murders; conversations with the confidential
22 informants that perhaps all police officers have
23 available to them.  You had a gang unit.
24          And again, I guess I'm making the

Page 208

1 assumption that some of this stuff was being done.
2 If it wasn't, then I think it's a deviation from
3 acceptable police practices.  But on the other
4 hand, if these things were being done and not
5 documented, that's once again a deviation from
6 acceptable standards.
7           So I don't know which it was.
8 Either they didn't do it, or they did do it and
9 they didn't document it.  So I -- I don't know
10 where the failure was.
11     Q.  Okay.  And, sir, let me make sure I
12 understand.
13          Are you saying they should have been
14 out looking for leads after that?  Is that what you
15 just said?
16     A.  I think that's what is expected of a
17 law enforcement officer that has come across the
18 murder of two individuals on a street corner is
19 that I think they -- I think the expectation of the
20 police department and the community that they serve
21 would expect that the officers are out there trying
22 to determine who committed the murder.
23     Q.  And, sir, would that -- would talking
24 to other known gang members from the area about if

Page 209

1 they had any information about the shooting, would
2 that be an appropriate investigation to look for a
3 lead?
4      A.  Certainly.
5      Q.  And that would be good police work,
6 right?  To question other known gang bangers from
7 the area that might have information about the
8 shooting.
9      A.  I think it's a well documented fact
10 that that's what the Chicago Police Department
11 had -- has done in other cases, and it's certainly
12 a reasonable thing for law enforcement officers to
13 do, certainly.
14     Q.  I wanted to go back to one of the
15 things you were talking about about Sergeant Mingey
16 should have asked for ballistics testing, right?
17 Do you remember just telling me about that in
18 answer to one of my other questions?
19     A.  I do recall that, yes.
20     Q.  Okay.  And so you'll agree that
21 ballistics testing ultimately was done at some
22 point in this case, right?
23     A.  It was done well after -- I think it
24 was done after the arrest of Maysonet, if I

THOMAS TIDERINGTON, 04/28/2023                          Page 210..213

Page 210

1 remember correctly.
2    Q.   And so you say it should have been done
3 sooner.
4    A.   Of course.  It should have been done as
5 soon as they expected that these two weapons would
6 be connected.  Why -- I can't think of any
7 legitimate law enforcement reason why you would
8 have delayed comparing the ballistics for these two
9 weapons when you suspected that that was the
10 connection between the two murder -- the murder and
11 the other shooting.
12        So the answer to your question is of
13 course, he should have done it as soon as he could
14 have.
15    Q.   And, sir, are you -- strike that.
16        Do you believe that Mingey
17 questioning Mr. Maysonet about the shooting, do you
18 believe that was an appropriate police
19 investigative tactic?
20    MS. BONJEAN:  I'm going to object to the form
21 of the question and the foundation.
22        Are you talking on July 15th?
23    MR. BRUEGGEN:  Yes.
24

Page 211

1 BY MR. BRUEGGEN:
2    Q.   The same thing we just talked about.
3        On July 15th, when Mr. Mingey went
4 and debriefed Mr. Maysonet and asked him about if
5 he knew anything about a different shooting than
6 why he was at the police station, is that an
7 appropriate investigative task by police officers?
8    A.   No.  I think an investigator can ask or
9 question anybody as long as they do it properly and
10 advise the person of his rights.
11        And apparently, Sergeant Mingey did
12 not believe that Maysonet could speak English,
13 which is evidenced by the fact that he took a
14 translator with him.
15        But is it inappropriate for an
16 investigator to talk to somebody?  No, I don't
17 think it was inappropriate at all.
18        But if he suspected that Maysonet
19 was involved, he had an opportunity to develop
20 tangible evidence, as I keep saying, to prove one
21 way or the other based on forensics -- request of
22 the forensics unit to compare the two weapons.  And
23 then he would have known whether or not there was
24 any connection, at least between the two shootings.

Page 212

1    Q.   Sir, I wanted to ask you -- switching
2 to Detective Halvorsen?
3    A.   Okay.
4    Q.   Other than his involvement or his name
5 being on the sup report, have you seen any other
6 evidence of his involvement in the Maysonet
7 investigation?
8    MS. BONJEAN:  Objection to the form of that
9 question.
10        You mean in the investigative file,
11 or anywhere?
12    MR. BRUEGGEN:  Anywhere.
13    MS. BONJEAN:  Like his own -- his own Fifth
14 Amendment invocations perhaps?  I don't understand
15 what you mean.
16    MR. BRUEGGEN:  And again, Jennifer, please
17 don't coach him.  He's -- he's an experienced
18 expert.  He's been doing a great job, you know,
19 making me ask good questions or better questions,
20 so --
21    MS. BONJEAN:  I mean, I just think you should
22 ask a fair question though too.  Like you're saying
23 anywhere, like in everything he's been provided, or
24 in the investigative file?  That's all I'm saying.

Page 213

1    MR. BRUEGGEN:  Okay.
2 BY MR. BRUEGGEN:
3    Q.   And I want to keep it broad, sir.
4        I just want as you sit here right
5 now, could you direct me to some evidence of
6 Halvorsen's involvement other than his name being
7 on the sup report?
8    A.   Well, wait a minute.  His name being on
9 the supplemental report, or him being the author --
10 the author of all these reports?
11        I think I'd have to go back and
12 look, but I believe he signed and authored all of
13 these reports.  So to suggest that he was only
14 mentioned is not the conclusion that I came to
15 based on my review of the documents.
16    Q.   Okay.  So on your review of the
17 documents, did you conclude Halvorsen was the
18 author?
19    A.   On -- on which document?
20    Q.   On the sup report, the long sup report
21 that we've talked about.
22    A.   Can I -- can I refresh my memory?
23    Q.   Yeah, if you want to look at it.
24 That's again in the investigative file.

THOMAS TIDERINGTON, 04/28/2023                    Page 214..217

Page 214

1    MS. BONJEAN: It's page 47.
2    THE WITNESS: Well, there's one on page 35
3 which lists Halvorsen --
4    MS. BONJEAN: Oh, yeah.
5    THE WITNESS: -- first as the -- and I've
6 been told -- and -- and again, this is why it is so
7 confusing. Because it's another investigative
8 mystery as to who actually authored these reports.
9         And I guess I have the same question
10 that perhaps you have. You know, did -- Halvorsen,
11 was he mentioned, or did he author the report?
12        So I've concluded based on my
13 knowledge and understanding of the sequence of
14 whose name appears on the supplements is the person
15 that authored the report.
16        If I'm mistaken -- and I'm also
17 looking at page 37 with Halvorsen apparently being
18 the first name on the report. If I'm mistaken and
19 if you can provide the information to suggest I'm
20 wrong, I would certainly amend it. But all of the
21 information that I'm looking at, and I'm also
22 looking at RFC 0042, Halvorsen's listed as the
23 author of that report as well.
24        So in my view, Halvorsen authored

Page 215

1 the vast majority of these reports.
2 BY MR. BRUEGGEN:
3    Q.   Okay, sir. And the reason I said his
4 name was on the report is because earlier when I
5 called him the author, you disputed that for all
6 the same reasons, for the confusion and stuff like
7 that.
8         So regardless, other than --
9    MS. BONJEAN: Objection to the form of that
10 question. You're misstating his testimony.
11        You asked him to make assumptions.
12 He's making an assumption about what he has
13 learned, but that is not -- he's not disputing
14 anything.
15 BY MR. BRUEGGEN:
16    Q.   Okay. So let me rephrase -- let me
17 restate the question.
18        Relating to Mr. Maysonet and
19 Mr. Halvorsen's involvement with Mr. Maysonet,
20 other than his involvement in drafting the reports,
21 are you aware of any other actions he did relating
22 solely to Mr. Maysonet?
23    MS. BONJEAN: Objection, form.
24    THE WITNESS: I would have to look through

Page 216

1 the reports. Again, I don't recall if he sat in on
2 any of the interviews.
3         As I discussed in my previous
4 testimony, there were other interviews that have no
5 type of documentation whatsoever. So it's
6 difficult for me to say whether Halvorsen was
7 actually with Guevara when they interviewed
8 Maysonet, you know, three or four or five times
9 before he gave his court reported statement.
10        So I -- I would have to go through
11 there -- through the reports and look in detail if
12 there's other things that Halvorsen did.
13 BY MR. BRUEGGEN:
14    Q.   Do you recall Mr. Maysonet mentioning
15 Ernest Halvorsen or describing him at any point in
16 his deposition when he was explaining his
17 interactions at Area Five the night he was
18 questioned?
19    A.   I don't recall what he said in his
20 deposition about Halvorsen. I think it was a
21 pretty lengthy deposition. I just again would have
22 to review that.
23    Q.   Sir, going back to your report, and
24 this is at page 15 of your report. Let me share my

Page 217

1 screen. I just want to make sure.
2         Sir, do you see page 15 of your
3 report?
4    A.   I do.
5    Q.   And is this what we talked about
6 earlier where you were putting both sides of the
7 story, where the first paragraph you talk about
8 what's in the police reports and then the next
9 paragraph is what plaintiff said?
10    MS. BONJEAN: Objection to form of that
11 question.
12    THE WITNESS: You know, you did break up when
13 you asked that question, so I don't know if I
14 followed it totally. I'm --
15 BY MR. BRUEGGEN:
16    Q.   No problem. Would you like me to
17 rephrase?
18    A.   Yeah, if you would, If you don't mind,
19 please.
20    Q.   Yeah. Earlier when we had talked about
21 you did not assess anybody's credibility so you
22 basically provided, here's the two stories that
23 were told that contradict each other.
24        And I just want to make sure that

THOMAS TIDERINGTON, 04/28/2023                          Page 218..221

Page 218

1 I'm understanding. Is this an example where you
2 say the story from the police records is this, the
3 story from Mr. Maysonet is this, and you're not
4 choosing which one's right or which one's wrong?
5      MS. BONJEAN: I'm going to object to the form
6 of that question to the extent that he's not the
7 ultimate trier of fact. But for the purposes of
8 rendering an opinion, he's rendering opinions
9 based -- he's not your expert, right? I mean, I
10 don't really understand.
11      He -- you know, he is making
12 assumptions for the purposes of his opinion about
13 if a jury credits, you know, Mr. Maysonet.
14 Unless you want -- unless -- you know, again he's
15 not your expert, so I'm not sure I understand the
16 question.
17      MR. BRUEGGEN: And, Jennifer, I appreciate
18 all that. I'm just merely going with just what's
19 factually on the paper here, just trying to make
20 sure I understand what it is. So I'm not asking
21 him to make assumptions or, you know, provide
22 opinions. Just factually on the paper.
23      THE WITNESS: Yeah. And I -- if you could
24 point out exactly what issue you're asking me about.

Page 219

1      I've read both paragraphs, and I'm
2 not clear as to where I made any assessment of
3 credibility on either part.
4 BY MR. BRUEGGEN:
5      Q. And, sir, that's -- that's what I'm
6 saying is you did not make an assessment of
7 credibility. You provided both sides of the story
8 without accepting one as being true. That's the
9 question.
10      MS. BONJEAN: Objection --
11 BY MR. BRUEGGEN:
12      Q. Am I --
13      MS. BONJEAN: I'm going to object to the
14 form. He is -- I'm going to object to the form of
15 that question, because you're making an assumption
16 that -- you're making assumptions here. He
17 summarized some of the materials he looked at.
18 That's what's here.
19 BY MR. BRUEGGEN:
20      Q. Yes. And so maybe it's unclear. I am
21 not saying you made a credibility assessment.
22      I am saying you simply laid out the
23 facts, a summary of the facts of the two sides.
24      MS. BONJEAN: Objection to the two sides

Page 220

1 business, but go ahead. You can answer.
2      THE WITNESS: Again, to the best of my
3 ability. And certainly, if there's -- you know,
4 I'm trying to reconstruct a somewhat lengthy
5 investigative file that is deficient in any way --
6 in many ways because of the lack of clarity in the
7 police reports.
8      So yeah, for the most part or to the
9 best of my ability, I tried to reconstruct what
10 happened based on what was contained in police
11 reports, on the one hand; and perhaps what the
12 plaintiff claims happened.
13      So I think in these two paragraphs I
14 just summarized my understanding of the documents.
15 And if there's areas where it went beyond that,
16 certainly if you could point that out and if I was
17 mistaken, I'm certainly happy to amend this report
18 in any way that would be appropriate.
19 BY MR. BRUEGGEN:
20      Q. And, sir, I appreciate that. I wasn't
21 trying to point out that. I'm just making sure
22 that I understood what -- how the report's written,
23 and now I do, so thank you very much for clarifying
24 that.

Page 221

1      I did want to ask about this page.
2      There's a discussion about the
3 consent form to speak to the detectives. Do you
4 remember that issue in this case when Mr. Maysonet
5 was incarcerated at Cook County Jail?
6      A. I do -- I am reading it. I don't know
7 if I remember the specific details. But I
8 understand a correction officer brought out a
9 consent form that was written in English for
10 Maysonet to sign.
11      Q. And I just want to make sure that
12 was -- you're not saying the detectives provided
13 Mr. Maysonet a consent form in English. That was
14 the Cook County jailer, right?
15      A. That's my understanding, yes, is that
16 the jailer had the form.
17      Yeah, I went on to say that the form
18 was signed by the corrections officer, not the
19 detectives.
20      Q. And, sir, do you recall in the sup
21 report, I believe it states that Mr. Maysonet was
22 Mirandized by Montilla on that occasion? Make sure
23 I'm correct --
24      A. I don't recall that specifically, but

THOMAS TIDERINGTON, 04/28/2023                    Page 222..225

Page 222

1  if that's what's documented in the report, I would
2  not refute it.
3      Q.  I'm sorry.  I'm looking -- I'm trying
4  to work off memory, which so ...
5          And now, moving on in your report,
6  down below that, you talk about -- and let me show
7  it to you on the report.  I just want to make sure
8  that we're literally on the same page so that it's
9  easy.
10         And I'm looking at this sentence.
11 It's the last paragraph or partial paragraph.
12         You say, I also find it to be highly
13 unusual and inconsistent with acceptable
14 investigative practices for Sergeant Mingey, the
15 unit supervisor, to take the investigative lead by
16 interviewing Maysonet on multiple occasions instead
17 of assigning the task to one of the homicide
18 detectives.
19         Do you see that, sir?
20     A.  I do.
21     Q.  And when you were a sergeant, did you
22 ever get involved actively in investigations?
23     A.  All of them.
24     Q.  And did you lead by example?

Page 223

1      MS. BONJEAN:  Objection to the form of that
2  question.
3      THE WITNESS:  Well, again, we'd have to talk
4  about what we're talking about leading from.  But I
5  was a -- considered an active supervisor, and --
6  but my role as a -- as a supervisor is to ensure
7  that the work is being done by my officers and that
8  it's being done appropriately.
9          Do I think there was anything wrong
10 with Mingey going to be part of this interview?
11 No, I don't think there was anything wrong with
12 that.  If he would have taken a detective that
13 had -- one of the case detectives involved in the
14 case and ensured that the report would have been
15 properly documented by the -- the detective.
16         But for a sergeant to take
17 investigative steps outside of the investigative
18 unit I believe is unusual.
19         If you look at the job description
20 of a sergeant, it's certainly not consistent with a
21 supervisor's role.
22 BY MR. BRUEGGEN:
23     Q.  I want to take the next sentence.
24         You say it's, inconsistent with

Page 224

1  acceptable investigative practice, right?  The
2  highlighted part?
3      A.  That's correct.
4      Q.  And so are you saying that Sergeant
5  Mingey talking to a witness in this capacity was a
6  deviation from acceptable police practices?
7      A.  No, not at all.
8          What I -- what I'm saying and I
9  testified -- and again, you know, you're trying to
10 dissect each -- you know, you've got to look at it
11 from the totality of the circumstances.
12         The fact that he was a sergeant
13 interviewing a suspect in and of itself is not
14 inappropriate.
15         What's inappropriate is the fact
16 that there was no documentation done by Mingey
17 whatsoever.  It's inappropriate for the sergeant
18 not to have taken any notes.  It is highly --
19 again, highly unusual for a sergeant to be doing
20 the investigative work in place of a detective.
21         Now, there may have been a reason
22 why Mingey did this instead of the case detectives,
23 but I would have expected to have seen that in some
24 type of investigative supplement that would have

Page 225

1  been prepared by Mingey.  I mean, you know, his --
2  he -- his job was the supervisor.  His job was not
3  to be a detective.
4          So when I say "highly unusual,"
5  there -- in my view, I concluded that there had to
6  be some type of exigent reason or unusual reason
7  for the sergeant to take the investigative steps
8  that he took without utilizing the other detectives
9  whose job it is to document these kind of
10 conversations, and in this case, a confession.
11 Allegedly a confession.
12     Q.  So, sir, are you saying that the police
13 reports indicates that Mr. Maysonet confessed to
14 being actively involved in the shooting on
15 July 1st, 20 -- or July 15th of 20 -- of 1990?
16     MS. BONJEAN:  Objection.  Aren't we on the
17 August 1st interview?  That's the section you're in
18 that you've been asking about.
19         If you want to go back to July 15th,
20 then do so, but I think it's a little unfair to ...
21 BY MR. BRUEGGEN:
22     Q.  And, sir, let me -- let me rephrase it.
23         Are you saying that Mr. Maysonet
24 confessed on August 1st and is that your

THOMAS TIDERINGTON, 04/28/2023                    Page 226..229

Page 226

1 interpretation of that? I'm just wondering what
2 you think, sir.
3      A.   I -- again, I mean, we can go back and
4 look at the reports, and we don't have to have a
5 memory exercise here. I mean, a lot of what I'm
6 testifying to is based on memory.
7           Can you give me a few minutes, let
8 me refresh my memory on that?
9      Q.   And, sir, I've put it up on the screen,
10 and it is page 50 --
11     A.   Okay.
12     Q.   -- where it has a little section on
13 August 1, 1990.
14     MS. BONJEAN: Want to take --
15     THE WITNESS: No, I see it.
16          I mean, you know, first of all, on
17 August 1st, somebody wrote in the police report,
18 and perhaps it was Halvorsen -- we don't know who
19 wrote this, and we know it wasn't Mingey and we
20 know it wasn't the witness, the translator that
21 wrote this -- he stated that he was not the shooter
22 but was present when the shooting occurred. So I
23 would suggest that that was somewhat of a
24 confession.

Page 227

1           On July 15th, he provided
2 information, which I believe is pretty relevant,
3 about individuals coming to his house, and that he
4 or his girlfriend provided them with a gun.
5           So both of those statements were I
6 would say pretty significant and would have -- and
7 quite frankly, it's a deviation from acceptable
8 police standards for not -- for the officer that
9 elicited and heard the conversation to not have
10 done any type of a report is simply unexplainable.
11 BY MR. BRUEGGEN:
12     Q.   And, sir, accepting that Mr. Maysonet
13 said what's documented in the police report on
14 July 15th of 1990, would it be appropriate for
15 the -- Sergeant Mingey to want to talk to him again
16 about the shooting of the Wiley brothers?
17     MS. BONJEAN: Objection to the form.
18     THE WITNESS: Again, without understanding
19 everything that Mingey was doing at this time and
20 without understanding all of the details leading up
21 to this, if Mingey had information from his first
22 meeting with Maysonet and went back to get
23 clarification, understanding how important
24 Maysonet's potential testimony or statement could

Page 228

1 be, it would have been appropriate for the sergeant
2 to take the lead investigator, the case agent with
3 him to hear this testimony.
4           I did note that he took a translator
5 with him, all right. And what's telling about that
6 is if Maysonet spoke fluent English in the first
7 meeting, why would he have taken a translator to
8 the second meeting? Why didn't he take one of the
9 lead detectives, I guess is one of the questions
10 when I was reviewing this case that came to mind.
11 BY MR. BRUEGGEN:
12     Q.   Sir, earlier, you talked about one
13 of -- one of your concerns was that the statements
14 were all from codefendants, right? That was a
15 concern?
16     MS. BONJEAN: Objection to the -- objection
17 to the form of that question. It also misstates --
18 BY MR. BRUEGGEN:
19     Q.   Sir --
20     MS. BONJEAN: -- testimony.
21 BY MR. BRUEGGEN:
22     Q.   Sir, do you know what I'm talking about?
23     A.   Well, yes. Not all of the statements.
24 There were some statements made by the sisters.

Page 229

1           But the evidence against Maysonet
2 essentially came from codefendants in this case,
3 with the exception of perhaps information from his
4 girlfriend is my understanding.
5      Q.   And I believe you said that when you
6 have a situation where you have multiple
7 codefendants providing statements pointing the
8 fingers at each other, you needed to corroborate
9 that? Did I understand that correctly?
10     A.   I think that's reasonable, yes.
11     Q.   And would interviewing Rosa Bello and
12 getting information from her help corroborate the
13 statements of multiple codefendants?
14     A.   I think that would be one step, of
15 course.
16          I don't think it would have been
17 the -- the nail that shut the case for me. I think
18 it would have been another step in the
19 investigative process that would have continued
20 until tangible evidence could have been developed.
21 Something beyond questionable statements by
22 codefendants.
23     Q.   And, sir, do you agree that Rosa
24 Bello's statement to the police and the assistant

THOMAS TIDERINGTON, 04/28/2023                    Page 230..233

Page 230

1 state's attorney did corroborate the statement of
2 Mr. Maysonet?
3       MS. BONJEAN:  Objection to the form.
4       THE WITNESS:  That it corrob -- can you pull
5 that up so we can look at that again just to
6 refresh my memory?
7 BY MR. BRUEGGEN:
8    Q.   Rosa Bello's statement is what you want?
9    A.   Yes, yes.
10      Q.   Yes, I can do that.  Give me a second
11 here.
12      MR. BRUEGGEN:  And, Jennifer, this is CCSAO
13 306 through I think 309.  I'll share my screen.
14           (Deposition Exhibit No. 10,
15              Witness Tiderington, was marked
16              for identification 04/28/2023.)
17      MS. BONJEAN:  Do you want it on paper?
18      THE WITNESS:  No, it's --
19 BY MR. BRUEGGEN:
20      Q.   Sir, are you able to see this?  I can
21 make it bigger or -- bigger if you want?
22      A.   No, I can see it.  I can see it.  Thank
23 you.
24      Q.   Okay.

Page 231

1    A.   If you just give me a second to read it.
2           Okay.  Can you go to the next page,
3 please?
4    Q.   Yes, sir.
5    A.   Okay.
6    Q.   And then just for completion sake, I
7 want to show you -- you see that last line says:
8 Rosa identified attached Exhibit 1 as Lluvia and
9 attached Exhibit 2 as Fro.
10           I just want to make sure you see the
11 entire thing.
12           Here's attached Exhibit 1 and
13 attached Exhibit 2.  Okay, sir?
14      A.   I see those, but -- yes, I see those,
15 yes.
16      Q.   The pictures aren't the best, but
17 obviously they're photocopied.
18           And so again, my question was:  Did
19 Rosa Bello's statement corroborate part of
20 Mr. Maysonet's statement.
21      A.   I don't think it did.  I -- I have a
22 lot of questions about her statement.
23           I guess my first question in
24 reviewing this document when I was offering my

Page 232

1 opinion was how many times was she spoken to before
2 she gave this handwritten statement that she didn't
3 write out but that was written out for her?  Who
4 interviewed her prior to the prosecutor being
5 present?
6           I believe there's information that
7 she was interviewed prior to being interviewed by
8 the assistant state attorney is my understanding.
9      Q.   And, sir, you are correct, and that's
10 in the same long sup report that we've looked at
11 several times that we talked about before that I
12 think starts at page 47, if you want to look at
13 that.  That's Exhibit 8.
14      A.   Right.
15      MS. BONJEAN:  47.
16      THE WITNESS:  Yeah, I got it.
17           Right.  But I just want to compare
18 what Jose said to what --
19      MS. BONJEAN:  Oh, got it.
20      THE WITNESS:  -- what Rosa said.
21           Okay.  I'm sorry, sir.
22           You were going to point to Rose --
23 Rosa's statement as -- I think you asked whether or
24 not it corroborates what Maysonet said?

Page 233

1 BY MR. BRUEGGEN:
2      Q.   Yes.  Corroborates in part what
3 Mr. Maysonet said.
4           And you said, Well, no, I can't come
5 to that because I have questions about what
6 happened prior to that statement.
7           And so I directed you back to the
8 sup report that explains what happened prior to
9 that statement.
10           So have you had a chance to look at
11 that, sir?
12      A.   Yeah.  I don't think it explains it.  I
13 think it creates more questions that -- that
14 weren't answered.  I don't know if it explains it
15 or corroborates -- corroborates it.
16           You know, some of the questions, you
17 know, did she -- did they do a photo lineup of the
18 suspects.  You know, there are suspects attached to
19 her statement, but it's a deviation of acceptable
20 police practices to show a Polaroid picture of a
21 suspect and say, Is this the person that did the
22 crime?
23           That should have been done in a
24 photo array, not by handing her a photo and saying,

THOMAS TIDERINGTON, 04/28/2023                    Page 234..237

Page 234

1  Is this the guy that you're talking about?
2          So I -- I think I have a serious
3  question about that.
4      Q.   And, sir, what about where it's a known
5  offender at that station, where someone says, Hey,
6  Joey did it.
7          Is it okay to show them a picture,
8  Hey, is this Joey?  Is that okay?
9      A.   Well, with the names of Fro, Lulu,
10 Lava, all of these names, I don't think she
11 positively identified any -- any individual.
12 Anybody that's worked gang investigations know that
13 street names often apply to more than one person.
14         So no, I -- I can't accept that as
15 appropriate because she possibly knew a street name
16 of somebody.  And I don't know if she knew it or if
17 they asked her if she was familiar with these names
18 as well, because once again, there are no GPRs
19 detailing the conversations that they had with her.
20         It was also unusual, if the gun was
21 wrapped in the towel, how would she have seen the
22 gun?  I think she testified later in a deposition,
23 if I'm correct, was that she didn't know anything
24 about guns.  She does not know what a 9-millimeter

Page 235

1  was from a .38 caliber.
2          So they attributed statements to her
3  that she had no way of really knowing, if -- if the
4  jury credits her deposition testimony.
5      Q.   Okay.  Sir, and I want to just stick
6  with the statement.  If you want Rosa's statement,
7  I could put it back up here so you could see it.
8      A.   Okay.
9      Q.   I got it up here?
10     A.   Yes.
11     Q.   And I'd like you to read this
12 paragraph, which is the second or third paragraph
13 on the first page of the statement, CCSAO 306.  And
14 actually, I'll just read it out loud.
15         On May 24, 1990, around 11:30 p.m.
16 Rosa was at home with Jose and her two children
17 watching television.  Three of Jose's friends
18 stopped by known to Rosa as Lluvia, Fro, and Tino.
19         Do you see that, sir?
20     A.   I do.
21     Q.   And so if that was information that
22 Rosa provided, then she knew the names of those
23 three people and knew them as Jose's friends.
24     A.   I guess that -- if that's the

Page 236

1  hypothetical that you're asking me to consider, I
2  would agree with that.
3      Q.   Okay.  And so in this situation where
4  Rosa knew the names of her, I guess, serious
5  boyfriend's friends, would it be appropriate to
6  show her a single photo and say, Is this the Fro
7  that you mentioned?
8      A.   I don't think it would be appropriate.
9  And -- and again, you got to look at it from the
10 totality of the circumstances.
11         You're asking -- the facts of the
12 case indicate that she was interviewed on
13 August 23rd about an incident that occurred in May.
14         I'm sorry.  Could you go back to
15 that --
16     Q.   Yeah, no problem.  I didn't mean to
17 take it down.  I thought you were --
18         (Simultaneous cross-talk.)
19     A.   That's fine.  I was in the middle of my
20 thought, and it was a good one.  Good timing.
21         So she was interviewed on
22 August 23rd about an incident that happened in May,
23 May 25th.  And for her, I mean, I just look at it
24 from my standpoint.  Of course I'm a lot older than

Page 237

1  perhaps she was, but I can't think of what I did on
2  a month ago on a particular day at a particular
3  time.  But how would she have known that she was at
4  home on May 24, 1990, around 11:30 p.m., and this
5  is the date that this occurred.
6          So it had to be some lead-up to
7  these conversations, and maybe that occurred in the
8  lead-up interviews before she was interviewed by
9  the state attorney.
10     Q.   And, sir, so my next question is:  If
11 you accept Rosa's statement as true, does that
12 corroborate Mr. Maysonet's -- part of
13 Mr. Maysonet's statement?
14     MS. BONJEAN:  I'm going to object to the
15 hypothetical, and -- but go ahead, if you can
16 answer.
17     THE WITNESS:  Again, I -- the statements are
18 similar, but we don't know how these statements
19 were created or if -- if the jury credits
20 Maysonet's story or his testimony, he never said
21 these things, these are things that were created by
22 Guevara.
23         And there was certainly testimony
24 that -- whether the jury credits it or not, that

THOMAS TIDERINGTON, 04/28/2023                              Page 238..241

Page 238

1 there was concern about or that detectives
2 threatened to take away Rosa's kids if she didn't
3 agree to testify.
4           So I think it's far more
5 complicated. And for that reason, I looked at the
6 facts. I looked at what was actually said, and
7 none of it makes sense. You know, how would she
8 know -- I -- I mean, just think about it.
9           You know, first of all, I think she
10 says that she doesn't like guns to be in the house,
11 and she was upset about that, or Maysonet said
12 that. So there was no explanation as to where the
13 gun came from originally. Who brought the gun, how
14 long was it at the house, where was it hidden. If
15 this gun -- it makes no sense if they were going to
16 give -- who was it, Fro and Lluvia and all these --
17 Tito, or whoever it was that they were going to --
18 why would he unwrap the gun in her presence and
19 hand it to them. I mean, you would conclude or
20 think that he would just hand the rolled-up towels
21 to these individuals.
22           So a lot of questions have come to
23 my mind in terms of whether or not this is a story
24 that was fabricated by Guevara and fed to both of

Page 239

1 them. And again, that's a question that I guess
2 the jury would have to decide on who's telling the
3 truth.
4 BY MR. BRUEGGEN:
5      Q.   Okay. And I appreciate that, sir. But
6 again, if you accept Rosa's statement -- or let me
7 rephrase.
8           If the trier of fact accepts Rosa's
9 statement as true, would that corroborate part of
10 Mr. Maysonet's statement?
11     A.   Which part of Maysonet's statement are
12 we comparing Rosa's statement to? And are we
13 considering that he disputes that this -- he later
14 disputes that this is what happened?
15           So I don't know. I guess it's a
16 complex question that I can't necessarily answer
17 with a yes-and-no answer.
18     Q.   Okay, understood. And the whole
19 premise of this is we were talking about
20 corroborating Mr. Maysonet's statement, and I said,
21 Well, what about Rosa Bello's statement.
22     A.   Well, again, it depends on what was
23 told to her in the lead-up interviews before she
24 wrote this statement -- or she didn't write it. I

Page 240

1 keep saying she wrote it. Somebody else wrote it
2 for her.
3           Was -- did she sign it because she
4 was worried that her kids were going to be taken
5 from her? It's -- there -- it's difficult to say
6 that this corroborates what Maysonet said.
7           I mean, I -- from an intellectual
8 standpoint, yeah, if you compare it to what is
9 written in the police reports, in the police
10 report, it is similar. I guess that's about the
11 best answer I can provide.
12     Q.   Okay, and that's fine. And again, I'm
13 going to --
14     A.   I would also -- just on a side note, I
15 believe one of the defendants, codefendants Fro or
16 one of other ones testified in deposition -- or
17 maybe at -- maybe it was a deposition, that he was
18 never at Mayson -- Maysonet's home I believe.
19     Q.   Sir, I want to go back to your report,
20 and this is page 19 of your report, and let me put
21 it up on the screen.
22     A.   Okay.
23     Q.   And I want to ask you about this line.
24           It says: Additionally, Bello could

Page 241

1 not identify photos of any of the individuals she
2 claimed were with plaintiff when they allegedly
3 obtained this firearm.
4           Do you see that, sir?
5      A.   I see that, yes.
6      Q.   And again, that's inconsistent with
7 Rosa Bello's statement that we just looked at,
8 right?
9      A.   I believe that was her deposition
10 testimony.
11     Q.   Okay. So her deposition testimony was
12 that she could not identify anybody?
13     A.   I believe that's -- I believe that's
14 her deposition testimony, yes.
15     Q.   Okay. So you're saying that her
16 deposition testimony then contradicts -- and here's
17 the statement again that says, Rosa identified
18 attached Exhibit 1 as Lluvia and attached Exhibit 2
19 as Fro.
20           And so -- sorry -- this statement is
21 purely about her deposition testimony. It has
22 nothing to do with her statement that she made
23 around the time of the incident.
24     A.   Well, again, we talked about the value

Page 242

1 of her statement and whether it was coerced or
2 whether it was fab -- fabricated or whether it was
3 the product of several previous interviews before
4 she met with the prosecutor.
5        So it's -- it's difficult to simply
6 answer yes and no on those because the police file
7 is inappropriately prepared, and it's not well
8 documented as to what occurred during these
9 consecutive interviews that they -- they had with
10 her and what was said and what was asked of her.
11        Additionally, there's testimony that
12 she was coerced or threatened to have her children
13 taken away if she didn't sign a statement or
14 provide these details.
15        I also -- and I know you didn't ask
16 this and -- but you said you like when I provide
17 additional information. I also understand she did
18 not testify at Maysonet's trial. And -- and if she
19 was such a -- well, let me leave it at that. It's
20 my understanding that she didn't testify at the
21 trial.
22    Q.   And, sir, do you know one way or
23 another why she did or did not testify at
24 Maysonet's trial?

Page 243

1    A.   I -- I don't.
2    Q.   And, sir, moving on in your report, you
3 lay out that plaintiff alleges that Guevara
4 targeted him because of a drug protection money
5 scheme that stopped? Do you recall that? That
6 Maysonet stopped paying Guevara protection money,
7 and then Guevara targeted him? That was Maysonet's
8 explanation?
9    A.   That's my understanding, yes.
10    Q.   That's your understanding from
11 Maysonet's testimony, right?
12    A.   That's correct.
13    Q.   Okay. And with that understanding, do
14 you have any knowledge or opinion as to why Guevara
15 wanted him to identify three other people to be
16 codefendants?
17    MS. BONJEAN: Objection to the form of that
18 question.
19    THE WITNESS: Well, you're asking me to
20 rationalize what a corrupt -- theoretically or
21 allegedly a corrupt police officer did and what his
22 methods of operations were or why he was doing
23 these things? I -- I can't. I can't rationalize
24 that.

Page 244

1 BY MR. BRUEGGEN:
2    Q.   And I appreciate that, sir. I just
3 want to make sure that you don't have an
4 explanation of why it was three additional people
5 as opposed to two additional people or one
6 additional person to be identified.
7    MS. BONJEAN: I'm going to object to that.
8 He said he doesn't know.
9        Can you explain the 40 exonerations?
10 I don't think any of us can, so ...
11    MR. BRUEGGEN: Jennifer, I appreciate that.
12 I'm just making sure -- I just want to make sure
13 that I'm not going to hear something for the first
14 time come trial, so ...
15    MS. BONJEAN: Okay, go ahead.
16    THE WITNESS: As we sit here today, I can't
17 rationalize it.
18 BY MR. BRUEGGEN:
19    Q.   And, sir, in reviewing this deposition,
20 did you review the deposition of Joseph Szybist,
21 who was the court reporter, who took Maysonet's
22 court reported statement; is that correct? And
23 I'll --
24    A.   I did.

Page 245

1    Q.   -- represent it's on your list.
2    A.   I did. I'm just trying to think back
3 as to the substance of that, but I do recall
4 reviewing it.
5    Q.   And do you remember there was a
6 photograph that was an exhibit to that deposition
7 that the court reporter testified he had taken?
8    A.   I -- that you would have to refresh my
9 memory. I don't recall seeing a photograph in the
10 deposition, and I don't know if there was an
11 attachment to it.
12    Q.   Okay, fair enough.
13        Do you have a general recollection
14 of the court reporter's testimony?
15    A.   Of Maysonet's statement to the police?
16 Is that what we're talking about?
17    Q.   Yes. The court reporter who took
18 Maysonet's statement, do you have a general
19 recollection of his testimony?
20    A.   Well, yes. I -- a general
21 understanding is that he took the statement of
22 Maysonet, and that he does not recall -- that he
23 believes his practice would be that if he typed it
24 in English that it would have been testimony -- the

THOMAS TIDERINGTON, 04/28/2023                     Page 246..249

Page 246

1 testimony would have been in English, I -- is some
2 of the highlights that I can recall without
3 refreshing my memory.
4       Q.   Fair enough.
5            Do you recall him also testifying
6 about after he types up the statement he then takes
7 a Polaroid photograph of the person who gave the
8 statement to be signed just to attach to the
9 statement so they can put a face to the statement?
10      A.   You know, that's again ringing some
11 bells, but I don't remember specifically.
12      Q.   Sir, I'm going to show you what we're
13 going to mark as Exhibit No. -- I think we're on 11.
14      MR. BRUEGGEN:  Madam Court Reporter, the
15 Exhibit No. 10 was the Rosa Bello statement.  I
16 don't know if I put that on the record.  I
17 apologize.
18           (Deposition Exhibit No. 11,
19            Witness Tiderington, was marked
20            for identification 04/28/2023.)
21 BY MR. BRUEGGEN:
22      Q.   So I'm going to share my screen.  This
23 will be marked as Exhibit 11, and this is
24 CCSAO 1473 to 1474.

Page 247

1            Let me zoom in on the -- do you see
2 this photograph on your screen, sir?
3      A.   I do.
4      Q.   And do you recall seeing this
5 photograph before?
6      A.   You know, I think I do, but I don't
7 know if I saw the photograph attached to a
8 deposition.  I'm not sure where I saw it, but it
9 looks familiar.
10      Q.   And again, you might have seen it.  It
11 was part of the CCSAO production that you reviewed,
12 so it might have been --
13      A.   Right.
14      Q.   -- attached in there, so ...
15      A.   Possibly, yes.
16      Q.   I want to show you, so this is the
17 front side of the photograph, and it's our
18 understanding this is the backside of the
19 photograph, sir?  Do you see that?
20      A.   I do.
21      Q.   Sir, when you worked for Fort
22 Lauderdale as a detective or as a sergeant for the
23 detectives, did your detectives ever take court
24 reported statements of suspects or witnesses?

Page 248

1      A.   I can't recall that we did.  We -- we
2 used a tape recording technology far more often
3 than a court reporter for obvious reasons.  It's I
4 believe much -- much better evidence.  It's hard to
5 dispute when you have a video or an audio of what
6 somebody said.  It's difficult to dispute that
7 that's what occurred.
8            So we utilized tape recordings far
9 more than a court reporter statement like this.
10      Q.   And, sir, I asked you this earlier and
11 you said you had some general recollection.
12           Do you remember the court reporter
13 testified that this would have been the Polaroid
14 photograph he would have taken after he took the
15 statement of Mr. Maysonet and typed it up?
16      A.   I -- I don't recall that.  I -- if
17 that's what it says -- I mean, if that's what it
18 says in his deposition that's what happened, I'm
19 not disputing that, but I don't recall it.
20      Q.   And looking at this photograph, do you
21 see any evidence that Mr. Maysonet was beaten?  And
22 let me zoom in even further?
23      MS. BONJEAN:  Objection to the form of that
24 question.

Page 249

1      THE WITNESS:  Well, I'm certainly not a
2 medical doctor.  I could tell you it doesn't look
3 like he's about to go to Disney World.  Doesn't
4 look too happy about being there.
5            You can also argue he looks like
6 he's in pain.  I don't know.  I've never met him,
7 so it's hard for me to say.  But if you're asking
8 me to assess the mood and physical condition of
9 this individual and this Polaroid, I don't think he
10 looks too well.
11           But that's --
12 BY MR. BRUEGGEN:
13      Q.   Okay.
14      A.   -- that's not a medical -- I'm not
15 offering that as a medical expert opinion though.
16      Q.   I -- I appreciate that, sir.
17           But do you see any evidence of
18 injuries on him?  Bruising or red marks from being
19 beaten all night.
20      MS. BONJEAN:  Objection.  First of all,
21 objection to the form of that question.  Also
22 misstates Mr. Maysonet's testimony about where he
23 was beaten, so don't -- don't -- just going to --
24 misstates the testimony.

THOMAS TIDERINGTON, 04/28/2023                    Page 250..253

Page 250

1        You can answer.
2        THE WITNESS:  Yeah, I -- I don't think I'm
3  going to -- that's not something I assessed in my
4  review, and it's not something that I think I --
5  it's not my area of expertise to make that
6  determination.
7  BY MR. BRUEGGEN:
8        Q.  And sir, do you have any reason to
9  dispute that this photograph was taken after
10 Mr. Maysonet gave his court reported statement?
11       MS. BONJEAN:  Objection, form, speculation.
12       THE WITNESS:  I -- I have no reason to
13 dispute it, but I don't know.
14 BY MR. BRUEGGEN:
15       Q.  Okay.  Fair enough.
16           Moving on in your report, let me
17 show you your report.  I just want to make sure
18 that it's clear what I'm talking about.  And this
19 is page 20 of your report.
20       A.  Okay.
21       Q.  And it's section (b), and you note:  I
22 observed three codefendants in this case made
23 contradictory statements about the murders each
24 providing different facts and theories about how

Page 251

1  the murders occurred and who played what roles in
2  the shooting.  For example, Gonzalez said plaintiff
3  was the shooter; plaintiff said Gonzalez was the
4  shooter; and Cruz identified Gonzalez as the
5  shooter.
6           Do you see that, sir?
7       A.  I do.
8       Q.  Okay.  So is it fair to say that based
9  on that, both plaintiff and Cruz identified
10 Gonzalez as the shooter?
11      A.  Well -- well, you got to read the next
12 sentence also though.
13          All men claim that their statements
14 were coerced and the product of physical coercion,
15 threats, and false promises by Detective Guevara.
16          So if the jury credits that, there's
17 no way I can make any conclusion about what you're
18 asking me to conclude.
19      Q.  And, sir, I -- you know, I appreciate
20 the evidence out there, and I'm just talking about
21 the actual statements themselves that were
22 provided.
23          You say they're contradictory, and I
24 just want to know:  Does Mr. Cruz' contradict

Page 252

1  Mr. Maysonet's?
2       MS. BONJEAN:  Objection to the form of that
3  question.
4           On the specific question of who
5  identified the person as the shooter, or the whole --
6           (Simultaneous cross-talk.)
7  BY MR. BRUEGGEN:
8       Q.  A review of that type.
9       MS. BONJEAN:  -- thing?
10      THE WITNESS:  Well, the statements -- I mean,
11 the statements stand for themselves.  I don't know
12 that I offered opinion -- I mean, the statements
13 are what they are, and you can draw your own
14 conclusions.
15          The conclusions I drew are that they
16 contradicted each other.  And if somebody reads the
17 statements and concludes something different, then
18 so be it.
19          That's what I concluded based on my
20 review of the statements.
21      Q.  And, sir, do you know if Justino Cruz
22 was interrogated by Detective Guevara?
23      A.  I'm sorry?
24      Q.  Was Justino Cruz interrogated by

Page 253

1  Detective Guevara?
2       A.  Oh, I don't know.  I'd have to go back
3  through the reports and deposition testimony and
4  understand that.  I don't as we sit here recall
5  that specifically.
6       Q.  And you recall from your review that
7  Justino Cruz pled guilty to this crime?
8       A.  I believe he did.
9       Q.  And then testified against only
10 Mr. Gonzalez in exchange for leniency on his
11 sentence?
12      A.  I don't know all of the details.  I
13 certainly at some point reviewed that, but I don't
14 have an independent memory of all the details as we
15 sit here today.
16          If you would like me to go through
17 that -- those court testimony, those proceedings, I
18 could do that and refresh my memory.
19      Q.  No, sir.  I don't need you to do that.
20 I'm just trying to figure out what you recall as
21 you sit here.
22      A.  Yeah, I don't -- like I said, there's
23 so many documents, I feel somewhat uncomfortable --
24 comfortable -- uncomfortable about doing a memory

THOMAS TIDERINGTON, 04/28/2023                              Page 254..257

Page 254

1 test, and you know, when there are documents that
2 we can verify. So you know, I would suggest that
3 if you're going to ask me specifically about
4 questions, about documents, that I take a look
5 those and, you know, before I -- I want to be as
6 precise as possible, so I don't want to misstate
7 something and -- when we have the ability to look
8 at that and clarify things.
9    Q.   I'll tell you what. Why don't you look
10 at Exhibit 8, which is the investigative file and
11 specifically at page 45, I will put it up. It's
12 Exhibit 8 --
13    A.   Okay.
14    Q.   -- specifically page 45, and you can
15 look at your hard copy or the one on the screen.
16    A.   Okay.
17    MS. BONJEAN: You want -- you want -- do you
18 want to also get Cruz' deposition? Do you want us
19 to print that out too?
20    MR. BRUEGGEN: No, I just --
21    THE WITNESS: No, he's not asking that.
22    MR. BRUEGGEN: Again, that's probably
23 300 pages. I'm just --
24    MS. BONJEAN: 45?

Page 255

1    THE WITNESS: I'm on page 45.
2 BY MR. BRUEGGEN:
3    Q.   Okay, sir. And do you -- do you see
4 who the detectives were that drafted this
5 supplementary report?
6    A.   Detective Smitka.
7    Q.   And I believe it's Schack, S-c-h-a-c-k.
8    MS. BONJEAN: Yeah, right here. Smitka and
9 Schack, yes. We see it at the bottom there.
10    THE WITNESS: Yes.
11 BY MR. BRUEGGEN:
12    Q.   And, sir, do you recall reviewing this
13 document?
14    A.   I have.
15    Q.   And is there any indication that
16 Detective Guevara interrogated Justino Cruz?
17    MS. BONJEAN: You mean specifically on this
18 document?
19    MR. BRUEGGEN: Yeah, specifically on this
20 document.
21    MS. BONJEAN: Okay.
22    THE WITNESS: If you just give me one second.
23 BY MR. BRUEGGEN:
24    Q.   No problem, sir.

Page 256

1    A.   Okay.
2    Q.   Sir, do you see any reference or
3 indication that Detective Guevara interrogated
4 Mr. Cruz?
5    A.   Well, there's an indication that he was
6 arrested by Guevara.
7        To answer your question
8 specifically, I have not seen any documents or GPRs
9 or notes that suggest that Guevara did or did not
10 interview him or -- so I -- I don't have any way of
11 knowing it.
12        But I would agree that there's
13 nothing in the report that says Guevara did
14 inter -- did interview him. But I would offer if
15 he was arrested by Guevara, it would be somewhat
16 unusual for the arresting officer not to have had
17 any kind of conversation with the person that he
18 arrested.
19    Q.   All right. And, sir, if you would
20 indulge me, I'd like to take just a couple-minute
21 break to get some more water and use the
22 facilities, if that's all right with you?
23    A.   Sure. 5 minutes?
24    Q.   That's fine.

Page 257

1    MS. BONJEAN: How much time on the record?
2 Can I get an indication?
3    MR. BRUEGGEN: Can we go off the record and
4 you can do the indication.
5    MS. BONJEAN: You can go off.
6    THE LEGAL VIDEOGRAPHER: We're off the video
7 record at 3:39 p.m.
8        (Recess taken.)
9    THE LEGAL VIDEOGRAPHER: We are back on the
10 video record at 3:47 p.m.
11 BY MR. BRUEGGEN:
12    Q.   Mr. Tiderington, are you ready to
13 continue?
14    A.   I am, yes. Thank you.
15    Q.   And moving on in your opinions, if we
16 could look at your report real quick because I just
17 want to orient ourselves to what's left, and
18 let's -- let me share this real quick.
19    A.   I'm sorry. What page -- oh, okay. 20.
20    Q.   Starting with page 20.
21    A.   Okay.
22    Q.   And, sir, I want to make sure I
23 understand.
24        It appears that you have three

THOMAS TIDERINGTON, 04/28/2023 Page 258..261

Page 258

1 opinions right here in bold that relate to the
2 underlying investigation.
3           This one on page 20, then you have
4 opinion 2 on page 24, and opinion 3 on page 28.
5 And then after that, it's not -- it's no longer
6 specifically about the investigation.  It's about
7 CPD's policies starting on page 33, correct, sir?
8 Do you see that?
9     A.   I do.
10    Q.   Okay.  And so I just want to touch on
11 those three specific opinions.
12           Under the first one, Deviations from
13 police training and generally accepted police
14 practices, it appears you have one subheading
15 that's, Investigative "tunnel vision" by Guevara
16 and other defendants.
17           Do you see that?
18    A.   I do.
19    Q.   On page 21.
20           And earlier, you gave us a
21 definition of tunnel vision, right?
22    A.   I'm sorry?
23    Q.   Earlier in the deposition, you already
24 gave us --

Page 259

1     A.   Yes.
2     Q.   -- that definition.
3     A.   Yes.
4     Q.   And then you --
5     A.   You covered -- you covered that very
6 well.
7     Q.   I appreciate that, sir, and so
8 obviously I won't spend that much time there.
9           And then for your second overarching
10 opinion, it's, Maysonet was unreasonably detained
11 and interrogated, and there's no subheadings under
12 there, right?
13    A.   That's correct.
14    Q.   And then the third is, The so-called
15 investigation of the murders of the Wiley brothers
16 is replete with further evidence of investigative
17 failures that violate accepted police practices,
18 and cast further doubt on the integrity of the
19 investigation, right?
20    A.   That's correct.
21    Q.   And you have the two subheadings under
22 there, the failure to document, and detectives
23 failed to document the information accurately and
24 thoroughly.

Page 260

1     A.   That's correct.
2     Q.   Okay.  And so I'm going to stop sharing
3 my screen, if that's all right with you.
4     A.   Sure.
5     Q.   And, sir, your first opinion that the
6 deviations of police training and generally
7 accepted police practices based on tunnel vision, I
8 wanted to ask you now that we've been talking about
9 this, can you tell me what Detective Montilla did
10 that you considered to be tunnel vision?
11    A.   I'm sorry.  What page are you on, Dave?
12 I'm sorry.  Page 20?
13    Q.   I'm just talking generally about that,
14 but yes, it would be page 20 through 24, that first
15 large opinion with the subheading of tunnel vision.
16    A.   Well, I think I detailed in my report
17 where I believe the deviation from acceptable
18 police standards were for the -- for that
19 detective.  I think it's well documented.
20           As far as looking at this, I don't
21 think you can look at a case in a vacuum.  I
22 understand based on his testimony that he looked at
23 himself as only as a translator, but I don't think
24 it removes his responsibility for properly

Page 261

1 conducting an investigation and documenting his
2 actions.
3           So beyond what I've already
4 testified to, I don't have any additional opinions
5 about this detective in terms of, you know, tunnel
6 vision.
7     Q.   How about for tunnel vision, same
8 question for Detective Paulnitsky?  What did he do
9 that you considered tunnel vision?
10    A.   Well, I think we'd have to take a lot
11 more time to talk about his actions.
12           It's questionable about whether or
13 not he actually arrested or whether Maysonet freely
14 accompanied him back to Area Five.  I think that's
15 a -- I think that's a factual dispute at this point
16 on whether or not he had arrested Maysonet or
17 incarcerated him inappropriately.
18    Q.   And, sir, would that be under your
19 second opinion that Maysonet was unreasonably
20 detained and interrogated?
21    A.   It would be, yes.
22    Q.   So I'm just focusing just on that first
23 opinion about the tunnel vision.
24    A.   Well --

THOMAS TIDERINGTON, 04/28/2023                    Page 262..265

Page 262

1    Q.   Do you have anything to say about
2  Paulnitsky regarding tunnel vision under that first
3  opinion?
4    A.   Yeah.  Again, I think I document my
5  opinion on each of the officers.  And whether one
6  fits in a category or another, I looked at it again
7  from the totality of the circumstances.  And there
8  may be overlaps in these categories, but the
9  substance of what they did I think is well
10 documented in my report.
11   Q.   And, sir, how about for Sergeant
12 Epplen?  What did Sergeant Epplen do that you
13 consider to be tunnel vision?
14   A.   Well, as a supervisor, he was in charge
15 of these officers.  He was responsible to ensure
16 that they properly documented, interviewed,
17 documented confessions, properly administered --
18 administered whether there were lineups.  I know
19 that's another question about whether or not there
20 were any lineups.
21        I'm assuming as the sergeant he
22 understood the length of time individuals were
23 being held in interrogation rooms.
24        So the sergeant is in charge of the

Page 263

1  operation to ensure that it's done appropriately.
2  So any misdeed on the part of the officers
3  certainly would fall on the shoulders of the
4  supervisor.
5    Q.   And do you know if Sergeant Epplen was
6  present while Maysonet was in custody?
7        And let me -- let me withdraw that
8  and let me rephrase it to make it clear.
9        Do you know if Sergeant Epplen was
10 working his shift and at Area Five when
11 Mr. Maysonet was in custody?
12   MS. BONJEAN:  Objection to the form of the
13 question.
14        The entire time he was in custody?
15   MR. BRUEGGEN:  Yes.
16   THE WITNESS:  I -- I don't know.  I -- it
17 seems to me that he -- the sergeant was on the day
18 shift, but again, I would have to go back and look
19 at the details.
20        I would not dispute the fact that he
21 was not there the entire time and that he -- I
22 believe he was on the opposite shift of some of
23 these officers.
24        I could be wrong about that, so but

Page 264

1  I -- that's my memory as we sit here today.
2  BY MR. BRUEGGEN:
3    Q.   All right.  And how about Detective
4  Halvorsen?  What was his involvement in having
5  tunnel vision as to Mr. Maysonet?
6    A.   Well, usually typically in cases that
7  I'm familiar with, the case agent is the one that
8  authors the report.  And the case agent is the --
9  is responsible to ensure that everything that is
10 being documented and -- and is responsible for
11 everything that occurs in a particular case.
12        So if my conclusions are right and
13 Halvorsen was the case agent or co-case agent along
14 with Guevara, then he would have had known -- or he
15 knew or should have known everything that occurred
16 there.
17        I don't know of a situation where we
18 just hire authors or people just to write the
19 reports.  Normally, the person that authors the
20 report is the one that is proactively involved in
21 the investigation.
22   Q.   What about Detective -- or sorry --
23 what about Sergeant Mingey as far as his tunnel
24 vision?  What are your opinions on that?

Page 265

1    A.   I think -- and I -- again, I usually
2  don't use this, but I think I testified pretty
3  thoroughly as far as my conclusions about what
4  Mingey did or didn't do.
5    Q.   Okay.
6    A.   And I think -- I think it reflects,
7  again, it would fall under the category of tunnel
8  vision.
9    Q.   And then finally, Detective Guevara,
10 what your thoughts on how he had tunnel vision in
11 this case?
12   A.   Well, do we start from the point where
13 he's refusing to testify in any cases, and if
14 that's the point that we're starting on, it's -- it
15 would go downhill from there.
16   Q.   Again, sir, I'm just focusing on this
17 case.  His tunnel vision at the time, not now
18 presently not testifying, but at the time, can you
19 point me to what you're looking at that says, This
20 shows me it was tunnel vision when they were
21 investigating Mr. Maysonet?
22   A.   Well, again, I think all of their
23 actions -- when I say "all of their," Guevara's
24 actions, I think illustrates the term that I'm

THOMAS TIDERINGTON, 04/28/2023                    Page 266..269

Page 266

1 using: Tunnel vision. And I think I've testified
2 to all the reasons why I came to that conclusion.
3      Q.    And, sir, with tunnel vision -- correct
4 me if I'm wrong, but I think you basically said
5 that it's focusing on a suspect as opposed to
6 letting the evidence lead you; is that correct?
7      A.    Well, as I previously testified, it is
8 focusing on a specific suspect without following
9 where the leads perhaps may take them, and also
10 understanding that there's other evidence. And if
11 you're going to ignore the evidence, if you're not
12 going to try to obtain additional corroborating
13 evidence, because your main focus is on charging
14 this one individual, that certainly would be my
15 definition -- definition of tunnel vision as well.
16         And again, it's not a legal term.
17 You know, it's a term described in the actions of
18 the officers, I guess.
19     Q.    And, sir, can you point me to the other
20 evidence that you believe that the defendant
21 officers ignored or didn't pay attention to when
22 they were focused on Mr. Maysonet that would have
23 led them in a different direction?
24     MS. BONJEAN: Objection, form. I mean, this

Page 267

1 was also asked and answered earlier starting, you
2 know, much earlier. I don't want to -- I'm not
3 trying to coach the witness, but he did discuss the
4 avenues he would have considered in an
5 investigation, so ...
6      THE WITNESS: I mean, we'd have to go back
7 and talk about the Lulu. We would have to talk
8 about the sisters not being interviewed. We would
9 have to talk about doing the forensic comparison of
10 the weapons.
11         You know, so we'd have to start all
12 over in the investigation, all of which I've
13 already testified to. There's nothing new.
14 Nothing -- we talked about tunnel vision. I think
15 I detailed in a lot of -- gave particulars and
16 specifics about it.
17         If you would like to go back over
18 that, we -- I would start from the beginning of the
19 police report and go forward.
20 BY MR. BRUEGGEN:
21     Q.    No, sir. And I'm not going to rehash
22 stuff. I'm just trying to make sure that I have
23 everything that you're going --
24     A.    It is.

Page 268

1      Q.    -- to say.
2         You said the ballistics comparison,
3 that was ultimately run, right? We talked about
4 that earlier?
5      A.    It was ultimately done at some point,
6 yes.
7      Q.    And did that -- the results of that
8 lead to any other investigative avenues?
9      A.    Did it lead to? No. It --
10     Q.    Yes.
11     A.    -- concluded. It concluded that the
12 theory or the hunch that Sergeant Mingey had was
13 not accurate, and --
14     Q.    So was there any --
15     A.    -- which -- which should have in my
16 opinion caused the detectives to thur -- to further
17 analyze their theory and their hunches, and to
18 realize that this was a case that the only evidence
19 that they had at this point was testimony evidence
20 about dubious -- from dubious individuals that may
21 or may not have been involved in gangs, and which
22 then should have caused the detectives to
23 understand -- to understand that there were still
24 tangible evidence out there that should have been

Page 269

1 sought after and investigated.
2      Q.    And, sir, when you said "dubious
3 individuals," are you including Rosa Bello as a
4 dubious individual?
5      A.    I would say if she was married to a
6 gang banger, I guess I've heard that Maysonet was a
7 gang banger at one point. I guess I'd have to
8 think about what my definition is about dubious.
9 And when I say dubious, all of the witnesses that
10 pointed to each other, there -- they had a motive
11 to lie about their involvement, and they certainly
12 had a motive to point a finger at somebody else.
13         Perhaps Rosa had that same motive,
14 if she feared that her children were going to be
15 taken away. If the jury credits her testimony that
16 that's what was told to her, it certainly would be
17 considered coercive testimony or coercive witness
18 statement -- a coercive witness statement that is a
19 deviation of acceptable police standards.
20     Q.    And, sir, the other investigative areas
21 you've talked about, we've already covered.
22         Re-interviewing the sisters who were
23 the ear witnesses, right?
24     A.    That's what we talked about, yes.

THOMAS TIDERINGTON, 04/28/2023                    Page 270..273

Page 270

1    Q.   And then the Lulu GPR, we talked about
2  that, right?
3    A.   We did.  We did.
4    Q.   Any other areas of investigation?
5    MS. BONJEAN:  I'm going to object.  I'm going
6  to object.
7         Any other areas that we haven't
8  already spoken about?
9    MR. BRUEGGEN:  And, Jennifer, if I could
10  please finish my question.
11   MS. BONJEAN:  I know, but these have been --
12  you're now covering ground that was already
13  covered, Dave.  And you know, I don't think
14  that's -- it gets to be a bit much.
15        But go ahead, you can answer.
16 BY MR. BRUEGGEN:
17   Q.   Again, I'm just trying to clarify and
18  ask the question.  You said we've already talked
19  about these.  I want to make sure that I have them
20  down.
21        We have those three areas we just
22  talked about:  The ballistics, Lulu, and the
23  sisters.  Was there any other --
24   MS. BONJEAN:  No, I'm going -- I'm going to

Page 271

1  object.  Those are examples.  Those are examples
2  that he's testified previously about, and that is
3  not --
4    MR. BRUEGGEN:  Jennifer, can I finish my
5  question?  I understand you want to object, but I
6  need to be able to finish my question.  You're just
7  kind of delaying things by trying to fight with me,
8  so --
9    MS. BONJEAN:  I'm not.  I just don't want to
10  go over the same territory, but go ahead.
11   MR. BRUEGGEN:  I'm not.
12 BY MR. BRUEGGEN:
13   Q.   Other than those three examples of
14  Lulu, the sister, and the ballistics evidence, was
15  there other -- any other areas of investigation
16  that you believe that the police failed to follow
17  up on?
18   A.   I have to answer that, because we're
19  into our sixth or seventh hour of dep --
20  deposition, and everything that I've testified to
21  previously, I stand by.
22        And if you're asking me, Now here's
23  the list.  Was there anything else, I would have to
24  point to and ask to refresh my memory by reading my

Page 272

1  deposition to see if I provided any additional
2  information to you.
3         So as we sit here today, without the
4  benefit of re-reading my deposition, without the
5  benefit of going through my report from page 1 all
6  the way through again, I believe that covers the
7  large categories that I've already testified to.
8    Q.   So would it be fair to say nothing
9  other than what you've already testified to; is
10  that fair?
11   A.   When you say "nothing" -- and again, I
12  know it's late and we're all getting tired.  I
13  believe that's all.  There could be other things,
14  but I won't -- wouldn't know that unless I was
15  allowed to go through the investigative file and
16  bring out other facts that -- I believe in my
17  testimony previous earlier today that I covered all
18  of those things appropriately.
19   Q.   Sir, moving on to your second opinion,
20  that Maysonet was unreasonably detained and
21  interrogated?  Okay?  Starts at page 24?
22   A.   Yes, sir.
23   Q.   I believe you told us you did not
24  believe that Mr. Maysonet should have been brought

Page 273

1  to Area Five when Paul -- when Detective Paulnitsky
2  saw him at the courthouse at that time?
3    A.   Well, I think that's another factual
4  dispute.  I believe the detective claims that it
5  was a voluntary -- that he voluntarily agreed to go
6  back to Area Five with him.  I think there's other
7  testimony or other documents, other -- other -- I'm
8  sorry.
9         In the police report, I believe I've
10  read that officers indicate that he was arrested on
11  that particular date.  And so the question is was
12  he arrested and taken from the courthouse, or the
13  detective indicated that he freely and voluntarily
14  went with him.
15        So what I took from that description
16  is that the detective knew that he didn't have
17  probable cause to arrest, and that's why he
18  claims -- and if the jury credits his testimony,
19  that Mr. Maysonet simply agreed to come with him to
20  the police station to clarify this stuff, then it
21  would not be an improper detaining of somebody if
22  he voluntarily went with him.
23        But there's also evidence that
24  the -- that Maysonet was arrested.  He was taken up

THOMAS TIDERINGTON, 04/28/2023                    Page 274..277

Page 274

1 to the police room in the courthouse. I think
2 indisputable evidence is that he was transported
3 and handcuffed, so it would indicate to me -- and
4 then he was placed in an interrogation room. So it
5 would indicate to me it had all the markings of
6 somebody that was under arrest versus somebody that
7 voluntarily came to the police station.
8      Q.   And so, sir, what about Detective
9 Montilla? What's your -- do you have an opinion on
10 Detective Montilla, whether he was involved in the
11 unreasonable detention of Mr. Maysonet?
12     MS. BONJEAN: Okay. I'm going to -- I'm
13 going to object to the form and foundation of that
14 question. The detention or arrest?
15     MR. BRUEGGEN: The unreasonable detention,
16 that's what the opinion says.
17     MS. BONJEAN: Okay.
18     THE WITNESS: I would have to go back and
19 see. I don't recall whether the detective, the
20 translator was involved. I believe he was involved
21 in -- I don't think he was involved in the
22 detention of Maysonet at the courthouse in any way.
23          I think he participated after he was
24 brought to the courthouse -- or I'm sorry -- to

Page 275

1 Area Five and interviewed.
2          I think I clearly articulated my
3 opinions about the detective, and I accept what he
4 said as far as his role -- role in this
5 investigation.
6          Once again, I think this is the
7 third or fourth time I said this. It doesn't
8 excuse his duty and responsibility of documenting
9 what he did or didn't do during the investigation,
10 and I think his failure to do that perhaps led
11 to -- has led to some of the problems that we're
12 having today trying to figure out what happened.
13 BY MR. BRUEGGEN:
14     Q.   And, sir, prior to detaining someone to
15 interrogate them, do you need physical evidence of
16 their involvement in a crime, or can it be based on
17 confessions or witness evidence?
18     MS. BONJEAN: Objection to the form. And
19 also, I don't know what case you're talking about,
20 but you can answer.
21     THE WITNESS: So any time you detain, arrest,
22 handcuff, transport, you have to have probable
23 cause in order to do so. So I guess that answers
24 your question. Or are you asking whether or not --

Page 276

1 I don't think it's my position to determine whether
2 they had probable cause. Based on the words of the
3 officer, the detective -- and I'm sorry, I forget
4 the officer detective who did the transport from
5 the courthouse?
6          Anyways, he said that he -- it was a
7 voluntary contact and that he freely accompanied
8 him to Area Five, and that is inconsistent with
9 other evidence that I reviewed in the case.
10 BY MR. BRUEGGEN:
11     Q.   Sir, in your opinions, you talk about
12 protecting the rights of an accused? Do you recall
13 that generally? And it's the same opinion, the
14 second unreasonable detention opinion.
15     A.   You're on page 24?
16     Q.   I'm on -- it's actually a little
17 farther along, page 26.
18     A.   And I'm sorry. If you could point to
19 the area that you have the question about?
20     Q.   Sorry. Let me withdraw that question.
21 I lost my place in my notes.
22     A.   Okay, no problem.
23     Q.   Sir, looking at page 27 of your report,
24 the very top line that's partially in bold?

Page 277

1     A.   Yes.
2     Q.   And you note: CPD policy specifically
3 prohibits "any circumstances of lengthy
4 incommunicado custody, deception, promises, or
5 suggestions.
6          Do you see that sentence?
7     A.   Yes.
8     Q.   And are you saying that Mr. Maysonet
9 was held incommunicado?
10     A.   Well, he was -- I don't know exactly
11 how long he was held, but he was certainly held for
12 a significant period of time incommunicado. I
13 believe he spent the night in the interrogation
14 room.
15          So yeah, I -- I think that would be
16 a fair conclusion.
17     Q.   And would -- would him speaking to his
18 sister and Rosa Bello while he was there, would
19 that be incommunicado, or does that count as
20 communication?
21     A.   Well, I guess it depends on you'd have
22 to make a determination of how long the person is
23 held and when -- when did these communications
24 occur.

THOMAS TIDERINGTON, 04/28/2023                    Page 278..281

Page 278

1    Q.    And did you make that determination in
2  your opinions?
3    A.    I -- and again, you pointed out a great
4  point.  There's no details as to what time these
5  events occurred.  You would expect -- based on the
6  questions you're asking, you would expect to be
7  able to look in an investigative file such as this
8  and find out that Rosa came to the police station,
9  Area Five, at 12:25 p.m. and met with Detective
10 Such-and-such who allowed her to meet with Maysonet
11 and have a conversation with him.  And that -- that
12 would have been of course detailed in a
13 supplemental report.
14        But we don't have that information,
15 so I can't draw those conclusions.
16    Q.    And so when you say incommunicado, it
17 depends on the time between communications or the
18 length?  I guess I'm not following your answer,
19 sir.  I'm sorry.
20    MS. BONJEAN:  Objection.  What's the
21 question?  He just -- the report just articulates a
22 policy.
23    MR. BRUEGGEN:  I appreciate that, Jennifer,
24 but he put it in there, it's bolded incommunicado.

Page 279

1  I'm asking him what his opinion is on
2  incommunicado.  He explained it, and I'm saying I
3  don't understand it.  I'm asking if he could
4  explain it in the time.  I appreciate --
5        (Simultaneous cross-talk.)
6    MS. BONJEAN:  No.
7    MR. BRUEGGEN:  -- the testimony --
8    MS. BONJEAN:  You're not doing that.  No, I'm
9  going to object.
10        (Simultaneous cross-talk.)
11    MR. BRUEGGEN:  Jennifer --
12    MS. BONJEAN:  No, I'm objecting.
13    MR. BRUEGGEN:  Jennifer, please don't
14 interrupt.  Let me finish.  I'm trying to move
15 quick, okay?  I'm trying to move --
16        (Simultaneous cross-talk.)
17    MS. BONJEAN:  I understand, but you're --
18 you're not even reading the next sentence.  I mean,
19 you're -- you're --
20    MR. BRUEGGEN:  Jennifer, he could point that --
21        (Simultaneous cross-talk.)
22    MS. BONJEAN:  -- arguing with him.
23        Okay.  Let me just put my objection
24 on the record.

Page 280

1        It's argumentative, specifically
2  about the incommunicado, so I'm going to object on
3  those grounds.  Go ahead.
4  BY MR. BRUEGGEN:
5    Q.    And, sir, again, I was asking for a
6  little clarification on your answer about
7  incommunicado.  You said it depends on how long he
8  was held, but we didn't know that.
9        Don't we know roughly the time that
10 he was -- came to Area Five and when he was
11 charged?  We know those two end points, right?
12    A.    I don't know if we do or not.  I think
13 we know the two end points, but we're missing a lot
14 of what occurred between those two points.
15        Again, if -- if you have that -- the
16 policy available, if you could pull that up, I
17 think the Chicago Police Department policy is more
18 specific than I was in this paragraph.
19        And if you give me the opportunity
20 to look at that, I think I could probably answer
21 your question more precisely.
22    Q.    Sir, moving back to page 26 of your
23 opinions, and I'll show it to you.  And I want to
24 focus on this portion right here.

Page 281

1        You say:  The fact that Guevara
2  committed so many repeated serious transgressions
3  during homicide investigations, resulting in the
4  wrongful prosecution and conviction of innocent --
5  innocent individuals, indicates to me that his
6  supervising and fellow officers must have known and
7  simply turned a blind eye to his misconduct.
8        Do you see that, sir?
9    A.    I do.
10    Q.    Okay.  And what do you base this fact
11 that Guevara committed so many repeated serious
12 transgressions?
13    A.    Well, I think the City of Chicago hired
14 a -- an outside entity to come in and evaluate some
15 of the cases, the Lassar report is one that I can
16 point to.  And they in part drew or pointed out --
17 they concluded what I indicate here in my report.
18    Q.    And, sir, can we just -- let's just go
19 off the record briefly.
20        (Discussion off the record.)
21 BY MR. BRUEGGEN:
22    Q.    All right.  Sir, do you remember where
23 you were?
24    A.    Yeah, I was just finished answering

THOMAS TIDERINGTON, 04/28/2023                    Page 282..285

Page 282

1 your -- answering your question.
2     Q.   Okay.
3         MS. BONJEAN:  Do you want me to close the
4 door?
5         MR. BRUEGGEN:  No, no, that's --
6         MS. BONJEAN:  Oh, no?
7         MR. BRUEGGEN:  No, you don't need to.  I
8 just -- again, I was just dis -- because I'm sorry.
9 I saw people walking by and waving and doing other
10 things, so ...
11        MS. BONJEAN:  Yeah, that's -- it's real
12 casual around here.  I don't make the rules.
13 BY MR. BRUEGGEN:
14    Q.   And, sir, in the Lassar report, do you
15 remember how many cases that said --
16    A.   Well, I --
17    Q.   -- it was a fact that Guevara did
18 something -- serious transgression?
19    A.   Well, I think I testified in my last
20 deposition, I don't -- maybe it was Iglesias, or I
21 was provided a document that there were over
22 34 cases that have been documented of individuals
23 that were exonerated based on the investigative
24 work of Detective Guevara.  And I don't know

Page 283

1 exactly what the number is now, but the No. 34
2 sticks out in my mind.
3         And I don't know exactly where I got
4 that information or who provided it, but it was in
5 some type of a document.
6         There was also information in the
7 Lassar report, not specifically about the number of
8 cases in which there were exonerations, but more
9 specifically about the practices of the Chicago
10 Police Department.
11    Q.   And, sir, then down below, you say, the
12 repeated criminal assault.
13        And I just want to know what you're
14 referring to when you say, These repeated criminal
15 assaults -- affirmed as part of Lassar's
16 investigation.
17        Can you identify those criminal
18 assaults for me?
19    A.   I would have to go through the Lassar
20 investigation and refresh my memory on that.
21    Q.   And, sir, last part on this topic is at
22 the top of page 28, you say, The failure to
23 document suspect interrogations is a gross
24 deviation -- sorry, The failure to document suspect

Page 284

1 interrogations contemporaneously is a gross
2 deviation from the generally accepted practice.
3         You see that?
4     A.   That's correct.  You read that
5 correctly.
6     Q.   Okay.  And do you believe it's required
7 that suspect interrogations have to be
8 contemporaneously recorded in a police report?
9         MS. BONJEAN:  Objection, form.
10        THE WITNESS:  Well, they have to somehow be
11 documented, detailed in a police report.
12 Oftentimes, it's by virtue of notes being taken.
13        So to think that a detective can
14 conduct a homicide investigation without taking any
15 notes and then write a 10-page report two months,
16 three months later is illogical to conclude that
17 that's -- it's illogical to conclude that that's
18 even possible.
19        So I guess there's two questions
20 here.  The first question is:  Should an officer
21 contemporaneously document what a witness or a
22 suspect says to him?  Yes, absolutely.
23        And I guess the second part is:
24 Once they capture this information, should it be

Page 285

1 documented in a police report?  And the answer to
2 that is also yes.
3 BY MR. BRUEGGEN:
4     Q.   Sir, moving on to your last opinion
5 with respect to the underlying investigation.
6         You're pointing out -- your position
7 is it's replete with further evidence of
8 investigative failures that violated accepted
9 police practices, right?
10    A.   That's correct.
11    Q.   And we've already talked about your
12 opinions on some of the failures that violated
13 police practices, particularly the recording of
14 interviews timely, right?
15    A.   That's one of them, but yeah.  We --
16    Q.   Yeah.  I'm just --
17        (Simultaneous cross-talk.)
18    A.   We've been talking for six hours about
19 the deficiency.  So yeah, it's difficult for me
20 just to summarize this as one, two, and three, if
21 that's what we're going to do.
22    Q.   And again, I'm just working on the
23 document you gave me.
24        What are the other violations of the

THOMAS TIDERINGTON, 04/28/2023                    Page 286..289

Page 286

1  acceptable police practices other than what we
2  talked about about all the charting issues or the
3  recording memorialization issues?
4       A.  Other than everything that I've
5  testified to here today since 10:00 o'clock this
6  morning, I think that that pretty much covered
7  everything that I intended in -- in terms of my
8  opinions in this report.
9       Q.  Sir, going down to your actual -- and I
10  just want to get clarification.
11          You say, Oral communications during
12  a homicide investigation is insufficient.
13          Do you see that, sir?
14       A.  I do.
15       Q.  And so when you worked for the Fort
16  Lauderdale Police Department as a detective and you
17  were working with homicide detectives on a murder,
18  would you be sending memos back and forth to each
19  other?
20       MS. BONJEAN:  Objection, form.
21       THE WITNESS:  Well, I guess that's not what
22  we're talk -- that's -- if you're asking me what I
23  meant in that, that -- in this case, that's not
24  what we're talking about.

Page 287

1          What I'm talking about in this case
2  is Sergeant Mingey allegedly captured a confession
3  or -- on at least one or two different occasions
4  from an individual that was ultimately charged with
5  a double murder, and there's no documentation
6  whatsoever of how he communicated this information
7  to the case agent or to the author of the report.
8  There's no contemporaneous notes of his interviews.
9  We don't know if they were in English or in
10  Spanish.  We don't know if the translator that went
11  with him ever talked with Maysonet, whether
12  interpreted any conversation, whether it was in
13  English or Spanish.
14          And it's my understanding, based on
15  Mingey's testimony and deposition, that it's
16  possible that he may have just told Halvorsen what
17  to write in the report.  I'd describe that as an
18  inappropriate oral communication of information of
19  this nature and of this importance.
20  BY MR. BRUEGGEN:
21       Q.  Okay.  So --
22       A.  I think you can communicate, Hey, I had
23  a pizza for lunch, with a detective, but I don't
24  think you should communicate orally, Hey, oh, by

Page 288

1  the way, two months ago this guy confessed to a
2  murder.  I don't think that that's appropriate.
3       MS. BONJEAN:  Okay.  Steve just re-entered.
4  BY MR. BRUEGGEN:
5       Q.  All right, sir.  So with that
6  qualification, that's what you meant in this
7  sentence, right?
8       A.  That's correct.
9       Q.  And, sir, can you point me to any
10  industry standard from 1990 that said
11  contemporaneous notes were required in
12  investigations?
13       MS. BONJEAN:  Okay.  Hold on second.  Please
14  stop for a second.
15          (Discussion off the record.)
16  BY MR. BRUEGGEN:
17       Q.  Sir, did you get my question?
18       A.  No, no.  About the plates?
19       Q.  Okay.  And I appreciate you bearing
20  with me.  I know it's been a long day, and we're
21  pushing through, and --
22       A.  No, I --
23       Q.  -- I see the light, so ...
24       A.  Okay.

Page 289

1       Q.  Can you point me or direct me to an
2  industry standard that was applicable in 1990 that
3  said -- that required police reports to be
4  contemporaneously noted?
5       MS. BONJEAN:  I'm going to object to the
6  form.  I assume you mean "written," right, Dave?
7  BY MR. BRUEGGEN:
8       Q.  Correct, yes.  An industry standard, a
9  written industry standard.
10       A.  Well, I'm certain there are.  Can I
11  point them to you?
12          I know when I went through the
13  Detroit police academy in 1978 as a young recruit
14  officer, part of our role-playing exercises
15  involved investigating and responding to homicide
16  investigations.  And one of the things that we
17  learned early on as a police recruit is that it was
18  your responsibility, the officer's responsibility
19  to document all of their actions and activity as it
20  relates to a -- a crime.
21          Along with that, most departments
22  that I'm familiar with have a policy that police
23  reports are to be completed in a timely manner,
24  right?

THOMAS TIDERINGTON, 04/28/2023                    Page 290..293

Page 290

1          Now, how do you define timely?
2    Well, I would define timely as by the end of the
3    shift, depending on the circumstances.  Certainly
4    by the end of the next shift or shortly thereafter,
5    I would expect that the reports would have been
6    completed.
7          I believe that's the industry
8    standard.  Can I point to it?  I think I can.  I
9    think I can provide you that information.
10         I think the Chicago Police
11   Department might have a policy, which clearly they
12   violate, but most police departments give that
13   direction to their officers, or at least that's the
14   training that reports would be done in a timely
15   manner.
16    Q.   And, sir, just focusing on all your
17   opinions, you take issue and say that in this
18   investigation there were a lot of issues with the
19   documenting of the investigative tasks; is that
20   accurate?
21    MS. BONJEAN:  Objection, form.
22    THE WITNESS:  I think that's unquestionable.
23   I don't think anybody would dispute that.  I
24   certainly haven't -- haven't had any -- any

Page 291

1    evidence that anybody's disputed any -- that
2    opinion in any way that I've given over many cases.
3    BY MR. BRUEGGEN:
4     Q.   Sir, I think you told us that that was
5    how you practice when you were in Fort Lauderdale
6    and how you expected the detectives under you to
7    practice -- or strike that.
8          That was bad question.  Sorry, my
9    mind is a little tired.  I apologize.  So --
10    A.   No worries.
11    Q.   -- this idea of timely recording your
12   investigative activity was something how you
13   practiced when you were at Fort Lauderdale, right?
14    A.   Well, Detroit Police Department, the
15   Fort Lauderdale Police Department, the Drug
16   Enforcement Administration.  I was on loan to the
17   Broward Sheriff's Office for a period of time while
18   I was assigned to the organized crime division.
19   I've taught at academies throughout the country.
20         So what I'm suggesting is consistent
21   with not only my personal experience, but other
22   departments that I've worked with around the
23   country, and quite frankly, a very large federal
24   agency, which is also consistent with standards

Page 292

1    perhaps that are set by the IACP and other police
2    chiefs around the country.
3          I've never seen a policy that says,
4    Just do a report whenever you feel like it, or six
5    months after the event.
6     Q.   And, sir, when you were with the DEA --
7    and I saw it and I wanted to ask you about this.
8    It was in your CV, and I can put your CV up there
9    if you would like.  If you bear with me, I could --
10    A.   No, I could remember what I did.  Thank
11   you.
12    Q.   There was some -- you talked about on
13   an investigation, a large investigation where a lot
14   of money was seized.  I want to make sure I --
15    A.   That's correct.
16    Q.   It was at page 96 of your CV, and I can
17   put it up on the screen if you'd like.
18         But it says:  Supervised and managed
19   one of the most sophisticated and successful
20   worldwide money laundering investigations
21   (Operation Princess.)  Seizing in excess of
22   $100 million in cash and over five tons of cocaine?
23    A.   That's correct.
24    Q.   And, sir, and I think I understand

Page 293

1    this, but was that where you guys would get --
2    informants would provide you information, you would
3    seize money, and then informants were entitled to a
4    percentage of the seizure as an encouragement for
5    informants?
6     A.   No, it's kind of complicated.  It
7    was -- it was an international money laundering
8    investigation.  The informants -- some of the
9    informants were entitled -- entitled to some of the
10   seized money based DEA's policies and practices.
11         Some of it dealt with commission's
12   money that were charged to the trafficker based on
13   the money that was being laundered for them.  And
14   the DEA in some instances would pay the
15   confidential informant not a percentage of what was
16   seized, but an ongoing stipend for their continued
17   work with the federal government.
18    Q.   Okay.  So providing the tips, you just
19   got a stipend.  It wasn't based on better tips, you
20   got paid more because you got a percentage of it?
21    A.   Well, some of it was.  I'm not -- I'm
22   saying it's -- it was a complicated five-year long
23   investigation.  Some of it was what we call a
24   reward payments or award payment.  Other

THOMAS TIDERINGTON, 04/28/2023                          Page 294..297

Page 294

1  informants, and one in particular, was paid a
2  monthly stipend.  She was also then paid -- also
3  there were awards that were paid to her.  So it was
4  a combination.
5          And it's not -- I can't really
6  describe it in 5 minutes.  It was a five-year
7  investigation, and it was -- it doesn't do it
8  justice if I tried to describe it here in 3 or
9  4 minutes.
10     Q.   I appreciate that, sir.
11          It's my understanding that one of
12  those informants filed a lawsuit against the
13  federal government related to her involvement in
14  that?
15     A.   That's true.
16     Q.   And what were her allegations in that
17  lawsuit?
18     A.   That the government did not do
19  enough -- she was kidnapped down in Columbia and
20  that she sued the government for not doing enough
21  to protect her and prevent her from being kidnapped.
22     Q.   Were you named in that lawsuit given
23  your involvement in the program, or were you just
24  on the ancillary as a witness?

Page 295

1     A.   No, I was the supervisor in charge.  I
2  don't know if I was named and then I was removed
3  from it.  I -- I don't recall.  It was several
4  years ago.  And I'm sure you have Pacer and you can
5  figure out whether or not I was named or not, but I
6  don't recall if I was or not.
7     Q.   And during the pendency of that
8  litigation, was there an issue with some of that
9  money that had been seized being missing?
10     MS. BONJEAN:  Objection to the form of that
11  question.  Was there an issue?  I mean --
12     THE WITNESS:  Well, it wasn't any issue on my
13  part.  There was an issue where a DEA agent stole a
14  million dollars, and he was convicted of it.  And
15  we -- when I say "we," myself and other agents
16  participated in the investigation that led to his
17  arrest, if that's what you're referring to.
18  BY MR. BRUEGGEN:
19     Q.   And, sir, wasn't there an issue with
20  approximately $33 million from the money that had
21  been recovered being missing?
22     A.   I know nothing about that.  I mean, no.
23          No, the only -- the only proven
24  allegation about missing money was the result of a

Page 296

1  theft by an agent by the name of Rene DeLaCova, who
2  was convicted.
3     Q.   And were there other allegations about
4  missing money?
5     A.   When you say allegations --
6     MS. BONJEAN:  Yeah, I'm going to -- I'm going
7  to object to the form of that question, the
8  foundation of that question as well.
9          If you can give us a little more
10  context as to the allegations.
11     THE WITNESS:  Right.
12  BY MR. BRUEGGEN:
13     Q.   And, sir, you told me that you were I
14  think you said the agent in charge of this program,
15  right?
16     A.   Well, I was the supervisor in charge.
17  It was a --
18     Q.   Supervisor in charge, sorry.
19     A.   Yep.
20     Q.   And so were you made known of any
21  allegations of some large amount of money being
22  missing to the tune of $33 million?
23     A.   No, that's -- that's ridiculous, no.
24  There was never any allegation from DEA or anybody

Page 297

1  else about any missing money other than the money
2  that was stolen by Rene DeLaCova, which he was
3  convicted of, the money was found in his house, and
4  he was charged and arrested.
5     Q.   Okay, sir.  And the reason I ask is
6  because you said the only allegation that was
7  proven was the one against Rene DeLaCova, and I --
8     A.   Well --
9     Q.   -- so I didn't know if there were other
10  allegations.
11     A.   There was a book written about it, and
12  as I've testified in other depositions, that don't
13  believe everything you read in a book.  A lot of it
14  is entertainment.
15          I guess I could use the example, a
16  recent -- again, the book is based on a true story.
17  Doesn't mean everything in it was true.  It doesn't
18  mean people were -- that were interviewed by the
19  author were under oath.
20          There's a -- recently a movie came
21  out called the Cocaine Bear.  It was based on a
22  true story.  And the only part of the story that
23  was true was cocaine was dropped in the woods and a
24  bear ate it and died.  But the movie is based on

THOMAS TIDERINGTON, 04/28/2023     Page 298..301

Page 298
1 this bear that went crazy and killed a bunch of
2 people based on being addicted to cocaine.
3  So if -- that was based on a true
4 story also, so I think it's -- hopefully it's a
5 good analogy.
6  Q.  I appreciate it.
7  You're basically saying you can't
8 believe everything you read, and you can't believe
9 all the allegations, and I understand that.
10  A.  No, I can tell you that if the DEA
11 thought there was $33 million that the case would
12 still have been continued to be investigated, but
13 there was no allegation that there was $33 million
14 missing.
15  Q.  And as a result of that Princess
16 litigation, did the DOJ basically force that unit
17 to change its policies on its awards and stuff like
18 that with informants?
19  A.  Not that I know of.  I can't -- I can't
20 speak for the DEA as far as their policies or what
21 changes to the policies occurred after this.  But I
22 have no knowledge that this caused them to change
23 any investigation -- or any policy.
24  Q.  And, sir, when that lawsuit happened,

Page 299
1 were you still detailed to the DEA, or had you
2 moved on in your career?
3  A.  I don't -- I don't recall.  Maybe I was
4 still assigned there.  I don't know when the
5 lawsuit was filed.  I may have already been
6 promoted and -- and reassigned.  I don't know.
7  MR. BRUEGGEN:  All right, sir.  And if we
8 could just take a quick break, I'm going to look at
9 my notes.  I think I'm just about done or done.
10 And so if we could just take a quick 5-minute break
11 so I can organize so I'm not wasting your time.
12  THE WITNESS:  Great, thank you.
13  THE LEGAL VIDEOGRAPHER:  We're off the video
14 record at 4:36 p.m.
15  (Recess taken.)
16  THE LEGAL VIDEOGRAPHER:  We are back on the
17 video record at 4:47 p.m.
18  MR. BRUEGGEN:  Mr. Tiderington, thank you
19 very much for your time.  I'm done with my
20 questions, but I know there's other attorneys who
21 want to ask you questions.  So thank you.
22  THE WITNESS:  Thank you very much.
23
24

Page 300
1  EXAMINATION
2 BY MS. CARNEY:
3  Q.  All right.  Hi, Mr. Tiderington.  As I
4 said earlier in the day, I'm Theresa Carney, and I
5 represent the City.  Can you hear me?
6  A.  I can.
7  Q.  Oh, okay.  So I'm going to be asking
8 you some questions about the second part of your
9 report, which --
10  A.  Okay.
11  Q.  -- I believe Dave has already marked as
12 Exhibit 7, but let me try to share it quick.
13  All right.  Can you guys see my
14 screen?
15  MS. BONJEAN:  Yes.
16 BY MS. CARNEY:
17  Q.  Okay.  And I'm going to start on
18 page 33 here, starting with opinion 4:  CPD's
19 policies and practices concerning documentation and
20 disclosures in homicide investigations are woefully
21 inadequate and result in the routine failure to
22 document and disclose the documents and information
23 learned during the homicide investigation into
24 criminal defendants.

Page 301
1  Do you see that there?
2  A.  I do.
3  Q.  Okay.  And this is largely the same
4 opinion that you've given in previous cases; is
5 that right?
6  A.  It is, yes.
7  Q.  Okay.  And opinion 4, the Monell
8 opinion in this case, and I believe you have a
9 subopinion of -- I believe there's a subopinion 5
10 in here?  Sorry.
11  A.  That's all right.
12  Q.  There it is, on page 51.
13  So and then that goes to the end of
14 your report, which is page -- which is 77 pages.
15  A.  Okay.
16  Q.  So is it fair to say about 44 pages of
17 this report is the Monell opinion, which is largely
18 the same as your previous reports?
19  A.  That's -- that's a fair statement, yes,
20 it is.
21  Q.  Okay.  So I'm going to bounce around a
22 little bit here.
23  If we go to page 34 of your report --
24  A.  Okay.

Urlaub Bowen & Associates, Inc.  312-781-9586

THOMAS TIDERINGTON, 04/28/2023                    Page 302..305

Page 302

1    Q.  -- we have -- I'm trying to get fancy
2  here, and it's not working.  I should not do that.
3         The first paragraph here, you say:
4  In addition to the Wiley investigative file, I've
5  reviewed many more Chicago homicide files and
6  corresponding criminal defense files.  And then you
7  say, For this -- oh, yeah, that didn't work.
8    A.  I'm reading it from the hard copy, so --
9    Q.  Okay, great.  I'm going to not be fancy
10 then.
11   A.  I'll take the board for you.
12   Q.  For this case, I reviewed all Area Five
13 homicide files (investigative files, permanent
14 retention files) the City produced for the period
15 of 1987 through 1990.
16        Do you see that there?
17   A.  I do.
18   Q.  Okay.  When you say you reviewed all
19 Area Five homicide files the City produced for the
20 period of 1987 through 1990, how many files total
21 did you review?
22   A.  When I say that, that's the files that
23 were provided to me by counsel here.  So I'm
24 assuming those were the ones that were provided by

Page 303

1  the City if that makes sense.
2    Q.  Yeah.  My question is more about the
3  number.
4         Do you recall sitting here today how
5  many total files that was?
6    A.  Yeah.  I think I have a chart if I
7  remember correctly, and I'm looking for ...
8    MS. BONJEAN:  An attachment?
9    THE WITNESS:  No, it's not an attachment.
10 It's part of the report.
11 BY MS. CARNEY:
12   Q.  Is it the chart on page 52?
13   A.  Yeah, that's -- that's what I was
14 looking for.
15   Q.  Okay.  So based on this chart, it looks
16 like there was 136 Area Five investigative files?
17 Does that look right?
18   A.  That does.
19   Q.  And 271 corresponding RD files.
20   A.  That's correct.
21   Q.  Okay.  Did you review each of those
22 files cover to cover?
23   A.  I did.
24   Q.  Okay.  How much time did you spend

Page 304

1  reviewing each of those files?
2    A.  I couldn't answer that.  Some I was
3  able to go through very quickly.  When I say able
4  to go through them very quickly, some had -- you
5  know, I was looking to determine the number of GPRs
6  that were contained in these files.  Some had zero.
7         So if it was a 40-page report and I
8  was able to go through it pretty quickly, I spent
9  very little time on it.  Others were far more
10 complicated and I spent more time on.
11   Q.  So on average, could you -- what would
12 be the least amount of time that you would have
13 spent on the file review?
14   MS. BONJEAN:  Objection, form.  Go ahead.
15   THE WITNESS:  Yeah, I don't know if I can
16 answer that, because I -- I don't know.  I didn't
17 track how long I spent on each file.  This -- this
18 was over a course of a couple weeks I think.  Or
19 maybe not a couple weeks, but it was over a course
20 of several days.
21        So I have no system where I would be
22 able to tell you accurately how much time I spent
23 on each file.
24

Page 305

1 BY MS. CARNEY:
2    Q.  Okay.  But if we were to add that up --
3  let me ask you this:  When you were reviewing these
4  files, were you -- you reviewed both the
5  investigative file and the RD file; is that
6  accurate?
7    A.  That's correct.
8    Q.  Okay.  So if you added 136 to 271,
9  that's 407 individual files that you reviewed,
10 right?
11   A.  That sounds correct.
12   Q.  Okay.  And did I hear you say before
13 just now that you were reviewing them only to see
14 if GPRs were located in them, or was --
15   A.  No, no.
16   Q.  -- your review broader?
17   A.  No, there were -- there were other
18 reasons that I was reviewing them.  But part of it
19 was an analysis of the GPRs.  And if there were no
20 GPRs in the report, then it lessened the time that
21 I would spend on that particular case file.
22   Q.  Okay.  So I think Dave marked your
23 invoice as Exhibit 6 before, so I'm showing you
24 that again on the screen here.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 04/28/2023                    Page 306..309

Page 306

1      And starting here around 12/13/2022,
2 you have several entries of, Review and analysis of
3 investigative/RDF files 1987 through -- and it's
4 got '91 -- '90, '91, '92, '93, '94, and '95.
5      Do you see that?
6   A.   I do.
7   Q.   Okay.  So I totaled those up and got a
8 total of about 22.55 hours.
9      Does that sound accurate for your
10 review of 407 files?
11   A.   It sounds accurate based on the
12 billable hours that I submitted, yes.
13   Q.   Okay.  What does that mean, accurate
14 based on the billable hours you submitted?
15   A.   I mean, you're asking me -- you said
16 you added those up, and you said it totaled such
17 and such, and I'm agreeing with you that that's
18 what that totals.
19   Q.   Okay.  So you invoiced 22.55 hours for
20 the review of 407 files.
21   A.   You know, I -- I don't know if it was
22 that exact.  I mean, I may have read a deposition
23 in the middle of this, or I may have looked at some
24 case files on the 26th and -- and it was reflected

Page 307

1 in my billable hours there.  I have an
2 unsystematic -- or unscientific way to track my
3 time.  But I do have an app and that's how I track
4 the time that I spent on it.
5      But it's not to say that I didn't
6 look at these files on January 5th along with other
7 files that I reviewed.
8   Q.   Okay.  So looking at your invoice,
9 there's no way to truly differentiate your review
10 of the Monell files from your review of the rest of
11 the material for you -- you reviewed for your
12 report?
13   A.   That's correct.
14   Q.   Okay.  So back at your report, couple
15 sentences down here in this first paragraph still,
16 you say, I also reviewed all Area Five homicide
17 files, corresponding criminal defense files for the
18 period of 1995 through 1998 as produced by the City
19 in the Solache/Reyes versus City of Chicago case,
20 right?
21   A.   I have, yes.
22   Q.   Okay.  And you've given testimony at
23 length in the consolidated cases of Solache and
24 Reyes, right?

Page 308

1   A.   Yes.  And I hope we don't have to do
2 that again today.
3   Q.   No, don't worry.  I don't have that
4 much time.
5      Based on your -- since your report
6 in the consolidated cases of Reyes and Solache
7 though, you were made aware that the Area Five
8 homicide files from 1995 through 1998 also had
9 corresponding Cook County State's Attorney files,
10 right?
11   A.   I learned that at some point.  I don't
12 know exactly when I learned that, but I did learn
13 that, yes.
14   Q.   Okay.  And I know in the Solache/Reyes
15 deposition you had not reviewed any of those --
16 those files.
17      Is that still true today?  Have you
18 reviewed any of the Cook County State's Attorney's
19 files that were produced in conjunction with the
20 1995 through 1998 Area Five files?
21   MS. BONJEAN:  I'm going to -- I'm going to
22 hold on and object.  For one second.
23      I am going to object to, you know,
24 questions that have been asked or already put to

Page 309

1 Mr. Tiderington in relation to other depositions,
2 and I also don't --
3   MS. CARNEY:  I'm not going --
4   MS. BONJEAN:  Also --
5   MS. CARNEY:  I'm not going to go into that.
6 It's --
7   MS. BONJEAN:  And I don't want to intrude on
8 any privileged communications between counsel in
9 Solache and Reyes of Mr. Tiderington, so I just
10 want to place that on the record, but --
11   MS. CARNEY:  Yeah, and that's not my
12 intention.  It's not my intention to rehash any of
13 the Solache/Reyes questions.
14 BY MS. CARNEY:
15   Q.   The question is simply:  Since that
16 point, have you reviewed any of the CCSAO files
17 that were produced and corresponded with the Area
18 Five files from 1995 through 1998?
19   A.   I would have to go back and look.  I
20 don't recall as we sit here today if I did or not.
21   Q.   Okay.  If I represent to you that it
22 is -- that no CCSAO files are listed in your
23 materials reviewed attachment to this report, does
24 that refresh your recollection about whether or not

THOMAS TIDERINGTON, 04/28/2023                    Page 310..313

Page 310

1 you've reviewed any CCSAO files from that dataset?
2     A.   I don't recall reviewing them relating
3 to this case whatsoever.
4          But the other question was did I
5 ever review them.  I don't recall if I did.  I
6 don't specifically remember that I reviewed them
7 relating to this case.  And I would have to, again,
8 go back and do some more research on if they were
9 provided and when I reviewed them.
10     Q.   Okay.  All right.  So this next
11 paragraph here, when you start with, Each of those
12 cases con -- well, actually, I have to read the
13 first sentence up here to make it complete.
14          So the very last sentence of that
15 top paragraph says:  I have also reviewed the
16 expert reports of Michael Brasfield in Fields
17 versus City of Chicago and Rivera versus City of
18 Chicago, which involve a similar review of hundreds
19 more homicide files and corresponding files for
20 different time periods (Rivera) or different Areas
21 (Fields), as well as the police homicide files in
22 Sierra, Reyes and Solache, Inglesias, Rivera,
23 Fields and Kluppelberg.
24          Do you see that there?

Page 311

1     A.   I do.
2     Q.   What police homicide files are you
3 referring to there?
4     A.   The permanent retention files and the
5 investigative files.
6     Q.   For those underlying criminal
7 investigations, or something more global?
8     A.   Well, it -- and again, we're getting
9 kind of far afield.
10          I reviewed Brasfield's reports as
11 they relate to the review that he did.  And then
12 I've reviewed other reports relating to Sierra,
13 Reyes, Iglesias, and -- well, now Johnson as well
14 and Gomez I think as well.
15          So I guess I don't know -- I guess I
16 don't know how to answer that question.
17     Q.   Okay.  In the next sentence, you say:
18 Each of those cases contain examples of
19 investigative material suppressed in CPD homicide
20 files, or that was otherwise not properly
21 documented or disclosed, that should have been
22 turned over to the criminal justice system based on
23 police training, and that would have clearly been
24 considered Brady material under generally accepted

Page 312

1 police practices.
2          Do you see that sentence?
3     A.   I do.
4     Q.   Okay.  What is the definition of Brady
5 under, quote, generally accepted police practices?
6     A.   Well, I don't know if -- I mean, I'm
7 not aware of a specific definition.
8     Q.   Okay.
9          MS. BONJEAN:  I mean -- I'm sorry.  This is a
10 late objection, but I'm going to object to the form
11 of that question.  That's it.
12 BY MS. CARNEY:
13     Q.   And then you --
14     A.   Let me -- I'm sorry.  Go ahead.
15     Q.   So you say each of those cases --
16          MS. BONJEAN:  I --
17          MS. CARNEY:  Yep, sorry.  What's up?
18          MS. BONJEAN:  I was just going to say it's
19 kind of a compound question.  I don't know -- you
20 know, you took a little snippet of it, so it was
21 confusing to me.  But again, I didn't mean to --
22 you know, I just want to object on that basis.
23          MS. CARNEY:  That's fine.  I'm just taking
24 his phrase here.  Brady material under generally

Page 313

1 accepted --
2          MS. BONJEAN:  But you're taking a phrase
3 though -- you're taking a little piece of it, so I
4 don't know that you're -- Brady under generally
5 accepted police practices don't necessarily go
6 together.  It could be all of it under generally
7 accepted police practices.  I don't --
8          MS. CARNEY:  Okay.  Well, then -- you know, I
9 really don't want to fight.  We're late, and I know
10 we all want to get home, but it's his report.  And
11 if he is telling me that it's written incorrectly
12 or not clear, he can tell me that.
13          THE WITNESS:  Okay.  No, it's very clear to
14 me, but your question was a little bit confusing.
15          And if you're asking me what is my
16 definition of Brady material from a law enforcement
17 officer's perspective and not a lawyer's
18 perspective, it's material that perhaps is
19 favorable to the defense that was not disclosed or
20 turned over by the police.
21 BY MS. CARNEY:
22     Q.   And you say each of these files contain
23 examples of investigative material suppressed in
24 CPD homicide files.

THOMAS TIDERINGTON, 04/28/2023                    Page 314..317

Page 314

1          Sitting here today, can you tell me
2 the -- what examples you're referring to of
3 investigative material that was suppressed in each
4 of the files you're referring to?
5     A.   Of the 500?  You want to go through
6 each one?
7     Q.   No.  Well, I guess that's -- let me ask
8 a different question.
9          Is this sentence talking about the
10 files in the above -- in the above paragraph, or
11 something else?
12    A.   Well, they speak to all of the files
13 that I've reviewed since I began looking at the
14 homicide investigations involving the Chicago
15 Police Department.  Some also include the
16 investigative work that -- that was done or the
17 expert witness work that was done by Michael
18 Brasfield on previous cases.  And his findings were
19 consistent with what my findings are as well.
20         And my -- quite frankly, my findings
21 are consistent with the Office of the Inspector
22 General, who also did an analysis, and other judges
23 that reviewed these cases.  And their analysis
24 support my conclusions or vice versa, I guess.

Page 315

1     Q.   Okay.  So sitting here today, is it
2 your opinion that in every single Chicago Police
3 Department investigative file you have reviewed you
4 have uncovered evidence that information was
5 suppressed?
6     MS. BONJEAN:  Objection, form, misstates his
7 testimony.
8     THE WITNESS:  No, I don't think that's what I
9 said.  I --
10 BY MS. CARNEY:
11    Q.   Okay.
12    A.   I -- okay.  That's not what I said.
13    Q.   Sorry, I don't want to be rude.  I know
14 you have a lot to say --
15    A.   Oh, no.
16    Q.   -- but I've got like an hour, so I got
17 to get through these.
18    A.   I know it's complicated, and there's a
19 lot of cases, and there's a lot of corruption, so
20 it's -- it is --
21    Q.   Okay, Mr. Tiderington?  There's no
22 question pending.  I really -- I don't want to
23 fight with you, and I just want to get through
24 this.  Thank you.

Page 316

1     A.   I understand.
2     MS. BONJEAN:  But just to be clear, Theresa,
3 this sentence doesn't read in every case.  It says,
4 Each of the cases contain examples.
5          So I mean, ask a fair question, you
6 know?
7     MS. CARNEY:  I'm reading his report.
8     MS. BONJEAN:  No, you're not though.
9          (Simultaneous cross-talk.)
10    MS. CARNEY:  If his --
11    MS. BONJEAN:  No --
12         (Simultaneous cross-talk.)
13    MS. CARNEY:  If his report is not clear, he
14 can tell me that he needs to fix his report, but --
15    MS. BONJEAN:  No.  You're not reading his
16 report.  That's the problem, Theresa.  Are you
17 saying in every case --
18         (Simultaneous cross-talk.)
19    MS. CARNEY:  I asked him -- if we need to go
20 off the record to have this fight, we can.  I'm not
21 wasting my time on this.
22         I asked him what he was referring
23 to.  He said all 500 cases that he has looked at.
24 So I asked him the follow-up question.  In each and

Page 317

1 every case, are you saying there was material that
2 was suppressed?
3          I'm sorry that he's answering it and
4 I have to follow up, but that's what it is.
5     MS. BONJEAN:  All right.  Go ahead.
6 BY MS. CARNEY:
7     Q.   So let me back up.
8          You say:  Each of those cases
9 contain examples of investigative material
10 suppressed.
11         What cases is that sentence
12 referring to?
13    A.   Well, I reviewed, again, hundreds of
14 case files in all of the cases that I've reviewed
15 from the beginning where I was retained on the
16 Reyes and Solache case.
17         There was a chart that was prepared
18 by Loevy that has been introduced into evidence I
19 believe on other cases involving hundreds of cases.
20 I've reviewed those files.  I've also spot-checked
21 to test the work that they did in conducting the
22 analysis.
23         And on this particular case, if you
24 want to change -- and that's really what I prepared

THOMAS TIDERINGTON, 04/28/2023                    Page 318..321

Page 318

1 to do today was talk about this case.
2        But I reviewed -- on page 52, these
3 are the cases that I specifically reviewed in
4 relation to this particular case, and it explains,
5 at least in my opinion, some of the deficiencies
6 that I've identified in review of these cases.
7        Q.    Okay.  So is this sentence, Each of
8 those cases contain examples of investigative
9 material suppressed in CPD homicide files, is that
10 referring to your chart on page 52, or something
11 else?  I'm just trying to figure out what files
12 you're talking about.
13       A.    Yes.  It would -- it would include --
14 of the cases that I reviewed, those cases contain
15 examples of investigative materials suppressed in
16 CPD homicide files.
17       Q.    Okay.  But you just said you reviewed --
18       A.    Or --
19       Q.    -- hundreds of cases --
20       A.    Or --
21       Q.    -- so which cases?
22       A.    Well, I can't tell you which cases
23 unless we pull out the chart.  Or again, was
24 otherwise not properly documented and disclosed

Page 319

1 that should have been turned over to the criminal
2 justice system based on my police training and so
3 on.
4        So in order to answer your question
5 like you want me to answer your question, we would
6 have to go through every one of the cases beginning
7 in the Brasfield report.  I think it was in 1987,
8 the case that he began looking at in '87.
9        Q.    Okay.  But as you sit here today in
10 regards to this particular report, you have never
11 looked at a Cook County State's Attorney's files
12 for any of the corresponding homicide
13 investigations that you're opining on, correct?
14       MS. BONJEAN:  Objection to the form of that
15 question, foundation.  But you can answer.
16       THE WITNESS:  I'm sorry.  You said I never
17 looked at any Cook County prosecutor files?
18 BY MS. CARNEY:
19       Q.    Have you ever looked at any Cook County
20 prosecutor files in relation to the investigative
21 files that you are opining on?
22       A.    Not -- not that's what -- not as what
23 as illustrated on page 52, no.
24       Q.    Okay.

Page 320

1        A.    There were no corresponding PD or
2 criminal defense files that I was -- that I
3 reviewed.
4        Q.    Okay.  In your opinion, how many
5 examples do you need for something to be considered
6 widespread?
7        MS. BONJEAN:  Objection to the form of that
8 question; and also to the extent you're asking for
9 a legal conclusion, also objection.
10       THE WITNESS:  I'm not sure -- I'm not sure I
11 can answer that question as far as what I
12 consider -- I certainly rec ...
13 BY MS. CARNEY:
14       Q.    Were you saying something, or did
15 that --
16       A.    I'm sorry.  There was a fire engine or
17 a police car going by.
18        And if you look on page 52, but I
19 don't know if there's a scientific answer that I
20 can provide for you.
21        But if say, for example, 1989, if
22 10 percent of the cases did not have GPRs, I would
23 consider that to be a widespread practice of
24 violate -- violating police department policies and

Page 321

1 practices.  But that isn't the only analysis that I
2 did.
3        I also considered the internal
4 analysis done by their own command officers,
5 Lieutenant Foster, the Office of Inspector General,
6 and the judges who concluded that there was a
7 widespread practice of misconduct related to
8 turning over Brady-related material.
9        This wasn't my -- you know, I didn't
10 discover this problem.  This -- I analyzed it from
11 the perspective of what others documented in their
12 investigations, including the Chicago Police
13 Department.
14       Q.    Okay.  So is it your opinion sitting
15 here today that if an investigative file does not
16 contain GPRs that is evidence that Brady material
17 was suppressed?
18       A.    No, that's not what I said.
19       Q.    Okay.
20       A.    I --
21       Q.    That's fine.  That's the -- if that's
22 not your opinion, then we'll --
23       A.    Okay.  It's not my opinion.
24       Q.    All right.  So now we have to go all

THOMAS TIDERINGTON, 04/28/2023                    Page 322..325

Page 322

1 the way to page 37 to find a new portion of the
2 report, and you --
3      MS. BONJEAN:  I'm sorry.  37 or 47?
4      MS. CARNEY:  37.
5      MS. BONJEAN:  Okay.
6 BY MS. CARNEY:
7      Q.   Second paragraph, you're talking -- you
8 say, I note CPD's written policy during the Wiley
9 brothers' homicide investigation was to require
10 detectives to document "relevant evidence."
11          Do you see that?
12     A.   I do.
13     Q.   Okay.  What is your definition of
14 relevant evidence?
15     MS. BONJEAN:  Objection to the form.
16          Go ahead.
17     THE WITNESS:  Anything that the detectives do
18 in relation to this investigation is relevant
19 within a certain degree.
20          If somebody orders a pizza so the
21 detectives can order lunch, I don't think it's
22 relevant.  But certainly, all of the invest --
23 investigative efforts on the part of the detectives
24 are certainly relevant.

Page 323

1          As an example -- I'm sorry, I'm
2 losing my voice -- if they go out and they knock on
3 the door and that person says, Oh, I don't know
4 anything about the shooting that occurred here last
5 night because I was at work or I was on vacation,
6 that's relevant, and it should be documented.
7          It's relevant because that same
8 person could come back a week later and say, Oh, I
9 witnessed John Smith commit that murder.
10          So an investigator doesn't know
11 what's relevant or not relevant while he's
12 conducting his investigation.  And therefore, best
13 practices and acceptable standards require the
14 officers to document all of their investigative
15 efforts.
16 BY MS. CARNEY:
17     Q.   And then you go on to say -- well, let
18 me ask you this:  What is your definition of
19 something -- of the line, something of evidentiary
20 value?  What would you -- how would you define
21 "evidentiary value"?
22     A.   Well, I mean, my report, the --
23 Lieutenant Foster testified that relevant evidence
24 means something of evidentiary value for special

Page 324

1 order 86-3.
2          If you're asking me what is my
3 definition of -- it's the same as relevant or it's
4 the same as the requirement of documenting all of
5 their investigative efforts.
6     Q.   Okay.  The next new paragraph also
7 starts with Lieutenant Foster.  And a couple lines
8 down, it says, This policy deviates from accepted
9 police practices at the time because it permitted
10 detectives to decide what constituted "relevant
11 evidence" only after detectives determined who they
12 believed to be the offender.
13          First of all, what police practices
14 of the time are you referring to there?
15     A.   I'm sorry.  Can you just point to where
16 we're at here again?
17     Q.   Yeah, right here.  So it says --
18     A.   Okay.
19     Q.   -- this policy -- so we're referring to
20 the fact that, Lieutenant Foster testified that CPD
21 policy did not require detectives to
22 contemporaneously record evidence developed during
23 investigations, that detectives could record
24 "relevant" evidence for the first time in a closed

Page 325

1 report after the suspect had been charged.  This
2 policy deviates from accepted police practices --
3 sorry -- accepted police practices of the time.
4          What police practices of the time
5 are you referring to?
6     A.   Well, I was -- I was working as a
7 police officer at that time, and any, I guess,
8 police practices would consider that to be a
9 requirement of documenting what an investigator did.
10          I think I testified way back in 1978
11 when I went through the police academy we were
12 taught that an investigator documents his or her
13 actions, and we don't determine whether or not it's
14 important.
15          We -- you know, as an example, say a
16 young officer at a crime scene and you'll see the
17 yellow tape, and the officer -- the young officer
18 is there recording every person that steps into
19 that crime scene because, you know, some people
20 might think it's not relevant, but it might be
21 relevant at some later time.
22          So the -- I guess the takeaway is
23 that an investigator, whether it was 1987, 1990,
24 was expected to document their investigative

THOMAS TIDERINGTON, 04/28/2023                          Page 326..329

Page 326

1 efforts. I've never seen a policy that states, Just
2 document whatever you feel is relevant.
3          The documents, the investigative
4 efforts of the officer that's conducting the
5 witness interview or the lineups, whatever the case
6 may be, it should be documented in a supplemental
7 police report.
8          I don't think that's -- I don't
9 think any police expert would dispute that that's
10 good practice from the '90s to wherever we're at
11 today.
12     Q.   Okay. I'm not really sure that that
13 answered my question, but I'll move on.
14          Is there a specific department that
15 you're working at that had a policy that dictated
16 that when the -- when your sup reports had to be
17 written?
18          Sorry, that might have been a bad
19 question.
20     MS. BONJEAN: Object to form. It was also
21 asked and answered, but go ahead.
22     THE WITNESS: Certainly, there -- I can't
23 recite exactly the language, but I believe every
24 department that I've ever worked with had a policy

Page 327

1 that requires the timely submission of -- of
2 reports, unless there were exigent circumstances or
3 reason why a report cannot be done in a timely
4 manner. And I guess my next question is, What's
5 timely? Well --
6 BY MS. CARNEY:
7     Q.   Well, no. Hold on, hold on.
8     A.   All right. Go ahead, ask me the
9 question.
10     Q.   I appreciate it, but let me ask the
11 questions.
12     A.   All right. I get it.
13     Q.   Did any of those policies that you're
14 referring to define what timely meant?
15     A.   Certainly, they would.
16     Q.   They would.
17          You can point me to a policy from
18 1990 that defined what timely meant?
19     A.   I'm sorry. You asked two questions.
20          Can I provide it, or were there
21 policies? I don't know that I can provide it to
22 you, but I certainly know that there were policies
23 that officers -- I know that I've disciplined
24 officers for not timely submitting police reports.

Page 328

1          So it's certainly a practice of any
2 police department to articulate what the
3 expectation is of an officer or an investigator in
4 terms of submission of police reports.
5          Even perhaps the Chicago Police
6 Department, I'm sure there's policies that would
7 have required it. Why they -- whether they
8 violated it or not is certainly another question.
9     Q.   All right. So skipping ahead here, we
10 don't get to new information -- we don't get to any
11 new information in your report until page 51.
12     MS. BONJEAN: Objection to the
13 editorializing. I don't know what you mean by
14 "new," but okay.
15     MS. CARNEY: Sorry, I'm just trying -- he
16 testified before that this is largely the same
17 report that he's provided in the other -- in the
18 previous cases where he was an expert, and I'm, in
19 order to be --
20     MS. BONJEAN: Okay, okay.
21     MS. CARNEY: -- efficient, skipping through
22 the things that he's already testified about
23 because he wrote them at length in verbatim in
24 other reports.

Page 329

1          I can go through each page and ask
2 if it's verbatim, but I was trying to --
3     MS. BONJEAN: No, that's -- I just didn't
4 know what you meant by that, but go ahead.
5 BY MS. CARNEY:
6     Q.   Okay. So now we're on page 51, and
7 this is a new subopinion where you say, Review of
8 CPD investigative files from the period of 1987
9 through 1990 demonstrate that CPD's policies and
10 practices relating to documentation and use of GPRs
11 were not being followed.
12          Do you see that?
13     A.   I do.
14     Q.   Okay. And down here a little bit, you
15 say: Based on my 40-year -- 44 years of law
16 enforcement experience, I know that a reasonably
17 trained investigators -- sorry -- I know that
18 reasonably trained investigators understand the
19 importance of case documentation and that files
20 should include at a minimum the following.
21          And you have a checklist here of
22 two, three, four, five, six, seven, eight, nine
23 items between pages 51 and 52. Do you see that?
24     A.   I do.

THOMAS TIDERINGTON, 04/28/2023           Page 330..333

Page 330

1   Q.   Okay. Where does this list come from?

2   A.   It came from my -- as I said, my

3 44 years of experience.

4   Q.   Is this list in any police order or

5 directive from your past employment?

6      MS. BONJEAN: Objection to the form of that

7 question.

8       You can answer.

9      THE WITNESS: I would say that portions of

10 it. I don't know if it was formatted in exactly

11 this way, but in some capacity, all of these things

12 are what would be expected to be found in a -- and

13 documented in a criminal case file.

14 BY MS. CARNEY:

15   Q.   Is there any one document that you can

16 point me to that lays out all of these items that

17 you believe should be included in investigative

18 files?

19      MS. BONJEAN: Objection to the form.

20      THE WITNESS: I think we could look at the

21 Chicago Police Department's policies.

22     I -- what I'm suggesting here is not

23 necessarily new information. This is pretty basic

24 stuff I would suggest. Investigative 101 is that

Page 331

1 the case file should include a checklist that

2 directs which documents must be included in the

3 file. I think that information is -- anybody that

4 conduct these types of -- these investigations

5 understands the importance of that.

6      I also believe -- and to go back, I

7 know we're late in the day here, but I think the

8 Los Angeles Police Department has what is called a

9 murder book. And many of these items may have come

10 from their murder book or a combination of my

11 experience along with what other agencies are doing

12 in terms of documentation and case file devel --

13 development.

14 BY MS. CARNEY:

15   Q.   Okay. So here, you have a bullet point

16 that says: A log of contacts with the prosecutor's

17 office.

18      Do you see that?

19   A.   I do.

20   Q.   Okay. Is it your -- well, where --

21 what policies can you point me to or training that

22 you've done can you point me to that says that

23 investigative files are required to or should have

24 a log of contacts for the prosecutor's office?

Page 332

1      MS. BONJEAN: Objection to the form.

2      You can answer.

3      THE WITNESS: Well, I think it's -- what I'm

4 trying to illustrate here is that there's a

5 standard practice or procedure that detectives

6 should follow.

7      Obviously all criminal cases -- I

8 don't want to say all, but the cases that I'm

9 familiar with, there's got to be interaction with

10 the prosecutor's office.

11      You know, to kind of skip around

12 here, but I think to even go back to the City of

13 Chicago has a policy. When they created the GPRs,

14 the policy, if I remember it correctly, also

15 indicated that the communication with the

16 prosecutor's office should be documented in these

17 GPRs.

18      So it's not a farfetched idea. It's

19 something that is certainly common in the police

20 industry, and in some fashion because it's a

21 relevant aspect of the investigation, the

22 communication with the prosecutor's office should

23 be documented.

24

Page 333

1 BY MS. CARNEY:

2   Q.   So if I were to go back and subpoena

3 your case files from the 1990s, would each one of

4 them have a log of contacts with the prosecutor's

5 office?

6   A.   Each one of them, probably not.

7   Q.   The next page has -- the second bullet

8 point here has initial incident report, a 24-hour

9 report, and a 5-day supplemental report.

10      Do you see that here?

11   A.   I do.

12   Q.   Whose terms are these? Whose report

13 names are these?

14   A.   Those are my terms.

15   Q.   Okay.

16   A.   I mean, every department -- to your

17 point, every department calls them something

18 different. And the purpose is to illustrate that

19 there should be ongoing oversight in these

20 investigative files.

21      You don't necessarily have to call

22 them initial incident reports. Chicago Police

23 Department or other departments may call them

24 supplemental reports, or you know, closed reports,

THOMAS TIDERINGTON, 04/28/2023                    Page 334..337

Page 334

1 or whatever the department chooses.
2        It's the substance that I'm
3 referring to here, not necessarily the titles.
4     Q.  Okay.  Moving down on page 52, you --
5 well, I guess we have to look at the top part here.
6        It says:  Detectives working on a
7 case necessarily take notes during witness
8 interviews and must document the information and
9 communicate that information to other detectives --
10 detectives.  That is an -- an inevitable and
11 important part of an investigation.
12        And then you say, The problem with
13 Chicago Police Department's practice is as follows.
14 And No. 1 here, you say:  These
15 notes are stored across multiple files -- both
16 during and after an investigation -- and are never
17 consolidated into the official file.
18        What multiple -- what multiple files
19 are you talking about?  What files are you talking
20 about there?
21     A.  Well, you have permanent retention
22 files.  You have investigative files.  You have
23 other -- the -- they also had a practice of what
24 was referred to as street files.

Page 335

1        You have information perhaps would
2 be in another gang file, they had their own set of
3 policies that didn't -- and practices that were
4 different than a homicide detective's policies and
5 practices.
6        There was also -- and I would have
7 to pull up the Office of Inspector General, who did
8 a more comprehensive report about the deficiencies,
9 and I think it's spelled out in more detail than
10 what I did in my report about the deficiencies that
11 they found when reviewing these policies, as well
12 as the depositions of Lieutenant Foster and others
13 that also recognized these and testified about the
14 deficiencies.
15     Q.  What's a street file?
16     A.  What's a --
17     MS. BONJEAN:  Objection, form.
18     THE WITNESS:  My understanding of the street
19 file -- and this is from depositions from
20 representatives from the City of Chicago -- were
21 that these were files that were kept in the
22 investigator's desk.  And I guess the -- some of
23 the investigators, in spite of the policies that
24 were implemented, failed to abide by the Chicago

Page 336

1 policies and looked at the street files as their
2 personal belongings versus a document, and felt
3 that they didn't have to follow Chicago PD policies.
4        Again, that was information that I
5 was able to review in the Office of Inspector
6 General, based on their analysis, of a practice
7 that -- a deficiency that even continued in most --
8 more recent days than -- it was the same
9 deficiencies in the 1990s and still existed even
10 today, I guess.
11 BY MS. CARNEY:
12     Q.  So we talked about this chart a little
13 bit that you pointed to where it shows the files
14 that you reviewed.
15        And you have -- first, you have this
16 line here, this column here, Cases without GPRs.
17        Do you see that?
18     A.  I do.
19     Q.  All right.  In 1990 -- sorry -- 1987
20 you said that there are four cases out of the
21 42 investigative files that you looked at that did
22 not contain GPRs.
23        Do you see that there?
24     A.  I do.

Page 337

1     Q.  Okay.  Which specific investigative
2 files did not contain GPRs?
3     A.  Well, we'd have to go back and look at
4 all of them.
5     Q.  Sitting here today, can you identify
6 any of the specific cases?
7     A.  Well, not without going through.  If
8 you look at page 54, I gave some examples with
9 cases missing relevant GPRs that would reasonably
10 be expected to be found.
11        Again, these are samples or
12 examples.  I certainly could have listed a lot more.
13     Q.  Okay.  So did you make note -- other
14 than what you have listed here on page 54, did you
15 make notes anywhere of which specific investigative
16 files did not include GPRs?
17     A.  No, that wasn't my purpose for doing
18 that.
19     Q.  Okay.  And then next to here, you have
20 Corresponding RD Files.
21        What's the purpose of this column?
22     A.  Well, the corresponding permanent
23 retention files were -- again, it's a separate
24 file, so I reviewed what information was -- was

THOMAS TIDERINGTON, 04/28/2023                          Page 338..341

Page 338

1 contained in those files.

2    Q.    And -- okay.

3          So for each of these cases that you

4 have listed here in '87, '88, '89, '90 that are

5 missing GPRs -- well, actually, let me go up here.

6          Point No. 3, a review of the notes

7 and GPRs contained in each of the investigative

8 files indicates it is likely the detectives

9 continued to use "street files" in spite of the

10 department's failed effort to ban them.  I reached

11 this conclusion by comparing the number and content

12 and details of the GPRs to the corresponding police

13 reports in each of the cases listed.

14         Do you see that?

15   A.    I do.

16   Q.    Okay.  So is it your opinion that

17 because these cases that you have listed here for

18 '87, '88, '89 and '90 do not have GPRs that there

19 was a street file for each of those cases?

20   A.    Well, there had to be something.  There

21 had to be some other documentation that was not

22 contained within the investigative file that I

23 reviewed, because how else would the detectives

24 been able to remember phone numbers, addresses,

Page 339

1 dates of birth, all of the specific information.

2 And there was some cases that they were complicated

3 homicides with multiple witnesses.

4          So I came to the conclusion that --

5 and it certainly supported my conclusion was the

6 OIG report as well as the testimony of the command

7 officers from Chicago that the policy is still a

8 policy that is -- has -- is plagued with problems.

9          But it's only logical to conclude

10 that there had to have been some other folder, file

11 kept elsewhere that contained this information.

12 How else would the detective been able to document

13 this stuff if there wasn't information contained

14 elsewhere?

15   Q.    So moving on to page 53.  So this --

16 this section of the report actually appears in your

17 other reports that you've written, but there's one

18 change that I want to ask you about.

19         You say in paragraph 3 -- in

20 paragraph 2 here, In numerous cases, including some

21 of the example pages cited in the paragraph below,

22 I found handwritten notes, sometimes on GPRs,

23 containing cryptic notations on a page, without

24 context.

Page 340

1          Correct me if I'm wrong, but I don't

2 see in this paragraph or the paragraph below any

3 examples.

4    MS. BONJEAN:  I'm sorry.  Where --

5    THE WITNESS:  Page 53 here.

6    MS. BONJEAN:  Okay.

7    THE WITNESS:  Well, I guess if you look at

8 page 54.  And again, I would -- if you look at

9 page 54, I provided a number of examples of what

10 was missing.

11         In terms of 1987, one of the files,

12 J384177, there were 25 pages of reports in the

13 investigative file with no GPRs and no notes.  So

14 that is an example.

15         I can go down the list with you.

16         There was one case -- well, more

17 than one case, but 1990 case, N352477, 61 pages, no

18 notes, no GPRs, and a very long and comprehensive

19 report.

20         So again, the question would be

21 where did that information come if it did not come

22 from -- from the investigative files that I

23 reviewed.

24

Page 341

1 BY MS. CARNEY:

2    Q.    Okay.  I don't think that answered my

3 question, because this says, Some of the

4 examples -- example pages cited in the paragraph

5 below, I found handwritten notes, sometimes on

6 GPRs, containing cryptic notations on a page,

7 without context.

8          So is it your testimony that

9 these -- this chart on page 54 where you're saying

10 that no GPRs exist are the examples of handwritten

11 notes, sometimes on GPRs, containing cryptic notes

12 on a page without context?

13   A.    Some of those, yes.

14         But again, we're talking about

15 400-some files I reviewed.  Some of them I listed

16 here.  I certainly could go back and clarify that

17 and amend the report if it's confusing.  And if you

18 would like me to provide additional examples, I --

19 I'd be happy to do that.

20   MS. BONJEAN:  Yeah, I think that's what we're

21 going to do.  That seems a little confusing.  I'm

22 going to ask Mr. Tiderington to -- to relook at

23 that and see if there's -- he can make some

24 clarifications for you.

THOMAS TIDERINGTON, 04/28/2023                        Page 342..345

Page 342

1      MS. CARNEY:  He wants to -- well, we can talk
2  about that later.  I don't think that's necessary.
3  BY MS. CARNEY:
4      Q.   But you did mention --
5      MS. BONJEAN:  You know, it's a long report.
6  If there's something that's confusing, it's bound
7  to happen sometimes.  But I think -- you know, I
8  know you're not perfect.  I'm certainly not
9  perfect.  So if there's some confusion there, you
10  know, it's fair to -- it's a good question.  I'm
11  saying that's a good question, and you know, maybe
12  he can't answer it right this second, but we'll
13  take it under advisement.
14  BY MS. CARNEY:
15      Q.   All right.  So you had brought up
16  this -- on page 54, this particular file here,
17  J384177.  Do you see that?
18      A.   I do.
19      Q.   Okay.  And you say there's 25 pages in
20  the file.
21           So I'm going to show you --
22      MS. CARNEY:  Katie, I don't what exhibit Dave
23  ended on.  Can you tell me?
24           (Reporter clarification.)

Page 343

1           (Deposition Exhibit No. 12,
2             Witness Tiderington, was marked
3             for identification 04/28/2023.)
4  BY MS. CARNEY:
5      Q.   Okay.  So we'll mark this as
6  Exhibit 12.  This is J -- and I'm sorry I didn't
7  send these before.  I was a little late in
8  preparing, but this is J384177.
9           You can see that up top here, right?
10      A.   I do, yes.
11      Q.   Okay.  And you can look at the bottom
12  of my screen where it says 1 of 25, right?
13      A.   Yes.
14      Q.   So we can flip through here.
15      A.   Well, wait a minute.  Let me -- let me
16  look through there.  I mean, I guess ask your
17  question, and then let me look through the file if
18  you could.
19      Q.   Well, this -- if you're -- if you're
20  reviewing a file titled J384177 --
21      A.   Right.
22      Q.   -- that's 25 pages --
23      A.   All right.  Let's go to the inventory
24  list so I can refresh my memory.

Page 344

1      Q.   Well, let me get -- that's not the --
2  let me get there.
3           So this is the investigative file
4  that you reviewed, right?  So there's -- we're
5  flipping through it quick, and I understand it's
6  quick, but I'll get to the --
7      A.   I -- I --
8      Q.   It's 25 pages.
9      MS. BONJEAN:  Okay.
10      THE WITNESS:  I was going to say okay.
11  BY MS. CARNEY:
12      Q.   Okay.  So that matches what you have on
13  this chart, right?
14      A.   It does.
15      Q.   Okay.  So then as -- and we can flip
16  through it a little slower, but your point in
17  citing this is that there are no GPRs in this file,
18  right?
19           Okay.  That's the end, right?  No
20  GPRs.
21      A.   I -- you scrolled through.  I didn't
22  see a GPR.
23      Q.   Okay.
24      A.   So I would agree with you if that's

Page 345

1  what you presented to me.
2      Q.   Did you look at the permanent retention
3  file for J384177?
4      A.   Well, this is marked -- I mean, what
5  you're showing me is marked as permanent retention
6  file.
7           (Deposition Exhibit No. 13,
8             Witness Tiderington, was marked
9             for identification 04/28/2023.)
10  BY MS. CARNEY:
11      Q.   Okay.  Now, if I go to J -- this will
12  be Exhibit 13.  This is a 33-page file marked
13  permanent retention file, RDJ 384177.
14           Do you see that?
15      A.   I do.
16      Q.   Okay.  And this one's in color.  It's
17  got the permanent retention stamp.  And I'm going
18  to go to what's RFC Maysonet 18688.
19           This is a copy of the investigative
20  file inventory, right?
21      MS. BONJEAN:  I mean, okay.
22      THE WITNESS:  It appears to be the inventory,
23  and it indicates that there were 19 pages of GPRs.
24

THOMAS TIDERINGTON, 04/28/2023                    Page 346..349

Page 346

1 BY MS. CARNEY:
2    Q.   Okay.  So it indicates that at some
3 point during the investigation, the investigative
4 file inventory was put into the permanent retention
5 file, right?
6    MS. BONJEAN:  Objection to the form.  Are you
7 testifying or him?  Like I don't ...
8 BY MS. CARNEY:
9    Q.   Do you understand what the purpose of
10 the investigative file inventory form is?
11   MS. BONJEAN:  I've now seen two of them, so I
12 mean, which one are you referring to?
13   MS. CARNEY:  The one that's right on the
14 screen right here.
15   MS. BONJEAN:  Is this the same -- is this the
16 same case number as the other --
17   MS. CARNEY:  Yep.
18   MS. BONJEAN:  -- the other permanent
19 retention file stamp?
20   MS. CARNEY:  This is the permanent retention
21 file.  This was produced as the permanent retention
22 file for J384177.
23   MS. BONJEAN:  Okay.  Hold on one second.
24       What exhibit is this?  You already

Page 347

1 marked one exhibit that was marked permanent
2 retention file.  I think you may be proving the
3 point here, but what was the previous exhibit?
4    MS. CARNEY:  Exhibit 12 --
5    MS. BONJEAN:  Exhibit 13?
6    MS. CARNEY:  Exhibit 12 was the investigative
7 file.
8    MS. BONJEAN:  No, it was -- no, it says
9 permanent retention file there.  Stop -- what are
10 you talking about?
11   MS. CARNEY:  Jennifer, are you testifying, or
12 is he?
13   MS. BONJEAN:  No, but you can't represent
14 that this is the investigative file.  You don't get
15 to testify.  You are literally showing documents
16 that are marked permanent retention file.
17   MS. CARNEY:  And if you would let me ask a
18 question, you would understand why.
19   MS. BONJEAN:  Okay.
20 BY MS. CARNEY:
21   Q.   Do you under -- Mr. Tiderington, do you
22 understand that there were two sets of production
23 made in this case:  One that was the investigative
24 files, and one that was the permanent retention

Page 348

1 file?
2    A.   I'm sorry.  Can you go back?  There's
3 another inventory sheet that --
4    Q.   No, I'm going to ask you my question.
5        Do you understand that in this case
6 there were two sets of files produced:  One was
7 investigative files, and one was permanent
8 retention files?
9    MS. BONJEAN:  I'm going to object to form of
10 that question and also --
11   THE WITNESS:  Yeah, I -- I would have to go
12 back and look through.  You're showing me
13 documents.  I would have to pull up the documents
14 that I reviewed.
15       I'm concerned that you won't show me
16 the inventory sheet that you scrolled past three
17 times now that might refresh my memory --
18 BY MS. CARNEY:
19   Q.   What --
20   A.   -- and I --
21   Q.   What inventory sheet?  You know, I --
22   A.   Hold on, hold on, hold on.  I can
23 answer my question, please.
24       I think it would help me refresh my

Page 349

1 memory if you allowed me to look at that, and it's
2 concerning why you are keeping that from me.  So I
3 can't --
4    Q.   It's concerning --
5    A.   I don't think you're --
6    Q.   -- that you can't answer my question.
7    A.   Wait a second, I'm not finished.
8        I don't think you're trying to trick
9 me, but it would be helpful I think if you showed
10 me -- all you got to do is click on page 2 and I
11 can see that.
12       If this is a memory game, I don't
13 think -- it's too late in the game, too late in the
14 day to be playing this game.  And I'll be the first
15 one to tell you if you make a mistake, I made a
16 mistake.  But I think it would be helpful for me to
17 see those documents.
18   Q.   What documents are you talking about?
19   A.   Go to page 2.  You asked me -- I want
20 to refresh my memory and --
21   Q.   Page 2 of what?  This?
22   A.   Right there, stop.  All right.  I'm
23 trying to understand what this is.  It looks like
24 it is a invest -- the inventory sheet for the file

THOMAS TIDERINGTON, 04/28/2023                            Page 350..353

Page 350

1 for the case.
2    Q.   Okay.  Let's read it on the top:
3 Investigative File Control.
4         Does that say investigative file
5 inventory?
6    A.   I've seen that as -- well, okay.  So
7 this is a document that is required when somebody
8 signs the document in and out.  I thought there was
9 another inventory sheet that I was looking at, but
10 I could be wrong.
11    MS. BONJEAN:  Maybe because you're scrolling
12 through it this fast.  But again, Theresa, you
13 can't -- you can't just throw up some documents
14 that he hasn't had a chance to look at when he's
15 looked at hundreds of these things, and --
16         (Simultaneous cross-talk.)
17    MS. CARNEY:  I understand that's your
18 position, but my position is that he has a report
19 here where he's making representations about files,
20 and I'm asking him questions about those
21 representations.
22    MS. BONJEAN:  That's fine.  And if you want
23 to do so, you should give him the file to look at,
24 okay?  Like you can't -- it is -- I don't care what

Page 351

1 his representations are on his report.  It doesn't
2 mean he has to have them memorized.  So if you're
3 asking --
4 BY MS. CARNEY:
5    Q.   Sitting here today -- okay, fine.
6         Sitting here today, you cannot
7 recall whether or not you looked at the -- at the
8 file that was produced to plaintiff as the
9 permanent retention file for J384177; is that
10 correct?
11    A.   I -- again, I would have to look
12 through it.  And I guess I could -- I guess I could
13 pull it up.
14         You're showing me something.  I
15 don't know exactly if it's the same thing that I
16 looked at.  I'm sure it is.  But I would want to --
17 if there's going to be a lot of questions about it,
18 I think I should be allowed -- I think I'd pull it
19 up on my computer and look at what I reviewed, and
20 then we could do it together.
21    Q.   Okay.  So if an investigative file
22 inventory sheet indicates that some -- that there
23 were at one -- that indicates GPRs with the number
24 19 next to it, what does that mean to you?

Page 352

1    A.   Well, I -- I don't know.  It should
2 mean that there were 19 GPRs generated for a
3 particular case, but --
4    Q.   Okay.  And if --
5    A.   Well, wait a minute.  I also got to
6 point out to you that what I illustrated on page 54
7 was that there was -- the file that I looked at had
8 25 pages.
9         So if you're telling me that there's
10 19 pages of GPRs in a file, I don't recall that
11 being associated with 177.  So I'm confused by your
12 question.
13    Q.   Because you're not letting me ask them.
14 You're just --
15         (Simultaneous cross-talk.)
16    A.   Okay.  I'm sorry.  All right.  Go
17 ahead.  I'll try to ...
18    Q.   Okay.  So we have a -- if you see --
19 and I'll ask this -- I'll ask this without the
20 exhibits.
21         If you have a file inventory sheet
22 that denotes 19 pages of GPRs for a particular file
23 and the investigative file as it was produced in
24 this litigation only contains 25 pages total,

Page 353

1 doesn't that indicate to you that the investigative
2 file as it exists today is not complete?
3    MS. BONJEAN:  Objection to the form of that
4 question, speculation.
5    THE WITNESS:  Well, I guess that's the whole
6 premise is yeah, the files are incomplete.
7 BY MS. CARNEY:
8    Q.   Great.  Okay.
9    A.   But --
10    Q.   1980 --
11    A.   But --
12    Q.   I have 30 minutes left, and I can't --
13 I know you want to go on about something about --
14         (Simultaneous cross-talk.)
15    A.   Well, no, I just wanted to clarify
16 because it's a mis -- yeah, but it doesn't
17 necessarily mean that they were ever in the file.
18 I just want to make sure that we're clear on that.
19    Q.   What is your basis to say that they
20 were never in the file?
21    A.   Well, I don't know if they were.  I --
22    Q.   Okay.
23    A.   I have no evidence to say whether or
24 not they were or they were not, so it -- I couldn't

THOMAS TIDERINGTON, 04/28/2023                            Page 354..357

Page 354

1  make that -- I couldn't offer that opinion.  I can
2  only take what was in the file.
3          It doesn't make -- there's no
4  logical reason for them not to have been in the
5  file or to be purged.  I can't think of a
6  legitimate law enforcement reason to purge these
7  documents from the file.  So I would conclude that
8  if they weren't in there when I looked at it, they
9  were never in there.
10     Q.   Okay.  So you are concluding.
11          What basis do you have to say that
12  they were never in the file?
13     A.   Well, I just testified that I don't
14  know -- and maybe there is a logical reason why
15  they would purge all of the GPRs from the reports,
16  but I cannot think of a logical reason for them to
17  do that is --
18     Q.   What basis do you have to say that
19  files were purged?
20     A.   You just told me that --
21     Q.   I did not tell you anything was purged.
22  I said it's evidence --
23     A.   Wait.
24     Q.   -- that they're not complete.  You

Page 355

1  added the word "purge."
2          What basis do you have to say that
3  the files were purged?
4     MS. BONJEAN:  I'm going to -- I'm going to
5  object.  This is what we -- this is an incomplete
6  hypothetical.
7          You want to -- is there a file that
8  you want him to look at that has GPRs in them that
9  he did not take into account?  If you do, just
10  show -- show us the GPRs.
11     MS. CARNEY:  That's not -- I'm trying to
12  clarify.  He's introducing opinions and words into
13  this that I'm trying to ask him what his basis for
14  that opinion is.
15     MS. BONJEAN:  You're really just proposing
16  incomplete hypotheticals is what you're doing
17  though, and that's -- that's --
18     MS. CARNEY:  Well, then ask your witness to
19  stop opining on things and having to have me follow
20  up on what his basis is.
21          He said he has a basis to believe
22  the files have been purged.  My question is --
23     MS. BONJEAN:  Based on your hypothetical.
24  Based on your hypothetical in which you said,

Page 356

1  Here's a file that says --
2          (Simultaneous cross-talk.)
3     MS. CARNEY:  All right.  You know what, I'm
4  going to go off the record.
5          (Simultaneous cross-talk.)
6     MS. BONJEAN:  -- the GPR --
7          (Simultaneous cross-talk.)
8     MS. CARNEY:  I have less than 30 minutes
9  left, and I'm not doing this with you today.
10     MS. BONJEAN:  Theresa, you just said,
11  Here's -- Here's evidence there was a file that
12  once had 16 GPRs but it doesn't anymore so --
13     MS. CARNEY:  Will you please take us off the
14  record.  I'm not wasting my time on you screaming
15  at me today.
16     MS. BONJEAN:  I'm not screaming.  I'm trying
17  to get clarity because it's not a fair question.
18  They're really just incomplete hypotheticals.
19          So go ahead.  If you need an extra
20  20 seconds, I'll give it to you.
21     THE LEGAL VIDEOGRAPHER:  Do you want to go
22  off?
23     MS. CARNEY:  No, we're fine.
24

Page 357

1  BY MS. CARNEY:
2     Q.   All right.  Moving on to page 50 -- oh,
3  actually, I have one more question on here.
4          1988, it says you reviewed a file
5  that is K14297.  What file are you talking about
6  there?
7     MS. BONJEAN:  What page?
8     MS. CARNEY:  54.
9     MS. BONJEAN:  54?
10     THE WITNESS:  54, I'm sorry.
11          I'm sorry.  Which one?
12  BY MS. CARNEY:
13     Q.   1998, you say, K14297, what file is
14  that?
15     A.   I -- again, I would have to go back and
16  look at what was sent to me.  It's -- the only
17  thing I can say is it is K14297.  I don't know what
18  you mean what file is it.
19     Q.   There is no K -- there is no file
20  K14297, so I'm just trying to figure out what
21  you're talking about.
22     A.   Then again, I would have to go back.
23  You know, did I leave a number off?  It's possible.
24  I would have to go back and look at it, but it

THOMAS TIDERINGTON, 04/28/2023                         Page 358..361

Page 358

1  was -- I could easily identify it because it's the
2  one that has 30 -- 37 pages in it and no GPRs.
3      Q.   Great.
4           Page 55, so you added this chart in
5  here, which isn't in your other reports, but it's
6  my -- but looking at it, and correct me if I'm
7  wrong, it's a summary of the files that you
8  reviewed for your other reports in Sierra,
9  Iglesias, and Solache/Reyes, right?  The '91
10 through '95, and '95 through '98 numbers?
11     A.   That is -- that is correct.
12     Q.   Okay.  All right.  So now we can skip
13 ahead to page 58, and all of this is actually the
14 same as the reports that -- or the -- from the
15 reports that you've previously written in
16 Solache/Reyes, Sierra, and Iglesias.
17          And I want to ask you about this
18 paragraph here where you say:  Like Brasfield, I
19 found many examples where information on
20 handwritten notes was not transferred into official
21 reports.
22          Do you see that?
23     A.   I do.
24     Q.   Okay.  And these are the same examples

Page 359

1  that you used in previous cases, right?
2      A.   Yes, they are.
3      Q.   Okay.  And one of those examples is
4  this particular note, which is identified here in
5  your report as RFC-Reyes/Solache 77452.
6           You see that Bates stamp on the
7  bottom?
8      A.   I do.
9      Q.   Right.  And we've talked about this
10 report before.  It's got a phone number up here,
11 and then it says, Large pan pizza, crazy bread with
12 sauce, right?
13     A.   That's what it says, yes.
14     Q.   Okay.  And this is still one of your
15 examples.  And I think we -- you testified before
16 that this was likely a pizza order that somebody
17 was putting in while working on a case, right?
18     A.   I guess -- I guess you would want to
19 know why somebody would write that on a GPR and
20 then include it in an investigative file, but it --
21 especially since the re -- file should have been
22 reviewed by supervisors to make sure that they were
23 complete and only contained information relative to
24 a particular case.

Page 360

1           I'm not going to dispute the fact
2  that this was probably a pizza order.  It looks
3  like crazy bread and with sauce as well, but I
4  can't explain why it was placed on a GPR.
5      Q.   Well, you don't know that it was placed
6  on a GPR, right?
7      A.   Or a note.  And -- well, it -- I
8  believe it was in an investigative file as well.
9           But we have spent a lot of time on
10 that pizza order in three or four different
11 depositions, but there's other more relevant
12 examples.
13     Q.   All right.  Skipping ahead to page 60.
14          All right.  Bottom of this page
15 here, you say:  The law firm of Loevy & Loevy
16 provided me with a spreadsheet that served as an
17 index of the investigative files, permanent
18 retention files, and criminal defense files for the
19 period of '95 through '98, right?
20     A.   They did, yes.
21     Q.   Okay.  And then a similar spreadsheet
22 was provided for '91 through '95, but without the
23 green columns reflecting the comparison to criminal
24 defense files, right?

Page 361

1      A.   That's correct.
2      Q.   Okay.  So both of these spreadsheets
3  were created by the law firm of Loevy & Loevy,
4  correct?
5      A.   They were provided to me, yes.
6      Q.   Okay.  Did you participate in any of
7  the coding that was done in order to create these
8  files?
9      MS. BONJEAN:  I'm going to object, and I'm
10 going to instruct him not to answer those
11 questions.
12          But I have a sneaking suspicion he
13 has answered those questions to death in other
14 depositions.  I am not comfortable with you
15 inquiring about things you've already inquired
16 about in other cases.  Like why?
17     MS. CARNEY:  Well, he's relying on
18 spreadsheets created by another law firm for this
19 report, and I think I'm entitled to ask him about
20 whether or not he had any interaction with the
21 people that created them or the coders, how many
22 there were, if he knew anything about the training.
23 That's all I was going to ask.
24     MS. BONJEAN:  But you've already asked those

THOMAS TIDERINGTON, 04/28/2023

Page 362
1 questions, and you know the answer to those
2 questions, but you're just trying to set him up to
3 say something inconsistent. That's all that's
4 happening.
5        How about this? How about you
6 produce to us all the depositions that you've taken
7 of him, because I don't even have them. So why
8 haven't you produced those to us? Why don't you
9 produce those to us, and then you would have --
10 since you have them, you have the answers to those
11 questions. I mean, I'm going to --
12    MS. CARNEY: I don't know what that has to do
13 with anything. You -- he produced a report for you
14 in this case where he's relying on work from
15 another law firm. I am entitled to ask questions
16 about that.
17    MS. BONJEAN: You are --
18    MS. CARNEY: And if you're going to instruct
19 him not to answer, then okay.
20    MS. BONJEAN: I mean -- (audio interruption.)
21 There's not even enough time when you're literally
22 just repeat -- you're literally just asking
23 questions of all depositions you've already taken
24 of him.

Page 363
1    MS. CARNEY: I have not asked -- I've asked
2 maybe one question that could be potentially
3 repetitive, but it wasn't, so ...
4    MS. BONJEAN: I mean, you know, if you want
5 to summarily ask him -- and again, I'm going to
6 give him the instruction that, you know, obviously
7 it's true that he relied on materials that have
8 also been the subject of other cases with a
9 significant overlap in this case.
10        But I just don't think it's -- you
11 know, you're not really doing it to discover
12 anything because you already have the answer to
13 those questions.
14    MS. CARNEY: What are you instructing him to
15 do?
16    MS. BONJEAN: Ask your question and then, you
17 know, whatever. I don't -- ask your question.
18 Let's see if we can -- I don't want to tell him not
19 to answer, but I also don't want to go down the
20 road of just repeating stuff. So if you can do it
21 quickly.
22    MS. CARNEY: I don't think I'm repeating
23 anything.
24

Page 364
1 BY MS. CARNEY:
2    Q.  But anyway, so there's two spreadsheets
3 here that you've attached.
4        (Background noise.)
5    Q.  I'm sorry?
6    A.  I didn't say anything.
7    MS. BONJEAN: No. Steve was muttering about
8 his back.
9 BY MS. CARNEY:
10    Q.  There's -- anyway, you have two
11 spreadsheets here.
12        These are the same spreadsheets that
13 you've used in your previous opinions; is that
14 correct?
15    A.  They are, yes.
16    Q.  Okay. And both of these were created
17 by the law firm of Loevy & Loevy based on their
18 review of the files that were provided, right?
19    A.  That's correct. That's what I've
20 testified in every deposition I've given so far
21 about this, yes.
22    Q.  Okay. And similar to the question --
23 similar to what you had done in other reports, you
24 don't know anything about the individual people who

Page 365
1 were coding the files that are on those
2 spreadsheets, right?
3    A.  That's correct.
4    Q.  Okay. The rest of this report is also
5 largely similar, but I just want to ask you a
6 couple questions here.
7        You -- and you've gone through these
8 example -- sorry, page 63, we'll start there.
9        Examples of relevant information in
10 police files that was withheld from criminal
11 defendants which should have been disclosed.
12        Do you see that?
13    A.  I do.
14    Q.  Okay. And these examples, we have Kim
15 Mathis, Ardell Clemons, Oscar Soto, Guy Rainey, and
16 Demetrius Johnson.
17        Those are all examples that you've
18 used in the past in your past reports on these
19 issues, right?
20    A.  That's correct.
21    Q.  Okay. And flipping through the rest of
22 your report, I think we're then to the end.
23    MS. CARNEY: So if I could have 5 minutes to
24 gather my thoughts and look at my notes.

THOMAS TIDERINGTON, 04/28/2023                          Page 366..369

Page 366

1    MS. BONJEAN:  Sure.
2    MS. CARNEY:  I think we should be done.
3    MS. BONJEAN:  All right.
4    THE WITNESS:  Thank you.
5    THE LEGAL VIDEOGRAPHER:  We are off the video
6 record at 6:00 p.m.
7            (Recess taken.)
8    THE LEGAL VIDEOGRAPHER:  We are back on the
9 video record at 6:05 p.m.
10    MS. CARNEY:  All right, Mr. Tiderington.  I
11 am done for the day.
12    THE WITNESS:  Okay.  Thank you very much.
13    MS. CARNEY:  I guess I should ask if Bob
14 Shannon has anything, or, Jennifer, if you have
15 some follow-up, but ...
16    MS. BONJEAN:  Hold on one second.
17        There's other lawyers.  Is there
18 anyone else?
19    MR. SHANNON:  No questions.  Thank you.
20    MR. SCHALKA:  I don't have any questions
21 either.  This is Michael.
22    MS. BONJEAN:  I have nothing for
23 Mr. Tiderington.
24    MR. BRUEGGEN:  All right then.  I think we

Page 367

1 are done.  Thank you for your time,
2 Mr. Tiderington.
3        Jennifer, are you guys reserving?
4    MS. BONJEAN:  Yeah, yeah, we'll reserve.
5    THE LEGAL VIDEOGRAPHER:  Okay.  We're off the
6 video record at 6:06 p.m. at the conclusion of the
7 deposition.
8            (The proceedings adjourned at
9              6:05 p.m.)

Page 368

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2        EASTERN DIVISION
3 JOSE JUAN MAYSONET, JR.,   )
                            )
4     Plaintiff,   )
                            )
5     vs.        )  No. 18 CV 2342
                            )
6 REYNALDO GUEVARA, et al.,   )
                            )
7     Defendants.  )
8
9    This is to certify that I have read my
10 deposition taken on Friday, April 28, 2023, in the
11 foregoing cause and that the foregoing transcript
12 accurately states the questions asked and the
13 answers given by me, with the changes or
14 corrections, if any, made on the Errata Sheet
15 attached hereto.
16
     _____
17        THOMAS TIDERINGTON
18
   No errata sheets submitted (Please initial)
19 Number of errata sheets submitted _____ pages
20 Subscribed and sworn to
   before me this _____ day
21 of _____ 2023.
22
   _____
23    Notary Public
24

Page 369

1    REPORTER'S CERTIFICATE
2    I, Katie K. Elliott, do hereby certify that
   THOMAS TIDERINGTON was duly sworn by me to testify
3 the whole truth, that the foregoing deposition was
   recorded stenographically by me and was reduced to
4 computerized transcript under my direction, and
   that said deposition constitutes a true record of
5 the testimony given by said witness.
6    I further certify that the reading and
   signing of the deposition was not waived, and
7 plaintiff's counsel was notified of the
   availability of the transcript for review and
8 signature.  Pursuant to Rule 30(e) of the Federal
   Rules of Civil Procedure, if deponent does not
9 appear or read and sign the deposition within 30
   days, the deposition may be used as fully as though
10 signed, and this certificate will then evidence
   such failure to appear as the reason for signature
11 not being obtained.
12    I further certify that I am not a relative
   or employee or attorney or counsel of any of the
13 parties, or a relative or employee of such attorney
   or counsel, or financially interested directly or
14 indirectly in this action.
15    IN WITNESS WHEREOF, I have hereunto set my
   hand and affixed my seal of office at Chicago,
16 Illinois, this 23rd day of May 2023.
17
18    _____
        Illinois CSR No. 084-004537
19
20
21
22
23
24

Urlaub Bowen & Associates, Inc.   312-781-9586