# Exhibit 17

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                EASTERN DIVISION

 3
   ARTURO DeLEON-REYES,          )
 4                               )
             Plaintiff,          )
 5                               )
         vs.                     )
 6                               )
   REYNALDO GUEVARA, ET AL.,     )
 7                               )
             Defendants.         )   No. 18 CV 01028
 8 _____ )   Consolidated w/
                                 )   No. 18 CV 02312
 9 GABRIEL SOLACHE,              )
                                 )
10           Plaintiff,          )
                                 )
11       vs.                     )
                                 )
12 REYNALDO GUEVARA, ET AL.,     )
                                 )
13           Defendants.         )

14               VOLUME II OF II

15

16        The CONTINUED VIDEOTAPED VIDEO

17 TELECONFERENCE deposition of THOMAS J.

18 TIDERINGTON, taken under oath on Thursday,

19 October 6, 2022, conducted via Zoom pursuant

20 to the Federal Rules of Civil Procedure,

21 before Maribeth Reilly, State of Illinois

22 Notary Public, and Certified Shorthand

23 Reporter No. 084-002306, commencing at

24 10:10 a.m. (CST).
```

THOMAS TIDERINGTON, 10/06/2022                                    Page 354..357

Page 354

```
 1  APPEARANCES:  (REMOTELY)
 2
     LOEVY & LOEVY, by
 3   MR. ANAND SWAMINATHAN
     MR. SEAN STARR
 4   311 North Aberdeen Street
     3rd Floor
 5   Chicago, Illinois  60607
     (312) 243-5900
 6   anand@loevy.com
     sean@loevy.com
 7
         Appeared on behalf of Plaintiff
 8       Arturo DeLeon-Reyes
         (Mr. Swaminathan was present with
 9        the witness.)
10   PEOPLE'S LAW OFFICE, by
     MS. JAN SUSLER
11   1180 North Milwaukee Avenue
     Chicago, Illinois  60622
12   (771) 235-0070
     jsusler@peopleslawoffice.com
13
         Appeared on behalf of Plaintiff
14       Gabriel Solache;
15
     LEINENWEBER BARONI & DAFFADA, LLC, by
16   MS. MEGAN K. McGRATH
     120 North LaSalle Street
17   Suite 2000
     Chicago, Illinois  60603
18   (312) 663-3003
     mkm@ilesq.com
19
20       Appeared on behalf of Defendant
         Reynaldo Guevara;
21
22
23
24
```

Page 355

```
 1  APPEARANCES:  (REMOTELY)
 2  THE SOTOS LAW FIRM, P.C.  by
     MS. CAROLINE JAMIESON GOLDEN
 3   141 West Jackson Boulevard
     Suite 1240A
 4   Chicago, Illinois  60604
     (630) 735-3300
 5   cgolden@jsotoslaw.com
 6       Appeared on behalf of
         the Individual Defendants except
 7       Guevara;
 8   ROCK FUSCO & CONNELLY, LLC, by
     MS. EILEEN E. ROSEN
 9   MS. ERICA FATIMA
     MS. THERESA CARNEY
10   MS. JESSICA ZEHNER
     333 West Wacker Drive
11   19th Floor
     Chicago, Illinois  60606
12   (312) 494-1000
     erosen@rfclaw.com
13   efatima@rfclaw.com
     tcarney@rfclaw.com
14   jzehner@rfclaw.com
15       Appeared on behalf of Defendant
         City of Chicago.
16
     ALSO PRESENT:
17
     MS. RACHEL WELLING,
18   Certified Legal Videographer;
19   MS. ROBYN FALASZ,
     Exhibit Technician;
20
     MS. MARIBETH REILLY,
21   Certified Shorthand Reporter;
22   MS. ISABELLA AGUILAR,
     Loevy & Loevy;
23
     MS. JANICE WILLIER,
24   Court reporter student.
```

Page 356

```
 1              I N D E X
 2  WITNESS                         EXAMINATION
 3  THOMAS TIDERINGTON
 4   By Ms. Golden                      358
 5   By Ms. Rosen                       361
 6   By Mr. Swaminathan                 697
 7
 8           E X H I B I T S
 9  NUMBER                        SCREEN-SHARED/
                                   REFERENCED
10
     TIDERINGTON
11  DEPOSITION EXHIBIT
12  Deposition No. 4                   392
13  Deposition No. 6                   415
14  Deposition No. 9                   460
15  Deposition No. 10                  450
16  Deposition No. 12                  680
17  Deposition No. 13                  525
18  Deposition No. 14                  528
19  Deposition No. 15                  540
20  Deposition No. 16                  541
21  Deposition No. 17                  545
22  Deposition No. 18                  545
23  Deposition No. 19                  553
24  Deposition No. 20                  568
```

Page 357

```
 1           E X H I B I T S
 2  NUMBER                        SCREEN-SHARED/
                                   REFERENCED
 3
     TIDERINGTON
 4  DEPOSITION EXHIBIT
 5  Deposition No. 21                  584
 6  Deposition No. 23                  615
 7  Deposition No. 24                  641
 8  Deposition No. 25                  636
 9  Deposition No. 26                  654
10  Deposition No. 27                  657
11  Deposition No. 29                  668
12  Deposition No. 30                  669
13  Deposition No. 31                  674
14  Deposition No. 33                  684
15
16       (EXHIBITS SCANNED/ATTACHED.)
17
         * * * * * * * *
18
19
20
21
22
23
24
```

THOMAS TIDERINGTON, 10/06/2022                    Page 358..361

Page 358

1        THE VIDEOGRAPHER:  We are back on
2 the video record at 10:10 a.m. for Day 2 of
3 the deposition of Thomas Tiderington.
4           THOMAS J. TIDERINGTON,
5 called as a witness herein, having been
6 previously duly sworn, was examined and
7 testified further as follows:
8           CONTINUED EXAMINATION
9 BY MS. GOLDEN:
10    Q.  Good morning, Mr. Tiderington.
11    A.  Good morning.
12    Q.  How are you doing?
13    A.  I'm fine.  Thank you.
14    Q.  Did you have an evening of rest?
15    A.  I did.
16    Q.  I will remind you that -- I'm
17 sorry.
18    A.  For a few hours, yes.
19    Q.  You are well enough to proceed?
20    A.  I am.
21    Q.  I will remind you that you are
22 still under oath.
23    A.  Yes, ma'am.
24    Q.  You understand that?

Page 359

1    A.  I do.
2    Q.  What, if anything, did you do to
3 prepare for the balance of this deposition
4 in between the time that we finished last
5 evening and began this morning?
6    A.  Well, one of the things I did, I
7 went back because you had asked me what
8 other cases I testified in.  So if you'd
9 like to give me -- if you'd like to give
10 you that information, I would be happy to do
11 so at this point.
12    Q.  Did you do anything else other
13 than go back and look at whatever cases you
14 had testified in?
15    A.  I --
16    Q.  Did you meet with Mr. Swaminathan?
17    A.  No, no.  We both went our separate
18 ways as soon as we got finished last night
19 at 8:30, 9:00, whatever it was.
20    Q.  Did you talk to anyone about the
21 deposition last night or this morning?
22    A.  No.
23    Q.  Have you spoken to Mr. Brasfield
24 about this case?

Page 360

1    A.  I don't think I spoke to him.  I
2 don't think I talked with him, no.  I may
3 have -- there might have been a text
4 message, but, no, I don't know.  No, I
5 didn't have any conversation about him -- or
6 with him about this case at all.
7    Q.  From the time you started working
8 on it until the current time?
9    A.  That's correct.
10    Q.  Did you review any records other
11 than the ones you mentioned about the other
12 cases you worked on?
13    A.  I went through my report again
14 last night.
15    Q.  Did you review anything other than
16 your report?
17    A.  Perhaps the -- when I say
18 "perhaps," some of the case files, some of
19 the record.  Nothing in great detail, but
20 just kind of skimmed through it.
21    Q.  And when you say "case files,"
22 what are you referring to?
23    A.  The police reports, the witness
24 statements, those types of things.

Page 361

1    Q.  And all of those items are in the
2 material -- on the list of materials you
3 reviewed?
4    A.  Yes.
5    Q.  Those are all materials that you
6 reviewed before, right?
7    A.  They were, yes.
8    Q.  And those were all materials that
9 you reviewed and considered before you
10 issued your report, which is Exhibit 6 in
11 the deposition?
12    A.  That's correct, with the exception
13 of the documents that we identified
14 yesterday.
15        MS. GOLDEN:  I don't have any
16 other questions.
17        THE WITNESS:  Thank you.
18            EXAMINATION
19 BY MS. ROSEN:
20    Q.  Good morning, Mr. Tiderington.
21 It's my turn.
22    A.  Good morning.
23    Q.  How are you?
24    A.  I'm fine.  Thank you.

THOMAS TIDERINGTON, 10/06/2022                    Page 362..365

Page 362

1      Q. My name is Eileen Rosen, and I
2  represent the City of Chicago, and I am
3  going to be asking you some questions about
4  your report.
5      A. Okay.
6         MS. ROSEN: Anand, you know, your
7  video is not on.
8         MR. ANAND: Sorry, sorry.
9         MS. ROSEN: No worries.
10 BY MS. ROSEN:
11     Q. So first, I have just some
12  follow-up from your testimony yesterday.
13  Based on your invoice we -- I think you
14  testified yesterday that you billed 78 hours
15  approximately in connection with the work
16  you did in preparation of your report,
17  correct?
18     A. That's correct.
19     Q. And then I think you told us that
20  there was unbilled time as well, and my
21  recollection is you estimated that at
22  something like 20 to 40 hours. Did I get
23  that right?
24     A. I may have -- I may have said

Page 363

1  that. I thought I said 40 or 50 hours. In
2  reality, I don't know the exact number.
3      Q. Because you didn't keep track?
4      A. That's correct.
5      Q. And you spent, I think you said,
6  another 15 or 20 hours in the last couple of
7  weeks preparing for the deposition, correct?
8      A. That would be correct.
9      Q. So if you spent approximately 80
10  hours that you billed for, and approximately
11  50 hours that you didn't bill for, and then
12  approximately 20 hours in the last couple of
13  weeks, that would be the total amount of
14  time that you spent reviewing materials in
15  connection with this case, correct?
16     A. That is correct.
17     Q. And the Brasfield dep that you
18  recently received, I think you said that was
19  the Rivera case; is that right?
20     A. That's correct.
21     Q. Did you see Mr. Brasfield's trial
22  testimony in Rivera?
23     A. I don't think so, no.
24     Q. I want to talk a little bit about

Page 364

1  your experiences in Fort Lauderdale and when
2  you were at the DEA. Were the types of
3  investigations that you worked on with the
4  DEA similar to the types of investigations
5  you did when you were with OCB?
6      A. There were some cases that were
7  very similar when I was in the organized
8  crime division, and there would be many
9  cases that we worked with the DEA, so yes.
10     Q. And are those investigations that
11  you worked on both with OCB and with when
12  you were assigned to the DEA, were those
13  long-term investigations?
14     A. Some were. Some were one-day
15  investigations. Some were five-year
16  investigations.
17     Q. And the five-year investigations,
18  what types of cases were those?
19     A. Well, with the DEA, it involved
20  international money laundering
21  investigation.
22     Q. And with OCB, the longer-term
23  investigations, what types of cases were
24  those?

Page 365

1      A. Well, again, a wide variety of
2  cases, but for the most part, it would have
3  been cases involving drug cartels, and their
4  criminal behavior, their criminal
5  activities.
6      Q. And the goal was to dismantle the
7  cartels, correct?
8      A. The overall goal, yes.
9      Q. And then the cases that were the
10  shorter term, the one-day ones, what types
11  of cases were those?
12     A. They could be drug raids. They
13  could have been prostitution-related cases.
14  They could have been anything crime -- you
15  know, anything crime-related in the City of
16  Fort Lauderdale involving any type of
17  organized crime, whether it was the Mafia,
18  whether it was the Colombia cartels. So
19  there is really no -- it doesn't really fit
20  into any one box, I should say.
21     Q. When you were assisting the DEA,
22  you told us that some of the things that you
23  did when you were assisting the DEA was to
24  obtain information and in furtherance of

THOMAS TIDERINGTON, 10/06/2022                    Page 366..369

Page 366

1 whatever the investigation was that they
2 were working on, correct?  Is that one of
3 the things that you would do, you and your
4 team, I guess?
5      A.  Certainly, yes.
6      Q.  What other types of things did you
7 do when you were in the role of assisting
8 the DEA?
9      A.  I'm sorry, I just want to make
10 sure we are talking about the same thing.
11 Are you talking about when I was assigned
12 full-time to the DEA as a supervisor, or
13 when I worked with the organized crime
14 division in Fort Lauderdale and worked joint
15 cases with the DEA?
16      Q.  I meant the latter, sorry.  I was
17 not clear, the joint cases.  When you were
18 -- I think you said yesterday that you
19 worked joint cases with the DEA while you
20 were assigned to the Fort Lauderdale Police
21 Department, and I am just trying to get a
22 sense of like what type of assistance you
23 would provide to the DEA in those
24 circumstances?

Page 367

1      A.  Well, again it would be, you know,
2 kind of a wide spectrum of assistance, or
3 perhaps joint investigations.  There were
4 many cases where we would at some point make
5 a determination of whether we would charge
6 somebody federally or whether we would
7 charge them in a state investigation.  You
8 know, as I'm sure you know, there's federal
9 charges -- you know, that there are state
10 charges that, you know, that federal agents
11 cannot necessarily bring forward and vice
12 versa.
13           So we would analyze what type
14 of case it was and whether we were better
15 suited to bring the case to a -- to a state
16 attorney or whether we take it to a federal
17 prosecutor, so it was essentially a
18 give-and-take.
19      Q.  And when it was a case that it was
20 going to be federally charged -- well, let
21 me back up for a second.
22           Who made the decision about
23 whether to pursue federal charges or state
24 charges?

Page 368

1      A.  Well, again, we are just generally
2 speaking.
3      Q.  Yes.
4      A.  It would have been a collective
5 decision made between the case agents, who
6 in that role, I would have been a case
7 agent.  There would have been another
8 special agent in the DEA, who's referred to
9 perhaps as a GS-13, and then there would be
10 supervisors involved in the decision.  So it
11 would be kind of a collective decision by,
12 if you will, you know, the frontline guys,
13 if you will.
14      Q.  And there would be consultation
15 with either State prosecutors and/or U.S.
16 Attorneys?
17      A.  Oftentimes, yes.
18      Q.  And so they were involved in the
19 decision-making about what types of charges,
20 whether it be federal charges or --
21      A.  Well, they would be involved in
22 the discussions about whether we would
23 charge them federally or whether it met the
24 federal threshold.  There are certain

Page 369

1 thresholds of quantities of drugs and types
2 of cases that the Feds would take versus a
3 case that we would take through the state
4 court.
5      Q.  I see.  And when you were in the
6 role of assisting, so you are assigned to
7 Fort Lauderdale Police Department, you are
8 assisting in a case that's going to be
9 federally charged, what types of things
10 would you do to assist in that type of a
11 case?
12      A.  Well, I guess it depends on which
13 case.  I mean, again generally speaking, if
14 I was the undercover operative, my role
15 would be just that.  I would be the
16 undercover officer.  I would prepare reports
17 or, you know, there were different methods
18 that we used to collect evidence from wire
19 tap investigations to covert listening
20 devices and so on.
21      Q.  And when you prepared reports,
22 what types of reports would you prepare?
23 Would they be Fort Lauderdale Police
24 Department reports, or would they be DEA

Page 370

1 reports?

2    A.  Well, for the most part, when we
3 were -- when I was assisting -- when I say
4 -- and again, maybe assisting is not the
5 right word.  When we were working joint
6 investigations, I would prepare Fort
7 Lauderdale documents, and the DEA agent
8 would prepare DEA documents.

9    Q.  And would you maintain those
10 reports in the Fort Lauderdale Police
11 Department?

12    A.  They would have been, yes.

13    Q.  And the DEA would maintain their
14 reports in the DEA records place, wherever
15 they keep their records, right?

16    A.  That is correct.

17    Q.  You testified yesterday about
18 note-taking and in the context of the
19 interview of witnesses, and I think you said
20 that you kept notes a lot of the time in the
21 more critical cases, but not in the more
22 minor cases.  Do I have that right?

23        MR. SWAMINATHAN:  Objection to
24 form and foundation.

Page 371

1        Go ahead.

2        THE WITNESS:  I may have said
3 that, but I don't know.  And again, perhaps
4 I should clarify that.  If I was a patrol
5 officer, and I went to the scene of an
6 accident and the witness came and told me,
7 you know, what occurred there, those were
8 notes that I probably would not have kept or
9 expected an officer to keep.

10        As a detective -- let me turn
11 this off here so we don't have that buzzing
12 here.

13        As a detective working
14 criminal investigations, I would keep my
15 notes, yes.

16 BY MS. ROSEN:

17    Q.  And you would keep your notes for
18 any type of case as a detective?

19    A.  Any case that I -- yes, any case
20 that I was involved in that I took notes on.

21    Q.  Yes.  And what did you take your
22 notes on?

23    A.  I'm sorry?

24    Q.  What type of vehicle did you take

Page 372

1 your notes on?  What did you write on?

2        MR. SWAMINATHAN:  Objection to
3 form.

4        Go ahead.

5        THE WITNESS:  Again, in Fort
6 Lauderdale, we didn't have a specialized
7 form that we used.  It would have been legal
8 pads primarily.

9 BY MS. ROSEN:

10    Q.  So just a regular old legal pad,
11 right?

12    A.  For the most part.  I'm sure there
13 were other types of paper that I used.  It's
14 been quite a while.

15    Q.  And then the notes, what would you
16 do with the information that was contained
17 in the notes?

18    A.  They would be kept in the case
19 file.

20    Q.  And would you -- what would you do
21 with the actual substance of the
22 information?  Would it just remain on the
23 notes, or would you do something with the
24 information that's on your notes?

Page 373

1        MR. SWAMINATHAN:  Objection to
2 form.

3        Go ahead.

4        THE WITNESS:  I guess it depended
5 on what type of case it was or, you know,
6 you know, there were times that it would be
7 included in the police report.

8 BY MS. ROSEN:

9    Q.  And sometimes not?

10    A.  And again, it -- you know, we are
11 not really talking about a specific case,
12 and you are asking me to think back 30 or 40
13 years, so I'm sure there were times that
14 they would not be, yes.

15    Q.  And then you said the notes would
16 be kept in the case file.  What are you
17 referring to when you say the case file?

18    A.  Well, at the time in Fort
19 Lauderdale, the case agent, I believe they
20 are still operating that way today, is the
21 case agent would create a file, and he would
22 be responsible or she would be responsible
23 for the contents of that file, and that
24 would be the official file for the

Page 374

1 investigation.
2    **Q.  And where would that file be**
3 **maintained?**
4    A.  It would have been kept within the
5 detective bureau.
6    **Q.  In a particular place?**
7    A.  In the file cabinet.
8    **Q.  Was there a file room?**
9    A.  There were.  We moved a couple of
10 times, the detective bureau did.  So, yes,
11 there was always a location where the
12 records were kept.
13    **Q.  And did detectives that were**
14 **assigned to that particular unit have access**
15 **to the file cabinets?**
16    A.  They would have, yes.
17    **Q.  And, obviously, you would have**
18 **access to your own case files, right?**
19    A.  That's correct.
20    **Q.  And would you take those case**
21 **files out on the street if you felt it was**
22 **necessary and in furtherance of your**
23 **investigation?**
24    A.  Probably not.  Probably not.  I

Page 375

1 don't think a case file would go out on the
2 street.  If there was -- if there were
3 certain documents that were needed, of
4 course, you could make copies of them and
5 take those with you.
6    **Q.  So the documents that you felt**
7 **were relevant for whatever investigative**
8 **task you were about to do, you would make**
9 **copies from the case file, and take the**
10 **copies out with you out on the street,**
11 **right?**
12    A.  Yeah, but I don't -- if you are
13 asking me -- I can't remember ever doing
14 that, but I don't know that it would be that
15 unreasonable, yes.
16    **Q.  And then once you completed**
17 **whatever the investigative task was, what**
18 **would you do with the copies of those -- of**
19 **those reports or notes or whatever it was**
20 **that you photocopied?**
21    A.  Again, as I just testified, I
22 don't recall doing that specifically.  I can
23 hypothetically tell you what, you know --
24 you know, if there is already the same copy

Page 376

1 in the case file, I would not expect the
2 detective to put those notes or those
3 reports back in there unless there were
4 notes contained on them or additional
5 information added to them.
6    **Q.  And what types of police reports**
7 **did you and your fellow officers prepare**
8 **when you worked in the Fort Lauderdale**
9 **Police Department as a detective?**
10    A.  I'm sorry, what do you mean by
11 what kind of reports?
12    **Q.  Yeah.  Did they have names?  The**
13 **forms that you would utilize to prepare your**
14 **reports, did they have names?**
15    A.  Yeah, there were reports where you
16 would have the standardized case number
17 based on like 82- and, you know, then there
18 would be sequential numbers to them.  We had
19 supplemental reports.
20          Was the police report itself
21 called by anything special?  Not that I can
22 recall.
23          I know in the time I spent
24 with the DEA, their reports were called

Page 377

1 DEA-6s.
2    **Q.  And when you were in the Fort**
3 **Lauderdale Police Department and you were**
4 **investigating a particular case, what types**
5 **of documents or information would you put in**
6 **the case file?**
7    A.  Anything related to the case.
8    **Q.  And did the case file contain all**
9 **original documents?**
10    A.  Or copies of the original
11 documents, yes.
12    **Q.  For the case -- for the documents**
13 **where there were copies of original**
14 **documents, where were the original**
15 **documents?**
16    A.  Well, I guess again -- again, we
17 are -- we are kind of talking about
18 hypotheticals here, so I am trying to think
19 back of where -- you know, if a detective
20 went to a doctor's office and said I need a
21 copy of, you know, this report and somebody
22 made a copy of the report for him, then that
23 copy would have been placed into the case
24 file and, you know, not the original.

THOMAS TIDERINGTON, 10/06/2022                    Page 378..381

Page 378

1    Q.  How about police reports, with
2  respect to any police report that was
3  prepared in connection with whatever the
4  investigation was, were the original reports
5  maintained in the case file?
6    A.  The original reports were then
7  maintained in the case file.  There may have
8  been copies of them.  But, yes, the
9  originals would have been contained in the
10 case file.
11   Q.  Were there directives from the
12 Fort Lauderdale Police Department regarding
13 the creation of police reports and notes in
14 case file?
15   A.  I'm sure there were.
16   Q.  As you sit here today, do you
17 recall what the requirements were of the
18 directives regarding the creation of police
19 reports and notes in the case file?
20   A.  I don't.  I don't recall the
21 specific policy.  And, of course, the 22, 23
22 years that I spent there, I'm sure, they
23 changed and evolved over time.
24   Q.  And then with respect to when you

Page 379

1  were in the detective bureau at the
2  Fort Lauderdale Police Department, I
3  understood your testimony yesterday to be
4  that the detective bureau had within it four
5  different units; the violent crimes unit,
6  OCB that eventually became special
7  investigations, the homicide unit, and
8  property crimes.
9       Did I get that right?
10   A.  For the most part.  And what I
11 mean by "the most part," I mean, you know,
12 over 22 years, it evolved and changed.  But
13 for the most part, yes, that was the make-up
14 of our detective division.
15   Q.  Was there somebody at the head of
16 the detective division?
17   A.  There was.
18   Q.  And what was that person's title?
19   A.  Well, obviously, the chief of
20 police was in charge of everything.  There
21 was a deputy chief that had -- one deputy
22 chief had control or responsibilities over
23 the patrol division.  There was another
24 deputy chief that would have had control

Page 380

1  over the investigative services division,
2  and then I think it was three deputy chiefs
3  at one point, and another admin deputy
4  chief.
5    Q.  When you say investigative
6  services, is that the same, synonymous with
7  the detective bureau, or was the detective
8  bureau within investigative -- you've got to
9  let my finish my question.
10   A.  I'm sorry.  I'm sorry.
11   Q.  -- or was the detective bureau
12 within the investigative services?
13   A.  Yes, and that's a good point.  I
14 am referring to it from different names.
15 So, I mean, at one point in time, it was
16 called investigative services.  Other times
17 it was called the detective bureau, but what
18 I am speaking of is all the same.  It is all
19 the same.
20   Q.  Okay, great.  And then when you
21 were the -- you were the captain, right?
22 You were the commanding officer?  You were a
23 captain, that was your rank, and then your
24 title was commander.  Do I have that right?

Page 381

1    A.  Right, that's correct.
2    Q.  When you were the commander, did
3  you report directly to the deputy chief of
4  the detective bureau?
5    A.  I did.
6    Q.  And does the deputy chief report
7  directly to the chief of police?
8    A.  That's correct.
9    Q.  And Mr. Brasfield was the chief of
10 police at a point in time while you were at
11 the Fort Lauderdale Police Department,
12 correct?
13   A.  Towards the end of my career, yes.
14   Q.  And what was your rank at the time
15 that Mr. Brasfield became chief of police in
16 Fort Lauderdale?
17   A.  I think it was a sergeant at that
18 point.
19   Q.  And before Mr. Brasfield became
20 the chief of police in Fort Lauderdale, did
21 you know him?
22   A.  I did not.
23   Q.  Was he the one that promoted you
24 to captain?

THOMAS TIDERINGTON, 10/06/2022                    Page 382..385

Page 382

1    A. I believe he was, yes.
2    Q. And was that a -- did you have to
3 test into that position, or was that a
4 meritorious promotion?
5    A. No. It was a testing process.
6    Q. And earlier today, Ms. Golden
7 asked you if you had any conversations with
8 Mr. Brasfield about this case, and you said,
9 no, but you mentioned something about you
10 might have texted with him.
11        Do you think you texted about
12 this case?
13    A. Not anything about this case other
14 than to say that I am -- that I was retained
15 and that -- and that he was involved in some
16 of the older cases, and I do recall that he
17 either texted me back and he said, yes, I'm
18 done. I don't want to have any
19 conversations because I don't want to ever
20 get dragged back into these cases, so that's
21 why I recall that I did not have any
22 conversation with him.
23    Q. And did he explain to you why he
24 did not want to be dragged back into these

Page 383

1 cases?
2    A. No. It was a very short, maybe
3 one sentence, and I kind of understood what
4 he meant, and that's why I never had any
5 conversation with him about his work or
6 about any of the work that he did on any of
7 the cases.
8    Q. What did you understand him to
9 mean?
10    A. I don't want to get dragged back
11 in, don't mention my name. I am not -- I
12 mean, it was more of a -- I hadn't talked
13 with Chief Brasfield for a long time, so it
14 was -- and again, I have to express how
15 brief the conversation was. I mean, it was
16 just like a text message and, you know, hope
17 you are doing well. I'm working on some of
18 your old cases.
19        Great, great. You know, glad
20 to hear you are doing this work and
21 congratulations. But I do recall he said
22 something to the effect that -- you know,
23 that he's done, that he is no longer doing
24 expert witness cases, and he would prefer

Page 384

1 not to -- I don't know if he said have a
2 conversation, but I took it to mean that
3 he -- you know, he didn't open the door for
4 me to call and us have a conference or any
5 discussion at all about the cases is kind of
6 my take-away from that short message.
7    Q. Okay. So the information that you
8 know about the work that Mr. Brasfield did
9 on the Fields case, the Rivera case, and the
10 Kluppelberg case comes solely from the
11 reports that he prepared in those cases,
12 correct?
13    A. That's correct. It certainly was
14 not from him in any way, shape, or form.
15    Q. And I guess to be complete, and
16 the deposition testimony that you were
17 recently provided from the Rivera case,
18 right?
19    A. Yes.
20    Q. All right. And with respect to
21 the information in Mr. Brasfield's report in
22 Rivera, did you read that report?
23    A. I did.
24    Q. And did you look at the

Page 385

1 spreadsheet that was attached to that
2 report?
3    A. I did look at a spreadsheet, yes.
4    Q. Did you analyze the spreadsheet in
5 any way, or did you just simply note that
6 there was a spreadsheet that had lots of
7 colors and lots of numbers and lots of
8 lines?
9    A. No. I took some time to
10 understand it, and I wanted to -- I wanted
11 to really understand what it meant, and so I
12 spent a great deal of time trying to
13 understand it and analyze. I don't want to
14 say I analyzed all of the information, but
15 certainly various spot-checking of the data
16 that was contained or attributed to the
17 spreadsheet.
18    Q. And how did you spot-check? What
19 do you mean?
20    A. Can I -- can we pull the chart up,
21 and I can kind of go over it with you?
22    Q. Actually, I don't have -- I am
23 talking about the Brasfield one, not yours.
24 Right? I am talking about the one that was

THOMAS TIDERINGTON, 10/06/2022                          Page 386..389

Page 386

1  attached to Rivera.
2     A. I don't -- can you pull that up?
3  I don't recall if I ever saw a specific
4  spreadsheet attached to his report.
5     Q. Well, I will -- I will do that
6  later if we have the time.
7     A. Okay.
8     Q. It's not a huge point for me.
9        As you sit here today, you
10 don't recall whether or not Rivera, right,
11 so I am talking -- I am not talking about
12 your report right now, so I just want to be
13 clear.
14    A. Right.
15    Q. The report that you reviewed that
16 was prepared by Mr. Brasfield, as you sit
17 here today, you don't recall whether or not
18 there was a spreadsheet similar to the one
19 in this case attached to that report that
20 you reviewed?
21    A. I don't recall if it was attached
22 to the report, no.
23    Q. Do you recall if you ever saw a
24 spreadsheet from Rivera?

Page 387

1     A. From specifically -- I believe we
2  are talking about the same spreadsheet. I
3  think the spreadsheet that I have attached
4  to my report, I am assuming it was the same
5  spreadsheet that was used by Mike Brasfield.
6     Q. So is it your understanding that
7  Mr. Brasfield analyzed the same files that
8  you analyzed?
9        MR. SWAMINATHAN: Objection to
10 form.
11       Go ahead.
12       THE WITNESS: I don't -- I can't
13 really say exactly what Mike did, and I
14 don't recall in enough detail in his report,
15 you know, really to answer that question.
16 BY MS. ROSEN:
17    Q. How about his report in Fields,
18 right -- Mr. Brasfield -- hold on.
19 Mr. Brasfield prepared a report in Fields.
20 Did you review that report in connection
21 with the work that you did in this case?
22    A. I believe I did.
23    Q. And did you note that there was a
24 spreadsheet in the Fields report that was

Page 388

1  utilized by Mr. Brasfield?
2     A. Again, you know, it's been several
3  months, so I don't recall. You have asked
4  me about two reports from Mike Brasfield. I
5  don't recall if the spreadsheet was attached
6  to his reports or not.
7        I have been provided a
8  spreadsheet. I don't know if it's the same
9  spreadsheet, exact same spreadsheet that
10 Mike Brasfield used or not. But if I did
11 look at his report, I probably could answer
12 that pretty quickly.
13    Q. As you sit here today, you don't
14 know if Mr. Brasfield reviewed in connection
15 with the work he did in Rivera and Fields
16 the same files that you reviewed; is that
17 correct?
18    A. I believe he did, but I don't know
19 for sure.
20    Q. And with respect to the files that
21 are referenced in the spreadsheet that is
22 attached to your report, who prepared that
23 spreadsheet?
24    A. Mr. Anand's office.

Page 389

1     Q. And do you know who at
2  Mr. Swaminathan's office prepared the
3  spreadsheet?
4     A. I don't.
5     Q. Do you know if it was one person
6  or many people?
7     A. I know Anand -- well, I guess I
8  can't get into the conversations, but I
9  don't know how many people worked on that
10 spreadsheet. I am assuming, and I could be
11 wrong with an assumption, but I am assuming
12 more than one person, but I don't know.
13    Q. Were you involved in the
14 decision-making regarding what information
15 to memorialize on the spreadsheet?
16    A. No. The spreadsheet was just
17 provided. I didn't alter or edit the
18 spreadsheet at all.
19    Q. And you were not involved in the
20 creation of the spreadsheet, right? You had
21 no input into the creation of the
22 spreadsheet, correct?
23    A. That is correct.
24    Q. And were you provided the files

THOMAS TIDERINGTON, 10/06/2022                    Page 390..393

Page 390

1  that -- from which the data that is noted in
2  the spreadsheet was taken?
3      A.  Yes, I was.
4      Q.  What files were you provided by
5  category?
6      A.  Can I -- again, can I pull -- can
7  I open up the report or not?
8      Q.  If you don't -- if you don't
9  remember, we can -- we will get to it in the
10  report.  I am just wondering, do you have
11  a -- as you sit here today, do you know what
12  categories of files were reviewed --
13      A.  Yeah.
14      Q.  -- to prepare the spreadsheet?
15      A.  Yeah.  I mean they were the Public
16  Defender -- files from the Public Defenders.
17  They were permanent retention files, and
18  they were investigative files.
19      Q.  You said Public Defender files,
20  investigative files, and what was the third?
21      A.  Permanent retention files.
22      Q.  Were you provided any Cook County
23  State's Attorney office files?
24      A.  I don't think so.

Page 391

1      Q.  Are you aware that the parties in
2  this case obtained files from the Cook
3  County State's Attorney's Office, companion
4  files to the files that you reviewed?
5      MR. SWAMINATHAN:  Objection to
6  form and foundation, especially based on the
7  timing of when his report was compared to
8  those disclosures, but go ahead.
9      THE WITNESS:  I would have to look
10  at my list of materials that were provided
11  to me, but I don't recall as we sit here
12  today that I was provided with any State
13  Attorney files.
14  BY MS. ROSEN:
15      Q.  And they are not referenced.  I
16  can tell you they are not referenced.  In
17  your materials reviewed, they were not
18  provided to you.
19      My question is a little bit
20  different.  Do you know that we have them?
21      A.  Are you telling me that you have
22  them now?
23      Q.  I am telling you that the parties
24  in this case had them at the time that --

Page 392

1      A.  Okay.
2      Q.  -- at the time -- during discovery
3  in this case.  So my question is:  Are you
4  aware that the parties have the Cook County
5  State's Attorney's Office files?
6      A.  I guess I am now.  I don't know
7  that I was before.
8      Q.  Pardon me.
9      A.  I am sorry, I am making that
10  difficult.
11      Q.  No, no, no.  I am just trying to
12  understand what you had and what you know of
13  and, you know, you are the expert, so I need
14  to know what data points you rely on.
15      (Whereupon, Tiderington
16      Deposition Exhibit No. 4 was
17      screen-shared/referenced.)
18  BY MS. ROSEN:
19      Q.  If we can take a look at Exhibit
20  4, which is the materials that you reviewed.
21      A.  I'm sorry?
22      Q.  Yes.  We are going to put it up on
23  the screen.  It's Attachment B if you have
24  the hard copy in front of you.

Page 393

1      MR. SWAMINATHAN:  You want to grab
2  the hard copy?
3      THE WITNESS:  Yes.  Exhibit 4.
4  BY MS. ROSEN:
5      Q.  Do you have it?
6      A.  Yes.  Okay.
7      Q.  Are we good?
8      A.  Yes.
9      Q.  And if we take a look at the
10  materials reviewed.  With respect to
11  information related to the case, there are
12  146 -- no, wait a second.  I'm sorry -- 116
13  items listed; is that correct?
14      A.  That is correct.
15      Q.  Have you reviewed -- actually, let
16  me take that back.  Hold on one second.
17      With respect to Items 1
18  through 96, did you review all of those
19  materials?
20      A.  I am going to go through and look
21  if you don't mind.
22      Q.  Yeah, sure.
23      A.  I believe I did, yes.
24      Q.  And when -- does that mean that

THOMAS TIDERINGTON, 10/06/2022                    Page 394..397

Page 394

1 you read all of them cover to cover, or does
2 that mean that you did something less than
3 that?
4        MR. SWAMINATHAN: Objection to
5 form.
6        Go ahead.
7        THE WITNESS: Probably something
8 less than that, depending on what the
9 document was.
10 BY MS. ROSEN:
11     Q. So can you tell me -- if you look
12 at Item 38, it's the deposition transcript
13 of Heather Brualdi. Do you see that?
14     A. I do.
15     Q. Did you read the entirety of
16 Ms. Brualdi's deposition?
17     A. In that particular depo, I think I
18 did read her deposition, yes.
19     Q. Do you have an understanding of
20 who she is and what her role is in this --
21 in the Soto homicide?
22     A. I believe she is with the State's
23 Attorney's Office.
24     Q. And do you have an understanding

Page 396

1 investigation?
2     A. You know, I don't. But if you
3 gave me a trigger word or two, I probably
4 would but ...
5     Q. Do you have a recollection of him
6 being at the Cook County State's Attorney's
7 Office at the time of the investigation?
8     A. That sounds about right.
9     Q. And do you know what his
10 assignment was during the Soto -- you got to
11 let me finish my question, sorry -- the Soto
12 homicide investigation?
13       MR. SWAMINATHAN: Objection to
14 form.
15       Go ahead.
16       THE WITNESS: I don't.
17 BY MS. ROSEN:
18     Q. Did you read thoroughly the
19 deposition transcript of Thomas O'Malley?
20 That's Item Number 42.
21     A. I do believe I read his depo. I
22 believe he is a State Attorney. He worked
23 in the State's Attorney's Office as well.
24     Q. Do you recall what his assignment

Page 395

1 of what assignment she was in in 1998 at the
2 time of the Soto homicide investigation?
3        MR. SWAMINATHAN: Objection to
4 form.
5        Go ahead.
6        THE WITNESS: I don't know
7 specifically what her assignment was. It
8 may have been in the depo, but I don't know
9 exactly what it was as we sit here today.
10 BY MS. ROSEN:
11     Q. How about the deposition
12 transcript of David Navarro, is that one
13 that you read thoroughly?
14     A. I would have to pull that up to
15 see if it would refresh my memory. For some
16 reason, Ms. Brualdi's depo sticks out in my
17 mind.
18        David Navarro, I would have to
19 again confirm and refresh my memory to
20 determine whether or not I read the entire
21 depo or whether I just read parts of it.
22     Q. As you sit here today, do you have
23 an understanding of or a memory of what
24 Mr. Navarro's role was in the Soto homicide

Page 397

1 was in 1998 at the time of the Soto homicide
2 investigation?
3     A. Not specifically as to what their
4 assignments were, no.
5     Q. Does the phrase "felony review"
6 mean anything to you?
7        MR. SWAMINATHAN: Objection to
8 form.
9        Go ahead.
10       THE WITNESS: That sounds perhaps
11 where they may have been assigned to.
12 BY MS. ROSEN:
13     Q. And do you have an understanding
14 of what being assigned to felony review at
15 the Cook County State's Attorney's Office
16 meant back in 1998?
17     A. Not in any great detail without
18 again reviewing the deposition statements,
19 testimony.
20     Q. And then Item Number 58 is the
21 deposition of Kathleen Loughran. Do you see
22 that?
23     A. I do.
24     Q. Do you know what case that

Page 398

1  deposition transcript came from?
2      A.  I don't as we sit here today.
3      Q.  Do you know what Ms. Loughran
4  testified about in her deposition in
5  whatever case the deposition transcript
6  belongs to?
7      A.  I do not, not as we sit here today
8  without having the ability to refresh my
9  memory.
10     Q.  I would pull it up for you, but I
11 don't know what dep transcript it is.
12         All right.  Moving down to
13 Item Number 94, Richard Brzeczek testimony.
14 Do you see that there?
15     A.  I do.
16     Q.  What type of testimony was that?
17     A.  Again, I was -- there's so many
18 documents, I would have to pull it up and
19 refresh my memory.
20     Q.  Does the fact that you wrote
21 "testimony" instead of "deposition
22 testimony" mean it was something other than
23 deposition?
24     A.  It probably means that, yes.

Page 399

1      Q.  How about with respect -- do you
2  know who Richard Brzeczek is?
3      A.  Again, I would -- I could easily
4  refresh my memory.  But as far as the memory
5  test goes, right now, I don't recall exactly
6  who -- what role he played in this
7  investigation.
8      Q.  And then with respect to Milton
9  Deas, that also just says testimony.  So is
10 it safe to assume it's something other than
11 deposition testimony?
12     A.  That's correct.
13     Q.  Do you recall who he is?
14     A.  I don't.
15     Q.  How about John Stibich, the same
16 testimony again.  Does that mean it's fair
17 to assume not deposition testimony?
18     A.  That's correct.
19     Q.  And as you sit here today, do you
20 recall who Mr. Stibich is?
21     A.  If you give me two words, I will
22 remember, but, no, I would have to refresh
23 it.
24     Q.  Okay.  And then when we go to Item

Page 400

1  Number 97, that says 1995 to 1998, Area 5
2  investigative files.  Do you see that there?
3      A.  Yes, I do.
4      Q.  And so you were -- you were
5  provided all of the investigative files that
6  are within that Bates range; is that
7  correct?
8      A.  I believe so, yes.
9      Q.  And it's your understanding, I
10 think, based on what you testified to
11 earlier, that those investigative files were
12 utilized in preparing the spreadsheet that
13 is attached to your report in this case,
14 correct?
15     A.  I believe so, yes.
16     Q.  Did you review each and every one
17 of those investigative files?
18     A.  No.
19     Q.  How many investigative files are
20 represented in Item No. 97, do you know?
21     A.  300-and-some.  I don't know the
22 exact number, maybe 340 or some -- somewhere
23 around -- around 300.
24     Q.  I think in your report -- and we

Page 401

1  will get there in a second -- you state 344.
2  Does that sound about right?
3      A.  It sounds about right.
4      Q.  How many of those 344
5  investigative files did you review?
6      A.  I am sorry.  For some -- I have to
7  get back.  Oh, I lost the Zoom meeting.
8  Okay, I'm back here now.  I am sorry, could
9  you please ask that again?
10     Q.  Sure.  Of the 344 investigative
11 files that you were provided, how many did
12 you actually review?
13     A.  Well, I spot-checked several of
14 them.  I don't know if I have an exact
15 number.  I would say somewhere around --
16 well, I went through a lot of the files.  I
17 don't know that I -- on some, I spent more
18 time than others, but I certainly went
19 through a good number of the files.
20     Q.  Can you estimate for me how many
21 files you reviewed of the 344?
22     A.  I probably looked at every one of
23 the files, but some in greater detail than
24 the others.

Page 402

1    Q.  How did you -- when you say you
2 looked at every one of the files, what do
3 you mean?
4    A.  I skimmed through each of the
5 files that I have, and some were -- I would
6 stop, and I would look at them in more
7 detail than others.
8    Q.  What would -- why would you stop?
9 Like what would cause you to stop?
10       MR. SWAMINATHAN:  Objection to
11 form.
12       Go ahead.
13       THE WITNESS:  What would cause me
14 to stop?  I guess I don't understand that
15 question, whether --
16 BY MS. ROSEN:
17    Q.  Okay, let me try it this way.  You
18 believe you skimmed every file, all 344
19 files, correct?
20    A.  I do.
21    Q.  And you said, sometimes you spent
22 more time with some files than others,
23 right?
24    A.  That's correct.

Page 403

1    Q.  And what methodology were you
2 utilizing to decide which files to spend
3 more time with?
4    A.  I don't know if there was any
5 great methodology.  I would look at if
6 something caught my interest, or I was -- if
7 it was something unusual, I spent more time
8 on that.
9    Q.  What types of things would catch
10 your interest?
11    A.  I guess, could I refer back to my
12 report, and I can give you some examples?
13    Q.  Yeah.  We are going to get to --
14 you do discuss in some detail some of these
15 files?
16    A.  Right.
17    Q.  I am just trying to get a sense
18 of, you know, your process.
19    A.  Yeah.
20    Q.  So we will -- I will definitely
21 give you an opportunity to look at that part
22 of the report, and I even have some of the
23 files marked as exhibits, and we can talk
24 about them.  I am just trying to get a sense

Page 404

1 of what types of things caught your interest
2 or you found unusual.
3       Was there something in
4 particular you were looking for, or was it
5 more haphazard than that?
6    A.  I would say that -- I mean, my --
7 the goal was to verify the information that
8 was contained in the chart.  And so I would
9 -- when you say haphazardly, I don't know if
10 I would agree to that.  But I would go
11 through the files and, you know, some of the
12 files, I would look at more closely than
13 others.
14       I don't know if there was any
15 specific reason or rhyme or methodology in
16 determining whether I am going to look at
17 one file in greater detail than the other,
18 but my goal was not to become familiar with
19 each of the 300 files.
20    Q.  So it was not your goal to become
21 familiar with each of the investigations
22 that underlie the 344 files you reviewed,
23 correct?
24    A.  I don't think it would have been

Page 405

1 humanly possible to do that.
2    Q.  And why not?
3    A.  Because there is 340 files, and
4 each file contains many, many pages.
5    Q.  Sometimes hundreds of pages,
6 right?
7    A.  That's correct.
8    Q.  And you said -- you used the
9 phrase "spot-check."  What were you
10 spot-checking?  What were you looking --
11 what were you checking?
12    A.  Well, I was -- again, initially, I
13 was trying to understand what the chart
14 meant, and then I would go through, and I'd
15 look in a file and see, you know, if GPRs
16 were contained in a particular file, or if
17 there were to-and-from memos contained in a
18 file.  So that's kind of the things I was
19 looking for are the categories that are
20 outlined and listed in the chart.
21    Q.  And then you also received --
22 listed here at Item 98, the 1995 to 1998
23 Cook County Public Defender files, right?
24    A.  Yes.

THOMAS TIDERINGTON, 10/06/2022                     Page 406..409

Page 406

1    Q.  Did you review -- do you know how
2 many files total were provided to you?
3    A.  I think I have the number.  I
4 think the chart indicates how many files
5 there were, but I don't recall specifically.
6    Q.  I think it's somewhere in the --
7 you do have it in your report.  It's
8 somewhere in the 60-something range, I
9 believe?
10   A.  Yes.
11   Q.  But regardless, did you review
12 each of those files?
13   A.  Again, I think I went through each
14 of the files, but I don't want to say that I
15 -- and I don't want to lead you to believe
16 that I did it with -- that I reviewed in
17 detail every document that was contained.
18 That was not the case.
19   Q.  Other than with respect to the
20 1995 to 1998 RD files, do you see that
21 there?
22   A.  Yes.
23   Q.  And you were provided those as
24 well, right?

Page 407

1    A.  That's correct.
2    Q.  And as you sit here right now, do
3 you recall how many of those files you got?
4    A.  I don't.
5    Q.  And what is a RD file, do you
6 know?
7    A.  Record division file.
8    Q.  And you used the phrase earlier
9 "permanent retention file"?
10   A.  Correct.
11   Q.  Is there a distinction between the
12 permanent retention file and the records
13 division file?
14   A.  Again, to be sure, I'd have to
15 pull those up to refresh my memory.
16   Q.  Pull what up?
17   A.  Both the permanent retention files
18 and the record files.
19   Q.  Well, I don't see permanent
20 retention files listed here.  I only see
21 record division files.
22   A.  I think those are -- those are one
23 in the same.
24   Q.  Okay.  All right.  And then if we

Page 408

1 look at Items 117 to 146, Ms. Golden asked
2 you some questions about those yesterday,
3 and I just want to make sure I understand
4 what their purpose here is in listing them
5 here in this report.
6    A.  Okay.
7    Q.  Am I correct that you did not
8 review all of these materials in connection
9 with the preparation of your report?
10   A.  Well, the material -- I guess what
11 I explained yesterday, and I will try to
12 explain again today, is that at some point
13 in my career, I would have looked at all of
14 these documents to some degree.
15        Did I use all of the listed
16 documents here specifically to prepare that
17 report?  No.
18        You know, there's -- many of
19 these documents or books, I don't footnote
20 or I don't reference at all in the report.
21 It was intended to demonstrate the types of
22 material that I've had or that I have
23 reviewed throughout my career, which, you
24 know, over 44 years in some capacity.

Page 409

1    Q.  Are we to assume that the
2 materials listed here at Items 117 through
3 146 are relevant in some way to the opinions
4 you were asked to evaluate -- let me start
5 that over.
6        Are we to assume that Items
7 117 through 146 contain relevant information
8 related to the -- your report?
9        MR. SWAMINATHAN:  Objection to
10 form.  Foundation.
11        Go ahead.
12        THE WITNESS:  Probably not
13 necessarily to my report, specifically.  But
14 to my universe of knowledge, I guess, is
15 maybe a way to describe it of teaching and
16 training officers and going through various
17 seminars and training exercises.  I think I,
18 you know, am certainly not going to suggest
19 that every one of these documents was
20 specifically used in order to prepare my
21 report.
22        The intent was to demonstrate
23 the types of material that I have been
24 exposed to throughout my career.

THOMAS TIDERINGTON, 10/06/2022                    Page 410..413

Page 410

1 BY MS. ROSEN:
2    **Q. You talked yesterday about the**
3 **French books that are on here, and I think**
4 **you said the reason you added them is**
5 **because Mr. Brasfield had them on his**
6 **report. Did I get that right?**
7    A. That's correct.
8    **Q. And you don't speak French, right?**
9    A. I don't.
10    **Q. And so you don't really know what**
11 **the contents of those French materials are,**
12 **correct?**
13    A. That's correct.
14    **Q. Yesterday when Ms. Golden was**
15 **asking you questions, she was specifically**
16 **asking you about your opinions related to**
17 **the gross deviation of acceptable standard**
18 **police practices. Do you recall generally**
19 **that testimony from yesterday?**
20    A. I do recall, yes.
21    **Q. And in the list of items that you**
22 **identified as being a gross deviation, you**
23 **mentioned police reports being withheld. Do**
24 **you recall that?**

Page 411

1    A. I would have to review my
2 transcript or if you could read the question
3 back to me. I vaguely recall, but if you
4 are going to ask me specific questions about
5 my testimony yesterday, I would have to --
6 or if you are going to ask me again about
7 things I have already testified to, I think
8 I would have to -- or I would want to hear
9 the questions and hear my answers.
10    **Q. Yeah. I am not like trying to**
11 **impeach you or anything. I am just trying**
12 **to direct you to this topic.**
13        **I guess I can ask it this way:**
14 **Is it your opinion that police reports were**
15 **withheld by the police officers that were**
16 **involved in the homicide -- the Soto**
17 **homicide investigation?**
18    A. That is my opinion, yes.
19    **Q. What specific police reports were**
20 **withheld?**
21    A. Well, again, I'd like to -- I'd
22 have to go through the case file, and we can
23 get specific.
24    **Q. Have you detailed the police**

Page 412

1 reports that you believe were withheld in
2 your report?
3        MR. SWAMINATHAN: Objection to
4 form.
5        Go ahead.
6        THE WITNESS: Can we turn to those
7 pages at this point, or are we going to
8 just --
9 BY MS. ROSEN:
10    **Q. No, I am just asking -- I am**
11 **simply asking you will we find the answer to**
12 **my question somewhere within the four**
13 **corners of your report?**
14    A. I'm sure we will.
15    **Q. Okay. You said yesterday**
16 **something about the Polaroids and that**
17 **Polaroids are only taken of possible**
18 **suspects. Do you recall testimony along**
19 **those lines?**
20    A. I do recall that we had that
21 discussion, yes.
22    **Q. What is the basis for your**
23 **conclusion that the police department only**
24 **takes Polaroids of possible suspects?**

Page 413

1        MR. SWAMINATHAN: Objection to
2 form and foundation.
3        THE WITNESS: Yeah, that's not
4 what I -- I don't think that's what I
5 testified to.
6 BY MS. ROSEN:
7    **Q. Well, explain to me what you**
8 **believe the importance of a Polaroid photo**
9 **is in a Chicago Police Department homicide**
10 **investigation?**
11        MR. SWAMINATHAN: Objection to
12 form and foundation.
13        Go ahead.
14        THE WITNESS: Well, I don't
15 know -- I think my testimony related to
16 specifically to the Soto investigation, and
17 that's what I was testifying to yesterday.
18 BY MS. ROSEN:
19    **Q. So explain to me with respect to**
20 **the Soto investigation the importance or**
21 **relevance of Polaroid photographs?**
22    A. Well, obviously, the importance is
23 the officers had to take photographs of
24 these individuals for a reason. And

Page 414

1 everybody that was identified, everybody
2 that was a witness, I did not see evidence
3 that there was photographs taken of each
4 witness.
5           There were photographs taken
6 of specific individuals that had
7 subsequently claimed that they were
8 interrogated and treated as mistreated and
9 treated as suspects in the case.
10          And I noted that in addition
11 to Solache, Reyes, Mejia, that the only
12 other photos were of those that also claim
13 to have been mistreated by the police
14 detectives.
15 BY MS. ROSEN:
16     Q.  And what conclusion do you draw
17 from those inferences?
18          MR. SWAMINATHAN:  Objection to
19 form.
20          Go ahead.
21          THE WITNESS:  Perhaps that they
22 were suspects in this investigation.
23 BY MS. ROSEN:
24     Q.  Okay.

Page 415

1     A.  And again, if you would allow me,
2 I did offer some analysis in my report, and
3 it would be helpful if I was able to refresh
4 my memory in terms of the Polaroid pictures.
5     Q.  Yeah, we will get to that.
6          (Whereupon, Tiderington
7           Deposition Exhibit No. 6 was
8           screen-shared/referenced.)
9 BY MS. ROSEN:
10     Q.  Let's take a look at Exhibit 6,
11 which is your report, and we will go to page
12 33.  So we are at Opinion 2 of your report,
13 and the heading is "CPD's Policies and
14 Practices Concerning Documentation and
15 Disclosures in Homicide Investigations are
16 Woefully Inadequate and Result in the
17 Routine Failure to Document and Disclose the
18 Documents and Information Learned during the
19 Homicide Investigation to Criminal
20 Defendants."
21          Did I read that correctly?
22     A.  You did.
23     Q.  So as I understand it, you have
24 two main global criticisms.  One is what you

Page 416

1 describe as a routine failure to document
2 information, right?
3     A.  That's correct.
4     Q.  And the second is a routine
5 failure to disclose the documents and
6 information learned.  Do I have that right?
7     A.  You do.
8     Q.  Now, with respect to your
9 conclusion about a routine failure to
10 document information learned in homicide
11 investigations, other than your review of
12 the information that you were provided in
13 connection with the Soto homicide
14 investigation, what else are you relying on
15 to support that main point, number 1?
16     A.  All right.  And we can go through
17 my report at this point?
18     Q.  Yeah, I mean, if you feel like
19 there is somewhere in your report that
20 answers that question.  You have it in front
21 of you, correct?
22     A.  I do.
23     Q.  Yeah, sure.
24          Just so we are clear, I am

Page 417

1 uninterested in information related to the
2 Soto homicide, right?  I am looking for
3 other evidence or data that you are relying
4 on for the conclusion that there is a
5 routine failure to document?
6     A.  So not specific to the Soto case
7 at all?
8     Q.  Correct.
9     A.  And then we can -- I can utilize
10 the chart here to discuss the analysis there
11 or not?
12     Q.  Do you believe that that
13 information is contained in the chart?
14     A.  Well, certainly.  Under -- there
15 is information that the Chicago Police
16 Department attempted to policies -- enacting
17 policies that would require their officers
18 to submit certain information into certain
19 files, and the policy was not being followed
20 globally within the department.  I think
21 there was testimony from the PD
22 representatives that indicates that the
23 policies were ineffective, and they did not
24 ensure that documents were being forwarded

THOMAS TIDERINGTON, 10/06/2022                    Page 418..421

Page 418

1 as required by department policy.
2     Q.  That's a different point, though,
3 right?  The failure to disclose is a
4 different point than the failure to
5 document, isn't it?
6     A.  Well, no.  Well, I think it's --
7 there is multiple issues within that
8 question, and there is the street file issue
9 where there is evidence that the officers
10 were maintaining parallel files and that
11 they had files that contained certain
12 information that was never -- that never got
13 to the permanent retention file or the
14 investigative file.
15          There was significant
16 exculpatory information that was found in
17 street files, and this is again, in my view,
18 all part of the problem within the Chicago
19 Police Department in terms of creating the
20 investigative files, properly creating the
21 investigative files, holding the officers
22 responsible for submitting the relevant
23 documents, and then disclosing these
24 documents as they are required to by law.

Page 419

1     Q.  Okay.  So let me try this again,
2 because I thought we had agreed that there
3 were two main points to be taken from the
4 heading that I read that is accompanying
5 Opinion Number 2, and that one was a failure
6 to document, and the other was a failure to
7 disclose?
8     A.  Correct.
9     Q.  Are those two separate points in
10 your mind?
11          MR. SWAMINATHAN:  Objection to
12 form.
13          Go ahead.
14          THE WITNESS:  Well, I think they
15 are two points, but they are all tied into
16 the same issue.  I think there is evidence
17 in the record that witnesses were
18 interviewed and that the proper GPRs were
19 not being used to document the information,
20 that there was investigative steps that were
21 taken that were failed -- that there was a
22 failure to document those investigative
23 steps.  I think that's what I saw throughout
24 the investigations, and specifically in more

Page 420

1 detail, the Soto investigation.
2 BY MS. ROSEN:
3     Q.  Yeah, so I am interested in what
4 other investigations you observed a failure
5 to document?
6     A.  Right.  If you want to look at the
7 Jones investigation.
8     Q.  Okay, so Jones, fine.  That's one
9 example.  Tell me about any other example --
10 well, Jones, what was not documented in
11 Jones?
12     A.  Well, there was documentation --
13 well, false or misleading documentation of a
14 photo lineup -- well, I'm sorry, of
15 information that was used to convict a young
16 man that was contrary to the reports that
17 were found in a street file at some point
18 later.
19     Q.  That's an example of a failure to
20 document, not a failure to disclose, a
21 failure to document?
22          MR. SWAMINATHAN:  Objection to
23 form and foundation.
24          Go ahead.

Page 421

1          THE WITNESS:  Well, I would say it
2 was an overall failure to document the
3 investigative stuff that the officers took
4 in the Jones matter.
5 BY MS. ROSEN:
6     Q.  What is the evidence that the
7 officers in Jones failed to document?
8     A.  All right.  If you give me a
9 second just to review that portion.
10     Q.  Sure.  What page are you
11 reviewing?
12     A.  Page 36 and 37.
13     Q.  Okay.
14     A.  Maybe it would be a good time to
15 take a break as well after -- whenever you
16 think it's appropriate.  We have been going
17 an hour and a half now.
18     Q.  Yeah, sure.  Why don't you just --
19 let's answer my question, and take a look at
20 36 and 37, and then tell me what was not
21 documented in Jones?
22     A.  Well, yeah, okay so in the Jones
23 case, obviously, Officer Laverty documented
24 his portion of the investigation in which he

THOMAS TIDERINGTON, 10/06/2022                    Page 422..425

Page 422

1 concluded that Jones could not have possibly
2 been the suspect. There was a separate
3 street file that failed to document how they
4 concluded that Jones was a suspect
5 adequately to document how they concluded
6 that Jones committed this crime.
7        MR. SWAMINATHAN: Are you good to
8 keep going, or do you want to take a break?
9        MS. ROSEN: You can take a break
10 if you are ready to take a break.
11        MR. SWAMINATHAN: It's up to you.
12        THE WITNESS: Yeah, I could take
13 five minutes. Five minutes, would that be
14 fine?
15        MS. ROSEN: Sure.
16        THE VIDEOGRAPHER: We are off the
17 video record at 11:25 a.m.
18        (Whereupon, a break was taken
19           at 11:25 a.m. to 11:34 a.m.)
20        THE VIDEOGRAPHER: We are back on
21 the video record at 11:34 a.m.
22 BY MS. ROSEN:
23   **Q. In the George Jones case that we**
24 **were just talking about happened in 1981,**

Page 423

1 **correct?**
2     A. I believe so, yes.
3   **Q. What other examples are in your**
4 **report that support the notion that the**
5 **Chicago Police Department's policies and**
6 **practices resulted in a routine failure to**
7 **document information learned during a**
8 **homicide investigation?**
9     A. Well again, before the break, I
10 mean, we were talking about -- you had said,
11 you know, you are really not talking about
12 the Soto case, but, obviously, I did a deep
13 dive into the Soto case versus a --
14 something lesser on the other 300 cases.
15        And what I saw in the Soto
16 case, all right, in terms of, you know, not
17 documenting, you know, what a witness said
18 or didn't say, contemporaneous notes, the
19 officer would interview a witness, and then
20 a month later write a police report, and
21 there were no responding notes with that.
22        These are things that I --
23 that were consistent when I was
24 spot-checking the other cases that I would

Page 424

1 also find as an example.
2   **Q. How were you able to determine**
3 **when you were spot-checking the other cases**
4 **that information was not being documented?**
5        MR. SWAMINATHAN: Objection to
6 form.
7        Go ahead.
8        THE WITNESS: Well, there would be
9 -- there would be cases where the police
10 report would attribute statements to a
11 witness, but then there were no notes. Some
12 of the -- some of the cases in a homicide
13 investigation, there were no notes
14 whatsoever. Nothing on GPRs. Nothing on
15 legal pads. Nothing in to-from memos.
16        So it's hard for me to
17 believe or understand that a homicide
18 investigation can be conducted without any
19 type of written notes taken by a police
20 officer.
21 BY MS. ROSEN:
22   **Q. Do you list those examples in your**
23 **report somewhere?**
24     A. I don't think I listed them

Page 425

1 specifically, no.
2   **Q. Can you identify them for us**
3 **today, the case files that you are talking**
4 **about?**
5     A. I'm sure I could if we pull them
6 up and go through them, yes, we could do
7 that.
8   **Q. We can go through all 344, is that**
9 **the way that you propose that we figure out**
10 **which case you are thinking about?**
11        MR. SWAMINATHAN: Objection to
12 form. Argumentative.
13        THE WITNESS: Well, I guess it's
14 your decision how you want me to do it.
15 BY MS. ROSEN:
16   **Q. I am asking you how can you answer**
17 **the question? Is the only way for you to**
18 **tell us which cases that you are thinking of**
19 **is to go through all 344 files? Is that the**
20 **only way to get an answer to the question?**
21     A. Well, I don't think we have to --
22        MR. SWAMINATHAN: Go ahead.
23        THE WITNESS: I'm sorry. I don't
24 think we have to go through 344. We could

THOMAS TIDERINGTON, 10/06/2022                    Page 426..429

Page 426

1 randomly pick a case, we could go through it
2 together, and I can explain what I would
3 expect to see in a case and what perhaps is
4 missing.
5 BY MS. ROSEN:
6      **Q. Why didn't you identify those**
7 **cases in your report in support of your**
8 **opinion?**
9      MR. SWAMINATHAN: Objection to
10 form and foundation.
11      Go ahead.
12      THE WITNESS: Well, I think I did,
13 and I did identify several instances, and I
14 think the Soto is probably the best example,
15 and I think it's detailed pretty
16 comprehensively.
17 BY MS. ROSEN:
18      **Q. Can you direct me to your report**
19 **where you list other cases other than the**
20 **Soto homicide that are examples of**
21 **detectives failing to document information,**
22 **and other than Jones?**
23      A. If you want to turn to page 50.
24      **Q. Okay.**

Page 427

1      A. We can go through those cases. I
2 think that illustrates some of the examples
3 that I could provide for you.
4      **Q. When you say "those cases," are**
5 **you referring to the list of RD numbers that**
6 **appear about midway through the -- through**
7 **the report?**
8      A. That's correct.
9      **Q. And you believe in those cases,**
10 **there are examples of police officers**
11 **failing to document information they learned**
12 **in a homicide investigation; is that**
13 **correct?**
14      A. I do.
15      **Q. And explain to me if the**
16 **information was not documented how you know**
17 **that the information existed?**
18      MR. SWAMINATHAN: Objection to
19 form.
20      Go ahead.
21      THE WITNESS: So I think your
22 question is: If something is missing, how
23 do you know it's missing?
24

Page 428

1 BY MS. ROSEN:
2      **Q. Exactly.**
3      A. Well -- and that's a good
4 question, but I have reviewed and conducted
5 enough criminal investigations to understand
6 what you would typically see in a homicide
7 file or any type of a criminal investigation
8 file, and what I am seeing in many of the
9 Chicago Police Department files is unlike
10 what I would typically see in other police
11 departments that I am familiar with.
12      **Q. Other than this list of RD**
13 **numbers, there is five of them, on page 50,**
14 **anyplace else where you have identified**
15 **files that support your conclusion that**
16 **there was a routine failure to document**
17 **information learned in a homicide**
18 **investigation?**
19      A. Well, I think we would also
20 reference the chart in Attachment F, which
21 also confirms my opinion there, I believe.
22      **Q. Is there a column that says**
23 **failure to document in the chart?**
24      A. I don't think it says a failure to

Page 429

1 document, but it certainly says what's
2 missing or what's contained within there.
3 GPRs as an example. I think there is a
4 column that lists that, and the numbers of
5 cases that do not have GPRs in them.
6      **Q. So if an investigative file**
7 **doesn't have a GPR, that fact supports your**
8 **conclusion of a failure to document; is that**
9 **correct?**
10      A. Well, it may. I don't want to say
11 in every case, but it would be something
12 that I would be concerned about. If I was a
13 supervisor looking over a file, I would be
14 concerned about that, yes. It would be -- I
15 would expect in the vast majority of
16 homicide cases that there would be some type
17 of notes by the investigator.
18      **Q. And did you look at the cases that**
19 **are listed in the chart? Well, let me back**
20 **up for a second, just so I am clear.**
21      **The point you are making is**
22 **that when we look at the chart, we will find**
23 **noted that there are investigative files**
24 **without any GPRs in those files? Is that**

Page 430

1 what you are saying?
2     A.  Yes.  Could I -- you don't mind if
3 I look at the chart at this point, right?
4     Q.  No, go ahead.
5     A.  Okay.
6     Q.  So is that the point you were
7 making?
8     A.  I think that's accurate, yes.
9     Q.  Can you tell me what column you
10 are looking at that establishes that?
11    A.  There is a column that says, "Are
12 there handwritten notes in the file not on
13 GPRs?" is one file.  "Are there any
14 handwritten notes?" is another column.
15    Q.  Is there a column that says, Are
16 there GPRs in the investigative file?
17        MR. SWAMINATHAN:  Objection to
18 form and foundation.
19        Go ahead.
20        THE WITNESS:  I am sorry, can you
21 ask that again?
22 BY MS. ROSEN:
23    Q.  Sure.  Is there a column that
24 notes whether or not there are GPRs in an

Page 431

1 investigative file?
2     A.  There is a column that says, "Are
3 there handwritten notes in a file that are
4 not on GPRs?" is one of the files -- one of
5 the columns.
6     Q.  That's a different point?
7     A.  Right.
8     Q.  Right?  That point is notes are in
9 the file, they are just not on a GPR form?
10        MR. SWAMINATHAN:  Are you asking
11 -- go ahead.
12 BY MS. ROSEN:
13    Q.  I am asking -- it's my
14 understanding of the chart.  Isn't that your
15 understanding of the chart?
16    A.  All right, yes.
17    Q.  I thought the point you were
18 making was that there are investigative
19 files that contain no GPRs?
20    A.  There are.
21    Q.  Correct?
22    A.  There are.
23    Q.  And so I am asking you, when we
24 look at this chart, what columns should I be

Page 432

1 looking for for that information?
2     A.  "Are significant documents missing
3 from the investigative file inventory?" is
4 another column in there.  And "Are there any
5 handwritten notes?"  All right, whether they
6 are on GPRs or whether or not are they on
7 legal pads.  Are there any handwritten
8 notes?
9     Q.  That's your interpretation of that
10 column?
11    A.  That's my understanding, yes.
12    Q.  What's your understanding based
13 on?
14        MR. SWAMINATHAN:  Objection to
15 form.  Foundation.
16        Go ahead.
17        THE WITNESS:  It says, "Are there
18 any handwritten notes in the investigative
19 file?"  And then there is a column that goes
20 through and says, yes, yes, yes, and then
21 there are some that say, no, no, no.
22 BY MS. ROSEN:
23    Q.  But that point is the point about
24 there's handwritten notes that aren't being

Page 433

1 written on a GPR?
2        MR. SWAMINATHAN:  No.  Objection
3 to form and foundation.
4        MS. ROSEN:  Are you testifying,
5 Anand?
6        MR. SWAMINATHAN:  You are putting
7 words in his mouth.
8        MS. ROSEN:  Because you prepared
9 the report, you want to explain it?  I am
10 asking him.
11        MR. SWAMINATHAN:  You are putting
12 words in his mouth.
13        MS. ROSEN:  No.  He can explain
14 it.  He can explain it.
15        MR. SWAMINATHAN:  He just showed
16 you the column, and you asked him a question
17 about the next column.  That's totally
18 unfair.
19        MS. ROSEN:  You know what, he
20 utilized this column to do this report,
21 these attachments for his opinion.  He can
22 be tasked with explaining it; not you.
23        MR. SWAMINATHAN:  He is
24 explaining, which what he -- he talked to

Page 434

1  you about one column, and you asked him a
2  question that makes a premise about the next
3  column.  That's not fair.
4      MS. ROSEN:  No more speaking
5  objections, please.
6      MS. GOLDEN:  Anand, I would just
7  respectfully ask that you not shake your
8  head yes or shake your head no.
9      MR. SWAMINATHAN:  No, please.
10     MS. GOLDEN:  Ms. Rosen has asked a
11 question and before the witness has answered
12 it.  I just saw that a couple of times and
13 nobody else is in the room.  I know that
14 it's -- it doesn't mean anything
15 necessarily, however, I would just ask that
16 you not -- try to refrain from doing that,
17 please.
18     MR. SWAMINATHAN:  Ask your next
19 question.
20 BY MS. ROSEN:
21     **Q.  Any other columns that you believe**
22 **support your opinion that there was a**
23 **routine failure to document information**
24 **learned from a homicide investigation?**

Page 435

1      A.  Okay, the fourth column from
2  the -- from the left "Are significant
3  documents missing from investigative file
4  inventory?"
5      **Q.  What is investigative file**
6  **inventory?**
7      A.  Well, the inventory sheet is where
8  all of the documents that are contained
9  within a case file should be on the
10 inventory, and the way the Chicago Police
11 Department, at least their policy, which I
12 believe was deficient, they used that as the
13 document to provide to the defense and
14 others apparently, as an index of what is
15 contained within the file.
16     **Q.  Okay.  So this column that you are**
17 **pointing to, which is Column I, right?**
18     A.  I don't have a -- what I am
19 looking at doesn't have a letter on it.
20     **Q.  Well, that's too bad.**
21     **So the header is "Are**
22 **significant documents missing from**
23 **investigative file inventory?  List report,**
24 **type and dates."  Correct?**

Page 436

1      A.  That's correct.
2      **Q.  So that means that the document is**
3  **in the file, it's not listed on the**
4  **investigative file inventory, correct?**
5      A.  That was one of the problems
6  identified, yes.
7      **Q.  So that means that the information**
8  **actually was documented -- the information**
9  **learned in the homicide investigation was**
10 **documented because it's in the file.  The**
11 **problem being identified there is that the**
12 **investigative file inventory is incomplete,**
13 **correct?**
14     A.  Again, that's one of the issues.
15 And there is also another column that says,
16 "Are there any handwritten notes?"
17     **Q.  Right.  That's the one that you**
18 **just told me about.**
19     A.  Right.  But then you asked on
20 whether or not I meant GPRs or whether or
21 not I meant -- and what the column and what
22 was contained in the file.  There are some
23 files -- my recollection when I went through
24 some of these files that there were no

Page 437

1  handwritten notes whatsoever in the files
2  about a homicide case.
3      **Q.  So your understanding of that**
4  **particular column, which is -- reads, "Are**
5  **there any handwritten notes?" is to capture**
6  **whether or not there is any piece of paper**
7  **in the file that contains handwriting?  Do I**
8  **have that correct?**
9      A.  That's my understanding.
10     **Q.  And what's the basis of your**
11 **understanding for drawing that conclusion?**
12     MR. SWAMINATHAN:  Objection to
13 form and foundation.
14     Go ahead.
15     THE WITNESS:  Well, I did note --
16 I did go -- I did -- some of the files that
17 I went through, there were -- there was a
18 file that -- or there were files that I did
19 not believe were consistent with what I
20 normally see in a homicide investigation.
21 And as I testified to, there were files that
22 did not have any type of handwritten notes
23 by the officer whatsoever.
24

THOMAS TIDERINGTON, 10/06/2022                    Page 438..441

Page 438

1  BY MS. ROSEN:
2      Q.  By any officer?
3      A.  By any officers.
4      Q.  And did you compare -- how did you
5  identify those files?  From the chart or on
6  your own?
7      A.  Through my spot-checking of the
8  cases.
9      Q.  How many files are there in that
10  column that say "no"?
11      A.  I --
12      Q.  Do you know?
13      A.  I don't know offhand.
14      Q.  Did you tabulate that?
15      A.  I don't think I did, no.
16      Q.  Okay.  Any other data contained
17  within your report to support the conclusion
18  that there was a routine failure to
19  document?
20      A.  I think we discussed it.
21      Q.  What is your understanding of what
22  is meant by the use of the phrase "street
23  file"?
24      A.  My understanding is street files

Page 439

1  were files that were used that perhaps the
2  detectives kept in their desk.  I think they
3  were also referred to perhaps as working
4  files, and that they were not considered a
5  formal file that would have been turned
6  over.
7      Q.  The investigative file -- are the
8  investigative files that you reviewed formal
9  files that are turned over?
10      A.  Well, I mean, all of these files
11  should be formal files within a police
12  department, regardless of what they are
13  called.  These are -- any -- any
14  documentation relating to a criminal case
15  should be considered a formal file.  And as
16  you have pointed out, there's a number of
17  different files within the Chicago Police
18  Department, parallel files, and I believe
19  that contributed to some of the problems
20  that I see, that I see that I saw in
21  conducting my analysis.
22      Q.  But my question is a little bit
23  different.  You reviewed investigative files
24  from 1995 to 1998, correct, 344 of them?

Page 440

1      A.  That's correct.
2      Q.  Were those considered formal files
3  by the Chicago Police Department?
4      MR. SWAMINATHAN:  Objection to
5  form.
6      Go ahead.
7      THE WITNESS:  I believe those were
8  considered standard, or we are using the
9  word "formal."  Yeah, I guess you have to
10  define what "formal" means, I guess.
11  BY MS. ROSEN:
12      Q.  Well, when I asked you your
13  understanding of street file, you said files
14  that were sometimes kept in desks that were
15  not considered a formal file that would be
16  turned over to the criminal process or to
17  the prosecutors or to the defense attorneys.
18  So then I am using that definition, your
19  word, to ask you about investigative files.
20      A.  Right.
21      Q.  So you reviewed 344 investigative
22  files from 1995 to 1998.  Is it your
23  understanding that those files were
24  considered formal files to be turned over by

Page 441

1  the Chicago Police Department?
2      A.  Yes.
3      Q.  And did you see any evidence in
4  your review of the materials -- let me start
5  over.
6      Did you see any evidence in
7  your review of the 344 investigative files
8  that entire files were not turned over to
9  criminal defendants or prosecutors?
10      MR. SWAMINATHAN:  Objection to
11  form and foundation.
12      Go ahead.
13      THE WITNESS:  I think there were
14  files missing from the Public Defender's
15  Office, yes.
16  BY MS. ROSEN:
17      Q.  Entire investigative files were
18  missing from the Public Defender's Office?
19      MR. SWAMINATHAN:  Objection to
20  form.
21      Go ahead.
22      THE WITNESS:  I believe so, yes.
23  BY MS. ROSEN:
24      Q.  Can you identify which RD numbers

THOMAS TIDERINGTON, 10/06/2022                    Page 442..445

Page 442

1 you are referencing?

2    A. You know what, I can't, not as we

3 sit here. It's my recollection. I could be

4 wrong. And if I am wrong and if you can

5 point out that I am mistaken, I certainly

6 would not argue about that.

7    Q. Do you in your report identify any

8 files, any investigative files, that were

9 completely missing from a criminal defense

10 file?

11    A. From the Public Defender's file?

12    Q. Yes.

13    A. I don't think I identified any of

14 those, no.

15    Q. On page 35 of your report, you

16 state -- if we could put the exhibit back

17 up, Exhibit 6. You state, "Standard police

18 practice in 1998 was to maintain a

19 centralized repository often referred to as

20 a single 'murder book' or 'homicide file' to

21 collect and store all investigative

22 information learned during the course of a

23 homicide investigation."

24        Do you see that there?

Page 443

1    A. I do.

2    Q. What is your basis for concluding

3 it was standard police practice in 1998 to

4 maintain a centralized repository?

5    A. Based on my experience.

6    Q. Anything else?

7    A. That's primarily my experience in

8 working with several different police

9 departments, yes.

10    Q. Well, Detroit, right?

11    A. That's correct.

12    Q. And Fort Lauderdale, right?

13    A. Correct.

14    Q. What other police department?

15    A. Well, the DEA and other

16 departments that we worked joint

17 investigations with. The Broward Sheriff's

18 Office would be an example. You know, we

19 worked many cooperative investigations.

20    Q. And it's your opinion based on

21 that experience that the DEA maintained a

22 centralized repository for its murder

23 investigations?

24    A. No, not for homicide

Page 444

1 investigations. For their investigations.

2    Q. The DEA doesn't do homicide

3 investigations, right?

4    A. That's correct. Well, they might

5 participate in a homicide investigation, but

6 typically what I am suggesting is the DEA

7 has a central depository and a case agent

8 that's responsible for that case file, which

9 is consistent with how criminal

10 investigations should be conducted.

11    Q. Do you know back in 1998 how New

12 York handled its record keeping with respect

13 to homicide investigations?

14    A. I do not.

15    Q. How about Los Angeles, do you know

16 what -- how Los Angeles handled its record

17 keeping or file maintenance with respect to

18 homicide investigations back in 1998?

19    A. I think L.A. -- I think L.A. was

20 the -- somewhat of the leader on the murder

21 book of where there is one central

22 depository for information.

23    Q. When did that come about?

24    A. I don't know exactly the date, but

Page 445

1 I know that that was what they taught, and I

2 know that that's what they recommended.

3    Q. Is there any -- is there any

4 police practice manual or national standards

5 that you are relying on in support of your

6 conclusion that it was standard police

7 practice in 1998 to maintain a centralized

8 repository for homicide investigations?

9    A. Well, I think IACP had information

10 on it. I don't know if it dated back into

11 1998. That, I am unclear of, and I would

12 probably have to look back and see what the

13 dates were on that.

14    Q. The materials that you reference

15 in your attachment?

16    A. No. You had asked whether IACP or

17 any other -- well, any other -- you had

18 asked any other department, but I had

19 mentioned IACP often provides model policies

20 to agencies, and I know they have spoken on

21 this topic. I don't know if it was prior to

22 1998 or after 1998 is what I would have to

23 go do additional research on.

24    Q. And you did not do that research

THOMAS TIDERINGTON, 10/06/2022             Page 446..449

Page 446

1 before now?
2     A. You know what --
3     Q. You have got to let me finish my
4 question.
5     A. I am sorry. I'm sorry.
6     Q. You did not do that research
7 before you prepared your report, correct?
8        MR. SWAMINATHAN: Objection to
9 form. Foundation.
10        Go ahead.
11        THE WITNESS: I would have to
12 again look back at the IACP information that
13 I have listed to see exactly what the dates
14 are on it.
15 BY MS. ROSEN:
16     Q. Listed on the attachments to your
17 report you mean, right?
18     A. The material provided by IACP,
19 yes.
20     Q. Right. You have some of that
21 listed on your -- two of your attachments,
22 right?
23     A. Right.
24     Q. So if it's not there, you didn't

Page 447

1 look at it, right?
2     A. That would be a fair assessment,
3 yes.
4     Q. How did you learn about the George
5 Jones case?
6     A. What do you mean how did I learn
7 about it? The information was provided to
8 me by plaintiff's counsel.
9     Q. And you also reference the Palmer
10 litigation in your report, correct?
11     A. That's correct.
12     Q. How did you learn about the Palmer
13 litigation?
14     A. That was information that was
15 provided.
16     Q. And if we take a look at page 38
17 of your report, the last line above the
18 paragraph with the heading "George Jones
19 Appeal," it says, "The Seventh Circuit did
20 not revisit or revise Judge Shadur's factual
21 findings."
22        Do you see that?
23     A. I do.
24     Q. There is a citation to the Palmer

Page 448

1 case. Do you see that?
2     A. Yes.
3     Q. Did you read the Palmer case that
4 you cite there?
5     A. Not in -- not in specific detail.
6     Q. So then how did you know that the
7 Seventh Circuit did not revisit or revise
8 Judge Shadur's factual finding?
9     A. I think I cut and pasted it from
10 that ruling.
11     Q. From the Seventh Circuit ruling?
12     A. From the document that I reviewed.
13 I don't know exactly if it was the Seventh
14 Circuit or if it was some other document.
15     Q. So you cite to that Palmer case,
16 right there, right? That's what that
17 footnote means?
18     A. That's correct.
19     Q. So do you think that you cut and
20 pasted from that particular decision that
21 you cite there?
22     A. I very well may have.
23     Q. But you are not sure?
24     A. I can't tell you for sure at this

Page 449

1 point.
2     Q. Did you read any other opinions
3 that were issue -- well, let me back up for
4 a second. It says -- the citation says,
5 Palmer versus City of Chicago, 755F.2d 560,
6 (7th Cir. 1985). Do you see that there?
7     A. I do.
8     Q. Do you know what the F.2d is a
9 reference to?
10     A. I don't.
11     Q. Do you know what the Cir. is a
12 reference to?
13     A. Circuit, I believe.
14     Q. Do you have an understanding of
15 what the Seventh Circuit is?
16     A. Probably not to the extent that
17 you do.
18     Q. Do you have any understanding of
19 what the Seventh Circuit is?
20     A. Not -- no, I don't. I know it's
21 part of the judicial system in Chicago.
22     Q. Have you been provided any other
23 opinions issued by the Seventh Circuit
24 regarding the Palmer litigation after 1985?

THOMAS TIDERINGTON, 10/06/2022                    Page 450..453

Page 450

1    A.  I don't think so.
2         (Whereupon, Tiderington
3          Deposition Exhibit No. 10 was
4          screen-shared/referenced.)
5   BY MS. ROSEN:
6     Q.  Let's take a look at Exhibit
7   No. 10?
8         MR. SWAMINATHAN:  Which exhibit?
9         MS. ROSEN:  10.
10        THE WITNESS:  Which is what?
11        MS. ROSEN:  It is the Seventh
12  Circuit's opinion issued November 26, 1986,
13  and if we go to page --
14        MR. SWAMINATHAN:  You are showing
15  him a different document that you are
16  referring to than the footnote one you are
17  talking about?
18        MS. ROSEN:  That's correct, page
19  4.  But you don't need to clue him in in
20  that way, Anand.
21        MR. SWAMINATHAN:  I am not clueing
22  him in.  I don't want there to be any
23  confusion.
24        MS. ROSEN:  Well, if he is

Page 451

1   confused, he is a big boy, and he can tell
2   me.
3         MR. SWAMINATHAN:  It wasn't your
4   intention, obviously, to have him mistakenly
5   think you were showing him a document other
6   than the one you showed him, right?  I
7   didn't cause you any -- unless your
8   intention was to mislead them.
9         MS. ROSEN:  Of course not, but you
10  don't need to be coaching your way through
11  this.
12        MR. SWAMINATHAN:  I'm not coaching
13  my way through anything.  I am just trying
14  to confirm -- unless your purpose was to
15  mislead him, what did I say to coach him?
16        MS. ROSEN:  Oh, my god, just stop.
17  BY MS. ROSEN:
18    Q.  Let's go to page 4 of the opinion,
19  and you will see -- why is yours looking
20  different than mine?  Keep going.
21        So the pagination is a little
22  bit different.  I am going to ask you to
23  take a look at the highlighted language
24  here, and it's describing the lawsuit that

Page 452

1   you discuss in your report, the class action
2   lawsuit.  And the Seventh Circuit notes in
3   that first highlighted paragraph:
4         "...it challenges the
5          constitutionality of the Chicago
6          Police Department's alleged
7          practice of concealing exculpatory
8          material collected in criminal
9          investigations and lodged in the
10         department's informal 'street
11         files.'  The District Court issued
12         a temporary restraining order
13         directing the City preserve such
14         material pending decision on the
15         plaintiff's motion for a
16         preliminary injunction.  In
17         compliance with this order, the
18         City adopted retention procedures
19         that in 1993 the District Court by
20         a preliminary injunction required
21         the City to continue and in
22         certain respects amplify."
23        Do you see that there?
24    A.  I do.

Page 453

1     Q.  And I take it, you have never read
2   this opinion before I am showing it to you
3   today, correct?
4     A.  Well, can I look at the beginning
5   of it?
6     Q.  Sure.  That's the beginning.  It
7   begins right there.  That's where the
8   language starts.
9     A.  The beginning of the document,
10  though?
11    Q.  Sure.
12    A.  I don't know how I could scroll.
13  I can't scroll up and see.
14    Q.  She will scroll.  Robyn will
15  scroll up for you.
16    A.  All right.  So I am just going to
17  read it.  Do you want me to read the
18  document or just rely on the highlighted
19  area?
20    Q.  Yeah, I just want you to rely on
21  the highlighted area, and I am asking you --
22  my question is:  Have you read that language
23  -- have you seen that language or read that
24  language that I just read to you before I am

THOMAS TIDERINGTON, 10/06/2022                    Page 454..457

Page 454

1 showing it to you today?

2        MR. SWAMINATHAN: Objection to
3 form and foundation.

4        Go ahead.

5        THE WITNESS: I have seen it. I
6 don't know verbatim, but I have seen similar
7 language to what you read to me.

8 BY MS. ROSEN:

9    Q. And then if we can go back to the
10 page I was on, and then below more
11 highlighted language, it says, "Meanwhile,
12 the City had appealed from the grant of the
13 preliminary injunction and in 1985, this
14 Court reversed."

15       Do you see that?

16   A. I do.

17   Q. And then the citation there is to
18 755 F.2d 560 (7th Cir. 1985), which is the
19 citation you have in footnote 61 of your
20 report, right?

21   A. That's correct.

22   Q. And then reading on to the next
23 highlighted section, it says:

24       "We also held, however, that

Page 455

1        the convicted defendants were
2        entitled to a preliminary
3        injunction (patterned on the
4        temporary restraining order)
5        directing the City to preserve the
6        defendants' files until the
7        defendants could discover whether
8        they had any basis either for
9        mounting a collateral attack on
10        their convictions or for obtaining
11        damages under Section 1983 for
12        violation of their constitutional
13        rights. We remanded the case for
14        the entry of a suitable
15        injunction."

16       Do you see that there?

17   A. I do see that.

18   Q. Did you understand that after the
19 Seventh Circuit reversed Judge Shadur that
20 they sent the case back under the conditions
21 that I just read to you so that plaintiffs
22 would have an opportunity to review the
23 files?

24   A. Did I understand that from based

Page 456

1 on what you just read to me?

2    Q. No. Well, did you understand that
3 as you were preparing your report that
4 that's what happened?

5        MR. SWAMINATHAN: Objection to
6 form.

7        Go ahead.

8        THE WITNESS: That's apparently
9 what happened. I don't know if I knew that
10 while I was doing my report or not.

11 BY MS. ROSEN:

12   Q. And then the next highlighted
13 language reads:

14        "With the case back in the
15        District Court, the plaintiffs'
16        lawyers inspected the files but
17        found nothing on which they could
18        base a claim that any member of
19        the class had been convicted in
20        violation of the constitution."

21       Do you see that there?

22   A. I do.

23   Q. Were you aware that none of the
24 files contained any material that indicated

Page 457

1 that any of the plaintiffs had had their
2 constitutional rights violated?

3        MR. SWAMINATHAN: Objection to
4 form and foundation. Misstates the
5 testimony -- or the exhibit, rather.

6        THE WITNESS: I don't know if I
7 was aware of that or not.

8 BY MS. ROSEN:

9    Q. Okay. If we can now go to the
10 next highlighted portion, which shows up as
11 page 7 for me. There we go.

12       All right. If we look to the
13 highlighted middle of the page that begins,
14 "The plaintiffs, we now know have lost this
15 case." Do you see that?

16   A. I do see that.

17   Q. And then it goes on to say:

18        "The plaintiffs asked for a
19        preliminary injunction. They got
20        it, but this Court threw it out.
21        The only relief we allowed was an
22        order (never actually entered by
23        the District Court so far as we
24        can determine) directing the City

THOMAS TIDERINGTON, 10/06/2022                    Page 458..461

Page 458

1    to retain its 'street files' and
2    allow convicted members of the
3    plaintiff class to inspect them
4    for information which they might
5    use either to get their
6    convictions overturned or to get
7    damages for wrongful conviction."
8       And then it goes on, "Such an
9    order is worthless if discovery
10   turns up nothing; indeed, it's
11   worse than worthless because then
12   the party has incurred an expense
13   without obtaining any benefit from
14   it.  That is what happened here.
15   Upon reviewing the files, the
16   plaintiffs' counsel were unable to
17   find anything worthwhile.  They
18   went on a fishing expedition and
19   the pond was empty."
20      Do you see that there?
21   A.  I do see that.
22      Q.  Were you aware that when you were
23   preparing your report that the files that
24   were at issue in the Palmer case, which were

Page 459

1    street files, which is as you described the
2    informal files that weren't being turned
3    over, that after plaintiffs' counsel in the
4    Palmer litigation reviewed those files, they
5    found nothing in those files that would
6    allow them to either overturn their
7    conviction or obtain money damages for a
8    wrongful conviction?  Is that something you
9    were aware of when you prepared your report?
10      MR. SWAMINATHAN:  Objection to
11   form and foundation.
12      THE WITNESS:  I don't know if I
13   was aware of it at that time, no.
14      MS. ROSEN:  We can take Exhibit 10
15   down.
16   BY MS. ROSEN:
17      Q.  If we go to page 39 of your
18   report, so back to Exhibit No. 6, at the
19   bottom of page 39, it begins your discussion
20   of the steps the Chicago Police Department
21   took after Jones and Palmer, correct?
22   A.  That's correct.
23      Q.  Okay.  And then in your opinion,
24   those steps are inadequate to ensure that

Page 460

1    all relevant investigative materials are
2    disclosed, correct?
3    A.  That was my opinion or is my
4    opinion, yes.
5       Q.  If we go to page 40 of your
6    report, you have a discussion of Special
7    Order 83-1 at the bottom of the page.  Do
8    you see that there?
9    A.  Yes.
10      Q.  And this is one of the directives
11   that in your view is inadequate, correct?
12   A.  That's correct.
13      Q.  And we already discussed it, but
14   you are aware that Mike Brasfield provided
15   opinions and testimony in a case called
16   Fields, correct?
17   A.  That's my understanding.
18      Q.  And, in fact, you have some
19   discussion of the Fields case in your
20   report, correct?
21   A.  That is correct.
22      (Whereupon, Tiderington
23      Deposition Exhibit No. 9 was
24      screen-shared/referenced.)

Page 461

1 BY MS. ROSEN:
2       Q.  If we could take a look at Exhibit
3 9.
4          And you were provided some
5 Fields materials other than Mr. Brasfield's
6 report, correct?
7    A.  I believe I was, yes.
8       Q.  Item 85 and Item 86 are the -- in
9 your attachment are Fields documents, Fields
10 PRF and Fields area file, right?
11   A.  I am looking at that at this
12 point, yes.
13      Q.  And there might be other Fields
14 materials on here.  I don't want to take the
15 time to look, but in any event, you were
16 provided some Fields material.
17         Were you provided any Fields
18 trial testimony from the civil case?
19   A.  I am going back to that
20 attachment, so if you can bear with me for a
21 second.
22      Q.  Sure.
23   A.  Okay.  I found it.  What -- I am
24 sorry, if you could please reask your

THOMAS TIDERINGTON, 10/06/2022                    Page 462..465

Page 462

1 question.

2    Q.  There are Fields documents noted.
3 I located quickly, as I am just looking at
4 this, Items 85 and 86 are related to the
5 Fields case, correct?

6    A.  Yes.

7    Q.  And 84, actually, right?  84, 85,
8 and 86?

9    A.  Yes.

10   Q.  And then you also had
11 Mr. Brasfield's report?

12   A.  That's correct.

13   Q.  So my question is:  Were you
14 provided any of the trial testimony from the
15 Fields civil trial?

16   A.  I don't recall seeing that.  It's
17 possible, but I don't recall as we sit here
18 today that I reviewed it.

19   Q.  So I am showing -- we have up here
20 marked as Exhibit No. 9 testimony from March
21 13th of 2014 in Mr. Fields' civil case.  If
22 we can go to page 36 of the PDF, this is the
23 -- wait, sorry.

24       If we could go to the next

Page 463

1 page, you will see that there is the direct
2 examination of plaintiff's witness Lou
3 Reiter.  Do you know who Lou Reiter is?

4    A.  I don't recall that name.

5    Q.  As you can see here from Line 13
6 and 14 of the transcript, Mr. Reiter was a
7 police consultant, and since this is the
8 direct examination by plaintiff, he is
9 plaintiff's expert --

10   A.  Correct.

11   Q.  -- in the Fields case that he is
12 testifying in this transcript, okay?

13       MR. SWAMINATHAN:  You want to
14 explain to him what -- are you explaining
15 what this transcript is, or what trial this
16 is, or which trial this is?  He's never seen
17 this document.

18       MS. ROSEN:  I've explained to him
19 that it was testimony from Mr. Fields'
20 trial.  That's what I explained to him, and
21 that is accurate.

22       MR. SWAMINATHAN:  There are
23 multiple trials.  You haven't explained --

24       MS. ROSEN:  I don't have to --

Page 464

1 Anand, if you want to ask him questions,
2 then you can ask him question at the end.

3       (Nonreportable cross-talk.)

4       MR. SWAMINATHAN:  You are asking
5 him --

6       MS. ROSEN:  This is my exam.
7 Don't talk over me.  I am going to conduct
8 my exam as I see appropriate.

9       MR. SWAMINATHAN:  No.  But if you
10 are going to -- you are showing him a
11 document he has never seen before.  If you
12 are going to ask him about that document,
13 you should give him the relevant context for
14 the document, otherwise you are just trying
15 to mislead him.

16       MS. ROSEN:  I am not.

17       MR. SWAMINATHAN:  So why are
18 you --

19       MS. ROSEN:  Anand, no, I am not.
20 We are not going to -- we are not going to
21 waste time on my record doing this.

22       MR. SWAMINATHAN:  No, it's not a
23 matter of wasting time.  You said this is
24 the trial transcript.  Why are you making

Page 465

1 that ambiguous statement?  You know what the
2 real facts are.  Why would you -- why don't
3 you explain the circumstances?  Why is it
4 deliberately the case that you want to
5 mislead him and not let him know the
6 context?

7       MS. ROSEN:  That is so
8 inappropriate for you to be saying that.
9 You have not even let me finish asking my
10 questions.

11       Is it not true that this is
12 trial testimony from Fields?  It absolutely
13 is true.  Is it not true that Mr. Reiter was
14 plaintiffs' expert?  It is true.  I am not
15 misleading him at all, and you can stop
16 talking now.

17       MR. SWAMINATHAN:  Okay.  Let the
18 record reflect counsel is showing this
19 witness a document that he has never seen
20 before.

21       MS. ROSEN:  You are making a
22 speaking objection to try to coach the
23 witness.

24       MR. SWAMINATHAN:  And counsel is

THOMAS TIDERINGTON, 10/06/2022                Page 466..469

Page 466

1 making representations about what the
2 document is that plaintiff's counsel, I
3 believe, are misleading representations
4 about what this is, given that the witness
5 has not seen this document before and
6 doesn't have a relevant context about
7 trials, and what trial this is referring to.
8 Go ahead.
9 BY MS. ROSEN:
10    **Q. Okay. Can we go to page 36 of the**
11 **PDF, please. And as you can see at the top**
12 **of this page here, it says, Reiter, cross,**
13 **right? So it's the cross-examination by the**
14 **defendant -- one of the defense counsel in**
15 **this case. And the question that is being**
16 **asked and the answers are highlighted, but I**
17 **would like to ask you some questions about,**
18 **and I will read them.**
19        **"And actually it was -- it**
20        **sounds like it was about -- it was**
21        **implemented January of '83, and**
22        **then the late '90s some other**
23        **department started to get around**
24        **to implementing written policies**

Page 467

1        **like this; is that true?**
2        **"Yes."**
3        **And then the question is:**
4        **"So Chicago was ahead of**
5        **its time with respect to this**
6        **written policy, isn't that true?"**
7        **And the answer is: "Yes."**
8        **Do you see that there?**
9 A. I do see that.
10    **Q. Have you ever heard from any**
11 **source that the directives that were**
12 **implemented by the Chicago Police Department**
13 **after Jones and Palmer in 1983 were ahead of**
14 **their time with respect to the written**
15 **policy on documentation of information**
16 **learned in homicide investigations?**
17        MR. SWAMINATHAN: Objection to
18 form and foundation and to any questions
19 showing the witness -- taking a witness to
20 page 36 of a 54-page document that he hasn't
21 seen before and simply asking him out of
22 context about one question and answer.
23        Go ahead.
24        THE WITNESS: I am sorry, could

Page 468

1 you please ask the question again just so I
2 am clear?
3        MR. SWAMINATHAN: And I will just
4 say same objection. Go ahead so you can get
5 question and answer.
6        MS. ROSEN: Can you just read back
7 my question, Maribeth.
8        (Whereupon, record read, as
9        requested.)
10        MR. SWAMINATHAN: Same objection.
11        THE WITNESS: So I guess before I
12 can answer that question, could I read a
13 couple of pages back because they are
14 discussing 83-1? So for context, I think it
15 would be important for me to understand what
16 was being discussed there.
17        MS. ROSEN: Sure. We can go back
18 a couple of pages. Let's go back two pages.
19        THE WITNESS: I mean, I am trying
20 to understand in context. This was an
21 expert for the plaintiff or -- I don't know
22 exactly who he is, I don't think.
23 BY MS. ROSEN:
24    **Q. Okay, and that's fair. I am**

Page 469

1 **representing to you that he was the expert,**
2 **one of plaintiff's experts in the Fields**
3 **trial that took place in 2014 and --**
4    A. In 2014?
5    **Q. The civil trial that took place in**
6 **2014, yes. Not his criminal case, the civil**
7 **case that took place.**
8        MR. SWAMINATHAN: Not civil. You
9 said the civil trial. This was not the
10 civil trial.
11        MS. ROSEN: Oh, my god, Anand,
12 honestly.
13        MR. SWAMINATHAN: You are
14 misrepresenting the record to him.
15        MS. ROSEN: The civil trial that
16 took place in 2014 is factually accurate.
17        MR. SWAMINATHAN: Why are you
18 deliberating going out of your way to make
19 it seem like there is only one civil trial?
20        MS. ROSEN: What difference does
21 it make if there were one or seven? I am
22 not going to keep engaging in this
23 conversation with you.
24        MR. SWAMINATHAN: No, you are

THOMAS TIDERINGTON, 10/06/2022                    Page 470..473

Page 470

1 deliberately saying things to him to make it
2 appear as though -- to create a sense of --
3 a set of facts that is not the case, and
4 that bothers me.
5       MS. ROSEN:  It is sworn testimony
6 by a witness.  Irrespective of when it was
7 given or at what time period, it is sworn
8 testimony.
9       MR. SWAMINATHAN:  It is sworn
10 testimony, but you are deliberately going
11 out of your way to use phrases to make it
12 seem as though there is one instance of a
13 civil trial and --
14       MS. ROSEN:  I am pretty sure he
15 got the point now that there was a second
16 civil trial.  You have made that point, and
17 I think it's irrelevant.
18 BY MS. ROSEN:
19     Q.  Okay.  So my question is really
20 pretty simple.  Had you heard from any
21 source that Special Order 83-1 was ahead of
22 its time?
23       MR. SWAMINATHAN:  You can answer
24 that question if you ever heard of it.  You

Page 471

1 can answer that.
2       THE WITNESS:  No, I haven't heard
3 that.
4       MS. ROSEN:  We are done with
5 Exhibit No. 9.  Thank you.
6       THE WITNESS:  I'm sorry.  Can I
7 just for one clarification?  Because I did
8 answer but now I am reflecting on my answer.
9 Ahead of their time in what respect?
10 BY MS. ROSEN:
11     Q.  In terms of the policy being ahead
12 of its time with respect to the requirements
13 regarding documenting information related to
14 homicide investigations?
15       MR. SWAMINATHAN:  Objection to
16 form and foundation.
17       You can go ahead.
18 BY MS. ROSEN:
19     Q.  Did you answer?
20     A.  Well, I guess I didn't answer
21 because I -- then my next question would be:
22 Which policy are you speaking of?  And then
23 I would have to look at that.  So I don't
24 know if you wanted me to get into that

Page 472

1 detail, and I don't know if my answer
2 reflected a suggestion that I knew which
3 policy that they were referring to.  But
4 nevertheless, I've never heard that Chicago
5 PD was ahead of their time in the record
6 keeping in any respect.
7 BY MS. ROSEN:
8     Q.  It's with respect to the Special
9 Order 83-1?
10       MR. SWAMINATHAN:  Objection to
11 form.  Asked and answered.
12       THE WITNESS:  So --
13 BY MS. ROSEN:
14     Q.  That was on the page.
15     A.  It was only -- it was only with
16 respect to Special Order 83-1?
17     Q.  Correct.
18     A.  No, I would never have heard that
19 from anybody.
20       I'm sorry, would this be a
21 good time to take a quick break?
22       MS. ROSEN:  Sure.  I am going to
23 need to break again in an hour.  So if you
24 want to take like a ten-minute break now,

Page 473

1 and then break for lunch at 1:30?  It's up
2 to you.
3       MR. SWAMINATHAN:  That's a good
4 question.  Tom, can you -- I guess what she
5 is saying in one hour she has to break.  So
6 we can do a lunch then if you can make it
7 another hour.  Or if you want to get lunch,
8 we should do it now.
9       THE WITNESS:  Are you only going
10 to be gone for an hour, or is this going to
11 maybe drag on into all day?
12       MS. ROSEN:  No, no, no.  I don't
13 expect to be longer than 30 minutes, if
14 that, so.
15       THE WITNESS:  Yeah, why don't we
16 take a quick break now and then if we can go
17 to lunch while you have to do whatever you
18 have to do.
19       MS. ROSEN:  Perfect.
20       THE WITNESS:  All right.  Thank
21 you.
22       MS. ROSEN:  Yes.
23       THE VIDEOGRAPHER:  We are off the
24 video record at 12:32 p.m.

Page 474

1      (Whereupon, a break was taken
2        at 12:32 p.m. to 12:44 p.m.)
3      THE VIDEOGRAPHER:  We are back on
4  the video record at 12:44 p.m.
5  BY MS. ROSEN:
6      Q.  If we can go back to Exhibit 6,
7  the report, and go to page 45.  This section
8  of your report discusses what in your
9  opinion amount to the insufficient remedies
10 to the street file problem.  Do you see
11 that?
12     A.  I do.
13     Q.  And so the first point is the
14 continued use of parallel files, correct?
15     A.  I'm sorry, where are you -- where
16 are you at?
17     Q.  Point 1 on page --
18     A.  I was on page 45, I apologize.
19     Q.  We are on page 45, right?  "The
20 policies described above are insufficient to
21 remedy the street file problem."
22     A.  I'm sorry.  I was on the wrong
23 page.  I have it now.
24     Q.  And one of your criticisms is

Page 475

1  about the continued use of parallel files,
2  correct?
3      A.  That's correct.
4      Q.  And then if we go to the next
5  page, another criticism is the discretion
6  that is allowed to the detectives to
7  determine what's relevant and needs to be
8  documented and disclosed.  Do you see that,
9  that's the line there on paragraph 2 -- I
10 mean, Point 2?
11     A.  I do see that, yes.
12     Q.  Okay.  So is it your view that the
13 detectives should not be allowed to utilize
14 their discretion to determine what
15 information is relevant to an investigation
16 that needs to be memorialized?
17     A.  That needs to be memorialized, you
18 mean turned over?
19     Q.  No.  Memorialized, written down?
20     A.  And again, I am thinking about
21 your question and make sure I understand it
22 completely.  Should an officer have
23 discretion about what they document in some
24 type of a report?

Page 476

1      Q.  Correct.
2      A.  I think it would be somewhat
3  discretionary with guidance from their
4  department, but anything that is related to
5  a criminal investigation, related to a
6  homicide should be documented, and I think
7  that's what law enforcement officers are
8  taught from the academy on.
9      Q.  And as I understand your criticism
10 of the directives that were put in place
11 after Jones and Palmer is that the directive
12 did not specifically instruct the detectives
13 regarding what needs to be documented.
14     Do I have that right?
15     A.  Which directive?  I think I know,
16 but I just want to clarify which directive
17 or all of the directives?
18     Q.  Well, let's go back to page 45 for
19 a second.  The heading is "The policies
20 described above are insufficient to remedy
21 the street files problem."  Correct?
22     A.  That's correct.
23     Q.  What is that referencing?  What
24 policies is that referencing?

Page 477

1      A.  The memos that came out, and
2  eventually, the special order.
3      Q.  So in your view, those policies
4  are insufficient, right?
5      A.  That's correct.
6      Q.  And then if we go to the next
7  page, page 46, one reason they are deficient
8  is because they allow the detectives
9  discretion to determine what is relevant and
10 needs to be documented and disclosed.  So I
11 am focusing on the documented part of it
12 so --
13     A.  Right.
14     Q.  -- as I understand it, you believe
15 that despite the fact that you just told me
16 that detectives have discretion that the CPD
17 policies were insufficient because they
18 allowed detectives to exercise their
19 discretion in determining what's relevant
20 and needs to be documented, right?
21     MR. SWAMINATHAN:  Objection to
22 form and foundation.
23     Go ahead.
24     THE WITNESS:  Yeah, that's kind of

THOMAS TIDERINGTON, 10/06/2022                         Page 478..481

Page 478

1 a long question.  I -- you would have to
2 look at other CPD policies, and their
3 policies would mandate what the officers
4 should include in police reports.  So in
5 that respect, I don't think there is a lot
6 of discretion.  I think that the officers
7 should follow whatever their policies are,
8 and I think the policies would tell the
9 officer that anything related to the
10 investigation should be documented, and then
11 we would move on to the next step of what
12 should be disclosed.
13 BY MS. ROSEN:
14      Q.  Okay, and we will get to the
15 disclosure part of it as we talk about the
16 problems that you identify further down in
17 your report about disclosures.
18          The item number 3 is "No
19 procedures or written instructions to
20 subpoena responders to make sure
21 investigative material from all location is
22 disclosed."  Do you see that?
23      A.  I do.
24      Q.  So is your criticism here simply

Page 479

1 that there is no written policy directing
2 the subpoena response unit, specifically
3 regarding units within the Chicago Police
4 Department from which they can obtain
5 records?
6      A.  Well, that's certainly part of my
7 criticism.
8      Q.  What's the rest of your criticism
9 with respect to the subpoena response unit?
10      A.  Well, as the department
11 spokesperson, there were problems, there was
12 no way for the subpoena service unit, the
13 records division, to know what units that
14 they would need to query, and if they ever
15 get a subpoena in order to get all the
16 documents on a particular case.
17      MS. ROSEN:  Can you read back his
18 answer.
19      (Whereupon, the record was
20           read as requested.)
21 BY MS. ROSEN:
22      Q.  So your recollection is that the
23 City of Chicago spokesperson said that there
24 was no way for the subpoena service unit to

Page 480

1 know from where to get the documents?  Is
2 that what you just said?
3      A.  Well, Hickey described that it was
4 a -- I think it was an art, I think is the
5 word that he used, and that it was possible
6 in a case with multiple units working on the
7 same investigation for the subpoena to go
8 to only one of these units.  So certainly, I
9 am summarizing what his statements were, but
10 that was my take-away from reading his
11 testimony.
12      Q.  Do you know how many subpoenas the
13 subpoena service response unit processed in
14 any given year in, say, 1998?
15      A.  How many?
16      Q.  Yes.  How many subpoenas they
17 processed?
18      A.  I thought you were asking me to
19 guess.
20      Q.  No.  Do you know?  Do you have any
21 idea?
22      A.  No, I don't.
23      Q.  And what is your understanding of
24 how subpoenas work in the criminal court in

Page 481

1 Cook County?
2      A.  I don't have an understanding of
3 how they work.
4      Q.  In your review of the materials in
5 connection with the Soto homicide
6 investigation, did you find a deficiency in
7 any CPD response to any subpoena issued
8 either by the state or any of the criminal
9 defendants?
10      MR. SWAMINATHAN:  Objection to
11 form.
12      Go ahead.
13      THE WITNESS:  I don't recall
14 seeing that.
15 BY MS. ROSEN:
16      Q.  All right.  If we move to page 48,
17 the fourth point is:  "There was inadequate
18 training, and monitoring/auditing to ensure
19 compliance with the special orders."  Do you
20 see that?
21      A.  I am sorry, what page?  You are on
22 48?
23      Q.  Yes, Point 4.
24      A.  Yes.

THOMAS TIDERINGTON, 10/06/2022                    Page 482..485

Page 482

1    Q.  So the fourth point you make here
2  in this section is that there -- there was
3  inadequate training and monitoring/auditing
4  to ensure compliance with the special
5  orders.  Do you see that?
6    A.  That's correct.
7    Q.  And you reference the training
8  that was done after Special Order 83-1 was
9  issued, right?
10   A.  Yes, that is correct.
11   Q.  And I don't see anything in here
12 about training that was done after the 86
13 directive was issued, or training that was
14 done after the 1988 SOP was issued.
15       Do you have any information
16 about training that was conducted within the
17 detective division in connection with the
18 issuance of those directives?
19   A.  Well, I guess you'd have to look
20 at Hickey's testimony that he believed that
21 the detectives were reverting back to their
22 own record keeping system.  He was not aware
23 of the policy being followed.  There was no
24 monitoring.  There was no auditing of the

Page 483

1  system.  If I understand your question
2  correctly.
3       MS. ROSEN:  Can you read back his
4  answer again, please, sorry.
5          (Whereupon, record read, as
6            requested.)
7  BY MS. ROSEN:
8    Q.  And that's your memory of
9  Mr. Hickey's testimony; is that correct?
10   A.  It is.
11   Q.  Back to my question, with respect
12 to 19 -- let's go with 1988 when the SOP was
13 issued, right, that's the standard operating
14 procedure manual for the detective division,
15 correct?
16   A.  Yes, it is.
17   Q.  And do you know, for example, when
18 a new detective -- when a police officer
19 made detective, say, in 1989 or 1990, do you
20 know what the process was with respect to
21 training for that new detective within the
22 Chicago Police Department?
23   A.  I don't.
24   Q.  Do you know whether or not they

Page 484

1  went to specific detective training?
2    A.  Well, in most police agencies,
3  they do have that type of a system set up
4  for new detectives, but I don't know.  I
5  don't believe I saw anything that would tell
6  me about the training for the new detective.
7    Q.  And so you don't know what was
8  being trained with respect to the new
9  directives related to general progress
10 reports and investigative files, correct?
11   A.  Well, only based on what Hickey
12 and Winstrom testified to that it was
13 inadequate, and it was deficient.
14   Q.  They both testified that it was
15 inadequate and it was deficient?
16   A.  Well, those -- in summary, that's
17 the take-away I got from their testimony,
18 yes.
19   Q.  Okay.
20   A.  They also mentioned they weren't
21 aware of any type of -- any officer ever
22 being disciplined for violating any of these
23 policies or procedures as well, which is
24 somewhat -- well, not somewhat.  It's highly

Page 485

1  unusual that officers -- somebody had to
2  have violated a policy, and there should
3  have been disciplinary action.
4    Q.  What is the basis for your
5  conclusion that somebody must have violated
6  these policies, and there should have been a
7  disciplinary action?
8    A.  Because I have been a police
9  officer for 44 years, and I know officers
10 violate policies.
11   Q.  Okay.  All right.  Let's go to
12 page 49.  At the top of page 49, you say, "A
13 review of investigative files shows the
14 special orders were not being followed."  Do
15 you see that?
16   A.  I do.
17   Q.  And when you say, "a review of the
18 investigative files," you are referencing
19 the investigative files that are referenced
20 in the spreadsheet, correct?
21   A.  That's correct.
22   Q.  And you indicated here, "I
23 received investigative files for 344
24 different homicide investigations conducted

THOMAS TIDERINGTON, 10/06/2022                    Page 486..489

Page 486

1 by Area 5 detectives for the period from
2 1995-1998." Do you see that?
3     A. That's correct.
4     Q. And that's the number we talked
5 about earlier, right?
6     A. Yes, it is.
7     Q. And then you footnote, "For two
8 homicide investigations, a permanent
9 retention file was produced but no
10 investigative file," and then you identify
11 the two RD numbers. "Those two files are
12 still listed in Attachment F. And as a
13 result, the spreadsheet contains 346 rows,
14 despite only 344 investigative files."
15         Do you see that?
16     A. I do.
17     Q. Is that something you figured out
18 by comparing those 344 files you received to
19 the spreadsheet?
20     A. I think that came about because
21 I -- it wasn't adding up, so I asked
22 counsel, plaintiff's counsel, to clarify
23 that for me.
24     Q. Got it. All right. And then if

Page 487

1 we start looking at your findings midway
2 through the page, you say, "Handwritten
3 notes, not on general progress reports, are
4 still routinely used." Do you see that?
5     A. I do.
6     Q. And then you say, "As discussed
7 above, the special orders directed officers
8 to use GPRs to take notes and were intended
9 to eliminate the use of handwritten notes,
10 which detectives had been treating as their
11 own property and something they were not
12 inclined to place in the CPD's file."
13         Do you see that?
14     A. I do.
15     Q. So, first of all, is it your
16 interpretation of the directives that the
17 directives mandate that any note must be
18 taken on a GPR?
19         MR. SWAMINATHAN: Objection to
20 form.
21         THE WITNESS: That's my
22 understanding of their policy, yes.
23 BY MS. ROSEN:
24     Q. In a circumstance where a

Page 488

1 detective needed to take a note but didn't
2 for whatever reason have a GPR or general
3 progress report available to him, what is
4 your opinion regarding what that particular
5 detective should do in that circumstance?
6     A. I guess in what type of a setting?
7 In an interview with a suspect? On the
8 street? In a grocery store? I'm not sure I
9 follow your question.
10     Q. Well, can you envision a
11 circumstance where a detective is
12 investigating a case, let's say out on the
13 street, and he -- he or she does not have
14 the GPR forms available for whatever reason.
15 He's run out, they fell in a puddle, his
16 coffee got spilled all over them, but the
17 investigation is progressing, and the police
18 officer is doing something that would
19 require a note --
20     A. Right.
21     Q. -- to be taken. What should the
22 police officer do in that circumstance?
23         MR. SWAMINATHAN: Objection to
24 form. Foundation.

Page 489

1         Go ahead.
2         THE WITNESS: All right. Again, I
3 would have to -- I would have to look at
4 Chicago's GPR policy to see what guidance
5 they gave in that with respect to their
6 officers.
7         I think I mentioned my
8 department did not require GPRs. I was
9 looking at it from a policy perspective. If
10 Chicago is requiring their officers to --
11 and perhaps had good reason because of the
12 problems they had in previous cases, if they
13 -- and as pointed out yesterday that the
14 sheer number of homicides that were
15 occurring in Chicago, I believe required
16 that the Chicago Police Department implement
17 perhaps a more robust policy than maybe
18 other departments. So Chicago Police
19 Department implemented a GPR program, and it
20 was apparently routinely being violated.
21 BY MS. ROSEN:
22     Q. That really wasn't my question.
23 My question was: --
24     A. I am sorry, but I thought that was

THOMAS TIDERINGTON, 10/06/2022                    Page 490..493

Page 490

1 your question.
**2      Q. Yeah. So my question was: What**
**3 is a police officer to do in a scenario**
**4 where there is this policy, and yet they**
**5 don't have a GPR available to them, and they**
**6 need to take --**
7        MR. SWAMINATHAN: Objection to
8 form.
9 BY MS. ROSEN:
**10     Q. -- and they need to take a note?**
11       MR. SWAMINATHAN: Objection to
12 form and foundation. Sorry.
13       THE WITNESS: Again, I don't know
14 if you have the policy that we can pull up,
15 and we can look at it. I think from a
16 practical matter, there would be exceptions
17 for officers to provide notes on something
18 other than a GPR.
19       But if I am reviewing this
20 case, or in my review of many cases, it
21 didn't seem like it was the exception. It
22 seemed to be the rule for most of -- for
23 many of the cases that I looked at.
24

Page 491

1 BY MS. ROSEN:
**2      Q. And if the handwritten notes that**
**3 aren't written on GPRs are included in the**
**4 investigative file, does that constitute a**
**5 violation of a criminal defendant's**
**6 constitutional rights?**
7        MR. SWAMINATHAN: Sorry, I missed
8 the first part. Can you read back that
9 question, please. Sorry.
10       (Whereupon, the record was
11        read as requested.)
12       MR. SWAMINATHAN: Objection to
13 form and foundation.
14       Go ahead.
15       THE WITNESS: No, I don't think it
16 would constitute a violation of their
17 constitutional rights. What I would -- what
18 I was offering an opinion on is whether or
19 not the officers were following the Chicago
20 Police Department's policies on -- and their
21 apparent attempt to have their officers
22 understand that these notes that they were
23 taking were not their personal property, and
24 that they had to be maintained. They had to

Page 492

1 be disclosed, and they had to be turned
2 over. So in my view, that is the apparent
3 reason why because they were having so many
4 problems that they implemented the GPR
5 program.
6        If you are asking me is it
7 okay for the officer to just typically
8 ignore the policy, but it's okay because it
9 doesn't really violate anybody's rights?
10 Well, that's not how police departments
11 operate.
12 BY MS. ROSEN:
**13     Q. Did you see any evidence in the**
**14 files you reviewed from -- the investigative**
**15 files you reviewed from 1995 to 1998 that**
**16 police officers were treating handwritten**
**17 notes as their personal property?**
18   A. Yes.
**19     Q. Can you explain that to me?**
20   A. Well, I mean, I reviewed testimony
21 from the police spokesman that said that
22 there was a -- it was a difficult process to
23 get the officers to understand that these
24 weren't personal -- that these personal

Page 493

1 notes had to be disclosed and documented.
**2      Q. And he was talking about shortly**
**3 after the institution of the policy in 1983,**
**4 right?**
5        MR. SWAMINATHAN: Object to form
6 and foundation.
7        Go ahead.
8        THE WITNESS: Well, I think he
9 said that the problem continues. And also I
10 do recall seeing an OIG report that
11 identified the problems that, I guess, we
12 are talking about in '83 and '84, and they
13 have identified the fact that the problems
14 still exist today, and that was in, I
15 believe, a 2020 OIG report without looking
16 at it closer.
17 BY MS. ROSEN:
**18     Q. The OIG -- the problem identified**
**19 in the OIG report is the problem that the**
**20 detectives were treating their notes as**
**21 personal property? Is that what you are**
**22 saying?**
23       MR. SWAMINATHAN: Objection to
24 form.

THOMAS TIDERINGTON, 10/06/2022                    Page 494..497

Page 494

1        Go ahead.
2        THE WITNESS: I would have to
3 look, and perhaps I am confusing it with
4 Hickey and -- Hickey's and Winstrom's
5 testimony, but I know that the OIG conducted
6 an audit and found many of the same problems
7 occurring in 2020 as were occurring back in
8 the '80s and '90s.
9 BY MS. ROSEN:
10       Q. Right. But my question is very
11 specific about whether or not you found
12 evidence in your review of the 1995 to 1998
13 investigative files that police officers
14 were treating notes as their personal
15 property?
16       MR. SWAMINATHAN: Objection to
17 form.
18       Go ahead.
19       THE WITNESS: I saw evidence that
20 the notes were not routinely being either --
21 either unexplainably there were no notes on
22 investigations that you would reasonably
23 expect to see notes and that many files were
24 void of notes as well.

Page 495

1        MS. ROSEN: Can you read back his
2 answer, please. Sorry
3        (Whereupon, record read, as
4        requested.)
5 BY MS. ROSEN:
6        Q. Okay. The next point is --
7 actually, the last line of this paragraph
8 is --
9        MR. SWAMINATHAN: I'm sorry, which
10 line of which paragraph?
11       MS. ROSEN: The handwritten notes.
12       MR. SWAMINATHAN: Yeah, okay,
13 sorry.
14 BY MS. ROSEN:
15       Q. It's the last two lines. "Of
16 those, 154 of the 334 or approximately 46
17 percent contained handwritten notes not on
18 GPRs." Do you see that?
19       A. I do.
20       Q. And then it says, "This is
21 consistent with Brasfield's findings in
22 Rivera, 61 percent, and Fields, 82 percent."
23 Do you see that there?
24       A. I do.

Page 496

1        Q. In your review, 46 percent is
2 consistent with 61 percent is consistent
3 with the 82 percent; is that right?
4        A. I think it's consistent that the
5 policy is not being followed.
6        Q. Is that what you mean by that?
7        A. It would be, yes.
8        Q. The next paragraph is to-from
9 memos are still being used. And it says,
10 "Special orders directed officers to stop
11 using to-from memos." Do you see that?
12       A. I do.
13       Q. And you believe that's explicit in
14 the directives?
15       A. I -- yes.
16       Well, I'm sorry, let's clarify
17 what directive you are speaking of.
18       Q. Well, you say, "As discussed
19 above, the special orders," plural, "also
20 directed officers to stop using to-from
21 memos."
22       A. Right. Can I review those real
23 quick? I mean, if you are going to ask me
24 questions about them, let me just have them

Page 497

1 in front of me.
2        Q. Well, I am not going to have you
3 spend 20 minutes reviewing pages and pages
4 and pages of directives.
5        A. Well, then there's not that many
6 pages.
7        Q. Yeah, there are.
8        A. Okay.
9        Q. There's five different directives.
10 So you put it in -- you reviewed the
11 directives before you wrote your report,
12 right?
13       A. I did.
14       Q. So are you -- you must be
15 confident that when you reviewed the
16 directive that they specifically mandated
17 that officers stop using to-from memos,
18 right?
19       MR. SWAMINATHAN: Objection to
20 form and foundation. And objection, the
21 witness has indicated that he would like to
22 be able to review the order before answering
23 the question. Counsel is refusing to let
24 him do so.

THOMAS TIDERINGTON, 10/06/2022                    Page 498..501

Page 498

1        You can answer to the extent
2 you can, Mr. Tiderington.
3        THE WITNESS: I'm sorry, if you
4 can read that question back.
5        MS. ROSEN: Yeah, I will just
6 rephrase it.
7 BY MS. ROSEN:
8    **Q. When you wrote, "The special**
9 **orders also directed officers to stop using**
10 **to-from memos to communicate investigative**
11 **information, you did that after reviewing**
12 **the directives, correct?**
13        MR. SWAMINATHAN: Same objection.
14        Go ahead.
15        THE WITNESS: That's correct.
16 BY MS. ROSEN:
17    **Q. And then the next point is Missing**
18 **or Incomplete Inventory Sheets. Do you see**
19 **that?**
20    A. I do.
21    **Q. And then if we go to the next**
22 **page, page 50, you indicate -- you identify**
23 **that 17 percent of the total investigative**
24 **files contained no inventory sheet. Do you**

Page 499

1 see that?
2    A. I do.
3    **Q. Let me ask you this: With respect**
4 **to the 1995 to 1998 investigative files, is**
5 **it your understanding that each and every**
6 **one of those investigative files is in the**
7 **same condition, meaning it has the same**
8 **information contained within them as they**
9 **did at the time they were created during the**
10 **respective homicide investigations?**
11    A. That would have been my
12 assumption, yes.
13    **Q. And what's that assumption based**
14 **on?**
15    A. That was the information that was
16 provided to me. There was no indication
17 that it was only a partial file.
18        Certainly, if you have other
19 information that is better information than
20 I had to review, I would certainly consider
21 it and would like to see it.
22    **Q. Have you had any experience in**
23 **responding to either a subpoena request or**
24 **discovery request for police files during**

Page 500

1 the course of your career as a police
2 officer?
3    A. Yes.
4    **Q. In what circumstance?**
5    A. Throughout my career, I have had
6 subpoenas issued for files, for documents.
7 I for a short period of time, I was in
8 charge of the Fort Lauderdale's Police
9 Department's records division.
10    **Q. And can you tell me --**
11    A. I am not through answering.
12        MR. SWAMINATHAN: Sorry, let him
13 finish.
14        THE WITNESS: And as a Plymouth
15 Township police chief for 20 years, I
16 certainly had a more intimate knowledge of
17 the subpoena process in a small agency.
18 BY MS. ROSEN:
19    **Q. But admittedly a small -- the**
20 **records that are maintained in a small**
21 **agency like Plymouth Township is very**
22 **different than, say, Fort Lauderdale, right?**
23    A. You know, I thought so when I
24 first got hired as the police chief, but it

Page 501

1 surprisingly -- a small agency, you still
2 have every aspect of policing to do. You
3 have the same policies. You still have to
4 buy vehicles. You have to do budgeting.
5        It's the scale. In larger
6 agencies such as Chicago or Detroit, the
7 larger agencies are broken down into
8 precincts, and really -- or areas, and what
9 a precinct or an area is in many respects is
10 a small police department.
11        So I would not say, well, it's
12 a small department, so you never really did
13 any of this stuff. And in a small agency, I
14 learned as the police chief, you are
15 intimately involved in all of these things
16 versus a larger department where you have a
17 records department, and you have a subpoena
18 department.
19        So anyways, hopefully, I
20 explained that to you clearly.
21    **Q. Have you ever had to locate police**
22 **files that were 20 or 30 years old?**
23    A. Yes.
24    **Q. How often did you have to do that?**

THOMAS TIDERINGTON, 10/06/2022                    Page 502..505

Page 502

1      A.  Well, again, I am looking back or
2  thinking back, you know, as a detective,
3  there would be cases where they were 20 or
4  30 -- maybe not 30.  I would say probably
5  maybe 15 or 20 years old, and what typically
6  happens and what I feel is what the industry
7  standard is or a reasonable way to do it, is
8  a memorandum is sent to each unit within the
9  police department detailing what information
10  is being sought.  And a commander of that
11  particular unit is required to sign off that
12  he searched his files, his records, and that
13  there was a -- there were items either
14  responsive or not responsive, and whether
15  they had documents or did not have documents
16  related to the subpoena.
17      Q.  Okay.  All right.  Then the next
18  point you make here is that the inventory
19  sheets were incomplete.  Do you see that,
20  the second paragraph?
21      MR. SWAMINATHAN:  Here at the
22  bottom of page 49?
23      MS. ROSEN:  I am at the top of
24  page 50.  "Even where there was an inventory

Page 503

1  sheet in many cases, the inventory sheet was
2  incomplete.  I found that 277 investigative
3  files contained inventory sheets that were
4  incomplete."
5      THE WITNESS:  I do.
6  BY MS. ROSEN:
7      Q.  How did you determine that the
8  inventory sheets were incomplete?
9      A.  Well, in some of the files I
10  looked, and I saw certain items in the
11  police report that were not reflected on the
12  inventory sheet.
13      Q.  Did you look at 277 investigative
14  files and determine that the inventory
15  sheets were incomplete, or was that
16  something you got from the spreadsheet?
17      A.  Well, I looked at some of them.
18  Certainly I didn't look at 277, but that's
19  something that was spot-checked and is
20  reflected in the spreadsheet.
21      Q.  Do you know how it was that the
22  coders that created the spreadsheet
23  determined that the inventory sheet was
24  incomplete?

Page 504

1      A.  No.
2      Q.  And when you say "incomplete," do
3  you mean that there were documents in the
4  file that were not listed on the inventory
5  sheet?
6      A.  Yes.  And again, just, I mean, if
7  we discounted the chart, the analysis or the
8  cases that I looked at or spot-checked,
9  there were items in the file that were not
10  contained on the inventory sheet.  Some
11  files didn't even have an inventory sheet.
12      Q.  Right.  That's a different point,
13  but I am just trying to get an understanding
14  of the definition of incomplete.
15      A.  All right.
16      Q.  So what you mean is there were
17  documents in the file that were not listed
18  on the inventory sheet?  Is that what you
19  mean?
20      A.  That is correct.
21      Q.  All right.  And then the next
22  paragraph is, "In addition, the inventory
23  sheets do not appear to be contemporaneously
24  updated as each new document is added."

Page 505

1      What exactly -- what problem
2  exactly are you identifying there?
3      A.  Well, it tells me that documents
4  are routinely being kept someplace, and then
5  perhaps added to the case file at some point
6  in time, and then that's when the inventory
7  sheet is completed.  As you see on some of
8  the cases, where all of these items are
9  placed in the case file all on the same date
10  by the same person.
11      Q.  Do you have an understanding back
12  in 1995 to 1998 who was responsible for
13  maintaining the investigative file and
14  completing the inventory sheet?
15      A.  I think it speaks -- in the
16  policy, I think it speaks to what -- I don't
17  recall.  I would have to look at it again.
18  I don't recall specifically as we sit here
19  today.
20      Q.  And your concern is that the
21  documents were being kept somewhere else
22  before they were put in the investigative
23  file?  Is that what you thought?
24      A.  Well, that's certainly a

THOMAS TIDERINGTON, 10/06/2022                    Page 506..509

Page 506

1 possibility.
**2      Q.  And what's your basis for that**
**3 assumption?**
4      MR. SWAMINATHAN:  Objection to
5 form.
6      THE WITNESS:  Well, I guess from a
7 practical matter, I -- the assumption I made
8 is that the documents would be inventoried
9 as they are placed in the file.
10 BY MS. ROSEN:
**11      Q.  Do you know the process by which,**
**12 for example, GPRs make their way into an**
**13 investigative file back in 1995 to 1998?**
14      A.  Well, they often did not,
15 obviously, but I don't know the specific --
16 I am sorry?
**17      Q.  Go ahead.**
18      A.  Again, I would have to look at the
19 policy that I had asked to review to see
20 specifically as to what the Chicago Police
21 Department's policy was.
**22      Q.  Do you have -- when you said they**
**23 didn't make their way into the file, do you**
**24 mean ever or belatedly?**

Page 507

1      A.  Well, both, I think.
**2      Q.  What evidence do you have that**
**3 documents didn't make their way into the**
**4 investigative file?**
5      MR. SWAMINATHAN:  Objection.
6 Asked and answered.
7      MS. ROSEN:  You can answer.
8      THE WITNESS:  Well, I think we
9 discussed that there is evidence that there
10 is documents that never made it into the
11 investigative file that were kept in
12 detective drawers.  They were kept in street
13 files.  I don't think anybody is disputing
14 that.
15 BY MS. ROSEN:
**16      Q.  From 1995 to 1998?**
17      A.  I -- I do believe that, yes.
**18      Q.  What's the evidence to support**
**19 your conclusion that during the time period**
**20 of 1995 to 1998, there were documents that**
**21 were -- that never made their way into the**
**22 investigative files?**
23      MR. SWAMINATHAN:  Objection.
24 Asked and answered.

Page 508

1      THE WITNESS:  Again, I mean, I can
2 pull out the chart.  We can go through the
3 same exercise that we already did.
4 BY MS. ROSEN:
**5      Q.  The document -- you mean, not**
**6 documenting things, right?  That's the**
**7 exercise we did is you pointing out to me**
**8 from the chart evidence that detectives were**
**9 not documenting things.  This is a different**
**10 point.**
**11      The point we were just talking**
**12 about, I thought, was whether or not**
**13 documents that existed did not make their**
**14 way ever into an investigative file.  That's**
**15 a different point.**
16      MR. SWAMINATHAN:  Your question?
17 Sorry, go ahead.
18 BY MS. ROSEN:
**19      Q.  So that's what I thought we were**
**20 talking about.  Are we not talking about**
**21 different things?**
22      MR. SWAMINATHAN:  Objection to
23 form and foundation.
24      THE WITNESS:  Well, I think we are

Page 509

1 talking -- well, I guess we are talking
2 about two different things, or maybe I am
3 confused by your questions.
4      MS. ROSEN:  Okay.  Well, that
5 could be.  It's 1:28, and I have to jump
6 off, so this is a good place to take a
7 break, and maybe I will have better
8 questions.
9      THE WITNESS:  Okay.
10      MR. SWAMINATHAN:  Eileen, it's
11 going to take us probably at least 45
12 minutes for lunch.  It's up the street, so
13 let's resume at about 45.
14      MS. ROSEN:  So 2:15?
15      MR. SWAMINATHAN:  Yes.
16      THE VIDEOGRAPHER:  We are off the
17 video record at 1:28.
18      (Whereupon, a break was taken
19      at 1:28 p.m. to 2:25 p.m.)
20      THE VIDEOGRAPHER:  We are back on
21 the video record at 2:25 p.m.
22 BY MS. ROSEN:
**23      Q.  If we can put Exhibit 6 back up on**
**24 the screen, and we are still on page 50.  I**

THOMAS TIDERINGTON, 10/06/2022                    Page 510..513

Page 510

1 want to direct your attention to the bolded
2 portion of the report near the bottom of the
3 page where it says, Review of Permanent
4 Retention Files.  Do you see that there?
5     A.  I do.
6     Q.  And we said earlier that the
7 permanent retention files are the records
8 division files, correct?
9     A.  That's my understanding, yes.
10     Q.  Why do you use the phrase
11 "permanent retention files" instead of
12 record division files in this portion of
13 your report?
14     MR. SWAMINATHAN:  Objection to
15 form.
16     Go ahead.
17     THE WITNESS:  I think that's what
18 they were referred -- I saw reference to
19 them.  I think that's how Chicago refers to
20 them as well.
21 BY MS. ROSEN:
22     Q.  And then it says, "All relevant
23 information in unofficial documents is not
24 transcribed in official reports."  Do you

Page 511

1 see that there?
2     A.  I do.
3     Q.  What is your definition of
4 unofficial documents?
5     A.  Well, I think we discussed it
6 earlier, and perhaps the street files or
7 documents that officers believed are
8 personal information versus and information
9 that perhaps they keep in their desk and not
10 in either the investigative file or the
11 permanent file.
12     Q.  When you are referencing
13 unofficial documents, you are referring to
14 street files?  Is that what you said?
15     MR. SWAMINATHAN:  Objection to
16 form.
17     Go ahead.
18     THE WITNESS:  I would -- I would
19 consider any documents created by a law
20 enforcement officer in the performance of
21 their duties are official reports.
22 BY MS. ROSEN:
23     Q.  So when you say, "unofficial
24 documents not transcribed in official

Page 512

1 reports," I am trying to understand what you
2 mean by unofficial documents, so?
3     A.  Well, what I am -- I guess what I
4 am explaining there is I think it's
5 indisputable that the officers have taken
6 notes.  There is no other possible way for
7 them to be able to create police reports a
8 month later without the virtue of having
9 taken some notes.  And if you see a case
10 file that does not have any notes but it has
11 a very lengthy report with names and
12 addresses and so on, you have to conclude
13 the only way they could have done that is by
14 taking notes that were not disclosed or --
15 I'm sorry, not placed into one of the --
16 either the retention file or in the
17 investigative file.
18     Q.  Okay.  So this is based on your --
19 your reference to unofficial documents are
20 documents that you have inferred exist
21 because in your review of the files, there
22 are files that contain no notes, and you
23 believe those files should contain notes.
24 Do I have that right?

Page 513

1     A.  I think you do, yes.
2     Q.  Okay.  So the unofficial documents
3 that you are referencing were not produced
4 in the 344 investigative files that you
5 reviewed, right?
6     A.  That's correct.
7     Q.  So you have never seen those
8 files?  It's just an inference -- I mean,
9 you have never seen those, quote, unquote,
10 unofficial documents?  It's just an
11 inference you are drawing based on your
12 belief that in the cases where there are
13 files where there are no notes, there should
14 be notes?
15     MR. SWAMINATHAN:  Objection to
16 form.  Foundation.
17     Go ahead.
18 BY MS. ROSEN:
19     Q.  Correct?
20     A.  That would be accurate.
21     Q.  So then you go on to say, "I was
22 provided with permanent retention files for
23 341 homicide investigations for the time
24 period 1995 to 1998."  Do you see that?

THOMAS TIDERINGTON, 10/06/2022                    Page 514..517

Page 514

1    A. I do.
2    Q. Okay. Did you review all 341
3 permanent retention or records division
4 files?
5    A. I skimmed through all of them, and
6 some of them I took a closer look at than
7 others.
8    Q. How many did you take a closer
9 look at?
10    A. Oh, it's hard to estimate, but I
11 don't know, maybe 20, 15, 20.
12    Q. And then if we go to page 51 of
13 your report, it says, "First, I examined the
14 permanent retention files standing alone to
15 assess whether they communicated a complete
16 picture of the investigation." Do you see
17 that?
18    A. I do.
19    Q. Why was that your first step?
20    MR. SWAMINATHAN: Objection to
21 form.
22    Go ahead.
23    THE WITNESS: Well, I guess you
24 have to take a first step in anything, but I

Page 515

1 wanted to get an understanding of the case,
2 and I -- the best way to do that would be to
3 look at what was contained in the permanent
4 retention file.
5 BY MS. ROSEN:
6    Q. Why didn't you first look to the
7 344 investigative files were provided?
8    A. I guess I could have.
9    Q. Is there a particular reason you
10 didn't?
11    A. I don't think so.
12    Q. In your review of the permanent
13 retention files, I assume you noticed that
14 there were no GPRs contained in any
15 permanent retention file, correct?
16    A. I think that's accurate, yes.
17    Q. And I assume you know from reading
18 the depositions of the City of Chicago
19 spokespeople, Mr. Hickey, Mr. Winstrom, that
20 that's by design, right? That's intended?
21    A. That would be -- that was the
22 intent. Apparently that was the intent of
23 the policy, yes.
24    Q. So if you were interested in

Page 516

1 looking at notes in connection with a
2 homicide investigation, you know that the
3 only place to look is in the investigative
4 file, correct?
5    A. Well, the notes were supposed to
6 be transcribed into the official police
7 reports as well.
8    Q. That was not my question. So let
9 me try again. My question is: If you were
10 interested in looking at the notes, then you
11 knew that you had to look in the
12 investigative file, right?
13    A. That's accurate, yes.
14    Q. And, in fact, yesterday, you
15 repeatedly made the point when Ms. Golden
16 was questioning you that in connection with
17 the Soto homicide investigation, you were
18 critical of the fact that there were not
19 contemporaneous notes with the various
20 interviews and interrogations that were
21 being conducted, correct?
22    A. That's correct.
23    Q. And the reason you were critical
24 of that is because you thought that without

Page 517

1 those notes, you couldn't follow the story
2 precisely of the investigation, correct, and
3 how it developed?
4    A. I don't think I testified. I
5 don't think that was my testimony.
6    Q. Well, why are you concerned about
7 the notes in the Soto homicide
8 investigation?
9    A. Well, I am concerned about the
10 notes because there were several interviews
11 with the suspects, and there was no
12 explanation as to what they said. The
13 detective -- and I have interviewed many,
14 many suspects in my career that you would
15 expect that an officer, a detective, would
16 be taking notes as to what was being told to
17 them.
18    I think one of the witnesses
19 even testified that she recalled -- and I
20 don't recall which one -- but that Guevara
21 was taking notes and that the notes -- there
22 were no notes that would have corresponded
23 with that interview.
24    Q. Okay. Then if we go to the second

Page 518

1  paragraph, you note that Mr. Brasfield also
2  reviewed the permanent retention files in
3  connection with his report, correct?
4      A. That's my understanding, yes.
5      Q. And you actually quote him here,
6  correct?
7      A. I do.
8      Q. And he in this paragraph uses the
9  phrase "official file." Do you see that?
10     A. Yes.
11     Q. It's referenced in the third line?
12     A. Yes.
13     Q. And then it's referenced again?
14     A. Yes.
15     Q. And he is using that phrase in
16  connection with current retention file or
17  the records division file, correct?
18     A. I think so, yes.
19     Q. But the investigative file is also
20  an official file, correct?
21         MR. SWAMINATHAN: Objection to
22  form.
23         Go ahead.
24         THE WITNESS: It would be.

Page 519

1  BY MS. ROSEN:
2      Q. And as you said, you could just as
3  easily have begun your review of the files
4  by looking at the investigative files first
5  instead of the records division files,
6  correct?
7         MR. SWAMINATHAN: Objection to
8  form and foundation. Mischaracterizes his
9  testimony.
10         Go ahead.
11         THE WITNESS: That's correct.
12  BY MS. ROSEN:
13     Q. Then you go through an analysis
14  that begins at the second half of the page
15  where you compare permanent retention files
16  to investigative files. Do you see that?
17     A. I do.
18     Q. Why did you -- what was the -- let
19  me strike that.
20         Why did you compare the
21  permanent retention or records division
22  files to the investigative files?
23     A. Well, I wanted to see if the --
24  what was -- if the information in the

Page 520

1  investigative files was being transferred
2  over to the retention files.
3      Q. In the investigative files, there
4  are, in addition to the GPRs and handwritten
5  notes, there are also the supplementary
6  reports that are typed reports, correct?
7      A. Yes, there are.
8      Q. And those are the same typed
9  reports that appear in the records division
10  or permanent retention files, correct?
11         MR. SWAMINATHAN: Objection to
12  form. Foundation.
13         Go ahead.
14         THE WITNESS: I believe they are,
15  yes.
16  BY MS. ROSEN:
17     Q. So when you compared the
18  investigative file to the permanent
19  retention file, you were -- you, obviously,
20  were not finding the notes, right, or the
21  GPRs, right?
22     A. That's correct.
23     Q. But you were finding supplementary
24  reports, right?

Page 521

1      A. I believe there were supplementary
2  reports in there, yes.
3      Q. Then you say, "Like Brasfield, I
4  found many examples where information on
5  handwritten notes was not transferred into
6  official reports." Do you see that?
7      A. I do.
8      Q. When you say "official reports"
9  right there, what precisely do you mean?
10     A. Police reports, supplemental
11  reports.
12     Q. And when you reference handwritten
13  notes, are you referencing handwritten notes
14  and general progress reports and to-from
15  memorandum that are all written in
16  handwriting; or are you simply referencing
17  -- let me start over.
18         When you reference handwritten
19  notes, are you including GPRs and to-from
20  memoranda in that reference?
21     A. I did, yes.
22     Q. So you were comparing the notes
23  and the GPRs to the police reports, the
24  supplementary reports and the permanent

THOMAS TIDERINGTON, 10/06/2022                    Page 522..525

Page 522

1  retention file, but not the report -- the
2  same reports that were already contained in
3  the investigative file?
4       A. I am sorry.  I am not sure I
5  followed that.
6       Q. I am just trying to understand why
7  you were comparing the investigative file to
8  the permanent retention file and what
9  information you believed you were learning
10  by that exercise?
11       A. Right.  No, I understand your
12  question now.  And again, I think I
13  testified earlier that I am familiar, you
14  know, with one file containing all of the
15  investigative reports, a single file, a
16  single master file, and I was trying to
17  understand how the Chicago PD operated with
18  parallel files.
19          So part of it was a learning
20  curve on my part to understand what was
21  going into the retention files or records
22  files, records division files, and how it
23  was different than what was in the
24  investigative file, and why there was two

Page 523

1  files.
2       Q. So then you say, "In many cases,
3  the information," meaning the information
4  that was not transferred from the notes to
5  the supp reports, "is potentially
6  exculpatory."  Do you see that there?
7       A. It could be, yes.
8       Q. And then, "In addition to other
9  instances discussed below, where such notes
10  were not disclosed to criminal defendants,
11  examples include," and then you list a
12  series of Bates numbers.  Do you see that
13  there?
14       A. I do.
15       Q. So that -- those Bates numbers
16  that you list right there, what are they
17  precisely an example of?
18       A. Where notes were not disclosed to
19  criminal defendants.  So the notes would be
20  contained in a certain file, and they were
21  not in the Public Defender file.
22       Q. But you don't reference the Public
23  Defender -- the companion Public Defender
24  files there, correct?

Page 524

1       A. That's correct.
2       Q. Why not?
3       A. I perhaps should have.
4       Q. Okay.  But in any event, this is
5  -- these examples are examples of
6  information you located in the investigative
7  file that you did not find in the criminal
8  defense file, correct?
9          MR. SWAMINATHAN:  Objection to
10  form.  Foundation.
11          Go ahead.
12  BY MS. ROSEN:
13       Q. The Public Defender file?
14          MR. SWAMINATHAN:  Same objection.
15          Go ahead.
16          THE WITNESS:  That's correct, yes.
17  BY MS. ROSEN:
18       Q. So let's take a look at some of
19  these files.  Let's look at -- and I think
20  it will be easier for you, Mr. Tiderington,
21  if you keep that page of your report in
22  front of you because there's a lot of
23  different numbers.
24       A. Okay.

Page 525

1       Q. These are the Bates number, but,
2  obviously, the files are RD numbers.  And if
3  we are comparing, it's easier to compare the
4  RD numbers, but this way we are all on the
5  same page.
6       A. Okay.
7          (Whereupon, Tiderington
8          Deposition Exhibit No. 13 was
9          screen-shared/referenced.)
10  BY MS. ROSEN:
11       Q. So let's take a look at Exhibit
12  No. 13.  Okay, and if we can shrink that so
13  it's 100 percent on the page on the screen
14  so we can see the Bates number.
15          Okay.  So at the bottom there,
16  the Bates number is RFC-Solache/Reyes 76011.
17  Do you see that?
18       A. I do.
19       Q. And I will represent to you -- and
20  we will go through them, but just so you
21  have an understanding, I have combined into
22  one exhibit 76011 through 16, which is
23  referenced in your report, okay?
24       A. Okay.

THOMAS TIDERINGTON, 10/06/2022                    Page 526..529

Page 526

1   Q.  And that corresponds to RD number
2 A596534, which we will see on the reports as
3 we scroll through them.
4        So do you recall identifying
5 these GPRs as GPRs that didn't exist in the
6 Public Defender file?
7        MR. SWAMINATHAN:  Objection to
8 form.  Foundation.
9            And I am just going to note
10 for the record, I think there is a -- I
11 think, Eileen, you are going to be spending
12 time on this point probably significantly,
13 and I think there is a misunderstanding.  I
14 am going to -- you can go ahead -- I
15 can't -- you can go ahead and ask your
16 questions, but I think it would be probably
17 worthwhile to clarify this because I will
18 end up trying to -- I will end up clearing
19 this up later, but you will have wasted a
20 bunch of time so I want to just note that.
21        MS. ROSEN:  Thanks.
22 BY MS. ROSEN:
23   Q.  Okay.  So how did you conclude
24 that these notes Bates-stamped 76011 through

Page 527

1 16 were not contained in the Public Defender
2 file?  What did you do?  What was your
3 methodology in discovering that?
4   A.  Can I look at the other documents
5 that you have?
6   Q.  Sure, yeah, you can scroll through
7 the pages.
8   A.  I don't think I can scroll
9 through.
10        MS. ROSEN:  Robyn, can you just
11 flip through the pages so he can look at
12 them.
13        THE WITNESS:  You know, I -- I
14 don't remember this one specifically.  The
15 take-away, if you will, on this is this
16 information that's contained here, you know,
17 should have -- and if you are telling me it
18 was turned over, it should have been turned
19 over because it could be exculpatory.
20 BY MS. ROSEN:
21   Q.  First of all, what's your basis
22 for saying it could be exculpatory?
23   A.  Well, I believe anything in an
24 investigative file could be exculpatory.

Page 528

1   Q.  So you haven't done any particular
2 analysis that there is actually information
3 in here that when you compare it to the
4 investigation that was done leads you to
5 believe that it's exculpatory?  It's simply
6 based on your belief that everything should
7 get turned over because it's potentially
8 exculpatory, right?
9   A.  That's correct.
10        (Whereupon, Tiderington
11        Deposition Exhibit No. 14 was
12        screen-shared/referenced.)
13 BY MS. ROSEN:
14   Q.  Okay.  All right.  Let's take a
15 look at Exhibit 14, which also comes from
16 the investigative file for A596534.
17        MR. SWAMINATHAN:  Was that the RD
18 number you just said?
19        MS. ROSEN:  Yes.  A59 -- hold on
20 A596534.
21 BY MS. ROSEN:
22   Q.  So this is a Chicago Police
23 Department Detective Division Supplementary
24 Report.  Do you see that?

Page 529

1   A.  I do.
2   Q.  And these are documents you are
3 familiar with from reviewing 344
4 investigative files and the 341 RD files,
5 right?
6   A.  That's correct.
7   Q.  And you will see at the top here
8 it says, offense classification homicide.
9 It says, IUCR code:  Homicide, first degree
10 murder/0110.  Do you see that?
11   A.  I do.
12   Q.  You know what a IUCR code is,
13 right?
14   A.  I don't know if I know what that
15 code is, no.
16   Q.  Oh, you don't?
17   A.  No.
18   Q.  So you don't know what the number
19 0110 denotes?
20   A.  I don't.
21   Q.  And then it says, "Status/Code
22 (this report):  Exceptionally cleared
23 closed."  Do you see that?
24   A.  I do.

THOMAS TIDERINGTON, 10/06/2022                    Page 530..533

Page 530

1    Q.  Do you know what that means to
2  be -- when an investigation is exceptionally
3  cleared and closed?
4    A.  I don't understand or I don't know
5  what the -- what the Chicago Police
6  Department codes are or what they mean as
7  far as exceptionally cleared cases.
8    Q.  Let's go to page 8 of the exhibit,
9  and it says on the second full paragraph:
10         "On the 31st of December,
11      1996, at the conclusion of her
12      investigation and after conferring
13      with her supervisor, ASA Kazaglis
14      rejected the lodging of murder
15      charges against Lamon Weathers.
16      ASA Kazaglis and her supervisor
17      stated that the testimony of the
18      witness Eric Camp would be
19      required to buttress the lineup
20      identification made by Vincent
21      Accuros, and only then would
22      charges be lodged.  Without Camp's
23      assistance in this investigation,
24      the Cook County State's Attorney's

Page 531

1      Office stated that charges against
2      Weathers could not be filed."
3         Do you see that there?
4    A.  I do.
5    Q.  And let's go to the last page of
6  the report.  Then if we go to the last three
7  paragraphs, it says:
8         "In addition, the RDs feel
9      they have exhausted all
10      investigative leads, and they have
11      made every reasonable attempt at
12      gaining the cooperation of the
13      decidedly uncooperative witness
14      Eric Camp.  Attempts at locating
15      (recanvassing) any additional
16      witnesses whose assistance would
17      be helpful in this investigation
18      also proved negative.
19         "Therefore, due to the above
20      facts, the undersigned detectives
21      respectfully request this case be
22      considered exceptionally cleared
23      and closed."
24         Do you see that?

Page 532

1    A.  I do.
2    Q.  And I will represent to you that
3  exceptionally cleared/closed means that
4  nobody was charged in this particular
5  homicide investigation, and I searched the
6  spreadsheet and there is no PD file.
7         So can you explain to me the
8  point that you were trying to make with the
9  notes that were Exhibit No. 13?
10    A.  I'm sorry, could you go back to
11  Exhibit 13?
12    Q.  Absolutely.
13    A.  And again, I don't remember this
14  specifically, but generally speaking, I
15  would find notes in the investigative file
16  that were not, by policy, transcribed or
17  explained in the police report is one of the
18  things that I discovered.
19    Q.  When you say "by policy," what do
20  you mean?
21    A.  Well, the police department had a
22  policy that the detectives would transcribe
23  their notes if it was, quote, relevant into
24  the police department -- into the police

Page 533

1  report explaining the details of their
2  notes.
3    Q.  And is that in one of the
4  directives that you analyzed, either 83 or
5  86 or the SOP?  Is that where you are
6  getting that the policy was that the notes
7  had to be transcribed into the supplementary
8  reports?
9    A.  Yeah.  I can't point as we sit
10  here today exactly where I read that, but it
11  certainly is a good practice, and something
12  that I am familiar with that if there's some
13  cryptic notes on a GPR, it would be only
14  logical that you would expect the police
15  report to reflect the meaning of those
16  notes.
17    Q.  So is the point of the examples in
18  paragraph 51 -- on page 51 of your report
19  that notes should be transcribed into --
20  into police reports?  Or is it that notes
21  should be produced so that we can find them
22  in the PD file?
23         MR. SWAMINATHAN:  Objection to
24  form and foundation.

THOMAS TIDERINGTON, 10/06/2022                    Page 534..537

Page 534

1         THE WITNESS:  I guess the answer
2  to that would be both, wouldn't it?  It's my
3  contention that detectives should be
4  explaining the notes that they are taking if
5  they are cryptic.  And if it's seemingly
6  important to the investigation to the point
7  where they wrote the phone numbers down or
8  addresses down or, you know, the victim said
9  this or victim said that, I think it's
10  important to have -- and I believe it's
11  Chicago's policy that that would be included
12  and explained in the police report.  And
13  then, of course, you know my position if
14  it's in the police report, it certainly
15  should be disclosed.
16  BY MS. ROSEN:
17      **Q.  And the notes should be disclosed,**
18  **too, right?**
19      A.  They should be, yes.
20      **Q.  So we are in agreement that the**
21  **notes should be disclosed and the police**
22  **report should be disclosed, right?**
23      A.  If --
24      **Q.  The supplementary reports, right?**

Page 535

1      A.  If you are telling me that you
2  agree with that, yes.
3      **Q.  So I guess I am back to -- and we**
4  **can go back to page 51 of your report,**
5  **Exhibit 6.  So these examples that you have**
6  **listed here, you told me were examples of**
7  **reports that were not located -- that you**
8  **could not locate in the Public Defender**
9  **file, correct?**
10      A.  I think I told you a couple
11  different things about those notes, and if
12  you allow me to read from my police report,
13  I found examples where the information on
14  handwritten notes was not transferred into
15  or transcribed or transferred into official
16  reports.  Brasfield made that same
17  observation.  In many cases, the information
18  was perhaps exculpatory, and in other
19  instances, it was my review -- and I
20  certainly may have missed it -- but they
21  oftentimes, I did not see them in the Public
22  Defender's file.
23      **Q.  So these -- the Bates stamps that**
24  **this paragraph -- I just need to understand**

Page 536

1  **what you are saying they are examples of.**
2  **You are an expert.  You are disclosed as**
3  **having reviewed materials.  These are the**
4  **materials you reviewed, and you believe they**
5  **support your opinions and that they are**
6  **examples of something.  I do not have a**
7  **clear understanding of what that something**
8  **is, so let's try it again.  I'm sure it's**
9  **me.**
10      **What these Bates stamps that**
11  **are here on this page, what are they**
12  **examples of?**
13      A.  Again, I will answer it, and
14  pretty much I am going to answer it the same
15  way I did the last time you asked the
16  question, and probably the most concise way
17  is to explain in my report.  Many examples
18  were information on handwritten notes was
19  not transferred into official police
20  reports.  Okay, so I guess we can take it
21  step-by-step, and I am not -- and again, you
22  understand that portion of my opinion?
23      **Q.  Yes.**
24      A.  Okay.  And in many cases, I

Page 537

1  believe that the information could be
2  potentially exculpatory.
3      **Q.  Yes.**
4      A.  In other instances, there were
5  notes that I assumed would have been in the
6  Public Defender's file that I did not find
7  in there.
8         And to take it one step
9  further, I believe it's reasonable if
10  there's notes, that the investigative
11  detective took notes and that I would
12  somehow see an explanation of those notes in
13  their police reports explaining the
14  importance or lack of importance of the
15  notes that they took.  If there is an
16  address or phone number or description of a
17  vehicle with no explanation in the police
18  report, then I think it would be
19  troublesome.  Because in most cases, the
20  police report, you know, perhaps is a short
21  story where it takes you in different
22  directions, and that's what I would expect
23  to see in a police report.
24      **Q.  So let's go back to Exhibit 13.**

THOMAS TIDERINGTON, 10/06/2022      Page 538..541

Page 538

1 What are these notes an example of?
2      MR. SWAMINATHAN: Objection.
3 Asked and answered.
4      Go ahead.
5      THE WITNESS: I'd have to look at
6 the police report, and I don't know, maybe
7 this is the reason. Maybe this was included
8 in the police report, but as we sit here, I
9 don't think it was. Here is a phone number.
10 All right. There is a reference "idiot." I
11 don't know if he is speaking about his
12 supervisor or if he is talking about a
13 street name of somebody that's identified as
14 a suspect.
15      So I am looking at this, and
16 there is a lot of questions. Obviously, the
17 detective felt it was important enough to
18 write this down. And as I testified
19 earlier, oftentimes they did not, so it's
20 really shocking when they do write something
21 down. It tells me that they thought it was
22 pretty significant. And if it's
23 significant, it should have been explained
24 in the police report.

Page 539

1      Q. So this is a -- these pages, the
2 six pages in exhibit 13 are not -- are
3 examples of information that you say was not
4 transferred to a supplementary report,
5 right?
6      A. That's my understanding, yes.
7      Q. And did you --
8      A. I mean, to confirm that, I would
9 have to go back, and I would have to look at
10 the supplemental report and the police
11 report, but that's my understanding, yes.
12      Q. Well, you did the work, right?
13      A. Well, but again, you know, there
14 is 6,000 documents in this case, and if we
15 are going to be concise, which I'm sure you
16 want me to be, I would take the opportunity
17 to go back and confirm what I am telling
18 you.
19      Q. Right. But you chose these
20 examples, so presumably when you --
21      A. Yes.
22      Q. -- chose the examples --
23      A. Right.
24      Q. -- you looked at the reports, and

Page 540

1 so you're confident in your work, are you
2 not?
3      A. Well, yeah. But I'm also
4 confident enough to understand that I have
5 the ability to go back and refresh my memory
6 and confirm what I am telling you because
7 it's a complicated case. There is over 100
8 pages of my report, and there is 6,000
9 documents. I don't think this is supposed
10 to be just a memory test. I think you are
11 probably looking for the most precise and
12 concise information that I can provide for
13 you.
14      Q. Well, we are not going to spend
15 hours for you to compare your examples to
16 the reports when you are the one that
17 created the examples. So if you are telling
18 me that that's what this example is, then
19 that's what we will go with.
20      (Whereupon, Tiderington
21      Deposition Exhibit No. 15 was
22      screen-shared/referenced.)
23 BY MS. ROSEN:
24      Q. All right. Let's take a look at

Page 541

1 Exhibit 15. So this is Bates-stamped 34554,
2 which is the first Bates stamp in your list?
3      A. Can you make that -- I am sorry,
4 can you make that a little bit larger?
5      Q. Yes.
6      A. We might have to -- there you go.
7      Q. Can you probably scroll so you can
8 see the top of the document.
9      A. Exactly. If you can scroll down a
10 little bit, please. Okay.
11      Q. What is this an example of?
12      A. Again, this is an example of
13 perhaps the officer doing the right thing,
14 taking notes on the GPR, and I think I
15 referenced this because I don't believe that
16 the information in the GPR is explained or
17 contained in any way in the police report.
18      (Whereupon, Tiderington
19      Deposition Exhibit No. 16
20      was screen-shared/referenced.)
21 BY MS. ROSEN:
22      Q. Let's take a look at Exhibit No.
23 16, and if you scroll to the bottom of this
24 page, the Bates number is AR-PD-041276. Do

Page 542

1  you see that?
2      A. I do.
3      Q. And you know from the work you
4  have done in this case that AR-PD is the
5  Bates range that was used by the Public
6  Defender's Office, right?
7      A. That's my understanding, yes.
8      Q. And while this is a terrible copy,
9  I think if you scroll to the top and scroll
10 to the bottom, you will see that this is
11 exactly a copy of Exhibit 15 that we were
12 just looking at, right?
13     A. Yes.
14     Q. So that tells us that this GPR was
15 produced and is contained in the Public
16 Defender file, right?
17     A. I wasn't disputing that.
18     Q. But your point still is that this
19 information should have been typed into a
20 supp report of some sort, right?
21     A. That would be logical. That would
22 be what I would expect in a professional
23 investigation, yes.
24     Q. So it's your expectation that

Page 543

1  every bit of information that is written
2  down on a note should be then transferred to
3  some sort of supplementary report?
4      MR. SWAMINATHAN: Objection to
5  form. Foundation.
6          Go ahead.
7      THE WITNESS: That's not what I
8  said at all. I said if a detective is
9  taking notes and if the notes are important
10 to the case, if the notes are, you know --
11 and if you go back to the last example,
12 there is phone numbers, there is addresses,
13 there is quotes of perhaps street names of
14 individuals, there are times, and I would
15 think that it would happen more often than
16 not that if the officer, detective, took
17 notes that there would be some type of a
18 mention or trans -- and when I say
19 transcribed, I don't necessarily mean
20 verbatim, but I think that looking at this,
21 there should be some explanation, although I
22 can't make out on my computer screen exactly
23 what this says, but I would have expected to
24 see some notation in the police report.

Page 544

1  BY MS. ROSEN:
2      Q. And what is your basis for your
3  opinion that there should have been
4  information from this note in some other
5  police report, despite the fact that the
6  note was produced to the criminal defendant?
7      MR. SWAMINATHAN: Objection.
8  Asked and answered.
9          Go ahead.
10     THE WITNESS: Well, an
11 investigator's job is to collect evidence.
12 And in order for items to be useful, the
13 notes, I believe, are taken as part of his
14 initial -- whether it's initial interview
15 with somebody, but then I think there has to
16 be some type of explanation as to the
17 importance of what the notes are.
18         And I am not saying that each
19 chicken scratch on a note would have to be
20 transcribed, but I saw many instances in
21 which notes were taken on GPRs and other
22 forms where there is just no explanation
23 whatsoever about what the notes meant, and I
24 think that's highly unusual.

Page 545

1          (Whereupon, Tiderington
2          Deposition Exhibit No. 17 was
3          screen-shared/referenced.)
4  BY MS. ROSEN:
5      Q. Let's take a look at Exhibit 17.
6      A. I'm sorry, can you scroll back
7  down. Okay.
8      Q. So this is 77368 and 77452, which
9  are from your list, okay?
10     A. I see that.
11     Q. All right. And then I will
12 represent to you that they are both out of
13 the same investigative file. Let's take a
14 look at Exhibit 18.
15         (Whereupon, Tiderington
16         Deposition Exhibit No. 18 was
17         screen-shared/referenced.)
18 BY MS. ROSEN:
19     Q. And this is also taken --
20 actually, this is the investigative file, so
21 this is from RD number A744094. And those
22 two notes that were in Exhibit 17 that are
23 part of your list on page 51 come from this
24 investigative file. In fact, there is the

THOMAS TIDERINGTON, 10/06/2022                    Page 546..549

Page 546

1 first note, and it says, Daniela Crosoli.
2 Do you see that?
3      A. I do.
4      Q. Then it says, sister of Adriana,
5 and then there is an address, and I think it
6 says, gave diaries to somebody on 10 October
7 96. Do you see that?
8      A. Yes.
9         MR. SWAMINATHAN: Eileen, what's
10 the Bates page for that one?
11        MS. ROSEN: 77368.
12        MR. SWAMINATHAN: Thank you.
13 BY MS. ROSEN:
14     Q. And if we go to the next page,
15 that's the resident alien card of Daniela.
16 If we keep going, and there is an ID card --
17 keep going to the next page, sorry. There
18 is an ID card for Adriana. You see that
19 that was referenced in that note?
20     A. Okay.
21     Q. Then if we go to the next page,
22 it's the back of that ID, and then if we go
23 to the next page, that's the investigative
24 file inventory sheet, right?

Page 547

1      A. Apparently, it is, yes. Well, I
2 take that back, it's, obviously, incomplete
3 obviously, right?
4      Q. Well, is it?
5      A. Well, where does it list the GPRs?
6      Q. Well, do we know if there is GPRs
7 in this file yet?
8      A. You just showed them to me, didn't
9 you?
10     Q. Okay, wait, those are just notes.
11 Those are not GPRs. You distinguished
12 between the notes and the GPRs, right?
13        MR. SWAMINATHAN: Objection to
14 form. Foundation. Argumentative.
15        Go ahead.
16        THE WITNESS: Weren't the notes
17 written on the GPRs?
18 BY MS. ROSEN:
19     Q. Were they?
20     A. Well, and you have identified part
21 of the problem here because we can't figure
22 it out.
23     Q. Well, I can figure it out. You
24 can't figure it out.

Page 548

1      A. Perhaps you can tell me. Then we
2 don't have to --
3      Q. I can represent to you that it
4 doesn't appear to be that these notes are
5 written on a GPR.
6         Do you know what a GPR form
7 looks like?
8      A. I do.
9      Q. Can you describe it to me?
10     A. If you can go back and you can
11 show me, and I can tell you that that's what
12 it looks like.
13     Q. Where do you want us to go back
14 to? The Daniela Crosoli reference?
15     A. No. I am sorry. And again, I am
16 trying to save time for you as well. I
17 don't want to waste time, but if you are --
18 if you are representing that this was not on
19 the GPR, I will concede that.
20        Obviously, there is
21 photocopies so sometimes you can't see all
22 of the lines and so on. I don't see any
23 indication on the file inventory of these
24 notes.

Page 549

1      Q. Can we go back to the third, the
2 third page of the PDF. This note right
3 here?
4      A. Yes.
5      Q. Does this appear to you to be
6 taken on a GPR?
7      A. No.
8      Q. All right. Let's go to page --
9      A. But again, to my point, what is
10 it? What does it mean? Why are --
11     Q. I think we are going to get there.
12     A. Oh, okay.
13     Q. Page 10 of the PDF. Okay. So
14 this is a supplementary report, right?
15     A. Yes, it is.
16     Q. And can you shrink it so that we
17 have 100 percent of the page on the screen.
18        At the top of the page, you
19 can see there Adriana Peptenar, the victim's
20 name?
21     A. It's actually shrunk. I can't see
22 it.
23     Q. We can make it bigger.
24     A. That's okay. I believe that's

Page 550

1 what her name is.  I saw it when it was
2 larger.
3      Q.  And the note was the name and
4 address of the sister of Adriana, right?
5      A.  I believe so, yes.
6      Q.  So that would be the significance
7 of the note, right?  It was identifying the
8 sister of the victim?
9      A.  Apparently, yes.
10      Q.  And then if we scroll down a
11 little bit, and you can maybe make it bigger
12 so Mr. Tiderington can read it.  At the
13 bottom it says, offender now deceased,
14 Stefan Peptenar, and then it provides
15 descriptives of the offender, now deceased.
16 Do you see that?
17      A.  I do.
18      Q.  And then you will also note above
19 the narrative, there is some boxes that say,
20 status continued.  Do you see that on the --
21 and it says, closed cleared, cleared open,
22 and then exceptionally cleared closed.  Do
23 you see that there?
24      A.  I do.

Page 551

1      Q.  And exceptionally cleared closed
2 for the Chicago Police Department means that
3 they have determined who the offender is,
4 but there will be no charges lodged, which
5 was the example from earlier when the state
6 would not approve charges.  Do you remember
7 that other example of exceptionally cleared
8 closed?
9      A.  I do.
10      Q.  And, obviously, in this particular
11 case, the offender is now deceased; so, of
12 course, there would be no charges being
13 lodged, right?
14      A.  That's logical, yes.
15      Q.  And then if we go to page 13 of
16 that same report, at the end of the report,
17 it says, "With the suicidal death of the
18 offender in this investigation, Stefan
19 Peptenar, it is requested that this case be
20 filed exceptionally/cleared/closed/death of
21 the offender."  Do you see that there?
22      A.  I do.
23      Q.  Obviously, in that particular
24 case, there would be no charges and no

Page 552

1 criminal defense file to be produced, right?
2 I mean to -- there would be no criminal
3 defense file for us to review, right?
4      A.  That makes perfect sense, right.
5      Q.  So now let's go back to Exhibit
6 17.  Now, that's the second note that you
7 flagged in your report, right, from this
8 same case?
9      A.  That's correct.
10      Q.  And it says, there is a phone
11 number, right?
12      A.  There is a phone number, yes.
13      Q.  And then there is the numeral one,
14 and it says large pan pizza.  Do you see
15 that?
16      A.  Yep, yes.
17      Q.  And then numeral 2, it says, crazy
18 bread with sauce.  Do you see that there?
19      A.  I do see that there.
20      Q.  And that's another -- then there
21 is another phone number, right?
22      A.  Right.
23      Q.  So is it possible that what this
24 is is that on the back of some report, the

Page 553

1 police officers that were working wrote down
2 people's orders for dinner?
3      A.  That's possible.
4      Q.  All right.
5      A.  And, by the way, I would not
6 expect that to be transcribed into a police
7 report.
8          (Whereupon, Tiderington
9           Deposition Exhibit No. 19 was
10           screen-shared/referenced.)
11 BY MS. ROSEN:
12      Q.  Then let's take a look at Exhibit
13 19, and this -- the RD number on this
14 particular example is B447609, and the Bates
15 numbers are the series of Bates numbers in
16 your report that begin with 94055 and go all
17 the way through 94096 to 99, so that whole
18 line.
19      A.  Okay.
20      Q.  Are you following me?  So these,
21 we can go through them one page at a time so
22 you can see them.  These are other examples
23 that are in this paragraph.
24      MR. SWAMINATHAN:  I'm sorry, can

THOMAS TIDERINGTON, 10/06/2022                    Page 554..557

Page 554

1 you go back to the first one?
2       MS. ROSEN:  Sure, yes.
3 BY MS. ROSEN:
4    Q.  So the first one are typed notes,
5 right?
6       MR. SWAMINATHAN:  And this is
7 94055?
8       MS. ROSEN:  Yes.
9       MR. SWAMINATHAN:  Yes.
10 BY MS. ROSEN:
11   Q.  Let's talk about the first page.
12 These are typed notes, right?
13   A.  Yes, they are.
14   Q.  On a general progress report?
15   A.  That's what it looks like exactly.
16   Q.  Do you see?
17        And there is boxes.  It's a
18 form, right, and so you just fill in the
19 form?
20   A.  Yes.
21   Q.  And these particular detectives
22 typed their general progress report or notes
23 in the general progress report, right?
24   A.  That appears what they did, yes.

Page 555

1    Q.  So in this particular -- what are
2 these notes an example of?  Is this another
3 example of information not being transcribed
4 into the supplementary reports?
5    A.  I would have to compare it to the
6 police report and supplemental report.
7    Q.  And you can't tell me if that's
8 what this is an example of unless you
9 compare it to the supplementary reports,
10 right?
11       MR. SWAMINATHAN:  Objection to
12 form.  Foundation.
13       Go ahead.
14       THE WITNESS:  I mean, if you give
15 me a minute or so to read this, maybe I can
16 jog my memory as to why, the importance of
17 it anyways.
18 BY MS. ROSEN:
19   Q.  Okay.
20   A.  Okay.
21   Q.  Okay.  So having reviewed the
22 first page of this exhibit, does that
23 refresh your recollection?
24   A.  I'd have to look at the rest of

Page 556

1 the --
2    Q.  Okay.
3    A.  Because there's parts of these
4 files, the officers did everything right.
5 I'm not saying that 100 percent of the time
6 they didn't do things correctly.
7    Q.  In this particular -- with this
8 particular GPR, having just read it as we
9 are sitting here, is it your position that
10 this information needed to be transferred to
11 a supplementary report?
12   A.  It should have been, yes.  And
13 more importantly, it sounds as though this
14 occurred -- they were out in the field when
15 all this happened.  So I guess it would be
16 my expectation that there would have been
17 notes, and they would have used those notes
18 to type this GPR but the notes still should
19 have been in the case file.
20   Q.  The notes are in the case file.
21 They are in the investigative file.  That's
22 where you found them.
23   A.  No, I understand that.  But the
24 corresponding notes that they used to type

Page 557

1 this GPR up.
2    Q.  So you are assuming that there
3 were notes?
4       MR. SWAMINATHAN:  Objection to
5 form.
6       Go ahead.
7 BY MS. ROSEN:
8    Q.  Handwritten notes, that's what you
9 are assuming because these are typed notes?
10   A.  I -- and again, I didn't -- I
11 don't know if I am making that assumption,
12 but I said, it's sometimes logical for the
13 detectives to take notes, and they may come
14 back and because their handwriting is
15 terrible, they may type it up, but they
16 would still have the handwritten notes, and
17 those handwritten notes still should have
18 been included.
19   Q.  So is that what this is an example
20 of, your --
21   A.  No, no, I don't know if that's
22 what this is an example of because you only
23 showed me one page of maybe 100 pages in
24 this file, so I would have to go through the

THOMAS TIDERINGTON, 10/06/2022                    Page 558..561

Page 558

1 entire file, and perhaps refresh my memory,
2 and maybe I would find some handwritten
3 notes that would correspond with this GPR.
4        I would -- I mean, quite
5 frankly, I think if they were going to type
6 up a GPR that it would have been probably
7 closer to policy if they would have typed up
8 a supplemental report related to this.
9    **Q. So now you are critical of the**
10 **fact that they typed their notes so that**
11 **they could be legible, is that what you are**
12 **saying?**
13        MR. SWAMINATHAN: Objection to
14 form. Foundation. Misstates his testimony
15 and argumentative.
16        Go ahead.
17        THE WITNESS: That's -- you know
18 that's not what I said. We are sitting here
19 talking about various hypothetical
20 situations because I don't have the complete
21 file in front of me, and I am suggesting
22 that there is many possibilities that would
23 perhaps demonstrate that they did everything
24 correctly.

Page 559

1        I think you would agree or the
2 command officers in Chicago would agree that
3 if the officers went in the field, and they
4 took handwritten notes, and then they came
5 back and they typed their handwritten notes
6 into a GPR -- and I am not saying that's
7 what they did here, but I am just saying if
8 this is what they did, the notes still would
9 have been required to be placed into the
10 investigative file.
11 BY MS. ROSEN:
12    **Q. Right. But these are examples**
13 **that you isolated and put in your report.**
14 **So I am trying to figure out why these,**
15 **these particular documents are important to**
16 **you for purposes of your opinion.**
17        **And what I understood you to**
18 **be saying is, first, you said this paragraph**
19 **is examples of information that was not**
20 **found in the PD file. Then you said this is**
21 **information that is not transferred to the**
22 **police reports, which is the supplementary**
23 **reports, as I understand you.**
24        **So I am just trying to**

Page 560

1 **understand what these are supposed to be**
2 **examples of.**
3    A. Right. But, I'm sorry, but you
4 also told me it wasn't important enough for
5 us to go back and allow me to review the
6 entire file. You are showing me one page of
7 hundreds of documents, and you are asking me
8 -- and I am -- again, I am giving you some
9 possibilities of things that I thought of
10 when I may have reviewed this that may have
11 been answered if I had the ability to scroll
12 through this file, instead of looking at one
13 page and one sentence.
14    **Q. Well, it's your report, and they**
15 **are your examples.**
16    A. Right. But I'm sorry, that's
17 true, but I had the ability to look at the
18 entire file, and now you are asking me to
19 opine on one single piece of paper. And I
20 am telling you or I am asking you, if we are
21 going to have this discussion, it would be
22 -- I could be more precise if I was allowed
23 the opportunity to go through these files
24 and further explain them to you.

Page 561

1    **Q. Okay. Let's go to the next page.**
2 **This is Bates 94058. What is this an**
3 **example of?**
4    A. Just for the record, so you have
5 taken this one page out of the -- out of
6 that case file, is that my understanding of
7 what this exercise is?
8    **Q. No. The exercise is is I have**
9 **pulled all of the pages that you cited in**
10 **your report as examples of something.**
11    A. Right, right.
12    **Q. So I am giving you the documents**
13 **that you have identified in your report and**
14 **asking you what they are examples of. I am**
15 **not self-selecting pages. They are the**
16 **pages you selected.**
17    A. No, I understand. I just wanted
18 to make sure I understood from your
19 perspective what this is.
20        Again, for me to be able to
21 refresh my memory, I would have to go back
22 to the case file and reference that. And
23 looking at it, I can't, as we sit here,
24 recall exactly why I referenced this without

THOMAS TIDERINGTON, 10/06/2022                    Page 562..565

Page 562

1 having the ability to go back and look at
2 that case file.
3    Q. Okay. Let's go to the next page,
4 and this is Bates-stamped 94059, also from
5 your report in that same sequence. What is
6 this an example of?
7    A. Of course, it would be the GPR
8 report, and this would be an example of
9 notes that would have been produced by the
10 investigative officer, the detective. And I
11 believe these notes, if I remember
12 correctly, they were not explained in the
13 police report or any supplemental report.
14    Q. Let's go to the next page. This
15 is 94060. What's this an example of?
16       MR. SWAMINATHAN: Objection to
17 form and foundation for the reasons already
18 stated, but go ahead.
19       THE WITNESS: Again, same answer.
20 This is a document that I would have
21 expected to be explained in a police report
22 or supplement.
23 BY MS. ROSEN:
24    Q. Let's go to the next page, Bates

Page 563

1 stamp 94089. What's this one an example of?
2    A. I'm sorry, can you -- can you
3 scroll back to the other -- can you go back?
4    Q. The previous page?
5    A. Yes.
6       MR. SWAMINATHAN: While he's doing
7 that, Eileen, this 11-page exhibit, are
8 these -- what makes up the 11 pages of this
9 exhibit?
10      MS. ROSEN: The pages that he
11 references, beginning at 94055 through 94096
12 through 99 on page 51 of his report.
13      MR. SWAMINATHAN: So this is
14 94055, 94058, 59, 60, 94089, 94092, 94094,
15 and then 94906 through 99? That's all that
16 this exhibit is?
17      MS. ROSEN: Correct. And they are
18 all from the same investigative file.
19      MR. SWAMINATHAN: Yes.
20      THE WITNESS: And again, I would
21 have to compare it to the rest of the file.
22 There was a reason that I identified this.
23 BY MS. ROSEN:
24    Q. Okay. Let's go to the next page.

Page 564

1    A. At some point in the near future,
2 can we plan for a five-minute break?
3    Q. Sure, as soon as we finish with
4 this exhibit.
5       Let's go to the next page.
6 94092, what is this an example of?
7       MR. SWAMINATHAN: Can you go down
8 a little bit.
9       THE WITNESS: So that's an example
10 of information that should have been
11 transcribed into a police report.
12 BY MS. ROSEN:
13    Q. Okay. Let's go to the next page.
14 94094, what's this an example of?
15    A. Again, I think it's relevant
16 information that should have been explained
17 in a police report.
18    Q. And let's go to the next page,
19 94096.
20    A. Same thing, it describes four
21 hooded males, dark clothing, should have
22 been contained in the police report.
23    Q. Let's go to the next page, 94097.
24 What's this an example of?

Page 565

1    A. Same answer.
2    Q. Okay. Let's go to the next page,
3 94098. What's this an example of?
4    A. It appears to be suspect
5 information, and it should have been
6 contained in a police report or supplemental
7 report.
8    Q. Okay. And then the next page,
9 94099?
10    A. Same answer.
11    Q. And then I think that's the end of
12 this exhibit. And your answer -- your
13 opinion that this information -- all of this
14 information in these GPRs should have been
15 transferred to a police report is
16 irrespective of whether or not every single
17 one of these documents is in the Public
18 Defender file, correct?
19      MR. SWAMINATHAN: Objection to
20 form.
21      Go ahead.
22      THE WITNESS: Well, yes, my first
23 opinion would be that it should have been
24 transcribed into a police report. And then

THOMAS TIDERINGTON, 10/06/2022                    Page 566..569

Page 566

1 if that was the case, then it should been
2 found in the Public Defender's file.
3 BY MS. ROSEN:
4      Q. I am saying --
5      MR. SWAMINATHAN: Sorry, go ahead.
6 BY MS. ROSEN:
7      Q. I am saying if these GPRs are all
8 in the Public Defender file, is it still
9 your position or your opinion that the
10 information needed to have been transcribed
11 into a supplemental report as well?
12     A. Certainly.
13          (Ms. Isabella Aguilar
14          entered the deposition
15          proceedings.)
16     MR. SWAMINATHAN: That was Exhibit
17 16, right?
18     MS. ROSEN: No. That was Exhibit
19 19, I believe.
20     MR. SWAMINATHAN: Is that right,
21 19? Yeah, 19.
22     MS. ROSEN: Yes.
23     THE WITNESS: Before we take a
24 break, earlier when we first started, I

Page 567

1 talked about some housekeeping matters that
2 we were going to take care of as far as
3 other cases that I have had listed from the
4 other attorney yesterday.
5 BY MS. ROSEN:
6      Q. Oh.
7      A. Is that something that we want to
8 discuss now, or is it not important at this
9 point or --
10     Q. We can get to it at the end if we
11 have time for it. I'd rather get done with
12 what we need from your report.
13     A. Okay.
14     Q. Thank you.
15     A. Five minutes? Ten minutes?
16     Q. Let's do ten minutes.
17     A. All right, thanks.
18     THE VIDEOGRAPHER: We are off the
19 video record at 3:35 p.m.
20          (Ms. Janice Willier, court
21          reporter intern, exited the
22          deposition proceedings.)
23          (Whereupon, a break was taken
24          at 3:35 p.m. to 3:47 p.m.)

Page 568

1      THE VIDEOGRAPHER: We are back on
2 the video record at 3:47 p.m.
3          (Whereupon, Tiderington
4          Deposition Exhibit No. 20 was
5          screen-shared/referenced.)
6 BY MS. ROSEN:
7      Q. Let's take a look at Exhibit 20,
8 and this is -- Exhibit 20 is the
9 investigative file for RD number C687989.
10 And if we go to the second page, we have the
11 investigative file inventory. Do you see
12 that?
13     A. Yes. I'm sorry, what's -- is
14 there a Bates stamp number on that?
15     Q. On which? The whole file?
16     A. Yes.
17     Q. Yes. It is -- it starts at 110109
18 and it goes to 110189. Contained within
19 this investigative file are 110176 and
20 110180, which are examples listed on page 51
21 of your report.
22     A. Right, yes, okay.
23     Q. And this one, we have the whole
24 investigative file is marked as an exhibit.

Page 569

1      MR. SWAMINATHAN: Exhibit 20, you
2 said?
3      MS. ROSEN: Yes.
4 BY MS. ROSEN:
5      Q. And this is the investigative file
6 inventory. Do you see that?
7      A. I do.
8      Q. And you see here under "Entering
9 Member," it says Haas, H-a-a-s, over and
10 over and over again?
11     A. Yes.
12     Q. Did you notice Detective Haas's
13 name on multiple investigative file
14 inventory sheets?
15     A. I did, yes.
16     Q. And, in fact, his name is all over
17 the investigative file inventory sheet for
18 the Soto homicide investigation, right?
19     A. His name and others, I believe,
20 but Haas I do recall, yes.
21     Q. And do you have any understanding
22 of what Detective Haas's function was back
23 in 1998 with respect to the investigative
24 file?

THOMAS TIDERINGTON, 10/06/2022                    Page 570..573

Page 570

1    A. It's my understanding that Chicago
2 policy is that they would designate a
3 detective within the area or within the --
4 within the area to be the records person.
5    **Q. Okay.**
6    A. That's my understanding.
7    **Q. And what's that understanding**
8 **based on?**
9    A. I thought I read it in a policy or
10 a directive that this is a process that they
11 are going to use.
12    **Q. Let's see, so the first one that**
13 **you have as an example here is 110176, which**
14 **I thought I had a PDF number on, but I**
15 **don't. Give me one second. I'll find it.**
16        **It is page 68 of the PDF,**
17 **okay, and this says, "Sat, Terry was there**
18 **when Kim spanked Cedric." Do you see that?**
19    A. I do.
20    **Q. And what is this an example of?**
21    A. I am sorry, can you scroll down
22 to -- I just want to look at the Bates
23 number. Okay. And again, I know we are on
24 page 68, but if you can go back a few pages

Page 571

1 so I can kind of orientate myself with this
2 file.
3    **Q. Sure.**
4    A. It's 81 pages.
5    **Q. Why don't we go to page --**
6    A. Why don't we go to the beginning?
7    **Q. No, we are not going to the**
8 **beginning. We can go to page 66.**
9    A. What's on page 65, though, is
10 going to be my question, of course.
11    **Q. Well, let's take a look at page**
12 **66. And, it says, 1 of 2. Do you see that**
13 **at the top of the page?**
14    A. I do.
15    **Q. And --**
16        MR. SWAMINATHAN: What's the Bates
17 of this page? Sorry, before you ask the
18 question, sorry.
19        MS. ROSEN: 110174.
20        MR. SWAMINATHAN: Okay.
21 BY MS. ROSEN:
22    **Q. Do you recall reviewing this GPR**
23 **when you were conducting your analysis?**
24    A. Not specifically.

Page 572

1    **Q. Do you recall a case where**
2 **reviewing a case where a mother was accused**
3 **of child abuse of her son that you**
4 **highlighted in your report?**
5    A. I do, yes.
6    **Q. And, in fact, take a look at page**
7 **57 of your report. Are you looking at page**
8 **57 of your report?**
9    A. I am.
10    **Q. And you see that's Kim Mathis?**
11    A. Yes.
12    **Q. Same RD number C687989?**
13    A. Yes.
14    **Q. So you have a, you know, a couple**
15 **of paragraph discussion about that case?**
16    A. I do.
17    **Q. So is that helping refresh your**
18 **recollection about the circumstances of this**
19 **particular case?**
20    A. Yeah. Just if you don't mind,
21 just give me one minute to read the -- kind
22 of the summary that I included. Would that
23 be all right?
24    **Q. Yes, that's fine.**

Page 573

1    A. Okay.
2    **Q. So is your recollection refreshed**
3 **about the circumstances of that particular**
4 **homicide investigation?**
5    A. Yes.
6    **Q. Is that a case that you spent a**
7 **little more time on than the others in**
8 **reviewing?**
9    A. I would say so, yes.
10    **Q. Let's go to this first page of**
11 **this general progress report. You see at**
12 **the top it says Kimberly Mathis?**
13    A. I do.
14    **Q. And it has the date at the top of**
15 **the report, right?**
16    A. Correct.
17    **Q. And then if you -- if we can**
18 **scroll down, you can see, "This morning**
19 **4:50, victim was awake, said that his**
20 **stomach hurt," and it goes on, and you see**
21 **that?**
22    A. I do.
23    **Q. Is it your understanding based on**
24 **your review of this file and this particular**

THOMAS TIDERINGTON, 10/06/2022                    Page 574..577

Page 574

1 GPR that this is memorializing an interview
2 with Kimberly Mathis?
3      A. It appears to be, yes.
4      Q. And then a couple of lines down,
5 it says, "Friday victim spent day at sister
6 Terry Mathis house."  Do you see that?
7      A. Yes.
8      Q. So based on that, is it your
9 understanding that Terry Mathis is Kimberly
10 Mathis's sister?
11     A. I believe that the report
12 indicated that was the sister, yes.
13     Q. And let's go to the next page now
14 of this general progress report, it says, 2
15 of 2, and it looks like -- it says at the
16 top there, "K. Mathis continued."  Do you
17 see that?
18     A. I'm sorry.  Yes, I do.
19     Q. So this is a continuation of the
20 interview of Ms. Mathis, right?
21     A. It appears to be, yes.
22     Q. And if we scroll down, it says,
23 "Got off work today at 4:00 a.m., went home,
24 Sebastian was there.  Victim was lying on

Page 575

1 laundry bag in bedroom, had neighbor call
2 police/ambulance."  Do you see that there?
3      A. Yes.
4      Q. And then if we go to the next
5 page, "Saturday, Terry was there when Kim
6 spanked Cedric."  Do you see that.
7      A. Yes.
8      Q. And that's the page, the Bates
9 number on that one is 110176 that appears in
10 your list on page 51?
11     A. Right.
12     Q. And it's my understanding based on
13 our earlier discussion about the other
14 examples in this paragraph is this is
15 information that you would expect to be
16 transcribed into a supplemental report,
17 right?
18     A. Well, I guess first, I would have
19 expected to see that perhaps on the GPR.  I
20 don't know what kind of document this was
21 written on.
22     Q. Does it appear to you that perhaps
23 that was the back side of the last page of
24 the GPR that was her note -- the note of her

Page 576

1 interview?
2      A. Can you scroll up and maybe right
3 on that?
4      Q. Can we go back to the preceding
5 page.  If you go back to the top of that
6 page and keep going.
7      A. Yes, yes.
8      Q. See the two holes at the top
9 there, the hole punch?
10     A. Yes.
11     Q. And scroll down, the next appears
12 to be the back side, right, of that report,
13 he ran out of space?
14     A. I think your conclusion is
15 correct.
16     Q. Okay, great.  All right.  So the
17 point of that particular page being noted on
18 page 51 is that the information should have
19 been transcribed into a supplemental report,
20 right?
21     A. It should have been.
22     Q. And then if we scroll to 1180,
23 just a couple more pages down, one more.
24 That's 110180, also referenced in that

Page 577

1 paragraph on page 51, right?
2      A. Yes.
3      Q. And it says, "Kim paged Terry
4 today around 5:00 p.m., said something like
5 Terry come here now.  I think Cedric is
6 dead."  Do you see that?
7      A. I do.
8      Q. And then does this appear to be
9 the back side of a GPR?
10     A. It looks like that, yes.
11     Q. Why don't we scroll up a page.
12 See there it says, Terry Mathis on the side?
13     A. Yes, I do.
14     Q. So does that appear to you to be
15 an interview with Kim's sister, Terry?
16     A. It appears to be, yes.
17     Q. And then actually if we scroll up
18 one more page, that says 2 of 2.  Let's go
19 up one more.  And that's 1 of 2, and then
20 for sure, it says, Terry Mathis across the
21 top, and gives her identifiers, and starts
22 memorializing the interview that was
23 conducted, right?
24     A. Yes, it does.

THOMAS TIDERINGTON, 10/06/2022                    Page 578..581

Page 578

1    Q.  And again, your point in including
2  the Bates Number 110180, which was the back
3  side of this set of GPRs was because it is
4  an example of information that should be
5  memorialized in a supplementary report,
6  right?
7       A.  Well, I guess before I answer
8  that, could I review the police report and
9  the supplement?
10      Q.  Well, I am just trying to
11  understand why it's in that paragraph, and I
12  thought that was what we had established
13  earlier is that these are examples of
14  information that you determined should have
15  been transcribed to a supplemental report?
16      MR. SWAMINATHAN:  Objection to
17  form and foundation.  The witness has asked
18  to be shown some single pages.  He's asked
19  to be able to see some other pages to answer
20  the question, and counsel has not done that,
21  so that's my objection.
22      Go ahead.  You can answer.
23      THE WITNESS:  And again, I am
24  trying to be as accurate as possible, and

Page 579

1  I'd like to -- and I'd like to look at the
2  police reports, and perhaps it would refresh
3  my memory.
4  BY MS. ROSEN:
5       Q.  So without reviewing the police
6  reports, you can't tell me why you included
7  110176 and 110180 on page 51 of your report?
8  Is that what you are saying?
9       A.  I believe it would be helpful if I
10  was allowed to refresh my memory is what I
11  am suggesting.
12      Q.  Unfortunately, I don't believe we
13  have time for you to scroll through an
14  81-page file at this moment.  Maybe at the
15  end of the dep if there is time, we can do
16  that.
17      A.  Okay.
18      Q.  But as we noted, Kim Mathis is
19  discussed on page 57 of your report as well,
20  correct?
21      A.  That's correct.
22      Q.  And if we go to page 56 of your
23  report at the top of page 56 -- or it should
24  be 57, yeah.  Back one.  There you go.

Page 580

1       It says, examples of relevant
2  information in police files that was
3  withheld from criminal defendants but should
4  have been disclosed, correct?
5       A.  That's correct.
6       Q.  So am I correct in assuming that
7  in this portion of the report, what you are
8  illustrating are examples where relevant
9  information, as memorialized in the police
10  reports, was not in the PD file; is that
11  right?
12      A.  Well, no.  I think -- well, I
13  think there would be several components to
14  that question.  It would have been whether
15  or not the GPR -- I am sorry, are you
16  raising your hand?
17      Q.  No.
18      A.  I thought you wanted me to stop.
19  It's whether or not the notes or the GPRs
20  were provided.
21      The other component or the
22  other part of that question in my mind was
23  was the relevant information in the GPRs
24  translated into a police report or explained

Page 581

1  in the police report?
2       So all of these examples may
3  not contain all of those issues, and that's
4  why I had asked to be allowed to refresh my
5  memory by looking at the entire file, so I
6  could give you a better answer.
7       Q.  Okay.  Let's take a look at your
8  discussion of the Kim Mathis file at page
9  57.
10      You wrote: "This case involves
11  the beating death of a child.  The
12  investigation revealed that Kim
13  Mathis, the child's mother,
14  admitted hitting the child on the
15  back with a belt four or five
16  times, and then he died two days
17  later.  The child died from blunt
18  trauma to the abdomen.  Detectives
19  pursued Mathis and according to
20  her testimony, beat, threatened
21  and intimidated her into signing a
22  statement that she had not read."
23      And the citation there is to
24  the Public Defender file, right?

THOMAS TIDERINGTON, 10/06/2022                    Page 582..585

Page 582

1    A. It is, yes.
2    Q. And then:
3       "The handwritten statement and
4    corresponding supplemental report
5    says that Mathis admitted hitting
6    the child in the back with a belt,
7    and also stomping on his abdomen
8    with her heel."
9       And then you cite to -- do you
10 know what you are citing to there? Is that
11 the RD file, or is that the investigative
12 file, do you know?
13   A. I believe it's the investigative
14 file.
15   Q. And then you say, "Mathis denied
16 to the CCSAO that she kicked or stomped on
17 her son," and you cite to the PD file. Do
18 you see that there?
19   A. I do.
20   Q. Then you go on to say, "The
21 investigative file includes handwritten
22 notes with a potential beating -- witness to
23 the beating. The handwritten note states
24 that Mathis's sister had been at the

Page 583

1 apartment when the beating occurred." And
2 that's a cite to 110176?
3    A. Right.
4    Q. Right? Which was the back side of
5 the continuation of the interview of Kim
6 Mathis, right?
7    A. That's correct.
8    Q. "But the clear/closed report says
9 that Mathis's sister was not at the
10 apartment during the beating and did not see
11 the child at that time of the report." And
12 then you cite to -- do you know if that is
13 the investigative file or RD file?
14   A. I believe it's the investigative
15 file.
16   Q. Okay. And then you say, "Given
17 that Mathis disputed that she had stomped on
18 her son's abdomen and testified that she was
19 coerced into giving her statement, it would
20 have been critical for the defense attorney
21 to know of all witnesses who were at the
22 house when the beating occurred." Do you
23 see that?
24   A. I do.

Page 584

1       (Whereupon, Tiderington
2       Deposition Exhibit No. 21 was
3       screen-shared/referenced.)
4 BY MS. ROSEN:
5    Q. Let's take a look at the PD file,
6 Exhibit 21. Now, did you notice in your
7 review of the files that a percentage of the
8 files that were produced by the PD were
9 redacted?
10   A. I did notice that, yes.
11   Q. Did you determine in any way
12 approximately what percentage of the files
13 were redacted?
14   A. I did not figure out a percentage,
15 but I would agree that there were several
16 files and several pages within the files
17 that were redacted.
18   Q. So in this particular file, the
19 first seven pages are redacted. So let's go
20 to page 8, and this is Bates stamped 29833,
21 which is the citation you provide in your
22 report for the proposition that Mathis
23 denied to the CCSAO that she kicked or
24 stomped on her son. Do you see that?

Page 585

1    A. I do.
2    Q. So this is the document that you
3 relied on to support your statement that
4 Mathis denied to the Cook County State's
5 Attorney's Office that she kicked or stomped
6 on her son, right?
7    A. Well, I have to read it.
8    Q. Well, it's your citation, right?
9    A. It's my citation, but I want to
10 read the report to make sure it's the same
11 document.
12   Q. You want to read the whole
13 document in order to determine whether or
14 not this is the document that you cited in
15 your report?
16   A. Well, if you are going to ask me
17 questions.
18      MR. SWAMINATHAN: He wants to just
19 look at this page that you have put in front
20 of him.
21      MS. ROSEN: Go ahead, read it.
22      THE WITNESS: Can you -- again, if
23 you can make it larger, please? Or I could
24 -- well, I was going to say I could pull it

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 10/06/2022                    Page 586..589

Page 586

1 up on my computer but ...
2        And can we go to the page just
3 before that as well?
4        MS. ROSEN:  Sure.  Why don't you
5 scroll up a page.
6        THE WITNESS:  All right.  So then
7 that's redacted, right?
8        MS. ROSEN:  Yes.  Everything is
9 redacted up until this page.
10        THE WITNESS:  Okay.
11        MR. SWAMINATHAN:  I have it up on
12 my computer and can make it bigger.  Is that
13 easier for you?
14        THE WITNESS:  I am good on this
15 one right now.  If we are going to read many
16 more, I will have to do that, though.
17        Can you scroll up just so I
18 can see the bottom of the page, please?
19 Thank you.
20        Next page, please.
21        And can you scroll up just a
22 little bit more, please.
23        Okay.
24

Page 587

1 BY MS. ROSEN:
2    Q.  So this is the document that you
3 cite to to support the proposition in your
4 report that Mathis denied to the CCSAO that
5 she kicked or stomped on her son, right?
6    A.  Well, you are on page 834.  Are
7 you talking about 833, or the whole
8 document?
9    Q.  I don't know.  It's your citation.
10 Let's go to 29833.  That's the page I asked
11 you to look at.  You asked to read the next
12 page.
13    A.  Right.
14    Q.  So you cited to this page.  Is
15 this the page that you are relying on to
16 support the proposition that the CCSAO --
17 that Mathis denied to the CCSAO that she
18 kicked or stomped on her son?
19    A.  That's my understanding, yes.
20    Q.  So it's your understanding that
21 this memorializes an interview between a
22 member of the Cook County State's Attorney's
23 Office and the criminal defendant?
24    A.  I believe that's what this

Page 588

1 document is.
2    Q.  So it says, "I went to interview
3 D," meaning Defendant "at CCJ today."  Do
4 you know what CCJ is an acronym for?
5    A.  I don't.  Cook County Jail.  I'm
6 sorry, Cook County Jail.
7    Q.  Correct, yes, Cook County Jail.
8        Okay, let's go to the very
9 last page of this report, which is -- hold
10 on, and I will give it to you, 21 of the
11 PDF.  If you read the last paragraph:
12        "After much discussion with
13        D's family and with D, I arranged
14        for them all to meet together in
15        the jury room.  The State wasn't
16        being unreasonable about the case
17        at all.  The State offered the
18        defendant 20 years if defendant
19        wanted to plead guilty.
20        Eventually defendant decided to
21        conference the case and Judge Egan
22        went along with that offer.
23        Defendant entered her plea of
24        guilty and got 20 years with 967

Page 589

1        days' credit."
2        Do you see that there?
3    A.  I do.
4    Q.  Does that indicate to you that, in
5 fact, this document represents the
6 memorialization of interviews and other work
7 done by Ms. Mathis's attorney and the Cook
8 County State's Attorney?
9    A.  Again, I am not an attorney.  I
10 don't know exactly, you know, if it was her
11 attorney, if it was the State Attorney.  I
12 don't think I can answer that.
13    Q.  Let's go to page 10 of the PDF.
14 All right, and if we go to the bottom of the
15 page at the entry that says 62599.
16        "The state informed me today
17        that the reason we don't have the
18        ME's report yet is because they
19        send their reports out for typing
20        and believe that the report was
21        finished.  In other words, they
22        screwed up and don't know why.  D
23        told me that her sister doesn't
24        want to talk to us without a

Page 590

1  lawyer. The sister won't even
2  talk to her own mother about what
3  happened. The sister, however,
4  has dumped her kids at her
5  mother's house and left.
6  Defendant gave me mom's name and
7  number, Ali Matisck, Texas with a
8  phone number because I want to
9  talk to the kids if mom won't
10  talk. Terry is acting like
11  somebody with something to hide.
12  I passed this on to Mary Clements
13  and told her to get to the kids
14  ASAP. The kids might be more
15  honest than Terry, especially if
16  Terry isn't around to influence
17  them."
18      Do you see that there?
19  A. I do.
20    Q. Did you review this entire file
21  when you were reviewing the PD file in
22  connection with the opinions that you
23  provided in this case?
24    A. In the Kim Mathis case or that

Page 591

1  portion?
2    Q. Yes.
3    A. I did. I can't say I remember
4  every word of the document, but I did, and
5  certainly there are things that I understood
6  and didn't understand.
7    Q. As you are looking at it now, does
8  it seem to make more sense that this is
9  actually the PD that is writing this
10  document and not the Assistant State's
11  Attorney?
12    A. It's quite possible, now that you
13  point that out, yes.
14    Q. Then if we look at the entry
15  below:
16      "6:28 this morning, Terry
17      Mathis, defendant's sister called
18      me. She wanted to make an
19      appointment to see me with her
20      9-year-old daughter. She was
21      certainly upset."
22      Do you see that?
23  A. I do.
24    Q. As I understood the point in your

Page 592

1  report, if we go back to your report, which
2  is Exhibit No. 6, your criticism is that
3  the notes about Terry Mathis being a
4  potential witness to the meeting should have
5  been disclosed to the defense attorney. But
6  quite clearly, from our review of the PD
7  file, the defense attorney was in contact
8  with the criminal defendant's sister, right?
9    A. It appears to be that way, yes.
10    Q. All right.
11      THE VIDEOGRAPHER:
12  Mr. Tiderington.
13      THE WITNESS: Yes, ma'am.
14      THE VIDEOGRAPHER: Can you tip
15  your screen down just a touch.
16      THE WITNESS: Sorry about that. I
17  tipped it back to read. My eyes aren't what
18  they used to be, and it's dark in here.
19      THE VIDEOGRAPHER: Thank you.
20  BY MS. ROSEN:
21    Q. Let's go -- you can take this
22  exhibit down, and put the -- oh, this is the
23  report, sorry.
24      Let's go to page 52 of the

Page 593

1  report, and this is the section that begins
2  with the heading "Criminal defense files
3  show that important investigative materials
4  are regularly withheld from criminal
5  defendants." Do you see that there?
6    A. I do.
7    Q. When you say "withheld," what do
8  you mean?
9    A. Generally speaking, that they
10  didn't receive them.
11    Q. Are you -- when you use the word
12  "withheld," are you intending to convey some
13  kind of intent? Meaning, are you intending
14  to convey that police officers were
15  deliberately withholding information, or is
16  it recklessness or negligence? Can you give
17  me an idea of your opinion on that?
18      MR. SWAMINATHAN: Objection to
19  form and foundation.
20      THE WITNESS: Yeah. I am just --
21  since we are kind of shifting gears, I just
22  want to kind of orientate myself to where we
23  are at with this, so if you can just bear
24  with me for one second.

THOMAS TIDERINGTON, 10/06/2022                    Page 594..597

Page 594

1        MS. ROSEN:  Yes.
2   BY MS. ROSEN:
3        Q.  Are you reading your report?
4        A.  I am just refreshing my memory.
5        Q.  About your report?
6        A.  Yes.
7        Q.  Let me know when you have finished
8   refreshing your memory about your report.
9        A.  Okay.
10       Q.  So back to my question about your
11  use of the word "withheld."  Are you
12  intending to convey intentional conduct by
13  police officers or reckless conduct or
14  negligence or none of the above?
15       A.  Well, I am making an observation
16  of what the evidence is, and what was
17  produced, what wasn't produced.  I use the
18  word "withheld" in the sense that it wasn't
19  provided.
20           Can I -- can I go to what the
21  individual intent of the officer was?  No, I
22  don't think I am doing that.  I do think
23  that there is a pattern of documents and
24  information that is typically or routinely

Page 595

1   being withheld, and I guess you could
2   conclude that if it's the responsibility of
3   the police department to provide all of this
4   information and it's not being done, it's
5   being withheld.
6        Q.  Let's talk about -- let's go to
7   page 53.  You say here, "Background on the
8   Area North investigative files and my file
9   review."  Do you see that there?
10       A.  Yes.
11       Q.  What's Area North?
12       A.  It's -- my understanding is it's
13  like what I call a precinct.  It's a
14  division within the Chicago Police
15  Department.
16       Q.  And is it your understanding that
17  in 1995 through 1998, the City of Chicago
18  had a precinct that was designated Area
19  North?
20       A.  Well, you are using -- I know I
21  use the word "precinct."  Maybe that wasn't
22  a good description.  Area where detectives
23  worked out of that was different than from
24  the headquarters, I guess, is my

Page 596

1   understanding.
2        Q.  I am not fixating on the word
3   "precinct."  I understood what you meant.  I
4   am fixating on Area North.  Was there an
5   Area North designation in the detective
6   division in the time period of 1995 to 1998?
7        A.  Yeah.  I'm sorry.  Yes, I believe
8   there was.
9        Q.  And then if we go to the last
10  paragraph on that page, it says:
11           "For file comparison purposes,
12           there were 105 criminal defense
13           files provided corresponding to 72
14           investigative files.  There were
15           some cases with multiple
16           defendants, so multiple criminal
17           defense files for a single
18           investigative file, or where the
19           PD file produced did not have a
20           corresponding investigative file,
21           or where the PD file either
22           contained no police documents or
23           so few that it was treated as
24           incomplete and not counted?"

Page 597

1           Do you see that there?
2        A.  I do.
3        Q.  So my understanding from that
4   sentence is you were provided, we said, 344
5   investigative files, right?
6        A.  That's correct.
7        Q.  And then from that, you received
8   corresponding criminal defense files of 105
9   but those matched to only 72 investigative
10  files, right?
11       A.  That's correct.
12       Q.  So that 344 number was reduced
13  down to 72, right?
14       A.  Yes.
15       Q.  For comparison purposes?
16       A.  For comparison, yes.
17       Q.  Then you have in Footnote 3, you
18  identify RD numbers that were files produced
19  by the Public Defender where there was no
20  corresponding investigative file, right?
21       A.  That's correct.
22       Q.  Was there a corresponding RD file?
23       A.  I don't know that answer as we sit
24  here today.

Page 598

1    Q.  And then there were also files
2  eliminated because they contained no police
3  documents or so few that they were treated
4  as incomplete?
5    A.  That's correct.
6    Q.  Right?
7    A.  Yes.  I'm sorry, I said --
8    Q.  I think we stepped over each
9  other.
10   A.  Okay, yes.
11   Q.  And those files are listed in
12 paragraph -- in Footnote 114, right?
13   A.  That's correct.
14   Q.  And then if we go to the next
15 page, it says:
16       "Finally I gave the City the
17       benefit of the doubt for purposes
18       of my analysis of criminal defense
19       files as compared to investigative
20       files.  To that end, I excluded
21       from my analysis criminal defense
22       files in which it appears that the
23       criminal defense file was
24       incomplete, as mentioned above in

Page 599

1       Footnote 114.  The files available
2       came from the Public Defender's
3       Office, so it is likely that in
4       many of these instances, the case
5       was transferred to private
6       counsel, and so the criminal
7       defense file may not be complete.
8       Those files contain a
9       strikethrough in Attachment F,
10      leaving 63 files for calculation
11      and analysis."
12      Correct?
13   A.  That's correct.
14   Q.  Okay.  So from the total universe
15 of investigative files that were provided to
16 you, the 344 for comparison purposes, you
17 only utilized 63 files; is that right?
18   A.  In comparing them to the Public
19 Defender's files?
20   Q.  Yes.
21   A.  Yes.
22   Q.  And then we already talked about
23 the fact that there are redactions in those
24 files, right?

Page 600

1    A.  We did.
2    Q.  And did you account for those in
3  any way?
4    A.  For the redaction of the files?
5    Q.  Yes.
6    A.  I assume that there was perhaps
7  some information that would be relevant that
8  was redacted.  I could only go based on the
9  documents that were provided that were not
10 redacted.  I had no -- I had no way of
11 determining what was underneath them.
12   Q.  So with respect to the files that
13 were redacted, did you have any
14 understanding of why particular documents
15 were redacted?
16   A.  I believe they were redacted by
17 the Public Defender's Office, but I don't
18 know that if I -- I don't know if it was
19 ever explained to me as the reason why they
20 were redacted.  I don't know.
21   Q.  And you don't foreclose the
22 possibility that relevant information could
23 have been redacted, right?
24   A.  Right.  I am sure it could have

Page 601

1 been, yes.
2    Q.  But despite the fact that many of
3  these files were redacted, the fact that
4  they were redacted did not cause you to
5  remove those files from your analysis, like
6  you did for some of these other -- under
7  these other circumstances that we just
8  discussed, right?
9    A.  That's -- that's a fair statement,
10 yes.
11   Q.  Okay.  Let's go to page 55 of your
12 report.  You say here, "My comparison of the
13 investigative files to corresponding defense
14 files revealed that every one of the
15 criminal defense files are missing documents
16 that were contained in the corresponding
17 police investigative files," correct?
18   A.  That's correct.
19   Q.  And how did you determine that?
20   A.  I looked at what was in the
21 investigative file and compared it to what
22 was in the Public Defender file.
23   Q.  You personally did that?  You
24 compared the pages of the files page by

THOMAS TIDERINGTON, 10/06/2022                    Page 602..605

Page 602

1  page?
2      A.  Well, I did a spot-check of that.
3  I can't take credit for every one, but my
4  intent was to -- if I was going -- by trying
5  to understand what the chart meant, I
6  spot-checked several cases, and it was
7  consistent with what the analysis was.
8      Q.  So you did not personally compare
9  all 63 investigative files to all 63 PD
10 files, correct?
11     A.  That's correct.
12     Q.  And you relied on the analysis as
13 reflected in the spreadsheet, correct?
14     A.  That's correct.
15     Q.  And you spot-checked that
16 analysis, right?
17     A.  That is correct.
18     Q.  And can you tell us what type of
19 spot-checking you did?
20     A.  I essentially went into some of
21 the cases and looking at the chart, I looked
22 at what was in the investigative file,
23 compared it to what was compared to what was
24 in the Public Defender's file.

Page 603

1      Q.  And you found no errors in the
2  chart?
3      A.  I don't believe I did, no.
4      Q.  Can you estimate how many
5  investigative files you compared to criminal
6  defense files personally?
7      A.  Not many.  I would say it was
8  under ten.
9      Q.  All right.  And then you say:
10         "The documents missing from
11         the defense attorney's files are
12         important investigative materials.
13         For example, the following
14         significant discoverable items
15         wereroutinely absent, and are
16         precisely the kind of documents
17         that should be routinely disclosed
18         to a criminal defendant under
19         normal police practices."
20         And then you identify
21 handwritten notes and general progress
22 reports, right?
23     A.  That's correct.
24     Q.  And that -- did you do that

Page 604

1  analysis in that paragraph yourself, or did
2  you take it from the spreadsheet attached?
3      A.  I took it from the spreadsheet.
4      Q.  And then with respect to
5  investigative file inventories, did you do
6  that analysis yourself, or did you take it
7  from the spreadsheet?
8      A.  That one was pretty easy to look
9  at.  I don't want to take credit for it.  I
10 know I looked closer at that, but I would
11 say I would still have to defer to the
12 spreadsheet.
13     Q.  And then you have this point about
14 issuing a subpoena.  And it says, "In many
15 of cases I reviewed, the defense attorney
16 issued a subpoena specifically for street
17 files, and that subpoena appears in the
18 investigative file, but not all of the
19 documents in the investigative file were
20 disclosed in response to the subpoena."
21         Do you see that?
22     A.  I do.
23     Q.  What was your understanding of --
24 do you have an understanding of why the

Page 605

1  subpoenas issued from the defense attorneys
2  used the phrase "street files"?
3      A.  I don't.  I guess I don't want to
4  opine on what they wrote in the subpoena.
5      Q.  How are you able to conclude that
6  there are documents missing from every
7  criminal defense file when a majority, if
8  not all, of the criminal defense files have
9  redacted pages in them?
10     A.  Well, again, you can only go on
11 the information that was provided.  If you
12 have better information that I can use for
13 comparison, I would certainly consider that.
14     Q.  When you reviewed the PD files and
15 saw the number of pages redacted, did it
16 cause you any concern?
17     MR. SWAMINATHAN:  Objection to
18 form.
19     THE WITNESS:  Well, the fact they
20 were redacted was not, I don't think, a
21 secret to anyone.  I think anyone involved
22 in this case knows that if they reviewed it
23 that they would know that those pages were
24 redacted.  So no particular concern, I

THOMAS TIDERINGTON, 10/06/2022                          Page 606..609

Page 606

1  guess.
2          I certainly wish I would have
3  had all of that unredacted information.  I
4  think it would have precluded this
5  discussion we are having today.
6  BY MS. ROSEN:
7      Q.  What do you mean it would have
8  precluded the discussion we are having
9  today?
10         THE VIDEOGRAPHER:  Eileen, I am
11  sorry, we are going to have to stop for just
12  a second.  I lost the last answer.
13         MS. ROSEN:  Yes.  We can go off
14  the record.
15         THE VIDEOGRAPHER:  Thank you.  We
16  are off the record at 4:40 p.m.
17         (Whereupon, a break was taken
18          at 4:40 p.m. to 4:52 p.m.)
19         THE VIDEOGRAPHER:  We are back on
20  the video record at 4:52 p.m.
21         MS. ROSEN:  And, Maribeth, can you
22  read back that last question that we didn't
23  get an answer to.
24

Page 607

1          (Whereupon, the record was
2           read as requested.)
3          THE WITNESS:  I guess I -- what I
4  meant was that I think we all would have
5  liked to have seen what the redacted
6  information was.  If we knew what it was, we
7  wouldn't be debating whether it was
8  important, or whether it was a police
9  report, or whether it was a work product
10  from the State Attorney -- from Public
11  Defender's Office.
12  BY MS. ROSEN:
13      Q.  Okay.
14      A.  But it is my understanding that
15  police reports were not redacted from these
16  files.
17      Q.  What is the basis of your
18  understanding that no police reports were
19  redacted from this file?
20      A.  I recall being told that by
21  plaintiff's counsel.
22      Q.  Which of plaintiffs' counsel told
23  you that no police reports were redacted
24  from the PD file?

Page 608

1      A.  Anand.
2      Q.  When did Anand tell you that no
3  police reports were redacted from the PD
4  file?
5          MR. SWAMINATHAN:  Hold on.  For
6  purposes -- just so you know, our
7  communications back and forth are
8  privileged.  However, to the extent there
9  were certain assumptions that you were asked
10  to make for purposes of your analysis, you
11  can identify those assumptions.  I think you
12  have already done that, but you can identify
13  the assumptions that you made.
14  BY MS. ROSEN:
15      Q.  When did Anand tell you that no
16  police reports were redacted from the PD
17  file?
18         MR. SWAMINATHAN:  Objection to
19  form and mischaracterizes testimony.
20         Again, you can identify what
21  assumptions, if any, you were told to make
22  by counsel.
23         THE WITNESS:  I think I did that.
24

Page 609

1  BY MS. ROSEN:
2      Q.  You think you did what?
3      A.  I made the assumption that police
4  reports were not redacted.
5      Q.  But you just told me Anand told
6  you that?
7          MR. SWAMINATHAN:  I didn't -- go
8  ahead.
9          THE WITNESS:  Well, I didn't say
10  that.  It was when I began looking at it.
11  BY MS. ROSEN:
12      Q.  So before you prepared your
13  report?
14      A.  Certainly.
15      Q.  And what exactly were you told
16  about whether or not police reports were
17  redacted from the PD file?
18         MR. SWAMINATHAN:  Well, once
19  again, you should not identify our
20  communications, but you can identify to the
21  extent I told you about any assumptions that
22  you were told to make by counsel, you can
23  identify them.
24         THE WITNESS:  Again, as I

THOMAS TIDERINGTON, 10/06/2022                    Page 610..613

Page 610

1 testified, I did not create this chart. I
2 spent a great deal of time trying to
3 understand what the chart contained. And I
4 do recall -- I mean, it's obvious that I
5 would be asked that question when I first
6 began looking at the chart, and it wasn't
7 today, and I was told that I could assume
8 that the redacted areas contained work
9 product from the Public Defender's Office:
10 BY MS. ROSEN:
11     Q. And were you provided an
12 explanation for why it was safe to make the
13 assumption that the redactions represented
14 work product from the Public Defender's
15 Office?
16     MR. SWAMINATHAN: You can answer
17 the question. You are only to testify as to
18 the assumptions you were told to make. So
19 to the extent you can answer that question
20 yes or no, you can do so.
21     THE WITNESS: I am sorry, can you
22 read that question, please.
23     THE REPORTER: Do you want me to
24 repeat it?

Page 611

1     THE WITNESS: Please.
2     (Whereupon, record read, as
3         requested.)
4     THE WITNESS: Yes.
5     MS. ROSEN: Now I lost the
6 question. Can you read my question back
7 again, sorry.
8     (Whereupon, record read, as
9         requested.)
10 BY MS. ROSEN:
11     Q. What was the explanation you were
12 provided?
13     MR. SWAMINATHAN: You can answer
14 as to whatever assumptions you were told to
15 make or explanation related to those
16 assumptions.
17     THE WITNESS: I think I have
18 answered that the -- I was told that I could
19 assume that police reports were not redacted
20 and that any redaction was attorney work
21 product.
22 BY MS. ROSEN:
23     Q. And you proceeded with your
24 analysis based on that assumption, correct?

Page 612

1     A. That is correct.
2     Q. And if, in fact, there were police
3 reports or other relevant information
4 redacted in the PD files, would that change
5 your conclusions that you reached in
6 connection with your comparisons between the
7 investigative file and the PD file?
8     MR. SWAMINATHAN: Objection to
9 form.
10     I am sorry, could you read
11 that back.
12     (Whereupon, record read, as
13         requested.)
14     MR. SWAMINATHAN: Objection to
15 form.
16     Go ahead.
17     THE WITNESS: Certainly, I would
18 consider that. I don't know if it would
19 change my opinion. It might bolster my
20 opinion.
21 BY MS. ROSEN:
22     Q. I mean, certainly, you'd have to
23 concede, right, that if the materials or the
24 majority of the materials that you have

Page 613

1 identified as being withheld because you
2 didn't find them in the PD files, if they,
3 in fact, are there and redacted for some
4 reason, then, obviously, that would change
5 your opinions, right?
6     A. Absolutely.
7     Q. Okay. And do you have any
8 understanding of where or how the PD
9 maintained their files from 1995 to 1998?
10     A. I do not.
11     I'm sorry, you said the PD. I
12 am assuming you mean Public Defender, not
13 the police department, is that --
14     Q. Thanks for checking that. Yes, I
15 meant the Public Defender.
16     A. No, I don't.
17     Q. Let's take a look at page 56 of
18 your report. Your discussion of Linox
19 Jackson and Tyrone Hammond.
20     A. Right.
21     Q. You say:
22         "Linox Jackson and Tyrone
23         Hammond were convicted of first
24         degree murder after allegedly

THOMAS TIDERINGTON, 10/06/2022                    Page 614..617

Page 614

1   shooting Jerry Hall during on May
2   19, 1995."
3        There is a typo there.
4        "The defense attorney's file
5   is missing extensive information
6   inculpating two other suspects
7   named Richell Akins (Tree) and
8   Ralph Mahomes, including any
9   suggestion that detectives
10  considered them suspects, such as
11  their IR histories and criminal
12  record search."
13       Do you see that there?
14  A.  I do.
15  Q.  Which defense attorney's file are
16  you referring to?
17  A.  The Public Defender's Office.
18  Q.  Was that Mr. Jackson's criminal
19  defense file or Mr. Hammond's criminal
20  defense file?
21  A.  I wouldn't know that.  I mean,
22  I -- again, I know you don't want to go back
23  and let me go through the files, but I would
24  have to do that to answer that question.

Page 615

1   Q.  But you didn't note it, right,
2   here in your report which file or files you
3   looked at?
4   A.  I did not.
5        (Whereupon, Tiderington
6        Deposition Exhibit No. 23 was
7        screen-shared/referenced.)
8   BY MS. ROSEN:
9   Q.  Let's take a look at Exhibit No.
10  23.  As you can see from the Bates stamp,
11  it's AR-PD, so the name on the first page
12  here is Linox Jackson.  Do you see that?
13  A.  I do.
14  Q.  Is this a file that you reviewed
15  in connection with your opinions in this
16  case, specifically the paragraph -- the
17  couple of paragraphs discussing
18  Mr. Jackson's case on page 56?
19  A.  I am just looking for the Bates
20  number in my report.
21  Q.  Well, you don't cite the PD file
22  in your report?
23  A.  Well, not there I don't, I guess
24  but ...

Page 616

1        That appears to be, yes.
2   Again, I'd have to -- if we can scroll
3   through there, I am certain something would
4   jar my memory, but I believe that's it, yes.
5   Q.  Well, obviously, it has his name
6   on it, right?
7   A.  Yes, it does.
8   Q.  And it says, charge murder, right?
9   A.  Yep, yes.
10  Q.  Let's go to the next page, that
11  says, M number.  Does that mean anything to
12  you?
13  A.  No.
14  Q.  And then the next page is
15  redacted, right?
16  A.  Correct.
17  Q.  And the next page, right?
18  A.  Yes.
19  Q.  Redacted?  And the next page is
20  redacted as well, correct?
21  A.  Correct.
22  Q.  As is the next page, right?
23  A.  Correct.
24  Q.  As is the next page, right?

Page 617

1   A.  Yes.
2   Q.  As is the next page, right?
3   A.  Yes.  All the pages that are --
4   don't have any writing on them are redacted.
5   Q.  Okay.  We can keep scrolling
6   through.  Okay, here we go.
7        So we are now on the eleventh
8   page of the 51-page file, and this is a
9   subpoena, right?
10  A.  Yes.
11  Q.  Issued, it looks like by the
12  Assistant Public Defender that was
13  representing Mr. Jackson, right?
14  A.  Yes.
15  Q.  But there's no stamps on it or a
16  date of the time served or anything like
17  that.  Do you see that?
18  A.  I don't see any timestamp on it.
19  I see a witness date of May 9th, but I don't
20  think that's what you are asking.
21  Q.  Where it says, clerk of the court,
22  that's not filled in?
23  A.  No, it's not.
24  Q.  And at the bottom, it says, "I

THOMAS TIDERINGTON, 10/06/2022          Page 618..621

Page 618

1 served this subpoena by handing a copy to,"
2 et cetera, et cetera, that's not filled in,
3 right?
4      A. You are correct, it's not.
5      Q. And in your review of all of these
6 files, you noticed subpoenas, right? You
7 commented on it. We just talked about that,
8 right?
9      A. Yes.
10      Q. And did you notice in those
11 subpoenas that when they were actually
12 issued and served that they had -- all that
13 information was filled out, right?
14      A. Well, I would have to go back and
15 look at them and see if all that information
16 was filled out.
17      Q. As you sit here today, you don't
18 recall that?
19      A. Well, I do recall. If you are
20 asking me if every one of them was filled
21 out, I can't say that they were. But the
22 premise that some of them were filled out, I
23 would agree with you.
24      Q. I know you are not a lawyer, but

Page 619

1 the fact that this part of the subpoena is
2 not filled out, does that indicate to you
3 actually this subpoena was not served?
4      A. That would not indicate that to
5 me. I mean, if you are telling me that's
6 what it indicates from a lawyer's
7 perspective, I would not disagree with you,
8 but that's not what it would indicate to me.
9      Q. Let's go to the next page. It's
10 another subpoena, right? This one to the
11 Illinois State Police, right?
12      A. Yes.
13      Q. For their forensic science
14 center -- to their forensic science center.
15 Do you see that?
16      A. Yes.
17      Q. Do you have any understanding of
18 what role in this time period, May of 2000,
19 that Illinois State Police, specifically its
20 forensic science center, had on homicides
21 that took place in Chicago?
22      A. I can make an assumption, but I
23 don't know if I'm right.
24      Q. You don't know, right? You don't

Page 620

1 know?
2      A. I don't know for sure, yes.
3      Q. And what's your assumption?
4      A. My assumption is that they were
5 the crime lab where evidence perhaps was
6 sent to them for analysis.
7      Q. Let's go to the next page.
8      A. Was I right?
9      Q. You are.
10      A. Thank you.
11      Q. The next page is -- looks like an
12 appearance form. You see that there?
13      A. Yes.
14      Q. But it's not signed, right?
15      A. That doesn't appear to be signed,
16 yes, you are correct.
17      Q. And the court number is blank. It
18 just says OO, which denotes the year?
19      A. Right, yes.
20      Q. CR, but there is no court number
21 there, right?
22      A. Yes, you're correct.
23      Q. And when you were reviewing this
24 file, did you notice that?

Page 621

1      A. Quite honestly, no.
2      Q. Let's go to the next page. It's
3 another copy of the same document, right?
4      A. Yes.
5      Q. And the next page, another copy of
6 the same document, right?
7      A. Yes.
8      Q. And the next page, and this is
9 something entitled, a motion for discovery,
10 right.
11      A. That's what it says, yes, motion
12 for discovery.
13      Q. And it's prepared on behalf of
14 Mr. Jackson, right, now comes the defendant,
15 Linox Jackson?
16      A. Yes.
17      Q. But once again, in the caption of
18 the case, that 00 CR, nothing is filled out,
19 right?
20      A. It's not.
21      Q. Let's go to the next. That's the
22 continuation of the motion for discovery,
23 right?
24      A. It is, yes.

THOMAS TIDERINGTON, 10/06/2022                    Page 622..625

Page 622

1    Q. And the next page. And the next
2 page. And the next page. One more.
3        If we scroll to the bottom,
4 and then it says, so those few pages there
5 were the motion for discovery, right?
6    A. Can I read them? I'm kidding. I
7 know it's late in the day, and I should not
8 be trying to be a comedian. But, yes,
9 that's what it appears to be, yes.
10   Q. And do you have any understanding
11 of what a motion for discovery is in the
12 context of a criminal case?
13   A. As it pertains to Chicago,
14 probably not.
15   Q. And then if we go one more page,
16 there is the signature page, but again, it's
17 not signed, right?
18   A. Correct.
19   Q. Let's go to page 23 of the PDF,
20 and this now appears to be a duplicate of
21 the document we just saw, right?
22   A. Yes.
23   Q. Let's go to 24, 25, 26, 27, and
24 that's a blank page, and then 28, and then

Page 623

1 29, and then 30. And with the exception of
2 the blank page that was inserted in the
3 middle there, that seems to be a duplicate
4 of the motion for discovery, right?
5    A. It appears that way.
6    Q. And let's go to page 31. And what
7 is that? It looks like another copy of the
8 motion for discovery, right?
9    A. Yes.
10   Q. And there is still no court number
11 in the caption, right?
12   A. Correct.
13   Q. Let's go to page 32, 33, 34, 35,
14 36, 37. And again, that's the signature
15 page without a signature. So that would be
16 now the third copy in this file for motion
17 for discovery, right?
18   A. It appears so, yes.
19   Q. Then let's go to the next page.
20 This looks like a form that appears to be
21 utilized by the Public Defender's Office
22 with respect to client interviews, right?
23 It's a blank? It's not filled in in this
24 case, right?

Page 624

1    A. Yes. Confidential, do not
2 disclose, client interview is what it says.
3    Q. And then the next page is a
4 continuation of that same form, right?
5    A. Yes.
6    Q. And the next page is another
7 subpoena, right? This one has a 00MC1
8 number on it. Do you see that at the top?
9    A. Yes.
10   Q. Does that mean anything to you?
11   A. No. I am assuming it's a case
12 number, but I don't know what significance
13 it is.
14   Q. Then let's -- you can see this
15 one, there is actually the stamp for the
16 clerk of the court?
17   A. Yes.
18   Q. If you keep scrolling, it's
19 actually stamped and served by. Do you see
20 that?
21   A. Correct, stamped by the Illinois
22 State Police.
23   Q. I think it's probably stamped by
24 the person that served the subpoena, and

Page 625

1 then stamped -- the signature, and then
2 stamped received by the Illinois State
3 Police, right?
4    A. Yes.
5    Q. And let's go to the next page.
6 This then is an appearance again in the
7 00MC1 case, right?
8    A. For some reason, the name's
9 crossed off, so I don't know if that's what
10 that means. If you tell me that that's what
11 it means, I would not argue with you.
12   Q. Well, I am referring to the court
13 number, it says case number and 00MC1, do
14 you see that?
15   A. Right, yes.
16   Q. Which is different than the ones
17 that weren't filled in were 00CR, right?
18   A. I believe so.
19   Q. If you don't --
20   A. Right.
21   Q. Sorry. But you don't know the
22 distinction between those two?
23   A. I don't.
24   Q. Let's go to the next page.

THOMAS TIDERINGTON, 10/06/2022                     Page 626..629

Page 626

1    A.  The only thing I wanted to point
2 out is the defendant's name was crossed off
3 there.
4        Q.  Yeah.  I don't have any idea why.
5 Maybe because it says Johnson and his name
6 is Jackson.
7            Let's go to the next page,
8 again, Johnson, same thing, but this time
9 it's not crossed out, right?
10   A.  But it's still wrong, yeah.
11       Q.  It's still wrong but not crossed
12 out?
13   A.  Yes.
14       Q.  Let's go to page 53.  This is
15 another subpoena that was served on the
16 Chicago Police Department.  You see the
17 stamps on it, right?
18   A.  Yes.
19       Q.  But again, this is on the MC1
20 case, not the CR case?
21   A.  Okay, yes.
22       Q.  Let's go to page 44.  This would
23 be Mr. Jackson's IR history, correct?
24   A.  It is.

Page 627

1        Q.  Let's go to the next page, another
2 subpoena, copy of the subpoena, I think, or
3 maybe it's another subpoena to the Chicago
4 Police Department, right?
5    A.  Correct.
6        Q.  Let's go to 46, an envelope,
7 correct?
8    A.  It appears to be an envelope.  I
9 can't tell if it's 8 1/2 by 11 or 11 by 14,
10 but it appears to be an envelope, yes.
11       Q.  Let's go to page 47.  Another
12 subpoena to the Chicago Police Department,
13 and this time to the office of the
14 superintendent.  Do you see that?
15   A.  Yes.
16       Q.  Let's go to the next page.
17 Another subpoena, this time to the records
18 division of the Chicago Police Department.
19 Do you see that?
20   A.  I do.
21       Q.  Let's go to the next page.  This
22 is another subpoena.  This time to the
23 photography division of the Chicago Police
24 Department, right?

Page 628

1    A.  Yes.
2        Q.  Let's go to the next page.  This
3 is another subpoena to the Chicago Police
4 Department.  This time to the bureau of
5 identification, right?
6    A.  Correct.
7        Q.  Let's go to the next page.  This
8 is another subpoena to the Chicago Police
9 Department, and this time to the
10 communications division of the Chicago
11 Police Department, right?
12   A.  Yes.
13       Q.  Let's go to the next page.  Oh, I
14 guess that's the end of the file.
15           So there are no -- other than
16 the IR history, there are no police reports
17 in this particular file, correct?
18   A.  That's correct, yes.
19       Q.  So under the rules that you had
20 established on page 53 about your analysis
21 where the PD file contained no police
22 documents, or so few that it was completed
23 as incomplete, it was not counted, and that
24 was the RD numbers were in Footnote 114,

Page 629

1 correct?
2    A.  I am sorry, the footnotes were in?
3        Q.  Sorry.  The RD numbers for the
4 cases that you did not analyze because the
5 PD file produced did not have police
6 documents, or so few that it was treated as
7 incomplete and not counted, those RD numbers
8 are listed in paragraph -- in Footnote 114
9 on page 53 of your report, right?
10   A.  Yes.  Just let me confirm that,
11 but I think you are correct.
12       Q.  Let me know when you are there.
13   A.  Yes.
14       Q.  And this particular case has an RD
15 number of Z219872, and it's not listed in
16 Footnote 114, right?
17   A.  I think I believe you are correct,
18 yes.
19       Q.  And, in fact, you actually
20 analyzed it specifically at page 56 of your
21 report?  It being this particular RD file or
22 investigative file?
23   A.  I did.
24       Q.  And your conclusions were that

THOMAS TIDERINGTON, 10/06/2022                    Page 630..633

Page 630

1  certain documents that were in the
2  investigative file weren't in the PD file,
3  right?
4      A.  That's correct.
5      Q.  But under your own rules of
6  engagement, this particular investigative
7  file should not have been counted, correct?
8      A.  I don't know that I -- how did you
9  draw that conclusion?
10     Q.  Well, this particular file has no
11 police documents in it, and I thought --
12     A.  Should it not have had police
13 documents in it?
14     Q.  Well, it was my understanding that
15 based on what you said on page 53 of your
16 report --
17     A.  Right.
18     Q.  -- was that if a PD file didn't
19 have police documents in it, you weren't
20 counting it, and you weren't analyzing it?
21     A.  I think I said if there was so few
22 documents in there.  I don't know if I said
23 if all the police reports were not in there.
24 Maybe I did.  I'll have to look at that

Page 631

1  again.
2      Q.  Well, we can read it again.  It's
3  on the screen.  It says:
4          "There were some cases where
5          multiple defendants -- with
6          multiple defendants, so multiple
7          criminal defense files for a
8          single investigative file, or
9          where the PD file produced did not
10         have a corresponding investigative
11         file, or where the PD file either
12         contained no police documents or
13         so few that it was treated as
14         incomplete and not counted."
15     A.  And you could be correct there.
16 Again, I think I reviewed 6,000 pages of
17 documents.  If I -- if I should have listed
18 this in a footnote, I will take that
19 responsibility.  And if I go back and
20 research it and think about it differently,
21 I will let you know as well.
22     Q.  So but going back to the fact that
23 on page 56, you make the claim that
24 documents were withheld because they were

Page 632

1  missing from the defense file, do you think
2  that's a fair claim to make in a case where
3  it's clear we have an incomplete file
4  because there are zero police reports in the
5  PD file?
6      A.  I am not going to argue that
7  point.  Like I said, I would have to go
8  back, and I know it's kind of late in the
9  day here, but I am not -- if what you are
10 saying is correct, and it appears that it
11 is, I should have used that, and I should
12 not have used that for the calculations.
13     Q.  Or as an example on page 56 of
14 your report, right?
15     A.  That's correct.  But like I said,
16 I would have to look at it, perhaps a fresh
17 look at it at some point.  But I don't know
18 what would have changed my opinion, and
19 perhaps that should have been -- perhaps
20 that was not the best example to use.
21     Q.  Let's go to your analysis of James
22 Edwards, Damaine Billups, Cornell Guthrie,
23 Alex Lane, N-Wata Mitchell, Willie Johnson.
24 In this particular case, you say that:

Page 633

1          "James Bryant was beaten and
2          stabbed to death by a group of
3          people on June 19th.  CPD engaged
4          in a sprawling investigation to
5          figure out who and how many people
6          had attacked him.  The
7          investigation led them to a
8          suspect named Tremaine Willis.
9          Investigators requested Willis's
10         IR sheet and a photograph in early
11         July of 1995, and then
12         investigators canvassed the
13         neighborhood and asked witnesses
14         to look at photos to see if they
15         could identify any of the
16         assailants."
17     And there is a citation to --
18 do you know, that's got to be an
19 investigative file, you think, or RD file?
20     A.  I believe it's the investigative
21 file.
22     Q.  And then it says:
23         "There is no reference to
24         Willis anywhere in the defense

THOMAS TIDERINGTON, 10/06/2022                         Page 634..637

Page 634

1      file.  Detective also pursued an
2      alternative suspect named Paul
3      Thomas, aka Johnson.  There is
4      information on Thomas missing from
5      the defense file, including, for
6      instance, his arrest report."
7          Do you see that there?
8      A.  I do.
9      Q.  Let's take a look and look at --
10  do you know when you say "defense file"
11  which of the six defendants are
12  referring to?
13     A.  If we could pull up Z273605, I
14  might be able to figure it out.  As we sit
15  here, I don't think I can recall, or I don't
16  recall which suspects, or suspect, I guess.
17     Q.  When you say we could pull up
18  Z273605, what do you mean?  Which file
19  related Z273605?
20     A.  The investigative file.
21     Q.  All right.  And you think the
22  investigative file will help you to figure
23  out which defense file you looked at?
24     A.  Well, I am trying to -- you are

Page 635

1  asking me to answer questions about this
2  file, and it would be helpful to look at it
3  from the beginning and, you know, maybe I
4  can walk you through the analysis, and how I
5  concluded it and my conclusions to it.
6      Q.  But I had a specific question,
7  which was, do you know which defense file?
8  There are six -- let me just finish my
9  question.  There are six defendants that --
10     A.  Okay.
11     Q.  -- that apparently were charged in
12  this case, right?
13     A.  Correct.
14     Q.  And so my question is:  When you
15  draw conclusions about what's in the defense
16  file, I would like to know if you remember
17  which defense file you were reviewing to
18  draw those conclusions?
19     A.  All right.  I understand that, and
20  like I said, I would like to look at all six
21  of the files, and I could perhaps then
22  answer that question.
23     Q.  Well, see, we don't have six files
24  because they weren't produced.  So I am

Page 636

1  trying to figure out -- we only have a
2  couple of the files, and I am trying to
3  figure out --
4      A.  Which ones -- I'm sorry, which
5  ones do you have?
6      Q.  Well, we have Willie Johnson.
7  Would you like to take a look at Willie
8  Johnson?
9      A.  That might be the lucky number, so
10  let's take a look at that.
11     Q.  Okay.  Let's take a look at
12  Exhibit No. 25.
13          (Whereupon, Tiderington
14          Deposition Exhibit No. 25 was
15          screen-shared/referenced.)
16  BY MS. ROSEN:
17     Q.  Now, this is an over 1,000 page
18  criminal defense file for Mr. Johnson.
19     A.  Correct.
20     Q.  And if we were to try to flip
21  through every page of this file, we would be
22  here until tomorrow, so I am not going to do
23  that.  I am going to allow you to look at --
24  if we ever get to portions of the file that

Page 637

1  aren't redacted, let's see if I can get
2  there.
3          So if we go to page 34 of the
4  PDF, so the first 33 pages are redacted of
5  this file.  And then we have this
6  supplementary report that describes who the
7  victim is.  Do you see that?
8      A.  Right.  And that's -- and it
9  indicates it's page 1 of the supplemental
10  report.
11     Q.  Correct.  And we can go to the
12  next page of the supplemental report, and it
13  has some identifying information about where
14  the crime happened, and then it identifies
15  some witnesses and people that were
16  interviewed, right?
17     A.  Right.
18     Q.  And then you can, if you want to
19  read where it starts that investigation
20  part, that first couple of paragraphs, and
21  let me know if that refreshes your
22  recollection at all about which of the
23  criminal defense files you were analyzing?
24     A.  I mean, this will be helpful

THOMAS TIDERINGTON, 10/06/2022                    Page 638..641

Page 638

1 because the other question was, were the
2 police reports redacted.  So my
3 recollection, I believe the original report
4 is in here as well, so right now we are
5 looking at the supplemental report.  But if
6 we continue through, I think you will find
7 that the original report is also in here on
8 this particular case.
9      Q.  When you say the original report,
10 what do you mean, the original -- the
11 general defense case report?
12      A.  Yes.
13      Q.  That doesn't tell us whether other
14 reports were redacted, right?  Like GPRs
15 could have been redacted?
16          MR. SWAMINATHAN:  Objection to
17 form and foundation.
18          THE WITNESS:  I guess it could
19 have been, but I guess to -- I guess I
20 thought your previous question -- and when I
21 said that it was my understanding that
22 police reports were not redacted, this -- I
23 want to go through this file to confirm what
24 I told you.

Page 639

1 BY MS. ROSEN:
2      Q.  Well, you don't know.  First of
3 all, that can't confirm it.  You have no
4 idea what's been redacted.  All you will
5 know is that there are police reports in
6 this file.
7          MR. SWAMINATHAN:  Objection to
8 form.
9 BY MS. ROSEN:
10      Q.  And we are certainly not going to
11 spend hours comparing the investigative file
12 to the thousand page PD file?
13      A.  Well, that's --
14          MR. SWAMINATHAN:  Objection to
15 form, foundation, and argumentative.
16 BY MS. ROSEN:
17      Q.  So you have testified that you
18 were operating under the assumption that all
19 of the redacted pages represented work
20 product, so that is the assumption you were
21 working under, and that is the assumption
22 that we will all work under with respect to
23 your analysis in the case.  We are certainly
24 not going to take hours at the twelfth hour

Page 640

1 of your deposition to have you try and
2 figure out if that's true or not.  If you
3 want to do that on your own time, then feel
4 free.
5          MR. SWAMINATHAN:  I don't know if
6 there is a question pending, but I don't
7 think that's what he asked for, but go
8 ahead.
9          MS. ROSEN:  Thanks.
10 BY MS. ROSEN:
11      Q.  So the question that started all
12 of this was there were six people charged in
13 this case, and you are making assertions
14 about information that was withheld, and so
15 you wanted to look at this particular file
16 to help answer that question.
17          Is this the file that you
18 reviewed, Mr. Johnson's file, in arriving at
19 your conclusions that certain materials were
20 missing from the criminal defense file?
21          (Ms. Aguilar exited the
22           deposition proceedings.)
23          THE WITNESS:  I believe I reviewed
24 all of the defendants' case files.

Page 641

1          (Whereupon, Tiderington
2           Deposition Exhibit No. 24 was
3           screen-shared/referenced.)
4 BY MS. ROSEN:
5      Q.  Let's look at -- you indicate --
6 well, let's also take a look at what we will
7 mark as -- or what has been marked as
8 Exhibit 24, which is the investigative file
9 in connection with this case, and if we
10 could go to page 393 of the PDF.
11          No, that's not right.  Can you
12 scroll down to 403.  Sorry, let me find it.
13          Let's go to 293, sorry.
14          Okay, so 293 is -- we are
15 looking at the investigative file.  If you
16 can scroll so you can see the Bates stamp.
17      A.  I'm sorry, just to clarify, which
18 investigative file are we looking at at this
19 point?
20      Q.  The one for Z273605.
21      A.  Okay.
22      Q.  You have an understanding that
23 when there is a murder that there is an
24 investigative file that's prepared, and

THOMAS TIDERINGTON, 10/06/2022                    Page 642..645

Page 642

1 there is only one investigative file,
2 despite the fact that multiple people could
3 get charged, right?
4      A. Well, there was not one. I mean,
5 that's part of the problem. There is not
6 one file. There's parallel files and --
7      Q. Have you seen more than one
8 investigative file?
9      A. No, no, I am not -- no, if there's
10 multiple defendants like the Soto case,
11 there is one investigative file, and there
12 were multiple defendants.
13     Q. Right, that was my question.
14     A. Okay.
15     Q. That was what I said,
16 investigative file. I wasn't talking about
17 parallels files or anything else,
18 investigative file.
19     A. Okay.
20     Q. But the same isn't true on the
21 defense, right? Every defendant has their
22 own criminal defense file, right?
23     A. I believe that's the case, yes.
24     Q. Okay.

Page 643

1      A. They would have a different
2 attorney assigned to them, yes.
3      Q. Right. So if we go to -- we are
4 in the investigative file. If we scroll to
5 the bottom so you can see the Bates. So the
6 Bates number is 40334, and that is one of
7 the documents that you indicate is missing
8 from the defense file, right? This is an
9 arrest report for Mr. Thomas, somebody that
10 you believe is an alternative suspect,
11 right?
12     A. I am sorry, pull that up or scroll
13 that up a little bit just so I can confirm,
14 if you can.
15     Q. So that he can see the name.
16     A. Yeah, I just want to make -- make
17 that a little larger.
18          I can't read that. If you can
19 scroll up a little bit and a little bit more
20 to the left.
21     Q. Do you see Thomas?
22     A. I see Thomas. I am trying to read
23 the narrative.
24     Q. The narrative of what?

Page 644

1      A. Well, the rest of the page.
2      Q. Okay.
3      A. I can't make that out after
4 arrest. And if you could perhaps make that
5 just a little bit larger.
6      Q. Above arrested, after identified
7 by RO's as a wanted person in CPD daily
8 bulletin, wanted for murder, probable cause
9 to arrest.
10     A. Thank you. I appreciate the help.
11     Q. Sure. So this is a document that
12 you say was not in the criminal defense
13 file, right?
14     A. That's my understanding, yes.
15     Q. Let's go back to Exhibit No. 25,
16 and let's go to page 393 of Exhibit No. 25.
17 Isn't that the same arrest report we were
18 just looking at?
19     A. And, I'm sorry, the Bates number
20 at the bottom of the page there is what?
21 It's from the Public Defender's Office,
22 correct?
23     Q. Yes.
24     A. All right. And for which

Page 645

1 defendant is this relating to?
2      Q. This is the Willie Johnson file.
3      A. I agree with you, it is in Willie
4 Johnson, yes.
5      Q. Let's go back to Exhibit 24, if we
6 could go to page 567 of the PDF. If you
7 look at page 57 of your report, you say -- I
8 guess it starts at the bottom of 56, you
9 say:
10          "Finally, while the
11      supplementary report states that a
12      witness named Ms. Smith saw three
13      or four suspects chasing the
14      victim, there is a handwritten
15      note stating that Ms. Smith said
16      that it might have been only two
17      people who were chasing the
18      victim."
19          And the citation for that is
20 RFC-Solache/Reyes 40609. And as you will
21 see, this is the Bates number at the bottom
22 matches the cite in your report, right?
23     A. Correct.
24     Q. Can you tell me where in this note

THOMAS TIDERINGTON, 10/06/2022                    Page 646..649

Page 646

1  it says that Ms. Smith said it might have
2  been only two people who were chasing the
3  victim?
4      A. Ms. Smith called the police in
5  something two, three, four suspects chasing
6  him.
7      Q. So it says two, three, or four,
8  right?
9      A. It does.
10     Q. Which is consistent with the
11 supplementary report, right?
12     A. I would have to look at the
13 supplemental report.
14     Q. Well, look at what you say about
15 the supplemental report in your report. It
16 says, while the supplemental report states
17 that a witness named Ms. Smith saw three or
18 four suspects chasing the victim.
19     MR. SWAMINATHAN: Objection to
20 form and foundation.
21     THE WITNESS: Well, I guess maybe
22 I am not following the line of questioning,
23 but the note says -- and again that would
24 be, you know, was it two, was it three or

Page 647

1  was it four suspects chasing him? Would be
2  my -- I guess my question that the officer
3  should have clarified in this police report.
4  That's why I wanted to go back and look at
5  the supplemental report.
6  BY MS. ROSEN:
7      Q. Is your quarrel with the fact that
8  the police report says three or four and the
9  note says two, three, or four?
10     A. No, it's not necessarily a
11 quarrel. But if you are asking me to be
12 concise, I would like to go back and look at
13 that supplemental report to refresh my
14 memory to explain what I -- what I meant in
15 that paragraph or in that sentence.
16     Q. Well, you don't cite the
17 supplemental report, so there is no way for
18 us to find it quickly.
19     A. Do you want me to look for it?
20     Q. No, I do not.
21         We can take those exhibits
22 down and go back to his report.
23         Exhibit No. 6, let's go to
24 page 57. This is Jose Melendez, A315294.

Page 648

1      Actually, I'm sorry, can we go
2  back to Exhibit No. 25. In your report, you
3  also indicate that there was -- the
4  investigation led to a suspect by the name
5  of Tremaine Willis, and that there is no
6  reference to Willis anywhere in the defense
7  file, right? That's on page 56 of your
8  report? We talked about that a minute ago.
9      A. Yeah, but I am getting somewhat
10 confused because we are going forward and
11 then we are jumping back. So now we are
12 back to the James Edwards case, is that what
13 you want me to --
14     Q. Yes. I am back to RD number
15 Z273605.
16     A. Okay.
17     Q. And we are now looking at
18 Mr. Johnson's Public Defender file again,
19 which was the file we were looking at
20 before.
21     A. Okay.
22     Q. And in your report, which I think
23 you also have in front of you, so we don't
24 have to pull it up on the screen if you need

Page 649

1  to refresh your recollection, you note that
2  the investigation led to a suspect named
3  Tremaine Willis, right?
4      A. That's correct.
5      Q. And then you reference at the
6  bottom of that first paragraph, there is no
7  reference to Willis anywhere in the defense
8  file, right?
9      A. That's correct.
10     Q. Let's go to page 461 of the PDF,
11 what is that?
12     A. I believe it's a criminal history.
13     Q. For who?
14     A. Willie.
15     Q. Is that the same person as
16 Tremaine Willis?
17     A. It appears to be, yes.
18     Q. So, in fact, there is a reference
19 to him in the defense file, right?
20     A. Well, I guess you are still
21 looking at the Willie Johnson defense file,
22 correct?
23     Q. Correct.
24     A. Well, we are back to -- we are

THOMAS TIDERINGTON, 10/06/2022                    Page 650..653

Page 650

1 back to exactly where we were a few minutes
2 ago. We would have to look at the other
3 files to see if he is referenced in all of
4 those.
5     Q. We don't have all of the files, so
6 we cannot look.
7     A. I think I have them, and I can
8 find it if you'd --
9     Q. You think you have all six of
10 these defense files?
11    A. I would look. I would like to
12 look. I don't know if I do or not.
13    Q. Well, okay, if we have time at the
14 end, I will let you look.
15    A. We may want to, if we could take
16 like a five-minute when you are done with
17 that before we move on to the --
18    Q. A break, you mean?
19    A. Yeah. My wife is texting me, and
20 I don't know if there is an issue, or she
21 just wants me to bring bread home.
22       MS. ROSEN: Sure, we can take a
23 break here.
24       THE VIDEOGRAPHER: We are off the

Page 651

1 video record at 5:43 p.m.
2       (Whereupon, a break was taken
3        at 5:43 p.m. to 5:53 p.m.)
4       THE VIDEOGRAPHER: We are back on
5 the video record at 5:53 p.m.
6 BY MS. ROSEN:
7     Q. Let's go back to your report,
8 Exhibit No. 6, page 57. We have a
9 discussion here about Jose Melendez. It's
10 A315294. Do you see that?
11    A. I do.
12    Q. And you say, "For this case, I
13 focused on comparing the investigative file
14 and permanent retention file, given the
15 redactions in the PD file." Do you see
16 that?
17    A. I do.
18    Q. And so I take it, in this
19 particular case, there were so many
20 redactions in the PD file that you did not
21 believe that you could compare the
22 investigative file to the PD file for
23 purposes of your analysis; is that right?
24    A. That's fair, yes.

Page 652

1     Q. So why did you go through the
2 exercise of comparing the investigative file
3 to the permanent retention file or RD file?
4     A. I probably should not have. I
5 mean, I -- it was probably not a great
6 example. I am not arguing that point.
7     Q. Okay. And if you go to the last
8 -- the last sentence of the discussion about
9 Jose Melendez, it says, "Ms. Pantoja's
10 undisclosed handwritten statement, on the
11 other hand, states that she did not know how
12 Mr. Melendez got to her house."
13       Do you see that?
14    A. I do.
15    Q. But you have no basis to say the
16 handwritten statement was undisclosed,
17 right? You didn't look at the PD file, or
18 you couldn't compare the PD file because of
19 the redactions, correct?
20    A. That's a fair conclusion, yes.
21    Q. And we already discussed Kim
22 Mathis.
23       Let's see, with respect to the
24 next witness -- I mean the next criminal

Page 653

1 defendant after Kim Mathis, so on page 58 of
2 your report, Ardell Clemons.
3     A. Okay.
4     Q. So in this case you note that:
5       "This case involves the
6       stabbing death of a woman named
7       Nyree Johnson. The investigation
8       revealed that Ardell Clemons, the
9       victim's friend, had been living
10       with the victim at the time of the
11       murder. Detectives pursued
12       Clemons who had fled to Florida.
13       Clemons was arrested just a few
14       days after the crime."
15       Do you see that?
16    A. Yes.
17    Q. And then you say, "The
18 investigative file includes several
19 documents that could have been relevant to
20 the defense but were not in the Public
21 Defender's file." Do you see that?
22    A. I do.
23    Q. And you note -- you identify a
24 handwritten note about another potential

THOMAS TIDERINGTON, 10/06/2022                    Page 654..657

Page 654

1 suspect who had previously worked with the
2 victim and was dating the victim, right?
3      A. Yes.
4      Q. And you cite the investigative
5 file, I think, for that?
6      A. Correct.
7            (Whereupon, Tiderington
8             Deposition Exhibit No. 26 was
9             screen-shared/referenced.)
10 BY MS. ROSEN:
11      Q. If we could take a look at Exhibit
12 No. 26 and go to page 194 of the PDF, scroll
13 down. So that's 44288, right? So that's
14 your citation, right, in your report?
15      A. Yes, yes, it is.
16      Q. And so this is the note that you
17 are referencing when you say, "One
18 handwritten note not in the PD file about
19 another potential suspect who previously
20 worked with the victim and was dating the
21 victim." Do you see that?
22      A. I do.
23      Q. What information is contained in
24 this report that leads you to conclude he is

Page 655

1 another potential suspect who previously
2 worked with the victim and was dating the
3 victim?
4      A. I would have to look at the -- I
5 think that information is contained in the
6 police report or the supplement.
7      Q. I see, okay. Then if we go to
8 page 166 of the investigative file. This is
9 the lease application that you reference,
10 right?
11      A. Yes.
12      Q. And you state, "Another document
13 in the investigative file but not in the PD
14 file is an apartment lease noting that the
15 victim left her former residence due to
16 domestic violence, what would have been a
17 lead into another potential alternative
18 suspect."
19           Do you see that there?
20      A. I do.
21      Q. And is that based on the fact that
22 -- well, why do you conclude -- who is the
23 potential alternative suspect that you are
24 inferring from this lease?

Page 656

1      MR. SWAMINATHAN: Objection to
2 form.
3      THE WITNESS: I believe it was a
4 boyfriend or somebody that had leased the --
5 that was listed on the lease with her.
6 BY MS. ROSEN:
7      Q. How do you know? What information
8 do you have about that?
9      A. I think there's something, again,
10 in the police report that would tie in the
11 significance of the fact that there was a
12 domestic violence incident. And, of course,
13 any time you have a young lady stabbed to
14 death, you would look at her relationships,
15 her acquaintances, and it certainly is
16 something that I'm sure a reasonable
17 investigator would have considered.
18      Q. And when you are evaluating these
19 materials, the note that we just looked at
20 and this lease, are you evaluating it in the
21 context of the information that you learned
22 from reviewing the PD file?
23      A. I don't know if I follow that
24 question.

Page 657

1      Q. Sure. When you were -- when you
2 are evaluating those notes and concluding
3 that these are potential suspects, and then
4 you say that could have been relevant to the
5 defense but were not in the Public
6 Defender's file, right?
7      A. Correct.
8      Q. Are you evaluating the criminal
9 defense file to evaluate what type of
10 defense they were offering in the particular
11 case?
12      A. No. My position is that any
13 reasonable officer would understand that
14 everything in a homicide file should be
15 turned over to the prosecutor.
16           (Whereupon, Tiderington
17            Deposition Exhibit No. 27 was
18            screen-shared/referenced.)
19 BY MS. ROSEN:
20      Q. Let's take a look at Exhibit No.
21 27, which is Mr. Clemons.
22      A. I'm sorry, and just to clarify
23 that point, just to make sure that I am
24 clear on that. I can't think of anything in

THOMAS TIDERINGTON, 10/06/2022                    Page 658..661

Page 658

1 an investigative file, in a homicide
2 investigative file that would not be
3 relevant to an investigation; and,
4 therefore, it would have been required to be
5 turned over by virtue of a subpoena or work
6 product to the -- for the State's Attorney.
7      Q.  But you didn't -- you didn't look
8 at any of the State's Attorney's files to
9 see if any of these materials that you say
10 were not in the criminal defense file were
11 actually in the State's Attorney's files,
12 right?
13      MR. SWAMINATHAN:  Can you read
14 that question back.
15      THE WITNESS:  Yeah.
16      (Whereupon, the record was
17      read as requested.)
18      THE WITNESS:  That is correct.  I
19 did not have access to any State Attorney
20 files.
21 BY MS. ROSEN:
22      Q.  And were you ever told that we did
23 actually receive the State Attorney files?
24      A.  I think I was told that, yes.

Page 659

1      Q.  Did you ask to review them?
2      MR. SWAMINATHAN:  Objection to
3 form and foundation.  It was produced in
4 February after disclosure.
5      MS. ROSEN:  Okay.
6 BY MS. ROSEN:
7      Q.  Did you ask to review them?
8      MS. ROSEN:  It didn't stop you
9 from giving him more materials in the last
10 couple of weeks.
11 BY MS. ROSEN:
12      Q.  Did you ask to review the State's
13 Attorney's files?
14      A.  Your question is, did I ask?  I
15 think when I first began examining the case
16 and the chart, I was told what was available
17 and that files from the State Attorney's
18 Office, I was instructed or told that they
19 were not available.
20      Q.  But at some point, you knew they
21 became available, right?
22      A.  I think I found that out today.
23      Q.  Today?
24      A.  Yes.

Page 660

1      Q.  Okay.  If all of the
2 information --
3      A.  Maybe yesterday.  I'm sorry, maybe
4 yesterday, or maybe within the last couple
5 of days it would have been.  It's a late
6 afternoon.
7      Q.  If you found out that the
8 materials you have identified in your report
9 as being withheld are actually contained in
10 the Cook County State's Attorney's files,
11 would that change your conclusions that the
12 Chicago Police Department withheld those
13 materials?
14      A.  If all the materials in the police
15 department investigative files were turned
16 over to the State Attorney's Office, I think
17 that would have been proper and reasonable
18 conduct on the part of the investigators.
19      Q.  Going back to Mr. Clemon's case
20 for just a second, if we could take a look
21 at -- actually, let's -- yeah, let's take a
22 look at page 414 of the PDF.
23      Do you recall that Mr. Clemons
24 was picked up in Key West?

Page 661

1      A.  I recall that he was in Florida.
2 I knew that he fled to Florida.  I don't
3 know if I remember it was Key West, but yes.
4      MR. SWAMINATHAN:  Smart man.
5 BY MS. ROSEN:
6      Q.  And do you recall when you were
7 reviewing his PD file in connection with
8 your analysis in this case that he was
9 interviewed by police officers from Key West
10 and admitted that he called the Chicago
11 Police Department and confessed to the crime
12 and then confessed to the crime to the Key
13 West police officers?
14      A.  I am refreshing my memory.  I
15 vaguely recall that, yes.
16      Q.  And did that, the fact that
17 Mr. Clemons called the Chicago Police
18 Department from Florida and confessed to the
19 crime, and then confessed to the Key West
20 police officers that picked him up and
21 interviewed him impact your analysis in any
22 way?
23      A.  Again, I'd have to go back and
24 read the details.  I don't know exactly what

THOMAS TIDERINGTON, 10/06/2022                    Page 662..665

Page 662

1 he told the investigators from Key West, and
2 if it comported with what he told the
3 Chicago investigators.
4    Q. Did you notice as you were
5 reviewing this file, this PD file, how many
6 pages were redacted?
7    A. I don't recall that as I sit here
8 today.
9    Q. All right. Let's -- we can take
10 this exhibit down. Let's go back to the
11 report, Exhibit No. 6. Exhibit No. 6 if we
12 look at the bottom of page 58, this is
13 Mr. Oscar Soto's case. This is another one
14 that you reviewed, right?
15        Let me strike that. This is
16 another case that you specifically analyzed
17 and compared the investigative file to the
18 Cook County Public Defender file, correct?
19    A. That is correct.
20    Q. How did you -- you have
21 identified, I believe it's eight.
22    A. I am sorry. I didn't hear that
23 question.
24    Q. I'm sorry, I mumbled.

Page 663

1        In this section of your
2 report, you identified eight examples of
3 cases where you sort of did a deeper dive
4 and did comparisons between the
5 investigative file and the Public Defender
6 file, correct?
7    A. That's correct.
8    Q. How did you choose these
9 particular files?
10    A. I think a combination of me
11 picking some of them and some of the cases I
12 was asked to look at by counsel.
13    Q. Can you tell us which cases
14 counsel asked you to look at?
15    MR. SWAMINATHAN: That would
16 require you to reveal our correspondence
17 communications, so I would tell you not to
18 answer that question. I guess you can
19 answer the question yes or no, can you
20 identify which ones. You can answer that
21 question.
22    THE WITNESS: I don't recall which
23 cases specifically I was asked to look at.
24

Page 664

1 BY MS. ROSEN:
2    Q. When you were asked to look at the
3 cases, were you provided any information
4 about why the particular cases were
5 selected?
6    MR. SWAMINATHAN: You can answer
7 that question yes or no.
8    THE WITNESS: No.
9 BY MS. ROSEN:
10    Q. Did counsel, plaintiff's counsel
11 identify all of the cases for you?
12    A. I'm sorry, all of -- all of the
13 eight or all of the cases in the chart?
14    Q. Of the eight.
15    A. No.
16    Q. They, obviously, identified all
17 the cases in the chart. They have created
18 the chart?
19    A. No.
20    Q. So, no, they didn't pick all of
21 them?
22    A. No.
23    Q. But as you sit here today, you
24 can't tell us if they picked one or seven,

Page 665

1 or anything in between, right?
2    A. I think I picked Melendez, and it
3 was a terrible pick on my part. So beyond
4 that, I really don't have a recollection.
5    Q. Let's take a look at Mr. Soto, who
6 was discussed at the bottom of page 58 on to
7 page 59. And it says:
8        "This case involves a
9        gang-involved shooting from one
10        vehicle to another vehicle. The
11        victim was a man named Miguel
12        Salas, who was shot on July 17,
13        1997, and died a few days later.
14        Detectives investigating an
15        unrelated aggravated battery
16        decided to show a photo array from
17        that case to the witnesses in the
18        Salas shooting. Three witnesses
19        allegedly identified two
20        individuals as a passenger and the
21        shooter on July 20, 1997. Later,
22        on July 23, 1997, after Detective
23        Guevara was apparently assigned to
24        the case, a different man, Oscar

THOMAS TIDERINGTON, 10/06/2022                    Page 666..669

Page 666

1    Soto was identified as the
2 shooter."
3         Do you see that?
4    A. I do.
5    Q. And what is your basis for saying
6 on July 23, 1997, after Detective Guevara
7 was apparently assigned to the case?
8    A. It's an observation.
9    Q. Based on your review of the file?
10   A. Yes.
11   Q. And is it your -- was it your
12 observation that the first time that
13 Detective Guevara was assigned to the case
14 was on July 23, 1997?
15   A. I believe so. But I know you are
16 not going to want to hear this at the
17 twelfth hour, but I would definitely want to
18 review that to make sure that I am being
19 accurate and concise.
20   Q. Do you have an understanding of
21 what specifically Detective Guevara was
22 assigned to do in connection with this
23 particular investigation?
24   A. Yes. I would certainly like to

Page 667

1 refresh my memory by reviewing that file.
2    Q. And without reviewing the file,
3 you can't my question, correct?
4    A. I want to be accurate, so I would
5 prefer to review the file.
6    Q. And then you say:
7         "While two supplementary
8    reports identifying the initial
9    two suspects and indicating
10   that" --
11        Let me start over.
12        It says, "While two
13   supplementary reports identifying
14   the initial two suspects and
15   indicating that witnesses could
16   not identify those suspects in a
17   lineup, are in the permanent
18   retention file, the arrest reports
19   for those suspects are not and
20   also do not appear to be in the PD
21   file."
22        Do you see that there?
23   A. Yes.
24   Q. When you say the arrest reports

Page 668

1 for those suspects are not and also do not
2 appear to be in the PD file, what are you
3 saying? The arrest reports are not where?
4    A. In the Public Defender's file.
5    Q. Okay. But the supplementary
6 reports are, correct?
7    A. I would have to look at that again
8 to confirm.
9    Q. Okay.
10   A. And again, I want to point out as
11 you did, some of these files are 700, 800,
12 900 pages long, so it is hard for me to
13 answer that without refreshing my memory.
14        (Whereupon, Tiderington
15        Deposition Exhibit No. 29 was
16        screen-shared/referenced.)
17 BY MS. ROSEN:
18   Q. Let's take a look at Exhibit 29,
19 and let's go to page 5. This is the RD file
20 that you referenced that contains the two
21 supplementary reports identifying the
22 initial two suspects. So if we scroll down
23 on this page.
24   A. We are still on the Soto case?

Page 669

1    Q. Correct, 59529, that's the
2 citation in your report, right?
3    A. Correct.
4    Q. So that's one supp report, right?
5 It's two pages. And then if we keep going,
6 even though your citation seems incomplete,
7 and we go to the next supp report that
8 discusses a lineup, right, with another
9 suspect, right?
10   A. Well, I don't see where it
11 discusses a --
12   Q. Sorry. The next page. Where it
13 discusses a lineup on the next page.
14   A. Okay.
15   Q. Right? This is the supp report
16 that says the witnesses couldn't identify
17 the lineup -- I mean couldn't identify the
18 suspect?
19   A. Yes.
20        (Whereupon, Tiderington
21        Deposition Exhibit No. 30 was
22        screen-shared/referenced.)
23 BY MS. ROSEN:
24   Q. And then if we go to Exhibit 30,

THOMAS TIDERINGTON, 10/06/2022                    Page 670..673

Page 670

1  which is the Public Defender file, if we go
2  to page 42 of that PDF.  That's the same
3  report, right, the first supplementary
4  report we looked at?  It talks about
5  offender Razo?
6      A. I believe so, yes.
7      Q. And then if we go to the next
8  page, it's blank, like it was in the other,
9  in the permanent retention file.  And then
10 if we go to the next page, we get to the
11 lineup report, and then the next page
12 indicates that they couldn't pick out the
13 witnesses, right?  So those are all the same
14 reports that were in the permanent retention
15 file?
16     A. Yes.
17     Q. But the criticism is that these
18 individuals' arrest reports aren't in the
19 Public Defender file, right?
20     A. That's correct.
21     Q. And --
22     A. I'm sorry, and several handwritten
23 GPRs did not appear in the Public Defender's
24 file either.

Page 671

1      Q. Okay.  But you don't detail those,
2  do you?  Oh, you do, okay.
3          All right, let's go -- well,
4  let's look at page 68 of the Public
5  Defender's file, so Exhibit 30.  And if we
6  just scroll through that, you will see there
7  is a whole bunch of redacted pages in here,
8  right?  You don't know what the PD actually
9  redacted, you were just told to assume that
10 it's work product, right?
11     A. That's correct, yes.
12     Q. Let's go to page 59 of your
13 report, Exhibit No. 6, Mr. Rainey's case.
14 So you state here:
15         "Cedric Morris was shot to
16         death on June 10, 1996.  Witnesses
17         reported seeing one or two
18         assailants with dark hoodies
19         pulled over their faces.
20         Detectives requested over a dozen
21         IR photos sufficient to compile
22         multiple photo arrays."
23         And then you cite a bunch of
24 requests for photos and photos.

Page 672

1          And then you conclude, "This
2          indicates that there were multiple
3          potential suspects and potential
4          multiple photo identification
5          procedures performed, but the
6          defense file does not include any
7          information about these photos or
8          lineups."
9          Do you see that?
10     A. I do.
11     Q. And are you certain -- well,
12 what's the basis for your conclusion that
13 the reason that all these photos were
14 compiled was to conduct photo identification
15 procedures?
16     A. Well, I guess that's part of the
17 criticism that I have.  I don't think it was
18 detailed in the police report or in a
19 supplemental report the purpose for
20 requesting these.
21     Q. Okay.  That -- sorry?
22     A. So I am left with making
23 assumptions.
24     Q. I see.  All right.  And then

Page 673

1  further, it says:
2          "According to a lineup and
3          supplementary report, Donnie
4          Morris identified Guy Rainey out
5          of a lineup.  Rainey was
6          ultimately charged.  Morris's
7          identification appears to be the
8          only inculpatory evidence in the
9          file.  But there is a handwritten
10         note in the investigative file
11         with Morris's name on it and the
12         statement 'Kevin Haas pull file to
13         see if he is still wanted.'"
14         Do you see that?
15     A. I do.
16     Q. And that says:
17         "Haas's name does not appear
18         in the defense file or in
19         supplementary reports explaining
20         his involvement.  The note
21         suggests Haas may have been an
22         alternative suspect and that
23         Morris could have been a suspect,
24         which would have weighed on his

THOMAS TIDERINGTON, 10/06/2022                    Page 674..677

Page 674

1       credibility in identifying Rainey.
2       This information written by the
3       detectives clearly investigative
4       in nature should have been
5       disclosed."
6           Do you see that?
7   A.  I do.
8       Q.  And does that name, Kevin Haas,
9   seem familiar to you?
10  A.  It does.
11      Q.  And do you believe that Detective
12  Kevin Haas was a suspect, a viable suspect,
13  in this investigation?
14  A.  Probably not.
15      Q.  Okay.  Why did you write that in
16  your report?
17  A.  I think it was a mistake.
18      (Whereupon, Tiderington
19      Deposition Exhibit No. 31 was
20      screen-shared/referenced.)
21  BY MS. ROSEN:
22      Q.  And if we pull Exhibit No. 31 and
23  go to page 106 of the PDF, this is the note
24  you are referencing, right?

Page 675

1   A.  It is.
2       Q.  Now that you have realized that
3   Kevin Haas is, in fact, Detective Haas and
4   was the individual for some period of time
5   charged with dealing with the investigative
6   files at the area, do you still believe that
7   Morris could have been a suspect, and it
8   would have weighed on his credibility in
9   identifying Rainey?
10  A.  Right.  I am sorry.  Can you go
11  back up a couple of pages.  I just kind of
12  try to want to figure out how I made that
13  mistake, and I think it was a GPR that was
14  prepared, and that would be on the back side
15  of the GPR if I remember correctly.  A
16  couple pages back.
17          And again, you know, clearly
18  there's so many documents, I am not
19  suggesting -- you don't have to go back that
20  far.  I just wanted to read the front of the
21  GPR to see how I made that mistake.  And
22  certainly, I can amend my report and correct
23  that.
24      Q.  And, in fact, Donnie Morris was

Page 676

1   with Mr. Rainey at the time with Mr. --
2   sorry, let me start over.
3           Donnie Morris was with Cedric
4   Morris at the time he was shot, correct?
5       MR. SWAMINATHAN:  Can you give me
6   the Bates, the note that we are talking
7   about?
8       MS. ROSEN:  Sure.
9       MR. SWAMINATHAN:  The page
10  reference.
11      MS. ROSEN:  It is Bates Number
12  72857.
13      MR. SWAMINATHAN:  Can you go back
14  up?  Yeah.
15      THE WITNESS:  Okay, I'm sorry,
16  your question again is?
17  BY MS. ROSEN:
18      Q.  It says across the top here,
19  Morris, Donnie, and then A403252.  That's
20  the RD number for this investigation
21  correct?
22  A.  That is correct, yes.
23      Q.  Yes, okay.  And Donnie Morris is
24  the uncle of Cedric Morris and was with him

Page 677

1   when he got shot, right, when Cedric got
2   shot?
3   A.  Again, I would have to review the
4   file to confirm that.
5       Q.  We can take this exhibit down.
6           Was the Demetrius Johnson case
7   that's listed at the bottom of page 59 of
8   your report one of the files that
9   plaintiff's counsel directed to your
10  attention?
11      MR. SWAMINATHAN:  Objection.  I am
12  instructing you not to answer.  That would
13  require you to reveal our correspondence and
14  communications.
15      Go ahead.
16      MS. ROSEN:  Did you say you
17  instructed not to answer?  Sorry.
18      MR. SWAMINATHAN:  Yes.
19      THE WITNESS:  I am sorry.  How
20  much longer do you think we will go, just
21  for planning purposes?
22      MR. SWAMINATHAN:  I think they've
23  got about, I think, either 25 or 24 minutes
24  left.

THOMAS TIDERINGTON, 10/06/2022                          Page 678..681

Page 678

1      THE WITNESS: Okay. That's fine.
2 BY MS. ROSEN:
3      Q. All right. Let's go to page 63 of
4 your report. There is a discussion here
5 about the Polaroid photos in the Soto
6 homicide investigation, a topic that we have
7 touched upon throughout the last couple of
8 days, right?
9      A. Yes.
10     Q. And this is your analysis
11 regarding the Polaroid photos, right? And
12 it rests, in part, on the fact that -- the
13 fact that Polaroid photos were taken of Rosa
14 Aranda, Jose Aranda, and Guadalupe Mejia led
15 you to conclude that they were treated as
16 alternative suspects and that would be
17 important exculpatory and impeachment
18 evidence, correct?
19     A. That's correct.
20     Q. Can you explain to me how it is
21 that the fact that Rosa Aranda and Jose
22 Aranda were treated as alternative suspects,
23 if, in fact, that was true, was exculpatory
24 evidence to Mr. Solache and Mr. Reyes?

Page 679

1      A. Well, if the police department had
2 and detectives, if they had other suspects,
3 they never explained in the police reports
4 how they cleared these other suspects. If
5 they believed that these other three
6 individuals committed the crime and there is
7 evidence in the record that suggests that
8 they were held for a lengthy period of time,
9 I think it was testimony that food was
10 thrown at one of them, and they claim -- and
11 I don't know if it actually happened, but
12 they claim they were physically abused. If
13 they were all treated as suspects, in my
14 view, the detectives would have had some
15 reason to suspect that they committed this
16 crime; so, therefore, I believe the
17 information would have been exculpatory
18 towards Reyes and Solache.
19     Q. And specifically, what you are
20 concluding here is that the Polaroid photos
21 were withheld, right?
22     A. Well, I think they were withheld.
23 I don't know if that's in dispute.
24     Q. Well, did you look at the

Page 680

1 impounded evidence in this case?
2      A. I did, yes.
3      Q. Did you notice that there in the
4 impounded evidence, there is a Polaroid
5 photo of Guadalupe Mejia?
6      A. Which Bates number are you
7 referring to?
8      Q. Reyes 1 -- Reyes 000111.
9      A. Can you pull that up or should I
10 find it?
11     (Whereupon, Tiderington
12     Deposition Exhibit No. 12 was
13     screen-shared/referenced.)
14 BY MS. ROSEN:
15     Q. No, I can. Let's mark Exhibit No.
16 12, or let's show him Exhibit No. 12. It's
17 already marked.
18     So do you see that there is
19 People's Exhibit No. 1? Do you recognize
20 who is depicted in that photograph?
21     A. Yes.
22     Q. Who is that?
23     A. I'm sorry. Guadalupe, I believe.
24     Q. Do you think maybe it might be

Page 681

1 Adriana Mejia?
2      A. I am sorry. Let me look at all
3 the other photos.
4      Q. I mean, I can --
5      A. Yeah, I don't want to try to
6 identify.
7      Q. That's fine. So the photo in the
8 top left, a woman in the teal sweatshirt is
9 Adriana Mejia, and the other photograph in
10 the top row, that's Rosaura Mejia.
11     A. Right.
12     Q. And then below in the left when
13 you are facing the photograph is -- and it's
14 People's Exhibit No. 3, that's Mr. Reyes.
15 And then next to him is Mr. Solache, and
16 then next to him is Guadalupe Mejia, right?
17 So that's a Polaroid photograph that was
18 taken at the police station, and it's part
19 of the impounded evidence, right?
20     A. That's correct.
21     Q. And so --
22     A. I don't know if it's part of the
23 impounded evidence. But if you say it is, I
24 won't argue with you about that.

THOMAS TIDERINGTON, 10/06/2022                    Page 682..685

Page 682

1    Q.  I will represent to you that the
2  parties in this case went and pulled all the
3  impounded evidence in connection with the
4  Soto homicide investigation, and these
5  photographs were in the impounded evidence,
6  and Mr. Reyes's counsel took photographs of
7  the impounded evidence, and this is one of
8  the photographs that was taken.
9          So that -- so the fact that it
10  was impounded, obviously, means that it was
11  produced in court and utilized at the trial,
12  and then impounded by the Circuit Court of
13  Cook County.  Do you understand that?
14    A.  I believe so, yes.
15    Q.  Okay.  So that means Guadalupe's
16  photograph, Polaroid photograph was actually
17  produced, despite the fact that when we are
18  reviewing the PD file today, we don't see it
19  in there for whatever reason, right?
20        MR. SWAMINATHAN:  Objection to
21  form and foundation.  Mischaracterizes the
22  evidence, but go ahead.
23        THE WITNESS:  It was not in -- it
24  was not in the PD file if that's what you

Page 684

1  Polaroid photograph was produced and
2  impounded in court, right?
3        MR. SWAMINATHAN:  Objection to
4  form and foundation.  Mischaracterizes the
5  evidence.
6  BY MS. ROSEN:
7    Q.  You can answer.
8    A.  Well, I don't know what was
9  produced in court.  I would have to refresh
10  my -- I don't know if I read all of the
11  trial testimony or looked at all of the
12  exhibits.
13          But once again, if you are
14  representing that that's what happened, I
15  would not argue with you.
16        (Whereupon, Tiderington
17        Deposition Exhibit No. 33 was
18        screen-shared/referenced.)
19  BY MS. ROSEN:
20    Q.  Let's take a look at Exhibit No.
21  33.  Have you seen -- you can scroll through
22  these photographs.  Have you seen these
23  photographs before?
24    A.  I think I have seen.

Page 683

1  are asking me.
2  BY MS. ROSEN:
3    Q.  Right.  We know it was not in the
4  PD file --
5    A.  Right.
6    Q.  -- but we have it available to us
7  today, right?
8    A.  Yes.
9    Q.  We don't know if the PD file that
10  is available to us today is a complete PD
11  file, do we?
12    A.  I don't have any way of knowing
13  that, that's correct.
14    Q.  And the fact that --
15    A.  I guess -- I am sorry.  I guess I
16  made the assumption that it was.
17    Q.  And why did you assume that?
18    A.  Well I -- well, maybe it's naive,
19  but why wouldn't it be a complete file?  If
20  they are asked to turn over the file, why
21  wouldn't they?  But I understand your point,
22  it may not be a complete file.
23    Q.  And certainly we know, regardless
24  of that point, that Guadalupe Mejia's

Page 685

1    Q.  Is it your understanding that
2  these are photographs that were taken by the
3  Cook County Public Defender's Office in this
4  case to explain to the parties and the Court
5  how they maintain their files from the
6  1990s?
7    A.  I don't have that information.
8    Q.  Does it seem to you based on a
9  review of these photographs that the files
10  are maintained in an orderly and pristine
11  fashion?
12          We can scroll back through
13  them actually so you can take a look at
14  them.
15    A.  But again, I don't know what --
16        MR. SWAMINATHAN:  Objection to
17  form.
18        Go ahead.
19        THE WITNESS:  I don't know if this
20  represents all homicide cases, felony cases,
21  all shoplifting cases, or all cases.  I
22  don't know that, and perhaps there is a more
23  centralized and organized area of their
24  records retention rooms that have more

THOMAS TIDERINGTON, 10/06/2022                                    Page 686..689

Page 686

1 sensitive investigations contained in them.
2 I don't know that.
3        MS. ROSEN:  Okay.  Why don't we --
4 I think we have got about ten minutes or so
5 left.  Why don't we take a break so I can
6 take a look at my notes, and we can finish
7 up.
8        MR. SWAMINATHAN:  Thank you.
9        THE VIDEOGRAPHER:  We are off the
10 video record at 6:37 p.m.
11        (Whereupon, a break was taken
12          at 6:37 p.m. to 6:48 p.m.)
13        THE VIDEOGRAPHER:  We are back on
14 the video record at 6:48 p.m.
15 BY MS. ROSEN:
16    **Q.  Other than the Polaroid**
17 **photographs that you say were withheld on**
18 **page 63 of your report, are there any other**
19 **documents that you saw in the investigative**
20 **file for the Soto homicide investigation**
21 **that was not in the Public Defender's file?**
22    A.  As we sit here, I don't believe
23 there were, but I want to explain my answer
24 if I could.

Page 687

1    **Q.  Sure.**
2    A.  So there is a number of documents
3 that it's more likely than not that the
4 detectives would have had to produce or
5 statements, handwritten notes -- I think I
6 have testified to this earlier.  It's
7 unreasonable to think that there were not
8 any types of notes of interviews with the
9 suspects prior to the State Attorney coming
10 in and taking the written statement.  And if
11 those documents, if they do exist, if these
12 were not produced, certainly, this would be,
13 I believe, a deviation of acceptable police
14 practices.
15    **Q.  Okay.  So if the detectives**
16 **memorialized those things, and if those**
17 **documents were not produced, then it would**
18 **be a deviation, right?**
19    A.  Well, and it's a Catch 22.  And if
20 they didn't document these things, I think
21 it's a deviation of police practices as
22 well.
23        So either they didn't do it,
24 which is inexcusable for a homicide

Page 688

1 detective, which is a deviation of normal
2 police practices or reasonable police
3 practices.  Or if they did take notes and
4 they didn't produce it, likewise.  So either
5 way, I think it's problematic.
6    **Q.  Different problem, but**
7 **problematic, right?**
8    A.  Different problem from what?
9    **Q.  There are two different problems,**
10 **but both are problematic?**
11    A.  No.  I think it's all the same
12 problem.
13    **Q.  Well, if they existed, and they**
14 **were not produced, then that's one type of**
15 **problem?  If they weren't memorialized at**
16 **all, that's a different kind of problem,**
17 **right?**
18    A.  That's correct.
19    **Q.  You testified yesterday that it**
20 **was highly unusual and not acceptable to, I**
21 **think it was, detain somebody in an**
22 **interrogation room for 40 hours.  Is that**
23 **right?  Did I get that right?**
24    A.  That's accurate, yes.

Page 689

1    **Q.  So it's your opinion that under no**
2 **circumstances is it permissible to detain**
3 **somebody for 40 hours in an interrogation**
4 **room?**
5        MR. SWAMINATHAN:  Objection to
6 form.  Asked and answered.
7        Go ahead.
8        THE WITNESS:  You say under no
9 circumstances, such as -- I mean, I guess I
10 have to -- it's a hypothetical question,
11 obviously.  I would have to think about what
12 situations it -- it's not common.  It's not
13 normal.  I don't think it's reasonable.
14 BY MS. ROSEN:
15    **Q.  What is your basis for concluding**
16 **that it's not common for an individual to be**
17 **detained in an interrogation room for 40**
18 **hours?**
19    A.  Well, it's just not something that
20 law enforcement officers do.  We -- if we
21 are going to lock somebody up, we give them
22 the ability to use the restroom.  We give
23 the ability to sleep on a mattress.  We give
24 them some dignity.  We don't make

THOMAS TIDERINGTON, 10/06/2022            Page 690..693

Page 690

1 individuals sleep in a chair in a closet, in
2 an interrogation room.
3        And I am also, oftentimes if
4 people are left in an interrogation room,
5 they are usually handcuffed because an
6 interrogation room isn't the same as a jail
7 cell. So I think there is testimony that
8 they were locked to the wall. Whether that
9 happened or not, I don't know. But
10 certainly if that's what occurred, and if
11 the Jury decides that that's what occurred,
12 then certainly it would be inhumane
13 treatment of a prisoner.
14     **Q. So your position is that they**
15 **shouldn't be continuously held in an**
16 **interrogation room without allowing them to**
17 **use the bathroom or be fed or to sleep on a**
18 **cot, those types of things? It's not the**
19 **40-hour detention that you are quarreling**
20 **with?**
21     A. I'm sorry, did you say there was a
22 cot, or is that a different scenario that we
23 are talking about?
24     **Q. I am trying to understand when you**

Page 691

1 **said, holding somebody in an interrogation**
2 **room for 40 hours, whether you were being**
3 **specific to this case, meaning the**
4 **circumstances as you understood them in this**
5 **case, or in any circumstance?**
6     A. Again, from the departments that I
7 am familiar with and from the federal agency
8 I am familiar with, prisoners would only be
9 held for a short period of time in an
10 interrogation room. After a period of time,
11 they would be put into a lockup facility
12 that had the ability to allow a prisoner to
13 be humanely -- treated humanely by allowing
14 them to sleep. And so, no, I can't think of
15 any -- and I also believe it's a violation
16 of Chicago Police Department's policy of
17 holding a prisoner in this fashion for such
18 a long period of time in an interrogation
19 room.
20     **Q. Okay. With respect to the**
21 **physical evidence that was collected in this**
22 **case, what is your understanding of when the**
23 **Chicago Police Department received results**
24 **of the analysis that was done in connection**

Page 692

1 **with the interrogations of Mr. Solache and**
2 **Mr. Reyes?**
3       MR. SWAMINATHAN: Can you read
4 back the question?
5       MS. ROSEN: I can rephrase it
6 because I --
7       THE WITNESS: I don't think I
8 understand the question.
9 BY MS. ROSEN:
10     **Q. You understand that there was**
11 **evidence that was collected, and it was**
12 **tested for DNA and other things, right?**
13     A. That's correct.
14     **Q. And you understand that at some**
15 **point, the Illinois State Police evaluated**
16 **the evidence and reported back on its**
17 **findings, right?**
18     A. That's correct.
19     **Q. Do you know when the ISP reported**
20 **back its findings to the Chicago Police**
21 **Department in relation to the days in which**
22 **Mr. Solache and Mr. Reyes were in police**
23 **custody?**
24     A. Can I refresh my memory by looking

Page 693

1 at the case file?
2     **Q. Sure. It's Exhibit No. 7.**
3     A. I'm sorry. Can you pull that up
4 or --
5     **Q. Yes, I am asking. It's Exhibit**
6 **No. 7.**
7     A. I thought you were telling me to
8 go get it.
9       MS. ROSEN: Robyn, can you get
10 Exhibit No. 7. Got it?
11       EXHIBIT TECHNICIAN: One second.
12 Technical difficulties here. One second for
13 me to figure out what's wrong.
14       MR. SWAMINATHAN: I have a copy of
15 the file in front of me. Do you want me to
16 show it to him?
17       MS. ROSEN: Sure, fine. Yeah,
18 that's fine. If he wants to just look at it
19 that way. Flip through it, and then let me
20 know when the ISP results were reported
21 back.
22       It's probably quicker for you
23 to just flip through the pages of the file
24 you have in front of you.

THOMAS TIDERINGTON, 10/06/2022                    Page 694..697

Page 694

1        THE WITNESS:  Yeah.  I think I am
2  looking at a report now, May 13, 1998.  Is
3  that the date that you --
4  BY MS. ROSEN:
5        Q.  Can you just -- I don't know it
6  off the top of my head, the precise date.
7  What's the Bates number of the page you are
8  looking at?
9        A.  097, 98, 99.
10       Q.  Yes.
11       A.  Okay.  And I think to answer the
12 question, the date was May 13th.
13       Q.  When were Mr. Solache and
14 Mr. Reyes in police custody?
15       A.  Well, turning to my report there,
16 just because I --
17       Q.  Sure.
18       A.  I'm sure you have the date, that I
19 can tell you whether or not I agree with you
20 on that.  Because I am having -- struggling
21 to find the date.
22       Q.  April 3rd, 4th, 5th, that time
23 frame?
24       A.  After refreshing my memory, that

Page 695

1  sounds correct.
2        Q.  So the lab results didn't come
3  back until over a month after Mr. Solache
4  and Mr. Reyes and Ms. Mejia were charged,
5  right?
6        A.  That's correct.
7        Q.  And so at the time that the
8  detectives were collecting the evidence from
9  Mr. Solache's person, right, they collected
10 his shoes, and they took Ms. Mejia's
11 clothing, and whatever other items they took
12 from the searches from the house, they had
13 no idea whether or not, or what physical
14 evidence was going to show or already
15 showed, right?
16       A.  Correct, yes, I don't think they
17 had any physical evidence that showed that
18 Reyes or Solache were responsible for the
19 crime.
20       Q.  Right.  But what I am saying is
21 they had no -- they had no physical evidence
22 test results at the time that they were
23 interrogating Mr. Solache and Mr. Reyes and
24 Ms. Mejia?

Page 696

1        A.  I would agree with you, yes.
2        Q.  And then you testified that for
3  some period of time you worked with -- I
4  think you said with the DEA in Chicago; is
5  that right?
6        A.  I worked cooperative cases with
7  the DEA in Chicago, yes.
8        Q.  What time frame was that
9  approximately?
10       A.  Well, a couple of cases probably
11 in the late '80s, and then some DEA cases
12 in -- before nineteen -- between 1990 and
13 1995.
14       Q.  Do you recall -- and you said you
15 worked with Chicago Police Department -- you
16 said you worked with Chicago police officers
17 in that time frame, right?
18       A.  Worked with the -- well, yeah,
19 there were Chicago police officers.  I
20 remember one in particular.  It was a
21 Chicago K-9 handler, a K-9 handler I think
22 that was assigned to the DEA task force that
23 we were working with.
24       Q.  Do you recall any of the names of

Page 697

1  any of the police officers that you worked
2  with in those -- during that time frame?
3        A.  I don't.
4        Q.  Have you worked with any Chicago
5  police officers after that 1990 and 1995
6  time frame?
7        A.  No.
8        MS. ROSEN:  I do not have any more
9  questions.
10       MR. SWAMINATHAN:  Megan, do you
11 have any questions?
12       MS. McGRATH:  I do not.  Thank
13 you.
14       EXAMINATION
15 BY MR. SWAMINATHAN:
16       Q.  I just have a few questions,
17 Mr. Tiderington.  You had indicated several
18 times in this deposition that you wanted
19 to -- you wanted to clarify something based
20 on if I can look at some records, if I
21 understand correctly?
22       A.  That's correct.
23       Q.  What was the clarification you
24 wanted to provided?

THOMAS TIDERINGTON, 10/06/2022      Page 698..701

Page 698

1     A.  I wanted to provide the
2  information about what other cases I had
3  testified in depositions.  And then I also
4  wanted to clarify, I think I mentioned there
5  was a trademark infringement case that I was
6  retained on, and the question was:  How did
7  this case get resolved, and did I testify or
8  was I allowed to testify?
9         I went back last night, and I
10  looked.  I looked at some emails, and my
11  understanding is that the case never went to
12  trial.  I received an email about two months
13  ago from the attorney thanking me for my
14  work and saying that my testimony
15  contributed to whatever prevailing or
16  whatever.  But I also after reading it
17  closely, I understood that the judge ruled
18  that my testimony would not be relevant if
19  it went to trial.
20         So I don't know -- again, I
21  don't know if there was a Daubert hearing or
22  if there wasn't.  But my understanding,
23  according to the attorney, was that he -- I
24  was retained to examine drug products such

Page 699

1  as rolling papers, pipes, scales.  And the
2  attorney asked me to examine those to
3  determine if they could be used with illegal
4  drugs, with marijuana or cocaine.  So my
5  analysis was whether or not the products
6  could be used with drugs.
7         Apparently, the judge -- and
8  this is according to the attorney.  The
9  judge said that it wasn't relevant on
10  whether or not the products could be used
11  with drugs.  What is relevant is whether or
12  not the products could be used with tobacco,
13  and I had testified that I was not a tobacco
14  industry expert, which I am not, and,
15  therefore, my testimony would not be
16  relevant.
17     Q.  I see, okay.  You were asked some
18  questions yesterday about whether there was
19  evidence to support the conclusion more
20  likely than not that Solache was abused.  Do
21  you recall that?
22     A.  I do.
23     Q.  Sir, your report does not actually
24  opine on the question of whether, in fact,

Page 700

1  Mr. Solache was abused; is that correct?
2     A.  That's correct, it does not.
3     Q.  If the Jury credits Mr. Solache's
4  testimony that he was abused, would that be
5  a deviation from police practices?
6     A.  It would be, yes.
7     Q.  But in this case, you were not
8  tasked with assessing whether you believed
9  Solache or Guevara or whoever else regarding
10  abuse, correct?
11     A.  That's correct.  I don't know if
12  they were abused.
13        (Reporter clarification.)
14     Q.  Would you agree that that's the
15  Jury's role?
16     A.  I do.
17     Q.  But in this case, you were not
18  tasked with assessing whether to believe
19  Mr. Solache or Mr. Guevara or whoever else
20  about abuse; is that right?
21     A.  That's correct.
22     Q.  Would you agree that's the role of
23  the Jury?
24     A.  I do.

Page 701

1     Q.  And ultimately if the Jury credits
2  Solache, that would be a deviation, correct?
3     A.  It would be, yes.
4     Q.  Putting aside of whether or not
5  Guevara actually abused Solache or not, did
6  you find other deviations from police
7  practices in this case?
8     A.  I did.
9     Q.  And so any -- sorry, strike that.
10        So your opinions about
11  deviations from police practices in this
12  case, do they depend on a conclusion or a
13  finding that Mr. Solache or Mr. Reyes was
14  abused?
15     A.  No, no, they would not.
16        MR. SWAMINATHAN:  I have no other
17  questions.
18        MS. ROSEN:  I don't have any
19  further questions based on that.
20        Carrie?  Ms. Golden?
21        MS. GOLDEN:  I am working on it.
22        MR. SWAMINATHAN:  It's seven
23  hours.  Carrie, if you want to ask one, you
24  can ask one, but we are at seven.

Page 702

1      MS. GOLDEN:  I was just going to
2  say I don't have any questions, but thank
3  you, Anand, for your gracious allowance of
4  one question.
5      MR. SWAMINATHAN:  Okay, thank you,
6  everybody.
7      MS. ROSEN:  Are you reserving?
8      MR. SWAMINATHAN:  Yes, we are
9  reserving.
10      MS. ROSEN:  Thanks, everyone.
11      THE WITNESS:  Thank you all.  I
12  appreciate it.
13      THE VIDEOGRAPHER:  We are off the
14  video record at 7:07 p.m. at the conclusion
15  of the deposition.
16          (Deposition proceedings.
17          concluded at 7:07 p.m.)
18
19
20      * * * * * * * *
21
22
23
24

Page 703

1      IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
2          EASTERN DIVISION
3
  ARTURO DeLEON-REYES,
4          Plaintiff,
        vs.
5  REYNALDO GUEVARA, ET AL.,
          Defendants.
6  _____   No. 18 CV 01028
  GABRIEL SOLACHE,           No. 18 CV 02312
7          Plaintiff,
        vs.
8  REYNALDO GUEVARA, ET AL.,
9          Defendants.
10          VOLUME II OF II
11      I, THOMAS J. TIDERINGTON, being first
12  administered an oath, say that I am the
13  deponent in the aforesaid deposition taken
14  on October 6, 2022; that I have read the
15  foregoing transcript of my deposition, and
16  affix my signature to same.
17  __Number of errata sheets attached.
18  __No errata sheets.
19
          THOMAS J. TIDERINGTON
20
  Subscribed and sworn to
21  before me this        day
  of            , 2022.
22
23
24  Notary Public

Page 704

1  STATE OF ILLINOIS  )
                     )  SS:
2  COUNTY OF DUPAGE   )
3
4      I, MARIBETH REILLY, a notary public
5  within and for the County of DuPage and
6  State of Illinois, do hereby certify that
7  heretofore, to-wit, on October 6, 2022,
8  remotely personally appeared before me,
9  THOMAS TIDERINGTON, in a cause now pending
10  and undetermined in the United States
11  District Court, Northern District of
12  Illinois, Eastern Division, wherein ARTURO
13  DELEON-REYES and GABRIEL SOLACHE are the
14  Plaintiffs, and CITY OF CHICAGO, ET AL. are
15  the Defendants.
16      I further certify that the said THOMAS
17  TIDERINGTON was first administered an oath
18  to testify the truth, the whole truth and
19  nothing but the truth in the cause
20  aforesaid; that the testimony then given by
21  said witness was reported stenographically
22  by me in the remote presence of the said
23  witness, and afterwards reduced to
24  typewriting by Computer-Aided Transcription,

Page 705

1  and the foregoing is a true and correct
2  transcript of the testimony so given by said
3  witness as aforesaid.
4      I further certify that the signature
5  to the foregoing deposition was reserved by
6  counsel for the respective parties and that
7  there were present at the deposition the
8  attorneys hereinbefore mentioned.
9      I further certify that I am not
10  counsel for nor in any way related to the
11  parties to this suit, nor am I in any way
12  interested in the outcome thereof.
13      IN TESTIMONY WHEREOF:  I certify to
14  the above facts this 17th day of October,
15  2022.
16
17
18
19
20  MARIBETH REILLY, CSR
  LICENSE NO.:  084-002306
21
22
23
24