# Exhibit 20

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3             EASTERN DIVISION

4

5  GERALDO IGLESIAS,          )
                           )

6         Plaintiff,      )
                           )

7           vs.          )  No. 19 CV 6508
                           )

8  REYNALDO GUEVARA, et al.,    )
                           )

9         Defendants.     )

10

11

12        The Videotaped Deposition of THOMAS J.

13  TIDERINGTON, conducted via Zoom, taken before

14  GREG S. WEILAND, CSR, RMR, CRR, pursuant to the

15  Federal Rules of Civil Procedure for the

16  United States District Court pertaining to the

17  taking of depositions, commencing at 9:02 o'clock

18  a.m. Central Standard Time, on the 13th day of

19  February, 2023.

20

21

22

23

24

THOMAS J. TIDERINGTON, 02/13/2023                    Page 2..5

---

Page 2

```
 1   PRESENT (via Zoom):
 2        LOEVY & LOEVY, by
          MS. RACHEL BRADY
 3        (311 North Aberdeen Street, 3rd Floor
          Chicago, Illinois 60607
 4        312.243.5900
          brady@loevy.com)
 5        Appeared on behalf of the plaintiff;
 6        LEINENWEBER BARONI & DAFFADA, LLC, by
          MR. MICHAEL J. SCHALKA
 7        (120 North LaSalle Street, Suite 2000
          Chicago, Illinois 60602
 8        866.786.3705
          mjs@ilesq.com)
 9        appeared on behalf of defendant
          Reynaldo Guevara;
10
          THE SOTOS LAW FIRM, PC, by
11        MR. JOSH ENGQUIST
          (141 West Jackson Boulevard, Suite 1240A
12        Chicago, Illinois 60604
          630.735.3305
13        jengquist@jsotoslaw.com)
          appeared on behalf of the individual
14        police officer defendants;
15        ROCK FUSCO & CONNELLY, LLC, by
          MS. EILEEN E. ROSEN
16        MS. CATHERINE M. BARBER
          MS. THERESA BEROUSEK CARNEY
17        (333 West Wacker Drive, 19th Floor,
          Chicago, Illinois 60606
18        312.494.1000
          erosen@rfclaw.com, cbarber@rfclaw.com,
19        tcarney@rfclaw.com)
          appeared on behalf of defendant
20        City of Chicago.
21   ALSO PRESENT:
          MS. RACHEL WELLING, The Videographer.
22
23
24
```

---

Page 3

```
 1                    INDEX
 2   February 13th, 2023
 3   TESTIMONY OF THOMAS J. TIDERINGTON
 4                                          PAGE
 5   Examination by Mr. Engquist .......................6
 6   Examination by Ms. Rosen ........................266
 7   Further Examination by Mr. Engquist .............354
 8   Examination by Ms. Brady ........................355
 9
10              DEPOSITION EXHIBITS
11   NUMBER      DESCRIPTION              PAGE
12   Exhibit 1   Expert Report of Thomas J.    10
13               Tiderington (full report with
14               attachments), 911 pages
15   Exhibit 2   Expert Report of Thomas J.    10
16               Tiderington, 74 pages
17   Exhibit 3   Attachment B, Materials       10
18               Reviewed, 5 pages
19   Exhibit 4   Fee Schedule, 1 page          10
20   Exhibit 5   Investigative file, Bates     10
21               labeled RFC-Iglesias 000001
22               through 000112
23   Exhibit 6   Invoice dated 11/19/22, 2 pages  10
24
```

---

Page 4

```
 1              DEPOSITION EXHIBITS (CONTINUED)
 2   NUMBER          DESCRIPTION              PAGE
 3   Exhibit 7   Updated case list [not tendered   354
 4               for attachment to transcript]
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 5

```
 1        THE VIDEOGRAPHER:  This is the beginning
 2   of Media Unit 1, and we are now on the video
 3   record at 9:02 a.m.
 4        This is the videotaped, video-conferenced
 5   deposition of Thomas Tiderington being taken on
 6   February 13th, 2023.
 7        This deposition is being taken on behalf
 8   of the defendants in the matter of
 9   Geraldo Iglesias versus Reynaldo Guevara,
10   et al.  The case number is 19-CV-6508 filed in
11   the United States District Court for the
12   Northern District of Illinois, Eastern
13   Division.
14        My name is Rachel Welling, certified legal
15   videographer, representing
16   Urlaub Bowen & Associates, with offices at
17   20 North Clark Street, Suite 600, Chicago,
18   Illinois.  The court reporter today is
19   Greg Weiland, also of
20   Urlaub Bowen & Associates.
21        Counsel, please identify yourselves for
22   the video record and the parties which you
23   represent.
24        MS. BRADY:  Good morning, everyone.  This
```

---

THOMAS J. TIDERINGTON, 02/13/2023                    Page 6..9

Page 6

1    is Rachel Brady.  I represent the plaintiff.
2         MR. ENGQUIST:  Good morning.
3    Josh Engquist on behalf of Defendants
4    Halvorsen, Gawrys, Riccio, and Biebel.
5         MS. ROSEN:  Good morning.  Eileen Rosen on
6    behalf of defendant City of Chicago.
7         Michael, we can't hear you.
8         Looks like your audio is not working, but
9    we can just say Michael Schalka on behalf of
10   Defendant Guevara, and maybe you can work on
11   it.
12        MR. SCHALKA:  Yes.
13        MS. ROSEN:  There you go.
14        MR. SCHALKA:  Can you hear me now?
15        Michael Schalka on behalf of Defendant
16   Guevara.
17        THE VIDEOGRAPHER:  Thank you.  Will the
18   court reporter please swear in the witness.
19        (Witness sworn.)
20             THOMAS J. TIDERINGTON
21   after being first duly sworn, testified as follows:
22             EXAMINATION
23   BY MR. ENGQUIST:
24        Q.  Good morning, sir.

Page 7

1        A.  Good morning.
2        Q.  Before we start, just a couple
3    housekeeping things.
4        I sent out -- since we've done this
5    before, I'm not going to go through a big, long
6    intro.
7        I did send out before, making sure that
8    you had a copy of your full report with you today so
9    we can just kind of go back and forth on it --
10       A.  I do.
11       Q.  -- without having to put it up on the
12   screen.  Okay.
13       A.  I do have it, yes.
14       Q.  Do you have access to all the materials
15   you reviewed as well?
16       A.  I do.  Some electronically, some in a
17   binder hard copy.
18       Q.  Okay.  And just so we're clear, since
19   we're not sitting there across from each other, what
20   do you have in front of you right now?
21       A.  My report.
22       Q.  Okay.  Is there anything else --
23       A.  I'm sorry.  And I have the binder behind
24   me, so if I need to go to one of those documents,

Page 8

1    I'll let you know when I grab the binder.
2        Q.  All right, great.  Just because, since we
3    can't see your screen, if anything else comes up on
4    your screen or something else you're looking at,
5    just let us know so at least we know what you're
6    reviewing.  All right?
7        A.  I will do so.
8        Q.  All right.  And I'm assuming -- we just
9    talked before -- that you're in your home today, so
10   we hopefully don't have the Wi-Fi problems.
11       But is there anybody else with you,
12   besides potentially the dogs you said that might be
13   barking?
14       A.  In my home office, no.  Obviously my wife
15   is somewhere else in the home, but hopefully she's
16   taking care of the dog.
17       Q.  Okay.  I know we've gone through this
18   before, but I just want to make sure it's kind of
19   clear.
20       Everything you -- your answers today have
21   to be oral; they have to be out loud.
22       All right?
23       A.  I understand that, yes.
24       Q.  If you answer a question, we're going to

Page 9

1    assume you understood it.
2        Is that fair?
3        A.  That's fair.
4        Q.  If you don't understand a question for any
5    reason, just let us know.  Who ever is asking the
6    question, I promise we will do our best to rephrase
7    it, repeat it, slow down, or do whatever we need to
8    do so you understand it.
9        All right?
10       A.  I understand that.  Thank you.
11       Q.  Okay.  I know you've given a deposition
12   fairly recently.  But since that time, has anything
13   changed that would cause you problems giving
14   testimony today?
15       A.  No.
16       Q.  Okay.  Are you on any medications today
17   that would affect your ability to be able to give
18   answers today?
19       A.  No.
20       Q.  Okay.  All right.  So earlier, I sent over
21   exhibits.  And just so we can put them on the record
22   of what they are, they are marked and then we will
23   kind of go through them, the first six, which
24   Exhibit Number 1 is the full report of

THOMAS J. TIDERINGTON, 02/13/2023                Page 10..13

Page 10

1  Thomas Tiderington with all the attachments.
2        The second one is just the report of
3  Thomas Tiderington for this case, Iglesias.
4        Exhibit Number 3 is materials reviewed.
5  That was also one of the attachments to his larger
6  full report.
7        Exhibit Number 4 was his rate, which was
8  also an attachment to the full report.
9        Number 5 is the investigative file, which
10  was Bates stamped RFC 1 through 112.
11        And Exhibit 6 is an invoice we just got
12  this morning for your invoice in this case.
13              (Exhibit 1, Exhibit 2,
14              Exhibit 3, Exhibit 4, Exhibit 5,
15              and Exhibit 6 were marked for
16              identification.)
17  BY MR. ENGQUIST:
18        Q.  And I'm assuming, Mr. Tiderington, you
19  have all those materials at your ready if you need
20  to get to them, correct?
21        A.  I do, yes.
22        Q.  Okay.  I didn't mark your CV as an exhibit
23  since we went through it before, but I do want to
24  check and see if there are any changes to your CV

Page 11

1  since the last time we spoke in the Sierra matter.
2        A.  No.
3        Q.  Okay.  Have you given any other testimony
4  since you gave -- since you've put out this report?
5  Is there any additional testimony that you've given
6  as an expert?
7        A.  Since the report, yes, there has been.
8        Q.  Okay.  Other than the depositions, the
9  deposition that we took, any other testimony?
10        A.  I think so, and I could look on the break
11  and I could give you an updated list of testimony
12  since the report that I wrote on this case.
13        Q.  Okay.  Well, let me just see.  The last
14  one listed in your report was testifying in the
15  Northern District of Georgia in the case of
16  Jerry Blasingame versus City of Atlanta.  That was
17  the last one that was listed.
18        A.  Yeah, there has been several other ones
19  since that time.
20        Q.  Okay.  And what are they?
21        A.  Well, that's what I'm saying.  We could --
22  I can either pull them up now and list them, or I
23  could -- on a break, I could send you my updated
24  list, whichever you refer.

Page 12

1        Q.  Actually, I'd rather just go through it
2  now.  Just otherwise chances are we're going to keep
3  on going and I'll forget about it, just kind of fall
4  through the cracks.
5        A.  Okay.  All right.  So if you bear with me,
6  I have to pull it up on the ...
7        I have two monitors, so if I'm looking
8  away, that means I'm looking at the other monitor
9  which I can pull stuff up on, if that's okay with
10  you.
11        Q.  That's fine.  And thank you for letting us
12  know.
13        A.  Okay.  So I guess I can work backwards.
14        So I had a deposition in January of 2023
15  relating to a case out of western Wisconsin.  The
16  case -- would you like the case number or do --
17        Q.  The name and case number would be great.
18        A.  The case number is 21 CV 00565 WMC, and
19  the attorney is Richard Student.
20        Q.  Do you remember the case name?
21        A.  I don't.  I don't have that listed.
22        Q.  And Richard Student, was he -- is he the
23  plaintiff's attorney or the defense attorney?
24        A.  He is the plaintiff attorney.

Page 13

1        Q.  Okay.  And I'm assuming this case involved
2  something against the police; is that correct?
3        A.  That's correct.
4        Q.  And which police department were you
5  testifying against?
6        A.  You know, I don't have that detail on my
7  sheet.  I'll have to pull that up.  I don't recall
8  offhand.  It was -- it was in western Wisconsin.  I
9  just don't recall the name of the police department.
10        Q.  Do you remember a thumbnail sketch of what
11  the case was about?
12        A.  Yeah, it was a -- it was the use of a
13  police canine where the dog severely injured the
14  defendant or the plaintiff in the case.
15        Q.  Okay.  All right.  And when is the next --
16  and we can get the report from you later on, but
17  what's the next one you have listed?
18        A.  Well, the December 2022 deposition on, I
19  believe it was, Sierra.
20        Q.  And after that?
21        A.  October 2022, a deposition related to one
22  of these cases.  I believe that was Reyes.  And that
23  brings us up to the Blasingame testimony --
24        Q.  Okay.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 14..17

Page 14

1    A. -- in Atlanta, Georgia.
2       So there were three additional, I guess,
3  since Blasingame.
4    Q. Okay. Yeah, and so on a break, you can
5  just email that over to your attorney, and then they
6  can produce that part of it just so we have an
7  updated one. Okay?
8    A. I can do that.
9    Q. All right. Thank you.
10      Besides giving testimony as an expert,
11 have you given testimony regarding your employment
12 or regarding your previous employment as a police
13 officer since the last time we spoke?
14      MS. BRADY: Objection, form.
15      THE WITNESS: Other than what I just
16   listed, no.
17 BY MR. ENGQUIST:
18   Q. Not as an expert but as an employee, as a
19 police officer, like, have you been named as a
20 witness or a defendant?
21   A. No, no. I'm retired as of, I guess, the
22 end of May or June of 2022. So no, the answer to
23 your question is no.
24   Q. Did you ever testify as a named defendant

Page 15

1  in a lawsuit?
2    A. I believe I have, yes.
3    Q. How many times?
4    A. Maybe two or three times.
5    Q. And out of those two or three times, how
6  many were in Michigan and how many were possibly in
7  Florida?
8    A. I think one was in Florida, and the other
9  two or three may have -- the other two or three
10 would have been in Michigan.
11   Q. And the one in Florida, do you remember
12 who you were being sued by?
13   A. Well, I don't know if I was being sued.
14 The federal government was being sued, and I was a
15 witness in the case.
16   Q. That was the one about the informant that
17 was kidnapped in, I think, Columbia?
18   A. Yes.
19   Q. Okay. That's the one where the jury
20 awarded I think, like, 1.8 million or something like
21 that?
22   A. I believe that is what it was, yes.
23   Q. Okay. And you don't recall whether or not
24 you were a defendant having a claim against you or

Page 16

1  if you were just a witness? You're not sure?
2    A. I don't recall if I was named. I know at
3  some point -- she was suing the government and not
4  me specifically, so I don't recall exactly the
5  way -- in terms of who was initially named or -- but
6  I know it was, it was the Department of Justice.
7    Q. Okay. And that was during the time that
8  you were attached to the Department of Justice, at
9  least assigned to the Department of Justice working
10 on that joint task force; is that correct?
11   A. That is correct, yes.
12   Q. Okay. And I believe she was one of your
13 CIs too, correct?
14   A. Well, she was an informant for the
15 government, yes. She was -- it was an informant
16 that I was responsible for or worked in my
17 particular group, yes.
18   Q. And you thought two or possibly three ones
19 in Michigan; is that correct?
20   A. That's correct.
21   Q. Would that be from your time at Plymouth
22 Township Police Department, or would that be even
23 further back into Detroit times?
24   A. No, it would have been Plymouth Township.

Page 17

1    Q. Okay. And do you remember what those were
2  that you were named as a defendant?
3    A. Department matters have all been
4  employees, employee misconduct in which I was
5  involved in the investigation and disciplinary
6  action of various employees.
7    Q. Okay. And did you testify in court on any
8  of those cases?
9    A. Depositions, I believe. I don't believe
10 there was ever -- I don't believe there was any
11 courtroom testimony.
12   Q. And did any of those result in the city
13 paying money?
14      MS. BRADY: Objection, foundation.
15      You can answer if you know.
16      THE WITNESS: I believe there was a
17   settlement on one; and then I believe the other
18   one, I don't believe any money was paid out.
19 BY MR. ENGQUIST:
20   Q. Okay. Which one was the settlement on?
21 Do you remember the facts of that case?
22   A. I -- there's a confidentiality agreement
23 associated with that, so I would have to find out
24 what I could testify to and what I can't.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 18..21

Page 18

1     Q.   Okay.  Did it have to do with a former
2 officer by the name of Brittany DeFrain?
3          MS. BRADY:  Hang on.  I'm going to object
4     to the form of that question.
5          MR. ENGQUIST:  Okay.
6          MS. BRADY:  And also, Tom, if you -- if
7     there are confidentiality agreements in place,
8     you don't have to answer any questions that you
9     think might violate that.
10         THE WITNESS:  I understand.
11         MS. BRADY:  Okay.  So if you think you can
12    answer this question without, you know,
13    crossing any line, go ahead.
14         THE WITNESS:  You know, I don't.  I would
15    rather err on the side of caution and find out
16    from the attorneys that handled the case on
17    what exactly I can testify to and what I cannot
18    testify about.
19 BY MR. ENGQUIST:
20    Q.   And what attorneys handled the case?
21    A.   The attorneys with the MMR, Michigan
22 Municipal League.  Chris Johnson was one of the
23 attorneys, I believe, that handled the case.
24    Q.   Okay.  So if it was in the newspaper that

Page 19

1 there was an out-of-court settlement reached with
2 former officer Brian [sic] DeFrain, who charged
3 discrimination because of probationary period
4 extended by you, and the settlement was $50,000, can
5 you confirm that, or is the paper wrong, or are you
6 going to refuse -- do you not want to answer the
7 question?
8          MS. BRADY:  Object to foundation.
9          But you can go ahead and answer about
10    what's publicly available.
11         THE WITNESS:  The only thing I would say
12    is don't believe everything that was written in
13    a newspaper; that it's certainly far more
14    complex than that.  And beyond that, I don't
15    know what I can share with you.
16 BY MR. ENGQUIST:
17    Q.   And you thought there might be another one
18 or two for your time at the Plymouth Police
19 Department, is that correct, where you were named?
20    A.   I believe there was, yes.
21    Q.   Okay.  But you don't recall those cases
22 about how they were resolved necessarily, do you?
23    A.   Well, no, I do recall how they were
24 resolved, but I know there was confidentiality

Page 20

1 agreements associated with them.
2    Q.   And in those other two, one or two
3 possible cases, did you give testimony, deposition
4 testimony?
5    A.   Yes.
6    Q.   And were you also represented by
7 Chris Johnson in those matters?
8    A.   I think Chris -- I think Mr. Johnson was
9 the attorney on those matters, yes.
10    Q.   Okay.  And do you recall if they were in
11 state or federal court there in Michigan?
12    A.   I believe they were federal court.
13    Q.   If we can, why don't we look at Exhibit
14 Number 6, which was your invoice in this case.  Make
15 sure we have that.
16         Do you have a copy of that?  I can put it
17 on the screen.
18    A.   If you don't mind putting it on the
19 screen, that would be helpful.
20    Q.   Give me one second.
21         All right.  Do you see it?
22    A.   I do.
23    Q.   Okay.  So this is marked as
24 Exhibit Number 6 previously.

Page 21

1         Looks like the bill that was submitted on
2 11/19/2022; is that correct?
3    A.   Yes.
4    Q.   Okay.  And I'll just scroll down.
5         And this is in the Iglesias matter,
6 correct?
7    A.   It is, yes.
8    Q.   Okay.  And if I scroll down, you have a
9 starting date at 9/19/2022.
10         Do you see that?
11    A.   I do.
12    Q.   Would it be fair to say that's when you
13 started work on this case?
14    A.   I believe so, yes.
15    Q.   Okay.  Is there any reason why it would
16 not be 9/19/2022?
17    A.   No, no.  I believe that's the date.
18    Q.   Okay.  And then it ends on 10/19/2022, a
19 month later; is that correct?
20    A.   On that invoice, yes.
21    Q.   Okay.  And with a total amount of
22 $18,898.75, correct?
23    A.   That is correct.
24    Q.   For -- it gives a total of 58.15 hours?

THOMAS J. TIDERINGTON, 02/13/2023

Page 22..25

Page 22

1    A.  That's correct.

2    Q.  Okay.  You said on this invoice.

3        Are there other invoices?

4    A.  There will be.  There isn't right now.

5    Q.  Oh, I understand you're going to have an

6  invoice for today's deposition.

7        But has there been any other work on the

8  case other than gearing up for this deposition and

9  this deposition?

10   A.  Oh, no.

11   Q.  Okay.  Now, in preparation for today's

12 deposition, did you prepare at all?

13   A.  I did.

14   Q.  Okay.  And when did you start preparing

15 for the dep?

16   A.  Oh, I guess a couple weeks ago.

17   Q.  And when you say you started "a

18 couple weeks ago," how did that -- is that you

19 reviewing something?  How did that start?  What did

20 you do to prepare?

21   A.  Well, I was notified that there would be a

22 deposition, so I began reviewing the material that

23 was provided to me related to this matter.

24   Q.  Okay.  And did you meet with anybody in

Page 23

1  preparation for your deposition?

2    A.  I -- I did, yes.

3    Q.  Okay.  How many times?

4    A.  Oh, I guess maybe two or three.

5        When you say "meet," it was not in person,

6  but it was over a phone conference.

7    Q.  Okay.  And who was that that you had phone

8  conferences with to prepare for your deposition?

9    A.  The attorneys for the plaintiff, Ms. Brady

10 and I call him Anand.  I can't pronounce his last

11 name.  I guess I should work on that.

12   Q.  And I know we don't have the next invoice,

13 but approximately how much time did you put in

14 preparing for today's deposition?

15   A.  I don't know if I have the exact number,

16 but somewhere between probably 15 and 20 hours.

17   Q.  So it could be as much as about a third of

18 the time it took you to prepare the report in this

19 case, correct, preparing?

20   A.  Perhaps.

21   Q.  I'll pull up Exhibit Number 4, which is --

22 do you want me to share the screen again?  I can.

23   A.  Sure.

24   Q.  It's your rate.  Let me just pull this up

Page 24

1  again.

2        Do you see it there?

3    A.  I do.

4    Q.  All right.  This was actually an

5  attachment to your larger report, and it just gives

6  the case review and expert report billing rate as

7  325, deposition testimony as $500 per hour, and

8  trial testimony is $4,500 per day, correct?

9    A.  That is correct.

10   Q.  Okay.  And that actually jives with your

11 invoice produced in this case because it was at $325

12 an hour for your review and case report, correct?

13   A.  That's correct.

14   Q.  Okay.  And your prep time, which was

15 estimated right now between 15 and 20 hours, that

16 would be at the 325 rate, correct?

17   A.  That's correct.

18   Q.  Okay.  Have those numbers changed at all

19 since you gave this to us in this case?

20   A.  I'm sorry, the numbers changed as far as

21 what goes?

22   Q.  Have they gone up?  Have they gone down?

23 Do you charge more now?

24   A.  My hourly fee is the same.

Page 25

1    Q.  Okay.  And what about the deposition

2  testimony fee or the trial testimony fee, has that

3  gone up since then?

4    A.  I'm sorry, no, all of the information with

5  Loevy & Loevy is accurate and reflects the hourly

6  rate and trial testimony and depo testimony that I

7  charge.

8    Q.  Okay.  Is this the same billing rate that

9  you charged to the case in Wisconsin?

10   A.  I don't believe so.  I believe that

11 there's -- my rates have gone up, but I haven't

12 changed my rates that I've charged to Loevy & Loevy.

13 These are the -- these are the same rates that I was

14 retained on a year and a half or two years ago, and

15 I haven't changed those.

16   Q.  Okay.  And do you know what your rate

17 change is for different clients like the one you

18 have in Wisconsin?

19   A.  I think at that time the rate was 350 an

20 hour.

21   Q.  Okay.  And was there a change in rate for

22 deposition testimony?

23   A.  Yes.

24   Q.  And what is that?

THOMAS J. TIDERINGTON, 02/13/2023      Page 26..29

Page 26

1     A.  I think the deposition testimony and trial
2     testimony is the same in the Wisconsin case, but the
3     hourly rate is different with Loevy & Loevy because
4     it reflects, again, what I was -- the hourly rate
5     that I was charging when I was retained by them.
6     **Q.  I understand.  I just want to make sure.**
7     **For this case in Wisconsin, the last one you did**
8     **involving the use of a canine, you said your case**
9     **review rate was different because it was 350 an**
10    **hour.**
11    **Was your deposition, deposition testimony**
12    **rate of $500 per hour the same in the Wisconsin**
13    **case?**
14    A.  I think it is, yes.
15    **Q.  Okay.  And the trial testimony is still at**
16    **$4,500 per day for the Wisconsin case, correct?**
17    A.  That's correct.
18    **Q.  Okay.  I just wanted to make sure that was**
19    **clear.  I wasn't quite understanding it.**
20    A.  No, I understand.
21    **Q.  If you look at Exhibit Number 3, which is**
22    **Attachment B to your report, you should probably**
23    **have that in front of you.  It's materials reviewed.**
24    **Do you have that in front of you?**

Page 27

1     A.  I do.
2     **Q.  Okay.  And just to be clear, materials**
3     **reviewed, you have a list of 151 items, correct?**
4     MS. BRADY:  Objection, form.
5     If you want to count, Tom, you can count.
6     MR. ENGQUIST:  Well, they're numbered,
7     Rachel.
8     BY MR. ENGQUIST:
9     **Q.  151, correct?**
10    A.  Yes, I think this reflects the material
11    that I've reviewed up to this point.
12    **Q.  Okay.  And just to be clear, I'm not**
13    **saying that 151 means 151 pages.**
14    **Many of these are multiple pages, correct?**
15    A.  Oh, absolutely, yes.
16    **Q.  For an example, like Number 2 in this**
17    **case, Number 2 listed here is a prosecutor's file,**
18    **and that's Bates stamped CCSAO Iglesias 1 through**
19    **765, correct?**
20    A.  That is correct.
21    **Q.  Okay.  And the Complaint in this matter**
22    **was actually fairly lengthy too.  It wasn't a single**
23    **page or even just a dozen pages, correct?**
24    A.  It was multiple pages, yes.

Page 28

1     **Q.  Okay.  And every deposition listed here would be**
2     **the full deposition that's listed, correct?  It**
3     **wouldn't just be partial, part of the deposition?**
4     **It would be full depositions?**
5     A.  Yes, it would be.
6     **Q.  Okay.  Now, were any of these documents**
7     **when they were provided to you edited in any way?**
8     **And what I mean by that, were they -- you know, did**
9     **you not get the complete document?  Did you only get**
10    **pieces of the documents?**
11    MS. BRADY:  Objection, form.
12    THE WITNESS:  No, I believe all of the
13    documents I have listed, I received the
14    documents, the total pages of all the
15    documents, I believe.
16    BY MR. ENGQUIST:
17    **Q.  Okay.  And when you -- you have a**
18    **breakdown here for materials reviewed.  Material 1**
19    **through 44, it says in conjunction with the report**
20    **you have these 44 things.  And the next ones, 45**
21    **through 49, are a subheading that states "File**
22    **Comparison Files."**
23    **Do you see that?**
24    A.  I do.

Page 29

1     **Q.  Now, did you review Items 45 through 49**
2     **before writing your report in this case, or was that**
3     **done in a previous case, or both?**
4     A.  Probably both.
5     **Q.  Okay.  And the next section, Items 50**
6     **through 151, so 101 items here, you have "Additional**
7     **Materials, including matters previously reviewed in**
8     **Reyes versus Guevara and Sierra versus Guevara,"**
9     **correct?**
10    A.  That's correct.
11    **Q.  Okay.  Were these 101 items, were they**
12    **reviewed in -- excuse me.**
13    **Were they reviewed in preparation for your**
14    **report in this case or only with the other matters,**
15    **Reyes and/or Sierra, or both?**
16    MS. BRADY:  Objection, form.
17    Go ahead.
18    THE WITNESS:  I think I understand.  I
19    think I -- I'm sorry, go ahead.
20    BY MR. ENGQUIST:
21    **Q.  No, that was a tad confusing.  But if**
22    **think you understand, why don't you give me the**
23    **answer.**
24    A.  I'm looking at material, and obviously

Page 30

1 I've been involved in several cases involving the
2 Chicago Police Department, and if I looked at
3 something in Reyes and Solache that applies to
4 Sierra, applies to Iglesias or Maysonet or any other
5 case, it would be, I guess, cumulative, cumulative
6 knowledge, I guess, is the way to describe it, of
7 what was occurring.
8    Q.  Okay.  Well, let me try to ask it a
9 different way.
10       You reviewed materials for Reyes before
11 you reviewed materials for Iglesias, correct?
12    A.  I would have, yes.
13    Q.  And you reviewed materials for Sierra
14 before you reviewed materials in Iglesias, correct?
15    A.  That's correct.
16    Q.  Okay.  So before writing your report in
17 this case, in Iglesias, did you go back and review
18 these materials 50 through 151?
19    A.  Oh, I certainly may have, yes.  I can't
20 tell you exactly which ones I went back and
21 reviewed, but I'm sure I did.
22    Q.  Okay.  When you say you're sure you did,
23 are you saying you might have gone back just to
24 refresh your recollection on something, or did you

Page 31

1 go back and actually review, like, a full -- like
2 the full items when you would go back and review?
3       MS. BRADY:  Objection, form.
4       Go ahead.
5       THE WITNESS:  It may have been both.
6 Certainly there were, you know, things that I
7 may have recalled in a certain case that I
8 would go back to refresh my memory as to what
9 was said, or there may have been a situation
10 where I went back and reviewed the entire
11 document.  But, again, the entire document may
12 have been 2 pages versus 2,000 pages.
13 BY MR. ENGQUIST:
14    Q.  Okay.  And are all the items 50 through
15 151 relevant to your opinions in this case?
16       MS. BRADY:  Objection, form.
17       THE WITNESS:  I would say that they were
18 all considered.  How relevant each one is, I
19 guess, is difficult to answer, but it's all of
20 the material is what I considered in this
21 report.
22 BY MR. ENGQUIST:
23    Q.  Okay.  I lost my spot here.  One second.
24       Can you -- one of the ones I was curious

Page 32

1 about, you produced this one.  You have
2 attachment -- I'm sorry, not attachment.  It's
3 Document Number 130, "Police Records, Their
4 Installation and Use," by O.W. Wilson.
5       Do you see that?
6    A.  I'm sorry.  I do see that.
7    Q.  Okay.  And do you have a copy of that
8 book?
9    A.  I may have.  I don't know if I do or not,
10 if I still do or not.
11    Q.  Okay.  And do you know when it was
12 printed?
13    A.  I -- I don't.  I'd have to go back and
14 look at it, but I think it was one of those
15 historical books, if I recall specifically.
16    Q.  And how did O.W. Wilson's writing here on
17 "Police Records, Their Installation and Use," affect
18 your opinions in this case?  How did they inform
19 your opinions in this case?
20    A.  It was a -- it was information that I
21 considered.  I can't say that there was any specific
22 reference that I would say that I could point to
23 that caused me to create an opinion or to -- it's
24 just a cumulative amount of information that I

Page 33

1 accumulated over my years of law enforcement
2 experience and teaching.  And, you know, at some
3 point, I may have looked at it or I did look at it,
4 and I can't say specifically what influence that had
5 over me.
6    Q.  Okay.  Are there any other, as you put it,
7 historical writings that you reviewed in preparation
8 for your deposition -- sorry, reviewed in
9 preparation for giving your report in this case?
10       MS. BRADY:  Objection, form.
11       THE WITNESS:  Well, a lot of the material,
12 I mean, obviously all the material is
13 historical obviously, but this -- these are
14 documents throughout my career that I've --
15 essentially are in my library that I've used at
16 one point or another throughout my career and
17 whether -- in either teaching college-related
18 courses or law enforcement training classes.
19 BY MR. ENGQUIST:
20    Q.  And do you find O.W. Wilson to be
21 authoritative in your field?
22       MS. BRADY:  Objection, form, calls for a
23 legal conclusion.
24       THE WITNESS:  I didn't say that, I don't

THOMAS J. TIDERINGTON, 02/13/2023                    Page 34..37

Page 34

1    think.  That wasn't my testimony, I don't
2    believe.
3    BY MR. ENGQUIST:
4        Q.  No.  Do you find him authoritative in your
5    field?
6        A.  Oh, I would have to go back and look.  As
7    we sit here today, I can't really even tell you what
8    was in the book, and it may have been some time
9    since I've looked at it.
10        So I'd have to review it and then let you
11    know about that.
12        Q.  Now, was that something that you yourself
13    gathered as part of the materials reviewed, or is
14    that something that was given to you as a material
15    to review in preparation for giving your -- for
16    creating your report in this case or other cases for
17    Loevy & Loevy?
18        MS. BRADY:  Objection, form.
19        THE WITNESS:  I would have to think about
20        it.  I think it's material that I had or
21        material that I read in some of the Brasfield
22        reports that I reviewed because I was curious
23        as to how he relied upon it as.
24

Page 35

1    BY MR. ENGQUIST:
2        Q.  If you want to look back at your materials
3    reviewed, a couple things that you have in here, and
4    they're also in your report, you have the
5    COI Petition, Number 11; the CIO Order, Number 12.
6        And how did you use those two items to
7    come to your opinions in this case?
8        A.  I would have to go back and look at -- I'd
9    have to go back and review those and refresh my
10    memory as to what they are.  I don't really recall
11    as we sit here.
12        Q.  Do you know what a COI order is?
13        A.  I believe --
14        MS. BRADY:  Object to form.
15        THE WITNESS:  I'm sorry.  Go ahead.
16        MS. BRADY:  Go ahead.
17        THE WITNESS:  I don't know.  It's an
18        interrogatory or a response, I believe, to -- I
19        don't know the legal terminology.
20        And, again, perhaps if you put it up on
21        the screen, it would help me to refresh my
22        memory as to what it is.
23    BY MR. ENGQUIST:
24        Q.  Do you know what a Certificate of

Page 36

1    Innocence here is in Illinois?
2        A.  I'm not sure I know exactly what it is.  I
3    guess I assume it indicates that a person has been
4    deemed to be innocent of the crime that he was
5    convicted of or she was convicted of.
6        Q.  Okay.  And how would that go about
7    informing your opinions on police procedure in this
8    case?
9        MS. BRADY:  Objection, form and
10        foundation.
11        Go ahead.
12        THE WITNESS:  I'm sorry, could you please
13        re-ask that question?  I'm not sure I
14        understood it.
15        MR. ENGQUIST:  Can we have it read back,
16        please.
17        (Question read.)
18        MS. BRADY:  I'll add an objection that I
19        think it assumes facts not in evidence.
20        But go ahead and answer if you can.
21        THE WITNESS:  Well, it's one of the
22        documents that I considered in the case.  I
23        don't know that I had more importance than any
24        other document.  It's the sum and substance of

Page 37

1    the material that I reviewed.
2    BY MR. ENGQUIST:
3        Q.  Okay.  So if the State's Attorney's Office
4    decided not to object to the Certificate of
5    Innocence or not actually take any position in it
6    and it was granted, how does that -- how does that
7    play into your opinions on the -- your opinions
8    regarding the investigation into the murders of
9    the -- the murder of Monica Roman in this case?
10        MS. BRADY:  I'll object to form and that
11        it misstates the evidence and incomplete
12        hypothetical.
13        THE WITNESS:  Yeah, if you're asking me
14        how it played into it, I can't really answer
15        that question because I don't know without
16        reviewing the documents if that was really the
17        case or what happened.
18    BY MR. ENGQUIST:
19        Q.  Well, would it matter to you one way or
20    the other how the Certificate of Innocence came to
21    be in coming to your opinions?
22        A.  No.
23        Q.  Number 44 listed here is Plaintiff's
24    Second Supplemental Responses to Defendant

Page 38

1  Halvorsen's First Set of Interrogatories to
2  Plaintiff.
3        Do you recall how you used this document
4  to help inform your opinions in this case?
5      A.  It's -- it's a document that I reviewed,
6  that I reviewed, that I reviewed that it's -- it's
7  something I considered, but I don't know exactly
8  what was contained in there.  I would have to look
9  at that again to refresh my memory.
10     Q.  Okay.  Just focusing on the Documents 1
11 through 44, did you receive all these documents from
12 the plaintiff's attorneys?
13     A.  I believe so, yes.
14     Q.  Okay.  I know you already said before none
15 of them were edited, as in like you didn't get an
16 incomplete file or incomplete document.
17        But were any of them highlighted or marked
18 in any way when they were produced to you?
19     A.  No.  I should say I don't believe they
20 were.  I don't have any recollection of anything
21 being highlighted in any of these documents.
22     Q.  Well, were they sent to you -- were they
23 sent to you electronically or paper form?
24     A.  It would have been electronically.

Page 39

1      Q.  Okay.  So you would still have the
2  originals, correct?
3      A.  I would -- I would still have the --
4      Q.  The original ones that were sent to you,
5  correct?
6      A.  I would have the electronic files that
7  were sent to me, yes.
8      Q.  And as you sit here today -- and since
9  this time -- actually, you said you spent time
10 reviewing and preparing for today's deposition.
11        Did you notice any of the items of the
12 materials reviewed that were highlighted or marked
13 in any way when they were sent to you?
14     A.  I don't believe so, no.
15     Q.  Okay.  Now, as part of review, your 15 to
16 20 hours, did you review these materials 1 through
17 44 at all?
18     A.  I did.
19     Q.  Which ones?
20     A.  I guess I'd have to go through.  I think I
21 looked at the Complaint, investigative file,
22 permanent retention file, photos, the trial
23 exhibits, transcripts.
24     Q.  The trial transcripts?

Page 40

1      A.  That's correct.  Do you want me to go
2  through each one of these?
3      Q.  I'm just curious.  Yeah, you started off,
4  so why don't we finish your answer.
5      A.  I don't think I reviewed 11 and 12.  I may
6  have, but I don't -- I don't recall if I did or not.
7        I don't believe I looked at Number 44
8  again.  I know I looked at it perhaps originally,
9  but I don't know if I looked at it during my prep.
10 I may have though, but I don't independently recall
11 that.
12        So everything else I reviewed as far as in
13 preparation for this deposition.
14     Q.  Okay.  And why would you have reviewed the
15 COI orders for Armando Serrano, José Montanez, or
16 Robert Bouto, Numbers 13, 14, and 15, in preparation
17 for your deposition?
18     A.  You know, I don't know if I did or not.
19 You bring that up, and that's a good point.  I know
20 I looked at it originally.  I don't know if I looked
21 at it in preparation.
22     Q.  Okay.  And how were the COI orders for
23 Serrano, Montanez, and Bouto impactful on your
24 opinions in this case?

Page 41

1      A.  I don't think -- I don't think they were
2  impactful.  Again, it's a document that was provided
3  to me that I looked at and considered.
4      Q.  You also have listed here you were given
5  the expert reports for Nancy Franklin and
6  Jennifer Dysart, Numbers 18 and 19.
7        You said -- did you review those in
8  preparation for your deposition today?
9      A.  I did.
10     Q.  Okay.  And did you use them as part -- as
11 part of your report in this case?
12     MS. BRADY:  Objection, form.
13     THE WITNESS:  I don't -- I would have
14 to -- I don't know.  I would have to look
15 through that again.  I don't know if I
16 reference any of their material in my report or
17 not.
18 BY MR. ENGQUIST:
19     Q.  Well, you're not an eyewitness expert, is
20 that correct, eyewitness identification expert?
21     A.  No, I'm not.
22     Q.  And you -- I'm assuming you would leave
23 that to people that hold themselves out to be
24 eyewitness experts, not yourself, correct?

Page 42

1    A.  Leave what out to be?
2    **Q.  Give opinions on eyewitness identification**
3  **issues.**
4    A.  Well, I certainly have a great deal of
5  experience with eyewitnesses.
6        Am I an eyewitness expert?  I guess you
7  would have to define that or what constitutes an
8  eyewitness expert.  I certainly have a lot of
9  practical experience interviewing eyewitnesses.
10    **Q.  And did any of the report -- any of the**
11  **information in the reports of either Jennifer Dysart**
12  **or Nancy Franklin, did they inform any of your**
13  **opinions in this case?**
14    A.  I think their opinions supported my
15  conclusions.
16    **Q.  So what came first?  Did you review those**
17  **reports and then find that they supported your**
18  **opinions and were already together or already**
19  **formed, or did you review those reports and then**
20  **write your opinions?**
21        MS. BRADY:  Objection, form, and
22    incomplete hypothetical.
23        Go ahead.
24        THE WITNESS:  I'm just -- it's like a

Page 43

1  chicken or an egg kind of a question, I guess.
2  BY MR. ENGQUIST:
3    **Q.  It is.**
4    A.  Certainly I have opinions that I believe
5  were supported by the information in their expert
6  reports, but their expert reports did not change my
7  opinions whatsoever.  My opinions are -- would have
8  been the same whether or not I read the reports or
9  did not, I guess, is the best way to explain that to
10  you.
11    **Q.  Okay.  Well, did you come to your opinions**
12  **in this case regarding eyewitness issues before or**
13  **reading the reports or after reading the reports?**
14        MS. BRADY:  Objection, form.
15        THE WITNESS:  Well, I guess the basis for
16    my opinion on eyewitness reliability, I guess
17    my -- the basis of my opinion started back in
18    1978 when I attended the Detroit Police
19    Academy.  So it would have been well before I
20    read either one of their reports.
21  BY MR. ENGQUIST:
22    **Q.  That wasn't my question though.**
23    A.  Okay.
24    **Q.  When you came to your opinions on**

Page 44

1  **eyewitness identification issues in your report, did**
2  **you come to those opinions before or after you read**
3  **the reports of either Nancy Franklin or**
4  **Jennifer Dysart?**
5    A.  Oh, no, I think my opinions were before I
6  read their reports.
7    **Q.  So you read the reports after you already**
8  **came to the opinions?**
9    A.  I don't -- you know, you're asking me to
10  put a time stamp on tens -- over 10,000 documents or
11  pages of documents.  I don't know if I can answer
12  that.
13        But it's my recollection that my report
14  was written before I read their reports.
15    **Q.  Okay.  If your report was written before**
16  **reading their reports, then why is it a materials**
17  **reviewed in preparation for the report?**
18    A.  Oh, I'm sorry.
19        MS. BRADY:  Yeah, objection, form, and I
20    think it's misstating his testimony.
21        MR. ENGQUIST:  I just repeated it back.
22  BY MR. ENGQUIST:
23    **Q.  But go ahead, sir.  You can explain it.**
24    A.  No, my opinions -- I formed my opinions in

Page 45

1  reviewing the information.  When exactly did I read
2  their reports, I can't tell you that as we sit here
3  today.  I guess I was trying to explain that my
4  opinions -- whatever influence the report had over
5  my opinions would not have changed my opinion or my
6  views of the reliability of eyewitness testimony or
7  identification.
8        So in writing my report, I can't tell you
9  as we sit here today when I read it, but it
10  certainly would not have changed my opinions.  It
11  supported my conclusions, I guess, is the best way
12  to describe it.
13    **Q.  Let's move to your report, if we can,**
14  **which is Exhibit Number 2.**
15        I believe, if I have this right -- sorry,
16  **give me one second.  Hopefully opening the documents**
17  **doesn't crash my computer.**
18    A.  I'm sorry, before we move on, would it be
19  all right if we take, like, a break every hour for
20  like five or ten minutes?
21    **Q.  That's absolutely fine.  Actually I was**
22  **going to kind of just do one thing, you know, make**
23  **sure we're talking about the same exhibit, and then**
24  **we will take a break.**

THOMAS J. TIDERINGTON, 02/13/2023                    Page 46..49

Page 46

1    A.  That's fine.
2    Q.  I'm all for taking breaks every hour or
3  so.  I prefer to do that myself.
4    A.  Okay.  Perfect.
5    Q.  So to be clear what we're talking about
6  here is Exhibit Number 2, and it's the first
7  74 pages in your report.  It began with a concluding
8  statement and your signature.  So make sure you have
9  that in front of you.
10    Why don't we break, and we will just come
11  back at -- it's now five to 10:00, so come back
12  around 10:00 o'clock-ish?
13    A.  Perfect.  Thank you.
14    MR. ENGQUIST:  Thank you.  Let's go off
15  the record.
16    THE VIDEOGRAPHER:  We're off the video
17  record at 9:55 a.m.
18    (Whereupon, a recess was taken
19      from 9:55 a.m. to 10:03 a.m.)
20    THE VIDEOGRAPHER:  We're back on the video
21  record at 10:03 a.m.
22  BY MR. ENGQUIST:
23    Q.  Okay.  Mr. Tiderington, when we left off,
24  we had pulled up Exhibit Number 2, which is the

Page 47

1  report, which is the first 74 pages of your full
2  report.
3    And just to be clear, Exhibit Number 1 is
4  your full report, and the reason I don't have that
5  up on my screen is because it's 190 -- I'm sorry,
6  911 pages long, correct?
7    A.  That is correct, with the attachments,
8  yes.
9    Q.  With the attachments.  Okay.
10    And just to be clear, the first -- when we
11  were talking about your report in this case, when we
12  talk about your time that you spent, the
13  58.15 hours, that was for reviewing the materials we
14  just went through and drafting this 74-page report,
15  correct?
16    A.  That's correct.
17    Q.  Okay.  Now, with the additional, after
18  Page 74 all the way to 911, was that all
19  previously -- previously put together in the other
20  two cases, or when was that put together?
21    MS. BRADY:  Objection, form.
22    THE WITNESS:  Well, some of the material
23  was put together in the other two cases, but,
24  again, it's a cumulative process where I'm

Page 48

1  adding to the list of materials and reviewing
2  the information as we progress with the other
3  cases that I'm involved with.
4  BY MR. ENGQUIST:
5    Q.  Okay.  And I understand that, and thank
6  you for explaining it again.  But I understand the
7  first 74 pages of this 911 pages is added to because
8  that's new; that's from Iglesias.
9    Was anything else added to the after
10  Page 75 through 911 during your time with Iglesias?
11    A.  No, only what was on the list of materials
12  reviewed.
13    Q.  Okay.  All right.  So we're focusing just
14  on the first 74 pages.
15    That 74 pages and the review of what you
16  said were like tens of thousands of pages of
17  documents, that's all covered by Exhibit Number --
18  excuse me -- 6, your invoice, correct?
19    MS. BRADY:  Objection, form.
20    THE WITNESS:  I'm not sure what you mean
21  by covered by my invoice.  I don't understand
22  that.
23  BY MR. ENGQUIST:
24    Q.  Well, your invoice has your time spent on

Page 49

1  the Iglesias case, correct?
2    A.  That's correct.
3    Q.  Okay.  So your time spent on the Iglesias
4  case would be reviewing the materials we talked
5  about you reviewing for the Iglesias report and also
6  the time spent drafting -- I'm sorry, drafting this
7  74 pages of the report, correct, the first 74 pages?
8    A.  That's correct.
9    Q.  All right.  Okay.  If we can start off on
10  Page 4.  Oh, actually, yeah, on Page 4, when you
11  talk about your terminology in certain parts here,
12  reasonable, reckless, negligent, unreasonable,
13  foreseeable, deliberate indifference, gross
14  deviation, do you see that?
15    A.  I do.
16    Q.  Okay.  When you were going through your
17  report, were you looking for things that you felt
18  might be negligent?
19    A.  Not necessarily.
20    Q.  Okay.  What do you mean by "not
21  necessarily"?
22    A.  Well, what do you mean when I was going
23  through my report?  I don't understand what you mean
24  by that.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 50..53

Page 50

1     Q.  Oh, okay.  Okay.  I'm sorry, I didn't
2  realize you didn't understand.
3        My question is, when you were drafting
4  your report, when you were reviewing materials, were
5  you looking for items that you believed would be
6  negligent?
7        MS. BRADY:  Objection, form.
8        THE WITNESS:  I don't know if I was
9  specifically looking for anything that was
10  negligent.  I was reviewing the case file, and
11  kind of my process is to review it.  And if I
12  was the police chief in that agency or if I was
13  a command officer in that agency, the process
14  that I use is if I was reviewing this case
15  file, I'm assuming that these are my officers
16  and what would be my opinion on the work that
17  they did.
18     So I wasn't necessarily looking for
19  anything negligent.  I was evaluating the
20  investigation, the investigative steps that
21  were taken, and the actions of the officers.
22  BY MR. ENGQUIST:
23     Q.  Okay.  Now, it says -- on the same page,
24  it says Introduction, and you list two basic things

Page 51

1  that you were asked to assess, correct?
2     A.  That's correct.
3     Q.  Okay.  The first one is "whether there
4  were deviations from generally accepted police
5  practices in the investigation of the murder of
6  Monica Roman that was conducted by various Chicago
7  police officers," correct?
8     A.  Yes, it does.
9     Q.  Okay.  So that's just regarding the
10  underlying investigation, correct?
11     A.  What do you mean "the underlying
12  investigation"?
13     Q.  When you're talking about deviations into
14  the -- regarding the investigation into the murder
15  of Monica Roman, you're only talking about that
16  investigation, correct, the murder of Monica Roman?
17     A.  Yeah, I think so.  I think the answer is
18  yes.  If I understand your question, yes.
19     Q.  You're looking at the underlying case, not
20  the broader policies, which is Number 2, correct?
21     A.  Oh, I understand.  Yes, you're correct.
22     Q.  Okay.  Because Number 2 is "whether the
23  Chicago Police Department's policies and practices
24  related to photo arrays/lineups, documentation and

Page 52

1  notetaking, including the creation, preservation,
2  and disclosure of investigative materials in
3  homicide cases were at the time adequate and
4  consistent with acceptable police practices around
5  the country," correct?
6     A.  That's correct.
7     Q.  Okay.  And just to be clear, and I know I
8  introduced myself in the very beginning, but I
9  represent Halvorsen, Gawrys, Riccio, and Biebel in
10  this case.  So I'm looking at the underlying
11  incident, okay?
12     A.  I understand.  Thank you.
13     Q.  And still Introduction, I know you do it
14  several times later on.
15        Going into Page 5, you note that
16  Detective Guevara had pled the Fifth when asked
17  about this in his deposition, correct?
18     A.  That's correct.
19     Q.  Okay.  And then you put in there, "In
20  other words, he did not deny committing egregious
21  misconduct in this case"?
22     A.  That's correct.
23     Q.  Okay.
24     A.  Or other cases.

Page 53

1     Q.  Okay.  Is that -- the fact that he's
2  taking 5, does that inform your opinions in this
3  case?  Is that a point that you need to have here to
4  form your opinions in this case on police procedure?
5     A.  No.  I mean, I found it to be highly
6  unusual and inconsistent with any and all criminal
7  investigations that I have ever been a part of or
8  know about.  I thought it was very unusual, but it
9  wasn't the sum and substance of or the basis for my
10  opinions.  It was one of the factors that I
11  considered.
12        Typically, if an officer is accused of
13  wrongdoing, he's going to shout from the mountaintop
14  that he didn't do that.  That wasn't the case here
15  in the cases that I've looked at.
16     Q.  Okay.  Sir, I'm a little confused by your
17  answer because you said did not inform your
18  opinions, but then there was -- then you said it was
19  something that you looked at.  So I'm not sure which
20  one it is.
21     A.  Well, something I considered in forming my
22  opinions.
23     Q.  Okay.  And what impact did that have on
24  your opinions, the fact that Rey Guevara is

THOMAS J. TIDERINGTON, 02/13/2023                Page 54..57

Page 54

1  currently -- taking the Fifth?
2       A.  What impact?  It was one step in the
3  process that I used.  I can't say that -- it
4  certainly wasn't the basis of all my opinions.  It
5  was a factor that I considered in coming to my
6  conclusions.
7       Q.  All right.  And then you have -- to
8  further summarize your opinions, you have several
9  things in here.
10      You talk about the jailhouse informant,
11  Francisco Vicente, correct?
12      A.  I do, yes.
13      Q.  And then you also talk about eyewitnesses
14  Hugo Rodriguez and Rosendo Ochoa?
15      A.  That's correct.
16      Q.  Okay.  And just to be clear,
17  Hugo Rodriguez and Rosendo Ochoa do not accuse
18  Detective Guevara or any other detectives or any
19  other police officers of misconduct, correct?
20      A.  I don't believe they do.  I think you're
21  accurate with that, but I would have to refresh my
22  memory on it, but I think you're accurate or this
23  statement is accurate.
24      Q.  Okay.  In fact, the only person accusing

Page 55

1  Detective Guevara or Detective Halvorsen of any kind
2  of misconduct is Francisco Vicente, correct?
3       MS. BRADY:  Objection, form.
4       THE WITNESS:  I don't know if that's
5  accurate.
6  BY MR. ENGQUIST:
7       Q.  Okay.  Why isn't that accurate?
8       A.  Well, we'd have to go through, I mean.  As
9  we go through my report, I think I could point out
10 some additional facts.  I believe that Iglesias has
11 testified that his statements were manipulated by
12 the detectives.
13      Q.  Okay.  So Mr. Iglesias accuses them of
14 having that -- of his statements being manipulated
15 that were documented by the police and by the
16 State's Attorney's Office, correct?
17      A.  That's correct.
18      Q.  Okay.  Anybody else?
19      A.  I think there are.  And, again, you know,
20 we're talking about a 75-page report.  So as we go
21 through it, if I note it or if I recall it, I'll
22 point it out to you.
23      Q.  Okay.  But you do think there's somebody
24 else besides the plaintiff in this case or

Page 56

1  Francisco Vicente accusing any officer of
2  misconduct, correct?
3       MS. BRADY:  Objection, form.
4       Go ahead.
5       THE WITNESS:  There may be.  Like I said,
6  my report stands by itself.  It's the basis of
7  my opinions, and there's a lot of details
8  contained in there.
9       So certainly when we -- I'm assuming we're
10 going to go through it pretty comprehensively,
11 and if there's additional things that I see in
12 the report, I'll point those things out to you.
13 BY MR. ENGQUIST:
14      Q.  I know.  I just think it was kind of a big
15 issue, the idea of alleged police misconduct.
16      I mean, we know that Francisco Vicente
17 makes very detailed allegations, very, very, against
18 both Halvorsen and Guevara.  I mean that's something
19 that you didn't forget, correct?
20      And we also know the plaintiff makes
21 allegations of misconduct that you've picked out
22 just a second ago.
23      But you don't recall whether or not any
24 other witnesses ever accused an officer of

Page 57

1  misconduct?
2       MS. BRADY:  Objection, form, as to what it
3  means to be accused of misconduct.
4       But go ahead.
5       THE WITNESS:  Yeah.  There was -- there's
6  deposition and, again, there's been so many
7  witnesses and so many cases that have accused
8  the detectives, I don't want to misspeak, and I
9  want to be precise and accurate.  And by
10 reviewing my report, and if you want to take
11 the time we can go through it now, and I can
12 answer your question after I page through each
13 step of my report.
14 BY MR. ENGQUIST:
15      Q.  And just to be clear, sir, I'm not asking
16 about different plaintiffs or different witnesses
17 being represented by plaintiff's counsel or other
18 people out there suing the City of Chicago or police
19 officers.  I'm talking about this underlying
20 investigation.
21      Okay?
22      A.  So certainly.
23      Q.  Because -- is that correct?  Because I'm
24 not -- because we're only talking about in this

THOMAS J. TIDERINGTON, 02/13/2023                      Page 58..61

Page 58

1  case, this underlying case at this point.  I'm not
2  talking about the broader everybody in the world
3  wants to sue the City of Chicago and police
4  officers.
5          I'm talking about this case, all right?
6      A.  Well, I don't know if that was my
7  testimony about everybody in the world wanting to
8  sue the Chicago Police Department.  I don't think I
9  ever said that.
10     Q.  No.  That was a bit hyperbolic; I agree.
11         But you did talk about other people in
12 other cases, and I'm not talking about other cases.
13 I'm not talking about Reyes or Solache.  I'm not
14 talking about Bouto.  I'm not talking about
15 Thomas Sierra.
16         I'm talking about the Iglesias case and
17 the underlying witnesses, okay?
18     A.  All right.  Do you want to go through page
19 by page at this point?
20     Q.  Well, I'm not -- I will go through it.  If
21 you can think of anything else as we go through it,
22 let me know.  But I'm assuming if it's not written
23 in there, it doesn't exist, okay?  Is that fair?
24         MS. BRADY:  Objection, form.

Page 59

1          THE WITNESS:  Well, if it's not written it
2  doesn't exist, I don't know if I can agree with
3  that.  But I think my report speaks for itself
4  and it's pretty comprehensive, and so I guess
5  we can go from there.
6  BY MR. ENGQUIST:
7      Q.  For the two witnesses that you have in
8  here, the eyewitnesses, Hugo Rodriguez and
9  Rosendo Ochoa, you note that they both had extremely
10 challenging viewing opportunities, correct?
11     A.  I do note that, yes.
12     Q.  Okay.  Are you saying that it would have
13 been impossible for them to view the shooter?
14     A.  I don't think my opinion was that it would
15 have been impossible.  I don't know that they were
16 in the best position to view them compared to
17 perhaps other witnesses that testified.  Certainly
18 their positions were -- I think you used the word
19 "challenging," and I agree with that.
20     Q.  I was using your word "challenging," sir.
21     A.  Okay.  Well, I agree with the fact that
22 their positions were challenging.
23     Q.  Okay.
24     A.  And one of the factors, and I also note

Page 60

1  that it's probably a deficiency in the criminal
2  investigation, was we don't know exactly from the
3  vantage point of where Ochoa was whether or not he
4  could have made the observations from his
5  second-floor apartment.  If the detectives -- and I
6  believe this would have been consistent with
7  acceptable police practices, for them to have gone
8  into that apartment and looked out the window and
9  then documented.  Maybe they did do it, but there's
10 certainly no documentation in the report that they
11 confirmed the vantage point of a key witness that
12 they were going to use in this criminal
13 investigation.
14         So we don't know exactly how good of a
15 vantage point Ochoa had and what he could have seen
16 or did not see from that location.
17     Q.  Oh, okay.  Are you saying that the police,
18 the state, the defense attorneys, they all ignored
19 the fact of looking out the window or at least
20 looking from the ground up to the window to see
21 whether or not you could view it?
22         MS. BRADY:  Objection, form.
23         THE WITNESS:  I'm sorry, you listed a
24 number of witnesses.  I don't know that I

Page 61

1  offered an opinion on all those witnesses.
2  BY MR. ENGQUIST:
3      Q.  No.  The police, the State's Attorney, and
4  the defense attorneys, are you saying they all
5  missed the idea of being able to see whether or not
6  the window viewed the shooting scene or where the
7  shooter was standing?
8          MS. BRADY:  Objection, form.
9          THE WITNESS:  When you say did they miss
10 it, I can only go on the documents that have
11 been provided to me, and I don't -- I haven't
12 seen any evidence that suggests that the
13 officers or anybody else actually went to that
14 apartment to view what Ochoa claims he saw --
15 BY MR. ENGQUIST:
16     Q.  Did you?
17     A.  -- or from the vantage point.
18         If there's information that says that
19 this, in fact, did happen, if you could provide it
20 to me, I certainly would review it and offer an
21 opinion based on that.
22     Q.  Let me ask you, if -- you can just tell me
23 as a police procedure expert here.
24         If you're on the street and you look up

THOMAS J. TIDERINGTON, 02/13/2023                    Page 62..65

Page 62

1 and you can see the window, would you assume that
2 the person, if the person is in the window, they
3 could see you?
4        MS. BRADY: Objection, form.
5        THE WITNESS: I guess it would depend on
6 where you're standing.
7 BY MR. ENGQUIST:
8    Q.  Really? So if you're standing there and
9 you look up and you see the window, you can see
10 clearly the window, would you assume the person that
11 is standing in the window could see you?
12        MS. BRADY: Objection -- hang on -- form
13 and incomplete hypothetical.
14        THE WITNESS: I'm sorry, are you speaking
15 from the point of where the shots were fired,
16 or are you --
17 BY MR. ENGQUIST:
18    Q.  It doesn't even necessarily -- it doesn't
19 necessarily even have to be where shots are fired.
20    A.  Wait a minute. I'm sorry. Please allow
21 me to answer your question.
22        If you're saying if I'm standing
23 someplace, I look up, can I assume -- and see a
24 window, can I assume that that person can see me, I

Page 63

1 guess that makes sense. I don't know that there was
2 any evidence in this case that I reviewed or in the
3 police reports that suggest that any officer from
4 the point of the shooting looked back at the window
5 and said, oh, that's where Ochoa was, made this
6 observation.
7        So I guess your question is a hypothetical
8 that I can't really answer.
9    Q.  So for you, for it to be complete, someone
10 would have had to write "I stood where the people
11 said the shooter was; I looked up; I saw the window;
12 therefore, Ochoa could have seen the shooter"? They
13 would have had to put that in the report for it to
14 be complete; is that right?
15        MS. BRADY: Objection, form.
16        THE WITNESS: To be complete, I don't know
17 if to be complete, but I think it would have
18 demonstrated more due diligence on the part of
19 the detectives. If you're going to use the
20 statement of a witness, and that witness was
21 120 yards -- 120 feet away or 80 feet away
22 compared to other witnesses that were 5 or
23 10 feet away, certainly I would do everything
24 to document and demonstrate that this witness

Page 64

1 was in a position to observe what they claimed
2 that they observed.
3 BY MR. ENGQUIST:
4    Q.  Okay.
5    A.  I believe they were in his apartment at
6 one point, so I don't know why they wouldn't have
7 done it.
8    Q.  Why they wouldn't have documented I can
9 see down the street where the person would have been
10 standing, correct?
11    A.  Certainly they should have documented the
12 fact that a key witness in this case had an
13 observation through a certain window, and these
14 detectives confirmed that the observation was
15 unobstructed and certainly that it was a
16 possibility.
17        Or more so, the detectives should have
18 done that to confirm the witnesses' statements or
19 perhaps determine that the witness was lying.
20    Q.  So do you believe that Mr. Ochoa could not
21 see where the shooter was standing from his window?
22    A.  He may have been able to see where -- he
23 may have been able to see the shooter.
24    Q.  Do you have any evidence -- do you have

Page 65

1 any evidence to suggest that he could not see the
2 shooter from his window?
3        MS. BRADY: Objection, form.
4 BY MR. ENGQUIST:
5    Q.  Any?
6        MS. BRADY: Josh, can I ask a question
7 about what your question is?
8        MR. ENGQUIST: No.
9        MS. BRADY: Well, in that case, objection
10 to form.
11 BY MR. ENGQUIST:
12    Q.  Go ahead.
13    A.  I'm sorry, could you ask that or have it
14 read back, please?
15        MR. ENGQUIST: Sure. Read it back,
16 please.
17        (Question read.)
18        THE WITNESS: I think the evidence
19 demonstrates that there would have been --
20 photographs that I looked at I think
21 demonstrates that there would have been
22 challenges, I guess is the word that we're
23 using, for the witness to have seen what he
24 stated that he observed.

THOMAS J. TIDERINGTON, 02/13/2023                          Page 66..69

Page 66

1           That combined with other factors would --
2    in my opinion, a reasonably trained officer
3    would have been very skeptical and would have
4    taken action to corroborate and verify the
5    information provided by a witness who had a
6    gang affiliation and perhaps a motive to be
7    untruthful.
8    BY MR. ENGQUIST:
9        Q.  You say "corroborate." You throw a lot of
10   different things.  You said various factors.  Let me
11   go back to the various factors part.
12           What other factors are you speaking of,
13   sir?
14       A.  What do you mean "what other factors"?
15           MS. BRADY:  Objection to form.
16   BY MR. ENGQUIST:
17       Q.  You said various factors.  I'm wondering
18   what the other factors are.
19           MS. BRADY:  Same objection.
20           THE WITNESS:  I guess one of the factors
21   is that Ochoa was untruthful.  Ochoa was an
22   admitted gang member.  Ochoa lied to the police
23   on other matters.
24           All of these factors should have been

Page 67

1    taken into consideration.  When the officers or
2    when a reasonably trained officer is conducting
3    an investigation, these are all factors that
4    would in my opinion be taken into consideration
5    and, therefore, perhaps further test or
6    corroborate the information provided by this
7    witness.
8    BY MR. ENGQUIST:
9        Q.  Okay.  And corroborating the witness'
10   information would be things like running an
11   identification procedure, correct?
12       A.  That's one of the things that they should
13   have done, yes.
14       Q.  Okay.  And they did, didn't they?
15       A.  How do you know that?
16       Q.  He picked him out, the plaintiff.  He
17   identified plaintiff in a photo array, sir.
18       A.  I'm sorry.  You said he should have done
19   what?  I guess I missed that question.
20       Q.  Conducted an identification procedure, I
21   said.
22       A.  Oh, I thought you meant they should have
23   fully identified the witness is one of the things
24   they should have done, and they should have

Page 68

1    determined if he used aliases in the past, if he had
2    a criminal history, if he had a gang affiliation, if
3    they should have identified him, perhaps, in gang
4    books that they may have had access to.
5           I thought you were talking about the
6    witness, who I think it's standard police procedures
7    to determine, when you're trying to determine the
8    credibility of a key witness, to understand that
9    witness' motive and perhaps, perhaps if there's a
10   reason for that witness to be untruthful.
11       Q.  Okay.  Now, you understand, sir, that this
12   was a gang crime in a gang-ridden area, right?
13           MS. BRADY:  Objection.
14           THE WITNESS:  I do.
15           MS. BRADY:  Go ahead.
16           THE WITNESS:  I do understand that.
17   BY MR. ENGQUIST:
18       Q.  And you understand that a lot of times in
19   areas where there's lots of gang members, you're
20   going to run into -- you're going to run into a
21   situation where your witnesses are going to be gang
22   members?
23       A.  That's correct.
24       Q.  Okay.  And so you're not going to just

Page 69

1    discount somebody because they happen to be a gang
2    member, are you?
3        A.  Am I going to discount them?  No.  I'm
4    going to use that as a step in my investigative
5    process, but I would also temper it by understanding
6    that that person's, perhaps, motive or the fact that
7    he may be in a competing or opposing gang, that's
8    certainly relevant to eyewitness identification of
9    an individual.
10       Q.  Was that -- was the fact that he was a
11   gang member known at the time of trial, Mr. Ochoa,
12   that he was a gang member?
13       A.  He testified that he was a gang member.
14       Q.  Okay.  And it was part of the trial that
15   he was from a rival gang, too, wasn't it?
16       A.  That's correct.
17       Q.  Okay.  And then when you're saying testing
18   his reliability, that was tested right there with
19   the jury, with the fact finder, correct?
20           MS. BRADY:  Objection, form.
21           THE WITNESS:  Well, it should have been
22   done by the investigators.  I don't dispute
23   that it was brought up at trial, but it should
24   have been vetted by the detectives that

THOMAS J. TIDERINGTON, 02/13/2023                    Page 70..73

Page 70

1    investigated this crime --
2    BY MR. ENGQUIST:
3        Q. I'm not sure what you mean --
4        A. -- and documented.
5        Q. I'm not sure what you mean by "vetted,"
6    sir.
7            So they're dealing with a gang member, and
8    it's from a rival gang.
9            Are they supposed to not take their
10   testimony? What are they supposed to do to vet it?
11       A. Well, one of the most simple and obvious
12   things would have been to go into the apartment and
13   actually look out that window and say, Yeah, that's
14   reasonable for him to have seen what he saw. Or
15   maybe they would have learned that, Hey, this is
16   impossible; unless he had binoculars or a telescope,
17   there's no way that this individual could have seen
18   what he saw.
19           So that's what I mean by "vetted," vetted
20   his testimony, vetted his -- the ability to see what
21   he claims he saw, especially in light of the fact
22   that there were other witnesses that had a much
23   better vantage point than Ochoa that did not see
24   what Ochoa claims that he saw.

Page 71

1        Q. Okay. That did not identify the
2    plaintiff, correct?
3            MS. BRADY: Objection, misstates the
4    testimony.
5            THE WITNESS: Didn't identify the actual
6    shooter.
7    BY MR. ENGQUIST:
8        Q. Yeah. Couldn't identify the shooter.
9            Now, you're also aware that sometimes
10   witnesses that may have a very good vantage point
11   that may actually see a shooter in a gang shooting
12   may not want to come forward and may very well say
13   that they didn't see anything when they did; isn't
14   that correct?
15       A. And actually that, you know, further bodes
16   my point and confirms my point is that I would also
17   be, based on my experience of working gang
18   investigations and criminal cartels, is that
19   typically gang members are very reluctant to testify
20   against other gang members. And I would certainly
21   question why this person is cooperating and what is
22   the motive behind this person cooperating.
23       Q. Now, you may have questions about
24   someone's motive.

Page 72

1        But are you saying that the person made
2    the identification, that shouldn't be communicated
3    to the State's Attorney's Office?
4            MS. BRADY: Objection.
5            THE WITNESS: I never said that at all.
6    BY MR. ENGQUIST:
7        Q. Okay.
8        A. I'm sorry, just -- thank you for allowing
9    me to clarify that.
10           All of this information should have -- and
11   it's right to consider the information from Ochoa.
12   It's right to consider all of the information that
13   any witnesses -- witness may give, and it should be
14   well documented.
15           And furthermore, though, I don't think it
16   should be the basis of stopping the investigation.
17   I think it's the role of the detectives to
18   corroborate the information and try to determine if
19   there's forensic information that would either
20   demonstrate that this questionable or dubious
21   witness may -- you know, the fact that they
22   identified somebody, I think it's important for the
23   detectives to take steps to corroborate that
24   information and to attempt to find forensic

Page 73

1    information, forensic evidence that supports what
2    this witness is saying. And none of that was done
3    in this case, and that's one of my big criticisms.
4        Q. Okay. Well, we will get to that, but
5    why -- you referred to Mr. Ochoa as dubious. Why --
6    you referred to him as dubious.
7            Is that because he was a gang member back
8    then in 1993?
9        A. Well, when I say "dubious" --
10       Q. It's a loaded term, sir. Don't you agree
11   with that, "dubious"?
12           MS. BRADY: Josh, can you show him the
13   place in his report where he uses that word?
14           MR. ENGQUIST: No. That was in his
15   testimony that came out of his mouth just a
16   second ago.
17           THE WITNESS: Right, okay. When I say
18   "dubious," and maybe I should define that or
19   maybe I should look up that definition of what
20   I mean by "dubious," is that I believe there's
21   a motive, a questionable motive behind the
22   information that Ochoa provided. And that's
23   when I say if he has lied to the police
24   officers in the past, if he has an extensive

THOMAS J. TIDERINGTON, 02/13/2023                    Page 74..77

Page 74

1    criminal history, that's what I mean by his --
2    the motive for providing information is
3    somewhat dubious or he's dubious.
4    BY MR. ENGQUIST:
5        Q.   Okay.  Did you find anything or any
6    evidence at all that Hugo Rodriguez or Rosendo Ochoa
7    knew Mr. Iglesias before the shooting, had any
8    contact with him at all?
9        A.   No, and that's one of the issues that
10   probably drew some concern for me as well.  I think
11   the testimony from Ochoa, who lived in this area, I
12   think he said he never saw him before.
13       Q.   Sir, my question, though, was just that
14   they never had contact with him before, right?  They
15   didn't have like a beef with him, correct?
16       MS. BRADY:  Objection, foundation.
17       Go ahead.
18       THE WITNESS:  I think that he testified
19   that they were opposing gang members, yeah.
20   BY MR. ENGQUIST:
21       Q.   Okay.  But they didn't know him, did they?
22       MS. BRADY:  Objection, foundation.
23       THE WITNESS:  There's no information that
24   they knew each other; I agree with that.

Page 75

1    BY MR. ENGQUIST:
2        Q.   And is there any indication that when they
3    looked at the photo array where they picked him out
4    that he was marked somewhere as being an opposing
5    gang member?
6        MS. BRADY:  Objection, form.
7        THE WITNESS:  When they showed him the
8    gang books or when they picked him out of --
9    BY MR. ENGQUIST:
10       Q.   The photo array, the photo array.
11       A.   Well, but, again, you have to look at
12   everything that they did in this investigation, and
13   lot of it was not documented, but there's evidence
14   that they were shown gang books at some point.
15       So do I know if they were shown gang books
16   from an opposing gang?  We don't know that because
17   it was not documented in the reports.
18       Q.   Okay.  Sir, but you're not answering my
19   question.
20       When they did identify him, you would
21   agree with me that, one, they didn't know
22   Mr. Iglesias before they identified him, correct, in
23   the photo array?
24       MS. BRADY:  Objection, form.  Who is

Page 76

1    "they"?
2    BY MR. ENGQUIST:
3        Q.   Oh, sure.  Hugo Rodriguez and
4    Rosendo Ochoa, before they identified him in a photo
5    array, they didn't know him, correct, personally,
6    correct?
7        MS. BRADY:  Objection, foundation.
8        THE WITNESS:  Well, how do we know that?
9        Based on the --
10   BY MR. ENGQUIST:
11       Q.   Are you guessing that they did know him?
12       A.   Well, again, you're dealing with
13   witnesses.  If we were talking about a fourth-grade
14   English teacher and the statement that he or she
15   might be providing, I think it's much different than
16   the statement of individuals that have extensive
17   criminal history and are participating in gang
18   violence and gang activities, and they're
19   identifying perhaps an individual from an opposing
20   gang.  I would not -- I would consider the
21   information certainly, but I wouldn't sit here today
22   and tell you that their information is valid and
23   that they never lied.
24       I guess if you -- if you want to -- as an

Page 77

1    example, Vicente, the informant in this case, claims
2    that he was --
3        Q.   I didn't ask about Vicente, sir.  I'm not
4    sure why you're going into Vicente, but you can
5    complete your answer, but I just want an answer to
6    my question, but go ahead.
7        A.   Well, you can't have it both ways.
8    Detectives can't have it both ways.
9        So you have Vicente, who is claiming that
10   he is coerced and beaten into giving statements, and
11   the detectives say that that's not true.  So you
12   have to be skeptical.  You have to understand the
13   motive, and you have to assign, perhaps, the amount
14   of credibility to what each witness may tell you.
15   Just because they tell you that they don't know
16   somebody doesn't mean that they don't know them.
17       Q.   All right.  You said -- you said -- I'm
18   going to break that down a little bit here, but one
19   of the things that you mentioned that I found kind
20   of interesting, you talked about, when I was asking
21   about Hugo Rodriguez and Rosendo Ochoa, you said
22   they participated in gang violence.  So -- and
23   that's one of the reasons why you shouldn't believe
24   them, because they were participating in gang

THOMAS J. TIDERINGTON, 02/13/2023                    Page 78..81

Page 78

1  violence.
2         What evidence do you have that they were
3  participating in gang violence?
4     A.  I think they testified that they were
5  members of a gang.
6     Q.  And so that means if they were members of
7  a gang they must have participated in gang violence
8  in your opinion as an expert?
9     A.  I think that's a fair assumption.
10    Q.  Okay.  And the same would go for
11 Mr. Iglesias.
12        When he was a gang member, he then would
13 have, as you put it, participated in gang violence?
14    A.  If he was in a criminal gang.  I believe
15 that violence is associated with these types of
16 gangs, yes.  I don't think there's any -- I don't
17 think that's a revelation.
18    Q.  All right.  Just make sure that part was
19 clear.
20        Now, I just want to go back.  You said
21 that you don't know whether or not Hugo Rodriguez or
22 Rosendo Ochoa knew the plaintiff ahead of time; they
23 could very well be lying.
24        Do you have any evidence from any source,

Page 79

1  including Mr. Iglesias, that Hugo Rodriguez or
2  Rosendo Ochoa knew him personally before the
3  incident?
4     A.  No.
5     Q.  Okay.  Do you have any evidence that would
6  show that Hugo Rodriguez and Rosendo Ochoa would
7  have known that when they looked at the photo array
8  that Mr. Iglesias was from a rival gang?
9        MS. BRADY:  Objection.  I believe that's
10       asked and answered.
11       Go ahead.
12       THE WITNESS:  Well, again, if they were
13       shown gang books and gang photos from opposing
14       gangs before they were shown the photo array,
15       that would suggest that the detectives told
16       them or they believed that these were gang
17       members from an opposing gang.
18       So I think that would be a logical
19       conclusion to come to.
20 BY MR. ENGQUIST:
21    Q.  So you believe that they would have known
22 that anybody in the photo would have been from a
23 rival gang?
24       MS. BRADY:  Objection, form.

Page 80

1  BY MR. ENGQUIST:
2     Q.  In the photo array.
3     A.  Well, if they were shown gang books prior
4  to that and then the detective showed up with a
5  photo array that came from the gang books,
6  certainly.
7     Q.  Why do you say the photo array came from
8  the gang books, sir?
9     A.  Where did they come from?
10    Q.  Do you know?
11    A.  I believe they came from the gang books is
12 what the testimony was.
13    Q.  Whose testimony did that come from, sir?
14    A.  I believe Guevara said that they were
15 aware of who Snake was and that they knew he was in
16 a gang, and they had a Polaroid picture of him.
17    Q.  And did anyone say that came from a gang
18 book?
19       MS. BRADY:  Objection, form.
20       THE WITNESS:  Where else would they have
21       gotten the Polaroid?  I mean, that was their --
22       the standard procedure back then, or at least
23       my understanding, from reviewing what the gang
24       books were at the time, were Polaroid pictures

Page 81

1  of known gang members.
2        So I'm assuming that that's -- excuse me.
3  I'm assuming that's where these photographs
4  came from.
5  BY MR. ENGQUIST:
6     Q.  Okay.
7     A.  I don't --
8     Q.  You're assuming they came from a gang
9  book, but you don't know that for sure, just to be
10 clear, correct?
11    A.  Well, and again, you've identified another
12 problem with this case is where did the photographs
13 come from?  If you have documentation that shows me
14 that they came elsewhere, I'd certainly consider
15 that.
16       But the conclusion that I came to based on
17 the information that I know is I'm assuming it came
18 from gang books.  If it didn't come from gang books,
19 it certainly would have been documented in the
20 police report or on the GPR, and none of that was
21 done.
22       So if you have information that differs
23 from my opinion, I'd certainly consider it.
24    Q.  Okay.  I'm not going to go through to

THOMAS J. TIDERINGTON, 02/13/2023                    Page 82..85

Page 82

1  point out where you might be wrong, sir, but I just
2  wanted to see where you're coming from.
3      Okay.  So --
4  A.  Well, I'm sorry.
5      Q.  -- based on your --
6  A.  I'm sorry, sir.  With all due respect, if
7  you're saying I'm wrong but you're not going to
8  provide me with information to help me correct the
9  areas that I'm wrong in, I don't think that that's
10 fair.
11     Q.  Sir, why would I correct all the
12 misstatements and all the problems within your
13 report?  You're an adversary to me, sir.
14     MS. BRADY:  Objection, calls for a legal
15 conclusion, harassing.
16     MR. ENGQUIST:  I'm not harassing him.  I'm
17 just telling him why would I be doing that,
18 sir?  Why would I be correcting the problems in
19 your report?
20     MS. BRADY:  Objection.
21     THE WITNESS:  Well, I don't think --
22     MS. BRADY:  Hang on, Tom.
23     Objection, foundation, calls for a legal
24 conclusion, harassing.

Page 83

1      THE WITNESS:  I don't think there are
2  problems in my report.  If there's other
3  information that I didn't consider that you
4  have, all I'm asking is or suggesting, that if
5  I'm provided that information, I'd certainly be
6  happy to look at it and consider it.  And if
7  the information would cause me to change my
8  report, I would certainly do an amendment to my
9  report and point out where I was mistaken or
10 wrong.
11 BY MR. ENGQUIST:
12     Q.  You also mentioned something earlier in
13 one of your answers that you said that if someone
14 was up in, I believe it was, Mr. Ochoa's apartment
15 and looked out and determined that you couldn't see
16 the location where the shooter was without having
17 binoculars or a telescope, that should have been
18 documented.
19     Do you have any evidence that it would
20 take a binoculars or a telescope to be able to view
21 the person from his window?
22 A.  I don't --
23     MS. BRADY:  Object to form as to "view the
24 person."

Page 84

1      Go ahead.
2      THE WITNESS:  I don't think that was my
3  testimony.
4  BY MR. ENGQUIST:
5      Q.  Okay.  Well, it's in there, but okay.
6  A.  Well, what -- I used it as an example.  I
7  said if the detectives looked out that window and
8  realized that there was no way that this witness
9  could see what he saw without the benefit of a
10 telescope or binoculars, then the detectives would
11 know unequivocally that he was lying is the
12 conclusion that I came to.
13     Q.  Yes.  And so if someone, like we talked
14 about before, was standing on the ground
15 approximately where the shooter was standing and
16 looked up and they can see in the window, they would
17 know that the person could see them?
18     MS. BRADY:  Objection.
19 BY MR. ENGQUIST:
20     Q.  Or at least reasonably assume that the
21 person could see them, correct?
22     MS. BRADY:  Objection, form.
23     THE WITNESS:  Well, that should have been
24 a -- that would have been a great experiment or

Page 85

1  a great way to test what Ochoa said.
2      And to your point, yeah, the officer would
3  have been correct if he would have said, Hey,
4  Mr. Partner or Mr. Halvorsen, why don't you go
5  up to that apartment and look out that window,
6  and I'll look up at you from this vantage
7  point, and I want to see what you can see.
8      So, again, what you pointed out would have
9  been very appropriate for the detectives to
10 have done, but I don't think they did do that,
11 unless you have information that suggests they
12 did.
13 BY MR. ENGQUIST:
14     Q.  Now, you just mentioned Mr. Halvorsen.
15     You know that Detective Halvorsen and
16 Detective Guevara were not the original officers
17 assigned to this case and weren't on the scene when
18 it happened, correct?
19 A.  I do that -- yes, I know that.  That was
20 just an example of -- it could have been any
21 detective that responded to the scene, yes.
22     Q.  Okay.  I just wanted to point that out,
23 because as we go through your report, you do do a
24 lot of kind of generalizations about detectives.

THOMAS J. TIDERINGTON, 02/13/2023                Page 86..89

Page 86

1     I want to make sure you're clear.  You're
2  not saying Detective Halvorsen should have been up
3  in the window looking down and documenting at the
4  time of the shooting or right after the shooting
5  what happened on the scene, correct?
6     A.  No, no.  To be clear, it's my
7  understanding that Guevara and Halvorsen did go to
8  Ochoa's apartment.  They're the ones that determined
9  that Mr. Ochoa saw this from his apartment, yes.
10     So yeah, when I said Halvorsen, yeah, if
11  they were going to rely on this information.  It
12  wasn't the street cops that originally responded to
13  this information that spoke with Ochoa.  It was
14  Halvorsen and Guevara, or at least that's my
15  understanding, that came up with this idea that this
16  witness could see from the apartment complex and,
17  you know, from the second-story apartment.
18     Q.  Okay.  If that's your understanding.
19     A.  So -- and if I'm mistaken, I would
20  certainly --
21     Q.  Do you want me to point out where you're
22  mistaken?
23     A.  If you'd like to, yes.
24     Q.  I wouldn't like to.

Page 87

1     A.  You would not like to?
2     Q.  No.
3     A.  Okay.
4     Q.  Page Number 5, also, sir, you have in here
5  about Hugo Rodriguez.  And this is the paragraph
6  right before "To further summarize my opinions."  It
7  says, "Hugo Rodriguez was in the back middle seat of
8  a moving car that was equipped with window blinds,
9  driving away from the shooter who was wearing a hood
10  over his head, and running away in the opposite
11  direction."
12     Does Hugo Rodriguez -- did Hugo Rodriguez
13  testify that he viewed his face as he was running
14  away from him, or did he say it was at a different
15  time?
16     MS. BRADY:  Objection, form.  If you want
17     to show him the testimony you're talking about,
18     please do, but this is not a memory test.
19  BY MR. ENGQUIST:
20     Q.  I'm not asking for a memory test.  You
21  have in here "running away in the opposite
22  direction."
23     Are you trying to imply, sir, that
24  Hugo Rodriguez said he could see the shooter's face

Page 88

1  as he was running away in the opposite direction?
2     A.  No, I don't think he could see his face as
3  he was running away.  I think --
4     Q.  Did he ever claim that was how he saw his
5  face?
6     A.  Well, I guess we're doing a memory test
7  here, but his testimony speaks for itself, and I
8  guess we could look at it and say exactly what he
9  said.
10     I do recall that there was some testimony
11  that he claims that he saw maybe out of the
12  passenger side window or the rear window.  Some of
13  his testimony is confusing to me because I don't
14  know that it comports with the facts that occurred
15  out there either.
16     Q.  But you're not trying to say that --
17  because the way the sentence reads, "running away in
18  the opposite direction," you're not saying that he
19  was viewing his -- viewing him, his face, or trying
20  to identify him as he was running away in the
21  opposite direction, correct?
22     A.  Well, my report stands for -- what I said
23  in the report stands for itself.  Certainly he saw
24  him running away from him.  I think he testified

Page 89

1  that he saw him put his hood up or something to that
2  effect.
3     Q.  All right.  You have in here to summarize
4  your opinions in a), you start off with CPD's
5  investigators, including Detective Guevara and
6  Halvorsen, applied tunnel vision to obtain the
7  evidence they needed to implicate Iglesias, their
8  prechosen suspect.
9     Do you see that there?
10     A.  I do.
11     Q.  Okay.  Who are the other CPD investigators
12  you're looking into there?
13     A.  Well, I think any of the investigators
14  that worked on this case, including the supervisor.
15     Q.  Any of the investigators.  Can you name
16  any of the investigators that would have been in
17  involved in you say "tunnel vision"?
18     A.  Well, all of them.
19     Q.  All of them, okay.  So let's just go with
20  the main defendants.
21     Can you say what Detective Gawrys did?
22     MS. BRADY:  Objection, form.  And also --
23     MR. ENGQUIST:  No, I think I have that
24  wrong anyway, so let me go back.  Strike that

THOMAS J. TIDERINGTON, 02/13/2023                    Page 90..93

Page 90

1    one.  Give me one second.  I can go back.
2  BY MR. ENGQUIST:
3      Q.  All right.  So when you're saying
4  investigators, other investigators applied tunnel
5  vision to obtain evidence implicating Iglesias, what
6  evidence did Detective Gawrys obtain to implicate
7  Iglesias?
8      A.  Well, again, all of these detectives
9  worked on this particular case.  There's information
10  that a tip came in from an unknown confidential
11  informant, perhaps to that Detective Gawrys or to
12  perhaps any of the other detectives that are listed,
13  but the report is -- doesn't explain who exactly
14  received the tip.
15     Q.  Sir, you read their testimony too,
16  correct?
17     A.  I did.
18     Q.  Okay.  So let me ask you, after
19  reviewing --
20     A.  Well, I'm sorry, which testimony are
21  you --
22     Q.  Detective Gawrys, Detective Riccio, the
23  testimony that was given by Guevara at trial.
24         Did you read any of that?

Page 91

1      A.  I did.
2      Q.  Okay.  So go back to my question.
3          What did Detective Gawrys -- what evidence
4  did he obtain to implicate Iglesias?  Just any
5  evidence at all.
6          MS. BRADY:  Yeah, I'll object just to
7      form.
8          Tom, if you want to take some time and
9      look at the reports where Defendant Gawrys is
10      listed, you can do that.
11  BY MR. ENGQUIST:
12     Q.  Do you need to look, review the report,
13  sir?
14     A.  I think it would be helpful.  I'd perhaps
15  be more precise if I was able to do that.
16     Q.  Okay.  So why don't you -- why don't we
17  go -- how long do you want to go look?
18     A.  As long as it will take.
19     Q.  Okay.  So do you want to take a break,
20  then, and you can start going through the report
21  again to determine that?
22         MS. BRADY:  No, no, we're not going to
23      take a break while he can look at the report.
24      This is his time.  If you have questions about

Page 92

1  evidence, he needs to be able to look at the
2  report during the deposition.
3  BY MR. ENGQUIST:
4      Q.  So you're saying you need to see the
5  report.  Which report do you need to see, sir?
6          MS. BRADY:  So give him a chance -- yeah,
7      give him a chance to put up the closing supp.,
8      you know, put it up on the screen, let him take
9      a look at it, and then he can answer your
10      question.
11  BY MR. ENGQUIST:
12     Q.  You have the closing --
13         MS. ROSEN:  No, Rachel, we're not going to
14      have him waste time on the record reviewing
15      hundreds of thousands of pages of documents.
16      So if he cannot answer a question without
17      reviewing the document, then he should tell us,
18      and then we can decide.  You don't instruct him
19      not to answer a question without reviewing the
20      document.  If we want to eat up time in our
21      deposition so that he can review hundreds of
22      thousands of pages, fine, but that's not your
23      call.
24         So have the court reporter read back the

Page 93

1  question.
2          MS. BRADY:  My instruction was not that he
3      review hundreds of thousands of pages of
4      records.  I asked Josh to put up the closing
5      supp. where Defendant Gawrys is listed so that
6      the witness can take a look at it and provide
7      an answer.
8          MS. ROSEN:  Okay.  Well, that's a speaking
9      objection and a direction to your client, to
10      your witness on how to answer a question, and
11      that's inappropriate.
12         So if he cannot answer any of our
13      questions without reviewing something, then
14      it's certainly within his purview to tell us he
15      can't do that, and then it's our decision
16      whether to waste time in the deposition doing
17      that, not your decision.
18         MS. BRADY:  And I believe he testified
19      that he would like to look at the document
20      before answering the question.
21         MS. ROSEN:  Well, then you instructed him
22      to do so, and then Josh said then let's go off
23      the record, and you said no.  That's not how
24      this is going to go.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 94..97

Page 94

1  BY MR. ENGQUIST:
2      Q.  Let's just go back to this, sir.
3          Can you think of any evidence that
4  Detective Gawrys obtained to implicate Iglesias?
5      A.  Yes, as I testified just prior was that he
6  was a case agent on this investigation that was in
7  my opinion a shoddy investigation, and a lot of
8  questionable things were done.  Part of the problem
9  is it lacks such detail it's difficult to
10 distinguish who exactly did what in this case.
11     Q.  Okay.  Sir, going back to my question, can
12 you name any evidence that Detective Gawrys obtained
13 to implicate Iglesias?
14     A.  Yeah, if you give me an opportunity to go
15 through the police report and refresh my memory, I
16 think it would be helpful.
17     Q.  Do you know what Detective Gawrys did in
18 this investigation?
19     A.  I'm sorry?
20     Q.  Do you know what actions he actually took
21 in this investigation?
22     A.  Is that -- you're going to tell me, or
23 you're asking that question?
24     Q.  No.  Do you know, do you know what

Page 95

1  Detective Gawrys did in this investigation?
2      A.  Certainly I do.
3          MS. BRADY:  Objection.  Yeah, objection,
4      form --
5  BY MR. ENGQUIST:
6      Q.  Go ahead.  Do you know?
7          MS. BRADY:  -- foundation.
8          Josh, please let me finish my objection
9      before you start talking.  The witness has
10     testified that he would like to review
11     documents in order to be able to fully answer
12     this question.
13 BY MR. ENGQUIST:
14     Q.  Okay.  Do you know what he did in this
15 investigation, sir?
16     A.  Certainly I do, but I'd like to refresh my
17 memory before I answer your question.
18     Q.  Okay.  Well, certainly you do.  Why don't
19 we go with that.
20         What do you recall that he did in this
21 investigation?
22     A.  Well, I -- again, I think I have the right
23 to refresh my memory before I answer your question
24 and, my understanding, that it's a logical thing for

Page 96

1  a witness to do, and that's what I'm asking you for
2  permission to do.
3      Q.  Okay.  You read his deposition, too,
4  didn't you?
5      A.  I'm sorry?
6      Q.  You read Gawrys' deposition?
7      A.  I did, but there were so many depositions,
8  I think it would be beneficial for both of us to
9  allow me to review the deposition if that's what
10 you're going to ask me about.  Or if you're going to
11 ask me about his testimony, I think you should allow
12 me to review that information.
13     Q.  Okay.  And you reviewed things for 15 to
14 20 hours in order to prepare for this deposition,
15 correct, including --
16         MS. BRADY:  Objection.
17 BY MR. ENGQUIST:
18     Q.  -- Detective Gawrys' deposition?  That was
19 one of the things that you said you reviewed?
20         MS. BRADY:  Objection, misstates the
21     testimony.
22         Go ahead.
23 BY MR. ENGQUIST:
24     Q.  Right, sir?

Page 97

1      A.  Along with I would estimate to be 10,000
2  pages of documents, yes.
3      Q.  Okay.  And, sir, when you were reading
4  this and you were drafting up your opinion, you were
5  aware that he gave testimony about what his exact
6  role was in the investigation, correct?
7      A.  What page are you referring to?
8      Q.  I'm not referring to a page.  I'm just
9  referring to your report and what you would have
10 known when you wrote it.
11     A.  And what page are you referring to in my
12 report?
13     Q.  I'm not.  I'm asking you about
14 Detective Gawrys.  Remember?
15         MS. BRADY:  Objection, form.
16         THE WITNESS:  Yeah, but I -- I guess I
17 don't really understand this because the time
18 that we're wasting, if you would have allowed
19 me to review the police report, I think I could
20 have gave you a precise answer.  But I don't
21 really feel it's appropriate for us to be doing
22 a memory game when there's documents that would
23 assist me in giving you a more accurate answer.
24

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS J. TIDERINGTON, 02/13/2023                    Page 98..101

Page 98

1  BY MR. ENGQUIST:
2      Q.  All right.  So how about this.  If
3  Detective -- if the only evidence out there, that
4  Detective Gawrys assisted in going out and arresting
5  Mr. Iglesias and that's the only thing he was
6  involved in, would your opinions still be the same,
7  that he applied tunnel vision and obtained evidence
8  only needed to -- they needed to implicate Iglesias?
9          MS. BRADY:  Objection, assumes facts not
10     in evidence, incomplete hypothetical, misstates
11     the record.
12         MR. ENGQUIST:  Does not.
13  BY MR. ENGQUIST:
14     Q.  Go ahead, sir.
15         MS. BRADY:  You can answer.
16         THE WITNESS:  If he was the arresting
17     officer on Iglesias, I think --
18  BY MR. ENGQUIST:
19     Q.  If he went out and assisted in arresting
20  him, yes, and that was his only action in the case.
21     A.  Well, what does that mean, he assisted in
22  arresting him?  I don't understand what that means.
23     Q.  You don't know what that means?
24     A.  Well, I guess it's a hypothetical that

Page 99

1  you're asking that I'm requesting that you clarify.
2  If he only went out and assisted, who did he assist?
3      Q.  Riccio.
4      A.  I'm sorry?
5      Q.  Riccio.
6      A.  Okay.  And --
7      Q.  This is all new to you, sir?
8      A.  It's not.
9      Q.  Okay.  Does it ring a bell exactly what
10  his -- what Detective Gawrys' actions were in the
11  case?
12     A.  Does it help me recall it?
13     Q.  Yes.
14     A.  No, I -- again, I think it's unfair for
15  you not to allow me to review the police report.
16     Q.  If you want to pull up a police report
17  right now and look at it, feel free.  I'll give you
18  five minutes, sir.  Go ahead.  You should know
19  exactly where you're going because you know what
20  police report you're looking for.
21         We will even stay on the record for you,
22  Rachel, for five minutes.  Go ahead.
23         MS. ROSEN:  For the record, it's 10:59,
24     according to my clock.

Page 100

1          MS. BRADY:  That's correct.
2  BY MR. ENGQUIST:
3      Q.  It's now 11:04, sir.  Did you have a
4  chance to find what you needed?
5      A.  Obviously I didn't review his testimony.
6  I've reviewed the police report, and he's listed on
7  a supplemental report as one of the investigating
8  officers along with Halvorsen, Guevara, Riccio, and
9  Gawrys.
10     Q.  Gawrys.
11     A.  Okay.  I apologize.
12     Q.  Okay.  Now, sir, you also read his
13  deposition too, correct?
14     A.  Not just -- I didn't review it, no.
15     Q.  Now, sir, one of the things that you read
16  and you even reviewed again that you even said was
17  the Complaint in this case, correct?
18     A.  I have reviewed the Complaint, yes.
19     Q.  Okay.  And you knew who the named
20  defendants were in this case, correct?
21     A.  I'm sorry?
22     Q.  You know -- you knew at the time you wrote
23  this report and you know now who the named
24  defendants are, don't you?

Page 101

1      A.  I believe so, yes.
2      Q.  And who are they?
3      A.  Guevara, Halvorsen, Riccio, and Gawrys, I
4  believe.  Again, I'd have to look at the Complaint
5  to be totally accurate on that.
6      Q.  Okay.  And, sir, do you think it's -- do
7  you think it's reasonable to assume that if you're
8  writing a report that's going to be used against the
9  named defendants that you would have some indication
10  of what they supposedly did during the case?
11         MS. BRADY:  Objection, form.
12         THE WITNESS:  Are you talking about the
13     officers, what they did in the case, or --
14  BY MR. ENGQUIST:
15     Q.  Yes.
16     A.  Well, certainly.  They're listed on the
17  police reports.
18     Q.  Yeah.  And if you're going to accuse them
19  of misconduct, you should have a good handle on what
20  you're actually saying they did; isn't that correct?
21         MS. BRADY:  Objection, form.
22         THE WITNESS:  That's correct.
23  BY MR. ENGQUIST:
24     Q.  Okay.  And you -- and just to be clear, in

THOMAS J. TIDERINGTON, 02/13/2023                    Page 102..105

Page 102

1  Detective Gawrys', in Steve Gawrys' deposition, he
2  was quite clear that the only thing he had to do
3  with the case was assist in the arrest, and he
4  wasn't involved in the case afterwards?
5       MS. BRADY: Objection, I believe that --
6       (Simultaneous speaking.)
7       MR. ENGQUIST: Go ahead.
8       MS. BRADY: I believe that misstates the
9  testimony.
10      MR. ENGQUIST: It does not.
11      MS. BRADY: I mean, he testified that he
12  has no recollection of the case, so ...
13      MR. ENGQUIST: No, that's actually not
14  true.
15 BY MR. ENGQUIST:
16      Q. So -- and you know that from --
17      A. I'm sorry, sir, let me just clarify. When
18  an officer allows his name to be listed on a police
19  report, it's indicative of the fact that he would
20  have reviewed it. It's my -- having been in law
21  enforcement for 44 years, that you don't just put
22  somebody's name on the police report without them
23  having knowledge of what the case was about and
24  participating in it. You know, certainly his name

Page 103

1  is listed on the report as a -- as one of the
2  investigating officers.
3       Q. So, sir, did you take these records as a
4  whole, and did you look at the deposition testimony,
5  the trial testimony, and the police reports in order
6  to come to your opinions in this case?
7       A. I did.
8       Q. Okay. And so, sir, you had been aware
9  that the person who testified that they received a
10  phone call that indicated that Snake was involved in
11  the murder, that was Rey Guevara?
12      A. I don't believe it was documented in the
13  police report.
14      Q. Sir --
15      A. I think --
16      Q. We just went through that. You did also
17  review trial testimony, deposition testimony, and
18  other things, correct?
19      A. I did.
20      Q. Okay. So you're aware that the only
21  evidence out there about who evidence that call was
22  from Detective Guevara, and he said it was him,
23  correct?
24      A. I don't know if that's the only evidence.

Page 104

1  I believe there was also deposition testimony that
2  the detective, and I don't recall which one without
3  reviewing it, had no recollection of who actually
4  received that call.
5       Q. Okay.
6       A. So --
7       Q. Is that the same -- is that the same as
8  someone saying -- if someone says "I don't remember
9  who got the call," if someone says "I received the
10  call," are you saying it causes doubt on the person
11  that says "I received the call"?
12      MS. BRADY: Objection, form.
13      THE WITNESS: Well, no, I think I was
14  trying to answer your question, and you said
15  was there any other testimony about who
16  received a call, and I think there's testimony
17  where detectives claimed that they don't recall
18  who received this phone call from this alleged
19  informant, I think, is the testimony that I
20  recall reading, and whether it was in
21  deposition or whether it was trial testimony.
22 BY MR. ENGQUIST:
23      Q. Why do you keep on saying "alleged
24  informant"?

Page 105

1       A. Do we know who the informant is?
2       Q. Okay. But you said "alleged informant,"
3  not like "unknown informant." You say "alleged
4  informant."
5       Are you saying that the call never came
6  in?
7       A. Well, there's no documentation of --
8  normally in a police agency, if you're going to
9  utilize the information from a confidential
10  informant, that there would be some basis for
11  documenting the fact that this informant called.
12  And most agencies that I'm familiar with would have
13  an assigned number for the confidential informant,
14  and although the informant may not be disclosed,
15  certainly there's a reference to who actually made
16  the phone call.
17      And you point out correctly that there
18  certainly was no follow-up to determine who the
19  informant is or what was the basis for the
20  information that the informant had. There was no
21  follow-up, at least not in the case file that I
22  reviewed, that would suggest that there's any way
23  for us to determine whether or not this informant
24  actually exists or not.

THOMAS J. TIDERINGTON, 02/13/2023

Page 106..109

Page 106

1    Q.  Okay.  Are you saying, sir -- let me go
2  back to my original question.  Then I'll pick apart
3  what you just said.
4        Are you trying to say that the informant
5  doesn't exist, that he was made up?  The person who
6  called in, the tipster, the person who called in
7  doesn't exist?  Are you saying that?
8    A.  Well, you're referring to him now as a
9  tipster, and he was referred to by the officers --
10    Q.  As tipster?
11    A.  -- as a confidential informant, and there
12  is a difference between somebody that calls in on an
13  anonymous tip line and somebody that is referred to
14  in an official police report as a confidential
15  informant.  The reliability standard is far
16  different than a tipster -- for a tipster versus a
17  confidential informant.
18        The word that the defendants used in the
19  police report indicate a confidential informant.  So
20  that's the basis for how I was responding to your
21  question.
22    Q.  Did you read any testimony in all your
23  reviews of all these hundreds of thousands of pages
24  about the term, the use of the term "confidential

Page 107

1  informant" within Area 5 back in 1993?
2    A.  I did.  That's --
3        MS. BRADY:  Objection as to form.
4        Go ahead.
5        THE WITNESS:  -- highly unusual.
6  BY MR. ENGQUIST:
7    Q.  Highly unusual, that it was used kind of
8  as a loose term for someone calling in, a tipster,
9  someone they knew, someone they didn't know; it was
10  used in a lot of different ways.
11        Would you agree --
12    A.  Well, I don't recall that.  I don't recall
13  that testimony.
14        I recall that there was testimony from the
15  Chicago Police Department representative, Winstrom
16  or perhaps somebody else, that confidential
17  informants -- there was a process within the Chicago
18  Police Department to document the information from
19  confidential informants, to assign case number, to
20  assign informant numbers to, to have a process
21  for approving the use of confidential informants,
22  but none of this applied to detectives.
23        So when I say "highly unusual," I do find
24  that to be highly unusual and inconsistent with

Page 108

1  acceptable police standards and practices.
2    Q.  Now, sir, when you dealt with confidential
3  informants, you were dealing with confidential
4  informants that you were either -- that were getting
5  paid by you for narcotics activities, correct?
6    A.  Not necessarily just narcotic activities.
7  Certainly if a confidential informant is going to be
8  utilized in any type of criminal investigation,
9  there's a process that we put into place, and most
10  agencies do.
11    Q.  I'm talking about your time at
12  Fort Lauderdale.
13        When you were down in Fort Lauderdale when
14  you were using confidential informants, those were
15  paid informants, correct?
16    A.  Not necessarily.  There was a number of
17  reasons why somebody would become a confidential
18  informant, not necessarily just being paid.
19  Certainly -- and, again, as you pointed out
20  correctly, is that you have to determine the motive
21  of somebody providing information.
22        So you mentioned a paid informant, but
23  there's other motives for people being informants;
24  reduction of sentences, vengefulness against perhaps

Page 109

1  individuals that are in competing business with
2  them, whether it's drug business or organized crime.
3        So the motive behind somebody providing
4  information that's going to be acted upon by law
5  enforcement is certainly important.
6        And this was -- I'm sorry, and I don't
7  want to be long-winded here, but the Chicago Police
8  Department did have a process in place for the
9  handling of confidential informants, but it didn't
10  apply to, and shockingly and surprisingly, it didn't
11  apply to these detectives.
12    Q.  It only applied normally to narcotics
13  activities here, correct?  Did you -- is that
14  correct?
15    A.  I don't know.  All I could recall from the
16  deposition testimony is it did not apply to these
17  detectives.
18    Q.  And what activity did Detective Riccio,
19  what was his involvement in this case?  And you can
20  glean that I'm assuming from not just the reports
21  but also from testimony that was given in this case
22  as well since you reviewed that.
23        What is your understanding of his
24  involvement?

THOMAS J. TIDERINGTON, 02/13/2023                    Page 110..113

Page 110

1     A.  Well, the page I have opened from the
2  police report is the same thing.  He was listed as a
3  case agent, or I think this is indicative of the
4  collective effort of all of these officers.  And
5  when I say all of them, Halvorsen, Riccio, Guevara,
6  and Gawrys, and the reports are all approved by the
7  sergeant, Sergeant Biebel.
8     Q.  Okay.  So when they use the term "RDs,"
9  you're assuming that everyone was involved in every
10  activity even if that's contradicted by later
11  testimony in court; is that right?
12     MS. BRADY:  Objection, misstates the
13  testimony.
14     Go ahead.
15     THE WITNESS:  Well, it's somewhat unusual
16  how they did it.  In most agencies that I'm
17  familiar with, each officer would have done
18  supplemental reports or completed GPRs on the
19  work that they did on a particular case, and I
20  don't see that here.
21     I think the exception, I think Riccio did
22  a couple of reports relating to the lineups, if
23  I remember correctly.
24

Page 111

1  BY MR. ENGQUIST:
2     Q.  You do remember correctly.  He actually
3  assisted in two lineups.
4     A.  Okay.
5     Q.  Is that --
6     A.  I'm sorry, is there a question?
7     Q.  No.  I was just -- I was just telling you
8  you actually remembered that part.  That was about
9  the two lineups, yes.
10     Besides the two lineups and being -- let
11  me just go back.
12     Did you review the testimony in the trial
13  court testimony and the deposition testimony
14  regarding the activities or what actions
15  Detective Riccio took during this investigation?
16     A.  Did I review it?  Yes.  Do I recall what
17  he testified to?  No.
18     Q.  Okay.  And do you take that into
19  consideration at all when coming up with your
20  opinions on his activities in this case for your
21  report?
22     MS. BRADY:  Objection, form.
23     THE WITNESS:  I'm not sure I understand
24  that question.

Page 112

1  BY MR. ENGQUIST:
2     Q.  If Detective Riccio or Detective Gawrys
3  testified about what their activities were, did you
4  take that into consideration at all when coming to
5  your opinions in this case?
6     A.  I think that was included in my opinions,
7  or certainly I considered that, yes.
8     Q.  Okay.  Did you consider it and ignore it,
9  because you have here that they -- like with Gawrys,
10  that he obtained evidence they needed to implicate
11  Iglesias, and you referred to the report but not his
12  testimony when we just discussed it.
13     MS. BRADY:  And to be clear, when you talk
14  about testimony, you're talking about his
15  deposition testimony, right?
16     MR. ENGQUIST:  Yep, sure am.
17     THE WITNESS:  Could you put that up
18  because I -- again, that may help me refresh
19  and answer your question in a more
20  comprehensive way.
21  BY MR. ENGQUIST:
22     Q.  What, put up his deposition for you to
23  review?
24     A.  Well, you're asking me questions about his

Page 113

1  deposition testimony, and as you know, there were
2  many depositions in this case, and I want to be
3  precise in answering your question.
4     Q.  Well, sir, I also wanted you to be
5  precise, but I was asking you specifically about
6  named defendants and what they did involving --
7  regarding this investigation, and that's what I'm
8  asking you about.
9     If you don't know that, then just say you
10  don't know.
11     A.  Well --
12     MS. BRADY:  Objection, form.  I don't
13  think I understand the question.
14  BY MR. ENGQUIST:
15     Q.  Well, let me ask you, sir, when you wrote
16  this report, did you feel it was necessary to be
17  precise about what the activities were of the people
18  that you were alleging misconduct on?
19     A.  Well, it's certainly a summary of what
20  occurred.  Obviously it's not a word-for-word.  It's
21  a summary of the actions that the officers take --
22  took during this investigation, so it's a summary of
23  that, yes.
24     Is there supporting information that we

THOMAS J. TIDERINGTON, 02/13/2023                    Page 114..117

Page 114

1  could easily point to?  If you're going to ask me
2  questions about testimony, again, I think it would
3  be fair for me to review that because there's
4  probably questions before and after the question
5  that you're asking me.
6      Q.  Sir, you knew when you wrote this report
7  it would be used to prosecute this case against
8  Detective Gawrys and Detective Riccio, correct?
9          MS. BRADY:  Objection, form.
10         THE WITNESS:  I was asked to look at the
11     case and determine whether or not it complied
12     with my understanding of acceptable police
13     practices.  I don't know that I specifically
14     thought that this is going to be needed to
15     prosecute any one of the officers.  I don't
16     know.
17 BY MR. ENGQUIST:
18     Q.  Well, sir, you were hired by the
19  plaintiff's attorney, correct?
20     A.  That's correct.
21     Q.  And you were given the Complaint, and you
22  reviewed before you wrote your report and even in
23  preparation for your deposition today where they
24  allege misconduct against both Gawrys and Riccio,

Page 115

1  correct, and Biebel, correct?
2      A.  That's correct.
3      Q.  And you knew when you were hired by them
4  and you were writing a report about this that those
5  would be targets when you were writing this report,
6  correct?
7          MS. BRADY:  Objection, form.
8          THE WITNESS:  Well, they were the
9      defendants, yes.
10 BY MR. ENGQUIST:
11     Q.  Okay.  And what you do instead is you talk
12  about just CPD investigators, but you know -- but
13  you've already said that they're part of that CPD
14  investigators when they're wrapped up in that, in
15  those comments, correct?
16     A.  I think that's a logical conclusion that
17  anybody would reach is that if there's officers'
18  names listed on police reports, that they
19  participated in the investigation, and --
20     Q.  Well, more than participated.  You said
21  they applied tunnel vision and obtained evidence
22  they needed to implicate Iglesias.
23     A.  I stand by that statement.
24     Q.  Okay.

Page 116

1          MS. BRADY:  Josh, when you reach a
2      convenient point, can we take another
3      five-minute break?
4          MR. ENGQUIST:  Yeah.  Give me one second.
5  BY MR. ENGQUIST:
6      Q.  Sir, did you think it would be important
7  to be clear in your report about which officers you
8  were alleging applied tunnel vision to obtain his --
9  implicate Iglesias?  Do you think it would be
10  important to actually be specific and clear about
11  that in your report?
12         MS. BRADY:  Objection, form.
13         THE WITNESS:  I think my report is clear.
14 BY MR. ENGQUIST:
15     Q.  It doesn't name them specifically, does
16  it?
17     A.  Well, but, again, I haven't seen evidence
18  that any of these detectives decided the information
19  that is being provided by a witness is questionable
20  so perhaps we should try to get some forensic
21  information or forensic evidence.
22     I haven't seen any evidence that Riccio or
23  Gau -- am I pronouncing it right, Gawry?
24     Q.  You haven't got it once right once.  It's

Page 117

1  Gawrys.
2      A.  Gawrys, I apologize.
3      I haven't seen any evidence that they
4  decided to go out and do a search warrant looking
5  for forensic evidence to support the witness
6  testimony.  I haven't seen any evidence that the
7  sergeant disagreed with anything that the detectives
8  brought forward.
9          So I think that demonstrates tunnel
10  vision.
11     Q.  Okay.  But you don't name them
12  specifically in your report, and you keep it vague,
13  correct?
14     A.  I'm sorry, I keep --
15         MS. BRADY:  Objection, form.
16 BY MR. ENGQUIST:
17     Q.  Because you say "CPD investigators."  That
18  could include Rutherford, who was on the scene.
19     It could include all the other officers
20  that were on the scene at any point, correct?
21     A.  I think -- I think you're right.  I think
22  it was a comprehensive failure on the part of the
23  Chicago Police Department.
24     Q.  So everybody involved in the investigation

THOMAS J. TIDERINGTON, 02/13/2023                    Page 118..121

Page 118

1  that shows up anywhere on the reports applied tunnel
2  vision to obtain evidence implicating Iglesias.  Is
3  that what you're saying?
4        MS. BRADY:  Objection, form.
5        THE WITNESS:  Anybody listed on what
6  report?
7  BY MR. ENGQUIST:
8     Q.  Well, they were all involved in the
9  investigation.  You put "CPD investigators."  We
10  have multiple people involved in the investigation.
11     A.  Right.
12     Q.  By using the term "CPD investigators," are
13  you saying everyone who touched this case who
14  belonged to CPD, including Gawrys, Guevara, and
15  Halvorsen, applied tunnel vision to obtain evidence
16  they needed to implicate Iglesias, their prechosen
17  suspect?
18     A.  I wouldn't say everyone.  I think there
19  were some initial police reports that were
20  completed.  I don't think that they were trying to
21  indict Iglesias.  I think there's some actions that
22  occurred before Guevara got involved and Halvorsen
23  got involved and the other detectives, so --
24     Q.  So when you use the term "CPD

Page 119

1  investigators" in this part right here --
2     A.  Which -- I'm sorry, what page?  I'm sorry.
3  What page are you --
4     Q.  We're still on Page 5.  We haven't moved
5  past Page 5.
6        When you're using the term "CPD
7  investigators" here, who are you referring to, and
8  why aren't you more specific?
9        MS. BRADY:  Objection, compound.
10  BY MR. ENGQUIST:
11     Q.  I'll take it one at a time.
12        Who are you referring to?
13     A.  Well, prior cases involved -- well, I'll
14  just read it for you.  "I observed in prior cases
15  involved many of the same CPD investigators,
16  including Guevara and Halvorsen, have applied tunnel
17  vision."
18        So that includes the sergeant.  He was
19  involved in several other cases.
20     Q.  So it includes Biebel.
21        Does it include Gawrys then?  Because he
22  wasn't involved in the other cases that you looked
23  at.
24     A.  You know, I'd have to go back and see if

Page 120

1  he was involved in the other cases.  I don't know as
2  we sit here today if he was.  I'd have to go back
3  and look at that.
4     Q.  What about Riccio?  Does it involve
5  Riccio, because Riccio was involved in the other
6  cases, wasn't he?
7        MS. BRADY:  I'm going to object to this
8  question and the prior question that it
9  misstates the record.
10        But you can answer.
11  BY MR. ENGQUIST:
12     Q.  Go ahead.
13     A.  I'd have to go back and look at the other
14  cases that I was involved with.
15     Q.  Well, if Riccio and Gawrys were involved
16  in Reyes and Solache or Sierra or Bouto, then they
17  wouldn't be part of this "CPD investigators" term
18  you have here, correct?
19        MS. BRADY:  Objection, form.
20        THE WITNESS:  Not at the time that I wrote
21  this report.  Yeah, I mean, there's other cases
22  since this time that I wrote this report, and I
23  don't know if they were involved in those cases
24  or not.

Page 121

1  BY MR. ENGQUIST:
2     Q.  You have no idea?  So when you wrote --
3  when you wrote this report, who were you referring
4  to as "CPD investigators" other than
5  Sergeant Biebel?
6     A.  Well, him and others.  There's others in
7  other cases.
8     Q.  You say "as observed in prior cases, many
9  involving the same CPD investigators".  "Same CPD
10  investigators."
11        What are the same CPD investigators you're
12  referring to other than Guevara, Halvorsen, and
13  Biebel?
14     A.  Well, that's three for you, and like I
15  said, I would have to go back and confirm whether or
16  not the other detectives were involved in these
17  cases.  I don't recall as we sit here today when
18  you're asking me that question.
19     Q.  So when you use that term, you don't know
20  what you're referring to when you wrote that term
21  "same CPD investigators, including Detectives
22  Guevara and Halvorsen"?
23        MS. BRADY:  Objection, form.
24        THE WITNESS:  I didn't say --

THOMAS J. TIDERINGTON, 02/13/2023                    Page 122..125

Page 122

1  BY MR. ENGQUIST:
2      Q.  Is that right, sir?
3      A.  No.  I said I would like an opportunity to
4  refresh my memory.  I didn't say I didn't know what
5  I was talking about.  You said that.
6      Q.  And what would refresh your recollection
7  about who you were referring to when you wrote this
8  report?
9      A.  Well, like I said, I'd have to go back and
10  look at the other cases that I'm involved in.
11     Q.  You'd have to go back and look at Reyes
12  and Solache, Bouto, and Sierra, because they were
13  the ones previous to this report, correct?
14     A.  That would be correct, yes.
15     Q.  That would be correct.
16         MS. BRADY:  So objection that I believe
17     this mischaracterizes the report.
18  BY MR. ENGQUIST:
19     Q.  Are you involved in any other cases
20  involving Area 5 and Detective Guevara other than
21  this case, Bouto, Sierra, and Reyes?
22         MS. BRADY:  Objection --
23         THE WITNESS:  Yes.
24         MS. BRADY:  -- form.

Page 123

1          THE WITNESS:  I'm sorry, Rachel.
2          MS. BRADY:  Also vague as to "involved
3      in."  This sentence doesn't say anything about
4      his involvement.
5  BY MR. ENGQUIST:
6      Q.  All right.  Well, I'm just talking about
7  the same CPD investigators, and you said it would be
8  from your previous work, and I'm trying to get what
9  that involves.
10         You said you'd have to review Reyes,
11  Bouto, and Sierra to see about their involvement,
12  whether or not Riccio or Gawrys was involved,
13  correct?
14     A.  That's correct.
15     Q.  Okay.  And do you know any other officers
16  that would be possibly as the "same CPD
17  investigators, including Guevara and Halvorsen"?
18  Because right now the "same CPD investigators" only
19  includes Biebel.
20         Do you know who else it would include
21  other than Biebel?
22     A.  I would have to go back and look.
23         MR. ENGQUIST:  Okay.  All right.  Now is a
24     good time for a break.

Page 124

1      Need five minutes again, sir, or --
2          THE WITNESS:  That would be great.
3          MR. ENGQUIST:  All right.  We will give
4  you seven, so we can go to 11:35.
5          THE WITNESS:  Okay.  Thank you.
6          THE VIDEOGRAPHER:  We're off the video
7  record at 11:29 a.m.
8              (Whereupon, a recess was taken
9              from 11:29 a.m. to 11:37 a.m.)
10         THE VIDEOGRAPHER:  We're back on the video
11  record at 11:37 a.m.
12  BY MR. ENGQUIST:
13     Q.  All right, sir.  Let's stay on Page 5
14  here.  Further down in that paragraph, which is
15  marked as a), right after it says "Monica Roman,"
16  there's a sentence that says, "In addition, there is
17  substantial evidence in the record that
18  Detective Guevara and other defendants intentionally
19  and willfully manufactured and falsified evidence,
20  manipulated witnesses, and withheld relevant
21  information from Iglesias and his attorneys."
22         Do you see that?
23     A.  I do.
24     Q.  Okay.  When you say "other defendants,"

Page 125

1  which other defendants are you accusing of this
2  misconduct?
3      A.  I'm accusing all of the named defendants
4  with this misconduct.  I believe they were all
5  equally responsible for the investigation.  I don't
6  think I've seen any evidence, as I mentioned before
7  we took the break, where I think Gawrys -- and did I
8  pronounce that correctly this time?
9      Q.  You did that time, yes.
10     A.  Thank you.  One out of seven.
11         Gawrys and the other detectives, I don't
12  think -- I don't know what the rank structure was in
13  terms of who was in charge or case agent, but they
14  had the ability to vet information and attempt to
15  find forensic information about this case to --
16     Q.  Sir, let's talk about what's actually
17  here, though, before you go on the longer answer
18  here.  We're asking about manufactured and falsified
19  evidence, manipulated witnesses, and withheld
20  relevant information.  Those are the points that
21  we're talking about here.  Okay?
22     A.  Okay.
23     Q.  Just to be clear, okay.
24         So let me ask you, what evidence was

THOMAS J. TIDERINGTON, 02/13/2023                    Page 126..129

Page 126

1  manufactured or falsified by Detective Gawrys?
2       A.  Well, there's no information -- I don't
3  believe I saw any GPRs that were prepared by him.
4  There's no information that there was any follow-up
5  or if the information on a GPR was provided to the
6  defense on Shorti or shooter.  I couldn't determine
7  whether or not, in one of the few GPRs that they
8  did, whether they referenced it about the son
9  knowing the shooter, Efrain I believe was his name,
10 Torres' son, knew Shorti or knew the shooter.  I
11 don't believe that that information was in the --
12 was turned over to the defense.
13      Q.  Sir, I was asking you about manufactured
14 or falsified evidence.
15          Can you answer that question, please?  And
16 then we will go through each step along the way.
17          What evidence did Detective Gawrys,
18 according to you, did he manufacture or falsify?
19      A.  Well, the information that was initially
20 reported to the police officers provided a very
21 vague description of who the shooter was.
22      Q.  Sir, I'm sorry, I hate to interrupt you,
23 and I don't really want to do that.  I'm asking you
24 specifically for Detective Gawrys.  What -- because

Page 127

1  you just accused him of this misconduct, and so I
2  want to break down the different misconduct you
3  accuse him of directly, okay.  You are accusing him
4  and you say -- because you say he's one of the other
5  defendants.
6          So what evidence did Detective Gawrys
7  manufacture or falsify?  That's what I want
8  answered, and then we will move to the next step.
9       A.  All right.  So you're only asking about
10 Gawrys specifically, not about --
11      Q.  Over and over again right now.
12          What evidence did Detective Gawrys
13 manufacture or falsify?
14      A.  Okay.  As I said, I'm looking at this as a
15 criminal investigation involving several detectives
16 who are listed as the reportees on the police
17 report.  So the assumption that I made was that
18 these detectives were involved in the criminal
19 investigation and knew and understood each aspect of
20 the case.
21          I don't know that I've seen any evidence
22 that Gawrys simply didn't do anything in the case.
23 I don't understand why he would be listed as a
24 reporting officer if he had no involvement or no

Page 128

1  authority to conduct any type of a follow-up
2  investigation in this case.
3          So --
4       Q.  Sir, if you can answer my question though.
5          What evidence did Detective Gawrys
6  manufacture or falsify?  What evidence did he
7  manufacture or falsify?  That's all I want to know
8  because that's what you say here.
9       A.  As I said, I think he -- there were
10 witnesses that were manipulated, and I don't know --
11      Q.  I'll get to that next.
12          What evidence was manufactured or
13 falsified, sir?
14      A.  Well, I think we have to identify what
15 information was manufactured or manipulated in this
16 total cases, and then it's difficult to assign
17 responsibility to each detective that was listed.  I
18 don't know exactly what each person's role in the
19 case was.  I can only go by what is listed with
20 their names on the police report.
21      Q.  Well, sir, you're accusing him of
22 willfully manufacturing and falsifying evidence.
23          Are you saying right now you can't tell me
24 what you're accusing him of manufacturing or

Page 129

1  falsifying?
2       A.  Well, no, you won't let me answer the
3  question because what I'm trying to say is I want to
4  describe all of the misconduct that occurred or
5  misconduct that I believe occurred during this case,
6  and I can't say specifically if it was this officer
7  that was responsible or if it was another officer
8  that was responsible for it.  And I'm not really
9  assigning credibility to each person.  I can just
10 make an observation of what was done and who's
11 listed on the police reports.
12      Q.  Well, let's see if you can answer this
13 question.
14          What witnesses did Detective Gawrys
15 manipulate?
16      A.  Well, we can refer back to the police
17 report.  I think there's evidence that there was
18 a -- possibly a shooter by the name of Shorti or
19 somebody involved in the case involving either --
20 identified either as the shooter or as Shorti that
21 was never followed up on.  And, again, I think that
22 would be inappropriate for these detectives to not
23 have done that.
24          There was a lead that was provided to

THOMAS J. TIDERINGTON, 02/13/2023                    Page 130..133

Page 130

1 another member of the police department concerning
2 an alternate, alternative suspect, and that was
3 never provided to the defense.
4      **Q. Sir, let me go back.**
5          **Do you know what --**
6 A. Well, wait a minute. Wait a minute.
7 You're not allowing me to finish my answer. You
8 asked me a question.
9      **Q. That's because you're not giving an**
10 **answer, sir, but go ahead.**
11 A. I'm not giving the answer apparently that
12 you want me to give.
13     **Q. No, you're not answering my question.**
14 A. Okay. Go ahead and ask your question
15 again, and I'll try. I'm trying to do my best.
16     **Q. Okay.**
17 A. I'll try to answer your question.
18     **Q. Do you know what it means when I say --**
19 **when you actually said -- or let me ask you.**
20         **When you say "manipulated witnesses,"**
21 **which witnesses are you speaking of, actual**
22 **witnesses that were manipulated by -- according to**
23 **you?**
24 A. And again, let me just refresh my memory

Page 131

1 here so we're talking about the same thing.
2          MS. ROSEN: Sir, can you tell us please
3     what you're looking at?
4          THE WITNESS: I'm looking at my police
5     report -- or, I'm sorry, my expert witness
6     report.
7          MS. ROSEN: Okay. Thank you.
8          THE WITNESS: Okay, I'm sorry, what was
9     the question again?
10 BY MR. ENGQUIST:
11     **Q. Which witnesses were manipulated? We will**
12 **start with that. You said manipulated witnesses.**
13         **Who are they?**
14 A. So when I say "witnesses," so initially
15 there was a report done. I think it was by
16 Detective Santopadre. And he interviewed a number
17 of the witnesses, and they provided what I believe
18 to be somewhat vague descriptions of who the shooter
19 was. That information was obtained shortly after
20 the shooting, so I concluded that it would probably
21 be the most reliable information because it was
22 so -- in terms of the time, it was fresh in the
23 witnesses' minds.
24         So that information was inconsistent with

Page 132

1 what ultimately other witnesses -- or what was
2 documented by the police of what other witnesses
3 said.
4      **Q. Let me go back to my question again.**
5          **Who are the witnesses you're speaking of?**
6 **You can just list them off. Give them by name.**
7          **What are the -- who are the witnesses that**
8 **got manipulated? Can you give me the names of the**
9 **people?**
10 A. Well, I can give you a number of the
11 witnesses. Then we will go back and look at --
12     **Q. Okay. Give me the names of the witnesses**
13 **you said were manipulated, please.**
14 A. Efrain Torres, Arnell Moore, Sara Torres,
15 Jesus Gonzales, Hugo Rodriguez, Daniel Sanchez,
16 José Coronell.
17     **Q. Okay. And you're saying all these**
18 **witnesses were manipulated?**
19 A. I'm not saying all of them were, but --
20     **Q. That's okay. Let's stop for one second.**
21 **My question, because it's in your report, should be**
22 **really, really simple. You say they manipulated**
23 **witnesses. Before I asked you about manufactured**
24 **evidence, and I couldn't get a straight answer on**

Page 133

1 that one.
2          **I'm just asking you --**
3 A. I'm sorry. Wait a minute. Wait a minute.
4      **Q. I'm asking you, what witnesses --**
5 A. Wait a minute.
6      **Q. -- were manipulated?**
7 A. Wait, you just said -- wait a minute. You
8 just said you couldn't get a straight answer on what
9 question?
10     **Q. Oh, no. I didn't get a single piece of**
11 **evidence. You didn't say this evidence, this**
12 **evidence, this evidence. But I'm going to go back**
13 **to that because you said you had to go through your**
14 **report, so I'll go back to that.**
15     **I just want to know right now what**
16 **witnesses were manipulated? One witness? Two**
17 **witnesses? Three witnesses? Give me their names.**
18         MS. BRADY: I'm just going to object.
19     One, please keep your tone respectful. Two,
20     I'm objecting to the form of this question
21     because it assumes that manipulating witnesses
22     is different than fabricating evidence.
23         But go ahead and answer, Tom.
24         MR. ENGQUIST: Okay. Nice speaking

THOMAS J. TIDERINGTON, 02/13/2023                    Page 134..137

Page 134

1    objection.
2  BY MR. ENGQUIST:
3       Q.  But go ahead, sir.  Why don't you list off
4  the manipulated witnesses for me.
5       A.  Well, I think I just listed off the
6  witnesses, and --
7       Q.  I said which ones were manipulated, sir.
8  That's my question.
9       A.  Okay.  So, and, again, off the top of my
10 head, I'll have to go back and --
11      Q.  Sir --
12      A.  -- look through my report.
13      Q.  Sir --
14      A.  Wait a minute.
15      Q.  -- I don't want you to go off the top of
16 your head.  You should be able to answer me who the
17 manipulated witnesses are.  If you need to look at
18 your report for a couple minutes to give me the list
19 of names of witnesses who were manipulated, that
20 would be fine because then we need to go through
21 that.
22          So tell me who they are.
23      A.  All right.  As I said, Efrain Torres, his
24 initial statement was that he saw the shooter, that

Page 135

1  he saw --
2       Q.  I'm just looking for the names, sir, just
3  looking for the names.
4          Efrain Torres.  Who is next?
5       A.  Again, I've listed all the witnesses.  I
6  will have to go through my report, and we can go
7  through each one and I can describe what my opinion
8  is on each one, but you don't want -- apparently
9  don't want me to do that.
10      Q.  No, sir.  What I want you to do is answer
11 my question.  You can review your report.  You have
12 it in front of you.  I'm not going to bother you if
13 you want to flip through a page and figure something
14 out, if you want to take a couple seconds to
15 formulate your answer.
16          I want a list.  When you say here that my
17 clients manipulated witnesses, I want to know which
18 witnesses you're talking about, and then I'll take
19 them one at a time.
20          So tell me which witnesses were
21 manipulated according to you.
22      A.  Wait, only by --
23      Q.  That's the question.
24      A.  Wait.  Only by your client or in this

Page 136

1  total --
2       Q.  We will get to that because apparently you
3  want to get to that part.  I want to know which
4  witnesses were manipulated.
5       A.  In the total investigation or just by your
6  client?
7       Q.  Oh, dear God, sir.  I'm asking you for
8  who -- which witnesses were manipulated.  That's all
9  I'm asking for.
10      A.  Okay.  And I've listed those for you.
11      Q.  You said -- but I asked you before, sir, I
12 said, so they were all manipulated, and then you
13 were like, well, these are -- are you saying every
14 witness in this case was manipulated?
15      MS. BRADY:  Objection, form, harassing.
16 Please keep it professional, Josh.
17      MR. ENGQUIST:  I'm doing my darnedest, but
18 I can't get an answer.
19      THE WITNESS:  No, okay.  That's why I'd
20 like to go through each one of the witnesses
21 that I listed and I can tell you whether or not
22 I believe they were manipulated at all.
23      MS. ROSEN:  Mr. Tiderington, you know, we
24 are limited in time here, and the question was

Page 137

1  pretty direct, right.  Mr. Engquist asked you
2  at Page 5 of your report, you say
3  Detective Guevara and other defendants
4  manipulated witnesses.
5          So look at Page 5 of your report, and all
6  he wants to know is for you to identify the
7  names of the witnesses manipulated.  That's
8  all.  It's pretty simple.  If you need to go
9  through your report, go through your report.
10 But --
11      THE WITNESS:  Okay.
12      MS. ROSEN:  -- it's a straightforward
13 question.
14      THE WITNESS:  All right.  Well, thank you
15 for telling me how simple things are.
16      MS. ROSEN:  You're welcome.
17      THE WITNESS:  I will take your suggestion.
18 And would you like me to make notes as I go
19 through the report so I can share that with
20 you, or how would you like me to do this?
21 BY MR. ENGQUIST:
22      Q.  I don't care if you take notes or make
23 notes.  All I want is the list of names of the
24 witnesses that you say were manipulated.  That's all

THOMAS J. TIDERINGTON, 02/13/2023                    Page 138..141

Page 138

1  I want.
2      A.  All right.  Can you give me a few minutes?
3      Q.  Sure.
4      MS. ROSEN:  And if we could note for the
5  record that it's now 11:53.
6      MS. BRADY:  Let's just go off the record
7  and take a couple minutes and everybody can
8  calm down.  Let's go off --
9      MR. ENGQUIST:  All right.  Let's go off
10  the record.
11      MS. BRADY:  -- for five minutes.
12      MR. ENGQUIST:  All right.
13      THE VIDEOGRAPHER:  We're off the video
14  record at 11:53 a.m.
15      (Whereupon, a recess was taken
16      from 11:53 a.m. to 12:02 p.m.)
17      THE VIDEOGRAPHER:  We're back on the video
18  record at 12:02 p.m.
19  BY MR. ENGQUIST:
20      Q.  All right, sir.  During the break, were
21  you able to go through your report so you can tell
22  me who you were referring to when you said
23  manipulated witnesses on Page 5, which witnesses
24  that you are referring to?

Page 139

1      A.  Yes.  The witnesses primarily are
2  Rodriguez and Ochoa essentially in my opinion;
3  Efrain Torres as well.
4      And I'm not -- I guess I cannot assign,
5  totally assign the blame to your client, Gawrys.  I
6  think it was primarily Guevara and Halvorsen, but I
7  don't know that for certain.
8      Q.  Sir, I just want to make sure.
9      When you're referring to manipulated
10  witnesses, you're referring to Hugo Rodriguez,
11  Rosendo Ochoa, and Efrain Torres, is that right?
12      A.  That's correct.
13      Q.  Okay.  No one else; is that right?
14      I just want to make sure that's the
15  witnesses you're referring to.
16      A.  Yeah, for the most part.  When you say "no
17  one else," as we sit here, those are the three
18  primary witnesses that I believe were manipulated.
19      Q.  Okay.  Just to be clear, I don't want to
20  go with you believe this might be the primary.
21      When you use the term "manipulated
22  witnesses," are these the three people you're
23  referring to in that paragraph on Page 5?
24      A.  They do.  It is, yes.

Page 140

1      Q.  Okay.  All right.  How did
2  Detective Gawrys manipulate Hugo Rodriguez?
3      A.  Well, as I said in my previous answer, I
4  don't have specific information that Gawrys actually
5  interacted with these witnesses.  I don't know if he
6  did or not.  There's no indication in any GPRs or
7  any specific mention in the police report that he
8  participated.
9      I wouldn't know that because, again, his
10  name is listed, but I don't know for sure.
11      Q.  Okay.  Well, you also have other things,
12  like the testimony of those three witnesses too,
13  correct?
14      A.  I -- perhaps.  I didn't have time in the
15  five minutes that I had to go back and review that,
16  but that is a good point that you just pointed out
17  as well, yes.
18      Q.  Okay.  And you reviewed their testimony
19  during the time that you took to prepare this report
20  and then your time it took you to prep for today's
21  deposition too, correct?
22      MS. BRADY:  Objection, asked and answered.
23      THE WITNESS:  I did, yes.
24

Page 141

1  BY MR. ENGQUIST:
2      Q.  Okay.  So as we sit here right now, you
3  can't point to Detective Gawrys manipulating any of
4  those witnesses, correct?
5      A.  That would be correct, yes.
6      Q.  Okay.  What about Detective Riccio, did he
7  have any contact with the three witnesses?
8      A.  He did.  Yes, he did.
9      Q.  Okay.  What contact did he have with whom?
10      A.  He conducted the lineups.
11      Q.  Okay.  He participated in the lineups; is
12  that right?
13      A.  That's correct.  That's correct.
14      Q.  And how did he -- did he manipulate any of
15  the witnesses when he was conducting -- when he was
16  helping to conduct the lineups?
17      A.  Well, if he was involved with showing the
18  photographs, the photo array and then later
19  showing -- having the live lineup shown, that would
20  be inconsistent with acceptable police practices.
21      Q.  Okay.  Are you -- do you know whether or
22  not Detective Riccio was involved in showing photo
23  arrays?
24      A.  I don't know if he was or not.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 142..145

Page 142

1    Q.  Okay.  If he was only involved in
2  assisting in the lineups, how did he manipulate the
3  three witnesses that you spoke of?
4    A.  Well, I believe his report is -- lacks
5  sufficient detail of what would have been acceptable
6  in a police report.  I think Guevara testified when
7  he was asked -- and I'll get back to your question,
8  don't worry.
9    Q.  Sir, rather than getting back to my
10  question, if you could just answer my question, we
11  will fly through this.
12    A.  That's what I -- that's what I am doing is
13  when Guevara testified that -- and he was asked, I
14  think, at trial what the witnesses said when they
15  identified Iglesias as the shooter, and he said,
16  yes, we recognize -- or I recognize Iglesias; he is
17  the guy that shot and killed Monica Roman, and he
18  said that about both the -- both Ochoa and
19  Rodriguez.
20       So if -- if Riccio was involved in that,
21  then that would be a manipulation as well.  There's
22  nothing in his report that indicates what those
23  witnesses said when they identified Iglesias, which
24  should have been contained in that report.

Page 143

1    Q.  You're talking about the report writing.
2       I'm asking you -- maybe an easier way to
3  say this, when you use the term in your
4  own report that they manipulated witnesses, what do
5  you mean by manipulating the witnesses?  I'm
6  assuming you don't mean writing a report later on.
7  You're talking about manipulating the actual
8  witnesses, correct?
9       Or why don't you tell me what you mean by
10  that.
11    A.  Well, what I mean by that is the initial
12  statements both Ochoa and Rodriguez provided are
13  much different than what was ultimately reported.
14  And, you know, was that Torres or was that -- I'm
15  sorry, was that Riccio or was that Halvorsen or
16  Guevara.
17    Q.  Okay.  I'm still not sure what you're
18  talking about.
19       When you're talking about manipulating
20  witnesses, are you saying that they were manipulated
21  into picking out the plaintiff?
22    A.  I believe they could have been, yes.
23    Q.  You believe they could have been or they
24  were?

Page 144

1    A.  I don't know.  Again, I can't -- I wasn't
2  there, so I don't know.  I can only give you an
3  opinion based on the evidence.
4       So it's possible that they were
5  manipulated into picking out Iglesias, yes.
6    Q.  Okay.  And what do -- when you're
7  talking -- you're assuming at this point you're
8  talking about Hugo Rodriguez and Mr. Ochoa, correct?
9    A.  That's correct.
10    Q.  Okay.  And you read their depositions,
11  correct?
12    A.  I did.
13    Q.  And you read their testimony in court,
14  correct?
15    A.  That's correct.
16    Q.  Have they ever said that anyone ever
17  manipulated them into making the decisions to --
18  making the decision to choose plaintiff as the
19  shooter, identifying him?
20    A.  I don't believe so.
21    Q.  Okay.  So they denied being manipulated,
22  correct?
23    A.  I believe they denied that, yes.  I don't
24  know if they were asked about manipulated or

Page 145

1  coerced.  I don't know what the wording was exactly,
2  but I would agree with you.
3    Q.  Okay.  So the witnesses themselves do not
4  say they were manipulated, correct?
5       MS. BRADY:  Objection, asked and answered.
6       THE WITNESS:  That's -- that's correct.
7  BY MR. ENGQUIST:
8    Q.  Okay.  And are you still of the opinion
9  that they were manipulated by the defendants in this
10  case?
11    A.  I am.
12    Q.  Okay.  And that's based on what?
13    A.  Well, their initial statements to the
14  police and then their far more detailed information
15  at a later time --
16    Q.  Okay.
17    A.  -- after -- after the officers selected
18  the individual that they felt was responsible for
19  the shooting.
20    Q.  And who do you assign blame on
21  manipulating Mr. Rodriguez and Mr. Ochoa?
22    A.  Who do I assign blame to?  I would say
23  that the officers that were involved in the
24  investigation and the lack of follow-up by these

THOMAS J. TIDERINGTON, 02/13/2023                    Page 146..149

Page 146
1  investigators, all of them that were the key
2  investigators in this case.
3      Q.  Okay.  And withheld relevant information
4  from Iglesias and his attorneys, without -- at this
5  point, all I want you to tell me is list off what
6  evidence was withheld, relevant information that was
7  withheld.  Just give me the list.
8      A.  I don't have -- I don't know if I have a
9  list.
10     Q.  Why don't you?  Well, when you said
11 "withheld relevant information," what were you
12 referring to?
13     A.  Well, you don't want me to discuss it.
14 You just want me to give you a list.  I don't have a
15 list.
16     Q.  Sir, this is the way it works.  I ask you
17 a question; you give me the answer to that question,
18 and then we go and break it down if I want.  Or if I
19 don't ask it, your attorney can ask you about it or
20 it might even be fair game later on.
21         Right now, the only way for me to be able
22 to get answers to my questions is if I ask them and
23 then you answer them.
24     A.  I understand.

Page 147
1      Q.  So if I ask when you say "withheld
2  relevant information," can you list the relevant
3  information that was withheld?  Yes or no first, and
4  then I'll ask you what it is.
5      A.  Yes.
6      Q.  Okay.  Can you list the relevant
7  information that was withheld?
8      A.  Yes.
9      Q.  What is it?
10     A.  GPRs.
11     Q.  Anything else?
12     A.  Information not contained in GPRs.
13     Q.  Anything else?
14     A.  Tips or leads, if you will.
15     Q.  Anything else that was withheld?
16     A.  Other investigative actions.
17     Q.  Anything else?
18     A.  I think those are the primary.  There may
19 be more, but those are that I can recall off the top
20 of my head.
21     Q.  Okay.  Do you want more time to look at
22 your report to do that?
23     A.  No.
24     Q.  Because the thing I don't want to do is I

Page 148
1  want to make sure I have a complete list before I go
2  through them.  That's what I want.
3      A.  No, I understand.
4      Q.  You need to make sure those are the four
5  things.  Let's make sure those are the four things,
6  sir.
7      A.  I think those are the four things, but I
8  don't think I should be precluded if we go through
9  four more pages and I identify another one and I'll
10 bring that to your attention.
11        So I'm not trying to -- I'm trying to
12 answer the question.
13     Q.  Well, why don't you answer my question
14 now.  Do you need to flip through your report?
15 Because you wrote this report, right?
16     A.  I did.
17     Q.  And you reviewed this report for hours
18 before your deposition today, correct?
19     A.  Right.
20     Q.  Okay.  So you should know where to look.
21 If there's anything else other than the four things
22 you listed, why don't you tell me.  You can look at
23 your report; you can flip through it.  You know
24 exactly -- you wrote the report.  You reviewed it;

Page 149
1  you know where it would be.
2          Why don't you tell me what else was --
3  what information, other relevant information that
4  was withheld from Iglesias and his attorneys.
5          MS. BRADY:  Josh, he's entitled to give
6      you the answer that this is what he can think
7      of at this time, and then if something else
8      comes up during the deposition, he's entitled
9      to be able to say that.
10         MR. ENGQUIST:  Yes, I know.  And I'm
11     asking him to make sure it's a complete answer
12     so I can move on.
13 BY MR. ENGQUIST:
14     Q.  Go ahead, sir.
15         MS. BRADY:  So I'll just object to form
16     then.
17         MR. ENGQUIST:  I'll just put on the record
18     we started this part of this question at 12:14.
19         MS. BRADY:  A more efficient way of doing
20     it might be to let him mention things as they
21     come up rather than asking him to review his
22     entire report right now.
23         MR. ENGQUIST:  I'm not asking him to
24     review his entire report.  He wrote the report.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 150..153

Page 150

1    He knows where the issues are, and I'm asking
2    him to make sure that those are the four things
3    and there's nothing additional so I can ask the
4    questions about it.
5        MS. BRADY:  Well, the report speaks for
6    itself.
7        MR. ENGQUIST:  It actually doesn't because
8    it has a lot of royal "we's" and everything
9    else, so I can't tell who did what and when.
10       THE WITNESS:  Well, that's the problem I
11   have in reviewing the case as well.
12   BY MR. ENGQUIST:
13       **Q.  But you're an experienced report writer,**
14   **right?  You're the expert in this situation,**
15   **correct?**
16       A.  Yeah, but this is far different --
17       **Q.  And you're --**
18       A.  Wait a minute.  You just asked me the
19   question.
20       **Q.  Go ahead.**
21       A.  This is far different than any other
22   homicide or criminal files that I've investigated
23   throughout my career.  And so that's why it's
24   somewhat difficult to give you an answer without

Page 151

1    using "we," "they," or "may."
2        But to get back to your question, I'm
3    comfortable with those five -- those four items that
4    I've identified, and hopefully I won't have to raise
5    a fifth one to you, but I'm assuming you would like
6    me to if I happen to -- if something else pops into
7    my head at some point.
8        **Q.  Well, I hope it's not just popping into**
9    **your head.  I hope it's actually in the report.  But**
10   **yes, you should mention it.**
11       A.  It will certainly do that.
12       **Q.  The GPRs, are you saying there should have**
13   **been GPRs that were not included?  Is that what**
14   **you're saying?**
15       A.  That's correct.
16       **Q.  Okay.  Information not contained in GPRs,**
17   **you're saying that there was information that wasn't**
18   **documented that you think should have been**
19   **documented, correct?**
20       A.  Well, based on the Chicago Police
21   Department's policies and procedures, certainly, and
22   based on my understanding of what a reasonable
23   investigator would have documented in a -- whether
24   it's a GPR or some type of supplemental report,

Page 152

1    certainly there was information missing in this case
2    file.
3        **Q.  Okay.  The tips or leads, what tips or**
4    **leads were not -- were withheld from Iglesias and**
5    **his attorneys?**
6        A.  The -- a tip came in or a lead came in
7    concerning an individual that may have been
8    responsible for this shooting and that he was, I
9    believe, a Spanish Cobra gang member.  That
10   information was investigated by Sergeant Mingey, I
11   believe, and none of that information was ever
12   translated into the Iglesias case file that I could
13   see.
14       **Q.  Are you referring to the debriefing of**
15   **Rankins?**
16       A.  I am.
17       **Q.  Okay.  So you think debriefing a criminal**
18   **about anything they would know about certain case --**
19   **about cases in general if he didn't know anything**
20   **should have made it in there, that "I debriefed**
21   **somebody that knew nothing about it" should have**
22   **showed up in this file?**
23       MS. BRADY:  Objection, misstates the
24   testimony and misstates the report, also form.

Page 153

1        THE WITNESS:  It's my understanding he
2    debriefed -- Mingey, Sergeant Mingey debriefed
3    an individual about this shooting, and he had
4    reason to debrief him about this shooting
5    because either a lead or a tip came in to him.
6        So it was related and relevant to this
7    case, and certainly it should have been
8    included in a supplemental report relating to
9    this case, certainly.
10   BY MR. ENGQUIST:
11       **Q.  Okay.  And who had been responsible for**
12   **doing that?  That would have been Mingey?**
13       A.  Responsible for doing what?
14       **Q.  Documenting the debriefing in this case**
15   **file.**
16       A.  Well, whoever received the tip should have
17   documented that the tip came in.  And then there
18   should have been a supplemental report or GPR that
19   was documented in the Iglesias case file.
20       Whether it was prepared by Mingey or
21   whether it was prepared by one of the key or one of
22   the detectives, it should have been done, and the
23   homicide detectives in this case should have ensured
24   that it was done.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 154..157

Page 154

1      Q.  So what is your understanding why
2  Sergeant Mingey spoke with Mr. Rankins?
3      A.  My understanding is a tip or a lead came
4  in that a Spanish Cobra may have been involved in
5  this shooting.
6      Q.  Okay.  And where did you get that from?
7      A.  In the case documents someplace.  I'm not
8  sure exactly what document I read that in.
9      Q.  Okay.
10     A.  Well, I'm sorry.  It was contained -- it
11  wasn't contained in the Iglesias file.  It was
12  discovered -- as my understanding, it was discovered
13  in another file, and then somehow it was determined
14  that it was related to this case, and that's how it
15  came to light, which, again, is a significant
16  problem and consistent pattern of practice of
17  misconduct that Chicago has been involved and known
18  for for many years.
19     Q.  Okay.  So I'm going to try that again.
20     All right.  So how did that tipper lead --
21  can you tell me what responsibility Sergeant Biebel
22  had to make sure that that tipper lead that you're
23  talking about, the debriefing of Rankin, should have
24  been in this file?

Page 155

1      MS. BRADY:  Objection, I believe that
2  mischaracterizes his testimony.  He's not
3  saying the tip is the debriefing of Rankins.
4  So please stop mischaracterizing his testimony.
5  BY MR. ENGQUIST:
6      Q.  I'll even fix that.
7      So who should have put in the information
8  about the debriefing into this file?
9      A.  Who should have put it in?
10     Q.  Yeah.
11     A.  I think I testified or I think the
12  question that I answered was that I think it was the
13  responsibility of the homicide detectives
14  investigating the Iglesias shooting.  I believe it
15  would have been Sergeant Mingey's responsibility to
16  document the information that came to him and the
17  debriefing or the briefing that he had with this
18  individual related to the shooting.
19     And then it would have been the sergeant's
20  responsibility to either know that this occurred, or
21  if he didn't know, he should have known.
22     Q.  So would that have been the responsibility
23  of Riccio?
24     MS. BRADY:  Objection, form.

Page 156

1      THE WITNESS:  As a co-case agent, perhaps,
2  yes.
3  BY MR. ENGQUIST:
4      Q.  Okay.  Do you have any information to show
5  that Riccio even knew about this debriefing of
6  Mr. Rankins?
7      A.  I don't.
8      Q.  Okay.  What about Gawrys, would the
9  responsibility have been for Gawrys to do that?
10     A.  I don't have any information that he knew
11  about it.
12     Q.  Okay.  What about Biebel?
13     A.  Well, I think it was his responsibility to
14  know about it.  So if he didn't know about it, he
15  should have known about it.
16     Q.  Okay.  So he should have known about it,
17  so, therefore, he should have done something about
18  it?  That's pretty much it?
19     A.  I think it's pretty significant.  I think
20  it's important, yes.  And it should have been
21  somehow communicated, yes.
22     Q.  And then the last thing you have here is
23  other information withheld.
24     What other information was withheld?  I

Page 157

1  think that is how you put it.
2      A.  What do you mean other -- oh, as far as
3  the --
4      Q.  When you listed GPR information --
5      A.  I'm sorry.  Go ahead.
6      Q.  I want to make sure I have this right
7  because my handwriting is kind of bad at times too.
8      GPRs, we did that already.  Information
9  not contained in GPRs, the tips and leads; that was
10  the Mingey debriefing of Rankins and the basis for
11  that.  And the last one was other information.
12     Which was that?  Can you tell me what that
13  is?
14     A.  Well, yeah, I think what I meant by that
15  or what I did mean by that is there's evidence that
16  witnesses were shown the various gang books, and
17  there's no information documenting the sessions that
18  were had where these witnesses actually were looking
19  through these gang books.  That should have been
20  documented as to which gang books were shown, who
21  was in the gang books.  Was Iglesias' photograph in
22  there?  Was -- you know, were they Spanish Cobra
23  gang books?  Were they Imperial Gangster gang books?
24  What gang books were actually shown to the

THOMAS J. TIDERINGTON, 02/13/2023                    Page 158..161

Page 158

1  witnesses?
2      Q.  Okay.  And do you know who showed the gang
3  books to the witnesses?
4      A.  That's part of the problem.  No, we don't
5  know that, but apparently they were shown.
6      Q.  Okay.  Do you know whether or not
7  Detective Riccio ever showed gang books to any
8  witnesses?
9      A.  I don't know that.
10     Q.  Do you know if Detective Gawrys ever
11  showed gang books to anybody?
12     A.  I have no way of knowing that.
13     Q.  Do you know if Sergeant Biebel ever showed
14  gang books to anybody?
15     A.  No way of knowing that.
16     Q.  Do you know if Halvorsen ever showed gang
17  books to anybody?
18     A.  I'm not sure.
19     Q.  What about Guevara, did he even show gang
20  books to anybody?
21     A.  I --
22         MS. BRADY:  Objection, foundation,
23  foundation to that one.
24         Go ahead.

Page 159

1         THE WITNESS:  I'm not sure who showed the
2      gang books, but there's indication in the
3      police report that gang books were shown to
4      these witnesses.
5  BY MR. ENGQUIST:
6      Q.  Now let's go back to manufacturing and
7  falsifying evidence.
8         What do you mean, just so we're all clear
9  about terms here, manufactured or falsified --
10  "manufactured and falsified evidence," what do you
11  mean by that?
12     A.  Well, if they document information in a
13  report that's not factually correct, that would be
14  manufactured evidence.
15     Q.  Okay.  So it was just made up basically;
16  is that fair to say?
17     A.  Or manipulated --
18         MS. BRADY:  Objection.
19         THE WITNESS:  Or manipulated, yes.
20  BY MR. ENGQUIST:
21     Q.  Or manipulated.  Well, we already went
22  through the manipulating the witnesses.
23         You're talking about manipulating evidence
24  now?  Are we talking about something separate or

Page 160

1  not?
2         MS. BRADY:  Objection, form.
3         Hang on, Tom.
4         Objection, form.
5         Go ahead.
6         THE WITNESS:  I think they could be one
7      and the same.
8  BY MR. ENGQUIST:
9      Q.  All right.  So you've already talked about
10  manipulating of witnesses.  We've done that, so put
11  that to one side.
12         You have listed in here -- these are your
13  words -- "intentionally and willfully manufactured
14  and falsified evidence."
15         So when you're saying "manufactured and
16  falsified evidence," can you describe what you mean
17  by that?  And then we will list -- then I'll have
18  you list what evidence was manufactured or
19  falsified, just so you know.
20     A.  Well, I guess I'm confused.  Do you want
21  me to give you an example of what was manufactured,
22  or is that the second part of the question?
23     Q.  Well, why don't you tell me what you mean
24  by manufactured or falsified evidence before we do

Page 161

1  that.
2      A.  I think I asked and answered or I answered
3  that question, I believe, already.  Any information
4  that is not factually correct would be manufactured
5  information.  Whether it's manipulated -- if it's
6  not factually correct, whether they manipulated it
7  or just simply created it is set -- has the same net
8  effect, I believe.
9      Q.  Okay.  So why don't we list the
10  manufactured evidence.  Go ahead.
11     A.  Well, I believe there's a statement in the
12  police report where Iglesias supposedly said that he
13  gets out of school and he hangs out in front of the
14  boys' club each day, and that went towards his alibi
15  or his lack of alibi.  Later on, I think it was
16  Guevara that testified something totally opposite to
17  what was originally in the police report.
18         So he either manufactured and lied about
19  it in the police report or he lied about it during
20  his testimony, and I couldn't determine which, where
21  he lied.
22     Q.  Okay.  And, of course, that would have
23  been known, if it was manufactured about the
24  statement from Mr. Iglesias, Mr. Iglesias would have

THOMAS J. TIDERINGTON, 02/13/2023                    Page 162..165

Page 162

1  known it was being manufactured, correct?
2      MS. BRADY: Objection, foundation.
3      THE WITNESS: I'm sorry. Say that again.
4  BY MR. ENGGQUIST:
5      Q. If you're saying there was manufactured
6  testimony or manufactured evidence about
7  Mr. Iglesias' statements --
8      A. Right.
9      Q. -- Mr. Iglesias would have been aware of
10  that at the time of trial, that it was manufactured?
11      MS. BRADY: Objection, form, foundation.
12      THE WITNESS: That's true.
13  BY MR. ENGGQUIST:
14      Q. Okay. Besides that statement by Iglesias,
15  you said about -- that Guevara was involved in.
16      What else was manufactured?
17      A. I believe there's other things. And
18  again, I know you're not going to like this answer,
19  but that's all I can recall off the top of my head.
20  If --
21      Q. You know, rather than going through this,
22  I want you to basically be able to give me the
23  answer, what you mean, because when you put in this
24  part here, "manufactured evidence," I want to know

Page 163

1  all the evidence that was manufactured other than
2  that statement.
3      So if you can take a second, please do.
4  Right now it's 12:29.
5      MS. BRADY: I'll just object to form. The
6  report speaks for itself.
7      MS. ROSEN: Well, the report is not going
8  to testify at trial, Rachel; he is. So we're
9  entitled to know what he's going to testify.
10      THE WITNESS: Okay.
11  BY MR. ENGGQUIST:
12      Q. All right. It's 12:33.
13      Can you give me any more of the
14  manufactured evidence that you're referring to?
15      A. So there's a number of things.
16      Q. Okay. Let's go through them. Give me the
17  list.
18      A. So the detectives knew or should have
19  known that the witnesses, based on the initial
20  interviews by police officers, they knew that the
21  witnesses could not identify the suspects, could
22  not -- I'm sorry, could not identify the shooter.
23  Yet, they continued to show them gang books. They
24  continued to show them a photo array. They showed

Page 164

1  them a lineup when, based on the initial interview
2  with the police officers and the description that
3  they provided, it was clear that they weren't going
4  to be able to identify the shooter. Yet, after --
5  two weeks after the shooting and, magically, once
6  Guevara and Halvorsen got involved, they closed the
7  case within a couple of days.
8      So I think that's one of the examples.
9      Q. Okay. Sir, but out of that what you just
10  rattled on about and putting aside --
11      A. I'm sorry. What -- I'm sorry. What was
12  the word that you used to describe my testimony?
13      Q. You went on about you said "magical." But
14  besides that, I just want to get an idea.
15      What was manufactured? Because you
16  said -- you gave a whole list of things they were
17  doing as part of their investigation.
18      What evidence was manufactured? Are you
19  saying the identifications were manufactured? What
20  are you saying are manufactured?
21      MS. BRADY: Objection to form.
22      Hang on, Tom.
23      Objection to form. This is harassing.
24      Josh, I would ask again now for the third time

Page 165

1  that you please be respectful.
2  BY MR. ENGGQUIST:
3      Q. So can you answer the question?
4      MS. BRADY: Also the question was
5  compound.
6      But you can answer.
7  BY MR. ENGGQUIST:
8      Q. I'm asking you, what was manufactured out
9  of what you just said?
10      A. Well, I believe the witness identification
11  was manufactured. You have testimony from another
12  officer that he interviewed witnesses and that those
13  witnesses told them -- told him that they could not
14  identify the shooter. And then, as I said,
15  "magically" is the word I used, a couple weeks
16  later, Guevara and Halvorsen were able to have the
17  witnesses change their mind and identify Iglesias as
18  the shooter.
19      Q. Okay. So we're talking about
20  Hugo Rodriguez and Rosendo Ochoa were -- their
21  identification was manufactured, correct?
22      A. I believe it could have been, yes. It's
23  more likely than not that it was.
24      Q. Okay. When did Hugo Rodriguez and

THOMAS J. TIDERINGTON, 02/13/2023                    Page 166..169

Page 166

1  Rosendo Ochoa say they could not make
2  identifications?
3      A.  I think they were originally interviewed
4  by, and I'm going to chop up his name, Santa --
5  what's the -- Santopadre, I believe, is the other
6  officer that interviewed them.  And I believe
7  there's testimony, his testimony relating to whether
8  or not he asked -- would ask a witness whether or
9  not they could identify the shooter or the suspect
10 in the case, and he said it was his practice to
11 indicate in the police report if the witness could,
12 in fact, identify.  And because that was not
13 included in his report, he was sure, not me, he was
14 sure that the witnesses were not able to identify
15 the shooter based on what he wrote in his police
16 report.
17     Q.  Okay.  When has -- did Hugo Rodriguez and
18 Rosendo Ochoa ever say they could not identify the
19 shooter?
20     MS. BRADY:  Objection, asked and answered.
21     You can answer.
22     THE WITNESS:  Well, I agree with that I
23 just answered the question.  He testified that
24 when he interviewed him, that he would have

Page 167

1  indicated in his police report that he would
2  have asked that question, that he would have
3  documented that in his police report.
4  BY MR. ENGQUIST:
5      Q.  Okay.  I'm asking you, though, so you're
6  saying Hugo Rodriguez and -- Hugo Rodriguez and
7  Rosendo Ochoa previously said they could not do
8  identification.  Is that what you're saying?
9      A.  I think you have to -- you can't just
10 compartmentalize it like you're trying to do.  I
11 think you have to look at the description that they
12 originally gave of the shooter, and then you have to
13 take in the testimony of Officer Santopadre, and you
14 would come to the same conclusion that I came to.
15     Q.  Okay.  So we have this statement by
16 Iglesias was manufactured, and you're saying the
17 identifications of Hugo Rodriguez and of
18 Rosendo Ochoa were manufactured.
19     Who manufactured the identifications of
20 Mr. Rodriguez?
21     A.  It would have been the detectives that
22 were investigating the shooting.
23     Q.  Can you name the detectives who
24 manufactured the -- manufactured the identification

Page 168

1  of Hugo Rodriguez?
2      A.  I believe it would have been Guevara and
3  Halvorsen primarily.
4      Q.  Who else?  Because you keep on saying
5  "primarily."
6      Who manipulated -- I'm sorry.
7      Who manufactured Hugo Rodriguez's
8  identification?
9      A.  And, again, I answered that.  I believe it
10 was Guevara and Halvorsen, but there was other --
11 Riccio, for example, was involved in the photo --
12 the photo lineup and claims that the witnesses
13 selected this individual, Iglesias, as the shooter.
14     So I don't know exactly what was said.
15 There's no GPRs related to the conversation that
16 they had, so I don't know if he was involved or not.
17     Q.  Okay.  And who manufactured, according to
18 you, the identification of Rosendo Ochoa?
19     A.  Same answer.
20     Q.  Okay.  Did -- any other manufactured
21 evidence?
22     MS. BRADY:  Objection, form.
23     THE WITNESS:  Well, I believe there's
24 still a question of whether or not, quote, a

Page 169

1  confidential informant called in and provided
2  Iglesias' name.  It was not handled
3  appropriately or it was not handled consistent
4  with acceptable police practices or standards
5  and was not documented.  So that's certainly
6  questionable.
7  BY MR. ENGQUIST:
8      Q.  Sir, but I'm asking you, are you saying
9  the CI calling and talking to Guevara is
10 manufactured?  I've asked you that before.
11     Was it manufactured?  Are you saying it's
12 manufactured or not?
13     MS. BRADY:  Objection, form.
14     THE WITNESS:  I think it's more likely
15 than not that it is manufactured due to the
16 fact that there's very limited information
17 about who the confidential informant was.  If
18 you're going to rely on informant information,
19 I believe you have a responsibility to
20 understand the background of the confidential
21 informant.  There's a reason why police
22 departments don't authorize the use of
23 confidential informants unless they've been
24 approved and documented.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 170..173

Page 170

1      So all of these things certainly raise a
2  question about the validity of the confidential
3  informant.  And, again, this isn't my
4  terminology.  This is their terminology.
5      If it was an anonymous tip, that may be
6  different.
7  BY MR. ENGQUIST:
8      Q.  Okay.  Just to be clear, when we're
9  talking about using a confidential informant and
10 having and knowing -- and checking on it, that would
11 be for things like -- let me just go back.
12      If you're using a confidential informant
13 as the basis for probable cause for an arrest or a
14 search warrant or things like that, then you would
15 really need to check into the veracity of the
16 confidential informant, correct?
17     A.  Or if you're going to utilize that
18 information to arrest somebody on a homicide, you
19 would want to check into the validity of the
20 informant's information as well.
21     Q.  Okay.  So if you're going to make an
22 arrest that's an arrest, you know, that's for
23 probable -- based on probable cause, you would need
24 to have that, right?

Page 171

1      A.  That's correct.
2      Q.  Okay.
3      A.  Well, yeah, I would -- that's a fair
4  statement.
5      Q.  Okay.  Let's go to the next page.  We're
6  all the way to Page 6 now.  Number -- letter c), you
7  have in here, "For example, I have not seen any
8  evidence that CPD investigators attempted to locate
9  the murder weapon or clothing worn by the
10 perpetrator."
11      Okay.  How long after the murder was the
12 arrest of the plaintiff in this case?
13     A.  I think, what, two weeks, if I remember
14 correctly.
15     Q.  Okay.  Do you think it was reasonable to
16 believe that he would have still had the gun and the
17 clothes worn, you know, at his house or at his
18 residence?
19      MS. BRADY:  Objection, form.
20      THE WITNESS:  I certainly would have
21 conducted a search warrant to say if he did.
22 That's for sure.
23 BY MR. ENGQUIST:
24     Q.  Do you think it would be reasonable that

Page 172

1  he would still keep it there?
2      MS. BRADY:  Objection, form.  Reasonable
3  to who?
4      MR. ENGQUIST:  I'm asking him if he thinks
5  it would be reasonable that the murderer would
6  keep the gun and the clothing at his house
7  two weeks after the murder.
8      MS. BRADY:  Are you asking if the murderer
9  would reasonably keep --
10     MR. ENGQUIST:  I'm asking him about his
11 reasonable thoughts.  That's what I'm asking
12 him.
13 BY MR. ENGQUIST:
14     Q.  Go ahead and answer.
15     MS. BRADY:  Objection to form.
16     THE WITNESS:  I think any reasonable
17 homicide investigation or reasonable homicide
18 detective certainly would have conducted a
19 search warrant of the home of the suspect in a
20 murder investigation.  Whether or not the
21 shooter was dumb enough to leave the gun there,
22 certainly there could have been other evidence.
23 There could have been similar .22 caliber
24 rounds.  There could have been shell casings.

Page 173

1  There could have been other forensic evidence
2  that would have supported the detectives'
3  contention that Iglesias was the shooter.
4      So do I think he would have been dumb
5  enough to leave the gun there?  He certainly
6  disposed of it someplace.  And I believe it's a
7  detective's job to get the forensic evidence,
8  especially when you have questionable informant
9  information and you have -- if you're only
10 going to rely on the statements of known gang
11 members as the sole basis for charging an
12 individual, yeah, I think you better go out and
13 do some search warrants.
14 BY MR. ENGQUIST:
15     Q.  Besides the charging situation here for
16 Mr. Iglesias, who decided whether or not to charge?
17     A.  I'm sorry?
18     Q.  Who decided whether or not to charge?
19     A.  Well, it's law enforcement.  It's the
20 police department's responsibility to provide the
21 information to, I believe, in this case to the State
22 Attorney's Office, and they ultimately decide on
23 whether or not to charge is my understanding.
24     Q.  Yeah.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 174..177

Page 174

1    A.  And that's consistent with what it's like
2  in many jurisdictions that I'm familiar with.
3    Q.  Letter d), you have, "Under the
4  circumstances, it was inappropriate for defendants
5  to conduct photo arrays and lineups with two
6  witnesses that had extremely challenging viewing
7  opportunities."
8        Are you saying that they should not have
9  conducted a photo array, they should have just
10 stopped once they had a tip that Snake was involved?
11       MS. BRADY:  Objection, form.
12       THE WITNESS:  Well, no, I don't think -- I
13 think they should have investigated.  I'm not
14 suggesting that they should not have
15 investigated.
16       What I'm suggesting to you is that they
17 did not investigate, and that's perhaps the --
18 that's a concern that I had with this
19 investigation and other similar cases that I've
20 looked at involving these officers is that they
21 didn't conduct an investigation that was
22 reasonable.
23 BY MR. ENGQUIST:
24    Q.  Well, let me go back to the term

Page 175

1  "investigation."
2        Now, is conducting a photo array of a
3  potential suspect investigation?
4    A.  It is.
5    Q.  Okay.  So information comes in; you
6  can't -- you know, it comes in about a person
7  potentially being involved.
8        Would it be wrong, then, to conduct an
9  investigative -- investigation by conducting a photo
10 array with that person in the photo array?
11   A.  Well, again, it depends on what
12 information you have and whether or not that witness
13 is able to reasonably identify somebody.  I don't
14 think you would have a witness view a photo lineup
15 or a photo array if the information is there's no
16 way I can identify the shooter.  I don't think you
17 would go and show that person a photo array and
18 certainly wouldn't rely upon it if you did.  I mean,
19 it would make no sense.
20   Q.  I agree with you, sir, but that goes back
21 to what we just talked about.
22       So you're saying that because you think it
23 was inappropriate to conduct photo arrays at all,
24 because the witnesses had challenging viewing

Page 176

1  opportunities and could not -- provide only vague
2  descriptions of the shooter, so therefore, they
3  shouldn't have conducted any photo arrays at all.
4  That's where you put a hard stop, correct?
5    A.  Well, I don't know if it's a hard stop,
6  but I certainly believe that if a witness -- and you
7  have Santopadre saying that this was an important
8  part of his initial investigation to determine
9  whether or not these witnesses could actually
10 identify the shooter.  If it's clear that they could
11 not identify the shooter, that you would not conduct
12 a photo array, especially if the suspect doesn't
13 match the description of what the witnesses told the
14 police that the shooter looked like.
15       The shooter -- wait a minute.
16   Q.  Go ahead.  Keep on going.
17   A.  The shooter was described as a
18 five-foot-seven Mexican, medium-complected.  I don't
19 believe that describes Iglesias.  I think the
20 description or the physical characteristics are far
21 different of Iglesias than they are of the
22 description provided by these witnesses, combined
23 with the fact that they had a challenging viewing
24 point, and then combined with the initial interview

Page 177

1  that they gave to Santopadre about not being able to
2  identify him.
3        So all of those things combined, it would
4  be questionable on whether or not you would actually
5  present a photo array to a witness.
6    Q.  Well, you actually say it's inappropriate
7  to conduct a photo array under the circumstances,
8  correct?
9    A.  Under those circumstances that I
10 described, yes.
11   Q.  So just to be clear, according to you, the
12 correct investigative police procedure would have
13 been if a tip came in and said Iglesias, or in this
14 case Snake, the IG, did the murder, that they would
15 not show a photo array to the witnesses, they would
16 not do any identification procedures because they
17 didn't think -- because of what you already had said
18 here, that they did not have an opportunity to view
19 it correctly?
20       MS. BRADY:  Objection, form, and
21 incomplete hypothetical.
22       Go ahead.
23       THE WITNESS:  I'm not sure I said that.
24 Maybe I better explain it one more time.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 178..181

Page 178

1  BY MR. ENGQUIST:
2      **Q.  I'm just looking at your words, sir, but**
3  **go ahead.  You can explain it one more time.**
4      A.  Well, yeah, but the reason I'm in a
5  deposition here is so I can clarify and explain my
6  answers for you.
7          And what I -- I think I just adequately
8  described it, and I don't know that you need to be
9  an expert to understand this, but common sense would
10  tell you if a witness tells you I can't identify
11  somebody, you know that that witness has a
12  challenging viewpoint.
13          You also know from previous law
14  enforcement experience that you cannot simply rely
15  on the identification of perhaps witnesses in a
16  critical incident such as these.  All of those
17  things are combined.  I think it would be
18  inappropriate -- well, inappropriate to act on the
19  identification, and I can't think of a logical
20  reason or a legitimate law enforcement reason why
21  you would show a witness a photo array of somebody
22  that already -- that witness already says I can't
23  identify them.
24          So it makes no sense.

Page 179

1      **Q.  I agree with you that this makes no sense.**
2  **But letter d), I just want to make it very clear,**
3  **you say, under the circumstances, and you've given**
4  **the circumstances, challenging viewing**
5  **opportunities, vague descriptions, and you also just**
6  **threw in the fact that supposedly they may not have**
7  **been able to view the person at all and said they**
8  **couldn't view -- identify the person.  You said**
9  **under the circumstances of this case, you put it is**
10  **inappropriate to conduct a photo array.**
11          **So once the tip came in, they could not**
12  **have conducted -- they should not have conducted the**
13  **photo array.  They should have stopped at that**
14  **point; is that right?**
15      A.  No.  They should have started.  They
16  should have started their investigation.  They
17  shouldn't have stopped it.  They should have began
18  their investigation of Iglesias.
19      **Q.  Okay.  And you're saying that**
20  **investigation should not have involved any photo**
21  **arrays, correct?**
22          MS. BRADY:  Objection, misstates the
23          record.  That's not what the paragraph says.
24

Page 180

1  BY MR. ENGQUIST:
2      **Q.  Sir, are you saying that their**
3  **investigation should not have consisted of any**
4  **identification procedures?**
5      A.  You're using the word "any identification
6  procedures."  I don't see where you're at at that
7  point in my report.
8      **Q.  Well, you put conduct photo arrays or**
9  **lineups.  The only other identification procedure I**
10  **can think of at this point to ID the shooter would**
11  **have been a show off, but I think we're well past**
12  **that.  We're two weeks down the road.**
13          MS. BRADY:  Can you read the whole
14          sentence?
15  BY MR. ENGQUIST:
16      **Q.  Sure.  "Under the circumstances, it**
17  **inappropriate for defendants to conduct photo arrays**
18  **and lineups with two witnesses that had extremely**
19  challenging viewing opportunities (e.g., distance,
20  obstructions, et cetera), and, consistent with that,
21  could provide only vague descriptions of shooters --
22  of the shooter when initially questioned by officers
23  at the scene and by the detectives that spoke with
24  them the same night."

Page 181

1          Did I read that incorrectly, sir?
2      A.  No, you read it perfectly.  You read it
3  perfectly, and I stand by that statement, and I
4  believe that once that tip came in, I don't -- I'm
5  not suggesting that they should have ignored the
6  tip, but they should have conducted a proper
7  investigation.  They should have attempted to
8  discover forensic information, forensic evidence.
9  There's other witnesses that they could have gone
10  out and interviewed.
11          They should have done a comprehensive
12  investigation to either determine if Iglesias was
13  the shooter or if he was not --
14      **Q.  But --**
15      A.  -- and they did not do that.  They relied
16  upon -- excuse me, sir.  They depended upon and
17  relied upon two eyewitnesses that told -- earlier
18  told police officers that they could not identify
19  the suspect too.
20          So I don't know what's so confusing about
21  that.
22      **Q.  No.  I'm just asking a question before,**
23  **and I'm just trying to get an answer.**
24          **So you're saying that once a tip came in,**

THOMAS J. TIDERINGTON, 02/13/2023                    Page 182..185

Page 182

1  the detectives should not have conducted a photo
2  array or lineups or anything about identifying him
3  by the eyewitnesses, correct?
4          MS. BRADY: Objection, misstates the
5      testimony, misstates the report.
6          MR. ENGQUIST: I don't think it does.
7  BY MR. ENGQUIST:
8      Q. Am I correct, sir?
9      A. No. You keep using the words any way or
10 something, and I don't think that's in my report.
11     Q. Okay.
12     A. But I will say that --
13     Q. I said with the eyewitnesses, with the
14 eyewitnesses.
15         MS. BRADY: The paragraph doesn't say any
16     eyewitnesses. It says those two witnesses.
17     So --
18 BY MR. ENGQUIST:
19     Q. You know what, that's a point. Let's make
20 it very clear.
21         Were there any other witnesses who claimed
22 at any point to be able to identify the shooter?
23     A. I don't think there were.
24     Q. Okay. So the only eyewitnesses that ever

Page 183

1  could have done any kind of identification of the
2  shooter at all would have been Ochoa and Rodriguez,
3  correct?
4      A. No, that's not correct at all.
5      Q. Oh, I'm sorry. You're saying they never
6  saw anybody. They couldn't make an identification
7  to begin with either, correct?
8      A. I'm not saying they didn't see the
9  shooter. I'm saying that they told -- and, again,
10 I -- I can only go on what the officers said in
11 their reports, and I can -- and that's what my
12 opinion is based on is that the description that was
13 documented by the officers certainly was not
14 consistent with Iglesias' physical characteristics.
15         And with that in mind, I would -- and the
16 challenging positions in which they claim that they
17 were at along with their questionable credibility,
18 all of these factors combined, I believe they should
19 not have acted on -- they should have conducted a
20 more thorough and comprehensive investigation into
21 the allegations made against Iglesias.
22     Q. Okay. Sir, under the circumstances of
23 this case, ones that you referred to in d) and
24 you've talked about already, was there ever an

Page 184

1  appropriate time for anybody to do an identification
2  procedure in this case?
3          MS. BRADY: Objection, form.
4          THE WITNESS: And just to be clear, when
5      you're saying "identification procedure,"
6      you're talking about a photo lineup, or are you
7      talking about -- or a live lineup or photo
8      array or both?
9  BY MR. ENGQUIST:
10     Q. Either or, either/and/or, yeah.
11     A. No, I don't think that they should have.
12     Q. Okay.
13     A. If the witnesses could not -- excuse me.
14 If the witnesses could not identify the suspects,
15 then it would have been inappropriate for them to --
16 it would have devalued any identification of these
17 suspects.
18     Q. Okay. And yet you are aware that the
19 State's Attorney's Office did approve charges based
20 off those identifications, correct?
21     A. I believe they approved charges, but I
22 don't know what was communicated to them or what was
23 not communicated to them.
24     Q. So you think that there was something else

Page 185

1  communicated to them that resulted in the charging
2  other than the two identifications made by Ochoa and
3  Rodriguez?
4      A. Well, procedurally, I think the policy
5  says is that the felony case files, a state attorney
6  or prosecutor will come to the station, will review
7  all the reports related to the matter and make a
8  charging determination.
9          The best that I can determine, that the
10 only reports that the state attorney could have
11 reviewed based on the inventory sheet that was
12 provided were reports that were created on
13 January 7th -- I'm sorry, June or July 7th -- I'm
14 mixing up my dates here -- June 7th, 1993.
15         So I guess that means that they relied on
16 the verbal communication of the detectives.
17         So do I know what Guevara told the state
18 attorney about the witnesses? Do I know whether or
19 not the state attorney knew that these were known
20 gang members, had questionable backgrounds, had a
21 history of lying to the police? I don't know if
22 that information was communicated to the state
23 attorney.
24         I do know that the state attorney

THOMAS J. TIDERINGTON, 02/13/2023                    Page 186..189

Page 186

1  requested additional identification. Apparently
2  they were not satisfied with just the two
3  identifications and requested that the detectives go
4  out and do additional work.
5      **Q. Okay. And just to be clear, you also know**
6  **that the state's attorney that came there interviewed the**
7  **witnesses also directly?**
8      A. I believe that's accurate, yes.
9      **Q. Okay. And --**
10     A. But to be clear, they interviewed them
11 after at least multiple interviews by Guevara and
12 Halvorsen. It wasn't the first interview that they
13 talked with the witness at.
14     **Q. And why does that matter, sir?**
15     A. Well, I think it's -- I think it's
16 relevant because there's no documentation of what
17 that witness may have said initially when law
18 enforcement investigated, in this case when
19 Halvorsen and Guevara interviewed them. I think
20 it's really relevant. Maybe they told a totally
21 different story; maybe they accused somebody else;
22 maybe they said it was a gang member from another
23 gang that was responsible, and then this is the
24 third or fourth version of their statement, and that

Page 187

1  is then brought in and told to the state attorney.
2  I think it would be relevant if that's what
3  occurred.
4      **Q. If that occurred. Do you have any**
5  **evidence that any of that occurred?**
6      A. Well --
7      **Q. Any, any evidence.**
8      A. Well, wait a minute. You've identified --
9      **Q. I know. I identified a problem in the**
10 **report.**
11     **But what I'm asking you, do you have any**
12 **evidence that any of that occurred that you just**
13 **went off on?**
14     A. Well, like you said, you've identified the
15 same problem I've identified is there's no
16 documentation, which is inconsistent with police
17 practices. And, you know, you should be able to
18 look at an investigative file today, five years ago,
19 or ten years ago and be able to determine every step
20 in the process.
21     Here you can only determine -- it's a
22 charging document. It's not an investigative
23 document.
24     So there's a clear violation of Chicago

Page 188

1  Police Department policies by not documenting the
2  information and not, you know, clearly articulating
3  that information in their police reports after they
4  documented it in a GPR, which they didn't do.
5      **Q. Okay. And, sir, to do that, when you're**
6  **making these suggestions that all these things could**
7  **have happened, you're discounting the sworn**
8  **testimony of the witnesses themselves; is that**
9  **correct?**
10     MS. BRADY: Objection, form.
11     THE WITNESS: What sworn testimony?
12 BY MR. ENGQUIST:
13     **Q. Of the eyewitnesses. They don't say that**
14 **they gave prior inconsistent statements or that**
15 **there was other people involved or that they never**
16 **could have viewed anybody or any of those other**
17 **hyperbole, hyperbolic speculations that you made.**
18 **None of them said that; is that right?**
19     MS. BRADY: Objection, form. Objection,
20 form. I believe it misstates the testimony.
21 Also foundation and harassing.
22     But go ahead.
23     THE WITNESS: Well, I guess it depends on
24 who you believe. If you believe

Page 189

1  Officer Santopadre's testimony that these
2  witnesses told him that they couldn't identify
3  the shooter, I guess that would be different
4  than what these witnesses are testifying to.
5      I think the witnesses, at least one of
6  them, I believe Ochoa, acknowledges that he
7  lied to the police on multiple occasions about
8  his identification, about his criminal history,
9  about his gang affiliation.
10     We know that Rodriguez, likewise, lied
11 about his gang affiliation.
12     So ...
13 BY MR. ENGQUIST:
14     **Q. So are you making credibility**
15 **determinations, sir?**
16     A. No. I'm stating facts of which I reviewed
17 information that was provided by them.
18     And I forgot the question at this point,
19 but these were factors that I considered when
20 determining whether or not a proper investigation
21 was conducted.
22     MR. ENGQUIST: All right. It's 1:00
23 o'clock. I'm thinking since we've been going
24 since 9:00 people are about ready for a break

THOMAS J. TIDERINGTON, 02/13/2023                          Page 190..193

Page 190

1    and possibly something to eat.
2        How long do people want?
3        MS. BRADY:  Can we take 45 minutes for
4    lunch?
5        MR. ENGQUIST:  45 minutes is fine.
6        Let's go off the record.
7        THE VIDEOGRAPHER:  We're off the video
8    record at 1:03 p.m.
9           (Whereupon, a lunch recess was
10          taken from 1:03 p.m. to
11          1:50 p.m.)
12       THE VIDEOGRAPHER:  We are back on the
13   video record at 1:50 p.m.
14   BY MR. ENGQUIST:
15       Q.  All right.  One second.  Sorry.  I'm a
16   page number off here.
17       All right.  When we finished off, we were
18   talking about how it would have been improper or
19   inappropriate to do a photo array or a lineup.
20       Let me ask you, if you can, after the
21   information came in that Snake may have been
22   involved in the homicide, if they weren't to do or
23   it would have been inappropriate to do a photo array
24   or lineup, what investigative steps should have

Page 191

1    taken place?
2        A.  Well, I think I mentioned before.  I think
3    they should have, first of all, vetted the
4    information from the confidential informant, you
5    know.  Did the -- was the informant in jail?  Was he
6    available to go out and meet with?
7        If the information seemed to be reliable
8    enough to get a search warrant, a search warrant
9    should have been executed at the residence; perhaps
10   surveillance of Iglesias to see if it was consistent
11   with what -- consistent with him hanging out at the
12   boys' club or in this area.
13       There was -- I haven't seen any evidence
14   that anybody in Ochoa's building was interviewed.
15   There was some evidence that there was a vehicle,
16   somebody heard the wheels, the tires squeal away
17   after the shooting.  There was no attempt to
18   identify this vehicle that may have fled the scene.
19       If they truly believed the informant's
20   information -- or I believe that was Vicente that
21   said that the information was that he was given the
22   gun by another gangbanger or somebody in a gang.
23       Q.  This is all pre-Vicente, so let's just --
24       A.  No, as I pointed out, there was

Page 192

1    information from Efrain Torres that he saw five gang
2    members and that at least two of them he recognized
3    as being from the neighborhood.
4        So it was clear that there could have been
5    the identification of these other gang members that
6    were hanging out just before the shooting.  There's
7    no evidence that they showed him any gang books to
8    try to identify co-conspirators in the case.
9        So those are a few of the things that they
10   should have done.
11       Q.  Okay.  I was specifically asking, though,
12   after the tip came in from the CI, and you said they
13   should have vetted the tip; they should have -- they
14   could have done surveillance, and then you went on,
15   but I just want to be clear.
16       This is in lieu of vetting the tip by
17   doing a photo array, correct?
18       A.  Well, I guess you have to evaluate the
19   benefit of doing a photo array and whether or not
20   you believe somebody can identify the witness or
21   identify the shooter.
22       Q.  Sir, I know, and you've already said that
23   before it would have been inappropriate to any
24   kind of photo array in this case.

Page 193

1        MS. BRADY:  Objection, I believe that
2    mischaracterizes the testimony.
3    BY MR. ENGQUIST:
4        Q.  We spent hours trying to get that
5    information, so I'm not going back.
6        A.  Well, just as a point of clarification,
7    there were others that were certainly in a better
8    position to have observed the shooter, but those
9    witnesses, likewise, indicated that they could not
10   identify them either.
11       So I don't know of any logical reason to
12   do a photo lineup at that point.
13       Q.  Now, it couldn't be something as -- you
14   couldn't do something like follow Mr. Iglesias, pull
15   him over, and then just search his car based off the
16   statement from over the phone, could you?
17       MS. BRADY:  Objection.
18   BY MR. ENGQUIST:
19       Q.  You couldn't just stop him and search his
20   vehicle based on the information you had received
21   that he may be involved in the homicide; is that
22   correct?
23       MS. BRADY:  Objection, form.  And I
24   believe that calls for a legal conclusion.

THOMAS J. TIDERINGTON, 02/13/2023                Page 194..197

Page 194

1    Go ahead.
2        THE WITNESS:  I guess it depends on the
3    reliability of the confidential informant.
4    Perhaps, if you deem the informant's
5    information to be reliable, you know, certainly
6    it would be a consideration, you know.  Perhaps
7    it would have gave them probable cause to do a
8    search warrant on the house based on the
9    informant's information, or perhaps they could
10   do a consensual encounter with him.  They could
11   interview him.  There's nothing to preclude
12   them from going and interview relatives of
13   Iglesias to find out, you know, or find out
14   where he worked, did he change his appearance
15   shortly after the shooting, you know.  Clearly
16   he didn't match the description, you know.  He
17   had earrings.  He had eyebrows that were kind
18   of funky looking.  That's a legal description
19   of them.
20       So there's a number of investigative steps
21   that I believe were reasonable that these
22   officers did not take and should have taken.
23   BY MR. ENGQUIST:
24       Q.  Well, was there evidence that he changed

Page 195

1    his appearance by shaving his eyebrows, the stripes
2    into his eyebrows?
3        A.  No.  I'm saying there's no evidence that
4    he did that, and if there's no evidence -- and that
5    goes to the inconsistency of the description
6    provided by the so-called witnesses.  So there's no
7    evidence he did that.
8        What I'm saying is if they interviewed
9    other individuals and determined, you know, that he
10   grew a beard, shaved, got, you know, tattoos on his
11   face, whatever he did, may illustrate that he was
12   trying to conceal his appearance or change his
13   appearance.
14       Q.  Sir, did the defense ever move to suppress
15   the identifications by either Ochoa or Rodriguez?
16       A.  I don't know that.
17       Q.  Do you know if the defense ever requested
18   getting information about the person who called on
19   the phone and gave the information to
20   Detective Guevara?
21       A.  I don't know if they did.  I guess it's my
22   opinion they should have if they didn't, but I don't
23   know if they did or not.
24       Q.  Okay.  Do you know if the defense put on

Page 196

1    any witnesses, as you suggested, to say that he --
2    that was his appearance on the day of the murder
3    with the shaved eyebrows?
4        A.  I don't know.
5        Q.  Okay.  Well, did you -- did you remark --
6    did you see that at all in the trial testimony, that
7    they made that kind of argument?
8        A.  I vaguely recall that there was some
9    discussion about the eyebrows, and I don't know if
10   this was in trial testimony or deposition testimony.
11       Q.  Sir, have you ever covered up for another
12   cop's misconduct?
13       A.  I'm sorry?
14       Q.  Have you ever covered up for another cop
15   officer's misconduct?
16       A.  No.
17       Q.  Have you ever falsified a statement to a
18   superior officer regarding an incident?
19       A.  No.
20       Q.  Okay.  Were you interviewed for a book
21   called Snatched?
22       A.  I was.
23       Q.  Okay.  And you -- actually, you have quite
24   a few quotes within the book.

Page 197

1        You were -- how long were you interviewed
2    for this book?
3        A.  I don't know.  Several times over a year
4    period, I would say.
5        Q.  You even gave the author photographs of
6    you in your life so they could put it in the book,
7    didn't you?
8        A.  I did.
9        Q.  Okay.  So you were cooperating with the
10   whole thing; is that right?
11       A.  I didn't write it, but I was cooperating,
12   providing information to the author, yes.
13       Q.  Okay.  And this is actually the book that
14   is based on the woman who ended up suing the federal
15   bureau -- or the federal government, and I believe
16   you were a part of that case in which she won money,
17   isn't that correct, $1.8 million?
18       A.  I don't know exactly how much money she
19   actually got, but yes, it's the same case.
20       Q.  Okay.  Now, did you ever read the book?
21       A.  I'm sure I did.  It's been quite a while.
22       Q.  Did anything pop out at you, like that's
23   completely untrue, it's wrong?
24       A.  Like what?

THOMAS J. TIDERINGTON, 02/13/2023                    Page 198..201

Page 198

1    Q.  Anything.
2        MS. BRADY:  Yeah, objection, form.
3        THE WITNESS:  Yeah, there wasn't -- I
4    mean, yeah, there were some inaccuracies.  You
5    know, again, I would say it's a true story, but
6    it's not -- it wasn't a hundred percent
7    factual.
8    BY MR. ENGQUIST:
9    Q.  Okay.  Did you have a partner back in
10   Detroit by the name of Noonan?
11   A.  No. Noonan?
12   Q.  Noonan, N-o-o-n-a-n.
13   A.  No.
14   Q.  Do you remember telling the author a story
15   about how you and your partner Noonan were trying to
16   apprehend somebody, and you heard shots being fired
17   in the alley, and when you got there your partner
18   had handcuffed the suspect; and your partner asked
19   you that "You didn't hear any shots, right," and you
20   responded, "No"; when the sergeant came and
21   questioned you about it, both you and Noonan denied
22   shooting; and then later on you found out that
23   Noonan, in fact, used a different weapon to shoot at
24   the offender?

Page 199

1        MS. BRADY:  Objection, form.
2        THE WITNESS:  I know the story.  The story
3    occurred in 1979, and it's not exactly as it
4    was portrayed in the book.
5    BY MR. ENGQUIST:
6    Q.  Okay.  It has quotes on it.
7        I mean, are you saying that you -- are you
8    saying that your partner did not shoot that suspect
9    and then denied shooting at a suspect?
10       MS. BRADY:  Objection, form and
11   foundation.
12       THE WITNESS:  I don't think he denied
13   shooting at the suspect.  I think the essence
14   of the story was that he shot at the suspect
15   with the suspect's gun, and that was -- that
16   was the essence of the story.
17   BY MR. ENGQUIST:
18   Q.  Okay.  Did you ever report your partner
19   for lying to your sergeant about him not shooting at
20   the suspect?
21       MS. BRADY:  Objection, form.
22       THE WITNESS:  He didn't lie.  He didn't
23   lie.  He did tell him that he shot at him with
24   the suspect's gun, and it was deemed to be a,

Page 200

1    quote, a good shooting.
2    BY MR. ENGQUIST:
3    Q.  Okay.  So you're saying the actuality is
4    that he told the sergeant, "No, Sergeant, I fired
5    with a different weapon," and it was okay?
6        MS. BRADY:  Objection, form and
7    foundation.
8        THE WITNESS:  Yeah, that's -- that's what
9    happened.  The issue isn't whether or not -- it
10   wasn't a question whether or not he shot at the
11   suspect.  Again, the moral of the story was
12   that he picked up the suspect's gun and shot at
13   him, but that was never -- nobody -- he didn't
14   lie about it.  I certainly didn't lie about it.
15   BY MR. ENGQUIST:
16   Q.  All right.  So let me -- actually, let me
17   see and share a screen.  It's Page 20 of the book.
18   I just want to make sure this refreshes your
19   recollection about what you told the author here.
20       Can you see that, sir?
21   A.  I'm reading it.  Yeah, I can see it.
22   Q.  Okay.  The "Tom" is you, correct?
23   A.  It is.
24   Q.  At the top, it says, "Pretty soon Tom

Page 201

1    heard a series of gunshots and ran around, to come
2    upon his partner cuffing a guy lying on the ground
3    in the alley.  Fortunately for everyone involved,
4    the suspects had seen the wisdom of diving to the
5    pavement before he got hit.  'You didn't hear any
6    gunshots, right,' Noonan told Tiderington.  'Ah,
7    no,' Tom responded.  At that moment, the shift
8    sergeant pulled up, and the burglary suspect
9    immediately started complaining loudly that Noonan
10   had tried to kill him.  To investigate the
11   accusation, the sergeant asked for Noonan's gun to
12   smell the barrel to see if it had been fired, and he
13   did the same with Tom's.  Neither weapon tested
14   positive, which thoroughly mystified Tom because he
15   had sworn he had heard a bunch of shots, and they
16   certainly hadn't been his.  It was later that Noonan
17   told him the suspect had thrown away his revolver
18   while attempting to escape and that he had picked it
19   up himself as seeing it as something akin to poetic
20   justice to fire away at the son of a bitch with his
21   own gun."
22       Do you see that?
23   A.  I do.
24   Q.  Are you now saying that it's not as

THOMAS J. TIDERINGTON, 02/13/2023                    Page 202..205

Page 202

1 reported here, that, in fact --
2    A.  No.
3    Q.  -- Noonan had told the sergeant what he
4 had done and it wasn't as -- it wasn't as is written
5 here --
6    A.  No.
7    Q.  -- that --
8    A.  What --
9        (Simultaneous speaking.)
10       MS. BRADY:  Hang on.
11 BY MR. ENGQUIST:
12   Q.  -- written here, that both you and Noonan
13 told him that no one fired a weapon at the suspect
14 who was complaining?
15       MS. BRADY:  So I'm going to object to form
16   and foundation.
17       THE WITNESS:  The -- a lot of it is
18   entertainment that you're reading in the book.
19   There was an effort to sell the book to the
20   movies.  There were a lot of things that were
21   exaggerated.  I don't believe I was under any
22   oath to tell the truth.  Again, this is
23   testimony.
24       The guy's name wasn't Noonan.  I don't

Page 203

1   know who Noonan is.
2       So it's -- a lot of it is entertainment
3   versus factual.
4 BY MR. ENGQUIST:
5    Q.  All right.  A couple of things in that.
6        What is the person's name if it wasn't
7 Noonan?
8        MS. BRADY:  Objection, form.
9        THE WITNESS:  David --
10       MS. BRADY:  Hang on.  Objection, form and
11   foundation.
12 BY MR. ENGQUIST:
13   Q.  David who?
14   A.  David Berjeski.
15   Q.  Can you spell the last name?
16   A.  B-e-r-j-e-s-k-i, I believe.
17   Q.  Okay.  And you said you weren't under
18 oath.
19       Are you denying you said this, or -- is
20 that what you're saying?
21       MS. BRADY:  Objection, form and
22   foundation.
23       THE WITNESS:  This was a story, a story
24   that the author listened to and then rewrote

Page 204

1   it, I believe, to be more -- to make it more
2   interesting or perhaps more entertaining.
3       Parts of it are factual.  Certainly there
4   was a shooting.  Nobody was shot, and the
5   officer used the suspect's gun to shoot at him.
6   I mean, that part is factual.
7       And when you say could have sworn, yeah,
8   the sergeant asked me what -- I remember who
9   the sergeant was.  He asked me what happened,
10   and I told him.  I said I was in front of the
11   house; I heard some shots, and I think -- I
12   think Dave shot at the guy.
13       And then the sergeant -- and this is my
14   memory of what happened in 1979.  I think the
15   sergeant said, "Let me -- did you fire?"  And I
16   said, "Nope."  And he said, "Can I smell your
17   gun?"  And I said, "Yes," and he smelled my
18   gun.
19 BY MR. ENGQUIST:
20   Q.  And who was the sergeant you said you
21 recalled?
22   A.  Sergeant Lloyd Praedell, P-r-a-e-d-e-l-l.
23 He has been dead for 20 years.
24   Q.  Okay.  So there wasn't an accusation that

Page 205

1 was being investigated by the sergeant at the time?
2       MS. BRADY:  Objection, form and
3   foundation.
4       THE WITNESS:  I'm sorry, what was the
5   question?
6 BY MR. ENGQUIST:
7    Q.  Was the sergeant investigating an
8 accusation that someone had tried to kill the
9 fleeing suspect --
10   A.  No.
11   Q.  -- the burglary suspect?
12       MS. BRADY:  Same objections.
13       THE WITNESS:  The sergeant showed up on
14   the scene.  At that time, officers could shoot
15   at fleeing felons.
16       So was he investigating it?  No.  He was
17   responding as a backup officer, I mean, but
18   it's his job to determine whether or not it was
19   a justified shooting.
20 BY MR. ENGQUIST:
21   Q.  And it was determined to be justified
22 there on the scene?
23       MS. BRADY:  Objection, form and
24   foundation.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 206..209

Page 206

1    THE WITNESS:  I believe, yeah, to answer
2    your question, yes.
3    BY MR. ENGQUIST:
4        Q.  As is written here, in fact, as is written
5    here that you had known later on that your partner
6    had fired at the felon but had lied to your
7    sergeant, that would have been wrong for you not --
8    that would have been inappropriate for you to keep
9    away from your sergeant that information, correct?
10       A.  Wait a minute.
11       MS. BRADY:  Objection, foundation, and
12   calls for speculation, incomplete hypothetical.
13       Go ahead if you understand.
14       THE WITNESS:  Where does it say that?  I
15   don't remember that in the book.
16   BY MR. ENGQUIST:
17       Q.  It says it was later that Noonan told him,
18   that's you, the suspect had thrown away the
19   revolver.
20       Are you saying that you then later on went
21   back to your sergeant and told him, in fact, your
22   partner had fired?
23       A.  No.  Berjeski told him he fired.  I
24   told --

Page 207

1        MS. BRADY:  Hang on.  Objection, form and
2    foundation.
3    BY MR. ENGQUIST:
4        Q.  Okay.  So this is all very fanciful?  This
5    is all made up; is that correct?
6        A.  No, it's -- when I say all made up,
7    there's a tinge of truth in the story.  The book,
8    again, is a made-for-television -- made for the
9    movie.  That was the intent on writing the book, and
10   there's some exaggerations.  There's some incidents
11   that were created in different ways to make it more
12   exciting.
13       And, again, this was done by the author.
14   And, you know, some of it, he would take a bit of a
15   true story and exaggerate it slightly to make it
16   more interesting for the reader.  And apparently it
17   worked with you, and I don't mean that in a
18   disrespectful way.
19       Q.  Now, you work with CIs yourself; isn't
20   that correct?
21       A.  I have.
22       Q.  Okay.  And what was the survival rate of
23   your CIs, sir?
24       MS. BRADY:  Objection, form and

Page 208

1    foundation.
2        THE WITNESS:  The survival rate?
3    BY MR. ENGQUIST:
4        Q.  Uh-huh.  Did many of them end up dead?
5        MS. BRADY:  Objection, form and
6    foundation.
7        THE WITNESS:  Well, some died of old age
8    or human -- natural causes, I should say.
9        I can only think of one informant that may
10   have been killed while that informant was
11   working with us, but I don't recall the details
12   of that.
13   BY MR. ENGQUIST:
14       Q.  Okay.  Now, sir, you've read this file.
15       Is your understanding -- make sure this
16   is correct -- that it was after Iglesias had been
17   charged and it was some point well after that that,
18   in fact, Vicente gave a statement and he became part
19   of the investigation or became part of the case?  Is
20   it better to say it that way?
21       MS. BRADY:  Objection.
22       THE WITNESS:  That's my understanding,
23   yes.
24

Page 209

1    BY MR. ENGQUIST:
2        Q.  Okay.  Let me see if I can get it here.
3    Let me try and get this right.
4        So he was charged, I believe, around the
5    24th or so, isn't that correct, in 1993, June 24th?
6        A.  I believe that's -- I believe that's
7    accurate, yes.
8        Q.  Okay.  And it was several days after that,
9    I believe on the 28th, that he gave a statement to
10   an ASA Pandit?
11       A.  I believe that's correct.
12       Q.  I'm sorry.  That's the wrong case.  I'm
13   sorry.  I got myself confused here.
14       A.  Latz, I believe.
15       Q.  No, I got myself confused.  Give me one
16   second.
17       A.  I know there's a lot of documents, so it
18   is sometimes confusing.
19       Q.  Especially when it comes to Vicente.
20       A.  Exactly.
21       Q.  I'm sorry.  July 16th, 1993, he gave --
22   Vicente provided a statement to ASA Mary Roberts
23   regarding Iglesias.
24       A.  That sounds correct, yes.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 210..213

Page 210

1    Q.  Okay.  So it was well after the charges
2    had been filed in the case, correct?
3        MS. BRADY:  Objection, form as to "well
4    after."
5        THE WITNESS:  Yeah, I agree it was after.
6    What was it, a couple weeks after I guess is
7    what we're --
8    BY MR. ENGQUIST:
9    Q.  Okay.  Now, you make note actually in your
10   report that after the charging is done, Halvorsen
11   and Guevara put in the report as a closed supp.
12   Report, and they asked for the case to be closed at
13   that point, correct?
14   A.  Yes.
15   Q.  Okay.  And then it's a couple weeks after
16   that that Mr. Vicente speaks with a state's attorney
17   while he's in custody over in Cook County Jail,
18   correct?
19   A.  That's my understanding, yes.
20   Q.  Now, if we look at Page 6 on letter f),
21   you have here Detectives Guevara and Halvorsen
22   relied upon statements of a jailhouse informant,
23   okay.
24       Can you explain to me how it was Detective

Page 211

1    and Guevara and Halvorsen relying upon the
2    statements of a jailhouse informant if their
3    investigation was closed and the statement was taken
4    by a state's attorney?
5    A.  Well, they used this testimony at trial, I
6    believe.
7    Q.  When you say they used his testimony,
8    you're saying the State's Attorney Office who took
9    Mr. Vicente's testimony in this case used his
10   testimony at trial; is that correct?
11   A.  That's my understanding, yes.
12   Q.  Was either Detective Guevara or Halvorsen
13   present when his statement was taken by the State's
14   Attorney's Office?
15       MS. BRADY:  Objection, foundation.
16       THE WITNESS:  I don't recall if they were.
17   It may have been -- an investigator from the
18   Cook County State Attorney's Office may have
19   been present.
20   BY MR. ENGQUIST:
21   Q.  It was.  It was not anybody from Chicago
22   Police Department.
23   A.  That's my understanding.
24   Q.  So since the evidence was gathered by the

Page 212

1    State's Attorney's Office and their investigator
2    regarding Mr. Vicente, and the State's Attorney's
3    Office decided whether or not to use that evidence
4    at trial, do you still believe that Mr. Vicente's
5    statement was part of the police investigation?
6    A.  Well, according to Vicente it was, yes.
7    He said he -- that testimony or his testimony was
8    coerced by Guevara.
9    Q.  Okay.  That is what he does say now; I
10   agree with you.
11       Did you also read his other testimony
12   about this incident?
13   A.  His statement to Mary Roberts, yes, I did.
14   Q.  Okay.
15   A.  And it's inconsistent with the facts, I
16   noted.
17   Q.  Do you believe Vicente to be a credible
18   person?
19   A.  Vicente?
20   Q.  Yeah.
21       MS. BRADY:  Objection, form.
22       THE WITNESS:  Not based on the information
23   that I reviewed in this case.  I've never met
24   him, so I can't judge his credibility.

Page 213

1    BY MR. ENGQUIST:
2    Q.  Okay.  You have in here in the beginning
3    about that his statement shouldn't be relied upon
4    because of the incentive to incriminate others in
5    order to benefit himself.
6        Do you see that?
7    A.  I do.
8    Q.  Okay.  But, in fact, it wasn't Guevara and
9    Halvorsen relying upon that statement.  That was the
10   State's Attorney's Office and later on the finder of
11   facts of the criminal trial against Mr. Iglesias;
12   isn't that correct?
13       MS. BRADY:  Objection, form.
14       THE WITNESS:  Well, I guess it depends on
15   which statement you believe of Vicente.  If you
16   believe his statement in recent deposition
17   testimony, he claims that he was coerced into
18   giving this information in order to assist
19   Guevara and Halvorsen in proving that Iglesias
20   committed the murder.
21       So I guess this illustrates the danger of
22   relying on confidential informant information
23   or informant information or witnesses that are
24   unreliable.  All of these things can happen if

THOMAS J. TIDERINGTON, 02/13/2023                    Page 214..217

Page 214

1    you don't do a comprehensive investigation and
2    collect forensic evidence against the suspects
3    that you believe committed the crime.
4         So this is an example of the lack of a
5    sufficient investigation to determine really
6    what happened out there.
7    BY MR. ENGQUIST:
8         Q.   Okay.  Sir, to be clear, Mr. Vicente
9    wasn't part of the police investigation in this
10   case, was he?
11        MS. BRADY:  Objection, form, and misstates
12   the testimony.
13        THE WITNESS:  Again, I think I answered
14   that, depending on whether or not you believe
15   him now or you believed him then.
16   BY MR. ENGQUIST:
17        Q.   Okay.  Well --
18        A.   And -- I'm sorry.  Let me just kind of
19   clarify that.
20        Q.   Sure.
21        A.   If you believe him back when he gave this
22   statement on whatever date it is, July 16th, there's
23   some inconsistencies in the statement that would
24   have -- a reasonable detective would have realized

Page 215

1    that this information is not accurate, and that
2    information then would have been, I believe,
3    questionable, and that information would have -- the
4    detective would have notified the state attorney;
5    hey, this guy is not credible, and we should go out
6    and try to get some forensic evidence against these
7    individuals because we're relying on the dubious
8    word of several informants.
9         Q.   Several informants?  Okay.  So let me just
10   go back to Mr. Vicente, since we're talking about
11   Mr. Vicente.
12        A.   Well, several -- I mean, if that was the
13   question, several, at least two.
14        Q.   Okay.  Just focus in on Mr. Vicente again
15   for a minute here.
16        According to Mr. Vicente, there are two
17   general versions.  There's, of course, permeations
18   with Mr. Vicente.  But you have one where he gave a
19   statement to the State's Attorney's Office while he
20   was in custody.  He gave it to the State's
21   Attorney's Office and to an investigator for the
22   State's Attorney's Office and later on testified at
23   trial.
24        And then you have another in that

Page 216

1    Halvorsen and Guevara coerced him to make up a story
2    about Mr. Iglesias; isn't that correct?
3         A.   Yes, that is correct.
4         Q.   Okay.  And you don't know which version of
5    those basic events are true; is that correct?
6         A.   I don't think any of us would know that.
7    That is correct, yes.
8         Q.   So let's just go with the first version
9    and go through that initially.
10        If Mr. Vicente gave this testimony or gave
11   this evidence to the State's Attorney's Office, they
12   determined to make -- to give -- to take his
13   statement, and they determined to use him at trial.
14        Do you still consider that to be part of
15   the police investigation after the file was closed?
16        MS. BRADY:  Objection, form as to "police
17   investigation."
18        Go ahead and answer if you understand.
19        THE WITNESS:  Well, understanding how
20   investigations work, I'm sure there would have
21   been communications between the case agent, the
22   homicide detectives, and the state attorney
23   about the statement provided by Vicente.  I
24   would -- I believe there would have had to have

Page 217

1    been some communication.
2         And, of course, it's not documented in the
3    case file, which is another deficiency of the
4    investigation.  There should have been a
5    supplemental report done when this state
6    attorney said, Hey, we've got a guy named
7    Vicente that wants to give a statement against
8    Iglesias, and there's no mention in the
9    investigative file that that happened.
10   BY MR. ENGQUIST:
11        Q.   And why would that have to happen?  The
12   state's attorneys were the ones gathering the
13   evidence and putting it out at trial?
14        MS. BRADY:  Objection, foundation, assumes
15   facts not in evidence, misstates the record.
16        THE WITNESS:  Well, I mean, I guess are
17   you suggesting that the officers never knew
18   that the statement was taken and they were not
19   privy to the statement?
20        I guess I -- in my opinion, I guess I
21   concluded that they would have had to have
22   reviewed this and would have had to have
23   understood that this is what Vicente was
24   claiming as part of their investigation.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 218..221

Page 218

BY MR. ENGQUIST:

**Q. So you believe that the State's Attorney's**
**Office would have taken his handwritten statement**
**and then gone to the Chicago Police Department and**
**given them a copy of the statement and asked for**
**further investigation?**

A. That sounds reasonable to me.

**Q. Okay. And what's your --**

A. Unless --

**Q. And what's your basis of the evidence to**
**support that thought?**

A. Well, police practice is that's typically
how it's done, at least in the agencies that I've
been involved with. You have a case agent on a
homicide; you have detectives that have worked a
homicide. You're not going to share -- the state
attorney is not going to share this information?
I find -- unless perhaps they had
information about misconduct involving Guevara and
Halvorsen and didn't want to provide this
information to them, I mean, that would be the only
logical reason that I could think of that they would
not provide the information to them.

**Q. Sir, you read the state's attorneys' file**

Page 219

in this case too, didn't you? We talked about it
earlier. It's one of the files you looked at. It's
Number 3 or so or 4 on your list.

A. Yes.

**Q. Okay. Did you see any indication that**
**they were communicating this information and sending**
**it back to the police department about Vicente?**

MS. BRADY: Objection, form.

THE WITNESS: You know, I don't know if I
looked at -- I don't know if I was looking for
that, but I don't recall seeing anything along
those lines.

BY MR. ENGQUIST:

**Q. Now, and just to be clear, when it comes**
**to Mr. Vicente giving a statement to the State**
**Attorney's Office, it's pretty clear, at least from**
**you, that that did not involve Sergeant Biebel,**
**Detective Riccio, or Detective Gawrys, correct?**

A. There's no evidence that it involved them,
no. But there's no evidence that they didn't know
either, so it's hard to say.

**Q. So since you have no evidence, you're**
**going to, what? You have no evidence either way,**
**nothing showing them that they had any involvement**

Page 220

with Vicente, and the only thing that you have
showing involvement, the statement from Mr. Vicente,
shows the state's attorney and a state's attorney
investigator being involved.

Are you saying that it still leaves it
open in your mind that they were involved in the
statement of Mr. Vicente?

MS. BRADY: Objection, mischaracterizes
the record and assumes facts not in evidence,
and form.

Go ahead and answer.

THE WITNESS: No, it's just an
observation. You asked me is there any
evidence that this document was shared with
them, and I said no, there's no evidence that
it was. And, likewise, there's no evidence
that it was not.

So I can't really say what was shared with
them at this point.

BY MR. ENGQUIST:

**Q. Is there any evidence that Mr. Vicente**
**ever spoke to Sergeant Biebel, Detective Riccio, or**
**Detective Gawrys?**

A. I don't think there is. I could be wrong,

Page 221

but I don't think there is.

**Q. All right. So let's go to Page 9.**

A. Okay.

**Q. This is another -- this is a summary**
**again. These is where you're summarizing some of**
**the investigation.**

**Do you see that here?**

A. I do.

**Q. All right. Let me make sure I'm in the**
**right spot.**

**All right. So let's go forward to**
**Page 11. On Page 11, you once again note that**
**Rodriguez lied about his gang affiliation, his age,**
**and date of birth.**

**Do you see that there?**

A. I do.

**Q. Okay. In your experience, did you find it**
**common that gang members would not -- would not**
**admit to gang affiliation or give information that's**
**incorrect about their date of birth or age or even**
**name to law enforcement?**

A. Yeah, it's my experience that gang members
would take every opportunity to lie to law
enforcement at every turn.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 222..225

Page 222

1    Q.  Okay.  And is that kind of a general
2  statement for basically any gang member?
3         MS. BRADY:  Objection, form.
4         THE WITNESS:  It's more of a general
5  observation.  I'm sure there is a god-fearing,
6  church-going gang member that has never lied to
7  the police.
8         So I'm just saying from a general
9  perspective, that's my experience is that gang
10 members who are usually involved in criminal
11 activity are reluctant to truthfully,
12 truthfully talk with the police about matters,
13 and that if they do talk to the police, it's
14 only for self-serving reasons.
15 BY MR. ENGQUIST:
16    Q.  Okay.  And that would be -- that general
17 statement would also equally apply to Mr. Iglesias
18 as he is a gang member too, he was a gang member as
19 well, correct?
20    A.  That's a -- that's accurate, yes.
21    Q.  Okay.  Now, you talked about an incentive
22 as a gang member and also for getting some kind of
23 benefit for his -- let me see if I get the right
24 here from Mr. Vicente.

Page 223

1         Basically you say an incentive to
2  incriminate others in order to benefit himself,
3  okay.
4         And what benefit were you talking about
5  when you were talking about Mr. Vicente that caused
6  you to call into question his testimony?
7         MS. BRADY:  Where are you, Josh?
8         MR. ENGQUIST:  I'm sorry, I was just going
9  back to his statement on Page 6 about
10 Mr. Vicente.  It's in f).
11        MS. BRADY:  Thanks.
12 BY MR. ENGQUIST:
13    Q.  Can you tell me what incentives you were
14 speaking of there?
15    A.  Well, the obvious incentive.  If it wasn't
16 monetary, it would have been some type of a
17 reduction in time served.
18    Q.  Would there also be an incentive to
19 give -- for his story to change in order to save his
20 own life?
21        MS. BRADY:  Objection, form, and
22 incomplete hypothetical, assumes facts not in
23 evidence.
24

Page 224

1  BY MR. ENGQUIST:
2     Q.  I'll ask it again then.  I'll ask it a
3  different way.
4         Do you think it would be -- it would
5  incentivize Mr. Vicente if his life was threatened?
6     A.  By Guevara or Halvorsen?
7     Q.  I'm just saying, having his life
8  threatened, do you think it would have incentivized
9  him?
10        MS. BRADY:  Objection, form.
11        THE WITNESS:  Well, if you believed him,
12 and that's why he was being coerced by these
13 two detectives, then it would incentivize him
14 to lie, yes.
15 BY MR. ENGQUIST:
16    Q.  What about the fact that there was a
17 hit -- there was a smash on sight, as he said, in
18 order to kill him by the IGs, Imperial Gangsters,
19 after he was testifying against other Imperial
20 Gangsters?  Do you think that would have
21 incentivized him to change his story?
22        MS. BRADY:  Objection, foundation and
23 form.
24        THE WITNESS:  In this particular case?

Page 225

1  BY MR. ENGQUIST:
2     Q.  Yes.
3     A.  Well, I guess maybe I'm not following.
4  When did he claim that he was being threatened?  You
5  mean after he gave the statement and that's the
6  reason why he changed his statement recently?  Is
7  that what you're asking?
8     Q.  Did you read his deposition, sir?
9     A.  I did.
10    Q.  Okay.  Then you are aware that there was,
11 according to him, a smash on sight order, an order
12 to kill him by the Imperial Gangsters?
13    A.  I don't recall reading that, but if you're
14 telling me it's in his deposition, I won't refute
15 that, but I don't recall it as we sit here today.
16    Q.  Okay.  So you don't recall the fact that
17 he had death threats against him?
18        MS. BRADY:  Objection.
19 BY MR. ENGQUIST:
20    Q.  Is that correct?
21        MS. BRADY:  Form.
22        THE WITNESS:  I vaguely do, but I can't --
23 I don't remember.  If you want to -- I'm sure
24 it's just a couple pages of testimony.  I'm

THOMAS J. TIDERINGTON, 02/13/2023                    Page 226..229

Page 226

1     sure we can look at it real quickly so I can
2     refresh my memory.
3  BY MR. ENGQUIST:
4        Q.   No, that's okay.
5             Do you think death threats by his former
6     gang, the Imperial Gangsters, would have an effect
7     on Mr. Vicente's testimony?
8        MS. BRADY:  Objection, form and
9     foundation, calls for speculation.
10       THE WITNESS:  Again, during what time
11    period?  You're talking about recently, within
12    the last couple years, or are you talking about
13    back in the early '90s?
14 BY MR. ENGQUIST:
15       Q.   Does it matter?
16       A.   I think it matters.
17       Q.   How does it matter, sir?
18       MS. BRADY:  Objection, form and
19    foundation.
20       THE WITNESS:  I think perhaps there's gang
21    members that are no -- that are in their 50s or
22    60s at this point that are no longer affiliated
23    with the gangs, you know.  Some claim that my
24    life was in danger by some of the Columbian

Page 227

1     cartels that I dealt with in the '80s, but I
2     don't have any fear that they're going to come
3     looking for me now in 2023.  And I think the
4     same would hold true for some of the -- some of
5     the gang operatives.
6  BY MR. ENGQUIST:
7        Q.   Okay.  How about in 2005 when
8     David Protess and his group over at Northwestern
9     began to work with Mr. Vicente to sign an affidavit
10    recanting his testimony regarding Iglesias?  Do you
11    think the threat on his life by the IGs would have
12    had an effect at that point?
13       MS. BRADY:  Objection, form, foundation,
14    assumes facts not in evidence, calls for
15    speculation.
16       Go ahead.
17       THE WITNESS:  I don't recall specifically
18    reading that information, but if it's a
19    hypothetical, sure, certainly it could have
20    some effect on it.
21 BY MR. ENGQUIST:
22       Q.   Okay.
23       A.   But I wouldn't know that unless I was able
24    to find out more about an additional detail.  I

Page 228

1     mean, just that simple statement, I would have to
2     learn more about the threats.
3        Q.   Okay.  What more about the threats would
4     you need to know other than that he knew that there
5     was a hit on him?
6        A.   Who told him that?
7        Q.   According to him, sir, it's in his
8     deposition.  The other IGs knew that there was a hit
9     on him when he was in prison.  I mean --
10       A.   Yeah.
11       Q.   -- it's a big part of his deposition, all
12    the threats and promises that were being given, you
13    know, after his testimony and how that continued up
14    to the 2000s, sir.
15       A.   Can we -- I mean, if you want to continue
16    questioning me about it, we could -- I could refresh
17    my memory.  I've read a lot of depositions in this
18    case.
19       Q.   Well, sir, the reason why I'm asking about
20    it is because Mr. Vicente is a big part of this
21    case.
22             Would you agree with that?
23       A.   I would say he's a part of the case.
24    You're defining -- I can't define what "a big part"

Page 229

1     is.  Certainly he was a part of the case.
2        Q.   Well, sir, to be clear, Mr. Vicente is the
3     only witness who testified at trial that said he was
4     coerced by the police in any way; isn't that
5     correct?
6        A.   I believe that's accurate, yes.
7        MS. BRADY:  Yeah, objection to form.
8  BY MR. ENGQUIST:
9        Q.   Okay.
10       A.   And, again, I don't want to be difficult,
11    but when you use the word "only" and -- you know, it
12    causes me -- I have to pause because there's a lot
13    of different players in the case.  And if something
14    comes to my attention that I don't recall as we sit
15    here, I want to make sure it's clear that the
16    information, if I'm -- if I have the ability to
17    review information, it would be helpful.
18       Q.   Sir, I'm not sure what you're asking to
19    review other than everything that you read, and I
20    don't know what that would be, which we wouldn't
21    want to do here at this point.
22       A.   No, that was a general statement.  When I
23    say you're asking me and you're using the words
24    "always" or "any way" or "the only one," you know,

THOMAS J. TIDERINGTON, 02/13/2023      Page 230..233

Page 230

1  for the most part I agree with you, but certainly if
2  I go back and look at some other documents and I see
3  something else, I will let you know if I was
4  mistaken.
5     **Q.  Okay.  Well, to be quite clear, in your**
6  **report, your entire report in this case, the only**
7  **person that's indicated in here that says they were**
8  **coerced in any way is Mr. Vicente.**
9     A.  I don't think I used the words "he's the
10  only one." In my report, I didn't use that he's the
11  only one that said this, but --
12     **Q.  If you can point to another person who**
13  **claims to be coerced, let me know.**
14     A.  Right. I will do that. Thank you.
15     **Q.  And, sir, from Mr. Vicente's testimony,**
16  **you're also aware that other members of the**
17  **Imperial Gangsters street gang actually sent letters**
18  **to other Imperial Gangsters in the prison system to**
19  **keep Vicente safe in order for him to give an**
20  **affidavit switching his testimony; is that right,**
21  **sir?**
22     A.  I believe --
23     MS. BRADY:  Objection.
24     THE WITNESS:  -- that was in the file. I

Page 231

1  don't know if --
2     MS. BRADY:  Yeah.  Just objection to form.
3  And --
4  BY MR. ENGQUIST:
5     **Q.  Go ahead and answer the question.**
6     MS. BRADY:  Go ahead.
7  BY MR. ENGQUIST:
8     **Q.  It is facts in evidence, too.  So go**
9  **ahead.**
10     A.  Right. In general, I would agree with
11  you. I don't know the specifics though. In
12  general, I would agree with you, yes.
13     **Q.  And do you think that would incentivize a**
14  **witness to change his testimony or lie?**
15     MS. BRADY:  Objection, form and incomplete
16  hypothetical.
17     THE WITNESS:  I guess it depends.
18  BY MR. ENGQUIST:
19     **Q.  What does it depend on?**
20     A.  Well, he wasn't concerned when he gave the
21  statement to the state attorney about the
22  retribution that may come.
23     So did he not -- I mean, did he think he
24  was going to get Christmas cards for testifying

Page 232

1  against Iglesias?  So when he gave this statement,
2  it doesn't appear that he was concerned about gang
3  retribution.
4     **Q.  Okay.  You say it doesn't seem like he was**
5  **concerned.**
6     **Sir, you are aware that he was put in**
7  **segregation and protective custody while he was in**
8  **Cook County Jail, aren't you?**
9     A.  I'm not sure of the time period, but --
10     **Q.  It's in his testimony, sir.**
11     A.  Again, I haven't looked at it recently,
12  and I could go through the deposition, and we
13  wouldn't have to play these memory games.
14     **Q.  I'm not trying to play memory games, sir.**
15  **He is -- he is a key witness in this case**
16  **and a big part of your report, and you just said**
17  **that he didn't show any fear of retribution.**
18  **I'm just asking you, sir, isn't it true,**
19  **sir, that he was, in fact, put in protective custody**
20  **while he was in Cook County Jail?**
21     A.  Well, I guess I meant when he -- when he
22  offered the information to begin with.
23     **Q.  He was in custody talking to the State's**
24  **Attorney's Office, yes.**

Page 233

1     A.  About several, three or four other
2  different murders apparently.
3     **Q.  Two other murders, sir.  You do know that,**
4  **correct?**
5     A.  I knew there was more than one, yes.
6     **Q.  Okay. It's two other murders.**
7     A.  Okay. I seem to think it was three, but
8  if you're telling me it's two, I won't --
9     **Q.  Two other murders, yes.**
10     A.  Which ones were those?
11     **Q.  Are you serious?  Seriously, you don't**
12  **know what other cases Mr. Vicente testified in?**
13     A.  I --
14     MS. BRADY:  Objection. Josh, please --
15  now this is the fourth time I've asked this.
16  Please be respectful.
17     MR. ENGQUIST:  I'm trying to be
18  respectful.
19  BY MR. ENGQUIST:
20     **Q.  But go ahead, sir.  Are -- you seriously**
21  **do not know what the other cases are?**
22     A.  If you allow me to refresh my memory, I
23  could --
24     **Q.  Sir --**

THOMAS J. TIDERINGTON, 02/13/2023                    Page 234..237

Page 234

1      A. -- answer your questions.
2      Q. -- your report is right in front of you.
3   Your report is right in front of you. I'm not
4   stopping you from looking down.
5      A. Well, I'm not reading that portion, but I
6   will if we're going to continue this conversation or
7   these questions. I'd be happy to.
8      Q. And, sir, are you also aware that
9   Mr. Vicente was put in protective custody after he
10  testified against other Imperial Gangsters and went
11  to prison? He was in protective custody when he was
12  in IDOC?
13     A. I guess I'm aware of that. I don't know
14  the specifics.
15     Q. And, sir, are you aware that he was --
16  when he went back to prison and was no longer in
17  protective custody, it was at that point that he was
18  approached about changing his testimony and signing
19  an affidavit in favor of Mr. Iglesias, Mr. Serrano,
20  and Mr. Montanez?
21     MS. BRADY: Objection. I believe that
22  misstates the record and assumes facts that are
23  not in evidence.
24

Page 235

1   BY MR. ENGQUIST:
2      Q. Go ahead, sir.
3      A. I don't recall that specifically, no.
4   Again, if you could point to the documents and allow
5   me to refresh my memory, I could perhaps clarify
6   that for you as far as what I understood or didn't
7   understand at the time.
8      Q. Well, did you have any understanding that
9   he was -- that Vicente was incentivized at all by
10  other gang members or members of the Northwestern
11  journalism class in order to switch his testimony?
12     MS. BRADY: Objection, form, foundation,
13  incomplete hypothetical, assumes facts not in
14  evidence.
15     MS. ROSEN: Rachel, can you explain the
16  "assumes facts not in evidence" objection?
17     MS. BRADY: Sure. So he's saying that
18  Francisco Vicente was incentivized by students
19  in the Northwestern journalism school to change
20  his story.
21     MS. ROSEN: Yeah.
22     MS. BRADY: There's zero evidence in the
23  record to support that.
24     MS. ROSEN: There's a deposition in this

Page 236

1   case with exhibits attached to it of
2   Mr. Vicente that established that.
3      So your objection is not well-founded.
4      MS. BRADY: I disagree that he says he was
5   incentivized by Northwestern students to change
6   his testimony. It's not worth fighting about
7   right now. I'm going to keep making the
8   objection.
9   BY MR. ENGQUIST:
10     Q. Okay, sir. Can you answer the question?
11     A. I forgot what it was.
12     MR. ENGQUIST: Okay. Could you read it
13  back, Mr. Court Reporter.
14     (Question read.)
15     THE WITNESS: Yeah, I don't recall any
16  specific details about that.
17  BY MR. ENGQUIST:
18     Q. Okay. To be clear, you don't recall him
19  testifying about that there was an order -- there
20  was a hit on his life by the Imperial Gangsters; is
21  that correct?
22     MS. BRADY: Objection, asked and answered.
23  Josh, if you want to show him the transcript,
24  you can show him the transcript.

Page 237

1      MR. ENGQUIST: I'm not going through the
2   transcript.
3   BY MR. ENGQUIST:
4      Q. Is that correct, sir?
5      A. I vaguely recall his testimony, but I
6   don't recall the specifics, the specific details
7   that you want me to answer.
8      Q. Okay. And the Imperial Gangsters is the
9   same gang that Mr. Iglesias belonged to, correct?
10     A. That's my understanding, yes.
11     Q. Okay. And, sir, from reading
12  Mr. Vicente's deposition, you're also aware that he
13  requested and received through the work of
14  Northwestern a change in his location of where he
15  was being imprisoned to be closer to loved ones?
16     MS. BRADY: I believe that also --
17  objection, that I believe that that misstates
18  the record and assumes facts that are not in
19  evidence.
20  BY MR. ENGQUIST:
21     Q. Okay. Sir?
22     A. I don't recall the specifics of his
23  testimony.
24     Q. Sir, do you think getting someone a change

THOMAS J. TIDERINGTON, 02/13/2023                    Page 238..241

Page 238

1  in location, a prisoner, so they can be closer to
2  their family could incentivize them to cooperate
3  with you?
4        MS. BRADY:  Objection, form, incomplete
5  hypothetical.
6        THE WITNESS:  To cooperate with me?
7  BY MR. ENGQUIST:
8      Q.  If you were trying to incentivize a person
9  in prison, do you believe honoring their request and
10  getting them moved from one prison to another prison
11  so they could be closer to family would help
12  incentivize them?
13        MS. BRADY:  Objection, form and incomplete
14  hypothetical.
15        THE WITNESS:  Again, it's hard for me to
16  answer that.  I don't know.  I don't know what
17  his motive was.
18  BY MR. ENGQUIST:
19      Q.  I'm asking you a hypothetical.  You don't
20  have to know his motive.
21        If a prisoner asked you --
22      A.  Oh, you're asking a hypothetical?
23      Q.  Sure, I'll ask if a prisoner asked you for
24  a favor saying you want him to talk to you about

Page 239

1  something, you want him to do something, and they
2  say this is what I want you to do for me, I want you
3  to get me moved to a different prison within the
4  state so I can be closer to my family and you make
5  that happen, would you -- you think that wouldn't
6  help incentivize the prisoner to do something that
7  you wanted?
8      A.  Well, first of all, it's --
9        MS. BRADY:  Objection, foundation.
10        Go ahead.
11        THE WITNESS:  Well, first of all, I've had
12  experience in trying to do this.  In the Bureau
13  of Prisons that I'm familiar with, certainly
14  the officer, the detective doesn't have the
15  ability to call up the warden and say, hey,
16  we're going to transfer this guy next week.
17  It's a much more involved process.  I don't
18  know if -- there's only a few instances in
19  which a law enforcement officer would be
20  involved in the process.
21        I believe it would typically have to come
22  from the court.  It would typically have to
23  come from the State Attorney's Office, and it's
24  not something that police officers typically

Page 240

1  get involved in, at least based on my
2  experience.
3  BY MR. ENGQUIST:
4      Q.  I'm not even asking about police officers.
5  What I had just described was something that
6  Northwestern did through its investigator and had
7  Mr. Vicente moved.
8      A.  I don't know anything about that.  You
9  asked me a hypothetical -- wait a minute.  You asked
10  me a hypothetical, and now you're asking me --
11  you're telling me that, no, it was specific to
12  Northwestern.
13      Q.  Yes, it was.
14      A.  So was it a hypothetical, or was it
15  something that Northwestern actually did?  I was
16  confused.
17      Q.  I asked you the hypothetical to see what
18  your answer was going to be.
19      A.  All right.  My answer --
20      Q.  Excuse me.  And then your answer was all
21  about law enforcement.
22        So I'm not talking -- so I'm being very
23  specific.  I'm not talking about law enforcement
24  having the ability to do it.

Page 241

1        If you read Mr. Vicente's deposition,
2  you'd be aware that Mr. Vicente did request that --
3  request to be moved to Northwestern, and
4  Northwestern and their private investigator got him
5  moved.
6      A.  Okay.  So that's beyond my area of
7  expertise.
8      Q.  Do you think having that kind of --
9  providing that kind of service to a prisoner could
10  incentivize them?
11        MS. BRADY:  Objection, form.
12        THE WITNESS:  I can only speak, and I
13  think I answered the question, about what law
14  enforcement -- I don't know what other agencies
15  may be able to do with the Bureau of Prisons.
16  But my experience, and I can only answer from a
17  law enforcement practice, that it's typically
18  difficult for a law enforcement officer to make
19  those promises or to accomplish, you know,
20  having a prisoner moved from one state prison
21  to another, if I understand your question
22  correctly.
23  BY MR. ENGQUIST:
24      Q.  I don't think you do.  But --

THOMAS J. TIDERINGTON, 02/13/2023                    Page 242..245

Page 242

1     A.  I don't.
2     Q.  Yeah.  But do you think if -- do you think
3  if providing -- if responding to a request to a
4  prisoner you're trying to get to change his
5  testimony, do you think that could help incentivize
6  the person?
7        MS. BRADY:  Objection, form, calls for
8     speculation, asked and answered, incomplete
9     hypothetical, and assumes facts not in
10    evidence.
11       But you can answer again, Tom.
12       THE WITNESS:  I think the keyword is --
13    again, you know, would this incentivize them if
14    I told them I'd move them to a different
15    prison?  Yeah, probably.
16 BY MR. ENGQUIST:
17    Q.  Now, you incentivized informants or
18 offenders or suspects at certain times in order to
19 do things that you wanted, correct?
20    A.  I never had them moved from a prison, but
21 yes.
22    Q.  Okay.  You would sometimes make sure they
23 wouldn't get a longer -- or you would help them so
24 they wouldn't get a longer sentence?

Page 243

1     A.  Depending on their cooperation, that's
2  correct.
3     Q.  Okay.  Some of them would be paid?  They
4  would make a living out of it?
5     A.  That's correct.
6     Q.  Okay.  And what other -- what other things
7  did you do to incentivize people into cooperating
8  with you in a criminal context?
9        MS. BRADY:  Objection, form.
10       Go ahead, Tom.
11       THE WITNESS:  Well, if they provided what
12    is called substantial assistance in criminal
13    matters, that would be brought forward to the
14    state attorney or the U.S. Attorney's Office,
15    and a decision would be made by either the
16    prosecutor, federal or state prosecutor, on
17    whether or not they were going to ask for a
18    reduction based on the cooperation.  That was
19    very common.
20 BY MR. ENGQUIST:
21    Q.  Were you ever involved in the process of
22 getting some kind of informant security so they
23 wouldn't die or get injured in some way, provide
24 protection in order to incentivize them?

Page 244

1        MS. BRADY:  Objection, form.
2        THE WITNESS:  Provide protection?  Well,
3     again, is this a hypothetical, or is this --
4  BY MR. ENGQUIST:
5     Q.  No.  I'm asking if you ever did that in
6  your years of law enforcement, provide protection to
7  an informant for their protection so they would --
8  so you can incentivize them to cooperate.
9        MS. BRADY:  Objection, form.
10       THE WITNESS:  I'm not sure I understand
11    what you're asking.  There's times we provided
12    security for informants.  There's times
13    where -- or a time when we learned that a
14    confidential informant had threats out against
15    him or her, so we would provide them with funds
16    to move out of the area.
17       I can't think of any situation where we
18    would tell an informant we will protect you if
19    you cooperate.  No, if that's your question, I
20    can't think of an instance in which we did
21    that.
22 BY MR. ENGQUIST:
23    Q.  And why would you have done that?
24    A.  I'm sorry?

Page 245

1     Q.  I understand what you're saying, that if
2  you knew there was a threat on an informant, you
3  could provide security; you could give -- you could
4  give them funds so they could move away so they're
5  not in danger.
6        But why wouldn't you use the threat of we
7  will provide you protection but only if you do
8  whatever, like give this testimony or something?
9        MS. BRADY:  Objection, form.
10       THE WITNESS:  I think that would be
11    coercive.  I think it would be -- well, again,
12    it depends.  I don't know exactly what we're
13    talking about here, so it's hard for me to give
14    you a fluent answer.  And I can't really think
15    of a good example in which we did do that.  I'm
16    not sure I'm following this line of
17    questioning.
18 BY MR. ENGQUIST:
19    Q.  No, I think you are following the line of
20 questioning.  You were saying that you thought it
21 would be too coercive to say if you don't do this, I
22 won't provide you protection, and you could very
23 well die.
24       That would be too coercive, right?

THOMAS J. TIDERINGTON, 02/13/2023                    Page 246..249

Page 246

1     MS. BRADY: Objection, form.
2     THE WITNESS: No, I think it would be
3  coercive if I go to the informant and say, This
4  is what I want you to do: I want you to do A,
5  B, and C, and if you don't do that, you're
6  going to get killed, all right. I can't think
7  of a situation in which that ever happened.
8  BY MR. ENGQUIST:
9     Q. Okay. Now, just going back to your use of
10  CIs, isn't it true that you had maybe a hundred
11  different CIs during your time?
12    A. I would say that's a fair estimate, yes.
13    Q. And it almost ended badly for every -- for
14  all of them?
15    MS. BRADY: Objection, form.
16    THE WITNESS: I guess you'd have to define
17  what you mean by "ended badly for all of them."
18  BY MR. ENGQUIST:
19    Q. Okay. Isn't it true, sir, you never had
20  an informant who left the life, the business, and
21  went off to something normal, something like a
22  normal life?
23    MS. BRADY: Objection, form.
24    THE WITNESS: Again, I think you're taking

Page 247

1  quotes from a book that was being sold for
2  entertainment purposes, but I think that's
3  pretty factual. Most of the informants that
4  I've had throughout my career typically don't
5  go on and become lawyers, and they're usually
6  involved in a life of crime before they're
7  involved with us as informants and perhaps
8  afterwards.
9  BY MR. ENGQUIST:
10    Q. And it's also true that it ended badly for
11  most of the people that you had as CIs; isn't that
12  correct, sir?
13    A. Well, I guess --
14    MS. BRADY: Objection, form.
15    Yeah, go ahead.
16    THE WITNESS: I guess you've got to define
17  what "end badly" really means.
18  BY MR. ENGQUIST:
19    Q. Okay. I'm going to put up another page of
20  that book that we were talking about earlier.
21  Snatched I believe it's called.
22    A. Right. Just to clarify, this is a side
23  note because you're interested apparently is that it
24  was -- the book was optioned by Leonardo DiCaprio to

Page 248

1  film a movie about. And the screenwriters -- there
2  were some liberties taken by the author, but there
3  was even some more liberties taken by the
4  screenwriters that involved me using explosives and
5  me shooting and killing people in Columbian prisons.
6     So I don't want you to confuse fiction
7  with reality, and that's perhaps what you're doing,
8  but we can go through this exercise if you would
9  like.
10    Q. I'm actually pulling from something that's
11  a quote, sir, in here. And if you're telling me
12  this quote is improper and wrong, you can just say
13  that. Okay?
14    A. I will. Thank you.
15    Q. We're on Page -- what page would this be?
16  It's unclear. It's Page 39 of the book.
17    A. Of this book?
18    Q. Of that book, yeah, Page 39. Oh, good,
19  you have a copy of it.
20    A. I do.
21    Q. Let me just close the shared screen so I
22  can actually see you.
23    MS. BRADY: Josh, can you please put that
24  back up on the screen? It wasn't sent to us in

Page 249

1  advance, and I don't have a copy, and I'd like
2  to read along.
3     MR. ENGQUIST: Sure.
4  BY MR. ENGQUIST:
5     Q. Page 39. Looking at the last paragraph,
6  it starts with the quote, "There was a guy, Bobbie
7  something, an Italian name. We called him Bob the
8  Slob, in his mid 40s."
9     Do you see that part right there?
10    A. I do.
11    Q. Okay. And from there all the way to the
12  end is in quotes.
13    A. I see that.
14    Q. Okay. And within that larger quote, you
15  have in here near the bottom, "I never had an
16  informant who left the business and went on to
17  something like a normal life, something that -- who
18  said or even halfway said, Hey, I made a lot of
19  money, this was great working with you guys. Thank
20  you very much. See you later."
21    Do you see that?
22    A. I do.
23    Q. Okay. Did you say those words?
24    A. Well, you skipped a whole portion of it.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 250..253

Page 250

1    Q.  I know.  I'm asking if --
2        (Simultaneous speaking.)
3        THE WITNESS:  Well, I know, but you have
4    to kind of put it in perspective.  He went
5    missing for a while.  Then they found him
6    bullet-riddled and stuffed into a suitcase and
7    dumped out in a mall parking lot in Metro Dade
8    or Miami-Dade.  None of that is true.  There
9    were a lot of people killed and bodies were
10   found in parking lots, but I don't know if Bob
11   the Slob was found dead there.  I don't have
12   any information about that.
13       So the author kind of combined two
14   different facts there, so just to clarify that
15   and to show you that this is -- again, some of
16   this is entertainment.
17       To move down to the quote that you're
18   asking me about, I never had an informant who
19   left the business and went off into something
20   or even had (reading sotto voce), I think
21   that's accurate.  I don't remember giving that
22   quote, but I don't disagree with the statement.
23   BY MR. ENGQUIST:
24       Q.  And the sentence before that quote, "With

Page 251

1    most of the CIs I've dealt with, which is maybe a
2    hundred, it almost always ended badly for them."
3        Are you denying that quote?
4        A.  I don't recall saying that.  No, I may
5    have said that.  I certainly may have said that.
6    But I don't think I meant that they ended up
7    bullet-riddled in parking lots.
8        What I meant by that quote, even if I did
9    say it, and I don't recall specifically if I did, it
10   sounds like something that I would say though, is
11   that the informants always -- my experience is they
12   go back to the life of crime.  They get involved in
13   drug activity.  They're involved in organized crime.
14       So yeah, I'm not disputing that.  I think
15   it's accurate.
16       Q.  Okay.  And so you'd agree with me, from
17   your experience, that acting as an informant is a
18   very dangerous thing to do?
19       A.  It could be.  Don't forget to get this
20   book though [indicating].  This is -- you might have
21   missed this one.
22       Q.  Sorry.
23       A.  I'll send it to you.
24       Q.  All right.  Feel free.  You have my

Page 252

1    address.
2        A.  I will.
3        Q.  All right.  So ...
4        Actually, can I take a quick five minutes
5    here, please?
6        A.  That would be great.
7        MR. ENGQUIST:  All right.  It's 3:00
8    o'clock.  Why don't we take five minutes, come
9    back at about 3:05.
10       THE WITNESS:  Okay.  Thank you.
11       THE VIDEOGRAPHER:  We're off the video
12   record at 3:00 p.m.
13       (Whereupon, a recess was taken
14       from 3:00 p.m. to 3:08 p.m.)
15       THE VIDEOGRAPHER:  We're back on the video
16   record at 3:08 p.m.
17   BY MR. ENGQUIST:
18       Q.  All right, sir.  Several times in this
19   deposition, you've mentioned other witnesses with a
20   better vantage point could not make -- or said they
21   could not make identification of the shooter.
22       Do you remember those?  Do you remember
23   that?
24       A.  Yes, I do.

Page 253

1        Q.  I believe one would be, like,
2    Arnell Moore, I believe the bus driver, who was
3    within maybe 10 or 15 feet of the shooter.
4        A.  That's correct.
5        Q.  Okay.  Now, from your years of experience,
6    did you find that people sometimes who may have
7    witnessed something would deny witnessing anything
8    because they didn't want to be involved?
9        A.  That could happen, yes.
10       Q.  Especially in murder cases, on the street
11   with gangs?
12       A.  That's possible, yes.
13       Q.  Okay.  So does it surprise you that
14   witnesses who may have been at a good vantage point
15   would deny to this day being able to identify the
16   shooter?
17       A.  Not necessarily to this day.  You know,
18   probably while they lived in the neighborhood, if
19   they had concern, if they had concern about
20   children, but after decades, I think perhaps the
21   concern may be less, especially if maybe that person
22   doesn't live in that state any longer or if there's
23   people that are deceased that were involved with the
24   case.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 254..257

Page 254

1    Q.  Okay.  But what about if the person they
2   could potentially identify was still alive and well?
3       MS. BRADY:  Objection, form.
4       THE WITNESS:  Well, that's an interesting
5   question because what I found is that a lot of
6   times individuals that have a lot of street
7   power, meaning whether they're gang members or
8   Columbian cartel operatives, once they go to
9   prison and they lose all of their money and
10  friendships, they certainly don't have the same
11  power, if you will, after they're in prison for
12  a number of years.  So their status in a gang
13  diminishes quite considerably, and so does
14  their ability to perhaps harm other witnesses.
15      And I can't -- I don't know any -- not
16  specifically to this case, and that's just a
17  general response to gang members that spend
18  decades in prison.
19  BY MR. ENGQUIST:
20      Q.  So going back to Mr. Vicente, are you
21  aware of the lengths at which Northwestern School of
22  Journalism and students and Mr. Protess went to get
23  Mr. Vicente to give a statement in this case and
24  other cases?

Page 255

1       A.  I don't know if I know the specific
2   details, no.
3       Q.  Sir, do you know the extent that the
4   State's Attorney's Office was aware of Mr. Vicente
5   being used in three different prosecutions?
6       A.  You said two, but I thought it was three
7   prosecutions, so I'm glad we could clarify that.
8       Q.  You said two more.  We were talking about
9   Iglesias, and it was two more prosecutions, two
10  other murders, so there's three total.
11      A.  Three total.  I'm sorry.  That's the
12  confusion.
13      I'm sorry.  Was I aware that the state
14  attorney knew this?
15      Q.  Yes.
16      MS. BRADY:  Objection, form.
17      THE WITNESS:  I -- I don't know that.
18  But to go back, though, I do know that
19  there had to be some communication between
20  Guevara, Halvorsen, the state attorney, and
21  Vicente.  If you believe Vicente, he was
22  coerced and beaten by Guevara, and that
23  occurred during visits to the jail.
24      So there had to be some cooperation or at

Page 256

1   least some communication, I would think,
2   between the State Attorney's Office and the
3   defendant officers.
4   BY MR. ENGQUIST:
5       Q.  You're aware that Mr. Vicente at some
6   points said that he was actually beaten within the
7   State's Attorney's Office office, their offices?
8       A.  I don't recall if I recall that
9   specifically.  I do recall him saying he was beaten
10  by Guevara and Halvorsen.
11      Q.  But you don't recall him testifying or,
12  you know, giving a story that he was actually beaten
13  while at the offices at 26th and California at the
14  State's Attorney's Office?
15      A.  I don't recall that.  It's possible.
16      Q.  Sir, are you aware whether or not the
17  different criminal defense attorneys in the three
18  different murder cases were aware of Mr. Vicente
19  being used in all three cases?
20      A.  I don't know that.
21      Q.  Do you think that would be important to
22  know?
23      A.  Important to who?
24      Q.  You.

Page 257

1       A.  In analyzing the policemen's conduct or
2   the conduct of the police department here?  Or, I'm
3   sorry, I'm not following.  I know it's late in the
4   day.  I don't know if I follow.
5       Q.  Do you think it would be important for you
6   to know that when you're coming to opinions in this
7   case?
8       A.  To know -- I'm sorry.  I'd have to ask you
9   again.  To know that -- if you could just clarify
10  that question one more time.  I apologize.
11      Q.  For your opinions in this case.
12      MS. BRADY:  Objection, form.
13      THE WITNESS:  I'm sorry.  My opinion in
14  this case and what prefaced, the question that
15  prefaced?
16  BY MR. ENGQUIST:
17      Q.  You asked me a question.
18      A.  No, something about the state attorney,
19  would I -- do I think it's important to know that
20  the state attorneys knew that there were three
21  cases?
22      Q.  Well, no.  Right before that, right before
23  that part, I was asking you about the criminal
24  defense attorney.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 258..261

Page 258

1      Sir, were you aware whether or not the
2  criminal defense attorneys in the three different
3  cases in which Vicente was a witness were aware that
4  Mr. Vicente was being used in all three cases,
5  potentially used?
6      A.  Yeah, I don't know that.
7      MS. BRADY:  Objection, form.
8  BY MR. ENGQUIST:
9      Q.  Did Detective Riccio testify at trial?
10     A.  I don't recall if he did or not.
11     Q.  Did Detective Gawrys testify at trial?
12     A.  I don't believe so.
13     Q.  Did Sergeant Biebel testify at trial?
14     A.  I -- I would have to review the testimony.
15  I don't believe he did is my recollection.
16     Q.  Did you ever take note of the flight of
17  direction of the other offender in coming to your
18  opinions in this case?
19     MS. BRADY:  Objection, form.
20     THE WITNESS:  He was running obviously
21     away from the vehicle in the opposite direction
22     that the vehicle was heading.
23  BY MR. ENGQUIST:
24     Q.  You mentioned earlier about nothing was

Page 259

1  done to try to locate the car which may have made a
2  squealing sound of tires.
3      A.  That's my understanding, yes.
4      Q.  Okay.  How would one go about finding the
5  car that may have made squealing sounds that was no
6  longer there?
7      A.  Well, it's simple basic investigative
8  work.  You go start knocking on doors in that
9  apartment complex and say were you home on this
10  particular day, did you see a car parked out here in
11  the back, did you hear tires squeal.  Those are
12  things that I would have expected to see in a
13  reasonable investigation.
14     Q.  Okay.  So you didn't see anyone do a
15  canvass?
16     A.  I believe they did a canvass, but I don't
17  believe they canvassed that two-story building.  I
18  believe it was the building across the street or on
19  the same side of the street as where the shooting
20  took place.
21     Q.  So you believe the scene officers should
22  have canvassed a different building and asked about
23  a car that may or may not have been parked there
24  that may or may not have made a squealing sound,

Page 260

1  correct?
2      A.  No.  Wait a minute.  The detectives
3  developed information in their investigation that
4  there apparently was a vehicle that squealed away
5  from the scene.  When they learned that information,
6  I don't know if it was the on-scene officers or
7  if -- it really should have been done by the
8  detectives that developed that information after it
9  was developed.
10     Q.  Okay.  And what detectives were those?
11     A.  Well, it would have been the detectives
12  assigned to the case.  Halvorsen, Guevara,
13  apparently were the two key detectives in this case.
14     Q.  Halvorsen and Guevara were not assigned to
15  the case at the time of the shooting or right after
16  for the initial investigation; isn't that correct?
17     A.  I understand that, yes.
18     Q.  Okay.  So the detectives that were running
19  with the case at that point were not
20  Detective Halvorsen and Guevara; is that correct?
21     A.  Well, there was -- Halvorsen and Guevara
22  got involved, I think, on July -- I'm sorry,
23  whatever the date was, June -- the shooting was on
24  June 7th, and I think they got involved a

Page 261

1  couple weeks later.
2      Q.  Okay.  And they got involved only because
3  of the information that they got from that phone
4  call; isn't that correct?
5      MS. BRADY:  Objection.  Yeah, objection,
6     form.
7     Go ahead.
8     THE WITNESS:  Yeah, I guess that's how
9     they got involved.  I don't know that for sure,
10     but yes, that sounds reasonable.
11  BY MR. ENGQUIST:
12     Q.  And you're saying as part of their
13  investigation, they should have gone back and talked
14  to people at the building about what happened a
15  couple weeks earlier; is that correct?
16     A.  There was -- I mean, once they realized
17  that the only information they had was gang member
18  identification, yeah, they needed to develop
19  additional information on this case is my opinion.
20     Q.  In your experience as a police officer, is
21  there probable cause to arrest somebody based solely
22  off eyewitness identification?
23     A.  There could be.
24     Q.  Sir --

THOMAS J. TIDERINGTON, 02/13/2023                    Page 262..265

Page 262

1      A.  Again, there's a lot of factors that go
2  into that question.  And to relate it back to this
3  investigation, you know, what's the motive of the
4  witness, number one.  I think I described, you know,
5  it's a fourth-grade teacher who is not related or
6  not affiliated with any gang member, was in a clear
7  position to have seen the witness.  Or a bank
8  robbery where the suspect came in and stood there
9  for three minutes or talked or during a rape in
10  which the victim saw the assailant, those are all --
11  you determine credibility based on the
12  informant's -- I'm sorry, the witness' motive for
13  cooperating with the police, their ability to have
14  seen what they claim they have saw -- that they saw
15  in a case are all relevant matters.
16          And law enforcement officers know, and
17  we've been taught since probably -- I went through
18  the academy in 1978, if you'll indulge me for a
19  second, and when I learned about eyewitness
20  identification was in my Detroit Police Academy
21  class in which we had role players go out on the
22  street and commit a crime, you know, with fake guns
23  or purse snatch or robberies.  And then they would
24  come back in, and the officers, the various

Page 263

1  witnesses would come in and tell the classroom what
2  they witnessed, what they saw.  And it's shockingly
3  different between what one witness would say
4  compared to what another witness would say after
5  observing the exact same thing.
6          So it's important to understand the value
7  of eyewitness identification without forensic and
8  without any corroborating information.  It's
9  almost -- it's a step that the officer should take,
10  but it's only one step in the investigative process.
11      Q.  And in this case, the eyewitness
12  identifications were evaluated by the State's --
13  were evaluated by the State's Attorney's Office,
14  correct?
15      MS. BRADY:  Objection, foundation.
16      THE WITNESS:  We're going through the same
17  questions we already answered a while ago, and
18  it depends on -- I don't know if they evaluated
19  it or if they knew all of the information
20  concerning the eyewitness identification.
21          If the investigators don't tell the state
22  attorney everything, and certainly there's
23  enough evidence in this case file that there's
24  a lack of documentation, so there certainly

Page 264

1  would not have been -- so if you're only
2  relying on the documents that the state
3  attorney would have reviewed, there's not
4  sufficient information in order to -- I guess
5  that's a legal decision, but I don't think it
6  would have been a case that I would have
7  presented as a police detective.
8  BY MR. ENGQUIST:
9      Q.  All right.  And, sir, I know we've been
10  through this, but you're also aware, because you've
11  read the state's attorney's file, that the State's
12  Attorney Latz actually interviewed the witnesses,
13  the eyewitnesses in the police department?
14      MS. BRADY:  Objection, asked and answered.
15  BY MR. ENGQUIST:
16      Q.  Correct, sir?  You're aware of that?
17      A.  They interviewed them once, but they -- I
18  don't believe they sat in all of the interviews.
19  And there were more than one interview --
20      Q.  And --
21      A.  -- with each one of the witnesses.
22      Q.  And you know the prosecuting attorneys met
23  with the witnesses before putting them on the stand,
24  or do you think they did?  Let me just ask you.

Page 265

1      Are you aware of whether or not they met
2  with the witnesses before they put them on the stand
3  at trial?
4      MS. BRADY:  Objection, foundation.
5      THE WITNESS:  I'm assuming they did, but I
6  don't know that.
7      But I do recall something, prepping the
8  witness for trial, and I'll have to go back,
9  and I don't remember who it was, but there's
10  testimony that one of the detectives reminded
11  the witness who Iglesias was by showing him a
12  photograph of him is my recollection of what
13  happened during trial preparation.
14  BY MR. ENGQUIST:
15      Q.  Okay.
16      A.  Or just prior to testimony, I believe.
17      Q.  And which witness was that, sir?
18      A.  You know, I -- I don't recall specifically
19  which witness.
20      MR. ENGQUIST:  Okay.  How much time do we
21  have on the record right now?  I just want to
22  get a time check.
23      THE VIDEOGRAPHER:  Sorry.  That was an
24  additional 17 minutes, added to 4 hours and

THOMAS J. TIDERINGTON, 02/13/2023                    Page 266..269

Page 266

1    46 minutes.  I believe that's 5 hours and
2    2 minutes.
3          MR. ENGQUIST:  Okay.  All right.  I want
4    to make sure my other co-defendants have some
5    time, so I'm going to pass the torch.  And if I
6    need to do cleanup afterwards, I will.
7          So I'll pass the torch at this point.
8          THE WITNESS:  Thank you, sir.
9                EXAMINATION
10   BY MS. ROSEN:
11         Q.   Good afternoon, Mr. Tiderington.  How are
12   you?
13         A.   I'm fine, Ms. Rosen.
14         Q.   Okay.  I have some questions for you
15   regarding the second, mostly the second half of your
16   report relating to your opinions regarding the City
17   of Chicago policies and practices.
18         But before we get to that, at Page 7 of
19   your report in subparagraph i), you state that
20   you've been provided with documents showing that
21   37 people were convicted based on the investigations
22   that Guevara participated in and have now had their
23   convictions thrown out.
24         Do you see that?

Page 267

1          A.   I do.
2          Q.   And I asked you about that at your
3    deposition in Sierra, and you could not -- about
4    where that documentation was, and you could not
5    direct me to that in Sierra.
6          Are you able to do that today?
7          A.   Yeah.  I went back after our deposition,
8    and it was a news article, and I don't know if I
9    pulled it up originally and read it or if it was
10   provided to me.  But since that time, I have gotten
11   a copy of that that I can provide to you.
12         Q.   Is that news article listed as a part of
13   the 151 materials that you have listed as materials
14   reviewed in Attachment B to your report?
15         A.   I don't think it was.
16         Q.   Why not?
17         A.   Because, as I said, originally I don't
18   know that it was provided to me.  I think it was a
19   document that I pulled up doing my Ph.D. Google
20   research on the case, and that's where I got that
21   information from.
22         Q.   Okay.  So the sentence that reads that
23   you've been provided documents, that phrase
24   "documents" refers to a single newspaper article; is

Page 268

1    that what you're saying?
2          A.   I believe it's a news article, yes.
3          Q.   So it's just one news article though,
4    right?
5          A.   It was just one news article.
6          Q.   Okay.  And then if you take a look at
7    Page 8 of your report, you reference Attachment E,
8    which is a spreadsheet of -- it says your data
9    analysis in Reyes/Solache regarding the 1995 to 1998
10   files.
11         Do you see that?
12         A.   I do.
13         Q.   And when you say your data analysis,
14   that's not quite accurate, right?  You didn't
15   prepare that chart?  That was prepared by
16   individuals at Loevy & Loevy, part of that team,
17   right?
18         A.   That's correct, and that's what I've
19   testified to.
20         Q.   Okay.  And then Attachment F says
21   "Spreadsheet of my data analysis in Sierra," and
22   then it says "in this case regarding 1991-1995
23   files."
24         Do you see that?

Page 269

1          A.   I do.
2          Q.   When you say spreadsheet of your analysis
3    in Sierra and this case, what do you mean?
4          A.   Well, in Sierra -- in the Reyes/Solache,
5    those were files that occurred from 1995 to 1998.
6    And the analysis during Sierra, that was related to
7    1991 through 1995, which encompasses the time period
8    of the Iglesias case.
9          Q.   Okay.  So the spreadsheet, Attachment F,
10   the files that are reflected in that spreadsheet
11   from 1991 to 1995 are the same set of files in both
12   the Sierra case and the Iglesias case; is that
13   correct?
14         A.   That's correct.
15         Q.   Okay.  And then again, you refer to it as
16   your data analysis, but that's not quite right.  You
17   didn't actually create the spreadsheet.
18         It was created by whoever, part of
19   Loevy & Loevy's team; is that right?
20         A.   I would say it was my analysis of their
21   spreadsheet is a better way to describe it.
22         Q.   Okay.  And in preparation for your
23   deposition here today, did you go back and look at
24   any of the files that are referenced in

THOMAS J. TIDERINGTON, 02/13/2023                    Page 270..273

Page 270

1 Attachment E, the Reyes/Solache data?
2     A.  Yes.
3         Q.  Can you tell me which files you went back
4 and looked at?
5     A.  I went back and looked at a lot of the
6 files from '95 to '98 and also from '91 to '95.  And
7 at some point, I wanted to go back and do a further
8 analysis of all these files, but I've gone
9 through -- since that time, I've gone through many
10 more of the files during both time periods.
11        Q.  So you testified earlier today that you
12 spent approximately 15 to 20 hours in the last
13 few weeks getting ready for this deposition here
14 today; is that right?
15    A.  That's correct.
16        Q.  Okay.  So in that time period, that 15 to
17 20 hours, part of what you did to prepare for your
18 deposition was to look at the 1995 to 1998 files and
19 the 1991 to 1995 files, correct?
20    A.  That's correct.
21        Q.  How much time did you spend looking at the
22 1995 to 1998 files?
23    A.  Well, there's another -- and I'm sure
24 you're aware that I've been retained on the Maysonet

Page 271

1 case, and as part of my analysis in that case, I did
2 some further review of both the Reyes and Sierra
3 files as well.
4         So I don't know if I can separate the
5 exact number of hours, and I don't know if I can
6 attribute it only to prepping for this deposition.
7         Q.  Okay.  So the 15 to 20 hours that you've
8 talked about earlier this morning in prepping for
9 this deposition excludes whatever time you spent
10 preparing for the Maysonet report, is that correct,
11 or preparing the Maysonet report; is that right?
12    A.  Well, I'm saying I looked at files in both
13 the Maysonet case and this case, and some of them
14 were -- some of that was the same analysis in both
15 cases.
16        So the time period that I'm tracking was
17 only for the time that I spent specifically in
18 preparation for this depo is how I track my time.
19        Q.  So in the 15 to 20 hours that you've spent
20 prepping for today's deposition, did you separately
21 look at either the 1995 to 1998 files or the 1991 to
22 1995 files?
23    A.  I did.  Yes, I did.
24        Q.  Okay.  And that's separate from whatever

Page 272

1 work you did in conjunction with your disclosures in
2 Maysonet, correct?
3     A.  That is correct.
4         Q.  Okay.  And as you sit here today, are you
5 able to tell us how much time you spent looking at
6 either the '95 to '98 file or the '91 to '95 files
7 in preparation solely for the deposition?
8     A.  No, I didn't break it out in that fashion.
9         Q.  Okay.
10        THE VIDEOGRAPHER:  Ms. Rosen.
11        MS. ROSEN:  Yes.
12        THE VIDEOGRAPHER:  Just an audio note.
13 Try to speak with your head up.  I know you're
14 looking at documents, but just help us out.
15 Thank you so much.
16        MS. ROSEN:  I will do my best.  Just
17 remind me if I'm looking down.
18        THE VIDEOGRAPHER:  Yes, ma'am.
19        MS. ROSEN:  Thank you.
20 BY MS. ROSEN:
21        Q.  Okay.  With respect to the issue related
22 to Efrain Torres and the note that talked about her
23 son, Mrs. Torres' son knowing the shooter or Shorti,
24 do you know what I'm talking about?

Page 273

1     A.  I do, yes, ma'am.
2         Q.  Okay.  So I guess I'm not quite following
3 your criticism about that.
4         You're saying that that -- what exactly
5 are you saying is the issue related to Mr. Torres'
6 statement?
7     A.  Well, I guess there's a number of issues.
8 First of all, there's no -- it was never explained
9 in the supplemental reports on the relevance of that
10 information, number one.  There's no documentation
11 that they questioned Efrain about, quote, Shorti or
12 the shooter or what relevance it had to this
13 investigation.
14        And then I don't believe that GPR was in
15 the prosecutor's file that I reviewed.
16        Q.  And we don't have the criminal defense
17 attorney's file in this case, correct?
18    A.  That is correct.
19        Q.  Okay.  Do you know whether or not the
20 prosecutor's file that we have is a complete copy of
21 the prosecutor's file?
22    A.  I don't know if it is.  I'm assuming it
23 is.  I don't know why it would not be.  I mean, I
24 don't know why they would selectively just copy part

THOMAS J. TIDERINGTON, 02/13/2023                    Page 274..277

Page 274

1  of it. I wouldn't know that.

2      Q. So what's your assumption that it's a
3  complete file based on?

4      A. Well, my assumption is just that, is that
5  it's a complete file. There's no -- I haven't been
6  provided any documentation or evidence that the file
7  was purged or documents were purged from that.

8          So I made the assumption that it was a
9  complete file, yes.

10     Q. Have you seen any testimony or -- let's
11 start with testimony.

12         Have you seen any testimony about what
13 happens to a file that comes out of the State's
14 Attorney's Office once a prosecution is complete and
15 the appeal is over?

16     A. I do recall some testimony, but I don't
17 recall where I -- I don't know where I recall it
18 from, and I don't know exactly the details.

19     Q. And do you know what they do with the
20 files at the -- what they did with the files in the
21 1990s at the Cook County State's Attorney's Office
22 once the criminal prosecution was complete in their
23 estimation?

24     A. I don't know specifically. I do recall

Page 275

1  there's some testimony that the files were
2  discovered in a warehouse or in a basement or
3  something, in their dingy basement or someplace.

4      Q. Okay. Now, going back to the Torres
5  issue, you have both obviously the Cook County
6  State's Attorney's file, the version that we've all
7  been provided in this case, and you have the Chicago
8  Police Department investigative file.

9          So I'm sure you noticed the General
10 Offense Case Report in that, in both of those files,
11 correct?

12     A. That the police report was in both files?

13     Q. A police report called a General Offense
14 Case Report --

15     A. Yes, yes.

16     Q. -- do you recall seeing that report in
17 both files?

18     A. I believe so, yes.

19     Q. And isn't it true that in that General
20 Offense Case Report, the scene officers note that
21 Mr. Torres says he saw the shooter coming out of the
22 Boys & Girls Club?

23         MS. BRADY: Objection. Tom, if you want
24     to take a second and find the General Offense

Page 276

1  Case Report and look at it --

2          MS. ROSEN: Rachel, I'm going to ask you
3  not to do that. He can either answer my
4  question and say he can or can't answer it, but
5  I am not going to let you instruct him how to
6  answer the question.

7          MS. BRADY: Right. I'm just telling him
8  that he has a right to review the document,
9  which he does. I'm not telling him how to
10 answer the question.

11         MS. ROSEN: No, I'm telling --

12         MS. BRADY: So, Tom, if you want to look
13 at the document, you can.

14         MS. ROSEN: He does not have a right to
15 review the document, okay. There are many
16 times in depositions of police officers when
17 you -- our clients or the defendants where you
18 expressly forbid them from looking at police
19 reports.

20         So it is improper for you to say to him he
21 has a right to do that. I may invite him to do
22 that if I think it's appropriate, but it is
23 improper for you to say that he has the right
24 to do that to answer the question.

Page 277

1          So I'd like an answer to my question,
2  which you've probably forgotten at this point.
3  I'm going to ask the court reporter to please
4  read it back.

5          (Question read.)

6  BY MS. ROSEN:

7      Q. Can you answer that question without
8  consulting with the report?

9      A. Well, again, it would be helpful if I had
10 an opportunity to review the police report, but I
11 believe -- I don't believe he said he saw him coming
12 out. I believe there was conversation that he saw
13 them standing in front of the boys club, if I
14 remember it correctly. And he described several
15 gang members or at least two gang members that he
16 was familiar with.

17         What sticks in my mind is one of them had
18 pink pants on and a black jacket, but I don't recall
19 specifically what he said about the shooter, whether
20 or not the shooter -- I don't think he said the
21 shooter -- that he saw the shooter come out because
22 he said he never identified the shooter.

23         So I would have to look at the police
24 report if you're asking me specifically what is

THOMAS J. TIDERINGTON, 02/13/2023                Page 278..281

Page 278

1  written in the police report.
2       Q.  Okay.  Fair enough.  But certainly in that
3  General Offense Case Report, the fact that he had
4  some information about the shooting was written
5  down, correct?
6       A.  Yes.
7       Q.  And he was interviewed at the police
8  station, correct, at some point?
9       A.  I believe he was interviewed a couple of
10  times; I believe once at the police station and
11  perhaps elsewhere.
12       Q.  And he was interviewed by Assistant
13  State's Attorney Latz, correct?
14       A.  During one of the interviews along with
15  one of the detectives.
16       Q.  Okay.
17       A.  But, again, you know, I would like to be
18  precise, and I certainly, you know, we're going on
19  six or seven hours and longer if you consider my
20  time because we're on Eastern Standard Time.  It
21  would be helpful if I was -- if you're asking me
22  specifics about what was written in the report, it's
23  easy for me to review then.  I have them at my
24  fingertips, and I'd be happy to do that, and we

Page 279

1  could give you a more precise answer.
2       Q.  Okay.  I'll keep that in mind if I need a
3  more precise answer.  So thank you, I appreciate it.
4       A.  All right.
5       Q.  If you can take a look at Page 16 of your
6  report, you make a note of the fact that ASA Lance
7  arrived at Area 5 and reviewed the investigative
8  file, and then you say something about the
9  investigative inventory sheet which only lists seven
10  items.
11            Do you see where I'm talking about?
12       A.  I do.
13       Q.  And then you conclude, "Which means that
14  any additional details or information about this
15  case would have had to have been provided verbally
16  by the defendant detectives or as a loose document."
17            Do you see that?
18       A.  Well, not a loose document but a
19  handwritten document, yes.
20       Q.  Well, you've written "or as a loose
21  document," right?
22       A.  I'm sorry, and/or a handwritten document,
23  I guess, or handwritten note, I guess, from either
24  Guevara or Halvorsen, yes.

Page 280

1       Q.  I'm just reading the words on the page.
2  So maybe I should just read the whole sentence. .
3            "Which means that any additional details
4  or information about this case would have had to
5  have been provided verbally by the defendant
6  detectives, or as a loose document, as there are no
7  records of any handwritten notes from either Guevara
8  or Halvorsen."
9            Do you see that?
10       A.  Yeah.  I'm sorry.  Yes, I think we're
11  saying the same thing in a different way.
12       Q.  Okay.  When you say "loose document," what
13  do you mean?
14       A.  Well, it wasn't in the investigative file.
15  It wasn't in the permanent retention file.
16            So it either had to have been some type of
17  a note, a GPR, or on the back of a napkin, or
18  somehow the information had to be documented, I
19  would guess.
20       Q.  Well, go to the next page of your report,
21  which is a cut-and-paste photo of the investigative
22  file inventory, and it identifies all of the reports
23  that were added to the investigative file inventory
24  June 24th, 1993.

Page 281

1            Do you see that there?
2       A.  I do.
3       Q.  Okay.  So that's the same day ASA Latz was
4  out, correct?
5       A.  Well, I guess the assumption I made is
6  that these were documents that were added to the
7  file after all of these things occurred.  It
8  couldn't have happened before she -- I don't see how
9  it could have happened before she was there or Latz
10  was there.
11       Q.  Well, look at -- one of the items,
12  Item 11, is a lineup supp.  Item 12 is a lineup
13  supp.
14            Do you see that?
15       A.  I do.
16       Q.  Okay.  And the lineups were conducted
17  before ASA Latz was there, correct?
18       A.  And you're assuming that that report was
19  done immediately afterwards and put in the file?  I
20  don't think that's what -- I don't think that's what
21  happened.
22       Q.  What's the basis for your assumption that
23  that's not what happened?
24       A.  Well, can I look at -- I'd have to look at

THOMAS J. TIDERINGTON, 02/13/2023                    Page 282..285

Page 282

1  the lineup report. I think there may be a time that
2  it was reviewed or approved.
3        Q.  Do you know whether or not -- what the
4  practice was at Area 5 regarding whether or not
5  lineup reports or other reports were prepared and
6  shared with prosecutors, felony review prosecutors
7  who were at the area before they were submitted for
8  final review?
9        MS. BRADY: Objection, form.
10       THE WITNESS: I know that there was a
11       practice that the reports had to be done within
12       a certain period of time, but I don't -- I'm
13       not aware of any practice that the reports had
14       to be prepared and provided to the state
15       attorney immediately after a lineup occurred,
16       no, if that was what your question is.
17  BY MS. ROSEN:
18       Q.  That was not what my question was, so let
19  me try it again.
20          My question is, were you aware of a
21  practice where when prosecutors were out at the
22  area, felony review prosecutors were out at the area
23  assisting in whatever ways they were assisting with
24  an investigation, that sometimes police officers

Page 283

1  were preparing reports and would share those reports
2  with the prosecutors before they got officially
3  submitted and entered into the file --
4        MS. BRADY: Objection.
5  BY MS. ROSEN:
6        Q.  -- to apprise the prosecutors of the
7  developments in the case if the case was -- the
8  investigation was ongoing while the prosecutors were
9  there?
10       MS. BRADY: Objection, form. I believe it
11       assumes facts that are not in evidence.
12       THE WITNESS: Certainly that seems
13       reasonable, but I don't know if that's what
14       their practice is, and I don't know if that's
15       what happened in this particular case.
16  BY MS. ROSEN:
17       Q.  Okay. And then you said something about
18  the permanent retention file, that these documents
19  weren't in the permanent retention file.
20          What's your understanding of how any
21  documents make their way into -- and when you say --
22  let me back up.
23          When you say permanent retention file, you
24  know that that's also and, in fact, most of the time

Page 284

1  referred to as the Records Division file by the
2  Chicago Police Department, right?
3        A.  I do.
4        Q.  Okay. So what, if any, understanding, do
5  you have of the process by which reports get
6  submitted so that they can be included in the
7  Records Division file?
8        A.  It's my understanding that the reports
9  from the -- supplemental reports and the police
10  reports are sent to the records department to be put
11  into the record retention file along with an
12  investigative file inventory.
13       Q.  And do you know where the -- how -- when
14  that happens in connection with the course of an
15  investigation?
16       MS. BRADY: Objection, form.
17  BY MS. ROSEN:
18       Q.  Either the time --
19       A.  It's my understanding it happens at the
20  end of the investigation typically.
21       Q.  All right. I'm going to ask you to take a
22  look at Page 19 of your report. About the middle of
23  the page, you write, "Meanwhile, Iglesias took that
24  the stand in his own defense. He denied having

Page 285

1  anything to do with the crime." And then there's a
2  cut and paste from -- I assume that's his transcript
3  from the criminal trial; is that right?
4        A.  That is correct.
5        Q.  And then it says, "The defendant in the
6  case of People versus Thomas Iglesias was convicted
7  by a jury and subsequently sentenced to 35 years in
8  prison."
9          Do you see that there?
10       A.  That's correct.
11       Q.  And is there some particular reason why
12  you referred to Mr. Iglesias at that point as "the
13  defendant in the case of People versus Thomas
14  Iglesias"?
15       A.  Is there a reason? Well, he was a
16  defendant.
17       Q.  I know, but all throughout your report,
18  you simply referred to him as "Iglesias," so just
19  the phraseology was strange.
20          So I just was trying to figure out if you
21  meant something --
22       A.  No, I don't think -- there's no hidden
23  reason why I did that.
24       Q.  Okay. If you could go to Page 21 of your

THOMAS J. TIDERINGTON, 02/13/2023                    Page 286..289

Page 286

1  report.  At the top of the page, the last sentence
2  of the carryover paragraph reads, "In fact,
3  Detective Anthony Wronkowski," and it says "Homicide
4  Coordinator," "stated that there should be 22
5  specific parts of an ongoing and completed Chicago
6  Police Department homicide investigation book."
7        Do you see that there?
8     A.  I do.
9     Q.  Who is Detective Anthony Wronkowski?
10    A.  I read that in a deposition, and I went
11 back and tried to find exactly because I noticed I
12 did not provide a citation for that, and it will
13 take me some work to determine that exactly, but
14 it's something that I read either in a deposition
15 either in this case or another one of the cases that
16 Reyes, Solache, Sierra, or perhaps even Brasfield.
17    Q.  So it might have come from Brasfield's
18 report?
19    A.  I don't know exactly where it came from.
20 And, again, it was something that I looked at a
21 few days ago, and I did do some searches, and I
22 wasn't able to -- because I wanted to provide -- I
23 should have provided a citation for that, and you
24 will have it by the next time we meet.

Page 287

1     Q.  In the materials reviewed list,
2  Attachment B, I don't see any reference to Detective
3  Wronkowski.
4        So do you think that you've been provided
5  some testimony from Detective Wronkowski that you
6  inadvertently omitted from the materials reviewed,
7  or you're just not even sure about that?
8     A.  I believe it was a deposition that I took
9  that information from.
10    Q.  Do you believe it was
11 Detective Wronkowski's deposition?
12    A.  I think it was.
13    Q.  Okay.  And do you know what a homicide
14 coordinator is as you sit here today?
15    A.  I don't know exactly what it means in
16 Chicago, no.
17    Q.  Okay.  And do you know, with respect to
18 Detective Wronkowski's statement or testimony,
19 whatever this is, that there should be 22 specific
20 parts of an ongoing and completed Chicago Police
21 Department homicide investigative book, what time
22 period he was referring to?
23    A.  I don't, and that's why I wish I would
24 have added the citation and looked at it more

Page 288

1  specifically.  But I do agree with him that there
2  should be a number of specifics in a homicide book,
3  and it's similar to what the LAPD does in what is
4  called their murder books.
5     Q.  I asked you this at the last deposition in
6  Sierra.
7        What is the American Judicature Society,
8  if you know?
9     A.  I don't.  And where do you see that?  I
10 don't recall.
11    Q.  It's Page 27 of your report.
12        Did you find it?
13    A.  You know, I don't see it.
14    Q.  At the top of Page 27 of your report.
15    A.  Oh, I'm sorry.  Yeah, I'll have to go back
16 and research that.  I don't -- as we sit here today,
17 I don't remember specifically.
18    Q.  How did you find that data that you cite
19 there from the American Judicature Society?
20    A.  Well, oftentimes, I read material, and
21 oftentimes I'll cut and paste something, but I
22 typically will reference it in my report.
23    Q.  And there's no citation here, right?
24    A.  I don't believe there is, but I don't know

Page 289

1  if there would have been if I referenced the
2  society, but I don't know that I can explain what it
3  is at this point.
4     Q.  So I'm just trying to figure out how to
5  confirm the stats that you have there, that
6  75 percent of the first 183 DNA exonerations
7  involved misidentifications.  That's what I'm trying
8  to figure out.
9        Can you help me out there?
10    A.  Again, I would have to go back and look at
11 that reference material and hopefully provide you
12 with a better explanation.
13    Q.  Okay.  At Page 28 of your report, you
14 reference Dr. Franklin and a fairness study that was
15 performed.
16        Do you see that?  It's the second bullet
17 point.
18    A.  I do.
19    Q.  What is a fairness study?
20    A.  Well, it was a study.  I mean, it was a
21 study that she did, and I think those were the words
22 that she used.  Those weren't necessarily my words.
23 And it involved eyewitness identification.
24    Q.  But you have no idea what that entails, a

THOMAS J. TIDERINGTON, 02/13/2023                    Page 290..293

Page 290

1  fairness study?  You're just referencing what she
2  wrote?
3      A.  I am, yes.
4      Q.  Okay.
5      A.  Anecdotally, I agree with her based on my
6  experience in working with eyewitnesses.
7          MS. BRADY:  And just a belated objection
8      to form.
9          THE WITNESS:  And I'm sorry.  And thank
10     you for letting me refresh my memory.  As it
11     relates to this case, I think if you looked at
12     the photographs of the lineup --
13  BY MS. ROSEN:
14     Q.  No, I have not asked you a question about
15  the lineups, so --
16     A.  Well, you asked me --
17     Q.  I asked you about the fairness study and
18  if you have an understanding of the fairness study.
19  So you're telling --
20     A.  No, all right.  That's fine.  If you don't
21  want me to answer, that's fine; I won't.
22     Q.  There's no question for you to answer.
23         All right.  If you could go to Page 45 of
24  your report.  Let me know when you're there.

Page 291

1      A.  Okay.
2      Q.  There's a paragraph, the last paragraph on
3  that page that begins "I also reviewed the
4  Seventh Circuit's later decision."
5          Do you see that?
6      A.  Yes.
7      Q.  And that's a -- that's in addition, right,
8  to this report?  That doesn't appear in either the
9  Sierra report or the Solache/Reyes report, correct?
10         MS. BRADY:  Just object to form.
11     If you can recall, you can answer.
12         THE WITNESS:  I think it was -- I think I
13     included it in the Sierra report, but I'd have
14     to go back and look.  I don't know for sure
15     though.
16  BY MS. ROSEN:
17     Q.  In any event, you recall I asked you
18  questions about that Seventh Circuit opinion in your
19  deposition in Solache/Reyes, correct?
20     A.  Yeah, well, I'm confused on whether it was
21  during Sierra or Reyes/Solache.
22         So yeah, I do remember.  I do remember
23  these questions, yes.
24     Q.  And that's why you added it to the report,

Page 292

1  right, because I questioned you about it at your
2  deposition, whether it was Solache/Reyes or Sierra?
3      A.  I think I --
4          MS. BRADY:  Objection to form.
5          THE WITNESS:  -- wanted to clarify -- I'm
6      sorry -- as a point of clarification I guess,
7      yes.
8  BY MS. ROSEN:
9      Q.  Okay.  And what's the point of adding in
10  the affidavit of Jeff Haas --
11         MS. BRADY:  Objection to form.
12  BY MS. ROSEN:
13     Q.  -- into this paragraph?  What's your --
14  what's your point of adding the information about
15  Jeff Haas?
16     A.  Well, that the -- that they determined
17  that the files had been -- I believe prepurged is
18  the words that he used in that, meaning purged
19  before they were turned over.
20     Q.  And what did you review other than
21  Mr. Haas' affidavit regarding his conclusion that
22  the files were prepurged?
23     A.  Well, I just -- this is what his statement
24  was.  I didn't review all those files, no.

Page 293

1      Q.  You didn't review anything else in
2  relation to that case, right, other than Mr. Haas'
3  affidavit, right?
4      A.  In relation to which case?
5          MS. BRADY:  Yeah.  Objection, form.
6  BY MS. ROSEN:
7      Q.  The case that the Seventh Circuit was
8  opining, giving an opinion about that you cite here,
9  the Palmer litigation.
10     A.  Right.  That wasn't a report that I
11  prepared.  That was a report prepared by
12  Mike Brasfield, and I did review that in Reyes and
13  Solache and in Sierra.
14     Q.  I'm sorry.  I'm confused.
15         Brasfield wrote a report about Palmer?  Is
16  that what you're saying?
17         MS. BRADY:  Objection, misstates the
18     testimony.
19         THE WITNESS:  I believe he did.  I'd have
20     to go back and look.
21  BY MS. ROSEN:
22     Q.  Okay.  Let's try it this way.  This
23  paragraph says --
24     A.  Hold on, hold on.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 294..297

Page 294

1    Q.  I'm at Page 45.
2    A.  Okay.  Wait one second.
3    Q.  The paragraph says "I also reviewed the
4  Seventh Circuit's later decision."
5       Do you see that?
6    A.  I did.
7    Q.  Okay.  When you say "the Seventh Circuit's
8  later decision," what are you referring to?
9    A.  The decision that was provided in that
10  report.
11   Q.  In which report?
12   A.  In the report in which -- I believe it was
13  Brasfield's expert report.  And, again, I'd have to
14  go back to look and confirm that.
15   Q.  Who provided you with the
16  Seventh Circuit's later decision that you referenced
17  here in your report?
18   A.  All the documents were provided by
19  plaintiff's counsel.
20   Q.  Okay.  And they also provided you with
21  Jeff Haas' affidavit, right, plaintiff's counsel?
22   A.  Yeah.  There's no other way I would have
23  gotten it.  Yes.
24   Q.  Okay.  And did you personally review the

Page 295

1  Seventh Circuit decision?
2    A.  I did.
3    Q.  What's the name of the case?
4    A.  As we sit here, I don't recall
5  specifically.
6    Q.  Who was Mr. Haas?
7    A.  He was, I believe, a public defender or a
8  defense attorney.
9    Q.  Okay.  All right let's go to Page 56 of
10  your report.
11   A.  I'm sorry, Page 56?
12   Q.  Correct.  All right.  And this is the
13  discussion of your analysis of the two different
14  datasets, right, the 1991 to 1995 dataset and the
15  1995 to 1998 dataset, right?
16   A.  That is correct.
17   Q.  Okay.  And it says at the top right under
18  the header, the heading under B, it says, "I
19  conducted a review of police files and criminal
20  defense files for the period from 1991 to 1995."
21       Do you see that?
22   A.  I do.
23   Q.  But you don't have the criminal defense
24  files from 1991 to 1995, correct?

Page 296

1    A.  Well, if you look at the last column where
2  I say it's N/A, and then if you look at the
3  footnote, those files were not provided.
4    Q.  Right.  We didn't get them, right?
5    A.  Right.
6    Q.  Okay.  So the line that says you conducted
7  a police -- review of police files and criminal
8  defense files for the period 1991 to 1995 is
9  inaccurate?
10      MS. BRADY:  Objection, form.
11      THE WITNESS:  I think it could have been
12   clearer.  I think the chart speaks for itself.
13   But yes, I agree where there could be some
14   confusion about that, yes.
15 BY MS. ROSEN:
16   Q.  Okay.  And then you did have some criminal
17  defense files from 1995 to 1998, right?  That was
18  part of the original Solache/Reyes dataset, right?
19   A.  That's correct.
20   Q.  And you know that there's also State's
21  Attorney's files available from the 1995 to 1998
22  dataset, right?
23   A.  I don't know if I was provided those.
24   Q.  That was not my question.

Page 297

1    A.  Well, do I know --
2    Q.  My question was, you know they're
3  available, right?  We discussed this at your
4  deposition in Solache/Reyes, that you learned as you
5  were getting ready for your deposition in
6  Solache/Reyes that, in fact, the parties had
7  obtained the State's Attorney files, some of the
8  State's Attorney files for the 1995 to 1998 dataset,
9  right?
10   A.  I remember that discussion, yes.
11   Q.  Okay.  So were you provided in connection
12  with your work in Iglesias the State's Attorney
13  files that were available to us for the 1995 to 1998
14  dataset?
15   A.  I don't believe I was, no.
16   Q.  Okay.  Did you ask for the State's
17  Attorney files for the 1995 to 1998 dataset?
18   A.  I'm trying to go back and decide or
19  determine whether or not I wrote this report before
20  my deposition or after the deposition I guess is the
21  first thing I'm trying to remember.
22       But no, I don't recall asking for those
23  files.
24   Q.  Well, I can tell you that your deposition

THOMAS J. TIDERINGTON, 02/13/2023                    Page 298..301

Page 298

1  in Solache/Reyes was October 5th and October 6th --
2     A.  Right.
3     Q.  -- of 2022.
4     A.  And I don't recall -- I don't recall
5  asking for those files, no.
6     Q.  Okay.  And why not?
7     A.  I guess at some point I think they may be
8  helpful, yes.  If they're provided, I'll review
9  them.
10    Q.  Okay.
11    A.  If you'd like to provide them to me, I'd
12  be happy to review them.
13    Q.  Well, I am not in a position to provide
14  you with anything or to pay you to do anything.
15  That's up to Mr. Iglesias' counsel.
16    A.  Okay.  Understood.
17    Q.  Okay.  Then in the chart, you say -- same
18  page, you indicate that for the 1991 to 1995 dataset
19  that you had available to you 475 files.
20       Do you see that?
21    A.  I do.
22    Q.  Okay.  And then if we go to Page 57, about
23  halfway through the page in the section about
24  handwritten notes, you note that only 424 of the 475

Page 299

1  investigative files contained handwritten notes.
2       Do you see that there?
3     A.  Yes.
4     Q.  Okay.  And then if you go to Page 59, at
5  the top of the page, you say you were provided 477
6  permanent retention files.
7       Do you see that at the top?
8     A.  I'm sorry, what page are you on,
9  Ms. Rosen?
10    Q.  The top of 59.
11    A.  Oh, 59.  I'm sorry.  It is kind of hard to
12  hear you.  I don't know if it's my mic or yours.
13       Okay.  I'm with you now.
14    Q.  Okay.  And at the top of 59, you say you
15  were provided 477 homicide investigations, but those
16  are permanent retention files, not investigative
17  files.
18       Is that the distinction there?
19    MS. BRADY:  Eileen --
20    THE WITNESS:  That's correct.
21    MS. BRADY:  -- can you repeat that?  I
22  didn't hear you.
23  BY MS. ROSEN:
24    Q.  At the top of Page 59, you write, "I was

Page 300

1  provided with permanent retention files for 477
2  homicide investigations."
3       So the distinction is between permanent
4  retention files and investigative files; is that
5  right?
6     A.  That's the distinction, yes.
7     Q.  Okay.  All right.  And then the same page,
8  59, in the middle of the page, you talk about
9  comparing and contrasting the permanent retention
10  files with the corresponding investigative files.
11       Do you see that?
12    A.  I do.
13    Q.  Okay.  And we've talked about this part of
14  your report in connection with your opinions in
15  Solache/Reyes and in your opinions in Sierra, right?
16    A.  Yes, ma'am.
17    Q.  Okay.  The question I have for you here
18  though is you reference RFC Iglesias 121416 and then
19  121420, 79168, 92370, 109932, 110061, 110043,
20  110062.
21       Do you see that?
22    A.  I do.
23    Q.  What are -- what are you referencing?
24    A.  Actually, I apologize.  It is a typo.  It

Page 301

1  should be RFC Sierra instead of Iglesias there, so I
2  do apologize for the confusion.
3     Q.  Okay.  So those are the same examples that
4  you provided in the Sierra report then, right?  You
5  could take my word for it.
6     A.  Yeah, I think they are, but there might be
7  a couple that are different.  If you're saying
8  they're exactly the same, I thought I added a couple
9  different ones, but these cases oftentimes run
10  together, yes.
11    Q.  Yeah.  I think the only distinction was
12  the reference to Iglesias.
13    A.  Okay.  I apologize for that mistake.
14    Q.  No worries.
15    A.  And let me know when it's a good time to
16  take a five-minute break, too, so I don't want to
17  interrupt you.
18    MS. ROSEN:  No, this is a good place.  We
19  can take a break.  We can take a break right
20  now.
21    THE WITNESS:  Okay.  Five minutes, is that
22  good for everybody?
23    MS. ROSEN:  Sure.
24    THE VIDEOGRAPHER:  We're off the video

THOMAS J. TIDERINGTON, 02/13/2023                    Page 302..305

Page 302

1    record at 4:11 p.m.
2         (Whereupon, a recess was taken
3         from 4:11 p.m. to 4:19 p.m.)
4         THE VIDEOGRAPHER:  We're back on the video
5    record at 4:19 p.m.
6    BY MS. ROSEN:
7         Q.  Okay.  Mr. Tiderington, if you could go to
8    Page 64 of your report.
9         A.  Okay.
10        Q.  Okay.  And then this is the portion of
11   your report where you provide examples from the
12   comparison made to the criminal defense files out of
13   the Solache/Reyes 1995 to 1998 dataset.
14        Do you see that?
15        A.  Yes.
16        Q.  And so the first example here is the one
17   with respect to Kim Mathis, correct?
18        A.  Correct.
19        Q.  And you use that example in the
20   Solache/Reyes report, correct?
21        A.  I did, and we talked about it in the
22   deposition, yes.
23        Q.  And then you also used that same example
24   in your report in Sierra, correct?

Page 303

1         A.  Yes.
2         Q.  Okay.  And in the Solache/Reyes
3    deposition, we talked about a particular record from
4    the criminal defense file that detailed the
5    Cook County public -- the Cook County public defense
6    attorney's memorialization of the work that he did.
7         Do you recall that?
8         A.  I don't know if I recall that
9    specifically, but I do know that we had a discussion
10   about that, yes.
11        Q.  Okay.  And in this report, you have made a
12   change, right, through the last line of the first
13   paragraph?  It says -- it currently says, "Mathis
14   denied to the CCPD that she kicked or stomped on her
15   son."
16        Do you see that?
17        A.  Yes.
18        Q.  And in the other report, it says Mathis
19   denied to the CCSAO that she kicked or stomped on
20   her son, right?
21        A.  I believe that was the difference, yes.
22        Q.  So why did you make that change?
23        A.  Well, I think -- to further clarify it, I
24   think we had that discussion, and I think you

Page 304

1    pointed out that during the depo, and I went back
2    and I looked and you were correct, I believe is the
3    reason I changed that.
4         Q.  Okay.  And in that same document where
5    Mathis denied to the Cook County public defender
6    that she kicked or stomped on her son, that same
7    Cook County public defender memorialized it an
8    interview with her sister, correct?
9         A.  There was, yes.
10        Q.  And her sister denied being a potential
11   witness, correct, to the attorney?
12        A.  Yeah, yes.
13        Q.  Okay.  So when you say that given that
14   Mathis refuted that she had stomped on her son's
15   abdomen and testified that she was forced into
16   giving her statement, it would have been critical
17   for the defense attorney to know all witnesses who
18   were in the house when the supposed beating
19   occurred, she knew that, right, because the sister
20   wasn't in the house?
21        MS. BRADY:  Eileen, can you repeat that
22   last question?
23        MS. ROSEN:  Can you read it back, please.
24        (Record read.)

Page 305

1    BY MS. ROSEN:
2         Q.  That is what you've written, right?
3         A.  That's correct.
4         Q.  Okay.  But we now know from the interviews
5    that were conducted by the Cook County public
6    defender that, in fact, the sister was not at the
7    house, right?
8         MS. BRADY:  Objection, form.
9         And if you want to review documents to
10        answer these questions, you can.
11        THE WITNESS:  Yeah.  And again, I know you
12        don't want to take the time to go through the
13        file, but the handwritten notes state that
14        Mathis' sister had been at the apartment when
15        the beating occurred.  But the clear closed
16        report says Mathis' sister was not at the
17        apartment during the beating.
18   BY MS. ROSEN:
19        Q.  And the sister said she was not -- the
20   sister told the attorney representing Ms. Mathis
21   that she was not at the house when the beating
22   occurred, so nothing was withheld?
23        MS. BRADY:  Objection, form.
24        THE WITNESS:  No, that wasn't -- that's

THOMAS J. TIDERINGTON, 02/13/2023                    Page 306..309

Page 306

1    not the conclusion I came to.  I was doing the
2    analysis between what was in the investigative
3    file and what was turned over.
4         So what was in the investigative file is
5    what I based my conclusion on.
6    BY MS. ROSEN:
7         Q.  Did you look at the CCSAO file for this
8    case?
9         A.  Did I have it.
10        Q.  Did you look at it?
11        A.  I don't think I had that material.
12        Q.  Okay.
13        A.  But, again, but you've identified part of
14   the problem.  The investigative file should contain
15   all of this relevant information.  Even if it was
16   from other agencies, there should have been some
17   supplemental report documenting that.
18        So as an investigator five years,
19   ten years, twenty years later, I shouldn't have to
20   go to multiple places and try to piecemeal this back
21   together the file should have all of this
22   information in it.
23        Q.  Well, the file did.  That's the point,
24   right?  The investigative file had all the

Page 307

1    information in it?  Isn't that your point?
2         MS. BRADY:  Objection, form.
3    BY MS. ROSEN:
4         Q.  The investigative file had a note --
5         A.  That was not --
6         Q.  -- that was not --
7         A.  -- turned over.
8         Q.  Well, that was not turned over, but you
9    don't know that, right?  All you know is that it
10   wasn't in the file that you reviewed?
11        A.  That's -- that's the analysis, yes.
12        Q.  Okay.
13        A.  And whether it was purged prior to that,
14   that's -- I have no way of knowing it.
15        Q.  Okay.  And you didn't look at the CCSAO
16   file either, correct?
17        A.  I did not have that file.
18        Q.  Okay.  And if that particular note were in
19   the CCSAO file, then there would be no issue
20   whatsoever, right?
21        MS. BRADY:  Objection, form.
22        THE WITNESS:  I guess I would agree with
23   you --
24

Page 308

1    BY MS. ROSEN:
2         Q.  Right.
3         A.  -- especially --
4         Q.  If the police turned over their file to
5    the prosecutor, then they fulfilled their Brady
6    obligation?
7         A.  That's -- that would be correct, yes.
8         Q.  Okay.  The next example that you use is
9    the case of Ardell Clemons, right?
10        A.  Yes.
11        Q.  And that's a case that you used in
12   Solache/Reyes, right?
13        A.  I did.  I did.
14        Q.  And it's also a case that you used in
15   Sierra, correct?
16        A.  Correct, Sierra, yes.
17        Q.  And did you refer the CCSAO file related
18   to Mr. Clemons' prosecution?
19        A.  I did not.
20        Q.  Okay.  And then the next example that you
21   used is the Oscar Soto case, right?
22        A.  That's correct.
23        Q.  And that's an example that you used in
24   Solache/Reyes, right?

Page 309

1         A.  Yes, ma'am.
2         Q.  And it's also an example that you used in
3    Sierra, right?
4         A.  That's correct.
5         Q.  And you've made changes to this portion of
6    your report, correct, from the report in Sierra?
7         A.  I did, yes.
8         Q.  Why did you make those changes?
9         A.  I think -- during our deposition, I think
10   you pointed out some areas that needed
11   clarification, and I think you were correct, and I
12   went back and clarified it.
13        Q.  Okay.  And did you look at the CCSAO file
14   from Mr. Soto's case?
15        A.  I did not.
16        Q.  Okay.  And then the next example that you
17   used is Guy Rainey's case, right?
18        A.  Correct.
19        Q.  Also an example that you used in
20   Solache/Reyes, right?
21        A.  Yes --
22        Q.  And also --
23        A.  -- I believe.
24        Q.  -- an example that you used in Sierra,

THOMAS J. TIDERINGTON, 02/13/2023                    Page 310..313

Page 310

1  right?

2      A.  Correct.

3      Q.  Did you go back and look at the CCSAO

4  file?

5      A.  I did not.

6      Q.  Okay.  And then the final example is

7  Demetrius Johnson, and that's an example that you

8  used in both Solache/Reyes and Sierra, right?

9      A.  Correct.

10      Q.  And in that case, we know that both the

11  criminal defense attorney file and the CCSAO file

12  are missing, right?

13      A.  That is correct.

14      Q.  Okay.  And so in the Iglesias case, you've

15  added no additional examples in that portion of your

16  report than you had in either Solache/Reyes or

17  Sierra, correct?

18      A.  That is correct.

19      Q.  Okay.  So is it safe to conclude that

20  those were the best examples that you could find?

21      MS. BRADY:  Objection, form.

22      THE WITNESS:  I don't know if they were

23  the best.  I think there's other examples.

24  There are certainly other examples.  And as I

Page 311

1  said, at some point, I'm going to take a deeper

2  dive into those files, but I don't know if

3  those were the best examples.

4  BY MS. ROSEN:

5      Q.  Well, you have -- sorry.  Go ahead.

6      A.  Again, you asked whether they're the best

7  examples.  I don't know if I quantified how good

8  they were or how bad they are as examples.

9      Q.  And why did you choose those cases as

10  examples?

11      A.  Well, I think they're reflective of my

12  opinion.

13      Q.  And you've had the 1995 to 1998 dataset

14  for well over a year now, right?

15      A.  That's correct, yes.

16      Q.  Right.  Because you were provided those in

17  connection with Solache/Reyes?

18      A.  That's correct.

19      Q.  And certainly if you would have found

20  better examples throughout the work you've been

21  doing over the last year, you would have added them?

22      A.  I don't know if that's accurate, but if

23  you're asking me can I go back through the files and

24  find additional examples, I think I can, and I guess

Page 312

1  I'd let you make the determination of whether or not

2  they're better than the other ones.  I don't know

3  how I'd make that determination.

4      Q.  Well, it's your report, and you're the one

5  trying to provide examples to support your opinion,

6  so -- and you've written three reports now, and

7  while you've cut some examples from the first

8  report, you've not added any examples, correct?

9      A.  That -- that's correct.

10      Q.  Okay.  I'm going to ask you to take a look

11  at Page 71 of your report.

12      Here you've added some comment about the

13  Sierra case, right?

14      A.  Correct.

15      Q.  So just a summary of Sierra, right?  It's

16  obviously not the full-blown report.

17      A.  That's correct.

18      Q.  You say that in Sierra the primary

19  incriminating evidence was two dubious eyewitness

20  identifications despite extremely challenging

21  viewing circumstances.

22      Do you see that there?  The middle of the

23  first paragraph under the heading Sierra.

24      A.  Yes.

Page 313

1      Q.  And then who are the two dubious

2  eyewitness identifications you're referring to right

3  there?

4      A.  Well, again, I think I'm comparing this

5  case to the Sierra case, and I'm using that word

6  again, "dubious," in both instances.  I'd have to go

7  book and look at the Sierra and refresh my memory on

8  that.  I don't know -- and I know we spent hours

9  talking about Sierra, but I'd have to go back and

10  refresh my memory on that.

11      Q.  Okay.  So as you sit here today, you don't

12  know who specifically you're referring to as the two

13  dubious eyewitness identifications?

14      A.  In the Sierra case?

15      Q.  Correct.

16      A.  Yeah, like I said, I'd like to refresh my

17  memory before I answer that.

18      Q.  And --

19      A.  Certainly in the Iglesias case, I think I

20  testified about the two dubious witnesses.  And so

21  that -- I just want to make sure that's clear.

22      Q.  Yeah, I wasn't asking about this case.  I

23  was asking about Sierra, so -- and it's fine if you

24  don't recall who the eyewitnesses were.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 314..317

Page 314

1    And then the next slide, it says, "And in
2  both cases, Guevara and his colleague made
3  statements from witnesses claiming to have knowledge
4  of incriminating evidence against the police
5  suspect," and then you say Hector Montanez and
6  Francisco Vicente.
7        Do you see that?
8    A.  No.  I'm sorry.  Where are you exactly?
9    Q.  Same paragraph, the next line.
10   A.  Oh, I'm sorry.  I didn't even read it.
11       Okay.
12   Q.  So I'm confused.  Hector Montanez, who is
13 that?
14   A.  He's in another case, and that may have
15 been a typo on my part.
16   Q.  And Vicente, is Vicente involved in the
17 Sierra case?
18   A.  He's not, but I think -- and again, I can
19 see where the confusion is.  I was trying to compare
20 this case, the Sierra case, with the events that
21 occurred in Iglesias, if you look at the last
22 sentence there, and I certainly should clean up the
23 language here to make it less confusing.
24   Q.  Okay.  All right.  Now if we go to the

Page 315

1  next page, the middle of the page, now you're
2  talking about crucial documents in the Roman
3  homicide investigation that were not turned over,
4  right?  That's the --
5    A.  Yeah, I'm sorry.  What paragraph are you
6  looking at so I can review?
7    Q.  Well, Page 72 of your report.
8    A.  Right.
9    Q.  At this point in your report, it's my
10 understanding that you are now discussing what you
11 have termed crucial documents from the Roman
12 homicide investigation that were not turned over; is
13 that right?
14   A.  That is correct.
15   Q.  Okay.  And you've identified the documents
16 in the third paragraph, correct, RFC Iglesias 1
17 through 8, 17 to 18?
18   A.  That's correct.
19   Q.  Okay.  So those are the documents that you
20 were concluding were not turned over, correct?
21   A.  Based on my review, yes.
22   Q.  Okay.  And what is the basis of your
23 conclusion that they were not turned over?
24   A.  They were not contained in the

Page 316

1  prosecutor's file.
2    Q.  Okay.  So it's simply based on your
3  comparison of the investigative file to the CCSAO
4  file, correct?
5    A.  That is correct, yes.
6    Q.  You're not relying on any testimony where
7  anybody is claiming that those documents were not
8  turned over, right?
9    A.  I think that's accurate, yes.
10   Q.  And as you indicated earlier, we don't
11 know if the file as it exists today is actually
12 complete, right?
13   A.  That's correct.
14       MS. ROSEN:  Okay.  And, Josh, if I could
15   ask you to screen share the investigative file,
16   which I think you marked as Exhibit 5.
17       MR. ENGQUIST:  Give me a second.
18       MS. ROSEN:  Thank you.
19 BY MS. ROSEN:
20   Q.  Okay.  So you can see that there, right?
21   A.  I can.
22   Q.  Okay.  So RFC Iglesias 1 is the
23 investigative file inventory.
24       So that document was one that you did not

Page 317

1  find in your review of the CCSAO file, correct?
2    A.  That's correct --
3    Q.  Sorry, Josh.  Will you make it just screen
4  size so we can see the bottom, the Bates number?
5        Right.
6    A.  Yeah, the inventory sheet, yes.
7    Q.  Okay.  So you did not find a copy of the
8  inventory sheet in your review of the CCSAO file,
9  right?
10   A.  That's correct.
11   Q.  Okay.  And then the next page, which would
12 be RFC Iglesias 2, this is a subpoena, right?
13   A.  Yes.
14       MS. ROSEN:  Josh, could you scroll down a
15   little bit so we can see who issued the
16   subpoena.
17 BY MS. ROSEN:
18   Q.  Okay.  So that was a subpoena that was
19 issued by John DeLeon.
20       Do you see that?
21   A.  I do.
22   Q.  Do you know who Mr. DeLeon is?
23   A.  I don't, no, not as we sit here today.
24   Q.  Did you review his deposition, by any

THOMAS J. TIDERINGTON, 02/13/2023                    Page 318..321

Page 318

1  chance?

2      A.  I don't know if I did or not.  I don't --

3  I don't recall if I did.

4      Q.  Okay.  And it says right here on the

5  document attorney for defendant, right?

6      A.  I see that now, yes.

7      Q.  Okay.  So quite obviously, this is a

8  subpoena for records from the Chicago Police

9  Department, which is why it's in the Chicago Police

10  Department file, right?

11      A.  That makes sense, yes.

12      Q.  Okay.  And it was issued by the criminal

13  defense attorney, right?

14      A.  Yes, apparently.

15      Q.  So he obviously knew about it because he

16  issued it, right?

17      A.  That's correct.

18      Q.  Okay.  And do you have any understanding

19  about whether or not a criminal defense attorney

20  would be required to provide notice to the

21  Cook County State's Attorney of any subpoenas they

22  issued such that they should receive a copy of the

23  subpoena?

24      A.  I don't know that.

Page 319

1      Q.  Would it surprise you if I represented to

2  you that, in fact, in a criminal prosecution, a

3  criminal defense attorney has an obligation to

4  provide notice to the State's Attorney, and the

5  State's Attorney has an obligation to provide notice

6  to the defense attorney if they issue subpoenas?

7      A.  I think that's a great practice.

8      Q.  Okay.  So the fact that a copy of this

9  subpoena is not contained in the CCSAO file, does

10  that give you any concern about whether or not, in

11  fact, the file that we have today is complete?

12      MS. BRADY:  Objection.

13      THE WITNESS:  The file, which --

14      MS. BRADY:  Yeah, objection, form.

15  BY MS. ROSEN:

16      Q.  The CCSAO file.

17      A.  I'm sorry?

18      Q.  The CCSAO file, the Cook County State's

19  Attorney file that you did not find this document

20  in.

21      A.  Right, and that's -- the comparison is

22  what was in the police files compared to what was in

23  the prosecutor's file.

24      Q.  Right.  But the criminal defense attorney

Page 320

1  had an obligation to provide notice to the

2  prosecutor, so there really should be a copy of this

3  subpoena in their file, right?

4      MS. BRADY:  Objection, form, and I believe

5      assumes facts not in evidence.

6      THE WITNESS:  If that's what you're

7      representing to me, you're certainly not going

8      to get an argument from me.  I am not a lawyer.

9      I don't know what is protocol in the State

10      Attorney's Office or in the defense files.

11  BY MS. ROSEN:

12      Q.  If, in fact, I'm correct that a criminal

13  defense attorney would have an obligation to provide

14  notice to the Cook County State's Attorney, is it

15  the fact that a copy of this subpoena isn't found in

16  a CCSAO as it exists today evidence of the fact that

17  we don't have a complete file?

18      MS. BRADY:  Objection, form, calls for

19      speculation and perhaps a legal conclusion.

20      THE WITNESS:  Yeah, I guess we'd have to

21      define what a complete file is.  What I -- what

22      I'm -- again, the comparison that I did is I

23      looked at what was in the investigative files

24      and what was in the prosecutor's file and

Page 321

1  determine what was missing from those files.

2      If there's a logical explanation for

3  what's not in there, for things not being in

4  there, I certainly won't take exception to

5  that.

6  BY MS. ROSEN:

7      Q.  Okay.  Let's go to the next page.

8      Here's another subpoena.  Let's go down.

9      This -- actually can you scroll back up

10  again for a second, Josh?

11      So this is a subpoena to command

12  Detective Guevara to appear, correct?

13      A.  That's what it appears to be, yes, ma'am.

14      Q.  Okay.  And then this subpoena was issued

15  by the -- by an Assistant State's Attorney

16  Thomas Bilyk.

17      Do you see that?

18      A.  I do.

19      Q.  And so theoretically Mr. Bilyk would have

20  a copy of the subpoena in his own file, right?

21      MS. BRADY:  Objection, form.

22      THE WITNESS:  I wouldn't know that.

23  BY MS. ROSEN:

24      Q.  Well, is it your opinion -- actually 27.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 322..325

Page 322

1        Okay.  Josh, can you scroll up to the
2   caption so we can see the case number.
3        So do you see here it says People of the
4   State of Illinois versus Rudy Martinez?
5   A.  I do.
6   Q.  And then the CR number for this file is
7   92CR-21339?  Do you see that?
8   A.  Yes.
9   Q.  Which is not Mr. Iglesias' case, right?
10  A.  That's correct.
11  Q.  So isn't it possible -- doesn't it make
12  more sense that, in fact, this subpoena was simply
13  misfiled in the investigative file?
14  A.  That's, you know, a logical explanation,
15  yes.
16  Q.  Okay.  Let's go to the next page.
17       Here's another subpoena in Mr. Iglesias'
18  case commanding Detective Halvorsen to appear in
19  court, right?
20  A.  That's what it appears to be, yes.
21  Q.  Okay.  If we could scroll down a bit,
22  Josh.
23       And this subpoena was issued by Assistant
24  State's Attorney David Studenroth, right?

Page 323

1   A.  That's correct.
2   Q.  And he was one of the prosecutors in this
3   case, right?
4   A.  That's correct.
5   Q.  And so he is the one that prepared this
6   subpoena for Detective Halvorsen to appear?
7   A.  That's what it appears to be, yes.
8   Q.  Okay.  And isn't this more evidence that
9   the prosecutor's file that we have today is
10  incomplete?
11  A.  That it's incomplete?
12  Q.  Yes.  Because why wouldn't the prosecutor
13  have a copy of his own subpoena in his own file?
14  A.  Again, I think you're asking me to draw a
15  conclusion that I don't know that I have the area of
16  expertise to offer an opinion on.
17       MS. BRADY:  Yeah, objection to foundation.
18  BY MS. ROSEN:
19  Q.  What is the foundation for your opinion
20  that the police department failed to turn over this
21  subpoena to the person that issued it?
22       MS. BRADY:  Hang on one second.
23       Yeah, I believe that misstates the report.
24       MS. ROSEN:  I don't know what you're

Page 324

1   talking about, but okay.
2   BY MS. ROSEN:
3   Q.  What is the basis for your --
4        MS. BRADY:  Eileen, are you asking me to
5   clarify my objection?  Because I will.
6        MS. ROSEN:  No.  I'll ask the question
7   again.
8   BY MS. ROSEN:
9   Q.  What is your basis for concluding that the
10  Chicago Police Department failed to turn over a
11  subpoena to the prosecutor that the prosecutor
12  issued?
13  A.  Okay.  You have an investigative file, and
14  most investigative files that I'm familiar with, all
15  of the information relevant to a case is contained
16  in some of the files that are reviewed.  These
17  subpoenas are typically regularly contained in those
18  files.
19       I simply provided an analysis of what was
20  in this file compared to what was in the
21  prosecutor's file.  And if there's a logical reason
22  why it's not in there, I won't argue with you, or I
23  would concede the fact that there may be logical
24  reasons for certain things not to be in this file.

Page 325

1   Q.  But the heading of the portion of your
2   report that discusses these materials is -- says the
3   failure to turn over crucial documents in the Roman
4   homicide investigation.
5        So you are drawing the conclusion that
6   these documents were not turned over and that they
7   were crucial documents, right?
8        MS. BRADY:  Objection, I believe that
9   misstates the report.
10       THE WITNESS:  I don't think a subpoena was
11  a crucial document.  I would say that it
12  illustrates a violation of Chicago Police
13  Department policies for creating a file and
14  then turning all of the relevant information
15  over to the prosecutor.  And if there's certain
16  things that are not contained in the file or
17  that are in the file that are not in the
18  prosecutor's file, I think it illustrates not
19  only the problem that I identified but the
20  problem that was confirmed by the OIG and other
21  judges and other individuals throughout the
22  '80s and '90s, and the problem still exists
23  today.
24

THOMAS J. TIDERINGTON, 02/13/2023                     Page 326..329

Page 326

BY MS. ROSEN:

2    Q.  Okay.  Let's go to the next page.

3        Okay.  Here these are some notes, right,

4  that you claim are not in the CCSAO file, right?

5    A.  I don't believe they are.  That's correct.

6    Q.  All right.  And let's go to the next page.

7        Do you know what this document is?

8    A.  I think it's some sort of criminal

9  history.

10   Q.  What's the date of this document?

11   A.  It looks like December 12th, I'm assuming

12 1993 perhaps, '4.  I can't -- I'm sorry.  It's

13 blocked here.

14   Q.  Because of the screen?

15   A.  '94.

16   Q.  Yeah, okay.  All right.  So this was

17 something that was run, it looks like, based on the

18 date of the report, December 12th, 1994, right?

19   A.  Yes.

20   Q.  Okay.  Let's go to the next page, which is

21 another document you say was not found in the

22 prosecutor file on your review, right, the numbers?

23   A.  I'm sorry.  Who wrote that?

24   Q.  I don't know.  I'm just saying these are

Page 327

1  some numbers written on a piece of paper that you

2  say are not in the CCSAO file, correct?

3    A.  That's correct.

4        MS. BRADY:  Can you zoom out just so we

5    can see the Bates number?

6        MS. ROSEN:  It's 7.

7        THE WITNESS:  Yes, that's correct.

8        MS. ROSEN:  We're just scrolling along,

9    Rachel.

10 BY MS. ROSEN:

11   Q.  Now we're going to go to 8, which is the

12 next document in your list that you say is not in

13 the file.  So this is a subpoena that was issued in

14 Mr. Iglesias' case.  And if you look at the bottom,

15 it says it was issued August 2nd, 1993.

16       Do you see that there?

17   A.  I do.

18   Q.  And it is a request for documents, right,

19 from the Chicago Police Department; is that correct?

20   A.  That appears to be, yes.

21   Q.  Okay.  And it predates the subpoena that

22 we looked at earlier for Mr. Halvorsen to appear.

23       Do you recall that?

24   A.  I do.

Page 328

1    Q.  And so do you have an understanding of how

2  subpoenas that are issued by either the Cook County

3  State's Attorney or the criminal defense attorney in

4  a criminal prosecution, when it gets tendered to the

5  Chicago Police Department, how much time the Chicago

6  Police Department has to respond to the subpoena?

7    A.  I don't know that.

8    Q.  And do you know what happens if additional

9  materials are added to the file after the subpoena

10 is complied with?  Do you know what the Chicago

11 Police Department's obligations, if any, are under

12 that scenario?

13   A.  I don't.

14   Q.  Okay.  Let's go now, Josh, to Page -- by

15 the way, this is also a subpoena that was issued by

16 the State's Attorney, so a subpoena issued by the

17 State's Attorney that you did not find in the

18 State's Attorney's file.  This is another example of

19 that phenomenon, right?

20   A.  That's correct.

21   Q.  Let's go to Page 17, which is the next on

22 your list.

23       Okay.  Do you know what this document is?

24   A.  It appears to be the -- for the Polaroid

Page 329

1  photographs that were used in the photo array, is

2  what I believe it was.

3        MS. BRADY:  And can you please zoom out so

4    we can see the entire page?

5        MS. ROSEN:  Josh, can you zoom out so they

6    can see the entire page?  Thank you.

7        MS. BRADY:  Thank you.

8  BY MS. ROSEN:

9    Q.  But do you know exactly what this document

10 is?

11   A.  I don't.  No, I don't.  I can make out 8

12 Polaroid, and I believe it says photos, so that's

13 why I believed it was related to the photo array.

14   Q.  But you have no idea what the purpose of

15 this document is?

16   A.  No.  There was nothing, no supplemental

17 reports or GPRs that indicated the significance of

18 this.

19   Q.  And why do you think there needs to be a

20 GPR or a supplementary report to indicate the

21 significance of clearly a form Chicago Police

22 Department report?

23       MS. BRADY:  Objection, form.

24       THE WITNESS:  Well, it appears to be some

THOMAS J. TIDERINGTON, 02/13/2023      Page 330..333

Page 330

1     type of evidence form. And if you place
2     something in evidence, you typically would do a
3     supplemental report indicating what you place
4     into evidence and what the evidence inventory
5     number is, and that would be typically found in
6     the investigative reports.
7     BY MS. ROSEN:
8     **Q. So do you see at the top on the right here**
9     **it says Inventory Number 1178456?**
10     A. I do.
11     **Q. Did you look through the supplementary**
12     **reports to determine whether or not there was a**
13     **reference to Inventory Number 1178456?**
14     A. I think the comparison that I did was what
15     was in the file compared to what was in the
16     prosecutor's file. And did I do the exercise that
17     you described? I don't think I did in this case.
18     **Q. Okay. Let's go to the next page and also**
19     **have you look there. That's 18.**
20     **Do you know what that document is?**
21     A. It's blank, so it appears to be a search
22     warrant. And as I've offered the opinion on many
23     situations or many cases, they never used this that
24     I've seen.

Page 331

1     **Q. So you believe this is a search warrant?**
2     A. A search warrant inventory. So this is
3     what -- again, it's missing from most of the files,
4     but this would be a document that would document
5     what was found at the location that was searched.
6     **Q. And how do you know that?**
7     A. Well, that's what it appears to be based
8     on -- I've done hundreds of search warrants in my
9     career, and this is a document that appears to be
10     similar to a search warrant inventory. And I could
11     be wrong, and if you can provide information that
12     indicates that I am incorrect, I would -- I'll
13     clarify exactly what it is.
14     **Q. Okay. Let's go to the next document in**
15     **your list.**
16     A. I'm sorry. Here at the bottom -- let me
17     more fully answer your question.
18     In executing said warrant, I seized the
19     things listed on the reverse side of this sheet from
20     the person on premise described above. So it is, in
21     fact, a search warrant returning inventory, as it's
22     commonly known in police departments.
23     **Q. Have you ever seen an original form**
24     **inventory set from the Chicago Police Department**

Page 332

1     **which would be this page, the Page 17 and 18 that**
2     **we're looking at? Do you have an understanding of**
3     **how those documents looked in their original format**
4     **from the Chicago Police Department?**
5     A. I don't know if I do or not. Without you
6     showing them to me, I can't say if I know the
7     difference.
8     **Q. Okay. Let's go to 26. It will be the**
9     **next document.**
10     **Okay. So this is an arrest report for**
11     **Mr. Iglesias for an arrest in January of 1993.**
12     **Do you see that?**
13     A. I do.
14     **Q. Okay. And this is another document that**
15     **you say you didn't find in the CCSAO file, right?**
16     A. That's correct.
17     **Q. Okay. Let's go to the next page, 27.**
18     **This is another page that you have not seen in the**
19     **CCSAO file.**
20     **Do you have any understanding of whether**
21     **that is something that's related to Page 26 that we**
22     **just looked at?**
23     MS. BRADY: Josh, can you zoom out,
24     please, so we can see the whole page? Thank

Page 333

1     you.
2     THE WITNESS: I don't know what that is.
3     BY MS. ROSEN:
4     **Q. Okay. Let's go to Page 32, which is next**
5     **in your list.**
6     **That's another inventory, right?**
7     A. That is. It appears to be, yes.
8     **Q. And the inventory number for this**
9     **particular inventory is 1093794, right?**
10     A. That's correct.
11     **Q. And did you look through any of the supp.**
12     **reports to see if that particular inventory number**
13     **was referenced in the supp. report?**
14     A. You know, I have the reports right here.
15     As we sit here, I don't recall if it was. I could
16     easily double-check for you, but I don't have
17     independent recollection if it was or not. It
18     should be. I don't know if it is.
19     **Q. And then it looks like for the inventory**
20     **for this field bullet envelopes, right?**
21     A. That's what it appears to be, yes.
22     **Q. And did you notice in your review of the**
23     **CCSAO file any work that was done by the State's**
24     **Attorney's Office or any discovery between the State**

THOMAS J. TIDERINGTON, 02/13/2023                    Page 334..337

Page 334

1  and the criminal prosecutor about these particular
2  pieces of evidence?
3      A. I don't recall any as we sit here today.
4      Q. Okay. And then the next page on your list
5  is 33.
6          This is a blank inventory of things seized
7  in a search without a search warrant at the top and
8  then at the bottom a search warrant inventory,
9  right?
10     A. It's a form. I don't believe there was
11  any search warrants related to this investigation.
12     Q. Correct. And it's the same form that we
13  looked at earlier, right?
14     A. It appears to be, yes.
15     Q. And you have no idea, as we previously
16  discussed, whether or not that's just part of the
17  form set of the inventory sheet that we just looked
18  at, right?
19     A. Oh, I don't know that, and it's -- again,
20  it's possible because we know there was no search
21  warrants done, so that is possible and maybe that's
22  a logical explanation, not a logical explanation for
23  not doing a search warrant but a logical explanation
24  of why this form is in here in a blank format.

Page 335

1      Q. Okay. And the next page is 34.
2          Another inventory that we were just
3  looking at, right? It's 1093794, the same one we
4  just looked at?
5      A. Correct.
6      Q. And then the next one that is in your list
7  is another inventory. It's 1093793 with Bates stamp
8  35, right?
9      A. That's correct.
10     Q. And that's sealed vial of blood, right?
11     A. That's correct.
12     Q. Did you see any information in the
13  Cook County State's Attorney file about any forensic
14  work that was being done or discovery being done
15  about the blood evidence in this case?
16     A. I believe there is some information about
17  that, yes.
18     Q. Okay. So people clearly were aware of the
19  fact that blood was inventoried, right?
20         MS. BRADY: Objection, foundation.
21         THE WITNESS: Not -- based on the
22     transmission of this document apparently, but
23     perhaps there was another way I would suggest.
24

Page 336

1  BY MS. ROSEN:
2      Q. Because you're concluding that this
3  document was not turned over, right?
4      A. Oh, yes, that's the conclusion.
5      Q. Right. So -- and the only way, the only
6  basis for that conclusion is simply comparing one
7  file to another and looking at the pieces of paper,
8  right?
9      A. With these, with the documents you've
10  shown so far, yes.
11     Q. Okay. Let's go to 36.
12         That's, again, the same form, the blank
13  form we've seen now for the third time, right?
14     A. That's correct.
15     Q. Let me ask you this: Did you look through
16  the trial transcripts about any of these documents
17  to see whether or not they were discussed in court
18  at all?
19     A. I don't recall seeing that in the trial
20  transcripts. It may be there, but I don't recall as
21  we sit here tonight.
22     Q. Okay. Let's look at the next page, 37, on
23  your list.
24         That's another inventory that we looked

Page 337

1  at, right? It's the vial of blood again?
2      A. It is.
3      Q. Okay. Can we scroll up for a second
4  again, Josh -- sorry -- to 35.
5          Do you see at the bottom it says in red
6  "Copy 3 - Court Copy - Attach to Court Papers"? Do
7  you see that?
8      A. I do.
9      Q. Did you look at the court file to see if
10  these inventories were in the court file for this
11  case?
12     A. No, I did not compare it to the court
13  files.
14     Q. Okay. Let's look at the next one on your
15  list, 44.
16         It's more inventories, right? This one is
17  for Inventory Number 1135801. This is for fired
18  bullet, right?
19     A. Yes.
20     Q. And again, it notes "Copy 3- Court Only -
21  Attach to Court Papers."
22         Do you see that there?
23     A. Yes.
24     Q. And then the next page, 45, is again that

THOMAS J. TIDERINGTON, 02/13/2023                    Page 338..341

Page 338

1  same form, now for the fourth time, a blank form.
2      A.  I see that.
3      Q.  Now, 46, if we can go to that one, the
4  next on your list, that's a duplicate of the one we
5  just saw, and it says, "Copy 4, Give or Send to
6  Finder, Arrestee, or Owner."
7      Do you see that?
8      A.  Yes.
9      Q.  And then the next on your list is 76,
10  Josh, if we can go there.
11      What is your understanding of what this
12  document is?  This is another document that you
13  indicate is not in the prosecutor's file.
14      A.  It appears to be a vehicle registration
15  where the officer may have ran either the VIN or the
16  license plate number of the vehicle.
17      Q.  And do you know whose vehicle this is,
18  what vehicle?
19      A.  I believe -- I believe it's the -- I'm
20  just looking for the ownership of the vehicle.  I
21  believe it was owned by Toleran or the father of one
22  of the occupants of the vehicle.
23      '82 Olds, right.  I believe it was the
24  vehicle that the victim was riding in is what I

Page 339

1  believe it is.
2      Q.  Okay.  And this was crucial information
3  that was not turned over to the prosecution, right?
4      A.  I'm sorry, you said it was crucial?
5      Q.  Yeah.  This is under the heading Crucial
6  Documents Not Turned Over.
7      A.  Well, certainly it's relevant to the case.
8      Q.  That was not my question.
9      A.  I would say the ownership of the vehicle
10  in which somebody was shot and killed is crucial,
11  yes.
12      MS. BRADY:  I will also object that I
13  think that that misstates the report and that
14  if you read the paragraph following the one --
15      (Simultaneous speaking.)
16      MS. ROSEN:  No speaking objections,
17  Rachel.  Thanks.
18  BY MS. ROSEN:
19      Q.  Let's go to Page 77.
20      MS. BRADY:  Eileen, please don't interrupt
21  me.  I have an obligation to correct the record
22  if I think that you're not providing the
23  witness with full information.
24      MS. ROSEN:  This is his report that he

Page 340

1  wrote.
2      MS. BRADY:  Yes, and you are mis --
3      MS. ROSEN:  He should know whether or not
4  I'm misstating it.  He can correct me.  If he
5  needs you to help him to tell me if I am
6  misstating his report, then I guess you guys
7  have a problem.  But he doesn't need your help.
8  It's his report.
9      MS. BRADY:  You also have an obligation
10  not to misstate the evidence, right.  So I'm
11  affording him an opportunity to take a look at
12  the report and ask -- and I'm asking you not to
13  misstate it.
14      MS. ROSEN:  Okay.
15  BY MS. ROSEN:
16      Q.  Page 77 is, I think, the next page.
17      This is a note, right, that you didn't
18  find in the prosecutor's file, right?
19      A.  That's correct.
20      Q.  Okay.  And then the last one is 83, which
21  is a Court Attendance Report for looks like Guevara
22  for court on looks like June 30th, 1993.
23      Do you see that there?
24      A.  I do.

Page 341

1      Q.  And that's a document that you didn't find
2  in the Cook County State's Attorney's file, correct?
3      A.  That's correct.
4      Q.  Have you ever seen a Court Attendance
5  Report in any Cook County State's Attorney file?
6      A.  I think I have.
7      Q.  Are you sure?
8      A.  I believe I have, but -- and if you look
9  at what I wrote in the next paragraph, some of these
10  documents that you've shown me, I'm not suggesting
11  they're all investigative in nature.  Some are
12  administrative in nature.  And I use that as an
13  example.
14      The court attendance sheet and subpoenas,
15  I believe, are administrative, and -- but if the
16  process was that they were going to duplicate the
17  entire investigative file and send it to the
18  prosecutor, these were notably what was missing from
19  those files.
20      Q.  Let's go back to your -- take a look at
21  your report at Page 72.
22      So the heading of Page 72 reads, and it's
23  bolded, right, "The failure to turn over crucial
24  documents in the Roman homicide investigation was a

THOMAS J. TIDERINGTON, 02/13/2023                    Page 342..345

Page 342

1  direct result of the failed policies and practices
2  discussed above."
3       Do you see that?
4   A.  I do.
5   Q.  Okay.  So I'm not misstating that that's
6  what at the top of this page, right?
7   A.  I'm sorry.  I didn't hear that.
8   Q.  I'm not misstating that that's at the top
9  of -- what's written at the top of this page, right?
10  A.  No, you're not misstating that at all.
11  Q.  Okay.  If we go back, if we go to Page 60
12  of your report.
13  A.  Go back to Page 60?
14  Q.  Yes, please.
15  A.  Okay.
16  Q.  Under -- it's the first paragraph under
17  the bolded heading about criminal defense files
18  show.
19       Are you with me?
20  A.  I am.
21  Q.  Okay.  And you wrote, "Under generally
22  accepted police practices, CPD's policy and practice
23  must be to require and ensure that prosecutors and
24  criminal defendants get everything from the police

Page 343

1  investigation, including all documents and
2  information about the crime that was learned during
3  the investigation," correct?
4   A.  That's what it says, yes.
5   Q.  And that's what you wrote, right?
6   A.  That's what I wrote, yes.
7   Q.  And so it's your opinion that under
8  generally accepted police practices, law enforcement
9  must ensure that prosecutors and criminal defendants
10  get everything from a police investigation; is that
11  correct?
12  A.  That is correct.
13  Q.  And you have strived to do that in all
14  investigations that you've been involved in during
15  the course of your career; is that correct?
16  A.  That's -- that's a fair statement.
17  Q.  Okay.  When -- going back to your work
18  that's memorialized in the book Snatched that
19  Mr. Engquist was asking you some questions about
20  earlier, can you tell me who Sandi Neil is or was?
21       MS. BRADY:  Objection to form.
22       THE WITNESS:  What page?
23       MS. BRADY:  Yeah, objection to form.
24       THE WITNESS:  What page are we talking

Page 344

1   about now?
2  BY MS. ROSEN:
3   Q.  She's all over the book.  Do you know who
4  Sandi Neal is --
5   A.  Yes.
6   Q.  -- this person?
7   A.  I do.
8   Q.  Okay.  And who is Sandi Neal or was
9  Sandi Neal in connection with the investigation that
10  involved this confidential informant that eventually
11  got kidnapped and eventually sued the DOJ?
12  A.  She was an analyst for the DOA at DOJ/DEA.
13  She was an employee of DEA.
14  Q.  And what was her role in connection with
15  this investigation that involved the informant that
16  ultimately got kidnapped?
17  A.  She was our crime analyst assigned to the
18  group that I was in charge of.
19  Q.  How long did this investigation involving
20  this individual that eventually got kidnapped go?
21  How many years did it span?
22  A.  Approximately five years.
23  Q.  And how many prosecutions were involved
24  from the work that you did with this particular

Page 345

1  confidential informant over the course of the
2  five years?
3   A.  Many prosecutions.
4   Q.  How many successful prosecutions?
5   A.  Well, and, again, we're going to have to
6  take some time and discuss what you mean by
7  "prosecutions" and what the investigation was
8  involved in or what our investigative strategy was.
9       If you would like me to explain it, it's
10  going to -- I can't answer in just a couple words,
11  and I would be misleading if I said there was only
12  one prosecution or no prosecutions.  It would be
13  misleading to tell you that.
14  Q.  Well, I think you said there were multiple
15  prosecutions, right?
16  A.  Many, many throughout the country, and
17  actually worldwide there were many prosecutions,
18  yes.
19  Q.  Resulting from this five-year
20  investigation, right?
21  A.  There were, yes.
22  Q.  Okay.  So then my follow-up question to
23  that was, how many were successful?
24  A.  All of them.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 346..349

Page 346

1     MS. BRADY: Objection, form.
2     Go ahead.
3  BY MS. ROSEN:
4     Q.  All of them?
5     A.  I'm sorry.  All of them that I'm aware of.
6     Q.  Okay.  Fine.  And what is a DEA 6?
7     A.  That's a DEA report.
8     Q.  Is that a typed report, or is that a
9  handwritten report?
10    A.  It's a typed report.
11    Q.  And what -- who prepares that type of a
12 report?
13    A.  I'm sorry?
14    Q.  Who is responsible for preparing a DEA 6?
15    A.  Any agent or task force agent that was
16 involved in a case and had action or took action in
17 a particular case.
18    Q.  And did you ever prepare DEA 6s?
19    A.  I did.
20    Q.  And did you create handwritten notes that
21 you eventually utilized to prepare your typed DEA
22 6s?
23    A.  I'm sure there were.
24    Q.  What did you do with your notes?

Page 347

1     A.  They were maintained in the investigative
2  files.
3     Q.  Where?  Like with the DEA 6s or in some
4  separate location?
5     A.  They would be within the case file where
6  the DEA 6s and case reports are.
7     Q.  So if we were to subpoena the DEA 6s for a
8  particular investigation, then we should find
9  handwritten notes that were -- that would accompany
10 them to the extent that handwritten notes were
11 taken, right?
12    MS. BRADY: Objection, form and
13    foundation.
14    THE WITNESS: I'm sure you would find
15    those, yes.
16 BY MS. ROSEN:
17    Q.  Did you always take handwritten notes
18 before you prepared your own DEA 6s?
19    A.  No, not always.  And to be clear, I was a
20 DEA supervisor at the time, so it was not usual for
21 me to be preparing an investigative report.  It was
22 typically the officers or my task force officers
23 that would prepare the 6s.  You know, certainly
24 there were 6s that I prepared.

Page 348

1     Q.  Okay.  And the people that worked under
2  you that more regularly prepared DEA 6s, did they
3  typically take notes?
4     A.  I would say yes.
5     Q.  And did they turn in their notes?
6     A.  They were --
7     Q.  Did they turn in their notes?
8     A.  They're required to maintain the notes
9  based on federal guidelines of prosection, yes.
10    MS. BRADY: Also, objection, form and
11    foundation.
12 BY MS. ROSEN:
13    Q.  Based on what?  I'm sorry, I didn't hear
14 what you said.
15    You said they were supposed to turn in
16 their notes based on?
17    A.  Based on the federal prosecution
18 guidelines and DEA policies at the time.
19    Q.  Okay.  Did DEA agents ever tape-record
20 interviewed individuals?
21    A.  Yes, very often.
22    Q.  And did they use those tape recordings to
23 prepare the DEA 6s on the case?
24    A.  You're breaking up.  I can hardly hear you

Page 349

1  at this point.
2     Q.  Sorry.  Did -- did agents use tape
3  recordings to prepare DEA 6s on occasion?
4     A.  I'm sure they would have, yes.
5     Q.  And would those tape recordings be
6  produced in response to a subpoena by criminal --
7  during a criminal prosecution by either a prosecutor
8  or a criminal defense attorney?
9     MS. BRADY: Object to foundation.
10    But you can answer.
11    THE WITNESS: Again, it's been many years,
12    but my recollection is that the tape recordings
13    would be placed as an evidence item and would
14    be listed in the DEA 6 and assigned an
15    inventory, evidence inventory control number.
16 BY MS. ROSEN:
17    Q.  Okay.  I'm going to -- Josh, if you could
18 show him 152 from the book.
19    MR. ENGQUIST: One sec.
20 BY MS. ROSEN:
21    Q.  And I'm just going to read the paragraph.
22 It says, "Back in the United States, she would
23 bolster to herself with Sandi and disgorge
24 everything from the 50 to 100 traffickers she'd cozy

THOMAS J. TIDERINGTON, 02/13/2023                    Page 350..353

Page 350

1  up to on each trip. Sandi took notes by hand
2  because taped might be subpoenaed for a trial.
3  Sessions lasted several days, and the reports might
4  add up to 15 or 20 pages typed single-spaced. DEA
5  procedure called for two agents to be present during
6  each debriefing. This served as a protection for
7  the agency in case Pilar later claimed she had been
8  beaten or sexually abused or that she'd never said
9  the things that were written down in the report.
10      Do you see that there?
11     A. I do.
12     Q. So do you recall having any discussion
13  with the author about the debriefing that would
14  happen between Pilar, the informant, and Sandi after
15  her various assignments that's being described in
16  this paragraph?
17     A. All right. And, again, to go back to my
18  testimony earlier, this is -- you're taking --
19  you're looking at a book that was designed and
20  written for entertainment purposes and to sell to a
21  movie house to make a major motion picture, and
22  you're suggesting it's the equivalent of a sworn
23  deposition on my part, and that is the farthest from
24  the truth that -- actually, I'm just kind of

Page 351

1  surprised that we're reading the book, and we will
2  have to -- I guess I'll have to read it tonight so
3  I'm clear and accurate.
4      But just that paragraph you read, it's
5  totally exaggerated. When she would go down to
6  Columbia, to suggest that she would be meeting with
7  50 to 100 traffickers, I think that's an
8  exaggeration. I don't think that she can conclude
9  that that's an accurate statement.
10      Again, this isn't sworn testimony. This
11  is how do we make this book exciting and
12  entertaining.
13     Q. So now --
14     MS. BRADY: I'll put in a belated
15  objection to form and foundation.
16  BY MS. ROSEN:
17     Q. The line about that Sandi took notes by
18  hand because tapes might be subpoenaed for a trial,
19  do you see that line there?
20     A. I do see that line.
21     Q. And are you saying that's inaccurate and
22  exaggerated for movie appeal?
23     MS. BRADY: Objection, foundation.
24     THE WITNESS: No, no. I mean, I'm trying

Page 352

1  to think back, and, again, we're talking over
2  25 years ago. But oftentimes, you were asking
3  me whether or not we used tape recordings, and
4  you didn't specify whether or not we used --
5  whether we tape-recorded our informants. There
6  were perhaps times that we did.
7      In this case, I believe there was tape
8  recordings of the informant. I don't know as
9  we sit here today when you're reading that --
10  there's no question Sandi took notes, yeah.
11  That's why I would take her to these
12  debriefings because she was responsible for
13  documenting what the informant told us in
14  DEA 6s. And I do remember either notes or I
15  remember her with a laptop or a computer typing
16  as the informant spoke.
17      So it's a combination of both, but, again,
18  again, I have to caution you that these books
19  that you're reading, and you probably --
20  there's some movies out there too, but I
21  wouldn't take this -- please understand that
22  this is entertainment. This is not a
23  documentary.
24     MS. ROSEN: Okay. Why don't we take a

Page 353

1  break here so I can talk to my colleagues here.
2  And we should get a time check because I think
3  we're getting close to the end.
4     THE VIDEOGRAPHER: We're off the video
5  record at 5:23 p.m.
6      (Whereupon, a recess was taken
7       from 5:23 p.m. to 5:46 p.m.)
8     THE VIDEOGRAPHER: We're back on the video
9  record at 5:46 p.m.
10     MS. ROSEN: I don't have any more
11  questions at this time.
12     MR. ENGQUIST: Mr. Tiderington, I've got a
13  couple things to pick up.
14     Do you need anything before I go, Mike?
15     MR. SCHALKA: Nothing from me, no.
16     MR. ENGQUIST: All right. I just wanted
17  to make sure.
18      We got an updated case list. If you don't
19  mind, I'm just going to mark it as the next
20  exhibit and send it in to be attached to the
21  record.
22      All right. I'm assuming no objection for
23  that, right?
24     MS. BRADY: No objection.

THOMAS J. TIDERINGTON, 02/13/2023                    Page 354..357

Page 354

1    MR. ENGQUIST:  Okay.
2         (Exhibit 7 was marked for
3         identification.)
4         FURTHER EXAMINATION
5  BY MR. ENGQUIST:
6    **Q.  Mr. Tiderington, before I let you go, have**
7  **you ever had your testimony barred in any way?**
8    A.  I think --
9         MS. BRADY:  Yeah, objection, foundation.
10  Only if you know.  Don't guess.
11  BY MR. ENGQUIST:
12   **Q.  Go ahead.**
13   A.  I think the technical answer is no, but I
14  think I want to err on the side of caution, and I
15  think in the last deposition we talked about the
16  marijuana trademark violation case.
17        Do you want me to go over that again?
18   **Q.  No.  I'm just saying, were you -- was your**
19  **opinion barred either completely or partly in your**
20  **case in Texas, the Bailey case?  I'm sorry, the**
21  **Oscar -- yeah, Bailey versus Oscar Ramos in the City**
22  **of Antonio.**
23   A.  Not that I know of.
24   **Q.  Okay.  Any other cases that you're aware**

Page 355

1  **of --**
2    A.  I should say I haven't spoken with that
3  attorney in quite some time, and, of course, I will
4  email him after we get off.  But if you have
5  information that it was, that's news to me.
6    **Q.  Okay.  Well, then it will be news to you**
7  **when you get it from him.**
8         **Any other cases that you recall that you**
9  **had your expert testimony barred in part or in full**
10  **that you remember or that you know of other than**
11  **that one case having to do with the marijuana and**
12  **the drug stuff?**
13   A.  Not that I know of, no.
14        MR. ENGQUIST:  Okay.  I don't have
15  anything further at this time.
16        MS. BRADY:  Okay.
17             EXAMINATION
18  BY MS. BRADY:
19   **Q.  Mr. Tiderington, I have just a few**
20  **questions for you.**
21        **Okay.  Do you recall Mr. Engquist asking**
22  **you some questions about where the photos that were**
23  **used in the photo array came from?**
24   A.  I do recall that, yes.

Page 356

1    **Q.  Okay.  And do you recall saying that you**
2  **assumed that they came from a gang book but you**
3  **weren't for sure?**
4    A.  I think that was my testimony, that they
5  came from the detectives, but I guess I assume they
6  were from a gang book or perhaps some other file
7  that they keep them in.
8    **Q.  Okay.  And do you base any of the opinions**
9  **you offer in your report on an assumption that those**
10 **Polaroid photo lineup photos came out of gang books?**
11   A.  No, no.  It was an observation.  It had no
12  impact on my opinion.
13   **Q.  Do you recall being asked some questions**
14  **about the lead that this shooter was a**
15  **Spanish Cobra?**
16   A.  I do.
17   **Q.  And what information about that lead was**
18  **relevant to your opinions in the Iglesias case?**
19   A.  Well, the fact that the sergeant felt that
20  it was important enough for the sergeant to go
21  interview the person that was providing the
22  information, and also the fact that there was
23  information that the shooter was a Spanish Cobra,
24  another gang.

Page 357

1    **Q.  And do you offer an opinion about whether**
2  **that information was withheld or not included in the**
3  **Iglesias file?**
4    A.  I have not seen any evidence that it was
5  included in the Iglesias file.  It should have been,
6  but I don't believe it was.
7    **Q.  Do you make any credibility determinations**
8  **about Francisco Vicente in your report?**
9    A.  I don't think I make any credibility.  I
10  think I described what his testimony is, and if --
11  it's not my job to determine his credibility.
12  That's the job and responsibility of the judge or
13  jury.
14   **Q.  Can you take a look at Page 19 of your**
15  **report.**
16   A.  Yes.
17   **Q.  Underneath that first image, it says, "The**
18  **defendant in this case, People versus Thomas**
19  **Iglesias, was convicted by a jury."**
20        **Do you see that?**
21   A.  I do.
22   **Q.  Do you want to correct anything about**
23  **that?**
24   A.  Yeah.  "Thomas" was a typo, and I -- it

THOMAS J. TIDERINGTON, 02/13/2023                    Page 358..361

Page 358

1  got past me.
2      Q.  Okay.  Mr. Engquist asked you to list the
3  witnesses who you opine were manipulated.
4      Do you recall that line of questioning?
5  A.  I do, yes.
6      Q.  And my notes have you listing
7  Efrain Torres, Rosendo Ochoa, and Hugo Rodriguez.
8      Do you remember giving that testimony?
9  A.  I do.
10     Q.  And during the course of this deposition,
11 have you recalled any other witnesses whose -- who
12 you opine were manipulated?
13     A.  Well, certainly Vicente, if the jury
14 credits his testimony that he was coerced, beaten,
15 manipulated, so Vicente should be added to that
16 list.
17     Q.  And does your report contain the bases for
18 your opinions that Vicente was manipulated?
19     A.  They do.
20     MS. BRADY:  I think that's all.  Give me
21 one second to check over my notes.
22     Yeah, I do have one more question.  Sorry
23 about that.
24

Page 359

1  BY MS. BRADY:
2      Q.  You mentioned at one point that the scene
3  officers -- strike that.
4      Yeah.  You know what, strike that
5  question.  I'm not going to ask it.
6      MS. BRADY:  I don't have any further
7  questions, so I think you're done unless anyone
8  else has a follow-up.
9      MR. ENGQUIST:  I have nothing based off
10 that.
11     MS. ROSEN:  I also have nothing.
12     MR. SCHALKA:  And nothing from me.
13     MR. ENGQUIST:  So if no questions, let's
14 go off -- well, waive or reserve, and then we
15 will go off the record.
16     MS. BRADY:  All right.  Tom, you're done.
17     MR. ENGQUIST:  Waive or reserve?  Waive or
18 reserve, and then we can go off the record.
19     MS. BRADY:  Oh, I'm sorry.  We will
20 reserve for now.  Thanks.
21     MR. ENGQUIST:  All right.  Reserve it is.
22 Thank you.
23     THE WITNESS:  Thank you all.  I enjoyed
24 spending time with you today.

Page 360

1      MS. BRADY:  Thank you.
2      THE VIDEOGRAPHER:  We're off the video
3  record at 5:54 p.m.
4      (Wherefore, the deposition was
5      concluded at 5:54 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 361

1  Iglesias vs. Guevara, et al.
2  No. 19 CV 6508
3
4      I hereby certify that I have read the
5  foregoing transcript of my deposition, given on
6  February 13th, 2023, at the place aforesaid,
7  consisting of pages 1 through 364, inclusive, and I
8  do again subscribe and make oath that the same is a
9  true, correct, and complete transcript of my
10 deposition so given as aforesaid, as it now appears.
11     Please check one:
12     _____ I made no corrections
13     _____ Number of errata sheets submitted
14
   (signed) _____
15              THOMAS J. TIDERINGTON
16
   ALSO PRESENT:_____
17
18
   SUBSCRIBED AND SWORN TO
19 before me this _____ day
   of _____ 2023.
20
   _____
21 Notary Public
22
23
24

THOMAS J. TIDERINGTON, 02/13/2023                    Page 362..363

```
                                          Page 362
1                    CORRECTION PAGE

2

3   CASE NAME:    Iglesias vs. Guevara, et al.

4   DEPOSITION OF:  Thomas J. Tiderington

5   DATE TAKEN:     February 13th, 2023

6

7   PAGE    LINE    CHANGE

8   ____    ____    _____

9   ____    ____    _____

10  ____    ____    _____

11  ____    ____    _____

12  ____    ____    _____

13  ____    ____    _____

14  ____    ____    _____

15  ____    ____    _____

16  ____    ____    _____

17  ____    ____    _____

18  ____    ____    _____

19  ____    ____    _____

20  ____    ____    _____

21  ____    ____    _____

22  ____    ____    _____

23  DATE:            _____

24  SIGNATURE:       _____
```

```
                                          Page 363
1              C E R T I F I C A T E

2           The within and foregoing deposition of the

3   witness, THOMAS J. TIDERINGTON, conducted via Zoom,

4   was taken before GREG S. WEILAND, CSR, RMR, CRR,

5   commencing at 9:02 o'clock a.m., on the 13th day of

6   February, 2023.

7           The said witness was first duly sworn and

8   was then examined upon oral interrogatories; the

9   questions and answers were taken down in shorthand

10  by the undersigned, acting as stenographer; and the

11  within and foregoing is a true, accurate and

12  complete record of all the questions asked of and

13  answers made by the aforementioned witness at the

14  time and place hereinabove referred to.

15          The signature of the witness was not

16  waived and the deposition was submitted to the

17  deponent as per copy of the attached letter.

18          The undersigned is not interested in the

19  within case, nor of kin or counsel to any of the

20  parties.

21          Witness my signature on this 8th day of

22  March, 2023.

23  _____

    GREG S. WEILAND, CSR, RMR, CRR

24  License No. 084-003472
```

Urlaub Bowen & Associates, Inc.   312-781-9586