# Exhibit 24

EXPERT REPORT OF BERNARD J. MURRAY

*MAYSONET V. GUEVARA, ET. AL.* 18-CV-2342

I.     Overview

a.     The Plaintiff's expert's conclusions that "CPD's Policies and Practices Concerning Documentation and Disclosures in Homicide Investigations are Woefully Inadequate and Result in the Routine Failure to Document and Disclose the Documents and Information Learned During the Homicide Investigation to Criminal Defendants" is largely based upon the flawed premise that that "[c]riminal defense files show that important investigative materials are regularly withheld from criminal defendants" (Pl. Exp. Rpt., at p.59.)  These opinions, including all their flaws, are largely copied from Mr. Tiderington's previous reports in the consolidated cases of *Reyes v. Guevara* and *Solache v. Guevara,* and *Sierra v. Guevara, and Iglesias v Guevara.*  He asserts that his findings mirror those in *Sierra.* (Pl Ex Rpt at 34.) In fact, the examples cited by Mr. Tiderington in this report are identical to those used in the *Sierra and Iglesias'* reports.  As such, this rebuttal report is similar to my previous rebuttal opinions and incorporates the totality of those opinions (including my deposition testimony in the *Solache/Reyes* cases as well as the combined deposition taken in the *Sierra* and *Iglesias* cases) here.  (*See*, *Iglesias* Report and all its attachments, attached here as Attachment A.)

Plaintiff's expert again assumes that documents currently missing from criminal defense attorneys' files but present in the CPD's investigative files establishes that they were withheld from criminal defendants prior to and at the time of the criminal trial. He makes this claim lacking any evidence to show that the criminal defense attorney's files are currently in the same condition as they were at the time of the original trial. He claims that "any review of prosecutor and criminal defense files should reveal a simple finding: all the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file." (Pl. Exp. Rpt., at 60.) Yet there is no evidence in the report that he examined all the prosecutor's files to determine if they had received reports that he now claims were withheld. Nor does he acknowledge that the public defenders' files may be incomplete because of the passage of time or because they withdrew from the case for private counsel.

In addition to the files and documents reviewed in the *Solache/Reyes* report, Plaintiff's expert also highlighted individual pages from four additional files from the *Sierra* production, without the benefit of having any of the corresponding public defender files, to opine that documents were withheld from the criminal defendants.

1

i        The Cook County Public Defender's Office (CCPD) has questioned the Plaintiff's expert's assumption that merely because a report is now missing from their files, then it was never provided to them. In a Motion to Quash Subpoena in *Velez v Dart, 18 CF 8144,* the Cook County Public Defender's Office stated "As the CCPD argued in its opening motion, this Court should also examine whether the benefit of production outweighs the monumental effort required to produce hundreds of files, and this Court should question the underlying assumption, adopted in other cases, that if a report is not found in the CCPD's file, that report must not have been given to the CCPD." (Reply in Support of Motion to Quash Subpoena at p.3.)

ii        The CCPD went on to argue that "The CCPD acknowledges that when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later." (Reply in Support of Motion to Quash Subpoena at p.3.)

b.        Plaintiff's expert also fails to acknowledge that some of the public defenders' files may be incomplete now because they were replaced by private attorneys. There is no indication that private attorney's files were examined by Plaintiff's expert.

c.        Finally, the public defender files contain significant redactions. Plaintiffs' expert testified during his deposition, in the *Solache/Reyes* case, that he was told to assume that all redacted materials were work product. He has no way of knowing if that assumption is accurate in this or in any other redacted files. Those redactions could very well undermine the conclusions he makes throughout the report that documents were missing from the public defender file.

d.        In the *Solache/Reyes* case, Plaintiff's expert initially compared 105 criminal defense attorneys' files to 72 investigative files. He states that these files are listed in Attachment E, which he also uses in support of his opinions in this case. Plaintiff's expert claims that after removing criminal defense files that did not have a corresponding investigative file, contained no police reports or very few so as to be incomplete, he ultimately limited his analysis to 63 criminal defense attorneys' files. He lists his process and exclusions in footnotes 111 and 112. (Pl. Exp. Rpt., at 60-61.)

i        In his report, he has indicated that the files removed from his considerations have strike-through lines in Attachment E. However, it appears that he considered files that he deemed "incomplete" in his

opinion in the body of his report. Also, he claims Attachment E contains 64 files that lack strike-throughs. (Ibid., at pp. 62). It's not at all clear how he finally settled on those 64 files. Plaintiff's expert specifically reviewed five files as "examples" in his report. (Ibid., at pp. 63-66.) The remaining files were contained in a table compiled by Loevy & Loevy, counsel for plaintiff's *Reyes, Sierra and Iglesias*.

ii.   In addition, Plaintiff's expert reviewed 344 Area 5 Investigative Files and 341 corresponding "permanent retention files" for the time period of 1995-1998. This spreadsheet was attached to Mr. Tiderington's report as Attachment E.

iii. Finally, Plaintiff's expert specifically compared five defense attorney files to CPD's investigative files.  He applies the same flawed logic specifically to these five files, that is that the criminal defense attorneys' files today contain the same documents as at the time of trial. One file that the Plaintiff's expert relied upon in both the *Solache/Reyes* and *Sierra* reports is devoid of any CPD reports. He appears to have removed that file from his consideration in this report.. There is no indication that he examined the prosecutors' files to determine if any of the allegedly withheld documents were found in those files. In fact, Plaintiff's expert conceded during his *Solache/Reyes* deposition that he was not aware that companion CCSAO files were produced in discovery.  (Expert's Deposition, 10/6/2022, Vol. II at pg. 391-392.)  An examination of the prosecutors' files reveals many of the allegedly withheld documents are contained in the CCSAO's trial files and therefore were not withheld. Moreover, Plaintiff's expert testified during the *Solache/Reyes* deposition that it was his position that "any reasonable officer would understand that everything in a homicide file should be turned over to the prosecutor[]" and accordingly conceded that if the documents were contained within the CCSAO file, that would have been proper and reasonable conduct on the part of CPD.  (Expert's Deposition, 10/6/2022, Vol. II at pg. 654, 660.) The prosecutors' files also record, on occasion, when they provided police reports, GPRs and "street files" which during the relevant time period (1991-1998) were another name for investigative files, to counsel in court.

iv.  Plaintiff's expert also claims that he found potentially exculpatory handwritten notes that were not transferred onto official reports. Plaintiff's expert seems to claim that these notes were not disclosed to criminal defendants. But in this section of his report, he only compared   permanent   retention   files   with   their   corresponding

investigative files. Inexplicably he does not discuss comparing these notes to any public defender's file. (Pl. Exp. Rpt, at p. 58-59.)

e.    For this report, I am also relying upon my analysis of the Plaintiff's expert's report in *Fields v City of Chicago* and *Rivera v City of Chicago* and the reports compiled in those cases. These reports were previously attached to an incorporated in my *Iglesias* report. (See Attachment A.)

II.    Discovery Obligations

a.    The Illinois General Assembly has acknowledged by statute that discovery procedures in criminal cases shall be in accordance with the Illinois Supreme Court Rules. 725 ILCS 5/114-13(a). They also have codified the long-standing procedures utilized by police and prosecutors to guarantee that police reports will be provided to the prosecutors' offices to be tendered during discovery:

> "Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated." 725 ILCS 5/1114-13(b)(11-19-03).

b.    Disclosure to the Accused: The Illinois Supreme Court Rules require that the prosecution disclose to defense counsel certain material and information within its possession or control in all felonies and felony juvenile delinquency cases. (Illinois Supreme Court Rule 412.) Among the items required to be disclosed are:

i.    The names and last known addresses of witnesses, their relevant written or recorded statements, and memoranda containing substantially verbatim reports of their oral statements. (Illinois Supreme Court Rule 412(a)(i)).

ii.    Any statements made by the accused (written, recorded, or oral) and a list of witnesses to the statement.

   iii.  Any reports of experts including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

   iv.  Any books, papers, documents, photographs or tangible objects which the prosecutor intends to use at trial or which were obtained from the accused.

   v.  And any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at trial.

c.  *Brady* and *Giglio* Disclosures: The U.S. Supreme Court decisions also require that prosecutors disclose exculpatory evidence that is material either to guilt or to punishment. *Giglio* requires evidence that could allow the defense to impeach the credibility of a prosecution witness. The police fulfill their *Brady* and *Giglio* disclosure obligations when they supply the information to the prosecutors.

   i. The Illinois Supreme Court also includes *Brady* disclosure obligations in their Rules. (Illinois Supreme Court Rule 412(c)).

d.  The Illinois Supreme Court Rules also require that the prosecution "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. (Illinois Supreme Court Rule 412 (f)). The prosecution's duty to disclose is a continuing obligation. If additional discoverable information comes to the prosecution's attention at a later date, the defendant should be promptly notified. (Illinois Supreme Court Rule 415 (b)).

e.  The Illinois Supreme Court Rules indicate that certain materials are not subject to disclosure. For example, work product is not subject to disclosure. The Rules state that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its legal or investigative staffs, or of defense counsel or his staff." Illinois Supreme Court Rule 412(j).

f.  The Chicago Police Department developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases.  From the perspective of a prosecutor, the CPD's policy is good.  It requires detectives to turn in all relevant material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. Plaintiff's expert relies on former police officer Michael Brasfield's previous opinions disclosed in

the *Fields* litigation[1] that, as a police officer, he routinely shredded his investigative notes. Unlike plaintiff Field's expert's own practice, CPD's policy requires the detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will nevertheless be maintained and produced to the prosecutor and defense attorney for later review. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other fashion; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

III.    Regulation of Discovery

a.  For crimes occurring in Chicago, Cook County Assistant State's Attorneys assigned to trial courtrooms learn both formally and informally how to obtain police reports and all other relevant information and evidence, including evidence from the Chicago Police Department. Prosecutors maintain checklists of documents that may exist and should be obtained. Along with the checklists come the methods to obtain the reports and evidence. Most of the documents listed on the checklists are created by the Chicago Police Department.

b.  Chicago Police Department reports are obtained primarily through subpoenas, request forms and telephone calls. The primary sources of reports, notes, criminal histories, or photographs in the Chicago Police Department are headquarters, the crime lab, the bureau of identification and the department's area headquarters. The Cook County State's Attorney's Office and the Chicago Police Department maintain an intra and interoffice mail service that facilitates the production of reports, photographs and criminal histories.

c.  By the 1980s, prosecutors routinely subpoenaed all police reports. This was in addition to the forms or phone calls that were still utilized. The subpoenas would include a request for police documents that became known informally by some prosecutors and defense attorneys as "street files." Chicago Police Department Investigative Files contain what attorneys referred to as "street files" *i.e.*, notes most often recorded on forms titled 'general progress reports' (GPRs). Prosecutors would often send these subpoenas to both the Superintendent's Office (also known as headquarters) and to the Area Headquarters. The Chicago Police Department subsequently directed that the subpoenas go through one location: The Superintendent's Office. From

---

[1] Plaintiffs' expert in this case relies on the plaintiff's expert in *Fields* as well as *Rivera* in arriving at his opinions. *See,* Pl. Exp. Rpt., at p. 34.

there, CPD's subpoena unit would cause the subpoenaed material to be collected from the relevant unit(s) and sent to the trial courts. Many criminal defense attorneys would also issue subpoenas for police reports and include the term "street files" in the documents requested, which would obtain copies of the Investigative Files.

d. To ensure a prompt flow of information, prosecutors would also reach out to Detectives and have them bring their investigative files to court for copying.

e. Once the police reports were in hand, the prosecutors would tender all of them to defense counsel. If after a review of the documents they appeared to be incomplete, more requests for potentially missing documents were made by the attorneys in the courtroom.

f. Prosecutors provide these documents to defense counsel in court and generally indicate when they believed they have tendered the complete file. Prosecutors also utilized an informal docket sheet within their files, commonly referred to as the blueback. Prosecutors often recorded on their bluebacks when they provided discovery to defense attorneys. Formal Answers to Discovery also briefly summarized some of the discovery. For example, the Answer listed witnesses' names found in the police reports the prosecution anticipated calling at trial.

g. To memorialize discovery compliance, prosecutors eventually created discovery receipts in the 1990s that listed the documents tendered to defense counsel. A signed copy of the receipts was often maintained in the prosecutors' files. More recent methods include numbering all the pages and scanning the documents.

h. Not all documents or pieces of evidence are tendered by prosecutors to defense counsel. However, these items are made available for defense counsel to examine prior to trial. For example, items of physical evidence such as a weapon or clothing are not photocopied but are made available for examination. Prosecutors often made photo arrays, crime scene photographs, or individual photographs, including polaroid photos, available for examination, too.

i. In addition to the prosecutor's obligations to disclose police reports during discovery, certain documents are also maintained in the court file or are provided to defense counsel in open court.

    i.   During a charged defendant's first court appearance, his defense counsel is provided with a copy of his one-page arrest report[2]. This document is utilized by the court to determine whether probable cause to detain exists. Defense counsel can also examine and copy the complaint for preliminary hearing. Although not provided to defense counsel during the initial appearance, the defendant's criminal history is summarized during the bond hearing to assist the court in setting an appropriate amount of bail. After a subsequent determination of probable cause, the formal indictment or information is also maintained in the court file. Finally, the court file maintains copies of arrest and search warrants and documents pertaining to extradition.

    ii.   The court file also contains Chicago Police Department Property Inventory Sheets. This document, known as the Inventory, lists evidence that was recovered and preserved by the police department during the investigation.

IV. Record Retention and Discovery Obligations

a.   Plaintiff's expert acknowledged during his *Solache/Reyes* deposition that it is "proper and reasonable conduct" for the Chicago Police Department to provide investigative materials to the Cook County State's Attorney's Office for discovery. (Expert's deposition, Vol. II, 10/6/22 at p. 660.)

b.   The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, CPD's policy furthers their ability to comply with discovery obligations. It requires detectives to "maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised during the subject investigation, initial court hearing or any subsequent reviews." *See,* Special Order 83-1. Prosecutors during this time period understood this to require detectives to turn in all relevant material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. CPD's policy requires detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will be maintained and produced to the prosecutor and defense attorney for later review.

---

[2] Notably, one of the documents Mr. Tiderington argues was withheld from Plaintiff Iglesias' defense counsel was his arrest report. This argument demonstrates his lack of understanding of the criminal justice system in Cook County.

       i.  At times, Plaintiff's expert complains that information was not recorded on a GPR form, Pl. Exp. Rpt., at p. 56, or was preserved by different units within CPD, Pl. Exp. Rpt., at p. 48. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other manner; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

      ii.  Nor does it matter that a different unit of CPD either created a report or maintained reports in different physical offices. Prosecutors and criminal defense attorneys were well aware that, for example, criminal history reports or lab reports were created and maintained by different units within the police department. This knowledge is demonstrated by the laundry-list of documents requested in subpoenas issued by either a prosecutor or a criminal defense attorney.

c.  From the inception of the Orders mandating the preservation of investigative materials, prosecutors as well as criminal defense attorneys, have issued subpoenas to receive not only typed reports but investigative materials. The subpoenas issued by all attorneys have used various terms for the investigative material. Primarily referred to as 'street files,' they are also referred to as area files, GPRs, notes, or running files.

d.  The subpoenas issued by prosecutors and criminal defense attorneys also reveal that lawyers involved in the criminal justice system understand that the Chicago Police Department has various units tasked with creating, compiling and maintaining records related to a criminal investigation. The subpoenas issued to obtain these records are often detailed to obtain all of those records. The primary identifying number is the case number, known as the records division or RD number. Other significant numbers to obtain records are the arrest report and photo number (known as the CB number), the criminal history number (known as the IR number) and the property inventory number (known as the EARPS or inventory number.)

       i.  While the permanent records division maintains the formal police reports such as the typed supplementary reports, the investigative files are maintained by the police Area that is primarily responsible for the investigation. Those files could contain notes, photos, or GPRs added to the file during the pendency of the investigation.

      ii.  All CPD officers compile their reports under the RD number and submit them for permanent retention. Those documents may be created by patrol, gangs, narcotics, crime lab, forensic investigators or bomb and arson units.

iii. Other units in the Chicago Police Department are tasked to maintain other records or evidence. For example, arrest photos and criminal histories are maintained in a central location known as the Bureau of Identification. Evidence collected from a crime scene and submitted to the CPD Lab for testing is maintained at the lab during testing. Reports generated by the Labs are accessed through a request using the case RD number.

iv. Forensic investigators who primarily collect evidence and photograph crime scenes maintain their photographs in their unit under the case RD number. The collected evidence is preserved with the Evidence and Recovered Property Section (EARPS). EARPS generates numerous copies of their property inventory sheets and submits one copy to the Clerk of the Circuit Court to maintain in the municipal court file.

e. Plaintiff's expert alleges throughout the report that "parallel files" are maintained by CPD and are often not provided to either criminal defense attorneys or prosecutors.

i. Plaintiff's expert is not clear, either in his report or during his testimony in the *Solache/Reyes*, *Sierra, or Iglesias* cases, on how he defines an investigative or parallel file.

1. If he is referring to the manner that CPD creates and maintains reports, this process is not concealed. Prosecutors and criminal defense attorneys are aware of the manner and location of how those reports are created and where they are stored.

2. If he is somehow suggesting that individual police officers are personally retaining reports that are not maintained in the investigative file, he does so through speculation as he cites no evidence to support that conclusion. The Special Orders from the early 1980s directed the detectives to the procedures to be used to maintain investigative materials.

3. Plaintiff's expert also claims that police officers from other units such as patrol or gangs *could have* files related to a homicide investigation, but CPD Special Orders are silent on whether the reports should be preserved or disclosed. (Pl. Exp. Rpt., at 48.) This claim is also based on speculation, cites no evidence in support and shows a lack of understanding of CPD's procedures.

    a. While Plaintiff's expert acknowledges that the CPD's 'Detective Division' maintained investigative materials, he appears to ignore that violent crimes detectives have the primary responsibility to investigate homicides. Nowhere in any file will you find a patrol officer, or a gang officer having primary responsibility to investigate or clear a homicide.

    b. If a patrol or gang officer participates in the investigation of a homicide, any reports generated by those officers are shared with the violent crimes detectives and filed by CPD under the RD number associated with the crime.

    c. Therefore, all reports compiled by a patrol officer, or a gang officer could be obtained by either the prosecution or the criminal defense attorney via a subpoena.

4. Plaintiff's expert claims that in any given investigation, at least three files could have been created. (Pl. Exp. Rpt., at p. 47.) The permanent retention file, a unit RD file and an investigative file. He also claims that other police units could maintain their own investigative materials and detectives could maintain their own running files. (Pl. Exp. Rpt., at p. 48.) He claims these reports were not subject to documentation, storage or disclosure. It is unclear what documents he is referring to and he cites no examples from the hundreds of files he "reviewed". Detectives could make copies of existing CPD reports kept at the Area during the course of the investigation, but these documents are already preserved in either the permanent retention/RD file or the Investigative File and therefore available by subpoena from either the prosecution or the criminal defense attorney.

f. Plaintiff's Expert's Opinions on GPRs

    i. Plaintiff's Expert claims that interview notes are stored in multiple files and are never consolidated into what he characterizes as the "official file" which is maintained by the Chicago Police Department. He claims that these notes are regularly withheld from criminal defendants. (Pl Exp Rpt at p. 52). He further states that by reviewing "notes and GPR's contained in each of the investigative files indicates that it is likely that detectives continued to use 'street files[.]'" *Id.*

11

1. Permanent retention files, investigative files and any other report generated by other units in the Chicago Police Department are all official reports.

2. Plaintiff's Expert ignores the possibility that investigative files from 1987-90 may be incomplete today. The lack of GPRs, today, does not mean that they did not exist during the investigation and prosecution. *See e.g.* discussion below at -- Nor does it mean that they were suppressed. Instead, Plaintiff's Expert jumps to speculate that detectives maintained street files in contravention of the existing Orders. Importantly, Plaintiff's Expert admits that there were no corresponding PD or criminal defense files that he reviewed pertaining to the Investigative files from 1987-1990. (Tiderington's 4/28/2023 Dep. at 319-320).

3. Plaintiff's Expert added to his report in *Maysonet* another chart listing eight specific cases where he claimed that GPRs were missing from the investigative files. This is a continuation of his flawed premise that the files, as they exist today, are in the same state they were during the criminal prosecution, and therefore, that detectives must have maintained street files. Below is an example that highlights the flaws in Plaintiff's Expert's assumptions.

    a. J 384177: The RD File (RFC-Maysonet 018668-018700)_ Contains an investigative file inventory form, which lists 19 pages of GPRs that were included in the investigative file at some point during the criminal investigation. *See,* RFC- Maysonet 18688. This is a clear example of how the files, as they exist today, may not be in the same condition as they were during the criminal investigation.

    b. As prosecutors collect police reports, they examine the documents to determine whether they have received complete responses to their requests. As part of this process they examine the Records Division a/k/a permanent retention documents in conjunction with the investigative file.

      c. Using the Records Division a/k/a permanent retention documents, prosecutors try to determine if they have received all of the detectives supplemental reports. For example, has the prosecutor received the closing supplemental report?

      d. Using the investigative file, prosecutors examine the file to determine if materials mentioned in the supplemental reports is preserved in the investigative file. For example, if a photo array was used during the investigation prosecutors would try to determine if it was preserved in the investigative file or inventoried with the evidence and recovered property section.

      e. Moreover, if the investigative file lacked GPRs or if the investigative file inventory listed GPRs that had not been provided, prosecutors would take further steps to acquire the GPRs or determine if all relevant information had been memorialized in the supplemental reports. Often a prosecutor would issue a subpoena for the missing documents or simply call one of the detectives and ask them to bring the missing documents to court.

V. Comparison of permanent retention/RD files with corresponding Investigative files

      a. Plaintiff's expert claims that he found potentially exculpatory handwritten notes that were not transferred into "official reports". He specially identifies a number of these notes and claims that they were either not transferred to an "official report" or that they were not disclosed to criminal defendants. (Pl. Exp. Rpt., p. 58). These are the same examples used in the *Solache/Reyes Sierra* and *Iglesias* reports, though he removed several previously used examples. The point of this section of the report is confusing, and Plaintiff's expert was not able to articulate the reason he identified these documents during his deposition in either *Solache/Reyes*, *Sierra or Iglesias*.

      b. Preliminarily, it should be noted that permanent retention/RD files and Investigative files are *both* official files. His premise that these handwritten notes were not transferred into official reports is flawed. The handwritten notes found in Investigative files are official reports available to defense counsel through subpoenas or tendered in discovery from the Cook County State's Attorney's Office.

c.  General Progress Reports are often handwritten notes used by Detectives during the course of their investigations and used when they compile supplementary reports. Plaintiff's expert seems to believe that all notes, some that he considers cryptic, should be typed into supplementary reports. (Pl. Exp. Rpt., at p. 58.)   The supplementary reports are often far more comprehensive than the notes. Prosecutors request all investigative materials while compiling discovery materials for discovery and for possible use at trial. The Chicago Police Department requires preservation of all investigative notes. This allows prosecutors and defense attorneys access to documents created in the course of the investigation.

d.  Next, Plaintiff's expert claims that these notes were not disclosed to criminal defendants. But in this section of his report, he only states that he compared permanent retention/RD files with their corresponding Investigative files. He does not discuss comparing these notes to a public defender's file.  In fact, for several files examined by Plaintiff's expert in this section, no public defender files exist.  (Tiderington Deposition, 12/8/22, at pp 305-306.) It is impossible for him to claim that these pages were not provided during pretrial discovery to the defendants and their counsel. Moreover, he was not provided with the Cook County State's Attorney's files to determine if the alleged suppressed documents were tendered by the prosecutors.

e.  In addition, Plaintiff's expert lists handwritten notes that he claims were not disclosed to defense counsel or not transferred into official reports, for four cases where there were no charges filed and therefore no public defender file.

   i   RFC Solache/Reyes 076011-14 and 15-16, are found in RD# A596534. This file involves the first-degree murder of Arney A. Reina. No defendant was charged in this case and thus there is no public defender file. (RFC Solache/Reyes 075911 and 075928-29.) The information contained on these pages is, primarily witness identification information, and is contained throughout the permanent retention file.

   ii  RFC Solache/Reyes 077368 and 077452 are found in RD# A-744094. This case also lacks a public defender file because no one was charged. This case involved a murder – suicide. (RFC Solache/Reyes 077378-79.)  Regarding the alleged missing pages, RFC Solache/Reyes 77368 is the contact information for the murder victim's sister. RFC Solache/Reyes 077452 appears to be a pizza order unrelated to this case, which Plaintiff's Expert had previously conceded that he would not have expected to have been transcribed into a police report.  (Tiderington Deposition 10/6/22, at pp. 552:5-553:7)

     iii  RFC Iglesias[3] 079168 is found in RD# X-066005. This case involves the investigation into the fatal shooting Jesus Garcia. Based upon the existence of a valid self-defense, no charges were filed by the Cook County State's Attorney's Office and there is no public defender file. Nevertheless, the people identified in RFC-Sierra 079168 are found throughout the permanent retention file and within supplementary reports.

     iv  RFC-Iglesias 092370 is found in RD# Z-093141. This case involves the 1995 fatal shooting of Jack Castle. Despite the involvement of federal law enforcement agencies, including the F.B.I., no charges were filed in this shooting. However, the loosely drawn map in RFC-Sierra 092370, is readily identified by examining the address of the occurrence found at RFC Sierra 092283.

f.    As for the remaining pages listed by Plaintiff's Expert on Page 58.

     i     RFC Solache/Reyes 34554 is found in RD# Z-000273 and is also located in the public defender's file at AR-PD-41276.

     ii    RFC 110176 and 110180 are handwritten notes found in the Kim Mathis file (RD # C-687989) discussed later in this report. Both handwritten notes appear to be the concluding sentence to an interview and located on the back side of a GPR. RFC 110176 is a note from an interview of Kim Mathis. RFC 110180 is a note from an interview of the defendant's sister Terry Mathis.

        1  Kim Mathis' note seems to indicate that her sister was present at the time of the beating. The remainder of all reports, including Kim Mathis' handwritten statement, indicates that her sister was not present. Moreover, in handwritten notes of Terry Mathis' interview, she states that she did not go upstairs. RFC Solache/Reyes 110178. This note is found in the public defender's file at AR-PD- 030049.

        2  Terry Mathis' note indicates that her sister paged her at approximately 5:00 pm and told her that her son was dead. While this note is not found in the poorly maintained public

---

[3] Mr. Tiderington admitted during his deposition in the *Iglesias* matter that these documents were actually produced in the *Sierra* case, and are the same documents referenced in the *Sierra* report. (Tiderington Dep. 2/13/2023 at pp. 300-301). As such, I will continue to review to these documents as RFC-Sierra in this report.

defender's file, it does not appear to be exculpatory. All other indications are that Terry Mathis was with her sister. the defendant, at the hospital when her son was declared dead. AR-PD-030018; RFC Solache/Reyes 110146.

3    The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. ARPD-029932-34 and AR-PD-029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time was there an inability to discuss Terry's presence at the house or the call regarding her son's death.

iii.   Plaintiffs' expert lists pages RFC 104166-70 as another example of investigative notes that were not disclosed to defense counsel or not transferred into official reports. These pages correspond to RD# C-250890 and court case number 98CR-13371. These pages are handwritten notes of a canvas for possible witnesses.

1    This is another example of a violation of the parameters that Plaintiffs' expert established in Footnote #112. There he stated that he would not rely upon partial or incomplete public defender files, which were designated on Attachment F, as this one was, with a strikethrough.

2    The public defender's file is numbered AR-PD 23546-23684. It only contains one police report. That report is the General Offense Case Report. AR-PD 23677-8. It is impossible to determine if the public defender had the canvas reports or any investigative reports in their possession prior to trial.

3    Included in the public defender's file are numerous subpoenas for Chicago Police Department police reports. The subpoenas were divided into individual requests for line-up reports, 911 calls, evidence reports and the defendant's photo. Two subpoenas are of note. One subpoena requests any and all police reports and specifically asks for general progress reports. (AR-PD 23626.)  The other subpoena requests any and all police reports including street files, working files or running files (AR-PD 23630.)

4    A review of the Cook County State's Attorney's Office's file reveals that a series of private attorneys represented the defendant early on (CCSAO 4791-92) and during a pre-trial motion to quash arrest (CCSAO 5427), during a guilty plea and

sentencing (CCSAO 4847) and during a motion to withdraw his guilty plea (4924.)

iv. Regarding Y-240898, Plaintiff's expert claims that RFC Sierra - 121416 and RFC Sierra-121420 were not disclosed to the criminal defendants or that the information was not included in permanent retention files.

    1  RFC Sierra – 121416 is a GPR note discussing Luis Guevara. A supplementary report found at RFC Sierra -121339 provides a lengthy interview of Luis Guevara.

    2  RFC Sierra – 121420 is a GPR note detailing a bus route to Florida. Also included is a reference to Theresa Robinson. A corresponding supplementary report, found at RFC Sierra 121337, summarizes an interview with Robinson. The bus route information was summarized on the following page of the supplementary report.

v. In T-290460, Plaintiff's expert identifies four pages that he claims are either not disclosed or not transcribed into an "official police report" such as a supplementary report.

    1  RFC Sierra 109932 appears to be the back of a GPR containing one sentence "tell you why he was crying." Lacking a public defender file to examine, Plaintiff's expert cannot claim that the GPR was missing. Nor does he attribute any exculpatory value to the sentence.

    2  RFC Sierra 110061 appears to be a GPR report that states "Get Guns +." A reference to acquiring weapons is found in the defendant Hornsby's statement to law enforcement found at RFC Sierra 109975. There he said a co-defendant instructed him to "go get the missiles." He understood missiles to mean guns.

    3  RFC Sierra 110043 is a hand drawn map of a T alley in the vicinity of George, Kedzie and Diversey streets. This is the approximate location of the crime and is discussed in supplementary reports found at RFC Sierra 109977 and 109980.

    4  RFC Sierra 110062 is a GPR that lists three witnesses with address information. A note indicated that one witness must be

found and interviewed. Also listed are various command staff police officers. Interviews with two of the witnesses are found in supplementary reports found at RFC Sierra 109964-65 and 109980-81.

VI. Comparison of Five Defense Attorney Files to Investigative Files.

    a. Plaintiff's expert specifically compared five defense attorney files to CPD's investigative files. These are the some of the same files that he lists in his expert report in *Solache/Reyes*, *Sierra and Iglesias* which he acknowledged were not good examples in support of his opinions. (Tiderington Dep. 12/8/2022 pp. 362:13-363:7).

<u>People v Kim Mathis C-687989 98CR30439 (V: Cydryck Spain)</u>

Plaintiff's expert contends that a GPR contains a handwritten note that places the defendant's sister at the scene of the crime at the time of the fatal beating of the defendant's own child. The cleared / closed report states that the defendant's sister was not present at the time of the beating.

    1. The note appears to be the back page of the GPR of an interview with the defendant. Defense counsel obviously has ample opportunity to discuss the presence or absence of his client's sister during the beating.

    2. Plaintiff's expert again assumes that the public defender's file is complete. And that the back page of the GPR was not provided by either the Chicago Police Department or the prosecution.

    3. Defense counsel's file reveals that during his interview with the defendant, she stated that her sister Terry dropped off her son. Terry was circling the block because there was no parking. After the victim entered the apartment, the defendant talked with her sister before leaving the car and entering her apartment. Terry drove off and was not in the apartment when the defendant 'whipped the victim.' AR PD 02932-33.

    4. The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time did she ever indicate that she was present during the beating.

        a. This running diary appears to be a document that should have been subject to redaction, as it is clearly attorney work-product. Without this running diary, I would have currently been without knowledge of what the criminal defense counsel knew prior to trial. It also begs the question of whether

18

other materials that were redacted could describe the extent of the material that now appears to be missing from the criminal defense attorney's file and further supports my conclusion that Plaintiffs' expert's methodology is flawed.

People v Ardell Clemons Z-475236 96CR240 (V: Nyree Johnson)

Plaintiff's expert points to two documents in the investigative file that are missing from the public defender's file. He claims that these documents could point to other suspects.

1.  Both documents are contained in the prosecutor's file (which Plaintiff's expert admits would have been "proper and reasonable" conduct) and likely tendered to defense counsel during discovery.

2.  The allegedly missing GPR note (RFC – Solache/Reyes 44288) is found in the prosecutor's file at CCSAO 53045. The allegedly missing lease (RFC – Solache/Reyes 44260) is found in the prosecutor's file at CCSAO 53426.

3.  The GPR note refers to a "possible suspect" that was described by Plaintiff's Expert as "dating" the victim in the GPR but as "only friends" in the police reports found in the public defender's file. The GPR does not state "dating" instead it states, "seeing her." (RFC 44288.)

4.  Nyree Johnson's body was found on October 6, 1995. (RFC – Solache/Reyes 51105). Four days later, Clemons called Area Five detectives from Florida. He confessed on the phone to killing Johnson. Later, he was arrested by Florida police officers and again confessed to them in a recorded interview. (RFC – Solache/Reyes 51129 -35.). On December 8, 1995, he provided a typed, courtreported statement again admitting to killing Johnson to a Cook County Assistant State's Attorney and a Chicago Police Department Detective. (RFC – Solache/Reyes 44157 – 81.)

5.  Although the allegedly missing documents were likely provided to defense counsel by either the Chicago Police Department or the Cook County State's Attorney's Office, they were unlikely to provide "leads" for either law enforcement or defense counsel to pursue.

People v Oscar Soto B-442532  97CR23347 (V: Miguel Salas)

In this gang-involved shooting, Plaintiff's expert acknowledges that two supplementary reports regarding two initial suspects are in the permanent retention/RD file, but he alleges that arrest reports and GPRs relating to these suspects do not appear in the public defender's file.

19

1. The public defender's file is incomplete. Although it contains 112 pages, 47 pages are wholly redacted. Of the remaining 65 pages, 28 are photos. The remaining 37 pages, include 2 blank pages and 2 photocopies of envelopes.

2. Included in the remaining 33 pages are defense counsel's subpoenas for various police reports. These subpoenas total 12 pages. This leaves 25 pages of police reports. The Chicago Police Department files total 158 pages including the 9 pages of GPRs plaintiff's expert claims were missing from the public defender's files.

3. The public defender's subpoenas for police reports are both general and specific. Defense counsel requested "any and all reports" including street files or GPRs. She also requested, in individual subpoenas, line up photos, scene photos, a B of I sheet and police report requests that did not include specifically list street files. She also subpoenaed Illinois State Police Reports.

4. It is impossible to claim that either the Chicago Police Department or the Cook County State's Attorney's Office failed to provide the allegedly missing documents based upon the incomplete information contained in the public defender's file.

<u>People v Guy Rainey A-403252 96CR20849 (V: Cedric Morris)</u>

Plaintiffs' Expert alleges that the presence of numerous requests for photos to compile photo arrays indicates that multiple identifications were performed but not reported. (Pl. Exp. Rpt., at 65-66.)  He bases this allegation on a note found in the investigative file naming Kevin Haas as a potential suspect. (RFC – Solache/Reyes 72857.) He alleges that Haas's name does not appear in the defense file or in any supplementary reports explaining his involvement.

The investigative file contains reports describing how and why the photo arrays were compiled (RFC 072888, RFC 072890, and RFC 072894) and how they were used (RFC 072879-81 and RFC 072905). A report describing the in-person line up also references the photo arrays. (RFC 072875-77.) Each of these reports were found in the public defender's file.

Kevin Haas was a Chicago Police Department Detective. Plaintiff's expert could possibly have discerned his status by reviewing RFC – Solache/Reyes 72864. That document is a handwritten note from another Chicago Police Department Employee assigned to the "Stop – Ident Desk" to Det. Haas.

<u>People v Demetrius Johnson, P-272087, 91 CR 9833 (V: Edwin Fred)</u>

1. Plaintiff's experts claims that investigative documents related to a line up identification of Bryan Johns were not provided to the criminal defense attorney. This claim is based upon an obviously incomplete criminal defense attorney file. The file does not contain

any CPD reports. And the file lacks any documents with the trial criminal defense attorney's name. (Deborah Gubin.) Inexplicably, the file does contain 23 pages of VA medical records for 30-year-old Levon Jefferson. These documents, requested by the defendant Johnson's first criminal defense attorney, Jack Carey, have no apparent connection to this case.

2   The criminal defense attorney's file does contain a letter from CPD's Communication Operations Section indicating most broadcasts were erased after 30 days and no relevant records were found in the master logging tape. A log reflecting the examination of the master logging tape was also found in the file. These documents were likely sent to the court in response to a CCSAO subpoena. The CCSAO blueback indicates that the "911 subpoena materials" were mailed to defense counsel on 7-1692. (Rivera Production at SAO 0015063.)

3   The criminal defense attorney's file also contains numerous subpoenas for police reports. It contains 2 copies of a subpoena for all CPD reports with an addendum requesting "streets files" with a court return date of 8-13-91. There are also three copies of the defense subpoena for CPD reports stamped received by CPD's Record Division on "'91 Jul 24 14:30." And three more copies of the same subpoena stamped as received by CPD's Record Division on "24 Jul 1991 11:42." Other court filings found in the defense attorney's file were two copies of a defense motion for discovery court file-stamped 9-17-91, an appearance form, a request to be released from jail to attend a wake and a petition for substitution of judges that was later withdrawn.

4   The remaining documents pertinent to this case are requests by the defense attorney to his investigators. One note demonstrates that the criminal defense attorney was aware of Johns and his possible significance to the case. The note indicates that Bryan Johns "knows the real D." (Rivera Production at JR-L 212483.)

5   Plaintiff's expert claims that the documents were also missing from the prosecutor's file. Again, Plaintiff's expert assumes that the prosecutor's file contains all the documents today that were in the file at the time of trial. An examination of the file demonstrates that the alleged missing investigative documents were provided to the criminal defense attorney during discovery. The ASA indicates on the blueback that he tendered to defense counsel "26 pgs RD (GPR Subp)." (Rivera Production at SAO 0015056.)

6   In the CPD's investigative material, the ASA's subpoena is present. The subpoena and the investigative material that follows it, including the Bryan John's unsigned line up report, totals 26 pages. Moreover, the other material in the Investigative File are court attendance reports, the medical examiner's report and a case disposition report. None of the remaining documents are GPRs or "street files."

7   Demetrius Johnson also states that he knew about the alleged Johns' lineup identification prior to his trial. On August 31, 2022, Demetrius Johnson testified in a

deposition that prior to his trial, Bryan Johns told him that Johns was identified in a lineup the night of the murder of Edwin Fred. (Johnson Deposition at p 310.) He testified that Johns revealed this information to him in a conversation in Cook County Jail. Moreover, he told his private attorney, Deborah Gubin. (Johnson Deposition at 313.) According to Johnson, he also told his attorney that Johns told him that he actually committed the murder. (Johnson Deposition p. 315.)

8    Finally, the document Plaintiff's Expert claims as missing (RFC-15470-71) is dated as being submitted on June 13, 1991. Demetrius Johnson's private counsel, Deborah Gubin filed a Motion for Additional Discovery, which specifically requested, "The photo of the line-up taken 6/13/1991." Impounded Evidence 343-344. During her deposition, Ms. Gubin testified that she was aware of the Chicago Police Department policies regarding lineup identifications, specifically that a photograph would have only been taken if the lineup resulted in a positive identification. (Deborah Gubin Dep. At 46:19-23.) As a prosecutor this indicates to me that she had the Erickson line-up report dated 6/13/1991 and she was now seeking the photographs for that lineup. …

VII. In addition, Mr. Tiderington includes his criticisms regarding purportedly withheld documents in the *Solache/Reyes, Sierra,* and *Iglesias* cases.

   a. *People v. Reyes and Solache,* RD #C 198728, 98-CV-12440 (V:Jacinta & Mariano Soto).

      i.   Chicago Police Department's retention and use of polaroid and IR photographs.

Plaintiffs' Expert claims in the Solache – Reyes prosecution, that polaroid photographs were withheld from defense counsel. The allegation is that these photographs are evidence that uncharged individuals were alternate suspects. (Pl. Ex. Rpt. at 69-71.)

During the course of an investigation, Detectives may utilize IR Photographs, also known as 'mug shots,' and polaroid photographs.

At the commencement of an investigation, they could merely be used to visually identify who had been interviewed. This is particularly helpful when an investigation is handed-off to another team of detectives.

These photographs could also be used to display to other witnesses to further the investigation. They are not always used as a photo line-up. They could merely be used to confirm a person's identity with another witness.

They were also used during a witness's or a defendant's interview. They could be used as exhibits during the interview or as a photo of the witness or defendant to demonstrate their appearance and identity at the time the statement was recorded.

During the course of the investigation, the photographs were maintained in a string-tied envelope within the investigative file. If the photographs were used as exhibits or in photo line-ups, they were formally inventoried when the charges were filed, or the investigation was closed.

Plaintiffs' Expert claims that RFC Solache / Reyes 76-83 contains photographs that were not tendered to defense counsel. He alleges that photographs, by themselves are evidence that they were alternate suspects. First, the documents contain seven photographs that are not investigatory polaroid photographs. Next, one photograph is defendant Arturo DeLeon Reyes eating a sandwich. Two of the polaroid photographs are of Guadalupe Mejia. (76 and 80) The remaining polaroid photographs are of Jorge Mejia (76), Felicia Soto (78) and Rosa Aranda (80).

The taking of a polaroid or utilization of a mug shot during an investigation does not, by itself, designate someone as a suspect or an offender. But Plaintiffs' expert claims, "Had defense counsel had these polaroid photos, he or she would have had additional reason to contact these witnesses, and to learn about why they had been at the station and questioned, and what information they had revealed." (Plaintiffs' Expert at 69-71.) Instead, trial defense counsel could use the police reports to develop their own theories are alternate suspects.

Felicia Soto and Rosa Arrando are listed on the first page of the General Case Offense Report. RFC Solache Reyes 418. Their knowledge of the case is discussed there, throughout the file and again in a supplementary report starting on RFC Solache Reyes 363. Guadalupe Mejia's involvement in the case is detailed at great length in a closing supplementary report found at RFC Solache Reyes 233-253. Jorge Mejia is Guadalupe's husband and also referenced in RFC Solache Reyes 233-253.

In the investigation into the murders of Mariano & Jacinto Soto several polaroid photographs were taken. The investigative file envelope, that during an investigation is often used to hold photographs, is found at RFC Solache Reyes 000084. During discovery, photographs were taken of the evidence impounded with the Clerk of Court. Specifically, Reyes 000111, contains 5 polaroid photographs. Four of the five photographs are numbered as People's Exhibits 1 through 4. One photograph is unnumbered. Photographs 1 – 4 are Adriana Mejia, Rosario Mejia, Arturo DeLeon Reyes and Gabriel Solache. The unnumbered photograph is Guadalupe Mejia. These photographs were in an envelope attached to Guadalupe Mejia's handwritten statement with the Cook County State's Attorney's Office. (Reyes 101-112). This indicates that the photographs were in fact used by the Cook County State's Attorney when taking Guadalupe's handwritten statement.

Moreover, the significance of the polaroid photographs being impounded with the trial court after trial demonstrates that polaroid photographs were not withheld from defense counsel. The speculation of withheld photographs rests on a defense file that may be incomplete

years later. The speculation that their interviews were not made available to the defendants is belied by the detailed information discussed throughout the reports.

   b. *People v Thomas Sierra* RD#226760 - 95 CR 18602 (V: Noel Andujar)

Prior to the murder of Noel Andujar, detectives investigated the Ruben Gonzalez murder. During that investigation, they observed the defendant and another suspect pay their respects to the Gonzalez's mother. They were driving a Buick Park Avenue with wire wheel covers. Once those detectives were also assigned to the Andujar murder, they realized that witnesses in that case described the same car used in that fatal shooting. With the help of Andujar's mother and gang crimes specialists, RFC Sierra 000123, Sierra and another offender were identified as the occupants of the Buick Park Avenue the detectives observed during the Gonzalez investigation. (RFC Sierra – 00122.)

Plaintiff's Expert alleges that the Sierra investigative file should have included police reports from the Gonzalez homicide. (Pl. Exp. Rpt., at p. 71.)

The supplementary report, starting at RFC Sierra – 000122, clearly describes the investigative steps that led to the search for Thomas Sierra. These steps are self-contained in the Sierra supplementary reports. The supplementary report lists the name of the victim in the previous homicide investigation, Ruben Gonzalez, and the interview of his mother, Esther Reyes, and the date, 20 May 95, that Sierra approached her and offered his condolences.

This supplemental report transparently describes the detectives' investigative steps that led them to search for Thomas Sierra.

During the discovery process, and leading up to trial, nothing prevented either the prosecutor or the defense attorney from obtaining and examining the Gonzalez case file. From a prosecutor's point of view, there was no reason to include the entirety of the Gonzalez investigative file within the the Andujar file.  Rather, both the prosecutors and defense attorneys would have been able to subpoena the file.

*People v. Iglesias,* RD #X 250303, 93-CR-15199 (V: Monica Roman)

   a. Plaintiff's Expert claims that investigative materials were missing from the prosecutor's file. He concludes that "…the failure to disclose to prosecutors the full contents of the investigative file before trial is an indication that detectives were not producing complete files, and policy picking and choosing, or purging, the files before disclosing them." Pl. Exp. Rpt. at p. 72.

   b. Plaintiff's Expert assumes that decades-old prosecutor's files should contain all documents found in the Chicago Police Department's files. It is the same failed

premise that he has applied to the public defender's files. He cannot comprehend that these files are not intact today.

c. During his deposition he repeated his assumption that the prosecutor's files today are complete files. He testified that he didn't know why the prosecutor's files would not be complete. He did acknowledge that some of these files were found in warehouses and dingy basements. But he did not know what happens to a prosecutor's file after a trial has been concluded. (Tiderington Dep. 02/12/2023 at pp. 273:19-275:3).

d. An examination of both prosecutors' files and public defenders' files have shown them to be incomplete. Sometimes woefully incomplete. To compound this false assumption as evidence of documents being withheld from defendants is baseless and misleading.

Plaintiff's Expert lists the following pages from the investigative file that were not contained in the prosecution file: RFC Iglesias 1-8, 17-18, 26-27, 32- 37, 44-46, 76-77, and 83.

a. RFC Iglesias 2-4 and 8, are subpoenas issued by the prosecutor's office to secure witnesses' presence in court. RFC Iglesias 83 is a court attendance report reflecting the results of the grand jury's true bill. One subpoena, RFC Iglesias 8, is for police reports.

   i. While plaintiff's expert acknowledges these documents lack an 'investigative nature,' he still claims their absence is evidence of documents withheld by the Chicago Police Department.

   ii. Prosecutors retain copies of their subpoenas in their files irrespective of whether the Chicago Police Department returns copies of them. The fact that they are missing from the prosecutor's file demonstrates that the Cook County State's Attorney's Office's files are incomplete.

b. RFC Iglesias 17-18, 32-37 and 44-46 are property inventory sheets. They reflect evidence recovered by the Chicago Police Department during the investigation. They are also filed with the court and maintained in the municipal file. These inventories include a photo array, a fired bullet recovered from a car, a fired bullet recovered by the medical examiner during the autopsy and a sample of the victim's blood also recovered during the autopsy.

   i. These inventories are critical to the prosecutor's presentation of evidence during trial. The evidence collected may also be further examined by forensic experts. The absence of these critical documents demonstrates that the prosecutor's file as it exists today is incomplete.

       ii.   The photo array evidence inventory report is found at RFC Iglesias 17-18. The use of the photo array was discussed in a supplementary report found at RFC Iglesias 90-93. The inventory number assigned to the photo array is found at RFC Iglesias 91.

       iii.  The recovery of the fired bullet, with the related inventory number, is listed both in evidence recovery reports (RFC Iglesias 47 and 58) and in a supplementary report (RFC Iglesias 50 and 105.)

       iv.  The recovery of a bullet from the deceased victim and the further testing of the victim's blood is discussed in the medical examiner's report at RFC Iglesias 86. The recovery of the bullet is also included in a supplementary report found at RFC Iglesias 88-89.

c. RFC Iglesias 76-77 is a vehicle inquiry leads request. This documents the retention of an automobile towed to a police department impound lot.

       i.   The victim in this case was shot while seated inside the automobile that was towed by the police to an impound lot. The car is literally the crime scene and discussed throughout the police reports. This vehicle inquiry leads report reflects the tow and the retention of the car. The absence of this significant document further demonstrates that the prosecutor's file is incomplete.

       ii.  Nevertheless, the facts related to the examination, towing and impounding of the car are found in supplementary reports, RFC Iglesias 50 and 105, and in a general progress report found at RFC Iglesias 66.

d. RFC Iglesias 26-27 is an arrest report for a drug possession case. This report may have been used to identify the defendant during the investigation. The supplementary report indicates that investigating officers had prior contact with a person using the defendant's nickname. RFC Iglesias 91. Prior arrest reports used during the investigation would be included in the prosecutor's files. The absence of this document again shows the incomplete nature of the prosecutor's file.

VIIII. *People v. Maysonet,* RD # N-234297, 92-CR-1014601 (V: Torrence Wiley & Kevin Wiley)

a. The investigative file, as it exists today, is not complete. This is demonstrated by examining the CCSAO file as the prosecutors' file contains GPR notes that are not currently in the CPD investigative file. (CCSAO 874-881).

b. During the pretrial discovery process, the CCSAO obtains CPD's reports, including GPRs. These reports including GPRs are then provided to defense counsel.

c. Therefore the GPRs found in the CCSAO file must have been obtained from CPD and tendered to defense counsel. Their absence today, in CPD's investigative file, demonstrates only that their files are incomplete today. It is not evidence that the GPRs were 'suppressed' by CPD. Quite the contrary, they were provided to CCSAO during pretrial discovery.

My opinions, findings, and observations herein are based upon my education, training and experience. The details of my background are listed in my curriculum vitae that is attached and incorporated herein by reference. Among other accomplishments, I have thirty-two years of experience as a trial prosecutor, and I have attained numerous supervisory positions including Chief of the Criminal Prosecutions Bureau in the Cook County State's Attorney's Office and Deputy Chief with the DuPage County State's Attorney's Office. I have also lectured on numerous aspects of criminal prosecutions including *Brady* and discovery responsibilities for prosecutor's offices in Illinois and nationwide through the National District Attorney's Association. I have most recently included discovery and *Brady* obligations in one of a series of annual ethics seminars sponsored by the Winnebago County State's Attorney's Office.

DATED: September 8, 2023

Respectfully Submitted:

Bernard J. Murray

27

## <u>MATERIALS REVIEWED</u>

1. Expert report of Thomas J. Tiderington in *Maysonet v. Guevara, et. al.,*

2. Deposition of Thomas J. Tiderington in *Maysonet v. Guevara, et. al.,*

3. RD # N-234297 (RD File and Investigative File)

    a. CCSAO File for the prosecution of Jose Maysonet.

4. Expert report of Thomas J. Tiderington in *Reyes v. Guevara, et. al.* and *Solache v. Guevara, et. al.*

5. Expert report of Thomas J. Tiderington in *Sierra v. Guevara, et. al.*

6. Expert report of Thomas J. Tiderington in *Iglesias v. Guevara, et. al.*

7. Deposition of Thomas J. Tiderington (Parts 1 and 2) in *Reyes v. Guevara, et. al.* and *Solache v. Guevara, et. al.*

8. Deposition of Thomas J. Tiderington in *Sierra v. Guevara, et. al.*

9. Deposition of Thomas J. Tiderington in *Iglesias v. Guevara, et. al.*

10. RD # A59634 (RD File)

11. RD # A744094 (RD File)

12. RD # B447609
    a. Public Defender File for Rodney Tooney
    b. CCSAO file for the prosecution of Rodney Tooney

13. RD # C250890 (RD File)
    a. Public Defender File for Patrick Bailey
    b. CCSAO file for the prosecution of Patrick Bailey

14. RD # C687989 (RD File)
    a. Public Defender File for Kimberly Mathis
    b. CCSAO file for the prosecution of Kimberly Mathis

15. RD # C 198126 (Investigative File for Soto Homicide)

16. Cook County Public Defender's Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144

17. Cook County Public Defender's Reply in Support of Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144

18. RD # Z273605 (Investigative File & RD File)
    a. Public Defender Files for Damaine Billups & Willie Johnson
    b. CCSAO File for the prosecution of Damaine Billups & Willie Johnson

19. RD # Z475236 (Investigative File & RD File)
    a. Public Defender File for Ardell Clemons
    b. CCSAO file for the prosecution of Ardell Clemons

20. RD # C 687989 (Investigative File & RD File
    a. Public Defender File for Kimberly Mathis
    b. CCSAO File for the prosecution of Kimberly Mathis

21. Deposition of Deborah Gubin in *Johnson v. Guevara,* N.D. Ill. Case No. 20-CV4156

22. Deposition of Kevin Sheehan in *Johnson v. Guevara,* N.D. Ill. Case No. 20-CV4156

23. RD # A 403252 (Investigative File & RD File)
    a. Public Defender file for Guy Rainey
    b. CCSAO file for the prosecution of Guy Rainey

24. RD # B 442532 (Investigative File and RD File)
    a. Public Defender File for Oscar Soto
    b. CCSAO File for the prosecution of Oscar Soto

25. RD #T 290460 (Investigative File & RD File)

26. RD #X 066055 (Investigative File & RD File)

27. RD #Z 093141 (Investigative File & RD File)

28. RD #Y 240898 (Investigative File & RD File)

29. RD # Z226760 (Investigative File & RD File)

30. RD # X 250303 (Investigative File & RD File)

31. *People v. Johnson,* 91-CR-19833, Common Law Record (April 14, 1994) Impounded Evidence 304-415.

# BERNARD J. MURRAY

**Education**

---

- University of Illinois - Chicago, Chicago, IL
  - Bachelor of Arts in Criminal Justice and Political Science. Minor in Sociology
- DePaul University – College of Law School, Chicago IL - Juris Doctor

**Bar Admissions:**

---

- State of Illinois – November 9, 1983
- United States District Court for the Northern District of Illinois – November 1983
- State of Illinois Capital Litigation Trial Bar, Lead Counsel – December 16, 2002

**Professional Experience**

---

- DuPage County State's Attorney's Office
  - Assistant State's Attorney – 2009 to 2015
  - Deputy Chief, Community Affairs Division – 2009 to 2010
  - Deputy Chief, Felony Trial Division – 2010 to 2014
  - First Assistant, 2018 - present
- Cook County State's Attorney's Office Assistant
  - State's Attorney –1983 to 2008
  - -Appeals, Juvenile, Felony Review, Preliminary Hearings and Felony Trial Divisions
  - Deputy Supervisor, Gang Prosecutions Unit 1993 to 1998
  - Supervisor, Felony Trial Division – 1998 to 2000
  - Deputy Chief, Special Prosecutions Bureau – 2000 to 2001
  - Chief, Criminal Prosecutions Bureau – 2001 to 2008
- Special Assistant State's Attorney for Jefferson County, IL – 1994 to 1996
- Special Assistant U.S. Attorney, Northern District of IL - 1992 to 1997

**Honors and Awards**

---

- Dean's List – University of Illinois – Chicago
- President - Illinois Prosecutors Bar Association – 1999 - 2005; Secretary - 2014
- Officer - Association of Government Attorneys in Capital Litigation – 2002 to present;      - President – 2010

**Memberships**

---

- University of Illinois - Chicago Criminal Justice Society
- Chicago Bar Association - Judicial Evaluation Committee

- American Bar Association
- Illinois Bar Association
- Illinois Prosecutors Bar Association
- National District Attorneys Association
- National College of District Attorneys - Lecturer and Trial Advocacy Faculty
- Association of Government Attorneys in Capital Litigation
- Cook County State's Attorney's Office - Senior Training Committee
- CLEAR Commission – Illinois Criminal Code Reform
- CLEAR Sentencing Commission – Illinois Criminal Sentencing Reform
- Illinois Sentencing Policy Advisory Council

## **PAST TESTIMONY**

1. Deposition Testimony
   a. *Fields v. City of Chicago*
   b. *Rivera v. City of Chicago*
   c. *Reyes v. Guevara et. al. & Solache v. Guevara et. al.*
   d. *Sierra v. Guevara*
   e. *Iglesias v. Guevara*

2. Trial Testimony
   a. *Fields v. City of Chicago*
   b. *Rivera v. City of Chicago*

## **HOURLY RATE**

$200/Hour for Out of Court Review
$300/Hour for Testimony

EXPERT REPORT OF BERNARD J. MURRAY

*IGLESIAS V. GUEVARA, ET. AL.* 19-CV-6508

I.    Overview

a.    The Plaintiff's expert's conclusions that "CPD's Policies and Practices Concerning Documentation and Disclosures in Homicide Investigations are Woefully Inadequate and Result in the Routine Failure to Document and Disclose the Documents and Information Learned During the Homicide Investigation to Criminal Defendants" is largely based upon the flawed premise that that "[c]riminal defense files show that important investigative materials are regularly withheld from criminal defendants" (Pl. Exp. Rpt., at p.60.)  These opinions, including all their flaws, are largely a copy and paste from Mr. Tiderington's previous reports in the consolidated cases of *Reyes v. Guevara* and *Solache v. Guevara,* and *Sierra v. Guevara.* In fact, the examples cited by Mr. Tiderington in this report are identical to those used in the *Sierra* report.  As such, this report is similar to my previous rebuttal opinions and incorporates the totality of my opinions (including my deposition testimony in *Solache/Reyes* case) here.  (See *Sierra* Report and all its attachments, attached here as Attachment A.)

Plaintiff's expert again assumes that documents currently missing from criminal defense attorneys' files but present in the CPD's investigative files establishes that they were withheld from criminal defendants prior to and at the time of the criminal trial. He makes this claim lacking any evidence to show that the criminal defense attorney's files are currently in the same condition as they were at the time of the original trial. He claims that "any review of prosecutor and criminal defense files should reveal a simple finding: all the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file." (Pl. Exp. Rpt., at 60.) Yet there is no evidence in the report that he examined the prosecutor's files to determine if they had received reports that he now claims were withheld. Nor does he acknowledge that the public defenders' files may be incomplete because of the passage of time or because they withdrew from the case for private counsel.

In addition to the files and documents reviewed in the *Solache/Reyes* report, Plaintiff's expert also examined pages from four additional files, without the benefit of having any public defender files, to opine that documents were withheld from the criminal defendants.

i    The Cook County Public Defender's Office (CCPD) has questioned the Plaintiff's expert's assumption that merely because a

1

report is now missing from their files, then it was never provided to them. In a Motion to Quash Subpoena in *Velez v Dart, 18 CF 8144,* the Cook County Public Defender's Office stated "As the CCPD argued in its opening motion, this Court should also examine whether the benefit of production outweighs the monumental effort required to produce hundreds of files, and this Court should question the underlying assumption, adopted in other cases, that if a report is not found in the CCPD's file, that report must not have been given to the CCPD." (Reply in Support of Motion to Quash Subpoena at p.3.)

ii      The CCPD went on to argue that "The CCPD acknowledges that when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later." (Reply in Support of Motion to Quash Subpoena at p.3.)

b.      Plaintiff's expert also fails to acknowledge that some of the public defenders' files may be incomplete now because they were replaced by private attorneys. There is no indication that private attorney's files were examined by Plaintiff's expert.

c.      Finally, the public defender files contain significant redactions. Plaintiffs' expert testified during his deposition, in the *Solache/Reyes* case, that he was told to assume that all redacted materials were work product. He has no way of knowing if that assumption is accurate in this or in other redacted files. Those redactions could very well undermine the conclusions he makes throughout the report that documents were missing from the public defender file.

 d.      In the *Solache/Reyes* case, Plaintiff's expert initially compared 105 criminal defense attorneys' files to 72 investigative files. He states that these files are listed in Attachment F, which he also uses in support of his opinions in this case. Plaintiff's expert claims that after removing criminal defense files that did not have a corresponding investigative file, contained no police reports or very few so as to be incomplete, he ultimately limited his analysis to 64 criminal defense attorneys' files. He lists his process and exclusions in footnotes 146 and 147. (Pl. Exp. Rpt., at 61-62.)

e.      In the *Sierra* and *Iglesias* cases, Plaintiff's expert reviewed 344 Area 5 Investigative Files and 341 corresponding "permanent retention files" for the time period of 1995-1998. There were no criminal defense files produced or reviewed.  (Pl. Exp. Rpt., at 56, 61).  This spreadsheet was attached to Mr. Tiderington's report as Attachment F.

2

i   He has indicated that the files removed from his considerations have strike-through lines in Attachment E. However, it appears that he considered files that he deemed "incomplete" in his opinion in the body of his report. Also, he claims Attachment E contains 64[1] files that lack strike-throughs. (Ibid., at pp. 62). It's not at all clear how he finally settled on those 64 files. Plaintiff's expert specifically reviewed five files as "examples" in his report. (Ibid., at pp. 64-68.) The remaining files were contained in a table compiled by the Plaintiff's counsel.

ii   In addition, Plaintiff's expert specifically compared five defense attorney files to CPD's investigative files  He applies the same flawed logic specifically to these five files, that is that the criminal defense attorneys' files today contain the same documents as at the time of trial. One file that the Plaintiff's expert relied upon in both the *Solache/Reyes* and *Sierra* reports is devoid of any CPD reports. He appears to have removed that file from his consideration in this report.  There is no indication that he examined the prosecutors' files to determine if any of the allegedly withheld documents were found in those files. In fact, Plaintiff's expert conceded during his *Solache/Reyes* deposition that he was not aware that companion CCSAO files were produced in discovery.  (Expert's Deposition, 10/6/2022, Vol. II at pg. 391-392.)   An examination of the prosecutors' files reveals many of the allegedly withheld documents are contained in the CCSAO's trial files and therefore were not withheld.  Moreover, Plaintiff's expert testified during the *Solache/Reyes* deposition that it was his position that "any reasonable officer would understand that everything in a homicide file should be turned over to the prosecutor[]" and accordingly conceded that if the documents were contained within the CCSAO file, that would have been proper and reasonable conduct on the part of CPD.  (Expert's Deposition, 10/6/2022, Vol. II at pg. 654, 660.) The prosecutors' files also record, on occasion, when they provided police reports, GPRs and "street files" which during the relevant time period (1991-1998) were another name for investigative files, to counsel in court.

iii   Plaintiff's expert also claims that he found potentially exculpatory handwritten notes that were not transferred onto official reports. Plaintiff's expert seems to claim that these notes were not disclosed

---

[1] Interestingly, Mr. Tiderington states first that his analysis included 64 files, but then in the next paragraph, states 63 files were left for calculation and analysis.  It is not at all clear what the total number used was.

to criminal defendants. But in this section of his report, he only compared permanent retention files with their corresponding investigative files. Inexplicably he does not discuss comparing these notes to any public defender's file. (Pl. Exp. Rpt, at p. 59.)

f. For this report, I am also relying upon my analysis of the Plaintiff's expert's report in *Fields v City of Chicago* and *Rivera v City of Chicago* and the reports compiled in those cases. These reports were previously attached to an incorporated in my *Sierra* report. (See Attachment A.)

II.   Discovery Obligations

a. The Illinois General Assembly has acknowledged by statute that discovery procedures in criminal cases shall be in accordance with the Illinois Supreme Court Rules. 725 ILCS 5/114-13(a). They also have codified the long-standing procedures utilized by police and prosecutors to guarantee that police reports will be provided to the prosecutors' offices to be tendered during discovery:

> "Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated." 725 ILCS 5/1114-13(b)(11-19-03).

b. Disclosure to the Accused: The Illinois Supreme Court Rules require that the prosecution disclose to defense counsel certain material and information within its possession or control in all felonies and felony juvenile delinquency cases. (Illinois Supreme Court Rule 412.) Among the items required to be disclosed are:

   i.   The names and last known addresses of witnesses, their relevant written or recorded statements, and memoranda containing substantially verbatim reports of their oral statements. (Illinois Supreme Court Rule 412(a)(i)).

   ii.  Any statements made by the accused (written, recorded, or oral) and a list of witnesses to the statement.

   iii. Any reports of experts including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

      iv.   Any books, papers, documents, photographs or tangible objects which the prosecutor intends to use at trial or which were obtained from the accused.

      v.   And any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at trial.

c. *Brady* and *Giglio* Disclosures: The U.S. Supreme Court decisions also require that prosecutors disclose exculpatory evidence that is material either to guilt or to punishment. *Giglio* requires evidence that could allow the defense to impeach the credibility of a prosecution witness. The police fulfill their *Brady* and *Giglio* disclosure obligations when they supply the information to the prosecutors.

      i. The Illinois Supreme Court also includes *Brady* disclosure obligations in their Rules. (Illinois Supreme Court Rule 412(c)).

d. The Illinois Supreme Court Rules also require that the prosecution "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. (Illinois Supreme Court Rule 412 (f)). The prosecution's duty to disclose is a continuing obligation. If additional discoverable information comes to the prosecution's attention at a later date, the defendant should be promptly notified. (Illinois Supreme Court Rule 415 (b)).

e. The Illinois Supreme Court Rules indicate that certain materials are not subject to disclosure. For example, work product is not subject to disclosure. The Rules state that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its legal or investigative staffs, or of defense counsel or his staff." Illinois Supreme Court Rule 412(j).

f. The Chicago Police Department developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, the CPD's policy is good. It requires detectives to turn in all relevant material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. Plaintiff's expert relies on former police officer Michael Brasfield's previous opinions disclosed in

the *Fields* litigation[2] that, as a police officer, he routinely shredded his investigative notes. Unlike plaintiff Field's expert's own practice, CPD's policy requires the detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will nevertheless be maintained and produced to the prosecutor and defense attorney for later review. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other fashion; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

III.  Regulation of Discovery

a.  For crimes occurring in Chicago, Cook County Assistant State's Attorneys assigned to trial courtrooms learn both formally and informally how to obtain police reports and all other relevant information and evidence, including evidence from the Chicago Police Department. Prosecutors maintain checklists of documents that may exist and should be obtained. Along with the checklists come the methods to obtain the reports and evidence. Most of the documents listed on the checklists are created by the Chicago Police Department.

b.  Chicago Police Department reports are obtained primarily through subpoenas, request forms and telephone calls. The primary sources of reports, notes, criminal histories, or photographs in the Chicago Police Department are headquarters, the crime lab, the bureau of identification and the department's area headquarters. The Cook County State's Attorney's Office and the Chicago Police Department maintain an intra and interoffice mail service that facilitates the production of reports, photographs and criminal histories.

c.  By the 1980s, prosecutors routinely subpoenaed all police reports. This was in addition to the forms or phone calls that were still utilized. The subpoenas would include a request for police documents that became known informally by some prosecutors and defense attorneys as "street files." Chicago Police Department Investigative Files contain what attorneys referred to as "street files" *i.e.*, notes most often recorded on forms titled 'general progress reports' (GPRs). Prosecutors would often send these subpoenas to both the Superintendent's Office (also known as headquarters) and to the Area Headquarters. The Chicago Police Department subsequently directed that the subpoenas go through one location: The Superintendent's Office. From

---

[2] Plaintiffs' expert in this case relies on the plaintiff's expert in *Fields* as well as *Rivera* in arriving at his opinions. *See,* Pl. Exp. Rpt., at p. 41.

there, CPD's subpoena unit would cause the subpoenaed material to be collected from the relevant unit(s) and sent to the trial courts. Many criminal defense attorneys would also issue subpoenas for police reports and include the term "street files" in the documents requested, which would obtain copies of the Investigative Files.

d. To ensure a prompt flow of information, prosecutors would also reach out to Detectives and have them bring their investigative files to court for copying.

e. Once the police reports were in hand, the prosecutors would tender all of them to defense counsel. If after a review of the documents they appeared to be incomplete, more requests for potentially missing documents were made by the attorneys in the courtroom.

f. Prosecutors provide these documents to defense counsel in court and generally indicate when they believed they have tendered the complete file. Prosecutors also utilized an informal docket sheet within their files, commonly referred to as the blueback. Prosecutors often recorded on their bluebacks when they provided discovery to defense attorneys. Formal Answers to Discovery also briefly summarized some of the discovery. For example, the Answer listed witnesses' names found in the police reports the prosecution anticipated calling at trial.

g. To memorialize discovery compliance, prosecutors eventually created discovery receipts in the 1990s that listed the documents tendered to defense counsel. A signed copy of the receipts was often maintained in the prosecutors' files. More recent methods include numbering all the pages and scanning the documents.

h. Not all documents or pieces of evidence are tendered by prosecutors to defense counsel. However, these items are made available for defense counsel to examine prior to trial. For example, items of physical evidence such as a weapon or clothing are not photocopied but are made available for examination. Prosecutors often made photo arrays, crime scene photographs, or individual photographs, including polaroid photos, available for examination, too.

i. In addition to the prosecutor's obligations to disclose police reports during discovery, certain documents are also maintained in the court file or are provided to defense counsel in open court.

i. During a charged defendant's first court appearance, his defense counsel is provided with a copy of his one-page arrest report[3]. This document is utilized by the court to determine whether probable cause to detain exists. Defense counsel can also examine and copy the complaint for preliminary hearing. Although not provided to defense counsel during the initial appearance, the defendant's criminal history is summarized during the bond hearing to assist the court in setting an appropriate amount of bail. After a subsequent determination of probable cause, the formal indictment or information is also maintained in the court file. Finally, the court file maintains copies of arrest and search warrants and documents pertaining to extradition.

ii. The court file also contains Chicago Police Department Property Inventory Sheets. This document, known as the Inventory, lists evidence that was recovered and preserved by the police department during the investigation.

IV. Record Retention and Discovery Obligations

a. Plaintiff's expert acknowledged during his *Solache/Reyes* deposition that it is "proper and reasonable conduct" for the Chicago Police Department to provide investigative materials to the Cook County State's Attorney's Office for discovery. (Expert's deposition, Vol. II, 10/6/22 at p. 660.)

b. The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, CPD's policy furthers their ability to comply with discovery obligations. It requires detectives to "maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised during the subject investigation, initial court hearing or any subsequent reviews." *See,* Special Order 83-1. Prosecutors during this time period understood this to require detectives to turn in all relevant material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. CPD's policy requires detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will be

---

[3] Notably, one of the documents Mr. Tiderington argues was withheld from Plaintiff Iglesias' defense counsel was his arrest report. This argument demonstrates his lack of understanding of the criminal justice system in Cook County.

maintained and produced to the prosecutor and defense attorney for later review.

    i.  At times, Plaintiff's expert complains that information was not recorded on a GPR form, Pl. Exp. Rpt., at p. 57, or was preserved by different units within CPD, Pl. Exp. Rpt., at p. 51-52. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other manner; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

    ii.  Nor does it matter that a different unit of CPD either created a report or maintained reports in different physical offices. Prosecutors and criminal defense attorneys were well aware that, for example, criminal history reports or lab reports were created and maintained by different units within the police department. This knowledge is demonstrated by the laundry-list of documents requested in subpoenas issued by either a prosecutor or a criminal defense attorney.

c.  From the inception of the Orders mandating the preservation of investigative materials, prosecutors as well as criminal defense attorneys, have issued subpoenas to receive not only typed reports but investigative materials. The subpoenas issued by all attorneys have used various terms for the investigative material. Primarily referred to as 'street files,' they are also referred to as area files, GPRs, notes, or running files.

d.  The subpoenas issued by prosecutors and criminal defense attorneys also reveal that lawyers involved in the criminal justice system understand that the Chicago Police Department has various units tasked with creating, compiling and maintaining records related to a criminal investigation. The subpoenas issued to obtain these records are often detailed to obtain all of those records. The primary identifying number is the case number, known as the records division or RD number. Other significant numbers to obtain records are the arrest report and photo number (known as the CB number), the criminal history number (known as the IR number) and the property inventory number (known as the EARPS or inventory number.)

    i.  While the permanent records division maintains the formal police reports such as the typed supplementary reports, the investigative files are maintained by the police Area that is primarily responsible for the investigation. Those files could contain notes, photos, or GPRs added to the file during the pendency of the investigation.

ii. All CPD officers compile their reports under the RD number and submit them for permanent retention. Those documents may be created by patrol, gangs, narcotics, crime lab, forensic investigators or bomb and arson units.

iii. Other units in the Chicago Police Department are tasked to maintain other records or evidence. For example, arrest photos and criminal histories are maintained in a central location known as the Bureau of Identification. Evidence collected from a crime scene and submitted to the CPD Lab for testing is maintained at the lab during testing. Reports generated by the Labs are accessed through a request using the case RD number.

iv. Forensic investigators who primarily collect evidence and photograph crime scenes maintain their photographs in their unit under the case RD number. The collected evidence is preserved with the Evidence and Recovered Property Section (EARPS.) EARPS generates numerous copies of their property inventory sheets and submits one copy to the Clerk of the Circuit Court to maintain in the municipal court file.

e. Plaintiff's expert alleges throughout the report that "parallel files" are maintained by CPD and are often not provided to either criminal defense attorneys or prosecutors.

i. Plaintiff's expert is not clear, either in his report or during his testimony in *Solache/Reyes* or in the *Sierra* case, on how he defines an investigative or parallel file.

1. If he is referring to the manner that CPD creates and maintains reports, this process is not concealed. Prosecutors and criminal defense attorneys are aware of the manner and location of how those reports are created and where they are stored.

2. If he is somehow suggesting that individual police officers are personally retaining reports that are not maintained in the investigative file, he does so through speculation as he cites no evidence to support that inference or conclusion. The Special Orders from the early 1980s directed the detectives to the procedures to be used to maintain investigative materials.

3. Plaintiff's expert also claims that police officers from other units such as patrol or gangs *could have* files related to a homicide investigation, but CPD Special Orders are silent on whether the reports should be preserved or disclosed. (Pl. Exp. Rpt., at 53.)  This claim is also based on speculation, cites no evidence in support and shows a lack of understanding of CPD's procedures.

   a. While Plaintiff's expert acknowledges that the CPD's 'Detective Division' maintained investigative materials, he appears to ignore that violent crimes detectives have the primary responsibility to investigate homicides. Nowhere in any file will you find a patrol officer, or a gang officer having primary responsibility to investigate or clear a homicide.

   b. If a patrol or gang officer participates in the investigation of a homicide, any reports generated by those officers are shared with the violent crimes detectives and filed by CPD under the RD number associated with the crime.

   c. Therefore, all reports compiled by a patrol officer, or a gang officer could be obtained by either the prosecution or the criminal defense attorney via a subpoena.

4. Plaintiff's expert claims that in any given investigation, at least three files could have been created. (Pl. Exp. Rpt., at p. 52.) The permanent retention file, a unit RD file and an investigative file. He also claims that other police units could maintain their own investigative materials and detectives could maintain their own running files. (Pl. Exp. Rpt., at p. 52) He claims these reports were not subject to documentation, storage or disclosure. It is unclear what documents he is referring to and he cites no examples from the hundreds of files he reviewed.  Detectives could make copies of existing CPD reports kept at the Area during the course of the investigation, but these documents are already preserved in either the permanent retention/RD file or the Investigative File and therefore available by subpoena from either the prosecution or the criminal defense attorney.

11

V. Comparison of permanent retention/RD files with corresponding Investigative files

    a. Plaintiff's expert claims that he found potentially exculpatory handwritten notes that were not transferred into "official reports". He specially identifies a number of these notes and claims that they were either not transferred to an "official report" or that they were not disclosed to criminal defendants. (Pl. Exp. Rpt., p. 59-60). These are the same examples used in the *Solache/Reyes* and *Sierra* reports, though he removed several previously used examples. The point of this section of the report is confusing, and Plaintiff's expert was not able to articulate the reason he identified these documents during his deposition in either *Solache/Reyes* or *Sierra*.

    b. Preliminarily, it should be noted that permanent retention/RD files and Investigative files are *both* official files. His premise that these handwritten notes were not transferred into official reports is flawed. The handwritten notes found in Investigative files are official reports available to defense counsel through subpoenas or tendered in discovery from the Cook County State's Attorney's Office.

    c. General Progress Reports are often handwritten notes used by Detectives during the course of their investigations and used when they compile supplementary reports. Plaintiff's expert seems to believe that all notes, some that he considers cryptic, should be typed into supplementary reports. (Pl. Exp. Rpt., at p. 59-60.) The supplementary reports are often far more comprehensive than the notes. Prosecutors request all investigative materials while compiling discovery materials for discovery and for possible use at trial. The Chicago Police Department requires preservation of all investigative notes. This allows prosecutors and defense attorneys access to documents created in the course of the investigation.

    d. Next, Plaintiff's expert claims that these notes were not disclosed to criminal defendants. But in this section of his report, he only states that he compared permanent retention/RD files with their corresponding Investigative files. He does not discuss comparing these notes to a public defender's file. In fact, for several files examined by Plaintiff's expert in this section, no public defender files exist. (Tiderington Deposition, 12/8/22, at pp 305-306.) It is impossible for him to claim that these pages were not provided during pre-trial discovery to the defendants and their counsel. Moreover, he was not provided with the Cook County State's Attorney's files to determine if the alleged suppressed documents were tendered by the prosecutors.

    e. Plaintiff's expert lists handwritten notes that were not disclosed to defense counsel or not transferred into official reports, for four cases where there were no charges filed and therefore no public defender file.

i   RFC Solache/Reyes 076011-14 and 15-16, are found in RD# A-596534. This file involves the first-degree murder of Arney A. Reina. No defendant was charged in this case and thus there is no public defender file. (RFC Solache/Reyes 075911 and 075928-29.) The information contained on these pages is, primarily witness identification information, and is contained throughout the permanent retention file.

ii   RFC Solache/Reyes 077368 and 077452 are found in RD# A-744094. This case also lacks charges or a public defender file because no one was charged. This case involved a murder – suicide. (RFC Solache/Reyes 077378-79.) Regarding the alleged missing pages, RFC Solache/Reyes 77368 is the contact information for the murder victim's sister. RFC Solache/Reyes 077452 appears to be a pizza order unrelated to this case.

iii   RFC Iglesias[4] 079168 is found in RD# X-066005. This case involves the investigation into the fatal shooting Jesus Garcia. Based upon the existence of a valid self-defense, no charges were filed by the Cook County State's Attorney's Office and there is no public defender file. Nevertheless, the people identified in RFC-Sierra 079168 are found throughout the permanent retention file and within supplementary reports.

iv   RFC-Iglesias 092370 is found in RD# Z-093141. This case involves the 1995 fatal shooting of Jack Castle. Despite the involvement of federal law enforcement agencies, including the F.B.I., no charges were filed in this shooting. However, the loosely drawn map in RFC-Sierra 092370, is readily identified by examining the address of the occurrence found at RFC Sierra 092283.

f.   RFC Solache/Reyes 34554 is found in RD# Z-000273 and is also located in the public defender's file at AR-PD-41276.

g.   RFC 110176 and 110180 are handwritten notes found in the Kim Mathis file (RD # C-687989) discussed later in this report. Both handwritten notes appear to be the concluding sentence to an interview and located on the back side of a GPR. RFC 110176 is a note from an interview of Kim Mathis.

---

[4] Mr. Tiderington admitted during his deposition in the *Iglesias* matter that these documents were actually produced in the *Sierra* case, and are the same documents referenced in the *Sierra* report. (Tiderington Dep. 2/13/2023 at pp. 300-301). As such, I will continue to review to these documents as RFC-Sierra in this report.

RFC 110180 is a note from an interview of the defendant's sister Terry Mathis.

    i   Kim Mathis' note seems to indicate that her sister was present at the time of the beating. The remainder of all reports, including Kim Mathis' handwritten statement, indicates that her sister was not present. Moreover, in handwritten notes of Terry Mathis' interview, she states that she did not go upstairs. RFC Solache/Reyes 110178. This note is found in the public defender's file at AR-PD- 030049.

    ii   Terry Mathis' note indicates that her sister paged her at approximately 5:00 pm and told her that her son was dead. While this note is not found in the poorly maintained public defender's file, it does not appear to be exculpatory. All other indications are that Terry Mathis was with her sister. the defendant, at the hospital when her son was declared dead. AR-PD-030018; RFC Solache/Reyes 110146.

    iii   The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD-029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time was there an inability to discuss Terry's presence at the house or the call regarding her son's death.

h.  Plaintiffs' expert lists pages RFC 104166-70 as another example of investigative notes that were not disclosed to defense counsel or not transferred into official reports. These pages correspond to RD# C-250890 and court case number 98CR-13371. These pages are handwritten notes of a canvas for possible witnesses.

    i   This is another example of a violation of the parameters that Plaintiffs' expert established in Footnote #147. There he stated that he would not rely upon partial or incomplete public defender files, which were designated on Attachment F, as this one was, with a strikethrough.

    ii   The public defender's file is numbered AR-PD 23546-23684. It only contains one police report. That report is the General Offense Case Report. AR-PD 23677-8. It is impossible to determine if the public defender had the canvas reports or any investigative reports in their possession prior to trial.

      iii  Included in the public defender's file are numerous subpoenas for Chicago Police Department police reports. The subpoenas were divided into individual requests for line-up reports, 911 calls, evidence reports and the defendant's photo. Two subpoenas are of note. One subpoena requests any and all police reports and specifically asks for general progress reports. (AR-PD 23626.) The other subpoena requests any and all police reports including street files, working files or running files (AR-PD 23630.)

      iv  A review of the Cook County State's Attorney's Office's file reveals that a series of private attorneys represented the defendant early on (CCSAO 4791-92) and during a pre-trial motion to quash arrest (CCSAO 5427), during a guilty plea and sentencing (CCSAO 4847) and during a motion to withdraw his guilty plea (4924.)

i.  Regarding Y-240898, Plaintiff's expert claims that RFC Sierra -121416 and RFC Sierra-121420 were not disclosed to the criminal defendants or that the information was not included in permanent retention files.

      i  RFC Sierra – 121416 is a GPR note discussing Luis Guevara. A supplementary report found at RFC Sierra -121339 provides a lengthy interview of Luis Guevara.

      ii  RFC Sierra – 121420 is a GPR note detailing a bus route to Florida. Also included is a reference to Theresa Robinson. A corresponding supplementary report, found at RFC Sierra 121337, summarizes an interview with Robinson. The bus route information was summarized on the following page of the supplementary report.

j.  In T-290460, Plaintiff's expert identifies four pages that he claims are either not disclosed or not transcribed into an "official police report" such as a supplementary report.

      i  RFC Sierra 109932 appears to be the back of a GPR containing one sentence "tell you why he was crying." Lacking a public defender file to examine, Plaintiff's expert cannot claim that the GPR was missing. Nor does he attribute any exculpatory value to the sentence.

      ii  RFC Sierra 110061 appears to be a GPR report that states "Get Guns +." A reference to acquiring weapons is found in the defendant Hornsby's statement to law enforcement found at RFC Sierra 109975. There he said a co-defendant instructed him to "go get the missiles." He understood missiles to mean guns.

15

iii  RFC Sierra 110043 is a hand drawn map of a T alley in the vicinity of George, Kedzie and Diversey streets. This is the approximate location of the crime and is discussed in supplementary reports found at RFC Sierra 109977 and 109980.

iv  RFC Sierra 110062 is a GPR that lists three witnesses with address information. A note indicated that one witness must be found and interviewed. Also listed are various command staff police officers. Interviews with two of the witnesses are found in supplementary reports found at RFC Sierra 109964-65 and 109980-81.

VI. Comparison of Five Defense Attorney Files to Investigative Files.

a. Plaintiff's expert specifically compared five defense attorney files to CPD's investigative files.  These are the some of the same files that he lists in his expert report in *Solache/Reyes*, and *Sierra* which he acknowledged were not good examples in support of his opinions.  (Tiderington Dep. 12/8/2022 pp. 362:13-363:7).

People v Kim Mathis C-687989 98CR30439 (V: Cydryck Spain)

Plaintiff's expert contends that a GPR contains a handwritten note that places the defendant's sister at the scene of the crime at the time of the fatal beating of the defendant's own child. The cleared / closed report states that the defendant's sister was not present at the time of the beating.

1. The note appears to be the back page of the GPR of an interview with the defendant. Defense counsel obviously has ample opportunity to discuss the presence or absence of his client's sister during the beating.

2. Plaintiff's expert again assumes that the public defender's file is complete. And that the back page of the GPR was not provided by either the Chicago Police Department or the prosecution.

3. Defense counsel's file reveals that during his interview with the defendant, she stated that her sister Terry dropped off her son. Terry was circling the block because there was no parking. After the victim entered the apartment, the defendant talked with her sister before leaving the car and entering her apartment. Terry drove off and was not in the apartment when the defendant 'whipped the victim.' AR PD 02932-33.

4. The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD-

16

029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time did she ever indicate that she was present during the beating.

    a. This running diary appears to be a document that should have been subject to redaction, as it is clearly attorney work-product. Without this running diary, I would have currently been without knowledge of what the criminal defense counsel knew prior to trial. It also begs the question of whether other materials that were redacted could describe the extent of the material that now appears to be missing from the criminal defense attorney's file and further supports my conclusion that Plaintiffs' expert's methodology is flawed.

## People v Ardell Clemons Z-475236 96CR240 (V: Nyree Johnson)

Plaintiff's expert points to two documents in the investigative file that are missing from the public defender's file. He claims that these documents could point to other suspects.

1. Both documents are contained in the prosecutor's file (which Plaintiff's expert admits would have been "proper and reasonable" conduct) and likely tendered to defense counsel during discovery.

2. The allegedly missing GPR note (RFC – Solache/Reyes 44288) is found in the prosecutor's file at CCSAO 53045). The allegedly missing lease (RFC – Solache/Reyes 44260) is found in the prosecutor's file at CCSAO 53426.

3. The GPR note refers to a "possible suspect" that was described by Plaintiff's Expert as "dating" the victim in the GPR but as "only friends" in the police reports found in the public defender's file. The GPR does not state "dating" instead it states, "seeing her." (RFC 44288.)

4. Nyree Johnson's body was found on October 6, 1995. (RFC – Solache/Reyes 51105). Four days later, Clemons called Area Five detectives from Florida. He confessed on the phone to killing Johnson. Later, he was arrested by Florida police officers and again confessed to them in a recorded interview. (RFC – Solache/Reyes 51129 -35.). On December 8, 1995, he provided a typed, court-reported statement again admitting to killing Johnson to a Cook County Assistant State's Attorney and a Chicago Police Department Detective. (RFC – Solache/Reyes 44157 – 81.)

5. Although the allegedly missing documents were likely provided to defense counsel by either the Chicago Police Department or the Cook County State's Attorney's Office, they were unlikely to provide "leads" for either law enforcement or defense counsel to pursue.

## People v Oscar Soto B-442532_97CR23347 (V: Miguel Salas)

In this gang-involved shooting, Plaintiff's expert acknowledges that two supplementary reports regarding two initial suspects are in the permanent retention/RD file, but he alleges that arrest reports and GPRs relating to these suspects do not appear in the public defender's file.

1. The public defender's file is incomplete. Although it contains 112 pages, 47 pages are wholly redacted. Of the remaining 65 pages, 28 are photos. The remaining 37 pages, include 2 blank pages and 2 photocopies of envelopes.

2. Included in the remaining 33 pages are defense counsel's subpoenas for various police reports. These subpoenas total 12 pages. This leaves 25 pages of police reports. The Chicago Police Department files total 158 pages including the 9 pages of GPRs plaintiff's expert claims were missing from the public defender's files.

3. The public defender's subpoenas for police reports are both general and specific. Defense counsel requested "any and all reports" including street files or GPRs. She also requested, in individual subpoenas, line up photos, scene photos, a B of I sheet and police report requests that did not include specifically list street files. She also subpoenaed Illinois State Police Reports.

4. It is impossible to claim that either the Chicago Police Department or the Cook County State's Attorney's Office failed to provide the allegedly missing documents based upon the incomplete information contained in the public defender's file.

## People v Guy Rainey A-403252 96CR20849 (V: Cedric Morris)

Plaintiffs' Expert alleges that the presence of numerous requests for photos to compile photo arrays indicates that multiple identifications were performed but not reported. (Pl. Exp. Rpt., at 65-66.) He bases this allegation on a note found in the investigative file naming Kevin Haas as a potential suspect. (RFC – Solache/Reyes 72857.) He alleges that Haas's name does not appear in the defense file or in any supplementary reports explaining his involvement.

The investigative file contains reports describing how and why the photo arrays were compiled (RFC 072888, RFC 072890, and RFC 072894) and how they were used (RFC 072879-81 and RFC 072905). A report describing the in-person line up also references the photo arrays. (RFC 072875-77.) Each of these reports were found in the public defender's file.

Kevin Haas was a Chicago Police Department Detective. Plaintiff's expert could possibly have discerned his status by reviewing RFC – Solache/Reyes 72864. That document is

a handwritten note from another Chicago Police Department Employee assigned to the "Stop – Ident Desk" to Det. Haas.

People v Demetrius Johnson, P-272087, 91 CR 9833 (V: Edwin Fred)

1. Plaintiff's experts claims that investigative documents related to a line up identification of Bryan Johns were not provided to the criminal defense attorney. This claim is based upon an obviously incomplete criminal defense attorney file. The file does not contain any CPD reports. And the file lacks any documents with the trial criminal defense attorney's name. (Deborah Gubin.) Inexplicably, the file does contain 23 pages of VA medical records for 30-year-old Levon Jefferson. These documents, requested by the defendant Johnson's first criminal defense attorney, Jack Carey, have no apparent connection to this case.

2 The criminal defense attorney's file does contain a letter from CPD's Communication Operations Section indicating most broadcasts were erased after 30 days and no relevant records were found in the master logging tape. A log reflecting the examination of the master logging tape was also found in the file. These documents were likely sent to the court in response to a CCSAO subpoena. The CCSAO blueback indicates that the "911 subpoena materials" were mailed to defense counsel on 7-16-92. (Rivera Production at SAO 0015063.)

3 The criminal defense attorney's file also contains numerous subpoenas for police reports. It contains 2 copies of a subpoena for all CPD reports with an addendum requesting "streets files" with a court return date of 8-13-91. There are also three copies of the defense subpoena for CPD reports stamped received by CPD's Record Division on "'91 Jul 24 14:30." And three more copies of the same subpoena stamped as received by CPD's Record Division on "24 Jul 1991 11:42." Other court filings found in the defense attorney's file were two copies of a defense motion for discovery court file-stamped 9-17-91, an appearance form, a request to be released from jail to attend a wake and a petition for substitution of judges that was later withdrawn.

4 The remaining documents pertinent to this case are requests by the defense attorney to his investigators. One note demonstrates that the criminal defense attorney was aware of Johns and his possible significance to the case. The note indicates that Bryan Johns "knows the real D." (Rivera Production at JR-L 212483.)

5 Plaintiff's expert claims that the documents were also missing from the prosecutor's file. Again, Plaintiff's expert assumes that the prosecutor's file contains all the documents today that were in the file at the time of trial. An examination of the file demonstrates that the alleged missing investigative documents were provided to the criminal defense attorney during discovery. The ASA indicates on the blueback that he tendered to defense counsel "26 pgs RD (GPR Subp)." (Rivera Production at SAO 0015056.)

6   In the CPD's investigative material, the ASA's subpoena is present. The subpoena and the investigative material that follows it, including the Bryan John's unsigned line up report, totals 26 pages. Moreover, the other material in the Investigative File are court attendance reports, the medical examiner's report and a case disposition report. None of the remaining documents are GPRs or "street files."

7   Finally, Demetrius Johnson also states that he knew about the alleged Johns' lineup identification prior to his trial. On August 31, 2022, Demetrius Johnson testified in a deposition that prior to his trial, Bryan Johns told him that Johns was identified in a lineup the night of the murder of Edwin Fred. (Johnson Deposition at p 310.) He testified that Johns revealed this information to him in a conversation in Cook County Jail. Moreover, he told his private attorney, Deborah Gubin. (Johnson Deposition at 313.) According to Johnson, he also told his attorney that Johns told him that he actually committed the murder. (Johnson Deposition p. 315.)

VII. In addition, Mr. Tiderington includes his criticisms regarding purportedly withheld documents in the *Solache/Reyes,* and *Sierra* cases.

   a.   *People v. Reyes and Solache,* RD #C 198728, 98-CV-12440 (V:Jacinta & Mariano Soto).

      i.   Chicago Police Department's retention and use of polaroid and IR photographs.

Plaintiffs' Expert claims in the Solache – Reyes prosecution, that polaroid photographs were withheld from defense counsel. The allegation is that these photographs are evidence that uncharged individuals were alternate suspects. (Pl. Ex. Rpt. at 69-71.)

During the course of an investigation, Detectives may utilize IR Photographs, also known as 'mug shots,' and polaroid photographs.

At the commencement of an investigation, they could merely be used to visually identify who had been interviewed. This is particularly helpful when an investigation is handed-off to another team of detectives.

These photographs could also be used to display to other witnesses to further the investigation. They are not always used as a photo line-up. They could merely be used to confirm a person's identity with another witness.

They were also used during a witness's or a defendant's interview. They could be used as exhibits during the interview or as a photo of the witness or defendant to demonstrate their appearance and identity at the time the statement was recorded.

During the course of the investigation, the photographs were maintained in a string-tied envelope within the investigative file. If the photographs were used as exhibits or in photo line-ups, they were formally inventoried when the charges were filed, or the investigation was closed.

Plaintiffs' Expert claims that RFC Solache / Reyes 76-83 contains photographs that were not tendered to defense counsel. He alleges that photographs, by themselves are evidence that they were alternate suspects. First, the documents contain seven photographs that are not investigatory polaroid photographs. Next, one photograph is defendant Arturo DeLeon Reyes eating a sandwich. Two of the polaroid photographs are of Guadalupe Mejia. (76 and 80) The remaining polaroid photographs are of Jorge Mejia (76), Felicia Soto (78) and Rosa Aranda (80).

The taking of a polaroid or utilization of a mug shot during an investigation does not, by itself, designate someone as a suspect or an offender. But Plaintiffs' expert claims, "Had defense counsel had these polaroid photos, he or she would have had additional reason to contact these witnesses, and to learn about why they had been at the station and questioned, and what information they had revealed." (Plaintiffs' Expert at 69-71.) Instead, trial defense counsel could use the police reports to develop their own theories are alternate suspects.

Felicia Soto and Rosa Arrando are listed on the first page of the General Case Offense Report. RFC Solache Reyes 418. Their knowledge of the case is discussed there, throughout the file and again in a supplementary report starting on RFC Solache Reyes 363. Guadalupe Mejia's involvement in the case is detailed at great length in a closing supplementary report found at RFC Solache Reyes 233-253. Jorge Mejia is Guadalupe's husband and also referenced in RFC Solache Reyes 233-253.

In the investigation into the murders of Mariano & Jacinto Soto several polaroid photographs were taken. The investigative file envelope, that during an investigation is often used to hold photographs, is found at RFC Solache Reyes 000084. During discovery, photographs were taken of the evidence impounded with the Clerk of Court. Specifically, Reyes 000111, contains 5 polaroid photographs. Four of the five photographs are numbered as People's Exhibits 1 through 4. One photograph is unnumbered. Photographs 1 – 4 are Adriana Mejia, Rosario Mejia, Arturo DeLeon Reyes and Gabriel Solache. The unnumbered photograph is Guadalupe Mejia. These photographs were in an envelope attached to Guadalupe Mejia's handwritten statement with the Cook County State's Attorney's Office. (Reyes 101-112). This indicates that the photographs were in fact used by the Cook County State's Attorney when taking Guadalupe's handwritten statement.

Moreover, the significance of the polaroid photographs being impounded with the trial court after trial demonstrates that polaroid photographs were not withheld from defense

counsel. The speculation of withheld photographs rests on a defense file that may be incomplete years later. The speculation that their interviews were not made available to the defendants is belied by the detailed information discussed throughout the reports.

b. *People v Thomas Sierra* RD#226760 - 95 CR 18602 (V: Noel Andujar)

Prior to the murder of Noel Andujar, detectives investigated the Ruben Gonzalez murder. During that investigation, they observed the defendant and another suspect pay their respects to the Gonzalez's mother. They were driving a Buick Park Avenue with wire wheel covers. Once those detectives were also assigned to the Andujar murder, they realized that witnesses in that case described the same car used in that fatal shooting. With the help of Andujar's mother and gang crimes specialists, RFC Sierra 000123, Sierra and another offender were identified as the occupants of the Buick Park Avenue the detectives observed during the Gonzalez investigation. (RFC Sierra – 00122.)

Plaintiff's Expert alleges that the Sierra investigative file should have included police reports from the Gonzalez homicide. (Pl. Exp. Rpt., at p. 71.)

The supplementary report, starting at RFC Sierra – 000122, clearly describes the investigative steps that led to the search for Thomas Sierra. These steps are self-contained in the Sierra supplementary reports. The supplementary report lists the name of the victim in the previous homicide investigation, Ruben Gonzalez, and the interview of his mother, Esther Reyes, and the date, 20 May 95, that Sierra approached her and offered his condolences.

This supplemental report transparently describes the detectives' investigative steps that led them to search for Thomas Sierra.

During the discovery process, and leading up to trial, nothing prevented either the prosecutor or the defense attorney from obtaining and examining the Gonzalez case file. From a prosecutor's point of view, there was no reason to include the entirety of the Gonzalez investigative file within the the Andujar file. Rather, both the prosecutors and defense attorneys would have been able to subpoena the file.

VIII. *People v. Iglesias,* RD #X 250303, 93-CR-15199 (V: Monica Roman)

a. Plaintiff's Expert claims that investigative materials were missing from the prosecutor's file. He concludes that "…the failure to disclose to prosecutors the full contents of the investigative file before trial is an indication that detectives were not producing complete files, and policy picking and choosing, or purging, the files before disclosing them." Pl. Exp. Rpt. at p. 72.

b. Plaintiff's Expert assumes that decades-old prosecutor's files should contain all documents found in the Chicago Police Department's files. It is the same failed

premise that he has applied to the public defender's files. He cannot comprehend that these files are not intact today.

c. During his deposition he repeated his assumption that the prosecutor's files today are complete files. He testified that he didn't know why the prosecutor's files would not be complete. He did acknowledge that some of these files were found in warehouses and dingy basements. But he did not know what happens to a prosecutor's file after a trial has been concluded.

d. An examination of both prosecutors' files and public defenders' files have shown them to be incomplete. Sometimes woefully incomplete. To compound this false assumption as evidence of documents being withheld from defendants is baseless and misleading.

Plaintiff's Expert lists the following pages from the investigative file that were not contained in the prosecution file: RFC Iglesias 1-8, 17-18, 26-27, 32- 37, 44-46, 76-77, and 83.

- a. RFC Iglesias 2-4 and 8, are subpoenas issued by the prosecutor's office to secure witnesses' presence in court. RFC Iglesias 83 is a court attendance report reflecting the results of the grand jury's true bill. One subpoena, RFC Iglesias 8, is for police reports.

    - i. While plaintiff's expert acknowledges these documents lack an 'investigative nature,' he still claims their absence is evidence of documents withheld by the Chicago Police Department.

    - ii. Prosecutors retain copies of their subpoenas in their files irrespective of whether the Chicago Police Department returns copies of them. The fact that they are missing from the prosecutor's file demonstrates that the Cook County State's Attorney's Office's files are incomplete.

- b. RFC Iglesias 17-18, 32-37 and 44-46 are property inventory sheets. They reflect evidence recovered by the Chicago Police Department during the investigation. They are also filed with the court and maintained in the municipal file. These inventories include a photo array, a fired bullet recovered from a car, a fired bullet recovered by the medical examiner during the autopsy and a sample of the victim's blood also recovered during the autopsy.

    - i. These inventories are critical to the prosecutor's presentation of evidence during trial. The evidence collected may also be further examined by forensic experts. The absence of these critical

documents demonstrates that the prosecutor's file as it exists today is incomplete.

    ii.  The photo array evidence inventory report is found at RFC Iglesias 17-18. The use of the photo array was discussed in a supplementary report found at RFC Iglesias 90-93. The inventory number assigned to the photo array is found at RFC Iglesias 91.

    iii.  The recovery of the fired bullet, with the related inventory number, is listed both in evidence recovery reports (RFC Iglesias 47 and 58) and in a supplementary report (RFC Iglesias 50 and 105.)

    iv.  The recovery of a bullet from the deceased victim and the further testing of the victim's blood is discussed in the medical examiner's report at RFC Iglesias 86. The recovery of the bullet is also included in a supplementary report found at RFC Iglesias 88-89.

c.  RFC Iglesias 76-77 is a vehicle inquiry leads request. This documents the retention of an automobile towed to a police department impound lot.

    i.  The victim in this case was shot while seated inside the automobile that was towed by the police to an impound lot. The car is literally the crime scene and discussed throughout the police reports. This vehicle inquiry leads report reflects the tow and the retention of the car. The absence of this significant document further demonstrates that the prosecutor's file is incomplete.

    ii.  Nevertheless, the facts related to the examination, towing and impounding of the car are found in supplementary reports, RFC Iglesias 50 and 105, and in a general progress report found at RFC Iglesias 66.

d.  RFC Iglesias 26-27 is an arrest report for a drug possession case. This report may have been used to identify the defendant during the investigation. The supplementary report indicates that investigating officers had prior contact with a person using the defendant's nickname. RFC Iglesias 91. Prior arrest reports used during the investigation would be included in the prosecutor's files. The absence of this document again shows the incomplete nature of the prosecutor's file.

My opinions, findings, and observations herein are based upon my education, training and experience. The details of my background are listed in my curriculum vitae that is attached and incorporated herein by reference. Among other accomplishments, I have thirty-two years of experience as a trial prosecutor, and I have attained numerous supervisory positions including Chief of the Criminal Prosecutions Bureau in the Cook County State's Attorney's Office and Deputy Chief with the DuPage County State's Attorney's Office. I have also lectured on numerous aspects of criminal prosecutions including *Brady* and discovery responsibilities for prosecutor's offices in Illinois and nationwide through the National District Attorney's Association. I have most recently included discovery and *Brady* obligations in one of a series of annual ethics seminars sponsored by the Winnebago County State's Attorney's Office.

DATED: April 3, 2023

Respectfully Submitted:

Bernard J. Murray

## MATERIALS REVIEWED

1. Expert report of Thomas J. Tiderington in *Reyes v. Guevara, et. al.* and *Solache v. Guevara, et. al.*

2. Expert report of Thomas J. Tiderington in *Sierra v. Guevara, et. al.*

3. Expert report of Thomas J. Tiderington in *Iglesias v. Guevara, et. al.*

4. Deposition of Thomas J. Tiderington (Parts 1 and 2) in *Reyes v. Guevara, et. al.* and *Solache v. Guevara, et. al.*

5. Deposition of Thomas J. Tiderington in *Sierra v. Guevara, et. al.*

6. Deposition of Thomas J. Tiderington in *Iglesias v. Guevara, et. al.*

7. RD # A59634 (RD File)

8. RD # A744094 (RD File)

9. RD # B447609
   a. Public Defender File for Rodney Tooney
   b. CCSAO file for the prosecution of Rodney Tooney

10. RD # C250890 (RD File)
    a. Public Defender File for Patrick Bailey
    b. CCSAO file for the prosecution of Patrick Bailey

11. RD # C687989 (RD File)
    a. Public Defender File for Kimberly Mathis
    b. CCSAO file for the prosecution of Kimberly Mathis

12. RD # C 198126 (Investigative File for Soto Homicide)

13. Cook County Public Defender's Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144

14. Cook County Public Defender's Reply in Support of Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144

15. RD # Z273605 (Investigative File & RD File)
    a. Public Defender Files for Damaine Billups & Willie Johnson
    b. CCSAO File for the prosecution of Damaine Billups & Willie Johnson

16. RD # Z475236 (Investigative File & RD File)
    a. Public Defender File for Ardell Clemons
    b. CCSAO file for the prosecution of Ardell Clemons

17. RD # C 687989 (Investigative File & RD File
    a. Public Defender File for Kimberly Mathis
    b. CCSAO File for the prosecution of Kimberly Mathis

18. Deposition of Deborah Gubin in *Johnson v. Guevara,* N.D. Ill. Case No. 20-CV-4156

19. Deposition of Kevin Sheehan in *Johnson v. Guevara,* N.D. Ill. Case No. 20-CV-4156

20. RD # A 403252 (Investigative File & RD File)
    a. Public Defender file for Guy Rainey
    b. CCSAO file for the prosecution of Guy Rainey

21. RD # B 442532 (Investigative File and RD File)
    a. Public Defender File for Oscar Soto
    b. CCSAO File for the prosecution of Oscar Soto

22. RD #T 290460 (Investigative File & RD File)

23. RD #X 066055 (Investigative File & RD File)

24. RD #Z 093141 (Investigative File & RD File)

25. RD #Y 240898 (Investigative File & RD File)

26. RD # Z226760 (Investigative File & RD File)

27. RD # X 250303 (Investigative File & RD File)

# BERNARD J. MURRAY

## Education

- University of Illinois - Chicago, Chicago, IL
  - Bachelor of Arts in Criminal Justice and Political Science. Minor in Sociology
- DePaul University – College of Law School, Chicago IL - Juris Doctor

## Bar Admissions:

- State of Illinois – November 9, 1983
- United States District Court for the Northern District of Illinois – November 1983
- State of Illinois Capital Litigation Trial Bar, Lead Counsel – December 16, 2002

## Professional Experience

- DuPage County State's Attorney's Office
  - Assistant State's Attorney – 2009 to 2015
  - Deputy Chief, Community Affairs Division – 2009 to 2010
  - Deputy Chief, Felony Trial Division – 2010 to 2014
  - First Assistant, 2018 - present
- Cook County State's Attorney's Office
  - Assistant State's Attorney –1983 to 2008
  - -Appeals, Juvenile, Felony Review, Preliminary Hearings and Felony Trial Divisions
  - Deputy Supervisor, Gang Prosecutions Unit 1993 to 1998
  - Supervisor, Felony Trial Division – 1998 to 2000
  - Deputy Chief, Special Prosecutions Bureau – 2000 to 2001
  - Chief, Criminal Prosecutions Bureau – 2001 to 2008
- Special Assistant State's Attorney for Jefferson County, IL – 1994 to 1996
- Special Assistant U.S. Attorney, Northern District of IL - 1992 to 1997

## Honors and Awards

- Dean's List – University of Illinois – Chicago
- President - Illinois Prosecutors Bar Association – 1999 - 2005; Secretary - 2014
- Officer - Association of Government Attorneys in Capital Litigation – 2002 to present; -
  -President – 2010

## Memberships

- University of Illinois - Chicago Criminal Justice Society
- Chicago Bar Association - Judicial Evaluation Committee
- American Bar Association
- Illinois Bar Association
- Illinois Prosecutors Bar Association
- National District Attorneys Association
- National College of District Attorneys - Lecturer and Trial Advocacy Faculty
- Association of Government Attorneys in Capital Litigation
- Cook County State's Attorney's Office - Senior Training Committee
- CLEAR Commission – Illinois Criminal Code Reform
- CLEAR Sentencing Commission – Illinois Criminal Sentencing Reform
- Illinois Sentencing Policy Advisory Council

## **PAST TESTIMONY**

1. Deposition Testimony
   a. *Fields v. City of Chicago*
   b. *Rivera v. City of Chicago*
   c. *Reyes v. Guevara et. al. & Solache v. Guevara et. al.*

2. Trial Testimony
   a. *Fields v. City of Chicago*
   b. *Rivera v. City of Chicago*

## **HOURLY RATE**

$200/Hour for Out of Court Review
$300/Hour for Testimony

# *IGLESIAS V. GUEVARA*

# ATTACHMENT A

EXPERT REPORT OF BERNARD J. MURRAY

I. Overview

a. The Plaintiff's expert's conclusions that "CPD's Policies and Practices Concerning Documentation and Disclosures in Homicide Investigations are Woefully Inadequate and Result in the Routine Failure to Document and Disclose the Documents and Information Learned During the Homicide Investigation to Criminal Defendants" is largely based upon the flawed premise that that "[c]riminal defense files show that important investigative materials are regularly withheld from criminal defendants" (Pl. Exp. Rpt., at p.58-59.) These opinions, including all their flaws, are largely a copy and paste from Mr. Tiderington's previous report in the consolidated cases of *Reyes v. Guevara* and *Solache v. Guevara.* As such, this report is similar to my previous rebuttal opinion and incorporates the totality of my opinions (including my deposition testimony in that case) here. (See Attachment A.)

Plaintiff's expert assumes that documents currently missing from criminal defense attorneys' files but present in the CPD's investigative files establishes that they were withheld from criminal defendants prior to and at the time of the criminal trial. He makes this claim lacking any evidence to show that the criminal defense attorney's files are currently in the same condition as they were at the time of the original trial. He claims that "any review of prosecutor and criminal defense files should reveal a simple finding: all the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file." (Pl. Exp. Rpt., at 60.) Yet there is no evidence in the report that he examined the prosecutor's files to determine if they had received reports that he now claims were withheld. Nor does he acknowledge that the public defenders' files may be incomplete because of the passage of time or because they withdrew from the case for private counsel.

In addition to the files and documents reviewed in the *Solache/Reyes* report, Plaintiff's expert also examined pages from four additional files, without the benefit of having any public defender files, to opine that documents were withheld from the criminal defendants.

i     The Cook County Public Defender's Office (CCPD) has questioned the Plaintiff's expert's assumption that merely because a report is now missing from their files, then it was never provided to them. In a Motion to Quash Subpoena in *Velez v Dart, 18 CF 8144,* the Cook County Public Defender's Office stated "As the CCPD

1

argued in its opening motion, this Court should also examine whether the benefit of production outweighs the monumental effort required to produce hundreds of files, and this Court should question the underlying assumption, adopted in other cases, that if a report is not found in the CCPD's file, that report must not have been given to the CCPD." (Reply in Support of Motion to Quash Subpoena at p.3.)

ii    The CCPD went on to argue that "The CCPD acknowledges that when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later." (Reply in Support of Motion to Quash Subpoena at p.3.)

b.    Plaintiff's expert also fails to acknowledge that some of the public defenders' files may be incomplete now because they were replaced by private attorneys. There is no indication that private attorney's files were examined by Plaintiff's expert.

c.    Finally, the public defender files contain significant redactions. Plaintiffs' expert testified during his deposition, in the *Solache/Reyes* case, that he was told to assume that all redacted materials were work product. He has no way of knowing if that assumption is accurate in this or in other redacted files. Those redactions could very well undermine the conclusions he makes throughout the report that documents were missing from the public defender file.

d.    In the *Solache/Reyes* case, Plaintiff's expert initially compared 105 criminal defense attorneys' files to 72 investigative files. He states that these files are listed in Attachment F, which he also uses in support of his opinions in this case. Plaintiff's expert claims that after removing criminal defense files that did not have a corresponding investigative file, contained no police reports or very few so as to be incomplete, he ultimately limited his analysis to 64 criminal defense attorneys' files. He lists his process and exclusions in footnotes 88 and 89. (Pl. Exp. Rpt., at 61.)

   i   He has indicated that the files removed from his considerations have strike-through lines in Attachment F. However, it appears that he considered files that he deemed "incomplete" in his opinion in the body of his report. Also, he claims Attachment F contains 64 files that lack strike-throughs. It's not at all clear how he finally settled on those 64 files. Plaintiff's expert specifically reviewed eight files as "examples" in his report. (Ibid., at pp. 64-68.) The remaining files were contained in a table compiled by the Plaintiff's counsel.

ii   In addition, Plaintiff's expert specifically compared eight defense attorney files to CPD's investigative files  He applies the same flawed logic specifically to these eight files, that is that the criminal defense attorneys' files today contain the same documents as at the time of trial. One file that the Plaintiff's expert relies upon is devoid of any CPD reports. There is no indication that he examined the prosecutors' files to determine if any of the allegedly withheld documents were found in those files. In fact, Plaintiff's expert conceded during his *Solache/Reyes* deposition that he was not aware that companion CCSAO files were produced in discovery. (Expert's Deposition, 10/6/2022, Vol. II at pg. 391-392.)   An examination of the prosecutors' files reveals many of the allegedly withheld documents are contained in the CCSAO's trial files and therefore were not withheld. Moreover, Plaintiff's expert testified during the *Solache/Reyes* deposition that it was his position that "any reasonable officer would understand that everything in a homicide file should be turned over to the prosecutor[]" and accordingly conceded that if the documents were contained within the CCSAO file, that would have been proper and reasonable conduct on the part of CPD.  (Expert's Deposition, 10/6/2022, Vol. II at pg. 654, 660.) The prosecutors' files also record, on occasion, when they provided police reports, GPRs and "street files" which during the relevant time period (1991-1995) were another name for investigative files, to counsel in court.

iii  Plaintiff's expert also claims that he found potentially exculpatory handwritten notes that were not transferred onto official reports. Plaintiff's expert seems to claim that these notes were not disclosed to criminal defendants. But in this section of his report, he only compared permanent retention files with their corresponding investigative files. Inexplicably he does not discuss comparing these notes to any public defender's file. (Pl. Exp. Rpt, at p. 58-59.)

e.  For this report, I am also relying upon my analysis of the Plaintiff's expert's report in *Fields v City of Chicago* and *Rivera v City of Chicago* and the reports compiled in those cases. (See, Attachment A.)

II.  Discovery Obligations

a.  The Illinois General Assembly has acknowledged by statute that discovery procedures in criminal cases shall be in accordance with the Illinois Supreme Court Rules. 725 ILCS 5/114-13(a). They also have codified the long-standing procedures utilized by police and prosecutors to guarantee

that police reports will be provided to the prosecutors' offices to be tendered during discovery:

> "Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated." 725 ILCS 5/1114-13(b)(11-19-03).

b. Disclosure to the Accused: The Illinois Supreme Court Rules require that the prosecution disclose to defense counsel certain material and information within its possession or control in all felonies and felony juvenile delinquency cases. (Illinois Supreme Court Rule 412.) Among the items required to be disclosed are:

   i. The names and last known addresses of witnesses, their relevant written or recorded statements, and memoranda containing substantially verbatim reports of their oral statements. (Illinois Supreme Court Rule 412(a)(i)).

   ii. Any statements made by the accused (written, recorded, or oral) and a list of witnesses to the statement.

   iii. Any reports of experts including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

   iv. Any books, papers, documents, photographs or tangible objects which the prosecutor intends to use at trial or which were obtained from the accused.

   v. And any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at trial.

c. *Brady* and *Giglio* Disclosures: The U.S. Supreme Court decisions also require that prosecutors disclose exculpatory evidence that is material either to guilt or to punishment. *Giglio* requires evidence that could allow the defense to impeach the credibility of a prosecution witness. The police fulfill their *Brady* and *Giglio* disclosure obligations when they supply the information to the prosecutors.

4

    i. The Illinois Supreme Court also includes *Brady* disclosure obligations in their Rules. (Illinois Supreme Court Rule 412(c)).

d. The Illinois Supreme Court Rules also require that the prosecution "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. (Illinois Supreme Court Rule 412 (f)). The prosecution's duty to disclose is a continuing obligation. If additional discoverable information comes to the prosecution's attention at a later date, the defendant should be promptly notified. (Illinois Supreme Court Rule 415 (b)).

e. The Illinois Supreme Court Rules indicate that certain materials are not subject to disclosure. For example, work product is not subject to disclosure. The Rules state that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its legal or investigative staffs, or of defense counsel or his staff." Illinois Supreme Court Rule 412(j).

f. The Chicago Police Department developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, the CPD's policy is good. It requires detectives to turn in all relevant material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. Plaintiff's expert relies on former police officer Michael Brasfield's previous opinions disclosed in the *Fields* litigation[1] that, as a police officer, he routinely shredded his investigative notes. Unlike plaintiff Field's expert's own practice, CPD's policy requires the detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will nevertheless be maintained and produced to the prosecutor and defense attorney for later review. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other fashion; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

---

[1] Plaintiffs' expert in this case relies on plaintiff Field's expert opinions in arriving at his opinions. *See,* Pl. Exp.Rpt., at p. 39.

III.    Regulation of Discovery

    a.  For crimes occurring in Chicago, Cook County Assistant State's Attorneys assigned to trial courtrooms learn both formally and informally how to obtain police reports and all other relevant information and evidence, including evidence from the Chicago Police Department. Prosecutors maintain checklists of documents that may exist and should be obtained. Along with the checklists come the methods to obtain the reports and evidence. Most of the documents listed on the checklists are created by the Chicago Police Department.

    b.  Chicago Police Department reports are obtained primarily through subpoenas, request forms and telephone calls. The primary sources of reports, notes, criminal histories, or photographs in the Chicago Police Department are headquarters, the crime lab, the bureau of identification and the department's area headquarters. The Cook County State's Attorney's Office and the Chicago Police Department maintain an intra and interoffice mail service that facilitates the production of reports, photographs and criminal histories.

    c.  By the 1980s, prosecutors routinely subpoenaed all police reports. This was in addition to the forms or phone calls that were still utilized. The subpoenas would include a request for police documents that became known informally by some prosecutors and defense attorneys as "street files." Chicago Police Department Investigative Files contain what attorneys referred to as "street files" *i.e.*, notes most often recorded on forms titled 'general progress reports' (GPRs). Prosecutors would often send these subpoenas to both the Superintendent's Office (also known as headquarters) and to the Area Headquarters. The Chicago Police Department subsequently directed that the subpoenas go through one location: The Superintendent's Office. From there, CPD's subpoena unit would cause the subpoenaed material to be collected from the relevant unit(s) and sent to the trial courts. Many criminal defense attorneys would also issue subpoenas for police reports and include the term "street files" in the documents requested, which would obtain copies of the Investigative Files.

    d.  To ensure a prompt flow of information, prosecutors would also reach out to Detectives and have them bring their investigative files to court for copying.

    e.  Once the police reports were in hand, the prosecutors would tender all of them to defense counsel. If after a review of the documents they appeared to be incomplete, more requests for potentially missing documents were made by the attorneys in the courtroom.

f.  Prosecutors provide these documents to defense counsel in court and generally indicate when they believed they have tendered the complete file. Prosecutors also utilized an informal docket sheet within their files, commonly referred to as the blueback. Prosecutors often recorded on their bluebacks when they provided discovery to defense attorneys. Formal Answers to Discovery also briefly summarized some of the discovery. For example, the Answer listed witnesses' names found in the police reports the prosecution anticipated calling at trial.

g.  To memorialize discovery compliance, prosecutors eventually created discovery receipts in the 1990s that listed the documents tendered to defense counsel. A signed copy of the receipts was often maintained in the prosecutors' files. More recent methods include numbering all the pages and scanning the documents.

h.  Not all documents or pieces of evidence are tendered by prosecutors to defense counsel. However, these items are made available for defense counsel to examine prior to trial. For example, items of physical evidence such as a weapon or clothing are not photocopied but are made available for examination. Prosecutors often made photo arrays, crime scene photographs, or individual photographs, including polaroid photos, available for examination, too.

i.  In addition to the prosecutor's obligations to disclose police reports during discovery, certain documents are also maintained in the court file or are provided to defense counsel in open court.

  i.  During a charged defendant's first court appearance, his defense counsel is provided with a copy of his one-page arrest report. This document is utilized by the court to determine whether probable cause to detain exists. Defense counsel can also examine and copy the complaint for preliminary hearing. Although not provided to defense counsel during the initial appearance, the defendant's criminal history is summarized during the bond hearing to assist the court in setting an appropriate amount of bail. After a subsequent determination of probable cause, the formal indictment or information is also maintained in the court file. Finally, the court file maintains copies of arrest and search warrants and documents pertaining to extradition.

  ii.  The court file also contains Chicago Police Department Property Inventory Sheets. This document, known as the Inventory, lists evidence that was recovered and preserved by the police department during the investigation.

IV.    Record Retention and Discovery Obligations

    a.  Plaintiff's expert acknowledged during his *Solache/Reyes* deposition that it is "proper and reasonable conduct" for the Chicago Police Department to provide investigative materials to the Cook County State's Attorney's Office for discovery. (Expert's deposition, Vol. II, 10/6/22 at p. 660.)

    b.  The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, CPD's policy furthers their ability to comply with discovery obligations. It requires detectives to "maintain the integrity of its investigative files to ensure that the due process rights of the accused are not compromised during the subject investigation, initial court hearing or any subsequent reviews." *See,* Special Order 83-1. Prosecutors during this time period understood this to require detectives to turn in all relevant material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. CPD's policy requires detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will be maintained and produced to the prosecutor and defense attorney for later review.

        i.  At times, Plaintiff's expert complains that information was not recorded on a GPR form, Pl. Exp. Rpt., at p. 56, or was preserved by different units within CPD, Pl. Exp. Rpt., at p. 51-52. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other manner; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

        ii.  Nor does it matter that a different unit of CPD either created a report or maintained reports in different physical offices. Prosecutors and criminal defense attorneys were well aware that, for example, criminal history reports or lab reports were created and maintained by different units within the police department. This knowledge is demonstrated by the laundry-list of documents requested in subpoenas issued by either a prosecutor or a criminal defense attorney.

    c.  From the inception of the Orders mandating the preservation of investigative materials, prosecutors as well as criminal defense attorneys, have issued

8

subpoenas to receive not only typed reports but investigative materials. The subpoenas issued by all attorneys have used various terms for the investigative material. Primarily referred to as 'street files,' they are also referred to as area files, GPRs, notes, or running files.

d.  The subpoenas issued by prosecutors and criminal defense attorneys also reveal that lawyers involved in the criminal justice system understand that the Chicago Police Department has various units tasked with creating, compiling and maintaining records related to a criminal investigation. The subpoenas issued to obtain these records are often detailed to obtain all of those records. The primary identifying number is the case number, known as the records division or RD number. Other significant numbers to obtain records are the arrest report and photo number (known as the CB number), the criminal history number (known as the IR number) and the property inventory number (known as the EARPS or inventory number.)

   i.  While the permanent records division maintains the formal police reports such as the typed supplementary reports, the investigative files are maintained by the police Area that is primarily responsible for the investigation. Those files could contain notes, photos, or GPRs added to the file during the pendency of the investigation.

   ii.  All CPD officers compile their reports under the RD number and submit them for permanent retention. Those documents may be created by patrol, gangs, narcotics, crime lab, forensic investigators or bomb and arson units.

   iii.  Other units in the Chicago Police Department are tasked to maintain other records or evidence. For example, arrest photos and criminal histories are maintained in a central location known as the Bureau of Identification. Evidence collected from a crime scene and submitted to the CPD Lab for testing is maintained at the lab during testing. Reports generated by the Labs are accessed through a request using the case RD number.

   iv.  Forensic investigators who primarily collect evidence and photograph crime scenes maintain their photographs in their unit under the case RD number. The collected evidence is preserved with the Evidence and Recovered Property Section (EARPS.) EARPS generates numerous copies of their property inventory sheets and submits one copy to the Clerk of the Circuit Court to maintain in the municipal court file.

9

e. Plaintiff's expert alleges throughout the report that "parallel files" are maintained by CPD and are often not provided to either criminal defense attorneys or prosecutors.

  i. Plaintiff's expert is not clear, either in his report or during his testimony in *Solache/Reyes* or in the *Sierra* case, on how he defines an investigative or parallel file.

    1. If he is referring to the manner that CPD creates and maintains reports, this process is not concealed. Prosecutors and criminal defense attorneys are aware of the manner and location of how those reports are created and where they are stored.

    2. If he somehow suggests that individual police officers are personally retaining reports that are not maintained in the investigative file, he does so through speculation as he cites no evidence to support that inference or conclusion. The Special Orders from the early 1980s directed the detectives to the procedures to be used to maintain investigative materials.

    3. Plaintiff's expert also claims that police officers from other units such as patrol or gangs *could have* files related to a homicide investigation, but CPD Special Orders are silent on whether the reports should be preserved or disclosed. (Pl. Exp. Rpt., at 52.)  This claim is also based on speculation, cites no evidence in support and shows a lack of understanding of CPD's procedures.

      a. While Plaintiff's expert acknowledges that the CPD's 'Detective Division' maintained investigative materials, he appears to ignore that violent crimes detectives have the primary responsibility to investigate homicides. Nowhere in any file will you find a patrol officer, or a gang officer having primary responsibility to investigate or clear a homicide.

      b. If a patrol or gang officer participates in the investigation of a homicide, any reports generated by those officers are shared with the violent crimes detectives and filed by CPD under the RD number associated with the crime.

10

       c. Therefore, all reports compiled by a patrol officer, or a gang officer could be obtained by either the prosecution or the criminal defense attorney via a subpoena.

       4. Plaintiff's expert claims that in any given investigation, at least three files could have been created. (Pl. Exp. Rpt., at p. 51-52.) The permanent retention file, a unit RD file and an investigative file. He also claims that other police units could maintain their own investigative materials and detectives could maintain their own running files. (Pl. Exp. Rpt., at p. 52) He claims these reports were not subject to documentation, storage or disclosure. It is unclear what documents he is referring to and he cites no examples from the hundreds of files he reviewed. Detectives could make copies of existing CPD reports kept at the Area during the course of the investigation, but these documents are already preserved in either the permanent retention/RD file or the Investigative File and therefore available by subpoena from either the prosecution or the criminal defense attorney.

V. Comparison of permanent retention/RD files with corresponding Investigative files

       a. Plaintiff's expert claims that he found potentially exculpatory handwritten notes that were not transferred into "official reports". He specially identifies a number of these notes and claims that they were either not transferred to an "official report" or that they were not disclosed to criminal defendants. (Pl. Exp. Rpt., p. 58-59). The point of this section of the report is confusing, and Plaintiff's expert was not able to articulate the reason he identified these documents during his deposition in either *Solache/Reyes* or *Sierra*.

       b. Preliminarily, it should be noted that permanent retention/RD files and Investigative files are *both* official files. His premise that these handwritten notes were not transferred into official reports is flawed. The handwritten notes found in Investigative files are official reports available to defense counsel through subpoenas or tendered in discovery from the Cook County State's Attorney's Office.

       c. General Progress Reports are often handwritten notes used by Detectives during the course of their investigations and used when they compile supplementary reports. Plaintiff's expert seems to believe that all notes, some that he considers cryptic, should be typed into supplementary reports. (Pl. Exp. Rpt., at p. 58-59.) The supplementary reports are often far more

comprehensive than the notes. Prosecutors request all investigative materials while compiling discovery materials for discovery and for possible use at trial. The Chicago Police Department requires preservation of all investigative notes. This allows prosecutors and defense attorneys access to documents created in the course of the investigation.

d.  Next, Plaintiff's expert claims that these notes were not disclosed to criminal defendants. But in this section of his report, he only states that he compared permanent retention/RD files with their corresponding Investigative files. He does not discuss comparing these notes to a public defender's file. In fact, for several files examined by Plaintiff's expert in this section, no public defender files exist. (Tiderington Deposition, 12/8/22, at pp 305-306.) It is impossible for him to claim that these pages were not provided during pre-trial discovery to the defendants and their counsel. Moreover, he was not provided with the Cook County State's Attorney's files to determine if the alleged suppressed documents were tendered by the prosecutors.

e.  Plaintiff's expert lists handwritten notes that were not disclosed to defense counsel or not transferred into official reports, for four cases where there were no charges filed and therefore no public defender file.

   i   RFC Solache/Reyes 076011-14 and 15-16, are found in RD# A-596534. This file involves the first-degree murder of Arney A. Reina. No defendant was charged in this case and thus there is no public defender file. (RFC Solache/Reyes 075911 and 075928-29.) The information contained on these pages is, primarily witness identification information, and is contained throughout the permanent retention file.

   ii   RFC Solache/Reyes 077368 and 077452 are found in RD# A-744094. This case also lacks charges or a public defender file because no one was charged. This case involved a murder – suicide. (RFC Solache/Reyes 077378-79.) Regarding the alleged missing pages, RFC Solache/Reyes 77368 is the contact information for the murder victim's sister. RFC Solache/Reyes 077452 appears to be a pizza order unrelated to this case.

   iii   RFC Sierra 079168 is found in RD# X-066005. This case involves the investigation into the fatal shooting Jesus Garcia. Based upon the existence of a valid self-defense, no charges were filed by the Cook County State's Attorney's Office and there is no public defender file. Nevertheless, the people identified in RFC-Sierra 079168 are found throughout the permanent retention file and within supplementary reports.

    iv  RFC-Sierra 092370 is found in RD# Z-093141. This case involves the 1995 fatal shooting of Jack Castle. Despite the involvement of federal law enforcement agencies, including the F.B.I., no charges were filed in this shooting. However, the loosely drawn map in RFC-Sierra 092370, is readily identified by examining the address of the occurrence found at RFC Sierra 092283.

f.  RFC Solache/Reyes 34554 is found in RD# Z-000273 and is also located in the public defender's file at AR-PD-41276.

g.  RFC 110176 and 110180 are handwritten notes found in the Kim Mathis file (RD # C-687989) discussed later in this report. Both handwritten notes appear to be the concluding sentence to an interview and located on the back side of a GPR. RFC 110176 is a note from an interview of Kim Mathis. RFC 110180 is a note from an interview of the defendant's sister Terry Mathis.

    i  Kim Mathis' note seems to indicate that her sister was present at the time of the beating. The remainder of all reports, including Kim Mathis' handwritten statement, indicates that her sister was not present. Moreover, in handwritten notes of Terry Mathis' interview, she states that she did not go upstairs. RFC Solache/Reyes 110178. This note is found in the public defender's file at AR-PD- 030049.

    ii  Terry Mathis' note indicates that her sister paged her at approximately 5:00 pm and told her that her son was dead. While this note is not found in the poorly maintained public defender's file, it does not appear to be exculpatory. All other indications are that Terry Mathis was with her sister. the defendant, at the hospital when her son was declared dead. AR-PD-030018; RFC Solache/Reyes 110146.

    iii  The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD-029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time was there an inability to discuss Terry's presence at the house or the call regarding her son's death.

h.  A series of investigative notes from page 59 of the Plaintiffs' expert's Report are from one file: Defendants Rodney Toney and Leon Fields. RD# B-447609 and case number 97CR23668. These notes are numbered RFC 94055, 94058-60, 94089, 94092, 94094 and 94096-99.

    i   To claim that these investigative notes were not tendered to defense counsel would ignore the parameters that Plaintiffs' expert established in Footnote #89. There he stated that he would not rely upon partial or incomplete public defender files. In fact, this file is specifically crossed off of Attachment F.

    ii  The public defender's file that corresponds to RD# B-447609 is 78 pages in length. AR-PD 23345-23423. But approximately half of those pages are redacted, and what remains does not include any Chicago Police documents. It is impossible to determine what the public defender had in their possession prior to trial.

    iii  The Cook County State's Attorney's file indicates that the two defendants were represented by private counsel. The Assistant Public Defender withdrew from the case on December 4, 1997. CCSAO 62893.

    iv  At the same time, the CCSAO file indicates that they provided police reports as early as September 28, 1997. CCSAO 62893. Discovery continued through 1998 with a specific reference to "street files" tendered to private defense counsels on 9-15-98. CCSAO 62896.

i.  Plaintiffs' expert lists pages RFC 104166-70 as another example of investigative notes that were not disclosed to defense counsel or not transferred into official reports. These pages correspond to RD# C-250890 and court case number 98CR-13371. These pages are handwritten notes of a canvas for possible witnesses.

    i   This is another example of a violation of the parameters that Plaintiffs' expert established in Footnote #89. There he stated that he would not rely upon partial or incomplete public defender files, which were designated on Attachment F, as this one was, with a strikethrough.

    ii  The public defender's file is numbered AR-PD 23546-23684. It only contains one police report. That report is the General Offense Case Report. AR-PD 23677-8. It is impossible to determine if the public defender had the canvas reports or any investigative reports in their possession prior to trial.

    iii  Included in the public defender's file are numerous subpoenas for Chicago Police Department police reports. The subpoenas were divided into individual requests for line-up reports, 911 calls,

evidence reports and the defendant's photo. Two subpoenas are of note. One subpoena requests any and all police reports and specifically asks for general progress reports. (AR-PD 23626.) The other subpoena requests any and all police reports including street files, working files or running files (AR-PD 23630.)

iv  A review of the Cook County State's Attorney's Office's file reveals that a series of private attorneys represented the defendant early on (CCSAO 4791-92) and during a pre-trial motion to quash arrest (CCSAO 5427), during a guilty plea and sentencing (CCSAO 4847) and during a motion to withdraw his guilty plea (4924.)

j.  Regarding Y-240898, Plaintiff's expert claims that RFC Sierra -121416 and RFC Sierra-121420 were not disclosed to the criminal defendants or that the information was not included in permanent retention files.

i  RFC Sierra – 121416 is a GPR note discussing Luis Guevara. A supplementary report found at RFC Sierra -121339 provides a lengthy interview of Luis Guevara.

ii  RFC Sierra – 121420 is a GPR note detailing a bus route to Florida. Also included is a reference to Theresa Robinson. A corresponding supplementary report, found at RFC Sierra 121337, summarizes an interview with Robinson. The bus route information was summarized on the following page of the supplementary report.

k.  In T-290460, Plaintiff's expert identifies four pages that he claims are either not disclosed or not transcribed into an "official police report" such as a supplementary report.

i  RFC Sierra 109932 appears to be the back of a GPR containing one sentence "tell you why he was crying." Lacking a public defender file to examine, Plaintiff's expert cannot claim that the GPR was missing. Nor does he attribute any exculpatory value to the sentence.

ii  RFC Sierra 110061 appears to be a GPR report that states "Get Guns +." A reference to acquiring weapons is found in the defendant Hornsby's statement to law enforcement found at RFC Sierra 109975. There he said a co-defendant instructed him to "go get the missiles." He understood missiles to mean guns.

iii  RFC Sierra 110043 is a hand drawn map of a T alley in the vicinity of George, Kedzie and Diversey streets. This is the approximate

location of the crime and is discussed in supplementary reports found at RFC Sierra 109977 and 109980.

    iv  RFC Sierra 110062 is a GPR that lists three witnesses with address information. A note indicated that one witness must be found and interviewed. Also listed are various command staff police officers. Interviews with two of the witnesses are found in supplementary reports found at RFC Sierra 109964-65 and 109980-81.

VI. Comparison of Eight Defense Attorney Files to Investigative Files.

    a.  Plaintiff's expert specifically compared eight defense attorney files to CPD's investigative files. These are the same files that he lists in his expert report in *Solache/Reyes*, which he acknowledged were not good examples in support of his opinions. (Tiderington Dep. 12/8/2022 pp. 362:13-363:7).

## People v Linox Jackson Jackson and Tyrone Hammond. Z-219872 (V: Jerry Hall)

Plaintiff's expert claims that the defense attorney's file is missing extensive information inculpating Richell "Tree" Akins and Ralph Mahomes. He alleges that their IR Histories criminal records searches are missing and the inventory sheet listing their IR sheets were not disclosed. Moreover, Plaintiffs' expert claims that a supplementary report with a detailed interview of Akins was not disclosed. Finally, he claims a handwritten note with Mahomes' name circled and a note regarding the shooting occurring in the car was not disclosed.

1. Plaintiff's expert relied upon a wholly inadequate defense attorney's file to reach his conclusions. Pursuant to his own guidelines, this file should have been pulled and not used for analysis.

    First, he is only relying on Linox Jackson's file. He is lacking a defense attorney's file for Tyrone Hammond.

    Next, the file he is basing his conclusions upon contains 51 pages. This file does not contain *any* police reports or investigative notes. Instead, it contains 8 wholly redacted pages and assistant public defender Jean Herigodt's appearance, motions for discovery and Jackson's IR sheet. It does contain numerous subpoenas for police reports and investigative materials.

    Finally, he is lacking the files of the two defense attorneys that actually represented each defendant. The State's Attorney's file indicates that Assistant Public Defender David Figura represented Tyrone Hammond and private attorney Richard Kloak

represented Linox Jackson. (CCSAO 91555.) They represented the two defendants through motions to suppress their video statements and eventual guilty pleas.

2   The CCSAO blueback indicates on numerous entries that police reports and other investigative materials were tendered to defense counsel on various court dates. Regarding Plaintiff's expert's claim that the supplementary report with a detailed interview of Akins was not disclosed is specifically refuted on this blueback. The supplementary report with this information was signed by Detective Wojcik. It was tendered to both attorneys in February 2001. (CCSAO 91558)

The CCSAO file has signed receipts for other reports that the Plaintiff's expert claims were not disclosed. Akins' handwritten statement was listed on a receipt dated 6-14-00 and found at CCSAO 92024. The 18-page supplementary report recounting Akins' statement is listed on a signed discovery receipt found at CCSAO 92005. Akins' IR history was listed on a receipt found at CCSAO 91939-40. Mahomes' rap sheet was listed on a receipt found at CCSAO 92004. Finally, a receipt for five pages of "GPRs" (investigative notes that were typed and handwritten) is found at CCSAO 92003.

## People v Edwards, et al., Z-273605 95CR23119 (V: James Bryant)

Six defendants were charged with the murder of James Bryant. Plaintiff's expert examined only two of the six defense files. Presumably because they were the only defendants represented by the public defender's office. All six defendants were found not guilty after a bench trial that concluded on September 10, 1996.

1. Plaintiff's expert indicates that six documents that may have been helpful to the defense attorneys were missing from the file. All but one of the documents were found in the Cook County State's Attorney's files.

2. Three of the pages listed alleged alternative suspects Tremaine Willis (RFC Solache/Reyes 40247 and - 49) and Paul Thomas. (RFC Solache/Reyes 40335). Those documents are found in the prosecutor's files at pages CCSAO 33303, 33236, 33233.

3. A handwritten note noting observations made by a witness named Miss Smith (RFC Solache/Reyes 40609) is found in the prosecutor's file at CCSAO 32994. The Plaintiffs' expert claims this note would have allowed defense counsel to argue it could have been as few as two offenders chasing the victim instead of the 2-3- or 4 estimation she provided in the handwritten note. This note does not contradict the information Miss Smith detailed in the Supplementary report (RFC Solache/Reyes 040108), which clearly indicates multiple possible offenders. Moreover the supplementary report provides more details regarding the attack than the one sentence in the note.

4. The CCSAO blueback lists numerous dates where they provided police reports and related discovery materials to defense counsels. (CCSAO 32595 – 97.) Specifically listing the tendering of the "entire street file" to the attorneys on 1-5-96 (CCSAO 32596.)

5. A hand-drawn map with notations in the lower right corner is alleged to be missing from the defense attorneys' files. (RFC Solache/Reyes 40304.) While this document is not found in the prosecutor's file, the information on the document is included in the supplementary report provided to defense counsel. This report found at RFC Solache/Reyes 40359 – 94.

    a. This report includes interviews of witnesses and offenders. This map could have been used with any of them. Specifically, the information written in the corner of the map appears to have come from a witness named Willie Oliver. (RFC Solache/Reyes 40364-65.) His interview includes the nickname of one of the defendants ("Gotti"), the use of a belt, talking disrespectfully like a father to the victim and jumping off the hood of a red car onto the victim. All of this information is on the map and included in the supplementary interview. Finally, the arrow drawn on the map could have indicated the path the defendants took after the attack. This information could also come from two police officers who arrived on the scene. Their information is also detailed in the same supplementary report.

People v Jose Melendez A-315294 (V: Villasenor)

Because of redactions to the Public Defender's file, Plaintiff's expert chose to compare the investigative file to the permanent retention file.

1. This technique violates the expert's methodology. Because of extensive redactions to the public defender's file, he cannot be confident that the file contains all relevant materials.

2. Plaintiff's expert claims that the lack of a GPR report on interviews with witnesses Salgado and Oliver prevented further interviews with them on the possibility of identifying the shooter. Of course, he is assuming that the GPR was not provided to defense counsel by subpoena to the prosecution or the Chicago Police Department. Yet he acknowledges that the supplementary report indicates that the witnesses did not see anyone running from the scene of the shooting. Even by the Expert's own acknowledgement, the attorney had a report identifying the witnesses, providing a significant description of their observations. Nothing precluded further interviews.

3. Plaintiff's expert provides another speculative analysis to witness Pamela Bassey's interview as recorded in the GPR and in the supplementary report. In the

supplementary report, Bassey reported looking out of window and stating that she "did not see anything." In the GPR, she told police "she saw nothing." Again, assuming arguendo that the GPRs were not provided to defense counsel, this claimed discovery violation is a distinction without a legal or practical difference.

4. The Plaintiff's expert provides a final illogical claim pertaining to a missing handwritten statement found only in the GPRs of the defendant's alibi witness. First, the illogical assumption is that the defense counsel did not have access to the handwritten report of his client's alibi witness is unsupported by the incomplete defense counsel's file. The redacted pages may very well contain that information. Next, the distinction is again one of semantics that does not undermine the witness' ability to testify to the alibi. The distinction pertains to how the defendant travelled to the witness's house; not whether the alibi existed.

## People v Kim Mathis C-687989 98CR30439 (V: Cydryck Spain)

Plaintiff's expert contends that a GPR contains a handwritten note that places the defendant's sister at the scene of the crime at the time of the fatal beating of the defendant's own child. The cleared / closed report states that the defendant's sister was not present at the time of the beating.

1. The note appears to be the back page of the GPR of an interview with the defendant. Defense counsel obviously has ample opportunity to discuss the presence or absence of his client's sister during the beating.

2. Plaintiff's expert again assumes that the public defender's file is complete. And that the back page of the GPR was not provided by either the Chicago Police Department or the prosecution.

3. Defense counsel's file reveals that during his interview with the defendant, she stated that her sister Terry dropped off her son. Terry was circling the block because there was no parking. After the victim entered the apartment, the defendant talked with her sister before leaving the car and entering her apartment. Terry drove off and was not in the apartment when the defendant 'whipped the victim.' AR PD 02932-33.

4. The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD-029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time did she ever indicate that she was present during the beating.
   a. This running diary appears to be a document that should have been subject to redaction, as it is clearly attorney work-product. Without this running diary, I would have currently been without knowledge of what

the criminal defense counsel knew prior to trial. It also begs the question of whether other materials that were redacted could describe the extent of the material that now appears to be missing from the criminal defense attorney's file and further supports my conclusion that Plaintiffs' expert's methodology is flawed.

## People v Ardell Clemons Z-475236 96CR240 (V: Nyree Johnson)

Plaintiff's expert points to two documents in the investigative file that are missing from the public defender's file. He claims that these documents could point to other suspects.

1. Both documents are contained in the prosecutor's file (which Plaintiff's expert admits would have been "proper and reasonable" conduct) and likely tendered to defense counsel during discovery.

2. The allegedly missing GPR note (RFC – Solache/Reyes 44288) is found in the prosecutor's file at CCSAO 53045). The allegedly missing lease (RFC – Solache/Reyes 44260) is found in the prosecutor's file at CCSAO 53426.

3. The GPR note refers to a "possible suspect" that was described by Plaintiff's Expert as "dating" the victim in the GPR but as "only friends" in the police reports found in the public defender's file. The GPR does not state "dating" instead it states, "seeing her." (RFC 44288.)

4. Nyree Johnson's body was found on October 6, 1995. (RFC – Solache/Reyes 51105). Four days later, Clemons called Area Five detectives from Florida. He confessed on the phone to killing Johnson. Later, he was arrested by Florida police officers and again confessed to them in a recorded interview. (RFC – Solache/Reyes 51129 -35.). On December 8, 1995, he provided a typed, court-reported statement again admitting to killing Johnson to a Cook County Assistant State's Attorney and a Chicago Police Department Detective. (RFC – Solache/Reyes 44157 – 81.)

5. Although the allegedly missing documents were likely provided to defense counsel by either the Chicago Police Department or the Cook County State's Attorney's Office, they were unlikely to provide "leads" for either law enforcement or defense counsel to pursue.

## People v Oscar Soto B-442532  97CR23347 (V: Miguel Salas)

In this gang-involved shooting, Plaintiff's expert acknowledges that two supplementary reports regarding two initial suspects are in the permanent retention/RD file, but he alleges that arrest reports and GPRs relating to these suspects do not appear in the public defender's file.

1. The public defender's file is incomplete. Although it contains 112 pages, 47 pages are wholly redacted. Of the remaining 65 pages, 28 are photos. The remaining 37 pages, include 2 blank pages and 2 photocopies of envelopes.

2. Included in the remaining 33 pages are defense counsel's subpoenas for various police reports. These subpoenas total 12 pages. This leaves 25 pages of police reports. The Chicago Police Department files total 158 pages including the 9 pages of GPRs plaintiff's expert claims were missing from the public defender's files.

3. The public defender's subpoenas for police reports are both general and specific. Defense counsel requested "any and all reports" including street files or GPRs. She also requested, in individual subpoenas, line up photos, scene photos, a B of I sheet and police report requests that did not include specifically list street files. She also subpoenaed Illinois State Police Reports.

4. It is impossible to claim that either the Chicago Police Department or the Cook County State's Attorney's Office failed to provide the allegedly missing documents based upon the incomplete information contained in the public defender's file.

## People v Guy Rainey A-403252 96CR20849 (V: Cedric Morris)

Plaintiffs' Expert alleges that the presence of numerous requests for photos to compile photo arrays indicates that multiple identifications were performed but not reported. (Pl. Exp. Rpt., at 67.) He bases this allegation on a note found in the investigative file naming Kevin Haas as a potential suspect. (RFC – Solache/Reyes 72857.) He alleges that Haas's name does not appear in the defense file or in any supplementary reports explaining his involvement.

The investigative file contains reports describing how and why the photo arrays were compiled (RFC 072888, RFC 072890, and RFC 072894) and how they were used (RFC 072879-81 and RFC 072905). A report describing the in-person line up also references the photo arrays. (RFC 072875-77.) Each of these reports were found in the public defender's file.

Kevin Haas was a Chicago Police Department Detective. Plaintiff's expert could possibly have discerned his status by reviewing RFC – Solache/Reyes 72864. That document is a handwritten note from another Chicago Police Department Employee assigned to the "Stop – Ident Desk" to Det. Haas.

## People v Demetrius Johnson, P-272087, 91 CR 9833 (V: Edwin Fred)

1. Plaintiff's experts claims that investigative documents related to a line up identification of Bryan Johns were not provided to the criminal defense attorney. This

claim is based upon an obviously incomplete criminal defense attorney file. The file does not contain any CPD reports. And the file lacks any documents with the trial criminal defense attorney's name. (Deborah Gubin.) Inexplicably, the file does contain 23 pages of VA medical records for 30-year-old Levon Jefferson. These documents, requested by the defendant Johnson's first criminal defense attorney, Jack Carey, have no apparent connection to this case.

2  The criminal defense attorney's file does contain a letter from CPD's Communication Operations Section indicating most broadcasts were erased after 30 days and no relevant records were found in the master logging tape. A log reflecting the examination of the master logging tape was also found in the file. These documents were likely sent to the court in response to a CCSAO subpoena. The CCSAO blueback indicates that the "911 subpoena materials" were mailed to defense counsel on 7-16-92. (Rivera Production at SAO 0015063.)

3  The criminal defense attorney's file also contains numerous subpoenas for police reports. It contains 2 copies of a subpoena for all CPD reports with an addendum requesting "streets files" with a court return date of 8-13-91. There are also three copies of the defense subpoena for CPD reports stamped received by CPD's Record Division on "'91 Jul 24 14:30." And three more copies of the same subpoena stamped as received by CPD's Record Division on "24 Jul 1991 11:42." Other court filings found in the defense attorney's file were two copies of a defense motion for discovery court file-stamped 9-17-91, an appearance form, a request to be released from jail to attend a wake and a petition for substitution of judges that was later withdrawn.

4  The remaining documents pertinent to this case are requests by the defense attorney to his investigators. One note demonstrates that the criminal defense attorney was aware of Johns and his possible significance to the case. The note indicates that Bryan Johns "knows the real D." (Rivera Production at JR-L 212483.)

5  Plaintiff's expert claims that the documents were also missing from the prosecutor's file. Again, Plaintiff's expert assumes that the prosecutor's file contains all the documents today that were in the file at the time of trial. An examination of the file demonstrates that the alleged missing investigative documents were provided to the criminal defense attorney during discovery. The ASA indicates on the blueback that he tendered to defense counsel "26 pgs RD (GPR Subp)." (Rivera Production at SAO 0015056.)

6  In the CPD's investigative material, the ASA's subpoena is present. The subpoena and the investigative material that follows it, including the Bryan John's unsigned line up report, totals 26 pages. Moreover, the other material in the Investigative File are court attendance reports, the medical examiner's report and a case disposition report. None of the remaining documents are GPRs or "street files."

22

7   Finally, Demetrius Johnson also states that he knew about the alleged Johns' lineup identification prior to his trial. On August 31, 2022, Demetrius Johnson testified in a deposition that prior to his trial, Bryan Johns told him that Johns was identified in a lineup the night of the murder of Edwin Fred. (Johnson Deposition at p 310.) He testified that Johns revealed this information to him in a conversation in Cook County Jail. Moreover, he told his private attorney, Deborah Gubin. (Johnson Deposition at 313.) According to Johnson, he also told his attorney that Johns told him that he actually committed the murder. (Johnson Deposition p. 315.)

VII. Withheld Documents in *People v Thomas Sierra* RD#226760 - 95 CR 18602 (V: Noel Andujar)

1.  Prior to the murder of Noel Andujar, detectives investigated the Ruben Gonzalez murder. During that investigation, they observed the defendant and another suspect pay their respects to the Gonzalez's mother. They were driving a Buick Park Avenue with wire wheel covers. Once those detectives were also assigned to the Andujar murder, they realized that witnesses in that case described the same car used in that fatal shooting. With the help of Andujar's mother and gang crimes specialists, RFC Sierra 000123, Sierra and another offender were identified as the occupants of the Buick Park Avenue the detectives observed during the Gonzalez investigation. (RFC Sierra – 00122.)

2.  Plaintiff's Expert alleges that the Sierra investigative file should have included police reports from the Gonzalez homicide. (Pl. Exp. Rpt., at p. 75.)

3.  The supplementary report, starting at RFC Sierra – 000122, clearly describes the investigative steps that led to the search for Thomas Sierra. These steps are self-contained in the Sierra supplementary reports. The supplementary report lists the name of the victim in the previous homicide investigation, Ruben Gonzalez, and the interview of his mother, Esther Reyes, and the date, 20 May 95, that Sierra approached her and offered his condolences.

    a.  This supplemental report transparently describes the detectives' investigative steps that led them to search for Thomas Sierra.

4.  During the discovery process, and leading up to trial, nothing prevented either the prosecutor or the defense attorney from obtaining and examining the Gonzalez case file.  From a prosecutor's point of view, there was no reason to include the entirety of the Gonzalez investigative file within the the Andujar file.  Rather, both the prosecutors and defense attorneys would have been able to subpoena the file.

My opinions, findings, and observations herein are based upon my education, training and experience. The details of my background are listed in my curriculum vitae that is attached and incorporated herein by reference. Among other accomplishments, I have

thirty-two years of experience as a trial prosecutor, and I have attained numerous supervisory positions including Chief of the Criminal Prosecutions Bureau in the Cook County State's Attorney's Office and Deputy Chief with the DuPage County State's Attorney's Office. I have also lectured on numerous aspects of criminal prosecutions including *Brady* and discovery responsibilities for prosecutor's offices in Illinois and nationwide through the National District Attorney's Association. I have most recently included discovery and *Brady* obligations in one of a series of annual ethics seminars sponsored by the Winnebago County State's Attorney's Office.

DATED: March 27, 2023

Respectfully Submitted:

Bernard J. Murray

24

## MATERIALS REVIEWED

1. Expert report of Thomas J. Tiderington in *Reyes v. Guevara, et. al.* and *Solache v. Guevara, et. al.*

2. Expert report of Thomas J. Tiderington in *Sierra v. Guevara, et. al.*

3. Deposition of Thomas J. Tiderington (Parts 1 and 2) in *Reyes v. Guevara, et. al.* and *Solache v. Guevara, et. al.*

4. Deposition of Thomas J. Tiderington in *Sierra v. Guevara, et. al.*

5. RD # A59634 (RD File)

6. RD # A744094 (RD File)

7. RD # B447609
    a. Public Defender File for Rodney Tooney
    b. CCSAO file for the prosecution of Rodney Tooney

8. RD # C250890 (RD File)
    a. Public Defender File for Patrick Bailey
    b. CCSAO file for the prosecution of Patrick Bailey

9. RD # C687989 (RD File)
    a. Public Defender File for Kimberly Mathis
    b. CCSAO file for the prosecution of Kimberly Mathis

10. RD # Z000273 (RD File)
    a. Public Defender File for Nakia Davis
    b. CCSAO File for the prosecution of Nakia Davis

11. RD # C 198126 (Investigative File for Soto Homicide)

12. Cook County Public Defender's Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144

13. Cook County Public Defender's Reply in Support of Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144

14. RD # Z273605 (Investigative File & RD File)
    a. Public Defender Files for Damaine Billups & Willie Johnson
    b. CCSAO File for the prosecution of Damaine Billups & Willie Johnson

15. RD # Z475236 (Investigative File & RD File)
    a. Public Defender File for Ardell Simmons
    b. CCSAO file for the prosecution of Ardell Simmons

16. RD # Z 219873 (Investigative File & RD File)
    a. Public Defender File for Linox Jackson
    b. CCSAO file for the prosecution of Linox Jackson

17. RD # C 687989 (Investigative File & RD File
    a. Public Defender File for Kimberly Mathis
    b. CCSAO File for the prosecution of Kimberly Mathis

18. RD # A 315294 (Investigative File & RD File)

19. Deposition of Deborah Gubin in *Johnson v. Guevara,* N.D. Ill. Case No. 20-CV-4156

20. Deposition of Kevin Sheehan in *Johnson v. Guevara,* N.D. Ill. Case No. 20-CV-4156

21. RD # A 403252 (Investigative File & RD File)
    a. Public Defender file for Guy Rainey
    b. CCSAO file for the prosecution of Guy Rainey

22. RD # B 442532 (Investigative File and RD File)
    a. Public Defender File for Oscar Soto
    b. CCSAO File for the prosecution of Oscar Soto

23. RD #T 290460 (Investigative File & RD File)

24. RD #X 066055 (Investigative File & RD File)

25. RD #Z 093141 (Investigative File & RD File)

26. RD #Y 240898 (Investigative File & RD File)

27. RD # Z226760 (Investigative File & RD File)

# BERNARD J. MURRAY

## Education

- University of Illinois - Chicago, Chicago, IL
        Bachelor of Arts in Criminal Justice and Political Science. Minor in Sociology
- DePaul University – College of Law School, Chicago IL - Juris Doctor

## Bar Admissions:

- State of Illinois – November 9, 1983
- United States District Court for the Northern District of Illinois – November 1983
- State of Illinois Capital Litigation Trial Bar, Lead Counsel – December 16, 2002

## Professional Experience

- DuPage County State's Attorney's Office
        Assistant State's Attorney – 2009 to 2015
        Deputy Chief, Community Affairs Division – 2009 to 2010
        Deputy Chief, Felony Trial Division – 2010 to 2014
        First Assistant, 2018 - present
- Cook County State's Attorney's Office
        Assistant State's Attorney –1983 to 2008
        -Appeals, Juvenile, Felony Review, Preliminary Hearings and Felony Trial Divisions
        Deputy Supervisor, Gang Prosecutions Unit 1993 to 1998
        Supervisor, Felony Trial Division – 1998 to 2000
        Deputy Chief, Special Prosecutions Bureau – 2000 to 2001
        Chief, Criminal Prosecutions Bureau – 2001 to 2008
- Special Assistant State's Attorney for Jefferson County, IL – 1994 to 1996
- Special Assistant U.S. Attorney, Northern District of IL - 1992 to 1997

## Honors and Awards

- Dean's List – University of Illinois – Chicago
- President - Illinois Prosecutors Bar Association – 1999 - 2005; Secretary - 2014
- Officer - Association of Government Attorneys in Capital Litigation – 2002 to present;    -
-President – 2010

## Memberships

- University of Illinois - Chicago Criminal Justice Society
- Chicago Bar Association - Judicial Evaluation Committee
- American Bar Association
- Illinois Bar Association
- Illinois Prosecutors Bar Association
- National District Attorneys Association
- National College of District Attorneys - Lecturer and Trial Advocacy Faculty
- Association of Government Attorneys in Capital Litigation
- Cook County State's Attorney's Office - Senior Training Committee
- CLEAR Commission – Illinois Criminal Code Reform
- CLEAR Sentencing Commission – Illinois Criminal Sentencing Reform
- Illinois Sentencing Policy Advisory Council

## **PAST TESTIMONY**

1. Deposition Testimony
   a. *Fields v. City of Chicago*
   b. *Rivera v. City of Chicago*
   c. *Reyes v. Guevara et. al. & Solache v. Guevara et. al.*

2. Trial Testimony
   a. *Fields v. City of Chicago*
   b. *Rivera v. City of Chicago*
   c.

## **HOURLY RATE**

$200/Hour for Out of Court Review
$300/Hour for Testimony

# *Sierra v. Guevara*

# ATTACHMENT A

EXPERT REPORT OF BERNARD J. MURRAY

I.      Overview

a.      The Plaintiffs' Expert's conclusions that "CPD's Policies and Practices Concerning Documentation and Disclosures in Homicide Investigations ae Woefully Inadequate and Result in the Routine Failure to Document and Disclose the Documents and Information Learned During the Homicide Investigation to Criminal Defendants" is largely based upon the flawed premise that that "[c]riminal defense files show that important investigative materials are regularly withheld from criminal defendants" (Pl. Exp. Rpt., at p.52.) He assumes that documents currently missing from the criminal defense attorneys' files but present in the CPD's investigative files establishes that they were withheld from criminal defendants prior to and at the time of the criminal trial. He makes this claim lacking any evidence to show that the criminal defense attorney's files are currently in the same condition as they were at the time of the original trial. He claims that "any review of prosecutor and criminal defense files should reveal a simple finding: all the documents in the police files up to the point of conviction are contained in the criminal defense attorney's file and the prosecutor's file." (P Exh Rpt at 52.) Yet here is no evidence in the report that he examined the prosecutor's files to determine if they had received reports that he now claims were withheld. Nor does he acknowledge that some of the public defenders' files may be incomplete because of the passage of time or because they withdrew from the case for private counsel.

i      The Cook County Public Defender's Office (CCPD) has questioned the Plaintiffs' assumption that merely because a report is now missing from their files, then it was never provided to them. In a Motion to Quash Subpoena in *Velez v Dart, 18 CF 8144,* the Cook County Public Defender's Office stated "As the CCPD argued in its opening motion, this Court should also examine whether the benefit of production outweighs the monumental effort required to produce hundreds of files, and this Court should question the underlying assumption, adopted in other cases, that if a report is not found in the CCPD's file, that report must not have been given to the CCPD." (Reply in Support of Motion to Quash Subpoena at p.3.)

ii      CCPD went on to argue that "The CCPD acknowledges that when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want

1

to search through their closed files thirty years later." (Reply in Support of Motion to Quash Subpoena at p.3.)

b.    Plaintiff's Expert also fails to acknowledge that some of the public defenders' files may be incomplete now because they were replaced by private attorneys. There is no indication that private attorney's files were examined by Plaintiffs' Expert.

c.    Finally, the public defender files contain significant redactions. Plaintiffs' expert testified during his deposition that he was told to assume that all redacted materials were work product. He has no way of knowing if that assumption is accurate in this or in other redacted files. Those redactions could very well undermine the conclusions he makes throughout the report that documents were missing from the public defender file.

 d.    Plaintiffs' Expert initially compared 105 criminal defense attorneys' files to 72 investigative files. He states that these files are listed in Attachment F. Plaintiffs' Expert claims that after removing criminal defense files that did not have a corresponding investigative file, contained no police reports or very few so as to be incomplete, he ultimately limited his analysis to 63 criminal defense attorneys' files. He lists his process and exclusions in footnotes 113 and 114. (Pl Exp Report at 53.)

i    He has indicated that the files removed from his considerations have strike-through lines in Attachment F. However, it appears that he considered files that he considered incomplete in the body of his report. Also, Attachment F contains 63 files that lack strike-throughs. It's not at all clear how he finally settled on those 63 files. Plaintiffs' Expert specifically reviewed eight files as "examples" in his report. (Ibid., at pp. 56-60.) The remaining files were contained in a table compiled by the Plaintiff's' counsel.

ii   The Plaintiffs' Expert applies the same flawed logic specifically to the eight files. That is that the criminal defense attorneys' files today contain the same documents as at the time of trial. One file that the Plaintiff's' Expert relies upon is devoid of any CPD reports. There is no indication that he examined the prosecutors' files to determine if any of the allegedly withheld documents were found in the prosecutors' files. In fact, Plaintiffs' expert conceded during his deposition that he was not aware that companion CCSAO files were produced in discovery. ( Expert's Deposition, 10/6/2022, Vol. II at pg. 391-392).  An examination of the prosecutors' files reveals many of the allegedly withheld documents are contained in the CCSAO's trial files and therefore not regularly withheld. Moreover, Plaintiffs'

expert testified that it was his position that "any reasonable officer would understand that everything in a homicide file should be turned over to the prosecutor[]" and accordingly conceded that if the documents were contained within the CCSAO file, that would have been proper and reasonable conduct on the part of CPD. (Expert's Deposition, 10/6/2022, Vol. II at pg. 654, 660). The prosecutors' files also record, on occasion, when they provided police reports, GPRs and "street files" which during the relevant time period (1995-1998) as another name for investigative files, to counsel in court.

iii   Plaintiffs' Expert claims that he found potentially exculpatory handwritten notes that were not transferred into official reports. Plaintiffs' expert also seems to claim that these notes were not disclosed to criminal defendants. But in this section of his report, he only compared permanent retention files with their corresponding investigative files. Inexplicably he does not discuss comparing these notes to a public defender's file. (Pl Exp at p. 51)

e.   For this report, I am also relying upon my analysis of the Plaintiff's Expert's report in Fields v City of Chicago and Rivera v Chicago and the reports compiled in that case. (See attachment A)

II.   Discovery Obligations

a.   The Illinois General Assembly has acknowledged by statute that discovery procedures in criminal cases shall be in accordance with the Illinois Supreme Court Rules. 725 ILCS 5/114-13(a). They also have codified the long-standing procedures utilized by police and prosecutors to guarantee that police reports will be provided to the prosecutors' offices to be tendered during discovery:

"Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated." 725 ILCS 5/1114-13(b)(11-19-03).

b.   Disclosure to the Accused: The Illinois Supreme Court Rules require that the prosecution disclose to defense counsel certain material and information within its possession or control in all felonies and felony juvenile delinquency

3

cases. (Illinois Supreme Court Rule 412.) Among the items required to be disclosed are:

    i.    The names and last known addresses of witnesses, their relevant written or recorded statements, and memoranda containing substantially verbatim reports of their oral statements. (Illinois Supreme Court Rule 412(a)(i)).

    ii.    Any statements made by the accused (written, recorded, or oral) and a list of witnesses to the statement.

    iii.    Any reports of experts including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

    iv.    Any books, papers, documents, photographs or tangible objects which the prosecutor intends to use at trial or which were obtained from the accused.

    v.    And any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at trial.

c.  *Brady* and *Giglio* Disclosures: The U.S. Supreme Court decisions also require that prosecutors disclose exculpatory evidence that is material either to guilt or to punishment. *Giglio* requires evidence that could allow the defense to impeach the credibility of a prosecution witness. The police fulfill their *Brady* and *Giglio* disclosure obligations when they supply the information to the prosecutors.

    i. The Illinois Supreme Court also includes *Brady* disclosure obligations in their Rules. (Illinois Supreme Court Rule 412(c)).

d.  The Illinois Supreme Court Rules also require that the prosecution "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. (Illinois Supreme Court Rule 412 (f)). The prosecution's duty to disclose is a continuing obligation. If additional discoverable information comes to the prosecution's attention at a later date, the defendant should be promptly notified. (Illinois Supreme Court Rule 415 (b)).

e.  The Illinois Supreme Court Rules indicate that certain materials are not subject to disclosure. For example, work product is not subject to disclosure. The Rules state that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its

legal or investigative staffs, or of defense counsel or his staff." Illinois Supreme Court Rule 412(j).

f. The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, the CPD's policy is good. It requires detectives to turn in all material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. Plaintiff's Expert disclosed in the *Fields* litigation[1] that, as a police officer, he routinely shredded his investigative notes. Unlike plaintiff Field's expert's own practice, CPD's policy requires the detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will nevertheless be maintained and produced to the prosecutor and defense attorney for later review. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other fashion; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

III.  **Regulation of Discovery**

a. For crimes occurring in Chicago, Cook County Assistant State's Attorneys assigned to trial courtrooms learn both formally and informally how to obtain police reports and all other relevant information and evidence. Prosecutors maintain checklists of documents that may exist and should be obtained. Along with the checklists come the methods to obtain the reports and evidence. Most of the documents listed on the checklists are created by the Chicago Police Department.

b. Chicago Police Department reports are obtained primarily through subpoenas, forms and telephone calls. The primary sources of reports, notes, criminal histories or photographs in the Chicago Police Department are headquarters, the crime lab, the bureau of identification and the department's area headquarters. The Cook County State's Attorney's Office and the Chicago Police Department maintain an intra and interoffice mail service that facilitates the production of reports, photographs and criminal histories.

---

[1] Plaintiffs' expert in this case relies on Field's expert opinions in arriving at his opinions. *See,* Plaintiffs' Expert Report at Attachment G.

c. By the 1980s, prosecutors routinely subpoenaed all police reports. This was in addition to the forms or phone calls that were still utilized. The subpoenas would include a request for police documents that became known informally by some prosecutors and defense attorneys as 'street files.' Chicago Police Department Investigative Files contain what attorneys referred to as "street files" *i.e.*, notes most often recorded on forms titled 'general progress reports' (GPRs). Prosecutors would often send these subpoenas to both the Superintendent's Office (also known as headquarters) and to the Area Headquarters. The Chicago Police Department subsequently directed that the subpoenas go through one location: The Superintendent's Office. From there, CPD's subpoena unit would cause the subpoenaed material to be collected from the relevant unit and sent to the trial courts. Many criminal defense attorneys would also issue subpoenas for police reports and include the term "street files" in the documents requested, which would obtain copies of the Investigative Files.

d. To ensure a prompt flow of information, prosecutors would also reach out to Detectives and have them bring their investigative files to court for copying.

e. Once the police reports were in hand, the prosecutors would tender all of them to defense counsel. If after a review of the documents they appeared to be incomplete, more requests for potentially missing documents were made by the attorneys in the courtroom.

f. Prosecutors provide these documents to defense counsel in court and generally indicate when they believed they have tendered the complete file. Prosecutors also utilized an informal docket sheet within their files, commonly referred to as the blueback. Prosecutors often recorded on their bluebacks when they provided discovery to defense attorneys. Formal Answers to Discovery also briefly summarized some of the discovery. For example, the Answer listed witnesses' names found in the police reports the prosecution anticipated calling at trial.

g. To memorialize discovery compliance, prosecutors eventually created discovery receipts in the 1990s that listed the documents tendered to defense counsel. A signed copy of the receipts was often maintained in the prosecutors' files. More recent methods include numbering all the pages and scanning the documents.

h. Not all documents or pieces of evidence are tendered by prosecutors to defense counsel. However, these items are made available for defense counsel to examine prior to trial. For example, items of physical evidence such as a weapon or clothing are not photocopied but are made available for examination. Prosecutors often made photo arrays, crime scene

photographs, or individual photographs, including polaroid photos, available for examination, too.

i.  In addition to the prosecutor's obligations to disclose police reports during discovery, certain documents are also maintained in the court file or are provided to defense counsel in open court.

    i.  During a charged defendant's first court appearance, his defense counsel is provided with a copy of his one-page arrest report. This document is utilized by the court to determine whether probable cause to detain exists. Defense counsel can also examine and copy the complaint for preliminary hearing. Although not provided to defense counsel during the initial appearance, the defendant's criminal history is summarized during the bond hearing to assist the court in setting an appropriate amount of bail. After a subsequent determination of probable cause, the formal indictment or information is also maintained in the court file. Finally, the court file maintains copies of arrest and search warrants and documents pertaining to extradition.

    ii.  The court file also contains Chicago Police Department Property Inventory Sheets. This document, known as the Inventory, lists evidence that was recovered and preserved by the police department during the investigation.

IV.  Record Retention and Discovery Obligations

a.  Plaintiffs' Expert acknowledged during his deposition that it is "proper and reasonable conduct" for the Chicago Police Department to provide investigative materials to the Cook County State's Attorney's Office for discovery. (Expert's deposition, Vol. II, 10/6/22 at p. 660)

b.  The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, CPD's policy furthers their ability to comply with discovery obligations. It requires detectives to turn in all material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. CPD's policy requires detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will be maintained and produced to the prosecutor and defense attorney for later review.

    i.  At times, Plaintiffs' Expert complains that information was not recorded on a GPR form or was preserved by different units within CPD. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other manner; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

    ii.  Nor does it matter that a different unit of CPD either created a report or maintained reports in different physical offices. Prosecutors and criminal defense attorneys were well aware that, for example, criminal history reports or lab reports were created and maintained by different units within the police department. This knowledge is demonstrated by the laundry-list of documents requested in subpoenas issued by either a prosecutor or a criminal defense attorney.

c.  From the inception of the Orders mandating the preservation of investigative materials, prosecutors as well as criminal defense attorneys, have issued subpoenas to receive not only typed reports but investigative materials. The subpoenas issued by all attorneys have used various terms for the investigative material. Primarily referred to as 'street files,' they are also referred to as area files, GPRs, notes, or running files.

d.  The subpoenas issued by prosecutors and criminal defense attorneys also reveal that lawyers involved in the criminal justice system understand that the Chicago Police Department has various units tasked with creating, compiling and maintaining records related to a criminal investigation. The subpoenas issued to obtain these records are often detailed to obtain all of those records. The primary identifying number is the case number, known as the records division or RD number. Other significant numbers to obtain records are the arrest report and photo number (known as the CB number), the criminal history number (known as the IR number) and the property inventory number (known as the EARPS or inventory number.)

    i.  While the permanent records division maintains the formal police reports such as the typed supplementary reports, the investigative files are maintained by the police Area that is primarily responsible for the investigation. Those files could contain notes, photos, or GPRs added to the file during the pendency of the investigation.

    ii.  All CPD officers compile their reports under the RD number and submit them for permanent retention. Those documents may be

created by patrol, gangs, narcotics, crime lab, forensic investigators or bomb and arson units.

iii. Other units in the Chicago Police Department are tasked to maintain other records or evidence. For example, arrest photos and criminal histories are maintained in a central location known as the Bureau of Identification. Evidence collected from a crime scene and submitted to the CPD Lab for testing is maintained at the lab during testing. Reports generated by the Labs are accessed through a request using the case RD number.

iv. Forensic investigators who primarily collect evidence and photograph crime scenes maintain their photographs in their unit under the case RD number. The collected evidence is preserved with the Evidence and Recovered Property Section (EARPS.) EARPS generates numerous copies of their property inventory sheets and submits one copy to the Clerk of the Circuit Court to maintain in the municipal court file.

e. Plaintiffs' expert alleges throughout the report that "parallel files" are maintained by CPD and are often not provided to either criminal defense attorneys or prosecutors.

i. Plaintiffs' Expert is not clear, either in his report or during his testimony, on how he defines an investigative or parallel file.

1. If he is referring to the manner that CPD creates and maintains reports, this process is not concealed. Prosecutors and criminal defense attorneys are aware of the manner and location of how those reports are created and where they are stored.

2. If he somehow suggests that individual police officers are personally retaining reports that are not maintained in the investigative file, he does so through speculation. The Special Orders from the early 1980s directed the detectives to the procedures to be used to maintain investigative materials.

3. Plaintiffs' Expert also claims that police officers from other units such as patrol or gangs could have files related to a homicide investigation, but CPD Special Orders are silent on whether the reports should be preserved or disclosed. (Pl. Exp. Rpt., at 46.)

9

a. While Plaintiffs' Expert acknowledges that the CPD's 'Detective Division' maintained investigative materials, he appears to ignore that violent crimes detectives have the primary responsibility to investigate homicides. Nowhere in any file will you find a patrol officer, or a gang officer having primary responsibility to investigate or clear a homicide.

b. If a patrol or gang officer participates in the investigation of a homicide, any reports generated by those officers are shared with the violent crimes detectives and filed by CPD under the RD number associated with the crime.

c. Therefore, all reports compiled by a patrol officer, or a gang officer could be obtained by either the prosecution or the criminal defense attorney via a subpoena.

4. Plaintiffs' Expert claims that in any given investigation, at least three files could have been created. (Pl. Exp. Rpt., at p. 45) The permanent retention file, a unit RD file and an investigative file. He also claims that other police units could maintain their own investigative materials and detectives could maintain their own running files. (Pl. Exp. Rpt., at p. 46) He claims these reports were not subject to documentation, storage or disclosure. It is unclear what documents he is referring to. Detectives could make copies of existing CPD reports kept at the Area during the course of the investigation, but these documents are already preserved in either the permanent retention/RD file or the Investigative File and therefore available by subpoena from either the prosecution or the criminal defense attorney.

V. Comparison of permanent retention/RD files with corresponding Investigative files

a. Plaintiffs' Expert claims that he found potentially exculpatory handwritten notes that were not transferred into "official reports". He specially identifies a number of these notes and claims that they were either not transferred to an "official report" or that they were not disclosed to criminal defendants. (Pl Exp Report at p. 51). The point of this section of the report is confusing, and Plaintiffs' Expert was not able to articulate the reason he identified these documents during his deposition.

10

b. Preliminarily, it should be noted that permanent retention/RD files and Investigative files are *both* official files. His premise that these handwritten notes were not transferred into official reports is flawed. The handwritten notes found in Investigative files are official reports available to defense counsel through subpoenas or tendered in discovery from the Cook County State's Attorney's Office.

c. General Progress Reports are often handwritten notes used by Detectives during the course of their investigations and used when they compile supplementary reports. Plaintiffs' Expert seems to believe that all notes, some that he considers cryptic, should be typed into supplementary reports. (Pl Exp Rpt at p. 51.) The supplementary reports are often far more comprehensive than the notes. Prosecutors request all investigative materials while compiling discovery materials for discovery and for possible use at trial. The Chicago Police Department requires preservation of all investigative notes. This allows prosecutors and defense attorneys access to documents created in the course of the investigation.

d. Next, Plaintiffs' expert claims that these notes were not disclosed to criminal defendants. But in this section of his report, he only states that he compared permanent retention/RD files with their corresponding Investigative files. He does not discuss comparing these notes to a public defender's file.

e. Plaintiffs' Expert lists handwritten notes that were not disclosed to defense counsel or not transferred into official reports, for two cases where there were no charges filed and therefore no public defender file.

  i RFC Solache/Reyes 76011-14 and 15-16, are found in RD# A-596534. This file involves the first-degree murder of Arney A. Reina. No defendant was charged in this case.

  ii RFC Solache/Reyes 77368 and 77452 are found in RD# A-744094. This case lacks charges or a public defender file because no one was charged. This case involved a murder – suicide.

f. RFC Solache/Reyes 34554 is found in RD# Z-000273 and is also located in the public defender's file at AR-PD-41276.

g. RFC 110176 and 110180 are handwritten notes found in the Kim Mathis file (RD # C-687989) discussed later in this report. Both handwritten notes appear to be the concluding sentence to an interview and located on the back side of a GPR. RFC 110176 is a note from an interview of Kim Mathis.

RFC 110180 is a note from an interview of the defendant's sister Terry Mathis.

    i   Kim Mathis' note seems to indicate that her sister was present at the time of the beating. The remainder of all reports, including Kim Mathis' handwritten statement, indicates that her sister was not present. Moreover, in handwritten notes of Terry Mathis' interview, she states that she did not go upstairs. RFC Solache/Reyes 110178. This note is found in the public defender's file at AR-PD- 030049.

    ii   Terry Mathis' note indicates that her sister paged her at approximately 5:00 pm and told her that her son was dead. While this note is not found in the poorly maintained public defender's file, it does not appear to be exculpatory. All other indications are that Terry Mathis was with her sister. the defendant, at the hospital when her son was declared dead. AR-PD-030018; RFC Solache/Reyes 110146.

    iii   The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD-029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time was there an inability to discuss Terry's presence at the house or the call regarding her son's death.

h.  A series of investigative notes from page 51 of the Plaintiffs' Expert's Report are from one file: Defendants Rodney Toney and Leon Fields. RD# B-447609 and case number 97CR23668. These notes are numbered RFC 94055, 94058-60, 94089, 94092, 94094 and 94096-99.

    i   To claim that these investigative notes were not tendered to defense counsel would ignore the parameters that Plaintiffs' Expert established in Footnote #114. There he stated that he would not rely upon partial or incomplete public defender files. In fact, this file is specifically crossed off of Attachment F.

    ii   The public defender's file that corresponds to RD# B-447609 is 78 pages in length. AR-PD 23345-23423. But approximately half of those pages are redacted, and what remains does not include any Chicago Police documents. It is impossible to determine what the public defender had in their possession prior to trial.

    iii   The Cook County State's Attorney's file indicates that the two defendants were represented by private counsel. The Assistant

12

Public Defender withdrew from the case on December 4, 1997. CCSAO 62893.

iv At the same time, the CCSAO file indicates that they provided police reports as early as September 28, 1997. CCSAO 62893. Discovery continued through 1998 with a specific reference to "street files" tendered to private defense counsels on 9-15-98. CCSAO 62896.

i. Plaintiffs' Expert lists pages RFC 104166-70 as his final example of investigative notes that were not disclosed to defense counsel or not transferred into official reports. These pages correspond to RD# C-250890 and court case number 98CR-13371. These pages are handwritten notes of a canvas for possible witnesses.

i This is another example of a violation of the parameters that Plaintiffs' Expert established in Footnote #114. There he stated that he would not rely upon partial or incomplete public defender files, which were designated on Attachment F, as this one was, with a strikethrough.

ii The public defender's file is numbered AR-PD 23546-23684. It only contains one police report. That report is the General Offense Case Report. AR-PD 23677-8. It is impossible to determine if the public defender had the canvas reports or any investigative reports in their possession prior to trial.

iii Included in the public defender's file are numerous subpoenas for Chicago Police Department police reports. The subpoenas were divided into individual requests for line-up reports, 911 calls, evidence reports and the defendant's photo. Two subpoenas are of note. One subpoena requests any and all police reports and specifically asks for general progress reports. (AR-PD 23626.) The other subpoena requests any and all police reports including street files, working files or running files (AR-PD 23630.)

iv A review of the Cook County State's Attorney's Office's file reveals that a series of private attorneys represented the defendant early on (CCSAO 4791-92) and during a pre-trial motion to quash arrest (CCSAO 5427), during a guilty plea and sentencing (CCSAO 4847) and during a motion to withdraw his guilty plea (4924.)

VI. Comparison of Eight Defense Attorney Files to Investigative Files.

a. Plaintiffs' Expert specifically compared eight defense attorney files to CPD's investigative files.

People v Linox Jackson Jackson and Tyrone Hammond. Z-219872. (V: Jerry Hall)

Plaintiffs' expert claims that the defense attorney's file is missing extensive information inculpating Richell "Tree" Akins and Ralph Mahomes. He alleges that their IR Histories criminal records searches are missing and the inventory sheet listing their IR sheets were not disclosed. Moreover, Plaintiffs' expert claims that a supplementary report with a detailed interview of Akins was not disclosed. Finally, he claims a handwritten note with Mahomes' name circled and a note regarding the shooting occurring in the car was not disclosed.

1. Plaintiffs' Expert relied upon a wholly inadequate defense attorney's file to reach his conclusions. Pursuant to his own guidelines, this file should have been pulled and not used for analysis.

    First, he is only relying on Linox Jackson's file. He is lacking a defense attorney's file for Tyrone Hammond.

    Next, the file he is basing his conclusions upon contains 51 pages. This file does not contain *any* police reports or investigative notes. Instead, it contains 8 wholly redacted pages and assistant public defender Jean Herigodt's appearance, motions for discovery and Jackson's IR sheet. It does contain numerous subpoenas for police reports and investigative materials.

    Finally, he is lacking the files of the two defense attorneys that actually represented each defendant. The State's Attorney's file indicates that Assistant Public Defender David Figura represented Tyrone Hammond and private attorney Richard Kloak represented Linux Jackson. (CCSAO 91555.) They represented the two defendants through motions to suppress their video statements and eventual guilty pleas.

2. The CCSAO blueback indicates on numerous entries that police reports and other investigative materials were tendered to defense counsel on various court dates. Regarding Plaintiffs' expert's claim that the supplementary report with a detailed interview of Akins was not disclosed is specifically refuted on this blueback. The supplementary report with this information was signed by Detective Wojcik. It was tendered to both attorneys in February 2001. (CCSAO 91558)

    The CCSAO file has signed receipts for other reports that the Plaintiffs' expert claims were not disclosed. Akins' handwritten statement was listed on a receipt dated 6-14-00 and found at CCSAO 92024. The 18-page supplementary report recounting Akins'

statement is listed on a signed discovery receipt found at CCSAO 92005. Akins' IR history was listed on a receipt found at CCSAO 91939-40. Mahomes' rap sheet was listed on a receipt found at CCSAO 92004. Finally, a receipt for five pages of "GPRs" (investigative notes that were typed and handwritten) is found at CCSAO 92003.

People v Edwards, et al., Z-273605 95CR23119 (V: James Bryant)

Six defendants were charged with the murder of James Bryant. Plaintiffs' Expert examined only two of the six defense files. Presumably because they were the only defendants represented by the public defender's office. All six defendants were found not guilty after a bench trial that concluded on September 10, 1996.

1. Plaintiffs' Expert indicates that six documents that may have been helpful to the defense attorneys were missing from the file. All but one of the documents were found in the Cook County State's Attorney's files.

2. Three of the pages listed alleged alternative suspects Tremaine Willis (RFC Solache/Reyes 40247 and -49) and Paul Thomas. (RFC Solache/Reyes 40335). Those documents are found in the prosecutor's files at pages CCSAO 33303, 33236, 33233.

3. A handwritten note noting observations made by a witness named Miss Smith (RFC Solache/Reyes 40609) is found in the prosecutors file at CCSAO 32994. The Plaintiffs' expert claims this note would have allowed defense counsel to argue it could have been as few as two offenders chasing the victim instead of the 2-3- or 4 estimation she provided in the handwritten note. This note does not contradict the information Miss Smith detailed in the Supplementary report (RFC Solache/Reyes 040108), which clearly indicates multiple possible offenders. Moreover the supplementary report provides more details regarding the attack than the one sentence in the note.

4. The CCSAO blueback lists numerous dates where they provided police reports and related discovery materials to defense counsels. (CCSAO 32595 – 97.) Specifically listing the tendering of the "entire street file" to the attorneys on 1-5-96 (CCSAO 32596.)

5. A hand-drawn map with notations in the lower right corner is alleged to be missing from the defense attorneys' files. (RFC Solache/Reyes 40304.) While this document is not found in the prosecutor's file, the information on the document is included in the supplementary report provided to defense counsel. This report found at RFC Solache/Reyes 40359 – 94.

   a. This report includes interviews of witnesses and offenders. This map could have been used with any of them. Specifically, the information written in the

15

corner of the map appears to have come from a witness named Willie Oliver. (RFC Solache/Reyes 40364-65.) His interview includes the nickname of one of the defendants ("Gotti"), the use of a belt, talking disrespectfully like a father to the victim and jumping off the hood of a red car onto the victim. All of this information is on the map and included in the supplementary interview. Finally, the arrow drawn on the map could have indicated the path the defendants took after the attack. This information could also come from two police officers who arrived on the scene. Their information is also detailed in the same supplementary report.

<u>People v Jose Melendez A-315294 (V: Villasenor)</u>

Because of redactions to the Public Defender's file, Plaintiffs' Expert chose to compare the investigative file to the permanent retention file.

1. This technique violates the Expert's methodology. Because of extensive redactions to the public defender's file, he cannot be confident that the file contains all relevant materials.

2. Plaintiffs' Expert claims that the lack of a GPR report on interviews with witnesses Salgado and Oliver prevented further interviews with them on the possibility of identifying the shooter. Of course, he is assuming that the GPR was not provided to defense counsel by subpoena to the prosecution or the Chicago Police Department. Yet he acknowledges that the supplementary report indicates that the witnesses did not see anyone running from the scene of the shooting. Even by the Expert's own acknowledgement, the attorney had a report identifying the witnesses, providing a significant description of their observations. Nothing precluded further interviews.

3. Plaintiffs' expert provides another speculative analysis to witness Pamela Bassey's interview as recorded in the GPR and in the supplementary report. In the supplementary report, Bassey reported looking out of window and stating that she "did not see anything." In the GPR, she told police "she saw nothing." Again, assuming arguendo that the GPRs were not provided to defense counsel, this claimed discovery violation is a distinction without a legal or practical difference.

4. The Plaintiffs' expert provides a final illogical claim pertaining to a missing handwritten statement found only in the GPRs of the defendant's alibi witness. First, the illogical assumption is that the defense counsel did not have access to the handwritten report of his client's alibi witness is unsupported by the incomplete defense counsel's file. The redacted pages may very well contain that information. Next, the distinction is again one of semantics that does not undermine the witness' ability to testify to the alibi. The distinction pertains to how the defendant travelled to the witness's house; not whether the alibi existed.

16

<u>People v Kim Mathis C-687989 98CR30439 (V: Cydryck Spain)</u>

Plaintiffs' Expert contends that a GPR contains a handwritten note that places the defendant's sister at the scene of the crime at the time of the fatal beating of the defendant's own child. The cleared / closed report states that the defendant's sister was not present at the time of the beating.

1. The note appears to be the back page of the GPR of an interview with the defendant. Defense counsel obviously has ample opportunity to discuss the presence or absence of his client's sister during the beating.

2. Plaintiffs' expert again assumes that the public defender's file is complete. And that the back page of the GPR was not provided by either the Chicago Police Department or the prosecution.

3. Defense counsel's file reveals that during his interview with the defendant, she stated that her sister Terry dropped off her son. Terry was circling the block because there was no parking. After the victim entered the apartment, the defendant talked with her sister before leaving the car and entering her apartment. Terry drove off and was not in the apartment when the defendant 'whipped the victim.' AR PD 02932-33.

4. The public defender's file contains an extensive diary of his interviews with the defendant, her extended family and Terry. AR-PD-029932-34 and AR-PD-029833 – 029846. Terry was cooperative and frequently talked with defense counsel. At no time did she ever indicate that she was present during the beating.
   a. This running diary appears to be a document that should have been subject to redaction, as it is clearly attorney work-product. Without this running diary, I would have currently been without knowledge of what the criminal defense counsel knew prior to trial. It also begs the question of whether other materials that were redacted could describe the extent of the material that now appears to be missing from the criminal defense attorney's file and further supports my conclusion that Plaintiffs' expert's methodology is flawed.

<u>People v Ardell Clemons Z-475236 96CR240 (V: Nyree Johnson)</u>

Plaintiff's Expert points to two documents in the investigative file that are missing from the public defender's file. He claims that these documents could point to other suspects.

1. Both documents are contained in the prosecutor's file and likely tendered to defense counsel during discovery.

17

2. The allegedly missing GPR note (RFC – Solache/Reyes 44288) is found in the prosecutor's file at CCSAO 53045). The allegedly missing lease (RFC – Solache/Reyes 44260) is found in the prosecutor's file at CCSAO 53426.

3. The GPR note refers to a "possible suspect" that was described by Plaintiffs' Expert as "dating" the victim in the GPR but as "only friends" in the police reports found in the public defender's file. The GPR does not state "dating" instead it states, "seeing her." (RFC 44288)

4. Nyree Johnson's body was found on October 6, 1995. (RFC – Solache/Reyes 51105). Four days later, Clemons called Area Five detectives from Florida. He confessed on the phone to killing Johnson. Later, he was arrested by Florida police officers and again confessed to them in a recorded interview. (RFC – Solache/Reyes 51129 -35.). On December 8, 1995, he provided a typed, court-reported statement again admitting to killing Johnson to a Cook County Assistant State's Attorney and a Chicago Police Department Detective. (RFC – Solache/Reyes 44157 – 81.)

5. Although the allegedly missing documents were likely provided to defense counsel by either the Chicago Police Department or the Cook County State's Attorney's Office, they were unlikely to provide "leads" for either law enforcement or defense counsel to pursue.

<u>People v Oscar Soto B-442532  97CR23347 (V: Miguel Salas)</u>

In this gang-involved shooting, Plaintiffs' Expert acknowledges that two supplementary reports regarding two initial suspects are in the permanent retention/RD file, but he alleges that arrest reports and GPRs relating to these suspects do not appear in the public defender's file.

1. The public defender's file is incomplete. Although it contains 112 pages, 47 pages are wholly redacted. Of the remaining 65 pages, 28 are photos. The remaining 37 pages, include 2 blank pages and 2 photocopies of envelopes.

2. Included in the remaining 33 pages are defense counsel's subpoenas for various police reports. These subpoenas total 12 pages. This leaves 25 pages of police reports. The Chicago Police Department files total 158 pages including the 9 pages of GPRs plaintiff's expert claims were missing from the public defender's files.

3. The public defender's subpoenas for police reports are both general and specific. Defense counsel requested "any and all reports" including street files or GPRs. She also requested, in individual subpoenas, line up photos, scene photos, a B of

I sheet and police report requests that did not include specifically list street files. She also subpoenaed Illinois State Police Reports.

4. It is impossible to claim that either the Chicago Police Department or the Cook County State's Attorney's Office failed to provide the allegedly missing documents based upon the incomplete information contained in the public defender's file.

<u>People v Guy Rainey A-403252 96CR20849 (V: Cedric Morris)</u>

Plaintiffs' Expert alleges that the presence of numerous requests for photos to compile photo arrays indicates that multiple identifications were performed but not reported. (Pl Expert report at 59) He bases this allegation on a note found in the investigative file naming Kevin Haas as a potential suspect. (RFC – Solache/Reyes 72857.) He alleges that Haas's name does not appear in the defense file or in any supplementary reports explaining his involvement.

The investigative file contains reports describing how and why the photo arrays were compiled (RFC 072888, RFC 072890, and RFC 072894) and how they were used (RFC 072879-81 and RFC 072905). A report describing the in-person line up also references the photo arrays. (RFC 072875-77.) Each of these reports were found in the public defender's file.

Kevin Haas was a Chicago Police Department Detective. Plaintiffs' Expert could possibly have discerned his status by reviewing RFC – Solache/Reyes 72864. That document is a handwritten note from another Chicago Police Department Employee assigned to the "Stop – Ident Desk" to Det. Haas.

<u>People v Demetrius Johnson, P-272087, 91 CR 9833 (V: Edwin Fred)</u>

1. Plaintiffs' Experts claims that investigative documents related to a line up identification of Bryan Johns were not provided to the criminal defense attorney. This claim is based upon an obviously incomplete criminal defense attorney file. The file does not contain any CPD reports. And the file lacks any documents with the trial criminal defense attorney's name. (Deborah Gubin.) Inexplicably, the file does contain 23 pages of VA medical records for 30-year-old Levon Jefferson. These documents, requested by the defendant Johnson's first criminal defense attorney, Jack Carey, have no apparent connection to this case.

2   The criminal defense attorney's file does contain a letter from CPD's Communication Operations Section indicating most broadcasts were erased after 30 days and no relevant records were found in the master logging tape. A log reflecting the examination of the master logging tape was also found in the file. These documents were likely sent to the court in response to a CCSAO subpoena. The CCSAO blueback

indicates that the "911 subpoena materials" were mailed to defense counsel on 7-16-92. (Rivera Production at SAO 0015063)

3   The criminal defense attorney's file also contains numerous subpoenas for police reports. It contains 2 copies of a subpoena for all CPD reports with an addendum requesting "streets files" with a court return date of 8-13-91. There are also three copies of the defense subpoena for CPD reports stamped received by CPD's Record Division on "'91 Jul 24 14:30." And three more copies of the same subpoena stamped as received by CPD's Record Division on "24 Jul 1991 11:42." Other court filings found in the defense attorney's file were two copies of a defense motion for discovery court file-stamped 9-17-91, an appearance form, a request to be released from jail to attend a wake and a petition for substitution of judges that was later withdrawn.

4   The remaining documents pertinent to this case are requests by the defense attorney to his investigators. One note demonstrates that the criminal defense attorney was aware of Johns and his possible significance to the case. The note indicates that Bryan Johns "knows the real D." (Rivera Production at JR-L 212483.)

5   Plaintiffs' Expert claims that the documents were also missing from the prosecutor's file. Again, Plaintiffs' Expert assumes that the prosecutor's file contains all the documents today that were in the file at the time of trial. An examination of the file demonstrates that the alleged missing investigative documents were provided to the criminal defense attorney during discovery. The ASA indicates on the blueback that he tendered to defense counsel "26 pgs RD (GPR Subp)." (Rivera Production at SAO 0015056)

6   In the CPD's investigative material, the ASA's subpoena is present. The subpoena and the investigative material that follows it, including the Bryan John's unsigned line up report, totals 26 pages. Moreover, the other material in the Investigative File are court attendance reports, the medical examiner's report and a case disposition report. None of the remaining documents are GPRs or "street files."

7   Finally, Demetrius Johnson also states that he knew about the alleged Johns' lineup identification prior to his trial. On August 31, 2022, Demetrius Johnson testified in a deposition that prior to his trial, Bryan Johns told him that Johns was identified in a lineup the night of the murder of Edwin Fred. (Johnson Deposition at p 310.) He testified that Johns revealed this information to him in a conversation in Cook County Jail. Moreover, he told his attorney, Deborah Gubin. (Johnson Deposition at 313.) According to Johnson, he also told his attorney that Johns told him that he actually committed the murder. (Johnson Deposition p. 315.)

VII   Chicago Police Department's retention and use of polaroid and IR photographs.

Plaintiffs' Expert claims in the Solache – Reyes prosecution, that polaroid photographs were withheld from defense counsel. The allegation is that these photographs are evidence that uncharged individuals were alternate suspects. (Plaintiffs' Expert Report at 63.)

During the course of an investigation, Detectives may utilize IR Photographs, also known as 'mug shots,' and polaroid photographs.

At the commencement of an investigation, they could merely be used to visually identify who had been interviewed. This is particularly helpful when an investigation is handed-off to another team of detectives.

These photographs could also be used to display to other witnesses to further the investigation. They are not always used as a photo line-up. They could merely be used to confirm a person's identity with another witness.

They were also used during a witness's or a defendant's interview. They could be used as exhibits during the interview or as a photo of the witness or defendant to demonstrate their appearance and identity at the time the statement was recorded.

During the course of the investigation, the photographs were maintained in a string-tied envelope within the investigative file. If the photographs were used as exhibits or in photo line-ups, they were formally inventoried when the charges were filed, or the investigation was closed.

Plaintiffs' Expert claims that RFC Solache / Reyes 76-83 contains photographs that were not tendered to defense counsel. He alleges that photographs, by themselves are evidence that they were alternate suspects. First, the documents contain seven photographs that are not investigatory polaroid photographs. Next, one photograph is defendant Arturo DeLeon Reyes eating a sandwich. Two of the polaroid photographs are of Guadalupe Mejia. (76 and 80) The remaining polaroid photographs are of Jorge Mejia (76), Felicia Soto (78) and Rosa Aranda (80).

The taking of a polaroid or utilization of a mug shot during an investigation does not, by itself, designate someone as a suspect or an offender. But Plaintiffs' expert claims, "Had defense counsel had these polaroid photos, he or she would have had additional reason to contact these witnesses, and to learn about why they had been at the station and questioned, and what information they had revealed." (Plaintiffs' Expert at 63.) Instead, trial defense counsel could use the police reports to develop their own theories are alternate suspects.

Felicia Soto and Rosa Arrando are listed on the first page of the General Case Offense Report. RFC Solache Reyes 418. Their knowledge of the case is discussed there, throughout the file and again in a supplementary report starting on RFC Solache Reyes

363. Guadalupe Mejia's involvement in the case is detailed at great length in a closing supplementary report found at RFC Solache Reyes 233-253. Jorge Mejia is Guadalupe's husband and also referenced in RFC Solache Reyes 233-253.

In the investigation into the murders of Mariano & Jacinto Soto several polaroid photographs were taken. The investigative file envelope, that during an investigation is often used to hold photographs, is found at RFC Solache Reyes 000084.   During discovery, photographs were taken of the evidence impounded with the Clerk of Court. Specifically, Reyes 000111, contains 5 polaroid photographs. Four of the five photographs are numbered as People's Exhibits 1 through 4. One photograph is unnumbered. Photographs 1 – 4 are Adriana Mejia, Rosario Mejia, Arturo DeLeon Reyes and Gabriel Solache. The unnumbered photograph is Guadalupe Mejia. These photographs were in an envelope attached to Guadalupe Mejia's handwritten statement with the Cook County State's Attorney's Office.  (Reyes 101-112).  This indicates that the photographs were in fact used by the Cook County State's Attorney when taking Guadalupe's handwritten statement.

Moreover, the significance of the polaroid photographs being impounded with the trial court after trial demonstrates that polaroid photographs were not withheld from defense counsel. The speculation of withheld photographs rests on a defense file that may be incomplete years later. The speculation that their interviews were not made available to the defendants is belied by the detailed information discussed throughout the reports.

My opinions, findings, and observations herein are based upon my education, training and experience. The details of my background are listed in my curriculum vitae that is attached and incorporated herein by reference. Among other accomplishments, I have thirty-two years of experience as a trial prosecutor, and I have attained numerous supervisory positions including Chief of the Criminal Prosecutions Bureau in the Cook County State's Attorney's Office and Deputy Chief with the DuPage County State's Attorney's Office. I have also lectured on numerous aspects of criminal prosecutions including *Brady* and discovery responsibilities for prosecutor's offices in Illinois and nationwide through the National District Attorney's Association. I have most recently included discovery and *Brady* obligations in one of a series of annual ethics seminars sponsored by the Winnebago County State's Attorney's Office.

Respectfully Submitted:

Bernard J. Murray

DATED: October 31, 2022

# BERNARD J. MURRAY

## Education

- University of Illinois - Chicago, Chicago, IL
  - Bachelor of Arts in Criminal Justice and Political Science. Minor in Sociology
- DePaul University – College of Law School, Chicago IL - Juris Doctor

## Bar Admissions:

- State of Illinois – November 9, 1983
- United States District Court for the Northern District of Illinois – November 1983
- State of Illinois Capital Litigation Trial Bar, Lead Counsel – December 16, 2002

## Professional Experience

- DuPage County State's Attorney's Office
  - Assistant State's Attorney – 2009 to 2015
  - Deputy Chief, Community Affairs Division – 2009 to 2010
  - Deputy Chief, Felony Trial Division – 2010 to 2014
  - First Assistant, 2018 - present
- Cook County State's Attorney's Office
  - Assistant State's Attorney –1983 to 2008
  - -Appeals, Juvenile, Felony Review, Preliminary Hearings and Felony Trial Divisions
  - Deputy Supervisor, Gang Prosecutions Unit 1993 to 1998
  - Supervisor, Felony Trial Division – 1998 to 2000
  - Deputy Chief, Special Prosecutions Bureau – 2000 to 2001
  - Chief, Criminal Prosecutions Bureau – 2001 to 2008
- Special Assistant State's Attorney for Jefferson County, IL – 1994 to 1996
- Special Assistant U.S. Attorney, Northern District of IL - 1992 to 1997

## Honors and Awards

- Dean's List – University of Illinois – Chicago
- President - Illinois Prosecutors Bar Association – 1999 - 2005; Secretary - 2014
- Officer - Association of Government Attorneys in Capital Litigation – 2002 to present;     -
  -President – 2010

## Memberships

- University of Illinois - Chicago Criminal Justice Society
- Chicago Bar Association - Judicial Evaluation Committee
- American Bar Association
- Illinois Bar Association
- Illinois Prosecutors Bar Association
- National District Attorneys Association
- National College of District Attorneys - Lecturer and Trial Advocacy Faculty
- Association of Government Attorneys in Capital Litigation
- Cook County State's Attorney's Office - Senior Training Committee
- CLEAR Commission – Illinois Criminal Code Reform
- CLEAR Sentencing Commission – Illinois Criminal Sentencing Reform
- Illinois Sentencing Policy Advisory Council

## MATERIALS REVIEWED

1. Expert report of Thomas J. Tiderington
2. Deposition of Thomas J. Tiderington (Parts 1 and 2)
3. RD # A59634 (RD File)
4. RD # A744094 (RD File)
5. RD # B447609
   a. Public Defender File for Rodney Tooney
   b. CCSAO file for the prosecution of Rodney Tooney
6. RD # C250890 (RD File)
   a. Public Defender File for Patrick Bailey
   b. CCSAO file for the prosecution of Patrick Bailey
7. RD # C687989 (RD File)
   a. Public Defender File for Kimberly Mathis
   b. CCSAO file for the prosecution of Kimberly Mathis
8. RD # Z000273 (RD File)
   a. Public Defender File for Nakia Davis
   b. CCSAO File for the prosecution of Nakia Davis
9. RD # C 198126 (Investigative File for Soto Homicide)
10. Cook County Public Defender's Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144
11. Cook County Public Defender's Reply in Support of Motion to Quash Subpoena in *Velez v. Dart,* N.D. Ill. 18-CV-8144
12. Reyes 00101-00112
13. RD # Z273605 (Investigative File & RD File)
    a. Public Defender Files for Damaine Billups & Willie Johnson
    b. CCSAO File for the prosecution of Damaine Billups & Willie Johnson
14. RD # Z475236 (Investigative File & RD File)
    a. Public Defender File for Ardell Simmons
    b. CCSAO file for the prosecution of Ardell Simmons
15. RD # Z 219873 (Investigative File & RD File)
    a. Public Defender File for Linox Jackson
    b. CCSAO file for the prosecution of Linox Jackson
16. RD # C 687989 (Investigative File & RD File
    a. Public Defender File for Kimberly Mathis
    b. CCSAO File for the prosecution of Kimberly Mathis
17. RD # A 315294 (Investigative File & RD File)
18. RD # A 403252 (Investigative File & RD File)
    a. Public Defender file for Guy Rainey
    b. CCSAO file for the prosecution of Guy Rainey
19. RD # B 442532 (Investigative File and RD File)

    a.  Public Defender File for Oscar Soto
    b.  CCSAO File for the prosecution of Oscar Soto

20. Deposition of Deborah Gubin in *Johnson v. Guevara,*
    N.D. Ill. Case No. 20-CV-4156

21. Deposition of Kevin Sheehan in *Johnson v. Guevara,*
    N.D. Ill. Case No. 20-CV-4156

Attachment A

## EXPERT REPORT OF BERNARD J. MURRAY

I.      Overview

    A.      The Plaintiff's Expert's conclusions that the CPD regularly withheld documents are based, in large part, on a fundamentally flawed premise. He assumes that documents missing from the defense attorney's files but present in the CPD's Investigative Files, establishes that they were withheld from prosecutors and criminal defendants, even though he admittedly has no evidence or personal knowledge to prove any documents were withheld in any case. But by examining the prosecutors' files, court documents, appellate opinions and sometimes by closer examination of the defense attorney's files themselves, it is apparent that a high percentage of the allegedly withheld documents were provided to prosecutors and defense counsel, and were not systematically or regularly withheld. Moreover, an examination of the documents claimed to have been withheld demonstrates the substantive information reflected in those documents was provided in other reports in a high percentage of time and was not suppressed. After all, it is the production of information to the prosecutors and defense attorneys in the courtroom that is most important. There are multiple other flaws in plaintiff's expert's report, including but not limited to that some of the documents he identifies as missing from the criminal defense files are not substantive investigative material, some are blank pieces of paper with only a detectives' name on them, some are clearly administrative in nature, some were actually in the criminal defense attorney file, some were in the court file available to the public, and some are photographs available to the defense attorney prior to trial and impounded with the clerk of the court.

    B.      The Investigative Files and prosecutor's files I reviewed in connection with my work on this case demonstrate the CPD's compliance with its discovery obligations under Illinois court rules and the Constitution. Rather than demonstrate a practice of withholding information, I have found a practice of producing information in accordance with the law and preserving information for later use in the criminal process in accordance with CPD's own special orders. My findings in each of the specific cases are detailed below, and are consistent with my many years of practice as a prosecutor in the felony courtrooms in Cook County.

II.     Discovery Obligations

    A.      The Illinois General Assembly has acknowledged by statute that discovery procedures in criminal cases shall be in accordance with the Illinois Supreme Court Rules. 725 ILCS 5/114-13(a). They also have codified the long-standing procedures utilized by police and prosecutors to guarantee that police reports will be provided to the prosecutors' offices to be tendered during discovery:

"Any public investigative, law enforcement, or other public agency responsible for investigating any homicide offense or participating in an investigation of any homicide offense, other than defense investigators, shall provide to the authority prosecuting the offense all investigative material, including but not limited to reports, memoranda, and field notes, that have been generated by or have come into the possession of the investigating agency concerning the homicide offense being investigated." 725 ILCS 5/1114-13(b)(11-19-03).

B.      Disclosure to the Accused: The Illinois Supreme Court Rules require that the prosecution disclose to defense counsel certain material and information within its possession or control in all felonies and felony juvenile delinquency cases. (Illinois Supreme Court Rule 412.)   Among the items required to be disclosed are:

1.      The names and last known addresses of witnesses, their relevant written or recorded statements, and memoranda containing substantially verbatim reports of their oral statements. (Illinois Supreme Court Rule 412(a)(i)).

2.      Any statements made by the accused (written, recorded, or oral) and a list of witnesses to the statement.

3.      Any reports of experts including results of physical or mental examinations and of scientific tests, experiments, or comparisons.

4.      Any books, papers, documents, photographs or tangible objects which the prosecutor intends to use at trial or which were obtained from the accused.

5.      And any record of prior criminal convictions, which may be used for impeachment, of persons whom the State intends to call as witnesses at trial.

C.      *Brady* and *Giglio* Disclosures: The U.S. Supreme Court decisions also require that prosecutors disclose exculpatory evidence that is material either to guilt or to punishment. *Giglio* requires evidence that could allow the defense to impeach the credibility of a prosecution witness. The police fulfill their *Brady* and *Giglio* disclosure obligations when they supply the information to the prosecutors.

1.      The Illinois Supreme Court also includes *Brady* disclosure obligations in their Rules. (Illinois Supreme Court Rule 412(c)).

D.      The Illinois Supreme Court Rules also require that the prosecution "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. (Illinois Supreme Court Rule 412 (f)). The prosecution's duty to disclose is a

continuing obligation. If additional discoverable information comes to the prosecution's attention at a later date, the defendant should be promptly notified. (Illinois Supreme Court Rule 415 (b)).

E.      The Illinois Supreme Court Rules indicate that certain materials are not subject to disclosure. For example, work product is not subject to disclosure. The Rules state that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its legal or investigative staffs, or of defense counsel or his staff." Illinois Supreme Court Rule 412(j).

F.      The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, the CPD's policy is good. It requires detectives to turn in all material they generate or receive during an investigation so that it is maintained in the Investigative Files for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. Unlike plaintiff's expert's own practice in which he shredded his notes, CPD's policy requires the detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will nevertheless be maintained and produced to the prosecutor and defense attorney for later review. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other fashion; the crucial point is that the relevant information developed during the course of the investigation is submitted for later use by the prosecutor and defense attorney.

III.    Regulation of Discovery

A.      For crimes occurring in Chicago, Cook County Assistant State's Attorneys assigned to trial courtrooms learn both formally and informally how to obtain police reports and all other relevant information and evidence. Prosecutors maintain checklists of documents that may exist and should be obtained. Along with the checklists come the methods to obtain the reports and evidence. The majority of the documents listed on the checklists are created by the Chicago Police Department.

B.      Chicago Police Department reports are obtained primarily through subpoenas, forms and telephone calls. The primary sources of reports, notes, criminal histories or photographs in the Chicago Police Department are headquarters, the crime lab, the bureau of identification and the department's area headquarters. The Cook County State's Attorney's Office and the Chicago Police Department maintain an intra and interoffice mail service that facilitates the production of reports, photographs and criminal histories.

C.      By the 1980s, prosecutors routinely subpoenaed all police reports. This was in addition to the forms or phone calls that were still utilized. The subpoenas would include a request for police documents that became known informally by some prosecutors and defense attorneys as "street files." Chicago Police Department Investigative Files contain what attorneys referred to as "street files" *i.e.*, notes most often recorded on forms titled 'general progress reports' (GPRs). Prosecutors would often send these subpoenas to both the Superintendent's Office (also known as headquarters) and to the Area Headquarters. The Chicago Police Department subsequently directed that the subpoenas go through one location: the Superintendent's Office. From there, CPD's subpoena unit would cause the subpoenaed material to be collected from the relevant unit and sent to the trial courts. Most criminal defense attorneys would also issue subpoenas for police reports and include the term "street files" in the documents requested, which would obtain copies of the Investigative Files.

D.      To insure a prompt flow of information, prosecutors would also reach out to Detectives and have them bring their Investigative Files to court for copying.

E.      Once the police reports were in hand, the prosecutors would tender all of them to defense counsel. If after a review of the documents they appeared to be incomplete, more requests for potentially missing documents were made by the attorney in the courtroom.

F.      Prosecutors provide these documents to defense counsel in court and generally indicate when they believed they have tendered the complete file. Prosecutors also utilized an informal docket sheet within their files, commonly referred to as the blueback. Prosecutors often recorded on their bluebacks when they provided discovery to defense attorneys. Formal Answers to Discovery also briefly summarized some of the discovery. For example, the Answer listed witnesses' names found in the police reports the prosecution anticipated calling at trial.

G.      To memorialize discovery compliance, prosecutors eventually created discovery receipts in the 1990s that listed the documents tendered to defense counsel. A signed copy of the receipts was often maintained in the prosecutors' files. More recent methods include numbering all of the pages and scanning the documents.

H.      Not all documents or pieces of evidence are tendered by prosecutors to defense counsel. However, these items are made available for defense counsel to examine prior to trial. For example, items of physical evidence such as a weapon or clothing are not photocopied but are made available for examination. Prosecutors often made photo arrays, crime scene photographs, or individual photographs available for examination, too.

I.  In addition to the prosecutor's obligations to disclose police reports during discovery, certain documents are also maintained in the court file or are provided to defense counsel in open court.

1.  During a charged defendant's first court appearance, his defense counsel is provided with a copy of his one-page arrest report. This document is utilized by the court to determine whether probable cause to detain exists. Defense counsel can also examine and copy the complaint for preliminary hearing. Although not provided to defense counsel during the initial appearance, the defendant's criminal history is summarized during the bond hearing to assist the court in setting an appropriate amount of bail. After a subsequent determination of probable cause, the formal indictment or information is also maintained in the court file. Finally, the court file maintains copies of arrest and search warrants.

2.  The court file also contains Chicago Police Department Property Inventory Sheets. This document, known as the Inventory, lists evidence that was recovered and preserved by the police department during the investigation.

IV.  Documents Not Tendered During Discovery

A.  Some of the documents that the Plaintiff's Expert claimed to be regularly withheld are either not documents or are not discovery. And some are photographs that are made available for examination prior to trial.

B.  Plaintiff's Expert lists numerous notes that he claims were withheld. Some of these notes were not investigative documents at all. The most obvious examples are sheets of paper with only a detective's name and assignment written on them. With documents sent via intra or interoffice mail, the common practice was to write the recipient's name and assignment on the reverse side of the document. The document was then either folded and stapled together and sent without an envelope or placed it into a manila, mailing envelope. This was most often done with property inventory sheets, lab reports, evidence reports or criminal histories.

1.  On some of the notes, the property inventory sheet information is visible in a mirror image because it has 'bled through' during photocopying. (Derrick Johnson - #14.) On other notes, the approximate location and shape of the staple holes or the twin ACCO paper fastener holes align with the report found preceding the note in the Investigative Files. (Serafin Flores - #7.)

C.  Plaintiff's Expert also lists documents that are not properly part of the investigation. For lack of a better term, these are documents of an administrative nature. Examples are the Daily Major Incident Log, the Investigative Files Inventory, the Investigative Files Control Log, Homicide File Review form, Court

Attendance Reports and subpoenas. On occasion, these documents may have been copied and provided to defense counsel, but they not part of the investigation and are maintained for administrative purposes and have no evidentiary value or purpose.

1.    Daily Major Incident Log: This is a document that is authored by a detective division sergeant acting as a watch coordinator or a watch commander and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period. The watch commander then forwards seven copies of the log to the Office of the Chief of Detectives. It is forwarded to the Superintendent and others on the command staff. There is no requirement that the log be added to the Investigative Files or the Investigative Files Inventory. There is also no indication that the watch coordinator participated in the investigation. The watch coordinator merely summarized the basic facts of the murder and the arrest of the offenders for this log. The information gathered during the investigation is detailed in the CPD reports composed by the detectives and tendered by prosecutors to defendants during the pre-trial discovery process.

2.    Investigative Files Inventory: This form lists the items included in the Investigative Files. The inventory itself is not a substantive investigative report. It is the items listed on the inventory that may be required to be disclosed pursuant to the Illinois Supreme Court's Rules.

3.    Investigative Files Control log: This log lists the occasions that a detective checked out and returned an Investigative Files. The file may have been checked out for court, for copying or to complete the investigation. The log is not a substantive investigative report.

4.    Homicide File Review form: This form is not a substantive investigative report. Moreover, for the occasions where the Plaintiff's Expert claimed the form had been withheld from defense counsel, the form was either blank or contained only the title of the investigation.

5.    Court Attendance Reports: In at least four files, court attendance reports allegedly were not tendered. This document lists police officer's attendance at a hearing or trial. These documents lack any evidentiary value and are administrative in nature.

6.    Subpoenas: Plaintiff's Expert listed subpoenas or related documents as reports that were withheld from defense counsel. Two of these subpoenas or related documents were communications from CPD's Office of Legal Affairs to provide Investigative Files materials pursuant to a civil lawsuit often years after the actual investigation. At least one

occasion, the allegedly missing document was a subpoena issued by the CCSAO for police reports during pre-trial discovery. None of these documents has any evidentiary value.

D.     Photographs: Merely because photographs were determined to be "missing" from the defense attorney's files, this does not mean they were not made available prior to trial. Prosecutors or police officers would often try to photocopy individual polaroid photos, arrest photos and photo arrays. The quality of the photocopied photos was poor. Prosecutors would more often make these photos available for examination by defense counsel during pre-trial discovery. If a polaroid photograph of a defendant or witness was taken at the same time that a statement was recorded, or if a photo array was used during identification procedures with witnesses, the photos were made available to defense counsel for examination and often impounded with the Clerk of the Circuit Court if entered into evidence.

1.     The Plaintiff's Expert claims that numerous crime scene photographs were withheld from defense counsel in at least four defense files. Prosecutors, or defense attorneys, would attempt to obtain extra sets of crime scene photographs or make scene photographs available for examination prior to trial. Scene photographs entered into evidence were impounded with the Clerk of the Circuit Court. It is very unlikely that any prosecutor or defense attorney would proceed to trial on a homicide without the crime scene photographs.  I never saw it happen in my thirty-two years of practice and the files I reviewed in this case do not support it happening either.

E.     The blank reverse sides of property inventory sheets. Although property inventory sheets are maintained in the court file and although they are uniformly identified in supplementary reports by description and serial number, Plaintiff's Expert claims that inventories and the blank or unmarked reverse sides were regularly withheld from defense attorneys. Prosecutors either tendered the property inventory sheets during pre-trial discovery or, on occasion, referred defense counsel to the court files. No information of any kind was marked on the reverse sides of the property inventory sheets that Plaintiff's Expert claims were withheld. It is more likely that neither the prosecutors nor the police department personnel photocopied a blank or unmarked side of the form.

F.     Miscellaneous: In seven cases, the Plaintiff's Expert list blank CPD mailing envelopes as a document that was withheld by the police department. In two files, he lists crime scene photo envelopes. These documents do not contain substantive evidence and are not discovery.

V.     Plaintiff's Expert's Methodology is Fundamentally Flawed.

A.     After being provided with approximately 457 Investigative Files from Area Central, the plaintiff identified 59 cases in which he claimed that information in an

7

Investigative Files was missing from a criminal defense file. The Plaintiff's Expert has asserted that he compared defense attorney's files in 51 cases to the Investigative Files recovered from the Chicago Police Department. If a document was present in the Investigative Files but missing from the defense attorney's file, the Plaintiff's Expert automatically (and improperly) assumed the Chicago Police Department withheld the document from prosecutors and criminal defendants, even though he admittedly has no evidence or personal knowledge of any such case. Despite this lack of evidence, and lack of foundation that any criminal defense attorney file was complete, Plaintiff's Expert concluded that because pages were missing from the criminal defense files in the "aggregate," he could speculate that the CPD withheld documents as a general practice. Plaintiff's Expert's conclusions not only consist of speculation, but they are refuted in large part by the prosecutor's files that have been located as well as other sources of information, some of which was in his possession and which he chose to ignore.

B.    The Plaintiff's Expert assumes without any evidence that the defense attorney's files, many of them 30 years old, are complete. He fails to consider the possibility that the defense attorney's files were purged over time, did not contain every document made available by the prosecution, were inadequately maintained, or that documents were misplaced or discarded during the criminal process or trial.

1.    The Plaintiff's Expert ignores obviously incomplete defense attorney files. File #25, James Crockett, is a prime example of the flaw in the Plaintiff's and his expert's methodology. He claims that 107 pages were missing from the defense attorney's file including the original case report, ten supplementary reports, eight GPRs, the post-mortem report and criminal history reports. Although the CCSAO was unable to locate their file, it becomes readily apparent that defense counsel had these documents prior to entering a guilty plea.

2.    A pre-trial status hearing transcript reveals that the prosecution believes it had provided a full set of discovery. And the prosecution's answer to discovery lists the names of thirty witnesses that were taken from the allegedly suppressed reports. Furthermore, the defense attorney demonstrated his familiarity with the reports by filing a motion to sever his client's case. But the most dramatic example demonstrating the defense counsel's familiarity with documents now claimed to have been withheld is in the guilty plea transcript. When the prosecutor inaccurately described the use and possession of a gun during the presentation of a factual basis for the plea, the defense attorney corrected him causing a recess. This transcript was in the criminal defense attorney file but Plaintiff's Expert disregarded it in contending that the CPD withheld information in that case.

3.    Other files demonstrating the flawed and unreliable methodology used by Plaintiff in attempting to identify documents allegedly withheld by

CPD include but are not limited to the following: In Melvin Williams - #47, Plaintiff's Expert claimed CPD suppressed documents without having a defense attorney's file to examine. Other files were patently incomplete based upon the extremely high number of documents claimed to be missing. Christopher Peoples - #35: Claimed to be missing 257 of 288 pages. All but 11 pages were identified within the CCSAO's file. Crisino Bravo - #31: 119 of 210 documents were claimed to be missing with all but 5 pages were found in the CCSAO's file. There are many other examples as discussed below.

C. Plaintiff's Expert does not explain how the Plaintiff identified the documents that were allegedly withheld from criminal defendants in cases where no criminal defense attorney's file was available to be examined.

D. The Plaintiff's Expert also fails to identify evidence that any defense attorneys contended that discovery had been withheld, either at the trial or appellate level. To this day, no defense attorneys have claimed a discovery violation from these files based on the information known to me. It should be noted that the Cook County Public Defender's office maintained, in a March 30, 2016 filing in this case, *Response for Disclosure of Attorney-Client Communications and Work Product,* that neither their office nor their clients are claiming that there was a *Brady* violation in connection with their cases. *Fields v City of Chicago*, 10 c 1168, (3/30/2016) Document # 940 at p. 2. It is my understanding that ASA Celeste Stack, a supervisor who handles post-conviction proceedings, is also unaware of any defendant in any of these cases making an allegation of a *Brady* violation in connection with the Investigative Files at issue.

1. None of the appellate opinions that I have reviewed contains an allegation of a discovery violation.

2. Seventeen defendants in fifteen cases entered guilty pleas after the prosecution tendered discovery. Eight other defendants in seven cases were found not guilty after trial. None of these defendants claimed any discovery violations.

3. Appellate opinions not only lack allegations of discovery violations; they also verify that documents alleged to have been withheld were instead pivotal to the outcome of the case. For example, in Derrick Hatchett (#40), the Plaintiff claims that GPRs reflecting notes of interviews with the defendant and supplementary reports summarizing an eyewitnesses' incriminating observations were withheld from the defense. However, Hatchett's defense counsel successfully suppressed his admissions to the police officers. Defense counsel could hardly have proceeded to a hearing, much less be successful, without possessing these GPRs. The appellate opinion also reveals that the eyewitness recanted significant parts of his statements to the police officers and prosecutors. The trial court's pre-trial and trial rulings to admit the

eyewitness' original statements as substantive evidence was again contested on appeal. It would have been impossible to litigate this issue in the trial court without both sides possessing the supplementary reports summarizing the eyewitness statements.

E. The Plaintiff's Expert made no effort to obtain or examine the prosecutor's files to determine if the allegedly missing documents were present. Although many of the CCSAO's files are missing, the 43 prosecutor's files available for examination contain many of the allegedly missing documents, including almost all of the supplementary reports and GPRs. With the prosecutor's discovery obligations, most if not all of these allegedly missing documents were likely provided to defense counsel during pre-trial discovery.

    1. It should also be noted that some of the prosecutors' files are not complete. For example, in the Williams, McNeil, and Murphy file - #47, the CCSAO indicates that they could only locate one of their two files. Other examples are identified below.

F. The Plaintiff's Expert made no effort to obtain or examine the prosecutors' discovery receipts or their blue backs. On many of the blue backs, the prosecutors note that they have tendered "complete sets" of police reports or have specifically listed when they have tendered "street files." (For example, Derrick Johnson - #14.) Discovery receipts also demonstrate that documents claimed to have been regularly withheld by the police department were tendered to defense counsel during discovery. A discovery receipt for Maurice Brown - #33, indicates that thirty-seven pages of GPRs were tendered. Also, Octavio Anima - #39 lists multiple disclosures of GPRs, totaling hundreds of pages, among the documents tendered by the prosecution.

    1. In other cases, the CCSAO has indicated that they have disclosed "street files" or other reports that are now missing from their files. This is evident although the CCSAO cannot locate their file. For example, the CCSAO is missing some of the David Duarte file. (#58.) They were able to locate their blueback. On one court date, the CCSAO indicated that they tendered a "full set of R.D.'s." (SAO-NF-0054779.) On a subsequent date, they indicated on their blueback that they tendered a "complete street file" to each defendant. (SAO-NF-0054780.)

G. The Plaintiff's Expert minimizes the significance of prosecution and defense subpoenas served on the Chicago Police Department. He claims that the use of a subpoena was no guarantee that all documents could be acquired through this process. This is part of his criticism of the CPD's failure to store all police reports in one location. First, there is evidence in the files that prosecutors and defense attorneys routinely used subpoenas to obtain police records. They depended upon the CPD to gather all reports listed in the body of their subpoenas. The Investigative Files contained copies of the subpoenas or entries on the Investigative Files that subpoenas were received. Defense attorneys

issued approximately fifty-six subpoenas in thirty-four of the cases. Prosecutors issued sixty-two subpoenas in thirty-seven of the cases. Second, as stated earlier, the CPD directed that subpoenas be served on one location - the superintendent's office also referred to as 'headquarters.' Prosecutors relied upon this process as a primary method of obtaining all police records. The subpoena unit would gather the various police documents from the specific units and forward them to court with the subpoena attached to the outside of the envelope containing the documents.

Third, there is no evidence that the CPD did anything other than copy all of the reports requested and return them to the court. Police officers, who at one time or another were assigned the responsibility of subpoena compliance, indicate that is precisely what they did. Steve Buglio was a detective assigned as a case management officer for a period of time. He was assigned to copy files in response to all subpoenas forwarded to the Area from the CPD's subpoena unit. He handled fifteen of the fifty-nine files. As a result of his involvement with a significant number of the files identified in Plaintiff's Expert's report, Mr. Buglio was interviewed by the undersigned. He stated that, in response to a subpoena, he copied the entire file. He would check the reverse sides of documents, too. He did not pick and choose what documents to copy. He entered the subpoena and his name in the Investigative Files inventory prior to intra office-mailing the documents back to the subpoena unit for delivery to court. He also stated that he did not copy the Investigative Files inventory or the Investigative Files control log. Other detectives and police personnel who acted as case management officers throughout the city describe a nearly identical process for copying Investigative Files, although it is apparent from the files that the Investigative Files inventory was sometimes copied as well. There is no evidence to support the Plaintiff's Expert's claim that the CPD regularly withheld documents.

Plaintiff's Expert's reliance on the fact that he found 12 cases in which a defense attorney issued a subpoena and not all of the documents contained in those 12 Investigative Files were found within the corresponding criminal defense files does not support the conclusion that the allegedly missing documents were the result of the CPD's failure to comply with the subpoena requests from the defense attorneys or that the CPD had a practice of not complying with subpoena requests. As stated elsewhere, there is no indication that the criminal defense files he reviewed were complete because, as Plaintiff's Expert even stated, he does not know how many different attorneys handled the files he reviewed prior to receiving them, how many appellate lawyers handled the files, and/or how many times the files were transferred in and out of different law offices. In other words, there is no way for anyone to verify that the criminal defense files, in their current state, contain all the documents that the defendant's attorney had in his or her possession at the time of trial.

Next, putting aside the fact that it is mere speculation that the documents not found within the criminal defense files are the result of the CPD not complying with subpoena requests from criminal defense attorneys, a closer

review of the identified Investigative Files and the corresponding CCSAO (to extent they were located) and criminal defense files clearly demonstrate that the CPD in no way engaged in a practice of "picking and choosing" which documents to turn over in responding to a subpoena.

By way of example, in *People v. Derrick Johnson* (G-148403), Plaintiff contends that 21 of the 187 pages contained in the Investigative Files were not located in the criminal defense file and that is a result of the CPD failing to comply with the defense attorney's subpoena (ACB 011197) issued directly to the records division of the CPD. As stated above, an examination of the CCSAO file blue back, however, contains a notation that a 181-page "street file" was tendered to defense counsel during pre-trial discovery. The very same entry indicates that 18 of the 181-pages had handwriting on the back of those documents. As such, there is no indication that the CPD deliberately withheld any documents found within the Investigative Files from the defendant and/or his attorney and/or that it failed to respond in accordance with the subpoena request identified by Plaintiff's Expert.

Similarly, in *People v. John Avery* (M-569727), Plaintiff contends that 7 of the 38 pages contained in the Investigative Files were not located in the criminal defense file and that even a subpoena issued by the defense attorney to the CPD directly (ACB 048157) did not result in the complete disclosure of the Investigative Files to the defendant. A review of the CCSAO, however, reveals that all but 3 of those pages were present in the prosecutor's file which indicates that the CPD complied with any subpoena issued. Moreover, the remaining three documents that Plaintiff claims were not produced have no evidentiary value. The conclusion to be drawn from these files is that the CPD does not have a policy and practice of failing to comply with subpoenas for relevant documents. In sum, Plaintiff's Expert's allegation of withholding documents in response to subpoenas is unsupported.

VI.     Plaintiff's Expert's Claim of Withheld Documents is Unsupported

A.      After an examination of the prosecutors' files, court documents and appellate opinions, it is obvious that a high percentage of the allegedly suppressed documents were provided to prosecutors and defense counsel and therefore not regularly withheld.

1.      Regarding the documents that the Plaintiff's Expert claims were withheld by the CPD, a high percentage were found in the prosecutors' files.

2.      Furthermore, by examining court documents and appellate opinions, it is clear that a high percentage of the unaccounted-for documents were either used by defense counsel in court or were likely tendered during pre-trial discovery.

3.      In some cases, the allegedly withheld documents were found or referenced in the criminal defense attorney's file. For example, in Octavio Anima (#39) Plaintiff's Expert claims that 113 documents were withheld from the defendant. One hundred of those documents were found in the *defense attorney's* file. Also, in Delvie Turpin (#45) Plaintiff claims that 123 documents were not found in the defense attorney's file. This claim is not based upon a review of the defense attorney's file. Instead it is based upon a 2005 Memorandum that purports to be a summary of discovery tendered to defense counsel. A subsequent disclosure by the defense attorney regarding his computer files makes reference to files containing many of the documents Plaintiff's Expert now claims were suppressed. With the examination of the CCSAO's file, all but 16 pages of the alleged suppressed 123 documents were found.

B.      Nearly all of the substantive, investigative documents such as supplementary reports or GPRs were either provided to defense counsel or the substance of the information on an allegedly suppressed document was included in a tendered report.

1.      A high percentage of the allegedly missing supplemental reports or GPRs were found in the prosecutors' files.

2.      In situations where GPRs were not found in the prosecutors' files, the pertinent information was, nevertheless, provided to defense counsel. For example, in Isaiah Brady (#23), Plaintiff's Expert claims that most of the GPR notes pertaining to interviews with two witnesses were not provided to defense counsel. A comparison of the GPRs to the supplementary reports that were found in the defense attorney's file demonstrates the information from the notes was reproduced in the reports, which plaintiff's expert admits is acceptable.

C.      There is no pattern to the type of documents that are missing from the defense attorneys' files. This, by itself, belies the Plaintiff's Expert's claim that police personnel were regularly withholding documents.

1.      Again referring to the Isaiah Brady (#23) file, if we are to believe that documents were regularly withheld, why would the CPD photocopy most but not all of the GPRs pertaining to the two witnesses' interview? If we accept the Plaintiff's Expert's allegation that police personnel could "pick and choose" what information to provide to defense counsel, why would they provide any of the GPRs? It's more likely evidence of an incomplete or poorly maintained defense attorney file.

Or regarding Rodolfo Garcia (#3), why would police personnel "pick and choose" to withhold one copy of a business card and one copy of an ID card, while providing the four hundred and thirty-nine other pages?

Plaintiff's Expert claims that the CPD regularly withheld important investigative materials from criminal defendants. To evaluate his claim, I examined the Investigative Files, portions of the CCSAO's files, portions of the US Attorney's files, and portions of the Criminal Defense files. I also examined portions of Circuit Court of Cook County documents, Appellate materials, and Reports of Proceedings. I have attached a list of the materials that I have examined that also includes other miscellaneous documents.

What follows is a case by case evaluation of the 59 files proffered by the Plaintiff which includes the 51 files relied upon by the Plaintiff's Expert. Included in the summary for each case is a brief factual description of the crime, the number of pages claimed to be suppressed, the actual number of pages not currently contained in either the prosecutor's or defense attorney's files, and a determination of whether important investigative information was withheld by the CPD. Based on my experience and my review of these files, I offer the opinions expressed in the first section of this report and elsewhere. I reserve the right to rely upon demonstrative exhibits at trial to further explain my analysis and summarize my findings.

Finally, Plaintiff's Expert's reliance on a cold comparison of permanent retention files with Investigative Files is irrelevant. (See page 34 of his report). As noted, prosecutors and defense attorneys in Cook County have long been aware of the CPD's practice of maintaining Investigative Files with the GPRs, notes, and other information at the Areas, and also of the permanent retention file, or RD file, that houses the original case report and supplementary reports at the records division. There is no material or relevant conclusions that can be drawn from a comparison of just those two police files in evaluating whether the documents in those cases were produced during the criminal case. The appropriate way to conduct that analysis is to obtain the prosecutor's files and other supporting documentation as necessary to determine if materials were produced, potentially including but not limited to pre-trial and trial transcripts of proceeding, bluebacks, receipts for discovery, and other documents. A mere comparison of the permanent retention files and the Investigative Files does not tell us whether documents were produced without also reviewing these other documents, and possibly going to other sources. However, contrary to Plaintiff's Expert's opinion, in the absence of the prosecutor's files, it would be my opinion based on my experience and review of the files in this case that both the permanent retention files and the Investigative Files could be expected to have been produced based on the practices and knowledge of CCSAO prosecutors and defense attorneys in Cook County Circuit Court.

My opinions, findings, and observations herein are based upon my education, training and experience. The details of my background are listed in my curriculum vitae that is attached and incorporated herein by reference. Among other accomplishments, I have thirty-two years of experience as a trial prosecutor and I have attained numerous supervisory positions including Chief of the Criminal Prosecutions Bureau in the Cook

County State's Attorney's Office and Deputy Chief with the DuPage County State's Attorney's Office. I have also lectured on numerous aspects of criminal prosecutions including *Brady* and discovery responsibilities for prosecutor's offices in Illinois and nationwide through the National District Attorney's Association. I have most recently included discovery and *Brady* obligations in one of a series of annual ethics seminars sponsored by the Winnebago County State's Attorney's Office.

## Evaluation of Plaintiff's Supplementary *Monell* Disclosures
## Relied Upon by Plaintiff and His Expert[1]

### Evaluation of Cases In Which the Prosecutors' Files Were Located

1.   *People v. Ray Fergerson, Jeff Fort, et al.* (C-217651)

On June 15, 1981, at approximately 12:30 a.m., Willie 'Dollar Bill' Bibbs was on the street near the Fountainhead Lounge at 115 E. 43rd Street. Bibbs was a known drug dealer and member of the Titanic Stones. As he talked to a friend named Dwight 'Kool Man' Preston, three masked men, armed with handguns, approached him from the nearby alley. Another friend of Bibbs', Greg Hollie, called to him from across the street. He warned him about the three men approaching him with handguns. After Hollie's warning, two of the masked men retreated to the alley while Bibbs and Preston ran to the entrance of the Fountainhead Lounge. As Preston entered the lounge with Bibbs behind him, the third masked man opened fire with his handgun striking Bibbs twice. Bibbs fell into the lounge and died later from his wounds. Greg Hollie informed the police that prior to the shooting he observed a man pacing near the alley. This man, later identified by Hollie and Preston as Earl Hawkins, yelled words to the effect of 'kill him now' prior to the shooting. The Organized Crime Drug Enforcement Task Force and the CPD developed information that implicated Jeff Fort and other members of the El Rukn gang in a conspiracy to kill Bibbs. Bibbs was selling drugs near the El Rukns' headquarters, known as 'The Fort,' and was reducing their drug sales.

Plaintiff contends that, after an examination of the Investigative File numbered CITY-NF-12995-13110, 16 of the 116 pages were not found in the defense attorney's file. An examination of the Cook County State's Attorney's Office's (CCSAO) file reveals that all but 7 pages of those 16 pages were present in the prosecutor's files. An examination of the U.S. Attorney's Office's (USAO) file reveals that all but 1 page was found.

   a.   6 of the 7 pages not now found in the CCSAO file (but in the USAO file) are Chicago Police Department (CPD) inventory sheets listing evidence recovered during the investigation and preserved for further use during the investigation and trial. (CITY-NF-13104 – 13109).

      i.   FIELDS 01289-96, is a disclosure letter to defense counsel from federal prosecutors in the matters of *United States v. Andrews* (89 CR 908) and *United States v Anderson* (89 CR 909). In this letter, the U.S. Attorney's Office disclosed seven pages of "Property Inventory notes" on the Willie Bibbs Homicide. That number of inventory sheets corresponds to the total number of inventory sheets found in the Investigative File. The U.S. Attorney's Office's letter indicates they obtained these documents via a subpoena directed to the CPD These

---

[1] This evaluation pertains to the specific documents Plaintiff alleges were not contained in the defense attorney's files.  (*See* Plaintiff's Supplemental *Monell* Disclosures, February 18, 2016).

inventory sheets were also found in the U.S. Attorney's Office's files and it is also my understanding the USAO obtained documents from the CCSAO.

    ii.   Inventory sheets are also commonly found in the Clerk of the Circuit Court's file. The CPD inventory documents are created with a quintuple form set. The third sheet is titled "COPY 3 – COURT COPY – ATTACH TO COURT PAPERS." The court's copy is usually attached to the arrest report or the complaint. The documents in the court file are available to attorneys for inspection and copying.

    iii.   The evidence listed in the inventories were weapons, ammunition and a digital scale that were recovered during the arrest of Earl Hawkins. In addition to Hawkins' arrest, the police arrested and charged Jeff Fort and 22 others for either Unlawful Use of a Weapon, Concealing a Fugitive or Obstructing Service of Process. The circumstances surrounding the recovery of the weapons with a listing of their inventory numbers is found in CITY-NF-13126 – 28 and 13133 – 35. These documents were found in the defense attorney's file.

b.   The contents of the remaining document, a General Progress Report (GPR) numbered CITY-NF-13018, are included in a Supplementary Report numbered CITY-NF-13011-13. That Supplementary Report is also numbered CITY-PRF-03842-44 and is found in the defense attorney's file.

Findings: A comparison of the Investigative File for the Willie Bibbs murder with the CCSAO file and the USAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Fort et al.* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

2.    *People v. Steven Spears* (D-192218)

Steven Spears and other members of the New Breed street gang shot and killed Telly Howell in a hallway in the ABLA public housing building located at 1209 S. Racine Avenue on April 3, 2009. Holloway was waiting in a hallway for 'blows,' a slang name for heroin. Co-defendant Dion Dorn and fellow New Breed gang members recognized him as the person who 'robbed the building' about two weeks before this evening. Holloway had robbed the New Breed gang members at gun point while they were selling cocaine. Spears and co-defendant Dion Dorn provided court-reported statements admitting their role in the shooting. Spears' father was present for his statement. Spears stated that he shot the victim or shot at him three times before his gun jammed. While other New Breed members also shot at Holloway, Spears chased the victim down the stairs to the ground level of the building from the 4th floor where the shooting had commenced.

Before reaching the ground level, another New Breed member also shot the victim and accidently shot Spears in the leg as well as another gang member in the lip.

Spears entered a guilty plea after a 402 conference with the trial court judge and was sentenced to 25 years of incarceration with the I.D.O.C. Co-defendant Dorn negotiated a guilty plea to 2nd Degree Murder and was sentenced to 15 years of incarceration with the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 003679 - 003883, that 48 of the 205 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 7 of those 48 pages were present in the prosecutor's files.

c.  ACB 003680 is a CPD "Investigative File Inventory." This inventory lists the items contained in the Investigative File. The list has 16 items, from statements to photographs, that the Plaintiff does not claim were omitted from the file.

d.  ACB 003844 is a GPR that includes the five names, one of whom is a police officer; a phone number, and other possible individual record (I.R.) and central booking (C.B.) numbers. None of the names listed correspond to anyone named in the file. Under one of the names, it indicates a "2000 resisting & obstruction" case. The murder and arrest of Spears and co-defendant Dorn occurred in April 1999. Upon information and belief, according to Detective Sanchez who investigated this homicide, this GPR is unrelated to the Telly Howell homicide and appears to have been misfiled.

e.  ACB 003848 - 51 is a leads response. The document reflects a request from a detective assigned to the case to determine if a co-defendant has a criminal history. It contains identifying characteristics of a suspect and a mere summary of the suspect's arrest record. In this case, the suspect's detailed arrest history is found at ACB 003843, which plaintiff admits was produced. The suspect's entire juvenile court arrest record is found at ACB 003846-47, which plaintiff also admits was produced.

f.  ACB 003883 is a Request for Evidence Identification Photographs. The document indicates that it was sent by an investigating detective on April 4, 1999. It also indicates that it was received by CPD's Forensic Services Unit on the same date. It also stamped "photographs not available." Since the crime occurred on April 3, 1999 it is possible that the photographs had not been printed at the time of the request. Nevertheless, the photographs are included in the file at ACB 003859-82.

Findings: A comparison of the Investigative File for the Telly Howell murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Spears* does

not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

3.    *People v. Rodolfo Garcia, et al.* (D-322218)

On May 29, 1999, after a meeting of the '22 Boys' street gang to raise money to buy guns, Garcia and 3 or 4 car loads of 22 Boys travelled to Maniac Latin Disciples' (MLD) territory to fight some of their rivals. In his videotaped statement, the defendant stated that upon observing MLDs flash gang hand signs, Garcia made a U-turn and rammed his Continental into the side of their car. He did this to prevent them from getting out of their car. The victim and others, however, did get out of the car. Garcia's fellow 22 Boys jumped from their cars, caught up with the victim and beat him to death with baseball bats. Garcia fled the scene and tried to hide from the police by staying at a southwest suburban hotel until he was arrested approximately three months later.

Garcia was found guilty after a bench trial on June 23, 2000. He was sentenced to 25 years of incarceration in the I.D.O.C. on October 5, 2000.

Plaintiff contends, after an examination of the Investigative File numbered ACB 004142 - 004581, that 2 of the 440 pages were not found in the defense attorney's file.

a.  The 2 pages missing are ACB 004441and 004504. 004441 is a photocopy of a defense attorney's photo identification and A.R.D.C. card with her business address and phone number handwritten on the document. This document is time stamped after midnight (00 48) on September 9, 1999. ACB 004504 appears to be a photocopy of the same attorney's business card. These two documents have little or no evidentiary value.

    i.   Defendant claimed in a pro se post-conviction petition that his trial counsel was ineffective for failing to file a pre-trial motion to suppress his videotaped statement. Both the trial and appellate courts rejected his allegations. The appellate court noted that during the videotaped statement, the defendant waived his right to counsel.

    ii.  The time stamp on the photocopy of the photo identification card and the A.R.D.C. card make this information irrelevant. Garcia was arrested at 1:00 a.m. on September 8 and was initially interviewed at 6:00 a.m. (See ACB 004450 – 55.) His videotaped statement to an assistant state's attorney occurred later on the 8th. Based upon the time stamp, the defense attorney did not appear at the police area until sometime after midnight on the 9th, well after the defendant's interviews and videotaped statement.

    iii. The CPD could not have withheld information from a criminal defense attorney that she was present at the Area because the criminal defense attorney knew she was present.

iv. The defendant's criminal trial lawyer testified he did not file a motion to suppress the confession because he believed that the confession was helpful to the defendant, and the defendant did not allege his confession was coerced until many years later.

Findings: A comparison of the Investigative File for the Pablo Gomez murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Garcia* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff. It should also be noted that plaintiff failed to produce any criminal defense file relative to this case.

4.   *People v. Jimmy Velasquez* (D-579065)

On September 16, 1999 at approximately 1 p.m., Virginia Robleo and her husband at the time, Jamie Quiroz, were talking just outside of their home. While they were talking, they noticed a green vehicle passing by slowly and then the driver tried to get out of the moving vehicle. The driver became tangled with the seat belt and fell down on the ground. The green vehicle kept moving for approximately 10 to 15 steps and stopped when it hit the curb. Defendant, the passenger in that vehicle, then got out of the vehicle and walked to the vehicle's driver's side and fired approximately three gunshots at the driver who was still on the ground. After the shooting, Virginia and Jamie both saw the shooter jump into a white vehicle and drive away. Both of these witnesses identified the defendant in court as the shooter. Another witness corroborated the sequence of the events of the shooting and wrote down the white car's license plate number. Later that day, shortly before his arrest, the defendant told another drug dealer that he had 'jacked' and shot a 'brazer.' This means he robbed and shot a Mexican who does not speak English. After his arrest, the defendant admitted shooting the victim. He said it was a drug deal that had gone bad. While in custody, the defendant was allowed to speak to his sister. After doing so, he told the detectives where to find the white vehicle, which belonged to his sister. The defendant borrowed her car prior to the shooting and he had told her, prior to his arrest, to report that the car was stolen.

After a jury trial, defendant was convicted and sentenced to 48 years in the I.D.O.C. He lost both his direct (2005) and post-conviction appeals (2013).

Plaintiff contends, after an examination of the Investigative File numbered ACB 004922 - 005042, that 18 of the 121 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 5 of those 18 pages were present in the prosecutor's files.

a.   ACB 004923-24 is a CPD "Investigative File Inventory." This inventory lists the items contained in the Investigative File. The list has 41 items, from statements to GPRs, that the Plaintiff does not claim were omitted from the file. ACB 004925 an Investigative File Control log with one entry for a CPD detective signing out and returning the file.

b. ACB 005007 is a hand drawn diagram of the crime scene including streets, addresses, cars, a stick figure and brief notes. This diagram was written on the back of a GPR, the front of which plaintiff admits was produced, and which includes the word "over" indicating for the reader that there is information on the reverse side. Other reports that were tendered in discovery indicate how this diagram was created. ACB 005007 includes a note attributed to Officer Guerrero, the first officer on the scene. That note is described in detail in the Supplementary Report found at ACB 004963 – 73, which plaintiff admits was produced. Officer Guerrero's description of the crime scene is specifically found at ACB 004966. The location of the evidence collected from the crime scene and the photographs taken by the Forensic Investigators confirms the information included in the diagram and is detailed in ACB 004929 and ACB 004931-38.

c. ACB 005025 is a leads response. The document reflects a request from a detective assigned to the case to determine the status of an Illinois license plate and the possible criminal arrest history of Ignacio Gonzalez. This document lists only that his "plates suspended – mandatory insurance violation." A note from an interview with Ignacio Gonzalez is found at ACB 005026-27 and in defense counsel's file. Gonzalez did not provide an alibi for the defendant. Moreover, the defendant testified at his own trial and, according to the defense attorney's closing argument, claimed he was driving around by himself at the time of the murder. (*See* CRIM.DEF FILES - FIELDS 000543.)

Findings: A comparison of the Investigative File for the Raul Herrera murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Velasquez* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. The content of the back of the one GPR referenced above (ACB 005007) was in a Supplementary Report in the defense file, and the front of the GPR itself has the word "over" written on it, notifying the reader that there is information on the back. It should also be noted that the original CCSAO file for this case was destroyed after it was put onto a disc, so it is possible that the back of this GPR (and the other few pages not on the disc) were simply not scanned onto the CCSAO disc, or that the person who copied the file at the Area inadvertently overlooked the back of the GPR. In either event, this file proves CPD compliance with its obligation to produce investigatory material, not a failure to comply as plaintiff's expert suggests.

5. *People v. Cecil Robinson* (E-010765)

In January of 1983, seventy-year-old Joseph Wodzisz, the owner of an auto repair and junk shop, was found bludgeoned to the death in the rear area of his store. In February of 1989, a computer search matched latent fingerprints recovered from a Ford auto radio and a bottle of wine, items both found at the scene in 1983, to the defendant.

The defendant confessed stating that the victim refused to refund the cost of the Ford auto radio that the defendant claimed he had purchased in the shop. The defendant stated that he put down the bottle of wine he had brought with him to the store and attacked the victim with a nearby electric buffer, striking him numerous times in the head. The defendant repeated his confession to an Assistant State's Attorney (A.S.A.) in a signed, handwritten statement.

The Defendant entered a plea of guilty and in December of 1990 was sentenced to 23 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 0000001 - 95, that 18 of the 95 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 10 of those 18 pages were present in the prosecutor's files.

a. ACB 0000002 is blank piece of paper containing a note which appears to read "JR 11Jan" and underneath it "22Jan." Although the murder occurred on January 9, 1983, this note has no evidentiary value.

b. ACB 0000003 is an Investigative File Inventory sheet listing 23 items such as supplementary reports, lab reports and the defendant's statement. The Plaintiff is not claiming they have not received the items listed. A second Investigative File Inventory Sheet listing 25 items, ACB 0000004, was found in the CCSAO's file.

c. ACB 0000039 is a blank piece of paper with a stamp indicating that a criminal history or an arrest report was "Issued On Inquiry" and dated "Feb 23 1989," was issued "By Name Check Only." It is apparently the back of at least one criminal history or possibly the arrest report preceding it in the file (ACB 0000038) that was produced during the investigation.

d. ACB 0000044 is a blank sheet of paper with the name "Switski A#4 V.C." This document is the reverse side of ACB 000043, the criminal history of the defendant. The criminal history was probably sent via interoffice mail to Detective Switski by writing his name on the back of the document. Detective Switski was assigned to this investigation. This otherwise blank piece of paper has no evidentiary value and the criminal history was in the defense file.

e. ACB 0000076 is an otherwise blank piece of paper with a note containing two intersections, a phone number, and a date. It is written on the reverse side of Inventory No. 969832, which plaintiff admits was produced. The phone number and date of birth correspond to Julio Melendez Jr who was interviewed on January 23, 1983. Information corresponding with that interview can be found at ACB 0000024-25, 0000033-37 and 0000060-61. Those pages were tendered in discovery. This note has no other evidentiary value.

f.  ACB 0000091 is a handwritten note stating "50,000.00 checking acct." There are no other references in the file referring to this note. The note appears unconnected with the crime under investigation.

g.  ACB 0000092-93 are two business cards for the address of the murder. The business cards list different businesses. Other than the address of the crime scene, these cards have no evidentiary value.

h.  ACB 0000094-95 appears to be the front and back of a CPD booking photograph for the defendant. The photograph's date corresponds to an earlier arrest of the defendant. The back of the photo (-95) lists the defendant's name and a date of birth. Other than the possible use in the investigation to match a face with a name, the photograph has no evidentiary value.

i.  Plaintiff's expert's claim that the CPD failed to comply with the criminal defense attorney subpoena is unsupported by the record.

Findings: A comparison of the Investigative File for the Joe Wodzisz murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Robinson* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.  This case also does not support the assertion that the CPD failed to comply with a subpoena. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

6.  *People v. William Doyle & Alvin Toney* (E-026792)

In January of 1983, Charmaine Nathan and Sheila Jackson were shot as they sat in a car near 56th and Michigan. Nathan died from her injuries. El Rukn leader Jeff Fort ordered a hit on George 'Duke' Thomas, a member of the Titanic Stones, for interfering with the El Rukns' drug sales. The El Rukns, in two cars, followed Thomas to the vicinity of the shooting but mistakenly fired into the wrong car. Each car stopped and fired into the victim's car. Doyle and Toney were among the group of El Rukns that fired their handguns into Nathan and Jackson's car.

Plaintiff contends, after an examination of the Investigative File numbered CITY-NF-13111 – CITY-NF-13232, that 50 of the 122 pages were not found in the defense attorney's file. The CCSAO was unable to locate their file. An examination of the files previously accumulated from the Chicago Police Department, the CCSAO and tendered during discovery by the U.S. Attorney's Office, reveals the presence of all but four pages.

a.  CITY-NF-13120 is a message slip that appears to state Pochordo 1-P295272, which does not appear to have any substantive or evidentiary value.

23

b. CITY-NF-13121 is a note containing the RD number, the file number and the words 'homicide file.' This note has no substantive or evidentiary value.

c. CITY-NF-13137 is a note that says "Cold & Cl."  It has no evidentiary value.

d. CITY-NF-13211 is a note containing the number 621250.  It has no evidentiary value.

Findings: A comparison of the Investigative File for the Charmaine Nathan murder with the USAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. The Charmaine Nathan investigation does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

7. *People v. Serafin Flores, Rafael Rodriquez and Robert Padilla* (E-399564)

The victims, 15 year-old, half-brothers Abraham Gonzalez and Angel Nieves mistakenly entered Serafin 'Kato' Flores' car in October of 1983. Flores' girlfriend, Delores 'Lala' Viramontes was also in the car and after they picked up co-defendants Rafael 'Chico' Rodriquez and Robert 'Slim' Padilla, they drove to an alley in the vicinity of 24th and St. Louis Avenue. The defendants were Latin Kings and Flores wanted to get revenge for being attacked by rival gang members he called "Ds." The victims were shot in the alley by Rafael 'Slim' Rodriquez. Abraham Gonzalez died later at Mt. Sinai hospital. At the hospital, Nieves identified photographs of the defendants. Viramontes testified in the grand jury and described the events surrounding the shooting. Flores was subsequently extradited from South Carolina, where he fled to after the shooting, and charged.

Plaintiff contends, after an examination of the Investigative File numbered ACB 005572 - 005778, that 86 of the 207 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 37 of those 86 pages were present in the prosecutor's files, and 9 of those pages are duplicates, leaving only 28 pages.

a. ACB 005572 appears to be the cover to the file with the names and warrant information for the three defendants. ACB 005633 is a warrant wanted stamp for defendant Padilla. This same information is found throughout the file including on pages ACB 005675-76 that were found in the CCSAO's files.

b. ACB 005573 is a CPD case assignment slip from their lab. It contains the ballistic results of an examination of two fired bullets. This information was in the CCSAO file as the prosecution had a copy of the Laboratory Report of the Firearms Examiner, Richard Chenow with the results of his analysis and chain of custody information.  (SAO-NF-0010280-81).

c. ACB 005586 is a blank sheet of paper with a handwritten note listing the name of one of the investigating detectives. ACB 005627 is a blank sheet of paper with a handwritten note listing the detective division's unit number. ACB 005686 is a blank sheet of paper with a note stating "mx/ref/docket#." ACB 005757 is a blank CPD envelope. These notes (which are the reverse sides of reports that were produced) and envelope have no evidentiary value.

d. ACB 005599 is a memo to the watch commander to hold the defendant Rodriguez past the regularly scheduled court call to allow the detectives to conduct a line up with the surviving victim, which lineup plaintiff admits was disclosed.

e. ACB 005608 is a note listing defendant Padilla's date of arrest and warrant number. The same information can be found at ACB 005657 which was found in the CCSAO's files.

f. ACB 005609 -11 and -22 are four court attendance reports for CPD officers. They have no evidentiary value and did not exist until the case was in court.

g. ACB 005636 and 005644 are the back sides of defendant Padilla's juvenile arrest cards listing prior cases. It is common for this information to be tendered in discovery and used during bond hearings. It is not contested that the front of both of Padilla's juvenile arrest cards were found in the defense attorney's file, and defendant Padilla would be knowledgeable about his own arrests.

h. ACB 005756 is the Investigative File Control log that indicates the file was signed out twice; once specifically for trial. This log has no evidentiary value. The four-page, Investigative File Inventory was found in the defense attorney's file. (CRIM.DEF FILES – FIELDS 037578 – 81)

i. ACB 5759 – 5776 are front and back side copies of photographs of Delores Viramontes, and defendants Flores and Padilla. The group includes two front and back sets of Viramontes' Polaroid photo, three sets of Padilla's and Flores' prior arrest photos. There is also an extra copy of Flores photograph. ACB 005777 is paper photo jacket to hold the photos. ACB 005778 is portrait photo of defendant Rodriguez. A copy of this photo was found in the CCSAO's file at ACB 005758. ACB 005759 apparently is the backside of ACB 005758 with a note written in Spanish. All of these persons are identified in reports plaintiff admits were produced.

Findings: A comparison of the Investigative File for the Abraham Gonzalez murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Flores* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as

suggested by plaintiff and Mr. Brasfield. Rather, the few miscellaneous pieces of paper not currently in the CCSAO file are administrative forms and file covers, reverse sides of documents that were produced with no substantive information, the back of juvenile record cards of one of the defendants, and photographs of individuals otherwise identified in the reports that were produced. The substantial investigatory documents that were produced from the Investigative File (consisting of many Supplementary Reports and GPRs) shows the CPD complied with its discovery obligations in this case, and that the criminal defense file produced by plaintiff is incomplete.

8.    *People v. Crisino Garcia* (F-048933)

On 2/9/84, the defendant was playing pool and drinking at a bar at 1101 N. Ashland Avenue. He left the bar to purchase lottery tickets and returned within minutes. After handing out the tickets, he claimed someone had taken his car keys. The victim stood up and told the defendant that he must have lost his keys. The defendant took out a handgun and shot and killed the victim. Another patron's arm was grazed by the same gunshot. The bartender and other patrons knew the defendant as a 'regular' for about a year at the tavern. The defendant fled to Mexico and was not located and extradited until 1994. After his extradition, he was identified in lineups and made a statement to the police and to an A.S.A.

He entered a plea of guilty and was sentenced to 20 years in the I.D.O.C. His subsequent attempts to withdraw his guilty plea (in which he admitted shooting the victim but claimed self-defense) were rejected by the trial and appellate courts.

Plaintiff contends, after an examination of the Investigative File numbered ACB 006037 - 006165, that 54 of the 129 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that 3 of those pages were in the CCSAO file and one page was in the criminal defense file (ACB 006118). Of the remaining 50 pages:

   a. ACB 006051 is a handwritten note containing a detective's name and a note. It does not contain any substantive information about the investigation. Similarly, ACB 006083 contains a detective's name and no other information. ACB 006078 is the back side of the CPD Daily Bulletin that included the defendant's wanted notice. It contains only information on recently stolen cars that are unrelated to the murder case. The front side of the CPD Daily Bulletin was found in the CCSAO's file.

   b. ACB 006118 appears to be a Hallmark Cards' stationary with handwritten notes. This page was located in the defense attorney's file. ACB 006119 appears to be a Hallmark Cards' Valentine's Day card. It could be the reverse side of ACB 006118 but by itself it has no evidentiary value.

   c. ACB 006122 is the victim's driver's license. It has no evidentiary value.

   d. ACB 006123 is contact information for a lawyer representing the victim's family. It has no evidentiary value.

e. ACB 006124 - 25 is a CPD Investigative File Control log. ACB 006124 is blank and -25 indicates that the file was checked out three times. Neither page has evidentiary value. ACB 006165 is log from March, 1986 with one entry indicating that the file was one of a series of 1984 files where the defendant was 'known but flown.'

f. ACB 006126-38 are the law enforcement searches on the license plates of the cars observed parked near the scene of the crime shortly after the shooting. The plates numbers can be found at ACB 006112-14 and -16; those documents were found in the defense attorney's files. Also, a detective supplementary report found at ACB 006105 indicates that the police were writing the plate numbers in their notes in an attempt to identify a suspect. The identification of the defendant through his license plate number is noted at ACB 006093.

g. ACB 006096 is the reverse side of the defendant's criminal history (which plaintiff admits was produced) and lists another license plate that apparently was not checked through leads.

h. ACB 006139 - 41 is a letter, typed in Spanish, from the Mexican Consulate. It was initially sent to the victim's family's attorney and forwarded to a CPD detective working on the case. It has no apparent evidentiary value and is not exculpatory. Contact with Mexican Consulate was further detailed at ACB 006070 -71.

i. ACB 006142 – 47 are phone records obtained via a Grand Jury subpoena during the search for the defendant. A CPD Detective Division 'To – From' memo and a grand jury subpoena were found in the CCSAO's file. They describe the CPD's search for the defendant by obtaining a grand jury subpoena for his brother's phone records. See SAO-NF-0101018 - 19. Besides the value in trying to locate the defendant, it has no evidentiary value, and it was available to the prosecutors who issued the subpoena.

j. ACB 006148 is a note with a name and no other substantive information.

k. ACB 0006149-50 is an FBI Agent's business card and a report indicating that he needs more information to file a federal UFAP warrant. Other than demonstrating the steps taken to issue a warrant for the defendant, it has no evidentiary value.

l. ACB 006151-61 contains a statement from the Firestone Auto Club to the defendant and the certified title history for the defendant's car. These documents provide possible addresses for the defendant to find him but lack any other information of evidentiary value.

m. ACB 006161-64 contains leads information for the vehicle identification number on the defendant's car and on the defendant's identification. There is no information of evidentiary value. Moreover, all of this information was

repeated throughout the file. The automobile information found on ACB 006161 was found in a different format with other information in the CCSAO's files. See SAO-NF-0101136.

n.  ACB 006115 lists descriptive information for the defendant. This information was typed into the detectives' supplementary reports and can be found at ACB 006115. ACB 006121 is a close-up cropped photo of the defendant. It is similar to an arrest photo found at ACB 006120, which plaintiff admits was produced.

Findings: A comparison of the Investigative File for the Carlos Vasquez murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Garcia* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.  The blue back indicates that the "st. file (w/ PR; Inv, GPR)" (SAO-NF-0009518), was produced (some ASAs and defense attorneys referred to the Investigative File or GPRs as the "street file"), and all the investigative documents from the Investigative File (*i.e.* the Supplementary Reports and GPRs) are in the CCSAO file, further suggesting the Investigative File was tendered.  Moreover, there is no evidence the CPD employee who responded to the request for information in this case or any other case would "pick and choose" what to produce.  Also, the blue back indicates that vehicle records were ordered as well as the CB photo, both of which are currently not in the CCSAO file.  It is possible, therefore, that documents currently not in the CCSAO file were discarded at some point by the prosecutors or misplaced after 32 years.

12.   *People v. Diante Wiley & Latoya Jones* (G-032399)

On January 16, 2001, six month old Shamire Jones died from 17 multiple injuries sustained through blunt force trauma. In her brief life, the defendants were also investigated by the D.C.F.S. for breaking Shamire's arm. Diante Wiley provided a video-taped statement describing how he slammed the baby into a car seat, violently shook the child and, after she threw up on him, threw her onto the bed. She bounced off the bed and struck her head against the wall. After that injury, she stopped moving. Upon finding Shamire lifeless, Laytoya Jones called for medical help. When police arrived at the residence in the 5200 block of South Marshfield, they found the defendant hiding underneath a bed.

Defendant Wiley entered a guilty plea and was sentenced to 25 years in the I.D.O.C. His post-conviction petition to withdraw his plea was rejected by the Illinois trial and appellate courts. Latoya Jones entered into a negotiated plea to Aggravated Battery to a Child and was sentenced to 12 years in the I.D.O.C.

Plaintiff contends that, after an examination of the Investigative File numbered ACB 009208 - 9420, 51 of the 213 pages were not found in the defense attorney's file.

An examination of the CCSAO's file reveals that all but 31 of those 213 pages were present in the prosecutor's files.

    a. ACB 009209 – 10 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. The list has 33 items, from supplementary reports to subpoenas.

    b. ACB 009215 is a CPD Investigative File Control log. It indicates that a detective signed out and returned the file between 1215 and 1300 on May 13, 2001. There is no information of evidentiary value. In all likelihood, the detective photocopied the file for court purposes.

    c. ACB 009216-19 are photocopies of Polaroid photographs. Included are witnesses 'Tyrre' Wiley (-16), Tia Wiley (-17) and the front and back sides of Defendant Latoya Jones' photograph (-18 and -19). All three provided handwritten statements to the felony review ASA and the police. These photographs were taken at the time of those statements. The photographs would have been tendered to defense counsel during pre-trial discovery and may have been used by the prosecution during pre-trial motions and at trial.

    d. ACB 009220 is a CPD "Daily Major Incident Log." This one-page document is authored by the Watch Commander and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period. There is no indication that the Watch Commander participated in the investigation other than learning the basic facts of the murder and the arrest of the offender contained in his summary. This information is contained in the CPD reports tendered to the defendants during pre-trial discovery.

    e. ACB 009283 is a Felony Complaint for Preliminary Hearing. This complaint was served on the defendant in court. A copy is retained by the Clerk of the Circuit Court in the Municipal Court file. Specifically, in the Branch 66 municipal court file.

    f. ACB 009288 is the criminal history of Latoya Jones, the mother of the 6-month old victim, a charged co-defendant and dated shortly after the crime. It lists one 8½ year old arrest as a juvenile for theft that was not referred to court. It is questionable under the *Montgomery* case if this arrest could be used to impeach her credibility at trial. Nevertheless, the most current version of Ms. Jones criminal history would have been tendered prior to trial by the prosecutors. The CCSAO's file contains a discovery receipt file stamped on March 2, 2001 and initialed by a defense attorney. This document states that the CCSAO provided both adult and juvenile criminal history records for Latoya Jones. (*See* SAO-NF-0001255)

g. ACB 009289 – 96 are CPD ICAM name searches with arrest photographs and criminal histories for Terrence T. Tyler (-89-90), 'Murice' L. Smith (-91 - 92), Devon Young (-93 - 94) and Maria D Johnson (-95 - 96). They were interviewed as part of the CPD investigation. Current versions of potential witnesses' criminal histories are provided during pre-trial discovery by the CCSAO. The CCSAO's file docket sheet, commonly known as the blue back, contains a notation that 'witness backgrounds' were tendered to defense counsel on July 16, 2001 in court. (*See* SAO-NF-0000847.)

h. ACB 009297 - 302 is a request to Chicago's Office of Emergency Communication to archive all voice transmissions (primarily 911 calls and police transmissions) regarding the incident at 5251 S Marshfield Avenue. This log confirms the timing of two 911 phone calls but has little other evidentiary value.

i. ACB 009333 is a CPD Felony Minute Sheet – Form 101. The document lists the charged defendants, a brief summary of the facts, and the prosecuting witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in the CPD case and supplementary reports tendered to the defendants.

j. ACB 009369 is a CPD ICAM photograph of defendant Latoya Jones with biographical information such as her name, date of birth, address, and her height and weight. All of this information is available on other copies of her central booking arrest report ('C.B.') and throughout the CPD supplementary reports.

k. ACB 009409 – 13 are CPD ICAM name searches with an arrest photograph and criminal histories for Scott L King (-09-10) and 'Kendric' K Williams (-11-13). King and Williams were witnesses that had spent time with the defendants before and after the time of the victim's murder. Their detailed interviews are recounted in the CPD reports tendered to the defendants in pre-trial discovery. Also, current versions of potential witnesses' criminal histories are provided during pre-trial discovery by the CCSAO. The CCSAO's file docket sheet, commonly known as the blue back, contains a notation that 'witness backgrounds' were tendered to defense counsel on July 16, 2001 in court. (*See* SAO-NF-0000847.)

Findings: A comparison of the Investigative File for the Shamire Jones murder with the CCSAO disc file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Wiley* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. The pages that are not currently on the CCSAO disc consist mainly of the Investigative File inventory and control card which

are administrative, the felony minute sheet which was in the prosecutor's possession, the felony complaint which was given to the defendant in court, the daily major incident log which is derivative of the case and supplementary reports, and miscellaneous witness background information which the blue back indicates was tendered and which would have been tendered in the ordinary course of business. I have also been informed that the original CCSAO file for this case was destroyed after it was put onto a disc, so it is possible that the miscellaneous documents not currently on that disc were simply not scanned onto the disc, discarded or misplaced. Many documents like the C.P.D ICAM name searches and photos identified above are on the CCSAO disc, which would indicate the Investigative File was produced, and there is no evidence the CPD employees who copied files would pick and choose which documents to produce; rather, they would produce the contents of the file. It is therefore possible the above referenced pages were initially in the CCSAO file. In either event, the investigative information in the Investigative File is currently in the CCSAO file and would have been tendered to the defense.

14.    *People v. Derrick Johnson* (G-148403)

Clarence Johnson was strangled to death in his South Loop apartment on April 22, 1985. His body was found by the building manager when friends came to his building looking for him. This case went unsolved until late March, 1989. At that point, latent fingerprint impressions recovered during the initial investigation were submitted for comparison to the A.F.I.S. database and were matched to the defendant Derrick Johnson. After failing a polygraph test, Johnson gave a handwritten statement to the police officers and a prosecutor admitting his role in Clarence Johnson's death. Derrick Johnson stated that after meeting the victim at a train station, he accompanied him to his apartment. At some point, they argued over the defendant's refusal to participate in a videotaped sex orgy with a third man. The defendant stated he believed that the victim would not let him leave unless he agreed to have sex. During this argument, the defendant put the victim in a 'sleeper hold' and strangled him to death.

The defendant was found not guilty by a jury on March 1, 1991.

Plaintiff contends, after an examination of the Investigative File numbered ACB 003679 - 003833, that 21 of the 187 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that at least two of those 21 pages were present in the prosecutor's files. Moreover, the CCSAO's file docket sheet, commonly known as the blue back, contains a notation that a 181-page 'street file' was tendered to defense counsel during pre-trial discovery. (*See* SAO-NF-0003946.) This same entry indicates that 18 of the 181 pages had writing on the back of those documents. The docket sheet further indicates that another approximately 65 pages of police reports were also "personally" given to defense counsel in court. Documents specifically mentioned that are relevant here are ET report, ET report with writing on the back, AFIS letter, latent print report, and crime lab request. (SAO-NF-0003946 – 47.) Many of the alleged missing documents below were in all likelihood the documents provided to defense counsel in court.

a. ACB 011174 appears to be a blank piece of paper that contains the handwritten names of Bernard Terry and James Taylor with '1700HRS' next to Taylor's name. At the bottom of the page are 10 two-digit numbers. This document may have been included in the documents tendered to defense counsel and described above.

b. ACB 01177 is the 2nd page of the CPD Investigative File summary. This summary lists only 6 entries for documents described as "ct att." That is in all likelihood an abbreviation for court attendance slips. Moreover, the defense is not contesting receipt of ACB 011178 which is the 1st page of the CPD Investigative File summary with 25 entries listing substantive police reports that are contained in the Investigative File. The actual six court attendance reports are found in the defense attorney's file and numbered ACB 011180-85.

c. ACB 011248 is a CPD Request for Latent Fingerprint Comparison submitted from the detectives to the identification section. This exact document, with the handwritten results of the comparison written on the face of the document, was tendered to the defense and is found at ACB 011243.

d. ACB 011258 appears to be a blank piece of paper that contains the words 'Ident Section.' This document may be the back side of ACB 011257, the Request for Latent Fingerprint Comparison form found in the defense attorney's file. This document, by itself, has no evidentiary value.

e. ACB 011259 is a CPD Request for Latent Fingerprint Comparison submitted from the detectives to the identification section. This exact document, with the handwritten results of the comparison written on the face of the document, was tendered to the defense and is found at ACB 011325. The only information missing from the tendered copy is the handwritten word "file."

f. ACB 011276 appears to be a lined sheet of paper with the handwritten notation of "Markham + Hood A/1 V.C." ACB 011326 contains only Markham's name. ACB 011334 appears to be a blank sheet of paper with the handwritten notation of "Markham + Hood A/1 V.C.". These documents are the reverse sides of other documents found in the defense attorney's file. ACB 011276 is the reverse side of 011275, an Evidence Report. A close examination of 011275 instructs the user to "use the reverse side for details of crime scene processing." ACB 011276, the reverse side, states "continuation of narrative" therefore indicating it is the same form. ACB 11326 is the reverse side of 011325, a Request for Latent Fingerprint Comparison form. ACB 011334 is the reverse side of 011333, a property inventory sheet. By closely examining 011334, the information contained on 011333 is visibly 'bleeding' through the document. It's obvious that the forms were sent via inter-office mail with the recipients' names written on the reverse sides of the documents. These documents, by themselves, have no evidentiary value.

g. ACB 011281 is a CPD Request for Latent Fingerprint Comparison submitted from the detectives to the identification section. This exact document, with the handwritten results of the comparison written on the face of the document, was tendered to the defense and is found at ACB 011233.

h. ACB 011294 is a CPD Request for Latent Fingerprint Comparison submitted from the detectives to the identification section. This exact document, with the handwritten results of the comparison written on the face of the document, was tendered to the defense and is found at ACB 011245.

i. ACB 011324, 11327, and 11330 are CPD Requests for Latent Fingerprint Comparisons submitted from the detectives to the identification section. These exact documents, with the handwritten results of the comparisons written on the face of the documents, were tendered to the defense and are found at ACB 011257, 11267 and 11253; respectively.

j. ACB 011347 is copy of the victim's criminal history. The same document, with the additional entry of his death, was tendered in discovery and can be found at ACB 011299.

k. ACB 011312 is a photocopy of four Polaroid photos of the defendant taken at the time he was interviewed by the police. ACB 011356-59 are individual photocopies of each photograph. ACB 011356 was found in the CCSAO file. The photos were used during a Motion to Suppress on November 20, 1990. Moreover, during cross-examination of the defendant, he acknowledged that one of the Polaroid photographs was taken when he signed a handwritten statement. (*Johnson Motion to Suppress*, 89 CR 9300, Transcript p. 47 and CRIM.DEF FILES - FIELDS 042119) During that same sequence of questions, he also stated that more than one photograph was taken. These photographs, in all likelihood, were tendered during pre-trial discovery, used during the hearing and possibly impounded with the Clerk of the Circuit Court.

Findings: A comparison of the Investigative File for the Clarence Johnson murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Derrick Johnson* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. The blue back establishes a 181 pages "street file" was produced (including the reverse side of 18 pages) to the criminal defense attorney, and the Investigative File is 186 pages. It is readily apparent some or all of the pages identified above as not currently in the prosecutor and defense attorneys' files were in those files at the time of trial, and the files are now incomplete. The flawed methodology of plaintiff's expert relying exclusively on the current content of the criminal defense file is demonstrated by the *People v Derrick Johnson* case, as that file is clearly incomplete. Any conclusions drawn from the content of the criminal defense file in this case are necessarily flawed.

15. *People v. Jeffrey Boyd and James Walker* (G-159857)

On April 30, 1985, at about 8:30 p.m., a group of people, including brothers Rico and Andre Chalmers, were standing near the corner of 5400 S. Halsted Street near Lanagan's Lounge. A white car pulled up at the corner, and defendants and El Rukn street gang members Walker and Boyd got of the car and started shooting at the group. Glendon McKinley, Vickie Nolden and Rico Chalmers were all struck and killed by gunfire. Walker was convicted by a jury and sentenced to Natural Life. Boyd was found not guilty during a simultaneous bench trial.

Plaintiff contends, after an examination of the Investigative File numbered ACB 011627 - 011977, that 133 of the 351 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file. Plaintiff's allegations that 133 pages of the Investigative File were not produced is refuted by AUSA Hogan's February 15, 1991 letter where he states that he produced 313 pages of GPRs, as well as 17 pages of property inventory reports, 16 pages of evidence reports, and 5 pages of request for print comparisons. An examination of the U.S. Attorney's Office's file reveals that all but 54 to 64 of those 133 pages were present in the prosecutor's files.

a. ACB 011630 – 43, 011645 – 51 and 011654 are Polaroid photographs. These photographs appear to have been used by police officers in the course of the investigation to identify people to the police. There is no indication that the photographs were used during formal identification processes. On a few of these photographs, the reverse side was copied with identifying information. For example, the reverse side ACB 011632, 011633, identifies that person as Willie Mitchell. Also identified in this manner is Andre Chalmers (011634-35), co-defendant James H. Walker (011636-37), Tyrone Wheatley (011639-40), Carl Bell (011641-42), Charles Green (011645-46), James Speights (011648-49), and Richard Bell (011650-51). Also, although the photocopies of the photographs are of poor quality, ACB 011631 appears to be another photo of co-defendant James Walker. ACB 011654 is a prior central booking arrest photo for Derrick Kees. Chalmers and Wheatley are eye witnesses to the shooting. Richard and Carl Bell provided information regarding the use of Richard's car during the shooting. Mitchell, Green, Speights and Kees are El Rukn gang members that were identified during the course of the investigation. This information was provided in reports tendered to the defense attorneys. Specific information on Mitchell, Speights and Kees is found in reports tendered to defense counsel and numbered ACB 011832 – 33, - 835 – 836, - 977, - 881 and - 784. Finally, ACB 011647 is a photo of a Mac 10 style handgun. This may be the same weapon that was discussed in documents tendered to defense counsel and numbered ACB 011826, 011935 – 36, - 952 and - 973.

b. ACB 011658 lists the names and phone numbers of two CCSAO prosecutors, the schedule for a witness and two officers and a request to keep another police supervisor updated. This note is not a document typically tendered with discovery materials. ACB 011669 – 70 is the front and back of a business

card for an Assistant U.S. Attorney. Since there is no indication that the Assistant was a witness, this information is not typically tendered with discovery materials.

c. ACB 011657, - 60, - 62, - 64, and – 66 are notes that contain information related to the search for the defendants. James Walker's name, aliases, possible addresses, and family members' contact information is listed. Also included is a warrant number. There are no substantive interviews included.

d. ACB 011667 is a brief, neatly written description of the 'shooter,' the shooting and the witness' flight. It is not attributed to any one witness. A few witnesses described the events in a similar manner and that information was found in reports provided to defense counsel. The shooter's description is most similar to a note found in the defense attorney's files and numbered ACB 011924.

e. A number of handwritten notes contain attorney and law enforcement identification information (011671, 011676 and 011682), witness and defendant contact and identification information (011657, 011668, 011677 - 78, 011681, 011686, 011689 - 90, and 011749), requests for photos and other police reports (011673, 011680, 011689 – 90), and attempts to identify automobiles (011668, 011680, and 011684.) Most of this information is found throughout the typed supplemental and other police reports found in the defense attorney's files. None of these notes contain interview summaries or other substantive information.

f. ACB 011661, - 63, - 72, - 74 and – 83 are partial CPD Watch Assignment Sheets. (ACB 011674 was found in the defense attorney's file.) These documents list police officers' schedules. These sheets are not typically tendered with discovery materials. An examination of the file indicates they are the back sides of scraps of paper used to take notes. This assumption is made based upon their size, approximately a quarter page, and the size of the notes found in sequence immediately preceding them. For example, ACB 011661 is the back of a note found at ACB 011660.

g. ACB 011687 and 011812 are CPD Crime Laboratory Evidence Reports. 011687 indicates that the Evidence Technician obtained victim Pollard's fingerprints at the morgue and turned them over to a detective. ACB 011812 indicates that the Evidence Technician obtained victim McKinley's fingerprints and an identification photo at the morgue and turned them over to a detective. Identification photographs of the victims taken by evidence technicians are found in the file at ACB 011702, - 704, and - 706. Throughout the file, the detectives requested background checks of these two victims. Their criminal histories are found throughout the file and specifically at ACB 01173 - 75.

h. ACB 011777 is the back of ACB 011776. It is a stamp indicating that a rap sheet, 011776, was "Issued On Inquiry." The stamp is often placed on the

face of the document. It has no significance other than to indicate the date that the criminal history was issued.

i. ACB 011804 – 811, - 837 and – 850 are property inventory sheets. ACB 011811 and 011850 are duplicates.

i. FIELDS 01289-96, is a disclosure letter to defense counsel from federal prosecutors in the matters of *United States v. Andrews* (89 CR 908) and *United States v Anderson* (89 CR 909). In this letter, the U.S. Attorney's Office disclosed seventeen pages of "Property Inventory Reports" on the Chalmers, McKinley and Nolden Triple Homicide. The U.S. Attorney's Office's letter indicates they obtained these documents via a subpoena directed to the CPD

ii. Inventory sheets are also commonly found in the Clerk of the Circuit Court's file. The CPD inventory documents are created with a quintuple form set. The third sheet is titled "COPY 3 – COURT COPY – ATTACH TO COURT PAPERS." The court's copy is usually attached to the arrest report or the complaint. The documents in the court file are available to attorneys for inspection and copying.

iii. ACB 011804 – 806 records the recovery of the victims' clothes from the medical examiner and a bullet in a 'sealed bullet envelope' from victim Nolden. The recovery of these items would be discussed in the Post Mortem Reports compiled by the Assistant Medical Examiner. A description of victim Chalmers' clothes is also found in documents tendered to defense counsel and numbered ACB 011744 and 011896.

iv. ACB 011807 lists the recovery of documents from a car. The recovery of the papers is also found in a document tendered to defense counsel and numbered ACB 011744.

v. ACB 011808 and the duplicated inventories found at ACB 011811 and -850 are two sets of photos used during the investigation. Their use is discussed by description and inventory number in documents tendered to defense counsel and numbered ACB 011723, 011742 and 011958.

vi. ACB 011809 records the recovery of 8 cartridge cases from the crime scene. The recovery of the items was discussed in a document found in the defense attorney's file and numbered ACB 011742.

vii. ACB 011837 is the recovery of evidence from a separate investigation. The report with a description of the items recovered was tendered to defense counsel and is numbered ACB 011835 – 36 and - 838 to - 839.

viii. ACB 011810 records the inventory of an Ingram 9 mm weapon, a clip and 22 live rounds. The recovery of this weapon with the inventory

number listed was discussed on documents tendered to defense counsel and numbered ACB 011826, 011935 – 36, - 952 and – 973.

Findings: A comparison of the Investigative File for this triple homicide with the USAO file establishes that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents.

16. *People v. Dion Banks & Shakina Feazell* (G-168213)

On March 24, 2001, Dion Banks and Shakina Feazell drove to the Ford City Mall to steal a car. Banks approached Rose Newburn as she sat in her car with her two children, ages 6 and 7. When Newburn refused to get out of her car, Banks shot twice through the closed window killing her. He then pulled her from the car and drove away with Feazell following him. Banks quickly dropped the two children off in the parking lot. As they left the mall parking lot, Feazell got into a car accident. Banks pulled over and fired his gun at the car involved in the accident. Later, police arrested Banks and Feazell on the west side of Chicago after another car accident. Feazell provided a detailed handwritten statement. Banks provided police a detailed oral statement but after talking to his Mother decided not to have his statement recorded.

Banks and Feazell were both convicted. In 2006, Banks was sentenced to death by a jury. This sentence was later commuted to natural life by the governor after the legislature repealed the death penalty. Feazell's case was overturned on appeal and she was again convicted and sentenced to 20 years in the I.D.O.C.

Plaintiff contends that, after an examination of the Investigative File numbered ACB 011978 - 012297, 2 of the 320 pages were not produced. An examination of the CCSAO's file reveals that those 2 pages were present in the prosecutor's files. ACB 011989 - 90 are duplicate copies of a photo of the homicide victim taken after she had unsuccessfully undergone life saving measures at a hospital. Various hospital tubes and I.V.s are visible in the photos. One of those photos appears to have been introduced at trial as People's Exhibit No. E1.

Findings: A comparison of the Investigative File for the Rose Newburn murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Dion Banks* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff.

21. *People v. Timothy Malone* (G-266841)

On May 9, 2001 at 1:00 p.m., the victim Eric Wilson was putting new rims on another person's Monte Carlo. The defendant pulled up and asked him the cost of the rims. Wilson told him $3,000. The defendant said he would come back. Approximately 20 minutes later, the defendant returned with 5 – 6 friends in a van. Malone asked Wilson where his Monte Carlo was. When Wilson said he did not know what he was

talking about, Malone pulled a handgun and starting chasing and shooting the victim. Others from the van shot as well before they fled. Wilson died from his gun-shot wounds. Approximately 3 witnesses identified Malone in lineups.

Malone was convicted in June, 2004 and sentenced to 56 years in the I.D.O.C. His conviction was upheld on direct appeal and his post-conviction petition was ultimately denied after a 3rd stage hearing by the trial court and this appeal was rejected by the appellate court.

Plaintiff contends, after an examination of the Investigative File numbered ACB 015161 - 015309, that 19 of the 149 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that 5 those 19 pages were present in the prosecutor's files.

    a. ACB 015162 – 64 and - 86 are CPD Investigative File Inventories. The pages numbered ACB 015163 – 64 are blank.

    b. ACB 015179 – 80 are CPD GPRs. Although they list the correct homicide case number, 01-040, the reports concern an unrelated case. The GPRs state that the crime occurred 15 days earlier and at a different address than the actual case file. The GPRs relate to 2 interviews that occurred on May 4, 2001 in relation to a homicide/aggravated robbery in which the victim's last name was Malone. Moreover, the officer who drafted the GPRs was not involved in this case and therefore the documents appear to be misfiled.

    c. ACB 015200 is a handwritten note that contains Detective Jackson's name, star and unit number. This page is most likely the back side of ACB 015199, a Crime Scene Processing Report that also lists the detective's name as the investigating officer. Once the reporting technician completed this document, he folded it in half, stapled it and sent it via CPD interoffice mail by writing Detective Jackson's name, star number and unit of assignment on it. Detective Jackson is listed throughout the typed supplementary reports. This note has no evidentiary vale.

    d. ACB 015263 is a note containing the information "16" with an arrow and "under 13 years." This page is most likely the back side of ACB 015262, a one-page report detailing the arrest of the defendant. A further examination of ACB 015263 reveals the information typed onto ACB 015262 'bleeding through' onto the background. While the note could relate to the ages of offenders charged in juvenile and adult court, the defendant in this case was 20 years of age at the time of the murder. It may be a reference to the ages of some of the witnesses in this case. One witness, Pierre Oxford, was age 14 at the time of the investigation and had been previously interviewed in his mother's presence. He would later view the defendant in a lineup and make a positive identification.

e. ACB 015270 lists "Gregory Atkins," his age and a phone number. Gregory Atkins could be a relative for a witness, Casey Atkins. Casey and Gregory Atkins' phone numbers are within one digit of each other. However, Gregory Atkins does not appear to be a witness and this note has little or no evidentiary value.

f. ACB 015192 is typed "to – from" memo from Detectives Jackson and Proctor to "all watches" dated 28 May 2001. All of this information is included in typed supplementary reports at ACB 015250 – 51 and at ACB 15213 -14 and included in the defense attorney's file. *See e.g.,* CRIM.DEF FILES - FIELDS 4629 & 4643.

g. ACB 015191 is a CPD Material Submitted for Use in the Daily Bulletin form. The detectives assigned to the case asked for information regarding the defendant Malone to be placed into the Daily Bulletin. This document notes that an 'investigative alert' was issued for the defendant. The information used to create the Bulletin listing is taken from information contained in the supplementary reports received by the defense attorneys. (*See* ACB 015212-14.) The reports indicate that an investigative alert was issued. (*See* ACB 015214.) An examination of the CCSAO's blueback for this case reveals that the actual investigative alert was used as an exhibit at a motion to quash the defendant's arrest and suppress evidence. (*See* SAO-NF-0002002.) Prior to the hearing, the blueback appears to indicate that the prosecutors were seeking a copy of the investigative alert and the bulletin. (*See* SAO-NF-0002000.) *See e.g.*, CRIM.DEF FILES - FIELDS 4629 & 4643.

h. ACB 015193 is a photocopy of an attorney's A.R.D.C. card and an identification card issued by the Cook County Sheriff. It has little or no evidentiary value. Earlier attorney visits to the defendant at the police station were recorded in a supplementary report at ACB 015214.

i. ACB 015194 is a G.P.R listing the times that the defendant used the bathroom or received water to drink. This information has little evidentiary value as the defendant, acting upon his attorney's advice, did not provide a statement. *See e.g.*, ACB 004644 (On June 28, 2001, Malone's attorney arrived at Area 1 and advised Malone not to answer any questions).

j. ACB 01595 lists the times that defense attorneys visited the defendant, the results of lineups and the arrival of A.S.A.s. The only information of evidentiary value, the lineup results, were included in supplementary reports found in the defense attorney's file. *See e.g.*, CRIM.DEF FILES - FIELDS 4644; 4647; 4657-4668.

Findings: A comparison of the Investigative File for the Eric Wilson murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Malone* does

not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

23.  *People v. Isaiah Brady* (G-268444)

In the early morning hours of May 10, 2001, Isaiah Brady shot his girlfriend, Andrea McDaniel, in the head. She died from this injury on May 12th. He called his mother who lives in Evanston to come to his apartment in Englewood because of an emergency. She and her husband arrived an hour later. Brady carried the victim to their car and they drove her to Provident Hospital. While the victim was being treated, the defendant fled going to his grandmother's house. There he took clothes and tried to take his grandmother's car keys. After a struggle over the keys near the car, the defendant fled into the park. The defendant had seven prior domestic violence incidents where the victim was either a witness or had suffered injuries from the defendant. In one incident in early 2001, the defendant shot the victim in the foot. Three of these prior incidents were introduced at trial. The defendant was arrested in Gardenia, California on June 7, 2001 after he made threats to his aunt. The Gardenia, California police also learned that the defendant made admissions to his aunt and a girlfriend regarding the death of Andrea McDaniel.

After a bench trial, the defendant was found guilty of first degree murder and sentenced to 50 years in the I.D.O.C. His appeal and post-conviction petition were denied by both the trial and appellate courts. His federal habeas corpus petition was denied by the district and circuit courts.

Plaintiff contends, after an examination of the Investigative File numbered ACB 015505 - 015758, that 83 of the 254 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 17 of those 83 pages were present in the prosecutor's files.

a.  ACB 015661 appears to be a handwritten note on the back of a GPR found at ACB 15660 which includes Sandra Burke's contact information and the statement "neighbors say he's there all the time." GPRA review of a discovery receipt found in the CCSAO's file indicates that thirty GPRs were tendered to defense counsel during pre-trial discovery (*See* SAO-NF-0007037.) The Investigative File also contains thirty pages of GPRs. (*See* ACB15642 – 71) It is likely that the claimed missing page was included.

Nevertheless, even assuming, *arguendo*, that the alleged missing page was withheld from the defendant, a review of the post-conviction proceedings along with the federal habeas corpus proceeding before Judge Matthew Kennelly (Case No. 10 C 2098) clearly establishes that there was no *Brady* violation in this case. Specifically, the defendant argued that his trial attorney was ineffective for failing to call Ms. Burke as a witness at trial as she provided an affidavit that, according to the defendant, would undermine the State's theory that the defendant left the victim to bleed out for hours as

Ms. Burke provided an affidavit that she was with the defendant on the day in question and that she dropped the defendant off at his apartment 30 minutes before the people were called as a result of the victim being shot. Based on the pleadings, there was no evidence as to whether the defendant's trial attorney actually knew about Ms. Burke as a potential witness. The defendant argued, however, that his trial attorney knew about her and in fact interviewed her. Either way, there would be no *Brady* violation because the defendant obviously knew about Ms. Burke and her potential testimony. As such, the alleged missing handwritten note would not constitute a *Brady* violation since Ms. Burke's testimony was known by the defendant, and possibly his trial attorney (if you believe the defendant's claims), at the time of trial.

b. ACB015670 appears to be further notes on an interview with a witness, Arlene McKinley, from the prior page number. A typed version of this witness's interview with information from ACB 015670 can be found a report that was found in the CCSAO's file at ACB 015723 – 24. Furthermore, a review of a discovery receipt found in the CCSAO's file indicates that thirty GPRs were tendered to defense counsel during pre-trial discovery. (*See* SAO-NF-0007037.) The Investigative File also contains thirty pages of GPRs. (*See* ACB15642 – 71) It is likely that the claimed missing pages were included.

c. ACB 015645 – 46 are the last 2 pages of a handwritten GPR which contains GPRs series of notes from Detective Padilla's interview of witnesses Marshaun and Darlisa Brady. The pages are notated "4 of" and "5 of" at the top of each document. ACB 015642 – 44, found in the CCSAO's files, are notated "1 of," "2 of" and "3 of" respectively. The contents of this GPRs is found in typed supplementary reports found in the defense attorney's and CCSAO's files and numbered ACB 015721 – 22. A review of a discovery receipt found in the CCSAO's file indicates that thirty GPRs were tendered to defense counsel during pre-trial discovery. (*See* SAO-NF-0007037.) It is likely that the claimed missing pages were included.

d. ACB 015606 - 09 and 015728 – 35 are a series of CPD Property Inventory Reports. In each case, the even numbered document (*i.e.*, ACB 015606) was the front of the inventory sheet with the substantive information and the odd numbered document was the blank reverse side (*i.e.*, ACB 015607). In each case the substantive even numbered documents were found in the CCSAO's file. The blank reverse side pages have no evidentiary value. Additionally, a review of the discovery receipt found in the CCSAO's file indicates that inventory sheets were tendered to defense counsel during pre-trial discovery (*See* SAO-NF-0007038.)

e. ACB 015697 is a Leads Response for Wanda Riley. The CCSAO's file has a different Leads Response for Ms. Riley. The CPD supplementary reports contains nearly all of this information and other identifying information at ACB 015717, a document that was found in the defense attorney's file. Furthermore, a review of a discovery receipt found in the CCSAO's file

indicates that six pages of LEADS reports for witnesses were tendered to defense counsel during pre-trial discovery (*See* SAO-NF-0007037.)

f. ACB 015584 is a CPD Investigative File Control log with one entry. It has no evidentiary value.

g. ACB 015585 is a CPD Daily Major Incident Log. This document is authored by a detective division sergeant acting as a watch coordinators and briefly summarizes the crime. There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder and, later, the arrest of the offender contained in his summary. This information is detailed in the CPD reports tendered to the defendant during pre-trial discovery.

h. ACB 015591 – 92 is a screen shot of a CPD Investigative alert. It replaced a prior alert, with nearly identical information (*See* ACB 015701-02). That report was located in the CCSAO file. This alert led to the issuance of an arrest warrant when the defendant was found in California and extradited.

i. ACB 015623 is the second page of a CPD supplementary report for a prior burglary with the same victim. A review of the discovery receipt found in the CCSAO's file indicates that both pages were tendered to defense counsel during pre-trial discovery (*See* SAO-NF-0007037.)

Findings: In conclusion, the alleged documents not found within the criminal defense file have no investigative or evidentiary value whatsoever. A comparison of the Investigative File for the murder of Andrea McDaniel with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. People v. Brady does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

26. *People v. George Frison* (G-326467)

On June 6, 2001, George Frison planned an armed robbery of heroin from the victim. Frison had previously acquired heroin from the victim and had not paid him. The victims, Kennedy Brooks and Eddie Baker met Frison and his co-defendants Anthony Mason and Edward Ware at 4300 S Michigan Avenue at Midnight. When defendants Frison and Mason entered Brooks' van they pulled their guns on the victims. When Baker was shot in the leg, he grabbed Mason's gun and pushed it down as Mason continued to fire the gun. Brooks and Baker got out of the van and ran away. Frison initially chased after Brooks and then both he and Mason returned to the car where co-defendant Ware was waiting. Ware took the weapon and chased after Brooks and fired at him before fleeing the scene. Brooks died from his gunshot wounds; Baker survived and led the police to Frison's house. Frison was arrested the next day at his residence

where the police recovered two handguns, two rifles and two shotguns. Frison gave a videotaped statement to police admitting his planning and role in the shootings.

Defendant Frison was found guilty by a jury and subsequently sentenced to a total of 42 years in the I.D.O.C. State court appeals and two post-conviction petitions were rejected by trial and appellate courts.

Plaintiff contends, after an examination of the Investigative File numbered ACB 017072 - 017380, that 123 of the 309 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 7 of those 123 pages were present in the prosecutor's files (with respect to crime scene photographs that are no longer maintained in the CCSAO file, they almost certainly were in the possession of the prosecutors and would have been made available to the defense prior to or at the time of trial, and some of them were used as evidence at trial and subsequently impounded by court order as discussed in subparagraph c below).

a. ACB 017073 – 75 is a CPD Investigative File Inventory.

b. ACB 017077 is a CPD File Control log indicating the file was checked out and returned on two occasions. It has no evidentiary value.

c. ACB 017079 – 116 and ACB 0170118 – 151 are crime scene and investigation photos. All but 10 of these 72 photographs were found in the CCSAO's file. The missing photographs, ACB 17104 – 05; -113, -129 to -134 and -141 are mostly photographs of bullet casings and other evidence at or near the victim's van. Some of these photographs may have been enlarged and used at trial. (*See e.g.*, SAO-NF # 21763 is nearly identical to ACB #17131 which was not found in either the criminal defense file or the CCSAO. SAO-NF #21760 is also nearly identical to another missing photo, specifically, ACB # 17130). All crime scene and investigative photos would have been copied to the defendant or made available prior to trial. The photos used at trial are routinely impounded with the Clerk of the Circuit Court as was done in this case. *See* SAO- NF 21210; 21212 (impounding order entered by the court on October 23, 2016).

d. ACB 017152 is a CPD Request for Evidence Identification Photographs that appears to be misfiled. The request was made 4 months prior to the date of occurrence of Brooks' murder. Moreover, it lists a different R.D. and homicide number.

e. ACB 017374 is a handwritten note that lists names and / or star numbers for CPD police personnel assigned to this case. (Pat McCormick, Struck & Mike O'Donnell). This note has no evidentiary value. Moreover, the majority of the information contained in this note can be found elsewhere in the criminal defense file. For example, in the case supplementary reports, in the sections entitled "Arresting Officers" and "Personnel Assigned", Mike O'Donnell's and Detective Struck's names and badge numbers are listed. *See e.g.*, CRIM.DEF

FILES - FIELDS 005907, 005909. Detective Struck is also listed as a potential witness in the State's discovery response. CRIM. DEF. FILES - FIELDS 006197.

f. ACB 017376 is a receipt for service for the victim's car from Star Nissan in Niles Illinois. It is the 2nd page of the receipt. The first, and more detailed page, was found in the CCSAO's files at ACB 017277.

Findings: A comparison of the Investigative File for the murder of Kennedy Brooks and the attempted robbery of Eddie Baker with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Frison* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete. For example, in a handwritten GPR relating to an interview of Michael Baker, there is a handwritten page 1 circled in the top right corner. CRIM.DEF FILES - FIELDS 005981. Plaintiff, however, identified ACB 017300, which is clearly marked as page 2 of the handwritten GPR relating to the interview of Michael Baker, as missing. This indicates that the defense attorney had reason to believe that there were missing pages to the GPR. Alternatively, defense counsel had page 2 but it was misplaced. Similarly, page 1 of 3 of a GPR handwritten report related to an interview with Eddie Baker in in the criminal defense file. *See* CRIM.DEF FILES - FIELDS 006007. The document is clearly marked "1 of 3." Pages 2 of 3 and 3 of 3 are identified by Plaintiff as being withheld. *See* ACB 017360-017361. Again, this indicates that either the defense attorney did have all three pages or the defense attorney was on notice that some of the pages were missing. Regardless, these GPRs, in their entirety, were located in the CCSAO file.

27. *People v. Santana McCree* (G-406405)

On July 10, 2001, defendant stabbed Denise Williamson once in the chest while they were smoking crack cocaine and heroin in the kitchen of the home he shared with his girlfriend, Ruth Goodson. Defendant's videotaped confession indicated he stabbed the victim because he thought she was trying to take his drugs. Goodson and her children were home during the incident; she heard a gasp from the kitchen and went downstairs to investigate. She saw a woman lying in a pool of blood in the middle of the floor and defendant told her that he stabbed the victim because she owed money to the Gangster Disciples gang. The gang, McCree claimed, was going to pay him $10,000 to kill her. Defendant and Goodson then wrapped the victim's body in a blanket, put it in a laundry bag, and loaded it onto a stroller. They left the body and the stroller in a vacant lot and dropped the bloody knife into a sewer. Later, the Defendant cleaned the kitchen and disposed of his bloody clothes. The next day Goodson went to her mother's house, where she told her family about the murder. Her family members subsequently took her to the police station, where she described to the police what had occurred. The victim's

body was recovered from the vacant lot and the defendant was arrested the following day.

The defendant provided numerous statements. When he was told that Goodson and another woman implicated him in the murder, he provided a videotaped statement admitting his actions. He also led police to the location of the knife and bloody clothes.

Defendant was convicted after a bench trial and sentenced to 40 years for murder and a consecutive 5 years for concealment of a homicidal death. Defendant's direct appeal and one appeal to reduce his sentence have been rejected by the trial and appellate courts.

Plaintiff contends, after an examination of the Investigative File numbered ACB 018900 - 019189, that 8 of the 290 pages were not found in the defense attorney's file. Two of those pages were found in the CCSAO's file.

    a. ACB 019028 – 30 are communications related to a request from the Office of Legal Affairs and the Illinois Torture Inquiry & Relief Commission to produce subpoenaed police reports. These requests were made in September, 2014, more than 10 years after the defendant was found guilty, and therefore are immaterial. The requests have no evidentiary value to the course of the criminal investigation.

    b. ACB 018942 is a copy of the title photo used to identify the scene photos. It has no evidentiary value. Indeed, there are numerous documents within the criminal defense file that identify what photos were taken and inventories of those photographs. *See* CRIM.DEF FILES - FIELDS 006945, 006954, 007042. Moreover, there were approximately 106 actual photographs in the criminal defense file. *See* CRIM.DEF FILES - FIELDS 007295 – 007411.

    c. ACB 019026 is a CPD Investigative File Control log. It lists one entry for the removal and return of the file. It has no evidentiary value.

    d. ACB 018992 is a CPD Investigative File Inventory listing lab reports, evidence inventories, subpoenas and crime scene reports. It has no evidentiary value.

Findings: In conclusion, the 6 pages not found within the criminal defense file have no investigative or evidentiary value whatsoever. A comparison of the Investigative File for the murder of Denise Williamson with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. McCree* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

30.   *People v. Albert and Maurice Spraggins* (G468726)

On November 22, 1985 in the evening hours, Maurice Spraggins rode in an elevator at 5041 S. State Street with the victim Albert "Reggie" Black and two others. Maurice recognized the victim as the same person who shot his brother Gregory in a dispute over money four years earlier. He went to his mother's apartment and provided this information to his other brother, Albert who is also known as Spanky. Spanky obtained a sawed-off shotgun and with Maurice they confronted the victim and his friends on the 12th floor. Maurice told Spanky to check the safety and scare the victim with the shotgun. Spanky said that since Black had shot his brother Gregory, he was going to shoot him. On the 12th floor, Black and two friends were standing on a gallery walkway. Spanky fired the shotgun twice, killing Black with a shot to the face and wounding one of his friends.

Maurice Spraggins was identified by the friends of the victim, arrested within a day and provided a court-reported statement. He was found not guilty on June 3, 1986.

Albert Spraggins fled to California and was arrested four years later in August, 1989. He was also identified by the friends of the victim. He was found not guilty on May 2, 1991.

Plaintiff contends, after an examination of the Investigative File numbered ACB 020860 - 021007, that 84 of the 148 pages were not found in the defense attorney's file. While examining the criminal defense attorney's file, a note apparently written by the defense attorney and numbered CRIM.DEF FILES - FIELDS 044045, makes mention of a detective's GPR and describes pertinent information found therein. An examination of ACB 020935-36, a GPR that was allegedly withheld, reveals the same information contained in the defense attorney's note. Moreover, an examination of the CCSAO's file reveals that all but 23 of the 84 pages identified by plaintiff were present in the prosecutor's files. All of the GPRs were included in the prosecutor's files.

a.  ACB 020861 is a handwritten note containing contact information for an Assistant State's Attorney. It has no evidentiary value. ACB 020896, and -98 are handwritten notes containing a police officer's name, star number and unit of assignment. These documents are the reverse sides of other documents found in the defense attorney's file. ACB 020896 is the reverse side of 020995, a LEADS request. ACB 020898 is the reverse side of 020897, also a LEADS request. It's obvious that the forms were sent via inter-office mail with the recipients' names written on the reverse sides of the documents. The reverse sides of the documents that list the officers' names have no evidentiary value. ACB 020908 is a blank piece of paper with the handwritten number 0262. It has no evidentiary value. ACB 020910 has the name Gregory Spraggins handwritten on the face of a F.O.P. election flyer. It has no evidentiary value.

b.  ACB 020870 – 72 are CPD Court Attendance Reports. They have no evidentiary value.

c. ACB 020862 and -64 are CPD Investigative File Inventory documents. They have no evidentiary value. ACB 020869 is a CPD Investigative File Control log indicating that the file was checked out and returned on three occasions in three different years. It has no evidentiary value.

d. ACB 020863 is a CPD Case Assignment Slip. It describes certain evidence was recovered from both the victim's body and at the crime scene. An evidence report (ACB 020921 and 021004) and the medical examiner's post mortem report (ACB 020938 – 42) describe in detail the recovery of these pieces of evidence. Those documents are found in both the defense attorney's and the CCSAO's files.

e. ACB 020865 – 68 are two copies, front and back, of arrest photos of Albert Spraggins. The back of each photo contains his alias, Albert Anderson, and -68 also has his date of birth. This defendant was not arrested for over four years and these photos were probably used during the search. By themselves, they have no independent evidentiary value.

f. ACB 020889 is a LEADS entry containing warrant information for Albert Spraggins. It has no evidentiary value. ACB 020919 is a LEADS entry requesting a search for the wanted defendant Albert Spraggins in Iowa in 1987. ACB 020920 is the reverse side of 020919 and lists a police officer's name, star number and unit of assignment. It appears the form was sent via interoffice mail. It has no evidentiary value. ACB 020899 is a typed 'to – from' memo from 1987. It details the recent LEADS request to search for the defendant in Iowa. It has no evidentiary value.

g. ACB 020904 – 05 is the front and blank back of a CPD Property Inventory sheet. The front side was found in the CCSAO's file at ACB 020906. The blank back side of the form has no evidentiary value.

h. ACB 020915 is the back side of Polaroid photo found at 020914. It contains the name and date of birth of Michael Spraggins, a cousin of Albert Spraggins. ACB 0020916 is a memo explaining that Michael Spraggins was arrested for traffic offenses and questioned to determine if he actually was Albert Spraggins. The front of the photo and the memo explaining the significance of the photo were found in the CCSAO's files.

Findings: A comparison of the Investigative File for the Albert Black murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Albert Spraggins and People v. Maurice Spraggins* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence, including the defense attorney's note regarding a GPR and the fact that the

CCSAO file contained all of the GPRs, suggests that the criminal defense file produced by plaintiff is incomplete.

31.    *People v. Crisino Bravo* (G-570120)

Shortly after midnight on September 23, 2001, the defendant was upset after an altercation with the occupants of a Chevy Impala, who he believed to be members of the LaRaza street gang. He got his .357 gun from the trunk of his car. Later, as codefendant and cousin Filiberto Bravo drove, defendant shot the gun four times at a red car which he believed contained LaRaza gang members. He also fired twice at a blue car. Filiberto shouted 'Saint love' as Crisino sat on the window frame and fired the handgun. The victim, Juan Olmeda, was shot in the head as he drove the blue car. He crashed his car into a parked car at 1316 W. 49th Street. After the shooting, Jose Gusman, who was also in the defendant's car, emptied the gun and disposed of the shells. Upon arrest, both Bravos provided videotaped statements describing the shootings. Crisino Bravo admitted to the shooting and Filberto admitted to driving the car and participating in the murder.  Crisino Bravo also told the officers where the gun could be located and it was recovered at a later time. Gusman, who provided the police a handwritten account of the shootings, also led the officers to the location of the shell casings where they were recovered.

The trial court ultimately found defendant guilty of first degree murder and aggravated discharge of a firearm in 2006. Defendant was sentenced to 20 years for the first degree murder conviction and to an additional consecutive 25 years because he had personally discharged a firearm during the offense. The defendant's cousin, Filiberto Bravo, pled guilty and was sentenced to 22 years imprisonment.

Plaintiff contends, after an examination of the Investigative File numbered ACB 023263 - 023472, that 119 of the 210 pages were not found in the defense attorney's file. A review of the defense attorney files indicates that plaintiff incorrectly identified 4 documents as not being found in the defense attorney files. Nevertheless, an examination of the CCSAO's file reveals that all but 5 of those 119 pages were present in the prosecutor's files.

   a.  ACB 023264 is a one-page CPD Investigative File Inventory listing 24 items including arrest reports, supplementary reports, evidence inventories, subpoenas and crime scene reports. It has no evidentiary value.

   b.  ACB 023350 is a one-page CPD Daily Major Incident Log. This is part of document that is authored by a detective division sergeant acting as a watch coordinator and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period.  There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder and the arrest of the offenders contained in his summary. This information is detailed in the CPD reports tendered to the

defendants during pre-trial discovery. (*See e.g.*, CRIM.DEF FILES - FIELDS 027519).

c. ACB 02351 is a C.P. D. Investigative File Control log. It indicates that the file was removed and returned once. It has no evidentiary value.

d. ACB 02387 is part of a form request used to request lab analysis from the Illinois State Police. It is a pre-printed form that contains a description of the analyses that are available as well as contact information. This document has no evidentiary value.

Findings: A comparison of the Investigative File for the Juan Olmeda murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Bravo et al.* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

32. *People v. Norman McIntosh* (G-705434)

On November 24, 2001, shortly after 9:00 a.m., the victim, his brother and two friends, all members of the BD street gang, posed as drug dealers and committed an armed robbery of the defendant as he sat in his car near 70th and Throop Streets. They took money, music CDs, 4 packets of crack cocaine and initially his car keys. As they walked away they threw the car keys at the defendant. The defendant said he was a Vice Lord gang member and he would be back. Later the victims were walking in the vicinity of 60th and Honore Streets, when the defendant drove by them and fired a Tech 9 style semi-automatic weapon. The victim Devon Hobson and his brother James were both stuck by bullets. Devon died during surgery while James survived his chest wound. The defendant was arrested in January, 2002 and was identified in line-ups by all three surviving victims.

The defendant was convicted in late 2003 and sentenced to an aggregate total of 45 years in the I.D.O.C. in 2004. His convictions were upheld on appeal.

Plaintiff contends, after an examination of the Investigative File numbered ACB 027079 - 027314, that 119 of the 236 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 12 of those 119 pages were present in the prosecutor's files (with respect to crime scene photographs that are no longer maintained in the CCSAO file, they almost certainly were in the possession of the prosecutors and would have been made available to the defense prior to or at the time of trial, and some of them likely were used as evidence at trial and subsequently impounded by court order: see SAO-NF 24-27 for a copy of the impounding order, and SAO-NF-753 and SAO-NF 761-765 which is a discovery receipt and answer to discovery showing the photographs were made available to the defense.)

a. ACB 027080 – 82 is a CPD Investigative File Inventory. It is of no value.

b. ACB 027133 – 34 are two pages of a CPD Major Daily Incident Log compiled by the Watch Commander.

c. ACB 02135 is a blank CPD Investigative File Control. It has no evidentiary value.

d. ACB 02187 is the 2nd and concluding page of a CPD line up supplementary report. The other page was found in the CCSAO's file. It is highly unlikely that this page was not tendered in discovery. ACB 02196 – 97 are the final 2 pages of a 5 page CPD line up supplementary report. It is highly unlikely that these pages were not tendered in discovery. Both line up supplementary reports describe the same line up. The formatting is different for the two reports but the information provided describing the line-up is identical. Moreover, the discovery receipt located within the CCSAO file lists both supplementary reports (5 pages each) as being turned over in their entirety to the defense on April 10, 2002. *See* SAO-NF #755 ("CPD Det. Suppl. Rep. R.D. #G705434 D.Evans #20927, Line-up").

e. ACB 02722 is a handwritten note that appears to be addressed to and thanking Pastor Meeks for donating bibles. This note has no evidentiary value.

f. ACB 027256 – 57 is a computer screen shot of an Investigative Alert. These two pages are a photocopy of ACB 02136 – 37 that were found in the CCSAO's files. Furthermore, the discovery receipt dated April 10, 2002, clearly states that defendant's attorney received a copy of the 2-page document in court. *See* SAO-NF 755.

Findings: A comparison of the Investigative File for the murder of Devon Hudson and the aggravated battery of James Hobson with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. McIntosh* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

33. *People v. Maurice Brown* (HH-175723)

On February 8, 2002, Maurice Brown's cousin was hit in the face while at a party at 3716 S. Indiana Avenue. Brown left the party but returned and told friends that he wanted to confront the people that hit his cousin. They assumed that Brown wanted to fight them. Instead, as Brown approached a group leaving the party, he pulled out a handgun and started shooting at them. Antonio Willis was struck in the chest by one of the bullets as he ran from Brown and died. Brown, with his attorney present,

surrendered himself to the police and in conflicting statements named two different suspects as the shooter. Brown was identified as the shooter by witnesses in lineups.

Brown was convicted by a jury and sentenced in 2004 to an aggregate sentence of 55 years in the I.D.O.C. His conviction was upheld on direct appeal and his post-conviction petition was rejected by trial and appellate courts.

Plaintiff contends, after an examination of the Investigative File numbered ACB 049234 - 049402, that 19 of the 169 pages were not found in the defense attorney's file. Seven documents were found in the CCSAO's file and three other pages appear to be from an unrelated case.

a.  ACB 0492240 is a CPD Homicide File Review form. Although the correct R.D. number is handwritten at the bottom of the page, a typed description of the victim, home address, occurrence address, dates and times of the victim's injury and death and the detectives assigned do not match this case.

b.  ACB 049306 – 07 is an Illinois State Police lab report that lists a different victim and R.D. number. The CCSAO's file contains two discovery receipts signed by defense counsel. These receipts contain an entry for a document provided to defense counsel titled 'I.S.P. Crime Lab "No Records found" ltr. RD#HH175723' on May 9, 2003. (*See* SAO-NF-0015459.) This appears to indicate that the lab could not find any records and that no examinations were conducted by their office.

c.  ACB 049235 – 36 is a CPD Investigative File Inventory listing arrest reports, supplementary reports, evidence inventories, subpoenas and crime scene reports. It has no evidentiary value.

d.  ACB 049243 is a CPD Investigative File Control log. It indicates that the file was removed and returned once. It has no evidentiary value.

e.  ACB 049266 – 67 a two-page CPD Daily Major Incident Log. This document is authored by two detective division sergeants acting as watch coordinators and briefly summarizes the crime. There is no indication that the watch coordinators participated in the investigation other than learning the basic facts of the murder and, later, the arrest of the offenders contained in his summary. This information is detailed in the CPD reports tendered to the defendants during pre-trial discovery.

f.  ACB 049264 is a cover sheet for the crime scene photos. The cover sheet, by itself, has no evidentiary value. The CCSAO's discovery receipts, signed by defense counsel, indicate that the prosecutors had at least 11 photos in their possession and all photos were available for viewing or copying upon request. The CCSAO's docket sheet, commonly known as the blue back, also indicates the defense attorneys requested a second copy of CPD line up photos because their copy was difficult to view. (SAO-NF-0014957.) This

entry was a short period of time before a motion to suppress identification was held.

g.  ACB 049385 is the back side of a GPR and the second page of a witness' (Stanley Foots') interview with the police. The first page, and front side, is found at ACB 049384. The complete interview is found in supplementary reports found in the defense attorney's file at ACB 049284 – 93. The CCSAO's discovery receipts also indicates that thirty-seven pages of GPRs were tendered to defense counsel on May 9, 2003. There are thirty-six GPR pages found in the Investigative File. If the two pages that appear to be the backsides of GPRs are added, then the total is thirty-eight.

h.  ACB 049387 is a handwritten note listing identification information for a woman labeled "Stanley's Girlfriend." Also included was the time and address where she was located. This note appears to be the back side of a GPR found at ACB 049386. Much of the same information on ACB 049387 was included on ACB 049386. This document could have been part of the thirty-seven pages of GPRs tendered by the prosecutors. All of this information with the substance of the detective's interview is found at ACB 049284 – 93.

Findings: Based on a comparison of the Investigative File for the Antonio Willis murder with the CCSAO file, it appears that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Brown* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. The documents that were not contained in the defense file either had no evidentiary value or appear to be related to a different case.

34.  *People v. Deshanta Young* (HH-285733)

On April 4, 2002, Willie Egeston, Kenyatta Martin and James Perkins were visiting Deondre Egeston in his second-floor apartment in Chicago. As Willie Egeston and Kenyatta Martin were leaving to pick up snacks, two armed men in ski masks and dressed in black burst through the kitchen door. Kenyatta Martin complied with the masked gunmen's order to lie on the kitchen floor. Willie Egeston ran to the bedroom occupied by James Perkins and Deondre Egeston, while being chased by one gunman. Deondre Egeston almost immediately jumped out of the second floor bedroom window. Perkins grabbed Deondre Egeston's loaded gun that he kept in his bedroom and shoved Willie Egeston behind him. Perkins fired at the armed intruder. Perkins was killed during the shootout but Willie Egeston survived his injuries. The defendant was arrested in Harvey on an aggravated kidnapping charge. At that time, Deondre Egeston's handgun was recovered from his car. The defendant was subsequently identified in ear and eye witness lineups by Martin and Willie Egeston.

The defendant was convicted after a jury trial and sentenced in 2009 to an aggregate sentence of 45 years in the I.D.O.C. (The defendant was sentenced to a consecutive 20 years in the I.D.O.C. on the Harvey case.)

Plaintiff contends, after an examination of the Investigative File numbered ACB 050932 - 051186, that 46 of the 255 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 4 of those 46 pages were present in the prosecutor's files.

    a. ACB 051011 – 14 is a CPD Daily Major Incident Log. This four-page document is authored by two detective division sergeants acting as a watch coordinators and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period. There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder and, later, the arrest of the offender contained in his summary. This information is detailed in the CPD reports tendered to the defendants during pre-trial discovery.

Findings: A comparison of the Investigative File for the James Perkins murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. DeShanta Young* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff. Rather, the evidence suggests that the criminal defense file produced by plaintiff is incomplete.

35. *People v Christopher Peoples* (HH-358668)

The defendant and two co-defendants, all Gangster Disciple gang members, home-invaded Brian Campbell's apartment at 50th and Halsted Street and shot him to death. Ninner Powers, Campbell's wife, testified at trial that at about 8:30 p.m. on May 8, 2002, James Mitchell, Marcel White and a third man came to the apartment where she lived with Campbell. The men accused her and Campbell of selling drugs for a rival gang. Powers testified that she had known Mitchell since his childhood. Powers also told Chicago police the nicknames of Mitchell and White and identified them in police photographs. She did not know the third man, who, according to her account, shot Campbell three or four times. On August 15, 2002, Powers was shown a second photo array and identified defendant as the shooter. She also identified defendant in a police lineup on September 6, 2002 and at trial. The defendant eventually admitted going to Campbell and Powers' apartment with his co-defendants but denied shooting anyone.

The defendant was convicted by a jury of first degree murder and home invasion and sentenced to an aggregate sentence of 85 years in the I.D.O.C. His conviction was upheld on appeal.

Plaintiff contends, after an examination of the Investigative File numbered ACB 031268 – 031555, that 257 of the 288 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 11 of those 257 pages were present in the prosecutor's files (with respect to crime scene photographs that are no longer maintained in the CCSAO file, they almost certainly were in the possession of the prosecutors and would have been made available to the defense prior to or at the time of trial, and some of them were used as evidence at trial and subsequently impounded by court order as shown by the impounding order in the case, SAO-NF-0070877-88).

a. ACB 031268 – 69 is the cover for the file and the jacket for the crime scene photos. Neither have any evidentiary value.

b. ACB 031294 – 97 are requests for and replies to the CPD's Office of Legal Affairs for copies of the file from 2014. These inquiries have no evidentiary value.

c. ACB 031298 a CPD Investigative File Control Log. It indicates that the file was checked out and returned three times in two years. It has no evidentiary value.

d. ACB 031299 – 306 are four CPD Daily Major Incident Logs. These eight pages were authored by a detective division sergeant and briefly summarizes the crime. There is no indication that he participated in the investigation other than learning the basic facts of the murder and the arrest of the offender contained in his summary. This information is detailed in the CPD reports tendered to the defendant during pre-trial discovery.

e. ACB 031499 was not found in the CCSAO's files, however it appears to be the handwritten inscription of a date, a time and the name of Antonio Rogers. This information may have been written on the back of ACB 031498. A copy of that photo was found in the CCSAO's files and would have been made available for viewing by the defendant at trial.

Findings: A comparison of the Investigative File for the Brian Campbell murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Peoples* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

36.    *People v. Devon Terrell* (HH-749335)

On October 31, 2002, the defendant and an accomplice went to the victim's apartment ostensibly to purchase marijuana. Their plan was to rob the victims of their drugs and money. After being admitted to the apartment, the defendant struggled with the victim Maurice Beaverly. The gun discharged striking the defendant in the thigh. The

defendant shot and killed Beaverly. Beaverly's girlfriend, Marcie Mosely, was also shot in the chest by the defendant when she entered the room from the kitchen. She survived. Her two children were unharmed. The defendant was arrested on a similarly motivated murder and eventually the police questioned him on this case when a firearm was found in his car. That weapon matched some of the ballistic evidence recovered in this case. The defendant's fingerprint was also found at the scene. During questioning, the defendant claimed he was talked into helping two others commit a robbery of the victim. He would not identify his codefendants truthfully and had previously lied to medical personnel about his gunshot wound. He did describe his entry into the victim's apartment to assist in the robbery but blamed his accomplices for the shootings. Terrell was also interviewed by an Assistant State's Attorney. He told the A.S.A. that he shot the victim. His statement was subsequently video-recorded.

The defendant was convicted in early 2008 and sentenced to 55 years in the I.D.O.C. on this case and natural life in prison for the second murder.

Plaintiff contends, after an examination of the Investigative File numbered ACB 56505 - 56684, that 25 of the 180 pages were not found in the defense attorney's file. One of those pages was found in the CCSAO's file.

    a. ACB 056507 is a CPD Investigative File Control log. It indicates that the file was checked out and returned four times in four years. It has no evidentiary value.

    b. ACB 056510 a CPD Investigative File Inventory listing supplementary reports, evidence inventories, crime scene reports. It has no evidentiary value.

    c. ACB 056508 is a CPD Daily Major Incident Log. This document is authored by a detective division sergeant acting as a watch coordinator and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period. There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder contained in his summary. This information is detailed in the CPD reports tendered to the defendants during pre-trial discovery.

    d. ACB 056509 is a handwritten note that appears to be the back side of a document included in the Investigative File, possibly ACB 056508. The note lists some numbers that, by themselves, lack any evidentiary value.

    e. ACB 056512 – 23 are three groups of SBC Ameritech phone records from on or about the date of the murder. A note in the CCSAO's file (SAO-NF-0050576) states: "Q: Do phone records show [defendant] made call?". This appears to show the State's Attorney's Office was aware of the existence of phone records in this case. Moreover, the phone records were obtained pursuant to a grand jury subpoena issued by the CCSAO.

f.  ACB 056532, -6546 and -6581 are CPD 'CHESS' Memos indicating that additional police reports from the Cold Case Squad were added to the case file. These memos are administrative in nature and lack any investigative information.

g.  ACB 056564 is a handwritten note that appears to be the continuation of a GPR found at ACB 056563. The note on -564 appears to be included on -563 which was found in the defense attorney's file. Furthermore, the witness' interview is included in a supplementary report found at ACB 056621 – 43. An examination of a discovery receipt from the CCSAO's file indicates that sixty-one pages of GPRs were tendered to defense counsel. (*See* SAO-NF-0050408.) CPD's Investigative File contains sixty-one pages of GPRs including ACB 056564. This indicates that defense counsel received this document during pre-trial discovery.

h.  ACB 056610 is a note that reads "Is Maurice Dead Yet?" This document appears to be the back side of ACB 056609, a GPR that was found in the defense attorney's file. This appears to be a question a detective was pondering. Marcie Mosely was shot and hospitalized but survived. This note lacks evidentiary value. Furthermore, an examination of a discovery receipt from the CCSAO's file indicates that sixty-one pages of GPRs were tendered to defense counsel. (*See* SAO-NF-0050408.) CPD's Investigative File contains sixty-one pages of GPRs including ACB 056610. This indicates that defense counsel received this document during pre-trial discovery.

i.  ACB 056616 appears to be a prank. It has no evidentiary value.

j.  ACB 056579 is a screen shot of a request to compare a weapon recovered under another R.D. number to evidence recovered in this case. The comparison was already underway and the match was documented throughout the police reports. Specifically, at ACB 056582 – 97. These reports describe the recovery of the weapon, the other R.D. number and the results of the request to compare the evidence. This screen shot does not have a title. It is clearly a request to compare a handgun to evidence collected during the homicide investigation. The CCSAO's discovery receipts list numerous documents provided to defense counsel that could be this document. For example, there is a document titled "evidence submission form" and another titled "IBIS correlation results." (*See* SAO-NF-0050403.) The discovery receipts list numerous firearm documents.

k.  ACB 056580 is a CPD Crime Scene Processing Report. It notes that palm prints were taken from the defendant and submitted to a detective assigned to the investigation. The details regarding the collection of this evidence is included in a supplementary report found at ACB 056582 – 97 and specifically at ACB 056594. A review of the CCSAO's discovery receipts indicates that three Crime Scene Processing Reports were tendered to defense counsel. (*See* SAO-NF-0050405.)

Findings: Based on a comparison of the Investigative File for the Maurice Beaverly murder with the CCSAO file, it appears that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Terrell* does not appear to provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

37.    *People v. John Fulton* (HJ-228346)

Defendant John Fulton attempted to purchase a handgun from the victim about a week before the murder. Instead of selling him a weapon, the victim, Christopher Collazo and an accomplice robbed him of approximately $15. Fulton was upset about the robbery and wanted revenge. He demanded money from the person who set up the gun purchase deal, Johnita Griffin. Griffin informed the defendant where the victim would be on the date of the murder. The defendant and two accomplices, Antonio Shaw and Anthony Mitchell, attacked Collazo on the street. Fulton hit the victim in the head with a baseball bat. The victim was duct-taped and gagged and taken to the vicinity of 5200 S. Peoria Street. Once there, the defendants placed the victim into a cardboard box and set it on fire with gasoline. After interviewing the person who set up the initial gun purchase, the police arrested the defendant and his accomplices. All three defendants made statements describing the murder of the victim.

Fulton was convicted and sentenced to an aggregate total of 31 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 033461 - 033646, that 12 of the 186 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 3 of those 12 pages were present in the prosecutor's files.

a.    ACB 033463 is a CPD Investigative File Control log. It indicates that the file was checked out and returned three times in two years. It has no evidentiary value.

b.    ACB 033498 is a memo dated January, 2010 regarding requests for files from CPD's Office of Legal Affairs. This memo has no evidentiary value.

c.    ACB 033605 is a handwritten note that references a different R.D. number. It appears to have been misfiled and has no evidentiary value.

Findings: A comparison of the Investigative File for the Christopher Collazo murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Fulton* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as

suggested by plaintiff. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

39.     *People v. Octavio Anima, et al.* (HJ-492443)

Octavio Anima and approximately ten members of the Latin Saints street gang chased the victim into an alley near 6300 S. Whipple Avenue where they kicked and beat him to death with a board. The victim was part of another group of boys that allegedly threw a bottle at one of the cars in which the Latin Saints had been travelling near 6300 S. Sacramento Avenue.

Approximately six members of the Saints' gang were charged with first degree murder. At least three of the defendants were convicted of first degree murder. Co-defendants Aguilar and Aguirre received 36 years, each, in the I.D.O.C. Anima was sentenced to 24 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 081966 - 082418, that 113 of the 453 pages were not found in the defense attorney's file. An examination of the Defense Attorney's file and the CCSAO's file reveals that all but 13 of those 113 pages were present in the files. One hundred of those pages were found in the defense attorney's file.

One hundred of those allegedly withheld 113 pages were found in the defense attorney's file.  As for the remaining 13 pages:

   a.   ACB 081968 is a CPD Investigative File Control log. It indicates that the file was checked out and returned four times in four years. It has no evidentiary value.

   b.   ACB 081991 – 92 are two memos from April 2014 regarding a F.O.I.A. request. These memos have no evidentiary value, and were created long after the 2003 criminal investigation and 2006-07 criminal prosecutions.  The representation that these 2014 documents were withheld by CPD in the 2003-2007 time frame creates significant doubt concerning the reliability of the process employed by plaintiff in identifying the allegedly withheld documents.

   c.   ACB 081993 – 96 is a CPD Daily Major Incident Log. This three-page document is authored by a detective division sergeant acting as a watch coordinator and briefly summarizes the crime. It is not an investigative document; the purpose of the log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period.  There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder and the arrest of the eight offenders contained in his summary. This underlying information is detailed in the CPD reports tendered to the defendants during pre-trial discovery.

d. ACB 082052 is handwritten note listing a car and its vehicle identification number. This car belonged to the victim and was returned to his family. The car's description and V.I.N. can be found in CPD police reports that were tendered to the defense attorneys and found in their files. The information can be found at ACB 082038 – 039, -052, and 082338, *see also* CRIM.DEF FILES - FIELDS 11279. It is likely that this information was tendered to defense counsel during pre-trial discovery. The CCSAO's file contains numerous discovery receipts listing GPRs. A discovery receipt for 1/8/04, lists 36 pages of GPRs. (SAO-NF-0040689.) A discovery receipt for 10/12 and 10/13/05, lists 71 pages of GPRs. (SAO-NF-0041628.) A discovery receipt for 1/31/06, lists 71 pages of GPRs. (SAO-NF-0042371.) A discovery receipt for 10/27/06, lists a 382-page street file containing 39 pages of GPRs. (SAO-NF-0041838.)

e. ACB 082173 - 177 is the criminal history report for an uncharged offender named Juan Soria. The CCSAO's file contains a discovery receipt that indicates a six-page document titled "CB Photo & Rap Sheet – Soria" was tendered to defense counsel on 1/08/04. *See* SAO-NF-0040689. This accounts for the alleged five pages missing from the defense file plus the CB photo as the sixth page.

f. Plaintiff contended that pages ACB 082178 – 277 were missing from the defense attorney's file. Each of the documents contained in pages numbered ACB 082178 – 277 were found in the defense attorney's file.

Findings:  A comparison of the Investigative File for the Pablo Valdez homicide with the CCSAO file and the defense attorney's file establishes that there was no investigative information withheld by the CPD relative to that case, and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents.  The defense attorney's file was extensive, and it contained at least 100 pages of documents plaintiff claims were withheld by the CPD.  The SAO file similarly contains those documents and provides multiple references to discovery tendered by the State to defense counsel.  Investigative information pertaining to the Valdez homicide from pages that were allegedly withheld by CPD can be found in other documents contained in the defense counsel's file materials. These findings provide compelling evidence of the unreliability of the methodology used by plaintiff in attempting to identify documents allegedly withheld by CPD. Even more egregiously, plaintiff has identified documents that did not even exist at the time of the criminal trials. *People v. Anima* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

41.  *People v. Anthony Johnson and Clayton Sims* (HJ-664232)

On October 1, 2003, Anthony Johnson was driving around in his car with Nolan Swain. At some point, they picked up Clayton Sims. Sims asked them to stop next to

Brandon Baity's car. Sims got out of the car to ostensibly ask the victim Baity for marijuana. Instead, Sims shot Baity several times killing him.

Sims was acquitted and Johnson was convicted in a separate trial. Johnson's case was reversed for a new trial. Johnson was convicted again and sentenced to 47 years in the I.D.O.C. His case was reversed by the appellate court.

Plaintiff contends, after an examination of the Investigative File numbered ACB 084690 - 084940, that 1 of the 251 pages were not found in the defense attorney's file. It is unclear how plaintiff determined something was missing from the criminal defense attorney's file, as no defense attorney's file has been identified or disclosed by plaintiff.

    a. ACB 084754 is a 'to-from' memo from two detectives providing information on a lead in the case to the rest of the Area's detectives. The information contained in this memo is found on at least two documents found elsewhere in the Investigative File for which there is no claim of suppression, and which presumably were tendered during pretrial discovery. Those documents are numbered ACB084809 and 084890.

Findings: *People v. Johnson/Sims* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff. As there is no criminal defense file available, it cannot be determined what was contained in or missing from that file. Moreover, the investigative information from the one page allegedly withheld by CPD was found in other documents possessed by the defense attorneys.

42. *People v. Phillip Hartsfield and Mohammed Abukhdeir* (HK-106793)

On January 4, 2004, Alejandro Martinez held a party at his house in the 5500 block of South Kolin Avenue. Among the people attending were Kristina Kasper and her friend Candy Richmond. Kristina was pregnant with the Defendant Hartsfield's child. While at the party, Kristina called him and became upset when she heard another woman's voice in the background. Kristina told other people at the party about the phone call. Instead of being sympathetic to her plight, some of the guests got into a verbal argument with her because Hartsfield was black. Around 4:00 a.m., Kristina and Candy decided to leave the party. As they did, Steven Howard continued the earlier verbal argument and allegedly struck them as they left the house. Kristina called Hartsfield and told him what happened. Around 7:00 a.m., Hartsfield and Abukhdeir drove to Martinez' house with Kristina and Candy in the car. The two defendants broke into Martinez' house. Hartsfield shot Martinez in the head as he slept in his bed.

In separate trials, Hartsfield was convicted but Abukhdeir was found not guilty. Hartsfield was sentenced to an aggregate sentence of 51 years in the I.D.O.C. Hartsfield's direct appeal and post-conviction petition were rejected by state trial and appellate courts. His petition for writ of habeas corpus is currently pending in federal court.

Plaintiff contends, after an examination of the Investigative File numbered ACB 035122 - 035264, that 68 of the 143 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 8 of those 68 pages were present in the prosecutor's files.

As an initial observation, it is unclear how plaintiff was able to determine what documents were missing from the criminal defense attorney's file, as no such file has been identified or disclosed by plaintiff. According to plaintiff's disclosure, the criminal defense attorney's file contained NO GPRs. An examination of the CCSAO's file reveals that 60 of the 68 pages allegedly withheld were present in the prosecutor's files, including numerous GPRs. Moreover, the CCSAO blue-back contains multiple entries indicating the State tendered discovery to defense counsel on a number of dates, including an entry dated 6/14/04 reflecting the State tendered a full set of "police reports, street file, & GPRs."

As to the remaining 8 pages:

a. ACB 035123 appears to be a cover sheet for a CPD file. It has no evidentiary value.

b. ACB 035124 – 25 is a CPD Investigative File inventory. It lists, on 2 pages, items such as reports, GPRs, statements, and photos. It has no evidentiary value. ACB 035264 is a pre-printed form entitled "Homicide File Review." The name of the victim and the R.D. number is handwritten onto the form. There are no other entries made on the form and it lacks any evidentiary value.

c. ACB 035249 – 51 is CPD supplementary report. This typed report is usually turned over in discovery by the CCSAO's office. According to this supplementary report, ISP had reported that a remote control recovered during the investigation lacked any latent fingerprints suitable for comparison. All of the information in the format section of the report was contained in the closing supplementary report that would have been tendered during discovery. That closing supplementary report is ACB 035128 – 49, a document plaintiff indicates was produced. Moreover, the May 13, 2004 ISP lab report itself, which was the subject of the supplementary report in question, is found at ACB 035252, which plaintiff acknowledges was produced.

d. ACB 035255 is a CPD Crime Scene Processing report. It indicates that photographs were taken of the crime scene. This report is commonly tendered to defense counsel during discovery. The actual photographs would be tendered or made available to counsel during discovery and at trial. There is no indication that the defense counsel lacked access to the photographs before or during trial. Moreover, defense counsel would have known of the existence of crime scene photographs taken by the CPD; scene photos are identified in the Cleared/Closed Supp. Report (ACB 035133).

Findings: A comparison of the Investigative File for the Alejandro Martinez homicide with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case, and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. Virtually all of the documents claimed to be withheld, including GPRs, were found in the CCSAO file. The SAO file also confirms the State on multiple occasions tendered discovery to defense counsel, including a "full set" of reports, the "street file," and GPRs. Any additional investigative information contained on pages that were allegedly withheld by CPD can be found elsewhere in the Investigative File in documents that plaintiff does not claim were suppressed. *People v. Hartsfield* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff. To the contrary, it provides another example of a disclosure that demonstrates the unreliability of the methodology used by plaintiff in attempting to identify documents allegedly withheld by CPD.

43.    *People v. Oliver Crawford, Ricardo Lee and Chad Johnson* (HK-158502)

On February 1, 2004, four people were shot near Mr. G's Food & Liquor store at 332 East 58th Street. Oliver Crawford died from his gunshot wounds. The defendants drove by the scene in a blue car and both Johnson and Crawford fired handguns at the victims. The defendants and some of the victims were members of the Gangster Disciples street gang and were engaged in an intra-gang dispute over drug sales in the immediate area. Defendants were identified by victims and people on the street. Crawford and Lee were arrested and charged shortly after the crime occurred. Johnson was not arrested until he was found in the Tennessee prison system where he was serving a sentence for narcotics and weapons offenses. He was extradited to Cook County and formally arrested and charged in October, 2006.

Ricardo Lee was convicted of Conspiracy and was sentenced to 6 years in the I.D.O.C. Oliver Crawford was convicted after a bench trial and sentenced to an aggregate total of 40 years in the I.D.O.C. His conviction was upheld on direct appeal and currently he has a post-conviction petition pending. Chad Johnson was convicted after a jury trial and sentenced to 80 years in the I.D.O.C. The appellate court reversed his conviction and ordered a new trial.

Plaintiff contends, after an examination of the Investigative File numbered ACB 037564 - 037904, that 339 of the 341 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 29 of those 339 pages were present in the prosecutor's files. As for the 30 pages:

a. ACB 037564 is the cover to the file and has no evidentiary value. ACB 037565 is a pre-printed form that contains only the defendant Crawford's name and I.R. number and the homicide number. It lacks any evidentiary value.

b. ACB 037566 is the Investigative File Control log indicating that the file was checked out and returned five times in four years. The log has no evidentiary

value. ACB 037577 – 80 is the CPD Investigative File Inventory. It lists, on 5 pages, items such as reports, GPRs, statements, and photos.

c.  ACB 037571 – 76 is a CPD Daily Major Incident Log. It was created and updated by a detective sergeant after the defendants were arrested or a victim passed away. The document lists police and civilian witnesses and describes the time, date and location of the crimes. It also contains a brief description of the crime, the defendant's arrest, and the approval of charges. The log also contains information on an unrelated case. All of this information was culled from detailed police reports tendered in discovery.

d.  ACB 37567 – 70 is a CPD Major Incident Notification Detail. It contains nearly the same information as the Daily Major Incident Log. This document was created after the third defendant was extradited and charged.

e.  ACB 037581 – 82 is an Illinois State Police lab report dated 12-8-09 for suspect Roderick Clark charged with Unlawful Use of a Weapon. The report indicates that a handgun recovered in an unlawful use of a weapon case was associated through an I.B.I.S. (Integrated Ballistics Identification System) database search to evidence collected in in this 2004 case. The lab reports that some but not all of the fired bullets and shell casings were discharged in the handgun recovered in the 2009 Unlawful Use of a Weapon case. All of this information is listed in another lab report with the same date but titled with the names of the murder defendant Crawford and the victim Dorbin that was found in the CCSAO's files. (ACB 03783- 84).

f.  ACB 037585 – 89 is a CPD case supplementary report submitted in February of 2009. The report indicates that a third defendant, Lee, was writted from the Illinois Department of Corrections and indicted on first degree murder charges in March and April of 2007. It appears that this report was generated because of "limitations" in the CLEAR Arrest Report. ACB 037589. Nearly identical information is contained in the defendant's arrest report from 2007 and found at ACB 037590 – 601 and contained in the CCSAO's files. ACB 037787 – 88 are photocopies of one of the surviving victims. It contains a handwritten note indicating that this witness identified two of the defendants. This information is contained in the police reports. Other than the note, these pictures have little evidentiary value.

g.  ACB 037843 – 44 is a CPD Original Case Incident Report for an apparently unrelated case. It lists Travon Wesley as a suspect. Wesley is listed as a possible alibi witness for defendant Lee. (At ACB 037840 which was found in the CCSAO's files.)

h.  ACB 037855 is a blank document with the handwritten name of an evidence technician. This note lacks any evidentiary value. The evidence technician's report, ACB 037888, was found in the CCSAO's files.

ACB 037878 is a CPD Event Query dated 24 February 2004. It contains an event chronology of Mitchell Hospital's calls to CPD informing them of a victim of a gunshot wound. The remaining event queries from callers at or near the scene of the crime can be found at ACB 37868 – 877.

Findings: A comparison of the Investigative File for the Chris Dorbin murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Oliver Crawford* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff. This is another case where plaintiff's claim that the CPD withheld documents was based on a failure to investigate in any meaningful respect; in fact, plaintiff didn't even produce a criminal defense attorney file for this case.

44.    *People v. Lakesha Collins* (HK-211174)

Laquita Calhoun and five other people, including Lakesha Collins, were charged with killing Alonzo Jones on February 28, 2004, after Jones was accused of molesting Calhoun's one-year-old daughter. Calhoun noticed an abnormality in her daughter's vagina while bathing the child on February 28, 2004. When defendant asked her neighbor, Jeanette Daniels, about the child's condition, Jones was present. Several of the co-defendants in this case were also present. Daniels had cared for the child that day. Calhoun asked Jones if he had harmed her child, and Jones responded he did not "want to say it in front of the others." One witness described Jones as mentally challenged. Calhoun said Jones privately admitted to her that he "did it." After Calhoun learned that Jones had assaulted her child, Calhoun, Collins, Daniels and the co-defendants attacked Jones. Jones was able to escape the residence, but Calhoun pursued him and pulled him back upstairs into the apartment. Jones was placed in the trunk of a car driven at various points by Calhoun and other co-defendants. Calhoun picked up another co-defendant, Foster, and they drove with Jones still in the vehicle's trunk. They drove to an alley, and Calhoun opened the trunk and told Jones to get out. Calhoun struck Jones about 10 times in his back and head with a stick and continued to strike Jones after he fell to the ground. Calhoun got back into the vehicle, and Foster 'accidentally' backed the car up over Jones' body as they attempted to drive away. As Foster drove away, Calhoun saw Jones crawling in the alley, and Foster drove around the block and returned to the alley, where he ran over Jones again. Jones' body was found the following morning in the alley.

Collins and Katherine Calhoun entered guilty pleas and were sentenced to 20 years each in the I.D.O.C. Laquita Calhoun was convicted and sentenced to an aggregate sentence of 37 years I.D.O.C. Jeanette Daniels was sentenced to 30 years in the I.D.O.C. Terrence Jones was sentenced to 35 years in the I.D.O.C.

Plaintiff contends that, after an examination of the Investigative File numbered ACB 38163 - 38338, 60 of the 176 pages were not found in the defense attorney's file.

An examination of the CCSAO's file reveals that all but 4 of those 60 pages were present in the prosecutor's files. As to the remaining 4 pages:

    a. ACB 038165 – 67 is the CPD Investigative File control and the Investigative File inventory.

    b. ACB 038219 is a to-from memo related to police reports requested as part of a civil case. It has no evidentiary value to the course of the investigation.

Findings: A comparison of the Investigative File for the Alonzo Jones murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Lakeisha Collins* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete. This is yet another case that demonstrates the flawed methodology of plaintiff's expert in assuming, without conducting any investigation, that the criminal defense file is complete.

45.   *People v. Delvie Turpin* (HK-406407)

Delvie Turin, a Black Disciple gang member, approached Jamie and Michael Williams, Met Boys gang members, near 51st and Calumet on June 3, 2004 around 3:00 p.m. He pulled two handguns from his pockets or waistband area and started firing at Jamie and Michael Williams. Both victims attempted to flee but Jamie fell to the ground and was shot multiple times by the defendant. Michael survived his single gunshot wound but Jamie died. At least five witnesses provided photo array identifications of the defendant that day.

Defendant was convicted and sentenced to an aggregate sentence of 60 years in the I.D.O.C. The defendant's conviction was upheld on direct appeal.

Plaintiff contends, after an examination of the Investigative File numbered ACB 040843 - 041049, that 123 of the 207 pages were not found in the defense attorney's file. Plaintiff's identification of documents allegedly suppressed by CPD is not based on the review of a criminal defense file; rather, the disclosure is based on a 2005 Memorandum that purports to provide a "summary of discovery submitted to us" in 04 CR 22032. The memo does not purport to be a comprehensive list of materials from the file. One of the criminal defense attorneys subsequently reported he no longer maintained a physical file, but he did have some computer files on an office server, which he produced. A review of these computer files confirms the defense was in possession of many of the documents Plaintiff claims were not turned over during pre-trial discovery. An examination of the CCSAO's file reveals that all but 17 of those allegedly withheld 123 pages were present in the prosecutor's files.

    a. As to the 17 pages not present in the SAO file: ACB 040883 – 85 are two entries on a CPD Daily Major Incident Log. This document is authored by a

detective division sergeant acting as a watch coordinator and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period. There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder and, later, the arrest of the offender contained in his summary. All of the underlying information is referenced elsewhere in the CPD reports tendered to the defendants during pre-trial discovery.

b. ACB 040886 – 87 is a CPD Investigative File inventory. It lists, on 2 pages, items such as reports, GPRs, statements, and photos. The log has no evidentiary value.

c. ACB 040900 is the defendant's arrest report for this case. It is part of the court's municipal file in every case and is used to make a determination of probable cause to detain during the defendant's initial appearance. A copy of the arrest report is provided to defense counsel during the initial bond hearing. It is ready available for defense counsel to review. Moreover, this document is always tendered by the CCSAO during pre-trial discovery.

    i. Defense attorney's file lists possession of an "Arrest Report" twice. The second entry lists the defendant's name in parenthesis under the report title.

d. ACB 040928 is copy of the defense attorney's A.R.D.C. card and Cook County Sheriff's Office-issued, attorney photo identification card. These cards were copied by CPD when the defense attorney came to visit the defendant. It should be noted that it is the same attorney who later represented the defendant in court. These items lack *Brady* significance.

e. ACB 040006 – 07 are screen shots of the investigative alert for the defendant. Investigative alerts are issued via law enforcement databases to tell police officers to arrest a suspect if they encounter them. All of the information is culled from CPD reports tendered in this case and primarily provides descriptive and biographical information.

f. ACB 041018 is Peter Humphries' arrest report for traffic offenses that occurred on June 4, 2004. Humphries was arrested for driving without a valid driver's license twelve hours after the shootings. To be released from custody, he claimed he had a video recording of the murder taken from his nearby residence. Later, he admitted that he lied about everything in the hopes of being released from custody on his traffic arrest. The details of Humphries' statements were tendered in discovery and can be found at ACB 040977 (supplementary report) and ACB 040982 – 83 (GPRs.)

   i. Defense attorney's file lists a witness file of information regarding "Peter Humphries."

g. ACB 041045 – 46 is the case report for the recovery and inventory of the drugs found in the car temporarily used transport the victim. ACB 041019 is a LEADS response from an inquiry for the owner of that car. The car is a red 1995 Chevrolet Monte Carlo that Keith Daniels initially used to transport the injured Michael Williams. The car was towed after the victim was carried to a nearby ambulance and the police officers recovered a bloody jacket that also contained packets of cocaine and marijuana from the car. Information detailing the transportation of the victim and the recovery of the jacket was detailed in police reports that were tendered to the defendant during pre-trial discovery. *See* ACB 040971, - 973, - 976, - 977, - 979, and – 894. A GPR (ACB 041001) dated June 3, 2004, also provides vehicle information regarding the red Monte Carlo. The CCSAO file contained this GPR.

   i. Defense attorney's file lists possession of reports tendered in discovery labelled "1995 Chevy Reports – Michael Williams."

   ii. Defense attorney's file lists a witness files titled "Keith Daniels" and "Michael Williams."

h. ACB 041033 is a blank GPR It has no evidentiary value.

i. ACB 041042 is the CPD Daily Bulletin that included the defendant's wanted notice and photograph. ACB 041043 is the Detective Division Major Incidents Citywide listing also includes the defendant's wanted notice. Neither contain any material not already included in the reports tendered to the defendant during discovery.

   i. Defense attorney's file lists possession of a report tendered in discovery labelled "CPD Daily Bulletin Notice." The defense attorney later lists a file as "CPD Daily Bulletin Notice."

j. ACB 041049 is a Homicide File Review Card. This document is not investigatory. The only information added to the card is the RD#, the victim's name, and the homicide number, all of which is found elsewhere in the Investigative File. The card has no evidentiary value.

Findings: A comparison of the Investigative File for the Jaimie Williams murder with the CCSAO file establishes there was no investigative information withheld by the CPD relative to that case, and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. Almost all of the documents claimed to be withheld, including GPRs, were found in the CCSAO file. The additional investigative information pertaining to the Williams homicide contained on pages that were allegedly withheld by CPD can be found elsewhere in the Investigative File in documents plaintiff does not claim were suppressed. *People v. Turpin* does not provide evidence to support a claim that the CPD had a practice of under-producing

investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Finally, the methodology used by plaintiff in identifying the allegedly withheld documents in this case is highly suspect. Not only are the allegations of suppression refuted in the main by the documents found in the CCSAO files, the criminal defense attorney's own computer files from his office server further repudiated plaintiff's claims that certain investigative documents were not produced to defense counsel.

46. *People v. Donnell Johnson* (HK-416661)

On June 8, 2004, the victim, W.T. Owens was shot to death by Donnell Johnson in front of numerous witnesses near 6200 S. Aberdeen Avenue. Johnson argued with Owens over damage to a 1991 Chevrolet Astro Van that Owens had driven earlier in the day. The van had been entrusted to the defendant while its owner was incarcerated. Owens was a passenger in the van at the time the defendant approached him. The argument erupted and the defendant fired once into the van at the victim. The victim got out of the van and ran. The defendant shot the victim numerous times causing his death.

The defendant entered a guilty plea and was sentenced to 32 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 041050 – 041244, that 58 of the 195 pages were not found in the defense attorney's file. One page, 041106, was found in the CCSAO's file. In addition, with respect to 44 crime scene photographs that are no longer maintained in the CCSAO file, they almost certainly were in the possession of the prosecutors and would have been made available to the defense prior to or at the time of trial, and some of them likely were used as evidence at trial and subsequently impounded by court order; in fact, the cover sheet for the photos is still in the prosecutor's file. The remaining 13 pages are discussed below:

    a. ACB 041052 is a blank Investigative File Control log. It has no evidentiary value.

    b. ACB 041099 – 100 is a CPD Investigative File inventory. It lists, on 2 pages, items such as reports, GPRs, statements, and photos.

    c. ACB 041140 and 041188 are hard written notes on a blank piece of paper. One indicates the name of an Assistant State's Attorney with his phone extension and the other indicates the time that an arrest warrant was approved. Neither note has any evidentiary value. The actual warrant is found at ACB 041185. The A.S.A.'s name and his role in the investigation is found in the police reports at ACB 041159 and at 041213 - 14. A discovery receipt in the CCSAO's file indicates that the arrest warrant and complaint were tendered to defense counsel. (*See* SAO-NF-0016260.)

    d. ACB 041237 – 44 are eight 'to – from' memos on the Owens Murder case. These memos, to and from Area One police personnel, describe what steps

had been accomplished and what steps needed to be completed in the investigation. The results of these investigative steps are included in the police reports throughout the file. An indication that these memos were provided to defense counsel is a discovery receipt found in the CCSAO's file. The receipt indicates that 36 pages of GPRs were tendered to defense counsel on November 29, 2005. (*See* SAO-NF-0016260.)

Findings: A comparison of the Investigative File for the W.T. Owens murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the City complied with its Brady obligations.

47.    *People v. Melvin Williams, Jamell Murphy and Noah McNeil a.k.a Wilon* (HK-449083)

On June 22, 2004, Melvin Williams devised a plan to rob the victim, Darryl Floyd, at Williams' residence, 7147 S Campbell Avenue. Floyd had taken $2400 from his late mother's house along with 2 handguns. Williams discussed this plan with co-defendants Murphy, McNeil and a person named Mike. Murphy was Williams's nephew. Once at Williams residence, the victim was attacked by McNeil who hit him with an unloaded shotgun. Murphy held his handgun pointed at the victim's head. Murphy lowered the aim of the gun and shot into Floyd's buttocks. Floyd jumped from the window to escape. He was taken to Christ Hospital where he died approximately 2 weeks later. Williams gave inconsistent statements and eventually claimed to know of the plan but that he did not take part. Murphy provided a video statement where he described the total involvement of the named defendants in the planning and execution of the scheme.

Melvin Williams was convicted and was sentenced to 50 years in the I.D.O.C. Jamell Murphy was sentenced to an aggregate sentence of 58 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 041754 - 042025, that 19 of the 272 pages were not found in the defense attorney's files. It is unclear how plaintiff made this contention as he didn't produce a criminal defense attorney file. An examination of a partial CCSAO file reveals that all but 11 of those 19 pages were present in the prosecutor's files, and the CCSAO clearly had possession of its own felony review folder (ACB 041883 – 88); (It should be noted that the CCSAO could only locate 1 of 2 files pertaining to this R.D. number.)

a.   ACB 041773 – 74 is a CPD Investigative File inventory. It lists on 2 pages, items such as reports, GPRs, statements, and photos. ACB 041755 is an Investigative File Control log indicating that the file was checked out and returned once. The log has no evidentiary value.

b.   ACB 041876-81 is an Internet database search for possible contact information for Sherman Evans . ACB 041882 is a driver's license search for addresses for a witness, Kathy Perry. These reports do not contain substantive information pertaining to the murder case and have negligible

evidentiary value because the witnesses are otherwise identified in the reports plaintiff admits were tendered.

c. ACB 041777 is a GPR listing the participants in a line up. This information should be contained in CPD supplementary reports. The interview of Ms. Allen and the fact a line-up was conducted was reported in a Supplementary Report, ACB 041891 – 95.

Findings: A comparison of the Investigative File for the Daryl Floyd murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Jamell Murphy et al.,* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

48. *SEE* #47

49. *People v. Verna Colbert* (HK-470751)

The police and paramedics were called to 7221 South Union Street at 4:30 a.m. on July 3, 2004, due to an unresponsive child, Varrien, at that location. Varrien's father, Alonzo Robinson, told police that defendant had brought two-year old Varrien there approximately 20 minutes earlier. After learning that defendant had gone to a nearby apartment, police arrested her there, where she was hiding in a closet and sweating profusely. She was treated at Provident Hospital and released to police custody. The following day she made statements admitting her abuse of the victim. Her statements were made to police officers and later were memorialized in a handwritten statement prepared by an A.S.A. The medical examiner found blunt force trauma, subdural hemorrhages and bruises all over the child's body and head. Many of the injuries were consistent with being attacked with a belt with a metal buckle and severe shaking.

Defendant was found guilty and eligible to be sentenced to death because the victim was under 12 years of age and the manner of death was brutal and heinous. The trial court judge sentenced the defendant to 63 years in the I.D.O.C. The appellate court upheld her conviction on direct appeal.

Plaintiff contends, after an examination of the Investigative File numbered ACB 062432 - 062666, that 22 of the 235 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 13 of those 22 pages were present in the prosecutor's files. As for the 13 pages:

a. ACB 062436 – 38 and – 446 are memos and other communications describing efforts to find the file in response to civil law suit subpoenas, one of which was in 2014. This information lacks evidentiary value and didn't exist at the time of the investigation.

b. ACB 062434 is a blank CPD Inventory File Control log. It has no evidentiary value. ACB 062639 is a blank homicide file review form. It has no evidentiary value.

c. ACB 062441 – 43 is a CPD Investigative File inventory. It lists, on 3 pages, items such as reports, GPRs, statements, and photos.

d. ACB 062439 – 40 is a CPD Daily Major Incident Log. It was created by a detective sergeant as the case was being investigated and then updated after the defendant was arrested and charged. The document lists police and civilian witnesses and describes the time, date and location of the crime. All of this information was culled from police reports tendered in discovery.

e. ACB 062563 – 64 is a criminal history report for a Stanley McDade, a witness. It lists 2 misdemeanors without convictions and ends in 1988 approximately 16 years before this investigation. It is doubtful under the *Montgomery* case, that this information could be used to impeach the witness' credibility at trial. Nevertheless, the most current version of the witness' criminal history report would have been tendered prior to trial by the prosecutors. It should also be noted that discovery receipts in the CCSAO's file indicates that the witness' hand written statement and grand jury transcripts were provided to defense counsel on 9/23/04 along with police reports. (*See* SAO-NF-0074235.)

Findings: A comparison of the Investigative File for the Varrien Colbert murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Verna Colbert* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete. This is another case that demonstrates the flawed methodology of plaintiff's expert in assuming, without conducting any investigation, that the criminal defense file is complete and relying on administrative documents such as civil subpoenas that are not relevant to the criminal discovery process and in some cases didn't exist at the time of the criminal prosecution.

50. *People v. Tharine Partee* (HK-593970)

On August 31, 2004, defendant shot and killed 15-year-old Joshua Dent and 16-year-old

Antonio Washington. Additionally, he shot and gravely injured 20-year-old Jamaal Durham.

This incident began when Shontell Littlejohn had a brief altercation with defendant, prompting her to call her brother, Charles Littlejohn, and his friend, Ivan Day, and apparently told them that defendant was bothering her about some derogatory statements that she had allegedly made. Following those telephone conversations,

Littlejohn contacted his friends, including Washington and Dent, and they went to confront defendant. Dent and Washington engaged in a physical altercation with defendant. Less than an hour later, the defendant approached Littlejohn's house and asked to talk to him. At this point, another fight occurred. The defendant claimed that he took Washington's gun from him and while defending himself from others who also possessed handguns, fired the gun in self-defense. Other witnesses claimed the defendant pulled his own gun from his back pocket and started firing at the victims. The defendant shot Dent and Washington and then Durham as he ran up nearby stairs. Only Durham survived.

After a bench trial, the defendant was found guilty of second degree murder and attempted first degree murder. The trial court sentenced defendant to an aggregate sentence of 80 years in the I.D.O.C. The defendant's conviction was upheld on appeal but his sentence was reduced to 55 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 063855 - 064131, that 4 of the 277 pages were not found in the defense attorney's file.

a. ACB 063941 – 42 is a CPD Daily Major Incident Log. It was created by a detective sergeant after the defendant was arrested and charged. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during each 24-hour period. The document lists police and civilian witnesses and describes the time, date and location of the crimes. It also contains a brief description of the crime, the defendant's arrest, his identification in 6 line ups and the approval of charges. All of this information was culled from police reports tendered in discovery.

b. ACB 063944 – 45 is a CPD Investigative File inventory. It lists, on 2 pages, items such as reports, GPRs, statements, and photos. All of the items were tendered in discovery. The log has no evidentiary value.

Findings: A comparison of the Investigative File for the Antonio Washington and Joshua Dent murders with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Tharine Partee* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

51. *People v. Devon Terrell* (HK-639684)

On September 22, 2004, the defendant and Michael Walton approached four men playing dice on the street at 6845 S. Rockwell Avenue. They asked to join the game but at the same time, the defendant pointed a gun at Cordell Holmes' head and demanded money. Holmes pushed the gun away and everyone ran. The defendant opened fire with his handgun striking Bryce Bell in the head and the body killing him.

Holmes was struck by gunfire too, but survived. The defendant was identified by three eyewitnesses in photo arrays and in physical lineups. During interviews with police officers he initially denied any involvement in the shootings. When told that he had been identified, he claimed that he took the gun from one of the victims while he was being attacked and shot once in self-defense. The defendant eventually provided a video-taped statement to an Assistant State's Attorney. He stated in the video that he and his co-defendants each brought guns to the dice game and both fired their guns at the victims.

Defendant was convicted on this case and sentenced to 55 years in the I.D.O.C. His conviction was upheld on direct appeal. Defendant was also convicted in a separate murder case and received a Natural Life sentence.

Plaintiff contends, after an examination of the Investigative File numbered ACB 064839 - 065188, that 46 of the 350 pages were not found in the defense attorney's file. An examination of the defense attorney's file, reveals that ACB 064935 and ACB 064952 – 58 were contained in their file. An examination of the CCSAO's file reveals that all but 34 of those 46 pages were present in the prosecutor's files.

a. ACB 06484 is an Investigative File Control log indicating that the file was checked out eight times in a six-year time period. The log has no evidentiary value. ACB 064980 – 82 is a CPD Investigative File inventory. It lists, on three pages, items such as reports, GPRs, statements, and photos. The log has no evidentiary value.

b. ACB 064932 – 37 are investigative alerts with investigative complaints and statuses for Michael Walton, Maurice Beaverly and Bryce Bell. Investigative alerts are issued via law enforcement databases to tell police officers to arrest a suspect if they encounter him. All of the information is culled from CPD reports tendered in this case and primarily provides descriptive and biographical information. ACB 064935 is Walton's alert and was found in the defense counsel's file. Moreover, it is nearly identical to ACB 064932.

c. ACB 064941 is a CPD Major Incident Notification Detail document. It was created after the final defendant was arrested and charged. It is a summary of the defendants, the victim and the charges with the recent charges placed against the final defendant. This document has no evidentiary value.

d. ACB 064944 - 48 is a civil complaint filed against the City of Chicago and members of the police department. It has no evidentiary value and was created after defendant's conviction.

e. ACB 064959 – 62 is defendant Walter's juvenile criminal history report. This document is tendered during discovery by the prosecutors.

f. ACB 064983 – 84 are requests for information from the Office of Legal Affairs after the civil lawsuit was filed. These requests have no evidentiary value and were created after defendant's conviction.

g. ACB 064985 – 87 is the Original Case Incident Report. This document is tendered during discovery by the prosecutors. It is essentially an electronic version of the General Offense Case Report found at ACB 065186. If anything, it lacks the narrative detail provided in the Case Report.

h. ACB 065080 – 81; 065086 – 87 and 065093 – 94 are LEADS responses for Terrell and Walton. The actual criminal arrest histories were tendered in discovery.

i. ACB 065082 – 85 is a CPD CLEAR database summary of the inventory sheets associated with this case. The actual items that were collected and inventoried are discussed in the police reports. This document is essentially a summary listing of inventory sheet numbers. The actual inventories or descriptions of the inventoried items can be found at ACB 065178 – 85, 065169 – 71, 065111, 065035, and 065016.

Findings: A comparison of the Investigative File for the Bryce Bell murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Terrell* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete. Identification of the civil pleadings created long after the conviction as documents "withheld" by the CPD is disingenuous and demonstrates plaintiff's flawed methodology regarding these disclosures.

52.    *People v. Eddie B Fenton* (HM-264904)

On April 1, 2006 at 1:00 a.m., the defendant's friend got into a fistfight outside the Ford City Movie Theaters. The victim, a basketball star at Robeson High School, and another friend approached the fight because one of their friends was involved. As they approached the fighters, the defendant pulled out his .357 caliber handgun and shot the victim in the head. The case was unsolved for a few years until officers developed information from an undercover narcotics investigation and America's Most Wanted television program. The defendant was arrested in 2010. Witnesses from the shooting identified the defendant. Other witnesses described Fenton asking for the gun prior to the shooting and disposing of it afterwards.

The defendant was convicted and sentenced to an aggregate sentence of 110 years in the I.D.O.C. While this case was pending trial, the defendant's D.N.A. was matched to a separate homicide from 2006 that occurred at a back-to-school party at Fenton's sister's house. He was eventually convicted of 2nd Degree Murder in that case and was sentenced to 30 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 078149 - 078825, that 17 of the 677 pages were not found in the defense attorney's file.

74

An examination of the CCSAO's file reveals that all but 4 of those 17 pages were present in the prosecutor's files.

a. ACB 078184 – 86 is a report of examination from the Chicago Regional Computer Forensic Laboratory. The lab was asked to take a security video, compress it and place it on a DVD-R for easier viewing after de-multiplexing the video. The report indicates that after accomplishing what was requested they made extra copies of the final DVD-R. The extra copies would be made available during pre-trial discovery. The inventory of the videos was noted in a CPD supplementary report that was found in the CCSAO's files. ACB 078662.

b. ACB 078200 is an evidence submission form issued by the Illinois State Police for use by the Chicago Police Report. The results of the requested analysis are included in the actual reports issued by the I.S.P. Lab. Those documents, ACB 078187 – 99 were found in the CCSAO's files.

Findings: A comparison of the Investigative File for the Willie Williams murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v. Eddie Fenton* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff.

54. *People v. Mervyn Wright* (J-418229)

On September 29, 1987 at 12:30 a.m. at the Roberts' Motel located at 6633 S. King Drive, the defendant shot and killed off-duty Chicago Police Officer Gregory Edwards. Wright travelled to the hotel to purchase narcotics from Irving Brown. Since he did not have any money, he decided to burglarize rooms at the hotel to get money to purchase the drugs. As the defendant scouted the rooms, he got into a verbal argument with the victim. As the victim stood inside his partially opened hotel room door, the defendant pushed the door open and entered. According to the defendant's court-reported statement, the victim shot him in the leg. The defendant struggled with the victim, took out his own gun and shot the victim numerous times causing his death. The defendant ran from the hotel, gave his gun to Irving Brown and ran to a nearby garage. Eventually he was arrested and transported to a hospital. Irving Brown corroborated parts of the defendant's statement and helped the officers recover the defendant's gun.

Defendant was convicted after a jury trial and sentenced to 80 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 046881 - 047084, that 56 of the 204 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 13 of those 56 pages were present in the prosecutor's files. As for those 13 pages:

75

a. ACB 046883 is the third and last page of a CPD Investigative File Inventory. The other two pages were found in the CCSAO's file.

b. ACB 046887 – 91 are five Polaroid photos that appear to be from the crime scene. If these photos were entered into evidence at trial, they would be impounded with the Clerk of the Circuit Court after a conviction. The CPD forensic examiners would also have taken photos of the crime scene at or about the same time these photos were taken. Those photos would have been copied to the defense attorneys or made available for viewing prior to trial.

c. ACB 046969 is the reverse side of a GPR (ACB 046968) that was found in the CCSAO's file. The notes cover about half of the page. The two pages together consistent of notes on an interview with Angela Williams. The substance of both pages was found in supplementary reports that were found in the CCSAO file and the defense attorney's file. That supplementary report is numbered ACB 047017 - 28.

d. ACB 046926 was found in the CCSAO's files, but it lacked a handwritten note that is present in this copy. The handwritten notes indicated "no suitable latent prints found." The criminal defense file contains a report that states no suitable prints were found on a revolver that was submitted for latent fingerprint testing.

e. ACB 046935 is a blank piece of paper with a small, black square. It has no evidentiary value. ACB 046936 is a blank piece of paper with the defendant's name printed on a small, shaded square. It is possibly a 'post–it' note. It has no evidentiary value.

f. ACB 047013 is a blank piece of paper with the number 418229 written on it. That is the numbers of the R.D. number, J-418229. It has no evidentiary value.

g. ACB 047058 -59 are criminal histories for Ervin Brown and the defendant. Both criminal histories would have been provided during pre-trial discovery. Moreover, Brown received a weapon from the defendant after the shooting. Brown's credibility would have been attacked because of his prior felony convictions. Prior to testifying an updated criminal history report would have been provided to defense counsel.

Findings: A comparison of the Investigative File for the Gregory Edwards murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. People v. Mervyn Wright does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by

plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

55.     *People v. Fredy Roberson* (M-566742)

On December 7, 1989 at 11:00 p.m. at 1621 W. 14th Place, the defendant got into an argument with the victim, possibly related to the victim's girlfriend, and stabbed him twice in the back causing his death. Roberson argued with the victim, Edgar "Chris" Watson, throughout the day. They starting arguing again for about 15 minutes before the stabbing. Roberson told the police and an Assistant State's Attorney that when he grew tired of the argument, he retrieved a knife from the other room. He knew the victim had a knife and thought he was reaching for it. While facing the victim, he reached over his shoulder and stabbed him twice in the back. He did not see the victim holding his knife at this point and Roberson believes that he cut his own hand during the struggle. He left the apartment, threw the knife in a field and called 911. His brother, Timothy, saw the first stab wound and corroborated the defendant's statement that the victim did not have his own knife in his hands. Police officers recovered the defendant's knife from the field.

The defendant entered a guilty plea and was sentenced to 20 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 047626 - 047677, that 8 of the 52 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 3 of those 8 pages were present in the prosecutor's files.

a.  ACB 047627 is a CPD Investigative File Summary. It lists 20 items such as reports, GPRs, and statements. The log has no evidentiary value. ACB 0476677 is a copy of CPD envelope with no other information other the police department's mailing address. This envelope has no evidentiary value.

b.  ACB 047673 is a CPD Request for Analysis / Receipt for Exhibit with results handwritten on the form. The form is commonly tendered to defense counsel during pre-trial discovery. This form indicates that a knife recovered in the residence during the investigation lacked any fingerprints. It should also be noted that the defendant indicated in his statement that he threw the knife that he used to stab the victim into a nearby field. It is also possible that this document was provided to defense counsel on two occasions during pre-trial discovery. The CCSAO's blue back indicates, on 2-28-91, that the defense attorney had lost the "CB & pol. Rpts." The note further indicates that the prosecutors retendered a full set of reports. (*See* SAO-NF-0005223.) ACB 047673 is a C.P.D. Request for Analysis / Receipt for Exhibit with results handwritten on the form. The form is commonly tendered to defense counsel during pre-trial discovery. This form indicates that a knife recovered in the residence during the investigation lacked any fingerprints. The Laboratory Report in the CRIM.DEF FILES - FIELDS 45785-86 shows the results of the

requested analysis. It should also be noted that the defendant indicated in his statement that he threw the knife that he used to stab the victim into a nearby field. It is also possible that this document was provided to defense counsel on two occasions during pre-trial discovery. The CCSAO's blue back indicates, on 2-28-91, that the defense attorney had lost the "CB & pol. Rpts." The note further indicates that the prosecutors retendered a full set of reports. (*See* SAO-NF-0005223.)

Findings: A comparison of the Investigative File for the Edgar Watson murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Fredy Roberson* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

56.    *People v. Steve Jones* (M-568343)

On December 9, 1989, Steve Jones, a Vice Lords street gang member and a co-defendant, Perry Lewis, while armed with a shotgun and a handgun respectively went to the Night Owl motorcycle club at 643 N. Kedzie Avenue around 3:00 a.m. The gang and the club members were not friendly and on this evening many Vice Lords were on the street near the club. When the door was opened to let a patron into the club, Jones and Perry opened fire. The 40-year-old victim, John Redmond, was stuck by the shots and died. Witnesses observed both defendants near the club prior to the shooting and Jones was also identified running away from the scene with the shotgun. Defendant provided an alibi. The alleged alibi witness did not confirm the alibi and provided inculpatory information instead. The defendant was identified in a lineup.

After a jury trial, the defendant was convicted and sentenced to an aggregate total of 36 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 048058 - 048142, that 13 of the 85 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that 2 of those 13 pages were present in the prosecutor's files. As for the remaining 11 pages:

a.    ACB 048137 – 42 is the front and back of two Polaroid photographs of the co-defendants Jones and Perry. ACB 048137 – 38 is the front and back of the Jones's photograph with his name, nickname and R.D. number handwritten on the reverse side. ACB 04839 – 42 is a copy of the front and back of Lewis Perry's photograph with his name handwritten on the reverse side. The front and back of Perry's photo were copied an extra time. The detectives would use these photographs during their investigation, possibly with photo arrays, and they may have been used at trial. The CCSAO's blueback indicates that Motions to Suppress Identifications were held and denied by the trial court on 10/9/90. (*See* SAO-NF-0013502.) The notation on the blueback indicates that

a photo spread and two line-up photos were entered into evidence. It is routine to impound items entered into evidence with the Clerk of the Circuit Court after trial. If some of the photos that are now claimed to be missing from the defense attorney's file were used during this motion and possibly later at trial, those items are likely impounded with the trial court. It would also indicate that the defense attorney had access to those photos prior to the motion and the trial.

b. ACB 048135 is CPD criminal history report for the victim. It lists only a plea to supervision on a U.U.W. misdemeanor from 1974. Although this criminal history has very little evidentiary value, it is provided to defense counsel during pre-trial discovery.

c. ACB 048130 – 33 are reports describing two separate attempts to intimidate witnesses associated with this case. 048130 -31 details the recovery of a letter from defendant Perry telling a friend to tell witnesses not to come to court. The second page, -31, is blank. 048132 – 3, is a general offense case report detailing another attempt to intimidate witnesses on the murder case. The victim on that report is Tracey O'Neal. The second page, -33, is blank. At trial, the prosecutor began to question Tracy O'Neal regarding an incident of a threat against him and the defense attorney objected, stating evidence of any threat had not been disclosed. (March 21, 1991 Trans. (90 CR 1287) 24-28). During the sidebar, the prosecutor said he needed to check the papers and thereafter confirmed that he had not tendered the evidence. Id. The judge denied the defendant's motion mistrial, but struck the prosecutor's initial questioning on the topic and the State was barred from questioning the witness further about the threats. *Id.*

d. ACB 048059 – 60 is an investigate file inventory. These two pages were found in the CCSAO's file. It should be noted that the second page of the inventory in the CCSAO's file lacked the final 3 entries: the victim's rap sheet and the two intimidation reports previously discussed.

Findings: A comparison of the Investigative File for the John Redmond murder with the CCSAO file establishes that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Steven Jones* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Specifically as to the evidence of threats and intimidation, based on the discussion at sidebar during the trial, the prosecutor apparently had documents and/or information relating to the threats in his possession, indicating it had been disclosed by CPD.

57. *People v. John Avery* (M-569727)

On December 9, 1989 at approximately 7:00 p.m. near the intersection of Western and Madison, the defendant argued with a friend, Pevario Guiton, over $10 in

beer money and threw him out of his car. While this was taking place, Avery hit Guiton with his gun causing it to discharge. This bullet struck the victim, Earnest Williams, in the head. The defendant immediately drove to the 12th District police station and told the officers what occurred. The officers recovered the gun and called for an ambulance. Williams was pronounced dead at Cook County Hospital. The defendant's daughter, who was also in the car, corroborated his version of events. Guiton corroborated the defendant's version, including being struck with the gun, but did not know the weapon had discharged a bullet.

After a bench trial, at which the defendant testified, the court convicted him of Involuntary Manslaughter and sentenced him to probation. He may have passed away while on probation.

Plaintiff contends, after an examination of the Investigative File numbered ACB 048143 - 048180, that 7 of the 38 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 3 of those 7 pages were present in the prosecutor's files. As for those 3 pages:

a. ACB 048144 is a CPD Investigative File Summary. It lists 16 items such as reports, inventories and lab requests. The log has no evidentiary value.

b. ACB 048179 is a criminal history report for the victim. It lists only a plea to conditional discharge on a U.U.W. misdemeanor from 1976. Although this criminal history has very little evidentiary value, it is provided to defense counsel during pre-trial discovery.

c. ACB 048180 is a copy of a blank CPD envelope. It has no evidentiary value.

Findings: A comparison of the Investigative File for the Earnest Williams murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. People v. John Avery does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

58. *People v. David Duarte* (M-580592)

On December 17, 1989, at approximately 1:00 a.m., the victim, Oswaldo Carmona was shot and killed at 2558 S. Central Park Avenue in a drive-by shooting. David 'Diablo' Duarte was a member of the 2-6 street gang. With fellow 2-6 members, Carillo and Gutierrez, he borrowed a car to drive his pregnant girlfriend, Patty Orozco, home. They also decided to shoot rival gang members, either the Kings or the Party Gents. Armed with a handgun, Duarte drove to 26th and Central Park Avenue where they encountered the victim. They called him over to their car. At this point Gutierrez handed the gun to Duarte and told him to shoot the victim. Duarte fired twice, killing the Carmona. Duarte admitted his actions to the police as did his girlfriend. Duarte also provided a court-reported statement.

The defendant was acquitted after a jury trial in May, 1992.

Plaintiff contends, after an examination of the Investigative File numbered ACB 48181 - 48327, that 14 of the 147 pages were not found in the defense attorney's file. The CCSAO was unable to locate its complete file (the file it did locate is missing GPRs even though the blueback states GPRs and the "street file" were received and tendered in discovery, SAO-NF-0054779-80). As for the 14 pages in question:

a. ACB 048204 is hand drawn map of Kolin Avenue between 31st Street and 26th Street. It also has the names 'Roger', 'Elmer' and 'Richie' written on either side of Kolin. It appears to be the back side of Julio Salazar's GPRs; ACB 048201 – 03. In the CPD supplementary report found at ACB 048265 - 69, Salazar's interview is included again with the information that Salazar and the detectives drove to S. Kolin Street and observed Roger and Elmer on the street. Salazar also pointed out Richie's house. This supplementary report details the information written onto the hand drawn map and this document was likely produced per the blue back

b. ACB 048216 is a handwritten note with the names and identifying information for the victim's mother and sister. All of this information is in the police reports at ACB 048248 – 53 and this document was likely produced per the blue back.

c. ACB 048316 is a blank CPD envelope. It has no evidentiary value.

d. ACB 048321 is a CB Record Summary for a person named Terry Harvey. No one by that name is associated with this case. Handwritten on the document is a different R.D. number then this case. As such, this document appears to be misfiled.

e. ACB 04817 – 20 appears to be the front and back of two Polaroid photos. ACB 048317 is the front of Jennifer V. Figueroa's photo. ACB 048318 has her name printed on what appears to be the back of the photo. ACB 04819 is a Polaroid photograph of Johnny Mares. ACB 048120 has his name, alias and the case R.D. number printed on the back of the photo. Figueroa and Mares' interviews are documented in ACB 048257 – 60. These photos were, in all likelihood, taken at the time of the interviews and were preserved for further use in the investigation and possibly at trial.

f. ACB 048322 – 27 are attempts by the detectives to locate the possible owner of the car used in the murder. The Soundex reports are for people witnesses claimed provided the car (Duran.) Notes refer to a Buick, a Granada and the possible identities and locations of the car owners. One note documents efforts to locate a witness' brother, Ignacio Orozco. The manner in which these names came to the detectives' attention is detailed in various supplementary reports that were made available to defense counsel during pre-trial discovery.

Findings: A comparison of the Investigative File for the Carmona Oswaldo murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. David Duarte* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. The blue back establishes that GPRs and the "street file" were produced, but the CCSAO file is incomplete because it does not include any GPRs.

59. *People v. Tony Allen* (M-587998)

On December 22, 1989 at approximately 10:00 p.m., the victim Edwin Cohen, was beaten to death with baseball bats and other blunt instruments by two groups of defendants in a C.H.A. Housing authority parking lot at 130 N. Wood Street. Allen and codefendant Daryl Milton were told that the victim was harassing young men from the housing authority. Armed with a baseball bat, they caught up with the victim and both defendants beat him with the bat, their feet and fists. They returned to their building. Another group of four or more defendants also attacked the victim with a baseball bat after Allen's attack. The victim died as a result of the blunt force trauma. In his statement to the police, the defendant maintained that the victim was alive after his attack and only died as a result of the second group's attack.

After a bench trial, the court found the defendant guilty of attempted murder and sentenced him to 14 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 048328 - 048423, that 12 of the 96 pages were not found in the defense attorney's file. Three of those twelve pages were found in the CCSAO's files.

a. ACB 048329 is a CPD Investigative File Summary. It lists items such as reports, inventories and lab requests. The log has no evidentiary value.

b. ACB 048345 is a general progress report that lists information regarding the description of possible offenders. This information is included in a supplementary report found at ACB 048346 – 7.

c. ACB 048364 is the second page of a general progress report that includes information from two sisters. The first page is found at ACB 048363 and the content of both GPRs is included in a supplementary report found at ACB 048366 – 68.

d. ACB 048386 is a handwritten note that lists an address for the mother of a person named as Andrew. In this investigation, a witness with the same first name was interviewed and provided information to the police. The report detailing his interview can be found at ACB 048397 – 402 and at -381 and -95 to -96.

e.  ACB 048407 is a subpoena issued by the CCSAO for records from the CPD It has no evidentiary value. ACB 048419 – 20 is a photocopy of the front and back of the victim's State of Illinois Identification Card. It has no evidentiary value. Also, the identifying information on the identification card was included in the police reports.

f.  ACB 048421 listed a new address for a witness on the case. It has no evidentiary value. During pre-trial discovery, the CCSAO is obligated to provide address information to defense counsel.

g.  ACB 048422 is a photocopy of a note that a CPD officer found under his windshield. He marked the note with his name and assignment before turning it over to detectives involved in the investigation of this case. The note and its recovery is discussed in detail at ACB 048367 – 68.

Findings: A comparison of the Investigative File for the Edwin Cohen murder with the CCSAO file establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its Brady obligations and with its own special orders regarding the preservation of documents. *People v. Tony Allen* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

60.  *People v. Ricky Icenberg* (M-590700)

On December 24, 1989, Icenberg went to an apartment building at 1105 S. Lytle Street in an attempt to get some of his belongings from a friend's apartment. JoAnn Pettis accompanied him. They were in the lobby near the 1st floor landing at around 4:30 p.m., when they met a mutual friend, Tracy Adams. While they were talking to her, the victim, Daphne Simpson entered the building and immediately argued with the defendant over some "bad stuff." Daphne was driven to the building by a friend. She went to the building to purchase heroin. As the argument continued, the defendant pulled out a handgun and said he didn't need 'any more of this.' He then shot the victim once killing her.

After a jury trial, the defendant was convicted and sentenced to 60 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 047678 - 047772, that 12 of the 95 pages were not found in the defense attorney's file. An examination of the CCSAO's file reveals that all but 9 of those 12 pages were present in the prosecutor's files.

a.  ACB 047694 is handwritten document of two names with contact information. This information is found in the CPD supplementary reports that were in the CCSAO's files at ACB 047711 – 15. ACB 047751 is a note with a known alias name for the defendant. That information is also included in ACB 047711 – 15. It also lists another address for the defendant. The CCSAO's blueback

indicates that, among other reports, "GPR's" were tendered to defense counsel on 7-13-90. (*See* SAO-NF-0014381.) These documents may have been provided to defense counsel at that time.

b. ACB 047696 is a piece of paper with a handwritten entry of "Abla Mngr Office." This note has no evidentiary value. The defendant was associated with an address in the ABLA projects that is listed at ACB 047711 – 15.

c. ACB 04767 – 72 are three Polaroid photos with names written on the reverse side. There is one photo of the victim and two of witnesses. These photos may have been used during the investigation and potentially at trial. If they were used at trial, they could have been impounded with the Clerk of the Circuit Court. Interviews of the two witnesses are included in s supplementary report at ACB 047699 – 704. This report was found in the CCSAO's files.

<u>Evaluation of Cases In Which Files Were Not Located</u>

9.    *People v. Lindsey Cannon* (F-380662)

On October 6, 1984, the defendant and other members of the Gangster Disciples gang tried to rob the victim and another man, who they believed to be Vice Lords gang members, near 2145 W. Lake St. After the initial struggle with the two victims, the defendant shot and killed one of the two men as he tried to run away. He then concealed his shotgun in a friend's couch where it was eventually recovered. The defendant was identified by the surviving victim in a lineup and by co-defendants' statements. Upon arrest he provided a court reported statement to the police and an A.S.A. admitting his involvement in the fatal shooting.

The defendant was convicted after a jury trial and sentenced to life imprisonment. According to the I.D.O.C. website the defendant has two other murder convictions from two separate 1984 cases. He was sentenced to 40 years and life imprisonment on those cases.

Plaintiff contends, after an examination of the Investigative File numbered ACB 007074 - 007196, that 37 of the 123 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. ACB 007075 – 76 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. It has no evidentiary value. ACB 007196 is a CPD Investigative File Control log than shows that the file was checked out and returned once. It has no evidentiary value.

b. ACB 007077 is a CPD Case Assignment Slip. It records the recovery of a fired pellet from the victim and turned over to the lab. The recovery of the pellet from the morgue is detailed in ACB 007168 -70, which plaintiff admits was produced. The comparison of the pellet to a test fired bullet was recorded in lab report found at ACB 007088, which plaintiff also admits was produced.

c. ACB 007087 is the blank, back of a CPD Property Inventory Sheet; probably ACB 007086. This blank form has no evidentiary value. ACB 007158 is a blank CPD form. It has no evidentiary value.

d. ACB 007123 is a CPD Receipt for Exhibits issued in this case when the CPD lab received a sawed-off rifle from detectives assigned to the case. Other than for possibly explaining the chain of custody this receipt has no evidentiary value. Furthermore, the recovery of the weapon is detailed in a supplementary report admittedly produced and found at ACB 007095 – 102 and the inventory sheet which was admittedly produced is at ACB 007119. Moreover, the test firing of this weapon by the lab is detailed at ACB 007088, which plaintiff also admits was produced.

e. ACB 007137 and 007172 – 73 are co-defendant Willie Drew's arrest report and criminal history report. These documents would have been provided by the CCSAO during pre-trial discovery. Arrest reports are also found in every court file and are, therefore, available for inspection and copying by defense counsel.

f. ACB 007142 and -43 to -44 are co-defendant Andre Johnson's criminal history report and a two-page case report for a prior gun case. The criminal history report would have been tendered during pre-trial discovery by the CCSAO. The gun report appears to be unconnected with this case.

g. ACB 007141 is an arrest report for defendant Cannon for disorderly conduct. It has no evidentiary value and may have only been used to identify the defendant during the investigation.

h. ACB 007181 is blank, CPD envelope. It has no evidentiary value.

i. ACB 007183 – 95 are numerous front and back copies of photos of co-defendants Drew and Johnson. There are two front and back copies for Drew. There are two front and back copies for Johnson from a juvenile arrest and five arrest photos from a recent arrest. A copy of one of the photographs, ACB 007192 – 95, was used in a photo array. That photograph and the array are documented and inventoried at ACB 007093 -94 and ACB 007139 – 40.

j. ACB 007182 appears to be a photograph of a case or a wallet. A wallet was recovered from the crime scene within a day. That recovery was recorded at ACB 007080 - 82.

k. ACB 00007179 – 80 are GPRs. The first page lists the victim's family members who were present at the hospital. It has no evidentiary value, but the information contained therein was in the criminal defense file. (CRIM.DEF FILES – FIELDS 039347. The second page list contact information for a witness who "didn't hear or see anything." The information from this witness is recorded in a supplementary report found at ACB 007163 – 66, which was also admittedly in the criminal defense file.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Bobby Kidd murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Cannon* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. The important investigative information is contained in the criminal defense attorney's file as it exists today. With respect to the few pages that cannot now be found in that file, the criminal histories were routinely obtained and produced by the prosecutors, which suggests that the defense attorney file is now incomplete. As for the two GPRs that are not now in the criminal defense attorney's file, the information on those two GPRs is contained in reports admittedly produced to the criminal defense attorney. Accordingly, it can be established for this case, even without the CCSAO file, that the CPD complied with its discovery obligations.

10.    *People v. Earl Stademeyer* (G-011889)

On January 9, 1985, at the apartment of a friend and after an evening of drinking, the defendant and the victim were involved in a physical fight over $7 owed to the defendant. During this fight, the defendant struck the victim with a vodka bottle, a baseball bat, a hammer and a file. The victim died from blunt force trauma and multiple stab wounds. A mutual friend informed the police of the fight and the defendant gave a statement describing the struggle.

The defendant appears to have been convicted on a plea to a lesser charge, most likely voluntary manslaughter, and was sentenced to six years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 008910 - 008984, that 13 of the 75 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

   a. ACB 008911 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. It is the second of two pages. The first, ACB 008912 was found in the defense attorney's file. It has no evidentiary value.

   b. ACB 008913 is a CPD Investigative File Control log than shows that the file was checked out and returned once. It has no evidentiary value.

   c. ACB 008941 – 42 is a CPD Crime Laboratory Division Report. The two-page report is dated August 8, 1984, approximately seven months after the defendant was charged. This blood serology report is uniformly tendered by the CCSAO during discovery irrespective of the limited evidentiary value that this particular report contains. The report, nevertheless, would have been tendered prior to the defendant's conviction by trial or plea on a lesser charge on October 22, 1985 and receiving a sentence of six years in the I.D.O.C. It is

also possible this Crime Lab report was created at the request of the prosecutors.

d. ACB 008962 is a handwritten note containing the names, star numbers and assignments of two police officers. That information is included in a supplementary report at ACB 008954 – 67 plaintiff admits was tendered. (Specifically at ACB 008958.)

e. ACB 008971 – 78 are eight CPD Property Inventory sheets listing evidence recovered during the investigation. These documents are usually tendered by the CCSAO during pre-trial discovery. They are also commonly found in the court file available for examination by defense counsel. The information contained in these inventory sheets is found in a CPD supplementary report at ACB 008957, which plaintiff admits was produced.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the William Shurn murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Stademeyer* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

11. *People v. Guy Johns* (G-014815)

On 1/7/85, the defendant joined two friends when they visited Sharon Mukes' apartment in the 3500 block of South State Street. Mukes' boyfriend, Gregory Tucker, arrived home and she asked the defendant and the two friends to leave. As they were leaving the apartment, the defendant got into an argument with Tucker. The defendant pulled a knife and started slashing and cutting Tucker. When Mukes came to his aid, the defendant severely slashed her, too. She fled to the bathroom and closed the door. The defendant, still armed with his knife, followed Tucker into still another room where Tucker fell out the window and to the ground seven floors below. The victim died from the injuries sustained from the knife and the fall.

The defendant received a 30-year sentence on July 28, 1987 after entering a guilty plea on May 19, 1987. His attempt to withdraw his plea was rejected by the trial and appellate courts and in a federal habeas corpus proceeding.

Plaintiff contends, after an examination of the Investigative File numbered ACB 008985 - 009112, that 12 of the 128 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. ACB 008986 – 87 is a CPD Investigative File Inventory. ACB 008987 was found in the criminal defense attorney's file at CRIM.DEF FILES – FIELDS 047678. ACB 008990 is a CPD Investigative File Control log. The inventory and the control log lack evidentiary value.

b.  ACB 008992, 009067, and 009091 are handwritten notes listing a police unit, a detective's name and unit, and another detective's name and assignment, respectively. These notes lack any substantive or evidentiary value.

c.  ACB 009092 – 93 is a medical examiner's body chart. It is misfiled. It belongs to the victim in RD G-011889.

d.  ACB 008989 is a copy of a Polaroid photograph of a window. Crime scene photographs would have been obtained by the prosecution and made available to the defense.

e.  ACB 009007 – 09 is a CPD Crime Laboratory Division Report dated June 27, 1985, approximately six months after the defendant was charged. This blood serology report is uniformly tendered by the CCSAO during discovery irrespective of the limited evidentiary value that this particular report contains. The report, nevertheless, would have been tendered well in advance of the defendant's guilty plea in May, 1987, and may have been written at the request of the prosecutors.

f.  The defense attorneys appointed to represent the defendant appear to have received a comprehensive set of police reports. During the pendency of this case, two assistant public defenders were appointed to represent the defendant. Transcripts reveal that the initial Assistant Public Defender conducted a Motion to Suppress Statements. On the record, he refers to specific police reports while cross-examining detectives assigned to the case. (*Johns Motion to Suppress*, 85 CR 2103, April 15, 1986 Transcript.) Moreover, when the second Assistant Public Defender was appointed to represent the defendant, he commented that the defense file was "extensive." (*Johns Motion to Suppress*, 85 CR 2103, July 31, 1986 Transcript, Page 2.) That attorney had obviously reviewed the file because he needed to locate a psychological report and a transcript from the pre-trial motion hearing.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Gregory Tucker murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Guy Johns* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

13.  *People v. Roscoe Evans* (G-108642)

The defendant had dated Patricia Armstrong in the summer of 1984. Their relationship ended. The defendant, in February of 1985, wanted to start seeing her again. She told him that she was pregnant and the child was not his. He called her on the phone at the Chicago Metro Newspaper offices at 2600 S. Michigan Avenue. This

paper was owned by Patricia's father and she worked there with her brother. During this phone call, the conversation became heated between her and the defendant. Her father Charles Armstrong, Sr., got on an extension line. Patricia overheard the defendant threaten her father stating he would get her father and destroy the entire Armstrong family. On March 25, 1985, the defendant entered the newspaper's offices and shot Charles Armstrong, Jr., in the face and thumb. He then shot Charles Sr., also present in the office, killing him. He fled the building, threw the rifle on a garage roof and ingested a caustic substance. At the hospital, he told the police officers, through handwritten notes, where to find the rifle and made other admissions. Charles, Jr., and other witnesses at the newspaper identified the defendant.

The defendant entered a plea of guilty and was sentenced to an aggregate total of 50 years in the I.D.O.C. on February 24, 1986. The defendant filed a post-conviction petition in the trial court in 1988 and withdrew it in 1992. In 2008, he filed another post-conviction petition. This petition was dismissed by the trial court and his appeal was denied in 2011.

Plaintiff contends, after an examination of the Investigative File numbered ACB 010440 - 101561, that 16 of the 122 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

  a. ACB 010441 - 42 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. ACB 010443 is a CPD Investigative File Control log. The inventory and the control log lack evidentiary value.

  b. ACB 010453 is a CPD Court Attendance Report for the detective's appearance at the grand jury. It has no evidentiary value.

  c. ACB010529 and -37 are handwritten notes that list only Detective Reardon's name and either his assignment or his star number. ACB 010529 is the back side of a Property Inventory sheet numbered ACB 010528. On the photocopy, the information contained on ACB 010528 is visible in the background of ACB 010529. It was routine to place a detective's name on documents prior to forwarding them via interoffice mail. In the same manner, Detective Reardon's name on ACB 010537 is probably the reverse side of ACB 010536, a receipt for evidence. And in all likelihood, it was placed there prior to forwarding that receipt to the detective via interoffice mail. These notes have no evidentiary value.

  d. ACB 010469 is an evidence report for another case. This document apparently was misfiled.

  e. ACB 010459 is a CPD Latent Fingerprint Examination Report requesting a comparison of elimination prints to evidence recovered in the investigation. This document would commonly be turned over to defense counsel during pretrial discovery by the CCSAO and, in fact, the print was discovered to be

the defendant's print per a July 3, 1985 Crime Lab Report plaintiff admits was produced to the defense. (ACB 010447).

f. ACB 010462 is a request to compare a rifle to firearms evidence recovered during the investigation. ACB 010463 apparently is the back side of the request with the results of the request. The firearms examiner stated that a formal report would follow. The formal, two-page report that contains the substance of the comparisons and the results was found in the defense attorney's file and are numbered here as ACB 010460 - 61.

g. ACB 010464 is a CPD Receipt for Exhibits. It indicates that a weapon and live ammunition were received from the detectives and submitted for fingerprint examination. ACB 010465 is a CPD Evidence Report indicating that a section of cardboard was submitted to the lab for fingerprint examination. ACB 010473 is the receipt for the cardboard. ACB 010447, a CPD Latent Fingerprint Examination Report, details the results of the examinations requested above. This document was found in the defense attorney's file. It should also be noted that ACB 010472 is a copy of ACB 010465 with an extra handwritten note. This document was found in the defense attorney's file.

h. ACB 0100471 is a CPD Receipt for Exhibits for a can of 'Drano' and sunglasses. The collection and inventory of these items is documented in a supplementary report that was found in the defense attorney's file and is numbered here ACB 010480 - 83.

i. ACB 010486 is a body chart usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected to find a version of the body chart included in a police report. This chart was most likely attached to a CPD Cause of Death supplementary report authored by a detective assigned to either the forensic unit or the medical examiner's office. The cause of death report with detailed information was found in the defense attorney's file at ACB 010484 -85.

j. ACB 010499 is one, final sentence apparently on the back of ACB 010498. ACB 010498 was found in the defense attorney's file and is a GPR that contains notes of an interview with a witness named Tracey Patterson. The information noted in both pages of Patterson's interview is included in a supplementary report found at ACB 010546-47. This report was also found in the defense attorney's files.

k. The defendant entered a guilty plea. Subsequently he has filed two state court post- conviction petitions both essentially seeking to withdraw his guilty plea. In neither petition did he claim a failure by the state to provide a full set of police reports. *People v Evans, 2011 IL App (1st) 100168-U.* It should be noted that the factual basis for his plea is found in the People's brief. The brief cited to the common law record transcript of the plea. It discussed the testimony of a witness, the use of Drano, and the results of ballistic and

fingerprint tests. *People v Evans, No. 10-0168, People's Brief at pp. 2 – 4.* This information is included in the reports that are now claimed to be missing. There was no claim of a discovery violation during the hearing or on appeal.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Charles Armstrong murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Roscoe Evans* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, the available evidence suggests that the criminal defense file produced by plaintiff is incomplete.

17.     *People v. Maurice Green* (G-215280)

During the early morning hours of June 9, 1985, the defendant came to the victim's residence to smoke cocaine. At one point, he tried to steal one packet of the cocaine. He argued with the victim and struck her several times in the head with a glass decanter. As he smoked cocaine, her body twitched on the floor. The defendant picked up a wine bottle and again struck her in the head several times until he saw blood on the brown paper bag that was wrapped around the bottle. Next, the defendant orally and anally copulated the victim's 15-year-old daughter at gun point. When the victim's son tried to enter the apartment, the defendant threatened him with the handgun and refused to allow him entry. Within minutes, the defendant fired shots through the kitchen window and down a hallway when he believed the son was trying to gain entry to the apartment. The police were called and a hostage situation commenced when the defendant refused to release the victim's daughter. After phone calls to other family members and the police, the defendant released the victim's daughter, tossed the gun out the window and surrendered. The defendant provided statements to both police officers and to prosecutors.

The defendant was convicted by a jury in 1987. In his pre-sentence interview, he admitted to the probation officers that he was guilty but he thought he committed manslaughter not murder. He was sentenced to 60 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 013368 – ACB 013570, that 21 of the 203 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

   a.  ACB 013502 – 03 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. ACB 013504 is a CPD Investigative File Control log. The inventory and the control log lack evidentiary value.

   b.  ACB 013390 is a CPD Felony Minute Sheet – Form 101. The document lists the charged defendant, a brief summary of the facts, and the prosecuting

witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in all of the CPD case and supplementary reports tendered to the defendants.

c. ACB 012291-93 is the front and back of a phone message to a detective informing him to contact the prosecutor assigned to handle the case in the Grand Jury and other instructions on witnesses and evidence to be brought to court. This note does not contain any substantive information gathered during the investigation, and was information in the possession of the prosecutors. ACB 013400 – 03 is a duplicate of a Grand Jury subpoena for a witness. It has no evidentiary value.

d. ACB 013414 is a note from the prosecutor who took the defendant's handwritten statement to the prosecutor in the Grand Jury informing them that the defendant claimed he would get two of the witnesses to recant. The prosecutor was in possession of his own note. In addition, the substance of the two witnesses' interviews are contained in the supplementary reports found in the defense attorney's file at ACB 013370 – 79 and ACB 013480 -89.

e. ACB 013404 - 05 are GPRs containing notes of interviews with three witnesses and the defendant. The substance of those notes is found in typed supplementary reports that were admittedly found in defense counsel's file. (ACB 013370 – 79 and at ACB 013380 – 89).

f. ACB 013393 and ACB 013398-99 are handwritten and typed copies of the arrest information for the defendant. This information is included in the CPD arrest report provided to defense counsel and numbered ACB 013397.

g. ACB 013406 is a GPR containing contact information for witnesses and police officers. ACB 013408 is a GPR with contact information for two witnesses. All of this information is included in typed supplementary reports that were admittedly found in defense counsel's file. (ACB 013370 – 79 and at ACB 013380 – 89).

h. ACB 013396 is a CPD Property Inventory sheet for three glass pipes. This information is documented in the supplementary report at ACB 013372 and at ACB 013377. The inventory reports are commonly tendered by the CCSAO during pre-trial discovery. There are also found in the court's municipal file and are available for inspection and copying by defense counsel.

i. ACB 013501 is a handwritten note with the name of a judge and a prosecutor with contact information. ACB 013546 is a handwritten note with a detective's name and assignment listed. These documents have no evidentiary value.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Mary Ann Hunter murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by

the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Maurice Green* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Even without the CCSAO file, plaintiff acknowledges 182 pages of a 203 page Investigative File was tendered, and the remaining information lacks evidentiary value, was in the prosecutor's possession, or was in the defense attorney's possession through formal Supplementary Reports.

18.    *People v. Lucille Pye* (G-284291) DUPLICATE OF #24.

On July 25, 1985, Lucille Pye stabbed Lenita 'Do' Williams once in the chest with a nail file during an argument over their mutual love interest, Michael Jeffery. Lucille Pye considered herself to be Michael Jeffery's common law wife. They had a relationship for over 6 years prior to Pye's incarceration for 18 months in a federal prison facility in Kentucky. During that time, Jeffery became involved with Lenita Williams. Upon Pye's release from the federal prison in 1985, she tried to re-establish her relationship with Jeffery. On the date of the murder, Pye had spent the day with Jeffery. Late in the afternoon, they met Williams on the street. Jeffery went to a nearby store and Pye and Williams argued about him. During this argument and fight, Pye stabbed Williams in the chest with her 7-inch nail file. Upon her arrest, Pye provided a court reported statement to police officers and a prosecutor describing the stabbing of Williams.

In 1986, Pye was found guilty after a bench trial of voluntary manslaughter and sentenced to 10 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 016197 - 16286, that 46 of the 90 pages were not found in the defense attorney's file. The CCSAO was unable to locate their file.

a.  ACB 016198 - 99 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. ACB 016200 is a blank CPD Investigative File Control log. The inventory and the control log lack evidentiary value.

b.  ACB 016206 is the victim's criminal history. It is in the criminal defense attorney's file at CRIM.DEF FILES - FIELDS 043329. ACB 016285 – 86 is the CPD case report for this case and is found in the criminal defense attorney's file at CRIM.DEF FILES - FIELDS 043313 – 14.

c.  ACB 016207 – 08 are two copies of the same inventory sheet. ACB 016209 is a copy of the blank back of an inventory sheet. The inventory reports are commonly tendered by the CCSAO during pre-trial discovery. There are also found in the court's municipal file and are available for inspection and copying by defense counsel.

d.  ACB 016218 is a body chart usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected

to find a version of the body chart included in a police report. This chart was most likely attached to a CPD Cause of Death supplementary report authored by a detective assigned to either the forensic unit or the medical examiner's office. The cause of death report with detailed information was found in the defense attorney's file and is numbered ACB 016217.

e. ACB 016220 – 22 are two GPRs that are typed and use a 'to-from' memo format. In the 'to-from' GPR format, one group of investigators is informing another set of detectives about the course of the investigation. These GPRs are disclosed by the CCSAO to the defense attorney during pre-trial discovery.

f. ACB 016223 is a handwritten GPR This GPR is disclosed by the CCSAO to the defense attorney during pre-trial discovery. The witness interviewed in this GPR is also listed in two supplementary reports found in the defense attorney's file and numbered ACB 016225 – 28 and ACB 016229 – 31.

l. ACB 016224 is a CPD Felony Minute Sheet – Form 101. The document lists the charged defendant, a brief summary of the facts, and the prosecuting witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in all of the CPD case and supplementary reports tendered to the defendants.

g. ACB 016242 – 43 is ten-year old arrest photo of the defendant with her name written on the back side. Either this photo or a current arrest photo from this case would have been tendered to defense counsel by the CCSAO during pre-trial discovery. The defense attorney's file contained the defendant's criminal history report that listed the arrest and central booking number included in the photo.

h. ACB 016246 – 47 is a copy of the final page and entry on the defendant's criminal history and the arrest report related to the only entry listed. These documents would have been tendered to defense counsel by the CCSAO during pre-trial discovery.

i. ACB 016249 is a CPD Release of Person in Custody form relating to Michael Jeffery. The details from his interview are found in the supplementary reports found in defense counsel's file and numbered ACB 016225 – 28.

j. ACB 016250 – 51 is a two-year old arrest photo of the victim with her name written on the back. Either this photo or a reprinted copy would have been tendered to defense counsel by the CCSAO during pre-trial discovery. The defense attorney's file contained the defendant's criminal history report, numbered ACB 016252, that listed the arrest and central booking number included in the photo. ACB 0163253 – 54 are two arrest reports for the victim.

The central booking numbers are also included in the victim's criminal history report. The photo by itself has no evidentiary value.

k.  ACB 016255 – 56 is a duplicate of ACB 16220 – 21 and discussed above in letter e.

l.  ACB 016257 – 58 is an older arrest photo of witness Michael Jeffery with his name written on the back. Much like the older arrest photo of the victim, the photo would have been tendered in pre-trial discovery but it lacks evidentiary value.

m.  ACB 016259 is a handwritten GPR It would have been tendered in pre-trial discovery by the CCSAO to defense counsel.

n.  ACB 016260 and 16262 are handwritten GPRs that contain contact information for the defendant and a witness. This information is contained in supplementary reports found in the defense attorney's files and numbered ACB 16225 – 28 and ACB 16529 – 31. ACB 016270 is a handwritten note also containing names of possible witnesses with some limited contact information. All of these notes would have been tendered to the criminal defense attorney during pre-trial discovery by the CCSAO.

o.  ACB 016261 is a handwritten GPR of an interview with Michael Jeffery. The substance of this note is contained in the supplementary reports found in the defense attorney's file and numbered ACB 016225 -28. ACB 0163 – 67 is witness Michael Jeffery's criminal history and ACB 016268 to – 69 are two older arrest reports for him. These items would have been tendered during pre-trial discovery. Moreover, Jeffrey's criminal history would have been re-ordered and re-tendered closer to the date of trial. ACB 016275-76 is a case report for a different case involving the arrest of Michael Jeffery. This report would have been tendered in pre-trial discovery.

p.  ACB 016272 is a note with a detective's name and assignment. It has no evidentiary value. ACB 016274 is a near duplicate of ACB 016222, lacking a handwritten note, *See* letter e above. ACB 016283 – 84 is a near duplicate of ACB 016220 – 21, lacking only the supervisor's approval. *See* letter e above.

Findings: The CCSAO cannot locate its file.  A review of the Investigative File for the Lenita Williams murder and the criminal defense file produced by plaintiff establishes that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents.  Moreover, the documents identified above would have been produced during pre-trial discovery as discussed above.

19.  *People v. Ruben Avilez* (G-248336)

On June 30, 1985, Ruben Avilez shot the victim in the head in the alley near Alma Rodriguez' apartment. Alma Rodriguez stated that she was at a block party with a man known to her as Peter (Pedro 'Peter' Pacheco) and his friend (Ruben Avilez) who

was unknown to her. They dropped her off at her apartment and she told them to leave after a short period of time. Rene Perez and the victim, Melvin Rodriguez, arrived at her apartment within minutes. After a short period of time, Alma told the victim and Perez to leave. After they left her apartment they met Avilez and Pacheco and they stated an argument. Alma overheard the argument and heard Pacheco tell the victim that she was his wife. Alma yelled out the window that she was not married to Pacheco. Perez said the argument became heated and he ran to a nearby street to get help. Avilez pulled a handgun on the victim and along with Pacheco they walked him to the alley where he was shot in the head. Both Alma and Perez could hear the gunshots. Perez ran to the alley to find the victim shot in the head.

Avilez was found not guilty in January, 1987. Pacheco was arrested but not charged in 2000.

Plaintiff contends, after an examination of the Investigative File numbered ACB 0014301 - 014467, that 70 of the 167 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a.  ACB 014367 – 68 is a supplementary report that summarizes an interview with the mother of the second offender in an attempt to locate him. This report is duplicated at ACB 014413 – 14. There is no substantive information regarding the defendant Avila who was charged six months earlier. It is possible that the CCSAO tendered this report to defense counsel in pretrial discovery.

b.  ACB 014427 is a GPR that contains a sketch of what purports to be the crime scene. This GPR would have been tendered during pretrial discovery by the CCSAO.

c.  ACB 014455 – 56 is a criminal history and warrant check for the second offender possibly issued in 1985 or 1986. It has no evidentiary value. The second offender's criminal history could have been tendered by the CCSAO to the defense counsel in 1985 – 1986 prior to his trial.

d.  The remaining 63 pages pertain to the re-investigation of the case in 2000 when the second offender was arrested. The second offender was not charged. These documents have no relevance to Avila's case as he was found not guilty thirteen years earlier in 1987. These documents did not exist at the time of his arrest and trial.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Melvin Rodriguez murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Ruben Avilez* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by

plaintiff and Mr. Brasfield. This is another example where Plaintiff's methodology in identifying the allegedly withheld documents is highly suspect as he claims that 63 pages of material generated in the year 2000 was withheld from a criminal defendant who went to trial and was acquitted in 1986.

20.    *People v. Freddie Brown* (G-257089)

On July 6, 1985, the victim, Ronald Johnigan, got into a verbal argument with the defendant Freddie Brown about a key to a gate to their apartment building. Brown, employed as a janitor for the buildings, refused to give Johnigan a key to the gate. The argument resulted in a physical fight in the alley. During the fight, the defendant pulled a knife and stabbed the victim in the abdomen causing his death. Witnesses observed parts of the fight. Although the defendant ran from the seen, he was arrested within hours. He provided a court reported statement where he claimed that during the fight, although the victim was unarmed, he was afraid that the victim might grab something to hit him. That's why he stabbed the victim.

In July, 1987 the defendant entered a plea of guilty to voluntary manslaughter and received a 4-year sentence in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 014789 - 014838, that 24 of the 50 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a.    ACB 014790 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. ACB 014791 is a CPD Investigative File Control log. The inventory and the control log lack evidentiary value.

b.    ACB 014792- 93 are two CPD Crime Lab reports. Both would be tendered in pre-trial discovery by the CCSAO. In addition, they would not be exculpatory to the defendant because he admitted he stabbed the victim, but claimed self-defense.

c.    ACB 014796 and 014804 is the same CPD Evidence Report. ACB 014804 contains an additional hand written note. Both reports would have been tendered during pre-trial discovery to defense counsel.

d.    ACB 014797 – 98 is the victim's criminal history. This document would have been tendered during pre-trial discovery to defense counsel by the CCSAO.

e.    ACB 014802 is the victim's body chart describing the injuries found on his body during the autopsy. A body chart is usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected to find a version of the body chart included in a police report. Because the initials of the detective assigned to the medical examiner's office are found at the bottom of this chart, it was most likely attached to a CPD Cause of Death supplementary report authored by him. That two-page

97

document, often titled 'Cause of Death Report,' was found in the defense attorney's files and is numbered here as ACB 014794 – 95.

f.   ACB 014806 – 19 are GPRs containing interviews, contact information and a sketch of the crime scene. ACB 014838 is the inventory sheet for the knife recovered in this case. All of these GPRs and the inventory sheet would have been tendered to the criminal defense attorney by the CCSAO during pre-trial discovery. The substance of these GPRs and the inventory of the knife can also be found in supplementary reports found in the defense attorney's file and numbered here as ACB 014821 – 24.

g.   ASA Joseph McNerney stated on the record during a hearing dated August 26, 1985 that he is "tendering to counsel" … "a full set of Chicago Police reports" as well as the defendant's court reported statement, defendant's rap sheet and defendant's arrest report.  After the defense attorney withdrew and the public defender was appointed, the defense attorney Goodman stated on the record on October 4, 1985 that he was handing to the public defender a variety of materials, including "numerous police reports." However, the defense attorney Mr. Hoke stated on the record on November 7, 1985 that he didn't "have any of those things," when referring to the written statement of defendant which was produced in open court earlier, as well as photographs, although he acknowledged that he had police reports and rap sheet.  The prosecutor and defense attorney then both state they will work together to make sure Mr. Hoke had all the discovery.

Findings: The CCSAO cannot locate its file.  However, a review of the Investigative File for the Ronald Johnigan murder, the court transcripts, and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Freddie Brown* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

22.   *People v. James Lee Walker* (G-267826)

On July 14, 1985 at 4848 S. St. Lawrence Avenue, Fred Williams asked the defendant for a ride to get tools so Williams could fix his car. The defendant Walker refused because Williams owed him favors from the past. The two men got into a verbal argument and Williams pulled a knife. Walker retreated into his residence to get his handgun. When he returned the argument continued. Walker at one point tried to strike Williams on his left arm and hand with his gun. When he attempted to do this, his handgun discharged and a bullet struck and killed 4-year old Angel Hendrix who was playing nearby. Both Walker and Williams provided court reported statements. Walker was charged with murder and Williams released. Walker was convicted after a bench trial of Voluntary Manslaughter and was sentenced to four years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 015390 – ACB 015504, that 63 of the 115 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a.  ACB 015390 is a copy of the cover of the file. It has no evidentiary value. ACB 015492 is a copy of the exterior of an Intra-Departmental Mail envelope. It has no evidentiary value.

b.  ACB 015391 – 92 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. ACB 015393 is a blank CPD Investigative File Control log. The inventory and the control log lack evidentiary value

c.  ACB 015394 and -96 are duplicate copies of a CPD Inventory sheet. This inventory pertains to evidence collected during the autopsy, and the information contained within it was identified in a Supplementary Report plaintiff admits was in the criminal defense attorney's file. ACB 015397 – 401 is the assistant medical examiner's post mortem report. These documents would have been tendered by the CCSAO to defense counsel during pre-trial discovery. In fact, the author of the post-mortem was identified in the State's answer to discovery.  (CRIM.DEF FILES - FIELDS 042303).

d.  ACB 015405 is the victim's body chart noting the injuries found on her body during the autopsy. A body chart is usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected to find a version of the body chart included in a police report. Because the initials of the detective assigned to the medical examiner's office are found at the bottom of this chart, it was most likely attached to a CPD Cause of Death supplementary report authored by him. That two-page report was found in the defense attorney's files at CRIM.DEF FILES - FIELDS 042317 - 18. These documents would have been tendered by the CCSAO to defense counsel during pre-trial discovery.

e.  ACB 015408 - 09 are two inventory sheets also listing evidence collected by the assistant medical examiner during her autopsy. These documents would have been tendered by the CCSAO to defense counsel during pre-trial discovery.

f.  ACB 015413 – 32 are GPRs that contain notes on interviews, witnesses' identifying information and notes related to a lineup. All of these GPRs would have been tendered during pretrial discovery. The absence of any GPRs in the defense file suggests that it is incomplete because both prosecutors and criminal defense attorneys were aware of the use of the GPR form for keeping notes on homicide cases during this time frame and would have followed up to obtain them if in fact they were not initially produced. Moreover, the content of the witness interviews is included in the body of supplementary reports (ACB 015436 - 49; 015402 – 04; 015411 – 12; 015588 -89; and

015433 – 35) and court reported statements (ACB 015450 – 68). All of these reports were found in the defense attorney's files.

g. ACB 015469 is a CPD Felony Minute Sheet – Form 101 for the defendant. The document lists the charged defendant, a brief summary of the facts, and the prosecuting witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in all of the CPD case and supplementary reports tendered to the defendants.

h. ACB 015470 is a CPD Evidence Report that reflects the photography of two knives and of a lineup. ACB 015471 and -73 are duplicate copies of a CPD Property Inventory sheet for the knives collected during the investigation. ACB 015474 is an inventory sheet for five older arrest photos of the participants in the lineup. These documents are turned over during pretrial discovery by the CCSAO to defense counsel. Inventory sheets are also commonly found in the Clerk of the Circuit Court's file. The contents of the inventory sheets and the lineup procedures are described in detail in a supplementary report and a lineup report both found in the defense attorney's file and numbered ACB 015436 – 49 and ACB 015433 – 35.

i. ACB 015477 - 80 are criminal history reports for the defendant and a witness with warrant stamps. ACB 015486 – 87 are arrest reports for the defendant and a witness. These reports would have been conveyed during pretrial discovery by the CCSAO and, with regard to the defendant, used during a bond hearing and included in the Adult Probation Department's pre-sentence report. Arrest reports are provided to defense counsel during the initial bond hearing.

j. ACB 015481 is a note listing a driver's license number and a social security number. The driver's license number starts with the letter 'W' and, after ruling out the only witness' name that begins with W, both numbers are in all likelihood the defendant's. Besides being used to identify the defendant, this information lacks any substantive value.

k. ACB 015482 – 84 are leads checks on a witness's driver license and his car and a CPD 'Release of Person in Custody' form for the same witness. The leads requests lack substantive value. The discussion of the witness' car was discussed at length in the police reports and in court reported statements that were found in the defense attorney's file. The witness' release from custody was also discussed at length in the same police reports.

l. ACB 015485 is a Felony Complaint for Preliminary Hearing. This complaint was served on the defendant in the preliminary hearing court and at bond court. A copy is retained by the Clerk of the Circuit Court in the Municipal Court file. Specifically, in the Branch 66 municipal court file.

m. ACB 015496 - 97 is a side-profile polaroid photo of the defendant with his name written on the back of the photo. The photo has no evidentiary value by itself. This photograph may have been taken at the time he made a court-reported statement. In that case, it would have been made available to the defense counsel during pretrial discovery by the CCSAO.

n. ACB 015498 – 504 are six prior arrest photos of a witness and the Request for Identification Photos form used by the detective to request those six photos. These photos have no substantive value. Nevertheless, one of these photographs would have been made available to the defense during pretrial discovery.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Angel Hendrix murder and the criminal defense file produced by plaintiff establishes that there likely was no substantive investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v James Lee Walker* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield and the documents identified above would have been produced to the prosecutors and ultimately the criminal defense attorney.

24.   *SEE* #18

25.   *People v. James Crockett* (G-321886)

In the early morning hours of August 19, 1985, Crockett's co-defendant shot and killed Ernest Jones at Ohio and St. Louis Streets in Chicago. Crockett, Rios, and others were taunting Willie Ford for not getting revenge against Ernest Jones for a previous beating. When the victim was spotted nearby, Crockett gave Ford his handgun. When Ford was reluctant to use the handgun, he gave it to Rios. Ford then ran across the street, and in an attempt to slow Jones down, asked him for a cigarette. This allowed Rios to sneak up behind Jones and shoot him. Rios and Ford fled the scene in another friend's car. Crockett tried to retrieve his handgun the next day but due to police presence in the area, he was unable to do so. On August 22, 1985, the defendant provided a court-reported statement admitting his role in the murder.

The defendant entered a guilty plea on April 24, 1986 and was sentenced to 22 years in the I.D.O.C. The defendant subsequently filed a post-conviction petition before the same trial court judge. During the pendency of the petition, the defendant entered into a plea agreement with the prosecutors on April 17, 1989 and was resentenced to 12 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 016649 – ACB 016807, that 107 of the 159 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. The criminal defense file is incomplete. It contains only two supplementary reports totaling 8 pages, a witness's handwritten statement, the defendant's arrest report, the defendant's court-reported statement and a memo from the prosecutor who interviewed him. The file also contains documents not created or maintained by the Chicago Police Department: two co-defendants' trial transcripts of three witnesses that occurred after the defendant entered a guilty plea and was sentenced, documents filed by a co-defendant, two appellate opinions, two pretrial motions to suppress authored by prior defense attorneys, the People's Answer to Discovery, the defendant's Habeas Corpus petition and a transcript of his change of plea hearing and sentencing.

b. Plaintiff contends that defense counsel did not receive ten supplementary reports totaling 26 pages and all eleven GPRs totaling eighteen pages. Also not found in the defense counsel's file were the postmortem report, three evidence technicians' reports, a tow report, three inventory sheets, the initial case report and both the victim's and the defendant's criminal histories.

c. By reviewing documents found in the defense attorney's files, it becomes evident that the defense attorney received many if not all of these documents prior to the entry of a guilty plea. By reviewing the People's Answer to Discovery and the guilty plea transcript, reference is made to witnesses' names, labs, offices and hospitals that were contained only in the allegedly missing documents.

d. The People's Answer to Discovery contains approximately thirty names of civilian and law enforcement witnesses not listed in the reports found in defense counsel's file. Furthermore, the Answer references potential witnesses from the medical examiner's office, a hospital, the Chicago Fire Department, the CCSAO, the Chicago Police Department Crime Lab, the CPD Communications Center and Youth Division. Most of these witnesses are listed by name but a few are referenced as potential witnesses from an office. The names and institutions listed in the Answer are referencing reports already tendered during discovery by the CCSAO. These are the documents that are now claimed to have never been tendered from the CPD or the CCSAO. The body of the Answer indicates that documents such as "police reports, arrest reports, inventory sheets, medical reports, lab reports…" have already been tendered or made available to defense counsel.

e. In the guilty plea transcript, during the recitation of the factual basis for the plea, the prosecutor referenced witnesses that were listed in reports now claimed to be missing from defense counsel's file: Dr. Konacki from the medical examiner's office, the CPD officer who compiled the initial case report, a doctor from a hospital that treated the victim, the recovery of evidence and testing by the CPD Crime Lab. The familiarity of defense counsel with those reports and the facts contained therein is also demonstrated during the guilty plea hearing. At one point, the prosecutor inaccurately stated the facts surrounding the possession and use of a

handgun. The defense attorney pointed this out causing a recess in the hearing to allow the prosecutor and defense counsel to agree on the factual basis of the plea.

f.  The municipal file reveals that defense counsel filed the appropriate pre-trial motion for discovery approximately five months prior to the guilty plea hearing. This motion seeks the reports that are now claimed to have never been tendered to defense counsel.

g.  A transcript from a pre-trial status hearing supports the position that the CCSAO tendered a full set of CPD police reports to defense counsel. During this hearing, the trial court asked the Assistant State's Attorney if his office had "complied with discovery requirements?" The Assistant State's Attorney replied: "I believe we have." (*Crockett, Mullen and Rios*, 85 C 9886, January 23, 1986 Transcript, Page 3.) Furthermore, Crockett's attorney was attempting to file a motion to sever him from trial with the co-defendants. (Id., at page 4.) Rios' attorney indicated that he would also file a severance motion while Mullen's attorney announced she was prepared to file her Answer to Discovery and set the case for trial. (*Id.*, at pp. 6-7.) All of these comments support the prosecutors' comment that the CCSAO had provided defense counsels with a full set of police reports.

Findings: The CCSAO cannot locate its file.  However, a review of the Investigative File for the Ernest Jones murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v James Crockett* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, it shows that the criminal defense file is substantially incomplete as described above. This case presents another example of the fundamental flaw in assuming the completeness of the criminal defense attorneys files, even when information in those files demonstrates they are incomplete.

28.  *People v. Edward Terrett* (G-446754)

Around 10:00 a.m. on November 5, 1985, Edward Terrett shot his girlfriend Merriam Aughtry in the chest and face killing her. He then took her food stamps and financial assistance money to buy cocaine. Terrett had injected cocaine the night before in her apartment. Aughtry did not know that Terrett was consuming cocaine. Aughtry's 4-year old daughter was in the apartment in a bedroom when the shooting took place. Terrett then used Aughtry's money and food stamps to purchase and consume about $485 worth of cocaine. He also traded his .357 caliber handgun to obtain more cocaine. On November 8, 1985, Terrett unlocked the apartment door and allowed officers into the apartment. Terrett admitted his actions to the police and later to an A.S.A. during a court-reported statement.

Terrett entered a guilty plea and was sentenced to 60 years in the I.D.O.C. in September, 1986.

Plaintiff contends, after an examination of the Investigative File numbered ACB 020109 – ACB 020156, that 16 of the 48 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. ACB 020110 is a CPD Investigative File Inventory. This inventory lists the items contained in the Investigative File. ACB 020111 is a CPD Investigative File Control log. The inventory and the control log lack evidentiary value. The defense attorney's file has a near-final version of the Inventory. CRIM.DEF FILES – FIELDS 043793. It lacks only one entry for a copy of the defendant's arrest card. The information on the arrest card was provided to defense counsel on the defendant's arrest report.

b. ACB 020113 is a handwritten arrest information card. All of the information on this card is included in the defendant's arrest report and was included in two supplementary reports found in defense counsel's file. They are numbered here as ACB 020116 – 17 and - 151 to – 54. The actual arrest report is also in the criminal defense attorney's file at CRIM.DEF FILES – FIELDS 043759.

c. ACB 020114 – 15 and ACB 020126 to - 27 are two copies of the initial Case Report. Defense counsel's files contains the same reports. Defense counsel's files contains versions with the approval signature in place otherwise the copies are identical. CRIM.DEF FILES – FIELDS 043793 – 94 and -803 to - 804.

d. ACB 020118 – 19 and - 122 to – 23 are copies of the first two pages of an unsigned supplementary report. Defense counsel's files contain the complete and final, signed version of these reports. The format is slightly different because the handwritten names of police officers on the ACB copies are now typed into the final version. CRIM.DEF FILES – FIELDS 043807 – 10. Note also that the complete and final report is also found in the ACB file at 020151 – 54.

e. ACB 020120 – 21 is the 'cause of death' supplementary report compiled by a police officer who attends the autopsy. ACB 020147 is a body chart that is filled in by the same officer. These reports are provided to defense counsel during pretrial discovery by the CCSAO's office. The defense attorney's file contained the assistant medical examiner's post mortem report and the two body charts created during the exam. CRIM.DEF FILES – FIELDS 043849 – 52 and - 55 and – 57.

f. ACB 020132 is an Inventory sheet for the clothes recovered from the victim during the post mortem examination. This sheet is found in the Clerk of the Circuit Court's municipal file available to defense counsel to view and copy. This sheet would also be tendered during pretrial discovery to defense

counsel by the CCSAO. The post mortem report that was found in defense counsel's files, CRIM.DEF FILES – FIELDS 043849 – 52, also notes the same clothes observed on the victim's body at the exam. The Evidence Report that was found in the defense attorney's file indicates that the clothes were to be picked up from the medical examiner's office. This is found at ACB 020155.

g. ACB 020156 is a handwritten note listing detectives' names and assignment. It has no evidentiary value.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Miriam Aughtry murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Edward Terrett* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

29. *People v. Larry Buchanan* (G-456900)

On November 15, 1985, Larry Buchanan stabbed Terry Franklin numerous times in the chest in his apartment. When his girlfriend, Michelle Sims, tried to stop the defendant he slapped her and then tried to rape her. He cut off her panties and while holding the knife to her throat he started to rape her. Franklin's brother, Henry, came to the apartment at this time and tried to gain entry. The defendant would not let him in. He said he would kill all of the Franklins. Henry could see through the partially opened door that the defendant was struggling with Sims. The police arrived shortly thereafter and the defendant allowed them in. The defendant told the responding officers that the victim "beat him" out of $100 and he wanted his money back. The defendant provided statements to the police and a court-reported statement to an A.S.A. where he claimed that the victim had physically attacked him and threatened to "take his manhood."

The defendant entered a guilty plea in May, 1986 and was sentenced by Judge Maloney to 35 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 020809 ACB 020859, that 17 of the 51 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. ACB 020810 is a CPD Investigative File Inventory. It has no evidentiary value. ACB 020859 is a blank CPD Investigative File Control log. It has no evidentiary value.

b. ACB 020814 is a CPD Receipt for Evidence acknowledging that a knife recovered from the crime scene and inventoried by evidence technicians was submitted to the lab for testing. This document would have been tendered by the CCSAO during pre-trial discovery to defense counsel. The information

contained in the document is summarized in the supplementary reports found in the defense attorney's file and numbered here as ACB 020848 – 52. ACB 020815 is a handwritten name of one of the detectives assigned to the case. It may have been the rear of the receipt. It lacks evidentiary value.

c.  ACB 020820 is a CPD Evidence Report. It summarizes the photos taken and the evidence collected at the crime scene by the evidence technicians. ACB 020856 is a copy of this report. ACB 020821 is the name of one of the detectives assigned to the case. It may have been written on the back of 020820. This report would have been tendered in pretrial discovery by the CCSAO. The information contained in the document is summarized in the supplementary reports found in the defense attorney's file and numbered here as ACB 020848 – 52.

d.  ACB 020830 – 31 is a two-page CPD Crime Laboratory Report. It lists the serological testing results of evidence collected at the crime scene. This document would have been tendered by the CCSAO during pre-trial discovery to defense counsel.

e.  ACB 020853 is a CPD Evidence Report. It summarizes the photos taken of the victim at the Cook County morgue by the evidence technicians. This report would have been tendered in pretrial discovery by the CCSAO. The information contained in the document is summarized in the supplementary reports found in the defense attorney's file and numbered here as ACB 020848 – 52.

f.  ACB 020835 – 36 are two inventory sheets listing the evidence recovered from the crime scene, specifically the knife and the second victim's bra and panties. These inventory sheets would have been tendered in pretrial discovery by the CCSAO. The information contained in the inventories is summarized in the supplementary reports found in the defense attorney's file and numbered here as ACB 020848 – 52. Nearly all inventories are also found in the Clerk of the Circuit Court's file and are available to review or copy by defense counsel. Moreover, these two pages are included in the defense attorney file so it is unclear why Mr. Brasfield claims they were not produced. CRIM.DEF FILES – FIELDS 043950-51.

g.  ACB 020832 is a body chart usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected to find a version of the body chart included in a police report. This chart was most likely attached to a CPD Cause of Death supplementary report authored by a detective assigned to either the forensic unit or the medical examiner's office. The cause of death report with detailed information was found in the defense attorney's file and is numbered here as ACB 020818 - 19. It is highly unlikely that the report without the chart would have been disclosed during pre-trial discovery to the defense attorney from the CCSAO.

106

h. ACB 020837 is a document that contains a photocopy of the *Miranda* Rights printed on a card by the Chicago Patrolmen's Association. This document is signed by the detectives and the defendant and dated with a specific time. This document would have been tendered during pre-trial discovery by the CCSAO's office to defense counsel. The defendant gave a statement after he was given his rights at 11:30 a.m. This information is summarized in the supplementary reports found in the defense attorney's file and numbered here as ACB 020848 – 52. The document could have been used during pre-trial motions to suppress statements.

i. ACB 020857 – 58 are two GPRs. Each document would have been tendered in pre-trial discovery by the CCSAO to defense counsel. ACB 020857 contains identifying information for the ambulance, the treating physician, the police officers assigned to the case as well as a prosecutor's name. A brief note describes the victim's injuries. ACB 020858 is a GPR listing the victim's clothes, injuries, the time of death, the treating physician's name and the medical examiner's notification and case number. All of this information was included in the supplementary reports found in the defense attorney's file.

j. ACB 020855 is a CPD Felony Minute Sheet – Form 101. The document lists the charged defendant, a brief summary of the facts, and the prosecuting witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in all of the CPD case and supplementary reports tendered to the defendants.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Terry Franklin murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Larry Buchanan* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield and the documents identified above would have been produced to the prosecutors and ultimately the criminal defense attorney.

38. *People v. Leviante Adams* (HJ-366143)

On May 15, 200, the defendant beat his former girlfriend, Raama Baker, to death with baseball bat near 6200 S. Walcott Avenue. The victim had an order of protection in place against the defendant for a previous violent attack against her. The murder took place near the defendant's house and members of his family observed parts of the attack. One of his family members took the bat and washed it off after the attack. Many of these family members testified before a grand jury and attempted to recant parts of their most incriminating testimony at trial.

The defendant was convicted after a jury trial and was sentenced to 45 years in the I.D.O.C.

Plaintiff contends, after an examination of the Investigative File numbered ACB 060612 – ACB 060838, that 93 of the 227 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. ACB 060615 – 40 are photographs from an unrelated case. Three separate title cards indicate a different location and R.D. number. Moreover, some of the photos are for a deceased male victim who suffered gunshot wounds. The defendant in this killed his ex-girlfriend with a baseball bat.

b. ACB 060641 – 61 are the correct photos for this case. The title card indicates the proper R.D. number. Also, in supplementary reports that plaintiff does not claim were withheld, the detectives on the scene describe what they observed and disclosed that the crime lab personnel had photographed the area and collected the physical evidence. Their description of the scene and the physical evidence collected matches what is observed in this sequence of photographs. This information is found at ACB 060742 – 61. These photographs would have been made available to defense counsel prior to trial by the CCSAO. Any photographs used at trial would have been impounded with the Clerk of the Circuit Court.

c. ACB 060662 is a CPD Investigative File Control log indicating that the file had been signed out and returned once. ACB 060663 – 64 is a CPD Investigative File Inventory. Neither of these documents have evidentiary value.

d. ACB 060702 is a sketch with notes. The notes contain directions to two witnesses' address in Indiana. The notes on the sketch include phone numbers for a waste disposal company. A review of the supplementary reports in the defense attorney's file indicates that two witnesses lived at the address noted on the file and that a weapon, a baseball bat, was thrown into a dumpster. The detectives noted that they contacted the waste disposal company during their investigation. This information is reported on pages numbered ACB 060686, -701 and -726.

e. ACB 060720 – 23 is a handwritten statement of a witness taken by an Assistant State's Attorney and a detective. This statement is on an SAO form and would have been tendered in pre-trial discovery by the CCSAO to defense counsel. This witness' attempt to recant part of her statements to police was an issue both at trial and later in a post-conviction hearing. *See People v Adams, 2013 II App (1st) 11108 (2013).*

f. ACB 060733 – 38 is a CPD Event History Table. It lists the time and the name of the 911 caller. The rest of the table includes notifications to police personnel. There is no substantive information included in this document. The document appears to contain the same information found in an Event Query;

the defense attorney's file contains an Event Query at CRIM.DEF FILES - FIELDS 009767 – 776.

g.  ACB 060764 is a note regarding the victim's condition at the hospital, the doctor who pronounced her death and the medical examiner's case number. All of this information is contained in supplementary reports that are not alleged to have been withheld. ACB 060680, -743, and -753. ACB 060765 is a GPR that lists contact information for the victim, a canvass witness' information and a note on the victim's condition at the hospital. The victim's information is found throughout the police supplementary reports and specifically at ACB 060742. The canvas witness' information is found at ACB 060750 and the hospital information at ACB 060743 and – 753.

h.  ACB 60765 is a GPR from Detective Adams dated 5/16/03.  It is found in the defense attorney's file at CRIM.DEF FILES - FIELDS 009737.

i.  ACB 060803 and -808 are prior arrest photos of the victim and the defendant respectively.  They were used during the course of the investigation and included in materials that were found in the defense attorney's file. They are numbered ACB 060712 – 13, 060718 – 19, and 060724 – 25.

j.  ACB 060804 – 07 contains the victim's two-page CPD criminal history and a LEADS check for other criminal histories without success. Although the CCSAO file could not be found to confirm it, these documents almost certainly would have been tendered by the CCSAO to defense counsel during pre-trial discovery.

k.  ACB 060809 – 820 is a LEADS search on the defendant that includes the terms of an order of protection against the defendant issued after a domestic battery on the victim. ACB 060823 -32 is an abbreviated electronic docket sheet for the same domestic battery case. This information was obviously tendered in pretrial discovery by the CCSAO to defense counsel. The domestic battery case and the order of protection were included in the indictment as an aggravated sentencing element and was also were the subject of a pretrial order permitting testimony at trial regarding, the battery, the order of protection and the resolution of the case. See *People v Adams, 2013 Il App (1st) 111081 (2013)*. Furthermore, a supplementary report, for which there is no claim of suppression, details the detectives' discovery of this information. That information is found at ACB 060754 – 55.

l.  ACB 060821 – 22 is the renewal of an investigative alert for the defendant. The alert itself, although it contains a brief summary of the facts, does not contain any undisclosed information of evidentiary value. The defendant's attorney tried to surrender him to the detectives on May 20, 2003 but notified the detectives a day later that he could not locate him. That information is included in a supplementary report found in defense counsel's file and numbered ACB 060686.

Findings: A comparison of the Investigative File for the Raama Baker homicide with the criminal defense attorney's file establishes that there was no investigative information withheld by the CPD relative to that case, and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. Any investigative information pertaining to the Baker homicide contained on pages that were allegedly withheld by CPD can be identified in documents found in the defense counsel's file materials. Other documents plaintiff claims were withheld by CPD are actually found in the criminal defense attorney's file or were CCSAO documents for which the CPD had no disclosure obligation, such as the handwritten statement of a witness prepared by an Assistant State's Attorney. *People v. Leviante Adams* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

40.    *People v. Derrick Hatchett and Arthur Foote* (HJ-647205)

On September 22, 2003, the victim accompanied the defendants Derrick Hatchett and Arthur Foote as well as Tron Johnson and 'Polo' in three cars. They attempted to see a concert downtown but were unable to get in. Johnson fell asleep in the gray Buick that Polo drove. He was startled awake when Polo suddenly stopped the car. At that point, Johnson noticed that they were parked in a residential neighborhood (near 5600 S. Lowe Avenue) behind the white Impala. Johnson then immediately heard gunfire and saw that 'Quick' (Foote) was shooting a semiautomatic handgun at the victim Taylor outside the white Impala. Johnson further stated that Quick shot at Taylor between 8 to 12 times, and that 'Lil Ride' (Hatchett) was also out of the white Impala with a semiautomatic gun in his hand. When Polo began steering the gray Buick away from the scene, Johnson noticed 'Lil Ride' start to run down the street chasing after Taylor and Quick, and heard about five more shots. At that moment, Johnson saw Lil Ride running with the gun extended and shooting at Taylor. Taylor, who was then about a half a block down the street, fell to the ground in front of a house. Witnesses from the neighborhood confirmed this sequence of events. As the ambulance was about to transport the victim to the hospital, CPD Sergeant Ryan asked who shot him. In a dying declaration, he identified Quick and Lil Ride as the people who shot him. Taylor died from his injuries at the hospital.

After separate trials, both Hatchett and Foote were convicted and sentenced to the I.D.O.C. for 45 and 50 years, respectively.

Plaintiff contends, after an examination of the Investigative File numbered ACB 084314 - 084689, that 23 of the 376 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a.    ACB 084405 is a CPD Daily Major Incident Log. This document is authored by a detective division sergeant acting as a watch coordinators and briefly summarizes the crime. It is not an investigative document; the purpose of the Log is to provide timely and accurate information to the CPD chain of command regarding noteworthy crimes and incidents which occur during

each 24-hour period. There is no indication that the watch coordinator participated in the investigation other than learning the basic facts of the murder and, later, the arrest of the offender contained in his summary. This information is detailed in the CPD reports tendered to the defendants during pre-trial discovery.

b. ACB 084406 – 07 is a 'to – from' memo from one set of detectives to another informing them of their interview of the defendant. The substance of this memo was repeated in a supplementary report found in the defense attorney's file and numbered ACB 084489 – 94. GPRs that were made at the time of the interview were also found in the defense attorney's files and are numbered ACB 084495 – 500. Both reports reference another investigator's report, from the Burnham Police Department, that was found in the defense attorney's file and is numbered ACB 084504 -05. All of these reports contain statements made by the defendant Hatchett regarding the murder. All of these statements were tendered in pretrial discovery by the CCSAO to the defense attorney. A review of the defendant's appellate court opinion reveals that his attorney was successful in suppressing his statements to police during a pretrial hearing. *See People v Hatchett, 397 Ill. App. 3d 495, 497, 922 N.E.2d. 477, 478 (1st Dt., 2009).* It is highly unlikely that the statement suppression hearing would have been held without the prosecution providing these reports to defense counsel.

c. ACB 084414 -15 is an Illinois State Police crime lab report that failed to match fingerprints to the defendants. This report would have been tendered during pretrial discovery from the CCSAO to the defense attorney. Moreover, a supplementary report detailing the request to make the fingerprint comparisons and Illinois State Police evidence submission forms were found in the criminal defense attorney's files and are numbered ACB 084516 – 21.

d. ACB 084431 – 36 is a supplementary report regarding the arrest, interview and line up of the second defendant, Arthur Foote. ACB 084437 – 38 are GPRs that relate to the supplementary report discussed above. A review of a transcript from a pre-trial status date indicates that the prosecutor was waiting for these reports and would provide them to defense counsel once they were available. *See People v Derrick Hatchett*, 04 CR 25808, August 11, 2005, Transcript Page 3.) These reports would have been tendered during pretrial discovery from the CCSAO to the defense attorney.

e. ACB 084439 is CPD Felony Minute Sheet – Form 101 for defendant Foote. The document lists the charged defendant, a brief summary of the facts, and some of the prosecuting witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in all of the CPD case and supplementary reports tendered to the defendants.

f.  ACB 084444 – 49 is a supplementary report detailing an interview with a key eyewitness, Tron Johnson. This report would have been tendered during pretrial discovery from the CCSAO to the defense attorney. A review of the defendant's appellate court opinion reveals that this witness recanted his pretrial statements to police and prosecutors. At trial, the court allowed the original statements in evidence as substantive evidence. On appeal, defense counsel challenged his conviction, in part, on the admission of these statements. The appellate court also noted that the trial court, during a pretrial hearing and during trial, ruled that the statements would be admissible as substantive evidence. *See People v Hatchett, 397 Ill. App. 3d 495, 506-507, 922 N.E.2d. 477, 484-486 (1st Dt., 2009).* It is highly unlikely that either the pretrial motion or the trial would have proceeded without the prosecution providing these reports to defense counsel.

g.  ACB 084474 – 76 are some of the GPRs detailing another interview with the defendant Hatchett. Other GPRs from these same interviews with Hatchett were found in the defense counsel's file and are numbered ACB 084477 – 80. These reports would have been tendered during pretrial discovery from the CCSAO to the defense attorney. The substance of these interviews with Hatchett are included in a supplementary report found in the defense attorney's files and numbered ACB 084450 – 58. As stated before, defense counsel was successful in suppressing the defendant's statements to police during a pretrial hearing. *See People v Hatchett, 397 Ill. App. 3d 495, 497, 922 N.E.2d. 477, 478 (1st Dt., 2009).* It is highly unlikely that the statement suppression hearing would have been held without the prosecution providing these reports to defense counsel.

h.  Transcripts from pre-trial status hearings reveal that the CCSAO was providing CPD reports to defense counsel. The documents now claimed to be missing could very well have been provided during the pre-trial discovery process between the CCSAO and the defendant's attorney. For example, the Assistant State's Attorney indicated at one hearing that he was providing "additional discovery" of 102 pages. (*People v Derrick Hatchett*, 04 CR 25808, December 28, 2004, Transcript Page 2.) The concern during these hearings was with obtaining Illinois State Police D.N.A. crime lab reports. On another court date, the Assistant State's Attorney provided more police reports and noted that, besides the D.N.A. material and possibly a "couple of pieces," that "all of the discovery was in" and that "I would think this is going to complete it." (*People v Derrick Hatchett*, 04 CR 25808, April 18, 2005, Transcript Page 2.)

Findings: The CCSAO cannot locate its file.   However, a review of the Investigative File for the Patrick Taylor murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Derrick Hatchett*

does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff.

53.     *People v. Albert Buckles* (J-381525)

On September 5, 1987 at approximately 2:00 a.m., the victim argued with a woman in the defendant's apartment. The victim threw a knife at her. He retrieved the knife and walked out of the apartment. Within minutes, the defendant and others also left the apartment. The defendant loaded and brought a handgun with him. Outside of the residence, the victim approached the defendant and others near the defendant's car. The defendant and the victim verbally argued and moved near the rear of the residence. The victim threw his knife at the defendant but missed him. The defendant took out his gun and fired once shattering the rear window of a parked car. The defendant claimed in his statement to the police that he thought the victim was taking out another knife. At this point the victim was about 37 feet away from him. When he saw these movements by the victim, the defendant fired his handgun again, striking and killing the victim.

After a bench trial, the defendant was sentenced to 5 years in the I.D.O.C. He was either convicted of voluntary manslaughter or armed violence.

Plaintiff contends, after an examination of the Investigative File numbered ACB 046796 - 046880, that 42 of the 85 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a.  ACB 046857 – 80 are misfiled police reports. These pages pertain to the cold case investigation on a 1981 murder recorded under R.D. # 81C214732.

b.  A few documents have no evidentiary value on their face. They are either blank or contain an officer's name or assignment number. ACB 046845 ("642"), 046848 ("Summerville"), 046851 (blank back of an inventory sheet), 046853 ("642"), 046855 ("Summerville 4/VC") and 046856 (blank CPD envelope.)

c.  ACB 046797 is a CPD Investigative File Inventory. It has no evidentiary value.

d.  ACB 046837 is an inventory sheet for a handgun and cartridges. Inventory sheets are contained in the court's municipal file that is available to defense counsel. This inventory is also noted in supplementary reports both by the inventory number and how it came to be collected by the officers. These reports were found in defense counsel's file and are numbered ACB 046807 – 15. This inventory sheet would have been tendered during pre-trial discovery by the CCSAO.

e.  ACB 046839 – 42 are GPRs reflecting identification information of police and civilian witnesses including notes taken during interviews of some of the witnesses. All of this information was included in supplementary reports found in the defense attorney's files and numbered ACB 046807 – 15; 046818 and

046852. The GPRs would have been tendered by the CCSAO to the defense attorney during pretrial discovery.

f. ACB 046843 is a hand drawn sketch of the crime scene. This sketch would have been tendered by the CCSAO to the defense attorney during pretrial discovery.

g. ACB 046844 is a CPD Firearms Receipt & Worksheet for the gun and cartridges recovered from the crime scene and inventoried. ACB 046847 is a CPD Preliminary Fired Evidence Report describing the results of the lab examination and testing of the handgun and cartridges previously inventoried. Both of these reports would have been tendered during pre-trial discovery.

h. ACB 046846 is a body chart usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected to find a version of the body chart included in a police report. This chart was most likely attached to a CPD Cause of Death supplementary report authored by a detective assigned to either the forensic unit or the medical examiner's office. The cause of death report with detailed information was found in the defense attorney's file and is numbered ACB 046816 - 17.

i. ACB 046849 – 50 are duplicate copies on an inventory sheet reflecting that the bullets recovered during the autopsy were collected by the medical examiner and turned over to the CPD The recovery of the bullets is discussed in the assistant medical examiner's post mortem report found in the defense attorney's files and numbered ACB 046798 – 01. This inventory sheet would have been tendered in pre-trial discovery and are often retained in the Clerk of the Circuit Court's case file that is available to defense counsel to examine and copy.

Findings: The CCSAO cannot locate its file.   However, a review of the Investigative File for the Joe Brown murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v Albert Buckles* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield.

61.    *People v. William Goodin* (G-165272)

On May 4, 1985, the defendant and the victim, Ronald Joe Anderson, were homeless and living in a box car on the IC tracks near 1100 S. Indiana Avenue. They were companions and sex partners for approximately 6 years. In the afternoon hours, they got into an argument when the victim demanded sex. The defendant pulled out a knife and while fending off the victim's advances, struck him near the heart with the knife. He punctured the victim's aorta killing him. The defendant fled to Milwaukee but

114

returned to Chicago and was arrested in November. He provided the police and the CCSAO with a handwritten statement describing the homicide.

The defendant entered a plea to involuntary manslaughter and was sentenced to probation in July, 1986.

Plaintiff contends, after an examination of the Investigative File numbered ACB 089308 – ACB 089463, that 91 of the 156 pages were not found in the defense attorney's file. The CCSAO was unable to locate its file.

a. Numerous Supplementary Reports, totaling 30 pages, that were not found in the criminal defense attorney's file would have been produced in pre-trial discovery: ACB 089382 – 87; 089389 – 405; 089411 – 12; 089414; and 089426 – 29. Evidence that these reports were produced is that the detectives involved in creating these reports are identified on the State's answer to discovery in the criminal defense attorney file. CRIM.DEF FILES – FIELDS 042366-70. The prosecutor would not have had these names to identify without these reports.

b. ACB 089429 is listed twice.

c. ACB 09362 – 65 are bates stamp numbers that are not in the sequence for this file. If this is a mistyped reference to ACB 089362 – 65, that supplementary report was found in the permanent retention file.

d. ACB 089326 – 28 is a GPR detailing an interview with the defendant. The substance of this interview is found in the supplementary reports (ACB 089320 – 23) and in a handwritten statement (ACB 089354 – 56) that were available to the defense attorney.

e. ACB 089330 – 31 is St. Louis, Missouri police department memo regarding their search for the defendant. CPD did note their contact with the St. Louis detectives in a supplementary report at ACB 089357 – 58.

f. ACB 0089332 is a Department of Illinois – Medical Eligibility Card for Patricia Powell that includes her address. This document has no evidentiary value. Moreover, the supplementary reports that include the substance of interviews with her were found in the defense attorney's files and are numbered ACB 089366 – 67 and ACB 08957 – 58.

g. ACB 089333 is a request for phone records. ACB 089334 – 52 are the requested phone records. The defendant subsequently turned himself in to the police. These records have little evidentiary value.

h. ACB 089353 is a CPD Felony Minute Sheet – Form 101 for the defendant. The document lists the charged defendant, a brief summary of the facts, and the prosecuting witnesses. This document is primarily relied upon by the preliminary hearing prosecutors to prepare charges for indictment or to locate

witnesses for either a preliminary hearing or grand jury proceedings. The information is contained in all of the CPD case and supplementary reports tendered to the defendants.

i.  ACB 089359 is an arrest warrant for the defendant. The issuance of the warrant was detailed in ACB 089357 – 58. A copy of the warrant is maintained in the court's file and available to defense counsel.

j.  ACB 089362 is a GPR relating to an interview of Patricia Powell. The substance of the interview is included in a supplementary report found in defense counsel's file and numbered ACB 089366 – 67 and 08957 – 58.

k.  ACB 089388 is a CPD Material Submitted for Use in the Daily Bulletin document. Detective McGuire's request alerts officers that the defendant is wanted for questioning. ACB 089368 – 81 are seven copies of the daily bulletin with an alert for the defendant. The request to put the alert in the daily bulletin was noted in a three-page supplementary report found in the permanent retention file and dated 12 Oct 1985. The daily bulletin material has little evidentiary value.

l.  ACB 089417 – 20 are GPRs containing notes of witness interviews. The content of those interviews is contained in a supplementary report found in the defense attorney's files and numbered ACB 089406 -10.

m.  ACB 089435 is a body chart usually prepared by the assistant medical examiner and attached to the post mortem report. It was also not unexpected to find a version of the body chart included in a police report. This chart was most likely attached to a CPD Cause of Death supplementary report authored by a detective assigned to either the forensic unit or the medical examiner's office. The cause of death report with detailed information was found in the permanent retention file and is numbered ACB 089426.

n.  ACB 089436 is a CPD Evidence Report. The participation of the evidence technicians, by name, was included in a supplementary report found in the defense attorney's file and numbered ACB 089457 – 61. This document would have been provided to defense counsel by the CCSAO in pre-trial discovery.

o.  ACB 089437 is a criminal history report for the victim. This document would have been provided to defense counsel by the CCSAO in pre-trial discovery. ACB 089438 is a leads inquiry for both the victim and the defendant. It has no evidentiary value.

p.  ACB 089445 is an inventory sheet for the victim's clothes. They were collected at the medical examiner's office. This inventory sheet would have been provided during pre-trial discovery. It is also found in the court file.

q. ACB 089452 – 55 are the GPRs of the detectives who arrived at the scene. The substance of the GPRs is included in the initial scene supplementary report found in the defense attorney's files and numbered ACB 089457 – 61. Other information from these GPRs are also found on a report numbered ACB 089429 that was found in the permanent retention file. These GPRs would also have been tendered to defense counsel during pre-trial discovery by the CCSAO.

r. ACB 089456 is an arrest report for a person arrested the day before the murder in the same vicinity. This person is not mentioned again in the investigation.

Findings: The CCSAO cannot locate its file. However, a review of the Investigative File for the Ronald Anderson murder and the criminal defense file produced by plaintiff establishes that there was no investigative information withheld by the CPD relative to that case and that the CPD complied with its *Brady* obligations and with its own special orders regarding the preservation of documents. *People v William Goodin* does not provide evidence to support a claim that the CPD had a practice of under-producing investigatory documents in the criminal process as suggested by plaintiff and Mr. Brasfield. Rather, it shows that the criminal defense file is incomplete as described above. This is another example demonstrating the error in assuming the completeness of the criminal defense attorneys' files, particularly when information in those files (*i.e.* the State's answer to discovery) demonstrates they are incomplete.

Dated: June 24, 2016

Bernard J. Murray
Bernard J. Murray

Bernard J. Murray
5710 South Moody Avenue
Chicago, Illinois 60638
April 5, 2017

Eileen Rosen
Attorney at Law
Rock Fusco & Connelly, LLC
321 North Clark Street
Ste 2200
Chicago, Illinois 60654

Re: *Rivera v. City of Chicago*

Dear Eileen Rosen:

We recently discussed my possible role as an expert witness in *Rivera v City of Chicago*. My proposed rates for the review of the Plaintiff's Expert's report and possible testimony are $200 for the out of court review and $300 for testimony.

If you find these terms acceptable, I am prepared to start immediately.

Sincerely,

Bernard J. Murray

EXPERT REPORT OF BERNARD J. MURRAY

I.      Overview

a.  The Plaintiff's Expert's conclusions that "[c]riminal defense files show that important investigative materials are regularly withheld from criminal defendants" rests on a flawed premise. (Pl. Exp. Rpt., at p.40) He assumes that documents currently missing from the criminal defense attorneys' files but present in the CPD's investigative files establishes that they were withheld from prosecutors and criminal defendants prior to and at the time of trial. He makes this claim lacking any evidence to show that either the criminal defense attorney's files or the prosecutors' files are currently in the same condition as they were at the time of the original trial. The Plaintiff's Expert also claims, without evidence, that documents were "withheld even where defendants issued subpoenas specifically requesting those documents." (Ibid.)

b.  Plaintiff's Expert also claims that the material withheld was relevant, exculpatory investigative material. An examination of the documents he identifies as missing from the criminal defense files demonstrates that many of them are not substantive investigative material. They are administrative documents such as file inventories, court attendance reports, and subpoenas. There are also documents that, if they were not provided during discovery, are available in court files open to the public. There are also claims of withheld photographs that are made available to the defense attorneys prior to trial.

c.  Plaintiff's Expert initially compared 48 criminal defense attorneys' files to 44 investigative files. Of those 44 investigative files, there are 33 corresponding CCSAO files. (Two CCSAO files were related to one CPD investigative file.) Plaintiff's Expert ultimately limited his analysis to 38 criminal defense attorneys' files. There are 26 CCSAO files related to these files. He only examined 7 cases where he also claimed to review the corresponding CCSAO's files. However, a CCSAO file is not available for one of the seven files. Plaintiff's Expert specifically reviewed these seven files as "examples" in his report.[1] (Ibid., at pp. 45-49.) The remaining files were contained in a table compiled by the Plaintiff's counsel. The Plaintiff's Expert applies the same flawed logic specifically to the seven files. That is that the criminal defense attorneys' files today contain the same documents as at the time of trial. One file that the Plaintiff's Expert relies upon is devoid of any CPD

---

[1] My detailed analysis of these seven files is found at page 12.

reports. He also claims that the seven files have a corresponding prosecutor's file that demonstrated that the same missing material was also "withheld" from the prosecutors. (Ibid., at p. 49.) He again assumes that the prosecutors' files today contain the same documents as at the time of trial. For the remaining links, he failed to even attempt to examine the prosecutors' files to determine if any of the allegedly withheld documents were found in the prosecutors' files. An examination of the prosecutors' files reveals many of the allegedly withheld documents are contained in the CCSAO's trial files and therefore not regularly withheld.

d. For this report, I am also relying upon my analysis of the Plaintiff's Expert's report in Fields v City of Chicago and the report compiled in that case. (See attachment A)

II. Discovery Obligations

a. The Illinois General Assembly has acknowledged by statute that discovery procedures in criminal cases shall be in accordance with the Illinois Supreme Court Rules. 725 ILCS 5/114-13(a). They also have codified the long-standing procedures utilized by police and prosecutors to guarantee that police reports will be provided to the prosecutors' offices to be tendered during discovery:

b. Disclosure to the Accused: The Illinois Supreme Court Rules require that the prosecution disclose to defense counsel certain material and information within its possession or control in all felonies and felony juvenile delinquency cases. (Illinois Supreme Court Rule 412.) Among the items required to be disclosed are:

c. *Brady* and *Giglio* Disclosures: The U.S. Supreme Court decisions also require that prosecutors disclose exculpatory evidence that is material either to guilt or to punishment. *Giglio* requires evidence that could allow the defense to impeach the credibility of a prosecution witness. The police fulfill their *Brady* and *Giglio* disclosure obligations when they supply the information to the prosecutors.

2

d. The Illinois Supreme Court Rules also require that the prosecution "ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged. (Illinois Supreme Court Rule 412 (f)). The prosecution's duty to disclose is a continuing obligation. If additional discoverable information comes to the prosecution's attention at a later date, the defendant should be promptly notified. (Illinois Supreme Court Rule 415 (b)).

e. The Illinois Supreme Court Rules indicate that certain materials are not subject to disclosure. For example, work product is not subject to disclosure. The Rules state that disclosure "shall not be required of legal research or of records, correspondence, reports or memoranda to the extent that they contain the opinions, theories or conclusions of the State or members of its legal or investigative staffs, or of defense counsel or his staff." Illinois Supreme Court Rule 412(j).

f. The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, the CPD's policy is good. It requires detectives to turn in all material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law. Plaintiff's Expert disclosed in the *Fields*' litigation that, as a police officer, he routinely shredded his investigative notes. Unlike plaintiff's expert's own practice, CPD's policy requires the detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will nevertheless be maintained and produced to the prosecutor and defense attorney for later review. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other fashion; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

III. Regulation of Discovery

a. For crimes occurring in Chicago, Cook County Assistant State's Attorneys assigned to trial courtrooms learn both formally and informally how to obtain police reports and all other relevant information and evidence. Prosecutors maintain checklists of documents that may exist and should be obtained. Along with the checklists come the methods to obtain the reports and evidence. Most of the documents listed on the checklists are created by the Chicago Police Department.

3

b. Chicago Police Department reports are obtained primarily through subpoenas, forms and telephone calls. The primary sources of reports, notes, criminal histories or photographs in the Chicago Police Department are headquarters, the crime lab, the bureau of identification and the department's area headquarters. The Cook County State's Attorney's Office and the Chicago Police Department maintain an intra and interoffice mail service that facilitates the production of reports, photographs and criminal histories.

c. By the 1980s, prosecutors routinely subpoenaed all police reports. This was in addition to the forms or phone calls that were still utilized. The subpoenas would include a request for police documents that became known informally by some prosecutors and defense attorneys as 'street files.' Chicago Police Department Investigative Files contain what attorneys referred to as "street files" *i.e.*, notes most often recorded on forms titled 'general progress reports' (GPRs). Prosecutors would often send these subpoenas to both the Superintendent's Office (also known as headquarters) and to the Area Headquarters. The Chicago Police Department subsequently directed that the subpoenas go through one location: The Superintendent's Office. From there, CPD's subpoena unit would cause the subpoenaed material to be collected from the relevant unit and sent to the trial courts. Many criminal defense attorneys would also issue subpoenas for police reports and include the term "street files" in the documents requested, which would obtain copies of the Investigative Files.

d. To insure a prompt flow of information, prosecutors would also reach out to Detectives and have them bring their investigative files to court for copying.

e. Once the police reports were in hand, the prosecutors would tender all of them to defense counsel. If after a review of the documents they appeared to be incomplete, more requests for potentially missing documents were made by the attorneys in the courtroom.

f. Prosecutors provide these documents to defense counsel in court and generally indicate when they believed they have tendered the complete file. Prosecutors also utilized an informal docket sheet within their files, commonly referred to as the blueback. Prosecutors often recorded on their bluebacks when they provided discovery to defense attorneys. Formal Answers to Discovery also briefly summarized some of the discovery. For example, the Answer listed witnesses' names found in the police reports the prosecution anticipated calling at trial.

g. To memorialize discovery compliance, prosecutors eventually created discovery receipts in the 1990s that listed the documents tendered to defense counsel. A signed copy of the receipts was often maintained in the prosecutors' files. More recent methods include numbering all the pages and scanning the documents.

h. Not all documents or pieces of evidence are tendered by prosecutors to defense counsel. However, these items are made available for defense counsel to examine prior to trial. For example, items of physical evidence such as a weapon or clothing are not photocopied but are made available for examination. Prosecutors often made photo arrays, crime scene photographs, or individual photographs available for examination, too.

i. In addition to the prosecutor's obligations to disclose police reports during discovery, certain documents are also maintained in the court file or are provided to defense counsel in open court.

   i. During a charged defendant's first court appearance, his defense counsel is provided with a copy of his one-page arrest report. This document is utilized by the court to determine whether probable cause to detain exists. Defense counsel can also examine and copy the complaint for preliminary hearing. Although not provided to defense counsel during the initial appearance, the defendant's criminal history is summarized during the bond hearing to assist the court in setting an appropriate amount of bail. After a subsequent determination of probable cause, the formal indictment or information is also maintained in the court file. Finally, the court file maintains copies of arrest and search warrants and documents pertaining to extradition.

   ii. The court file also contains Chicago Police Department Property Inventory Sheets. This document, known as the Inventory, lists evidence that was recovered and preserved by the police department during the investigation.

IV. Record Retention and Discovery Obligations

a. Plaintiff's Expert acknowledges that a criminal defendant may receive investigative material either from the CPD or from the prosecutor's office during discovery. (Ibid., at p. 40)

5

b.  The CPD developed a policy, Special Order 83-1 and later orders, to ensure compliance with the rules of discovery in criminal cases. From the perspective of a prosecutor, CPD's policy furthers their ability to comply with discovery obligations.  It requires detectives to turn in all material they generate or receive during an investigation so that it is maintained in the Investigative File for production and use during the criminal case and enhances the prosecutor's ability to fulfill his or her responsibilities under the law.  CPD's policy requires detectives to submit their handwritten notes as well as their formal reports for inclusion in the file. This policy is beneficial as information contained in a GPR or note will be maintained and produced to the prosecutor and defense attorney for later review.

   i.  At times, Plaintiff's Expert complains that information was not recorded on a GPR form or was preserved by different units within CPD. It does not matter to the attorneys in the courtroom whether the detectives write their notes on a GPR, a legal pad, in a to/from memo format, or in some other manner; the crucial point is that the relevant information developed during the investigation is submitted for later use by the prosecutor and defense attorney.

   ii.  Nor does it matter that a different unit of CPD either created a report or maintained reports in different physical offices. Prosecutors and criminal defense attorneys are well aware that, for example, criminal history reports or lab reports were created and maintained by different units within the police department. This knowledge is demonstrated by the laundry-list of documents requested in subpoenas issued by either a prosecutor or a criminal defense attorney.

c.  From the inception of the Orders mandating the preservation of investigative materials, prosecutors as well as criminal defense attorneys, have issued subpoenas to receive not only typed reports but investigative materials. The subpoenas issued by all attorneys have used various terms for the investigative material. Primarily referred to as 'street files,' they are also referred to as area files, GPRs, notes, or running files.

d.  The subpoenas issued by prosecutors and criminal defense attorneys also reveal that lawyers involved in the criminal justice system understand that the Chicago Police Department has various units tasked with creating, compiling and maintaining records related to a criminal investigation. The subpoenas issued to obtain these records are often detailed to obtain all of those records. The primary identifying number is the case number, known as the records division or RD number. Other significant numbers to obtain records are the arrest report and photo number (known as the CB number), the criminal history number (known as the IR number) and the property inventory number (known as the EARPS or inventory number.)

6

    i.   While the permanent records division maintains the formal police reports such as the typed supplementary reports, the investigative files are maintained by the police Area that is primarily responsible for the investigation. Those files could contain notes, photos, or GPRs added to the file during the pendency of the investigation.

    ii.   All CPD officers compile their reports under the RD number and submit them for permanent retention. Those documents may be created by patrol, gangs, narcotics, crime lab, forensic investigators or bomb and arson units.

    iii.   Other units in the Chicago Police Department are tasked to maintain other records or evidence. For example, arrest photos and criminal histories are maintained in a central location known as the Bureau of Identification. Evidence collected from a crime scene and submitted to the CPD Lab for testing is maintained at the lab during testing. Reports generated by the Labs are accessed through a request using the case RD number.

    iv.   Forensic investigators who primarily collect evidence and photograph crime scenes maintain their photographs in their unit under the case RD number. The collected evidence is preserved with the Evidence and Recovered Property Section (EARPS.) EARPS generates numerous copies of their property inventory sheets and submits one copy to the Clerk of the Circuit Court to maintain in the municipal court file.

e.  Plaintiff's expert alleges throughout the report that "parallel files" are maintained by CPD and are often not provided to either criminal defense attorneys or prosecutors.

    i.   Either in his report or during his deposition, Plaintiff's Expert is not clear on how he defines a parallel file.

        1.  If he is referring to the manner that CPD creates and maintains reports, this process is not concealed. Prosecutors and criminal defense attorneys are aware of the manner and location of how those reports are created and where they are stored.

        2.  If he somehow suggests that individual police officers are personally retaining reports that are not maintained in the investigative file, he does so through speculation. The

Special Orders from the early 1980s directed the detectives to the procedures to be used to maintain investigative materials.

3. Plaintiff's Expert also claims that police officers from other units such as patrol or gangs could have files related to a homicide investigation but CPD Special Orders are silent on whether the reports should be preserved or disclosed to prosecutors or defense attorneys. (Pl. Exp. Rpt., at 57.)

   a. While Plaintiff's Expert acknowledges that the CPD divided investigations into Areas and violent and property crimes sections, he appears to ignore that violent crimes detectives have the primary responsibility to investigate homicides. Nowhere in any file will you find a patrol officer or a gang officer having primary responsibility to investigate or clear a homicide.

   b. If a patrol or gang officer participates in the investigation of a homicide, any reports generated by those officers are shared with the violent crimes detectives and filed by CPD under the RD number associated with the crime.

   c. Therefore, all reports compiled by a patrol officer or a gang officer could be obtained by either the prosecution or the criminal defense attorney via a subpoena.

4. Plaintiff's Expert claims that detectives may have three files during the investigation. (Pl. Exp. Rpt., at p. 56) In addition to the permanent retention and investigative files, he identifies a third file accumulated at the area during the investigation. This third file contains copies of permanent retention documents related to the homicide. These documents are already preserved in the permanent retention file and therefore available by subpoena from either the prosecution or the criminal defense attorney.

   a. This third file is merely copies of already existing CPD reports kept at the Area for reference by the Detectives during the course of the investigation.

8

    ii. Plaintiff's Expert claims detectives continue to store information in separate files that were not ultimately stored with the investigative file. Plaintiff's Expert cites as an example the lineup photos from the Plaintiff's criminal investigation that were produced from "ERPS" (sic) for "the first time in this civil case in 2013." (Pl. Exp.'s Rpt. at p. 49). As stated before, the Evidence and Recovered Property Section (EARPS) serves as the standard repository for evidence that is retained for use in investigations and at trials. The property inventory number and a description of the evidence is included in the supplementary reports. The actual property inventory form is maintained in the CPD records with a copy forwarded to the Clerk of the Circuit Court for placement in the municipal court file.

        1. The evidence retained with EARPS is not concealed from the defendant nor are the police reports documenting its existence. The documents are available via a subpoena or by examining the court file. The evidence itself is made available to the criminal defense attorney prior to or at trial.

V.    Claimed Withheld Investigative Material

  a. Some of the documents that Plaintiff's Expert identifies as missing from the criminal defense files are not substantive investigative material. While Plaintiff's Expert acknowledges that some documents in a police file may be administrative in nature and not crucial evidence (Pl. Exp. Rpt., at p. 42), he still includes these documents in in his attachments.

  b. Some of the clearly administrative and non-investigative material that Plaintiff Expert's claims was withheld from the criminal defense attorneys include:

    i. Investigative file inventories, investigative file control forms, subpoenas, court attendance reports, prosecutors' letters detailing defendant's conviction, case assignment sheets, and court notification forms.

    ii. There are documents that are not investigative reports:

        1. Front and back folder covers, interoffice mail envelopes, photo request forms and a fax cover sheet. Moreover, CPD would often fold a report and staple it together prior to sending it via interoffice mail. Often the sending party would write either the police officers name and assignment on the

            outside of the document or merely the destination. A copy of the officer's name and assignment is not investigative material.

c. The medical examiner's report including the toxicology report and body diagram are documents that are not created by the CPD though they may have been included in an investigative file. These documents are provided to the criminal defense attorney during discovery by the prosecution. A CPD copy of the medical examiner's body diagram attached to a cause of death supplementary report is routinely provided to defense counsel during pre-trial discovery.

d. There are documents claimed to be withheld by the CPD that are commonly disclosed by the prosecution but are also maintained in the court file. These documents are therefore available to the criminal defense attorney:

    i. EARPS Property Inventory documents, Preliminary Hearing Complaint, Defendants' Arrest Reports and Arrest Warrants including fugitive arrest receipts and extradition waivers.

e. In Attachment F, the titles of many of documents alleged to be withheld from the criminal defense attorneys clearly indicate that they are not investigative materials. Rather they are administrative documents or are documents not created or maintained by CPD. Other documents are found in the court file or are routinely provided during pre-trial discovery and were found in the CCSAO files.

    i. Plaintiff's Expert lists investigative file inventories, subpoenas, medical examiner's reports, court attendance reports, court notification forms, envelope, SAO disposition reports, state's attorney letters, investigative file control documents, court complaints, EARPS property inventory reports, and 101 forms.

    ii. The CPD investigative files listed in Attachment G range from about 30 to over 400 pages. In nearly every case listed, one or more of these above listed documents were listed as missing from the criminal defense attorneys' files. In some cases, they were the only documents alleged to be withheld.

f. There are documents claimed by the plaintiff's expert to be withheld by CPD that were found in the prosecutors' files. Pursuant to statute and Illinois Supreme Court Rules, prosecutors are obligated to compile and disclose certain material and information within its possession, including police investigative reports, to defendants in all felony cases.

10

i. CCSAO files were not found for all the criminal defense attorneys' files. And where the files were found, it is difficult to determine whether the CCSAO file today is in the same condition now as it was at the time of trial. Nevertheless, every CCSAO file contained many of the CPD investigative materials that Plaintiff's Expert claimed were withheld.

ii. Among the allegedly withheld documents found in the CCSAO files were supplementary reports, requests for fingerprints, criminal histories, witness statements, felony 101 forms, lineup photos, defendants' statements, case reports, handwritten notes, and GPRs.

iii. In two of these files, investigative material alleged to be missing from the criminal defense attorneys' files were also missing from the prosecutors' files as they exist today.

1. Israel Pacheco J 433347 – RFC 07158-59 is a two-page supplementary report detailing an interview with a witness, Miguel Collazo, who implicates co-defendant Madrid. This is a significant report that would usually be obtained during discovery and provided to defense counsel. The content of the report shows that the interview was known to the prosecutors. The witness was interviewed at the State's Attorney's office and provided a statement that was retained by the CCSAO.

   a. RFC 7160-61 and 7162-63 are two lineup reports. These reports are routinely tendered by the prosecutor's office. The criminal defense attorneys were aware of these lineups because two of them are listed as present for both lineups. It should also be noted that no positive identifications were made by the witnesses.

   b. RFC 7184-85 is a cause of death supplementary report. Although all the information in this report is contained in detail in the medical examiner's post mortem report, this police report is routinely provided to the criminal defense attorney during discovery.

2. Samuel Robinson N 581836 – In this second file, RFC13648 is a typed note detailing an anonymous tip from a concerned citizen implicating a possible, additional third defendant.

11

Only two defendants were charged and only one, Samuel Robinson, was convicted as the actual shooter. Although the information here is not necessarily *Brady* or *Giglio* material, this document would have been tendered during discovery.

VI.    Comparison of Seven Defense Attorney Files to Investigative Files.

a.    Plaintiff's Expert compared seven defense attorney files to CPD's investigative files. He also claimed that he examined a CCSAO file on each of these files. He claimed that the same material withheld from the criminal defense attorneys was also withheld from the prosecutors. However, a CCSAO file is not available for one of the seven files.

b.    <u>People v David Quinones, Bruce Andras & Marc Johnson, J-209456, 87 CR 7785 (V: *Eddie Mercado* & Nicky Lanzarin and Luis Rodriguez)</u>

    i.    Plaintiff's expert claims that the absence of RFC 6443, a form used by CPD officers to request prior arrest photographs, reveals the presence of an undisclosed alternative suspect. Of the three names on the form, one was found only on the form and nowhere else in the file. Plaintiff's expert speculates, without any evidence, that this person could be an alternative suspect and that the absence of his name elsewhere in the file also indicates that other investigative materials created in the file are missing.

    ii.    The photographs could be used to identify, to the police officers, a suspect or a witness. Or it could also consist of photographs to be used in identification procedures such as a photo array. Mickey Harris' name does not appear anywhere in the documents associated with the Quinones' file. Although not likely, Mickey Harris' photograph may have been obtained for possible use in a photo array on the current case. It is more likely that Harris may have come to the detective's attention in an entirely separate investigation and the detective added the name to the request form as a matter of convenience.

    iii.    Plaintiff's Expert also claims that two case numbers were withheld. RFC 6334 contains the case number "94CR0105701." This is a Cook County Criminal Court case number. Since "94" refers to the year 1994, this case and case number could not have existed until 7 years after the murder occurred. It could be a misfiled document

or the reverse side of document. Under any explanation, it is irrelevant to the case at hand.

iv. The second case number is found on RFC 6332 – a handwritten note "87117788701." The Cook County Clerk's Office uses numbers in this format for the 1st Municipal court system. In all likelihood, this is a preliminary hearing number used for one of the defendants during the approximate first 30 days in a 1st municipal court prior to the indictment, the substitution of the indictment number (87 CR 7785) and the assignment to the Criminal Court.

v. This number may have been written on the back of a court notification document for a hearing on defendant Quinones' case. (RFC 6331) Three officers were notified to appear in court on defendant Quinones' case. That coincides with Plaintiff's Expert's claim that the case number was not found in the other two defendants' criminal defense attorneys' files.

c. <u>People v Miguel Borrotto, P-526822, 91 CR 27721 (V: *Fulgencio Torres* & Angel Sotos)</u>

i. Plaintiff's Expert claim that two documents missing from the criminal defense counsel's file demonstrate that the defendant owned a car with different license plate numbers than the document found in the defendant's jacket. First, the documents may have been in the criminal defense attorney's file at the time of the trial. Second, the document found in the defendant's jacket (and found in the criminal defense attorney's file at JR-L 212638) reveals the presence of both license plate numbers. Finally, the alleged missing documents have no bearing on the course of the investigation. The defendant's auto or its license plate number were not part of crime. It was the defendant's name on the form found at the crime scene that lead the police to search for him.

ii. One of the claimed missing documents, RFC 16401, is the purchase contract for a 1991 Nissan. The defendant and his wife's names are on the contract dated 3-21-91. Although a license plate number is not listed, the auto's V.I.N. is included. The second claimed missing document, RFC 16394, is a LEADS inquiry on the V.I.N. that is listed on the contract (RFC 16401.) The V.I.N. number is also listed on the Secretary of State's "License Plate/Sticker Replacement" form (RFC16300) found in the jacket abandoned by the defendant at the crime scene. (And found in the criminal

defense attorney's file.) Both the defendant and his wife's names and address are listed on the replacement form left at the crime scene by the defendant.

iii. The LEADS inquiry (RFC 16394) was made the same day of the murder, October 26, 1991. The document also indicates the name of the defendant and his wife as owners of the auto and list the YVK670 number as the license plate number associated with the auto. The final entry indicates the information was last updated on "090991." The plate number is handwritten on the document. A phone number written on the form is listed today to "Campbell Terrace Apartments" at 2061 N. Campbell Avenue in Chicago. That is the same general address for the defendant's wife in October 1991.

iv. RFC 16335 is the Secretary of State's "License Plate/Sticker Replacement" form found in the jacket abandoned by the defendant at the crime scene. (Found in the criminal defense attorney's file at JR-L 212638.) The form indicates that a new license plate with number ZZ1384 is replacing the existing license plate bearing number YUK-670. YUK670 is nearly identical to YVK670 and the "U" or "V" could merely be a poor handwriting mistake. The older number was handwritten while the new number was both typed and handwritten. This transaction occurred on October 22, 1991, four days before the murder. The Defendant and his wife's names are handwritten upon the form as well as the same V.I.N. from the alleged withheld documents. It is likely that the new license plate number was not recorded with the Secretary of State's office four days after the transaction and on the same day as the murder.

v. Plaintiff's Expert also claims that a document listing two names that were not found anywhere in the investigative file indicates that there were other investigative documents withheld from the criminal defense attorney. The names were found at RFC 16397 a document that appears to be the reverse side of RFC 16396 based upon its shape. RFC16396 is a blank CPD form titled "Miscellaneous Incident Exception Report" and not claimed to be withheld or missing from the criminal defense attorney's files. The document contains identification information on two people, Eduardo Castro and Karl Lugo. Those names are not found anywhere else in the file. Instead of considering the possibility that this information may have been misfiled, plaintiff's expert assumes it is proof of withheld documents. An example of misfiled

documents is found in this file. In the criminal defense attorney's file, JR-L 212732 is a subpoena on an unrelated case.

d. <u>People v Samuel Slack, J-080925, 87 CR 10978 (V: Estella Winburn)</u>

    i. Plaintiff's Expert claimed there was a corresponding CCSAO file for this case that demonstrated that CPD withheld the same documents from the criminal defense attorneys and the prosecutors. However, there is no CCSAO file. Nevertheless, Plaintiff's Expert claimed that CPD withheld documents from the prosecutors without having the ability to examine the prosecutor's file to determine if that allegation was accurate.

    ii. Plaintiff's Expert claims that two fingerprint comparison reports are missing. The first claimed missing report is RFC 5984. This report indicates that the V's left middle fingerprint was found on "color picture #3" an item that was recovered during the investigation and previously submitted to the crime lab. (See JR-L 217457 and RFC 06082). This picture was found in the victim's discarded belongings that were recovered at the crime scene. This report has no Brady value as it does not exculpate the defendant. It is not unexpected to find the victim's fingerprints on her own belongings.

    iii. While this report is not found in the criminal defense attorney's files, numerous other copies of a fingerprint report pertaining to the absence of the victim's fingerprints were provided. That report was found in the criminal defense attorney's files at JR-L 217460 and elsewhere.

    iv. The other claimed missing report is RFC 05982. This document is a form titled "Request for Latent Fingerprint Comparison." Detectives Mohan and Santopadre requested, on behalf of a prosecutor assigned to the case, an AFIS check on the defendant to all unidentified latent prints.  First, since this is a request form, the results would not be found on this document. Second, other versions of this request were found in the criminal defense attorney's files: JR-L 217461 and JR-L 217464. Third, the negative results of the AFIS search were found in the criminal defense attorney's files: JR-L 217463. Finally, a few copies of a more precise report indicating that "no comparison" of the defendant's prints to latent prints recovered in this case were found in the defense attorney's file at JR-L 217462.

v. The significance of the absence of a comparison of the defendant's prints to latent prints in this case was not lost on the criminal defense attorney. He subpoenaed the presence of the Fingerprint Examiner for numerous court dates and requested they bring the evidence and the comparison fingerprints to court.

vi. Plaintiff's expert also claims that 5 photographs from a photo array were withheld from the criminal defense attorney. However, the report that describes the use of this photo array (RFC 6007) also indicates that the photos were preserved for future use and lists an inventory number with the CPD's Evidence & Recovered Property Section. RFC 6007 is found in the criminal defense attorney's materials at JR-L 217104-105. The actual property inventory sheet is found in the criminal defense attorney's file at JR-L 217443.

vii. Items preserved by the CPD in this manner were available for viewing upon request by the criminal defense attorney. During this time, CPD's Evidence and Recovered Property Section was in the basement of the Administrative Building at 2650 S. California Avenue adjacent to the Criminal Court House. A nearby bulk warehouse was also used to store evidence during this era.

viii. From the context of RFC 6007, the defendant's photograph was one of the five photographs used in this array and was tentatively identified by witness Alvin Robles. Samuel Slack's photograph is not included in the group of photographs that the Plaintiff's Expert alleges were withheld from the criminal defense attorney. It is likely that these Polaroid photographs are not the array that was used with Robles and preserved at the CPD's EARP section. It is likely that these photos were not used in any photo identification procedures.

ix. This group includes Jeffery Johnson. Johnson was initially selected by Alvin Robles in two separate photos from a gang book; not from an array. That is a collection of numerous photographs of gang affiliated people. Robles subsequently failed to identify Johnson in a physical or live line up. Those reports were found in the criminal defense attorney's files. JR-L 217090 – 092, JR-L 217096 and JR-L 217097 – 098.

x. Fines Gerard Savage's photograph was also among the Polaroid photographs. A report describing how Savage came to the attention of the CPD was found in the criminal defense attorney's files at JR-

L 217102 – 103. This report also indicates that Savage was not identified by two other witnesses. Savage's arrest report number is listed in this report.

xi. Plaintiff's Expert also claims that arrest reports for 2 of the men appearing in these photos were withheld by the CPD. Jeffery Johnson's arrest report's central booking number is listed in reports found in the criminal defense attorney's files. A copy of his criminal history was also found in the criminal defense attorney's file at JR - L 217366. Information of Johnson's arrest is also found at JR-L 217371. If the report itself was not provided by the CCSAO during discovery, the criminal defense attorney could easily order a copy of it directly from the CPD. It was (and is) common for criminal defense attorneys to order potential witnesses' criminal histories and arrest reports directly from the CPD. For example, in this case, the criminal defense attorney subpoenaed the criminal history of witness Alvin Robles. JR-L 217252. Similarly, Fines Savage's arrest report number is found in the defense attorney's materials at JR-L 217102 -103. Savage's IR number found in criminal defense attorney's files at JR-L 217383.

xii. The criminal defense attorney subpoenaed the gang crimes book from numerous police officers and for numerous court dates. Obviously to attack the identification of the defendant by a witness who initially identified someone else as the offender.

e. People v Jesse Swanigan, N-028256, 90 CR 13343 (V: Rev. Ray Stoll)

i. Plaintiff's Expert claims that a message from 'John Reed' was withheld from the criminal defense attorneys and his name appears nowhere else in the file. John Reid's identifying information was found on a different GPR found in the criminal defense attorney's file. The document indicates that he is not a witness but a friend and member of a church. The GPR indicates "John Reid M/W/67 (+ Carol) 2066 N Humboldt 489-1133 Friend member of church." This information was part of a GPR found in the criminal defense attorney's file at JR-L 208059.

ii. Plaintiff's Expert claims that several mug shot photos were withheld from the criminal defense attorney including photos with a note claiming that the defendant was unidentified or misidentified.

    iii.   The CPD files indicate that a witness (Ronald Hayes) made a positive identification of the defendant from a photo array. RFC11388 and JR-L 208231. And 5 color photos were retained in a property inventory # 731858 found at JR-L 208096, 208099, and 208100. Another witness made a positive identification of the defendant in a live line up. JR-L 208208 and JR-L 208117. The criminal defense attorney filed a motion to quash arrest and suppress this lineup because of the alleged improper arrest.

    iv.   When the detectives were looking for the defendant they showed photos to his ex-wife. From the context of the report it seems to indicate that the ex-wife was shown more than one photograph of the defendant. At JR-L 208230 she indicates that a photo was "a better version of the D." There is no indication in the file of a misidentification of the defendant but is possible that the defendant's ex-wife had difficulty identifying him from an earlier photo.

    v.   It should be noted that at the time of the defendant's arrest he made a statement indicating that he came upon the real defendant and scared him away. The defendant then took the car and items stolen from the victim. Therefore, he never denied being present at the scene of the crime.

f.   <u>People v Curtis Kirkland, M-258570 91 CR 5108 (Stanley Moody)</u>

    i.   Plaintiff's Expert claims that four handwritten notes listing names and information not found elsewhere in the investigative file were only uncovered by the criminal defense attorney. The Plaintiff's expert undercuts his own argument by stating that the names were listed on a GPR (RFC10081) found in the criminal defense attorney's file.

    ii.   An examination of the criminal defense attorney's file indicates once the prosecution provided this GPR during discovery, she filed a formal motion for discovery seeking more time to investigate this information. Including examining photographs that were included in the multiple document repository (M.D.R.) alluded to in the body of the GPR. (JR-L 223635-67.)

    iii.   It should be noted that the presence of other possible offenders is consistent with witness accounts of the crime. Possibly as many as eight people chased, attacked and beat the victim ultimately

resulting in his death. Two eyewitnesses identified Kirkland as one of the offenders. The other names do not preclude the fact that defendant Kirkland was still accountable for the death of Stanley Moody.

iv. Plaintiff's Expert claims that one of the documents allegedly not found in the criminal defense attorney's files is consistent with a description of the crime by a witness uncovered only by the criminal defense attorney. Plaintiff's expert claims that the defense found a witness from the laundromat for the first-time months after the offense. The same GPR that was tendered to the criminal defense attorney listing the other possible offenders also indicates that the crime may have taken place by a "cleaning/laundry store." (RFC10081). Moreover, the initial scene supplementary report indicates that a manger for the laundromat, Courtney Moore, was interviewed and said the store was closed and he saw nothing. (RFC161794.)

v. Nevertheless, the criminal defense attorney interviewed Avery Moore. Avery Moore, Courtney's uncle, claimed he worked that night, closed the store around the time of the murder and claimed that Kirkland was not one of the attackers. A subsequent interview with Courtney Moore by the prosecutors' investigators revealed that he alternated closing the laundromat with his uncle Avery. He stated he closed the store that evening not his uncle. (JR-L 223957-59.) Avery Moore was also re-interviewed and stated that he was knew the defendant and played ball with him. (Id.) It should also be noted that the state's attorney's blueback indicates that the defendant went to trial two years after Avery Moore gave his statement to the criminal defense attorney and he was not called to testify by the defense.

g. <u>People v Tomas Nieves, N-162782, 92 CR 6601 (Benedicta Gonzalez)</u>

i. Plaintiff's expert claims that "it is not clear from the investigative file how police identified Nieves as a suspect." (Pl. Exp. Rpt., at p. 48) It is clear from reading the supplementary reports how this was done. At RFC 11948- 51, the detectives detailed that eyeglasses found at the scene were traced to the defendant through his optometrist and by other individuals observing Nieves wearing the glasses. Also, at RFC 11915-20 detectives detail how they developed further information implicating Nieves in the victim's

death. This was done initially but not exclusively from an interview with a woman by the name of Margarita Arce.

ii. Plaintiff's expert also claims that Polaroid photos of the crime scene were withheld. (P's expert report at p. 48) Initially it should be noted that Polaroid photos taken at a crime scene may augment a detective's initial investigation. Forensic Investigators are tasked with the responsibility of collecting evidence from the scene including taking photographs. Crime scene photographs take time to develop but are always made available to the defendant through discovery from the prosecutors and / or the CPD. When crime scene Polaroid photographs are taken, they are used by detectives in the first few days of an investigation prior to the availability of the Forensic Investigator's photographs. Next, there is no evidence that the Polaroid photos were not made available by either the police or the prosecutors prior to trial. They may have been photocopied but as likely they were made available for viewing by the prosecutors.

iii. Finally, "photos of the scene" is listed in the initial, crime supplementary report. This comment may refer to either the Polaroid photos that were taken or the forensic investigators' photographs. The eye glasses were also noted in this report with the property inventory number used to track them.

h. People v Demetrius Johnson, P-272087, 91 CR 9833 (V: Edwin Fred)

i. Plaintiff's Experts claims that investigative documents related to a line up identification of Bryan Johns were not provided to the criminal defense attorney. This claim is based upon an obviously incomplete criminal defense attorney file. The file does not contain any CPD reports. And the file lacks any documents with the trial criminal defense attorney's name. (Deborah Gubin.) Inexplicably, the file does contain 23 pages of VA medical records for 30-year-old Levon Jefferson. These documents, requested by the defendant Johnson's first criminal defense attorney, Jack Carey, have no apparent connection to this case.

ii. The criminal defense attorney's file does contain a letter from CPD's Communication Operations Section indicating most broadcasts were erased after 30 days and no relevant records were found in the master logging tape. A log reflecting the examination of the master logging tape was also found in the file. These documents were likely sent to the court in response to a CCSAO

20

subpoena. The CCSAO blueback indicates that the "911 subpoena materials" were mailed to defense counsel on 7-16-92. (SAO 0015063)

   iii.  The criminal defense attorney's file also contains numerous subpoenas for police reports. It contains 2 copies of a subpoena for all CPD reports with an addendum requesting "streets files" with a court return date of 8-13-91. There are also three copies of the defense subpoena for CPD reports stamped received by CPD's Record Division on "'91 Jul 24 14:30." And three more copies of the same subpoena stamped as received by CPD's Record Division on "24 Jul 1991 11:42." Other court filings found in the defense attorney's file were two copies of a defense motion for discovery court file-stamped 9-17-91, an appearance form, a request to be released from jail to attend a wake and a petition for substitution of judges that was later withdrawn.

   iv.  The remaining documents pertinent to this case are requests by the defense attorney to his investigators. One note demonstrates that the criminal defense attorney was aware of Johns and his possible significance to the case. The note indicates that Bryan Johns "knows the real D." (JR-L 212483.)

   v.  Plaintiff's Expert claims that the documents were also missing from the prosecutor's file. Again, Plaintiff's Expert assumes that the prosecutor's file contains all the documents today that were in the file at the time of trial. An examination of the file demonstrates that the alleged missing investigative documents were provided to the criminal defense attorney during discovery. The ASA indicates on the blueback that he tendered to defense counsel "26 pgs RD (GPR Subp)." (SAO0015056)

   vi.  In the CPD's investigative material, the ASA's subpoena is present. The subpoena and the investigative material that follows it, including the Bryan John's unsigned line up report, totals 26 pages. Moreover, the other material in the Investigative File are court attendance reports, the medical examiner's report and a case disposition report. None of the remaining documents are GPRs or "street files."

VII.  Plaintiff's Expert's claims that CPD routinely withholds investigative materials from criminal defense attorneys is not established. First, he assumes that criminal defense attorney's files, as they exist today, contain all the reports

produced during pretrial discovery. One of the files he relies upon did not contain any police reports. This is clear evidence that the present-day defense attorney files are incomplete. Second, since prosecutors have the legal responsibility to produce relevant CPD investigative reports during pre-trial discovery, Plaintiff's Expert should have examined the CCSAO trial files. These files could more accurately determine if some or all of the alleged withheld investigative materials were provided to the defense attorneys. Third, Plaintiff's Expert claimed to examine seven files that revealed, he claimed, that CPD withheld the same investigative material from both the criminal defense attorneys and the prosecutors. However, a CCSAO file was not available for comparison for one of the seven files. There was no explanation why he did not examine the remaining 19 CCSAO files. Fourth, Plaintiff's Expert routinely includes both non-investigative materials and outside agencies' reports in his list of documents allegedly withheld by the CPD. Fifth, Plaintiff's Expert routinely claims there are "parallel files" maintained by the CPD. To the extent that different units within the CPD create and maintain police materials, those files are known to all lawyers in the criminal justice system and are easily obtained. Finally, prosecutors and criminal defense attorneys routinely use subpoenas to obtain CPD's investigative materials from different units within the department.

My opinions, findings, and observations herein are based upon my education, training and experience. The details of my background are listed in my curriculum vitae that is attached and incorporated herein by reference. Among other accomplishments, I have thirty-two years of experience as a trial prosecutor and I have attained numerous supervisory positions including Chief of the Criminal Prosecutions Bureau in the Cook County State's Attorney's Office and Deputy Chief with the DuPage County State's Attorney's Office. I have also lectured on numerous aspects of criminal prosecutions including *Brady* and discovery responsibilities for prosecutor's offices in Illinois and nationwide through the National District Attorney's Association. I have most recently included discovery and *Brady* obligations in one of a series of annual ethics seminars sponsored by the Winnebago County State's Attorney's Office.

Respectfully Submitted:

*Bernard J. Murray*

Bernard J. Murray

DATED: May 12, 2017