# Exhibit 25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
JACQUES RIVERA,　　　　)
　　　Plaintiff,　)
　-vs-　　　　　　) No. 12 CV 4428
REYNALDO GUEVARA, ET AL.,　)
　　　Defendants.　)
　　　The deposition of JAMES HICKEY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before KIMBERLY J. KARAS, a notary public within and for the County of Cook and State of Illinois, at 375 East Chicago Avenue, 8th Floor, Chicago, Illinois, on the 6th day of May, 2014, commencing at the hour of 1:08 o'clock p.m. and terminating at the hour of 4:54 o'clock p.m.

Reported by:  Kimberly J. Karas
License No.:  084-003548

1

APPEARANCES:

RODERICK AND SOLANGE MacARTHUR JUSTICE
CENTER, by
MR. LOCKE BOWMAN
Northwestern University School of Law
357 East Chicago Avenue
8th Floor
Chicago, Illinois  60611
(312) 503-1336
ereana-hart@law.northwestern.edu
j-bowman@law.northwestern.edu
　and
LOEVY & LOEVY, by
MR. STEVE ART
MR. RUSSELL AINSWORTH
MR. ANAND SWAMINATHAN
312 North May
Suite 100
Chicago, Illinois  60607
(312) 243-5900
art@loevy.com
　Representing the Plaintiff;

2

APPEARANCES CONTD:

ROCK, FUSCO & CONNELLY, LLC, by
MS. EILEEN ROSEN
321 North Clark Street
Suite 2200
Chicago, Illinois  60654
(312) 494-1000
erosen@rockfuscoconnelly.com
　Representing the City of Chicago;

THE SOTOS LAW FIRM, P.C., by
MR. JEFFREY N. GIVEN
550 East Devon
Suite 150
Itasca, Illinois  60143
(630) 735-3300
jgiven@jsotoslaw.com
　Representing named Defendant Chicago
　Police Officers.

3

I N D E X
WITNESS　　　　　　EXAMINATION
JAMES HICKEY
　By Mr. Bowman　　　　5


E X H I B I T S
NUMBER　　　　IDENTIFICATION
Hickey Exhibit
　No. 1　　　　48
　No. 2　　　　70
　No. 3　　　　77
　No. 4　　　　88
　No. 5　　　　108
　No. 6　　　　122

4

1 (Pages 1 to 4)

1    (Whereupon, the witness
2    was duly sworn.)
3    JAMES HICKEY,
4 called as a witness herein, having been first duly
5 sworn, was examined and testified as follows:
6    EXAMINATION
7 BY MR. BOWMAN:
8    Q. Tell us your name please.
9    A. James K. Hickey, H-i-c-k-e-y.
10    Q. Mr. Hickey, we've met before. Indeed
11 we've been through this process before. And I know
12 you're an experienced witness.
13    Do be careful with me, I'm very slow of
14 speech. Make sure that I finish asking the
15 question before you start to answer even if you
16 know what I'm going to ask you.
17    And yes's, no's rather than -- rather than
18 ambiguous sounds are required.
19    If you need to take a break at any point
20 just let me know. Please answer the question
21 pending before we stop, that's the only caveat.
22 Other than that whenever you need to stop we can
23 stop.
24    I owe you clear questions. So if I've

5

asked you something that is not clear for any
2 reason, doesn't make sense to you, please tell me.
3 I will keep rephrasing the question until I've got
4 it to the point where you can understand it. And
5 if -- if I -- if you don't tell me that you haven't
6 understood a question I'm going to assume that it
7 was clear, that you did understand it, and that
8 you're responding to the question that I've asked.
9    Is that fair?
10    A. Yes, it is.
11    Q. All right. Again, you know, I know you've
12 been around this before not only with me but with
13 others. I have to apologize there will be some
14 repetition simply because we need to create a clear
15 record for this case.
16    So with apologize if you could begin by
17 giving me your educational background please?
18    A. Bachelors in History, 1971. A Masters in
19 Urban Studies, 1975. A Doctorate in Public
20 Administration, 1978.
21    Q. Is that a DPA?
22    A. DPA, yes.
23    Q. And that was in '78?
24    A. Correct.

6

1    Q. What institutions awarded you these
2 degrees?
3    A. Loyola, Loyola, and Nova, N-o-v-a.
4    Q. Okay. What is Nova?
5    A. It's an institution in Florida. It was a
6 regional training. I would call it the -- it was
7 nontraditional at the time, 1978.
8    Q. Got it. And could you also please give me
9 a resume of your experience with the Chicago Police
10 Department beginning at the point of your being
11 sworn in?
12    A. 14 June, 1971, I was appointed to the
13 Chicago Police Department. I served in various
14 sworn capacities over the year. I was a police
15 officer assigned to the Englewood Community. I
16 subsequently was assigned to the youth division
17 where I worked in the juvenile court. Subsequent
18 to that I was given another assignment in the youth
19 division to the special investigations unit which
20 specialize in child pornography type of cases and
21 narcotics.
22    In August 1977 I was appointed to
23 detective. I was assigned to the Area 1 homicide
24 and sex unit, that's 51st and Wentworth.

7

Subsequent to that I was assigned to detective
2 headquarters.
3    Q. Is that 11th and State?
4    A. At that time it was 1121 South State
5 Street, 5th Floor.
6    And subsequent to that, about 1983, I was
7 assigned to the crime lab. I worked in the crime
8 lab for four years. I made sergeant while I was
9 there.
10    I was promoted to lieutenant in 1988. I
11 was assigned to the Englewood Community again, 007
12 District. From there I went to patrol headquarters
13 at 11th and State.
14    After patrol headquarters I was assigned
15 to Midway Airport. After Midway Airport I was
16 assigned to create a unit called random drug
17 testing unit. It tested police officers on an
18 unannounced basis for illicit controlled
19 substances.
20    After that I was assigned to the Bureau of
21 Investigative Services at 1121 South State Street.
22    Subsequent to that I was assigned to the
23 3rd District, 7100 South on Cottage Grove known as
24 the Grand Crossing Community, I was a watch

8

2 (Pages 5 to 8)

1 commander there.
2    Q.  Did you say Cottage Grove, I'm sorry?
3    A.  Cottage Grove.
4    Q.  Grand Crossing?
5    A.  The Grand Crossing Community, right.
6    I was there for I think three years or
7 three Bulls celebrations as I recall.
8    Q.  So this would have been in the 1990's?
9    A.  Yes.  Some things you remember.
10    Then I was assigned as a watch commander
11 to the 11th District at Harrison and Kedzie.  And
12 subsequent to that in 1997 I was assigned to
13 research and development.
14    Q.  I'm sorry, 1997?
15    A.  1997.
16    And September 30th, 1999 I retired and was
17 rehired as a civilian on October 1st, 1999.  I
18 stayed in research and development.
19    I subsequently was assigned to the -- I
20 was assistant director of research and development
21 and then I became assistant director of the records
22 division.  Then I was the assistant director of the
23 information technology group.  And in 2008 I was
24 back in research and development where I remain

9

1 today.
2    Q.  Okay.  Thank you.
3    A.  You're welcome.
4    Q.  So have you ever held any exempt rank?
5    A.  I have not.
6    Q.  Just a couple of questions by way of
7 follow-up.  Focusing on your experience as a
8 detective can you tell me how long you were
9 assigned at Area 1, I have August 1977 down as a
10 start?
11    A.  Until Fall 1982 -- I'm sorry, Fall -- Fall
12 1980, I'm sorry.  Fall 1980.
13    Q.  Okay.  And then was it in the Fall of 1980
14 that you transferred to detective headquarters at
15 11th and State?
16    A.  Correct.
17    Q.  So during these events involving the
18 street file controversy you were the detective
19 assigned to the headquarters at 11th and State?
20    A.  Yes, sir.
21    MS. ROSEN:  Objection to the form of the
22 question.
23    BY MR. BOWMAN:
24    Q.  In your three years at Area 1 did you

10

1 concentrate on homicide and sex crimes in terms of
2 your investigative responsibilities?
3    A.  That was the name of the unit, yes.  But
4 we also handled aggravated batteries and other
5 types of assaults including simple assaults.
6    Q.  Would it be fair to say that you were
7 personally involved in a large number of homicide
8 investigations in the three years that you were
9 assigned to homicide and sex in Area 1?
10    MS. ROSEN:  Object to the form.
11    You can answer.
12    THE WITNESS:  Yes.
13    BY MR. BOWMAN:
14    Q.  Can you approximate the number?  I mean --
15 and I realize that that's a completely unfair
16 question be just in terms of order of magnitude
17 would it be more than 50?
18    A.  As to my -- we're assigned a homicide
19 investigation every day.  Sometimes they were
20 scenes and sometimes they were simple follow-up.  I
21 would have to do some math before I answered that.
22 It was regularly.
23    Q.  Well, if I understand your answer
24 correctly it would be fair to say that on a daily

11

1 basis for the three years between August of '77 and
2 the Fall of '80 you were working homicide
3 investigations in one fashion or another?
4    A.  That's correct.
5    Q.  So in that process you gained personal
6 experience regarding the note taking, investigation
7 recording, files keeping practices of the
8 detectives around you on the job?
9    A.  Correct.
10    Q.  All right.  What -- do you have any
11 personal knowledge of why you were moved to
12 detective headquarters, was this a request on your
13 part or a decision that was made above your level?
14    MS. ROSEN:  Objection, form.
15    THE WITNESS:  A decision made above my level.
16 We were in the process as an organization
17 reorganizing the detective structure and I was
18 probably viewed as a strong writer.
19    BY MR. BOWMAN:
20    Q.  Who was the chief of detectives when you
21 were moved to the detective headquarters?
22    A.  William Handhardt.
23    Q.  And what were your responsibilities at
24 detective headquarters in the years between your

12

3 (Pages 9 to 12)

1  transfer there in the Fall of 1980 and your move to
2  the crime lab at some point in 1983?
3      A.  My morning duties were simply to gather
4  the reports from the then six areas which describe
5  the crime and major developments on cases which had
6  occurred in the past 24 hours.  I would try to
7  synthesize it and summarize it for the chief of
8  detectives, that was my morning duties.
9          And then I would describe my other duties
10  pretty much as special assignments.
11      Q.  Were the reports that you gathered from
12  the six areas for summarization, reports that I've
13  heard described as major incident reports?
14      A.  They would be included, yes.
15      Q.  Okay.  So can you tell me what reports you
16  were gathering and reviewing and summarizing on a
17  daily basis in those years?
18      A.  Each area was divided into six watches of
19  eight hours a piece.  And each watch in each of the
20  areas had to leave a report at the end of their
21  tour of duty.  Whether something significant
22  happened or not.  Negative reports were required.
23  So we have a status from each of the watches from
24  each of the detective areas.  And the specialized

13

1  units like bomb and arson.
2          Attached to these logs might be major
3  incident worksheets, it might be a supplementary
4  report, it might include pattern identification
5  where perhaps a burglary had been resolved in which
6  ten victims cases were resolved, fixed, solved.
7  Yes.
8      Q.  As part of the same arrest?
9      A.  Right.  But certainly focusing on the
10  violent crimes.
11      Q.  All right.  And what was the -- to the
12  extent it was explained to you what was the purpose
13  for your preparing this summary for Chief
14  Handhardt?
15      A.  There was a morning meeting with the
16  superintendent of police.  And superintendent had
17  each of his major division represented at this
18  meeting and wanted to know what was going on in the
19  department citywide.
20      Q.  Now, can you give me some examples of the
21  special assignments that you were tasked with over
22  the course of these three years?
23      A.  Sure.  I can think of at least three.  One
24  was the reorganization of the detective division

14

1  from what I would describe as a speciality
2  organization where we had citywide burglary units,
3  robbery units, homicide, sex, general assignments.
4  And we redesigned the structure to be more
5  geographically centered.  Really going from crime
6  specific to a geography or a population center
7  service organization.  That was one.
8          Another was crime statistics.  We --
9  that's always been an issue in -- for police
10  departments.  It's not new today.
11      Q.  Meaning that police departments are fairly
12  or not sometimes judged by the politicians and the
13  public based on the level of crime and the
14  effectiveness of the department in closing cases?
15      A.  It's the entire subject of victimization
16  and our service and our effectiveness.
17          And a third topic, a major topic, was the
18  investigative files.
19      Q.  Right.  Now, do you have a recollection of
20  how that came to be assigned to you -- actually let
21  me -- let me strike that question and ask you a
22  given one.
23          How did it come to your attention first
24  that there was an issue regarding investigative

15

1  files that was going to require attention?
2      MS. ROSEN:  Objection, form.
3          You can go ahead and answer.
4      THE WITNESS:  There was the now rather
5  well-known case in Area 2 I believe the -- the case
6  was the George Jones case.  That certainly received
7  the attention of the detective division.  And at
8  issue was a memorandum.  And almost any time a
9  subject comes up an organization inherently asks
10  itself is this a policy question.  It's -- and that
11  is how at the beginning it came to our attention.
12      Q.  All right.  And then -- and we'll talk
13  about it later but you were assigned to undertake
14  some investigation and participate in the process
15  of reacting to the Jones case on a policy basis
16  within the department, fair summary?
17      A.  Yes, sir.
18      Q.  All right.  Do you know -- okay.  And so
19  then in 1983 you moved over to the crime lab, what
20  precipitated that move?
21      A.  I was offered an assignment there, it
22  involved promise of a little more money.
23      Q.  What was your assignment in the crime lab?
24      A.  I went as a detective and I -- my title

16

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 subsequently changed after a while there, it was a
2 police lab technician title.
3     Q. What were your duties in the crime lab?
4     A. I would describe myself as the
5 administrative person in the crime lab. I would
6 fill in occasionally for crime scene processing but
7 mostly was administrative.
8     Q. Did you have any expertise in forensics,
9 crime scene processing?
10     A. No, I did not.
11     Q. Okay. When you moved in 1983 from the
12 detective division to the crime lab was there a
13 change in administration in the -- in the ranks
14 above you at all?
15     MS. ROSEN: Objection.
16     MR. BOWMAN: That's a terrible question.
17 That's an awful question. Forget it.
18 BY MR. BOWMAN:
19     Q. When you moved did Handhardt remain as
20 chief of detectives?
21     A. No, he did not.
22     Q. Okay. When did Handhardt -- as I recall
23 it Handhardt was demoted from the exempt ranks by
24 Fred Rice, is that correct?

17

1     A. That is correct.
2     Q. And are you aware of the circumstances,
3 the reasons for that demotion?
4     A. No, I'm not.
5     Q. Was Handhardt's demotion -- and who
6 replaced Handhardt?
7     A. George McMann.
8     Q. Okay. When McMann replaced Handhardt was
9 that the point at which you moved over to the crime
10 lab?
11     A. Not immediately.
12     Q. But was it shortly thereafter?
13     A. Probably two months.
14     Q. Was this a function of McMann wanting to
15 put his own team in?
16     A. No, it wasn't. I told you I was offered a
17 position with the promise of a little more money.
18     Q. So this was your initiative as opposed to
19 something that came down from one high?
20     A. I accepted the offer, it was not my
21 initiative.
22     Q. Who made the offer to you?
23     A. Paul Gall the director of the crime lab.
24     Q. And you stayed there for five years?

18

1     A. Four for sure, I'm a little fuzzy on the
2 exit date.
3     Q. Okay. Did you become -- I'm having
4 trouble deciphering my notes. Did you become a
5 sergeant while you were in the crime lab?
6     A. I did.
7     Q. You took the exam?
8     A. Yes.
9     Q. And then in 1988 you became a lieutenant?
10     A. Correct.
11     Q. Was that as a result of an exam also?
12     A. Yes.
13     Q. And as a lieutenant did you then move over
14 into the patrol division?
15     A. I did.
16     Q. When you became a sergeant did you stay in
17 the crime lab?
18     A. I did.
19     Q. Okay. Is that unusual?
20     A. Yes.
21     Q. Is there any particular reason that you're
22 aware of why that happened?
23     A. My bosses wanted to keep me where I was.
24     Q. And then you spent a short amount of time

19

1 in the 7th District which is Englewood as a
2 lieutenant?
3     A. Correct.
4     Q. Is that a watch commander position?
5     A. It was as field lieutenant.
6     Q. Meaning you were out in a car --
7     A. Right.
8     Q. -- supervising people who were on the
9 street?
10     A. Sergeants and police officers.
11     Q. How many sergeants were under your
12 command?
13     A. Typically three or four on any given day.
14     Q. How long after your promotion to
15 lieutenant did you move back to headquarters?
16     A. Relatively short period of time, I would
17 say three months.
18     Q. Any particular reason for that move that
19 you're aware of?
20     A. The chief of the -- chief of patrol
21 requested that I work for him.
22     Q. And who was that?
23     A. George Ruckrich, R-u-c-k-r-i-c-h.
24     Q. What duties did you have at patrol

20

5 (Pages 17 to 20)

headquarters?

A. I was in charge of the assignment of personnel. Not that I would have final say but in patrol adequate manpower evenly distributed is an important matter. And I worked on the budget. Again I didn't prepare the final budget but when you do the budget in patrol division you're -- you take -- it's a big chunk of the police department budget. So I worked on the issues that pertain to that. And I also worked on again special projects.

Q. How long did you remain in headquarters before you moved to Midway Airport?

A. Two and a half, three years.

Q. What was the year, if you remember, that you moved to Midway?

A. I'm sorry. I made lieutenant in '88.

Q. Early 90's?

A. Might be '89. I don't know, I'm sorry.

Q. And what duties did you have at Midway?

A. Actually my job was to create the airport unit of the police department. Up until that time O'Hare Airport was part of the 16th District on the northwest side, Midway was part of the 8th District on the southwest side, and Meigs Field was part of

21

the 1st District.

So my first duty was to prepare -- make it a unified command where the commander would have but one subject matter, one area of responsibility, the airports. Everyone can't be an expert in everything. And at the end of that I was the -- given the assignment for Midway and Meigs Field.

Q. And how long were you involved in that?

A. Probably only a year.

Q. And then was it at that point that you moved into this random drug testing business?

A. Right. Superintendent Martin, Leroy Martin had picked me for this unit which I did not volunteer for.

Q. I appreciate that.

A. It happens.

Q. You were not a popular person in the police department when you --

A. No, I think the subject matter was not popular. I'm sure I was -- always had my same popularity rating whatever it might be.

Q. All right. And then after some period of time with drug testing you moved back into the

22

Bureau of Investigative Services at 11th and State, what was your set of responsibilities there?

A. I was the administrative lieutenant to a deputy superintendent and I -- one of the things I worked on was reducing the number of detective areas I think from six to five areas. We also tried to foster closer working relationships between the detective division and the organized crime division.

Q. Is organized crime related in any way to gang crimes or is that a different --

A. Gang crimes has traveled in the organization from one bureau to another over the decades. So you'd have to almost phrase your question as to what year and -- you know, at this time they were not in the Bureau of Investigative Services.

Q. At any point over the course of your years in the police department have you ever had any assignments that caused you to interface with gang crimes in any way?

MR. GIVEN: Object to the form.

You can answer.

MS. ROSEN: Go ahead.

23

THE WITNESS: When I was working detective there was a gang unit at Area 1.

BY MR. BOWMAN:

Q. Other than that?

A. I can't recall any hands-on workings with gang crimes.

Q. Who was the deputy superintendent for whom you served as administrative lieutenant at the Bureau of Investigative Services?

A. That's the same name as former patrol --

Ruckrich.

A. George Ruckrich.

Q. All right. Then you had a series of assignments at the 3rd District and the 11th District and were these in the patrol division?

A. Yes.

Q. Okay. And then you reported that in 1997 you went into research and development. Tell me about that -- that assignment, what your responsibilities were and how you came to be in it?

A. I actually interviewed for that assignment. The position I interviewed for and the position that I -- the duties I fulfilled were as

24

6 (Pages 21 to 24)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 the commanding officer of the policy and the
2 procedures section. In that section we draft
3 directives on behalf of the superintendent of
4 police. There is a development process, a review
5 process, and a request process they have the
6 superintendent sign the order.
7     Q. How many folks did you have on your staff?
8     A. I believe 16 was the number.
9     Q. And I'm guessing from the way you describe
10 it that the job required a strong logical mind,
11 good writing skills, and the like?
12     A. An understanding of the organization
13 helped as well.
14     Q. Right. And were -- can you describe the
15 folks who worked for you what -- what were they
16 line detectives, line patrol officers who were just
17 randomly pulled in, how did that work?
18     A. I think I had three sergeants and the rest
19 police officers all were educated.
20     Q. Meaning they -- some of them had gotten
21 degrees under the auspices of the police
22 department?
23     A. Correct.
24     MS. ROSEN: Object to the form.

25

BY MR. BOWMAN:
2     Q. Other than the preparation of policy and
3 procedure directives were there any other
4 responsibilities that the research and development
5 office had under your supervision?
6     A. In that time period one of our other
7 responsibilities it comes under the form of a
8 directive but it -- something that takes up a lot
9 of time, uniforms. Our uniform standards, all our
10 equipment, personal equipment. We're like a
11 military, we have a lot of books describing those
12 items.
13     Q. All right. Anything else?
14     A. At that time that's what it was.
15     Q. Well, to be clear my question spans your
16 role in the position from 1997 post your 1999
17 retirement and as a civilian, would the answer be
18 the same throughout that period?
19     A. To '99 for sure, yes.
20     Q. And did it change in some way thereafter?
21     A. In 2008.
22     Q. Okay. Right. I see. So you're -- I get
23 you. So you came back after --
24     A. Right.

26

1     Q. -- after 2008?
2     A. Right.
3     Q. So why don't we move ahead then to 2008
4 and can you tell me what your responsibilities are.
5 And by you're I mean the responsibilities of
6 yourself and those under your jurisdiction in the
7 research and development unit?
8     A. I returned to research and development as
9 the commanding officer, policy and procedures, for
10 a second time. And a couple years later my boss
11 left the police department -- actually more than a
12 couple. This is '14, she left in about '11. So my
13 responsibilities have widened a little bit. It
14 also includes the statistics for the Chicago Police
15 Department. There has to be one voice, one single
16 authority on the subject of statistics otherwise it
17 gets very confusing.
18     Q. Are you familiar with an article that
19 appeared recently in Chicago Magazine relating to
20 statistics?
21     A. By Mr. Bernstein, yes, I am.
22     Q. And has -- is that article talking about
23 issues under your jurisdiction in terms of how
24 murders and other violent crimes are counted and so

27

1 forth?
2     A. Yes.
3     MS. ROSEN: Object to the form.
4 BY MR. BOWMAN:
5     Q. Who was your boss who resigned or retired
6 a couple years ago?
7     A. Rachel Johnston, J-o-h-n-s-t-o-n.
8     Q. All right. There was a period of time
9 when you were in charge of records, what years was
10 that?
11     A. I was assistant director for -- and I
12 worked for our director of records James Piper. He
13 retired and I remained in charge, the year escapes
14 me, I'm sorry.
15     Q. About how long were you in that area?
16     A. Probably two and a half years.
17     Q. Okay. And is this the area of the police
18 department that we refer to as the records
19 division?
20     A. It is.
21     Q. And what were your responsibilities as
22 assistant director and -- as assistant director in
23 the records division?
24     A. I would -- when we had a director and I

28

1  would assist him in whatever duties he wanted to
2  give me.  But primarily it's trying to supervise
3  the various subunits and personnel within those
4  units.
5      Q.  And that's a little generic and vague.
6  Can you relate -- relate that to particular duties
7  and responsibilities of the division itself?
8      A.  Sure.  The records division at that time
9  was comprised of the identification section.  The
10 identification section literally processes all the
11 fingerprints from all the arrestees, manages all
12 the rap sheets, all the criminal history records,
13 maintains the archives for all mugshots, latent
14 fingerprints that are recovered.  It also at that
15 time accepted all the paper case reports and
16 processed them.  By that I mean they would make
17 copies and disseminate them to the unit of
18 investigative authority for follow-up.  The records
19 division also has a public service arm where the
20 public would literally walk in looking for copies
21 of reports.  Probably the most often distributed
22 copy is traffic crash reports.
23     Q.  Been there, done that.
24     A.  Right.

29

1      So some of the issues that would come up
2  during this time was automation.  You know, how can
3  we do it better for less.
4      Q.  All right.  And has there in the recent
5  years been a transition to digitalize all of this
6  process to make it much less file dependent?
7      A.  They are -- they continue to strive for
8  that goal.  I don't know if it's ever going to be
9  reachable but, yes, there has been efforts made.
10     Q.  Okay.  All right.  Now, I wrote down
11 something you listed among the responsibilities of
12 the records division and that was acceptance of
13 paper case reports.  And then the making of copies
14 of those reports and the dissemination of them to
15 the unit of investigative authority for follow-up.
16 What does that mean?
17     A.  In this era a beat -- before I go on I
18 forgot one other unit within the responsibilities
19 that would be the subpoena unit, the subpoena
20 service unit.  We can talk about that in a little
21 bit but.
22     Now I go back to what does that mean
23 regarding the paper -- the paper case reports would
24 be written by the beat officer.  The beat officer's

30

1  sergeant may approve the report.  The original of
2  that report was sent down to records processing
3  section.  They would make copies.  They would send
4  the original for storage, for filing.  And they
5  would disseminate those copies that they made.  And
6  frankly detective division would require three and
7  four, five copies of every one.  You know, one for
8  the detective, one for the unit, one for the
9  supervisor.  I was always amazed as just to how
10 many copies were made.
11     Q.  Okay.  Now, so this is just -- is the
12 function that you're describing basically has to do
13 with the general offense case report and the
14 funneling of those papers to the particular area
15 and unit within the detective division for
16 follow-up?
17     A.  Yes.
18     MS. ROSEN:  Objection to the form.
19 BY MR. BOWMAN:
20     Q.  As a general --
21     A.  For the general offense case reports, yes,
22 sir.
23     Q.  All right.  Now, let's talk about the
24 subpoena service unit.  What are the -- what does

31

1  that unit do?
2      A.  That is the unit within the Chicago Police
3  Department that subpoenas are delivered for
4  service.  They fill as if it's a work order and
5  cause a search of different units, files to obtain
6  the requested information.
7      Q.  Okay.  So, in other words, if I'm a
8  criminal defense lawyer and I have a case in the
9  Circuit Court of Cook County in some branch,
10 somewhere and I subpoena the -- all the materials
11 in the police department's possession relating to
12 the case that comes to the subpoena service unit
13 for fulfillment?
14     A.  Yes, sir.
15     Q.  And does that -- is there a process within
16 the police department that ensures that the
17 subpoena service unit actually gets the subpoena?
18     A.  I don't think I understand the question.
19     Q.  Well, suppose I walk over to 51st and
20 Wentworth and drop off a subpoena there.  Is there
21 a process to get it to 35th and Michigan to this
22 subpoena service unit?
23     A.  I think -- using your hypothetical I think
24 you would be directed to drop it off at the

32

8 (Pages 29 to 32)

1    headquarters building. I don't think they're even
2    going to accept it. But that's -- depending upon
3    what employee you meet.
4        Q.  Are you aware of any procedural mechanism
5    within the police department to ensure that all
6    subpoenas are directed, delivered, or otherwise
7    received by the subpoena service unit for
8    processing?
9        A.  It's probably in a directive on the
10   description of the duties and responsibility of the
11   records division in our organizational description
12   of various units.
13       Q.  When the records division subpoena service
14   unit receives a subpoena say for all documents and
15   materials relating to a particular pending criminal
16   case what is the process whereby the unit goes
17   about fulfilling that -- fulfilling that request?
18       A.  The person assigned to the subpoena unit
19   will read the court order for the information, the
20   subpoena, and try to decipher what is it they want.
21       Q.  Okay.
22       A.  Obviously the key variable is the records
23   division case number, that seems to be a
24   fundamental key to obtain other documents and

33

1    reports. They will go to a subunit in the records
2    division for a copy of the police reports, the
3    original, and the supplementary reports which are
4    on file in the records division. They will make a
5    copy of the subpoena and send it out to the
6    detective area in which the crime occurred and ask
7    if they have any investigative files under -- for
8    that RD number. They will read it and again trying
9    to decipher what it is that the individual
10   requester wanted.
11          If it's a driving under the influence case
12   they'll probably direct a copy of the subpoena to
13   the traffic court records asking for any and all
14   records that they have.
15          If there is an interrogation where the
16   individual went to the polygraph unit for
17   examination they would direct a copy to the
18   forensic services division asking for that
19   polygraph report. Or other units which specialize
20   in services and create reports and retain reports.
21       Q.  Okay. And those other areas could be the
22   evidence recovered property section?
23       A.  Certainly, it could be research and
24   development looking for copies of old policies.

34

1        Q.  Could be. It could be -- I guess it's no
2    longer -- there's no longer a crime lab in the
3    police department but there could be evidence tech
4    type materials, right, that --
5        A.  The crime scene processing reports. And
6    just to correct a little bit we do now have a
7    firearms unit within the forensic services. It was
8    restarted within the last year.
9        Q.  So -- and there are probably other units,
10   divisions, centers within the police department
11   that we haven't put on our list, right, where
12   records might repose relating to a particular case?
13       A.  That's correct.
14       Q.  Now, in terms of fulfillment of the
15   subpoena does it depend on the precision and the
16   drafting skill of the lawyer who prepared the
17   subpoena which repositories of records within the
18   police department are going to be searched in
19   response to the subpoena. Or is there some
20   mechanism whereby the subpoena service unit
21   attempts to search proactively for any pertinent
22   documents within the department?
23       MS. ROSEN: Object to the form of the question.
24       THE WITNESS: I think it's a combination of

35

1    both. Obviously the more explicit the requester is
2    the less likely the service provider will omit that
3    unit for a search of their records. But I've seen
4    the service -- subpoena service unit work and I
5    think they tend to give them more than is requested
6    because of their own insights. You know what I
7    mean. After a while you know what they really mean
8    is this as well. And let's save myself the trouble
9    they'll probably come back next week and ask for
10   the same thing.
11       Q.  Is there a policy, a procedure, or a
12   directive of some kind that -- that governs the
13   manner in which the subpoena service unit is
14   supposed to conduct itself in terms of proactively
15   looking for documents in response to a subpoena or
16   does it depend instead on the individual person
17   assigned the fulfillment responsibilities for the
18   subpoena?
19       MS. ROSEN: Object to the form.
20       MR. GIVEN: Also time frame to the extent
21   you're asking him for then, now, I wasn't quite
22   sure.
23       MR. BOWMAN: Well, I mean, I think that we're
24   talking about a period of time for which Mr. Hickey

36

9 (Pages 33 to 36)

1    has personal knowledge.
2        MR. GIVEN:  Same objection.
3        He can answer.
4        THE WITNESS:  No directive.
5        MR. BOWMAN:  Okay.  I'm going to stop for just
6    a couple of minutes and just take a break and
7    stretch our legs.
8            (Whereupon, a short break was
9            taken.)
10   BY MR. BOWMAN:
11       Q.  Okay.  We've been talking, Mr. Hickey,
12   about the subpoena service unit.  Was that unit in
13   existence to your knowledge in the 1980's?
14       A.  I wasn't there, I don't know.  Somebody
15   had to perform the function.  I just don't know if
16   the unit formally existed.
17       Q.  Do you have any --
18       A.  It's a basic service.
19       Q.  Right.  So whether it was called the
20   subpoena service unit or something else would it be
21   fair to say that the process that we've been
22   talking about relating to the fulfillment of
23   subpoenas was conducted in more or less the same
24   fashion in the 1980's as what you've described in

37

1    your testimony?
2        A.  Yes, there's both the formal subpoena
3    request and then, you know, of course there are the
4    telephone requests from the prosecutors.  I don't
5    believe they were always formally submitted.  Some
6    are more in a rush than others.  You know, I need a
7    copy of what can you get me on and -- you know.
8        Q.  But in terms of requests by a subpoena
9    from defense counsel this process that you've been
10   describing was in play in 1980 through 1989 to the
11   best of your memory?
12       A.  Yes.  I mean, with one qualification.  I
13   mean, should the defense counsel be concerned about
14   what he got or the absence of something there's
15   always the telephone.  I mean, it's -- to clarify
16   the request or to make it a bit more clear as to
17   what I think I'm missing.
18       Q.  Can you describe the personnel who were
19   assigned to this duty of subpoena fulfillment, are
20   they sworn personnel?
21       A.  They tended not to be.  In the era when I
22   was actually there I think there was five of them.
23   I think there was one police officer, the rest
24   were --

38

1        Q.  Clerks?
2        A.  Well, I mean, one I remember having a
3    college degree and -- you know, I don't know the
4    background of the others.
5        Q.  What training is provided -- I'm sorry.
6    During the period that you have personal
7    familiarity within the 90's what training was
8    provided to the police personnel who performed the
9    function of subpoena fulfillment?
10       A.  On-the-job training.
11       Q.  So nothing formal?
12       A.  No.
13       Q.  And to the best of your knowledge and
14   understanding was that also the case in the 1980's?
15       A.  I can only presume so.
16       Q.  Do you have any reason to doubt it?
17       A.  I do not.
18       Q.  Now, the way you've described the
19   procedure the person fulfilling a subpoena might or
20   might not have occasion to make requests from
21   various locations within the police department for
22   documents in response to a subpoena, right?
23       A.  Correct.
24       Q.  And in doing that the documents presumably

39

1    would come in at various different points in time
2    from these different locations, right?
3        A.  Correct.
4        Q.  Is there a procedure -- was there in the
5    period that you're personally familiar with was
6    there a procedure for delivering the records in
7    response to the subpoena on a rolling basis or were
8    they all gathered together and shipped in response
9    to the subpoena at one time?
10       A.  I understand the question.  It was date
11   organized, when is it due and that's how they -- it
12   was -- their primary basis was date and of course
13   the RD number --
14       Q.  Okay.
15       A.  -- within the date.
16       Q.  Are you saying that the subpoenas would be
17   filed in some way based on date due and the
18   documents would then be collected and placed into a
19   folder and then on the -- when a particular date
20   came up that then those documents would go out?
21       A.  I saw a lot of rubber bands holding
22   documents together.
23       Q.  Is there any -- to your knowledge is there
24   any document of any kind that constitutes a paper

40

10 (Pages 37 to 40)

1   trail of the request from the subpoena service unit
2   to the various areas within the police department
3   for the documents that might exist in response to a
4   particular subpoena?
5       A.  To my knowledge there's an absence of this
6   type of internal tracking.
7       Q.  Do you know if there's some informal
8   mechanism by which things were kept track of?
9       A.  I've seen subpoena officers annotate on a
10  form to whom they sent the request.  And it's
11  probably more standard practice.  I mean, because
12  you have to know who you sent it to.  But they tend
13  not to keep it once the information has been
14  returned to them.
15      Q.  How -- let's -- let's take a particular
16  example of a case like the one that brings us here
17  today in which the investigations conducted jointly
18  by the detective division and gang crimes officers?
19      MS. ROSEN:  Object to the form of your
20  question.
21      MR. BOWMAN:  Can I correct the form, is there
22  something -- what did I say that was wrong.
23      MS. ROSEN:  Well, I don't know that I would
24  characterize it as jointly.

                                                    41

1       MR. BOWMAN:  All right.  Well, let me do this.
2   Let me see if this works.
3   BY MR. BOWMAN:
4       Q.  Consider a case like the one that brings
5   us here today in which both the detective division
6   and gang crimes officers participated in the
7   investigation.  In that circumstance if a defense
8   lawyer subpoenas all documents related to the
9   investigation and provides an RD number presumably
10  the clerk or the officer within the subpoena
11  service unit as you've described the first thing
12  that he would do is he would go to the records
13  division file, obtain the original report and
14  supplementary reports from that file, yes?
15      A.  Yes, sir.
16      Q.  And then he would then presumably know
17  that a request to a particular area was warranted
18  for detective division investigative file relating
19  to the matter, yes?
20      A.  Yes, sir.
21      Q.  Okay.  So then he would make an internal
22  request for that document?
23      A.  Correct.
24      Q.  Or set of documents, yes?

                                                    42

1       A.  Yes, sir.
2       Q.  Then how -- what would be the process by
3   which the subpoena fulfillment officer would know
4   to look elsewhere within the police department for
5   additional documents such as a gang crimes unit?
6       A.  Perhaps only the mention of the type of
7   case it is.  Again DUIs might have DUI records, you
8   know, detective -- homicides certainly would have
9   an investigative record.
10      Q.  Right.  Well, if it's a homicide case then
11  -- then there might be a protocol, a more report,
12  something of that nature that the individual would
13  know would be part of the case of that nature,
14  right?
15      A.  Correct.
16      Q.  And so he would request that from a
17  different location within the police department?
18      A.  If they didn't get it from the -- the
19  detective area inside the investigative file they
20  might refer to the Cook County Medical Examiner's
21  office.
22      Q.  All right.  In terms of the question that
23  I posed a few minutes ago relating to gang crimes
24  whether the subpoena fulfillment officer would know

                                                    43

1   to ask gang crimes for documents would literally
2   depend on whether that individual noticed from
3   review of reports that it was a gang involved
4   matter, fair?
5       MS. ROSEN:  Object to the form of the question.
6       THE WITNESS:  They'd have to be reading beyond
7   Page 1 I think to see a motive or the type of
8   manner that person was killed.
9       Q.  Right.
10      A.  And these are disinterested, neutral -- I
11  don't mean disinterested in a negative way, they
12  are fulfilling a clerical function.  And for fun
13  they're probably not reading the 25 pages of
14  reports.
15      Q.  Well, that's what I was going to suggest
16  to you, Mr. Hickey, that these individuals as you
17  point out they're fulfilling a clerical function,
18  right?
19      Yes?
20      A.  Yes, sir.
21      Q.  And they're busy?
22      A.  Yes, sir.
23      Q.  Everything is date driven and they've got
24  a lot of subpoenas, yes?

                                                    44

                                        11 (Pages 41 to 44)

1    A.  Yes, sir.
2    Q.  And the police reports are not inherently
3  fascinating reading for any of us, right?
4    A.  That's correct.
5    Q.  So the truth of the matter is that it's
6  entirely likely in practice that the -- that the
7  request to the gang crime unit for gang crime
8  documents which is simply not happening --
9    MS. ROSEN:  Object to the form of the question.
10  BY MR. BOWMAN:
11    Q.  -- unless the defense lawyer was savvy
12  enough to know that he needed to include that
13  specifically in his subpoena --
14    MS. ROSEN:  Object to the form of the question.
15  BY MR. BOWMAN:
16    Q.  -- right?
17    A.  I don't know what other type of record
18  might be available from the gang crimes unit.  I
19  mean, they don't --
20    Q.  That's not my question.
21    A.  Yeah, okay.
22    Q.  That's not my question.
23    MS. ROSEN:  Well, actually it kind of is your
24  question.  So maybe --

45

1    MR. BOWMAN:  No, it is not my question.  My
2  question -- I get to decide what my question is and
3  you can ask questions later.
4    MS. ROSEN:  Okay.
5  BY MR. BOWMAN:
6    Q.  But my question is is -- as a practical
7  matter in light of the circumstances here unless
8  the particular defense lawyer was savvy enough to
9  include a reference to gang crimes in the subpoena
10  as a practical matter there would be no request for
11  gang crimes documents in response to a subpoena
12  that's simply asked for records under a certain RD
13  number, fair?
14    MS. ROSEN:  Object to the form of the question.
15    THE WITNESS:  Fair.
16  BY MR. BOWMAN:
17    Q.  And you have no reason to doubt that the
18  answer you just gave applies to the period of time
19  of the 1980's, 1980 to 1989, right?
20    MS. ROSEN:  Same form, objection.
21    THE WITNESS:  Correct.
22  BY MR. BOWMAN:
23    Q.  Okay.  Now, let me just go back here to --
24  and look at my notes.  You said that you were

46

1  involved in information technology as well for a
2  period of time?
3    A.  Yes, sir.
4    Q.  What were your duties and responsibilities
5  there?
6    A.  My primary duty was to act as outreach or
7  liaison to other police departments.  Certainly
8  all -- all towns in Cook County and throughout most
9  of the state and some towns in Wisconsin and
10  Indiana to share with them our computerized
11  information.
12    Q.  And what period of time were you involved
13  with that project, I mean date wise?
14    A.  I'm really good on the old years.  Right
15  after I left the records division I was moved to --
16  I don't know the year, I'm sorry.
17    Q.  Okay.
18    MR. BOWMAN:  All right.  Now let me mark an
19  exhibit.
20  BY MR. BOWMAN:
21    Q.  This is a notice of Rule 30(b)(6)
22  deposition that we sent to the lawyers in this
23  case.  I'll mark it for identification as Hickey
24  Exhibit Number 1.

47

1    (Whereupon, Hickey Deposition
2    Exhibit No. 1 was marked for
3    identification.)
4  BY MR. BOWMAN:
5    Q.  My reason for showing this to you,
6  Mr. Hickey, is to ask you to focus on certain
7  paragraphs as to which we've been informed that you
8  will be testifying on behalf of the City of
9  Chicago.
10    And the first of those paragraphs is on
11  the second page of Exhibit 1 and it's Numbered C.
12  If you can just read that silently to yourself.
13    A.  Okay.
14    Q.  Can you -- is it your belief that you're
15  in a position to testify authoritatively on behalf
16  of the police department with respect to the
17  matters that are described in this paragraph?
18    A.  It is.
19    Q.  Did you review any documents to prepare
20  yourself to testify regarding the use and conduct
21  of in-person and photographic lineups by the police
22  department?
23    A.  I did.
24    Q.  Can you tell me what you looked at?

48

12 (Pages 45 to 48)

1     A.  Department directive I think it was 83
2  something.  838 maybe.
3     Q.  Is it possible that it's --
4     A.  The title is lineups.
5     Q.  -- 83-5.
6     A.  83-5, thank you.
7     Q.  Anything else?
8     A.  I looked at our -- our current order just
9  briefly.
10     Q.  Other -- did you have any role in the --
11  in the drafting of the current order?
12     A.  I did not.  Oh, the current order, yes, I
13  did.
14     Q.  Okay.  And that was during your time in
15  the records division?
16     A.  No.
17     Q.  I'm sorry, in the research and development
18  area?
19     A.  Right.
20     Q.  Other than your involvement with the
21  creation of directives as the head of research and
22  development is there anything else that qualifies
23  you to testify on behalf of the City with respect
24  to lineups?

49

1     A.  The fact that I was a detective and
2  conducted -- personally conducted lineups.
3     Q.  And your involvement in the -- as in the
4  detective division dates back into the 1980's,
5  correct?
6     A.  Late 70's, 1980's, yes, sir.
7     Q.  Anything else?
8     A.  That would be about it.
9     Q.  Okay.  You've also been designated in
10  response to Subparagraph D the documentation and
11  preservation of information learned during a
12  homicide investigation.  Is it your belief that you
13  are in a position to testify authoritatively on
14  behalf of the Chicago Police Department with
15  respect to this matter?
16     A.  It is.
17     Q.  Did you review any documents to prepare
18  yourself to testify regarding the documentation and
19  preservation of information learned during a
20  homicide investigation on the part of the Chicago
21  Police Department?
22     A.  Not specifically for this deposition but I
23  am intimately familiar with the subject matter.
24     Q.  And that -- to be clear and we've talked

50

1  about it already but that -- that has to do with
2  the assignments that you received relating to
3  documentation retention and filing back in 1982 and
4  1983?
5     A.  Yes.  And my testifying in various
6  litigation that subject since.
7     Q.  And I think I know the answer to this but
8  just to be clear you've testified on this subject
9  in the -- in the Palmer case, correct?
10     A.  I did.
11     Q.  And in the Michael Evans case in which you
12  and I meet each other years ago?
13     A.  2005.
14     Q.  And we're not getting any younger either
15  obviously.
16     A.  No.
17     Q.  And then recently in the Fields case?
18     A.  Nathan Fields case, right.
19     Q.  Right.  Is there any other matter in which
20  you testified on this subject?
21     A.  I don't recall at this moment.
22     Q.  As part of preparing yourself generally
23  for your testimony you have familiarized yourself
24  with the various orders that the detective division

51

1  has promulgated through the years?
2     A.  Yes, sir.
3     Q.  And you have personal knowledge of the
4  circumstances leading to the 1982 and the 1983
5  orders on this subject that we'll talk about in a
6  minute, right, because of your own involvement?
7     A.  Yes, Mr. Bowman.
8     Q.  Is there anything else about your career
9  in the police department and obviously you were a
10  detective yourself for several years and have
11  firsthand knowledge as you've already testified.
12  Is there anything else that qualifies you to
13  testify on this subject?
14     A.  That should be about it.
15     Q.  Okay.  And then you've also been
16  designated with respect to Item E.  You want to
17  just read that silently to yourself.
18     A.  Okay.
19     Q.  And you also consider yourself qualified
20  to testify authoritatively for the Chicago Police
21  Department with respect to these matters?
22     A.  I do.
23     Q.  And it's basically the same circumstances
24  of your career, background as a testifying witness

52

13 (Pages 49 to 52)

1  and so forth that you've just talked about that
2  qualifies you with respect to this paragraph,
3  right?
4      A.  Yes, sir.
5      Q.  And then if -- if you could take a minute
6  to look at subparagraph F which is right below the
7  one I just asked you about.
8      A.  Okay.
9      Q.  All right.  It would be fair to say that
10 your experiences, the assistant director and acting
11 director of the records division is part of what
12 gives you the background to testify authoritatively
13 for the police department on this subject as well?
14     A.  Yes, sir.
15     Q.  Anything else?
16     A.  That would be it.
17     Q.  Okay.  All right.  And you've also been
18 designated with respect to Paragraph 3 on Page 3.
19 If you just read that silently to yourself, that's
20 a short one.
21     A.  Okay.
22     Q.  And, you know, this is just lawyer's
23 abundance of caution.  This is basically the same
24 subject matter as the -- as the issues laid out in

53

---

1  subparagraph D and E on Page 2, right?
2      A.  Yes, sir.
3      Q.  So your answer is in terms of your
4  qualifications to testify and the basis for your
5  testimony would be about the same, right?
6      A.  That's correct.
7      Q.  All right.  And then finally in Paragraph
8  4 which relates to training on a number of subjects
9  you've been designated with respect to Subparagraph
10 J?
11     A.  Okay.
12     Q.  And do you believe yourself to be in a
13 position to testify authoritatively on behalf of
14 the Chicago Police Department with respect to the
15 training provided to detectives in particular with
16 respect to the 1982, 1983, and 1986 police orders
17 relating to the street files problem?
18     A.  I do.
19     MS. ROSEN:  Object to the form of that
20 question.
21 BY MR. BOWMAN:
22     Q.  Now other than detectives to your
23 knowledge were any other police officers provided
24 any training relating to those '82, '83, and '86

54

---

1  orders on street files?
2      A.  Youth officers because they were part of
3  the Bureau of Investigative Services were also
4  included in the training.
5      Q.  Okay.  And were you involved in the
6  training of youth officers?
7      A.  I was.
8      Q.  What about gang crimes specialists to your
9  knowledge were they provided any training?
10     A.  No, they were not in the Bureau of
11 Investigative Services.
12     Q.  So it's based on that you could be
13 confident that they did not get trained?
14     A.  Correct.
15     MS. ROSEN:  On Palmer.
16     MR. BOWMAN:  Oh, yes.  No, I didn't mean to --
17 BY MR. BOWMAN:
18     Q.  To be very clear when I said that they did
19 not get trained in that last question I was asking
20 they did not get trained with respect to the issues
21 arising out of Jones and Palmer and the problem of
22 street files, correct?
23     MS. ROSEN:  Object to the form.
24     THE WITNESS:  Correct.

55

---

1  BY MR. BOWMAN:
2      Q.  Other than youth officers are there any
3  other Chicago police officers other than detectives
4  who did receive that training?
5      A.  The sergeants, lieutenants and exempt
6  commanding officers in the Bureau of Investigative
7  Services.
8      Q.  Anyone else?
9      A.  That was it.
10     Q.  All right.  It's not -- I mean, it may or
11 may not be specifically covered in these paragraphs
12 of the deposition notice that we've been
13 discussing.  I wanted to ask you one specific
14 question, are you knowledgeable concerning the
15 policies and procedures at the present time in the
16 Chicago Police Department with respect to the
17 filing, storage, and retention of investigative
18 documents in the detective division?
19     MS. ROSEN:  Can you read back the question.
20         (Whereupon, the record was read
21          as requested.)
22     THE WITNESS:  I would say I'm not.  I've not
23 actively sought out information as to what's going
24 on today.

56

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

BY MR. BOWMAN:

Q. All right. Do you know who would be?

A. The detective area commanders.

Q. Okay. Would that be the best -- the best source of information in your judgment on that subject?

MS. ROSEN: Objection, form.

THE WITNESS: I don't know who the Bureau of Detectives would assign. It's certainly an important topic. I would expect the command staff whether they be a deputy chief or the chief or the commanders to be familiar with the practices. And the lieutenants. The lieutenants would truly have hands-on understanding. They have direct administrative control.

BY MR. BOWMAN:

Q. Okay. All right. I want to take you back to 1982. And you've testified that the -- that the George Jones case came to your attention and to the attention of others in the department at the time of its unfolding, correct?

A. Correct.

Q. As the -- after -- after Laverty went into the courtroom of Judge Cousins and presented the

57

parties to the proceedings there involving George Jones with the files in his possession is it -- is it fair to say that there was concern within the Chicago Police Department about what had happened?

MS. ROSEN: Object to the form of the question.

THE WITNESS: Yes.

BY MR. BOWMAN:

Q. And can you describe the nature of the concern?

A. As an investigative unit that had a decentralized structure we wanted to make sure that all the areas violent crime units were operating using the same guidelines.

Q. And specifically using the same guidelines with respect to the creation, control, management of documents in the course of an investigation?

A. That's correct.

Q. Now, it's my understanding that Detective Laverty was disciplined on what I would characterize as a technicality for not informing his supervisor that he would be testifying in court, do you recall that?

A. Actually I'm sorry, I don't.

Q. Okay. All right. Other than issues

58

relating to how Mr. Laverty himself -- how Mr. Laverty conducted himself was there any discussion in which you personally participated with either Chief Handhardt or anyone else in the command staff as to what should be done as a result of the publicity and the notoriety that the George Jones prosecution generated?

MS. ROSEN: Object to the form of the question.

THE WITNESS: There was a meeting in the deputy superintendent's office, deputy superintendent in charge of investigative services a fellow by the name of Thomas Lyons, he was Handhardt's supervisor. And at the meeting where it was the command staff of the detective division and there were a few others in the room including myself.

BY MR. BOWMAN:

Q. When did this meeting take place?

A. Oh, I don't -- 1982. I couldn't give you a date at this time.

Q. Was this before the temporary restraining order in April of 1982?

A. Close but I -- honestly, I don't know if it was prior to or - it might have been prior to. I can't remember. Close in time.

59

Q. All right. Other than Lyons and Handhardt and yourself who was else was present?

A. Oh, I -- the various commanders.

Q. Commanders from the various areas?

A. Right, right. Six of them.

Q. I know it's been many years, what was the -- what was the gist of the conversation of that meeting?

MS. ROSEN: Objection, relevance.

THE WITNESS: I say the -- one of the primary questions was terminology. There seemed to be a wide variance to what people referred to as detective notes, running files, working files, and where they might be kept. That seemed to be a question that was facing the group.

Q. So would it be fair to say that the -- the group was -- was convening together to provide Deputy Superintendent Lyons and the other brass in the room with an explanation as to what was going on on the ground?

A. Yes, sir.

Q. All right. Now, there was an objection to a question I asked -- and several objections, I referred to the street files problem. And I want

60

15 (Pages 57 to 60)

1 to be clear with you what I'm referring to and see
2 if we can reach a common understanding.
3      In the George Jones case would it be
4 consistent with your understanding based on your
5 personal involvement with the response to this case
6 that what happened was that there were materials in
7 a file that Detective Laverty possessed that others
8 involved in the investigation may have possessed at
9 some time that were not part of the documentation
10 that was provided to the State's Attorney and the
11 defense lawyers and the -- and directly the judge
12 in George Jones's prosecution, is that consistent
13 with your understanding?
14    A. Fair. But I don't know if there were
15 multiple documents. I know of only one.
16    Q. And the one document would be the memo
17 recording an interview with the key witness?
18    A. That's correct.
19    Q. And in that memo the account of the
20 interview was substantially different than the
21 account that was provided in an official
22 supplementary report, right?
23    A. That is correct.
24    Q. And that discrepancy between what was in

61

1 the file memo and what was in the official
2 supplementary report lead to the dismissal of the
3 charges against Mr. Jones, it lead to the filing of
4 the Palmer litigation, it lead to George Jones's
5 civil case, it lead ultimately to an opinion from
6 the 7th Circuit saying that the police department
7 had a policy of placing exculptory materials
8 outside of the official record, right?
9    MS. ROSEN: I'm going to object to the form of
10 the question. And state affirmatively that you're
11 misstating what the 7th Circuit concluded as a
12 result of the Palmer litigation.
13    MR. BOWMAN: That's not what I'm referring to.
14 I'm referring to what the 7th Circuit concluded as
15 a result of the George Jones litigation.
16    MS. ROSEN: I'm going to maintain my objection
17 even with that clarification.
18    MR. BOWMAN: All right. Just to be clear.
19 BY MR. BOWMAN:
20    Q. Now, you've heard the objection, in your
21 understanding did I get it right?
22    A. I don't know honestly why the George Jones
23 case was dismissed or I -- I don't even know the
24 disposition of that case. I mean, I truly don't.

62

1      And I don't know about the conclusion of
2 the 7th Court -- appellate court was it.
3      I do know in the end I thought it was a
4 favorable decision for the City, one of the
5 appellate courts.
6      But you are absolutely right, the
7 document, the Laverty memo was the -- cause of
8 concern and our -- brought attention of the Chicago
9 Police Department to this issue.
10    Q. On behalf of the Chicago Police Department
11 today do you acknowledge that the -- that the
12 failure to place what you've referred to as the
13 Laverty memo relating to the interview with Pervy
14 Pointer in the Jones case, the failure to place
15 that memo in the official file was a failure of
16 policy. And a failure of policy that resulted in a
17 violation of Mr. Jones's constitutional rights?
18    MS. ROSEN: Object to the form of the question.
19    THE WITNESS: It was problematic. We have an
20 obligation to truth. I mean -- and we are -- all
21 policies can be improved, sharpened, strengthened.
22 I don't know if one memo a policy makes. But
23 certainly any example of this is an example that we
24 haven't done all we can to preserve the facts on a

63

1 particular case.
2 BY MR. BOWMAN:
3    Q. Okay. Well, let me break it down. Do you
4 acknowledge today on behalf of the Chicago Police
5 Department that in the specific case of George
6 Jones that the failure to include the Laverty memo
7 in the official file that was produced to the
8 participants in the criminal justice system
9 resulted in a violation of George Jones's
10 constitutional rights?
11    MS. ROSEN: Can you read back the question.
12      (Whereupon, the record was read
13      as requested.)
14    MS. ROSEN: I'm going to object to the form of
15 the question.
16    MR. BOWMAN: What's wrong with it?
17    MS. ROSEN: What's wrong with the form.
18      Okay, can you read it back again.
19      (Whereupon, the record was read
20      as requested.)
21    MS. ROSEN: I'm objecting to your use of the
22 phrase official file. I'm objecting to your use of
23 the term -- now I lost it.
24      I'm sorry, can you read it back one more

64

16 (Pages 61 to 64)

1   time.

2       (Whereupon, the record was read

3       as requested.)

4   MS. ROSEN: Okay. So my objection is to the

5   phrase to include the Laverty memo in the official

6   file, that's my form objection.

7   MR. GIVEN: I'm also not sure that it doesn't

8   call for a legal conclusion. I'll object on that

9   basis as well.

10   MR. BOWMAN: All right.

11   MS. ROSEN: I mean, I don't mean to make this

12   more difficult than it is.

13   MR. BOWMAN: No, no, you're fine. And I

14   appreciate your explaining the reason for your

15   objection. I wanted to -- wanted to know it. And

16   you're courteous to provide it. And I've got no

17   problem at all.

18       I'll stand on the question and ask for an

19   answer please.

20   THE WITNESS: Up until this time memos were not

21   placed in files. A detective who wants to write on

22   the subject should have included it on a

23   supplementary report. If you feel that strongly

24   about it here's the document.

65

1       But as to the topic, to the information,

2   if a member of the Chicago Police Department -- any

3   member of the Chicago Police Department has

4   information that would be of exculptory nature it

5   should be included -- it should be preserved.

6   BY MR. BOWMAN:

7   Q. All right. I'm going to ask that my

8   question be read back one more time. And I

9   appreciate that you may not be able to answer it

10   yes or no. If you can't, fair enough. But if you

11   could answer it yes or no I would appreciate a yes

12   or no?

13   A. Okay.

14       (Whereupon, the record was read

15       as requested.)

16   THE WITNESS: I don't know how to answer that,

17   I'm sincere.

18   BY MR. BOWMAN:

19   Q. All right. I gather though that from your

20   previous testimony that you would acknowledge on

21   behalf of the Chicago Police Department that there

22   is a responsibility of police officers to place all

23   information that's developed in the course of an

24   investigation into the official departmental

66

1   reports that are produced to the parties in the

2   criminal justice system, right?

3   MS. ROSEN: Object to the form.

4   THE WITNESS: Certainly all relevant

5   information. I mean, there might be something that

6   is generated but it is not at all pertinent to the

7   investigation.

8   BY MR. BOWMAN:

9   Q. But to the extent the information is

10   pertinent to the investigation in any way, shape,

11   or form you would agree that if it's generated in

12   the course of the investigation it belongs in the

13   -- in the body of documentation whether you called

14   it official or something else that is produced to

15   the participants in the criminal justice system?

16   A. I fully agree.

17   Q. And you would agree that that did not

18   happen in the George Jones case, right?

19   A. Yes, sir.

20   Q. And would you agree that in the particular

21   circumstances of the George Jones case because of

22   the nature of the excluded information that the

23   failure to have included this particular memo was

24   particularly egregious?

67

1   MS. ROSEN: Object to the form of the question.

2   THE WITNESS: It caused deep concern within the

3   organization.

4   BY MR. BOWMAN:

5   Q. Okay. And did the -- and did the concern

6   within the organization include the concern that

7   similar problems might exist in the files of other

8   cases?

9   A. We wanted to conduct a fact finding

10   review. We didn't know.

11   Q. Were you concerned that that might, might

12   actually be the case?

13   A. It could be but it might not be as well.

14   Q. Okay. Were the participants in the

15   meeting that you've just described with Deputy

16   Superintendent Lyons, Chief of Detectives Handhardt

17   and others concerned about the need to determine

18   whether a problem such as the problem that occurred

19   in the Jones case might exist in the files of other

20   Chicago police detective division investigations?

21   A. That was one of the concerns expressed.

22   Q. And was any action ordered or requested of

23   you in the course of this meeting?

24   A. I was directed with others to conduct a

68

17 (Pages 65 to 68)

1 site visit to the detective violent crimes units to
2 determine which units and what type of files were
3 being maintained or in existence they weren't being
4 maintained, that was our problem, outside the
5 normal files maintained by the violent crimes unit.
6    Q.  Okay.  Who in addition to yourself was to
7 undertake these visits?
8    A.  There were a couple of sergeants and a
9 couple of detectives and we split up the six areas.
10 I don't know -- I think on day one or the first two
11 days I might have gone -- personally gone to three
12 areas.
13       But upon coming back it was determined
14 that I and I alone would actually visit the areas
15 that I hadn't visited.  They wanted one set of eyes
16 to look at all the areas.  Because again we had
17 this problem of terminology and consistently of
18 interpretation.
19    Q.  So ultimately the responsibility fell to
20 you?
21    A.  It did.
22    Q.  Okay.  Now, did you undertake these site
23 visits before or after the temporary restraining
24 order in the Palmer case?

69

1    MS. ROSEN:  Object to the form and just in
2 terms of -- you mean, the issuance of the order,
3 just for timing.
4    MR. BOWMAN:  Yes.  Yes.
5 BY MR. BOWMAN:
6    Q.  The -- it's my understanding that the
7 order was issued on or about April 20, 1982.  Did
8 you undertake the site visits before the order came
9 down or after?
10    A.  I don't know.  It's -- same month, within
11 a week.  I don't remember if it was before or
12 after.  It was very close in time and place.
13    Q.  Okay.  Well, let's just look at some of
14 the documents.
15    MR. BOWMAN:  I'll mark for identification as
16 Exhibit 2 a teletype order, this will take us back
17 to yesterday, dated April 20, 1982 and signed by
18 Superintendent Brzeczek.
19       (Whereupon, Hickey Deposition
20        Exhibit No. 2 was marked for
21        identification.)
22 BY MR. BOWMAN:
23    Q.  Are you familiar with this document?
24    A.  I am.

70

1    Q.  Do you recall the process, the
2 preparation, and the distribution of this
3 particular order?
4    A.  Yes, I was working with a sergeant from
5 legal affairs, Terry Gaynor.  And I remember he was
6 the better typist than I.  And I think he actually
7 typed out the draft of this.  He was assigned to
8 the office of legal affairs.
9       And mechanically to get a message like
10 this out -- this is a quick message, this is not a
11 published general order or a special order or
12 department notice which goes to the print shop.
13 This literally goes to a central location where
14 there was a teletype -- a central teletype, it's
15 old technology, and it's given a number and it is
16 disseminated to all units in the police department.
17    Q.  Okay.  Did you witness Brzeczek's
18 signature on this?
19    A.  I did not.
20    Q.  Okay.  Did you walk it over to the
21 teletype operator?
22    A.  Yes, I did.
23    Q.  And then it gets blasted out by teletype
24 to every affected unit within the police

71

1 department?
2    A.  Yes, sir.
3    Q.  And the object here is to make sure that
4 the information is disseminated immediately?
5    A.  Yes, sir.
6    Q.  Or as immediate as possible given the
7 technological limitations of the day, right?
8    A.  Yes, sir.
9    Q.  And the order requires the preservation of
10 everything generated in the course of any detective
11 divisional investigation, fair summary?
12    A.  All contents of all police departments
13 investigative files will be kept in contact --
14 intact.  I do remember there being confusion even
15 with this.
16    Q.  What is the confusion that you recall?
17    A.  It talks about all contents in these
18 files.  The notes of detectives were never kept.
19    Q.  In the files?
20    A.  So therefor never kept in any file.
21    Q.  Okay.  So are you saying that there was a
22 loophole within this directive?
23    A.  I would --
24    MS. ROSEN:  Object to the form of the question.

72

18 (Pages 69 to 72)

1    THE WITNESS: I wouldn't call it a loophole.
2  It's -- it's just a topic that was not included.
3  It had never been included. And it would almost
4  assume something not in record.
5  BY MR. BOWMAN:
6    Q. Well, and I guess I didn't mean to be
7  suggesting something nefarious by my use of the
8  term loophole. But what I'm interested in knowing
9  is at the time this order was issued had sufficient
10  investigation been done at that point to ascertain
11  that some, if not all, detectives participating in
12  investigations had a practice of keeping their own
13  personal files separate from any recognized
14  official area repository for files?
15    A. No, I don't think that's a fair -- you
16  said personal files. Frankly I think a lot of
17  detectives did not keep personal files. They would
18  use a working file that was laying on the coat
19  rack. You know, they're not going to be taking it
20  home with them.
21    Q. You know, I've been around this more than
22  once myself. And this -- this terminology can get
23  to the point of being -- really being maddening.
24    But what you said in your early -- earlier

73

1  answer describing this teletype message was that
2  the contents of police department investigative
3  files known in various -- but under various
4  nomenclature, office file, unit file, working file,
5  sometimes referred to as a street file, sometimes
6  referred to as a running file, all of these files
7  will be kept intact, that's what the teletype
8  message says in summary, right?
9    A. Right.
10    Q. Now, I understood your earlier answer to
11  mean that -- that even in the context of this
12  message there was some unclarity as to whether
13  files that were not, quote-unquote, police
14  department investigative files were subject to this
15  directive, did I mishear you or misunderstand you?
16    A. No, I was -- yes, but I was also referring
17  to personal notes.
18    Q. Right.
19    A. Yes.
20    Q. And with respect to personal notes some
21  detectives kept them, some detectives kept them
22  from any police department investigative file, they
23  simply retained them as their own in their personal
24  possession, yes?

74

1    A. I'm not aware of detectives keeping
2  handwritten notes any longer than they absolutely
3  had to until they wrote a report.
4    Q. Right. And then they would throw them
5  away?
6    A. Absolutely.
7    Q. Right. And that was problem, yes?
8    MS. ROSEN: Object to the form of the question.
9    THE WITNESS: No, there's no constitutional
10  requirement to preserve --
11  BY MR. BOWMAN:
12    Q. From the point of --
13    A. -- notes.
14    Q. -- view of the Chicago Police Department
15  was it in 1982 a problem in the aftermath of George
16  Jones that some detectives were keeping notes in
17  their personal possession and throwing them away
18  after -- after completing the supplementary
19  reports?
20    MS. ROSEN: Object to the form of the question.
21    THE WITNESS: At this moment I truly believe
22  there was not clear instructions on the handwritten
23  notes.
24    However, when Superintendent Brzeczek

75

1  testified in front of Milton Shader as I did I
2  don't know even know what hearing it was, it became
3  rather crystal clear to us that he wanted to
4  preserve all handwritten notes as well. And that's
5  when I wrote the policy -- drafted the policy that
6  was signed by the chief.
7    Q. Okay. The 1983 policy?
8    A. Right.
9    Q. This point it was unclear whether the
10  preservation of handwritten notes was something
11  that the police department should strive to insist
12  upon?
13    A. It wasn't clear enough.
14    Q. Are you aware of feedback from commanders
15  in the area based on your site visits in response
16  to the teletype message that's marked for
17  identifications as Exhibit 2 that there was
18  unclarity as to whether it applied to the working
19  notes, the working memorandum of individual police
20  detectives?
21    MS. ROSEN: Object to the form of the question.
22    THE WITNESS: I was aware that there was
23  various interpretations regarding the topic of
24  handwritten notes.

76

19 (Pages 73 to 76)

BY MR. BOWMAN:

Q. Specifically in the response to this teletype message?

A. Correct.

Q. All right. Now the date on the teletype message is April 20, right?

A. Correct.

Q. Okay. Let's look next at a detective division notice with the Number 82-2 on it. Which I just marked for identification as Exhibit 3 to your deposition.

(Whereupon, Hickey Deposition Exhibit No. 3 was marked for identification.)

BY MR. BOWMAN:

Q. Did you write this?

A. I did.

Q. And did you -- tell me what the process is, it appears from the date that this came out shortly on the heels of the teletype message?

A. It looks like it came out the day before.

Q. It does. But that's not likely, right.

A. I'd say it's exactly right, I mean.

Q. All right. So did you write the teletype

77

message, I didn't ask you that?

A. No, I memorized that Sergeant Gaynor was a better typist.

Q. The other thing I didn't ask you was to whom did the teletype message go, to what units?

A. It went out to all citywide units. All units within the Chicago Police Department that actually had a facsimile machine to receive it.

Q. Did it go to the gang crimes units?

A. I don't know if they had a facsimile machine. I'm not being facetious, I really don't know.

Q. I understand. Did it go to all of the detective division units?

A. Yes, it did.

Q. Did it go to the patrol division units?

A. Yes.

Q. Are there any units other than the detective division units and the patrol division units that you can be sure it went to?

A. Legal affairs, the office of the superintendent. Wherever there was a physical machine, I don't know how many we had.

Q. Okay. Now, is it fair to say that the

78

Exhibit 3 the detective division notice was a more formalized document that reiterated the same message as a teletype?

A. It -- very similar. It seemed to -- the detective division file control, if I were to critique it, did not describe what made up the investigative file. Whereas the later order was very definitive.

Q. Is it likely now that your recollection -- start over.

Has your recollection been refreshed that you wrote and caused Exhibit 3 to be disseminated before you had conducted the site visits and learned about the actual practices on the ground in various areas?

A. No. Just from the sequence of it all I would say the fact finding was first, the site visit was first and then when we agreed upon what to do the order came out, that would make more sense to me.

Q. Well, if you look at Exhibit 2 it says that the teletype message is coming about as a result of a temporary restraining order issued by Judge McMillen, you see that?

79

A. Okay.

Q. And you know that McMillen was presiding at that point in the Palmer litigation, right?

A. Okay.

Q. Yes?

A. Yes.

Q. Okay. So does that suggest to you that -- that the teletype message and the detective division notice 82-2 were sent out as a result of developments in the Palmer litigation as opposed to being a result of site visits that you were conducting --

MS. ROSEN: Object to the form of the question.

BY MR. BOWMAN:

Q. -- in the detective areas?

A. They were so close in time. I'm sorry, I don't know the dates of the site visits and I don't know the date of the TRO hearing.

Q. All right. Let's look at notice 82-2. It contains a definition of something called a unit investigative file. This is Roman II on Page 1, you see it there, right?

A. Yes, sir.

Q. And the definition reads as follows: A

80

20 (Pages 77 to 80)

1 unit investigative file is any document or group of
2 documents the subject of which relates to criminal
3 incidents and which are maintained and stored under
4 detective division control with any unit, right?
5     A.  Yes, sir.
6     Q.  And you'll agree that that definition
7 appears not to the cover documents that are not
8 maintained and not stored under detective division
9 control, right?
10    A.  That's what it says.
11    Q.  Right.  Right.  And you'll agree with me
12 that that is to the extent detectives might
13 perceive their own memo files and their own note
14 files as not being under detective division
15 control, it creates an ambiguity and a potential
16 problem in terms of keeping control of the
17 documents, fair?
18    MS. ROSEN:  Object to the form of the question.
19    THE WITNESS:  The written word is subject to
20 some further follow-up questions.
21 BY MR. BOWMAN:
22    Q.  Well, do you agree with my statement?
23    MS. ROSEN:  Object to the form of the question.
24    THE WITNESS:  Could you repeat it one more time

81

1 please.
2     MR. BOWMAN:  I'll just repeat it rather than
3 imposing on our court reporter.
4     THE WITNESS:  Okay.
5 BY MR. BOWMAN:
6     Q.  Will you agree with me that the way the
7 definition of unit investigative file is drafted
8 here there is a ambiguity in that the definition
9 appears not to apply to documents that are not
10 maintained and stored under detective division
11 control with any unit and therefor if detectives
12 perceive their personal notes and memos not to be
13 under detective division control but to be under
14 their control that the -- that the notice is
15 ambiguous and may not -- and may not keep control
16 over the documents?
17    MS. ROSEN:  Object to the form.
18    MR. GIVEN:  Also competence and foundation to
19 answer the question in the way you phrased it.
20    THE WITNESS:  I can see it could be interpreted
21 so therefor ambiguous to some but perhaps not all.
22 BY MR. BOWMAN:
23    Q.  Now, do you have any personal information
24 based on your site visits or other feedback that

82

1 you got as you were investigating this problem of
2 document control and document retention and
3 document storage, did you get any personal feedback
4 that the teletype message and the notice Exhibits 2
5 and 3 were indeed ambiguous and were being
6 misunderstood?
7     A.  Perhaps not immediately but over the next
8 couple of months.
9     Q.  Okay.  And was it your intention in
10 drafting Exhibit 3 to obligate detectives to
11 maintain and keep intact all documents relating to
12 investigations?
13    A.  All documents.  Documents mostly were
14 interpreted as interwatch memoranda, to do lists,
15 notes being passed from watch to watch between
16 investigative teams.  I remember myself being
17 confused as to whether or not personal notes should
18 or should not be maintained.
19    Q.  Under Exhibit 3?
20    A.  Under Exhibit 3.
21    Q.  And if I understood you correctly you
22 learned during Brzeczek's testimony before Judge
23 Shader at the preliminary injunction hearing that
24 indeed they should be?

83

1     A.  That was his --
2     MS. ROSEN:  Object to the form.
3         Go ahead.
4     THE WITNESS:  That was his policy preference.
5 BY MR. BOWMAN:
6     Q.  Yes.  Did you observe his testimony at the
7 hearing?
8     A.  I did not, I believe I was excluded.
9     Q.  But you learned of it?
10    A.  Yes, sir.
11    Q.  Okay.  Now, among other things Exhibit 3
12 establishes a unit file control logbook, what is
13 that?
14    A.  That's nothing more than that last
15 document.  It's a multi-lined sheet of paper trying
16 to institutionalize control over a file folder
17 which contained miscellaneous documents.
18    Q.  All right.  Did this format remain in
19 effect after the creation of 83-6?
20    A.  It did not.
21    Q.  So it ended at that point?
22    A.  Yes, sir.
23    Q.  Okay.
24    MR. BOWMAN:  All right.  I'm going to propose

84

21 (Pages 81 to 84)

1 another short break.
2         (Whereupon, a short break was
3         taken.)
4 BY MR. BOWMAN:
5    Q.  In 1982, Mr. Hickey, when you attended the
6 meeting with Deputy Superintendent Lyons and Chief
7 Handhardt and others was the gang crimes unit in
8 existence?
9    A.  Yes.
10    Q.  Were they -- was gang crimes housed within
11 the Bureau of Investigations at that time?
12    A.  No, it was not.
13    Q.  Where were they?
14    A.  They were in a bureau called Bureau of
15 Field Tactical Services.  They were in a division
16 of that called special functions group.
17    Q.  And was any representative from gang
18 crimes in the room for the meeting that you've
19 described with Deputy Superintendent Lyons and
20 others?
21    A.  No, sir.
22    Q.  To your knowledge did anyone conduct any
23 site visits, audits, investigations with respect to
24 the manner in which the gang crimes units would

85

1 were keeping maintaining and storing documents from
2 investigations --
3    MS. ROSEN:  Objection, form.
4 BY MR. BOWMAN:
5    Q.  -- in response to the George Jones case?
6    A.  Not in regards to the detectives site
7 visit, no.
8    Q.  Well, obviously not in regards to a
9 detective site visit but for any other reason, any
10 other purpose related to Jones did somebody go to
11 the gang crimes specialists and ask them what they
12 were doing with relation to the preservation of
13 notes and documents?
14    MR. GIVEN:  Let me get in my objection before
15 you answer.  Objection to form and -- form,
16 foundation, and competence.
17         You can answer if you can.
18    THE WITNESS:  I'm not aware of any.
19 BY MR. BOWMAN:
20    Q.  Do you have any knowledge as to whether
21 anyone in the police department undertook in any
22 way to ensure that gang crimes investigators
23 maintained their notes, memoranda, interoffice
24 memos of any kind generated in the course of an

86

1 investigation in the manner that was done with
2 respect to the detective division?
3    MS. ROSEN:  Objection, form.
4    THE WITNESS:  No, Mr. Bowman.
5    MR. BOWMAN:  Could I have my question and
6 answer back, I'm so sorry.
7         (Whereupon, the record was read
8         as requested.)
9 BY MR. BOWMAN:
10    Q.  Do you know who should be asked that
11 question --
12    MS. ROSEN:  Objection, form.
13 BY MR. BOWMAN:
14    Q.  -- in order to get an answer?
15    A.  Whoever may have been in charge of gang
16 crimes in that era.
17    Q.  Okay.  Do you have any reason to believe
18 that -- that anybody did that?
19    MR. GIVEN:  Objection, asked and answered.
20    MS. ROSEN:  Did what?
21 BY MR. BOWMAN:
22    Q.  Do you have any reason to believe that
23 anybody undertook to ensure that gang crimes
24 responded to the George Jones situation by

87

1 preserving notes, to-from memos, interwatch memos,
2 those sorts of things?
3    MS. ROSEN:  Objection, asked and answered.
4    THE WITNESS:  I do not.
5 BY MR. BOWMAN:
6    Q.  Let me hand you next a memo dated April
7 21, 1982 authored by the commander of the Area 3
8 detective division, a man named John Stibich and
9 directed to Raymond Clark acting chief of the
10 detective division.  I've marked it for
11 identification as Exhibit 4.
12         (Whereupon, Hickey Deposition
13         Exhibit No. 4 was marked for
14         identification.)
15 BY MR. BOWMAN:
16    Q.  After you've taken all the time you need
17 to read Exhibit 4 through just look up at me and
18 I'll ask you some questions about it.
19    A.  Okay.
20         Yes, sir.
21    Q.  Are you familiar with this memo?
22    A.  I recall seeing it.
23    Q.  What was the occasion in your
24 understanding that prompted the creation of this

88

22 (Pages 85 to 88)

1  memo?
2      A.  The continuing discussion amongst the
3  exempt as to what is a working file and should they
4  be kept.
5      Q.  In your recollection did the chief of the
6  detective division request the input of the various
7  area commanders on those subjects?
8      A.  By virtue of -- I don't remember the
9  actual assignment.  But by virtue of this memo it
10  suggests so.
11      Q.  Was a copy of this memo directed to you
12  for your review in connection with the duties that
13  you were under -- assigned to undertake in relation
14  to investigating the filing that was taking place
15  in the areas at this time?
16      A.  I'm quite certain it was shared with me.
17  I don't remember it precisely but yes.
18      Q.  Is it your understanding that Commander
19  Stibich is describing the use of working files in
20  Area 3 where he was in charge?
21      A.  Yes, sir.
22      Q.  Now, what he indicates is that a working
23  file contains not only official reports but also
24  documents, memos, requests from one detective to

89

1  another, crime scene photographs, and other
2  pertinent information necessary for the conduct of
3  an investigation, yes?
4      A.  Yes, sir.
5      Q.  And Stibich reports that having a working
6  file is essential to conduct a competent major
7  investigation, right?
8      A.  Yes, sir.
9      Q.  His point is that when there's more than
10  one team of detectives working on the same matter
11  that the detectives need to be in touch with one
12  another in writing regarding the progress of the
13  investigation, right?
14      A.  Yes, sir.
15      Q.  And is that consistent with your
16  experience as a detective?
17      A.  It is.
18      Q.  So he says that the working file serves as
19  a means of communication from one detective to
20  another when an official supplementary report is
21  not prepared, is that consistent with your
22  experience as a detective?
23      A.  Yes, sir.
24      Q.  And then Stibich goes on to list a series

90

1  of reasons why it's necessary to maintain a working
2  file in a case.  And there's a series of bullet
3  points on Page 1 and 2 of the exhibits, do you see
4  that?
5      A.  I do.
6      Q.  And among other things the working file
7  might contain a running account of things
8  accomplished and future things to be done, that's
9  what Stibich reports here, yes?
10      A.  Yes, sir.
11      Q.  And is that consistent with your
12  experience as a detective?
13      A.  Yes, sir.
14      Q.  And is that what you found in your
15  investigation of activities in the various areas in
16  your work in 1982 and 1983?
17      A.  In some but not all cases.
18      Q.  All right.  And when you say in some but
19  not all cases do you mean in some but not all
20  areas?
21      A.  No.  All the above -- no, in cases.
22      Q.  Some cases might have this -- this --
23      A.  And others may not.  There are some cases
24  that there didn't seem to be a written word other

91

1  than the supplementary reports.
2      Q.  But there were some where there did?
3      A.  Yes, sir.
4      Q.  Okay.  Stibich says that the working file
5  in his words can serve as a, quote, forum for
6  different detectives to give their respective
7  viewpoints, opinions, conjectures, suppositions,
8  and, quote-unquote, gut feelings regarding a
9  specific investigation, closed quote, do you see
10  that?
11      A.  I do see that.
12      Q.  And is that consistent with your
13  experience as a detective?
14      A.  No, it's not.  Mostly it was a to do list
15  or a request for someone to follow-up on a certain
16  aspect of the crime.  It really -- I didn't see
17  evidence that there were dueling opinions as to the
18  theory of a crime.
19      Q.  Okay.  Well, do you think Stibich has this
20  wrong?
21      MS. ROSEN:  Object to the form of the question.
22      THE WITNESS:  I don't think it speaks to all
23  units, all cases.  I mean, we already said not all
24  cases.

92

23 (Pages 89 to 92)

BY MR. BOWMAN:

Q. With respect to some of the cases in Area 3 will you concede that Stibich's description here of a forum for different viewpoints, opinions, and so forth is accurate?

MS. ROSEN: Object to the form of the question, it's vague. Are you saying that --

Can you read back the question.

(Whereupon, the record was read as requested.)

MS. ROSEN: When you say accurate do you mean accurate as in that's what's happening or accurate as a reason for justifying the use of working files.

MR. BOWMAN: Accurate as --

BY MR. BOWMAN:

Q. First of all, will you concede that with respect to some files at Area 3 that Stibich is accurately describing the use in practice of working files when he says that the file is a forum for different viewpoints, opinions, conjectures, and so forth?

MS. ROSEN: Object to the form.

THE WITNESS: My review, my assessments I

93

didn't see this. But he wrote it so he must believe it. So I cannot challenge his -- his now dead man's written word.

BY MR. BOWMAN:

Q. He also says that the working file may contain documentation of the credibility of witnesses and of suspects, do you see that?

A. I do.

Q. And would you agree with me that the Laverty memo in the Jones case would be an example of such information in a working file?

A. I think this is speaking -- no, I don't. I haven't seen the Laverty memo in a number of decades. I don't know at this moment what was in it. I think you're speaking as detectives would speak to one another. I don't know what the witness saw from his vantage point.

Q. Those kinds of things?

A. Yeah, and it's --

Q. In your experience is that information that might be contained in the notes and memoranda of a detective in a working file?

A. It could be but it wasn't very often.

Q. Sometimes it was?

94

A. It could be, yes, sir.

Q. Skipping over the reference to the file as a safeguard. The last bullet point on the bottom of Page 1 reads that the working file may function, quote, as a guide for a detective entering the specific investigation whereby he can immediately be brought up to date as to the progress of the investigation. Is that consistent with your experience as a detective?

A. No, because to understand the case you really did have to read the file. It may have told you what was done last night but I wouldn't call it a summary of the investigation.

Q. Okay. Stibich says that the working file may be a means of eliminating witnesses and/or suspects, is that consistent with your experience?

A. Yes, I think as I originally mentioned in the site visit my observations were too often tracks of the investigation were not documented. They, in fact, looked at Suspect A and found it not -- found him to be innocent and then went on to a second suspect and that story of elimination was not included in the official reports and sometimes it was included in a memo.

95

Q. Got it. And that you'll agree with me is problematic, right?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I believe that more than less should be put into supplementary investigation reports. How did you get to the final chapter. It's not always a straight line.

BY MR. BOWMAN:

Q. Right. And would you agree in general with the proposition that an investigator may not at the time of an investigation appreciate what does and what does not have exculptory value with respect to the steps taken in the investigation? Let me rephrase that.

Will you agree with the proposition that as an investigation is unfolding the investigator may not know what aspects of the unfolding investigation may or may not have exculptory value?

A. In most cases they probably do but there are cases and situations where they don't.

Q. Right. And would you agree that that is a reason why it is important to put all of the investigative process into the official supplementary report as opposed to just leaving

96

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1   some of it out?
2     MS. ROSEN: Object to the form of the question.
3     THE WITNESS: I disagree. I don't know if
4   every single person interviewed has to be reduced
5   to a supplementary report but certainly the major
6   ones.
7   BY MR. BOWMAN:
8     Q. Well, you described in your testimony a
9   few minutes ago learning during your site visits
10   that -- that too often in your judgment detectives
11   were not recording certain story lines from an
12   investigation where those story lines did not lead
13   to the --
14     A. Right.
15     Q. -- result that was documented in the
16   official report, right?
17     A. Yes, sir.
18     Q. And all I'm asking is whether you'll agree
19   that that circumstance carries with it the risk
20   that exculptory information will not be in the
21   official report?
22     A. No, I don't totally agree. If you rule
23   someone out some can argue does it matter if
24   they're part of the story. You just lost a day

97

1   investigating that person.
2     Q. Well, it may not be exculptory in the
3   least but it -- but it also might be, right?
4     A. Well --
5     MS. ROSEN: Object to the form of the question.
6     THE WITNESS: I don't think it's exculptory for
7   the person you've just not charged. I mean, you
8   freed them from suspicion. You've cleared them as
9   a subject of investigation.
10     But I do understand and I more agree than
11   not, sir, that the story, the investigation, should
12   be fuller than it was.
13   BY MR. BOWMAN:
14     Q. Well, there are a couple of points that
15   Stibich makes at the top of Page 2 that bear
16   directly on this. Stibich writes that the working
17   file may contain a listing of leads undertaken,
18   sometimes false, that are not included in the
19   official reports, right?
20     A. Yes, sir.
21     Q. And that, in fact, was consistent with
22   what you found on your site visits?
23     A. Yes, sir.
24     Q. And was that consistent with your

98

1   experience as a detective?
2     A. Yes.
3     Q. And then going down to the bottom of the
4   list Stibich writes that a working file may contain
5   a listing of information that later proves to be
6   worthless and does not become an integral part of
7   the investigation, court presentation. And that
8   was consistent with what you found in your site
9   visits?
10     A. I don't know what he's referring to as a
11   listing of information. Again, most of the
12   interwatch memo were requests for members of the
13   different watches to perform a function on their
14   behalf, take someone down to the polygraph,
15   re-canvass, go back to the room where nobody
16   answered on the night of the murder, whatever it
17   might be. But is that a listing that proves to be
18   worthless. I don't recall ever seeing a listing of
19   information.
20     Q. But you did see memos of the sort that you
21   just described?
22     A. Yes, sir.
23     Q. That were in working files and not in the
24   official reports?

99

1     A. Yes, sir.
2     Q. Okay. It was Stibich's conclusion that --
3   and he writes this at the very end of his memo, at
4   the conclusion of the investigation by clearing and
5   closing and arrest all pertinent information and
6   documentation should be transferred to the official
7   file and then the working file can be discarded?
8     A. I see that.
9     Q. And in -- I mean, obviously the procedure
10   is a little bit more complicated as it came to be
11   written down in the 1983 order but the bottom line
12   is pretty much that that's -- that's what should
13   happen, right?
14     MS. ROSEN: Object to the form of the question.
15     THE WITNESS: There never was a requirement for
16   the investigative file to mirror that of the unit
17   file or the official file.
18     It was simply an obligation if you took
19   notes to preserve them in the investigative file.
20   If you prepared an interoffice memorandum on a
21   general progress report or any other way preserve
22   it and this is how and where you should keep it in
23   the investigate file. But there was not an
24   obligation to create two identical files.

100

25 (Pages 97 to 100)

BY MR. BOWMAN:

Q.  But the bottom line point was that as of 1983 there was an official recognition at least on the part of the detective division that any officer notes generated in the course of an investigation, any memorandum of an investigatory nature that came into being as a result of the investigation, lists of things that should be done, and the like should all be kept and preserved and maintained as a part of the official file of the case, accurate?

A.  Yes, sir.

MS. ROSEN:  I'm going to object to the form.

MR. BOWMAN:  Can I have an explanation of what I did wrong in phrasing that question.

MS. ROSEN:  Well, because you -- you've -- maybe it's I'm just confused.  I thought you started this with what he said should be done at the conclusion is what got memorialized in '83, isn't that what --

MR. BOWMAN:  No, my question didn't relate back to any other question that I asked.

MS. ROSEN:  Well, I am maintaining my objection.

101

BY MR. BOWMAN:

Q.  Do you acknowledge on behalf of the Chicago Police Department that if what we've just agreed is the official responsibility of investigators in the department is if that is not done that there is an unacceptable risk that exculptory information may not be included in a file as happened in the George Jones case?

MS. ROSEN:  Object to the form.

THE WITNESS:  I would like a clarification on the use of the word investigator.  Are you referring to anyone in the Chicago Police Department who investigates --

MR. BOWMAN:  Yes.

THE WITNESS:  -- or are you referring to detectives?

MR. BOWMAN:  Anyone.

THE WITNESS:  The investigative file procedures were designed to enforce detective division procedures.  It was localized within the detective division.

So I would say you're right if you're using the word detective.  But, no, if it pertains to the general investigating officers wherever they

102

may be in the Chicago Police Department.

BY MR. BOWMAN:

Q.  And is that simply because of the limits on your expertise or are you saying that -- that the proposition is inaccurate outside of the detective division?

A.  It's inaccurate outside of the -- it's a technical -- I disagree with you on technical. It's -- it was a detective division special order issued to the detective division members for violent crime field investigations.

Q.  All right.  What I intended to ask is whether if notes and memoranda generated by an investigator in the course of an investigation are not kept and included in the official file, if there is an unacceptable risk that exculptory Brady material will not be part of the file as it must be under the constitution.

I'm not asking, you know -- I'm not intending to ask anything technical, I'm just asking as a general proposition speaking on behalf of the police department in your opinion is that an accurate statement?

MS. ROSEN:  Object to the form of the question.

103

MR. GIVEN:  Also incomplete hypothetical and foundation objection as well.

MS. ROSEN:  And can I just get a clarification, when you make reference to an official file are you -- what are you referencing?

MR. BOWMAN:  I'm referencing the file that is made available to the participants in the criminal justice system.

MS. ROSEN:  Okay.

THE WITNESS:  I don't think there is a danger of losing exculptory material or information if the general police officer investigating a crime submits a supplementary report.

One of the nicer things about our report procedures in the police department is that we do not have a prohibition against writing a supplementary report.  If you feel that you have uncovered something you have an obligation to report it.  You know, it's -- all people in the Chicago -- all sworn members of the Chicago Police Department are potentially contributors to an investigation.  And they all have an obligation to preserve information that exonerates or involves an individual.  If they learn that he was in Indiana

104

26 (Pages 101 to 104)

1  on the night and they know that this is pertinent
2  they have an obligation.
3  BY MR. BOWMAN:
4      Q.  Well, let me be more specific then.  We've
5  learned in this case that in 1988 gang crimes
6  specialists prepared on a daily basis something
7  that was colloquially referred to as a humper and
8  more -- less colorfully described as a daily
9  activity report listing their -- all their
10  activities on an investigation on a particular day.
11      But it appears to us since we've never
12  seen it that these reports were not preserved.
13  They were not included in the file that was
14  provided to the participants in the criminal
15  justice system.
16      What I'm asking is specifically with
17  respect to those documents on behalf of the Chicago
18  Police Department do you have acknowledge that the
19  failure to preserve those documents and the failure
20  to include them in the file provided to the
21  participants in the criminal justice system creates
22  as unacceptable risk that exculptory material that
23  may have developed in the course of an
24  investigation and not been included in an official

105

1  report will not be in the file?
2      MS. ROSEN:  Object to the form of the question
3  and foundation with respect to establishing that
4  this witness has any knowledge about what
5  information is contained in a daily activity
6  report.
7      MR. GIVEN:  Also incomplete hypothetical.
8      THE WITNESS:  This daily activity humper report
9  I don't know what it is.  I'm not at all surprised
10  that we have a daily activity report in various
11  enforcement units.  If it existed we could probably
12  find the form.  The form, maybe not the individual
13  report.  I mean, I'm just --
14  BY MR. BOWMAN:
15      Q.  Where would we look for the form?
16      A.  Research and development.
17      Q.  Does research and development maintain the
18  formats from old forms --
19      A.  Yes.
20      Q.  -- that were in use dating all the way
21  back into the 80's?
22      A.  Yes.
23      Q.  Okay.
24      A.  We've learned something today.

106

1      But that -- that's not about any one
2  investigation.  I mean, it -- I don't pretend to
3  have knowledge of what this form looks like.  But
4  it's about what you did today, you know.  It's your
5  boss wanting to know if you made arrests, it's --
6  you know.
7      Q.  Well, if I what did today includes talking
8  to a witness in a particular case and mysteriously
9  there is no report about the conversation with that
10  witness --
11      A.  If it's important.  Sorry.
12      Q.  -- if it's a -- will you accept the
13  proposition that if it's an important witness that
14  the failure to preserve and include these reports
15  in the file provided to the participants in the
16  criminal justice system contains a risk that
17  exculptory information may not be included in the
18  documentation?
19      MS. ROSEN:  Objection, form, foundation, calls
20  for speculation.
21      MR. GIVEN:  I'm not sure it was a question.
22      THE WITNESS:  If the information is important
23  that a gang crimes specialist should have recorded
24  it on a supplementary report or at the least picked

107

1  up the phone and called the detective and shared
2  the information.  I mean, that's --
3  BY MR. BOWMAN:
4      Q.  Let me hand you another memo which I
5  believe was written in the context of your 1982
6  activities.  I've marked it for identification as
7  Exhibit 5.
8          (Whereupon, Hickey Deposition
9           Exhibit No. 5 was marked for
10          identification.)
11  BY MR. BOWMAN:
12      Q.  The title of this document is memo to
13  discrepancies between detective area unit files and
14  the records division reports of the same records
15  division number.  It appears that you authored
16  it --
17      A.  Yes, it does.
18      Q.  -- based on your name at the bottom of the
19  Page 2?
20      A.  That is correct.  I recognize this.  It's
21  been a while since I've seen it though.
22      Q.  Can you tell me the context in which it
23  was written please?
24      A.  This was written after my having conducted

108

1  the site visit to the six detective areas.
2      Q.  And was --
3      A.  Probably in April of 1982.
4      Q.  Was this a report for the benefit of the
5  chief of detectives?
6      A.  Yes, sir.
7      Q.  And was it transmitted to him to the best
8  of your information?
9      A.  It was, I prepared it for him.
10     Q.  And in summary you're reporting to the
11 chief of detectives that you had learned of
12 discrepancies between what you referred to as the
13 unit files of an area and the records division file
14 of official reports at police headquarters?
15     A.  Yes, sir.
16     Q.  And you indicate that often times there
17 are additional pieces of paper in the unit files
18 and assorted miscellaneous documents included in
19 unit files that are not in the official record
20 suppository, yes?
21     A.  Yes, sir.
22     Q.  And this would be documents of the nature
23 we've been talking about before including notes, to
24 from memos of an investigatory nature, to do lists,

109

1  and the like?
2      A.  Phone books, personal phone books, just
3  scraps of paper.
4      Q.  Is my --
5      A.  Yes, sir.
6      Q.  The question that I asked is accurate?
7      A.  Yes, sir.
8      Q.  It included the notes and the memos that
9  we've been talking about?
10     A.  Yes.
11     Q.  And then you also report that each violent
12 crime unit states that they routinely upon the
13 clearing of a homicide case purge the file of
14 miscellaneous documents but only in Area 3 and Area
15 5 is this purging actually done, can you tell me
16 what the meaning of that is?
17     A.  These documents that existed were not
18 placed into an official file.
19     Q.  And when you write that the files were
20 purged of the miscellaneous documents does that
21 mean that they were thrown away?
22     A.  Yes.
23     Q.  Okay.  And that this, in fact, happened in
24 Area 3 and Area 5?

110

1      A.  Yes.
2      Q.  Now, there's also a reference here to
3  major incident worksheets.  And they've come up
4  before in our deposition, right, we've talked about
5  them in the context of your morning duties in terms
6  of preparing the summary for Chief Handhardt?
7      A.  Yes, sir.
8      Q.  And you write here that the major incident
9  worksheets contain material which may be
10 detrimental to the prosecution of arrested
11 offenders including remarks by detectives which
12 often question either the validity of the victim's
13 complaint or the veracity or moral virtues of the
14 victims themselves you refer to this as poetic
15 license that could serve to undermine the
16 prosecution of the case, what are you referring to
17 there?
18     A.  Descriptions of victims that were not
19 complimentary.
20     Q.  Disparaging their credibility for example?
21     A.  Probably speaking more to their moral
22 character than -- I don't know about their
23 credibility but.
24     Q.  But in any event you conclude here that if

111

1  these -- if such language were to be placed into
2  the hands of a competent defense lawyer that it
3  could be used in and exculptory way to cast doubt
4  upon the credibility of the witness and the
5  viability of a prosecution?
6      MS. ROSEN:  Objection, form.
7      THE WITNESS:  The use of slang rarely helps in
8  an objective criminal justice review.
9  BY MR. BOWMAN:
10     Q.  Do I have that right?
11     A.  Yes, sir.
12     Q.  Were the major incident worksheets
13 eliminated in 1983, was that the intention?
14     A.  Oh, no.  No.
15     Q.  Do they continue to be used?
16     A.  I don't know about today.  But they were
17 continued to be used for, you know, at least a
18 decade or more afterwards.
19     Q.  Were they in use in the -- throughout the
20 1980's?
21     A.  Yes.
22     Q.  80's?
23     A.  Yes.
24     Q.  Including in 1988?

112

28 (Pages 109 to 112)

1  A.  Yes.  It's two sides, side one is nothing
2  more than a series of data fields, we used to call
3  them boxes, right.  And it simply was there to
4  facilitate note taking.  Firearm description, vin
5  number of the automobile, address, driver's license
6  number.  Things you couldn't possibly remember when
7  you went to prepare your report.
8       And on the back side was a brief summary
9  of the events.  You know, I'm going home in 45
10  minutes, I can't tell you the whole story, but it's
11  a he said, she said type of crime or whatever slang
12  they might have used.
13   Q.  And the narrative on the back side in your
14  estimation was sometimes problematic --
15   A.  Yes, sir.
16   MS. ROSEN:  Object to the form.
17  BY MR. BOWMAN:
18   Q.  -- as you have described in your memo?
19   A.  Yes, sir.
20   Q.  Now, if there were a murder in 1988 that
21  were -- that was investigated in one of the
22  detective divisions would the procedure and the
23  expectation be that there would be a major incident
24  worksheet created for that investigation?

                                              113

1  A.  No.
2   Q.  Okay.  Explain?
3   A.  It's a -- you can say a fielder's choice
4  here but it's the detective's option to write -- in
5  1988 write everything down on the general progress
6  report freehand, okay, just notes.  Victim, date
7  and time, weather, weather conditions, the vin
8  number, whatever you think is important.  Or to use
9  the handy dandy note facilitator called the major
10  incident worksheet.  There's not a requirement to
11  use the back side.  I could use one the major
12  incident worksheet to help me legibly write down my
13  notes from the crime scene and go back and begin
14  the official report and never having written
15  anything on the back side of the major incident
16  worksheet.  We skipped a step.
17   Q.  Okay.  So let me ask it this way, would it
18  be the expectation and the procedure with respect
19  to a murder investigation occurring in 1988 that
20  the detective would either generate a major
21  incident worksheet or would create freehand notes
22  either on the back of the general offense case
23  report or elsewhere characterizing and describing
24  the case?

                                              114

1   MS. ROSEN:  He didn't say the back of a general
2  offense case report he said on a general progress
3  -- a GPR.
4   MR. BOWMAN:  Oh, I misunderstood.  Okay.
5   THE WITNESS:  Yes.
6   MR. BOWMAN:  Let me ask the question again.
7   THE WITNESS:  If I did I certainly meant --
8   MS. ROSEN:  No, you said general progress
9  report.
10  BY MR. BOWMAN:
11   Q.  So would it be -- would it be the
12  expectation that the detective would either create
13  the major incident worksheet or would use a GPR to
14  document the circumstances of a crime and the data
15  regarding the crime for official purposes?
16   MS. ROSEN:  But don't answer that because
17  they're going to fix the problem in the question.
18   THE WITNESS:  Only for notes, the taking of
19  notes.  The general progress report and the major
20  incident worksheet are notepads.
21  BY MR. BOWMAN:
22   Q.  Right.  All I'm asking is would you
23  expect --
24   A.  Yes, I would.

                                              115

1   Q.  -- in a murder investigation from 1988
2  that either there would be a GPR with the
3  information that you've described or a major
4  incident worksheet with the information, one or the
5  other in the file?
6   A.  Yes.
7   Q.  Okay.  Now, suppose it were not a murder
8  investigation but an aggravated battery
9  investigation, would you have the same expectation
10  with respect to a 1988 investigation namely that
11  there would be either a major incident worksheet or
12  comparable notes on the GPR?
13   A.  Yes, because I don't know how you can
14  conduct an investigation without some note taking.
15  I mean, eventually you have to write a report.
16   Q.  Okay.  Now, I want to skip ahead since our
17  time today is limited.  I just got a couple of
18  questions I want to ask you about filing that
19  extends into today.  And if you need some guidance
20  from the official directives you let me know and I
21  think I can provide them.
22       When 83-2 was generated you wrote it?
23   A.  I drafted it, yes.
24   Q.  Okay.  And one of the provisions in 83-2

                                              116

1  is that in a case where a homicide investigation
2  remains open or cleared slash open in the
3  circumstance where one offender is apprehended and
4  the other is remained either unidentified or at
5  large that the retention procedure is for the file
6  to remain at the area for a period of ten years at
7  which point it is transferred to the records
8  division warehouse, is that consistent with your
9  understanding of what 83-2 called for?
10     A.  That's accurate.
11     Q.  And when the SOP manual for the detective
12 division was created in 1988 it contained the same
13 requirement with respect to open and cleared open
14 files namely that they stayed at the area for ten
15 years then go to records division, right?
16     A.  Yes, sir.
17     Q.  And that remained the case until very
18 recently in 2011 when the procedure was changed and
19 open or cleared open cases are now permitted to
20 remain at the -- at the area indefinitely, right?
21     A.  I don't know that but.
22     Q.  Okay.  Well, let me ask you this question,
23 it has -- it has come to our notice in this
24 particular case that at Area North there are some

117

1  35 filing cabinets in a room on the first floor
2  that contain -- supposedly contain cleared open and
3  open investigations -- start over.
4       It's come to our attention that at Area
5  North there are 35 filing cabinets that supposedly
6  contain open and cleared open homicide files dating
7  all the way back to 1961, have you been made aware
8  of that fact?
9      MS. ROSEN:  Object to the form of the question
10 and your use of the word supposedly.
11     THE WITNESS:  I have no knowledge of that.
12 BY MR. BOWMAN:
13     Q.  All right.  If what I've just told you is
14 accurate and at Area North there are filing
15 cabinets with open homicide files and cleared open
16 homicide files and potentially some closed homicide
17 files dating all the way back to 1961 is there any
18 -- to your knowledge any Chicago Police directive
19 or policy that justifies the maintenance of those
20 files at that location?
21     MS. ROSEN:  Object to the form of the question.
22     THE WITNESS:  Let me speak to 1983.  Prior to
23 1983, this 1961 file or others.  When I drafted the
24 order never in my wildest dreams did I think I was

118

1  writing a policy retroactively.  I thought it was
2  from this day forward, all right.  You know, it's
3  -- you know, it's certainly everyone's experience
4  that things retroactive don't work out well.
5  Whether they be laws or filing procedures.
6       But in regards to what you've just told
7  me, something I didn't know, in 2011 changed.
8  Everything I would expect from 1983 up to 2011 the
9  order calls for it to be moved after ten years.
10      Now there are reasons it may stay on the
11 floor.  It may be called back.  And that probably
12 has more to do with what is going on on an
13 individual case basis.  It might be the anniversary
14 of a major case, someone might be assigned to look
15 at all cold cases that are five to ten years of
16 age.  I don't know the inner workings of the
17 detective division.
18      But, yes, would be my answer.  I would
19 think that those cases between 1983 up to 2011
20 should have been sent to the records division
21 warehouse.
22 BY MR. BOWMAN:
23     Q.  And then might one or -- or a handful of
24 files might be called back for a specific reason

119

1  but to store them if that is, in fact, happening at
2  a location in the area would it best be
3  inconsistent with the expectations of 83-2?
4      A.  I think proportion is important here.
5  Remember that the '83 directive called for the
6  creation of an investigative file for every violent
7  crime field investigation, every robbery, every
8  aggravated battery, every criminal sexual assault,
9  murder.  And I don't know how many of those types
10 of cases were all the districts that comprise Area
11 North over a ten year period of time.
12     Q.  Time out.  My question pertained just to
13 homicide files?
14     A.  Okay.
15     Q.  Okay.  So -- and if I wasn't clear about
16 that --
17     A.  No, I'm sorry.
18     Q.  What's come to our attention is that the
19 -- is that the 35 file cabinets of files dating
20 back to 1961 are exclusively homicide files.
21      Now, with that information and focus will
22 you agree that the maintenance of such a large
23 number of homicide files in a location where
24 they're not supposed to be is inconsistent with the

120

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1  expectations of 83-2 and department policy?
2      MS. ROSEN:  Object to the form.
3      THE WITNESS:  You said 82 but I know you meant
4  83.
5      MR. BOWMAN:  Sorry.
6      THE WITNESS:  And it would be inconsistent.
7  BY MR. BOWMAN:
8      Q.  And do you have any explanation of -- from
9  why such a large number of homicide files would be
10  located at Area North?
11     MS. ROSEN:  Object to the form of the question.
12     THE WITNESS:  You mentioned a couple times 35
13  filing cabinets.
14  BY MR. BOWMAN:
15     Q.  Right.
16     A.  I don't know how large any one individual
17  file is.  It could be a box, it could be, you know,
18  two folders, I don't know.  So, again, I don't know
19  at this moment how many homicides they've had in
20  their jurisdiction.  I mean, some cases -- you
21  know, the Tylenol case would have a lot of files.
22  I don't know what's in there or how large any one
23  is.
24     Q.  Well, if you assume as we've learned in

121

1  this case that the files are not particularly
2  massive.  That actually we're not talking about the
3  Browns Chicken case, we're not talking about the
4  Tylenol case?
5      A.  Is that up there.
6      Q.  We're talking about the files of typical
7  size described in the deposition as, you know, one
8  or two Redwell folders.  So with that information
9  and focus do you know of any reason why consistent
10  with department policy these files were being kept
11  at Area North?
12     MS. ROSEN:  Objection, form, foundation.
13     THE WITNESS:  I don't know the reason.  But you
14  informed me in 2011 the policy changed so now it's
15  all legally there.
16  BY MR. BOWMAN:
17     Q.  Well, that was actually a question I was
18  going to ask you as the representative of the
19  department.  Let's look at the 2011 order.  I'm
20  going to mark it for identification as Exhibit 6 to
21  the deposition.
22          (Whereupon, Hickey Deposition
23          Exhibit No. 6 was marked for
24          identification.)

122

1  BY MR. BOWMAN:
2      Q.  Exhibit Number 6 to be clear for the
3  record is a detective division special order
4  bearing number -- bearing number 11-01 issued on
5  May 5, 2011 together with a set of addenda numbered
6  1 through 4.
7          You should take all the time you need to
8  look through this.  My question is going to be
9  about Addendum 4 relating to file storage.
10     A.  All right.
11     Q.  Okay.  So you'll see that the 2011 order
12  changes the procedure from what you had drafted in
13  83-2 and which in my understanding carries through
14  up to 2011 by providing that the cleared open and
15  open homicide cases stay at the area indefinitely,
16  right?
17     A.  Yes, sir.
18     Q.  Now, as the representative of the police
19  department with respect to file storage and the
20  like you're not saying that when the 2011 order
21  went into effect that the records division started
22  giving back a bunch of open and cleared open cases
23  that would otherwise have been stored with them
24  under the old procedure to the areas, right?

123

1      MS. ROSEN:  Object to the form of the question
2  with respect to the records division sending it
3  back.
4      THE WITNESS:  I am not saying that.
5  BY MR. BOWMAN:
6      Q.  Right.  Because that would make no sense
7  at all, right?
8      MS. ROSEN:  Object to the form of the question.
9  BY MR. BOWMAN:
10     Q.  Right?
11     A.  It would make little sense.
12     Q.  Okay.  And it would -- it would -- I mean,
13  you know, based on your own experience as a drafter
14  of these things and specifically the drafter of
15  83-2 the expectation of the drafter is that this
16  new procedure is going forward and it's not
17  re-creating history with respect to the storage of
18  files that went before, right?
19     A.  Yes, sir.
20     Q.  Okay.
21     MR. BOWMAN:  Now, let's go off the record for a
22  minute.
23          (Whereupon, a discussion was
24          had off the record.)

124

31 (Pages 121 to 124)

BY MR. BOWMAN:

Q.   The -- earlier this afternoon I was asking you a series of questions about subpoenas and the fulfillment of subpoenas within this particular unit of the records division, you recall those questions and your answers, right?

A.   Yes, sir.

Q.   When the State's Attorney's Office would request documents from the police department relating to a pending matter in the criminal courts would the State's Attorney's request go to the same unit?

A.   Yes.

Q.   And would it be handled in generally the same way?

A.   Yes.  It might be a different form but it's the same people providing the service.

Q.   Would the State's Attorneys typically submit subpoenas or would they do it in a less formal way?

A.   I don't know what they did more of to be honest with you.  I'm -- I thought they had a separate form in which they requested information but I cannot speak authoritatively on that, I'm

125

sorry.

MR. BOWMAN:  All right.  So we're concluded for today.

We agreed that we'll come back again on the 10th of June at 10:00 o'clock.

(Whereupon, the deposition was continued sine die.)

126

STATE OF ILLINOIS  )
                   )  SS:
COUNTY OF C O O K  )

KIMBERLY J. KARAS, being first duly sworn, on oath says that she is a court reporter doing business in the State of Illinois; and that she reported in shorthand the proceedings of said hearing, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said hearing.

_Kimberly J. Karas_
KIMBERLY J. KARAS, CSR
LIC. NO. 084-003548

127

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052