# Exhibit 28

Jon Shane, 3/10/2023

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE JUAN MAYSONET,           )
      Plaintiff,          )
                     )
        -vs-              )Case Number 18 CV 2342
                     )
REYNALDO GUEVARA, et al.,      )
        Defendants.        )

VIDEOTAPED

AUDIO-VIDEOCONFERENCE DEPOSITION

JON SHANE

a material witness herein, called for examination pursuant
to Notice and the Federal Rules of Civil Procedure as they
pertain to the taking of depositions before Lea Ruth Cohen,
CSR, and a Notary Public in and for the County of Peoria,
State of Illinois, on Friday, March 10, 2023, commencing at
the hour of 10:05 a.m., via Zoom platform.


ALL APPEARANCES VIA ZOOM:


JENNIFER BONJEAN, ESQUIRE
(in-person with deponent)
a n d
ASHLEY COHEN, ESQUIRE
Bonjean Law Group
750 Lexington Avenue, 9th Floor
New York, New York  10022
(718)875-1850
jennifer@bonjeanlaw.com
a n d
STEVEN A. GREENBERG, ESQUIRE
Steven A. Greenberg, Ltd.
53 West Jackson Boulevard, Suite 1260
Chicago, Illinois  60604
(312)879-9500
steve@greenbergcd.com
on behalf of the Plaintiff;

Jon Shane, 3/10/2023

---

**2**

1    ALL APPEARANCES VIA ZOOM: (cont.)
2
3         JOSH M. ENGQUIST, ESQUIRE
            The Sotos Law Firm
4      141 West Jackson Boulevard, Suite 1240A
            Chicago, Illinois 60604
5              (630)735-3300
            jengquist@jsotoslaw.com
6    on behalf of Defendants City of Chicago police officers
     Halvorsen, Mingy, Epplen, Montilla and Paulnitsky;
7
8         THERESA B. CARNEY, ESQUIRE
            Rock Fusco & Connelly, LLC
9      333 West Wacker Drive, 19th Floor
            Chicago, Illinois 60606
10             (312)474-1000
            tcarney@rfclaw.com
11    on behalf of Defendant City of Chicago;
12
13        MICHAEL M. SCHALKA, ESQUIRE
        Leinenweber Baroni & Daffada, LLC
14    120 North LaSalle Street, Suite 2000
            Chicago, Illinois 60602
15             (312)380-6635
            mkm@ilesq.com
16    on behalf of Defendant Reynaldo Guevara;
17
          ROBERT T. SHANNON, ESQUIRE
18                 Hinshaw
             100 Park Avenue
19          Rockford, Illinois 61101
               (815)490-4900
20          rshannon@hinshawlaw.com
     on behalf of Defendant Frank DiFranco;
21
          SEAN C. STARR, ESQUIRE
22            Loevy & Loevy
     311 North Aberdeen Street, 3rd Floor
            Chicago, Illinois 60607
23             (312)243-5900
            sean@loevy.com
24    on behalf of Defendant Alfredo Gonzalez;

---

**3**

1
2              ALSO PRESENT VIA ZOOM:
             Nick Trotta, Legal Videographer
             Robin Faz, Exhibit Technician
3             Urlaub Bowen & Associates
            20 North Clark Street, Suite 600
4              Chicago, Illinois 60602
                 (312)781-9586
5             ntrotta@urlaubbowen.com
             robin@urlaubbowen.com.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**4**

1                    I N D E X
2
     Called on behalf of the Defendant City of Chicago:
3
     JON SHANE
4
     Direct Examination by Ms. Carney   pgs. 6 - 106
5
6
7
8
9    Exhibit      Page   Description
10
11   Shane 1 . . . 9   Curriculum Vitae
12   Shane 2A . . . 29  Invoice 260
13   Shane 2B . . . 40  Invoice 280
14   Shane 2C . . . 45  Invoice 293
15   Shane 3 . . . 61   Jon M. Shane report
16   Shane 3A . . . 46  Exhibits
17   *Shane 13 . . . 32 Data Collection Protocol
18   Shane 14 . . . 99  Complaint Category Tables
19
20
21
22
23
24         (*Indicates skip in sequence.)

---

**5**

1         THE VIDEOGRAPHER:  Good morning.  This is
2    the beginning of media unit one, and we are now on the
3    video record at 10:05 a.m.
4         This is the videotaped videoconference discovery
5    deposition of Dr. Jon Shane being taken on March 10th,
6    2023.
7         This deposition is being taken on behalf of the
8    Defendant in the matter of Jose Juan Maysonet versus
9    Reynaldo Guevara, et al.  The case number is 18 CV 2342,
10   filed in the United States District Court for the Northern
11   District of Illinois, Eastern Division.
12        My name is Nick Trotta, legal videographer,
13   representing Urlaub Bowen & Associates with offices at
14   20 North Clark Street, Suite 600, Chicago, Illinois.
15        The court reporter today is Lea Cohen, also of
16   Urlaub Bowen & Associates.
17        Counsel, please identify yourselves for the
18   record and the parties which you represent.
19        MS. BONJEAN:  Good morning.  Jennifer
20   Bonjean, B-O-N-J-E-A-N, of the Bonjean Law Group on behalf
21   of the Plaintiff Jose Maysonet.  Also present in my firm is
22   Ashley Cohen, C-O-H-E-N, on behalf of Mr. Maysonet, and the
23   deponent Dr. Jon Shane is also present.
24        MR. ENGQUIST:  Good morning.  Josh Engquist

---

Jon Shane, 3/10/2023

6

1    on behalf of Defendants Halvorsen, Mingey, Epplen,
2    Montilla, Paulnitsky.
3            MR. GREENBERG:  Steve Greenberg, also on
4    behalf of Maysonet.
5            MR. SHANNON:  Bob Shannon on behalf of
6    Defendant DiFranco.
7            MR. SCHALKA:  Michael Schalka on behalf of
8    Defendant Guevara.
9            MS. CARNEY:  Theresa Carney on behalf of the
10   Defendant City of Chicago.
11           THE VIDEOGRAPHER:  All right.  Will the
12   court reporter please swear in the witness?
13           (Witness sworn.)
14               JON SHANE,
15   having been called on behalf of the Defendant City of
16   Chicago, being first duly sworn, was examined and testified
17   as follows:
18           DIRECT EXAMINATION
19   BY MS. CARNEY:
20       Q.  Good morning, Dr. Shane.  I guess it's closer to
21   afternoon out there.  As I just said, my name is Theresa
22   Carney and I represent the City of Chicago in this case.  I
23   believe you've given depositions before; is that correct?
24       A.  Yes.

7

1        Q.  So I'm sure you're familiar with a lot of the
2    ground rules.  We are on Zoom which makes it a little bit
3    harder to get a sense for when someone is done asking a
4    question and when you're done answering.  So I will try
5    very hard to wait until you're done answering the question
6    before I ask another one, and I ask you to try even though
7    you might anticipate what I'm asking, give me a second to
8    finish the question so we can have a clean record.
9        A.  Okay.
10       Q.  As you know, obviously there is a court reporter
11   here taking everything down so we need to make sure that
12   our answers are verbal and out loud so that the court
13   reporter can get that.
14           If you need to take a break at any time, let me
15   know.  The only thing I ask is that we don't take a break
16   when a question is pending.  Is that okay?
17       A.  Okay.
18       Q.  It's Dr. Shane, right?
19       A.  You can call me Jon.
20       Q.  No, I want --
21       A.  It's early.
22       Q.  I want to give you the credit where credit is
23   due.
24           Where are you currently employed?

8

1        A.  John Jay College of Criminal Justice in
2    Manhattan.
3        Q.  What is your current role at John Jay College?
4        A.  I'm a professor of criminal justice.
5        Q.  And do you work with Dr. Lior Gideon at John Jay
6    College?
7        A.  Yes.  He's in the same department.
8        Q.  Okay.  How long have you guys worked together?
9        A.  Since I was hired.  When you say together, do you
10   mean together in the same department?  We don't do research
11   together because he's in a different discipline.  I just
12   want to make sure I'm clear on what you mean by together.
13       Q.  Yeah, and that's a great point.  If at any point
14   I ask a question and you don't understand what I'm asking,
15   which will probably happen more often than not, you know,
16   feel free to ask me to rephrase it or to clarify it.  If
17   you answer it, I'm going to assume you understood me.  Is
18   that fair?
19       A.  Yes.
20       Q.  I guess when I say together I just mean you guys
21   work at the same college in the same department, right?
22       A.  That's correct.
23       Q.  Do you conduct any research with Dr. Gideon?
24       A.  No.

9

1        Q.  When did you get hired at John Jay College?
2        A.  I think technically I was hired in September of
3    2008.  I deferred for one semester to finish my PhD, and I
4    started my very first semester which was the spring of
5    2009.
6        Q.  Just to probably make this easier, I think we'll
7    go right ahead and mark your CV as -- I've premarked it as
8    Exhibit 1 so if we could pull that up on the screen?  Do
9    you have it in front of you?
10           (Remote screen sharing.)
11       A.  I'll get it.  It's right here.
12       Q.  Whatever is easier for you.  We have it up on
13   screen too or you can look at the hard copy.
14           This is a copy of the CV that was attached to the
15   report you tendered in this case.  Is this the most
16   up-to-date version of your CV, if you could flip through it
17   and let me know?
18       A.  It looks like it is.  It's hard to tell because I
19   did have some other casework in here --
20       Q.  Okay.
21       A.  -- that you might see on page 85, but I think for
22   the most part there is nothing substantive to go over.
23       Q.  I see here it looks in the third little section
24   Teaching Positions and Instructional Responsibilities,

Jon Shane, 3/10/2023

---

10

1 professor of John Jay College of Criminal Justice. What
2 kind of classes are you teaching this semester?
3     A. I teach a course called introduction to law
4 enforcement. I'm teaching research methods and I'm
5 teaching statistics.
6     Q. The statistics class that you're teaching, is
7 that an intro to statistics or is it more of a graduate
8 level? I guess what kind of statistics class is it?
9     A. It's a graduate level course.
10     Q. And then the research methods class?
11     A. That's also a graduate level.
12     Q. Are there any specific research methods that you
13 focus on in the research methods course?
14     A. No. It's very broad. It covers both
15 quantitative and qualitative measures.
16     Q. The statistics class, though, is that primarily a
17 quantitative class?
18     A. Yes.
19     Q. Okay. What types of qualitative research methods
20 do you teach in the research methods course?
21     A. Interviewing, embedded research, complete
22 participant observation, participant observation, focus
23 groups.
24     Q. What is embedded research?

---

11

1     A. Something like complete participant observation
2 where a researcher goes into a community or a group or
3 something like that and embeds themself in with that group.
4 Sort of like an anthropological approach.
5     Q. I'm sure maybe, I guess as we go through this,
6 but have you conducted any qualitative -- have you written
7 any papers or dissertations on qualitative research
8 methods?
9     A. On the methods themselves?
10     Q. Yes.
11     MR. ENGQUIST: Object to the form of that
12 question. Go ahead. You can ask her to clarify.
13     A. Do you mean on the methods themselves?
14     Q. Yeah, sorry. Let me back up. Let me try it a
15 little bit different. So the qualitative methods that
16 you're teaching, have you ever conducted research --
17 qualitative research in that vein? Does that make sense?
18 Is that a bad question again?
19     A. Well, I -- you're asking if I ever applied one of
20 the qualitative methods in a particular piece of research
21 that I've done?
22     Q. Sure. That's a great way to phrase it. Thank
23 you. Have you ever applied the qualitative methods that
24 you teach in research that you've done?

---

12

1     A. Yes.
2     Q. Are there examples of that application in your
3 CV?
4     A. Yes.
5     Q. Can you -- if you can, could you point me to some
6 of those?
7     A. Yes, just give me a moment.
8     If you look on page 87, and it's the first entry,
9 Key administrative and operational differences in the
10 police quasi-military model.
11     Q. So that would be an example of some qualitative
12 research, where you have applied qualitative research
13 methods?
14     A. That's correct, yes. That was complete
15 participant observation.
16     Q. What was -- I guess what question were you
17 seeking to answer in this journal article about key
18 administrative and operational differences in police
19 quasi-military model?
20     A. That the quasi-military model of policing is the
21 myth and that fire departments are more set up both
22 organizationally and operationally more like the military
23 than the police department is.
24     Q. Did that paper include any sort of quantitative

---

13

1 analysis as well?
2     A. No.
3     Q. Then, flipping to page 85 of your CV, this lists
4 your deposition and trial experience. For each of these --
5 the broader question for this section is do you do this
6 type of work, deposition and trial work, through John Jay
7 College or is it more an independent consulting business?
8     A. Independent of John Jay.
9     Q. Do you have an LLC or consulting business set up?
10     A. Yes.
11     Q. What is that name of that consulting business?
12     A. Jon M. Shane Associates.
13     Q. Okay. Do you have any employees?
14     A. I do not.
15     Q. What type of work or cases do you generally take
16 on through your consulting business?
17     A. You broke up a little bit. Did you ask me what
18 type of cases do I take on?
19     Q. Yeah. What types of cases do you generally take
20 on through your consulting business?
21     A. Police policy and practice issues.
22     Q. How much of -- I don't need numbers, but just
23 percentagewise how much of your income would you say is
24 derived from your consulting business versus your

Jon Shane, 3/10/2023

14

1  employment at John Jay?
2      A.  Oh, I don't know.  I've never broken it out that
3  way but probably not much.
4      Q.  Okay.
5      A.  Most of my income comes from John Jay College.
6      Q.  Just for the sake of trying to pin it down, would
7  you say less than 25%?
8      A.  I mean it might -- it might be somewhere around
9  there.  Maybe 20, 25%, something like that.  I've never
10 really examined it that way.
11     Q.  Okay.  That's fair.  Let me ask it this way.  How
12 many cases do you have --
13         MS. CARNEY:  Is something wrong, Jennifer?
14         MS. BONJEAN:  Yeah, I'm turning the messages
15 off on the computer because messages are coming across and
16 I think it's distracting or would be distracting for the
17 deponent.
18 BY MS. CARNEY:
19     Q.  How many cases do you take on at any given time
20 through your consulting business?
21     A.  Over the course of -- over the course of what
22 period?  In a year?
23     Q.  Yeah, let's say within a year.  Do you have
24 multiple cases going on or do you take one on at a time?

15

1      A.  Yeah, that -- I probably have a few in progress
2  at any given time, yes.
3      Q.  Like say right now how many do you have in
4  progress?
5      A.  I don't know.  I couldn't -- I couldn't tell you.
6  Maybe four or five.
7      Q.  In your work --
8      A.  Let me just ask you to clarify, when you say in
9  progress, what do you mean by in progress?  Cases that have
10 not settled or have not been adjudicated or something?
11     Q.  Yeah, I mean, that's a great question.  I would
12 say cases where you're either working on drafting a report
13 or have provided the report to whoever hired you.
14     A.  Well, yeah, that's a tough question because there
15 are instances where I've submitted reports and I have never
16 heard anything, I don't know if the case settled, things
17 like that, but I can tell you right now I have two reports
18 that are in progress that I'm literally, literally drafting
19 at this moment.
20     Q.  Okay.
21     A.  I mean literally like that, but, yeah, that's why
22 I want to just get what you understand by in progress.
23     Q.  Yeah, no, that makes sense.
24         In regards to your work on police -- opining on

16

1  police policy and practices, have you ever opined on the
2  policies of the City of Chicago Police Department before?
3         MS. BONJEAN:  Objection, form.
4      A.  I think the answer is no, I don't remember
5  anything prior to this case.
6  BY MS. CARNEY:
7      Q.  Looking at your deposition and trial experience,
8  how much of that listed on pages 85 through 86, could you
9  quantify how much is plaintiff work versus defense work?
10     A.  Midway down on page 85, Carl Lida, the attorney,
11 that was a criminal defense case.  On page 86 at the top
12 Raoul Bustillo, the attorney, that is criminal defense.
13 David Schwartz right below that, that was civil defense.
14 And the last one at the bottom on page 86, another David
15 Schwartz, that was defense as well defending the police
16 department.
17     Q.  Okay, and then let me ask you this.  Were you
18 hired by the City of Chicago to draft a report in the Blake
19 Conyers versus the City of Chicago case back in 2012?
20     A.  I don't even remember that.  It doesn't sound
21 familiar.  Ten years ago?  2012?
22     Q.  Yeah.  It looks --
23     A.  Can you describe it?
24     Q.  It was an expert opinion regarding the Chicago

17

1  Police Department's handling of prisoner's personal
2  property potentially from 2019.
3      A.  2019?  I don't even recall the case, to be honest
4  with you.  Is it my work, do you know?
5      Q.  It says Dr. Jon M. Shane.
6      A.  I would have to look that up.  I don't remember
7  that off the top of my head.  Was that on behalf of the
8  plaintiff or the defense?
9      Q.  I believe it was on behalf of the City of
10 Chicago.
11     A.  I don't remember -- I don't remember anything
12 about that, to be honest with you.  I'm not saying that it
13 didn't happen but it just doesn't ring a bell.  Is there
14 any more listed above, have you that you can describe for me
15 what that was and refresh my memory?
16     Q.  Yeah.  We can come back to it.  I just was
17 curious if -- your name had popped up.
18         Do you remember being hired by attorneys at Taft,
19 the law firm Taft in the City of Chicago?
20     A.  Taft?  No, that doesn't ring a bell.  What's the
21 name of the attorney?
22     Q.  I don't have a name of the attorney,
23 unfortunately.
24     A.  Okay.

Jon Shane, 3/10/2023

18

1    Q.  Okay, that's fine.  I just -- just asking.
2    A.  It's distinctly possible, it just doesn't ring a
3  bell.
4        What did you say that the case was about?  Can
5  you repeat that what the case was about, please?  I think I
6  do remember now that you say it.  You said it had something
7  to do with prisoner's personal property?
8    Q.  Yeah, City of Chicago's handling of prisoner's
9  personal property.
10   A.  Yeah, I remember this.  There was a case where
11 the police department -- the challenge was against the
12 police department's property and inventory procedures and I
13 was opining on behalf of the City of Chicago that their
14 procedures were consistent with those procedures found in
15 other major cities like New York City, Los Angeles, I think
16 Newark may have been one that I referenced.  I remember the
17 case vaguely now that you say it, yeah.
18   Q.  Then, just kind of flipping through -- you have a
19 very long CV so I have to flip through a little bit.
20   A.  Okay.
21   Q.  I want to ask you some questions, I think we're
22 on page 90 --
23   A.  Okay.
24   Q.  -- about your time at the Newark Police

19

1  Department.  If you could tell me a little bit about when
2  were you first hired as a police officer on the Newark
3  Police Department?
4    A.  I was hired by the Newark Police Department in
5  March 1989.
6    Q.  What were you -- was that for patrol or --
7    A.  Well, my first assignment was to patrol, yes,
8  after the academy.
9    Q.  How long did you stay in patrol?
10   A.  From -- let's see, from August of '89 to probably
11 somewhere around '93 when I went to what was known as the
12 target team.
13   Q.  Can you tell me a little bit about the target
14 team in Newark in 1993?
15   A.  Yeah.  That was a city-wide tactical team that
16 was put together to counter carjackings and bank robberies
17 at the time.
18   Q.  How long did you stay at the target team?
19   A.  Probably until about March of '93.  I think I
20 went there in '92 and I came out of there in '93.
21   Q.  Where did you go after the target team?
22   A.  I went to the research, analysis and planning
23 division.
24   Q.  How long did you stay there?

20

1    A.  Well, I was in and out of there periodically.
2    Q.  Okay.
3    A.  So I was in from March of '97 -- '93 to May of
4  '97.  Then I was promoted in June of 1995.  Then I went out
5  and back into the field, then I came back into the division
6  later on at different points in my career.
7    Q.  I believe it says you were at the Newark Police
8  Department until 2005; is that correct?
9    A.  Yes.  December of '05.
10   Q.  December of '05?
11   A.  Yes.
12   Q.  How often were you out doing field work?
13   A.  Well, I mean, I held a number of enforcement
14 positions.  So there was a period when I was in homicide,
15 when I was working in homicide as the supervisor.  I would
16 cover the robbery division.  I was also on the emergency
17 response team at the same time that I was in an
18 administrative position so that overlapped.
19       Then I was in the command operations center
20 toward the end of my career, I would be in the field then.
21 I was working in the north district station and the east
22 district station as the field supervisor and a desk
23 supervisor so I was in the field then.
24       Then there were also periods of time periodically

21

1  when the police director or the chief of police would have
2  some sort of summer initiative they called it and they
3  would take administrative personnel and they would be put
4  out into the field periodically as you worked in various
5  assignments.
6    Q.  How long would you say you were investigating
7  homicides?
8    A.  Well, I was a supervisor there.  I didn't
9  actually do the investigations.  I was supervising
10 investigations.
11   Q.  Got it.
12   A.  And that was -- let me look at my -- from May of
13 '97 to September of '97 I was there.
14   Q.  While you were at the Newark Police Department,
15 were you ever in any -- either in an internal affairs
16 appointment or -- yeah, were you ever in internal affairs?
17 Let me ask it this way.  Sorry.  Bad question.
18       Did Newark Police Department have an internal
19 affairs division during the time frame that you were there?
20   A.  Yes, they did.
21   Q.  Okay.  And were you ever working in the internal
22 affairs division?
23   A.  Not working in the division, no.
24   Q.  The Newark Police Department, how -- what entity

Jon Shane, 3/10/2023

22

1    within the Newark Police Department or what entity outside
2    the Newark Police Department investigated complaints of
3    misconduct against police officers during the time frame
4    that you were employed there?
5        A.   The internal affairs division would do that, the
6    sergeants and supervisors, lieutenants, captains in the
7    commands would do investigations there, and then also the
8    Essex County prosecutor's office or the attorney general's
9    office, depending on the nature and scope of the
10   investigation, would work with the Newark Police Department
11   on misconduct.
12       Q.   So as a supervisor -- as a supervisor in the
13   homicide division, did you investigate allegations of
14   misconduct against any of your detectives?
15       A.   Not anybody directly assigned to me, but I just
16   want to make sure I'm clear on what you mean by that.  So
17   at the time the police department, the homicide section of
18   the police department would investigate police shootings.
19       Q.   Okay.
20       A.   So there would be a parallel criminal
21   investigation that homicide would conduct and there would
22   be an administrative investigation for policy violations
23   that internal affairs would conduct, but if you're asking
24   about the people that were assigned to homicide that worked

23

1    as homicide investigators with me that I was supervising
2    the answer is no, I did not investigate them for
3    misconduct.
4        Q.   Okay.  So let me just ask you it this way.  Could
5    you explain to me the process for police misconduct
6    complaints in the Newark Police Department during your
7    tenure as a police officer?
8        A.   Well, a complaint would be generated either from
9    within the organization or outside the organization and
10   there would be a determination whether or not it was
11   criminal or administrative.
12            If it was criminal, it would be worked on between
13   the Newark Police Department and the Essex County
14   prosecutor's office.  If they needed -- they meaning the
15   team that was investigating it, if they needed additional
16   resources they might go to the state attorney general's
17   office, or if it got really out of hand and they needed a
18   lot of resources they might go to the U.S. attorney's
19   office and the FBI in Newark.  If it was an administrative
20   investigation, it would be handled by internal affairs or
21   internal affairs would send it to one of the supervisors at
22   the local command where the officer was working.
23            So when you say misconduct, I mean that's a very,
24   very broad term which is why I'm trying to differentiate to

24

1    give you some sense of what the scope of the investigation
2    might be.
3            If it were criminal, it would be handled by an
4    internal affairs and prosecutor's office, the attorney
5    general and/or the U.S. Attorney's office, again, depending
6    on the size and the scope of that.  If it was
7    administrative, meaning a policy violation of some kind,
8    then it would be handled within the organization.
9        Q.   Okay.  And at that time who made the -- who made
10   the call that the complaint was criminal versus
11   administrative?
12       A.   Internal affairs, based on the nature of the
13   complaint that came in.
14       Q.   Would it be fair to say that everything would go
15   into internal affairs first and then it could branch out
16   from there?
17       A.   Well, when you say came into internal affairs,
18   that's not entirely accurate --
19       Q.   Okay.
20       A.   -- meaning a person could send an anonymous
21   letter to the police precinct, they could walk into a
22   police precinct, they could make a phone call.  So the
23   intake process which is guaranteed by the New Jersey
24   Attorney General's policy on internal affairs is that

25

1    anybody has to accept a complaint at any time from anybody
2    about anything and that can be made anywhere.
3        Q.   Okay.
4        A.   A clearinghouse might be internal affairs.  So
5    all -- I mean, if I'm understanding you correctly, if
6    somebody made a complaint at the precinct, somebody would
7    come in and fill out a complaint form, they would take the
8    person's complaint, they would forward that form to
9    internal affairs.
10       Q.   Got it.
11       A.   And then from internal affairs they would make
12   those administrative decisions that you were talking about.
13       Q.   Got it.  That makes sense.
14            During your time in research and analysis were
15   you ever tasked with drafting policy for the New York --
16   Newark Police Department?
17       A.   Yes.
18       Q.   What kind of policies have you drafted?
19       A.   I can tell you I've either drafted, revised or
20   created new policies from the ground up on virtually
21   everything that was in the Newark Police Department at that
22   time from rules and regulations to police pursuits to use
23   of force, domestic violence.  Every single policy that the
24   Newark Police Department had, including its rules and

Jon Shane, 3/10/2023

26

1  regulations at some point in my career, whether it was in
2  the beginning from '93 to '97 or later on when I was the
3  executive officer or the commanding officer of that
4  division, I touched every single policy in the Newark
5  Police Department.
6      Q.  All right, moving on.  When were you first
7  retained in this case to provide an expert opinion?
8      A.  On or about March 22nd, 2022.
9      Q.  Oh, and I forgot to ask you before, about how
10 many cases have you, I don't want to know on stuff that
11 you've consulted with, but provided an expert report for
12 for Miss Bonjean and the Bonjean Law Group, if you can
13 remember?
14     A.  How many overall?
15     Q.  Yeah.
16     A.  Including -- with Miss Bonjean?
17     Q.  Yes.
18     A.  Maybe four, four or five.
19     Q.  Okay.
20     A.  Let me take a look.
21         MS. BONJEAN:  Prepared a report for?  Not
22 consulted, right?
23     Q.  Right.  Just prepared a report for, not
24 consulted.

27

1      A.  Let me take a quick look, hold on.
2          Three, including this one four.  I'm going to say
3  four off the top of my head.  I don't have my files in
4  front of me but I think that's a reasonable estimate.
5      Q.  That's fair.  This lists in your CV, starting on
6  page 85 to 86, this is just the cases that you've given
7  deposition and trial testimony in; is that correct?
8      A.  Yes.
9      Q.  So this list doesn't necessarily include all the
10 cases that you may have written a report for?
11     A.  That's correct.
12     Q.  So that would explain why the Conyers versus City
13 of Chicago case wouldn't be included on here if you didn't
14 give a deposition in that case?
15     A.  Yeah, that's a good point.  Yes.
16     Q.  Actually, I want to ask you a couple questions
17 about -- there is a case listed here on page 86, it's about
18 four from the bottom of that section.  It's one you had
19 with Miss Bonjean of December 2016.
20     A.  Yes.
21     Q.  I believe that's the Constantino versus City of
22 Atlantic City case.  Does that sound about right?
23     A.  Yeah, sure.
24     Q.  Can you explain to me a little bit about what

28

1  that case was about?
2          MS. BONJEAN:  I'm going to just object to
3  the form of that question, and I don't know if you're
4  asking about this particular proceeding or the case overall
5  but I'll let you --
6          MS. CARNEY:  Fair.  That's fair.
7  BY MS. CARNEY:
8      Q.  Do you recall sitting here today what analysis
9  you were asked to do in the Constantino versus City of
10 Atlantic City case?
11     A.  Yes.
12     Q.  What was that?
13     A.  We looked in internal affairs files and we looked
14 at the practices of the police department at that time.
15     Q.  Do you recall if you did a quantitative or a
16 qualitative assessment of those files?
17     A.  I think there was a little bit of both.
18     Q.  Do you recall sitting here today what the
19 qualitative analysis that you did was?
20     A.  Yes.  We were looking at the internal affairs
21 practices, the investigation and the way it was conducted.
22     Q.  Do you recall how many total internal affairs
23 files you reviewed in that case?
24     A.  No.  Several hundred.  Maybe upwards of a couple

29

1  thousand.
2      Q.  Okay.  That -- was that for -- sorry.  That's a
3  bad question.
4          MS. BONJEAN:  I'm just going to object on
5  the form of that question.
6          MS. CARNEY:  Yep, that's fine.  That makes
7  sense.
8  BY MS. CARNEY:
9      Q.  I think I'm done with your CV for the moment.
10         If we could pull up, and I've already marked it
11 as Exhibit 2A, which would be one of your invoices,
12 invoice 260.
13         (Remote screen sharing.)
14     A.  Okay.
15         MS. BONJEAN:  Glasses?  I was asking, it
16 looks like he needs glasses.
17     Q.  Can you see?
18     A.  She's not helping things.
19     Q.  Well, the font is very small.
20     A.  No, no, it's not you.
21     Q.  Okay.  So this is invoice number 260?
22     A.  Okay.
23     Q.  Dated 3/22/2002 (sic).  Do you see that?
24     A.  Yes.  I'm looking at it, yes.

Jon Shane, 3/10/2023

30

1    Q.  It looks like your hourly rate for this case is
2  395 an hour.  Does that sound right?
3    A.  Yes.
4    Q.  I want to go down to there is a line item here
5  3/29/2002, do you see that?  Sorry.  2022, not 2002.
6  Developing MS Excel Chicago PD CR record card file and
7  companion SPSS data file.  Do you see that?
8    A.  Yes.
9    Q.  What is a CR record card file?
10   A.  The Chicago Police Department's inventory of
11 complaints.  They call them CR files.
12   Q.  Right.  Not that part.  Where you say you're
13 developing an MS Excel record card file.
14   A.  What do you mean?  What are you asking?  What did
15 I develop in Microsoft Excel?
16   Q.  Yeah.  What does it mean to develop an MS Excel
17 Chicago PD CR record card file?
18   A.  It means I created an electronic file of the data
19 that I was examining.
20   Q.  Got it.  Does that mean you created a spreadsheet
21 where you would break down certain elements of the CR file
22 and input it into that spreadsheet?
23   A.  Yes.
24   Q.  Okay.  Then the companion SPSS file, data file,

31

1  the SPSS is statistical software, right?
2    A.  Yes.
3    Q.  Okay.  The next one down says, Populating data
4  collection protocol for Maysonet in MS Excel?
5    A.  Yes.
6    Q.  Can you tell me what it means to populate the
7  data collection protocol?
8    A.  Same thing, extracting components from the CR
9  files, putting them into an electronic form.
10   Q.  Did you personally review each of the CRs
11 produced in this case?
12       MS. BONJEAN:  Objection, form.  You can
13 answer if you understand.
14   A.  The ones that are listed here in my report.  Is
15 that what you're asking me?
16   Q.  We can get to this a little bit more when we get
17 to the report, but sitting here right now without the
18 report do you recall how many physical CR files were
19 produced in this case?
20       MS. BONJEAN:  Objection, form, foundation.
21   A.  No, I don't know off the top of my head, no.
22   Q.  Okay.  So I guess I'm just trying to understand
23 when you say populating data collection protocol and you
24 said that's extracting components from the CR files and

32

1  putting them into electronic format.  Does that mean that
2  you are sitting there going through each individual CR and
3  culling that information yourself?
4    A.  Yes.
5    Q.  Okay.  So then what's the protocol?
6    A.  That's the Excel file.  That's the data
7  collection protocol.  That's what it's called.
8    Q.  Okay.  So the protocol is actually the Excel
9  file --
10   A.  Yes.
11   Q.  -- that you created?
12   A.  Yes.
13   Q.  Got it.  Is that the same as the data collection
14 protocol code book?
15   A.  The code book is a list of definitions that I
16 refer to.
17   Q.  Got it, okay.  So if we could pull up Exhibit 13
18 which is a document we received in response to your
19 subpoena.  It's Maysonet Data Collection Protocol code
20 book.
21       (Remote screen sharing.)
22   Q.  Can you see it?
23   A.  Yeah.
24   Q.  Okay.  So this is the definitions that you were

33

1  working with as you were creating the MS Excel file; is
2  that correct?
3    A.  Correct.  Correct.
4    Q.  Who created this protocol?
5    A.  I did.
6    Q.  You did, okay.  While we're on it, I'm just going
7  to ask you some questions about this.  If you go down to
8  Type of Complaint 1?
9    A.  Yes.
10   Q.  It says identify the complainant -- sorry.
11 Identify the complaint; excessive force is for a lawful
12 police objective.  Assault is for an unlawful act.  Do you
13 see that?
14   A.  Yes.
15   Q.  Did you create that definition for your work in
16 the Maysonet case?
17   A.  I created that as a coding scheme.
18   Q.  As a coding scheme, okay.  So for then each of
19 these Type 1, 2, 3, 4, 5, are you -- sorry, let me start
20 that over.
21       When you're reviewing each of the CRs, were you
22 looking at each of those CRs to make a determination about
23 whether or not it was in your view excessive force or your
24 view assault?

Jon Shane, 3/10/2023

---

34

1  A.  I had to differentiate between those two because
2  I didn't find anything in the Chicago Police Department's
3  policies and practices that explained the difference
4  between a criminal offense, an administrative offense,
5  excessive force and assault, and I never saw the words
6  excessive force listed.  As much as I can remember, I
7  didn't see excessive force listed in the CR files.  I saw
8  the word assault listed.  And I didn't understand how they
9  were differentiating between these two things.
10      So to take a reasonable approach that was fair to
11  both the City and to the Plaintiff, as I was collecting
12  this data I was trying to understand what the differences
13  are.
14      Q.  Okay.
15      A.  So I coded it that way.
16      Q.  So in reviewing the CRs you had -- you yourself
17  were trying to make a determination about whether or not it
18  should be classified as excessive force or assault?
19      A.  Based on the content of the CR file.
20      Q.  Okay.  Did you -- as you were reviewing each of
21  the CRs, did you take notes on whether or not a specific CR
22  was going to be coded as an excessive force or as an
23  assault?
24          MS. BONJEAN:  I'm going to object on work

---

35

1  product grounds.
2      Q.  Okay.  Let me ask it this way.
3          MS. BONJEAN:  He can answer the question of
4  whether he took notes, I suppose, but --
5      A.  So the answer is no, I did not take notes.  I
6  assume you mean like physical hand notes or some sort of
7  typewritten notes and the answer is no.  If I read
8  something in the CR file, then I put it into the Excel
9  file.
10      Q.  Okay.  So is it fair to say that the totality of
11  the information that you gathered from the CR files was
12  inputted into this MS Excel file that you created?
13      A.  Well, when you say totality you mean based on
14  this protocol?
15      Q.  Based on this protocol.
16      A.  Yes.
17      Q.  So there is no way to know whether or not a
18  specific CR was coded by you as excessive force or assault
19  unless we look at that MS Excel file?
20      A.  We would have to do that, yes.  It doesn't exist
21  anywhere else.
22      Q.  Okay.  And for each of those CRs where you were
23  making a judgment call -- yeah, where you were making a
24  judgment call about excessive force versus assault, you

---

36

1  were essentially opining on your belief in the validity of
2  the allegations in the CR; is that right?
3          MS. BONJEAN:  Objection to form, foundation.
4      A.  Can you repeat that, please?
5      Q.  Yeah.  Sorry about that.  So for each of the CRs
6  that potentially contained an excessive force complaint,
7  it's your interpretation of the facts was what was the
8  deciding factor between whether to code it as excessive
9  force or assault; is that correct?
10          MS. BONJEAN:  I'm still objecting to form.
11  That's a little different than what you initially asked but
12  still objection form.
13      A.  Well, I believe that the internal affairs file
14  was coded as an assault.  I believe they were all coded as
15  assault.  I don't remember seeing anything that was listed
16  as excessive force.
17      Q.  Okay.  So, sitting here today, it's your belief
18  that the City of Chicago does not classify CRs as excessive
19  force?
20          MS. BONJEAN:  Objection, form, foundation,
21  misstates his testimony, and also -- yeah, foundation.  Go
22  ahead, you can answer if you understand.
23      A.  Say that again, please.  Did you want to know how
24  I'm interpreting how the City of Chicago classifies its

---

37

1  cases?
2      Q.  Well, I guess I'm trying to understand, and maybe
3  I'm misunderstanding you, but you're saying that when you
4  reviewed the CR files you did not see classifications of
5  excessive force?  Is that accurate or am I
6  misunderstanding?
7      A.  I think that's accurate.  I don't recall seeing
8  things that were labeled excessive force.  I do remember
9  seeing things that were labeled assault.
10      Q.  And so when reviewing the CRs you had to
11  interpret the facts within those CRs to determine whether
12  it was, based on your definition, excessive force for a
13  lawful police objective or assault an unlawful act?
14      A.  Well, the file itself was labeled assault.
15  That's coming directly from the CR file.  That wasn't
16  coming from me.
17      Q.  Okay.  But either way the only way to
18  establish -- the only way to know how you coded each
19  individual CR is through this MS Excel file that you
20  created; is that right?
21      A.  Yes.
22      Q.  Okay.  Going down a little bit here, there is
23  this victim contacted section?
24      A.  Yes.

---

Jon Shane, 3/10/2023

---

38

1  Q.  It says, Yes, by phone.  Yes, in person.  No
2  contact established.  Did that mean no, no contact was
3  established?  Or, no, contact was established but they
4  didn't interview?
5  A.  No, this is just regarding contact.  Interview is
6  elsewhere.
7  Q.  Okay.  So that would be the same then for witness
8  contacted?  The no contact established just means there was
9  no contact established?
10  A.  Correct.  That the CR file did not demonstrate
11  that there was contact established.
12  Q.  Got it, okay.  Then starting at in-person witness
13  interviews-- I guess there's a couple of them up there,
14  too, but you have this N/A, not applicable, in the
15  definitions?
16  A.  Yes.
17  Q.  Who -- what does that mean in your definitions
18  for the data collection protocol, the not applicable?  That
19  no -- like, for example, using in-person interview of the
20  witness, why would that not be applicable to that CR?
21  A.  That there was no witness to interview.
22  Q.  Got it, okay.  So then going back to your
23  invoices, so I think I have this one as 2A.  The very
24  bottom invoice -- the very bottom line it says, Synopsis &

---

39

1  Notes on all cases.  Do you see that?
2  A.  Yes.
3  Q.  Is that something different than the MS Excel
4  file that you created?
5  A.  No.  That's one of the lines or one of the
6  fields, I should say, that's the best way to say it, one of
7  the fields in Excel.
8  Q.  What did that field include?
9  MS. BONJEAN:  Sorry, just grabbing a pen.
10  Q.  The Synopsis & Notes on all cases, what did that
11  field include in your review?
12  A.  It's a synopsis of the CR file.
13  Q.  Okay.  Did anybody else review the CRs in order
14  to code them in the MS Excel spreadsheet?
15  MS. BONJEAN:  Hold on.  I'm going to object
16  to that question and also lodge a work product objection.
17  I guess that's the same thing.  I'm going to object on work
18  product grounds.
19  MS. CARNEY:  So you're not going to let him
20  answer that one?
21  MS. BONJEAN:  No.  I mean I don't know
22  that -- we can talk about it with you but at the moment I'm
23  going to advise him not to answer, and if you want to talk
24  about it off and then see if we can reach an agreement

---

40

1  about something if you want.
2  MS. CARNEY:  Okay.  Well, let me see if I
3  can ask it this way.
4  BY MS. CARNEY:
5  Q.  For your data collection protocol document that
6  you created -- you know what --
7  MS. CARNEY:  We can talk about it on a
8  break, Jennifer, if that's okay?
9  MS. BONJEAN:  Yeah, let's do that at a break
10  so I can -- yeah, let's just do that at a break.  We don't
11  need to take up time now but I'm going to object at the
12  moment.
13  MS. CARNEY:  Okay.
14  BY MS. CARNEY:
15  Q.  So if we move on to Invoice 280 which would be
16  2B.
17  (Remote screen sharing.)
18  Q.  And this is kind of a silly question but -- so
19  you go from invoice 260 to 280.  There is -- the invoices
20  in between that, is that fair to assume those are for other
21  cases you're working on and that's why there is the big
22  jump?
23  A.  Yes.
24  Q.  So there is no invoices missing?  We're not

---

41

1  missing invoices 261 to 279 for this case, right?
2  A.  Oh, no, no, no.
3  Q.  All right.  So on this invoice we have, Defining
4  the dataset.  Do you see that there?
5  A.  Yes.
6  Q.  Can you explain to me what it means to define the
7  dataset?
8  A.  It means to compile everything from the
9  information that I gleaned out of the CR files and get it
10  into the MS Excel spreadsheet, make sure that all the
11  spelling is correct, that the fields are correct, that
12  there are no errors.
13  Q.  Okay.  Then down a little bit you have
14  preliminary data analysis and then data analysis.  What's
15  the difference between the preliminary data analysis and
16  your data analysis?
17  A.  Nothing much.  I'm doing -- when I say the
18  preliminary data analysis, that's my first look at the
19  data.  I want to make sure that the database is operating
20  properly, I want to make sure things are not misspelled,
21  and when I call up a function that it's working properly.
22  Q.  Got it.  If we could flip back to 2A?
23  (Remote screen sharing.)
24  Q.  So starting on line 3-29-2022, Developing

---

Jon Shane, 3/10/2023

42

1   MS Excel. That appears to be the first time that you're
2   really digging into the data. Does that sound right?
3       A. Where are you? I just want to make sure I'm
4   looking at the same --
5       Q. Yeah. It's the 2.4 hours on 3-29-2022.
6       A. Yeah. And your question is?
7       Q. That seems to be the first entry where you're
8   really, based on what you've told me about what these mean,
9   digging into the data and reviewing the data?
10          MS. BONJEAN: I'm going to object to the
11  form. Go ahead.
12      A. No. I mean I was looking at the data prior to
13  that to get a sense of what the files look like, and this
14  is the point in time when I started to create the file, the
15  MS Excel file, but I'm looking at the data ahead of that.
16      Q. Okay. So if we add up, though, starting from
17  there all the way down to the last one which has the
18  synopsis and the notes I get about 17 to 18 hours,
19  17.6 hours in reviewing the data, populating the data
20  collection, developing the MS Excel spreadsheet. Does that
21  sound about right?
22      A. On this particular form?
23      Q. Yeah.
24      A. This particular invoice number 280?

43

1       Q. 260.
2       A. Or 260?
3       Q. Yeah.
4       A. Well, do you have a calculator? I didn't add
5   these numbers up.
6       Q. I used a calculator, I promise, and I got 17.6.
7       A. Okay. I'll trust you.
8       Q. All right.
9       A. Okay, yeah.
10      Q. Then looking at the rest of the invoices that
11  you've provided, so we've got 2B which is 280, is there any
12  line item on there that includes populating -- I mean I
13  guess defining the data, is that right? You said that's
14  compiling everything and putting it into MS Excel, right?
15      A. Yeah, and at the same time when you look down
16  under preliminary analysis, a little further down where
17  it's 2.5 hours on October 20th, 2022.
18      Q. The preliminary data analysis?
19      A. Yes. There is a strong chance there that I was
20  adding data at that point too to make sure that everything
21  was accurate.
22      Q. Okay. Then what about the one underneath it, the
23  4.5 of data analysis and review? Would that have been --
24      A. Go ahead, I'm sorry.

44

1       Q. Sorry. Would that have been more inputting data
2   or is that more of the review of the data?
3       A. Well, that's -- it's a little bit of both, but I
4   would say that there is more on the review side than on the
5   populating side. At this point when we're talking about
6   doing data analysis we've run through the preliminary
7   analysis, we're checking for data integrity, those kinds of
8   things. When we get to data analysis, very little is left
9   to populate.
10      Q. Got it.
11      A. That's because it's an iterative process.
12      Q. It's a what process?
13      A. It's an iterative process. You look at the data,
14  you transfer it into MS Excel; you go back to the data, you
15  look to Excel, you go back. Then you make sure all your
16  data is accurate when you have it there and you go back and
17  forth between the two.
18      Q. Got it. But is it fair to say that maybe by
19  October of 2024 -- sorry. Wow, my dates are all sorts of
20  screwed up today. October 24th of 2022, as you said,
21  there was very little left to populate, the majority of the
22  data was in MS Excel?
23      A. Yes, I would say that's accurate. Maybe the
24  25th where you see it says data analysis drafting. I

45

1   think at this point everything is populated and ready to
2   go.
3       Q. Okay, great. Then we have one more invoice at
4   Exhibit 2C.
5           (Remote screen sharing.)
6       A. What's that one?
7       Q. So 293 from December 4th, 2022.
8       A. I just don't have --
9           MS. BONJEAN: Hold on, we don't have a hard
10  copy of that.
11      A. Can you scroll up a little? Okay.
12      Q. So it looks like at this point you're drafting --
13  no, you're finishing drafting up the report it looks like?
14  Couple entries for drafting, some conference calls with
15  Ms. Bonjean, Ms. Cohen. Is this the last invoice that you
16  submitted to Ms. Bonjean for your work on the Maysonet
17  case?
18      A. Well, I don't have them all in front of me. I
19  believe these are the last three. I don't have any
20  outstanding, I can tell you that.
21      Q. So I think this report was issued January 13th,
22  2023. So you finished up the report that day, sent it off
23  and you were done for then, for that point in time?
24      A. That's correct. That's correct.

Jon Shane, 3/10/2023

46

1        Q.   All right, great.  I'm going to show you what
2   I've marked as 3A.
3                (Remote screen sharing.)
4        Q.   I don't know why I did it as an An but I did.
5   This was attached to your expert report and it's titled
6   Exhibits.  Do you see that?
7        A.   Yes.
8        Q.   Is this a list of everything that you reviewed or
9   is this just the exhibits that were cited in your report?
10        A.   No, these are things that I reviewed.
11        Q.   Just out of curiosity, what is the relevance of
12   putting the page numbers on this document for each of the
13   documents that you reviewed?
14        A.   Just so I can have an accurate record of what
15   document I had at that time.
16             MS. BONJEAN:  Object to the form.  Object to
17   the form.  I'm confused too.
18             MS. CARNEY:  Okay.  All right.  We've been
19   going for about an hour.  I'm going to move on to another
20   part.  Do we want to take a quick break or --
21             MS. BONJEAN:  We can take a two-minute break
22   so I can just grab a coffee.
23             MS. CARNEY:  Yeah, that's fine.  Give
24   everybody five so they can get around their offices.

47

1             THE VIDEOGRAPHER:  We're going off the video
2   record at 11:09.
3                (Whereupon a recess was taken.)
4             THE VIDEOGRAPHER:  All right.  We are back
5   on the video record at 11:20 a.m.
6             DIRECT EXAMINATION (cont.)
7   BY MS. CARNEY:
8        Q.   All right, Dr. Shane.  I want to move on to a
9   little bit more broader subject and ask you about empirical
10   studies.  Can you define for me what an empirical study is?
11        A.   An empirical study is one that uses systematic
12   observation to answer a particular question.
13        Q.   When you say systematic observation, what do you
14   mean by that?
15        A.   I mean you just can't look at things haphazardly.
16   You have to have some sort of systematic observation
17   protocol of what you're examining and the rules you've laid
18   down for examining those things.
19        Q.   Based on your resumé, you have conducted
20   empirical studies in the past; is that accurate?
21        A.   Yes.
22        Q.   When you set up an empirical study, are there
23   certain protocols that you need to follow in order to set
24   that study up?

48

1             MS. BONJEAN:  Objection, form.
2        A.   When you say certain protocols, what do you mean
3   exactly?  That's a little unclear.
4        Q.   Yeah.  Well, I guess I'm trying to understand
5   because you said a systematic observation is a protocol to
6   determine what you are examining, right?  You can't do it
7   haphazardly?
8        A.   Correct.
9        Q.   So I'm trying to understand when you are tasked
10   with or are conducting an empirical study, how do you set
11   that up to ensure that you're not doing it haphazardly?
12             MS. BONJEAN:  Objection, form, foundation.
13        A.   Well, you ask a research question.  From the
14   research question you create what is called a testable
15   hypothesis, and from that testable hypothesis you then
16   systematically collect data and those are the observations
17   that you make.  Then you test that hypothesis and you test
18   it to determine whether or not it is supported or it's not
19   supported
20        Q.   Okay.  And then the data that you collect, is
21   that -- is the type and the amount of data you collect
22   dependent on the research question and the hypothesis
23   you're looking to test?
24             MS. BONJEAN:  Objection to the form and

49

1   foundation to that question.
2        A.   You say the type and amount?
3        Q.   Yeah, so -- sorry.  So you want to collect data.
4   So you just gave me four kind of pillars for an empirical
5   study:  Research question, testable hypothesis, collect the
6   data and then you test that hypothesis.
7             I guess my question is how do you determine how
8   much data or what kind of data needs to be collected in
9   order to test that hypothesis?
10        A.   Well, those are two different things.
11        Q.   Got you.
12        A.   The type and the amount are two different things.
13             The type of data is dependent upon what you can
14   access at that moment for that sort of thing.  I mean you
15   might want to look at survey questions, you might want to
16   survey individuals, you might have an existing dataset
17   where some other researcher has already collected the data
18   and you're using their dataset, that's known as secondary
19   data.
20             And the amount of data is dependent upon the type
21   of question that you are looking at and what is called a
22   power analysis, and a power analysis is dependent upon the
23   type of statistical test that you are going to use to make
24   sure you have a sufficient number of cases.

Jon Shane, 3/10/2023

---

50

1    Q.  Got it.  You had mentioned secondary data.  What
2  is secondary data?
3    A.  Secondary data is some other data you rely on or
4  that you're using that someone else has collected.
5    Q.  In the quantitative research world are there any
6  precautions that need to be taken when using secondary
7  data?
8    A.  You're always subject to limitations with
9  published data, yes.  The definitions, the quality of the
10  data, could be missing data pieces, what's known as missing
11  data.
12    Q.  You said something about definitions.  What do
13  you mean -- what are you referring to with definitions in
14  the secondary data?
15    A.  Well, in the research world you have two types of
16  definitions.  One is called a conceptual definition, and
17  you should think of that as a dictionary type definition,
18  what you mean when you say a word.  Then you have what are
19  known as operational definitions, and operational
20  definitions are how you plan to measure that particular
21  construct.
22    Q.  So, for example, the data collection protocol
23  that we looked at before which was Exhibit 13, would that
24  have been -- that would have been operational definitions;

---

51

1  is that right?
2        MS. BONJEAN:  Objection, form.
3    A.  Let me just take a look.  Some of these have a
4  little bit of both.
5    Q.  Okay.
6    A.  For example, complaint source, and I call it
7  internal/external.  How I'm measuring that is the presence
8  or absence of those conditions.
9    Q.  So is that conceptual or operational?
10    A.  Well, the conceptual definition for complaint
11  source is whether the complaint source was from an external
12  source or an internal source.
13    Q.  Okay.
14    A.  That's conceptually.  How it's measured is either
15  one or the other.
16    Q.  Got it.  When you -- if you're not using
17  secondary data, if you're using data that you yourself have
18  gathered --
19    A.  That's called primary data.
20    Q.  Primary data, okay.  How do you -- are there any
21  protocols or requirements for how to go about collecting
22  primary data or is it dependent on the research question
23  that you're being asked to answer?
24    A.  That's not -- that's not clear to me what you

---

52

1  mean by when you say collect the data.
2    Q.  Okay.
3    A.  What do you mean by that?
4    Q.  Yeah.
5    A.  If I'm collecting the data -- I'm not clear on
6  your question.
7    Q.  That's fair.  We were talking about types of data
8  before, right, what you can access versus potentially an
9  existing dataset or secondary data.  If you're starting
10  with primary data, it's -- define for me primary data so I
11  can make sure that I'm saying this right.  How do you
12  define primary data?
13    A.  Primary data is the data that the researcher
14  collects themselves.  Now, if I collect the data and
15  someone else used my data they would be using secondary
16  data.
17    Q.  Okay.  So when you're tasked with a research
18  question and you want to obtain primary data, I guess my
19  question is how do you go about collecting that primary
20  data?  Do you have to set up your own research protocols, a
21  code book?  What are the steps that as a researcher you
22  would go through to collect that primary data for use in
23  answering a research question?
24        MS. BONJEAN:  Objection, form.

---

53

1    A.  You would do those very things that you're just
2  talking about.  You identify the source, what -- where you
3  can get data, how you plan to collect it, is it going to be
4  surveys, are you going to look through agency records?  How
5  do you plan to get the data.
6        Then, when you have the data, you have to start
7  to extract fields from that data that fit your research,
8  your overall research.  Like, for example, you may want to
9  know what a demographic profile looks like so you collect
10  age, race, sex, things like that.  If you wanted to know
11  some other aspect of the research that helps answer a
12  particular hypothesis, you would collect the data and
13  either it exists or it doesn't exist.
14    Q.  Got it.  When in this setup do you do your power
15  analysis?  I guess I'm trying to figure out is kind of the
16  timeline for how to set up -- how to go from research
17  question to analysis and when the data comes into play,
18  when you define the data.  That's kind of the broad way I'm
19  looking at this.
20        So my question then is, you know, once you do all
21  those steps for the primary data, when does the power
22  analysis come into play?
23    A.  You do that early on in your methodology.  You
24  start to think through -- again, that's an iterative

---

Jon Shane, 3/10/2023

54

1   process. You go back and forth between the type of method
2   that you're going to use and then you think about the type
3   of statistics that you want to run, and then while you're
4   thinking about the statistics you want to run you go back
5   to the method to make sure you can collect that kind of
6   data. So you go back and forth. Iterative process.
7       The power analysis comes in early on in the
8   methodology stages when you're thinking through it so
9   you're able to determine the number of cases that you need.
10      Q.  That's because you want to have a statistically
11  significant sample to run your analysis; is that accurate?
12      A.  Well, I wouldn't say a statistically significant
13  sample. I would say you want to have the study to have
14  sufficient power.
15      Q.  Got it.
16      A.  And to have sufficient power means to be able to
17  detect an effect when one is present.
18      Q.  What are the impacts -- well, let me ask you
19  this. Are power analysis necessary in qualitative research
20  or just quantitative research?
21      A.  Quantitative.
22      Q.  What's the impact of not having sufficient power?
23      A.  You could potentially have erroneous results that
24  you -- or, inferences that you draw from the data.

55

1       Q.  Is there a particular equation to conduct a power
2   analysis?
3       A.  You can use -- typically most researchers use a
4   power analysis calculator, and you define the parameters
5   inside -- in the calculator and it will give you the number
6   of cases you need.
7       Q.  Got it. Is this where -- well, let me ask it
8   this way. Is there like a power range, you can have like
9   higher levels of power or lower levels of power but it's
10  still sufficient power?
11      A.  Yes, you can do that.
12      Q.  What are those ranges?
13      A.  Well, I'd have to look at a power analysis
14  calculator to do it, but you can plug in different desired
15  power levels, you can plug in what are called different
16  alpha levels, alpha level is where your statistical
17  significance is defined. When you make those adjustments,
18  the power will adjust and you'll either need more cases or
19  fewer cases depending on what it is you've set.
20      If you set load detention levels meaning I want
21  to detect an effect at a relatively low level, you'll need
22  more cases to do that. If you want to say, well, I'm
23  interested in some medium size effect, you'll need fewer
24  cases to do that.

56

1       Q.  Okay. Is that the same as a confidence level
2   analysis or is this different?
3       A.  Are you talking about a confidence interval?
4       Q.  Sure. I guess that's a good question because
5   I've heard it referred to as a confidence level. Is there
6   a difference between confidence level and confidence
7   interval?
8       A.  Okay, I think -- yeah, there is. To answer your
9   question, yes, there is, but I think what you're saying is
10  that your confidence level is the same as your alpha level.
11      Q.  Is that what -- confidence level and alpha level
12  are essentially --
13      A.  The same thing, yes.
14      Q.  Got it. And then --
15      A.  Rarely use that word confidence level. It's
16  usually alpha level. That's why I wanted to make sure I
17  knew what I was --
18      Q.  I'm sorry. I'm making you dig way back in the
19  memory bank.
20      A.  That's all right.
21      Q.  This is maybe another term that's not used very
22  often anymore, but like percentage -- is there a percentage
23  of error that -- I'm blanking on the term I want to use so
24  we'll move past that.

57

1       Sufficient results, okay. Then the amount of
2   data necessary for any given research question depends on
3   the research question and the power levels that you want to
4   establish; is that accurate?
5       A.  It doesn't depend on the -- what do you mean when
6   you say it depends on the research question?
7       Q.  Well, I guess -- let me ask it that way then.
8   Does the number -- does the amount of data -- does the
9   amount of data -- is the -- does the research question
10  impact the amount of data necessary?
11      A.  No. Those two things are separate.
12      Q.  Okay.
13      A.  The research question is the overarching question
14  that you're interested in understanding.
15      Q.  Okay.
16      A.  Let me give you an example. Let's say we wanted
17  to talk about levels of fear in a neighborhood. So the
18  research question might be how do men and women differ on
19  their perceptions of fear in neighborhood. That's the
20  research question.
21      Q.  Okay.
22      A.  Now, how much data you collect depends on your
23  power analysis. If I wanted to run -- let's just --
24  completely illustrative. Let's say I wanted to run what's

Jon Shane, 3/10/2023

58

1  called a multiple regression model where I'm interested in
2  knowing the outcome of those perceptions on an ordinal
3  scale, let's say from 1 to 10, 1 being -- or, 0 to 10, 0
4  being no fear, 10 being a lot of fear. I would go out and
5  I would conduct a power analysis based on a multiple
6  regression model with, let's say, 10 or 12 different
7  variables and my power analysis calculator would tell me
8  how many cases I need.
9      Q.  Okay. This is just -- I'm sorry if this is
10  repetitive. This is just for quantitative research, not
11  qualitative research?
12      A.  Well, it depends on what exactly you mean. The
13  answer is yes, you can use this for qualitative research to
14  assure that you get a sufficient number of -- let's say
15  we're doing surveys but we're not going to subject those
16  surveys to statistical analysis. What we want to know is
17  whether or not there are themes that arise.
18      Q.  Got it.
19      A.  So various themes may come up, and one of the
20  things we know about saturation levels is they generally
21  occur at low numbers. So the tendency is to over sample so
22  you have a wide, sufficient sample to be able to draw your
23  inferences from.
24      Q.  In the context of your work in this case, what

59

1  was the research question that you were asked to answer?
2      A.  So the first one which appears on page 11 is did
3  the Chicago Police Department fail to supervise its
4  personnel consistent with accepted industry practices when
5  complaints again the Defendant officers were generated?
6      Q.  All right.
7      A.  The second one was did a pattern of complaints
8  emerge against Chicago police officers between 1980 and
9  2008. Those appear on pages 11 and 12 of my report.
10      Q.  So for the first research question, did the
11  Chicago Police Department fail to supervise its personnel
12  consistent with accepted industry practices, how did you
13  set -- where is my steps? What was then -- so you have
14  that research question. What was the testable hypothesis
15  you were looking for or that you created to answer that
16  question?
17      A.  We didn't have a testable hypothesis in this.
18      Q.  Okay. Why not?
19      A.  Because we weren't conducting -- we weren't
20  trying to test any given hypothesis in this. We wanted to
21  look -- we wanted to look at the data to see whether or not
22  the practices were consistent with the -- we wanted to see
23  whether or not the practices of the Chicago Police
24  Department were consistent with industry standards at that

60

1  time.
2      Q.  Okay. So is that considered a quantitative
3  research question or a qualitative research question?
4      A.  That's -- that's more -- that's more qualitative.
5  I mean there are some quantitative aspects of it when we
6  started to look at the data.
7      Q.  Okay. And then the next step of collecting data
8  based on what we talked about this would have been -- was
9  this primary data or secondary data that you used in this?
10      A.  This is primary data.
11      Q.  Okay. When answering this research question, did
12  you define the parameters of the data that you needed to
13  answer the question?
14          MS. BONJEAN: Objection to the form of that
15  question.
16      A.  What exactly do you mean did I define the
17  parameters of the data?
18      Q.  So we talked about primary data, identifying the
19  source, how to collect it and then extracting the fields
20  that fit the research, right?
21      A.  Yes.
22      Q.  Okay. So did you follow those steps in order to
23  obtain the primary data that you used to answer this first
24  research question that we just talked about, did the

61

1  Chicago Police Department fail to supervise its personnel?
2      A.  Yes, I did.
3      Q.  Okay. Then you said the second research question
4  was --
5      A.  Page 12.
6      Q.  -- did a pattern of complaints emerge against
7  Chicago police officers between 1980 and 2008? Is that
8  qualitative research question or quantitative research
9  question?
10      A.  That's a little bit of both. Primarily
11  quantitative.
12      Q.  Since we're diving right in, we might as well
13  move on to the report and start going through that. So
14  I've marked the exhibits as having the report as Exhibit 3.
15  If you have it in front of you, I don't know that we need
16  to put it up unless somebody else really would like it up?
17          MS. BONJEAN: We have a paper copy here in
18  front of him.
19      Q.  Okay. It's probably easier to work off the paper
20  copy anyway.
21          (Remote screen sharing.)
22      Q.  I've marked as Exhibit 3 your report in this
23  case, Maysonet versus Guevara, et al. You have in front of
24  you a full copy of your report; is that correct?

Jon Shane, 3/10/2023

62

1    A.  Yes.
2    Q.  This is a true and accurate copy of the report
3    that you provided in this case?  If you want to flip
4    through it.
5    A.  It is, yes.
6    Q.  Okay.  I'm just going to -- we've gone -- I'm
7    trying not to overlap questions but I'm going to go through
8    the report and ask specific questions about portions of it.
9    So right away on page one in your Statement of
10   Qualifications.
11   A.  Okay.
12   Q.  The first paragraph it says, My expertise is
13   police policy and practice and theoretical underpinnings of
14   the police.  What are theoretical underpinnings of the
15   police?
16   A.  How the police were formed, why they were formed,
17   what their social and sociological tasks were.
18   Q.  Got it.  Moving on to the next line you say, My
19   other teaching and research interests are situational crime
20   prevention, social disorganization theory, routine
21   activities theory.  What is situational crime prevention?
22   A.  Well, I can point you to a good example of that.
23   So the definition of situational crime prevention is to
24   examine the relationship between an offender, a capable

63

1    guardian or the absence of a capable guardian and
2    somebody's motivation for committing a crime, and then
3    manipulating the environment as best as you can to
4    systematically and as permanently as you can to prevent
5    crime from occurring.
6         If you -- I'll tell you where to turn.  If you
7    turn to my CV, page 86.  Tell me when you're there.
8    Q.  I'm here, sorry.
9    A.  So you'll see a couple of entries under
10   Publications, one is 2014 Shane and Magnuson, Successful
11   and Unsuccessful Pirate Attacks Worldwide:  A Situational
12   Analysis.
13   Q.  There it is, okay, yeah.
14   A.  Then the one right above that, Shane, Piza and
15   Mandalla 2015, Situational Crime Prevention and Worldwide
16   Piracy.
17   Q.  Okay.
18   A.  So my interest is not in piracy.  My interest is
19   in situational crime prevention.  And what I was interested
20   in knowing there is based on the things I know about crime
21   prevention.  Could tactics that are applied on land be
22   adapted to prevent worldwide piracy on the high seas, and
23   the answer was yes to those questions.  So I'm interested
24   in how police departments can implement crime prevention

64

1    measures.
2         MS. BONJEAN:  I just asked him if he
3    embedded himself with some pirates.
4         MS. CARNEY:  I was going to ask that but I
5    thought it might be too far afield.
6         THE WITNESS:  The answer is I tried but I --
7    true story, I tried but I couldn't get a ride on a cargo
8    ship.  True story.
9    BY MS. CARNEY:
10   Q.  Social disorganization theory, what's that?
11   A.  Yes.  Social disorganization theory is an
12   ecological theory about how cities are constructed and the
13   conditions that arise within cities, concentrated poverty,
14   disadvantage, a lot of those different things.
15   Q.  Do you study any cities in particular or is it
16   just a --
17   A.  No.  A broad, general overview.  I mean the
18   classic studies have been done in Chicago.  So, for
19   example, a group named Shaw and McKay did what are known as
20   concentric circles and they talked about the arrangement of
21   the city from its inner core which would be the downtown
22   and then they had these concentric zones that go all the
23   way out to residential areas and the stability that plays
24   doubt within certain areas.

65

1         I personally have not studied the City of
2    Chicago, though.  I just want to make that clear.
3    Q.  Then routine activities theory, what's that?
4    A.  Yes.  Routine activities theory is a theory about
5    how humans move about in time and space and how a motivated
6    offender comes in contact with a suitable target in the
7    absence of a capable guardian and that is what is known as
8    the chemistry of crime.  That is when opportunity arises
9    and crime, although not inevitable, is likely to occur.
10   Q.  Okay.  Flipping to page two, we talked already a
11   lot about your employment and your time at the Newark
12   Police Department.  I have one -- a couple more questions
13   about your time there at the police department.
14        When you were employed at the Newark Police
15   Department, did you ever receive a complaint of misconduct
16   against you?
17   A.  No.
18   Q.  All right.  I'm on page six of your report, basis
19   of your opinion.  You say you relied on your experience in
20   criminal justice, police operations and police
21   administration on the accepted standards of care recognized
22   by police organizations and officials throughout the United
23   States.  What standards of care are you referring to?
24   A.  The policies and customs of policing that have

Jon Shane, 3/10/2023

66

1   been in play since at least the 1960s when the
2   International Association of Chiefs of Police began to
3   develop what are known as training keys. Then that's
4   evolved. In 19, I want to say, 87 the IACP was tasked by
5   the U.S. Department of Justice to house their model policy
6   program. So the IACP has created and drafted model
7   policies that have been the standards, as well as another
8   group called CALEA, C-A-L-E-A, which is the Commission for
9   the Accreditation of Law Enforcement Agencies, and they set
10  standards nationwide for policing.
11      Q.   So we talked about the -- what was it, the
12  international something of chiefs of police?
13      A.   The International Association of Chiefs of Police
14  which is known as the IACP.
15      Q.   What was the last one you just --
16      A.   CALEA, C-A-L-E-A, Commission for the
17  Accreditation of Law Enforcement Agencies.
18      Q.   Then you say you were an active member of the
19  American Society of Criminology, the Police Executive
20  Research Forum and the Academy of Criminal Justice
21  Sciences; is that right?
22      A.   Yes, that's correct.
23      Q.   Taking these one by one, when did you first
24  become involved in the American Society of Criminology?

67

1       A.   I'm not sure. It would have to be at least when
2   I began my PhD program so I would have to say maybe
3   somewhere around 2004.
4       Q.   What role do you have in the American Society of
5   Criminology?
6       A.   No role. I'm just a member.
7       Q.   Just a member? Okay.
8       A.   Yes.
9       Q.   Not just a member. That's good.
10          The Police Executive Research Forum, when did you
11  become involved there?
12      A.   That's been much further along. I mean that
13  probably happened at some point in my police career. I
14  don't know but it's been quite a long time.
15      Q.   Do you have an active role in that or is it just
16  membership?
17      A.   No. Just a dues paying member.
18      Q.   Then the Academy of Criminal Justice Sciences,
19  when did you first become involved in that?
20      A.   That was probably around the same time as ASC,
21  2004, late 2004.
22      Q.   Got it. Also a member?
23      A.   Just a member, correct. I don't hold any office
24  or anything.

68

1       Q.   Starting on page six going through page eight you
2   list about 44 various lectures, workshops, research, stuff
3   like that. Based on my review of these, it doesn't appear
4   that any of these involve police misconduct and the
5   analysis of police misconduct, and maybe I'm wrong. So if
6   I'm wrong, can you point me to which ones do?
7       A.   Well, when you say police misconduct, I mean,
8   that's a little narrow. So what do you mean by misconduct?
9       Q.   Well, I guess what I'm looking for is one of
10  these publications 1 through 44 that --
11      A.   Wait, wait. These are not publications. These
12  are workshops --
13      Q.   Sorry.
14      A.   -- and lectures and things.
15      Q.   These lectures, workshops, grants and
16  presentations.
17      A.   Okay.
18      Q.   So my question is did any of these speak to or
19  involve the same issues that you're opining on in this
20  report?
21      A.   Such as like internal affairs or police
22  management --
23      Q.   Yeah.
24      A.   -- or mismanagement, accountability, oversight,

69

1   things like that?
2       Q.   Sure, yeah.
3       A.   Okay. Number two when we talk about what
4   happened in Guatemala.
5           Number three, the National Association for
6   Civilian Oversight.
7           Number four, the Commission on Civil Rights, the
8   Office of Civil Rights.
9           Number five, Bridging the Great Divide, Community
10  Partnerships.
11          Number six, we talked about criminal
12  investigations in this course but at the same time we
13  talked about investigative misconduct such as coercing
14  confessions, operating outside the bounds of accepted
15  practice during a criminal investigation, those kinds of
16  things.
17      Q.   I guess is it fair to say that the titles might
18  not give a full picture of what was discussed at these
19  various lectures or workshops?
20      A.   Well, I -- they're broad titles. There were a
21  lot of other things that were discussed in there.
22      Q.   Okay.
23      A.   And some of these titles I did not construct,
24  they were constructed by the people who held the

Jon Shane, 3/10/2023

70

1  conference.
2      Q.  No, that's fair.
3      A.  Shall I continue?
4      Q.  No, that's okay.  Unless there is any in
5  particular you want to point me to that --
6      A.  Well, we talked about police legitimacy and
7  performance management in number eight.
8          Back to investigative conduct in number nine.
9          Investigative misconduct in number 10.
10         Investigative misconduct in number 11.
11         Number 12, when we talk about performance
12 management, collecting internal affairs data and reporting
13 on streams of data for internal affairs and the internal
14 management of a police department is something that goes
15 into performance management.
16         Number 13 when we talked about sentinel events we
17 talked about how police-related misconduct can result in,
18 excuse me, wrongful conviction.
19         Number 15 was a performance management discussion
20 similar to the one that you saw in number 12.
21         Number 18 was a discussion on police use of
22 force.
23         Number 21, I delivered an ethics lecture to an
24 international group concerning police-related practices,

71

1  ethical behavior.
2          Number 24, looking at racial disparities in
3  police-initiated stops.  Here we were talking about the
4  implications for unconstitutional stops.
5          I'm moving on to page eight so you can follow.
6      Q.  Okay.
7      A.  The impact of organizational stressors, that's
8  number 29.  That dovetails on a paper that I wrote
9  regarding the organizational -- the stress that
10 organizations create, internal affairs being one of the
11 organizational stressors.
12         Number 30 we talked about police accountability
13 in this lecture to a group at a law school.  When I say we,
14 I mean me.
15     Q.  Fair.
16     A.  I should say I.
17         Number 31, we talked about performance and
18 accountability metrics in Jamaica.  I was talking about the
19 types of data collection, what kind of analyses you
20 collect.
21         Number 33, the use of confidential informants.
22 That also revolves around the ethics concerning informants
23 and the problems that police officers and informants can
24 get into when they have relationship issues and are

72

1  influenced or mismanaged.
2          Number 34 is the Performance Management paper
3  that I wrote.  That also appears on my CV and that is a
4  broad structure about developing performance management in
5  police departments, the types of data that you would want
6  to collect, the statistics that you want to examine so you
7  can track how well you're doing inside the organization.
8          In a broader sense number 36, Implementing and
9  Institutionalizing the Compstat process.  Just a quick
10 aside what the Compstat process is it's a managerial tool
11 that is used by many contemporary police departments, and
12 the idea behind Compstat is to collect streams of data and
13 report on those streams to determine whether you're
14 reaching your goals or if things are going awry, you know,
15 crime patterns that emerge, personnel patterns that emerge,
16 things like that.
17         And that's it.
18     Q.  Just to follow up on a couple of those, you
19 mentioned a handful that had to do with investigative
20 misconduct.  Are you opining at all in this report about
21 the conduct at the underlying criminal investigation that
22 led to Mr. Maysonet's arrest?
23     A.  What do you mean am I opining on the underlying
24 conduct?

73

1      Q.  Well, do you -- are you providing an opinion
2  about how -- about the underlying criminal investigation?
3      A.  No.
4      Q.  And are you providing an opinion in this report
5  regarding any use of force or alleged use of force in the
6  underlying criminal investigation?
7      A.  I'm not clear on your question.  What I've done
8  in here is I've looked at CR files and the complaints that
9  arose from them.
10     Q.  But you're not opining on whether or not use --
11 there was an improper use of force used in the underlying
12 criminal investigation that led to Mr. Maysonet's arrest?
13     A.  No.
14     Q.  Okay.  Kind of talked about your research, we
15 talked about that.
16         Moving on to page 11, digging right into the
17 heart of your opinion here.  The first paragraph says that
18 you conclude the Chicago Police Department failed to
19 properly supervise the Defendants in this matter as
20 required by industry standards in effect at the time.
21     A.  Where are you exactly?
22     Q.  Yeah, I'm sorry.  Your first paragraph on page
23 11.
24     A.  Yes, go ahead.

Jon Shane, 3/10/2023

74

1    Q.   Second sentence, I conclude.
2    A.   Yeah, go ahead.
3    Q.   I conclude the Chicago Police Department failed
4    to properly supervise the Defendants in this matter as
5    required by industry standards in effect at the time.  Do
6    you see that?
7    A.   Yes.
8    Q.   Of the underlying incident.  Do you recall,
9    sitting here today, what year the underlying incident took
10   place in?
11   A.   1990.
12   Q.   And when you say industry standards in effect at
13   that time, which industry standards are you referring to?
14   A.   Internal affairs, supervision, those kinds of
15   things.  I mean those are all the things that I lay out in
16   the report, standards that are laid out in the report,
17   yeah.
18   Q.   Are they -- are specific industry standards that
19   were in effect at the time referenced in your report?
20   A.   There are.  Things like early warning systems,
21   management accountability, supervision.
22   Q.   Were there written standards at this time in
23   regards to early warning systems that you're referring to?
24   A.   What do you mean exactly?

75

1    Q.   When you say something like industry standards
2    that were in effect at the time and then you're talking
3    about early warning systems, I guess I'm wondering if
4    you're referring to an actual written industry standard
5    such as some of those ones we were talking about earlier
6    like --
7    A.   Yeah, I can show you where they appear in here.
8    Q.   Okay.
9    A.   If you look at page 22, you'll look -- I traced
10   some of the history for the early warning standards that
11   were in effect at the time.
12   Q.   Are you talking about footnote 26?
13   A.   Yes, I am.
14        MS. BONJEAN:  26 or 25?
15        THE WITNESS:  26.
16        MS. BONJEAN:  Oh, 26, sorry.
17        THE WITNESS:  I know, that's small.
18   BY MS. CARNEY:
19   Q.   So it's your position that the information that
20   you cite in footnote 26 were written industry standards in
21   place at the time of the underlying incident in 1990?
22   A.   In addition to the agency's policies itself, yes.
23   Q.   What is a dissertation?
24   A.   What is a dissertation?

76

1    Q.   Yeah.
2    A.   You mean a doctoral dissertation or a master's
3    dissertation?  They're used differently.
4    Q.   So in footnote 26 you cite to patterns in police
5    misconduct, citizen complaints against the police, UMI
6    Dissertation Service.
7    A.   Let me just get there.  Yes, okay.
8    Q.   So what --
9    A.   So this was someone's dissertation.  This was
10   someone's dissertation.
11   Q.   So in the way that you're referencing it here is
12   that a doctoral dissertation or something else?
13   A.   I don't remember if it was a doctoral
14   dissertation or if it was a master's thesis dissertation,
15   but the UMI Dissertation Service is -- services is the
16   organization that catalogs dissertations.
17   Q.   Regardless if it's a master's dissertation or a
18   doctoral dissertation, is a dissertation considered to be a
19   written industry standard?
20   A.   It's probably based -- I mean I'd have to look at
21   this, but a dissertation is based on the developing state
22   of the field at that time, yes.
23   Q.   Then moving down to your first research question
24   which we've talked about a little bit.

77

1    A.   What page are you on?
2    Q.   Sorry, I'm jumping around.  Back to page 11.
3    A.   Okay, go ahead.
4    Q.   So you answer your question as, Yes.  The Chicago
5    Police Department supervisory staff knew or should have
6    known what complaints against the Defendant officers were
7    accruing in a manner that signaled the need for
8    intervention and should have taken supervisory measures to
9    stop the behavior and correct the deficiencies --
10   A.   Yes.
11   Q.   -- consistent with their agency policies, right?
12   A.   Yes.
13   Q.   Which supervisors are you referring to in this
14   paragraph?
15   A.   I'm referring to all the supervisors throughout
16   the chain of command.  All of them.  If you look at the
17   responsibilities that I've outlined, all of them have a
18   responsibility for subordinate personnel.  Sergeants are
19   responsible for the officers, the lieutenants are
20   responsible for the sergeants and so on all the way up.  So
21   everyone in the organization has a responsibility to ensure
22   that the policies are being adhered to and that personnel
23   are meeting or exceeding expectations.
24   Q.   Is your opinion contained to the CRs that you

Jon Shane, 3/10/2023

78

1  reviewed or the broader Chicago Police Department
2  supervisory staff?
3      A.  The broader staff.  The implication or the
4  inference that I draw is that this is -- this is a subset
5  in time, cross-section analysis that reflects what's going
6  on in the organization citywide at that time.
7      Q.  I'm going to jump ahead real quick to page 14
8  where it says here that there are 146 CR numbers.  Do you
9  see that on the top of page 14?
10     A.  Yes.
11     Q.  What is your understanding of where those CRs --
12  I'm sorry, let me start over.  The 146 CRs, that was your
13  dataset; is that right?
14     A.  Yes.
15     Q.  What is your understanding of where from the
16  Chicago Police Department those CRs came from?
17     A.  Where did they come from within the Chicago
18  Police Department?
19     Q.  Within the Chicago Police Department.
20     A.  Detectives in Area Five, but I guess the internal
21  affairs division is the one who catalogs them, who has
22  them.
23     Q.  You're right, that was not the best question.
24         What is your understanding of the area within the

79

1  Chicago Police Department that those 146 CR numbers
2  represented?
3         MS. BONJEAN:  Objection to the form of the
4  question.  Understanding of the area like --
5         MS. CARNEY:  Yeah, sorry.  Let me try again.
6  BY MS. CARNEY:
7      Q.  Is it your understanding that those 146 CRs were
8  pulled from detectives department-wide or from a more
9  limited group of detectives?
10     A.  From a more limited group.
11     Q.  What was that limited group that those detectives
12  CRs -- that these CRs were pulled from?
13     A.  Area Five.
14     Q.  Based on your review of 146 CRs out of Area Five
15  you have drawn the conclusion that all supervisors
16  throughout the department knew or should have known that
17  complaints against Defendant officers were accruing in a
18  manner that signaled the need for intervention?
19     A.  Yes.
20     Q.  Why is that?
21     A.  There is no indication anywhere in any of the CR
22  files that any of the supervisory practices were different
23  elsewhere.  They're all operating under the same
24  promulgated policies of the Chicago Police Department.  The

80

1  defendant and non-defendant officers have similar CR files
2  and the findings are similar.
3         MS. BONJEAN:  I'm sorry, this is a late
4  objection.  I'm going to object to the form of that
5  question.  It's pretty broad.  But the answer can stand.
6      A.  Also, the supervisory practices were being
7  funneled into a centralized agency -- agency?
8  Organizational element which is internal affairs, and
9  internal affairs should have been monitoring those
10  complaints, they should have been in routine contact with
11  the upper reaches of the organization.
12     Q.  Okay.  And then you say the Defendant officers.
13  Is there a Defendant officer in particular you're referring
14  to here or is this all the Defendant officers?
15         MS. BONJEAN:  Objection to the form of that
16  question.
17     A.  Well, Paulnitsky and Guevara had the predominant
18  patterns that emerged.
19     Q.  Okay.  Then you say were accruing in a manner
20  that signaled a need for intervention.  What do you mean by
21  signaled a need for intervention?
22     A.  I meant that the complaints were being generated,
23  they were being generated on a relatively consistent basis,
24  frequently enough that it would be virtually impossible for

81

1  anyone in internal affairs to say that they didn't
2  recognize that complaints were coming in against these
3  particular officers, and that is the signal that something
4  has to change.
5      Q.  When you say relatively frequently, what do you
6  mean by that?
7      A.  Well, I have a place in here on the time to a new
8  complaint.  Bear with me and I'll find it.
9         Look at page 55, I have two paragraphs on the
10  time to a new complaint.
11     Q.  Okay.  All right, we'll come back to -- all
12  right.  Then after that paragraph you list out a handful of
13  CPD orders.  Do you see that?
14     A.  Are you back on page 14?
15     Q.  I was back on page 11, actually.  Sorry.
16     A.  Oh.  Okay, yes.
17     Q.  So is it your position that these policies that
18  you list are sufficient and that the supervisors weren't
19  complying, or is it your position that the policies are
20  insufficient?
21         MS. BONJEAN:  Object to the form.  You can
22  answer to the best of your ability.
23     A.  Yeah, what -- what do you mean by were the
24  policies sufficient or insufficient?  What do you mean?

Jon Shane, 3/10/2023

82

1    Q.   Let me ask you this.  Sitting here today and in
2  your report are you opining at all about the
3  appropriateness of the policies that the City of Chicago
4  had in place during this time period as it relates to
5  complaint and disciplinary procedures?
6        MS. BONJEAN:  I'm still going to object.
7  I'm sorry, Theresa, I'm not trying to be difficult.  Are
8  you talking about written policies?
9        MS. CARNEY:  Yes.  Sorry.  Yes.  I'm
10  referring specifically to the policies that he has listed
11  in subsections b through e on page 11.
12  BY MS. CARNEY:
13    Q.   So my question is are these written policies that
14  you're citing to, do you have an opinion about whether or
15  not the written policies were sufficient as it relates to
16  complaints of misconduct and disciplinary procedures for
17  the time frame?
18    A.   Again, I'm struggling with that.  I'm not trying
19  to be difficult.  Do you mean do I believe that these
20  policies were consistent with the industry standards in
21  effect at that time?
22    Q.   Yes.
23    A.   That -- okay.  So the answer is yes to that.  And
24  they were sufficient where the responsibilities were laid

83

1  out to the degree that anybody in this chain of command
2  knew or should have known what to do when complaints were
3  coming in and when they were receiving complaints from
4  these officers.
5    Q.   Okay.  And so based on that then your opinion is
6  that the supervisors were not complying with the written
7  policies at the time?
8    A.   That's correct.
9    Q.   Okay.  I'm moving on to page 12.  Your second
10  research question, Did a pattern of complaints emerge
11  against Chicago police officers between 1980 and 2008?  Do
12  you see that?
13    A.   Yes.
14    Q.   Why did you pick the time frame 1980 to 2008?
15  What's the relevance of that time frame?
16    A.   I think that's the way the data came to me.
17    Q.   Okay.  Then you say, The Chicago Police
18  Department supervisory staff knew or should have known that
19  clear patterns of personnel complaints were emerging across
20  various years and different types of offenses against the
21  defendant and non-defendant officers and should have taken
22  measures to stop the behavior.  Do you see that?
23    A.   Yes.
24    Q.   Okay.  What patterns are you referring to here?

84

1    A.   The type and the frequency of complaints.
2    Q.   What type of complaints were you noticing a
3  pattern for?
4        MS. BONJEAN:  I'm going to object to the
5  form of that question.
6    A.   Bear with me.  I'm getting there.
7        If we go to page 48, you can see the years in
8  question.
9    Q.   Okay.
10    A.   You have the time frames, we can see the
11  complaints by category.
12        We go to page 50, you'll see that I conducted
13  what's called a Pareto Analysis.
14    Q.   Okay.
15    A.   Which is basically the 80/20 rule where 80% of
16  the problem comes from 20% of the category.  If you look on
17  page 51, Table 9, you'll see we look at defendant and
18  non-defendant officers for the types of complaints that
19  were coming in.
20    Q.   Okay.  So those tables, Table 8 and Table 9,
21  you're referencing those patterns when you say on page 12
22  clear patterns of personnel complaints were emerging?
23    A.   Yes.
24    Q.   You also just referenced on page 48 Table 7.  Do

85

1  you see that there?
2    A.   Wait, let me go back.  Hold on.
3        Yes, for the years?
4    Q.   Yes.
5    A.   Yes.
6    Q.   When you say complaints by year, is that the
7  number of CRs that you had by year or is that something
8  else?
9    A.   These are -- I want to make sure I'm clear.
10  You're talking about what the unit of analysis is?
11    Q.   Yes.
12    A.   The unit of analysis is the complaint.  You'll
13  see that under letter a. there is 746 complaints with 84
14  unique categories that come up under Table 8.
15    Q.   So what is your definition of the word complaint
16  in this report?
17    A.   So a complaint is something that someone comes in
18  and alleges or not -- no, that's not the right word.
19        Someone alleges something about an officer.  So
20  there may be two or three different complaints in a single
21  incident.  So there might be assault, coercion and verbal
22  threats or something, three different complaints about one
23  incident captured under one CR number.
24    Q.   Where -- this Table 7, is this -- are these

Jon Shane, 3/10/2023

---

86

1    complaints coming from the 146 CR files that you reviewed?
2        A.   Yes.
3        Q.   Okay.  And over this 28-year period of 1980 to
4    2008, right?
5        A.   Yes.
6        Q.   Are you aware of how many total CRs there were
7    over this 28-year time period in the Chicago Police
8    Department?
9            MS. BONJEAN:  Objection.  In the department?
10           MS. CARNEY:  In the department.
11           MS. BONJEAN:  None of us are aware.  You
12   won't give us that information.  Objection, foundation.  Go
13   ahead.
14           THE WITNESS:  No, I'm not.
15   BY MS. CARNEY:
16       Q.   Did you review the annual -- the CPD annual
17   reports for the time period of 1980 through 2008?
18       A.   I did see some of them.  I don't remember if I
19   saw all of those specific years, but there are some pages
20   toward, you know, one of the elements of the organization
21   when they talk about internal affairs or complaints against
22   personnel.  I don't remember the exact terminology but they
23   do talk about that.
24       Q.   So are you aware that in the CPD annual reports

---

87

1    there are sections that talk about the number of complaints
2    received by either internal affairs or the Office of
3    Professional Standards for a given year?
4        A.   Yeah, there is something about that, yes.  A
5    summary number.
6        Q.   Correct.  Did you ever attempt to total up the
7    numbers of complaints that were listed in the annual
8    reports from the years 1980 to 2008?
9        A.   You mean based on that summary data?
10       Q.   Well, based on the data that's compiled in the
11   annual reports.
12       A.   No, I didn't do any analysis on that.
13       Q.   Okay.
14       A.   No.
15       Q.   If I told you that I went through the CPD annual
16   reports and tallied up the number of complaints that were
17   listed in each of those documents from the years 1980 to
18   2008 and I told you I got approximately 200,000 -- I'm
19   sorry, 271,350 CRs during that time period -- so let me
20   start over.
21           I will represent to you that I went through the
22   annual reports from 1980 to 2008 and totaled up the numbers
23   that CPD has for those years and got a total of 271,350 CRs
24   for that time period.  If you were to conduct a power

---

88

1    analysis on the 146 CRs that you reviewed as it relates to
2    the 271,000 CRs, approximately 271 CRs that were issued
3    during that time period, what would your power score be or
4    would that be a sufficient sample size?
5            MS. BONJEAN:  Objection to the form of that
6    question.
7        A.   It would depend on the type of -- it would depend
8    on the type of statistical procedure I was using.
9        Q.   What do you mean?
10       A.   Because power analysis is predicated upon the
11   type of statistical procedure that you're going to use.
12   I'm doing a descriptive analysis here.  I'm not doing an
13   inferential analysis.
14       Q.   When you say you're doing a -- I'm sorry, you
15   said you're doing a descriptive analysis?
16       A.   Yes.
17       Q.   What does that mean?
18           MS. BONJEAN:  I'm going to object to the
19   form of the question.  When you say -- both as to the
20   question, yeah.  You pointed at something, Jon, so could
21   you --
22       A.   I'm talking about the analysis that you see
23   beginning on page 48.  I'm describing the complaints that
24   we have.

---

89

1        Q.   Okay.
2        A.   I didn't have access to drawing a broader sample
3    of everything that was going on in the Chicago Police
4    Department at that time.
5        Q.   Okay.
6        A.   This is the data that I was given.
7        Q.   Okay.  You just said descriptive analysis and not
8    something else analysis.  What was that word you said?
9    Sorry.
10       A.   Inferential.
11       Q.   Inferential analysis?
12       A.   Yes.
13       Q.   What's an inferential analysis?
14       A.   That's your ability to draw inferences from a
15   sample to the wider population.
16       Q.   Okay.  Do you conduct an inferential analysis at
17   all in this report?
18       A.   I do not.
19       Q.   Okay.  If you were to conduct an inferential
20   analysis, would 146 samples out of a sample size of over
21   200,000 be sufficient, a sufficient power?
22       A.   It could be, yes.  It could be.
23       Q.   In what circumstances could that be a sufficient
24   power?

---

Jon Shane, 3/10/2023

90

1    A.  Depending on the type of statistical tests I
2  used.
3        I'll give you by way of just one very easy
4  example.  When you conduct a political survey and you're
5  trying to determine who is going to be the next president
6  and you ask 1,000 people across the United States out of
7  350 million.  If you conduct a random sample and your
8  sample is drawn in a valid manner you can typically infer
9  from that random sample what the outcome is going to be.
10    Q.  But that sample would need to be, as you said, a
11  random sample and conducted in a valid manner.  When you
12  say valid manner, what does that mean?
13    A.  That means you have to sample randomly, you have
14  to have a method for how you collect each one of the
15  individuals who is going to partake in the survey.
16    Q.  Got it.
17        MS. BONJEAN:  I'm sorry, Theresa, I don't
18  mean to stop you.  I don't know if you guys wanted to take
19  a quick lunch?  I'm sure Dr. Shane will want to grab a bite
20  to eat at some point.  I don't know when is a good stopping
21  point.  We're an hour in so I'm just putting that out
22  there.
23        MS. CARNEY:  You know what, that's fine.
24  I -- I am fine with stopping and taking a lunch now.

91

1        MS. BONJEAN:  Not a long lunch.  Just like,
2  I don't know if 20 minutes would be okay for everybody?
3  You okay with 20, 30 minutes?
4        THE WITNESS:  Yeah.
5        MS. CARNEY:  Let's do 30 minutes to keep it
6  even.
7        MS. BONJEAN:  Sure, 30 minutes is good.
8        MR. ENGQUIST:  Come back at 1:00 our time?
9        MS. BONJEAN:  Yeah, that'd be great.
10        THE VIDEOGRAPHER:  We're off the video
11  record at 12:28 p.m.
12        (Whereupon a recess was taken.)
13        THE VIDEOGRAPHER:  We're back on the video
14  record at 1:04 p.m.
15        DIRECT EXAMINATION (cont.)
16  BY MS. CARNEY:
17    Q.  All right, Dr. Shane.  Let's go back to page 12
18  of your report.
19    A.  Yes.
20    Q.  Okay.  So we were just talking about your second
21  research question and your answer there talking about the
22  clear patterns of personnel complaints.  You had told me
23  that clear patterns are the type and frequency as laid out
24  by you in Tables, I believe, 8 and 9; is that accurate?

92

1    A.  Let me find them.  Hold on.
2    Q.  Or is it 7, 8 and 9?
3    A.  7, 8, 9, 10, 11, 12.
4    Q.  Okay.  So going all the way to Table 12?
5    A.  13, 14.  Those are patterns there.
6    Q.  Okay.  And Table 13 which is on page 60, that is
7  a table regarding the complaints against Detective Guevara,
8  right?
9    A.  Yes.
10    Q.  And then Table 14 is a table regarding
11  Detective Paulnitsky; is that right?
12    A.  Yes.
13    Q.  Okay.  When you say clear patterns, other than
14  the type and the frequency -- well, sorry, that's a bad
15  question.
16        When you're talking about clear patterns, when
17  did those -- are there any specific officers that you were
18  referring to that showed these clear patterns of personnel
19  complaints?
20    A.  Those that were analyzed in the data.
21    Q.  Okay.  So this is not referencing any specific
22  detective or officer?
23    A.  Well, I reference Paulnitsky and Guevara in those
24  particular tables.

93

1    Q.  Okay.  Any other -- sorry.  Go ahead.
2    A.  Then there is the defendant and the non-defendant
3  officers together in the other tables that I pointed out to
4  you.
5    Q.  Okay.  When did these clear patterns that you are
6  analyzing in the tables start to emerge?  What year?
7    A.  Hold on.  19 -- let's see, hold on.  1980, '84,
8  '85, '86, '87, '88, '89, '90.
9    Q.  Okay.  So looking at Table 7, is that what you
10  were just referring to?
11    A.  Yes.
12    Q.  Looking at Table 7, out of the 21 complaints from
13  1980, do you know how many of those were from a Defendant
14  officer in this case?
15    A.  No, not without going back to the data, no.
16    Q.  1984 -- well, let me ask you this.  Why are 19 --
17  why is there nothing listed for '81, '82, '83?
18    A.  Nothing -- nothing emerged.
19    Q.  Okay.  1984, the four complaints listed in
20  Table 7, can you tell me which Defendant officers those
21  four complaints were for?
22    A.  Not based on this table, no.
23    Q.  Is there anywhere in your report where you can
24  tell --

Jon Shane, 3/10/2023

94

1   A.   No.  You'd have to go back to the data.
2   Q.   Okay.  That's -- and that's true for every year
3   that you listed here, '85, '86, '87, '88, '89, '90, I think
4   those were the ones you said out loud?
5   A.   In Table 7, yes.
6   Q.   In Table 7.  Without going back to your MS Excel
7   spreadsheet, you cannot tell us which of those complaints
8   were against the Defendant officers in this case?
9   A.   That's correct.
10  Q.   Okay.  And without going back to your MS Excel
11  spreadsheet you cannot tell us whether or not any of these
12  complaints were against a Defendant officer in this case or
13  were -- let me rephrase that.
14  A.   It does include the Defendant officers, if that's
15  what you mean.
16  Q.   Right.  So the chart includes the Defendant
17  officers; is that right?
18  A.   Yes.
19  Q.   But you can't tell whether or not the four
20  complaints there are actually for a defendant officer or
21  potentially a non-defendant officer?
22  A.   That's right.
23  Q.   And there is a chance that those four complaints
24  are in fact for non-defendant officers?

95

1   A.   It's possible.
2   Q.   But we can't figure that out without going back
3   to your MS Excel spreadsheet that you talked about earlier?
4   A.   Yes.
5   Q.   Okay.  Back to page 12, you say still in that
6   first paragraph the data reveal Chicago Police Department's
7   accountability systems are broadly ineffective for
8   detecting misconduct and holding officers accountable when
9   they violate CPD policy.  Do you see that?
10  A.   Yes.
11  Q.   Then you go on to say, These observations impair
12  the CPD's ability to describe and count internal personnel
13  complaints and do not follow accepted policy standards for
14  complete and thorough investigations.
15  A.   Yes.
16  Q.   What do you mean by describe and count?  How do
17  your observations impair CPD's ability to describe and
18  count internal personnel complaints?
19  A.   The way that the complaints are classified has a
20  series of minute categories that are spread across
21  different types of complaints.  There seems to be a --
22  what's the word I'm looking for?  An overlap of categories.
23  Q.   What do you mean by that?
24  A.   Yeah, let me show you.  Hold on.

96

1   So if you turn to page 32 at the very bottom.
2   Q.   Okay.
3   A.   And you look at how they classify these
4   complaints, it doesn't seem to follow a consistent
5   convention.  I don't see what the difference is between
6   allowing a prisoner escape and allowing a suspect to
7   escape.  I don't see a difference between deceitful conduct
8   and perjury.  And I list 20 different things between pages
9   32 and 34 that have these overlap, and because there is
10  overlapping categories it impairs their ability to identify
11  trends and patterns that are coming up because they don't
12  have a consistent coding scheme.
13  Q.   Okay.  In our -- did you review in preparation
14  for this report the Complaint Category Tables that CPD and
15  internal affairs used back in the --
16  A.   I had seen them, yes.  These broad categories --
17      MS. BONJEAN:  Hold on.  Let her ask a
18  question.  Are you talking about this?
19      MS. CARNEY:  Yeah.
20      MS. BONJEAN:  Yeah, he has a copy of it.
21  BY MS. CARNEY:
22  Q.   So these broad categories that you're describing
23  here on pages 32 through 34, are those CPD complaint
24  categories or are those your own complaint categories?

97

1   A.   No, these come from the CR that are listed right
2   next to them.
3   Q.   Is this how CPD categorizes the initial complaint
4   that was taken in on their face sheet?
5   A.   This is what appears in the body of the report.
6   Q.   Okay.  So --
7       MS. BONJEAN:  I'm sorry.  Objection, form.
8   Go ahead.
9   Q.   As you've already described to me before, there
10  can be several different complaints within one CR, right?
11  A.   Yes.
12  Q.   And each CR is given a designated complaint
13  category for the initial main complaint; isn't that
14  correct?
15  A.   It is, yes.  That's based on this document that
16  we were talking about.
17  Q.   Okay.  So when you're saying that the
18  observations impair CPD's ability to describe and count the
19  internal personnel complaints, you're talking about your
20  own -- the breakdown of the CR into individual complaints
21  from within the CR, right?
22      MS. BONJEAN:  Objection, form.
23  A.   It's not my own.  It's what they wrote in their
24  investigation.

Jon Shane, 3/10/2023

98

1    Q.   Right, but that's not -- sorry.  Go ahead.
2    A.   I didn't create these.
3    Q.   But this is not how CPD classifies their
4    complaints on the face sheets of the CRs, right?
5    A.   Well, they use a combination of these broad
6    categories that you might see here that are entitled
7    Complaint Category Tables.
8    Q.   Correct.
9    A.   Then, when you read the body of the investigation
10   they're not necessarily congruent with that.
11   Q.   Right.  Because there can be more than one, as
12   you've explained, complaint within the overarching CR,
13   right?
14   A.   There might be more than one complaint, yes.
15   Q.   Okay.  So, for example --
16   A.   But the initial code doesn't necessarily reflect
17   what the investigation was about either.
18   Q.   How so?
19   A.   Well, I --
20       MS. BONJEAN:  I'll object to the form and
21   foundation.
22   A.   I saw on more than one example something might be
23   described as miscellaneous or a rule violation and then the
24   body of the investigation goes in to talk about assaults or

99

1    verbal threats or something like that.  They're miles
2    apart.
3    Q.   Are you aware of how OPS or IAD, what the intake
4    process was back in the late '80s, early '90s, when CPD
5    received a personnel complaint?
6    A.   What do you mean was I familiar with the process?
7    How they -- I mean it's laid out in their policies.  I've
8    read that.
9    Q.   Okay.  Is it fair to say that CPD would -- the
10   initial complaint may come in under a certain complaint
11   category and then the investigation may lead it to a
12   different violation?
13   A.   Yeah, that's possible, yes.
14   Q.   Then you say count internal personnel complaints.
15   How are CPD -- how is CPD's ability to count internal
16   personnel complaints impaired?
17   A.   Because when they fragment the categories as they
18   have done here patterns -- it gives them the ability to
19   diffuse these categories to such a degree that patterns
20   would be difficult to emerge, be difficult to detect
21   because they spread them across so many different
22   categories.  So when they're calling one complaint
23   excessive force and another one an assault and another one
24   a battery, they've got three different categories for those

100

1    things when they all relate to the same thing.
2    Q.   If we could pull up what I've marked as
3    Exhibit 14 which is that Complaint Category Tables that we
4    kind of keep talking about so let's just pull it up.
5        (Remote screen sharing.)
6    Q.   Yeah, okay.  Do you have it?
7        MS. BONJEAN:  He has it in paper form.
8    Q.   That's fine.  We have the exhibit tech, we might
9    as well use her.
10       This is that Complaint Category Tables that we've
11   kind of been talking about.  On here you see things like 05
12   Excessive Force, right?
13   A.   I see Group 05, yes.
14   Q.   And then in Group 05 there is a variety of
15   different types of excessive force complaints, right?
16   A.   Yes.
17   Q.   Can you point me to where you see on here a
18   complaint category of assault?
19   A.   I don't know if it's on this particular form but
20   I know that it exists in the investigations.
21   Q.   Okay.  If it exists in the investigation that's
22   more of a description of the event, not necessarily the
23   complaint category that was used, right?
24   A.   No, not necessarily because they find in the

101

1    allegations sustained or not sustained and they'll say not
2    sustained on the assault.  They don't say not sustained
3    regarding excessive force regarding Group 05.
4    Q.   Okay.
5    A.   Not that I recall seeing anything like that.
6    Q.   When you -- well, I'll keep going through here.
7    How do these observations about ability to describe and
8    count the internal personnel complaints impair CPD's
9    ability to hold officers accountable?
10   A.   Because what they do is they -- and I'll show you
11   where I have it written here.  If you look at the bottom of
12   page 34, I describe how -- the answer to the question that
13   you're posing.  When you fragment these categories you
14   build in this plausible deniability about where the
15   complaints come from, what they are, what types of patterns
16   may emerge, and incrementally it takes more time to build
17   complaints in individual categories like all these
18   subcategories you see here before you're able to say, oh, a
19   complaint emerged.
20       When the reality is an assault or a use of
21   excessive force, some kind of altercation with your
22   neighbor or domestic all amount to assaults, but they
23   categorize these things differently and they spread them
24   across the landscape and you don't see a pattern emerge

Jon Shane, 3/10/2023

---

102

1 because they've broken them down so fine you can't detect
2 anything.
3     Q.   Can you explain to me why -- or how if you are on
4 page 32, these examples that you cite here, we just used a
5 couple of them here, allowing a prisoner to escape is the
6 same as allowing a suspect to escape?
7     A.   That's what they -- that's how they have these
8 things categorized.  I don't see the difference.  There is
9 no description of the differences.
10     Q.   You don't believe there is a difference between
11 allowing a prisoner to escape versus allowing a suspect to
12 escape?
13     A.   No.  They're both suspects.
14     Q.   Okay.
15     A.   And they categorize them in the same way.  And
16 it's not just that one particular one, there is 20
17 different ones that I list here.
18     Q.   I understand.  We'll go through a couple.  Number
19 two for deceitful conduct versus perjury.  It's your belief
20 that deceitful conduct and perjury are the same?
21     A.   As it's categorized.
22     Q.   But are the complaint categories for this
23 CR180229 and the perjury one 237167, do you remember
24 sitting here today what the complaint categories were for

---

103

1 those CRs?
2     A.   No, I don't recall off the top of my head, but
3 those are listed in the body of the investigation.
4     Q.   Are you aware of how CPD prioritizes the
5 complaints when it comes to the complaint categories that
6 are used?
7     A.   I haven't seen anything that dictated the level
8 of priority.
9     Q.   Would you categorize a complaint of excessive
10 force as more of a priority versus -- than deceitful
11 conduct within a complaint?
12         MS. BONJEAN:  I'm going to object to the
13 form of that question.
14     A.   No.  I mean, it's context specific.  You would
15 have to know what the context is.  If you're telling me
16 that somebody is in court testifying and they're under oath
17 and they're engaged in deceitful conduct or somebody
18 applied a pair of handcuffs too tightly to somebody which
19 is an excessive force claim, I would say the deceitful
20 conduct under oath is more of a priority than somebody's
21 handcuffs that were too tight.
22     Q.   Each of these CRs needs to be viewed in context
23 to what the actual complaint is, right, and allegations
24 are?

---

104

1     A.   Yes.
2     Q.   They can't be broad-stroked descriptions of
3 deceitful conduct, right?
4     A.   Well, when you're talking about categorizing
5 complaints you should have a consistent coding scheme broad
6 enough to be able to capture all of the things that come
7 under that parent category so you've got a pattern that
8 emerges so you can determine whether or not officers are
9 misbehaving or they're involved in misconduct.  The greater
10 you diffuse those categories across the landscape the less
11 likely you are to detect a pattern.
12     Q.   So if we go back to -- let me ask you this.
13 Nevermind.
14         If we go back to page 12, section 3,
15 justification for your opinion.  We talked a little bit
16 about this before, the source data are CPD internal affairs
17 records known as Complaint Registers, 1980 to 2008, right,
18 that's your source data?
19     A.   Yes.
20     Q.   That includes the Defendant officers and a sample
21 of non-defendant officers, right?
22     A.   Yes, that's correct.
23     Q.   Do you know how many non-defendant officers were
24 included in the source data?

---

105

1     A.   Yeah, I have it written in here somewhere.  I
2 don't know off the top of my head.
3     Q.   Okay.
4         MS. BONJEAN:  Do you want him to look at --
5         MS. CARNEY:  No -- yeah, if he can point to
6 me where he has it.  I don't need him to count but if he
7 has it listed.
8         THE WITNESS:  I think it's on page 14 in the
9 body of the 80 Defendant officers.
10 BY MS. CARNEY:
11     Q.   80 Defendant officer cases and 66 non-defendant
12 officer cases?
13     A.   Right.
14         MS. BONJEAN:  I'm sorry, hold on.  I'm just
15 looking at something for my own edification.
16         THE WITNESS:  Those are the names of the
17 officers, yeah.
18         MS. BONJEAN:  Yeah, I think that's what
19 she's asking.
20         THE WITNESS:  Were you asking the names of
21 the Defendant officers?
22         MS. CARNEY:  Just how many.  If you don't
23 know off the top of your head, that's fine.
24         MS. BONJEAN:  Point her to the footnote

---

Jon Shane, 3/10/2023

106

1  where she can find --
2       THE WITNESS:  Page 46.  You can count them
3  on page 46.
4  BY MS. CARNEY:
5       Q.   Okay.  Then this is going to go back -- and we
6  might have to take a break, Jennifer, to talk about this --
7  but the data were analyzed using MS Excel and Statistical
8  Package for the Social Sciences, that's that SPSS we were
9  talking about, right?
10      A.   Where are you exactly?
11      Q.   Back to page 12 in the justification for your
12 opinion.
13      MS. BONJEAN:  Yes.
14      A.   Okay, yes.
15      Q.   So this kind of goes back to what we were talking
16 about in your invoices which is the inputting of the data,
17 right?
18      A.   Well, this is the analysis that was done.
19      Q.   Okay.
20      A.   The data had to be entered into that software, if
21 that's what you're asking.
22      Q.   My question is, and this is where we might need
23 to take a break, is who was tasked with inputting all of
24 the source data into MS Excel and/or SPSS?

107

1       MS. BONJEAN:  Okay.  That I'm going to -- I
2  think we do need to take a break.  I'm not telling him --
3  I'm not opposed to him answering that question but I kind
4  of -- entirely, but I want to make sure there is
5  reciprocity.  We need to have a discussion about what your
6  position will be when your experts, you know, take -- get
7  deposed, you know what I'm saying?
8       MS. CARNEY:  Yeah.  Can we go off the record
9  real quick?
10      MS. BONJEAN:  Yeah.
11      THE VIDEOGRAPHER:  Sure.  We're off the
12 video record at 1:28 p.m.
13      (Whereupon a recess was taken.)
14      THE VIDEOGRAPHER:  All right.  We are back
15 on the video record at 1:52 p.m.
16      MS. CARNEY:  Okay.  So, just for the record,
17 Ms. Bonjean and I just took a break to discuss some issues
18 that arose around the potential work product privileges or
19 no work product privileges surrounding the MS Excel
20 spreadsheet and the Statistical Package for Social Sciences
21 software.
22      The parties have agreed to adjourn the dep until
23 those issues can been resolved and then come back and start
24 again -- not start again but continue.

108

1       THE VIDEOGRAPHER:  We are going off the
2  video record at 1:53, and this concludes the video
3  deposition of Dr. Jon Shane.
4       (Continued sine die.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

109

1
2  STATE OF ILLINOIS :
3                     : SS
4  COUNTY OF PEORIA :
5       I, Lea Ruth Cohen, CSR, and Notary Public in and
6  for the County of Peoria, State of Illinois, do hereby
7  certify that heretofore, to-wit, on Friday, March 10, 2023
8  appeared before me via remote audiovisual means:
9
10      JON SHANE, a material witness herein.
11
12      I further certify that the said witness was by me
13 first duly sworn to testify to the truth, the whole truth
14 and nothing but the truth in the cause aforesaid; that the
15 testimony then given by said witness was reported
16 stenographically by me via remote audiovisual means and
17 afterwards reduced to typewriting, and the foregoing is a
18 true and correct transcript of the testimony so given by
19 said witness as aforesaid.
20
21
22
23
24

Jon Shane, 3/10/2023

110

1          I further certify that the signature of the
2   witness was not waived.
3
4          I further certify that I am not counsel for nor
5   in any way related to any of the parties to this suit, nor
6   am I in any way interested in the outcome thereof.
7
8          In testimony whereof, I hereunto set my hand and
9   affix my notarial seal on this day, Thursday, March 30,
10  2023.
11
12
13
14   
15                  Notary Public
16
17
18      Lea Ruth Cohen, Certified Shorthand Reporter
        (State of Illinois License #084-002868)
19          My commission expires 4/12/2026
20
21
22
23
24