# Exhibit 29

JON SHANE, 05/26/2023

111

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jose Juan Maysonet, Jr.,          )
                                  )
              Plaintiff,          )
                                  )
        vs.                       ) No. 18-CV-2342
                                  )
Reynaldo Guevara, et al.,         )
                                  )
              defendants.         )


        VOLUME II, Pages 111 - 333

    The continued videotaped deposition of JON SHANE,
taken under oath on Friday, May 26, 2023, via Zoom,
pursuant to the Rules of the Supreme Court of Illinois
and the Code of Civil Procedure, before Riley A. Moran,
Certified Shorthand Reporter No. 084-004945, commencing
at 9:33 a.m., pursuant to notice.



    APPEARANCES:

        BONJEAN LAW GROUP, PLLC, by
        MS. JENNIFER A. BONJEAN
        (750 Lexington Avenue, 9th Floor
         New York, NY 10022
         (718)875-1850
         jennifer@bonjeanlaw.com)
           appeared on behalf of the plaintiff;

JON SHANE, 05/26/2023

---

112

```
 1
 2      APPEARANCES:  (Cont'd)
 3      STEVEN A. GREENBERG, LTD., by
        MR. STEVEN A. GREENBERG
 4      (53 West Jackson Boulevard, Suite 1260
        Chicago, IL 60604
 5      (312)879-9500
        steve@greenbergcd.com)
 6       appeared on behalf of the plaintiff;
 7      THE SOTOS LAW FIRM, P.C., by
        MR. JOSH M. ENGQUIST
 8      (141 West Jackson Boulevard, Suite 1240A
        Chicago, IL 60604
 9      (630)735-3300
        jengquist@jsotoslaw.com)
10       appeared on behalf of the defendants
         Officers Halvorsen, Mingy, Epplen, Montilla,
11       and Paulnitsky;
12
        ROCK FUSCO & CONNELLY, LLC, by
13      MS. THERESA B. CARNEY
        (333 West Wacker Drive, 19th Floor
14      Chicago, IL 60606
        (312)494-1000
15      tcarney@rfclaw.com)
         appeared on behalf of the defendant City of
16      Chicago;
17
        LEINENWEBER BARONI & DAFFADA, LLC, by
18      MS. MEGAN K. MCGRATH
        (120 North LaSalle Street, Suite 2000
19      Chicago, IL 60602
        (312)663-3003
20      mkm@ilesq.com)
         appeared on behalf of the defendant Officer
21       Reynaldo Guevara;
22
23
24
```

---

113

```
 1
 2      APPEARANCES:  (Cont'd)
 3      HINSHAW & CULBERTSON, LLP, by
        MR. ROBERT T. SHANNON
 4      (151 North Franklin, Suite 2500
        Chicago, IL 60606
 5      (312)704-3000
        rshannon@hinshawlaw.com)
 6       appeared on behalf of the defendant Officer
         DiFranco;
 7
 8      ALSO PRESENT:  Mr. Nick Trotta
              Legal Videographer
 9
        Ms. Brett Schatzle
10      Exhibit Technician
11      Ms. Haley Coolbaugh
        Paralegal, Bonjean Law
12
13                 *  *  *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24
```

---

114

```
 1                    I N D E X
 2
 3      Witness:                         Page
 4      Jon Shane
 5       Examination by:
 6        Ms. Carney [Resumed]..............116
 7        Mr. Engquist ....................271
 8        Ms. Bonjean .....................285
 9
10
11                 E X H I B I T S
12
13      No.  Description          Marked/Referenced
14      15  Dr. Shane's Supplemental Report .......117
15      16  CPD CR data master file ...............180
16      4   CR 223928 (RFC 3503-3631, Guevara) ....197
17      8   CR 179835 (RFC 2689-2854, Montilla) ...208
18      11  CR 237167 (RFC 4045-4132, Montilla) ...212
19      17  CR 180229 (RFC 12245-12297) ...........230
20      18  General Order 83-3 ....................326
21
22             (Exhibits scanned/attached.)
23
24
```

---

115

```
 1          THE VIDEOGRAPHER:  Good morning.  This is the
 2      beginning of Media Unit 1.  We are now on the video
 3      record at 9:33 a.m.  This is the videotaped
 4      videoconferenced discovery deposition of Dr. Jon Shane
 5      being taken on May 26th, 2023.
 6              This deposition is being taken on the
 7      behalf of the defendant in the matter of Jose Juan
 8      Maysonet versus Reynaldo Guevara, et al.  The case number
 9      is 18-CV-2342 filed in the United States District Court
10      for the Northern District of Illinois, Eastern Division.
11              My name is Nick Trotta, legal
12      videographer representing Urlaub Bowen & Associates with
13      offices at 20 North Clark Street, Suite 600, Chicago,
14      Illinois.  The court reporter today is Riley Moran, also
15      of Urlaub Bowen & Associates.
16              Counsel, please identify yourselves for
17      the video record and the parties which you represent.
18          MS. BONJEAN:  Jennifer Bonjean on behalf of the
19      plaintiff.
20          MR. ENGQUIST:  Josh Engquist on behalf of
21      Defendants Halvorsen, Mingy, Epplen, Montilla, and
22      Paulnitsky.
23          MS. MCGRATH:  Megan McGrath on behalf of Defendant
24      Guevara.
```

---

JON SHANE, 05/26/2023

116

1    MS. CARNEY:  Theresa Carney on behalf of the
2   Defendant City of Chicago.
3       MR. SHANNON:  Bob Shannon on behalf of Defendant
4   DiFranco.
5       MS. CARNEY:  I think that's it.
6       THE VIDEOGRAPHER:  All right.  Will the court
7   reporter please swear in the witness.
8           (Witness sworn.)
9           Jon Shane,
10  called as a witness herein, having been first duly sworn,
11  was examined and testified as follows:
12          EXAMINATION
13  BY MS. CARNEY:
14      Q.   All right.  Good morning, Dr. Shane.  How are
15  you?
16      A.   All right.  Very well.  Good morning.
17      Q.   So this is going to start a little -- this is
18  going to feel a little choppy to start because, if you
19  recall, we got about two and a half hours in last time,
20  and we adjourned, and counsel and I have conferred, and a
21  couple additional things have been produced since that
22  point, including you produced what I've marked as
23  Exhibit 15, a supplement to your report.
24      A.   Yes.

117

1       MS. CARNEY:  Brett, if we could pull that up just
2   to -- there she is.
3           (Deposition Exhibit Number 15,
4           Witness Shane, was marked for
5           identification 5/26/23.)
6   BY MS. CARNEY:
7       Q.   Okay.  Dr. Shane, I've marked this as
8   Exhibit 15, and this is the supplemental report that you
9   issued after we adjourned the last deposition, which
10  deals with -- and we'll talk about it more in depth in a
11  little bit -- but just generally speaking --
12          Brett, if we could go to the first
13  page -- sorry.  The second page.  There we go.
14          This is a supplement opinion based on
15  some additional CRs for Defendant Guevara; is that,
16  generally speaking, accurate?
17      A.   Yes, correct.
18      Q.   Okay.  Counsel also produced --
19          And, Brett, this is the one I'm going to
20  show.  Let's see if I can do this right.  Can you guys
21  see my screen?  Did I do it right?
22      A.   I can see it.
23      Q.   Okay.
24      MS. BONJEAN:  Yep.

118

1   BY MS. CARNEY:
2       Q.   Okay.  Counsel also produced to us a document
3   that's called CPD CR data -- I think it's master
4   spreadsheet.  My thing is a little blocked.  And this is
5   the master spreadsheet of the raw data that we were
6   discussing during part one of your deposition; is that
7   accurate?
8       A.   Yes, correct.
9       Q.   Okay.  We'll come back to this in a little
10  bit, too.
11          Okay.  If we could pull up -- we'll just
12  dive right in -- Exhibit 3, which is your initial report.
13      MS. BONJEAN:  Are you putting it up?  Oh, okay.
14      MS. CARNEY:  Yeah.  Sorry.  I --
15      MS. BONJEAN:  That's all right.  I was going to
16  pull out my own copy if you weren't, but...
17      MS. CARNEY:  We have an exhibit tech today helping
18  me out, so she's --
19      MS. BONJEAN:  Excellent.
20      MS. CARNEY:  Except for the spreadsheet.  I will
21  attempt to do that one on my own, so I apologize in
22  advance.
23  BY MS. CARNEY:
24      Q.   All right.  So we left off around page 12 of

119

1   your report.
2           So if we could head there, Brett.
3       A.   Can you increase the Zoom level for me,
4   please?  Maybe, like -- let's -- yeah.  Let's see what
5   125 looks like.  Can you do maybe, like, 135?  Let's see
6   what that looks like.  Just type -- yeah.  Just type in
7   135.
8       MS. BONJEAN:  You could pull out your paper copy,
9   too, if that's easier but -- if you have one.
10      THE WITNESS:  I have it on my desktop, but then I
11  lose my -- because I'm working off of my laptop here,
12  I'll lose --
13  BY MS. CARNEY:
14      Q.   There.  How's that?
15      A.   -- sight of everybody.
16          Yeah.  That looks good.  Okay.
17      Q.   Okay.  So actually, we need to scroll down a
18  little bit to what's page 12 on the bottom of the page,
19  so one more.
20          Okay.  So this is about where we left
21  off.  Last time, we were talking about paragraph three,
22  justification for your opinion.  And in this paragraph
23  here where it says 3a, this is the source data that we
24  were discussing.  It says, "The data were supplied by

JON SHANE, 05/26/2023

120

1  Plaintiff's counsel in electronic format."  And then next
2  sentence starts, "The source data are CPD internal
3  affairs records known as Complaint Register files from
4  1980 to 19" -- I'm sorry -- "to 2008."  Do you see that?
5       A.   Yes.
6       Q.   Okay.  Hold on.  I lost my spot already.
7  It's hard to start over when you've already got a couple
8  hours in.
9       MS. BONJEAN:  Yes.
10  BY MS. CARNEY:
11       Q.   Sorry.  All right.  And then the next par --
12  so this paragraph here is describing the spreadsheet
13  known as the CPD CR data master file; is that correct?
14       MS. BONJEAN:  Objection --
15  BY MS. CARNEY:
16       Q.   Where you say --
17       MS. BONJEAN:  I'm sorry.
18  BY MS. CARNEY:
19       Q.   -- "the data were analyzed using MS Excel and
20  Statistical Package for Social Sciences"?
21       MS. BONJEAN:  I'm going to object to the form of
22  that question.  Foundation as well.
23            You can answer if you understand, Jon.
24       THE WITNESS:  Are you asking me -- can you -- can

121

1  you say that again?  I wasn't clear.
2  BY MS. CARNEY:
3       Q.   Yep.  Sorry about that.
4            All right.  So this paragraph is talking
5  about the justification for your opinion and the source
6  data that you used in order to form that opinion; is that
7  accurate?
8       A.   Yes, that's correct.
9       Q.   Okay.  And you talk about complete register
10  files from 1980 to 2008 for defendant officers and a
11  sample for non-defendant officers and that you analyzed
12  that data using both MS Excel and what is known as SPSS;
13  is that right?
14       A.   Yes, that's correct.
15       Q.   Okay.  And the MS Excel document that you're
16  referencing here is what I think we're going to need to
17  mark as Exhibit 16, but it's the spreadsheet that I just
18  showed you that was produced to us after we adjourned the
19  last time; is that right?
20       A.   Yes, that's correct.
21       Q.   Okay.  And during the first part of your
22  deposition, we talked a lot about kind of your process in
23  how you -- how you analyzed the CRs and broke them down
24  into that spreadsheet.  Do you remember that?

122

1       A.   Yes, I do.
2       Q.   Okay.
3       A.   Sure.
4       Q.   And is that MS -- is that MS Excel
5  spreadsheet the only spreadsheet that you used when
6  compiling the data for the source data?
7       A.   Well, when you say the "only spreadsheet,"
8  are you differentiating from SPSS?
9       Q.   I am.
10       A.   So the -- the data was -- was coded into
11  Microsoft Excel, and then for one of the -- one of the
12  procedures, I used SPSS.  I just want to make sure we're
13  clear on -- that what I'm answering is correct.
14       Q.   Yep.  That makes sense.  Thank you.  Okay.
15       A.   Okay.
16       Q.   So then moving down, you say here, "The data
17  in the CR files are relational."  Can you explain to me
18  what "relational" means when -- in this paragraph?
19       A.   Well, I go on to explain it right after that.
20  It's relational in the sense that there's what's known as
21  a one-to-many relationship; so you may have one
22  complaint, but you may have many dispositions.  You may
23  have many officers.  Many officers may -- may have many
24  dispositions.  That's -- that's why it says -- the next

123

1  sentence reads, "It's a one-to-many relationship."
2       Q.   Okay.  So you're -- in your report, you're
3  using -- so the incident is the CR; is that accurate?
4       A.   Well --
5       MS. BONJEAN:  Yeah.  I'm going to object to the
6  form of that question.
7            Go ahead.
8       THE WITNESS:  Let's -- let's call it -- let's call
9  it the complaint is the CR for the moment.  I mean, we're
10  going to have to differentiate how we're using some of
11  this terminology.  But let's say someone come -- someone
12  comes in to make a complaint, and the complaint becomes
13  the CR.  From the CR, allegations and officers and
14  dispositions are eventually defined.
15  BY MS. CARNEY:
16       Q.   Okay.
17       MS. BONJEAN:  Can you guys hold on one second?
18  This is where -- I'm sorry -- I need to take a two --
19  (muted).
20       MS. CARNEY:  Yep.  Let's go off the record.
21       THE VIDEOGRAPHER:  All right.  We're going off the
22  video record at 9:44 a.m.
23            (Recess taken.)
24       THE VIDEOGRAPHER:  This is the continuation of

JON SHANE, 05/26/2023

124

1    Media Unit 1.  We are back on the video record at
2    9:49 a.m.
3    BY MS. CARNEY:
4         Q.    Okay.  If we can bring back up Exhibit 3
5    where we were, I think it will make sense to just go to
6    the next page of that -- of your report.  And in this
7    paragraph, Dr. Shane, you actually are talking -- this
8    first paragraph up here, you are talking about the unit
9    of analysis?
10        A.    Yes.
11        Q.    Okay.  And you say, "The unit of analysis was
12   switched when appropriate to accommodate the analysis."
13   When is it appropriate to switch the unit of analysis?
14   What do you mean there?
15        A.    It depends on what type of analysis I'm
16   conducting.  So if I want to look at complaint level
17   data, then I will look at just the complaint level.  But
18   if I want to look at dispositions, then I have to switch
19   the unit to the disposition level.
20        Q.    Okay.  In the next sentence, you said, "The
21   unit of analysis includes incident level, officer level,
22   complaint level and disposition level."  Is that what you
23   were just talking about with how to -- how to break down
24   each CR?

125

1         A.    Yes.
2         Q.    So for this report, is it fair to say
3    that you used incident level as your terminology to
4    describe the CR itself?
5         MS. BONJEAN:  Object -- objection.  Form.
6         THE WITNESS:  The -- the complaint level was the
7    CR.  The incidents were the allegations.  The officers
8    were the police officers, and the dispositions were the
9    dispositions.
10   BY MS. CARNEY:
11        Q.    Okay.  Hold on.  I missed that.  So you said
12   the complaint level was the CR itself?
13        A.    That's right.
14        Q.    Incident level was -- what? -- the
15   allegation?
16        A.    The allegations, yes.
17        Q.    And then officer and disposition level are
18   self-explanatory; right?  Officer is the number of
19   officers and the actual officer involved?
20        A.    That's correct.
21        Q.    And the disposition level is the result of
22   the investigation; right?
23        A.    Yes, correct.
24        Q.    Okay.  Okay.  So -- and then that is how you

126

1    broke down the CRs in the spreadsheet that we were
2    looking at before; is that right?
3         A.    Yes.
4         MS. BONJEAN:  Objection.  Form.
5    BY MS. CARNEY:
6         Q.    Okay.  So moving down then to subparagraph b
7    here, "Case" -- "Case Methodology for Process
8    Evaluation."  You say here that your process evaluation
9    consisted of analyzing content from 40 randomly selected
10   internal affairs investigations.  Was this -- is this
11   section discussing your qualitative research or your
12   quantitative research in regards to this report?
13        A.    Well, it's -- it's a little bit of both.  The
14   content that came from the internal affairs records would
15   be qualitative.  That was looking at the various
16   components.  But then that was also put into -- I
17   quantified those.  I counted them up.
18        Q.    Okay.
19        A.    But, generally, it's the qualitative end of
20   it.
21        Q.    Okay.  And we may have brought -- talked
22   about this during the first part of the dep, but are --
23   can you -- are you aware of any research papers where
24   police accountability is analyzed using a qualitative

127

1    approach?
2         MS. BONJEAN:  I'm going to object to the form.
3         But go ahead.
4         THE WITNESS:  Can you be a little more specific?
5    Do you -- do you mean -- what do you mean when you say,
6    "a qualitative approach"?
7    BY MS. CARNEY:
8         Q.    Well, if I'm understanding -- so -- well, let
9    me go -- let's go down a little bit more into this
10   paragraph, and maybe that will help me crystallize my
11   question a little bit better.  So you say, like you just
12   talked about, "The content reflects components of the
13   standard internal affairs investigation."  And then,
14   "Following generally accepted method for saturation and
15   variability, 40 CPD investigations were randomly selected
16   to ensure accurate and objective results."
17        Is saturation and variability -- are
18   those terms that are used for quantitative research or
19   qualitative research?
20        MS. BONJEAN:  Objection.  Form.
21        THE WITNESS:  Generally qualitative.
22   BY MS. CARNEY:
23        Q.    Okay.  So the 40 randomly selected files that
24   you -- that you were analyzing in this section, would

JON SHANE, 05/26/2023

128

1  that have been enough for a qualitative -- or I'm
2  sorry -- a quantitative analysis of the CR files?
3      A.   Well, it -- that's a difficult question the
4  way you pose it.  First -- first of all, it's a -- the
5  report consists of two elements.  It's -- it has
6  qualitative elements, and it has quantitative elements.
7  That's number one.  Number two, when you say is it
8  sufficient -- what did you say?  Is it sufficient for a
9  qual -- quantitative analysis only?
10     Q.   Yes.
11     A.   Well, the answer is it depends on what it is
12 you're trying to examine.  It depends on what you're
13 trying to achieve with that.
14     Q.   Okay.  Is it -- or can you tell me then what
15 in -- in this -- for this case selection methodology that
16 you're discussing in this paragraph, what were you trying
17 to achieve with the 40 randomly selected cases?
18     A.   What I wanted to do is to look at the
19 component pieces of each of the investigations.  I wanted
20 to see what things that they did during investigation to
21 determine if there were any omissions from standard
22 investigation practices.
23     Q.   Okay.  And so then I just want --
24     A.   Those --

129

1      Q.   Oh, sorry.  Were you done?
2      A.   Those components pieces amounted to -- to
3  various themes that came up.
4      Q.   Okay.  So then I guess what I'm trying to
5  figure out is was your -- was your goal in -- in
6  reviewing these component pieces from the 40 randomly
7  selected cases -- was it a -- were you looking to -- I
8  want to phrase it correctly because I know the terms mean
9  different things.  But were you looking to do a
10 qualitative review of those 40 cases or a quantitative
11 review?
12     MS. BONJEAN:  Objection.  Form.
13     THE WITNESS:  Well, it was -- it was qualitative
14 insofar as I wanted to see what themes arose from the
15 data that came from the actual investigations.  I did
16 quantify some of -- some of those themes.
17 BY MS. CARNEY:
18     Q.   Okay.  And when you say you "did quantify
19 some of those themes," what does that mean?
20     A.   It means I counted up the sorts of things
21 that arose from that -- from those themes.
22     Q.   And then did you form any opinions based on
23 that quantitative counting of the things that came from
24 those themes?  Does that --

130

1      MS. BONJEAN:  Object to form.
2      THE WITNESS:  Yes.  My opinion -- my opinion was
3  that the investigations were not complete.  They had a
4  number of missing component pieces.
5  BY MS. CARNEY:
6      Q.   Okay.  So -- so that research question and
7  ultimate answer, is that -- was that a quantitative
8  finding from the 40 cases?
9      MS. BONJEAN:  Object to form.
10     THE WITNESS:  What research question?
11 BY MS. CARNEY:
12     Q.   Sorry.  I was trying to -- so you said that
13 you did -- you did quantify some of those themes by
14 counting out the various things that came from those
15 themes by quantifying them; right?
16     A.   Correct, correct.
17     Q.   Did I understand that right?  Okay.
18     A.   Yes.
19     Q.   And then from that quantifi -- is
20 quantification a word?  From --
21     A.   It is.
22     Q.   Is it?
23     A.   It is, yeah.  Sure.
24     Q.   Okay.  Good.  So from that quantification of

131

1  those -- those component pieces that created those
2  themes -- now I got excited about my new word, and then I
3  lost my train of thought.
4          Okay.  So you -- from that quantification
5  of those themes, you came up with -- to the conclusion in
6  your opinion that the investigations were not complete,
7  and they were missing component pieces; is that right?
8      MS. BONJEAN:  Objection.  Foundation and form.
9      THE WITNESS:  No.  I reached that -- that
10 conclusion based on what I drew from looking at the
11 individual files, not simply because it was quantified.
12 BY MS. CARNEY:
13     Q.   Okay.  So I guess I'm trying to figure out if
14 there was any sort of quantitative research done or
15 quantitative analysis done on just the subset of the
16 40 randomly selected files that led you to your opinion
17 that the investigations were not complete and missing
18 component pieces, or was that a qualitative research
19 analysis?
20     MS. BONJEAN:  I'm going to object.  Asked and
21 answered.  I think he answered that already.
22          But if you -- go ahead.
23     THE WITNESS:  I don't think it's an either/or
24 question.

JON SHANE, 05/26/2023

132

1    BY MS. CARNEY:
2        Q.    Okay.
3        A.    So the -- the -- the answer is when I
4    reviewed these 40 files, I identified component pieces
5    that were missing.  It was a qualitative review to look
6    for various elements of investigative practices.  And
7    then from that, I counted the various pieces that were
8    missing, and that's a quantitative appraisal.
9        Q.    Okay.  And so my question ultimately is for
10   the quantitative appraisal, were -- and I think the
11   word -- the -- the term you used in the beginning of the
12   dep -- the -- part one of the dep was the statistic --
13   like, the power analysis or appropriate power; is that
14   right?  Am I remembering that correctly?
15       A.    Well, you did ask me about a power analysis,
16   yes.
17       Q.    Okay.  And we talked a little bit about
18   confidence level intervals and the term -- the correct
19   terminology for -- for what it means for -- for a study
20   to have enough power.  Is that -- am I remembering that
21   correctly?
22       A.    Yes, yes.  It's -- and if you remember, I
23   said it's predicated upon the test that you use.
24       Q.    Okay.  So I guess my question is the

133

1    quantitative appraisal that you ultimately did on the
2    40 -- the subset of 40 cases, did that have a high enough
3    power to be statistically significant?
4        A.    I wasn't test -- I wasn't testing those for
5    statistical significance.
6        Q.    Okay.
7        A.    They're just percentages, and they're
8    reflected in a -- in a table that's in this -- in this
9    document.
10       Q.    Got it.  All right.  Took me a little while
11   to get there, but maybe I'm getting my flow back here.
12       A.    Okay.
13       Q.    All right.  So we go down the paragraph a
14   little bit.  You say -- it's this -- it says to -- it's a
15   sentence that starts with, "To ensure a better
16   representation of investigations, a larger data" -- "a
17   larger sample" -- "sample of data were selected across
18   the defendant and non-defendant officers." Do you see
19   that?
20       A.    Yes.
21       Q.    Okay.  And then the next sentence is what I'm
22   interested in.  You say, "To ensure proportional
23   representation from each sample, a proportion of the
24   cases were drawn from each strata until reaching

134

1    40 cases."
2        A.    Okay.
3        Q.    So my understanding from this paragraph is
4    that you had two strata, defendant officers and
5    non-defendant officers; is that correct?
6        A.    Yes, that's correct.
7        Q.    Okay.  What is the importance of ensuring
8    that you had two different strata and a proportional
9    representation from each of those strata?
10       MS. BONJEAN:  Objection.  Form.
11       THE WITNESS:  Drawing a proportional sample ensures
12   that you have a generally strong representation from each
13   of -- of the groups.  You don't want to over sample for
14   one or under sample for another, so you draw it
15   proportionately to ensure that you have good
16   representation from each side.
17   BY MS. CARNEY:
18       Q.    Okay.  Moving on to the next page, you say
19   that a "Random selection for the CR files was used to
20   reduce bias by providing each investigation an equal
21   chance of being selected." Was the random --
22       A.    Where -- can you -- excuse me.  Where are you
23   reading from, please?
24       Q.    Sorry.  It's the second sentence here --

135

1        A.    Okay.  I see.
2        Q.    -- that starts at the -- okay.
3               Was the random selection done -- was
4    there a random selection process done for each strata, or
5    was it after the 40 cases were picked, then a random...
6        A.    No.  The 40 cases come from the random
7    sample.
8        Q.    Okay.  And the 40 cases were picked from
9    the -- the defendant officer strata and the non-defendant
10   officer strata; right?
11       A.    Yes, that's correct.
12       Q.    Okay.  Then you -- the next sentence says,
13   "There are 146 CR numbers."  Do you see that?
14       A.    Yes.
15       Q.    So based on what we talked about before, that
16   unit of analysis is the complaint level; is that correct?
17       A.    Yes, that's correct.
18       Q.    Okay.  Do you know the time period that the
19   146 CR numbers spans?  Do you...
20       A.    I thought it was what we had earlier.  I
21   mean, I don't know off the top of my head, but I thought
22   it was written -- it's written somewhere in here.
23       Q.    Okay.  So that's the 1980 to 2008 --
24       A.    Yes, that's right.

JON SHANE, 05/26/2023

136

1    Q.   Okay.
2    A.   Yes.  The non-defendant officers may have --
3  may have had a shorter time frame.
4    Q.   Is that because the defendant officers -- the
5  CR histories for their -- spanned their entire career?
6    A.   I'm not sure if it was the entire career.  I
7  mean, this is the data that I was given.
8    Q.   That's fine.  Okay.  So now we're going to go
9  down to section c here, Methodology for Computing
10 Percentage of Completed Investigative Activities in CR
11 Files.
12   A.   Okay.
13   Q.   Okay.  And I know you have a table in this --
14 this refers to Table 6, which is little bit farther back
15 in your report, so we'll get to that in a second.  Now,
16 it says that you -- so you say here that you were
17 switching to the unit -- sorry.  Let me start over.
18       The first paragraph, first sentence says,
19 "Completed investigative activities were computed by:
20 1) using the incident as the unit of analysis."  So based
21 on what we talked about before, incident level was the
22 allegations; is that right?
23   A.   Yeah.  But I think here, we're -- we're
24 talking about the complaint -- complaint itself -- the

137

1  complaint level.
2    Q.   Okay.  Why do you believe that here, incident
3  is complaint level, and before, incident was allegation
4  level?  Is there something that differentiates in the
5  report?
6    A.   No.  I think -- I think what I'm saying here
7  is that this should be the complaint level because
8  there's only 146 files, and we're looking at the -- at
9  the complaints themselves.
10   Q.   Okay.  So here, incident -- the incident as
11 the unit of analysis is the complaint level?
12   A.   Complaint level.
13   Q.   Got it.  And then you say, "Subtracting
14 investigative activities that were not applicable."  What
15 does it mean for an investigative activity to be not
16 applicable?
17   A.   Well, if you look down at footnote number 7,
18 I talk about what it is, and then there's an example in
19 there.  Sometimes -- it's exactly what it says.  It
20 just -- it wasn't applicable.  Like, no -- for example,
21 in the -- in the footnote number 7, there was a CR where
22 the accused officer signed out photography equipment, so
23 there's no victim to contact.
24   Q.   Okay.

138

1    A.   So contacting the victim's not an applicable
2  investigative element.
3    Q.   Got it.  So let's actually flip to -- all of
4  these investigative activities are actually in a table
5  that you put together -- right? -- Table 6?
6    A.   I don't know the number offhand, but I can
7  point you to it if you scroll down.
8    Q.   Yeah.  Let me see if I can find the page.
9  Okay.  It's page 46 of your report.  Let's go there.
10   A.   Okay.
11   Q.   Can you see that?
12   A.   Yes.
13   Q.   Okay.  So here it says, "Percentage of
14 Completed Investigative Activities in the CR Files," and
15 you have a list of -- I counted them out --
16 23 investigative activities.  And then some of them have
17 this little star, so footnote 60 down here says, "Those
18 items marked with a star are required by Chicago Police
19 Department General Order 82-14, Complaint and
20 Disciplinary Procedures."
21       If an item doesn't have a little star --
22   A.   Okay.
23   Q.    -- then who created that investigative
24 activity?

139

1    A.   Which investigative activity?
2    Q.   Well, for example, the first one there, it
3  says, "cameras located at the scene."
4    A.   You're asking me where did that idea come
5  from?
6    Q.   Correct.
7    MS. BONJEAN:  Objection to the form of the
8  question.
9       You can answer.
10   THE WITNESS:  That comes from basic investigative
11 practices that would take place in an internal affairs
12 investigation, and that's based on my years of experience
13 conducting them, supervising them.
14 BY MS. CARNEY:
15   Q.   Okay.  So taking that one, for example,
16 "cameras located at the scene," what does "located" mean
17 to you?
18   A.   That there would have been cameras at the
19 scene that may have captured the incident.
20   Q.   And for some of the CRs we talked about
21 before -- you know, the time span from the CRs starts in
22 1980; is that correct?
23   A.   Yes.
24   Q.   Okay.  And are you aware of the prevalence of

JON SHANE, 05/26/2023

140

1  cameras on -- in nineteen -- on various -- sorry. That's
2  a bad question.
3          Did you go through the CRs based on the
4  year to determine whether or not cameras at the --
5  located at the scene would actually have been applicable
6  to the time period?
7  MS. BONJEAN: Objection to the form and foundation
8  of that question.
9  THE WITNESS: Well, surveillance cameras have been
10 around for -- for decades; so what do you mean did I go
11 through each year?
12 BY MS. CARNEY:
13     Q.  Well, for example, if a CR is from 1980 --
14     A.  Yes.
15     Q.  -- did you look at that CR to determine
16 whether or not the cameras at the scene -- cameras
17 located at the scene was an applicable investigative
18 activity given the time period and the location of the
19 potential investigation?
20     A.  Well, the -- the answer is yes. The -- the
21 surveillance cameras in general have been around for
22 decades. They -- they were around in the '60s and '70s.
23 Their prevalence increased as time wore on.
24     Q.  Okay. But as we discussed before, this

141

1  doesn't have an asterisk next to it, which means that it
2  was not something that was required by the general order
3  at the time; is that correct?
4      A.  Although it wasn't promulgated in the general
5  order, it was certainly an investigative practice at that
6  time. Police departments were canvassing for cameras --
7  surveillance cameras at that time for sure.
8      Q.  Okay. So then moving down to the second one,
9  "communication tapes preserved." Do you see that there?
10     A.  Yes, of course.
11     Q.  Okay. That's another one that doesn't have
12 an asterisk, so does that mean that it's something that
13 came -- it's an investigative -- investigative activity
14 that you included based on your belief of best
15 investigative practices?
16 MS. BONJEAN: Objection to the form. Misstates his
17 earlier testimony on this.
18         But you can answer.
19 THE WITNESS: Well, for example, in 1985, I started
20 my police career in the communication center in the
21 Clifton Police Department, and at that time,
22 communication tapes were used extensively in
23 investigations. And the detectives and police officers
24 that were in the police department that had been there

142

1  for many years previously had been using those tapes for
2  many, many years before my arrival in 1985. So I know
3  from first-hand experience that they were being used.
4  BY MS. CARNEY:
5      Q.  Okay. When you say "communication tapes," I
6  guess what are you -- what are you including in that
7  definition?
8      A.  That includes telephone communications and
9  radio communications.
10     Q.  Okay. And sitting here today, are you aware
11 what the retention schedules were during the relevant
12 time period from the Office of Emergency Management and
13 Communication for the City of Chicago?
14     A.  No, not off the top of my head. I don't know
15 that.
16     Q.  Just flipping back up to the first one,
17 "cameras located at the scene." If you say that -- if
18 you indicate that that activity was not completed, does
19 that mean that cameras were not looked for, or they were
20 ignoring cameras that were available?
21     A.  There was no evidence in the -- in the CR
22 files that they canvased for cameras -- that they
23 conducted that investigative step.
24     Q.  Okay. All right. So then moving down to the

143

1  third one here, "district phone tapes preserved." Do you
2  see that?
3      A.  Yes.
4      Q.  Okay. What are you referring to when you say
5  "district phone tapes"?
6      A.  Communication tapes, telephones between the
7  police precincts and the communication center.
8      Q.  Is it your understanding that CPD had these
9  communication tapes or district phone tapes during the
10 relevant time period?
11     A.  Yes.
12     Q.  Okay. Where does that understanding come
13 from?
14     A.  From my knowledge of the industry.
15     Q.  Okay. The next one down, "referred to Cook
16 County Prosecutor's Office."
17     A.  Okay.
18     Q.  What do -- what do you consider a referral to
19 the Cook County Prosecutor's Office?
20     A.  So if the police department has an
21 investigation underway that is potentially criminal,
22 referring that matter to the -- to the prosecutor's
23 office for direction, guidance, and potentially a joint
24 investigation.

JON SHANE, 05/26/2023

144

1    Q.   So I guess my question is more what do you --
2  what do you consider to be a referral?  Reaching out to
3  the Cook County State's Attorney's Office?  Seeking
4  charges?  What -- when you say "referred," I'm trying to
5  understand what that -- what you're looking for.
6    A.   Contacting them and documenting who you spoke
7  to, what the results were, whether they were willing to
8  participate, whether they declined prosecution.
9    Q.   Okay.  So number five is "photos of the scene
10  obtained."  Do you see that there?
11    A.   I do.
12    Q.   Okay.  I guess my question for this one is
13  what do you mean by "obtained"?  Are you looking for the
14  CR investigators to have been taking their own
15  photographs or looking for them to have gone to CPD to
16  obtain any photographs they took?  What do you mean by
17  this?
18    A.   Whether or not the investigators obtained
19  crime scene photographs or other photographs of the scene
20  of the incident.
21    Q.   So in your -- in your definition, that could
22  have been the CR -- the investigators, in fact, taking
23  their own photos?
24    A.   It would include investigators or somebody

145

1  that previously took them.  It really doesn't matter who
2  took the photographs.  I'm talking about whether or not
3  photographs of the scene were obtained.
4    Q.   All right.  So number six says, "CPD medical
5  form describe complaint of pain or injuries."  Do you see
6  that?
7    A.   Yes.
8    Q.   Okay.  What is this form?  Is it -- is this a
9  form that you are -- is there a form you're thinking
10  of -- that you're referring to here?  What form are you
11  talking about?
12    A.   There is a form that was in the -- in the
13  files.
14    Q.   It's a -- and it's a Chicago Police
15  Department form?
16    A.   Yes.  I saw it in the files, correct.
17    Q.   Do you know -- I'll come back to that one.
18        Number seven down here -- sorry.  My
19  numbers are getting blurry -- "officer identified by
20  victim/witness."  Do you see that there?
21    A.   I do.
22    Q.   Okay.  What does that mean?
23    A.   It means whether or not the victim or witness
24  identified the officer involved and what measures were

146

1  taken to assist that person in doing that.
2    Q.   Okay.  The next one says, "Arrest photos."
3  Arrest photos of who?  Who are you referring to here?
4    A.   Of anybody that was arrested.
5    Q.   The next one says, "Cook County medical form
6  describe complaint of pain or injuries."  Do you see
7  that?
8    A.   I do, yes.
9    Q.   What is that form?
10    A.   Same thing.  There's a -- there's a form that
11  was in some of the CR files that described medical
12  conditions by Cook County.
13    Q.   Okay.  So is this a different form than the
14  CPD form you were talking about?
15    A.   Yes.  It's related to the jail.
16    Q.   Okay.  So this is a record that was created
17  by the jail that you're referring to?
18    A.   I don't recall if it's a Cook County form or
19  if it's a CPD form, but it was produced by the jail.
20    Q.   Okay.  Oh, I messed up my numbers here
21  because number ten was the same one here, pain or
22  injuries, but that's now the same thing.
23        So we'll go down here to "photos of
24  victim taken by IAD."  Do you see that?

147

1    A.   I do, yes.
2    Q.   Okay.  That one's fine.  Okay.  So, actually,
3  we're going to move down to "in-person interview with
4  witness" and "in-person interview with victim."  Do you
5  see that?
6    A.   I do, yes.
7    Q.   Okay.  Where is there -- who -- where is
8  there a requirement that the interview with the witness
9  or victim needs to be in person?
10    A.   It's a common --
11    MS. BONJEAN:  Objection to the form of that
12  question.
13        Go ahead.
14    THE WITNESS:  It's a common investigative practice
15  in internal affairs and criminal investigations to meet
16  with the victim, to meet with the witness, to get a
17  first-hand account, rather than over the phone or by
18  letter, to get a better understanding of what happened.
19  BY MS. CARNEY:
20    Q.   All right.  So the next one down says,
21  "arrest report of the complainant."  Do you see that
22  there?
23    A.   Yes.
24    Q.   What if the complainant wasn't arrested?

JON SHANE, 05/26/2023

148

1      MS. BONJEAN:  (Indiscernible.)
2      THE WITNESS:  If -- if the person was not arrested,
3  I wouldn't expect to see the arrest form.
4      MS. CARNEY:  Okay.
5      THE REPORTER:  And I'm sorry.  I didn't catch what
6  you said last time, Ms. Bonjean.
7      MS. BONJEAN:  Nothing.  Objection.  Form.
8  BY MS. CARNEY:
9      Q.  Okay.  So if you don't expect to see that
10  form -- an arrest report, then would that have been
11  classified as not applicable?
12      A.  Well, there are a few.  If you look at --
13      MS. BONJEAN:  Jon -- Jon, just answer the question.
14      THE WITNESS:  Can you repeat the question?
15  BY MS. CARNEY:
16      Q.  Yeah.  Sorry.  So -- so I asked you, you
17  know, what about if the -- if the complainant wasn't
18  arrested, and you said if the complainant wasn't
19  arrested, you wouldn't expect to see an arrest report; so
20  I guess I'm trying to figure out if that's one of the
21  files that you would have marked -- or investigative
22  activities that you would have marked as not applicable
23  because the task was not expected to occur?
24      A.  Yes.

149

1      Q.  Okay.  All right.  And then going down here,
2  it says, "witness contacted."  Do you see that?
3      A.  Yes.
4      Q.  What is the difference between this task,
5  "witness contacted," and "in-person interview with the
6  witness"?
7      A.  Well, someone's contacted if they've got --
8  if they've got ahold of them.  Someone is interviewed if
9  they -- if they've been interviewed.
10      Q.  So you're creating two different steps of
11  contact versus the actual interview?
12      A.  That's correct.
13      Q.  So the same, then, for the very last one,
14  "victim/complainant contacted."  You're creating two
15  different steps here -- well, first of all, this victim
16  and complainant contacted is actually a requirement from
17  CPD's general orders -- right? -- because it has this
18  little asterisk next to it?
19      A.  Yes.
20      Q.  Okay.  So then by including the additional
21  investigative step that you made of in-person interview
22  with the victim, you're creating an additional
23  investigative step separate and apart from just
24  contacting them; right?

150

1      MS. BONJEAN:  Objection.  Form.
2      THE WITNESS:  Well, I'm -- I'm not creating
3  anything.  These are the -- these are accepted practices
4  in the policing industry.  These are things that a police
5  department would be expected to do if they were
6  conducting an internal affairs investigation.
7  BY MS. CARNEY:
8      Q.  Is there somewhere that you can point to or
9  that you can cite to where these 22 investigative
10  activities are outlined by a police agency or an
11  oversight agency as being required for all internal
12  affairs investigations?
13      A.  Well, I think we could probably find policies
14  around the country of various police departments that
15  have these things in place.  The US Department of
16  Justice, the COPS Office promulgated internal affairs
17  guidelines.
18      Q.  And were these things in place during the
19  relevant time period of 1980 through 2008?
20      A.  They've -- they've always been elements of --
21  of criminal and -- criminal and administrative
22  investigations.
23      Q.  Okay.  But -- all right.  So then going back
24  to page 14, just kind of where we started --

151

1      Thanks, Brett.  If you could go all the
2  way down to the footnote -- footnote 8.
3      All right.  Dr. Shane, here you say,
4  "Unclear means the CR includes a reference to the
5  investigative task, but the investigative task cannot be
6  determined."  I guess I'm confused.  What do you mean by
7  it "includes a reference to the investigative task, but
8  that task can't be determined"?  Can you explain that?
9      A.  They may have said some things about doing
10  one of those investigative tasks, but there was no
11  corroborating information that it actually occurred.  I
12  remember seeing on more than one occasion, "We" -- "We
13  tried to contact the victim" or something like that, or
14  "I tried to contact the victim," and it -- that's all it
15  says.
16      How?  How did you do that?  Did you go to
17  the -- did you go to the person's house?  Did you send a
18  letter?  Did you telephone them?  What phone number did
19  you use?  Were the district tapes preserved so you could
20  say, "I called from this number at this date and time"?
21  I couldn't confirm that it actually occurred, but they
22  made reference to it occurring.
23      Q.  In 1980, were -- in 1980, were other
24  departments preserving each and every district tape

JON SHANE, 05/26/2023

---

152

1    showing a phone call to a victim in an internal invest --
2    internal affairs investigation?
3            MS. BONJEAN:  Objection.  Foundation.
4            THE WITNESS:  They certainly should have been.
5    Yeah.  I mean, it certainly was an approved and accepted
6    investigative practice, yeah.  Yes.
7    BY MS. CARNEY:
8        Q.    Can you --
9        A.    In Clifton where I was working in 1985, the
10   Clifton Police Department was doing it.
11       Q.    In 1985, the Clift -- the Clifton Police
12   Department was preserving all the district tapes making
13   outbound phone calls to victims or complainants in
14   internal affairs investigations?
15       A.    As -- as best as I recall, the answer is yes.
16   In fact, I worked in the communications division, and we
17   were constantly tasked with pulling tapes for that very
18   purpose.
19       Q.    All right.  Page 15, this paragraph is mostly
20   talking about evaluations here.  Mid -- mid-paragraph you
21   say, "Evaluations must be the product of daily
22   observation and close working relationships."  Do you see
23   that?
24       A.    I do, yes.

---

153

1        Q.    Okay.  When you're talking about evaluations,
2    are you saying that evaluations always need to be
3    written?
4        A.    Well, most police departments conduct written
5    performance evaluations.  Explain -- explain to me what
6    you -- what you're thinking in terms of the way you're
7    differentiating between written and, I guess, some other
8    form of evaluation.
9        Q.    Well, I guess that's my question to you.  Do
10   you know of any other ways that evaluations could have
11   been taking place that weren't necessarily documented?
12       A.    Well, you can -- you're supervising police
13   officers on a daily basis, but that's not what I'm
14   referring to here.  I'm referring to written evaluations.
15       Q.    Okay.  So this paragraph is referring to
16   written evaluations?
17       A.    Yes, written performance evaluations.
18       Q.    Okay.  The next paragraph talks about
19   effective early identification systems, EIS systems?
20       A.    Yes.
21       Q.    Sitting here today, can you think of other
22   examples of departments in the '80s and '90s that had
23   these EIS systems in place?
24       A.    Well, early warning systems, also known as --

---

154

1    I should say early warning systems, EWS, or early
2    identification systems are -- are the -- are the same
3    thing, and they were pioneered in the 1970s.  I believe
4    the first agency to begin experimenting with them -- with
5    them was Miami.  They diffused throughout the industry in
6    the 1980s.  By the 1990s, most police departments moved
7    from a paper-based system to an electronic system.
8        Q.    And when you say paper-based -- they moved
9    from a paper-based system to an electronic system, what
10   do you mean by that?
11       A.    I mean that computers were not available at
12   that time.  The -- the paper-based system certainly
13   existed prior to 1990, and we -- we knew who was
14   committing offenses.  We had written documentation.
15   Police departments had -- had those things.  They just
16   moved into the electronic era when computers became
17   widely disbursed -- I mean, just throughout American
18   culture in general, not just police departments.
19       Q.    And these early warning systems that
20   you're -- that were being pioneered in the 1970s, what
21   was the process for how those early warning systems --
22   the ones that you're thinking -- the ones that you're
23   describing from Miami, what was a general process of an
24   early warning system?

---

155

1            MS. BONJEAN:  I'm going to object to the form of
2    that question and foundation.  You're talking
3    specifically Miami or just generally early warning
4    systems?
5    BY MS. CARNEY:
6        Q.    Well, let's start generally, the early
7    warning systems that you're thinking of through the '80s
8    and '90s, the paper-based systems that you're talking
9    about where there was known information and written
10   documentation.  How did that process work?  How is -- how
11   is an early warning system in -- what was the process
12   that was in place for such an early warning system during
13   that time period?
14           MS. BONJEAN:  Objection to the form and foundation
15   of that question.
16               If you can answer, Jon.
17           THE WITNESS:  I just want to make sure I'm clear on
18   what you -- what you mean.  You're asking me what kind of
19   process was in place for -- for what?  Identifying
20   officers that had repeat offenses, or what -- what do you
21   mean specifically?
22   BY MS. CARNEY:
23       Q.    Okay.  That's fair.  So let me back up.  What
24   was the purpose -- in the '80s and '90s in these early

---

JON SHANE, 05/26/2023

156

1   warning systems that you're talking about in this
2   paragraph, what was the purpose of an effective early
3   identification system or early warning system?
4        A.   The purpose was --
5   MS. BONJEAN:  Objection.  Form.  Foundation.
6   THE WITNESS:  The purpose was to --
7   MS. BONJEAN:  You can answer.
8   THE WITNESS:  I'm sorry.  The purpose was to ensure
9   that police departments would look to their documented
10  records and find out what problems were occurring with
11  police officers, what the repeat -- who the repeating
12  police officers were, what kinds of allegations were
13  coming in, when, where, all sorts -- of all sorts of
14  things related to complaints against personnel.
15  BY MS. CARNEY:
16       Q.   Okay.  And how were those early warning
17  systems being implemented in the '80s and '90s -- in the
18  '80s pre-electronic -- like, precomputers -- the
19  paper-based system that you were just talking about?
20       A.   Well, it just --
21  MS. BONJEAN:  Objection.  Form.
22  THE WITNESS:  It was just --
23  MS. BONJEAN:  I'm sorry.  Give me a sec -- give
24  me -- I'm sorry.  Jon, just give me a second to get my

157

1   objection on the record.
2            Form.  Foundation.
3            You can answer.
4   THE WITNESS:  The -- it was just that.  I guess I'm
5   trying to understand what you mean.  It was a paper-based
6   system.  They had -- they had documented records of which
7   officers were being complained against, who the
8   complainants were, what the allegations were, date, time,
9   location, the officer's assignment.  Chicago had --
10  specifically had the -- Personnel Concerns Program
11  that they were referring officers to.
12  BY MS. CARNEY:
13       Q.   Okay.  So is -- are you giving -- are you
14  opining on -- strike that.
15            Is it your opinion that Chicago did not
16  have an early warning system in the '80s and '90s or that
17  the Chicago Police Department's proced -- hold on.  Bad
18  question.
19            Is your opinion that the City of Chicago
20  Police Department did not have any early warning system
21  in place during the relevant time period?
22       A.   No.  They did have one in place.
23       Q.   Okay.  So is it your opinion that the Chicago
24  Police Department's early warning system was ineffective?

158

1        A.   That's my opinion, correct.  They mentioned
2   that themselves in an article that I referenced in -- in
3   this document.
4        Q.   So then I guess my question to you is what
5   process are you aware of in the '80s that made other
6   early warning systems effective that the Chicago Police
7   Department did not have?
8        A.   Well, there's nothing wrong with a
9   paper-based system.  It just actually has to be
10  implemented.  You have to use it.  You have to -- you
11  have to refer back to the documents in question.
12       Q.   Okay.  All right.  So then the next paragraph
13  here, "Notwithstanding CPD's General Orders."  Do you see
14  that?
15       A.   Yes.
16       Q.   Okay.  So if you go down to, like, the third,
17  fourth sentence --
18       A.   Okay.
19       Q.   -- so the whole sent -- you know, just for
20  context, I'll read the whole thing.  "Notwithstanding
21  CPD's General Order 83-3, there's no evidence in
22  discovery that the Chicago Police Department supervised
23  the defendant officers by identifying and monitoring
24  their behavior through either an electronic or

159

1   paper-based system of agency records, despite the fact
2   they knew or should have known that complaints were
3   accruing and then subsequently initiating and ensuring
4   corrective action was taken."  Do you see that sentence?
5        A.   Yes.
6        Q.   Okay.  When you say "they knew," who -- who's
7   the "they"?  Who are you referring to?
8        A.   The Chicago Police Department and the
9   supervisors in the -- in the department who are
10  responsible for monitoring personnel.
11       Q.   Are you -- is there a specific supervisor
12  that you have -- are you talking about a specific
13  supervisor within the Chicago Police Department or
14  supervisors generally?
15       A.   Well, everybody in the chain of command has
16  responsibility to supervise police officers from the
17  superintendent on down to the -- down to the first-line
18  supervisors, which is typically the sergeant level.  I
19  mean, that -- that's why you have what's known as the
20  chain of command.  You have a very -- a very identifiable
21  supervisory structure in all police departments to ensure
22  that personnel meet or exceed their obligations, that
23  they comply with policy.
24       Q.   Okay.  All right.  Skipping up -- skipping

JON SHANE, 05/26/2023

160

1    ahead to page 21. Okay. You say, "Although the internal
2    affairs process is often triggered by a citizen
3    complaint, all police departments are also required to
4    proactively detect troubling patterns in officer
5    conduct." Do you see that?
6        A.  Yes.
7        Q.  Okay. What do you mean -- is this the early
8    warning system that -- that you were talking about
9    before, or is this something different?
10       MS. BONJEAN: Objection to the form of that
11   quest -- question.
12       THE WITNESS: It's referring both to the early
13   warning system and to supervisory practices.
14   BY MS. CARNEY:
15       Q.  And then moving down here, you say, "Law
16   enforcement agencies" -- there it is -- "have a duty to
17   monitor their employees' behavior, and establish
18   mechanisms that provide the internal affairs function and
19   the law enforcement executive with the ability to track
20   the complainant" -- "the complaint records of individual
21   officers and identify those with a disproportionate
22   number of complaints against them." Do you see that?
23       A.  Yes.
24       Q.  Okay. When you say "disproportionate" --

161

1    "disproportionate number of complaints against them,"
2    what do you mean by that? Do you have a number in mind,
3    or is there...
4        A.  Not a number necessarily, but when patterns
5    emerge, they should be acted upon. Patterns, you know,
6    occur -- occur with general regularity; so if a
7    particular officer is -- let's say -- let's say you have,
8    you know, a number of officers working in the patrol
9    division. If one of those officers is working the day
10   shift under a particular supervisor along with several
11   other officers and that officer continues to receive
12   complaints relative to other officers who are similarly
13   situated, we need to find out what's going on with that
14   particular officer.
15       Q.  Okay. So that actually leads me to my next
16   question. Are there any variables in play when looking
17   at the number of complaints against a particular officer?
18   Because you said "similarly situated." What does that
19   mean?
20       MS. BONJEAN: Okay. Objection. That was two
21   questions there.
22       MS. CARNEY: Yeah. That was two questions. I --
23   you're right.
24

162

1    BY MS. CARNEY:
2        Q.  Would you -- so let me start with this. When
3    you say "similarly situated," what does that mean?
4        A.  Officers working in the patrol division,
5    officers working in the narcotics division, something
6    like that.
7        Q.  Okay. So there are variables at play in
8    regards to this kind of analysis; right?
9        MS. BONJEAN: I'm going to object to the form of
10   that question.
11       THE WITNESS: When you say "analysis," do you -- do
12   you mean how the -- I'm not clear what you mean. How the
13   complaints are coming in?
14   BY MS. CARNEY:
15       Q.  Yeah. So when you're trying to figure out if
16   an officer has a disproportionate number of complaints,
17   are you comparing, say, an officer in the narcotics
18   division with an officer on desk duty?
19       A.  No, I'm not.
20       Q.  Okay. So that's what you mean by "similarly
21   situated." You need to look at officers that are
22   similarly situated in their role in the department?
23       A.  That's correct.
24       Q.  Okay.

163

1        MS. BONJEAN: I'm sorry. And you're still talking
2    about sort of the definition of how you determine
3    disproportionate number; is that right --
4        MS. CARNEY: Yes, yes.
5        MS. BONJEAN: -- Theresa? Okay.
6    BY MS. CARNEY:
7        Q.  All right. And then moving to page 22. The
8    top sentence here says, "Behavioral data compiled by a
9    police department should be analyzed as part of an early
10   intervention system. An early intervention system, also
11   known as an early warning system, is intended as an
12   incident-driven system, not an outcome-driven system."
13   Do you see that?
14       A.  Yes.
15       Q.  What -- what does that mean, to be an
16   incident-driven system, not an outcome?
17       A.  It means that police departments are
18   interested in the source of the complaints themselves.
19   The complaint is the -- is the indicator of performance,
20   not the outcome, meaning the disposition was sustained or
21   not sustained or exonerated or unfounded.
22       Q.  Okay. So these early warning systems are
23   meant, in -- in your opinion, to trigger something based
24   on the number of complaints that come in, not necessarily

JON SHANE, 05/26/2023

164

1　the outcome of the complaints after the fact?
2　　　A.　That's correct.
3　　　MS. BONJEAN:　Objection to form.
4　　　THE WITNESS:　I think I'm too quick on the trigger
5　here.　Jen, did you say something?
6　　　MS. BONJEAN:　It's all right.　The answer can
7　stand.
8　BY MS. CARNEY:
9　　　Q.　In the 1980s and 1990s, are you aware of any
10　departments that had early warning systems that were --
11　that had incident -- I'm sorry.　That had outcome -- let
12　me start that completely over.
13　　　　　In the 1980s and 1990s, are you aware of
14　any police departments that had incident-driven systems
15　in place?
16　　　MS. BONJEAN:　Okay.　I'm going to object to the
17　form.
18　　　　　But you can answer, Jon.
19　　　THE WITNESS:　Are you asking me if I'm aware of any
20　police departments that had an early warning system in
21　place?
22　BY MS. CARNEY:
23　　　Q.　Yeah.　I guess I'm confused in your opinion
24　in this section.

165

1　　　A.　Okay.
2　　　Q.　Are you criticizing the fact that these early
3　warning systems were incident-driven versus
4　outcome-driven, or is this just an observation that early
5　warning systems were typically incident-driven?
6　　　A.　Not were.　Are.
7　　　Q.　Are.　Okay.
8　　　A.　Yes.　They -- they are incident-driven
9　systems.　I was just -- I was just trying to be as clear
10　as possible that they're not outcome-driven; so -- so
11　let's say someone -- there's a complaint against a
12　particular police officer, and the investigation is
13　unfounded or not sustained.　And let's say that -- let's
14　say the officer has -- I don't know -- 15 complaints, you
15　know, over the course of, you know, two years or three
16　years or something like that, and all of the -- all of
17　the -- none of them are sustained.　That's not what's
18　important to a police department.　They are -- what's
19　important is that the officer is generating complaints.
20　Then what we do is then -- then we look deeper into the
21　individual investigations, so we find out, well, why are
22　all these investigations not being sustained?
23　　　Q.　Got it.
24　　　A.　These are all part of the management

166

1　practices of a police department -- the things that
2　you're mentioning.
3　　　Q.　Okay.　So then down here a couple sentences,
4　you say, "When personnel complaints arise, it is
5　incumbent upon supervisors and managers to initiate and
6　ensure action is taken to address those complaints,
7　especially when a pattern of complaints accrues."　Do you
8　see that?
9　　　A.　I see that, yes.
10　　　Q.　Okay.　We talked about this a little bit last
11　time, so I don't want to go into a dissertation issue,
12　but what -- when you say "pattern of complaints accrues,"
13　what are you -- what are you considering a pattern?
14　　　A.　The regular or -- or repeated complaints that
15　are being received by a police department from either
16　citizens or internally regarding specific officers or
17　specific divisions.
18　　　Q.　Okay.　And are you making -- oh, never mind.
19　　　　　All right.　So we're going to move to the
20　next page, but I've been going for a little bit now if we
21　want to take a quick break.
22　　　THE VIDEOGRAPHER:　Everybody good with that?　Yep?
23　　　THE WITNESS:　Well, you don't have to take a break
24　on my account, but, I mean, if you're breaking for your

167

1　account, that's different.
2　　　MS. CARNEY:　I would like to take a quick break.
3　Is that okay?
4　　　THE WITNESS:　All right.　All right.　No.　I'm just
5　saying -- all I was saying is, you know, plow through.
6　That's all.
7　　　MS. CARNEY:　No.　We will plow through, but I just
8　wanted to take a quick five-minute break.
9　　　THE WITNESS:　Okay.　Yeah, sure.　Sure.
10　　　MS. BONJEAN:　Whatever you need, Theresa, is fine.
11　Just -- we're fine.
12　　　MS. CARNEY:　Let's come back at 11:00, so that's
13　eight minutes.
14　　　MS. BONJEAN:　Okay.　We'll do that.
15　　　THE VIDEOGRAPHER:　Going off the video record at
16　10:52 a.m.
17　　　　　(Recess taken.)
18　　　THE VIDEOGRAPHER:　This is the beginning of Media
19　Unit 2.　We are on the video record at 11:01 a.m.
20　BY MS. CARNEY:
21　　　Q.　Okay.　Back to Exhibit 3.　We're on page 23
22　of your report, subsection e, General Observations of the
23　Chicago Police Personnel Complaint Data and Supervisory
24　Process.

JON SHANE, 05/26/2023

168

1    A.   Okay.
2    Q.   Okay.  So the first sentence here says, "The
3  general observations of the data reveal that the Chicago
4  Police Department's accountability systems (i.e., early
5  warning" -- "early warning, supervision, and personnel
6  investigations) during the relevant time period and
7  beyond were broadly ineffective for detecting misconduct
8  and holding officers accountable when they violate the
9  law or CPD policy."  Do you see that?
10   A.   Yes, I do.
11   Q.   Okay.  So we've talked about this before.
12  The relevant time period, is that still the 1980 through
13  2008 time period that we talked about earlier?
14   A.   Yes.
15   Q.   And then you say, "broadly ineffective for
16  detecting misconduct."  How so?
17   A.   There was no evidence I saw that the police
18  department was using the system that they had in place.
19   Q.   What would you have expected to see in the --
20  in the discovery that would have showed that they were
21  using the systems that were in place?
22   A.   I would have expected to see that supervisors
23  were intervening, personnel were reassigned, that the
24  investigation revealed all those things, Personnel

169

1  Concerns -- people were referred to Personnel Concerns,
2  what the outcome in Personnel Concerns would have been,
3  that the -- the investigations would have been -- some --
4  someone in the chain of command would have looked at the
5  investigation and said, "Wait a minute.  This is missing
6  components.  You need to go back and" -- "and do this."
7  Maybe someone was reassigned.  And explaining along the
8  way, you know, what -- what they found.  I didn't see
9  anything in that regard.
10   Q.   And is that all information that you believe
11  should have been contained in the CR files themselves?
12   MS. BONJEAN:  Objection to the form of that
13  question.
14   THE WITNESS:  I think some of it would have been in
15  the CR file when the investigation was occurring.  Some
16  of it would have been part of the officer's disciplinary
17  history.
18  BY MS. CARNEY:
19   Q.   Okay.  And did you review any disciplinary
20  histories for non-defendant officers?
21   MS. BONJEAN:  Objection to the -- the form of that
22  question.  And foundation -- I'm sorry -- also the
23  foundation of that question.
24   THE WITNESS:  I don't remember seeing that type of

170

1  data in the -- in the non-defendant officers' CR files or
2  the disciplinary histories.
3  BY MS. CARNEY:
4    Q.   And when you're saying "disciplinary
5  histories," what are you referring to?
6    A.   A running total of the disciplinary history
7  of a particular officer.
8    Q.   Okay.  Moving down, you say, "These general
9  observations impair CPD's ability to describe and count
10  internal personnel complaints and do not follow accepted
11  policy standards for complete and thorough
12  investigations."  Do you see that?
13   A.   I do, yes.
14   Q.   Okay.  What do you mean?  What general
15  observations are you talking about here?
16   A.   The list follows right below.
17   Q.   Okay.  So the general observations are the
18  list that you have starting on page -- well, I see.
19   A.   Are you asking what page it starts on?
20   Q.   No.  I'm sorry.  I confused myself.
21        So you're saying the general observations
22  that you're talking about are -- is the failure to -- the
23  first item is the failure to classify personnel
24  complaints as administrative or criminal?

171

1    A.   I guess I wasn't -- say that again.  Are you
2  asking me --
3    Q.   Yeah.  Sorry.  I think we're -- we're both on
4  the wrong page here.
5        So my question is you say, "These general
6  observations impair CPD's ability to describe and count
7  internal personnel complaints."  What general
8  observations are you referring to?
9    A.   The general observations that are derived
10  from the CR files, and I -- and I list right here a
11  number of things, generally, that I found.
12   Q.   Okay.  Where -- where does that list start?
13   A.   Right here on this page.  I can't see the
14  page numbers from where I am so -- all right.  Now you
15  have it scrolled up to page 23, so starting at lower
16  Roman number i, which is titled "Failure to Classify
17  Personnel Complaints as 'Administrative' or 'Criminal.'"
18   Q.   Okay.  So then if we flip to the next page so
19  I get it, this is a continuation of Roman numeral i --
20  right? -- little i?
21   A.   Yes, right.  Uh-huh.
22   Q.   Okay.
23   A.   Correct.
24   Q.   So then 25, we have little Roman numeral ii?

JON SHANE, 05/26/2023

---

172

1    A.   Yes.
2    Q.   Okay.  So that's another general observation;
3  right?
4    A.   Yes, correct.
5    Q.   Okay.  So let's keep scrolling through.  All
6  right.  So this is the next little Roman numeral iii,
7  "Failure to Define, Quantify and Address 'Repeated Minor
8  Infractions.'"  Is that another general observation?
9    A.   Yes.
10    Q.   Okay.  So now we're on page 29, and we have
11  little Roman numeral iv, "Allegations Not Necessarily
12  Investigated Against a Defined Customary Standard."  Is
13  that another general observation?
14    A.   Yes, it is.
15    Q.   Okay.  Page 30, we have little Roman
16  numeral v, "Sustained Criminal Complaints are Handled as
17  Administrative."  That's a continuation of the general
18  observations; right?
19    A.   Yes, it is.
20    Q.   All right.  Page 31 has -- what is this? --
21  vi and vii; right?
22    A.   I can only see vi from here.
23    Q.   Okay.
24    A.   Okay.  There's vii, yes.

---

173

1    Q.   All right.  So those are also general
2  observations that you're referring to that we were --
3    A.   Yes.
4    Q.   -- just talking about; correct?
5    A.   Yes.
6    Q.   Okay.  Now we're on page 32 -- what is
7  this? -- vii -- little Roman -- little Roman numeral vii?
8    A.   Okay.
9    Q.   Is that also a general observation that you
10  were referring to before?
11    A.   Yes.
12    Q.   Okay.  So then I think the next one goes to
13  page 36.  As you're scrolling through, stop me if I'm
14  wrong but...
15    A.   That's number ix.
16    Q.   Okay.
17    A.   I don't know what page that is.  I can't see
18  it, but that's number ix.
19    Q.   That's page 36 of your report.
20    A.   Okay.
21    Q.   All right.  And then I think the last one is
22  on page 37 of your report.  This is x -- little Roman
23  numeral x.
24    A.   Okay.

---

174

1    Q.   So then let's just scroll through 38 so we
2  can make sure we got them all.  Okay.  Now we're into
3  little f, so that's the next section; so those ten
4  subsections are the general observations that you're
5  referring to on page 23?
6    A.   Yes.
7    Q.   Okay.  I just wanted to make sure I got them
8  all.
9    A.   Okay.
10    MS. CARNEY:  Sorry, Brett.  Can we go back up to
11  page 23?  Okay.  Great.
12  BY MS. CARNEY:
13    Q.   So we just talked about the general
14  observations, and you say they "impair CPD's ability to
15  describe and count internal personnel complaints."  How
16  is it that these ten general observations impair CPD's
17  ability to describe and count internal personnel
18  complaints?
19    MS. BONJEAN:  Object -- objection.  Form.
20      Go ahead.  You can ask again there if you
21  need to.
22    THE WITNESS:  Because what happens here is they --
23  they commingle a few things, and by commingling things,
24  you can't differentiate whether you've got an adequate

---

175

1  count of administrative complaints or -- or criminal
2  complaints.
3    MS. BONJEAN:  I'm going to -- I'm going to -- I'm
4  sorry.  Are you asking specifically about Roman
5  numeral i, or are you asking more generally about all the
6  general observations?  I'm sorry.  I just don't know if I
7  understand the question.
8    MS. CARNEY:  Yeah.  All ten general observations.
9    MS. BONJEAN:  Yeah.  I'm going to object to the
10  form and foundation of that question.
11      If you can answer, she's talking about
12  all of them.
13    THE WITNESS:  Yeah.  I mean, collectively,
14  that's -- I mean, collectively, that's the conclusion.  I
15  can -- I would have to look at each one of them to
16  explain its contribution, but collectively -- and when I
17  say "collectively," I guess I should say generally,
18  that's what I -- that's what I find.
19  BY MS. CARNEY:
20    Q.   Okay.  And then the next sentence, you say,
21  "do not follow accepted policy standards for complete and
22  thorough investigations."  What policy standards are you
23  referring to there?
24    A.   Well, generally accepted standards in the

---

JON SHANE, 05/26/2023

176

1   industry of the types that I talked about earlier that
2   police departments follow when conducting internal
3   affairs investigations but also the CPD's policies
4   themselves. I believe -- and don't hold me to this just
5   off the top of your head -- but I thought it was one of the
6   general orders -- it might be 82-14 -- says that
7   investigations must be thorough. I think there was --
8   there -- there may have been an addendum listed to that.
9   Again, I'm -- I'm just speaking off the top of my head,
10  but that is listed in my report here somewhere.
11      Q.   Okay. Okay. So if we go down to footnote 28
12  here, you say, "Criminal misconduct is when there is a
13  reasonable suspicion to believe that a Department member
14  committed a crime. Assault is one such complaint." Do
15  you see that?
16      A.   Yes.
17      Q.   Where is that definition coming from?
18      A.   It's -- well, it's my -- it's my
19  interpretation of police work from having been in the
20  business since 1985. It's also something that is
21  discussed in the US Department of Justice standards. I
22  certainly know as -- as having investigated internal
23  affairs complaints and having supervised internal affairs
24  complaints what constitutes a crime and what does not.

177

1       Q.   When you say "reasonable suspicion" -- I'm
2   sorry. Bad question.
3            Subcategory little i here that we were
4   talking about, "Failure to Classify Personnel Complaints
5   as 'Administrative' or 'Criminal.'" Do you see that?
6       A.   Yes.
7       Q.   Okay. And that -- that first line here is
8   where we get to your definition of criminal misconduct.
9   How does an individual making a complaint such as
10  handcuffs are too tight grounds to say an officer
11  committed a crime?
12      A.   Well, it has to be contextualized. That's
13  what the investigation should disclose. Once you started
14  to interview the complainant, take photographs, collect
15  evidence, you begin to interpret how this crime has
16  occurred. I can use excessive force with my handcuffs.
17      Q.   And is it your opinion that excessive force
18  is always -- should always be considered a criminal act?
19      A.   It should be investigated as such until you
20  confirm or dispel it, yes.
21      Q.   All right. So on the next page, you say at
22  the very top here, "For example, there are 233 complaints
23  against personnel for assault and 1 complaint for perjury
24  found in the data, both of which are criminal offenses."

178

1   Do you see that?
2       A.   Yes, I do.
3       Q.   Okay. And we talked about this at the first
4   part of your deposition. The categoriza -- the
5   qualifying or categorizing the complaints as assault was
6   something that you did based on your interpretation of
7   the -- of the CR; right?
8       A.   Well, they use the -- when I say "they," the
9   investigator used that language. They said that somebody
10  came in and complained that a particular officer
11  assaulted them, or they -- they will use the elements of
12  an assault. They'll say that "Somebody came in and
13  punched me in the face," or "threw me to the ground,"
14  or -- or "hit me in the head," or something like that.
15      Q.   Okay. So when you say there's 233 complaints
16  against personnel for assault, what kind of complaints
17  are you including in that 233?
18      A.   Well, the --
19           MS. BONJEAN: I'm going to object. I don't think
20  he's -- I don't think it says that, though. It says, "of
21  those 234 complaints."
22           MS. CARNEY: No. The -- the line up. 233 -- 233
23  complaints against personnel for assault.
24           MS. BONJEAN: Oh, okay. My apologies. I

179

1   thought -- there are 233. Okay. Carry on. My
2   apologies.
3            THE WITNESS: So you asked me what was included in
4   that to -- to understand how it was an assault?
5   BY MS. CARNEY:
6       Q.   Yeah. What kind of complaints are you
7   including in that 233?
8       A.   Those very things that I just mentioned to
9   you, where an investigator would say the complainant came
10  in and -- "punched me in the head, punched me in the
11  face, knocked me to the ground, put the handcuffs on too
12  tight." There were a number of -- of different things
13  that they described as an assault.
14      Q.   Okay. And when you use the word "complaints"
15  in this paragraph, what is the unit of analysis that
16  you're referring to there? Is that incident level?
17  Officer level?
18           MS. BONJEAN: Hold on. Hold on. Hold on. I'm
19  going to -- I'm going to object to the form of that
20  question.
21           Go ahead.
22           THE WITNESS: Okay. Go ahead, Theresa. Would you
23  restate --
24

JON SHANE, 05/26/2023

180

```
1    BY MS. CARNEY:
2        Q.   Yeah.
3        A.   -- restate that, please?
4        Q.   What is the unit of analysis that you're
5    using there for complaints?  Is that --
6        A.   We're talking about the allegations.
7        Q.   Okay.  All right.  I'm going to -- sorry.
8    I'm trying to use your spreadsheet.  I'm going to go
9    to -- okay.
10       MS. CARNEY:  I'm going to share my screen now,
11   Brett, if you don't mind.  Let's see if I can make this
12   work.
13                (Deposition Exhibit Number 16,
14                Witness Shane, was marked for
15                identification 5/26/23.)
16   BY MS. CARNEY:
17       Q.   Okay.  Can you -- can you see that,
18   Dr. Shane?
19       A.   I do, yes.
20       Q.   Okay.  Okay.  So this is the spreadsheet that
21   was produced as your CR master file -- right? -- that we
22   talked --
23       A.   Okay.
24       Q.   -- about before?  Okay.  And I'm on the
```

181

```
1    bottom here in your tab called "complaints by category."
2        A.   Okay.
3        Q.   And if I look at assault, I only see 232
4    complaints for assault here.  Do you know why there's the
5    discrepancy between the spreadsheet and the report?
6        A.   I don't just by looking at it in this way.  I
7    would have to -- I would have to look at the analysis one
8    more time.  We're talking about one -- it's one complaint
9    off, and I don't know if that is because we're looking at
10   complaints or if we're looking at the -- the individual
11   disposition level where you would see the allegations.
12       Q.   Okay.  So then if I go to the "raw data
13   (complaint level)," do you see that I'm clicking on that
14   part of your spreadsheet?  "Raw data --
15       A.   Yes.
16       Q.   -- (complaint level)"?
17       A.   Yes.
18       Q.   Okay.
19       A.   Yes.
20       Q.   So I'm going to go over to type of complaint,
21   and I've got the filters on.  Do you see that?
22       A.   Yes.
23       Q.   So if I drop down "type of" here, there are
24   several different categories for assault.  We've got
```

182

```
1    assault, just assault; assault allegations 1, 3, 5, and
2    7; assault allegations 1 through 6; assault McCarthy; and
3    attempted assault.  Do you see that there?
4        A.   I do.
5        Q.   Okay.  Sitting here today, do you know why
6    there's different categories of assault that were used in
7    the type of complaint?
8        A.   It had to do with the way the -- the CRs
9    captured the information.  Some -- sometimes there were
10   different types of assault, you know.  "He punched me in
11   the face, and he knocked me down"; so allegation -- like,
12   if you look at the second one where it says assault
13   allegations 1, 3, 5, and 7, sometimes they had exactly
14   what I'm talking about.  "Somebody punched me in the
15   head," that was number 1.  And number 2 was -- was
16   demeanor, and then number 3 was "punched me in the
17   mouth," and number 4 was something else.  Number 5 was
18   "threw me to the ground."
19       Q.   Okay.  So each --
20       A.   They had a tendency in these CRs to -- to do
21   that -- to list all of these -- all of -- all of the
22   things that it seemed like someone said to them.
23       Q.   Okay.  So if I click on all of these -- so
24   this -- this is your spreadsheet broken down -- the raw
```

183

```
1    data broken down by complaint level, which is the unit of
2    analysis of allegations that we just talked about; right?
3        A.   No.  We talked that it was at the allegation
4    level.
5        Q.   Okay.  Is there -- I did not find an
6    allegation level on this spreadsheet.  Can you maybe
7    point me to it?
8        A.   If you go to the dispositions, it's the --
9    it's the same thing.
10       Q.   Okay.
11       A.   So if you remember when we talked earlier
12   about -- remember when we talked about the one-to-many
13   relationships, that sort of thing.
14       Q.   So if I'm in -- so now I'm in the disposition
15   level --
16       A.   Yes.
17       Q.   -- and if I click on this assault filter --
18       A.   Yeah.  Go ahead.
19       Q.   -- I should get -- I should get 233 or 232
20   depending on...
21       A.   That's correct.
22       Q.   Okay.  So within your spreadsheet, when you
23   say "complaint level," what does the -- what does this
24   unit of analysis mean within this spreadsheet?
```

JON SHANE, 05/26/2023

184

1    A.  That's the complaint that came in.
2    Q.  Got it.  And then disposition level is the
3 allegation unit of analysis?
4    A.  Well, or the disposition level of analysis.
5    Q.  Got it.
6    A.  So let's say, for example, you know, Police
7 Officer Joe Smith had a complaint against him come in
8 today, and the allegations were assault, demeanor --
9 assault, demeanor, and unlawful entry.  You would have
10 three entries for Joe Smith on that particular day
11 because you would have dispositions for each one of those
12 allegations in your investigation.
13    Q.  Okay.  So looking at this, it is broken down
14 by, it looks like, CR number, and then it's got the rest
15 of the data here, but this is broken down then by
16 disposition?
17    A.  That's right, yes.
18    Q.  Final disposition for each individual
19 allegation within the CR.  Am I -- am I understanding
20 that right?
21    A.  Yeah.  That -- that's -- what you're looking
22 at are the dispositions for each of the allegations in
23 the CR.
24    Q.  Okay.  But then the raw data at the complaint

185

1 level is simply the CR?
2    A.  Yes, that's correct.
3    Q.  Got it.  Okay.  All right.  I can stop
4 sharing that for this second -- moment.
5    MS. CARNEY:  Brett, can we bring up Exhibit 3
6 again, please?
7 BY MS. CARNEY:
8    Q.  All right.  Second paragraph, "There's no
9 evidence in discovery that indicates CPD is prohibited
10 from initiating a criminal charge in municipal court for
11 sustained complaints of assault."  Do you see that?
12    A.  I do see that, yes.
13    Q.  All right.  Are you -- first of all, are you
14 aware of the process in Cook County for seeking charges
15 against anybody?
16    A.  The process is that they refer it to the
17 prosecutor's office.
18    Q.  So if a prosecutor rejects charges, what is
19 your expectation or what is it your belief that CPD
20 should do if charges are rejected?
21    A.  Well, it doesn't necessarily have to be an
22 indictable offense, but if the prosecutor's office says,
23 "We're not going to charge any criminal complaints either
24 at the municipal level or at the county level," then the

186

1 police department has to go with administrative only, but
2 I didn't see any complaints that were referred to the
3 prosecutor's office.
4    Q.  Is it your expectation that the CR files
5 should contain documents from the Cook County
6 Prosecutor's Office?
7    A.  Most definitely, yes.  If the -- if a police
8 officer -- excuse me -- if an investigator is conducting
9 an investigation and they are in contact with the -- with
10 the prosecutor's office and the prosecutor's office
11 declines to, what we would say, accept the case, then
12 there should be some sort of letter that comes back from
13 the prosecutor's office.  There should be communication
14 going to and from so there's -- you can close that loop.
15    Q.  Is it your understanding that that was the
16 process that was occurring in the '80s and '90s in the
17 city of Chicago in the Cook County's Prosecutor's Office?
18    MS. BONJEAN:  I'm going to object to the form of
19 that question.  Are you asking whether it's happening in
20 Cook County or it was happening elsewhere?
21 BY MS. CARNEY:
22    Q.  In Cook County.
23    A.  Well, the process was certainly available
24 then for them to do that.  There was nothing prohibiting

187

1 them from doing that.  They certainly -- they certainly
2 should have, as a matter of course, reached out to the
3 prosecutor's office whenever they had a criminal
4 allegation.
5    Q.  Right.  But my question is a little bit
6 different because you were talking about that it was your
7 belief and your expectation that there would be
8 documentation in a CR file regarding, essentially,
9 communications between the investigative agency and the
10 prosecutor's office?
11    A.  Correct.
12    Q.  I guess my question is that how -- is that
13 the process or was that the process in Cook County in the
14 1980s and '90s?
15    MS. BONJEAN:  I'm going to object to the -- to the
16 foundation of that question, the form of that question.
17    You can answer if -- if you're able to.
18    THE WITNESS:  I guess -- I guess -- I guess I'm not
19 clear.  That's an element of -- of accepted practice.  So
20 yes, it should have been occurring in Cook County at that
21 time.  If -- if someone came in and complained of a
22 criminal offense and was explaining to a Chicago Police
23 Department investigator that they were the victim of a
24 crime that occurred at the hands of a police officer, a

JON SHANE, 05/26/2023

188

1  criminal investigation would ensue, and the investigator
2  would be in contact with the Cook County Prosecutor's
3  Office.
4          And if, at some point, the prosecutor's
5  office said, "We're declining the case," or "We don't
6  want the case," whatever -- whatever that -- process that
7  may be, they would issue them some documentation that
8  says, "We're" -- "We've not accepted this case for
9  prosecution.  Handle this administratively."
10 BY MS. CARNEY:
11   Q.   Right.  I understand that that's what you say
12 were elements of accepted practice at the time and it
13 should have been happening --
14   MS. BONJEAN:  I'm going to object.  He didn't say
15 "accepted."  Expected.  Those are two different things,
16 but...
17   MS. CARNEY:  Okay.  Sorry.  You're right.
18 BY MS. CARNEY:
19   Q.   Excepted.  That was what you expected to be
20 happening, and it was expected practice, but was that the
21 process in Cook County in the '80s and '90s?
22   A.   Well, I guess -- I guess I'm not -- I guess
23 I'm not clear on what you're saying.  Was it that -- was
24 that the process?  That --

189

1    Q.   Were state's attorneys --
2    A.   -- that is the investigative process.
3  There's no doubt about that.
4    Q.   Right.  But --
5    A.   And if they weren't doing it, that -- that --
6  that's exactly what the problem is.  That's why I've
7  identified it as the problem.
8    Q.   Were state's attorneys in --
9    A.   They should have been doing those things.
10   Q.   Sorry.  Were you done?
11   A.   I was just saying they should have been doing
12 those things.
13   Q.   Right.  I understand that -- I understand
14 that part, but were Cook County state's attorneys in the
15 '80s and '90s issuing letters of declaration --
16 declination to the police department in regards to
17 internal affairs investigations in the '80s and '90s?
18   MS. BONJEAN:  I'm going to object.  He's answered
19 it.  Clearly not.  I mean, that's the -- that's the
20 problem.
21   MS. CARNEY:  Well, that's the problem.  He hasn't
22 said that.  He said he expects it to be there but --
23   MS. BONJEAN:  Right.
24   MR. SHANNON:  I'm going to object --

190

1    MS. BONJEAN:  I think he said he didn't see it.
2    THE WITNESS:  No.  I --
3    MR. SHANNON:  I'm going to object to the
4  foundation.
5    MS. BONJEAN:  You can answer.
6    THE WITNESS:  What I had said was -- I mean, you're
7  looking -- you're looking for specific words from me.
8  What I had said was that that's part of the problem.  I
9  suppose what I'm -- what I'm including in that is, yes,
10 the investigator wasn't doing it.  They weren't seeking
11 advice from the prosecutor's office.  The prosecutor's
12 office wasn't reciprocating, saying, "We're not taking
13 the case."  That -- that is the problem itself.
14         There's no -- there is no documentation
15 to -- to ensure that the police department was in
16 communication with the prosecutor's office, that there
17 was a reciprocal element of documentation coming back to
18 the -- to the police department from the prosecutor's
19 office about a -- about a particular matter.  They -- if
20 you're asking me were they doing it, no, there's no
21 evidence that they were doing it.
22 BY MS. CARNEY:
23   Q.   Okay.  And what is your basis for the -- your
24 opinion that other police departments and prosecutorial

191

1  agencies were following this process that you've outlined
2  in the '80s and through 1992?
3    A.   Well, I was working in the field at the time.
4  It was happening in police departments all -- all across
5  the country.  Whenever a crime is committed, it's a basic
6  element of investiga -- of investigations.
7    Q.   Can you -- so -- but I'm talking about
8  internal affairs investigations and what police
9  departments at the time had this process in place that
10 you're discussing between the -- sorry.
11   A.   Well, I'll give you -- I'll give you one
12 instance.  In the Clifton Police Department, there was an
13 investigation that was initiated against a particular
14 sergeant who was accused of stealing from a -- from a
15 search -- a search warrant, and the investigation
16 unfolded, and the police department was in contact with
17 the prosecutor's office.  This is, again, a matter of
18 routine investigation.  It happens in all criminal --
19 criminal cases.
20         And the officer was indicted, went to
21 trial, was convicted, and that was in the '80s.  That was
22 when I was working in the -- in the Clifton Police
23 Department.
24   Q.   Okay.

JON SHANE, 05/26/2023

192

1    A.   I wouldn't expect it to be any different
2  anywhere else when a police department learns of a crime,
3  whether that crime was committed by a police officer
4  or -- or anybody else.
5    Q.   Okay.  So is it your opinion that in these
6  233 complaints against personnel for assault that you --
7  that you categorized as assault in the CRs, that each and
8  every one of those should have been criminally charged?
9    A.   No, not charged.
10   MS. BONJEAN:  Objection.  Misstates his testimony.
11   THE WITNESS:  I'm sorry.  What happened?
12 BY MS. CARNEY:
13   Q.   She objected.
14   A.   Oh, okay.  I would not say "charged."  What
15 I'm -- what I'm -- what I'm saying is that each one of
16 those should have been investigated as a crime until
17 confirmed or dispelled, and that should have included
18 consultation with the prosecutor's office and that there
19 should be documentation showing what the police
20 department did in referring it to the prosecutor's office
21 and what the prosecutor did once they had it -- whether
22 they accepted it for prosecution or declined it.
23   Q.   So going back to the hypothetical I had
24 before, each time that an arrestee complains that their

193

1  handcuffs were too tight, it is your opinion that that
2  should have been criminally investigated in consultation
3  with the Cook County State's Attorney's Office?
4    MS. BONJEAN:  I'm going to object to the incomplete
5  hypothetical and the lack of contextualization, as
6  Dr. Shane would say.
7         You can answer, Dr. Shane, if you're
8  able.
9    THE WITNESS:  Well, that's -- that's what I was
10 going to say.  I think it lacks a little context.  Again,
11 if someone comes in and complains about their handcuffs
12 being too tight, we have to figure out, as a matter of
13 course, whether it was done in a criminal manner, or
14 perhaps the officer applied them improperly, and/or the
15 person maybe sat on them with their hands behind their
16 back being -- during the transport, and maybe the
17 handcuffs were ratcheted up too tightly as they were
18 sitting there as a -- as a matter of being moved around
19 inside the radio car on the way back to the precinct.
20 But if -- if somebody comes in and characterizes that as
21 an assault, the answer is yes.  You can certainly assault
22 somebody with your handcuffs.
23 BY MS. CARNEY:
24   Q.   Okay.  So is it your testimony, then, that

194

1  the intent needs to be -- the intent matters, then --
2  right? -- in regards to the investigation?
3    A.   As far as criminal cases are concerned, sure.
4    Q.   All right.  Moving down, you talk about
5  commingling criminal and administrative complaints.  Hold
6  on.  All right.  Actually, we're -- we'll move on.
7         Page 25, this is your little Roman
8  numeral ii, "Promulgating a Permissive Policy on the
9  Internal Affairs Function."  Do you see that?
10   A.   Yes, I do.
11   Q.   Okay.  You say that CPD's policies were
12 "replete with permissive language, and qualified
13 statements to such a degree that it enables and justifies
14 incomplete investigations and of" -- "and of poor
15 quality."  Did you compare CPD's written policies from
16 this time period to any other department policies?
17   A.   No.  But it's based on my experience of
18 policy construction.  I have been writing police policy
19 for the better part of my career -- probably at least
20 50 percent of my career, somewhere around there.
21   Q.   Moving down to subsection b here on page 26.
22 So this is still part of your little Roman numeral ii,
23 "Promulgating a Permissive Policy on Internal Affairs."
24 This is the investigative practices section.  You say,

195

1  "The victim, complainant and witness must be personally
2  interviewed (nothing specified)," and you kind of have
3  that throughout various bullets here.  What do you mean
4  by "nothing specified"?  What are you referring to?
5    A.   I didn't see any language in the policy that
6  dictated what the officers should do so they had -- they
7  had policy guidance and supervisors had guidance on what
8  was expected of them.
9    Q.   Okay.  Page 29, what did we decide this was?
10 Little Roman numeral iv?
11   A.   Okay.
12   Q.   "Allegations are Not Necessarily Investigated
13 Against a Defined Customary Standard."  You say, "The CPD
14 typically does not identify the standard against which
15 the officer's conduct is to be measured (the specific
16 rule and name, number, specific policy name and number)."
17 What are you referring to here?
18   A.   So when an allegation came in in the CR file,
19 it didn't -- it didn't explain what standard they were
20 investigating against.  I saw -- I didn't see anything
21 that -- at least that I can remember off the top of my
22 head, that said, well, the officer is alleged to have
23 violated policy number ABC123 and what that policy says
24 the officer should have done and then measure that

JON SHANE, 05/26/2023

196

1    against the officer's actual observed behavior.
2        Q.    So is it your -- in your review of the CRs,
3    you didn't -- is it your testimony that you didn't see
4    any rule violations that were listed or specified within
5    the CRs?
6        MS. BONJEAN:  Objection.  Form.
7        THE WITNESS:  I remember seeing some -- sometimes
8    there were things like a Rule 8 violation or something
9    like that, but it wasn't consistent, and a lot of times,
10   the standard was not identified.
11   BY MS. CARNEY:
12       Q.    When you say "the standard wasn't
13   identified," what are you -- what was your expectation or
14   what do you believe should have been in the CR?
15       A.    Whatever policy or rule or regulation or law
16   that the officer was alleged to have violated.
17       Q.    And it's your opinion that that should have
18   been -- that should have been within the CR file?
19       A.    It should be part of the investigation, so
20   the investigator should have identified what standard
21   against which they were measuring the officer's conduct.
22       Q.    Okay.  So is it your belief that the
23   investigative agency wasn't aware of the standards that
24   they were analyzing the conduct under because it wasn't

197

1    documented within the CR?
2        MS. BONJEAN:  Objection to the form, foundation of
3    that question.
4        THE WITNESS:  I can't tell you whether they were
5    aware or not, but what I can tell you is that any
6    investigation that -- that goes forward, whether it's a
7    homicide or a demeanor complaint, has to have a standard
8    of some sort.  There has to be something that the officer
9    violated.  Listing that is just part of the
10   investigation.
11   BY MS. CARNEY:
12       Q.    Okay.  Page 30.  You say, "Sustained Criminal
13   Complaints are Handled as Administrative."  And then
14   you -- in the middle of here, you say, "The data reveal
15   four allegations of assault and one allegation of
16   improper use of a deadly force that were sustained.
17   However, the Cook County Prosecutor's Office was not
18   notified and criminal complaints were not prepared
19   against the accused officers."  Do you see that there?
20       A.    Yes, I see that.
21            (Deposition Exhibit Number 4,
22             Witness Shane, was marked for
23             identification 5/26/23.)
24

198

1    BY MS. CARNEY:
2        Q.    Okay.  So if we pull up Exhibit 4, which is
3    CR 223928, which is one of the four that you found in
4    this paragraph --
5            Oh, sorry, Brett.  We've got to switch to
6    Exhibit 4.
7            Okay.  So this is the CR that we were --
8    one of first CRs -- one of the four CRs that you just
9    listed in this paragraph that was sustained.
10       A.    Okay.
11       Q.    Okay.  We need to go down to -- it's Bates
12   number RFC3549.  I don't know what page it is.  Sorry.
13   It will be about 40 pages past this.  Oh, yeah.  Almost
14   there.  3549.  Okay.  Brett, can you just make it so we
15   can see the full page?
16            Okay.  Can you see that, Dr. Shane?
17       A.    No.  It's too small.  Can you -- can you --
18   can you raise that a little?  I can see it generally, but
19   I can't -- I can't read it.
20       Q.    Okay.  How's that?
21       A.    A little better.  Okay.  Let's try it, I
22   guess.
23       Q.    Okay.  Don't worry.  There's not --
24            If you can just go up a little bit so we

199

1    can see the top.
2            Okay.  Are you aware of what this
3    document is?
4        A.    Not off the top of my head, no.  And when you
5    say "aware of what it is," meaning is it a CPD form, or
6    what do you -- what do you mean?
7        Q.    So if I represent to you that this is a
8    Chicago Police Department general offense case report, do
9    you understand what a general offense case report was for
10   the Chicago Police Department?
11       A.    It's an incident report.
12       Q.    Okay.  And this incident report -- this
13   general offense case report is within the CR; right?
14       A.    Okay.  Yes.
15       Q.    Okay.  And do you understand that in the
16   Chicago Police Department, when you open a general --
17   when you fill out a general offense case report and you
18   have what you see in the top corner, an RD number, that
19   means a criminal investigation was opened?
20       A.    Where -- where does it say RD number?
21       Q.    It's at the very top right hand of the
22   document you're looking at.  It's A-01280 -- it's cut off
23   but...
24       A.    Was this initiated by the internal affairs

JON SHANE, 05/26/2023

200

1   investigator?
2       Q.   Well, we could look down, but it says here
3   victim and offender, and it has -- it is a criminal
4   investigation open that is contained within the CR file
5   in regards to this incident.
6       A.   Okay. Continue. I want to hear what you
7   mean. Continue.
8       Q.   Okay. Well, my quest -- so my question is so
9   based on the evidence within the CR file, it -- it
10  appears that a criminal investigation was opened, as you
11  believe should have been done; right?
12      A.   It should have been initiated by the police
13  department.
14      Q.   Okay. So based on the records that we have,
15  it was.
16      MS. BONJEAN:  Objection to the form. That -- that
17  is -- objection to the form. This -- you're saying the
18  records show this was initiated by the police
19  department --
20      MS. CARNEY:  I'm saying --
21      MS. BONJEAN:  -- as opposed --
22      MS. CARNEY:  -- a criminal investigation was opened
23  into the allegations contained within this sustained CR
24  of assault that you are --

201

1       MS. BONJEAN:  Okay.
2       MS. CARNEY:  -- finding problems with.
3       MS. BONJEAN:  I'm going to -- I'm going to object
4   to the form of this question. I think his problem is
5   different than what you're suggesting his problem is.
6       But go -- go ahead, Dr. Shane, if you
7   can -- if you understand the question.
8       THE WITNESS:  So -- so the -- the police department
9   should have initiated a criminal investigation, and that
10  should have been in conjunction with the prosecutor's
11  office. Is this -- is this -- was this case investigated
12  as a -- as a criminal incident?
13  BY MS. CARNEY:
14      Q.   When you say "in conjunction with the
15  prosecutor's office," what do you mean?
16      A.   I mean that the police department, having
17  been made aware of a crime that took place involving a
18  police officer, should have notified the prosecutor's
19  office, and they should have proceeded to investigate it
20  as -- as a crime.
21      Q.   Okay.
22      A.   I'm -- I'm asking who -- who initiate -- who
23  initiated it?
24      Q.   Well, let's --

202

1       A.   Is it --
2       Q.   Brett, if we could scroll down a little bit
3   here and see who -- so this initial case incident report
4   looks like has two reporting officers, Molda and Stubit.
5   Do you see that there?
6       A.   Okay.
7       Q.   Those are Chicago Police Department
8   officers -- patrol officers who initiated a criminal
9   investigation into this.
10      A.   Well, they took -- they took their complaint of
11  a criminal investigation; right?
12      Q.   Is that --
13      A.   They didn't -- I mean, correct me if I'm
14  wrong, but the way I interpret this form -- and I think I
15  remember seeing this -- is that the officers took a
16  report of a criminal investigation, but the department
17  itself, through internal affairs, did not initiate a
18  criminal investigation.
19          I'm not saying that this document should
20  not have been prepared. What I am saying is that once in
21  receipt of it, the internal affairs division should have
22  proceeded as a criminal investigation, which would have
23  included notifying the Cook County Sher -- excuse me --
24  the Cook County Prosecutor's Office because a police

203

1   officer was involved.
2       Q.   So is it your test --
3       A.   That's --
4       Q.   -- is it your opinion that the internal
5   affairs organization at the time should have opened a
6   separate criminal investigation in conjunction with the
7   one that was already opened by CPD?
8       MS. BONJEAN:  I'm going to object to the -- the
9   facts not in evidence. Just because this guy filed a
10  complaint doesn't mean anything was opened.
11      THE WITNESS:  Well, that's what I -- that's what I
12  said just a minute ago. I said it's obvious they
13  reported it. They have the -- they have a -- somebody
14  took a report of it, but there's no evidence that it was
15  investigated as such, and there's certainly no evidence
16  that the -- the internal affairs division did anything to
17  notify the prosecutor's office that a criminal
18  investigation was underway involving a police officer.
19  BY MS. CARNEY:
20      Q.   All right. Do you understand how criminal
21  investigations begin within the Chicago Police
22  Department?
23      MS. BONJEAN:  Okay. I'm going to object. Do you
24  understand, Theresa, how -- how they begin? I mean --

Urlaub Bowen & Associates, Inc.  312-781-9586

JON SHANE, 05/26/2023

204

1    MS. CARNEY: Jennifer, yes.
2    MS. BONJEAN: -- I mean -- okay.
3    MS. CARNEY: And I don't -- we don't need to do
4    this. Can you -- can you stop testifying for him? Let
5    him answer.
6    MS. BONJEAN: I'm not.
7    MS. CARNEY: You are. You have several times now,
8    and I've let it go, so just stop.
9    MS. BONJEAN: You can --
10   BY MS. CARNEY:
11   Q.    Do you, Dr. Shane, understand how a criminal
12   investigation is opened within the Chicago Police
13   Department?
14   MS. BONJEAN: I'm going to object to the form and
15   foundation of that question.
16   THE WITNESS: A criminal investigation is opened
17   when a -- when an individual makes the criminal
18   complaint.
19   BY MS. CARNEY:
20   Q.    Okay. What is this document? Do you
21   understand what this document is that I'm showing you?
22   A.    Yes. This -- this document is -- is
23   documenting that someone made a criminal complaint.
24   Q.    Okay. And if we scroll up again, Brett.

205

1    Sorry.
2          You see that the complaint was assigned
3    an RD number. Do you see that at the top? A-01280
4    something that I can't read.
5    A.    Okay.
6    Q.    Do you know what that represents --
7    A.    What is -- what is -- can you tell me what RD
8    stands for?
9    Q.    Records division.
10   A.    Okay.
11   Q.    So do you understand what a records division
12   number is within the Chicago Police Department?
13   A.    Not off the top of my head, I do not.
14   Q.    Okay. Do you --
15   A.    I mean, is it -- is it a tracking number?
16   Q.    We can -- if you don't understand, that's
17   fine. But what I'm trying to ask you is you -- your
18   complaint about this sustained CR is that no criminal
19   investigation was opened and no referral was made to the
20   Cook County Prosecutor's Office, or the Cook County
21   Prosecutor's Office was not notified, and a criminal
22   complaint was not prepared. Do you see that? Sorry.
23   That was --
24   A.    Yes. Go ahead.

206

1    Q.    -- that was in your report.
2          Okay. So I'm showing you that a criminal
3    investigation was opened in regards to this incident.
4    A.    No, I disagree with that. What this shows is
5    that someone took a report and listed the officer,
6    Guevara, and listed the victim. I don't see any evidence
7    that it was investigated as a criminal matter, and I
8    don't see any evidence that the prosecutor's office was
9    notified in conjunction with the internal affairs
10   criminal investigation that would have proceeded that
11   way.
12         And I don't see any evidence that the
13   officer or the -- the investigating officer notified the
14   prosecutor's office and explained to them what they had
15   and then the prosecutor's office said, "Yes, we're going
16   to accept that, and we're going to prosecute it," or,
17   "No, we're going to decline it and handle it
18   administratively," which led me to say that this is a
19   sustained complaint that they found, and there's no
20   evidence that a criminal investigation was initiated.
21   I'm not saying they didn't take a report of it. I'm
22   saying they didn't investigate it as such.
23   Q.    Okay. So it's your testimony today that
24   simply opening up a criminal investigation is not enough?

207

1    You need to see...
2    MS. BONJEAN: I'm going object to the --
3    THE WITNESS: I would need to see --
4    MS. BONJEAN: -- I'm going to object to the form.
5    I'm going to object to the form of that question. And it
6    assumes facts not in evidence. And -- and foundation.
7          Go ahead.
8    THE WITNESS: I would need to see the criminal
9    investigation, and I would need to see the involvement of
10   the prosecutor's office to understand what -- what
11   transpired.
12   BY MS. CARNEY:
13   Q.    Okay. And if you don't see that in the CR,
14   you are making the assumption that none of it occurred?
15   A.    There's no evidence --
16   MS. BONJEAN: Objection to the form of the
17   question.
18   THE WITNESS: There's no evidence that a criminal
19   investigation was undertaken.
20   MS. BONJEAN: I'm sorry. Theresa, can you tell me
21   what CR number this is again? I don't see the number.
22   MS. CARNEY: Yeah. It's 223928.
23   MS. BONJEAN: 223928. Thanks.
24

JON SHANE, 05/26/2023

---

208

1        (Deposition Exhibit Number 8,
2        Witness Shane, was marked for
3        identification 5/26/23.)
4   BY MS. CARNEY:
5        Q.   Okay.  All right.  If we can go to what I've
6   marked as Exhibit 8, which is CR 179835.  Okay.  This is
7   one of the CRs that you list in this paragraph as an
8   allegation of improper use of deadly force that was
9   sustained but the prosecutor's office was not notified
10  and criminal complaints were not prepared.  Do you see
11  that?
12       A.   I see the -- I just see 179835.
13       Q.   Okay.
14       A.   That's the CR file.
15       Q.   All right.  Hold on.  I forgot to write the
16  page number I want for this.  Okay.  So, Brett, if you
17  could go to what is page 16 of this document.
18            All right.  So this is a Bureau of
19  Operational Services memo dated October 20th, 1990 --
20            And if you go to the next page, Brett.
21            -- you can see personnel assigned.  And
22  the very last thing here says, "ASA Neal Goodfried" -- do
23  you see that? -- from the State's -- State's Attorney's
24  Office?

---

209

1        A.   Yes, I see that.
2        Q.   Okay.  So this memo actually shows that a
3   state's attorney was assigned to this sustained CR's
4   investigation; right?
5        A.   Okay.  And -- what did the state's
6   attorney's office do?
7        Q.   That's a good question for the state's
8   attorney's office, isn't?
9        A.   Well, no.  It's a good -- it's a good
10  question for the investigator because the investigator's
11  responsible for coordinating what goes on between the
12  Chicago Police Department and the -- and the prosecutor's
13  office; so if you had an ASA assigned, what did they do?
14  What advice did they give him?  Where are the records?
15  What -- what communication took place?  That -- that --
16  that's what I'm questioning.  Okay.  So they put somebody
17  down.  What does that mean?  Somebody was notified
18  that -- that this occurred?  What did they -- what did
19  they do?  What was their involvement?
20       Q.   Do you understand what a U file is?
21       A.   No.
22       MS. BONJEAN:  I'm going to object -- object to the
23  form of that question.  I don't even know what a U file
24  is; so maybe you can use the full --

---

210

1        THE WITNESS:  No.
2        MS. BONJEAN:  -- what's U stand for instead of
3   using an acronym?
4        MS. CARNEY:  I'm not using an acronym.  It's just
5   called a U file.
6        MS. BONJEAN:  Well, it must stand for something if
7   it's called U -- is it, like, the letter U?
8        MS. CARNEY:  Can you go -- Brett, can you go to
9   page 19, the last paragraph?  "Assistant" -- "Assistant
10  Deputy Superintendent Greenlee ordered the undersigned to
11  have the OPS 'U' number for" -- "converted to a CR number
12  for a thorough and comprehensive investigation."
13       MS. BONJEAN:  I'm going to -- I'm going
14  to -- I see that.  First of all, I want to place on the
15  record I'm going to ask -- and I'll follow up in
16  writing -- that the City produce consistent with the
17  requests that were made many, many eons ago for any
18  policies that relate to the internal affairs function.
19  And, specifically, it would be nice to know what this --
20  what -- you know, it's great that you know it, Theresa,
21  since you represent police officers and the City of
22  Chicago, but part of the problem is is y'all don't
23  produce information that's been requested; so any
24  policies that reflect this whole, A, what a U number is

---

211

1   and what it means to convert it to a C number, please
2   produce.
3        MS. CARNEY:  We can definitely talk about that.  I
4   mean, I will go back and look and see what has -- what
5   has been --
6        MS. BONJEAN:  Yeah.  I mean, you act like, "Oh,
7   it's just a U number" and roll your eyes like everyone's
8   supposed to know.  You represent these people.  We don't.
9   And you ask our experts to, like, look at things, but you
10  don't produce anything, so yeah --
11       MS. CARNEY:  Okay.  That's just not true, and it's
12  just -- that's just not true.
13       MS. BONJEAN:  Okay.  Well, I'd like to see a
14  policy.  What it means -- what's a U number and what it
15  means to convert it to a C number.  Let's see it.  Go
16  ahead.  Ask your question.
17       MS. CARNEY:  I did, and you've answered for him
18  that he has no idea.
19       MS. BONJEAN:  No.  I don't -- I mean, it's not --
20  it's not -- he didn't answer anything.  He -- he said he
21  didn't know what a U number was, and -- nor do I so --
22       MS. CARNEY:  Okay.  Great.
23            (Simultaneous speaking.)
24       MS. BONJEAN:  -- only you do and maybe -- and maybe

---

JON SHANE, 05/26/2023

---

212

1   the -- the fellows you represent.
2        THE WITNESS: Theresa, I did say I didn't know what
3   a U number was.
4        MS. CARNEY: Okay. Thank you.
5            (Deposition Exhibit Number 11,
6            Witness Shane, was marked for
7            identification 5/26/23.)
8   BY MS. CARNEY:
9        Q.   All right. And finally, let's look at
10  Exhibit 11. So this is another one. This is CR -- what
11  is -- which one is this? -- 237167. And, actually, we
12  need to flip back to Exhibit 3 really quick so you can --
13  I can put this one in context.
14           This is from the second batch that you're
15  talking about down here, Dr. Shane, where you say, "Other
16  sustained complaints have criminal connotation are
17  not referred to the Cook County Prosecutor's Office." Do
18  you see that?
19       A.   Okay. Okay. Yes.
20       Q.   So this is number four, CR 237167. Do you
21  see that?
22       A.   Okay. Yes.
23       Q.   Okay. So let me see if I can find this page.
24  Okay. So if you can -- Brett, if you could go to page 49

---

213

1   of this -- of Exhibit 11. Okay. If you can scroll all
2   the way down.
3            Well, let me just put -- so this is a
4   Special Investigation Section memo from June 25th, 1997,
5   and on the very bottom, it says -- so this is talking
6   about some things that happened in court, and if you want
7   to read the whole thing, we can take that time to do
8   that.
9            But it says, "During the hearing,
10  Ms. Miller filed a Motion to Dismiss wherein they
11  formally accused Detective Montilla of falsely testifying
12  before the grand jury related to" -- blank -- "making a
13  positive identification of Wilson. The motion indicates
14  that an investigator from the Public Defender's Office
15  interviewed" -- the names are redacted -- "and reportedly
16  told him she was unable to pick out anyone, though she
17  thought 'one of the bigger guys might have been the guy,'
18  but he was not certain. ADP Miller provided the sergeant
19  with a copy." And then it says the Sergeant spoke with
20  A -- the ASA and informed him it would be necessary to
21  obtain the statements.
22           So in this particular CR where you say
23  they have a criminal connotation but they were not
24  referred to the Cook County Prosecutor's Office, the Cook

---

214

1   County prosecutor actually knew that there were
2   allegations of perjury in front of a grand jury, and it
3   was, in fact, used in the criminal trial and a motion to
4   dismiss. Do you see that?
5        A.   I didn't see any documents from the
6   prosecutor's office relative to what they did.
7        Q.   Why would you expect to see documents from
8   the prosecutor's office about what they did in the CR
9   file maintained by the Chicago Police Department?
10       A.   Well, that's --
11       MS. BONJEAN: Objection to the form of that
12  question.
13           Go ahead.
14       THE WITNESS: Those are all criminal component
15  pieces of what goes into an internal affairs file.
16  BY MS. CARNEY:
17       Q.   The prosecutor's file is a critical component
18  piece to what goes on -- goes in an internal affairs
19  file?
20       MS. BONJEAN: Objection to the -- objection to the
21  form of that question. He didn't say the prosecutor's
22  file.
23       THE WITNESS: When a -- when a -- when an
24  investigation is undertaken in a criminal context, the

---

215

1   Chicago Police Department, in conjunction with the
2   prosecutor's office, would have some kind of
3   communication going back and forth. If the prosecutor's
4   office opened an -- opened an investigation -- a criminal
5   investigation into perjury, they would have whatever
6   their investigation revealed. That -- those documents
7   would be part of the investigative file at -- at the
8   local police department.
9   BY MS. CARNEY:
10       Q.   What is your basis for saying the
11  investigation that the prosecutor's office did should be
12  in the investigative file at the police department?
13       MS. BONJEAN: Objection to the form of that
14  question.
15       THE WITNESS: That is the same as collecting any
16  other document related to an investigation whether
17  you're -- I mean, you could be talking about -- let's --
18  I'm just making this up. Let's say, hypothetically,
19  medical records. If someone claimed an injury, you would
20  go get medical records to substantiate the medical -- the
21  person's medical condition relative to the complaint.
22           You would do the same thing here. If
23  you're telling me that the -- that the CPD, in
24  conjunction with the prosecutor's office, was working a

---

JON SHANE, 05/26/2023

216

1    criminal matter related to perjury, they would
2    absolutely -- "they" meaning the Chicago Police
3    Department -- would absolutely have the documents that
4    the Chicago -- excuse me -- that the Cook County
5    Prosecutor's Office was working with.  That would all
6    become part of their file so they could say, "Look.  This
7    is exactly what the -- Cook County Prosecutor's
8    Office did."
9    BY MS. CARNEY:
10       Q.   I guess I'm not understanding what your basis
11   is for saying that, other than it's your belief it's good
12   investigative practices.  Is there a policy -- is there
13   some sort of national standard that requires the
14   prosecutor -- the police departments to include the
15   prosecutor's investigation within their file?
16       A.   Yes.  It's -- it's the -- so the answer is
17   yes, and it's no different than collecting any other
18   documents related to an investigation.  That -- that's
19   what I'm saying.
20       Q.   Is it --
21       A.   You would -- you would always expect
22   documentation from police officers -- investigators,
23   rather.  Whatever they went out and collected.
24       Q.   Okay.  But I'm talking about --

217

1        A.   Why would another government agency be any
2    different?
3        Q.   Is it your belief that the Cook County
4    State's Attorney's Office provided the Chicago Police
5    Department with their investigative materials --
6        MS. BONJEAN:  Objection --
7    BY MS. CARNEY:
8        Q.   -- in the '80s and '90s?
9        MS. BONJEAN:  I'm going to object to the form of
10   that question.  It's -- it's misstating what his
11   testimony is.
12       MS. CARNEY:  Okay.  Well, I'm sorry.  I don't
13   understand what his testimony is right now, so I'm trying
14   to figure it out.
15   BY MS. CARNEY:
16       Q.   You keep -- Dr. Shane, I'm sorry, but you
17   keep seemingly commingling this prosecutor's office file
18   with the --
19       MS. BONJEAN:  No.
20   BY MS. CARNEY:
21       Q.   -- police department file.
22            Hold on, Jennifer.
23       MS. BONJEAN:  Objection to the form.  He's not
24   commingling anything.  I know it's a foreign concept,

218

1    Theresa, to the City of Chicago, but he's not commingling
2    anything.  He's being very clear.
3        MS. CARNEY:  Can you stop yelling at me today?  We
4    just want to get -- we've got, like, two hours left.
5        MS. BONJEAN:  Okay.  I'm not yelling.  I'm -- this
6    is just how I'm -- how I'm wired.  I apologize.  Go
7    ahead.
8    BY MS. CARNEY:
9        Q.   I don't understand what you're saying,
10   Dr. Shane, because you seem to be saying to me -- and I'm
11   sure Jennifer will object and tell me I'm wrong, and
12   that's fine.  You can tell me I'm wrong, too.
13            You seem to be saying that there is an
14   obligation that the Chicago Police Department obtains
15   documents that are gathered by the Cook County
16   Prosecutor's Office.  Is that what you are saying?
17       A.   As part of a criminal investigation related
18   to a police officer where an internal affairs
19   investigation is underway, the answer is yes.  It
20   wouldn't be any different -- I'm try -- let me just --
21   let me give you an analogy so you can understand what I'm
22   saying.
23       Q.   Okay.  But hold on.  I -- okay.  Go ahead.
24       A.   It wouldn't be --

219

1        Q.   I guess -- go ahead.
2        A.   Let me finish.  Then you go, and then we'll
3    see if we can have a meeting of the minds here.
4            It wouldn't be any different for a
5    homicide.  Let -- let me just -- let me just give you a
6    complete hypothetical.  Person is killed on the street.
7    Chicago Police Department homicide division comes out and
8    begins the investigation, and they have an assistant
9    state's attorney assigned from Cook County.  Whatever the
10   Cook County Prosecutor's Office has done relative to that
11   investigation would be part of that completed homicide
12   file for the Chicago Police Department.
13            The same -- the same thing translates to
14   an internal affairs investigation.  Police officer in
15   Chicago is accused of perjury.  A State's Attorney's
16   Office -- a member of the State's Attorney's Office is
17   involved in the investigation that was opened by the
18   Chicago Police Department.  Whatever the state's attorney
19   did relative to that investigation against that officer
20   as part of that internal affairs investigation would be
21   documented, and that package of documents that -- that
22   the prosecutor's office developed would be part of the CR
23   file.
24       Q.   Okay.  Is it your understanding --

JON SHANE, 05/26/2023

220

1    A.  That's -- that's a standard practice.
2    Q.  I get that is what your opinion is in
3  this case, but is it your understanding that that was how
4  the Cook County Prosecutor's Office worked in the 1980s
5  and 1990s, that they would provide their investigation to
6  the Chicago Police Department in a homicide
7  investigation?
8    MS. BONJEAN:  Objection -- objection to the -- to
9  the form of that -- that question.
10   THE WITNESS:  Whether they were doing it and
11 whether they should have done it are two different
12 things.  They absolutely should have been doing that.
13 Now, if they neglected to do it, that's -- that's a poor
14 practice.
15 BY MS. CARNEY:
16   Q.  Okay.  Page 32.  Oh, sorry.  Back to your --
17 Exhibit 3.  I'm sorry.  We're on little Roman
18 numeral vii, "CPD Data Classification Does Not Follow a
19 Consistent Convention."  What does this mean?
20   A.  I saw things that were classified that seemed
21 to have overlapping connotations.  So they -- in one --
22 in one sense, they would call it an assault, or they
23 might call it -- and using a different example, they
24 might call it perjury or deceitful conduct or false

221

1  information.
2    I didn't understand how they were
3  differentiating between these things, and what that does
4  is it enables the department to diffuse these complaints
5  across a broader landscape, and then it doesn't look like
6  patterns are emerging because you might only have a few
7  complaints in any -- in any one category when they all
8  reflect, let's say, integrity -- an integrity violation
9  or -- or candor violation or something like that.
10   Q.  Okay.  And we talked about this a little bit
11 in the first part of your dep.  You reviewed the
12 complaint category tables for the internal affairs
13 division of the Chicago Police Department; right?
14   A.  Yes, correct.
15   Q.  Okay.  And you understood, based on your
16 testimony in the first part, that CRs were categorized by
17 the -- with one initial complaint category, which was
18 typically the more egregious complaint; right?
19   A.  Well, I never understood how they prioritized
20 them because there was no documentation regarding that.
21 I don't know -- and we talked about priority.  If you
22 remember, one of the things you had asked me was what's a
23 bigger priority -- oh, gosh.  I forget -- I forget how
24 the question went.

222

1    But -- but my example to you was that it
2  would be a bigger priority if someone were -- were
3  committing an act of perjury in court under oath as
4  opposed to somebody applying handcuffs too tightly.  I
5  think that's what you had said.  You asked me if -- if
6  the excessive force was more important than, like, false
7  information or something like that.
8    And the point that I'm drawing -- the
9  overriding -- the overriding point I'm drawing from a
10 police management perspective is that there's -- there is
11 nothing in CPD that's defines the -- the cardinal nature
12 of -- of these offenses -- what's more important than the
13 next thing; so I don't know how they categorized those
14 things, you know, in terms of, quote, "more importance."
15   Q.  And I think that one of the things you told
16 me during the last time in regards to that example is
17 that context matters; right?
18   A.  Yeah.  Context is important, of course.  Yes.
19   Q.  Right.  Because as you said, "Well,
20 excessive" -- well, maybe you didn't say it like this,
21 but -- so tell me if I'm generalizing it wrong.  But
22 excessive force -- if excessive force -- if the category
23 of excessive force is handcuffing too tight versus lying
24 under oath at the grand jury, the context of the fact

223

1  that the excessive force is handcuffs are too tight shows
2  that it might not be as high of a priority as, say, lying
3  under oath at the grand jury; right?
4    A.  Well, what -- what I'm saying is how -- how
5  does the -- how does the CPD differentiate priority --
6  the cardinal offenses?  How do they -- how do they order
7  these offenses?
8    Q.  Underneath here, you talk about a variety of
9  different overlapping or vague categories that you --
10 that you believe skewed the results?
11   A.  Can you scroll down, please?
12   Q.  Yeah.  Sorry.
13     Brett, can we go down to the very bottom
14 of page 32?
15   A.  Okay.  Yeah.  We talked about this the first
16 time around.
17   Q.  Yeah.  We talked about this a little bit; so
18 I'm not going to go back to it too much but -- actually,
19 we -- yeah.  We can go -- we don't have to do that right
20 now.
21     All right.  So let's go to page 35, and,
22 actually, we might need to -- so this is a continuation
23 of little Roman numeral viii, "The Classification Does
24 Not Follow a Consistent Convention."

JON SHANE, 05/26/2023

224

1     A.   Okay.
2     Q.   And then you say -- I just want to make sure
3  we get the context here.  The paragraph above where I'm
4  talking about -- we're on page 34 -- "By fragmenting the
5  complaint categories as CPD does, the Department
6  intrinsically builds implausible [sic] deniability into
7  their internal affairs program."  And you say that word
8  again on page 35.  "Plausible deniability also insulates
9  elected officials from the prying eyes of the
10 electorate."  How so?
11    A.   By diffusing these complaints across a
12 broader spectrum of categories so they can build into
13 their narrative the idea that, "Well, we don't have any
14 patterns that emerged."  What you're looking at right
15 here is what I was trying to get across with the
16 overlapping categories above, that different -- you know,
17 different -- there's different categories for sort of the
18 same thing.  How do you -- how are they differentiating
19 between perjury and, you know, deceitful conduct or false
20 information?
21    Q.   Okay.  So that actually leads me to -- Brett,
22 if I could share again -- well, actually, hold on.
23 Before -- oh, okay.
24         That actually leads me to my next

225

1  question, which on page 32 of your report -- which,
2  unfortunately, we just took down, which is fine -- you
3  have two --
4         Oh, yes.  Thank you, Brett.
5         You talk about -- because you just said
6  deceitful conduct and perjury.  All right.  So there's
7  that -- that's that number 2 here where you say that
8  these are examples of "overlapping or vague categories
9  including, but not limited to, the following complaints."
10    A.   Okay.
11    Q.   And then you have -- right? -- deceitful
12 conduct and perjury?
13    A.   Okay.
14    Q.   All right.  So if I now share my screen and
15 show you your spreadsheet here -- all right.  So let me
16 show you what I did so it doesn't look sketchy.  I'm in
17 your "raw data (incident level)"; so this is, like we
18 talked about before -- is this the CR level?
19    A.   That's the allegation level.  I believe
20 that's the allegation level.  Go to the bottom, and just
21 show me how many you have there.  Can you just go all the
22 way down to the bottom -- scroll all the way down?
23    Q.   A hundred and forty -- well, it says 147, but
24 the first line is obviously the headers, so I think --

226

1     A.   Okay.  No.  Then -- I'm sorry.  This is
2  the -- this is the complaint level.
3     Q.   Okay.  So I'm going to filter out the
4  complaint register numbers, and I'm just going to look
5  for 180229.  So this is the complaint that we were just
6  looking at here, and if you scroll, you have categories
7  for type of complaint, type of complaint 2, type of
8  complaint 3, and type of complaint 4.  Do you see that
9  there?
10    A.   Yes.  Okay.
11    Q.   Okay.  So this one was classified by you as
12 an assault as the first level -- as the -- as the first
13 complaint?
14    A.   Well, don't -- don't think that this is an
15 ordinal scale.  I don't -- I don't want you to think
16 that.  It's not listed in any matter of priority.  Is
17 that -- is that what you're getting at?
18    Q.   Okay.  So it's not --
19    A.   I just want --
20    Q.   -- this is not listed in any order of
21 priority?
22    A.   No, no.
23    Q.   Okay.
24    A.   It's not in ordinal scale of highest to

227

1  lowest.
2     Q.   Did this -- I don't think it has it on here.
3  Do you recall sitting here today what the complaint
4  category was of this CR?  Did you document that anywhere?
5     A.   No, not off -- I mean --
6     MS. BONJEAN:  Objection to form.
7     THE WITNESS:  -- I don't remember off the top of my
8  head.
9  BY MS. CARNEY:
10    Q.   Okay.  Did you give any weight to the
11 complaint categories that CPD used when classifying these
12 types of complaints?
13    MS. BONJEAN:  I'm going to object to the form of
14 that question and --
15    THE WITNESS:  No.  I never independently assigned
16 an ordinal structure to the data.  That was something I
17 was expecting the CPD to do if they were do -- if they
18 were doing it that way; for example, if they're meting
19 out discipline against an officer, what are -- what --
20 how do they do that?  How do they -- what ordinal level
21 scale do they have that suggests one complaint is more
22 important than the other?  I mean, I didn't see anything
23 like that.
24

JON SHANE, 05/26/2023

228

1    BY MS. CARNEY:
2        Q.    Okay.  So if CPD had assigned this as an
3    excessive force complaint, you didn't -- wouldn't take
4    that into consideration at all about -- in the ordinal
5    scale?
6        MS. BONJEAN:  Objection to the -- to the form of
7    that question.  Consideration how?  I don't -- what's the
8    question mean?  Form.
9        THE WITNESS:  Yeah.  Theresa, I'm not -- I'm not
10   clear on what you mean.  I did -- I did not assign an
11   ordinal ranking to the data anywhere.
12   BY MS. CARNEY:
13       Q.    Okay.  And it's your testimony that CPD
14   didn't either?
15       A.    If -- well, I'm saying that I didn't see any
16   documentation policy-wise, rule, regulation, or anything
17   that described how they differentiate what we would call
18   the cardinal proportionality of these things -- these --
19   these offenses.  I did not do it.  I don't -- and if
20   they're -- if they are doing it, I don't know how they're
21   doing it.
22       Q.    So when you were reviewing the CR files, did
23   you notice that any of the CRs were categorized by
24   complaint category tables?

229

1        MS. BONJEAN:  Objection to the form.
2        THE WITNESS:  Well, I remember that there was --
3    there was a complaint table.  If -- is that what you're
4    asking me?  Did I remember seeing --
5    BY MS. CARNEY:
6        Q.    Yeah.
7        A.    There is is -- there is a table of sort of
8    what -- of what they used to describe the complaints.
9        Q.    Okay.  And do you recall in your review of
10   these CRs seeing those complaint categories contained
11   within the CR files?
12       MS. BONJEAN:  Objection.  Form.
13       THE WITNESS:  Well -- well, I think I'm saying the
14   same thing.  Yes, there -- there is a complaint table
15   that lists the -- the complaint categories.
16   BY MS. CARNEY:
17       Q.    Right.  And what I'm asking you is in the --
18   in the individual CRs, do you recall seeing a notation of
19   the category of complaint that that CR fell under?
20       MS. BONJEAN:  Objection.  Form.  Why don't you just
21   show him something?
22       THE WITNESS:  Yeah.  I guess I'm not -- I'm not
23   clear.  I mean, I don't recall off the top of my head.
24

230

1            (Deposition Exhibit Number 17,
2            Witness Shane, was marked for
3            identification 5/26/23.)
4    BY MS. CARNEY:
5        Q.    Hold on.  All right.  Let me -- so this, I
6    think, will be Exhibit 17, and I'll send it around.  But
7    this is the CR -- let me make sure I can do this
8    smoothly.
9        A.    Just bear with me.  I'm going to stand up.
10   I've got to stretch my legs a minute.
11       Q.    Do you want to take a quick break?
12       A.    No, that's okay.  I'm good.
13       Q.    Okay.  All right.  So I have up on the screen
14   the CR we've been talking about that was on that
15   spreadsheet -- 180229.  We'll mark this as Exhibit 17.
16       A.    Can you raise the zoom for me, please?
17       Q.    Yep.  Can you see that?
18       A.    A little -- one more.  Yeah.  That's good
19   right there.
20       MS. BONJEAN:  I'm sorry.  Theresa, did you say you
21   emailed this one to us?
22       MS. CARNEY:  I haven't yet.  You told me to show
23   him something, so I am.
24       MS. BONJEAN:  Oh, okay.  Fair enough.  I didn't

231

1    know that's what you were doing.  Okay.  I won't
2    complain.
3    BY MS. CARNEY:
4        Q.    Okay.  So this is the CR we were just talking
5    about -- 180229.
6        A.    Okay.
7        Q.    If we go down to -- and this is a CR that you
8    reviewed, and if you go down to page 6 here, it says,
9    "Complaint Against a Department Member" --
10       A.    Yes.
11       Q.    -- "Chicago Police Department."  So this is
12   the complaint, and it has up here "Initial Complaint
13   Category 05A."  Do you see that?
14       A.    Yes.
15       Q.    Okay.  Do you know what 05A stands for?
16       A.    No, not off the top of my head.  I do not.
17       Q.    Okay.  Based on the complaint category tables
18   that I showed you last time, and we can --
19       A.    Okay.
20       Q.    -- bring it back up if you want me to, but
21   I'll tell you that that category is excessive force -- 05
22   is excessive force, and A is arrestee during an arrest;
23   so CPD classified this as an excessive force complaint.
24       MS. BONJEAN:  Oh, that's what you're talking about.

JON SHANE, 05/26/2023

232

1    Okay.  I understand now.
2         THE WITNESS:  Okay.
3    BY MS. CARNEY:
4         Q.    Okay.  Did you take those complaint
5    categories and assignments into consideration when
6    conducting your analysis?
7         A.    What -- what -- what do you mean "into
8    consideration"?  What -- what do you mean by that?
9         Q.    Well, you just told me that you didn't put
10   an -- an ordinal structure to the data and that you
11   didn't see that CP -- that they were -- that CPD was
12   doing it that way.
13        A.    Yeah.  Okay.  And how -- how -- how are
14   they -- how is this an ordinal scale?
15        Q.    I'm not saying it is.  I'm asking if you took
16   into consideration the fact that CPD -- the internal
17   agency at the time received this complaint, read the
18   allegations, and classified it first and foremost as an
19   excessive force complaint?
20        A.    Oh, I mean, I'm not doubting that they
21   classified it that way.  Okay.  I mean, I agree with you.
22        Q.    Okay.  So there was some sort of
23   classification being done by CPD in these files in
24   regards to the allegations?

233

1         A.    Well, I never denied that they -- they were
2    not classifying things.  What I was saying is that the
3    classification didn't follow a consistent pattern, and
4    what they were able to do is -- is diffuse across the
5    landscape all of these minute categories.  And by
6    breaking it up that way, which I called fragmenting,
7    patterns don't emerge.
8         It takes -- well, I shouldn't say they
9    don't emerge.  It takes a longer time period for them to
10   emerge because something might be classified as an
11   assault in one case; maybe it's an excessive force in
12   another case.  This one involves an arrestee.  And when
13   you just keep breaking things up like that, you need more
14   data to -- to establish a pattern.
15        MS. BONJEAN:  I'm sorry, Theresa, to bother you.
16   Was the -- I know we looked at the chart, and I know that
17   you referenced it.  Did you attach it as an exhibit
18   earlier --
19        MS. CARNEY:  Yes.
20        MS. BONJEAN:  -- in the deposition?
21        MS. CARNEY:  Yes.  We looked --
22        MS. BONJEAN:  You did?  Can you tell me what
23   exhibit number it is?  I'm sorry.
24        MS. CARNEY:  It was Exhibit 14.

234

1         MS. BONJEAN:  Okay.  Thank you.
2    BY MS. CARNEY:
3         Q.    Okay.  So we can move -- so I guess just one
4    more question on this fragmenting issue.  Is it -- if
5    there was an allegation that somebody -- or a detective
6    misrepresented themselves in a -- in a specific setting
7    versus somebody who falsified testimony in front of the
8    grand jury, is it your testimony that those two things
9    are the same or equal and should be classified the same?
10        A.    Well, I --
11        MS. BONJEAN:  I'm sorry.  I'm going to object to
12   the incomplete hypothetical.
13        But -- but you can answer.
14        THE WITNESS:  Well, what I'm -- what I'm saying is
15   that when -- when you've got all of these minute
16   categories, they all involve dishonesty, or it's -- you
17   know, you can call it integrity.  I don't see much
18   difference in proffering false information or lying in a
19   search warrant affidavit or perjury.  Depending on the
20   setting, obviously, one can be criminal and one might --
21   might not be, but they all involve integrity violations.
22   BY MS. CARNEY:
23        Q.    All right.
24        A.    And remember, this is -- this is --

235

1    implicates supervision and management; so from a police
2    perspective, I want to know which officers are garnering
3    repeated complaints for integrity violations, be they
4    perjury, false information, deceitful conduct.
5         Q.    Brett, if we could go to page -- Exhibit 3,
6    page 38.
7         All right.  So midway through this
8    paragraph, you say, "A best practice is to maintain all
9    records related to these files."  I believe, for context,
10   we're talking about internal investigation files, but
11   correct me if I'm wrong.
12        A.    Yes, internal affairs files.
13        Q.    "As they relate" -- okay -- "As they relate
14   to a particular officer for that officer's entire career.
15   Once the officer is separated from the Department, the
16   complete file is archived indefinitely to accommodate
17   future legal proceedings."  Do you see that there?
18        A.    Yes, I do.
19        Q.    Okay.  What other departments in the '80s and
20   '90s were archiving files -- sorry.  What other
21   departments in the 1980s and '90s were archiving
22   disciplinary files indefinitely to accommodate for future
23   legal proceedings?
24        A.    Well, the Newark Police Department was doing

JON SHANE, 05/26/2023

236

1   that. They had a massive warehouse where they were --
2   where they were putting those things away because this --
3   the idea of exonerations, for example, was -- was just
4   emerging. And they were aware at that time that
5   police-related errors were responsible for those kinds of
6   things.
7       Q.   And was the Newark Police Department under
8   any sort of -- was there any collective bargaining
9   agreement at the time that prevented or that allowed --
10  sorry. That was a bad question.
11           Are you aware of any contract
12  negotiations and collective bargaining agreements that
13  occurred between the Chicago Police Department and its
14  officers during the '80s and '90s that prevented the
15  maintenance of disciplinary files indefinitely?
16      MS. BONJEAN:  Objection to the form.
17      THE WITNESS:  Somehow I remember seeing something.
18  I thought maybe it was in deposition. Perhaps -- oh, I
19  don't know if it was Flores or somebody else. I don't
20  remember. But there was discussion about purging an
21  officer's particular file, but I don't remember anything
22  that said that the police department had to destroy those
23  records consistent with the labor agreement.
24

237

1   BY MS. CARNEY:
2       Q.   Page 39. I know it feels like there's a lot
3   left, but we've actually done a good amount of this
4   already, so...
5       A.   We're on the last leg here. Come on,
6   Theresa.
7       MS. BONJEAN:  I've got some questions. Sorry.
8       MS. CARNEY:  Oh, no. I think Josh does, too --
9       MS. BONJEAN:  Not a lot.
10      MS. CARNEY:  -- so you're not -- you're not --
11  you're not up yet, Jennifer.
12      MS. BONJEAN:  No, that's fine. I'm not -- I'm not
13  rushing.
14  BY MS. CARNEY:
15      Q.   Okay. Tables -- so this is subsection f, so
16  now we're -- we're out of the general observations that
17  we were discussing before, and we're in a new section,
18  the "Process Evaluation" -- "Evaluation for CPD Personnel
19  Complaints." Second paragraph here, it says, "Tables 4
20  and 5 present the general recurring themes arising from
21  content analysis of the internal investigation." What
22  are these recurring themes that you're referring to here?
23      A.   Well, if you -- if you look in Table 4,
24  you'll see where it says "observations."

238

1       Q.   Okay. So those are your recurring themes --
2   those observations there?
3       A.   Yes.
4       Q.   Okay. And are you offering any opinions on
5   specific investigations that should have had a different
6   outcome?
7       A.   Well, any one of these investigations were
8   certainly subject to a different outcome had all of this
9   information been obtained.
10      Q.   All right. So -- and then again you say in
11  here that "The investigations are superficial, not
12  complete, and do not comport with accepted industry
13  standards." What standards are you referring to there?
14      A.   The investigative practices that we've talked
15  about all along -- that these are the component pieces
16  that you would expect to find in an internal affairs
17  investigation.
18      Q.   We'll try to talk about a couple of these.
19  If we need to bring them up, I can find them, but let's
20  go to Table 4. The first CR is 123850, and in this
21  second bullet point there, you say, "No officer reports
22  were submitted." What does that mean?
23      A.   That the individual officers were not
24  required to submit reports documenting their actions -- a

239

1   common investigative practice.
2       Q.   Okay. And then number 3, you say, "No
3   interview with the victims," but you cite to footnote 52,
4   which if we go down, it says, "Although the investigator
5   did attempt to contact the victims/complainants through
6   their attorney, the attorney told the investigator his
7   clients would not give a statement. There's no customary
8   declination letter from the attorney. The declination
9   cannot be verified."
10           What else -- if the attorney won't let
11  the investigators talk and the attorney does not provide
12  a declination letter, what else are the internal affairs
13  investigators supposed to do?
14      A.   Well, in this particular instance -- I mean,
15  this one isolated case, I would say that the declina --
16  the dec -- oh, excuse me -- the declination letter would
17  be -- would be documented by the investigator, sent to
18  the attorney. In that time, it would be done via fax
19  machine. The attorney would -- would sign it and send
20  it -- and send it back.
21           Now, naturally, the attorney might refuse
22  to do that, but then there would be a documented process.
23  "This is the letter I sent to the attorney. This is what
24  I said. Here's the fax sheet" -- or the fax receipt,

JON SHANE, 05/26/2023

240

1    rather; excuse me -- "trying to" -- "to document that."
2        Q.   All right.  Moving on to page 41, Table 5.
3    We'll go all the way down to the -- so it's CR 166878,
4    and the third item you say here is "No canvass at the
5    scene."  And I can pull up the CR if you want, but I took
6    a look at the CR, and this CR was initiated because of a
7    civil suit a year after the incident.  In a case like
8    that, what kind of canvass of a scene would be helpful a
9    year after the incident?
10       A.   Well, you revisit the scene to examine it,
11   take measurements, to see if it's -- if it's any
12   different than it was at the time of the incident.
13   There -- there may be people that were there at the time.
14   I mean, obviously, of course, things may have changed,
15   but it's -- it's an element of -- of corroboration
16   because you want to be able to make sure that what's
17   being told to you actually exists insofar as possible.
18       Q.   And then number 6, you say, "No target letter
19   issued to the officers."  What does that mean?
20       A.   A target letter is a letter that -- informing
21   them that they are under investigation.
22       Q.   I'm going to represent to you, in my review
23   of the file, these officers were served with a summons
24   in -- of the civil suit.  Isn't that sufficient to let

241

1    them know that they're the subject of an investigation?
2        A.   Well, I mean --
3    MS. BONJEAN:  Objection to --
4            Hold on.
5            I'm going to object -- I'm going to
6    object to the form of that question.
7            Go ahead.
8        THE WITNESS:  I mean, if you're telling me that
9    they used that as a proxy, all it tells me is that
10   they're subject to a civil suit.  It doesn't necessarily
11   tell me that they're subject to an internal affairs
12   investigation.
13   BY MS. CARNEY:
14       Q.   Okay.  So this one continues on to the next
15   page, and we have number 7 that says, "No office" --
16   wait.  Yeah -- "No officer statements taken," and you
17   have a little footnote there.  And footnote --
18       A.   And what does the footnote say?
19       Q.   Sorry.  Footnote 55 -- 4 all the way at the
20   bottom says, "The accused officer could not be
21   interviewed because he suffered brain damage in a
22   motorcycle accident."
23           Sorry, Brett.  Can you --
24       A.   I remember seeing that, yeah.

242

1        Q.   Okay.  You remember it.  What else could be
2    done in the -- when an officer has brain damage and
3    cannot be interviewed?
4        A.   Well, again, I mean, if we're talking about
5    this one particular instance, there -- there didn't seem
6    to be anything further at any -- at any other given time.
7    Now, if -- if there's nothing else, then I would concede
8    the point that, you know, that -- that point -- that
9    point in that particular investigation might not be
10   relevant.  But that's also why I -- you know, I put it
11   down there.  I didn't want you to think I was leaving
12   something out.
13       Q.   All right.  Page 43.  You -- so that first
14   full paragraph -- we'll move on from the tables -- third
15   line -- it's, like, the fourth or fifth sentence down
16   here.  It says -- or line down.  It says, "The process
17   evaluation indicates investigations frequently contain
18   missing elements that could change the disposition of the
19   case."  What is your basis for saying that these elements
20   could change the disposition of the case?
21       A.   Well, it's distinctly possible that if the
22   investigation was complete, they would have had more
23   corroborating information, more evidence to sustain the
24   charges.

243

1        Q.   Okay.  And then moving down, you say, "Each
2    investigation that is flawed, but subsequently endorsed
3    by each member of the command staff in the chain is
4    explicit approval of the investigation process."  Do you
5    see that?
6        A.   Yes, I see it.
7        Q.   Okay.  Are there any specific investigations
8    that you are saying were flawed that you reviewed?
9        A.   Well, the list that I -- that I just showed
10   you in Tables 4 and 5.  I think there was another one
11   also that's in this report where an investigator imputed
12   intent on behalf of the particular officer when intent is
13   not an element of police department rules and
14   regulations, and the officer admitted that they
15   proffered -- I think it was fictitious information.  I
16   don't remember exactly.  And then they -- they rendered a
17   not sustained disposition.
18           Now, anybody looking at that would say to
19   themselves, "This investigation has to go back because
20   the disposition is" -- "is incorrect."  But most of these
21   investigations were sent through with these errors in
22   them and endorsed all the way up the chain of command.
23       Q.   Okay.  And when you say that if the
24   investigation was done complete, based on your assessment

JON SHANE, 05/26/2023

244

1  of them, more evidence could have sustained the charges,
2  the opposite could also be true -- right? -- more
3  evidence could have kept the disposition the same?
4      MS. BONJEAN:  Objection.  Form.
5      THE WITNESS:  The answer is yes, it's possible, but
6  that's why we rely on a completed investigation so we can
7  say that we've -- that the process has been reasonably
8  executed and fair.
9  BY MS. CARNEY:
10     Q.   Okay.  Page 44, you talk about -- so this
11 starts with the -- on the page before.  You say,
12 "Supervisory review and approval of police reports at the
13 time they are submitted is an administrative function
14 aimed at accountability and is intended to ensure the
15 reports are complete and reflect the actions and
16 omissions of the submitting officer."
17          Which -- are you talking about specific
18 reports in this subparagraph, or is this a general
19 observation?
20     A.   It's -- it's a general observation that any
21 report that is submitted by a police officer or an
22 investigator -- any report anywhere is what I'm saying --
23 that the reports are supposed to reflect the actions and
24 omissions of that officer; so if we're talking about

245

1  investigative tasks -- the things you did, the things you
2  didn't do.  If we're talking about a particular police
3  officer who was required to submit a report as part of
4  their internal affairs investigations, what is said --
5  contained in that report and what is not contained in
6  that report.
7      Q.   Okay.  But this paragraph in -- this
8  subsection in particular is -- is general observations.
9  You're not pointing out specific reports in the CRs that
10 you looked at that you are saying are incomplete and how
11 they were incomplete; right?
12     A.   No, I'm -- I'm making this as -- as a general
13 observation.
14     Q.   Okay.  In subsection --
15     THE REPORTER:  Did you mute, Jen?  You're on -- did
16 you object?
17     MS. BONJEAN:  Oh, I'm sorry.  Yes.  I apologize.
18 My dogs were barking.  I put myself on mute, but yes, I
19 had an objection to that question.  I think Jon answered,
20 though.
21          Go ahead.
22 BY MS. CARNEY:
23     Q.   Subparagraph ii there, you say, "The approved
24 department forms are utilized, which ensure consistency

246

1  and due process."  Are you -- again, is this -- are you
2  saying specific forms were not being used, or is this a
3  general observation?
4      A.   No.  It's a general observation about --
5  aimed at accountability and supervision.
6      Q.   So in that same vein, on the bottom of 44,
7  you say, "Because the supervisors endorsed the
8  investigations submitted by the internal affairs
9  investigators, the supervisors agreed with the
10 investigator's method even though the method did not
11 comport with accepted industry standards."
12          Are you issuing this opinion on -- in
13 regards to specific supervisors, or is this a general
14 observation?
15     MS. BONJEAN:  Okay.  I'm going to object to -- you
16 keep using the word "general" observation.  I know he
17 used that at one point, but that's not what he says here;
18 so I'm going to object to the form of that question.  I
19 think this is a finding of his.
20          But go ahead.  You can go ahead.
21     THE WITNESS:  So what I'm saying here is that the
22 missing component pieces resulted in incomplete
23 investigations, and all the way through the chain of
24 command, those investigations bearing those missing

247

1  components were endorsed by supervisors.  Those missing
2  components did not comport with accepted practices;
3  therefore, they were not supervising and they were not
4  managing the internal affairs process as they should
5  have.
6  BY MS. CARNEY:
7      Q.   Okay.  So then which supervisors are you
8  talking about?
9      MS. BONJEAN:  I'm going to object --
10     THE WITNESS:  Any one of the supervisors --
11     MS. BONJEAN:  -- object to the form of that
12 question.
13     THE WITNESS:  Any -- any one of the supervisors who
14 endorsed those reports -- those specific reports.
15 BY MS. CARNEY:
16     Q.   So any supervisor on any CR that you've
17 reviewed?
18     A.   That was incomplete.
19     Q.   But you don't have -- okay.  Which CRs are
20 you indicating are incomplete?  The ones just contained
21 in Tables 4 and 5, or are there others?
22     MS. BONJEAN:  Objection to the form.  And asked and
23 answered.
24     THE WITNESS:  I'm specifically referring to 4 and

JON SHANE, 05/26/2023

248

1    5.
2    BY MS. CARNEY:
3        Q.   Okay.  So any supervisor that reviewed the
4    investigations contained in Tables 4 and 5 and endorsed
5    those investigations are accountable for incomplete
6    investigations; is that what you're saying?
7        MS. BONJEAN:  Objection to the form of the
8    question.
9            Go ahead.
10       THE WITNESS:  They're -- they're accountable for
11   allowing an incomplete investigation to go forward, and
12   that means that they've endorsed the -- the investigative
13   process as it stands in its incomplete fashion.
14   BY MS. CARNEY:
15       Q.   Okay.
16       A.   Can we take five for a bathroom break?
17       Q.   Absolutely.
18       MR. ENGQUIST:  Actually, why don't we just take ten
19   if we can?
20       THE WITNESS:  Okay.
21       MR. ENGQUIST:  I need a break, too.
22       MS. BONJEAN:  How much time do we have on the
23   record, too?  I'm sorry.
24       THE VIDEOGRAPHER:  Give me just one second.  I can

249

1    add it up.
2        MS. CARNEY:  Did you go off, Nick?
3        THE VIDEOGRAPHER:  We'll go off the video record at
4    12:55 p.m.
5            (Recess taken.)
6        THE VIDEOGRAPHER:  This is the beginning of Media
7    Unit 3.  We are back on the video record at 1:07 p.m.
8    BY MS. CARNEY:
9        Q.   Okay.  Back to Exhibit 3, which is your
10   initial report, and we're on page 48.  Okay.  And let's
11   look at Table 8, "Complaints by Category," and I think we
12   talked about this a little bit when we started the dep in
13   the initial portion of it, but who created these
14   categories?
15       A.   Well, these are the categories that are
16   reflected in the narrative portion of the CR
17   investigations.
18       Q.   Okay.  Moving on to page 50, subparagraph --
19   oh, sorry.  Got to keep going a little bit.  Thanks,
20   Brett.
21           Subparagraph b here.  I'm going to say
22   this wrong, I'm sure.  Is it the Pareto Analysis?
23       A.   Pareto.
24       Q.   Pareto.  Okay.  Can you explain to me the

250

1    Pareto Analysis or the Pareto Principle?
2        A.   Yeah.  It's basically what's known as the
3    80-20 Principle.  So you have categories of complaints.
4    You then look at the number of complaints ordered from
5    greatest to least.  You figure out the percentage that
6    each of those -- that each of those complaint categories
7    represents.  Then you have the cumulative percentage, and
8    then you have the cumulative percentage of categories.
9    And if you scroll down, I'll show you exactly what I
10   mean.
11       Q.   Yes.  If we could go to paragraph -- or
12   page 51, Table 9, I think talks about the cumulative
13   percentage and the cumulative percentage of complaint
14   categories.
15       A.   Yeah.  So you're looking at the final
16   product, and what this analysis is intended to do -- and
17   this is a basic descriptive statistic that you would find
18   supervisors in internal affairs doing, presenting this,
19   you know, to police managers to get a handle on which
20   categories of complaints represent the most potentially
21   risky issues.
22       Q.   Okay.  So complaints by category, these
23   categories are the same categories that are in Table 8
24   that we just talked about; right?  They're just sorted

251

1    into this Pareto Analysis of 80-20?
2        A.   That's correct, yes.
3        Q.   Okay.  And so the little letter n here,
4    that's the number of total complaints --
5            (Simultaneous speaking.)
6        A.   Yes.  That's -- those are the -- that's the
7    frequency of it and, in statistical terms, just stands
8    for frequency.  That's all.
9    BY MS. CARNEY:
10       Q.   Got it.
11       A.   But it's the number, yes.
12       Q.   Okay.  And when we're saying complaints by
13   category, the unit of analysis when we're saying
14   complaints in this context, we're talking, again, about
15   the allegations; right?
16       A.   Yes.  Just -- can you just scroll to the
17   bottom of this table?  Let me see what the -- the sum is.
18   I just want to make sure that I am accurate, but I'm
19   reasonably certain that I am.  All the way down --
20       Q.   So this --
21       A.   -- to the bottom.
22       Q.   Yeah.  It goes all the way to page 53, and
23   the total is 746.
24       A.   Yes, yes.  I'm right.  Uh-huh.

JON SHANE, 05/26/2023

252

1    Q.   Okay.  So complaints in this -- the unit of
2  analysis is the allegations?
3    A.   That's right.
4    Q.   Got it.  So the percentage, that's the
5  percentage of total allegations in the data set?
6    A.   Yes.
7    Q.   Okay.  And then cumulative percentage, that's
8  just another way of saying total percentage in the data
9  set?  Because I see that those -- oh, no.  That can't be
10  right because the numbers aren't the same, necessarily.
11    A.   No.  Cumulative percent -- let me just
12  explain this real quickly.  Let me go -- and I gave you
13  this before, but now that we're looking at it, it'll
14  probably be a little clearer.
15        So you start with the category of
16  complaint, and then what you do is sum those by
17  greatest -- and you sum them and then order them greatest
18  to least, which is what you see in column n, as in
19  "Nancy."
20    Q.   Okay.
21    A.   The next column is percentage.  233
22  complaints represent 31.2 percent of the complaints that
23  are shown in this table.
24    Q.   So 31.2 percent of the 746 total

253

1  allegations --
2    A.   Yes.
3    Q.   -- in this table?  Got it.  Okay.
4    A.   Are -- are assaults.  And then the cumulative
5  percentage is the percentage of each of those added
6  together to sum to 100; so you'll notice the first one is
7  31.2 percent, and the second one is 7.2 percent.  If you
8  add those together, the cumulative percentage of those
9  two things by the time you get down to threats is
10  38.5 percent.
11    Q.   Okay.  What is the purpose of -- what does
12  the cumulative percentage show?
13    A.   It shows that -- if you look over to the --
14  to the right-hand side, that 2.4 percent of the
15  categories include 38 percent, which is just those two
16  categories.
17    Q.   Okay.  So 2.4 -- so we're looking at threats;
18  right?
19    A.   So the first two -- the first two categories,
20  assault and threats, you -- you see that; right?
21  Those --
22    Q.   Yes.
23    A.   -- you see those?
24        Okay.  So those two categories make up

254

1  38.5 percent of the allegations that have come in.
2    Q.   Got it.
3    A.   And then right below that, you'll see 45.2
4  and --
5    Q.   Okay.  So each one is basically adding on to
6  the -- to the next?
7    A.   Yes.  That's why it's called a cumulative
8  percentage.
9    Q.   Okay.
10    A.   It's a cumulative total.
11    Q.   And then the cumulative percentage of
12  complaint categories, could you just explain that one to
13  me one more time?
14    A.   Yeah.  So you take the number of categories.
15  You divide by one, and it's 1.2 percent, and then you add
16  1.2 percent to each of those as you go.  As you can see,
17  the first one is 1.2.
18    Q.   Okay.
19    A.   If you add 1.2, that's going to be 2.4, and
20  then if you add 1.2, it's going to be 3.6.
21    Q.   Okay.  So say we go all the way down to
22  unlawful entry and search, and so that includes -- one,
23  two, three, four, five, six, seven -- eight categories.
24  So eight categories are 8.3 percent of the total --

255

1    A.   That's right.  8.3 percent --
2    Q.   -- allegations?
3    A.   Yes.  8.3 percent of the -- of the categories
4  represent 61.5 percent of the complaints that came in.
5    Q.   Got it.  Okay.  Okay.  So then going to
6  page 54, Table 10 is the "Pareto Analysis of Frequency of
7  Complaints by Year."  So this would have been the same
8  type of analysis as Table 9 but broken down by year
9  instead of by complaint category; right?
10    A.   Yes, that's right.
11    Q.   Okay.  And again, when you look down here, it
12  says 746.  This is the unit of analysis' allegations;
13  right?
14    A.   Yes, correct.
15    Q.   Page 57, this is a table talking about
16  sustained complaints by complaint source?
17    A.   Okay.  Yes.
18    Q.   So this -- you say, "Table 11 suggests
19  potential bias in the investigation where there is an
20  intrinsic credibility granted to those inside the
21  organization who initiate a complaint compared to those
22  from outside the organization."
23        Are there any other variables in play
24  here other than internal or external, or is that the only

JON SHANE, 05/26/2023

256

1   variable that you looked at for the sustained -- the rate
2   of sustained -- the sustained rate?
3       MS. BONJEAN: Objection to form. Sorry. Form.
4       THE WITNESS: If you're referring to Table 11, the
5   answer is no. It's only the complaint source and the
6   disposition.
7   BY MS. CARNEY:
8       Q.   Okay. And then on the bottom of this page,
9   it says, "Pattern of Complaints Against the Defendant
10  Officers," and we have subparagraph a, "Between 1980 and
11  2008, the defendant officers accumulated 152 individual
12  complaints arising from 48 different complaint
13  categories." This 152 individual complaints, what is the
14  unit of analysis there? Is that CR, allegation, or
15  something else?
16      A.   I don't -- I don't recall. I think I'd have
17  to look at that another time. But it might be -- I think
18  it's the -- it's the allegations. Can you -- can you
19  raise the zoom level for me, please, just a little bit?
20      Q.   Like, bigger or smaller?
21      A.   Yeah. Raise it to, like -- like, 170 or
22  something. That should do. Yeah. That's -- that's
23  good. Very good. If you scroll down -- let me -- can I
24  see the table below? Scroll -- keep scrolling. Let me

257

1   see -- all the way to the bottom.
2       Q.   Oh, yeah. There's a footnote there, so that
3   might -- so footnote 74 says, "The unit of analysis is
4   complaints, filtered by defendant officers." So again,
5   complaints, that was allegations as the unit of analysis;
6   right?
7       A.   Yes.
8       Q.   And then Table 12 in total is the same
9   analysis that we talked about from Table 9 but sorted by
10  defendant officers; right?
11      A.   Can we go back up and let me see the top,
12  please? Yes, that's right. No, no, no. Table 12 --
13  yeah. There you go. Little higher. Yes.
14      Q.   All right. Good news is I'm done with that
15  report for now. Bad news is I got to go to your
16  supplemental report.
17      A.   Okay.
18      Q.   So we're going to go to Exhibit -- what I've
19  marked previously as Exhibit 15, and this is -- we talked
20  about it briefly at the beginning of the dep. This is
21  the supplemental report that you issued in this case --
22      A.   Yes.
23      Q.   -- regarding some additional CR files for
24  Defendant Guevara; right?

258

1       A.   Yes.
2       Q.   Okay. Just a couple points here. The
3   first -- second paragraph here, you say, "Of particular
4   importance are CR files 124631 and 150473." Are you --
5   do you have any opinion or understanding about whether or
6   not those CR files are complete?
7       MS. BONJEAN: Sorry. Objection to the form and --
8   and also foundation, I guess.
9       THE WITNESS: I don't know if they are complete or
10  incomplete. I mean, I'm presuming that they are complete
11  because I would expect the CPD to have complete records.
12  BY MS. CARNEY:
13      Q.   So I know I used the word, so let me try
14  to -- when you say that the files have complete -- you
15  say "complete records." What does that mean? What
16  records are you assuming are -- sorry. That was a bad
17  question.
18           Do you know whether or not any -- the CRs
19  are missing any information regarding the internal
20  affairs investigation?
21      MS. BONJEAN: Objection to the form and foundation.
22      THE WITNESS: Well, they're missing component
23  pieces, yes. There -- there is -- there's a table at the
24  end of this document. Yes.

259

1   BY MS. CARNEY:
2       Q.   Okay. I guess my question is a little bit
3   different. I'm not asking you if you believe that
4   they're missing component pieces. I'm asking you if you
5   believe that there are pages that were completed that
6   contain information that are no longer in the -- in that
7   file?
8       MS. BONJEAN: Objection to the form. And
9   incomplete hypothetical --
10      THE WITNESS: Oh, in other words --
11      MS. BONJEAN: -- speculation.
12           Go ahead.
13      THE WITNESS: Sorry. Oh, sorry. I stepped on you.
14  Did you want to say that again, Jen?
15      MS. BONJEAN: No. I think she got me. Go ahead.
16      THE WITNESS: So, Theresa, you're asking me
17  hypothetically that the investigation contained 20 pages,
18  but I only saw pages 1 through 10?
19  BY MS. CARNEY:
20      Q.   Correct.
21      A.   I don't know that to be the case.
22      Q.   Further down here, you say, "This
23  investigation is replete with errors and is not as
24  thorough as required and is not impartial." What errors

JON SHANE, 05/26/2023

260

1  are you identifying in the CR 124631?
2      A.   Can you go all the way to the end, please,
3  all the way down to the table that's appended?  Yeah.
4  That's the table.
5           Is this what you're asking, Theresa?
6  These are the missing components.
7      Q.   Okay.  So -- well, let me ask you this.
8  Table 1 here has -- is called "Missing Components," and
9  it lists by CR file.  Are these the same component pieces
10 that you are analyzing in your original report in
11 Tables 4 and 5?
12     A.   Yeah, the same -- same elements.  Yes.
13     Q.   Okay.  So when you say that the investigation
14 is replete with errors, it's that it is missing these --
15 these component pieces as you identify them in Table 1?
16     A.   That's right.
17     Q.   Okay.  And at the very bottom of page 1,
18 you've got a handful of footnotes, and at the very bottom
19 of the footnote -- the last footnote, it says, "Although
20 Officer Guevara cannot have been charged with Ethnic
21 Intimidation for the offense against Ms. Turner since the
22 law had yet to be effective, he fulfilled the elements of
23 the crime by assaulting Ms. Turner based partially on her
24 race."

261

1          Are you crediting Ms. Turner's
2  allegations in the complaint?  Are you finding -- sorry.
3          Are you making a credibility
4  determination regarding the allegations in the Turner
5  complaint, 124631?
6      A.   I'm not making, I guess, a credibility
7  determination as much as I'm -- I believe that the
8  complaint that has -- as you -- as you see it as
9  presented in the CR file is accurate.
10     Q.   Okay.
11     A.   I mean, there's no doubt that the
12 investigation had to be investigated as I'm -- as I'm
13 talking about here.
14     Q.   Page 2, the first full paragraph.  So
15 earlier, you say this -- this complaint was not
16 sustained; I didn't ask that before, but this complaint
17 that but -- I didn't ask that before, but this complaint
18 was not sustained; is that correct?
19     A.   I believe the next one was sustained.  Yes.
20     Q.   Okay.  So later in this paragraph, though,
21 you say, "There's no evidence in discovery that CPD
22 disciplined Officer Guevara or subjected him to any
23 corrective action."  If the complaint wasn't sustained,
24 what punishments should've CPD imposed on Guevara at the

262

1  time?
2      A.   Well -- well, remember what I had said
3  originally.  First, that internal affairs is a -- is a
4  process-oriented practice.  It's not an outcome-oriented
5  practice.  That's number one.  Number two, given that
6  there are so many errors here, things that were not done,
7  it's difficult -- it's difficult to say that the -- that
8  the outcome wouldn't have been different.  That's number
9  two.  And -- and number three, there's no reason why they
10 could not have monitored him under Personnel Concerns or
11 monitored him with extra supervision or moved him out of
12 an enforcement position.
13     Q.   I believe that complaint was in 1982; is that
14 right?  I think we looked at --
15     A.   I believe it was '82, yes.
16     Q.   Okay.
17     A.   If you just wanted to go back up and put it
18 on the record --
19     Q.   Yeah.  We can just -- sorry.
20     A.   Just go for the date.  Yeah.  Right there.
21 So August 17, 1982, and the second one was July 16, 1986.
22     Q.   Yep.  Okay.  So then moving on to the next
23 paragraph.  You say, "About four years later, Officer
24 Guevara was again involved in an incident that should

263

1  have been classified as a biased crime.  CR investigation
2  150473 concluded with a 'sustained' finding for a
3  'Violation of Rule 8 - disrespect to or maltreatment of
4  any person while on or off duty.'"  Do you see that?
5      A.   Yes.
6      Q.   Okay.  You said -- then you say, "However,
7  CPD did not sustain the complaint for assault, which is
8  precisely what occurred."  Are you making a credibility
9  determination in regards to the allegations in this CR?
10     A.   I'm -- I'm saying that the -- that the CR as
11 presented indicates that an assault occurred and that it
12 was corroborated by witnesses, and they sustained it as
13 such.
14     Q.   Moving on to page 3, footnote 9.  I'm trying
15 to think -- find where it falls in here.  This is for
16 CR 150473, Mr. Warren.  The very bottom of the first
17 paragraph says, "There's also no evidence in discovery
18 that CPD disciplined Officer Guevara or subjected him to
19 corrective action."  But then footnote 9 says, "The CR
20 file indicates that Chief Administrative" --
21 "Administrator David Fogel recommended Officer Guevara
22 receive five days' suspension, but there's no evidence in
23 discovery that this was executed."  Do you see that?
24     A.   Yes.

JON SHANE, 05/26/2023

264

1      Q.   Okay.  Doesn't that show that the CR file
2   itself is not a complete -- is an incomplete CR file
3   since there's no -- since it notes that he was
4   recommended for five days' suspension, but we don't know
5   what happened?
6      MS. BONJEAN:  Objection.  Form.  Foundation.
7   Speculation.
8      THE WITNESS:  Can you repeat that again?  I'm
9   sorry.  Please.
10  BY MS. CARNEY:
11     Q.   Yeah.  Sorry.  So you note here that there is
12  indication in the CR file that he was to -- that it was
13  recommended that Officer Guevara receive five days'
14  suspension, but we don't know what the ultimate
15  suspension was; right?
16     A.   We don't know if there was anything that was
17  carried out by the CPD.
18     Q.   Right.  So my question isn't that evidence
19  that this file is incomplete since we don't know the
20  outcome of the recommendation?
21     MS. BONJEAN:  Objection to the form.  Speculation.
22     THE WITNESS:  I would -- I would say no, that it
23  appears to me that that's -- that's where the
24  investigation ended.

265

1   BY MS. CARNEY:
2      Q.   So it's your understanding that when
3   discipline is recommended, there's no other steps that
4   are taken within internal affairs or the Chicago Police
5   Department?
6      A.   No.  There's --
7      MS. BONJEAN:  Objection.  Misstates his test --
8            Let me -- let me --
9            Objection.  Objection.  Assumes facts not
10  in evidence.  Misstating his testimony.
11           You can answer.
12     THE WITNESS:  No, I'm not -- I'm not saying that
13  there are -- that there are no additional steps.  What
14  I'm saying is that there's no evidence in this file that
15  it was executed.
16  BY MS. CARNEY:
17     Q.   Okay.  Page 4, second sentence of the second
18  full paragraph, you say, "On page 48 of my original
19  report, there are no" -- "Table 7, there are no reported
20  CR complaints for 1982.  However, through the new
21  discovery material, CR 124631 was reported August 17th,
22  1982.  This is an indication that CPD internal affairs
23  recordkeeping function contains missing records that are
24  relevant to the agency's operating practice."  Do you see

266

1   that?
2      A.   Yes.
3      Q.   Okay.  Are you aware of whether or not that
4   CR would have been in the -- sorry.  Bad question.
5            Are you aware of whether or not in 1982
6   that CR was contained within the CPD internal affairs
7   recordkeeping functions?
8      MS. BONJEAN:  Objection to the form.  Foundation.
9      THE WITNESS:  I don't -- I don't think I'm --  I
10  don't think I'm clear on the question.  I mean, this is
11  something -- maintaining records is an organizational
12  function, you know.  Whether, you know, it necessarily
13  belongs to internal affairs or if it's another
14  recordkeeping function elsewhere in the organization,
15  they certainly should have had a record of it.
16  BY MS. CARNEY:
17     Q.   Right.  And I guess what I'm asking you is
18  are you aware of whether or not there was a record of
19  this CR during the relevant time period of, say, 1980
20  through 1992 --
21     MS. BONJEAN:  I'm going to --
22  BY MS. CARNEY:
23     Q.   -- prior to the underlying incident?
24     MS. BONJEAN:  I'm going to object to the form.

267

1   Incomplete hypothetical to the -- and specifically to the
2   relevant time period.  I don't know.  Relevant --
3      MS. CARNEY:  I defined it.
4      MS. BONJEAN:  -- to whom but --
5      MS. CARNEY:  I defined it.  Before the -- 1980
6   through 1992, which would have been prior to the and the
7   year after the underlying incident.
8      MS. BONJEAN:  But relevant -- but relevant how?  I
9   mean, I'm just going to object to the form.  I'm not
10  going to do a speaking objection.
11           But go ahead.
12     THE WITNESS:  So your question was -- can you
13  repeat the question?  I apologize.
14  BY MS. CARNEY:
15     Q.   Yeah.  So my question was do you know whether
16  or not -- so let me back up.  Today, 2023, this
17  particular record, it's your opinion that CPD internal
18  affairs recordkeeping function contains missing records
19  that are relevant to the agency's operating practices;
20  right?
21     A.   That is my position, yes.
22     Q.   Okay.  Do you believe that in -- between
23  1982 -- or I'm sorry -- 1980 and 1992, this particular CR
24  was missing from CPD internal affairs recordkeeping

JON SHANE, 05/26/2023

268

1  functions?
2       A.   Well, given that it wasn't produced in
3  discovery and it's related to Guevara, who is the
4  defendant, that is something that should have come
5  through discovery.  I don't know why it wouldn't have
6  been part of the discovery package at that time.
7       Q.   But that's not my question, though.  My
8  question is whether or not this particular CR was part of
9  the CPD internal affairs recordkeeping function between
10  1980 and 1992?
11      MS. BONJEAN:  Objection -- objection to the form.
12  Foundation.
13           She's asking whether you know whether it
14  existed in '92.
15      THE WITNESS:  It existed in 1982.
16      MS. BONJEAN:  She's asking whether you know whether
17  it was -- the police department had it up until at least
18  '92.  Do you know that?
19           Objection.  Form.
20      MS. CARNEY:  Thank you, Jennifer.
21      THE WITNESS:  I don't know specifically.
22  BY MS. CARNEY:
23      Q.   Okay.  All right.  Page 6.  You reference an
24  Officer Stegmiller.  Do you see that --

269

1       A.   Yes.  Stegmiller.  Yes.  Uh-huh.
2       Q.   -- in the first paragraph?
3            Who's that?
4       A.   CPD officer.  If you -- if you look down to
5  the -- I reference it in -- in one of the footnotes.
6  Actually, it might be up above.  I don't -- no.  Go down
7  a little further.  I'm sorry.  I just don't have -- I
8  don't have a copy of that report.  Can you go back up to
9  the other page?  Maybe it's up above.  Yeah.  Hold it --
10  hold it right here.  Yeah.  So if you look -- Theresa, if
11  you look at footnote -- it's hard for me to see -- I
12  think that's 14 --
13      Q.   Okay.
14      A.   -- you'll see the source data for -- for
15  Stegmiller.
16      Q.   Got it.  Okay.  In regards to your opinion
17  that certain CRs should have been criminally
18  investigated, is the -- is the mere allegation that a CR
19  might implicate a criminal statute enough in your mind
20  that it should be referred to the -- it should be
21  considered a crime and referred to the State's Attorney's
22  Office?
23      A.   It should be undertaken as such, yes.  And as
24  the investigation begins to unfold, there should be a

270

1  discussion between the CPD and the prosecutor's office
2  about what they know, how much evidence they have, and
3  whether or not there's anything to corroborate what
4  occurred.  And as that moves forward, I mean, there
5  absolutely has to be a discussion between the two
6  organizations, and then as they move forward, to
7  determine whether or not the evidence exists or it
8  doesn't.
9       Q.   All right.  I hate to take another break, but
10  I think I'm done; so I just want to quick check my notes
11  so I can pass it on to Josh.  We can probably only take
12  five minutes for this one.
13      THE VIDEOGRAPHER:  You want to take a break?
14      MS. BONJEAN:  Josh, do you think you'll have a lot?
15      MR. ENGQUIST:  No, I don't think I'll have a lot.
16      MS. BONJEAN:  Okay.  Great.
17      THE VIDEOGRAPHER:  All right.  Going off the video
18  record at 1:41 p.m.
19           (Recess taken.)
20      THE VIDEOGRAPHER:  This is the beginning of Media
21  Unit 4.  We are back on the video record at 1:54 p.m.
22      MS. CARNEY:  All right.  Dr. Shane, I am done.  I'm
23  going to pass it on to Josh.  Thank you.
24      THE WITNESS:  Okay.  Thank you.

271

1            EXAMINATION
2  BY MR. ENGQUIST:
3       Q.   Okay, Mr. Shane.  I just want to --
4       MS. BONJEAN:  It's doctor.  It's Dr. Shane.
5  BY MR. ENGQUIST:
6       Q.   I'm sorry, Dr. Shane.  The -- I just want to
7  ask you a quick question, and I don't think we need to
8  break out the whole thing.  But the CPD CR data master
9  file that was sent over, just so I can understand what
10  one thing means -- I understand you have the complaints.
11  You have the complaint categories, and you went through
12  the whole Pareto Analysis of the complaints.  I think I'm
13  good on that.
14           You have one column that says outliers,
15  and then you have false and true.  What does false mean,
16  what does true mean, or do you need me to break it up?
17      A.   No.  It's just the way Excel identifies
18  whether it is or is not outside the parameters.
19      Q.   Okay.  So true would be outside the
20  parameters, and false would be not an outlier; correct?
21      A.   Right.
22      Q.   Okay.
23      A.   And I think in the report that I identify
24  which ones are outliers.

JON SHANE, 05/26/2023

272

1    Q.   Okay.  I just wanted to make sure that I was
2  reading that correctly because true and false just didn't
3  seem to make sense to me.
4    A.   Understood.
5    Q.   Okay.  The other thing is -- do you have a
6  copy of your report with you or not?
7    A.   I do not.
8    Q.   Okay.  Then can I have the -- I might have
9  the -- have to have the report put up just -- but I don't
10  think I --
11    MS. BONJEAN:  You want to pull it up?
12    MR. ENGQUIST:  I might need to; I might not to --
13  might not need to.  I'd rather just kind of go through
14  this quick.
15    MS. CARNEY:  Brett's still here, so we -- it's
16  Exhibit 3 for...
17    MR. ENGQUIST:  Okay.  Thanks.
18  BY MR. ENGQUIST:
19    Q.   There's one part of your complaint --
20  actually, let's put it up.  Exhibit 3, page 61.
21    A.   Did you say a list of my complaints?  What
22  did you say?  I'm sorry.
23    Q.   No.  Paulnitsky's complaint.
24    MS. BONJEAN:  Oh, Paulnitsky's.

273

1    MR. ENGQUIST:  Yeah.
2  BY MR. ENGQUIST:
3    Q.   It's page 61.  If you go down a little bit to
4  the next paragraph.  Right there.
5        In this section, you're talking about
6  Officer Paulnitsky.  That's what I wanted to ask you
7  about.  All right?
8    A.   Okay.
9    Q.   Okay.  In here, if you go down a little
10  further to the footnote, please, footnote number 81.
11        And the footnote -- and it's a lengthy
12  footnote; it goes to the next page -- you're talking
13  specifically about one CR -- CR --
14    A.   Yes.
15    Q.   -- 237040?
16    A.   Yes.
17    Q.   Okay.  This has to do with whether or not --
18  submitting a false official report.  Do you recall that?
19    A.   I do.
20    Q.   Okay.  Now, in what you have in here, and I
21  believe you started touching on it earlier when
22  Ms. Carney was asking questions, that all rule -- all
23  police rules and regulations are strict liability; is
24  that correct?

274

1    A.   Yes, correct.
2    Q.   Okay.  Now, does intent have anything to do
3  with it at all?
4    A.   No.
5    Q.   Okay.  So --
6    A.   Not for -- not for agency rules and
7  regulations, no.
8    Q.   Okay.  So for you, it doesn't make any
9  difference on whether or not he intended to put something
10  false in his report or whether it was accidental; is that
11  correct?
12    A.   Well, not --
13    MS. BONJEAN:  Objection to -- object to the --
14        Hold on, Jon, please.
15        Objection to the -- to the -- to the form
16  of that question and the foundation of that question as
17  to rules and regs.
18        Go ahead.
19    THE WITNESS:  So the -- the answer is no.  In a --
20  in a police department, rules and regulations do not have
21  a mental culpability element.
22  BY MR. ENGQUIST:
23    Q.   Okay.  Further -- further down in that -- in
24  that footnote, you put in here that "Officer Paulnitsky

275

1  evaded becoming Brady eligible because of his
2  dishonesty."  So, sir, were you making a determination
3  that he, in fact, was dishonest when he had an error in
4  this report?
5    A.   Well --
6    MS. BONJEAN:  Objection to form.
7    THE WITNESS:  Excuse me.
8    MS. BONJEAN:  Go ahead.
9    THE WITNESS:  He -- he admitted that -- that he did
10  that.
11  BY MR. ENGQUIST:
12    Q.   Did he admit that he did it on purpose, that
13  it was dishonest, or he made a mistake?
14    A.   No.  That -- that's irrelevant.  In -- in a
15  police department, your state of mind when you violate a
16  rule or regulation is not relevant.
17    Q.   Okay.  And just --
18    A.   And he admitted that he did put that
19  erroneous information, and the investigator found that
20  he -- that he put down erroneous information.
21    Q.   Okay.  And did -- did Officer Paulnitsky
22  say -- was there any indication that he said that -- that
23  he did that on purpose or it was an accident?
24    MS. BONJEAN:  Objection to the form.

JON SHANE, 05/26/2023

276

1    THE WITNESS:  Well, he -- I believe he said that it
2  was a mistake.
3  BY MR. ENGQUIST:
4    Q.   Okay.
5    A.   I don't know the exact language, but again,
6  state of mind is -- is irrelevant.  Intent is irrelevant
7  so --
8    Q.   Okay.
9    A.   -- it doesn't matter.
10    Q.   I'm just -- I'm just -- just making it clear.
11  He said it was a mistake?
12    A.   Oh, okay.  No.  I just -- I want to be -- I
13  want to be clear, too.  Sure.
14    Q.   Okay.  All right.  And the finding of the
15  investigator was that it was human error; correct?
16    A.   Well, if that's what he says.  I don't quite
17  understand what that means.
18    Q.   Okay.  All right.  And now, as I said before,
19  you have down in here and later on that Officer
20  Paulnitsky evaded becoming Brady eligible because of his
21  dishonesty.  So, sir, are you -- are you making a finding
22  that he was dishonest, that it, in fact, wasn't human
23  error?
24    MS. BONJEAN:  Objection.  Form.

277

1    THE WITNESS:  Well, he admitted that -- that he put
2  erroneous information in there.
3  BY MR. ENGQUIST:
4    Q.   Sir, is there something -- is that -- when
5  someone -- when someone has human error and admits that
6  it's a mistake, is that dishonesty that would make
7  someone Brady eligible?
8    A.   It -- it would in a police department, yes.
9    Q.   It would?
10    A.   It would.
11    Q.   So if an officer has an official police
12  report, like an arrest report, and puts down the wrong
13  address and later on admits, "I erroneously put down
14  false information there.  The address was, in fact,
15  wrong.  It should be this address," that person would
16  then be eligible for -- for Brady there?  They would be
17  dishonest; correct?
18    A.   Well, I mean it has to be a material issue.
19  It has to be a material issue that -- that's related to
20  Brady.  I put that in here.  But generally, when it is a
21  material issue, that makes you Brady eligible.
22    Q.   Okay.  So when someone wrote -- in this case,
23  it was a -- it was a -- was a report or a memo he wrote
24  to a superior saying he couldn't do outside training on a

278

1  certain day because he believed he had court, and later
2  on, he said, "I made a mistake.  Court was canceled.  I
3  can do the training"; correct?
4    MS. BONJEAN:  I'm going to object to the form.
5    THE WITNESS:  That's what was said, yes.
6  BY MR. ENGQUIST:
7    Q.   Okay.  And you believe that error is so
8  material that it shows dishonesty, and it should be
9  part -- make him Brady eligible; is that correct?
10    A.   Well, I can tell you that it certainly is an
11  element of dishonesty, and if it's -- if it's determined
12  to be such, yes, absolutely.
13    Q.   Okay.
14    A.   That's what police departments do.  They --
15  they -- they capture these kind of integrity
16  violations --
17    Q.   Okay.  What's --
18    A.   -- and they expect the report to be accurate.
19    Q.   Okay.  And just to be clear, the term
20  "dishonesty," does that have any element of intent in
21  your mind," to be dishonest?
22    A.   Not in -- not in terms of rules and
23  regulations.  It's -- it's -- it's irrelevant.  If you --
24    Q.   Okay.

279

1    A.   -- establish -- if the rule establishes that
2  you shall not use derogatory language and you do and then
3  you say, "Well, yeah, I did that, but it was a mistake,"
4  well, you -- you violated the rule.
5    Q.   Sir, we're not talking about using derogatory
6  language.  We're specifically --
7    A.   Any rule violation.
8    Q.   Any -- any rules.  Okay.  But my -- but my
9  question goes -- you go a little further than that.  I
10  mean, you say it should be strict liability.  He admitted
11  a mistake; therefore, false report.  It doesn't matter if
12  it's a human error or not.  And then you go on to say --
13  just to make sure it's clear -- that he should become
14  Brady eligible -- Brady eligible because of his
15  dishonesty.  Are you saying that if there's human error
16  in a police report, that that would make someone Brady --
17  somebody Brady eligible, no matter what it is?
18    A.   Potentially, yes.
19    Q.   Potentially?
20    A.   Yeah.
21    Q.   And when -- and when I say -- when you say
22  "potentially," what's the potentially based on?
23    MS. BONJEAN:  I'm going to object to the form
24  because the whole word eligibility is just eligible.  It

JON SHANE, 05/26/2023

280

1  doesn't say someone should be on a Brady list.  I
2  don't -- he's saying eligible.
3      THE WITNESS:  Okay.  The -- the violation itself
4  makes you eligible.
5  BY MR. ENGQUIST:
6      Q.   Okay.  If you --
7      A.   If -- if a rule exists in a police department
8  and -- your -- your mental state of mind does not matter.
9  So if you provide fictitious information or false
10  information, that certainly makes you Brady eligible.  I
11  mean, people are prosecuted for -- excuse me -- they're
12  prosecuted for -- give me a second.  I've got to think of
13  the -- what the terminology is that I'm looking for.
14  They're -- they're -- they're prosecuted for fictitious
15  police reports all the time, things that they did put
16  down and things that they didn't put down --
17      Q.   Okay.
18      A.   -- acts and omissions.
19      Q.   Okay.  You refer to his intent as his
20  dishonesty.  Are you making a finding that he was, in
21  fact, dishonest when he put down the -- the incorrect
22  information in the report?
23      A.   Well, he -- he admitted that he put incorrect
24  information.

281

1      Q.   Sir --
2      A.   Incorrect information is --
3      Q.   -- that's not my question.  My question was
4  are you making a finding that he was dishonest when he
5  put down the incorrect information in the report?
6      A.   Based on his admission, yes.
7      MS. BONJEAN:  I'm going to object to the form.
8  BY MR. ENGQUIST:
9      Q.   Based on his admission that he had human --
10  that it was erroneous, you're finding that's dishonest;
11  correct?
12      A.   It is.  It is, yes.  It's not accurate.
13      Q.   Okay.  So let me ask you.  Do you have the
14  same -- if someone goes on the stand and is under oath
15  and says something and is mistaken when they said it,
16  it's wrong, but they didn't intend to say something
17  wrong.  They just made a mistake.  Would you say that
18  person is dishonest, or would you say just the person
19  made a mistake?
20      A.   I mean, it would have to be taken in its
21  context, but you could certainly investigate that as a
22  matter of perjury, sure.
23      Q.   I'm -- I'm not asking -- I'm asking about a
24  finding, sir, because you made a finding here that he was

282

1  dishonest --
2      MS. BONJEAN:  I'm going to object --
3  BY MR. ENGQUIST:
4      Q.   -- so I'm asking you --
5      MS. BONJEAN:  Objection to --
6          Hold on.
7          Objection to the form of that question.
8      MR. ENGQUIST:  Okay.
9      MS. BONJEAN:  I'm also going to say you are giving
10  him an incomplete hypothetical, and if you want to ask
11  him specifically about this finding in his footnote, if
12  you want to call it a finding, go ahead.  But you're
13  changing up a hypothetical, and it's incomplete.
14      MR. ENGQUIST:  Could you read back my question,
15  please?
16      MS. BONJEAN:  Wait.  Can you read -- oh, read back
17  the question.
18      MR. ENGQUIST:  Yeah.  Please.
19          (Whereupon the question was read
20          back.)
21      THE WITNESS:  How do you differentiate between a
22  mistake and -- and not a mistake -- on purpose?
23  BY MR. ENGQUIST:
24      Q.   Well, that's what I'm asking you, sir.

283

1  Doesn't it go to intent?
2      A.   In -- in a criminal proceeding, but in a --
3  in a police department, that's not the case.  In a police
4  department with an administrative violation, there's no
5  intent required.  If the rules specify something and you
6  do something contrary to the rule, it doesn't matter what
7  the intent is.
8      Q.   But, sir, you used the term "dishonest";
9  correct?
10      A.   Yes.
11      Q.   And doesn't the word dishonest require some
12  form of intent?
13      A.   No.  It requires accuracy.
14      Q.   Okay.  So for your -- for your terminology,
15  dishonest is the same as being incorrect; is that
16  correct?
17      MS. BONJEAN:  Objection to the form of that
18  question.
19      THE WITNESS:  Yes, it does.
20  BY MR. ENGQUIST:
21      Q.   Okay.  So if you had an error in one of your
22  reports, it would be right to call you dishonest;
23  correct?
24      A.   Yeah, sure.

JON SHANE, 05/26/2023

284

1    Q.   Okay.
2    A.   Accuracy is important.
3    Q.   Dishonest.  Not -- not inaccurate, not
4    mistaken, but it would be correct to refer to you as
5    dishonest; correct?
6    A.   I would say so, yes.
7    Q.   Okay.
8    A.   I think so.
9    MR. ENGQUIST:  That's all I have.
10   MS. BONJEAN:  Okay.  Hold on one second.  You can
11   take that down.  I'm going to try not to take a break and
12   go right in.  Hold on one second.  One second.
13          Haley, do you have -- Haley, are you
14   there?
15   MS. COOLBAUGH:  Yes, I am.
16   MS. BONJEAN:  Okay.  I may have Haley pull up some
17   things along the way.  Okay.  I may need to be reminded
18   of what the actual exhibit numbers are because I think
19   everything I'm going to be pointing to is already an
20   exhibit.
21          Okay.  Okay.  First of all, can we pull
22   up Dr. Shane's report?  And I'm sorry.  What exhibit --
23   is it 4?  What is it?
24   MS. CARNEY:  3.

285

1    MS. COOLBAUGH:  That's Exhibit 3.
2          EXAMINATION
3    BY MS. BONJEAN:
4    Q.   Okay.  I'm going to present your report back
5    to you, Dr. Shane, as Exhibit 3, and I want to follow up
6    with a couple questions.  Okay?
7    A.   Uh-huh.
8    Q.   First of all, in your analysis, did you --
9    well, strike that.
10          You were retained by, obviously, my law
11   firm on behalf of the plaintiff to conduct an examination
12   of the Chicago Police Department's internal affairs --
13   internal affairs function; is that generally correct?
14   A.   Yes.
15   Q.   Okay.  And at page 11 of your report, one of
16   the conclusions or opinions that you rendered --
17          11, please.
18          -- is that the Chicago Police Department
19   failed to supervise its personnel consistent with
20   accepted industry practices when complaints against the
21   defendant officers were generated.  Do you see that?
22   A.   Yes.
23   Q.   Okay.  And did you put together a methodology
24   for testing that question that was posed to you?

286

1    A.   I did.
2    Q.   Okay.  And I'm not going to go through all of
3    it in detail because you have asked -- been asked a lot
4    of questions.  But did you lay out that methodology in
5    your report in a fair amount of detail?
6    A.   I did, yes.
7    Q.   Okay.  And in laying out your methodology,
8    did you rely on certain standards to test this question,
9    again, sir, to use in your determination of whether the
10   answer to this question on page 11 was yes or no?
11   A.   Yes.
12   Q.   Okay.  And can you tell me the different
13   standards to which you looked to determine whether or not
14   the Chicago Police Department failed to supervise its
15   personnel consistent with industry practices during the
16   relevant time period?  And at -- at a high level, you
17   can, you know, answer that question.
18   A.   Yes.  I can point to my own experience at the
19   time, having drafted policy, revised policy, having read
20   policy, being a professor of criminal justice since 2009
21   at John Jay College, and having an understanding of the
22   historical underpinnings of police policy, how they're
23   drafted, the IACP -- which is the International
24   Association of Chiefs of Police -- and their model policy

287

1    center, looking at policies that were crafted there,
2    examining police policies from other organizations when I
3    drafted policy.
4    Q.   Okay.  And did you look at any policy
5    specific to the Chicago Police Department?
6    A.   Several.  And I've -- I've noted them in this
7    document, yes.
8    Q.   Okay.  And in question 1, did you identify
9    some of the general police department generals orders
10   that you used as standards in reaching your conclusion
11   that the Chicago Police Department did not supervise its
12   personnel consistent with industry practices?
13   A.   Yes.
14   Q.   Okay.  Now I want to ask you specifically as
15   to Chicago Police Department General Order 82-14 which
16   deals with complaint and disciplinary procedures for a
17   thorough investigative process.  Did you look --
18   A.   Before you -- before you continue, can I have
19   somebody raise the zoom level on that for me so I can see
20   it?
21   Q.   Oh, oh, sure.
22          Yeah, Haley.  But let's put up -- well,
23   we don't have to.  Yeah.  Just -- you can put the policy
24   back up and just zoom in for Dr. Shane, please.

JON SHANE, 05/26/2023

288

1   MS. COOLBAUGH: You said put the policy back up or
2   his report?
3   MS. BONJEAN: No, no, I'm sorry. His report. My
4   apologies.
5   MS. COOLBAUGH: Sure.
6   MS. BONJEAN: Okay. You still didn't zoom in,
7   though. You zoomed in and then zoomed back out.
8   BY MS. BONJEAN:
9   Q.   Okay. Okay. Is that good, Jon?
10  A.   It's a little -- go ahead. Take it from
11  there.
12  Q.   Okay. So did you look at the Chicago Police
13  Department's General Order 82-14 regarding complaint and
14  disciplinary procedures as part of your analysis?
15  A.   Yes.
16  Q.   Okay. And you were asked a number of
17  questions about, I think, how you reached the conclusion
18  that the investigative process in internal affairs was
19  not thorough. Let me start with -- first of all, does
20  the -- did the Chicago Police Department in -- in 1990 or
21  1982 even demand a thorough investigative process of
22  internal affairs complaints?
23  A.   Yes.
24  Q.   Okay. And tell me based on the -- and,

289

1   again, I want you to think back to this relevant time
2   period. Were there -- were there policies in place, both
3   at the Chicago Police Department through this general
4   order and other police departments of which you were
5   familiar, that laid out, at least in broad strokes, what
6   was required to conduct a thorough investigation in an
7   internal affairs case?
8   A.   Yes. Generally, yes.
9   Q.   Okay. And did you rely on those standards,
10  including the Chicago Police Department's standard, in
11  setting out the investigative actions that you would
12  expect to see in an internal affairs investigation?
13  A.   Yes.
14  Q.   Okay. And I want to go, if we can -- give me
15  one second. I'll tell you. Okay. I'm going to go to
16  page 39. Dr. Shane, starting at page 39, you --
17  at lower case Roman -- or not Roman numeral -- lower case
18  f, you said, "Process Evaluation of CB" -- "CPD Personnel
19  Complaints." Do you see that?
20  A.   Yes, I do.
21  Q.   Okay. Did you review complaint register
22  files against those -- that standard or methodology that
23  you came up with of what should be in an internal affairs
24  complaint or investigation? That was a terrible

290

1   question.
2   A.   Yes.
3   Q.   Okay. Can you explain how you did that --
4   that process that you -- I know you laid it out, but if
5   you could explain how -- the methodology that you used.
6   A.   Well, the component pieces of an
7   investigation are things that you would find in either a
8   criminal or an administrative investigation. Whether you
9   interview someone, whether you interview the victim,
10  whether you canvass the -- canvass the scene, those are
11  basic investigative elements that you'll find anywhere in
12  any investigation; so those are the standards that I
13  would expect to see having been completed as part of the
14  internal affairs process by Chicago Police Department.
15  Q.   Okay. And you wrote here, "Tables 4 and 5
16  present the general recurring themes arising from the
17  content analysis of the internal investigation." Now,
18  you use the -- the language "recurring themes." Does
19  that mean you just sort of read through these and just
20  got a general sense of them, or did you do a granular
21  analysis of each complaint register investigation?
22  A.   No. I did a granular analysis, each of which
23  is shown below in Tables 4 and 5.
24  Q.   Okay. And did you examine every complaint

291

1   register investigation for the same categories of
2   investigative actions?
3   A.   Yes.
4   Q.   Okay. And does Table 4 and 5 lay out
5   specifically the -- results of that process?
6   A.   That's correct.
7   Q.   Okay. By the way, you mentioned this. I
8   want to ask you -- you said -- you said -- strike that.
9   Would you agree that the fundamentals of
10  a thorough investigation -- the fundamentals. I'm not
11  talking about whether technology is developed or any of
12  those things. But the fundamentals of an investigation,
13  whether it's criminal, administrative, or otherwise, have
14  they remained the same, for the most part, over the last
15  half century?
16  A.   I would say yes, at least that long.
17  Q.   Okay. All right. I want to go to page 23.
18  Okay. At lowercase e, you wrote, "General Observations
19  of the Chicago Police Complaint Data and the Supervisory
20  Process." You have that as a -- as a heading italicized.
21  Do you see that?
22  A.   Yes.
23  Q.   Okay. Can you tell me specifically what this
24  section identifies as -- well, strike that.

JON SHANE, 05/26/2023

292

1    When you said "general observations,"
2  again, do you mean, like, just hunches, or, you know,
3  what did you mean by "general observations"?
4    A.   I mean the ten things that are listed below
5  that the data revealed from the contents of the
6  investigations.
7    Q.   Okay.  And were your -- these observations
8  constitute your findings from looking at the data that
9  you reviewed and the additional materials you were
10  provided in determining whether the Chicago Police
11  Department had an internal affairs function that was
12  consistent with industry standards at the time?
13    A.   Yes.
14    Q.   Okay.  Okay.  I want to look at -- and I want
15  to look at them -- a couple of them real quickly,
16  including this Roman numeral i that says, "Failure to
17  Classify Personnel Complaints as Administrative or
18  Criminal."  Do you see that?
19    A.   Yes.
20    Q.   Okay.  So I believe that we looked at a
21  couple CR files in connection with this, and I do want to
22  go back to those real quickly.  But was it consistent
23  with industry standards at the time that an internal
24  affairs function would have a line of communication with

293

1  a prosecuting agency where allegations came into the
2  department concerning officer conduct that could be
3  construed as criminal in nature?
4    A.   Yes.
5    Q.   Okay.  And is it your opinion that the
6  Chicago Police Department, either in practice or in
7  policy -- however you want to put it -- did not have a
8  sufficient line of communication with the prosecuting
9  agency when a complaint was made against an officer that
10  could be construed, if true, as a criminal act?
11    MS. CARNEY:  Objection to form.
12    THE WITNESS:  Yes.  Sorry.  The answer is yes.
13  BY MS. BONJEAN:
14    Q.   Okay.  And I think the top, I guess, category
15  of allegations that you found in the data was assault;
16  correct?
17    A.   Can you repeat that?  I'm sorry.
18    Q.   Yeah.  The -- top or the highest number
19  of allegations that you found in the data that you were
20  provided and that you looked at, I should say, was, in
21  fact, a claim or allegation of an assault; correct?
22    A.   Yes.  That was the most frequently occurring
23  complaint, yes.
24    Q.   Okay.  Okay.  And I'm just trying to -- okay.

294

1    Haley, I want to -- let's pull up -- I'm
2  sorry.  I'm just trying to do this as efficiently as
3  possible.  I want to pull up -- let's pull up Complaint
4  Register Number 179835, which I think was Exhibit 8.
5    Okay.  I think you -- we looked at this
6  earlier.  This is the one regarding the -- Montilla's
7  shooting or off duty -- I don't know if it was off duty
8  or what.  It was a police shooting.  Do you remember this
9  one?
10    A.   Is this the one for excessive force or
11  unauthorized use of deadly force or something like that?
12    Q.   Yeah, I believe so.  I believe so.
13    A.   Okay.
14    Q.   Okay.  So -- hold on.  Let me pull it up
15  myself so I'm looking at the same thing.  Oh, I have it
16  here.
17    Okay.  Now, fair to say this complaint
18  register investigative file is 166 pages?
19    A.   Okay.  Yes.  I would agree with that.
20    Q.   Okay.  And I believe this is the one where
21  Theresa showed you a page where there was a name of a
22  state's attorney that was listed.  I'm going to find it
23  exactly.  Hold on one second.
24    A.   Yeah.  It was back a little further in that

295

1  document.
2    Q.   Okay.  The fact that there was simply the
3  name of a police officer listed in a mem -- or I'm sorry.
4  Strike that.
5    Does that fact that there was a name of a
6  state's attorney listed in some memo somewhere satisfy
7  you that the department, in connection with this
8  complaint register investigation, was meeting industry
9  standards in terms of its communication and consultation
10  with the prosecuting agency?
11    A.   No.
12    MS. CARNEY:  Objection.  Form.
13    THE WITNESS:  Sorry.
14  BY MS. BONJEAN:
15    Q.   Did you -- did you see anything in this -- at
16  least in this criminal -- strike that -- in this
17  complaint register investigation of coordination with the
18  prosecuting office or the Cook County State's Attorney's
19  Office about how this case should be handled?
20    A.   No, I did not.
21    Q.   And particularly with a police shooting case,
22  would you have expected to see that?
23    A.   Unequivocally, yes.
24    Q.   In fact, in the state of New Jersey, as an

JON SHANE, 05/26/2023

296

1  example, what happens in every police shooting case --
2  every last one?
3      A.   Well, do you want to talk about today or at
4  this time -- during this time?
5      Q.   No.  That's a good -- that's a good point.  I
6  guess, you know, today, every last one goes before a
7  grand jury; is that right?
8      A.   Yeah.  And today, the Attorney General's
9  Office has superceded local police departments and county
10  prosecutors' offices for deadly force investigations or
11  death investigations.  But at this time when police
12  shootings occurred, the local police department in
13  conjunction with the county prosecutor's office would
14  investigate this together --
15      Q.   Okay.
16      A.   -- and the county prosecutor's office would
17  provide the local police departments with the contents of
18  whatever it is they had done relative to the
19  investigation.
20      Q.   Okay.
21      A.   So the -- for example, the Newark Police
22  Department would have a complete -- a complete file --
23  internal affairs file including the documents from --
24  from the prosecutor.

297

1      Q.   Okay.  And I know Ms. Carney asked you a lot
2  of questions about whether you would expect to see the
3  prosecutor's file in here.  Putting aside whether the
4  complete prosecutor's file would have been here, would
5  you have expected to see communications or reports or
6  some type of documents that reflected consultation with
7  the State's Attorney's Office about how this case should
8  be treated?
9      MS. CARNEY:  Objection.  Form.
10      THE WITNESS:  Yes, unequivocally.
11      MS. CARNEY:  Asked and answered.
12  BY MS. BONJEAN:
13      Q.   Okay.  And did you see that?
14      A.   Well, let me just back up.  My answer was,
15  "Yes, unequivocally," to that previous question.
16          And then to your question about did I see
17  that, the answer is no.
18      Q.   Okay.  All right.  Let's go on then to, if we
19  could, I think it's exhibit -- it's Exhibit 4, which is
20  Complaint Register 223928, if you could pull that up,
21  Haley.  Thank you.
22          Okay.  And just to cut to the chase, this
23  is the sustained allegation as it relates to Detective
24  Guevara.  Do -- do you remember us discussing this CR?

298

1      A.   No.  Which -- which sustained complaint is
2  this one?
3      Q.   Okay.  So this is -- I'm going to represent
4  this is -- we're looking at Exhibit 4.  It's 223928.
5  It's sustained -- well, first, I'm going to have you look
6  at -- let's look at Bates stamp 3508, and if you need to
7  look at your report or something, let me know.
8          Okay.  Okay.  Yeah.  Just stop there.
9          Okay.  Do you see the -- the suspension
10  notification?
11      A.   Okay.  Yes, I do.
12      Q.   Okay.  And by the way, was it an industry
13  standard at the time that if a complaint register
14  resulted in some type of suspension, discipline, some
15  consequence in any way, it would be noted somewhere in
16  the internal affairs file or, in this case, what we call
17  the complaint register file?
18      A.   Yes, it would, absolutely.
19      MS. CARNEY:  Objection to form.
20      THE WITNESS:  Oh, sorry.
21      MS. CARNEY:  It's fine.
22      THE WITNESS:  The answer is, "Yes, absolutely."
23  BY MS. BONJEAN:
24      Q.   Okay.  Is it important that an internal

299

1  affairs investigation reflect what actually happened at
2  the conclusion of it?
3      A.   Well, when you say "actually" occurred, do
4  you mean the -- the incident or all of the component
5  pieces related to the investigation?
6      Q.   Okay.  Yeah.  Not a good question.
7          Is it -- was it important back in the
8  relevant time period -- and let's call it the early '90s
9  or late '80s -- that an internal affairs investigative
10  file or complaint register file reflect what the
11  department's formal position was in terms of the
12  officer's conduct and their response to it?
13      A.   Yes.
14      Q.   Okay.  Why is that, and was that important
15  back even during this relevant time period of the late
16  '80s/early '90s?
17      A.   Well, and it continues to be relevant today
18  because that establishes a full accounting of what
19  occurred, what responses the agency took to resolve that,
20  and what was done.
21      Q.   And in this particular CR file, it looks as
22  if there was a recommendation and notification that
23  Detective Reynaldo Guevara, while off duty, he engaged in
24  basically a domestic incident where there was an

JON SHANE, 05/26/2023

300

1  unjustified physical altercation with a female family
2  member. He -- it looks like by striking her. Do you see
3  that?
4      A.   Yes, I see that. Uh-huh.
5      Q.   Okay. Now, if this was anybody but Detective
6  Guevara, it was just a regular person, is this something
7  that is an arrestable offense?
8      MS. MCGRATH: Objection to form.
9      MS. CARNEY: Objection. Form.
10  BY MS. BONJEAN:
11     Q.   Again, you know, we're going to -- strike
12  that, and let me start over and lay some better
13  foundation.
14         If a complaint came in and someone made
15  this allegation or called the police, 911, and made this
16  allegation, what would happen to the average person if
17  that happened even back in 1990?
18     A.   Well, if the police went to the scene and
19  they developed probable cause, they'd be arrested.
20     Q.   Okay. And so this particular allegation was
21  sustained as to -- and I'm going to go -- well, strike
22  that.
23         You see there was a disciplinary
24  recommendation of -- for a suspension as to -- to

301

1  Guevara. Do you see that?
2      A.   Where does it say that on this document?
3      Q.   Well, it says "Suspension notification.
4  Cause of disciplinary action recommended by OPS." Do you
5  see that?
6      A.   Yeah, but I'm -- I'm just trying to follow
7  along here. It says that they "Hereby suspends the above
8  member for 1 day." Is that what you're -- is that what
9  you're referring --
10     Q.   Yeah, yeah. I'm just saying --
11     A.   Oh, okay. I'm sorry.
12     Q.   You see that; right?
13     A.   Yeah, yeah. I see it. Yeah.
14     Q.   Okay. Now back to, I think, what we were
15  discussing earlier, did you see anything in this CR
16  investigative file that showed that the Chicago Police
17  Department OPS investigators consulted with the Cook
18  County Prosecutor's Office about whether or not Guevara
19  should be prosecuted for this crime?
20     A.   No, I did not.
21     Q.   Okay. Now, I know that we looked at a
22  general offense case report, which is at page 3549.
23         Go ahead and go there.
24         Okay. Now, I think -- I think Theresa

302

1  was asking you -- well, you can see that, you know,
2  the -- the victim in this case made a complaint. In
3  fact, I think the other officers were disciplined for not
4  arresting him because of this complaint. But my question
5  is the fact that the victim in this case went and made a
6  complaint that nobody acted on, is that the same as
7  internal affairs consulting with a prosecuting agency
8  about how this case should be handled?
9      MS. CARNEY: Objection. Form.
10     THE WITNESS: No.
11     MR. ENGQUIST: Objection to the --
12     THE WITNESS: Sorry.
13     MR. ENGQUIST: Objection to form. Also
14  argumentative and leading -- leading nature in the
15  beginning.
16         But go ahead.
17     MS. BONJEAN: Okay. Well, fair enough, I suppose.
18  BY MS. BONJEAN:
19     Q.   First of all, did you see anything in --
20  apart from this, you know, that somebody made a
21  complaint -- it looks like the victim in this case -- did
22  you see anything in this file that showed that Detective
23  Guevara was actually investigated for having committed a
24  criminal offense by any -- by the prosecutors at all?

303

1      A.   No, I did not.
2      Q.   Okay. And did you see any reports or memos
3  or any documentation that suggested that there was any
4  communication from the internal affairs investigators
5  with anyone in the Cook County Prosecutor's Office
6  saying, you know, "There was this complaint. We have
7  sustained it. What do you intend to do, or what do you
8  want to do," or anything that showed a line of
9  communication between the two agencies?
10     A.   I did not see anything --
11     MS. CARNEY: Objection to form. Asked and
12  answered.
13  BY MS. BONJEAN:
14     Q.   Go ahead. You can answer.
15     A.   I did not see anything in that regard.
16     Q.   Do you have any reason to believe that just
17  because a complaint is made with a local precinct that
18  that automatically means that there's going to be a
19  criminal investigation conducted?
20     A.   No.
21     Q.   And by the way, I guess here's another
22  question. Is it problematic that this complaint is being
23  made to the Chicago Police Department about a Chicago
24  police officer? Well, let me ask you -- I'm sorry. I'm

JON SHANE, 05/26/2023

304

1    going to ask you this question.  Strike that.
2           If a complaint comes in as a criminal
3    complaint, does the Chicago Police Department have an
4    obligation to investigate it criminally?
5        A.   Can you repeat that?  I'm sorry.  Please.
6        Q.   Yeah.  If -- if someone comes in and makes a
7    complaint with the Chicago Police Department, "I was
8    battered," do they have an obligation to actually do some
9    investigation on it?
10       A.   Yes.
11       Q.   Okay.  Not only did you not see any
12   communications with the Cook County Prosecutor's Office,
13   but did you see anything in this file that showed that,
14   apart from taking this complaint, the Chicago Police
15   Department did anything to even investigate her
16   allegation criminally?
17       MS. CARNEY:  Objection to form.
18       THE WITNESS:  No, I did not.
19   BY MS. BONJEAN:
20       Q.   Now, would you --
21       A.   No, I did not.
22       Q.   Okay.  And if there was a parallel internal
23   affairs investigation and a parallel criminal
24   investigation by the Chicago Police Department, even

305

1    within the same agency, would you expect there to be some
2    overlap or communications between those two divisions of
3    the same agency?
4        A.   Yes, I would.
5        Q.   Would you expect --
6        MS. CARNEY:  Belated -- sorry.  Belated objection
7    to form.
8    BY MS. BONJEAN:
9        Q.   Would this -- would you expect the CR file to
10   contain any supplemental reports or any types of
11   investigative reports that -- that were prepared in
12   connection with the criminal piece of the investigation?
13       A.   Yes, I would.
14       Q.   And, in fact, have you seen that in other
15   cases that you look at or other CRs where they actually
16   have included, like, an arrest report or supplemental
17   reports?  Some of the other CR files do have those
18   reports in -- contained in them?
19       A.   Yes, there are others.  Correct.
20       Q.   And did we see anything like this in
21   connection with the complaint against -- battery
22   complaint against Mr. Guevara?
23       A.   Not in this matter, no.
24       Q.   Okay.  All right.  Let's now look at I

306

1    think -- I think we're at -- I'm sorry.  Okay.  Okay.  I
2    think it's Exhibit 11, 237167.  I don't remember if
3    it's...
4        A.   Can you maximum that window, please?
5        MS. BONJEAN:  Yeah.  Haley, maximize the whole
6    thing.
7        THE WITNESS:  And then -- and then increase the
8    zoom, would you, please?
9        MS. BONJEAN:  Oh, I know what this one is.
10       THE WITNESS:  The -- the plus sign up at the top.
11   The plus sign.
12       MS. BONJEAN:  No, Haley.  The plus sign.  What are
13   you doing?
14       MS. COOLBAUGH:  I'm trying -- I'm trying to move
15   the bar at the top so I can access it.  Right now,
16   this -- it says I'm screen sharing.  It's in the way of
17   the plus sign, so give me one second.
18       MS. BONJEAN:  You're literal -- I don't even know
19   what you're doing right now.
20       THE WITNESS:  One more.
21   BY MS. BONJEAN:
22       Q.   Okay.
23       A.   All right.  That should be good.
24       Q.   Okay.  Okay.  This is Complaint Register

307

1    237167.  I think we looked at this one earlier and,
2    again, regarding Mr. Montilla.  Let's see.
3           Okay.  Let's go to page 4049 or Bates
4    stamp 4049 just to refresh Dr. Shane's recollection about
5    what the allegation is here.
6           Okay.  Okay.  Do you see this is an
7    allegation where the complainant alleged that Montilla
8    falsely testified before the grand jury?  Do you see
9    that?
10       A.   Yes.
11       Q.   Okay.  And I believe you were asked questions
12   about this CR file because you had determined there,
13   again, the Chicago Police Department wasn't
14   differentiating or -- between their administrative
15   investigation or a potential criminal investigation; is
16   that right?
17       A.   Yes.
18       Q.   And I think Theresa showed you some -- a -- I
19   don't know -- a report in here.  Maybe it was a memo.
20   I'm trying to find it.  Let me see.  One second.  That
21   essentially said, well, the -- the state's attorney knew
22   about it because the complaint was made, you know, by one
23   of the attorneys involved in the case.  Do you see that?
24       A.   I remember her saying that.

JON SHANE, 05/26/2023

---

308

1    Q.   Okay.  Okay.  So let's just assume that's
2  true.  Does your opinion change about whether or not the
3  Chicago Police Department's internal affairs function was
4  adequately treating this as a potential criminal
5  violation versus an administrative violation simply
6  because it happened to have occurred in criminal court?
7       MS. CARNEY:  Objection.  Form.
8       THE WITNESS:  No.  They didn't differentiate
9  between the two.
10 BY MS. BONJEAN:
11      Q.   Okay.  Is it -- and in your mind, is it
12 sufficient that to -- to satisfy your expectation in a
13 complete and thorough -- strike that.
14           For a complete and thorough internal
15 affairs investigation, you'd expect there to be
16 coordination and communication with the prosecutor's
17 office; right?
18      A.   Regarding criminal complaints, yes.
19      Q.   Yes, yes.  Thank you.
20      A.   Yes.
21      Q.   Is that satisfied simply because the state's
22 attorney happens to find out in some other way?
23      MS. CARNEY:  Objection.  Form.  Argumentative.
24      THE WITNESS:  No.  It could be some informality in

---

309

1  which it occurred.  That doesn't make it a formal
2  communique between the prosecutor's office and the -- and
3  the police department.
4  BY MS. BONJEAN:
5       Q.   Is it your opinion that, consistent with
6  industry standards, that part of an internal affairs
7  investigation should include a protocol by which there is
8  notification and communication with a prosecuting agency
9  where there is an allegation of potential criminal
10 conduct against a police officer?
11      A.   Yes.
12      Q.   And if it just happens to be that a state's
13 attorney or the prosecutor finds out in some other
14 manner, does that mean that the policy or that practice
15 is being complied with?
16      A.   No.  It's not a triggering condition if it's
17 found out informally.
18      Q.   All right.  All right.  Thank you.  We can
19 put that aside.  I'm getting there.  Okay.  I want to
20 have you look at -- hold on.  Give me one second.  Sorry.
21           Okay.  By the way, Dr. Shane, did you
22 also look at the 30(b)(6) deposition of Lieutenant Flores
23 in rendering your decision or opinions here in your
24 report?

---

310

1       A.   I did, yes.  Yes.
2       Q.   And at page 26 -- I think we went through
3  this; I just want to clarify -- you identified certain
4  investigative practices that you opine were necessary to
5  be consistent with industry practices or industry
6  standards; right?
7       A.   Can you repeat that, please?
8       Q.   Yeah.  At page -- starting at page 25 --
9           If you could pull it up, Haley, please,
10 his report -- Exhibit 3.  Okay.
11           Do you remember this portion of your --
12 your report that we looked at?
13      A.   Yes.
14      Q.   Okay.  And if we could go down to the next
15 page.
16           Okay.  And these investigate practices,
17 you identified; right?
18      A.   Yes.
19      Q.   Okay.  And these investigative practices that
20 you've identified, I believe you previously testified
21 that they were consistent with industry standards and
22 norms even in 1990; right?
23      A.   And before that, yes.
24      Q.   Right.  And are these generally the

---

311

1  investigative practices that you examined the CR files in
2  this case to determine whether they had been carried out?
3       A.   That's correct, yes.
4       Q.   Okay.  I'm not going to -- we went through
5  all that.  Let me -- let's go down to -- hold on -- okay.
6  I think page 29.
7           Okay.  You -- you opined that the
8  allegations in a complaint register file in Chicago were
9  not necessarily investigated against a defined customary
10 standard.  Do you see that?
11      A.   I see that, yes.
12      Q.   And I think relatedly --
13           We can scroll down.
14           -- but I think you also noted that -- at
15 page 32 that CPD data classifications did not follow a
16 consistent convention; right?
17      A.   I remember saying that, and I remember
18 writing it.  I don't know what the -- yeah.  That's --
19 that's --
20      Q.   Right in front of you.
21      A.   -- that's the exact title there, yeah, that
22 I'm looking at.
23      Q.   Okay.  So I want to go -- I want to focus in
24 a little bit on the -- this classification problem.  Not

---

JON SHANE, 05/26/2023

312

1  to beat a dead horse, but explain again as best you can
2  why a classification system is important for identifying
3  problem officers.
4      A.   Because when you --
5      MS. CARNEY:  Objection.  Form.  Asked and answered.
6          Sorry, Dr. Shane.  Go ahead.
7      THE WITNESS:  Sorry.
8          Because when you have a system in place
9  like they do here in Chicago which has been -- which has
10 been shown to us, you fragment the data.  And when you
11 fragment the data, it is spread across a larger landscape
12 of classification categories.  And when you have this
13 larger classification of categories, patterns don't
14 emerge as quickly as they would if you had a consistent
15 coding scheme to begin with.
16         So assaults and excessive force are two
17 different categories, and if they appear in two different
18 places, you need more of them to -- to -- to have a
19 pattern emerge.
20 BY MS. BONJEAN:
21     Q.   Right.  So in looking at -- I think we've
22 marked it previously --
23         Haley, could you bring up Exhibit 14?
24         And this is that complaint categories

313

1  table that internal affairs apparently used, I guess.
2  And hold on a second.  Okay.  You remember seeing this;
3  right?
4      A.   I do, yes.
5      Q.   Okay.  So I want to give you a hypothetical
6  and -- well, strike that.
7          First let me ask you do you see that
8  this -- this table appears to have sort of a group that
9  has a complaint category and then subgroups.  Do you see
10 that?
11     A.   Yes.
12     Q.   Okay.  Now, I guess my question is --
13 let's -- I want to give you a hypothetical.  A woman
14 comes in to internal affairs and complains that multiple
15 officers raided her home with no warrant, no probable
16 cause.  One of the officers struck her son.  Another
17 officer falsely arrested another son, and that same
18 officer slapped the mother in the face.  Okay?
19     A.   Yes.
20     Q.   Okay.  Now, looking at this complaint
21 category table that the Chicago Police Department has put
22 together, which group would you put all that in for this
23 complaint?
24     MS. CARNEY:  Objection.  Form.  Incomplete

314

1  hypothetical.
2  BY MS. BONJEAN:
3      Q.   Would you even know where to begin?  Let me
4  ask you that.
5      A.   Based on the way you've defined it, it could
6  go in -- in different places.  It could go under law --
7  unlawful entry.  It could go under assault.  It could go
8  under excessive force.  It could go under improper arrest
9  or unlawful arrest.
10     Q.   Right.  So just to drive home the point, this
11 could be a group 3.  It could be a civil rights
12 violation -- right? -- what I've just provided; correct?
13     A.   Yes, it could be.
14     Q.   It could be a group -- it could be a group 4;
15 correct?
16     A.   Yes, it could.
17     Q.   4D is a -- well, I guess there's a search.
18 It could be a group 5; correct?
19     A.   Well, it could be also 4B -- B, as in
20 "boy" -- arrest, improper.
21     Q.   Right.
22     A.   As well as the search that you were talking
23 about.
24     Q.   Right.  So my question is if a complaint

315

1  comes in to internal affairs or OPS that could qualify as
2  to any number of these categories and -- and would you
3  agree it could be different for each officer; right?
4      A.   Yes, it could be.  Sure.
5      Q.   And is it the duty of the Chicago Police
6  Department not just to keep data for data's sake but
7  actually to keep data to determine whether they have
8  officers who need intervention?
9      A.   Well, that -- that's the point of data to
10 begin with, which is to make decisions.
11     Q.   Right.
12     A.   You -- you collect data so you can make
13 decisions, and one of the decisions would be to intervene
14 in an -- in an officer's career that is exhibiting a
15 pattern of -- of adverse behavior.
16     Q.   Okay.  So if taking -- let's just take
17 Detective Guevara for a second.  Okay?  In your
18 supplemental report, I think you summarized at least
19 three complaints that -- would you agree? -- have a good
20 amount of similarity between them?
21     MS. CARNEY:  Objection.  Form.
22     THE WITNESS:  Well, there -- in the supplemental
23 report, there were two.
24

JON SHANE, 05/26/2023

316

1   BY MS. BONJEAN:
2       Q.   Oh, there were two?  Okay.
3       A.   There -- there were two.  Oh, I think -- oh,
4   I think what you're say -- where there were -- there were
5   three -- there were three complainants.  Is that what you
6   mean or do you mean...
7       Q.   I thought -- for some reason I thought the
8   supplemental report had three different CRs, but whatever
9   the case may be, would you agree that there are, at least
10  in Detective Guevara's complaint history -- I think
11  during the '80s, there were at least three complainants
12  who made allegations that involved essentially an assault
13  and then abusive -- or abusive language?
14      A.   At least that many.  There were -- there were
15  several assaults.
16      Q.   Okay.  So if -- if the internal affairs
17  division or OPS categorized one of those as 5D and one of
18  those as 1A and another as 3G -- okay? -- would a pattern
19  emerge very readily just based on those complaint
20  categories?
21      A.   No.  That's exactly what I was talking about
22  earlier.
23      Q.   Okay.  And yet they all involved some claim
24  of verbal abuse; right?

317

1       A.   Yes.
2       Q.   They all involved some claim of assault;
3   correct?
4       A.   Correct.
5       Q.   And they all would -- again, if found to be
6   the case, would at least be an allegation of a civil
7   rights violation; correct?
8       A.   Yes.  Sure.
9       Q.   And, Haley, scroll up.
10           They could also be a commission of a
11  crime which would be group 8; right?
12      A.   Yes.
13      Q.   Okay.  So if there isn't a -- if the
14  department lacks a procedure by which allegations get
15  categorized with the purpose of detecting patterns in
16  police behavior, would that, in your mind, be consistent
17  with industry practices or national industry standards
18  for police monitoring and discipline or supervision?
19      MS. CARNEY:  Object -- sorry.  Objection.  Form.
20  Outside the scope of his report.
21      MS. BONJEAN:  I mean, I don't think...
22  BY MS. BONJEAN:
23      Q.   You can answer.
24      A.   Can I answer?

318

1       MS. CARNEY:  You can answer.  Sorry.
2       THE WITNESS:  So the -- so the answer is -- I want
3   to make sure I understood you correctly.  The -- you want
4   a consistent coding scheme so a police supervisor or
5   police manager on -- as an end user can identify patterns
6   that are emerging based on the categories of offenses
7   that are coming in.
8   BY MS. BONJEAN:
9       Q.   Right.  And if you use a complaint category
10  table like the one that is here in Exhibit 14 -- okay? --
11  would you say that would lend itself to identifying those
12  patterns of police conduct that you're looking for?
13      A.   No.  It diffuses them.
14      Q.   All right.  And did you see any evidence in
15  the discovery record that you've been provided that any
16  internal affairs investigator was even trained in how to
17  use these complaint category tables?
18      A.   I did not, no.
19      Q.   In looking at the internal affairs complaints
20  that you looked at, did you see any rhyme or reason or
21  logic behind why something might be a group 8B versus a
22  5J or 5H or, you know, any number of categories it could
23  fall into?
24      MR. ENGQUIST:  Objection to the form.

319

1   Argumentative.
2       THE WITNESS:  I did not.
3   BY MS. BONJEAN:
4       Q.   Okay.  That may be all I have here.
5           Oh, let me ask you this.  And so when you
6   were doing your analysis and you had your allegation --
7   when you were coding for the allegations in your report;
8   right?
9       A.   Yes.
10      Q.   Okay.  The allegations -- I think you said
11  that you -- or strike that.
12           The categories of allegations that you
13  used, you derived them generally from the dispositions in
14  the complaint registers; is that right?
15      A.   Well, from the narrative of the
16  investigation.
17      Q.   Okay.
18      A.   What the investigators wrote.
19      Q.   Okay.  So it came from the narrative of what
20  the investigators wrote; right?
21      A.   Yes, correct.
22      Q.   So you were able to do that.  They could have
23  done it that way, too; right?
24      MS. CARNEY:  Objection.  Form.

JON SHANE, 05/26/2023

320

1     THE WITNESS:  Yes.
2  BY MS. BONJEAN:
3     Q.    They could've -- they could've categorized it
4  the way you categorized it?
5     A.    Yes.
6     Q.    They could've; right?
7           And did you see whether or not in any
8  materials you were provided that they -- that they used
9  categories that would allow the supervisory apparatus to
10  identify those officers that had a pattern of
11  particularly -- or a particular type of misconduct?
12     A.    No.
13     Q.    Okay.  So, for example, some officers have
14  problems with use of force; right?
15     A.    Yes.
16     Q.    Okay.  And that can be determined by the
17  number of excessive force complaints, use of force
18  reports; right?
19     A.    Complaints from people, observations from
20  supervisors, complaints from other police officers.  Yes.
21     Q.    Okay.  And whether an excessive force or an
22  assault happens to an arrestee or some guy driving down
23  the street, those might be factually different, but would
24  you agree that, ultimately, the relevant information for

321

1  the purpose of police management is that this is an
2  officer who uses physical force when he's not supposed
3  to?
4     MS. CARNEY:  Objection.  Form.
5     THE WITNESS:  That -- that's exactly what I'm
6  talking about.
7  BY MS. BONJEAN:
8     Q.    Okay.
9     A.    The -- the -- the high level management
10  practice is exactly that.  It's the fact that you've got
11  complaints against police officers for assault.  Now,
12  whether it happened on duty or off duty to an arrestee or
13  to someone in their house or in their car or on a
14  playground is -- is not necessarily the most important
15  thing.  What's important is that the officer's driving
16  complaints for use of force.
17     Q.    So, for instance, taking Detective Guevara as
18  an example.  When he was a patrol officer, he accrued a
19  number of complaints alleging assault, excessive force,
20  physical use of force that was unjustified; right?
21     A.    That's correct, yes.
22     Q.    Okay.  Now, you wouldn't necessarily expect
23  when he's a patrol officer to see an inappropriate use of
24  force in an interrogation room; right?

322

1     A.    You broke up a little bit.  Did you ask me if
2  I had -- if I would expect to see a use of force during
3  an interrogation?
4     Q.    No.  What I'm saying is for someone who is a
5  patrol officer -- okay? -- a patrol officer --
6     A.    Yeah.
7     Q.    -- would you expect to see that they would
8  have an assault or a claim of excessive force in the
9  course of a murder investigation in an interrogation
10  room?
11     MS. CARNEY:  Objection to form.
12     THE WITNESS:  No.
13  BY MS. BONJEAN:
14     Q.    Okay.  So my point is is Detective Guevara
15  also had allegations of coerced interrogations later on
16  in his career; right?
17     A.    Yes, he did.
18     Q.    Okay.  And would you agree that that's
19  because he was conducting interrogations when he was a
20  detective rather than a patrol officer?
21     A.    Yeah.  I think he was in an investigative
22  capacity, yes.
23     Q.    Okay.  So any reason to belie -- or strike
24  that.  Let me ask it this way.

323

1           As a -- if you're a supervisor or someone
2  in the chain of command at the Chicago Police Department,
3  would you be concerned that someone who's accrued
4  multiple assault or excessive force or unjustified uses
5  of force in their capacity as a patrol officer might use
6  that in their capacity as a detective later on if you
7  promote them, for instance?
8     MS. CARNEY:  Objection.  Form.  Incomplete
9  hypothetical.
10     THE WITNESS:  First, the answer is yes.  Second,
11  the answer is I outlined that very -- the answer to that
12  very question in my report.
13  BY MS. BONJEAN:
14     Q.    So --
15     A.    The answer is yes.  I would expect to see a
16  continued pattern because the behavior wasn't corrected
17  to begin with.
18     Q.    And whether -- whether unjustified use of
19  force is happening on the street during patrol or in
20  course of interrogations, would you agree that there's
21  still, again, a fundamental problem with an officer
22  willing to use force to achieve whatever means he wants
23  to depending on what his assignment is?
24     MS. CARNEY:  Objection to form.  Argumentative.

JON SHANE, 05/26/2023

324

```
1        THE WITNESS:  I would -- my answer is yes.  If
2   some -- someone is prone to using excessive force,
3   they're going to continue to do that if it's not
4   corrected.
5   BY MS. BONJEAN:
6        Q.    And just as another example, some police
7   officers have problems with stealing; right?
8        A.    Yes.
9        MS. CARNEY:  Objection.  Form.
10  BY MS. BONJEAN:
11       Q.    Okay.  So for instance, in that, you might
12  see someone who has a whole bunch of irregularities in
13  their inventorying procedures; right?
14       A.    Yes.
15       Q.    They're -- sometimes officers will be
16  disciplined multiple times because they screwed up in
17  inventorying and something went missing; right?
18       MS. CARNEY:  Objection.  Form.
19       THE WITNESS:  Yes.
20  BY MS. BONJEAN:
21       Q.    Okay.  As a supervisor, a police officer who
22  continues to have problems inventorying evidence that
23  might have value, would that be something that you would
24  say -- that a -- either an early warning system or some
```

325

```
1   type of early identification system might say, "Aha," you
2   know.  "We've got to look at this person a little more
3   closely for reasons other than just he doesn't know how
4   to inventory things"?
5        MS. CARNEY:  Objection to form.
6        THE WITNESS:  Yes.
7        MS. CARNEY:  Incomplete hypothetical.  Calls for
8   speculation.
9   BY MS. BONJEAN:
10       Q.    But in order to do that, do you have -- and
11  this is the point I'm trying to make.  In order to do
12  that, is it dependent largely on a department having an
13  efficient and effective categorization procedure of
14  complaints when they come in from either civilians or
15  even from inside the department?
16       A.    The -- the answer is yes, and that should
17  also be coupled with the human element of supervision.
18       MS. BONJEAN:  Right.  Okay.  All right.  All right.
19  Let's take a one-minute break.  I think I'm done.
20       THE VIDEOGRAPHER:  Take a break?  We're going off
21  the record at --
22       MS. BONJEAN:  Yes.  Yeah.  Just one minute.
23       THE VIDEOGRAPHER:  -- 3:06 p.m.
24              (Recess taken.)
```

326

```
1        THE VIDEOGRAPHER:  This is the beginning of Media
2   Unit 5.  We are going back on the video record at
3   3:09 p.m.
4   BY MS. BONJEAN:
5        Q.    Okay.  Lastly -- I had it on my list, but I
6   forgot to get to it.  I want to have you look at one of
7   the policies you've identified in your report.  I believe
8   it's 83-3.  It's a general order called Personnel
9   Concerns --
10       A.    Okay.
11       Q.    -- and did we mark this one?
12       MS. CARNEY:  I did not.
13       MS. BONJEAN:  Okay.  So we'll mark it.
14       MS. CARNEY:  That should be 18.
15       MS. COOLBAUGH:  Yes.  It's Exhibit 18.
16              (Deposition Exhibit Number 18,
17              Witness Shane, was marked for
18              identification 5/26/23.)
19  BY MS. BONJEAN:
20       Q.    Okay.  Dr. Shane, is General Order 83-3 one
21  of the general orders you reviewed in connection with
22  your expert report?
23       A.    Yes, I did.
24       Q.    Okay.  And is it one of the general records
```

327

```
1   that laid out certain standards against which you looked
2   to when examining the data in this case?
3        A.    Yes.
4        Q.    Okay.  Now, I want to first ask you to look
5   at the definitions -- well, first, let's look at the
6   purpose of the order.  It says to "establish Personnel
7   Concerns Programs for Department members."  Do you see
8   that?
9        A.    Yes, I see it.
10       Q.    Okay.  And then going down to the -- the
11  definitions, do you see that there is a definition for,
12  quote, "behavioral alert system"?
13       A.    Yes, I do.
14       Q.    And it talks about or defines it as "A
15  systematic review of a Department's member's behavior
16  pattern to alert supervisors to the need for an
17  intervention."  Do you see that?
18       A.    Yes.
19       Q.    Okay.  Are there -- would you say this is
20  akin to or sounds an awful lot like an early invention
21  system or an early warning system?
22       A.    It does, yes.
23       Q.    Okay.  And --
24       A.    They're -- they're identifying some kind of
```

JON SHANE, 05/26/2023

---

328

1    process in place.
2    Q.   And -- and the purpose of the process is to
3    identify patterns; right?
4    A.   That's exactly correct, yes.
5    Q.   Okay.  And to alert supervisors of a need for
6    intervention with a particular member of the department;
7    right?
8    A.   Correct, yes.
9    Q.   And then there's also underneath that a
10   definition which talks about Personnel Concerns Program,
11   which says, "A program on intensive supervision of
12   Department members who have been designated as personnel
13   concerns."  Do you see that?
14   A.   Yes, I see that.
15   Q.   And then apparently, a member who is a
16   personnel concern is defined then in number C -- or
17   letter C, which says, "A Department member who has a
18   history of unacceptable performance and who has not been
19   responsive to repeated corrective efforts of supervisory
20   members," and, "This is a formal designation of a
21   Department member which is applied by the Director of
22   Personnel."  Do you see that?
23   A.   Yes.
24   Q.   All right.  And then there's some other

---

329

1    definitions that I'm sure you've looked at.  First, let
2    me ask this.  In the materials that you received, did you
3    see any evidence that Detective Guevara had ever been
4    identified as a department member who had a personnel
5    concern and needed Personnel Concerns Program?
6    MS. MCGRATH:  Objection to form.
7    THE WITNESS:  I did not.
8    BY MS. BONJEAN:
9    Q.   Okay.
10   A.   I did not.
11   Q.   Did you see any evidence in the records,
12   whether it be any of the CR files we looked at, any of
13   the memos, any of the material you were provided, any of
14   the histories of any of the defendant officers, or any --
15   that Detective Guevara, for example, had alerted the
16   behavioral alert system because of a pattern of behavior?
17   MS. MCGRATH:  Same objection.  Form.
18   THE WITNESS:  I did not see anything that triggered
19   the behavioral -- behavioral alert system.
20   BY MS. BONJEAN:
21   Q.   By the way, have you -- have you seen any --
22   other than this reference -- other than this policy
23   itself, have you ever seen any policies that -- in the
24   Chicago Police Department that elaborate on what the

---

330

1    behavioral alert system is, what it does, what it's
2    intended to do, how's it worked -- how it works, or
3    anything other than what's in this policy?
4    A.   I have not, no.
5    Q.   Okay.  Now going down to the general
6    responsibilities, which is Roman numeral IV, it indicates
7    here that the general responsibility of the
8    Administrators of the OPS will "review investigations
9    conducted by their office for patterns of behavior which
10   would warrant concern."  Do you see that?
11   A.   Yes, I do.
12   Q.   Okay.  Did you see anything in the materials
13   that you reviewed that administrators of OPS were, in
14   fact, reviewing investigations conducted by their office
15   for patterns of behavior which would warrant concern and
16   documenting that somewhere?
17   A.   I did not see that anywhere.
18   Q.   Did you see anything in the materials that
19   you provided overall that this policy was actually being
20   adhered to by the Chicago Police Department?
21   A.   I did not, no.
22   MS. BONJEAN:  Okay.  I have nothing further for
23   Dr. Shane.
24   MR. ENGQUIST:  I've got nothing based on that.

---

331

1    MS. CARNEY:  I have no additional questions.
2    MS. BONJEAN:  All right.  Okay.  Everybody enjoy
3    your weekend.  Jon, enjoy the beach.
4    THE WITNESS:  All right.
5    THE VIDEOGRAPHER:  All right.
6    (Simultaneous speaking.)
7    THE REPORTER:  Signature?
8    MS. BONJEAN:  Jon, you want to waive?
9    THE WITNESS:  What does that mean?  (Indicating.)
10   MS. BONJEAN:  Oh, you can -- you can -- you can --
11   you can review the deposition just to make sure the court
12   reporter got everything down right.  It doesn't -- you
13   can still get a copy of your deposition, but you can --
14   either way or --
15   THE WITNESS:  Well, if I find an error, I'll let --
16   I'll let somebody know but -- you know.
17   MS. BONJEAN:  Well, do you want to review -- you
18   want to review it in advance, or do you want to just
19   assume she got it right, or do you want to...
20   THE WITNESS:  No.  I'll assume she got it right.
21   MS. BONJEAN:  Okay.
22   THE WITNESS:  She's a professional.
23   MS. BONJEAN:  All right.  I mean, there's a
24   videographer here, too, so...

---

JON SHANE, 05/26/2023

332

1      THE WITNESS:  Yeah.
2      THE VIDEOGRAPHER:  All right.  I'll take us off.
3      MS. BONJEAN:  Okay.
4      THE VIDEOGRAPHER:  This concludes Media Unit 5 of
5   today's video deposition of Dr. Jon Shane.  We are going
6   off the video record at 3:16 p.m.
7                  (The deposition concluded at
8                   3:16 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

333

1
                REPORTER'S CERTIFICATE
2
      I, Riley A. Moran, do hereby certify that JON SHANE
3   was duly sworn by me to testify the whole truth, that the
    foregoing deposition was recorded stenographically by me
4   and was reduced to computerized transcript under my
    direction, and that the said deposition constitutes a
5   true record of the testimony given by said witness.
6      I further certify that the reading and signing of
    the deposition was waived by the deponent.
7
      I further certify that I am not a relative or
8   employee or attorney or counsel of any of the parties, or
    a relative or employee of such attorney or counsel, or
9   financially interested directly or indirectly in this
    action.
10
      IN WITNESS WHEREOF, I have hereunto set my hand and
11  affixed my seal of office at Chicago, Illinois, this 8th
    day of June 2023.
12
13
14     _____
       Illinois CSR No. 084-004945
15
16
17
18
19
20
21
22
23
24

Urlaub Bowen & Associates, Inc.   312-781-9586