Exhibit 30

UNITES STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jose Juan Maysonet, Jr,                          )
                                                 )
                    Plaintiff,                   )
                                                 )
v.                                               )
                                                 )
Reynaldo Guevara, Ernest Halvorsen,              )
Edward Mingey, Epplen;                           )
Fernando Montilla,                               )
Roland Paulnitsky, City of Chicago,              )
and Cook County,                                 )
                                                 )
                    Defendants.                  )

**EXPERT REPORT OF JEFFREY J. NOBLE**

1.      My name is Jeffrey J. Noble, and I make this report at the request of defendants'
        counsel.

2.      I was a police officer in the City of Irvine for 28 years rising to the position of Deputy
        Chief of Police prior to my retirement.  I served as an interim Deputy Chief of Police at
        the Westminster Police Department for nine months.

        a.      I was a police officer for 28 years and retired in July 2012 as the Deputy Chief of
                Police with the Irvine Police Department, located in southern California.  As a
                Deputy Chief, I was directly responsible for all police operations including Patrol,
                Traffic, Criminal Investigations, Emergency Management, Crime Prevention,
                DARE, K9s, Training, and SWAT.  The City of Irvine encompasses over 70 square
                miles with a population of over 218,000.  I served in a wide range of assignments
                as an Officer, Senior Officer, Sergeant, Lieutenant, Commander and Deputy
                Chief, including Patrol, Traffic, Detective, SWAT, Training, Internal Affairs,
                Emergency Management and Crime Prevention.  The Irvine Police Department
                had over 200 police officers and over 100 civilian employees during my
                employment with the department.

        b.      In April 2014, I was hired by the Westminster, California Police Department as an
                interim Deputy Chief of Police.  My employment with the Westminster Police
                Department was by means of a temporary contract, and I was asked to review
                the department's Internal Affairs unit; department policies relating to Internal
                Affairs investigations, discipline and police officer conduct; conduct department

1

audits and inspections; and act as a liaison with a civilian oversight monitor who was hired during the same period. My employment was at the request of the Chief of Police, was ratified by the City Council and was sought due to the arrest of a police officer for an off-duty criminal sexual assault, the arrest of an on-duty officer for extortion and a lawsuit filed by three Latino officers alleging discrimination and retaliation. I concluded this interim position in January 2015. The Westminster Police Department had 87 police officers and 40 civilian employees during my temporary contracted employment.

c.      As a police supervisor and manager, I have extensive experience conducting internal administrative investigations on a wide range of issues including use of force, vehicle pursuits, officer misconduct, criminal interrogations and interviews, harassment and sexual assaults.

4.      I have a Juris Doctor degree, with honors, from Western State University College of Law and I am admitted to practice law in the State of California. I have a Bachelor's degree in Criminal Justice with an emphasis on Administration from California State University at Long Beach.

5.      As a police consultant and expert witness, I have extensive experience on matters involving police investigative procedures, misconduct and corruption. For example:

a.      In 2014, I was part of a Carnegie Institute of Peace Think Tank for addressing police use of force in developing countries.

b.      I have consulted with other police organizations on a wide range of police practices, procedures, including criminal and administrative investigations. For instance, I was retained in 2004 as an expert to review and evaluate the internal investigation conducted by the San Francisco, California, Office of Community Complaints of the case widely known as "Fajitagate" involving the indictment of seven command staff members and three officers of the San Francisco Police Department. In 2007 and again in 2009, I was retained by the City of Austin, Texas to review the police department's internal homicide and Internal Affairs investigation of two officer involved fatal shootings.

c.      I have been retained as both a defense and a plaintiff's expert in over 300 cases and have testified as an expert in state court in California, Washington, Tennessee, Connecticut, Minnesota, Illinois and New Mexico and in federal court in Illinois, Tennessee, Georgia, South Carolina, North Carolina, Virginia, Texas and California.

d.      I have prepared expert reports for cases in the states of California, Washington, Pennsylvania, Georgia, Illinois, Tennessee, Idaho, Arkansas, Texas, Colorado, New York, Oklahoma, Connecticut, Florida, New Mexico, Minnesota, Ohio,

2

Kentucky, Louisiana, Indiana, Wisconsin, Virginia, Delaware, Oregon, Arizona, New Mexico, New Jersey, Mississippi, North Carolina, South Carolina, Wyoming, Kansas and Missouri.

e.   I have been retained in criminal cases involving allegations of criminal uses of force by police officers in the states of New Mexico, Delaware, Minnesota, Pennsylvania, California, Georgia, Washington, and Florida.

f.   I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice. This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics. The project was an effort to develop national best practices in internal investigations for police agencies. I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct. Because of this project the COPS Office published a document entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice."

g.   I have given presentations at the International Association of Chiefs of Police conference in 2004, 2009, 2012, and 2014; the national COPS conference on Internal Affairs issues and the Academy of Criminal Justices Sciences annual meeting on tactical reckless decision making in 2009; the American Psychological Association annual conference in 2013; and National Tactical Officers' Association annual conference in 2004.

h.   In 2013, I gave a presentation in Mexico at the request of the Mexican government on preventing corruption in police institutions.

i.   I have published 21 articles on policing which discussed the subject matters of: Internal Affairs, personnel issues, pursuits, use of force issues and investigative procedures. Those articles are listed in my attached resume.

j.   I have published two chapters for policing textbooks on tactical recklessness and the code of silence.

k.   I have co-authored, along with Geoffrey Alpert, Ph.D., a textbook on police Internal Affairs investigations titled, "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight."

l.   As evidence that the opinions in our book are accepted by other experts of police administrative investigations, my book was cited extensively in the COPS 2009 publication, "Building Trust Between the Police and the Citizens They Serve: An Internal Affairs Promising Practice Guide for Local Law Enforcement."

m.   In 2020, I co-authored a textbook, "Evaluating Police Uses of Force," with Seth Stoughton and Geoffrey Alpert.

6.   My experience, training and background are more fully described in my attached resume.

7.   My areas of expertise in policing include, but are not limited to: police use of force; pursuits; police administration; training; police operations; criminal investigations; interviews and interrogations; civil rights violations and investigations; internal/administrative investigations; criminal investigations; police discipline; citizen complaints; and police policies and procedures.

8.   I reviewed the following material in making my opinions:

- Expert Report of Jon Shane
- CRs of Defendant Officers
  - 123850, 152507, 155500, 168160, 172123, 179835, 180037, 188930, 251502, 220046, 182519, 1013854, 308007, 305680, 288729, 284331, 273466, 247214, 195435, 288729, 200441, 256148, 237040
- CRs of Non-Defendant Officers
  - 147769, 152902, 155382, 155614, 155619, 155714, 155876, 156243, 156444, 156749, 156916, 157059, 157143, 157556, 157592, 157627, 158211, 158279, 158349, 158534, 159703, 160370, 160688, 161290, 162687, 165516, 165563, 167206, 167252, 168160, 168690, 170700, 170706, 171016, 171720, 166878, 168290, 168914, 169532, 170021, 170373, 181515, 170700, 171720, 172221, 172748, 173369, 174770, 180271, 181250, 155876, 179504, 171827, 171841, 171943, 172611, 172876, 173098, 173446, 173479, 174337, 174866, 175513, 177248, 178230, 178876, 179504, 179882, 179902, 180229, 298042, 180543, 180550, 180588, 180716, 180853, 180866, 181515, 181809
- Directives
  - 82-13 – Squadrol Operating Procedures
  - 82-14 – Complaint and Disciplinary Procedures
  - 83-3 – Complaint and Disciplinary Procedures, SPAR
  - 85-7 – Records Management
  - 86-3 – Community Gang Control Program
  - 86-3 – Patrol Specialist
  - 86-4 – District Commanders
  - 86-6 – Processing Multiple Arrests
  - 86-8 – Deadly Force
  - 86-15 – Requirements for Department Reports
  - 87-7 – Field and Custodial
  - 87-10 – Records Management
  - 87-20 – Official Reports

4

- 88-9 – Criminal History Records
- 88-11 – Lockup/Lockup Keepers
- 88-18 – Lineup Procedures
- 88-29 – Review of Personnel Records
- 89-3 – Preliminary Investigations
- 89-4 – Forms Management
- 89-9 – Stop Orders
- 90-3 – Information Report System
- 91-9 – Rumor Central
- 91-11 – Restraining Arrestees
- 91-16 – Freedom of Information
- 91-20 – Damage Claims Against the City
- 92-4 – Anti-Gang Loitering Ordinance
- 92-6 – Seizure and Forfeiture of Vehicles, Vessels and Aircraft
- 92-6 – Search Warrants
- 92-15 – Anti-Stalking Statute
- 93-3 – Complaint and Disciplinary Procedures
- 92-7 – Anti-Gang Loitering Ordinance Seminar
- 89-2 – Assignment of Evidence Technicians to Districts
- 89-13 – Audio/Visual Equipment
- 86-3 – Community Gang Control Program
- 88-4 – Computerized Criminal History
- 88-30 – Computerized Records on Active Criminals
- 80-18 – Demeanor, Courtesy, use of Non-Deadly Force and Protection of Citizens' Rights
- 90-8 – Department Organization for Command
- 83-21 – Differential Response Call Back program
- 92-14 – Distribution of Case and Supplementary Reports
- 88-19 – Felony Review by Assistant State's Attorney
- 83-13 – Field Reporting/Beat Book
- 87-6 – Guidelines for Distributing Information
- 87-1 – Information Resource Management System
- 88-13 – Miscellaneous Incident Reporting Procedures
- 84-7 – Miscellaneous Personnel Actions
- 83-14 – Non-Traffic Arrest Warrant Procedures
- 84-7 – Payroll and Timekeeping
- 89-26 – Performance Ratings – Sworn Members
- 93-2 – Performance Ratings
- 87-13 – Police Associations and Ethnic Organizations
- 92-8 – Police Districts and Area Centers
- 82-25 – Probationary Police Officer Performance Evaluation
- 89-1 – Processing Grievances and Discrimination Complaints of Department Members
- 92-5 – Processing Persons Under Department Control

- o 89-25 – Records Division Numbers, Assignment and Processing of
- o 84-9 – Reproduction and Graphic Arts Services
- o 79-30 – Request to Hold and Review Recording Tapes
- o 88-15 – Responsibilities and Procedures
- o 83-1 – Responsibilities of Sergeant s Assigned to Field Activities
- o 91-46 – Revised Attendance and Assignment Record
- o 87-43 – Revised Department Rules and Regulations, Delayed Implementation
- o 92-6 – Seizure and Forfeiture of Vehicles, Vessels and Aircraft
- o 88-15 – Uniform/Citizen's Dress Requirements and Equipment Specifications
- Various CPD Policies and Training Materials (RFC 48266-501066)
  - o Grievance – Counseling Service Reports/PCP
  - o Arbitration – Reassignment
  - o 09-02 – Performance Evaluation System
  - o Grievance – Behavioral Alert System
  - o Case Inspection Report Form
  - o 82-2 – Detective Division File Control
  - o 90-56 – The Scheduled Court Call System
  - o Course Outline – Felony Review
  - o 82-14 – Complaint and Disciplinary Procedures
  - o 82-14 – Complaint and Disciplinary Procedures
  - o 83-3 – Personnel Concerns
  - o 84-3 – Crime Scene processing
  - o 87-7 – Interrogations: Field and Custodial
  - o 89-3 – Preliminary Investigations
  - o 93-3 – Complaint and Disciplinary Procedures
  - o 93-3 – Complaint and Disciplinary procedures
  - o Course Lesson Plan: Interviewing and Interrogations
  - o Interviews and Interrogations: Lesson Plan and Materials
  - o Course Lesson Plan: Investigative Forms
  - o Course Lesson Plan: Property Crimes Format
  - o Course Lesson Plan: Bomb and Arson
  - o CPD Rules and Regulations
  - o DSO 89-26 – Performance Ratings
  - o Pre-Service Detective Training Schedule
  - o S07-01 – Inventory System for Property Taken into Custody
  - o Special Order 83-1 – Investigative Files
  - o 83-13 – Court Citing and Attendance
  - o 85-15 – Court Witness Notification Program
  - o 86-3 – Investigative Files
  - o 87-4 – Inspections
  - o 87-18 – Department Publications
  - o 87-20 – Official Reports

- o  88-5 – Supervisory Inspections
- o  89-1 – Detective Division Standard Operating Procedure Manual
- o  91-1 – Inspection Policy and Procedures
- o  91-3 - Inspection Reports
- o  92-11 – Court Witness Notification Program
- o  96-2 – Investigative Responsibility
- o  97-1 Miscellaneous Procedures
- o  97-7 – Procedures Required of Detectives
- o  Detective Division: Standard Operating Procedures
- o  Detective Division: Standard Operating Procedures (1991-94)
- o  Detective Division: Training Programs Supplemental Case Reporting (Book #1)
- o  Detective Division: Training Programs Supplemental Case Reporting (Book #2)
- o  Course Lesson Plan: Supplementary Report Writing
- o  Course Lesson Plan: Report Writing
- o  Course lesson Plan: Supplemental Report Writing
- o  Court Order (April 1982) All Files Must be Kept Intact
- o  Course Lesson Plan: Violent Crimes Format
- o  Course Lesson Plan: Violent Crimes Format
- o  Course Lesson Plan: Violent Crimes Practicum
- o  Violent Crimes Practicum

9.  At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such aid, I will ensure that they are made available for review, if requested, prior to their use.

10.  My professional charges for this litigation work is an hourly fee of $400 plus expenses including all travel time.  My fees for deposition and trial testimony are a flat rate of $2,500 for the first four hours and $600 per hour for every additional hour, plus travel time and expenses.

11.  If I am provided additional materials that changes, alter or amends my opinions, I will prepare a supplemental report.

12.  To ensure my methodology was reliable, my opinions are based on a comprehensive review of the provided materials that establishes my understanding of the facts of the case and on the professional and generally accepted principles and practices in policing as of the date of this incident.  "Generally accepted practices" refers to those protocols, techniques, and procedures that are widely known, acknowledged, and relied upon in the field.  A practice is generally accepted when well-educated, well-trained, and experienced professionals would agree that it is conventional, customary, and reasonably standard.  Generally accepted practices in policing reflect technical and specialized knowledge in the law enforcement field.  A practice can be generally

7

accepted without necessarily being universally adopted or rising to the level of a long-established, empirically validated best practice.  Generally accepted practices may be, but are not necessarily, reflected in Department of Justice consent decrees, publications by professional associations (such as the International Association of Chiefs of Police, the Police Executive Research Forum, the National Police Foundation, etc.), in agency policies, and in reputable training materials.

13.    To identify and apply the applicable generally accepted practices in policing, I rely on my knowledge, skill, experience, training, and education in law enforcement.  This includes work in my field of study as a policing scholar and author; my knowledge of historical and contemporary law enforcement standards and methods; and the relevant professional and academic literature. I employ a similar methodology when I conduct professional evaluations of police officers or agencies as a consultant and when writing for reputable academic and professional publishers. The methodology I applied in this case is consistent with the methodology utilized by other experts in the field of law enforcement when analyzing incidents of this type.

14.    My use of terminology such as "excessive," "unreasonable," and "disproportionate," etc., is intended to and should be read as references to the professional and generally accepted standards in policing and is not intended and should not be interpreted as references to or the application of legal standards within the sole province of the factfinder or judge.

15.    The opinions that follow are made within a reasonable degree of certainty within the field of police practices based on over 35 years of professional law enforcement experience and scholarship.

**Mr. Shane's Review of the CR Investigations is Deeply Flawed and Any Conclusions that he Draws from His Review is Without Merit**

16.    Dr. Shane reviewed the contents of 40 of the 146 Internal Affairs Division (IAD) and Office of Professional Standards (OPS) investigation provided to plaintiffs in this matter.[1] Dr. Shane criticized those 40 investigations (22 involving the defendant officers and 18 involving a random sampling of investigations that were conducted within the *Monell* timeframe of 1987-1990) of complaints made against the defendant officers in this matter.  Those 40 investigations form the basis of Dr. Shane's opinions regarding the reasonableness of administrative investigations during the *Monell* timeframe.

17.    Dr. Shane opined that missing investigative elements could have changed the outcome of the investigations and that the flawed investigations were endorsed by CPD

---

[1] Shane report at 13 and Shane deposition at 131.  The results of his review of the 40 files are compiled in Tables 4 and 5 on pages 39-42 of Dr. Shane's report.

supervision.[2] Dr. Shane then completed an analysis of the percentage of completed investigative actions based on his review of the 40 files and opined there was an overall lack of thoroughness in the investigations based on his review of the files.[3]

18.    Dr. Shane stated that his opinions were based on these 40 investigations, however 17 of the investigations were not within the *Monell* timeframe.[4] Thus, his opinions regarding the *Monell* time period was limited to 23 investigations.

19.    While Dr. Shane criticized the following investigations of the defendant officers, his criticisms are generally unfounded.

   a.    123850

      1.)    Mr. Shane criticisms included: Officers were never formally interviewed; No officer reports were submitted; No interview of victims; No attempt to canvass the scene for witnesses; No photographs of the scene taken; No arrest photographs taken of victim. Mr. Shane acknowledged that "Although the investigator did attempt to contact the victims/complainants through their attorney, the attorney told the investigator his clients would not give a statement, there is no customary declination letter from the attorney. The declination cannot be verified."[5]

      2.)    The CPD initiated a CR based on the filing of a civil lawsuit[6] and it was alleged that officers forcibly entered the complainant's home, struck and threatened the residents and James Llaguno was held in custody for three days without being charged.[7] The case was closed because the family's attorney would not allow OPS to take their statements.[8] The case involved the investigation of a triple homicide and a kidnapping of a child.

      3.)    Contrary to Mr. Shane's opinion, the fact that the involved parties would not provide statements was documented in the report and a declination form is only used when the complainant expressly want to withdraw their complaint – which is not what happened in this case.

---

[2] Shane report at 43.
[3] Shane report at 45-46.
[4] 123850, 152507, 182519, 188930, 195435, 200441, 220046, 247214, 251502, 256148, 273466, 284331, 288729, 289081, 305680, 308007, and 1013854. Additionally, 288729 and 289081 are the same matter, not two separate investigations.
[5] Shane report at 39.
[6] RFC-Maysonet 001718.
[7] RFC-Maysonet 001718-1721.
[8] RFC-Maysonet 001723.

4.)    All of the officers provided written statements regarding the allegations and denied misconduct.[9]

    a.    During this time period, the Chicago Police Department made use of what it calls "To/From" reports in many cases in order to conduct interviews of officers who may be witnesses to misconduct or who may be the subject officer of a misconduct investigation.

    b.    A "To/From" report is essentially a written response by an officer to interrogatories posed by the investigator. While there are "better" methods that may be used to conduct interviews of subject officers – and these "better" methods of an in-person interview were used by the CPD/OPS in some cases during that time frame, the use of "To/From" reports is not unreasonable.

    c.    "To/From" reports do provide a statement by the officer. These statements that are typically a general denial of misconduct do serve the purpose of documenting the officer's statement, which can be used to sustain an allegation. Experts can always offer better ways to conduct an interview, better questions to ask, a better environment for the interview and a wide range of other factors. However, the standard is not whether or not an investigator could have done a "better" job, rather it is whether or not his actions were "reasonable." The use of "To/From" reports in the manner used by the CPD is reasonable.

5.)    Mr. Shane's claim that there were no photographs of the scene and the lack of photographs somehow renders the investigation unreasonable is absurd. The incident occurred on January 7, 1980 and OPS was not notified of a complaint until a lawsuit was filed two years later on March 17, 1982. Moreover, the lack of cooperation by the complainants would have prevented OPS from taking scene photographs if any evidence of a forced entry remained after two years.

6.)    Contrary to Mr. Shane's claim, homicide investigation reports were included in the file.[10]

7.)    Finally, Mr. Shane complains that there were no photographs of the subject who was arrested. Yet, he does not provide any opinions on why those photographs may be relevant when there are no claims that force

---

[9] RFC-Maysonet 001724-1726.
[10] RFC-Maysonet 001751-1785.

was used against the arrestee.

8.)     I am of the opinion that the investigation was reasonable.

b.     152507

1.)     Mr. Shane's criticisms included: No officer reports were submitted; No interview of witnesses; No attempt to obtain a Russian translator to speak to the Russian-speaking victim; No proof of contact letter mailed to victim dated August 24, 1986; Paulnitsky's torn shirt was not photographed and logged into evidence; No photographs of Paulnitsky's injuries; No signed release from complainant Mr. Gorfin who wished no further action.[11]

2.)     It was alleged that on August 20, 1986, that Detective Paulnitsky struck the complainant on his left elbow with a garden hose. The officer stated that he was coming home and a vehicle was blocking his driveway and when he spoke with the complainant, the complainant punched and threatened to kill him. The complainant was arrested for battery. The allegation were not sustained.[12]

3.)     While Mr. Shane claims the complainant was a Russian speaker and there was no translator, and the investigator did document a language barrier,[13] there is no evidence in the file that he was unable to communicate with the investigators. Indeed, there is a two-page interview of the complainant in the file.[14]

4.)     An area canvass was conducted.[15]

5.)     The officer was interviewed in-person.[16]

6.)     The fact that the complainant did not wish to cooperate any further with the investigation is documented in the report.[17]

7.)     I am of the opinion that the investigation was reasonable.

---

[11] Shane report at 39.
[12] RFC-Maysonet 001860-1862.
[13] RFC-Maysonet 001872.
[14] RFC-Maysonet 001869-1870.
[15] RFC-Maysonet 001877.
[16] RFC-Maysonet 001883-1886.
[17] RFC-Maysonet 001887.

11

    c.      155500

        1.)      Mr. Shane's criticisms included: Victims were not contacted; No interview of witnesses; No statement taken from witnesses; No attempt to canvass the scene; No interview of officer.[18]

        2.)      The complainant alleged that on April 8, 1987, officers took her husband to the police station for questioning and left her three minor children at home alone.[19]

        3.)      The officers stated that the subject voluntarily went to the police station to be interviewed regarding a homicide.  While there, he signed a consent to search form and Detective Paulnitsky went to his home. Paulnitsky claims he spoke with the subject's 12-year-old daughter who said she frequently babysits her siblings.  Paulnitsky claims the subject never told him of a concern regarding the children.[20]

        4.)      Both the subject and his wife, the complainant, were interviewed.

        5.)      Contrary to Mr. Shane's claim that the officers were not interviewed, there were to/from memos in the file.[21]

        6.)      While Mr. Shane complains there was no attempt to canvass, he does not suggest why a canvass would be necessary in this case when there are no allegations that someone could have witnessed anything.

        7.)      The investigation did not clear the officers of misconduct, rather the finding was not sustained as it could not be proved that the officers left the children unattended, and the children could not take care of themselves.

        8.)      I am of the opinion that the investigation was reasonable.

    d.      168160

        1.)      Mr. Shane's criticisms included: While officers were contacted, no formal statements were taken; No statement from victim taken; No attempt to

---

[18] Shane report at 39.
[19] RFC-Maysonet 001991.
[20] RFC-Maysonet 001993.
[21] RFC-Maysonet 001998-2001.

canvass the scene.[22]

2.) It was alleged that officers searched their basement without a search warrant and they failed to properly identify themselves.[23]

3.) The investigation found the allegation of an unlawful search to be exonerated because the arrestee had provided the officers with a written consent to search. The complainant's allegation that the officers did not provide identification when requested was not sustained because the officers denied the misconduct and there was no independent evidence to determine if identification was provided.[24]

4.) The officers did provide to/from statements regarding the allegations.

5.) A signed consent to search form was in the file.[25]

6.) Finally, contrary to Mr. Shane's claim, the victim was interviewed at her residence.[26]

7.) I am of the opinion that this investigation was reasonable.

e. 172123

1.) Mr. Shane stated he did not observe any deficiencies.[27]

2.) I am of the opinion that this investigation was reasonable.

f. 179835

1.) Mr. Shane's criticisms included: No attempt to canvass the scene; and no supplemental reports submitted.[28]

2.) The complainant alleged that on October 20, 1990, Officer Montilla shot Jesse Martinez without justification and kicked Sammy Rodriguez after he had been handcuffed.[29]

---

[22] Shane report at 39.
[23] RFC-Maysonet 002071.
[24] RFC-Maysonet 002076.
[25] RFC-Maysonet 002110.
[26] RFC-Maysonet 002074.
[27] Shane report at 39.
[28] Shane report at 39.
[29] RFC-Maysonet 002689.

13

3.)     While Mr. Shane claims there was no area canvass, the canvass was conducted and documented in a report.[30]

4.)     While Mr. Shane states that no supplemental reports were submitted, he does not identify what he believes to be missing.  Moreover, the investigation sustained the allegations of excessive force for the shooting.[31]

5.)     I am of the opinion that this investigation was reasonable.

g.     180037

1.)     Mr. Shane's criticisms included: No in person interview of victim; No victim statement taken; No in person interview with witnesses; No witness statements taken; No attempt to canvass the scene; No photos of the scene taken; No formal interview of officer taken.

2.)     The complainant alleged that during the past year (1990) the accused officer, who is their neighbor, requested parking citations be issued to his vehicle, struck the victim with his screen door when she tried to talk to him, vandalized his vehicle and verbally abused them.[32]

3.)     The complainant, his girlfriend, and his girlfriend's mother were all interviewed over the telephone.[33]  There is no generally accepted practice that requires all interviews to be conducted in person.

4.)     The officer provided to to/from statement regarding the allegations.[34]

5.)     Mr. Shane does not explain his criticism of a lack of scene photographs where the dispute occurred over a one-year period and involved citations given to a vehicle that was parked unlawfully and allegations of verbal abuse.  Neither scene photographs nor an area canvass would be required in this matter.

6.)     The investigation found that the allegation of calling officers to issue parking citations was exonerated and the remaining allegations were not sustained.[35]

---

[30] RFC-Maysonet 002694.

[31] RFC-Maysonet 002696.

[32] RFC-Maysonet 002855.  This matter was reviewed by the Police Board where he was found not guilty of all allegations.  Officer Montilla had his police powers restored on August 19, 1991. RFC-Maysonet 002853-2854.

[33] RFC-Maysonet 002865-2867.

[34] RFC-Maysonet 002870-2871.

[35] RFC-Maysonet 002856.

7.)     It is my opinion that this investigation was reasonable.

h.     182519

1.)     Mr. Shane's criticisms included: No in person interview with victim; No witness statement taken; No in person interview with witnesses; No statements taken from witnesses; No attempt to canvass the scene; No incident reports describing the events leading to the CR; No investigative reports from accused officer in CR file; No interview with officer; No officer statement taken.

2.)     The complainant alleged that on February 21, 1991, Detective Guevera told her "Shut up you don't know what the fuck you're talking about" when she questioned his intent to search her mother's apartment.[36]

3.)     Contrary to Mr. Shane's claims, the complainant and her mother were interviewed.[37]

4.)     This incident was alleged to have occurred inside a home and an area canvass would not be appropriate.

5.)     The allegations were not sustained.[38]

6.)     Two detectives provided to/from statements.[39]

7.)     I am of the opinion that the investigation was reasonable.

i.     188930

1.)     Mr. Shane's criticisms included: No in person interview of victim; No statement taken from victim; No attempt to canvass the area; No formal interview of officers.

2.)     The complainant alleged that on November 22, 1991, after being involved in a traffic collision with Detective Paulnitsky, that he failed to identify himself and called her a "bitch."[40]  Paulnitsky claims he did provide identification and denied calling the complainant by any name.

---

[36] RFC-Maysonet 002882.
[37] RFC-Maysonet 002883 and 002891-2892.
[38] RFC-Maysonet 002883.
[39] RFC-Maysonet 002889-2890.
[40] RFC-Maysonet 002987.

15

3.) The detective did provide a to/from memorandum.[41]

4.) Contrary to Mr. Shane's statement, the complainant was interviewed and her statement was documented in a report. The complainant admitted that she stopped her vehicle after seeing police lights and that the detective did show her identification, but she wanted to speak with a "street cop." During her interview she said she could not recall what the officer said to her.[42]

5.) The investigation was found to be exonerated regarding showing identification and not sustained as to the claim of name calling.[43]

6.) I am of the opinion that the investigation was reasonable.

j.    195435

1.) Mr. Shane's criticisms included: No victim statement taken; No witness statement taken; Not all accused officers' statements were taken.

2.) The complainant alleged that on September 25, 1992, that Paulnitsky and Payton stole $2,300, stereo equipment and a nude photo of the complainant's girlfriend from his apartment and that they made a false report.[44]

3.) Contrary to Mr. Shane's statement, the investigator did attempt to interview the complainant, but the complainant refused based on advice of their attorney. The investigator contacted the attorney who stated there was a pending criminal case and he did not want his client interviewed.[45] Moreover, Dr. Shane's claim that absent a "customary declination letter"[46] the declination cannot be verified[46] is without merit. There is no generally accepted practice in policing that a specific form be used to document a complainant's unwillingness to proceed with an investigation. Here, the investigator documented the name, address, and phone numbers of the complainant and the attorney[47] should the verification of the declination become necessary.

---

[41] RFC-Maysonet 002993.
[42] RFC-Maysonet 002988.
[43] RFC-Maysonet 002988.
[44] RFC-Maysonet 003003.
[45] RFC-Maysonet 003008 and 003034-3045.
[46] Shane report at footnote 53.
[47] RFC-Maysonet 003034-3035.

16

    4.)    Mr. Shane claims no witness statements were taken but the investigator did take the statement of the witness Mr. Connoly and a follow up statement where he was presented with a photo lineup of the officers.[48]

    5.)    The complainant admitted in an interview that he made the theft allegations to try to avoid being arrested.[49]

    6.)    Finally, the subject officers did submit to/from reports[50] and Thiel was interviewed in person.[51]  Paulnitsky did not provide a statement but the allegations against him were solely related to theft which the complainant admitted did not occur.

    7.)    I am of the opinion that this investigation was reasonable.

k.    200441

    1.)    Mr. Shane's criticisms included: No in person interview with victims; No victim statements taken; No in person interview with witnesses; No witness statements taken; No incident report concerning events leading to the CR; No interview of officer; Officer's statement not taken.

    2.)    The complainant alleged that on May 8, 1993, Paulnitsky refused to identify himself and stuck Marquez in the face.  And that Officers Graves and Aguilar struck Marquez.[52]

    3.)    Mr. Shane claims both that the witness interviews were conducted over the phone *and* that they were not conducted at all.  While it is correct that the interviews of the victims and witnesses were conducted over the phone, it is incorrect to say they were not conducted at all.  The witnesses, Mr. Adams and Mr. Mammana-Lupo, were interviewed.[53]

    4.)    Moreover, the officers did provide to/from statements.[54]

    5.)    I am of the opinion that this investigation was reasonable.

---

[48] RFC-Maysonet 003009, 003036 and 003053.

[49] RFC-Maysonet 003018.

[50] RFC-Maysonet 003043-3044; 3048;

[51] RFC-Maysonet 003058-3060.

[52] RFC-Maysonet 003082.

[53] RFC-Maysonet 003091 and 003095-3096.

[54] RFC-Maysonet 003113-3114; 003119-3121.

l.      220046

    1.)      Mr. Shane's criticisms included: No target letter issued to accused officers; No officer reports submitted; No interviews of officers.

    2.)      The CR was initiated due to 150 CPD officers with suspended driver's licenses due to outstanding parking citations, failing to show proof of insurance or other Vehicle Code violations.[55]

    3.)      Dr. Shane's criticism of a lack of target letters to the 150 employees is unfounded as the file only contained a list of the employees who may have had their driver's licenses suspended due to unpaid parking tickets. The investigation was referred to each employee's chain of command to notify the officers and to conduct the investigation.

    4.)      Internal Affairs sent the list of involved officers to their appropriate chain of command for investigation. The referral of this investigation to the chain-of-command was reasonable.

m.      247214

    1.)      Mr. Shane's criticisms included: No target letters issued to accused officers; No officer statements taken; no probing questions put to officers.

    2.)      Officers made complaints against one another that on July 27, 1998, officers used racial epitaphs and drove in a negligent manner.[56]  The allegations against Officer Perisee were sustained and the allegations against Paulnitsky were not sustained.[57]

    3.)      Contrary to Mr. Shane's opinion, all of the involved officers provided statements in this incident that occurred in a police parking facility.[58]

    4.)      It is my opinion that the investigation that resulted in sustained findings was reasonable.

---

[55] RFC-Maysonet 003429-3445.
[56] RFC-Maysonet 004488.
[57] RFC-Maysonet 004490-4491.
[58] RFC-Maysonet 0044944497.

18

n.    251502

    1.)    Mr. Shane's criticisms included: No in person interview with victim; No in person interview with witnesses; No formal statement of victim taken; No formal statement of witnesses taken; No interview of accused officer; No formal statement of accused officer taken.

    2.)    It was alleged that on February 6, 1999, Detective Guevara, while off-duty, used profanity and threatened a sergeant.[59]  The allegations were sustained and Guevera was given a 20-day suspension.[60]

    3.)    The sergeant and four other officers were interviewed[61] and they provided written statements.[62]

    4.)    Guevera provided a written statement.[63]

    5.)    While Mr. Shane believes the investigation to be unreasonable, the allegations were sustained and the officer was disciplined.

    6.)    I am of the opinion that the investigation was reasonable.

o.    256148

    1.)    Mr. Shane's criticisms included: No formal statement of witnesses taken; No officer report submitted; No CPD medical form describing the victim's injuries.

    2.)    The complainant alleged that on August 24, 1999, the accused officers engaged in physical abuse.[64]  Additionally, the investigator personally observed bruising on Mr. Hernandez.[65]

    3.)    Mr. Shane claims there was no CPD medical form describing the victim's injuries, but the report included hospital and inmate records describing the injuries.[66]  During his deposition, Dr. Shane could not identify the

---

[59] RFC-Maysonet 004621.
[60] RFC-Maysonet 004619.
[61] RFC-Maysonet 004626.
[62] RFC-Maysonet 004631-4635.
[63] RFC-Maysonet 004636.
[64] RFC-Maysonet 004921-4922.
[65] RFC-Maysonet 004946.
[66] RFC-Maysonet 004924.

form that he claims was missing.[67]  There is no generally accepted practice in policing to use a specific form to identify medical records and instead placing copies of the medical records in the file, as occurred here, is sufficient.

4.) Contrary to Mr. Shane's claim the investigator did obtain witness statements.[68]

5.) It is unclear what Mr. Shane means by no officer report submitted, but the officers were interviewed in person and reports regarding the lineup where the alleged incident occurred were included in the file.

6.) I am of the opinion that this investigation was reasonable.

p. 273466

1.) Mr. Shane's criticisms included: No in person interview with victim; No formal statement from victim taken; No in person interview with witnesses; No formal statement from witnesses taken; No attempt to canvass the scene; No incident report concerning the events leading to the CR; No formal statement of accused officer taken.

2.) The complainant, Kathy Paulnitsky, alleged that Sergeant Callaghan failed to conduct a proper investigation and told her that he was not going to listen to her.  Teresa Paulnitsky alleged Detective Paulnitsky threw a wooden board striking her son's vehicle.[69]  Both complainants were interviewed over the telephone.

3.) Teresa was interviewed and admitted that she did not see Paulnitsky throw the board and there was no damage to her son's vehicle.[70]  Kathy said she did not wish to pursue the matter but refused to sign a declination letter.[71]  Kathy's allegations were not sustained and Teresa's allegation was unfounded.[72]

4.) Sergeant Callaghan submitted a to/from memo.[73]

---

[67] Shane deposition Vol II at 145-146 and 215-216.
[68] RFC-Maysonet 005005, 005016-5017; 005022, 005026, 005039, 005044
[69] RFC-Maysonet 005439.
[70] RFC-Maysonet 005439.
[71] RFC-Maysonet 005439.
[72] RFC-Maysonet 005440.
[73] RFC-Maysonet 005446.

20

5.)      Detective Paulnitsky submitted a to/from memo.[74]  It is my opinion that the investigation was conducted reasonably.

q.     284331

1.)      Mr. Shane's criticisms included: No in person interview with victim; No formal statement from victim; No in person interview with witnesses; No witness statements taken; No attempt to canvass the scene; No statement of accused officer taken.

2.)      The complainant alleged that on September 5, 2002, Detective Paulnitsky showed the complainant his handgun which was in his holster and said, "I'm going to get you."[75]

3.)      Contrary to Mr. Shane's statement, both complainants were interviewed.[76]

4.)      Paulnitsky did provide a to/from statement.[77]

5.)      Here, one complainant acknowledged she did not see the conduct that she alleged and the other refused to cooperate with the investigation.  I am of the opinion that the investigation was reasonable.

r.     288729

1.)      Mr. Shane's criticisms included: No in person interview with victim; No formal statement from victim; No attempt to canvass the scene; No formal statement of the accused officer taken.

2.)      The complainant alleged that on April 10, 2003, Detective Paulnitsky harassed her because she no longer wanted to pursue her case.[78]

3.)      It appears that this CR is the same investigation as 289081 which is discussed below.

s.     289081

1.)      Mr. Shane's criticisms included: No victim statement taken; Witnesses

---

[74] RFC-Maysonet 005453.
[75] RFC-Maysonet 005571.
[76] RFC- Maysonet 005574-5575 and 005576-5577.
[77] RFC-Maysonet 005584.
[78] RFC-Maysonet 005592.

were not contacted; No formal statement of the accused officer taken.

2.) The complainant alleged that on April 10, 2003, Detective Paulnitsky was harassing her by telephoning regarding a case she no longer wanted to pursue and threatening to take her children.[79]

3.) Contrary to Mr. Shane's statement, the complainant was interviewed.[80]

4.) Paulnitsky did submit a to/from memo denying that he made any threats.[81]

5.) The allegations were the result of statements made during telephone conversations and Mr. Shane does not identify what witnesses should have been contacted.

6.) I am of the opinion that the investigation was reasonable.

t.   305680

1.) Mr. Shane's criticisms included: No formal statement of accused officer taken.

2.) It was alleged that on May 5, 2005, Detective Paulnitsky was inattentive to duty as he failed to secure recovered property.[82]

3.) Detective Paulnitsky prepared a memorandum regarding the allegations.[83] It was determined that Paulnitsky returned pamphlets to a subject's girlfriend at the direction of a supervisor as the subject was threatening suicide. The supervisor acknowledged the order. The allegations were exonerated.[84]

4.) It is my opinion that this investigation was reasonable.

u.   308007

1.) Mr. Shane's criticisms included: No in person interview with victim; No victim statement taken; No attempt to canvass scene or find witnesses;

---

[79] RFC-Maysonet 005592.
[80] RFC-Maysonet 005597.
[81] RFC-Maysonet 005605.
[82] RFC-Maysonet 006095.
[83] RFC-Maysonet 006109.
[84] RFC-Maysonet 006096.

No target letter issued to accused officer; No officer report submitted; No formal statement of accused officer taken.

2.) The complainant, an attorney, alleged that on June 14, 2003, that Detective Paulnitsky falsely arrested his client for aggravated battery of a child.[85]

3.) The attorney would not sign an affidavit, nor would he allow investigators to contact his client. The investigation was closed due to the lack of an affidavit.

4.) It is my opinion that this investigation was reasonable.

    v.    1013854

1.) Mr. Shane's criticisms included: No target letter issued; No investigative log; No officer report submitted.

2.) It was alleged by a CPD lieutenant that Detective Paulnitsky recorded conversations unlawfully with other members of CPD.[86]

3.) All of the allegations were sustained.[87]

4.) The officer was interviewed in person.[88]

5.) It was recommended that Paulnitsky's employment be terminated,[89] but it appears that he retired during the investigation.

6.) I am of the opinion that the investigation was reasonable.

20. CRs for Non-Defendant Officers

    a.    155876

1.) Mr. Shane's criticisms include: No in person interview with victim; No witnesses contacted; No attempt to canvass the scene; No target letter issued to officer; No formal interview of officer; No officer statement taken.

---

[85] RFC-Maysonet 006129.
[86] RFC-Maysonet 006448.
[87] RFC-Maysonet 006453.
[88] RFC-Maysonet 006511-6513.
[89] RFC-Maysonet 006487.

2.)    The complainant alleged that on September 22, 1983, he was arrested without probable cause.[90]  The issues of probable cause were addressed at the complainant's criminal trial and he was convicted of rape and sentenced to life imprisonment.

3.)    The complaint was received four years after the incident thus an area canvass would not be appropriate.  In his deposition, Dr. Shane opined that detectives should have re-visited the crime scene to see if it was any different from the time of the crime and to determine if the claims made were possible.[91]  Dr. Shane ignores the fact that officers responded to a suspicious vehicle, observed the rape in progress and where the victim identified the complainant as the suspect.[92]

4.)    Contrary to Mr. Shane's statement, the victim was interviewed.[93]

5.)    The officers did submit written statements.

6.)    The investigation was reasonable.

b.    162687

1.)    Mr. Shane's criticisms include: No attempt to canvass the scene; No target letter issued to accused officers; No reports from accused officers were submitted; No medical records for the complainant, even though this was assault case; No interview with accused officers; No officer statements taken.

2.)    The complaint was based on a civil lawsuit.  The file only contained a copy of the lawsuit complaint and a copy of the criminal investigation. Moreover, the documents in the file are identified as attachments 2, 5, 7, and 9.  The lack of chronological attachments and an investigative report makes it apparent that the file is not complete.

c.    166878

1.)    Mr. Shane's criticisms include: No in person interview with victim; No victim statement taken; No canvass at the scene; No incident reports; No investigative reports; No target letter issued to accused officers; No

---

[90] RFC-Maysonet 010384.
[91] Shane deposition at 240.
[92] RFC-Maysonet 010440-10454.
[93] RFC-Maysonet 010431.

24

officer statements taken; No interview of accused officer.

2.) The complainant alleged that between December 1987 and February 1988, officers arrested the victim unlawfully. The investigation was based on a lawsuit and the attorney would not allow his client to be interviewed.[94]

3.) The officers did provide to/from reports regarding the allegations.[95] One of the involved officers did not provide a statement because he had been involved in a traffic accident and suffer brain damage and was unable to communicate.[96]

4.) The arrest reports were included in the file.[97]

5.) While Mr. Shane complains that the victim was not interviewed, he ignores that the victim's attorney refused to allow his client to provide a statement.[98]

6.) The investigation was closed due to lack of cooperation.[99]

7.) It is my opinion that the investigation was reasonable.

d. 168290

1.) Mr. Shane's criticisms include: No victim statement taken; No in person interview with witnesses; Only witnesses contacted were other officers; No attempt to canvass the scene for additional witnesses; No accused officers' statement taken.

2.) The complaint was based on a civil lawsuit and it was alleged that on February 18, 1989, the officers seized baseball cards and other items from the victim's business. The victim would not cooperate with the investigation and would not provide a statement. The items were seized based on a search warrant and consent and were later returned.[100]

3.) The officers submitted to/from reports.[101]

---

[94] RFC-Maysonet 011122.
[95] RFC-Maysonet 011137-11138.
[96] RFC-Maysonet 0011141.
[97] RFC-Maysonet 011139.
[98] RFC-Maysonet 011145.
[99] RFC-Maysonet 011122.
[100] RFC-Maysonet 011241.
[101] RFC-Maysonet 011279-11283 and 011287-11290.

25

4.) There was no dispute that the officers seized the property, thus there was no need for an area canvass.

5.) This investigation was reasonable.

e.    168914

1.) Mr. Shane's criticisms include: Witnesses not contacted; No attempt to canvass scene; No reports from accused officers were submitted.

2.) The complainant alleged physical abuse.[102] The officers claim they responded to a call of subjects stripping a vehicle and when they arrived the complainant fled. The officers acknowledged that they tackled him knocking him to the ground but denied physical abuse.[103]

3.) The arrest report is included in the file.[104]

4.) Mr. Shane claims the victim was not contacted but there is a transcribed interview of the victim in the file regarding his arrest,[105] and his complaint.[106]

5.) The complainant would not sign a medical release explaining the reason for no medical reports in the file.[107]

6.) There is no indication that there was a witness who was not interviewed.

7.) This investigation was conducted reasonably.

f.    169532

1.) Mr. Shane's criticisms include: Victim not contacted; No in person interview with witness; No witness statement taken; No attempt to canvass the scene; No medical reports regarding victim's injuries.

2.) The complainant alleged that he was beaten with guns and flashlights.[108]

---

[102] RFC-Maysonet 011383.
[103] RFC-Maysonet 011383.
[104] RFC-Maysonet 011388-11391.
[105] RFC-Maysonet 011397-11399.
[106] RFC-Maysonet 011392.
[107] RFC-Maysonet 011383.
[108] RFC-Maysonet 011447.

The officers claim they saw the complainant dropping a packet of narcotics, there was a foot pursuit and he pushed an officer down some stairs. The complainant was arrest for possession of heroin, aggravated battery and resisting arrest.[109]

3.) Contrary to Mr. Shane's claim, the report states that a canvass was conducted.[110]

4.) The investigator made reasonable efforts to interview the complainant but were unable to contact him.[111]

5.) All of the officers were interviewed in person and there is no indication that there was a witness, thus there was no witness statement or in person interview of a witness.

6.) This investigation was conducted reasonably.

g. 170021

1.) Mr. Shane's criticisms include: No victim statement taken; No witnesses contacted; No attempt to canvass the scene; No incident reports; No investigative reports; No interview with accused officers; No officer statement taken.

2.) The complainant alleged that on August 2, 1989, two officers verbally abused her son.[112]

3.) One of the officers died on August 8, 1989.[113] The other officer submitted a to/from report.[114]

4.) The complainant did not witness the incident but contrary to Mr. Shane's statement, the victim was interviewed.[115]

5.) There was an investigative report in the file.[116]

---

[109] RFC-Maysonet 011448.
[110] RFC-Maysonet 011448 and 011478.
[111] RFC-Maysonet 011476-11477.
[112] RFC-Maysonet 011520.
[113] RFC-Maysonet 011521.
[114] RFC-Maysonet 011529.
[115] RFC-Maysonet 011521.
[116] RFC-Maysonet 011520-11521.

6.)      The arrest report was included in the file.[117]

7.)      The investigation was conducted reasonably.

h.      170373

1.)      Mr. Shane's criticisms include: No in person interview with victim; No victim statement taken; No attempt to locate witnesses; No interview with accused officers; No officer statements taken.

2.)      The complainant alleged that on August 20, 1989, officers searched her apartment without consent or a warrant.[118]

3.)      Contrary to Mr. Shane's claim, the victim was interviewed and she admitted that she admitted the officers into her home and allowed them to search her apartment.[119] Mr. Shane complains in a footnote in his report that there was no recording of the telephone interview, no signed consent to search form, and no sworn statement from the victim that she gave consent. There is no generally accepted police practice that interviews be recorded in 1989, that consent forms were required on all consent searches and Mr. Shane ignores the victim's statement that she gave the officers consent.

4.)      The officers submitted to/from reports.[120]

5.)      Mr. Shane claims there was no attempt to locate a witness but this incident occurred inside a home where no one else was present and there is no indication that there was a witness.

6.)      The investigation was conducted reasonably.

i.      170700

1.)      Mr. Shane's criticisms include: No victim statement taken; No witness statement taken; No canvass of the scene; No photographs of the scene; No officer statements taken.

2.)      The complainant alleged that on September 3, 1989, that officers entered her home without first knocking and announcing and that they stole $900

---

[117] RFC-Maysonet 011530.
[118] RFC-Maysonet 011532.
[119] RFC-Maysonet 011536.
[120] RFC-Maysonet 011537, 011541,

form the victim's bedroom.[121]

3.) Contrary to Mr. Shane's statement, the victims were interviewed in person, along with the witnesses.[122]  It is difficult to believe that Mr. Shane could have missed the discussion of the witness statements in the report along with the five memorandums that are all labeled witness statements in the file.

4.) There were to/from reports in the file from seven different officers[123] and an indication in the report that some of the officers were interviewed in person.[124]

5.) The investigation was reasonable.

j.   171720

1.) Mr. Shane's criticisms include: No witnesses contacted; No attempt to canvass the scene; No target letter issued to accused officers; No reports from accused officers were submitted; No officer statements were taken; No medical reports regarding victim's injuries.

2.) The complainant alleged that on April 28, 1987, that multiple officers physically abused the complainant by knocking him to the ground and kicking him.[125]

3.) The complainant filed a lawsuit and would not provide a statement.[126]

4.) The investigation was closed due to a lack of cooperation from the complainant.

5.) The investigation was reasonable.

k.   172221

1.) Mr. Shane's criticisms include: No in person interview with witness; No witness statement taken; No incident reports; No officer statement taken.

---

[121] RFC-Maysonet 012920.  012931-12935.
[122] RFC-Maysonet 012924.
[123] RFC-Maysonet 012970-12977.
[124] RFC-Maysonet 012926.
[125] RFC-Maysonet 011558.
[126] RFC-Maysonet 011559.

      2.)     An officer changed a flat tire in his police vehicle and discovered an old Sears spare tire in the trunk which was not a department issued tire.[127]

      3.)     The reporting officer was interviewed.[128]

      4.)     The officer who drove the vehicle on the prior shift provided a to/from statement.[129]

      5.)     The investigation was reasonable.

l.     172748

      1.)     Mr. Shane's criticisms include: No investigative reports; No officer statements taken.

      2.)     The complainant alleged that detectives removed $1,200 from his residence and failed to inventory or return the property to him.[130]

      3.)     The allegations were not sustained.[131]

      4.)     The crime report was included in the file along with the investigation report of the allegations.

      5.)     The officers submitted to/from statements.

      6.)     The investigation was reasonable.

m.     173369

      1.)     Mr. Shane's criticisms include: No reports from accused officers were submitted; No attempt to canvass the scene for witnesses; No witnesses were located or contacted.

      2.)     The complainant alleged that on August 16, 1989, that officers verbally abused him and struck him with a flashlight.[132]

---

[127] RFC-Maysonet 013384.
[128] RFC-Maysonet 013387.
[129] RFC-Maysonet 013393.
[130] RFC-Maysonet 011796.
[131] RFC-Maysonet 011799.
[132] RFC-Maysonet 011834.

      3.)     While Mr. Shane criticizes the investigator for not conducting an area canvass, he ignores the fact that the complaint was not made until January 17, 1990, four months after the incident.

      4.)     The officers were interviewed in person.[133]

      5.)     There is no evidence that there was a witness who was not interviewed.

      6.)     The investigation was reasonable.

n.    174770

      1.)     Mr. Shane's criticisms include: No victim statement taken; No witnesses contacted; No attempt to canvass the scene; No accused officer statement taken.

      2.)     The complainant alleged that on March 25, 1990, that the officers pointed their guns at her son as he came out of his bedroom.[134] The officer said he was at the residence looking for a homicide suspect and when a door suddenly opened, he pointed his gun, but immediately holstered it when he saw a child.[135]

      3.)     This incident occurred inside a home and a canvass would not be appropriate.

      4.)     The investigator went to the complainant's home to obtain a statement, but she said she was too busy. The investigator left her with a business card to schedule an appointment for an interview.[136] The investigator followed up with a certified letter.[137]

      5.)     The officers did provide to/from statements.

      6.)     The investigation was reasonable.

o.    179504

      1.)     Mr. Shane's criticisms include: No victim statement taken; No attempt to canvass the scene; No officer statement taken.

---

[133] RFC-Maysonet 011854-11855 and 11860-11861.
[134] RFC-Maysonet 011969-11970.
[135] RFC-Maysonet 011970.
[136] RFC-Maysonet 011979.
[137] RFC-Maysonet 011980.

2.) The complainant alleged that on October 4, 1990, a tenant took property that did not belong to her and responding officers failed to take a report.[138]

3.) The complainant was interviewed by the investigator.[139] During his interview, the complainant acknowledged that the tenant had not yet been evicted and the property could have belonged to the tenants. The complainant was advised it was a civil dispute.

4.) The officers did submit written statements.

5.) The investigation was reasonable.

p. 180271

1.) Mr. Shane's criticisms include: No victim statement taken; No witnesses contacted; No attempt to canvass the scene.

2.) The complainant alleged that on November 5, 1990, she called the police because her boyfriend violated a protection order, but the officers did not take any action.[140]

3.) Contrary to Mr. Shane's statement, the victim's statement was taken by the investigator.[141]

4.) No witnesses were contacted because the complainant refused to identify them.[142]

5.) The incident occurred inside a home, thus no canvass would have been appropriate.

6.) The investigation was conducted reasonably.

q. 181250

1.) Mr. Shane's criticisms include: No victim statement taken; No witness statement taken; No attempt to canvass the scene; No officer statements

---

[138] RFC-Maysonet 013672.
[139] RFC-Maysonet 013673.
[140] RFC-Maysonet 013823.
[141] RFC-Maysonet 013824.
[142] RFC-Maysonet 013824.

taken.

2.) The complainant alleged that on December 20, 1990, officers searched her apartment without a warrant or consent.[143]

3.) Contrary to Mr. Shane's statement, the victim was interviewed,[144] along with witnesses.[145] Indeed, one of the witnesses said the police were given consent to search the apartment.[146]

4.) The officers did submit written statements.

5.) The investigation was reasonable.

r.    181515

1.) Mr. Shane's criticisms include: No witness statement taken; No attempt to canvass the scene; No reports submitted by accused officers.

2.) The complainant alleged that on December 7, 1990, officers searched his home and did not inventory one kilogram of cocaine, $2,050 in cash and several pieces of jewelry that were taken from his home.[147]

3.) The allegation was found to be not sustained.[148]

4.) Statements were taken from the two subjects who were at the residence at the time of the search.[149]

5.) This incident occurred inside a residence and a canvass would not be appropriate.

6.) The arrest reports were included in the file.[150]

7.) The officers were interviewed in person.[151]

8.) The investigation was conducted reasonably.

---

[143] RFC-Maysonet 014005.
[144] RFC-Maysonet 014009.
[145] RFC-Maysonet 014010-14011.
[146] RFC-Maysonet 014011.
[147] RFC-Maysonet 014038.
[148] RFC-Maysonet 0114039.
[149] RFC-Maysonet 014041.
[150] RFC-Maysonet 014053-14060.
[151] RFC-Maysonet 014076-14079, 14082-14084, 14091-14093.

21.     It is my opinion that the investigations were conducted reasonably, and that Dr. Shane's criticisms are without merit.

22.     There is no evidence that the Chicago Police Department fails to accept or document complaints of officer misconduct.  Indeed, the evidence is that the Chicago Police Department has an open complaint process and that all complaints are accepted.

   a.     The Chicago Police Department assigns tracking numbers to all complaints to ensure that all complaints are investigated and that the allegations may be attributed to the officer whom the complaint was made against.

   b.     The creation of the OPS represents a significant attempt to infuse administrative investigations with unique neutrality and independence.  OPS was comprised of civilian investigators tasked with investigating all allegations of excessive force against sworn members of the force, including all off-duty officer use of force investigations.  This represents a dramatic effort to overcome the criticism commonly raised that police officers are not capable of investigating themselves.

   c.     OPS represented a conscious effort to avoid many of the concerns identified in other department's administrative investigations and includes a career path for investigative personnel who are members of this unique unit.

   d.     OPS was unique in policing in that very few other agencies maintain such an independent organization designed to investigate the most serious allegations of misconduct against the police.

23.     The investigations into allegations of officer misconduct by IAD and OPS were reasonable.

   a.     IAD and OPS conducted interviews and interrogations of witnesses and subject officers.  The complainants often sign these statements.  The signature of the complainant is an important investigative step as it shows that the complaint has been properly recorded and that the intake officer has not minimized the alleged conduct.

   b.     IAD and OPS conducted area canvasses in an attempt to locate additional witnesses when appropriate.

   c.     IAD and OPS took photographic evidence when appropriate, particularly to document the injuries of a complainant.

   d.     IAD and OPS collected department reports regarding an incident including: crime

reports; dispatch records; and staffing reports. These reports are included with IAD and OPS investigative reports. The inclusion of this material allowed IAD and OPS and department supervision to review the reports as they are reviewing the IAD or OPS report and allows a level of oversight in that the reports are available for later review for matters like this.

e.      IAD and OPS seized evidence when appropriate.

f.      IAD and OPS directed evidence to be examined by experts when appropriate. For example, the submission of weapons for potential trace evidence that would tend to support or discredit an officer's testimony.

g.      IAD and OPS collected and transcribed dispatch communication tapes when appropriate.

h.      IAD and OPS collected medical records of complainants and subject officers when appropriate.

i.      IAD and OPS documented their investigative steps through written memorandums that are submitted to their supervisor as the investigation proceeds and through the investigators' case notes.

j.      IAD and OPS prepared reports that document their investigative efforts and their findings.

k.      IAD and OPS underwent a reasonable level of supervisory oversight within their own office in that supervisors' review and approve investigator's reports.

l.      IAD and OPS made reasonable findings based on their investigation.

m.      IAD and OPS made reasonable penalty recommendations based on their findings and the officer's prior department history.

n.      IAD, OPS and the Chicago Police Department maintain records of their investigations, the findings, and any disciplinary action.

o.      There is no evidence of bias, collusion, or other improper motive by any IAD or OPS investigator, supervisor, or manager.

p.      At the conclusion of the investigation, IAD and OPS would send the complainant a letter alerting them to the findings of their investigation. This is important as it allows community members to know that their complaint was investigated and that if they have concerns, they may contact anyone of a number of stakeholders

in the process that includes the investigating agency, state or federal officials, their attorney, their political representative, or a special interest group to seek further action.

q.      Unlike most police agencies across the nation, the City of Chicago has developed meaningful roles for civilians in the administrative investigation and disciplinary process.  All use of force complaints are investigated by civilians, the police department reviews the investigation and all appeals are heard by the civilian staffed Police Board.

24.    The Chicago Police Department is actively involved in the investigation and resolution of allegations of misconduct against its officers.

a.      Supervisors and managers are provided the opportunity to review OPS reports where the disciplinary recommendation is less than 30 days.  The supervisors and managers are able to provide input through a "concurrence" report.  In those reports, CPD supervisors and managers may agree or disagree with the findings.  If they disagree, they are required to prepare a report outlining their concerns and when appropriate request additional investigation.

b.      The Chicago Police Department imposes discipline based on the reports prepared by IAD and OPS.

c.      The Chicago Police Department publishes the overall number of complaints received by the department on an annual basis, the findings and a summary of recommended disciplinary actions taken by the department.

25.    It appears that Dr. Shane's review of the investigations was hypercritical, and he found investigations to be unreasonable for issues as simple as not conducting an interview in person and ignoring that an interview was conducted.  The appropriate standard of review when assessing the quality of an internal affairs investigation is reasonableness. The standard of review is not whether the investigation was "perfect," whether "every stone was overturned" or if the investigation could have been conducted "better."  If this were the standard no investigation could pass muster, as any expert could opine on a myriad of additional steps that could have been taken, different questions that could have been asked, questions that could have been asked in a different way, or different methods to conduct the investigation.  To determine the quality of an investigation, a reviewer should look at the totality of the circumstances to assess if the investigation was reasonably thorough, fair, and timely.[152]

---

[152] *See,* Noble, J. and G. Alpert, Evaluating the Quality of Law Enforcement Investigations: Standards for Differentiating the Excellent, Good and Reasonable, From the Unacceptable.  The Journal of California Law Enforcement (Vol. 46, No. 1, 2012)

26.     Moreover, Dr. Shane stated that his opinions were based on his experience working and supervising Internal Affairs investigations,[153] yet he acknowledged that he never worked Internal Affairs.[154]

27.     Finally, I agree with Dr. Shane when he stated in his report that, "When data rules are flawed, the results are flawed and decisions based on the date are also flawed."[155]  As discussed above, Dr. Shane made so many errors in reviewing the investigations that his data was seriously flawed, thus his analysis was similarly deeply flawed.  I am of the opinion that the investigations in this matter were conducted reasonably.

**There is No Generally Accepted Policing Practice That Requires Agencies to Promulgate Internal Affairs Policies that List Investigative and Administrative Steps to Conduct an Investigation**

28.     Dr. Shane said there are 9 administrative practices and 16 investigative practices[156] that are accepted practices in the policing industry and that he would expect these standards to be in place in any police agency between 1980-2008 and that he would expect these practices to be included in the department's Internal Affairs policy.[157]  However, Dr. Shane could not identify any source for his opinion other than to say he could "probably find policies around the country of various police departments that have these things in place," and that they are promulgated in the Internal Affairs Guidelines published by the US Department of Justice, COPS Office.[158] Indeed, Dr. Shane said he did not compare CPD's policies with any other agency.[159]

   a.    The COPS Office did publish, "Standards and Guidelines for Internal Affairs: Recommendations for a Community of Practice," in 2007.

   b.    I served as an independent policy advisor to the Large City Internal Affairs Project, which was funded by the United States Department of Justice.  This group consists of the 12 largest police agencies in the United States as well as a select group of independent policy advisors and academics.  The project was an effort to develop national best practices in internal investigations for police agencies.  I was the chair of a sub-committee whose efforts were focused on the investigation of allegations of officer misconduct.  It was this group that wrote the publication for the COPS Office.

---

[153] Shane deposition at 139 and 176.
[154] Shane deposition at 21.
[155] Shane report at 32.
[156] Shane report at 25-27.
[157] Shane deposition at 150.
[158] Shane deposition at 150.
[159] Shane deposition at 194.

     c.      There is nothing in the manual that requires many of the practices opined by Dr. Shane.  There is no requirement that victims, complainants, and witnesses be interviewed in person, that incident reports are required, or that all personnel submit an official administrative report, among others.

     d.      Indeed, the Office of the Attorney General for the State of New Jersey published a guide on Internal Affairs Policy and Procedure, updated in November 2022,[160] that provides guidelines for Internal Affairs investigations.  That text similarly does not require that steps that Dr, Shane opines are required and specifically states while an in person interview of complainants is preferable, telephonic interviews may be conducted.[161]

29.    There is no generally accepted practice in policing for agencies to promulgate the types of policies suggested by Dr. Shane, nor does he provide any evidence that such an accepted practice exists in policing between 1987-1990.

**The Chicago Police Department Has Reasonable Policies and Procedures to Regulate the Conduct of Their Officers**

30.    The Chicago Police Department has enacted reasonable policies and procedures designed to establish consistent work standards and to regulate the behavior of its employees.  Police departments develop policies and procedures to guide their employees' actions and to prevent employee misconduct by articulating the types of behaviors that are objectionable and to communicate that there are consequences for employees who fail to conform their behavior to department standards.  Reasonable policies and procedures are the foundation for the prevention of employee misconduct.

31.    The Chicago Police Department has developed and implemented reasonable policies to control the conduct of their officers and for the intervention regarding officers who may be displaying problematic behavior that does not reach the level of disciplinary action.  Included in those policies are:

     a.)    General Order 93-03 – Complaint and Disciplinary Procedures.  This directive outlines the department's complaint and disciplinary procedures and includes: the department member's bill of rights; employee specific responsibilities (complaint acceptance, OPS, IAD); conduct of the investigation; reporting and review procedures; special situations; and summary punishment.

     b.)    General Order 05-02 - Behavioral Intervention System (BIS).  The system is not a disciplinary program, rather, the system is designed to identify department members who may be in need of department assistance due to personal

---

[160] https://www.nj.gov/oag/iapp/docs/IAPP_November-2022.pdf
[161] At 34.

problems that may be impacting their work.  The program offers counseling resources to the affected employee.  The directive outlines the criteria for identifying members to be placed in the program and the responsibilities of management, IAD and the employee.

c.)  General Order 05-04 - Personnel Concerns Program.  The Personnel Concerns program is designed to provide an Individualized Performance Plan (IPP) for employees who have been identified as having difficulties that are affecting the members' competency.  Like BIS, this program is also intended to be non-disciplinary.  It is for problems that if not addressed may lead to severe disciplinary measures or separation from the department.  This directive outlines the criteria for identifying members to be placed in the program and the responsibilities of management, IAD and the employee.

d.)  These are the types of policies and programs that are recommended in the policing literature.  These policies are reasonable and the evidence shows that they are implemented, followed and enforced.

32.  Dr. Shane acknowledged that CPD's policies were consistent with industry standards.[162]

**There is No Evidence That the Chicago Police Department in Some Systemic Way Fails to Discipline Officers Who Engage in Misconduct**

33.  The Chicago Police Department does impose discipline to correct employee behavior.  As publicly reported in its Annual Reports, the Chicago Police Department recommended discipline in sustained cases between 1987 and 1990 an annual average of 193 reprimands; 440 one-to-five-day suspensions; 42 six-to-fifteen-day suspensions; 42 sixteen-to-thirty-day suspensions; 13 suspensions of more than thirty days; and 33 terminations.

34.  An average of 62 employees per year between 1987 and 1990 resigned while under investigation.  These resignations evidence the fact that employees know that they will be terminated for serious misconduct and to avoid termination they resign while under investigation.  Moreover, the status "resignation while under investigation" is not applied to anyone who may have an outstanding internal investigation at the time of their separation which may inflate this type of statistic, but is only applied when the Superintendent believes there is a likelihood that the investigation will result in a sustained finding accompanied by a recommendation for a substantial disciplinary penalty, or if there is a possibility that the investigation may result in the decertification of the person's peace officer status.

---

[162] Shane deposition at 82.

**Independent Civilian Oversight is Not the Rule of American Policing, But Rather It is The Exception**

35.     Independent civilian oversight of the police, particularly oversight agencies that have the authority to conduct independent investigations into allegations of police conduct is not the rule of American policing; rather it is a rare exception.  Of the some 18,000 state and local law enforcement agencies in the United States[163] only about 120 law enforcement agencies have some type of citizen oversight,[164] which equates to less than .007 percent of law enforcement agencies that have any type of civilian oversight.  Moreover, the number of police departments that have an <u>independent</u> oversight agency that actually investigates allegations of misconduct is far lower.

36.     In his book, "Police Accountability: The Role of Citizen Oversight," Samuel Walker divides the most common forms of civilian oversight into four classes. Class I systems represent review bodies composed of non-police personnel that are autonomous from law enforcement agencies.  These boards have complete investigative responsibility --they investigate complaints and make recommendations for disciplinary action, as well as the responsibility for making policy recommendations (OPS was a Class I system).  Class II systems, Police Review/Citizen Oversight, include agencies where investigation of the complaint and discipline recommendations are conducted by the police department, but the citizen board has input into the review and analysis of the reports. Class III systems, Police Review/Citizen-Police Appeal Board, represent a model where police departments maintain responsibility over the investigation, review and disposition of the case, but complainants can appeal the outcome to a board composed of officers and citizens. Class IV systems reflect an independent auditor approach where the investigation, review, and disposition of cases are handled internally by the agency, but a citizen-based body (individual auditor or group) reviews the complaint process as a means of transparency and regulation, with the ability to make policy recommendations on the review process.[165]

37.     OPS was a Class I system that represents the most robust form of independent oversight in that OPS accepted complaints, conducted independent investigations, made recommendations as to findings and disciplinary actions, made policy recommendations, was mostly independent of the police department and it published reports, statistics, and information regarding its investigations to the public.

38.     Of the largest police agencies in the nation, the City of Chicago is one of the very few that maintain a Class I independent investigatory agency for allegations of police

---

[163] Reaves, B. A. (2011). Census of State and Local Law Enforcement Agencies, 2008. Washington, D.D.: Department of Justice, Bureau of Justice Statistics. http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=2216
[164] http://nacole.org/resources/police-oversight-jurisdiction-usa
[165] Walker, S. (2000). Police Accountability: The Role of Citizen Oversight. Belmont, CA: Wadsworth/Thomson Learning, at 62.

misconduct,[166] and one of the very few that not only accept citizen complaints but also conducts investigations based on subject matter alone like officer-involved shootings, death or injury while in-custody, and taser activations, without an allegation of misconduct.

**Any Reliance that Dr. Shane Places on Sustained Rates is Without Merit**

39. There are no standards, protocols, or policies for complaint processes that are uniformly adhered to by police departments across the nation. This lack of uniformity makes any estimate of a proper sustained rate for inter-department comparisons impossible.

   a. The problem of comparisons of complaint and disciplinary data between police departments in the United States was highlighted in the COPS publication entitled, "Standards and Guidelines for Internal Affairs: Recommendations from a Community of Practice." That publication was developed from a grant that brought the leaders of Internal Affairs organizations from across the country, including Atlanta, Boston, Chicago, Dallas, Detroit, Houston, Los Angeles (police department and sheriff), Miami-Dade, New Orleans, Philadelphia, Phoenix, Washington Metro, Seattle, Charlotte-Mecklenberg and San Francisco. Included in this group were a number of experts in the field, including myself.

   b. The group learned that there was a great disparity in the definition of terms, differences in investigative processes and differences in state and local laws, collective bargaining agreements, and organizational and political cultures that created difficulties in achieving commonality. This lack of commonality of terms, processes and reports makes it impossible to compare data from one agency to another without knowing the specific differences of each individual agency.

   c. Similar findings on the problem of term definitions and comparisons between departments were discussed in the 1996 DOJ report on "National Data Collection on Police Use of Force." In that report, the problem with defining terms such as police use of force, excessive use of force and use of excessive force was discussed not only to understand the difference among the terms, but to understand reporting differences. Further, in their discussion of comparing use rates the authors stated, "the use of rates to compare jurisdictions may be misleading when other factors are not taken into consideration. Two jurisdictions may differ considerably in demographic characteristics such as age

---

[166] The ten largest law enforcement agencies in the United States are: New York City (36,023) Class I, Chicago (13,354) Class I, Los Angeles Police Department (9,727) Class IV, Los Angeles County Sheriff (9,461) Class IV, California Highway Patrol (7,202) – None, Philadelphia (6,624) –Class IV, Cook County Sheriff (5,655) - None, Houston (5,053) – Class IV, New York State Police (4,847) - None, Pennsylvania State Police (4,458)- None.

distribution of the population, ethnic composition, economic base, and other factors.  The rates may also differ simply because the police department in one jurisdiction has been more honest in its reporting on use of force.  The same problems can occur even when comparisons are made between two different areas of the same city."

d.      The report added that the meaning of a complaint rate is not entirely clear.  "A low force complaint rate could mean that police are performing well or that the complaint process is inaccessible; likewise, a high force complaint rate could mean that officers use force often or that the complaint process is more accessible."  Similarly, a low sustained rate may mean that the officers are performing their duties appropriately or that the investigative process is failing to identify misconduct.  It is unreasonable to conclude based on the sustained rate alone that the Chicago Police Department is somehow failing to address officer misconduct.

e.      The report clearly states "Citizen complaint data must be interpreted with caution.  Differences in how agencies receive, process, and record complaints can account for differences in the volume and rate of complaints across agencies."

f.      There is wide agreement in the policing literature that complaint and sustained rates should not be used to evaluate police departments in dealing with allegations of misconduct.

    1.      In "Police Use of Force Official Reports, Citizen Complaints, and Legal Consequences" the authors state that complaint rates are one of the "most badly abused police-based statistics."   They also state that "higher rates of complaints received by departments may reflect high citizen confidence in the investigation and disposition of complaints and thus argued that a more open and responsive' system for processing complaints would likely lead to an increase in complaints."

    2.      In "Police Accountability: The Role of Citizen Oversight," Samuel Walker found that sustained rates are consistently very low in all complaint review procedures, that there are enormous problems with the data that are used to compute the sustained rate, and that no one has developed a standard for an acceptable rate.

    3.      In "The New World of Police Accountability," Walker wrote, "The sustained rate, however, is not an appropriate performance measure."

    4.      Dr. Alpert and I discussed similar conclusions in our book, "Managing Accountability Systems for Police Conduct: Internal Affairs and External

Oversight," where we wrote, "The lack of standardization between agencies makes it nearly impossible to compare numbers from one organization to another."

g.   A sustained rate, in and of itself, is not a valid measure of the overall integrity and effectiveness of a complaint review process.  There are valid reasons why most community member complaints are not sustained.  For instance, sometimes complainants retract their complaint, refuse to cooperate in the investigation, lack credibility (they are intoxicated or mentally ill), or they cannot identify the officer.  Some complaints cannot be sustained because the statement of the officer and the complainant conflict and there were no independent witnesses or evidence.  Sometimes there is no signed affidavit as required by law.  Some complaints are proven to be false.  When these factors are considered, it is unreasonable to argue that a high rate of non-sustained complaints proves that the entire process is biased or procedurally substandard.  The only reasonable method to determine if a complaint is properly investigated or if it should be sustained is by reviewing the facts and circumstances of each specific investigation.

h.   **The only method to determine a proper sustained rate is to review the facts of each specific case.**  If all of the cases should be sustained, the appropriate sustained rate should be 100%.  If none of the cases should be sustained, the sustained rate should be 0%.

i.   While it is understandable that some persons would seek methods to gain an understanding of how administrative investigations and findings are being handled by a law enforcement agency, and while it may seem like a reasonable statistic to the layperson, within the law enforcement and criminology profession the consensus is that sustained rates simply are not a reliable indicator of quality. **The only method to determine the reasonableness of an investigation is to review the specific investigation.**  No reasonable police practices expert would suggest otherwise.

40.   Any reliance that Dr. Shane places on sustained rates is without merit.

**Dr. Shane's Opinion that the CPD Has a Bias Against External Complainants is Without Merit**

41.   Dr. Shane opined that because the sustained rate for complaints generated by an internal source is higher than those sustained by a complaint made from an external source that the CPD views complainants outside to the organization to not be as credible as internal sources.[167]

---

[167] Shane report at 56-57.

42. It is not surprising that internal complaints are sustained at a higher rate than external complaints. Internal complainants are employees of the organization and there are typically no issues with locating the complainant or obtaining a statement as is often a concern with external complainants.

43. Indeed, the Department of Justice found that the Newark Police Department, Dr. Shane's department, was far more likely to sustain complaints against officers when the complaint was made by another NPD officer or supervisor.[168]

44. Any weight that Dr. Shane places on the sustained rates on internally generated complaints versus externally generate complaints is without merit.

**Dr. Shane's Opinion that the CPD Fails to Document Employee Corrective Action is Without Merit**

45. Dr. Shane opined that based on his review of the IAD and OPS files, that the CPD failed to fully document corrective action creating confusion regarding progressive discipline.[169]

46. It is not surprising that corrective action was not documented in the Internal Affairs files. Internal Files are created to document an investigation and may include disciplinary recommendations, but generally do not include documentation of disciplinary action. Instead, Sergeant Flores testified that disciplinary actions are contained in an employee's personnel file[170] that will refer to the Internal Affairs investigation. Similarly, corrective action through training is generally documented in an employee's training file that lists all of the training that an employee has attended.

**Dr. Shane's Opinion that the CPD Fails to Maintain Records Related to Discipline, Corrective Action and Early Warnings is Without Merit**

47. Dr. Shane opined the CPD prematurely purges data from an officer's personnel history and maintaining those records would have been a best practice.[171]

48. While Dr. Shane believes that all disciplinary files and records of all counseling and corrective actions should be maintained, he offers no evidence that such a procedure is a generally accepted practice in policing. In a January 2017 article, Reuters examined 82 police union contracts and found that a majority of agencies had provisions that required destroying disciplinary files, some after 6 months. In 18 cities, suspensions are

---

[168] Investigation of the Newark Police Department, United States Department of Justice Civil Rights Division (July 22, 2014) at 36.
[169] Shane report at 36-37.
[170] Flores deposition at 77.
[171] Shane report at 37-38.

erased after 18 months or less.  Unlike the City of Chicago, some agencies have created other policies that may serve to protect their officers from allegations of misconduct. For example, Reuters found nearly half of the agencies allowed accused officers to access the entire investigative file - including witness statements, GPS readouts, photographs, videos and notes from the internal investigation, before they are interrogated and contracts in 17 cities set time limits for citizens to file complaints about police officers, some as short as 30 days.[172]

49. Additionally, Sergeant Flores testified that CR files are maintained for an officer's entire career and disciplinary actions remain in the employee's personnel file.[173]

50. There is no evidence that the CPD failed to maintain records between 1987-1990 and Dr. Shane offers no evidence of a generally accepted police practice during that time period or even today.

**CPD's Behavioral Alert System and Personnel Concerns System were Reasonable Between 1987-1990**

51. Chicago's Behavioral Alert and Personnel Concerns programs and similar programs used in other police departments are not "Early Warning Systems" but are "Early Identification and Intervention Systems."  These systems are designed to highlight officers whose behavior reaches some predetermined threshold or differs when compared to officers in similar situations, and to take some reasonable steps to intervene with counseling or training designed to improve or correct the problematic behavior.  Early Identification and Intervention Systems are separate from a police department's formal discipline system.  The discipline system involves official action toward officers in response to sustained allegations of misconduct.  Discipline systems are reactive, initiated only after misconduct has been confirmed.  Early Identification and Intervention Systems, on the other hand, are designed to help officers improve their performance, and the actions taken toward an officer are informal, flexible, and confidential.  No formal record of the content of an intervention – what an officer says, any recommendation for professional counseling – is maintained.  Early Identification and Intervention Systems are proactive, seeking to address performance problems before they become a matter for formal disciplinary action.

   a.   In Chicago, the BIS and PCP programs were created in 1983 and have fulfilled three important roles. First, the program ensures the counseling of a member regarding his or her unacceptable behavior. Second, supervisors with the programs are available for other department supervisors to create goals and strategies to effectively manage their problematic employees.  Finally,

---

[172] http://www.reuters.com/investigates/special-report/usa-police-unions/#graphic-police
[173] Flores deposition at 136-137.

supervisors can offer additional advice when prior interventions have been ineffective.

b.  BIS is a proactive, supportive response to a member having identified indicators that if not addressed could lead to serious problems.  The identified indicators are for "less serious transgressions" that may be resolved through supervisor intervention.  PCP has been designed to act as a reactive response offering guidance and support for members having sustained allegations of excessive force, domestic violence, alcohol related issues, any sustained CR with a ten or more-day suspension, or five or more sustained CRs within five years.

c.  These programs fulfill the responsibility of the department to actually intervene in order to change an employee's problematic behavior.  The programs appear to have been developed reasonably and consistently with the national literature on early identification and intervention systems, they have been in place for many years, and they are not some type of window dressing designed to create an appearance of employee assistance.  These are active programs addressing real concerns.

52.  These programs were not designed to discipline, to re-investigate past complaints of misconduct, or to "aggressively weed out problem officers," rather the systems are developed to identify small problems so training and counseling can be implemented at an early stage to prevent possible future misconduct.

53.  I am not alone in the opinion that Early Identification and Intervention Systems are designed for counseling, rather than discipline.

a.  "An EI [Early Intervention] system is officially separate from the formal disciplinary system.  It is designed to help officers improve their performance through counseling, training, or coaching.  No record of participation in an EI program is placed in an officer's personnel file, although a separate record of participation is usually maintained by the internal affairs or professional standards unit.  One or more of the incidents identified by an EI system may warrant formal disciplinary action that is officially recorded, but identification by the EI system remains separate from the disciplinary process."[174]

b.  "As discussed earlier, successful EIS are a nondisciplinary approach to officer performance problems. Consequently, they are intended to be separate from the formal disciplinary system. Establishing an early intervention system, however, does not mean that a department is going to be soft on discipline. Officers will be

---

[174] "Early Intervention Systems for Law Enforcement Agencies: A Planning and Management Guide."  Office of Community Oriented Policing Services (COPS) (2003), Samuel Walker, at 3.

46

punished for violations of law or department policy through the formal disciplinary system. Essentially, an early intervention system can be viewed as a complementary nondisciplinary component of an agency's personnel management toolbox."[175]

c.    In my book, Dr. Alpert and I wrote, "The goal is to intervene with officers identified, usually with counseling or training designed to improve or correct the problematic behavior." "…while discipline may be appropriate for a specific action, it is not appropriate for the information that is developed by an early identification system (EIS)."[176]

d.    Dr. Walker wrote in "Supervision and Intervention within Early Intervention Systems: A Guide for Law Enforcement Chief Executives" (DOJ, December 2005) that EIIS systems "function most effectively when they are used to help identify and address problems before officers get into serious trouble (e.g., before formal complaints or lawsuits arise and before an officer's well-being is compromised). The key is to view (and promote) the system as a nondisciplinary component of an agency's personnel management toolbox."

54.    While Dr. Shane opines that these systems were not used[177] and that they were disciplinary, there is some evidence that employees were placed in the PCP or BIS programs.  For example:

a.    In 1985, an officer filed a grievance claiming the Behavioral Alert System was disciplinary.  The arbitrator found that the system was not disciplinary, rather it was an instrument for screening of problems and providing advice and counsel to officers.[178]

b.    In 1997, an officer filed a grievance on being placed in the Personnel Concerns Program in 1994.  The arbitrator found that her placement in the program was not part of her disciplinary history, the files are only maintained for one year, she was not demoted or subjected to loss of salary, thus the program was not disciplinary in nature.  Indeed, the purpose of the programs is to identify officers whose behaviors indicates possible further disciplinary or performance problems unless corrective action is taken.  Finally, the arbitrator found that because the programs are not disciplinary that the just cause standard was not required.[179]

---

[175] "Strategies for Intervening with Officers through Early Intervention Systems: A Guide for Front-Line Supervisors." Police Executive Research Forum (PERF) (2006), Samuel Walker, Stacy Osnick Milligan and Anna Berke, at 27.
[176] "Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight." Waveland Press (2008), Jeffrey J. Noble and Geoffrey P. Alpert, at 286.
[177] Shane deposition at 168.
[178] RFC-Maysonet 048306-48318.
[179] RFC-Maysonet 048266-48291.

**Dr. Shane's Opinion that Detective Paulnitsky was a *Brady* Officer Based on CR 237040 is Without Merit**

55.    Dr. Shane said that based on CR 237040 that Detective Paulnisky should have been identified as a *Brady* officer.  Dr. Shane opined that because Detective Paulnisky admitted that he made an error in a written report there was sufficient information to sustain an allegation of a false report.[180]  Dr. Paulnisky said that intent is irrelevant to a dishonesty allegation.[181]  Dr. Shane said based solely on Detective Paulnisky's admission that there was erroneous information in his report that Detective Paulnisky was dishonest.[182]  Dr. Shane said dishonest is the same as being incorrect and that if he had an error in one of his reports it would be right to call him dishonest.[183]

56.    In May 1997, Detective Paulnisky was scheduled to attend in-service training.  Detective Paulnisky submitted a memo stating that he was scheduled to both be in court and to work a special assignment and requested that the training be re-scheduled.[184]  A supervisor checked the dates and discovered that the court hearing was for a motion and Detective Paulnisky was not subpoenaed or required to be in court and that he was not scheduled to work a special assignment.[185]  Five days after his first memo, Detective Paulnisky submitted a second memo stating he had made an error with the dates and he was available for court.[186]  Detective Paulnisky said he made an error and did not intend to submit false information.[187]

57.    The allegation of submitting a false report was not sustained as the investigator could not show evidence of his intent rather than a simple error, but did sustain an allegation for inattention to duty for failing to properly check the dates prior to submitting his memo.[188]

58.    Contrary to Dr. Shane's suggestion that the chain of command ignored or "trivialize[d]" the investigation, Deputy Chief Frangella wrote a memo recommending a sustained finding and a two-day suspension.[189] Assistant Deputy Superintendent Hoke agreed,[190] but Chief Hillard believed there was not sufficient evidence to find that Paulnitsky deliberately misled his supervisors.[191]

---

[180] Shane report at 61-62.
[181] Shane deposition at 278 and 283.
[182] Shane deposition at 281.
[183] Shane deposition at 283.
[184] RFC-Maysonet 004023.
[185] RFC-Maysonet 004027.
[186] RFC-Maysonet 004027.
[187] RFC-Maysonet 004032.
[188] RFC-Maysonet 004018.
[189] RFC-Maysonet 004039.
[190] RFC-Maysonet 004040.
[191] RFC-Maysonet 004041.

59.    Moreover, a Complaint Review Panel hearing was conducted, and it was found that the error was not intentional but it did amount to inattention of duty.[192]

60.    While Dr. Shane criticizes the actions of the command staff, the record reveals strong evidence that the issues were seriously considered, debated, and ultimately determined through a review board hearing.

61.    First, Mr. Shane is simply wrong that intent is not an element of dishonesty or a false report. Police officers are required to be trustworthy, honest, and maintain the highest level of integrity. Police officers are held to a higher standard than nonpolice as they represent the government as agents of the law and the criminal justice system. Police officers who engage in intentional, malicious, deceptive action in a formal setting such as during a criminal or administrative investigation will permanently destroy an officer's credibility. Indeed, under *Brady v. Maryland*, and the cases that followed, evidence of a police officer's untruthfulness is deemed exculpatory evidence and police departments must provide this information to prosecutors anytime the subject officer is a witness in a criminal matter. Because an officer who engages in intentional, malicious, deceptive misconduct lacks the credibility to testify in court, an essential job function, there is no alternative in an employment context other than termination or permanent removal from any possible activity that requires a reliable truthful person.[193]

62.    Second, the policing profession was generally uneducated on the issue of police officer truthfulness and the *Brady* decision until after the year 2000. Indeed, I wrote the first article published in IACP's Police Chief magazine on this issue and that article was published in 2003. There simply was no such as "*Brady*" officer prior to the year 2000.

### Dr. Shane's Opinion that CPD Data Classification Does Not Follow a Consistent Convention is Without Merit

63.    Dr. Shane opined that one foundational element of an internal affairs program is to develop and adhere to a formal data classification scheme and the failure to create a formal scheme for classification prevents the CPD from detecting patterns of behavior.[194]

---

[192] RFC-Maysonet 004042-4044.

[193] *See e.g.,* Noble, J., and G. Alpert, *Lies, True Lies and Conscious Deception: Police Officers and the Truth.* Police Quarterly, Volume 12, Number 2 (June 2009) and Noble, J., *Police Officer Truthfulness and the Brady Decision,* Police Chief Magazine (October 2003). See also, US Model Criminal Jury Instructions 8.135 – perjury, which includes an element that the "defendant acted willfully, that is deliberately and with knowledge that the testimony was false." And, 8.73 False Statement to Government Agency requires "the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful."

[194] Shane report at 32-36.

64.  Dr. Shane's complaint is that there is not a list of terms to classify allegations.  For example, he criticizes the CPD for using both the term "false arrest," and "unlawful arrest," and "negligent driving," and "reckless driving," among many others.[195]

65.  While Dr. Shane opines this failure of creating a single list of classifications that do not overlap allows the CPD "plausible deniability," to ignore officer misconduct.[196]

66.  However, Dr. Shane does not provide a single source of classification terms that were generally accepted in policing for internal affairs investigations between 1987-1990. Indeed, even in 2012, 22 years after the *Monell* period a group of experts and leaders of Internal Affairs divisions of the 12 largest agencies in the country met to discuss internal affairs standards.  That group, of which I was a member, found that, "The group learned that even where we expected commonality in practice there was much more disparity than expected. We learned that the definitions of terms shared were not always universal. Where we assumed there would be shared definitions, the group found that the assumption was wrong."[197]

67.  I am of the opinion that there was no generally accepted practice in policing between 1987-1990, or even today, to adhere to a formal data classification system.

**Dr. Shane's Opinion that all Allegations Where a Crime May Have occurred Should be Referred to the Cook County Prosecutor's Office**

68.  Dr. Shane opined that "all criminal allegations should be investigated as though a crime occurred, including referral to the Cook County County's Prosecutor's Office."[198]

69.  While Dr. Shane criticized the CPD for not referring all investigations to the prosecutor's office where there is an allegation that a crime may have occurred – like excessive force, he does not cite any source between 1987-1990 to support his claim.

70.  While I am not aware of any source that suggests between 1987-1990 that all allegations of a possible criminal nature should be referred to the prosecutor's office, the issue was considered in the 2012 during the community of practice of Internal Affairs managers. The issue was addressed, and the report stated, "Questions arise whether complaints of excessive or unnecessary force must always be dealt with as a criminal complaint. A suggestion for a resolution of the question is that a complaint that alleges or suggests

---

[195] Shane report at 33-34.
[196] Shane report at 34.
[197] STANDARDS AND GUIDELINES FOR INTERNAL AFFAIRS: Recommendations from a Community of Practice (2012) at 11.
[198] Shane report at 30.

that an officer's use of force was willfully, intentionally, recklessly, or knowingly excessive or unreasonable should be classified and investigated as a criminal complaint. Some agencies have negotiated agreements over what complaints need to be prosecuted or presented to prosecutors for a decision on prosecution. It is recommended that each agency establish an explicitly codified protocol for the presentation of cases for potential prosecution. Any doubt or uncertainty with respect to a criminal classification should be resolved in consultation with the District Attorney or other local prosecutor."[199]

71.    There was no generally accepted practice between 1987-1990 to refer all complaints where there is an allegation of a criminal offense to the prosecutor's office.

**Dr. Shane's Criticisms in his Supplemental Report Regarding Four Administrative Investigations of Detective Guevara are Unfounded**

72.    Dr. Shane reviewed four administrative investigations regarding allegations of misconduct by Detective Guevara and concluded that the CPD was aware of Detective Guevara's misconduct and there was a pattern of behavior by Guevara that showed he was not meeting the standards of professionalism defined by CPD policies.[200]

73.    Based on CR 124631, Dr. Shane opined that "Officer Guevara assaulted Ms. Turner, and used racially-motivated language during his interaction."[201] Dr. Shane criticized the investigation for among other things not preserving the crime scene, not requesting a supervisor, not collecting relevant reports including the arrest report, and not taking statements.[202]

   a.    Contrary to Dr. Shane's claims, there were statements taken from Annie and Bernard Turner and the involved officers. The investigative report discusses the statements and there is a list of evidence attachments to the report that includes the statements.[203] While the 40 year old file did not contain the attachments, it was apparent that statements were obtained.

   b.    The file also states that the arrest reports were collected and were listed as attachments to the report.[204]

   c.    While Dr. Shane concludes that Guevara assaulted Ms. Turner and used racially-motivated language, he ignores the fact that neither complainant ever identified

---

[199] STANDARDS AND GUIDELINES FOR INTERNAL AFFAIRS: Recommendations from a Community of Practice (2012) at 22.
[200] Shane supplemental report at 6.
[201] Shane supplemental report at 2.
[202] Shane supplemental report 6-8.
[203] Bluhm 030379.
[204] Bluhm 030381.

Guevara as actually engaging in any misconduct. Guevara was one of two officers who arrested the Turner's and absent the statements, it is not clear which officer the Turner's were complaining about. It appears that Mr. Shane accepted the allegations as true, regardless of the fact that the allegations were not sustained and there is no independent evidence that would have led a reasonable investigator to sustain the allegations.

d. Here, the officers claim that Ms. Turner resisted arrest. There was no crime scene to preserve and there is no generally accepted practice in police to request a supervisor for every arrest where a low level of force was used.

74. CRs 125360, 145129 and 143475 are all incomplete files. These files lack sufficient information to draw reasonable conclusions.

75. Similarly, CR 150473 is an incomplete file. There are 34 attachments listed but the attachments are not included in the file. Moreover, while the investigative report is in the file, page 5 of the report is not included. The investigator did sustain the allegations against Guevara for an incident that began as a traffic stop after the complainant allegedly cut off Guevara and resulted in Guevara using force after the complainant punched Guevara in the face. Dr. Shane said there was no evidence in the file that Guevara was disciplined, but indicated that a five-day suspension was recommended.[205] Had Dr. Shane read the following two pages of the file, he would have seen that Fogel changed his findings and the only allegation that was sustained was for verbal abuse.[206] Moreover, a letter of reprimand notification was in the file indicating the Guevara received a written reprimand.[207]

### No Reasonable CPD Officer Could Believe They Could Act Inappropriately with Impunity and That Nothing Would Happen

76. Based on the totality of my review of this matter including: the Chicago Police Department's policies and procedures; the reasonable investigatory efforts of the Internal Affairs Division, the Office of Professional Standards and the Independent Police Review Authority; the willingness and openness of the Chicago Police Department's complaint acceptance complaints, the fact that they issue tracking numbers and conduct reasonable internal investigations; that investigations are sustained when the facts merit that conclusion; the amount and level of discipline meted out by the department, particularly the SPARS; and the number of officers who separated from the department on their own in anticipation of termination, I am of the opinion with a reasonable degree of professional

---

[205] Shane supplemental report.
[206] Maysonet 1705.
[207] Maysonet 1706.

certainty that the Chicago Police Department acted in a reasonable manner and that there is no evidence that the Chicago Police Department engaged in a pattern or practice of: (1) failing to conduct reasonable investigations of alleged officer misconduct; or (2) failing to impose adequate, reasonable, and documented discipline designed to correct behavior, prevent future misconduct, and to serve as an example to other employees.

77.    Further, I am of the opinion that the City of Chicago provided a reasonable level of oversight of the CPD through the many efforts documented in this report.

78.    Finally, I am of the opinion that no reasonable police officer could reasonably believe that he or she could act with impunity for violations of department rules and regulations or in violation of law. To the contrary, there is substantial evidence that the CPD makes efforts to identify, root out, investigate and discipline those employees who act inappropriately.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Rancho Santa Margarita, CA.

Jeffrey J. Noble                                            Date   10/23/23

53

# JEFFREY J. NOBLE

Rancho Santa Margarita, CA 92688

Telephone: (949) 279-4678
*Email:* jeffnoble@cox.net
www.policeconduct.net

## EXPERIENCE

*CONSULTANT/EXPERT WITNESS* (2005 – Present)

Provide consulting and expert witness services on a wide range of law enforcement and personnel issues including misconduct, corruption, use of force, workplace harassment, pursuits, police administration, training, police operations, criminal and administrative investigations, interviews and interrogations, civil rights violations, police procedures, and investigations.

*FEDERAL COURT APPOINTED MONITOR*

Santa Clara, California, Sheriff's Department (March 2019 – present)

Review of policies, procedures and use of force applications in the Santa Clara County Jails as part of a federal court consent decree in the matter of *Chavez v. County of Santa Clara.*

*DEPUTY CHIEF OF POLICE* (April 2014 – January 2015)

Westminster Police Department, California
(Sworn 87; Civilian – 40; Population- 91,377; 10 sq. mi.)

Served as an interim Deputy Chief of Police to review Internal Affairs, auditing processes, department policies and procedures, risk management and to facilitate the efforts of a new external oversight agency.

*DEPUTY CHIEF OF POLICE* (September 1984 – July 2012)

Irvine Police Department, California
(Sworn – 205, Civilian – 100; Population: 217,000; 70 sq. mi.)

Served as a Patrol Officer, Narcotics Detective, Traffic Detective, Training Sergeant, SWAT sergeant and Commander, Internal Affairs, Sergeant, Lieutenant, Commander and Deputy Chief of Police. As the Deputy Chief of Police, I was responsible for all operations of the Irvine Police Department including Patrol, Traffic and Investigations.

# JEFFREY J NOBLE

## EDUCATION

*Western State University, College of Law* (Irvine, California)
J.D. *with honors*, 1993.
Assistant Editor, Consumer Law Journal.  California State Bar, 1994, #170911.

*California State University at Long Beach*
B.A. Criminal Justice, 1989

*Senior Management Institute for Police*
Police Executive Research Forum.  Boston University, Boston, Massachusetts, 2002

## PUBLICATIONS

### Books:

Stoughton, S., Noble, J. and G. Alpert, *Evaluating Police Uses of Force*, New York University Press (2020).

Noble, J., and G. Alpert, *Managing Accountability Systems for Police Conduct: Internal Affairs and External Oversight*.  Prospect Heights, IL. Waveland Press (2008).

### Book Chapters:

Alpert, G., J. Noble and J. Rojek, *Solidarity and the Code of Silence,*  Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).

Noble, J., and G. Alpert, *State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?* (Updated) Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Seventh Edition (2015).

Noble, J., and G. Alpert, *State Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?* Dunham, R. and G. Alpert (Eds.).  Critical Issues in Policing: Contemporary Readings.  Prospect Heights, IL, Waveland Press.  Sixth Edition (2009).

# JEFFREY J NOBLE

*Articles:*

Stoughton, S., Noble, J., and Alpert, G., *How to Actually Fix America's Police*, The Atlantic (June 2020)

Stoughton, S., Noble, J., and Alpert, G., *George Floyd's death shows exactly what police should not do,* The Washington Post (May 29, 2020)

Stoughton, S., Alpert, G. and Noble, J., *Why Police Need Constructive Criticism*, The Atlantic (December 23, 2015)  http://www.theatlantic.com/politics/archive/2015/12/officer-porter-mistrial-police-culture/421656/

Stoughton, S., Noble, J. and Alpert G., *Better Information is the Key to Policing Reform,* The Atlantic, (September 24, 2015) http://www.theatlantic.com/politics/archive/2015/09/better-information-is-the-key-to-policing-reform/406696/

Noble, J., *Rethinking Tactical Team Warrant Entries*, The Tactical Edge (Summer 2014).

Noble, J. *Assessing Police Discretion,* The Journal of California Law Enforcement (Vol. 47, No. 4, 2013).

Noble, J. and G. Alpert, *Criminal Interrogations of Police Officers After Use-of-Force Incidents,* FBI Law Enforcement Bulletin (September 2013).

Noble, J. and G. Alpert, *What Do We Really Know About American Policing?* The Journal of California Law Enforcement (Vol. 47, No. 1, 2013).

Noble, J., *Do I Need A SWAT Team?  Threat Assessments for Warrant Services*, The Tactical Edge (Winter 2013).

Alpert, G., J. Rojek and J. Noble, *The Cognitive Interview in Policing: Negotiating Control*. ARC Centre of Excellence in Policing and Security: Briefing Paper, Australian Government Research Council (June 2012).

Noble, J. and G. Alpert, *Evaluating the Quality of Law Enforcement Investigations: Standards for Differentiating the Excellent, Good and Reasonable, From the Unacceptable*. The Journal of California Law Enforcement (Vol. 46, No. 1, 2012)

Noble, J., *Police Explorers: Protecting a Valued Asset.* The Journal of California Law Enforcement (Vol. 45, No. 3, 2011).

Noble, J., and G. Alpert, *Lies, True Lies and Conscious Deception: Police Officers and the Truth*. Police Quarterly, Volume 12, Number 2 (June 2009).

Noble, J., Assessing *Witness Credibility*. International Association of Chiefs of Police, Training Key #597 (2006).

Noble, J., Albertsons *Homicide: An Active "Shooter" Response*, The Tactical Edge (Fall 2004).

Noble, J., Police *Officer Truthfulness and the <u>Brady</u> Decision*, Police Chief Magazine (October 2003).

Noble, J., *The Boomerang Employee – What to do When a Fired Employee Comes Back*, The Journal of California Law Enforcement (Volume 37, No. 1, 2003).

Noble, J., Why *Appearance Matters*, Network – California Peace Officers' Association Newsletter (August 2001).

# JEFFREY J NOBLE

Noble, J., *Tactical Team Basics: Warrants*, The Tactical Edge (Summer 2000).

Noble, J., Encouraging *Interaction*, Minnesota Cities Magazine (Volume 84, Issue 11, November 1999).

Noble, J., *Neighborhood Watch Evolves Into Community Engagement Tool in Irvine*, Community Policing Consortium.  www.communitypolicing.org/publications/artbytop/w6/w6noble.htm (October 1999).

Noble, J., Childhood Experiences Find a Place in Today's Public-Safety Strategies, Community Links (Ph. VI, No.3, Issue 9 - Summer 1999).

Noble, J., *Police Pursuits: Law Enforcement or Public Safety?* The Journal of California Law Enforcement (Volume 33, No.1, 1999).

Noble, J., *Alternative Work Schedules can be an Evolution of Team Policing*, Network - California Peace Officers' Association Newsletter (December 1998).

Noble, J., *Continuing Police Training: The Interactive Multimedia Approach*, The Journal of California Law Enforcement (Volume 29, No.1, 1995).

Noble, J., *Environmental Advertising Claims: "Ozone Friendly"* Consumer Protection, 2 W. St. U. Consumer L.J. 95 (1993).

## SELECTED PROFESSIONAL ACTIVITIES

*Peer Review* – Law Enforcement Dog Encounters Training Toolkit for Law Enforcement, DOJ, Office of Community Oriented Policing Services, COPS, (December 2018)

*Presenter* – Developing or Revitalizing an Internal Affairs Unit.  Public Agency Training Council: Internal Affairs Conference (December 2014)

*Presenter* – Addressing Police Misconduct: Standards to Consider.  The International Association of Chiefs of Police Annual Conference (October 2014).

*Presenter* – Reducing Traffic-Related Officer Injuries and Deaths.  The International Association of Chiefs of Police Annual Conference in Orlando, Florida (October 2014).

*Participant* – Reducing Violence and Improving the Rule of Law: Organized Crime, Marginalized Communities, and the Political Machine.  Carnegie Endowment for International Peace. Washington, D.C. (September 2014)

*Presenter* – Preventing Corruption in Police Institutions.  Police Accountability in Democracies: First International Congress on Police Internal Affairs. Los Cabos, Baja California Sur, Mexico (October 2013).

*Presenter* – Testilying: Lies, True Lies, and Conscious Deception: Police Officers' Truth and the Brady Decision. American Psychological Association Annual Conference in Honolulu, Hawaii (July 2013).

*Presenter* – Police Misconduct Issues: Police Explorers and Reasonableness of Internal Affairs Investigations, The International Association of Chiefs of Police Annual Conference in San Diego, California (October 2012).

*Peer Review* – Building and Enhancing Criminal Justice Researcher-Practioner Partnerships, National Institute of Justice (June 2012).

*Committee Chairperson* – California Peace Officers' Association Communications Sub-Committee.

# JEFFREY J NOBLE

Responsible for publication of the Journal of California Law Enforcement (Jan. 2012 – present)

*Presenter* – The Lying Police Officer: Is Any Deception Acceptable?  With Karen Kruger.   The International Association of Chiefs of Police Annual Conference in Denver, Colorado (Nov. 2009).

*Presenter* – State-Created Danger: Should Police Officers be Accountable for Reckless Tactical Decision Making?  The Academy of Criminal Justice Sciences Annual Meeting in Boston, Massachusetts. (March 2009).

*Committee Chairperson* – Major Cities Chiefs of Police Task Force in Internal Affairs. Los Angeles, California (2005-2008).

*Peer Review* – Boston Police Department: Enhancing Cultures of Integrity Technical Assistance Guide, Office of Community Oriented Policing Services #TDL 2008-371 (July 2008)

*Peer Review* – Undocumented Immigrants in U.S./Mexico Border Counties: The Cost of Law Enforcement and Criminal Justice Services, National Institute of Justice #TDL 2008- 321 (December 2007).

*Presenter* – Truth or Consequences: Dealing with the Deceitful Police Officer, with Jeffrey Schlanger and Michael Stone, The International Association of Chiefs of Police Annual Conference, Los Angeles, California (November 2004).

*Presenter* - Albertsons Homicide: An Active "Shooter" Response, The California Association of Tactical Officers Annual Conference, Palm Springs, California (September 2004).

*Presenter* – Boomerang Employees, COPS Conference, Washington, D.C. (2002).

## PROFESSIONAL AFFILIATIONS

*California Peace Officers' Association* – Chair, Communications Sub-Committee (2012 – 2018)
*Police Executive Research Forum*
*International Association of Chiefs of Police*
*National Tactical Officers' Association*
*Special Olympics Torch Run* Southern California Region, Assistant Director (1997 – 2012)

## CONSULTING/EXPERT WITNESS

2023    <u>Maysonet v. City of Chicago</u> (Defense) (Expert Report)
Monell Allegations
Theresa Carney, Rock Fusco & Connelly, LLC, 333 W. Wacker Drive, 19th Floor
Chicago, Illinois 60606

2023    <u>Waddy v. City of Chicago</u> (Defense) (Deposition)
Monell Allegations
Dan Nolan, Reiter Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2023    <u>Corona v. City of Fontana</u> (Plaintiff) (Expert Report)
High-Risk Car Stop
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena,

# JEFFREY J NOBLE

California 91103

2023 <u>Richards v. City of Tucson</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
John H. Bradley, Strang Bradley LLC, 613 Williamson St, Suite 204, Madison WI 53703

2023 <u>Stephenson v CHP</u> (Plaintiff) (Expert Report)
Use of Force
Nicholas Lerman, Steven A. Lerman and Associates, LLC, 6033 West Century Blvd., Suite 740 Los Angeles, CA 90045

2023 <u>Cikes v San Leandro</u> (Plaintiff) (Expert Report)
Use of Force
David M. Helbraun, Helbraun Law Firm, 220 Montgomery Street, Suite 1100, San Francisco, CA 94104

2023 <u>Sullivan v. Buena Park</u> (Plaintiff) (Deposition)
Officer Involved Shooting
Bobby Reagan, Dordick Law, 1122 Wilshire Blvd., Los Angeles, CA 90017

2023 <u>Osage v. Borough of State College</u> (Plaintiff) (Expert Report)
Use of Force
Andrew Celli, Emery, Celli, Brinckerhoff, Abady, Ward &Maazel, 600 Fifth Ave., 10th Floor, New York, NY 10020

2023 <u>Keup v. Sarpy County, Nebraska</u> (Plaintiff) (Expert Report)
Use of Force
Brain Fahey, Fraser Stryker PC LLO, 500 Energy Plaza, 409 South 17th Street, Omaha, NE 68102

2023 <u>Gibson v. City of Chicago</u>, (Defense) (Expert Report) (Deposition)
Monell Allegation
Dan Nolan, Reiter Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2023 <u>Estevis v. City of Laredo, TX</u>, ((Plaintiff) (Expert Report)
Officer Involved Shooting
David James, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023 <u>Settle v. Escambia County Sheriff, FL</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Eric Stevenson, Stevenson Klotz, 510 E. Zaragoza Street, Pensacola, FL 32502

2023 <u>Crosby v. Colleton County Sheriff's Office</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Mullins McLeod, McLeod Law Group, 3 Morris Street, Suite A, Charleston, SC 29403

2023 <u>Ramos v City of Austin</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Rebecca Weber, Hendler Flores Law, 901 S. MoPac Expressway, Bldg 1, Suite 300, Austin, TX 78746

2023 <u>People v Roedema</u> (Defense) (Expert Report)
Criminal allegation of use of force by a police officer

# JEFFREY J NOBLE

Donald Sisson, 7100 E Belleview Ave. Suite 101, Greenwood Village, CO 80111

2023 <u>Assiff v Los Angeles County Sheriff's Department</u> (Plaintiff) (Expert Report)
Use of Force
Thomas M. Ferlauto, 25201 Paseo de Alicia, Suite 270, Laguna Hills, CA 92653

2023 <u>Beltran v City of Austin</u> (Plaintiff) (Expert Report)
David James, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023 <u>Espericueta v. Riverside County</u> (Plaintiff) (Expert Report) (Deposition)
Officer involved shooting
Neil Gehlawat, Taylor & Ring, 1230 Rosecrans Ave., Suite 360, Manhattan Beach, CA 90266

2023 <u>Talley/Rodriguez v. City of Austin</u> (Plaintiff) (Expert Report)
Use of Force
Scott Hendler, Hendler Flores Law, 901 S. MoPac Expressway, Bldg. 1, Suite #300, Austin, Texas 78746

2023 <u>Sparks v City of Seattle</u> (Defense) (Expert Report)
Reasonable Policies
Tara Gillespie, Seattle City Attorney's Office, Civil Division – Torts Section, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104-7095

2023 <u>Perez v City of Fontana</u> (Plaintiff) (Expert Report)
Detention and Interrogation
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2023 <u>Augustus v LAPD</u>, (Plaintiff) (Expert Report) (Deposition) (Trial) (Second Trial)
High Risk Car Stop Tactics
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2023 <u>Goodale v. San Antonio</u>, (Plaintiff) (Expert Report)
Officer Involved Shooting
Patrick Toscano, Toscano Law Firm, PC, 846 Culebra Rd. Suite 500, San Antonio, Texas 78201

2023 <u>McLaughlin v. San Bernardino Sheriff's Department</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Renée V. Masongsong, Law Offices of Dale K. Galipo, 21800 Burbank Boulevard, Suite 310, Woodland Hills, California 91367

2023 <u>Parsa v. Lopinto</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Andrew C. Clarke, The Cochran Firm – Midsouth, One Commerce Square, Suite 1700, Memphis, Tennessee 38103

2023 <u>Sanders v. Austin</u> (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2023 <u>Armijo v. Adams County</u> (Defense) (Expert Report)
Use of Force
Kerri A. Booth, Senior Litigation Attorney, Adams County Attorney's Office, 4430 South

# JEFFREY J NOBLE

Adams County Parkway, 5th Floor, Suite C5000B, Brighton, CO 80601

2022 <u>Rodrigue Armijo v. Adams County v. Long Beach</u> (Plaintiff) (Deposition) (Trial)
Search and Control Hold Tactics
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2022 <u>Bhandari v. National City</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2022 <u>Huerta v. County of Tulare</u> (Plaintiff) (Expert Report) (Criminal Trial Testimony) (Deposition)
Arrest and use of force
Doug Rochen, ACTS Law, 16001 Venture Blvd., Suite 200, Encino, CA 91436

2022 <u>Bahadoran v. City of New York</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jonathan Abady, Emery, Celli, Brinckerhoff, Abady, Ward & Maazel, LLP, 600 Fifth Avenue at Rockefeller Center, 10th Floor, New York, NY 10020

2022 <u>Underwood v. Austin</u> (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2022 <u>People v. Simmonds</u> (Prosecution) (Grand Jury Testimony)
Officer Involved Shooting
Anti-Corruption & Civil Rights Division, Office of the Fulton County District Attorney, Atlanta Judicial Circuit, 136 Pryor Street SW| 3rd Floor, Atlanta, GA 30303

2022 <u>Harder v. City of Seattle</u> (Defense) (Expert Report) (Deposition)
Allegation of vehicle pursuit
Tara Gillespie, Seattle City Attorney's Office, Civil Division – Torts Section, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104-7095

2022 <u>Womble v. City of Durham</u> (Defense) (Expert Report)
Allegation of False Conviction
Henry Sappenfield, Kenon Cracer, PLLC, 4011 University Drive, Suite 300, Durham, NC 27717

2022 <u>Oshan v. District of Columbia,</u> (Plaintiff) (Expert Report)
Vehicle Pursuit
Patrick Regan, Regan Zambri & Long, PLLC, 1919 M Street, N.W., Suite 350, Washington, DC 20036

2022 <u>Denk v. City of Peoria, AZ</u> (Defense) (Expert Report)
Officer Involved Shooting
Amanda C. Sheridan, Senior Assistant City Attorney, Civil Litigation, City of Peoria, City Attorney's Office, 8401 Monroe Street, Suite 280, Peoria, AZ 85345

2022 <u>State of Missouri v. Prichard and Brummett</u> (Prosecution) (Deposition)
Dion Sankar, Chief Deputy Prosecutor, Jackson County Prosecutor's Office, 415 E 12th Street Kansas City, Missouri 64106

2022 <u>Ong v. City of Beverly Hills</u> (Plaintiff) (Deposition)

Updated October 23, 2023

# JEFFREY J NOBLE

Traffic Control
Stephen Johnson, Berglund and Johnson Law Group, 21550 Oxnard, Suite 900, Woodland Hills, CA 91367

2022 <u>Kelley v. City of San Marcos, TX</u>, (Plaintiff) (Expert Report)
Use of Force
Rebecca Webber, Hendler Flores Law, 901 S. MoPac Expressway, Building 1, Suite 300, Austin, TX 78746

2022 <u>Zelaya (Juarez Cedillo) v. LAPD</u> (Plaintiff) (Expert Witness) (Deposition) (Trial)
Use of Force
Miguel Flores, Carrillo Law Firm, LLP, 1499 Huntington Drive, Suite 402, South Pasadena, CA

2022 <u>Cullinan v. LAPD</u>, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Peter M. Williamson, Williamson Law Firm, 3200 Foothill Drive, Suite 4, Westlake Village, CA 91361

2022 <u>Jane AM v. LAPD</u>, (Plaintiff) (Expert Report) (Deposition) (Trial)
Detention and Use of Force
Laura Jimenez, Carrillo Law Firm, LLP, 1499 Huntington Drive, Suite 402, South Pasadena, CA 91030

2022 <u>People v. Reynolds, Crestview, FL</u>, (State) (Grand Jury)
Use of Force
Michelle G. Sandler, Assistant State Attorney, Felony Supervisor – Fort Walton Beach Office, 1804 Lewis Turner Boulevard, Fort Walton Beach, FL 32547

2022 <u>Aden v. City of Bloomington</u>, (Plaintiff) (Expert Report)
Officer Involved Shooting
Eva Rodelius, Wilson Law Group, 3019 Minnehaha Ave, Minneapolis, MN 55406

2022 <u>Jackson v. Nassau County</u>, (Plaintiff) (Expert Report) (Deposition)
Allegation of wrongful conviction
Gabriel P. Harvis, Esq., Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New York 10005

2022 <u>Baugus v. Newton</u> (Morrow County Sheriff's Department, Ohio), (Plaintiff) (Expert Report)
Creation of danger that led to death
Connie Gadell-Newton, Fitrakis & Gadell-Newton, LLC, 100 E. Main Street, Columbus, OH 43215

2022 <u>Rios v. LAPD</u>, (Plaintiff) (Expert Report)
High-Risk Car Stop
Toni Jaramilla, 1900 Avenue of the Stars, Suite 900, Los Angeles, CA 90067

2022 <u>Sloan v. Anderson County Sheriff, SC</u>, (Plaintiff) (Expert Report)
Officer Involved Shooting
Joshua Snow Kendrick, Kendrick & Leonard, P.C., 506 Pettigru Street, Greenville, SC 29601

2022 <u>Jones v. Dupage County Sheriff's Office</u>, (Defense) (Expert Report) (Deposition)
Officer Involved Shooting

# JEFFREY J NOBLE

Patrick R. Moran, Rock Fusco & Connelly, LLC, 321 N. Clark Street, Suite 2200, Chicago, Illinois 60654

2022    Brown v. Turbyfill (Spotsylvania County Sheriff's Department, VA), (Plaintiff) (Expert Report)
Officer Involved Shooting
Mark J. Krudys, The Krudys Law Firm, PLC, Truist Place, 919 East Main Street, Suite 2020, Richmond, VA 23219

2022    Cruz v. Riverside County Sheriff's Department, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Steven Lerman, Steven A. Lerman and Associates, LLC, 6033 West Century Blvd., Suite 740
Los Angeles, CA 90045

2022    Yancy v. Tillman, Clayton County Police, GA, (Plaintiff) (Expert Report)
Entry and Use of Force
Tanya F. Miller, DUBOSE MILLER, LLC, 75 14th Street NE, Suite 2110, Atlanta, GA 30309

2022    Penny v. LAPD, (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Shaleen Shanbhag, Hadsell, Stormer, Renick Dai LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022    Herrera v. Austin, (Plaintiff) (Expert Report)
Use of force during demonstration
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2022    Barragan v. LAPD, (Plaintiff) (Expert Report)
Positional Asphyxia
Dominique Boubion, Carrillo Law Firm, 1499 Huntington Drive, Suite 402, South Pasadena, CA 91030

2022    Sen v. Los Angeles, (Plaintiff) (Expert Report) (Deposition)
High-Risk Car Stop Tactics
Brian Olney, Hadsell, Stormer, Renick & DAI, LLP, 128 N. Fair Oaks Ave., Pasadena, California 91103

2022    Ibarra v. Lee (Rogers County, OK), (Plaintiff) (Expert Report) (Deposition)
Officer involved Shooting
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2022    Tate v. Chicago (Defense) (Expert Report)
Monell Allegations
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law
Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2022    Lunneen v. Berrien Springs (Plaintiff) (Expert Report)
Use of Force
Noah W. Drew, Spence Lawyers, 15 S. Jackson Street, Jackson, WY 83001

2021    Carr v San Diego County Sheriff (Plaintiff) (Expert Report) (Deposition)
Use of Force

Updated October 23, 2023

# JEFFREY J NOBLE

Joseph M. McMullen, Law Offices of Joseph M. McMullen, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2021 <u>Mountford v. City of Santa Monica</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Jeremy D. Jass, 4340 Von Karman Avenue, Suite 100, Newport Beach, CA 92660

2021 <u>State v. Dagas</u> (Prosecution) (Trial Testimony)
Allegation of False Police Report
Judy Taschner, Deputy District Attorney, Special Operations Division, San Diego County District Attorney's Office, East County Regional Center, 250 E. Main Street, El Cajon, CA 92020

2021 <u>Stickney v. City of Phoenix</u> (Defense) (Expert Report)
Use of Force
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021 <u>Evans v City of Austin</u> (Plaintiff) (Expert Report)
Use of Force
Jeff Edwards, Edwards Law, 603 W 17th St., Austin, Texas 78701

2021 <u>Rennells v. Kenealy</u> (Plaintiff) (Expert Report)
Use of Force
James End, First, Albrecht & Blondis, 158 N. Broadway, Suite 600 Milwaukee, WI 53202

2021 <u>Johnson v Baltimore</u> (Defense) (Expert Report)
*Monell* Allegations
Kara K. Lynch, Chief Solicitor, Baltimore City Department of Law, 100 N. Holliday Street, Room 101, Baltimore, Maryland 21202

2021 <u>Brown v City of Chicago</u> (Defense) (Expert Report) (Deposition)
*Monell* Allegations
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2021 <u>Gonzalez v. CHP</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Dale Galipo, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2021 <u>Baney v City of Chapin</u> (Plaintiff) (Expert Report)
Use of Force
Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201

2021 <u>Washington v City of Chapin</u> (Plaintiff) (Expert Report)
Use of Force
Joshua Snow Kendrick, Kendrick & Leonard, 1522 Lady Street, Columbia, SC 29201

2021 <u>King v. Fontana</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Hang Le, Law Offices of Dale K. Galipo, 21800 Burbank Blvd., Suite 310, Woodland Hills, CA 91367

2021 <u>Harbin v. City of Breckenridge Hills, Missouri</u> (Plaintiff) (Expert Report) (Deposition)

Updated October 23, 2023

# JEFFREY J NOBLE

Use of Force
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101

2021 Green v St. Louis (Plaintiff) (Expert Report)
Officer Involved Shooting
Javad Khazaeli, Khazaeli Wyrsch LLC, 911 Washington Ave, Suite 211, St. Louis, MO 63101

2021 Debeaubien v CHP (Plaintiff) (Expert Report) (Deposition)
Failure to Investigate
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2021 Love v. Chicago (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Marion C. Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law
Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021 Groom v Paso Robles (Plaintiff) (Expert Report)
Sexual assault by police officer
Neda Lotfi, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266

2021 Barrera v. City of Woodland (Plaintiff) (Expert Report) (Deposition)
Use of Force
Neil Gehlawat, Taylor & Ring, 1230 Rosecrans Avenue, Suite 360, Manhattan Beach, CA 90266

2021 Shorter v. City of Greenville, MS (Plaintiff) (Expert Report)
Officer Involved Shooting
Tiffany Wright, Co-Director, Human and Civil Rights Clinic, Howard University School of Law

2021 Andrich v. City of Phoenix (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wieneke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021 Monk v. Gulick (Chesterfield, VA), (Plaintiff) (Expert Report)
Use of Force
Thomas Johnson, Bricker, Anderson & Johnson, 411 East Franklin Street, Suite 504, Richmond, VA 23219

2021 Hernandez v. City of Los Angeles (Plaintiff) (Expert Report)
Officer Involved Shooting
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2021 Garten v. City of Costa Mesa, (Plaintiff) (Expert Report) (Deposition)
Detention and search.
Richard Herman, Law Office of Richard P. Herman, P. O. Box 53114, Irvine, California 92619-3114

2021 Harris v. City of Phoenix, (Defense) (Expert Report)
Officer Involved Shooting
Christina Retts, Wieneke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2021 Gagliani v. Lexington County Sheriff, SC, (Plaintiff) (Expert Report) (Deposition)
Use of Force
Eric Cavanaugh, Cavanaugh & Thickens, LLC, 1717 Marion St, Columbia, SC 29201

# JEFFREY J NOBLE

2021   Torres v. City of Cheyenne, WY (Plaintiff) (Expert Report)
       Use of Force
       Thomas B. Jubin, Jubin & Zerga, LLC., 2614 Pioneer Avenue, P.O. Box 943, Cheyenne,
       Wyoming 8203-0943

2021   Velez v. City of Sacramento, (Plaintiff) (Expert Report)
       Officer Involved Shooting
       Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2021   Mojarrad v. Edwards, City of Raleigh, NC, (Plaintiff) (Expert Report) (Deposition)
       Officer Involved Shooting
       Cate Edwards, Edwards Kirby, 3201 Glenwood Avenue, Suite 100, Raleigh, North Carolina
       27612

2021   Pope v. Hill, (Plaintiff) (Deposition)
       Pursuit
       Bart Turner, Savage, Turner, Durham, Pinckney & Savage, 102 East Liberty Street, Eight Floor
       (31401), PO Box 10600, Savannah, GA 31412

2021   Rightsell v. Indiana State Police, (Plaintiff) (Expert Report)
       Officer Involved Shooting
       Bruce Kehoe, Wilson Kehoe Winingham, 859 N Meridian St, Indianapolis, IN 46208

2021   Mendez v City of Chicago, (Defense) (Expert Report) (Deposition)
       Monell Allegation
       Marion Moore, Chief Assistant Corporation Counsel, City of Chicago Department of Law,
       Federal Civil Rights Litigation Division, 2 N. LaSalle St., Suite 420, Chicago, Illinois 60602

2021   Helvie v Jenkins (Adams County Sheriff, CO.), (Defense) (Expert Report)
       Use of Force
       Kerri A. Booth, Adams County Attorney's Office, 4430 South Adams County Pkwy., 5th Floor,
       Suite C5000B, Brighton, CO 80601

2021   State of Minnesota v. Chauvin (State) (Expert Report)
       Use of Force
       Steve Schlescher, Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1400, St.
       Paul, MN 55101

2021   Humphrey v. Friar (City of Millington, TN), (Plaintiff) (Expert Report) (Deposition)
       Sexual Misconduct
       Andrew C. Clarke, The Cochran Firm – Midsouth, One Commerce Square, Suite 1700,
       Memphis, Tennessee 38103

2021   Skommesa v. City of Murrieta (Plaintiff) (Expert Report) (Deposition)
       Use of Force
       Michael R. Marrinan, Law Office of Michael R. Marrinan, 501 W. Broadway, Suite 1510
       San Diego, CA. 92101

2021   Dominguez v. City of Escondido (Defense) (Expert Report)
       Use of Force
       Keith Phillips, Assistant City Attorney, City Attorney's Office, City of Escondido, 201 N.

# JEFFREY J NOBLE

Broadway, Escondido, CA 92025

2021 <u>Brown v. Ontario</u> (Defense) (Expert Report)
Use of Force
Daniel S. Roberts, Cole Huber LLP, 3401 Centrelake Dr., Ste. 670, Ontario, CA 91761

2021 <u>Galloway v. Nassau County Police</u> (Plaintiff) (Expert Report) (Deposition)
Allegation of wrongful conviction
Gabriel P. Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New York 10005

2021 <u>Richards v. Las Vegas Metropolitan Police</u> (Plaintiff) (Expert Report)
Officer involved shooting
E. Brent Bryson, 32302 West Charleston Blvd., Las Vegas, NV 89102

2021 <u>Hall v. City of Atlanta</u> (Plaintiff) (Expert Report) (Deposition)
Monell Allegation
Shean Williams, The Cochran Firm, 100 Peachtree Street NW, Suite 2600, Atlanta, Georgia, 30303

2021 <u>Drew v. Irby, Fauquier County Sheriff, VA</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force, Arrest
Victor M. Glasberg, 121 S. Columbus Street, Alexandria, VA 22314

2021 <u>Alves v. Riverside County Sheriff's Department</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2020 <u>VanGilder v. McClean and Beale</u> (Plaintiff) (Expert Report)
Failure to Render Medical Assistance
Mark J. Krudys, The Krudys Law Firm, PLC, SunTrust Center, 919 East Main Street, Suite 2020, Richmond, VA 23219

2020 <u>Hood/Washington v. Chicago</u> (Defense) (Expert Report) (Deposition)
Monell Allegations
George Yamin, The Sotos Law Firm, 550 East Devon Avenue, Suite 150, Itasca, IL 60143

2020 <u>Grabbingbear v. Europe</u> (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Donald Sisson, Elkus and Sissnon, PC, 7100 E. Belleview Ave., Suite 101, Greenwood Village, CO 80111

2020 <u>Thurman v. Spokane County Sheriff's Department</u> (Defense) (Expert Report)
Reasonableness of Internal Investigation
Michael Kitson, Lane Powell, 1420 5th Avenue, #4200, Seattle, WA 98101

2020 <u>Dew v. City of Seaside</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Karen C. Joynt, Joynt Law, 225 S. Lake Ave., Suite #300, Pasadena, CA 91101

2020 <u>Arnold v. City of Olathe, Kansas</u> (Plaintiff) (Expert Report) (Deposition)
Tactical Decision Making

# JEFFREY J NOBLE

Ryan J. Gavin, Kamykowski, Gavin & Smith, P.C., 222 S. Central Ave., Suite 1100, St. Louis, MO 63105

2020 <u>Scott and Johnson v. Detroit</u> (Plaintiff) (Expert Report)
Allegation of Wrongful Convictions
Nick Bourland, Emery Celli Brinckerhoff Abady Ward & Maazel LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020

2020 <u>Chinaryan v. LAPD</u> (Plaintiff) (Expert Report) (Trial)
High-risk car stop
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2020 <u>Lisner v. Huntington Park</u> (Plaintiff) (Expert Report)
Employment Action
Michael J. Grobaty, Murtaugh Treglia Stern & Deily LLP, 2603 Main Street, Penthouse, Irvine, CA 92614

2020 <u>Meadows v. Town of Rising Sun, MD</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeffrey Nusinov, Nusinov, Smith, LLP, 6225 Smith Avenue, Suite 200B, Baltimore, MD 21209

2020 <u>People v. Nelson (King County, Washington)</u> (People) (Expert Report)
Officer Involved Shooting
Kathy Van Olst, King County Prosecuting Attorney's Office, 516 Third Avenue, W400 Seattle, WA 98104

2020 <u>Mesa v. Leon Valley, Texas</u> (Plaintiff) (Expert Report)
Pursuit
Gene Toscanao, 846 Culebra Road, San Antonio, Texas 78201

2020 <u>Doe v. Charlotte Board of Education</u> (Defense) (Expert Report) (Deposition)
Police investigation
Lori Keeton, The Law Offices of Lori Keeton, 13850 Ballantyne Corporate Place, Suite 500, Charlotte, North Carolina 28277

2020 <u>Bisetti v. City of Austin</u> (Plaintiff) (Expert Report) (Deposition)
Arrest and Disciplinary Action
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2020 <u>Amaral v. City of San Diego</u> (Plaintiff) (Expert Report) (Deposition)
Use of force
Gastone Bebi, 501 West Broadway, Suite 1340, San Diego, CA 92101

2020 <u>Baker v. Coburn and McHugh</u> (Stratford, Texas) (Plaintiff) (Expert Report)
Officer Involved-Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2020 <u>Scott v. Charlotte</u> (Defense) (Deposition)
Officer Involved Shooting
Mark Newbold, Deputy City Attorney, Charlotte-Mecklenburg, 601 E. Trade Street Charlotte, NC 28202

# JEFFREY J NOBLE

2020  Dudley v. City of Kinston (Plaintiff) (Expert Report) (Deposition)
Allegation of Wrongful Conviction
David Rudolf, Rudolf-Widenhouse, 225 East Worthington Ave., Suite 100, Charlotte, NC 28203

2020  Taylor v. Los Angeles County Sheriff's Department (Plaintiff) (Expert Report)
Internal Investigation, Failure to Render Medical Aid
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

2020  McBean v. Peraza (Plaintiff)
Officer Involved Shooting
David I. Schoen, 2800 Zelda Road, Suite 100-6, Montgomery, Alabama  36106

2020  Hayes v. City of Portland (Defense) (Expert Report) (Deposition)
Officer Involved Shooting
Bill Manlove, Portland Office of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2020  Eatherton v. County of Riverside (Plaintiff) (Expert Report)
Use of force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2020  Godifay v. King County, WA (Defense) (Expert Report)
Alleged police pursuit
Daniel L. Kinerk, King County Senior Deputy Prosecuting Attorney, 900 King County Administration Building, 500 Fourth Avenue, Seattle, WA 98104-2316

2020  Doxator v. O'Brien, Green Bay Police Department (Plaintiff) (Expert Report) (Deposition)
Use of Force
Forrest K. Tahdooahnippah, Dorsey & Whitney, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402

2020  Krechmery v. City of Ontario (Plaintiff) (Expert Report)
Use of Force
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2019  Taylor v. Seattle, (Defense) (Expert Report)
Officer Involved Shooting
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

2019  Thomas v. County of Sacramento (Plaintiff) (Expert Report)
Officer Involved Shooting
Stewart Katz, 555 University Avenue, Suite 270, Sacramento, CA 95825

2019  Elifritz v. City of Portland, (Defense) (Expert Report)
Monell allegation
Naomi Sheffield, Deputy City Attorney, Portland Officer of the City Attorney, 1221 SW Fourth Avenue, Room 430, Portland, OR 97204

2019  People v. Krichovich and LaCerra (Broward County, FLA) (State) (Deposition) (Trial)
Use of Force
Christopher Killoran, Assistant State Attorney, Seventeenth Judicial Circuit of Florida Broward County Courthouse, 201 S.E. Sixth Street, Fort Lauderdale, FL 33301-3360

Updated October 23, 2023

# JEFFREY J NOBLE

2019    Wilson v. City of Mission, TX (Plaintiff) (Expert Report) (Deposition)
        Officer Involved Shooting
        Victor Rodriguez, 121 North 10th Street, McAllen, TX 78501
2019    Davis v. Waller (Georgia Bureau of Investigations) (Defense) (Expert Report)
        Officer Involved Shooting
        Ron Stay, Assistant Attorney General, Georgia Department of Law, 40 Capitol Square SW,
        Atlanta, Georgia
2019    Yatsko v. Graziolli (Cleveland Police Department) (Plaintiff) (Expert Report)
        Officer Involved-Shooting
        Jeremy Tor, Spangenberg, Shibley & Liber, 1001 Lakeside Ave. East, Suite 1700, Cleveland,
        OH 44114
2019    Contreras v. City of Granger, WA (Plaintiff) (Expert Report)
        Employment
        Aaron V. Rocke, Rocke Law Group, PLLC, 101 Yesler Way, Suite 603, Seattle, WA 98104
2019    Doolittle v. Hickory, N.C. (Plaintiff) (Expert Report) (Deposition)
        Use of Force
        Paul Tharpe, Arnold & Smith, 200 North McDowell Street, Charlotte, NC 28204
2019    Slater v State of Arizona Department of Game and Fish (Defense) (Expert Report)
        Use of Force
        Timothy Watson, Assistant Attorney General, Liability Management Section, 2005 N. Central
        Ave., Ste. 100, Phoenix, AZ  85004
2019    Howard v. City of Durham, NC (Defense) (Expert Report) (Deposition) (Trial)
        Allegation of Wrongful Conviction
        J. Nicholas Ellis, Poyner Spruill, 130 S. Franklin, Rocky Mount, NC 27804
2019    Tate v. City of Seattle (Defense) (Expert Report)
        Detention and Use of Force
        Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104
2019    McNally v. San Diego (Plaintiff) (Expert Report) (Deposition) (Trial)
        Use of Force
        Mike Marrinan, 501 W. Broadway, Suite 1510, San Diego, CA 92101
2019    Godinez v. Chicago (Defense) (Expert Report)
        Monell allegation
        Avi Kamionski, Nathan and Kamionski, LLP, 140 S. Dearborn, Suite 1510, Chicago, IL 60603
2019    Shortridge v. City of Arvada, CO (Defense) (Expert Report)
        Use of Force
        Julie Richards, Senior Assistant City Attorney, City Attorney's Office, 8101 Ralston Road
        Arvada, CO 80002
2019    Dunn v. City of Seattle (Defense) (Expert Report)
        Violent Persons File – NCIC
        Brian Esler, Miller, Nash, Graham & Dunn, LLP, 2801 Alaskan Way, Suite 300, Seattle, WA
        98121

Updated October 23, 2023

# JEFFREY J NOBLE

2019  <u>Heard v. City and County of Denver</u> (Defense) (Expert Report)
Use of Force
Michele Horn, City and County of Denver, City Attorney's Office, 201 W. Colfax Ave., Dept 1108, Denver, CO 80202

2019  <u>Windle v. State of Indiana</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Zaki Ali, 522 West 8th Street, Anderson, Indiana 46016

2019  <u>Wisdom v. County of Nassau</u> (Plaintiff) (Expert Report)
Allegation of False Arrest
Gabriel Harvis, Elefterakis, Elefterakis & Panek, 80 Pine Street, 38th Floor, New York, New York 10005

2019  <u>Castaway v. City of Denver</u> (Defense) (Expert Report)
Officer Involved-Shooting
Wendy Shea, City and County of Denver, City Attorney's Office, 201 W. Colfax Ave., Dept 1108, Denver, CO 80202

2019  <u>Mosquera v. City of San Gabriel</u> (Plaintiff) (Expert Report)
Identification Procedures
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2019  <u>Harper v. Zoelling</u> (Snohomish County Sheriff's Department), (Plaintiff) (Expert Report) (Deposition)
Police Practices
Jeff Kallis, Kallis Law, 321 High School Rd., Suite D3, Bainbridge Island, WA 98110

2019  <u>Elmansoury v. Garden Grove</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Jeremy Jass, Jass Law, 4510 E. Pacific Coast Hwy., Suite 400, Long Beach, CA 90804

2019  <u>Lee v. San Diego</u> (Plaintiff) (Expert Report) (Deposition)
Use of Force
Mike Marrinan, 501 W. Broadway, Suite 1510, San Diego, CA 92101

2019  <u>Kubiak v. City of Chicago</u> (Defense) (Expert Report) (Deposition)
Allegation of code of silence
David Seery, Deputy Corporation Counsel, Administration, City of Chicago, Department of Law 121 N. LaSalle Street, Room 600, Chicago, Illinois 60602

2019  <u>People v Krook</u> (Prosecutor) (Grand Jury Testimony) (Trial)
Officer Involved Shooting
Richard Dusterhoft, Office of the Ramsey County Attorney, Criminal Division Director

2019  <u>Roque v. Austin</u> (Plaintiff) (Expert Report)
Officer Involved Shooting
Jeff Edwards, The Edwards Law Firm, 1101 East 11th Street, Austin, TX 78702

2019  <u>Green v Lara</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting

Updated October 23, 2023

# JEFFREY J NOBLE

Victor Rodriguez, 121 North 10th Street, McAllen, TX 78501

2018 <u>Estate of McIntosh v. City of Chicago</u> (Defendant) (Expert Report) (Deposition)
*Monell* Allegations
Patrick R. Moran, Rock Fusco & Connelly, LLC, 321 North Clark Street Suite 2200, Chicago, Ill 60610

2018 <u>Delacruz v. City of Port Arthur</u>, TX (Plaintiff) (Expert Report)
Use of Force
Mo Aziz, Abraham, Watkins, Nichols, Sorrels, Agosto & Aziz, 800 Commerce, Houston, TX 77002

2018 <u>Westfall v. Luna (Southlake PD, TX)</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
Use of Force
Grant Schmidt, Winston & Strawn, 2121 N. Pearl, Suite 900, Dallas, TX 75201

2018 <u>Lyles v. Seattle</u> (Defense) (Expert Report)
Officer Involved Shooting
Ghazal Sharifi, Seattle City Attorney's Office, 701 Fifth Avenue, Suite 2050, Seattle, WA 98104

2018 <u>Le v. King County (WA)</u> (Defense) (Expert Report)
Officer Involved Shooting
Dan Kinerk, King County Prosecuting Attorney's Office, 500 Fourth Avenue, Seattle, WA

2018 <u>Sweet v. City of Mesa, AZ</u> (Defense) (Expert Report) (Deposition)
Reasonableness of tactics
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2018 <u>Collins v. San Diego County</u> (Plaintiff) (Expert Report) (Trial)
Reasonableness of Detention and arrest
Elizabeth Teixeira, Law Offices of Robert Vaage, 110 West "A" Street, Suite 1075, San Diego, CA 9201

2018 <u>Ballew v. City of Pasadena</u> (Plaintiff) (Expert Report)
Use of Force
John Burton, The Law Offices of John Burton, The Marine Building, 128 North Fair Oaks Avenue, Pasadena, California 91103

2018 <u>Valverde v. City of Denver</u> (Defense) (Expert Report)
Officer Involved Shooting
Michele Horn, Assistant City Attorney, Civil Litigation Section, City and County of Denver

2018 <u>Port Authority Police Benevolent Association v. The Port Authority of New York and New Jersey</u> (Defense) (Expert Report) (Arbitration Testimony)
Contract Dispute
Jason Stanevich, Littler, 265 Church Street, Suite 300, New Haven, CT 06510

2018 <u>Smith v. Chicago</u> (Defense) (Expert Report)
Policies and practices
Dan Nolan, Reiter-Burns, 311 S. Wacker, 5200, Chicago, IL 60606

2018 <u>Carpenter v. Cleveland County Sheriff, N.C.</u> (Plaintiff) (Expert Report) (Trial)
Officer Involved Shooting

# JEFFREY J NOBLE

Paul Tharp, Arnold & Smith, PLLC, 200 N. McDowell Street, Charlotte, NC 28204

2018 <u>Courts v. Lee</u> (Defense) (Deposition)
Traffic Collision
Jennifer Russel, Ford, Walker, Haggerty & Behar, One World Trade Center, 27th Floor, Long Beach, CA 90831

2018 <u>Studdard v. Shelby County (TN)</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved Shooting
Daniel Seward, 4510 Chickasaw Road, Memphis, TN 38117

2018 <u>Farmer/Milliner v. City of Chicago</u> (Defense) (Expert Report)
Monell allegations
Raoul Mowatt, Chicago Law Department, 30 North LaSalle, 900, Chicago, IL 60602

2018 <u>Milke v City of Phoenix</u> (Defense) (Expert Report) (Deposition)
Allegation of wrongful conviction
Christina Retts, Wienenke Law Group, 1095 W. Rio Salado, #209, Tempe, AZ 85281

2018 <u>Kager v. Virginia Beach</u> (Plaintiff) (Expert Report) (Deposition) (Trial)
Officer Involved shooting
Ed Brady, Brady, Fischel & Daily, LLC, 721 Melvin Ave., Annapolis, MD 21401

2018 <u>Davis v. Chicago</u> (Defense) (Expert Report) (Trial)
Employment
Howard Levine, Chicago Law Department, 30 North LaSalle, 1020, Chicago, IL 60602

2018 <u>Williams v. King County, WA</u> (Defense) (Expert Report)
Officer Involved Shooting
Dan Kinerk, King County Prosecuting Attorney's Office, 500 Fourth Avenue, Seattle, WA

2018 <u>Faria v. McCarrick</u> (Plaintiff) (Expert Report) (Deposition)
Wrongful Conviction
Bevis Schock, 7777 Bonhomme Ave., 1300, St. Louis, MO 63105.

2018 <u>Zuniga v. CHP</u> (Plaintiff) (Deposition) (Trial)
Arrest and Use of Force
Dicks and Workman, 750 B Street, 2720 Symphony Towers, San Diego, CA 92101

2018 <u>Walker (Sanders) v. City of Independence, LA</u> (Plaintiff) (Expert Report)
Pursuit
Neile deGravelles, deGravelles & Palmintier, 618 Main Street, Baton Rouge, LA 70801

2018 <u>Espinoza v. City of Tracy</u> (Defense) (Expert Report)
Reasonableness of Internal Affairs Procedures and Investigation
Jesse Maddox, Liebert Cassidy Whitmore, 5250 N. Palm Avenue, Suite 310, Fresno, CA 93704

2018 <u>Luque-Villanueva v. County of San Diego</u> (Plaintiff) (Expert Report)
Reasonableness of arrest
Jerry Steering, 4063 Birch St., Suite 100, Newport Beach, CA 92660

2018 <u>Flores v. San Bernardino</u> (Plaintiff) (Expert Report) (Deposition)
Officer Involved- Shooting
Arnoldo Casillas, Casillas & Associates, 3777 Long Beach Blvd, Long Beach, CA 90807

# JEFFREY J NOBLE