# Exhibit 49

1             IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF ILLINOIS

                    EASTERN DIVISION

3

4  DEMETRIUS JOHNSON,               )

                           )

5              Plaintiff,    )

                           )

6        vs.               ) No. 20 cv 4156

                           )

7  REYNALDO GUEVARA, the ESTATE of  )

    ERNEST HALVERSON, DARRYL DALEY,    )

8  WILLIAM ERICKSON, JOHN HEALY, and  )

    the CITY OF CHICAGO,           )

9                           )

              Defendants.    )

10

11             VOLUME II, Pages 43-304

12     The videotaped deposition of THOMAS TIDERINGTON,

13  taken under oath on Wednesday, September 20, 2023, via

14  Zoom, pursuant to the Federal Rules of Civil Procedure,

15  before Riley A. Moran, Certified Shorthand Reporter

16  No. 084-004945, commencing at 9:12 a.m., pursuant to

17  notice.

18

19

      APPEARANCES:

20

           LOEVY & LOEVY, by

21          MR. ANAND SWAMINATHAN

           (311 North Aberdeen, Suite 3

22          Chicago, IL 60607

           (312)243-5900

23          anand@loevy.com)

             appeared on behalf of the plaintiff;

24

THOMAS TIDERINGTON, 09/20/2023        Page 44..47

Page 44

```
 1
            APPEARANCES: (Cont'd)
 2
            LEINENWEBER BARONI & DAFFADA, LLC, by
 3          MR. MICHAEL J. SCHALKA
            (120 North LaSalle Street, Suite 2000
 4          Chicago, IL 60602
            (866)786-3705
 5          mjs@ilesq.com)
               appeared on behalf of the defendant Reynaldo
 6          Guevara;
 7
            THE SOTOS LAW FIRM, P.C., by
 8          MR. JOSH M. ENGQUIST
            (141 West Jackson Boulevard, Suite 1240A
 9          Chicago, IL 60604
            (630)735-3300
10          jengquist@jsotoslaw.com)
               appeared on behalf of the defendant officers
11          Halverson, Daley, Erickson, and Healy;
12
            ROCK FUSCO & CONNELLY, LLC, by
13          MS. EILEEN E. ROSEN and
            MS. THERESA B. CARNEY
14          (333 West Wacker Drive, 19th Floor
            Chicago, IL 60606
15          (312)494-1000
            erosen@rfclaw.com
16          tcarney@rfclaw.com)
               appeared on behalf of the defendant City of
17          Chicago.
18
            ALSO PRESENT: Ms. Rachel Welling
19                        Certified Legal Videographer
20                    *    *    *    *    *    *    *
21
22
23
24
```

Page 45

```
 1                          I N D E X
 2
      Witness:                                          Page
 3
         Thomas Tiderington
 4
              Examination by:
 5
              Mr. Engquist.......................47
 6
              Ms. Rosen .......................218
 7
              Mr. Swaminathan .................266
 8
              Ms. Rosen .......................296
 9
10
11                        E X H I B I T S
12
13    No.   Description                 Marked/Referenced
14     4    Attachment B-Materials reviewed ......47
15     5    Mr. Tiderington's billing for
            Johnson..............................53
16
       6    Testimony list .......................56
17
       7    Updated testimony list ...............62
18
       1    Mr. Tiderington's expert report ......66
19
       8    CCSAO 5 ..............................90
20
       9    Petition for Late Leave to Appeal ...126
21
      10    Supplement to Original Report .......190
22
      11    Privileged documents ................205
23
24                (Exhibits scanned/attached.)
```

Page 46

1      THE VIDEOGRAPHER: This is the beginning of Media

2 Unit 1, and we are now on the video record at 9:12 a.m.

3 This is the videotaped videoconferenced deposition of

4 Thomas Tiderington being taken on September 20th, 2023.

5 This deposition is being taken on behalf of the defendant

6 in the matter of Demetrius Johnson versus Reynaldo

7 Guevara, et al. The case number is 20 cv 4156 filed in

8 the United States District Court for the Northern

9 District of Illinois, Eastern Division.

10      My name is Rachel Welling, certified

11 legal videographer representing Urlaub Bowen & Associates

12 with offices at 20 North Clark Street, Suite 600,

13 Chicago, Illinois. The court reporter today is Riley

14 Moran, also of Urlaub Bowen & Associates.

15      Counsel, please identify yourselves for

16 the video record and the parties which you represent.

17     MR. ENGQUIST: Good morning. Josh Engquist on

18 behalf of Defendants Healy, Halverson, Daley, and

19 Erickson.

20     MR. SCHALKA: Good morning. Michael Schalka on

21 behalf of Guevara -- Defendant Guevara.

22     MS. ROSEN: Good morning. Eileen Rosen on behalf

23 of Defendant City of Chicago.

24     MR. SWAMINATHAN: Anand Swaminathan for Plaintiff

Page 47

1 Demetrius Johnson.

2     THE VIDEOGRAPHER: Will the court reporter please

3 swear in the witness?

4          (Witness sworn.)

5          Thomas Tiderington,

6 called as a witness herein, having been first duly sworn,

7 was examined and testified as follows:

8          EXAMINATION

9 BY MR. ENGQUIST:

10     Q. All right. Mr. Tiderington, I know we left

11 off last time 39 minutes into it, not very far into it,

12 but I just want to pick up where we left off. All right?

13     A. Okay. Yes.

14     Q. I know we went through the ground rules last

15 time. Do you need me to go through the ground rules

16 again this time?

17     A. I don't think so. I think I understand them.

18         (Deposition Exhibit Number 4,

19         Witness Tiderington, was marked

20         for identification 5/9/23.)

21 BY MR. ENGQUIST:

22     Q. Great. Where we left off was Exhibit --

23 Exhibit Number 4, so let me share my screen. All right.

24 Do you see that, sir?

THOMAS TIDERINGTON, 09/20/2023                    Page 48..51

Page 48

1    A.   I do.

2    Q.   Okay.  Where we left off on your materials
3  reviewed was on number 79 through to the end, which is --
4  go all the way to the bottom -- 184.  Now, you title this
5  section right here from 79 all the way through the end as
6  additional materials including materials previously
7  reviewed in Reyes versus Guevara, Sierra -- and Sierra
8  versus Guevara.

9        My question to you is can you identify
10  for me which materials you reviewed again in preparation
11  for your report in this case?  And I can start scrolling
12  through if you need me to.

13    A.   Yeah.  I don't -- I don't recall specifically
14  if I went through any -- relooked at any of this
15  information.  I may have.  I just don't recall if I did
16  or not.

17    Q.   Okay.  So that would be 79 through 99, which
18  is on the -- Fields.  I'm -- I'm just going to keep on
19  moving down.  If something else comes up that you believe
20  you reviewed in preparation specifically for this -- for
21  this report, let me know.  And 100 is the -- ends with
22  the Brasfield report.  Do you see that?

23    A.   I do.

24    Q.   Okay.  And is that also something that you

Page 49

1  don't recall whether or not you reviewed for this case?

2    A.   I don't recall reviewing any of those
3  documents specifically for this case.  I may have pulled
4  up as an example -- and I don't know if I did -- but
5  Brasfield's report and read a portion of it, or I may
6  have pulled up item nine -- number 91 and read a portion
7  of it, but I don't recall specifically.

8    Q.   Okay.  Would that be the same answer -- do I
9  need to scan through the rest of them, or would it be the
10  same answer until the very end?

11    A.   You can scroll down but probably the same
12  answer.

13    Q.   Okay.  Let's look at this section right here,
14  which is 101 though 121.

15    A.   Okay.

16    Q.   Okay.  Did you review any of these materials?
17  Now, you do have some repeats in here.  I'm assuming that
18  you did review those you since you reviewed them
19  earlier -- the Demetrius Johnson documents -- but is
20  there anything else in here that you reviewed in order to
21  prepare your report in this case?

22    A.   Again, obviously the Johnson information I
23  would have reviewed specifically for this case.

24    Q.   Anything else?

Page 50

1    A.   Not that I can recall.

2    Q.   Okay.  Let me ask you about item number 119.
3  It says, "CCSAO File (CC" -- "CCSAO 1 through" and then
4  it stops.  Do you know what that refers to, sir?

5    A.   I don't.  I'd have to go back and look.  I'm
6  not -- I don't recall as we sit here today.

7    Q.   What would you have to go back and look at
8  to -- to determine what that is?

9    A.   I would have to go through the material that
10  I have in the Reyes/Solache case and see if -- if
11  that's -- I mean, it's -- it's in the order for
12  Reyes/Solache, so it probably had something to do with
13  that case.

14    Q.   Okay.  Let me keep on moving down, so let's
15  go to -- I believe we left off at 121, so 122 through
16  143.  Is there anything in this part of the list that you
17  reviewed in preparation for your -- giving your -- for
18  doing your report in this case?

19    A.   Again, same answer.  I may have gone back and
20  looked at certain parts of various reports, but I don't
21  recall specifically.

22    Q.   Okay.  Then to the end at 147.  Anything in
23  there that you reviewed in order to create your report in
24  this case?

Page 51

1    A.   Not that I can recall.

2    Q.   Okay.  Now, 148 through 169, anything in this
3  part of your list that you reviewed in preparation for
4  creating your report in this case?

5    A.   Again, it would be the same answer.

6    Q.   Okay.  And then to the end at 184, anything
7  in this part of the list?

8    A.   Again, same answer.

9    Q.   Now, since you submitted this attachment
10  for -- to this report, have you reviewed anything else in
11  addition?

12    A.   I received some -- some information last
13  night, Defendants' Answers to Plaintiff's First Set of
14  Request to Admit.  It was obviously after I submitted my
15  report, but I did receive it last night.

16    Q.   And did you review it last night?

17    A.   Yes, I did.

18    Q.   Okay.  And the request to admit, that's the
19  City's request to admit responses, I'm assuming?

20    A.   Defendant City of Chicago's Answers to
21  Plaintiff's First Set of Request to Admit.

22    Q.   Okay.

23    A.   And Defendant City of Chicago's Answer to
24  Plaintiff's Third Set of Request to Admit, Defendant City

THOMAS TIDERINGTON, 09/20/2023                    Page 52..55

Page 52

1  of Chicago's Answer to Plaintiff's Sixth Set of Request
2  to Admit.
3      Q.   Okay.  And just to be clear, none of those
4  were part of your original report or even your -- or your
5  addendum -- correct? -- none of those materials?
6      A.   That's correct.
7      Q.   Okay.  As you -- specifically kind of what I
8  was asking for was whether or not you reviewed anything
9  else in addition perhaps for your addendum report?
10     A.   Yes.  I'm just looking at my affidavit here
11  to -- I provided the Cook County Public Defender's
12  file -- or portions of the Public Defender's file I guess
13  is a better way to describe it.
14     Q.   And why would you say that's a better way to
15  describe it?
16     A.   Well, I don't know if -- I don't -- I'd have
17  to look at the -- the file again to see exactly what was
18  in there, but I don't know if it was a complete file.
19     Q.   Okay.  So as you sit here today, you don't
20  recall whether or not that was a complete public defender
21  file or just part of a public defender file that you
22  received?
23     A.   Again, I'd have to look at it to refresh my
24  memory.

Page 53

1           (Deposition Exhibit Number 5,
2            Witness Tiderington, was marked
3            for identification 9/20/23.)
4  BY MR. ENGQUIST:
5      Q.   Okay.  All right.  Let's go on to Exhibit 5,
6  which is the billing we received for you from this case
7  dated 4/8/2023.  One second.  All right.  Is that up on
8  your screen, sir?
9      A.   Yes, it is.
10     Q.   Okay.  Good.  This is a one-page document.
11  It was Bates-stamped Tiderington 2479, and the entries
12  start on 1/9/23 all the way through 3/8/23 when you
13  submitted your report in this case -- your first part of
14  your report.  Is this the complete billing that you've
15  done and the hours you worked on for your report, sir --
16  your initial report?
17     A.   Yes.
18     Q.   Okay.  Has there been any other invoices or
19  billing since then?
20     A.   Not to this point, no.
21     Q.   Okay.  Do you intend to submit some more
22  billing since then?
23     A.   I do.
24     Q.   What for?

Page 54

1      A.   The additional time that I spent reviewing
2  the case and prep -- preparing for the deposition and
3  travel to Chicago.
4      Q.   Okay.  My question, though, is also -- is,
5  like, is there any additional billing for your addendum?
6      THE WITNESS:  Go ahead.
7      MR. SWAMINATHAN:  Go ahead.
8           Objection.  Asked and answered.
9           Go ahead.
10     THE WITNESS:  Yeah.  That would have been the
11  additional time since I submitted my report.  Anything --
12  any time that I spent working on the case would be
13  included in -- in my next invoice.
14  BY MR. ENGQUIST:
15     Q.   Oh, okay.  And how much time was spent on
16  the -- on the addendum?  Do you know how much billing
17  that would be?
18     A.   You know, I don't know offhand.
19     Q.   Can you give me an approximation?
20     A.   Maybe three or four hours.  That's -- that's
21  a guess.  I don't have my record with me.
22     Q.   Okay.  But you do have records on your
23  billing already?
24     MR. SWAMINATHAN:  Objection to form.

Page 55

1           Go ahead.
2      THE WITNESS:  Well, yeah.  I haven't submitted an
3  invoice yet, but I would have a record of that, yes.
4  BY MR. ENGQUIST:
5      Q.   Okay.  And how do you keep those records?
6  Like, in the format you have here or you have -- I'm
7  sorry; I just took it down -- that you had on your
8  billing where you have, like, a sheet listing the date
9  and the hours and description and the rate?
10     A.   That's one of the ways that I do it, yes.
11     Q.   Okay.  Is there any other way you do it?
12     A.   Sometimes I just submit the number of hours
13  that I worked on a case.
14     Q.   How do you keep your records, though?
15     A.   I have an app on my phone.  It's called Time
16  Tracker.
17     Q.   Okay.  And do you have your phone with you
18  now?
19     A.   I do.
20     Q.   Okay.  And is it possible for you to go on
21  your app and be able to give us an idea of how much time
22  you've spent -- you've already marked in your app for
23  working on the addendum?
24     A.   I mean, it wouldn't be -- it wouldn't go back

Page 56

1  six months.  I use it almost daily, and then I would
2  translate it over to an Excel spreadsheet.  It's not --
3  there's no historical data on it.
4      Q.  Oh, okay.  So you -- you have everything on
5  an -- in an -- in an Excel spreadsheet; am I correct?
6      A.  That's correct.  That's correct.
7      Q.  Okay.  And you don't have your Excel
8  spreadsheet with you; is that correct?
9      A.  That's correct.
10         (Deposition Exhibit Number 6,
11          Witness Tiderington, was marked
12          for identification 9/20/23.)
13  BY MR. ENGQUIST:
14      Q.  Okay.  All right.  Pulling up Exhibit 6,
15  which was your testimonial list that was produced in this
16  case.  Now, do you see that there, sir?
17      A.  I do.
18      Q.  Okay.  Now, when this was produced, it was as
19  of February of 2023?
20      A.  That's correct.
21      Q.  Okay.  And that's where it ends off.  It's --
22  it's the most recent on the top.  So the most recent one
23  that was listed here was a deposition that you did, and
24  it doesn't give the case name, but a deposition that you

Page 57

1  did -- do you see that there? -- in February of --
2      A.  As of -- yeah.  As of February 2023 at the
3  time, yes.
4      Q.  Okay.  And anything additional since then in
5  February of 2023?
6      A.  Yes, there -- there has been.
7      Q.  Okay.  How many?
8      A.  You know, I don't know offhand.  I can send
9  you the updated one as of -- as of today, you know, but I
10  don't have that info.  I can probably pull it up if you
11  want me to do it now, but I don't have -- off the top of
12  my head, I can't answer that.
13      Q.  Well, you said you could probably pull it up.
14  How would you pull that information up, sir?
15      A.  On my compu -- laptop.
16      Q.  Okay.  The laptop -- is that the laptop
17  you're using right now for this deposition?
18      A.  It is.
19      Q.  Okay.  And how long would it take you to pull
20  that up?
21      A.  A few minutes.  I don't think it will take me
22  a long time.
23      Q.  Okay.  So why don't we worry about doing that
24  maybe on a break, but let me ask you just a couple

Page 58

1  questions about that beforehand.  Out of the additional
2  times you've given deposition or trial testimony since
3  February of 2023, how many of those were -- were for
4  Loevy & Loevy?
5      A.  Again, that would be on the information I --
6  without looking at it, I hate to -- to guess.  Maybe two
7  dep -- two depositions.  I don't think there's been any
8  trial testimony.
9      Q.  Okay.  And besides Loevy & Loevy, how many
10  other different entities or groups have you testified
11  for?
12      A.  Again, several.
13      Q.  Do you recall any of those?
14      A.  Any of the deposition testimonies for -- for
15  other cases --
16      Q.  Any of your -- no.  I'm sorry -- I'm sorry
17  for breaking in.  I'm sorry about that.  Any of the other
18  law firms or groups that you testified on behalf of other
19  than Loevy & Loevy since February of 2023?
20      A.  Again, you're asking about depositions or
21  trial testimony and/or both?
22      Q.  Well, the -- the -- if you look, this exhibit
23  is a list of deposition and trial testimony, so --
24      A.  Right.

Page 59

1      Q.  -- that's what I'm asking you about.  I'm
2  asking you about either.
3      A.  So, again, I don't have the list in front of
4  me.  We can -- I know I testified in a -- in a trial down
5  in Miami last March that I don't think is listed here.  I
6  was testifying on behalf of the defendant.  And then
7  there's been several depositions I believe since
8  February.  I don't know exactly how many, but I certainly
9  can provide you with that list.
10      Q.  Okay.  The trial down in Miami in March, you
11  said you were for the defendant.  Was that a criminal
12  defendant or a civil defendant, sir?
13      A.  It was civil.
14      Q.  And who had hired you in that case?
15  MR. SWAMINATHAN:  Objection to form.
16          Go ahead.
17  THE WITNESS:  I don't recall the name of the law
18  firm, but it was a law firm out of South Florida.  Again,
19  it's on the list of testimony -- my updated list.
20  BY MR. ENGQUIST:
21      Q.  Okay.  And -- excuse me -- and who was the
22  defendant in that case?
23      A.  The defendant was Walmart.
24      Q.  Okay.  And what was the nature of your

THOMAS TIDERINGTON, 09/20/2023                                   Page 60..63

Page 60

1  testimony in that case?

2       MR. SWAMINATHAN: Objection to form.

3          Go ahead.

4       THE WITNESS: I testified -- it -- it involved an

5  allegation of a civil right violation again the store

6  security folks, and I reviewed the case and offered an

7  opinion as to whether or not the actions of security

8  were -- were appropriate or not.

9  BY MR. ENGQUIST:

10      Q.   Was it an arrest situation, sir?

11      A.   It was. Well, I'm sorry. No. It wasn't an

12 arrest. It was an encounter with a possible shoplifter.

13 There wasn't an arrest. There was not an arrest.

14      Q.   And what were the results of that trial, if

15 you know?

16      A.   The defendants prevailed.

17      Q.   And were any of -- was any of your -- were

18 any of your opinions limited or barred in any way by the

19 court there in Miami?

20      A.   No. Not that I know of, anyways.

21      Q.   Okay. Was it a federal case or a civil case,

22 sir -- or a state case?

23      A.   It was a state case, I believe.

24      Q.   And I believe you said you thought there

Page 61

1  might be other depositions for others other than Loevy &

2  Loevy during that period of time, too, from February 2023

3  until today; is that correct?

4       A.   That is correct, yes, sir.

5       Q.   Okay. And do you recall what any of those

6  are right now?

7       A.   I'm sorry. Where any of those were -- what?

8       Q.   Do you recall what any of those are?

9       A.   Again, not without looking at my list.

10      Q.   Okay.

11      A.   I mean, I can pull the list up if you want.

12      Q.   If you can -- actually, if you can -- if you

13 can pull the list up and -- if it's okay with Anand, and

14 we can just get that produced, and we can just attach

15 that and kind of go from there.

16      MR. SWAMINATHAN: If you can pull it up, why don't

17 you go through -- I don't know to what extent it contains

18 any other information, but why don't you pull it up for

19 purposes of your own review --

20      THE WITNESS: Right.

21      MR. SWAMINATHAN: -- to answer questions, and then

22 to the extent we can produce it, we'll produce it, or to

23 the extent we just give you an updated list, we'll give

24 you the updated list.

Page 62

1       MR. ENGQUIST: Well, rather than him looking at

2  something that I can't see his notes to give answers --

3  then I don't know what's on there, which would cause kind

4  of a strange issue itself -- why don't we just take a

5  couple minutes right now, and you can look at what he has

6  there, and you can decide on whether or not it's going to

7  be produced.

8       MR. SWAMINATHAN: Okay. Let me look at it.

9       MR. ENGQUIST: All right. We can go off the record

10 for a second.

11      MR. SWAMINATHAN: Put it on mute for a second.

12      THE VIDEOGRAPHER: We're off the video record at

13 9:32 a.m.

14          (Recess taken.)

15      THE VIDEOGRAPHER: We're back on the video record

16 at 9:43 a.m.

17          (Deposition Exhibit Number 7,

18           Witness Tiderington, was marked

19           for identification 9/20/23.)

20 BY MR. ENGQUIST:

21      Q.   Okay. Sir, I got -- I got the updated list,

22 so I'm going to mark it as Exhibit Number 7, and -- and,

23 actually, if you have a copy in front of you -- do you

24 have a copy in front -- or if not, I can put it on the

Page 63

1  screen. No big deal. Let me put it on the screen.

2       A.   Yeah. I don't have -- I'm sorry. I don't

3  have it in front of me.

4       Q.   It's fine.

5       A.   If I try to minimize this, then I'll lose

6  you, and then we'll start all over again, so...

7       Q.   Okay. All right. So Exhibit Number 7 now is

8  the updated testimony list, and I'm going to go down to

9  the second page where it has March of 2023, and we have

10 Broward, County Florida. Would that be the trial that

11 you were speaking of, sir?

12      A.   Yes, it was.

13      Q.   Okay. Go up another one, and now we have

14 March of 2023, a deposition it looks like for Mike Laux

15 in Arkansas. Can you tell me were you opining for in

16 that case, the plaintiff or defendant?

17      A.   That would have been the plaintiff.

18      Q.   Okay. And is that a civil plaintiff, I'm

19 assuming; correct?

20      A.   Yes, it was.

21      Q.   Okay. And who was the plaintiff?

22      A.   I don't recall who the plaintiff was.

23      Q.   Do you remember the nature of the case?

24      A.   I do. It was a search warrant -- narcotic

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 09/20/2023                    Page 64..67

Page 64

1 search warrant case where the plaintiff claims that the
2 officers acted inappropriately by entering their house
3 without probable cause or justification.
4      Q.   Okay.  And then we look at June of 2023.  It
5 looks like you have something there in Nevada -- in the
6 federal court in Nevada, and you were hired by Michael
7 Mcavoy and Timothy Revero, and were you working for the
8 plaintiff or defendant in that case, sir?
9      A.   That was the plaintiff.
10     Q.   Okay.  And what kind of case was that?
11     A.   It was an allegation of unlawful unnecessary
12 use of force by the police officers.
13     Q.   Okay.  So the defendant in that case was --
14 was a local -- was a local police department?  Is that
15 what it was?
16     A.   It was, yes.
17     Q.   And do you remember where in Nevada?
18     A.   I think it was Las Vegas, actually.
19     Q.   Okay.  And do you know what's happened with
20 that case?
21     A.   I believe it's still pending.
22     Q.   Okay.  And then up from there, you have the
23 Western District of Kentucky.  It looks like another
24 deposition.  And were you working for the plaintiff or

Page 65

1 defendant in that case, sir?
2      A.   That was the plaintiff.
3      Q.   And what kind of case was that?
4      A.   That was a -- I believe it was a use of
5 force.  Deadly force, actually.
6      Q.   Okay.  And right above there is -- it looks
7 like the same page number.  Do I have that right?
8      A.   I see that.  That's -- yeah.  That was a typo
9 on my part.
10     Q.   Okay.  So you only gave one deposition in
11 that case; is that correct?
12     A.   I only gave one dep -- I only gave one
13 deposition.
14     Q.   Okay.  Is there something else supposed to be
15 in the area of the second Western District of --
16     A.   No.  Just in attempting to update my chart
17 there, and I -- again, I sent it -- sent it to you as a
18 Word document, so I haven't really finalized it.
19 Obviously, there's a duplicate entry, so I don't believe
20 there's anything else that's supposed to go there.
21     Q.   Okay.  All right.  And the next two are with
22 Loevy & Loevy -- correct? -- in August?
23     A.   That's correct, yes.
24     Q.   Okay.  Then 17-cv, what case is that?

Page 66

1      A.   Savory -- Savory.
2      Q.   Savory.  Okay.  Thank you.  All right.  Let
3 me take that down.  All right.  Oh, I'm sorry.  I didn't
4 ask you is there anything that should be in addition to
5 Exhibit Number 7 that you haven't yet added to that new
6 updated list?
7      A.   I don't think so, no.
8      Q.   All right.
9      A.   Oh, I'm sorry.  Perhaps that 39-minute
10 deposition a month ago -- I guess I need to add that --
11 in the Johnson case.
12     Q.   You could, yes, or you could just do it as
13 one since it's a continuation, but that's up to you about
14 your recordkeeping.  It's fine.  I'm aware of that one.
15     A.   All right.
16          (Deposition Exhibit Number 1,
17           Witness Tiderington, was marked
18           for identification 5/9/23.)
19 BY MR. ENGQUIST:
20     Q.   And I know we started looking at it before.
21 It is your report in this case.  Do you have a copy of
22 that in front of you -- a hard copy?
23     A.   I do.
24     Q.   Okay.  And the hard copy you have, I know

Page 67

1 last time, you didn't have all the attachments.  I was
2 just trying to make sure of what you have in front of you
3 just in case we need to put something on the screen.
4      A.   I just have my report.  I don't have the
5 attachments.
6      Q.   Okay.  So that would be -- let me try to get
7 the right page here -- 1 through 68?
8      A.   That's correct.
9      Q.   Okay.  All right.  So let's not worry about
10 putting it on the screen.  Let's just kind of walk
11 through it.  All right?
12     A.   Fine.
13     Q.   Okay.  All right.  So if you look at page 4
14 into page 5, it's your introduction -- introduction --
15 introduction and then you summarizing your opinions.  I
16 just want to go through some of those opinions you have
17 in there.  Okay?
18     A.   Okay.
19     Q.   The first opinion when you're summarizing
20 your opinions here, you talk about the defendants -- if
21 you look at the second paragraph under that section, you
22 say, "The Defendants here apply tunnel vision to obtain
23 evidence they need to implicate Demetrius Johnson, the
24 prechosen suspect."  Do you see that?

THOMAS TIDERINGTON, 09/20/2023                     Page 68..71

Page 68

1  A.  I do.
2     Q.  Okay.  And just to be clear, which defendants
3  are you saying apply tunnel vision to obtain evidence to
4  implicate Demetrius Johnson, their prechosen suspect?
5     A.  Well, I assessed the entire investigation,
6  and I identified, I think for the most part, what each
7  officer did or didn't do.  I guess I would have to go
8  through the entire report and identify the actions of
9  each officer, apparently, I mean, to answer your question
10  fully, I guess.
11     Q.  You mean you -- as you sit here today, you
12  can't -- let me just ask you.  Can you tell me what
13  Officer Daley did that you believe was tunnel vision to
14  obtain evidence against Demetrius Johnson?
15     A.  Well, I think what Officer Daley did for the
16  most part was pretty good police work for the most part,
17  and I don't know if tunnel vision would necessarily apply
18  to Daley.  I think Daley acted on the information that
19  was available to him.  I think he took the appropriate
20  steps in -- based on his understanding of the probable
21  cause to -- to make an arrest.  I think he documented his
22  actions in terms of arresting -- making an arrest.
23        I also think it's commendable about his
24  assessment of the Area 5 detectives and Guevara, so I

Page 69

1  don't know that Daley did a lot of things wrong.  I think
2  there's certain things that he should have done that he
3  didn't do.
4     Q.  Okay.  So just going back to my question, you
5  wouldn't put him in this -- in this part where you say
6  defendants apply tunnel vision, that wouldn't include
7  Officer Daley; correct?
8     A.  Well, again, I think there were certain
9  things in -- in looking at the investigative file that
10  Daley should have done, and I guess I don't know if I
11  would have termed that tunnel vision necessarily.
12        And some of the things I think that Daley
13  should have done which he didn't do, he didn't explain in
14  his report why Elliot was charged with the gun that was
15  found.  There's some discrepancies about what type of
16  weapon was actually in the van.
17        There's some investigative mysteries, as
18  I call them, about why they didn't go in and search the
19  location where the two suspects in the van went into
20  the -- into an -- into an apartment complex or an
21  apartment building and possibly handed off another gun.
22  So there's a lot of things he didn't do but -- that --
23  that I think he should have done.
24     Q.  Okay.  Sir, but just focusing on my question,

Page 70

1  if you can.  You have in here, "Defendants applied tunnel
2  vision to obtain evidence they needed to implicate
3  Demetrius Johnson, their prechosen suspect."  Are you
4  saying that Defendant Daley did apply tunnel vision to
5  obtain evidence to implicate Demetrius Johnson, his
6  prechosen suspect, or is he not included in that
7  sentence -- in that opinion?
8     A.  I'd have to think about that more.  I don't
9  know if it was tunnel vision.  As I said, I believe Daley
10  believed Johns committed -- I think he believes it
11  today -- that Johns committed the murder, so I don't know
12  if that would be tunnel vision.  I'd -- I'd have to think
13  about that more.
14     Q.  Well, sir, you came to these opinions.  Did
15  you come to an opinion in your report that Mr. Daley
16  applied tunnel vision to obtain evidence he needed to
17  implicate Demetrius Johnson, his prechosen suspect?
18     A.  Again, I don't think that applies -- at least
19  doesn't apply strongly to Daley.  I think when you look
20  at the totality of circumstances, I didn't look and
21  assess individual culpability.  I looked at the case from
22  the perspective of what each officer did and -- and the
23  outcome of -- of the case is what I looked at.
24        So to answer your question, I'd -- I'd

Page 71

1  have to go back and think about that more.  For the most
2  part, I was very impressed with the work that Daley did
3  on this case.
4     Q.  Okay.  So you can't tell me -- when you refer
5  to defendants applying tunnel vision, you can't tell me
6  which defendants you are talking about?
7     MR. SWAMINATHAN:  Objection to -- objection to
8  foundation.  Mischaracterizes his testimony.
9     THE WITNESS:  Well, I didn't say that.  Obviously,
10  Guevara, their -- Halverson, the sergeants that signed
11  off on these reports, obviously there was information
12  that indicated -- strongly indicated that -- that there
13  was -- initially, the information was that there were at
14  least two shooters.
15        There's other information -- strong
16  information that Johns had committed the murder, and I
17  don't think the investigation was conducted properly to
18  either determine whether Johns was responsible for it, or
19  they never determined that he was not responsible for it
20  either.
21  BY MR. ENGQUIST:
22     Q.  Okay.  Sir, if you can, can you just please
23  limit your answers to my questions?  I'm asking
24  specifically about your opinion that they applied tunnel

Page 72

1 vision, not things that you think they could have done
2 better or different parts about Mr. Johns.  You have
3 specifically here, "applied tunnel vision to obtain
4 evidence they needed to implicate Demetrius Johnson."
5 Okay?  That's the only part I'm asking about.
6          Can you tell me whether or not
7 Mr. Erickson applied tunnel vision to obtain evidence he
8 needed to implicate Demetrius Johnson in this case?
9     A.  Again, it's difficult to answer it the way
10 that you want me to answer it.  I -- the way that I -- I
11 stand by my report, and I -- I think you have to look at
12 the totality of the circumstances, the actions of each
13 individual officer.  Did Erickson -- was he -- was he
14 focused on the arrest of Johnson?  I explained what his
15 actions were in this case, so I guess my report stands
16 for itself.
17     Q.  Did Erickson have anything to do with any of
18 the evidence collected that implicated Demetrius Johnson
19 in this case?
20        MR. SWAMINATHAN:  Objection to form.
21        Go ahead.
22        THE WITNESS:  The evidence that was collected?  I'm
23 not sure what you're speaking of.
24

Page 73

1 BY MR. ENGQUIST:
2     Q.  Okay.
3     A.  I don't know what -- I don't know what
4 evidence was collected, actually.
5     Q.  Did -- okay.  Well, let's look.  Was
6 Mr. Erickson involved in any of the identifications of
7 Demetrius Johnson as the shooter?
8     A.  I'd have to go back and look.  I don't know
9 if he was listed in the reports by Guevara and Halverson
10 or not.  I don't know if he sat in on those or not.  I
11 don't think he did, actually, but I'd have to go back and
12 look through -- through the reports and confirm that.
13     Q.  Okay.  Well, sir, if I -- if I can tell you
14 Mr. Erickson was not involved after the first night,
15 could he be involved in -- in gathering any of the
16 evidence like the identification of Demetrius Johnson?
17        MR. SWAMINATHAN:  Objection to foundation.  That's
18 a mischaracterization.  You -- he is not identified on
19 any pieces of paper after the first day may be a
20 statement that you can make a representation about.
21           But -- but with that -- with that
22 objection -- objection to form and foundation -- you can
23 go ahead.
24        MS. ROSEN:  No speaking objections, please.

Page 74

1 BY MR. ENGQUIST:
2     Q.  I can put --
3        MR. SWAMINATHAN:  Yeah.  He mischaracterized the
4 testimony.  If you're going to make representations,
5 let's at least make them accurate.
6        MS. ROSEN:  Well, you still cannot make speaking
7 objections.  The objection was --
8        MR. SWAMINATHAN:  No, but I will make -- I will
9 only make a speaking objection in one scenario, when
10 we're going to make a representation that the evidence is
11 X, if that -- then that's going to be accurate.
12        MS. ROSEN:  Well, you should be able to trust your
13 expert to know what the -- what the evidence is, so no
14 speaking objections.
15        MR. SWAMINATHAN:  I'm not going to allow
16 representations that are not accurate, and I will
17 continue to do that in the deposition.
18        Go ahead.
19 BY MR. ENGQUIST:
20     Q.  All right.  Mr. Tiderington, can you point to
21 any evidence that shows that Mr. Erickson was involved
22 after the first night of the -- after the -- of the
23 shooting in the investigation at all?
24     A.  Again, as we sit here at this moment, I

Page 75

1 can't; but as we go through my report or if I have an
2 opportunity to look at the investigative file, if that
3 changes -- if I recall something, I will let you know.
4     Q.  Well, I know before your first deposition,
5 you prepared before your deposition.  Did you prepare for
6 your deposition today?
7     A.  I did.
8     Q.  Okay.  And how did you prepare for your
9 deposition today?
10     A.  I reviewed the documents that were provided
11 to me.
12     Q.  And when you say the documents provided to
13 you, which documents are you speaking of?
14     A.  Many of the documents that we went over in
15 that list of materials provided specifically relating to
16 the Johnson investigation such as the permanent retention
17 file, investigative file, those types of things.
18     Q.  Okay.  So you did review the police reports
19 in preparation for today; correct?
20     A.  I certainly did, yes.
21     Q.  Okay.  Did you review any deposition
22 testimony in preparation for today?
23     A.  I did.
24     Q.  Which depositions did you review in

THOMAS TIDERINGTON, 09/20/2023                                          Page 76..79

Page 76

1  preparation for today?
2       A.   I -- again, you know, I know you don't want
3  to make this into a memory test, and we have the
4  information available to us; but off the top of my head,
5  I recall reviewing Sheehan's deposition.  There were
6  other depositions that I reviewed, but I don't recall
7  exactly which ones.  We can go through the list again,
8  and I can tell you.
9       Q.   And how long did you take to prepare for your
10  deposition today?
11      A.   I don't have the --
12      Q.   And just to be clear, that's not including --
13  not including the time you spent preparing when we first
14  started this deposition.  I'm talking about for just for
15  today.
16      A.   Oh, probably eight to ten, maybe twelve
17  hours.
18      Q.   Okay.  And were any of those eight to ten to
19  twelve hours preparing along with the counsel who hired
20  you in this case?
21      A.   Yes.
22      Q.   Okay.  And how long were you preparing with
23  counsel for this case?
24      A.   Not counting the first deposition?  You're

Page 77

1  only talking about today's deposition?
2       Q.   Only today, yes.
3       A.   Oh, I don't know the exact number, but maybe
4  five or six hours yesterday.
5       Q.   Now, when you came to town -- are you in town
6  for something else, or are you giving testimony in
7  something else, or is it just --
8       A.   No.
9       Q.   -- you just came in town for this deposition?
10      A.   I just came into town for this deposition.
11      Q.   Would it be fair to say if your report
12  doesn't indicate any actions by Erickson after the --
13  after the first day that there -- that your -- that there
14  wouldn't be any actions by Erickson after the first day?
15      MR. SWAMINATHAN:  Objection to -- objection to
16  form.
17          You can go ahead.
18      THE WITNESS:  As we sit here, without -- again,
19  I've got a 67-page report.  I've got a report in front of
20  me.  You know, there's thousands of documents related to
21  this case.  As we sit here today, I don't recall
22  specifically if Erickson was involved after the initial
23  lineup.  I don't believe he was, but I could be mistaken
24  about that.

Page 78

1  BY MR. ENGQUIST:
2       Q.   And when you -- can you give me a definition
3  of what tunnel -- when you -- when you talk about tunnel
4  vision, what tunnel vision is?
5       A.   What I mean by tunnel vision is that in --
6  well, in this particular case, I believe that there --
7  there was strong evidence that other individuals could
8  have committed this murder and that the -- that
9  information apparently was ignored by the investigators,
10  and their effort was -- it appeared that their effort was
11  to -- to charge Demetrius Johnson with this case rather
12  than investigating all of the leads that were available
13  to them.  That's what I termed as tunnel vision.
14      Q.   Okay.  And you already said before you
15  believe with how you described tunnel vision was also
16  affecting -- was also -- let me see.  You believe that
17  Sergeant Healy was also applying tunnel vision to obtain
18  evidence he needed to implicate Demetrius Johnson;
19  correct?
20      A.   Well, I've worked in police work for
21  44 years, and supervisors are typically in charge of the
22  operations, and they know every step of the way what is
23  occurring.  It would be difficult for me to believe
24  that -- that an officer -- that a sergeant would not have

Page 79

1  a finger on the pulse of the case and understand every
2  step of the way who was being charged, what witnesses may
3  have said or didn't say, what lineups were conducted.
4          All of these things I believe are the
5  responsibilities of a supervisor, and either -- I guess
6  either one of two things happened.  Either the supervisor
7  wasn't doing his job, which would be a deviation of
8  acceptable police standards, or if he was doing his job,
9  he would have recognized and would have been part of the
10  investigation and ultimately culpable for the outcome of
11  it.
12      Q.   Okay.  And what section -- what parts of the
13  investigation was Sergeant Healy involved in?
14      A.   I believe he signed off on -- on -- signed
15  off on the reports, and -- and it's not as simple as just
16  affixing your name.  When a sergeant signs off on a
17  report in most police departments that I'm familiar with,
18  the supervisor's attesting that he -- that the
19  information is -- is correct and accurate and that he
20  reviewed it and that it conforms with department policies
21  and practices.
22          It's not as simple as, "Oh, I'm going to
23  sign my name to the report, but I don't know anything
24  that went on."  Again, if -- if that was -- if that is

THOMAS TIDERINGTON, 09/20/2023                                    Page 80..83

Page 80

1  the excuse, it's, again, a deviation from acceptable
2  police standards.
3       Q.   Okay.  And, sir, just to be clear, you're
4  saying from your experience.  So when you were a
5  supervisor and you signed off on reports, you were
6  attesting to the truth and accuracy of everything in the
7  report even if you didn't do it; is that correct?  Is
8  that how you practiced, sir?
9       A.   I would say that's -- that's accurate, yes.
10      Q.   Okay.
11      A.   And if I found out that the report was not
12  factually correct, that officer would not be working for
13  me.
14      Q.   Well, sir, how did you -- how did you --
15  you say "if I found out."  When you were signing off on it,
16  you said you were attesting to the truth and accuracy of
17  the information in the report.  How did you go about
18  assessing the truth and accuracy of the report?
19      A.   Well, first of all, as a hands-on supervisor,
20  I would have been overseeing these operations.  I would
21  have known who the suspects were.  I would have known who
22  conducted the interviews.  I would have known if -- if
23  witness statements were documented.  I would have known
24  if GPRs were completed.  I would have asked questions

Page 81

1  if -- if there were investigative mysteries that needed
2  to be articulated in the police report.
3       So very simply, the sergeant, it's his
4  responsibility to ensure that the -- that the document --
5  the police report that he's signing off on is factually
6  correct and consistent with department policies and
7  practices.
8       Q.   So just to be clear, when you're talking
9  about the serg -- the sergeant's duties, you're thinking
10  of a sergeant actually involved in the day-to-day
11  investigation of the case; correct?
12      MR. SWAMINATHAN:  Objection to form.
13           Go ahead.
14      THE WITNESS:  Well, yeah.  You can't have it both
15  ways.  If -- I wouldn't sign off on a report unless I
16  knew what I was signing.  I wouldn't just blindly sign my
17  name, and if you're suggesting that that's what happened,
18  I think their policies need to be evaluated.  If -- if
19  that's what you're suggesting, is that the sergeant had
20  no idea; he just simply signed his name, I think that's a
21  deviation of acceptable police practices and standards
22  relating to the responsibilities of the supervisor.
23  BY MR. ENGQUIST:
24      Q.   Well, sir, you've read other depositions of

Page 82

1  other sergeants in your various cases that you've been
2  hired by Loevy & Loevy on; correct?
3       A.   I have.
4       Q.   Okay.  And from reading those depositions of
5  the sergeants that were signing off on arrest reports or
6  signing off on case reports or sup reports, is that your
7  understanding that -- of how those -- those sergeants
8  viewed their job at the time, as attesting to the truth
9  and accuracy of everything in the report?
10      MR. SWAMINATHAN:  Objection to form.
11           Go ahead.
12      THE WITNESS:  Well, I can say that's probably how
13  they should have viewed their job, and -- and if they did
14  view it that way, we probably wouldn't be here today.
15  BY MR. ENGQUIST:
16      Q.   Now, sir, you reviewed the police records
17  that we have in this case.  Is it your understanding that
18  that's a complete file?
19      A.   I can on -- I can only review what's
20  provided.  Is it a complete file?  If you're suggesting
21  that it's not, you have additional documents that you can
22  show me, I would consider them.  I can only review what's
23  provided, and I'm assuming that was the complete file.
24      Q.   Okay.  So your assumptions when you did this

Page 83

1  report is that the police records that you had were the
2  complete police file; correct?
3       MR. SWAMINATHAN:  Objection to form.
4            Go ahead.
5       THE WITNESS:  Well, again, if -- if there's
6  additional documents that were not in -- that were not
7  provided to me, if you know of documents that were not
8  provided to me or that you know of documents that are
9  available that are not in this file that weren't provided
10  for me to consider, I would like to see those, I guess.
11  BY MR. ENGQUIST:
12      Q.   Sir, I'm not asking you for that.  I'm asking
13  you when you wrote your opinion in this case, this long
14  report that you keep on referring to, was your assumption
15  when you wrote this report is that all the police
16  records, that was a -- it was a complete file of the
17  police records?
18      MR. SWAMINATHAN:  Objection to form.
19           Go ahead.
20      THE WITNESS:  Again, which file?  Are we talking
21  about the permanent retention file?  Are we talking about
22  the investigative file, or which file are you --
23  BY MR. ENGQUIST:
24      Q.   Both.

THOMAS TIDERINGTON, 09/20/2023                                    Page 84..87

Page 84

1    A.   -- asking about?
2    Q.   Both.  If this was a complete set of police
3    records.
4        MR. SWAMINATHAN:  Objection to form.
5    BY MR. ENGQUIST:
6        Q.   Was that your assumption when you wrote this,
7    sir?
8        MR. SWAMINATHAN:  Same objection.
9        THE WITNESS:  When you say "complete," obviously it
10   wasn't complete.  There's a lot of things that the
11   officers should have included in there that they did not.
12   So I guess if I understand your question is, yeah, the --
13   the investigative file should have contained additional
14   information that it did not.
15   BY MR. ENGQUIST:
16       Q.   Okay.  Well, and that's actually not what I
17   was asking -- or I'm not asking you about what things you
18   thought they should have created.  I'm asking you whether
19   or not you thought it was a complete file, and what I
20   mean by that, sir, is you believe that that -- that
21   what -- the documents we have today are what -- the
22   documents they had back in 1991.  Is there a question?
23       MR. SWAMINATHAN:  Objection.  Is there a question?
24

Page 85

1    BY MR. ENGQUIST:
2        Q.   Yeah.  Do you -- is that -- was that your
3    assumption, sir, that the documents you have today are
4    the documents they had back in 1991?
5        MR. SWAMINATHAN:  Objection to form.  Foundation.
6    Asked and answered.
7        Go ahead.
8        THE WITNESS:  I mean, the only way I can -- if
9    there's additional documents that weren't provided to me,
10   then I would review those; but, of course, the documents
11   that were provided I assume were the documents that were
12   available in those files.  If there's reports missing,
13   how would I know what is missing?
14           I don't -- I guess I don't understand
15   that line of questioning, and I don't know what I don't
16   know I guess is the way to describe it.  I don't know
17   what's missing because it's not there, so how could I
18   tell you what was missing from the file if I never knew
19   what was there to begin with?
20   BY MR. ENGQUIST:
21       Q.   All right.  Sir, you do make comments
22   throughout your report about that you believe certain
23   things should have been done, that certain -- you know,
24   maybe police reports don't make sense.  There's --

Page 86

1    there's steps missing in the investigation; correct?
2        A.   At which --
3        Q.   Well --
4        A.   I think I agree with you, but if -- if you
5    want to specifically point to something, I can review
6    that, but I'm not disagreeing with you.  Yes, there's
7    things that the officers should have done that they
8    didn't do, yes.
9        Q.   In order to come to that opinion, would you
10   have to know all the things they did in the fact that you
11   would have to have all the reports that were generated
12   back in 1991 in order --
13       MR. SWAMINATHAN:  Objection --
14   BY MR. ENGQUIST:
15       Q.   -- to come to that conclusion; is that fair
16   to say?
17       MR. SWAMINATHAN:  Objection to form.
18       Go ahead.
19       THE WITNESS:  Well, yeah.  I'd have to have all the
20   reports that the officers did.
21   BY MR. ENGQUIST:
22       Q.   Okay.  And one of the things that you talk
23   about in here -- and we'll go through it in more detail
24   later -- is the fact that there were no GPRs; isn't that

Page 87

1    correct?
2        A.   I did not see any GPRs in the -- in the file.
3        Q.   And, in fact, you comment that that was a --
4    that was one of the failings in the investigation;
5    correct?
6        A.   Well, it's -- it's a violation of their own
7    department policies, so I guess it would be a failure if
8    you're not abiding by your own department policy, yes.
9        Q.   Okay.  And just to be clear, you're talking
10   about the departmental policy that if a detective takes
11   notes, it should be on the GPR form and saved; correct?
12       A.   I think that summarizes the -- the policy,
13   but I don't disagree with your -- the way that you
14   summarized it, yes.  That --
15       Q.   Okay.
16       A.   -- that policy was developed by the Chicago
17   Police Department requiring the officers to utilize GPRs
18   and -- and to include -- include those in their files.
19       Q.   Okay.  Not that they're required to take
20   notes, but if they do, they have to be on a GPR and --
21   and maintained; correct?
22       A.   Well, yeah, but it's obvious that there's
23   certain investigative actions that were taken that
24   required notes to be taken; and -- and if -- if notes

THOMAS TIDERINGTON, 09/20/2023          Page 88..91

Page 88

1 were taken, they -- according to policy, they had to be
2 on the GPR, and they had to be incorporated into their
3 police reports.
4     **Q.  Now, sir, as part of your review, you also**
5 **read the trial testimony in this case; correct?**
6     A.  I did.
7     **Q.  Okay.  So you read the testimony of Detective**
8 **Guevara; correct?**
9     A.  I believe I did.  I don't recall specifically
10 what he said.
11     **Q.  Okay.  Well, do you recall him specifically**
12 **being asked about a specific GPR when he had the document**
13 **in his hand and they were using it as an exhibit during**
14 **trial?**
15     MR. SWAMINATHAN:  Objection to form.
16         Go ahead.
17     THE WITNESS:  I don't.  If you want to refresh my
18 memory, perhaps that would help.
19 BY MR. ENGQUIST:
20     **Q.  Well, I'm just saying did you note that at**
21 **all?  Apparently not; is that correct?**
22     MR. SWAMINATHAN:  Objection to form.
23         Go ahead.
24     THE WITNESS:  I don't recall that as we sit here

Page 89

1 today.
2 BY MR. ENGQUIST:
3     **Q.  Okay.  And now, in fact, if they were talking**
4 **about a GPR during the trial, you would -- and you don't**
5 **have a GPR now, would that lead you to believe that maybe**
6 **you don't have all the documents they had back in 1991?**
7     A.  Well, again, I don't know if that's a
8 hypothetical that you're asking me, whether or not they
9 were discussing GPRs at trials -- at the trial.  I would
10 have to refresh my memory by reading that testimony
11 and -- to put it in context.
12     **Q.  Well, let's just take it -- you don't have to**
13 **take my word for it.  You can look at -- you can look**
14 **later and see it for yourself, but just take it as a**
15 **hypothetical for now.  If they were talking about a GPR**
16 **with Detective Guevara on the stand, would that lead you**
17 **to believe that you were missing documents from what they**
18 **had back in 1991?**
19     A.  Well, I guess it would lead me to believe
20 either -- if -- either he wrote a GPR and didn't include
21 it in his investigative file or it was not transferred to
22 or not incorporated into the police report.  I don't know
23 what that means.  I don't know what he did with it.  I
24 know what he -- according to policy what he should have

Page 90

1 done with it.
2     I don't understand how things would be
3 missing from the investigative file.  Files typically are
4 secured where you don't simply walk in and edit and
5 audit -- or edit and take things in and out of -- of a
6 file; so I can't think of a logical acceptable reason why
7 things would be -- would not be in -- in those files.
8     **Q.  Okay.  And as part of your review in this**
9 **case, you also reviewed the documents from the CCSAO --**
10 **correct? -- from the Cook County State's Attorney's**
11 **Office; correct?**
12     A.  I did.
13     **Q.  And you also reviewed the deposition -- or**
14 **you talked about the deposition of Mr. Sheehan; correct?**
15     A.  I did.
16         (Deposition Exhibit Number 8,
17         Witness Tiderington, was marked
18         for identification 9/20/23.)
19 BY MR. ENGQUIST:
20     **Q.  Okay.  Actually, let me just change that out.**
21 **This would be much easier to do live.  Give me one**
22 **second.  Let me show you what I've been marking as**
23 **Exhibit 8.  This is CCSAO 5, and you may recall this from**
24 **Mr. Sheehan's deposition.  Let me share the screen.  All**

Page 91

1 **right.  Let's go to the top.  Do you see this, sir?**
2     MR. SWAMINATHAN:  Can you just identify the Bates
3 range, Josh, that you're looking at?
4     MR. ENGQUIST:  It's just one page.  I just pulled
5 one page, CCSAO 5.
6     MR. SWAMINATHAN:  Okay.
7     THE WITNESS:  I do.
8 BY MR. ENGQUIST:
9     **Q.  Okay.  And is this something that you**
10 **reviewed as part of your -- part of your review?**
11     A.  I did.
12     **Q.  Okay.  And, you know, I'm assuming you also**
13 **saw it in Mr. Sheehan's deposition, the note here from**
14 **10/22/91, and it has Sheehan next to it, and it says,**
15 **"Tendered to defense," and you see the different things**
16 **listed?**
17     A.  Yes.
18     **Q.  Okay.  RD 26 pages.  CB.  Do you see -- and**
19 **it keeps on going on.  Defendant's B of I and juvenile**
20 **sheet, vic's B of I, and it keeps on going on.  At the**
21 **very bottom, it says -- number 9, it says, "GPRs**
22 **(37 pages) (includes RDs, CBs)," and it goes on from**
23 **there.  Do you see that?**
24     A.  I do.

THOMAS TIDERINGTON, 09/20/2023                                    Page 92..95

Page 92

1     Q.   Okay.  So just listed here in the notes --
2  and I know Mr. Sheehan even talked about during his
3  deposition -- that based off this, he -- and he actually
4  talked about it in his deposition -- that he reviewed --
5  he asked for the file to be brought to him.  He was able
6  to review it and then produce materials directly to
7  defense counsel.  Do you see that?  And it included GPRs.
8     MR. SWAMINATHAN:  Objection to form and foundation.
9  Mischaracterizes the testimony.
10    You can go ahead.
11    THE WITNESS:  Yeah.  That's not my understanding of
12 what his testimony was.
13 BY MR. ENGQUIST:
14    Q.   Really?  What was your understanding of his
15 testimony about GPRs, sir?
16    A.   Well, again, his testimony speaks for itself,
17 so both of us are summarizing or trying to remember
18 exactly what he said.  We can look at his deposition
19 testimony, but I believe there was some place in his
20 deposition where he referred to police reports as general
21 police reports.  I know that the total file is somewhere
22 around 35 or 36 or 37 pages.
23          I don't believe -- and I could be wrong,
24 and -- and I would defer to Sheehan on -- on this -- but

Page 93

1  of all the cases that I've looked at involving Area 5 and
2  Guevara specifically, I've never seen a case involving
3  Guevara where there's 37 pages of GPRs, so I just don't
4  believe that the GPRs that he's noting here are that.  I
5  think he's referring to the general police reports is I
6  think how he referred to them in his deposition.
7     Q.   Okay.  And if they refer to GPRs during the
8  trial testimony, that's something you don't recall;
9  correct?
10    A.   Well, again, you've got to put it in context
11 for me.  I don't -- there -- there was a lot of pages of
12 testimony.  I don't remember as we sit here today
13 specifically what was said about that.  I do know that
14 Sheehan said that there was definitely something missing
15 from the file and that he wasn't aware that there was a
16 report drafted by Erickson.  I do specifically remember
17 that -- his testimony as far as that goes.
18    Q.   And you also are aware that the state's
19 attorney's file is missing as well -- correct? -- their
20 trial file is missing?
21    A.   I don't know that.
22    Q.   You don't know that?
23    A.   Well, if -- if you're representing that to
24 me, I won't -- I won't disagree with you, but I don't

Page 94

1  recall specifically that it -- what happened to the file.
2  You're probably right.
3     Q.   Well, I can -- I can show it to you if you
4  need to see it, sir.
5     A.   No.  I believe you.
6     Q.   Okay.  I mean, it was part of the materials
7  that you reviewed.  It would have been CCSAO 243 through
8  244 where they talk about that it's missing -- the trial
9  file is missing.  That was part of your review, wasn't
10 it?
11    A.   I recall that, yes.
12    Q.   Okay.
13    MR. SWAMINATHAN:  Josh, when you're getting to a
14 stopping point, I would like to hit the bathroom again.
15 Sorry.
16    MR. ENGQUIST:  Sure.  Let's take five minutes right
17 now.
18    MR. SWAMINATHAN:  Okay.  Thank you.
19    THE WITNESS:  Thank you.
20    THE VIDEOGRAPHER:  We're off the video record at
21 10:22 a.m.
22          (Recess taken.)
23    THE VIDEOGRAPHER:  We're back on the video record
24 at 10:30 a.m.

Page 95

1  BY MR. ENGQUIST:
2     Q.   All right.  Sir, let me go back to Exhibit
3  Number 8, please.  I'll share the screen again.  Okay.
4  It says -- when it talks about -- in this list here done
5  by Mr. Sheehan, it talks about CB.  What's a CB?
6     A.   I don't know.
7     Q.   Do you know what he means when he says RD?
8     A.   I don't know exactly what he means.
9  Reporting detective perhaps.
10    Q.   Okay.  Do you know what inventory slips are?
11    A.   I guess there's a couple different meanings
12 for inventory -- inventory slips.  It could refer to
13 evidence.  It could refer to the inventory for the
14 permanent retention files.
15    Q.   Okay.  So you've -- you believe there are
16 inventory slips having to do with the permanent retention
17 files as you put it?
18    A.   Well, that's the problem.  There's not.
19 There should have been, but I don't recall seeing any
20 inventory sheet that's typically found in these -- not
21 typically -- but it, based on policy, should have been
22 in -- listed in their investigative file and permanent
23 retention file.
24    Q.   Oh, you're talking about the list in the

Page 96

1  front of an investigative file?  Is that what you're
2  speaking of?
3      A.  Yeah.  I don't think there was one, if I
4  remember correctly.  Perhaps you can confirm that for me.
5  I don't remember seeing one.
6      Q.  Okay.  And it also --
7      A.  And that -- and that -- I'm sorry.
8      Q.  Oh, go ahead.
9      A.  It just -- it just occurred to me that that
10 would have listed any GPRs that were prepared in -- in
11 this case -- should have or would have been listed on --
12 on the inventory sheet according to their policies.
13     Q.  If it -- if it was, as you -- as you're
14 assuming, it's a complete file; correct?
15     A.  Well, again, I don't know what I don't know.
16 I don't know what's missing because it's missing,
17 apparently.
18     Q.  Okay.  And also under number 9, it says, "HW
19 notes."  Do you know what that stands for, sir?
20     A.  I'm sorry.  Where?
21     Q.  Number 9 here, it also lists, "HW notes."  Do
22 you know what HW notes are?
23     A.  I don't.
24     Q.  Okay.  Have you ever -- would it make sense

Page 97

1  that it would be handwritten notes?
2      A.  It could be.
3      Q.  Okay.  What else could it be, sir?
4      A.  Well, I don't know.  I mean, these are --
5  this is shorthand taken by an attorney, and you're asking
6  me to decipher his shorthand.  I don't know what it
7  means.  I can tell you there was no handwritten notes in
8  the investigative file, so I don't think it means that.
9  There was nothing -- there was no inventory sheet in
10 either of the files, so we can't point to that to see
11 what was missing from the file.
12         That -- that was the fail-safe that was
13 supposedly implemented by the Chicago Police Department,
14 to -- to detail and document all of the documents that
15 were prepared, so we're having this debate because we
16 don't know.
17     Q.  Okay.  And it also has here a firearms report
18 by Chenow.  Do you recall seeing that, sir?
19     A.  The report?
20     Q.  Yeah.
21     A.  I believe there was a firearms report, yes.
22     Q.  Okay.  All right.  Just moving back on where
23 the -- where your summary of your opinions are here.  The
24 second full -- second large paragraph there, it says --

Page 98

1  it starts with, "In addition."
2      A.  I'm sorry.  What page just so I can --
3      Q.  It's page 5, sir.  We're just still going
4  along on page 5.
5      A.  Okay.
6      Q.  Okay.  "In addition, there is substantial
7  evidence in the record that Detective Guevara and other
8  defendants intentionally, willful" -- "and willfully
9  manufactured and falsified evidence, manipulated
10 witnesses, and withheld rele" -- "relevant information
11 from Johnson and his attorneys."  Do you see that?
12     A.  I do.
13     Q.  Okay.  I want to just focus in on
14 "manufactured" evidence, that part right there.  Okay?
15 Can you tell me what evidence was manufactured by
16 Mr. Daley?
17     A.  I don't think he manufactured any evidence.
18     Q.  Okay.  Can you tell me what evidence was
19 manufactured by Detective Halverson?
20     A.  Well, again, I'd have to go through his -- my
21 understanding of his total involvement in the case.
22 There's witness statements that either were documented
23 and not provided or not documented that should have been
24 provided.  There's information that an individual was

Page 99

1  identified in a lineup, and their report was never
2  provided.
3          So I would have to go through my entire
4  report, and we can do that, and I can explain each --
5  each step of the way of Halverson's actions and inactions
6  if you'd like.
7      Q.  I just want to focus in on "manufactured"
8  evidence.  What evidence did Mr. Halverson manufacture?
9      A.  Again, I think I explained that.  I think
10 there was either -- he signed off on a lot of these
11 reports.  I believe that some of the reports are not
12 factually correct according to certain witnesses.
13     Q.  Okay.  Can you tell me now as we sit here
14 what evidence he manufactured?
15     A.  Again, not without -- I'll keep that in the
16 back of my mind as we go through the report.  If I can
17 identify it specifically, I'll do that for you as we go
18 through the report.
19     Q.  What evidence did Sergeant Healy manufacture?
20     A.  Again, Healy approved I believe most of these
21 police reports, and he would have been the person that
22 was in charge of this investigation.
23     Q.  What evidence, though, did he manufacture?
24     A.  I don't know that he specifically

THOMAS TIDERINGTON, 09/20/2023

Page 100..103

Page 100

1 manufactured any evidence.
2    Q.   When you say "manipulated witnesses," which
3 witnesses are you speaking about that were manipulated?
4 And, sir, I know you're looking at your report right now.
5 I have no problem if you -- since you have the whole
6 report in front of you if you want to -- if you want to
7 go back and forth on that, but I just -- so just so you
8 know, in sticking you to page 5, I just want to know
9 which witnesses were manipulated.
10    A.   Right. I mean, I can tell you generally, but
11 as we go through the report, there's more details; so
12 that's -- I was trying to be precise, but obviously,
13 there were witnesses that were claimed to have been shown
14 photos of suspects, and then they were later shown
15 lineups of the same suspects. There were witnesses that
16 claimed that they were shown a picture of the suspect.
17 There's witnesses that were -- said that the officers
18 coached them during the identification process, and
19 there's perhaps more as we go through the report.
20    Q.   Which witnesses said they were coached?
21    A.   I don't remember specifically, but I do
22 recall one of the witnesses said that the -- the
23 detectives told her, "That's him" or "That's not him,"
24 when they identified him. I'm trying to save time by

Page 101

1 quickly going through this, but I do recall that
2 witnesses either said in their depositions or -- that --
3 that they were shown photographs, or during the lineup,
4 they were told that the suspect was -- that wasn't the
5 right person or something to that effect.
6    Q.   Did any of the witnesses in their deposition
7 testimony -- any of the witnesses who testified at
8 trial -- ever come off their identification of Demetrius
9 Johnson?
10    MR. SWAMINATHAN: Objection to form and foundation.
11    Go ahead.
12    Just to form.
13    Go ahead.
14    THE WITNESS: Which -- you're -- which three wit --
15 or which -- which witnesses are you speaking of?
16 BY MR. ENGQUIST:
17    Q.   The witness who testified at trial. Do you
18 remember -- do you know the witness who testified at
19 trial, sir?
20    A.   I don't recall specifically. We'd have to go
21 through that --
22    Q.   Okay.
23    A.   -- again but...
24    Q.   Rosa Burgos, sir. Did Rosa Burgos come off

Page 102

1 her identification of Demetrius Johnson as the shooter?
2    MR. SWAMINATHAN: Objection to form.
3    THE WITNESS: I don't recall if she did or not.
4 BY MR. ENGQUIST:
5    Q.   Okay. Did Elba Burgos -- or Elva depending
6 on which side is being asked -- did she come off her
7 identification of the plaintiff as the shooter during her
8 deposition?
9    A.   I'd have to review her deposition again to be
10 sure. I don't recall.
11    Q.   You don't recall. Okay. What about Ricardo
12 Burgos? Did he come off his identification of Plaintiff
13 as the -- as the shooter?
14    MR. SWAMINATHAN: Same objection. Objection to
15 form.
16    THE WITNESS: Again, I'd have to look at his -- his
17 testimony. I don't recall if he did or not.
18 BY MR. ENGQUIST:
19    Q.   Do you know if any of the witness who
20 testified at trial that Plaintiff was -- that identified
21 Plaintiff as the shooter at trial recanted their
22 identification?
23    MR. SWAMINATHAN: Objection to form.
24    Go ahead.

Page 103

1    THE WITNESS: I don't know if they did or not.
2 BY MR. ENGQUIST:
3    Q.   You -- well, you did read their testimony --
4 correct? -- and you read their depositions?
5    A.   Well -- well, I did, but I don't recall as we
6 sit here today specifically what each person said --
7    Q.   Okay. Would you find --
8    A.   -- or testified to.
9    Q.   -- would you find it significant at all if
10 the eyewitnesses still maintained or at least didn't
11 recant the -- the identification of Plaintiff as the
12 shooter?
13    MR. SWAMINATHAN: Objection to form and foundation.
14 Mischaracterizes the evidence.
15    Go ahead.
16    THE WITNESS: Well, you have to combine that with
17 what other witnesses claim occurred as well. You have
18 other eyewitnesses that claimed that -- that Johns
19 committed the murder.
20 BY MR. ENGQUIST:
21    Q.   You're speaking of Aby Gonzalez?
22    A.   That's correct.
23    Q.   Okay. Well, we'll get to Aby Gonzalez.
24    So you -- you don't find it significant

THOMAS TIDERINGTON, 09/20/2023      Page 104..107

Page 104

1 if they stayed on their test -- if they stayed on their
2 testimony that -- or their identification because of Aby
3 Gonzalez; is that correct?
4    A. No. I'm not sure what testimony you're
5 asking me to offer an opinion on. You'd have to put it
6 in context for me for me to understand exactly what
7 you're asking.
8    Q. Okay. Well, I asked you before whether or
9 not you knew if any of the witnesses who testified at
10 trial ever recanted their identification, and you didn't
11 know; correct?
12    MR. SWAMINATHAN: Objection to form and -- sorry.
13 Go ahead. Objection to form and foundation.
14      Go ahead.
15    THE WITNESS: I said I don't recall as we sit here
16 today if they did.
17 BY MR. ENGQUIST:
18    Q. Okay. And I asked you -- what I was trying
19 to ask you, whether or not you would find it significant
20 if none of the witnesses who testified at trial recanted
21 their identification.
22    MR. SWAMINATHAN: Objection to form and foundation.
23      Go ahead.
24    THE WITNESS: Well, significant, I don't know how

Page 105

1 significant. It would be something, obviously, that I
2 would have considered, but how significant is it?
3 There's -- there's a lot of evidence in this case that --
4 that has created what I call, again, investigative
5 mysteries that have never been answered.
6      So I don't know if I would weigh that any
7 more -- I certainly didn't assess credibility of any of
8 the witnesses. I just considered what each of them
9 testified to and what they said to the police offi -- to
10 the -- to the officers after the shooting and in
11 subsequent interviews.
12 BY MR. ENGQUIST:
13    Q. You didn't note the fact that they didn't
14 recant their identifications, though, did you?
15    MR. SWAMINATHAN: Objection to form and foundation.
16      Go ahead.
17    THE WITNESS: I don't know if I noted that. I
18 don't believe I noted that in my report.
19 BY MR. ENGQUIST:
20    Q. Okay. And why wouldn't you have noted that
21 fact in your report?
22    MR. SWAMINATHAN: Objection to foundation.
23 Mischaracterizes the evidence. And form.
24      Go ahead.

Page 106

1    THE WITNESS: Again, you're asking me -- what
2 specifically -- what testimony specifically are you
3 asking me about?
4 BY MR. ENGQUIST:
5    Q. The testimony we've been talking about for
6 the last several minutes, sir, the testimony -- the
7 deposition testimony and the trial testimony of the
8 eyewitnesses who testified at trial.
9    A. Right. So --
10    MR. SWAMINATHAN: Hold on. What's the question?
11 BY MR. ENGQUIST:
12    Q. The question was why didn't you note that
13 they didn't recant their identifications?
14    MR. SWAMINATHAN: Objection to form and foundation.
15 It's in his report.
16      Go ahead.
17    THE WITNESS: Again, I would have to have some
18 context exactly what testimony you're referring to. I
19 don't know.
20 BY MR. ENGQUIST:
21    Q. Okay.
22    A. If you're asking me why didn't I include this
23 in my report, I need to know exactly what you're
24 referring to. Whether --

Page 107

1    Q. I'm sorry -- I'm sorry you don't understand
2 my question. I'll just move on.
3    A. Okay.
4    Q. Now, did you review the deposition testimony
5 of Aby Gonzalez?
6    A. I did.
7    Q. Okay. And does Aby Gonzalez claim to be an
8 eyewitness to the shooting?
9    A. In -- in -- yes. Yes, she does.
10    Q. "She" does? It's your understanding --
11    A. I'm sorry.
12    Q. -- that Aby --
13    A. I'm sorry. I'm sorry. Yes, he does. I
14 apologize.
15    Q. Okay. And you're saying that he still today
16 claims that he's an eyewitness to the shooting; is that
17 right?
18    A. I don't know if you have a document that
19 you're asking me about, if you could show it to me. I
20 don't know exactly what you're asking.
21    Q. Well, sir, I asked you if you reviewed his
22 deposition, and that's what I'm speaking about, his
23 deposition in this case because he didn't give testimony
24 at trial; correct?

Urlaub Bowen & Associates, Inc.    312-781-9586

THOMAS TIDERINGTON, 09/20/2023                          Page 108..111

Page 108

1    A.   I think you're correct, yes.
2    Q.   Okay.  And my question was does Aby Gonzalez
3    say he was an eyewitness to the shooting?
4    A.   Says he was an eyewitness to the shooting?
5    He told police that.
6    Q.   Okay.  Does he say he was an eyewitness to
7    the shooting?
8    A.   That's what he told police.  I don't know
9    what --
10   Q.   Okay.  Okay.  What did he say in his
11   deposition, sir?
12   A.   I don't know.  I'd have to -- I'd have to
13   look at his deposition and find out and tell you exactly
14   everything he said.  I don't know.
15   Q.   Okay.  So as you sit here today, you don't
16   recall whether or not Aby Gonzalez said whether he
17   viewed -- he actually saw the shooting or whether or not
18   he didn't see the shooting?  That's a fact you don't
19   know; correct?
20   A.   Well, you have -- apparently you're reading
21   from a deposition.  If you could provide that to --
22   Q.   I'm not reading -- I'm actually looking at
23   your report, sir.  I'm asking you the question.  Go
24   ahead.

Page 109

1    A.   If -- if you're asking me about his
2    deposition, if you could pull that up or give me an
3    opportunity to review it.  If you're going to ask me
4    questions about what he said, I can do -- I can refresh
5    my memory, but I don't know that I can answer that
6    question without refreshing my memory.
7    Q.   Okay.  Just the detail on whether or not
8    he -- he claims to be an eyewitness is something that you
9    don't recall; fair to say?
10   A.   Well, during his deposition or what he -- or
11   shortly after the murder?
12   Q.   Sir, he's only given testimony one time in
13   the case.  The only time -- only thing I'm asking you
14   about is his testimony.
15   A.   His testimony.  Okay.  I'm --
16   Q.   Okay.  So just to be clear, I'm not asking
17   you about anything else other than his testimony, and I'm
18   saying the fact -- the simple fact of whether or not he
19   claimed to be an eyewitness is a fact that you don't
20   recall from reviewing his deposition; correct?
21   A.   Without refreshing my memory, that's correct.
22   Q.   Okay.  You also note -- you also put in here
23   that, "Defendants totally disregarded alibi information
24   provided by Johnson."  Is that one of your --

Page 110

1    A.   On what page?
2    Q.   I'm specifically looking at page 6, letter c.
3    A.   That's correct.
4    Q.   Okay.  And when you say, "Defendants totally
5    disregarded his alibi information," which defendants are
6    you speaking of?
7    A.   Well, it would be all of the defendants that
8    were responsible for the investigation, for the arrest
9    of -- and for his arrest and prosecution.
10   Q.   I'm asking you for the detail which
11   defendants, though.  There's several -- you know that
12   there are several named defendants in this case; correct?
13   A.   That's correct.
14   Q.   Can you name them?
15   A.   I could look at the list, yes.  Guevara,
16   Halverson, Erickson, Healy, and Daley.
17   Q.   Okay.  So which of those defendants
18   disregarded alibi information provided by Johnson?
19   A.   Well, there's so little documentation as to
20   what each individual officer did, it's hard to make
21   that -- it's hard to answer that question.  Clearly,
22   Daley I don't believe was assigned to investigate the
23   homicide, so I don't think he would be included; but the
24   other defendants that are listed were intricate --

Page 111

1    intricate and -- investigators, and it appears that they
2    were assigned to investigate the -- this crime.
3    Q.   Okay.  And was Erickson involved in the case
4    when -- when Mr. Johnson became a suspect?
5    A.   I don't know if he was or not.
6    Q.   Okay.  And how did the defendants disregard
7    the alibi information?  What do you mean by disregarding
8    it?
9    A.   Well, they didn't -- well, I don't think they
10   addressed it, number one, and it's an investigative
11   mystery in the report.  I think the -- Guevara mentioned
12   Johnson going to pick up his girlfriend and that it
13   wasn't possible because -- and, again, I'm trying to
14   recite by memory -- that he told -- Guevara told him --
15   and I don't know who was with Guevara when they had this
16   interview.  I don't know if it was Halverson, or I don't
17   know if it was Erickson or who was with him -- but
18   essentially told him that it's not possible for his --
19   his girlfriend to work seven days a week, and that,
20   essentially, is how they discounted his alibi.
21   Q.   Okay.  Was that alibi used at trial?
22   A.   I don't know that.
23   Q.   You don't recall whether or not he put on an
24   alibi defense at trial?

THOMAS TIDERINGTON, 09/20/2023                    Page 112..115

Page 112

1    A.   I don't recall specifically what was said
2  about that at trial, no.
3    Q.   Okay.  So you don't know whether or not it
4  was fully brought up at trial and whether or not it was
5  discounted at trial; correct?
6    A.   I don't recall that as we sit here today.
7    Q.   Okay.  But you did review the trial
8  testimony; correct?
9        MR. SWAMINATHAN:  Objection.  Asked and answered.
10       Go ahead.
11       THE WITNESS:  I did.
12 BY MR. ENGQUIST:
13   Q.   Okay.  Did you review the depositions of the
14 alibi witnesses?
15   A.   I don't recall if I did.  If -- if they were
16 provided to me, I would have, yes.  I don't remember
17 specifically.  I believe one was his sister, and one was
18 a friend if I -- if I remember correctly.
19   Q.   Okay.
20   A.   And there was -- well...
21   Q.   I'm sorry.  What was that?
22   A.   I don't think there was -- I'm sorry.  There
23 wasn't a question pending.
24   Q.   Okay.  Now, from your understanding of

Page 113

1  reviewing the materials, was the plaintiff a member of a
2  street gang back then?
3    A.   I believe there was information that he was,
4  yes.
5    Q.   Okay.  And what gang was that?
6    A.   I have it in my report.  I don't recall.  I'd
7  have to find it in the report.
8    Q.   Okay.  Would Maniac Latin Disciples ring a
9  bell?
10   A.   That's possible, yes.
11   Q.   Okay.  Was he also in the same gang with --
12 with Mr. Bryan Johns?
13   A.   I don't know as we sit here today if he was
14 or not.
15   Q.   Did you read the deposition of Terrell Agee
16 or Agee?
17   A.   I believe that was provided to me, yes.
18   Q.   Okay.  If it was provided to you, sir, I'm
19 assuming you reviewed it?
20   A.   I would have at some point.
21   Q.   Okay.
22   A.   I didn't -- I didn't review it in preparation
23 of today's deposition.
24   Q.   Okay.  Do you recall Mr. Agee talking about

Page 114

1  how they would go King hunting?
2    A.   I don't recall that.  It's -- it's possible.
3  Again, as you know, there's a lot of depositions; there's
4  a lot of cases.  I would have to look at that deposition
5  specifically to answer your questions about it.
6    Q.   Well, do you remember -- do you remember what
7  gang Aby Gonzalez was affiliated with?
8    A.   I don't.  No, I don't.
9    Q.   Would it surprise you that it was the Latin
10 Kings?
11   A.   No, that would not surprise me.
12   Q.   Do you know whether or not the Maniac Latin
13 Disciples and Latin Kings were on friendly terms or
14 unfriendly terms back in 1991?
15   A.   I believe there's information that they were
16 on unfriendly terms.
17   Q.   Okay.  And do you recall what King hunting
18 referred to?
19   A.   In the deposition?
20   Q.   Yes.
21   A.   I don't.  Like I said, I'd have to refresh my
22 memory by reviewing that.
23   Q.   Okay.  Well, let me ask you.  I know you had
24 experience with cartels and large drug operations when

Page 115

1  you were in Florida.  What's -- what's your experience
2  with street gangs, sir?
3    A.   There's street gangs in South Florida.  A lot
4  of them were Colombian, Haitian gangs, Jamaican gangs.
5  We had a large gang population.
6    Q.   Okay.  But what was your experience with
7  dealing with investigations involving street gangs, sir?
8    A.   I was involved in many investigations
9  involving street gangs.
10   Q.   Okay.  So, sir, in your experience dealing
11 with street gangs, had you ever encountered a situation
12 where gangs would go out and beat up other members of
13 gangs as a show of force?
14   A.   They would, yes.  Protecting the turf.
15   Q.   Or for sport?
16   A.   I said protecting turf.
17   Q.   I know, but --
18   A.   Or for sport?
19   Q.   Yeah.  Have you ever heard it for sport?
20   A.   I've heard that, yes.
21   Q.   Okay.  Would it surprise you that King
22 hunting was exactly that as described Mr. -- by Mr. Agee,
23 as hunting for sport for beating up Latin Kings?
24   A.   No, that would not surprise me.

THOMAS TIDERINGTON, 09/20/2023

Page 116..119

---

Page 116

1  Q.  Would it surprise you that when he would go
2  out and do King hunting, sometimes he would go with Bryan
3  Johns, and sometimes he would also go with Demetrius
4  Johnson?
5  A.  If that's what he testified to, it would not
6  surprise me.
7  Q.  Okay.  In your experience with street gangs,
8  had you ever known street gangs to falsely identify rival
9  street gang members as being involved in crimes?
10  A.  I'm sure they would, yes.  I'm trying to
11  think of specific instances.  I don't know that I can
12  think of one as we sit here today, but I would not
13  disagree with that.
14  Q.  Okay.  So you wouldn't disagree when Mr. Agee
15  testified to that actually going on while he -- back in
16  1991 during this period of time?
17  A.  I would not disagree with that.
18  Q.  Okay.  Specifically Latin Kings trying to put
19  cases on him and his friends because of their King
20  hunting?
21  A.  I would not disagree with that.  I wouldn't
22  have any firsthand knowledge of that, but I wouldn't
23  disagree with what he's saying.
24  Q.  Okay.  And what's your understanding from

---

Page 117

1  your review of the records of the relationship between
2  Bryan Johns and Demetrius Johnson back in 1991?
3  A.  I think they knew each other.  I don't know
4  if -- I don't know if there's information beyond that,
5  they had knowledge of each other.
6  Q.  Okay.  You weren't aware -- so, sir, based
7  off your review, you're not aware of whether or not they
8  were close friends or not?
9  A.  I don't recall if they were close friends.  I
10  don't recall that.
11  Q.  Okay.
12  A.  What -- well, I guess I'm not sure what
13  you're referring to or what documents you're referring
14  to.  Perhaps I could see to refresh my memory.
15  Q.  I'm just going off your understanding of --
16  because you reviewed this case and you have this report
17  here of your understanding of their relationship.  Let me
18  ask you -- when you were evaluating this case as a
19  reported expert in police procedure, did you consider the
20  relationship between Bryan Johns and Demetrius Johnson
21  relevant at all to -- to note?
22  A.  I don't know that I had any information.
23  There -- there certainly wasn't anything in the police
24  report that would reflect that there was a close

---

Page 118

1  relationship between these two.  That's certainly where I
2  would have expected to see that if it had something to do
3  with the investigative actions or the strategies on the
4  part of the police department, but I don't recall seeing
5  any of that.
6  Q.  Okay.  Well, sir, you didn't just focus on
7  just the paperwork you could find that was located about
8  the police work that was done.  You also apparently,
9  based off your list here, reviewed documents outside that
10  including depositions, motions being filed by plaintiffs,
11  trial testimony, declarations, things of that nature;
12  correct?
13  A.  I did, yes.
14  Q.  Okay.  One second.  This is much easier to do
15  with just paper in front of me.  All right.  So let's --
16  let's go -- we're looking at pages 8 and 9.  That's where
17  I'm going to be kind of focusing right now just so you
18  can have that in front of you.  You were talking about
19  Darryl Daley before and the things that he did.  One of
20  the things that you mentioned was the gun recovery.  We
21  are on page 9 in your report.  And if you --
22  A.  Okay.
23  Q.  -- look at the middle of that page where --
24  the paragraph where it says, "Daley also stated in his

---

Page 119

1  police report that he discovered," quote, "'a 2-inch
2  chrome AMT .25 caliber handgun secreted under the vinyl
3  covering of the motor cover.  The crime lab was notified
4  what was recovered by Beat 9601.'  The gun does not appear
5  to have been inventoried.  There is no evidence report,
6  crime scene processing report or other report documenting
7  a .25 caliber" -- "caliber handgun was inventoried, or
8  that it was tested or analyzed."
9  Do you see that?
10  A.  I do.
11  Q.  Okay.  Now, sir, you are aware that a
12  .38 caliber semiautomatic was recovered and tested;
13  correct?
14  A.  I'm not aware of that, no.
15  Q.  You're not aware of that?
16  A.  A .38, you said?
17  Q.  Yes.  You are aware the .38 caliber was
18  recovered?
19  A.  No.  A 380, which is different than a
20  .38 caliber was --
21  Q.  Okay.  I'm sorry.
22  A.  -- recovered at -- no.  No worries.  I just
23  wanted to make sure because there was some confusion
24  about .38 caliber rounds also, so I was kind of surprised

---

THOMAS TIDERINGTON, 09/20/2023          Page 120..123

1 to hear that they found a .38 caliber gun as well but --

2      **Q. Okay. Because you -- the paragraph below**

3 **that, you talk about an AMT 380 Kurz semiautomatic**

4 **pistol, stainless, being recovered -- correct? -- from**

5 **the van?**

6      A. That's correct.

7      **Q. Okay. So in this section of the report, are**

8 **you -- are you opining that there are two separate guns**

9 **in the van or that it was misidentified as a .25 caliber**

10 **and later recovered and determined to be a 380?**

11      A. Well, again, you've identified another

12 problem within the investigative file. I don't know

13 which it is. Certainly a .25 automatic to somebody that

14 is a gun person like Daley -- I think Daley testified in

15 his depo that he was either on the SWAT team or some -- a

16 gun team. I believe it was a SWAT team.

17         But a .25 is -- is readily apparent to

18 anybody that has -- I shouldn't say "anybody," but it's

19 apparent to those that have gun experience. It's not

20 easy to -- especially if he handled it, which I believe

21 he did -- but to confuse a 380 with a .25 is -- is -- is

22 perplexing, I would say, in the least.

23      **Q. Okay. So you're saying that --**

24      A. And then -- I'm sorry. And -- and we know

1 that there was information that there were at least two

2 shooters and two different guns as well, so combined with

3 that information, anybody that looked -- or in reviewing

4 this file, you would have assumed that there was at least

5 two different firearms used during this murder.

6      **Q. Okay. Now, were you aware that your client,**

7 **Mr. Johnson, actually stipulated that the firearms expert**

8 **Robert -- or Richard Chenow would testify that the bullet**

9 **recovered from Edwin Fred was a .38 special fired from a**

10 **revolver and could not have been fired from a**

11 **semiautomatic handgun recovered by -- observed in the van**

12 **by Officer Daley, that it was already stipulated that**

13 **that testing was done?**

14      A. I understand that, yes.

15      **Q. Okay. So if that testing was done and it was**

16 **clear from Mr. Johnson, at least back at trial and later**

17 **on in his petition for an appeal, that it was the same**

18 **gun, why are you confused and believe that there was two**

19 **guns in the van?**

20      MR. SWAMINATHAN: Objection to form and foundation.

21 Mischaracterizes the evidence.

22         Go ahead.

23      THE WITNESS: Well, I think you just said that they

24 were the same gun, so I don't know if I didn't hear you

1 correctly or if you --

2 BY MR. ENGQUIST:

3      **Q. Yes.**

4      A. -- misspoke. So that he testified that they

5 were -- so there are two guns, a .25 and a 380? Is that

6 what you're suggesting that his testimony was?

7      **Q. Yes.**

8      A. Oh. Well, all right. So the question is --

9 I mean, this is the first time that I had confirmation

10 that there was, in fact, a .25 automatic and a 380. I

11 believe that that's what the evidence demonstrated, but

12 this is the first confirmation that I've heard that

13 that's actually what happened.

14      **Q. No. What I'm saying is that there was one**

15 **gun in the van recovered -- observed by Officer Daley,**

16 **and it was --**

17      MR. SWAMINATHAN: Objection --

18 BY MR. ENGQUIST:

19      **Q. -- it was a 380.**

20      MR. SWAMINATHAN: Objection to form and foundation.

21 Mischaracterizes the evidence.

22         Go ahead.

23      THE WITNESS: Well, I don't think it was -- I don't

24 think any gun was recovered by Daley. I think Daley

1 found the gun, and then the evidence technicians

2 recovered it. The gun that they recovered was a

3 380 caliber and was described as a -- described -- but

4 Daley described the gun that he found as a .25 automatic,

5 which -- which is far different than a 380 with a 4-inch

6 barrel. He described it as a 2-inch chrome AMT

7 .25 caliber handgun secreted under a vinyl covering for

8 the motor cover.

9         So that tells me that Daley found a

10 .25 automatic and that the gun that was recovered and

11 placed into evidence was a 380, that there were two

12 different guns, and that coincides with other witness

13 statements that there were at least two shooters during

14 this -- during the murder.

15 BY MR. ENGQUIST:

16      **Q. Now, you read Officer Daley's deposition;**

17 **correct?**

18      A. I did.

19      **Q. And he identified the photograph of the gun**

20 **that was recovered; correct?**

21      A. I don't know if he did or not. I don't

22 remember that part.

23      **Q. Okay. And are you aware that the picture**

24 **that he identified is the gun that was recovered by the**

THOMAS TIDERINGTON, 09/20/2023                     Page 124..127

Page 124

1  evidence technicians?

2       MR. SWAMINATHAN:  Objection to form.

3            Go ahead.

4       THE WITNESS:  I don't know if -- I don't recall

5  that testimony.  I don't know if he was ever asked about

6  the .25 automatic that he -- I don't recall him

7  explaining what happened to the .25 automatic.

8  BY MR. ENGQUIST:

9       Q.   Okay.  So you still believe that there were

10  two separate guns, a .25 automatic and a .38 cal -- and a

11  380, even though it was already stipulated that the gun

12  observed by Officer Daley could not have fired a

13  .38 special fired from the revolver that killed Edwin

14  Fred; correct?

15       MR. SWAMINATHAN:  Objection to form and foundation.

16            Go ahead.

17       THE WITNESS:  Well, I'm sorry.  There's -- there's

18  several questions there.  First of all, let me see if I

19  got all the questions out of that -- that group of

20  questions.  The .38 special rounds that were -- that

21  supposedly were recovered, I don't believe those were

22  .38 caliber rounds.  A .38 caliber round cannot be shot

23  out of a 380 handgun, so I don't know where the mistake

24  was or if it was a mistake or if there was actually

Page 125

1  .38 caliber rounds recovered.

2            And if there were .38 caliber rounds

3  recovered out of that van, that would indicate that a

4  .38 caliber weapon was used or perhaps -- the .38 caliber

5  rounds cannot be shot out of the .25 automatic or the

6  380, so I don't know where the confusion was, but on --

7  on the testing, it said that they tested five

8  .38 special.  Those are .38 caliber rounds.

9  BY MR. ENGQUIST:

10       Q.   Uh-huh.  Yes.  I'm talking about the

11  .38 caliber round that was recovered from the body.

12  That's what it says.

13       A.   No, that's not what it says.  It -- my

14  understanding of what it says is that there was a -- they

15  couldn't determine what caliber round that was recovered

16  from the body, that they defined it as a -- I think a

17  midrange caliber weapon.  I don't think they described it

18  as a .38 caliber.

19       Q.   Okay.  So your understanding then, it

20  wouldn't be that there was no stip -- I mean, do you know

21  if there was a stipulation that the bullet recovered from

22  Edwin Fred was a .38 special fired from a revolver?

23       A.   Are you representing that the -- the weapon

24  that was used was a .38 caliber and that the round that

Page 126

1  was recovered from the body was a .38 caliber round?  I

2  haven't seen that.

3            (Deposition Exhibit Number 9,

4            Witness Tiderington, was marked

5            for identification 9/20/23.)

6  BY MR. ENGQUIST:

7       Q.   So let me put up Exhibit Number 9.  Exhibit

8  Number 9 is Bates-stamped CCSAO 352 through 361.  It's a

9  Petition for Leave to Appeal, and it's by Demetrius

10  Johnson.  Do you see that there?

11       A.   I do.

12       Q.   Let me see if I can find the right spot.  I'm

13  talking about this sentence right here that I

14  highlighted.  "It was stipulated that Firearms Expert

15  Richard Chenow would testify that the bullet recovered

16  from Edwin Fred was a .38 Special fired from a revolver,

17  and could not have been fired from the semiautomatic

18  handgun observed by" -- "in the van by Officer Daley."

19       A.   Okay.  So that's consistent with my opinions

20  and consistent with my understanding as well, yes.

21       Q.   Okay.  Well, you actually have in here that

22  nothing was ever analyzed.  Are you just saying -- is

23  that still with the belief that there were two guns in

24  the van?

Page 127

1       A.   Well, wait a minute.  And, again, I know

2  you're not intentionally trying to confuse me, but there

3  was a lab report -- and we could pull that up or to save

4  time, perhaps not; I could ask him to do it -- but there

5  was a lab report that indicates that the -- the rounds

6  were sent to the crime lab for testing and that they

7  determined that round that was found in the body of

8  the deceased could not have been fired by the 380 firearm

9  that was recovered from the van.  That's my information.

10            Now, is it possible that there was a

11  .38 special that never recovered -- a revolver?  I

12  think it's speculative, but I -- it's consistent with

13  possibly what occurred there.  Obviously, if the -- if

14  the suspects in that van were responsible for the

15  shooting, there was an opportunity for them to take that

16  .38 caliber into that apartment and -- and drop it or

17  hand it off to somebody, so that would be very consistent

18  with -- with my opinions.

19       Q.   Okay.  I'm just going with the opinion --

20  what is your opinion?  Was there -- do you believe based

21  off this -- off this part here in your report that there

22  were two weapons in the van, or was there one weapon in

23  the van?

24       A.   Well, we know there was at least one weapon.

THOMAS TIDERINGTON, 09/20/2023                    Page 128..131

Page 128

1  We know there was a 380 caliber hand -- semiautomatic
2  handgun that was recovered by the evidence technicians
3  and was placed into evidence.  Daley describes a
4  different gun.  Now, if you're representing to me that
5  Daley simply made a mistake, and he described the
6  .25 automatic and what he was really referring to was a
7  380 -- but I don't know that I saw that in his deposition
8  testimony.
9          So when I'm reading Daley's police report
10 indicating that he found a .25 caliber semiautomatic
11 handgun in the van, I have to take him for his word.  I
12 don't think -- Daley seems like a pretty straightforward
13 guy.  He seems like he's experienced.  There was -- I
14 noted that he had experience I think in the SWAT team, so
15 I'm not sure why he would say that there was a
16 .25 automatic handgun in that van when there wasn't one.
17     **Q.   Okay.  So let me just go back to my question**
18 **with -- is your opinion that there were two weapons in**
19 **the van, or was there one weapon in the van?**
20     MR. SWAMINATHAN:  Objection.  Asked and answered.
21          Go ahead.
22     THE WITNESS:  I can only go based on what Daley
23 said.  If Daley is accurate and says that he found a
24 .25 automatic handgun in the van, there was two handguns

Page 129

1  in that van.  We know that the 380 was recovered, and if
2  Daley is accurate, if his police report is accurate --
3  and I have no reason to doubt him -- then there would
4  have been two different handguns.
5          Now possibly three because, as you
6  pointed out, these .38 caliber rounds that you -- that
7  that we're talking about here had to have been shot from
8  a .38 caliber handgun; so it would be totally consistent
9  that a third -- a third weapon at one point could have
10 been in that van.
11 BY MR. ENGQUIST:
12     **Q.   Okay.  All right.  So if I can just refer you**
13 **to page 10 of your report.  Are you there?**
14     A.   I am.
15     **Q.   Okay.  And in your report, there are color**
16 **pictures.  You have two pictures on the top, and the one**
17 **on the right is the handgun that was recovered by the**
18 **evidence technician; correct?**
19     A.   Apparently, yes.
20     **Q.   Okay.  And you're saying that viewing that,**
21 **you can tell that is a 380?**
22     A.   I can tell that's a 380, yes.
23     **Q.   Okay.**
24     A.   Now --

Page 130

1     **Q.   You can tell it's --**
2     A.   I'm sorry.  I'm sorry.  And let me clarify
3  this.  I would be 100 percent able to determine if I was
4  able to look at it in real life and handle it and --
5  and -- and look at it.  In the photo, let me say that it
6  appears that it's a 380.
7          So I don't want to say that I can
8  100 percent identify it based on a picture, but certainly
9  if I was on the scene with the experience that I have
10 with weapons, that I would have been able to immediately
11 determine the caliber of weapon that that was, yes.
12     **Q.   Okay.  All right.  The next section of your**
13 **report I know you talk about two separate lineup reports**
14 **for the night of the incident, one signed off by Healy,**
15 **and one that is not -- is not signed off by Healy.  It's**
16 **only signed off -- at least it has the name Erickson on**
17 **it and nothing else; correct?**
18     A.   That's correct.
19     **Q.   Okay.  And just to be clear, what you were**
20 **saying before is that you have -- you called it the**
21 **mysteries of the case or the unknowns, or how did you**
22 **refer to that before?**
23     A.   Well, investigative mysteries is --
24     **Q.   Investigative mysteries.**

Page 131

1     A.   -- a term that I --
2     **Q.   Yeah.  And --**
3     A.   -- a term that I use during my teaching
4  police officers, yes.
5     **Q.   Oh, that's a -- that's a term you've coined**
6  **for -- for teaching police officers, investigative**
7  **mysteries?**
8     A.   I have, yes.
9     **Q.   Okay.  So let's just about talk about what**
10 **you -- talk about the investigative mysteries here and in**
11 **reconciling those reports on the night of the incident.**
12 **Now, based off the reports that you have, that you've**
13 **been able to review, the materials you have, you don't**
14 **have an explanation explaining the two different reports;**
15 **correct?**
16     MR. SWAMINATHAN:  Objection to form.
17          Go ahead.
18     THE WITNESS:  No.
19 BY MR. ENGQUIST:
20     **Q.   Okay.**
21     A.   I don't have an ex -- I don't have an
22 explanation, no.
23     **Q.   Okay.  And just to be clear --**
24     A.   And I'm not -- I'm sorry.  It's not really my

THOMAS TIDERINGTON, 09/20/2023                    Page 132..135

Page 132
1 job to explain it, but I haven't seen any explanation
2 from the officers in the investigative case files
3 explaining it --
4    Q.  Okay.  And just --
5    A.  -- is a better way to --
6    Q.  Okay.  And just to be clear, you don't know
7 whether or not the file that exists today is how it
8 existed in 1991 when the case was being tried; correct?
9    A.  I don't have any reason not to think that
10 they are not in the same condition that they were in
11 1991.  I haven't seen any evidence that suggests
12 otherwise.
13    Q.  Okay.
14    A.  But if there's additional documents that you
15 have that are -- should have been in the file that I have
16 not reviewed, I certainly would welcome the opportunity
17 to review those for you.
18    Q.  All right.  Just to be clear, you're saying
19 that there's no evidence to suggest to you that the file
20 is in -- was in -- is incomplete today; correct?
21        MR. SWAMINATHAN:  Objection to form and foundation.
22        Go ahead.
23        And mischaracterizes the testimony.
24        Go ahead.

Page 133
1        THE WITNESS:  I have not seen any explanation as to
2 why -- if the file is incomplete, why it's incomplete.  I
3 have not seen any evidence of that.
4 BY MR. ENGQUIST:
5    Q.  Okay.  What did Aby Gonzalez say in his
6 deposition about the lineup or lineups on the night of
7 the shooting -- on June 12th?
8    A.  I know I would -- would have to look at his
9 deposition and see what he said.
10    Q.  Did you review his deposition?
11    A.  I have, but I didn't review it in preparation
12 of today's deposition.
13    Q.  Would it surprise you to say that he doesn't
14 recall ever even seeing a lineup at all in this case?
15        MR. SWAMINATHAN:  Objection to form and foundation.
16        Go ahead.
17        THE WITNESS:  I would have to refresh my memory.  I
18 don't recall that.
19 BY MR. ENGQUIST:
20    Q.  Okay.  Do you recall him saying that
21 sometimes he would lie to police officers back then in
22 1991?
23        MR. SWAMINATHAN:  Objection to form and foundation.
24        Go ahead.

Page 134
1        THE WITNESS:  I don't know.  It's possible he said
2 it in his depo.  I don't recall that.
3 BY MR. ENGQUIST:
4    Q.  In fact, I don't believe you make any mention
5 of his deposition testimony in your -- I don't know how
6 many pages this is -- in your 68-page report; is that
7 correct?
8    A.  That's quite possible.
9    Q.  Why wouldn't you note what Aby Gonzalez says
10 happened that night in his deposition in your report?
11        MR. SWAMINATHAN:  Objection to form.  Are you
12 asking why he didn't say what happened -- why he didn't
13 refer to what he said in his deposition or what he said
14 that night?
15 BY MR. ENGQUIST:
16    Q.  What he said in his deposition.  Why wouldn't
17 you have what he said in his deposition occurred that
18 night in your -- in your 68-page report?
19        MR. SWAMINATHAN:  Objection to form and foundation.
20 Argumentative.
21        Go ahead.
22        THE WITNESS:  Again, I'd have to look at
23 specifically what you're asking me about why I didn't --
24 what -- what I didn't include in my report.  I certainly

Page 135
1 focused a great deal of my attention on the investigative
2 efforts of the police officers based on the reports that
3 they submitted, and -- and I was asked to determine if
4 their actions deviated from acceptable police standards
5 and practices.
6        I don't want to say that the deposition
7 wasn't important to me, but I don't know if it had a lot
8 of impact on my assessment of what investigative actions
9 the officers took during that time period.  I don't know
10 if -- if his deposition would have had a big influence
11 over that.
12 BY MR. ENGQUIST:
13    Q.  What's your understanding on -- on whether or
14 not Plaintiff knew about Bryan Johns standing in a lineup
15 the night of the shooting prior to his trial?
16        MR. SWAMINATHAN:  Objection to form.
17        Go ahead.
18        THE WITNESS:  Whether he knew about the lineup or
19 not?  I'm sorry.  Is that what you're asking me,
20 Mr. Engquist?
21 BY MR. ENGQUIST:
22    Q.  Yeah.  What's your under -- what's your
23 understanding of the plaintiff, Demetrius Johnson,
24 understanding -- what's your understanding of his

THOMAS TIDERINGTON, 09/20/2023                                    Page 136..139

Page 136

1  understanding on whether or not a lineup had occurred
2  with Bryan Johns the night of the shooting?
3       MR. SWAMINATHAN:  Objection to form.
4            Go ahead.
5       THE WITNESS:  I recall that there was some
6  conversation that he had with Johns in a lockup facility
7  or something where Johns told him that, "The police tried
8  to pin this on me" or something to that effect.  I don't
9  know specifically what Johnson knew or didn't know.  I
10 don't know that information.  It certainly would not have
11 had an impact on me in terms of evaluating the
12 investigative actions of the officers.
13 BY MR. ENGQUIST:
14      Q.  So whether or not Plaintiff claims that Bryan
15 Johns told him he stood in a lineup and was, in fact, the
16 shooter doesn't affect your opinions at all in this case;
17 is that fair to say?
18      A.  That's -- that's not what I said.
19      Q.  Okay.  Well, would it -- does that -- does
20 that affect your opinions at all?
21      A.  Well, no.  What I -- I said what I recall,
22 and -- and, again, if there -- if you can allow me to
23 review the sections that you're asking me about -- as I
24 said, I'd have to refresh my memory, or you would have to

Page 137

1  allow me the opportunity to read that portion.
2            Off the top of my head, I recall there
3  was some testimony that -- that he and Johns spoke while
4  they were in a lockup facility and that Johns told
5  Johnson that, "The cops tried to pin this on me at one
6  point."  That's my recollection of the conversation.
7  BY MR. ENGQUIST:
8       Q.  Okay.  So your recollection is that the cops
9  were trying to pin it on him, like, frame Bryan Johns; is
10 that correct?
11      A.  Oh, I don't -- I don't -- I'm just reciting
12 what I think they said to each other.  I don't know what
13 the meaning of what he -- I can't determine exactly what
14 Johns meant.
15      Q.  As you're sitting here today for your
16 deposition after writing this report and prepping twice
17 for it including several hours before this deposition
18 today, do you recall whether or not Bryan Johns -- or
19 Demetrius Johnson has claimed that Bryan Johns confessed
20 the murder to him?
21      MR. SWAMINATHAN:  Objection to form.
22            Go ahead.
23      THE WITNESS:  I don't know if he did or not.
24

Page 138

1  BY MR. ENGQUIST:
2       Q.  Okay.  In your analysis -- it starts on
3  page 18 -- one of the things you start off with is once
4  again going through talking about Detective Guevara --
5  former Detective Guevara asserting his Fifth Amendment
6  rights.  Do you see that?
7       A.  I do.
8       Q.  Okay.  Does the fact that he's asserted his
9  Fifth Amendments rights affect your opinion one way or
10 the other?
11      A.  No, I don't think it affected my opinion.
12      Q.  Okay.
13      A.  I noted that it was highly unusual.  I don't
14 know of any police officer that has invoked his rights
15 under similar situations.  Most officers want to testify
16 and want to put the bad guys in jail, so to speak, so I
17 think it's highly unusual, but it certainly would not
18 have influenced -- certainly there's a lot of
19 similarities in cases, but it wouldn't have influenced my
20 assessment of specifically what happened in this case.
21      Q.  Okay.
22      MR. SWAMINATHAN:  Josh, when you get done with this
23 section, can we take a break?  We've been going another
24 hour -- a little over an hour.

Page 139

1       MR. ENGQUIST:  Sure.  We can take a break.  That's
2  fine.
3       MR. SWAMINATHAN:  Well, you can finish this
4  section.  I didn't mean to cut you off.  I just wanted
5  to --
6       MR. ENGQUIST:  No.  That's -- I was actually going
7  to move on to a different part because that was -- that
8  was -- he did his little Fifth thing, and then I'll just
9  move on for the next part.
10      MR. SWAMINATHAN:  Okay.  Thanks.
11      MR. ENGQUIST:  How long do you want?
12      THE WITNESS:  Five minutes?
13      THE VIDEOGRAPHER:  All right.
14      MR. SWAMINATHAN:  Five.  Okay.
15      THE VIDEOGRAPHER:  Okay.  We're off the video
16 record at 11:28.
17            (Recess taken.)
18      THE VIDEOGRAPHER:  We're back on the video record
19 at 11:43 a.m.
20 BY MR. ENGQUIST:
21      Q.  All right.  All right.  Sir, just to kind of
22 go back, earlier you were saying that you, as a
23 supervisor, the way you looked at it, that when you
24 signed off on reports, you were signing to the truth and

Page 140

1  accuracy of all those reports.  Do you remember that?
2      A.  I do.
3      Q.  Okay.  And kind of like the buck stops here.
4  This is -- this is my job; is that right?
5      A.  I think that's a supervisor's responsibility,
6  yes.
7      Q.  Okay.  Now, I know in previous depositions,
8  we did talk about the fact that, actually, one of your
9  larger cases were times when you were working with the
10  DEA.  Do you remember those --
11      A.  Okay.
12      Q.  -- down in Florida?  Down in Florida, you
13  worked for the DEA; correct?
14      A.  I did, yes.
15      Q.  Okay.  And, in fact, I believe you previously
16  testified that you -- that you were actually in charge of
17  a team; is that correct?
18      A.  I was the supervisor in charge of a group,
19  yes.
20      Q.  Okay.  And I'm assuming you signed off on
21  reports when you did that; correct?
22      A.  I would have, yes.
23      Q.  Okay.  Now, I believe we've also test --
24  talked about this before, but just to be clear, after

Page 141

1  your time working there with the DEA, there was some
2  questions having to do with missing money; isn't that --
3  isn't that true?
4      A.  I don't know if there was a question about
5  it.  The incident came up, of course, yes.
6      Q.  Well, there's over 30 million dollars that
7  was unaccounted for; isn't that correct?
8      A.  No, that's -- that's not -- that's not
9  correct at all.
10      Q.  Really?  How much was unaccounted for, sir?
11      A.  I don't know if there's any money unaccounted
12  for.  I don't believe there was any money unaccounted
13  for.
14      Q.  Okay.  Sir, do you know whether -- are you
15  aware that the -- that the Department of Justice changed
16  the DEA guidelines when it came to money going in and out
17  to confidential sources after your case?
18      A.  I don't know if that's accurate, and I -- but
19  I do know that the DEA or the Department of Justice
20  determ -- never -- determined there was no money missing.
21  Nobody within the Department of Justice ever determined
22  there was money missing, and to suggest that there was a
23  disingenuous and is not factually correct.
24      Q.  Okay.

Page 142

1      A.  And -- and you're taking this -- you're
2  taking this again from a book where -- that was designed
3  to be entertainment versus factual.
4      Q.  Actually, I wasn't taking that from the book,
5  sir.  I understand before you disavowed any part in the
6  book that you found -- well, you disavowed sections of
7  the book that we brought up.  I was actually referring to
8  a DOJ report on -- on that -- on the missing money.
9  That's what I was referring to.
10      A.  Well, I don't believe --
11      MR. SWAMINATHAN:  Hey, Josh, have you produced that
12  to us?
13      MR. ENGQUIST:  I'm sorry?
14      THE WITNESS:  I don't believe you have a DOJ --
15      MR. SWAMINATHAN:  Have we --
16      THE WITNESS:  Oh, I'm sorry.
17      MR. SWAMINATHAN:  -- have you produced that to us?
18      MR. ENGQUIST:  I don't remember if it was produced
19  in a different case or not, but I remember reading it
20  before when I was prepping for this; but I can always
21  produce it later on, and we can talk about it more later.
22      THE WITNESS:  Yeah.  To be clear, there was no --
23      MR. SWAMINATHAN:  Yeah.  Just -- just to be clear,
24  the Plaintiff's position is if you're going to ask him

Page 143

1  questions about some report that you have that you think
2  is relevant to this case enough so that you're going to
3  ask him questions about it, you need to produce it to us.
4      MR. ENGQUIST:  Okay.  Well, I'm asking about his
5  background.
6  BY MR. ENGQUIST:
7      Q.  And it wasn't as interesting until you said
8  that when you sign things that you were avowing for the
9  truth and accuracy of it for me, so that's why it kind of
10  popped into my head here.
11      A.  Right.  But then you went into a whole
12  different allegation that there's missing money, and I --
13  the officers that worked for me for this many years,
14  it's -- it's a disservice to suggest that there was
15  missing money than you did not see any DOJ documents
16  suggesting that there was missing money.
17      Q.  Okay.
18      A.  And if you do have a document, I certainly
19  would like to see it.
20      Q.  All right.  But if there was missing money
21  and you signed off on that investigation, that would be
22  your responsibility; correct?
23      MR. SWAMINATHAN:  Objection to form and foundation.
24      THE WITNESS:  I have no idea what you're talking

THOMAS TIDERINGTON, 09/20/2023                    Page 144..147

Page 144

1  about.  There is no missing money, so --
2  BY MR. ENGQUIST:
3      Q.   No.  I'm just -- I was just asking -- I
4  understand you're disavowing that.  I'm just saying --
5  I'm asking as a hypothetical.  If you signed off on
6  reports having to do with investigations that were going
7  on with confidential informants and it turned out there
8  were multimillion dollars missing, that would be on
9  your -- that would be your responsibility; correct?
10     MR. SWAMINATHAN:  Objection to form and foundation.
11     THE WITNESS:  No, it wouldn't be my responsibility.
12 It's my responsibility to make sure that my officers are
13 conducting their investigations properly and consistent
14 with department policies.  If -- if somebody within the
15 DOJ or DEA elsewhere stole money that I had nothing to do
16 with, that has -- and, again, this is ridiculous, and I
17 don't even -- I shouldn't even be responding to it
18 because it's not factual.
19 BY MR. ENGQUIST:
20     Q.   Okay.  All right.  Your first section under
21 opinions has to do with tunnel vision.  I know we talked
22 about that a bit briefly before, but you're talking about
23 tunnel vision when it comes to prosecuting -- are you
24 talking about tunnel vision when it just comes to

Page 145

1  prosecute -- prosecuting -- or I'm sorry -- investigating
2  Demetrius Johnson, or are you also talking about tunnel
3  vision when it comes to the initial arrest of Bryan
4  Johns?
5      A.   No.  I think the initial arrest of Bryan
6  Johns was appropriate.  I think --
7      Q.   Okay.
8      A.   -- it was good police work.  I think it was
9  good police work.
10     Q.   All right.  So if we're specifically talking
11 about -- when you're talking about tunnel vision in this
12 case, you're talking about tunnel vision when it came to
13 Demetrius Johnson; correct?
14     A.   Well, not -- as it relates to the entire
15 investigation, yes.
16     Q.   When did Demetrius Johnson become a potential
17 suspect in this case?
18     A.   I think like a month after the shooting.  I
19 can give you the exact date, but that's even confusing.
20     Q.   If you want to, you can look at your --
21     MR. SWAMINATHAN:  Yeah.  He's looking at it.
22 BY MR. ENGQUIST:
23     Q.   -- your timeline on there for pages 14 and
24 15.

Page 146

1      A.   Okay.
2      Q.   Okay.  So when did he first become a suspect?
3      A.   Well, the shooting occurred on June 12th.
4  There is some confusion on -- on June 21st.  Apparently,
5  there was some indication that Ricardo Burgos indicated
6  that he was shown a picture of Johnson on that date by
7  the detectives.
8      Q.   Okay.  So is that when he became a suspect,
9  sir?
10     A.   Well, we don't know when he became a suspect
11 because there's no information in the investigative file
12 indicating specifically when he became a suspect.  I can
13 only evaluate what is in the investigative file and the
14 police reports.
15     Q.   Well, that's not true, sir, because you were
16 just putting in part of the testimony from Mr. --
17 Mr. Burgos as part of your database there; correct?
18     A.   Well, that's where I said it was confusing
19 because you asked me when he became a suspect, and I said
20 it was confusing.  If -- to continue on, the first note
21 by law enforcement by the investigators was on June --
22 July 11th.
23     Q.   Okay.  And on July 11th, was Demet -- was
24 Demetrius Johnson in the photo being -- the photo array

Page 147

1  being shown to witnesses?
2      A.   No.
3      Q.   Okay.
4      A.   Not that I know of, anyways.
5      Q.   Okay.  And, well, you -- you've seen the
6  photo array, haven't you?
7      A.   Which one?  There apparently was more than
8  one, but the -- the one that we're -- we're speaking of,
9  yes.  I believe that was shown on July 11th and that
10 Demetrius was not in that photo array.
11     Q.   Okay.  But his brother Darrall was; correct?
12     A.   That's my understanding, yes.
13     Q.   Okay.  And it was from there, based on
14 comments about Darrall Johnson, that they ended up
15 getting a photograph of Demetrius Johnson; correct?  And
16 when I say "they," I mean Detective Halverson and
17 Guevara; correct?
18     MR. SWAMINATHAN:  Objection to form and --
19     Go ahead.
20     THE WITNESS:  That's my understanding, yes.
21 BY MR. ENGQUIST:
22     Q.   Okay.  And until that point, at least from
23 the police work that you've been -- you reviewed, there
24 was no indication of Demetrius being on the radar of any

THOMAS TIDERINGTON, 09/20/2023                          Page 148..151

Page 148

1  investigating officer -- is that correct? -- for this
murder?
2
3      A.   That's my understanding, yes.
4      Q.   Okay.  And then it was after his
5  identification from that photograph is that -- after that
6  point is where lineups were done with the witnesses who
7  testified at trial; correct?
8      A.   No, I don't think it was based on that
9  photograph.  It was a photograph that the investigators
10 ultimately obtained from Daley was the photograph that
11 led to that, yes.
12     Q.   Yeah, yeah.  That's --
13     A.   I think that's what you're --
14     Q.   That's what I was referring to, but thank you
15 for --
16     A.   Okay.
17     Q.   -- the clarification.  So it was after the --
18 after there was comments made about Darrall Johnson that
19 led the detectives to seek out a photograph of Demetrius
20 Johnson; correct?
21     A.   That's my understanding, yes.
22     Q.   Okay.  And then after his identification from
23 that photograph -- when I'm -- after Demetrius Johnson's
24 identification from that photograph is when lineups were

Page 149

1  then upheld having to do with the witnesses that ended up
2  testifying at trial; correct?
3      A.   Essentially, yes.
4      Q.   Okay.  Okay.  And Demetrius Johnson was
5  actually -- when he was in custody after -- after the
6  lineups, he was interviewed -- excuse me -- by an
7  assistant state's attorney; isn't that correct?
8      A.   At some point, yes.
9      Q.   Okay.
10     A.   And when I say "at some point," I think in
11 the police report -- I would have to pull it out to
12 refresh my memory -- but I think they referred to it as
13 the first formal interview, and the first formal
14 interview suggests to me that there were, quote, "other
15 informal interviews," perhaps.
16     Q.   By the ASA?
17     A.   Well, that -- that's a great question.  I
18 would like to know that, and it should have been
19 documented but -- perhaps not by the ASA, but probably by
20 investigators before they met with the ASA.
21     Q.   Well, from your understanding of reviewing
22 other cases here in Cook County, do state's attorneys on
23 felony review document their interviews with witnesses
24 and suspects on their own?

Page 150

1      A.   I'm sorry?  Do --
2      Q.   Do assistant --
3      A.   I'm sorry?
4      Q.   -- state's attorneys in felony review
5  document their interviews of witnesses and suspects on
6  their own?
7      A.   I think some of them have, yes.
8      Q.   You've seen, like, felony review folders
9  where they -- where they put down who they interview?
10     A.   I believe I have, yes.  I mean, it's -- it's
11 typically the officer would document that as well, but I
12 think I've seen reports written by the state attorney's
13 office.
14     Q.   And after going further now into this -- into
15 your report, can you point to any investigative action
16 taken by Erickson after the first night of the shooting?
17     A.   No.  There's no documentation of any further
18 action by Erickson, I don't believe.
19     Q.   Are there any witness statements about
20 Erickson being involved in the investigation after the
21 initial night of the shooting?
22     A.   I don't believe so.
23     Q.   Okay.  Is there any documentation of
24 Halverson being involved with the investigation the night

Page 151

1  of the shooting?
2      A.   The night of the shooting, again, I'd have to
3  look at the police report where -- I certainly can pull
4  it up there, and we can go through it, but certainly
5  Halverson was involved in almost the entire
6  investigation.  Was he there on the night of the
7  shooting?  I don't -- I don't believe he was.
8      Q.   Okay.
9      A.   But I'd have to, again, refresh my memory by
10 looking at the easily accessible police reports to
11 confirm that.
12     Q.   Okay.  Well, let me look at -- if you look --
13 turn to page 20, if you can.  It'd be the third bullet
14 point down or I guess, like, hollowed out bullet point.
15     A.   Okay.
16     Q.   Okay.  It says, "I have not seen any
17 documentation that defendant C" -- "that the defendant
18 CPD investigators ever attempted to determine the caliber
19 of the weapon used to murder Fred."  Do you see that?
20     A.   I do.
21     Q.   Okay.  Now, just earlier in this deposition,
22 we looked at, actually, Mr. -- Mr. Demetrius Johnson's
23 filing in which he talked about the stipulation that the
24 caliber of the weapon used to murder Mr. Fred was .38.

THOMAS TIDERINGTON, 09/20/2023

Page 152

1  Do I need to put that back up?

2      A.   No.  That -- that -- yeah.  But that wasn't

3  as a result of investigative actions.  That's what I was

4  referring to.  I don't believe that the investigators

5  ever determined that.

6      Q.   Oh, okay.  So just to be clear, to determine

7  the caliber of a bullet found in a body, would you expect

8  the detectives or patrol officers to determine the

9  caliber of the bullet that's taken out of a person's

10 body?

11     A.   No, that would not have been their job.

12     Q.   Okay.  Whose job would it have been?

13     A.   Well, their job would have been to look for

14 and attempt to find any potential murder weapon by doing

15 search warrants and by interviewing the suspects.

16 Perhaps the suspects in the van, perhaps they should have

17 been interviewed to find out if there was a second gun

18 that was used, perhaps the .38 caliber, to -- to commit

19 this murder.  It's in no evidence.

20     Q.   Sir -- sir, I'm sorry --

21     MR. SWAMINATHAN:  Hold on.  Please don't -- please

22 don't -- please don't cut him off.  Please, please.

23     Go ahead, Mr. Tiderington.

24     THE WITNESS:  I have not seen -- I have not seen

Page 153

1  any evidence that they interviewed any of the suspects in

2  the van relating to this murder or questioned them about

3  any weapons that were there or no evidence that they

4  tested for gunshot residue on their hands.  These are all

5  basic investigative steps that should have been taken to

6  determine the caliber of weapon that was used to commit

7  the murder.

8  BY MR. ENGQUIST:

9      Q.   Sir, GSR testing doesn't determine caliber of

10 a bullet in a body, does it?

11     A.   No, it certainly doesn't.

12     Q.   Okay.  And, also, sir, when you have in here,

13 "I have seen no documentation that defendant CPD

14 investigators ever attempted to determine the caliber of

15 the weapon used to murder Fred," that's the only part I'm

16 asking about.  And to determine the caliber of the bullet

17 that killed Fred, you would expect someone like a

18 firearms expert to determine that in a lab; correct?

19     A.   Well, that or the detectives at the crime

20 scene locating shell casings.  That would give them a

21 good indication of the caliber.  It wouldn't necessarily

22 mean that that was the weapon that was used to kill him,

23 but certainly, that would have been tangible evidence

24 indicating the caliber of the weapon.  But to your point,

Page 154

1  no, the analysis would have had to have been done by a

2  qualified lab technician and perhaps not even by a

3  stipulation but by a qualified lab technician.

4      Q.   Yeah.  And in this case, the stipulation was

5  about -- firearms expert Richard Chenow determined that;

6  correct?

7      A.   That sounds accurate.

8      Q.   Okay.  So when you put in here that you have

9  not seen any documentation that defendant CPD

10 investigators ever attempted to determine the caliber of

11 the weapon used to murder Fred, would it be improper for

12 them then to rely upon a firearms expert to give them

13 that determination?

14     MR. SWAMINATHAN:  Go ahead.

15     THE WITNESS:  Well, rely in what fashion?  If a

16 firearm expert said, "Hey, I'm pretty sure it was a

17 .38 caliber," then I think the officers would -- should

18 or would have taken that into consideration and sought

19 out the potential weapon they -- with a -- with a -- with

20 a good understanding of what type of weapon they were

21 looking for.

22 BY MR. ENGQUIST:

23     Q.   Okay.

24     A.   Perhaps it was a revolver.  The fact that

Page 155

1  there perhaps were no shell casings on the -- at the

2  crime scene would indicate that it perhaps was a

3  revolver.  If -- if the investigators actually canvassed

4  the crime scene and -- and methodically looked for

5  evidence at the scene, if there were no casings, that

6  would suggest that the two guns that were used were, in

7  fact, revolvers.

8      Q.   Okay.  Were there casings at the scene, sir?

9      A.   Not -- apparently not that were recovered.  I

10 haven't seen any reports indicating that there were

11 casings recovered from the scene.

12     Q.   Okay.  Is there anything improper about

13 detectives relying upon a firearms expert to determine

14 the caliber of a weapon used in a murder?

15     MR. SWAMINATHAN:  Objection.  Asked and answered.

16     Go ahead.

17     MR. ENGQUIST:  I have not got a straight answer on

18 that one time.

19     THE WITNESS:  Well, no.  I thought I answered it

20 straight, but no, I don't think that there would be --

21 BY MR. ENGQUIST:

22     Q.   Okay.

23     A.   -- anything necessarily improper about it,

24 but, again, I would have to -- normally, that

THOMAS TIDERINGTON, 09/20/2023                          Page 156..159

Page 156

1  determination is made by the crime lab; so I guess my
2  only hesitation is, you know, what was the analysis or
3  who did the analysis would be the only factor that I
4  would want to consider.
5       Q.  Sir, are you -- are you saying that you don't
6  believe the analysis that was done by firearms expert
7  Richard Chenow was -- was done properly?  Is that one of
8  your opinions?
9       A.  No, I'm not saying that at all.
10      Q.  Okay.  So the fact that you have not seen
11  documentation of the CPD defendant officers ever
12  attempting to determine the caliber of the weapon used in
13  the murder of Fred is because they didn't determine the
14  bull -- the caliber of the bullet that was used to murder
15  Fred; correct?
16      MR. SWAMINATHAN:  Objection to form and foundation.
17      Go ahead.
18      THE WITNESS:  No.  I described what I believe in --
19  in normal, typical homicide investigations what the
20  investigators should have done, and perhaps, again, maybe
21  they did do all of these things and didn't document it,
22  which would be a deviation; or if they did do these
23  things, then it would be a deviation from acceptable
24  standard.

Page 157

1       So there -- there wasn't a lot of
2  detailed information about who canvassed the crime scene,
3  were they looking -- there -- there was never any mention
4  after the first day by the responding officers who
5  documented the fact that witnesses said there were two
6  shooters and two guns.
7       There is no explanation whatsoever in the
8  investigative file how they concluded that there was a
9  sole gunman and that was their focus, was on identifying
10  the sole gunman when clearly multiple witness said --
11  witnesses said -- and witnesses that were in a better
12  position to see the suspect -- suspects.
13      So there -- again, there was no report
14  that indicates what happened to that second shooter or
15  how they concluded there was only a sole gunman.
16      Q.  Okay.  Sir, if you can, take out your report
17  and look at page 20.
18      A.  Okay.
19      Q.  And the one sentence I was asking you about,
20  the one sentence, "I have not seen any documentation that
21  defendant CPD investigators ever attempted to determine
22  the caliber of the weapon used in the Fred murder,"
23  period.  That's the sentence.  Just -- just let me
24  finish.  That's the sentence I'm asking you about.  Okay?

Page 158

1  That's it.
2       A.  Okay.
3       Q.  I'm not asking you about what further steps
4  they might have done based on any number of things that
5  you talked about.  What I'm asking you is the fact that
6  you have not seen documentation of the CPD defendant
7  investigators attempting to determine the caliber of the
8  weapon used in the Fred murder is because, in fact, that
9  determination was being done by a firearms expert;
10  correct?
11      A.  You're saying "because."  I don't know when
12  that firearms expert was hired by these investigators to
13  determine that.  I can't answer that, but what -- what
14  you're suggesting is not supported in the evidence --
15      Q.  Oh, okay.
16      A.  -- or supported by the evidence.
17      Q.  Okay.
18      A.  I don't know --
19      Q.  Okay.  No, sir, we can -- we can go on with
20  that one.  That's -- that's fine with me.
21      Okay.  At the bottom of page 20, you talk
22  about Demetrius Johnson -- the way you put it -- is
23  "their prechosen suspect."  Okay?  And when you're saying
24  "their" prechosen suspect, who are you referring to as

Page 159

1  "their"?  Who is the person -- who are the people that
2  are choose -- are prechoosing Demetrius Johnson as -- as
3  their suspect?
4       A.  The investigators that were charged with the
5  investigation --
6       Q.  Which ones --
7       A.  -- of this crime.
8       Q.  Which ones prechose him?
9       A.  All of the defendants that were part and
10  parcel to this investigation with perhaps the exception
11  of Daley who was not assigned to investigate that
12  homicide.
13      Q.  And Erickson who was not there?  There's no
14  indication that he was involved in that part of the
15  investigation?
16      MR. SWAMINATHAN:  Objection.  Foundation.
17  Mischaracterizes the evidence.
18      Go ahead.
19      THE WITNESS:  Again, I'd have to go back and -- and
20  look through the reports to find out exactly when
21  Erickson was -- was there.  You're suggesting that he was
22  only there on the day of the shooting.  I don't know if
23  that's the case.
24

THOMAS TIDERINGTON, 09/20/2023                          Page 160..163

Page 160
1 BY MR. ENGQUIST:
2      Q.   Can you point to anything that indicates that
3 he was involved beyond the first night?
4      A.   Again, I'd have to look at the report.
5      Q.   I'll give you five minutes to go through your
6 report if you want to to tell me where it is.  Do you
7 want the time?
8      A.   No.  I'm sorry.  I'd have to look through the
9 permanent retention file, the police reports relating to
10 that.  If you're suggesting that he was only there on
11 that night, I don't think you would lie to me, but I
12 don't know if that's accurate or not.
13     Q.   Okay.  Sir, when you put down things like
14 defendants and defendants or investigators, why don't you
15 ever indicate who did what?
16        MR. SWAMINATHAN:  Objection to form.  Foundation.
17        Go ahead.
18        THE WITNESS:  Well, I stand by my report, and I
19 think it's sufficient.  If you have some observations, I
20 will take it as corrective criticism, and perhaps in the
21 future, I'll explain it in more detail.
22 BY MR. ENGQUIST:
23     Q.   Okay.  Sir, you know, as -- as you hold
24 yourself out to be a police expert here -- and I'm

Page 161
1 assuming you wrote reports as a police officer; correct?
2      A.   I did, yes.
3      Q.   And you've -- and you've already talked
4 before that you reviewed police reports, and then you
5 signed off on them and stood behind them as factually
6 correct; right?
7      A.   That is correct.
8      Q.   If a police officer working under your --
9 under you as their supervisor, sergeant or above, gave
10 you a report where they lumped everybody into one thing
11 as assailants or offenders but never said who did what
12 the entire way through, would that be a proper way to
13 write a report?
14        MR. SWAMINATHAN:  Objection to form.
15        Go ahead.
16        THE WITNESS:  Well, we're talking about two totally
17 different scenarios here.  We're talking about a police
18 report that has the chance of perhaps putting somebody in
19 prison for a long period of time and -- and an expert
20 report.  I'm not serving as a police officer, and I'm not
21 writing this as a -- as a police officer.  I think it's a
22 totally different standard.
23        If my report is lacking and -- and you're
24 suggestion's that it should use additional clarification,

Page 162
1 I will take that under advisement, and I will consider
2 that in the future.  I don't want to confuse you, and I
3 think it is confusing to people that it's -- that I
4 should try to articulate it better in the future, and
5 that's -- that's what I will take away from this.
6 BY MR. ENGQUIST:
7      Q.   Well, sir, do you consider good report
8 writing that when you write it, you don't know who you're
9 referring to?
10        MR. SWAMINATHAN:  Objection to form and foundation.
11 Argumentative.
12        Go ahead.
13        THE WITNESS:  I don't think I -- when you say I
14 don't know who I'm referring to, I did answer the
15 question.  I do know who I'm referring to.  You're asking
16 me is Erickson involved.  I articulated what -- in my
17 mind, what his involvement was based on the police
18 reports, so I stand by my report.
19 BY MR. ENGQUIST:
20     Q.   Okay.  Now, you remark about the fact that on
21 the scene -- the initial -- initial scene, there's
22 indication of potentially two different people -- two
23 different offenders; correct?
24        A.   That's my understanding of what the

Page 163
1 responding officers determined, yes.
2      Q.   Okay.  And the witnesses who testified at
3 trial, how many offenders did they testify to?
4      A.   I don't know exactly what their trial
5 testimony was, but I believe it was relating to only the
6 one -- only the one shooter.
7      Q.   Did anyone at the trial ever testify there --
8 to there being a second offender?
9      A.   Not to my knowledge.
10     Q.   Do you remember any cross-examination of any
11 witness about whether or not there were two offenders at
12 the time of the -- time of the incident?
13     A.   No, but obviously, there should have been.
14     Q.   If there were two offenders, and Bryan Johns
15 is still apparently by you considered to be one of the
16 possible suspects and he's an MLD, would it be reasonable
17 to assume that any other offenders would also be MLDs?
18        MR. SWAMINATHAN:  Objection to form and foundation.
19        THE WITNESS:  I don't know.  I don't know how to
20 answer that, actually.
21 BY MR. ENGQUIST:
22     Q.   Why not?
23     A.   Well, you're asking me to assume.  I -- well,
24 I'm sorry.  Can you ask that one more time and if --

THOMAS TIDERINGTON, 09/20/2023                    Page 164..167

Page 164

1    Q.  Sure.
2    A.  -- you can point -- point specifically to
3  where in the police report you're reading from.
4    Q.  I'm not reading from a report, sir. I'm
5  asking you -- I mean, you reviewed this material. I'm
6  asking you. Bryan Johns was an MLD; correct?
7    A.  When you say MLD, Mexican --
8    Q.  Maniac Latin Disciple, sir.
9    A.  Okay.
10   Q.  Correct?
11   A.  That's my understanding.
12   Q.  Okay. And according to other witnesses, the
13 plaintiff was also an MLD; correct?
14   A.  That's my understanding, yes.
15   Q.  Also according to Terrell Agee or Agee who is
16 Plaintiff's friend, Plaintiff and Bryan Johns were
17 friends; correct?
18   A.  I don't know that. I'm not going to dispute
19 that fact with you, but I don't know that for sure.
20   Q.  Would it be a -- do you think it would be a
21 fair investigative path to go down that if you believed
22 one of the shooters was an MLD to believe that his
23 accomplices would also be MLDs?
24   MR. SWAMINATHAN: Objection to form and foundation.

Page 165

1           But go ahead.
2    THE WITNESS: I don't know if I'm qualified to
3  offer that opinion.
4  BY MR. ENGQUIST:
5    Q.  Why not?
6    A.  Well, because I don't know if that's what the
7  evidence -- I can only review the evidence. You're
8  asking would it make sense? Perhaps. I guess I can
9  follow that logic.
10   Q.  Okay. Well, as an -- as an investigator, I
11 mean, you hold yourself out to be an expert in police
12 investigations; correct?
13   A.  That's correct.
14   Q.  Okay. So if you're dealing with a homicide
15 involving what you believe to be one of the people being
16 a Maniac Latin Disciple, would it be fair to take
17 investigative steps because the other -- the other
18 participants in the crime may also be Maniac Latin
19 Disciples?
20   A.  That's possible. I'm following the logic,
21 yes.
22   Q.  That would be reasonable police work;
23 correct?
24   A.  To conclude that?

Page 166

1    Q.  To investigate that direction.
2    A.  Well, sure. Certainly they should have
3  investigated that, yes.
4    Q.  The next section you have here is about you
5  believe, "The defendants grossly deviated from basic
6  investigative protocols while conducting photo and live
7  lineups with Demetrius Johnson." Do you see that?
8    A.  Oh, I'm sorry. What page are you on?
9    Q.  Page 24. Did you read that heading you
10 wrote, sir?
11   A.  I did, yes.
12   Q.  Okay.
13   A.  Yes.
14   Q.  Once again, I'm going to ask you. It says,
15 "the defendants." Who?
16   A.  Well, I think I've explained it. That would
17 include everyone that had involvement in -- in this
18 investigation, and -- and clearly, it's not a
19 well-documented investigation. There's missing or
20 documents that have not been prepared properly; so it's
21 difficult for me to say exactly who was there and who was
22 not there.
23       To your point, yeah, all of that should
24 have been included in the investigative reports about who

Page 167

1  sat in on which investigation. I think it's obvious that
2  Daley, his involvement was limited to the arrest on the
3  initial day. I don't think I -- I don't think I saw any
4  evidence that he was involved afterwards, but I can't say
5  the same for -- for the other defendants in the case.
6        Erickson -- if you're representing to me
7  that Erickson had nothing to do other than his
8  involvement on the first day, I can't -- I don't have any
9  evidence to dispute that that I recall at this time,
10 anyways.
11   Q.  Okay. So once again, your report just refers
12 to defendants; however, you didn't delineate who you were
13 speaking of, but at least we have some clarification now;
14 correct?
15   MR. SWAMINATHAN: Objection to form.
16       Go ahead.
17   THE WITNESS: Well, I think it's obvious who we're
18 speaking of, and -- and, again, your point is well-taken.
19 In the future, I will try to articulate it more
20 specifically.
21 BY MR. ENGQUIST:
22   Q.  Okay. The first part you talk about here is
23 an undocumented photo array with Ricardo Burgos. Do you
24 see that?

THOMAS TIDERINGTON, 09/20/2023                    Page 168..171

Page 168

1    A.   Yes.

2    Q.   It's on page 25.

3    A.   Yep.

4    Q.   Okay.  And that comes from his trial

5 testimony; is that -- is that fair to say?

6    A.   I believe that's ac -- yes.

7    Q.   Okay.  And did he give the date of June 21st,

8 or did he give an approximation when he was -- when he

9 was giving the date?

10    A.   I think he gave a range or some

11 approximation.

12    Q.   Okay.  And based off that testimony, you

13 believe there was an undocumented photo array; correct?

14    A.   It appears to be, yes.

15    Q.   Okay.  Now, there's also other police reports

16 that indicate that the police officers did not know about

17 Ricardo Burgos until much later in the investigation; is

18 that correct?

19         MR. SWAMINATHAN:  Objection to form.

20         THE WITNESS:  Again, you would have to point me --

21 which police report are you referring to?

22 BY MR. ENGQUIST:

23    Q.   Sir, if you don't know the answer, you can

24 just say you're not -- you don't know.  That's fine.  Or

Page 169

1 if you want to go back and look, you can look on your own

2 time, but I'm asking you is that correct?  If you don't

3 know, you don't know.

4         MR. SWAMINATHAN:  Objection to form, foundation to

5 the extent there's a question there.

6         Go ahead.

7         THE WITNESS:  Well, I'd have to refresh my memory

8 to find out exactly when they learned of his, quote,

9 "existence."

10 BY MR. ENGQUIST:

11    Q.   So you don't know, sir -- is that fair to

12 say? -- as we're sitting here right now?

13         MR. SWAMINATHAN:  Go ahead.

14         THE WITNESS:  As we sit here, I would want to

15 refresh my memory before I answer that to be precise and

16 accurate.

17 BY MR. ENGQUIST:

18    Q.   Okay.  And according to your opinion here,

19 who showed him the undocumented photo array on June 21st,

20 1991?

21    A.   I believe that was Guevara.

22    Q.   And who says that, sir?

23    A.   I don't recall.  That's my recollection.  I

24 could be wrong, but I thought that's the -- I believe

Page 170

1 that's the information I had, and I would have to go back

2 and confirm that.

3    Q.   Okay.  So your -- so -- but you believe that

4 Ricardo Burgos said Guevara showed him a photo array?

5    A.   I would -- again, you know, we're -- we're

6 having this memory test, and I -- you know, as you know,

7 there's a lot of documents.  There's a lot of similar

8 names.  There's a lot of names that individuals were

9 named one way and then mistakenly named another way; so

10 it is somewhat confusing, but all the documents are

11 there, and I certainly could refresh my memory.

12    Q.   So to be clear, if it's just Guevara, the

13 only person you're talking about for this what you

14 believe was an undocumented photo array with Ricardo

15 Burgos would only -- only be involving Defendant Guevara,

16 not any other defendant; is that correct?

17    A.   No.  I don't believe Guevara would have done

18 it alone.  He would have had a partner with him, I

19 believe.

20    Q.   And why do you believe that, sir?  What's

21 your evidence of that?

22    A.   I believe that that's how -- if -- if I

23 remember it correctly, I believe that there was -- that

24 he would document a second officer that would have been

Page 171

1 with him in the police reports.  Let me just take a quick

2 look at the police reports, and perhaps I can clarify

3 this.

4         All right.  So the report that I'm

5 looking at is a report that was signed by Guevara and

6 approved by -- I can't make out the sergeant's name.

7 This would be Bates 0058, 0060 where he talks about he

8 was -- that he -- he summarized what Ricardo Burgos told

9 him.  It doesn't indicate who he was with when he got

10 these statements from Burgos, though.

11    Q.   Okay.  Does it indicate that he's with

12 anybody?

13    A.   It does not.

14    Q.   Are you talking about a sup report?  Oh, this

15 is RFC-Johnson 58 through 60; correct?

16    A.   That's correct.

17    Q.   Okay.  And it's only signed by Detective

18 Guevara, and he's the only detective at the end of the

19 report on page 60; correct?

20    A.   That's correct, yes.

21    Q.   Okay.  And the sergeant who signed it is not

22 Healy; correct?

23    A.   It doesn't look like it, no.

24    Q.   Okay.  Okay.  The next -- next section has to

1  do with an improper photo identification with Elba Burgos
2  and Angel Cordova.  Do you see that there?  It's on
3  page 26.
4      A.   Yes.
5      Q.   Okay.  And what was -- you put down it was
6  improper.  What was improper about the photo
7  identification?
8      A.   Well, Ricardo, it's my understanding that he
9  was interviewed two weeks after the shooting.  He said he
10 was moving -- he was in a moving car driving away from
11 the shooting.
12     Q.   Sir -- sir, I'm sorry.  I hate to interrupt,
13 but I'm talking about the identification with Elba Burgos
14 and Angel Cordova.  It's the first bullet point on
15 page 26, and you started speaking about Ricardo.  That's
16 why I interrupted you.  I'm asking specifically about
17 that part.
18     MR. SWAMINATHAN:  Do you see where he's referring
19 to on page 26, the first -- the first -- the bullet
20 point?
21     THE WITNESS:  Oh, I'm sorry.  I'm sorry.  All
22 right.  Well, obviously the -- the first part of the
23 concern that I have is they -- they took a photograph
24 with three suspects in it.  That's not a proper photo

1  lineup.  Perhaps it's suggestive.  The -- the -- if I
2  remember correctly, Demetrius was the shortest, and
3  there's information that the shooter was a short male.
4          And then they later -- all right.  So
5  they -- they show a photograph of three individuals.
6  First is having a typical lineup that would consist of
7  five or six individual photographs, and -- and you allow
8  the sus -- the witness to go through each one of the
9  photographs and -- and look at them -- view them
10 individually, so that, in my opinion, was highly
11 inappropriate and highly unusual.
12         Then you followed up -- or they followed
13 up.  After the photo identification, they did a live
14 lineup with -- with the same individual that was in the
15 picture in the lineup, so it's -- it's highly suggestive
16 and -- and inappropriate.
17 BY MR. ENGQUIST:
18     Q.   Okay.  Sir, do you hold yourself out to be an
19 expert in eyewitness identification?
20     MR. SWAMINATHAN:  Objection to form.
21         Go ahead.
22     THE WITNESS:  I've been involved in many photo
23 lineups and live lineups, so I would suggest that I have
24 a great deal of experience in that.

1  BY MR. ENGQUIST:
2      Q.   But do you hold yourself out as an expert in
3  eyewitness identifications?
4      A.   I've never been qualified as an expert in --
5  in ident -- eyewitness identification, so I would have to
6  think about that, whether or not I would consider myself
7  an expert.  I don't know.  I've never thought about that.
8      Q.   Well, do you advertise your -- advertise your
9  job at all to get employment as an expert witness?
10     A.   I don't.  No, I don't.
11     Q.   Okay.  Have you ever acted as an eyewitness
12 identification expert?
13     A.   No, not that I can recall.
14     Q.   Okay.  Well, it's 12:30 now, so I guess your
15 taco truck is there.  Why don't we take -- take some time
16 here.  How long do you guys want?
17     MR. SWAMINATHAN:  I think hopefully 30 minutes, we
18 should be able to be done here.  Does that work for you
19 all?
20     MR. ENGQUIST:  Let me just -- let me double-check
21 with everybody else here.
22     Eileen?  Mr. Schalka?  How long do you
23 guys need?
24     MS. ROSEN:  Thirty minutes is fine with me.

1      MR. SCHALKA:  Works for me.
2      MR. ENGQUIST:  Okay with you, Mike?  All right.
3      MR. SCHALKA:  Yeah.
4      MR. SWAMINATHAN:  Thanks, guys.
5      MR. ENGQUIST:  So why don't we -- why don't we come
6  back at 1:00 o'clock then?
7      THE WITNESS:  All right.  Thank you.
8      THE VIDEOGRAPHER:  We're off the video record at
9  12:30 p.m.
10         (Recess taken.)
11     THE VIDEOGRAPHER:  We're back on the video record
12 at 1:30 p.m.
13 BY MR. ENGQUIST:
14     Q.   All right.  Mr. Tiderington, if I can go back
15 to page 25 of your report.  You have listed here -- when
16 you have -- for the section where it says, "Guevara
17 showed Ricardo Burgos a photo array that included
18 Demetrius Johnson," you talk about on June 21st, 1991.
19 You had one cite, and that's to the transcript.  Do you
20 see that there?
21     A.   I do.
22     Q.   Okay.  And I know we already went through
23 that report, and it didn't -- there was no report
24 indicating that.  Have you had a chance to review the

Page 176

1  transcript to see that -- where you got that date from?

2      A.   Did I?

3      Q.   Okay.  Well, you know what?  I'll make it

4  easier.  Why don't I just put it up on the screen.  Okay?

5      A.   Okay.

6      Q.   All right.  This is the transcript from --

7  the criminal trial transcript for Mr. Burgos.  I'm

8  starting on page 182, and if you want to, you can just

9  read through it with me as I scroll and tell me when --

10  tell me when to keep on scrolling down.

11     MS. ROSEN:  Mr. Tiderington, are you looking at the

12  screen?

13     THE WITNESS:  No.  I'm trying to make sure I

14  understand what I'm looking for, so I'm trying to read

15  from page 25 what you're asking me.

16  BY MR. ENGGQUIST:

17     Q.   Okay.  Then let me go back.  On page 25 under

18  the bullet point there, we already talked about to a

19  certain degree --

20     MR. SWAMINATHAN:  Sorry.  Josh, just give him a

21  second.  I think he's looking at his report to orient

22  himself, and I think he'll tell you when he's ready to --

23     THE WITNESS:  Right.

24     MR. SWAMINATHAN:  You want him to look at the

Page 177

1  testimony on the screen; is that right?

2      MR. ENGQUIST:  Yeah.  Because it has to --

3      MR. SWAMINATHAN:  Yeah.

4      MR. ENGQUIST:  -- do with the first sentence in

5  that section.

6      MR. SWAMINATHAN:  So, Josh, I think he's just

7  saying he wants to look at his report to see what you're

8  referring to, and then he's going to -- you'll tell him

9  when you're ready to look at it?

10     THE WITNESS:  Yeah.

11     MR. SWAMINATHAN:  Okay.

12     THE WITNESS:  Okay.

13  BY MR. ENGGQUIST:

14     Q.   Okay.  All right.  So I'm going -- I'm at the

15  pages that you document here to support that fact, that

16  on June 21st, nine days -- nine days after the shooting,

17  Guevara showed Ricardo Burgos a photo array including

18  Demetrius Johnson.  So we're on page 182.  Let me know

19  when I can scroll down, and we'll go all the way through

20  185 -- or 1085.  I'm sorry.

21     A.   All right.  You can scroll down.  Stop.

22  Okay.  All right.  Go ahead.  Go ahead, please.  All

23  right.  This is where he begins talking about it.  I

24  guess there you go.

Page 178

1      Q.   Where does it indicate that he was shown the

2  photos on June 21st, 1991?

3      A.   Well, I didn't -- I was looking at the

4  photographs.  I don't know about the exact date.  I'd

5  have to go back.  I believe that was --

6      Q.   All right.  I'll go back.

7      A.   Well, I believe that was the date.  I....

8      Q.   Well, you have indicated here June 21st, and

9  I was going through the pages.  One -- one mentioned here

10  that you've already read through is now -- now after this

11  incident on June the 12th, sometime later did the police

12  talk to you about the case; and I'm asking you where do

13  you get the June 21st, 1991, date from out of those

14  pages?  Do you want me to keep on scrolling to see if you

15  see it?

16     A.   You know, yeah.  I would -- guess you would

17  have to.  I don't know exactly where I got the date from.

18  I'm assuming --

19     Q.   Okay.

20     A.   -- that it was somewhere in there and --

21     Q.   Well, you'd agree with me you haven't seen it

22  so far, have you?

23     A.   I don't think I've seen is.

24     Q.   Okay.  I'll keep on scrolling down.  Let me

Page 179

1  know when you're done with page 180 -- well, 1083.

2      A.   Okay.

3      Q.   We're on page 1084 now.  Let me know when I

4  can scroll.

5      A.   Okay.  Okay.

6      Q.   This is the rest of ten -- page 1084.

7      A.   All right.  Okay.  Okay.

8      Q.   And that's the end of page 1085.

9      A.   All right.  I don't see it.

10     Q.   Okay.  So would it be fair to say that the

11  pages you cite do not support the fact that he saw a

12  photo array or a photo -- yeah -- a photo array on

13  June 21st, 1991?

14     A.   Well, I don't -- I didn't see it there.  I

15  mean, I don't know if it was elsewhere in the depo or --

16  but the pages that you just scrolled, I did not see it,

17  no.

18     Q.   All right.  And, in fact, on the pages we

19  scrolled through, also -- it also indicated the fact that

20  the photographs that he said he viewed were in court that

21  day, and he was talking about them.  They were cited --

22  they were shown to him as an exhibit; correct?

23     MR. SWAMINATHAN:  Object -- objection to form.  I

24  don't -- I missed the question.

THOMAS TIDERINGTON, 09/20/2023           Page 180..183

Page 180

1         But go ahead.

2       THE WITNESS: Yeah. I don't know if I -- I wasn't

3 looking for that part. I -- you -- I was looking for the

4 section that related to the photo array, so I don't know

5 that I paid attention to that.

6 BY MR. ENGQUIST:

7      **Q. All right. Let me move forward a little bit**

8 **here. Turn to page 26. Are you there in your report,**

9 **sir?**

10     A. I am, yes.

11      **Q. Okay. On page 26 on the very bottom, you**

12 **have a bullet point there having to do with Ricardo**

13 **Burgos. Do you see that?**

14     A. I do.

15      **Q. Okay. I want to direct your attention to**

16 **the, I guess, third sentence that goes on to the next**

17 **page. You have in here, "He testified that he never saw**

18 **the shooting and he would have not been able to make an**

19 **identification," and then you cite to his deposition on**

20 **page 45. Do you see that?**

21     A. I do.

22      **Q. Okay. Sir, you did review his deposition,**

23 **didn't you?**

24     A. At some point, I did, yes.

Page 181

1      **Q. Okay. So you're also aware that Mr. Burgos**

2 **testified that he suffered a head injury and had memory**

3 **issues since that point?**

4     A. I recall something along that -- those lines,

5 yes.

6      **Q. And he also testified that he doesn't recall**

7 **his testimony, but if he test -- whatever he testified to**

8 **back in 1991 was truthful?**

9     A. I believe I recall that. Of course, I can't

10 recall verbatim what he said; but if you're reading from

11 something and that's what he said, I won't dispute that.

12      **Q. However, you don't cite that part of it. You**

13 **only cite the part where he is claiming -- after claiming**

14 **he has a memory issue says he never saw the shooting; is**

15 **that fair to say?**

16     A. Well, I think that's what he testified to.

17      **Q. Okay. And you wrote that down knowing that**

18 **he said he had had a memory problem from an injury;**

19 **correct?**

20     A. Well --

21     MR. SWAMINATHAN: Objection to form. Foundation.

22 Argumentative.

23      Go ahead.

24     THE WITNESS: Well, I don't know if you can say

Page 182

1 that I knew that he had that or -- you know, there --

2 there's a lot of deposition testimony. I think that

3 page -- his deposition testimony was several hundred

4 pages. I don't know what I knew at the time when I wrote

5 that.

6 BY MR. ENGQUIST:

7      **Q. Okay. Well, when you wrote that, that was**

8 **after you read his entire deposition, I'm assuming;**

9 **correct?**

10     A. I would have reviewed his deposition, sure.

11      **Q. Okay. So when reviewing his entire**

12 **deposition, you would have known he was claiming memory**

13 **loss; correct?**

14     A. Well, you're asking me what I -- I'm having

15 memory loss right now. You're asking me what I

16 remembered when I wrote this several months ago. I don't

17 recall specifically what I recalled several months ago

18 when I wrote this --

19      **Q. Okay. Sir --**

20     A. -- and so you're asking me --

21      **Q. No. I'm not asking you if you recall what**

22 **you -- what you remembered several months ago. I'm**

23 **asking you when you reviewed his entire deposition, you**

24 **would have been aware that he claimed to have a memory**

Page 183

1 **problem since the incident --**

2     A. Right.

3      **Q. -- since the shooting; correct?**

4     A. If -- if that was in his deposition, again, I

5 don't have any independent recollection if that's what he

6 said. I vaguely recall there was some discussion about

7 him not being able to remember, but I don't know the

8 specifics of that.

9      **Q. Okay. And you -- and do you recall him**

10 **actually testifying to the fact that everything he**

11 **testified to at the trial was true?**

12     A. You know, you have his depo. I would be --

13 if you want to refresh -- if you're going to ask me

14 questions about his depo, I'd prefer to review his depo;

15 and you can point to specific areas, and that would

16 perhaps refresh my memory of this.

17      As you know, there were many depositions,

18 and there's been many cases. So I want to be precise,

19 and we have the information to review, and if you're

20 going to ask me, I would appreciate if I -- if you gave

21 me an opportunity to review it.

22      **Q. Let's go on to Elba. You have Elba next in**

23 **there, and you testify -- and you have -- in the second**

24 **sentence here, you refer to her deposition where she**

THOMAS TIDERINGTON, 09/20/2023                                    Page 184..187

Page 184

1  testified she never went to the police station in June or
2  July of 1991 and never spoke to Reynaldo Guevara or any
3  other police officer.  Do you see that?
4       A.   I do.
5       Q.   Okay.  Now, sir, from your review of
6  Ms. Burg -- Elba Burgos's deposition, you know, were you
7  aware after reading that that she also didn't -- couldn't
8  recall if she was married, her husband's name, her
9  children's names?
10      A.   I don't know if I recall that or not.  I
11 don't recall it as we sit here today that that's what she
12 said.
13      Q.   Do you --
14      A.   Vaguely recall it, but I don't -- if you're
15 asking me specifically what she testified to and you want
16 me to -- if you're asking me -- how many pages was
17 that -- was that depo?  I think 350 or 340 pages?
18      Q.   So you remember the number of pages, but you
19 don't remember the fact that there was discussion about
20 the fact that she was suffering from a memory problem at
21 that time?
22      A.   No --
23           MR. SWAMINATHAN:  Objection to form.
24 Argumentative.

Page 185

1            Go ahead.
2            THE WITNESS:  No.  If I remembered them -- I was
3  asking how many pages there were.  If I remembered it, I
4  would have -- I would have said that, but I don't recall.
5  But I know many of these depositions are several hundred
6  pages, and you're asking me specific questions about
7  specific lines in the deposition; and without the ability
8  to go back and review it to -- to put it in context and
9  to refresh my memory, it's -- it's difficult for me to do
10 that as we sit here.
11 BY MR. ENGQUIST:
12      Q.   Her deposition is 64 pages -- or 65 pages
13 long, sir.
14      A.   See?  I didn't recall that.
15      Q.   So you do make note that she doesn't recall
16 ever being involved with the police in 1991; however, you
17 do not put in here that Aby Gonzalez, who does not claim
18 to have a memory problem from what I recall, also
19 testified that he -- he did not view the incident; is
20 that correct?
21      A.   Wait a minute.
22           MR. SWAMINATHAN:  Objection to form.  Foundation.
23           Go ahead.
24           THE WITNESS:  Are you -- are you talking about the

Page 186

1  day of the incident when -- when he picked Johns out of
2  the lineup, or are you talking about some other time?
3  BY MR. ENGQUIST:
4       Q.   Sir, we've already been through this.  Aby
5  Gonzalez testified under oath that he wasn't a witness to
6  the crime; remember?
7            MR. SWAMINATHAN:  Objection to form.  Foundation.
8  Argumentative.  What's the question?  Are you asking him
9  if he remembers Aby Gonzalez's testimony?  Is that the
10 question?
11           MR. ENGQUIST:  I'm asking if he remembers if one of
12 the key witness in the case denied actually being a
13 witness to the case.
14 BY MR. ENGQUIST:
15      Q.   Do you remember that, sir?
16      A.   I'm trying to put it in context of -- during
17 the deposition?
18      Q.   Yes.  During the deposition, the only time
19 he's given testimony on the case.
20      A.   Okay.  So I'm not sure what your question is,
21 though.
22      Q.   My question was -- let me just put it this
23 way.  Isn't it true that Aby Gonzalez denied being a
24 witness to the shooting?

Page 187

1            MR. SWAMINATHAN:  Are you saying in his deposition?
2            MR. ENGQUIST:  That is the only time he's ever
3  given any testimony at all.
4            MR. SWAMINATHAN:  Josh, you have to ask the
5  question so he understands what you're referring to.  Are
6  you referring to the police reports or the deposition?
7  If you're continuing --
8            MR. ENGQUIST:  Okay.
9            MR. SWAMINATHAN:  -- to ask him for a memory test
10 about the deposition --
11           MR. ENGQUIST:  Anand, I've asked him -- I've said
12 it over and over again.  I'm talking about his
13 deposition.
14 BY MR. ENGQUIST:
15      Q.   The only time he's ever given any testimony
16 at all about this incident, he denied being a witness;
17 isn't that correct?
18      A.   Again, I think you're -- you are correct, but
19 I would -- in order -- if you're going to ask me specific
20 questions about his deposition, I would appreciate the
21 opportunity to refresh my memory so I can give you a
22 precise answer rather than trying to guess and try to
23 remember what he said.  It's -- it's difficult, and we
24 know we have these documents, and I can easily look at

THOMAS TIDERINGTON, 09/20/2023                    Page 188..191

Page 188
1  them and refresh my memory.
2      Q.   Well, you didn't take it upon yourself to
3  cite to his deposition at all in your report, did you,
4  sir?
5      A.   Well, I'd have to look.  I mean, I didn't
6  type that in my report if that's what you're asking, but
7  I don't know specifically what area in his deposition
8  precisely you're asking me about.
9      Q.   You never refer to his deposition at all in
10  your report --
11     A.   Well --
12     Q.   -- is that true?
13     A.   -- I'm trying to think if I did or not.
14  I'm -- I'm not sure.
15     Q.   Now, you also have Rosa listed here, and you
16  refer -- and you don't refer to her deposition; is that
17  correct?
18     A.   In this bullet point, it was regarding what
19  she -- she told the police on the night of the shooting
20  and as -- as part of their investigation.
21     Q.   Okay.  And do you recall -- do you recall
22  whether or not she was consistent with that in her
23  deposition?
24     A.   I again would have to compare the -- her

Page 189
1  statement to police and with her deposition.  I don't
2  recall as we sit here today.
3      Q.   Let me ask you.  Of the three people you have
4  here listed on pages 26 and 27, Ricardo Burgos, Elba
5  Burgos, and Rosa Burgos, it has -- did any of those three
6  in their deposition ever disavow or recant their sworn
7  testimony from the trial?
8      MR. SWAMINATHAN:  Objection.  Form and foundation.
9          Go ahead.
10     THE WITNESS:  I don't know without reviewing it.
11  BY MR. ENGQUIST:
12     Q.   Do you think that would be an important thing
13  to know, sir?
14     A.   It wasn't important as -- as far as my police
15  practices review of -- of what the officers did.
16  Certainly, it's -- it's something that I would have
17  considered and I probably did consider when I reviewed
18  the depositions; but, again, as we sit here today, I
19  can't say specifically I recall that or how important it
20  was to me because I don't even know -- I don't even know
21  what you're referring to specifically.
22     Q.   Their depositions, sir, the things that are
23  on your --
24     A.   Well --

Page 190
1      Q.   -- in your list of materials that were
2  reviewed.
3      A.   Well, no.  I know, but I don't -- I haven't
4  had an opportunity to refresh my memory specifically
5  about the questions that you're asking me about the
6  deposition.
7      Q.   Whether or not they recanted at all.  That's
8  something that you don't recall; correct?
9      A.   I don't recall that.
10     Q.   Okay.  Now, sir, you did an addendum to this
11  report; isn't that correct?
12     A.   I'm sorry?
13     Q.   You did an addendum to this report?
14     A.   I did.
15     Q.   Okay.  And let me just -- nope.  Not there.
16  Let me see if I can find the right spot here.
17     MR. ENGQUIST:  We're on Exhibit -- is it Exhibit 10
18  right now?  Yeah.  We're on Exhibit 10; correct,
19  Ms. Court Reporter?
20     THE REPORTER:  Correct, yes.
21         (Deposition Exhibit Number 10,
22          Witness Tiderington, was marked
23          for identification 9/20/23.)
24

Page 191
1  BY MR. ENGQUIST:
2      Q.   Okay.  Do you have your addendum with you,
3  sir?
4      A.   I do.
5      Q.   Okay.  Oops.  Give me one second to get it to
6  work.  All right.  So we'll just say we're marking your
7  addendum as Exhibit Number 10, and just to be clear, it's
8  a three-page document.  One page is just the case title.
9  The second page is labeled Background and goes through
10  your addendum, and then the -- the third page is you're
11  just incorporating it into the -- by reference, and
12  you're signing off on it; is that fair to say?
13     A.   Yes.
14     Q.   Okay.  So let's go through your -- and this
15  has to do with receiving and reviewing the Cook County
16  Public Defender information from their file; correct?
17     A.   That's correct, yes.
18     Q.   Okay.  You have it listed as, "I received the
19  Cook County Public Defender file for Demetrius Johnson's
20  proceedings, including notes from Mr. Johnson's public
21  defender, Jack Carey, and his interviews with Mr. Johnson
22  and various witnesses."
23         To be clear -- I mean, let me ask you.
24  Do you believe what you received was a complete public

THOMAS TIDERINGTON, 09/20/2023                    Page 192..195

Page 192

1  defender file?
2      MR. SWAMINATHAN: Objection to form.
3          Go ahead. Answer to the extent you can.
4      THE WITNESS: I don't know what a complete public
5  defender file is, so I can only review what was provided
6  to me. I don't know if that was a complete file.
7  BY MR. ENGQUIST:
8      Q.  Did you see any police reports in it?
9      A.  I don't believe so.
10     Q.  Actually, what you received was something
11  that was marked as privileged docs; correct?
12     A.  I believe so, yes.
13     Q.  Okay. And it was 30 pages long; is that
14  fair? -- is that correct? Yeah. It was 30 pages long?
15     A.  That's -- I believe so, yes.
16     Q.  Okay. Now, the first thing you have in here
17  is that -- it says, "For example, a straightforward
18  interpretation of Mr. Carey's notes of January 9th, 1992,
19  interview with Rosa Burgos," and you give the page
20  number, "is that Ms. Burgos viewed a lineup the night of
21  the shooting (which was the lineup of Bryan Johns). At
22  that lineup, three participants made identification, and
23  the 'cops said not the guy.'" Do you see that?
24     A.  I do.

Page 193

1      Q.  Okay. Is that consistent with her sworn
2  testimony at trial?
3      A.  I don't know.
4      Q.  Did you ever compare Mr. -- Mr. Carey's
5  handwritten notes that you said are straightforward --
6  that you had a straightforward interpretation of to the
7  actual sworn testimony of the witnesses?
8      A.  I did not do that comparison, no.
9      Q.  Why not?
10     A.  I didn't do it.
11     Q.  You have in here from your straightforward
12  interpretation of Mr. Carey's notes that three
13  participants made an identification the night of the
14  inc -- night of the shooting; correct?
15     A.  That -- that was my understanding or my
16  interpretation of the notes, yes.
17     Q.  Okay. Now, in this case, you -- in your --
18  in your original report, you talk about two different
19  reports that indicate a lineup being performed or lineups
20  being performed on the night of the incident; correct?
21     A.  Just to clarify, we're talking about
22  Erickson's lineup report and Guevara's lineup report? Is
23  that what you're referring to?
24     Q.  I'm talking -- yeah. Well, in general terms,

Page 194

1  yes. I'm talking about the two lineup reports, one
2  signed off by a supervisor, one not signed off by a
3  supervisor, both indicating a lineup going on the night
4  of the -- night of the shooting -- on the -- on
5  June 12th.
6      A.  I think that's fair. We don't know if it was
7  a lineup or two lineups, but -- but you're correct that
8  there is an investigative mystery there, yes.
9      Q.  Okay. Out of those two reports, did -- do
10  either one of the reports indicate three people making a
11  positive identification?
12     A.  I would have to look at it. I think it was
13  Guevara's report. I don't know. I'd have to refresh my
14  memory with that.
15     Q.  You think Guevara's report indicates three
16  people made a positive identification --
17     MR. SWAMINATHAN: He just said he would have to
18  look at his report. Let him look at his report.
19     MR. ENGQUIST: I'm just clarifying the report,
20  Anand.
21     MS. ROSEN: Stop interrupting.
22     MR. ENGQUIST: Stop.
23  BY MR. ENGQUIST:
24     Q.  Sir, if I have it correctly, do you believe

Page 195

1  that that is the report that indicates there were three
2  identifications made?
3      MR. SWAMINATHAN: Go ahead. Take the time to look
4  at -- he's looking -- he's looking -- he's looking at
5  his -- at the police reports.
6  BY MR. ENGQUIST:
7      Q.  All right. Sir, if you're looking at your
8  police reports, please tell me what you're looking at.
9      A.  I'm looking at the police report of --
10  Guevara's police report of the lineup. That's what
11  you're asking me about; right?
12     Q.  Yes. And, sir, I'm going to ask you --
13     A.  So you're --
14     Q.  -- if you're doing that, sir --
15     A.  Wait a minute.
16     Q.  Sir, let me finish, please.
17     A.  Okay.
18     Q.  If you do start looking at other documents in
19  front of you, since I'm not there because we're doing
20  this remotely even though you're in Chicago, I would need
21  you to tell me what you're looking at and not just start
22  looking at things without telling me what you're doing;
23  is that fair?
24     A.  No. I -- that's fair.

THOMAS TIDERINGTON, 09/20/2023                    Page 196..199

Page 196

1    Q.   The Guevara -- the one you're referring to,
2    is this going to be RFC-Johnson 40 through 42 -- or
3    actually 43 for the backsides?
4    A.   Yeah. I'm getting -- I'm getting there.
5    Q.   I can put it up on the screen. I just want
6    to make sure that's what you're looking at.
7    A.   Yeah, yeah. That would be what I would be
8    looking at.
9    Q.   Okay. Now, in this report, which is also
10   referenced several times in your additional -- original
11   report, does that indicate there were three
12   identifications made the night of the shooting?
13   A.   Wait a minute. I'm not -- I'm not sure.
14   You're -- you're asking me to compare three different
15   reports here; right?
16   Q.   No, I'm not, sir.
17   A.   Well, I'm not following your question.
18   Q.   The way this start -- sir, I'm sorry if
19   you're having trouble following. The way this started
20   off is that -- excuse me -- we were talking about the
21   line from your straightforward interpretation of
22   Mr. Carey's notes. By your interpretation, Ms. --
23   Ms. Burgos -- Rosa Burgos stated that three participants
24   made identifications -- made an identification the night

Page 197

1    of the shooting, and the cops said not the guy.
2    A.   Okay.
3    Q.   So my question is --
4    A.   Hold on. Hold on right there. Can I -- can
5    you pull up that document so I can take a look at what
6    you're referring to so I understand exactly what you're
7    asking me?
8    Q.   It's your addendum report, sir.
9    A.   I know. I don't have the attachments. I
10   don't have that in front of me, and you're asking me
11   questions specifically about the -- Jack Carey's notes.
12   And so if you --
13   Q.   Actually, sir, I'm asking you about your
14   straightforward interpretation.
15   MR. SWAMINATHAN: Yes, and what he's saying is he's
16   referred to it in his -- you're show -- the section of
17   the report that refers to page 21 of 30 of that document,
18   he's asking if you can just put the document up.
19   BY MR. ENGQUIST:
20   Q.   Okay. Sir, I can put the document up later,
21   but I want to know based off your straightforward
22   interpretation that three participants made an
23   identification that night -- that's what we're talking
24   about -- and I had asked you did any police reports

Page 198

1    indicate there were three identifications. You seemed to
2    indicate that you believed Mr. Guevara's did. Does it
3    indicate there were three identifications?
4    MR. SWAMINATHAN: Objection to foundation.
5    Mischaracterizes the testimony.
6    Go ahead.
7    THE WITNESS: Okay. And I'm reading from RFC 42.
8    This is Guevara's report with Erickson's signature on it
9    as well on June 12th or 12 June 91. The area detectives
10   relative to a suspect in the Fred, Edwin, homicide.
11   After four witnesses viewed this lineup, the result of it
12   was negative because the result of the lineup was
13   negative. The subject Johns, Bryan, was released without
14   charging.
15   BY MR. ENGQUIST:
16   Q.   Okay. So after reading that, is it fair to
17   say that there were -- that his report does not indicate
18   three participants made identi -- made an identification?
19   A.   Yeah. That would indicate that, yes.
20   Q.   Okay. The other report that you refer to in
21   your report as the Erickson report, does that indicate
22   there were three identifications made? Do I need to put
23   that one up, too? I can.
24   A.   You might as well if you have it there.

Page 199

1    Q.   Okay. Now this is Bates-stamped
2    RFC-Johnson 26 and 27. Let me know when you want me to
3    scan down.
4    A.   Okay. You can scan down. Okay. So the --
5    the report indicates that three persons viewed the
6    lineup.
7    Q.   Okay. Do you want me to keep on scanning
8    down? You're still on page 1.
9    A.   That's fine, if you'd like. I don't know
10   what other questions you're going to ask me about it.
11   Q.   We're on page 2, and I'll move it down so you
12   can see the full part of the bottom.
13   A.   Okay.
14   Q.   Does this report indicate that three
15   participants made an identification?
16   A.   No.
17   Q.   Okay. The next paragraph, you have another
18   example of your straight -- straightforward
19   interpretation of Mr. Carey's notes is that June 9th,
20   1992, interview with Ricardo Burgos. Talk about that
21   part -- let's see here -- that Mr. Burgos viewed two
22   lineups, one the night of the shooting, the other in
23   July. Do you see that?
24   A.   I do.

THOMAS TIDERINGTON, 09/20/2023                    Page 200..203

Page 200

1    Q.   Okay.  Let me ask you, is there any
2  indication that Mr. Burgos saw a lineup the night of the
3  incident?  And I can go back to the last two reports if
4  you want to look at those again.
5    A.   I don't think -- I don't think there is.
6    Q.   Okay.  Does Mr. Burgos in any of his
7  testimony either at the trial or during his deposition
8  ever indicate that he talked to police the night of the
9  shooting?
10   A.   In his testimony?  I don't know about his
11  testimony.  I'd have to go back and look at the police
12  reports that detail what -- what he told police.
13   Q.   Okay.  Well, sir, when -- even according to
14  your own report, which we've gone through and had issues
15  with about Mr. Burgos -- let me go back to it -- you have
16  the first -- and it is on page 14 of your report, and we
17  talked about this, what was incorrect or correct about
18  it.  But at least -- at least in your initial report, you
19  initially indicated that the first interview with Ricardo
20  Burgos was on June 21st.  That would have been nine days
21  after the shooting?
22   A.   I'm looking through the police reports
23  again to try to understand --
24   Q.   Which --

Page 201

1    A.   -- your question.
2    Q.   And just so -- just so you know, which
3  police -- just so I know, which police reports are you
4  reviewing right now, sir?
5    A.   Guevara's, Bates 40.  Okay.  So here's
6  another investigative mystery, if you will.  I believe --
7  26, 27 -- do I have this right? -- Ricardo Burgos -- and
8  this is 0025.  I don't know if the dates are wrong on
9  this or not, but...
10   Q.   I'm sorry.  What Bates are you looking at,
11  sir?
12   A.   Okay.  There's two different dates on -- on
13  this report.  One is --
14   Q.   Which report are you looking at?
15   A.   I'm looking at Bates 26 and -- twenty -- 25
16  and 26.
17   Q.   And what -- and what report is that?  What
18  date of it?
19   A.   This is the backside of Guevara's report.
20   Q.   The backside of what report?
21   A.   Bates 25.
22   Q.   Okay.  Give me one second.
23   MR. SWAMINATHAN:  He's talking about --
24   MR. ENGQUIST:  Are you talking about the lineup

Page 202

1  report, sir?
2    MR. SWAMINATHAN:  -- the June 23rd, 1991, report.
3  It starts on RFC-Johnson 24 and 25.
4  BY MR. ENGQUIST:
5    Q.   Give me one second.  I have to go to it now.
6  All right.  This is the one we looked at earlier.  Okay.
7  So what is your confusion about RFC-Johnson 24 and 25?
8    A.   I forgot what the question was, to tell you
9  the truth, but on -- on this report, it indicates
10  June 23rd, 1991.
11   Q.   Okay.  All right.  So my question was -- just
12  going back to what my question was -- are there any
13  reports that indicate that Mr. Burgos talked to the
14  police at -- during the night of the shooting or at the
15  night of the shooting?
16   A.   I don't believe so.  Again, as we sit here, I
17  don't recall if he did or not, but I would have to go
18  back and go through my report, but I think June 23rd
19  seems to be right.
20   Q.   Okay.  And, sir, just to be clear,
21  Mr. Burgos's testimony at trial also indicated -- didn't
22  indicate that he saw the -- he talked to the police the
23  night of the shooting; isn't that correct?
24   A.   I don't know what his testimony was without

Page 203

1  refreshing my memory about it.
2    Q.   So when you do your, as you put in here, your
3  straightforward interpretation of Mr. Carey's notes, you
4  read it to believe that he saw two lineups, one the night
5  of the shooting, the other in July; correct?
6    MR. SWAMINATHAN:  His interpretation of the --
7  you're asking him if that's what his interpretation of
8  the notes is --
9    MR. ENGQUIST:  That's what he says.  It says, "A
10  straightforward interpretation of Mr. Carey's notes of
11  June 9th, 1992, interview of Ricardo Burgos, page 13 of
12  30, shows that Mr. Burgos viewed two lineups, one the
13  night of the shooting, and the other in July."  Do you
14  see that?
15   MR. SWAMINATHAN:  Yes.  But that sentence reads if
16  that is what -- if what's described in the notes is what
17  happened, so I'm trying to understand if you're asking
18  him if that's what his interpretation of the notes --
19  that he's saying the notes is a straightforward
20  interpretation or if you're saying that's what really
21  happened in real life.  He's telling you in his report
22  his answer to the latter question.  I guess -- sorry.
23   MR. ENGQUIST:  That's a very long answer, Anand --
24       (Simultaneous speaking.)

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 09/20/2023                    Page 204..207

Page 204

1        MR. SWAMINATHAN:  I apologize.  I apologize.
2   Objection to form and foundation because it's not clear
3   if you're asking him -- anyway, objection to form and
4   foundation.
5   BY MR. ENGQUIST:
6        Q.   So to be clear, what you have in here is your
7   interpretation of the notes; correct?
8        A.   Absolutely.  I don't know if my
9   interpretation's correct.
10       Q.   Okay.  And your interpretation of him viewing
11  a photo or doing some kind of -- I'm sorry -- doing a
12  lineup the night of the shooting isn't consistent with
13  the police reports in this case or Mr. -- Mr. Burgos's
14  testimony; isn't that correct?
15       MR. SWAMINATHAN:  Trial testimony you're asking him
16  about, I think, based on your prior question?
17  BY MR. ENGQUIST:
18       Q.   It could be either testimony.
19       A.   Again, I don't recall what he testified in
20  his deposition or what he testified in trial, and I think
21  if you show me page 13, I might be able to jar my memory
22  and allow me to refresh what I was looking at at that
23  point.
24       Q.   Sure.  Page 13.

Page 205

1        A.   Okay.  And -- and, again, I don't know
2   exactly what he was saying here.  This is an
3   interpretation.  Whether it's right or not, I have no
4   idea.
5        Q.   Okay.  Now, you also indicate that -- the
6   next paragraph of your addendum about Mr. Johnson's --
7   Mr. Carey's interview with Mr. Johnson.  Do you see that?
8        A.   I do.
9        Q.   Okay.  Sir, did you also note from your
10  review of that material that Mr. Carey -- that one of the
11  first things he did in the case was actually do a jail
12  visit and interview of Mr. Johns?
13       A.   I would have to look at the notes, but I
14  vaguely recall that that -- there may have been notes
15  relating to that.  I don't know for sure.
16            (Deposition Exhibit Number 11,
17             Witness Tiderington, was marked
18             for identification 9/20/23.)
19  BY MR. ENGQUIST:
20       Q.   All right.  Let me share my screen with you
21  again.  We'll just mark as Exhibit -- where do I have it
22  down? -- Exhibit Number 11, and this is page -- they're
23  not Bates stamped really well -- but page 3 of it.  It
24  says Demetrius Johnson, the case number, Carey's name.

Page 206

1   Gives the date of 8/28/91.  It says, "Carey, jail
2   visit -- Bryan Johns."  Do you see that?
3        A.   I do.
4        Q.   Okay.  Do you know whether or not Mr. Carey
5   had a previous relationship with Bryan Johns?
6        A.   I don't know that.
7        Q.   Do you know whether or not he ever
8   interviewed him before in -- in any other homicide case?
9        A.   I don't recall that.
10       Q.   Okay.  Would it make a difference to you if
11  you knew that, in fact, Mr. Carey had previously
12  interviewed Mr. Johns in a different homicide case and
13  taken his statement by recording it and then having it
14  transcribed in order to help out his criminal
15  defendant -- client?
16       A.   Would it help me to -- I don't know what the
17  significance of that would have been.
18       Q.   Okay.  Well, would it give you any indication
19  about Mr. Carey's ability to meet with Bryan Johns,
20  record his conversations if he wanted to record them?
21       A.   Well, of course.  Tech -- technology was
22  available for -- to record all these witness statements
23  and conversations, so of course he had the ability to do
24  that, and quite frankly, so did the officers, and none of

Page 207

1   them did that either; but certainly the technology was
2   available, and I would not be surprised that somebody
3   would capture this evidence by tape recording it.
4        Q.   Have you seen any interview notes by
5   Mr. Carey of Bryan Johns?
6        A.   I don't recall if I did or not.
7        Q.   Okay.  Well, I'll represent to you they're
8   not in pages 1 through 30 produced by the public
9   defender's office.
10       A.   Then -- then I've never seen them.
11       Q.   Do you know any reason why Mr. Carey would
12  either not take notes from his interview with Bryan Johns
13  or not produce them to anybody or keep them?
14       A.   I have no idea.
15       MS. ROSEN:  Josh, before you move on, can you show
16  him all 30 pages and make sure that's the extent of the
17  documents that he saw from the public defender's office?
18       MR. ENGQUIST:  I can do that.
19  BY MR. ENGQUIST:
20       Q.   Just making sure we have the same since you
21  don't have it in front of you.  This would be CPD
22  privileged documents, and starting on page 1 -- and I'm
23  going to scan through them slowly --
24       A.   Okay.

THOMAS TIDERINGTON, 09/20/2023                    Page 208..211

Page 208

1    Q.   -- and you just let me know when to stop.  If
2  you don't mind, I'm just going to keep on moving.  That
3  one's --
4    A.   Yeah, that's fine.
5    Q.   Okay.  Don't think you need long on that
6  page.
7    A.   Yeah.  I'm good on that page.
8    Q.   Okay.  We're on page 3 now.
9    A.   Okay.
10   Q.   Page 4.
11   A.   Okay.
12   Q.   Page 5.
13   A.   Wait.  I'm sorry.  Go back, if you would.
14   Q.   Sure.  Let me know when you want me to move.
15   A.   All right.
16   Q.   Page 6.
17   A.   Okay.
18   Q.   Page 7.
19   A.   Okay.
20   Q.   Page 8.
21   A.   I'm good.
22   Q.   Page 9.
23   A.   Okay.
24   Q.   Then the rest of page 9.

Page 209

1    A.   Okay.
2    Q.   Page 10.
3    A.   Yeah.
4    Q.   Page 11.
5    A.   Okay.
6    Q.   Page 12.
7    A.   Right.
8    Q.   Page 13.
9    A.   Okay.
10   Q.   14.
11   A.   All right.
12   Q.   15.
13   A.   Okay.
14   Q.   16.
15   A.   All right.
16   Q.   17.
17   A.   Okay.
18   Q.   Here's 18.
19   A.   Okay.  That's blank.  You can skip through
20 any blank page if you'd like.
21   Q.   Okay.  I just wanted to make sure it's on the
22 record that I'm doing it since we're doing this on --
23   A.   Right.
24   Q.   19.

Page 210

1    A.   Hold on one second here on 19 for a minute.
2  Okay.
3    Q.   And then the remainder of page 19 to make
4  sure you see the whole thing.
5    A.   Yep.
6    Q.   Page 20 is blank.  21.
7    A.   Okay.
8    Q.   The rest of page 21.
9    A.   Okay.
10   Q.   22 is blank.  23.
11   A.   Okay.
12   Q.   Next page.  We're on to page 25 now.
13   A.   All right.
14   Q.   The rest of page 25.
15   A.   Okay.
16   Q.   26, which is blank.  27.
17   A.   All right.
18   Q.   I'll scroll to the bottom of it so you can
19 see the whole thing.
20   A.   Okay.
21   Q.   28, blank.
22   A.   Blank.
23   Q.   29.
24   A.   Okay.

Page 211

1    Q.   The rest of page 29.
2    A.   Yep.
3    Q.   30.
4    A.   All right.
5    Q.   And the rest of page 30.
6    A.   Okay.
7    Q.   Okay.  And to be clear, is that the sum total
8  of the documents you reviewed from the public defender's
9  file?
10   A.   They appear to be, yes.
11   Q.   Okay.  And just to be clear, there were no
12 mention -- there's no mention in that file having to do
13 with interviews -- I'm sorry.  There was no interview
14 notes for Bryan Johns; correct?
15   A.   I don't think there were, that's correct.
16   Q.   Okay.  There's no -- there's no mention of
17 attempting to interview Fina Montanez; correct?
18   A.   I don't recall that there was, no.  And,
19 again, it's my interpretation of his notes.  There very
20 well could have been, but not that I was able to
21 interpret.
22   Q.   Well, do you even know if these are the
23 complete notes of the things that Mr. -- Mr. Carey did
24 when he was working for the defense for Mr. Johnson?

THOMAS TIDERINGTON, 09/20/2023                                    Page 212..215

Page 212

1       MR. SWAMINATHAN: Objection to form and foundation.
2       THE WITNESS: I would have no way of knowing that.
3  BY MR. ENGQUIST:
4       Q.   Okay.  So you don't know whether or not he
5  did interview Aby Gonzalez and just didn't leave notes in
6  his file?
7       A.   I would have no way of knowing that.
8       Q.   Okay.  And you have no idea whether or not he
9  interviewed Fina Montanez or any other witnesses --
10 correct? -- if the notes aren't in the file as they exist
11 today; correct?
12      A.   That's correct.
13      Q.   Sir, I know we touched on it briefly, but I
14 just want to make sure I'm kind of clear on a couple
15 points. While you were working as a supervisor for that
16 task force -- the DEA task force --
17      A.   Right.
18      Q.   -- in Florida, what years was that again?
19      A.   It would have been approximately 1989, 1990,
20 to approximately 1995 -- end of '95, I believe.
21      Q.   Okay.  During that period of time, were you
22 ever accused of misconduct by either anybody in the
23 federal government there or the DEA or the DOJ or your --
24 or the Fort Lauderdale Police Department?

Page 213

1       A.   No.
2       Q.   Okay.  Were any of the members of your team
3  that you supervised accused of misconduct during that
4  period of time?
5       A.   No, and I need to qualify that.  There was an
6  agent within the DEA Fort Lauderdale office that was
7  accused of theft of a sizable amount of money.  He was a
8  DEA supervisor.  He was not under my supervision.  He was
9  working part of a -- on a case that there was a
10 connection to our case, and he was charged, arrested,
11 investigated, and pled guilty.
12      Q.   And no one else was charged in that -- in
13 that investigation; correct?
14      A.   I think his wife might have been charged, but
15 I don't -- no other agents that I know of.
16      Q.   Okay.  Sir, have you ever been accused of --
17 of, like, going to court for, you know, on-duty court
18 detail, you know, for testimony, signing in, and then
19 just leaving and spending your day somewhere else?
20      A.   No.
21      MR. ENGQUIST: I think that's all I have for now.
22 I'll pass the baton there to either Eileen or Mike
23 Schalka.
24      MR. SWAMINATHAN: And so I just want to make a note

Page 214

1  for the record.  It appears at several points in this
2  deposition, Josh, you -- you potentially referred to
3  documents that you have reviewed that you were asking him
4  questions about.  To the extent there are documents that
5  you have reviewed and that you were asking him about in
6  this deposition, those should be produced to us.
7       MR. ENGQUIST: I'm not sure which documents you're
8  referring to right now.
9       MR. SWAMINATHAN: Well, you referred earlier to
10 some -- a DOJ report.  Please produce that report to us.
11 And you've just now referred to some allegations of some
12 kind of time sheet problem or some misappropriation of
13 money or theft.  Please provide those documents to us as
14 well.
15      MR. ENGQUIST: Oh, there's no documents about the
16 allegation of basically ghost payrolling.  That's
17 something I just heard on my own by interviewing people,
18 but there's no documents for me to produce.
19      MR. SWAMINATHAN: Are there any doc -- so please
20 produce documents on the others, if you can do that,
21 please.
22      MR. ENGQUIST: I'll produce to the extent there's
23 anything I need to produce if I'm going to cross him on
24 it, definitely.

Page 215

1       MR. SWAMINATHAN: No, no, no.  I'm -- that's what
2  I'm asking.  You have now crossed him on it --
3       MR. ENGQUIST: And I just gave you my answer.  I'll
4  pass the baton.
5       MR. SWAMINATHAN: No, no, no.  I didn't hear your
6  answer.  Are you saying you will give me those documents,
7  or are you saying you might give me those documents?
8       MR. ENGQUIST: We'll -- we'll produce anything I'm
9  going to be using, yeah.
10      MR. SWAMINATHAN: No, not going to be using.  I'm
11 asking about the things you just used.
12      MR. ENGQUIST: I didn't use anything.  I had no
13 documents in front of me.
14      MR. SWAMINATHAN: No, no, no.  I'm not -- I'm not
15 playing a game.  That's what I'm saying.  I'm not playing
16 a game.
17      MR. ENGQUIST: Neither am I.
18      MR. SWAMINATHAN: You -- no, no, no.
19      MR. ENGQUIST: I have no documents in front of me.
20      MR. SWAMINATHAN: No, no, no.  Stop.  Let me
21 finish.  I want to be very clear.  You have questioned --
22 I'm going to say it again.  You've questioned him twice
23 during this deposition, once about a Department of
24 Justice -- purported Department of Justice report and

THOMAS TIDERINGTON, 09/20/2023                                    Page 216..219

Page 216

1  another time about the report and allegations about
2  somebody stealing money who was a DEA agent or something
3  like that.
4          To the extent you have -- you have looked
5  at any documents and are relying on those documents to
6  question him on those matters, which is what I understand
7  you to have done, you should -- I want those documents
8  produced to us.
9          If your response is because I didn't put
10 those documents in front of me right now when I asked him
11 the question or I didn't show him the document in the
12 deposition; I'm not going to produce it to you, I want
13 that to be really clear because then I'm -- because then
14 I'm going to raise the issue with the court.  But if
15 you're --
16 MR. ENGQUIST:  Okay.
17 MR. SWAMINATHAN:  -- telling me I have -- I have no
18 idea of any of those because I've never seen any such
19 document that even causes me to ask the question; I'm
20 just making the question up out of nowhere, that's fine.
21 So what I'm asking you is to the extent you have
22 documents --
23 MR. ENGQUIST:  Okay.  Anand, I got your -- Anand, I
24 got your point, but just to be clear, the whole part

Page 217

1  about the other DEA agent, he brought that up.  I didn't
2  bring it up at all.
3  MR. SWAMINATHAN:  Okay.  Are you going to -- are
4  you going to -- are there any documents you are going to
5  produce to me based on the questioning today?
6  MR. ENGQUIST:  I'm pretty sure I'm going to, yeah,
7  and you'll see them.
8  MR. SWAMINATHAN:  Say that -- say that again.
9  MR. ENGQUIST:  I have to go find them.  I have to
10 go find them, and I'll produce something to you, Anand.
11 MR. SWAMINATHAN:  Okay.  Thank you.
12 MR. SCHALKA:  I don't have anything to add to
13 Josh's questions.
14 MS. ROSEN:  Good afternoon, Mr. Tiderington.  How
15 are you?
16 THE WITNESS:  I'm fine.  Thank you.  How are you?
17 MS. ROSEN:  I'm good.  I have some questions for
18 you.
19 MR. SWAMINATHAN:  Eileen -- Eileen, sorry.  Just
20 before you start, if you have some questions that will
21 take some time, can we take a quick break?  If you're
22 going to be short, we can --
23 MS. ROSEN:  Yeah.  Sure.  Yeah.  We can do that.
24 If you'd rather take a break now, that's fine.

Page 218

1  MR. SWAMINATHAN:  Let's -- let's take a quick
2  break.
3  THE WITNESS:  Time?
4  MR. SWAMINATHAN:  Oh, you want to know how much
5  time on the record?  Yeah.  Well, why don't we take a
6  break for five minutes, and then Madam Court Reporter,
7  can you let us know the time on the record?
8  THE VIDEOGRAPHER:  We're off the video record at
9  2:27 p.m.
10         (Recess taken.)
11 THE VIDEOGRAPHER:  We're back on the video record
12 at 2:35 p.m.
13 MS. ROSEN:  Did we get a time count -- an
14 accurate...
15 THE VIDEOGRAPHER:  So it's 4 hours and 20 minutes,
16 which does include the previous deposition.
17         EXAMINATION
18 BY MS. ROSEN:
19 Q.  Okay.  All right.  Mr. Tiderington --
20 A.  Yes, ma'am.
21 Q.  -- by my count, this is the sixth report that
22 you have done and the sixth deposition that you have done
23 related to Guevara cases.  Does that seem right to you?
24 A.  It does.  That sounds right.  I would have to

Page 219

1  go back, and I don't know if I've ever counted them up,
2  but that sounds right.  And if you're looking at
3  something, I would probably -- I would not dispute that.
4  Q.  Well, we can just look at -- if you just look
5  at page 7 of your report, the bottom of the page there,
6  you identify the Reyes and Solache cases; right?
7  A.  Right.
8  Q.  That was the first one that you did; right?
9  A.  Yep.
10 Q.  And then Sierra, that was the second one that
11 you did; right?
12 A.  Yep, yes.
13 Q.  And then Iglesias, that was the third one
14 that you did; right?
15 A.  That's correct.
16 Q.  And then we have the Maysonet case; right?
17 A.  Yes.
18 Q.  And we have the Gomez case, which is not on
19 here because I think you did this report before you did
20 the Gomez report?
21 A.  Right, I think, yes.
22 Q.  And then this case; right?
23 A.  That is correct.
24 Q.  Okay.  So that's six.  With respect to the

THOMAS TIDERINGTON, 09/20/2023                    Page 220..223

Page 220
1  methodology that you used in the context of arriving at
2  your opinions in these six cases, did you use the same
3  methodology each time?
4      A.  I would have, yes.
5      Q.  Okay.  And with respect to the materials that
6  you were provided for each case, did you review all of
7  the materials cover to cover, or did you review some of
8  the materials cover to cover and other materials to some
9  lesser extent?
10      MR. SWAMINATHAN:  Eileen, are you asking in the
11  instance of this particular Johnson report or the
12  overall -- across all the cases?
13      MS. ROSEN:  Yeah.  I'm asking him just generally
14  about his methodology across the cases.
15      THE WITNESS:  Yeah.  I would look at all of the
16  material that's provided.  I would spend more time on
17  certain documents that I felt are -- are more relevant
18  than perhaps documents involving legalese or lawyery type
19  stuff.  I don't know if I spent a lot of time on stuff I
20  didn't understand.
21      Or if there were hundreds of pages of
22  autopsy reports, I don't think I'd be looking at how many
23  bullets were shot into the body versus the science behind
24  the autopsy; so if I understand your question, yeah, I

Page 221
1  would spend more time on certain documents and less on --
2  on others.
3  BY MS. ROSEN:
4      Q.  Okay.  And then with respect to your -- the
5  documents you reviewed in this case that was I believe
6  Exhibit 4, did you say you had that in front of you, or
7  you don't?
8      A.  I do not.
9      MS. ROSEN:  Josh, can you screen share that again
10  for me, please?
11      MR. ENGQUIST:  Hold, please.
12      MS. ROSEN:  Thanks.
13      MR. ENGQUIST:  Sorry.  I'm --
14      MS. ROSEN:  No worries.
15      MR. ENGQUIST:  -- busy fighting with my computer,
16  so give me one second.
17      MS. ROSEN:  It's all right.
18      MR. ENGQUIST:  Okay.  That's Exhibit Number 4.
19      MS. ROSEN:  Yeah.  If you can just take it to the
20  second page of that.
21  BY MS. ROSEN:
22      Q.  Okay.  So if we look at this Exhibit
23  Number 4, items 1 through 11 apply to Mr. Johnson's
24  criminal prosecution; is that right?

Page 222
1      A.  It appears so, yes.
2      Q.  I guess except for one, which is his civil
3  complaint in this case; right?
4      A.  Yes.
5      Q.  And then also I guess except for number 8,
6  which appears to be some kind of a report from the
7  Serrano investigation.  Do you know if that is specific
8  to Mr. Johnson's case or if it's unrelated?
9      A.  It would be unrelated.
10      Q.  Okay.  And so we have -- item number 2 is the
11  CCSAO file, so that's what was produced to you with
12  respect to the Cook County State's Attorney's Office
13  file; right?
14      A.  That's correct.
15      Q.  And Mr. Engquist asked you some questions
16  earlier about that about whether or not you had noticed
17  that there was a notation in that file that they couldn't
18  find their trial file.  So do -- as you sit here today,
19  do you have an assumption one way or the other about
20  whether or not you have the complete CCSAO file?
21      A.  I don't know.
22      Q.  Okay.  And then the investigative file, the
23  records division file, some photographs, Mr. Johnson's
24  criminal trial transcripts, some pleadings having to do

Page 223
1  with his post-conviction proceeding, and I don't see here
2  a note -- a reference to the Cook County Public Defender
3  file; right?
4      A.  That would not have -- yeah.  I wouldn't
5  have -- I wouldn't have had that when I did this report.
6      Q.  Okay.  And that's because you didn't get the
7  note that we talked about just a little bit ago, Exhibit
8  Number 11, until after you had prepared your report;
9  correct?
10      A.  That -- that is correct, yes.
11      Q.  Do you know one way or the other if there are
12  other documents that the parties have in this case that
13  also come from the Cook County Public Defender's file?
14      A.  I don't know.
15      Q.  Okay.  So other than the 30 pages that make
16  up Exhibit Number 11 that are mostly notes prepared by
17  Public Defender Carey, you have not seen any other
18  documents that were obtained and are maintained in the
19  Cook County Public Defender file; is that correct?
20      A.  I don't think so.
21      MS. ROSEN:  Okay.  Josh, you can take that down.
22  Thank you.
23  BY MS. ROSEN:
24      Q.  All right.  Now, in terms of your opinions

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 09/20/2023                                    Page 224..227

Page 224

1 regarding the City of Chicago's policies and practices,
2 we've talked about your opinions in that regard over --
3 over I guess every single one of these depositions that
4 you've already given; so I'm not going to retread old
5 territory --
6     A.   Okay.
7     Q.   -- but I do have some specific questions
8 about your methodology with respect to your opinions in
9 that regard and, specifically, your file comparison and
10 the opinions that you've articulated in your -- in this
11 report and the other reports that are almost identical
12 regarding what you've discovered based on a review of the
13 investigative file, the records division file, the PD
14 files that you have been provided.  So that's where I
15 want you to sort of think -- that's where all of my
16 questions are going to be focused.  Okay?
17    A.   Okay.
18    Q.   So in the Solache/Reyes case, you were
19 provided file -- the investigative files and the records
20 division files and some public defender files that span
21 the years 1995 to 1998; is that correct?
22    A.   I'm getting to that section here.
23    Q.   Yeah.  I think it -- you say it -- in this
24 report, you identify the date of that.  I think it's the

Page 225

1 bottom of 31 into the top of page 32.
2     A.   Okay.
3     Q.   Right.  So it's -- the time period from
4 Solache/Reyes was '95 to '98; right?
5     A.   Oh, I'm sorry.  Yes.
6     Q.   Okay.  And you had the investigative files,
7 the records division files, and then some criminal
8 defense files; right?
9     A.   Yes, that is correct.
10    Q.   Okay.  And you recall -- right? -- that
11 Solache/Reyes was the first of the cases where you --
12 first of the Guevara cases where you provided an expert
13 report and the first deposition that you gave; right?
14    A.   I believe that was the first one, yes.
15    Q.   Okay.  And at your first deposition in the
16 Solache/Reyes cases, I made you aware that in the
17 Solache/Reyes cases, the parties had also obtained some
18 Cook County State's Attorney files from the 1995 to 1998
19 dataset; right?
20    A.   I vaguely recall that.  It's been a while,
21 but I do vaguely recall you reminding me that, yes, or --
22    Q.   Okay.
23    A.   -- telling me that.
24    Q.   Okay.  And you were not provided those files

Page 226

1 in connection with your opinions in Solache/Reyes;
2 correct?
3     A.   That's correct.
4     Q.   And you have not been provided those files in
5 any of the other five cases that you have reviewed
6 materials for and rendered opinions for; correct?
7     A.   That's correct.
8     Q.   Have you ever asked for them?
9     MR. SWAMINATHAN:  Objection.  That calls for
10 privileged information.  You're asking him about
11 communications between counsel and -- and the witness, so
12 I'm instructing him not to answer.
13 BY MS. ROSEN:
14    Q.   Are you at all concerned that -- strike that.
15         With respect to the Cook County State's
16 Attorney's Office files, you would agree, wouldn't you,
17 that those files may contain information relevant to your
18 opinions; correct?
19    A.   They might, but I don't think they do because
20 I think in each one of my depositions I've asked you or
21 I've asked the opposing counsel to provide me any
22 documents that they feel that I don't have that would be
23 relevant to my opinion, and I haven't received anything.
24    Q.   So the -- the rules do not permit defense

Page 227

1 counsel to provide plaintiff's counsel -- plaintiff's
2 expert with materials.  Those materials have to come
3 through plaintiff's counsel, so I am not permitted to
4 provide you with materials.
5         I will say that in many of these
6 depositions, we have pulled documents as exhibits from
7 the Cook County State's Attorney's file, and maybe when
8 you review those deps someday, you'll see that you've
9 seen some of them; but just so that you know, I am not
10 permitted to give you documents under the rules.
11    A.   Okay.  Thank you.  I appreciate that
12 education.
13    Q.   Sure, sure.  Okay.  In any event, despite the
14 fact that you have been on notice since October 2022,
15 which is when your deposition in Solache/Reyes occurred,
16 you have not asked -- well, strike that.
17         With respect your review of the 1995 to
18 1998 dataset -- and when I use the term "dataset," I mean
19 all -- all of the files -- so the investigative file,
20 the records division files, and whatever criminal defense
21 files we were able to obtain -- my recollection of your
22 previous testimony is that you didn't review every single
23 page of every single one of those files but that you
24 spot-checked them; is that right?

THOMAS TIDERINGTON, 09/20/2023                    Page 228..231

Page 228

1      A.   Yes, ma'am, that would be accurate.
2      Q.   Okay.  And -- and you were spot-checking
3  them, and when you were spot-checking them, you were
4  doing some comparison to the spreadsheet that was
5  provided to you and prepared by individuals at
6  Plaintiff's counsel's office; correct?
7      A.   That would be correct, yes.
8      Q.   Okay.  And my recollection is from
9  Solache/Reyes that as you were doing whatever
10 spot-checking you were doing, you didn't notice any
11 information that was in the spreadsheet that was
12 inaccurate; right?
13     A.   Inaccurate?  I don't know if I did or not.  I
14 don't know -- I didn't verify everything that was in the
15 spreadsheet.
16     Q.   That wasn't -- that wasn't what I was asking,
17 so let me just be clear so that --
18     A.   Okay.
19     Q.   -- you understand that.
20     A.   Okay.
21     Q.   When you were doing the spot-checking, the
22 way I understood the way that you -- your previous
23 testimony on this point was that you would spot-check
24 some of these files, and that while you were

Page 229

1  spot-checking, you would also compare whatever
2  information you were learning from the file to the
3  information that was provided and -- and include it into
4  the spreadsheet; and that for the files that you did
5  spot-check, you didn't notice any errors or inaccuracies;
6  right?  You didn't catch any problems?
7      A.   I think that would be accurate, but I -- but
8  I should say since Reyes, I probably have looked at all
9  of this material on -- on multiple times and probably
10 have looked at all of these files much closer than I did
11 during Reyes and Solache.
12     Q.   So is it your testimony that as -- because
13 you've had so much time with these files that you now
14 have reviewed all of the investigative files, all of the
15 RD files, and all of the criminal defense files in the
16 1995 to 1998 dataset?
17     A.   I don't want to say "all," but I'd -- I'd
18 rather use the word a lot of them.
19     Q.   Okay.  And in the time that you have spent
20 reviewing more of the files from the 1995 to 1998
21 dataset, have you also compared the information that you
22 were learning from the files to the information that was
23 inputted into the spreadsheet by Plaintiff's counsel's
24 team?

Page 230

1      A.   I did look at it.  I don't know if I did a
2  comparison -- an analytical comparison to see if it was
3  100 percent accurate.  I looked at what I thought were
4  deviations in -- in the -- the files, and I saw --
5  certainly saw patterns of things that were missing in
6  these files.  Some of that or most of that probably was
7  reflected in -- in the chart that was prepared by
8  counsel.
9      Q.   Well, correct me if I'm wrong, but I believe
10 that the -- the various tallies that are -- can be found
11 in your report -- right? -- you have -- you -- throughout
12 your report, you note the number of, for example, files
13 that contain notes that aren't written on GPRs or files
14 that are missing the inventory, things like that.  You
15 utilized the spreadsheet to get those numbers; right?
16     A.   I would have, yes.
17     Q.   Okay.  So you were relying on the accuracy of
18 the spreadsheet in order to do that analysis; right?
19 That was your methodology, was to rely on the
20 spreadsheet?
21     A.   That would be accurate.
22     MR. SWAMINATHAN:  Eileen, before you ask the next
23 question, I just want to make -- I'm going to make a
24 standing objection.  I'm just -- I'm going to allow

Page 231

1  some -- some questioning, but I think this is really just
2  rehashing and re-questioning him about the exact same
3  territory we've now covered multiple times.
4          So I'm not stopping the questioning at
5  this point, but -- because I understand some are on the
6  background, and confirming what his methodology was is
7  okay; but I have a standing objection to just
8  re-questioning him about the methodology now that he said
9  he applied the same methodology in this case.
10 BY MS. ROSEN:
11     Q.   Okay.  All right.  And then you also were
12 provided an additional set of data in the Sierra case;
13 right?  That's reflected at the bottom of page 31 of this
14 report?
15     A.   That is correct.
16     Q.   And the Sierra dataset was for the period of
17 time 1991 to 1995; right?
18     A.   That is correct.
19     Q.   And for the Sierra dataset, you were only
20 provided investigative files and what you're calling
21 permanent retention files, which is synonymous with
22 records division files; right?
23     A.   That is correct.
24     Q.   Okay.  But no criminal defense files were

THOMAS TIDERINGTON, 09/20/2023                    Page 232..235

Page 232

1  produced; right?
2      A.   That is correct.
3      Q.   Although you do have some criminal defense
4  files for the 1995 time period because you would have
5  been provided those in the Solache/Reyes dataset; right?
6      A.   That is correct.
7      Q.   Okay.  And so the spreadsheet that you were
8  provided that was prepared by Plaintiff's counsel's team
9  in Sierra has one overlap year; correct?
10     A.   Well, yes, it would.  '95, I guess.
11     Q.   Right.  So ninety -- the '95 -- there is '95
12  data both in Sierra and Solache/Reyes; correct?
13     A.   That's correct.
14     Q.   Did you -- did you notice that before I sort
15  of raised that here today?
16     A.   I don't know if I did.  I mean, I can
17  obviously look at the same thing that you looked at, but
18  I don't know if I recognized that or noticed that.
19     Q.   Okay.  And did you compare the two
20  spreadsheets from Sierra to -- from -- the two
21  spreadsheets, the one from Sierra and the one from
22  Solache/Reyes, to see if the coding for the file for the
23  year 1995 was consistent?
24     A.   I may have at some point over the last couple

Page 233

1  years, but I don't remember specifically if I did.  I
2  certainly didn't do it in preparation for today's
3  testimony.
4      Q.   If, in fact, you did compare the coding for
5  the year 1995 from the Sierra spreadsheet to the coding
6  from 1995 in the Solache/Reyes spreadsheet and you
7  noticed inconsistencies in the coding, would you have
8  noted that in your report -- in any of your reports?
9      A.   Well, I'd have to go back and review that.
10  It's -- it's been quite a while.  When you say
11  "inconsistencies," in -- in what part of my review?
12     Q.   Not inconsistencies in your review.  I'm
13  talk -- I'm focusing -- so just so that we're clear;
14  right?  So you were provided in both Sierra and
15  Solache/Reyes with spreadsheets; right?
16     A.   Right.
17     Q.   And those spreadsheets code information that
18  was obtained from reviewing the files; right?
19     A.   They do.  I would probably want to pull those
20  charts out if you're going to ask a lot more questions
21  about it because I'm just trying to remember from -- you
22  know, and as you know, it's very small print, and there's
23  a lot of different colors on those charts, so I'd have to
24  really look at it to -- to follow and understand what

Page 234

1  you're asking.
2      Q.   I'm not going to be asking you specific
3  questions about any of the columns or any of the
4  information.  I'm just trying to get a general
5  understanding of your methodology and how you used those
6  spreadsheets in arriving at your -- your opinions; so I
7  don't think you're going to -- I don't think that looking
8  at the spreadsheets in any way is going to be helpful --
9      A.   Okay.
10     Q.   -- because these are just sort of general
11  foundational questions about your methodology.
12          With respect -- let me ask you this.
13  With respect to those spreadsheets -- the Sierra
14  spreadsheet and the Solache/Reyes spreadsheet, was -- was
15  it provided to you in Excel format so that you could
16  manipulate it?
17     A.   No, no.  I received it in I believe hard copy
18  large pages.
19     Q.   So it's printed out hard copies, and it was
20  bigger than 8 by -- 8 by 10, I hope?
21     A.   Yes, it was.  I may have gotten an electronic
22  copy, but it would have been a PDF.  It would not have
23  been something I had the ability to manipulate or change
24  or go into is my --

Page 235

1      Q.   Okay.
2      A.   -- recollection, anyways.
3      Q.   Okay.  So having experience in reviewing
4  those spreadsheets, it would have been very difficult for
5  you -- right? -- to have compared the coding from one
6  spreadsheet to the other to notice whether or not there
7  were inconsistencies in anything more than a very cursory
8  way; correct?
9      A.   I don't know how difficult it would have
10  been.  I don't recall doing that, or I don't recall
11  seeing any inconsistencies, but I, you know, certainly
12  would go back and look at them.  If there are
13  inconsistencies, I'd take note of them.
14     Q.   Okay.  Let's -- you said today -- today
15  repeatedly, and my recollection is in your other
16  depositions, you've said it -- you've said the same thing
17  or similar things -- is that you have, in connection with
18  this case and with all the other cases, reviewed a lot of
19  materials that you don't have committed to memory and
20  that this isn't a memory contest and that your report
21  speaks for itself.
22          So I understand that, but I do have some
23  questions about how you utilized the materials that
24  you've been provided as you're developing your opinions.

THOMAS TIDERINGTON, 09/20/2023                    Page 236..239

Page 236

1 So is it fair to say that when you are actually writing
2 your report and developing your opinions that you have
3 the information fresh in your memory when you're writing
4 the report?
5    A.   I would say that that's a fair statement,
6 yes, and accurate.  I would hope so, yes.
7    Q.   Okay.  Let's take a look at page 6 of your
8 report that you have in front of you; right?
9    A.   I can get it.  I thought we were done with
10 it, but I can get it.
11    MR. SWAMINATHAN:  You said page 6?
12    MS. ROSEN:  Page 6, yep.
13    THE WITNESS:  Okay.
14 BY MS. ROSEN:
15    Q.   Sub -- it's subparagraph f.  It says, "I have
16 been provided with information showing that 39 people who
17 were convicted based on investigations Guevara
18 participated in have now had their convictions thrown
19 out."  Do you see that there?
20    A.   I do.
21    Q.   And I think I specifically have asked you
22 about this before.  I don't see a notation anywhere in
23 the materials reviewed portion of your report where these
24 39 cases or people are identified.  I don't see it in any

Page 237

1 of the six reports.  Can you tell me where I would find
2 that information?
3    A.   I think that was communicated to me.  I don't
4 know that I have a cite for that.  I believe that
5 information was communicated to me, or I saw it in a --
6 in a news report or something to that effect.  I'm pretty
7 confident it's -- it's someplace in the -- in my
8 documents, but I wouldn't know where to direct you to
9 look.
10    Q.   And why didn't you include whatever it is you
11 reviewed to arrive at that information in your materials
12 reviewed portion of your -- of any of your reports?
13    A.   Well, perhaps it may have been told to me by
14 counsel or -- I don't know exactly where I got that --
15 that information.
16    Q.   Okay.  In total, you have reviewed -- well,
17 let's go -- let me get to the right place in your report
18 because I'm sure you're not going to remember.  Let's go
19 to page 47 of your report.  Are you there?
20    A.   Okay.
21    Q.   So I'm looking at the chart at the top of the
22 page.  You have reviewed a total -- separate from the
23 files that you've been provided that may not be in these
24 totals for the underlying cases, so separate from

Page 238

1 Mr. Sierra's actual case or Mr. Solache's.  Do you
2 understand what I'm excluding there for just a second?
3 You've been provided 475 investigative files and
4 corresponding permanent retention or records division
5 files from 1991 to 1995; right?
6    A.   Approximately, yes.
7    Q.   Approximately.  You don't think -- you think
8 maybe that's just an approximate number?
9    A.   Well, no.  There were -- if you look at the
10 footnote, there were actually 496 permanent retention
11 files, but 21 of those had no corresponding investigative
12 files.
13    Q.   Oh, I see what you're saying.  The chart is
14 comparables?
15    A.   Correct.
16    Q.   Okay.  I got it.  Thank you for that
17 clarification.  So you have 475 investigative files, 344
18 additional files from the 1995 to 1998 dataset; right?
19    A.   That's correct.
20    Q.   But you don't know how many overlap files
21 there are for the year 1995; right?
22    A.   I don't know.  I'd have to go back and look.
23 I don't know.
24    Q.   Okay.  And then with respect to the

Page 239

1 corresponding permanent retention files, you have in this
2 chart 475 for 1995 to nineteen -- for 1991 to 1995 and
3 341 for 1995 to 1998; right?
4    A.   Yes.
5    Q.   And, again, you don't know how many are
6 overlaps; right?
7    A.   That's correct, I don't.
8    Q.   Okay.  And then you have a total -- for the
9 period of 1991 to 1998, a total of 72 criminal defense
10 files; right?
11    A.   Yes.
12    Q.   Well, actually, if we look at --
13    A.   105, right.
14    Q.   So there were 105 produced but only 72
15 corresponded?
16    A.   That's correct.
17    Q.   Okay.  All right.  And you've received no
18 other -- and you've received no state's attorney files
19 for the 1991 to 1998 time period other than perhaps the
20 state's attorney files you were provided in the six
21 cases -- right? -- from the discovery in the cases?
22    A.   That's correct.
23    Q.   Okay.  All right.  Now let's go back to
24 page 6 of your report.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 09/20/2023                    Page 240..243

Page 240

1    A.   Okay.

2    Q.   At the bottom of page 6, you indicate that

3  it's your opinion that, among other things, the policies

4  and practices of the Chicago Police Department "resulted

5  in the routine failure to disclose documents and

6  information to the criminal defendants."  Do you see that

7  there?

8    A.   I do.

9    Q.   And you are basing that conclusion on a

10 review of 72 criminal defense files; right?

11   A.   Not only that, no.  There -- there's other

12 things.  The OIG report -- I don't know specifically what

13 the date was -- but it indicated that this is a systemic

14 problem even, you know, as recent as, you know, the -- in

15 the last ten years.  There's -- obviously, the Chicago

16 Police Department implemented policies in order to try to

17 correct what they determined was a problem -- a serious

18 systemic problem with their own agency.

19        So it wasn't solely based on my review.

20 I saw what the Chicago Police Department was attempting

21 to do and the policies that they enacted which, quite

22 frankly, were inadequate -- inadequate and -- and didn't

23 fix the problem that they identified themselves that they

24 were trying to correct.  It didn't fix it.

Page 241

1    Q.   The policy change that you're referring to

2  happened when?

3    A.   You know, I don't know the exact date.  Back

4  in -- well...

5    Q.   Are you looking at your report to --

6    A.   Yeah.  If -- I mean, if --

7    Q.   -- answer that question?  That's fine.  I

8  just want you to note that you need to look at your

9  report to answer --

10   A.   Right.

11   Q.   -- the question of when the policy changes

12 occurred.

13   A.   I guess it started back in 1981 when District

14 Judge Milton Shadur conducted a hearing and reached the

15 following conclusions.  I can read these to you.

16   Q.   I don't need you to read them to me.  I can

17 read your report.  I just really wanted to know the date.

18   A.   Well, you know, I don't know the exact date,

19 but '82, there was a teletype.  '83, there was a special

20 order.  Yeah.  I don't know the specific date in which

21 the policy was enacted.  I think it was a problem that

22 they were trying to fix over several years.  '86, there

23 was another special order.

24   Q.   What -- do you know what the difference is

Page 242

1  between the '83 order and the '86 order as you sit here

2  today, or would you have to look at those orders?

3    A.   Well, of course, I'm going to have to look

4  at -- I'm going to --

5    Q.   Okay.

6    A.   -- have to -- yeah.  I don't -- I don't have

7  independent recollection of that.

8    Q.   Okay.  All right.  I do actually have a

9  couple follow-ups as I'm scrolling through the report.

10 So take a look at page 26 of your report.  Mr. Enquist

11 asked you some questions about these particular bullet

12 points with respect to Ricardo Burgos, Elba Burgos, and

13 Rosa Burgos, and I have just a couple follow-ups to that.

14   A.   Okay.

15   Q.   With respect to Ricardo Burgos, you cite for

16 that -- the only citation for that bullet point is his

17 deposition testimony -- correct? -- if you look at

18 footnote 33?

19   A.   Yeah.  I'm just trying to -- I'm trying to

20 recall, but I believe that's correct; but I also believe

21 it was confirmed in the public defender's notes as well,

22 but I don't know if I can connect those two as we sit

23 here at this late hour.  But I think there was some

24 indication that they corroborated what he said here,

Page 243

1  perhaps.

2        MR. SWAMINATHAN:  Eileen, which -- which paragraph

3  are you looking at?  I just didn't hear.

4        MS. ROSEN:  The one about Ricardo that begins at

5  the bottom of page 26.

6  BY MS. ROSEN:

7    Q.   You don't cite his criminal trial testimony;

8  right?

9    A.   No.  As we -- no.  I testified to that a

10 couple times today.

11   Q.   Is there -- was there a particular

12 methodological reason why you chose to cite only to

13 Mr. Burgos's deposition testimony when you also had

14 available to you his criminal trial testimony?

15   A.   I don't know that I ever did a comparison of

16 the two, and as we sit here, I can't tell you exactly

17 what he testified to.

18   Q.   Okay.  And then with respect to Elba Burgos,

19 again, you cite only to her deposition testimony; right?

20   A.   I did, yes.

21   Q.   And then you cite to I think the police

22 report or one of the police reports, RFC-Johnson 18 and

23 19; right?

24   A.   That's correct.

THOMAS TIDERINGTON, 09/20/2023                          Page 244..247

Page 244

1    Q.   Okay.  And you don't cite to her criminal
2  trial testimony; correct?
3    A.   I did not, no.
4    Q.   And I'm going to ask you the same question.
5  Is there a methodological reason why you would only rely
6  on this particular individual's deposition testimony and
7  not her criminal trial testimony?
8    A.   I don't recall what her trial testimony was
9  as we sit here, so I can't really answer that.
10    Q.   When you read Elba Burgos's deposition, did
11  you come away from that deposition with the sense that
12  the parties had located the same Elba Burgos that had
13  testified at Mr. Johnson's criminal trial?
14    A.   I don't -- I don't know if I did or not.  I
15  mean, again, I would have to review the portion of the
16  deposition that you're speaking of.  I don't recall,
17  again, what her trial testimony was or whether it was
18  similar or the same.
19    Q.   Well, I mean, I'm -- my question is not about
20  similarity between the testimony.  My question is about
21  identity.  When you -- I assume you read the entirety of
22  Ms. Burgos -- Ms. Elba Burgos's deposition; correct?
23    A.   I reviewed her deposition.  I can't tell you
24  to what degree.  I don't recall if I read every single

Page 245

1  word in the deposition.
2    Q.   Did you -- do you recall reading in her
3  deposition that she told Plaintiff's counsel that she had
4  never lived at the address that was listed in the police
5  report as her address, and she said she never lived
6  there?
7    A.   I don't -- I don't recall that in the
8  deposition.  I'm not saying it's not there, but you're
9  asking me do I recall that.  I don't.  There were a lot
10  of depositions in this case.
11    Q.   Would you have noted in your report -- well,
12  strike that.
13        And then for Rosa Burgos, you don't cite
14  her deposition testimony; right?
15    A.   I apparently did not, no.  I don't recall
16  specifically what she testified in her deposition.
17    Q.   You had her deposition testimony; right?
18  It's listed as item number 23 on your materials reviewed
19  list.
20    A.   I believe I did, yes.
21    Q.   Okay.  And is it -- was there a -- did you
22  make a methodological choice not to include her
23  deposition testimony at that portion of your report where
24  you were recounting what these different witnesses had to

Page 246

1  say?
2    A.   No.  I didn't make a -- I don't recall
3  specifically making a decision about including the
4  deposition testimony over the trial testimony.  I don't
5  know that I ever did the compare -- I don't know that I
6  ever did a comparison of what they testified to during
7  the trial versus what they testified in deposition.
8    Q.   How would you describe Aby Gonzalez's role in
9  Mr. Johnson's prosecution?
10    MR. SWAMINATHAN:  Objection to form.
11        Go ahead.
12    THE WITNESS:  Well, I never -- I don't think I
13  considered what the -- what Gonzalez's role was in the
14  prosecution.  I considered it in terms of the police
15  practices and the investigation.  I don't know if I ever
16  thought about it in terms of the prosecution.
17  BY MS. ROSEN:
18    Q.   Okay.  How did you think about -- what did
19  you think about his role in the police investigation?
20    A.   Well, clearly, there was a police report
21  prepared indicating that Gonzalez viewed a lineup and
22  identified somebody in the lineup, and that was
23  documented by a police officer.
24    Q.   Did you notice that police -- that

Page 247

1  report, that Erickson report, did not have any
2  supervisors' signatures on it?
3    A.   I did notice that, yes.
4    Q.   And what did you make of that?
5    MR. SWAMINATHAN:  Objection to form.
6        Go ahead.
7    THE WITNESS:  You're asking me to speculate, and
8  that's part of the problem within these investigative
9  files.  There's no explanations for a lot of what these
10  investigators did.  I would have expected that a
11  supervisor would have approved the report.  Maybe it was
12  presented to a supervisor, and the supervisor wouldn't
13  sign it.  I don't know any of that.
14        And, again, that is one of the
15  deficiencies we're sitting here -- a law enforcement
16  professional or commander should be able to take an
17  investigative file and read through it, and it should be
18  like breadcrumbs.  It should lead you from the beginning
19  of the case to a logical conclusion, and there should not
20  be so many mysteries along the way.
21        So can I explain?  No.  And there is no
22  explanation within the investigative file that I reviewed
23  or any of the information that I reviewed indicating why
24  that report was not turned over and why it was not in the

THOMAS TIDERINGTON, 09/20/2023                           Page 248..251

Page 248

1 permanent retention file, why it was not in an inventory
2 sheet, or why it was not provided to the defense. I
3 can't explain any of that.
4 BY MS. ROSEN:
5      **Q.   Did you look at Aby Gonzalez's deposition**
6 **testimony for perhaps some explanation about what**
7 **happened at that lineup or what didn't happen at that**
8 **lineup or if that lineup actually occurred?**
9      A.   Well...
10     **Q.   Can you tell me what you're looking at?**
11     A.   No.  I'm just looking at the report again.
12 But, I mean, if you're suggesting to me today that
13 Erickson lied in his police report when he wrote that, I
14 will have to defer to your judgment that he lied when he
15 prepared it; but there's no other explanation as to
16 what -- what somebody testified in a deposition years
17 later would have no relevance on whether or not an
18 officer prepared a report.
19          If that -- if the officer did not feel
20 that Gonzalez was credible after he wrote the report,
21 there should have been a supplemental report done
22 indicating that -- you know, that this witness is not
23 credible and provide the following reasons, but I did not
24 see that in the investigative file.

Page 249

1      **Q.   And your -- your assumption is that the**
2 **investigative file as it exists today is complete; right?**
3      MR. SWAMINATHAN:  Objection to form.  Foundation.
4 Mischaracterizes his testimony in the report.
5 BY MS. ROSEN:
6      **Q.   You can answer.**
7      A.   Oh, I don't -- I don't believe the
8 investigative file is complete because either one of two
9 things happened.  Either all of the things that these
10 investigators should have done, they either didn't do, or
11 they did do it and they didn't document it, or they
12 violated their own policies not -- by not providing
13 the -- not following the policies by preparing GPRs and
14 incorporating that information into the reports.
15          To go back to the Gonzalez case, I
16 think -- and I must -- may have misinterpreted what
17 you're asking -- but to suggest that because Gonzalez
18 testifies to something years later is the reason why that
19 investigator did not include that report in the
20 investigative file is -- it doesn't make any logical --
21 it doesn't -- it's not logical in my mind.
22     **Q.   So let me just be clear about my question so**
23 **that we have a clear understanding of what it was that I**
24 **was asking you about the investigative file.  Is -- are**

Page 250

1 **your opinions in this case based on your assumption that**
2 **the investigative file that we have today in this case is**
3 **in the same condition as it was back in 1991 and 1992**
4 **leading up to Mr. Johnson's criminal prosecution?**
5      MR. SWAMINATHAN:  Objection to form and objection,
6 asked and answered.
7 BY MS. ROSEN:
8      **Q.   You can answer.**
9      MR. SWAMINATHAN:  And I'll make a foundation
10 objection, too.
11          Go ahead.
12     THE WITNESS:  Well --
13     MS. ROSEN:  I'm asking about an assumption he's
14 making and --
15     THE WITNESS:  -- well, I'm not saying it's an
16 assumption.  I can't answer that question because I
17 don't -- if there's something missing from that file, I
18 have no way of knowing.  There's no documentation, and
19 that was the purpose of having an inventory sheet, and
20 these -- this was the fix that the Chicago Police
21 Department determined.  I have no idea if there's
22 documents that are missing.
23          Now, I can say I've reviewed a lot of
24 Guevara's cases, and to suggest that he wrote 37 GPRs and

Page 251

1 wrote zero GPRs in every other case that I ever reviewed
2 of Guevara, it doesn't seem practical or logical to
3 conclude that this is the only case that he wrote GPRs on
4 because all of the other ones, he did not.  So this case
5 file is pretty consistent with the other Guevara cases
6 that I've looked at -- very consistent, as a matter of
7 fact.
8 BY MS. ROSEN:
9      **Q.   Okay.  I'm going to try this one more time.**
10     A.   Okay.
11     **Q.   I'm asking you --**
12     A.   I apologize.
13     **Q.   Yeah.  I'm asking you whether or not the**
14 **opinions in your report -- right? -- you make assumptions**
15 **in certain circumstances when you're opining; correct?**
16     A.   Well, I guess I would, but we would have to
17 talk specifically about whether or not it was an
18 assumption.  A lot of my assumptions may be supported by
19 information as well, so it still might be an assumption,
20 but it's supported by evidence.
21     **Q.   Okay.  So, for example, in the PD files that**
22 **you were provided, there's a lot of redactions; right?**
23     A.   There's redactions, yes.
24     **Q.   And you were told to assume that the**

THOMAS TIDERINGTON, 09/20/2023                    Page 252..255

Page 252

1 redactions contained privileged information; right?
2     A.   I don't know if I was told that.
3     Q.   Okay.  I'm pretty sure that's what you
4 testified to in Solache/Reyes, that you were told to
5 operate under the assumption that all of the redactions
6 were -- were privileged and that they were redacted by
7 the attorneys because they were privileged.
8     A.   Right.  Oh, I'm sorry.  I thought you were
9 talking about this case.
10    Q.   No.  I'm talking about the seven -- I said --
11 I thought I said -- maybe I didn't.  I thought I said the
12 72 files that you reviewed, there's redactions.  In any
13 event --
14    A.   Okay.  I'm following you now.  I thought we
15 were talking -- you're talking about all the cases in
16 general?
17    Q.   Yeah.  I'm talking about -- right -- the PD
18 files.  Not the file -- right.  So in this case, we got
19 the privileged documents --
20    A.   Right.
21    Q.   -- right?  That's what pages 1 through 30
22 are.
23    A.   Right, right.
24    Q.   You understand that; right?

Page 253

1     A.   Yes.
2     Q.   Okay.  In the other cases, we got files, and
3 there are many pages that are redacted in the other 72
4 files or 105 or whatever the accurate number is; right?
5     A.   That's correct.
6     Q.   Okay.  And you were told to operate under the
7 assumption that those redactions only redacted privileged
8 information and not police reports and not information
9 relevant to your opinions; right?
10    A.   I believe so.  I don't know if it was that
11 specific, but I -- you know, again, I'm not trying to be
12 difficult, but I don't recall specifically what I was
13 told, but it sounds -- I'm not going to dispute what
14 you're saying.  It sounds similar to what I was told,
15 yes.
16    Q.   Okay.  So the opinions that you arrived at
17 based on what documents were in those files were based on
18 that assumption; right?
19    A.   For the most part, yes.  But there's --
20 obviously, if something was redacted, I would still see
21 that it was a GPR, but there might have been redacted
22 information on the GPR; but I would still have recognized
23 a GPR as being prepared in -- in a case, if I'm following
24 your questions.

Page 254

1     Q.   Right.  Except for that in -- in those
2 files -- I don't know if you recall, but in those files,
3 it's whole pages that are redacted; so we don't what the
4 page -- we wouldn't know if it was a GPR or not; right?
5          But in any event, my point is not that --
6 that specific.  My point is that that is an example of
7 you drawing conclusions and rendering opinions based on
8 certain assumptions; right?
9     A.   I guess so, yes.
10    Q.   And so now for this case, with respect to the
11 investigative file that was produced that you've reviewed
12 in this case, are you operating under the assumption that
13 it is in the same condition as it was in 1991 and 1992
14 when Mr. Johnson was arrested and prosecuted?
15    MR. SWAMINATHAN: Objection to form.  Asked and
16 answered.
17    THE WITNESS:  Yeah.  I don't have any way of
18 knowing that.
19 BY MS. ROSEN:
20    Q.   So you're not assuming it one way or the
21 other?
22    A.   No.  I only reviewed the information that was
23 provided.
24    Q.   Okay.  All right.  Let's take a look at

Page 255

1 number 49 -- page 49.  Sorry.
2     A.   Okay.
3     Q.   At the bottom of the page, you have some
4 examples.  You list some RD numbers.  Do you see that
5 there?
6     MR. SWAMINATHAN: You said page 46, Eileen?
7     MS. ROSEN:  Sorry.
8     THE WITNESS:  49.
9     MS. ROSEN:  49.
10    MR. SWAMINATHAN: Sorry.
11    THE WITNESS:  I do.
12 BY MS. ROSEN:
13    Q.   Okay.  And these RD numbers come from either
14 the 1991 to '95 dataset or the '95 to '98 dataset; right?
15    A.   I believe so.  I haven't looked at this in --
16 in a while, and I didn't expect we were going to go over
17 this because I know we did it so many times before, so I
18 don't recall specifically.  I'd have to refresh my
19 memory, but yes.  It seems right.
20    Q.   Is it in -- where else would you have
21 obtained RD numbers if it wasn't from the '91 --
22    A.   No.
23    Q.   -- to '95 dataset or the '95 to '98 dataset?
24    A.   Right.  And I think you're correct in your

THOMAS TIDERINGTON, 09/20/2023                    Page 256..259

Page 256

1  assumption.
2      Q.   Okay.  Thank you.  Okay.  If we go to
3  page 51, you have a heading towards the -- about
4  halfway -- midway through the page.  It says, "Criminal
5  defense files show that important investigative materials
6  are regularly withheld from criminal defendants."  Do you
7  see that there?
8      A.   Yes.
9      Q.   And that portion of your report is based
10  exclusively on the -- the 72 files -- right? -- the
11  72 criminal defense files?
12     A.   Well, compared to -- what were perhaps in the
13  investigative file compared to what's in the permanent
14  retention file, yes.
15     Q.   So it -- but it -- but you're -- that's the
16  basis for the opinions that follow is the comparison
17  between the investigative file, the RD file, and the
18  criminal -- the 72 criminal defense files; right?
19     A.   That's correct.
20     Q.   Okay.  In the Maysonet case, you received
21  some additional files; is that right?
22     A.   I did.
23     Q.   But you got no additional criminal defense
24  files; correct?

Page 257

1      A.   I would have to go back and look and see what
2  I got with the Maysonet.  I don't recall as we sit here
3  today.
4      Q.   Okay.  In any event, had you received
5  additional criminal defense files, they would have been
6  listed in your report; right?
7      A.   In the Maysonet report, yes.
8      Q.   Yes.  That's what I mean --
9      A.   Yes.
10     Q.   -- in the Maysonet.
11     A.   Yes.  Not this report, of course.
12     Q.   And you don't say it in this report.  Even
13  though you have the chart -- right? -- you don't say
14  anything in this report about obtaining -- well, let me
15  ask you this, actually.  Let's go back to your chart.
16  Hold on one second.
17          Okay.  So you had prepared your report in
18  Maysonet before you prepared this report; right?  We
19  talked about that already.  In the chart at page 47, why
20  don't you include the Maysonet file?
21     A.   I don't know.  Actually, I'd have to go back,
22  and I'm thinking whether or not I did the Maysonet before
23  I did this report or not.  If you're looking at the dates
24  and you tell me that that's what I did, I'm not going to

Page 258

1  dispute that.
2      Q.   Well, I'm relying on your report.  You say
3  it.  Like, if we go to the -- hold on.  At the bottom of
4  page 7 of your report you say it, that your opinions here
5  are corroborated in part by what you did in Maysonet.
6      A.   Yes.  Okay.  So it appears that I did do the
7  Maysonet report first.  I can't answer as to why I didn't
8  include that in this report.
9      Q.   Okay.  Okay.  Let's go to page 65 of your
10  report.  This is your discussion about the Fred homicide
11  investigation, the one that Mr. Johnson was prosecuted
12  for.  And if you look at the third paragraph, it says,
13  "It's my understanding that in this case, a criminal
14  defense file was not found."  Do you see that?
15     A.   I do.  I do.
16     Q.   Okay.  So at the time you wrote this report,
17  it was your understanding that there was no portion of
18  the criminal defense file that had been located; is that
19  correct?
20     A.   No portion -- I understood there was not a
21  file.  You know, whether it was a portion of the file or
22  the whole file, I understood there was not a file.
23     Q.   And then afterwards, you were provided
24  30 pages of Mr. Carey's notes basically; right?

Page 259

1      A.   Notes, yes.  That's correct.
2      Q.   Okay.  And to this day, you are unaware of
3  the fact that there are something like 120 additional
4  pages from that file that were located by the parties in
5  this case; correct?
6      A.   I don't know that.
7      Q.   Okay.  Okay.  Let's go to page 66.
8  "Additional information not documented or not disclosed,"
9  that's the section I'm in.  So the first one is the -- it
10  says, "Photo identification procedures."  It says a photo
11  array that contained Mr. Johnson that was shown to
12  Mr. Burgos in June of 1991.  Do you see that?
13     A.   I do.
14     Q.   And that's -- you're referencing there the
15  same thing that we've already talked about today --
16  right? -- that Mr. Engquist asked you some questions
17  about and that I asked you some questions about; is that
18  right?
19     A.   That's correct.  That's correct.
20     Q.   Okay.  And then the next bullet point is,
21  "There are no reports or notes, or any document
22  whatsoever, documenting any interviews of Bryan Johns and
23  the two other men that were arrested with him by Officer
24  Daley shortly after the Fred shooting."  Do you see that?

THOMAS TIDERINGTON, 09/20/2023                          Page 260..263

Page 260

1    A.    I do.

2    Q.    Okay.  So the criticism there is that

3    there's -- you would have expected there to be interviews

4    of Mr. Johns and the two other men, and you would have

5    expected some sort of documentation about those

6    interviews; right?

7    A.    Without a question, certainly.  Yes.

8    Q.    Okay.  And then the last point is that there

9    are no --

10   A.    I mean -- I'm sorry.  Just to be clear on

11   that -- that issue is these individuals were arrested for

12   the murder of -- of Fred, and they fit the description.

13   They were in the location.  Daley I think did a great job

14   as I testified earlier, and there's no documentation of

15   any interview -- investigative interview asking where

16   they were, whether or not they had access to a gun,

17   whether or not -- there was no investigative effort done

18   from my perspective and no real reason to release them.

19   That was never fully documented in the police report,

20   what was the basis for releasing them either.

21        So -- so yes.  To answer your question, I

22   would have expected a detailed interview of these

23   individuals with documentation to support what they asked

24   each one of them.

Page 261

1    Q.    Okay.  Give me one second.  I'll come back.

2    Okay.  And then the final bullet point is that there are

3    no notes anywhere in the file; right?  Not final point.

4    The third point.  Sorry.  Is that there's no notes;

5    right?

6    A.    Well, there's a lot of interviews.  There's a

7    lot of witnesses, and there's nothing to support the

8    details of the interrogations or of the witness

9    statements other than perhaps brief comments in the

10   police report, so to answer --

11   Q.    Well, there are some supplementary reports --

12   right? -- that detail some of these interviews.  Your

13   point here, though, is that there aren't -- that -- it

14   says, "Interview notes.  No GPRs or other notes"; right?

15   A.    Right.

16   Q.    That's what you wrote for that?  Okay.

17   A.    Right.  And I would dispute whether or not

18   they were detailed notes of what somebody said, but

19   that's for another day; but -- but yes, to your point, I

20   was not provided with any GPRs, and as I testified

21   earlier, I've never seen Guevara prepare a GPR in any

22   case, so I wasn't surprised that he didn't prepare one in

23   this case.

24   Q.    There were other detectives involved in this

Page 262

1    case other than Guevara; right?

2    A.    Absolutely.  And --

3    Q.    Do you know what -- what Detective Erickson's

4    habits were with respect to GPRs?

5    A.    Well, and -- and, again, I've been asked this

6    question what each detective did throughout this case,

7    and -- and that is another deviation from acceptable

8    police standards to not document the activities of each

9    individual officer.

10        Perhaps on the one hand, you're

11   suggesting that this file is incomplete, and then you're

12   asking me what each person did, so I don't know which it

13   is.  If there's documentation that these officers did

14   other things, certainly, I think it would be relevant to

15   my opinions; but as far as the detectives -- the way they

16   wrote -- wrote the report, they typically do not specify

17   who did exactly what.  They say R/detectives.  They don't

18   identify who did -- specifically did what -- did what.

19        And generally accepted police practice is

20   an officer is supposed to document his or her activities,

21   not give it to some author to write and tell him to, you

22   know, jot this down in your report; so it's a deviation

23   from acceptable police standards for not -- for an

24   officer not documenting his or her actions.

Page 263

1    Q.    I don't think that was an answer to my

2    question, but I'll let it go.  With the final point --

3    A.    Well, I had to be --

4    Q.    -- with the final point, it has to do with

5    the gun, and I believe you and Mr. Engquist have covered

6    that.  Why don't we take a break so I can take a look at

7    my notes, and I need to check one thing.  I think I have

8    a few more questions, but I need to check something

9    first.

10        MR. SWAMINATHAN:  Five minutes, Eileen, you said?

11        MS. ROSEN:  Yeah.  That's fine.

12        THE VIDEOGRAPHER:  We're off the video record at

13   3:45 p.m.

14        (Recess taken.)

15        THE VIDEOGRAPHER:  We're back on the video record

16   at 3:48 p.m.

17   BY MS. ROSEN:

18   Q.    Mr. Tiderington, you said just a little while

19   ago that Bryan Johns was arrested, and you would expect

20   police reports to say why he was released, whether he was

21   talked to, et cetera, et cetera.  What's the basis for

22   your opinion that Bryan Johns was arrested?

23   A.    Daley said he arrested him.

24   Q.    When did Daley say that?

THOMAS TIDERINGTON, 09/20/2023                          Page 264..267

Page 264

1     A.   Daley said it in his deposition.  Daley said
2  it in his police report.  Daley talked about how
3  surprised he was that he was released.  There's no
4  question that he was arrested.  I don't -- I don't think
5  that's in dispute or I didn't think was in dispute.
6          Daley also said that the occupant of the
7  van -- Elliot, I believe it was -- was charged with the
8  weapon violation, but I think Daley was very clear
9  that -- that he would -- that there was an arrest made,
10  and there was a -- and there was a release of him
11  afterwards.
12     Q.   What police report are you referring to with
13  respect to -- that Daley prepared?
14     A.   Well, it would have been Daley's -- either
15  his police report or his deposition.
16     Q.   Well, you said his police report; right?
17     A.   Well, I said -- I said I believe he said it
18  in both his police report and in his deposition, but let
19  me see if I can find it real quick.  Do you -- do you
20  have his police report up that you can show me?
21     Q.   No.  I don't know which -- what -- what
22  police report you're referring to, so if you have it --
23  you have the police reports in front of you; right?
24     A.   Yeah.  But somehow the Bates numbers got all

Page 265

1  mixed up, but anyways -- oh, here it is.
2     Q.   Can you tell us the Bates number that you're
3  looking at?
4     A.   34 -- RFC-Johnson 34.
5     Q.   34?
6     A.   Yes.  "Subjects and the vehicle were then
7  transported to Area 5 violent crimes for further
8  investigation."  It must -- it must have been in his
9  deposition because he -- he did talk in his deposition
10  about being surprised that they released him and that he
11  was sure that -- that based on the circumstances, that
12  Johns was responsible for the shooting.
13     Q.   Did you see any arrest report for Bryan
14  Johns?
15     A.   Well, I'm reading -- the only report related
16  to -- and, again, you identified another problem within
17  the investigative file.  The only report relating to
18  Johns that I know of was -- was a report by Daley and --
19  and perhaps the lineup report by Guevara.
20     Q.   So you don't see any arrest report for Bryan
21  Johns; right?  You didn't find any arrest report for
22  Bryan Johns?
23     A.   I don't recall if there was or -- no, I
24  don't -- I don't believe there's an arrest report.

Page 266

1     MS. ROSEN:  I don't have any additional questions
2  at this time.
3     THE WITNESS:  Thank you.
4     MS. ROSEN:  Thank you.
5     MR. SWAMINATHAN:  I think -- I think that's
6  everybody on the defense side; right?
7     MR. SCHALKA:  Nothing else from me.
8     MR. SWAMINATHAN:  Yeah.  Okay.  I just have a
9  few -- few follow-up questions.
10             EXAMINATION
11  BY MR. SWAMINATHAN:
12     Q.   Mr. Tiderington, you were asked some
13  questions about your -- I think the phrase used was
14  methodological choices.  Do you recall being asked some
15  questions about that?
16     A.   Yes.
17     Q.   In terms of your methodological choices, did
18  you consider all of the depositions that you were
19  provided in -- in the Demetrius Johnson case?
20     A.   I did.
21     Q.   Did you review all the depositions that you
22  were provided?
23     A.   I would have reviewed them all, yes.
24     Q.   So did you consider all of the depositions

Page 267

1  that you were provided along with the other materials you
2  were provided relating to the Demetrius Johnson matter?
3     A.   I would have, yes, or I did.
4     Q.   And in terms of your methodology in
5  formulating your opinions in this case, did your
6  methodology include considering the entirety of those
7  depositions?
8     A.   It would have, yes.
9     Q.   And did it include considering all of the
10  other evidence that was available to you?
11     A.   It did.
12     Q.   Okay.  And sitting here today, do you have --
13  are you able to sort of speak from memory about specific
14  things that were contained in specific depositions today
15  as you sit here?
16     A.   No, not specifically in -- in all of the
17  depositions.
18     Q.   And would it be fair to say that sitting here
19  today, it's hard to remember specifics about what's
20  contained in each deposition in this matter?
21     A.   It is very difficult.
22     Q.   But the fact that you are not able to
23  specifically recall information contained in particular
24  depositions in this case, does that mean that you didn't

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 09/20/2023                                Page 268..271

Page 268

1 take those depositions into consideration in forming your
2 opinions?
3      A.  I hope that -- no, that's not what that
4 means.
5      Q.  Okay.  All right.  And so to be clear, did
6 you consider the depositions that were provided to you in
7 this matter as part of your methodology in forming your
8 opinions in this case?
9      A.  I did.
10     Q.  Okay.  And so you were asked some questions
11 about the depositions of I think it was Aby Gonzalez,
12 Rosa Burgos, Ricardo Burgos, Elba Burgos.  Did you read
13 and consider all of those depositions?
14     A.  I read all the depositions that were
15 provided, and I considered them, yes.
16     Q.  And did you consider them as part of your
17 methodology in forming your opinions in this case?
18     A.  I would have or I did, yes.
19     Q.  And with regard to your report, was the
20 purpose of your report to provide a thorough -- well,
21 strike that.
22         You were asked some questions about why
23 you didn't cite particular deposition testimony in your
24 report.  Do you recall that?

Page 269

1      A.  I do.
2      Q.  Is it fair to say that you did not cite to
3 every single deposition in this -- that you reviewed in
4 this case?
5      A.  That's totally accurate, yes.  That is.
6      Q.  Is it true that you also did not cite to
7 every single police report that you were provided in this
8 case?
9      A.  That is also accurate.
10     Q.  Is it true that you did not cite to every one
11 of the various pages of the various transcripts that you were
12 provided in this case?
13     A.  That's correct.  I did not.
14     Q.  Sir, was it your purpose in your report to
15 provide a thorough and detailed recounting of every
16 single item of evidence you considered in this case?
17     A.  That was what I attempted to do, and I
18 believe I did.
19     Q.  Okay.  And so in providing a -- strike that.
20         Was your purpose to sort of detail every
21 single thing that you reviewed in this case, or was it to
22 provide a summary generally --
23     A.  Oh.
24     Q.  -- of the information you reviewed in this

Page 270

1 matter?
2      A.  No.
3      MR. ENGQUIST:  Objection --
4      MS. ROSEN:  Objection.  Leading.
5      MR. ENGQUIST:  And asked and answered.
6 BY MR. SWAMINATHAN:
7      Q.  Go ahead.
8      MR. ENGQUIST:  But you can lead him again, I guess.
9 Go for it.
10     THE WITNESS:  No.  If I -- if I provided a very
11 detailed report of every single thing that happened, my
12 report would be thousands of pages long, and it was -- my
13 methodology is to -- is to review a case like I have from
14 the perspective of a police commander, to look at the
15 facts of the case, the investigative files, and determine
16 if -- I assume if these officers were working for me,
17 what decisions -- investigative decisions would I have
18 made by reading their investigative file.  Sometimes
19 they -- we're somewhat more fortunate in these cases
20 because not only do I have the investigator's report
21 and -- oftentimes, I have depositions from witnesses and
22 depositions from suspects.
23         So the methodology that I used to
24 evaluate whether or not the officers acted -- acted

Page 271

1 according to policies, practices, and procedures is the
2 same methodology that I've used throughout my career to
3 determine whether or not an officer, a detective, an
4 investigator acted appropriately.
5 BY MR. SWAMINATHAN:
6      Q.  And would it be fair to say that in your
7 report, there are some places where you do cite a
8 particular -- particular police reports or deposition
9 testimony or transcripts; is that fair?
10     A.  That's correct, I did.
11     Q.  And -- and why did you chose to do that in
12 some instances?
13     A.  Perhaps to -- to highlight certain things.  I
14 don't know if there was any particular reason that I
15 would footnote something and not something else.
16     Q.  Okay.  And was one of the reasons to
17 highlight particular aspects of the evidence that were
18 relevant to particular opinions you were offering in
19 those sections of your report?
20     A.  That would --
21     MS. ROSEN:  Objection.  Leading.
22     THE WITNESS:  That would have been correct, yes.
23 BY MR. SWAMINATHAN:
24     Q.  And so you were asked a number of questions

THOMAS TIDERINGTON, 09/20/2023                Page 272..275

Page 272

1 about, you know, the -- the testimonies of witnesses on
2 pages 26 and 27 of your report. Can you pull that out,
3 please?
4     A.   Okay.
5     Q.   Okay. And you see at the bottom of page 26
6 into page 27 where it talks about -- where you have the
7 last bullet point on page 26 talks about the improper
8 live lineup procedures of Ricardo Burgos, Elba Burgos,
9 and Rosa Burgos. Do you see that?
10    A.   I do.
11    Q.   And then you see listed there some
12 information about -- about various statements or evidence
13 related to Ricardo, Elba, and Rosa. Do you see that?
14    A.   I do.
15    Q.   And you were asked a number of questions
16 about why you didn't cite to the deposition testimony of
17 these particular individuals. Do you recall that?
18    A.   I do, yes.
19    Q.   Okay. Now, just to provide some context,
20 the -- these -- these bullet points on pages 26 and 27,
21 they're a part of a section of your report. What is the
22 overall section of your report that they're contained in?
23 You can take that.
24    A.   No, I'm not going to take it. The overall

Page 273

1 section is, "The defendants grossly deviated from basic
2 investigative protocols while conducting the photo and
3 live lineups with Demetrius Johnson."
4     Q.   Okay. And on pages 24 and 25, you have some
5 paragraphs that talk about eyewitness identification
6 procedures generally; is that true?
7     A.   That's correct.
8     Q.   Okay. And can you generally summarize for us
9 what the opinion is that you're providing at the bottom
10 of page -- you know, on those pages, 24 and 25, in your
11 report in this section?
12    A.   Well, essentially, I'm -- I'm describing that
13 it would be inappropriate for an investigator to show a
14 photograph of one individual to three individuals and
15 then ask that same person to view a live lineup at a
16 later time.
17    Q.   Okay. Are you talking about on page -- the
18 bottom of page 25 there?
19    A.   I am.
20    Q.   Okay. And with regard to the overall
21 section, before we get into the specific details of the
22 pages above that, on the end of page 24 into page 25, you
23 talk about the International Association of Chiefs of
24 Police Law Enforcement Policy Center documents and some

Page 274

1 of those things. Do you see that?
2     A.   I do.
3     Q.   And please just explain for us what the
4 purpose of those -- that section of your --
5     A.   Yeah.
6     Q.   -- report is.
7     A.   Yeah. I was trying to highlight and
8 illustrate that eyewitness identification as the sole
9 basis for closing an investigation is very troublesome
10 and very dangerous. I think there's been enough training
11 in law enforcement communities over the last 20 or
12 30 years for officers to understand that the eyewitness
13 identification is probably -- when you compare it to
14 tangible evidence, the goal is not for an officer to get
15 an eyewitness identification to close the case.
16        It should be -- an eyewitness
17 identification should be paired with tangible evidence to
18 prove somebody either guilty or not guilty, and if you
19 are relying solely on eyewitness -- because it --
20 they're -- it's so unreliable. We spent seven hours
21 talking about what this witness said versus what that
22 witness said.
23        If you're relying solely on eyewitness
24 statements, which is a characteristic of Guevara and

Page 275

1 perhaps Area 5 detectives according to Daley's account of
2 his knowledge of these detectives, it seems their goal is
3 to close the case as quickly as possible rather than to
4 continue to investigate and develop what I call tangible
5 evidence -- the gun, the bullets, the weapon that was
6 used, and so on.
7        And if you are going to use eyewitness
8 identification, then you have to understand that the
9 words that the suspect says or the words that the
10 witnesses say is really all that you're going to have.
11 That becomes tangible evidence. So it's incumbent upon
12 an investigator to capture those words of a witness,
13 whether it's witness identification of a lineup.
14        And certainly the best way to capture it
15 is through tape recording and -- and by this time in 1991
16 or whenever this case occurred, it was standard equipment
17 in -- used in many police departments, and it's quite
18 shocking that the Chicago Police Department did not use
19 this technology that was available since the early --
20 late '70s, I would guess.
21    Q.   And these concerns about the overall
22 reliability of eyewitness identifications in general,
23 were these concerns known within law enforcement in 1991?
24    A.   Oh, absolutely. I recall them when I went

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 09/20/2023                                    Page 276..279

Page 276

1  through the Detroit Police Academy in 1978.
2      Q.  Okay.  Now turning back to the bottom of
3  page 26 into page 27, would it be fair to say that
4  section where you're discussing Ricardo and Elba and Rosa
5  is a section in which you're discussing some of the
6  obvious concerns about the reliability of their
7  identifications?
8      A.  That is, yes.
9      Q.  Okay.  And -- and so in that section there
10  where you talk about -- where you highlight specific
11  aspects of prior statements of Ricardo, Elba, and Rosa,
12  whether it's in police reports or in transcripts or
13  affidavits, whatever it is, was the purpose of that
14  section to highlight everything that those individuals
15  have said in all of their various statements or
16  testimonies in this case, or was it to highlight examples
17  of ways in which they themselves testify to potential
18  unreliability in the identification?
19      MR. ENGQUIST:  Objection.  Leading.
20      MS. ROSEN:  Objection.  Leading.
21      THE WITNESS:  No.  I think it's the latter.  I
22  think any seasoned investigator understands that, the
23  unreliability of a -- of a witness's identification, and
24  I do think that investigators need to take that into

Page 277

1  consideration; and the goal -- the investigative goal
2  should not be, "Let's get two eyewitnesses to identify
3  somebody."
4      There's tangible evidence out there, and
5  if these investigators worked for me, they would have
6  been doing search warrants.  They would have been gun --
7  they would have been conducting gunshot residue, testing
8  on the hands.  They would have been taking taped
9  statements from the witnesses, from the suspects.  They
10  would have documented all of their investigative actions.
11      You wouldn't have had one officer
12  signing with a signature another officer's name on a
13  police report by using their signature.  None of that
14  would have happened, and -- and all of that is a
15  deviation from acceptable police practices.
16  BY MR. SWAMINATHAN:
17      Q.  On the bottom of page 26 into page 27
18  regarding Ricardo, Elba, and Rosa, was your purpose to
19  lay out all of the various things that are said across
20  all of their testimony and all of the evidence in this
21  case and make factual conclusions about whether these
22  were good IDs or bad IDs or true IDs or false IDs?
23      A.  No.
24      MR. ENGQUIST:  Objection.  Leading.

Page 278

1  BY MR. SWAMINATHAN:
2      Q.  Go ahead.
3      A.  That wasn't my purpose.
4      MS. ROSEN:  And asked and answered.
5      THE WITNESS:  That wasn't my purpose.  My purp --
6  BY MR. SWAMINATHAN:
7      Q.  Go ahead.
8      A.  I'm sorry.
9      Q.  Go ahead.
10      A.  My -- my purpose was to demonstrate just
11  that.  There's always going to be -- if four people are
12  standing on the corner and they see a car accident,
13  you're going to get four versions of what happened; so
14  there's always going to be a variation of -- of what
15  witnesses say, and that's -- therefore, the investigation
16  should not end based on the identification of a witness.
17      Certainly, an investigator has to also
18  take into consideration whether or not that witness was
19  in a position to see what that person is claiming
20  happened as well.  I mean, that -- those are all factors
21  that go towards the -- the officer's determination of the
22  credibility of the eyewitness.
23      Q.  Okay.  On pages 26 and seven -- 27 where you
24  talk about specific -- where you cite to specific aspects

Page 279

1  or statements from Ricardo, Elba, and Rosa Burgos, was
2  your purpose to identify that, with regard to the general
3  concerns about reliability of eyewitness identifications
4  in general, there was actually some evidence in this very
5  case that would support those types of concerns even in
6  this --
7      MS. ROSEN:  Objection.  Leading.
8  BY MR. SWAMINATHAN:
9      Q.  Go ahead.
10      A.  Well, certainly.  There's -- there were many
11  instances in this case that support what I just testified
12  to in terms of the unreli -- unreliability of a -- of a
13  witness.
14      Q.  But hopefully, you're not reaching
15  conclusions and making the jury's determination about
16  whether or not these were reliable or accurate or false
17  and so on; is that fair?
18      A.  No.  Not -- I -- no.  I never -- none of my
19  opinions make that determination.
20      Q.  Okay.  I just -- I have a couple questions
21  about your supplemental report, so let's just -- let's
22  just go to your supplemental report.  We don't need to
23  put it up on the screen, but you have -- you have your
24  supplemental report in front of you?

THOMAS TIDERINGTON, 09/20/2023                           Page 280..283

Page 280

1    A.   I do.
2    Q.   You were asked some questions about the
3 portion of your report on page 2 where you talk about a
4 straightforward interpretation of Mr. Carey's notes of
5 his January 9th, 1992, interview with Rosa Burgos.  Do
6 you recall that?
7    A.   I do.
8    Q.   And you were asked some questions about how
9 you concluded that a straightforward interpretation of
10 Mr. Carey's notes was that three participants -- that
11 Ms. Burg -- Ms. Burgos told him that three participants
12 made an identification, and the cop said not the guy.  Do
13 you recall that?
14   A.   I do.
15        MR. SWAMINATHAN:  Okay.  Josh, since I don't have
16 control of the screen, can you put those Carey notes up,
17 please?
18        MR. ENGQUIST:  Not right now.  My Adobe just
19 crashed on me when I was trying to get something else up.
20        MR. SWAMINATHAN:  Do I have share -- oh, I have --
21 I have the ability to share screen.  Okay.  Let me see if
22 this works.  Are you able to see this document on the
23 screen?
24        THE WITNESS:  I do.

Page 281

1        MR. SWAMINATHAN:  Okay.  This -- Josh, what exhibit
2 number is this again?
3        MR. ENGQUIST:  I believe 11.
4 BY MR. SWAMINATHAN:
5    Q.   Okay.  I'm showing you a document marked
6 Exhibit 11.  The first page says Demetrius Johnson 91 CR,
7 Box 489.  I believe it was, as Josh said, Exhibit 11 to
8 the deposition.  He was showing it to you earlier.
9        I'm going to page -- it says at the top
10 of your report, actually.  It's which page -- page 21.
11 Okay.  I'm showing you page 21 of Exhibit 11.  These are
12 the Rosa Burgos January 9th, '92, notes that you were
13 referring to in your report; is that correct?
14   A.   That's correct.
15   Q.   Okay.  And these are the notes that you had
16 said, you know, you'd like to look at these in answering
17 questions about -- about what you said; correct?
18   A.   Yes.
19   Q.   Okay.  And so where you said that you're
20 interpreting the notes to say that Ms. Burgos had
21 communicated to Public Defender Carey that three
22 individ -- three participants made an identification, and
23 the cops said not -- not the guy, can you tell us where
24 in these notes you're taking that from?

Page 282

1    A.   What -- what you're showing there on page 21.
2    Q.   Okay.  And there is a section here that says,
3 "All" -- quote, "All three picked one the last time.
4 Cops said not the guy (the night of the shooting)."  Is
5 that what you're referring to?
6    A.   Yes.  Oh, I'm sorry.  Yes.
7    Q.   Okay.  So -- and those -- you're just simply
8 reciting that based on what's said there, the straight --
9 straightforward interpretation of that is that Ms. Burgos
10 told PD Carey that three people picked someone on the
11 night of the shooting; correct?
12        MS. ROSEN:  Objection.  Leading.
13        THE WITNESS:  Well, correct, and that would be
14 pretty signif -- if that did, in fact, happen, that would
15 be pretty significant because it was never documented in
16 any of the police reports that I saw.
17 BY MR. SWAMINATHAN:
18   Q.   Okay.
19   A.   I don't know if it happened or not.  I'm just
20 saying if -- if that is what that means is what I'm
21 suggesting, that it would be pretty significant.
22   Q.   Okay.  And was that the purpose of your -- is
23 that what you were trying to communicate in your report
24 with regard to that opinion, that if, in fact, what's

Page 283

1 written there is what happened, that would be a deviation
2 from accepted police practices?
3    A.   Oh, absolutely, yes.  I don't know exactly
4 what he meant, and I'm not in a position to determine
5 that.
6    Q.   And counsel asked you if there was any
7 evidence in any of the reports that you've seen in this
8 case that indicated that there had been three
9 identifications on the first night, and your answer was,
10 indeed, you've not seen any reports to that effect;
11 correct?
12   A.   That's correct.
13   Q.   And, indeed, if that's what happened and
14 there are no reports to that effect, would that be a
15 problem?
16   A.   That would be pretty significant, yes.
17   Q.   Okay.  And with regard to the next paragraph
18 regarding -- of your supplemental report talking about
19 Carey's January 9th, 1992, interview with Ricardo
20 Burgos -- let's go back to that one.  Do you see those on
21 your screen there?
22   A.   I do.
23   Q.   Okay.  And this page, it says Ricardo Burgos
24 January 9th, 1992.  Are these the notes you're referring

THOMAS TIDERINGTON, 09/20/2023        Page 284..287

Page 284

1 to in your supplemental report?

2     A. They are.

3     Q. Okay. And in your supplemental report, you

4 say that a straightforward interpretation of the notes is

5 that Mr. Burgos viewed two lineups, one the night of the

6 shooting and the other in July. Where in these notes are

7 you getting that interpretation from?

8     A. "Same guy both. L/V ups" or "L/VUs" or --

9 I --

10     Q. Do you interpret that to be L/Us or lineups?

11     A. Yes.

12     Q. Okay. So same guy, both lineups, and then

13 the next line says, "night of shooting." The next one

14 says, "July lineup." Is that what you were referring to?

15     A. That's what I was referring to, yes.

16     Q. Okay. So that's what you were relying on for

17 your straightforward interpretation?

18     A. And "driving by eastbound," and I believe

19 that was corroborated in the police depart -- in one of

20 the police reports as well.

21     Q. And if that, in fact, occurred, that

22 Mr. Burgos was shown two different lineups in this case

23 including one on the night of the shooting, that's

24 something that should have been documented; correct?

Page 285

1     MS. ROSEN: Objection. Leading.

2     THE WITNESS: Well, certainly. If that happened,

3 then it should have been documented, yes.

4 BY MR. SWAMINATHAN:

5     Q. And did you see any evidence in the report

6 that you reviewed in this case that any such lineups were

7 documented? Ricardo Burgos -- two lineups were

8 documented for Ricardo Burgos?

9     A. No.

10     Q. Okay. And if there was a -- and so if what

11 Mr. Burgos describes -- if what is -- strike that.

12     If what's described in Mr. Carey's notes

13 is true, would that be a deviation from accepted police

14 practices?

15     A. Definitely it would be, yes.

16     Q. Is that what you were trying to communicate

17 in your report?

18     A. It was.

19     Q. And, by the way, counsel asked you a number

20 of times in this deposition whether it was your

21 interpretation that -- that this was a complete file, in

22 other words, was -- were there documents missing from

23 this file. Would it be fair to say that one of the

24 opinions you offered in your 60-something page report in

Page 286

1 this case that, in fact, this appears to be an incomplete

2 file?

3     A. I would suggest to you that it is, yes.

4     Q. And is one of your opinions in your report --

5 disclosed opinions in this case that there are a number

6 of investigative steps that appear to have occurred in

7 this case -- or you would expect to have been -- occurred

8 in this case that are not documented?

9     A. Definitely, yes.

10     Q. And so is it your opinion that this is a case

11 in which a number of ends that you would expect to be

12 documented are, in fact, not documented in the files

13 available to you?

14     A. That would be accurate.

15     MS. ROSEN: Objection -- objection. Leading.

16 leading, leading, leading.

17 BY MR. SWAMINATHAN:

18     Q. Go ahead.

19     A. That would be accurate, yes.

20     Q. Is that consistent with your opinion as you

21 offered in other cases involving the Area 5 homicide

22 detectives?

23     MS. ROSEN: Objection. Leading.

24     THE WITNESS: It -- it is, yes.

Page 287

1 BY MR. SWAMINATHAN:

2     Q. Is it consentient with your findings in your

3 review of the many Area 5 homicide files that you

4 considered across 1991 through 1998?

5     MS. ROSEN: Objection. Leading.

6     THE WITNESS: It is, yes. It is.

7 BY MR. SWAMINATHAN:

8     Q. And is it -- earlier in this deposition, you

9 were asked -- in fact, I think counsel represented to you

10 that it was their position -- the defendants' position

11 that the homicide files available to you in this case are

12 incomplete or missing documents. Is that your

13 understanding of the defendants' position in this

14 deposition?

15     MS. ROSEN: Objection. Form.

16     MR. ENGQUIST: Objection. Asked and answered.

17     MS. ROSEN: Foundation. What are you even talking

18 about, Anand?

19     MR. SWAMINATHAN: I'm talking about what Josh said

20 at the beginning of this deposition which is that the

21 defendants' position is that the files are incomplete.

22     MS. ROSEN: What files?

23     MR. ENGQUIST: I didn't -- I never gave my --

24     MS. ROSEN: He didn't say that.

THOMAS TIDERINGTON, 09/20/2023                    Page 288..291

Page 288

1    MR. ENGQUIST:  Yeah.  I never gave my position on
2    anything, and he's already answered questions about --
3        MR. SWAMINATHAN:  You had asked probably about one
4    hour of questions in this deposition in which Defendants'
5    position is the files are incomplete or missing
6    documents.  Absolutely.
7        MS. ROSEN:  What -- what files are you talking
8    about?
9        MR. SWAMINATHAN:  The police files.  The police
10   files.
11       MS. ROSEN:  There has not been a single question
12   about police files generally being incomplete --
13       MR. SWAMINATHAN:  Oh, of course not.
14       MS. ROSEN:  -- so I object to this line of
15   questioning.  In fact, nobody's asked a bunch of
16   questions about any files other than the files in this
17   case.
18       MR. SWAMINATHAN:  That's what I'm talking about.
19   That's what I'm talking about.  The police files in this
20   case.  That's what I'm talking about.
21       MS. ROSEN:  Oh, my God.
22       MR. SWAMINATHAN:  Okay.  Let me ask the question,
23   but I'm shocked that we're having a debate about whether
24   Defendants have taken a position in this deposition about

Page 289

1    whether they're -- whether they're saying that the
2    Demetrius Johnson police files in this case are
3    incomplete or missing documents, but I'll ask the
4    question.
5        MS. ROSEN:  Okay.  We're not -- so to be clear, the
6    defendants are not taking positions in depositions.
7    Defendants are asking questions in depositions of your
8    expert based on what -- his understandings of things, so
9    Defendants are taking no positions.  They are asking
10   questions.
11       MR. SWAMINATHAN:  I disagree with that, but --
12       MS. ROSEN:  With that in -- with that in mind, you
13   can go ahead and reask whatever you're going to ask.
14       MR. SWAMINATHAN:  I disagree with that, but we
15   don't have to resolve that debate.
16   BY MR. SWAMINATHAN:
17       **Q.  So you were asked a number of questions in**
18   **this deposition -- strike that.**
19       **Is it your understanding that one of the**
20   **assumptions that Defendants were making in a number of**
21   **questions they asked you in this deposition is that the**
22   **Demetrius Johnson police files are, in fact, incomplete**
23   **or missing documents?**
24       MS. ROSEN:  Objection.  Form.

Page 290

1        THE WITNESS:  I was asked a number of times on
2    whether or not I assumed that all of the files were
3    complete.  I was asked that a number of times about what
4    I interpreted to be the Johnson case, yes.
5    BY MR. SWAMINATHAN:
6        **Q.  And you indicated to counsel early in this**
7    **deposition that yesterday you reviewed a document which**
8    **was the Defendants' Responses to Plaintiff's Request to**
9    **Admit number 1.  Do you recall that?**
10       A.  I do.
11       **Q.  And we can pull the document up if we need**
12   **to, but would it be fair to summarize some of what you**
13   **reviewed in that document is the City of Chicago**
14   **admitting that the police files from the Demetrius**
15   **Johnson case are incomplete and/or missing documents?**
16       MS. ROSEN:  So I'm going to object to all of these
17   questions.  First of all, it was a late production to
18   Mr. Tiderington that had nothing to do with any of his
19   disclosed opinions and had nothing to do with the
20   originally disclosed report or the supplemental report,
21   and now you are asking him to supplement his opinions in
22   this deposition.
23       Nobody on the defense side asked a single
24   question about those requests to admit or what the City's

Page 291

1    position was, and the City and the City defendants have
2    never taken a position in this deposition about anything,
3    so we are going to move to bar any answers based on a
4    failure to properly disclose, just so you know.
5    BY MR. SWAMINATHAN:
6        **Q.  Go ahead.**
7        A.  I'm sorry.  Can you ask that --
8        **Q.  Yeah.  Would it be -- and counsel can have**
9    **the same objection to this question.  I stipulate you**
10   **have the same objection just so we can move on.**
11       **Would it be fair to say that in the**
12   **request to admit responses that you reviewed, one of the**
13   **admissions that the City makes is that the Demetrius**
14   **Johnson police files in this case are missing documents?**
15       A.  That's what the documents said that I
16   reviewed, yes.
17       **Q.  And --**
18       MS. ROSEN:  Have you -- Anand, since you have not
19   given us the courtesy of providing us the RTAs that you
20   gave him last night, can you tell me specifically which
21   RTA you're referring to right now?
22       MR. SWAMINATHAN:  I just said RTA number 1, but he
23   specifically said on the record it's RTA 1, 3, and 6.
24

THOMAS TIDERINGTON, 09/20/2023                    Page 292..295

Page 292

1  BY MR. SWAMINATHAN:
2      Q.  Okay.  And putting aside the RTAs for a
3  minute.  Let's not get caught up in a sideshow.  One
4  of -- it is -- is one of your opinions -- is it fair to
5  say that one of your opinions in this case is that there
6  are a number of documents, reports, and notes that you
7  would expect to see in this police file that are missing?
8      MR. ENGQUIST:  Objection.  Leading.
9      THE WITNESS:  Yes.
10  BY MR. SWAMINATHAN:
11      Q.  And so the idea that something could have not
12  happened as a witness described it and it's not contained
13  in any of the police reports available to you, is that a
14  persuasive argument to you?
15      MR. ENGQUIST:  Objection.  Leading and --
16      THE WITNESS:  No.  There's --
17      MR. ENGQUIST:  -- form.
18      THE WITNESS:  -- there's a lot of things that were
19  unexplained in the investigative file.  It doesn't
20  necessarily mean it didn't happen.  Either it wasn't
21  documented; it wasn't put in the file.  I can't -- I
22  don't know what the -- the cause was, but there's
23  certainly a lot of unexplained investigative mysteries
24  that should have been explained in -- in police reports.

Page 293

1  BY MR. SWAMINATHAN:
2      Q.  And in your report, you document various
3  examples of the types of things that you expect to be
4  documented that are not contained anywhere in this
5  file -- in these files available to you?
6      A.  Yes.
7      Q.  And so when counsel -- in light of the fact
8  that the City itself has admitted in its request to admit
9  and it's your own opinion that the files in this case are
10  missing a number of things you would expect to see in a
11  police file, do you accept anybody's representations
12  about what officers participated at what point of this
13  investigation?
14      MR. ENGQUIST:  Objection to --
15      MS. ROSEN:  Objection to form.
16      MR. ENGQUIST:  Yeah.  It's an -- it's an
17  undisclosed improper opinion.
18      MS. ROSEN:  Undisclosed -- undisclosed opinion.
19  BY MR. SWAMINATHAN:
20      Q.  Go ahead.
21      A.  No.  Like I said, there's a lot of
22  investigative actions that were either not documented
23  or -- or if they -- if the investigative steps were
24  taken, there's no documentation of these steps.  Just

Page 294

1  because the fact that it's not in the police report or it
2  doesn't indicate which officer did one thing doesn't
3  necessarily mean it didn't happen.
4      Q.  And is that one of the reasons you regularly
5  use the term "defendants" in your report rather than
6  identifying specific officers?
7      MS. ROSEN:  Objection.  Leading.  In fact, it's
8  contrary to what he testified to.
9      THE WITNESS:  I don't think it's contrary, but
10  that's -- that's one of the -- one of the things in these
11  police reports that I just testified to a little while
12  ago is the detectives refer to themselves as R/dets, and
13  you don't know -- if you're reviewing a case, you don't
14  know who did what in these particular cases.
15      So when I was asked, you know, what did
16  each officer do specifically, it's hard for me to detail
17  exactly what each officer did because there's not enough
18  documentation which, of course, is a deviation from
19  acceptable police standards.
20  BY MR. SWAMINATHAN:
21      Q.  And given the fact that these files appear to
22  be incomplete in terms of documenting the various actions
23  taken by officers, can you say one way or the other
24  whether or not Halverson, for example, was involved in

Page 295

1  this investigation on the first day along with Guevara
2  and Erickson?
3      A.  I can't say whether he was or was not.
4      Q.  And can you say one way or other whether or
5  not Erickson was involved in the investigation beyond the
6  first day in light of the fact that the documents and the
7  police reports appear to be incomplete?
8      A.  I cannot.
9      Q.  Okay.  And is that one of the reasons that
10  you refer in your report regularly to defendants rather
11  than making claims about exactly which officers were
12  working on or participating in which event?
13      A.  It is, yes.
14      MS. ROSEN:  Objection.  Leading.  Asked and
15  answered.
16  BY MR. SWAMINATHAN:
17      Q.  Go ahead.
18      A.  It is, yes.
19      MR. SWAMINATHAN:  I have no more questions.
20      MS. ROSEN:  We have some more questions, but we
21  need to take a break.
22      THE WITNESS:  Five minutes?
23      MR. SWAMINATHAN:  Yeah.  Should be fine.
24      THE VIDEOGRAPHER:  We're off the video record at

THOMAS TIDERINGTON, 09/20/2023                    Page 296..299

Page 296

1  4:23 p.m.
2         (Recess taken.)
3     THE VIDEOGRAPHER: We're back on the video record
4  at 4:28 p.m.
5         FURTHER EXAMINATION
6  BY MS. ROSEN:
7     Q.   Mr. Tiderington, when you were provided --
8  when were you first provided the City of Chicago's
9  responses to Plaintiff's Request to Admit numbers 1, 3,
10  and 6?
11    A.   I think last night.
12    Q.   And how much time did you spend reviewing --
13  well, let me back up.  Are you saying you were provided
14  the City's Answers to Plaintiff's First Set of Request to
15  Admit and Plaintiff's Third Set of Request to Admit and
16  Plaintiff's Sixth Set of Request to Admit?
17    A.   I believe so, yes.
18    Q.   Okay.  And how much time did you spend
19  reviewing those documents?
20    A.   I don't know exactly.  Maybe an hour,
21  45 minutes.  I don't -- I don't recall specifically.
22    Q.   Okay.  And with respect to the first -- the
23  City's responses to the First Set of Request to Admit,
24  what was the general topic of those requests?

Page 297

1     A.   Well --
2     Q.   And I don't want you to look at them.  I
3  don't want you to look at them.
4     A.   I'm sorry?
5     Q.   If you have them in front of you, I don't --
6     A.   Yeah.
7     Q.   -- want you to look at them, so --
8     A.   The City of Chicago can confirm the entire
9  Erwin homicide --
10    Q.   So wait, wait, wait, wait.  You were reading,
11  and so my instruction to you is to answer this question,
12  I do not want you to read the document.
13    MR. SWAMINATHAN: Mr. Tiderington, you do not --
14  you can do what -- you can answer the question however
15  you would like to.
16    MS. ROSEN: No, he cannot.  No --
17    MR. SWAMINATHAN: Yes, he can.
18    MS. ROSEN: -- he absolutely cannot.
19    THE WITNESS: Okay.  All right.  I --
20    MS. ROSEN: You do this to police officers all the
21  time.  If he wants to follow up and review the
22  document -- I am going to ask him my question and
23  instruct him the way I see fit.  If you're going to
24  instruct him not to answer, then I guess we're going to

Page 298

1  suspend the deposition so that we can contact the court.
2     MR. SWAMINATHAN: I'm going to instruct you to
3  do -- so she can instruct you however she wants.  She
4  isn't in control of you.
5     THE WITNESS: Okay.
6     MR. SWAMINATHAN: All right.  You -- you -- if you
7  need -- to answer the question, if you need to look at
8  something, you can look at something.  It's up to you.
9     THE WITNESS: I understand.
10    MS. ROSEN: That is not -- that is not the rules,
11  Anand.  That is --
12    MR. SWAMINATHAN: Yes, it is.
13    MS. ROSEN: -- absolutely not -- it is not the
14  rules.  You instruct police officers all the time that
15  they cannot look at documents, and the only reason that
16  you're allowed to do this right now is because you are on
17  Zoom, and -- and I -- and you are allowing him to have
18  documents in front of him that we cannot see --
19    MR. SWAMINATHAN: I would like to know where --
20    MS. ROSEN: -- and that is particularly -- that is
21  partic -- do not interrupt me.  That is particularly
22  problematic when you represented to us that this was
23  going to be by Zoom because he was in Michigan.  In fact,
24  you made us start early, and, in fact, he's here.  You

Page 299

1  did not give us notice that he was here, and if we knew
2  he was here, we would do this in person, so it is --
3     MR. SWAMINATHAN: No.  First of all --
4     MS. ROSEN: -- particularly -- it is particularly
5  problematic that you are now saying that he can disregard
6  my request, my instruction that he answer questions from
7  memory.  That is something that is done all the time.
8     MR. SWAMINATHAN: It is -- it is -- I would like to
9  know where I said to a witness, You cannot look at the
10  document that is sitting in front of you that is an
11  exhibit if you need to look at it to answer a question --
12    MS. ROSEN: This is not an exhibit.
13    MR. SWAMINATHAN: -- on an essential thing and you
14  cannot look at the document --
15    MS. ROSEN: You did not mark it as an exhibit.
16    MR. SWAMINATHAN: The idea that --
17    MS. ROSEN: It is not an exhibit.
18    MR. SWAMINATHAN: -- the idea that it is some kind
19  of memory test in which he has to be able to -- it's
20  so -- that is so improper, but go ahead and ask your
21  question.  Let's see -- let's see what -- if he needs to
22  look at it -- Tom, why don't you tell her if you need to
23  look at it to be able to answer the question, but to me,
24  this is absolutely objectionable.

THOMAS TIDERINGTON, 09/20/2023                               Page 300..303

Page 300

1 BY MS. ROSEN:
2     Q.   Are you able to answer my question about what
3 the general topic -- topic matters were addressed in
4 Request to Admit number 1 without looking at the
5 document?
6     A.   Well, I've already looked at it, but I can
7 say it in my own words, is that the City of Chicago
8 affirmed that the investigative file was complete.
9     Q.   Okay.  And then with respect to Request to
10 Admit number 3, can you answer the general topic matter
11 of what is contained and addressed in request to admit
12 number 3 without reviewing the document?  I'm not asking
13 you to --
14      MR. SWAMINATHAN:  Same objection.  It's improper to
15 ask -- same objection.  It is absolutely improper --
16      MS. ROSEN:  I am asking a different question.
17 Don't interrupt me.  I am asking --
18      MR. SWAMINATHAN:  I'm making my objection.  You
19 just asked him the question, and I'm making my objection.
20 Just wait.  My objection to the question is that it is
21 absolutely improper to have a witness -- tell them they
22 cannot look at the document that they identify as needing
23 to review in order to answer the question.
24      Go ahead.

Page 301

1 BY MS. ROSEN:
2     Q.   I did not ask that question.
3     A.   Okay.
4     Q.   Please don't answer that.  I said are you
5 able -- can you tell me what is in the RTA without
6 reviewing it?  That is -- that is a simple question.
7      MR. SWAMINATHAN:  Okay.  Go ahead.
8      THE WITNESS:  I don't know what number 3 is, no.
9 BY MS. ROSEN:
10     Q.   Okay.  Can you tell me what is -- what
11 questions are being asked and what topics are being
12 addressed in RTA number 6 without reviewing it?
13     A.   No.
14     Q.   Okay.  With respect to the file -- the
15 investigative file and the RT -- RD file and the
16 documents that were contained in the files in 1991 and
17 1992 leading up to Mr. Johnson's prosecution, can you
18 tell us whether or not definitively documents -- let me
19 strike that.  Let me do this again.
20      With respect to what was produced to the
21 criminal defense attorney in connection with
22 Mr. Johnson's prosecution, do you know what documents
23 were produced?
24     A.   I do not.

Page 302

1     Q.   With respect to what was produced to the Cook
2 County State's Attorney during the criminal prosecution
3 involving Mr. Johnson, do you know what police documents
4 were produced?
5     A.   I do not.
6      MS. ROSEN:  I don't have any more questions.
7      MR. SWAMINATHAN:  Anything else from Defendants?
8      MR. ENGQUIST:  No.
9      MR. SCHALKA:  No.
10      MR. SWAMINATHAN:  Nothing from me.
11      MS. ROSEN:  Are you reserving?
12      MR. SWAMINATHAN:  We are reserving.
13      MS. ROSEN:  Okay.  Thanks, everyone.
14      THE WITNESS:  Thank you, Eileen and Josh.  Thank
15 you.  And --
16      THE VIDEOGRAPHER:  Okay.  We're off the video
17 record at 4:35 p.m. at the conclusion of the deposition.
18      MR. ENGQUIST:  I'll order.  Thank you.
19          (The deposition concluded at
20           4:35 p.m.)
21
22
23
24

Page 303

1
             IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
3
4 DEMETRIUS JOHNSON,                )
                                    )
5              Plaintiff,           )
                                    )
6         vs.                       ) No. 20 cv 4156
                                    )
7 REYNALDO GUEVARA, the ESTATE of   )
  ERNEST HALVERSON, DARRYL DALEY,   )
8 WILLIAM ERICKSON, JOHN HEALY, and )
  the CITY OF CHICAGO,              )
9                                   )
              Defendants.           )
10
11      This is to certify that I have read my
  deposition taken on Wednesday, September 20, 2023, in the
12 foregoing cause and that the foregoing transcript
  accurately states the questions asked and the answers
13 given by me, with the changes or corrections, if any,
  made on the Errata Sheet attached hereto.
14
15
16      _____
              THOMAS TIDERINGTON
17
18 No errata sheets submitted (Please initial)
  Number of errata sheets submitted _____ pages
19
20 Subscribed and sworn to
  before me this _____ day
21 of _____ 2023.
22
  _____
23
  Notary Public
24

THOMAS TIDERINGTON, 09/20/2023                    Page 304..305

Page 304

1
2
            REPORTER'S CERTIFICATE
3
4       I, Riley A. Moran, do herby certify that THOMAS
    TIDERINGTON was duly sworn by me to testify the whole
5   truth, that the foregoing deposition was recorded
    stenographically by me and was reduced to computerized
6   transcript under my direction, and that said deposition
    constitutes a true record of the testimony given by said
7   witness.
8       I further certify that the reading and signing of
    the deposition was not waived, and that the deposition
9   was submitted to Mr. Anand Swaminathan, Plaintiff's
    counsel, for signature.  Pursuant to Rule 207(a) of the
10  Supreme Court of Illinois, if deponent does not appear or
    read and sign the deposition within 28 days, the
11  deposition may be used fully as though signed, and this
    certificate will then evidence such failure to appear as
12  the reason for signature not being obtained.
13      I further certify that I am not a relative or
    employee or attorney or counsel of any of the parties, or
14  a relative or employee of such attorney or counsel, or
    financially interested directly or indirectly in this
15  action.
16      IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal of office at Chicago, Illinois, this 27th
17  day of September 2023.
18
19
20          _Riley Moran_
            Illinois CSR No. 084-004945
21
22
23
24

Page 305

1   Errata Sheet
2
3   NAME OF CASE: DEMETRIUS JOHNSON vs REYNALDO GUEVARA, et al.
4   DATE OF DEPOSITION: 09/20/2023
5   NAME OF WITNESS: Thomas Tiderington
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25              _____