# Exhibit 52

# In The Matter Of:

*Maysonet v.*
*Guevara*

---

*Roland Paulnitsky*
*September 17, 2019*
*Video Deposition*



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3   JOSE JUAN MAYSONET, JR.,    )

 4              Plaintiff,       )

 5         vs.                   )    No. 18-cv-02342

 6   REYNALDO GUEVARA, ERNEST    )
     HALVORSEN, EDWARD MINGEY,   )
 7   EPPLEN, FERNANDO MONTILLA,  )
     ROLAND PAULNITSKY, FRANK    )
 8   DI FRANCO, CITY OF CHICAGO  )
     and COOK COUNTY,            )
 9                               )
10              Defendants.      )

11         The video-recorded deposition of ROLAND

12   PAULNITSKY, taken in the above-entitled case on

13   the 17th day of September, 2019, at the hour of

14   10:17 a.m. at the offices of the Sotos Law Firm,

15   141 West Jackson Boulevard, Suite 1240A, Chicago,

16   Illinois, pursuant to agreement of counsel.

17

18   Reported by: Karen P. Burns, CSR

19   License No.: 084-002615

20

21

22

23

24

25
```

## Page 2

```
 1   APPEARANCES:

 2        BONJEAN LAW GROUP
          BY: MS. JENNIFER A. BONJEAN
 3
          100 Dean Street
 4        Suite 422
          Brooklyn, New York 11238
 5        (718) 875-1850
          jennifer@bonjeanlaw.com,
 6
              On behalf of the plaintiff;
 7
     STEVEN A. GREENBERG, LTD.
 8   BY: MR. KYLE JORGENSEN

 9        53 West Jackson Boulevard
          Suite 1260
10        Chicago, Illinois 60604
          (312) 879-9500
11        kyle@greenbergcd.com,

12            On behalf of the plaintiff;

13   THE SOTOS LAW FIRM
     BY: MR. JOSH ENQUIST
14
          141 West Jackson Boulevard
15        Suite 1240A
          Chicago, Illinois 60604
16        (312) 735-3300
          jenquist@jsotoslaw.com,
17
              On behalf of defendants
18            Ernest Halvorsen, Edward Mingey,
              Lee Epplen, Fernando Montilla and
19            Roland Paulnitsky;

20

21

22

23

24

25
```

## Page 3

```
 1   APPEARANCES (Continued):

 2        ROCK, FUSCO & CONNELLY, LLC
          BY: MS. EILEEN E. ROSEN
 3
          321 North Clark Street
 4        Suite 2200
          Chicago, Illinois 60654
 5        (312) 494-1000
          erosen@rfclaw.com,
 6
              On behalf of defendant
 7            City of Chicago.

 8        LEINENWEBER BARONI & DAFFADA LLC, by
          MR. JUSTIN LENNON LEINENWEBER,
 9
          120 North LaSalle Street
10        Suite 2000
          Chicago, Illinois  60602
11        (847) 251-4091
          jll@ilesq.com
12
              on behalf of defendant
13            Reynaldo Guevara;

14   COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
     MS. SARA DIXON SPIVY,
15
          50 West Washington Street
16        Suite 500
          Chicago, Illinois  60602
17        (312) 603-5971
          sara.spivy@cookcountyil.gov
18
              on behalf of defendants
19            Frank DiFranco and Cook County.

20

21   ALSO PRESENT:

22        Mr. Gabriel Martin, Videographer;

23        Ms. Gabby Orozco, Legal intern
24        (partial proceeding).

25
```

## Page 4

```
 1                    I N D E X

 2   WITNESS                          EXAMINATION

 3   ROLAND PAULNITSKY

 4     By Ms. Bonjean                       6

 5

 6

 7                  E X H I B I T S

 8   EXHIBIT NAME  DESCRIPTION             PAGE

 9   Paulnitsky Exhibit

10   Exhibit 1     Document Bates numbered   69
                   CCSA0000100-101
11
     Exhibit 2     Document Bates numbered  182
12                 MAYSONET 9596-9617

13   Exhibit 3     Document Bates numbered  270
                   RFC-Maysonet 000001-66
14
     Exhibit 4     Document Bates numbered  270
15                 RFC-Maysonet 000067-102

16   Exhibit 5     Document Bates numbered  311
                   CCSA001145
17
     Exhibit 6     Document Bates numbered  317
18                 CCSA001145, 1556 and 1557

19   Exhibit 7     Document Bates numbered  356
                   RFC-Maysonet 000378-404
20
     Exhibit 8     Document Bates numbered  358
21                 CCSA0000364-371

22

23        (Exhibits attached to transcript.)

24

25
```

Maysonet v.
Guevara

Video Deposition

Page 5

1    THE VIDEOGRAPHER: We are now on the
2  record in the matter of Maysonet versus
3  Guevara, et al. in the United States District
4  Court for the Northern District of Illinois,
5  Eastern Division, case number 18 CV 02342.
6    Today's date is September 17,
7  2019, and the time is now 10:17 a.m.  This is
8  the videorecorded deposition of Ronald
9  Paulnitsky.  We are located at the Sotos Law
10  Firm, Chicago, Illinois.  My name is Gabriel
11  Martin and I am the videographer.  The court
12  reporter is Karen Burns, both with Rizman
13  Rappaport Court Reporters.
14    For the record, will Counsel
15  please introduce yourself and who do you
16  represent?
17    MS. BONJEAN: Jennifer Bonjean on
18  behalf of the plaintiff, Mr. Maysonet.
19    MR. LEINENWEBER: Justin Leinenweber on
20  behalf of defendant Officer Guevara.
21    MS. SPIVY: Sara Spivy, Assistant
22  State's Attorney, on behalf of the County
23  defendants.
24    MS. ROSEN: Eileen Rosen on behalf of
25  the City of Chicago.

Page 6

1    MR. ENQUIST: And Josh Enquist on
2  behalf of defendants Halvorsen, Mingey,
3  Epplen, Montilla and Paulnitsky.
4    THE VIDEOGRAPHER: Now the court
5  reporter is going to swear in the witness.
6    (Witness duly sworn.)
7    ROLAND PAULNITSKY,
8  having been first duly sworn, was examined and
9  testified as follows:
10    EXAMINATION
11    BY MS. BONJEAN:
12  Q.  Good morning, Mr. Paulnitsky.  My name
13  is Jennifer Bonjean.  I represent the plaintiff,
14  Jose Maysonet, in this matter in which you are a
15  named defendant.  I suspect you have some
16  familiarity with the deposition process, but I
17  would like to go over some ground rules with you
18  so that we are on the same page.
19  A.  Yes.
20  Q.  Do you understand, sir, that you are
21  under oath here today?
22  A.  Yes.
23  Q.  Do you understand that it is the same
24  oath that you would take as if you were in a court
25  of law with a judge and attorneys present

Page 7

1  litigating a case?
2  A.  Yes.
3  Q.  Have you testified under oath before?
4  A.  Yes.
5  Q.  How many times?
6  A.  Several.
7  Q.  Is "several" less than ten or more than
8  ten?
9  A.  More than ten.
10  Q.  More than 100?
11  A.  Yes.
12  Q.  Do you understand that by taking the
13  oath, that you are swearing that your testimony is
14  truthful to the best of your ability?
15  A.  Yes.
16  Q.  And you're expected to give truthful
17  answers to every single question I ask of you here
18  today?
19  A.  Yes.
20  Q.  I am looking for full and complete
21  responses to my questions.  Do you understand
22  that?
23  A.  Yes.
24  Q.  And can we agree that you will not
25  purposely omit any material facts that would be

Page 8

1  naturally responsive one of my questions?
2    MS. ROSEN: Objection to form.
3    MR. ENQUIST: Join.
4    MS. SPIVY: Same.
5    THE WITNESS: Yes.
6    BY MS. BONJEAN:
7  Q.  It's perfectly acceptable to give an
8  estimation in response to a question; a date,
9  times, things of that nature, particularly in a
10  case that is this old.  So if you do so, I would
11  just ask that you indicate that you're doing so,
12  okay?
13  A.  Yes.
14  Q.  Now, if you do not understand one of
15  the questions I ask you, will you let me know?
16  A.  Yes.
17  Q.  And I will give you the opportunity or
18  I will try to rephrase and provide a clearer
19  question so that you can answer it, okay?
20  A.  Yes.
21  Q.  And if at any point during the
22  deposition you recollect a piece of information
23  that is responsive to a prior question, will you
24  let me know that?
25  A.  Yes.

Maysonet v.
Guevara

Video Deposition

Page 9

1 Q. That way I'll give you the opportunity
2 to go back and provide a more fulsome response,
3 okay?
4 A. Yes.
5 Q. Obviously the court reporter cannot
6 transcribe us both speaking at the same time, so I
7 will do my very best to wait for you to answer my
8 question and I would ask that you wait for me to
9 ask the question, even if you know where I'm going
10 with it, okay?
11 A. Yes.
12 Q. And if you need a break, certainly you
13 are at liberty to take one. I would ask only that
14 you answer any question that may be pending prior
15 to asking for a break, okay?
16 A. Yes.
17 Q. And as you sit here today, is there any
18 reason why you cannot give truthful and complete
19 testimony to the best of your ability?
20 A. There is not.
21 Q. Okay. How many times have you had your
22 deposition taken before?
23 A. I don't recall.
24 Q. Can you estimate for me?
25 A. I would estimate more than six.

Page 10

1 Q. And of those six depositions that you
2 basically recall, can you tell me what you recall
3 about each one?
4     MS. ROSEN: Object to the form,
5 compound.
6     THE WITNESS: No.
7     BY MS. BONJEAN:
8 Q. Do you remember any single deposition
9 you've ever sat for?
10 A. No, I do not.
11     MS. ROSEN: Object to the form.
12     BY MS. BONJEAN:
13 Q. Have you been sued previously?
14 A. Yes.
15 Q. How many times have you been sued?
16 A. I don't recall.
17 Q. You don't recall? Can you approximate
18 how many times you've been sued?
19 A. I don't want to guess.
20 Q. I'm not asking you to guess, I'm asking
21 you to approximate. Can you approximate?
22 A. I cannot.
23 Q. So there has been so many times that
24 you can't approximate how many times?
25     MS. ROSEN: Objection to the form.

Page 11

1     MR. ENQUIST: Join.
2     MS. SPIVY: Join.
3     THE WITNESS: I don't remember.
4     BY MS. BONJEAN:
5 Q. Is your testimony that you are unable
6 to approximate how many times you've been sued?
7     MS. ROSEN: Objection, form.
8     THE WITNESS: That's correct.
9     BY MS. BONJEAN:
10 Q. And do you remember any suit in which
11 you have been a named defendant in your capacity
12 as a Chicago Police officer?
13 A. I do not.
14 Q. Not a single one?
15 A. No.
16 Q. Nothing sticks out in your head?
17     MS. ROSEN: Objection, form.
18     THE WITNESS: Nope.
19     BY MS. BONJEAN:
20 Q. Not even a name?
21     MS. ROSEN: Objection, form.
22     THE WITNESS: No.
23     BY MS. BONJEAN:
24 Q. How about an allegation; no prior
25 allegations you ever remember?

Page 12

1     MS. ROSEN: Objection, form.
2     THE WITNESS: I don't recall.
3     BY MS. BONJEAN:
4 Q. Does the name Miguel Castillo mean
5 anything to you?
6 A. No.
7 Q. Nothing?
8     MS. ROSEN: Objection, form, harassing.
9     BY MS. BONJEAN:
10 Q. I'm just getting clear. You actually
11 are testifying truthfully under oath that you
12 don't know the name Miguel Castillo?
13 A. I don't recall.
14 Q. You don't recall the name?
15     MS. ROSEN: Objection, asked and
16 answered.
17     THE WITNESS: I don't recall.
18     BY MS. BONJEAN:
19 Q. Do you remember being sued with a
20 colleague, Officer Jose Zuniga, in a case brought
21 by a complainant named Miguel Castillo?
22 A. I remember the other police officer,
23 yes.
24 Q. What do you remember about the other
25 police officer?

Maysonet v.
Guevara

Video Deposition

---

Page 13

1  A.  Just that there was an allegation
2  against us, several of us.
3  Q.  Okay.  And do you remember now that you
4  interrogated Mr. Castillo in connection with a
5  homicide investigation?
6  A.  I don't recall.
7  Q.  And do you remember having your
8  deposition taken in that case?
9  A.  I don't remember.  Do you have a report
10  that I can refresh my memory?
11  Q.  I'm asking you if you remember having
12  it taken.  I'm not asking you anything about what
13  you said, just do you remember sitting for a
14  deposition?
15  A.  As I said before, there was I believe
16  about six depositions I was part of.  I'm not sure
17  which names are -- what names were available at
18  that time on the allegations against me.
19  Q.  Okay.  Do you remember that
20  Mr. Castillo accused you of coercing a statement
21  from him?
22  A.  I don't recall.
23  Q.  You don't recall doing it or you don't
24  recall being alleged to -- don't recall being
25  accused of doing it?

---

Page 14

1  A.  I don't recall the facts of the
2  allegations against me, no.
3  Q.  Were you aware that Mr. Castillo's
4  convictions were later reversed and dismissed?
5      MS. ROSEN: Objection, form,
6  foundation.
7      BY MS. BONJEAN:
8  Q.  Or the charges were dismissed?
9  A.  I don't recall that case, ma'am.
10  Q.  No.  Do you know how that case
11  resolved?
12      MS. ROSEN: Objection, form.  Which
13  case, the civil case or the criminal case?
14      MS. BONJEAN: Good question.
15      BY MS. BONJEAN:
16  Q.  I've represented that the case, the
17  criminal case, was resolved by dismissal.  Do you
18  know how the civil case, in which you were a named
19  defendant, was resolved?
20  A.  I don't recall.
21  Q.  Do you remember ever receiving any
22  notice that the case had been settled?
23  A.  I don't know if I did or not.
24  Q.  Okay.  So Mr. Castillo's allegations
25  against you, you have zero recollection of,

---

Page 15

1  correct?
2  A.  I don't recall.
3  Q.  Is that a yes?
4  A.  Ma'am, it's been so many years that
5  I've been retired, I don't recall.
6  Q.  So that's a yes; you don't have any
7  recollection of the allegations that Miguel
8  Castillo made against you?
9  A.  I don't recall.
10  Q.  So that's a yes?
11  A.  I don't recall.
12  Q.  You don't recall what?
13  A.  The allegations brought forward or what
14  the outcome was.
15  Q.  Okay.  That's what I asked you.  Any
16  other depositions that you have any memory of?
17      MS. ROSEN: Object to the form.
18      THE WITNESS: No.
19      BY MS. BONJEAN:
20  Q.  Do you have any medical conditions that
21  prevent you from remembering things?
22  A.  I have diabetes.
23  Q.  Have your doctors told you that
24  diabetes impacts your memory?
25  A.  I've had conversations with my

---

Page 16

1  specialist about what diabetes is.
2  Q.  That wasn't the question that I asked
3  you.  I asked you the specific question of whether
4  you have been told by your doctor or any
5  professional that diabetes affects your memory
6  negatively?
7  A.  In general or my own being?
8  Q.  I'm sorry?
9  A.  I was told by my specialist about what
10  diabetes is, what could be some results of
11  diabetes and medicines that I'm taking.
12  Q.  Okay, so I'll ask you this.  Are you
13  under the belief or do you -- strike that.
14      Do you have the understanding that the
15  disease of diabetes impacts your ability to
16  remember things?
17  A.  I don't know.
18  Q.  You don't know whether you have the
19  belief?  Either you have the belief or you don't
20  have the belief or something in between, but --
21  A.  I could only answer for myself.  I
22  don't know exactly what the diabetes is doing to
23  my body.
24  Q.  Okay.  Have you been told by any health
25  professional that diabetes has the capacity to

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 17

1 impact your memory?
2 A.  I don't recall if I received that
3 information from my doctor or not.
4 Q.  Okay.  And do you have any reason to
5 believe that diabetes impacts your memory?
6 A.  I have no reason to believe that it may
7 affect or may not affect.
8 Q.  Well, have you found that since you
9 started suffering from diabetes, that your memory
10 has failed you?
11      MS. ROSEN: Objection, form.
12      THE WITNESS: I don't know.  I can't
13 answer that.
14      BY MS. BONJEAN:
15 Q.  And what medications are you taking
16 right now?
17 A.  Well, I'm taking 18 medicines a day.
18 Q.  Okay.  And are all those medications to
19 treat your diabetes?
20 A.  No.
21 Q.  What else are these medications
22 treating?
23 A.  High blood pressure, hypertension,
24 problems with my prostate.  There is other
25 medications that I'm taking that somewhat counter

Page 18

1 effect some of the medications that I'm taking.
2 Q.  And are you under the belief that any
3 of those medications, either individually or
4 collectively, have an impact on your ability to
5 remember events from the past?
6 A.  I don't have an opinion.  I'm not a
7 medical doctor to see what they're doing to my
8 body.  I have medicine that's prescribed to me, I
9 take them daily, twice a day, and I pray to God
10 that it helps my condition.
11 Q.  And your condition being your memory?
12 A.  Again, I have diabetes and
13 hypertension.
14 Q.  Okay.  So your condition being diabetes
15 and hypertension, but you can't identify any
16 specific communication from your doctors telling
17 you that these medicines or your condition have a
18 negative impact on your memory, right?
19 A.  I don't recall.
20 Q.  So is that a no, you cannot identify --
21      MS. ROSEN: Objection, form, harassing.
22 I don't recall is I don't recall.
23      MR. ENQUIST: Join.
24      BY MS. BONJEAN:
25 Q.  So you don't recall whether your doctor

Page 19

1 ever told you that?
2 A.  I don't recall what information he gave
3 me.  I believe that's privileged between my doctor
4 and myself.
5 Q.  Well, perhaps, but to the extent that
6 it impacts your memory, that's something that I
7 think I would have the right to ask you about, if
8 you can communicate that to me without revealing
9 communications with your doctors?
10      MS. ROSEN: I'm going to object to the
11 form of that question.
12      MR. ENQUIST: I'll join.
13      BY MS. BONJEAN:
14 Q.  Well, I asked you earlier, sir, today,
15 whether there was any reason you couldn't give
16 truthful and complete testimony here today.
17      Do you remember when I asked that
18 question?
19 A.  I do.
20 Q.  And you said you couldn't think of any
21 reason, right?
22 A.  Yes.
23 Q.  You didn't indicate to me at that time
24 that you had memory issues, right?
25      MS. ROSEN: He's not telling you he has

Page 20

1 memory issues.  We went down this road
2 because you're challenging whether or not his
3 answers about I don't recall to prior
4 depositions are truthful or not.  That's a
5 whole different thing. He's not saying to
6 you that he can't answer your questions.  You
7 don't like the I don't recall's or you don't
8 believe the I don't recall's.
9      MS. BONJEAN: It's not that -- I don't
10 recall means that you can't remember
11 something, so I think it's a pretty logical
12 inquiry, Eileen.  If someone says they don't
13 recall, then there might be a reason they
14 don't recall, so that's what I'm exploring.
15      MS. ROSEN: Right, but now you're
16 suggesting that he has somehow been
17 untruthful.
18      MS. BONJEAN: I suggested no such
19 thing.  That is a figment of your
20 imagination.
21      BY MS. BONJEAN:
22 Q.  Mr. Paulnitsky, your memory is not
23 preventing you from providing testimony here
24 today, correct?
25 A.  It is not.

Maysonet v.
Guevara

Video Deposition

Page 21

1 Q. Okay. But you can't tell me anything
2 about the prior depositions that you've sat for,
3 correct?
4 A. I don't remember them.
5 Q. And you don't know anything -- you
6 can't tell me, for instance, how many of them
7 involved lawsuits as -- filed against you as a
8 Chicago Police officer, correct?
9 A. I don't remember.
10 Q. Okay. Do you remember ever having any
11 judgments entered against you?
12 A. I never had any judgments against me.
13 Q. Well, how do you know?
14 A. Because I never did.
15 Q. You remember that about those lawsuits,
16 though?
17 MS. ROSEN: Object to the form.
18 MR. ENQUIST: Join.
19 THE WITNESS: Yes.
20 BY MS. BONJEAN:
21 Q. All right. What did you do to prepare
22 for your deposition here today?
23 A. I met with my attorneys.
24 Q. How many times?
25 A. Pertaining to my deposition, probably

Page 22

1 three times, maybe four.
2 Q. And who are your attorneys?
3 A. Josh and his partner and his law firm.
4 Q. And did you meet with Josh and his
5 partner at this law firm all three or four times?
6 A. I believe so.
7 Q. And how long did each of those meetings
8 take?
9 A. Probably less than an hour.
10 Q. And who was present for those meetings,
11 apart from your lawyers?
12 A. One meeting there was other detectives,
13 retired detectives, retired supervisors.
14 Q. Do you mean the other defendants in
15 this case?
16 A. Yes.
17 Q. And that was only for one of those
18 meetings?
19 A. Yes.
20 Q. And the other meetings you met alone
21 with your attorneys?
22 A. Yes.
23 Q. Did you ever meet with your attorneys
24 in preparation for this deposition with anyone
25 other than the other defendants in this case?

Page 23

1 A. Met with the City attorney.
2 Q. Okay. Aside from other attorneys on
3 the defense side of the V and the defendants in
4 this case, were any other individuals present?
5 A. No.
6 Q. Apart from meeting with your attorneys,
7 did you review any documents in connection -- in
8 preparing for your deposition today?
9 A. Yes.
10 Q. What did you review?
11 A. I reviewed my grand jury statement.
12 Q. Anything else?
13 A. Police supplemental reports.
14 Q. Did you say supplemental report or
15 reports?
16 A. Reports.
17 Q. Review anything else?
18 A. No.
19 Q. So you've only seen or reviewed your
20 grand jury testimony and supplemental reports that
21 were prepared in connection with this case?
22 A. Yes.
23 Q. Have you spoken to or with any of the
24 defendants, co-defendants in this case, since the
25 complaint has been filed?

Page 24

1 MR. ENQUIST: Just you're talking about
2 outside our presence?
3 MS. BONJEAN: Correct.
4 THE WITNESS: Outside -- let me
5 understand the question.
6 MS. BONJEAN: Sure.
7 THE WITNESS: Outside of my attorneys?
8 BY MS. BONJEAN:
9 Q. Yes. I'll ask it again.
10 Putting aside your meetings with your
11 attorney and co-defendants, did you ever speak
12 with any of the co-defendants in this case outside
13 the presence of your attorneys?
14 A. Yes.
15 Q. Okay. Who have you spoken to?
16 A. I said hello to Freddie Montilla. I
17 said hello to Sergeant Mingey and Detective
18 Halvorsen.
19 Q. And how many times have you had the
20 opportunity to converse with Montilla, Mingey and
21 Halvorsen since this lawsuit was filed?
22 A. Twice.
23 Q. And when was the first time you spoke
24 to Freddie Montilla since this lawsuit was filed?
25 A. When I answered your subpoena at 26th

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v. Guevara

Video Deposition

**Page 25**

1  and California.

2  Q.  Okay.  And when was the second time you

3  spoke to him?

4  A.  A couple weeks ago here.

5  Q.  After his deposition?

6  A.  I don't know when his deposition was.

7  Q.  Okay.  When you spoke to him a couple

8  weeks ago, what did you say to him and what did he

9  say to you?

10  A.  It was just chitchat.

11  Q.  And how did the conversation come to

12  be?

13  A.  Well, I haven't seen them in a long

14  time.  I was wondering how they were doing and how

15  their family was.

16  Q.  So you called them?

17  A.  No.  You asked me where I talked to

18  them and what I said.  It was here.  I wouldn't

19  know how to call them.

20  Q.  So let me back up.  This conversation

21  that you had with Mr. Montilla outside the

22  presence of your attorneys, where did the

23  conversation take place?

24  A.  Right in this room.

25  Q.  Okay.  And was it before or after you

**Page 26**

1  spoke with your attorneys?  Were you waiting to

2  speak to your attorneys?

3  A.  Yes.

4  Q.  Or were you coming and socializing with

5  Mr. Montilla on a regular basis?

6      MR. ENQUIST: Objection, form.

7      THE WITNESS: It was in this room

8  before my attorneys were present.

9      BY MS. BONJEAN:

10  Q.  Okay.  And how long did the

11  conversation last?

12  A.  Maybe less than ten minutes.

13  Q.  And did you discuss the underlying

14  case; that is, Maysonet's case?

15  A.  No.

16  Q.  What did you talk about?

17  A.  I just told you.  I haven't seen them

18  for several years.  I wanted to know how their

19  families were, they asked me how mine was, just

20  idle chitchat.

21  Q.  Okay, idle chitchat.  And was that the

22  same circumstance under which you last spoke to

23  Sergeant Mingey?

24  A.  Yes.

25  Q.  Here in this conference room?

**Page 27**

1  A.  Same place, same time.

2  Q.  Same place, same time.  And also

3  Halvorsen was present?

4  A.  Yes.

5  Q.  Was Lee Epplen present?

6  A.  Yes.

7  Q.  So he was here, as well?  I assume Rey

8  was not here?

9  A.  No.

10  Q.  So correct me if I'm wrong.  A couple

11  weeks ago before you met with your attorneys in

12  preparation for your deposition, you all sat in

13  this conference room and had idle chitchat, is

14  that right?

15  A.  Yes.

16  Q.  And did anyone raise any issues or --

17  strike that.

18      Did anybody speak about the underlying

19  civil lawsuit?

20  A.  Not in my presence.

21  Q.  All right.  So prior to that time when

22  you were in the conference room speaking with the

23  co-defendants in the case, when was the next most

24  recent time that you spoke with any of the

25  co-defendants in this case?

**Page 28**

1  A.  That was the last time.

2  Q.  Okay.  And before that date, when was

3  the next time?

4  A.  The first time?

5  Q.  Yeah, the first time?

6  A.  When I answered your subpoena.

7  Q.  Okay.  So let's talk about that.

8      Prior to getting a subpoena from me on

9  behalf of Mr. Maysonet in the fall of 2017, did

10  you know that Mr. Maysonet's convictions had been

11  reversed?

12  A.  I did not.

13  Q.  Had anyone from the Cook County State's

14  Attorney's office contacted you to alert you that

15  Mr. Maysonet's convictions had been reversed in

16  the fall of 2016?

17  A.  No one.

18  Q.  No e-mails, nothing?

19  A.  Nothing.

20  Q.  Okay.  So is it fair to say that the

21  first time that you learned that Mr. Maysonet's

22  case was back in the Circuit Court for some reason

23  was when you received a subpoena from me?

24  A.  Yes.

25  Q.  And upon receiving a subpoena from me,

Maysonet v.
Guevara

Video Deposition

---

Page 29

1 what did you do with that subpoena?
2 A. I contacted the Fraternal Order of
3 Police.
4 Q. Now, is it your practice to contact the
5 Fraternal Order of Police when you get a subpoena
6 to come testify in a criminal prosecution in which
7 you have played an investigative role?
8    MS. ROSEN: Object to the form.
9    THE WITNESS: At that time I was no
10 longer a detective. I was retired.
11    BY MS. BONJEAN:
12 Q. Understood. So I'll revise my
13 question. Let's talk about prior to your
14 retirement. Was it your practice to contact the
15 Fraternal Order of Police upon receipt of a
16 subpoena to give testimony in a prosecution in
17 which you played an investigative role?
18 A. No.
19 Q. Now, certainly after your retirement
20 you've been called on to testify from time to
21 time, correct?
22 A. One other time that I can remember.
23 Q. Okay. And what was that case?
24 A. That was a cause and origin of a fire.
25 Q. What was the case?

---

Page 30

1 A. I don't remember what the name of the
2 case was. I do remember where it was, though, if
3 that would help you.
4 Q. Sure. Where was it?
5 A. I want to say Wabash and Balbo. It was
6 a former restaurant.
7 Q. And was it an arson case?
8 A. I determined it was not an arson.
9 Q. Okay. And after your retirement you
10 were called to testify in some matter pertaining
11 to this incident?
12 A. Yes.
13 Q. Was it a criminal prosecution or a
14 civil litigation?
15 A. Civil litigation.
16 Q. All right. Did you contact the
17 Fraternal Order of Police when you received the
18 subpoena in that case?
19 A. No.
20 Q. Okay. And your testimony is that since
21 your retirement, you have not been called upon to
22 testify in any proceedings, criminal proceedings,
23 related to work you conducted while you were still
24 a sworn police officer?
25 A. Correct.

---

Page 31

1 Q. Okay. So upon receipt of the subpoena
2 that Mr. Maysonet issued you, you said you
3 contacted the Fraternal Order of Police.
4    Why did you contact the Fraternal Order
5 of Police?
6 A. For legal advice.
7 Q. And why did you believe you needed
8 legal advice?
9 A. Because I was retired.
10 Q. And what type of legal advice did you
11 believe you needed by virtue of the fact that you
12 were retired?
13 A. I received a subpoena.
14 Q. Right, and what about receiving a
15 subpoena led you to believe, ah, I need legal
16 advice?
17 A. Because I was retired and received a
18 subpoena and I wanted the FOP's advice what to do.
19 Q. So you wanted to know whether you had
20 to comply with the subpoena?
21    MS. ROSEN: Objection, form.
22    MR. ENQUIST: Join.
23    THE WITNESS: No. I just wanted to
24 know what I had to do as a retired policeman.
25

---

Page 32

1    BY MS. BONJEAN:
2 Q. What did you have questions about?
3 Well, what was your uncertainty about whether
4 you -- what you had to do in response to a
5 subpoena?
6 A. It was a subpoena to appear at 26th and
7 California, and I wanted to know what the
8 procedure was for me being retired.
9 Q. And why did you think the Fraternal
10 Order of Police was the place to go to figure out
11 whether you had to comply with the subpoena?
12 A. I pay monthly dues for that advice.
13 Q. Thanks for telling me that, I
14 appreciate the information, but not what I asked.
15    My question was, what makes you
16 think -- why was the Fraternal Order of Police
17 able -- why did you believe the Fraternal Order of
18 Police was who you needed to consult with to
19 determine whether you had to respond to a
20 subpoena?
21    MS. ROSEN: Objection, asked and
22 answered.
23    MR. ENQUIST: Join.
24    MS. ROSEN: He just told you why.
25    THE WITNESS: I received your subpoena

---

Maysonet v.
Guevara

Video Deposition

Page 33

1  to appear at 26th and California and I wanted
2  legal advice.
3      BY MS. BONJEAN:
4  Q.  You thought you needed legal advice,
5  right?
6      MS. ROSEN: Object to the form.
7      MR. ENQUIST: Join.
8      THE WITNESS: No.  I wanted to know
9  what my rights were as a retired police
10  officer.
11      BY MS. BONJEAN:
12  Q.  Because you didn't want to come
13  testify, correct?
14      MS. ROSEN: Object to the form,
15  harassing.
16      MS. SPIVY: Join.
17      THE WITNESS: I did not say that.
18      BY MS. BONJEAN:
19  Q.  What rights did you think you might
20  have?
21  A.  I wanted to --
22      MS. ROSEN: Object to the form.  You
23  can go ahead and answer.
24      MR. ENQUIST: Go ahead.
25      THE WITNESS: I wanted to know what a

Page 34

1  retired police officer, what the procedure is
2  for answering a subpoena at 26th and
3  California.
4      BY MS. BONJEAN:
5  Q.  You, sir -- again, you were a police
6  officer for how long?
7  A.  A couple weeks short of 40 years.
8  Q.  40 years.  And in your 40 years as a
9  Chicago Police officer, have you seen any
10  subpoenas in your time?
11  A.  I have.
12  Q.  And you understand that they are court
13  orders, correct?
14  A.  Yes.
15  Q.  You understand that it's summoning you
16  to appear in court to give testimony about a
17  matter that you have information about, correct?
18  A.  Yes.
19  Q.  You certainly understand that you are
20  not at liberty to ignore court subpoenas, correct?
21  A.  Yes.
22  Q.  Okay.  And that when you are issued a
23  subpoena that's served on you, that you are
24  obligated to respond to the subpoena because it's
25  a court order, right?

Page 35

1  A.  Yes.
2  Q.  Okay.  So what was confusing about that
3  to you when you received it?
4      MS. ROSEN: I'm going to object.  He
5  never said it was confusing, so I'm objecting
6  to the form.  I'm objecting that this is
7  argumentative, and I don't believe he ever
8  said that he wasn't going to comply with the
9  subpoena so I'm not even sure why you're even
10  going down this road and wasting time.
11      MS. BONJEAN: Go ahead, you can answer.
12      THE WITNESS: As a retired police
13  officer, I wanted to know what the procedure
14  was for me in particular to appear in court.
15      BY MS. BONJEAN:
16  Q.  Did you believe that maybe the rules of
17  subpoenas were different because you were a
18  retired Chicago Police officer?
19      MS. ROSEN: Objection, relevance.
20      MR. ENQUIST: Join.
21      THE WITNESS: I wanted to know what the
22  procedure was for a retired police officer,
23  in particular, me.
24      BY MS. BONJEAN:
25  Q.  I know.  You testified to that more

Page 36

1  than once and I heard you.  I have a different
2  question, okay, if you could answer the question I
3  have, which is, did you believe that subpoenas,
4  court orders, subpoenas, didn't have the same
5  effect because you were retired?
6      MS. ROSEN: Object to the form,
7  argumentative.
8      MR. ENQUIST: I'll join.
9      THE WITNESS: Again, I wanted to know
10  what the procedure was pertaining to a
11  retired police officer.
12      BY MS. BONJEAN:
13  Q.  I know.  I heard you say that, and I
14  don't doubt that you wanted to know what the
15  procedure was.
16      My question is, did you believe that
17  maybe you didn't have to respond to the subpoena
18  because you were retired?
19  A.  I have to give you the same answer.  I
20  wanted to know what the procedure was for a
21  retired police officer to --
22  Q.  Did you -- sorry.  Didn't mean to cut
23  you off.
24  A.  -- to appear in court.
25  Q.  Okay.  Did you believe that retired

Maysonet v.
Guevara

Video Deposition

Page 37

1 police officers did not have to comply with
2 subpoenas?
3 A. I did not believe that.
4 Q. Okay. So you knew you had to comply
5 with the subpoena, right?
6 MS. ROSEN: Objection, asked and
7 answered.
8 MR. ENQUIST: Join.
9 THE WITNESS: I knew that I was
10 subponaed to appear in court. Your
11 subpoena, I called the FOP because I wanted
12 to know what the procedure was for a retired
13 police officer.
14 BY MS. BONJEAN:
15 Q. Okay. And you knew that you had to
16 comply with the subpoena, right?
17 MR. ENQUIST: Objection, asked and
18 answered.
19 THE WITNESS: Yes.
20 BY MS. BONJEAN:
21 Q. And did you do anything else after
22 receiving the subpoena from Mr. Maysonet?
23 MR. LEINENWEBER: Objection, form,
24 vague.
25 THE WITNESS: I'm not sure I know what

Page 38

1 you mean.
2 BY MS. BONJEAN:
3 Q. Sure. Did you contact anyone else
4 after receiving the subpoena; again, not anyone
5 associated with the FOP?
6 A. Yes. I received a phone call from an
7 FOP representative.
8 Q. Who?
9 A. I don't know.
10 Q. So you don't know who called you a few
11 years ago in connection with the Maysonet case?
12 MS. ROSEN: Objection, asked and
13 answered.
14 THE WITNESS: I don't know what person
15 from the FOP called me back.
16 BY MS. BONJEAN:
17 Q. Okay. So when you called the FOP, you
18 called who? Was there a phone number, a direct
19 line, how do you call them?
20 A. I called them on the telephone number
21 that's on -- that was on my current FOP book that
22 year.
23 Q. Okay. And who did you speak to when
24 you called them?
25 A. Whoever answered the phone. I know it

Page 39

1 was a female.
2 Q. Okay. And what did you say to her?
3 A. I identified myself as a retired police
4 officer, I told them I received a subpoena, I said
5 I would like some legal advice.
6 Q. And what did she say in response?
7 A. Spell your name, what phone number
8 could you be reached at, and that was the end of
9 the conversation.
10 Q. Okay. And you then got a return phone
11 call?
12 A. Some time later.
13 Q. Okay. And you got a return phone call
14 from an FOP representative?
15 A. Yes.
16 Q. Whose name you don't recall, correct?
17 A. It was one of their officers at the
18 time. I wouldn't know if he's still an officer,
19 if that person is an officer, is back on the
20 street or retired.
21 Q. Okay. Not someone you knew previously?
22 A. I don't think I knew who that person
23 was.
24 Q. Okay. And what did he say when he
25 called you?

Page 40

1 A. He asked me how they could be of
2 service. I told them I received a subpoena. I
3 told him what the subpoena -- the name of the
4 subpoena and also your name, and they said thank
5 you, somebody will be calling you.
6 Q. All right. And did you eventually get
7 another call?
8 A. Yes.
9 Q. And who was that from?
10 A. Attorney Tim Grace.
11 Q. Now, after receiving the subpoena from
12 me, did you reach out to anybody else other than
13 the FOP?
14 A. I said I received a phone call from
15 attorney Tim Grace.
16 Q. Right. And my question is, after
17 receiving the subpoena, did you contact anyone
18 else aside from the FOP?
19 A. Well, Tim Grace is not part of the FOP,
20 he's a private attorney.
21 Q. And you testified that he contacted
22 you, right?
23 A. Yes.
24 Q. Okay. Well, I'm asking you whether you
25 contacted someone else after you received the

Rizman Rappaport (973)992-7650
"When every word counts"

Page 41

1  subpoena?  Forget about Tim Grace.
2  A.  I didn't contact anybody.
3  Q.  Okay.  You didn't contact any other
4  officers?
5  A.  No.
6  Q.  You didn't contact Mingey?
7  A.  No.
8  Q.  Guevara?
9  A.  No.
10  Q.  Montilla?
11  A.  No.
12  Q.  Epplen?
13  A.  No.
14  Q.  Bill Dorsch?
15  A.  He contacted me.
16  Q.  When did he contact you?
17  A.  Almost immediately, a couple days after
18  I received the subpoena.
19  Q.  Okay.  And what did Bill Dorsch say to
20  you when he contacted you?
21  A.  That he worked for you.
22  Q.  He worked for me?
23  A.  Yes.
24  Q.  Okay.  And did he say what he did for
25  me?

Page 42

1  A.  Yes.
2  Q.  What did he say?
3  A.  He's an investigator for you.
4  Q.  Okay.  And did he suggest that he had
5  investigated the Maysonet case?
6  A.  No.
7  Q.  Okay.  What else did he say?
8  A.  He asked that I call you in New York.
9  Q.  Okay.
10  A.  Then after suggesting that, he says,
11  but I don't think she's in New York, I think she's
12  in Chicago.
13  Q.  Okay.  And then what did you say?
14  A.  I said thanks, Bill, and I ended the
15  conversation.
16  Q.  Okay.  Any further conversation with
17  Mr. Dorsch?
18  A.  Several.
19  Q.  You mean after receiving the subpoena?
20  A.  Yes.
21  Q.  Okay.  When is the next time you spoke
22  to Bill Dorsch?
23  A.  When I was -- before I retired from the
24  Chicago Board of Education, he would unexpectedly
25  come into the building that I was working at.

Page 43

1  Q.  Okay.  When did you retire?
2  A.  A little bit over two years ago.
3  Q.  And when he would come by, did you
4  speak with him?
5  A.  I had no choice.
6  Q.  Why didn't you have any choice?
7  A.  Well, I worked with him, I wanted to
8  give him the courtesy of seeing what he wanted.
9  Q.  Well, you had a choice?
10      MS. ROSEN: Object to the form and
11  argument.
12      BY MS. BONJEAN:
13  Q.  It's not accurate you didn't have a
14  choice; you chose to, right?
15      MS. ROSEN: Objection, form,
16  argumentative.
17      THE WITNESS: It was my choice.
18      BY MS. BONJEAN:
19  Q.  It was your choice?
20  A.  Well, it was -- I had no option.  He
21  was in a school that I worked in and I wanted to
22  give him the courtesy.
23  Q.  Right.  You wanted to give him the
24  courtesy to speak to him.  That was your choice,
25  correct?

Page 44

1  A.  Yes.
2  Q.  And what was the nature of your
3  conversations?
4  A.  He would ask me things that were, in my
5  opinion, unnecessary to talk about and then he
6  would talk about you and another attorney.
7  Q.  What other attorney?
8  A.  I think her first name is Kathleen.
9  Zellner.
10  Q.  Uh-huh.  And what did he say about me
11  and Kathleen Zellner?
12  A.  That he worked for you.
13  Q.  Oh, okay.  And what did he say he did,
14  he did investigative work for me?
15  A.  Yes.
16  Q.  Did he mention whether he did
17  investigative work for Ms. Zellner?
18  A.  Yes.
19  Q.  Anybody else?
20  A.  Then he told me that he was also
21  working for Northwestern University wrongful
22  convictions.
23  Q.  Okay.  And what did you say in response
24  to Mr. Dorsch announcing to you that he worked for
25  Northwestern University's center on wrongful

Page 45

1  convictions and other defense attorneys?
2  A.  Told him that was nice that he was
3  making money.
4  Q.  Anything else?
5  A.  Probably asked how he was doing.  I
6  know he said he was divorced, asked him if he was
7  going out with anybody.  He told me he married a
8  woman that had a chain of hotels.
9  Q.  Anything else you discussed?
10  A.  His toupee.
11  Q.  What did you discuss about his toupee?
12  A.  Well, over the years that I worked with
13  Bill, he would always have a different hairstyle.
14  I remember once we were out of the car and his
15  toupee was blown off by the wind.
16  Q.  So you chuckled about this story from
17  the past, is that right?
18  A.  I did.
19  Q.  Okay.  Did you ask him why he testified
20  that Reynaldo Guevara had motioned or indicated to
21  a witness viewing a photo array who to identify
22  from that photo array?
23  A.  I know he was obsessed with a couple
24  people from Area 5.  He did speak about Reynaldo.
25  To be honest with you, it went in one ear and went

Page 46

1  out the other.  I'm no longer a policeman, I
2  didn't want to hear it.
3  Q.  So you didn't ask him anything about
4  his prior testimony that he had witnessed Reynaldo
5  Guevara suggest to a witness who to identify from
6  a photo array?
7  A.  Never said that to me.
8  Q.  Were you aware that he had testified to
9  that?
10  A.  Sometime after he did that, yes, I was.
11  Q.  So you weren't aware of that two years
12  ago when he came and visited you at the Department
13  of Education?
14  A.  Actually no, I wasn't.
15  Q.  When did you first become aware that he
16  had given sworn testimony in a number of cases
17  about Guevara suggesting to a witness who to pick
18  out of a photo array?
19      MS. ROSEN: Object to the form.
20      THE WITNESS: Sometimes after -- excuse
21  me.  Sometime after his visits to me.
22      BY MS. BONJEAN:
23  Q.  And how did you learn that information?
24  A.  Well, he would bring it up after a
25  couple contacts that I had with him when he would

Page 47

1  come in.  That's when I found out about it.
2  Q.  And you actually were partners with
3  Dorsch at one time?
4  A.  Oh, yeah.
5  Q.  How long?
6  A.  Well, we were in the 20th District
7  together as patrolmen and we were on the same
8  watch on the same tactical team.  And then when he
9  became a detective, I couldn't give you
10  approximately how many years.  It was several
11  years on and off.
12  Q.  And you both were the subject of
13  complaint registers investigations together from
14  time to time, right?
15      MS. ROSEN: Object to the form.
16      THE WITNESS: I think so.
17      BY MS. BONJEAN:
18  Q.  Although you have much more extensive
19  complaint register history, right?
20      MS. ROSEN: Object to the form.
21      MR. ENQUIST: Foundation.
22      MS. SPIVY: Join.
23      THE WITNESS: I don't know that.
24      BY MS. BONJEAN:
25  Q.  Do you know how many complaint

Page 48

1  registers you had lodged against you in your
2  career?
3  A.  Don't know, don't care.
4  Q.  Did you ever care?
5  A.  I don't think so.
6  Q.  Don't think so?
7  A.  No.
8  Q.  Okay.  Did your conversations with your
9  former partner involve anything else than what you
10  have already described here?
11  A.  You mean Bill?
12  Q.  Yeah.
13  A.  I think one conversation, it was about
14  another case that we had or that he kept telling
15  me that he had knowledge of.  I didn't have any
16  part of it but --
17  Q.  What was the case?
18  A.  John Wayne Gacy.
19  Q.  Oh, okay.  Anything else?
20  A.  And the Brown's Chicken case.
21  Q.  And what did he ask you about the
22  Brown's Chicken case?
23  A.  He didn't ask me anything.  He was
24  telling me that the wrong people were in custody
25  and that he's investigating it again and it's

Maysonet v.
Guevara

Video Deposition

---

Page 49

1  going to be the subject of a documentary.
2  Q.   And did you have any firsthand
3  knowledge about the Brown's Chicken investigation?
4  A.   I did not have firsthand knowledge of
5  it.
6  Q.   Did you have secondhand knowledge about
7  the Brown's Chicken investigation?
8      MS. ROSEN: Object to the form,
9  relevance.
10     THE WITNESS: I was conducting an
11  investigation with Bill in Area 5 where a
12  couple people that we were talking to related
13  some kind of knowledge of Brown's Chicken.
14     BY MS. BONJEAN:
15  Q.   Were you on the task force for the
16  Brown's Chicken?
17  A.   No.
18  Q.   How was it that you were investigating
19  the Brown's Chicken?
20     MS. ROSEN: Objection, relevance.
21     THE WITNESS: We were conducting an
22  investigation and Brown's Chicken came up,
23  and with that information we went to our
24  commander and had a conversation with our
25  commander about a couple things that was

---

Page 50

1  brought up during an unrelated investigation.
2      BY MS. BONJEAN:
3  Q.   And what was the significance as it
4  relates to the Brown's Chicken murder?
5  A.   Well, it was all over the news media
6  about Brown's Chicken, and we wanted to tell the
7  task force there was information that was gathered
8  on an unrelated matter, maybe they would like to
9  talk to these people.
10  Q.   And do you know whether they did?
11  A.   I believe Sergeant Paul Carroll did,
12  and Dick Zuley.
13  Q.   And was this information that
14  inculpated the charged individuals or exculpated
15  the charged individuals?
16     MS. ROSEN: Objection, relevance.
17     THE WITNESS: I don't know what they
18  did with the information.
19     BY MS. BONJEAN:
20  Q.   And what was the information?
21  A.   It's so long ago, I don't recall.
22  Q.   Well, do you remember anything about
23  it?
24     MS. ROSEN: Objection, relevance.  I'm
25  going to have a standing objection to all

---

Page 51

1  these Brown's Chicken murder questions,
2  investigation questions.  Just because you
3  have a particular interest in it doesn't make
4  it relevant in this case.
5      MS. BONJEAN: I have just a couple more
6  questions because it's --
7      MS. ROSEN: I still have a standing
8  objection to all of them.
9      MS. BONJEAN: That's fine.
10     BY MS. BONJEAN:
11  Q.   I'm just wondering, you said you spoke
12  to some witnesses.  What was the nature --
13  A.   No, I did not say that.
14  Q.   Okay.  Do you typically investigate
15  cases that are outside your jurisdiction?
16     MS. ROSEN: Objection, form.
17     MR. ENQUIST: Join.
18     THE WITNESS: Not typically.
19     BY MS. BONJEAN:
20  Q.   And what made you do so in this case?
21     MS. ROSEN: Objection, form,
22  mischaracterizes his testimony.  I don't
23  think he said anything about he conducted an
24  investigation.
25     MS. BONJEAN: I think he did.

---

Page 52

1      THE WITNESS: As I said before, I was
2  conducting an unrelated investigation.  That
3  word came up, I went to my supervisor,
4  contacted the two Chicago Police officers
5  that were assigned to the task force.  That's
6  all the conversation that I had about Brown's
7  Chicken.  That's the only thing I did.
8  Whether they acted on it, I don't know.
9      BY MS. BONJEAN:
10  Q.   Okay.  Anything else between you and
11  Mr. Dorsch that was communicated when
12  Mr. Maysonet's case came back to the circuit
13  court?
14  A.   Bill would always talk about the same
15  thing.  I would listen and glad that he left when
16  he did.
17  Q.   And what did he -- you say he always
18  talked about the same thing.  What's the same
19  thing that he kept talking about?
20  A.   You.
21  Q.   What else besides the fact that -- go
22  ahead?
23  A.   Attorney Zellner, and he talked about
24  his son being fired from the police -- one of his
25  sons being fired from the police department.

---

Rizman Rappaport (973)992-7650
"When every word counts"

Page 53

1 Q.  Okay.
2 A.  He would always talk about how he did
3   not like the majority of the people in Area 5.
4 Q.  Anything else?
5 A.  That's all I remember.
6 Q.  And anything else related to
7   Mr. Maysonet's case?
8 A.  Just to call you.
9 Q.  Did he say why he wanted you to call
10   me?
11 A.  He asked if I received the subpoena.
12   My impression was he knew I received that
13   subpoena, and he wanted me to call you in
14   New York.  And then he says, I believe she's in
15   Chicago.
16 Q.  Okay.  Did you find that unusual?
17 A.  Didn't even think about it.
18 Q.  Sounds like it's one of the few things
19   you actually remember.
20   MR. ROSEN: Objection to the form,
21   argumentative.
22   MR. ENQUIST: Join.
23   MS. BONJEAN: I'll withdraw it.
24   BY MS. BONJEAN:
25 Q.  Okay.  Did you contact any of the other

Page 54

1   individuals who have been sued with you in this
2   case after receiving the subpoena?
3 A.  Never.
4 Q.  You remember coming up to me at 26th
5   Street?
6 A.  I remember you coming up to me with a
7   picture of myself and you asked if I wanted to
8   talk to you, and I told you absolutely not, I'll
9   only talk to my attorney.
10 Q.  Okay.  And I had a picture of you?
11 A.  Yes, you did.  You had a board like
12   that and there was a black and white photo of me.
13 Q.  Was it an old photo, was it a new
14   photo?
15 A.  I don't recall.
16   MS. ROSEN: Objection, relevance.
17   THE WITNESS: I know it was me.  I
18   don't know when it was taken, how it was
19   taken, where it was taken.
20   BY MS. BONJEAN:
21 Q.  So I had a photo of you.  Was it a
22   photo of you as a Chicago Police officer or like
23   recently, like -- you know, I don't know, since
24   your retirement?
25   MS. ROSEN: Objection, relevance.

Page 55

1   MR. ENQUIST: Asked and answered.
2   THE WITNESS: I don't know when it was
3   taken, where it was taken, how it was taken.
4   BY MS. BONJEAN:
5 Q.  You can't even recollect whether it was
6   you as a young man or you as an old man?
7   MS. ROSEN: Object to the tone of your
8   voice, object to this line of questioning as
9   irrelevant and if you want to make yourself a
10   witness, clearly you don't believe you showed
11   him a photograph, then we can talk about you
12   being a witness in the case and we can depose
13   you, but --
14   MS. BONJEAN: Yes, because I'm sure me
15   showing the man a picture of himself is
16   certainly material to something, somewhere,
17   somehow.
18   MS. ROSEN: Then why are you asking
19   about it?
20   MS. BONJEAN: I'm just curious.  He
21   testified to it.
22   MS. ROSEN: Okay.  Well, depositions
23   aren't about your curiosity.  We've heard
24   about your curiosity over the Brown's murder
25   investigation.  Now we're hearing about your

Page 56

1   curiosity about showing him a picture that
2   you clearly disbelieve that you showed him.
3   MS. BONJEAN: Are you done yelling?
4   MS. ROSEN: I am, because you're
5   wasting time.
6   MS. BONJEAN: Well, you know what?
7   MS. ROSEN: How about relevant
8   testimony, relevant questions?
9   MS. BONJEAN: You don't get to decide
10   what's relevant.  I mean, you're not the
11   final arbiter on that.
12   MS. ROSEN: You're right.  I'm not the
13   final --
14   MS. BONJEAN: So perhaps maybe limit
15   the speaking objections so that we can move
16   ahead.
17   MS. ROSEN: I will make my objections
18   based on what they are.
19   MS. BONJEAN: Okay.  Well, I'm going to
20   ask my questions.
21   MS. ROSEN: Go ahead.  You have seven
22   hours.  Fill it how you see fit.
23   BY MS. BONJEAN:
24 Q.  So you would agree we never actually
25   saw each other before the Maysonet criminal

Maysonet v.
Guevara

Video Deposition

Page 57

1　prosecution, right?
2　　MS. ROSEN: Objection, relevance.
3　　THE WITNESS: I never knew who you were
4　until you came up to me as I was sitting in
5　the gallery.
6　　BY MS. BONJEAN:
7　Q.　And do you have any theory about how I
8　would have known what you looked like?
9　　MS. ROSEN: Objection, relevance.
10　　THE WITNESS: Never thought about it.
11　　BY MS. BONJEAN:
12　Q.　And so it's your testimony that I
13　approached you, not that you approached me, is
14　that right?
15　　MS. ROSEN: Objection, relevance.
16　　MR. LEINENWEBER: Also asked and
17　answered.
18　　MR. ENQUIST: Join.
19　　THE WITNESS: I didn't know who you
20　were.　You came up to me.　You introduced
21　yourself.　I did not want to talk to you at
22　all.
23　　BY MS. BONJEAN:
24　Q.　And we didn't talk, did we?
25　　MS. ROSEN: Objection, relevance.

Page 58

1　　THE WITNESS: The only thing I said to
2　you, you asked me who I was.　I told you yes,
3　I was.　You asked me if I wanted to talk.　I
4　says absolutely not.
5　　BY MS. BONJEAN:
6　Q.　Okay.　By the way, do you remember my
7　questions about you being under oath?
8　　MS. ROSEN: Objection, form,
9　argumentative.
10　　BY MS. BONJEAN:
11　Q.　Do you know what the oath means?
12　　MS. ROSEN: Objection, argumentative.
13　　MR. ENQUIST: Join.
14　　THE WITNESS: Yes, I do.
15　　MS. ROSEN: And as I indicated earlier,
16　if we're going to go down this road, then
17　you're risking us putting you under oath.
18　　MS. BONJEAN: Please, put me under
19　oath.
20　　MS. ROSEN: Fine.　Get yourself
21　disqualified out of the case.
22　　MS. BONJEAN: You know what? I wish I
23　had a dollar for every time someone tried to
24　disqualify me from a case.
25　　MR. LEINENWEBER: You're getting 2

Page 59

1　bucks.
2　　MS. BONJEAN: It's actually been far
3　more.
4　　MS. ROSEN: What does that say?　We
5　won't go there.
6　　MS. BONJEAN: No, it does say
7　something, doesn't it?
8　　MS. ROSEN: Yeah, it does.
9　　MS. BONJEAN: Unsuccessfully, by the
10　way.
11　　MS. ROSEN: It does say a lot about
12　your tactics.　That's what it says.
13　　MS. BONJEAN: Or effectiveness.
14　　MS. ROSEN: We'll see about that.
15　　BY MS. BONJEAN:
16　Q.　In any event, just to be clear, I
17　approached you, we never met before, right?
18　　MS. ROSEN: Objection, asked and
19　answered for I think the third time.
20　　MR. ENQUIST: Join.
21　　BY MS. BONJEAN:
22　Q.　Where were we?
23　　MS. ROSEN: 26th and California.
24　　MS. BONJEAN: It's a big building if
25　you've ever been there.

Page 60

1　　MR. LEINENWEBER: He already testified
2　in the gallery.
3　　BY MS. BONJEAN:
4　Q.　Was it in the gallery that I approached
5　you?
6　A.　When I was seated on the bench.　That's
7　when you came up to me.　It was one of the small
8　courtrooms.
9　Q.　Okay.　And what was I wearing?
10　A.　I don't know.
11　Q.　How did you know it was me?
12　A.　You told me it was you.
13　　MS. ROSEN: Objection, relevance.
14　　BY MS. BONJEAN:
15　Q.　All right.　And then after you said you
16　didn't want to speak to me or whatever transpired
17　during this conversation in which I showed you a
18　picture that you have zero recollection of, what
19　did you do?
20　　MR. ENQUIST: Objection, form.
21　　MS. ROSEN: Object to the form, object
22　to the argumentative, object to the
23　relevance.
24　　MR. LEINENWEBER: Also misstates the
25　witness' testimony.

Page 61

1    MR. ENQUIST: Join.
2    THE WITNESS: I stayed seated in the
3 gallery.
4    BY MS. BONJEAN:
5 Q.  Now, after receiving this subpoena,
6 we'll go back to that, it's your testimony that
7 you did not make contact either by telephone or
8 e-mail or in any other fashion with any of the
9 other individuals who are co-defendants in this
10 case, correct?
11    MS. ROSEN: Objection, asked and
12 answered.
13    THE WITNESS: I never called anyone.
14    BY MS. BONJEAN:
15 Q.  That's not my question.  Did you have
16 any contact whatsoever with any of the other
17 individuals in this case, whether they initiated
18 contact or you initiated contact, after you
19 received the subpoena?
20    MR. LEINENWEBER: Objection, vague.
21    THE WITNESS: I never seen them, talked
22 to them, met with hem.
23    BY MS. BONJEAN:
24 Q.  So the answer is no, you had no contact
25 with any of the other co-defendants in this case

Page 62

1 after you received the subpoena until you arrived
2 at 26th Street?
3 A.  When I received the subpoena, I went to
4 26th and California.  I was standing in the
5 hallway.  I saw Freddie first.  A couple minutes
6 later I saw Ernie and Eddie.  That's the first
7 time I ever met them, saw them, talked to them.
8 Q.  So the first time you saw them was in
9 the hallway at 26th Street after you received the
10 subpoena, correct?
11 A.  That's when I answered your subpoena.
12 Q.  Yes.  And the first time you spoke to
13 any one of them was at 26th Street after you
14 received the subpoena, correct?
15 A.  Yes, ma'am.
16 Q.  And you didn't receive a call or
17 initiate a call to Guevara?
18 A.  No.
19 Q.  Why do you say it with such adamance?
20 Do you have an issue with Guevara?
21    MS. ROSEN: Objection, form.
22    THE WITNESS: I'm answering your
23 question.
24    BY MS. BONJEAN:
25 Q.  What about Mingey?

Page 63

1 A.  No.
2 Q.  Montilla?
3 A.  No.
4 Q.  Halvorsen?
5 A.  No.
6 Q.  Did you reach out to any Cook County
7 State's Attorneys after receiving this subpoena?
8 A.  No.
9 Q.  So the only individuals you spoke to
10 after receiving the subpoena were FOP
11 representatives and then eventually Tim Grace, who
12 contacted you, is that right?
13 A.  And you at the court building.
14 Q.  Right.  I was saying before you went to
15 court, but okay.
16 A.  Oh.
17 Q.  You weren't up in the cafeteria with
18 any of the defendants when you were at 26th
19 Street?
20    MS. ROSEN: Object to the form.
21    THE WITNESS: I was not.
22    BY MS. BONJEAN:
23 Q.  And did you have any conversations
24 about anything related to the Maysonet case when
25 you were in the hallway with your fellow

Page 64

1 co-defendants?
2 A.  I had no conversation about that case.
3 Q.  Okay.  What did you guys talk about in
4 the hallway?
5 A.  Again, I hadn't seen them for years.  I
6 was inquiring how they were and how their family
7 was.
8 Q.  Anything else?
9 A.  Could have been.  I don't recall.
10 Q.  So to the best of your recollection,
11 the only thing you remember talking about in the
12 hallway at 26th Street with Montilla and Halvorsen
13 and the other co-defendants is idle talk, right?
14 A.  Sure.  I hadn't seen them for years.
15 Q.  Okay.  But that was the scope and
16 extent of your conversation, right?
17    MS. ROSEN: Objection, asked and
18 answered.
19    BY MS. BONJEAN:
20 Q.  To the best of your recollection?
21 A.  Didn't talk about this case.
22 Q.  Did you talk about any other cases?
23    MS. ROSEN: Objection, asked and
24 answered.
25    THE WITNESS: I only said to them,

Maysonet v.
Guevara

Video Deposition

Page 65

1  how's things going, stuff like that.
2      BY MS. BONJEAN:
3  Q.  Did you discuss Rey at all with any of
4  these individuals?
5  A.  Not at all.
6  Q.  All right.  So at what point did you
7  realize or learn that Mr. Maysonet's double murder
8  conviction had been vacated?
9  A.  It was sometime after I received the
10  subpoena.
11  Q.  Okay.  And how did you learn that
12  information?
13  A.  I think it was from Tim Grace.
14  Q.  Okay.  And if it calls for a
15  communication between you and your counsel, you
16  can assert your privilege.  If your answer calls
17  for a communication, that is.
18      Did you have -- how many calls did you
19  have with Mr. Grace before you appeared at 26th
20  Street?
21  A.  There was the initial conversation and
22  then I went down to his office.
23  Q.  When did you decide that you would
24  assert your Fifth Amendment right to remain silent
25  if called to testify during the Maysonet hearing

Page 66

1  and trial?
2  A.  I never decided to or not to.  I
3  listened to my attorney as he was telling me what
4  that --
5      MR. ENQUIST: Don't go into the
6  conversations you had with your attorney.
7      THE WITNESS: Okay.  I did not make a
8  decision.
9      BY MS. BONJEAN:
10  Q.  Well, you knew Mr. Grace had
11  represented that you would assert your Fifth
12  Amendment right to the Cook County State's
13  Attorneys and to actually the judge as well,
14  right?
15  A.  The only thing I'm going to say to that
16  is he informed me what the Fifth was.  I did not
17  make a decision.
18  Q.  Okay, my question is different.  You
19  were aware that Mr. Grace had represented to both
20  the Cook County State's Attorney's office and the
21  judge and in open court that you would assert your
22  Fifth Amendment right if you were called to
23  testify.
24      You were aware of that, right?
25  A.  I was not at the court proceeding and I

Page 67

1  did not make a final decision.
2  Q.  Okay.  You were aware that he made that
3  representation, correct?
4  A.  Again, I wasn't in court.  I did not
5  know what I was going to do at the final moment.
6  Q.  I didn't ask you what you were going to
7  do at the final moment.
8      MS. ENQUIST: Can you read back my
9  question and see if he'll answer it if you
10  ask it?
11      MS. ROSEN: Object to the form, object
12  to the argumentative, the editorial comments.
13      MR. ENQUIST: Join.
14      (Record read as requested.)
15      THE WITNESS: I wasn't in court.  I
16  don't know what motions he made.
17      BY MS. BONJEAN:
18  Q.  So you were not aware that he had told
19  the Cook County State's Attorney's office that you
20  would assert your Fifth Amendment right to remain
21  silent if called to testify?
22  A.  I don't know what he said.  I had
23  privileged conversation with him and my mind
24  wasn't made up what I was going to do.
25  Q.  So if Mr. Grace made that

Page 68

1  representation, he did so without your approval,
2  is that your testimony?
3  A.  That is not.
4  Q.  So you understand that the Fifth
5  Amendment privilege belonged to you, not
6  Mr. Grace, right?
7  A.  That's correct.
8  Q.  Okay.  And if he told the Cook County
9  State's Attorney or the judge that you would
10  assert your Fifth Amendment right if called to
11  testify, that that would not be accurate, is that
12  what you're saying?
13  A.  That's not what I'm saying.
14  Q.  Well, I thought you just testified,
15  correct me if I'm wrong, that you had not made a
16  decision?
17  A.  I, the day of that court hearing, was
18  still undecided what I would do.
19  Q.  Okay.  Again, if Mr. Grace represented
20  to the court that you had made a decision and you
21  would assert your Fifth Amendment right, is it
22  your testimony that he misrepresented that?
23      MS. ROSEN: Object to the form,
24  argumentative.
25

Page 69

1    BY MS. BONJEAN:
2 Q. I'm sorry?
3 A. It's not my testimony.
4    MS. BONJEAN: Will you mark this,
5 please?
6    (Whereupon, Paulnitsky
7    Deposition Exhibit No. 1 was
8    marked for identification.)
9    MS. BONJEAN: These were Dropbox. Here
10 are some extra copies.
11    MR. LEINENWEBER: Do you know what the
12 file name is?
13    MS. BONJEAN: Gabby, are you able to
14 figure that out?
15    BY MS. BONJEAN:
16 Q. I'm handing you what has been marked as
17 Exhibit 1.
18    Do you see this letter, Mr. Paulnitsky?
19 A. Yes.
20    MS. BONJEAN: Hold on.
21    MR. LEINENWEBER: That's all right. I
22 have this copy.
23    MS. BONJEAN: Hold on. I'm not sure
24 what it's labeled or if it's in there, but
25 since you have it, you guys hopefully can

Page 70

1 share.
2    BY MS. BONJEAN:
3 Q. Mr. Paulnitsky, have you seen this
4 letter before?
5 A. Yes.
6 Q. You have. And you saw this letter
7 before Mr. Grace sent it because he e-mailed it to
8 you, right?
9 A. I don't recall him e-mailing this to
10 me. That's not to say that he didn't, I just
11 don't recall if he did or not.
12 Q. Well, when do you remember seeing this
13 letter?
14 A. The last time -- or last and first time
15 that I know I've ever seen this was as I was
16 talking to my attorneys.
17 Q. Okay. In this building, correct?
18 A. Yes, ma'am.
19 Q. Okay. And you would agree it's dated
20 November 13, 2017, right?
21 A. Yes.
22 Q. And it's a letter from your attorney,
23 Mr. Grace, to Jim Papa, correct?
24 A. Yes.
25 Q. And Jim Papa was the Cook County

Page 71

1 State's Attorney who was assigned to the Maysonet
2 prosecution, right?
3 A. I don't know that.
4 Q. All right. Well, can you read that it
5 says that he is the Assistant State's Attorney?
6 A. It says that.
7 Q. And that it's regarding Mr. Maysonet?
8 A. Yes.
9 Q. And in this letter, if you look about
10 two thirds down, the first paragraph, Mr. Grace
11 represents to Mr. Papa that, quote, "As such, my
12 clients intend to invoke their right to remain
13 silent afforded them under the Fifth Amendment to
14 the United States Constitution and the due process
15 clause of both the Federal and State Constitutions
16 respectively."
17    Do you see that?
18 A. Yes.
19 Q. "However, they are willing to testify
20 under a grant of immunity"?
21    MS. ROSEN: Is that a question?
22    BY MS. BONJEAN:
23 Q. Are you following along?
24 A. Yes, I'm reading.
25 Q. So do you see that there?

Page 72

1 A. Yes.
2 Q. "We would be requesting full
3 transactional immunity and total blanket immunity
4 from any future prosecution which relates to or
5 arises from their testimony."
6    Do you see that?
7 A. Yes.
8 Q. Why was your attorney asking for
9 immunity?
10    MS. ROSEN: Objection. To the extent
11 that it calls for attorney/client
12 communications it's an improper question.
13    MR. ENQUIST: I join.
14    MS. ROSEN: And foundation and
15 speculation regarding why Mr. Grace did
16 whatever he did.
17    MS. SPIVY: Join.
18    BY MS. BONJEAN:
19 Q. Well, Mr. Grace's letter is a matter of
20 public record, so I'm just asking what your
21 understanding was of why he asked for
22 transactional and total blanket immunity for you
23 and Mr. Montilla?
24    MS. ROSEN: Objection, foundation,
25 calls for speculation and your statement that

Page 73

1  it's a matter of public record, whether it is
2  or isn't, is irrelevant to the objection.
3      MS. BONJEAN: I don't see anything that
4  suggests it's confidential.  Go ahead.
5      MR. ENQUIST: It's confidential.
6      MS. ROSEN: It says "Confidential"
7  across the top of it.  Pooh-pooh the
8  confidentiality.
9      MS. BONJEAN: It's not that.  I didn't
10  see it.  But in any event, it's a matter of
11  public record in this case, certainly, and
12  maybe a matter of public record outside this
13  case at some point.
14      BY MS. BONJEAN:
15  Q.  But in any event, can you answer my
16  question?
17  A.  I had a conversation with Mr. Grace.
18  That conversation is privileged between me and
19  him.
20  Q.  I'm not asking you to tell me about
21  your conversation.  I'm asking you why he
22  asked -- why you wanted immunity.  Why did you
23  want immunity?
24      MS. ROSEN: Object to the form of the
25  question.

Page 74

1      MR. ENQUIST: Join.
2      MS. ROSEN: And to the extent that it
3  invades the attorney/client privilege, it is
4  an improper question.
5      MR. ENQUIST: To the extent that it
6  involves conversations that you had with
7  Grace, I'm going to instruct you not to
8  answer.
9      BY MS. BONJEAN:
10  Q.  Okay.  Mr. Paulnitsky, the
11  attorney/client privilege protects your
12  communications with your counsel and I am not
13  asking for any information about your
14  communications.  But I am asking, why did you want
15  transactional or blanket immunity?
16      MS. ROSEN: Same objection.
17      MR. ENQUIST: Join.
18      THE WITNESS: Same answer.
19      BY MS. BONJEAN:
20  Q.  Which is what?
21  A.  I had a conversation with my attorney
22  Grace.  That conversation is between me and him.
23  Q.  I'm not asking for your conversation,
24  sir.
25      MS. ROSEN: You are.

Page 75

1      MS. BONJEAN: No, I'm not.
2      MS. ROSEN: If that's his answer, then
3  yes, you are.
4      MS. BONJEAN: I'm not asking for his
5  communications.  I'm asking why he wanted
6  transactional and full blanket immunity.
7      MS. ROSEN: If the -- hypothetically
8  speaking, if the reason is only because of
9  information provided to him by his lawyer,
10  then yes, you are.  Yes.  If I were to ask
11  your client that question, you would be
12  screaming bloody murder.
13      MS. BONJEAN: I never assert privilege,
14  not once in any litigation, so I don't know
15  where you're getting that from.  We have
16  nothing to hide.  So go ahead, sir.
17      MS. ROSEN: Okay.  We'll remember that.
18      THE WITNESS: I had a conversation with
19  attorney Grace.  That conversation is between
20  me and him and nobody else.
21      BY MS. BONJEAN:
22  Q.  Okay.  Well, no one is asking about
23  your conversation.  You wanted blanket immunity,
24  right?
25  A.  Again, I had a conversation with

Page 76

1  Mr. Grace.  That conversation is between me and
2  him only.
3  Q.  Sir, you're not suggesting that
4  Mr. Grace misrepresented anything to Mr. Papa,
5  correct?
6      MS. ROSEN: Objection, asked and
7  answered.
8      MR. ENQUIST: Join.
9      THE WITNESS: I never said that, I
10  never suggested it.
11      BY MS. BONJEAN:
12  Q.  Okay.  So Mr. Grace would not have
13  represented something to Mr. Papa that was a lie,
14  right?  You have no reason to believe that,
15  correct?
16      MS. ROSEN: Objection, form.
17      THE WITNESS: Again, ma'am, my
18  conversation with my attorney is between me
19  and him and nobody else.
20      BY MS. BONJEAN:
21  Q.  Are you having a hard time
22  understanding my questions, sir?
23      MS. ROSEN: Objection, argumentative.
24  I believe your questions are improper, so
25  your question right now of him in that

Page 77

1  argumentative way is improper.
2      BY MS. BONJEAN:
3  Q.  Are you having a hard time
4  understanding my questions?
5  A.  I can only answer that question as I
6  did.
7  Q.  Okay.  Mr. Grace represented that "my
8  clients," that being you, "intend to invoke their
9  right to remain silent."
10     Do you see that in this letter?
11 A.  Yes.
12     MS. ROSEN: Objection, asked and
13 answered.
14     BY MS. BONJEAN:
15 Q.  Okay.  And you have no reason to tell
16 me here today that Mr. Grace was going rogue and
17 was not -- was indicating something that was not
18 consistent with your wishes, right?
19 A.  I never said that.
20 Q.  Okay.  So you wanted to -- you
21 indicated to the Cook County State's Attorney's
22 office that you were going to exercise your Fifth
23 Amendment rights through your counsel, right?
24     MS. ROSEN: Objection, form,
25 foundation.

Page 78

1      MR. ENQUIST: And asked and answered.
2      THE WITNESS: I had a conversation with
3  my attorney Grace.  I'm not going to get into
4  that conversation.  I never had a
5  conversation with the State's Attorney's
6  office.
7      BY MS. BONJEAN:
8  Q.  Okay.  But he represented to the
9  State's Attorney that you were going to assert
10 your Fifth Amendment right.  We can agree on that,
11 correct?
12 A.  I only agree with what's on black and
13 white.
14 Q.  Right.  And on black and white he
15 indicated that you would assert your Fifth
16 Amendment right, so we've established that.  He
17 also indicated that you would be willing to
18 testify under a grant of immunity.
19     That's in black and white here too,
20 right?
21 A.  It is.
22 Q.  Okay.  And he also represented on your
23 behalf that you would testify only if you received
24 full transactional immunity and total blanket
25 immunity.

Page 79

1      That's in black and white here as well,
2  correct?
3  A.  Yes.
4  Q.  And Mr. Grace, you don't know him to be
5  a liar, right?
6      MS. ROSEN: Objection, asked and
7  answered.
8      THE WITNESS: I thought he was a
9  fantastic, great attorney.
10     MR. ENQUIST: I just want to go back
11 and object to, you mischaracterized the
12 document when you said "only," but you can
13 answer the question.  I object to the form, I
14 just couldn't read fast enough.
15     BY MS. BONJEAN:
16 Q.  He writes on the second page that, "My
17 clients are retired and older men and to be quite
18 honest, are afraid of the climate that exists in
19 these types of post conviction proceedings."
20     Do you see that?
21 A.  Yes.
22 Q.  What climate were you afraid of in
23 these post-conviction proceedings?
24     MS. ROSEN: Objection, form,
25 argumentative

Page 80

1      THE WITNESS: I had a conversation with
2  my attorney Grace.  That conversation is
3  privileged.
4      BY MS. BONJEAN:
5  Q.  So is it your testimony that you only
6  became afraid of the climate after you spoke to
7  your attorney, Mr. Grace?
8      MS. ROSEN: Objection, form, and to the
9  extent that it requests information protected
10 by attorney/client privilege, it's
11 objectionable.
12     MR. ENQUIST: If it has to do with a
13 conversation you just had with Grace, I'll
14 instruct you not to answer.  But if it has to
15 do with somebody from the outside, you can
16 answer the question.
17     THE WITNESS: It was part of a
18 conversation that I had with Mr. Grace, but
19 to be honest with you, everything you see in
20 the newspaper today is how we hate the police
21 and derogatory against the police, and I did
22 not want to become part of the fake news.
23     BY MS. BONJEAN:
24 Q.  Okay.  What fake news did you fear
25 becoming a part of?

Maysonet v.
Guevara

Video Deposition

Page 81

1    MS. ROSEN: Objection, relevance.
2    THE WITNESS: I did not want my name to
3  be out in any news media for any reason at
4  all, other than obituary column for me.
5    BY MS. BONJEAN:
6  Q.  And why is it that you were so fearful
7  of your name being out in the public realm in
8  connection with any issue other than your death?
9  A.  No reason for it.  I'm retired.
10 Q.  But you would agree that as a Chicago
11 Police officer, you were allegedly a public
12 servant, right?
13   MS. ROSEN: Object to the form,
14 argumentative.
15   MR. ENQUIST: Join.
16   THE WITNESS: I'm not sure what I
17 mean -- what you mean by "allegedly a public
18 servant."
19   BY MS. BONJEAN:
20 Q.  Did you consider yourself a public
21 servant when you were a Chicago Police officer?
22 A.  Yes.
23 Q.  Did you understand that you -- your job
24 was to serve and protect the people of the City of
25 Chicago?

Page 82

1    MS. ROSEN: Object to the form.
2    THE WITNESS: Yes.
3    BY MS. BONJEAN:
4  Q.  And that that included all the people
5  of the City of Chicago, including my client,
6  Mr. Maysonet?
7    MS. ROSEN: Object to the form,
8  argumentative.
9    MR. ENQUIST: Join.
10   THE WITNESS: Yes.
11   BY MS. BONJEAN:
12 Q.  Now, this view that you hold that the
13 media is overwhelmingly anti-police, did you hold
14 that view before you were called to testify or
15 were subpoenaed in the Maysonet case?
16   MS. ROSEN: Objection, relevance.
17   THE WITNESS: I don't recall when I
18 felt that way.  I couldn't give you a time
19 frame.
20   BY MS. BONJEAN:
21 Q.  But so this climate that Mr. Grace
22 references in his letter, is that a climate that
23 you were concerned about only after you were
24 called as a witness in the Maysonet case or was it
25 something that you were fearful of before that?

Page 83

1    MS. ROSEN: Objection, form, relevance.
2    MR. ENQUIST: And foundation.
3    THE WITNESS: I did not like how the
4  news media was treating any policeman
5  anywhere in this country.
6    BY MS. BONJEAN:
7  Q.  And he also wrote, "They want to assist
8  in the prosecution of this case but do not want to
9  place themselves in jeopardy due to baseless
10 allegations."
11   Do you see that?
12 A.  Yes.
13 Q.  What type of jeopardy were you fearful
14 of being placed in?
15   MS. ROSEN: Objection, form,
16 foundation.
17   MR. ENQUIST: I'm also going to
18 instruct you if it has to do with
19 conversations you specifically had with your
20 attorney, if that's the only basis for it,
21 then don't answer the question.
22   MS. BONJEAN: That's not even correct.
23   MR. ENQUIST: It is.
24   MS. BONJEAN: If it has to do with?
25 That's not what the attorney/client privilege

Page 84

1  protects.
2    MR. ENQUIST: Well, if his answer to
3  that only has to do with conversations he had
4  with his attorney, discussions he had with
5  his attorney, then yeah, it is privileged.
6    MS. BONJEAN: It's not a
7  has-to-do-with.  It protects communications,
8  and nothing more.
9    MR. ENQUIST: If his basis of knowledge
10 or his basis of belief is based only on the
11 fact of his communications with his attorney,
12 yes, it is privileged.
13   BY MS. BONJEAN:
14 Q.  Did you fear that you -- I'll strike
15 that.
16   Did you fear that you were in jeopardy
17 prior to talking to Mr. Grace?
18   MS. ROSEN: Object to the form.
19   THE WITNESS: I had no opinion until I
20 talked to my attorneys.
21   BY MS. BONJEAN:
22 Q.  Okay.  But you actually, for the first
23 time in your entire career, reached out to
24 attorneys after getting the subpoena in this case,
25 right?

Page 85

1    MS. ROSEN: Object to the form and
2  mischaracterizes the record.
3    THE WITNESS: Could you --
4    BY MS. BONJEAN:
5  Q.  Sure.  The one and only time that you
6  have ever reached out to criminal defense counsel
7  in connection with a subpoena --
8    MS. ROSEN: How is an FOP attorney a
9  criminal defense counsel?
10    MS. BONJEAN: Oh, my apologies.  That's
11  what Montilla testified to.  You weren't here
12  for that, so I apologize.
13    MS. ROSEN: Okay.  I mean, an FOP
14  attorney is an FOP attorney.
15    MS. BONJEAN: Well, I have a good faith
16  basis to ask that because that's what
17  Montilla characterized him as.
18    BY MS. BONJEAN:
19  Q.  Do you see Mr. Grace as a criminal
20  defense attorney?
21  A.  Yes.
22  Q.  Okay.
23    MS. ROSEN: But he didn't say he
24  reached out to a criminal defense attorney,
25  he said he reached out to the FOP and then

Page 86

1  Tim Grace called him.  That's the problem
2  with your question.
3    MS. BONJEAN: If you say so.  Do you
4  want to just do this dep?  I feel like you
5  have done more speaking in this deposition.
6  I mean, you know, pot, kettle, that whole
7  thing.
8    I forgot what my question was.
9  I'll start over.
10    BY MS. BONJEAN:
11  Q.  Mr. Paulnitsky, did you fear that you
12  were in any jeopardy when you received the
13  subpoena prior to talking to Mr. Grace?
14    MR. ENQUIST: Objection, asked and
15  answered.
16    THE WITNESS: When I received that
17  subpoena, I wanted to talk to an attorney.  I
18  talked to an attorney, it's privileged
19  information what we talked about or what my
20  feelings were.
21    BY MS. BONJEAN:
22  Q.  Okay.  Again, sir, are you having
23  trouble?  Because you're engaging in speeches that
24  are not responsive to the questions, and I don't
25  really understand why you're doing that.  I'm just

Page 87

1  worried maybe you're struggling.
2    MS. ROSEN: Objection, argumentative.
3    BY MS. BONJEAN:
4  Q.  I know you don't want to answer the
5  questions and I can understand why, but you're
6  obligated to answer the questions because you
7  promised to tell the truth here, okay?
8    MS. ROSEN: Objection, argumentative.
9    MR. ENQUIST: Join.
10    BY MS. BONJEAN:
11  Q.  Now, the first time you ever reached
12  out to an FOP lawyer to advise you regarding a
13  subpoena in a criminal prosecution was in the Jose
14  Maysonet case, correct?
15    MS. ROSEN: Objection, asked and
16  answered.
17    MR. ENQUIST: Join.
18    THE WITNESS: I reached out for the FOP
19  attorney -- please let me finish this before
20  you're doing whatever you're doing there.
21    MS. BONJEAN: I'm not doing anything.
22    THE WITNESS: I reached out to the FOP
23  lawyer for this case.  If in my career -- and
24  I don't recall if I did, if I ever reached
25  out to the FOP for guidance or not.  I don't

Page 88

1  recall.
2    BY MS. BONJEAN:
3  Q.  So you are unable to recall any other
4  time that you reached out to the FOP upon
5  receiving a subpoena in a criminal prosecution,
6  correct?
7    MS. ROSEN: Objection, asked and
8  answered.
9    THE WITNESS: I don't recall if I did.
10  40 years is a long time to remember.
11    BY MS. BONJEAN:
12  Q.  I'm asking you, sir, this question:
13  Will you agree that you cannot recall another
14  instance in which you reached out to the FOP
15  seeking legal advice upon receipt of a subpoena in
16  a criminal prosecution?
17    MS. ROSEN: Objection, asked and
18  answered.
19    MR. ENQUIST: Join.
20    THE WITNESS: I don't recall if I did
21  or not, ma'am.
22    BY MS. BONJEAN:
23  Q.  You can't recall a single other time,
24  correct?
25    MS. ROSEN: Objection, asked and

Maysonet v.
Guevara

Video Deposition

Page 89

1    answered.
2        THE WITNESS: I'm not going to guess
3    like you want me to guess.  I don't recall.
4        BY MS. BONJEAN:
5    Q.  So I'm not asking you to guess.  You
6    can't recall a single time, correct?
7        MS. ROSEN: Objection, asked and
8    answered.
9        THE WITNESS: I don't recall.
10       BY MS. BONJEAN:
11   Q.  A single other time, correct?
12   A.  I don't recall.
13   Q.  Okay.  Well, you have not identified
14   any other case when you've done that, have you?
15       MS. ROSEN: Objection, asked and
16   answered.
17       MR. ENQUIST: Join.
18       THE WITNESS: I don't recall.
19       BY MS. BONJEAN:
20   Q.  Can you please tell me one other case
21   in which you did that?
22   A.  I don't recall.
23   Q.  Because there is no other case, right?
24       MS. ROSEN: Objection, argumentative.
25       MR. ENQUIST: Join.

Page 90

1        MS. SPIVY: Join.
2        THE WITNESS: I don't recall.
3        BY MS. BONJEAN:
4    Q.  Well, you can't recall any other time
5    that you reached out to the FOP for criminal
6    advice upon receipt of a criminal prosecution.
7    We've established that.
8        My question is, do you understand that
9    as a retired police officer, you might be called
10   upon to still give testimony in connection with
11   prosecutions in which you were an investigator or
12   played an investigative role?
13   A.  I understand that.  That's why I'm
14   here.
15   Q.  No, you're here because you're being
16   sued.
17       MS. ROSEN: Objection, argumentative.
18       BY MS. BONJEAN:
19   Q.  Do you understand the difference
20   between here, right here now and in a criminal
21   case?
22       MS. ROSEN: Objection, relevance.
23       THE WITNESS: I understand.
24       BY MS. BONJEAN:
25   Q.  Okay.  And you understand in a criminal

Page 91

1    prosecution you are a witness, typically,
2    unless -- well, that's a great question.
3        Have you ever been charged with a
4    crime?
5    A.  No.
6    Q.  Never?
7    A.  Never.
8        MS. ROSEN: Objection, asked and
9    answered.
10       BY MS. BONJEAN:
11   Q.  Even in your youth?
12       MS. ROSEN: Objection, asked and
13   answered.
14       MR. ENQUIST: Join.
15       THE WITNESS: Absolutely not.
16       BY MS. BONJEAN:
17   Q.  Ever been arrested?
18   A.  Never.
19   Q.  So you understand that in a criminal
20   prosecution, then, if you're being subpoenaed,
21   typically you're going to be subpoenaed as a
22   witness, right?
23   A.  That's fair to say.
24   Q.  Okay.  And you understand that, as a
25   Chicago Police officer who worked for 40 years in

Page 92

1    the department, that there might be an occasion
2    where, even after your retirement you would have
3    to give sworn testimony regarding some of the work
4    that you did while you were an officer, right?
5    A.  I knew there was a chance.
6    Q.  And that you're obligated to come in,
7    even though you're retired, to provide testimony
8    to assist in a prosecution, correct?
9        MR. ENQUIST: Objection, asked and
10   answered.  We've gone through this.
11       THE WITNESS: I knew as a citizen that
12   I might receive a subpoena for something.
13       BY MS. BONJEAN:
14   Q.  Not just as a citizen, but as a retired
15   police detective?
16   A.  I knew that.
17   Q.  Okay.  In fact, is there a policy about
18   this in the Chicago Police Department that you're
19   aware of?
20       MS. ROSEN: Objection, form, vague as
21   to what you are referring to as "this."
22       MR. LEINENWEBER: Also foundation.
23       BY MS. BONJEAN:
24   Q.  Does the police department have a
25   policy related to whether or not you are required

Page 93

1  to comply with prosecutions or cooperate with
2  prosecutions even after your retirement?
3      MS. ROSEN: Objection, relevance.
4      THE WITNESS: I couldn't recall if
5  there was one or not.
6      BY MS. BONJEAN:
7  Q.  All right.  So after Mr. Grace --
8  strike that.
9      Did Mr. Grace -- I think you testified
10 you weren't in the courtroom when Mr. Grace told
11 the judge that you would assert your Fifth
12 Amendment rights, correct?
13     MS. ROSEN: Objection, foundation.
14     THE WITNESS: I was not present.
15     BY MS. BONJEAN:
16 Q.  All right.  And did you later learn
17 that Mr. Maysonet's convictions -- strike that,
18 that Mr. Maysonet's charges had been tossed?
19     MS. ROSEN: Objection, asked and
20 answered.
21     THE WITNESS: At some point in time I
22 did.
23     BY MS. BONJEAN:
24 Q.  Did you read the newspaper the next
25 day?  Same day, next day?

Page 94

1  A.  I didn't read the newspaper, but I was
2  standing in front of my house when I received a
3  phone call.
4  Q.  From?
5  A.  I believe it was my attorney, Tim
6  Grace.
7  Q.  Okay.  But you didn't read the Chicago
8  Tribune the next day?
9      MS. ROSEN: Objection, asked and
10 answered.
11     THE WITNESS: I don't know if I did or
12 not.
13     BY MS. BONJEAN:
14 Q.  Did you see the Chicago Tribune report
15 that you and fellow officers had indicated that
16 you would plead the Fifth Amendment?
17 A.  I don't recall.
18     MS. ROSEN: Objection, relevance.
19     THE WITNESS: I don't recall if I did
20 or not, ma'am.
21     BY MS. BONJEAN:
22 Q.  Okay.  And how did you feel about the
23 fact that Mr. Maysonet's convictions and charges
24 had ultimately been dismissed?
25 A.  I know I did my job.  After I did my

Page 95

1  job, it was up to the court system, the State's
2  Attorney.  I had no feelings.
3  Q.  You were indifferent to his being
4  released from custody?
5  A.  I could care less.
6      MS. ROSEN: Object to the form.
7      MR. ENQUIST: You've been going for
8  about an hour and a half.  I think this is a
9  good time to give him a break.
10     MS. BONJEAN: If he needs one.
11     THE WITNESS: Yeah, could I?
12     MR. ENQUIST: Yeah.
13     THE VIDEOGRAPHER: We're going off the
14 record at 11:47 a.m.
15     (Discussion off the record.)
16     (Short recess.)
17     THE VIDEOGRAPHER: We are back on the
18 record at 11:56 a.m.
19     BY MS. BONJEAN:
20 Q.  Mr. Paulnitsky, when were you hired by
21 the Chicago Police Department?
22 A.  March 4, 1968.
23 Q.  Did you graduate from high school?
24 A.  I did.
25 Q.  What high school?

Page 96

1  A.  Senn High School.
2  Q.  Spell it?
3  A.  S-e-n-n.
4  Q.  And where is it?
5  A.  Chicago.
6  Q.  Where is it located by street?
7  A.  Oh, I want to say -- bear with me one
8  second.  5900 North Glenwood, G-l-e-n, wood, in
9  Chicago.
10 Q.  You remember the exact address of your
11 high school, huh?
12 A.  I do.
13 Q.  That's impressive.  Did you grow up in
14 Chicago?
15 A.  I did.
16 Q.  And what area did you grow up in?
17 A.  West Rogers Park.
18 Q.  What's your date of birth?
19 A.  June 8, 1947.
20 Q.  And what year did you graduate from
21 high school, then?
22 A.  1966, I believe.
23 Q.  And upon graduation from high school,
24 did you work or go to the military or --
25 A.  I worked for a couple months and then I

Maysonet v.
Guevara

Video Deposition

Page 97

1  went into the U.S. Army National Guard.
2  Q.  What did you work as when you graduated
3   from high school?
4  A.  I believe I worked at Walgreen's and
5   then I worked for my father.
6  Q.  And what did your father do?
7  A.  My father was the owner of an air
8   freight and trucking company.
9  Q.  And then you enlisted or --
10 A.  Yes.
11 Q.  Okay.  You enlisted in the U.S. Army
12  and what was your assignment after you enlisted?
13  Strike that.  That was a terrible question.
14    You enlisted in the U.S. Army and I
15  assume that you went through some type of basic
16  training, correct?
17 A.  Yes.
18 Q.  All right.  And then after completion
19  of your basic training, were you deployed
20  anywhere?
21 A.  After my basic training, I then
22  proceeded to learn my MOS.
23 Q.  And what's MOS?
24 A.  Well, that would be my occupation.
25 Q.  And what does MOS stand for, if you

Page 98

1  remember?
2  A.  No, I'm sorry, I don't.
3  Q.  Okay.  And describe for me what it is
4   if you don't remember what --
5  A.  Oh, after my basic training I went to
6   Fort Sill, Oklahoma, where I learned field
7   artillery.
8  Q.  So you went to Oklahoma and studied
9   field artillery, is that correct?
10 A.  Yes.
11 Q.  How long did you do that?
12 A.  Oh, a couple months, and then I came
13  back home to a reserve unit.
14 Q.  Okay.  So you never served in Vietnam,
15  is that correct?
16 A.  Correct.
17 Q.  Did you ever -- were you ever deployed
18  anywhere?
19 A.  Yes.
20 Q.  Where is that?
21 A.  City of Chicago.
22 Q.  So you were deployed in the City of
23  Chicago as a reservist, is that right?
24 A.  As a National Guard.
25 Q.  As a National Guard?

Page 99

1  A.  Yes.
2  Q.  Reservist or National Guard?
3  A.  Well, it's a matter of terminology.
4  Some people call it Army Reserve National Guard.
5  Some people call it National Guard Army Reserve.
6  Q.  And is this -- how many times were you
7   deployed in the City of Chicago?
8  A.  I was deployed once by the Federal
9   government and we were called up several times in
10  the city for civil unrest.
11 Q.  Okay.  And this was during 1968 or '7,
12  what year?
13 A.  I believe it was in 1967, '68, so on
14  and so forth.
15 Q.  Have anything to do with the Democratic
16  National Convention that was --
17 A.  I was there.
18 Q.  Hm?
19 A.  I was there.
20 Q.  Were you deployed during those events?
21 A.  First I was a policeman and then I was
22  called up.  I was on the street when I was
23  deployed.
24 Q.  That was '68.  You were already a
25  Chicago Police officer, correct?

Page 100

1  A.  Yes.
2  Q.  So when did you get deployed by the
3   Federal government when you were in the National
4   Guard?
5  A.  I'm not sure when it was.
6  Q.  Well, why were you deployed?
7  A.  Well, the city was being damaged by
8   several different groups that were opposed to
9   political views.
10 Q.  What groups were damaging the city?
11 A.  I could only name a couple.  I'm not
12  sure if I would name them all.
13 Q.  Well, name the ones that you know?
14 A.  Well, you had the Students For a
15  Democratic Society.  You had a couple groups, the
16  Black Panthers, and anybody that thought that they
17  were in a group that could do damage.
18 Q.  All right.  And any other groups that
19  you can think of?
20 A.  No.
21 Q.  Okay.  And how many times were you
22  deployed by the National Guard or the -- strike
23  that.
24    How many times were you deployed by the
25  Federal government when you were a member of the

Page 101

1  National Guard to address civil disrest in the
2  City of Chicago?
3  A. Once by the Federal government.
4  Q. Okay. And how many times were you
5  deployed to address civil disrest in the City of
6  Chicago as a National Guard member by someone
7  other than the Federal government?
8  A. Several times.
9  Q. And who would be responsible for
10  deploying you under those circumstances?
11  A. Our governor.
12  Q. Okay. And who was the governor in
13  1967?
14  A. I don't recall.
15  Q. How did you avoid Vietnam?
16  MS. ROSEN: Object to the form.
17  MR. ENQUIST: Objection to form.
18  THE WITNESS: By luck.
19  BY MS. BONJEAN:
20  Q. Just luck?
21  MS. ROSEN: Object to the form.
22  THE WITNESS: Yeah. I was lucky.
23  BY MS. BONJEAN:
24  Q. Did you want to go to Vietnam?
25  MS. ROSEN: Objection, relevance.

Page 102

1  THE WITNESS: If I had to, I would.
2  BY MS. BONJEAN:
3  Q. Did you or your father take any action
4  to protect you from going to Vietnam?
5  MS. ROSEN: Objection, relevance,
6  foundation.
7  MR. ENQUIST: Join.
8  THE WITNESS: I'm not sure what you
9  mean by that.
10  BY MS. BONJEAN:
11  Q. You don't understand my question?
12  A. I'm not sure I understand your
13  question, yes.
14  Q. Okay. Did you or did any member of
15  your family take any action, such as writing a
16  letter, making a phone call, take any action
17  whatsoever, to aid in the effort to prevent you
18  from going to Vietnam?
19  MS. ROSEN: Objection, form,
20  foundation, relevance.
21  THE WITNESS: Not that I know of, no.
22  BY MS. BONJEAN:
23  Q. So it was sheer luck that you didn't
24  get deployed?
25  MR. ENQUIST: Objection, asked and

Page 103

1  answered.
2  MS. ROSEN: Asked and answered and
3  argumentative.
4  THE WITNESS: I would think it was that
5  I was lucky. If I would have been deployed,
6  so be it.
7  BY MS. BONJEAN:
8  Q. Right. But you don't have any reason
9  to believe that anyone on your behalf took efforts
10  to help so that you wouldn't get deployed?
11  A. No.
12  MS. ROSEN: Objection, asked and
13  answered.
14  THE WITNESS: Never happened.
15  BY MS. BONJEAN:
16  Q. Okay. So were you honorably
17  discharged?
18  A. Yes.
19  Q. And then did you apply to the Chicago
20  Police Department immediately upon leaving the
21  National Guard or how did that work?
22  A. I needed a job. I had to make ends
23  meet for myself, so I became a policeman. I
24  applied for the job.
25  Q. And that was after you left the

Page 104

1  National Guard?
2  A. While I was in the National Guard.
3  Q. Okay. So while you were a member of
4  the National Guard, you applied for a police
5  department position?
6  A. Yes.
7  Q. And how did you do that?
8  A. I believe -- bear with me. I believe I
9  went down, I think it was downtown and obtained a
10  application, completed that application and
11  submitted that application.
12  Q. And you were hired?
13  A. Eventually, after a physical and tests,
14  yes.
15  Q. You attended the Police Academy, I
16  assume?
17  A. Yes.
18  Q. And when did you attend?
19  A. 4th of March, 1968.
20  Q. How long was the Police Academy?
21  A. Eight or nine weeks at the time.
22  Q. And upon graduation from the Police
23  Academy, what was your first assignment with the
24  Chicago Police Department?
25  A. Patrol.

Page 105

1  Q.  Okay.  And that was also, I assume,
2  your rank, a patrol officer?
3  A.  I was a patrolman.
4  Q.  Patrolman.  And where were you
5  assigned?
6  A.  1st District.
7  Q.  And what are the geographical locations
8  of the 1st District?
9  A.  It's probably changed since that time.
10  Q.  Sure, fair enough.  What were they back
11  then?
12  A.  I want to say Lake Michigan, Halsted
13  Street, Wacker Drive to, I want to say 18th
14  Street.  However, it took in Soldier's Field, so
15  that would be a little bit more than 18th Street,
16  I think.
17  Q.  So sort of South Loop and then even
18  south of there?
19  A.  What's considered South Loop right now.
20  Q.  How long were you there?
21  A.  I don't recall.
22  Q.  And what were your duties and
23  responsibilities during your time at the 1st
24  District?
25  A.  My duties were patrol.

Page 106

1  Q.  And what are the duties and
2  responsibilities of a patrolman, again during this
3  time period, which would have been the late '60s?
4  A.  Patrol, like I said stated.  Reports,
5  enforcing the municipal and the state codes.  That
6  would include writing tickets.  If there was an
7  arrest situation, if arrests would be warranted, I
8  would arrest people.
9  Q.  Where did you go after the 1st
10  District?
11  A.  20th District.
12  Q.  And were you still in patrol at that
13  time?
14  A.  Yes.
15  Q.  How long were you there at the 20th
16  District?
17  A.  I couldn't tell you now.  I would be
18  guessing, I'm sorry.
19  Q.  Same type of responsibilities, however?
20  A.  Yes, and I was also on a tactical unit
21  for some time there.
22  Q.  Okay.  And a tactical unit is a
23  uniformed position?
24  A.  Sometimes.
25  Q.  How long were you at the 20th District?

Page 107

1  Oh, you said you didn't know.
2  Where did you go next?
3  A.  I wanted to go to the 14th District --
4  or I'm sorry, the 19th District.
5  Q.  The 19th District.  And why did you
6  want to go to the 19th District?
7  A.  I was bored.
8  Q.  What was alluring about the 19th
9  District?
10  A.  Just different streets.
11  Q.  Why not the 18th, the 16th, the 2nd?
12  What was unique about the 19th?
13  MS. ROSEN: Objection, form.
14  THE WITNESS: It appealed to me.
15  BY MS. BONJEAN:
16  Q.  What about it appealed to you?
17  A.  Just liked it.
18  Q.  What about it made you like it?
19  A.  I don't know.
20  Q.  What is the geographical boundaries of
21  the 19th District?
22  A.  That's going to be a hard one.
23  Q.  Or what were they?
24  A.  Montrose Avenue, the lakefront to
25  Wacker -- I'm sorry.  I think it was Fullerton

Page 108

1  Avenue on the south.  Then on the west, this is
2  where it gets tricky.  It went in some places to
3  Bradley Place.  If you're not familiar with that,
4  that's where WGN was, and just for a couple sort
5  of blocks and then it would go a little bit
6  further east, and I don't remember what street
7  that was.
8  Q.  And how long were you at the 19th?
9  A.  I don't recall.
10  Q.  Were you still on patrol?
11  A.  Yes.
12  Q.  Did you meet any of the co-defendants
13  in this case when you were in either the 1st
14  District or -- what did you say, the 20th?
15  A.  Yes, ma'am.
16  Q.  And then the 19th?
17  A.  Yes.
18  Q.  Did you meet any of the co-defendants
19  in this case?
20  A.  Not that I'm aware of.
21  Q.  Just so I get this out of the way, when
22  did you first meet Rey Guevara?
23  A.  When I was a detective in Area 5.
24  Q.  Okay.  What about Lee Epplen?
25  A.  Lee, I believe I worked with in

Page 109

1 Summerdale. 20th District, I'm sorry. 20th
2 District.
3 Q. Oh, so you do remember working with him
4 at the 20th District?
5 A. I knew he was there. I was there.
6 Q. Did you work together at all?
7 A. I don't know.
8 Q. Okay. So this would have been very
9 early in your career that you worked with Lee
10 Epplen, right?
11 A. Sure.
12 Q. What about Mingey?
13 A. I really don't recall meeting Ed until
14 I was at Area 5.
15 Q. What about Montilla?
16 A. That would be at Area 5, also.
17 Q. Halvorsen?
18 A. I met him, I believe, when I was still
19 in patrol at the 14th District.
20 Q. Okay. So was the 19th District all
21 that you had hoped it would be? Did you enjoy it
22 there?
23 A. Never had a bad day anywhere.
24 Q. Okay. So is that a yes, you did enjoy
25 it there?

Page 110

1 A. I enjoyed my career every place I've
2 been, every day I worked.
3 Q. Okay. And what was your favorite part
4 of working at the 19th District?
5 A. I couldn't give you a definite answer,
6 what I enjoyed most about it.
7 Q. What were your top three favorite
8 things?
9 A. Good restaurants, friendlier people and
10 more people because of how the area was.
11 Q. Friendlier than the 1st or the 20th?
12 A. Yes.
13 Q. What was the demographic of the 19th?
14 A. I told you, it was --
15 Q. Not geographic, demographics?
16 MS. ROSEN: Objection, form.
17 THE WITNESS: I would be guessing at
18 the time, because it's changed so much.
19 BY MS. BONJEAN:
20 Q. You don't remember at the time what it
21 was?
22 A. It was a mixture of people.
23 Q. Would you call it a diverse area?
24 A. Yes, I would.
25 Q. Really?

Page 111

1 A. Yes.
2 Q. After the 19th, where did you go?
3 A. I went to the 14th District.
4 Q. You would not say the 14th District was
5 diverse, would you?
6 MS. ROSEN: Object to the form.
7 THE WITNESS: Yeah, it was.
8 BY MS. BONJEAN:
9 Q. It's not predominantly Hispanic?
10 A. At the time I was there?
11 Q. Yeah.
12 A. Gee, I would have to think about that.
13 Give me a second. Well, the way I could answer
14 that is certain areas had different ethnic groups.
15 Q. Certain areas within the 14th District?
16 A. Yes.
17 Q. Okay. And what area in the 14th
18 District was comprised mostly of white people?
19 A. Well, most of the 14th District was,
20 but there was a couple pockets where there would
21 be other types of people.
22 Q. What year was this that you were in the
23 14th District?
24 A. Oh, I don't recall.
25 Q. No idea?

Page 112

1 A. '70s, early '70s.
2 Q. Early '70s. How long were you there?
3 A. A couple years.
4 Q. And what did you do there?
5 A. I was in patrol and on the tactical
6 unit.
7 Q. Okay. And what were your day-to-day
8 responsibilities?
9 A. Enforcing laws.
10 Q. And did you have the opportunity to
11 enforce laws as it relates to people who were
12 members of gangs?
13 A. Yeah.
14 Q. Did you make arrests when you were in
15 the 14th District?
16 A. Yes.
17 Q. Lots of them?
18 A. Yes.
19 Q. Okay. And what type of arrests did you
20 make?
21 A. Anywhere from disorderly conduct to
22 murders.
23 Q. Was it a particularly violent area?
24 A. I thought so.
25 Q. Was it considered a place that had

Maysonet v.
Guevara

Video Deposition

Page 113

1   higher crime than other districts?
2   A.  I don't know what the official stats
3   were, but I was busy.
4   Q.  Do you know where it fell generally on
5   the roster of districts in terms of crime rates?
6   A.  No.
7   Q.  And how much -- how many of your
8   arrests were gang-related by percentage, if you
9   can estimate?
10  A.  I couldn't estimate.
11  Q.  Would you say at least some percentage
12  was gang-related crime?
13  A.  Yes.
14  Q.  50 percent?
15  A.  I would be guessing.
16  Q.  Okay.  Was it more than non
17  gang-related crime or less than non gang-related
18  crime?
19  A.  Well, there was other crimes in the
20  district.
21  Q.  So about half and half, is that what
22  you're saying?
23  A.  I would think so.
24  Q.  Okay.  And where did you go after the
25  14th?

Page 114

1   A.  I went back to the 20th District, and
2   then a short time later I became a field training
3   officer and then the district -- they redistrict
4   the whole city and then we had an option, being a
5   training officer, either to stay at the 20th
6   District, go to the 23rd District, go to the 19th
7   District or the brand new 24th District.
8        So since I was working at the time
9   where the cut-off boundary, which was Peterson
10  Avenue, I was working north of Peterson Avenue,
11  I -- you know, you put your wish list in and my
12  wish list was to stay at -- or go to the 24th
13  District from 20th as a patrol specialist.
14  Q.  Okay.  Would that have been closer to
15  your home?
16  A.  Yes.
17  Q.  And did you get your first choice?
18  A.  That was my only choice.
19  Q.  Oh.  Well, you said you put a wish list
20  together?
21  A.  That was --
22  Q.  Okay.  Well, a wish list usually
23  suggests there is a list involved.  So it was just
24  a request for one location?
25       MS. ROSEN: Object to the form.

Page 115

1        THE WITNESS: It was one request.
2        BY MS. BONJEAN:
3   Q.  Okay.  And you got it?
4   A.  Yes.
5   Q.  Okay.  And how long were you at the
6   24th?
7   A.  Until I made detective.
8   Q.  And what year did you make detective?
9   A.  I want to say 1983.
10  Q.  And how did you become detective?  Did
11  you apply for it?
12  A.  I became a meritorious detective.
13  Q.  Okay.  And what is a meritorious
14  detective?
15  A.  My supervisors thought that I would be
16  best to serve the police department and citizens
17  of Chicago as a homicide/violent crimes detective.
18  Q.  And what were you doing immediately
19  prior to being promoted to the position of
20  homicide detective?
21  A.  I told you I was a field training
22  officer.
23  Q.  Okay.  So you were doing that up until
24  that point, is that right?
25  A.  Yes.

Page 116

1   Q.  Nothing in between, okay.  And so you
2   didn't have to take a test, right?
3   A.  I did not take a test.
4   Q.  You didn't have to take a test because
5   you were meritoriously promoted, right?
6   A.  Correct.
7   Q.  Just like Rey Guevara was promoted,
8   correct?
9        MS. ROSEN: Object to the form.
10       THE WITNESS: I couldn't tell you how
11  he was promoted.
12       BY MS. BONJEAN:
13  Q.  You didn't take a test and actually
14  score well on a test and then get promoted, right?
15       MS. ROSEN: Objection, asked and
16  answered.
17       MR. ENQUIST: Join.
18       THE WITNESS: I didn't take a test.
19       BY MS. BONJEAN:
20  Q.  You know that that is one way in which
21  some detectives get promoted, is they actually
22  have to test for it and compete for it, correct?
23       MR. ENQUIST: Objection, form.
24       MS. ROSEN: Relevance.
25       THE WITNESS: With every rank in the

Page 117

1  police department, except the exempt ranks.
2      BY MS. BONJEAN:
3  Q.  Except what?
4  A.  The exempt ranks.
5  Q.  Right.  So that's a yes, except for the
6  exempt ranks?
7      MS. ROSEN: He said yes.
8      THE WITNESS: Yes.
9      BY MS. BONJEAN:
10 Q.  Okay.  And then another way you can get
11 promoted is if your supervisors like you and think
12 you do a good job, correct?
13     MS. ROSEN: Object to the form,
14 foundation.
15     MR. ENQUIST: Join.
16     THE WITNESS: I suppose.
17     BY MS. BONJEAN:
18 Q.  Well, is there something else that goes
19 into it other than your supervisors deciding they
20 like you and wanting to promote you?
21     MS. ROSEN: Objection, form,
22 foundation.
23     THE WITNESS: Well, I imagine that your
24 work productivity has something to do with
25 it.

Page 118

1      BY MS. BONJEAN:
2  Q.  But you don't know, right?
3      MS. ROSEN: Objection, foundation.
4      THE WITNESS: I don't know what formula
5  that they used.
6      BY MS. BONJEAN:
7  Q.  Is there a formula that was used?
8      MS. ROSEN: Objection, foundation.
9      THE WITNESS: I'm just saying formula.
10 I don't know what they look for.
11     BY MS. BONJEAN:
12 Q.  Okay.  But you didn't have to actually
13 do anything specific to get promoted, you were
14 just told you were going to be meritoriously
15 promoted, right?
16 A.  I was asked if I would like to get that
17 position.
18 Q.  Right, you were asked.  But apart from
19 being asked, there was nothing you had to do to
20 show that you were the best man for the job,
21 right?
22     MS. ROSEN: Objection, form, asked and
23 answered.
24     MR. ENQUIST: Join.
25     THE WITNESS: I would think that being

Page 119

1  a field training officer, my reputation was
2  enough.
3      BY MS. BONJEAN:
4  Q.  I know that's what you think, but you
5  didn't have to do anything, right?  That's all I'm
6  asking.
7      MS. ROSEN: Objection, asked and
8  answered.
9      MR. LEINENWEBER: Also vague.
10     MR. ENQUIST: Objection, foundation.
11     THE WITNESS: I did my job.
12     BY MS. BONJEAN:
13 Q.  Right.  You didn't have to take a test,
14 correct?
15     MS. ROSEN: Objection, asked and
16 answered.
17     MR. ENQUIST: Join.
18     THE WITNESS: I did not take a test.
19     BY MS. BONJEAN:
20 Q.  Right.  You didn't get interviewed,
21 correct?
22 A.  I was interviewed by a couple exempt
23 ranks.
24 Q.  So you were interviewed?
25 A.  Yes.

Page 120

1  Q.  Okay.  And in what part of the process
2  were you interviewed?
3      MS. ROSEN: Objection, form.
4      THE WITNESS: I was called in by my
5  district commander.  He asked me if I would
6  like it, and I believe that I was called in
7  by the deputy chief of the area where my
8  district fell into.
9      BY MS. BONJEAN:
10 Q.  And what did he ask you?
11 A.  Oh, I don't remember what questions.  I
12 think --
13 Q.  Go ahead.
14 A.  Mainly you're a patrol specialist now,
15 would you like to advance to detective.
16 Q.  Okay.  So apart from being asked
17 whether you wanted to be a detective, can you tell
18 me what any superior asked you during these
19 interviews?
20 A.  I couldn't tell you that, ma'am.
21 Q.  So after you were meritoriously
22 promoted, where were you assigned?
23 A.  On paper I was assigned to Area 4.
24 However, I was never there to work.  I went to the
25 Area 5 detective division.

Page 121

1  Q.  Okay.  I have a question about that,
2  but before I do, by the way, did you ever go to
3  college?
4  A.  Yes.
5  Q.  When did you go to college?
6  A.  I went to college right after I
7  graduated from Senn High School, before I went
8  into the Army.
9  Q.  Okay.  And where did you attend
10  college?
11  A.  Central YMCA College, in the Loop.  I
12  don't think they're in operation any more.
13  Q.  So it was a community college?
14  A.  Well, it was a private college.
15  Q.  Was it a four-year college or a
16  two-year?
17  A.  It was a two-year.  Imagine if you
18  wanted to go for four years, they would take your
19  money.
20  Q.  Did you actually graduate with --
21  A.  No, I did not.
22  Q.  Can I ask my question before you answer
23  it?
24  A.  Sure.
25  Q.  Okay.  Did you actually graduate with a

Page 122

1  degree from the Central -- what's it called?
2  A.  YMCA.
3  Q.  YMCA.  Did you graduate?
4  A.  No.
5  Q.  So you have no advanced degree,
6  correct?
7  A.  No.
8  Q.  Your highest level of education is a
9  high school diploma?
10  A.  Yes.
11      MS. ROSEN: I'm going to object to the
12  form of that question because it's not
13  accurate.
14      MS. BONJEAN: It's not accurate?
15      MS. ROSEN: Well, you said his highest
16  formal education.  You didn't ask him his
17  highest degree.  He said he took other
18  classes at community college.  So the
19  question you asked was highest form of
20  education, so that's inaccurate.
21      MS. BONJEAN: Okay.  So I will
22  rephrase, then.
23      BY MS. BONJEAN:
24  Q.  The highest degree that you received is
25  a high school diploma, correct?

Page 123

1  A.  Yes.
2  Q.  Okay.  So you said in 1983 you were
3  assigned Area 4 on paper but really went to
4  Area 5?
5  A.  Yes.
6  Q.  Okay.  How did that work?
7  A.  How that came about was, there was a
8  small class of detectives that I was in, I want to
9  say maybe 32, so the class was split in half.  The
10  first half went to various areas.  There were six
11  at the time.  The second half was sent back to a
12  district.  I was sent back to my district working
13  as a field training officer.  There was a
14  telephone call for other people to report to their
15  assignments.  Everybody in my group went to Area 4
16  on paper.  Don't know why, don't know how, but I
17  was called to go to Area 5.
18  Q.  So after you became detective, you said
19  you initially went back as a field training
20  officer?
21  A.  Yes, because they only took half of our
22  class.
23  Q.  Okay.  So you weren't actually doing
24  detective work initially?
25  A.  For a couple weeks, no.

Page 124

1  Q.  Okay, yeah.  How long was that period
2  of time when you went back to your old
3  responsibilities?
4  A.  It was a couple weeks.  I went back as
5  a patrol specialist.
6  Q.  For a couple of weeks, and then you
7  were assigned to Area 5 but Area 4 on paper?
8  A.  It was on paper, and then when the
9  transfer order came out I was officially Area 5.
10  Q.  And how long were you at Area 5 but on
11  paper at Area 4?
12  A.  Maybe one period.
13  Q.  What's one period?
14  A.  28 days.
15  Q.  So about a month?
16  A.  Something like that.
17  Q.  So you never actually did investigative
18  work at Area 4, is that what you're saying?
19  A.  No.
20  Q.  So you went to Area 5 as a detective
21  and this would have been in '83, right?
22  A.  Yes.
23  Q.  And you said there were six areas?
24  A.  At the time.
25  Q.  Okay.  And was Area 5 at Grand and

Maysonet v.
Guevara

Video Deposition

Page 125

1 Central at this time? It wasn't, right?
2 A. They had just moved.
3 Q. They had just moved?
4 A. Yes.
5 Q. Already in '83?
6 A. I think it was just before 1983.
7 Q. Okay. And was the 25th District there
8 as well, or were they --
9 A. It was downstairs.
10 Q. Downstairs, right?
11 A. Yes.
12 Q. At Grand and Central, correct?
13 A. Yes.
14 Q. And the 14th District was over on
15 Shakespeare?
16 A. It was still at 2138 North California.
17 Q. Oh, 2138 North California. And that's
18 where Area 5 had been, correct?
19 A. Yes.
20 Q. All right. And in 1983 when you went
21 to Area 5, were the areas organized as violent
22 crime areas and property crime areas?
23 A. They just switched over.
24 Q. Okay. And before that, it was
25 organized differently, is that right?

Page 126

1 A. Yes.
2 Q. Okay. But in 1983 there was a violent
3 crime area, correct?
4 A. Yes.
5 Q. Property crimes, correct?
6 A. Yes.
7 Q. Both housed at Grand and Central?
8 A. Yes.
9 Q. Same floor actually, right?
10 A. Second floor.
11 Q. Second floor. And you were
12 specifically assigned to Area 5 violent crimes?
13 A. Yes.
14 Q. How was it determined, if you know,
15 whether a detective would go to a violent crime
16 area or a property crime?
17 A. I don't know.
18 Q. Okay. Did you have a say in the
19 matter?
20 A. I asked to be assigned to violent
21 crimes.
22 Q. And why did you want to be assigned to
23 violent crimes as opposed to property crimes?
24 A. I did not want to handle burglaries and
25 thefts. Didn't appeal to me.

Page 127

1 Q. And was it boring?
2 MS. ROSEN: Object to the form.
3 THE WITNESS: My opinion, it would be
4 boring to me.
5 BY MS. BONJEAN:
6 Q. So you were interested in homicides and
7 the more serious violent crimes, correct?
8 A. I was interested in violent crimes.
9 Q. And when you got to Area 5 as a
10 detective, who was your supervisor, do you
11 remember?
12 A. Nick Schuler.
13 Q. Nick Schuler?
14 A. Yes.
15 Q. Were any of the defendants in this case
16 already at Area 5 when you got there?
17 A. Lee Epplen.
18 Q. Was he a sergeant?
19 A. Yes.
20 Q. Anybody else that you recall?
21 A. That's all I can remember.
22 Q. Now, did you have to go to some type of
23 detective school prior to being a detective?
24 A. Yes.
25 Q. And where did that take place?

Page 128

1 A. At the Training Academy.
2 Q. How long was it?
3 A. I'm not sure.
4 Q. And can you describe for me what type
5 of training would-be detectives received?
6 A. There was typing, general orders,
7 special orders, department directives, criminal
8 law, detective division procedures.
9 Q. Was this classroom instruction
10 primarily?
11 A. There was classroom, as well as other
12 places.
13 Q. What other types of instruction?
14 A. I went to heavy weapons school at -- I
15 believe it was Camp Zion.
16 Q. So like firearms instruction?
17 A. Instructions other than my service
18 revolver.
19 Q. Okay. So different types of firearms?
20 A. Yes.
21 Q. Anything else, again, apart from the
22 classroom instruction?
23 A. That's the only thing I can think of
24 that I remember.
25 Q. All right. Now, in the classroom

Maysonet v.
Guevara

Video Deposition

---

Page 129

1   discussion or at the classroom instruction, did
2   you have teachers or instructors?
3   A.   Yes.
4   Q.   And were these sworn personnel of the
5   Chicago Police Department?
6   A.   Some were.
7   Q.   Some were not?
8   A.   Yes.
9   Q.   And what were they, if not --
10  A.   Some were instructors from city
11  colleges.  I believe they brought in speakers from
12  the FBI, Secret Service, State Police, other law
13  enforcement agencies.
14  Q.   Okay.  Now, you testified that you
15  studied department directives?
16  A.   Yes.
17  Q.   And this would be written policies of
18  the department?
19  A.   At that time.
20  Q.   At that time, obviously, correct?
21  A.   Yes.
22  Q.   And did you have an expectation to be
23  familiar with the policies of your department?
24  A.   I hoped to have been.
25  Q.   And you also received instruction on

---

Page 130

1   criminal law?
2   A.   Yes.
3   Q.   And what was the purpose of receiving
4   instruction on criminal law?
5         MR. ENQUIST: Objection, foundation.
6         MS. ROSEN: Objection, foundation.
7         THE WITNESS: To familiarize yourself
8   with certain -- I believe then it was chapter
9   38, which was mainly the criminal laws.
10  Familiarize yourself with what offenses are,
11  know what the proper charges you would ask
12  for as a detective to the State's Attorney's
13  office.
14        BY MS. BONJEAN:
15  Q.   So it was your understanding that in
16  order to charge people with crimes, you had to be
17  familiar with the criminal code, correct?
18  A.   No, I couldn't charge anybody on a
19  felony without -- when I was telling my case, I
20  would call felony review.  It was their decision.
21  Q.   Understood.  But in order to arrest
22  someone, you had to actually charge them with
23  something, right?
24  A.   If I get probable cause.
25  Q.   Right.  So as part of your

---

Page 131

1   responsibilities as a detective, you had to
2   understand the concept of probable cause, I
3   assume, right?
4   A.   Yes.
5   Q.   Were you instructed at the Training
6   Academy about what probable cause is and what the
7   standard is?
8   A.   All through my career I have been
9   instructed.
10  Q.   Okay.  So it wasn't a new concept to
11  you at the time you went to the Training Academy
12  as a detective, correct?
13  A.   It was more detailed.
14  Q.   Okay.  And how was it more detailed, if
15  you are able to describe that?
16  A.   Being in patrol, you were limited, you
17  know, what charges, traffic tickets, parking
18  tickets.  Anything of a serious nature, if you had
19  somebody in custody or any type of incident, you
20  would always call the detective division and they
21  would do the followup investigations.
22  Q.   So you had a greater level of
23  responsibility as a detective in terms of charging
24  people that were under arrest, right?
25  A.   There was that aspect of being a

---

Page 132

1   detective, yes.
2   Q.   Okay.  So anything else you learned
3   while you studied the criminal code other than the
4   actual offenses that were contained in the
5   criminal code?
6   A.   Not at that time.
7   Q.   Okay.  Did you receive instruction on
8   investigative actions such as committing -- strike
9   that -- such as conducting photo arrays?
10  A.   Yes.
11  Q.   And how about conducting lineups?
12  A.   Yes.
13  Q.   What about interrogations?
14  A.   Yes.
15  Q.   Questioning suspects, questioning
16  witnesses, is that right?
17  A.   Yes.
18  Q.   Was there a distinction made between
19  how you question a suspect versus how you question
20  a witness?
21  A.   I didn't think so, except for suspects,
22  the Miranda warnings.
23  Q.   So again, pursuant to your training,
24  was it your understanding that you approached the
25  questioning of a suspect similarly to how you

---

Maysonet v.
Guevara

Video Deposition

Page 133

1  approached the questioning of a witness with the
2  exception that you would have to give Miranda
3  warnings if the person was a suspect?
4  A.  Basically, yes.
5  Q.  And did you study any case law when you
6  were there?
7  A.  I'm not sure.
8  Q.  Did you understand where Miranda
9  warnings came from?
10 A.  Yes.  We had a course in that, yes.
11 Q.  Were you instructed that if a person
12 exercised their right to counsel, you were
13 obligated to cease any type of interrogation?
14 A.  Yes.
15 Q.  So that was something you were aware
16 of, even as of 1983, correct?
17 A.  As a patrolman.
18 Q.  Even before that, right?
19 A.  Yes.
20 Q.  And in your career did you always honor
21 those requests when they were made of you?
22 A.  Yes.
23 Q.  Now, did you receive training on report
24 writing?
25 A.  Yes.

Page 134

1  Q.  And I assume you received training on
2  report writing even before you made it to the
3  Training Academy for detective school, right?
4  A.  Yes.
5  Q.  But when you went to detective school,
6  it was different types of reports, right?
7  A.  Yes.
8  Q.  Okay.  What type of reports were you
9  trained to complete, like types of reports?
10 A.  When?
11 Q.  When you were at the Training Academy
12 for detective school?
13 A.  There were stop orders, there was daily
14 bulletin requests, there was name check requests,
15 there were supplemental report checks, there was
16 inventorying property, lineup reports.  I probably
17 forgot something, but yeah.
18 Q.  What about GPR's, was that something
19 that was in existence in 1983?
20 A.  I think it just came into play.
21 Q.  And what was your understanding of the
22 purpose behind a GPR?
23 A.  There if there was any notes to be
24 taken in regards to a case, there was a form,
25 General Progress Report, you would fill that out.

Page 135

1  You would put your notes on there.  If you didn't
2  have one, a piece of paper, and then you would
3  attach it to the file.
4  Q.  Did the GPR's replace any type of memo
5  books or anything of that nature?
6  A.  I never saw those.
7  Q.  Did you ever carry a memo book as a
8  patrol officer?
9  A.  Maybe a piece of paper.  If I would
10 receive a phone -- a radio assignment, I would
11 just put the address in.
12 Q.  Okay.  And what were the guiding
13 principles on how to prepare a supplemental report
14 as you were trained at the Training Academy?
15 A.  It depends on what the supplemental
16 report was.  There was formats for different types
17 of crimes.
18 Q.  So there were certain formats that you
19 were trained to follow, depending on what crime
20 was involved, is that right?
21 A.  Yes.
22 Q.  Okay.  Were there still -- were you
23 taught on how to prepare a good report, a thorough
24 report?
25 A.  I thought every report that I ever

Page 136

1  prepared was a thorough, good report.
2  Q.  And you were trained to do that,
3  correct?
4  A.  Yes.
5  Q.  Okay.  And in your mind what makes a
6  thorough or good report?
7  A.  By writing down the facts you learned
8  about an incident.
9  Q.  And would you agree that the pertinent
10 facts should be contained in any type of report
11 that you prepare?
12 A.  Sometimes.
13 Q.  The who and the what and the where and
14 the why, to the best of your ability?
15 A.  Majority of the time.
16 Q.  Again, barring an unusual circumstance,
17 that would be the goal in preparing a police
18 report, right?
19 A.  As you said, who, what, where --
20 Q.  Yes.
21 A.  Who, what, when and where.
22 Q.  Correct?
23 A.  Yes.
24 Q.  And police reports are supposed to be
25 accurate; you're trained to do that, right?

Maysonet v.
Guevara

Video Deposition

Page 137

1 A. They're only accurate as to the
2 information that you know and obtain.
3 Q. Right. Obviously you don't know
4 whether someone is telling you the truth or not,
5 but you were trained that it was important to
6 accurately report what is being communicated to
7 you in a police report, right?
8 A. Yes.
9 Q. And you were trained that it's
10 important to accurately report what you have seen
11 with your own eyes, correct?
12 A. Some reports, yes.
13 Q. Now, were you trained on whether or not
14 you could report about what another officer has
15 seen or heard?
16 MS. ROSEN: Object to the form.
17 THE WITNESS: I cannot account for what
18 they've seen or what they did. I can only
19 account for my actions.
20 BY MS. BONJEAN:
21 Q. So was it your understanding upon
22 completion of the Training Academy that you were
23 required to -- strike that.
24 Was it your understanding that it was
25 your obligation to prepare a report about things

Page 138

1 that you have seen or heard rather than -- that's
2 still bad. Let me start over.
3 During your career as a detective, did
4 there ever come a time when you prepared a report
5 to memorialize what another detective did?
6 A. There could have been.
7 Q. So that was something that was
8 acceptable according to the Chicago Police
9 Department's policies and practices?
10 A. I believe it was.
11 Q. Okay. So if a police officer said I
12 did X, will you prepare a report on this, that was
13 something that you would be willing to do?
14 A. I could have.
15 Q. So you could not, though, under those
16 circumstances, vouch for the accuracy of what
17 you're reporting, right?
18 A. I'm only reporting what I know to be
19 facts.
20 Q. Right. But if someone tells you, I did
21 X and you didn't see it with your own eyes, you
22 have take their word for it, right?
23 A. Yes.
24 Q. And that's something that you did from
25 time to time as a Chicago Police officer?

Page 139

1 A. I could have.
2 Q. Do you remember doing that?
3 A. I could have.
4 Q. It's not something that you wouldn't
5 have done, right?
6 A. I could have done it.
7 Q. Right. You wouldn't have objected to
8 doing something like that?
9 A. No, no.
10 Q. But you would agree that if you're just
11 reporting what someone else did, you can't attest
12 to its truth or accuracy, right?
13 A. I'm just recording what I was told by
14 who I was told.
15 Q. If you were recording what another
16 detective did, would you put that in the body of
17 your report, that detective such-and-such told me
18 this happened?
19 A. Not always.
20 Q. Okay. So if you -- so you would put it
21 in there as if you saw it?
22 A. I would only put in my report my
23 observation in that case, yes.
24 Q. And if the observation was another
25 detective asked you to report on something, would

Page 140

1 you do that for him?
2 MR. ENQUIST: Objection, asked and
3 answered. We've gone through this.
4 MS. BONJEAN: I'm sorry. He said two
5 different things, so I'm going to have to get
6 some understanding.
7 MR. ENQUIST: I disagree.
8 MS. ROSEN: Object to the form.
9 MS. BONJEAN: Well, maybe I just didn't
10 understand.
11 MR. ENQUIST: You've asked him several
12 times. We keep on objecting, but go ahead.
13 THE WITNESS: I could have.
14 BY MS. BONJEAN:
15 Q. You could have what?
16 A. I might have put that in one of the
17 reports that I authored.
18 Q. You might have put what?
19 A. What you asked me.
20 Q. Which is what?
21 A. Would you read back the question,
22 please?
23 Q. So you're just agreeing, you don't even
24 know what I asked you and you're just saying I
25 could have?

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 141

1    MS. ROSEN: Object to the form.
2    MR. ENQUIST: And argumentative.
3    BY MS. BONJEAN:
4  Q.  No, I'm serious.  Do you know what I
5  asked you even?
6    MS. ROSEN: Object to the form.  Asked
7  you when?
8    MS. BONJEAN: I don't know what he's
9  even responding to, so I'm wondering what he
10  was responding to.
11    MS. ROSEN: Object to the form.  Is
12  there a question?
13    THE WITNESS: Responding to the last
14  couple questions that were the same questions
15  that you asked me.
16    BY MS. BONJEAN:
17  Q.  Which you don't even remember?
18    MS. ROSEN: Object to the form.
19    THE WITNESS: I want to make sure.
20    BY MS. BONJEAN:
21  Q.  Okay.  So let's get on the same page so
22  that the record has some meaning.
23    MS. ROSEN: Object to the argument and
24  editorialize.
25

Page 142

1    BY MS. BONJEAN:
2  Q.  You can only report accurately what
3  you've done or heard or seen, correct?
4    MR. ENQUIST: Objection,
5  mischaracterizes previous testimony,
6  argumentative, form.
7    THE WITNESS: I would have recorded
8  what I learned.
9    BY MS. BONJEAN:
10  Q.  What you heard?
11  A.  If I found it to be something that
12  should be in a report.
13  Q.  Okay.  So if you heard a witness or a
14  suspect tell you something that you thought was
15  relevant to an investigation, you were trained to
16  prepare a report to memorialize those statements,
17  correct?
18  A.  That's fair to say.
19  Q.  Okay.  And during your career, did you
20  ever assign that responsibility to a fellow
21  detective, and when I say "assign that
22  responsibility," what I mean by that is, did you
23  ever ask another detective to memorialize
24  something that only you heard?
25  A.  I could have.

Page 143

1  Q.  And why would you ever do that?
2  A.  Because that detective was writing the
3  report pertaining to something that we were doing.
4  Q.  Okay.  So it's possible that you would
5  tell another detective what you heard so that he
6  could include it in a report, is that what you're
7  testifying to?
8  A.  That's somewhat accurate.
9  Q.  Okay.  And if you were the person
10  responsible for actually preparing, for instance,
11  a supplemental report of some type and another
12  detective came to you and said X happened, it
13  would be in keeping with your habits to actually
14  include that if it was relevant to the
15  investigation, right?
16    MR. ENQUIST: Objection, vague and
17  confusing.
18    THE WITNESS: I'm going to answer it as
19  sometimes I would, sometimes I wouldn't.
20    BY MS. BONJEAN:
21  Q.  And why would you sometimes do it and
22  sometimes not do it?
23  A.  It depends on what type of report I'm
24  writing and if it had anything to do with that
25  particular case.

Page 144

1  Q.  Okay.  If you were investigating a
2  matter with another detective and that detective
3  told you that a witness had made certain
4  statements that were relevant to the
5  investigation, can you please include that in this
6  report, you would do that from time to time,
7  right?
8  A.  I could have had him type on my report
9  what he learned.  That wasn't uncommon.
10  Q.  So that you would all be typing on the
11  same document, is that right?
12  A.  Possible.  That happened.
13  Q.  Okay.  And if you were including a
14  narrative in one of your reports that had been
15  conveyed from another detective, was it your
16  practice to make note that the information came
17  from another detective?
18  A.  Could have.
19  Q.  Is it something that you were trained
20  to do?
21  A.  I don't think I was trained in that
22  aspect.
23  Q.  So essentially, report writing could be
24  very much a collaborative enterprise, right?
25  A.  Yes.

Page 145

1  Q.  And in fact, reports don't necessarily
2  even indicate who is responsible for putting the
3  words on the piece of paper, right?
4      MS. ROSEN: Objection, form,
5  foundation.
6      MR. ENQUIST: Join.
7      THE WITNESS: I'm not sure I understand
8  that question.
9      BY MS. BONJEAN:
10  Q.  If -- you testified earlier to a
11  scenario where different detectives might actually
12  type into the same supplemental report, right?
13  A.  I said that under the circumstances
14  that you asked me, I could have said, you can type
15  in your interview in my report so you wouldn't
16  have to go through all the formatting.
17  Q.  Right.  That happened from time to
18  time, right?
19  A.  Yes.
20  Q.  And if this was a situation where that
21  did happen, did you notate in that report that
22  that portion of the report came from another
23  detective?
24  A.  I could have.
25  Q.  Was it something that you were trained

Page 146

1  to do?
2  A.  I don't think I was trained to do it.
3  Q.  So the contents of a report -- strike
4  that.
5      To the best of your understanding, you
6  were not required by any policy or practice to
7  indicate at the end of a report everybody who may
8  have contributed to that report, correct?
9      MS. ROSEN: Objection, form,
10  foundation.
11      THE WITNESS: I can only answer for me
12  and in my supplemental reports, if there was
13  multiple detectives that were assigned to
14  that investigation, there was a category,
15  personnel assigned, and I would put their
16  name.
17      BY MS. BONJEAN:
18  Q.  Right.  But just because there is a
19  list of personnel assigned does not tell us who
20  wrote what, right?
21      MS. ROSEN: Objection, foundation.
22      THE WITNESS: I would have to look at
23  the report and see under what circumstances.
24      BY MS. BONJEAN:
25  Q.  Okay.  But my question really was

Page 147

1  different.  My question was, were you trained that
2  it was acceptable to prepare a report as a group
3  effort without identifying everybody who
4  contributed to that report?
5      MR. ENQUIST: Objection, form.
6      MS. ROSEN: Form, foundation.
7      THE WITNESS: I don't know.
8      BY MS. BONJEAN:
9  Q.  So you don't remember being instructed
10  that it was important to actually identify anyone
11  who was participating in the authorship of a
12  report, right?
13  A.  I could only account for how I did a
14  report.
15  Q.  I'm asking you training.  Training.
16  That's the question.
17  A.  I don't know.
18  Q.  You don't remember?
19  A.  I don't recall.
20  Q.  Were you trained that it was important
21  to memorialize interviews in and around the time
22  that they occurred?
23  A.  Yes.
24  Q.  And one of the purposes of a report is
25  to refresh your recollection later on when you

Page 148

1  have to either testify or need to refer to that
2  report, right?
3  A.  Well, that depends on how later, how
4  much time went by.
5  Q.  Well, you were busy at Area 5, right?
6  in the '80s, '90s, right?
7  A.  The whole city was.  Area 5 was busy.
8  Q.  So that's a yes, right?
9  A.  Yes.
10  Q.  You were busy.  You investigated a lot
11  of cases, correct?
12  A.  I did.
13  Q.  And had a lot of information in your
14  head as a result of investigating lots of cases at
15  Area 5, correct?
16  A.  I had information on cases that I was
17  working on.
18  Q.  Right.  And you would agree that it's
19  important to memorialize information that you've
20  developed in an investigation so that you don't
21  forget, right?
22  A.  Well, I would memorialize the majority
23  of the times, but if something was fresh in my
24  mind and I knew that -- at the time I knew this
25  information was fresh, there was no rush for me to

Page 149

1　write it down on a piece of paper or report.
2　Q.　But eventually you would want to
3　memorialize it within -- you know, maybe not
4　immediately, but within a short period of time,
5　correct?
6　A.　I don't know what you mean by "short."
7　Q.　Well, why don't you tell me what the
8　rule was?　What was the policy?
9　A.　There wasn't a policy.
10　　　MS. ROSEN: Objection, form,
11　foundation.
12　　　BY MS. BONJEAN:
13　Q.　So there was no policy of the Chicago
14　Police Department that you had to record pertinent
15　information relative to an investigation within a
16　certain period of time?
17　A.　How your question seems to me, I don't
18　have to record something that day, a short period
19　of time.
20　Q.　How about the next day?
21　　　MS. ROSEN: Objection, form.
22　　　THE WITNESS: I don't think so.
23　　　BY MS. BONJEAN:
24　Q.　How about the following day?
25　A.　I don't know.

Page 150

1　　　MS. ROSEN: Objection, form.
2　　　BY MS. BONJEAN:
3　Q.　What do you mean, you don't know?
4　　　MS. ROSEN: Objection, form.
5　　　THE WITNESS: As long as the facts were
6　fresh in my memory, there was no need for me
7　to rush with a report.
8　　　BY MS. BONJEAN:
9　Q.　But eventually, facts become less fresh
10　over time, right?
11　A.　They could.
12　Q.　Right.　And since they could, it would
13　be important to, within some reasonable amount of
14　time, record relevant information, right?
15　　　MS. ROSEN: Objection, form.
16　　　THE WITNESS: I would say so.
17　　　BY MS. BONJEAN:
18　Q.　There is other benefits to recording
19　statements or information in and around the time
20　that you received it, right?
21　A.　Could be.
22　Q.　Maybe to defend against some later
23　allegation that you made it up, right?
24　　　MS. ROSEN: Objection, form.
25　　　THE WITNESS: I don't know.

Page 151

1　　　BY MS. BONJEAN:
2　Q.　You don't know?
3　　　MS. ROSEN: Objection, form,
4　argumentative.
5　　　BY MS. BONJEAN:
6　Q.　Does that sound logical as a detective
7　of 40 years or 20 years, however long you were a
8　detective?
9　　　MS. ROSEN: Objection, form,
10　argumentative.
11　　　THE WITNESS: I could only tell you
12　what I did.
13　　　BY MS. BONJEAN:
14　Q.　Right.　And I'm asking, is it your
15　understanding that in addition to it being
16　beneficial to record what actions you take in an
17　investigation so it can refresh your recollection
18　years down the line or months down the line, that
19　another reason is to corroborate your eventual
20　testimony, right?
21　A.　It's possible.
22　Q.　Right.　Otherwise defense attorneys
23　might say you're making it up, right?
24　　　MS. ROSEN: Objection, form, foundation
25　as to what other defense attorneys might say.

Page 152

1　　　MR. ENQUIST: Join.
2　　　THE WITNESS: I don't know what they
3　would say.
4　　　BY MS. BONJEAN:
5　Q.　Right.　But if a defense attorney said
6　Detective Paulnitsky, what you testified to here
7　today, you're testifying to this today but that
8　didn't really happen, if you had a report, you
9　could say no, I made a report at the time; that
10　would be a good way to refute that charge of
11　fabrication, right?
12　　　MS. ROSEN: Objection, form,
13　foundation, calls for speculation.
14　　　MR. ENQUIST: Join.
15　　　THE WITNESS: It's their opinion.
16　　　BY MS. BONJEAN:
17　Q.　Right.　I mean, it may be their
18　opinion, but did you have a job to do when you
19　were called to testify in criminal prosecutions?
20　　　MS. ROSEN: Objection, form.
21　　　THE WITNESS: I did my job.
22　　　BY MS. BONJEAN:
23　Q.　Okay.　So you don't know the value of a
24　police report, right?　I guess that's what you're
25　saying?

Maysonet v.
Guevara

Video Deposition

---

Page 153

1     MS. ROSEN: Objection, form,
2  argumentative.
3     MR. ENQUIST: Objection.
4     THE WITNESS: I know the value of a
5  police report and all reports within the
6  Chicago Police Department.
7     BY MS. BONJEAN:
8  Q.  Okay, so now we're getting somewhere.
9     MS. ROSEN: Objection to the editorial
10  commentary.
11     BY MS. BONJEAN:
12  Q.  What is the value of a police report?
13     MS. ROSEN: Objection, form.
14     MR. ENQUIST: Could you read the
15  question back, please?
16     (Record read as requested.)
17     THE WITNESS: I think it's very
18  self-explanatory.  Police report is a summary
19  of what occurred and what happened, the facts
20  pertaining to the incident.
21     BY MS. BONJEAN:
22  Q.  What is the value of it?  You said, I
23  know the value of a police report so I'm asking
24  you to explain your answer?
25     MS. ROSEN: That was in response to you

---

Page 154

1  saying well, I guess you don't know the value
2  of a police report, so objection, form,
3  foundation and argumentative.
4     MS. BONJEAN: Well, whatever it was in
5  response to, it came out of his mouth and I'm
6  asking him, what is the value of a police
7  report?
8     MS. ROSEN: Objection, argumentative.
9     THE WITNESS: The value of a police
10  report is to record certain facts.
11     BY MS. BONJEAN:
12  Q.  And why is that valuable?
13     MS. ROSEN: Objection, form.
14     THE WITNESS: Because there is a public
15  report that's public record of what's
16  pertaining to an incident.
17     BY MS. BONJEAN:
18  Q.  So the public has an interest in
19  knowing what steps are taken in an investigation?
20     MS. ROSEN: Objection, form,
21  foundation.
22     BY MS. BONJEAN:
23  Q.  Is that what you're saying?
24  A.  I would think so.
25  Q.  Okay.  Any other values to a police

---

Page 155

1  report?
2  A.  You're recording alleged allegations
3  and you're conducting an investigation.
4  Q.  Yes, and any other value to a police
5  report other than the public has an interest in
6  knowing what happens in an investigation?
7  A.  And other police officers.
8  Q.  Other police officers have an interest
9  in knowing what happened in an investigation,
10  right?
11  A.  Yes.
12  Q.  So that they can see what preceded,
13  maybe, work that they are taking up in an
14  investigation?
15  A.  Possible.
16  Q.  Like if a witness was already spoken
17  to, you might want to know what they said before
18  you speak to them, correct?
19  A.  It's possible.
20  Q.  A police report might show you whether
21  a particular witness had been spoken to or
22  interviewed, right?
23  A.  Yes.
24  Q.  I think you agreed to this, but that
25  police reports have the capacity to refresh your

---

Page 156

1  recollection at some later point?
2  A.  They could.
3  Q.  Particularly in a case where, for
4  instance this case, the person wasn't prosecuted
5  until five years after their arrest, right?
6  A.  I don't recall.
7  Q.  Right.  But when there is a gap in time
8  from time of arrest to prosecution, a police
9  report serves the purpose of refreshing a
10  detective's recollection about what investigative
11  actions took place, right?
12  A.  It's possible.
13  Q.  So for instance, today here, when I
14  question you about what happened in this
15  investigation, having a police report would be
16  helpful to refresh your recollection about what
17  happened, right?
18  A.  Could.
19  Q.  And also a police report could
20  corroborate what a police officer is saying
21  happened in an investigation, right?
22     MR. ENQUIST: Objection, asked and
23  answered.
24     THE WITNESS: It could.
25

---

Rizman Rapaport (973)992-7650
"When every word counts"

Page 157

1     BY MS. BONJEAN:
2  Q.  So those are all things police reports
3  have the capacity to do, correct?
4  A.  Yes.
5  Q.  Anything else that you can think of
6  that I'm missing?
7  A.  What you're thinking and how I'm
8  thinking towards that question could be different,
9  so I will not speculate on that.  The police
10 report, as I stated, has facts in there and your
11 investigation and what you did.
12 Q.  Right.  We know what it functions as.
13 The question that we've been talking about is what
14 value does that have, and can you think of any
15 other value a police report has other than what
16 you've already testified to?
17    MS. ROSEN: Objection, form.
18    THE WITNESS: I can't think of anything
19 else.
20    (Ms. Orozco is no longer
21    in attendance.)
22    BY MS. BONJEAN:
23 Q.  All right.  Were you taught during your
24 detective training that it was acceptable to lie
25 to a suspect during an interrogation?

Page 158

1  A.  No.
2  Q.  You can't lie to a suspect?
3     MS. ROSEN: Objection, form.
4     THE WITNESS: I've never lied to
5  anybody.
6     BY MS. BONJEAN:
7  Q.  What's that?
8  A.  I've never lied to anybody.
9  Q.  Never?
10 A.  Not that I can recall.
11 Q.  Ever been disciplined for making false
12 statements in OPS investigations or anything?
13 A.  It's possible.
14 Q.  Okay.  But to the best of your
15 knowledge you've never lied?
16 A.  Never lied to a suspect.
17 Q.  Okay.  Ever lied to anybody?
18    MS. ROSEN: Objection, form,
19 foundation.
20    MS. BONJEAN: He said -- I wouldn't
21 have even asked the question except he
22 doesn't lie to anybody, so I'm just trying to
23 get clarity.
24    MS. ROSEN: Then why are you asking it
25 again if you think that's what he said?

Page 159

1     MS. BONJEAN: I'm going to give him the
2  opportunity to amend that.
3     THE WITNESS: Questions and answers
4  stay the same.
5     BY MS. BONJEAN:
6  Q.  Okay.  You've never lied to a suspect,
7  is that right?
8     MS. ROSEN: Objection, asked and
9  answered, I think for the third time.
10    THE WITNESS: There is no need to.
11    BY MS. BONJEAN:
12 Q.  Is that a yes or a no?
13 A.  My answer is there is no need to lie to
14 a suspect.  It's unethical.
15 Q.  Okay.  So your testimony is that you've
16 never lied to a suspect because it's unethical?
17 A.  That's correct.
18 Q.  And does that include white lies, big
19 lies, small lies, all types of lies?
20 A.  A lie is a lie.
21 Q.  What about to a witness; is it your
22 understanding that it's permissible under any
23 circumstances to lie to a witness who you are
24 interviewing?
25 A.  As a police officer, it's unethical and

Page 160

1  I would never do that.
2  Q.  What was the policy of the Chicago
3  Police Department when you became a detective
4  regarding memorializing lineups?
5  A.  You would make out a lineup
6  supplementary report and that would tell you what
7  the case was, where the lineup was, who was
8  conducting the lineup, the person taking a photo
9  of the lineup, if there was any witnesses and who
10 the subjects that were participating in the lineup
11 were.
12 Q.  And were you required by policy to
13 memorialize a negative ID back in the late '80s?
14 A.  I did it.
15 Q.  So you routinely --
16 A.  If I was conducting a lineup with
17 negative results, that would be the subject of my
18 report, negative results.
19 Q.  Okay.  And do you know what the policy
20 was of the department at the time?
21 A.  Yes, to record the lineups.
22 Q.  Okay.  And that was irrespective of
23 what the outcome of that lineup was?
24 A.  Yes.
25 Q.  So positives, negatives, fillers,

Page 161

1  anything, you had to record it, is that your
2  understanding?
3  A.  Yes.
4  Q.  You never worked in gang crimes north,
5  right?
6  A.  Never.
7  Q.  Did you consider yourself knowledgeable
8  about gangs when you were a detective at Area 5?
9  A.  Back then, yes.
10  Q.  And where did you -- how did you obtain
11  your knowledge about gangs?
12  A.  From the street.
13  Q.  Were you someone that had a lot of
14  sources on the street?
15  A.  I had people that I could ask questions
16  to.
17  Q.  Was there a particular gang that you
18  considered yourself more knowledgeable about than
19  others?
20  A.  No.
21  Q.  No, you said?
22  A.  No.
23  Q.  You would agree that in 1990 it was a
24  pretty violent time in the city, right?
25  A.  I think every year is violent in the

Page 162

1  city.
2  Q.  Well, not every year is equally
3  violent, correct?
4  A.  Stats show some are more, some are
5  less.
6  Q.  In 1990 the homicide rate was higher
7  than it had been five years earlier and higher
8  than it was five years later, right?
9  A.  I don't know.  I would have to look at
10  the stats.
11  Q.  You don't remember 1990 being
12  particularly violent, though?
13  A.  No.
14  Q.  Just like any other year as far as you
15  knew?
16  A.  Correct.
17  Q.  Now, at Area 5 -- I want to talk now
18  about in 1990, approximately, okay?  Can you tell
19  us whether you were trained on how to not only
20  prepare a report but what to do with reports after
21  you prepared them?
22  A.  Yes.
23  Q.  Okay.  And how did you receive that
24  training, was it formal or was it informal?
25  A.  At the Academy I learned what to do.

Page 163

1  When I got to Area 5 there was a procedure where
2  to submit the report to.
3  Q.  Okay.  So what was the procedure in
4  1990 at Area 5 on how you -- after you prepared a
5  report, what you did with it?
6  A.  I gave it to my supervisor.
7  Q.  Okay.  Did you make copies of it before
8  you gave it to your supervisor?
9  A.  It depends what type of report it was.
10  Q.  So and when you prepared a report, it
11  might be a report you authored or it might have
12  been co-authored with other detectives, right?
13  A.  Yes.
14  Q.  And then if it was a supplemental
15  report, as an example, you had to make a copy of
16  it?
17  A.  Again, it would depend on what type of
18  report.
19  Q.  What did it depend on to determine
20  whether you had to make a copy or not a copy?
21  A.  I would -- on shootings, homicides, I
22  would make a couple copies.  Depending on the
23  severity of the shooting I would make a copy and
24  put it on the homicide board that we had so other
25  detectives would know.  I would also make a copy

Page 164

1  that would go into the investigative file, again,
2  so other detectives would know what I'm doing, and
3  then I can't remember at the time if they -- I
4  know one year they wanted a couple Xerox copies
5  attached to that report that you made for office
6  distribution.  I don't remember what year that
7  came about.
8  Q.  Okay.  So let's talk specific about
9  homicide cases in and around 1990, okay?
10  A.  Uh-huh.
11  Q.  If you authored a report you would
12  typically make a copy, or one or two copies of the
13  report, right?
14  A.  Yes.
15  Q.  What did you do with the original?
16  A.  It would go -- the sergeant had a
17  basket or a bin.  It would go in there.
18  Q.  And after you submitted your report
19  into the sergeant bin, did you ever see it again?
20  A.  That original report?
21  Q.  Yes.
22  A.  No.
23  Q.  Were there times when the report had to
24  be modified per your sergeant's orders?
25  A.  I don't recall ever getting a report

Maysonet v.
Guevara

Video Deposition

Page 165

1 back.
2 Q.  Okay.  So how long were you a detective
3 at Area 5?
4 A.  Long time.  I'm not sure how long.
5 Q.  Can you approximate for me, please?
6 A.  No.  I would be guessing.
7 Q.  Well, where did you work prior to your
8 retirement?
9 A.  At a bomb and arson unit.
10 Q.  How long were you there?
11 A.  I think about three years.
12 Q.  And when did you retire?
13 A.  2008.
14 Q.  And where were you prior to bomb and
15 arson?
16 A.  Area 1.
17 Q.  How long were you at area 1?
18 A.  A couple years.
19 Q.  And then before area 1?
20 A.  Area 5.
21 Q.  So Area 5 from 1983 to at least the
22 early 2000s, right?
23 A.  I could live with that answer.
24 Q.  Okay.  So either 20 or shy of 20 years,
25 right?

Page 166

1 A.  Okay.
2 Q.  Now, in those 20 years or less than
3 20 years, whatever it is that you were at Area 5,
4 can you remember a single time when a sergeant
5 returned a police report to you with instructions
6 to correct something or add more detail or any
7 type of directive?
8 A.  Again, I don't remember ever getting a
9 report back.
10 Q.  So in your entire career at Area 5,
11 your recollection is when you submitted one of
12 your reports into the sergeant's basket, you
13 didn't see it again, right?
14 A.  That original report?
15 Q.  Correct.
16 A.  I didn't see that original paper.
17 Q.  Do you know where it went?
18 A.  I would assume that it would go to the
19 review office and eventually downtown.
20 Q.  Where was the review office?
21 A.  That was also on the second floor.
22 Q.  And who worked the review office?
23 A.  I don't know.
24 Q.  What was the review office?
25 A.  They would review reports.

Page 167

1 Q.  So would this be after the sergeant
2 reviewed the report or are you talking about the
3 sergeant's review of the report?
4 A.  No, the sergeant or supervisor.
5 Q.  Okay.  So you put it in the basket,
6 somebody reviews it and then it makes its way
7 downtown; that's your best guess as to what
8 happened to it?
9 A.  That is the proper procedure.
10 Q.  Sometimes you seem to be an expert on
11 the proper procedure, sometimes you don't
12 remember, so I'm trying to get to --
13     MS. ROSEN: Objection to the editorial
14 comments.
15     MS. BONJEAN: Depending on -- I'll
16 refrain.
17     BY MS. BONJEAN:
18 Q.  So if this was a homicide case in 1990,
19 you would have made a couple copies; one went on
20 the board, on the clipboard, right, of the
21 homicide, in the sergeant's office, right?
22 A.  Yes.
23 Q.  And that was so that sergeants coming
24 in and detectives could look at the report if they
25 wanted to, right?

Page 168

1 A.  Any detective.
2 Q.  And then another copy would go into the
3 investigative file, right?
4 A.  Yes.
5 Q.  What is an investigative file?
6 A.  That would be an office file that I
7 would take out if I was doing an investigation on
8 a crime, no matter what the crime was, that would
9 have information, reports in there.
10 Q.  What information, what types of reports
11 went into an investigative file?
12 A.  You could have notes, GPR's, you could
13 have a case report, supplemental reports.
14 Q.  And was there an index or a log on the
15 front of the investigative file that reflected the
16 documents that were supposed to be in the
17 investigative file?
18 A.  Yes.
19 Q.  And do you know how that got filled
20 out?
21 A.  By the detective that put it in there.
22 Q.  So when a detective completed a report,
23 he or she would put it into -- were there any
24 shes?  Were there any female detectives in 1990 at
25 Area 5?

Page 169

1  A.  I think two.
2  Q.  All right.
3  A.  No, one.
4  Q.  Okay.  So if a detective completed a
5  report, he or she would place the report in the
6  investigative file and then would log it on some
7  type of log or index, is that right?
8  A.  I would assume.
9  Q.  Is that what you did?
10  A.  That's what I did.
11  Q.  Okay.  And is that what you were
12  trained to do?
13  A.  Yes.
14  Q.  And if you wanted to go back and look
15  at reports, you could pull the investigative file,
16  I assume?
17  A.  Yes.
18  Q.  Where was the investigative file
19  maintained?
20  A.  In a file cabinet.
21  Q.  Was there a separate room for it?
22  A.  Ours was right behind where the
23  sergeant sits.
24  Q.  And did any detective have the ability
25  to go pull an investigative file?

Page 170

1  A.  Yes.
2  Q.  You didn't have to get permission or
3  anything, right?
4  A.  No.
5  Q.  Would you say the investigative file is
6  sort of the most complete file related to an
7  investigation?
8      MS. ROSEN: Objection, form,
9  foundation.
10      THE WITNESS: I don't know if it was a
11  complete file, the most complete file or not.
12      BY MS. BONJEAN:
13  Q.  Well, did Area 5 maintain any other
14  files related to the investigations it conducted?
15  A.  I would imagine after the report that I
16  made, after the sergeant approved it, after it
17  went through review, I believe that went downtown.
18  Q.  Okay.  And that would be part of some
19  permanent retention file, is that right?
20  A.  Yes.
21  Q.  Apart from the permanent retention
22  file, were there any other files maintained at
23  area -- strike that.
24      Apart from the permanent retention file
25  that was maintained downtown and the investigative

Page 171

1  file that was maintained at Area 5, can you think
2  of any other filing systems that existed at Area
3  5?
4  A.  The only one I knew of.
5  Q.  And did you keep any files, sort of
6  separate files for your own personal use at your
7  desk or anything?
8  A.  Nobody had a desk.
9  Q.  Okay.  Did you keep any personal files
10  anywhere for your own personal use?
11  A.  No.
12  Q.  So if you wanted access to all the
13  reports that were prepared in connection with an
14  investigation, you would go to the investigative
15  file, is that right?
16  A.  Yes.
17  Q.  Did you hear -- strike that.
18      What's the first thing you remember
19  about the Wiley brothers' murders on May 25, 1990?
20  A.  The first thing that I remembered?
21  Q.  Uh-huh.
22  A.  Besides where it happened, was reading
23  that board that I referred to.  So I like to keep
24  involved in any submitted reports involving the
25  crimes.  There was some talk, I'm not sure how

Page 172

1  long it was after, that there was a 9 millimeter
2  that was involved in that homicide.
3  Q.  Were you on duty when the Wiley
4  brothers were murdered?
5  A.  I don't know.
6  Q.  Do you remember there being a call
7  about the two African-American men who were shot
8  down on North Avenue in the early morning hours of
9  May 25 of 1990?
10  A.  I was working 4:00 to 12:00, so if it
11  happened after 12:30, I wasn't there.
12  Q.  Okay.  So you believe at the time, 1990
13  May, you would have been working 4:00 to 12:00?
14  A.  That's the shift that I would be
15  working.
16  Q.  Is that the -- which watch is that?
17  A.  They call it the third watch.
18  Q.  Okay.  So if the crime occurred at 1:00
19  a.m., it's your best guess you would not have been
20  on duty at that time, right?
21  A.  I would have most likely been out of
22  the building.
23  Q.  All right.  You have no recollection of
24  being at the scene, I assume, correct?
25  A.  When it happened?

Page 173

1  Q.  Yes.  My apologies.  Yes.
2  A.  No.
3  Q.  Responding to the scene at the time
4   that the bodies were laying in the street?
5  A.  No, ma'am.
6  Q.  Now, was it your practice when you came
7   in from being off duty to look at the board and
8   see what cases had been updated or anything of
9   that nature?
10  A.  When I came to work?
11  Q.  Yes.
12  A.  Took my coat off, go in the sergeant's
13   office.  After saying hello to anybody that was in
14   that office, I would grab the board and go sit at
15   a desk that was available and just read all the
16   reports.
17  Q.  And that kept you apprised of what was
18   happening with any number of investigations within
19   Area 5, right?
20  A.  Yes.
21  Q.  You could see whether any investigative
22   work had been done on any cases that were already
23   being investigated plus any new cases, right?
24  A.  Right.  That board had 95 percent of,
25   you know, what happened last night and that.

Page 174

1   Sometimes there was still a detective typing so it
2   wouldn't be up there, you know, immediately,
3   because he was still typing.
4  Q.  So the board contained reports that
5   were pretty fresh, is that what you're saying?
6  A.  Yes, but you could have a detective
7   that responded to an incident, say, theoretically
8    1:00 in the morning and he was still doing their
9   investigation or his investigation and the report
10   wasn't submitted.  He was still typing it.
11  Q.  Okay.
12  A.  So that wouldn't be up there at that
13   time.
14  Q.  All right.  So do you have a
15   recollection of seeing a report prepared in
16   connection with the Wiley brothers' murders when
17   you came in after your shift and looked at that
18   board?
19  A.  I must have seen it.  It was the
20   midnight officer that handled it, the scene, and I
21   did not recall seeing him when I came to work so I
22   assumed it was there.
23  Q.  And did you take any actions in
24   connection with that murder investigation after
25   you read those scene reports?

Page 175

1   MR. ENQUIST: Objection, vague.  Are
2   you talking immediately?
3   BY MS. BONJEAN:
4  Q.  Yeah, immediately, upon reading them?
5  A.  I don't think so.
6  Q.  Were you assigned to the case?
7  A.  Eventually.
8  Q.  When were you first assigned to the
9   case, the Wiley brothers' murder investigation?
10  A.  When I did anything on it?  Assigned,
11   I'm not sure what you mean by that.
12  Q.  When did you understand that you were
13   assigned to investigate the Wiley brothers' murder
14   investigation?
15  A.  I had information that I learned over a
16   period of time, and with that information I acted
17   on that information.
18  Q.  Okay.  That's not my question.  When?
19   Do you know what "when" means?  When is a time.
20   MS. ROSEN: Objection, argumentative.
21   BY MS. BONJEAN:
22  Q.  When did you first come to know that
23   you were assigned to investigate the Wiley
24   brothers' murders?
25  A.  I don't know if I was ever officially

Page 176

1   assigned to it.
2  Q.  Okay.  That's what I was asking.  So
3   you don't have a recollection of ever being
4   assigned by a sergeant to the Wiley brothers'
5   murders investigation, correct?
6  A.  I had information that I knew and I
7   acted upon the information.
8  Q.  I heard that.  The question is
9   different.
10   Did a sergeant ever assign the case to
11   you to investigate?
12  A.  As the lead detective, no.
13  Q.  Is there something called a lead
14   detective?
15  A.  Today there is.  Back then there
16   wasn't.
17  Q.  Okay.  So then you wouldn't have been
18   assigned as a lead detective since there was no
19   such thing back then, right?
20  A.  That's correct.
21  Q.  Okay.  Were you ever assigned by a
22   sergeant to investigate the Wiley brothers'
23   murders?
24  A.  I'm not sure if I was or not.
25  Q.  Do you have a recollection of being

Maysonet v.
Guevara

Video Deposition

Page 177

1  assigned?
2     MS. ROSEN: Objection, asked and
3  answered.
4     THE WITNESS: I don't recall if I was
5  or not.
6     BY MS. BONJEAN:
7  Q.  So it's possible you were?
8  A.  It could be.
9  Q.  And it's possible you weren't?
10  A.  Could be, too.
11  Q.  But have you seen any piece of paper
12  that reflects that you were assigned to
13  investigate the Wiley brothers' murder
14  investigation?
15  A.  I did not see one.
16  Q.  So after you became familiar with the
17  underlying facts of the crime in and around
18  May 25 of 1990, what investigative actions did you
19  take in connection with the Wiley brothers'
20  murders?
21  A.  I was reading the submitted reports
22  that were submitted that was on that board.  I
23  also had a couple conversations with the other
24  detectives relative to that investigation.
25  Q.  Anything else?

Page 178

1  A.  Well, eventually.
2  Q.  I know eventually you arrested
3  Mr. Maysonet, right?
4  A.  Yes.
5  Q.  Okay.  Prior to that, any investigative
6  conduct you engaged in other than reading the
7  initial reports and then apparently talking to
8  some detectives; anything else?
9  A.  Not that I recall at this time.
10  Q.  Do you recall interviewing a person by
11  the name of Efrain Cruz?
12  A.  I don't remember if I did or not.
13  Q.  If you had interviewed someone named
14  Efrain Cruz and he had provided you with
15  information about the Wiley brothers' murders,
16  would you have recorded it in a report?
17  A.  I would have.
18  Q.  If you had placed Efrain Cruz in a
19  lineup, would you have memorialized it in that
20  lineup -- would have memorialized that lineup?
21  A.  I would have.
22  Q.  And consistent with what your practices
23  were, you would have done so even if it was a
24  negative ID, right?
25  A.  Yes.

Page 179

1  Q.  And if it was a filler ID, you would
2  have, right?
3  A.  Filler?
4  Q.  Even if the filler was identified, you
5  would have?
6  A.  The results of any lineup was always
7  recorded by me.
8  Q.  Okay.  So if Efrain Cruz was placed in
9  a lineup that you conducted, you would have
10  recorded the results of that lineup regardless of
11  the outcome, right?
12  A.  Yes.
13  Q.  Did you speak to or question an
14  individual by the name of Francisco Varas,
15  otherwise known as Cisco?
16  A.  I don't recall.
17  Q.  Okay.  Have you seen any reports that
18  reflect that you interviewed an individual by the
19  name of Francisco Varas?
20  A.  I don't recall.
21  Q.  Do you remember conducting any lineups
22  in which you placed Mr. Varas?
23  A.  I don't recall.
24  Q.  Possible though, right?
25  A.  If I did participate in that lineup, it

Page 180

1  would have been memorialized.
2  Q.  Okay.  So if there is not a report
3  memorializing it, are you testifying it didn't
4  happen?
5     MS. ROSEN: Objection, foundation, form
6  of the question.
7     THE WITNESS: Again, any lineup that I
8  conducted would be memorialized with the
9  results.
10     BY MS. BONJEAN:
11  Q.  Okay.  So it's possible, then, that you
12  did conduct a lineup with Efrain Cruz in it,
13  right?
14     MS. ROSEN: Objection, form.
15     THE WITNESS: If you show me a lineup
16  conducted by me, then I could answer yes or
17  no, but I don't know.
18     BY MS. BONJEAN:
19  Q.  But it's possible, since you don't have
20  an independent recollection one way or the other,
21  right?
22     MS. ROSEN: Objection, form.
23     MR. ENQUIST: Join.
24     THE WITNESS: I don't know if I did or
25  didn't.

Maysonet v.
Guevara

Video Deposition

Page 181

BY MS. BONJEAN:

1 Q. Right. So it's possible that you did
2 and it's possible that you didn't, right?
3 MS. ROSEN: Objection, form.
4 THE WITNESS: That's fair to say.
5 BY MS. BONJEAN:
6 Q. And the same thing would be true for
7 Francisco Varas; it's possible that you did and
8 it's possible that you didn't, right?
9 MS. ROSEN: Objection, form.
10 MS. BONJEAN: Put him in a lineup?
11 MR. ENQUIST: Same objection.
12 THE WITNESS: Any lineup that I
13 conducted, I memorialized.
14 BY MS. BONJEAN:
15 Q. I know. That's a separate issue, but
16 I'm saying you don't have an independent
17 recollection of placing any of these individuals
18 in lineups, right?
19 A. I don't recall.
20 Q. Okay. And again, the only thing that
21 would refresh your recollection would be a
22 lineup -- a report, right?
23 MS. ROSEN: Objection, form,
24 mischaracterizes his testimony.

**Page 181**

1 BY MS. BONJEAN:
2 Q. Right. So it's possible that you did
3 and it's possible that you didn't, right?
4 MS. ROSEN: Objection, form.
5 THE WITNESS: That's fair to say.
6 BY MS. BONJEAN:
7 Q. And the same thing would be true for
8 Francisco Varas; it's possible that you did and
9 it's possible that you didn't, right?
10 MS. ROSEN: Objection, form.
11 MS. BONJEAN: Put him in a lineup?
12 MR. ENQUIST: Same objection.
13 THE WITNESS: Any lineup that I
14 conducted, I memorialized.
15 BY MS. BONJEAN:
16 Q. I know. That's a separate issue, but
17 I'm saying you don't have an independent
18 recollection of placing any of these individuals
19 in lineups, right?
20 A. I don't recall.
21 Q. Okay. And again, the only thing that
22 would refresh your recollection would be a
23 lineup -- a report, right?
24 MS. ROSEN: Objection, form,
25 mischaracterizes his testimony.

**Page 182**

1 THE WITNESS: Yes, you would have to
2 show me a report.
3 BY MS. BONJEAN:
4 Q. Okay. But as you sit here today, you
5 don't have an independent recollection one way or
6 the other whether you put those individuals in
7 lineups, right?
8 MS. ROSEN: Objection, asked and
9 answered, form.
10 THE WITNESS: I don't know.
11 BY MS. BONJEAN:
12 Q. I want to draw your attention to --
13 A. Can I just get a glass of water?
14 Q. Yeah.
15 MS. BONJEAN: Would you just mark this?
16 (Whereupon, Paulnitsky
17 Deposition Exhibit No. 2 was
18 marked for identification.)
19 MS. ROSEN: Is this something that you
20 shared?
21 MS. BONJEAN: I'll give you copies.
22 Yes, it was shared, but I'm not showing it to
23 him.
24 BY MS. BONJEAN:
25 Q. I want to draw your attention to

**Page 183**

1 July 15, 1990. Do you remember arresting
2 Mr. Maysonet in connection with a shooting?
3 MS. ROSEN: Objection, form.
4 THE WITNESS: I had the opportunity to
5 place him in custody for shooting three
6 people.
7 BY MS. BONJEAN:
8 Q. Okay. And where were you when you
9 placed him into custody for that?
10 A. I believe in front of his house.
11 Q. And how did you find him in front of
12 his house?
13 A. I went there with my partner at the
14 time, Anthony Bongiorno.
15 Q. And what brought you to his apartment?
16 A. There was an investigation of an
17 aggravated battery. There was a photo that was
18 given to Detective Holec and it was part of the
19 file, and Tony and I were asked to pick up the
20 investigation and to find out who a particular
21 subject in a group photo was.
22 Q. And who asked you to pick up the
23 investigation?
24 A. It was the watch commander.
25 Q. So you were assigned to pick up that

**Page 184**

1 investigation, is that right?
2 A. Yes.
3 Q. And you were given a photograph that
4 depicted what?
5 A. A group of males.
6 Q. Okay. And what were the males doing?
7 A. I don't recall.
8 Q. And what do you remember the
9 significance of the photo being?
10 A. There was investigation by the midnight
11 detective that the individual that had done the
12 shooting was in that picture.
13 Q. And was there a witness who had
14 identified someone from the picture, is that what
15 you're saying?
16 A. Yes.
17 Q. And you were assigned to arrest the
18 individual?
19 A. To learn -- to pick up the
20 investigation, to learn who that individual was.
21 Q. Okay. And as of July 15, 1990, you had
22 already familiarized yourself with the Wiley
23 brothers' murders as well, right?
24 A. You're asking me about the aggravated
25 battery that I'm talking about.

Maysonet v.
Guevara

Video Deposition

Page 185

1  Q.  What I'm asking you is as of July 15,
2  1990, you had already familiarized yourself with
3  the Wiley brothers' murders, correct?
4  A.  I'm not sure what date it was.
5  Q.  Not sure what date what was?
6  A.  The date I became familiar with it.
7  Q.  I thought you testified that shortly
8  after the murders you would have come in and
9  looked at the board and looked at the reports.
10      Is that now inaccurate?
11  A.  No.
12      MS. ROSEN: Objection, mischaracterizes
13  his testimony.
14      BY MS. BONJEAN:
15  Q.  So if I represented to you that the
16  Wiley brothers were murdered on May 25, 1990, how
17  soon after that date do you say you familiarized
18  yourself with the reports around the murder
19  investigation?
20  A.  Whenever a report was submitted on the
21  board.
22  Q.  So if the report had been submitted on
23  the board the next day, that's the time you would
24  have familiarized yourself with it?
25  A.  If I was working that day.

Page 186

1  Q.  All right.  But eventually you would
2  have, right?
3  A.  Yes.
4  Q.  And I thought that you testified that
5  one of your recollections was actually sitting
6  down and looking at the reports?
7  A.  I just said that.
8  Q.  Okay.  That's correct, right?
9  A.  Yes.
10  Q.  So by July 15, 1990, you were familiar
11  with the Wiley brothers' murder investigation,
12  correct?
13      MS. ROSEN: Objection, form.
14      THE WITNESS: That date, I imagine.
15      BY MS. BONJEAN:
16  Q.  Okay.  And had you taken any
17  investigative actions prior to July 15, 1990 in
18  connection with the Wiley brothers' murders?
19  A.  No.
20  Q.  Just read the reports?
21  A.  Read the report and had conversations
22  about that murder and other murders.
23  Q.  Okay.  And did you have conversations
24  about that murder and other murders prior to
25  July 15, 1990?

Page 187

1  A.  I'm not sure of the date, but yes,
2  those conversations.
3  Q.  And who did you have those
4  conversations with?
5  A.  With my watch commander and boss,
6  Sergeant Mingey and other detectives.
7  Q.  And what did you learn during those
8  conversations?
9  A.  There were some similarities in the
10  weapon that was used, 9 millimeter.  I also
11  learned that Sergeant Mingey and Detective
12  Montilla had a conversation with him at the County
13  Jail, with Mr. Maysonet at the County Jail.
14  Q.  So you learned that prior to your
15  arrest of Mr. Maysonet on July 15, 1990?
16      MS. ROSEN: Objection, form.
17      THE WITNESS: It was prior to my
18  arrest.
19      BY MS. BONJEAN:
20  Q.  Okay.  And in speaking to Sergeant
21  Mingey, do you recall discussing that there was a
22  9 millimeter used in the Wiley brothers' murders?
23  A.  During our conversation.
24  Q.  Okay.  And why were you discussing what
25  type of weapon was used in the Wiley brothers'

Page 188

1  murder investigation?
2  A.  The exact reason at the time I don't
3  know.  Conversation -- during that conversation it
4  was a 9 millimeter that used.  That seemed to
5  be interesting because Mr. Maysonet allegedly used
6  a 9 millimeters in those aggravated batteries.
7  Q.  Right.  But those aggravated batteries
8  didn't happen until July of 1990, right?
9  A.  You have the date.  I'm not sure what
10  date it was.
11  Q.  Okay.  But you recall talking to the
12  detectives about the weapons that were -- about
13  the weapon that may have been used in the Wiley
14  brothers' murders, right?
15  A.  Yes.
16  Q.  And what would have been the purpose to
17  be having these conversations with your supervisor
18  or the watch commander?
19  A.  Just to inform people that were on our
20  watch what was going on.
21  Q.  And at that time do you know whether
22  you were actually assigned to that case?
23      MR. ENQUIST: Which case?
24      MS. BONJEAN: The Wiley brothers'
25  murders.

Maysonet v.
Guevara

Video Deposition

Page 189

1     THE WITNESS: I don't ever remember
2  specifically being assigned to it.
3     BY MS. BONJEAN:
4  Q.  But if in your investigative work
5  something came up that might help solve that
6  murder, you would want to have background
7  information, right?
8  A.  Yes.
9  Q.  And in fact, the detectives at Area 5
10  worked pretty collaboratively together, right?
11  A.  When I was there they did.
12  Q.  Yeah.  In the 1990s they worked
13  collaboratively together, correct?
14  A.  For the most part.
15  Q.  So even if one officer or detective was
16  assigned to a murder investigation, another might
17  help out, correct?
18  A.  That's correct.
19  Q.  And we already discussed that you might
20  actually even co-author reports together, right?
21  A.  Yes.
22  Q.  And you routinely shared information
23  about investigations to help each other out,
24  right?
25  A.  Yes.

Page 190

1  Q.  And I want to get back to something.
2  So it's your recollection that prior to arresting
3  Mr. Maysonet on the triple attempt shooting case,
4  you had received information from Sergeant Mingey
5  and Montilla about statements that Maysonet had
6  made?
7  A.  That's not what I said.
8  Q.  Okay.
9  A.  I said during my investigation of that
10  triple aggravated battery, we did some
11  investigative work.  During the course of
12  investigation we were shown -- there was a
13  photograph that was given to Detective Holec and
14  we were assigned to see if we could find out who
15  that photograph was and that also we learned a 9
16  millimeter was used in that triple shooting.
17  Q.  Okay.  Well, I am going to represent
18  that Mr. Maysonet was arrested for the triple
19  aggravated battery on July 15, 1990, okay?
20  A.  Go ahead.
21  Q.  Any reason to quarrel with that?
22  A.  If that's what you're telling me is on
23  that report.
24  Q.  All right.  And prior to that date,
25  what if anything did you know about who might be

Page 191

1  responsible for the murders of Torrence and Kevin
2  Wiley?
3  A.  Before that?
4  Q.  Before that date?
5  A.  I didn't know.
6  Q.  Did you have any information that
7  Mr. Maysonet was involved in the Wiley brothers'
8  murders prior to July 15 of 1990?
9  A.  Prior to that aggravated battery, I had
10  no information.
11  Q.  And did you have any information to
12  suggest that anyone in particular might have been
13  involved in that shooting?
14  A.  The only information I had was what was
15  told to me during our conversation we had at Area
16  5 where there was a 9 millimeter that was used and
17  that Ed Mingey and Freddie Montilla, they had gone
18  to the County Jail and talked to Mr. Maysonet.
19  Q.  Okay.  So you had information prior to
20  your arrest of Mr. Maysonet on July 15, 1990 that
21  Mingey and Montilla had spoken to Mr. Maysonet at
22  the County Jail?
23  A.  Not at that time.  During my
24  investigation --
25  Q.  Which investigation?

Page 192

1  A.  Of the triple shooting.
2  Q.  Okay.
3  A.  Okay, there was facts that were
4  submitted in the reports and then sometime after
5  he was arrested by us, that the information, I
6  learned, after his arrest, that they had went to
7  the County Jail and talked to him.
8  Q.  Let's try this one more time.
9  A.  The answer is going to be the same.
10  Q.  What information did you have prior to
11  July 15, 1990 that Mr. Maysonet even had any
12  knowledge about the shooting of the Wiley
13  brothers?
14     MS. ROSEN: Objection, asked and
15  answered.
16     MR. ENQUIST: Join.
17     THE WITNESS: The only information I
18  had, after Tony and I made the arrest --
19     BY MS. BONJEAN:
20  Q.  You're going to after.  I'm talking
21  about before.  Listen to the question.
22     MS. ROSEN: He has already said before
23  he had no information.
24     MS. BONJEAN: Just stop.  He is talking
25  out of both sides of his mouth and I know you

Rizman Rapaport (973)992-7650
"When every word counts"

Page 193

1    don't want him answering.
2        MS. ROSEN: I don't care. You're
3    talking out of both sides of your mouth. He
4    has answered repeatedly that he had no
5    information before.
6        MS. BONJEAN: Okay, great. Thank you
7    for lodging your objection. Duly noted. The
8    video's got it, the court reporter's got it.
9    I'm going to ask my questions and get
10   clarity, okay?
11       MS. ROSEN: Okay.
12       BY MS. BONJEAN:
13   Q.  Prior to July 15, 1990 -- do you know
14   what "prior" means? It means before, right?
15       MR. ENQUIST: Objection, form,
16   argumentative.
17       MS. ROSEN: Objection, form,
18   argumentative. Did you need a break?
19       MS. BONJEAN: I don't need a break.
20       MS. ROSEN: Is your blood pressure
21   going down or up or something? What's
22   happening?
23       MR. ENQUIST: We're going to get
24   through this question and then we're going to
25   take a break.

Page 194

1        BY MS. BONJEAN:
2    Q.  Do you need a break?
3    A.  I think maybe you do. I don't. I'm
4    fine.
5    Q.  Okay, great.
6    A.  I'm only concerned about you right now.
7        MR. LEINENWEBER: I would actually like
8    a break.
9        MS. BONJEAN: Well, we'll take a break
10   in a few minutes.
11       THE WITNESS: Again, you asked me a
12   couple times. I told you, I did not have any
13   knowledge, other than what I read, about the
14   Wileys, okay, at that time. I --
15       BY MS. BONJEAN:
16   Q.  Stop. That answers my question.
17       So prior to July 15, 1990, all you knew
18   about was what you read in those reports, right?
19   A.  That's correct.
20   Q.  Okay. And you had conversations, you
21   said, with Mingey, about the type of weapon that
22   might have been used in the Wiley brothers'
23   murders, right?
24   A.  Yes.
25   Q.  And that would have been before your

Page 195

1    arrest of Mr. Maysonet, correct?
2    A.  No, that's not correct. As I said
3    before, I didn't know about any connection or
4    possible connection until after my aggravated
5    battery was done, okay, and then I was privy to a
6    couple conversations.
7    Q.  Okay. So all of your conversations
8    with Mingey were after your arrest with
9    Mr. Maysonet -- strike that.
10       All of your conversations about the
11   Wiley brothers' murders were after your arrest of
12   Mr. Maysonet, is that right?
13   A.  I'm sure that we had conversations
14   about it because --
15   Q.  After or before?
16   A.  Probably after they were murdered.
17   Q.  Okay.
18   A.  Okay? But I'm doing this
19   investigation, I'm also listening to what's going
20   on with that homicide that we have, and then I
21   focused more on that murder investigation after he
22   was placed in custody for the shootings.
23   Q.  Okay. What do you remember about your
24   conversations with Sergeant Mingey before
25   Mr. Maysonet was arrested on the unrelated ag bat?

Page 196

1    A.  The exact conversations I don't recall,
2    but it had information pertaining to the murders,
3    a 9 millimeter was used, and then at some point in
4    time I learned that Freddie Montilla and Eddie
5    Mingey had gone to the County Jail to talk to
6    Maysonet when he was in custody.
7    Q.  Okay. So the information about the 9
8    millimeter, did you learn that before or after you
9    arrested Mr. Maysonet?
10   A.  I'm not sure.
11   Q.  Okay. And information that Mingey and
12   Montilla had spoken to Maysonet in the Cook County
13   Jail, did you learn that before or after you
14   arrested Mr. Maysonet on the ag bat?
15   A.  I believe it was after.
16   Q.  So on July 15, 1990, you received
17   information and had a photograph that somebody in
18   that photograph was identified in connection with
19   the shooting of three individuals, is that right?
20   A.  Yes.
21   Q.  And was Mr. Maysonet the individual in
22   that photograph?
23   A.  He was in that photograph.
24   Q.  Okay. And is that what led you to go
25   arrest him?

Maysonet v.
Guevara

Video Deposition

Page 197

1   A.   After we learned his name, we, Tony and
2   I, proceeded to an address that was familiar with
3   his whereabouts.
4   Q.   How did you learn his name?
5   A.   Tony Bongiorno, who was a former gang
6   investigator, learned that information.
7   Q.   Do you know how he learned it?
8   A.   By going through the gang files.
9   Q.   And what's entailed in doing that?
10  A.   I'm sorry?
11  Q.   What's entailed in that?
12  A.   By looking at files, I guess.
13  Q.   Well, if he just had a picture, did he
14  have a nickname or something?
15  A.   Yes, he did.
16  Q.   Oh, okay.  You're welcome.  And so he
17  was going through the files --
18       MS. ROSEN: Objection to the editorial
19  comment.
20       BY MS. BONJEAN:
21  Q.   -- to look for a real name of this
22  nickname that he had?
23  A.   Yes.
24  Q.   And what nickname did you learn?
25  A.   I don't recall what it was.

Page 198

1   Q.   So and after you got the name you went
2   to Mr. Maysonet's home?
3   A.   Yes.
4   Q.   And what did you do at his home?
5   A.   Identified ourselves and asked him
6   to -- well, we identified ourselves, told him we
7   were investigating three people that were shot,
8   asked him to come into Area 5.
9   Q.   And did you speak English to him?
10  A.   Yes, I did.
11  Q.   And did he speak English back to you?
12  A.   Yes, he did.
13  Q.   And did he consent to go to Area 5 with
14  you?
15  A.   Yes, he did.
16  Q.   And you took him to Area 5?
17  A.   Yes.
18  Q.   Okay.  And did you continue to speak to
19  him in English?
20  A.   Yes.
21  Q.   In the car?
22  A.   I'm not sure if I did or not.
23  Q.   All right.  So what happened when you
24  got back to Area 5 with Mr. Maysonet?
25  A.   Went up to the second floor of the

Page 199

1   office, he was placed in a room, advised of the
2   allegations against him again, also advised of his
3   Miranda warnings.
4   Q.   And did you do that in English?
5   A.   I'm not sure if I or Tony, which one of
6   us did it.
7   Q.   Did one of you do it in English?
8   A.   Of course.
9   Q.   And he spoke English back to you?
10  A.   Yes, he did.
11  Q.   All right.  And then what happened
12  after you read him his Miranda warnings?
13  A.   We had a conversation about the
14  incident.
15  Q.   And what did he say?
16  A.   He had no clue what we were talking
17  about or where he was.
18  Q.   All right.  And then what happened?
19  A.   He was placed in a lineup.
20  Q.   Okay.  And after he was placed in a
21  lineup, was he identified in that lineup?
22  A.   Yes.
23  Q.   And then what happened?
24  A.   I believe that I took pictures of the
25  lineup.  I believe that Tony made out a lineup

Page 200

1   report and State's Attorney was called.  They
2   called us back on the telephone, they asked us
3   what was going on, explained to them we had a
4   triple aggravated battery.  Somebody came out from
5   the State's Attorney's office.
6   Q.   All right.  And did you have any
7   further conversations with Mr. Maysonet after you
8   called felony review?
9   A.   I'm not sure if I did or not.
10  Q.   And all of your conversations were in
11  English?
12  A.   Yes, they were.
13  Q.   And you had no problems understanding
14  him?
15  A.   I understood him perfectly.
16  Q.   And he had no problems understanding
17  you as best as you could tell?
18  A.   We were communicating.  He never said
19  that he had a problem.
20  Q.   And at no point were you using an
21  interpreter?
22  A.   I believe not, though we had one that
23  was immediately available if we needed one.
24  Q.   But you don't recall using one,
25  correct?

Maysonet v.
Guevara

Video Deposition

Page 201

1  A.  I would have to look at the report.  I
2    don't think we used one at all.
3  Q.  But you remember speaking English to
4    him without difficulty?
5  A.  Yes, I do.
6  Q.  And do you remember him having any type
7    of accent?
8  A.  I don't recall.
9  Q.  Do you remember finding it difficult to
10   understand him speaking in English?
11     MR. ENQUIST: Objection, asked and
12   answered.
13     THE WITNESS: I communicated with him.
14     BY MS. BONJEAN:
15  Q.  My question is, do you remember finding
16   it difficult to communicate with him even in
17   English?
18  A.  I did not.
19  Q.  And you did not find it difficult to
20   understand the words he was saying in the course
21   of your investigation, is that right?
22     MR. ENQUIST: Objection, asked and
23   answered.
24     THE WITNESS: Yes.
25

Page 202

1     BY MS. BONJEAN:
2  Q.  Did Mr. Maysonet exercise his right to
3    counsel at any point during your conversations
4    with him?
5  A.  Didn't want an attorney.
6  Q.  I'm sorry?
7  A.  He never asked for an attorney.
8  Q.  And if he had asked for an attorney,
9    would you have honored that request?
10  A.  All my questioning would have stopped,
11   Tony's would have stopped, we would have allowed
12   him to call anybody he wanted.
13  Q.  And again, you would have honored his
14   request that he did not want to speak to you or
15   your fellow detectives if he had exercised his
16   right to counsel, correct?
17  A.  Yes.
18     MS. ROSEN: Are you still looking for a
19   break?
20     MR. LEINENWEBER: Yeah.  Any time,
21   Jennifer, that is --
22     MS. BONJEAN: Yeah, I'm almost done
23   with my line of thought.
24     THE VIDEOGRAPHER: I also have five
25   minutes on the tape.

Page 203

1     MS. BONJEAN: Okay, that will work.
2     BY MS. BONJEAN:
3  Q.  How long was your conversation with
4    Mr. Maysonet at Area 5?
5  A.  I don't recall.
6  Q.  Did you talk to him before and after
7    the lineup or just before the lineup?
8  A.  Before and after.
9  Q.  And what was the nature of the
10   conversation after the lineup?
11  A.  After the lineup?
12  Q.  Yeah.
13  A.  I told him he was identified.
14  Q.  Okay.  Any other further conversation?
15  A.  I don't recall.
16  Q.  Just basically communicating to him
17   that he had been identified?
18  A.  He's been identified.
19  Q.  And he's going to be charged?
20  A.  I can't charge him, that I called --
21  Q.  I said, and that he was going to be
22   charged?
23     MR. ENQUIST: Objection.  He was
24   answering.
25

Page 204

1     BY MS. BONJEAN:
2  Q.  I understood that you can't.
3  A.  No.  You cut me off.  I told him I was
4    going to call felony review.  That was the end of
5    that conversation.
6  Q.  Okay.  So after you spoke to felony
7    review, did you have any further conversations
8    with Mr. Maysonet?
9  A.  Not at that time.
10  Q.  All right.  And certainly you prepared
11   a GPR in connection with your investigative work
12   on July 15, 1990, right?
13  A.  I prepared a closing supp.
14  Q.  And you prepared a GPR as well, right?
15     MS. ROSEN: Objection, form.
16     THE WITNESS: Yes.
17     BY MS. BONJEAN:
18  Q.  And why did you prepare a GPR?
19  A.  Because I had multiple people that were
20   looking at the lineup and also his placement in
21   the lineup.
22  Q.  And did you find it important to
23   memorialize that in a GPR?
24  A.  You're required to do a -- yes.  Yes,
25   I'm sorry.

Maysonet v.
Guevara

Video Deposition

Page 205

1  Q.   You're required to --
2  A.   I put it on the GPR and then that GPR
3  helped prepare a lineup supplementary report.
4  Q.   And is that consistent with the
5  policies and practices of the Chicago Police
6  Department?
7  A.   Yes.
8      MS. BONJEAN: Okay.  We can take a
9  break.
10     THE VIDEOGRAPHER: We are going off the
11 record at 1:47 p.m.
12     (Discussion off the record.)
13     (Short recess.)
14     THE VIDEOGRAPHER: We are back on the
15 record at 2:13 p.m.
16     BY MS. BONJEAN:
17 Q.   Mr. Paulnitsky, remind me again who
18 received this picture that you referenced in your
19 testimony before we broke?
20 A.   Detective Holec.
21 Q.   Holec?
22 A.   H-o-l-e-c.
23 Q.   E-c.  Okay.  So what did you know about
24 the shooting that had happened in July of 1990
25 prior to July 15 when you actually brought

Page 206

1  Mr. Maysonet into custody?
2  A.   Into custody on the homicide?
3  Q.   No.  Let me back up, okay?
4  A.   Okay.  I'm not sure about the dates of
5  the ag bat and the murder, so maybe if I look at
6  them.
7  Q.   Yeah, I'll have you -- I'm going to --
8  you can look at what's been marked as Exhibit 1,
9  okay?
10     MR. LEINENWEBER: Which one is that?
11     MS. ROSEN: Exhibit 2, you mean.
12     MS. BONJEAN: Oh, sorry, Exhibit 2.  I
13 have copies here.  They were all submitted
14 through Dropbox.  Exhibit 2, which is Bates
15 stamped Maysonet 9596 through 9617, does
16 everyone have the same -- okay, all right.
17     BY MS. BONJEAN:
18 Q.   Mr. Paulnitsky, I'm going to have you
19 look at the pages that are Bates stamped -- it's
20 kind of hard to see, but they would be Bates
21 stamped Maysonet 9614 and 9615.  It's at the
22 very -- sort of towards the end of the packet.
23 A.   I'm looking.  I'm guessing that's the
24 original case report?
25 Q.   The general offense or original case

Page 207

1  report, yes.
2  A.   Yes, ma'am.
3  Q.   Do you see that?
4  A.   Yes, ma'am.
5  Q.   Okay.  If you could take a look at
6  that, does this tell you when this incident
7  occurred?
8  A.   July 3, 1990 at 2200 hours.
9  Q.   Okay.  And did you respond to the scene
10 of this shooting?
11 A.   No.
12 Q.   All right.  You had an opportunity at
13 some point to look at this original report, right?
14 A.   Yes.
15 Q.   And you would agree that there are no
16 individuals identified as the perpetrators of this
17 shooting, correct?
18 A.   Yes.
19 Q.   You would agree with that?
20 A.   That there is nobody identified?
21 Q.   Correct.
22 A.   Yes.
23 Q.   And you would agree that it doesn't --
24 it has a description of two offenders, right?  One
25 is a little more detailed than the other, would

Page 208

1  you say that?
2  A.   Yes.  Could I just grab my
3  handkerchief, please?
4  Q.   Yes.
5  A.   Oh, I've got it.  I'm sorry.  Thank
6  you.
7  Q.   Sure.  So would you agree that there
8  appear to be two offenders that are described,
9  right?
10 A.   Yes, ma'am.
11 Q.   And one is described with more
12 particularity than the other?
13 A.   Some of this is whited out or -- do you
14 have a better copy?
15 Q.   I don't.  I don't maintain these
16 copies, so I get what I get.  But I understand
17 that the first words are a little cut off, but it
18 would appear, correct me if I'm wrong, that there
19 is a age and height and weight and hair color and
20 complexion and marks or scars description for one
21 offender and not for the other?
22 A.   Yes.
23 Q.   Is that right?
24 A.   Yes.
25 Q.   Okay.  Now, can you tell me when it was

Maysonet v.
Guevara

Video Deposition

Page 209

1    that you learned about a photograph related to
2    this incident that would help identify the
3    offenders?
4    A.  May I look at the report?
5    Q.  Sure, if it will help you.
6    A.  Please.  Am I still talking?
7    Q.  If you're able to tell me when you
8    learned about a photograph?
9    A.  It says at the bottom, Maysonet 9600.
10   Q.  Okay.
11   A.  Okay.  And Robert Hernandez.
12   Q.  Sure.
13   A.  Do you want me to read that?
14   Q.  Sure.
15   A.  Okay.  "Robert Hernandez related
16   essentially the same account as did Nelson.
17   Hernandez went on to say that he had provided the
18   above-mentioned photo.  Hernandez obtained the
19   photo some time ago from a female friend who was a
20   girlfriend of a Latin King."
21   Q.  Okay.  And this, "had provided the
22   above-mentioned photo," is this a photo that was
23   mentioned by Nelson?
24   A.  This is the photograph that Detective
25   Holec obtained during his investigation.

Page 210

1    Q.  It says "above-referenced."  Maybe I'm
2    missing it.  Can you point me to where the above
3    reference -- oh, I see.
4    A.  I'm lost.  What page are you on?
5    Q.  Yeah, let's look at page Maysonet 9599?
6    A.  Yes, ma'am.
7    Q.  In the middle with a William Vale, it
8    says, "Although neither Molina nor Vale could
9    provide a description of the driver, Molina went
10   on to say that a group photo of Latin Kings was
11   shown to him and Molina made a tentative
12   identification of one of the persons as the
13   shooter."
14       Do you see that?
15   A.  That would be --
16   Q.  Right sort of in the middle?
17   A.  Page -- I'm sorry.  Paragraph 4?
18   Q.  Yeah.
19   A.  Okay.
20   Q.  Do you know where that photo was
21   obtained from?
22   A.  My understanding, that when Holec was
23   doing his investigation, that during his
24   investigation somebody came up with it, with that
25   photograph, and Larry asked where that came from

Page 211

1    and he says it was given to him by a girlfriend of
2    a former friend, had a group photo of male
3    Hispanics.
4    Q.  Okay.  So can you point to me anything
5    in this report that was prepared or submitted on
6    July 4, 1990 that explains how it was that the
7    detective came in possession of a photo of Latin
8    Kings?
9    A.  Sure.  Just let me read this, please.
10       That paragraph --
11   Q.  Hernandez?
12   A.  William Vale.
13   Q.  Right.  Vale says he was shown --  I'm
14   just trying to understand it.  William Vale says
15   he was shown a photograph of some Latin Kings, and
16   then later, I think you read from it earlier, page
17   9600, it says that "Hernandez went on to say that
18   he had provided the above-mentioned photo."
19       So is it your understanding that
20   Hernandez gave the photo to Detective Holec?
21   A.  That's the impression I was under.
22   Q.  So he gave -- and do you know why he
23   gave a photo of some Latin Kings to Holec?
24   A.  Other than what was recorded here, that
25   there was a photo, the alleged offender was in

Page 212

1    that photo.
2    Q.  Okay.  And then, and you weren't
3    involved in this part of the investigation, is
4    that right?
5    A.  No.
6    Q.  You were assigned after that, correct?
7    A.  Yes.
8    Q.  So after these tentative
9    identifications were made from a photo that had
10   Latin Kings in it, you were assigned to go confirm
11   the identity of the person in the photo, is that
12   right?
13   A.  Not to confirm.  To try to identify who
14   that picture was.
15   Q.  Right.  Do you know where that photo
16   is?
17   A.  I know where it was.
18   Q.  Where was it?
19   A.  I inventoried it.
20   Q.  You did?
21   A.  Yes.
22   Q.  So it was part of the investigative
23   file?
24   A.  No.
25       MS. ROSEN: Objection, form.

Page 213

1     BY MS. BONJEAN:
2  Q.  Well, where did you inventory it?
3  A.  The police department.
4  Q.  As evidence?
5  A.  Yes.
6  Q.  Okay.  And on page Maysonet 9612 --
7  A.  12?
8  Q.  Yeah.  Is that the inventory form that
9  you prepared?
10 A.  Yeah.  I see two copies of that, yeah.
11 Q.  And does this reflect the photo --
12 A.  Yes.
13 Q.  -- that you inventoried?  Okay.
14    So after you got these tentative ID's
15 for the photo, you were assigned to go figure out
16 who the person was in the photo, right?
17 A.  To try to learn the identity.
18 Q.  And how did you go about doing that?
19    MR. ENQUIST: Objection, asked and
20 answered.  Go ahead.
21    THE WITNESS: Tony Bongiorno, another
22 detective, who was familiar with gangs,
23 because he worked there before he became a
24 detective.
25

Page 214

1     BY MS. BONJEAN:
2  Q.  Right.  I don't see anywhere in here
3  where there is a reference to a nickname, though,
4  which is what I thought you testified to earlier?
5  A.  No, you asked me and I said at that
6  time I didn't know.
7  Q.  Okay.  So you don't know whether a
8  nickname was provided, right?
9  A.  Correct.
10 Q.  Certainly if a nickname was provided by
11 any of these individuals, that's something that
12 would have been included in a supplemental report,
13 right?
14    MS. ROSEN: Objection, calls for
15 speculation.
16    THE WITNESS: Could have been.
17    BY MS. BONJEAN:
18 Q.  That would be optimal, right?
19    MS. ROSEN: Objection, form.
20    THE WITNESS: Sometimes today nicknames
21 are different tomorrow.
22    BY MS. BONJEAN:
23 Q.  So is it your testimony that it wasn't
24 routine to memorialize the nicknames of people who
25 have been identified as the offenders in a

Page 215

1  shooting in a supplemental report?
2  A.  Well, on my report I did put down
3  Mr. Maysonet's nickname.
4  Q.  Okay.  Sir, I would ask that you look
5  at the document as I ask you to, or if you need to
6  refresh, so we can be on the same page.  That was
7  after you arrested him, right?
8  A.  I recorded that.  I don't know what
9  nickname Tony was given.
10 Q.  Okay.  So let's -- that's not -- you
11 testified earlier, I believe, that in addition to
12 the photo where the victims had tentatively
13 identified an individual in the photo, that he
14 went into his gang resources and was able to
15 determine who the actual person was because he had
16 a nickname that was provided to him.
17    Is that not accurate?
18    MS. ROSEN: Objection, form.
19    THE WITNESS: That's what -- the best
20 of my ability and recollection, yeah.
21    BY MS. BONJEAN:
22 Q.  Okay.  And where -- is that an
23 independent recollection?  Because it's not
24 reflected in the report that was prepared on
25 July 4 of 1990 when these witnesses allegedly made

Page 216

1  their identifications from the photo?
2     MS. ROSEN: Objection, form.
3     THE WITNESS: It's in here.
4     BY MS. BONJEAN:
5  Q.  Where?
6  A.  Page 2, 9597 on the bottom.  "Wanted:
7  King Leo."
8  Q.  Okay.  Do you know where the name King
9  Leo came from?  That's --
10 A.  No.
11 Q.  Do you know whether one of the
12 witnesses provided that nickname?
13 A.  I don't know where Larry got it, Holec
14 got it.
15 Q.  Well, what are the possibilities of
16 where you would have gotten such information?
17    MS. ROSEN: Did you say "where you"?
18    BY MS. BONJEAN:
19 Q.  Where the detective -- I meant that in
20 the royal sense, but where -- what are the
21 possibilities of where a detective could have
22 learned that information?
23    MS. ROSEN: Objection, calls for
24 speculation.
25    THE WITNESS: My opinion where he could

Page 217

1  have got it?
2      BY MS. BONJEAN:
3  Q.  Yeah.  Where did he --
4  A.  From his investigation.
5  Q.  Right.  From talking to witnesses,
6  right?
7  A.  I would assume.
8      MS. ROSEN: Objection, calls for
9  speculation.
10      BY MS. BONJEAN:
11  Q.  Any other place he might have been able
12  to learn the possible nickname of the offenders?
13  A.  From the victims.
14  Q.  Right.  And I know at the bottom of
15  Maysonet 9599, on which there is a reference to
16  one of the offenders wearing a sweatshirt that
17  says "Leo" on it, right?  It's at the bottom.
18      Do you see that?
19  A.  I'm looking for it, ma'am.  I'm sorry.
20  Q.  The last line on 9599.
21  A.  "Sweatshirt with 'Leo'."
22  Q.  Do you see that?
23  A.  Yes, ma'am.
24  Q.  Okay.  So apart from the fact that one
25  of the offenders was wearing a sweatshirt that had

Page 218

1  "Leo" written on it, do you know where the
2  information came from that one of the offenders
3  had the nickname King Leo?
4      MS. ROSEN: Objection, asked and
5  answered.
6      MR. ENQUIST: Objection,
7  mischaracterizes the document.  Go ahead.
8      THE WITNESS: I'm sorry, could you
9  please repeat that?
10      BY MS. BONJEAN:
11  Q.  Apart from what's written at the bottom
12  of 9599, what other information can you point me
13  to that would explain how the detective who
14  prepared this report got the nickname King Leo?
15      MS. ROSEN: Objection, asked and
16  answered.
17      THE WITNESS: I don't know how
18  Detective Holec got it.  I assume during his
19  investigation somebody said that.
20      BY MS. BONJEAN:
21  Q.  And you would agree that if somebody
22  gave the nickname King Leo, you would want to
23  report that in the report as he did, right?
24      MS. ROSEN: Objection, form.
25      THE WITNESS: Yes.

Page 219

1      BY MS. BONJEAN:
2  Q.  But you don't think it's important to
3  identify where he got that information, right?
4      MS. ROSEN: Objection, form.
5      MR. ENQUIST: Objection, form.
6      BY MS. BONJEAN:
7  Q.  Or do you?
8      MS. ROSEN: Objection, form.
9      THE WITNESS: I don't know where he got
10  the picture from, no.
11      BY MS. BONJEAN:
12  Q.  Would you agree that if he had written
13  in his report where he got the information about
14  the nickname, you would be able to tell me where
15  he got the information about the nickname?
16  A.  If it was recorded here, I could answer
17  that.
18  Q.  You could answer that question.  And
19  you can't answer that question because he didn't
20  record it, right?
21  A.  Correct.
22  Q.  All right.  And I think your testimony
23  was that he then somehow determined that one of
24  the offenders that had been identified or one of
25  the individuals in the photograph that had been

Page 220

1  tentatively identified was Mr. Maysonet, right?
2      MR. ENQUIST: Objection, form,
3  mischaracterizes previous testimony.  Are you
4  talking about Holec?
5      BY MS. BONJEAN:
6  Q.  Do you understand or no?
7  A.  I think I do.
8  Q.  I thought you said Bongiorno took
9  Holec's information --
10  A.  Yes.
11  Q.  -- and figured out it was Jose
12  Maysonet.  Is that wrong?
13  A.  I thought you were talking about Holec.
14  Bongiorno, he did his investigation and he came up
15  with the full name of who King Leo was.
16  Q.  Right.  Do you know where his report is
17  that details the investigative acts he took to
18  determine that Mr. Maysonet's nickname is
19  allegedly King Leo?
20      MS. ROSEN: Objection, asked and
21  answered.
22      THE WITNESS: May I look through these
23  reports?  Page 9605, there is two paragraphs
24  on that page.  May I read them?
25

Maysonet v.
Guevara

Video Deposition

---

Page 221

BY MS. BONJEAN:

1 Q. I can read them. I don't need you to
2 read all of them.
3     Are you talking about where it says
4 that they just developed information that Jose
5 Maysonet was a Latin King with the street name
6 King Leo?
7 A. Under "Investigation," that first
8 paragraph, yes, ma'am.
9 Q. I see it. Again, can you point me to
10 any document that explains or shows why they
11 thought his nickname was King Leo?
12 A. Detective Holec, on his report, had
13 made reference to a King Leo.
14 Q. Right, that the offender had possibly
15 the nickname King Leo. I'm asking what made
16 Bongiorno or you or any of you believe that
17 Mr. Maysonet had a nickname King Leo?
18 A. When Tony did his investigation and he
19 came up with a possible name, there was also a
20 picture that was attached to the card, and that
21 picture that was on that card at Western and
22 Belmont gang crimes office matched the picture of
23 the group of individuals, the one that was picked
24 out as the shooter.

---

Page 222

1 Q. Oh, so now you know that Bongiorno
2 actually went and looked in the card index or name
3 index and was able to find an index card of
4 Mr. Maysonet in which it said his nickname was
5 King Leo?
6 A. Yes.
7 Q. Okay. Did you see that card?
8 A. Yes, I did.
9 Q. Okay. Did you inventory that card, as
10 well?
11 A. I did not.
12 Q. Did you make a photograph of it and put
13 it in the report?
14 A. I did not.
15 Q. Do you know how the information got on
16 the card?
17 A. By a previous gang crime specialist
18 that had contact with him.
19 Q. Okay. And do you know who that person
20 would be?
21 A. No.
22 Q. So you don't really have any firsthand
23 knowledge that Mr. Maysonet's nickname is King
24 Leo, right?
25 A. Just what was on the intelligence

---

Page 223

1 information at the police department.
2 Q. Right. Some unsourced card in the
3 police department that you cannot produce to us,
4 right?
5     MS. ROSEN: Objection, argumentative.
6     MR. ENQUIST: Join.
7     MR. LEINENWEBER: Also foundation.
8     THE WITNESS: It wasn't unsourced. It
9 was a document being preserved by the police
10 department.
11     BY MS. BONJEAN:
12 Q. Oh, it was preserved by the police
13 department?
14 A. Yes.
15 Q. Really?
16     MS. ROSEN: Objection, argumentative.
17     BY MS. BONJEAN:
18 Q. Do you know where they have it right
19 now?
20     MS. ROSEN: Argumentative, foundation.
21     BY MS. BONJEAN:
22 Q. Do you know where it is presently?
23 A. I was never involved as an officer
24 assigned to gang crimes. I do know that it was in
25 their office with many, many others.

---

Page 224

1 Q. Okay. So you don't know it was
2 preserved by the Chicago Police Department,
3 correct?
4 A. I would only assume it was.
5 Q. So you're just assuming that, right?
6 A. Yes, ma'am.
7 Q. You have no firsthand knowledge that it
8 was preserved?
9     MS. ROSEN: Objection, form.
10     THE WITNESS: I don't have any
11 firsthand knowledge where those photos are
12 today.
13     BY MS. BONJEAN:
14 Q. Okay. And you don't know the source of
15 the information on those cards that you don't know
16 whether they exist or don't exist to this day,
17 correct?
18     MR. ENQUIST: Objection, argumentative.
19     MS. ROSEN: Objection.
20     MR. LEINENWEBER: Also vague.
21     THE WITNESS: I have no idea where they
22 would be.
23     BY MS. BONJEAN:
24 Q. You don't know the source of the
25 information that was on the card that you claim

---

Rizman Rapaport (973)992-7650
"When every word counts"

Page 225

1  showed that Mr. Maysonet's nickname was King Leo,
2  correct?
3      MS. ROSEN: Objection, argumentative.
4      THE WITNESS: The source of the
5  information was by other police officers
6  assigned to the gang crimes unit.
7      BY MS. BONJEAN:
8  Q.  And what other police officers would
9  that be?
10 A.  I wouldn't know.
11 Q.  So you're assuming that's the source of
12  the information, correct?
13 A.  There was investigator names on that
14  card who completed that card.
15 Q.  But you don't know who they are,
16  correct?
17 A.  I do not.
18      MS. ROSEN: Objection, form.
19      BY MS. BONJEAN:
20 Q.  And you don't know where they got the
21  information, right?
22 A.  No, ma'am.
23 Q.  So that's my point.  You don't know the
24  original source of this claim that Mr. Maysonet
25  went by a nickname of King Leo, right?

Page 226

1      MS. ROSEN: Objection, argumentative.
2      MR. ENQUIST: Join.
3      THE WITNESS: The only claim that I
4  know there is a picture with a nickname
5  that Tony was looking for.  He had a picture
6  of it.  The picture matched up to a picture
7  that we had during our investigation.
8      BY MS. BONJEAN:
9  Q.  Okay.  And you don't know the source of
10  the information on that card that Tony retrieved,
11  correct?
12 A.  I wouldn't know who issued that card or
13  who completed that card.
14 Q.  All right.  And you have an independent
15  recollection of that card as you sit here today?
16 A.  Yes.
17 Q.  Incapable of remembering all the times
18  you've been sued, but you remember all the
19  information on that card?
20      MS. ROSEN: Objection, argumentative.
21      MR. ENQUIST: Join.
22      MR. LEINENWEBER: Also misstates the
23  witness' testimony.
24      MS. SPIVY: Join.
25      THE WITNESS: Again, I remember the

Page 227

1  card.
2      BY MS. BONJEAN:
3  Q.  Okay.  What other information was on
4  the card?
5  A.  The card had his name, a description.
6  Q.  What was the description?
7  A.  I don't know.
8  Q.  Okay.  What were his other nicknames?
9  Did he have any other nicknames?
10 A.  I don't recall.
11 Q.  What else do you recall specifically
12  about the information on the card that you said
13  you remember?
14      MS. ROSEN: Objection, form,
15  argumentative.
16      THE WITNESS: I do remember it had a
17  name, an address, a birth date, a
18  description, where the individual frequents
19  and what organization that he was affiliated
20  with.
21      BY MS. BONJEAN:
22 Q.  But that's all the cards; they all have
23  that information, right?  That's the whole purpose
24  of the index card, correct?  Who they hung out
25  with, right?

Page 228

1  A.  Okay.
2  Q.  Nicknames, correct?
3  A.  Okay.
4  Q.  Cars they drove, right?
5  A.  I agree.
6  Q.  Okay.  Again, I understand that the
7  index cards contained that type of information.
8  What I'm asking is, what do you remember
9  specifically about those factors or identifiers as
10  it relates to Mr. Maysonet's card?
11 A.  Everything that you asked me about.
12  His name, his address --
13 Q.  Okay.  So what was the name on the
14  card?
15 A.  It had Jose Maysonet on it.
16 Q.  So you don't remember the actual
17  information on the card, you remember the
18  categories of information, right?
19 A.  I think you're cutting me off here,
20  ma'am.  You're not letting me explain.
21 Q.  I think I understood what you said.  I
22  would just like you to answer my question, if you
23  don't mind.  We could get out of here quicker.
24 A.  It had his name, his birth date, where
25  he lived, where he frequents, what affiliation he

Maysonet v.
Guevara

Video Deposition

Page 229

1  had.
2  Q.  Okay.  And where did he frequent?
3  A.  Well, at the time I remember --
4  Q.  Sir, I'm going to ask you, please, not
5  to look at reports.  I'm going to ask you --
6  because that's not the index card, is it?
7      MS. ROSEN: This is harassing and
8  argumentative.
9      MS. BONJEAN: It's not.
10     MR. ENQUIST: It is.
11     MS. ROSEN: It is.  You're stepping
12  over his answer, you're interrupting him --
13     MS. BONJEAN: Because I'm trying to
14  preserve the integrity of the question and
15  the answer, and I prefer him not leafing
16  through a report to try to glean information
17  that he's going to make up.
18     MS. ROSEN: I'm sorry, that was
19  incredibly offensive, incredibly offensive,
20  that you just right now are accusing a
21  witness of making things up on the record.
22  Okay?
23     MS. BONJEAN: Yeah.  Well, I'm going to
24  show some restraint, but those are some
25  reasonable inferences to make, okay?

Page 230

1      MR. LEINENWEBER: Just so we're clear,
2  the report you're worried about him reviewing
3  is the one you just handed him as Exhibit 2
4  and told him to review, right?
5      MS. BONJEAN: No, it's not.
6      MR. LEINENWEBER: It's not?
7      MS. BONJEAN: No.
8      MS. ROSEN: Isn't that what's sitting
9  in front of him?
10     MS. BONJEAN: I didn't ask him to thumb
11  through it with respect to every question
12  that I intend to ask.  I as a courtesy gave
13  it to him to alert him and ask him to look
14  through it when I asked him to look through
15  it.  He's talking about index cards.  Unless
16  the index card is in there, I don't want him
17  looking at it right now.
18     MR. LEINENWEBER: He asked you several
19  times if he could review the report.
20     MS. BONJEAN: And I said yes, several
21  times.
22     MR. LEINENWEBER: Absolutely.  So now
23  you don't get to be upset that he maybe has
24  information from the report.
25     MS. BONJEAN: I'm not upset.  I don't

Page 231

1  understand how looking at a report --
2      MR. LEINENWEBER: It seems as though
3  you are.
4      MS. BONJEAN: No, I'm not upset.  I
5  don't understand why looking at a report that
6  doesn't contain the name index is going to
7  help him remember the information on the
8  index card.
9      MR. LEINENWEBER: Okay, that's a fair
10  point, but I don't --
11     MS. BONJEAN: That's the point I was
12  making.
13     BY MS. BONJEAN:
14  Q.  We're talking about the index card that
15  Bongiorno went and got.  Do you remember the line
16  of questioning?
17  A.  I do.
18  Q.  Okay.  So I would ask that you turn
19  that report -- unless it's in there, I'm going to
20  ask you that you just put it aside for a second,
21  okay?
22  A.  It's in there.
23  Q.  The card is in there?
24  A.  The card is not in there.  The
25  information is in there.

Page 232

1  Q.  Okay.  And where is the information?
2  A.  May I look at it now?
3  Q.  Well, where is the information from the
4  card specifically?  Sure, point me to it.
5  A.  9605, last paragraph.  That's the
6  information that I obtained off -- that Tony and I
7  obtained off the contact card that was on file at
8  the gang crimes office.
9  Q.  Okay, right.  But you already had
10  Mr. Maysonet in custody at that point; you really
11  didn't need the card any more, did you?
12     MS. ROSEN: Objection, argumentative.
13     MR. ENQUIST: Join.
14     MS. ROSEN: The question was, where was
15  the information recorded in the report.  And
16  you don't like that he tells you where he
17  recorded the information off of the card, and
18  now you're like, well, that was after you
19  arrested him.
20     BY MS. BONJEAN:
21  Q.  But where does it say that you got this
22  information from the index card?
23  A.  May I read it to you?
24  Q.  Just point me to where you said you got
25  the information from the index card?

Maysonet v.
Guevara

Video Deposition

Page 233

1      MS. ROSEN: That was not your question.
2      BY MS. BONJEAN:
3  Q.  It was my original question.  Point to
4  me in the report where the information from the
5  index card can be found?
6      MS. ROSEN: And that's what he pointed
7  to.  Now you're asking him, where does it say
8  that this information comes from.  That's a
9  different question.
10     MS. BONJEAN: Okay.  Well, that's the
11 question that I would like to ask.
12     MS. ROSEN: Okay.  Well, then ask that
13 question.
14     BY MS. BONJEAN:
15 Q.  Where does it say that this information
16 came from the card?
17 A.  The information that was obtained, Tony
18 Bongiorno, my partner, gathered at the gang crimes
19 north unit at Western and Belmont.
20 Q.  Okay.  Does this information tell us
21 where his hangout spots were that you said was on
22 the index card?
23 A.  Second paragraph.
24 Q.  Go ahead.  You can read it.
25 A.  "King Leo was known to the reporting

Page 234

1  detective as Jose Maysonet, that frequents the
2  area of Spaulding Avenue and Beach Avenue, and was
3  known to reside at 3202 North Homan Avenue."
4  Q.  Okay.  And this information, you're
5  saying, came directly from the index card, is that
6  right?
7  A.  Yes.
8  Q.  And did you prepare this report?
9  A.  I did.
10 Q.  Okay.  So now you remember -- it wasn't
11 just Bongiorno, you actually remember seeing the
12 index card and putting that information into your
13 report, is that right?
14 A.  We both did, yes.
15 Q.  Did you write that paragraph or did he?
16 A.  No, I did.  I typed up this report.
17 Q.  Okay.  So you were looking at the card
18 that you said you pulled the information from to
19 put in here, right?
20 A.  Yes.
21 Q.  Yes?  And you didn't make a Xerox copy
22 of the card?
23     MS. ROSEN: Asked and answered.
24     THE WITNESS: I did not.
25

Page 235

1      BY MS. BONJEAN:
2  Q.  Okay.  You didn't do anything to
3  preserve what the card showed for the purposes of
4  this investigative file, right?
5  A.  I did not.
6  Q.  You didn't hand over this card with
7  this information to the prosecutor's office,
8  right?
9  A.  I did not.
10 Q.  You're not aware that Bongiorno did
11 either, correct?
12 A.  Not in my presence.
13 Q.  Okay.  So the information from which
14 you prepared this report, you never actually
15 produced to the Cook County State's Attorneys,
16 correct?
17     MS. ROSEN: Objection, foundation,
18 calls for speculation.
19     MR. ENQUIST: Join.
20     THE WITNESS: I did not produce it.
21     BY MS. BONJEAN:
22 Q.  And as far as you know, it was never
23 produced, right?
24     MS. ROSEN: Objection, foundation,
25 calls for speculation.

Page 236

1      MR. LEINENWEBER: Also vague.
2      THE WITNESS: I don't know if it was or
3  not ma'am.  I'm sorry.
4      BY MS. BONJEAN:
5  Q.  And if that card didn't actually
6  reflect a nickname of King Leo, would you agree
7  that that might be information that Mr. Maysonet's
8  attorney, if he had a competent attorney, would
9  want to know?
10     MS. ROSEN: Objection, calls for
11 speculation.
12     MR. ENQUIST: Join.
13     MR. LEINENWEBER: Also incomplete
14 hypothetical.
15     THE WITNESS: I can't answer that.
16     BY MS. BONJEAN:
17 Q.  But you didn't think it was important
18 to make sure that that card was made part of the
19 investigative file, right?
20 A.  That's correct.
21 Q.  All right.  Okay.  You can put that
22 aside.  Thank you.
23 A.  Okay.
24 Q.  So after you've had these conversations
25 with Mr. Maysonet at Area 5 and you have received

Maysonet v.
Guevara

Video Deposition

Page 237

1 approval from felony review to charge him, tell me
2 what happened next with respect to Mr. Maysonet?
3 A. He was taken down to the lockup.
4 Q. Okay. And anything else?
5 A. I don't know what they do in the
6 lockup.
7 Q. And did you see Mr. Maysonet again
8 after you brought him to the lockup?
9 MS. ROSEN: Ever?
10 MS. BONJEAN: That day, before he was
11 transported to the County.
12 THE WITNESS: I did not.
13 BY MS. BONJEAN:
14 Q. Did Sergeant Mingey or any sergeant ask
15 you whether they could speak to Mr. Maysonet?
16 A. I don't recall if they did or not.
17 Q. You have no recollection, though, of
18 having a conversation with Sergeant Mingey about
19 interviewing Mr. Maysonet, right?
20 A. Sergeant Mingey is my supervisor. All
21 the supervisors are responsible for everything and
22 everybody that's on that floor.
23 Q. So he would not have to get your
24 permission to speak to Mr. Maysonet, right,
25 correct?

Page 238

1 A. That's correct.
2 Q. So to the best of your understanding,
3 after you let Mr. Maysonet know that he was being
4 charged, you sent him off to the lockup and you
5 didn't see him again, is that correct, until maybe
6 months later, a month later?
7 A. Yes.
8 Q. And you don't know whether or not
9 Mr. Maysonet had any conversations with any other
10 individuals, detectives, sergeants, et cetera, in
11 Area 5 on July 15, 1990, right?
12 A. I don't recall if he did or not.
13 Q. And as you sit here today you don't
14 know whether he did or did not, is that right?
15 A. You're right.
16 Q. Okay. So what do you recall next as it
17 relates to Mr. Maysonet?
18 A. I recall seeing him on the street at
19 26th and California.
20 Q. You recall seeing him on the street on
21 August 22, 1990?
22 A. I'm not sure of the dates. If I could
23 look at my report, I could tell you.
24 Q. So you arrested Mr. Maysonet on
25 August 22, 1990, okay? And what were the

Page 239

1 circumstances under which you encountered
2 Mr. Maysonet on the date that you arrested him?
3 A. I saw him on the street as I was going
4 into 26th and California, criminal courts
5 building.
6 Q. Okay. And what time was it?
7 A. I'm not sure. It was in the morning.
8 Q. Okay. Were you going into 26th Street
9 for a particular court appearance?
10 A. I must have. That's the only reason I
11 would be there.
12 Q. Do you know where you were going?
13 A. No.
14 Q. Is it possible you were going to room
15 101?
16 MS. ROSEN: Objection, calls for
17 speculation.
18 THE WITNESS: I wouldn't know. I don't
19 recall where I was going that day.
20 BY MS. BONJEAN:
21 Q. It's possible, though, you were going
22 to room 101, right?
23 A. No, I wouldn't be going to the chief
24 judge's chambers.
25 Q. You wouldn't be going to branch 66?

Page 240

1 A. I thought that was 100. I may be
2 wrong.
3 Q. Is it possible you were going to branch
4 66?
5 MS. ROSEN: Objection, calls for
6 speculation.
7 THE WITNESS: I don't know.
8 BY MS. BONJEAN:
9 Q. So it is possible?
10 MS. ROSEN: Objection, form.
11 THE WITNESS: It's possible, but I
12 don't know why I was there.
13 BY MS. BONJEAN:
14 Q. But if I, for instance, got the court
15 sheets for branch 66 that day and looked at the
16 homicide cases or the violent crime cases, it's
17 possible that one of those cases could have been
18 your case, right?
19 MS. ROSEN: And it's possible they
20 couldn't have been. What does that mean?
21 Objection, form.
22 THE WITNESS: I don't recall why I was
23 there.
24 BY MS. BONJEAN:
25 Q. All right. And you would have been

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 241

1  going there in the morning for a court appearance,
2  though, right?
3  A.  Yes.
4  Q.  And you don't know whether it was in
5  one of the courtrooms or branch 66; you have no
6  idea, right?
7     MS. ROSEN: Objection, asked and
8  answered.
9     MR. ENQUIST: Join.
10  THE WITNESS: I don't recall why I was
11  there.
12    BY MS. BONJEAN:
13  Q.  Well, you weren't on a social visit,
14  were you?
15    MS. ROSEN: Objection, asked and
16  answered.
17    THE WITNESS: I don't know why I was
18  there.
19    BY MS. BONJEAN:
20  Q.  Where did you see Mr. Maysonet when you
21  first saw him?
22  A.  On the street.
23  Q.  On what street?
24  A.  California Avenue.
25  Q.  Okay.  And what was he doing?

Page 242

1  A.  He was walking eastbound.
2  Q.  He was what?
3  A.  Walking eastbound.
4  Q.  And who was he with?
5  A.  Himself.
6  Q.  And what was he doing, just walking?
7  A.  He was walking.
8  Q.  Was he walking away from the court
9  building?
10  A.  Yes, ma'am.
11  Q.  Okay.  And what did you do when you saw
12  him walking eastbound away from 26th and
13  California?
14  A.  I was surprised to see him.
15  Q.  And why were you surprised to see him?
16  A.  Because I thought he was still
17  incarcerated for the triple aggravated battery.
18  Q.  Well, you understand the concept of
19  bond, right?  People make bond, make bail?
20  A.  I do.
21  Q.  All right.  That just seemed improbable
22  that he would have been able to make bail or why
23  was it such a surprise?
24    MS. ROSEN: Objection, form.
25    THE WITNESS: My experience, if you

Page 243

1  allegedly shoot three people, you have a high
2  bond.  Most people can't post that bond.
3     BY MS. BONJEAN:
4  Q.  Okay.  So you were surprised because
5  you thought he probably had a high bond and were
6  surprised to find that he had made the bond, is
7  that right?
8     MS. ROSEN: Objection, asked and
9  answered.
10    BY MS. BONJEAN:
11  Q.  Is that a yes?
12  A.  That's a yes.
13  Q.  Okay.  So what did you do, then, when
14  you saw him?
15  A.  At that time I approached him, told him
16  who I was, showed him my badge and asked him if he
17  would come back to Area 5 with me relative to
18  another shooting.
19  Q.  And why did you want him to come back
20  to Area 5 with you relative to another shooting?
21  A.  I was privy to conversations regarding
22  the double murder and I thought that it would
23  further the investigation.
24  Q.  So you weren't assigned to the Wiley
25  brothers' murders on August 26, 1990, right?

Page 244

1  A.  Correct.
2  Q.  And you testified that you had
3  information about the Wiley brothers' murders, is
4  that right?
5  A.  Yes.
6  Q.  And how did you get this information?
7  A.  As I just said, I was part of some
8  conversations that were taking place at Area 5
9  violent crimes.
10  Q.  Okay.  So let's talk about these
11  conversations that you heard.  What's the first
12  conversation that you heard relative to the Wiley
13  brothers' murders at Area 5?
14  A.  I'm not sure what that first
15  conversation was.
16  Q.  Who was part of the conversation?
17  A.  Sergeant Mingey, I and other detectives
18  that were there.
19  Q.  You, Sergeant Mingey, anybody else that
20  you recall?
21  A.  No.
22  Q.  Okay.  And when did this conversation
23  take place?
24  A.  At the beginning of our tour of duty.
25  Q.  Okay.  And do you know where, what time

Maysonet v.
Guevara

Video Deposition

Page 245

1  frame it was?  Was it shortly after the Wiley
2  brothers' murders or was it --
3  A.  I don't.  I can't recall.
4  Q.  Okay.  Relative to your arrest of
5  Mr. Maysonet, when was this conversation?
6  A.  I don't recall.
7  Q.  So you don't know now whether it was
8  before or after you arrested him on July 15, 1990?
9  A.  Oh, the conversation that I was part of
10  with Sergeant Mingey and other detectives took
11  place at Area 5 before I encountered him on the
12  street.
13  Q.  Right.  Okay.
14  A.  What date, I couldn't tell you when it
15  was.
16  Q.  Okay.  But this was after your arrest
17  of him on July 15, 1990?
18      MS. ROSEN: Didn't we already establish
19  this an hour ago?
20      MS. BONJEAN: No.
21      THE WITNESS: This conversation was
22  after my arrest for the three shootings, the
23  aggravated batteries.
24      BY MS. BONJEAN:
25  Q.  Okay.  So if the arrest of Mr. Maysonet

Page 246

1  was on July 15, 1990 and then you stopped him or
2  saw him on street on August 22, 1990, are you able
3  to tell us between those dates when you first
4  heard Sergeant Mingey talking about the Wiley
5  brothers' murders?
6  A.  I couldn't tell you when it was.
7  Q.  Okay.  Where were you?
8  A.  During these conversations?
9  Q.  Yeah.  This first conversation that you
10  referenced?
11  A.  On the second floor of Area 5.
12  Q.  Okay.  It was you and Sergeant Mingey,
13  you don't know who else was there.  Do you know
14  where exactly you were on the second floor?
15  A.  No.
16  Q.  All right.  And what did Sergeant
17  Mingey convey to you during this conversation?
18  A.  At that time I learned that a similar
19  weapon was used.  I also learned --
20  Q.  I'm sorry, you learned what?
21  A.  That a similar type of weapon was used,
22  9 millimeter, in the triple shooting, as well as
23  the double murder.
24  Q.  Okay.
25  A.  The 9 millimeter was used in both

Page 247

1  incidents.
2  Q.  Okay.  So you learned at that first
3  time that the 9 millimeter weapon was used both in
4  the ag bat and in the double murder, right?
5  A.  Wrong.
6  Q.  Okay.  What did you learn?
7  A.  I learned that a 9 millimeter was
8  learned in both incidents.
9  Q.  Okay.  What else did you learn?
10  A.  There was a conversation that took
11  place in the County Jail with Mingey and Montilla.
12  Q.  All right.  And what did you know about
13  the conversation that took place between Mingey
14  and Montilla and Mr. Maysonet?
15  A.  That they said -- related that he was
16  there, had knowledge and wanted a deal cut.
17  Q.  A deal cut for what?
18  A.  For his part in the double murder.
19  Q.  Okay.  Anything else that you learned
20  during your conversations with Sergeant Mingey?
21  A.  Basically there could have been more or
22  less.  I don't know.  I don't recall.
23  Q.  Okay.  So what you do recall is
24  learning that the Wiley brothers' murders involved
25  a 9 millimeter?

Page 248

1  A.  Yes.
2  Q.  And that Mr. Maysonet's attempt
3  involved a 9 millimeter, right?
4  A.  Yeah.  The three shootings involved a 9
5  millimeter.
6  Q.  Right.  So you learned that there was a
7  9 millimeter used in both offenses, right?
8  A.  Yes.
9  Q.  You had no knowledge that it was the
10  same 9 millimeter; you just knew that a 9
11  millimeter weapon had been used in both incidents,
12  correct?
13  A.  I didn't know if that was the same
14  weapon or not.
15  Q.  Okay.  And you also knew that when you
16  arrested Mr. Maysonet on August 22 or spoke to him
17  on August 22 on the street, that he had had a
18  conversation with Sergeant Mingey and Sergeant
19  Montilla at Cook County Jail, right?
20  A.  Detective Montilla.
21  Q.  Detective Montilla, correct?
22  A.  Yes.
23  Q.  And what else did you know about the
24  conversation that had taken place other than
25  Mr. Maysonet saying that he had knowledge, he was

Maysonet v.
Guevara

Video Deposition

Page 249

1 there and wanted to cut a deal?
2 A. I don't recall what else.
3 Q. But that's what you recall as you sit
4 here now, correct?
5 A. Yes.
6 Q. And was that Cook County Jail meeting
7 conveyed to you in that first time you spoke to
8 Sergeant Mingey or was it at a subsequent time
9 that you spoke to him?
10 A. I believe it wasn't the first time that
11 we talked.
12 Q. How many conversations in total did you
13 have with Sergeant Mingey between July 15, 1990
14 and August 22, 1990?
15 MR. ENQUIST: About this?
16 MS. BONJEAN: Yeah, about the Wiley
17 brothers' murders.
18 THE WITNESS: I don't know.
19 BY MS. BONJEAN:
20 Q. Was it more than one?
21 A. I don't know, ma'am.
22 Q. So it could have been one?
23 A. Yes.
24 Q. I'm trying to understand everything you
25 knew, to the best of your recollection, about

Page 250

1 Maysonet's involvement in the Wiley brothers'
2 murders before you arrested him or asked him to
3 come to Area 5 on August 22, 1990, okay?
4 A. Yes, ma'am.
5 Q. And correct me if I'm wrong. You
6 mentioned the weapon connection that you knew
7 about, right?
8 A. Didn't know if it was a connection. I
9 knew that in two incidents, a 9 millimeter was
10 used.
11 Q. Okay. And also just that you had heard
12 from Sergeant Mingey that Maysonet had
13 communicated to him and Montilla at Cook County
14 Jail that he was present for the Wiley brothers'
15 murders and wanted to cut a deal and was somehow
16 involved, is that right?
17 A. Yes.
18 Q. Anything else?
19 A. Not that I can recall right now.
20 Q. And based on that information, you
21 asked Mr. Maysonet to accompany you to Area 5?
22 A. I did.
23 Q. And he consented?
24 A. He did.
25 Q. He spoke to you in English?

Page 251

1 A. He did.
2 Q. Was not with any of his family members,
3 right?
4 A. He was by himself.
5 Q. And did Mr. Maysonet tell you that he
6 had to be in court in front of Judge Morgan on his
7 attempt murder case that you had actually been
8 involved in investigating?
9 A. He did not.
10 Q. Did he explain to you why he was at
11 26th Street if he wasn't going to court?
12 A. Did not tell me why he was there at
13 all.
14 Q. Did you ask him, why are you at 26th
15 Street?
16 A. No.
17 Q. Did you deduce that maybe he was there
18 to go to court for a case that you had been
19 involved in investigating?
20 A. Saw him on the street, ma'am. Did not
21 see him in the court building.
22 Q. And did he tell you that he had already
23 been in court at branch 66?
24 A. He did not.
25 Q. Did you ask?

Page 252

1 A. There was no reason to.
2 Q. Would your prior testimony be accurate
3 about what time it was that you saw Mr. Maysonet
4 on the street?
5 MS. ROSEN: Objection, form,
6 foundation.
7 THE WITNESS: It could reflect what
8 time I saw him.
9 BY MS. BONJEAN:
10 Q. Okay. So you wouldn't have lied under
11 oath, right?
12 A. No.
13 Q. So whatever you testified to is
14 accurate and truthful, right?
15 MS. ROSEN: Objection, form,
16 foundation. There is more than two
17 alternatives to that. So foundation.
18 MR. ENQUIST: You can answer.
19 THE WITNESS: I would have to look at
20 my report to reflect what time I encountered
21 him.
22 BY MS. BONJEAN:
23 Q. I'm not asking you to tell me what time
24 you encountered him right now, because I recognize
25 that that's many years ago. But if you testified

Page 253

1   to what time you encountered him, you have no
2   reason to believe that that wouldn't have been
3   accurate?
4   A.   If I testified all those years ago, it
5   would be accurate.
6   Q.   So after he consented to go back to
7   Area 5 with you, did you take him back to Area 5?
8   A.   No.
9   Q.   Why not?
10  A.   Because I had my private car and I
11  provided transportation for him.
12  Q.   He didn't say, I can get there myself?
13  A.   No.
14  Q.   Did you ask him, do you want to meet me
15  over there?
16  A.   No.
17  Q.   Why not?
18  A.   No reason to.  He said that he would go
19  with me to Area 5 in this matter, in this
20  investigation.
21  Q.   But he wasn't going with you; he was
22  going in a marked police car not with you, right?
23  A.   Well, eventually.  He was transported.
24  Q.   He wasn't going with you to Area 5,
25  correct?

Page 254

1   A.   Not physically.
2   Q.   No.  You were driving your car there,
3   correct?
4   A.   Yes.
5   Q.   And he wasn't coming in your car with
6   you, right?
7   A.   Correct.
8   Q.   And according to you, you arranged for
9   his transportation there?
10  A.   I did.
11  Q.   And he never said, I'll just meet you
12  there, right?
13  A.   Correct.
14  Q.   Okay.  And how did you arrange for his
15  transportation?
16  A.   By telephone.
17  Q.   Did you have a cell phone?
18  A.   No.
19  Q.   Okay.  What telephone did you use?
20  A.   The one in the police room that was on
21  the third floor of that building.
22  Q.   All right.  And Mr. Maysonet
23  accompanied you there, as well?
24  A.   Yes.
25  Q.   So you both went into 26th Street,

Page 255

1   correct?
2   A.   Yes.
3   Q.   He went through the security, right?
4   A.   Security then was not as it is today.
5   Q.   Fair enough.  And up to the third
6   floor.  Again, he was not with any family members,
7   is that right?
8   A.   He was by himself, ma'am.
9   Q.   And you brought him up there and
10  arranged for a police car to come pick him up,
11  correct?
12  A.   A police vehicle.  I don't know if it
13  was a car or if it was a squadrol.
14  Q.   All right.  And again, this was all
15  just as a convenience for Mr. Maysonet so that he
16  would have transportation there?
17  A.   Yes.
18  Q.   And then did you wait with him until
19  the squadrol showed up or the police car showed
20  up?
21  A.   Yes.
22  Q.   Okay.  Why did you wait with him?
23  A.   There was nobody else that could be
24  with him.  It was the court sergeant and myself in
25  the room.  Other detectives and police officers

Page 256

1   were coming by signing the court logs and they
2   were going to do what they --
3   Q.   Why did anyone need to be with him at
4   all?
5   A.   I wanted to talk to him.
6   Q.   Okay.  So what did you talk about?
7   A.   Nothing at that time while we were
8   waiting for the squadrol.
9   Q.   You said you wanted to talk to him.
10  What did you want to talk to him about?
11  A.   I wanted to talk to him about a double
12  murder.
13  Q.   Okay.  My question was why did you wait
14  with him.  You said you wanted to talk to him.
15  A.   No.  I said I waited with him because
16  there was only a court sergeant there, other
17  people that were detectives or patrolmen in and
18  out of that room.  I asked him if he would assist
19  in coming in to Area 5.
20  Q.   Right.  I thought you asked him that on
21  the street?
22  A.   I did.
23  Q.   Okay.  So you asked him that again in
24  the third floor police office?
25  A.   No.  You asked me a question, why I was

Maysonet v.
Guevara

Video Deposition

Page 257

1  waiting with him.  I was waiting for his
2  transportation.
3  Q.  Okay.  Why were you waiting with him
4  for his transportation?
5  A.  Because I wanted to make sure that he
6  went back to Area 5.
7  Q.  Okay.  And why did you want to make
8  sure?
9  A.  Because I asked him if he would
10  voluntarily come with me.
11  Q.  And did you think there was a chance he
12  might not wait for that transportation if you
13  left?
14  A.  I thought there could have been a
15  better than average chance he would have left.
16  Q.  And why would that be?
17  A.  Just had that gut feeling.
18  Q.  And why?
19  A.  I don't know.
20  Q.  But according to you he consented, so
21  why all of a sudden do you think he's going to not
22  cooperate and just leave?
23  A.  I was there.  I wasn't going anywhere.
24  I was waiting with him for transportation.
25  Q.  So you were waiting next to him for

Page 258

1  transportation.  You didn't trust that he would
2  stick around for the transportation if you left,
3  right?
4  A.  The thought occurred to me.
5  Q.  And is it your testimony that he was
6  free to go, though, at that point?
7  A.  He was there voluntarily.
8  Q.  Not my question.  The question was, was
9  he free to go if he wanted to go?
10  A.  I don't know.  The question never came
11  up.
12  Q.  As you sit here today based on the
13  information that you have, was he free to go if he
14  said I don't want to go back to Area 5 with you?
15  A.  The question never came up, so I didn't
16  have an opinion and I still don't.
17  Q.  Well, you didn't let him get there on
18  his own, correct?
19  A.  Yes.
20  Q.  Okay.  You accompanied him to the
21  police office in 26th Street, right?
22  A.  Yes.
23  Q.  You arranged for his transportation,
24  correct?
25  A.  Yes.

Page 259

1  Q.  You stayed with him until his
2  transportation arrived, right?
3  A.  Yes.
4  Q.  You said that you wanted to make sure
5  that he went to Area 5, correct?
6  A.  Yes.
7  Q.  Okay.  But you are not willing to say
8  that he was free to leave or he was not free to
9  leave, right?
10     MS. ROSEN: Objection, form, asked and
11  answered.
12     THE WITNESS: As I told you, it never
13  crossed my mind.  It was never an issue.
14     BY MS. BONJEAN:
15  Q.  Well, it had to have crossed your mind
16  at some point, correct?
17     MS. ROSEN: Objection, argumentative.
18     THE WITNESS: It was never an issue.
19     BY MS. BONJEAN:
20  Q.  Well, it was an issue, because
21  Mr. Maysonet filed a motion to quash arrest and
22  suppress evidence.
23  Do you remember that?
24     MS. ROSEN: Objection, form.
25     THE WITNESS: It was never an issue

Page 260

1  with me.
2     BY MS. BONJEAN:
3  Q.  You testified at that hearing on the
4  motion, right?
5  A.  I remember testifying.
6  Q.  Okay.  So it was an issue for somebody,
7  would you agree with that?
8     MS. ROSEN: Objection, argumentative,
9  asked and answered.
10     MR. ENQUIST: Join.
11     THE WITNESS: I would assume.
12     BY MS. BONJEAN:
13  Q.  Okay.  And did you have probable cause
14  to arrest him at that point?  I'm talking about on
15  the street.
16  A.  Again, I asked him if he would assist
17  in the investigation voluntarily, and he said yes.
18  Q.  I know.  I understand what your
19  testimony is.  My question is different.
20  Did you have probable cause to arrest
21  him when you encountered him on the street on
22  August 22, 1990?
23  A.  I'm not sure if I did or not at that
24  time.
25  Q.  How long did you wait with Mr. Maysonet

**Maysonet v.**
**Guevara**

Video Deposition

---

Page 261

1  in the office on the third floor of 26th Street
2  before the transportation arrived?
3  A.  I'm not sure.
4  Q.  And did you let other Area 5 detectives
5  know that you had him with you?
6  A.  I made a phone call on the police
7  phone.
8  Q.  And who did you call?
9  A.  Telling them that I'll be in shortly
10  and, I forgot if it was a patrol car or a
11  squadrol, was bringing in somebody for me, and I
12  gave the name.
13  Q.  Okay.  And did the transportation
14  eventually arrive?
15  A.  Yes, ma'am.
16  Q.  Okay.  And then what happened?
17  A.  They drove him back to Area 5, drove
18  him to area 5.
19  Q.  And did you eventually go to Area 5,
20  then?
21  A.  Yes.
22  Q.  And what happened when you got there?
23  A.  When I got there, I wanted to know
24  where he was.  He was in a room, and then I left
25  the room.

---

Page 262

1  Q.  Did you see him in the room?
2  A.  Yes, I did.
3  Q.  Did you speak to him?
4  A.  Yes, I did.
5  Q.  And what did you say to him and what
6  did he say to you?
7  A.  Do you need a bathroom, do you need
8  anything at that time, do you want to make a phone
9  call, are you hungry.
10  Q.  Just pleasant chitchat?
11  A.  Basically at that time that's what I
12  said to him.
13  Q.  Okay.  Were you with anyone when you
14  said that to him?
15  A.  I don't know if I was or not.
16  Q.  And did he say anything in response?
17  A.  He said he was good.
18  Q.  He said he didn't want to talk to
19  anybody?
20  A.  Not at that time, not to me.
21  Q.  He didn't tell you he wanted to talk to
22  his sister or his girlfriend, right?
23  A.  Never.
24  Q.  And spoke to you in English, correct?
25  A.  Yes.

---

Page 263

1  Q.  You were able to understand him
2  perfectly, right?
3  A.  Yes.
4  Q.  He didn't speak with any type of accent
5  that prohibited you from understanding him, right?
6  A.  I understood him.
7  Q.  Never had any difficulties
8  understanding him, correct?
9  A.  Yes, ma'am.
10  Q.  And he was just cool hanging out at
11  Area 5, right?
12  A.  Seemed like he was comfortable.
13  Q.  Is that something that happens a lot,
14  people are just comfortable hanging out at Area 5
15  waiting to be questioned on double murders?
16      MS. ROSEN: Objection, foundation,
17  calls for speculation.
18      THE WITNESS: I don't know what his
19  mind frame was while he was waiting.  I asked
20  him if he needed anything or wanted to make a
21  phone call or go to the bathroom or if he was
22  hungry.  He told me in English he was good,
23  and I left the room.
24      BY MS. BONJEAN:
25  Q.  Was he free to leave at that point?

---

Page 264

1  That point being when you checked in on his
2  wellbeing and asked him whether he wanted to go to
3  the bathroom, something to eat, a steak dinner,
4  whatever you were asking him?
5      MS. ROSEN: Objection to the editorial
6  sarcastic commentary embedded within that
7  question.
8      THE WITNESS: He was there voluntarily
9  to assist in this investigation.
10      BY MS. BONJEAN:
11  Q.  Was he free to leave?
12  A.  I don't know if he was or not.
13  Q.  Did you have probable cause to arrest
14  him when he was in your interrogation room or
15  interview room?
16  A.  There was a lot of questions that
17  needed to be answered.
18  Q.  So is that a yes?
19  A.  I don't know.
20  Q.  All right.  So you left out of the room
21  after he said he was peachy keen and what happened
22  next?
23      MR. ENQUIST: Objection to the form,
24  argumentative.
25      THE WITNESS: That's all the

---

Maysonet v.
Guevara

Video Deposition

Page 265

1 conversation I had with him.
2    BY MS. BONJEAN:
3 Q.  That's the only conversation you had
4 with him?
5 A.  Until he -- until the State's Attorney
6 that was reviewing the case wanted to take him for
7 a ride of the murder scene.
8 Q.  So you did not question Mr. Maysonet
9 about the Wiley brothers' murders, is that right?
10 A.  Not that I recall.
11 Q.  And you asked him no questions about
12 his involvement in the Wiley brothers' murders, is
13 that right?
14 A.  I don't recall asking him about it.
15 Q.  And you didn't confront him with any
16 information you had about prior statements he had
17 allegedly made to Sergeant Mingey or Detective
18 Montilla about his knowledge or involvement in the
19 Wiley brothers' murders, is that right?
20 A.  That's correct.
21 Q.  Your conversation consisted of just
22 some pleasantries and nothing more, is that right?
23 A.  We had the conversation about his
24 wellbeing being in the police station.
25 Q.  Right.

Page 266

1 A.  I left the room.  That's all I did
2 until I was asked to take him for a ride.
3 Q.  Okay.  Who asked you to take him for a
4 ride?
5 A.  State's Attorney DiFranco --
6 Q.  And -- I'm sorry, go ahead.
7 A.  -- and Detective Montilla.
8 Q.  All right.  And how were you asked to
9 go for a ride?
10 A.  Verbally.
11 Q.  And did you agree?
12 A.  Yes.
13 Q.  And how many people went on this ride?
14 A.  Detective Montilla, DiFranco, me and
15 Maysonet.
16 Q.  And why was it necessary for two
17 detectives and a State's Attorney to go on the
18 ride?
19    MS. ROSEN: Objection, foundation.
20    THE WITNESS: DiFranco reviewed all
21 submitted facts that were given to him by
22 detectives and DiFranco wanted him to show
23 him what he was talking about on the street.
24    BY MS. BONJEAN:
25 Q.  And what submitted facts were provided

Page 267

1 to ASA DiFranco?
2    MS. ROSEN: Objection, foundation.
3    THE WITNESS: Any police reports that
4 were submitted at that time, conversations
5 with Mingey, with Montilla, any detectives
6 that had any conversation with him at that
7 point.
8    BY MS. BONJEAN:
9 Q.  And how was that information conveyed
10 to DiFranco?  I'm talking about the conversations
11 Mr. Maysonet purportedly had with Mingey and
12 Montilla?
13    MS. ROSEN: Objection, foundation.
14    MR. ENQUIST: Join.
15    THE WITNESS: I guess verbal
16 conversation.
17    BY MS. BONJEAN:
18 Q.  Have you ever seen any police report
19 GPR that memorializes these purported
20 conversations that occurred between Mingey,
21 Montilla and Mr. Maysonet?
22    MS. ROSEN: Object to the form of the
23 question.
24    THE WITNESS: I don't recall seeing.  I
25 don't know if --

Page 268

1    BY MS. BONJEAN:
2 Q.  I'm sorry?
3 A.  I don't recall.
4 Q.  You don't recall seeing them, correct?
5 A.  I don't recall looking at any reports.
6 Q.  Do you recall ever seeing any GPR's
7 that reflect this conversation with
8 Mr. Maysonet -- between Mr. Maysonet and Sergeant
9 Mingey and Montilla at the Cook County Jail?
10 A.  I don't recall if there were.
11 Q.  Your information you received just from
12 hearing conversations, is that right?
13 A.  Yes.
14 Q.  You didn't review any reports prior to
15 seeing Mr. Maysonet on the street on August 22,
16 correct?
17 A.  The only thing I saw, what was hanging
18 up on the board and verbal conversations.
19 Q.  Right.  And the stuff hanging on the
20 board, you don't remember ever seeing any GPR's
21 about the Cook County Jail visit, right?
22 A.  I don't think that any GPR's would have
23 been put up there, just supp reports or original
24 reports.
25 Q.  Did you see that information contained

Page 269

1  in any supp report prior to encountering
2  Mr. Maysonet on the street on August 22, 1990?
3  A.  I don't recall if there was or not.
4  Q.  Because when you testified earlier, you
5  testified about getting that information through a
6  conversation.  Is that what you remember?
7  A.  That's what I just said.
8  Q.  Okay.  Is that the only memory you have
9  of how you got that information?
10 A.  I remember hearing a conversation that
11 I was part of and I remember looking at reports.
12 Q.  What was contained in the reports about
13 the meeting at Cook County Jail?
14 A.  I don't recall.  Just other than the
15 conversation, the verbal conversation that I was
16 part of that Montilla and Mingey went there, they
17 were talking to him and he wanted a deal cut for
18 his participation in the murders.
19 Q.  And again, just to be clear, you saw a
20 report, you didn't see a report or you don't
21 remember seeing a report about that prior to
22 encountering Mr. Maysonet on the street?
23     MS. ROSEN: Objection, asked and
24 answered.
25     MR. ENQUIST: Join.

Page 270

1      THE WITNESS: Again, I'm talking about
2  a conversation that I was part of.
3      BY MS. BONJEAN:
4  Q.  And I'm talking about a report.
5  A.  And I said I don't recall if there was
6  one or not at that time.
7      MS. BONJEAN: All right.  I'm going to
8  hand you -- would you mark these two
9  exhibits, please?  This is all Dropbox.
10     (Whereupon, Paulnitsky
11     Deposition Exhibit No. 3 and 4
12     was marked for identification.)
13     BY MS. BONJEAN:
14 Q.  I'm handing you what has been marked as
15 Exhibit 3.  Can you look at the first page and
16 tell me if you recognize the first page at all?
17 A.  No.
18 Q.  No, you don't recognize it?
19 A.  This is the first time I saw this page.
20 Q.  Okay.  Do you recognize it, though?
21 A.  Well, it has an RD number, it has the
22 number 190.  It says it's Exhibit 3 and then it
23 says RFC-Maysonet 000001.
24 Q.  All right.  It also has some other
25 information on there, right?  It says "Assigned:

Page 271

1  P. Boyle."
2      Do you see that?
3  A.  I see Boyle, Tapkowski, Dickinson.
4  Q.  And does that mean anything to you?
5  A.  This looks like it could be a Xerox
6  copy of a file.
7  Q.  Investigative file?
8  A.  I don't know.
9  Q.  You've seen some investigative files in
10 your 20 years at Area 5, have you not?
11 A.  I have.
12 Q.  And do they look like this or do they
13 look different than this?
14 A.  My recollection, they look different.
15 Q.  Yeah?  How do they look different?
16 A.  They would have a tab that would have
17 some information on it.
18 Q.  Like what?
19 A.  Who the victims were and the location.
20 Q.  Okay.  Anything else?
21 A.  That's all that I can remember.
22 Q.  Where would the index log be that
23 contained all the reports that were part of the
24 investigative file?  Would that be inside the
25 investigative file?

Page 272

1  A.  Well, if this was the investigative
2  file that you're talking about, you would open it
3  up and it would be on the -- as you open it up, it
4  would be on the left side.
5  Q.  So it would be inside the file?
6  A.  Yes.
7  Q.  Okay.  So this doesn't look like an
8  investigative file to you, correct?
9  A.  No.  There would be two holes here
10 where they would have a clip that would keep the
11 inventory stuff in there.
12 Q.  Right.  So again, this doesn't look
13 like an investigative file to you, right?
14 A.  May I look at it?  From the outside it
15 does not to me.
16 Q.  I'm going to let you look at it, but I
17 first just want the record to be clear.  I'm
18 asking you about the outside of it, does it look
19 like it?
20 A.  Not that I remember it being.
21 Q.  Okay.  So yeah, I would like to go
22 through it with you, okay?
23 A.  Fine.
24 Q.  RFC-Maysonet number 2 through 6, these
25 are court attendance reports.

Maysonet v.
Guevara

Video Deposition

Page 273

1　　Do you see that?
2　A.　May I take the clip off?
3　Q.　Sure.
4　A.　And how far?
5　Q.　2 through 6.
6　A.　Okay.
7　Q.　These are court attendance reports,
8　correct?
9　A.　Yes.
10　Q.　And what are court attendance reports?
11　A.　Where everybody in the department that
12　goes to court was required to fill this out that
13　you were in court.
14　Q.　Okay.　So these were all prepared after
15　Mr. Maysonet was already charged with the Wiley
16　brothers' murders, right?
17　A.　Yes.
18　Q.　Go to RFC-Maysonet 7.　Can you tell me
19　what that appears to be?
20　A.　I really don't know what it is other
21　than what it says here.
22　Q.　And what does it say?
23　A.　"Start of Felony Case.　Page," can't
24　read it, "of 047.　Defendant Name."　Is that
25　Christopher?　"Gossens," G-o-s-s-e-n-s.

Page 274

1　Q.　Do you know who Christopher Gossens is?
2　A.　No.
3　Q.　Do you know who Alfredo Gonzalez is?
4　A.　No.
5　Q.　Did you know who Alfredo Gonzalez was
6　back in August of 1990?
7　　　MS. ROSEN: Objection to form.
8　　　THE WITNESS: I don't know if I did or
9　not.
10　　　BY MS. BONJEAN:
11　Q.　Okay.　What about Justino Cruz?
12　A.　I don't recall.
13　Q.　What about Efrain Cruz, did you know
14　him?
15　A.　I don't recall.
16　Q.　Do you remember participating in the
17　arrests of any other of the other co-defendants in
18　the Wiley brothers' murder case?
19　A.　I don't think I did.
20　Q.　Okay.　Can we agree that this screen
21　that's on this RFC-Maysonet 7 has a date reflected
22　from 1995?
23　　　MR. ENQUIST: Just up in the date.
24　　　THE WITNESS: Yeah, I was just going to
25　say that.　08-10-95 on all three entries.

Page 275

1　　　BY MS. BONJEAN:
2　Q.　Okay.　So this looks like something
3　that existed after Mr. Maysonet was arrested on
4　August 22, 1990, right?
5　A.　I never saw this before.
6　Q.　All right.　The next couple of pages,
7　two pages, are more attendance reports prepared
8　from 1994, right?
9　A.　Yes.
10　Q.　And then pages 10 and 11 are letters
11　from the Cook County State's Attorney's office to
12　Area 5 detectives both prepared in '95.
13　　Do you see that?
14　A.　I see one on page 10.　Am I going
15　beyond that?
16　Q.　Yeah, keep going.
17　A.　11.
18　Q.　All right.　12 is another screenshot of
19　something.　Do you know what that is?
20　A.　Looks like that first --
21　Q.　Do you recognize it as the clerk's
22　docket system?
23　A.　I wasn't familiar with their docket
24　system.
25　Q.　Okay, fair enough.　Next page,

Page 276

1　RFC-Maysonet 13 is another letter dated May 8,
2　1992, right?
3　A.　Yes.
4　Q.　Jack O'Malley's office to Officer
5　Halvorsen, right?
6　A.　Yes.
7　Q.　The next RFC 14 through 19 -- sorry,
8　through 20 are more court attendance reports, is
9　that fair, all of them dated in the year of 1992?
10　A.　Up to page 20, you said?
11　Q.　19 -- 20, 20.
12　A.　Yes.
13　Q.　Now, starting with RFC-Maysonet 21 to
14　23, this is a report of postmortem examination of
15　one of the victims, Torrence Wiley.
16　　Do you see that?
17　A.　Yes.
18　Q.　Is this something that you would have
19　looked at in connection with the Wiley brothers'
20　murder investigation?
21　A.　I could have looked at it.
22　Q.　It would have been something that was
23　on that board?
24　A.　No.
25　Q.　Where would you have retrieved it to

Maysonet v.
Guevara

Video Deposition

Page 277

1  look at it?
2  A.  It would be in the office file.
3  Q.  The office file?
4  A.  Yes.
5  Q.  Is that the same as the investigative
6  file?
7  A.  It is not.
8  Q.  What's the office file?
9  A.  It's the original case reports on a
10  murder, stuff like that.
11  Q.  All right.  And where were those
12  maintained?
13  A.  That would be in a different file
14  cabinet.
15  Q.  Okay.  And what else is contained in
16  the office file?
17  A.  Important papers, documents.
18  Q.  I'm sorry?
19  A.  Documents, important documents and
20  papers.
21  Q.  Important documents and papers?
22  A.  Such as these.
23  Q.  What else, what other types of
24  documents?
25  A.  That's all I can recall.

Page 278

1  Q.  Supplemental police reports?
2  A.  I don't know if they would be in the
3  same thing.  Usually murders, ag bats would be put
4  in the office there.
5  Q.  What office?
6  A.  Violent crimes office.
7  Q.  I know, but when you say "office," what
8  do you mean specifically by that?
9  A.  Oh, behind where sergeant is.
10  Q.  The sergeant's office?
11  A.  Well, the sergeant's office was also
12  considered where files would be kept, yeah.
13  Q.  I see.  And it's also where the
14  lieutenant would also be sometimes, right?  Did
15  they share an office?
16  A.  Not really.  I mean, you had to walk
17  into sergeant's office to walk into the
18  lieutenant's office.
19  Q.  I see.  So in the sergeant's office
20  there was also an office file that would contain
21  reports including, for instance, the report of the
22  postmortem examination, right?
23  A.  Yes.
24  Q.  And the office file was separate and
25  apart from the investigative file, correct?

Page 279

1  A.  Yes.
2  Q.  And what other types of documents were
3  contained in the office file?
4      MS. ROSEN: Objection, foundation.
5      THE WITNESS: I don't know.
6      BY MS. BONJEAN:
7  Q.  How did documents get into the office
8  file?
9      MS. ROSEN: Objection, foundation.
10      BY MS. BONJEAN:
11  Q.  If you know?
12  A.  I don't know.
13  Q.  And how was the office file organized?
14      MS. ROSEN: Objection, foundation.
15      THE WITNESS: In numerical order by
16  year.
17      BY MS. BONJEAN:
18  Q.  And were you able to just go in and
19  grab an office file if you found it pertinent to
20  whatever work you were doing?
21  A.  If it wasn't contained in the
22  investigative file, I assume.
23  Q.  Okay.  And was it organized by RD
24  number or --
25  A.  Year and RD number.

Page 280

1  Q.  Year and RD number.
2  A.  Numerical.
3  Q.  So if you couldn't find something in
4  the investigative file, you might go into the
5  office file and see if you could find it in that
6  file, correct?
7  A.  Theoretically.
8  Q.  And did you do that sometimes?
9  A.  I don't know if I did or not.
10  Q.  Well, you just said you thought this
11  would have been in the office file?
12  A.  Yeah, because this is autopsy reports.
13  Q.  I'm sorry?
14  A.  Autopsy reports.
15  Q.  Okay.  So autopsy reports can sometimes
16  be important to investigations, right?
17  A.  Sure.
18  Q.  To find out if some theory is
19  consistent with the manner of death, right?
20  A.  Yes.
21  Q.  And if you wanted to look at a
22  postmortem examination report, you would
23  potentially be able to find that in the office
24  file within the sergeant's office, correct?
25  A.  Yes.

Page 281

1  Q.  Okay.  And as it relates to this case,
2  you don't know whether or not you looked at the
3  postmortem examination report or you do know?
4  A.  I don't recall if I did or not.
5  Q.  All right.  Could have, though?
6  A.  It's possible.
7  Q.  All right.  How about RFC-Maysonet 25,
8  do you see that?
9  A.  Not yet.  Yes.
10  Q.  Okay.  Toxicology report?
11  A.  Yes.
12  Q.  Do you know whether you saw this at any
13  point?
14  A.  I don't know if I did or not.
15  Q.  And is this something that you would
16  have been able to access if you wanted to, if you
17  were working on this case?
18  A.  It's a possibility.
19  Q.  And where would you find this
20  information?
21  A.  This would be right next to this
22  (indicating).
23  Q.  Next to the postmortem examination?
24  A.  Yeah.
25  Q.  In the office file?

Page 282

1  A.  Yes.
2  Q.  All right.  Moving on, RFC-Maysonet 26
3  through 28 and 29, it's the same information but
4  for Kevin Wiley.
5    Do you see that?
6  A.  Yes, ma'am.
7  Q.  I assume your answer is the same, that
8  you don't know whether you looked at these
9  materials at any point?
10  A.  Correct.
11  Q.  But it is something that you might have
12  had access to if you wanted to look at them,
13  right?
14  A.  Yes, ma'am.
15  Q.  All right.  Can you go to RFC-Maysonet
16  30?  What are these cards?  They're not cards, but
17  what does this reflect?
18  A.  Well, they have the name of Torrence
19  Wiley, homicide/murder, the RD number, the
20  homicide file number.  Then there is Kevin Wiley,
21  which basically has the same information.
22  Q.  What's a homicide file number?
23  A.  It would be -- if you bear with me, I'm
24  going to point to this first one, Torrence Wiley.
25  On the righthand upper hand corner there is the RD

Page 283

1  number.
2  Q.  Yeah.
3  A.  There is the date.
4  Q.  Correct.
5  A.  The homicide file number.
6  Q.  Right.
7  A.  The 90 would represent 1990.  Slash 293
8  would be the number of homicides in the area.
9    Then you go to the next card, which is
10  Kevin Wiley, RD number, the date, and that number
11  is 294.  So Torrence's would be 293 of the year
12  and Kevin would be 294 that year.
13  Q.  All right.  And what is the purpose of
14  a homicide file number?
15    MS. ROSEN: Objection, form.
16    THE WITNESS: I believe it was only the
17  stats in the office at that time.  You know,
18  besides the RD number, it would be homicide
19  293 for Area 5.
20  BY MS. BONJEAN:
21  Q.  Right.  Why does it say "Homicide
22  File," though?  It doesn't just say "Homicide
23  293."  It says "Homicide File," so what file is it
24  referencing?
25    MS. ROSEN: Objection, foundation.

Page 284

1    THE WITNESS: I would assume that it
2  was the office file number besides the RD
3  number.  I never understood that, because you
4  have an RD number.
5    MS. BONJEAN: Right.
6    THE WITNESS: So I really don't know.
7  I would just assume that's --
8  BY MS. BONJEAN:
9  Q.  If you could keep your finger there on
10  page 30 and look back at the first page of this
11  document that I've shown you, if you don't mind?
12  The very first page, this (indicating)?
13  A.  The cover sheet?
14  Q.  Yeah.
15  A.  Okay.
16  Q.  Do you see those numbers in the
17  righthand corner that say "90-50" and "90-51"?
18    Just do you see them?
19  A.  I see it.
20  Q.  Do you know what they reference?
21  A.  No.
22  Q.  So now if you could look at
23  RFC-Maysonet 31, this is a cause of death report.
24    Do you see that?
25  A.  Yes.

Page 285

1  Q.   And it's dated May 25, 1990, which was
2  the same day that the Wiley brothers were shot.
3       Do you see that?
4  A.   Yes, ma'am.
5  Q.   Okay.  Is this a report that you would
6  have potentially looked at in the office on the
7  homicide board?
8  A.   Not on the board.
9  Q.   Okay.  Where would this be?
10 A.   Could have been a copy, could have been
11 attached to an investigative file.
12 Q.   Is this something that would have been
13 in the office file or just the investigative file?
14      MS. ROSEN: Objection, foundation.
15      THE WITNESS: Could have been both.
16      BY MS. BONJEAN:
17 Q.   Okay.  You can keep going.  There is
18 another one for the other victim, Kevin Wiley.
19      Do you see that?
20 A.   Yes, ma'am.
21 Q.   Okay.  You can keep going.  There is a
22 report --
23      MS. ROSEN: What page are you on?
24      BY MS. BONJEAN:
25 Q.   35.  There is a report that was

Page 286

1  submitted on May 1, 1992.
2       Do you see that?
3  A.   Yes.
4  Q.   Okay.  That's almost two years after
5  Mr. Maysonet was arrested, right?
6  A.   This is dated May 1, 1992.
7  Q.   Right.  So two years after the shooting
8  and almost -- whatever, at least 18 months after
9  Mr. Maysonet was arrested in August of 1990,
10 correct?
11 A.   Yes, ma'am.
12 Q.   So surely this report was not something
13 that you had access to prior to Mr. Maysonet's
14 arrest, right?
15 A.   I never saw this report.
16 Q.   And since it was submitted after
17 Mr. Maysonet's arrest, it's not something that you
18 would have looked at or had access to, correct?
19 A.   I didn't look at it.  I don't know if I
20 would have had access to it.  I didn't look at it.
21 Q.   It was prepared after Mr. Maysonet was
22 arrested.
23 A.   I understand that, but you asked me
24 would I have access to this.
25 Q.   Would you have had access to something

Page 287

1  that wasn't prepared prior to Mr. Maysonet's
2  arrest?
3  A.   I misunderstood the question.
4  Q.   Yeah.  That's fine.  Assuming that this
5  is not a falsified police report and that it
6  actually was actually submitted on May 1, 1992,
7  can we agree that it would not have been prepared
8  at the time that Mr. Maysonet was arrested?
9  A.   We can.
10      MS. ROSEN: Objection, form.
11      BY MS. BONJEAN:
12 Q.   Okay.  And that is also true for the
13 next report that bears the Bates stamp
14 RFC-Maysonet 37 and 38?
15 A.   Yes.
16 Q.   And that is also actually true for the
17 report that bears RFC-Maysonet 39 through 41?
18 This is not a report that was either prepared or
19 reviewed by you prior to you arresting
20 Mr. Maysonet?
21 A.   Yes.
22 Q.   RFC-Maysonet 42 through 43 and 44 is
23 also a report that was submitted on August 24,
24 1990.
25      Do you see that?

Page 288

1  A.   Yes.
2  Q.   Again, assuming that this is not a
3  falsified report, this would have been a report
4  prepared at least a day after Mr. Maysonet was
5  arrested and charged with the murders, correct?
6       MR. ENQUIST: Objection, form.
7       MS. ROSEN: Objection, form.
8       THE WITNESS: Yes.
9       BY MS. BONJEAN:
10 Q.   And do you remember taking any action
11 with the investigation after Mr. Maysonet was --
12 well, after you left Mr. Maysonet at Area 5 in
13 that interview room?
14      MR. ENQUIST: Objection, already asked
15 and answered.  I'm not sure when you're
16 talking about leaving him in the room.  We've
17 already had another testimony.
18      MS. BONJEAN: I'm sorry?
19      MR. ENQUIST: We've already had another
20 testimony after -- I'm not sure when you're
21 talking about leaving the room.  There was
22 other testimony about his interactions.
23      BY MS. BONJEAN:
24 Q.   Okay.  I thought you testified that
25 after you asked him whether he wanted a phone

Maysonet v.
Guevara

Video Deposition

Page 289

1  call, a drink or anything like that, that he said
2  no, I'm good, and that you didn't actually
3  interact with him again, or did you?
4  A.  I did not until --
5      MR. ENQUIST: Finish your answer.
6      THE WITNESS: I did not interact with
7  him.
8      BY MS. BONJEAN:
9  Q.  Okay.  Did you ever interact with him
10 again?
11 A.  Just on that request with the State's
12 Attorney when we drove him.
13 Q.  Oh, okay.  Understood.  Later on.  I
14 had forgotten about that.  Thank you.
15     But that was still -- that was the same
16 day that he was in custody or the following day,
17 is that right?
18 A.  Yes.
19 Q.  Okay.  So now I would like you to look
20 at -- I'm going to actually have you work
21 backwards.  I'm going to first ask you to
22 disregard the last two pages of this file and --
23 A.  Disregard it?
24 Q.  Yeah.  I don't think it relates to this
25 case.  Take a look at it, tell me if you have any

Page 290

1  reason to believe this has something to do with
2  this case?
3  A.  This is a homicide of Gloria Sanchez.
4  Q.  Right.
5  A.  I have no clue why this is there.
6  Q.  It seems to have -- it has a one-off on
7  the RD number, so maybe it just got misfiled.  I
8  have no idea, either.
9      I'm going to have you look at
10 RFC-Maysonet 63 and 64, if you would.
11     Do you see it?
12 A.  63, 64?
13 Q.  Yes.
14 A.  Yes.
15 Q.  Okay.  It's a progress report of a
16 field investigation, is that right?
17 A.  Yes, ma'am.
18 Q.  Okay.  And it's prepared by Detectives
19 J. Boyle and B. Brennan?
20 A.  Yes.
21 Q.  Now, are these fellows detectives who
22 would have been assigned to this case, possible?
23 A.  It seems like they wrote a progress
24 report, so they did something with it.
25 Q.  Right.  When someone is assigned to the

Page 291

1  case, does that mean that they're forever assigned
2  to the case or is it just assigned for that shift?
3      MS. ROSEN: Objection, foundation.
4      THE WITNESS: Assigned for that
5  assignment.
6      BY MS. BONJEAN:
7  Q.  Right.  Is that assigned until it's
8  closed or assigned for just the shift that day?
9  A.  Yes.
10 Q.  Which one?
11 A.  Just the shift for that day.
12 Q.  Okay.  So you don't have any reason to
13 believe that Boyle and Brennan were assigned for
14 any other purpose than to do some investigative
15 conduct on this day?
16     MS. ROSEN: Objection, foundation.
17     THE WITNESS: I have no knowledge of
18 these reports.
19     BY MS. BONJEAN:
20 Q.  Okay.  This was a report that was
21 submitted on May 25, 1990, the same day that the
22 Wiley brothers were murdered, right?
23 A.  Yes.
24 Q.  This would be the type of report that
25 might be on the board, the homicide board, right?

Page 292

1  A.  If it was completed then, yes.
2  Q.  Right.  At some point it would end up
3  on the board potentially, correct?
4  A.  I would think so.
5  Q.  And it reflects interviews with members
6  of the victims' families.
7      Do you remember seeing this report?
8  A.  I don't remember seeing it.  I'm not
9  saying that I didn't see it.  I don't recall.
10 Q.  Have you seen it in preparation for
11 your deposition here today?
12 A.  I don't think so.
13 Q.  Did you ever see any evidence that the
14 Wiley brothers were involved in any gang activity?
15 A.  I don't recall.
16 Q.  Did you ever see any evidence that they
17 were drug dealers or even drug users?
18 A.  I don't recall if I did or not.
19 Q.  Did you ever have any information that
20 the shooting itself was gang motivated at all?
21 And I'll say this, prior to Mr. Maysonet's arrest
22 in or around August 22 of 1990?
23 A.  I don't recall or not.  I don't know.
24 Q.  As you sit here today, do you know
25 whether it was gang related?

Page 293

1 A. I don't know if it was or not.
2 Q. RFC-Maysonet 59 through 62 is another
3 supplemental report that is characterized as a
4 field investigation.
5 Do you see that?
6 A. 59 through 62?
7 Q. Yes.
8 A. May I look at it?
9 Q. Please.
10 A. I don't know if I saw this or not.
11 Q. It's a supp though, right?
12 A. It's a progress report.
13 Q. And is this the type of supplemental
14 report that would be on the board and accessible
15 to you after it was prepared if you wanted to find
16 out what was happening with this investigation?
17 MS. ROSEN: Object to the form.
18 THE WITNESS: I would think so.
19 BY MS. BONJEAN:
20 Q. Moving in the other direction, 55 and
21 56, do you see what that report is?
22 A. Not yet. This is a canvass report.
23 Q. Okay. And can you see that there are
24 individuals who have been interviewed in
25 connection with this murder investigation?

Page 294

1 A. Yes.
2 Q. And again, this report was submitted on
3 May 25, 1990, is that right?
4 A. 26th of May, 1990.
5 Q. That's when it was approved, but it was
6 submitted on May 25, correct?
7 MS. ROSEN: Objection, form,
8 foundation.
9 THE WITNESS: Yes, ma'am.
10 BY MS. BONJEAN:
11 Q. All right. Again, can you read Alma
12 Preceeo's narrative regarding what Alma Preceeo
13 told the detectives and tell me if that refreshes
14 your recollection about whether you've ever seen
15 this report or read this report?
16 A. Alma?
17 Q. It's page 55. It says Alma Preceeo, I
18 think.
19 A. Oh, I see it. I'm sorry. Yes, ma'am.
20 Q. Does that ring a bell for you at all?
21 A. It does, but I don't know if I saw it
22 way back when or recently.
23 Q. So it's something you may have seen
24 just in preparation for your deposition here
25 today?

Page 295

1 A. It's a possibility.
2 Q. But you don't remember whether you
3 looked at it back prior to arresting Mr. Maysonet?
4 A. I can't tell you if I did or not.
5 Q. But again, this might be a report --
6 this is one of those reports that might be on the
7 board in the sergeant's office?
8 A. Possibility.
9 Q. All right. And then the last report in
10 the packet starts with RFC-Maysonet 47 through 54.
11 This is a supplemental report or a cleared/open
12 report.
13 Do you see that?
14 A. Let me go to the last page.
15 Q. Sure.
16 A. You're correct.
17 Q. Okay. This report, what role did you
18 play in preparing this report in the sense of
19 putting the words on the piece of paper?
20 A. I didn't.
21 Q. Okay. So did you write -- and when I
22 say "write," I mean actually type in the
23 information on any portion of this report?
24 A. No.
25 Q. Your name is listed on the first page

Page 296

1 in the bottom row, second column.
2 Do you see that?
3 A. Yes.
4 Q. And what does it mean that your name is
5 there?
6 A. That means that I gave some type of
7 information for the author of the report.
8 Q. Okay. So you provided information to
9 the author of the report, and who is the author of
10 the report as best you can tell?
11 MS. ROSEN: Objection, foundation.
12 THE WITNESS: Detective Halvorsen.
13 BY MS. BONJEAN:
14 Q. All right. And do you recall giving
15 information to Detective Halvorsen about this case
16 prior to his preparation of this report?
17 A. I do.
18 Q. Okay. And when was it that you gave
19 information to Detective Halvorsen about whatever
20 you had to say about this case?
21 A. I'm not sure.
22 Q. Was it before he prepared the report?
23 A. Yes.
24 Q. So let's try to think back. You were
25 working third watch, right?

Maysonet v.
Guevara

Video Deposition

Page 297

1  A.  I believe I was that day, yes.
2  Q.  Okay.  So, which meant you started at
3  what time?
4  A.  I'm an early guy.  I mean, I'm always
5  early for anything I do in life.
6  Q.  Okay.
7  A.  So normal time is, I think it was at
8  4:00.  So sometimes because of the traffic
9  situation I would get there at 3:30, quarter to 4,
10  4:00.
11  Q.  And this is p.m.?
12  A.  Yes.
13  Q.  So on August 22 when you were at 26th
14  Street in the morning, were you working overtime?
15  A.  Yes.
16  Q.  So, and you would have put in for
17  overtime certainly if you were working overtime,
18  right?
19  A.  Yes.
20  Q.  And that was pretty routine, wasn't it,
21  that you would try to get your court dates on
22  shifts that you weren't actually working?
23      MR. ENQUIST: Objection.
24      MS. ROSEN: Object to the form,
25  foundation.

Page 298

1      MR. ENQUIST: Join.
2      BY MS. BONJEAN:
3  Q.  I'm not suggesting there is anything
4  wrong with that, I'm just saying that wasn't
5  unusual?
6  A.  Well, court is in the daytime.
7  Q.  Right.
8  A.  So I mean, if you had court, you're
9  always working overtime if you worked the night
10  shift or the morning shift.
11  Q.  Right.  If you worked the third watch,
12  you always had to be -- if you were going to be in
13  court you couldn't show up at 4:00, right?
14  A.  Yeah.
15  Q.  Okay.  So when you went to Area 5 after
16  bringing Mr. Maysonet there in the morning, you
17  said you put him in an interview room, asked him
18  if he needed anything and then you left, right?
19  A.  Yes.
20  Q.  Until you came back, I assume during
21  your shift, and participated in the field trip
22  that you went on, right?
23      MS. ROSEN: Object to the form.
24      THE WITNESS: I was outside on the
25  second floor all the time.  I never left the

Page 299

1  building until that request to drive to the
2  murder scene.
3      BY MS. BONJEAN:
4  Q.  Okay.  So you were essentially working
5  overtime through a lot of this, right?
6  A.  Yes.
7      MS. ROSEN: Object to the form.
8      BY MS. BONJEAN:
9  Q.  All right.  You didn't go home in
10  between, for instance, and come back?  You stayed
11  at Area 5?
12  A.  No, I was there.
13  Q.  So you were there the entire time?
14  A.  Yes.
15  Q.  And you were there when Mr. Maysonet
16  was questioned by Detective Guevara, right?
17      MS. ROSEN: Objection, form,
18  foundation.
19      THE WITNESS: I wasn't there when
20  Guevara talked to him.
21      BY MS. BONJEAN:
22  Q.  You weren't?
23  A.  I wasn't in the room.
24  Q.  No, but you were on the second floor?
25  A.  I was in the building, yes.

Page 300

1  Q.  Right.  You were in Area 5 violent
2  crimes offices, right?
3  A.  Yes.
4  Q.  And my understanding, correct me if I'm
5  wrong, is that after you got there, you never left
6  until after you took Mr. Maysonet to the scene?
7  A.  You're correct.
8  Q.  So you certainly were aware of what was
9  happening with the investigation even if you
10  weren't actively participating in it, right?
11  A.  Yes.
12  Q.  This report, take a look at it if you
13  need to, was submitted after Mr. Maysonet was
14  charged, right?
15  A.  You're talking about the cleared/open?
16  Q.  Yes.
17  A.  Yes.
18  Q.  Okay.  That's why it was cleared,
19  right; he was charged?
20  A.  Yes.
21  Q.  And that was a decision that was made
22  by an Assistant State's Attorney, correct?
23  A.  Yes.
24  Q.  So this is not a report that you would
25  have been able to review prior to bringing

Rizman Rappaport (973)992-7650
"When every word counts"

---

Page 301

1  Mr. Maysonet into Area 5, fair?
2  A.  That's correct.
3  Q.  What role did Detective Gawrys play on
4  this case?
5     MS. ROSEN: Objection, foundation.
6     THE WITNESS: I have no idea.
7     BY MS. BONJEAN:
8  Q.  Do you know why he's listed here --
9     MS. ROSEN: Objection, foundation.
10    BY MS. BONJEAN:
11 Q.  -- as an arresting officer?
12 A.  The only thing I can think of, at the
13 time he was partners with Guevara.
14 Q.  All right.  I would like you to look at
15 RFC-Maysonet 49.
16 A.  49?
17 Q.  Yes.
18 A.  Okay.
19 Q.  I'm going to read to you the section
20 that says "Manner and Motive:  Victims who were
21 male black youths were standing on the street when
22 they were approached by the offenders who are
23 Latin and members of the Latin Kings.  Offenders
24 shot victims to death.  Motive was gang rivalry."
25    Do you see that?

Page 302

1  A.  Yes, ma'am.
2  Q.  What is your understanding of what the
3  gang rivalry was?
4  A.  What I understand it pertaining to this
5  or what I understand?
6  Q.  What was the gang rivalry that is
7  referenced here?
8     MS. ROSEN: Objection, foundation.
9     THE WITNESS: I would only be guessing.
10 I really don't know.
11    BY MS. BONJEAN:
12 Q.  Okay.  What's your guess, then?
13 A.  What I guessed is Hispanic men with
14 Afro American men.  I did not know of any black
15 men, Afro American men, being in the Latin Kings.
16 Q.  Okay.  But what was your knowledge
17 about whether -- you would agree that not all
18 black men are in gangs, right?
19    MS. ROSEN: I'm sorry, can you repeat
20 that question she just asked?
21    THE WITNESS: Yes.
22    MS. ROSEN: Wait.  I want the court
23 reporter to read it back before you answer.
24    (Record read as requested.)
25    THE WITNESS: Yes.

Page 303

1     BY MS. BONJEAN:
2  Q.  Okay.  And that was also true in 1990,
3  that not all black men were in gangs, correct?
4  A.  Yes.
5  Q.  All right.  So do you have any factual
6  basis to believe that the Wiley brothers were in
7  fact members of any gang?
8  A.  I had no information to that.
9  Q.  So you don't know what was meant by
10 "Motive was gang rivalry"?
11 A.  Correct.
12 Q.  And when you put your name on this
13 report, are you attesting to knowing everything
14 contained in the report or knowing the basis of
15 everything contained in the report?
16    MS. ROSEN: Object to the form.
17    THE WITNESS: When I put down my name
18 on a report, I sign my report that I looked
19 at it, I did it and I reviewed it.
20    BY MS. BONJEAN:
21 Q.  This is not that report, though, right?
22 A.  My signature is not on here.
23 Q.  Okay.  So what am I to assume from the
24 fact that your signature is not on this report?
25    MS. ROSEN: Object to the form.

Page 304

1     THE WITNESS: I gave the author, Ernie
2  Halvorsen, the only thing that I did was from
3  the time that I saw Mr. Maysonet on the
4  street at 26th and California until I got
5  back at the Area, and then later in the day
6  drove him at the request of the State's
7  Attorney to the crime scene.  That's all I
8  did.
9     BY MS. BONJEAN:
10 Q.  Do you know if you read this report
11 after it was prepared?
12 A.  I don't know if I did or not.
13 Q.  Okay.  Would it have been your practice
14 to read a report that you had contributed to after
15 it was prepared even if you weren't the one
16 authoring it?
17 A.  I could have reviewed it.  Probably
18 did.  Don't remember if I did.
19 Q.  Possible you did, possible you didn't,
20 is that --
21 A.  That's correct.
22 Q.  If you had reviewed it and there was
23 something in there that was inaccurate, would you
24 have alerted Detective Halvorsen to that fact?
25 A.  If he was the author, yes.

Maysonet v.
Guevara

Video Deposition

Page 305

1 Q. All right. The next paragraph reflects
2 "Vehicle Used" and it describes a vehicle?
3 A. Same page, ma'am?
4 Q. Yes.
5 A. Okay.
6 Q. "Older model Pontiac."
7     Do you see that?
8 A. Yes, ma'am.
9 Q. "This car is alleged to belong to a
10 Latin King first name Jeffery"?
11 A. Yes, ma'am.
12 Q. Did you find out who Jeffery was?
13 A. I did not.
14 Q. Okay. Did you go to the index cards
15 that contain gang members' identifiers that we
16 spent some time talking about earlier to determine
17 who Jeffery was?
18 A. I did not.
19 Q. Do you know whether any other detective
20 did?
21 A. Probably not.
22 Q. Why not?
23 A. State's Attorney didn't require that we
24 find or attempt to locate Jeffery.
25 Q. How do you know that?

Page 306

1 A. Never asked us to. Never asked me to.
2 Q. Do you know if he asked anybody to?
3 A. I would assume not.
4 Q. Do you think maybe it would have been
5 good investigative work to try to find the owner
6 of the car that was involved in a double murder?
7 A. I wasn't asked to do it.
8 Q. Right. I'm asking your professional
9 opinion about it. I understand you're not --
10 A. I don't know what the State's Attorney
11 required at that time. I would only be
12 second-guessing, but I was not asked and I did not
13 hear him ask anybody in my presence.
14 Q. Okay. Well, the Cook County State's
15 Attorney testified that he had no role in
16 investigating the case; that was all the
17 detectives' job?
18 A. That's correct, but if he would have
19 asked me to try to locate Jeffery or a car by the
20 name of Jeffery, I would have done so.
21 Q. Right. But you don't need permission
22 from the Cook County State's Attorney's office to
23 continue to investigate a crime, particularly one
24 that's still open, right?
25 A. Again, I had very limited part in this

Page 307

1 investigation.
2 Q. Right. But my question is, you do not
3 require permission from a Cook County State's
4 Attorney to conduct further investigation in an
5 open murder case, right?
6 A. That's correct.
7 Q. All right. And can we agree that if
8 not you, somebody should have talked to Jeffery,
9 whose car was allegedly involved in this double
10 murder, right?
11     MS. ROSEN: Objection, calls for
12 speculation.
13     THE WITNESS: I don't know. I would be
14 guessing.
15     BY MS. BONJEAN:
16 Q. Well, it says Jeffery's car was part of
17 a double murder, yeah?
18 A. I did not try to learn the identity of
19 Jeffery and I don't know if anybody was asked to
20 learn the identity of Jeffery.
21 Q. No one needed to be asked to learn the
22 identity of Jeffery, we've established that. I
23 know you said you didn't. Do you know why you
24 didn't try to find out who Jeffery was?
25     MS. ROSEN: Object to the form and to

Page 308

1 the argumentative, editorial comment in the
2 middle of the question.
3     THE WITNESS: As I stated before, I had
4 a very, very limited role in this report or
5 investigating this, other than information
6 that I was told verbally and Mr. Maysonet had
7 agreed to accompany me to the area and then
8 going for a ride with him and the State's
9 Attorney. That's all I did.
10     BY MS. BONJEAN:
11 Q. Right. But I'm trying to understand
12 why no one tried to talk to Jeffery, but you can't
13 elucidate that question?
14 A. I know I didn't. I can only --
15 Q. And you don't know why it wasn't
16 something that was a priority for any detective to
17 talk to the owner of the car that was involved in
18 this double murder, correct?
19 A. I do not.
20 Q. Did you see Jennifer Borowitz at Area 5
21 when you were there?
22 A. I don't recall if I did or not.
23 Q. Do you know who she is?
24 A. I don't recognize the name. That
25 doesn't mean that I didn't know that she was a

Rizman Rapaport (973)992-7650
"When every word counts"

Page 309

1   State's Attorney.
2   Q.  But you don't recollect her being there
3   during the time that you were there from the
4   morning of August 22 until August 23?
5   A.  I don't know if I saw her or not.  I
6   don't even know at that time if I knew who she
7   was.
8   Q.  So you were there for over 24 hours,
9   about?
10  A.  Sure.
11  Q.  Did you sleep there?
12  A.  Well, I could have closed my eyes at
13  one point.
14  Q.  I don't completely understand why, if
15  you weren't involved in the investigation,
16  why -- were you there for some other purpose?
17  A.  I was there because I took him for a
18  ride with the State's Attorney and if the State's
19  Attorney needed anything else, I was available
20  with Montilla.
21  Q.  Yeah, there were a number of detectives
22  working this case, at least after you brought
23  Mr. Maysonet in, right?  There is about five names
24  on the back of this cleared/open report, correct?
25  A.  Sure.

Page 310

1   Q.  And according to you, you played a very
2   minimal role, right?
3   A.  That's correct.
4   Q.  Why would you have stayed over 24 hours
5   at the police station to just chauffeur
6   Mr. Maysonet and the others to the crime scene?
7       MS. ROSEN: Object to the form of the
8   question.
9       THE WITNESS: I don't know why.
10      BY MS. BONJEAN:
11  Q.  By the way, who drove to the crime
12  scene?
13  A.  I was driving, DiFranco was there,
14  Montilla was there, Maysonet was there.
15  Q.  What kind of car were you driving?
16  A.  I want to think I had an unmarked Ford.
17      MS. ROSEN: You're almost out of time.
18      MS. BONJEAN: All right, we can stop.
19      THE VIDEOGRAPHER: We are going off the
20  record at 4:07 p.m.
21      (Discussion off the record.)
22      (Short recess.)
23      THE VIDEOGRAPHER: We are back on the
24  record at 4:19 p.m.
25      MS. BONJEAN: Can you mark this,

Page 311

1   please?
2       (Whereupon, Paulnitsky
3   Deposition Exhibit No. 5 was
4   marked for identification.)
5       MS. BONJEAN: Thank you.
6       BY MS. BONJEAN:
7   Q.  Okay.  Mr. Paulnitsky, after you
8   brought Mr. Maysonet to Area 5 and then had your
9   brief conversation in which you checked for
10  his -- to see if he needed anything, see if he
11  needed to make a phone call, you had no contact
12  with him again until the next day when you brought
13  him to the scene with DiFranco and Montilla,
14  right?
15  A.  Yes.
16  Q.  Okay.  But you were still overseeing
17  the investigation during that 24-hour period that
18  you were at --
19  A.  I wasn't overseeing the investigation.
20  Q.  You were keeping up, paying attention
21  to the investigation, right?
22  A.  I was.
23  Q.  Is that a yes?
24  A.  Yes.
25  Q.  Okay.  I'm going to hand you what has

Page 312

1   been marked as Exhibit 5, have you take a look at
2   that.
3       MS. ROSEN: What is that?
4       MS. BONJEAN: Oh, sorry.
5       MR. ENQUIST: We can share one.
6       MS. BONJEAN: Yeah, it's on the
7   Dropbox.
8       MR. ENQUIST: So I know what it is.
9       MS. BONJEAN: It's the request to hold
10  over a prisoner.
11      MR. LEINENWEBER: Request to hold,
12  that's 5?
13      MS. BONJEAN: Yeah.
14      MR. LEINENWEBER: Got it.
15      BY MS. BONJEAN:
16  Q.  Do you see this exhibit before you?
17  A.  Yes.
18  Q.  Okay.  What is it?
19  A.  This is a request to hold over a person
20  that's in custody.
21  Q.  And what is the purpose of this
22  request?
23  A.  So basically additional investigation.
24  Q.  Okay, but who does the request go to?
25  A.  I typed this up.  I brought it down to

Maysonet v.
Guevara

Video Deposition

Page 313

1    the watch commander in the 25th District.
2  Q.   And that's who signed it or approved
3    it?
4  A.   Yeah.  I don't recognize the name so --
5  Q.   Why do you need to fill one of these
6    out?
7  A.   So that anybody that's being held in
8    custody, they do not go to court, the next court
9    call.
10 Q.   Okay.  Well, when do you have to fill
11   one of these out?
12 A.   If I was going to -- my case, to hold
13   the person past that, the morning court call.
14 Q.   Okay.  And who is responsible for
15   filling one of these requests to hold over
16   prisoners past regular court call?
17 A.   Could be any detective up there.
18 Q.   So any detective working on the case?
19 A.   Could be.
20 Q.   And this particular request to hold was
21   prepared and signed by you, right?
22 A.   Yes, ma'am.
23 Q.   Okay.  And why -- if you were not
24   involved in the investigative activities related
25   to Mr. Maysonet after you brought him to Area 5,

Page 314

1    why were you the one who filled this out?
2  A.   Because I could have been a detective
3    on the floor that was available while I was doing
4    other tasks, trying to catch up on some of my
5    reports that I had.
6  Q.   Okay.  So any detective who is working
7    the case can fill this out, is that right?
8  A.   Probably any detective in the violent
9    crimes unit could do that, yes.
10 Q.   Okay.  But again, you had some
11   familiarity with the case, obviously?
12 A.   Yes.
13 Q.   And you were keeping up with what was
14   going on, correct?
15 A.   Yes, ma'am.
16 Q.   You had to know that Mr. Maysonet
17   needed to be held past the court call, right?
18 A.   Yes, ma'am.
19 Q.   You got that information from, I'm
20   assuming, the investigating detectives?
21 A.   Through other detectives, yes, ma'am.
22 Q.   Yeah, through other detectives?
23 A.   Yes, ma'am.
24 Q.   And then based on the information you
25   received, you requested that he be held over.

Page 315

1        Why did he need to be held over?
2  A.   Additional investigation by the State's
3    Attorney and also investigation by some other
4    detectives.
5  Q.   Okay.
6  A.   Did you want this back?
7  Q.   No, you can -- well, yeah.  It can go
8    here.
9        Do you know where this document
10   ultimately lands after it's been submitted by you
11   and approved by someone?
12 A.   That's attached -- one copy would be
13   attached, I believe, to the arrest report if there
14   was one that was completed at that time.  One copy
15   would be given to our watch commander so he would
16   be aware of what was going on, and could have been
17   put in the file, too.  Anything that I submitted
18   would have went in the file.
19 Q.   What file?
20 A.   Pertaining to this, it would be
21   attached to the reports of this.
22 Q.   The investigative file?
23 A.   Yes.
24 Q.   And this request to hold was prepared
25   by you at 2400 hours on August 23?

Page 316

1  A.   Can I see it again?  I'm sorry if I
2    gave it to you too premature.
3        MS. ROSEN: Did you say 2400?
4        MS. BONJEAN: Yeah.  It says 2400.
5        MS. ROSEN: Where?  I see 18.
6        MR. ENQUIST: 1800.
7        MS. BONJEAN: That's a different
8    document.
9        BY MS. BONJEAN:
10 Q.   What does yours say, Mr. Paulnitsky?
11 A.   This is requesting hold over and it is
12   expected that the investigation be completed at
13   2400 hours on August 23.
14       MS. ROSEN: Are they two different
15   Bates numbers?
16       MS. BONJEAN: They are.
17       MR. LEINENWEBER: Yeah, there is three
18   Bates numbers in the file.
19       MS. BONJEAN: Okay.  I just separated
20   them.  I thought they were extra copies, but
21   they were one document.  So that's what
22   happened.
23       So I apologize, but let's do this.
24   Can you just mark this --
25       MR. LEINENWEBER: Do you want to just

Maysonet v.
Guevara

Video Deposition

Page 317

1  add that to that?
2      MS. BONJEAN: I'm going to just mark a
3  whole new exhibit.
4      MS. ROSEN: Then can you tell us the
5  Bates number of the new exhibit?
6      MS. BONJEAN: Yeah.
7      (Whereupon, Paulnitsky
8      Deposition Exhibit No. 6 was
9      marked for identification.)
10     BY MS. BONJEAN:
11  Q.  Now I'm going to hand you what has been
12  marked as Exhibit 6 and have you look at all of
13  these.
14     MS. ROSEN: Can you just give us the
15  Bates numbers at the bottom?
16     MS. BONJEAN: Oh, yeah.  It's CCSAO
17  11 -- let me make sure I've got this right.
18  1145 and then 1156 and 1157?
19     MS. ROSEN: No.
20     MS. BONJEAN: No?  Let me see.
21     MS. ROSEN: The one you gave --
22     THE WITNESS: I have actually three.
23     MS. BONJEAN: Okay, let me just --
24     MR. ENQUIST: This was 1556 before.
25     MS. ROSEN: Right.  I had 1556 before.

Page 318

1      MS. BONJEAN: Yeah.  So there is three
2  requests to hold.  One is CCSAO 1145.
3      MS. ROSEN: Okay.
4      MS. BONJEAN: One is 1556 and one is
5  1557.
6      MR. LEINENWEBER: So just to confirm,
7  1145 is Exhibit 5 and then the next two
8  pages, 56 and 57, are Exhibit 6?
9      MS. BONJEAN: I just remarked 6 with
10  all three of them.
11     MR. LEINENWEBER: Oh, I get it now.
12  Okay, sorry.
13     MS. BONJEAN: It seems to me 45 and 57
14  are the same document.
15     MR. ENQUIST: And the one that you
16  handed him before, I'm just making sure,
17  Exhibit 5, was 1145?
18     MS. BONJEAN: Yes, it was 1145.
19     MR. ENQUIST: All right.  So I had it
20  different.  Okay.
21     BY MS. BONJEAN:
22  Q.  All right.  So look at the second page
23  of this Exhibit 6 that is Bates stamped CCSAO
24  1556?
25  A.  Yes.

Page 319

1  Q.  This one indicates that the
2  investigation will be completed at 1800 hours.
3      Do you see that?
4  A.  Yes.
5  Q.  Okay.  On the 23rd.  What time is that?
6  A.  6:00.
7  Q.  In the evening?
8  A.  6:00 p.m.
9  Q.  On August 23?
10  A.  Yes.
11  Q.  And then what is 2400 hours on August
12  23, what time is that?
13  A.  Midnight, 12:00 midnight.
14  Q.  So is that August 23 or August 24?
15  A.  August 23.
16  Q.  So 57 actually should come before 56,
17  right?
18      MS. ROSEN: Objection, form.  You mean
19  time-wise?
20      MS. BONJEAN: Time-wise, yeah.
21      BY MS. BONJEAN:
22  Q.  Which one was prepared first?
23  A.  I believe the 1800 hours, the 6:00 one
24  was first.
25  Q.  But midnight on August 23 is before

Page 320

1      6:00 on August 23, right?
2  A.  Well, actually I could have meant 2359
3  hours and that was probably what I meant.
4  Q.  Okay.  So what you think is that it was
5  23 --
6  A.  59.
7  Q.  -- 59?
8  A.  Reason being is, 6:00, there would be
9  night court at that time.
10  Q.  Okay.  So I just want to make sure I
11  understand this.
12      You arrived at Area 5 on the morning of
13  August 22 with Mr. Maysonet, right?
14  A.  Is that what time is on that report?
15  Q.  Yes.
16  A.  Okay.
17  Q.  That's when you see him at 26th Street,
18  right?
19  A.  Okay.
20  Q.  And you stay at Area 5 until the
21  following morning, correct?
22  A.  Yes.
23  Q.  And you're aware that he has made a
24  court reported statement, correct?
25  A.  I'm not sure.

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

---

Page 321

1 Q. Well, you took him on a ride, right?
2 A. Yes.
3 Q. That was after he made a court reported
4 statement, correct?
5 A. I'm not sure if he made the court
6 reported before the ride or after the ride. I
7 would have to look at the report.
8 Q. Okay. So let's put the court calls to
9 the side and just look at -- go back to this
10 cleared open report that we've been looking at?
11 A. Tell me what page?
12 Q. Sure. How about the last page of it,
13 RFC-Maysonet 54.
14 Do you see that?
15 A. I'm looking at this page.
16 Q. Okay. So we've got a timeline here on
17 August 23, at 6:30 in the morning, ASA DiFranco
18 was there interviewing Mr. Maysonet with
19 Detectives Guevara and Montilla.
20 Do you see that, first paragraph?
21 A. Yes.
22 Q. And then at 7:10 there is more
23 conversation in the conference room between
24 Guevara, Montilla, DiFranco.
25 Do you see that?

---

Page 322

1 A. Yes.
2 Q. Okay. And then on August 23 at 9:28
3 a.m. a court reported statement is taken.
4 Do you see that?
5 A. Yes.
6 Q. Then after that, it says "ASA DiFranco
7 requested that Jose Maysonet be driven to the
8 scene of the murder to corroborate the statement
9 that he had just given."
10 Do you see that?
11 A. Yes.
12 Q. Okay. And it has your name there,
13 right?
14 A. Yes.
15 Q. So can we agree that you drove to the
16 scene after 9:28 a.m. when he gave his court
17 reported statement?
18 A. Yes.
19 Q. Okay. So back to my questions before,
20 you are there about 24 hours when you take him to
21 the scene, right, you've been at Area 5,
22 approximately?
23 A. Give or take.
24 Q. And then you stay on until 6:00 p.m. on
25 the 23rd?

---

Page 323

1 A. Possibly.
2 Q. I'm going to have you look at CCSAO
3 1556.
4 A. Yes, ma'am.
5 Q. You filled out this request to hold,
6 right?
7 A. Yes, ma'am.
8 Q. And you indicated that the
9 investigation would be completed by 6:00 p.m. on
10 August 23, right?
11 A. Approximately, yes.
12 Q. So you were there at 6:00 p.m. on
13 August 23 when you completed this, is that right?
14 MS. ROSEN: Objection. Wait, what?
15 BY MS. BONJEAN:
16 Q. When you completed this, do you know
17 whether you were there at 6:00 p.m.?
18 MS. ROSEN: Can I just -- I'm sorry.
19 Can I just look at what it says? "When the
20 investigation is completed at 1800," right?
21 That's the reference?
22 MS. BONJEAN: Well yeah, but he
23 completes another one after that.
24 MS. ROSEN: Okay. I'm just trying to
25 be clear on what you're saying.

---

Page 324

1 BY MS. BONJEAN:
2 Q. And my question is, do you know when
3 you completed this?
4 A. No.
5 Q. Okay. But you know that you were
6 estimating that the investigation would be done by
7 6:00 p.m., correct?
8 A. Yes.
9 Q. And that time came and went, I assume,
10 right, which is why you had to do another one?
11 A. Yes.
12 Q. Okay. And you filled this one out just
13 before midnight, is that right?
14 A. Sometime later.
15 Q. Or sometime after 6:00 p.m.?
16 A. Yes.
17 Q. Okay, that's fair. So sometime after
18 6:00 p.m. you filled out the holdover which is
19 CCSAO 1557, right?
20 A. Yes.
21 Q. And you estimated that it would be done
22 by midnight, is that correct?
23 A. Yes.
24 Q. But you don't know exactly when you
25 completed this?

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

---

Page 325

1  A.  I do not.
2  Q.  All right.  So really you were at Area
3  5 for at least 36 hours straight, is that right?
4  A.  Could have been.
5  Q.  Not unusual for you?
6  A.  Not at all.
7  Q.  Okay.  And do you know whether you were
8  working on any other cases while you were at Area
9  5 for approximately 36, maybe more, hours?
10 A.  Sure.  Could have been clearing up my
11 handouts, catching up on my paperwork.
12 Q.  But you are confident you were there;
13 you didn't go home?
14 A.  Correct.
15 Q.  Did you play any role in questioning
16 Mr. Maysonet about the underlying events while you
17 were there this entire time at Area 5?
18 A.  I don't recall talking to him after the
19 initial contact to make sure he was there,
20 everything was okay, and then with driving him.  I
21 don't recall any contact.
22 Q.  You don't recall conducting any
23 questioning of him about his involvement in the
24 Wiley brothers' murders, is that right?
25 A.  I don't remember.

---

Page 326

1  Q.  Okay.  Is it possible that you did?
2  A.  I don't recall that I did.
3  Q.  Do you think you would have prepared a
4  report or a GPR if you had questioned him about
5  the Wiley brothers' murders?
6  A.  Well, if I would have talked to him
7  about that, anything that he told me I would have
8  recorded on a GPR, perhaps.
9  Q.  Okay.  But you don't remember doing so,
10 is that right?
11 A.  I don't recall talking to him.
12 Q.  Okay.  And what was said by you or him
13 or anyone in the car during the field trip to the
14 crime scene?
15 A.  Well, I was driving and he was
16 directing me where to go, where to stop, where to
17 go.
18 Q.  So Mr. Maysonet was directing you where
19 to go, where to stop?
20 A.  Yes.
21 Q.  And the purpose of this was to have
22 Mr. Maysonet corroborate his court reported
23 confession, right?
24 A.  What he told the State's Attorney.
25 Q.  Right.  Is that what you understand the

---

Page 327

1  purpose of this was?
2  A.  That's the reason that I drove him.
3  Q.  Do you remember where he told you to
4  go?
5  A.  I don't remember exactly.  I know that
6  it was the scene of the incident and I was just
7  following directions.
8  Q.  You don't specifically remember where
9  he said go left, go right, this is where this
10 happened or anything like that?
11 A.  No, I do not.
12 Q.  Did you prepare a report reflecting
13 what statements Mr. Maysonet allegedly said to you
14 when you drove him to the crime scene?
15 A.  No.
16 Q.  Why not?
17 A.  The State's Attorney was with me.  He
18 asked for -- he requested that we go for a ride
19 and I would assume that he would have recorded it
20 in his felony review file.
21 Q.  Okay.  Did you prepare any additional
22 reports other than what you have had the
23 opportunity to look at in this exhibit -- I don't
24 know what number it is.
25 A.  This would be Exhibit 3.

---

Page 328

1  Q.  Okay.  Did you see any reports that you
2  prepared -- and when I say "prepared," I mean
3  authored in this --
4  A.  As we were going through it I saw court
5  attendances.
6  Q.  Right.  Any supplemental reports that
7  you prepared?
8  A.  I did not see any.
9  Q.  Okay.  Do you remember preparing any
10 supplemental reports in connection with this case?
11 A.  I don't think that I did.
12 Q.  Do you remember preparing any GPR's in
13 connection with this case?
14 A.  I thought I did.  I could have been
15 mistaken.  I don't see them here.
16 Q.  Have you ever seen any GPR's that you
17 prepared in connection with this case, being the
18 Wiley brothers' murders?
19 A.  I don't -- I don't know if I did.  I
20 don't recall seeing them in here, so I don't know
21 if I did or not.
22 Q.  Have you ever seen any GPR's that were
23 prepared in connection with the Wiley brothers'
24 murders?
25 A.  I don't know if I did or not.

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

---

Page 329

1 Q. Prior to your deposition, did you have
2 an opportunity to see any GPR's?
3 A. I don't recall seeing any GPR's.
4 Q. Have you ever seen any GPR's that
5 reflected the statements that Mr. Maysonet
6 allegedly made to Sergeant Mingey and Detective
7 Montilla?
8 A. I only learned the information
9 verbally.
10 Q. Right. Did you ever see any GPR's at
11 any point?
12 A. I don't know if I did or not. I don't
13 recall.
14 Q. Okay. So you don't know whether they
15 were prepared, right?
16 A. Yes, ma'am.
17 Q. We've already marked it, I'm going to
18 have you look at -- maybe I didn't give it to
19 you -- Exhibit 4. This is a file that's marked
20 "Permanent Retention File."
21 A. Do you want this back?
22 Q. I'll take it back.
23 A. Let me just clip it together, please.
24 How about the holdover papers?
25 Q. I'll take those. Thank you.

---

Page 330

1 Do you know what a permanent retention
2 file is?
3 A. I think so.
4 Q. Okay. What do you think it to be?
5 A. Permanent retention of certain files.
6 Q. Do you know how it differs from, say,
7 the investigative file?
8 MS. ROSEN: Objection, foundation.
9 THE WITNESS: I really don't know
10 fully.
11 BY MS. BONJEAN:
12 Q. All right. I would ask that you look
13 through the permanent retention file and tell me
14 if you see any additional reports that were not
15 contained in the previous exhibit, Exhibit 3 that
16 we looked at?
17 MS. ROSEN: You want him to compare?
18 MS. BONJEAN: If he wants to look at
19 both, yeah, if he sees any reports that he
20 did not --
21 THE WITNESS: Let me thumb through this
22 before --
23 MS. BONJEAN: Sure, go ahead.
24 THE WITNESS: You told me to disregard
25 this one (indicating)?

---

Page 331

1 MS. BONJEAN: Yeah. I don't think it
2 has something to do with it. Maybe it's the
3 smoking gun, I don't know. I have no -- I
4 can't connect it to this case.
5 (Pause in proceedings)
6 THE WITNESS: Sorry it took so long.
7 BY MS. BONJEAN:
8 Q. That's okay. Did you find anything
9 additional in the permanent retention file?
10 A. Each file has things that the other
11 ones don't have.
12 Q. Okay. What did you find in the
13 permanent retention file that was not in the
14 investigative file?
15 A. The permanent retention file has the
16 911 calls that came in to 911, person shot. This
17 other file had court supps.
18 Q. Right. I understand that the other
19 exhibit has some documents that the permanent
20 retention file does not.
21 If you could just tell me whether there
22 are any reports in the permanent retention file
23 that were not in the investigative file, that's
24 all I need to know.
25 A. I want to say the EI report, I didn't

---

Page 332

1 see it in this file.
2 Q. Which one?
3 A. Crime scene report. I don't believe it
4 was in this file. Neither was the crime
5 laboratory report. Polygraph examination I didn't
6 see in this file. 9 millimeter report from the
7 crime lab, I don't believe was in there.
8 Q. Did you find any GPR's in the permanent
9 retention file?
10 A. I did not.
11 Q. Did you have any knowledge that Rey
12 Guevara would engage in shakedown schemes of gang
13 members when he was either a gang crimes
14 specialist or a detective at Area 5?
15 A. I did not --
16 MS. ROSEN: Object to foundation.
17 MR. ENQUIST: I object to the form, as
18 well.
19 MR. LEINENWEBER: I'll join.
20 BY MS. BONJEAN:
21 Q. You did not, right?
22 A. I had no knowledge.
23 Q. Did you ever hear that he was involved
24 in any type of extortion schemes while you were at
25 Area 5?

---

Maysonet v.
Guevara

Video Deposition

Page 333

1    MS. ROSEN: Objection, foundation.
2    THE WITNESS: I did not.
3    BY MS. BONJEAN:
4  Q.  Did you ever observe him engage in any
5  behavior that could be construed as extortion?
6  A.  I did not.
7  Q.  Did you ever hear of -- hear any rumors
8  or hear any even secondhand information that Rey
9  Guevara had allowed individuals to buy their way
10  out of trouble while he was either a gang crimes
11  specialist or as a detective at Area 5?
12  A.  I did not.
13  Q.  Are you aware of any misconduct that
14  Guevara may have engaged in while he was at
15  Area 5?
16  A.  I never saw anything.
17    MR. LEINENWEBER: Objection to
18  foundation and form.
19    BY MS. BONJEAN:
20  Q.  I'm sorry?
21  A.  I never saw anything.
22  Q.  You never saw him commit any --
23  A.  I never knew of anything, any
24  allegations or saw anything.
25  Q.  In your 40 years on the department, did

Page 334

1  you ever witness with your own eyes any fellow
2  police officer engage in any conduct that was
3  either criminal or a serious constitutional
4  violation?
5  A.  I did not.
6  Q.  In 40 years, nothing, is that right?
7  A.  I don't remember any of it.
8  Q.  Did you ever witness an act of
9  excessive force by a fellow officer in your
10  40 years on the department?
11  A.  I never did.
12  Q.  Did you ever witness any police officer
13  make less than honest representations in a police
14  report while you were in the department for four
15  decades?
16  A.  I did not see it.
17  Q.  Have you ever made anything less than
18  honest representations in a police report during
19  your time?
20  A.  I did not.
21  Q.  And have you always provided completely
22  truthful testimony in connection with your work as
23  an Area 5 detective?
24  A.  Yes.
25  Q.  Now, you received discipline and had a

Page 335

1  sustained allegation against you for preparing a
2  report that contained false information, is that
3  right?
4  A.  I don't recall.
5  Q.  Do you recall in June of '97 being the
6  subject of a complaint for preparing a report with
7  false information related to Steven Hood?
8  A.  I don't recall it.
9  Q.  You don't -- do you recall there being
10  a recommendation that you be suspended for
11  60 days?
12  A.  I don't recall it.
13  Q.  You don't recall then retiring?
14  A.  Retiring? I'm sorry?
15    MS. ROSEN: Retiring?
16    BY MS. BONJEAN:
17  Q.  Retiring after that?
18    MS. ROSEN: Who retiring?
19    MS. BONJEAN: Him.
20    MS. ROSEN: Oh, "then retiring." I
21  thought you said "them."
22    BY MS. BONJEAN:
23  Q.  No.  Then retiring?
24  A.  I retired because I'm too old.
25  Q.  Okay.  But again, do you recall this

Page 336

1  complaint register lodged against you for a number
2  of things, but largely for providing false
3  information in a cleared/closed arrest report?
4  A.  I do not.
5  Q.  Do you remember getting into a
6  emotional exchange with Mr. Escalante?
7  A.  I do.
8  Q.  Okay.  What was that around?
9  A.  What day?
10  Q.  What was that about?  What do you
11  remember about that?
12  A.  My opinion, because I filed an EEOC
13  complaint against the unit that I was in.  It was
14  in retaliation for not withdrawing my complaint.
15  Q.  What was in retaliation?
16  A.  I was treated terribly.
17  Q.  What specifically did they do to
18  retaliate against you?
19  A.  Apparently they went out of their way
20  to check on my investigations and to interview
21  people that I had talked to, to see what I was
22  doing.
23  Q.  What's an ELC?
24    MS. ROSEN: EEOC.
25    THE WITNESS: EEOC.

Maysonet v.
Guevara

Video Deposition

Page 337

1    BY MS. BONJEAN:
2  Q.  Oh, EEOC.  SO what was the basis of
3   your EEOC complaint against the department?
4  A.  I signed up to take a test for a
5   certain position and they told me I was too old to
6   take the test.
7  Q.  Who told you that?
8  A.  Escalante and O'Donnell.
9  Q.  Okay.  And what position were you
10  attempting to get?
11  A.  A bomb technician.
12  Q.  And what do bomb technicians do?
13  A.  Defuse bombs.
14  Q.  And do you know whether in fact it's
15  true that there are age limitations for people
16  that are going to be working with bombs?
17  A.  There was not at that time.
18  Q.  And is there now, to the best of your
19  knowledge?
20  A.  I don't know.
21  Q.  Okay.  So you applied for a position to
22  be a bomb technician and why do you think that
23  they told you that you were too old for the
24  position, if you know?
25  A.  They told me outright I was too old.

Page 338

1  Q.  But did you ask them -- strike that.
2     Do you think that that was the real
3   reason or do you think there was another reason?
4  A.  Oh, that was the real reason.  In my
5   mind it was.
6  Q.  Okay.  So the reason was that they
7   thought you were too old for the position, right?
8  A.  Yes.
9  Q.  Okay.  You disagreed, obviously?
10  A.  I did, and so do department directives
11  to take that test.
12  Q.  Okay.  So and you filed an EEOC
13  complaint about it?
14  A.  Yes.
15  Q.  And what happened with that complaint?
16  A.  It was investigated.
17  Q.  Okay.  And what was the result of that
18  investigation?
19  A.  They found that I was not too old,
20  there was no set rules of the age, and if I wanted
21  to go forward, that I should.
22  Q.  And did you?
23  A.  No.
24  Q.  Why not?
25  A.  Why should I?  I retired.

Page 339

1  Q.  So you wanted to be bomb technician,
2   that didn't work out, so you then instead retired?
3  A.  Yes.
4  Q.  Were you just sort of disenchanted with
5   the department at that point?
6     MS. ROSEN: Object to the form.
7     THE WITNESS: No.  I was too old.
8     BY MS. BONJEAN:
9  Q.  So you would agree that you were too
10  old to be a bomb technician at that point?
11  A.  No.  Sometimes when you get up in the
12  morning you think to yourself, it's time to
13  retire.
14  Q.  Okay.  So ultimately you didn't pursue
15  the bomb technician position but according to you,
16  you were given permission or were told that you
17  could apply for that position, is that right?
18  A.  According to what I received from the
19  government, they did an investigation and if I
20  wanted to obtain an attorney, to do so.
21  Q.  And what was the exact date of your
22  retirement?
23  A.  Just shortly before my 40th year-end.
24  Q.  So that would have been --
25  A.  Maybe February.

Page 340

1  Q.  2008?
2  A.  Yeah.
3  Q.  And you actually made a complaint
4   register file against Commander Escalante, right?
5  A.  No.  He was the lieutenant.
6  Q.  Well, he was the lieutenant at the time
7   of the complaint, right?
8  A.  Yes.
9  Q.  And he subsequently became a commander,
10  though, right?
11  A.  Yeah.
12  Q.  Why do you say it that way?
13  A.  I just answered your question.
14  Q.  Well, you said it with a little
15  disdain.
16     MS. ROSEN: Is that a question?
17     BY MS. BONJEAN:
18  Q.  Yeah, my original question.  Why did
19  you say it that way?
20  A.  No reason.
21  Q.  Are you friendly with Commander
22  Escalante?
23  A.  I never saw him after I retired.
24  Q.  Okay.  But did you accuse Lieutenant
25  Escalante of threatening you?

Rizman Rappaport (973)992-7650
"When every word counts"

Page 341

1 A. I did.
2 Q. And then you subsequently turned in
3 your retirement papers?
4 A. Yes, I did.
5 Q. All right. And why was he threatening
6 you -- or strike that.
7 What was he doing to threaten you?
8 A. Everything he said to me was in a
9 menacing, threatening manner.
10 Q. Like what?
11 A. Any word out of his mouth was
12 derogatory.
13 Q. Like what? What was he threatening you
14 about?
15 A. Everything.
16 Q. Was he your supervisor?
17 A. He was.
18 Q. Okay. And give me one example of a
19 threat that he made toward you?
20 A. I can't. I forgot. It's been years.
21 Q. So you can't remember one example of a
22 threat?
23 A. No.
24 Q. Did you curse at Lieutenant Escalante?
25 A. Could have.

Page 342

1 Q. What did you curse at him about?
2 A. If I cursed at him, it's probably what
3 I thought of him.
4 Q. And did you actually record --
5 subversively record a conversation that you had
6 with him?
7 A. No. He thought I did. I didn't.
8 Q. Were you disciplined for that?
9 A. I retired right after that incident.
10 Q. Were you indicted for that?
11 A. Indicted? For what?
12 Q. For surreptitiously recording somebody?
13 A. No.
14 Q. You know it's a crime, right? Or at
15 least certainly it was in Illinois at the time. I
16 think it still is.
17 A. Under certain criteria.
18 Q. Right. Did you believe that you were
19 exempt from that rule when you recorded him or
20 you --
21 A. I believed that my life was threatened,
22 and for my own personal wellbeing.
23 Q. So you mean your life, you mean your
24 actual physical safety was threatened?
25 A. Yes.

Page 343

1 Q. Okay. And what did he do to threaten
2 your physical safety?
3 A. I don't remember the exact. He came at
4 me with a menacing manner.
5 Q. Did he touch you?
6 A. He was about to.
7 Q. Did he have a weapon?
8 A. Carries a gun, doesn't he?
9 Q. You all carry guns, but did he have his
10 weapon in his hand?
11 A. I don't recall if he did or not.
12 Q. So your testimony under oath is that he
13 came at you in a threatening, menacing manner as
14 if he was going to assault you?
15 A. Yes.
16 Q. And what did he say to you when he came
17 at you with a threatening, menacing --
18 A. I don't recall.
19 Q. And you don't recall what it was about?
20 A. I don't recall. It's been years.
21 Q. Not that many years. Less than ten
22 years?
23 A. That's a long time for me.
24 Q. Well, it must not have been too
25 threatening if it doesn't stick in your head,

Page 344

1 right?
2 MR. ENQUIST: Objection.
3 MS. ROSEN: Objection, argumentative.
4 BY MS. BONJEAN:
5 Q. But before this incident in which you
6 claim that Lieutenant Escalante tried to attack
7 you, he had had some role in your discipline or
8 proposed discipline related to preparing a report
9 that contained false information, right?
10 A. That was an allegation. I differed
11 with the investigation.
12 Q. You what?
13 A. I differed from the investigating
14 officer that investigated the complaint.
15 Q. You deferred?
16 A. I differed.
17 MS. ROSEN: Differed.
18 BY MS. BONJEAN:
19 Q. Differed?
20 A. From internal affairs.
21 Q. Did you cooperate with the
22 investigation?
23 A. Yes, I did.
24 Q. Okay. And the internal affairs
25 sustained all the allegations against you, right?

Maysonet v.
Guevara

Video Deposition

Page 345

1 A. I was retired. I don't know what they
2 did.
3 Q. Well, did you ever get notification
4 that they had been sustained?
5 A. I did not.
6 Q. Okay. But when the recommendation for
7 a suspension was made, you were not yet retired,
8 right?
9 A. I was retired.
10 Q. You were retired before OPS made their
11 recommendation? IPRA?
12 A. I was never notified.
13 Q. You were never notified, okay.
14    Do you know how many complaint
15 registers have been lodged against you through
16 your career?
17    MS. ROSEN: Objection, asked and
18 answered probably about eight hours ago.
19    THE WITNESS: Do not.
20    BY MS. BONJEAN:
21 Q. Do you know how many have been
22 sustained?
23 A. Do not.
24 Q. Okay. Do you remember ever receiving
25 any discipline during the course of your career as

Page 346

1 a Chicago Police officer?
2 A. I know I did. I don't know when or
3 under what circumstances.
4 Q. Did you receive any suspensions, major
5 suspensions?
6 A. I think I probably did.
7 Q. And do you recall what were the bases
8 of those major suspensions, if any?
9 A. No.
10 Q. Your complaint register history would
11 speak for itself, I assume?
12 A. It's all documented.
13 Q. Did you know Joe Miedzianowski?
14 A. Yes.
15 Q. How did you know him?
16 A. He was assigned to gang crimes north.
17 Q. And you were assigned where when he was
18 assigned to gang crimes north?
19 A. Area 5.
20 Q. Did you -- were you aware that he had
21 engaged in shakedown schemes when he was a officer
22 with the Chicago Police Department?
23 A. I wasn't aware.
24 Q. You're aware that he was ultimately
25 prosecuted for --

Page 347

1 A. Yes.
2 Q. -- activity of that nature, right?
3 A. Yes. I am now.
4 Q. And you're aware that he's serving a
5 natural life sentence, correct?
6 A. Yes.
7 Q. When did you first become aware that he
8 was a police officer engaged in criminal conduct?
9 A. I think when he was arrested.
10 Q. Were you surprised that he was
11 arrested?
12 A. Very much so.
13 Q. Because you had no inkling that he was
14 engaging in any criminal behavior?
15 A. Correct.
16 Q. Do you know whether Rey Guevara and Joe
17 Miedzianowski were partners in crime?
18    MS. ROSEN: Object to the form.
19    MR. LEINENWEBER: Object, form, vague.
20    THE WITNESS: Could you repeat that
21 question?
22    BY MS. BONJEAN:
23 Q. Yeah. Do you know whether they were
24 coconspirators in criminal activity?
25    MS. ROSEN: Objection, form.

Page 348

1    MR. LEINENWEBER: Same.
2    THE WITNESS: No, I do not.
3    BY MS. BONJEAN:
4 Q. So did you ever see them hang out
5 together?
6    MS. ROSEN: Objection, form, vague.
7    THE WITNESS: I don't remember if I did
8 or not.
9    BY MS. BONJEAN:
10 Q. Did you ever see them work together?
11 A. They were in the same unit. I would
12 assume they did. Being in the same unit, you have
13 to work with people.
14 Q. Were you aware -- would you consider
15 yourself friends with Detective Guevara when you
16 worked with him?
17 A. Working, while we were working we were
18 on good terms.
19 Q. I mean, I'm assuming that some
20 detectives you like better than others, is that
21 fair to say?
22 A. Just like some people I like better
23 than others, yeah.
24 Q. Sure. So was Detective Guevara someone
25 that you had a lot of regard for or was he someone

Maysonet v.
Guevara

Video Deposition

Page 349

1 that you didn't particularly care for or something
2 in between?
3 A. He was a coworker. I like all my
4 coworkers.
5 Q. Including Bill Dorsch?
6 A. My opinion changed on Bill Dorsch.
7 Q. But when you worked with him, you liked
8 him okay?
9 A. Went to his son's wedding.
10 Q. So is that a yes?
11 A. Yes.
12 Q. When did your opinion change of Bill
13 Dorsch?
14 A. When he started coming around for no
15 reasons at all and then he told me to call you.
16 Q. Why would you find that so offensive,
17 if he just said call this lawyer who's just
18 subpoenaed you?
19 MS. ROSEN: Objection, form.
20 BY MS. BONJEAN:
21 Q. Why did that bother you?
22 A. There is no reason to talk to you.
23 Q. Okay, but he didn't force you to call
24 me, right?
25 A. He pestered me.

Page 350

1 Q. He pestered you, but you're a grown
2 man, right?
3 MS. ROSEN: What is the point of these
4 questions? Objection, relevance.
5 BY MS. BONJEAN:
6 Q. You don't listen to Bill Dorsch, right,
7 if you don't want to, is that fair?
8 A. That's fair.
9 MS. ROSEN: Objection, form.
10 BY MS. BONJEAN:
11 Q. Okay. So the mere fact that he told
12 you to call me made you conclude that he's changed
13 or you don't like him any more?
14 MS. ROSEN: What is your obsession with
15 Bill Dorsch?
16 MR. LEINENWEBER: Objection, form,
17 misstates prior testimony.
18 MS. ROSEN: Objection.
19 MS. BONJEAN: I don't have an obsession
20 with Bill Dorsch.
21 MS. ROSEN: It seems like we begin the
22 day and end the day talking about Bill
23 Dorsch, who has nothing at all to do with
24 anything in this case based on the questions
25 I've heard so far. Is he on a report that

Page 351

1 I'm missing?
2 MS. BONJEAN: Is he on a report that
3 you're missing?
4 MS. ROSEN: Yeah. Is he on some police
5 report where Bill Dorsch's name is on it?
6 MS. BONJEAN: He's only given sworn
7 testimony multiple times about misconduct at
8 Area 5.
9 MS. ROSEN: Yeah, I know, the whole
10 umbrella story. I got it.
11 MS. BONJEAN: Umbrella story?
12 MS. ROSEN: Yeah. This is all about
13 the umbrella man.
14 MS. BONJEAN: I have no idea what
15 you're talking about.
16 MS. ROSEN: Well, you should know. If
17 you're going there, you should know.
18 MS. BONJEAN: The umbrella man. Okay.
19 THE WITNESS: I'm sorry, your question?
20 BY MS. BONJEAN:
21 Q. My question is, the mere fact that he
22 asked you to call me, is that the reason your
23 opinion changed of him or was there something
24 else?
25 MR. LEINENWEBER: Objection, misstates

Page 352

1 the witness' prior testimony.
2 MR. ENQUIST: Go ahead.
3 THE WITNESS: My opinion of Billy
4 changed when he started working for People's
5 Law Office, when he started working for you
6 and when he asked questions that I had
7 nothing to do with. There is a reason for it
8 and I chose to stay my distance from him.
9 BY MS. BONJEAN:
10 Q. So when he started working for people
11 who represent people who have been convicted of
12 crimes, that's when your opinion changed, right?
13 MS. ROSEN: Objection, form,
14 argumentative.
15 MR. ENQUIST: Objection,
16 mischaracterizes previous testimony. Go
17 ahead.
18 THE WITNESS: Yes.
19 BY MS. BONJEAN:
20 Q. Just a couple quick questions, I just
21 want to make sure that I -- did you play any role
22 in interviewing Rosa Bello, Mr. Maysonet's
23 girlfriend?
24 A. I did not.
25 Q. Did you ever see her at Area 5 when you

**Maysonet v.**
**Guevara**

Video Deposition

Page 353

1    were there for that 36 hours or however long you
2    were there?
3    A.   I don't recall seeing her.  It's not to
4    say that she wasn't there when I was there.  I
5    don't recall.
6    Q.   Did you ever see any members of
7    Mr. Maysonet's family at Area 5 when you were
8    there during the time that he was held in custody?
9    A.   I believe not.
10   Q.   And did you participate in interviewing
11   any of the individuals who were ultimately charged
12   as co-defendants in the case?
13   A.   No.
14   Q.   Do you remember taking any
15   investigative actions in the case involving the
16   Wiley brothers' murders after Mr. Maysonet was
17   charged and transported to the County?
18   A.   As I told you, the crime scene, went
19   out with the State's Attorney, Freddie Montilla
20   and him.
21   Q.   But after that, any actions in
22   connection with the case with any co-defendants,
23   anybody?
24   A.   No.
25   Q.   So the last memory you have of working

Page 354

1    on this case, apart from eventually testifying,
2    was taking Mr. Maysonet to the scene, is that
3    right?
4    A.   Yes.
5    Q.   Oh, did you know Rick Beuke?
6    A.   I knew him to be a State's Attorney.
7    Q.   Did he sometimes come to Area 5 in
8    felony review when you were there?
9    A.   I think so.  I'm not sure.  I think so.
10   Q.   Do you remember ever seeing him there?
11   A.   To be honest with you, I don't remember
12   seeing him there.
13   Q.   Did you know that Rick Beuke and Rey
14   Guevara were friends?
15   A.   I did not.
16   Q.   Did you know that Rick Beuke had
17   represented Rey Guevara on a number of personal
18   matters?
19   A.   I did not.
20   Q.   Did you know that Rick Beuke was
21   representing Rey Guevara in a number of personal
22   matters at the same time he was representing
23   Mr. Maysonet in his criminal case?
24   A.   I did not.
25   Q.   Fair to say that you would have

Page 355

1    testified at the attempt murder case or the ag bat
2    case that you were involved in had you been called
3    to testify?
4    A.   Of course.
5    Q.   That case ultimately was not tried but
6    you would have testified, right?
7    A.   If I was called.
8    Q.   Right.  You wouldn't have called Tim
9    Grace, right?
10       MS. ROSEN: Object to the form.
11       MR. ENQUIST: Join.
12       THE WITNESS: No.
13       BY MS. BONJEAN:
14   Q.   Okay.  And you did testify in the
15   double murder case as well, right?
16   A.   I don't recall if I did or not.
17   Q.   Did you read your testimony prior to
18   today?
19   A.   I did, but I don't recall.
20   Q.   You remember actually testifying,
21   though, right, even if you don't remember what you
22   said?
23   A.   Again, I don't recall but I recall
24   testifying about the arrest.
25       MS. BONJEAN: Here, I have one other

Page 356

1    question.  Would you mark this whatever the
2    next number is?  It's on the Dropbox.
3        MR. ENQUIST: What is it?
4        MS. BONJEAN: It's his testimony.
5        MR. LEINENWEBER: Grand jury testimony?
6        MS. BONJEAN: There's also the trial
7    testimony.
8        MR. LEINENWEBER: And motion to quash?
9        MS. BONJEAN: Yes.  Pretrial.
10       (Whereupon, Paulnitsky
11       Deposition Exhibit No. 7 was
12       marked for identification.)
13       MR. LEINENWEBER: Is that 7?
14       MS. BONJEAN: Yes.
15       THE WITNESS: May I look at this?
16       MS. BONJEAN: Yes, please.
17       BY MS. BONJEAN:
18   Q.   Does this refresh your recollection
19   about whether you gave testimony in a pretrial
20   hearing in Mr. Maysonet's case on January 10,
21   1995?
22   A.   I would have to read the report to see
23   if I --
24   Q.   Well, let's look at page 379.  Do you
25   see your name there, "Motion to Quash Arrest"?

Maysonet v.
Guevara

Video Deposition

Page 357

1  A.  I see my name, yes.
2  Q.  Okay.  And if you go to page 382, do
3   you see that these transcripts reflect that you
4   provided testimony?
5  A.  On the bottom?
6  Q.  Yeah, where it says "Roland Paulnitsky,
7   called as a witness herein"?
8  A.  Yes.
9  Q.  Okay.  Any reason to quarrel with the
10   fact that you gave testimony at a pretrial hearing
11   on January 10, 1995?
12  A.  If it's here, then I was there.
13  Q.  Okay.  You don't have an independent
14   recollection of it?
15  A.  I don't recall, ma'am.
16  Q.  Okay.  And do you remember giving
17   testimony at the grand jury in this case?
18  A.  Isn't this from the grand jury?
19  Q.  No.  That's the pretrial hearing,
20   motion to quash arrest.
21  A.  Oh, it's the pretrial hearing?
22  Q.  Yes.  Hold on a second.  She's going to
23   mark it.
24
25

Page 358

1      (Whereupon, Paulnitsky
2   Deposition Exhibit No. 8 was
3   marked for identification.)
4   BY MS. BONJEAN:
5  Q.  And if you could look at Exhibit 8, do
6   you see on the first page it says "Before the
7   Grand Jury of Cook County," 29th of April, 1992?
8  A.  Yes.
9  Q.  And it has you listed as a witness?
10  A.  Yes.
11  Q.  Do you remember testifying at this
12   re-indictment in the Maysonet case?
13  A.  Yes.
14  Q.  You do remember that?
15  A.  Yes.  My name is here.
16  Q.  But do you remember it or you're just
17   reading off the piece of paper?
18  A.  You told me not to look at other
19   than -- I remember being there, giving testimony.
20   I'm on page 3, as you suggested.
21  Q.  Oh, yeah.
22  A.  No?
23  Q.  No, that's all right.  Hold on one
24   second.  I wanted to ask you a question.
25      If you could turn to page 4?

Page 359

1  A.  Of the same document?
2  Q.  Yeah.  At the bottom it says, "Did your
3   investigation reveal that the defendant, Jose
4   Maysonet, drove himself and other co-defendant,
5   including Christopher Gossens, to the location of
6   the shooting"?
7  A.  Yes.
8  Q.  And then your answer was "Yes."  When
9   you answered yes, do you know what you were
10   referencing in terms of your investigation?  Was
11   it the investigation or your investigation?
12  A.  It's part of the conversation that I
13   had with Mingey and Montilla.
14  Q.  What was?
15  A.  That he put himself there as the
16   driver.
17  Q.  That he drove himself and a
18   co-defendant, Christopher Gossens, to the location
19   of the shooting?
20  A.  Yes.
21  Q.  So your testimony is that Sergeant
22   Mingey told you that in a conversation with
23   Mr. Maysonet, Mr. Maysonet admitted to driving
24   himself and the co-defendant, Christopher Gossens,
25   to the location of the shooting?

Page 360

1  A.  He put himself at the shooting.  In
2   later investigation I read his statement.
3  Q.  Okay.  So you derived this from later
4   reading his statement?
5  A.  Yes.
6  Q.  You didn't actually develop that
7   information --
8  A.  No, I read it.
9  Q.  And so when you testified at the grand
10   jury in response to all of these leading questions
11   with a yes, you were primarily referencing
12   investigative work that had been conducted by
13   somebody else, right?
14  A.  Correct.
15  Q.  And was that commonplace, to do that?
16  A.  Yes.
17      MS. BONJEAN: All right.  I have
18   nothing further.
19      MR. LEINENWEBER: I have nothing.
20      MS. SPIVY: No questions.
21      MR. ENQUIST: We'll reserve.
22      THE VIDEOGRAPHER: We're going off the
23   record at 5:24 p.m. with the end of the
24   deposition of Roland Paulnitsky.
25      (FURTHER DEPONENT SAITH NOT.)

Maysonet v.
Guevara

Video Deposition

Page 361

```
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ILLINOIS
 2               EASTERN DIVISION

 3  JOSE JUAN MAYSONET, JR.,     )

 4        Plaintiff,            )

 5    vs.                       )     No. 18-cv-02342
                                )
 6  REYNALDO GUEVARA, et al.,   )

 7        Defendants.           )

 8        I, ROLAND PAULNITSKY, being first duly

 9  sworn, on oath say that I am the deponent in the

10  aforesaid deposition taken on the 17th day of

11  September, 2019; that I have read the foregoing

12  transcript of my deposition, consisting of pages 1

13  through 360 inclusive; and I do again subscribe

14  and make oath that the same is a true, correct and

15  complete transcript of my testimony so given as

16  aforesaid:

17        _____  as it now appears

18        _____  as it now appears with corrections
                 (Check one.)
19

20              ROLAND PAULNITSKY

21

22  Subscribed and sworn to
    before me this      day
23  of          , 2019

24
    Notary Public
25
```

Page 362

```
 1  STATE OF ILLINOIS      )
                           )  SS:
 2  COUNTY OF D U P A G E  )

 3        I, KAREN P. BURNS, a notary public within

 4  and for the County of DuPage County and State of

 5  Illinois, do hereby certify that heretofore,

 6  to-wit, on the 17th day of September, 2019, ROLAND

 7  PAULNITSKY personally appeared before me at 141

 8  West Jackson Boulevard, Suite 1240A, Chicago,

 9  Illinois.

10        I further certify that the said ROLAND

11  PAULNITSKY was first duly sworn to testify the

12  truth, the whole truth and nothing but the truth

13  in the cause aforesaid; that the testimony then

14  given by said witness was reported

15  stenographically by me in the presence of the said

16  witness, and afterwards reduced to typewriting by

17  Computer-Aided Transcription, and the foregoing is

18  a true and correct transcript of the testimony so

19  given by said witness as aforesaid.

20        I further certify that the signature to

21  the foregoing deposition was reserved by counsel

22  for the respective parties.

23        I further certify that the taking of this

24  deposition was pursuant to notice and that there

25  were present at the deposition the attorneys
```

Page 363

```
 1  hereinbefore mentioned.

 2        I further certify that I am not counsel

 3  for nor in any way related to the parties to this

 4  suit, nor am I in any way interested in the

 5  outcome thereof.

 6        IN TESTIMONY WHEREOF:  I have hereunto

 7  set my hand and affixed my notarial seal this

 8  1st day of October, 2019.

 9

10

11

12

13        _____
          NOTARY PUBLIC, DU PAGE COUNTY, ILLINOIS
14        License number 084-002615

15

16

17

18

19

20

21

22

23

24

25
```