Exhibit 54

**In The Matter Of:**

*Maysonet v.*
*Guevara*

*Fernando Montilla*
*August 27, 2019*
*Video Deposition*



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Page 1

```
 1           THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION

 3   JOSE JUAN MAYSONET, JR.,

 4       Plaintiff,

 5       vs.                    No. 18-cv-02342

 6   REYNALDO GUEVARA, ERNEST
     HALVORSEN, EDWARD MINGEY,
 7   EPPLEN; FERNANDO MONTILLA,
     ROLAND PAULNITSKY, FRANK
 8   DIFRANCO, CITY OF CHICAGO, and
     COOK COUNTY,
 9
         Defendants.
10                                      /

11

12           The video-recorded discovery deposition

13   of FERNANDO MONTILLA, taken in the above-entitled case,

14   on the 27th day of August, 2019, at 11:03 o'clock a.m.

15   at the offices of The Sotos Law Firm, 141 West Jackson

16   Boulevard, Suite 1240A, Chicago, Illinois, pursuant to

17   agreement of counsel.

18

19   Reported by:  Karyn H. Chalem, RPR, CSR
     License No.:   084-004167
20

21

22

23

24

25
```

Page 2

```
 1   A P P E A R A N C E S

 2       BONJEAN LAW GROUP
         100 Dean Street
 3       Suite 422
         Brooklyn, New York  11238
 4       BY:  JENNIFER A. BONJEAN
              ASHLEY B. COHEN  (partial proceeding)
 5       (718) 875-1850
         jennifer@bonjeanlaw.com
 6       ashley@bonjeanlaw.com
              On behalf of the Plaintiff;
 7
         STEVEN A. GREENBERG, LTD.
 8       53 West Jackson Boulevard
         Suite 1260
 9       Chicago, Illinois  60604
         BY:  KYLE JORGENSEN
10            STEVEN A. GREENBERG  (partial proceeding)
         (312) 879-9500
11       kyle@greenbergcd.com
         steve@greenbergcd.com
12            On behalf of the Plaintiff;

13       THE SOTOS LAW FIRM
         141 West Jackson Boulevard
14       Suite 1240A
         Chicago, Illinois  60604
15       BY:  DAVID A. BRUEGGEN
         (312) 735-3300
16       dbrueggen@jsotoslaw.com
              On behalf of the Defendants
17            Ernest Halvorsen
              Edward Mingey
18            Lee Epplen
              Fernando Montilla
19            Roland Paulnitsky;

20       ROCK, FUSCO & CONNELLY
         321 North Clark Street
21       Suite 2200
         Chicago, Illinois  60654
22       BY:  THERESA B. CARNEY
         (312) 494-1000
23       tcarney@rfclaw.com
              On behalf of the Defendant
24            City of Chicago;

25
```

Page 3

```
 1   A P P E A R A N C E S (cont'd)

 2       LEINENWEBER BARONI & DAFFADA
         120 North LaSalle Street
 3       Suite 2000
         Chicago, Illinois  60602
 4       BY:  MICHAEL J. SCHALKA
         (847) 251-4091
 5       mjs@ilesq.com
              On behalf of the Defendant
 6            Reynaldo Guevara;

 7       COOK COUNTY STATE'S ATTORNEY'S OFFICE
         50 West Washington Street
 8       Suite 500
         Chicago, Illinois  60602
 9       BY:  EDWARD M. BRENER
         (312) 603-5971
10       edward.brener@cookcountyil.gov
              On behalf of the Defendants
11            Frank DiFranco
              Cook County.
12

13   Also Present:

14       SAMANTHA DAMIANO, videographer

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

```
 1                    I N D E X

 2   WITNESS:                            PAGE:

 3   FERNANDO MONTILLA

 4       Examination by Ms. Bonjean            6

 5

 6   EXHIBITS:

 7       Exhibit 1                          180
         Exhibit 2                          205
 8       Exhibit 4                          237
         Exhibit 5                          246
 9       Montilla 3                         248
         Exhibit 3A                         253
10       Exhibit 6                          351
         Exhibit 7                          355
11       Exhibit 8                          356
         Exhibit 9                          357
12       Exhibit 10                         367
         Exhibit 11                         374
13       Exhibit 12                         388

14

15

16

17

18

19

20

21

22

23

24

25
```

Maysonet v.
Guevara

Video Deposition

**Page 5**

1    THE VIDEOGRAPHER: We're now on the
2  record in the matter of Jose Maysonet, Jr., versus
3  Reynaldo Guevara, et al., in the United States
4  District Court for the Northern District of
5  Illinois, Eastern Division, Case Number
6  18-cv-02342. Today's date is August 27th, 2019,
7  and the time is now 11:03 a.m.
8    This is the video-recorded deposition
9  of Fernando Montilla. We are located at Sotos Law
10 Firm, 141 West Jackson Boulevard, Suite 1240A,
11 Chicago, Illinois. My name is Samantha Damiano,
12 legal video specialist, representing Rizman
13 Rappaport. The court reporter is Karyn Chalem with
14 Rizman Rappaport.
15    For the record, would counsel please
16 introduce themselves and who they represent.
17    MS. BONJEAN: Jennifer Bonjean,
18 B-O-N-J-E-A-N, on behalf of the plaintiff, Jose
19 Maysonet. Also present will be Ashley Cohen,
20 C-O-H-E-N. We're both from the Bonjean Law Group.
21    MR. JORGENSEN: Kyle Jorgensen. It's
22 K-Y-L-E, J-O-R-G-E-N-S-E-N, with Greenberg Trial
23 Lawyers.
24    MR. BRENER: Edward Brener,
25 B-R-E-N-E-R. I represent Frank DiFranco and Cook

**Page 6**

1  County.
2    MR. SCHALKA: Michael Schalka,
3  S-C-H-A-L-K-A. I represent defendant Guevara in
4  this case.
5    MS. CARNEY: Theresa Carney,
6  C-A-R-N-E-Y, on behalf of the defendant City of
7  Chicago.
8    MR. BRUEGGEN: Dave Brueggen on behalf
9  of the defendant officers and the deponent, Freddie
10 Montilla.
11    THE VIDEOGRAPHER: The court reporter
12 will now swear in the witness.
13    THE REPORTER: Will you raise your
14 right hand, please.
15    (Witness sworn.)
16    FERNANDO MONTILLA,
17 called as a witness herein, having been first duly
18 sworn, was examined and testified as follows:
19    THE WITNESS: I do.
20    EXAMINATION
21    BY MS. BONJEAN:
22 Q.  Good morning, Mr. Montilla.
23 A.  Good morning.
24 Q.  My name is Jennifer Bonjean. I represent
25   the plaintiff, Jose Maysonet, in this litigation in

**Page 7**

1  which you are a named defendant.
2    I understand that you are -- you go by the
3  name Montilla, or I heard your attorney say
4  Montilla. Is there one that you prefer?
5 A.  Well, I pronounced it, since I've been here
6   since a little boy, Montilla, so...
7 Q.  Okay. So I will call you Mr. Montilla.
8 A.  That would be fine.
9 Q.  And can you tell me what your first name is.
10 A.  Fernando.
11 Q.  Fernando, okay. And do you go by "Freddie"
12   sometimes?
13 A.  Yes.
14 Q.  I won't call you "Freddie," but is that what
15   you go by?
16 A.  Yes. Yeah, I grew up with that as a
17   nickname, so...
18 Q.  All right. Have you had your deposition
19   taken before, sir?
20 A.  Not that I recall. No, ma'am.
21 Q.  Okay. I'm speaking a little louder because
22   I think I got the impression that maybe you're
23   having a hard time hearing?
24 A.  Yes, ma'am. My hearing aid batteries died
25   and I forgot my hearing aids at home because I don't

**Page 8**

1  have batteries.
2 Q.  I see.
3 A.  Because I had to get here early, so...
4 Q.  Can you hear at the level I'm speaking at
5   right now?
6 A.  Yes, ma'am. If you look at me, I can
7   probably read your lips a little too, so...
8 Q.  Okay. If you have any troubles, will you
9   let me know?
10 A.  Yes, ma'am, I will.
11 Q.  All right. Since you have not had your
12   deposition taken before, I'm going to go through
13   some ground rules so that you understand what this
14   process is, and you can let me know if you don't
15   understand how it goes. Okay?
16 A.  Okay.
17 Q.  I'm here on behalf of the plaintiff. I'm
18   going to be asking you questions. I'm going to be
19   expecting answers to those questions, full and
20   complete answers to the best of your ability.
21   Do you understand that?
22 A.  Yes, ma'am.
23 Q.  Okay. And do you understand that you are
24   under oath here today?
25 A.  Yes, ma'am.

Maysonet v.
Guevara

Video Deposition

Page 9

1 Q. And do you understand that the oath you took
2 here today is the same oath that you would take in
3 a court of law if we were in front of a judge?
4 A. Yes, ma'am.
5 Q. Okay. Have you testified under oath before?
6 A. Yes, ma'am.
7 Q. And do you understand that by taking the
8 oath, you are swearing to tell the truth to the
9 best of your ability?
10 A. Yes, ma'am.
11 Q. And do you understand that if you make
12 willful false statements, you may subject yourself
13 to perjury?
14 A. Yes, ma'am.
15 Q. If at any point you do not understand a
16 question that I'm asking you, will you let me know?
17 A. Yes, ma'am.
18 Q. And I will rephrase it as many times as I
19 need to so that you understand what I'm asking.
20 A. Yes, ma'am.
21 Q. Okay. Can we also agree that if you answer
22 one of my questions, you understood my question?
23 A. Yes, ma'am.
24 Q. Okay. And can we agree that you will do
25 your best to give complete answers to my questions

Page 10

1 again to the best of your ability?
2 A. Yes, ma'am.
3 Q. That you will not purposefully omit
4 information that might be naturally responsive to
5 my question?
6 A. Yes, ma'am.
7 Q. Now, during the course of this deposition, I
8 will be asking questions that may strain your
9 memory. Okay?
10 A. Yes, sir.
11 Q. I know this is an old case. If at any point
12 you believe or you want to qualify your answer
13 with, you know, it's a -- you don't have a clear
14 memory or you think something might be the case,
15 you are certainly at liberty to do that. Just let
16 us know that you're estimating or giving us your
17 best guess of what happened at a time when it's not
18 fresh in your recollection. Okay?
19 A. Okay.
20 Q. I don't want you just obviously guessing,
21 but if you remember some pieces of an incident,
22 just do your best, and let us know if you can't
23 remember more than what you've provided. Okay?
24 A. Yes, ma'am.
25 Q. If at any point during the course of this

Page 11

1 deposition you remember something that might be
2 responsive to an earlier question, will you let me
3 know that?
4 A. Yes, ma'am.
5 Q. And then I'll give you an opportunity to go
6 back and either clarify or elaborate. All right?
7 A. Okay.
8 Q. Now, the court reporter can't transcribe us
9 talking at the same time, and you're doing great
10 thus far. I'm going to ask that even if you think
11 you know what I'm going to ask you, that you wait
12 for me to complete my question.
13 A. Yes, ma'am.
14 Q. And I will try not to step on any of your
15 answers. All right?
16 A. Okay.
17 Q. Now, you mentioned that you did not have
18 your hearing aids in today. Correct?
19 A. Yes, ma'am. The batteries died, so I don't
20 have extra.
21 Q. Okay.
22 A. I forgot to buy them yesterday.
23 Q. Okay. Do you wear hearing aids every day?
24 A. Yes, ma'am.
25 Q. All right. And are you okay in a quiet

Page 12

1 setting, such as this, where there's not going to
2 be a lot of background noise?
3 A. Yes, ma'am.
4 Q. All right. And like I said, at any point if
5 you are not understanding my questions, let us
6 know, because it's important that you understand my
7 questions and give answers to the best of your
8 ability.
9 A. Yes, ma'am.
10 Q. All right. And apart from the hearing aid
11 issue, are there any other medical issues that you
12 can think of that might interfere with your ability
13 to give complete and truthful testimony here today?
14 A. I suffer from osteoarthritis, so sometimes I
15 have to move around a lot. My -- right now, my --
16 my right foot, my toes are all numb right now. From
17 the sciatica, swollen.
18 Q. Oh, I see. Okay. Well, I think that's
19 something that we can deal with. This isn't a
20 marathon. You should let us know that if you need
21 to take a walk or stand up.
22 A. Yes.
23 Q. If you need to stand, I don't see any reason
24 why we couldn't deal with that, if that's more
25 comfortable --

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 13

1  A.  Yes, ma'am.
2  Q.  -- for you.  You just let me know.  Okay?
3  Now, you indicated you've never had your
4  deposition taken before.  Is that right?
5  A.  That's correct.
6      MR. BRUEGGEN: Misstates.  He said he
7  couldn't remember.
8      THE WITNESS: I can't remember.  I
9  don't know if I ever had one.  I don't remember.
10  BY MS. BONJEAN:
11  Q.  Well, have you ever been named as a
12  defendant in any civil litigation?
13  Have you ever been sued?
14  A.  I don't -- I don't recall.
15  Q.  Okay.  Have you ever sued anyone?
16  A.  Pardon me?
17  Q.  Have you ever sued anyone?
18  A.  Yes, ma'am.
19  Q.  How many times?
20  A.  Once.
21  Q.  And what were the circumstances under which
22  you sued someone?
23  A.  Wee hours of the morning.  He turned around.
24  I -- I felt that I saw something in his hand.  He
25  turned, and I shot, fear for my life.  That's the

Page 14

1  only time I ever shot.
2  Q.  Okay.  Did you sue someone for shooting them
3  or did they sue you?
4  A.  They didn't shoot me.  I shot.
5  Q.  Right.  Did you sue the person or did the
6  person that you shot sue you?  Sue.
7  A.  Sue?
8  Q.  Yeah.
9  A.  I think so.  I'm not -- I'm not sure.
10  Q.  Okay.  So I'm familiar with the incident in
11  which you had an on-duty police shooting.  Is that
12  right?
13  A.  Yes, ma'am.
14  Q.  Okay.  Let's put that aside for a second.
15  A.  Okay.
16  Q.  Have you been involved in any other
17  lawsuits, not -- and I'm talking not just related
18  to your police work.  Any other lawsuits.
19  A.  No, ma'am.
20  Q.  Okay.  And you've never sued anyone, brought
21  a lawsuit against someone?
22  A.  No, ma'am.
23  Q.  You've never sued someone for a -- like a
24  car accident or anything like that?
25  A.  No, ma'am.

Page 15

1  Q.  Okay.  Now, when you were involved in the
2  shooting incident that you referenced --
3  A.  Yes, ma'am.
4  Q.  -- before, do you recall having to sit in a
5  conference room, similar to this, and have
6  questions asked of you?
7  A.  No, ma'am.
8  Q.  Okay.  And do you know what happened with
9  the lawsuit that involved the shooting?
10  A.  I have no idea, ma'am.
11  Q.  Okay.  And do you remember the name of the
12  person who got shot?
13  A.  Vague recollection, but if I can be -- see
14  something, I might remember.  It's hard.
15  Q.  Sure.  Does the name Thaddeus Jimenez sound
16  right to you?
17  A.  I have no idea who that person is.
18  Q.  Okay.
19      (Off stenographic record discussion.)
20      BY MS. BONJEAN:
21  Q.  How about Jesse Martinez, does that sound
22  familiar?
23  A.  Sounds familiar.
24  Q.  Okay.  Is that the person you shot?
25  A.  I think so.

Page 16

1  Q.  Okay.  And did Jesse Martinez bring a
2  lawsuit against you?
3  A.  I think he did through -- I don't know.  I
4  never heard anything.
5  Q.  Okay.  And you don't remember having
6  questions asked of you like I'm asking you today?
7  A.  No, ma'am, I don't recall.
8  Q.  All right.  And Thaddeus Jimenez doesn't
9  ring a bell at all?
10  A.  Slightly, but I'd need to be refreshed.  I
11  don't know.
12  Q.  Sure.
13  A.  I need to see something.
14  Q.  Okay.  We'll get there.  I just wanted to
15  see what you remembered, if anything, about those
16  individuals.
17  Now, I know you said you don't ever remember
18  participating in a deposition.  Do you ever
19  remember going to court in which you were one of
20  the parties in the lawsuit?
21  A.  No, ma'am.
22  Q.  Okay.  I'm not talking about as a witness.
23  I know you testified as a witness many times --
24  A.  Uh-huh.
25  Q.  -- but I'm talking about as a party to the

Rizman Rapaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 17

1  lawsuit.  Do you have any recollection of ever
2  being in a court proceeding?
3  A.  No, ma'am.
4  Q.  Okay.  Now, Mr. Montilla, in November of
5  2017, were you subpoenaed to give testimony at a
6  pretrial hearing in connection with Mr. Maysonet's
7  re-prosecution?
8  A.  Can you repeat that?
9  Q.  Sure.  In November of 2017, not so long
10  ago --
11  A.  Yes.
12  Q.  -- were you subpoenaed to come to 26th
13  Street in connection with Mr. Maysonet's criminal
14  case?
15  A.  Yes, ma'am.
16  Q.  Okay.  And did you get a subpoena for that?
17  A.  Yes, ma'am.
18  Q.  And were you aware at the time you received
19  the subpoena that Mr. Maysonet's convictions for
20  the double murder that is the underlying basis of
21  this lawsuit had been vacated?
22  A.  I heard something about it, yes.
23  Q.  Okay.  Who did you hear something about it
24  from?
25  A.  I --

Page 18

1      MR. BRUEGGEN: Just object.  If you
2  heard it from your attorney, you know, don't talk
3  about that.
4      THE WITNESS: Yeah.  Okay.
5      BY MS. BONJEAN:
6  Q.  Okay.  So, again, did you have an attorney
7  prior to receiving the subpoena for Mr. Maysonet's
8  criminal prosecution in November of 2017?
9  A.  No, ma'am.
10  Q.  Okay.  So what did you -- and -- strike
11  that.
12  Had you heard that Mr. Maysonet's
13  convictions had been vacated prior to receiving
14  that subpoena?
15  A.  No, ma'am.
16  Q.  Okay.  So when is the first time you heard
17  that Mr. Maysonet's convictions for the double
18  murders of the Wiley brothers had been vacated?
19  A.  I -- contact at FOB because I needed to find
20  out what I can do, and that's when they told me and
21  I was assigned an attorney.
22  Q.  Okay.  So when you received the subpoena to
23  come to court --
24  A.  Yes, ma'am.
25  Q.  -- did you recognize Mr. Maysonet's name?

Page 19

1  A.  Yes, ma'am.
2  Q.  Okay.  And what did you remember when you
3  saw his name on that piece of paper?
4  A.  Connection with the Wiley brothers.
5  Q.  Okay.  And what else?
6  A.  That he was brought in for questioning to
7  Area 5.
8  Q.  Okay.  And anything else you remembered?
9  A.  I was asked to interpret.
10  Q.  Okay.
11  A.  From Spanish to English, English to Spanish.
12  Q.  Right.  Now, when you received the subpoena,
13  did you -- did you remember the case?
14  A.  Very vaguely.
15  Q.  Okay.  Did you remember -- had you had any
16  information about the case when you received the
17  subpoena, that it had been back in the Circuit
18  Court or had come back or anything?
19  A.  No, ma'am.
20  Q.  Okay.  So that -- so when you got that
21  subpoena, it was sort of out of the blue, is that
22  fair to say?
23  A.  Yes, ma'am.
24  Q.  You had no -- you hadn't had any prior
25  conversations with anyone about Jose Maysonet?

Page 20

1  A.  No, ma'am.
2  Q.  Okay.  Now, prior to receiving the subpoena,
3  did you have information that Rey Guevara had been
4  sued in a number of cases?
5      MR. BRENER: Foundation.
6      MR. BRUEGGEN: Object to form.  You can
7  answer.
8      BY MS. BONJEAN:
9  Q.  You can answer.
10  A.  I heard something.  I read it on the paper,
11  newspaper.
12  Q.  Okay.  And what did you read in the
13  newspaper about Rey Guevara?
14  A.  Just that he was being charged with certain
15  things.
16  Q.  Okay.  And prior to receiving the subpoena,
17  had you had any contact with Mr. Guevara?
18  A.  No, ma'am.
19  Q.  When's the last time you spoke to Rey
20  Guevara?
21  A.  When I retired in January of 2007.
22  Q.  So it's been over --
23  A.  Almost 13 years.
24  Q.  -- 13 years?
25  A.  Yeah.

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 21

1 Q. Okay. Have you had the opportunity to see
2 him at any events for Area 5 detectives or any
3 other police events?
4 A. No, ma'am.
5 Q. And did not maintain regular contact with
6 him?
7 A. Now, what, ma'am?
8 Q. You did not maintain regular contact with
9 him?
10 A. No, ma'am.
11 Q. Okay. Okay. Now, you received the
12 subpoena. You said you contacted the FOB?
13 A. Yes, ma'am.
14 Q. Okay. Why did you contact the FOB?
15 A. Because I didn't understand the subpoena, so
16 I wanted legal representation to help me out, find
17 out what this was about.
18 Q. Okay. Have you seen a subpoena before?
19 A. Yes, ma'am.
20 Q. And you've certainly seen subpoenas in your
21 career as a police officer, right?
22 A. Yes, ma'am.
23 Q. Okay. And in fact, you've given testimony
24 how many times, do you think, in your career as a
25 police officer?

Page 22

1 A. Oh, hundreds of times, ma'am.
2 Q. So why was -- why, when you received the
3 subpoena, did you feel that you needed to contact a
4 lawyer?
5 A. I didn't understand this. It didn't say
6 anything about going to 26th and California or
7 something, and I figure let me contact them, because
8 I was retired and I wanted to get some opinion from
9 an attorney from the FOB to help me out.
10 Q. Okay. And I want to be clear. I'm not
11 asking you to reveal to me any of your
12 conversations with your attorneys.
13 A. Yes, ma'am.
14 Q. But I am asking specifically about, prior to
15 contacting your attorney, what made you contact the
16 FOB. And if I could paraphrase, that you said you
17 were retired?
18 A. Yes, ma'am.
19 Q. And did you find it surprising to get a
20 subpoena?
21 A. Yes, ma'am.
22 MR. BRUEGGEN: Objection, form, asked
23 and answered.
24 THE WITNESS: Okay.
25 /////

Page 23

1 BY MS. BONJEAN:
2 Q. Now, prior to receiving the subpoena, had
3 you spoken to any Cook County State's Attorneys
4 about Mr. Maysonet's case?
5 MR. BRENER: Form.
6 MR. BRUEGGEN: Object to form, time.
7 MS. BONJEAN: Fair. Let me start over.
8 BY MS. BONJEAN:
9 Q. Prior to receiving the subpoena in November
10 of 2017, okay -- strike that. Let me start over.
11 Prior to receiving the subpoena in November
12 17th -- November of 2017, had you had any
13 conversations with any Cook County State's Attorneys in
14 the last -- in the year prior to that?
15 A. No, ma'am.
16 Q. Okay. I know you talked to Cook County
17 State's Attorneys about Mr. Maysonet's case
18 probably many, many years ago, but I'm talking
19 about in the last five years, did you speak with
20 any Cook County State's Attorneys about
21 Mr. Maysonet's case?
22 A. Not that I recall.
23 Q. All right. Now, when you went -- now, you
24 contacted the FOB, and at some point you got in
25 contact with -- a lawyer assigned to you. Is that

Page 24

1 how it works?
2 A. Yes, ma'am.
3 Q. And was that Tim Grace?
4 A. Yes, ma'am.
5 Q. All right. And after you had Mr. Grace
6 represent you or he agreed to represent you, did
7 you then at a certain point come to 26th Street?
8 Do you remember that?
9 A. Yes, ma'am.
10 Q. Did you come more than once or did you come
11 just one time?
12 A. Pardon me?
13 Q. Did you come more than once or one time?
14 A. Just once.
15 Q. All right. And, again, during this period
16 of time, November of 2017, did you have the
17 opportunity to speak with any Cook County State's
18 Attorneys?
19 MR. BRENER: Form.
20 MR. BRUEGGEN: You can answer.
21 BY MS. BONJEAN:
22 Q. You can answer.
23 A. I think so. I don't recall.
24 Q. Okay. Well, when you came to 26th Street in
25 November of 2017 --

Maysonet v.
Guevara

Video Deposition

Page 25

1  A.  Yes, ma'am.
2  Q.  -- after receiving that subpoena, did you
3  speak with any Cook County State's Attorneys then?
4  A.  I think so.
5  Q.  Do you remember who you spoke to?
6  A.  No, ma'am.
7  Q.  Okay.  Did you speak to a person by the name
8  of Jim Papa?
9  A.  Yes, that sounds familiar.  Yes.
10 Q.  Okay.  And do you know how many
11 conversations you had with Mr. Papa?
12 A.  I think once or twice.
13 Q.  Okay.  Did you ever speak to Mr. Papa on the
14 phone?
15 A.  I might have.  I don't recall.
16 Q.  Do you know if it was before you came to
17 26th Street or after you came to 26th Street?
18 A.  Ma'am, I don't recall.
19 Q.  Okay.  Do you remember what the nature of
20 the conversation was with Mr. Papa?
21    MR. BRENER: Form.  Which conversation?
22    BY MS. BONJEAN:
23 Q.  You can answer.
24 A.  I think it was -- talked about the Maysonet
25 case, I think it was.

Page 26

1  Q.  Okay.  And when you had this conversation
2  with Mr. Papa in and around the time that you came
3  to 26th Street in November of 2017 --
4  A.  Yes, ma'am.
5  Q.  -- what did he say to you and what did you
6  say to him, if you can paraphrase?
7  A.  I don't recall, ma'am.
8  Q.  Okay.
9  A.  That, I don't recall.
10 Q.  Did he have you look at any police reports?
11 A.  I think he showed me something.  I'm not
12 sure.  I remember something.
13 Q.  Okay.  Did he have you look at --
14    MR. BRUEGGEN: Hold on.  Can I just
15 interject?  Was your attorney present when you met
16 with Mr. Papa?
17    THE WITNESS: No.
18    MR. BRUEGGEN: Okay.  Just to clarify.
19    MS. BONJEAN: Not that it would matter.
20 I mean, it's a third party present during --
21    BY MS. BONJEAN:
22 Q.  So when Mr. Papa was speaking to you at 26th
23 Street, did he also show you any prior testimony or
24 transcripts of testimony?
25 A.  Ma'am, that, I don't recall.

Page 27

1  Q.  Okay.  How long was your meeting with
2  Mr. Papa?
3  A.  Twice, I think.
4  Q.  Okay.  So two meetings?
5  A.  What kind of meeting, ma'am?
6  Q.  There were two meetings with Mr. Papa?
7  A.  I think so.
8  Q.  Okay.  And where did they take place?
9  A.  I think 26th and Cal.
10 Q.  Were they in his office at the Cook County
11 State's Attorneys?
12 A.  I think so, yes.
13 Q.  All right.  And was anyone else present
14 besides Mr. Papa?
15 A.  Not that I recall.
16 Q.  Okay.  Were there any other detectives
17 present?
18 A.  No, ma'am.
19 Q.  Former detectives.
20 A.  Not that I recall.
21 Q.  Or retired detectives.
22 A.  Yeah.
23 Q.  Okay.  And during this one or two
24 conversations with Mr. Papa, did he tell you that
25 you were going to have to testify in Mr. Maysonet's

Page 28

1  retrial?
2  A.  Yes, ma'am.
3  Q.  Okay.  And was he preparing you for that
4  testimony?
5     MR. BRUEGGEN: Object to foundation.
6     THE WITNESS: Huh?
7     MR. BRUEGGEN: Object to foundation.
8  You can answer.
9     BY MS. BONJEAN:
10 Q.  You can answer.
11    THE WITNESS: I can answer?
12    MR. BRUEGGEN: You can answer, yes.
13    THE WITNESS: Yes.
14    BY MS. BONJEAN:
15 Q.  Okay.  And what did he say that he wanted
16 you to do in connection with your testimony?
17 A.  What do you mean what he wanted me to do?
18 Q.  That was a bad question.  Thank you.  I will
19 rephrase it.
20 How did he prepare you for your testimony?
21 A.  Reading the reports and I think my testimony
22 on their prior conviction, I think it was.
23 Q.  Okay.  So he wanted you to look at your
24 prior reports, correct?
25 A.  Yes, ma'am.

Maysonet v.
Guevara

Video Deposition

Page 29

1 Q. And he also wanted you to look at your prior
2 testimony, right?
3 A. Yes, ma'am.
4 Q. Okay. And did he tell you he just wanted
5 you to testify consistent with what you had
6 previously testified to?
7 MR. BRENER: Objection, form.
8 THE WITNESS: To the best of my
9 ability, yes.
10 BY MS. BONJEAN:
11 Q. Okay. And did he -- did he tell you that
12 there had been allegations made by Mr. Maysonet
13 against a number of detectives, including Reynaldo
14 Guevara?
15 A. I don't think he did.
16 Q. Okay. Did he tell you about any allegations
17 that Mr. Maysonet may have made against you?
18 A. That, I don't recall.
19 Q. Okay. So did he give you any -- and I'm
20 talking about "he," Mr. Papa.
21 During your meetings with him, did he give
22 you any information about what had happened since
23 you were in court over two decades ago?
24 MR. BRENER: Form.
25 THE WITNESS: No, ma'am.

Page 30

1 BY MS. BONJEAN:
2 Q. Okay. So he had you look at your reports,
3 right?
4 A. Yes, ma'am.
5 Q. Had you look at your prior testimony?
6 A. Yes, ma'am.
7 Q. Told you he wanted you to testify consistent
8 with your prior testimony, right?
9 A. Yes, ma'am.
10 Q. Anything else?
11 A. No, ma'am.
12 Q. Okay. Now, when you were in court in
13 November-ish of 2017 for Mr. Maysonet's retrial,
14 did you see any other Chicago police detectives who
15 are now retired?
16 A. Yes, ma'am.
17 Q. Okay. Who did you see?
18 A. I think on the hallway outside the court, I
19 think it was Paulnitsky.
20 Q. Uh-huh.
21 A. I think I saw Sergeant Mingey, Ernie
22 Halvorsen. I think that's all I recall seeing.
23 Q. Okay. And did you have any conversations
24 with any one of those individuals either as a group
25 or one-on-one?

Page 31

1 A. No, ma'am.
2 Q. Okay. Why not?
3 A. Just it's a sense of not conferring with
4 people, because, you know, when you're outside a
5 court to talk about anything, I never did.
6 Q. I see. And these were former colleagues of
7 yours, correct?
8 A. Yes, ma'am.
9 Q. Did you maintain a relationship, friendship,
10 connection, with any of these detectives after you
11 retired?
12 A. No, ma'am.
13 Q. Not a one?
14 A. Not one, ma'am.
15 Q. Is there anyone in the Chicago Police
16 Department -- did you have someone -- any officers
17 you maintained connections with after you retired?
18 A. I had a good friend, John Boyle, but I see
19 him every maybe once a year. They invite me to
20 their house for Easter.
21 Q. I see. Okay. Apart from --
22 A. Yeah, that's it.
23 Q. -- Boyle, anybody else?
24 A. No, that's it.
25 Q. All right. Okay. Now, when you appeared in

Page 32

1 court with Mr. Grace in connection with
2 Mr. Maysonet's re-prosecution in November of 2017,
3 your attorney represented to the court that if
4 called to testify, you were going to assert your
5 Fifth Amendment rights.
6 Do you remember that?
7 A. No, ma'am. Never mentioned that.
8 Q. Okay. Well, were you in court when he
9 stated that?
10 A. No, ma'am.
11 Q. You didn't hear Mr. Grace say that?
12 A. No, ma'am.
13 Q. So he -- so at no point did you -- did
14 you -- strike that.
15 Did you ever learn that Mr. Grace had
16 asserted your Fifth Amendment rights?
17 MR. BRUEGGEN: Objection to the extent
18 it calls for conversation with an attorney.
19 THE WITNESS: I --
20 MR. BRUEGGEN: Objection to the extent
21 it calls for a conversation with an attorney.
22 Again, Freddie, don't talk about any
23 conversations --
24 THE WITNESS: Okay.
25 MR. BRUEGGEN: -- you had with me or

Maysonet v.
Guevara

Video Deposition

Page 33

1 any of your attorneys.
2     BY MS. BONJEAN:
3 Q. Yeah, I'm not asking about conversations
4 with your attorneys. You're telling me that at --
5 you did not know that Mr. Grace asserted your Fifth
6 Amendment right to remain silent in open court or
7 said you would assert your Fifth Amendment right to
8 remain silent if you were asked questions, is that
9 correct?
10 A. Yes.
11     MR. BRUEGGEN: Objection, misstates his
12 testimony.
13     BY MS. BONJEAN:
14 Q. Correct?
15     MR. BRUEGGEN: Same objection. Go
16 ahead.
17     THE WITNESS: Yes.
18     BY MS. BONJEAN:
19 Q. And did you at any point learn that your
20 attorney had represented in open court to a sitting
21 Circuit Court judge that you would assert your
22 Fifth Amendment rights to remain silent if
23 questions were asked of you about Mr. Maysonet's
24 case?
25 A. Yes.

Page 34

1 Q. When did you learn that?
2 A. After the court was over with, met outside.
3 We met -- when we spoke outside the court.
4 Q. Okay.
5 A. And he advised me, he told me, you know --
6     MR. BRUEGGEN: Freddie, don't talk
7 about what you talked to your attorney about,
8 please.
9     BY MS. BONJEAN:
10 Q. Okay. So it's your testimony, though,
11 that -- well, strike that.
12 Did you intend to assert your Fifth
13 Amendment right to remain silent?
14 A. No, ma'am. I was willing to testify.
15 Q. So you were willing to testify, but your
16 attorney went rogue, is that right?
17     MR. BRUEGGEN: Objection, form,
18 argumentative.
19     MR. BRENER: Join.
20     MR. BRUEGGEN: You can answer.
21     THE WITNESS: I'm following my -- my
22 attorney was advising, so I follow what he did,
23 ma'am.
24     BY MS. BONJEAN:
25 Q. Okay. So you -- well, what I'm trying to

Page 35

1 get a handle on is, you -- were you aware when he
2 represented to the Circuit Court judge that you
3 were going to assert your Fifth Amendment rights,
4 if asked -- if asked questions under oath?
5     MR. BRUEGGEN: Object to form.
6     BY MS. BONJEAN:
7 Q. When -- when did -- when did you find out
8 that your attorney had -- as an officer of the
9 court --
10 A. Yes.
11 Q. -- rules of professional responsibility
12 apply to him.
13 A. That's right.
14 Q. When did you find out that he told the
15 Circuit Court judge that you would assert your
16 Fifth Amendment rights if called to testify?
17     MR. BRUEGGEN: Objection, asked and
18 answered.
19     MR. BRENER: Foundation and also
20 argumentative with respect to his obligations of
21 the court.
22     MS. BONJEAN: Okay. We don't have
23 speaking objections at this table.
24     BY MS. BONJEAN:
25 Q. Go ahead.

Page 36

1 A. I was supposed to testify. I was there to
2 testify. I was willing to testify. My attorney
3 went in, told me to stay outside.
4 Q. Okay.
5 A. Short while later, he came out, and he
6 says --
7 Q. I'm not -- I'm not --
8 A. Okay.
9 Q. -- I'm not asking you to talk about what he
10 told you --
11 A. Okay.
12 Q. -- when he came out, but my question is:
13 Before he went into the courtroom, did you know
14 that you were going to be exercising your Fifth
15 Amendment right to remain silent if called to
16 testify?
17     MR. BRUEGGEN: Object to form.
18     MS. CARNEY: Asked and answered.
19     THE WITNESS: No, ma'am.
20     BY MS. BONJEAN:
21 Q. Okay. So according to you, you were always
22 willing to testify?
23 A. Yes.
24     MS. CARNEY: Objection, asked and
25 answered.

Page 37

BY MS. BONJEAN:

1    Q.   You can answer again.

3    A.   Yes, ma'am.

4    Q.   And Tim Grace, who was your attorney,
5    represented something that was not consistent with
6    what you wanted to this judge, is that right?

7    A.   That is -- huh?

8        MR. BRUEGGEN: Objection, form.

9        BY MS. BONJEAN:

10   Q.   Well, you understand that the Fifth
11   Amendment right to remain silent belongs to you and
12   only you, right?

13   A.   Yes, ma'am.

14   Q.   Nobody else can exercise your Fifth
15   Amendment right to remain silent, only you can?

16   A.   That's correct.

17   Q.   Okay.  And if an attorney went into court,
18   as an officer of the court, and represented to a
19   judge that you were going to assert your Fifth
20   Amendment right to remain silent, okay, if your
21   attorney did that, you're telling us that that was
22   not with your consent, correct?

23       MR. BRUEGGEN: Object to form.  It
24   misstates his testimony.  Go ahead.

25       MS. CARNEY: Asked and answered.

Page 38

1        BY MS. BONJEAN:

2    Q.   If you under -- if you --

3    A.   That's correct.

4    Q.   So he told the judge that you were going to
5    plead the Fifth, and that wasn't true?

6        MR. BRUEGGEN: Asked and answered.

7        MS. CARNEY: Objection, asked and
8    answered.

9        BY MS. BONJEAN:

10   Q.   Right?

11       MR. BRENER: Join.

12       THE WITNESS: He's representing me,
13   ma'am, so...

14       BY MS. BONJEAN:

15   Q.   Well, see, here's -- I understand he's
16   representing you, but my question is, is:  You're
17   telling us you were going to testify?

18   A.   Yes, ma'am.

19   Q.   Okay.  And he went into court and said you
20   weren't going to testify.  He said -- he went into
21   court and said you were going to exercise your
22   Fifth Amendment rights.  Okay?

23       MR. BRUEGGEN: Objection, asked and
24   answered.

25       MS. CARNEY: Is that a question?

Page 39

BY MS. BONJEAN:

2    Q.   And -- okay.

3        MS. BONJEAN: I know you don't like
4    this, but we're going to get clarity.  He said two
5    things.  He has said --

6        MS. CARNEY: I thought you just
7    lectured him on no speaking objections.

8        MS. BONJEAN: I'm not -- I'm not
9    objecting.

10       MS. CARNEY: You don't need to lecture
11   me.

12       MS. BONJEAN: I'm not objecting.

13       MS. CARNEY: I put my objection on the
14   record.

15       MS. BONJEAN: This isn't an objection.

16       THE REPORTER: One at a time.

17       MS. CARNEY: You do not need to lecture
18   me.  I put my objection on the record.  You can
19   continue asking your questions, but at some point
20   you're going to be badgering him.  He's asked it
21   five times.

22       MS. BONJEAN: I'm not getting clarity
23   because he said two things.

24       BY MS. BONJEAN:

25   Q.   Okay.  You've said two things.  You've

Page 40

1    said -- you've suggested that you were taking the
2    advice of counsel, right?

3    A.   That's correct.

4    Q.   Okay.  Which is different than him doing
5    something that you didn't know or give him
6    permission to do, right?

7        MR. BRUEGGEN: Object to form.

8        THE WITNESS: Ma'am, I don't know what
9    went on in court.

10       MS. BONJEAN: Okay.

11       THE WITNESS: He's representing me.
12   That's what I go by.

13       MS. BONJEAN: Okay.

14       THE WITNESS: He's my attorney.

15       MS. BONJEAN: Right.

16       BY MS. BONJEAN:

17   Q.   Now -- but you said you understood that the
18   Fifth Amendment right to remain silent and not
19   incriminate yourself belongs to you, right?

20   A.   That's correct.

21       MR. BRUEGGEN: Objection, asked and
22   answered.

23       BY MS. BONJEAN:

24   Q.   It didn't belong to Mr. Grace, correct?

25       MS. BONJEAN: You can keep doing it.  I

Maysonet v.
Guevara

Video Deposition

---

Page 41

1  don't care.
2      MR. BRUEGGEN: That's fine.  I was --
3      MS. BONJEAN: You can keep making your
4  objections.
5      BY MS. BONJEAN:
6  Q.  They're going to continue to object and
7  you're still going to have to answer my questions
8  till I get the clarity I need.  Okay?
9  A.  I don't understand.
10 Q.  Okay.  Well --
11 A.  I never invoked my Fifth Amendment, never.
12 Q.  Okay.  I know, but your attorney did.
13 A.  That's my attorney.
14 Q.  Okay.
15 A.  He's representing me.
16 Q.  Okay.  So you -- but -- I understand that he
17 was representing you, but did you give him consent
18 to let the Court know that you would plead the
19 Fifth Amendment if called to testify?
20 A.  No, ma'am.
21 Q.  Okay.  So he did something that you didn't
22 approve of, right?
23     MR. BRUEGGEN: Object to form.
24     BY MS. BONJEAN:
25 Q.  Right?

---

Page 42

1  A.  Correct, I guess.
2  Q.  He told the judge that you were going to
3  plead the Fifth, and you weren't going to plead the
4  Fifth?
5      MS. CARNEY: Objection, asked and
6  answered.
7      BY MS. BONJEAN:
8  Q.  Is that right?
9      MR. BRENER: Asked and answered.  Join.
10     BY MS. BONJEAN:
11 Q.  You can answer that.
12 A.  I keep answering the same thing, ma'am.  He's
13 representing me.
14 Q.  That's not an answer.
15     MS. BONJEAN: Please ask him back the
16 question.
17     When he answers the question, we'll
18 move on.
19     MS. CARNEY: He's answered it five
20 times.
21     MS. BONJEAN: Can you ask my question
22 back, please.
23     (Following question read back:  He told
24 the judge that you were going to plead the Fifth,
25 and you weren't going to plead the Fifth?)

---

Page 43

1      BY MS. BONJEAN:
2  Q.  Correct?
3      MR. BRUEGGEN: Objection, form, vague.
4      BY MS. BONJEAN:
5  Q.  Okay.  Your attorney told Judge Joyce that
6  if called to testify, you were going to exercise
7  your Fifth Amendment right, correct?
8      MR. BRUEGGEN: Objection, asked and
9  answered.  Go ahead and answer.
10     THE WITNESS: Yes, I always going to --
11 I'm not going to invoke my Fifth Amendment.  I was
12 ready to testify in every case.
13     BY MS. BONJEAN:
14 Q.  You're not answering my question.  You're
15 answering -- you're saying what you want to say
16 right now, and we'll go -- we'll be able to move on
17 when you answer my question.
18 A.  Ma'am, he went in court.
19 Q.  Let me stop.  Your attorney went in front of
20 a judge and told that judge you were going to
21 exercise your Fifth Amendment right to remain
22 silent if called to testify, correct?
23     MR. BRUEGGEN: Objection, asked and
24 answered.  You can answer again, Freddie.
25     THE WITNESS: Yes.

---

Page 44

1      BY MS. BONJEAN:
2  Q.  Okay.  And your testimony here today is that
3  you were not going to exercise your Fifth Amendment
4  right if called to testify, right?
5      MR. BRUEGGEN: Objection, misstates his
6  testimony.
7      BY MS. BONJEAN:
8  Q.  Were you going to testify if called?
9  A.  Yes.  Yes, ma'am.
10 Q.  Okay.  So he misrepresented something to the
11 Court, correct?
12     MR. BRUEGGEN: Objection, form.
13     BY MS. BONJEAN:
14 Q.  Correct?
15 A.  Ma'am, I don't know.  He's my attorney.  He's
16 in court.  I'm not.
17 Q.  I know.
18 A.  I don't know what --
19 Q.  If he --
20 A.  -- what I'm supposed to tell you.
21 Q.  If he told the Court that you were going to
22 plead the Fifth, that would be untrue, correct?
23     MR. BRUEGGEN: Object to form.
24     BY MS. BONJEAN:
25 Q.  Answer the question.

---

Rizman Rappaport (973)992-7650
"When every word counts"

Page 45

1  A.  Ma'am, all I can -- the best of my -- all I
2  can tell you is he's represented me in the court.
3  I'm not in the courtroom with him.
4  Q.  I -- okay.  So are you saying he didn't --
5  you don't know what he told the Court?
6      MR. BRUEGGEN: Objection, asked and
7  answered.
8      MS. BONJEAN: No.
9      BY MS. BONJEAN:
10 Q.  Are you aware that your attorney told the
11 judge that you would plead the Fifth if called to
12 testify?
13     MR. BRUEGGEN: Objection, asked and
14 answered.
15     MS. CARNEY: Asked and answered.
16     MR. BRUEGGEN: This is -- you're going
17 over the same material.  I know what you're trying
18 to get at, and you should, but you keep going back.
19     MS. BONJEAN: Because he's not
20 answering.  Now he -- I mean, he's suggesting now I
21 wasn't in court, it was just my attorney.
22     BY MS. BONJEAN:
23 Q.  Were you aware that your attorney exercised
24 your Fifth Amendment rights on your behalf to the
25 judge?

Page 46

1      MR. BRUEGGEN: Objection, asked and
2  answered.
3      THE WITNESS: After he came out from
4  court, yes.
5      BY MS. BONJEAN:
6  Q.  Okay.  So you were aware of that, correct?
7  A.  Yes, after court.
8  Q.  Okay.  Now my question is:  If called to
9  testify, you were going to testify, according to
10 you, correct?
11 A.  That's correct.
12 Q.  So he misrepresented that to the Court, that
13 you weren't going to testify, correct?
14     MR. BRUEGGEN: Objection, asked and
15 answered.
16     THE WITNESS: I don't understand that,
17 ma'am.  He's representing me.  I don't know how he
18 can misrepresent me in court if he's my attorney.
19     BY MS. BONJEAN:
20 Q.  He told the judge something that wasn't
21 true, right?
22     MR. BRUEGGEN: Object to form.
23     MR. BRENER: Foundation.
24     BY MS. BONJEAN:
25 Q.  If he said you weren't going to testify

Page 47

1  because you were going to exercise your Fifth
2  Amendment right, was that true?
3  A.  Ma'am, he's the --
4      MR. BRUEGGEN: Object to form, asked
5  and answered.  Go ahead.
6      THE WITNESS: He's the attorney.  He's
7  in court for me.  I'm outside.
8      BY MS. BONJEAN:
9  Q.  I'm asking -- you can't have it both ways,
10 sir.  You can't come into here and say I was going
11 to testify and then --
12     MS. CARNEY: Okay.
13     MR. BRUEGGEN: Ms. Bonjean --
14     MS. CARNEY: You're now badgering him.
15     MR. BRUEGGEN: Yeah.
16     MS. CARNEY: You cannot yell at him.  I
17 understand.
18     MS. BONJEAN: He can't hear because he
19 doesn't have his hearing aids in.
20     MS. CARNEY: Would you like to continue
21 the dep, then?
22     MS. BONJEAN: No.  He should have come
23 prepared.
24     MR. BRUEGGEN: Ms. Bonjean, just ask
25 questions.

Page 48

1      MS. CARNEY: It's not my fault he
2  doesn't have his hearing aids.  You don't have to
3  scream at him and lecture him like a child.  Ask
4  your questions.
5      MS. BONJEAN: Okay.  Well, he's -- I am
6  not screaming at him, but we're going to get -- I'm
7  going to get an answer to my question.
8      MS. CARNEY: You've gotten it 16 times.
9      MS. BONJEAN: No, I haven't.
10     MS. CARNEY: Just because you don't
11 like it.
12     MS. BONJEAN: He hasn't answered it.
13     BY MS. BONJEAN:
14 Q.  When -- when your attorney told the judge
15 that you weren't going to testify, that wasn't
16 true, was it?
17     MR. BRUEGGEN: Objection, asked and
18 answered, form.
19     THE WITNESS: Ma'am, he's representing
20 me in court.  I'm not in court.
21     BY MS. BONJEAN:
22 Q.  Is that an answer to my question?  Is that
23 an answer to my question?
24     MS. CARNEY: It's his answer to your
25 question.  If he doesn't understand what you're

Page 49

1  asking him, that's the answer to your question.
2      BY MS. BONJEAN:
3  Q.  Do you not understand what I'm asking?
4  A.   You're telling me that my lawyer lied before
5  a judge.
6  Q.  If your -- if your -- if your attorney told
7  the judge that you weren't going to testify because
8  you were going to invoke your Fifth Amendment
9  right, is that accurate?
10     MR. BRUEGGEN: Objection, asked and
11  answered and form.
12     THE WITNESS: That's my attorney.  He's
13  representing me.
14     BY MS. BONJEAN:
15  Q.  Is it accurate that you were not going to
16  testify and you were going to plead the Fifth?
17     MR. BRUEGGEN: Objection, asked and
18  answered.
19     THE WITNESS: I was never going to
20  plead the Fifth.
21     BY MS. BONJEAN:
22  Q.  So that was inaccurate when he told the
23  judge that?
24     MR. BRUEGGEN: Objection, asked and
25  answered.

Page 50

1      BY MS. BONJEAN:
2  Q.  Right?
3  A.  He's -- I don't know how I can explain it.
4  He's my attorney, so I have to --
5  Q.  I --
6  A.  I put my -- into the attorney.  He
7  represented me in the court.  I was never in the
8  court.  I don't know what happened in the court.
9  Q.  I'm not asking you whether you -- you said
10  you -- you already testified, sir, that you knew
11  that he told the judge that you were going to plead
12  the Fifth.  Did you or did you not know that?
13  A.  No, until after.
14  Q.  After the fact you knew that, right?
15  A.  That's correct.
16  Q.  And did you say to your attorney, hey, why
17  did you do that, I would have testified?
18     MR. BRUEGGEN: Objection, calls for
19  attorney-client privileged communication.
20     MS. BONJEAN: No, which I think he's
21  waived, but okay.  We'll leave it at that for the
22  moment.
23     BY MS. BONJEAN:
24  Q.  So it's your testimony that you would have
25  testified all along, right?

Page 51

1  A.  That is correct.
2  Q.  And if he told the judge that you weren't
3  going to testify, that was just, what, a mistake?
4      MR. BRUEGGEN: Objection, asked and
5  answered.
6      THE WITNESS: I don't know, ma'am.
7  He's in the -- I'm not in the courtroom with him.
8      BY MS. BONJEAN:
9  Q.  I'm not asking whether -- I'm saying if he
10  told the judge that, was that accurate that you
11  weren't going to testify?  It wasn't, right?
12     MR. BRUEGGEN: Objection, asked and
13  answered, form.
14     THE WITNESS: I don't know what
15  happened in court.
16     BY MS. BONJEAN:
17  Q.  Okay.  I'll tell you what happened in court.
18  He told the judge you were going to plead the
19  Fifth.  And you're telling me you were never going
20  to plead the Fifth, is that right?
21     MR. BRUEGGEN: Objection, form, asked
22  and answered.
23     BY MS. BONJEAN:
24  Q.  Is that correct?
25     MR. BRUEGGEN: Compound.  Same

Page 52

1  objections.
2      THE WITNESS: Yes, ma'am, that's
3  correct.
4      BY MS. BONJEAN:
5  Q.  Did you make an ARDC complaint against
6  Mr. Grace?
7  A.  No, ma'am.
8  Q.  Did you make a complaint with the Attorney
9  Registration and Disciplinary Commission because he
10  told the judge something that wasn't true on your
11  behalf?
12  A.  No, ma'am.
13  Q.  Why not?
14  A.  Ma'am, I didn't know he was doing -- I didn't
15  know he did something wrong.  He was representing
16  me.  He's my lawyer.
17  Q.  Okay.  But he told the judge something that
18  you didn't want to do, right?
19     MR. BRUEGGEN: Object to asked and
20  answered.
21     THE WITNESS: I don't know, ma'am.
22     BY MS. BONJEAN:
23  Q.  Did you read the newspaper the next day or
24  the same day?
25  A.  I don't read the newspapers all the time.

Page 53

1  Q.  Okay.  Did you read the newspaper the same
2   day about the case that you were involved in?
3  A.  What do you mean?
4      MR. BRUEGGEN: Object to form.
5      BY MS. BONJEAN:
6  Q.  Did you read the newspaper about Jose
7   Maysonet's case, the Chicago Tribune that very same
8   day, that said five officers are going to take the
9   Fifth in this double murder case?  Did you read
10  that?
11 A.  I don't read -- I don't read the Tribune.
12 Q.  Okay.  Did you read anything in any news
13  publication about Chicago police officers pleading
14  the Fifth in the Jose Maysonet's case?
15 A.  Later on.
16 Q.  Okay.  And did you say to yourself, hey,
17  wait, I wasn't going to plead the Fifth, why are
18  they saying that?  Did you ask yourself that?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: No, ma'am.
21     BY MS. BONJEAN:
22 Q.  Why not?
23 A.  I don't know.  I don't know why they did
24  this.  They're individuals.
25 Q.  I'm talking about you.

Page 54

1  A.  Ma'am, I was willing to testify from day one.
2  Q.  Okay.  But your attorney said otherwise?
3  A.  That's my attorney.
4  Q.  Okay.
5  A.  I have to follow what he says.
6  Q.  Do you have to?
7  A.  Yes, ma'am.
8  Q.  Why?
9  A.  He's representing me.
10 Q.  Okay.  Well, if he told you to jump off a
11  bridge, would you do that?
12     MR. BRUEGGEN: Object to form.
13     MR. BRENER: Argumentative.
14     MR. BRUEGGEN: Argumentative.
15     BY MS. BONJEAN:
16 Q.  No, right?
17 A.  Hypothetical question, ma'am.
18 Q.  Okay.  Well, if he told you to testify to
19  something that wasn't true, would you do that?
20 A.  No, ma'am.
21 Q.  Okay.
22     MR. BRUEGGEN: Objection, incomplete
23  hypothetical, form.
24     BY MS. BONJEAN:
25 Q.  Okay.  So are you saying that you were --

Page 55

1   you were -- are you now testifying that you were
2   okay with the fact, you were -- you were not upset
3   about the fact that your attorney told the State's
4   Attorneys and the judge in open court that you
5   would plead the Fifth?  You were never upset about
6   that?
7  A.  No, ma'am.
8      MR. BRUEGGEN: Objection, form,
9   compound.
10     MS. CARNEY: Objection, form,
11  argumentative.
12     MR. BRENER: Join.
13     BY MS. BONJEAN:
14 Q.  Correct?
15     MR. BRUEGGEN: Same objections.
16     THE WITNESS: Yes.
17     BY MS. BONJEAN:
18 Q.  It never bothered you?
19 A.  No, ma'am.
20 Q.  And you never said, wait a second, that's
21  not true, I would have testified, is that right?
22     MR. BRUEGGEN: Objection, asked and
23  answered.
24     BY MS. BONJEAN:
25 Q.  Right?

Page 56

1  A.  I would have testified.  He knows that.
2  Q.  Okay.  So he just -- he just told the judge
3   that against your will?
4      MR. BRUEGGEN: Objection, asked and
5   answered.
6      BY MS. BONJEAN:
7  Q.  Okay.  Did you ever talk to any of your
8   colleagues or former colleagues about the fact that
9   you pled the Fifth after the fact?
10     MR. BRUEGGEN: Object to form,
11  colleague.
12     MS. BONJEAN: I'll rephrase.
13     BY MS. BONJEAN:
14 Q.  Did you ever talk to the other detectives
15  who were called to testify in the Maysonet case
16  after that court appearance?
17 A.  No, ma'am.
18 Q.  And did you know that Mr. Maysonet's
19  convictions were vacated, tossed out, after that
20  court appearance?
21 A.  Yes, ma'am.
22 Q.  Okay.  How did you learn that?
23     MR. BRUEGGEN: Objection to the extent
24  it calls for attorney-client privileged
25  communication.  Go ahead, sir.

Maysonet v.
Guevara

Video Deposition

Page 57

1     THE WITNESS: From my attorney.
2     BY MS. BONJEAN:
3  Q.  Okay.  You don't -- if it's from your
4  attorney, you don't -- you don't have to answer
5  that.
6     Did you read it in the newspaper as well at
7  some point?
8  A.  I don't recall.
9  Q.  Okay.  And what were your impressions when
10  you learned that Mr. Maysonet's double murder
11  conviction had been vacated?
12     MR. BRUEGGEN: Object to form,
13  impressions.
14     BY MS. BONJEAN:
15  Q.  Your understanding.
16  A.  He was vacated.  It was vacated.  Nothing I
17  could do.  What can I say?
18  Q.  Well, you could have testified, right?
19     MS. CARNEY: Objection, argumentative.
20     MR. BRUEGGEN: Objection,
21  argumentative.
22     BY MS. BONJEAN:
23  Q.  Right?
24     MR. BRUEGGEN: Same objections.
25  /////

Page 58

1     BY MS. BONJEAN:
2  Q.  Are you -- you don't have to listen to your
3  attorney's advice, right?
4     MR. BRUEGGEN: Objection, form,
5  argumentative.
6     MS. CARNEY: Objection, argumentative.
7     BY MS. BONJEAN:
8  Q.  You understand that, right?
9     MR. BRUEGGEN: Same objections.
10     BY MS. BONJEAN:
11  Q.  You can answer, sir.
12  A.  Yes.
13  Q.  Okay.  Did you ever go to the Christmas
14  parties that are held for Chicago police detectives
15  or the Area 5 Chicago police detectives?
16  A.  Not after 2007.
17  Q.  Okay.  Now, you're a Spanish speaker, right?
18  A.  Yes, ma'am.
19  Q.  Where's your family from?
20  A.  Puerto Rico.
21  Q.  Okay.  So you -- you are Puerto Rican?
22  A.  Yes.
23  Q.  Okay.  Both parents?
24  A.  Pardon me?
25  Q.  Are both your parents Puerto Rican?

Page 59

1  A.  Yes.
2  Q.  Okay.  So did you grow up in the house
3  speaking Spanish?
4  A.  Yes.
5  Q.  Okay.  Is Spanish your first language?
6  A.  Yes.
7  Q.  Okay.  Where did you grow up?
8  A.  I was in Puerto Rico until I was 7, and then
9  the last 67 years I've been here.
10  Q.  Okay.  So you grew up speaking Spanish in
11  Puerto Rico, fair?
12  A.  Yes.
13  Q.  All right.  And do you consider yourself
14  still fluent and conversant in Spanish?
15  A.  Yes.
16  Q.  Do you speak it regularly now?
17  A.  No, ma'am.
18  Q.  All right.  Do you have children?
19  A.  Yes.
20  Q.  Did you speak Spanish to your children
21  growing up?
22  A.  No, ma'am.
23  Q.  Okay.  Now, Rey Guevara is a Spanish speaker
24  as well, correct?
25  A.  Yes, ma'am.

Page 60

1  Q.  Okay.  Also from Puerto Rico, right?
2  A.  I assume.
3  Q.  Okay.  Did you speak Spanish with one
4  another?
5  A.  No, ma'am.
6  Q.  Never?
7  A.  No, ma'am.
8  Q.  Have you ever heard Rey speak Spanish?
9  A.  Yes, ma'am.
10  Q.  And how is his Spanish?
11     MR. BRUEGGEN: Object to form,
12  foundation.
13     THE WITNESS: Speak.
14     BY MS. BONJEAN:
15  Q.  When you heard it, did you ever have any
16  troubles understanding what he was saying?
17  A.  No.
18  Q.  Okay.  Some people have said that he kind of
19  had a Spanglish or sort of a terrible type of
20  Spanish.
21  Is that something you would agree with, or
22  not really?
23     MR. BRUEGGEN: Object to form.  Go
24  ahead, sir.
25     THE WITNESS: I would agree with that.

Page 61

BY MS. BONJEAN:

1 Q. It wasn't great Spanish, right?
2 A. No.
3 Q. Okay. There's been testimony in the past
4 that, for instance, Spanish speakers from Mexico
5 sometimes had a real hard time understanding him.
6 Would that track or make sense to you?
7 MR. BRENER: Objection.
8 MS. CARNEY: Objection, form.
9 MR. BRUEGGEN: Objection, form,
10 foundation.
11 MS. CARNEY: You can answer.
12 THE WITNESS: I have no idea, ma'am.
13 BY MS. BONJEAN:
14 Q. Okay. But you would agree that his Spanish
15 wasn't top-notch?
16 MR. BRUEGGEN: Objection, asked and
17 answered.
18 THE WITNESS: Yes.
19 BY MS. BONJEAN:
20 Q. Okay. Is there -- would you say that
21 there's like one dialect of Spanish from Spanish
22 speakers in Puerto Rico or even on that island
23 there are different dialects?
24 MR. BRUEGGEN: Object to form and

Page 62

1 foundation.
2 BY MS. BONJEAN:
3 Q. If you know.
4 A. I don't know, ma'am.
5 Q. Okay. Now, what did you do to prepare for
6 your deposition here today?
7 A. I looked over documents.
8 Q. Okay.
9 A. Spoke with --
10 Q. And again I'm not asking you to tell me
11 about what you spoke with your attorneys about, but
12 what did you do to prepare?
13 A. I looked over documents that pertained to the
14 case.
15 Q. Okay. And I'm assuming you did speak with
16 your attorneys at some point in preparation for the
17 deposition?
18 A. Yes.
19 Q. Okay. Don't tell me what was said.
20 A. Uh-huh.
21 Q. How many times did you meet with your
22 attorneys in preparation for your deposition today?
23 A. Four times.
24 Q. And where did you meet with them?
25 A. Here.

Page 63

1 Q. Okay. So let's talk about the first time
2 you met with them. How long ago was that, roughly?
3 A. The 12th of August.
4 Q. Okay. Oh.
5 A. I think it was the 12th.
6 Q. Okay. And apart from your attorneys and
7 yourself, was there any -- were there any other
8 people present?
9 A. No, ma'am.
10 Q. Okay. And which attorney did you meet with?
11 Did you meet with anybody else? Just by name.
12 A. Josh. Josh.
13 Q. Okay. All right. And then you said you had
14 another meeting?
15 A. Yes.
16 Q. Okay. Do you know how long -- strike that.
17 Do you know when that meeting took place?
18 A. I think the following Monday.
19 Q. Okay. And how long was the first meeting?
20 A. Just about an hour or two.
21 Q. Okay. And what about the second meeting?
22 A. About the same.
23 Q. All right. Same people present for the
24 second meeting?
25 A. Yes, ma'am.

Page 64

1 Q. And what about the third meeting?
2 A. About the same amount of time, same people.
3 Q. Okay. And the same for the fourth meeting?
4 A. Yes.
5 Q. Okay. And as you sit here today without
6 anything in front of you, do you know what
7 documents you actually reviewed prior to your
8 deposition?
9 A. The testimony in court.
10 Q. Your testimony?
11 A. Yes.
12 Q. Okay. So your prior testimony you reviewed?
13 A. Yes.
14 Q. Okay. What else?
15 A. Some reports.
16 Q. Police reports?
17 A. Yes.
18 Q. Do you know how many police reports you
19 looked at?
20 A. No, ma'am.
21 Q. Okay.
22 A. Don't recall.
23 Q. Do you know if you looked at the
24 investigative file?
25 A. No, ma'am.

Maysonet v.
Guevara

Video Deposition

Page 65

1  Q.  Okay.  Just a couple of reports, is that
2   what you're saying?
3  A.  Yes.
4  Q.  Okay.  Anything else?
5  A.  No, ma'am.
6  Q.  Anybody else's testimony you review?
7  A.  No, ma'am.
8  Q.  Okay.  Mr. Montilla, how old are you
9   presently?
10  A.  I'm 74-and-a-half.
11  Q.  Okay.  And what's your date of birth?
12       MR. BRUEGGEN: Object to form.  I'm
13  sorry, let's -- does it need to be on the record?
14       MS. BONJEAN: No, it could be off the
15  record, but I'd still like to know.
16       MR. BRUEGGEN: Okay.
17       THE WITNESS: 15 February 1945.
18       BY MS. BONJEAN:
19  Q.  Okay.  Now, I think you said you were born
20   in Puerto Rico.  Right?
21  A.  Yes, ma'am.
22  Q.  What town?
23  A.  Pardon me?
24  Q.  What town?
25  A.  I don't recall.

Page 66

1  Q.  Oh, okay.  Did you have a big family?
2  A.  My family?
3  Q.  Yeah.
4  A.  No.  My mother, father and two brothers.
5  Q.  Okay.  And at some point you came to the
6   mainland, is that right?
7  A.  Yes, ma'am.
8  Q.  Do you remember what year that was?
9  A.  1952.
10  Q.  And when you...
11       (Off stenographic record discussion.)
12       BY MS. BONJEAN:
13  Q.  Okay.  When you came to the mainland, you
14   came with your family?
15  A.  Yes, ma'am.
16  Q.  This was parents and some siblings?
17  A.  Yes.
18  Q.  And where did you settle when you came over
19   here?
20  A.  Chicago.
21  Q.  And you were about 7, you said?
22  A.  I was 7.
23  Q.  Okay.  Are you the oldest in your family?
24  A.  No.  I'm the middle.
25  Q.  Middle, all right.  And what part of the

Page 67

1   city did you settle in?
2  A.  Taylor Street.
3  Q.  Oh.
4  A.  The west side, near west side.
5  Q.  I lived there, too.
6   And this would have been in 1960, about, or
7   '59?
8  A.  In what -- what respect?
9  Q.  When you came to Chicago.
10       MR. BRUEGGEN: Objection, asked and
11  answered.
12       THE WITNESS: 1952, we came here.
13       MS. BONJEAN: Oh, I'm sorry.  I'm
14  sorry.  My apologies.  You were born in '45.  I
15  had -- I wrote the --
16       THE WITNESS: Yeah.
17       MS. BONJEAN: My apologies.  My
18  apologies.  Okay.
19       BY MS. BONJEAN:
20  Q.  And was your father in law enforcement work
21   or did he do something else?
22  A.  My father did something else.
23  Q.  Okay.  Where did you go to high school?
24  A.  St. Philip's.
25  Q.  Where did you go to grade school?

Page 68

1  A.  Notre Dame, across the street from my house.
2  Q.  I went to Notre Dame.  How weird is that?
3       MS. COHEN: Do you want this on record?
4       MS. BONJEAN: Whatever.  Interesting.
5       BY MS. BONJEAN:
6  Q.  So you went to high school, and what year
7   did you graduate high school?
8  A.  1965.
9  Q.  Okay.  And upon graduating high school, what
10   did you do in terms of further education or work?
11  A.  I was trying -- I was working, trying to make
12   money.  My dad didn't have money to go to college
13   and I was drafted into the Vietnam War.
14  Q.  Okay.  What were you doing in terms of work?
15   What type of work were you doing at that time?
16  A.  I think I was a driving school instructor for
17   a while.
18  Q.  Uh-huh.
19  A.  Sold insurance and a laborer, then I got
20   drafted.
21  Q.  Okay.  What year were you drafted?
22  A.  December 6th, 1965.
23  Q.  Okay.  Army?
24  A.  Yes, ma'am.
25  Q.  Where did you do your basic training?

Maysonet v.
Guevara

Video Deposition

Page 69

1  A.  We learned the basics on a march, general
2  orders, fire a weapon.
3  Q.  No, no, no.  Where?  Where?
4  A.  Where?  Fort Polk, Louisiana.
5  Q.  And did you actually serve, then, in
6  Vietnam?
7  A.  Yes, ma'am.
8  Q.  Okay.  And what years were you deployed in
9  Vietnam?
10  A.  May of '65.
11  Q.  Did you do one tour?
12  A.  No, ma'am.  I did two.
13  Q.  Two, okay.
14  A.  I volunteered.
15  Q.  The second one you --
16  A.  Yes, ma'am.
17  Q.  -- stayed for.
18  And what -- what were your assignments in
19  Vietnam?
20  A.  When I first went there, I was a machine
21  gunner for the first cavalier air mobile.  They
22  mustered out.  I still had time to serve.  They sent
23  me to Saigon, and I think it was called the Koelper
24  Compound with MAC Vie, which is the Military
25  Assistance Command, Vietnam.  Then I was assigned to

Page 70

1  an advisory team and I was a radio operator.
2  Q.  Okay.  Did you do any service as a -- in
3  military police there?
4  A.  We were semi-military police there.
5  Q.  Okay.  And what were your duties as
6  semi-military police in Vietnam?
7  A.  We had to protect the compound.  We had to
8  secure it, question people coming in and everything,
9  and then we went about our other duties.
10  Q.  And what types of other duties did you have?
11  A.  Patrol and everything.
12  Q.  Okay.  Did you do any type of investigations
13  when you --
14  A.  No, ma'am.  No.
15  Q.  Okay.  Ever have an opportunity to
16  interrogate prisoners or anything of that nature?
17  A.  No, ma'am.
18  Q.  Okay.  And what rank did you leave the Army
19  with when you left in -- '67, is that right?
20  A.  Pardon me?
21  Q.  '67 you got out or --
22  A.  Yes, ma'am.  December -- September 9, 1967.
23  I was a Specialist Fourth Class.
24  Q.  Okay.  Honorably discharged, I assume?
25  A.  Yes, ma'am.

Page 71

1  Q.  Okay.  Now, after you were honorably
2  discharged from the Army, what did you do by way of
3  employment or further education?
4  A.  I went back to my old job as an assistant --
5  what was it?  I can't remember.  And they put me in
6  a little office with just a door, and I couldn't
7  stand it.  I walked out.
8  Q.  And by the way, during this time from when
9  you graduated high school to the time that you came
10  home from Vietnam, were you still single or were
11  you married or any --
12  A.  I was single.
13  Q.  Okay.  So after you walked out of the job
14  that you went back to, what did you do?
15  A.  I went in construction.
16  Q.  Okay.  And did you have any particular
17  skills in construction or were you going to learn?
18  A.  I had some skills, and I was -- basically I
19  was just a laborer and moved up to a -- I forgot
20  what they called that.  A union rep.
21  And there's another thing I did and my pay
22  went up a couple of dollars.
23  Q.  And how long did you do the construction
24  work?
25  A.  Four -- maybe four or five years.

Page 72

1  Q.  Now, during this time that you were working
2  construction, did you have thoughts of going into
3  law enforcement?
4  A.  Yes, ma'am.
5  Q.  Okay.  When did you start knowing you wanted
6  to go into law enforcement?
7  A.  1968.
8  Q.  Okay.  So this was something post Vietnam,
9  right?
10  A.  Yes, ma'am.
11  Q.  It wasn't like a childhood dream or anything
12  like that?
13  A.  No, ma'am.
14  Q.  All right.  Now, in 1968, did you have to --
15  what did you have to do to apply for a position
16  with the Chicago Police Department?
17  A.  Took a test.
18  MR. BRUEGGEN: Object to foundation.
19  BY MS. BONJEAN:
20  Q.  Okay.  And did you do that?
21  A.  Yes, ma'am.
22  Q.  Did you apply to any other law enforcement
23  agencies?
24  A.  No, ma'am.
25  Q.  Just Chicago?

Maysonet v.
Guevara

Video Deposition

---

Page 73

1  A.   Yeah, Chicago Fire Department.  That was it.
2  Q.   Did you take the test more than once or just
3  once?
4  A.   I took the police department three times.
5  Q.   Okay.  And how did it work back then?  Did
6  you get on some type of list after you take it, and
7  if you didn't get a job, the list might expire or
8  something?
9  A.   I was on a list.  Then I was told that I
10  cannot be a policeman because I had warrants.  Never
11  had a warrant in my life.  Never been arrested.  So
12  my investigator investigated it.  So he says take
13  the test again.  They try to do that -- they did
14  that twice to me.  The third time I made it.  They
15  gave up.  I didn't have no warrants.  So I came on
16  the job in '73.
17  Q.   Who told you you had warrants?
18  A.   The police department.
19  Q.   And it was your understanding that you did
20  not have any warrants?
21  A.   That's correct.
22  Q.   Okay.  Do you know -- did you ever find out
23  why they thought you had warrants?
24  A.   No, ma'am.
25  Q.   Did you ever have an opportunity to look at

Page 74

1  your IR history, your criminal history?
2  A.   I never had an IR.
3  Q.   Uh-huh.  So never got to the bottom of it,
4  huh?
5  A.   No, ma'am.
6  Q.   But third time's a charm and they ultimately
7  gave you a job with the department?
8  A.   Yes, ma'am.
9  Q.   And that would have been in '73?
10  A.   Well, I went in in '76.  They gave me three
11  years back because of I was trying for all that
12  time, so they put me back to 1973 instead of '68,
13  '69.
14  Q.   Gotcha.
15  A.   I didn't mind.
16  Q.   So they kind of acknowledged that they had
17  made a mistake?
18  A.   Yes, ma'am.
19  Q.   All right.  So the system had some type of
20  error, huh?
21  A.   Yes, ma'am.
22       MR. BRUEGGEN: Object to form,
23  foundation.
24       BY MS. BONJEAN:
25  Q.   Did you make any enemies in the police

Page 75

1  department?
2  A.   Pardon me?
3  Q.   I said:  Did you have some enemies in the
4  police department?
5  A.   No, ma'am.
6       MR. BRENER: Foundation.
7       MR. BRUEGGEN: Object to form.
8       THE WITNESS: Can I take a walk for a
9  minute?
10       MS. BONJEAN: Of course.  Take a break.
11       THE VIDEOGRAPHER: We're going off the
12  record at 12:01 p.m.
13       (Recess taken from 12:01 to 12:16.)
14       THE VIDEOGRAPHER: We are now back on
15  the record at 12:16 p.m.
16       BY MS. BONJEAN:
17  Q.   Mr. Montilla, why did you become a Chicago
18  police officer?
19  A.   Just out there in my mind.  That's all.
20  Q.   Nothing -- nothing else, just --
21  A.   Benefits.
22  Q.   Good job?
23  A.   The benefits was more -- that counted more.
24  I think that was it.
25  Q.   Okay.  Now, after you were hired by the

Page 76

1  Chicago Police Department, did you attend a police
2  academy?
3  A.   Yes, ma'am.
4  Q.   And were you a part of a particular class?
5  A.   Yes, ma'am.
6  Q.   What was the class?  What year or date?
7  A.   '76 something.  I don't remember.
8  Q.   Okay.  Now, did you attend the police
9  academy with any of the other defendants in this
10  case?
11  A.   No, ma'am.
12  Q.   Do you know who all the defendants are in
13  this case?
14  A.   Did I know, ma'am?
15  Q.   Do you know who all the defendants are in
16  this case?
17  A.   I think I named them all.  I'm not sure.
18  Q.   We'll go over them just so we're on the same
19  page.
20  You know, of course, that Rey Guevara is one
21  of the defendants?
22  A.   Yes, ma'am.
23  Q.   And Sergeant Mingey is one of the
24  defendants?
25  A.   Yes, ma'am.

Maysonet v.
Guevara

Video Deposition

Page 77

1  Q.  And did you know that Roland Paulnitsky is
2  one of the defendants?
3  A.  Who, ma'am?
4  Q.  Paulnitsky?
5  A.  Yes, ma'am.
6  Q.  And Ernie Halvorsen is one of the
7  defendants?
8  A.  Yes, ma'am.
9  Q.  Okay.  And it's your testimony that
10  you did --
11  MS. COHEN: Epplen.
12  MS. BONJEAN: Huh?
13  MS. COHEN: Lee Epplen.
14  BY MS. BONJEAN:
15  Q.  oh, and Sergeant Lee Epplen is one of the
16  defendants?
17  A.  I didn't know that.
18  Q.  Okay.  I apparently forgot, too.
19  Am I fair -- is it fair to say that you did
20  not go to the police academy with any of those
21  individuals?
22  A.  That is correct.
23  Q.  Okay.  Do you know whether you joined the
24  department before Rey Guevara did or after?
25  A.  I don't know, ma'am.

Page 78

1  Q.  Okay.  Now, do you remember any of the
2  training you received at the police academy?
3  A.  Yes, ma'am.
4  Q.  Tell me about it.  What type of training did
5  you get?
6  A.  Report writing, law.  We learned about the
7  law, report writing.
8  Q.  What do you remember about report writing,
9  this training you received?
10  A.  The general reports, how to make a report,
11  what you have to really put in there.
12  Q.  And what did they teach you about that?
13  A.  Pardon me?
14  Q.  What did they teach you about report
15  writing?
16  A.  Just a summary, that you made a summary.  You
17  didn't write word for word everything you did, just
18  a summary relating what -- what happened on the
19  street, what the person told you.
20  Q.  Was it conveyed to you that it was important
21  to be accurate?
22  A.  Yes, ma'am.
23  Q.  Okay.  And was it important to document when
24  witnesses or people told you things that were
25  relevant to an incident or a crime?

Page 79

1  MS. CARNEY: Objection, form.
2  THE WITNESS: That was in the detective
3  division.
4  MS. BONJEAN: Okay.  We'll get there.
5  BY MS. BONJEAN:
6  Q.  What else did you learn in the police
7  academy?
8  A.  Well, I learned how to make reports, you
9  know, an accident report, regular reports, auto
10  theft reports.  We learned how -- well, we had to do
11  calisthenics and everything.
12  Q.  Physical requirements?
13  A.  Yes, ma'am.  We had to run and...
14  Q.  Did you receive any training in the police
15  academy on how to interview witnesses?
16  A.  No, ma'am.
17  Q.  Okay.  What about interviewing or
18  questioning suspects?
19  A.  No, ma'am.
20  Q.  Okay.  Did you receive any training on when
21  you were supposed to memorialize your policing
22  activities?
23  A.  What do you mean "memorialize"?  I don't
24  understand.
25  Q.  Did you receive any training on when you

Page 80

1  were supposed to document your policing activities
2  or your work?
3  A.  In the detective division.
4  Q.  Okay.  Now, after you graduated from the
5  police academy, what was your first assignment in
6  the department?
7  A.  I made detective in 1980.
8  Q.  After you graduated from the police
9  academy --
10  A.  Oh, I went Monroe Street.
11  Q.  Monroe --
12  A.  12th district.
13  Q.  Okay.  12th district.
14  A.  Yes, ma'am.
15  Q.  Patrol?
16  A.  Yes, ma'am.
17  Q.  What were your duties and responsibilities
18  as a patrol officer in the 12th district?
19  A.  Patrol my beat.
20  Q.  Was that an on-foot patrol or in-car?
21  A.  Car.
22  Q.  Did you have a partner?
23  A.  Yes.
24  Q.  Who was your partner?
25  A.  I had a field training officer, Houlihan.

Maysonet v.
Guevara

Video Deposition

Page 81

1 Q. Houlihan.
2 A. Yes, ma'am.
3 Q. And could you put a time frame on this for
4 me. When did you start in the 12th district?
5 A. I think six months after I went in.
6 Q. So are we into 1974?
7 A. I -- well, '76 is when I really went in.
8 Q. Right.
9 A. So figure it was, I think, May. I don't
10 remember what time, but I know I was six -- I think
11 we went six months in the academy.
12 Q. Do you know how long you were assigned to
13 the 12th district?
14 A. I went there until I made detective in 1980.
15 Q. Okay. And from the time that you were in
16 the department to the time you made detective, were
17 you always at the 12th district?
18 A. Yes, ma'am.
19 Q. Always in patrol?
20 A. Yes, ma'am.
21 Q. And where geographically is the 12th
22 district located?
23 A. That's -- the 12th district is on Monroe and
24 Racine, and we covered an area from Fulton south to
25 almost Cermak, and from Western east to Halsted or

Page 82

1 Canal.
2 Q. Now, when you were at the 12th district, did
3 you have an occasion to work with any of the
4 defendants who are named in this case?
5 A. No, ma'am.
6 Q. Now, at some point you said you became a
7 detective. Right?
8 A. Yes, ma'am.
9 Q. Tell me what the -- what was the process to
10 become a detective.
11 A. I took a test, but I was promoted
12 meritoriously.
13 Q. Okay. And tell me what it means to be
14 promoted meritoriously.
15 A. You're doing a great job, you're performing,
16 everything is being done, and they -- they rate you
17 on all your activities, your report writing,
18 whatever activities you had, and then you become a
19 detective.
20 Q. Okay. Is there another way to become a
21 detective?
22 A. Yes, ma'am, by taking a test.
23 Q. Okay. And how does that process work?
24     MR. BRUEGGEN: Object to foundation, if
25 you know.

Page 83

1     BY MS. BONJEAN:
2 Q. If you know.
3 A. Same, I think.
4 Q. Do you have to score a certain number on the
5 test?
6 A. Yes, ma'am.
7 Q. All right. And is there, then, a list of
8 people who are ranked based on how well they did on
9 the test?
10     MR. BRUEGGEN: Object to foundation.
11 If you know.
12     THE WITNESS: I think so.
13     BY MS. BONJEAN:
14 Q. Okay. That's not how you were promoted,
15 correct?
16 A. No, ma'am, that's correct.
17 Q. And can we agree that when you went from
18 your patrol position to detective, that was a
19 promotion?
20 A. Yes, ma'am.
21 Q. Okay. And were there certain benefits that
22 went along with being promoted to detective?
23 A. No, ma'am, no benefits.
24 Q. Any raise -- any pay raise?
25 A. Oh, yeah. We got a pay raise, yeah.

Page 84

1 Q. Oh, okay.
2 A. Okay.
3 Q. But no -- apart from your pay raise, there
4 were no other perks?
5 A. No, ma'am.
6 Q. Okay. You didn't get your own, like, car or
7 anything like that --
8 A. No, ma'am.
9 Q. -- to drive around? Okay.
10 Now, you said you became detective in 1980?
11 A. Yes, ma'am.
12 Q. All right. After you were meritoriously
13 promoted to detective in 1980, did you have to
14 attend a detective school?
15 A. The academy.
16 Q. Okay. And how long was the detective
17 academy?
18 A. I think I was there a month.
19 Q. Now, are any of the defendants who are named
20 in this case -- strike that.
21 Were any of the defendants who are named in
22 this case in your detective academy?
23 A. No, ma'am.
24 Q. Okay. Now, what types of training did you
25 receive in the detective academy? What I mean --

Maysonet v.
Guevara

Video Deposition

Page 85

1  what I mean "what types," I mean how was it taught?
2  Was there classroom instruction, for instance?
3  A.  We had other detectives that were real
4  knowledgeable.  We learned from them.
5  Q.  Okay.  And did they teach you in like a
6  lecture setting?
7  A.  In a what?
8  Q.  Lecture, a lecture setting.
9  A.  Yes, we had lectures and everything.
10 Q.  Okay.  Did you have in-field simulations or
11 anything?  How did it -- how did it work?
12 A.  We went -- we went --
13     MR. BRUEGGEN: Object to form.  Go
14 ahead and answer.
15     THE WITNESS: We learned basically how
16 to make detective division reports.
17     MS. BONJEAN: Okay.
18     THE WITNESS: How to investigate, how
19 to look for evidence.
20     BY MS. BONJEAN:
21 Q.  Okay.  And was that done mostly through
22 other detectives teaching you and telling you how
23 to do that or were there other ways in which you
24 were taught that?
25 A.  They taught us and they -- how to

Page 86

1  investigate, what to look for in a crime scene.
2  Q.  Right.  I'm going to ask you about all that.
3  I'm just trying to understand, was this all in a
4  classroom setting?
5  A.  Yes, ma'am.  Just in a classroom, yeah.
6  Q.  Okay.  Okay.  Now, you said that you were
7  taught about report writing in the detective
8  division?
9  A.  Yes, ma'am.
10 Q.  Okay.  What did you -- what do you remember
11 about the report writing training that you received
12 when you attended the detective police academy?
13 A.  Basically that you make sure you get the age
14 of the person you're interviewing, if they're
15 working or not, what happened during the crime.
16 They tell you what happened.  You list that on the
17 narrative.  And if -- how to get -- if you gather
18 evidence, you make a report on the evidence.
19 Q.  And were you instructed to document in a
20 report what investigative conduct you took in a
21 particular case?
22     MS. CARNEY: Objection, form.
23     THE WITNESS: That came later on.
24     BY MS. BONJEAN:
25 Q.  When did that come?

Page 87

1  A.  I -- I don't -- I know it was years later,
2  they introduced something.
3  Q.  Okay.  Well, let's talk about -- let's first
4  focus on what you learned in the detective academy.
5  Am I calling that right?  Do you call it detective
6  academy or...
7  A.  No, just the academy.
8  Q.  Okay, just the academy, but it was specific
9  training for detectives, right?
10 A.  Yes, ma'am.
11 Q.  So when you were attending the academy for
12 your training to become a detective, you've
13 testified that you received instruction on report
14 writing.  Correct?
15 A.  Yes, ma'am.
16 Q.  And as part of that instruction, were you
17 taught to prepare reports in and around the time or
18 contemporaneous with whatever event you were
19 documenting?
20 A.  Yes, ma'am.
21     MR. BRUEGGEN: Object to form.
22     THE WITNESS: Okay.  Yes, ma'am.
23     BY MS. BONJEAN:
24 Q.  Yeah.  Was it conveyed to you the importance
25 of doing -- of reporting an event as close to the

Page 88

1  time as possible of when it happened?
2     MS. CARNEY: Object to form.
3     MR. BRUEGGEN: Object to form.
4     THE WITNESS: Yes, ma'am.
5     BY MS. BONJEAN:
6  Q.  So, for instance, if you were interviewing a
7  witness to a crime, you would want to document what
8  that witness told you in a report as soon as
9  possible so that it would be accurate, right?
10 A.  Yes, ma'am.
11 (Simultaneous objections from counsel.)
12     THE REPORTER: Wait, wait, wait.
13     MS. CARNEY: Form.
14     MR. BRENER: Incomplete hypothetical.
15     THE WITNESS: Can you repeat the
16 question, please?
17     MS. BONJEAN: Sure.
18     BY MS. BONJEAN:
19 Q.  Were you taught during the training that it
20 was important to report, for instance, what a
21 witness may have told you as soon as possible?
22     MR. BRUEGGEN: Same objections.
23     MR. BRENER: Same objection.
24     THE WITNESS: Yes, ma'am.
25 /////

Page 89

BY MS. BONJEAN:
1
2 Q.  Okay.  And why is that?
3 A.  Pardon me?
4 Q.  And why would that be?  Why is it important
5 to document an interview with a suspect, for
6 instance, or a witness in -- as close as time as
7 possible to when they gave you that information?
8     MR. BRUEGGEN: Object to form.
9     THE WITNESS: For court purposes.
10    BY MS. BONJEAN:
11 Q.  What do you mean by that?
12 A.  In case you have to go to court and need the
13 witness and the witness has to be interviewed by a
14 states's attorney, the -- you have everything that
15 they stated there.
16 Q.  Right.  My question's a little different.
17 I think you testified that one of the
18 instructions you received when you were at the
19 academy was that when you are, for instance,
20 interviewing a witness, you want to make a report
21 of what that witness told you, right?
22 A.  That's correct.
23 Q.  Okay.  And you don't want to wait a week or
24 two weeks to make that report.  You want to make
25 that report as close in time as when they gave you

Page 90

1 the information, right?
2 A.  That is --
3     MR. BRUEGGEN: Object to form and
4 incomplete hypothetical.  Go ahead.
5     MR. BRENER: Join.
6     THE WITNESS: That is correct.
7     BY MS. BONJEAN:
8 Q.  Okay.  And why is it important to prepare
9 your report in as close proximity to the time that
10 they conveyed the information to you -- why is that
11 important or what were you taught about why that
12 was important?
13    MR. BRUEGGEN: Objection, compound and
14 asked and answered.
15    THE WITNESS: Because you -- you can't
16 hold information in your brain for two months.  You
17 have to write it down right away, and then you
18 document it.
19    MS. BONJEAN: Right.
20    BY MS. BONJEAN:
21 Q.  So -- and what else do you remember about
22 being -- about report writing or what was taught to
23 you about report writing when you went to the
24 academy?
25 A.  Just the basic information that you have to

Page 91

1 get, how to write that report and make sure you --
2 you put things chronologically, and that's what we
3 did.
4 Q.  Okay.  What else do you remember about the
5 training you received at the academy when you were
6 there for your detective training?
7 A.  Typing, learned how to type, learned how to
8 use the computer.
9 Q.  Did you learn how to investigate?
10 A.  Not in the -- not for patrol, no.
11 Q.  In detective school, though -- I thought we
12 were talking about detective school.
13 A.  I thought you were talking about the
14 original, when I first went to the academy.
15 Detective school, you're trained different.
16 Q.  Yeah.  I was saying detective school --
17 A.  Oh, I'm sorry.  I missed it someplace.
18 Q.  -- and you said -- and I asked you if that
19 was how I should refer, and you said, no, just the
20 academy, so we got off track.  Okay.
21 A.  Yeah.
22 Q.  Let's -- I'm talking specifically in
23 1980-ish --
24 A.  Yeah.
25 Q.  -- when you went to the academy for your

Page 92

1 detective training.  Okay?
2 A.  Yes.
3 Q.  Okay.  You received additional training as
4 it relates to preparing reports, correct?
5 A.  Yes.
6 Q.  Okay.  And part of that training was that
7 you wanted to document important information in an
8 investigation, right?
9 A.  That is correct.
10 Q.  And would you agree that if a witness tells
11 you some information, that would be important
12 information to document?
13    MR. BRUEGGEN: Objection.
14    MS. CARNEY: Objection, form.
15    MR. BRUEGGEN: Incomplete hypothetical.
16    MR. BRENER: Join.
17    MR. SCHALKA: Join.
18    THE WITNESS: Yes.
19    BY MS. BONJEAN:
20 Q.  Okay.  And, for instance, if a suspect told
21 you some information about the crime, that would be
22 important information to document?
23    MR. BRENER: Incomplete hypothetical.
24    MR. BRUEGGEN: Same objections.
25    THE WITNESS: Yes.

Maysonet v.
Guevara

Video Deposition

---

Page 93

BY MS. BONJEAN:

1 BY MS. BONJEAN:
2 Q. Okay. And certainly if a suspect admitted
3 to a crime, you would want to document that, right?
4 MR. BRUEGGEN: Same objections.
5 MR. BRENER: Join.
6 THE WITNESS: Yes, ma'am.
7 BY MS. BONJEAN:
8 Q. Okay. Or if a witness or a suspect said
9 somebody else was involved in a crime, you would
10 want to document that, right?
11 A. Yes, ma'am.
12 Q. Okay. And that's all -- that type of
13 training is training you received in the detective
14 program that you attended in the academy, right?
15 A. Yes.
16 Q. Okay. And, also, I think you testified to
17 this, but let me just clarify that as part of that
18 training, it's important to document information
19 relevant to an investigation as soon as you can?
20 MR. BRUEGGEN: Objection, asked and
21 answered.
22 MS. CARNEY: Objection, form.
23 THE WITNESS: Yes, ma'am.
24 BY MS. BONJEAN:
25 Q. Okay. Now, at the detective school or

---

Page 94

1 detective training that you received, did you learn
2 about conducting investigations?
3 A. Yes.
4 Q. Okay. And what do you remember about the
5 training you received as it relates to conducting
6 investigations?
7 A. I went to Area 4. I was working as a -- as a
8 burglary detective. The burglary detectives, I
9 would work with one and the other, and they would
10 show me how to make the reports, how to -- if you
11 have an arrest, officers make an arrest, how to
12 contact the State's Attorney, how to present the
13 case.
14 Q. Okay. When you were in the training
15 program, did they teach you how to interview
16 witnesses?
17 A. Yes.
18 Q. Okay. Did you learn how to conduct lineups?
19 A. Yes.
20 Q. Okay. Is that something you learned in the
21 detective training in the academy?
22 A. Yes, ma'am.
23 Q. Okay. Did -- were you taught how to
24 document lineups or create reports when you
25 conducted a lineup?

---

Page 95

1 A. Yes.
2 Q. What about interrogating or questioning
3 suspects, did you receive any training in -- on
4 that when you were -- went to the academy for your
5 detective school?
6 A. Yes.
7 Q. What other investigative strategies or
8 tactics did you receive training on when you were
9 at the academy, if you -- if you can come up with
10 any others?
11 MS. CARNEY: Just to clarify, we're
12 still in the detective?
13 MS. BONJEAN: Yeah, uh-huh.
14 THE WITNESS: As a detective?
15 MS. BONJEAN: Correct.
16 THE WITNESS: How to gather evidence,
17 how to view a crime scene, what to document, call
18 in -- if you need a -- an evidence technician or if
19 you needed the crime lab, you have to make all
20 these calls, and you have to document everything,
21 when you made the contact, who came out, what they
22 did, and you document everything.
23 BY MS. BONJEAN:
24 Q. Would you agree that learning how to
25 document an investigation was an important part of

---

Page 96

1 your training when you were at the police academy
2 in the detective training?
3 A. Oh, yes.
4 MR. BRUEGGEN: Object to form.
5 THE WITNESS: Yes.
6 BY MS. BONJEAN:
7 Q. Okay. Something that sounds like it was
8 emphasized a great deal when you were at the
9 training?
10 MR. BRUEGGEN: Object to form.
11 THE WITNESS: Yes.
12 BY MS. BONJEAN:
13 Q. Now, did you learn things like how to
14 develop a theory about the case or how to follow
15 leads or any of those things when you were in the
16 detective division, or is that something more on
17 field -- in-field training or on-the-job training?
18 MR. BRUEGGEN: Object to form,
19 compound.
20 THE WITNESS: It's probably in-field,
21 you know, when you're out there.
22 BY MS. BONJEAN:
23 Q. Okay. I mean, you know -- you know, for
24 example, what a motive is, right?
25 A. Yes.

---

Rizman Rapport (973)992-7650
"When every word counts"

Page 97

1  Q.  And can motive evidence be important
2  evidence?
3  A.  Yes.
4  Q.  Okay.  So -- and would you agree that it's
5  important to try to learn the motive of a crime, it
6  helps you solve the crime?
7       MR. BRUEGGEN: Objection.
8       MR. BRENER: Objection, hypothetical.
9       MS. CARNEY: Object to form.
10      THE WITNESS: Yes.
11      BY MS. BONJEAN:
12  Q.  Okay.  And when you were receiving your
13  training in the academy, is that -- is that subject
14  matter like that discussed or was that more sort of
15  once you're on the job?
16      MR. BRUEGGEN: Object to form.
17      THE WITNESS: Once you're on the job.
18      MS. BONJEAN: Yeah.
19      BY MS. BONJEAN:
20  Q.  Would you agree that the goal of an
21  investigation is to find the bad guy?
22      MR. BRUEGGEN: Object to form.
23      THE WITNESS: Yes.
24      BY MS. BONJEAN:
25  Q.  To find the perpetrator of the crime?

Page 98

1  A.  Yes.
2  Q.  Okay.  By the way, who was your supervisor
3  at the 12th district?  I know I'm going backwards a
4  way.
5  A.  I don't remember, ma'am.
6  Q.  Okay.
7  A.  That's a long time ago.
8  Q.  Okay.  Was -- when you were at the 12th
9  district, do you remember being supervised by
10  Sergeant Mingey at all at the 12th district?
11  A.  Never met Sergeant Mingey.
12  Q.  Okay.  You mean until Area 5?
13  A.  Until Area 5, yes.
14  Q.  Okay.  What about Lee Epplen, did he ever
15  supervise you prior to Area 5?
16  A.  No, ma'am.
17  Q.  Okay.  So you were meritoriously promoted in
18  1980 to detective, you attended the training, and
19  then you were assigned somewhere, correct?
20  A.  Yes.
21  Q.  Okay.  Where were you assigned?
22  A.  Area 4, burglary, Harrison and Kedzie.
23  Q.  When you were a new detective, do you
24  have -- is there like a field training process as
25  well?

Page 99

1  A.  No, ma'am.
2  Q.  Okay.  Do you have any type of, sort of,
3  direct supervisor or someone that is looking after
4  your activities?
5       MR. BRUEGGEN: Object to form.
6       THE WITNESS: We have supervisors, yes.
7       BY MS. BONJEAN:
8  Q.  Okay.  But nothing specific to being a
9  rookie detective, right?
10  A.  No, ma'am.
11  Q.  Okay.  Now, when you were assigned to Area 4
12  at Harrison and Kedzie, did you get a partner?
13  A.  Once in a while.
14  Q.  All right.  And, again, would that be in
15  1980 that you went to Area 4?
16  A.  Yes.
17  Q.  And tell me again what type of crimes you
18  were investigating.
19  A.  Burglary.
20  Q.  Did it -- did Area 4 -- was that part of
21  property crimes?
22  A.  We had -- at that time we had burglary, auto
23  theft, the rape unit, homicide, robbery.  That's how
24  it was categorized at that time.
25  Q.  All different units --

Page 100

1  A.  Yes, ma'am.
2  Q.  -- within Area 4?
3  A.  Different detectives.
4  Q.  Hold on one second.  Let me -- just so the
5  record's clear.
6       All of those categories of crimes that you
7  just provided to us, there were different units
8  within Area 4 that investigated those separate
9  crimes?
10  A.  Yes, ma'am.
11  Q.  Okay.  And at some point did that change?
12  A.  Yes, ma'am.
13  Q.  Okay.  Do you remember when?
14  A.  No, ma'am.  In the, I think, the late '80s.
15  I'm not sure.
16  Q.  It went -- it went to property crimes and
17  violent crimes, is that -- is that right?
18  A.  Yes, ma'am.
19  Q.  Okay.  But in 1980, you were assigned to
20  Area 4 and specifically assigned to the burglary
21  unit, is that fair?
22  A.  Correct.
23  Q.  And do you recall who your supervisor was
24  when you first went to Area 4?
25  A.  No, ma'am.  I can't recall his name.

Page 101

1  Q.  Okay.  That's fine.
2    How long were you at Area 4?
3  A.  I was there a couple of years.
4  Q.  Always in burglaries?
5  A.  Yes, ma'am.
6  Q.  All right.  And then where did you go after
7    you were in Area 4, in burglaries, for a couple
8    years?
9  A.  Area 1, 51st and Wentworth.
10  Q.  What I meant to ask you is:  When you were
11    at Area 4, did you happen to work with any of the
12    detectives who are named in this case?
13  A.  No, ma'am.
14  Q.  Okay.  You went to Area 1 at 51st and
15    Wentworth.  What unit did you work in then?
16  A.  Burglary again.
17  Q.  Did you like working burglaries?
18  A.  Yes, ma'am.
19  Q.  Why?
20  A.  Because it's -- I don't know.  You're looking
21    for an unknown without -- unless you can find
22    evidence, fingerprints, motive of operandi, point of
23    entry, what they did.  You document everything.
24  Q.  Did you enjoy the process of trying to find
25    who was responsible through these different

Page 102

1    investigative --
2  A.  Yes, ma'am.
3  Q.  And how long did you work at Area 1 in
4    burglaries?
5  A.  Let me see.
6    Seven years.
7  Q.  So does that take us to close to like 1989?
8  A.  Something like that.
9  Q.  Do you remember who your supervisors were at
10    Area 1?
11  A.  Well, my only supervisor I remember the most
12    was Sergeant Carl Merritt.
13  Q.  And I assume none of the defendants in this
14    case were at Area 1 when you were there?
15  A.  That's correct.
16  Q.  Okay.  When you were at Area 4 or at Area 1,
17    did you do any gang crimes investigations or
18    anything like that?
19  A.  No, ma'am.
20  Q.  Just all burglaries, right?
21  A.  Just burglary.
22  Q.  And would it be fair to say that after
23    whatever training you received in the academy to
24    become a detective, you received on-the-job
25    training after that?

Page 103

1  A.  Some.
2  Q.  Did you have like in-service trainings?
3  A.  No, ma'am, not that much there.
4  Q.  Okay.  Learned by doing, I suppose.
5  A.  Yeah, basically on your own.
6  Q.  Okay.  And when you were working at Area 4
7    and then Area 1, you were in plain clothes, I
8    assume.  Right?
9  A.  Yes, ma'am.
10  Q.  And did you have a partner during your time
11    at Area 1 for any portion of those seven years?
12  A.  Once in a while.
13  Q.  Anyone that stands out as someone who
14    you were with for an extended period of time?
15  A.  One guy I remember, Roman.  I can't remember
16    his last name.  Most of them are all dead, so...
17  Q.  Okay.  So after Area 1, you went to Area 5,
18    is that right?
19  A.  Yes, ma'am.
20  Q.  All right.  What year was that?
21  A.  Well, from 2007, go back 20 years, so that
22    would be seven and -- '80 something, I think it was.
23    20 years I did in Area --
24  Q.  '89?
25  A.  I think so, yeah.  I did 20 years in Area 5.

Page 104

1  Q.  Okay.
2  A.  Or 27 years.  Oh, no, I was 27 years as a
3    detective, I'm sorry.  20 years in Area 5.
4  Q.  Okay.  And when you went to Area 5 in, I'm
5    approximating, 1989, what unit were you assigned
6    to?
7  A.  Property crimes.
8  Q.  Okay.  And at that point, there had been a
9    switch in how the areas were organized, is that
10    right?
11  A.  That is correct.
12  Q.  Okay.  And Area 5 had a violent crimes
13    division?
14  A.  Yes.
15  Q.  And then it had a property crimes division?
16  A.  Correct.
17  Q.  And property crimes, did that involve
18    burglaries?
19  A.  Yes, ma'am.
20  Q.  What other type of crimes constituted
21    property crimes at Area 5?
22  A.  Shoplifting theft, auto theft, a few other.
23    I don't remember all of them.
24  Q.  Okay.  And then violent crimes was -- were
25    homicides, right?

Maysonet v.
Guevara

Video Deposition

Page 105

1   A.  Homicide, robbery, and criminal sexual
2   assault, criminal sexual cases.
3   Q.  Okay.  Now, when you got to Area 5, was
4   Detective Guevara there as well already?
5   A.  No, ma'am.
6   Q.  He came after you?
7   A.  Yes, ma'am.
8   Q.  He was meritoriously promoted after you,
9   right?
10  A.  I don't know.
11      MR. BRUEGGEN: Object to foundation.
12      BY MS. BONJEAN:
13  Q.  Was Sergeant Mingey working at Area 5 when
14  you were assigned there?
15  A.  No, ma'am.
16  Q.  What about Lee Epplen?
17  A.  I think he was midnight sergeant, I think.
18  Q.  And Detective Paulnitsky, was he there?
19  A.  I don't recall.
20  Q.  What about Ernie Halvorsen?
21  A.  I think Ernie was there.  I'm not sure.
22      (Off stenographic record discussion.)
23      BY MS. BONJEAN:
24  Q.  So to the best of your recollection, maybe
25  Sergeant Epplen and Ernie Halvorsen were at Area 5

Page 106

1   when you got there?
2   A.  Yes, ma'am.
3   Q.  All right.  And you're not sure about the
4   others, right?
5   A.  No, ma'am.
6   Q.  Either at the training at the academy to
7   become a detective or in your years as a detective
8   before coming to Area 5, did you learn how to put
9   together photo arrays?
10      MS. CARNEY: Objection, form.
11      THE WITNESS: Yes.
12      BY MS. BONJEAN:
13  Q.  Okay.  And, again, if you assembled a photo
14  array for a witness to look at, were you instructed
15  to memorialize or report that you had shown a
16  witness a photo array?
17  A.  Yes, ma'am.
18  Q.  And were you required to document what the
19  outcome of showing a witness the photo array?
20  A.  Yes, ma'am.
21  Q.  Would that be true if you were showing
22  witnesses mug books?
23  A.  Yes.
24  Q.  Okay.  Were you required to document when
25  you showed an off -- strike that.

Page 107

1   Were you required to document when you
2   showed a witness a book of mug shots?
3   A.  Yes.
4       MS. CARNEY: Objection, form.
5       MR. BRUEGGEN: Objection, form.
6       THE WITNESS: Yes, ma'am.
7       BY MS. BONJEAN:
8   Q.  And were you required to document that
9   irrespective of whether they identified somebody or
10  didn't identify somebody?
11      MR. BRUEGGEN: Object to form.
12      MS. CARNEY: Join.
13      BY MS. BONJEAN:
14  Q.  You can answer.
15  A.  Yes, ma'am.
16  Q.  So even if someone looked at a photo array
17  and didn't identify somebody, you were still
18  expected to document that in a report, right?
19      MR. BRUEGGEN: Object to form.
20      THE WITNESS: Yes.
21      BY MS. BONJEAN:
22  Q.  Okay.  Can I assume that's true of doing
23  live lineups as well?
24      MR. BRUEGGEN: Object to form.
25      THE WITNESS: Yes, ma'am.

Page 108

1       BY MS. BONJEAN:
2   Q.  If you assemble a lineup and have a witness
3   look at a lineup, you were expected to document
4   that lineup, right?
5       MR. BRUEGGEN: Object to form.
6       THE WITNESS: Yes, ma'am.
7       BY MS. BONJEAN:
8   Q.  And that would be true whether or not the
9   witness identified someone from the lineup or not,
10  right?
11      MR. BRUEGGEN: Object to form.  Go
12  ahead.
13      THE WITNESS: That is correct.
14      BY MS. BONJEAN:
15  Q.  And of course, if they did identify someone
16  from the lineup, you were expected to document
17  that, correct?
18  A.  That is correct.
19  Q.  And that's even if they didn't identify the
20  suspect, right?
21  A.  Correct.
22  Q.  And in your time as a detective, did you
23  follow that rule?
24  A.  Did I do it?
25  Q.  When you were a detective, did you follow

Page 109

1    the rule of documenting all of the investigative
2    procedures --
3    A.  Yes, ma'am.
4    Q.  -- that you took --
5        MR. BRUEGGEN: Object to form.
6        MS. BONJEAN: Okay.  I didn't finish my
7    question, so --
8        MR. BRUEGGEN: I know, but he was
9    answering.  I'm sorry.
10       MS. BONJEAN: Okay.
11       MR. BRUEGGEN: Why don't we try it
12   again.
13       BY MS. BONJEAN:
14   Q.  I'm talking specifically about
15   identification, investigative tools such as lineups
16   and photo arrays that we just discussed.  Okay?
17   In your time as a detective, did you always
18   document when you showed someone a photo array?
19       MR. BRUEGGEN: Object to form.
20       MS. CARNEY: Object to form.
21       THE WITNESS: That's correct.
22       BY MS. BONJEAN:
23   Q.  Okay.  And when -- when you showed a witness
24   a lineup, did you always document that?
25       MR. BRUEGGEN: Same objection.

Page 110

1        THE WITNESS: That's correct.
2        BY MS. BONJEAN:
3    Q.  I'm going to -- I want to ask you a couple
4    questions moving forward and then we're going to go
5    backwards, but you said you were at Area 5 for 20
6    years.  Right?
7    A.  Yes, ma'am.
8    Q.  Were you in property crimes the entire time
9    you were there?
10   A.  No, ma'am.
11   Q.  Well, where did you go and when did you go
12   there?
13   A.  When I was in property crimes, they moved me
14   into the violent crime.  I can't remember what year,
15   because I was doing a lot of interpreting and I was
16   handling a lot of robberies while I was working in
17   property crimes, and they wanted me to come to
18   the -- to the violent crimes.
19   Q.  Do you know when you switched to violent
20   crimes?
21   A.  No, ma'am.  Maybe, I don't know, five, six
22   years after, seven years later.  I can't remember.
23   Q.  Okay.  So into the '90s, though, right?
24   A.  That could be, yes, ma'am.
25   Q.  Okay.  It wasn't in your first two years

Page 111

1    there, is that right?
2    A.  No, ma'am.
3    Q.  Did you ever -- and part of violent crimes
4    would have also been homicide investigations,
5    right?
6    A.  I didn't do the homicide investigations at
7    first.
8    Q.  Got it.
9    When you first went to violent crimes some
10   time in the '90s, you did mostly robberies, is that
11   right?
12   A.  Yes, ma'am.
13   Q.  All right.  And did you have the opportunity
14   to work with the gang crimes units when you were at
15   Area 5?
16   A.  No, ma'am.
17   Q.  All right.  Okay.  I want to specifically
18   ask you about Area 5 a little bit in -- again, I
19   want to use the time frame around 1990, okay,
20   when -- I guess that's shortly after you were
21   assigned there.  Is that right?
22   A.  Yes.
23   Q.  Okay.  Where was Area 5 located?
24   A.  Grand and Central.  5555 West Grand Avenue.
25   Q.  And Grand and Central housed the violent

Page 112

1    crimes unit, right?
2    A.  How what, ma'am?
3    Q.  It housed, it was where Area -- violent
4    crimes was, right?
5    A.  Yes, ma'am.
6    Q.  Okay.  And property crimes, correct?
7    A.  And property crimes.
8    Q.  Was there a district there as well, like
9    police --
10   A.  Downstairs, the 25th district.
11   Q.  So it was in the same building?
12   A.  Yes, ma'am.
13   Q.  So there was a downstairs.  Can I assume
14   there was an upstairs as well?
15   A.  Yes, ma'am.
16   Q.  And what was upstairs?  Was that the
17   detective division?
18   A.  On one side, detective division.  The other
19   side, we had juveniles section and the commander's
20   office.
21   Q.  And on the ground floor was the 25th
22   district?
23   A.  25th district.  And then you had the lockup
24   and you had the court.
25   Q.  Got it.

Page 113

1  So the lockup was on the ground floor,
2  correct?
3  A.  Yes, ma'am.
4  Q.  And there was some courtrooms down there as
5  well?
6  A.  They were farther on the other side.
7  Q.  All right.  Now, violent crimes was on the
8  second floor, correct?
9  A.  Yes, ma'am.
10 Q.  And can you describe for me what the violent
11 crimes unit looked like?
12    MR. BRUEGGEN: Object to form.
13    THE WITNESS: When you come in the
14 stairs or the elevator, you make a right, you go in
15 through the doors.  On the right-hand side when you
16 walk in, it's called the special desk.  They pick
17 up all the phone calls that are coming in.
18    Straight ahead was the -- a room where
19 they kept photos and special books in there.  Then
20 you made a -- you turned left.  Desks on the
21 right-hand -- on the left-hand side, the detectives
22 did their work.  On the right-hand side were a
23 couple of interview rooms and then the room for the
24 sergeants from property -- violent crimes and the
25 lieutenant.  Then you had the bathrooms.  Then you

Page 114

1  had a couple of more interview rooms, I think it
2  was.  Then the -- the office for property crimes.
3  Then you had more interview rooms.
4    Straight in the back was the general
5  progress, guys that did general reports.  To the --
6  when you went in the room to the left was a -- the
7  lineup room.  Then straight in the back was photos
8  and everything you can get back there.
9    And you walk down from the hall in the
10 property crimes, they had -- the youth division
11 office was there after a while.
12    BY MS. BONJEAN:
13 Q.  Now, when you were doing your work preparing
14 reports, where would you do that at?
15 A.  In the property crimes section.
16 Q.  Okay.  And did you have a desk there?
17 A.  Oh, there were desks.  You just took whatever
18 desk was open.
19 Q.  And you didn't have like a private office,
20 but you had -- you were in the main area where
21 there were --
22 A.  Yes, ma'am.
23 Q.  Okay.  And then the violent crime guys had
24 their desks in a different room?
25 A.  Their section, yes.

Page 115

1  Q.  And were there interview rooms off of each
2  of the property division and the violent crimes?
3  A.  Yes, ma'am.
4  Q.  The lineup room, can you describe it for me?
5  A.  Well, there's a big room there, and they --
6  you have guys that are typing certain reports in
7  there.  I forgot what they called these guys.  They
8  just -- they did all the work on the telephone.
9  Just when you looked to the left was a big
10 window with the blind, or a shade, I mean, something
11 like that.  And then you walk around the corner and
12 you go into it, this is the lineup room.  It has a
13 bench, and that's where you put the -- the suspects
14 or whatever, the people you want them to look, and
15 that was it.
16 Q.  Now, there was a viewing room where the
17 witnesses would view the lineup, right?
18 A.  Yes.  Yes.
19 Q.  And was there glass that separated the
20 viewing room from where the suspects or the fillers
21 were seated or standing?
22 A.  Yes.
23 Q.  Were -- were the rooms connected in any way
24 or were they --
25 A.  No, ma'am.  Just split up with the wall and

Page 116

1  the glass.
2  Q.  Okay.  And if you were seated in the portion
3  of the room or the -- where the suspects or the
4  lineup participants were either seated or standing,
5  could they see into the viewing room?
6  A.  No, ma'am.
7  Q.  Why not?
8  A.  It was a one-way glass.
9  Q.  What is that?
10 A.  It means so they can't see the -- the
11 witnesses, the victims or whatever who's looking at
12 the lineup.
13 Q.  So someone could be viewing a lineup and
14 they can see into the room where the lineup
15 participants are seated or standing, but the lineup
16 participants can't see into the viewing room to see
17 the witnesses or victims or whoever may be viewing
18 the lineup, is that right?
19 A.  That is correct.
20 Q.  Okay.  Could they hear what --
21 A.  No.
22 Q.  Okay.  So just so the record's clear, if you
23 were in the area where the lineup was being
24 conducted and you were part of the lineup, you
25 wouldn't be able to hear what was going on in the

Maysonet v.
Guevara

Video Deposition

Page 117

1  viewing room, is that right?
2  A.  That is correct.
3  Q.  And vice versa?
4  A.  Vice versa, yes.
5  Q.  Sometimes the witnesses -- or strike that.
6    Sometimes people who are in lineups are
7    asked to say something in lineups, right?
8  A.  Yes.
9  Q.  And that's for the benefit of the witness,
10   correct?
11 A.  Yes.
12 Q.  And how would they be able to hear that
13   if --
14 A.  We turn on the speaker that you can only
15   hear, you know, in the room.
16 Q.  Got it.
17   So there was a way for someone in the
18   viewing room to hear what was going on in the room
19   where the lineup participants were seated or
20   standing?
21 A.  That is correct.
22 Q.  But not vice versa, right?
23 A.  No.
24 Q.  At no point could anybody who was in the
25   room that was participating in the lineup hear what

Page 118

1  was going on in the viewing room, right?
2  A.  Yes.
3  Q.  And when conducting a lineup, was it
4    customary for a police officer to be in the room
5    where the lineup participants were?
6    MR. BRUEGGEN: Object to form.
7    MS. CARNEY: Object to form.
8    THE WITNESS: It all depends.
9    BY MS. BONJEAN:
10 Q.  Okay.  It depends on what?
11 A.  If we need one in there or not.
12 Q.  Well, correct me if I'm wrong.  When
13   someone's participating in a lineup, sometimes
14   they're asked to turn to the right or turn to the
15   left, right?
16 A.  Yes.
17 Q.  Okay.  And would that direction come from
18   the viewing room or was there somebody in the room
19   where the participants were standing?
20 A.  We speak through the microphone and let them
21   know to turn left or right.
22 Q.  Okay.  In what circumstances would a police
23   officer actually be in the room where the lineup
24   participants were?
25   MR. BRUEGGEN: Object to form.

Page 119

1    BY MS. BONJEAN:
2  Q.  If you can think of one.
3  A.  Well, it depends.  I have no idea.
4    Whatever -- you know, if needed.  If you need one,
5    you need one.  If you don't, you don't.  I can't put
6    a finger on it.
7  Q.  Well, why would you ever need one in there?
8    MS. CARNEY: Object to form.
9    THE WITNESS: In the event someone
10   wanted something or someone was violent that we
11   have to keep an eye on.
12   BY MS. BONJEAN:
13 Q.  For safety reasoning?
14 A.  Yes.
15 Q.  Okay.
16 A.  Yeah.
17 Q.  And can you think of any other reasons aside
18   from safety that a police officer would be in the
19   room where the lineup --
20 A.  No.
21 Q.  -- participants are?  Okay.
22 A.  No.
23   THE REPORTER: You have to repeat that.
24   MS. BONJEAN: Yeah.
25   /////

Page 120

1    BY MS. BONJEAN:
2  Q.  Wait for me to finish the question.
3  A.  Yeah, okay.
4  Q.  I know -- I know you know where I'm going --
5  A.  I know.  I know.  Yes, ma'am.
6  Q.  -- but it's hard on her.  Okay.  I'll ask it
7    one more time just so the record's clear.
8    Apart from safety concerns, can you think of
9    any other reason why a police officer would be in
10   the room where the lineup participants were seated
11   or standing?
12 A.  No, ma'am.
13 Q.  All right.  Now, based on your testimony,
14   it's fair to say that there would be a detective in
15   the viewing room, correct?
16 A.  Correct.
17 Q.  And what's the purpose of the detective in
18   the viewing room?  What's his job when he's
19   conducting a lineup?
20 A.  He just stands there.
21   MR. BRUEGGEN: Object to form.
22   THE WITNESS: He's just waiting, that's
23   all, in case he needs instructions.
24   BY MS. BONJEAN:
25 Q.  Okay.  And does the detective have to give

Page 121

1   the witness instructions?
2   A.  No.  We do.
3   Q.  Right.  What I'm saying is:  When you're
4   conducting a lineup, is it part of the procedure to
5   tell the witness certain instructions to determine
6   whether they can make an identification?
7   A.  Yes, ma'am.
8   Q.  Okay.  And is that done in the viewing room?
9   A.  Yes, ma'am.
10  Q.  All right.  And if some instruction needs to
11  be made to the participants in the lineup, it was
12  done by a microphone or speaker?
13  A.  Yes.
14      MR. BRUEGGEN: Object to form,
15  misstates the testimony.
16      THE WITNESS: Yes, ma'am.
17      BY MS. BONJEAN:
18  Q.  All right.  And this two -- this glass,
19  which was, you said, one-way glass?  Is it one-way
20  or two-way?
21  A.  We can see them.  They can't see us.
22  Q.  Right.  Okay.  Is it -- it's a special --
23  it's treated in a special way so that people from
24  inside the lineup area can't see in, right?
25  A.  Yes.

Page 122

1       MR. BRUEGGEN: Object to foundation.
2       MR. BRENER: Objection to foundation.
3       BY MS. BONJEAN:
4   Q.  But is it just regular glass, is it extra
5   thick?
6       MR. BRUEGGEN: Object to foundation.
7       MR. BRENER: Join.
8       BY MS. BONJEAN:
9   Q.  If you know.
10  A.  It has a film on it, I think.
11  Q.  A film, okay.  But you can knock on it,
12  right?
13  A.  Yes.
14  Q.  Okay.  And people in the room could hear you
15  knocking.  That's -- is that fair?
16  A.  Yes, ma'am.
17  Q.  Okay.  In your time at Area 5, did you ever
18  witness any detectives conduct a fake lineup?
19      MR. BRUEGGEN: Object to form.
20      THE WITNESS: Pardon me?
21      MS. CARNEY: Object to form.
22      BY MS. BONJEAN:
23  Q.  Did you ever witness any detectives conduct
24  like a fake lineup?
25      MR. BRUEGGEN: Object to form.

Page 123

1       MS. CARNEY: You can answer.
2       MR. BRUEGGEN: You can answer.
3       THE WITNESS: No, ma'am.
4       BY MS. BONJEAN:
5   Q.  Do you know what I mean by "fake lineup"?
6   A.  Yes, ma'am.
7   Q.  Okay.  What do I mean by -- what do you
8   think I meant by "fake lineup"?
9   A.  Having suspects in there that aren't really
10  suspects or anything, and then you get a witness,
11  and you probably tell the witness this is the guy
12  that did it.
13  Q.  Well...
14  A.  Or something similar to that.
15  Q.  Okay.  That's one way.  Let me be more
16  clear.
17  Did you ever see a detective assemble a
18  lineup, where there was actually no -- nobody
19  actually viewing the lineup, no witness viewing the
20  lineup?
21  A.  No, ma'am.
22  Q.  Okay.  Because you could do that, right?
23      MR. BRUEGGEN: Object to form.
24      BY MS. BONJEAN:
25  Q.  The people participating in the lineup can't

Page 124

1   see who's in the viewing room, right?
2   A.  That's correct.
3   Q.  Okay.  So what I'm asking is:  Did you ever
4   witness a circumstance where a detective pretended
5   a witness was there viewing a lineup?
6       MR. BRUEGGEN: Objection, asked and
7   answered and form.
8       MS. CARNEY: You can answer.
9       THE WITNESS: No, ma'am.
10      BY MS. BONJEAN:
11  Q.  Okay.  And I'm assuming you've never done
12  that, where you put together a lineup, told the
13  suspect he was standing in a lineup and that a
14  witness was going to view the lineup, but there
15  really was no witness?
16  A.  Never.
17  Q.  And you've never witnessed that?
18  A.  That's correct.
19      MR. BRUEGGEN: Objection, asked and
20  answered.
21      BY MS. BONJEAN:
22  Q.  And if a detective did such a thing, would
23  that be a tactic that was consistent with the rules
24  and regs or policies of the Chicago Police
25  Department?

Page 125

1    MR. BRUEGGEN: Object to form.
2    MS. CARNEY: Object to form.
3    MR. BRUEGGEN: Foundation.
4    THE WITNESS: Can you rephrase that for
5  me just a little bit?
6    BY MS. BONJEAN:
7  Q.  If a detective did do that, what I just
8  described, they told a suspect to stand in a lineup
9  and that there was going to be a witness looking at
10  that lineup, but that was in fact false, there was
11  no witness, would that be consistent with the
12  policies of the Chicago Police Department?
13    MR. BRUEGGEN: Object to form,
14  foundation.  You can answer.
15    THE WITNESS: Yes, ma'am.
16    BY MS. BONJEAN:
17  Q.  It would be?
18  A.  I think so.
19  Q.  You think it's --
20  A.  I've never -- no.
21  Q.  Is it -- is it your understanding that that
22  is an appropriate investigative practice, to tell a
23  suspect that he's standing in a lineup, he put him
24  in a lineup, and there's no actual witness viewing
25  the lineup?

Page 126

1    MR. BRENER: Form and foundation.
2    MR. BRUEGGEN: Join.
3    MR. SCHALKA: Join.
4    MS. CARNEY: And asked and answered.
5  Go ahead.
6    THE WITNESS: I've never seen that.  I
7  never heard of it.
8    BY MS. BONJEAN:
9  Q.  I know you've never heard of it, but I'm
10  asking would it be okay to do that.  When I say
11  "okay," would it be consistent with the policies of
12  the Chicago Police Department to do that?
13    MR. BRUEGGEN: Objection, form,
14  foundation.
15    MR. BRENER: Foundation.
16    THE WITNESS: No, ma'am.
17    BY MS. BONJEAN:
18  Q.  Why not?
19    MR. BRUEGGEN: Same objections.
20    MR. BRENER: Join.
21    THE WITNESS: It's not a proper thing
22  to do.
23    BY MS. BONJEAN:
24  Q.  Why isn't it a proper thing to do?
25  A.  It's not an investigative tool.

Page 127

1  Q.  Are you allowed to lie to suspects in the
2  course of an investigation?
3  A.  No, ma'am.
4    MR. BRUEGGEN: Objection, form,
5  incomplete hypothetical.
6    BY MS. BONJEAN:
7  Q.  Are there any circumstances when you can lie
8  to a suspect during the course of an investigation?
9    MR. BRUEGGEN: Same objections.
10    THE WITNESS: No, ma'am.
11    BY MS. BONJEAN:
12  Q.  Okay.  So if a detective told a suspect,
13  "you were identified in that lineup," when in fact
14  there was no one actually even viewing the lineup,
15  you would agree that would be improper, right?
16    MR. BRUEGGEN: Object to form,
17  foundation.
18    MS. CARNEY: Join.
19    THE WITNESS: Yes, ma'am.
20    BY MS. BONJEAN:
21  Q.  And have you ever falsely told a suspect
22  that he was identified in a lineup, when in fact he
23  was not identified in a lineup?
24  A.  Never.
25  Q.  Have you ever seen a detective that you've

Page 128

1  worked with tell a suspect that he was identified
2  in a lineup, when in fact he was not?
3  A.  Never.
4  Q.  Would you agree that if you witnessed that
5  type of conduct, that is, a detective falsely
6  telling someone he was identified in a lineup,
7  that's something that you would have to report to a
8  supervisor?
9    MR. BRUEGGEN: Object to form.
10    THE WITNESS: I suppose so.
11    BY MS. BONJEAN:
12  Q.  Were you trained, either in the police
13  academy or in the detective bureau, detective
14  training, or in any in-service trainings, that you
15  had an obligation to report misconduct of your
16  fellow officers?
17    MS. CARNEY: Object to form.
18    MR. BRUEGGEN: Incomplete hypothetical.
19    MS. CARNEY: Go ahead.
20    BY MS. BONJEAN:
21  Q.  That wasn't a hypothetical.
22  A.  Yes, ma'am.
23  Q.  I was asking --
24  A.  Yes.
25  Q.  -- if you've ever been trained on that

Maysonet v.
Guevara

Video Deposition

Page 129

1 concept.
2 A. We've been told.
3 Q. Yeah. That if you see a police officer
4 doing something either illegal or in violation of
5 the policies and procedures, you had an obligation
6 to report that?
7     MR. BRUEGGEN: Object to form.
8     THE WITNESS: Yes, ma'am.
9     BY MS. BONJEAN:
10 Q. And in your career as a Chicago police
11 officer, did you ever have the occasion to report
12 misconduct by another officer?
13     MS. CARNEY: Object to form. Go ahead.
14     THE WITNESS: No, ma'am.
15     BY MS. BONJEAN:
16 Q. Not once?
17 A. Not once.
18 Q. And can I assume that's because not once in
19 your career did you ever witness any misconduct by
20 another police officer?
21 A. That is correct.
22     MS. CARNEY: Object to form.
23     THE WITNESS: That is correct.
24     BY MS. BONJEAN:
25 Q. And if you had witnessed misconduct by

Page 130

1 another police officer in your two-and-a-half
2 decades on the department, you would have reported
3 that?
4     MR. BRENER: Calls for speculation.
5     MS. CARNEY: Object to form.
6     THE WITNESS: Yes, ma'am.
7     BY MS. BONJEAN:
8 Q. Okay. Now, I think you testified that it's
9 your understanding that there's never a situation
10 when you should be -- you're permitted to lie to a
11 suspect. Is that right?
12     MR. BRUEGGEN: Object to form.
13     THE WITNESS: Yes, ma'am.
14     BY MS. BONJEAN:
15 Q. Okay. Like, for instance, can you falsely
16 tell a suspect that his fingerprints were found at
17 the scene, when that in fact is not true?
18     MR. BRUEGGEN: Object to form.
19     THE WITNESS: No, ma'am.
20     BY MS. BONJEAN:
21 Q. Okay. What about this: Are you permitted
22 to tell a suspect that he's been implicated in a
23 crime by somebody else, when that in fact is not
24 true?
25     MR. BRUEGGEN: Object to form.

Page 131

1     THE WITNESS: No, ma'am.
2     BY MS. BONJEAN:
3 Q. That would be improper, right?
4 A. Yes, ma'am.
5     MR. BRUEGGEN: Same objection.
6     BY MS. BONJEAN:
7 Q. What about telling a woman that if she
8 doesn't cooperate in your investigation, you're
9 going to report her to DCFS or take her kids away,
10 would that be proper?
11     MR. BRENER: Incomplete hypothetical.
12     MS. CARNEY: Object to form.
13     THE WITNESS: No, ma'am.
14     BY MS. BONJEAN:
15 Q. Okay. Can you think of any circumstance
16 under which it would be proper to threaten to take
17 someone's child away just to gain their cooperation
18 in an investigation?
19     MR. BRUEGGEN: Object to form.
20     THE WITNESS: No, ma'am.
21     BY MS. BONJEAN:
22 Q. Are you currently employed at all?
23 A. No, ma'am.
24 Q. Okay. Retired, fully retired?
25 A. Yes, ma'am.

Page 132

1 Q. Can I assume also that you would agree that
2 there's never a circumstance under which you can
3 use physical force against someone, a suspect, in
4 an interrogation or questioning?
5     MR. BRUEGGEN: Object to form.
6     MR. BRENER: Form.
7     THE WITNESS: That is correct.
8 Q. And let me -- let me -- let me put a finer
9 point on it.
10 Of course if you're defending yourself or
11 something of that nature, but -- maybe physical
12 force would be warranted, but my question is: Is
13 there ever a circumstance under which you can use
14 physical force or physical abuse to induce someone
15 to make a statement against their interests?
16     MR. BRUEGGEN: Object to form and
17 compound. You can answer.
18     THE WITNESS: Never.
19     BY MS. BONJEAN:
20 Q. Okay. What about witnesses, is there ever a
21 circumstance under which you are permitted to use
22 either force or threats of force to gain their
23 cooperation in giving a statement or cooperating in
24 an investigation?

1     MR. BRUEGGEN: Objection, form,
2  compound.
3     THE WITNESS: No, ma'am.
4     BY MS. BONJEAN:
5  Q.  Now, when you went to Area 5 in 1989, did
6  you work with a partner?  I may have asked that,
7  but I don't think I did.
8  A.  It's on and off.  It all depends.
9  Q.  Okay.  And do you remember what shift you
10  worked when you went to Area 5?
11  A.  Third watch.
12  Q.  Kind of the midnights?
13  A.  4 to 12.
14  Q.  Oh, 4 to 12.
15     What were the different watches in 1990?
16  A.  First watch is midnights.  Second watch is
17  days.  Third watch is afternoons.
18  Q.  4 to 12?
19  A.  4 to 12.
20  Q.  How long did you work the third watch?
21  A.  On and off, almost all my 20 years.
22  Q.  Gotcha.
23     In 1990, were you working the third watch?
24  A.  Yes.
25  Q.  Now, specifically 1990 was a violent time in

1  the city, right?
2  A.  Pardon me?
3  Q.  1990 was a violent time in the city of
4  Chicago, correct?
5     MR. BRENER: Form and foundation.
6     MR. BRUEGGEN: Object to form and
7  foundation.  Go ahead and answer.
8     THE WITNESS: I assume.
9     BY MS. BONJEAN:
10  Q.  Well, you were policing the city in 1990.
11  Would you agree it was a particularly violent time?
12     MS. CARNEY: Object to form.
13     MR. BRUEGGEN: Object to form.
14     THE WITNESS: I don't patrol the city
15  as a detective.
16     BY MS. BONJEAN:
17  Q.  As a detective, are you aware of what the
18  crime rates were --
19  A.  Yes.
20  Q.  -- in the city?  Okay.
21     And crime rates are one way to tell if a
22  city is experiencing a fair amount of violence,
23  correct?
24  A.  It depends on the area --
25  Q.  Right.

1  A.  -- what is happening, yes.
2  Q.  Sure.
3  A.  You're kept up on that.
4  Q.  Yeah.  In fact right now, you read about it
5  a lot in the newspaper, about all the violence in
6  the city, right?
7  A.  That is correct.
8  Q.  Okay.  And would you agree that in 1990, it
9  was -- there was a lot of violence in different
10  parts of the city as well?
11     MR. BRUEGGEN: Object to form.
12     THE WITNESS: Yes.
13     BY MS. BONJEAN:
14  Q.  Some years crime rates are higher than
15  others, right?
16  A.  That is correct.
17  Q.  Okay.  And crime rates can be measured in a
18  number of different ways, right?
19  A.  That's correct.
20  Q.  Would you agree that, for instance, the
21  number of homicides in a year might be one way to
22  measure the crime rates in the city?
23  A.  I assume.
24  Q.  Okay.  And in 1990, there were approximately
25  850 homicides that year?

1  A.  I didn't --
2     MS. CARNEY: Objection, foundation.
3     THE WITNESS: I didn't keep track.
4     BY MS. BONJEAN:
5  Q.  Okay.  Well, do you remember -- do you
6  remember being busy?
7  A.  Well, yeah, we were always busy.
8  Q.  Right.  And what were you busy doing?
9  A.  I was doing investigations in burglary and
10  robberies.
11  Q.  Right.  And are burglaries and robberies
12  crimes?
13  A.  Yes, ma'am.
14  Q.  Okay.  So were you busy investigating
15  crimes?
16  A.  Well, yes.
17  Q.  Okay.  And -- and how did Area 5 rank in
18  terms of crime compared to other areas?
19     MR. BRENER: Foundation.
20     MR. BRUEGGEN: Objection, form.
21     BY MS. BONJEAN:
22  Q.  In 1990.
23  A.  I'd have to look at reports.  I wouldn't -- I
24  couldn't say how -- you know, categorize it.
25  Q.  Well, I'm not asking you to, you know, be

Page 137

1  precise about it, but do you remember Area 5 being
2  a busy area?
3      MS. CARNEY: Object to form.
4      THE WITNESS: Certain districts in Area
5  5.
6      BY MS. BONJEAN:
7  Q.  Okay.  Right, but -- but certain districts
8  had more crime than others, correct?
9  A.  Correct.
10 Q.  Okay.  But Area 5, in total, did it have
11 among -- among all the areas a fair amount of
12 violent crimes?
13     MR. BRENER: Foundation.
14     MR. BRUEGGEN: Object to form.
15     THE WITNESS: I can't say, I mean.
16     BY MS. BONJEAN:
17 Q.  All the same from Area 1?
18 A.  No, ma'am.  Somehow -- some areas had more
19 crime than other areas.
20 Q.  That's what I'm asking.
21 A.  Okay.
22 Q.  Some crime -- some areas had more crime than
23 others, right?
24 A.  Yes.
25 Q.  And some had less crimes than others, right?

Page 138

1  A.  That's correct.
2  Q.  Okay.  Where did Area 5 rank?  And you don't
3  have to be precise, but was it at the upper end,
4  the lower end, in the middle?  What do you
5  remember?
6      MR. BRUEGGEN: Object to form.  Go
7  ahead.
8      THE WITNESS: Probably in the middle.
9      BY MS. BONJEAN:
10 Q.  It was just in the middle?
11 A.  I think so.
12 Q.  No more homicides than, say, other --
13 A.  Ma'am, I can't speculate on that.  I never
14 paid -- you know, counted or read all that stuff.
15 You know, we would be told that some crimes happened
16 here, okay, you know how many crimes happened there,
17 and that was it.
18 Q.  So as a police detective, you just didn't
19 really discuss how much crime was in the area that
20 you were policing?
21 A.  No, ma'am.
22 Q.  No.  It wasn't an important part of your
23 job?
24     MR. BRENER: Objection.
25     MS. CARNEY: Objection.

Page 139

1      MR. BRUEGGEN: Objection, form,
2  argumentative.
3      MS. BONJEAN: Just asking.
4      THE WITNESS: It's an important part of
5  your job, but...
6      BY MS. BONJEAN:
7  Q.  Didn't your supervisors want -- strike that.
8  Was part of your responsibilities as a
9  detective to try to solve crimes?
10 A.  Yes, ma'am.
11 Q.  Okay.  And would you agree that part of the
12 responsibilities of the Chicago Police Department
13 was to reduce crime?
14     MR. BRUEGGEN: Object to form.
15     BY MS. BONJEAN:
16 Q.  Yes?
17 A.  Yes, ma'am.
18 Q.  Those were -- those were the goals, right?
19 A.  Yes, ma'am.
20 Q.  Okay.  So given that those were the goals of
21 the police department, are you testifying that it
22 just wasn't discussed much, how much crime was in
23 your particular area?
24     MS. CARNEY: Objection.
25     MR. BRENER: Misstates prior testimony.

Page 140

1      MS. CARNEY: Misstates the testimony,
2  argumentative, asked and answered.
3      THE WITNESS: That's discussed at roll
4  calls.
5      BY MS. BONJEAN:
6  Q.  Right.  Right.
7  A.  Yeah.
8  Q.  It was discussed at roll calls, right, but
9  you don't have a sense, as you sit here today,
10 whether Area 5 had more crime than, say, Area 1 or
11 2?
12     MR. BRENER: Asked and answered.
13     THE WITNESS: I'd say that we're about
14 the middle.  I couldn't say.
15     BY MS. BONJEAN:
16 Q.  Okay.  Do you remember there being a fair
17 amount or a good amount of gang activity in Area
18 5 --
19     MR. BRUEGGEN: Object to form.
20     BY MS. BONJEAN:
21 Q.  -- in 1990?
22     MR. BRUEGGEN: Same objection.
23     MR. BRENER: Join.
24     THE WITNESS: I assume.
25 /////

Page 141

1    BY MS. BONJEAN:
2  Q.  Why do you assume?
3  A.  I never investigate gangs, and so...
4  Q.  Uh-huh.  Do gang members ever commit
5   burglaries?
6  A.  Some, I think.
7  Q.  Do gang members ever commit property crimes?
8  A.  Oh, they did probably -- probably they did to
9   get money.
10  Q.  Uh-huh.  Do -- so, again, was it -- as you
11   sit here today, back in 1990, do you remember there
12   being a lot of gang violence in Area 5 in the early
13   '90s?
14  A.  Yes.
15    MS. CARNEY: Object to form.
16    BY MS. BONJEAN:
17  Q.  You can answer.
18  A.  Yes.  14th district was one heavy one.
19  Q.  Okay.  What about the 25th?
20  A.  Pardon me?
21  Q.  What about the 25th?
22  A.  Moderate, I think.
23  Q.  Humboldt Park had a lot of gang activity,
24   right?
25  A.  Yes.  That's -- yeah.  That was the 14th

Page 142

1   district.
2  Q.  Okay.  And just to be clear, you had no
3   history or experience as a gang crime specialist or
4   officer, right?
5  A.  That is correct.
6    MR. BRUEGGEN: Object to form.
7    MS. CARNEY: Object to form.
8    BY MS. BONJEAN:
9  Q.  Okay.  And according to you, you didn't --
10   you didn't actually investigate gang-related crimes
11   unless they happened to be a burglary, right?
12  A.  That's correct.
13  Q.  Okay.  Now, you have to admit, gang members
14   are often or frequently accused of robberies
15   during -- you must have come across some gang
16   activity when you were investigating robberies,
17   right?
18    MS. CARNEY: Object to form.
19    MR. BRUEGGEN: Object to form.
20    MR. SCHALKA: Object to form.
21    THE WITNESS: I never looked at it that
22   way.
23    BY MS. BONJEAN:
24  Q.  How did you look at it?
25  A.  As a -- as a crime and I'm trying to find the

Page 143

1   perpetrator.  That was how I took it.
2  Q.  But knowing whether someone was motivated
3   because of their gang affiliation might be
4   something that would feature into an investigation,
5   right?
6    MS. CARNEY: Object to form.
7    MR. BRENER: Foundation.
8    THE WITNESS: I never looked at it that
9   way, ma'am.
10    BY MS. BONJEAN:
11  Q.  Never considered whether or not their gang
12   affiliation --
13  A.  No, never, not until, you know, if you make
14   an arrest or something, then someone would say,
15   yeah, he's in a gang.
16  Q.  Uh-huh.  Okay.
17   You'd agree that there is a correlation
18   between gang activity and crime, though, right?
19    MR. BRUEGGEN: Object to foundation.
20    MS. CARNEY: Object to form,
21   foundation.
22    MR. BRENER: Join.
23    MS. CARNEY: You can answer.
24    THE WITNESS: Yes, there is.
25  /////

Page 144

1    BY MS. BONJEAN:
2  Q.  Okay.  Gang -- gangbangers commit crimes,
3   right?
4  A.  Yes, ma'am.
5  Q.  In fact, gang activity is associated with
6   drug crimes, right?
7    MR. BRUEGGEN: Object to form.
8    MS. CARNEY: And foundation.
9    BY MS. BONJEAN:
10  Q.  Gang activities can be associated with drug
11   crimes, right?
12  A.  I assume.
13  Q.  All right.  What's your understanding of who
14   runs the drug trade in Humboldt Park in the 1990s?
15    MR. BRUEGGEN: Object to form and
16   foundation.
17    MS. CARNEY: Object to form,
18   foundation.
19    MR. BRENER: Join.
20    BY MS. BONJEAN:
21  Q.  If you know.
22  A.  I didn't know, ma'am.
23  Q.  You don't have any knowledge?
24  A.  No.  I -- I wasn't in gangs.  I, like I said,
25   I didn't know, you know, what gangs were doing what,

Page 145

1  who was controlling drugs.
2  Q.  Well, were there -- was there somebody other
3  than gang members selling drugs in Humboldt Park in
4  the 1990s or you just don't know?
5      MR. BRUEGGEN: Foundation.
6      MS. CARNEY: Object to form,
7  foundation.
8      THE WITNESS: I don't know, ma'am.
9      BY MS. BONJEAN:
10 Q.  Did you know then and you don't remember now
11 or is it -- I'm confused.
12     MR. BRUEGGEN: Object to form.
13     BY MS. BONJEAN:
14 Q.  Like is it something you've forgotten or you
15 just -- or you didn't even know then who was doing
16 the drug dealing?
17 A.  I didn't know who was doing the drugs.  There
18 were drugs, but, you know, I didn't go looking to
19 see who's doing the drugs, because they had the --
20 the gangs unit that does all that investigation.
21 Q.  Is there any correlation between burglaries
22 and property crimes and drug use?
23     MR. BRUEGGEN: Object to --
24     MS. CARNEY: Object to form,
25 foundation.

Page 146

1      THE WITNESS: They need money.  They do
2  whatever they did to get money.
3      BY MS. BONJEAN:
4  Q.  Right.  People who need drugs sometimes do
5  property crimes to --
6  A.  Yes.
7  Q.  -- feed their drug habit, right?
8  A.  Yes.
9  Q.  Okay.  What about shootings, did you have an
10 opportunity to investigate shootings when you were
11 at Area 5?
12 A.  Yes.
13 Q.  Okay.  And was that part of when you were in
14 violent crimes?
15 A.  Yes.
16 Q.  Okay.  That would have been more in the
17 mid-'90s?
18 A.  Yes.
19 Q.  Now, in 1990, when you started working at
20 Area 5 and you were assigned to investigate a case,
21 can you tell me how that -- how that worked.  How
22 did you get assigned to investigate a case, who
23 assigned you and what was the process?
24     MR. BRUEGGEN: Object to form.  It
25 misstates his testimony.

Page 147

1      MS. BONJEAN: It's a question.  I
2  didn't -- wasn't characterizing it.
3      MR. BRUEGGEN: You said when he started
4  working in 1990.
5      BY MS. BONJEAN:
6  Q.  When you started working in Area 5 in the --
7  in 1989 or 1990, tell me what the process was for
8  getting assigned to investigate a case.
9      MR. BRUEGGEN: Objection, form.
10     BY MS. BONJEAN:
11 Q.  You can answer.
12     MR. BRUEGGEN: Answer.
13     THE WITNESS: It's assigned by a
14 sergeant.
15     BY MS. BONJEAN:
16 Q.  Okay.  And how did that happen?  Did he just
17 come up to you at roll call?  When did it happen?
18 How did it happen?
19 A.  They're handed out to you or put in your
20 mailbox, and when you get those jobs, that's what
21 you handle.
22 Q.  Okay.  And once you got assigned to an
23 investigation, what were you expected to do?
24     MR. BRUEGGEN: Object to form,
25 incomplete hypothetical.

Page 148

1      THE WITNESS: You have to investigate,
2  see what happened, find out what's -- if there's
3  any suspects or anything on that case.
4      BY MS. BONJEAN:
5  Q.  Were there any other ways in which you would
6  get assigned to a case other than getting a slip of
7  paper in your mailbox?
8      MR. BRUEGGEN: Object to form and
9  foundation.
10     THE WITNESS: Something just happened,
11 a sergeant would assign you on the streets.
12     BY MS. BONJEAN:
13 Q.  So if there was a crime that just occurred
14 and they needed someone to go out to the scene, you
15 might -- he might say go?
16 A.  Yes.
17 Q.  Okay.  Now, as part of your investigative
18 responsibilities after being assigned to a case,
19 did you prepare reports?
20 A.  Did I...
21 Q.  Prepare reports.
22 A.  Yes, ma'am.
23 Q.  Okay.  And we discussed a little bit about
24 report writing earlier.
25     What type of reports are there?  What's the

Page 149

1 world of -- what type of reports are there?
2 A. I had to make a --
3 MR. BRUEGGEN: Object to form.
4 THE WITNESS: I had to make a
5 supplementary report.
6 BY MS. BONJEAN:
7 Q. Okay. So -- well, let me ask it this way.
8 Is there something called a general offense case
9 report?
10 A. They came in later, I think. Later on
11 that -- after they changed things around in the
12 department, I think.
13 Q. Well, there's an initiating report, right?
14 A. That's -- that's your original report.
15 Q. Right, the original report.
16 A. Correct.
17 Q. I called it a general offense case report.
18 A. That's general offense.
19 Q. Maybe I'm wrong, but --
20 A. Yes, general offense.
21 Q. -- but there's an original report, right?
22 A. That's correct.
23 Q. And then everything after the original
24 report is called something else, right?
25 A. Yes.

Page 150

1 Q. Okay. What other types of reports are there
2 after there's an original report filed?
3 A. Upon my investigation, I make a supplementary
4 report based on what I find out.
5 Q. What type of information goes into a
6 supplemental report?
7 A. Interviewing witnesses, the victim, see what
8 was -- what the person -- what was stolen or what
9 was lost in the crime; if I need to contact -- I
10 need an evidence technician, you contact an evidence
11 technician, you make your report. And once you
12 start interviewing witnesses, I prepare a GPR,
13 general offense report. I list --
14 Q. Progress report?
15 A. Yeah. I put that there because I used that
16 for typing up my reports. I can't remember what I'm
17 doing all day long, I write it down, and use that
18 for my investigative purposes.
19 Q. Would you agree that the supplemental report
20 is meant to document your investigation?
21 A. That's correct.
22 Q. And is it important for the reports to be as
23 accurate as possible?
24 A. Yes, ma'am.
25 Q. And you mentioned general progress reports

Page 151

1 as well?
2 A. That's correct.
3 Q. Those are called GPRs?
4 A. GPRs, yeah.
5 Q. Okay. What is a GPR?
6 A. It's an investigative tool that we had. It
7 was assigned -- came out from headquarters, and it
8 had a report and we have to make a GPR. We have to
9 document who we -- what we found at the crime, who
10 we -- who we interview, who responded to the crime
11 when you're there. You list all that
12 chronologically, and that goes into another -- a
13 second supplementary report and that's attached to
14 it.
15 Q. Now, the general progress reports, that's a
16 form that you could handwrite on, right?
17 A. That's correct.
18 Q. Because I'm assuming back in 1990, you
19 didn't walk around with a Smartphone or a
20 typewriter or anything like that?
21 A. That's correct.
22 Q. And if you interviewed a witness to a crime
23 and you wanted to take notes, you had to write it
24 on a piece of paper, right?
25 A. That's correct.

Page 152

1 Q. And the general progress report is the form
2 that was used to document interviews, right?
3 A. Yes, ma'am. Everything.
4 Q. Anything, right?
5 A. That's correct.
6 Q. And then you would use those GPRs later to
7 prepare your formal supplemental report, right?
8 A. That's correct.
9 Q. And what was your understanding of what
10 would happen to the general progress report after
11 you wrote on it?
12 A. You attach it to your closing supplementary
13 or your -- in between supplementaries, goes in
14 there, it goes -- follows a report and it's put in
15 the file.
16 Q. Were you allowed to just toss it or throw it
17 away?
18 A. You never throw it away.
19 Q. Can't throw away a GPR?
20 A. No, ma'am.
21 Q. That, in fact, would be a gross violation of
22 the policies of the Chicago Police Department?
23 MR. BRENER: Objection.
24 MR. BRUEGGEN: Objection, form.
25 MS. CARNEY: Objection, form.

Maysonet v.
Guevara

Video Deposition

---

Page 153

1  MR. BRUEGGEN: You can answer.
2  THE WITNESS: Yes, ma'am.
3  BY MS. BONJEAN:
4  Q.  Okay.  And in your career as a detective,
5  did you ever throw away a general progress report?
6  A.  Never.
7  Q.  Okay.  So if you prepared a general progress
8  report, you would attach it to the final
9  supplemental report that you had prepared, correct?
10 A.  Or in between reports.  Whatever -- any time
11 you make a general progress report, it goes with
12 your supplementary -- that you made a general
13 progress, that goes through -- that goes with the
14 file.
15 Q.  Okay.  And forgive me, because I'd never --
16 I wasn't there.  Does it actually go in -- when you
17 prepare a GPR, do you put it in a basket?  Do you
18 put it somewhere?  Where did you actually put it
19 when you were finished with it?
20 A.  You attach it to your reports.  It goes to
21 the -- to the supervisor.  He does the approval,
22 then it's handed over to another detective and where
23 he puts it in a file.
24 Q.  Okay.  Now, in the course of your
25 investigative work on a case, you might have a

---

Page 154

1  number of general progress reports, right?
2  A.  That's correct.
3  Q.  Now, do you hold on to them and then hand
4  them over at the close of the case, or do you
5  submit them during the course of the investigation
6  as you prepare them?
7  A.  As you -- you prepare them, and you hand them
8  in as soon as you finish them.
9  Q.  Okay.  Do they always go with the
10 supplemental report, the typewritten supplemental
11 report?
12 A.  Yes.
13 MR. BRUEGGEN: Object to form.
14 THE WITNESS: Yes.
15 BY MS. BONJEAN:
16 Q.  Okay.  So once you take the information from
17 a GPR and you incorporate it into a supplemental
18 report, when you're finished with that supplemental
19 report, the whole collection of materials goes to a
20 supervisor, is that right?
21 A.  Yes.
22 Q.  Okay.  And then the supervisor reviews the
23 materials, I assume?
24 MR. BRUEGGEN: Object to form and
25 foundation.  Go ahead.

---

Page 155

1  THE WITNESS: Yes.  He has to go
2  through -- there's a form that we -- they put in
3  there that's attached to the file which states a
4  GPR, what you did, who responded.  It's all
5  chronologically attached there.  The GPR,
6  everything goes with that file.
7  BY MS. BONJEAN:
8  Q.  And then after the -- the supervisor has to
9  approve it, right?
10 A.  That's correct.
11 Q.  And after a supervisor approves the
12 supplemental report with the attached GPRs, what
13 happens to that collection of documents?
14 MR. BRUEGGEN: Objection, foundation.
15 MS. CARNEY: Objection, foundation.
16 MR. BRUEGGEN: Go ahead.
17 BY MS. BONJEAN:
18 Q.  If you know.
19 A.  That goes to another detective in the -- in
20 the back room, where they file everything, and in
21 case we need to pull that report later on, it's
22 right back there.  We can find the report with
23 everything in there.
24 Q.  Okay.  And those reports -- strike that.
25 Those files that you just referenced, are

---

Page 156

1  you talking about the investigative files?
2  MR. BRUEGGEN: Object to form.
3  THE WITNESS: Everything, from the --
4  from the original report all the way through
5  whatever detective made the last supplementary.
6  BY MS. BONJEAN:
7  Q.  It all has to go to the same file, correct?
8  A.  That's correct.
9  Q.  And did the file have a name or was it --
10 A.  It went by an RD number.
11 Q.  Okay.
12 A.  Records division number, an RD.
13 Q.  And if you were looking for the file on a
14 case, would you just ask for the file or would you
15 say investigative file, or what would you call it?
16 A.  Just the -- the report.  That's all you want.
17 You look for the general -- the -- the number of the
18 case, and they pull it out for you and give you the
19 whole file.  It's supposed to be all together.  You
20 don't ask for an investigative file.  You ask for
21 the entire file.  It comes all together.
22 Q.  Right.  Yeah, that's what I'm asking.
23 So if you wanted to look at -- if you
24 were -- wanted to look at a case and you wanted to
25 see the investigative file or the file -- I'm

---

Rizman Rappaport (973)992-7650
"When every word counts"

Page 157

1  calling it an investigative file.  You just called
2  it a file.  Is that how you referenced it --
3  A.  Yes.
4  Q.  -- back then?
5  A.  Yes.
6  Q.  Okay.  And you said it was organized by RD
7  number?
8  A.  Pardon me?
9  Q.  It was organized by RD number?
10  A.  Yes, ma'am.
11  Q.  And did this room where they kept these
12  files have open and closed cases?
13  A.  Yes.
14  Q.  Okay.  So -- and just to be clear, there was
15  an actual room that housed or kept the files that
16  contained the reports that documented an entire
17  investigation from start to finish, right?
18  A.  Yes.
19  Q.  Do you remember something called an
20  inventory index card?
21  A.  Yes.
22  Q.  Okay.  What is that?
23  A.  When you sign out a file, you put your name
24  on that you took this file out to review the file or
25  you're going to follow up on something.

Page 158

1  Q.  Okay.  So was there a system in place that
2  allowed the detective who ran the file room to
3  determine who had a file at any time?
4  A.  From the sign-out sheets.
5  Q.  Right.  That's that I'm asking.  There were
6  sign-out sheets?
7  A.  Yes.
8  Q.  Okay.  What about -- did the files have a
9  log of everything that was supposed to be in the
10  file, every report that was supposed to be in the
11  file?
12  A.  Yes.  There's a sheet in there --
13  Q.  And what's that called?
14  A.  -- documenting everything.  I can't remember.
15  I know there's a sheet in it.  We had to fill that
16  out.
17  Q.  Yeah.  And what color was that sheet, do you
18  know?
19  A.  I think it was green.  I'm not sure.
20  Q.  Okay.  And was it sort of a log of every
21  report that was in there?
22  A.  Yes.
23  Q.  And who fills out -- who filled out that log
24  or that sheet?
25  A.  The detective.  Whenever you signed that file

Page 159

1  out, you filled that -- you have to put that in
2  there.
3  Q.  Okay.  So let's say you -- you completed a
4  supplemental report and you gave it to the
5  supervisor.  Right?
6  A.  That's correct.
7  Q.  And he approves it, and then it goes to this
8  detective in the file room, right?
9  A.  That's correct.
10  Q.  And then it's supposed to go into the file
11  that has the RD number associated with it, correct?
12  A.  That's correct.
13  Q.  Who would make the notation that we're
14  putting Detective Montilla's supplemental report
15  into this file right now on that green piece of
16  paper?
17  A.  I think the detective in that -- in the room
18  where the file was at.
19  Q.  Okay.  It wasn't something you filled out.
20  It was the detective --
21  A.  No, he has to fill that out.
22  Q.  Okay.  Got it.
23  And does it stay in the file?
24  A.  Everything has to stay with the file.
25  Q.  Now, if you wanted to go get a file on a

Page 160

1  case that, for instance, you weren't necessarily
2  investigating, but that somehow became to relevant
3  to one of your investigations, did you have the
4  ability to go get that file?
5  MR. BRUEGGEN: Object to form.
6  THE WITNESS: Yes.  I had to fill out
7  that form, let the guy know I'm taking out the
8  file.  I put a card in there saying I have the
9  file.
10  BY MS. BONJEAN:
11  Q.  So he knows who has the file?
12  A.  Yes.
13  Q.  And it doesn't go missing, right?
14  A.  That's correct.
15  Q.  And -- and then when you were finished with
16  the file, you just returned it?
17  A.  Yes, ma'am.
18  Q.  Now, when you returned it, do you know
19  what -- was there any process that the person who
20  was running that room did to ensure that all the
21  documents stayed in that file?
22  A.  I don't know.
23  MR. BRUEGGEN: Object to form,
24  foundation.
25  THE WITNESS: I have no idea.  All I do

Page 161

1  is I put in the date and the time that I returned
2  it.
3      BY MS. BONJEAN:
4  Q.  Okay.  Are there any circumstances under
5  which it would be allowable to take a document out
6  of one of those files and then return it without
7  that document?
8      MR. BRUEGGEN: Object to form.
9      MS. CARNEY: You can answer.
10     THE WITNESS: No, ma'am.
11     BY MS. BONJEAN:
12 Q.  Why not?
13 A.  You just don't take a file out from a file
14 that's an original report.  Stays in there.
15 Q.  Yeah.  Why is that so important?
16 A.  Because it's an important investigative tool
17 that stays with that file.
18 Q.  Okay.  That would -- that wouldn't be
19 permissible under the policies of the department to
20 remove a report from a file, right?
21 A.  That's correct.
22     MR. BRENER: Foundation.
23     THE WITNESS: That is correct.
24     MR. BRUEGGEN: Jennifer, are you going
25 to move on to a new section or are you -- so we can

Page 162

1  take a break and let him stretch out.
2      MS. BONJEAN: Hold on one second.
3      BY MS. BONJEAN:
4  Q.  Just a couple more and then I'll let you
5  take a break.  Okay?
6  A.  Okay.
7  Q.  In your experience using GPRs, did you
8  utilize them to document your interviews with
9  witnesses?
10 A.  Yes.
11 Q.  Okay.  And did you write on them at the same
12 time that you were interviewing the witness?
13 A.  Yes.
14 Q.  Okay.  So it was a contemporaneous or
15 simultaneous documentation of your interview with
16 the witness.
17 A.  That's correct.
18 Q.  That's how you used it, right?
19 A.  Yes.
20 Q.  And I think you stated earlier it was an
21 important tool because you can't keep everything in
22 your head.  Right?
23 A.  That is correct.
24 Q.  You need to later refer to that GPR so that
25 you can take the information and put it into your

Page 163

1  supplemental report?
2  A.  Yes.
3  Q.  Okay.  Give me one second.
4  Once you submitted a supplemental report
5  with your GPRs to your supervisors or supervisor,
6  what would happen if new information came along
7  that you wanted to document?  Could you go back to
8  that supplemental report or you just start a new
9  one?
10 A.  Can you try to repeat that again?  I lost
11 you.
12 Q.  Sure, uh-huh.
13 After you submitted your supplemental
14 report, okay, and any attached GPRs to your
15 supervisor, what would you do if you had new
16 information related to the investigation?
17 A.  I make a supplementary report and put that RD
18 number and give it to the sergeant.  He looks at it,
19 file, and it goes with the file.
20 Q.  Okay.  But my question is, is:  You -- you
21 would start a new supplemental report, right?
22 A.  Yes.
23 Q.  You wouldn't go back and pull a supplemental
24 report and add information to it, correct?
25 A.  That's correct.

Page 164

1  Q.  Once -- once you've submitted a supplemental
2  report to your supervisor for approval, you do not
3  go back and amend that report, right?
4  A.  That is correct.
5  Q.  Okay.  You can -- you can just start a new
6  report, correct?
7  A.  Pardon me?
8  Q.  You just start a new report if you --
9  A.  You have to.  You have to start a new report.
10 Q.  Yeah.  And why are you not permitted to go
11 back to approved reports to add to them?
12     MR. BRUEGGEN: Object to form.  Go
13 ahead.
14     THE WITNESS: You cannot add to a
15 report that's been approved.
16     BY MS. BONJEAN:
17 Q.  Right.  And why is that?
18 A.  Because it's not warranted.  It's not
19 feasible.
20 Q.  And would it violate the policies and
21 practices of the department?
22 A.  Oh, yeah.
23 Q.  Okay.
24     MR. BRUEGGEN: Is this a good time for
25 a break?

Page 165

1     MS. BONJEAN: Yes, we can take a break.
2     THE VIDEOGRAPHER: We are going off the
3   record at 1:33 p.m.
4     (Recess taken from 1:33 to 1:47.)
5     THE VIDEOGRAPHER: We're now back on
6   the record at 1:47 p.m.
7     MS. BONJEAN: Mr. Montilla, I wanted to
8   introduce you to my co-counsel, Steve Greenberg,
9   who has joined us. I don't know if you met before
10  he came in here.
11    MR. GREENBERG: I think we've met in
12  the past, but...
13    MS. BONJEAN: Okay. All right.
14  BY MS. BONJEAN:
15  Q. I had a couple follow-up questions about
16  report writing.
17    When you prepare your supplemental report
18  off of your GPRs and you're getting ready to submit
19  it, what -- what date do you put in the box that
20  says "date submitted"?
21  A. Can you repeat that? I lost one little
22  portion.
23  Q. Sure. When you have prepared a supplemental
24  report --
25  A. Okay.

Page 166

1   Q. -- and you're getting ready to submit it to
2   your supervisor, okay --
3   A. Yes.
4   Q. -- or a supervisor, you have to date it,
5   right, put the date on it?
6   A. Yes.
7   Q. The date you're submitting it, correct?
8   A. That's correct.
9   Q. And do you use the date that you're actually
10  submitting it?
11  A. Yes.
12  Q. Okay. Are there any circumstances under
13  which, for instance, you could backdate a report?
14  A. No, ma'am.
15  Q. Not supposed to do that, right?
16  A. Not supposed to, no.
17  Q. What about dating it on a date in the
18  future, that's not acceptable either, right?
19  A. That's correct.
20  Q. You use the date that you're actually
21  submitting it?
22  A. The day you hand it to the sergeant, he has
23  to sign it.
24  Q. Okay. All right. Now, I asked you some
25  questions earlier about how detectives get assigned

Page 167

1   to a case.
2   A. How what?
3   Q. How detectives get assigned to a case.
4   A. Yes.
5   Q. Okay. And I think you mentioned that one
6   way is you get a notice in your box that you've
7   been assigned to an investigation. Right?
8   A. That's correct.
9   Q. And if a crime happens while you happen to
10  be in the department, that might be another way in
11  which you would get assigned to the case, right?
12  A. That's correct.
13  Q. And your -- the sergeant who is on duty
14  might say you need to go respond, correct?
15  A. Yes.
16  Q. Okay. What is a scene detective?
17  A. Pardon me?
18  Q. A scene detective.
19  A. There is no scene detective.
20  Q. No such thing?
21  A. No, ma'am.
22  Q. What about detectives --
23    MS. BONJEAN: Can you guys stop? I
24  can't concentrate.
25  /////

Page 168

1   BY MS. BONJEAN:
2   Q. When a crime occurs and people get assigned
3   to go to the scene, do you call them scene
4   detectives?
5   A. No.
6   Q. Okay.
7   A. Detectives.
8   Q. Just detectives, okay.
9     There's nothing about -- is there something
10  called a scene report?
11  A. Crime scene.
12  Q. Yeah, a crime scene report.
13  A. That's when a crime officer -- he does the
14  crime scene report.
15  Q. Okay. What about a canvass report?
16  A. That's just a canvass report. Everybody --
17  we all respond to a canvass report if we -- to help
18  out on the case.
19  Q. Okay. Would you agree that sometimes
20  investigations don't get closed or solved in a
21  24-hour period?
22  A. That's correct.
23    MS. CARNEY: Object to form. Sorry.
24    THE WITNESS: Oh, sorry.
25  /////

Maysonet v.
Guevara

Video Deposition

---

Page 169

BY MS. BONJEAN:

1 BY MS. BONJEAN:
2 Q. Sometimes investigations can extend weeks or
3 months, right?
4 A. That is correct.
5 Q. Okay. And there are detectives who may be
6 assigned to investigate a case when it first
7 occurs, a crime first occurs, right?
8 A. Yes.
9 Q. And there might be a different set of
10 detectives that come in at a later point, right?
11 A. Yes.
12 Q. Okay. Who ultimately is responsible for an
13 investigation? What set of detectives is
14 ultimately responsible for an investigation?
15 MR. BRENER: Form.
16 MS. CARNEY: Object to form.
17 MR. BRUEGGEN: Object.
18 BY MS. BONJEAN:
19 Q. If you understand.
20 A. An investigation is a continuing file.
21 There's always a detective following up.
22 Q. So there's no one detective on a case
23 who's -- it's not like the first detectives who are
24 assigned to the case are responsible for that case?
25 A. That's correct.

---

Page 170

1 Q. And would you agree that in any
2 investigation there could be a number of different
3 detectives who are assigned to work on that case?
4 A. That's correct.
5 Q. And the detective who closes the case may
6 not be the same detective who was initially
7 assigned to the case?
8 A. That's correct.
9 Q. Now, when you're first assigned to a case as
10 an investigator or detective, is part of your
11 responsibility or a part of what you would do be to
12 look at the victim, like find out as much as you
13 can about the victim?
14 MR. BRUEGGEN: Object to form.
15 THE WITNESS: What kind of crime?
16 BY MS. BONJEAN:
17 Q. It depends on the crime?
18 A. Yes, ma'am.
19 Q. Okay. What about in a homicide
20 investigation?
21 A. Yes.
22 Q. You'd want to know who the victim was,
23 right?
24 A. That's correct, yes.
25 Q. And what types of information do you want to

---

Page 171

1 know about the victims?
2 A. Where the victim is at, where you found --
3 where they found them, if he's been shot or stabbed.
4 If there's any evidence around them, you have to
5 mark it.
6 Q. What about the criminal history of a victim,
7 would you want to know like what his arrest history
8 looks like?
9 A. Pardon me?
10 Q. Would you want to know what the arrest
11 history of a victim is potentially?
12 A. Down the line later on. First your
13 investigation is to find out who the person is.
14 Q. Right, but at some point you might -- do you
15 want to know whether the person is gang involved,
16 for instance?
17 A. Once you learn the identity, yes.
18 Q. Right, but --
19 A. You pull everything, if he's got a record.
20 Q. Right. You want to find out what the
21 criminal history of his victim, because that might
22 give you some information about something like, for
23 instance, motive, right?
24 A. Correct.
25 Q. And in fact, it was pretty customary as part

---

Page 172

1 of an investigation to run the criminal histories
2 of victims, right?
3 MR. BRUEGGEN: Object to form.
4 MR. BRENER: Join.
5 THE WITNESS: Yes.
6 BY MS. BONJEAN:
7 Q. And also suspects, of course, correct?
8 A. Yes.
9 Q. And even witnesses sometimes, right?
10 A. Yes.
11 Q. How are open investigations maintained? The
12 files, how were they maintained? Were they
13 maintained in a filing cabinet in that same
14 detective room we discussed earlier?
15 MR. BRUEGGEN: Object to form and
16 foundation. Go ahead.
17 THE WITNESS: They're kept by that --
18 the detective who take care of those files.
19 BY MS. BONJEAN:
20 Q. And that's open cases and closed cases?
21 A. That's -- closed cases, usually once they're
22 completely closed, they're in the basement.
23 Q. Got it, but if a case was open, it would be
24 in that detective room?
25 A. Yes.

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 173

1  Q. Was there any place where there -- where you
2  would know what cases were open at any given time?
3      MS. CARNEY: Object to form.
4      MR. BRUEGGEN: Go ahead.
5      THE WITNESS: I assume.
6      BY MS. BONJEAN:
7  Q. Was there like a board somewhere?
8  A. Those are the 24 hour that just happened.
9  There's a board just for that.
10 Q. Just for the crimes that occurred in --
11 A. Just occurred within 24 hours.
12 Q. Okay.
13     MS. CARNEY: Sorry. Do we have a time
14 frame on -- are we like '89, '90, '91, or --
15     MS. BONJEAN: We're in 1990.
16     MS. CARNEY: Okay.
17     MS. BONJEAN: Sticking to 1990. Okay?
18     MS. CARNEY: Thank you.
19     BY MS. BONJEAN:
20 Q. If at any point your answer is different
21 because in 1990 they did it one way and in 1995
22 they did it another way, you can let me know that,
23 but just assume I'm asking specifically about in
24 1990. Okay?
25 A. Okay.

Page 174

1  Q. Okay. Just to be clear, there was a board
2  that identified the crimes that had occurred within
3  the past 24 hours, is that right?
4  A. I assume, yes, that's correct.
5  Q. Okay. What about open homicide
6  investigations, was there any type of board that
7  reflected open homicide investigations in the
8  department?
9  A. I don't recall.
10 Q. Now, when you went to Area 5, I think you
11 testified that you believe Ernest Halvorsen and Lee
12 Epplen were - were already there.
13 Did you have occasion to investigate any
14 cases with Ernest Halvorsen apart from Jose
15 Maysonet's case?
16 A. No, ma'am.
17 Q. And at some point, I think you testified,
18 that Rey Guevara came to Area 5. Right?
19 A. Yes.
20 Q. Do you recall when he came to Area 5?
21 A. No, ma'am.
22 Q. Okay. Did you have any occasion to
23 investigate any cases with Detective Guevara prior
24 to Jose Maysonet's case?
25 A. No, ma'am.

Page 175

1  Q. Did you investigate any cases with Detective
2  Guevara after Jose Maysonet's case?
3  A. No, ma'am.
4  Q. So Jose Maysonet's case is the only case you
5  ever worked on with Detective Guevara?
6  A. Yes, ma'am.
7  Q. What about Detective Paulnitsky, did you
8  have an occasion to work on any cases with
9  Detective Paulnitsky prior to Jose Maysonet's
10 arrest?
11 A. I don't recall.
12 Q. Possible?
13 A. Possible.
14 Q. Was Paulnitsky violent crimes or property?
15 A. He was violent crime.
16 Q. Okay. And what about after Jose Maysonet's
17 arrest, which would have been in August of 1990,
18 did you have an occasion to work on any
19 investigations with Detective Paulnitsky?
20 A. No, ma'am.
21 Q. Okay. I'm going to ask the same question as
22 it relates to...
23     (Off stenographic record discussion.)
24     BY MS. BONJEAN:
25 Q. How about Sergeant Mingey, he was your

Page 176

1  sergeant at various points through your career,
2  right?
3  A. Yes.
4  Q. Okay. When you first went to Area 5 in
5  1990, who was your sergeant?
6  A. When I was in property crimes?
7  Q. Yeah.
8  A. I don't know. I can't remember.
9  Q. Okay.
10 A. We had -- property crimes was different than
11 violent crimes, so...
12 Q. Right. Was Mingey ever a sergeant at
13 property crimes?
14 A. No, ma'am.
15 Q. He was a robbery guy, right?
16 A. Violent crime guy.
17 Q. Violent crimes.
18 And when you worked in violent crimes, was
19 he one of your supervisors?
20 A. Yes, ma'am.
21 Q. Okay. But that would have been more
22 mid-'90s, right?
23 A. Yes.
24 Q. Okay. All right. Now, did you ever have an
25 occasion to see Rey Guevara commit any misconduct?

Video Deposition

---

Page 177

1     MS. CARNEY: Object to form.
2     THE WITNESS: No, ma'am.
3     BY MS. BONJEAN:
4  Q.  Never in your career?
5  A.  Never.
6  Q.  And that includes in the course of this
7   investigation?
8  A.  In where?
9  Q.  That includes in the course of this
10  investigation involving Jose Maysonet?
11  A.  Yes, ma'am.
12  Q.  And what about Ernest Halvorsen, did you
13  ever have an occasion to see Ernest Halvorsen
14  commit any misconduct?
15     MS. CARNEY: Object to form.
16     THE WITNESS: No, ma'am.
17     BY MS. BONJEAN:
18  Q.  And again that also includes in the course
19  of this investigation?
20  A.  Yes, ma'am.
21  Q.  Same for Roland Paulnitsky, did you ever see
22  Roland Paulnitsky commit any form of misconduct?
23     MS. CARNEY: Object to form.
24     THE WITNESS: No, ma'am.
25  /////

---

Page 178

1     BY MS. BONJEAN:
2  Q.  And, again, that's also the case for this
3   investigation, right?
4  A.  That's correct.
5  Q.  Okay.  Did you ever see any detective at
6   Area 5 commit any misconduct?
7  A.  No, ma'am.
8     MS. CARNEY: Object to form.
9     THE WITNESS: No, ma'am.
10     BY MS. BONJEAN:
11  Q.  As a matter of fact, I think you testified
12  earlier that you -- how long were you a Chicago
13  police officer?  How long in total were you a
14  Chicago police officer?
15  A.  34 years all total.
16  Q.  Okay.  And in your 34 years as a Chicago
17  police officer, you never once witnessed any
18  officer commit misconduct, right?
19  A.  Yes, ma'am.
20     MR. BRUEGGEN: Object to form.  Go
21  ahead.
22     THE WITNESS: Yes, ma'am, that's
23  correct.
24     MS. BONJEAN: That's correct.
25  /////

---

Page 179

1     BY MS. BONJEAN:
2  Q.  All right.  I'm going to turn now to the
3   underlying facts of this case a little bit.  Okay?
4   When did you learn that two African-American
5   men had been shot on North Avenue during the early
6   morning hours of March 25th, 1990?
7  A.  That same night.
8  Q.  How did you learn?
9  A.  I was working on the street and I heard the
10  call on the radio.
11  Q.  Were you in your police vehicle?
12  A.  I was in my unmarked squad car, yes.
13  Q.  Okay.  So you were in an unmarked car.  Were
14  you working alone or with someone?
15  A.  I don't -- I think I was working with
16  someone.  I don't recall who.
17  Q.  You don't remember who?
18  A.  No, ma'am.
19  Q.  And what do you recall about what you heard
20  over the radio?
21  A.  That two people were shot on North Avenue, I
22  think near Kimball, I think.  I'm not sure.  So we
23  respond.  As a detective, we have to respond to
24  assist.
25  Q.  Okay.  So did you actually respond to the

---

Page 180

1   scene?
2  A.  Yes, ma'am.
3  Q.  And that would have been shortly after you
4   heard the call?
5  A.  Yes, ma'am.
6     MS. BONJEAN: I'm going to have you
7   mark something.
8     Forget it.  Forget it.
9     I had copies of everything but this,
10  but I'll take a look at it.  I just want to -- I'm
11  going to have him look at it.
12     MS. CARNEY: I'm just going to write
13  the -- could we put the Bates number on the record
14  when you --
15     MS. BONJEAN: Sure.
16     MR. BRUEGGEN: Yeah.  You guys want to
17  pass it down, just look at it.
18     MS. BONJEAN: Okay.  Can you mark this,
19  please.
20     (Exhibit 1 marked.)
21     BY MS. BONJEAN:
22  Q.  Mr. Montilla, I'm going to hand you what
23  I've marked as Exhibit 1, if you could take a look
24  at that photograph.
25  A.  Okay.

---

Page 181

1 Q. Do you recollect that scene?
2 A. Yes, ma'am.
3 Q. Okay. And what is that picture?
4 A. You have those -- the responding officers,
5 they have the squad car there. Just to the west of
6 the front of -- right front of the squad car is one
7 of the gentlemen -- the black young guys that was
8 shot.
9 Q. Uh-huh.
10 A. And just to the -- off from the passenger
11 side, maybe about ten feet, there was the other
12 gentleman laying in the empty lot.
13 Q. Okay. And is that the scene you responded
14 to when you were in your unmarked vehicle on the
15 early morning hours of May 25th of 1990?
16 A. Yes, ma'am.
17 Q. Okay. And you said that you automatically
18 went there when you heard the radio. Is that
19 right?
20 A. Yes, ma'am.
21 Q. Or were you dispatched there by a sergeant?
22 A. I responded on my own.
23 Q. Okay. And that was customary to respond on
24 your own?
25 A. Yes, ma'am.

Page 182

1 Q. All right. And you didn't have to wait for
2 a sergeant to tell you to go to the scene, is that
3 correct?
4 A. No, that's correct.
5 Q. You weren't assigned to investigate the case
6 at this point, correct?
7 A. That is correct.
8 Q. But you went there because you've heard this
9 serious event had happened and you went to the
10 scene just upon hearing that, right?
11 A. Yes, ma'am.
12 MR. BRUEGGEN: Object to form. It
13 misstates his testimony, but go ahead.
14 THE WITNESS: Yes, ma'am.
15 BY MS. BONJEAN:
16 Q. And what did you do once you got there?
17 A. Waited around in case the detectives asked if
18 anybody needs everything. We help protect the crime
19 scene, and if they needed us to do any type of an
20 investigation, go around, see, you know, if we could
21 find witnesses or anything, we do, do a canvass.
22 Q. So is it fair to say you responded to the
23 scene in case you were needed to help investigate
24 or start investigating the case?
25 A. Yes.

Page 183

1 Q. All right. And you don't remember who you
2 went there with, right?
3 A. No, ma'am, I can't remember.
4 Q. Do you remember who else was on scene?
5 A. No, ma'am, I can't remember all.
6 Q. Okay. Do you know how long you were at the
7 scene?
8 A. 15, 20 minutes maybe.
9 Q. Okay. Did you take any investigative
10 actions while you were on the scene?
11 A. Not that I recall.
12 Q. Okay. Did you talk to anybody about what
13 these two men that were apparently victims of
14 gunshots that were laying on the street?
15 A. I don't recall.
16 Q. Okay. Do you remember learning anything
17 while you were there for that 15 or 20 minutes at
18 the scene of the crime?
19 A. No, ma'am.
20 Q. Okay. Now, after 15 or 20 minutes, do you
21 recall where you went?
22 A. I think I went back to the area.
23 Q. And you're talking about Grand and Central?
24 A. Yes, ma'am.
25 Q. And why did you go back to Grand and

Page 184

1 Central?
2 A. I think I was going to get off of work.
3 Q. Okay. What time would you have been getting
4 off?
5 A. Midnight.
6 Q. All right. So if this crime happened around
7 1 a.m., you would have been --
8 A. I might -- I think I worked a little -- or I
9 might have been working midnight. I don't remember.
10 Q. Okay. I was going to ask that. On May 25th
11 of 1990, do you recall what shift you were working?
12 A. I think I might have been working midnights.
13 Q. Okay. You weren't working the third watch
14 at that time?
15 A. Yeah, if I was that late, I had to be working
16 midnights.
17 Q. Is it possible that you just stayed later?
18 A. No, ma'am.
19 Q. You wouldn't have stayed later?
20 A. Not past my time.
21 Q. Now, when you were working a particular
22 shift, did you work that day-to-day or did it
23 change from time to time?
24 A. I worked it for a long time, third watch.
25 Q. All right. Okay. Did you know the victims?

Page 185

1 A. No, ma'am.
2 Q. Had you ever seen the victims prior to May
3 25th of 1990?
4 A. No, ma'am.
5 Q. Are you aware of having any contacts with
6 the victims prior to May 25th, 1990?
7 A. No, ma'am.
8 Q. Now, prior to May 25th, 1999, when you
9 responded to this scene, had you had any contacts
10 with Jose Maysonet?
11 MR. BRENER: Form.
12 MR. BRUEGGEN: And just to clarify, you
13 said 1999.
14 MS. BONJEAN: Okay. My apologies. Let
15 me start over.
16 BY MS. BONJEAN:
17 Q. Prior to responding to this scene on May
18 25th of 1990, did you have any contacts with Jose
19 Maysonet?
20 A. No, ma'am.
21 Q. Did you know who Jose Maysonet was?
22 A. No, ma'am.
23 Q. Did you have any prior contacts -- strike
24 that.
25 Did you have any contacts with an individual

Page 186

1 by the name of Alfredo Gonzalez prior to May 25th
2 of 1990?
3 A. No, ma'am.
4 Q. If I told you the nickname Lluvia or Lluvio,
5 does that ring a bell to you at all?
6 A. No, ma'am.
7 Q. Okay. What about Justino Cruz, do you know
8 if you had any contacts with him -- and when I say
9 "contacts," I mean any conversations, any -- any
10 type of interaction -- prior to May 25th of 1990?
11 A. No, ma'am.
12 Q. And what about an individual by the name of
13 Christopher Goossens?
14 A. No, ma'am.
15 Q. Okay. Do you recall having any contacts
16 with an individual by the name of Efrain Cruz prior
17 to May 25th of 1990?
18 A. No, ma'am.
19 Q. And how about Francisco Varas?
20 A. No, ma'am.
21 Q. Okay. So none of those names, as you sit
22 here today, are familiar to the extent that you
23 remember having contact with them prior to May
24 25th, 1990?
25 A. Can you repeat that again? You lost me

Page 187

1 someplace.
2 Q. Yeah, it wasn't a good question. Sure.
3 You don't remember talking to any of those
4 individuals that I've just mentioned prior to May
5 25th of 1990, right?
6 A. That's correct.
7 Q. Do you remember hearing anything about any
8 of those individuals prior to May 25th, 1990,
9 either from other detectives or other police
10 officers?
11 A. No, ma'am.
12 Q. Had you ever heard the name Jose Maysonet
13 prior to May 25th of 1990?
14 A. No, ma'am.
15 Q. Okay. You never heard his name mentioned
16 around Area 5 or anything like that?
17 A. Never.
18 Q. Okay. Now, after you left the scene of the
19 Wiley brothers' murders on May 25th, 1990, you said
20 you went back to the -- went back to Grand and
21 Central, correct?
22 A. That's correct.
23 Q. What is the next time where you heard any
24 information about this -- these murders?
25 A. No, ma'am.

Page 188

1 Q. When did you next hear anything about the
2 Wiley brothers' murders?
3 A. I don't understand.
4 Q. After May 25th, 1990 --
5 A. Yeah.
6 Q. -- did you ever receive any additional
7 information about the murders of these men?
8 A. No, ma'am.
9 Q. Never?
10 A. Never.
11 Q. Do you know who was responsible for
12 investigating this after you left the scene on May
13 25th --
14 A. No, ma'am.
15 Q. -- of 1990?
16 A. No, ma'am.
17 Q. Okay. Did any sergeant give you any
18 responsibilities to investigate this incident after
19 May 25th of 1990?
20 A. No, ma'am.
21 Q. Do you know who was assigned to investigate
22 the Wiley brothers' murders after May 25th of 1990?
23 A. No, ma'am.
24 Q. So when you left the scene in the early
25 morning hours of May 25th, 1990, you had no

Page 189

1  responsibilities as it relates to investigating the
2  case, correct?
3  A.  That is correct.
4  Q.  When's the next time that you heard anything
5  about this case?
6  A.  At Area 5, when I was asked to do some
7  interpreting.
8  Q.  Okay.  Now, we know from the reports that
9  you purportedly was present for an interview with
10  Mr. Maysonet on July 15th of 1990.
11  Does that sound right to you?
12      MR. BRUEGGEN:  Object, form.  Go ahead.
13      THE WITNESS:  That's about right.
14      BY MS. BONJEAN:
15  Q.  Okay.  So I want to focus on between May
16  25th, 1990, and July 15th, 1990, did you hear any
17  detectives at Area 5 discuss the investigation of
18  the deaths of these two individuals?
19  A.  No, ma'am.
20  Q.  Okay.  Did you witness with your own eyes
21  any investigative conduct in the department related
22  to this investigation or this murder?
23  A.  No, ma'am.
24  Q.  For instance, did you see any detectives
25  doing any lineups between May 25th, 1990, and July

Page 190

1  15th, 1990, that were in connection with the Wiley
2  brothers' murders?
3  A.  No, ma'am.
4  Q.  Okay.  So is it fair to say that between May
5  25th, 1990, and July 15th, 1990, you heard nothing
6  about the murders of Torrence and Kevin Wiley,
7  correct?
8  A.  That's correct.
9  Q.  And is it fair to say that you had no idea
10  who was responsible for investigating the deaths of
11  the Wiley brothers between May 25th, 1990, and July
12  15th, 1990?
13  A.  That's correct.
14  Q.  And do you know whether or not there were
15  any suspects in the murders of the Wiley brothers
16  that were identified between May 25th, 1990, and
17  July 15th, 1990?
18  A.  That's correct.
19  Q.  You did not know any?
20  A.  No, ma'am.
21  Q.  You knew nothing, correct?
22  A.  Nothing.
23  Q.  Okay.  So now let's get to July 15th, 1990.
24  All right?
25  At some point you came into contact with

Page 191

1  Mr. Maysonet, is that correct?
2  A.  Yes, ma'am.
3  Q.  Okay.  So on July 15th, 1990, do you recall
4  what shift you were working then?
5  A.  I think I was working third watch.
6  Q.  Okay.  Which means you would have arrived to
7  Grand and Central at what time approximately?
8  A.  Around 4.
9  Q.  And you would have left at what time
10  approximately?
11  A.  Midnight.
12  Q.  Okay.  So on July 15th, 1990, you had
13  occasion to have a contact with Mr. Maysonet.  Tell
14  me how that came about.  How did that happen?
15  A.  Can you repeat that for me, please?
16  Q.  Sure.  On July 15th, 1990, during your
17  shift, you had an opportunity to speak with
18  Mr. Maysonet, right?
19  A.  Yes.
20  Q.  Okay.  And how was it that you came to be in
21  a position to have a conversation with Mr. Maysonet
22  on July 15th of 1990?
23  A.  Detective Paulnitsky asked me to interpret
24  for him, Spanish to English, English to Spanish.  He
25  wanted to talk to a guy in the room.

Page 192

1  Q.  Okay.  And where were you when Detective
2  Paulnitsky asked you to interpret?
3  A.  I think I was in -- I was in Area 5,
4  somewhere on the floor.  I can't tell you where.
5  Q.  Okay.  And to the best of your knowledge,
6  was Detective Paulnitsky a Spanish speaker?
7  A.  No, ma'am.
8  Q.  Okay.  And what did he want to question the
9  guy about to the best of your understanding at the
10  time?
11  A.  About a shooting.
12  Q.  Okay.  And what did he say to you?
13  A.  Pardon me?
14  Q.  What did Detective Paulnitsky say to you?
15  A.  I don't remember, ma'am, word for word or
16  anything.
17  Q.  Well, not word for word, but generally what
18  did he say?  How did he come up to you and --
19  A.  He asked me if I want to interpret in case
20  the gentleman -- he asked a question and he wanted
21  me to interpret into Spanish in case the guy we're
22  interviewing didn't understand the questions, and I
23  would repeat it back in Spanish.
24  Q.  Okay.  And was it your understanding that
25  there was someone in custody who was a Spanish

Page 193

1 speaker?
2 A. Yes.
3 Q. Okay. And Detective Paulnitsky asked you to
4 interpret because he could not communicate with the
5 individual, is that fair to say?
6 A. That's what he said, yes.
7 Q. Okay. And did you oblige?
8 A. Yes.
9 Q. Okay. And where did this interview take
10 place?
11 A. In the -- on the crime section, in one of the
12 interview -- little interview rooms there.
13 Q. Okay. And who was present for the interview
14 apart from yourself?
15 A. I think it was Paulnitsky and I.
16 Q. Okay. And tell me what Detective Paulnitsky
17 asked -- well, strike that.
18 What's the first thing that you did when you
19 went into the room in terms of addressing
20 Mr. Maysonet?
21 A. We introduce ourselves.
22 Q. Okay.
23 A. And I would say if Detective Paulnitsky -- or
24 if he stated it in his English, I'd say it in
25 Spanish. If the guy didn't understand, I'd tell him

Page 194

1 I'm there to interpret from him to English to
2 Spanish and his replies back in English.
3 Q. Okay. Do you remember how long that
4 interview took with Paulnitsky, yourself and
5 Mr. Maysonet?
6 A. No, ma'am, didn't take very long.
7 Q. Okay. And you were speaking Spanish?
8 A. Yes, ma'am.
9 Q. Detective Paulnitsky was speaking English?
10 A. Yes, ma'am.
11 Q. So it went like this; correct me if I'm
12 wrong. Detective Paulnitsky would ask a question.
13 You would interpret it to Spanish --
14 A. Yes.
15 Q. -- or translate to Spanish?
16 A. Yes.
17 Q. And then Mr. Maysonet would respond in
18 Spanish, and then you would interpret it back in
19 English to Detective Paulnitsky?
20 A. Yes, ma'am.
21 Q. Okay. And you said this didn't happen very
22 long?
23 A. Yeah, it couldn't have been long.
24 Q. All right. What was the subject matter of
25 the interview?

Page 195

1 A. A shooting.
2 Q. Okay. And do you know where the shooting
3 took place?
4 A. No, ma'am.
5 Q. It wasn't this shooting?
6 A. I don't think so. It was a shooting. He
7 wanted me to talk to him about a shooting. That's
8 it.
9 Q. Okay. Do you know whether it was the
10 shooting that happened on North Avenue or a
11 different shooting?
12 A. I don't know, ma'am. I'm just doing -- just
13 asked to, you know, help out.
14 Q. Okay. But you don't remember the substance
15 of it at all?
16 A. No, ma'am.
17 Q. Okay. And did you prepare a report in
18 connection with this interview that you helped
19 conduct with Mr. Maysonet?
20 A. No, ma'am.
21 Q. Why not?
22 A. I'm an interpreter. I don't take notes
23 because when I'm interpreting, it's impossible to
24 write at the same time.
25 Q. Okay.

Page 196

1 A. It's up to the detective to do the report.
2 Q. So what do you remember about why
3 Mr. Maysonet was in custody other than there was
4 some type of shooting?
5 A. That's it.
6 Q. That's it?
7 A. Yes, ma'am.
8 Q. Anything else?
9 A. No, ma'am.
10 Q. Had you read any reports about the incident
11 that you were going to be questioning or helping
12 Paulnitsky question him about prior to entering
13 that interview room?
14 A. No, ma'am.
15 Q. Did you give Mr. Maysonet his Miranda rights
16 when you went into the interview room?
17 A. I -- I assume I did. I don't recall.
18 Q. Okay. Would you have done that in Spanish?
19 A. Yes.
20 Q. Okay. And would you have given him a form
21 to sign or would you have just spoken to him in
22 Spanish?
23 A. Just spoken to him.
24 Q. All right. And what do you remember
25 Mr. Maysonet saying in response to those questions

Page 197

1 by Detective Paulnitsky?
2 A. I don't recall, ma'am.
3 Q. Well, do you remember him confessing to a
4 crime?
5 A. Pardon me?
6 Q. Do you remember him confessing to a crime?
7 A. Ma'am, I don't remember that interview. All
8 I know is I just translated.
9 Q. Okay. You don't remember anything about the
10 interview?
11 A. Nothing about it, no.
12 Q. Do you remember whether he indicated that he
13 wanted his attorney present for the interview?
14 A. No indication.
15 Q. Okay. If he had wanted his attorney
16 present, what would you have done?
17 A. I would have stopped the questioning, walked
18 out of the room.
19 Q. Okay. And do you remember doing that?
20 A. I was -- never.
21 Q. You don't remember stopping the interview
22 because he asked for his attorney, is that right?
23 A. I don't remember the man asking for an
24 attorney.
25 Q. Okay. But you understand that if he had

Page 198

1 asked for an attorney, it would have -- that you
2 would have been obliged to stop the interview,
3 correct?
4 A. Oh, yeah.
5 Q. And would you have stopped the interview?
6 A. Yes. Let the detective know what the man
7 said and walk out of the room.
8 Q. Okay. Okay. So correct me if I'm wrong.
9 You had a short conversation and -- when you were
10 functioning primarily as an interpreter. Is that
11 right?
12 A. Yes.
13 Q. Would you say that your function in that
14 interview was solely as an interpreter?
15 A. Yes.
16 Q. You weren't doing any investigative work in
17 connection with the questions that were asked of
18 Mr. Maysonet by Detective Paulnitsky?
19 A. That's correct.
20 Q. Okay. Now, after that interview ended or at
21 least after your portion of it ended, what did you
22 do?
23 A. I probably went back to my regular
24 investigations.
25 Q. Okay. Do you have any recollection of what

Page 199

1 you did?
2 A. No, ma'am.
3 Q. Okay. And that was on July 15th, 1990?
4 A. If it's on the report, apparently, yes.
5 Q. All right. What happened next?
6 A. Next to what, ma'am?
7 Q. Anything else in connection with
8 Mr. Maysonet that day?
9 A. No, ma'am.
10 Q. That was it?
11 A. That was it.
12 Q. And do you remember Mr. Maysonet saying
13 anything of substance during that interview?
14 A. No, ma'am.
15 Q. As you sit here today, you just remembered
16 it was about a shooting?
17 A. Yes, ma'am.
18 Q. Okay. And you made no reports whatsoever,
19 correct?
20 A. That's correct.
21 Q. And did you prepare a GPR?
22 A. No, ma'am.
23 Q. Did you see Detective Paulnitsky preparing a
24 GPR?
25 A. I don't know, ma'am.

Page 200

1 Q. I mean, I'm asking if you remember.
2 A. No, I don't remember.
3 Q. And do you know whether he prepared any
4 supplemental reports?
5 A. I don't know, ma'am.
6 Q. Okay. Did you ever have an occasion to
7 speak with Mr. Maysonet after July 15th, 1990?
8 A. Yes.
9 Q. Okay. And where did that conversation take
10 place?
11 A. Sergeant Mingey asked me to go with him to 26
12 and Cal. He wanted to interview a gentleman out
13 there that was in custody.
14 Q. Uh-huh.
15 A. And that's when I responded there with him.
16 Q. Okay. What did you know about the
17 investigation of the Wiley brothers prior to August
18 1st, 1990?
19 A. Nothing.
20 Q. Okay. But you do remember Sergeant Mingey
21 saying he wanted to go interview somebody?
22 A. Yes.
23 Q. And he wanted you to interpret?
24 A. Yes.
25 Q. Was Sergeant Mingey a Spanish speaker?

Maysonet v.
Guevara

Video Deposition

---

Page 201

1  A.  No, ma'am.
2  Q.  All right.  And do you have a recollection
3   of going to Cook County?
4  A.  Yes, ma'am.
5  Q.  With Sergeant Mingey?
6  A.  Yes, ma'am.
7  Q.  And what did Sergeant Mingey tell you about
8   the purpose of the investigation or the interview?
9  A.  Just want to talk to him about a shooting.
10 Q.  Okay.  And what did you say in response to
11  that?
12 A.  Pardon me?
13 Q.  What did you say in response to Sergeant
14  Mingey telling you he wanted to talk to an inmate
15  at Cook County Jail?
16 A.  I'd go with him.
17 Q.  All right.  Was it customary or -- that
18  Sergeant Mingey was actively investigating cases?
19    MS. CARNEY: Object to form.
20    MR. BRUEGGEN: Foundation.  Go ahead.
21    THE WITNESS: Yes.
22    BY MS. BONJEAN:
23 Q.  Was he a hands-on type of supervisor?
24    MR. BRUEGGEN: Object to form,
25  foundation.  You can answer.

---

Page 202

1    THE WITNESS: Yes.
2    BY MS. BONJEAN:
3  Q.  He was someone that actually helped
4   investigate cases.  He didn't just sit at a desk
5   and approve reports, right?
6    MR. BRUEGGEN: Same objection.  Go
7   ahead.
8    THE WITNESS: I suppose so.
9    BY MS. BONJEAN:
10 Q.  I mean, he was going to interview somebody?
11 A.  Yeah.
12 Q.  Right?
13 A.  Yeah.
14 Q.  No other detective was going with him,
15  correct?
16 A.  No.
17 Q.  Just yourself?
18 A.  Well, let me, yeah.
19 Q.  But you were functioning as an interpreter,
20  right?
21 A.  That's correct.
22 Q.  Okay.  And so do you know how it was
23  arranged that you were going to meet with this
24  inmate at Cook County Jail?
25 A.  No, ma'am.

---

Page 203

1    MR. BRUEGGEN: Object to foundation.
2   You can go ahead.
3    THE WITNESS: No, ma'am.
4    BY MS. BONJEAN:
5  Q.  Okay.  So what happened when you got there?
6   And I'm talking about at Cook County Jail.
7  A.  Well, we had to lock our guns up.  We went
8   in.  They brought a form, I think.  The -- the
9   sheriffs brought a form to the gentleman we were
10  going to interview, and he had to sign this form
11  that he was going to talk to us.
12 Q.  Okay.  Did you see the sheriff bring the
13  form?
14 A.  They had the forms.  I brought it to him.  He
15  wasn't in the room with us.
16 Q.  Okay.  So before he got into the room, the
17  sheriff gave him a form to sign, correct?
18 A.  Yes.  Yes, ma'am.
19 Q.  Okay.  And were you present when the sheriff
20  gave the form to the inmate to sign?
21 A.  We were in the same area --
22 Q.  Okay.
23 A.  -- but I didn't see him hand it to him, but I
24  know, so...
25 Q.  Okay.  And what was the purpose of the form?

---

Page 204

1  A.  I think it's a waiver for -- to speak without
2   a lawyer.
3  Q.  Okay.  Did you have an understanding about
4   whether the inmate had a lawyer?
5  A.  No, ma'am.
6  Q.  I mean, is it a good assumption that --
7  A.  Well, yeah, he had a lawyer, yes, apparently.
8  Q.  I mean, if he was in Cook County Jail,
9   there's a good chance he had a lawyer, right?
10 A.  Yes.
11 Q.  It could have been the public defender's
12  office, but he probably was represented, right?
13 A.  Yes.
14 Q.  Did you later learn that this person was
15  Jose Maysonet?
16 A.  Yes.
17 Q.  Okay.  Did you know going to Cook County
18  Jail that you were going to interview Jose
19  Maysonet?
20 A.  No, ma'am.
21 Q.  You didn't even know who it was?
22 A.  That's correct.
23 Q.  Okay.  Did Sergeant Mingey tell you who the
24  individual was who you were going to interview?
25 A.  On our way there probably.

---

---

Page 205

1 Q. Okay. Did the name mean anything to you on
2   your way there?
3 A. No, ma'am.
4 Q. Didn't even remember the name?
5 A. That's correct.
6 Q. And did you -- do you remember that you had
7   previously served as an interpreter when you
8   interviewed him with Detective Paulnitsky?
9 A. I think so.
10 Q. Did you remember that when he said the name
11   or when you saw him?
12 A. When I saw him.
13 Q. Got it. Okay.
14   MS. BONJEAN: I'm going to mark this.
15   (Exhibit 2 marked.)
16   BY MS. BONJEAN:
17 Q. Okay. Mr. Montilla, I'm going to hand you
18   what I've marked as Exhibit 2. Do you see this
19   document?
20 A. Pardon me?
21 Q. Take a look at it. Do you recognize the
22   document?
23 A. The Cook County, yeah, Department of
24   Corrections, yeah.
25 Q. Okay. And is this the document you were

---

Page 206

1   referring to earlier that was the consent to be
2   interviewed?
3 A. Yes.
4 Q. Okay. And do you see Mr. Maysonet's name at
5   the top there?
6 A. Yes.
7 Q. And it says, "consent to be interviewed by
8   Sergeant Mingey." Do you see that right underneath
9   there?
10 A. Right at there, yes.
11 Q. Okay. And is this the document that the
12   Cook County sheriff had Mr. Maysonet sign?
13 A. Yes, ma'am.
14 Q. Okay. This wasn't a document you brought
15   with you, right?
16 A. No. We don't bring this, no.
17 Q. Now, this was -- this is --
18 A. Cook County.
19 Q. This is a Cook County Department of
20   Corrections document?
21 A. That is correct.
22 Q. Can we agree that it's written in English?
23 A. Yes.
24 Q. Okay. And down in the box below, it says,
25   "I, Inmate Jose Maysonet, do hereby consent to be

---

Page 207

1   interviewed without my attorney present. This
2   consent is without threat or promises and on my
3   freewill." And then it purports to have his
4   signature there. Do you see that?
5 A. Yes, ma'am.
6 Q. Okay. And then there's a date that says
7   August 1st, 1990?
8 A. Yes.
9 Q. Does that look right?
10 A. It looks, yes.
11 Q. Yeah. And then down at the bottom, it looks
12   like someone signed off and there's -- I can't read
13   the signature, but it says star 17. Do you see
14   that?
15 A. Yes.
16 Q. That's not you, right?
17 A. No.
18 Q. This was done by the Cook County sheriff?
19 A. Probably Cook County, yes.
20 Q. And were you present when the Cook County
21   sheriff explained this document to Mr. Maysonet?
22 A. No.
23   MR. BRUEGGEN: Objection, asked and
24   answered. Go ahead.
25   THE WITNESS: No, ma'am.

---

Page 208

1   BY MS. BONJEAN:
2 Q. Okay. So you don't know what the Cook
3   County sheriff said to Mr. Maysonet when he signed
4   this document?
5 A. That is correct.
6 Q. Okay. Now, after this was signed, did
7   Mr. Maysonet accompany you into an interview room?
8 A. He was brought into the interview room.
9 Q. Okay. And were you already in the interview
10   room?
11 A. Yes.
12 Q. So you and who else, Sergeant Mingey?
13 A. Yes.
14 Q. Okay. So you and Sergeant Mingey were in an
15   interview room, correct?
16 A. That's correct.
17 Q. And then a Cook County sheriff brought Jose
18   Maysonet into the interview room?
19 A. Yes.
20 Q. Okay. Now, tell me what you said to
21   Mr. Maysonet or what he said to you when he first
22   entered the room.
23 A. Sergeant Mingey asked him questions.
24 Q. Okay.
25 A. And he needed me -- if I had to interpret, I

---

Maysonet v.
Guevara

Video Deposition

Page 209

1  interpreted.
2  Q.  Okay.  And -- and was Mr. Maysonet speaking
3   in Spanish?
4  A.  I think he was speaking some English.
5  Q.  Okay.  He was speaking a mix?
6  A.  Pardon me?
7  Q.  Speaking like a mix?
8  A.  Yeah.
9  Q.  Like a Spanglish kind of?
10  A.  On and off, yeah.
11  Q.  Okay.  Were you actually interpreting from
12   time to time?
13  A.  Sometimes I would, yes.
14  Q.  Okay.  And what was Sergeant Mingey asking
15   Mr. Maysonet?
16  A.  Something about a shooting, if he knew any
17   information on a shooting.
18  Q.  And do you know whether it was in reference
19   to the shooting that happened on North Avenue?
20  A.  No, ma'am, I can't recall.
21  Q.  Okay.  And what was Mr. Maysonet saying in
22   response to those questions?
23  A.  That, I can't -- I think -- I can't recall.
24  Q.  Okay.  Well, was -- was Sergeant Mingey
25   accusing Mr. Maysonet of being involved in the

Page 210

1  shooting?
2  A.  No.  There was no accusations made.
3  Q.  Okay.  Was Sergeant Mingey questioning
4   Mr. Maysonet about his knowledge about a shooting?
5  A.  Yes.
6  Q.  Okay.  And what did Mr. Maysonet say in
7   response to those questions?
8       MR. BRUEGGEN: Object to foundation.
9       THE WITNESS: I'd have to see reports
10   if there was anything made on that interview.
11       BY MS. BONJEAN:
12  Q.  Okay.  Do you have an independent
13   recollection of Mr. Maysonet making any
14   incriminating statements?
15  A.  No, ma'am.
16  Q.  Do you remember him saying anything about
17   having provided a gun to individuals who
18   participated in the shooting?
19  A.  No, ma'am.
20  Q.  Do you remember him saying anything about
21   being present for the shooting?
22  A.  No, ma'am.
23  Q.  Do you remember him basically denying any
24   involvement in the shooting?
25  A.  I -- not that I recall, ma'am.

Page 211

1  Q.  Was it a -- how long did the interview last?
2  A.  It didn't last very long.  A few minutes.
3  Q.  Okay.  Anything of substance take place
4   during --
5  A.  Not that I recall.
6       MR. BRUEGGEN: Object to foundation.
7       THE WITNESS: Not that I recall, ma'am.
8       BY MS. BONJEAN:
9  Q.  Okay.  And, again, were you functioning as
10   an interpreter during this meeting or in an
11   investigative fashion or both?
12  A.  I was an interpreter.
13  Q.  Only an interpreter, right?
14  A.  Only an interpreter, yes.
15  Q.  During that meeting, do you recall
16   Mr. Maysonet invoking his right to counsel?
17  A.  No, ma'am.
18  Q.  Do you remember him saying, you know, if you
19   want to question me about this shooting, you can do
20   it through my attorney?
21  A.  No, ma'am.
22  Q.  Never mentioned an attorney during the
23   meeting to the best of your recollection?
24  A.  No, ma'am.  That's correct.
25  Q.  And did you -- this form that we've marked

Page 212

1  as Exhibit 2, did you ever translate this form to
2   him in Spanish?
3  A.  No, ma'am.
4  Q.  Okay.  You never actually discussed this
5   form after he came into the room?
6  A.  No, ma'am.
7  Q.  All right.  And did you give him his Miranda
8   rights at that time?
9  A.  No, ma'am.
10  Q.  Okay.  Do you recall during the interview
11   things getting heated?  When I say "heated," I mean
12   contentious, where the parties were yelling at each
13   other.
14  A.  No, ma'am.
15  Q.  Do you remember Mr. Maysonet raising his
16   voice at any point?
17  A.  No, ma'am.
18  Q.  Do you remember Sergeant Mingey ever raising
19   his voice?
20  A.  No, ma'am.
21  Q.  Did you ever raise your voice?
22  A.  No, ma'am.
23  Q.  Okay.  So it was just a cordial type of
24   conversation?
25  A.  Yes.

Page 213

1 Q. And at some point did the Cook County
2 sheriff come in to the meeting at all?
3 A. No.
4 Q. Okay. You said it didn't last very long.
5 Can you estimate how long this meeting at Cook
6 County Jail lasted?
7 A. Few minutes. It wasn't long.
8 Q. All right. Well, would it be fair to say
9 that it lasted only a few minutes because it didn't
10 yield much information?
11    MR. BRUEGGEN: Object to foundation.
12    THE WITNESS: I can't recall, ma'am.
13    BY MS. BONJEAN:
14 Q. Okay. Do you remember if Jose Maysonet gave
15 any information valuable to whatever investigation
16 Sergeant Mingey was conducting?
17    MS. CARNEY: Object to form.
18    THE WITNESS: Not that I know of.
19    BY MS. BONJEAN:
20 Q. Okay. And you don't remember him making any
21 states incriminating -- any statements
22 incriminating himself in any shooting, right?
23 A. That's correct.
24 Q. How did the interview end?
25    MR. BRUEGGEN: Object to foundation.

Page 214

1    BY MS. BONJEAN:
2 Q. How did it --
3 A. We just said okay. We stopped the interview
4 and we walked out, and then the sheriff returns him
5 back to his cell, wherever he has to take him.
6 Q. All right. And did you prepare any reports?
7 A. No, ma'am.
8 Q. Did you take any notes during the interview?
9 A. No, ma'am.
10 Q. Why not?
11 A. I'm not the investigating detective. I'm the
12 interpreter. Whoever is doing the questioning, they
13 have to write all the -- everything down. Not up to
14 me.
15 Q. Okay.
16 A. I'm just an interpreter.
17 Q. And did you notice whether Sergeant Mingey
18 was taking any notes during the interview?
19 A. I don't think so, ma'am.
20 Q. Okay. Do you know whether he went back to
21 the department and took any notes?
22 A. No idea.
23 Q. Do you know whether he prepared a GPR from
24 the interview after he went back to the area?
25 A. I have no idea, ma'am.

Page 215

1 Q. Okay. So once you left Cook County Jail,
2 you took no actions whatsoever to document what
3 happened during that interview at Cook County Jail,
4 right?
5 A. That's correct.
6    MR. BRUEGGEN: Object to form.
7    THE WITNESS: That's correct.
8    BY MS. BONJEAN:
9 Q. Okay. And by the way, we're talking about
10 an interview that happened on August 1st, 1990.
11 Between the time of the Wiley brothers'
12 murders on May 25th, 1990, and August 1st, 1990,
13 had you learned anything about the investigation as
14 it related to the Wiley brothers' murders?
15 A. No, ma'am.
16 Q. Had you taken part in any part of the
17 investigation?
18 A. No, ma'am.
19 Q. Had you heard any conversation about the
20 investigation?
21 A. No, ma'am.
22 Q. Okay. So you were completely in the dark,
23 fair to say, about what occurred between May 25th,
24 1990, and August 1st, 1990, as it relates to the
25 Wiley brothers' murder investigation?

Page 216

1    MR. BRUEGGEN: Object to form. Go
2 ahead.
3    THE WITNESS: That is correct.
4    BY MS. BONJEAN:
5 Q. And did you have any conversations about
6 your interview with -- strike that.
7 Did you have any conversations about the
8 interview that was conducted between Detective
9 Paulnitsky and Mr. Maysonet back in July 15th,
10 1990, with any other detectives or police
11 personnel?
12 A. No, ma'am.
13 Q. Okay. And I'm going to ask the same
14 question as it relates to August 1st, 1990.
15 Did you have any conversations with any
16 detectives, sergeants or police personnel about
17 that interview in which you acted as an interpreter
18 for Sergeant Mingey and Mr. Maysonet?
19 A. No, ma'am.
20 Q. So when you left there, your work was done,
21 and you took no other actions to either write a
22 report about that interview or even speak about it,
23 right?
24 A. That's --
25    MR. BRUEGGEN: Objection, form,

Maysonet v.
Guevara

Video Deposition

Page 217

1 compound. Go ahead.
2    THE WITNESS: That's correct.
3    MS. BONJEAN: One second.
4    Let's take a five-minute break. That
5 way, you can walk and I can get my documents in
6 order.
7    THE VIDEOGRAPHER: We're going off the
8 record at 2:34 p.m.
9    (Recess taken from 2:34 to 2:51.)
10    (Exhibits 3, 4 and 5 marked.)
11    THE VIDEOGRAPHER: We're now back on
12 the record at 2:51 p.m.
13    BY MS. BONJEAN:
14 Q. Mr. Montilla, after you left Cook County
15 Jail on August 1st of 1990, did you have any
16 interactions with Mr. Maysonet again?
17 A. Some time, I think, later on.
18 Q. Okay. Do you recall how much time elapsed
19 between --
20 A. No.
21 Q. Hold on. Let me finish my question. Okay?
22 Do you know how much time elapsed from your
23 meeting at Cook County Jail to the time that you
24 saw him again?
25 A. No, ma'am.

Page 218

1 Q. Okay. And what were the circumstances under
2 which you saw Mr. Maysonet after the Cook County
3 Jail interview?
4 A. Interpreting.
5 Q. Okay. And where was that?
6 A. Area 5.
7 Q. All right. And that same time frame, from
8 August 1st, 1990, to the date on which you saw
9 Mr. Maysonet again at Area 5, did you play any role
10 in the investigation of the Wiley brothers'
11 murders?
12 A. No, ma'am.
13 Q. Okay. Do you recall hearing any information
14 about the ongoing investigation into the Wiley
15 brothers' murders?
16 A. No, ma'am.
17 Q. Do you recall who was even assigned to
18 investigating the Wiley brothers' murders?
19 A. No, ma'am.
20 Q. So between August 1st, 1990, and later on
21 when you saw Mr. Maysonet at Area 5, you have no
22 recollection of learning any information about the
23 Wiley brothers' murders, is that right?
24 A. That's right.
25 Q. And do you know whether or not there had

Page 219

1 been any suspects developed between August 1st,
2 1990, and the time when you met Mr. Maysonet again
3 at Area 5?
4 A. No, ma'am.
5 Q. So at this occasion when you saw
6 Mr. Maysonet at Area 5, do you recall -- were you
7 working that day?
8 A. What date?
9 Q. That you saw Mr. Maysonet at Area 5. I
10 assume you were working, right?
11 A. The first time or...
12 Q. No, no, no. When you saw him -- let me lay
13 the foundation a little better. Okay?
14 After the August 1st meeting at Cook County
15 Jail, you said you saw him again at Area 5. Is
16 that right?
17 A. Yes.
18 Q. Okay. And as you sit here today, you don't
19 recall how much time elapsed, right?
20 A. That's correct.
21 Q. Okay. But you do remember seeing him again
22 at Area 5, correct?
23 A. Yes, ma'am.
24 Q. Okay. And I assume you were on duty that
25 day. Right?

Page 220

1 A. Yes, ma'am.
2 Q. Do you remember what shift you were working
3 that particular day?
4 A. I don't recall.
5 Q. Do you remember whether it was during the
6 day or night when you saw Mr. Maysonet?
7 A. I think it was during the day.
8 Q. Okay. And can you describe the
9 circumstances under which you saw Mr. Maysonet at
10 Area 5 some time after that meeting at Cook County
11 Jail?
12 A. I was asked to interpret.
13 Q. And who asked you to interpret?
14 A. I think it was Paulnitsky again.
15 Q. Okay. And did Detective Paulnitsky tell you
16 why he wanted you to interpret or for what purpose?
17 A. Just ask some questions.
18 Q. Okay. Now, did you -- when Detective
19 Paulnitsky came to you and asked you to interpret,
20 did you know it was for Mr. -- an interview --
21 another interview with Mr. Maysonet?
22 A. Yes.
23 Q. Okay. Did he say Mr. Maysonet's name to
24 you?
25 A. Yes.

Page 221

1  Q.  Oh, by the way, when you saw Mr. Maysonet in
2   Cook County Jail, is that when you recognized that
3   you had previously served as an interpreter?
4  A.  I think so, yes.
5  Q.  Okay.  And -- okay.  So I'm sorry to have
6   jumped back, but I just wanted to get some clarity
7   on that.
8   Okay.  So Paulnitsky again asks you to serve
9   as an interpreter.  And did he say -- did he tell
10   you why or what case he wanted to ask Mr. Maysonet
11   about?
12  A.  I don't recall, ma'am.
13  Q.  Okay.  Did -- do you remember him saying
14   that he wanted to question Mr. Maysonet about the
15   shootings of the two black men on North Avenue?
16  A.  I don't recall.
17  Q.  Okay.  So you just remember it being a
18   shooting that he -- or do -- I don't want to put
19   words in your mouth.  Well, what do you remember
20   Detective Paulnitsky asking?
21  A.  Just wanted me to interpret about a shooting.
22   That's all I remember.
23  Q.  Okay.  And did you?
24  A.  Yes.
25  Q.  Okay.  Where did this interview take place?

Page 222

1  A.  In Area 5.
2  Q.  And to be clear, this is now your third time
3   serving as an interpreter for an interview with
4   Mr. Maysonet, right?
5  A.  Yes.
6  Q.  And who was present for this interview?
7  A.  I can't recall.  It had to be Paulnitsky
8   probably there.  I can't recall who else.
9  Q.  Anybody else?
10  A.  I don't recall, ma'am.
11  Q.  And do you remember Paulnitsky asking
12   Mr. Maysonet questions about the shooting?
13  A.  If I see a report, something written down, I
14   might be able to recall.  I don't remember all the
15   questions, ma'am.
16  Q.  And did you give responses -- or strike
17   that.
18   Did he give responses?  "He" being
19   Mr. Maysonet.
20  A.  If he -- excuse me?
21  Q.  Yeah.  Did Mr. Maysonet answer Detective
22   Paulnitsky's questions?
23  A.  I think he did.  I'm not sure.
24  Q.  And were you interpreting back and forth
25   again?

Page 223

1  A.  Yes, ma'am.
2  Q.  And do you remember whether Mr. Maysonet
3   made any incriminating statements during this
4   interview?
5  A.  I don't recall, ma'am.
6  Q.  Do you remember him making any statements
7   that would suggest that he was involved in a
8   shooting during the interview?
9  A.  Not that I recall.
10  Q.  And do you remember Detective Paulnitsky
11   getting angry at Mr. Maysonet during this
12   interview?
13  A.  No, ma'am.
14  Q.  Do you remember Detective Paulnitsky
15   grabbing Mr. Maysonet by the neck at any point?
16  A.  No, ma'am.
17  Q.  Do you remember Detective Paulnitsky yelling
18   at Mr. Maysonet?
19  A.  No, ma'am.
20  Q.  Do you remember Detective Paulnitsky ever
21   accusing Mr. Maysonet of being involved in a
22   shooting?
23  A.  No, ma'am.
24  Q.  If you had seen Detective Paulnitsky grab
25   Mr. Maysonet by the neck, what would you have done?

Page 224

1  A.  Ended the interview and walk out of the room.
2  Q.  Okay.  Would you have made a report?
3  A.  I would have told the sergeant.
4  Q.  But that didn't happen, right?
5  A.  That didn't happen, no, ma'am.
6  Q.  Okay.  How long did this interview take?
7  A.  I don't know, ma'am.  I'm not sure.
8  Q.  Not very long.  Was it --
9  A.  I can't speculate.  I have no idea.
10  Q.  Okay.  Fair enough.
11   After the interview, what did you do?
12  A.  I don't know, ma'am.
13  Q.  Did you leave?
14  A.  I probably hung around the area there,
15   probably doing some work.
16  Q.  Do you remember taking any investigative
17   actions in connection with the shooting that was
18   the subject of the interview with Mr. Maysonet?
19  A.  No, ma'am.
20  Q.  Okay.  Do you remember preparing any GPRs in
21   connection with your interview or the interview of
22   Mr. Maysonet?
23  A.  No, ma'am.
24  Q.  Okay.  Why not?
25  A.  I don't take GPRs.  It's up to the detective.

Page 225

1  I'm just interpreting.  It's hard to write as you're
2  interpreting.
3  Q.  Right.  And you didn't prepare any report
4  after you interpreted during this interview between
5  Paulnitsky and Mr. Maysonet, right?
6  A.  That's correct.
7  Q.  And if you were working the third watch,
8  what time would you have left work that day?
9  A.  Midnight.
10 Q.  Okay.  Do you recall, as you sit here today,
11 what time you left work?
12 A.  No, ma'am.
13 Q.  All right.  Are you positive you worked the
14 third watch or you just don't recall?
15 A.  I'm not sure.  I'd have to look at reports,
16 see what watch I worked, you know.
17 Q.  Okay.  Fair enough.
18 Now, prior to going to interpret this
19 interview with Paulnitsky and Mr. Maysonet, had you
20 had an opportunity to review any reports related to
21 the Wiley brothers' murders?
22 A.  No, ma'am.
23 Q.  Okay.  And it sounds to me, based on your
24 testimony, that prior to every interview with
25 Mr. Maysonet, you did not review any reports.

Page 226

1  Right?
2  A.  That is correct.
3  Q.  And you had no knowledge about what was
4  happening with the investigation of the Wiley
5  brothers' murders, correct?
6  A.  That's correct.
7  Q.  Now, did you have an occasion to come in
8  contact with Mr. Maysonet again?
9  A.  Probably.  I don't know.
10 Q.  After the interview with Paulnitsky?
11 A.  I think later on that night.  I'm not sure.
12 Q.  Okay.  And what's the next thing you
13 remember?
14 A.  Pardon me?
15 Q.  What's the next thing that you remember as
16 it relates to Mr. Maysonet?
17 A.  Ma'am, I'd have to look at reports to see
18 what went on.  I can't recall.  That's a long time
19 ago.
20 Q.  No, I understand.  I was -- I'm not looking
21 for specifics.
22 Do you remember being present with Detective
23 Guevara at some point?
24 A.  That, I don't recall, ma'am.  I have -- I
25 don't know.

Page 227

1  Q.  Okay.  Do you remember being present and
2  acting as an interpreter -- strike that.
3  Do you remember being present during any
4  interview of Mr. Maysonet by Detective Guevara?
5  A.  No, ma'am.
6  Q.  Okay.  Do you remember serving as an
7  interpreter during an interview with Detective
8  Guevara?
9  A.  No, ma'am.
10 Q.  Would you have served as an interpreter for
11 Guevara given the fact that Guevara spoke Spanish?
12 A.  If he spoke Spanish, I don't have to do an
13 interview with him.
14 Q.  Okay.  Do you ever remember serving as an
15 interpreter between Guevara and Mr. Maysonet?
16 A.  No, ma'am.
17 Q.  Okay.  And as you sit here today, you don't
18 have an independent recollection of being present
19 during an interview between Detective Guevara and
20 Mr. Maysonet, right?
21 A.  That's correct.
22 Q.  At some point do you remember being present
23 during a statement that Mr. Maysonet gave with a
24 court reporter?
25 A.  I might have.  I don't recall.  I might have

Page 228

1  been there.
2  Q.  Okay.  Well, I'm going to show you some
3  documents in a minute, okay, and we'll maybe get --
4  A.  Okay.
5  Q.  -- some clarity on this, but I first am just
6  trying to probe whatever you can remember from this
7  incident, although I know it's a long time ago.
8  After the interview with Detective
9  Paulnitsky in which you served as an interpreter,
10 do you have an independent recollection of any
11 additional interviews with Mr. Maysonet?
12 A.  I had some later, I think.
13 Q.  Okay.
14 A.  I just can't recall what times or...
15 Q.  Okay.  Well, what do you remember?  Tell me
16 what you do remember about those later interviews.
17 A.  Being with State's Attorney DiFranco.
18 Q.  Okay.  So you do remember State's Attorney
19 DiFranco?
20 A.  Yes, ma'am.
21 Q.  Okay.  Do you remember being present for any
22 interviews of Mr. Maysonet with any other Assistant
23 State's Attorney?
24 A.  I don't recall.  I might have been.  I'm not
25 sure.

Maysonet v.
Guevara

Video Deposition

Page 229

1  Q.  What about any female State's Attorneys, do
2  you remember any female State's Attorneys present
3  there?
4  A.  Might have been.  I think so --
5  Q.  Okay.
6  A.  -- but I can't -- I can't recall what time
7  or...
8  Q.  Okay.  What do you remember about the
9  interview with a female State's Attorney, if
10  anything?
11  A.  Were talking.  I think she called felony
12  review and had someone else in.  I think her shift
13  was ending, I think.
14  Q.  Uh-huh.
15  A.  And that was it.  I think that was it.
16  Q.  Do you know how long she was there at the
17  area?
18  A.  No, ma'am.  I'd have to see what, you know --
19  if -- if there was anything written down what I did
20  at that time, give me a timeline.
21  Q.  Okay.  Do you remember being present for any
22  interview by Detective Guevara of Mr. Maysonet?
23       MR. BRUEGGEN: Objection, asked and
24  answered.  Go ahead.
25       THE WITNESS: No, ma'am.

Page 230

1       BY MS. BONJEAN:
2  Q.  Okay.  But you do remember an interview
3  during which DiFranco was present, correct?
4  A.  Yes, ma'am.
5  Q.  And what was your function during that
6  interview?
7  A.  Pardon me?
8  Q.  What was your function during that
9  interview?
10  A.  In case I needed to interpret.
11  Q.  Okay.  And did you interpret?
12  A.  No, ma'am.
13  Q.  You didn't interpret?
14  A.  No, ma'am.
15  Q.  So tell me what you remember -- strike that.
16  Did Mr. DiFranco speak Spanish?
17  A.  No, ma'am.
18  Q.  Okay.  So did he interview Mr. Maysonet?
19  A.  He talked to him.
20  Q.  Okay.  And what do you remember about that?
21  A.  I think Maysonet was speaking English to him.
22  Q.  Only English?
23  A.  Yes, ma'am.
24  Q.  No Spanish whatsoever?
25  A.  No, ma'am.

Page 231

1  Q.  Okay.  And what did Mr. Maysonet say in
2  English?
3  A.  Ma'am, I have no idea, ma'am.  I'd have to
4  look at a report.
5  Q.  Well, do you have any recollection
6  generally?  Did he confess to a double murder?
7  A.  Ma'am, I'd have to remember something.  I don't
8  recall the whole conversation, what went from the --
9  from the beginning to the end, I have no idea.  I
10  know --
11  Q.  Tell me one thing you remember about the
12  conversation.
13  A.  He took us for -- he wanted to take us to a
14  crime scene, where the crime happened.
15  Q.  Okay.  So you remember going to a crime
16  scene with Mr. Maysonet?
17  A.  Yes.  Paulnitsky, myself, DiFranco and
18  Mr. Maysonet.
19  Q.  Okay.  And where -- where did you go?
20  A.  We went to the -- where the Wiley brothers
21  were killed.
22  Q.  Okay.  So -- and that scene was the same
23  scene that you had gone to on the night of the
24  murders, right?
25  A.  Yes, ma'am.

Page 232

1  Q.  Okay.  And did you all go in the same car?
2  A.  Yes.
3  Q.  What type of car was it?
4  A.  Unmarked squad car.
5  Q.  So it was you, it was ASA DiFranco, correct?
6  A.  Yes.
7  Q.  It was Mr. Maysonet?
8  A.  Yes.
9  Q.  And it was Roland Paulnitsky?
10  A.  Yes, ma'am.
11  Q.  Anybody else?
12  A.  No, ma'am.
13  Q.  And what was the purpose of going to the
14  crime scene, if you remember?
15  A.  He took us there to show us how it happened.
16  I think that's what he did.  And that's what we did.
17  We followed up.  He showed us how he parked in the
18  alley, walked along the gangway or the side of the
19  building and fired.
20  Q.  Okay.  Did you get out of the car?
21  A.  I don't remember.  I don't recall.
22  Q.  Uh-huh.  And was it night out or was it
23  morning?  What was -- what time of the day was it?
24  A.  It was light.  I know it was light.  It
25  wasn't dark.

Video Deposition

Page 233

1 Q. And was it before or after Mr. Maysonet made
2 a court-reported statement?
3 A. Before.
4 Q. Okay. And whose idea was it to go to the
5 crime scene?
6 A. I think it was Mr. Maysonet, I think.
7 Q. And why was he so eager to show you where he
8 had committed a double murder?
9 A. I have no idea, ma'am. He just -- they're
10 having their conversation and we go. He says I'll
11 show you where it happened. And that's what we
12 followed up on.
13 Q. Okay.
14 A. And then the questioning started after that.
15 Q. Okay. And where did the questioning take
16 place?
17 A. In Area 5.
18 Q. Okay. And who was present for that?
19 A. DiFranco, myself. I think Guevara might have
20 been in there; I'm not sure. And Paulnitsky, but
21 I'm not sure.
22 Q. Okay. Was there a court reporter there?
23 A. If -- I think so, yes.
24 Q. Okay.
25 A. Yeah.

Page 234

1 Q. And during this -- was it a question/answer
2 type of situation or how did the interview take
3 place, do you recall?
4 A. It was like a question and answer, I think.
5 Q. Okay. And again according to you, you were
6 just there essentially to serve as an interpreter,
7 if necessary, right?
8 A. That is correct.
9 Q. And it sounds to me like, at least according
10 to your testimony, that during the court-reported
11 statement, you didn't have to serve as an
12 interpreter?
13 A. I don't recall.
14 Q. Mr. Maysonet spoke entirely in English?
15 A. Spoke English, yes, ma'am.
16 Q. From start to finish?
17 A. I think so, yes.
18 Q. Did you serve as an interpreter between
19 DiFranco and Mr. Maysonet at any time period before
20 the court-reported statement?
21 A. I don't recall.
22 Q. Was there -- do you remember being present
23 for an interview that preceded the actual statement
24 that was taken with a court reporter present?
25 A. There was something between DiFranco,

Page 235

1 Maysonet and everything, yes. That's when he
2 decided to call a reporter, I think.
3 Q. Okay. And was that before or after you went
4 to the crime scene?
5 A. After.
6 Q. Okay. And how was -- and there must have
7 been some type of interview with DiFranco before
8 you went to the crime scene, too, correct?
9 A. Yes.
10 Q. Okay. Were you present for that one?
11 A. I think so, yes, ma'am.
12 Q. Okay. I'm just trying to get this all
13 straight.
14 After Mr. Maysonet was at Area 5 -- strike
15 that.
16 By the way, do you know how Mr. Maysonet got
17 to Area 5?
18 A. Pardon me?
19 Q. Do you know how Mr. Maysonet got to Area 5?
20 A. No, ma'am.
21 Q. Do you know whether he came there on his own
22 accord or had been arrested or anything?
23 A. No, ma'am.
24 Q. Okay. So you do recall serving as an
25 interpreter between Paulnitsky and Mr. Maysonet,

Page 236

1 right?
2 A. Yes, ma'am.
3 Q. And then at some later point you recall
4 assisting DiFranco with an interview of
5 Mr. Maysonet, right?
6 A. Yes.
7 Q. And you don't remember Guevara, right?
8 A. No, ma'am.
9 Q. Okay. And then at some point you remember
10 accompanying DiFranco, Maysonet and Paulnitsky to
11 the crime scene, right?
12 A. That's correct.
13 Q. And then you came back and there was another
14 interview with DiFranco and Maysonet?
15 A. Yes.
16 Q. And then eventually there was a
17 court-reported statement --
18 A. Yes.
19 Q. -- that was taken?
20 A. Yes.
21 Q. And do you remember the substance of any of
22 these interviews as you sit here today?
23 A. Talking about being with three guys or
24 something. He gave them a gun --
25 Q. Okay.

Page 237

1  A.  -- from his house, and then that's -- they
2  went there.  They had hoodies, I think it was, and
3  they shot.  And then he said he fired.
4  Q.  Okay.  So you have some recollection of the
5  three guys and a gun and the hoodies and the
6  shooting, right?
7  A.  Yeah, on that day, yes.
8  Q.  Okay.  Prior to that day in which
9  Mr. Maysonet was in custody at Area 5, had you ever
10 heard Mr. Maysonet make any statements about three
11 guys?
12 A.  No, ma'am.
13 Q.  Okay.  And I'm going to put -- let's put a
14 date on this.  I'm going to have you actually --
15     MS. COHEN: I have the marked one.
16     MS. BONJEAN: Give me the marked one.
17     MS. COHEN: It's marked 4.
18     MS. BONJEAN: I know, because I have
19 another one marked 3.
20     BY MS. BONJEAN:
21 Q.  I'm going to show you what's been marked as
22 Exhibit 4.
23     MR. BRUEGGEN: Do you want him to read
24 that or are you saying --
25     MS. BONJEAN: I'm just having him look

Page 238

1  at it for now.
2      MS. COHEN: You can share one, I think.
3      MR. SCHALKA: Yeah, whatever.
4      MS. CARNEY: Yeah, we're good.
5      BY MS. BONJEAN:
6  Q.  Now, Mr. Montilla, do you recognize this
7  document?
8  A.  Yes, ma'am.
9  Q.  And what do you recognize it to be?
10 A.  It's an investigation for the shooting for --
11 with DiFranco.
12 Q.  Okay.  But what is it specifically?  Is it a
13 statement of Mr. Maysonet?
14 A.  I'm trying to read it here.  It's --
15 Q.  Well, just look at the top.  What does it --
16 what does it purport to be?
17 A.  Yeah, I think so.
18     MR. BRUEGGEN: If you need to read it,
19 read it, and then you can --
20     THE WITNESS: Yeah, I need to read it.
21     BY MS. BONJEAN:
22 Q.  Okay.  I'm asking you what does it purport
23 to be.  Just read the first three lines.  That's
24 all I'm asking you to read, and then you can take
25 your time reading anything else.  The first --

Page 239

1  right up here.
2  A.  Shooting death of Torrence and Kevin Wiley,
3  taken in an interview room on the 2nd floor, violent
4  crimes headquarters.
5  Q.  Okay.  And does it say statement of Jose
6  Maysonet right there?
7  A.  Yes, ma'am.
8  Q.  Okay.  I'm going to give you the opportunity
9  to read it as I ask questions, but I'm going to go
10 ahead and some questions for now.  Okay?
11 A.  Okay.
12 Q.  And if you need to read and refer, you are
13 certainly welcome to.
14    You would agree that it says statement of
15 Jose Maysonet up there at the top, right?
16 A.  That's correct.
17 Q.  And it also says taken in an interview room,
18 2nd floor, Area 5, violent crimes headquarters,
19 right?
20 A.  That's correct.
21 Q.  And do you remember being in the interview
22 room of the 2nd floor?
23 A.  I think so.
24 Q.  Let me finish my questions.  Okay?
25    And it indicates that the statement was

Page 240

1  taken on Thursday, August 23rd, 1990 at the hour of
2  9:28 a.m., right?
3  A.  Yes.
4  Q.  Does that sound right?
5  A.  Yes.
6  Q.  Okay.  Now -- and just to be clear now that
7  we have a date, between August 1st, 1990, when you
8  saw Mr. Maysonet at Cook County Jail, and August
9  23rd, 1990, at 9:28 a.m., okay, had you done any
10 investigative work on the Wiley brothers' murders?
11 A.  Just the interview, ma'am.
12 Q.  Okay.  Apart from what you did when
13 Mr. Maysonet came into Area 5 before that, did you
14 do any other work on the case?
15 A.  No, ma'am.
16 Q.  Okay.  Now, this statement was taken
17 Thursday, August 23rd, at 9:28 a.m.
18    You indicated that you also were present for
19 a statement with Paulnitsky, right?
20 A.  I think so.  I don't recall.
21 Q.  That's before this, though, right?
22 A.  I think so.
23 Q.  Okay.  And was that the day before or
24 earlier in the morning?
25 A.  I don't recall that time.

Maysonet v.
Guevara

Video Deposition

Page 241

1 Q. Okay. All right. But you do remember this
2 statement with the court reporter, and it also says
3 right there in the middle that Frank DiFranco was
4 present along with Detective Fred Montilla.
5 Do you see that?
6 A. Yes, ma'am.
7 Q. And is star number 16410 you?
8 A. Yes.
9 Q. And down at the bottom, there's some
10 signatures.
11 Do you see your signature down there?
12 A. Yes.
13 Q. And according to you, you did not serve as
14 an interpreter during this statement, right?
15 A. I assume. I think so. I think he spoke
16 English.
17 Q. Well, that's what I'm saying. If he spoke
18 English, you didn't need to act as an interpreter,
19 right?
20 A. Yes, if.
21 Q. Okay. Do you recall whether or not
22 Mr. Maysonet spoke English during this interview
23 that's reflected on Exhibit 4?
24 A. With DiFranco, he spoke English, ma'am. I
25 recall he spoke English.

Page 242

1 Q. Okay. So the entire time that he spoke to
2 DiFranco, according to you, he spoke English?
3 A. I think I had to interpret one word or
4 something. I don't remember all that. I know he
5 spoke English.
6 Q. Okay. So why were you present for this
7 statement?
8 A. Pardon me?
9 Q. Why were you present for this statement if
10 he was speaking English?
11 A. I was asked to be there in the -- by DiFranco
12 in case he needed -- I needed to interpret from
13 English to Spanish in case he didn't understand a
14 question or something.
15 Q. Okay. But in the prior interviews, you had
16 served as an interpreter, right?
17 A. Yes.
18 Q. But this one, he was able to speak in
19 English?
20 A. Yes, ma'am.
21 Q. And would you agree -- go ahead and look at
22 it if you need to. It appears to be a question and
23 answer type of statement?
24 MR. BRUEGGEN: Just flip through the
25 pages.

Page 243

1 THE WITNESS: Huh?
2 MR. BRUEGGEN: Flip through the pages,
3 look at it, and then...
4 THE WITNESS: Yep. Okay.
5 BY MS. BONJEAN:
6 Q. Does that sound right?
7 A. Yeah.
8 Q. Okay. And it's your recollection that
9 Mr. DiFranco was asking questions in English and
10 Mr. Maysonet was responding in English, right?
11 A. Yes.
12 MR. BRENER: Asked and answered.
13 THE WITNESS: I recall that, yeah.
14 BY MS. BONJEAN:
15 Q. And did Mr. Maysonet provide his name to the
16 court reporter as you recall?
17 MR. BRUEGGEN: Object to form.
18 THE WITNESS: Did who?
19 BY MS. BONJEAN:
20 Q. Did he provide his name to the court
21 reporter as you recall?
22 A. I assume he did, yes.
23 Q. Okay. Do you know -- it says "Jose
24 Maisonet," M-A-I-S-O-N-E-T, both at the top and
25 also in Mr. DiFranco's.

Page 244

1 Do you know who gave that spelling to the
2 court reporter?
3 A. I have no idea, ma'am.
4 Q. Okay.
5 One second.
6 Okay. You can put it aside for the moment.
7 After this statement was taken, what, if
8 anything, do you remember about Mr. Maysonet?
9 A. Nothing more that I could --
10 Q. Do you remember if he was charged? Do you
11 remember anything that happened?
12 A. I think he was charged. They charged him,
13 yeah.
14 Q. Did you serve as an interpreter again after
15 this statement was taken?
16 A. I don't recall, ma'am.
17 Q. Okay. Do you remember taking any
18 investigative actions after this statement was
19 taken?
20 A. No, ma'am.
21 Q. Okay. Nothing, right?
22 A. Nothing, yes, ma'am.
23 Q. What about Mr. Maysonet's wife or
24 girlfriend, do you remember talking to her?
25 A. Pardon me?

Maysonet v.
Guevara

Video Deposition

Page 245

1  Q.  Mr. Maysonet's wife or girlfriend, do you
2   remember talking to her?
3  A.  I think I did.
4  Q.  Okay.  When did you talk to her?
5  A.  Some time in that day, I think.  I'm not
6   sure.
7  Q.  In the same time period?
8  A.  I think up in the front, yes.
9  Q.  Okay.  Do you remember if it was before
10   Mr. Maysonet's statement was taken or after?
11  A.  I have no idea, ma'am.  I'd have to look at
12   reports.  It wouldn't -- I don't know when I talked
13   to her.
14  Q.  Okay.  Do you remember -- you remember
15   interviewing her, though?
16  A.  Yes.  Interview, I talked to her.
17  Q.  Okay.  Do you remember speaking to her in
18   Spanish?
19  A.  I don't recall, ma'am.
20  Q.  Do you remember speaking to her in English?
21  A.  I might have.
22  Q.  Okay.  If you were just serving as an
23   interpreter, why were you interviewing
24   Mr. Maysonet's wife?
25  A.  Ma'am, I have no idea.  I was probably asked

Page 246

1   to go up there or she probably -- you know, they
2   told -- told me to talk to her or ask her anything.
3  Q.  But you have no recollection of the
4   interview?
5  A.  No, ma'am.
6  Q.  Nothing?
7  A.  Nothing.
8  Q.  Do you remember her saying anything
9   incriminating or exculpatory, anything?
10  A.  No, ma'am.
11  Q.  I'm going to have you look at Exhibit 5.
12  A.  What's this here?
13      MR. SCHALKA:  For Exhibit 3, you had --
14      MS. BONJEAN:  I didn't do 3 yet.  I'm
15   going to go -- I'll go back to it.
16      BY MS. BONJEAN:
17  Q.  Okay.  I've handed you what's been marked as
18   Exhibit 5.  Do you recognize this document,
19   Mr. Montilla?
20  A.  Yeah.  It's a statement from Rosa Bello.
21  Q.  Who's Rosa Bello?
22  A.  I don't know.  It says here it's a wife.
23  Q.  Okay.  Do you remember speaking to the wife
24   or girlfriend of Mr. Maysonet?
25  A.  I apparently did it.  I'm on here.

Page 247

1  Q.  Okay.  In fact, it says your name and also
2   ASA Frank DiFranco, correct?
3  A.  Yeah.
4  Q.  And it looks like this statement was taken
5   at 2:10 p.m.?
6  A.  At what?
7  Q.  2:10 p.m., up there at the top.
8  A.  Yeah.
9  Q.  Okay.  And that would have been after the
10   court-reported statement of Mr. Maysonet, right?
11  A.  Apparently, yes.
12  Q.  Okay.  And does this -- oh, strike that.
13   Do you know who wrote this statement?
14  A.  No, ma'am.
15  Q.  Is that your handwriting?
16  A.  No, ma'am.
17  Q.  Okay.  Do you know whether it's Rosa Bello's
18   handwriting?
19      MR. BRENER:  Foundation.
20      MS. BONJEAN:  It's a "did you know" --
21   "do you know."
22      THE WITNESS:  I don't know who wrote
23   the statement, ma'am.  I have no idea.
24      BY MS. BONJEAN:
25  Q.  Okay.  Do you know whether it's Frank

Page 248

1   DiFranco's handwriting?
2  A.  Might be.  I don't know, ma'am.
3  Q.  You just don't know?
4  A.  No, ma'am.  I don't have no idea.
5  Q.  Okay.  Can you look at the last page.
6   You see a photograph there.  Do you
7   recognize that guy?
8  A.  I don't know who that is, ma'am.
9  Q.  Okay.  What about the back --
10  A.  No, ma'am.  I have no idea.
11  Q.  Okay.  And as you sit here today, you don't
12   remember anything about the substance of Rosa
13   Bello's statements, right?
14  A.  That's correct.
15  Q.  I am going to now --
16      MR. BRUEGGEN:  Are you done with Number
17   5?
18      MS. BONJEAN:  For the moment.  I may go
19   back to it.
20      BY MS. BONJEAN:
21  Q.  I'm going to have you look at Montilla 3.
22   Here.
23      MS. BONJEAN:  It seems like some of
24   them are double-sided.  It's the same Bates stamp.
25   Some are double-sided.  Here.

Page 249

1    Hold on to these because, at least for
2  tomorrow, because I'm not --
3       MR. GREENBERG: If you want, we can put
4  them in my office.
5       MS. BONJEAN: If you want to be the
6  secretary, go right ahead.
7       MR. BRUEGGEN: We can check them along
8  with you and you'll hang on to them and bring them
9  to each dep. Let the young guy do it.
10      MS. BONJEAN: Kyle.
11      MR. JORGENSEN: That's what I'm here
12  for.
13      BY MS. BONJEAN:
14  Q.  Okay. I am going to have -- Mr. Montilla,
15  you will see in the right-hand corner of these
16  documents --
17  A.  Yeah.
18  Q.  -- there's something called a Bates stamp.
19  Okay. It's like a -- it's a numbering system so
20  that we can --
21  A.  Okay.
22  Q.  And I'm going to ask you some questions
23  about this, and if you need time to review whatever
24  I'm having you look at, take as much time as you
25  need. Okay?

Page 250

1  A.  Okay.
2  Q.  Have you ever seen this front page before?
3  A.  No, ma'am.
4  Q.  Is this what the files looked like at Area 5
5  that had investigative material in it?
6  A.  No, ma'am. I never saw that.
7  Q.  I'm talking about -- do you remember we had
8  that whole conversation earlier about the files
9  that were kept in the -- by the detective --
10  A.  Yeah.
11  Q.  -- that you could sign out?
12  A.  Yeah.
13  Q.  Okay.
14      MS. BONJEAN: And also, by the way,
15  there's two in there.
16      MS. CARNEY: Yeah.
17      MS. BONJEAN: Yeah, there's both.
18      BY MS. BONJEAN:
19  Q.  But this -- this does not look like those
20  files?
21  A.  I don't remember, ma'am. I don't recall.
22  Q.  Okay. Okay. Can you turn to the first page
23  that we have there.
24  In the left-hand corner, it says court
25  attendance report. Do you see that?

Page 251

1  A.  Yes, ma'am.
2  Q.  What's a court attendance report? What are
3  these?
4  A.  You made the report when you go to court.
5  You have to put the times when you went, the RD
6  number and everything on the -- on here, and it
7  marks the hours you spend in court.
8  Q.  Who prepares these reports?
9  A.  The detective that goes to the court.
10  Q.  Okay. And what is the purpose of these
11  reports?
12  A.  To get paid overtime, if you work overtime.
13  Q.  Okay. And on this first page right in the
14  middle, you could see it says detectives in court,
15  and it says Detective R. Guevara. Do you see that?
16  A.  Yes, ma'am.
17  Q.  Okay. And is -- would that lead you to
18  believe that Detective Guevara filled out this
19  court attendance report?
20  A.  I -- yes, ma'am.
21  Q.  All right. So you can skip ahead.
22  I'm actually going to have you look at --
23  start -- give me one second.
24  Okay. I'm going to have you look starting
25  at page RFC-Maysonet 65.

Page 252

1  A.  65?
2  Q.  Uh-huh.
3       MS. BONJEAN: Do you want to help him,
4  Dave, or do you want me to?
5       MR. BRUEGGEN: I can.
6       MS. BONJEAN: And, actually, you know
7  what I'm going to do? I meant to do this before
8  and you picked up on this. Hold on one second.
9       I'm going to have you mark something
10  else here. I'm going to mark the permanent
11  retention file separately.
12      MS. CARNEY: Thank you.
13      MS. BONJEAN: It was xeroxed together,
14  but it was not meant to be.
15      MR. GREENBERG: So what page is that?
16      MS. CARNEY: Do you want to call that
17  3A?
18      MS. BONJEAN: Yeah. Yeah. So for the
19  record, Exhibit 3 is going to consist of
20  RFC-Maysonet 1 through --
21      MS. CARNEY: 66?
22      MS. BONJEAN: -- through, yeah, 1
23  through 66. And then RFC-Maysonet 67 through 107
24  will be 3A, we'll call it, and that begins with a
25  document that was staffed permanent retention file.

Maysonet v.
Guevara

Video Deposition

Page 253

1   It bothered me, too.
2   MS. CARNEY: Thank you.
3   (Exhibit 3A marked.)
4   BY MS. BONJEAN:
5   Q.   So we're starting at the back, which I've
6   directed you to.  RFC-Maysonet 65 and 66, what do
7   you recognize this to be?
8   A.   Just a general offense case report.
9   Q.   Okay.  And it says Gloria Sanchez and Sheila
10  Santiago.  Do you know who these people are or what
11  this case is about?
12  A.   No, ma'am.
13  Q.   Okay.  Do you know why it's in the
14  investigative file for Mr. Maysonet?
15  A.   No idea, ma'am.
16  Q.   Okay.  Okay.  I'm going to have you, please,
17  if you would, look at the document starting at page
18  59.
19  What is this document?
20  A.   It's a supplementary report made on the
21  murder.
22  Q.   And do you see where it says "field
23  investigation" there, down there in the narrative
24  section?
25  A.   Yeah.

Page 254

1   Q.   What's a field investigation?
2   A.   That's the guys that responded to the -- to
3   the shooting and they were assigned to handle it.
4   Q.   Okay.  And you responded to the shooting,
5   but you weren't assigned to handle it, right?
6   A.   No, ma'am.
7   Q.   Okay.  And it has the victims as being
8   Torrence Wiley and Kevin Wiley, correct?
9   A.   Yes.
10  Q.   And they were male blacks, who were 26 and
11  27 years old, is that right?
12  A.   Yeah.
13  Q.   Okay.  And this incident occurred on May
14  25th, 1990, at least according to the supplemental
15  report, right?
16  A.   Yes.
17  Q.   Okay.  Do you have a recollection of ever
18  reviewing this supplemental report?
19  A.   Never reviewed it, ma'am.
20  Q.   Are you sure you never reviewed it?
21  A.   I never -- I never reviewed this.
22  Q.   Is it you don't remember reviewing it or
23  you're confident you never reviewed it?
24  A.   I'm sure I never reviewed anything on that
25  homicide.

Page 255

1   Q.   Okay.  Let's go to the next page.
2   So what type of information is contained on
3   this second page of this supplemental report?
4   MR. BRUEGGEN: Object to form, vague.
5   THE WITNESS: The injuries, what
6   hospital it was taken to or the county morgue, what
7   type of weapon was used, the location where it
8   happened, date and time.
9   BY MS. BONJEAN:
10  Q.   Is that pretty typical for a --
11  A.   Yeah.  That's --
12  Q.   -- field investigation?
13  A.   Yeah, this is typical.
14  Q.   Okay.  And what's manner and motive?  What
15  is, not -- you don't have to read it to me, but
16  what is -- what is meant by manner and motive?
17  A.   The manner, they were shot.
18  Q.   Uh-huh.
19  A.   The motive, unknown.
20  Q.   Okay.  And a motive is the reason that --
21  A.   Yeah, the reason they were shot, you know.
22  Q.   Okay.  And at least at the time that this
23  was prepared, the motive was unknown, right?
24  A.   Right.
25  Q.   Okay.  And then if you could turn to the

Page 256

1   next page, there's a section that identifies the
2   personnel who were assigned, right?
3   A.   That what, ma'am?
4   Q.   There's a section that shows the personnel
5   who were assigned?
6   A.   Yes.
7   Q.   And your name is not among them, right?
8   A.   That's correct.
9   Q.   Okay.  And that's consistent with your
10  recollection, right?
11  A.   Yes, ma'am.
12  Q.   And is this the first time you're looking at
13  this field investigation report?
14  A.   Yes, ma'am.
15  Q.   Okay.  And you'll see that, if you want to
16  take a look at it, there are some names of
17  individuals on -- starting on the bottom of that
18  page and on to the next page.
19  Do you see that?
20  A.   Ma'am, you're speaking to the table.  I can't
21  hear you.
22  Q.   Sure.
23  A.   You got to look at me because I'm going deaf.
24  Q.   No problem.
25  If you look at the bottom of that second

Maysonet v.
Guevara

Video Deposition

Page 257

1  page.
2  A.  This, okay.
3  Q.  That page is fine.  Do you see some names
4  over here?
5  A.  Yeah.  Oh, here.
6  Q.  Take a look at that and tell me what you
7  recognize those names to be, if anything.
8  A.  Nothing.
9  Q.  Okay.  And as you sit here and read this,
10  does this bring back any recollection or ring any
11  bells that you ever looked at this before?
12  A.  No, ma'am.
13  Q.  Okay.  First time you've ever seen this to
14  the best of your knowledge?
15  A.  Yes.
16     MR. BRUEGGEN: Objection, asked and
17  answered.  Go ahead.
18     BY MS. BONJEAN:
19  Q.  Okay.  Let's go -- then keep going, and
20  we're going to look at RFC-Maysonet 63 and 64.
21  Yeah.
22  A.  Okay.
23  Q.  You see this is another supplemental report,
24  correct?
25  A.  Yeah.

Page 258

1  Q.  It looks like the reporting officer was
2  Detective Boyle?
3  A.  Yes.  Boyle and Brennan.
4  Q.  Right.  And supervising -- or approving was
5  Mingey?
6  A.  Yes.
7  Q.  Do -- does this report -- take a look at it.
8  Just take as much time as you want and tell me if
9  you have any recollection of after having seen this
10  report previously.
11  A.  No, ma'am.
12  Q.  No?
13  And I'll represent, you can disagree, but --
14  or take your time reading it, if you don't take my
15  word for it, that this -- this seems to be
16  interviews with family members of the victims.  It
17  says brother of victim, brother of victim.
18  A.  Seems like it.
19  Q.  Right.  And does it ring a bell for you that
20  you ever looked at any reports --
21  A.  No, ma'am.
22  Q.  -- regarding interviews with family?
23  A.  No, ma'am.
24  Q.  All right.  Okay.  I'm going to have you
25  look at RFC-Maysonet 55.

Page 259

1  This is another supplemental report,
2  correct?
3  A.  Yes.
4  Q.  And it involves again the Wiley brothers'
5  murder on North Avenue?
6  A.  Yes.
7  Q.  And in the narrative section, it says this
8  is a canvass report, correct?  In the narrative
9  section.
10  A.  I got to look where -- I don't see where it
11  says a canvass -- oh, canvass continued, yeah, okay.
12  Canvass report, okay.
13  Q.  Right there.
14  A.  Yeah, I gotcha.
15  Q.  Okay.  What is a canvass report?
16  A.  You go out on the -- you go out on the street
17  and you knock on doors, try to find people, if they
18  saw anything or heard any shots.  And when you -- if
19  you speak with somebody, you put it on the report
20  and you type it down and it goes with the file.
21  That's all a canvass report is.
22  Q.  All right.  I meant to ask you this earlier.
23  When you spoke to Mr. Maysonet in Spanish, were you
24  able to understand him in Spanish?
25  A.  Yes.

Page 260

1  Q.  Okay.  And when he spoke in English, did he
2  have a Puerto Rican accent?
3  A.  Yes.
4  Q.  Pretty thick, right?
5  A.  Yeah.
6  Q.  Okay.  Were you able to understand him when
7  he spoke in English?
8  A.  Yeah.
9  Q.  Okay.  All right.  Now, this canvass report
10  has some names of individuals that appear to have
11  been either in the area or some type of occurrence
12  witnesses, is that fair?
13  A.  Apparently, yes.
14  Q.  Okay.
15  A.  It's written here.
16  Q.  Right.  Please take as much time as you
17  want, look at this report and tell me if you have a
18  recollection of ever having seen this report
19  previous to today.
20  A.  Ma'am, I've never seen this report.
21  Q.  You're confident of that?
22  A.  Yes, ma'am.
23  Q.  Okay.  Now, I'm going to draw your attention
24  specifically to the narrative section again, to an
25  interview with Alma -- I think it says Preceeo?

Page 261

1 A. Preceeo, it looks like it.
2 Q. Preceeo, right?
3 And I'm going to read it. Read along with
4 me, if you would.
5 Alma -- "Preceeo, Alma, female, white
6 Hispanic," right?
7 A. Uh-huh.
8 Q. "3419 West North Avenue." Do you see that?
9 A. Yeah.
10 Q. And that would have been on the same block
11 as 3428 West North Avenue?
12 A. Yeah. I assume, yeah.
13 Q. "Related that she was awakened," it says,
14 "in an argument." Do you see that?
15 A. Yes.
16 Q. I'm sorry, "awakened" --
17 MR. BRUEGGEN: You skipped a line.
18 BY MS. BONJEAN:
19 Q. I'm sorry. "She was awakened 24 hours"?
20 A. 2400.
21 Q. 2400, sorry. What's that time --
22 A. Midnight.
23 Q. -- for civilians? Midnight?
24 A. Midnight.
25 Q. Okay. So "she was awakened at 2400 hours,"

Page 262

1 which is midnight, "by the sound of two male
2 English voices that were engaged in an argument."
3 Do you see that?
4 A. Yes.
5 Q. "Preceeo stated that she could only hear
6 bits of the conversation." And then there's some
7 parentheticals that say "I am trying to help you.
8 I am going to kill you. I am going to kill you
9 first. You said that we should get the last bus."
10 Do you see those?
11 A. Yes.
12 MS. CARNEY: Sorry. I think it's
13 "would," "we would."
14 MS. BONJEAN: "You said that we would
15 get the last bus."
16 MS. CARNEY: Thank you.
17 MS. BONJEAN: My apologies.
18 BY MS. BONJEAN:
19 Q. Do you see those?
20 A. Yes.
21 Q. Okay. It continues. "The total argument
22 lasted for about an hour. After hearing four
23 shots, Preceeo called the police."
24 Do you see that?
25 A. Yes.

Page 263

1 Q. Preceeo then gave reporting detectives her
2 sister's, Carmen Macias's business telephone
3 number, who was also home when the incident
4 occurred.
5 Do you see that?
6 A. Yeah.
7 Q. Do you have a recollection of ever reading
8 this paragraph or receiving this information in any
9 form or fashion prior to today?
10 A. No, ma'am.
11 Q. Okay. Would you agree that this information
12 would be -- would provide some leads into the
13 investigation of the Wiley brothers' murders?
14 MR. BRUEGGEN: Object to foundation,
15 form. You can answer.
16 THE WITNESS: Maybe.
17 BY MS. BONJEAN:
18 Q. If she was awakened at midnight and it
19 lasted an hour and the shooting was at 1:00 and she
20 heard these things, would you say that this is
21 material that's worth investigating?
22 MR. BRUEGGEN: Object to foundation.
23 Go ahead.
24 THE WITNESS: Yes.
25 /////

Page 264

1 BY MS. BONJEAN:
2 Q. Now, if you go to the next page, I'm going
3 to read this. "Carmen Macias" -- who is previously
4 referenced as the sister of Alma
5 Precis -- Preceeo -- "female, white Hispanic, 3419
6 West North Avenue, was contacted by telephone at
7 place of employment and related that she was
8 awakened around 2400 hours." Also around midnight,
9 right?
10 A. Yeah.
11 Q. "By the sound of two male blacks having an
12 argument. One had a very calm voice. The second
13 had a loud, abrasive-type voice and sounded as if
14 he may have been drunk. Macias was only able to
15 hear parts of the argument that lasted for at least
16 an hour. Both subjects referred a number of times
17 to someone called Lulu Dog."
18 A. I see that.
19 Q. "And also had some disagreement about a bus.
20 Macias did not call the police after hearing shots
21 because she did not have her telephone in her
22 apartment, but considered going downstairs to her
23 father, Inocenci, who was also interviewed,
24 apartment and using his telephone to call the
25 police. Macias later looked out of her window and

Page 265

1  saw the two victims down on the street."
2       MR. BRUEGGEN: Wait for a question.
3       MS. BONJEAN: Yes.
4       BY MS. BONJEAN:
5  Q.  Do you have a recollection of ever reading
6   this paragraph before?
7  A.  No, ma'am.
8  Q.  Do you have a recollection of ever receiving
9   this information in any form, either audibly,
10   orally or on some other report, anything?
11  A.  No, ma'am.
12  Q.  Does this at all ring a bell to you?
13  A.  No, ma'am.
14  Q.  Would you agree that this information from
15   Carmen Macias provides some leads that would be
16   worth investigating in connection with the murder
17   of the Wiley brothers?
18  A.  Yes.
19       MR. BRUEGGEN: Objection, foundation,
20   form.
21       BY MS. BONJEAN:
22  Q.  Do you think maybe it might be worth trying
23   to find out who Lulu Dog was, for instance?
24       MR. BRUEGGEN: Object to foundation,
25   incomplete hypothetical.

Page 266

1       THE WITNESS: Yes.
2       BY MS. BONJEAN:
3  Q.  Okay.  Now I would like you to take a look,
4   if you would, starting at page forty --
5   RFC-Maysonet 47.
6   Mr. Montilla, I'm going to have you look at
7   another document that starts at RFC-Maysonet 47 and
8   goes through RFC-Maysonet 54 and is a part of
9   Exhibit 3.
10   Would you agree that this is another
11   supplemental report?
12  A.  Yes, ma'am.
13  Q.  And it's a supplemental report that was
14   prepared in connection with the murders of Torrence
15   Wiley and presumably Kevin Wiley?
16  A.  I -- yes.
17  Q.  Is that right?
18  A.  Yes.
19  Q.  And who were the reporting detectives on
20   this report, if you can tell?
21  A.  Halvorsen, Ernie Halvorsen, Rey Guevara,
22   Steve Gawrys and Roland Paulnitsky.
23  Q.  Okay.  And do you, as you sit here today,
24   remember Roland Paulnitsky being one of the
25   detectives who investigated the Wiley brothers'

Page 267

1   murders?
2  A.  I don't know if he investigated or not,
3   ma'am.
4  Q.  Okay.  But his name is on this report,
5   right?
6  A.  Yes, ma'am.
7  Q.  Would that lead you to believe that he maybe
8   took part in the investigation?
9  A.  Could have been involved.  I don't know,
10   ma'am.
11  Q.  Would you put your name on a report for an
12   investigation you took no part in?
13  A.  No, ma'am.
14  Q.  Okay.  All right.  In the narrative section,
15   it has -- oh, strike that.
16   First of all, what's the date that this
17   report was submitted?
18  A.  Twenty -- it was approved by the sergeant, I
19   think, 24 August 1990 at 11:45 p.m.
20  Q.  Okay.  And do you know when it was submitted
21   to the sergeant?
22  A.  Pardon me?
23  Q.  Do you know when it was submitted to the
24   sergeant by looking at this report?
25  A.  Do I know...

Page 268

1  Q.  When the report was submitted to.
2  A.  Well, if the sergeant signed it on the 24th,
3   that's when he got it.
4  Q.  Right, okay.  And do you see there's a box
5   that says "date report submitted"?  Do you see
6   that, August 23rd, 1990?
7  A.  Yes.
8  Q.  Okay.  Did you play any role in preparing
9   this report?  And if you need to look at it, take
10   as much time as you need.
11  A.  No, ma'am.
12  Q.  You didn't play any role?
13       MR. BRUEGGEN: Make sure you look at
14   the document.
15       THE WITNESS: Okay.
16       MR. BRUEGGEN: There's eight pages
17   there.
18       THE WITNESS: Rephrase the question to
19   me.
20       BY MS. BONJEAN:
21  Q.  Did you play any role whatsoever in
22   preparing this document?
23  A.  Apparently I got -- I'm here with Paulnitsky
24   and myself on the reporting, and Gawrys below that,
25   arresting officers, right here.

Page 269

1  Q.  Okay, arresting officers.  Actually, I'll
2  just have you actually look at the very last page
3  of the report.  We're going to go back, but just
4  look at the last page.
5  Do you see your name at the bottom there?
6  A.  Yes.
7  Q.  Okay.  Is that you?
8  A.  Yes, ma'am.
9  Q.  Now, does the fact that your name is
10  represented here lead you to believe that you took
11  a role in authoring this report?
12  A.  I was the -- doing the interpreting, I guess
13  they put me down because I was a -- considered an
14  arresting officer on this case.
15  Q.  Okay.  Listen to my question, though.  Okay?
16  Does the fact that your name appears here
17  lead you to believe that you played a role in
18  authoring the report?
19  MR. BRUEGGEN: Object to form.
20  THE WITNESS: Yes.
21  BY MS. BONJEAN:
22  Q.  Okay.  Do you think -- so you played a role
23  in writing the report?
24  A.  No, ma'am.
25  Q.  Okay.  That's what I meant by "authoring."

Page 270

1  A.  Okay.  No, I didn't write the report.
2  Q.  Okay.  So I'll use different language.
3  A.  Okay.
4  Q.  Does the fact that your name appears here
5  lead you to believe that you played a role in
6  actually writing this document?
7  A.  No, ma'am.
8  Q.  Okay.  Are you confident that you played no
9  role in actually writing the words that are on this
10  exhibit?
11  A.  Yes, ma'am.
12  Q.  That's correct, right?
13  A.  That's correct.
14  Q.  Okay.  Do you have a recollection of ever
15  reviewing this supplemental report?
16  A.  No, ma'am.
17  Q.  Okay.  Did it happen from time to time that
18  a detective's name may appear on a report as a
19  reporting detective, but the detective actually
20  didn't do the reporting?
21  A.  Yes.
22  Q.  Okay.  And why would that happen?
23  A.  They --
24  MR. BRUEGGEN: Object to form,
25  foundation.

Page 271

1  THE WITNESS: Apparently participated
2  in some part of the case.
3  BY MS. BONJEAN:
4  Q.  Okay.  So if someone participated in the
5  investigation, they may be listed on the report,
6  but that doesn't mean they wrote the report, right?
7  A.  That's right.
8  Q.  Okay.  And would you say that's fair here,
9  that you did not have anything to do with writing
10  this report?
11  A.  That's correct.
12  Q.  Okay.  And I think I asked this, but I'm
13  sorry.  Indulge me if I did.
14  You don't remember ever reading this report
15  either, right?
16  A.  That is correct.
17  Q.  Okay.  Do you remember reading this report
18  at any point prior to today?
19  MR. BRUEGGEN: Make sure you look at
20  the report.
21  THE WITNESS: Now that I looked at it,
22  I don't know, ma'am.
23  BY MS. BONJEAN:
24  Q.  Okay.  It's not familiar to you?
25  A.  No, not familiar.

Page 272

1  Q.  And do you see that Sergeant Epplen is the
2  supervisor who signed off on this?
3  A.  Yeah.  He was the midnight sergeant.
4  Q.  Okay.  So let's go to the second page.  The
5  first page indicates that Jose Maysonet and Alfredo
6  Gonzalez are in custody.  Do you see that?
7  A.  Yes.
8  Q.  Okay.  Do you remember ever having any
9  conversations with Alfredo Gonzalez while he was at
10  Area 5?
11  A.  Not that I recall, ma'am.
12  Q.  Okay.  And the next page references Tino or
13  a possible name of Chris Cruz.  Do you see that?
14  A.  Yes.
15  Q.  And that's someone who is wanted?  It says
16  "wanted" to the left, right?
17  A.  Yes.
18  Q.  Is that just sort of what -- sort of
19  obvious, they're looking for him or he --
20  A.  Apparently they're looking for him, yeah.
21  Q.  Okay.  Do you remember the name Chris Cruz
22  or Tino?
23  A.  Pardon me?
24  Q.  Do you have any knowledge about Tino or
25  Chris Cruz?

Page 273

1 A. No, ma'am.
2 Q. Okay. And Chris Fernandez?
3 A. No, ma'am.
4 Q. Okay. You are listed as an arresting
5 officer of Mr. Maysonet. Do you see that?
6 A. Yeah.
7 Q. Now, you didn't put your name there.
8 Somebody did?
9 A. No. Yes.
10 Q. Okay. Why were you listed as an arresting
11 officer?
12     MR. BRUEGGEN: Object to foundation,
13 form.
14     MR. BRENER: Join.
15     BY MS. BONJEAN:
16 Q. If you know.
17     MR. BRUEGGEN: You can answer.
18     THE WITNESS: Apparently when he gave
19 up the -- made a statement or something and said he
20 did the murder, they apparently put me on there
21 because I was there.
22     BY MS. BONJEAN:
23 Q. Okay. Would you have called yourself an
24 arresting officer?
25 A. No.

Page 274

1 Q. What is an arresting officer?
2 A. When you actually made the actual arrest.
3 Q. Okay. And did you actually make the arrest
4 of Mr. Maysonet?
5 A. No, ma'am.
6 Q. Do you remember making the arrest of
7 Mr. Maysonet?
8 A. I didn't arrest him. I know that.
9 Q. Right.
10 A. And this is put on the report -- when you
11 assist, they put you as an arresting officer.
12 Q. Okay. Somebody put you as an arresting?
13 A. Yes, ma'am.
14 Q. Do you -- can you tell by looking at this
15 document who actually put the words on these pieces
16 of paper?
17 A. No, ma'am. Other than, you know --
18 Q. I mean, is -- go ahead. I'm sorry. I
19 didn't mean to cut you off.
20 A. Halvorsen did the report.
21 Q. Okay. Is it -- is it -- is it customary
22 that whosever name is in that first upper box to
23 the left is the person who authored or wrote the
24 report?
25 A. Yes.

Page 275

1 Q. Okay. So by looking at this, does it
2 suggest to you that it was Halvorsen who actually
3 wrote the report?
4 A. Yes, ma'am.
5 Q. Okay. Let's go to the -- back to the next
6 page.
7 Well, let's keep going. We're going to look
8 at page three of the report, but it says
9 RFC-Maysonet 49 at the bottom right-hand corner.
10 A. This one here. Where?
11 Q. If you could look at the manner/motive, do
12 you see it says, "manner/motive. Victims, who were
13 male black youths, were standing on the street when
14 they were approached by the offenders, who are
15 Latin and members of the Latin Kings. Offenders
16 shot victims to death. Motive was gang rivalry."
17 Do you see that?
18 A. Yes.
19 Q. Okay. Did you have any information that the
20 Wiley brothers were in a gang?
21 A. No, ma'am.
22 Q. Okay. As you sit here today, do you have
23 any idea what gang they were in?
24 A. No, ma'am.
25 Q. Now, it says "vehicle used" underneath that.

Page 276

1 Older model Pontiac Bonaventure, I'm assuming, two
2 door, light blue top over dark blue bottom. Do you
3 see that?
4 A. Yes.
5 Q. "This car is alleged to belong to a Latin
6 King, first name Jeffery." Do you -- do you
7 remember getting that information from anyone?
8 A. No, ma'am.
9 Q. Do you know who Jeffrey is?
10 A. Pardon me?
11 Q. Do you know who Jeffrey is?
12 A. No, ma'am.
13 Q. Do you remember Mr. Maysonet ever mentioning
14 a guy named Jeffrey?
15 A. No, ma'am.
16 Q. The next section is "notifications." It has
17 two Assistant State's Attorneys listed there. ASA
18 Jennifer Borowitz and ASA Frank DiFranco?
19 A. Yes, ma'am.
20 Q. Okay. Do you remember both of those
21 Assistant State's Attorneys being at Area 5?
22 A. Do I remember what, ma'am?
23 Q. Do you remember both of those Assistant
24 State's Attorneys being at Area 5?
25 A. Yes.

Video Deposition

Page 277

1 Q.   And it also says interviewed Rosa Bella --
2   Bello.  Do you see that?
3 A.   Yes, ma'am.
4 Q.   Okay.  And you participated in the interview
5   of Rosa?
6 A.   Apparently I did, yes, ma'am.
7 Q.   Okay.  Okay.  Now, we're going to -- I want
8   to read through this with you and --
9 A.   Oh, down here?
10 Q.   Okay.  It says, "on July 15th, 1990,
11   Sergeant Mingey, Area 5 violent crimes, became
12   aware of an offender charged in a shooting
13   incident, in which three persons were shot on the
14   street.  This person was Jose Maysonet."
15   Keep going.
16   "This shooting incident was reported under
17   RD N-303737.  Recovered from the scene of this
18   shooting were three fired cartridge casings, with a
19   class of nine millimeters.  These casings were
20   inventoried under inventory 784562.
21   "Sergeant Mingey was aware of the fact that
22   the weapon used to kill Torrence and Kevin Wiley
23   was a nine millimeter automatic pistol.  Sergeant
24   Mingey believed that there might be a connection
25   between these two separate shooting incidents."

Page 278

1   On July 15th, 1990, Sergeant Mingey in
2   company with Detective Frank Montilla interviewed
3   Jose Maysonet.  Do you see that?
4 A.   Yes, ma'am.
5     MR. BRUEGGEN: Just F. Montilla, not
6   Frank.
7     MS. BONJEAN: Oh, sorry.  F. Montilla.
8     MR. BRUEGGEN: Let me clarify.  You're
9   not Frank, right?
10     THE WITNESS: No, I'm not Frank.  I
11   don't know why they put Frank.
12     MR. BRUEGGEN: They didn't.
13     MS. BONJEAN: They didn't.  I just made
14   it up, so --
15     THE WITNESS: Okay.
16     MS. BONJEAN: -- my apologies.
17     BY MS. BONJEAN:
18 Q.   It says, "Maysonet, while he was at Area
19   5 -- strike that, "interviewed Jose Maysonet while
20   he was at Area 5.  Detective F. Montilla speaks
21   Spanish.  Detective E." -- I think it's meant to be
22   F. -- "Montilla advised Jose Maysonet of his
23   Miranda rights."
24   Go ahead and just read that paragraph to
25   yourself.  I won't read it all to you.

Page 279

1 A.   Pardon me?
2 Q.   Read that paragraph to yourself.
3     MR. BRUEGGEN: This paragraph.
4     THE WITNESS: The whole paragraph,
5   okay.
6     MS. BONJEAN: Yeah.
7     THE WITNESS: Yeah.
8     BY MS. BONJEAN:
9 Q.   Let me know when you're finished.
10 A.   Okay.
11 Q.   Okay.  Now, you previously testified about
12   a -- serving as an interpreter for an initial
13   interview or -- the first time you met with
14   Mr. Maysonet.  Do you remember that?
15 A.   Uh-huh.
16 Q.   You testified earlier about that.
17   You testified earlier that the first time
18   you met with him was with Mr. Paulnitsky.  Right?
19 A.   I -- yes.
20 Q.   Okay.  Do you think that Mr. -- it was
21   Mr. Paulnitsky or Sergeant Mingey or you don't know
22   as you sit here today?
23 A.   Pardon me?
24 Q.   Do you know whether that first interview
25   with Mr. Maysonet was Sergeant Mingey or Paulnitsky

Page 280

1   or you don't know as you sit here today?
2 A.   I can't remember.  I don't know.
3 Q.   Okay.  But fair to say you don't remember
4   interviewing Mr. Maysonet with Sergeant Mingey on
5   July 15th, 1990, correct?
6 A.   I don't remember, but I know I interviewed
7   him with Sergeant Mingey.
8 Q.   Well, you -- where was that?
9 A.   I think this was at Area 5.  I'm not sure,
10   but it says here Area -- Area 5.
11 Q.   Okay.  But --
12 A.   Yeah.
13 Q.   I know what the document says.
14 A.   Yeah.
15 Q.   I'm asking you:  Do you remember having an
16   interview with Jose Maysonet at Area 5 with
17   Sergeant Mingey?
18 A.   Yes, ma'am.  Yeah.
19 Q.   Okay.  You didn't testify to that earlier,
20   did you?
21 A.   I know I -- no.
22 Q.   So what about this -- why do you think --
23   what about this made you remember that?
24 A.   I was in the area.  Sergeant Mingey asked me
25   if I can -- I think asked me -- he wanted to

Maysonet v.
Guevara

Video Deposition

---

Page 281

1   interview this guy about some kind of weapon.
2   Q.   Okay.  But you testified earlier that --
3   well, strike that.
4   So did you also have an interview with
5   Detective Paulnitsky and Mr. Maysonet then?
6   A.   I think so.  I don't recall all that, ma'am.
7   I don't recall all the dates.
8   Q.   Okay.  But you remember earlier, you
9   testified about the first time that you met
10  Mr. Maysonet was with Detective Paulnitsky.  Right?
11  A.   Yes.
12  Q.   Okay.  Is that correct?
13  A.   Yes.
14  Q.   That's your recollection?
15  A.   My recollection is I spoke with Mason at Area
16  5.
17  Q.   With -- you have a recollection of speaking
18  to Mr. Maysonet at Area 5 with Detective Paulnitsky
19  and Mr. Maysonet, right?
20  A.   Yes.
21  Q.   And this was prior to going to Cook County
22  Jail, right?
23  A.   I think so.
24  Q.   Does that sound right?
25  A.   It sounds right.  I might have the dates

---

Page 282

1   mixed up, ma'am.  I don't know.
2   Q.   Okay.  So now when I asked you earlier about
3   whether you recollected having any interactions
4   with Mr. Maysonet other than the ones you had
5   testified about, you didn't mention one with
6   Sergeant Mingey at Area 5.
7   A.   Ma'am, I didn't recall.
8   Q.   Okay.  So are you -- are you saying that
9   this refreshes your recollection about that?
10  A.   Yes, ma'am.  Yeah.
11  Q.   Okay.  So tell me about that interview.
12  A.   With Sergeant Mingey?
13  Q.   Yeah.  What do you remember about it?  I
14  don't want you to read it to me.  I can read it.
15  A.   No.  Sergeant Mingey asked me, do you want to
16  talk to this guy.  We went in there.
17  Q.   Okay.
18  A.   Jose Maysonet made some statement about the
19  Latin Kings.  He had a -- a gun that they asked him
20  to keep in his house.  Later on, they came and they
21  asked him for the gun back.  He went to his house,
22  gave them -- got the gun, gave it to the Kings, and
23  they drove off.  Then he stated -- I think it was at
24  that time he said he heard about some guys getting
25  shot and he assumed that the guys that got the gun

---

Page 283

1   shot.
2   So then we -- Sergeant Mingey asked some more
3   questions, and he refused to answer any more
4   questions then and there.  I think he said he wanted
5   a -- a bargain or something.
6   Q.   Okay.  Now, remember when I asked you
7   questions about this earlier?
8   A.   Yes, ma'am.
9   Q.   You didn't mention anything about this.
10  A.   Ma'am, I -- I have a report to recall my
11  memory.
12  Q.   Well --
13  A.   So I need reports to recall memory.  I'm old.
14  Q.   But, sir, I asked you if you remember
15  Mr. Maysonet saying anything even incriminating,
16  and you said no.
17  A.   No, I don't remember it.  If I see a report,
18  it will enlighten my mind.  I'm 74 years old.  This
19  is almost 30 years ago.
20  Q.   Right.
21  A.   I can't remember everything, you know, that
22  happened.
23  Q.   Okay.
24  A.   I need to see all the reports to read things.
25  Q.   Okay.  So does -- so this actually refreshes

---

Page 284

1   your recollection?
2   A.   Yes, ma'am.
3   Q.   Okay.  So tell me where you were when that
4   interviewed happened.
5   A.   Area 5.
6   Q.   Where?
7   A.   Upstairs in one of the small rooms.
8   Q.   Okay.  And who was present?
9   A.   It was just Sergeant Mingey and I.
10  Q.   Okay.  And did this interview happen before
11  you interviewed Mr. Maysonet with Detective
12  Paulnitsky or after you interviewed Mr. Maysonet
13  with Detective Paulnitsky?
14  A.   I think after or -- wait.  With Sergeant
15  Mingey and I?
16  Q.   Yeah.
17  A.   Before Paulnitsky.
18  Q.   So you interviewed Mr. Maysonet with
19  Detective Paulnitsky before you interviewed him
20  with Sergeant Mingey?
21  A.   I'm not sure.  I think so.  I'm not sure,
22  ma'am.
23  Q.   Well, what's your best recollection?
24  A.   I know it was Paulnitsky and I at one time,
25  and Sergeant Mingey at another time.

---

Rizman Rappaport (973)992-7650
"When every word counts"

Maysonet v.
Guevara

Video Deposition

Page 285

1 Q. Okay. Now, this paragraph you just read
2 that you now remember, did you serve as an
3 investigator or an interpreter during this
4 interview?
5 A. Interpreter.
6 Q. Just an interpreter?
7 A. Just an interpreter.
8 Q. Okay. You weren't responsible for reporting
9 this?
10 A. That's right.
11 Q. Okay. But you would expect Sergeant Mingey
12 to have reported about this incident, correct?
13 A. Yes.
14 MR. BRUEGGEN: Object to form.
15 BY MS. BONJEAN:
16 Q. Now, when you spoke -- now that your
17 recollection is refreshed --
18 A. Uh-huh.
19 Q. -- when you spoke to Sergeant Mingey on July
20 15th, 1990, what did Sergeant Mingey specifically
21 question Mr. Maysonet about? And if you need to
22 look at that to --
23 A. I will look at it, but I think it was
24 against -- asked him about the shooting on North
25 Avenue.

Page 286

1 Q. Okay. Do you remember Sergeant Mingey
2 asking him about the shooting on North Avenue?
3 A. I think he did.
4 Q. Okay. And do you remember why he wanted to
5 ask Mr. Maysonet questions about the shooting on
6 North Avenue?
7 MR. BRUEGGEN: Object to foundation.
8 THE WITNESS: Okay. A 45 was used, and
9 there was a 45 used prior to that on an aggravated
10 battery. People -- three people, I think, were
11 shot.
12 BY MS. BONJEAN:
13 Q. Okay. And how did you remember that?
14 A. Once I start reading, things will come back
15 to my mind.
16 Q. Okay. What did Mingey tell you about --
17 strike that.
18 Prior to sitting down with Sergeant Mingey
19 and Mr. Maysonet on July 15th, 1990, had you
20 reviewed any police reports?
21 A. No, ma'am.
22 Q. Okay. And did you prepare a GPR that
23 reflected this interview on July 15th of 1990?
24 A. No, ma'am.
25 Q. Did Sergeant Mingey prepare a GPR --

Page 287

1 A. I don't know. He might have, ma'am.
2 Q. Okay. Let me -- let me finish my question.
3 Do you know whether Sergeant Mingey prepared
4 a GPR that reflected this interview on July 15th,
5 1990?
6 A. I don't know, ma'am.
7 Q. Okay. Would you expect there to be a GPR
8 reflecting this interview with Mr. Maysonet?
9 A. Yes. Yes.
10 MS. CARNEY: Objection, foundation,
11 form.
12 BY MS. BONJEAN:
13 Q. Would you agree that Jose Maysonet has
14 provided some important information in connection
15 with the murder of the Wiley brothers here?
16 MS. CARNEY: Objection, form.
17 THE WITNESS: Yes.
18 BY MS. BONJEAN:
19 Q. Yeah, you would agree with that?
20 A. Yeah.
21 Q. Okay. And in fact, he's provided
22 information that, arguably, implicated himself in
23 the crime, correct?
24 A. Yes.
25 Q. He says he gave a gun to some Latin Kings

Page 288

1 that may have been involved in this shooting,
2 right?
3 A. Yes.
4 Q. Okay. So, again, this information should be
5 reflected in a GPR somewhere, right?
6 A. Yes.
7 MR. BRUEGGEN: Object to form.
8 THE WITNESS: Yes.
9 BY MS. BONJEAN:
10 Q. What information did you have about who
11 might be responsible for the Wiley brothers'
12 murders prior to July 15th of 1990?
13 A. Can you repeat that for me?
14 Q. Sure. Prior to July 15th of 1990 --
15 A. Yeah.
16 Q. -- what information did you have about any
17 possible suspects in the murders of the Wiley
18 brothers?
19 A. None.
20 Q. Mr. Maysonet provided the first bit of
21 information about who might be responsible for the
22 Wiley brothers, right?
23 MR. BRUEGGEN: Objection to --
24 MS. CARNEY: Objection, misstates his
25 testimony.

Maysonet v.
Guevara

Video Deposition

Page 289

BY MS. BONJEAN:

2 Q. Is that correct?

3 A. I assume right here, yes, on the 15th --

4 Q. Okay. Were --

5 A. -- that I know.

6 Q. Okay.

7 MR. BRUEGGEN: Jennifer, when you're to

8 a point of breaking.

9 MS. BONJEAN: Yeah. Well --

10 MR. BRUEGGEN: I want to get him up,

11 stretching just a little.

12 MS. BONJEAN: Yeah.

13 BY MS. BONJEAN:

14 Q. Okay. Now -- hold on one second.

15 After this conversation with Mr. Maysonet in

16 which you served as an interpreter for Sergeant

17 Mingey, did you have any further discussions with

18 Sergeant Mingey about -- about this interview?

19 A. No, ma'am.

20 Q. Did you discuss what you were going to do

21 with this information?

22 A. No, ma'am.

23 Q. And why is that?

24 A. I'm not the investigator and I'm not a

25 homicide detective.

Page 290

1 Q. Okay. So as far as you're concerned, your

2 only function was to serve as an interpreter on

3 July 15th of 1990?

4 A. That is correct.

5 Q. And do you recall whether or not

6 Mr. Maysonet told you or told Sergeant Mingey

7 through you that he had an attorney?

8 A. Not that I recall.

9 Q. Okay. Do you recall whether or not

10 Mr. Maysonet exercised his right to counsel during

11 this meeting?

12 A. No, ma'am.

13 Q. No, you don't recall it, or you're confident

14 he did not?

15 A. I'm confident he denied it.

16 Q. And why are you so confident of that?

17 A. Because he started talking to us and give us

18 information.

19 Q. Okay. And he didn't say he was represented

20 by anybody?

21 A. No.

22 Q. All right. Now, after that interview, what,

23 if anything, did you do in connection with

24 investigating the Wiley brothers' murders?

25 A. Another interview.

Page 291

1 Q. Okay. And when was that interview?

2 A. That was in the county jail.

3 Q. Okay. Between the July 15th, 1990 interview

4 and the August 1st, 1990 interview in the county

5 jail, what investigative actions did you take in

6 connection with the Wiley brothers' murders?

7 A. I took no investigative actions.

8 Q. Nothing?

9 A. Nothing, no.

10 Q. You're confident of that?

11 A. Yes, ma'am, I'm confident.

12 Q. And anything -- any report I can give you to

13 refresh your recollection?

14 A. If you give me a report, it will refresh my

15 memory, but I didn't do any investigative stuff on

16 this case, other than interpreting.

17 Q. Okay. So what happened that -- so you

18 testified about August 1st, 1990. You remembered

19 going to the jail with Sergeant Mingey, right?

20 A. Yes, ma'am.

21 Q. And we talked about this earlier.

22 A. Yes.

23 Q. You said the interview didn't last very

24 long. Right?

25 A. Pardon me?

Page 292

1 Q. You said the interview didn't last very

2 long.

3 A. No, I don't think it lasted very long.

4 Q. Okay. And you don't remember Mr. Maysonet

5 saying anything incriminating during that

6 interview?

7 A. I don't recall, ma'am.

8 Q. Okay. Now, you don't remember, of course,

9 writing any reports or GPRs from that interview,

10 because you were just an interpreter, right?

11 A. Yes, ma'am.

12 Q. Now, you said you remembered Mr. Maysonet

13 asking for a deal. What was he asking you for a

14 deal -- related to what?

15 A. I haven't...

16 Q. Do you know why?

17 A. I think Sergeant Mingey asked him if he knew

18 who the shooters were, and he wanted to make a deal.

19 Sergeant Mingey says no, no deal, and that's --

20 interview ended.

21 Q. But what did Mr. Maysonet want in exchange

22 for giving up the names of the shooters?

23 A. I have no idea, ma'am.

24 Q. Okay. And to be clear, prior to July 15th,

25 1990, you had no reason to believe that

Page 293

1 Mr. Maysonet was involved in the shooting of the --
2 A. That's -- that's correct.
3 Q. Hold on. Let me finish.
4 A. Okay.
5 Q. Prior to July 15th, 1990, you had no reason
6 to believe that Mr. Maysonet had any role in the
7 murders of the Wiley brothers, right?
8 A. That's correct.
9 Q. Okay. And between July 15th and August 1st,
10 1990, you can't tell us of any information that you
11 developed or became aware of regarding who might be
12 responsible for the Wiley brothers' murders, right?
13 MR. BRUEGGEN: Objection, asked and
14 answered. Go ahead.
15 THE WITNESS: Correct.
16 BY MS. BONJEAN:
17 Q. And then on August 1st, 1990, it's your
18 recollection that the interview didn't last very
19 long. Right?
20 A. That's correct.
21 Q. But go ahead and read this paragraph, if you
22 would, for me.
23 MR. BRUEGGEN: This paragraph, the next
24 one.
25 THE WITNESS: Okay.

Page 294

1 BY MS. BONJEAN:
2 Q. Based on your prior testimony, you don't
3 have an independent recollection of what is written
4 here, right?
5 A. That's right.
6 Q. You're just reading this --
7 A. I'm reading this for the first time.
8 Q. Okay. And, again, you didn't write this,
9 right?
10 A. That's correct.
11 Q. And does this jibe with your recollection of
12 the meeting?
13 A. Yes.
14 Q. Okay. So when you said earlier that the
15 meeting didn't last very long, do you still stand
16 by that, or do you think it --
17 A. I still stand by it. It didn't last long.
18 Q. Okay. And during this meeting,
19 Mr. Maysonet, at least according to this, stated he
20 was -- stated that he was involved in the murders
21 of the two black youths, right?
22 A. Yeah.
23 Q. That's an incriminating statement, right?
24 A. Yes, it is.
25 Q. That's a confession really, right?

Page 295

1 A. Yeah.
2 Q. That's an admission, right?
3 A. Yeah.
4 Q. You didn't remember him making that, though?
5 A. No, I don't remember. I didn't recall,
6 unless I read it. If it's an old report, I don't
7 remember. It's hard to remember.
8 Q. But you don't remember him confessing to the
9 murders at Cook County Jail, right?
10 A. At the time that -- in my answer, no, I don't
11 recall, until I see reports, then I can -- it'll
12 refresh memories.
13 Q. Right. So when you read the report, you now
14 remember it?
15 A. Yes, ma'am. It refreshes my memory.
16 Q. Okay. So how did he say it?
17 A. In Spanish, he said he was three, he knew who
18 the guys were, and he wanted to make a deal.
19 Q. Okay. So now you remember those --
20 A. Yeah. I remember him wanting to make a deal.
21 Sergeant Mingey says we don't make deals, and that
22 was it.
23 Q. Okay. But you remember him saying that he
24 was involved?
25 A. Yes, ma'am. Yeah.

Page 296

1 Q. Okay. And he also stated that he was not
2 the shooter, but was present when the shooting
3 occurred, right?
4 A. Yes, ma'am.
5 Q. But he knows who the shooter is, right?
6 A. Yeah.
7 Q. And you remember all that?
8 A. Yes, ma'am.
9 Q. Okay. Now, you would agree, of course, that
10 this is essentially a confession, right?
11 A. Yes.
12 Q. Okay. And when somebody confesses to a
13 crime, as a detective what do you do?
14 MR. BRUEGGEN: Object to form,
15 foundation, incomplete hypothetical. Go ahead and
16 answer.
17 THE WITNESS: Place them into custody.
18 BY MS. BONJEAN:
19 Q. Okay. You place them under arrest, right?
20 A. Yes, ma'am.
21 Q. Now, he was already in custody.
22 A. Yes.
23 Q. So what would you do when someone confesses
24 to a murder, but they're already in custody?
25 A. You go back to the area. You put it on a

Page 297

1 report and you get a writ to writ them out of jail
2 and bring them into the area and formally charge
3 them.
4 Q. Right. And this is, of course -- this is a
5 death penalty case, right?
6 A. Yes, ma'am.
7 MR. BRUEGGEN: Object to foundation.
8 BY MS. BONJEAN:
9 Q. Two bodies, right?
10 A. Yes.
11 Q. A pretty serious crime?
12 MR. BRUEGGEN: Object to --
13 MS. CARNEY: Objection, form.
14 BY MS. BONJEAN:
15 Q. You don't get more serious than two bodies,
16 except maybe five bodies or ten bodies, right?
17 A. Yes.
18 Q. Okay. And certainly you would want to
19 prepare a report reflecting this confession, right?
20 MR. BRUEGGEN: Object to form.
21 THE WITNESS: Yes.
22 BY MS. BONJEAN:
23 Q. Okay. And you would want to prepare that
24 report immediately after someone confessed, right?
25 A. Yes.

Page 298

1 Q. Okay. Would you do it -- how would you do
2 it, in a GPR and then in a supplemental? How would
3 you do it?
4 A. It all depends on --
5 MR. BRUEGGEN: Object to form,
6 incomplete hypothetical. Go ahead and answer.
7 THE WITNESS: It all depends on the
8 detective that was there with me. He has to make
9 this report. Probably a GPR.
10 BY MS. BONJEAN:
11 Q. Right. And I know you didn't do it and I
12 know -- I'm not asking you to tell me what Sergeant
13 Mingey did. I'm asking you to tell me what you
14 would expect Sergeant Mingey to do.
15 A. Make a GPR.
16 MR. BRUEGGEN: Object to form.
17 BY MS. BONJEAN:
18 Q. Go ahead.
19 A. And then a supplementary.
20 Q. Okay. And would you expect him to do that
21 when he got back to Area 5 immediately?
22 A. Yes.
23 Q. Do you remember Sergeant Mingey asking
24 Mr. Maysonet whether he'd be willing to give a
25 handwritten statement?

Page 299

1 A. I don't recall, ma'am, no.
2 Q. Okay. Do you remember Sergeant Mingey
3 asking Jose Maysonet whether he'd be willing to
4 make a statement in some other fashion, such as
5 with a court reporter or video?
6 A. On August 1st?
7 Q. Yeah.
8 A. No, I don't recall that, ma'am.
9 Q. Okay. Now, did you ever review or see any
10 GPRs prepared by Sergeant Mingey?
11 A. No, ma'am.
12 Q. Okay. And in connection in preparation for
13 your deposition here today, did you see any GPRs
14 prepared by Sergeant Mingey?
15 A. No, ma'am.
16 Q. And Sergeant Mingey would have been the
17 person responsible for preparing the GPR, correct?
18 A. Yes.
19 MR. BRUEGGEN: Object to foundation.
20 BY MS. BONJEAN:
21 Q. And that would be for the July 15th, 1990
22 interview and the August 1st, 1990 interview,
23 correct?
24 MR. BRUEGGEN: Same objection.
25 THE WITNESS: Yes.

Page 300

1 BY MS. BONJEAN:
2 Q. Okay. It wouldn't be you, right?
3 A. No.
4 Q. Was there anyone else there?
5 A. No. Just us. That's it.
6 Q. So it wouldn't have been Mr. Maysonet's
7 responsibility for preparing a GPR, would it?
8 A. No, ma'am.
9 Q. Okay. And after Mr. Maysonet confessed to
10 this double murder on August 1st, 1990, what
11 investigative actions did you take in connection
12 with the Wiley brothers' murders?
13 A. With Paulnitsky, with the State's Attorneys,
14 you making statements and charging. That was it.
15 Q. Okay. But we've already established, and
16 you looked at the statement, that Mr. Maysonet did
17 not make any statements to ASA DiFranco until
18 August 23rd of 1990, right?
19 A. I suppose so, if it's in the report.
20 Q. Right. So what happened between August 1st,
21 1990, and August 20 -- well, August 22nd, 1990, by
22 way of investigative actions?
23 A. I have no --
24 MR. BRUEGGEN: Object to foundation.
25 MS. CARNEY: And form.

---

Page 301

1  THE WITNESS: I have no idea, ma'am.
2  BY MS. BONJEAN:
3  Q.  Did you take any actions to investigate the
4  case after Mr. Maysonet confessed, essentially, to
5  you on August 1st, 1990?
6  MS. CARNEY: Objection, asked and
7  answered.
8  MS. BONJEAN: I'm sorry.  Let me strike
9  that.
10  BY MS. BONJEAN:
11  Q.  Between August 1st, 1990, and August 22nd,
12  1990, did you take any actions in terms of the
13  investigation?
14  A.  No.
15  MS. CARNEY: Objection, asked and
16  answered.
17  THE WITNESS: No, ma'am.
18  BY MS. BONJEAN:
19  Q.  Okay.  What actions, if any, did Sergeant
20  Mingey take to corroborate Mr. Maysonet's
21  confession on August 1st, 1990?
22  MR. BRUEGGEN: Object to foundation.
23  MS. CARNEY: Object to foundation.
24  MR. BRENER: Join.
25  /////

---

Page 302

1  BY MS. BONJEAN:
2  Q.  If you know.
3  A.  I have no idea, ma'am.
4  Q.  We would see that in a report probably,
5  right?
6  MR. BRUEGGEN: Object to foundation.
7  MS. CARNEY: Object to foundation.
8  MR. BRUEGGEN: Speculation.
9  MR. BRENER: Join.
10  THE WITNESS: Yes.
11  BY MS. BONJEAN:
12  Q.  Did you do anything to corroborate
13  Mr. Maysonet's statements from August 1st, 1990?
14  A.  No, ma'am.
15  Q.  Okay.  Do you know whether any detective did
16  anything to corroborate Mr. Maysonet's statements
17  from August 1st, 1990?
18  MS. CARNEY: Objection, foundation.
19  THE WITNESS: I have no idea, ma'am.
20  BY MS. BONJEAN:
21  Q.  Do you know whether Mr. Maysonet's
22  statements -- well, strike that.
23  Did you -- did you -- did you ever even read
24  the reports that --
25  A.  No.

---

Page 303

1  Q.  -- had been prepared?
2  A.  Read whose report?
3  Q.  Did you read any reports that had been
4  prepared in connection with this double murder
5  prior to August 1st, 1990?
6  MS. CARNEY: Objection, asked and
7  answered.
8  THE WITNESS: No, ma'am.
9  MS. BONJEAN: Well, he remembers things
10  all of a sudden.  So I'm going to have to ask it
11  again, since you've looked at this.
12  THE WITNESS: I didn't prepare
13  anything, no, ma'am.
14  BY MS. BONJEAN:
15  Q.  Okay.  Do you remember reading any reports?
16  A.  No, ma'am.  No.
17  Q.  Okay.
18  MR. BRUEGGEN: Is this a good time for
19  a break?
20  MS. BONJEAN: One second.  Hold on.
21  BY MS. BONJEAN:
22  Q.  Did you charge Mr. Maysonet for the double
23  murder?
24  A.  Did I what?
25  Q.  Did you charge Mr. Maysonet for the double

---

Page 304

1  murder after August 1st, 1990, but before August
2  22nd, 1990?
3  A.  I didn't charge him, but I think Paulnitsky
4  charged him, put my name on there as an arresting
5  officer.
6  Q.  Okay.  But did you charge Mr. Maysonet for
7  the double murder of the Wiley brothers on August
8  2nd, 1990?
9  A.  I didn't formally charge him.
10  Q.  Okay.  Do you know if anyone charged
11  Mr. Maysonet on August 2nd, 1990, after he
12  confessed to the murders?
13  A.  I have no -- I have no idea, ma'am.
14  Q.  Do you know whether anybody charged
15  Mr. Maysonet with the double murders after he
16  confessed to them on August 1st, 1999 (sic), prior
17  to Paulnitsky bringing him into custody on August
18  22nd?
19  A.  No, ma'am.
20  Q.  Okay.  Do you have any idea why the
21  investigating detectives -- which according to you
22  is not you, right?
23  A.  That's correct.
24  Q.  Any idea why the investigating detectives
25  did not come back and charge Mr. Maysonet for the

---

Maysonet v.
Guevara

Video Deposition

Page 305

1  double murder after he confessed to you and
2  Sergeant Mingey on August 1st, 1990?
3      MR. BRUEGGEN: Objection, speculation.
4      THE WITNESS: I -- I have no idea,
5  ma'am.
6      BY MS. BONJEAN:
7  Q.  Certainly you would agree that there was
8  probable cause to arrest him for the double murders
9  after he confessed to you on August 1st?
10 A.  Yes.
11 Q.  Right?
12 A.  Yes.
13 Q.  And you don't know why he wasn't charged?
14 A.  That's correct.
15 Q.  Immediately?
16 A.  Yes.
17     MS. BONJEAN: Okay.  We can take a
18 break.
19     THE VIDEOGRAPHER: We're going off the
20 record at 4:17 p.m.
21     (Recess taken from 4:17 to 4:28.)
22     (Mr. Greenberg no longer present.)
23     THE VIDEOGRAPHER: We're now going back
24 on the record at 4:28 p.m.
25 /////

Page 306

1      BY MS. BONJEAN:
2  Q.  Mr. Montilla, you spent many years as a
3  detective, correct?
4  A.  Yes, ma'am.
5  Q.  And even though you weren't a homicide
6  detective in 1990, you have investigated homicides,
7  right?
8  A.  Just a couple.
9  Q.  Okay.  You've investigated serious felony
10 offenses, right?
11 A.  Say what?
12 Q.  You've investigated serious felony offenses?
13 A.  Yes.
14 Q.  Okay.  Robberies, right?
15 A.  Yes.
16 Q.  Any sexual assaults?
17 A.  Yes.
18 Q.  Burglaries?
19 A.  Yeah.
20 Q.  Other violent crimes?
21 A.  Yes, ma'am.
22 Q.  Okay.  Is there a difference between
23 investigating homicide cases and investigating
24 robbery cases, for instance?
25 A.  Big difference.

Page 307

1      MR. BRUEGGEN: Object to form.  Go
2  ahead.
3      THE WITNESS: Okay.  Big difference.
4  Different type of reporting you have to make.
5      BY MS. BONJEAN:
6  Q.  Well, the fundamentals of an investigation
7  are the same, though, aren't they?
8  A.  Yeah, fundamentals are basically the same,
9  but there's more meat to it for a murder or an
10 aggravated battery than it is for a robbery.
11 Q.  If it's a more complex case, there might be
12 more things you need to do, right?
13     MR. BRUEGGEN: Object to form.  Go
14 ahead.
15     THE WITNESS: Yes.
16     BY MS. BONJEAN:
17 Q.  If there's forensics involved, you might
18 have to involve different forensic teams in the
19 investigation, right?
20 A.  Yes.
21 Q.  Okay.  But the fundamentals, the way you
22 approach a crime and investigating a crime, is the
23 same from one case to the next, right?
24 A.  Up to a point.
25 Q.  Okay.  You want to get information,

Page 308

1  corroborate information, right?
2  A.  Yes.
3  Q.  You want to determine motives to crimes,
4  correct?
5  A.  Yes.
6  Q.  Okay.  Just want to figure out why somebody
7  did something, right?
8  A.  Yes.
9  Q.  All right.  Now, after you spoke with
10 Mr. Maysonet on July 15th, 1990, with Sergeant
11 Mingey at Area 5, I know you said you took no
12 investigative actions.  Right?
13 A.  That's correct.
14 Q.  Okay.  And would you agree, though, that as
15 an investigator, a detective should have attempted
16 to take the information that Mr. Maysonet provided
17 and either corroborate it or develop it?
18     MR. BRUEGGEN: Objection.
19     MS. CARNEY: Object to form.
20     THE WITNESS: I assumed it.  Everybody
21 does different ways.  I have no idea.
22     BY MS. BONJEAN:
23 Q.  Well, I'm not talking about the ways --
24 A.  Yeah.
25 Q.  -- he did it.  I'm saying if -- if

Page 309

1 Mr. Maysonet told -- if you were investigating this
2 case, rather than just the interpreter --
3 A. Yeah.
4 Q. -- and Mr. Maysonet told you about giving a
5 nine millimeter to three Latin Kings and then the
6 two African-American men were shot, you'd want to
7 follow up on that, right?
8 A. Yes.
9 MR. BRUEGGEN: Object to form.
10 BY MS. BONJEAN:
11 Q. Okay. And then after August 1st, 1990,
12 after Jose Maysonet confessed to being at the crime
13 with these three other Latin Kings, that's
14 information you'd want to corroborate, too, as an
15 investigator, right?
16 A. Yes.
17 Q. If you could, correct?
18 A. Yeah.
19 Q. All right. Now, I don't know if your
20 recollection has been refreshed or not, but I just
21 want to orient you.
22 Between August 1st, 1990, and August 22nd,
23 1990, you took no investigative actions in
24 connection with this case -- "this case," I mean
25 the Wiley brothers' murders -- and you're not aware

Page 310

1 of any other investigative actions that were taken,
2 correct?
3 A. That's correct.
4 Q. And if you wanted to confirm that there was
5 no investigative conduct that took place between
6 August 1st and August 22nd, where would you look?
7 MR. BRUEGGEN: Object to form,
8 foundation.
9 THE WITNESS: I have no idea. I'm not
10 in homicide. I wouldn't know where they keep that
11 stuff.
12 BY MS. BONJEAN:
13 Q. You don't know where they kept the homicide
14 files?
15 A. Not all -- no, ma'am. I don't know where
16 the -- I had nothing to do with this case so I don't
17 know why I would be looking for this case to find
18 out what's going on.
19 Q. Okay. Well, let's say it's not a murder
20 case. Okay? Let's say it's a burglary case or
21 some other crime that you would have investigated.
22 Right?
23 If you wanted to find out whether or not
24 some other detective did some investigating on your
25 case, would you go to the file to see if any

Page 311

1 reports were prepared?
2 A. No, ma'am. I don't go back on -- I keep new
3 crime. I don't go back to an old case, see if it
4 was solved or what detective handled it. I have --
5 I don't go looking for that.
6 Q. Okay. Maybe I'm not making myself clear.
7 We've already established earlier in this
8 deposition that sometimes investigations can last
9 over a period of time. Right?
10 A. Yeah.
11 Q. Okay. In fact, the Wiley brothers were
12 murdered on May 25th, 1990, correct?
13 A. Correct.
14 Q. And Mr. Maysonet wasn't arrested until
15 August 22nd, 1990, for this --
16 A. Okay.
17 Q. -- correct?
18 A. Correct.
19 Q. You know, several months, right?
20 A. Yeah.
21 Q. And during that period of time, would you
22 have expected to see some investigation?
23 A. If I was a supervisor, yes.
24 Q. Okay. Right. If you -- you would expect
25 there to be investigation taking place, even though

Page 312

1 I understand you're saying that that wasn't your
2 job, right?
3 A. Yes.
4 Q. And we also established that new detectives
5 come into a case sometimes, that they necessarily
6 weren't the detectives at the start of the case and
7 they're not necessarily the detectives that close
8 the case, right?
9 A. That's correct.
10 Q. But when a new detective comes into a case,
11 they want to look at the reports that have been
12 prepared, right?
13 A. Yes.
14 Q. And they want to see what's been done on the
15 case before they do their investigative work,
16 right?
17 A. Well, to see if there's anything to follow up
18 in there, yes.
19 Q. Right. And who's been interviewed, right?
20 A. If they're assigned to investigate farther,
21 that's what they have to do.
22 Q. And how would you find that information out?
23 You'd have to go look at the reports, right?
24 A. No, ma'am. Sergeant assigns you first. You
25 just don't go grab a report and start working on

Page 313

1 something.
2 Q.  Let's say you're assigned.  How would you
3 get the information you need to find out what had
4 been done to investigate the case prior to you
5 getting involved?
6 A.  Well, I read the whole file, find out what's
7 been happening.
8 Q.  Okay.
9 A.  If there's anything for me to follow up on,
10 that's what I do.
11 Q.  Okay.  And that's what an investigator would
12 do.  They would read the whole file and then figure
13 out next steps, right?
14 A.  That's correct.
15     MR. BRUEGGEN: Object to form.
16     THE WITNESS: Yeah, that's correct.
17     BY MS. BONJEAN:
18 Q.  Now, I think -- and, again, maybe you've
19 been refreshed and your recollection's different
20 now, but earlier you testified that the next thing
21 you recall was serving as an interpreter for
22 Detective Paulnitsky after Mr. Maysonet was in
23 custody at Area 5.  Right?
24 A.  I think so, yes.
25 Q.  And when I say that, I mean, this is after

Page 314

1 the Cook County Jail meeting.
2 A.  Yes.
3 Q.  Okay.  Do you remember anything else about
4 meeting with Jose Maysonet until you met with him
5 and Detective Paulnitsky at Area 5 on August 22nd,
6 1990?
7 A.  Prior to that?
8 Q.  Yeah.  In between the Cook County Jail and
9 when he was in Area 5.
10 A.  No, ma'am, I don't recall.
11 Q.  Okay.  I'm going to have you look now at the
12 report.
13 A.  Okay.  If I see the report, maybe it will
14 refresh me.
15 Q.  Sure.
16 A.  I don't know.
17 Q.  Okay.  Look at the last paragraph there.
18 A.  Right here.
19 Q.  The second to last paragraph you read,
20 right, and that discussed your meeting at Cook
21 County Jail on August 1st, 1990, right?
22 A.  Yeah.
23 Q.  And then it says August 26th, 1990.
24 A.  August where?
25     MR. BRUEGGEN: August 22nd.

Page 315

1     MS. BONJEAN: Ah, sorry.  Strike that.
2     BY MS. BONJEAN:
3 Q.  On August 22nd, 1990, it starts there.  Do
4 you see that?
5 A.  Yeah, I see that.
6 Q.  Go ahead and read that last paragraph there.
7 A.  To myself?
8 Q.  Yeah, sure.  Go ahead.
9 A.  Okay.
10 Q.  Do you see where it says Detective
11 Paulnitsky was aware of the previous admissions
12 that Jose Maysonet had made?
13 A.  Yes, I see that here.
14 Q.  Okay.  Do you know how Detective Paulnitsky
15 became aware of the previous admissions?
16 A.  I have no idea, ma'am.
17 Q.  Okay.  What are the number --- what are the
18 what in which he might have become aware of those
19 previous admissions?
20     MR. BRENER: Objection, calls for
21 speculation.
22     THE WITNESS: Being a detective in Area
23 5, at roll call, sergeant mentioned things what's
24 going on with cases to the -- to the homicide guys.
25 /////

Page 316

1     BY MS. BONJEAN:
2 Q.  Okay.  Could he have looked at some GPRs
3 that memorialized it?
4 A.  I have no idea what he did, ma'am.
5 Q.  Okay.  But you would -- would you expect
6 there to be some GPRs in the file?
7     MR. BRUEGGEN: Object to form.
8     MS. CARNEY: Object to form.
9     THE WITNESS: Yes, ma'am.
10     BY MS. BONJEAN:
11 Q.  I mean, there was a confession.  You'd
12 expect there to be a GPR in the file, right?
13     MS. CARNEY: Object to form.
14     MR. BRUEGGEN: Same objection.
15     BY MS. BONJEAN:
16 Q.  Yes?
17 A.  Yes.
18 Q.  Okay.  Now, you can go to the next page,
19 which is page five, but is Bates stamped
20 RFC-Maysonet 51.  The first paragraph, it says, "at
21 Area 5, Jose Maysonet was advised of his Miranda
22 rights by Detective F. Montilla."  Do you see that?
23 A.  Yes, ma'am.
24 Q.  Do you remember giving Mr. Maysonet his
25 Miranda rights?

Page 317

1 A. If it's on paper, I did it.
2 Q. Well, you didn't write this.
3 A. Ma'am, it's written, it's written.
4 Q. I know, but you didn't write it.
5 A. I know that.
6 Q. Okay. So is it just because it's written
7 that you know it happened?
8 A. Ma'am, when they wrote this report, they
9 write all this stuff, whatever was there from GPRs
10 and everything. They make a closing report. They
11 put everything in here that what detectives
12 participated in. So apparently I participated in
13 this, if it's written in the report, even though I
14 didn't write it.
15 Q. I understand, but you don't have a
16 recollection of giving him his Miranda rights,
17 right? You're assuming that you did because you're
18 reading it in this report, right?
19 A. Ma'am, if it's on the report, I gave him his
20 rights.
21 Q. You didn't write this report, though.
22 A. Doesn't matter. I gave him his rights.
23 Q. Well --
24 A. As long as my name shows up on the report, I
25 was there. That means I had to do everything that

Page 318

1 they're putting down on this report, because --
2 Q. So everything --
3 A. -- I don't keep my own copies. I don't write
4 my own reports.
5 Q. So you didn't write this report, right?
6 A. That's correct.
7 Q. You've never read this report according to
8 you?
9 A. That's correct.
10 Q. Okay. But you just assumed that if
11 Halvorsen put it on the paper, it must have
12 happened, right?
13 A. Yes, ma'am.
14 Q. And there's no circumstance under which
15 Mr. Halvorsen would ever put anything in a report
16 that wasn't true, right?
17     MR. BRUEGGEN: Object to form,
18 speculation, foundation.
19     BY MS. BONJEAN:
20 Q. Right?
21 A. That is correct.
22 Q. Okay. And if Detective Guevara put it on a
23 piece of paper, you know it's true also, right?
24 A. Yes.
25     MR. BRUEGGEN: Object to form,

Page 319

1 foundation, speculation.
2     BY MS. BONJEAN:
3 Q. So you assume that if any detective puts
4 something in a report, it must be true, correct?
5 A. Yes, ma'am.
6     MR. BRUEGGEN: Object to form.
7     BY MS. BONJEAN:
8 Q. And why do you assume that?
9 A. Because it's written by a detective in the
10 report. Whatever name shows up there from the
11 investigative files and everything, my name was on
12 there means I did something.
13 Q. Okay. But can a -- is a detective capable
14 of putting a false statement into a report?
15 A. Wouldn't do that.
16     MR. BRUEGGEN: Object to form,
17 argumentative.
18     BY MS. BONJEAN:
19 Q. Have you ever even heard of a detective
20 putting a false statement in a report?
21 A. No, ma'am.
22 Q. So in your, again, three decades' experience
23 in the police department, never heard of a police
24 officer ever including a statement that wasn't a
25 hundred percent entirely accurate in a police

Page 320

1 report?
2 A. That is --
3     MR. BRUEGGEN: Objection, form. Go
4 ahead.
5     THE WITNESS: That is correct.
6     BY MS. BONJEAN:
7 Q. And is that true for Detective Guevara also?
8 A. I have --
9     MR. BRUEGGEN: Object to form,
10 foundation. Go ahead.
11     THE WITNESS: I have no idea, ma'am.
12     BY MS. BONJEAN:
13 Q. Well, if Detective Guevara wrote this
14 report, would you assume it happened?
15 A. I'd have to assume it happened.
16 Q. Why do you have to assume?
17 A. Because it's on paper. It comes from another
18 report.
19 Q. Okay.
20 A. Just --
21 Q. I just wrote "I am 21 years old" on this
22 piece of paper. Does that make it true because I
23 wrote it on a piece of paper?
24     MS. CARNEY: Objection, argumentative.
25     MR. BRUEGGEN: Objection.

Maysonet v.                    Video Deposition
Guevara

---

Page 321

1  MR. BRENER: Join.
2  MR. SCHALKA: Join.
3  BY MS. BONJEAN:
4  Q.  Does it make it true?
5  A.  I have no idea if it's true or not.
6  Q.  Okay.  I'm not 21 years old.  We can agree
7  on that, right?
8  A.  I understand that.
9  Q.  Okay.  So if I wrote it on a piece of paper,
10  it doesn't make it true, right?
11  A.  That's correct.
12  Q.  Okay.  So my point is, just because it's on
13  the piece of paper doesn't make it true, right?
14  MR. BRUEGGEN: Object to form, asked
15  and answered.
16  THE WITNESS: This is a report made for
17  the type of division by detectives.  Whatever's in
18  that report is testified to, and it means that I
19  performed an action and that's why my name reports
20  is on there.
21  BY MS. BONJEAN:
22  Q.  Okay.  So -- and if the report said that
23  Fred -- Detective F. Montilla kissed Jose Maysonet
24  in the interview room, would that be true just
25  because it's on the report?

---

Page 322

1  MS. CARNEY: Objection, argumentative.
2  MR. BRUEGGEN: Argumentative and now
3  badgering.
4  MS. BONJEAN: I'm not -- I'm not
5  badgering.  I'm just trying to understand where
6  he's coming from.
7  THE WITNESS: You're making up a
8  hypothetical thing there, ma'am.
9  BY MS. BONJEAN:
10  Q.  No.  That wouldn't be true, though, right?
11  You didn't kiss Mr. Maysonet, did you?
12  A.  Nobody would put anything false in a report.
13  Q.  Nobody would ever put anything false --
14  A.  I've never seen it in my life, in 34 years in
15  the police department.
16  Q.  So why have over a dozen people been
17  exonerated because of Detective Guevara's
18  misconduct?
19  MR. BRUEGGEN: Objection, form,
20  foundation.
21  MS. CARNEY: Objection, form,
22  foundation.
23  MR. BRENER: Object to form.
24  THE WITNESS: I have no idea, ma'am.
25  /////

---

Page 323

1  BY MS. BONJEAN:
2  Q.  What's your -- what's your -- what's your
3  theory about that?
4  A.  Pardon me?
5  Q.  Why do you -- what's -- what do you think's
6  going on, they're just letting people out of prison
7  for fun?
8  MS. CARNEY: Objection, argumentative.
9  THE WITNESS: I have no theory and I
10  don't make any type of statements on it.  It's a --
11  what happened happened.  That's it.  I'm here to
12  answer your questions.  That's why I'm here.
13  That's it.
14  BY MS. BONJEAN:
15  Q.  No, I understand, and I appreciate you
16  asking (sic) my questions, but I'm just -- I guess
17  I'm just befuddled that you would think that
18  it's -- it's inconceivable that anyone could put a
19  false statement in a report.
20  MR. BRUEGGEN: Objection,
21  argumentative.
22  BY MS. BONJEAN:
23  Q.  Is that just for Chicago police officers or
24  is that all law enforcement police officers across
25  the country?

---

Page 324

1  MS. CARNEY: Objection, argumentative.
2  MR. BRUEGGEN: Objection, argumentative
3  and --
4  MS. BONJEAN: No, I'm just curious.
5  MR. BRUEGGEN: -- bordering on
6  harassing.
7  BY MS. BONJEAN:
8  Q.  Is it for just Chicago police officers that
9  you would vouch for that or is that for any police
10  officer?
11  MR. BRUEGGEN: Same objections.
12  BY MS. BONJEAN:
13  Q.  That's a legitimate question.  You can
14  answer.
15  A.  I can't give you an answer on that, ma'am.
16  Q.  Why?
17  A.  Because I'm going by what was written, what
18  we did, and that's what I go by.
19  Q.  No, but you just said that it would never
20  happen that a police officer would put a false
21  statement in a report.
22  A.  In my -- in my investigative years, yes, I've
23  never seen that done.
24  Q.  Okay.
25  A.  And I don't think -- I've never seen a

---

Page 325

1  policeman do that.
2  Q.  Okay.  And that's -- and when you say
3  that -- and you can't imagine a police officer
4  doing that, right?  You've testified to that?
5  A.  That is correct.
6  Q.  Okay.  Are you talking about just Chicago
7  police officers are incapable of doing that or do
8  you think all police officers?
9  A.  I'm talking about the police -- policemen
10  right here in my life that I've seen.  I'm not
11  saying about the policemen in California, New York
12  or --
13  Q.  Okay.
14  A.  -- anyplace else.
15  Q.  Okay.
16  A.  I'm just describing for myself that I've
17  never seen this.
18  Q.  Okay.  And you've worked with a lot of
19  police officers in the Chicago Police Department
20  over the years, right?
21  A.  That is correct.
22  Q.  How many do you think?
23  A.  I don't know.  20, 30.
24  Q.  In thirty-some years, only 20 or 30?
25  A.  Yeah.  You only get partners only so much

Page 326

1  and --
2  Q.  I'm not talking about your partners.  There
3  were at least like seven detectives on this case.
4  A.  No, I worked with -- they worked all around
5  me.  Doesn't mean I was with them in a case.
6  Q.  I understand, but --
7  A.  Just a lot -- a lot of detectives in the
8  police department.
9  Q.  Right.
10  A.  Over 4,000 guys that were -- so many guys
11  were in the area or something.
12  Q.  Okay.  And at no point did you ever see a
13  police officer make any statement that was
14  misleading or false in a report, right?
15  A.  Not in my life.
16  MR. BRUEGGEN: Object to compound.
17  BY MS. BONJEAN:
18  Q.  Okay.  Let's -- now, do you remember earlier
19  I asked you about the conversation you had at Area
20  5 with Detective Paulnitsky after Mr. Maysonet was
21  arrested or was in custody?
22  A.  Conversation with Paulnitsky?
23  Q.  Yeah.  Remember, I asked you about the
24  choking.  Do you remember all that, sir?
25  A.  The -- pardon me?

Page 327

1  Q.  The choking, do you remember I asked you
2  about whether you saw Detective Paulnitsky choke
3  Mr. Maysonet?
4  A.  Yes, I recall.
5  Q.  Okay.  So you remember that line of
6  questioning?
7  A.  Yeah.
8  Q.  Okay.  And you -- again, this would have
9  been after Mr. Maysonet was in custody at Area 5,
10  and you said you served as an interpreter again?
11  A.  Yeah.
12  Q.  Okay.  And I think you indicated that it was
13  a quick conversation.  Right?
14  A.  The what?
15  Q.  It was a quick conversation.
16  A.  Yeah, as far as I recall.  I think it was a
17  quick conversation.
18  Q.  Okay.  And do you remember during that
19  conversation whether he confessed to the murders?
20  A.  I don't recall, ma'am, unless I --
21  Q.  Okay.  But if it's on the piece of paper --
22  A.  If it's on paper --
23  Q.  -- that it happened?
24  A.  -- it happened.
25  Q.  Okay.  Okay.  Go ahead, let's read that

Page 328

1  first paragraph.
2  A.  Huh?
3  MR. BRUEGGEN: Read that to yourself.
4  She wants you to read that paragraph to yourself,
5  then she'll have questions.
6  THE WITNESS: Okay.
7  BY MS. BONJEAN:
8  Q.  Okay.  Now, you've read that.  You don't
9  have an independent recollection of this --
10  A.  That's correct.
11  Q.  -- right, but you're reading this, and you
12  are assuming because it's on -- in this report,
13  that it happened, right?
14  A.  I assume, yes, ma'am.
15  Q.  All right.  But you don't remember it,
16  right?
17  A.  No, I don't remember.
18  Q.  Okay.  Let's keep going.  "On August 22nd,
19  1990, Detectives E. Halvorsen, R. Guevara and S.
20  Gawrys arrived at Area 5 to work the third watch.
21  This investigation was passed on to these
22  detectives."  Do you see that?
23  A.  Yeah.
24  Q.  Okay.  So if they were arriving for the
25  third watch, what time would that be?

Page 329

1  A.  That's 4 -- 4:30.
2  Q.  Okay.  And would you have been getting off
3  work around that time?
4  A.  I don't remember if I was working days or
5  afternoons.  I don't remember.
6  Q.  Okay.  But --
7  A.  If I was working days, I would be getting off
8  at that time when they're coming there.
9  Q.  Okay.  So let's -- let's use common sense
10  here.  You allegedly were with Detective
11  Paulnitsky, interviewing Jose Maysonet on August
12  22nd, 1990, right?
13  A.  Yeah.
14  Q.  Okay.  And according to this report in that
15  first paragraph, you were there when Mr. Maysonet
16  made these statements.  And, again, you were
17  serving an interpreter and not an investigator,
18  correct?
19  A.  Yeah.
20  Q.  Okay.  And then that same day, it says the
21  investigation was passed off to Halvorsen, Guevara
22  and Gawrys.  Do you see that?
23  A.  Yeah.
24  Q.  Okay.  So would that lead you to believe
25  that you were not working the third watch?

Page 330

1  A.  It would lead me to believe.  I don't know.
2  That's -- they're violent crime guys.  They were
3  handling the case, so...
4  Q.  Right.
5  A.  And on this day, I don't know what --
6  Q.  Well, you were present for interviews that
7  preceded the third watch, right?
8  A.  Yeah.  Right, yeah.
9  Q.  At least according to this?
10  A.  Yeah.
11  Q.  And this is the bible, right?
12  A.  I understand, yeah.
13  Q.  Okay.  You were present, so do you know --
14  do you have a -- does it lead you to believe that
15  maybe you would have been getting off work at that
16  time?
17  A.  Yeah, I --
18  Q.  Okay.
19  A.  -- believe, yeah.
20  Q.  And then it says, "at 2000 hours" -- what
21  time is that?
22  A.  8:00.  8 p.m.
23  Q.  -- "Jose Maysonet was interviewed by
24  Detective Guevara, who speaks English.  During this
25  interview" --

Page 331

1      MR. BRUEGGEN: Speaks Spanish.
2      BY MS. BONJEAN:
3  Q.  -- "who speaks Spanish.  During this
4  interview, Jose Maysonet agreed to tell all he
5  knew," right?  Do you see that?
6  A.  Yeah.
7  Q.  Okay.  Do you remember being present for
8  that interview?
9  A.  No.
10  Q.  Okay.  And does the report say you were
11  present for that interview?
12  A.  I don't think so.
13  Q.  Okay.  Now, there's a summary of what
14  Mr. Maysonet purportedly told Detective Guevara,
15  correct?
16  A.  Yes.
17  Q.  Okay.  Now, during this interview, you
18  weren't present, so you don't know whether
19  Detective Guevara beat Mr. Maysonet, right?
20  A.  That's correct.
21  Q.  Okay.  You did not see it, right?
22  A.  Right.
23  Q.  And would you agree that it would be
24  improper, in fact illegal, to beat Mr. Guevara --
25  to beat Mr. Maysonet in order to coerce him into

Page 332

1  making this statement, right?
2  A.  Yes.
3  Q.  Okay.  We can keep going on.
4  Now...
5      (Off stenographic record discussion.)
6      BY MS. BONJEAN:
7  Q.  Okay.  So Mr. Maysonet's statements to
8  Detective Guevara are summarized at the top or
9  continued onto the first half of this narrative,
10  right, on this page?
11  A.  Yeah.
12  Q.  And then it says, "on August 22nd, 1990, at
13  2100."
14  A.  Yeah.
15  Q.  What time is that, 9?
16  A.  9 p.m.
17  Q.  Okay.  "Maysonet's wife arrived at Area 5."
18  Do you see that?
19  A.  Yes.
20  Q.  Okay.  Were you present when she arrived?
21  A.  No, ma'am, not that I know of.
22  Q.  Okay.  All right.  Now -- but then it says,
23  "Rosa Bella in summary stated the following on
24  the" -- do you see that?
25  A.  Yeah.

Page 333

1 Q. Were you present when she made these
2 statements?
3 A. I don't recall, ma'am.
4 Q. Okay. You saw earlier you identified a
5 handwritten statement that you were supposedly --
6 A. Yeah.
7 Q. -- present for --
8 A. Yeah.
9 Q. -- the following day?
10 A. Yeah, I saw that.
11 Q. But do you know whether you were present for
12 whatever is reported here?
13 A. Yeah.
14 Q. Do you know if it's the -- this summary is
15 based on your conversation with her or some other
16 conversation?
17 A. I have no idea, ma'am.
18 Q. Okay. Now, I'm going to keep going. Okay.
19 Let's go down to August 23rd at 4:30. Do you see
20 that?
21 A. Yep.
22 Q. That's the next day at 4:30 p.m., right?
23 A. Yeah.
24 Q. It says, "ASA Jennifer Borowitz, felony
25 review, was assigned to this investigation. She

Page 334

1 had been in the office at Area 5 on an unrelated
2 investigation and was familiar with this homicide
3 investigation." Do you see that?
4 A. Yes.
5 Q. "An interview was conducted with Jose
6 Maysonet. Present for this interview was ASA
7 Borowitz and Detectives Guevara and Montilla." Do
8 you remember that now?
9 A. Yes. Yes.
10 Q. You didn't have -- you don't have an
11 independent recollection of that, right?
12 A. No, not all independent, but I was there with
13 Borowitz.
14 Q. You remember seeing Borowitz, the --
15 A. Yeah. The young lady, yeah.
16 Q. Okay. And during this interview, according
17 to this report, Mr. Maysonet basically confessed
18 again, right?
19 A. Yeah.
20 Q. Okay. And, again, you don't have an
21 independent recollection of that, but you're
22 assuming that because it's in the report, it
23 happened, right?
24 A. Yes.
25 Q. Or as you sit here today, you don't remember

Page 335

1 being there, listening to Mr. Maysonet's
2 confession, right?
3 A. No.
4     MR. BRUEGGEN: Object to form.
5     BY MS. BONJEAN:
6 Q. But because it's in the report, you assume
7 it happened, right?
8 A. Yes.
9 Q. All right. "At the conclusion of this
10 interview, Jose Maysonet agreed to provide a
11 court-reported typed statement." Do you see that?
12 A. Yeah.
13 Q. But "due to the amount of time these
14 statements take, a second Assistant State's
15 Attorney was assigned to replace ASA Borowitz." Do
16 you see that?
17 A. Yeah.
18 Q. Okay. How many times has Mr. Maysonet
19 confessed by August 23rd at 4:30? It seems like a
20 lot of times, yeah?
21 A. Yeah, a few times.
22 Q. Confessed at the Cook County Jail, right?
23 A. He made a statement there, yes.
24 Q. Well, he said he was there, right --
25 A. Yeah.

Page 336

1 Q. -- and he was involved? That's a
2 confession, right?
3 A. Yeah. He made a statement.
4 Q. And then he made it again on August 22nd,
5 when Paulnitsky interviewed him with you,
6 correct --
7 A. Correct.
8 Q. -- according to the report?
9 And then he made it again to Detective
10 Guevara, right?
11     MR. BRUEGGEN: Object to foundation.
12     BY MS. BONJEAN:
13 Q. According to this, right?
14     MR. BRUEGGEN: Read the report.
15     MS. BONJEAN: Huh?
16     MR. BRUEGGEN: I told him to read the
17 report --
18     MS. BONJEAN: Oh.
19     MR. BRUEGGEN: -- because he clarified
20 that he wasn't present, so...
21     MS. BONJEAN: Right.
22     THE WITNESS: On which?
23     BY MS. BONJEAN:
24 Q. This was -- according to the report at
25 least, he made another statement to Guevara on

Page 337

1  August 22nd, right?
2  A.  Yeah.
3  Q.  And then again he confessed again to you
4  with ASA Borowitz, right?
5  A.  Yeah.
6  Q.  Correct?  Okay.
7  And now, if you turn the page, August 23rd
8  at 6:30, ASA Frank DiFranco arrived and conducted
9  his first interview with Jose Maysonet, and also
10  present was Detective Guevara and Montilla, and
11  again he -- he confessed again, right?
12  A.  Yeah.
13  Q.  Where are we at, five or six times now?
14  A.  I don't know.  I didn't count all, so...
15  Q.  Okay.  Quite a few times, though, right?
16  A.  Yeah.
17  Q.  All right.  And each time the detective
18  would be making a GPR, right?
19      MR. BRUEGGEN: Object to form,
20  foundation.
21      MS. CARNEY: Foundation.
22      MR. SCHALKA: Foundation.
23      THE WITNESS: I assume.
24      BY MS. BONJEAN:
25  Q.  I mean, you would as a detective, correct?

Page 338

1  A.  I would have as a detective, yes.
2  Q.  Right.  I mean, you have someone confessing
3  to a double homicide.  You would want to be taking
4  down what he's saying, right?
5  A.  Yes.
6  Q.  Not just because it might be evidence
7  against him or used to convict him, but to take
8  that information and follow other leads, right?
9  A.  That is correct.
10  Q.  I mean, he told you about three other
11  offenders.  You want to find them, too, right?
12  A.  That is correct.
13  Q.  Okay.  So you would expect there to be
14  reports that have documented all of this valuable
15  information that Mr. Maysonet is providing, right?
16  A.  That's --
17      MR. BRUEGGEN: Object to form.
18      THE WITNESS: That is correct.
19      BY MS. BONJEAN:
20  Q.  Okay.  Now, on August 23rd at -- August
21  23rd, 1990, at 7:10, he's now in a conference room,
22  and you're present, Reynaldo Guevara's present,
23  right?  Do you see that?
24  A.  Yeah.  Yeah.
25  Q.  It looks like that was another time.  And

Page 339

1  then we have the 9:28 a.m., which resulted in the
2  court-reported statement, correct?
3  A.  Uh-huh.
4      MR. BRUEGGEN: Is that a yes?
5      BY MS. BONJEAN:
6  Q.  Was that a yes?
7      MR. BRUEGGEN: Yes?
8      THE WITNESS: Yes.
9      BY MS. BONJEAN:
10  Q.  Okay.  Now, just to be clear, the
11  interviewing that was conducted by Guevara when
12  Mr. Maysonet confessed to him before you arrived,
13  you -- you have no knowledge about that, right?
14  A.  That is correct.
15  Q.  Do you know Mr. Maysonet alleges that he was
16  physically abused during that interrogation?
17  A.  I heard that.
18  Q.  Okay.  And you don't know one way or another
19  whether that happened, right?
20  A.  That is correct.
21  Q.  So after the court-reported statement, it
22  looks like ASA DiFranco requested that Jose
23  Maysonet be driven to the scene.  Do you see that?
24  A.  Where at?
25  Q.  The next paragraph.  It says, "Jose Maysonet

Page 340

1  thereafter read his statement, which he signed."
2  Do you see that?
3  A.  Thereafter, after they read his statement
4  here?
5  Q.  Yeah.  And then it looks like this was when
6  you-all went to the scene?
7  A.  Pardon me?
8  Q.  You-all went to the scene, then, after that?
9  A.  Yeah.
10  Q.  Okay.  But earlier you thought you went to
11  the scene before he made his court-reported
12  statement, but --
13  A.  Yeah.
14  Q.  -- this suggests that you went to the scene
15  after the court-reported --
16  A.  After.
17  Q.  Okay.  And you would rely on this?
18  A.  Yes.
19  Q.  Okay.  And then it says, "ASA DiFranco
20  deferred formal charging of Jose Maysonet pending
21  additional interviews with Alfredo Gonzales."
22  Any idea why ASA DiFranco deferred formal
23  charging after Jose Maysonet purportedly confessed
24  about eight times prior to April -- I'm sorry,
25  August 23rd in the morning?

Page 341

1    MR. BRENER: Form and foundation.
2    MR. BRUEGGEN: Object to foundation.
3    MS. CARNEY: You can answer.
4    THE WITNESS: I have no idea.
5    BY MS. BONJEAN:
6  Q.  Okay.  It wasn't your decision, right?  You
7    had no involvement in that decision, right?
8  A.  No.
9  Q.  And this report has your name typed at the
10   end, but it doesn't have your signature, correct?
11   The report has your name typed?
12 A.  No, it doesn't have my signature, no.
13 Q.  Okay.  And it's your best guess that your
14   name was included on here because you participated
15   in the investigative activity, right?
16 A.  Yes, that's correct.
17 Q.  But according to you, you just served as an
18   interpreter, right?
19 A.  Yes, ma'am.
20 Q.  Okay.  You weren't really an investigator on
21   this case?
22 A.  No, ma'am.
23 Q.  You never were assigned to investigate this
24   case?
25 A.  That's correct.

Page 342

1  Q.  Your only role was to interpret?
2  A.  Interpret.
3  Q.  Okay.  And these papers we looked at, are
4    these -- strike that.  Sorry.  Hold on one second.
5    Do you have any recollection of interpreting
6    for anybody after Mr. Maysonet made his
7    court-reported statement?
8  A.  No, ma'am.
9  Q.  Okay.  I want to draw your attention to
10   RFC-Maysonet 42 through 44.  There's another
11   supplemental report.
12 A.  Okay.
13 Q.  Okay.  This is another supplemental report,
14   right?
15 A.  Yeah.
16 Q.  And this report looks to have been submitted
17   on August 24th, 1990, and then approved on August
18   27th, 1990, by Sergeant Epplen?
19 A.  Okay.
20 Q.  All right.  Does that look right to you?
21 A.  Pardon me?
22 Q.  Does that look correct to you?
23 A.  Yes.
24 Q.  Okay.  It also has you identified as an
25   arresting officer of a Justino Cruz.  Do you see

Page 343

1    that?
2  A.  Yes.
3  Q.  Okay.  Do you remember participating in the
4    arrest of Justino Cruz?
5  A.  No, ma'am.
6  Q.  And then -- and can I assume, because you're
7    looking at this, you're going to assume that you
8    did participate in that arrest?
9  A.  I was participating in the original arrest of
10   Maysonet.  Apparently they put me in for everybody
11   else included in the case.
12 Q.  Okay.  Why would they put you in as an
13   arresting officer if you were just an interpreter?
14 A.  I have no idea, ma'am.
15 Q.  That's not accurate, right?
16 A.  No, but they give credit when you're in a --
17   if you're interpreting, because they're interpreted,
18   they're going to put you with the whole entire case.
19 Q.  Okay.  But --
20 A.  You're going to get credit for the whole
21   thing and -- because you're going to testify and
22   everything.  They're just giving -- all they do is
23   give you credit for the arrest.
24 Q.  Okay.  But --
25 A.  That's all they're doing.

Page 344

1  Q.  So reports are designed to -- or to give you
2    credit?
3  A.  Yeah, reflect all the officers that are
4    involved.
5  Q.  Okay.  But somebody could have easily
6    written Detective Montilla, or Montilla, assisted
7    with interpreting, right?
8    MR. BRUEGGEN: Object to form and
9    foundation, speculation.
10   THE WITNESS: I assume, yeah.
11   BY MS. BONJEAN:
12 Q.  Well, I mean, do you believe that Detective
13   Halvorsen knows how to spell "interpreter"?
14 A.  Yeah.
15 Q.  Okay.  Does he know how to use a typewriter?
16 A.  He's a very good -- he uses, what do you call
17   it, computers and everything.  He's very good at
18   that.
19 Q.  Yeah, so I've heard.  So we can expect him
20   to know how to write the word "interpreter" and use
21   the typewriter, right?
22 A.  Yeah, that's correct.
23 Q.  So he could have included in here, Detective
24   Montilla helped us in interpreting, right?
25 A.  For the entire case, yeah, not all of it.

Maysonet v.
Guevara

Video Deposition

Page 345

1 Q. No, but he could have where you did, right?
2 A. He could have, yes, but I can't say anything,
3 what he would do on this, because I don't know where
4 he got all this information to type it in.
5 Q. Okay. But he listed you as an arresting
6 officer.
7 A. I understand.
8 Q. And you, according to you, did not
9 participate --
10 A. I did not physically arrest him.
11 Q. Okay.
12 A. Okay.
13 Q. According to you, you didn't actually even
14 investigate the case?
15 A. That's correct.
16 Q. Okay. One second.
17 You can put that aside.
18 Do you know the difference between a street
19 file and permanent retention file?
20 MS. CARNEY: Objection, form.
21 THE WITNESS: And a what file?
22 BY MS. BONJEAN:
23 Q. A permanent retention file.
24 A. Yeah. The street file is -- it's used for
25 investigations. The other file, it's there for

Page 346

1 permanent record --
2 Q. Right.
3 A. -- with everything else that's included in
4 there.
5 Q. Okay. So the street file were those files
6 that were kept at the area, right?
7 A. Yeah.
8 MR. BRUEGGEN: Objection, form.
9 MS. CARNEY: Objection, form.
10 THE WITNESS: Yes.
11 BY MS. BONJEAN:
12 Q. Okay. Sometimes they were called area
13 files, right?
14 A. The whole file is called the area file.
15 Q. Yeah. And then what do you understand a
16 permanent retention file to be?
17 A. That's everything included.
18 Q. Does the permanent retention file always
19 contain everything that was in the street file?
20 MR. BRUEGGEN: Object to foundation.
21 MS. CARNEY: Object to form.
22 BY MS. BONJEAN:
23 Q. To the best of your knowledge.
24 A. To the best of my knowledge, yes.
25 Q. Okay. And who maintains the permanent

Page 347

1 retention file, if you know?
2 A. That's kept by the area. That's all I know.
3 Q. The permanent retention file is kept by the
4 area, too?
5 A. I think so. I'm not sure, ma'am.
6 Q. Okay. You don't know where the permanent --
7 A. No, I don't know.
8 Q. Okay. I'm just going to have you look at
9 Exhibit 3A, if you would.
10 A. Okay.
11 Q. Do you see that?
12 A. Yeah, permanent retention file.
13 Q. Okay. And how do you know that's a
14 permanent retention file?
15 A. It's stamped on here.
16 Q. Right. And these other documents that we
17 were looking at in Exhibit 3 did not have a stamp
18 that said permanent retention file?
19 A. That's correct.
20 Q. Now, you testified earlier about how these
21 area files had a log of sorts, where all the
22 reports and information that was in the file were
23 reflected, correct?
24 A. Yes. It's a log that lists everything, yes.
25 Q. Does it have a name?

Page 348

1 A. No, I don't remember. That, I don't
2 remember.
3 Q. Okay. You thought you remembered it being
4 the color green?
5 A. I think so, yeah.
6 Q. Okay. Have you ever seen the log that
7 reflects all the reports contained in the area file
8 in connection with this case?
9 A. No, ma'am.
10 Q. And I'm talking about back in 1990, '95 or
11 2019, earlier today, have you ever seen that
12 document?
13 A. No, ma'am.
14 Q. Okay. Did every area file have that
15 document?
16 A. Pardon me?
17 MR. BRUEGGEN: Objection.
18 BY MS. BONJEAN:
19 Q. Did every area file have a document like
20 that to the best of your recollection?
21 A. To the best of my knowledge, yes.
22 Q. Okay.
23 (Off stenographic record discussion.)
24 MR. BRUEGGEN: Let me know if you need
25 a break, if you need to stand or whatnot.

Rizman Rappaport (973)992-7650
"When every word counts"

Page 349

1     THE WITNESS: I'm fine.
2     MR. BRUEGGEN: Okay. Good.
3     THE WITNESS: I'll relax when I get
4  home.
5     MS. BONJEAN: Can you mark this,
6  please.
7     (Exhibit 6 marked.)
8     BY MS. BONJEAN:
9  Q.  Before I ask you about this document,
10  Mr. Montilla, when you interviewed Mr. Maysonet on
11  July 15th, 1990, and August 1st, 1990, with
12  Sergeant Mingey present, okay, he spoke primarily
13  in Spanish, is that --
14 A.  Yes.
15 Q.  -- is that right?
16    MR. BRUEGGEN: Objection, misstates his
17  testimony.
18    BY MS. BONJEAN:
19 Q.  Is that correct?
20 A.  Yes.
21 Q.  Okay. And because Sergeant Mingey did not
22  speak Spanish, you were the only person who knew
23  what Mr. Maysonet was saying, right?
24 A.  Pardon me?
25 Q.  You were the only person who can tell us

Page 350

1  what Mr. Maysonet said during those interviews?
2 A.  At that time, yes.
3 Q.  Okay. And yet you didn't prepare a report
4  to reflect it, correct?
5 A.  That's correct.
6 Q.  So whatever Sergeant Mingey prepared, if he
7  did, would have been information that he got from
8  you, not directly from Mr. Maysonet, correct?
9 A.  That is --
10    MR. BRUEGGEN: Object to form,
11  misstates prior testimony.
12    MS. BONJEAN: Okay.
13    THE WITNESS: That is correct.
14    BY MS. BONJEAN:
15 Q.  Okay. And because you were the only person
16  who could understand what Mr. Maysonet was saying
17  during those meetings when he was speaking in
18  Spanish, did you think maybe you should also write
19  a report?
20 A.  No, ma'am.
21    MR. BRUEGGEN: Objection, misstates his
22  prior testimony.
23    BY MS. BONJEAN:
24 Q.  Go ahead.
25 A.  No, ma'am.

Page 351

1 Q.  Okay. And can you tell me why you didn't
2  feel --
3 A.  I'm an interpreter. I don't work with the
4  case they ask me to interpret. I become an
5  interpreter, not a detective or a policeman at that
6  time.
7 Q.  Okay. All right. I'm going to hand you
8  what's been marked as Exhibit 6, if you would.
9 A.  All right.
10    MS. BONJEAN: Is it two sided? I just
11  want to make sure.
12    MR. BRUEGGEN: No. No, it's just one
13  sided.
14    MS. CARNEY: That one is not.
15    MS. BONJEAN: Oh, okay. Here. Can I
16  have that back?
17    MS. COHEN: Look at the Bates stamp.
18    MS. BONJEAN: It's going to be a
19  two-page document --
20    MR. BRUEGGEN: Do you want to staple
21  it?
22    MS. BONJEAN: -- that has Maysonet
23  10890 and Maysonet 10891. Okay?
24    BY MS. BONJEAN:
25 Q.  Mr. Montilla, have you ever seen this

Page 352

1  document before?
2 A.  I've seen documents like this, but not this
3  here.
4 Q.  Okay. Do you know what it is?
5 A.  Yes, ma'am.
6 Q.  What is it?
7 A.  It's an arrest record.
8 Q.  Okay. And who is the -- who is the first
9  page an arrest record for?
10 A.  Wiley, Torrence.
11 Q.  Okay. And is that one of the victims on
12  North Avenue?
13 A.  Yes, ma'am.
14 Q.  And the other page, who's that an arrest
15  record for?
16 A.  Kevin Wiley, his brother.
17 Q.  The other, right?
18  And do you see the stamp that says "issued
19  on inquiry, May 25th, 1990"?
20 A.  Yes, ma'am.
21 Q.  What does that mean to you?
22 A.  It means that the detectives went and got a
23  copy of -- ran his name and see if he had an IR
24  number, and they went and got his copy.
25 Q.  And we talked about this earlier, about how

Page 353

1  it might be helpful to the investigation to pull
2  the criminal histories or arrest histories of a
3  victim, right?
4  A.  Yes.
5  Q.  And does it look like that's what the
6  detectives did?
7  A.  Apparently, yes.
8  Q.  All right.  And Mr. Wiley didn't have much
9  of an arrest history, did he?
10 A.  No, he didn't.
11 Q.  And what about Kevin Wiley, not really much
12 of an arrest history either, right?
13 A.  About the same thing.
14 Q.  And these -- those -- I know everyone calls
15 them youths, but they weren't young men, right?
16 A.  Right.
17 Q.  I mean, they weren't teenagers, correct?
18 A.  That's correct.
19 Q.  They were in their mid to late 20s?
20 A.  Yeah.  Okay.
21 Q.  Is there anything about this arrest record,
22 arrest history, that leads you to believe that
23 these two were gang members?
24 A.  No, ma'am.
25 Q.  They don't look like the rap sheets of a

Page 354

1  gang member, right?
2  A.  Pardon me?
3  Q.  They don't look like the rap sheets or the
4  arrest --
5  A.  No.
6  Q.  -- histories of gang members, correct?
7  A.  That's correct.  Misdemeanors.
8  Q.  Okay.  Mr. Montilla, despite the fact that
9  you were not doing any of the investigating in this
10 case, you testified a number of times in the case,
11 right?
12     MR. BRUEGGEN: Object to form.
13     MS. CARNEY: And argumentative.
14     MS. BONJEAN: I'm not trying to argue.
15     BY MS. BONJEAN:
16 Q.  You did -- you testified a number of times,
17 right?
18 A.  Ma'am, pardon me?
19 Q.  You testified a number of times in
20 Mr. Maysonet's prosecution, correct?
21 A.  Yes, ma'am.
22 Q.  Okay.  Three times, right?
23 A.  I don't remember.  I know I testified.
24 Q.  Okay.  A lot of times to testify as an
25 interpreter, right?

Page 355

1  A.  Pardon?
2     MS. CARNEY: Object to form.
3     BY MS. BONJEAN:
4  Q.  That's a lot of times to testify if you were
5  just acting as an interpreter, correct?
6  A.  Yes.
7  Q.  Okay.  So you testified at the hearing on
8  the motion to quash arrest and suppress evidence,
9  right?
10 A.  I assume so.
11 Q.  Okay.
12     MS. BONJEAN: Here, let me mark these,
13 if I could.
14     Can you mark these three.
15     (Exhibits 7, 8 and 9 marked.)
16     (Off stenographic record discussion.)
17     BY MS. BONJEAN:
18 Q.  Okay.  Mr. Montilla, I'm going to have you
19 look at what I marked as Exhibit 7, if you would.
20 I'm not going to go through everything, but
21 do you see your name here on this testimony?
22 A.  Yes, ma'am.
23 Q.  Okay.  And do you recall giving testimony at
24 Mr. Maysonet's pretrial motion to quash and
25 suppress evidence?

Page 356

1  A.  I'm sure I did.
2  Q.  Okay.  And if you want to take time to look
3  at this, do you have any reason to dispute that
4  this is the testimony that you provided at that
5  motion to quash?
6  A.  I don't -- I don't think so.  I don't dispute
7  anything.  It's a court-reported statement.  Okay.
8  Q.  Let me know when you've had a chance to
9  peruse it.
10 A.  How far do you want me to go on this?
11 Q.  I just want to -- I want you to see if it
12 refreshes your recollection of testifying at the
13 pretrial.
14 A.  Yeah, I remember this, yeah, with -- Ellen
15 Mandeltort, I remember --
16 Q.  What do you remember about Ellen Mandeltort?
17 A.  A good State's Attorney.
18 Q.  Uh-huh.  Why was she good?
19 A.  She was very good, a very intelligent lady.
20 Q.  Uh-huh.  Okay.
21 And I'm now going to have you look at
22 Exhibit 8.  And tell me if you want to look through
23 that.  I'm going to represent to you that that's
24 your testimony from the motion to suppress the
25 statements, the hearing on the motion to suppress

Page 357

1  the statements.
2  A.  Okay.  Yeah.
3  Q.  So there were two pretrial hearings that you
4  testified --
5  A.  Pardon me?
6  Q.  Two pretrial hearings that you testified to.
7  A.  Okay.
8  Q.  Does that -- does that sound familiar?
9  A.  Has to be.  This is all court written by a
10  court reporter.  I was there, so I can't deny all
11  this.
12  Q.  Right.  You testified to all of that,
13  correct?
14  A.  Yeah, I testified.
15  Q.  And you have no reason to quarrel with the
16  testimony that's reflected in these transcripts,
17  right?
18  A.  That is correct.
19  Q.  Okay.  And then you also testified at trial
20  in front of a jury, right?
21  A.  Yes.
22  Q.  You remember that, correct?
23  A.  Yes, I remember that.
24  Q.  I'm going to show you Exhibit 9 --
25  A.  Okay.

Page 358

1  Q.  -- if you would.
2  I'm sorry it's light, but the original was
3  pretty light, so...
4  So you remember testifying before --
5  A.  Yes, with Beuke, his lawyer, yes, ma'am.
6  Q.  Did you know -- do you know Rick Beuke?
7  A.  No.  I only met him in court.
8  Q.  Okay.  Did you know he was friends with Rey
9  Guevara?
10  A.  No, ma'am.
11  Q.  Okay.  Did you ever see Rick Beuke at Area
12  5?
13  A.  No, ma'am.
14  Q.  Not once?
15  A.  No.
16  Q.  Okay.  Were you aware that Rey Guevara was
17  demanding protection payment money from Jose
18  Maysonet?
19  A.  He was demanding what, ma'am?
20  Q.  Protection -- money from Jose Maysonet.
21  A.  No, ma'am.
22  Q.  And that they had an arrangement -- again,
23  this was prior to Mr. Maysonet's arrest -- where
24  Mr. Maysonet would be able to deal or sell drugs
25  without interference from the police if he paid

Page 359

1  Guevara money?
2  A.  I never heard that, ma'am.
3  Q.  Okay.  Were you aware that Mr. Guevara would
4  accept money to change outcomes in cases?
5  MR. SCHALKA: Objection, form.
6  THE WITNESS: Never.
7  BY MS. BONJEAN:
8  Q.  Ever see -- you never worked a case with
9  Guevara other than this one, correct?
10  A.  That is correct.
11  Q.  Do you know who Joseph Miedzianowski?
12  A.  Oh, yeah.
13  Q.  Okay.  Did you see him at Area 5 from time
14  to time?
15  A.  Once.
16  Q.  What were the circumstances under which you
17  saw him there?
18  A.  There were -- came in to -- for some kind of
19  assist on making an arrest or something.
20  Q.  Okay.  Do you remember the case?
21  A.  No, ma'am.
22  Q.  Okay.  Did you ever see him with Detective
23  Guevara?
24  A.  No, ma'am.
25  Q.  Okay.  So you're not aware of any criminal

Page 360

1  activity by Guevara with -- that he carried out
2  with Joe Miedzianowski, right?
3  A.  That's correct.
4  MR. BRUEGGEN: How are you feeling,
5  still good?
6  THE WITNESS: Uh-huh.
7  MR. BRUEGGEN: Again, if you need to
8  stand up, just stand up, stretch out.
9  THE WITNESS: Huh?
10  MR. BRUEGGEN: If you need to stand up,
11  just let her know, stand up, stretch out.
12  BY MS. BONJEAN:
13  Q.  Mr. Montilla, you mentioned that you had an
14  on-duty police shooting while you were employed by
15  the Chicago Police Department.  Right?
16  A.  That's correct.
17  Q.  And that was actually only a couple months
18  after you arrested Mr. -- or you were involved in
19  Mr. Maysonet's --
20  A.  I think so.
21  Q.  -- arrest, right?
22  A.  Yeah.  I think I was working midnights.
23  Q.  And was there a complaint register that was
24  initiated as a result of that incident?
25  A.  Yes, ma'am.

Maysonet v.
Guevara

Video Deposition

Page 361

1  Q.  And were you disciplined in connection with
2  that incident?
3  A.  I was suspended pending separation.
4  Q.  Do you -- did you sit for a number of
5  interviews with OPS?
6  A.  Yes.
7  Q.  Okay.  You were interviewed by OPS, right?
8  A.  Yes, ma'am.
9  Q.  Okay.  And -- let's see.
10  And you were sustained -- well, hold on one
11  second.
12  Was there a recommendation for separation?
13  A.  Yes, ma'am.
14  Q.  Why were you recommended for separation?
15  A.  I have no idea, no idea at all.
16  Q.  You don't have any idea?
17  A.  No, ma'am.
18  Q.  Well, what were you told?
19  A.  Pardon me?
20  Q.  What were you told?
21  A.  I was told FO -- OPS found that I should be
22  suspended pending separation under -- upon their
23  investigation.
24  Q.  And is that because they found your shooting
25  unjustified?

Page 362

1  A.  Apparently.  I thought I did a good shooting.
2  Q.  Okay.  And somebody disagreed at some point,
3  right?
4  A.  Apparently they have to.  That's their job.
5  Q.  It's not their job to find that it was an
6  unjustified shooting -- or find that it was an
7  unjustified shooting, right?
8  A.  Pardon me?
9  Q.  It wasn't their job to find that it was
10  unjustified shooting.  It was just their job to
11  investigate the shooting?
12  A.  Investigate, that's correct.
13  Q.  Okay.  And did anyone ever communicate to
14  you why they thought it was an unjustified
15  shooting?
16  A.  No, ma'am.
17  Q.  So as you sit here today, you don't know why
18  they found it unjustified?
19  A.  That is correct.
20  Q.  Do you think it was unfair that they found
21  it unjustified?
22  A.  Yes.  I thought I had a good shooting.
23  Q.  Okay.  Do you -- hold on one second.
24  So what happened?  Why didn't you get
25  terminated?

Page 363

1  A.  It went before the police board.  I was
2  represented by counsel there.
3  Q.  Who represented you?
4  A.  Joe Roddy.
5  Q.  And what was the outcome?
6  A.  I was exonerated and I was given my job back
7  and all my backpay, that I -- according to the
8  police board, I did everything according to the
9  rules and regulations set forth by the Chicago
10  Police Department.
11  Q.  OPS disagreed, but the hearing officers
12  found otherwise, right?
13  A.  Yes, ma'am.
14  Q.  Now, you indicated earlier that you never,
15  in your history as a police officer, did you ever
16  prepare a false report or ever even see another
17  detective prepare a false report, right?
18  A.  That is correct.
19  Q.  But OPS found that you made a false report,
20  didn't they?
21  A.  Well, that's their -- their findings.
22  Q.  Right.  They found that you made a false
23  police report, correct?
24  A.  No.  I didn't make a false police report.
25  Q.  I know that that's what you're saying, but

Page 364

1  OPS found otherwise, right?
2  A.  Yes.  They found otherwise, that's correct.
3  Q.  Okay.  Did OPS find that you had made false
4  statements to the investigating body?
5  A.  Ma'am, whatever they put down, I guess so.  I
6  can't testify for them.  What they found, they
7  found.  I did it right.  I made a good report and I
8  didn't lie on anything, and I'll stand that on a
9  bible.
10  Q.  Okay.  And do you know why they thought
11  otherwise or why --
12  A.  No, ma'am.
13  MR. BRUEGGEN: Object to foundation.
14  Go ahead.
15  BY MS. BONJEAN:
16  Q.  I'm asking if you know.  You don't know?
17  A.  They didn't tell me much, ma'am.  All they
18  did was separate me.  That's all I got.
19  Q.  Well, did you get a report of their
20  findings?
21  A.  I don't remember.
22  Q.  Okay.  How long were you suspended?
23  A.  Quite a while.  I don't remember how long
24  exactly.
25  Q.  As long as a year?

Maysonet v.
Guevara

Video Deposition

Page 365

1  A.  No, less than a year.
2  Q.  All right.  And after you were -- your
3  suspension ended and you were reinstated, did you
4  go back to work?
5  A.  I went to the academy for a refresher course
6  and then back to work.
7  Q.  Okay.  And did you go back to Area 5?
8  A.  Yes.
9  Q.  Okay.  Did you get any remedial training or
10  anything as it related to your shooting incident?
11  A.  Pardon me?
12  Q.  Did you get any discipline ultimate --
13  strike that.
14  Did you get any training -- retraining as a
15  result of the shooting incident?
16  A.  No, ma'am.  I just went to the academy for a
17  refresher and back to work.
18  Q.  That wasn't -- the refresher wasn't
19  discipline.  It was just because you had been out
20  of work for a while, right?
21  A.  Right, yeah.
22  Q.  Did you receive any training as a result of
23  the incident as a response to the incident itself?
24  A.  No, ma'am.
25  Q.  Okay.

Page 366

1  A.  Not that I recall.
2  (Off stenographic record discussion.)
3  BY MS. BONJEAN:
4  Q.  Do you remember a complaint register lodged
5  against you by a Michael Pong or Marjorie Pong?
6  A.  No, ma'am.
7  Q.  Doesn't ring a bell?
8  A.  No, ma'am.
9  Q.  Okay.  Okay.  Do you remember being the
10  subject of a complaint register with Detective
11  Kato?
12  A.  No, ma'am.
13  Q.  Did you ever work with Detective Kato?
14  A.  No, ma'am.
15  Q.  Never did?
16  A.  Never.
17  Q.  Okay.  Did you ever participate in an
18  interrogation of a suspect with Detective Kato?
19  A.  Not that I recall.
20  Q.  Do you know who Detective Kato is?
21  A.  Yes, ma'am.
22  Q.  How do you know Detective Kato?
23  A.  He came to Area 5 a few times and I met him
24  there.  I was introduced to him.
25  Q.  Okay.

Page 367

1  MS. BONJEAN: I'm going to -- can you
2  mark this for me, please.
3  (Exhibit 10 marked.)
4  BY MS. BONJEAN:
5  Q.  Detective -- or, Mr. Montilla, I'm going to
6  hand you what's been marked as Exhibit 10.
7  A.  Okay.
8  Q.  Do you recognize this complaint register
9  investigation file?
10  A.  I recognize this, yes.
11  Q.  Okay.  And I'm going to ask you to turn to
12  like the -- the page that is Bates stamped Maysonet
13  17346.
14  A.  Ma'am, you're talking that way, ma'am.  I
15  can't hear you.
16  Q.  Yeah, I'm sorry.  Maysonet 17346.
17  A.  Okay.
18  Q.  Okay.  Do you see that the victim's name is
19  Devon Daniels?
20  A.  Who?
21  Q.  Devon Daniels.
22  A.  Where is that at?  Daniels.  Okay.
23  Q.  And do you see that the name of the officers
24  who are identified, the accused officers, are
25  Kriston Kato and Fernando Montilla?  And that would

Page 368

1  be up above.
2  THE WITNESS: Where's she seeing this
3  at?
4  Okay.
5  BY MS. BONJEAN:
6  Q.  You're Fernando Montilla, right?
7  A.  Yeah.
8  Q.  And your star number was 20778?
9  A.  Yeah, that was my new star number.
10  Q.  Okay.  And as you sit here today, are you
11  telling us that you have no recollection of a
12  complaint register lodged against you for
13  activities that you allegedly undertook with
14  Detective Kato?
15  A.  Might have been Area 5.  I don't recall all
16  of it, ma'am.  I don't.
17  Q.  Did you ever investigate a case with
18  Detective Kato?
19  A.  Never.
20  Q.  Okay.  So I'm going to just read the
21  allegations here.  It says: The complainant was
22  received and registered by Investigator James
23  Montgomery on February 19th, 1996.  The
24  complainant, Paula Daniels, was not a witness to
25  the incident.  She filed this complaint of her son,

Page 369

1 Devon Daniels, the victim. Mr. Daniels claimed
2 that some time between 17 and 18th of February,
3 1996, between 1300 to 500 hours, while in an
4 interrogation room in Area 5 headquarters,
5 Detective Kriston Kato tightened the handcuffs on
6 his wrists and jerked him around by the same,
7 knocked his hat off his head and slapped him on the
8 head, kneed him in the groin, kicked him on the
9 legs and shin, and along with Detective Fernando
10 Montilla and James Troken, beat him about the body,
11 pulled his hair and choked him until he confessed
12 to a murder.
13 Do you see that allegation?
14 A. Yes, ma'am.
15 Q. Okay. Now, since it's written on a piece of
16 paper, we have to assume it's true, right?
17 A. I hope --
18 MR. BRUEGGEN: Objection,
19 argumentative.
20 MS. CARNEY: Misstates his testimony.
21 BY MS. BONJEAN:
22 Q. Correct?
23 MS. CARNEY: Go ahead.
24 MR. BRUEGGEN: Go ahead.
25 THE WITNESS: Correct.

Page 370

1 BY MS. BONJEAN:
2 Q. Huh? Correct?
3 A. Yeah, that's what's written here.
4 Q. So it must have happened, right?
5 A. Not necessarily.
6 Q. Oh, wait. Didn't we say earlier that if
7 it's on a -- on a report, that it must have
8 happened?
9 A. I'm being accused of something that's
10 investigated by the police department, and they're
11 saying I did this. I didn't do that and I know
12 that.
13 Q. Okay. So can we agree now that just because
14 it's written in the report doesn't make it true?
15 MS. CARNEY: Objection, argumentative.
16 THE WITNESS: They're saying this here,
17 ma'am. They're saying I'm accused of doing
18 something.
19 MS. BONJEAN: Right.
20 THE WITNESS: Okay? This is a person
21 accusing me of doing something to them.
22 MR. BRUEGGEN: Right.
23 THE WITNESS: That's written on paper.
24 BY MS. BONJEAN:
25 Q. It's written in a report.

Page 371

1 A. It's investigated. I prove they did wrong,
2 so this is how it's proven. That's a CR number.
3 Q. Okay. But this is -- this is a police
4 document?
5 A. Ma'am, it's written, yes.
6 Q. Okay. It's a report, correct?
7 A. Yes, ma'am.
8 Q. Okay. And you're saying that what is
9 alleged against you is not true, right?
10 A. That is correct.
11 Q. Okay. So -- and my only point is that just
12 because someone says it's so and it ends up in a
13 report doesn't make it true, does it?
14 MR. BRUEGGEN: Objection,
15 argumentative.
16 THE WITNESS: Not necessarily.
17 BY MS. BONJEAN:
18 Q. Right. It doesn't make it true, correct?
19 A. That's right. It's a CR investigation.
20 Q. Right. And we can't assume that just
21 because the OPS investigator put this information
22 in this report, that it actually happened, right?
23 A. That's correct.
24 Q. OPS investigators are police officers,
25 right?

Page 372

1 A. That's correct.
2 Q. Having read that, though, do you remember
3 being part of an interview of a Devon Daniels with
4 Detective Kato?
5 A. No, ma'am, I don't recall that.
6 Q. What about Troken, do you know who that is?
7 A. Pardon me?
8 Q. Troken?
9 A. Yeah. He was partnered with me for a while.
10 Q. Okay. Can you turn to page Maysonet 17358.
11 A. Okay.
12 Q. Okay. You see it says Form 101. It's hard
13 to read, but it says for Assistant State's Attorney
14 use only. Do you see that?
15 A. Pardon me?
16 Q. It's hard --
17 A. Felony review, yeah. Okay.
18 Q. Yeah. Well, what is this document, do you
19 know?
20 A. This is prepared by felony review. It's a
21 statement identifying a person in a photograph or
22 doing a crime or something, and then it shows the
23 names of the officers and everybody involved, and
24 victims and witnesses on there.
25 Q. Okay. And your name appears there, right?

Page 373

1　A.　Pardon me?
2　Q.　Your name appears there as --
3　A.　Yes, it occurs, yes.
4　Q.　Along with Detective Kato, correct?
5　A.　Kato, yep.
6　Q.　Okay.  So does this --
7　A.　Troken, Carothers.
8　Q.　Does it lead you to believe that maybe you
9　did actually participate in an investigation
10　involving --
11　A.　I probably did.  My name is on there with
12　Carothers.  I was training Carothers.
13　Q.　Okay.  So this report, though, is correct,
14　right?
15　A.　That's correct.
16　Q.　Right.  All right.  But you earlier said you
17　never investigated a case with Detective Kato?
18　A.　Never.  Never.
19　　　MR. BRUEGGEN: Objection.
20　　　THE WITNESS: Only once here.  This
21　is -- this is old.  I don't remember what we did on
22　this.
23　　　BY MS. BONJEAN:
24　Q.　Okay.  I'm not asking you what you did, but
25　now you remember that you actually did

Page 374

1　investigate --
2　A.　Apparently we did something with Kato.
3　Q.　Okay.  So you were very sure earlier, so now
4　you're not sure, right?
5　　　MS. CARNEY: Objection, argumentative.
6　　　MR. BRENER: Join.
7　　　BY MS. BONJEAN:
8　Q.　The Assistant State's Attorney would have no
9　reason to just make your name up and put it there
10　as a witness, right?
11　　　MR. BRUEGGEN: Object to form,
12　argumentative.
13　　　THE WITNESS: Pardon me?
14　　　BY MS. BONJEAN:
15　Q.　You have no reason to believe that the
16　State's Attorney would just put your name there
17　just for yucks, correct?
18　A.　It's on the report.
19　　　MR. BRUEGGEN: Same objections.
20　　　MS. BONJEAN: Okay.  We are almost
21　done.
22　　　Can you mark this.
23　　　(Exhibit 11 marked.)
24　　　BY MS. BONJEAN:
25　Q.　Mr. Montilla, I'm going to hand you what's

Page 375

1　been marked as Exhibit 11.  Can you look at that
2　and tell me what that is.
3　　　MR. BRUEGGEN: Look at the whole
4　document.
5　　　MS. COHEN: Here's another copy for
6　you.
7　　　MS. CARNEY: Oh, thank you.
8　　　BY MS. BONJEAN:
9　Q.　Have you had a chance to look at it?
10　A.　Pardon me?
11　Q.　Have you had a chance to look at it?
12　A.　Some of it here, yes.
13　Q.　Okay.  What is it?
14　A.　I'm being accused of doing stuff to Maysonet,
15　I think.
16　Q.　Okay.  But what is specifically this
17　document?
18　　　MR. BRUEGGEN: Read it.
19　　　MS. BONJEAN: And please do not coach
20　him.
21　　　THE WITNESS: Huh?
22　　　MR. BRUEGGEN: I was telling him to
23　actually read it.
24　　　MS. BONJEAN: Okay.  Well...
25　　　THE WITNESS: Pardon me?

Page 376

1　　　MR. BRUEGGEN: I think he just looked
2　at the caption.
3　　　THE WITNESS: Yeah.
4　　　BY MS. BONJEAN:
5　Q.　Okay.  Well, do you recognize this document.
6　A.　I never had one before.  First time.  Okay.
7　Yeah.  I'm looking at it.
8　Q.　Okay.  Well, go to the last page.
9　A.　Pardon me?
10　Q.　Go to the last page of the document.
11　A.　Last page.  Okay.
12　Q.　What is that?
13　A.　A signature of me that I'm certifying that
14　I -- of a defendant on this case, the captioned
15　case.
16　Q.　Okay.  What are you certifying to?  It says,
17　"I hereby certify that the foregoing answers to the
18　interrogatories are true and accurate to the best
19　of my information."  Do you see that?
20　A.　Yes.
21　Q.　Okay.  Do you remember signing that?
22　A.　Yes.
23　Q.　Okay.
24　A.　That's my signature.
25　Q.　Okay.  So back to this document, do you now

Page 377

1  recognize what you were certifying to the truth of?
2  A.  Yeah.
3  Q.  What is it?
4  A.  That I was going to tell the truth on the
5  case and everything why.
6  Q.  Okay.  Sir, look at this document.  Have you
7  ever seen this document before?
8  A.  When I signed it, yes.
9  Q.  Okay.  Who showed it to you?
10  A.  Can't remember the attorney that was present
11  with me.  I can't remember.
12  Q.  Okay.  Let's look at interrogatory number
13  one.  Do you see that?
14  A.  Pardon me?
15  Q.  Do you know what an interrogatory is?
16  A.  No.  Explain it to me, please.  I can't
17  remember a lot of stuff.  I forget.
18  Q.  That's okay.
19  Do you remember reviewing this document
20  before you signed that certification?
21  A.  Yes, ma'am.  I had to review it, yes.
22  Q.  Okay.  And did you do that?
23  A.  Yes, ma'am.
24  Q.  And did you -- did you assist in answering
25  these questions?

Page 378

1  A.  Yes.
2  Q.  Okay.  Now, for instance -- hold on.
3  MR. BRUEGGEN: Jennifer?
4  MS. BONJEAN: Yeah.
5  MR. BRUEGGEN: This has highlights and
6  writing on it.  I think I probably wasn't supposed
7  to get that copy.  I wrote "Exhibit 11" on there.
8  MS. BONJEAN: Oh.  Yeah, I don't even
9  know.
10  MS. COHEN: Must have been yours.
11  MS. BONJEAN: Chances are I can't read
12  whatever I write anyway, but...
13  BY MS. BONJEAN:
14  Q.  Okay.  I'm going to have you look at
15  interrogatory number four.
16  THE WITNESS: Here?
17  MS. CARNEY: Yeah.
18  MR. BRUEGGEN: Yes.
19  BY MS. BONJEAN:
20  Q.  Okay.  It says:  Please identify every
21  communication that you had with any person,
22  including, but not limited to plaintiff, suspects,
23  persons of interest and any of the individual
24  defendants or anyone else, about any of the
25  allegations, events or circumstances described in

Page 379

1  plaintiff's complaint.  For each such
2  communication, please provide a summary of the
3  communication, identify when, with whom, and in
4  what medium, whether it was in person, phone,
5  email, text, the communication occurred, and
6  provide the dates of the communication.  If you
7  answer this interrogatory by referring to
8  documents, please identify the document and affirm
9  that the sum total of your communications
10  responsive to this interrogatory are contained in
11  the documents that you referenced.
12  Do you see that?
13  A.  Yes.
14  Q.  Okay.  What did you do to -- what actions
15  did you take or what did you review so that you
16  could answer this question?
17  A.  I don't understand the question.
18  Q.  How did you -- how did you -- this is a
19  question to you.  Do you understand that?
20  A.  Yeah.
21  Q.  Okay.  And how did you go about preparing to
22  answer this question?
23  A.  I don't -- I don't get it.  I've never
24  been -- I don't know about this.
25  Q.  Did you look at any documents when you --

Page 380

1  did you answer this question?
2  A.  Yeah, I answered these here with -- whatever
3  I was and where I did this, I don't remember.
4  Q.  Okay.  So what did you do so that you
5  could -- you understand that these are sworn --
6  sworn questions -- sworn questions that are asked
7  of you, and you are giving sworn answers to these
8  questions, right?
9  A.  Yeah, and I did the -- it was all written
10  here by my objections to everything.
11  Q.  Okay.  And I understand your attorney
12  probably wrote the objections.  That's what
13  attorneys do.
14  A.  Yeah.
15  Q.  But what I'm asking is:  What did -- apart
16  from the objections, what did you do so that you
17  could answer this question to the best of your
18  ability?
19  A.  I guess look at the case.  I'm not -- I don't
20  remember.
21  Q.  Well, what did you do?
22  A.  Ma'am, I don't remember all this, ma'am.  I
23  don't remember this.
24  Q.  You signed this certification --
25  A.  I understand I signed it, but I don't

Page 381

1  remember.  What year was this?  I don't know.
2  Q.  It was in May of 2019, it looks like.
3  A.  Okay.  I don't remember all that.
4  Q.  Just a couple months ago.
5  A.  A couple months.
6  Q.  Okay.  What did you do to determine whether
7  or not -- strike that.
8  What did you review so that you could answer
9  this question fully and completely?
10 A.  I guess all the reports.
11 Q.  Well, did you look at the reports?
12 A.  I think I did, yeah.  We went through
13 everything.  I know that.
14 Q.  Okay.  Well, for instance, you referenced an
15 interview with Mr. Maysonet and Detective
16 Paulnitsky that you said occurred prior to the
17 interview with Sergeant Mingey.
18 Do you remember that?
19 A.  Yes.
20 Q.  Okay.  Where did you get that information
21 from?
22 A.  Just reading reports.  If I would have read
23 the reports and I see everything, I was assuming
24 that these were the dates that we were together.
25 Q.  Okay.  Did you remember that interview with

Page 382

1  Paulnitsky?
2  A.  I remember at Area 5, yes.
3  Q.  Yeah.  And this was before your interview
4  with Mingey?
5  A.  I think it was after.
6  Q.  Okay.  So now that's --
7  A.  Yeah, I think it was --
8  Q.  You don't really remember, right?
9  A.  Not all of it, no.  I'm having a hard time.
10 I'm -- can't remember.  Unless I read reports, then
11 I'll remember, to refresh.
12 Q.  Okay.  And you have to rely on the reports
13 to tell you what happened, right?
14 A.  That is correct, yeah.
15 MR. BRUEGGEN: Object to form.
16 BY MS. BONJEAN:
17 Q.  Okay.  You have zero recollection by
18 yourself without those reports, right?
19 MR. BRUEGGEN: Object to form,
20 misstates the first two hours of the dep.
21 BY MS. BONJEAN:
22 Q.  Okay.  Well, you have -- I'll strike that.
23 That's not entirely fair, but you have very limited
24 information, other than what you testified to
25 during the first two hours of the deposition,

Page 383

1  right?
2  A.  That's correct.
3  Q.  And what -- so what else -- did you do
4  anything else to prepare these interrogatories,
5  other than look at reports?
6  A.  Not that I recall.
7  Q.  Okay.  Did you -- did you -- and you read
8  these before you certified to it?
9  A.  Yes.  I read everything, yeah.
10 Q.  And it's -- and it's complete and accurate
11 to the best of your ability, right?
12 A.  That is correct.
13 Q.  And as far as you know, there's no
14 additional information contained either in your
15 head or on any reports -- strike that.  That was
16 terrible.
17 You answered these interrogatories fully and
18 completely to the best of your ability, right?
19 A.  Yes, ma'am.
20 Q.  And you did a -- and you looked at
21 all the reports, right?
22 A.  Yeah.  We have to go through everything, yes.
23 Q.  Okay.  And you looked at the investigative
24 file and all the police reports?
25 A.  Whatever we had --

Page 384

1  MR. BRUEGGEN: Object to form,
2  foundation.  Go ahead.
3  THE WITNESS: Whatever we had, that's
4  what we looked through.
5  BY MS. BONJEAN:
6  Q.  Okay.  Did you see any GPRs?
7  A.  I don't recall, ma'am.  I don't remember
8  everything that I saw in there.
9  Q.  Do you remember seeing one GPR ever?
10 MR. BRUEGGEN: Objection, asked and
11 answered.  Go ahead.
12 MS. CARNEY: And form.
13 THE WITNESS: I only got -- what
14 reports I had is what I had to read.
15 BY MS. BONJEAN:
16 Q.  I understand that you --
17 A.  I didn't get the entire file.
18 Q.  Okay.  Let me ask it this way.  Have you
19 ever, since the minute that you started
20 interpreting for Sergeant Mingey or anybody else,
21 from that date to this date, have you ever seen a
22 GPR prepared by any detective in this case?
23 MS. CARNEY: Objection, form.
24 THE WITNESS: Not during my interviews,
25 I don't recall.

Page 385

BY MS. BONJEAN:

1  BY MS. BONJEAN:
2  Q.   And in preparation for your deposition
3  today, do you remember reviewing any GPRs?
4       MR. BRUEGGEN: Objection, asked and
5  answered.  Go ahead.
6       THE WITNESS: No, ma'am.
7       BY MS. BONJEAN:
8  Q.   Do you know why there are no GPRs?
9  A.   I have no idea, ma'am.
10      MS. CARNEY: Objection, foundation.
11      THE WITNESS: I have no idea.
12      BY MS. BONJEAN:
13 Q.   I mean, is it because -- I mean, let me ask
14 you it this way.  You testified throughout this
15 deposition that you would have expected a GPR to be
16 prepared after interviews with Jose Maysonet.
17 Right?
18 A.   Yes, ma'am.
19 Q.   Okay.  And you said that wasn't your job,
20 correct?
21 A.   That's correct.
22 Q.   Okay.  If no such GPRs exist, do you have
23 any idea where they might be?
24      MS. CARNEY: Objection, form,
25 foundation.

Page 386

1       MR. SCHALKA: Join.
2       MR. BRENER: Join.
3       THE WITNESS: I have no idea, ma'am.
4  That should have been with the file.
5       BY MS. BONJEAN:
6  Q.   They should have been with the file, right?
7  A.   That is correct.
8  Q.   If they existed, correct?
9  A.   That is correct.
10 Q.   And you would have expected them to exist?
11 A.   That is correct.
12      MR. BRUEGGEN: Object to form.
13      MS. BONJEAN: Okay.  Let's take a
14 five -- two-minute break, but I think I'm done.
15      MR. BRUEGGEN: Why don't we make it
16 five so he can --
17      MS. BONJEAN: Yeah, let's take a
18 five-minute break.
19      MR. BRUEGGEN: -- kind of stretch out
20 just in case other people have questions.
21      THE VIDEOGRAPHER: We're going off the
22 record at 5:46 p.m.
23      (Recess taken from 5:46 to 5:52.)
24      (Exhibit 12 marked.)
25      THE VIDEOGRAPHER: We are now back on

Page 387

1  the record at 5:52 p.m.
2       BY MS. BONJEAN:
3  Q.   Mr. Montilla, you remember earlier, very
4  early part of the day, when I asked you questions
5  about you appearing for Mr. Maysonet's retrial?
6  A.   I did what, ma'am?
7  Q.   His retrial, when you came to the Cook -- to
8  the 26th Street and California.
9  A.   Yes, ma'am.
10 Q.   Do you remember that --
11 A.   Yeah.
12 Q.   -- when you had reached out to Tim Grace to
13 represent you?
14 A.   Yes, ma'am.
15 Q.   And you said you were confused by the
16 subpoena, right?
17 A.   Yes.
18 Q.   By the way, had you ever -- have you ever --
19 have you ever called a lawyer before after getting
20 a subpoena in a case?
21      MR. BRUEGGEN: Objection, asked and
22 answered.  Go ahead.
23      THE WITNESS: I don't recall.
24      BY MS. BONJEAN:
25 Q.   Okay.  This is the only time that you

Page 388

1  recall --
2  A.   Yeah.
3  Q.   -- calling a lawyer?
4  A.   As I recall, yeah.
5  Q.   Okay.  I'm going to hand you what's been
6  marked as Exhibit 12.  Okay?
7       THE VIDEOGRAPHER: Counsel, will you
8  please attach your microphone?
9       MS. BONJEAN: Oh, yeah.
10      BY MS. BONJEAN:
11 Q.   Do you see this -- what appears to be a
12 letter?
13 A.   Yeah.
14 Q.   It's written to Jim Papa, Assistant State's
15 Attorney?
16 A.   Yeah.
17 Q.   It says November 13th, 2017, at the top
18 there?
19 A.   Okay.
20 Q.   Right?
21 A.   Yeah.
22 Q.   And then it says regarding People versus
23 Maysonet?
24 A.   Yes.
25 Q.   And then underneath it, it says in re

Maysonet v.
Guevara

Video Deposition

Page 389

1  retired Detectives Roland Paulnitsky and Fernando
2  Montilla?
3  A.  Yes.
4  Q.  Okay.  And at the end, it's Tim -- signed by
5  Timothy Grace?
6  A.  Yes, ma'am.
7  Q.  Okay.  And he's your attorney, right?
8  A.  Yes.
9  Q.  I'm going to read it, okay, and then I'm
10  going to stop you and ask you a question.  Okay?
11  A.  Okay.
12  Q.  It says, "Mr. Papa, as you recall, I
13  represent the interests of retired Detectives
14  Roland Paulnitsky and Fernando Montilla.  As I
15  understand and as we have spoken, your office is
16  currently prosecuting the case of People versus
17  Maysonet.  I also understand that the testimony of
18  both my clients are needed to continue on with that
19  prosecution.  My clients understand and appreciate
20  your position.  Unfortunately, the allegations made
21  in the motions filed by the defendant's attorney
22  implicate them in crimes."
23  Do you see that?
24  A.  Yes.
25  Q.  "All crimes that are complained of would be

Page 390

1  outside of any statute of limitation and thus could
2  not be subject" -- "the subject of a criminal
3  prosecution.  The only crime that could be
4  contemplated would be that of perjury.  If my
5  clients testified and if your office or the
6  Department of Justice believed that they had in
7  fact offered false testimony, they would be in
8  jeopardy."
9  Do you see that?
10  A.  Yes, ma'am.
11  Q.  Do you agree with that?
12  A.  Pardon me?
13  Q.  Do you agree with what he said there?
14  A.  Yes, ma'am.
15  MS. CARNEY: I'm just going to put an
16  objection on the record to foundation for the
17  letter, just for the record.
18  MS. BONJEAN: Okay.
19  BY MS. BONJEAN:
20  Q.  Have you ever seen this letter?
21  A.  Pardon me?
22  Q.  Have you ever seen this letter?
23  A.  I think I did, yes, ma'am.
24  Q.  Okay.  And did you see it before he sent it
25  to Mr. Papa?

Page 391

1  A.  Yes.
2  Q.  Right.
3  A.  Yeah.
4  Q.  Okay.  And I'll keep reading.  "As such, my
5  clients intend to invoke their right to remain
6  silent afforded them under the Fifth Amendment to
7  the United States Constitution and the due process
8  clause of both the federal and state constitutions
9  respectively."
10  Do you see that?
11  A.  Yes, ma'am.
12  Q.  Okay.  So you knew that Mr. Grace was going
13  to tell the Court that you were going to invoke
14  your Fifth Amendment rights before he did so,
15  correct?
16  A.  In a way, yes.
17  Q.  Well, you read the letter, you said, right?
18  A.  Right now, yes, I'm reading this letter.
19  Q.  Sir, you just testified that you saw the
20  letter prior to court, right?
21  A.  I think I did.  I don't -- I don't recall all
22  this stuff.
23  Q.  Now you don't remember, right?
24  A.  But I know that whatever's here, I guess, you
25  know, that I was talking with Tim Grace and doing

Page 392

1  all this for me.
2  Q.  Okay.  When you read this letter
3  previously --
4  A.  Yes, ma'am.
5  Q.  -- you never said to Mr. Grace, hey, I want
6  to testify, did you?
7  MR. BRUEGGEN: Objection, misstates the
8  testimony.
9  MS. BONJEAN: It's a question.
10  THE WITNESS: I always wanted to
11  testify.
12  BY MS. BONJEAN:
13  Q.  Did you tell -- when you saw this letter --
14  when Mr. Grace sent you a copy of this letter --
15  A.  Yeah.
16  MS. CARNEY: Objection, foundation.
17  BY MS. BONJEAN:
18  Q.  Okay.  Did Mr. Grace give you -- you said
19  you saw this letter.  Are you taking that back now?
20  A.  I'm not taking anything back.
21  Q.  Okay.  You're the one that is -- says that
22  you've never lied under oath, right?
23  A.  That's right.  I never lied under oath,
24  ma'am.
25  Q.  Okay.  Just about 12 seconds ago, you said

Maysonet v.
Guevara

Video Deposition

Page 393

1  that you saw this letter prior to going to court at
2  26th Street.
3      MR. BRUEGGEN: Objection, misstates his
4  testimony.
5      MS. BONJEAN: Well...
6      THE WITNESS: I don't remember the
7  court date.
8      MS. BONJEAN: Can we go back to what he
9  said about that?
10     THE WITNESS: Huh?
11     (Discussion with court reporter.)
12     BY MS. BONJEAN:
13 Q.  Do you remember being asked this question
14  not too long -- that won't work.
15  Okay.  I can assure you, because I just saw
16  it with my own eyes, that when I asked you did you
17  see this letter before you went to court, you said
18  yes.
19 A.  Yes.  Yes.  I remember this case.  I remember
20  this.
21 Q.  Okay.  And Mr. -- Mr. Grace wouldn't have
22  sent a letter like this without letting you see it
23  beforehand, right?
24 A.  Yes, ma'am, that is correct.
25 Q.  Okay.  So you saw this letter before --

Page 394

1 A.  Yeah.
2 Q.  -- you went to court, correct?
3 A.  Yes.
4 Q.  Okay.  In fact, this letter is November
5  13th, 2017, correct?
6 A.  Yeah.
7 Q.  Okay.  And that was before Mr. Maysonet was
8  released, right?
9 A.  I don't know when he was released.
10 Q.  I guess it speaks for itself.
11 A.  Yeah.  Okay.  Yeah.
12 Q.  It's public record when he was released,
13  correct?
14 A.  Okay.  Okay.
15 Q.  All right.  So you knew prior to going to
16  court that Mr. Grace was going to exercise your
17  Fifth Amendment rights on your behalf, right?
18     MR. BRUEGGEN: Object to form,
19  foundation, and I don't think -- I think you even
20  stated earlier he can't exercise rights on behalf
21  of Mr. Montilla, so...
22     BY MS. BONJEAN:
23 Q.  Well, he -- you knew prior to going to court
24  that Mr. Papa had told -- ah.
25     MR. BRUEGGEN: It's too late.  We

Page 395

1  should just call it an evening.
2      MS. BONJEAN: We're almost done.
3      BY MS. BONJEAN:
4 Q.  You knew prior to going to court that
5  Mr. Grace had told Mr. Papa that if you testified,
6  you were going to take the Fifth, right?
7 A.  If I wasn't granted immunity, that's the only
8  reason.
9 Q.  Right.
10 A.  That's how come I signed that paper.
11 Q.  Okay.  What paper?
12 A.  If I would -- this here.
13 Q.  Okay.  Okay.
14 A.  If I would be granted immunity.  If I wasn't
15  granted, that we're going to -- we were exercising
16  my rights to invoke the Fifth Amendment.  I went
17  with what was saying here with the letter of the law
18  down here.
19 Q.  So yeah.  So you -- you were aware that
20  Mr. Grace had told the State's Attorney you were
21  going to invoke the Fifth, right?
22 A.  If I wasn't granted immunity, yes.
23 Q.  Right.  And they didn't give you immunity,
24  right?
25 A.  According to my lawyer, Grace, no.

Page 396

1 Q.  Okay.  And so -- and just to be clear, you
2  read this letter, and you never told Mr. Grace, no,
3  don't send that letter, right?
4 A.  I never said anything.  He's my lawyer.
5 Q.  Right.
6 A.  I go with my lawyer.  I trust my lawyer, what
7  he's doing for me.  This is what he did for me here.
8 Q.  And you -- you were okay -- or strike that.
9  You were comfortable with Mr. Grace sending
10  this letter, right?
11 A.  Yes.
12 Q.  And this reflected what you wanted, right?
13 A.  Yes.
14 Q.  Okay.
15     MS. BONJEAN: I have nothing further.
16     MR. BRENER: I have no questions.
17     MR. SCHALKA: I have no questions.
18     MS. CARNEY: I have no questions.
19     MR. BRUEGGEN: I don't have any
20  questions.
21     THE WITNESS: I don't ask questions.
22     MR. BRUEGGEN: Signature, we'll
23  reserve.
24     MS. BONJEAN: Whatever you want.
25     THE VIDEOGRAPHER: We are now going off

Page 397

```
 1   the record at the end of the deposition of Fernando
 2   Montilla.  The time is 6:00 p.m.
 3        (Deposition concluded at 6:00.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 398

```
 1   STATE OF ILLINOIS      )
 2   COUNTY OF COOK         )
 3              JOSE JUAN MAYSONET, JR.
 4              vs.
                REYNALDO GUEVARA, et al.
 5              18-cv-02342
 6
 7
 8              I hereby certify that I have read the
 9   foregoing transcript of my deposition, given on
10   August 27, 2019, consisting of pages      through    ,
11   inclusive, and I do again subscribe and make oath that
12   the same is a true, correct and complete transcript of
13   my deposition so given as aforesaid, as it now appears.
14
15           Please check one:
16                I have no corrections
17                Number of errata sheets
                  enclosed
18
19   (signed)    FERNANDO MONTILLA
20
     SUBSCRIBED AND SWORN TO
21   before me this      day
22   of        , A.D., 2019.
23      NOTARY PUBLIC
24
25
```

Page 399

```
 1            CERTIFICATE
 2               OF
 3       CERTIFIED SHORTHAND REPORTER
 4
 5        I, KARYN H. CHALEM, a Certified Shorthand
 6   Reporter of the State of Illinois, CSR License No.
 7   084-004167, do hereby certify:
 8        That previous to the commencement of the
 9   examination of the aforesaid witness, the witness was
10   duly sworn by me to testify the whole truth concerning
11   the matters herein;
12        That the foregoing deposition transcript was
13   stenographically reported by me and was thereafter
14   reduced to typewriting under my personal direction and
15   constitutes a true and accurate record of the testimony
16   given and the proceedings had at the aforesaid
17   deposition;
18        That the said deposition was taken before me
19   at the time and place specified;
20        That I am not a relative or employee or
21   attorney or counsel for any of the parties herein, nor a
22   relative or employee of such attorney or counsel for any
23   of the parties hereto, nor am I interested directly or
24
25
```

Page 400

```
 1   indirectly in the outcome of this action.
 2            IN WITNESS WHEREOF, I do hereunto set my
 3   hand at Chicago, Illinois, this 6th day of September,
 4   2019.
 5
 6
 7
 8
 9            KARYN CHALEM, CSR, RPR
              CSR No:  084-004167
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```