IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR | ) | Case No. 18-CV-02342 |
| | ) | |
| Plaintiff, | ) | District Judge Mary M. Rowland |
| | ) | Magistrate Judge Maria Valdez |
| v. | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, LEE | ) | |
| EPPLEN, FERNANDO MONTILLA, | ) | |
| ROLAND PAULNITSKY, FRANK | ) | |
| DIFRANCO, CITY OF CHICAGO, and COOK | ) | |
| COUNTY, | ) | |
| | ) | |
| Defendants. | ) | |

**CITY OF CHICAGO'S *DAUBERT* MOTION TO BAR OPINIONS OF JON M. SHANE**

**INTRODUCTION**

Plaintiff disclosed Jon M. Shane as an expert to opine on the Chicago Police Department's ("CPD") disciplinary systems, specifically that CPD operated a dysfunctional, sham and deficient disciplinary, internal affairs, and/or police accountability system, and that CPD failed to supervise, monitor, and discipline its officers who engaged in misconduct. Dkt. 136; *Monell* stipulation, Dkt. 347. Relevant to this motion, Shane's two opinions are: (1) CPD failed to follow accepted industry standards, and its own policies, when it failed to properly supervise the defendant officers in this matter; and (2) CPD failed to identify a pattern of complaints that emerged against Chicago police officers between 1980-2008. Shane Report at 11-12, attached as Ex. A. Shane lacks the requisite experience or knowledge to render these opinions. But even if he were qualified, in this case, Shane fails to base his testimony on sufficient facts or data and does not apply a reliable method in a trustworthy manner to the facts of this case. Shane's *Monell* opinions should be barred.

**LEGAL STANDARD**

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). *Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009). Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert,* 509 U.S. at 589; *see also C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827, 934 (7th Cir. 2015). Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the

1

facts of the case. Fed. R. Evid. 702. As recently emphasized by the Advisory Committee Notes to the 2023 Amendments to Rule 702, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments. The Court should "scrutinize proposed expert witness testimony to determine if it has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (internal quotations omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d, 644 (7th Cir. 2010) (internal quotations omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017). The proponent of the expert bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Id., see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## ARGUMENT

Shane lacks the requisite experience and background to opine on the quality of disciplinary investigations, let alone conclude that any patterns emerged against the defendant officers, specifically, and Chicago police officers, generally, by examining data from Complaint Register files ("CR files"). CR files are the files that document the information gathered during

administrative investigations associated with complaints of misconduct made against officers and contain the records of the administrative investigation into those complaints.

But even if qualified, Shane should be barred because he renders opinions based upon completely insufficient data and an unreliable methodology. Specifically, Shane used the content from forty randomly selected CRs from two different "strata," CRs for Defendants Guevara, Halvorsen[1], Mingey, Epplen, Montilla and Paulnitsky ("Defendant Officers"), and CRs for non-defendant officers from Area 5, concluding patterns purportedly emerged from this review. Ex. A at 12-13, 57. Shane also relied on data and sources (including model policies drafted by the Commission for the Accreditation of Law Enforcement Agencies and International Association of Chiefs of Police) outside the relevant timeframe to draw his conclusions.

Having no internal affairs experience qualifying him to opine on the quality of CR investigations, created a list of 47 definitions and activities ("datapoints") he extracted from the CRs, using only 23 to assess the quality of the CR investigations. Ex. A at 46 (Table 6); Shane's Dep., attached as Ex. B at 32:17-33:5. Shane made these selections without relying on any studies or other authority establishing their relevance to assessing the quality or reasonableness of an investigation. Ex. B at 139:2-13. In fact, only four of the datapoints are derived from CPD's written policies (*see*, Ex. A at 46, fn. 60) which, as explained *infra*, Shane concedes meet industry standards. Furthermore, to be relevant, Shane must look at the disciplinary system as it existed in 1990, when the arrest and prosecution against Maysonet began. *See,* Officers' SOF at ¶¶3, 44. Of the small subset of CR files Shane examined spanning 28 years, eighteen years post-date 1990, leaving a mere 25 CR files from the sample that pre-date 1990. Ex. A at 96.

**I.      SHANE IS NOT QUALIFIED TO RENDER THE OPINIONS IN HIS REPORT.**

---

[1] On March 26, 2020, this Court granted Plaintiff's unopposed motion naming JoAnn Halvorsen as Special Representative for Ernest Halvorsen (deceased). Dkt. 122.

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). The question is not whether the expert is qualified in general, but "whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). The court must look at each of the expert's conclusions individually "to see if he has the adequate education, skill, and training to reach them." *Gayton*, at 617.

> In any field of social science, an expert should have to testify, at a minimum, to the longevity of that particular field, the amount of literature written about the subject, the methods of peer review among its scholarly journals, the quantity of observational or other studies conducted in that field, the comparative similarity of observations obtained, the reasons why those studies are deemed valid and reliable, and the general consensus or debate as to what the raw data means. In addition, the particular expert who wishes to testify must establish that he is sufficiently familiar with the topics mentioned above to render an informed opinion about them.

*United States v. Hall*, 974 F. Supp. 1198, 1203 (C.D. Ill. 1997); *see also Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 3142755, at *4 (N.D. Ill. July 25, 2017) (finding expert offering testimony about coercive interview techniques and false confessions but who had not researched or systematically analyzed documented factors that correlate with false confessions). Although "[t]he fact that an expert may not be a specialist in the field that concerns [his] opinion typically goes to the weight to be placed on that opinion, not its admissibility," *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016), the witness must still meet the Rule 702 threshold of knowledge, skill, experience, training, or education. *See* 2023 Committee Notes to Fed. R. Evid. 702, citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) ("The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration.").

Shane's background is in criminal justice. His baccalaureate, Master of Arts, and doctoral degrees are each in criminal justice. Ex. A at 3. He is currently a professor of criminal justice at John Jay College of Criminal Justice. Ex. A at 1. Prior to beginning his research and teaching career in 2005, Shane had a career in law enforcement, the majority of which was at the Newark Police Department. Ex. A at 1-2. But Shane's law enforcement background does not qualify him to render opinions about the nature and sufficiency of internal affairs investigations. He never worked as a supervisor or investigator in internal affairs. Shane's CV, at Ex. C; Ex. B at 21:14-23. His opinions regarding the reasonableness of CPD's internal affairs investigations thus exceed Shane's expertise or experience. *See Hall*, 840 F.3d at 926 (noting that the court "must look at each of the conclusions [an expert] draws to see if has the adequate education, skill, and training to reach them"). In sum, Shane does not have the requisite expertise to examine disciplinary investigations, determine their quality, and offer opinions as to their sufficiency. He also lacks sufficient background or experience to provide a foundation for his application of a qualitative and quantitative hybrid analysis to reach conclusions about police disciplinary systems, specifically the inferential leap that CPD's disciplinary system did not follow accepted industry standards for identifying and addressing patterns of complaints or that supervisors failed to identify clear patterns of complaints. Ex. C. For these reasons, Shane is unqualified to provide opinions concerning the sufficiency of CPD's disciplinary investigations.

II.      **SHANE USES UNRELIABLE METHODS AND IRRELEVANT DATA.**

Without the requisite personal experience in police disciplinary investigations himself, Shane purports to rely on a hybrid quantitative and qualitative analysis of the small subset of CR files he was provided to show that CPD's investigations into police misconduct are lacking. Shane concludes that clear patterns of allegations emerged across various years of several types of

5

offenses against Defendant and non-defendant officers, that supervisors should have known about these patterns, and should have taken steps to stop the alleged behavior based on an examination of data from 1980-2008. Ex. A at 12. He also opines the data shows that supervisory staff knew or should have known that the complaints against Defendant Officers (specifically a pattern of complaints alleging 1) physical confrontation, 2) actions that affect legitimacy and community perception, 3) Fourth Amendment violations and 4) truthfulness) were accruing in a manner that signaled the need for intervention and should have taken supervisory measures to stop the behavior. *Id*. at 11, 59. But this opinion is based upon an insufficient dataset of CRs and Shane concedes that other than Guevara and Paulnitsky, no definable complaint patterns emerged for the other Defendant Officers. Ex. A at 59, fn 75. And, as discussed more fully below, with respect to Guevara and Paulnitsky. the pre-1990 CRs from the dataset show no such patterns.

**A. Shane had no reliable basis for the datapoints he chose to analyze from the CR files.**

To conduct his evaluation of the CR files, Shane identified datapoints to gather to evaluate the quality of the investigation. Shane's report and deposition testimony demonstrate he had no sound methodology for his data collection. He developed his own system for identifying numerous "activities" to assess the quality of police disciplinary investigations between 1980-2008. *See, e.g.*, Ex. D, Data Collection Protocol; *see also*, Ex. B at 30:16-31:15 (Shane created an electronic file of the data he was examining, breaking down certain elements from the CR files to input them into a spreadsheet, which he called his "protocol."). *Id.* The datapoints Shane chose were not derived from nationally reliable standards and are set forth in his "code book" or "Data Collection Protocol." Shane described the "code book" as a list of definitions that he referred to throughout his report. Ex. B at 32:13-16. However, Shane cannot provide any evidence that his code book has ever been tested or used by anyone else. And, when asked if anyone assisted Shane to identify

6

and extract the variables from the random selection of CR files, he was precluded from answering based on work product grounds. Ex. B at 39:13-18.

Shane's made up "code book" provides instructions for what data should be extracted from each of the sample CR files to be entered into an Excel spreadsheet. Ex. A at 46; Ex. B at 31:22-32:16, 121:9-122:13; Ex. D. Shane testified that he relied on "basic investigative practices that would take place in an internal affairs investigation" when determining which investigative activities to include in the "code book." Ex. B at 138: 13-139:13. But as set forth *supra*, Shane has never worked in an internal affairs division, or any other body (e.g., OPS) tasked with conducting police disciplinary investigations, and he therefore is not qualified to identify relevant datapoints for rendering opinions regarding the reasonableness of CPD's disciplinary investigations. In fact, administrative investigations into police officers look broadly at the tactical, strategic and training implications of a particular incident in conjunction with an examination of whether an agency policy was violated, while criminal investigations focus on whether a crime has been committed, concentrating on the specific actions and mental state of the accused. *See,* DOJ Office of Community Oriented Policing Services, Standards and Guidelines for Internal Affairs, at Ex. J. Accordingly, the investigative tactics between the two types of investigations differ significantly. Shane himself concedes that administrative investigations focus on "policy violations" conducted by internal affairs, yet he often conflated reasonable investigative tactics in criminal investigations with reasonable investigative tactics in administrative investigations. Ex. B at 22:20-23, 147:7-18, 150:8-22. Shane provides no basis for this conclusion. *Id.,* Ex. A.

To satisfy *Daubert*, the proffered testimony must have a reliable basis in the knowledge and experience of the relevant discipline, consisting of more than subjective belief or unsupported

7

speculation. *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.") By assessing reliability, the court ensures the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

Shane is unable to point to any studies of police disciplinary investigations that utilized the same datapoints he used here. Ex. B at 141:19-143:14. Shane consistently stated that the datapoints he included in the "code book" were simply derived from his knowledge of police investigative practices alone, establishing that the datapoints are nothing more than Shane's *ipse dixit*. *Id.* Thus there is too great an analytical gap between the data and the opinions he offers.

**B. Shane's methodology to support Opinion 1 is inherently flawed.**

Shane concedes that CPD's written policies for the investigation of misconduct complaints comport with accepted national standards. Ex. B at 82:13-83:8. Shane testified that the written policies in place at the time were "sufficient" in that the "responsibilities were laid out to the degree that anybody in this chain of command knew or should have known what to do when complaints were coming in and when they were receiving complaints from these officers[]" but he did not compare CPD's policies to any other police department's policies during the relevant time period, Ex. B at 82:1-83:4. Simply put, Shane does not, and cannot, challenge the sufficiency of CPD's written policies or that CPD had written policies in place to adequately address citizen complaints of misconduct and the investigation of the same.

8

Instead, Shane opines that none of the supervisors in the chain of command were complying with the written policies at the time of the Wiley brothers' homicide investigation. *Id.* at 83:5-8. He further opines that CPD failed to employ best practices when implementing its written policies. Ex. A at 23. But Shane has no basis for these conclusions other than his say so. First, Shane refers to the relevant time period of the "instant case" but does not define what that time period actually is and relies upon a substantial amount of data that post-dates Plaintiff's arrest and prosecution. Ex. A at 11, fn. 2. Shane's reliance on post-incident data belies any conclusion that Shane confined the "relevant time period" to before Plaintiff's arrest and prosecution which, for *Monell* purposes, is the appropriate time period of analysis. *See, e.g., Brown v. City of Chicago,* 633 F. Supp. 3d 112, 1177, fn. 61 (N.D. Ill. 2022.)

Second, Shane grounds Opinion 1 on his conclusion that "there was no evidence in the record," based solely from his review of the CR files, that establishes 1) performance evaluations occurred as required by CPD policy; 2) CPD is prohibited from initiating a criminal charge for a sustained complaint for assault; 3) CPD defined, quantified or addressed repeated minor infractions consistent with Department policy, including referrals to PCP; 4) CPD internal affairs used classification rules or data definitions and there is no mention of the complaint classification in the CPD General Orders or Directives supplied in discovery; 5) CPD under took any system-wide review or changes in response to complaint patterns; 6) CPD under took any management analysis of culture, supervision, or policy relating to "the observed patterns" in the data; 7) Sergeant Epplen submitted any performance evaluations for Defendant Officers; 8) CPD took corrective measures to disrupt patterns, practices or trends of inappropriate behavior; 9) OPS and Internal Affairs communicated, shared records, archived records or coordinated their investigations; 10) the Superintendent held any commanders responsible for their subordinates'

9

conduct; 11) CPD took any managerial action to mitigate personnel complaints. Ex. A at 17, 24, 28, 32, 35, 36, 61, 66-69.

But these conclusions are derived from his flawed assumption that all the information he was looking for *should* be in the CR files. Shane cites no authority to establish that all of this information should be contained in an administrative investigation into an allegation of misconduct against a police officer. Such an unfounded expectation regarding *what* should be contained within CR files can be tied directly to Shane's lack of experience in internal affairs or police disciplinary investigations. Moreover, that Shane used these unfounded and unsupported expectations to reach such broad conclusions regarding CPD's supervision of its personnel generally shows the flaws in his circular methodology. *See,* § 2.C. Instead of understanding the systems that were in place and how those programs and policies were used, Shane made assumptions to support his ultimate conclusions.

To illustrate, regarding criticism number 2, Shane testified that he expected CPD CR files to contain documents from the Cook County State's Attorney's Office ("CCSAO") prosecutor files if an officer's alleged misconduct was being considered for criminal charging. Ex. B at 186:4-14. But Shane provides no basis for this assumption. Ex, A. In fact, he was entirely unaware of the CCSAO's process during the relevant time period and simply testified to his expectations. Ex. B at 187:5-190:21.

With respect to each of the criticisms, Plaintiff did not request documents or statistics related to any of the other enumerated topics set forth *supra*. *See,* Dkt. 163 at D; Plaintiff's Fourth RFP to the City, ¶¶1-13, 19, attached as Ex. E; Plaintiff's First RFP to the City, ¶¶49-50, attached as Ex. F. And, the documents produced show the programs were being used. For example, in 1985, an officer filed a grievance claiming the Behavioral Alert System in place was disciplinary.

RFC-Maysonet 048306-48318, at Ex. G. Likewise, in 1997 (though outside the relevant time frame), documents show that an officer filed a grievance after being placed in the Personnel Concerns Program in 1994. RFC-Maysonet 048266-48291, at Ex. H. There would be no reason for officers to file grievances if these programs weren't being used. Similarly, it is hard to understand his claim that there is no evidence that OPS and IAD archived their records when he had available to him CRs going back to 1980.

**C. Shane's methodology to support of both Opinions 1 and 2 is inherently flawed.**

During Shane's deposition, he attempted to enlarge his opinion to conclude that *all* CPD supervisory staff, throughout the chain of command, city-wide, knew or should have known that complaints were accruing in a manner that signaled the need for intervention. Ex. B at 77:4-78:6; 79:14-19. However, Shane does not provide a reliable methodology for concluding that any pattern emerged that would have put *any* supervisors on notice, let alone those who supervised Defendant Officers during the investigation into the Wiley brothers' homicide.

**1. Shane's source data is insufficient to support his Opinions.**

Shane opines based upon his review of 40 CRs, "clear patterns of personnel complaints were emerging across various years and different types of offenses against the defendant and non-defendant officers" which the City should have stopped and corrected. Ex. A at 12 ("The source data are CPD internal affairs records known as Complaint Register (CR) files from 1980 to 2008 for the Defendant Officers and a sample of non-defendant officers."). The random sample was drawn from 80 CRs opened against Defendant Officers from 1980-2008 (which span 40 years for Paulnitsky, 37 years for Mingey, 31 years for Montilla, 29 years for Guevara and 38 years for Halvorsen) and 66 non-defendant CRs from 1987-1990 (*Monell* CRs) produced in discovery. Ex. A at 14, City SOF at ¶107. According to his report, to ensure proportional representation from

11

each sample, a specific proportion of the cases were drawn from each "strata" (*i.e.* each of the two groups of officers, 55% for Defendant Officers and 45% for non-defendant officers) until reaching 40 total CRs.  Ex. A at 14-15.

Shane testified that his process was a little bit of both qualitative and quantitative research, because the "content," (i.e. the datapoints in the data collection protocol) that came from the records are qualitative, as he was looking at various components.  Ex. B at 126:9-16.  Specifically, his report includes several tables that reflect his analysis of the datapoints derived from this "random sample" (*See e.g.,* Ex. A at Tables 4-12) as well as references to specific CR files or "examples" that he says support his opinions.  *See e.g.,* Ex. A at 31, 33-34.  He then "quantified" those datapoints and "counted them up."  Ex. B at 126:16-17.  Despite this hybrid model of both qualitative and quantitative analysis, Shane's report adhered to the concept of "saturation," which he testified is generally only used with a qualitative analysis.  Shane defines saturation as the "point at which no new information or themes are observed in the data."  Ex. A at 13.  According to Shane, saturation occurs at relatively low levels, sometimes within the first twelve cases, though his report states that he sought a larger sample to "ensure representation."  Ex. A at 13; Ex. B at 127:17-21.

But, Shane admits that he "did quantify" several of the themes he purports to have found from datapoints, and that his opinions were based on that quantitative assessment.  Ex. B at 129:9-130:4.  Yet, Shane concedes that he did not conduct an inferential analysis (defined as the "ability to draw inferences from a sample to the wider population") to reach his opinions.  Ex. B at 89:13-18.  Nor did he test whether the 40 CRs were statistically significant.  Ex. B at 133:2-5.  Rather, Shane testified that since he was doing a descriptive analysis (qualitative), he did not need to ensure that he had a sufficient sample size.  Ex. B at 88:10-13.  However, Shane conceded that an appropriate power analysis, ensuring statistical significance, is necessary for quantitative analysis,

12

otherwise erroneous results and inferences could be drawn from the data. Ex. B at 54:18-24. Shane provides no basis establishing his hybrid analysis is a reliable methodology to draw opinions regarding a police department's disciplinary systems. Ex. A, generally. And, he has done no research applying qualitative research methods to discern emerging patterns of misconduct in police departments. *See generally,* Ex. B at 11:22-13:2.

The Court must ensure that a proposed expert's methodology is "scientifically valid" and his conclusions are "based on sufficient facts or data." *Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406, at *4 (N.D. Ill. Jan. 24, 2020). To evaluate Shane's hybrid methodology, it is important to note that during the 1980-2008 time period Shane was analyzing, there were 271,350 total CRs initiated against Chicago police officers city-wide. Ex. B at 86:6-88:8. By limiting his analysis to 40 CRs, Shane only reviewed .015% of the total CRs for that time period, thus he did not employ scientifically valid methodology or sufficient facts or data to draw the conclusions he purports to draw regarding CPD's disciplinary system.

### 2. Shane's source data regarding Defendant Officers post-dates 1990 and cannot establish a pattern of misconduct in 1990.

Even more fatal to Shane's methodology is his reliance on data from CRs outside the appropriate relevant time period to support his opinions that supervisory staff knew or should have known that complaints against Defendant Officers were accruing in a manner that signaled a need for intervention and should have taken supervisory measures to stop and correct the deficiencies consistent with their agency policies. Ex. A at 11. Shane's analysis does not differentiate between CR files initiated prior to Plaintiff's 1990 arrest and prosecution and those initiated *after*. Any CRs initiated *after* his arrest and prosecution are too remote to establish a practice pursuant to *Monell*. *See e.g., Velez v. City of Chicago,* 2023 WL 6388231, at *23, n. 10 (N.D. Ill. Sep. 30, 2023) (reasoning that the lawsuits cited by Plaintiff against defendant officers were too remote in

time from plaintiff's lawsuit to establish widespread practice). While the dataset included 80 CRs initiated against Defendant Officers, only 14 of those CRs were initiated against Defendant Officers, *prior* to Plaintiff's 1990 arrest. Any data derived from conduct that occurred after Plaintiff's arrest and prosecution are not a reliable indicator of what the City's "widespread policies" were at the time Plaintiff alleges the wrongdoing occurred, and only the policies in effect at that time could have caused him any alleged harm. Notably, out of the 22 cases included in the random sample from Defendant Officers' CRs, 15 *post-dated* the arrest and prosecution of Plaintiff (some by 10-18 years).

The law is clear that post-event evidence is irrelevant under *Monell*. *Calusinski v. Kruger,* 24 F.3d 931, 936 (7th Cir. 1994)(holding a municipality liable for its official policies or custom and usage is predicated on the theory that it knew or should have known about the alleged unconstitutional conduct on the date of the incident); *Prince v. City of Chicago,* 2020 WL 1874099, at *5 (N.D. Ill. 2020)(Harjani, M.J.)(holding that "certainly CRs obtained by detectives after 1991 are not relevant to the *Monell* claim arising from alleged customs and practices that were in place before the 1991 Porter homicide."). Accordingly, any reliance on data or information after Plaintiff's arrest and prosecution is is not a reliable method for determining what caused Plaintiff harm here, or a reliable indicator of what notice the City had prior to the alleged unconstitutional conduct.

### 3. Shane's opinions regarding Defendants Paulnitsky and Guevara are based on flawed assumptions and insufficient source data.

At the outset, Shane concedes that he was unable to establish any "definable complaint patterns" against Halvorsen, Mingey, Epplen or Montilla. Ex. A at 57, fn.75. Therefore, his opinion regarding a pattern of complaints against Defendant Officers must be limited to only Guevara and Paulnitsky. As discussed *supra,* Shane's methodology is inherently flawed given his

14

inclusion of CRs that post-date Plaintiff's arrest and prosecution. This fatal flaw is even more glaring regarding Guevara and Paulnitsky. Shane opines that from 1986-2004, Guevara accumulated 39 complaints from 21 incidents, of which more than one-third were for what he classified as "assault.[2]" Ex. A at 59. According to Shane, between 1986-2004, Paulnitsky accumulated 76 complaints from 42 incidents, and had a "similar complaint profile" to Guevara, with assault being his leading complaint category. Ex. A at 61.

However, confining the analysis to the Guevara and Paulnitsky's CRs initiated *prior* to Plaintiff's arrest shows that Shane's opinion is based upon 10 CRs initiated against two detectives. Shane's concession that the other Defendants had "no definable complaint patterns" leaves four CRs for Guevara[3], and six for Paulnitsky. City SOF at ¶ 128. While these CRs included allegations of excessive force, failure to make a proper notification, warrantless searches and verbal threats, it is simply not enough to support Shane's conclusion that *all* Defendant Officers were "accruing [complaints] in a manner that signaled a need for intervention[]" *prior* to Plaintiff's August 1990 arrest as it related to a pattern of 1) physical confrontation (4 total CRs), 2) actions that affect legitimacy and community perception (1 CR), 3) Fourth Amendment violations, (2 CRs) and 4) truthfulness (zero CRs from the 10 at issue).

As Shane's report and testimony establish, any trial testimony regarding his analysis of the CRs themselves, or the purported patterns that he discerned from them are based entirely on flawed methodology and his opinions should be barred.

---

[2] Shane conceded that he did not understand how CPD was differentiated between "assault" and "excessive force" within the CR files made his own determination whether an allegation should be classified as an "assault." Ex. B at 34:8-9, 16-19. He did not take any notes of CR files that he coded as an excessive force or as an assault. Ex. B at 34:20-35:5. He further testified that he did not recall seeing any complaints classified as excessive force. Ex. B at 37:2-9. CPD's Complaint Category Tables, which Shane reviewed, clearly indicates a category for excessive force, and *not* assault. RFC Maysonet 050214, attached as Ex. I.
[3] Of the CRs initiated against Defendant Guevara *prior* to Plaintiff's arrest, *two* were sustained, including one for excessive force, and one for making a false statement. City SOF at ¶¶129-130.

15

WHEREFORE, Defendant, the City of Chicago, respectfully requests this Honorable Court grant its *Daubert* Motion to Bar the Opinions of Jon M. Shane in their entirety, and for any other relief as this Court deems just and reasonable.

Dated: July 15, 2024

Respectfully Submitted,

/s/Eileen E. Rosen

EILEEN E. ROSEN, Atty. No. 6217428
*Special Assistant Corporation Counsel*

Eileen E. Rosen
Theresa B. Carney
Austin G. Rahe
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, IL 60606
(312) 494-1000
erosen@rfclaw.com