# Exhibit A

# EXPERT OPINION REGARDING THE CHICAGO POLICE DEPARTMENTS INTERNAL AFFAIRS PROCESS AND THE PATTERN OF COMPLAINTS AGAINST CHICAGO POLICE OFFICERS REYNALDO GUEVARA AND ROLAND PAULNITSKY BETWEEN 1980-2008

**SUBMITTED TO:**    Jennifer Bonjean, Esq.
Ashley Cohen, Esq.
Bonjean Law Group
750 Lexington Ave 9th floor
New York, NY 10022

**January 13, 2023**

**PERTAINING TO:**    Jose Juan Maysonet, Jr Plaintiff,

v.

Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Epplen; Fernando Montilla, Roland Paulnitsky, City of Chicago, and Cook County.

United States District Court
Northern District of Illinois
Eastern Division

Chicago, Illinois

**PREPARED BY:**    Dr. Jon M. Shane
jmsnpd@gmail.com

## STATEMENT OF QUALIFICATIONS AND BASES OF OPINION

*Employment Record*

My name is Jon M. Shane. I am a professor of criminal justice at John Jay College of Criminal Justice, which is located at 524 W. 59th Street, New York, NY, 10019. I have been a member of the faculty in the Department of Law, Police Science and Criminal Justice Administration since January 2009. I teach graduate and undergraduate courses related to criminal justice with a concentration in policing. I also conduct research on policing. My expertise is police policy and practice and the theoretical underpinnings of the police, which are reflected in my teaching and research. My other teaching and research interests are situational crime prevention, social disorganization theory, routine activities theory, violent crime and criminal justice statistics, particularly how statistics are used in criminal justice. In my capacity as a professor, I regularly consult with attorneys and law enforcement agencies around the country and internationally on police policy and practice issues and training programs.

Prior to my faculty appointment I had a career in law enforcement in both civilian and sworn capacities from December 1985 to December 2005, retiring at the rank of captain from the Newark (NJ) police department. I began my law enforcement career on December 2, 1985 as a police dispatcher for the Clifton, New Jersey police department. On March 20, 1989, I became a police officer for the Newark, New Jersey police department. I held several positions throughout my career in both operational and administrative assignments. I was promoted to sergeant in June 1995; lieutenant in July 1998; captain in September 2000. On January 21, 2005, I was notified by the New Jersey Department of Personnel that I was eligible and qualified to be promoted to deputy chief according to state standards (certification # PL050068, January 14, 2005). The majority of my career was spent in both operational and administrative assignments drafting, reviewing or implementing policy for the Newark Police Department. In these roles I created, revised or reviewed policies and implementation orders governing the administration and operations of the Newark Police Department. I also provided direct advice and consultation with the Police Director, Chief of Police and other command staff members regarding agency policy that was based on research, trends and best practices in U.S. law enforcement. Throughout my career I supervised or managed police officers and other supervisors as they conducted criminal investigations, including homicide cases.

I began my research and teaching career in 2005 as a lecturer and an adjunct professor of criminal justice at Rutgers University and Fairleigh Dickinson University. Table 1 is a summary of my employment from 1985 to present; table 2 is a summary of my training, education and professional development, and table 3 is a summary of my related employment and experience. My curriculum vitae is attached.

**Table 1**
*Summary of Employment Record*

| Date | Agency | Assignment | Position |
|------|--------|------------|----------|
| January 2009 Present | John Jay College of Criminal Justice, New York City | Department of Law and Police Science | Associate Professor |
| 2005/2008 | Rutgers University, Newark, NJ | Newark College of Arts and Sciences | Lecturer |
| Spring 2005 | Fairleigh Dickinson University, Teaneck, NJ | School of Administrative Science, Petrocelli College | Adjunct Professor |
| August 2004 December 2005 | Newark (NJ) Police Department | Office of the Chief of Police, Command Operations Center | Command Staff |
| April 2004 August 2004 | | Operations Bureau, North District Station | Commanding Officer |
| August 2002 April 2004 | | Office of the Police Director, Office of Policy and Planning | Commanding Officer |
| June 2002 August 2002 | | Operations Bureau, East District Station | Commanding Officer |
| January June 2002 | | Office of the Police Director, Office of Policy and Planning | Commanding Officer |
| April 2000 January 2002 | | Office of the Police Director, Office of Policy, Planning and Technology | Commanding Officer, Management Information Systems |
| July 1999 April 2000 | | Operations Bureau, North District Station | Tour Commander |
| July 1998 July 1999 | | Office of the Police Director, Office of Policy and Planning | Executive Officer |
| September 1997 July 1998 | | Office of the Police Director | Special Assistant to the Police Director |
| May 1997 September 1997 | | Criminal Investigation Bureau, Violent Crime Division | Homicide Section Supervisor |
| June 1995 September 1995 | | Field Operations Bureau, East & West District Police Stations | Field Supervisor |
| August 1994 | | Field Operations Bureau, Emergency | Operator and Team |

**Table 1**
*Summary of Employment Record*

| Date | Agency | Assignment | Position |
|---|---|---|---|
| September 1997 | | Response Team | Supervisor |
| March 1993<br>May 1997 | | Office of the Police Director, Research, Analysis and Planning Division | Detective |
| November 1992<br>March 1993 | | Special Investigation Bureau, Special Projects Section, TARGET Team | Police Officer |
| August 1989<br>November 1992 | | Field Operations Bureau, South District Station | Police Officer |
| March 1989<br>August 1989 | | Office of the Chief of Police, Police Academy | Police Recruit |
| December 1985<br>March 1989 | Clifton (NJ) Police Department | Communications Division | Police Dispatcher |

*Education and Professional Development*

I hold a baccalaureate degree (October 2002), Master of Arts degree (January 2005) and doctoral degree (October 2008) in criminal justice from Rutgers University. I also hold a certification in non-profit management (August 2004) from Rutgers Graduate School of Public Administration. During my law enforcement career, I attended three senior management programs for police leadership: 1) 193rd Session of the FBI National Academy (April 5 – June 19, 1998); 2) 25th Session of the Senior Management Institute for Police (June 21, 2001); and 3) Police Foundation Visiting Police Fellowship program, Washington, D.C. (January – June 1997).

The FBI National Academy is a professional course of study for U.S. and international law enforcement leaders that serves to improve the administration of justice in police departments in the United States and abroad and to raise law enforcement standards, knowledge, and cooperation worldwide. The Senior Management Institute for Police (SMIP) is a program of the Police Executive Research Forum that provides senior police executives intensive training in the latest management concepts and practices used in business and government. SMIP promotes general management theory, policy development, planning processes, organizational structure and behavior. The Visiting Police Fellowship program at the Police Foundation affords police leaders the opportunity to work with nationally recognized experts in policing, police policy, and research. The program allows the fellow to benefit from the specialized skills of individual relationships and exposure to state-of-the-art ideas that promote professional growth through research, training and technology.

During my tenure in the Newark Police Department, I was a state certified police academy instructor (April 15, 1993 – December 31, 2004) and a member of the Newark Police Emergency Response Team (December 1994 – September 1997). In my capacity as a police academy instructor, I taught various courses to recruit-level and in-service personnel including agency rules and policy, search and seizure, use of force, chemical agents and tactics. In my capacity as an ERT member and supervisor I was trained as a chemical agents instructor by the FBI and taught recruit-level and in-service personnel on the types, effects and consequences of chemical agents.

My training sessions often combined classroom and practical exercises to add dimension and depth to the classroom material. Practical exercises allow trainees to directly apply the knowledge, skills and abilities they acquired in the classroom to live sessions in a supervised manner. This gives the trainee immediate feedback and critique about the consequences and effects of their actions through a range of simulations that are designed to add as much realism and literal truth as possible to the exercise. Table 2 is a summary of my professional development.

**Table 2**

*Summary of Education and Professional Development*

| Date | School | Degree or Certificate |
|---|---|---|
| October 1, 2008 | Rutgers School of Criminal Justice, Newark, NJ | Doctorate, criminal justice |
| January 17, 2005 | Rutgers School of Criminal Justice, Newark, NJ | Master of Arts, criminal justice |
| August 31, 2004 | Rutgers Graduate School of Public Administration, Newark, NJ | Certificate, non-profit management |
| October 1, 2002 | Rutgers University, University College, Newark, NJ | Bachelor of Science, criminal justice |
| June 21, 2001 | Police Executive Research Forum, Harvard University John F. Kennedy School of Government, Senior Management Institute for Police—Session 25, Boston, MA | Certificate of completion |
| November 3, 1998 | Value-Centered Leadership: Ethics, Values and Integrity, International Association of Chiefs of Police, Newark, N.J. | Certificate of completion |
| April 5, 1998 June 19, 1998 | Federal Bureau of Investigation, FBI National Academy, 193rd session, Quantico, Va. | Certificate of completion |
| July 1997 | Practical Homicide Investigation, Vernon J. Geberth, Newark, NJ | Certificate of completion |
| January 1997 June 1997 | Police Foundation, Visiting Police Fellowship Program, Washington, D.C. | Certificate of completion |
| April 1995 | Chemical Agents in Law Enforcement Instructor, Federal Bureau of Investigation, Ft. Dix, NJ | Certificate of completion |
| June 25, 1993 | Advanced Criminal Investigations, Essex County Police Academy and Federal Bureau of Investigation, Cedar Grove, NJ | Certificate of completion |

**Table 2**
*Summary of Education and Professional Development*

| Date | School | Degree or Certificate |
|---|---|---|
| April 21, 1993 | Methods of Instruction, Newark Police Academy, New Jersey Division of Criminal Justice, Newark, NJ | Certificate of completion |
| April 15, 1993 December 31, 2004 | State Certified Police Academy Instructor, Newark Police Academy, Newark, NJ | Certificate of completion |
| November 18, 1992 | New York-New Jersey Anti-Car Theft Committee, National Insurance Crime Bureau, Tarrytown, NY | Certificate of completion |

*Related Employment and Experience*

In addition to my law enforcement career and my research and teaching career, I have related experience in police administration, criminal justice and research. Table 3 summarizes my employment and related experience.

**Table 3**
*Related Employment and Experience*

| | |
|---|---|
| March 2006 July 2006 | Consultant to Essex County College, Newark, NJ to assist with design and implementation of a geographic information system (GIS) training program for law enforcement and homeland security initiatives |
| February 2005 September 2005 | *Staff Member*, NJ Attorney General's Office - Camden Commission for Public Safety. Final report accessible at http://www.state.nj.us/lps/com-report-camden.pdf |
| | *Research Associate, Rutgers Police Institute*. Conducted public safety research and a police management study in Camden, NJ as a staff member of the *Camden Commission for Public* Safety. Research included a management study on efficiency and recommendations on best practices for organizational change, deployment and sustained crime control initiatives. |
| May 2004 Present | *Senior Research Associate, Police Foundation Washington, D.C.* Currently, serving as a senior research associate to the Police Foundation on a variety of topics related to policing. |
| October 2003 May 2004 | *Research Team Member, Rutgers Center for Mental Health.* Conducted research on police interactions and responses to persons with mental health issues. Study included conducting on site interviews with police officers as well as calls for service data analysis. |
| September 2003 September 2004 | *Differential Police Response: Neighborhood Social Disorganization and Police Response Time to Domestic Violence Calls.* Principal investigator and author of explanatory research on police response time to domestic violence calls in Newark, New Jersey. The objective was to explain the relationship between indicators of social disorganization and police response time to domestic violence calls for service. |

On the basis of my research, teaching, education, training and experience, I am therefore familiar with the policies, practices and customs associated with policing, including the risks, vulnerabilities and uncertainties, as well how police officers are trained, the importance of policy and how policy is developed and implemented at the line level.

*Publications*

      My publications are listed on my CV (attached).


*Basis of Opinion*

      In preparing this report and expressing my opinion, I relied on the knowledge I have acquired through research, teaching, education and professional development that other experts in my field would consider reliable. I also relied on my experience in criminal justice, police operations and police administration on the accepted standards of care recognized by police organizations and officials throughout the United States as the custom and practice for the administration, management and supervision of police agencies and police personnel. In this regard, I am an active member of the American Society of Criminology (ASC), the Police Executive Research Forum (PERF) and the Academy of Criminal Justice Sciences (ACJS). These organizations are dedicated to improving and promoting criminal justice policies, practices, education and professional standing for criminal justice educators and practitioners through a national and international research agenda that is multidisciplinary and focused on crime, delinquency, public policy analysis and debate.

      My professional opinion and police expertise are sought after through various invited lectures, training workshops, research grants and presentations at local, national and international venues on crime, police management, police performance and police policy and practice issues:

1. Harris County Constable, Precinct 1, Houston, Texas (with Justice System Partners, South Easton, MA), May 2021.
2. Police policy advisor, Guatemala Public Ministry, June 2016.
3. Panelist, National Association for Civilian Oversight of Law Enforcement (NACOLE) and John Jay College of Criminal Justice, academic conference series - Building Public Trust: Generating Evidence to Enhance Police Accountability and Legitimacy, April 22, 2016.
4. United States Commission on Civil Rights, Office of Civil Rights Evaluation, panel on Police Practices and Prosecution of Police Deadly Force, invited panelist. Panel presentation, April 20, 2015.
5. Panel moderator, Bridging the Great divide: Can Police-Community Partnerships Reduce Crime and Strengthen Our Democracy? *Building Police Legitimacy with Community Stakeholders,* September 5, 2014.
6. Invited training workshop, Uruguayan National Police, Basic Course in Criminal Investigations Training Workshop, Montevideo, Uruguay*,* June 9 to June 20, 2014.
7. Police Foundation, National Institute of Justice and US Department of Justice, COPS Office, Sentinel Events Initiative on Wrongful Convictions, Washington, D.C., February 7, 2014.
8. Inter-American Development Bank policing presentation on policing and the expectations for developing countries, Washington, D.C. *,* December 3, 2013.

9.  Scholarship Program for Training in Advanced Criminal Investigations for Uruguay Police, (practice grant, Ministry of the Interior, Uruguay), October 18, 2013.
10. Invited training workshop, Uruguayan National Police, Advanced Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, October 8-18, 2013.
11. Invited training workshop, Uruguayan National Police, Basic Course in Criminal Investigations Training Workshop, Montevideo, Uruguay, August 20 to September 5, 2013.
12. Invited training workshop, U.S. Army 89th Military Police Brigade, performance management training workshop, Ft. Hood, TX, July 29-30, 2013.
13. U.S. Department of Justice, National Institute of Justice roundtable on "sentinel events initiative" to uncover criminal justice system weaknesses that lead to organizational accidents, Washington, D.C., May 21-22, 2013.
14. Maritime Piracy: A Situational Analysis (research grant, PSC CUNY Award # 66767-00 44), May 15, 2013.
15. U.S. Army Military Police, Senior Leader Conference and Military Police 2020 Strategic Planning Session, National Conference Center, Lansdowne, VA, May 6-9, 2012.
16. Amendola, K., Hulcher, D. & Koval, K. *with* Heitman, A., & Shane, J. M. (2012).Personnel reallocation and scheduling: *Final report staff scheduling options,* Atlantic City, NJ Police Department. Washington, D.C: Police Foundation.
17. Amendola, K.A., Weisburd, D. Hamilton, E., Jones, G., Slipka, M., Shane, J.M & Ortiz, C[1]. (2012). The impact of law enforcement shift practices and extra-duty employment on various health, safety, performance, and quality of life measures. Washington, D.C: Police Foundation.
18. Invited panel participant, providing commentary on Roger Graef's *When Cops Kill,* to explore police shootings and what really happens to the brain and body of police officers when they pull the trigger. Moderated by President Jeremy Travis, John Jay College, April 22, 2013.
19. Panel moderator, 23rd Annual Problem-oriented Policing Conference, *Houston Police Department: Back from the Brink: Reducing Crime and Disorder in the Antoine Corridor,* Presenters: Michael Hill, Ryan Watson and Chris Schuster., October 22-23, 2012.
20. University of New Haven, Center for Advanced Policing, Innovations in Police Management Course, New Haven, CT., August 6-10, 2012.
21. Research and teaching agenda Bramshill Police College (U.K.) January 2012 – April 2012.
22. Presentation to the Chinese People's Public Security University, Police Security Bureau, on creating a nexus between police workload and budget, police policy and practice issues, Beijing, China, November 27- December 3, 2011.
23. Deterrence or System Overload? The Effect of Imprisonment and Clearance Rates on Auto Theft in the United States, Annual Meeting American Society of Criminology, Washington, D.C., November 17, 2011.
24. Open Society's Roundtable on Current Debates, Research Agendas and Strategies to address racial disparities in police-initiated stops in the U.K. and U.S.A., *Panel Moderator,* John Jay College of Criminal Justice, New York, August 10-11, 2011.
25. U.S. Department of State and FBI, *Panel Moderator,* Community Policing and Conflict Resolution, Federal Plaza, New York City, May 4, 2011.
26. Lexis/Nexis Government 2011 Insight Conference, *Panel Member,* moderated by Chuck Wexler, Executive Director Police Executive Research Forum (PERF), April 5, 2011.

---

[1] This research report received the 2012 Outstanding Experimental Field Trial Award from the Division of Experimental Criminology/American Society of Criminology (ASC). The award was presented to Dr. Karen Amendola et al. at the 68th annual meeting of the ASC in Chicago on November 14, 2012.

27. New Haven (CT) Police Department, Investigative Training Course, West Haven, CT, November 9, 2010.
28. U.S. Department of Justice COPS Office National Leadership Roundtable, *Leadership For Public Safety II,* with the Community Policing Leadership Institute (CPLI) at the John Jay College of Criminal Justice Office of Continuing and Professional Studies, April 29-30, 2010;
29. The Impact of Organizational Stress on Police Performance (research grant, PSC CUNY Award # 63310-00-41), April 15, 2010.
30. Benjamin Cardoza Law School lecture on police accountability, Professor Ellen Yaroshefsky, March 10, 2010.
31. Jamaica Constabulary Police Force, Leading Police Performance and Accountability Symposium 2010, training workshop, Kingston, Jamaica, March 30–April 2, 2010.
32. The Myth of The American Police Quasi Military Model, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA, February 26, 2010.
33. Rethinking Police Use of Confidential Informants, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA, February 23, 2010.
34. Performance Management in Police Agencies: A Conceptual Framework, Annual Meeting American Society of Criminology, Philadelphia, PA, November 5, 2009.
35. Crime Track: A Statewide Crime Data Collection System, with Christopher Andreychak, Rutgers University—School of Criminal Justice, Annual Meeting American Society of Criminology, Philadelphia, PA, November 5, 2009.
36. Implementing and Institutionalizing Compstat in Maryland Police Agencies, with the University of Maryland, Institute for Governmental Service and Research, September 24-25, 2009; October 22-23, 2009; November 20, 2009.
37. Ohio Association of Chiefs of Police, 2008 in-service training conference, Deer Creek, Ohio, April 22, 2008.
38. Florida Police Chiefs Association 56th Annual Summer Training Conference, Palm Beach Gardens, FL, June 23, 2008.
39. Virginia Association of Chiefs of Police, Annual Conference, Hot Springs, VA, August 19, 2008.
40. The Houston Area Police Chief's Association, Woodlands Public Safety Training Center, Conroe, Texas, October 28, 2008.
41. Ottawa Association of Law Enforcement Planners, Algonquin College, Ottawa, Ontario, Canada, May 5, 2007.
42. Louisiana Attorney General's Command College, Baton Rouge, Louisiana, August 8, 2007;
43. IMPACT Users Technology and Performance Conference, Saratoga Springs, NY, September 17, 2007.
44. International Association of Law Enforcement Planners, Calgary, Alberta, Canada, October 16-17, 2007.

I am also a senior research associate at the National Policing Institute (formerly Police Foundation) Washington, D.C. and I have been empaneled by the Center for Problem-Oriented Policing to conduct research on behalf of the U.S. Department of Justice, COPS Office, where I am active in police research that has national and international implications.

My research, participation in national forums and broad reading in policing and criminology have given me the theoretical and empirical grounding for examining the impact of police operations on the community. On January 24, 2011, I was named the "highly commended award winner" by the 2010 Emerald/European Foundation for Management Development, Outstanding Doctoral Dissertation Research Award. This international competitive award is conferred upon those whose dissertation research makes a significant contribution to the field. I received the award under the *Leadership and Organizational Development* category. To broaden my perspective on crime, criminology and policing issues, I serve as an occasional peer-review member for several national and international criminal justice and policing journals, including: Crime Science (2015), Criminology (2014); Criminology & Public Policy (2012); Sociological Quarterly (2012); Police Quarterly (2011); Criminal Justice Review (2011); International Journal of Police Science and Management (2011; Criminal Justice & Behavior (2010); Journal of Criminal Justice (2010); Taylor-Francis Publishing (2010); Thompson-Wadsworth Publishing ; Police Practice & Research: An International Journal (2010); Policing: An International Journal of Police Strategies & Management (2009, 2012); *Environmental Criminology and* Crime Analysis abstract review (2011, 2012 conferences); and International Journal of Comparative and Applied Criminal Justice (2010). On August 20, 2011, I accepted appointment as an *Editorial Advisory Board Member* to the International Journal of Emergency Services published by Emerald.

My teaching and course design experience has provided me first-hand knowledge of the ways police operations and policies impact the community in a pluralistic society governed by the rule of law. My teachings at the undergraduate level are: 1) Police and the Community; 2) Introduction to Criminal Justice; 3) Introduction to Law Enforcement; and 4) Criminology. My teachings at the graduate level are: 1) Contemporary Issues in Community Policing; 2) Police Ethics; 3) Problem-Oriented Policing; 4) Issues in Criminal Justice—Police and Corrections; 5) Using Computers in Social Science—Statistics; and 6) research methods and design. On January 14, 2011, I was appointed a member of the doctoral faculty in the criminal justice program, where I am responsible for teaching and mentoring students and serving the general needs of the doctoral program. Since my appointment at John Jay College, I have won various awards and been included on the Dean's List (2008-2009; 2009-2010; 2013-2014), a status conferred by the CUNY Office of Graduate Studies in recognition for faculty members who mentor or substantially influence a graduate student's academic success. On August 25, 2011, I was named "Mentor of the Year" by

the American Society of Criminology, the leading organization for practitioners and academicians from the many fields of criminal justice and criminology. On December 9, 2013, I was named the "2014 Outstanding Mentor of the Year" by the Academy of Criminal Justice Sciences.

Directly related to my teaching experience is my participation on the curriculum committee in the Department of Law, Police Science and Criminal Justice (LPS) Administration at John Jay College. The curriculum committee is responsible for: 1) creating proposals for a contemporary curriculum; 2) identifying standards for the discipline; 3) aligning the curriculum with Middle States accreditation standards; 4) developing measurable objectives for courses; 5) identifying course-appropriate resource materials and textbooks; and 6) identifying linkages with the college mission. As part of the LPS curriculum committee, I participated in revising the criminal justice bachelor of science degree (CJBS, 2013) and the police studies degree (PS, 2014). I revised the introductory course on law enforcement, a key foundational course, and created a new course on police use of force for the Police Studies degree.

My administrative experience in policing has provided me with an understanding of the manner in which police policy and practice occurs on a daily basis, from the policy level to the line level. As a command-rank officer in a major urban police department I had a unique opportunity to gain rare insight into police administration, operations and organizational culture, something that is difficult to observe in most other ways and often hidden from outsiders. In addition to the aforementioned experience, I also relied on the data presented in the documents that are listed under exhibits in this report to formulate my opinion.

*Previous Opinions*

I have either testified as an expert at trial or by deposition listed in CV (appended). I have been compensated for my work on this matter.

## CONCLUSIONS AND OPINION

Based on the available evidence and data, within a reasonable degree of professional certainty in the policing industry, I conclude that the Chicago Police Department failed to properly supervise the defendants in this matter as required by industry standards in effect at the time[2] of the underlying incident. I further conclude that the Chicago Police Department did not follow accepted industry standards, and its own policies, when it failed to identify and address patterns of complaints against its police officers. The Chicago Police Department also did not follow accepted industry standards for identifying and addressing patterns of complaints against its police officers. My opinion is as follows:

1. **Did the Chicago Police Department fail to supervise its personnel consistent with accepted industry practices when complaints against the defendant officers were generated?** Yes. The Chicago Police Department supervisory staff knew or should have known that complaints against the defendant officers were accruing in a manner that signaled a need for intervention and should have taken supervisory measures to stop the behavior and correct the deficiencies consistent with their agency policies. The findings are not consistent with the following standards:

   a. Responsibilities defined by the job specifications for each rank of the Chicago Police Department supervisory staff;

   b. Chicago Police Department General Order 82-14, Complaint and Disciplinary Procedures (effective October 15, 1982) for a thorough investigative process;

   c. Chicago Police Department General Order 86-4, District Commanders (effective June 10, 1986), where District Commanders are responsible for subordinates' conduct;

   d. Chicago Police Department General Order 83-1, Responsibilities of Sergeants Assigned to Field Activities (effective January 8, 1983), where sergeants assigned to field activities are responsible for conducting semi-annual performance evaluations;

   e. Chicago Police Department General Order 83-3, Personnel Concerns (effective March 9, 1983), where a specially trained supervisor has the responsibility to closely

---

[2] Although this report may at times read in the present tense, all opinions expressed in this report relate to the relevant time period of the instant case and are based on the data and discovery provided for that time period.

monitor, evaluate, guide and improve the performance of an assigned personnel concern.

2. **Did a pattern of complaints emerge against Chicago police officers between 1980 and 2008?** Yes. The Chicago Police Department supervisory staff knew or should have known that clear patterns[3] of personnel complaints were emerging across various years and different types of offenses against the defendant and non-defendant officers and should have taken measures to stop the behavior and correct the deficiencies. Overall, the data reveal that the Chicago Police Department's accountability systems (i.e., early warning systems, supervision and personnel investigations) are broadly ineffective for detecting misconduct, and holding officers accountable when they violate the law or CPD policy. These observations impair the CPD's ability to describe and count internal personnel complaints and do not follow accepted policy standards for complete and thorough investigations. The findings are not consistent with the following standards:

   a. Chicago Police Department General Order 82-14, Complaint and Disciplinary Procedures (effective October 15, 1982), Repeated Minor Infractions;

   b. Chicago Police Department General Order 86-4, District Commanders (effective June 10, 1986), where District Commanders are responsible for subordinates' conduct;

3. **Justification for Opinion.** The justification for the opinion is set forth below.

   a. *The Chicago Police Department Discovery Materials.* The data were supplied by Plaintiff's counsel in electronic format consistent with discovery in this case. The source data are CPD internal affairs records known as Complaint Register (CR) files from 1980 to 2008 for the defendant officers and a sample of non-defendant officers. The data were analyzed using MS Excel and Statistical Package for the Social Sciences (SPSS version 18, also known as Predictive Analytics SoftWare, PASW Statistics 18. SPSS and PASW are the same software).

   The data in the CR files are relational. This means a one-to-many relationship exists when a parent record (e.g., one incident, identified by the CR number) potentially references other related records (e.g., many complaints, many officers or

---

[3] A pattern is defined as given a regular or repeated form to; forming a consistent or characteristic arrangement.

dispositions).[4] The unit of analysis was switched when appropriate to accommodate the analysis. The unit of analysis includes the incident level, officer level, complaint level and disposition level. For example, one officer may receive many complaints during a single incident. If there are many complaints in a single incident, then there are many dispositions for one complaint (one disposition for each complaint). When analyzing personnel complaints, the unit of analysis changes from the incident to the complaint. The same is true for dispositions to ensure there is a one-to-one map of complaints to dispositions, all of which relate to the parent record (the parent record is the incident, as captured by the CR number). Switching the unit of analysis accommodates the one-to-many relationship in the data (e.g., one incident, many officers; one incident, many complaints; many complaints, many dispositions).

b. *Case Selection Methodology for the Process Evaluation.* The process evaluation consisted of analyzing content from forty (40) randomly selected internal affairs investigations from the CPD that were tendered during discovery. The content reflects components of a standard internal affairs investigation. Following the generally accepted method for saturation and variability (Guest, Bunce & Johnson, 2006[5]), forty (40) CPD investigations were randomly selected to ensure accurate and objective results. The concept of "saturation" is the point at which no new information or themes are observed in the data. Saturation often occurs at relatively low levels, sometimes within the first twelve cases. To ensure a better representation of investigations, a larger sample of data were selected across the defendant and non-defendant officers. To ensure proportional representation from each sample, a proportion of the cases were drawn from each strata (i.e., each of the two groups of officers, 55% for defendant officers and 45% for non-defendant officers) until reaching 40 total cases. Forty cases provides 3.3 times more cases than would typically be needed before saturation occurs (n=12). Case selection followed conventional rounding criteria (round up from .5).

---

[4] For example, CPD Form 44.112 (Rev. 3/84) is a relational form, where it captures the incident (identified by the CR#) and may list a single officer with many complaints and many dispositions.

[5] Guest, G., Bunce, A., & Johnson, L. (2006). How many interviews are enough? An experiment with data saturation and variability. *Field Methods*, *18*(1), 59-82.

Using free randomization software (Urbaniak, 2016[6]), two sets of data were generated, one for defendant officers (55%) and one for non-defendant officers (45%). Random selection for the CR files was used to reduce bias by providing each investigation an equal chance of being selected. There are 146 CR numbers. Each CR number represents one (1) case. There are 80 defendant-officer cases (55%) and 66 non-defendant-officer cases (45%) (n=146). The CR numbers were numerically ordered in ascending order for each strata. The range of cases for defendant officers was 1-80 with 80 unique numbers in an unsorted range used to identify the CR numbers for inclusion. The same method was used for the non-defendant officers (see Appendix A, the shaded CR numbers were selected for inclusion). Starting with the first random number assigned to each group of officers (i.e., number 49 for defendant officers; number 57 for non-defendant officers) and proceeding sequentially, the respective CR numbers was identified for inclusion. The result was 22 cases included for defendant officers (55%) and 18 cases included for non-defendant officers (45%).

c.  *Methodology for Computing Percentage of Completed Investigative Activities in the CR Files.* Completed investigative activities (table 6) were computed by: **1)** using the incident as the unit of analysis. There are 146 CR files; **2)** subtracting investigative activities that were not applicable (N/A);[7] **3)** subtracting investigative activities that were unclear;[8] **4)** the subtotal is completed investigative activities, minus investigative activities that were not clear, and minus investigative activities that were not applicable; and **5)** the percentage of completed investigative activities is the completed investigative activities divided by the subtotal (e.g., **victim contacted investigative task:** 146-17=129; 103/129=80%).

d.  *Standard for Supervising Police Personnel.* Supervisors are a police department's most important asset for continually reinforcing evolving policies, procedures, goals, and objectives and ensuring that they are carried out properly. The primary responsibility

---

[6] Urbaniak, G. C., & Plous, S. (2013). Research Randomizer (Version 4.0) [Computer software]. Retrieved on October 23, 2022 from https://www.randomizer.org/#randomize.

[7] N/A=not applicable. Not applicable was applicable was applied to cases where the investigative task was not expected to occur. For example, CR# 172876 the accused officers signed out photography equipment that was never returned. In that case, the investigative tasks "Victim Contacted," "In person interview with Victim," and "Statement from Victim" are all N/A because there was not an identifiable victim.

[8] Unclear means the CR includes reference to the investigative task, but the investigative task cannot be determined.

for maintaining and reinforcing officer conformance with the Department's standards of conduct and operational procedures is lodged with first-line supervisors. Supervisors are required to closely monitor and evaluate the general conduct and performance of all officers in their unit. Evaluations must be the product of daily observation and close working relationships. Supervisors must remain attentive to any indications of behavioral, physical, or other problems that may affect an officer's job performance as well as any behaviors that may indicate conduct that is inconsistent with state and federal laws, as well Department policy, procedures, and rules. When observed, any information of this type that is deemed relevant should be documented immediately. When problems are detected, a supervisor should recommend additional training, counseling, or other corrective action.

Effective early identification systems (EIS) assist supervisors and managers in identifying employees whose performance warrants review and, where appropriate, outlining intervention procedures in circumstances where the employee's behavior may have negative consequences for the employee, coworkers, the Department, and/or the general public. An EIS allows for identified officers to receive enhanced supervisory attention and more frequent performance evaluation. Mentoring and guidance at this preemptive stage may lead to improved performance and prevention of misconduct. Supervisors are expected to recognize potentially troublesome officers, identify officer training needs and provide professional support in a fair and consistent manner. Complaints against police officers generally represent the identification of problem officers and are an indication that personnel are not complying with accepted practices.

Notwithstanding CPD's General Order 83-3, there is no evidence in discovery that the Chicago Police Department supervised the defendant officers by identifying and monitoring their behavior through either an electronic or paper-based system of agency records, despite the fact that they knew or should have known that complaints were accruing and then subsequently initiating and ensuring corrective action was taken.[9] When complaints are generated, the Department's supervisory

---

[9] The findings in this report are consistent with those of the United States Department of Justice (DOJ) Civil Rights Division and United States Attorney's Office Northern District of Illinois, January 13, 2017. The DOJ investigation of the Chicago Police Department revealed "…the Department does not use long-available supervisory tools, such as a

apparatus is activated to initiate and ensure the matter is investigated consistent with accepted standards and corrective action is taken.[10] Police supervision exists at graduated levels distinguished by ranks[11] with increasing responsibility to ensure personnel meet the legal, ethical and policy standards of the industry. As a matter of basic personnel management and human resource development, every police department in the United States has an obligation to monitor its employees' performance through its supervisors to ensure standards of workmanship, conduct, and output are maintained, that personnel are called to account, and that desired police objectives are achieved.

Police agencies recruit, select, and train officers to effectively serve the goals of the organization. Effective personnel management assumes that employee performance is assessed and evaluated on a regular basis, and that the organization collects and analyzes performance data relevant for that purpose. Complaint data is one element. For example, the Chicago Police Department maintains a tall organizational structure. Supervisors at every level are tasked with the responsibility to monitor personnel for compliance with industry standards. This is reflected in the characteristics of the respective job class promulgated by the City of Chicago, Human Resources, Police Job Specifications:[12]

---

comprehensive early intervention system (EIS), to identify patterns of concerning officer behavior and prevent patterns of misconduct and poor policing from developing or persisting. A well-designed EIS would allow CPD to track officer conduct, proactively assess risk for future problematic behavior, and intervene when necessary to improve behavior through non-disciplinary corrective action, such as additional training, counseling, or other supportive programs. Currently, despite having spent significant time and resources building an EIS, CPD does not have a functioning system (p. 111)…systemic deficiencies in CPD's early intervention systems have prevented CPD from taking two steps that are crucial to ensuring officer safety and wellness, as well as ensuring policing that is effective and lawful. First, CPD does not adequately and accurately identify officers who are in need of corrective action; and second, CPD does not consistently or sufficiently address officer behavior even where CPD identifies negative patterns. Because of these failures, CPD officers are able to engage in problematic behaviors with impunity, which can—and do—escalate into serious misconduct. This has dramatic consequences for the public. It also impacts the health and safety of officers, who either do not get the support and services they need, or are forced to work alongside individuals who are not receiving such support" (p. 114).

[10] Lieutenant Flores testified to this practice at deposition (Flores deposition, 94:23-25; 95:1-20).

[11] The Chicago Police Department's supervisory rank structure is: (1) Sergeant, (2) Lieutenant, (3) Captain, (4) Commander, Director, Coordinator, (5) Deputy Chief, (6) Chief, (7) Deputy Superintendent; (8) First Deputy Superintendent, and (9) Superintendent of Police (Chicago Police Department, Department Organization For Command, General Order G01-02, Effective, May 10, 2018. Retrieved on October 16, 2022 from https://directives.crimeisdown.com/directives/data/a7a57be2-1291da66-88512-91e3-fb25744de048d4ef.html?commit=7d10e9f4e8ef6cf625d86b5078446faa3d4bc730).

[12] Retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html. The responsibilities for Sergeant are consistent with those specified in CPD General Order 83-1, Responsibilities of Sergeants Assigned to Field

1. **Sergeant.** Responsible for:

   a. …supervising subordinate personnel…

   b. Supervises subordinate personnel including…monitoring officer activity, providing guidance to officers on how to handle incidents, monitoring adherence to department policies and procedures, and ensuring that officers are carrying out assigned responsibilities;

   c. Performs various leadership and mentoring duties by observing and evaluating subordinate performance and, as appropriate, providing direction, regular feedback, counseling, and/or coaching to resolve performance problems and improve subordinate work performance;

   d. Observes subordinate behavior for signs of personal and/or wellness issues and suggests appropriate internal and external resources to address the issue(s);

   e. Receives, reviews, and investigates allegations of officer misconduct and prepares and submits related documentation up the chain-of-command as required by department policy;

   f. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers.[13]

2. **Lieutenant.** Responsible for:

   a. Ensures that Sergeants are monitoring their officers' daily activities…;

   b. Maintains an environment in which clear standards exist for acceptable behavior and performance and sets an exemplary personal example;

   c. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers; [14]

---

Duties (January 8, 1983). Also, 83-1 "does not relieve other superior officers of responsibility in the same areas." The job specifications for each rank are consistent with the traditional expectations set forth in 83-1 and 90-8, Department Organization for Command (November 1, 1990).

[13] City of Chicago Sergeant Class Title, Code 9171, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html). The job specifications are consistent with the responsibilities defined by CPD General Order 83-1, Responsibilities of Sergeants Assigned to Field Activities (effective January 8, 1983). According to CPD General Order 83-1, sergeants assigned to field activities are also responsible for conducting semi-annual performance evaluations. Performance evaluations are an instrument for determining individual strengths and weaknesses across a spectrum of performance dimensions related to an employee's specific function. They can also detect emerging problems. There is no evidence in discovery that performance evaluations occurred as required by CPD policy.

3. **Captain.** Responsible for:

   a. Serves as a final reviewer of citizen complaints and investigations of employee misconduct; recommends changes and highlights critical points before submission to the Commander;

   b. Gathers and evaluates information from electronic systems directly and through reports prepared by staff to use in identifying issues; solving problems;

   c. Provides direction, consultation, and guidance to staff to maintain staff performance, help them resolve unusual, sensitive, or complex problems; and ensure staff compliance with policies and procedures;

   d. Conducts performance evaluations to document staff performance; reviews performance evaluations completed by subordinate supervisors to ensure that proper procedures are followed, and evaluation processes are conducted in a standardized manner;

   e. Reviews citizen complaints and investigations of employee misconduct to ensure the integrity of complaint investigations;

   f. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers.[15]

4. **Commander.** Responsible for:

   a. Reviews citizen complaints and investigations of employee misconduct to ensure the integrity of complaint investigations;

   b. Directs research and analysis related to developing long-term plans regarding operations and developing policies and procedures to address current and potential new problems;

   c. Assesses and reviews complex written information including policies and procedures, legislation, case law, etc. to evaluate operations, inform decisions, and determine compliance with policies, procedures, and legal mandates;

   d. Reviews, assesses, and implements appropriate responses to issues based on data gathered through a variety of sources;

---

[14] City of Chicago Lieutenant Class Title, Code 9173, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[15] City of Chicago Captain Class Title, Code 9175, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

  e. Provides direction, consultation, and guidance to staff to maintain staff performance, help them resolve unusual, sensitive, or complex problems; and ensure staff compliance with policies and procedures;

  f. Conducts performance evaluations to document staff performance; reviews performance evaluations completed by subordinate supervisors to ensure that proper procedures are followed, and evaluation processes are conducted in a standardized manner;[16]

5. **Deputy Chief.** Responsible for:

  a. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

  b. Direction and management of a major bureau or division within the Chicago Police Department (e.g.,…Internal Affairs…);

  c. Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[17]

6. **Chief.** Responsible for:

  a. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

  b. Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[18]

7. **Deputy Superintendent.** Responsible for:

  a. Manages CPD administrative functions such as Field Services, Records Inquiry, Performance Management, Training Division, and Professional Counseling;

---

[16] City of Chicago Commander Class Title, Code 9752, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html). The job specifications are consistent with the responsibilities described in CPD General Order 86-4, District Commanders (effective June 10, 1986).

[17] City of Chicago Deputy Chief Class Title, Code 9796, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[18] City of Chicago Chief Class Title, Code 9785, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

    b. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

    c. Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[19]

8. **First Deputy Superintendent.** Responsible for:

    a. Complies with department rules, regulations, and policies and all Federal, State, and Municipal laws that govern the activities of Police Officers;

    b. Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command;[20]

9. **Superintendent of Police.** Responsible for:

    a. Directs the organization, promotion, and disciplinary action of all department members;

    b. Complies with department rules, regulations, policies, and all Federal, State, and Municipal laws that govern the activities of Police Officers;

    c. Demonstrated commitment to holding supervisory personnel accountable for the timely and effective execution of organizational policy by individuals under their command.[21]

       The duties reflected in the job characteristics promulgated by the Chicago Police Department are intrinsic to supervision and have been ever since the ranks were established. The responsibilities exist to provide direction and control over personnel and to ensure personnel meet their legal and ethical obligations as they carry out their assigned duties. Although the means to achieve these ends may change over time (e.g., the advent of technology), the standards remain constant.[22]

---

[19] City of Chicago Deputy Superintendent Class Title, Code 9782, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[20] City of Chicago First Deputy Superintendent Class Title, Code 9781, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[21] City of Superintendent of Police Class Title, Code 9957, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

[22] For example, handling calls for service in a polite, efficient and effective manner (the ends) remains constant even though telephones and police cars replaced foot patrol (the means) for delivering service. Or, identifying and monitoring

Identifying problematic employees is a legitimate management goal as the police Department seeks to enhance the quality of the service they deliver and maintain positive relations with the community they serve, particularly through community policing.[23]

Although the internal affairs process is often triggered by a citizen complaint, all police departments are also required to proactively detect troubling patterns in officer conduct before that conduct escalates into more serious issues (e.g., criminal conduct; excessive force). This was just as true in 1990 as it is today. To enhance integrity, and provide an optimal level of service to the community every law enforcement agency is required to establish procedures for dealing with problem employees. Law enforcement agencies have a duty to monitor their employees' behavior, and establish mechanisms that provide the internal affairs function and the law enforcement executive with the ability to track the complaint records of individual officers and identify those officers with a disproportionate number of complaints against them. Law enforcement agencies are required to utilize the information developed by these mechanisms to prevent individual officers from engaging in conduct that violates the constitutional liberties every member of the community enjoys. It also is expected that law enforcement agencies will utilize the information to prevent patterns, practices or trends[24] of inappropriate behavior or conduct from developing.

---

crime patterns and trends remains constant (the ends) even though geographic information systems (GIS) replaced pin maps (the means). Also, identifying and monitoring problematic police officers remains constant (the ends) even though computers and software replaced hard-copy paper systems (the means).

[23] For example, the duties listed in the job specifications for every rank in the Chicago Police Department reflect language that promotes community policing. Words and phrases include: "community relations," "community relationships," "the importance of community relations," "build community trust," "quality police service in partnership with other members of the community and strives to attain the highest degree of ethical behavior and professional conduct at all times," "integrating community input into the planning and implementation of police services," "promotes efforts of subordinates to actively engage the community and build public trust," "developing a program to increase community engagement within the department," "strengthening the department's relationship with the community, including ensuring that staff participate in community-oriented policing activities," and "works with residents through community policing." It is evident the Chicago Police Department values and prioritizes their relationship with the community.

[24] A "pattern" is defined as given a regular or repeated form to; forming a consistent or characteristic arrangement. A "trend" is defined as general direction in which something is developing or changing. On March 9, 1983, the Chicago Police Department promulgated General Order 83-3, Personnel Concerns to monitor and supervise personnel who exhibit behavior that is contrary to "the goals of the Department" (Bates 48432). Although the intent of the General Order's is to examine employees for "patterns of behavior" (Bates 48432), the General Order does not specify what constitutes a pattern, or what represents an "unacceptable pattern of behavior."

Behavioral data compiled by a police department should be analyzed as part of an early intervention system (EIS). An EIS, also known as early warning system, (EWS)[25] is intended as incident-driven system, not outcome-driven system. This means despite the outcome of any internal investigation, or whether someone files a complaint, the incident is the driving factor, not the outcome, for taking personnel action before negative discipline becomes necessary. When personnel complaints arise, it is incumbent upon supervisors and managers to initiate and ensure action is taken to address the complaints, especially when a pattern of complaints accrues,[26] notwithstanding the outcome of any investigation. This means although complaints may not be substantiated (e.g., not sustained, exonerated, or unfounded disposition), the police agency is still responsible for addressing the officer's behavior. Early identification of problematic employees can increase the agency's accountability to the public and offer employees an opportunity to meet standards of performance, receive timely assistance and support in the form of training and counselling before resorting to negative discipline. Whether or not the agency employs an electronic EIS does not alter a supervisor's critical role to directly monitor the performance and behavior of personnel under their charge.

An EIS operates on the theory that education, training, health and wellness programs, and other forms of internal and external support can help employees improve their performance (this is known as positive discipline). Making employees

---

[25] An early warning system, either electronic or paper-based is intended to assist supervisors and managers in identifying employees whose performance warrants review and, where appropriate, outlining intervention procedures in circumstances where the employee's behavior may have negative consequences for the employee, coworkers, the agency, and/or the general public. Early warning systems serve to improve employee health, promote community-police relations, encourage positive behavior, and reduce public complaints. These systems also assist the employee in reaching their full potential by using data to identify performance trends worthy of review and enhance supervision.

[26] Identifying and addressing patterns of complaints against police officers has been an element of police personnel management and academic research since the early 1970s (see for example: A.E. Wagner. **1972**. "Patterns in Police Misconduct - Citizen Complaints Against The Police." UMI Dissertation service. Ann Arbor, MI—correlational techniques were used to compare the relationships between the individuals and their milieu. Findings indicate that police officers accused of misconduct are seldom disciplined since few cases are substantiated and rarely differ from any other officer; Toch, H. J., Grant, D., & Galvin, R. T. (**1975**). *Agents of change*. New York: John Wiley—developed a program in which Oakland, California, police officers with records of use-of-force incidents were counseled by peer officers; Milton, Catherine. H., Jeanne W. Halleck, James Lardner, and Gary L. Albrecht. (**1977**). "Police use of deadly force." Washington, DC: National Police Foundation—examined use of force complaints; Porter, B. (1984). *The Miami riot of 1980*. Lexington, MA: Lexington Books and U.S. Commission on Civil Rights. (1984). *Confronting racial isolation in Miami*. Washington, DC: Government Printing Office—The Miami Police Department became concerned with its officers' behavior that generated citizen complaints in **1979** in response to a major police-community relations crisis (the study period was 1976 to 1978).

aware of behaviors that are outside the legal and ethical scope of accepted practice not only allows them to adjust their own practices, but it also demonstrates that agency leadership is attuned to the work being done, which can be positive for morale. As an element of risk management,[27] this is accomplished by continuously identifying, analyzing, and evaluating an officer's conduct and developing the best methods of preventing or limiting loss (e.g., remedial training; transfer out of an enforcement assignment to an administrative assignment; splitting apart problematic partners; reassignment to a different geographic area; reassignment to a different supervisor; referral to an employee assistance program; fitness for duty evaluation; termination). A police agency that captures and reports on officer conduct is more likely to detect training deficiencies, challenging personal circumstances, excessive stress, underlying medical conditions (e.g., sleep disorders, fatigue, diabetes), safety risks to officers, and the like.

e. *General Observations of the Chicago Police Personnel Complaint Data and the Supervisory Process.* The general observations of the data reveal that the Chicago Police Department's accountability systems (i.e., early warning, supervision and personnel investigations) during the relevant time period and beyond were broadly ineffective for detecting misconduct, and holding officers accountable when they violate the law or CPD policy. These general observations impair the CPD's ability to describe and count internal personnel complaints and do not follow accepted policy standards for complete and thorough investigations. If the Department does not classify complaints consistently, then counts are inaccurate and inaccurate data result in inaccurate outcomes. When the data are inaccurate, decisions that are based on them are flawed.

   i. **Failure to Classify Personnel Complaints as "Administrative" or "Criminal."** The CPD Complaint Register" (CR) files do not clearly differentiate whether a personnel complaint is criminal or administrative. Criminal complaints (e.g., assault[28]) may lead to prosecution and jail or prison. Administrative complaints may lead to internal discipline or other corrective

---

[27] Risk management is the systematic proactive approach to reducing adverse consequences before they occur (this is known as positive discipline).

[28] Criminal misconduct is when there is reasonable suspicion to believe that a Department member committed a crime. Assault is one such complaint.

action (e.g., insubordination). For example, there are 233 complaints against personnel for assault and 1 complaint for perjury found in the data, both of which are criminal offenses. Not a single complaint (100%) was referred to the Cook County Prosecutor's Office for a coordinated criminal investigation. Of those 234 complaints, 4 complaints of assault were sustained (1.7%) and those complaints also were not referred to the Cook County Prosecutor's Office.

There is no evidence in discovery that indicates the CPD is prohibited from initiating a criminal charge in municipal court for a sustained complaint of assault—as would happen if an investigation of a civilian complaint found probable cause of an assault—even if the prosecutor's office was not involved. Consequently, it is not possible to quantitatively analyze the relationship between multiple variables to understand the correlation and the strength of that relationship (e.g., criminal/administrative offense & sustained/not sustained), which is a vital aspect of police supervision and management.

By comingling criminal and administrative complaints, the Department loses the ability to differentiate the seriousness of cases and analyze data for its preventative value. A preventive goal should be deterrence, both specific and general.[29] Comingling criminal and administrative complaints enables the Department to diffuse accountability through the ranks and across agencies; diffused accountability exists when a supervisor is less likely to take responsibility for action or inaction because they believe it is not their responsibility. The data in discovery support this proposition: since none of the complaints tendered in discovery were referred to the Cook County Prosecutor's Office (including criminal allegations of assault), it is evident the CPD treated all of the complaints in the instant case as administrative matters, instead of criminal matters when appropriate, which is not acceptable.

---

[29] Specific deterrence is achieved when individual officers who commit crimes or Department infractions are caught and punished to ensure they are deterred from similar future behavior. General deterrence refers to the effects of criminal or administrative sanctions on the general workforce (i.e., future potential offenders) to keep them from committing crimes or Department infractions.

ii. **Promulgating a Permissive Policy on the Internal Affairs Function.**[30]

Although the CPD promulgated a policy on the internal affairs function, the policy is replete with permissive language, and qualified statements to such a degree that it enables and justifies incomplete investigations and of poor quality.[31] Without objective standards, CPD supervisors and investigators are left to rely on their own idiosyncratic procedures, and institutionalized past practices that may not necessarily comport with accepted standards, as well as improperly shorten an investigation and never be called to account because the policy allows for such conduct to occur. For example, the following accepted internal affairs practices are either vaguely codified in CPD policy, or they are not specified:

a. **Administrative Practices**

1. When must the Cook County Prosecutor's Office be notified? What are the mandatory notification criteria?[32]

2. What are the selection criteria for choosing internal affairs investigators (e.g., rank, years of experience, investigative background, prior disciplinary history)? (nothing specified).

3. What analysis does internal affairs perform to inform CPD management about investigations and complaint patterns? How frequently? (nothing specified).

4. What constitutes a pattern of complaints? (nothing specified).

5. What constitutes a minor infraction?[33] (nothing specified).

---

[30] Chicago Police Department General Order 82-14, Complaint and Disciplinary Procedures (effective October 15, 1982), Addendum 3, Conduct of the Investigation. Addendum 3 does not include any related General Orders, which indicates Addendum 3 is the exhaustive policy and does not cross-reference or rely on any other CPD policy.

[31] For example, 82-14, Addendum 3 uses qualifying words and phrases to limit an investigator's actions, such as: **1)** "if"; **2)** "if necessary;" **3)** "as soon as possible;" **4)** "if the allegation indicates;" **5)** "if the alleged act is a crime… the Assistant Deputy Superintendent, Internal Affairs Division, the Administrators of the Office of Professional Standards, or the on duty Assistant Deputy Superintendent, Bureau of Operational Services…will determine the further action to be taken, consulting the State attorney…" **6)** "terminate the .investigation when it is determined at any time that the complaint is unfounded or the member clearly exonerated; **7)** "strongly indicates."

[32] For example: "If the alleged act is a crime…The Assistant Deputy Superintendent, Internal Affairs Division, Administrators of the Office of Professional Standards, or the Assistant Deputy Superintendent, as appropriate, will determine the further action to be taken, consulting the Office of the State's Attorney and appropriate Detective Division personnel for guidance when necessary" (Bates 48407). The investigator is prohibited from notifying the Cook County Prosecutor's Office during an investigation involving a crime.

[33] "Minor infractions" is the subject of CPD General Order 82-14. However, minor infractions, major infractions, and patterns are not defined and quantified.

6. What constitutes a major infraction? (nothing specified).

7. What constitutes repeated infractions? (nothing specified).

8. What training is required for an investigator before they are assigned to internal affairs or OPS and during in-service periods? (nothing specified).

9. What is the process for recusing an investigator because of a conflict of interest? (nothing specified).

b. **Investigative Practices**

1. The victim, complainant and witness must be personally interviewed (nothing specified);

2. An incident report must be prepared when a victim, complainant or witness alleges a crime occurred (nothing specified);

3. All relevant internal reports and records (e.g., communication recordings, radio transmissions, incident reports, arrest reports) must be obtained and preserved as expeditiously as possible (nothing specified);

4. All involved personnel must submit an official administrative report documenting their actions and knowledge of the incident;[34]

5. All external records and documents of any other individual or entity that could prove helpful in the investigation must be obtained and preserved as expeditiously as possible (e.g., reports from other law enforcement agencies, hospital records, doctors' reports, medical records, jail records, court records and transcripts, F.B.I. records, motor vehicle abstracts and telephone and cellular phone records. Where required, a search warrant, communications data warrant or a subpoena to acquire the information must be obtained) (nothing specified);

6. All electronic, computer, digital and video records must be obtained and preserved as expeditiously as possible (e.g., NCIC entries, video surveillance) (nothing specified);

7. All physical evidence must be obtained (e.g., fingerprints, clothing, hair or fabric fibers, bodily fluids, stains and weapons. All evidence must be

---

[34] This action is qualified with "if necessary…" (Bates 48402). There is never an instance where it is not necessary for an accused employee to submit a formal written report accounting for their actions during an internal affairs investigation.

handled according to established evidence procedures) (nothing specified);

8. Photographs of the victim, complainant or witness must be obtained (e.g., if a complaint involves assault, or use of force, photographs must be taken as close as possible to the time of the incident, preferably at the time the incident is reported) (nothing specified);

9. Yearly photograph of each officer must be maintained for identification purposes when the officer is unknown to the victim, complainant or witness to assist with identifying the involved officers (nothing specified);

10. How and when to compel officers to submit to physical tests to collect evidence (e.g., Breath sample; Blood sample; Buccal swab; Requiring an officer to speak; Voice recordings; Participation in a lineup; Handwriting samples; Hair and saliva samples; Urine specimens; Video recording; Drug testing; Polygraph testing and Field sobriety tests) (nothing specified);

11. Obtaining and executing search warrants, as necessary (nothing specified);

12. Obtaining and executing consent searches (nothing specified);

13. Executing administrative searches (nothing specified);

14. Conducting and documenting a neighborhood canvass (nothing specified);

15. Conducting electronic surveillance and intercepting communications (nothing specified);

16. When and how to initiate a separate internal investigation for collateral issues[35] identified during an existing internal affairs investigation. Investigating collateral issues can provide the Department its executive

---

[35] The work of an internal affairs division should not be limited to resolving complaints by narrowly focusing on whether the subject officer engaged in misconduct. In many instances, examining collateral issues presented by the complaint can be as important as resolving the original allegation. For example, while investigating an allegation of assault during an arrest, the officer's actions in making the arrest may be improper (e.g., false arrest). In such instances, internal affairs must still investigate whether the officer should have effected the arrest in the first place. Collateral investigations may also prompt a staff inspection or compliance audit

staff with information concerning: 1) the utility and effectiveness of the Department's policies and procedures; 2) the competency and skills of individual law enforcement officers; and 3) appropriate topics for in-service training programs (nothing specified).

iii. **Failure to Define, Quantify and Address "Repeated Minor Infractions."** It is evident the CPD was aware that repeated infractions, albeit minor, was something the Department regarded as a problem that demanded attention. The Department drafted an addendum to an existing policy to ensure that repeated minor infractions were addressed (see CPD General Order 82-14 Bates 48421). However, there is no evidence in discovery that the CPD defined, quantified or addressed repeated minor infractions consistent with Department policy, including referrals to the Personnel Concerns program as instructed by the policy.

The CPD General Order 82-14, Complaint and Disciplinary Procedures states: "Repeated Minor Infractions: Department members who have repeated minor infractions will be processed in accordance with the Department directive entitled "Personnel Concerns" (Bates 48421). The CPD does not define or quantify "repeated" as it relates to infractions (e.g., how many infractions constitutes "repeated"?) and does not define "minor infractions" (e.g., a statement of the exact meaning of minor infractions). Without clear definitions and classification rules about what constitutes "repeated" and what constitutes "minor infractions," supervisory staff can avoid processing Department members according to the Personnel Concerns directive, as instructed by General Order 82-14. The Department misses the opportunity to intervene with an employee who is accumulating minor infractions. Similarly, officers will avoid triggering any early warning system when the Department does not define the infractions or the number of infractions before the system alerts supervisors to an emerging pattern based on accumulated infractions.[36] If the CPD was monitoring employee behavior for

---

[36] Although the CPD does not define and quantify "repeated infractions," it is evident from the policy (General Order 82-14) that CPD is aware of the need to track repeated infractions and monitor personnel for intervention when they accumulate infractions.

repeated infractions and taking corrective action based on those infractions, then the CR files would contain data from the early warning system identifying specific at-risk personnel, memoranda to- and from- commanding officers about those at-risk personnel and the corrective action that was taken, including implementation orders with suspense dates for corrective action to be completed and referrals to the Personnel Concerns Program. There is no such data in discovery.

iv. **The Allegations are Not Necessarily Investigated Against a Defined Customary Standard**.[37] The CPD typically does not identify the standard against which the officer's conduct is to be measured (i.e., the specific rule name and number; the specific policy name and number). Before any conclusions or inferences regarding acceptable or justifiable practice may be drawn, and before any disposition may be rendered, it is necessary to compare observed behavior against an expected standard. Standards provide the basis for comparison; they are the reference points against which other things can be evaluated and reveal continuity or discontinuity between the infractions being measured and the expectation. Police practice is governed by three controlling mechanisms: 1) substantive law; 2) procedural law; and 3) agency policy.[38] The accepted standards of conduct are defined by these mechanisms to ensure public safety is balanced against the right to privacy and individual liberty. However, when a personnel investigation is undertaken, the standard of conduct is not necessarily identified to ensure the officer's observed behavior can be compared to the

---

[37] For example, CPD Form 44.112A (1/84) indicates that "Rule violations will be cited by number only" (Bates 10385). However, the rule violation number is not necessarily cited as required; the rule violation is the standard against which the officer's conduct is to be measured. For example, CR# 147769 does not specify the CPD rule or policy the investigator was investigating, yet the investigator found: "All of the officers involved in the investigation had acted properly in the extended detention of the complainant MUHAMMED" (Bates 10024, misspelling in original). See similar findings with CR# 155876, where the investigator did not identify a standard, but found: "The R/O's investigation could not detect any wrong doing on the part of the officers mentioned in Civil Suit" (Bates 10385)… "The R/O's investigation revealed that the accused officers had acted properly and within the scope of the Department's rules and regulations" (Bates 10385).

[38] For example, all demeanor complaints violate **General Order 80-18, Demeanor, Courtesy, Use of Non-Deadly Force and Protection of Citizens' Rights** ("The police officer should always maintain a courteous and professional demeanor when dealing with the public. This requires a constant awareness that certain actions and body language could be interpreted as non-physical abuse") and **General Order 92-1, Human Rights and Human Resources** ("Members will not exhibit a condescending attitude or direct any derogatory terms toward any person in any manner"). However, CR complaints for demeanor do not necessarily cite these General Orders or measure the officer's conduct against the standard in the Orders.

expected behavior identified by the standard. Without matching the observed conduct with the expected conduct, a disposition may be rendered that does not account for each element of the articulated standard. Therefore, the investigation may miss critical aspects of the officer's conduct and the disposition may unduly favor the officer.

v. **Sustained Criminal Complaints are Handled as Administrative Complaints.** All assault allegations are criminal allegations. All criminal allegations should be investigated as though a crime occurred, including referral to the Cook County Prosecutor's Office, until the evidence confirms or dispels such a claim, or a legal justification is identified. Subsumed within any criminal allegation are violations of Department policies. When a criminal allegation is received from a complainant, a criminal investigation should begin. A criminal investigation against a police officer should include all of the components of a customary criminal investigation until the allegation is confirmed or dispelled; to do otherwise is to risk losing valuable and irrecoverable evidence and witness testimony. The data reveal four allegations of assault (CR#s 223928, 156916, 171016, and 175513) and one allegation of improper use of deadly force (CR# 179835) were sustained. However, the Cook County Prosecutor's Office was not notified and criminal complaints were not prepared against the accused officers. The officers received administrative discipline ranging from a reprimand to termination; the disposition for Officer Michael Cusack was not reported during one complaint. Other sustained complaints that have a criminal connotation but were not referred to the Cook County Prosecutor's Office include: **1)** making a false report or statement (CR# 172123); **2)** failure to investigate (CR# 1006209); **3)** submitting a false report (CR# 1006209); **4)** perjury (CR# 237167); and **5)** allowing a prisoner to escape (CR# 155614).

Restated, by comingling criminal and administrative complaints, the Department loses the ability to differentiate the seriousness of cases and analyze data for its preventative value. Doing so also enables the Department to diffuse accountability through the ranks; diffused accountability exists when a supervisor is less likely to take responsibility for action or inaction because they

believe it is not their responsibility (e.g., a criminal matter belong to OPS, not internal affairs; a criminal matter belongs to the Cook County Prosecutor's Office, not CPD). The sustained assault complaints are evidence of this practice.

vi. **There is no evidence the officers submit reports accounting for their actions separately without conferring with each other beforehand**. A fundamental principle of conducting any investigation (criminal or administrative) involving multiple targets and witnesses is to keep the individuals separate to ensure they do not agree on a common story and their recollection of the facts is as they remember them and is not contaminated by another person's recollection of the event. The CPD IA investigator does not necessarily control the reporting situation; this allows officers to confer beforehand, which is not an accepted investigative practice. The IA investigator may also proffer questions ahead of time for the officers to answer, sometimes delivered via email, which reveals the investigator's intentions, signals where the investigation is heading and enables officers to confer about a common story. This preempts the investigator's ability to test the veracity of the witness; preformatted questions for the target or the witness to answer is not the same as reviewing notes or documents prior to answering any questions. Invariably, when the officer submits their report they deny the allegations, or deny witnessing anything that would confirm the allegation. This impugns the propriety of the questioning since an IA investigation should be objective.[39]

vii. **Assault Allegations are Investigated as Policy Violations.** An assault is a criminal allegation. Assaults should be investigated as a crime until the facts confirm or dispel the allegation or a legal justification is identified, not merely as a policy violation. Whether or not the county prosecutor decides to prosecute an officer is of no consequence for the Department. The Department is obligated to conduct a sufficient investigation to warrant a non-indictable charge in municipal court, or disciplinary action for a sustained rule infraction (sufficient in this sense means the investigation is thorough, objective and

---

[39] For example see CR# 155382 (Bates 10299), CR# 156749 (Bates 10549), CR# 158211 (Bates 10880) for a To-/From- reports requesting the target officers collectively submit reports.

contains all items of corroborating evidence to condemn the officer's conduct through a disciplinary hearing). To do otherwise is to trivialize the matter. For example, the data reveal four allegations of assault CR# (223928, 156916, 171016, and 175513) and one allegation of improper use of deadly force (CR# 179835) were sustained. However, the Department handled the investigations as policy violations and sought administrative discipline ranging from a reprimand to termination; the disposition for Officer Michael Cusack was not reported in one case. Restated, the sustained assault complaints are evidence of this practice.

viii. **CPD Data Classification Does Not Follow a Consistent Convention.** One of the foundational elements of an internal affairs program and an early warning system is to develop and adhere to a formal data classification scheme. Doing so creates conceptual order in the data, particularly mutual exclusivity. Data are mutually exclusive when the complaint type appears only once in a category based on a standard definition. Without a standard definition, the classification is vague and may overlap with other similar definitions.[40] When the data do not follow consistent classification rules, outcome of any analysis is flawed, including counts. When data rules are flawed, the results are flawed and decisions based on the data are also flawed.

The CPD personnel complaints are not conceptually clear based on standard definitions. This obscures the classification scheme, which obscures the ability to accurately count and classify complaints and make decisions based on accurate data. This also allows the Department to confuse criminal complaints with administrative complaints through comingling. When this occurs, the Department trivializes the officer's conduct. For example, overlapping or vague categories include, but are not limited to, the following complaints, which skew results and obscure accuracy:[41]

1. Allowing prisoner to escape (CR# 155614, 155619, 160688) and allowing suspect to escape (CR# 155619);

2. Deceitful conduct (CR# 180229) and perjury (CR# 237167);

---

[40] There is no evidence in discovery of the CPD internal affairs classification rules or data definitions and there is no mention of the complaint classification system in the CPD General Orders or Directives supplied in discovery.
[41] This list is does not include all potential overlapping cases in the data. This list is for illustrative purposes only.

3. Failure to arrest Guevara (CR# 223928) and failure to authorize arrest of Guevara (CR#223928);

4. Violation of department rules[42] (CR# 243485) and failure to follow procedure (CR# 165516, 171016);

5. Failure to conduct fair investigations (CR# 157059) and failure to properly investigate (CR# 373466);

6. Failure to provide medical treatment (CR# 236739) and denial of medical care (CR# 146819);

7. Falsifying evidence (CR # 270916, 255984, 289081), falsifying testimony (CR# 174337), falsifying testimony and withholding evidence (CR# 239988), intentional misinterpretation of arrestee's statements (CR# 170855), securing warrant through false statements (CR# 173098) and deceitful conduct (CR# 180229);

8. False testimony (CR# 174337), perjury (CR# 237167) and falsifying testimony and withholding evidence (CR# 239988);

9. Negligent driving (CR# 247214) and reckless driving (CR# 205257);

10. Submitting a false report (CR#237040), falsifying evidence (CR# 297534) and deceitful conduct (CR# 180229);

11. Assault (CR# 123850) and improper use of deadly force (CR# 179835);

12. Denial of attorney (CR# 280774, 209374, 212230, 180229) and denial of counsel (CR# 159703);

13. Unjustified physical and verbal threats (CR# 251502), threats (CR# 152612) and demeanor (CR# 178050);

14. Planting Evidence (CR# 173098), falsifying evidence (CR# 297534) and deceitful conduct (CR# 180229);

15. Coercing confession (CR#226211) and falsifying evidence (CR#171841);

---

[42] "Violation of department rules" is a vague category. All personnel complaints presumably violate a Department rule or policy. There is no classification criteria in the discovery materials explaining how the CPD classifies "violation of department rules" compared to any other rule violation. The classification process appears to be laden with discretion and does not follow any rational structure. Without a rational structure, the CPD is able to classify cases that do not accurately reflect the actual allegation. The allegation is then subject to interpretation by different employees, which trivializes the matter.

16. Demeanor (CR# 213103), verbal abuse (CR# 180229) and threats (CR# 152612);

17. False arrest (CR# 304802) and unlawful arrest (CR# 226211);

18. Intentional misrepresentation of arrestee's statements (CR# 170855), coercing confession (CR#226211) and falsifying evidence (CR#171841);

19. Disrespect toward a supervisor (CR# 253198) and insubordination (CR# 251502);

20. Verbal abuse (CR# 180229) and threats (CR# 152612).

Additionally, when data are subdivided further into more discrete categories, the Department loses the ability to detect patterns because conceptually similar cases (e.g., verbal abuse and demeanor; verbal abuse and threats; assault and improper use of deadly force; planting evidence and falsifying evidence; denial of attorney and denial of counsel; deceitful conduct and perjury) are diluted. More complaint subcategories means it is more likely the Department will not identify patterns when they actually exist. By subdividing the data further and further into more discrete categories, the Department will require more data in each subcategory to detect a pattern. Collecting more data means more waiting; more waiting means more time must elapse between complaints; more elapsed time means more victims; more victims means allowing problem-prone officers to remain in the field untreated by corrective action to accumulate more complaints.

By fragmenting the complaint categories as CPD does, the Department intrinsically builds plausible deniability into their internal affairs program and their early warning system. For example, using discrete categories that bear on truthfulness, such as "planting evidence," "falsifying evidence," "false testimony," "deceitful conduct," "perjury," "falsifying testimony and withholding evidence," "securing warrant through false statements," and "submitting a false report" the department misses the opportunity to identify those officers who are at risk of engaging in conduct that will lead to wrongful arrest, prosecution and incarceration. Plausible deniability provides the CPD

staff, particularly first-line supervisors and senior officials in a formal or informal chain of command,[43] the ability to deny knowledge of, or responsibility for, complaint patterns that emerge by police officers. Plausible deniability also insulates elected officials from the prying eyes of the electorate and public commentary by giving them the ability to cast the individual officer as the offender—a bad apple—instead of undergoing Department-wide introspection, such as supervisory, managerial, training, and policy failures.[44] Since complaints are diffused across various subcategories, patterns will emerge more slowly in many unnoticed increments. Consequently, the fewer complaints that emerge under a single category are not seen as objectionable.

Associating subcategories with parent categories is a fundamental part of performance management and early warning systems. Parent categories group discrete infractions (i.e., subcategories) into an aggregate category (e.g., parent category "demeanor" includes threats, verbal abuse and demeanor complaints). Similarly, there is no difference between a physically coercive interrogation and excessive force. Both are acts of inappropriate use of force. A patrol officer making arrests who has a pattern of excessive force complaints against an arrestee that is not corrected is likely to continue using excessive force when they move from patrol to a specialized division (e.g., investigations). Another example is theft. If a patrol officer develops a pattern of complaints of stealing from arrestees, then it is not difficult to imagine that the officer will continue his or her behavior when they move from patrol to a specialized function (e.g., gang enforcement; narcotics; criminal investigations).

However, aggregating the data captures a larger range of values that strengthens the Department's ability to detect these types of patterns when they exist. Any early warning system must be designed to disrupt and deter

---

[43] "Chain of command" is the unbroken line or chain of authority in an organization as information flows from the highest manager down through the intermediate managers to the managers at the level of operation and upward in the same manner. See CPD General Order 90-8, Department Organization for Command (November 1, 1990) for the rank structure and chain of command.

[44] See, for example, Scully, J. (2008). Rotten apple or rotten barrel: the role of civil rights lawyers in ending the culture of police violence. *National Black Law Journal , 21*(2), 137-172. When multiple officers receive warnings within a specific category—of the type observed in the instant case—this may signify the need for safer practices, increased resources, additional training, higher situational awareness, or department policy changes. There is no evidence in discovery that the CPD under took any system-wide review or changes in response to complaint patterns.

problematic behavior and promote accountability. But if the data are fragmented, then this goal is difficult if not impossible to attain. The CPD does not aggregate complaint data under a parent category to easily identify patterns. Furthermore, there is no evidence in discovery that the Department under took any management analysis of culture, supervision or policy as it relates to the observed patterns in the data.

ix. **Corrective Action is Not Necessarily Documented.** When conducting any type of corrective action, supervisors must fully document the details of the circumstances of the incident(s) on which the action is based. The specifics of the corrective action must also be documented together with information such as the date it took place, persons present, name of the person conducting the session, and any statements made by the employee that have bearing on the employee's performance or behavior. Compiling employee disciplinary offenses and the subsequent penalties are invaluable for comparative purposes in determining the consistency of disciplinary actions between individuals and between divisions, assignments, and varied Department components. In addition, summary and comparative data on the overall nature of employee misconduct in the Department can point to potential problems in policy, training, or supervision as well as identifying possible solutions. When systematically organized, individual employee conduct that may point to more serious problems can be flagged through an EIS and addressed on a preemptive basis.

Documenting positive and negative discipline is an accepted industry practice related to supervising and record-keeping.[45] Accurate record-keeping is an essential function of democratic policing because it promotes transparency, affixes responsibility, and exacts accountability. Responsibility is about making decisions on matters of public policy that are legal and within Department policy. Maintaining records and using the data embedded in written documents to

---

[45] Lieutenant Flores testified at deposition that as early as 1983, in the CPD, source data on excessive force complaints existed and disciplinary history data were available for review (Flores deposition, 124: 14-20; 125:3-12). Lieutenant Flores also testified at deposition that prior to 1990, use of force data were available for review, but the data were not reviewed with an eye toward identifying patterns of behavior (Flores deposition, 131:21-25; 132:1-2).

inform policy and practice is a standard method for police departments to assess performance in all areas, such as crime, disorder and personnel activities.

Lieutenant Robert Flores testified at deposition that the CPD does not necessarily document corrective action such as remedial training provided to an officer[46] or through the formal Personal Concerns Program.[47] This creates confusion regarding progressive discipline, such as whether the officer was previously given an opportunity to correct his or her behavior, when the correction took place, who administered the correction, and how the correction was administered. These are basic elements of supervision and control. An officer's history of correction is paramount to: 1) initiating progressive discipline; 2) initiating retraining; 3) determining whether a Department policy is deficient and must be revised; 4) initiating operational action, such as separating the officer from their partner, reassigning the officer to a different supervisor, transferring the officer to another assignment or geographic location, or 5) taking some other personnel action to remediate the problem.

By avoiding formal documentation, the Department cannot accurately measure employee performance. Consequently, the informality of omitting documented corrective action from an officer's personnel file enables an officer with a history of deficiencies to hide within the bureaucracy[48] and escape Department intervention because there is no audit trail.

x. **Maintaining Centralized Data and Prematurely Purging Data from an Officer's Personnel History While they are Active Employees.** Personnel records exist to track and monitor an employee's performance. These records are a measure of organizational and individual accountability. Personnel records help

---

[46] Flores deposition, 96:14-25.

[47] Flores deposition, 109:25; 110:1-17. The CPD General Order for Personnel Concerns (83-3, March 9, 1983), indicates "The purpose of the Behavioral Alert System is to…standardize a system for *documenting* and maintaining records of corrective action taken" (Bates 48433) (emphasis mine).

[48] Lieutenant Flores did not provide any evidence at deposition to support CPD that from 1987 to 1990 the Department promulgated policies or practices that were intended to analyze the prevalence of misconduct by its officers, personnel deficiencies, shortcomings, any other problems, or to prevent misconduct. Lieutenant Flores also testified at deposition that during this same time period at the CPD, aside from someone noticing that an employee was accruing Internal Affairs complaints, or OPS complaints, there was no actual review process of the employee's complaint history to alert his or her supervisor that complaints were mounting. Lieutenant Flores agreed that the process was "fairly informal" (see Flores deposition, 103:7-25; 104:1; 123:10-23; 123:24-25; 121:24-25; 122:1-3; 123:23-25; 124:1-11). This violates basic supervisory practices and early warning practices, and is not consistent with CPD General Order 83-3, Personnel Concerns (promulgated March 9, 1983) for monitoring personnel.

improve individual and collective performance, such as through training programs and policy development. Personnel record-keeping is crucial for police agencies so supervisors can examine early signs that an officer needs additional training or other corrective action to be more effective in their role.

Lieutenant Flores testified at deposition that the CPD did not archive an officer's complete disciplinary history in one location that was readily accessible to all CPD supervisors[49] and the CPD did not retain personnel records such as counseling for more than one year; after one year, the data were purged from the CPD archives.[50] In the case of internal affairs investigative records, which should include records related to discipline, corrective action and early warning notifications, longer retention times provide the Department with the resources and evidence necessary to assist with correcting personnel deficiencies, including prospective policy changes. A best practice is to maintain all records related to these files as they relate to a particular officer for that officer's entire career. Once the officer is separated from the Department, the complete file is archived indefinitely to accommodate future legal proceedings (e.g., civil action; criminal exonerations). Purging personnel records related to internal affairs after one year compromises supervisory practices and impairs longitudinal and retrospective data analyses,[51] which are important police management control mechanisms. When supervision is compromised, mismanagement arises. There is no evidence in discovery to indicate that personnel records and internal affairs records could not have been archived on microfilm according to CPD General Order 87-10, Records Management (September 4, 1987). Doing so would be a best practice.

---

[49] Flores deposition, 144: 13-17; 147: 8-17.
[50] Flores deposition, 98:5-13; 128:25; 129:1-6; 139:22-25; 140:1-3.
[51] The benefit of longitudinal analysis is that police managers and supervisors (i.e., the Superintendent and command staff officers) are able to detect developments or changes in the characteristics of those subjected to personnel complaints at both the group (e.g., squad of officers; division of the police department) and the individual level (e.g., patrol officers; narcotics investigators; homicide investigators). It also enables managers to repeatedly examine the same individuals to detect any changes that might occur over a period of time (e.g., across different Department divisions; across different supervisors; across seasons of the year; across different years in their careers). The key is that longitudinal analysis extends beyond a single moment in time. Retrospective analysis enables police managers to look backward into archived data and estimate effects on specific outcomes (e.g., the effect of positive or negative discipline on repeated Department infractions; the conditions under which officers receive certain personnel complaints). Without years of legacy data, performing longitudinal analysis or retrospective analysis is not possible. If the Department does not archive personnel data, then early warning systems and supervisors practices will be weakened.

f. *Process Evaluation for CPD Personnel Complaints.* The process evaluation is undertaken to assess whether the CPD internal affairs program is implemented according to accepted industry standards. This evaluation focuses on the program's internal investigations of CPD personnel to determine whether the investigations are thorough and meet accepted industry standards. A process evaluation examines aspects of the program's operations that contribute to its intended goals. If the process is functioning according to industry standards, then the intended outcome is assured (the intended outcome is a thorough internal investigation).

Tables 4 and 5 present the general recurring themes arising from the content analysis of the internal investigations. In general, the investigations are superficial, they are not complete, they do not comport with accepted industry standards, and they are not thorough. The most fundamental effect of superficial and incomplete internal affairs investigations is the perception of corruption as it relates to constitutional guarantees.

| Table 4 | |
|---|---|
| *Observations from Each Complaint Register Investigation in the Process Evaluation for the Defendant Officers* | |
| **CR Number** | **Observations** |
| 123850 | 1. Officers were never formally interviewed. <br> 2. No officer reports were submitted. <br> 3. No interview of victims[52] <br> 4. No attempt to canvass the scene for witnesses <br> 5. No photographs of the scene taken <br> 6. No arrest photographs taken of victim |
| 152507 | 1. No officer reports were submitted <br> 2. No interview of witnesses <br> 3. No attempt to obtain a Russian translator the Russian-speaking victim <br> 4. No proof of contact letter mailed to victim dated August 24, 1986 <br> 5. Paulnitsky's torn shirt not photographed and logged into evidence <br> 6. No photographs of Paulnitsky's injuries <br> 7. No signed release from complainant Mr. Gorfin who wished no further action |
| 155500 | 1. Victims were not contacted <br> 2. No interview of witnesses <br> 3. No statement taken from witnesses <br> 4. No attempt to canvass the scene <br> 5. No interview of officer |
| 168160 | 1. While officers were contacted, no formal statements were taken <br> 2. No statement from victim taken <br> 3. No attempt to canvass the scene |
| 172123 | No deficiencies observed |
| 179835 | 1. No attempt to canvass the scene |

[52] Although the investigator did attempt to contact the victims/complainants through their attorney, the attorney told the investigator his clients would not give a statement (Bates 1723), there is no customary declination letter from the attorney. The declination cannot be verified.

**Table 4**

*Observations from Each Complaint Register Investigation in the Process Evaluation for the Defendant Officers*

| CR Number | Observations |
|---|---|
| | 2. No supplemental reports submitted |
| 180037 | 1. No in person interview of victim<br>2. No victim statement taken<br>3. No in person interview with witnesses<br>4. No witness statements taken<br>5. No attempt to canvass the scene<br>6. No photos of the scene taken<br>7. No formal interview of officer taken |
| 182519 | 1. No in person interview with victim<br>2. No witness statement taken<br>3. No in person interview with witnesses<br>4. No statements taken from witnesses<br>5. No attempt to canvass the scene<br>6. No incident reports describing the events leading to the CR<br>7. No investigative reports from accused officer in CR file<br>8. No interview with officer<br>9. No officer statement taken |
| 188930 | 1. No in person interview of victim<br>2. No statement taken from victim<br>3. No attempt to canvass the area<br>4. No formal interview of officers |
| 195435 | 1. No victim statement taken[53]<br>2. No witness statement taken<br>3. Not all accused officers' statements were taken |
| 200441 | 1. No in person interview with victims<br>2. No victim statements taken<br>3. No in person interview with witnesses<br>4. No witness statements taken<br>5. No incident report concerning events leading to the CR<br>6. No interview of officer<br>7. Officer's statement not taken |
| 220046 | 1. No target letter issued to accused officers<br>2. No officer reports submitted<br>3. No interviews of officers |
| 247214 | 1. No target letters issued to accused officers<br>2. No officer statements taken; no probing questions put to officers |
| 251502 | 1. No in person interview with victim<br>2. No in person interview with witnesses<br>3. No formal statement of victim taken<br>4. No formal statement of witnesses taken<br>5. No interview of accused officer<br>6. No formal statement of accused officer taken |
| 256148 | 1. No formal statement of witnesses taken<br>2. No officer report submitted<br>3. No CPD medical form describing victim's injuries |
| 273466 | 1. No in person interview with victim<br>2. No formal statement from victim taken |

---

[53] Although the investigator did contact the victim, the victim told the investigator he did not want provide a statement based on advice from his lawyer (Bates 3008), there is no customary declination letter from the attorney or the victim. The declination cannot be verified.

**Table 4**

*Observations from Each Complaint Register Investigation in the Process Evaluation for the Defendant Officers*

| CR Number | Observations |
|---|---|
| | 3. No in person interview with witnesses<br>4. No formal statement from witnesses taken<br>5. No attempt to canvass the scene<br>6. No incident report concerning the events leading to the CR<br>7. No formal statement of accused officer taken |
| 284331 | 1. No in person interview with victim<br>2. No formal statement from victim<br>3. No in person interview with witnesses<br>4. No witness statements taken<br>5. No attempt to canvass the scene<br>6. No statement of accused officer taken |
| 288729 | 1. No in person interview with victim<br>2. No formal statement from victim<br>3. No attempt to canvass the scene<br>4. No formal statement of the accused officer taken |
| 289081 | 1. No victim statement taken<br>2. Witnesses were not contacted<br>3. No formal statement of the accused officer taken |
| 305680 | 1. No formal statement of accused officer taken |
| 308007 | 1. No in person interview with victim<br>2. No victim statement taken<br>3. No attempt to canvass scene or find witnesses<br>4. No target letter issued to accused officer<br>5. No officer report submitted<br>6. No formal statement of accused officer taken |
| 1013854 | 1. No target letter issued<br>2. No investigative log<br>3. No officer report submitted |

**Table 5**

*Observations from Each Complaint Register Investigation in the Process Evaluation for the Non-Defendant Officers*

| CR Number | Observations |
|---|---|
| 15876 | 1. No in person interview with victim<br>2. No witnesses contacted<br>3. No attempt to canvass the scene<br>4. No target letter issued to officer<br>5. No formal interview of officer<br>6. No officer statement taken |
| 162687 | 1. No attempt to canvass the scene<br>2. No target letter issued to accused officers<br>3. No reports from accused officers were submitted<br>4. No medical records for the complainant, even though this was assault case<br>5. No interview with accused officers<br>6. No officer statements taken |
| 166878 | 1. No in person interview with victim<br>2. No victim statement taken<br>3. No canvass at the scene<br>4. No incident reports<br>5. No investigative reports<br>6. No target letter issued to accused officers |

**Table 5**

*Observations from Each Complaint Register Investigation in the Process Evaluation for the Non-Defendant Officers*

| CR Number | Observations | |
|---|---|---|
| | 7. | No officer statements taken[54] |
| | 8. | No interview of accused officers |
| 168290 | 1. | No victim statement taken |
| | 2. | No in person interview with witnesses |
| | 3. | Only witnesses contacted were other officers |
| | 4. | No attempt to canvass the scene for additional witnesses |
| | 5. | No accused officers' statement taken |
| 168914 | 1. | Witnesses not contacted |
| | 2. | No attempt to canvass scene |
| | 3. | No reports from accused officers were submitted |
| 169532 | 1. | Victim not contacted |
| | 2. | No in person interview with witness |
| | 3. | No witness statement taken |
| | 4. | No attempt to canvass the scene |
| | 5. | No medical reports regarding victim's injuries |
| 170021 | 6. | No victim statement taken |
| | 7. | No witnesses contacted |
| | 8. | No attempt to canvass the scene |
| | 9. | No incident reports |
| | 10. | No investigative reports |
| | 11. | No interview with accused officers |
| | 12. | No officer statement taken |
| 170373 | 1. | No in person interview with victim[55] |
| | 2. | No victim statement taken |
| | 3. | No attempt to locate witnesses |
| | 4. | No interview with accused officers |
| | 5. | No officer statements taken |
| 170700 | 1. | No victim statement taken |
| | 2. | No witness statement taken |
| | 3. | No canvass of the scene |
| | 4. | No photographs of the scene |
| | 5. | No officer statements taken |
| 171720 | 1. | No witnesses contacted |
| | 2. | No attempt to canvass the scene |
| | 3. | No target letter issued to accused officers |
| | 4. | No reports from accused officers were submitted |
| | 5. | No officer statements were taken |
| | 6. | No medical reports regarding victim's injuries |
| 172221 | 1. | No in person interview with witness |
| | 2. | No witness statement taken |
| | 3. | No incident reports |
| | 4. | No officer statement taken |
| 172748 | 1. | No investigative reports |
| | 2. | No officer statements taken |
| 173369 | 1. | No reports from accused officers were submitted |

---

[54] The accused officer could not be interviewed because he suffered brain damage in a motorcycle accident.

[55] Although the investigator documented that the complainant said she allowed the officers into her home (Bates 11533): **1)** there is no recoding of the telephone call between the complainant and investigator; **2)** no signed consent to search form; **3)** no record of the phone number the investigator called; and **4)** no sworn statement from the victim attesting to the fact that she authorized the entry. The victim's consent cannot be verified.

**Table 5**

*Observations from Each Complaint Register Investigation in the Process Evaluation for the Non-Defendant Officers*

| CR Number | Observations | |
|---|---|---|
| | 2. | No attempt to canvass the scene for witnesses |
| | 3. | No witnesses were located or contacted |
| 174770 | 1. | No victim statement taken |
| | 2. | No witnesses contacted |
| | 3. | No attempt to canvass the scene |
| | 4. | No accused officer statement taken |
| 179504 | 1. | No victim statement taken |
| | 2. | No attempt to canvass the scene |
| | 3. | No officer statement taken |
| 180271 | 1. | No victim statement taken |
| | 2. | No witnesses contacted |
| | 3. | No attempt to canvass the scene |
| 181250 | 1. | No victim statement taken |
| | 2. | No witness statement taken |
| | 3. | No attempt to canvass the scene |
| | 4. | No officer statements taken |
| 181515 | 1. | No witness statement taken |
| | 2. | No attempt to canvass the scene |
| | 3. | No reports submitted by accused officers |

Chicago Police Department General Order 82-14, Complaint and Disciplinary Procedures requires "The ranking on-duty member of the unit which has initiated an, investigation or to which an investigation has been assigned will immediately designate a command or supervisory member of the unit to conduct the investigation. Every effort will be made to ensure that the investigation is conducted by an impartial manner" (Bates 48402). The process evaluation indicates the investigations frequently contain missing elements that could change the disposition of the case. Therefore, the investigations are not thorough as required, and they are not necessarily impartial. This deprives the victim/complainant, the CPD, and the general public of an accurate and unbiased investigation.[56]

Supervisory review and approval of a personnel investigation is an endorsement of the investigative process. Each investigation that is flawed, but subsequently endorsed by each member of the command staff in the chain of command is explicit approval of the investigative process. Supervisory review and

---

[56] Table 11 suggests potential bias in the personnel investigations.

approval of police reports at the time they are submitted is an administrative function aimed at accountability and is intended to ensure:[57]

    i.   The reports are complete and reflect the actions and omissions of the submitting officer;[58]

    ii.   The approved department forms are utilized, which ensure consistency and due process;

    iii.   The details of the incident establish the elements of a crime or rule infraction and, if necessary, the required levels of Constitutional proof (i.e., reasonable suspicion; preponderance of the evidence; probable cause);

    iv.   The officer's actions are consistent with legal and administrative rules;

    v.   Identify collateral issues important to the agency's performance, including policy and procedures, competency and skills of individual officers, and appropriate topics for in-service training;

    vi.   A supervisor provides immediate contact with the submitting officer and has an opportunity to review the incident in its totality and provide direction and control over personnel, materials and resources as needed;

    vii.   The official reports follow the approved chain of command from point of origin to final destination so that all members in the chain of command remain informed.

By endorsing police reports, the supervisors are accountable for and concur with the reports' contents, the officers' conduct, and they also attest that the reports meet the customary standards listed above. Because the supervisors endorsed the investigations submitted by the internal affairs investigators, the supervisors agreed with the investigator's method even though the method did not comport with

---

[57] Sergeant Mingey and Sergeant Epplen testified to these responsibilities at deposition (Mingey deposition, 81:19-22; 82:5-9; Epplen deposition, 90:19-24; 91:1-5; 92:16-25; 93:1-25; 94:1-12; 100:22-25; 101:11-18, 21-25; 102:1-7).

[58] Sergeant Epplen testified at deposition that, as a supervisor, he would have no way of knowing what officers under his supervision were omitting from a report (Epplen deposition, 133:18-22). To effectively supervise investigative personnel, a supervisor is required to know common investigative tasks (e.g., area canvass; interview victim witnesses and officers), common investigative techniques (e.g., surveillance; collect evidence; record statements) and to probe officers for answers when they submit a report that does not contain these common elements. A report that is missing common investigative tasks must be returned to the officer to be completed and resubmitted. If a supervisor is aware of common investigative tasks and techniques, then the supervisor would be able to identify reporting deficiencies and any missed tasks toward a thorough investigation. Sergeant Epplen did not comment on these practices during deposition.

accepted industry standards. When flawed investigations are endorsed, the Department misses the opportunity to uncover potential problems, preempt emerging patterns and take corrective action.

Conducting an internal investigation is a process. That process encompasses a range of activities resulting in a final product that involves collecting and interpreting facts to inform criminal and/or administrative proceedings. The CR files are replete with incomplete activities fundamental to a thorough investigation.[59] When these activities are left unaddressed, the investigation is not thorough and lacks evidence sufficient to justify the disposition. Consequently, the final product includes equivocal findings and equivocal findings result in an unreliable investigation. The general recurring themes arising from the content analysis of the investigations that support my conclusion appear in table 6. Table 6 is a summary of investigative activities in the CR files, expressed in numerical terms that were completed. These activities are fundamental to any internal affairs investigation and are expected to be completed in each applicable case (i.e., 100%) to ensure a thorough investigation, as required by CPD General Order 82-14. Because many of these activities are incomplete, they reflect a lack of initiative and tenacity that are indispensable for a thorough investigation. The result is a final product whose findings are unreliable. In general, the investigations are superficial, they are not thorough, and they do not comport with Chicago police Department standards.

---

[59] Chicago Police Department General Order 82-14, Complaint and Disciplinary Procedures requires a thorough investigation.

**Table 6**
*Percentage of Completed Investigative Activities in the CR Files*

| Investigative Activity[60] | n | Activity completed | Activity N/A | Activity Unclear | Subtotal | % Completed |
|---|---|---|---|---|---|---|
| Cameras located at scene | 146 | 0 | 3 | 0 | 143 | 0 |
| Communication tapes preserved | 146 | 0 | 7 | 0 | 139 | 0 |
| District phone tapes preserved | 146 | 0 | 9 | 0 | 137 | 0 |
| Referred to Cook County Prosecutor's Office | 146 | 0 | 11 | 0 | 135 | 0 |
| Photos of scene obtained | 146 | 2 | 2 | 0 | 144 | 1 |
| CPD medical form describe complaint of pain or injuries | 146 | 4 | 6 | 0 | 140 | 3 |
| Officer identified by victim/witness | 146 | 4 | 0 | 0 | 146 | 3 |
| Arrest photos | 146 | 5 | 8 | 0 | 138 | 4 |
| Cook County medical form describe complaint of pain or injuries | 146 | 10 | 9 | 0 | 137 | 7 |
| Photos of victim taken by IAD | 146 | 11 | 6 | 0 | 140 | 8 |
| Scene canvass | 146 | 17 | 3 | 0 | 143 | 12 |
| Did victim/complainant require medical attention | 146 | 27 | 2 | 0 | 144 | 19 |
| Statement taken from witness[61]* | 146 | 22 | 37 | 0 | 109 | 20 |
| Statement taken from victim/complainant* | 146 | 30 | 16 | 0 | 130 | 23 |
| Officer statement taken | 146 | 38 | 3 | 0 | 143 | 27 |
| In-person interview with witnesses | 146 | 34 | 37 | 4 | 105 | 32 |
| In-person interview with victim | 146 | 42 | 17 | 8 | 121 | 35 |
| Arrest report of the complainant | 146 | 57 | 5 | 0 | 141 | 40 |
| Incident report prepared | 146 | 85 | 3 | 0 | 143 | 59 |
| Witnesses contacted | 146 | 72 | 37 | 0 | 109 | 66 |
| Officer submit administrative report* | 146 | 95 | 1 | 0 | 145 | 66 |
| Victim/complainant contacted* | 146 | 103 | 17 | 0 | 129 | 80 |

g. *Chicago Police Internal Affairs Data.* Analyzing CPD's own data is useful in assessing the state of its internal affairs program and to augment the qualitative review of the randomly selected personnel investigations. The data for the analysis presented ahead includes the defendant officers, a sample of non-defendant officers.[62] It is difficult, if

---

[60] Those items marked with an * are required by Chicago Police Department General Order 82-14, Complaint and Disciplinary Procedures (effective October 15, 1982), Addendum 3, Conduct of the Investigation.

[61] Although the investigator is required by policy 82-14 to take written statements from the victim/complainant and witnesses, this is practice is qualified: "If the allegation is such that a recommendation for separation is unlikely, the statement(s) need not be formal question-and-answer or narrative type. If the allegation is such that the case is likely to result in a recommendation for separation, the statement(s) will be in question-and-answer form" (Bates 48402). The policy does not provide any direction as to what allegations are eligible for separation.

[62] The data were supplied by Plaintiff's counsel via the discovery process. The **defendant officers** are Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Sergeant Epplen, Fernando Montilla, and Roland Paulnitsky. The non-defendant officers are those who were named in a complaint along with the defendant officers and a sample of non-defendant officers. The **non-defendant officers** are Abel Gallegos, Alan Thiel, Allen Jaglowski, Anthony Bongiorno, Anthony Callaghan, Anthony Carothers, Anthony DeLeondardis, Anthony Graffeo, Anthony Gvozdenovich, Anthony Wojcik, Arnold Cisco, Bernard Brennan, Bernard Graf, Carl Smith, Carlos Delgado, Carmel Abbate, Carolyn Okon, Christ Karedes, Christine Speros, Clyde Raymond, Cynthia Potoriero, D Sobczyk, Daniel Cunningham, Daniel Dugan, Daniel Engel, Daniel McCarthy, Daniel Noon, Daniel Sako, David Caldwell, David Golubiak, David Hoffencamp, David Omuro, David Paul, David Schmidt, David Strain, Dean Angelo, Dennis Palasz, Donald Johnson, Donald Korte,

not impossible to credit the Chicago Police Department that supervisors or managers, particularly the internal affairs division, did not know a pattern of complaints was developing across various members of the Department. The pattern consists of the same officers receiving the same or similar complaints during the same time period. Lieutenant Flores testified at deposition that Internal Affairs or OPS would notify the commanding officer of a specific division that an officer under his or her command had a pattern of complaints emerging.[63]

There is no evidence in discovery that any of the defendant officers, despite their mounting complaint histories, were notified of a pattern or were referred to the Personnel Concerns Program or the Behavioral Alert System.[64] There is also no evidence in discovery the CPD used their knowledge of complaints to institute any

---

Donald Owsley, Edmund Mook, Edward Cagney, Edward Healy, Edward Perez, Edward Westphal, Edwin Dickerson, Eldridge Lee Akers, Eliezer Ortiz, Elroy Baker, Frank Patze, Frank Vukonich, Fred Allen, Gillian McLaughling, Glenn Turner, Gregory Masonick, Gregory Salvi, Harlan Rothgeb, Hector Vergara, Herbert Wandel, Herman Laboy, Howard Hagen, James Anhalt, James Baraniak, James Barniak, James Beutel, James Brady, James Cradick, James Gartner, James Grant, James Lanners, James Lupi, James Parker, James Sesso, James Sweeney, James Troken, Jean Moreth, Jeanne Radjenovich, Jeffery Kumorek, Jeffrey Messina, Jenny Molda, Jerome Bogucki, Jimmy Cruz, John Blake, John Boyle, John Brimer, John Carioscia, John Crain, John Doe, John Griffin, John Guzman, John Heagney, John Jambrosek, John Leonard,  John Lewison, John McKenna, John McMurray, John Munoz, John Schnoor, John Sebeck, John Sullivan, John Thomas, John Wasco, Jon Woodall, Jose Capetillo, Jose Zuniga, Joseph Fallon, Joseph Maratto, Joseph Mastro, Joseph Miedzianowski, Joseph Molitor, Joseph Salemme, Joseph Skiba, Joseph Sparks, Karl Hervai, Kay Louis, Kenneth Stoppa, Kevin McDonald, Kriston Kato, Kurt Hagemann, Larry Tomala, Lawrence Culbertson, Lawrence Thezan, Lee Williams, Leonard Conduto, Leroy Baumann, Linda Turek, Louis Rabbit, Louis Vasquez, Lupe Bustos, Mark Marianovich, Mark Pawelski, Martin Burke, Martin Stich, Matthew Thiel, Michael Cusack, Michael Doyle, Michael Fleming, Michael Haran, Michael Herigodt, Michael Mancuso, Michael Mason, Michael Rock, Michael Stephens, Michael Stevens, Michael Wick, Michal Bolger, Miguel Nieves, Neal Jack, Pamela Triner, Patrick Brogan, Paul Derosa, Paul Zacharias, Peter Arpaia, Philip Watzke, Rafael Rodriguez, Ralph Price, Randall Zawis, Raymond Cowell, Raymond Mackowski, Raymond Schalk, Richard Aquilar, Richard Brueck, Richard Curley, Richard Guerrero, Richard Maher, Richard Moeller, Richard Zuley, Robert Browne, Robert Colella, Robert Collins, Robert Doelker, Robert Graves, Robert Kussy, Robert Lawler, Robert Pistilli, Robert Schumacher, Robert Stubitsch, Robert Wallander, Roberto Malpica, Ronald Abbee, Ronald Coleman, Ronald Concz, Ronald Huss, Ronald Mudry, Ronald Parzam, Ronald Rufo, Ronald Stasica, Ronald Stasiga, Roseann Fitzgerald, Samuel Manno, Scott Schwieger, Sergeant Keane, Sergio Rajkovick, Stanley Sebastian, Stephan Combes, Stephen Franko, Stephen Gawrys, Susan Schmit, Tameron Martin, Terrence Dunn, Terrence McCarthy, Therese Lykins, Thomas Cichon, Thomas Fallon, Thomas Kwasinski, Thomas O'Connor, Thomas O'Donnell, Thomas Payton, Thomas Reynolds, Thomas Shea, Timothy Nolan, Timothy O'Shea, Timothy Terrance, Tom Morales, Tony Deleonardis, Vincent Tondryk, Virgil Perisse, Wayne Gehl, Wayne Thompson, Wilfredo Roman, William Connor, William Dorsch, William Durr, William O'Brien, and William Woitowich.

[63] Flores deposition, 118:11-25; 119: 1-20.

[64] CPD General Order 82-14 identifies Repeated Minor Infractions as situation that requires processing Department members according to the Department directive titled "Personnel Concerns" (General Order 83-3, Personnel Concerns, March 9, 1983). There is no evidence in discovery that CPD defines or quantifies "repeated" (e.g., how many infractions constitutes "repeated"?) and defines "minor infractions" (e.g., a statement of the exact meaning of minor infractions, as compared with major infractions). There is also no evidence in discovery that CPD referred any of the defendant officers to Personnel Concerns consistent with General Order 82-14, or that corrective action was taken consistent with General Order 83-3, Personnel Concerns.

remedial action, training, policy changes, modifications to assignment or supervision despite the fact that an internal affairs investigator could recommend remedial training upon completing an investigation.

h. *Complaints Against Personnel.* The personnel complaint data is described as follows:

a. The data range is 28 years, from 1980 to 2008 (table 7) consisting of 746 complaints and 84 unique complaint categories (table 8).

**Table 7**

*Complaints by Year*

| | | |
|---|---|---|
| 1980 | 21 | 2.8% |
| 1984 | 4 | 0.5% |
| 1985 | 20 | 2.7% |
| 1986 | 17 | 2.3% |
| 1987 | 147 | 19.7% |
| 1988 | 41 | 5.5% |
| 1989 | 205 | 27.5% |
| 1990 | 102 | 13.7% |
| 1991 | 5 | 0.7% |
| 1992 | 4 | 0.5% |
| 1993 | 16 | 2.1% |
| 1994 | 19 | 2.5% |
| 1995 | 10 | 1.3% |
| 1996 | 35 | 4.7% |
| 1997 | 23 | 3.1% |
| 1998 | 13 | 1.7% |
| 1999 | 12 | 1.6% |
| 2001 | 8 | 1.1% |
| 2002 | 19 | 2.5% |
| 2003 | 4 | 0.5% |
| 2004 | 4 | 0.5% |
| 2005 | 4 | 0.5% |
| 2006 | 1 | 0.1% |
| 2007 | 8 | 1.1% |
| 2008 | 4 | 0.5% |
| | **746** | **100.0%** |

**Table 8**

| *Complaints by Category* | **n** | **%** |
|---|---|---|
| Assault | 233 | 31.2% |
| Threats | 54 | 7.2% |
| Verbal Abuse | 50 | 6.7% |
| Unlawful Entry | 37 | 5.0% |
| Unlawful Arrest | 30 | 4.0% |
| Unlawful Confiscation Of Property | 29 | 3.9% |
| Unlawful Entry And Search | 26 | 3.5% |
| Unlawful Detention | 22 | 2.9% |
| Failure To Follow Procedure | 21 | 2.8% |
| Coercing Confession | 18 | 2.4% |
| Failure To Identify As Officers | 14 | 1.9% |
| Unlawful Search | 13 | 1.7% |
| Destruction Of Property | 12 | 1.6% |

**Table 8**

| *Complaints by Category* | n | % |
|---|---|---|
| Gun-Pointing | 12 | 1.6% |
| Planting Evidence | 12 | 1.6% |
| Denying Phone Call | 11 | 1.5% |
| Demeanor | 8 | 1.1% |
| False Arrest | 8 | 1.1% |
| Denial Of Attorney | 7 | 0.9% |
| Failure To Investigate | 7 | 0.9% |
| Falsifying Evidence | 7 | 0.9% |
| Failure To Return Property | 5 | 0.7% |
| Unlawful Interrogation | 5 | 0.7% |
| Allowing Prisoner To Escape | 4 | 0.5% |
| Denial Of Medical Care | 4 | 0.5% |
| Discouraging Complainant From Pressing Charges In A Case | 4 | 0.5% |
| Failure To Care For Department Property | 4 | 0.5% |
| Failure To Mirandize | 4 | 0.5% |
| Violation Of Department Rules | 4 | 0.5% |
| Wrongful Arrest | 4 | 0.5% |
| Failed To Properly Complete General Case Report | 3 | 0.4% |
| Harassment | 3 | 0.4% |
| Inattention To Duty | 3 | 0.4% |
| Intoxication | 3 | 0.4% |
| Failure To Arrest Burglar | 2 | 0.3% |
| Failure To Arrest Guevara | 2 | 0.3% |
| Failure To Conduct Fair Investigations | 2 | 0.3% |
| Failure To Enforce Traffic Violation | 2 | 0.3% |
| Failure To Provide Medical Treatment | 2 | 0.3% |
| Failure To Provide Search Warrant | 2 | 0.3% |
| Failure To Render Aid | 2 | 0.3% |
| Failure To Search | 2 | 0.3% |
| Failure To Take Action | 2 | 0.3% |
| Falsifying Testimony And Withholding Evidence | 2 | 0.3% |
| Leaving Minors Alone | 2 | 0.3% |
| Loss Of CPD Property | 2 | 0.3% |
| Reckless Driving | 2 | 0.3% |
| Securing Warrant Through False Statements | 2 | 0.3% |
| Submitting False Report | 2 | 0.3% |
| Allowing Suspect To Escape | 1 | 0.1% |
| Deceitful Conduct | 1 | 0.1% |
| Disobedience Of An Order | 1 | 0.1% |
| Disrespect Towards Supervisor | 1 | 0.1% |
| Failure To Appear For CR Investigation | 1 | 0.1% |
| Failure To Authorize Arrest Of Guevara | 1 | 0.1% |
| Failure To Display Current City Vehicle Sticker | 1 | 0.1% |
| Failure To Fill Out Battery Report | 1 | 0.1% |
| Failure To Initiate Complaint | 1 | 0.1% |
| Failure To Properly Investigate | 1 | 0.1% |
| Failure To Pursue Case | 1 | 0.1% |
| Failure To Report Complaint | 1 | 0.1% |
| Failure To Secure Property | 1 | 0.1% |
| Falsifying Birthdate On Driver's License | 1 | 0.1% |
| Falsifying Testimony | 1 | 0.1% |
| Giving Case Report To General Public | 1 | 0.1% |
| Having Non-Department Issued Spare Tire In Squad Car | 1 | 0.1% |
| Having Suspended Driver's Licenses | 1 | 0.1% |

**Table 8**

| *Complaints by Category* | n | % |
|---|---|---|
| Improper Use Of Deadly Force | 1 | 0.1% |
| Instructing Victim To File False Police Report | 1 | 0.1% |
| Insubordination | 1 | 0.1% |
| Intentional Misinterpretation Of Arrestee's Statements | 1 | 0.1% |
| Issuance Of Unconstitutional Citation | 1 | 0.1% |
| Making False Report/Statement | 1 | 0.1% |
| Negligent Driving | 1 | 0.1% |
| Not Having Valid Chicago Parking License | 1 | 0.1% |
| Perjury | 1 | 0.1% |
| Possession Of Illegal Firearms | 1 | 0.1% |
| Refusal To Bond | 1 | 0.1% |
| Refusal To Obey Order | 1 | 0.1% |
| Retaliation | 1 | 0.1% |
| Unjustified Discharge Of Firearm | 1 | 0.1% |
| Unjustified Physical And Verbal Threats | 1 | 0.1% |
| Unlawful Eavesdropping On Fellow Officer | 1 | 0.1% |
| Wrongful Arrest & Denial Of Counsel | 1 | 0.1% |
| **Total** | **746** | **100.0%** |

b.  *Pareto Analysis.* The Pareto Principle (also known as the 80-20 Rule) is a principle of analysis that indicates certain types of events are highly concentrated among particular people, places and things (in the instant case, complaints against Chicago police officers). This kind of concentration is not peculiar to complaints against police officers, but is almost a universal law. For example, a small portion of the population holds most of the wealth. As applied to police personnel complaints, the principle is useful to determine where complaints are concentrated so police supervisors and managers can focus resources and limit their efforts to those complaints that will that yield the greatest preventive benefits.

Table 9 shows that 17 types of complaints (indicated by the shaded cells) account for 20.2% of complaint categories, which accounts for 80.7% of all complaints during the analysis period (a perfect observed fit with Pareto theory). For example, assault complaints (n=233) comprise 31.2% of all complaint categories. Assaults are criminal allegations and should be treated with the utmost preventive action by CPD. Among the most serious complaint categories are potential criminal complaints, which includes assault, threats, gun pointing, planting evidence and false arrest. These complaints total 319, which is 43% of the total.

There was a clear pattern of complaints arising over the analysis period, most of which dealt with a physical confrontation (e.g., assault, unlawful detention, unlawful arrest), actions that affect legitimacy and community perception (demeanor, verbal abuse, threats), Fourth Amendment violations (unlawful entry, unlawful arrest, unlawful detention, unlawful search, coercing a confession) and truthfulness (perjury, falsifying evidence). The complaints that affect legitimacy are contrary to the duties listed in the job specifications for every rank in the Chicago Police Department, which is to promote positive community relations. Had the Superintendent of Police and the command staff prioritized the effort to address the most common complaints—consistent with their job specifications—then they may have discovered additional patterns such as repeat officers, repeat supervisors or repeat locations, which could have been part of a personnel improvement plan. This is why supervisors at every level in the CPD are tasked with the responsibility to monitor personnel for compliance with industry standards.

**Table 9**
*Pareto Analysis of Complaints Involving Defendant and Non-defendant Officers*

| Complaints by Category | n | % | Cumulative % | Cumulative % of Complaint Categories |
|---|---|---|---|---|
| Assault | 233 | 31.2% | 31.2% | 1.2% |
| Threats | 54 | 7.2% | 38.5% | 2.4% |
| Verbal Abuse | 50 | 6.7% | 45.2% | 3.6% |
| Unlawful Entry | 37 | 5.0% | 50.1% | 4.8% |
| Unlawful Arrest | 30 | 4.0% | 54.2% | 6.0% |
| Unlawful Confiscation Of Property | 29 | 3.9% | 58.0% | 7.1% |
| Unlawful Entry And Search | 26 | 3.5% | 61.5% | 8.3% |
| Unlawful Detention | 22 | 2.9% | 64.5% | 9.5% |
| Failure To Follow Procedure | 21 | 2.8% | 67.3% | 10.7% |
| Coercing Confession | 18 | 2.4% | 69.7% | 11.9% |
| Failure To Identify As Officers | 14 | 1.9% | 71.6% | 13.1% |
| Unlawful Search | 13 | 1.7% | 73.3% | 14.3% |
| Destruction Of Property | 12 | 1.6% | 74.9% | 15.5% |
| Gun-Pointing | 12 | 1.6% | 76.5% | 16.7% |
| Planting Evidence | 12 | 1.6% | 78.2% | 17.9% |
| Denying Phone Call | 11 | 1.5% | 79.6% | 19.0% |
| Demeanor | 8 | 1.1% | 80.7% | 20.2% |
| False Arrest | 8 | 1.1% | 81.8% | 21.4% |
| Denial Of Attorney | 7 | 0.9% | 82.7% | 22.6% |
| Failure To Investigate | 7 | 0.9% | 83.6% | 23.8% |
| Falsifying Evidence | 7 | 0.9% | 84.6% | 25.0% |

**Table 9**

*Pareto Analysis of Complaints Involving Defendant and Non-defendant Officers*

| Complaints by Category | n | % | Cumulative % | Cumulative % of Complaint Categories |
|---|---|---|---|---|
| Failure To Return Property | 5 | 0.7% | 85.3% | 26.2% |
| Unlawful Interrogation | 5 | 0.7% | 85.9% | 27.4% |
| Allowing Prisoner To Escape | 4 | 0.5% | 86.5% | 28.6% |
| Denial Of Medical Care | 4 | 0.5% | 87.0% | 29.8% |
| Discouraging Complainant From Pressing Charges In A Case | 4 | 0.5% | 87.5% | 31.0% |
| Failure To Care For Department Property | 4 | 0.5% | 88.1% | 32.1% |
| Failure To Mirandize | 4 | 0.5% | 88.6% | 33.3% |
| Violation Of Department Rules | 4 | 0.5% | 89.1% | 34.5% |
| Wrongful Arrest | 4 | 0.5% | 89.7% | 35.7% |
| Failed To Properly Complete General Case Report | 3 | 0.4% | 90.1% | 36.9% |
| Harassment | 3 | 0.4% | 90.5% | 38.1% |
| Inattention To Duty | 3 | 0.4% | 90.9% | 39.3% |
| Intoxication | 3 | 0.4% | 91.3% | 40.5% |
| Failure To Arrest Burglar | 2 | 0.3% | 91.6% | 41.7% |
| Failure To Arrest Guevara | 2 | 0.3% | 91.8% | 42.9% |
| Failure To Conduct Fair Investigations | 2 | 0.3% | 92.1% | 44.0% |
| Failure To Enforce Traffic Violation | 2 | 0.3% | 92.4% | 45.2% |
| Failure To Provide Medical Treatment | 2 | 0.3% | 92.6% | 46.4% |
| Failure To Provide Search Warrant | 2 | 0.3% | 92.9% | 47.6% |
| Failure To Render Aid | 2 | 0.3% | 93.2% | 48.8% |
| Failure To Search | 2 | 0.3% | 93.4% | 50.0% |
| Failure To Take Action | 2 | 0.3% | 93.7% | 51.2% |
| Falsifying Testimony And Withholding Evidence | 2 | 0.3% | 94.0% | 52.4% |
| Leaving Minors Alone | 2 | 0.3% | 94.2% | 53.6% |
| Loss Of CPD Property | 2 | 0.3% | 94.5% | 54.8% |
| Reckless Driving | 2 | 0.3% | 94.8% | 56.0% |
| Securing Warrant Through False Statements | 2 | 0.3% | 95.0% | 57.1% |
| Submitting False Report | 2 | 0.3% | 95.3% | 58.3% |
| Allowing Suspect To Escape | 1 | 0.1% | 95.4% | 59.5% |
| Deceitful Conduct | 1 | 0.1% | 95.6% | 60.7% |
| Disobedience Of An Order | 1 | 0.1% | 95.7% | 61.9% |
| Disrespect Towards Supervisor | 1 | 0.1% | 95.8% | 63.1% |
| Failure To Appear For CR Investigation | 1 | 0.1% | 96.0% | 64.3% |
| Failure To Authorize Arrest Of Guevara | 1 | 0.1% | 96.1% | 65.5% |
| Failure To Display Current City Vehicle Sticker | 1 | 0.1% | 96.2% | 66.7% |

**Table 9**
*Pareto Analysis of Complaints Involving Defendant and Non-defendant Officers*

| Complaints by Category | n | % | Cumulative % | Cumulative % of Complaint Categories |
|---|---|---|---|---|
| Failure To Fill Out Battery Report | 1 | 0.1% | 96.4% | 67.9% |
| Failure To Initiate Complaint | 1 | 0.1% | 96.5% | 69.0% |
| Failure To Properly Investigate | 1 | 0.1% | 96.6% | 70.2% |
| Failure To Pursue Case | 1 | 0.1% | 96.8% | 71.4% |
| Failure To Report Complaint | 1 | 0.1% | 96.9% | 72.6% |
| Failure To Secure Property | 1 | 0.1% | 97.1% | 73.8% |
| Falsifying Birthdate On Driver's License | 1 | 0.1% | 97.2% | 75.0% |
| Falsifying Testimony | 1 | 0.1% | 97.3% | 76.2% |
| Giving Case Report To General Public | 1 | 0.1% | 97.5% | 77.4% |
| Having Non-Department Issued Spare Tire In Squad Car | 1 | 0.1% | 97.6% | 78.6% |
| Having Suspended Driver's Licenses | 1 | 0.1% | 97.7% | 79.8% |
| Improper Use Of Deadly Force | 1 | 0.1% | 97.9% | 81.0% |
| Instructing Victim To File False Police Report | 1 | 0.1% | 98.0% | 82.1% |
| Insubordination | 1 | 0.1% | 98.1% | 83.3% |
| Intentional Misinterpretation Of Arrestee's Statements | 1 | 0.1% | 98.3% | 84.5% |
| Issuance Of Unconstitutional Citation | 1 | 0.1% | 98.4% | 85.7% |
| Making False Report/Statement | 1 | 0.1% | 98.5% | 86.9% |
| Negligent Driving | 1 | 0.1% | 98.7% | 88.1% |
| Not Having Valid Chicago Parking License | 1 | 0.1% | 98.8% | 89.3% |
| Perjury | 1 | 0.1% | 98.9% | 90.5% |
| Possession Of Illegal Firearms | 1 | 0.1% | 99.1% | 91.7% |
| Refusal To Bond | 1 | 0.1% | 99.2% | 92.9% |
| Refusal To Obey Order | 1 | 0.1% | 99.3% | 94.0% |
| Retaliation | 1 | 0.1% | 99.5% | 95.2% |
| Unjustified Discharge Of Firearm | 1 | 0.1% | 99.6% | 96.4% |
| Unjustified Physical And Verbal Threats | 1 | 0.1% | 99.7% | 97.6% |
| Unlawful Eavesdropping On Fellow Officer | 1 | 0.1% | 99.9% | 98.8% |
| Wrongful Arrest & Denial Of Counsel | 1 | 0.1% | 100.0% | 100.0% |
| **Total** | **746** | **100.0%** | | |

Table 10 applies Pareto Analysis to the yearly complaints against personnel during this period. The data show that 32% of the years (1980, 1985, 1987, 1988, 1989, 1990, 1996 and 1997) accounts for almost 80% (79.6%) of the complaints (a near perfect observed fit with Pareto theory). This is also the time period when CPD was developing the "Automated Early Warning System." Chicago Police Superintendent Matt L. Rodriguez, Internal Affairs Agent Robert Geinosky, and Assistant Deputy Superintendent Raymond Risley were aware that previous personnel tracking methods were "seriously flawed."[65] This is why the CPD began automating their hard-copy paper records. There is no data in discovery that the defendant officers were identified by the CPD as at-risk or subjected to intervention by supervisors or command staff consistent with their job specifications.

**Table 10**
*Pareto Analysis of Frequency of Complaints by Year*

| Complaint Year | n | % | Cumulative % | Cumulative % of Years |
|---|---|---|---|---|
| 1989 | 205 | 27.5% | 27.5% | 4.0% |
| 1987 | 147 | 19.7% | 47.2% | 8.0% |
| 1990 | 102 | 13.7% | 60.9% | 12.0% |
| 1988 | 41 | 5.5% | 66.4% | 16.0% |
| 1996 | 35 | 4.7% | 71.0% | 20.0% |
| 1997 | 23 | 3.1% | 74.1% | 24.0% |
| 1980 | 21 | 2.8% | 76.9% | 28.0% |
| 1985 | 20 | 2.7% | 79.6% | 32.0% |
| 1994 | 19 | 2.5% | 82.2% | 36.0% |
| 2002 | 19 | 2.5% | 84.7% | 40.0% |
| 1986 | 17 | 2.3% | 87.0% | 44.0% |
| 1993 | 16 | 2.1% | 89.1% | 48.0% |
| 1998 | 13 | 1.7% | 90.9% | 52.0% |
| 1999 | 12 | 1.6% | 92.5% | 56.0% |
| 1995 | 10 | 1.3% | 93.8% | 60.0% |
| 2001 | 8 | 1.1% | 94.9% | 64.0% |
| 2007 | 8 | 1.1% | 96.0% | 68.0% |
| 1991 | 5 | 0.7% | 96.6% | 72.0% |
| 1984 | 4 | 0.5% | 97.2% | 76.0% |
| 1992 | 4 | 0.5% | 97.7% | 80.0% |
| 2003 | 4 | 0.5% | 98.3% | 84.0% |
| 2004 | 4 | 0.5% | 98.8% | 88.0% |
| 2005 | 4 | 0.5% | 99.3% | 92.0% |
| 2008 | 4 | 0.5% | 99.9% | 96.0% |
| 2006 | 1 | 0.1% | 100.0% | 100.0% |
|  | 746 | 100.0% |  |  |

---

[65] See Burke, T.W. (June 1995). "Predicting Police Misconduct With a Neural Network Program." *Law Enforcement Technology, 22*(6), p. 57

c. *Time to a New Personnel Complaint.*[66] Using the date an incident was reported to the CPD, the time to a new internal affairs complaint was relatively frequent. There are 146 observation periods between January 7, 1980 and February 1, 2008. The average number of days between personnel complaints for the defendant and non-defendant officers was 71 days (70.7). This means there was a new personnel complaint about once every two and a half months (2.4). The median value is much lower; the median time to a new personnel complaint during this period is 25 days. The mathematical average is sensitive to outliers.[67] There are 19 observation periods that are numerical outliers. Outliers are extreme or atypical data values that are notably different from the rest of the data.[68] If the outliers are removed, then the average number of days to a new personnel complaint was 22 days (22.2) with a median value of 12 days and a modal value of 7 days.

If the time to a new personnel complaint is compared against the average number of days in a month (30), then it is apparent the CPD was receiving complaints on a frequent basis from the defendant and non-defendant officers between 1980 and 2008. Using either model (with or without outliers), the data are evidence that complaints from this group of officers came to the CPD's attention with such frequency that it is difficult if not impossible to credit the Department that they were not aware complaints were mounting.

d. *Internal and External Complaints (source) and Sustained Complaints (disposition).* There were 746 complaints, but only 742 dispositions.[69] Of the total complaints with dispositions (n=742), 9% were sustained and all others were not sustained.[70] Most complaints were generated from external sources (91%) compared with those generated from internal sources (9%). When examining the data further for

[66] Time to a new internal affairs complaint is measured in days by subtracting the second complaint date from the first complaint date (e.g., 1/7/1980 - 3/16/1984 = 1,530 days).
[67] An outlier is an observation that lies an abnormal distance from other values in data set. A data point is considered an outlier when it falls more than 1.5 times the lower or upper bound of the value. The upper bound in this series is 160.5 and the lower bound is -83.5. Values outside this range are outliers.
[68] Outliers in the data are 1,530; 647; 274; 308; 220; 185; 191; 163; 187; 165; 527; 164; 208; 238; 222; 161; 171; 317; and 229 days.
[69] Four (4) complaints did not have dispositions listed in the CR file: 1) **171220**, Officer Paulnitsky; 2) **213103** Officer Montilla (2 allegations of demeanor); and 3) **220046**, Officer Guevara. These four cases were excluded from this analysis since dispositions do not exist.
[70] Dispositions that were counted as part of the "not sustained" category include not sustained, unfounded, and exonerated.

a relationship between the source of the complaint (internal vs. external) and the disposition (sustained yes/no), another pattern emerges.

Table 11 shows the likelihood of sustaining a complaint based on the source of the complaint and tests for relationship between these variables using the chi-square test of independence.[71] If a complaint was generated from an internal a source (n=46), then the CPD sustained 46 of 68 complaints, 68% sustained rate. However, if the complaint was generated from an external source (n=674), then the CPD only sustained 21 of 674 complaints, 3%. The rate of sustained complaints is nearly 23 times higher (22.6) for internal complaints than external complaints. This wide disparity results in a statistically significant relationship[72] ($p$<.000) with a very strong positive association (V=.650), where internal complaints are more likely to be sustained than external complaints (as indicated by the positive standard residual +16.1, shaded cell, compared to -5.1).[73] Said differently, external complaints (those generated by citizens) are less likely to be sustained than those generated by someone inside the CPD. This means the outcome of an investigation (sustained or not) depends, at least partly, on the source of the complaint (internal or external).

---

[71] Chi-square is a statistical test that is applied with two nominal variables from a single population. The procedure is used to determine whether there is a significant relationship between the two variables.

[72] A "significant relationship" is the likelihood that a result or relationship is caused by something other than mere random chance, meaning he result did not happen by chance alone. By statistical convention, significant relationships exist at the 0.05 alpha level or lower. Significant does not mean important or meaningful.

[73] The residuals are based on the difference between the observed (O) and the expected (E) values. They are useful in helping to interpret chi-square tables by providing information about which cells contribute to a significant chi-square. If the standardized residual is beyond the range of ± 2, then that cell can be considered a major contributor. A positive residual (+) means that there are more observed cases in a cell than you would expect in the null hypotheses were true (i.e., the null hypothesis is that the disposition and complaint source are independent). A negative residual (-) means that there are fewer observed cases than you would expect if the null hypothesis were true.

**Table 11**
*Sustained Complaints by Complaint Source*

| Disposition | | | | Complaint Source | | Total |
|---|---|---|---|---|---|---|
| | | | | External | Internal | |
| Sustained | No | | Count | 653 | 22 | 675 |
| | | | Expected Count | 613.1 | 61.9 | 675.0 |
| | | | % of Total | 88.0% | 3.0% | 91.0% |
| | | | Std. Residual | 1.6 | -5.1 | |
| | Yes | | Count | 21 | 46 | 67 |
| | | | Expected Count | 60.9 | 6.1 | 67.0 |
| | | | % of Total | 2.8% | 6.2% | 9.0% |
| | | | Std. Residual | -5.1 | 16.1 | |
| Total | | | **Count** | **674** | **68** | **742** |
| | | | **Expected Count** | **674.0** | **68.0** | **742.0** |
| | | | **% of Total** | **90.8%** | **9.2%** | **100.0%** |
| $\chi^2$ (1) = 313.138, *p*<.000, V=.650 | | | | | | |

Table 11 suggests potential bias in the investigation, where there is intrinsic credibility granted to those inside the organization who initiate a complaint compared to those from outside the organization who initiate a complaint. Said differently, those outside the organization may not be seen as credible as those inside the organization and therefore do not have their allegations sustained at an equal rate (all things being equal). A finding such as this is cause for police supervisors and managers to pause and examine individual cases and the investigative process more closely for quality and thoroughness.

i. *Pattern of Complaints Against The Defendant Officers.* The defendant officers included in this analysis are Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, Sergeant Epplen, Fernando Montilla, and Roland Paulnitsky.

a. **Complaint Types.** Between 1980 and 2008, the defendant officers accumulated 152 individual complains arising from 48 different complaint categories. Applying the Pareto Principle to the defendant officers, patterns similar to the overall pattern that involved the non-defendant officers arises (table 12), where 20.8% of the complaint categories accounts for 67.1% of the complaints.

**Table 12**
*Pareto Analysis of Complaints[74] Involving Defendant Officers*

| Complaint | n | % | Cumulative % | Cumulative % of Complaints |
|---|---|---|---|---|
| Assault | 31 | 20.4% | 20.4% | 2.1% |
| Threats | 16 | 10.5% | 30.9% | 4.2% |
| Verbal abuse | 14 | 9.2% | 40.1% | 6.3% |
| Unlawful entry | 8 | 5.3% | 45.4% | 8.3% |
| Unlawful arrest | 7 | 4.6% | 50.0% | 10.4% |
| Demeanor | 7 | 4.6% | 54.6% | 12.5% |
| Unlawful detention | 6 | 3.9% | 58.6% | 14.6% |
| Falsifying evidence | 6 | 3.9% | 62.5% | 16.7% |
| Failure to identify as officers | 4 | 2.6% | 65.1% | 18.8% |
| Unlawful search | 3 | 2.0% | 67.1% | 20.8% |
| Harassment | 3 | 2.0% | 69.1% | 22.9% |
| Coercing confession | 2 | 1.3% | 70.4% | 25.0% |
| Destruction of property | 2 | 1.3% | 71.7% | 27.1% |
| Intoxication | 2 | 1.3% | 73.0% | 29.2% |
| Gun-pointing | 2 | 1.3% | 74.3% | 31.3% |
| Denial of attorney | 2 | 1.3% | 75.7% | 33.3% |
| Inattention to duty | 2 | 1.3% | 77.0% | 35.4% |
| Submitting false report | 2 | 1.3% | 78.3% | 37.5% |
| Failure to render aid | 2 | 1.3% | 79.6% | 39.6% |
| Failure to investigate | 2 | 1.3% | 80.9% | 41.7% |
| Failure to return property | 2 | 1.3% | 82.2% | 43.8% |
| Denial of medical care | 1 | 0.7% | 82.9% | 45.8% |
| Disobedience of an order | 1 | 0.7% | 83.6% | 47.9% |
| Failure to fill out battery report | 1 | 0.7% | 84.2% | 50.0% |
| Leaving minors alone | 1 | 0.7% | 84.9% | 52.1% |
| False arrest | 1 | 0.7% | 85.5% | 54.2% |
| Denying phone call | 1 | 0.7% | 86.2% | 56.3% |
| Improper use of deadly force | 1 | 0.7% | 86.8% | 58.3% |
| Unlawful confiscation of property | 1 | 0.7% | 87.5% | 60.4% |
| Discouraging complainant from pressing charges in a case | 1 | 0.7% | 88.2% | 62.5% |
| Reckless driving | 1 | 0.7% | 88.8% | 64.6% |
| Refusal to bond | 1 | 0.7% | 89.5% | 66.7% |
| Falsifying testimony and withholding evidence | 1 | 0.7% | 90.1% | 68.8% |
| Having suspended driver's licenses | 1 | 0.7% | 90.8% | 70.8% |
| Failure to provide medical treatment | 1 | 0.7% | 91.4% | 72.9% |
| Perjury | 1 | 0.7% | 92.1% | 75.0% |
| Failure to mirandize | 1 | 0.7% | 92.8% | 77.1% |
| Failure to pursue case | 1 | 0.7% | 93.4% | 79.2% |
| Violation of department rules | 1 | 0.7% | 94.1% | 81.3% |
| Disrespect towards supervisor | 1 | 0.7% | 94.7% | 83.3% |
| Insubordination | 1 | 0.7% | 95.4% | 85.4% |
| Refusal to obey order | 1 | 0.7% | 96.1% | 87.5% |
| Unjustified physical and verbal threats | 1 | 0.7% | 96.7% | 89.6% |
| Retaliation | 1 | 0.7% | 97.4% | 91.7% |
| Falsifying birthdate on driver's license | 1 | 0.7% | 98.0% | 93.8% |
| Failure to secure property | 1 | 0.7% | 98.7% | 95.8% |
| Failure to appear for CR investigation | 1 | 0.7% | 99.3% | 97.9% |

---

[74] The unit of analysis is complaints, filtered by defendant officers.

**Table 12**
*Pareto Analysis of Complaints[74] Involving Defendant Officers*

| Complaint | n | % | Cumulative % | Cumulative % of Complaints |
|---|---|---|---|---|
| Unlawful eavesdropping on fellow officer | 1 | 0.7% | 100.0% | 100.0% |
| **Total** | **152** | | | |
| **Complaint Categories** | **48** | | | |

The defendant officers demonstrated a clear pattern of complaints arising over the analysis period, most of which dealt with a physical confrontation (e.g., assault, unlawful detention, unlawful arrest), actions that affect legitimacy and community perception (demeanor, verbal abuse, threats), Fourth Amendment violations (unlawful entry, unlawful arrest, unlawful detention, unlawful search) and truthfulness (falsifying evidence). The data have the same implication for supervision and management as discussed above.

b. **Officer Paulnitsky and Officer Guevara**. Of the defendant officers in the instant case, Officers Paulnitsky and Guevara compiled complaint histories that were more pronounced than the other officers with clearly identifiable patterns.[75] From 1986 to 2004, Officer Guevara compiled 39 complaints from 21 incidents. More than one-third of Officer Guevara's complaints were for assault (33.3%) over half of his complaints (51.3%) derive from 19% of the complaint categories (indicated by the shaded cells of the table). Although assault is a serious complaint that should be a priority for the CPD to control, failure to identify as an officer and falsifying evidence implicate candor and integrity. Falsifying evidence, in particular, can potentially affect his ability to serve as a police officer (e.g., Brady violation) and has the potential to impair the prosecution of a case. Officer Guevara had one (1) external complaint sustained for assault.

---

[75] Except for Officers Guevara and Paulnitsky, definable complaint patterns did not emerge for the other defendant officers.

**Table 13**
*Officer Guevara Complaint Analysis*

| Complaint Category | n | % | Cumulative % | Cumulative % of Complaint Categories |
|---|---|---|---|---|
| Assault | 13 | 33.3% | 33.3% | 4.8% |
| Falsifying evidence | 3 | 7.7% | 41.0% | 9.5% |
| Failure to identify as officer | 2 | 5.1% | 46.2% | 14.3% |
| Verbal abuse | 2 | 5.1% | 51.3% | 19.0% |
| Gun-pointing | 2 | 5.1% | 56.4% | 23.8% |
| Unlawful arrest | 2 | 5.1% | 61.5% | 28.6% |
| Failure to fill out battery report | 1 | 2.6% | 64.1% | 33.3% |
| Disobedience of an order | 1 | 2.6% | 66.7% | 38.1% |
| Unlawful search | 1 | 2.6% | 69.2% | 42.9% |
| Harassment | 1 | 2.6% | 71.8% | 47.6% |
| Reckless driving | 1 | 2.6% | 74.4% | 52.4% |
| Intoxication | 1 | 2.6% | 76.9% | 57.1% |
| Having suspended driver's licenses | 1 | 2.6% | 79.5% | 61.9% |
| Failure to provide medical treatment | 1 | 2.6% | 82.1% | 66.7% |
| Insubordination | 1 | 2.6% | 84.6% | 71.4% |
| Unjustified Physical and Verbal Threats | 1 | 2.6% | 87.2% | 76.2% |
| Refusal to Obey Order | 1 | 2.6% | 89.7% | 81.0% |
| Failure to render aid | 1 | 2.6% | 92.3% | 85.7% |
| Unlawful detention | 1 | 2.6% | 94.9% | 90.5% |
| Threats | 1 | 2.6% | 97.4% | 95.2% |
| Falsifying birthdate on driver's license | 1 | 2.6% | 100.0% | 100.0% |
| **Total** | **39** | **100.0%** | | |

Sergeant Epplen testified at deposition that he never had any concerns about Officer Guevara's performance as a detective, or about his investigative methods or about whether his conduct failed to comport with the policies of the Department. Sergeant Epplen scored his performance a B.[76] However, from 1986 to 2004, Officer Guevara accumulated 36 complaints from 20 incidents;[77] the specific years were 1986, 1989, 1991, 1992, 1993, 1995, 1996, 1997, 1998, 1999, 2001, 2002, and 2004. The complaints included assault, failure to fill out

---

[76] Epplen deposition, 177:13-24; 178: 1-15; 179: 2.
[77] CR#s 152612, 192902, 168160, 304802, 182519, 195857, 205257, 217624, 263553, 220046, 223928, 236739, 266681, 255701, 248946, 251502, 256148, 270916, 283321, and 297534.

battery report, disobedience of an order, unlawful search, failure to identify as officer, unlawful arrest, verbal abuse, harassment, reckless driving, gun-pointing, intoxication, falsifying evidence, having suspended driver's license, failure to provide medical treatment, insubordination, unjustified physical and verbal threats, refusal to obey order, failure to render aid, unlawful detention, threats and falsifying birthdate on driver's license. It is difficult if not impossible to credit Sergeant Epplen that he was not aware of any performance deficiencies from Officer Guevara given his complaint history. If I credit Sergeant Epplen that he never observed any performance problems, then this is evidence that no one from CPD notified Sergeant Epplen that Officer Guevara was receiving complaints that required his intervention.[78] Sergeant Epplen also testified at deposition that he was responsible for conducting performance evaluations.[79] There is no evidence in discovery that Sergeant Epplen submitted any performance evaluations for Officer Guevara, or any of the defendant officers in the instant case.[80]

Officer Paulnisky's complaint history was even more pronounced than Officer Guevara. Between 1986 and 2004, Officer Paulnitsky compiled 76 complaints from 42 incidents. His complaint profile is similar to Officer Guevara, where assault is a leading complaint category (15.8%) along with threats (15.8%). Approximately 58% (57.9%) of his complaints derive from about 20% (20.7%) of the complaint categories (indicated by the shaded cells of the table). Although assault is a serious complaint that should be a priority for the CPD to control, unlawful arrest and coercing a confession implicate candor and integrity.[81] Both types of complaints can potentially affect his ability to serve as a

---

[78] Lieutenant Flores testified at deposition that Internal Affairs or OPS would notify the commanding officer of a specific division that an officer under his or her command had a pattern of complaints emerging (Flores deposition, 118:11-25; 119: 1-20).
[79] Epplen deposition, 174: 5-8.
[80] Sergeant Epplen testified at deposition that he could not recall conducting any performance evaluations for Officer Guevara (Epplen deposition, 175: 8-16) or any of the defendant officers (Epplen deposition, 176: 19-25). This is not consistent with CPD DSO 89-26, Performance Ratings, Sworn Members (December 30, 1989) (Bates 49044-49054). Sergeant Epplen did undergo the "Supervisors Management Training Program" on October 4, 1994.
[81] Officer Paulnitsky was the subject of an investigation for submitting a false report (CR# 237040). The investigation found that Officer Paulnitsky "…submitted his response to the allegation and stated that he submitted a report that *contained erroneous information*…" (emphasis mine) (see Bates 4018). The investigator found: "After reviewing the aforementioned information the reporting sergeant concludes that there is not sufficient evidence to indicate that

police officer (e.g., Brady violation) and have the potential to impair the prosecution of a case. Officer Paulnitsky had one (1) external complaint sustained for failure to return property.

**Table 14**

*Officer Paulnitsky Complaint Analysis*

| Complaint Category | n | % | Cumulative % | Cumulative % of Complaint Categories |
|---|---|---|---|---|
| Assault | 12 | 15.8% | 15.8% | 3.4% |
| Threats | 12 | 15.8% | 31.6% | 6.9% |
| Verbal abuse | 10 | 13.2% | 44.7% | 10.3% |
| Demeanor | 4 | 5.3% | 50.0% | 13.8% |
| Unlawful arrest | 4 | 5.3% | 55.3% | 17.2% |
| Coercing confession | 2 | 2.6% | 57.9% | 20.7% |
| Harassment | 2 | 2.6% | 60.5% | 24.1% |
| Destruction of property | 2 | 2.6% | 63.2% | 27.6% |
| Failure to identify as officer | 2 | 2.6% | 65.8% | 31.0% |
| Denial of attorney | 2 | 2.6% | 68.4% | 34.5% |
| Unlawful entry | 2 | 2.6% | 71.1% | 37.9% |
| Submitting false report | 2 | 2.6% | 73.7% | 41.4% |

detective Paulnitsky's *intent* was to submit a false official report but was human error" (emphasis mine) (Bates 4018). The allegation was not sustained. However, the investigator's finding was not correct. All police rules and regulations are strict liability offenses. Strict liability exists when an officer is liable for committing an act or omission regardless of their intent or mental state when they committed the act or omission; Department infractions do not require a mentally culpable state. There is no basis for the investigator to add the officer's intent as an element of the infraction and then prove the officer's intent before sustaining the rule violation. A "sustained" complaint means that the allegation is true by a preponderance of the evidence and that the conduct at issue was a violation of agency rules. The investigator's "not sustained" disposition was improper. Officer Paulnitsky admitted he submitted erroneous information in an official report ("The reporting detective was in error in reporting that he was scheduled to work Special Employment, 5 June 1997" Bates 4027), which is sufficient to sustain the allegation. The investigator sustained a second charge of "inattention to duty" in the same investigation (Bates 4019) and does not mention Officer Paulnitsky's intent for this infraction. This trivializes the investigation, since there was sufficient evidence that Officer Paulnitsky—by his own admission—did not submit a factual report. This is a matter of candor and implicates Officer Paulnitsky's ability to report the truth. It also implicates the investigator's integrity, understanding of Department rules and regulations and how to render a disposition in an internal affairs investigation. By failing to sustain the charge of submitting a false report, Officer Paulnitsky evaded becoming *Brady* eligible because of his dishonesty. Police departments have a duty to disclose exculpatory material that would have a reasonable probability of altering the results of a criminal trial, any material that could reasonably mitigate the sentencing of a defendant, and any material relevant to the credibility of government witnesses, including, but not limited to, police officers. Examples include: **1)** information regarding any mental or physical impairment of any governmental witness that would cast doubt on their ability to testify accurately and truthfully at trial (e.g., police officers); **2)** an official finding of misconduct that reflects on the witness's truthfulness, bias, or moral turpitude (e.g., a sustained finding during an internal affairs investigation); or **3)** a police officer's untruthfulness, dishonesty, bias, or agency records related to serious misconduct in conjunction with the officer's service as a police officer. There is a broad range of conduct that may be considered material to untruthfulness. Lying under oath, whether subject to a perjury conviction or not, and filing a false report are examples of material conduct. Lying raises questions about the officer's credibility and may be used by the defense in certain circumstances. The issue of covering up—such as what occurred in the instant case with the investigator's disposition—also reflects on the investigator's integrity. Lastly, concurring with the investigator's "not sustained" finding implicates the supervisory chain of command. The supervisors who endorsed the investigation knew, or should have known, that the "not sustained" finding was inappropriate and that proving "intent" was not an element of the offense. Instead, they each concurred with the investigator to accept a flawed investigation instead of correcting the error.

**Table 14**
*Officer Paulnitsky Complaint Analysis*

| Complaint Category | n | % | Cumulative % | Cumulative % of Complaint Categories |
|---|---|---|---|---|
| Inattention to duty | 2 | 2.6% | 76.3% | 44.8% |
| Failure to return property | 2 | 2.6% | 78.9% | 48.3% |
| Failure to investigate | 2 | 2.6% | 81.6% | 51.7% |
| Unlawful detention | 1 | 1.3% | 82.9% | 55.2% |
| Leaving minors alone | 1 | 1.3% | 84.2% | 58.6% |
| Unlawful search | 1 | 1.3% | 85.5% | 62.1% |
| Denying phone call | 1 | 1.3% | 86.8% | 65.5% |
| Unlawful confiscation of property | 1 | 1.3% | 88.2% | 69.0% |
| Refusal to bond | 1 | 1.3% | 89.5% | 72.4% |
| False arrest | 1 | 1.3% | 90.8% | 75.9% |
| Falsifying testimony and withholding evidence | 1 | 1.3% | 92.1% | 79.3% |
| Failure to pursue case | 1 | 1.3% | 93.4% | 82.8% |
| Disrespect towards supervisor | 1 | 1.3% | 94.7% | 86.2% |
| Retaliation | 1 | 1.3% | 96.1% | 89.7% |
| Failure to secure property | 1 | 1.3% | 97.4% | 93.1% |
| Failure to appear for CR investigation | 1 | 1.3% | 98.7% | 96.6% |
| Unlawful eavesdropping on fellow officer | 1 | 1.3% | 100.0% | 100.0% |
| **Total** | **76** | **100.0%** | | |

   c.  **Sustained Rates for Assault, Unlawful Arrest and False Arrest.** The CPD sustained one (1) complaint of assault against one defendant officer (CR# 223928, Officer Guevara[82]) and did not sustain any complaints of unlawful arrest or false arrest. The sustained rate for assault complaints was slightly higher for the non-defendant officers. The CPD sustained 3 complaints of assault (1.3%)[83] and did not sustain any complaints of unlawful arrest false arrest.

   j.  *Conclusion.* As early as 1983, the Chicago Police Department promulgated a policy defining the responsibilities of field sergeants,[84] which included evaluating subordinates' "activities on a day-to-day basis," "semi-annual performance evaluations," monitoring subordinate personnel who are "habitually lax and

---

[82] Officer Guevara was off duty when he struck his stepdaughter, the victim. The police were called and the other accused officers arrived. Those officers failed to adequately fill out a case report. A senior officer, Vasquez, failed to authorize Guevara's arrest for battery notwithstanding multiple witnesses having corroborated the victim's story.
[83] Three (3) complaints of 231 complaints recorded CR#s (156916, 171016 and 175513).
[84] CPD General Order 83-1, Responsibilities of Sergeants Assigned to Field Activities (effective January 8, 1983) (Bates 14167).

indifferent in the performance of their duties," monitoring "deficiencies of personnel." By 1988, the Chicago Police Department sought to automate the personnel monitoring process from a paper-based system to an electronic system[85] to augment human supervision. On June 29, 1994, Superintendent Matt L. Rodriguez announced the Department was about to implement the "Automated Early Warning System," an electronic personnel management system intended to identify at-risk officers (see Burke, 1995, p. 57).[86]

During the development phase of the automated system, the Department conducted a preliminary study of the disciplinary, demographic and performance records of 191 sworn personnel who were dismissed or resigned under investigation between 1988 and 1993.[87] Assistant Deputy Superintendent, Internal Affairs Division, Raymond Risley, and his colleagues, acknowledged that the only cost-effective way to identify "at risk" personnel in an agency as large as the Chicago Police Department was to collect and store data electronically (Burke, 1995, p. 56). Risley also acknowledged that the sheer size of the Chicago police force makes it "pretty much impossible for all at-risk individuals to be identified [by supervisors]…We consider it much more efficient and capable of identifying at-risk personnel sooner than command officers might be able to do. The old method just can't compete with it."[88] Superintendent Rodriguez indicated that the means by which the Department identified at-risk personnel was "seriously flawed;" Rodriguez noted that "the current program was seriously flawed because it (1) was so subjective; (2) it provided no standard patterns of unacceptable behavior; and (3) the program failed to identify 'at-risk' personnel before their behavior became unacceptable" (Burke, 1995, p. 57). After the Department completed its preliminary study, they then utilized the software for the 12,000 sworn personnel in the agency (Burke, 1995, p. 58).

---

[85] Burke, T.W. (June 1995). "Predicting Police Misconduct With a Neural Network Program." *Law Enforcement Technology, 22*(6):56-58, 68.
[86] The software was known as Brainmaker.©
[87] According to Chicago Police Internal Affairs Agent Robert Geinosky, as reported by Burke, p. 58.
[88] Dvorak, J. (no date). "Neural Network Red-Flags Police Officers With Potential For Misconduct" (retrieved on October 17, 2022 from https://calsci.com/Police.html).

It is evident the Chicago Police Department knew it had a responsibility to monitor its personnel for adverse behavior and that from at least 1988 to 1993, the upper ranks[89] of the Department were aware that their existing system for identifying and tracking problematic officers was flawed, so they turned to an electronic system ("Automated Early Warning System") to augment human supervision (those responsibilities defined by CPD policy and job specifications). The upper ranks of the CPD were aware that personnel were accruing complaints because they had the individual hard-copy complaints that they used to populate the automated system (Brainmaker) during development, but they did not necessarily identify and monitor those officers. In fact, Lieutenant Flores did not provide any evidence at deposition to support CPD that from 1987 to 1990 the Department promulgated policies or practices that were intended to analyze the prevalence of misconduct by its officers, identify personnel deficiencies, shortcomings, or other problems, or prevent misconduct.[90] Lieutenant Flores also testified at deposition that during this same time period at the CPD, aside from someone noticing that an employee was accruing Internal Affairs complaints, or OPS complaints, there was no actual review process of the employee's complaint history to alert his or her supervisor that complaints were mounting.[91] Lieutenant Flores agreed that the process was "fairly informal"[92] and was not necessarily documented. Lieutenant Flores also testified at deposition that the complaint data were not reviewed periodically as part of a policy or practice to determine whether certain officers should be alerted about their adverse behavior.[93]

It was evident the Chicago Police Department knew the "Automated Early Warning System" would enable supervisors to: **1)** get control of problem officers they did not see often due to shift changes; **2)** alleviate the problem of those officers

---

[89] The upper-ranking personnel include Superintendent Matt Rodriguez and Assistant Deputy Superintendent, Internal Affairs Division, Raymond Risley.
[90] Flores deposition, 103:7-25; 104:1. Although the CPD promulgated General Order 83-3, Personnel Concerns on March 9, 1983, he did not present any evidence that the policy was implemented as intended.
[91] Flores deposition, 123:10-23.
[92] Flores deposition, 123:24-25; 121:24-25; 122:1-3; 123:23-25; 124:1-11. The CPD General Order for Personnel Concerns (83-3, March 9, 1983), indicates "The purpose of the Behavioral Alert System is to…standardize a system for *documenting* and maintaining records of corrective action taken" (Bates 48433) (emphasis mine). The fact that CPD promulgated a formal policy and the attendant language indicates a formal monitoring process. Lieutenant Flores' deposition testimony indicates the Personnel Concerns program was not implemented as formally as intended.
[93] Flores deposition, 124: 21-25; 125:1-25; 126:1-17.

who frequently requested transfers to cover their poor performance; and **3)** guard against supervisors who would cover for their subordinates (see Burke, 1995, p. 57). This means the CPD was aware that at least a certain proportion of supervisors were covering for poorly performing officers, which is contrary to CPD policy.[94] However, despite is initial success, the Department terminated the automated system's use based on the Union's objections and the data "went missing."[95] The "Automated Early Warning System" was not intended to supplant human supervision; it was intended to augment supervision, particularly sergeants and commanders who interact with officers most frequently. It is difficult if not impossible to credit the Chicago Police Department that they were not aware the defendant officers were accruing complaints in the late 1980s and into the mid-1990s, particularly since the officers were receiving complaints during the period when the "Automated Early Warning System" was being developed.

As an aspect of risk management, which is a fundamental responsibility of police management, command staff members and the Superintendent of Police have an obligation to monitor their employees' behavior (as promulgated by CPD General Orders and job specifications referenced throughout this report). Although an early warning system can reaffirm accountability standards, it cannot enforce them. Therefore, holding members accountable for their actions will always depend on leadership engagement and commitment. Regardless of the type of early warning system a police department implements, all supervisors must play an active role in ensuring all officers remain productive and professional. The internal affairs program must, as part of its function, provide the command staff and the Superintendent the ability to track complaints lodged against individual officers and identify those officers with repeated complaints. The first step toward remedial action is to identify the officer and the type of complaint, then initiate and ensure corrective action to

---

[94] These supervisory practice are not consistent with: **1)** Chicago Police Department General Order 86-4, District Commanders (effective June 10, 1986), where District Commanders are responsible for subordinates' conduct, including correcting negative performance; and **2)** Chicago Police Department General Order 82-14, where the unit commanding officer will: determine whether the evidence indicates any culpability of supervisory personnel for the violation. (The failure of supervisory personnel at any level of command to hold subordinates accountable requires disciplinary action.) If culpability is apparent, a Complaint Register number will be obtained and a separate investigation will be conducted" (Bates 48414).
[95] The United States Department of Justice (DOJ) Civil Rights Division and United States Attorney's Office Northern District of Illinois, January 13, 2017, p. 117.

prevent the officer from engaging in behavior that violates the law or Department policy. The information that is developed from internal complaints should be used to disrupt patterns, practices or trends of inappropriate behavior, including revising policies that may be outdated or contain outmoded practices. There is no evidence in discovery that any of these corrective measures occurred.

When complaints accrue, regardless of the investigation's findings, patterns will reveal the need for training, supervision or policy changes. Every law enforcement agency must establish a protocol for tracking employee behavior and reviewing all internal affairs complaints made against its employees (sworn and civilian), regardless of outcome, for evidence of a pattern or practice of inappropriate or unconstitutional conduct. If the review points toward an emerging pattern, practice or trend of inappropriate behavior or misconduct, then the internal affairs investigator must notify and consult with the appropriate supervisor. The investigator and the supervisor must review the information from the investigation and the early warning system along with any other relevant information from department records for the purpose of initiating a course of supervisory action designed to interrupt the emerging pattern, practice or trend; the purpose of an early warning system is to detect patterns and trends before the conduct escalates or is repeated.

Notwithstanding the accumulated complaint histories of the defendant officers, there is no evidence in discovery that the CPD monitored, or tracked the officers for patterns of complaints, or initiated and ensured any corrective action. The CPD maintained a bifurcated system for personnel complaint investigations—the Office of Professional Standards and the Internal Affairs Division. This division of labor enabled the Department to diffuse accountability between OPS and Internal Affairs. There is no evidence in discovery that OPS and Internal Affairs communicated, shared records, archived records[96] or coordinated their investigations to identify patterns or problematic officers and ensure accountability. The job specifications for CPD supervisory personnel vest the responsibility for oversight and monitoring subordinate personnel with supervisory personnel. For example,

---

[96] See Flores deposition, 144:13-17; 147: 8-17 for his account of archiving the CPD's disciplinary records involving officers.

District Commanders are responsible for their subordinates' conduct (e.g., see the responsibilities described by CPD General Order 86-4, District Commanders, effective June 10, 1986). Enforcing General Order 86-4 is the Superintendent's responsibility, which is predicated on his or her dedication and adherence to the principle of accountability. If the Superintendent did not enforce a policy of holding commanders accountable when complaint patterns emerged, then no other unit within the Department was responsible for carrying out that important function. Merely investigating complaints without any follow–up action is tantamount to managerial indifference. There is no evidence in discovery the Superintendent held any commanders responsible for their subordinates' conduct consistent with General Order 86-4 or 83-1.[97]

Lieutenant Flores testified at deposition that he was not aware when the first automated early warning system existed within the Chicago Police Department.[98] He also did not provide any evidence to support that the CPD examined any disciplinary or performance records (hard-copy paper or electronic format) of sworn personnel from 1988 to 1990 or the early '90s[99] to ensure patterns were disrupted and personnel received treatment. Lieutenant Flores also did not offer any evidence during his deposition supporting the CPD's policies and practices related to identifying, investigating or preventing employees' policy failures. Lieutenant Flores testified that apart from having an internal affairs division that investigated personnel complaints, the CPD did not make any other efforts to identify, investigate, or prevent failures by CPD employees connected to their compliance with the agency's policies or procedures.[100] The CPD CR files support his testimony and also do not provide any supporting evidence of preventing employee misconduct.[101]

---

[97] CPD General Order 83-1, Responsibilities of Sergeants Assigned to Field Duties (January 8, 1983). Also, 83-1 "does not relieve other superior officers of responsibility in the same areas."
[98] Flores deposition, 132:23-25; 133:2-3.
[99] Flores deposition, 133:4-18.
[100] Flores deposition, 70:17-25. The CPD tasks supervisory personnel with the responsibility to identify, investigate, prevent and correct personnel deficiencies. Lieutenant Flores testified to this practice at deposition (Flores deposition, 94:23-25; 95:1-20).
[101] If the CPD was monitoring employee behavior for misconduct and taking corrective action based on personnel complaint data, then the CR files would contain data from the early warning system about specific at-risk personnel, memoranda to- and from- commanding officers about the at-risk personnel and the corrective action that was taken, and implementation orders with suspense dates for corrective action to be completed. There is no such data in discovery.

A clear pattern of complaints emerged in the Chicago Police Department between 1980 and 2008. As the Pareto Analysis shows, the CPD could have and should have directed its preventive effort where the majority of complaints emanated from, which would have given them the ability to prioritize those issues and develop a personnel improvement plan. There is no evidence the CPD developed any personnel plans to address chronic complaints particularly those involving a physical confrontation between the officer and the victim/complainant such as verbal abuse, coercing a confession, demeanor and assault. Addressing complaints was left to the discretion of the individual officers' commanding officer and there is no evidence the commanding officers received any information or took any corrective action. There is also no evidence the Superintendent directed any commanding officers to take any corrective or that the Superintendent held any commanding officers responsible for their subordinates' repeated adverse behavior. There is no evidence in discovery of any managerial action taken by the CPD to mitigate personnel complaints.

Empirical analysis of personnel complaint data provides feedback and evidence for police administrators regarding whether the internal investigation process works to promote fairness and equity for both citizens and the accused officers. In the absence of such evidence, police administrators do not have a mechanism to determine whether an internal investigation's outcome is reliable. The failure to collect, analyze and act on the available personnel complaint data in the Chicago Police Department is tantamount to managerial indifference, including an abrogation of the Superintendent's responsibility to direct the organization.[102] The failure to act also implicates the supervisory chain of command at the CPD during the time period in question. Collectively, the evidence suggests a combination of a lack of institutionalized oversight, willful blindness, and the abrogation of responsibility at each level of supervision.■

---

[102] See City of Chicago Superintendent of Police Class Title, Code 9957, Police Job Specifications (retrieved on October 16, 2022 from https://www.chicago.gov/city/en/depts/dhr/supp_info/police_job_specifications.html).

# EXHIBITS

| Exhibits | | | |
|---|---|---|---|
| **Category** | **Documents** | **Date or Identifying Number** | **Pages** |
| **Depositions** | | | |
| | Deposition of Lieutenant Robert Flores | 17-Oct-22 | 166 |
| | Deposition of Lieutenant John Foster | 18-Oct-22 | 230 |
| | Deposition of Fernando Montilla | 27-Aug-19 | 430 |
| | Deposition of Lee Epplen | 28-Aug-19 | 403 |
| | Deposition of Edward Mingey | 11-Sep-19 | 429 |
| | Deposition of Roland Paulnitsky | 17-Sep-19 | 392 |
| | Deposition of Reynaldo Guevara | 25-Oct-19 | 408 |
| **CR Files** | | | |
| | CR 147769 | 17-Jan-86 Bates RFC Maysonet 010022-010206 | 185 |
| | CR 152902 | 7-May-87 010207-010265 | 59 |
| | CR 155382 | 9-May-88 010266-010352 | 87 |
| | CR 155614 | 24-Apr-87 012489-012511 | 23 |
| | CR 155619 | 28-Dec-87 012512-012661 | 150 |
| | CR 155714 | 13-May-87 010353-010383 | 31 |
| | CR 155876 | 4-Jun-87 010384-010467 | 84 |
| | CR 156243 | 3-Jun-87 010468-010497 | 30 |
| | CR 156444 | 18-Jun-87 010498-010523 | 26 |
| | CR 156749 | 28-Apr-88 010524-010560 | 37 |
| | CR 156916 | 5-Nov-87 010561-010621 | 61 |
| | CR 157059 | 5-Aug-87 010622-010667 | 46 |
| | CR 157143 | 11-Sep-87 010668-010707 | 40 |

| | | |
|---|---|---|
| | 14-Sep-87 | |
| CR 157556 | 010708-010744 | 37 |
| | 11-Mar-88 | |
| CR 157592 | 010745-010822 | 78 |
| | 26-Feb-88 | |
| CR 157627 | 010823-010846 | 24 |
| | 29-Dec-87 | |
| CR 158211 | 010847-010919 | 73 |
| | 29-Dec-87 | |
| CR 158279 | 010920-010936 | 17 |
| | 30-Nov-87 | |
| CR 158349 | 010937-010978 | 42 |
| | 1-Nov-87 | |
| CR 158534 | 010979-010993 | 15 |
| | 26-Feb-88 | |
| CR 159703 | 012662-012706 | 45 |
| | 15-Apr-88 | |
| CR 160370 | 010994-011009 | 16 |
| | 16-Jul-88 | |
| CR 160688 | 011010-011033 | 24 |
| | 3-Jun-88 | |
| CR 161290 | 012707-012763 | 57 |
| | 7-Jul-88 | |
| CR 162687 | 011034-011082 | 49 |
| | 3-Mar-89 | |
| CR 165516 | 012764-012919 | 156 |
| | 14-Mar-89 | |
| CR 165563 | 011083-011120 | 38 |
| | 15-Mar-89 | |
| CR 166878 | 011121-011146 | 26 |
| | 12-Apr-89 | |
| CR 167206 | 011147-011180 | 34 |
| | 5-Apr-89 | |
| CR 167252 | 011181-011196 | 16 |
| | 24-Aug-89 | |
| CR 168160 | 011197-011239 | 43 |
| | 22-Jun-89 | |
| CR 168290 | 011240-011332 | 93 |
| | 22-Aug-89 | |
| CR 168690 | 011333-011374 | 42 |
| | 30-Oct-89 | |
| CR 168914 | 011375-011446 | 72 |
| | 13-Sep-89 | |
| CR 169532 | 011447-011519 | 73 |
| | 9-Aug-89 | |
| CR 170021 | 011520-011531 | 12 |
| | 18-Oct-89 | |
| CR 170373 | 011532-011557 | 26 |
| | 9-Jan-90 | |
| CR 170700 | 012920-012980 | 61 |
| | 7-Feb-90 | |
| CR 170706 | 012981-013014 | 34 |

|              |                | |
|--------------|----------------|------|
|              | 14-Jun-90      |      |
| CR 171016    | 013015-013334  | 320  |
|              | 30-Oct-90      |      |
| CR 171720    | 011558-011579  | 22   |
|              | 16-Nov-89      |      |
| CR 171827    | 013335-013357  | 23   |
|              | 24-Aug-90      |      |
| CR 171841    | 011580-011795  | 216  |
|              | 14-Nov-90      |      |
| CR 171943    | 013358-013381  | 24   |
|              | 24-Jan-90      |      |
| CR 172221    | 013382-013400  | 19   |
|              | 29-Mar-90      |      |
| CR 172611    | 013401-013458  | 58   |
|              | 26-May-90      |      |
| CR 172748    | 011796-011833  | 38   |
|              | 31-Jan-90      |      |
| CR 172876    | 013459-013560  | 102  |
|              | 1-Feb-90       |      |
| CR 173098    | 013561-013604  | 44   |
|              | 13-Mar-90      |      |
| CR 173369    | 011834-011869  | 36   |
|              | 1-Mar-90       |      |
| CR 173446    | 011870-011884  | 15   |
|              | 16-Mar-90      |      |
| CR 173479    | 011865-011919  | 35   |
|              | April 19. 1990 |      |
| CR 174337    | 011920-011968  | 49   |
|              | 23-May-90      |      |
| CR 174770    | 011969-011998  | 30   |
|              | 17-May-90      |      |
| CR 174866    | 013605-013670  | 66   |
|              | 18-Jul-90      |      |
| CR 175513    | 011999-012095  | 97   |
|              | 18-Sep-90      |      |
| CR 177248    | 012096-012159  | 64   |
|              | 29-Aug-90      |      |
| CR 178230    | 012160-012172  | 13   |
|              | 22-Oct-90      |      |
| CR 178876    | 012173-012199  | 27   |
|              | 4-Oct-90       |      |
| CR 179504    | 013671-013683  | 13   |

|  |  |  |  |
|---|---|---|---|
|  |  | 17-Nov-90 012200-012244 |  |
|  | CR 179882 |  | 45 |
|  |  | 31-Jan-91 013684-013822 |  |
|  | CR 179902 |  | 139 |
|  |  | 31-Dec-90 012245-012297 |  |
|  | CR 180229 |  | 53 |
|  |  | 20-Dec-90 013823-013859 |  |
|  | CR 180271 |  | 37 |
|  |  | 13-Dec-90 013860-013908 |  |
|  | CR 180543 |  | 49 |
|  |  | 29-Jan-91 013909-013956 |  |
|  | CR 180550 |  | 48 |
|  |  | 13-Dec-90 012298-012313 |  |
|  | CR 180588 |  | 16 |
|  |  | 28-Dec-90 012314-012347 |  |
|  | CR 180716 |  | 34 |
|  |  | 11-Dec-90 012348-012375 |  |
|  | CR 180853 |  | 28 |
|  |  | 21-Dec-90 013957-014002 |  |
|  | CR 180866 |  | 46 |
|  |  | 3-Feb-91 014003-014036 |  |
|  | CR 181250 |  | 34 |
|  |  | 9-May-91 014037-014125 |  |
|  | CR 181515 |  | 89 |
|  |  | 1-Feb-91 014126-014147 |  |
|  | CR 181809 |  | 22 |
|  |  | 23-Jun-94 012376-012488 |  |
|  | CR 205257 |  | 113 |

**Guevara CR Files**

|  |  |  |  |
|---|---|---|---|
|  |  | 3-Dec-86 001889-001926 |  |
|  | CR 152612 |  | 38 |
|  |  | 7-May-87 001927-001989 |  |
|  | CR 152902 |  | 63 |
|  |  | 24-Aug-89 002070-002112 |  |
|  | CR 168160 |  | 43 |

| | | |
|---|---|---|
| | 1-Mar-90 002881-002892 | |
| CR 182519 | | 12 |
| | 22-Oct-92 003066-003079 | |
| CR 195857 | | 14 |
| | 23-Jun-94 003124-003236 | |
| CR 205257 | | 113 |
| | 20-Oct-95 003393-003428 | |
| CR 217624 | | 36 |
| | 20-Jun-96 003429-003453 | |
| CR 220046 | | 25 |
| | 21-Mar-96 003503-003631 | |
| CR 223928 | | 129 |
| | 12-Aug-96 003676-003776 | |
| CR 226211 | | 101 |
| | 17-Jun-97 003970-004013 | |
| CR 236739 | | 44 |
| | 30-Nov-98 004535-004618 | |
| CR 248946 | | 84 |
| | 16-Oct-00 004619-004648 | |
| CR 251502 | | 30 |
| | 5-Nov-99 004695-004754 | |
| CR 255701 | | 60 |
| | 15-Sep-00 004916-005080 | |
| CR 256148 | | 165 |
| | 13-Aug-00 005081-005093 | |
| CR 263553 | | 13 |
| | 24-Oct-00 005094-005390 | |
| CR 266681 | | 297 |
| | 21-Feb-00 005400-005413 | |
| CR 270916 | | 14 |
| | 1-Dec-02 005548-005567 | |
| CR 283321 | | 20 |
| | 6-Dec-04 005973-006009 | |
| CR 297534 | | 37 |
| | 7-Jul-05 006068-006093 | |
| CR 304802 | | 26 |

**Montilla CR Files**

| | 5-Jan-89 002038-002069 | |
|---|---|---|
| CR 163692 | | 32 |
| | 23-Aug-90 002677-002688 | |
| CR 178050 | | 12 |
| | 28-Dec-90 002689-002854 | |
| CR 179835 | | 166 |
| | 23-Oct-94 003371-003382 | |
| CR 213103 | | 12 |
| | 24-Mar-96 003632-003675 | |
| CR 224987 | | 44 |
| | 10-Dec-97 004045-004132 | |
| CR 237167 | | 88 |
| | 30-Dec-97 004236-004355 | |
| CR 240708 | | 120 |

**Other CR Files**

| | 7-Dec-82 001718-001807 | |
|---|---|---|
| CR 123850 | | 90 |
| | 27-Sep-85 001808-001858 | |
| CR 146819 | | 51 |
| | 26-Feb-88 002014-002037 | |
| CR 157627 | | 24 |
| | 21-Aug-90 002645-002676 | |
| CR 177115 | | 32 |
| | 3-May-96 003454-003502 | |
| CR 222987 | | 49 |
| | 16-Feb-97 003777-003792 | |
| CR 233861 | | 16 |
| | 22-Apr-98 004407-004481 | |
| CR 243485 | | 75 |
| | 27-Sep-99 004755-004915 | |
| CR 255984 | | 161 |
| | 30-May-01 005425-005434 | |
| CR 271697 | | 10 |
| | 22-May-02 005503-005547 | |
| CR 280774 | | 45 |

|  |  |  |
|---|---|---|
|  | 22-Oct-03 |  |
|  | 005611-005906 |  |
| CR 289081 |  | 296 |

**Paulnitsky CR Files**

|  |  |  |
|---|---|---|
|  | 15-Jan-87 |  |
|  | 001859-001888 |  |
| CR 152507 |  | 30 |
|  | 20-Apr-87 |  |
|  | 001990-002013 |  |
| CR 155500 |  | 24 |
|  | 23-Feb-90 |  |
|  | 002113-002217 |  |
| CR 170855 |  | 105 |
|  | 28-Sep-89 |  |
|  | 002218-002253 |  |
| CR 171220 |  | 36 |
|  | 24-Aug-90 |  |
|  | 002254-002523 |  |
| CR 171841 |  | 270 |
|  | 12-Mar-90 |  |
|  | 002524-002644 |  |
| CR 172123 |  | 121 |
|  | 6-Nov-90 |  |
|  | 002855-002880 |  |
| CR 180037 |  | 26 |
|  | 4-Nov-91 |  |
|  | 002893-002985 |  |
| CR 187289 |  | 93 |
|  | 7-Dec-91 |  |
|  | 002986-002998 |  |
| CR 188930 |  | 13 |
|  | 11-Jan-93 |  |
|  | 002999-003065 |  |
| CR 195435 |  | 67 |
|  | 21-Jul-93 |  |
|  | 003080-003123 |  |
| CR 200441 |  | 44 |
|  | 30-Jul-94 |  |
|  | 003237-003323 |  |
| CR 209374 |  | 87 |
|  | 21-Dec-94 |  |
|  | 003324-003370 |  |
| CR 212230 |  | 47 |
|  | 7-Jan-95 |  |
|  | 003383-003392 |  |
| CR 213950 |  | 10 |
|  | 12-Aug-96 |  |
|  | 003676-003776 |  |
| CR 226211 |  | 101 |
|  | 23-May-97 |  |
|  | 003793-003903 |  |
| CR 235638 |  | 111 |
| CR 235639 | 25-Apr-97 | 66 |

| | | |
|---|---|---|
| | 003904-003969 | |
| | 22-May-97 | |
| | 004014-004044 | |
| CR 237040 | | 31 |
| | 4-Nov-97 | |
| | 004133-004235 | |
| CR 239988 | | 103 |
| | 15-Oct-97 | |
| | 004356-004377 | |
| CR 240762 | | 22 |
| | 12-Feb-98 | |
| | 004378-004406 | |
| CR 243205 | | 29 |
| | 11-Sep-98 | |
| | 004482-004534 | |
| CR 247214 | | 53 |
| | 11-Jul-99 | |
| | 004649-004694 | |
| CR 253198 | | 46 |
| | 6-Mar-01 | |
| | 005391-005399 | |
| CR 268910 | | 9 |
| | 22-May-01 | |
| | 005414-005424 | |
| CR 271597 | | 11 |
| | 11-Jul-02 | |
| | 005435-005474 | |
| CR 273466 | | 40 |
| | 24-Jun-02 | |
| | 005475-005502 | |
| CR 277401 | | 28 |
| | 9-Apr-03 | |
| | 005568-005591 | |
| CR 284331 | | 24 |
| | 10-Apr-03 | |
| | 005592-005601 | |
| CR 288729 | | 19 |
| | 15-Jul-03 | |
| | 005907-005954 | |
| CR 290777 | | 48 |
| | 7-Feb-04 | |
| | 005955-005972 | |
| CR 295703 | | 18 |
| | 19-May-04 | |
| | 006010-006042 | |
| CR 298042 | | 33 |
| | 14-Dec-04 | |
| | 006043-006067 | |
| CR 302449 | | 25 |
| | 10-Jul-05 | |
| | 006094-006117 | |
| CR 305680 | | 24 |
| | 18-Aug-05 | |
| CR 3060442 | 006118-006128 | 11 |

|  |  |  |
|---|---|---|
|  | 18-Jan-07 006129-006192 |  |
| CR 308007 |  | 64 |
|  | 5-Jan-06 006193-006197 |  |
| CR 310073 |  | 5 |
|  | 15-May-06 006198-006209 |  |
| CR 312992 |  | 10 |
|  | 25-Apr-07 006208-006230 |  |
| CR 1004284 |  | 23 |
|  | 27-Feb-09 006231-006404 |  |
| CR 1006209 |  | 174 |
|  | 31-Mar-08 006405-006447 |  |
| CR 1013474 |  | 43 |
|  | 24-Jun-08 006448-006515 |  |
| CR 1013854 |  | 68 |
|  | 20-Mar-19 000988-001016 |  |
| Complaint Logs History |  | 29 |

**Directives**

|  |  |  |
|---|---|---|
|  | 12-Dec-80 14150 |  |
| General Order 80-18 |  | 1 |
|  | 11-Sep-82 014162-014166 |  |
| Department Special Order 82-25 |  | 5 |
|  | 8-Jan-83 014167-014168 |  |
| General Order 83-1 |  | 2 |
|  | 11-Jun-86 014198-014199 |  |
| General Order 86-4 |  | 2 |
|  | 29-Sep-86 14206 |  |
| General Order 86-8 |  | 1 |
|  | 1-Mar-89 014290-014300 |  |
| General Order 89-3 |  | 11 |
|  | 30-Dec-89 014309-014312 |  |
| Department Special Order 89-26 |  | 4 |
|  | 4-Jul-92 014357-014370 |  |
| General Order 92-1 |  | 14 |
|  | 7-Jul-93 14456 |  |
| Department Notice 93-2 |  | 1 |
| General Order 93-3 | 15-Jul-93 | 80 |

| | | |
|---|---|---|
| | 014457-01536 | |
| General Order 82-14 | October 15, 1982 | 38 |
| | 14-Sep-79 | |
| | 014148-014149 | |
| Department Special Order 79-30 | | 2 |
| | 19-Sep-82 | |
| | 014151-014161 | |
| General Order 82-13 | | 11 |
| General Order 83-3 | March 9, 1983 | 4 |
| | 9-Sep-83 | |
| | 014169-014172 | |
| General Order 83-13 | | 4 |
| | 6-Dec-83 | |
| | 014173-014179 | |
| General Order 83-14 | | 7 |
| | 4-Nov-83 | |
| | 014180-014182 | |
| Department Special Order 83-21 | | 3 |
| | 6-Jun-84 | |
| | 014183-014184 | |
| General Order 84-3 | | 2 |
| | 2-Nov-84 | |
| | 014185-014188 | |
| General Order (Amendment) 84-7 | | 4 |
| | 2-Nov-84 | |
| | 014189-014190 | |
| General Order (Amendment) 84-7 | | 2 |
| | 6-Apr-84 | |
| | 014191-014192 | |
| Department Special Order 84-9 | | 2 |
| | 16-Oct-85 | |
| | 014193-014194 | |
| General Order 85-7 | | 2 |
| | 21-Feb-86 | |
| | 014195-014196 | |
| Department Special Order 86-3 | | 2 |
| | 22-Apr-86 | |
| General Order 86-3 | 14197 | 1 |
| | 22-Aug-86 | |
| | 014200-014205 | |
| General Order 86-6 | | 6 |
| | 24-Dec-86 | |
| | 14207 | |
| Department Special Order 86-15 | | 1 |
| | April 11, 1987 | |
| | 014208-014209 | |
| General Order 87-1 | | 2 |
| | 28-Oct-87 | |
| | 014210-014211 | |
| General Order 87-6 | | 2 |
| | 31-Oct-87 | |
| | 014212-014216 | |
| General Order 87-7 | | 5 |
| Department Special Order 87-10 | 8-Sep-87 | 4 |

| | | |
|---|---|---|
| | 014217-014220 | |
| | 16-Oct-87 014221-014222 | |
| Department Special Order 87-13 | 30-Dec-87 | 2 |
| Department Special Order 87-20 | 14223 14-Aug-87 | 1 |
| Department Notice 87-43 | 14224 12-Feb-88 014225-014226 | 1 |
| Department Special Order 88-4 | 26-Mar-88 014227-014228 | 2 |
| Department Special Order 88-9 | 27-Apr-88 014229-014233 | 2 |
| General Order 88-11 | 25-May-88 014234-014238 | 5 |
| General Order 88-13 | 12-Aug-88 014239-014242 | 5 |
| General Order 88-15 (Amendment) | 30-Apr-92 014243-014250 | 4 |
| General Order 88-15 (Amendment) | 24-Sep-88 014251-014259 | 8 |
| General Order 88-18 | 28-Sep-88 014260-014262 | 9 |
| General Order 88-19 | 9-Dec-88 014263-014264 | 3 |
| Department Special Order 88-29 | 15-Dec-88 014265-014267 | 2 |
| Department Special Order 88-30 | 31-Jan-89 014268-014287 | 3 |
| General Order 89-1 | 5-Jan-89 014288-014289 | 20 |
| Department Special Order 89-2 | 21-Jan-89 14301 | 2 |
| Department Special Order 89-4 | 6-Sep-89 014302-014305 | 1 |
| General Order 89-9 | 24-May-89 14306 | 4 |
| Department Special Order 89-13 | | 1 |
| Department Special Order 89-25 | 20-Dec-89 | 2 |

| | | |
|---|---|---|
| | 014307-014308 | |
| | 9-Jan-90 | |
| | 14313 | |
| General Order 90-1 | | 1 |
| | 10-Feb-90 | |
| | 014314-014316 | |
| General Order 90-3 | | 3 |
| | 1-Nov-90 | |
| | 014317-014336 | |
| General Order 90-8 | | 20 |
| | 4-Jul-91 | |
| General Order 91-9 | 14337 | 1 |
| | 28-Sep-91 | |
| | 014338-014339 | |
| General Order 91-11 | | 2 |
| | 23-Jul-91 | |
| | 014340-014345 | |
| Department Special Order 91-16 | | 6 |
| | 6-Sep-91 | |
| | 14346 | |
| Department Special Order 91-20 | | 1 |
| | 12-Aug-91 | |
| | 014347-014356 | |
| Department Notice 91-46 | | 10 |
| | 8-Aug-92 | |
| | 014371-014374 | |
| General Order 92-4 | | 4 |
| | 9-Sep-92 | |
| | 014375-014421 | |
| General Order 92-5 | | 47 |
| | 24-Oct-92 | |
| | 014422-014424 | |
| General Order 92-6 | | 3 |
| | 29-Jul-92 | |
| | 014425-014433 | |
| Department Special Order 92-6 | | 9 |
| | 24-Jul-92 | |
| | 014434-014436 | |
| Department Special Order 92-7 | | 3 |
| | 7-Jan-93 | |
| | 14437 | |
| General Order 92-8 | | 1 |
| | 18-Nov-92 | |
| | 014438-014453 | |
| Department Special Order 92-14 | | 16 |
| | 11-Nov-92 | |
| | 014454-014455 | |
| Department Special Order 92-15 | | 2 |
| Various CPD Policies | Bates 48266 to 50166 | 1,900 |

**CPD Employee
Records**

| | | |
|---|---|---|
| Employee Training Record | 001017-1063 | 47 |
| Employee Record-Edward Mingey | 001064-1132 | 69 |
| Employee Record-Lee Epplen | 001133-1234 | 102 |
| Employee Record- Renaldo Guevara | 001235-1373 | 139 |
| Employee Record-Ernest Halvorsen | 001374-1515 | 142 |
| Employee Record-Fernando Montilla | 001516-1593 | 78 |
| Employee Record-Roland Paulnitsky | 001594-1677 | 84 |
| Complaint/Demand for Jury Trial | Civil Action No. 2018 CV 02342 Jose Juan Maysonet Jr. v Reynaldo Guevara et al | 56 |
| Brady/Giglio and Officer Integrity Power Point | | 56 |
| Notice or Rule 30(b)(6) Deposition City of Chicago | Civil Action No. 2018 CV 02342 22-Jul-22 | 3 |
| Complaint Category Tables Internal affairs Division CPD | 050214-050215 | 2 |
| | **Total** | **14,621** |

## ACKNOWLEDGEMENT

This report provides my opinion on police policy and practice based on the available information at this time. I presume the information provided to me is accurate and correct. If additional information becomes available at a later time, then I may submit a supplemental report. Depending on the new information, my opinion in this report may or may not change. My opinion is based upon a reasonable degree of professional certainty. My comments on the appropriateness and standards of care are professional opinions based upon on the facts of this specific case and should not be generalized to the wider policing community. The opinion I expressed does not constitute a recommendation for policy changes or other administrative action.


___/s/ *Jon M. Shane*___

**Jon M. Shane**

# Jon M. Shane

John Jay College of Criminal Justice
Department of Law, Police Science and Criminal Justice Administration
524 W. 59th Street
New York, NY 10019
jmsnpd@gmail.com
www.jmshane.com

## ACADEMIC QUALIFICATIONS

| | | | |
|---|---|---|---|
| 2008 | Ph.D. | Criminal Justice | School of Criminal Justice, Rutgers University, Newark, NJ |
| 2005 | MA | Criminal Justice | School of Criminal Justice, Rutgers University, Newark, NJ |
| 2002 | BS | Criminal Justice | School of Criminal Justice, Rutgers University, Newark, NJ |

## RESEARCH INTERESTS

Issues in police policy and practice; social disorganization theory; situational crime prevention; problem-oriented policing; secondary effects; violent crime; organizational accidents

## TEACHING POSITIONS AND INSTRUCTIONAL RESPONSIBILITIES

| | | | |
|---|---|---|---|
| 2020-Present | Professor | John Jay College of Criminal Justice | New York, NY |
| 2015-2017 | Director | New York City Police Department, Executive Master's Program | New York, NY |
| 2014-2020 | Associate Professor | John Jay College of Criminal Justice (tenured & promoted, September 2014) | New York, NY |
| 2011-2022 | Doctoral Faculty | CUNY Graduate Center, Ph.D. Program in Criminal Justice | New York, NY |
| 2009-2014 | Assistant Professor | John Jay College of Criminal Justice | New York, NY |
| 2005-2008 | Adjunct Lecturer | Rutgers University, Newark College of Arts and Sciences | Newark, NJ |
| 2005 | Adjunct Professor | Fairleigh Dickinson University-School of Administrative Science, Petrocelli College | Teaneck, NJ |

## HONORS, RECOGNITION AND AWARDS

| | | |
|---|---|---|
| Recognized as a widely cited scholar for "early onset" of influence[103] | Top 100 Cited Works 2010-2015 | Jan 2019 |
| The 2014 Academy of Criminal Justice Sciences Outstanding Mentor of the Year | Winner | Feb 21, 2014 |
| The 2012 Award for Outstanding Experimental Field Trial | Winner (research team member) | Nov 2012 |
| The 2011 American Society of Criminology Mentor of the Year | Winner | Aug 26, 2011 |
| The 2010 Emerald/European Foundation for Management Development (EFMD) Outstanding Doctoral Research Award (ODRA) | Highly Commended Award Winner | Jan 24, 2011 |
| Dean's List 2009-2010 | Certificate of appreciation for | Oct 28, 2010 |
| Dean's List 2008-2009 | graduate student mentorship | Oct 15, 2009 |

## COURSES TAUGHT

Advanced Issues in Policing (D)
Contemporary Problems in Community Policing (G)
Criminology (U)
Introduction to Criminal Justice (U)
Introduction to Law Enforcement (U)
Issues in Criminal Justice (Police & Corrections) (G)
Police and the Community (U)
Police Ethics (G)
Problem-Oriented Policing (G)
Research Design and Methods (G)
Using Computers in Social Research (statistics) (G)

---

[103] Graham, A., Pratt, T.C., Lee, H & Cullen, F. T. (2019). Contemporary classics? The early onset of influence of articles published in criminology and criminal justice journals, 2010-2015. *Journal of Criminal Justice Education, 30*(3), 348-375 (part of the top 4.1% of all articles published in 20 criminology and criminal justice journals from 2010 to 2015 [Organizational Stressors and Police Performance]. The articles in these journals represent an elite group of research…, p. 354).

D=Doctoral; G=Graduate; U=Undergraduate

## DEPOSITION AND TRIAL EXPERIENCE

| Event | Venue | Date | Case Number and Attorney |
|---|---|---|---|
| Deposition testimony (use of force; chemical munitions) | United States District Court, Western District of Missouri | October 12, 2022 | 4:21-CV-662-HFS (James Thompson, Esq.) |
| Trial testimony (adverse employment action; retaliation) | Superior Court of Washington For King County | September 29, 2022 | 20-2-09949-0-SEA (Sumeer Singla, Esq.) |
| Deposition testimony (general police policy and practice) | United States District Court For The Western District of Washington | August 11, 2022 | Case No.: 2:200-cv-00983-TSZ (Tyler Weaver Esq.) |
| Trial testimony (on-call overtime compensation) | State of Kentucky, Jefferson Circuit Court Division Seven (7)—Louisville, KY | July 22, 2021 | 16-CI-01500 (Ann Oldfather Esq.) |
| Deposition testimony (investigations policy and practice) | Circuit Court of The 17th Judicial Circuit in and for Broward County, Florida | October 5, 2021 | Case No.: 1511533CF10A (Carl Lida, Esq.) |
| Deposition testimony (adverse employment action; retaliation) | Superior Court of Washington For King County | August 17, 2021 | 20-2-09949-0-SEA (Sumeer Singla, Esq.) |
| Deposition testimony (internal affairs) | Superior Court, Bergen County, New Jersey | July 19, 2021 | BER-L-1051-19 (Kieran Dowling, Esq) |
| Deposition testimony (on-call overtime compensation) | State of Kentucky, Jefferson Circuit Court Division Seven (7)—Louisville, KY | July 14, 2021 | 16-CI-01500 (Ray Haley, Esq.) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | July 29, 2020 | 17-3604 (KM-MAH) (Aymen Aboushi, Esq.) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | May 14, 2020 | 2:15-cv-03215-ES-JAD (Brooke Barnett, Esq.) |
| Deposition testimony (on-call overtime compensation) | United States District Court, District of New Jersey—Newark | March 10, 2020 | 2:18-cv-10731 (Valerie Palma DeLuisi, Esq.) |
| Deposition testimony (use of force) | United States District Court Northern District of New York-Utica, New York | January 9, 2020 | 1:18-cv-00672-LEK-TWD (Ronald Rosenkranz, Esq). |
| Trial testimony (qualified as an expert in police internal affairs and discipline and police policy and practices) | Superior Court, Atlantic County, New Jersey | March 25-26, April 1, 2019 | ATL-L-2517-11 (David Castellani, Esq) |
| Deposition testimony (internal affairs) | Superior Court, Atlantic County, New Jersey | November 1, 2018 | ATL-L-2517-11 (David Castellani, Esq) |
| Deposition testimony (use of force) | United States District Court for the Middle District of Alabama, Northern | July 30, 2018 | 2:11-cv-370 (Michael Allsup, Esq) |

| | Division | | |
|---|---|---|---|
| Trial testimony (criminology/statistics) | Superior Court, Hudson County, New Jersey | June 5, 2018 | indictment no. 17-10-0716 (Raoul Bustillo, Esq) |
| Deposition testimony (general police policy/practices) | Superior Court, Monmouth County, New Jersey | March 9, 2018 | MON-L-1284-15 (David Schwartz, Esq) |
| Trial testimony (internal affairs) | United States District Court, District of New Jersey—Camden | March 6, 2018 | 1:13-CV-02741 (Jennifer Bonjean, Esq) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Camden | February 23, 2018 | 3:13-CV-07374-JAP-DEA (Barry Pollack, Esq) |
| Qualified in federal court as an expert in criminal investigations (criminal investigations/internal affairs) | United States District Court, District of New Jersey—Camden | September 5, 2017 | 14-CV-05092 (Jennifer Bonjean, Esq) |
| Qualified in federal court as an expert in statistics (statistics) | United States District Court, District of New Jersey—Camden | December 2016 | 1:13-cv-06667-RBK-JS (Jennifer Bonjean, Esq) |
| Qualified in federal court as expert in criminal investigations (criminal investigations/confidential informants) | United States District Court, District of New Jersey—Camden | February 26, 2013 | 08-1873 (NLH) (JS) (Jennifer Bonjean, Esq) |
| Deposition testimony (show-up procedures) | Superior Court of New Jersey Law Division, Middlesex County | August 23, 2011 | MID L-005876-09 (Lawrence Lustberg, Esq) |
| Deposition testimony (use of force) | United States District Court, District of New Jersey—Newark | January 13, 2011 | 2:09-CV-4170 (KSH-DS) (David Schwartz, Esq) |

## PUBLICATIONS

*Peer-reviewed Journals*

Twerski, A. & **Shane, J.M.** (2018). Bringing the science of policing to liability for third-party crime at shopping malls. *Marquette Law Review, 101*(3): 776-802.

**Shane, J.M.,** Piza, E. & Silva, J. R. (2017). Piracy for ransom: The implications for situational crime prevention. *Security Journal.* DOI 10.1057/s41284-017-0115-0.

**Shane, J.,** Lawton, B. & Swenson, Z. (2017). The prevalence of fatal police shootings by U.S. police, 2015-2016: Patterns and answers from a new data set. *Journal of Criminal Justice, 52,* 101-111.

**Shane, J.M.** (2016). Improving police use of force: A policy essay on national data collection. *Criminal Justice Policy Review.* 1-21.

**SHANE, J.M.,** PIZA, E. & MANDALLA, M. (2015). SITUATIONAL CRIME PREVENTION AND WORLDWIDE PIRACY: A CROSS-CONTINENT ANAL *CRIME SCIENCE, 4*(21): 1-13.

**SHANE, J.M.** & MAGNUSON, S. (2014). SUCCESSFUL AND UNSUCCESSFUL PIRATE ATTACKS WORLDWIDE: A SITUATIONAL ANALYSIS. *JUSTICE QUARTERLY.*

HTTP://DX.DOI.ORG/10.1080/07418825.2014.958187.

**SHANE, J.M.** (2012). THE POLICE DISCIPLINARY SENTENCING MATRIX: AN EMERGING CONCEPT. *POLICE QUARTERLY, 15*(1): 62-91.

**Shane, J.M.** (2011). Daily work experiences and police performance. *Police Practice & Research, 13*(3): 1-19.

**Shane, J.M.** (2011). Deterrence or system overload? The effect of imprisonment and clearance rates on auto theft in the United States. *Law Enforcement Executive Forum Journal, 11*(1): 149-178.

**Shane, J.M.** (2010). The limits of auto parts marking as a situational crime prevention measure: A qualitative analysis. *Law Enforcement Executive Forum Journal, 10*(3): 109-140.

**Shane, J.M.** (2010). Organizational stressors and police performance. *Journal of Criminal Justice. 38*(4): 807-818. [Top 100 Cited Works

2010-2015].

**Shane, J.M.** (2010). Key administrative and operational differences in the police quasi-military model. *Law Enforcement Executive Forum Journal, 10*(2): 75-106.

**Shane, J.M.** (2010). Performance management in police agencies: A conceptual framework. *Policing: An International Journal of Police Strategies & Management, 33*(1): 6-29.

Sellers, C.L., Sullivan, C.J., Veysey, B.M., & **Shane, J.M.** (2004). Responding to persons with mental illnesses: Police perspectives on specialized and traditional practices. *Behavioral Sciences and the Law, 23*(5): 647-657.

*Books & Book Chapters*

**Shane, J.M.** (2020). Stress Inside Police Organizations: How the Organization Creates Stress and Performance Problems in Police Officers London: Routledge.

**Shane, J.M.** & Magnuson, S. (2019). Worldwide maritime piracy and the implications for situational crime prevention. In M. Natarajan (ed.) *International and Transnational Crime and Justice: An Anthology.* Cambridge University Press.

**Shane, J.** & Swenson, Z. (2018). Unarmed and Dangerous: Patterns of Threats by Citizens During Deadly Force Encounters with Police Officers. U.K: Routledge.

SHANE, J. (2016). CONFIDENTIAL INFORMANTS: A CLOSER LOOK AT POLICE POLICY. SPRINGER BRIEFS IN CRIMINOLOGY SERIES. NEW Y NY: SPRINGER.

SHANE, J. (2013). LEARNING FROM ERROR IN POLICING: A CASE STUDY IN ORGANIZATIONAL ACCIDENT THEORY. SPRINGER BRIEFS IN CRIMINOLOGY SERIES. NEW YORK, NY: SPRINGER.

HAQ, Q. & SHANE, J.M. (2012). THE IMPACT OF WORK ENVIRONMENT ON POLICE PERFORMANCE. IN V. SERGEVNIN (ED.), *CRITICAL ISSUE AMERICAN CRIMINAL JUSTICE SYSTEM.* RUSSIAN ACADEMY OF NATIONAL ECONOMY AND PUBLIC ADMINISTRATION UNDER THE PRESIDENT OF RUSSIAN FEDERATION. MOSCOW.

**Shane, J.M** & Lieberman, C.A. (2009). Criminological theories and the problem of modern piracy. In M. Haberfeld and A. von Hassell (eds.), *Modern Piracy and Maritime Terrorism: The Challenge of Piracy for the 21st Century.* Dubuque, IA: Kendall-Hunt Publishing.

**Shane, J.M.** (2009). September 11th terrorist attacks on the United States and the law enforcement response. In M. Haberfeld and A. von Hassell (Eds.), *A New Understanding of Terrorism—Case Studies, Analyses and Lessons Learned.* New York: Springer.

**Shane, J.M.** (2007). *What Every Chief Executive Should Know: Using Data to Measure Police Performance.* New York: Looseleaf Law Publications.

*Monographs & Monograph Chapters*

SHANE, J.M. (2012). ABANDONED PROPERTIES. PROBLEM-ORIENTED GUIDES FOR POLICE, WASHINGTON, DC: U.S. DEPARTMENT OF JUS OFFICE OF COMMUNITY ORIENTED POLICING SERVICES.

**Shane, J.M.** (2008). Go After Terrorism Grants. Brief # 20. In G. Newman and R.V. Clarke, *Policing Terrorism: An Executive's Guide.* Washington. D.C: U.S. Department of Justice.

**Shane, J.M.** (2008). Developing a Performance Management Model. New York: Looseleaf Law Publications.

*Professional Journals (Non peer reviewed)*

**Shane, J.M.** (2008, September). Developing a performance measurement model. *FBI Law Enforcement Bulletin,* Vol. 77, No. 9.

Delorenzi, D., **Shane, J.M.** & Amendola, K.L. (September 2006). The Compstat process: Managing performance on the pathway to leadership. *Police Chief,* Vol. 73, No. 9.

**Shane, J.M.** (June 2005). Activity-based budgeting: Creating a nexus between workload and costs. *FBI Law Enforcement Bulletin,* Vol. 74, No. 6.

**Shane, J.M.** (April, May, June 2004.). Compstat process. *FBI Law Enforcement Bulletin.* Vol. 73. No. 4, 5 and 6.

**Shane, J.M.** (May 2003). Writing a winning grant proposal. *FBI Law Enforcement Bulletin.* Vol. 72. No. 5.

*Government Publications*

**Shane, J.** (2014). Reducing Failure: A View of Policing Through an Organizational Accident Lens. In "Mending Justice: Sentinel Event Reviews," *National Institute of Justice, Special Report,* pp. 50-52. Washington, D.C: National Institute of Justice.

Shane, J.M. (August 5, 2009). Report of the expert panel on parts-marking, professional theft and other vehicle security; Auto body repair shops; Prosecution of parts cases. In. M. Maxfield and R.V. Clarke. *Parts Marking and Anti-theft Devices Technology Study.* For Maryn Consulting on behalf of National Highway Traffic and Safety Administration, Washington, D.C. (pp. 107-152).

Clarke, R.V., Zanin, N. & **Shane, J.M.** (August 2004). Reducing drug dealing in private apartment complexes: Final report to the U.S. Department of Justice Office of Community Oriented Police Services on a Project Undertaken in Newark, NJ to Test the Utility of the Problem-Oriented Guides for Police." Washington, D.C.: U.S. Department of Justice, COPS Office. Accessible at www.popcenter.org/library.

*Other Publications*

**Shane, J.M.** (July 2021). Situational crime prevention: Removing opportunity and improving defence to tackle violent crime. *Policinginsight.com*

Amendola, K.A., Weisburd, D. Hamilton, E., Jones, G., Slipka, M., **Shane, J.M** & Ortiz, C. (December 2011). The impact of law enforcement shift practices and extra-duty employment on various health, safety, performance, and quality of life measures. Washington, D.C: Police Foundation.

Jones-Brown, D. & **Shane, J.M.** (July 2011). An exploratory study of the use of informants in drug prosecutions in New Jersey. Newark, NJ: ACLU-NJ

**Shane, J.M.** (June 2010). Miranda's "clear-statement" requirement. New York City Police Department, *Executive Development Section Executive Newsletter, 1*(2).

**Shane, J.M.** (Task force advisor and contributor). (2010). Reducing inherent danger: Report of the task force on police-on-police shootings. Albany, NY: New York State Task Force on Police-on-Police Shootings.

## CONFERENCE PRESENTATIONS AND INVITED LECTURES

*Conference Presentations*

"When Do Police Kill in Metropolitan America"? American Society of Criminology, Thematic Panel, Atlanta, GA, **November 2018.**

"Policing the Mentally Ill: A Problem-Oriented Approach," Seminar on Legal and Ethical Issues in Psychiatry and General Medicine, invited lecture Columbia University Medical Center, **October 13, 2015.**

"United States Commission on Civil Rights, Office of Civil Rights Evaluation, panel on Police Practices and Prosecution of Police Deadly Force," invited panelist. Panel presentation, **April 20, 2015.**

"Successful and unsuccessful pirate attacks worldwide: A situational analysis." Annual Meeting Academy of Criminal Justice Sciences, Orlando, FL. **March 6, 2015.**

"Columbia University, School of Public Health, guest lecture on American policing and the relationship between crime and public health. Hosted by Dr. Sara Albiola. **February 23, 2015.**

"Terrorist Threat Perceptions of Police Leaders from Small and Medium Police Departments." Feature Roundtable: Annual Meeting Academy of Criminal Justice Sciences, Philadelphia, PA, **February 19, 2014.**

"The Police Employee Disciplinary Sentencing Matrix: An Emerging Concept." Annual Meeting Academy of Criminal Justice Sciences, Dallas, TX, **March 21, 2013.**

"A Study on Police Sector Integrity." Annual Meeting Academy of Criminal Justice Sciences, Dallas, TX, **March 21, 2013.**

"Abandoned Buildings and Lots." Annual Problem-Oriented Policing Conference, Providence, RI, **October 22-23, 2012.**

"Deterrence or system overload? The Effect of Imprisonment and Clearance Rates on Auto Theft in the United States." Annual Meeting American Society of Criminology, Washington, D.C: **November 16, 2011.**

"Organizational Stressors and Police Performance." Annual Meeting American Society of Criminology, San Francisco, Ca: **November 19, 2010.**

"The Myth of The American Police Quasi Military Model," Presentation, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA: **February 26, 2010.**

"Rethinking Police Use of Confidential Informants," Presentation, Annual Meeting Academy of Criminal Justice Sciences, San Diego, CA: **February 23, 2010.**

"Performance Management in Police Agencies: A Conceptual Framework," Poster presentation, Annual Meeting American Society of Criminology, Philadelphia, PA: **November 5, 2009.**

"Confronting Gun Traffickers: Stopping the Interstate Flow of Illegal Guns through Tracing and Analysis." Roundtable presentation with Christopher Andreychak, 2008 Annual Meeting American Society of Criminology, St. Louis, MO: **November 15, 2008.**

*Invited Lectures*

"Inter-American Development Bank" on policing in democratic societies, Washington, D.C., **December 2, 2014.**

"Presentation to the Chinese People's Public Security University, Police Security Bureau, Beijing, China on creating a nexus between police workload and budget, police policy and practice issues." **November 29, 2011.**

"Developing a Performance Management Model," Leading Police Performance and Accountability Symposium 2010, Jamaica

Constabulary Force, Kingston, Jamaica: **March 30 – April 2, 2010.**

"Tattletales and Victims: Rethinking Police Use of Confidential Informants," John Jay College Graduate Lecture Series: **November 30, 2009.**

"Key Administrative and Operational Differences in the Police Quasi Military Model," CUNY Hostos Community College, Bronx, NY: **October 13, 2009.**

"Eyewitness Identification: Improving Reliability and Preventing Wrongful Convictions," panel discussant providing a perspective on police policy and practice. American Judicature Society, Annual Meeting, New York City: **August 8, 2008.**

---

### TRAINING WORKSHOPS

| | | |
|---|---|---|
| **2018** | March 29 | Use of Force Investigations Guide–An ASCIA and Police Foundation Webinar, ***Washington, D.C.*** |
| **2018** | March 13 | Murder Book - A Profile of the Los Angeles Police Department's Homicide Case Management Framework, Police Foundation Webinar, ***Washington, D.C.*** |
| **2015** | April 4-17 | Uruguay National Police, Basic and Advanced Criminal Investigations, ***Montevideo, Uruguay.*** |
| **2014** | June 9-20<br>Sept 15-16 | Uruguay National Police, Basic and Advanced Criminal Investigations, ***Montevideo, Uruguay.*** |
| **2013** | July 9-11 | U.S. Army Senior Military Police Leaders Conference of Performance Management Process, ***Ft. Hood, TX.*** |
| | September 18-20 | U.S. Army Senior Military Police Leaders Conference of Performance Management Process, ***Ft. Campbell, KY.*** |
| **2010** | November 9 | New Haven (CT) Police Department Investigative Training Course, ***West Haven, Connecticut.*** |
| | March 30 to April 2 | Leading Police Performance and Accountability Symposium 2010, Jamaica Constabulary Force. Producers House Building, ***Kingston, Jamaica.*** |
| **2009** | September to November (Various dates) | Implementing and Institutionalizing CompStat in Maryland. Grant program with University of Maryland and Governor's Office of Crime Prevention, ***Baltimore, MD.*** |
| **2008** | April 22 | Developing a Performance Management Model. Ohio Association of Chiefs of Police. 2008 in-service training conference, ***Deer Creek, Ohio.*** |
| | June 23 | Developing a Performance Management Model. Florida Police Chiefs Association 56th Annual Summer Training Conference, ***Palm Beach Gardens, Florida.*** |
| | August 19 | Developing a Performance Management Model. Virginia Association of Chiefs of Police, Annual Conference, ***Hot Springs, Virginia.*** |
| | October 28 | Developing a Performance Management Model. The Houston Area Police Chief's Association, Woodlands Public Safety Training Center, ***Conroe, Texas.*** |
| **2007** | May 5 | Developing a Performance Management Model. Ottawa Association of Law Enforcement Planners. Algonquin College, ***Ottawa, Ontario, Canada.*** |
| | August 8 | Developing a Performance Management Model. Louisiana Attorney General's Command College, ***Baton Rouge, Louisiana.*** |
| | October 16-17 | Developing a Performance Management Model. International Association of Law Enforcement Planners, ***Calgary, Alberta, Canada.*** |

**PREVIOUS EMPLOYMENT AND RELATED EXPERIENCE**

| | |
|---|---|
| March 2006<br>July 2006 | Consultant to Essex County College, Newark, NJ to assist with design and implementation of a geographic information system (GIS) training program for law enforcement and homeland security initiatives |
| February 2005<br>September 2005 | *Staff Member*, NJ Attorney General's Office - Camden Commission for Public Safety.<br>Final report accessible at http://www.state.nj.us/lps/com-report-camden.pdf |
| | *Research Associate, Rutgers Police Institute*. Conducted public safety research and a police management study in Camden, NJ as a staff member of the *Camden Commission for Public* Safety.  Research included a management study on efficiency and recommendations on best practices for organizational change, deployment and sustained crime control initiatives. |
| May 2004<br>Present | *Senior Research Associate, Police Foundation Washington, D.C. (currently National Policing Institute)*.  Currently, serving as a senior research associate to the Police Foundation on a variety of topics related to policing. Most recently, assisted preparing a research grant to the National Institute of Justice entitled: *A National Assessment of the Risks and Benefits of Shift Practices and Related Policies in Law Enforcement: Impact on Officer and Organizational Performance*. |
| October 2003<br>May 2004 | *Research Team Member, Rutgers Center for Mental Health*.  Conducted research on police interactions and responses to persons with mental health issues.  Study included conducting on site interviews with police officers as well as calls for service data analysis. |
| September 2003<br>September 2004 | *Differential Police Response: Neighborhood Social Disorganization and Police Response Time to Domestic Violence Calls*.  Principal investigator and author of explanatory research on police response time to domestic violence calls in Newark, New Jersey. The objective was to explain the relationship between indicators of social disorganization and police response time to domestic violence calls for service. |
| March 1993<br>August 2003 | Successfully solicited by proposal over $50 million in state and federal grants for various police initiatives including community policing, personnel, equipment and training as a member of the Newark Police Department, Research, Analysis and Planning Division |
| June 2001 | Harvard University, John F. Kennedy School of Government and Police Executive Research Forum (PERF)—Senior Management Institute for Police, Session 25, Boston, MA |
| February to June 1998 | Federal Bureau of Investigation, FBI National Academy—193rd Session Quantico, Virginia |
| January to June 1996 | Police Foundation Washington, D.C. Visiting fellow, Police Fellowship Program |
| March 1989<br>December 2005 | Newark (NJ) Police Department (Retired, Captain of police). See below for detailed law enforcement experience. |
| December 1985<br>March 1989 | Clifton (NJ) Police Department |

**GRANTS AND FUNDING**

| | | | |
|---|---|---|---|
| October 18, 2013 | Ministry of the Interior, Uruguay | $253,156.00 | Scholarship Program for Training in Advanced Criminal Investigations for Uruguay Police |
| October 18, 2012 | PSC CUNY (award pending) | $10,003.74 | Principal investigator to examine maritime piracy using situational crime prevention |
| April 15, 2010 | PSC CUNY (Award # 63310-00 41) | $3,990 | Principal investigator, to examine the impact of organizational stressors on police performance |
| November 2008 | State of Maryland Governor's Office of Crime Control | $185,696 | Co-principal investigator with Dr. Rachel Boba, Dr. Jeanne Bilanin and Laura Wyckoff to develop and implement |

| | |
|---|---|
| Programs | Compstat for police agencies throughout Maryland (University of Maryland—IGSR) |

## SERVICE

*Professional*

- Book review: Speaking Truth to Power, *Criminal Law and Criminal Justice Books*  — 2017
- Peer-review member, *Crime Science*  — 2015
- Peer-review member, *The Sociological Quarterly*  — 2012
- Editorial advisory board member, *International Journal of Emergency Services*  — 2011
- Peer-review member, *Police Quarterly*  — 2011
- ACJS 47th Annual Meeting, *Ethics in Policing, Modalities; Dynamics of Use of Force & The Police Command Structure,* Panel chair  — 2010
- Delphi Panel participant, Incentive Research Foundation; offered a police perspective to re-validate and update *The Master Measurement Model of Employee Performance* study conducted in 1992  — 2010
- Peer-review member, *Journal of Criminal Justice*  — 2010, 2017
- Peer-review member, *Criminal Justice & Behavior*  — 2010
- Peer-review member, *International Journal of Comparative and Applied Criminal Justice*  — 2010
- Peer-review member, *Taylor Francis Publishing*  — 2010
- Peer-review member, *Police Practice & Research*  — 2010
- Peer-review member, *Policing: An International Journal of Police Strategies & Management*  — 2009-2010
- Book review member Thompson/Wadsworth publishing  — 2009
- Rutgers School of Criminal Justice Alumni Association, Treasurer  — 2009-2010
- Invited lecture, Benjamin Cardoza Law School  — March 22, 2010
- Invited lecture, U.S. Department of Justice COPS Office National Leadership Roundtable, *Leadership For Public Safety II,* with the Community Policing Leadership Institute (CPLI) at the John Jay College of Criminal Justice Office of Continuing and Professional Studies  — April 29-30, 2010

*Department*

- Grant development task force  — 2011
- Police Studies Coordinator  — 2009-2013
- LPS Faculty Research Salon Discussant  — November 2009
- LPS ad hoc Curriculum Committee member  — 2010-2015

*College*

- Doctoral faculty member  — Jan 14, 2011
- *Clinton Global Initiative*, faculty representative to student committee  — 2009-2011
- Council of Major Coordinators  — 2009-2011
- Council of Allied Major Coordinators (Dean Ann Lopes, Committee Chair)  — 2010-2011
- CUNY Faculty COACHE Survey  — November 2009
- Chair of the AA Degree Educational Partnerships Committee, CUNY Justice Academy (David Barnet, Director of Educational Partnerships)  — 2010-2011
- CRJ 101 student performance evaluation study participant  — Sept-Dec 2009

*Community*

- Bay Area Rapid Transit Police (BART) Police-Citizen Encounters (with Dr. Maki Haberfeld and Consortium for Police Leadership in Equity (CPLE) at UCLA. Research application was awarded in November and work began in January 2013.  — Nov. 27, 2012
- New York City Police Department, Executive Development Section Article Contributor

  June 2010

| | | March 26, 2010 |
|---|---|---|
| • Student outreach effort, Passaic County Technical Institute, Wayne, NJ (With Jeanette Taverez, Undergraduate Admission Counselor) | | |
| • Paterson (NJ) Mayor's Task Force on Crime and Violence | | October 2009 |

**PROFESSIONAL AFFILIATION AND MEMBERSHIP**

| | |
|---|---|
| Academy of Criminal Justice Sciences | 2009-Present |
| Police Executive Research Forum | 2003-Present |
| American Society of Criminology | 2004-Present |
| Society for Police and Criminal Psychology | 2008-2009 |

**LAW ENFORCEMENT EXPERIENCE**

| Parent Command | Division/Unit | Date | |
|---|---|---|---|
| **Office of the Chief of Police** | Command Operations Center | August 2004 | December 2005 |

The Command Operations Center (COC) provides command rank supervision to the Department during non-business hours. The COC personnel monitor significant planned or spontaneous events, inspect Department-wide operations including field deployment, operational readiness, and administrative procedures. The COC also provides control of resources to address prevailing service demands, command level presence and oversight at the scene of unusual incidents. Personnel assigned to COC also address citizen complaints to ensure departmental objectives are achieved.

| **Operations Bureau** | North District Police Station—District Commander | April 2004 | August 2004 |
|---|---|---|---|

*See East District Station for responsibilities*

| **Office of the Police Director** | Office of Policy and Planning | August 2002 | April 2004 |
|---|---|---|---|
| *See Research, Analysis and Planning Division for responsibilities* | | January 2002 | June 2002 |

| **Operations Bureau** | East District Police Station— District Commander | June 2002 | August 2002 |
|---|---|---|---|

The East Police District is the largest geographical precinct in the city with a residential population of approximately 80,000 and a daytime population of more 200,000. Newark's most coveted areas are situated here, including Newark International Airport, Port Newark seaport, the New Jersey Performing Arts Center, University Heights, the campuses of Rutgers University, New Jersey Institute of Technology and Essex County College, and Restaurant Row in the Ironbound. Responsibilities include charge of district station performance, a complement of 160 police officers and detectives, property and evidence, fifty-vehicle fleet, crime analysis, ComStat, personnel assignments, internal affairs and integrity control, records management, and prisoner detention.

| **Office of the Police Director** | Office of Policy, Planning and Technology—Commanding Officer, Management Information Systems | April 2000 | January 2002 |
|---|---|---|---|

MIS exists to ensure the Department operates efficiently through the use of technology. Responsible for managing the Department's information systems which include hardware and software from Intergraph, Oracle and Motorola. Also, GIS services (mapping), computer aided dispatching (CAD), records management system (RMS), researching new technologies, and administering a $5 million budget for personnel and equipment. Directed the following projects:
• Construction and implementation of a state-of-the-art Computer Learning Center
• Development of a multimillion dollar Oracle® records management system (RMS)
• Implementation of a wireless (CDPD) network
• Reorganization and management of the geographic information systems (GIS) program

| **Operations Bureau** | North District Police Station—Tour Commander | July 1999 | April 2000 |
|---|---|---|---|

During a tour of duty, responsible for the efficient operation of one of four geographical District police stations. Responsibilities include

supervision of first line supervisors, motor patrol and foot patrol officers; conducting personnel inspections and performance evaluations; initiating disciplinary procedures and personnel investigations; monitoring and counseling subordinate personnel; conducting roll call training, recommending commendations. Also accountable for District desk operations and precinct activities, including charge determinations, reviewing, approving and classifying reports, prisoner detention, assignments, and bail.

| | | | |
|---|---|---|---|
| **Office of the Police Director** | Policy and Planning Division—Executive Officer | July 1998 | July 1999 |

*Responsibilities same as listed under Research, Analysis & Planning*

| | | | |
|---|---|---|---|
| **Office of the Police Director** | Special Assistant to the Police Director | September 1997 | July 1998 |

The Police Director's Office is responsible for the policy position of the Police Department. Responsible for developing policy, implementing strategic crime control initiatives, responding to interagency correspondence and letters of complaint, acting as an intermediary among police executives, political and community leaders, representing the Police Director as directed, media relations and public information—Police Department spokesperson—and overall tasks designed to direct the mission of the Newark Police Department.

- Coordinated and appeared in an ethics training video produced for the U.S. Department of Justice—COPS Office through a grant to the Police Foundation, Washington, D.C.
- Assigned to the Criminal Investigation Bureau—Fugitive Apprehension Section to design and implement a Fugitive Apprehension Program.
- Task force member to audit, reorganize and develop policy for the central property and evidence function.

| | | | |
|---|---|---|---|
| **Criminal Investigation Bureau—Violent Crime Division** | Homicide Section—Detective Supervisor | May 1997 | September 1997 |

The Homicide Section is responsible for all death investigations, officer-involved shootings, and kidnapping investigations. Responsible for monitoring all active investigations, reviewing "cold" cases, reviewing, classifying and approving investigations, charge determinations, crime scene management, statistical analysis, and database management.

| | | | |
|---|---|---|---|
| **Field Operations Bureau** | East & West District Police Station—Field Supervisor | June 1995 | September 1995 |

Responsible for the supervision of motor patrol and foot patrol officers; conducting personnel inspections and performance evaluations; initiating disciplinary procedures and personnel investigations; monitoring and counseling subordinate personnel; conducting roll call training, recommending commendations. Also accountable for desk operations and precinct activities, including charge determinations, reviewing, approving and classifying reports, prisoner detention, and bail.

| | | | |
|---|---|---|---|
| **Office of the Police Director** | Research, Analysis & Planning Division—Detective | March 1993 | May 1997 |

Responsible for the research and development of budgetary proposals, Department policies, tactical and strategic planning, comparative, statistical and crime analysis, State and Federal grant proposals, interagency surveys, and overall tasks designed to improve the efficiency and effectiveness of the Newark Police Department.

- Over a four-year period successfully solicited by proposal over $40 million in Federal and State funds for community policing initiatives, equipment, personnel, and construction projects.
- Cadre member of the Emergency Operations Center (E.O.C). E.O.C is responsible for activation during all mobilization exercises, demonstrations/protests, severe weather emergencies, civil disorder conditions, airport disasters and other similar critical incidents.
- Participated in a five month police fellowship at the Police Foundation Washington, D.C. Fellowship entailed writing proposals, designing training curricula, conducting research on policing, and participating in management studies on a national level. Also assisted in the development of the Police Foundation's segment of the *Community Policing Consortium Phase V* grant proposal, submitted to the U.S. Department of Justice, COPS Office.
- Participated in the development and implementation of the Newark Police Department's Emergency Response Team (E.R.T). Team

member and supervisor August, 1994 - September, 1997.

| **Special Investigation Bureau** | TARGET Team—Police Officer | November 1992 | March 1993 |
| --- | --- | --- | --- |

Assigned to the Tactical Auto Recovery Group and Enforcement Team (T.A.R.G.E.T). This proactive anti-crime unit was designed to combat bank robberies, serial crimes, high-profile incidents, carjackings, and auto thefts on a citywide level. T.A.R.G.E.T. jointly participated with the F.B.I.'s Violent Crime Fugitive Task Force and the Joint Bank Robbery Task Force for combined operations.

| **Field Operations Bureau** | South District Police Station—Police Officer | August 1989 | November 1992 |
| --- | --- | --- | --- |

Appointed to the Newark Police Department and assigned to the South Police District one of four geographical police precincts in the City. The South District encompasses a residential population of more than 80,000 residents, including several public housing tracts with a population in excess of 10,000 people. The South District also harnesses a sizeable industrial/commercial manufacturing area that raises the daytime population to more than 100,000 people.

- Responsible for service demands and response to calls for police service.
- Assigned to Special Enforcement 1990-1992; district level street-crime suppression unit designed to address local conditions. Responsible for plain clothes/anti-crime efforts, decoy, vice, robbery, prostitution and narcotics operations.
- Participated in selective enforcement operations, including saturation patrol and directed patrol operations in high crime neighborhoods.
- Participated in various community policing programs at the district level
- Field Training Officer 1990-1991

| | Communications Technician | December 1985 | March 1989 |
| --- | --- | --- | --- |
| **Communications Division (Clifton, NJ Police Department)** | | | |

Clifton city is one of the urban-15 communities in New Jersey serving a population of nearly 90,000. Responsible for managing police, fire and EMS field assets through a computer aided dispatch system. Also responsible for processing incoming calls for public safety and using advanced crime information systems (CJIS, NCIC).

**DISTINCTION**

| | |
| --- | --- |
| Police Director's Special Recognition Award | 1997 |
| Department Award Excellent Police Duty | 1997, 1996, 1992, 1991, 1990 |
| New Jersey Exemplary Awards Program | 1996 |
| Webber Seavey Award for Quality in Law Enforcement (Finalist) | 1994 |

**PROMOTIONS**

| | |
| --- | --- |
| Captain | September 2000 |
| Lieutenant | July 1998 |
| Sergeant (rank) | July 1995 |
| Detective (status) | March 1993 |

## Appendix A (Randomization Results)

| | | | | | |
|---|---|---|---|---|---|
| *Randomization Results for the Process Evaluation Case Selection* | | | | | |
| Defendant Officers | | | Non-defendant Officers | | |
| Case ID# | CR# | Randomly Selected Cases (n=22) | Case ID# | CR# | Randomly Selected Cases (n=18) |
| 1 | 123850 | 49 | 1 | 155382 | 57 |
| 2 | 146819 | 63 | 2 | 155614 | 40 |
| 3 | 152507 | 74 | 3 | 155619 | 64 |
| 4 | 152612 | 64 | 4 | 155714 | 43 |
| 5 | 152902 | 16 | 5 | 155876 | 35 |
| 6 | 155500 | 72 | 6 | 156243 | 29 |
| 7 | 157627 | 17 | 7 | 156749 | 31 |
| 8 | 163692 | 6 | 8 | 156916 | 65 |
| 9 | 168160 | 46 | 9 | 157059 | 20 |
| 10 | 170855 | 20 | 10 | 157143 | 47 |
| 11 | 171220 | 18 | 11 | 157592 | 28 |
| 12 | 171841 | 3 | 12 | 158211 | 38 |
| 13 | 172123 | 9 | 13 | 158279 | 26 |
| 14 | 177115 | 59 | 14 | 158349 | 32 |
| 15 | 178050 | 30 | 15 | 158534 | 30 |
| 16 | 179835 | 53 | 16 | 159703 | 5 |
| 17 | 180037 | 13 | 17 | 160370 | 53 |
| 18 | 182519 | 23 | 18 | 160688 | 23 |
| 19 | 187289 | 80 | 19 | 161290 | 24 |
| 20 | 188930 | 65 | 20 | 162687 | 62 |
| 21 | 195435 | 21 | 21 | 165516 | 66 |
| 22 | 195857 | 1 | 22 | 165563 | 25 |
| 23 | 200441 | 78 | 23 | 166878 | 63 |
| 24 | 205257 | 24 | 24 | 167206 | 59 |
| 25 | 209374 | 25 | 25 | 167252 | 48 |
| 26 | 212230 | 61 | 26 | 168290 | 3 |
| 27 | 213103 | 31 | 27 | 168690 | 39 |
| 28 | 213950 | 32 | 28 | 168914 | 19 |
| 29 | 217624 | 34 | 29 | 169532 | 4 |
| 30 | 220046 | 7 | 30 | 170021 | 33 |
| 31 | 222987 | 8 | 31 | 170373 | 41 |
| 32 | 223928 | 73 | 32 | 170700 | 52 |
| 33 | 224987 | 69 | 33 | 170706 | 8 |
| 34 | 226211 | 44 | 34 | 171016 | 49 |
| 35 | 233861 | 58 | 35 | 171720 | 37 |
| 36 | 235638 | 71 | 36 | 171827 | 13 |
| 37 | 235639 | 40 | 37 | 171943 | 42 |
| 38 | 236739 | 51 | 38 | 172221 | 45 |
| 39 | 237040 | 15 | 39 | 172611 | 44 |
| 40 | 237167 | 41 | 40 | 172748 | 15 |
| 41 | 239988 | 60 | 41 | 172876 | 21 |
| 42 | 240708 | 56 | 42 | 173098 | 12 |
| 43 | 240762 | 42 | 43 | 173369 | 56 |
| 44 | 243205 | 43 | 44 | 173446 | 6 |
| 45 | 243485 | 29 | 45 | 173479 | 54 |
| 46 | 247214 | 45 | 46 | 174337 | 50 |
| 47 | 248946 | 62 | 47 | 174770 | 46 |

| *Randomization Results for the Process Evaluation Case Selection* | | | | | |
|---|---|---|---|---|---|
| **Defendant Officers** | | | **Non-defendant Officers** | | |
| **Case ID#** | **CR#** | **Randomly Selected Cases (n=22)** | **Case ID#** | **CR#** | **Randomly Selected Cases (n=18)** |
| 48 | 251502 | 37 | 48 | 174866 | 14 |
| 49 | 251502 | 57 | 49 | 175513 | 10 |
| 50 | 253198 | 67 | 50 | 177248 | 1 |
| 51 | 255701 | 22 | 51 | 178230 | 60 |
| 52 | 255984 | 79 | 52 | 178876 | 22 |
| 53 | 256148 | 70 | 53 | 179504 | 27 |
| 54 | 263553 | 12 | 54 | 179882 | 51 |
| 55 | 266681 | 39 | 55 | 179902 | 11 |
| 56 | 268910 | 35 | 56 | 180229 | 16 |
| 57 | 270916 | 52 | 57 | 180271 | 7 |
| 58 | 271597 | 50 | 58 | 180543 | 17 |
| 59 | 273466 | 14 | 59 | 180550 | 61 |
| 60 | 277401 | 2 | 60 | 180588 | 34 |
| 61 | 280774 | 5 | 61 | 180716 | 55 |
| 62 | 283321 | 28 | 62 | 180853 | 2 |
| 63 | 284331 | 66 | 63 | 180866 | 9 |
| 64 | 288729 | 19 | 64 | 181250 | 36 |
| 65 | 289081 | 33 | 65 | 181515 | 18 |
| 66 | 290777 | 47 | 66 | 181809 | 58 |
| 67 | 295703 | 68 | XXX | XXX | XXX |
| 68 | 297534 | 76 | XXX | XXX | XXX |
| 69 | 298042 | 4 | XXX | XXX | XXX |
| 70 | 302449 | 75 | XXX | XXX | XXX |
| 71 | 304802 | 26 | XXX | XXX | XXX |
| 72 | 305680 | 77 | XXX | XXX | XXX |
| 73 | 306442 | 11 | XXX | XXX | XXX |
| 74 | 308007 | 10 | XXX | XXX | XXX |
| 75 | 310073 | 27 | XXX | XXX | XXX |
| 76 | 312992 | 54 | XXX | XXX | XXX |
| 77 | 1004284 | 55 | XXX | XXX | XXX |
| 78 | 1006209 | 48 | XXX | XXX | XXX |
| 79 | 1013474 | 36 | XXX | XXX | XXX |
| 80 | 1013854 | 38 | XXX | XXX | XXX |