# Exhibit B

Jon Shane, 3/10/2023

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOSE JUAN MAYSONET,            )
          Plaintiff,           )
                               )
          -vs-                 )Case Number 18 CV 2342
                               )
REYNALDO GUEVARA, et al.,      )
          Defendants.          )

VIDEOTAPED

AUDIO-VIDEOCONFERENCE DEPOSITION

JON SHANE

a material witness herein, called for examination pursuant
to Notice and the Federal Rules of Civil Procedure as they
pertain to the taking of depositions before Lea Ruth Cohen,
CSR, and a Notary Public in and for the County of Peoria,
State of Illinois, on Friday, March 10, 2023, commencing at
the hour of 10:05 a.m., via Zoom platform.


ALL APPEARANCES VIA ZOOM:


JENNIFER BONJEAN, ESQUIRE
(in-person with deponent)
a n d
ASHLEY COHEN, ESQUIRE
Bonjean Law Group
750 Lexington Avenue, 9th Floor
New York, New York  10022
(718)875-1850
jennifer@bonjeanlaw.com
a n d
STEVEN A. GREENBERG, ESQUIRE
Steven A. Greenberg, Ltd.
53 West Jackson Boulevard, Suite 1260
Chicago, Illinois  60604
(312)879-9500
steve@greenbergcd.com
on behalf of the Plaintiff;

**2**

```
 1          ALL APPEARANCES VIA ZOOM: (cont.)
 2
 3              JOSH M. ENGQUIST, ESQUIRE
                   The Sotos Law Firm
 4          141 West Jackson Boulevard, Suite 1240A
                 Chicago, Illinois  60604
 5                   (630)735-3300
                  jengquist@jsotoslaw.com
 6   on behalf of Defendants City of Chicago police officers
       Halvorsen, Mingy, Epplen, Montilla and Paulnitsky;
 7
 8             THERESA B. CARNEY, ESQUIRE
                 Rock Fusco & Connelly, LLC
 9           333 West Wacker Drive, 19th Floor
                 Chicago, Illinois  60606
10                   (312)474-1000
                  tcarney@rfclaw.com
11       on behalf of Defendant City of Chicago;
12
13            MICHAEL M. SCHALKA, ESQUIRE
              Leinenweber Baroni & Daffada, LLC
14         120 North LaSalle Street, Suite 2000
                 Chicago, Illinois  60602
15                   (312)380-6635
                  mkm@ilesq.com
16        on behalf of Defendant Reynaldo Guevara;
17
               ROBERT T. SHANNON, ESQUIRE
18                     Hinshaw
                  100 Park Avenue
19             Rockford, Illinois  61101
                   (815)490-4900
20                rshannon@hinshawlaw.com
       on behalf of Defendant Frank DiFranco;
21
               SEAN C. STARR, ESQUIRE
22                   Loevy & Loevy
          311 North Aberdeen Street, 3rd Floor
23              Chicago, Illinois  60607
                   (312)243-5900
                  sean@loevy.com
24        on behalf of Defendant Alfredo Gonzalez;
```

**3**

```
 1          ALSO PRESENT VIA ZOOM:
 2          Nick Trotta, Legal Videographer
              Robin Faz, Exhibit Technician
 3          Urlaub Bowen & Associates
            20 North Clark Street, Suite 600
 4            Chicago, Illinois  60602
                   (312)781-9586
 5              ntrotta@urlaubbowen.com
                robin@urlaubbowen.com.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1                    I N D E X
 2
    Called on behalf of the Defendant City of Chicago:
 3
    JON SHANE
 4
    Direct Examination by Ms. Carney   pgs. 6 - 106
 5
 6
 7
 8
 9   Exhibit     Page  Description
10
11   Shane  1 . . .  9   Curriculum Vitae
12   Shane 2A . . . 29   Invoice 260
13   Shane 2B . . . 40   Invoice 280
14   Shane 2C . . . 45   Invoice 293
15   Shane  3 . . . 61   Jon M. Shane report
16   Shane 3A . . . 46   Exhibits
17   *Shane 13 . . . 32  Data Collection Protocol
18   Shane 14 . . . 99   Complaint Category Tables
19
20
21
22
23
24        (*Indicates skip in sequence.)
```

**5**

```
 1          THE VIDEOGRAPHER:  Good morning.  This is
 2   the beginning of media unit one, and we are now on the
 3   video record at 10:05 a.m.
 4          This is the videotaped videoconference discovery
 5   deposition of Dr. Jon Shane being taken on March 10th,
 6   2023.
 7          This deposition is being taken on behalf of the
 8   Defendant in the matter of Jose Juan Maysonet versus
 9   Reynaldo Guevara, et al.  The case number is 18 CV 2342,
10   filed in the United States District Court for the Northern
11   District of Illinois, Eastern Division.
12          My name is Nick Trotta, legal videographer,
13   representing Urlaub Bowen & Associates with offices at
14   20 North Clark Street, Suite 600, Chicago, Illinois.
15          The court reporter today is Lea Cohen, also of
16   Urlaub Bowen & Associates.
17          Counsel, please identify yourselves for the
18   record and the parties which you represent.
19          MS. BONJEAN:  Good morning.  Jennifer
20   Bonjean, B-O-N-J-E-A-N, of the Bonjean Law Group on behalf
21   of the Plaintiff Jose Maysonet.  Also present in my firm is
22   Ashley Cohen, C-O-H-E-N, on behalf of Mr. Maysonet, and the
23   deponent Dr. Jon Shane is also present.
24          MR. ENGQUIST:  Good morning.  Josh Engquist
```

Jon Shane, 3/10/2023

6

1    on behalf of Defendants Halvorsen, Mingey, Epplen,
2    Montilla, Paulnitsky.
3            MR. GREENBERG:  Steve Greenberg, also on
4    behalf of Maysonet.
5            MR. SHANNON:  Bob Shannon on behalf of
6    Defendant DiFranco.
7            MR. SCHALKA:  Michael Schalka on behalf of
8    Defendant Guevara.
9            MS. CARNEY:  Theresa Carney on behalf of the
10   Defendant City of Chicago.
11           THE VIDEOGRAPHER:  All right.  Will the
12   court reporter please swear in the witness?
13           (Witness sworn.)
14               JON SHANE,
15   having been called on behalf of the Defendant City of
16   Chicago, being first duly sworn, was examined and testified
17   as follows:
18           DIRECT EXAMINATION
19   BY MS. CARNEY:
20   Q.   Good morning, Dr. Shane.  I guess it's closer to
21   afternoon out there.  As I just said, my name is Theresa
22   Carney and I represent the City of Chicago in this case.  I
23   believe you've given depositions before; is that correct?
24   A.   Yes.

7

1    Q.   So I'm sure you're familiar with a lot of the
2    ground rules.  We are on Zoom which makes it a little bit
3    harder to get a sense for when someone is done asking a
4    question and when you're done answering.  So I will try
5    very hard to wait until you're done answering the question
6    before I ask another one, and I ask you to try even though
7    you might anticipate what I'm asking, give me a second to
8    finish the question so we can have a clean record.
9    A.   Okay.
10   Q.   As you know, obviously there is a court reporter
11   here taking everything down so we need to make sure that
12   our answers are verbal and out loud so that the court
13   reporter can get that.
14           If you need to take a break at any time, let me
15   know.  The only thing I ask is that we don't take a break
16   when a question is pending.  Is that okay?
17   A.   Okay.
18   Q.   It's Dr. Shane, right?
19   A.   You can call me Jon.
20   Q.   No, I want --
21   A.   It's early.
22   Q.   I want to give you the credit where credit is
23   due.
24           Where are you currently employed?

8

1    A.   John Jay College of Criminal Justice in
2    Manhattan.
3    Q.   What is your current role at John Jay College?
4    A.   I'm a professor of criminal justice.
5    Q.   And do you work with Dr. Lior Gideon at John Jay
6    College?
7    A.   Yes.  He's in the same department.
8    Q.   Okay.  How long have you guys worked together?
9    A.   Since I was hired.  When you say together, do you
10   mean together in the same department?  We don't do research
11   together because he's in a different discipline.  I just
12   want to make sure I'm clear on what you mean by together.
13   Q.   Yeah, and that's a great point.  If at any point
14   I ask a question and you don't understand what I'm asking,
15   which will probably happen more often than not, you know,
16   feel free to ask me to rephrase it or to clarify it.  If
17   you answer it, I'm going to assume you understood me.  Is
18   that fair?
19   A.   Yes.
20   Q.   I guess when I say together I just mean you guys
21   work at the same college in the same department, right?
22   A.   That's correct.
23   Q.   Do you conduct any research with Dr. Gideon?
24   A.   No.

9

1    Q.   When did you get hired at John Jay College?
2    A.   I think technically I was hired in September of
3    2008.  I deferred for one semester to finish my PhD, and I
4    started my very first semester which was the spring of
5    2009.
6    Q.   Just to probably make this easier, I think we'll
7    go right ahead and mark your CV as -- I've premarked it as
8    Exhibit 1 so if we could pull that up on the screen?  Do
9    you have it in front of you?
10           (Remote screen sharing.)
11   A.   I'll get it.  It's right here.
12   Q.   Whatever is easier for you.  We have it up on
13   screen too or you can look at the hard copy.
14           This is a copy of the CV that was attached to the
15   report you tendered in this case.  Is this the most
16   up-to-date version of your CV, if you could flip through it
17   and let me know?
18   A.   It looks like it is.  It's hard to tell because I
19   did have some other casework in here --
20   Q.   Okay.
21   A.   -- that you might see on page 85, but I think for
22   the most part there is nothing substantive to go over.
23   Q.   I see here it looks in the third little section
24   Teaching Positions and Instructional Responsibilities,

Jon Shane, 3/10/2023

---

**10**

1  professor of John Jay College of Criminal Justice. What
2  kind of classes are you teaching this semester?
3      A.  I teach a course called introduction to law
4  enforcement. I'm teaching research methods and I'm
5  teaching statistics.
6      Q.  The statistics class that you're teaching, is
7  that an intro to statistics or is it more of a graduate
8  level? I guess what kind of statistics class is it?
9      A.  It's a graduate level course.
10     Q.  And then the research methods class?
11     A.  That's also a graduate level.
12     Q.  Are there any specific research methods that you
13  focus on in the research methods course?
14     A.  No. It's very broad. It covers both
15  quantitative and qualitative measures.
16     Q.  The statistics class, though, is that primarily a
17  quantitative class?
18     A.  Yes.
19     Q.  Okay. What types of qualitative research methods
20  do you teach in the research methods course?
21     A.  Interviewing, embedded research, complete
22  participant observation, participant observation, focus
23  groups.
24     Q.  What is embedded research?

---

**11**

1      A.  Something like complete participant observation
2  where a researcher goes into a community or a group or
3  something like that and embeds themself in with that group.
4  Sort of like an anthropological approach.
5      Q.  I'm sure maybe, I guess as we go through this,
6  but have you conducted any qualitative -- have you written
7  any papers or dissertations on qualitative research
8  methods?
9      A.  On the methods themselves?
10     Q.  Yes.
11        MR. ENGQUIST: Object to the form of that
12  question. Go ahead. You can ask her to clarify.
13     A.  Do you mean on the methods themselves?
14     Q.  Yeah, sorry. Let me back up. Let me try it a
15  little bit different. So the qualitative methods that
16  you're teaching, have you ever conducted research --
17  qualitative research in that vein? Does that make sense?
18  Is that a bad question again?
19     A.  Well, I -- you're asking if I ever applied one of
20  the qualitative methods in a particular piece of research
21  that I've done?
22     Q.  Sure. That's a great way to phrase it. Thank
23  you. Have you ever applied the qualitative methods that
24  you teach in research that you've done?

---

**12**

1      A.  Yes.
2      Q.  Are there examples of that application in your
3  CV?
4      A.  Yes.
5      Q.  Can you -- if you can, could you point me to some
6  of those?
7      A.  Yes, just give me a moment.
8         If you look on page 87, and it's the first entry,
9  Key administrative and operational differences in the
10  police quasi-military model.
11     Q.  So that would be an example of some qualitative
12  research, where you have applied qualitative research
13  methods?
14     A.  That's correct, yes. That was complete
15  participant observation.
16     Q.  What was -- I guess what question were you
17  seeking to answer in this journal article about key
18  administrative and operational differences in police
19  quasi-military model?
20     A.  That the quasi-military model of policing is the
21  myth and that fire departments are more set up both
22  organizationally and operationally more like the military
23  than the police department is.
24     Q.  Did that paper include any sort of quantitative

---

**13**

1  analysis as well?
2      A.  No.
3      Q.  Then, flipping to page 85 of your CV, this lists
4  your deposition and trial experience. For each of these --
5  the broader question for this section is do you do this
6  type of work, deposition and trial work, through John Jay
7  College or is it more an independent consulting business?
8      A.  Independent of John Jay.
9      Q.  Do you have an LLC or consulting business set up?
10     A.  Yes.
11     Q.  What is that name of that consulting business?
12     A.  Jon M. Shane Associates.
13     Q.  Okay. Do you have any employees?
14     A.  I do not.
15     Q.  What type of work or cases do you generally take
16  on through your consulting business?
17     A.  You broke up a little bit. Did you ask me what
18  type of cases do I take on?
19     Q.  Yeah. What types of cases do you generally take
20  on through your consulting business?
21     A.  Police policy and practice issues.
22     Q.  How much of -- I don't need numbers, but just
23  percentagewise how much of your income would you say is
24  derived from your consulting business versus your

---

Jon Shane, 3/10/2023

14

1  employment at John Jay?
2      A.  Oh, I don't know.  I've never broken it out that
3  way but probably not much.
4      Q.  Okay.
5      A.  Most of my income comes from John Jay College.
6      Q.  Just for the sake of trying to pin it down, would
7  you say less than 25%?
8      A.  I mean it might -- it might be somewhere around
9  there.  Maybe 20, 25%, something like that.  I've never
10  really examined it that way.
11      Q.  Okay.  That's fair.  Let me ask it this way.  How
12  many cases do you have --
13          MS. CARNEY:  Is something wrong, Jennifer?
14          MS. BONJEAN:  Yeah, I'm turning the messages
15  off on the computer because messages are coming across and
16  I think it's distracting or would be distracting for the
17  deponent.
18  BY MS. CARNEY:
19      Q.  How many cases do you take on at any given time
20  through your consulting business?
21      A.  Over the course of -- over the course of what
22  period?  In a year?
23      Q.  Yeah, let's say within a year.  Do you have
24  multiple cases going on or do you take one on at a time?

15

1      A.  Yeah, that -- I probably have a few in progress
2  at any given time, yes.
3      Q.  Like say right now how many do you have in
4  progress?
5      A.  I don't know.  I couldn't -- I couldn't tell you.
6  Maybe four or five.
7      Q.  In your work --
8      A.  Let me just ask you to clarify, when you say in
9  progress, what do you mean by in progress?  Cases that have
10  not settled or have not been adjudicated or something?
11      Q.  Yeah, I mean, that's a great question.  I would
12  say cases where you're either working on drafting a report
13  or have provided the report to whoever hired you.
14      A.  Well, yeah, that's a tough question because there
15  are instances where I've submitted reports and I have never
16  heard anything, I don't know if the case settled, things
17  like that, but I can tell you right now I have two reports
18  that are in progress that I'm literally, literally drafting
19  at this moment.
20      Q.  Okay.
21      A.  I mean literally like that, but, yeah, that's why
22  I want to just get what you understand by in progress.
23      Q.  Yeah, no, that makes sense.
24          In regards to your work on police -- opining on

16

1  police policy and practices, have you ever opined on the
2  policies of the City of Chicago Police Department before?
3          MS. BONJEAN:  Objection, form.
4      A.  I think the answer is no, I don't remember
5  anything prior to this case.
6  BY MS. CARNEY:
7      Q.  Looking at your deposition and trial experience,
8  how much of that listed on pages 85 through 86, could you
9  quantify how much is plaintiff work versus defense work?
10      A.  Midway down on page 85, Carl Lida, the attorney,
11  that was a criminal defense case.  On page 86 at the top
12  Raoul Bustillo, the attorney, that is criminal defense.
13  David Schwartz right below that, that was civil defense.
14  And the last one at the bottom on page 86, another David
15  Schwartz, that was defense as well defending the police
16  department.
17      Q.  Okay, and then let me ask you this.  Were you
18  hired by the City of Chicago to draft a report in the Blake
19  Conyers versus the City of Chicago case back in 2012?
20      A.  I don't even remember that.  It doesn't sound
21  familiar.  Ten years ago?  2012?
22      Q.  Yeah.  It looks --
23      A.  Can you describe it?
24      Q.  It was an expert opinion regarding the Chicago

17

1  Police Department's handling of prisoner's personal
2  property potentially from 2019.
3      A.  2019?  I don't even recall the case, to be honest
4  with you.  Is it my work, do you know?
5      Q.  It says Dr. Jon M. Shane.
6      A.  I would have to look that up.  I don't remember
7  that off the top of my head.  Was that on behalf of the
8  plaintiff or the defense?
9      Q.  I believe it was on behalf of the City of
10  Chicago.
11      A.  I don't remember -- I don't remember anything
12  about that, to be honest with you.  I'm not saying that it
13  didn't happen but it just doesn't ring a bell.  Is there
14  any more listed above that you have that you can describe for me
15  what that was and refresh my memory?
16      Q.  Yeah.  We can come back to it.  I just was
17  curious if -- your name had popped up.
18          Do you remember being hired by attorneys at Taft,
19  the law firm Taft in the City of Chicago?
20      A.  Taft?  No, that doesn't ring a bell.  What's the
21  name of the attorney?
22      Q.  I don't have a name of the attorney,
23  unfortunately.
24      A.  Okay.

Jon Shane, 3/10/2023

18

1    Q.  Okay, that's fine.  I just -- just asking.
2    A.  It's distinctly possible, it just doesn't ring a
3  bell.
4        What did you say that the case was about?  Can
5  you repeat that what the case was about, please?  I think I
6  do remember now that you say it.  You said it had something
7  to do with prisoner's personal property?
8    Q.  Yeah, City of Chicago's handling of prisoner's
9  personal property.
10   A.  Yeah, I remember this.  There was a case where
11  the police department -- the challenge was against the
12  police department's property and inventory procedures and I
13  was opining on behalf of the City of Chicago that their
14  procedures were consistent with those procedures found in
15  other major cities like New York City, Los Angeles, I think
16  Newark may have been one that I referenced.  I remember the
17  case vaguely now that you say it, yeah.
18   Q.  Then, just kind of flipping through -- you have a
19  very long CV so I have to flip through a little bit.
20   A.  Okay.
21   Q.  I want to ask you some questions, I think we're
22  on page 90 --
23   A.  Okay.
24   Q.  -- about your time at the Newark Police

19

1  Department.  If you could tell me a little bit about when
2  were you first hired as a police officer on the Newark
3  Police Department?
4    A.  I was hired by the Newark Police Department in
5  March 1989.
6    Q.  What were you -- was that for patrol or --
7    A.  Well, my first assignment was to patrol, yes,
8  after the academy.
9    Q.  How long did you stay in patrol?
10   A.  From -- let's see, from August of '89 to probably
11  somewhere around '93 when I went to what was known as the
12  target team.
13   Q.  Can you tell me a little bit about the target
14  team in Newark in 1993?
15   A.  Yeah.  That was a city-wide tactical team that
16  was put together to counter carjackings and bank robberies
17  at the time.
18   Q.  How long did you stay at the target team?
19   A.  Probably until about March of '93.  I think I
20  went there in '92 and I came out of there in '93.
21   Q.  Where did you go after the target team?
22   A.  I went to the research, analysis and planning
23  division.
24   Q.  How long did you stay there?

20

1    A.  Well, I was in and out of there periodically.
2    Q.  Okay.
3    A.  So I was in from March of '97 -- '93 to May of
4  '97.  Then I was promoted in June of 1995.  Then I went out
5  and back into the field, then I came back into the division
6  later on at different points in my career.
7    Q.  I believe it says you were at the Newark Police
8  Department until 2005; is that correct?
9    A.  Yes.  December of '05.
10   Q.  December of '05?
11   A.  Yes.
12   Q.  How often were you out doing field work?
13   A.  Well, I mean, I held a number of enforcement
14  positions.  So there was a period when I was in homicide,
15  when I was working in homicide as the supervisor.  I would
16  cover the robbery division.  I was also on the emergency
17  response team at the same time that I was in an
18  administrative position so that overlapped.
19        Then I was in the command operations center
20  toward the end of my career, I would be in the field then.
21  I was working in the north district station and the east
22  district station as the field supervisor and a desk
23  supervisor so I was in the field then.
24        Then there were also periods of time periodically

21

1  when the police director or the chief of police would have
2  some sort of summer initiative they called it and they
3  would take administrative personnel and they would be put
4  out into the field periodically as you worked in various
5  assignments.
6    Q.  How long would you say you were investigating
7  homicides?
8    A.  Well, I was a supervisor there.  I didn't
9  actually do the investigations.  I was supervising
10  investigations.
11   Q.  Got it.
12   A.  And that was -- let me look at my -- from May of
13  '97 to September of '97 I was there.
14   Q.  While you were at the Newark Police Department,
15  were you ever in any -- either in an internal affairs
16  appointment or -- yeah, were you ever in internal affairs?
17  Let me ask it this way.  Sorry.  Bad question.
18        Did Newark Police Department have an internal
19  affairs division during the time frame that you were there?
20   A.  Yes, they did.
21   Q.  Okay.  And were you ever working in the internal
22  affairs division?
23   A.  Not working in the division, no.
24   Q.  The Newark Police Department, how -- what entity

Jon Shane, 3/10/2023

22

1    within the Newark Police Department or what entity outside
2    the Newark Police Department investigated complaints of
3    misconduct against police officers during the time frame
4    that you were employed there?
5        A.   The internal affairs division would do that, the
6    sergeants and supervisors, lieutenants, captains in the
7    commands would do investigations there, and then also the
8    Essex County prosecutor's office or the attorney general's
9    office, depending on the nature and scope of the
10   investigation, would work with the Newark Police Department
11   on misconduct.
12       Q.   So as a supervisor -- as a supervisor in the
13   homicide division, did you investigate allegations of
14   misconduct against any of your detectives?
15       A.   Not anybody directly assigned to me, but I just
16   want to make sure I'm clear on what you mean by that.  So
17   at the time the police department, the homicide section of
18   the police department would investigate police shootings.
19       Q.   Okay.
20       A.   So there would be a parallel criminal
21   investigation that homicide would conduct and there would
22   be an administrative investigation for policy violations
23   that internal affairs would conduct, but if you're asking
24   about the people that were assigned to homicide that worked

24

1    give you some sense of what the scope of the investigation
2    might be.
3        If it were criminal, it would be handled by an
4    internal affairs and prosecutor's office, the attorney
5    general and/or the U.S. Attorney's office, again, depending
6    on the size and the scope of that.  If it was
7    administrative, meaning a policy violation of some kind,
8    then it would be handled within the organization.
9        Q.   Okay.  And at that time who made the -- who made
10   the call that the complaint was criminal versus
11   administrative?
12       A.   Internal affairs, based on the nature of the
13   complaint that came in.
14       Q.   Would it be fair to say that everything would go
15   into internal affairs first and then it could branch out
16   from there?
17       A.   Well, when you say came into internal affairs,
18   that's not entirely accurate --
19       Q.   Okay.
20       A.   -- meaning a person could send an anonymous
21   letter to the police precinct, they could walk into a
22   police precinct, they could make a phone call.  So the
23   intake process which is guaranteed by the New Jersey
24   Attorney General's policy on internal affairs is that

23

1    as homicide investigators with me that I was supervising
2    the answer is no, I did not investigate them for
3    misconduct.
4        Q.   Okay.  So let me just ask you it this way.  Could
5    you explain to me the process for police misconduct
6    complaints in the Newark Police Department during your
7    tenure as a police officer?
8        A.   Well, a complaint would be generated either from
9    within the organization or outside the organization and
10   there would be a determination whether or not it was
11   criminal or administrative.
12       If it was criminal, it would be worked on between
13   the Newark Police Department and the Essex County
14   prosecutor's office.  If they needed -- they needed the
15   team that was investigating it, if they needed additional
16   resources they might go to the state attorney general's
17   office, or if it got really out of hand and they needed a
18   lot of resources they might go to the U.S. attorney's
19   office and the FBI in Newark.  If it was an administrative
20   investigation, it would be handled by internal affairs or
21   internal affairs would send it to one of the supervisors at
22   the local command where the officer was working.
23       So when you say misconduct, I mean that's a very,
24   very broad term which is why I'm trying to differentiate to

25

1    anybody has to accept a complaint at any time from anybody
2    about anything and that can be made anywhere.
3        Q.   Okay.
4        A.   A clearinghouse might be internal affairs.  So
5    all -- I mean, if I'm understanding you correctly, if
6    somebody made a complaint at the precinct, somebody would
7    come in and fill out a complaint form, they would take the
8    person's complaint, they would forward that form to
9    internal affairs.
10       Q.   Got it.
11       A.   And then from internal affairs they would make
12   those administrative decisions that you were talking about.
13       Q.   Got it.  That makes sense.
14       During your time in research and analysis were
15   you ever tasked with drafting policy for the New York --
16   Newark Police Department?
17       A.   Yes.
18       Q.   What kind of policies have you drafted?
19       A.   I can tell you I've either drafted, revised or
20   created new policies from the ground up on virtually
21   everything that was in the Newark Police Department at that
22   time from rules and regulations to police pursuits to use
23   of force, domestic violence.  Every single policy that the
24   Newark Police Department had, including its rules and

Jon Shane, 3/10/2023

26

1  regulations at some point in my career, whether it was in
2  the beginning from '93 to '97 or later on when I was the
3  executive officer or the commanding officer of that
4  division, I touched every single policy in the Newark
5  Police Department.
6      Q.  All right, moving on.  When were you first
7  retained in this case to provide an expert opinion?
8      A.  On or about March 22nd, 2022.
9      Q.  Oh, and I forgot to ask you before, about how
10 many cases have you, I don't want to know on stuff that
11 you've consulted with, but provided an expert report for
12 for Miss Bonjean and the Bonjean Law Group, if you can
13 remember?
14     A.  How many overall?
15     Q.  Yeah.
16     A.  Including -- with Miss Bonjean?
17     Q.  Yes.
18     A.  Maybe four, four or five.
19     Q.  Okay.
20     A.  Let me take a look.
21         MS. BONJEAN:  Prepared a report for?  Not
22 consulted, right?
23     Q.  Right.  Just prepared a report for, not
24 consulted.

27

1      A.  Let me take a quick look, hold on.
2          Three, including this one four.  I'm going to say
3  four off the top of my head.  I don't have my files in
4  front of me but I think that's a reasonable estimate.
5      Q.  That's fair.  This lists in your CV, starting on
6  page 85 to 86, this is just the cases that you've given
7  deposition and trial testimony in; is that correct?
8      A.  Yes.
9      Q.  So this list doesn't necessarily include all the
10 cases that you may have written a report for?
11     A.  That's correct.
12     Q.  So that would explain why the Conyers versus City
13 of Chicago case wouldn't be included on here if you didn't
14 give a deposition in that case?
15     A.  Yeah, that's a good point.  Yes.
16     Q.  Actually, I want to ask you a couple questions
17 about -- there is a case listed here on page 86, it's about
18 four from the bottom of that section.  It's one you had
19 with Miss Bonjean of December 2016.
20     A.  Yes.
21     Q.  I believe that's the Constantino versus City of
22 Atlantic City case.  Does that sound about right?
23     A.  Yeah, sure.
24     Q.  Can you explain to me a little bit about what

28

1  that case was about?
2          MS. BONJEAN:  I'm going to just object to
3  the form of that question, and I don't know if you're
4  asking about this particular proceeding or the case overall
5  but I'll let you --
6          MS. CARNEY:  Fair.  That's fair.
7  BY MS. CARNEY:
8      Q.  Do you recall sitting here today what analysis
9  you were asked to do in the Constantino versus City of
10 Atlantic City case?
11     A.  Yes.
12     Q.  What was that?
13     A.  We looked in internal affairs files and we looked
14 at the practices of the police department at that time.
15     Q.  Do you recall if you did a quantitative or a
16 qualitative assessment of those files?
17     A.  I think there was a little bit of both.
18     Q.  Do you recall sitting here today what the
19 qualitative analysis that you did was?
20     A.  Yes.  We were looking at the internal affairs
21 practices, the investigation and the way it was conducted.
22     Q.  Do you recall how many total internal affairs
23 files you reviewed in that case?
24     A.  No.  Several hundred.  Maybe upwards of a couple

29

1  thousand.
2      Q.  Okay.  That -- was that for -- sorry.  That's a
3  bad question.
4          MS. BONJEAN:  I'm just going to object on
5  the form of that question.
6          MS. CARNEY:  Yep, that's fine.  That makes
7  sense.
8  BY MS. CARNEY:
9      Q.  I think I'm done with your CV for the moment.
10         If we could pull up, and I've already marked it
11 as Exhibit 2A, which would be one of your invoices,
12 invoice 260.
13         (Remote screen sharing.)
14     A.  Okay.
15         MS. BONJEAN:  Glasses?  I was asking, it
16 looks like he needs glasses.
17     Q.  Can you see?
18     A.  She's not helping things.
19     Q.  Well, the font is very small.
20     A.  No, no, it's not you.
21     Q.  Okay.  So this is invoice number 260?
22     A.  Okay.
23     Q.  Dated 3/22/2002 (sic).  Do you see that?
24     A.  Yes.  I'm looking at it, yes.

Jon Shane, 3/10/2023

---

30

1    Q.  It looks like your hourly rate for this case is
2    395 an hour.  Does that sound right?
3    A.  Yes.
4    Q.  I want to go down to there is a line item here
5    3/29/2002, do you see that?  Sorry.  2022, not 2002.
6    Developing MS Excel Chicago PD CR record card file and
7    companion SPSS data file.  Do you see that?
8    A.  Yes.
9    Q.  What is a CR record card file?
10   A.  The Chicago Police Department's inventory of
11   complaints.  They call them CR files.
12   Q.  Right.  Not that part.  Where you say you're
13   developing an MS Excel record card file.
14   A.  What do you mean?  What are you asking?  What did
15   I develop in Microsoft Excel?
16   Q.  Yeah.  What does it mean to develop an MS Excel
17   Chicago PD CR record card file?
18   A.  It means I created an electronic file of the data
19   that I was examining.
20   Q.  Got it.  Does that mean you created a spreadsheet
21   where you would break down certain elements of the CR file
22   and input it into that spreadsheet?
23   A.  Yes.
24   Q.  Okay.  Then the companion SPSS file, data file,

---

31

1    the SPSS is statistical software, right?
2    A.  Yes.
3    Q.  Okay.  The next one down says, Populating data
4    collection protocol for Maysonet in MS Excel?
5    A.  Yes.
6    Q.  Can you tell me what it means to populate the
7    data collection protocol?
8    A.  Same thing, extracting components from the CR
9    files, putting them into an electronic form.
10   Q.  Did you personally review each of the CRs
11   produced in this case?
12       MS. BONJEAN:  Objection, form.  You can
13   answer if you understand.
14   A.  The ones that are listed here in my report.  Is
15   that what you're asking me?
16   Q.  We can get to this a little bit more when we get
17   to the report, but sitting here right now without the
18   report do you recall how many physical CR files were
19   produced in this case?
20       MS. BONJEAN:  Objection, form, foundation.
21   A.  No, I don't know off the top of my head, no.
22   Q.  Okay.  So I guess I'm just trying to understand
23   when you say populating data collection protocol and you
24   said that's extracting components from the CR files and

---

32

1    putting them into electronic format.  Does that mean that
2    you are sitting there going through each individual CR and
3    culling that information yourself?
4    A.  Yes.
5    Q.  Okay.  So then what's the protocol?
6    A.  That's the Excel file.  That's the data
7    collection protocol.  That's what it's called.
8    Q.  Okay.  So the protocol is actually the Excel
9    file --
10   A.  Yes.
11   Q.  -- that you created?
12   A.  Yes.
13   Q.  Got it.  Is that the same as the data collection
14   protocol code book?
15   A.  The code book is a list of definitions that I
16   refer to.
17   Q.  Got it, okay.  So if we could pull up Exhibit 13
18   which is a document we received in response to your
19   subpoena.  It's Maysonet Data Collection Protocol code
20   book.
21       (Remote screen sharing.)
22   Q.  Can you see it?
23   A.  Yeah.
24   Q.  Okay.  So this is the definitions that you were

---

33

1    working with as you were creating the MS Excel file; is
2    that correct?
3    A.  Correct.  Correct.
4    Q.  Who created this protocol?
5    A.  I did.
6    Q.  You did, okay.  While we're on it, I'm just going
7    to ask you some questions about this.  If you go down to
8    Type of Complaint 1?
9    A.  Yes.
10   Q.  It says identify the complainant -- sorry.
11   Identify the complaint; excessive force is for a lawful
12   police objective.  Assault is for an unlawful act.  Do you
13   see that?
14   A.  Yes.
15   Q.  Did you create that definition for your work in
16   the Maysonet case?
17   A.  I created that as a coding scheme.
18   Q.  As a coding scheme, okay.  So for then each of
19   these Type 1, 2, 3, 4, 5, are you -- sorry, let me start
20   that over.
21       When you're reviewing each of the CRs, were you
22   looking at each of those CRs to make a determination about
23   whether or not it was in your view excessive force or your
24   view assault?

---

Jon Shane, 3/10/2023

34

1   A. I had to differentiate between those two because
2   I didn't find anything in the Chicago Police Department's
3   policies and practices that explained the difference
4   between a criminal offense, an administrative offense,
5   excessive force and assault, and I never saw the words
6   excessive force listed. As much as I can remember, I
7   didn't see excessive force listed in the CR files. I saw
8   the word assault listed. And I didn't understand how they
9   were differentiating between these two things.
10      So to take a reasonable approach that was fair to
11  both the City and to the Plaintiff, as I was collecting
12  this data I was trying to understand what the differences
13  are.
14      Q. Okay.
15      A. So I coded it that way.
16      Q. So in reviewing the CRs you had -- you yourself
17  were trying to make a determination about whether or not it
18  should be classified as excessive force or assault?
19      A. Based on the content of the CR file.
20      Q. Okay. Did you -- as you were reviewing each of
21  the CRs, did you take notes on whether or not a specific CR
22  was going to be coded as an excessive force or as an
23  assault?
24      MS. BONJEAN: I'm going to object on work

35

1   product grounds.
2       Q. Okay. Let me ask it this way.
3       MS. BONJEAN: He can answer the question of
4   whether he took notes, I suppose, but --
5       A. So the answer is no, I did not take notes. I
6   assume you mean like physical hand notes or some sort of
7   typewritten notes and the answer is no. If I read
8   something in the CR file, then I put it into the Excel
9   file.
10      Q. Okay. So is it fair to say that the totality of
11  the information that you gathered from the CR files was
12  inputted into this MS Excel file that you created?
13      A. Well, when you say totality you mean based on
14  this protocol?
15      Q. Based on this protocol.
16      A. Yes.
17      Q. So there is no way to know whether or not a
18  specific CR was coded by you as excessive force or assault
19  unless we look at that MS Excel file?
20      A. We would have to do that, yes. It doesn't exist
21  anywhere else.
22      Q. Okay. And for each of those CRs where you were
23  making a judgment call -- yeah, where you were making a
24  judgment call about excessive force versus assault, you

36

1   were essentially opining on your belief in the validity of
2   the allegations in the CR; is that right?
3       MS. BONJEAN: Objection to form, foundation.
4       A. Can you repeat that, please?
5       Q. Yeah. Sorry about that. So for each of the CRs
6   that potentially contained an excessive force complaint,
7   it's your interpretation of the facts was what was the
8   deciding factor between whether to code it as excessive
9   force or assault; is that correct?
10      MS. BONJEAN: I'm still objecting to form.
11  That's a little different than what you initially asked but
12  still objection form.
13      A. Well, I believe that the internal affairs file
14  was coded as an assault. I believe they were all coded as
15  assault. I don't remember seeing anything that was listed
16  as excessive force.
17      Q. Okay. So, sitting here today, it's your belief
18  that the City of Chicago does not classify CRs as excessive
19  force?
20      MS. BONJEAN: Objection, form, foundation,
21  misstates his testimony, and also -- yeah, foundation. Go
22  ahead, you can answer if you understand.
23      A. Say that again, please. Did you want to know how
24  I'm interpreting how the City of Chicago classifies its

37

1   cases?
2       Q. Well, I guess I'm trying to understand, and maybe
3   I'm misunderstanding you, but you're saying that when you
4   reviewed the CR files you did not see classifications of
5   excessive force? Is that accurate or am I
6   misunderstanding?
7       A. I think that's accurate. I don't recall seeing
8   things that were labeled excessive force. I do remember
9   seeing things that were labeled assault.
10      Q. And so when reviewing the CRs you had to
11  interpret the facts within those CRs to determine whether
12  it was, based on your definition, excessive force for a
13  lawful police objective or assault an unlawful act?
14      A. Well, the file itself was labeled assault.
15  That's coming directly from the CR file. That wasn't
16  coming from me.
17      Q. Okay. But either way the only way to
18  establish -- the only way to know how you coded each
19  individual CR is through this MS Excel file that you
20  created; is that right?
21      A. Yes.
22      Q. Okay. Going down a little bit here, there is
23  this victim contacted section?
24      A. Yes.

Jon Shane, 3/10/2023

38

1    Q.  It says, Yes, by phone.  Yes, in person.  No
2    contact established.  Did that mean no, no contact was
3    established?  Or, no, contact was established but they
4    didn't interview?
5        A.  No, this is just regarding contact.  Interview is
6    elsewhere.
7        Q.  Okay.  So that would be the same then for witness
8    contacted?  The no contact established just means there was
9    no contact established?
10       A.  Correct.  That the CR file did not demonstrate
11   that there was contact established.
12       Q.  Got it, okay.  Then starting at in-person witness
13   interviews-- I guess there's a couple of them up there,
14   too, but you have this N/A, not applicable, in the
15   definitions?
16       A.  Yes.
17       Q.  Who -- what does that mean in your definitions
18   for the data collection protocol, the not applicable?  That
19   no -- like, for example, using in-person interview of the
20   witness, why would that not be applicable to that CR?
21       A.  That there was no witness to interview.
22       Q.  Got it, okay.  So then going back to your
23   invoices, so I think I have this one as 2A.  The very
24   bottom invoice -- the very bottom line it says, Synopsis &

39

1    Notes on all cases.  Do you see that?
2        A.  Yes.
3        Q.  Is that something different than the MS Excel
4    file that you created?
5        A.  No.  That's one of the lines or one of the
6    fields, I should say, that's the best way to say it, one of
7    the fields in Excel.
8        Q.  What did that field include?
9        MS. BONJEAN:  Sorry, just grabbing a pen.
10       Q.  The Synopsis & Notes on all cases, what did that
11   field include in your review?
12       A.  It's a synopsis of the CR file.
13       Q.  Okay.  Did anybody else review the CRs in order
14   to code them in the MS Excel spreadsheet?
15       MS. BONJEAN:  Hold on.  I'm going to object
16   to that question and also lodge a work product objection.
17   I guess that's the same thing.  I'm going to object on work
18   product grounds.
19       MS. CARNEY:  So you're not going to let him
20   answer that one?
21       MS. BONJEAN:  No.  I mean I don't know
22   that -- we can talk about it with you but at the moment I'm
23   going to advise him not to answer, and if you want to talk
24   about it off and then see if we can reach an agreement

40

1    about something if you want.
2        MS. CARNEY:  Okay.  Well, let me see if I
3    can ask it this way.
4    BY MS. CARNEY:
5        Q.  For your data collection protocol document that
6    you created -- you know what --
7        MS. CARNEY:  We can talk about it on a
8    break, Jennifer, if that's okay?
9        MS. BONJEAN:  Yeah, let's do that at a break
10   so I can -- yeah, let's just do that at a break.  We don't
11   need to take up time now but I'm going to object at the
12   moment.
13       MS. CARNEY:  Okay.
14   BY MS. CARNEY:
15       Q.  So if we move on to Invoice 280 which would be
16   2B.
17       (Remote screen sharing.)
18       Q.  And this is kind of a silly question but -- so
19   you go from invoice 260 to 280.  There is -- the invoices
20   in between that, is that fair to assume those are for other
21   cases you're working on and that's why there is the big
22   jump?
23       A.  Yes.
24       Q.  So there is no invoices missing?  We're not

41

1    missing invoices 261 to 279 for this case, right?
2        A.  Oh, no, no, no.
3        Q.  All right.  So on this invoice we have, Defining
4    the dataset.  Do you see that there?
5        A.  Yes.
6        Q.  Can you explain to me what it means to define the
7    dataset?
8        A.  It means to compile everything from the
9    information that I gleaned out of the CR files and get it
10   into the MS Excel spreadsheet, make sure that all the
11   spelling is correct, that the fields are correct, that
12   there are no errors.
13       Q.  Okay.  Then down a little bit you have
14   preliminary data analysis and then data analysis.  What's
15   the difference between the preliminary data analysis and
16   your data analysis?
17       A.  Nothing much.  I'm doing -- when I say the
18   preliminary data analysis, that's my first look at the
19   data.  I want to make sure that the database is operating
20   properly, I want to make sure things are not misspelled,
21   and when I call up a function that it's working properly.
22       Q.  Got it.  If we could flip back to 2A?
23       (Remote screen sharing.)
24       Q.  So starting on line 3-29-2022, Developing

Jon Shane, 3/10/2023

42

1    MS Excel.  That appears to be the first time that you're
2    really digging into the data.  Does that sound right?
3        A.  Where are you?  I just want to make sure I'm
4    looking at the same --
5        Q.  Yeah.  It's the 2.4 hours on 3-29-2022.
6        A.  Yeah.  And your question is?
7        Q.  That seems to be the first entry where you're
8    really, based on what you've told me about what these mean,
9    digging into the data and reviewing the data?
10           MS. BONJEAN:  I'm going to object to the
11   form.  Go ahead.
12       A.  No.  I mean I was looking at the data prior to
13   that to get a sense of what the files look like, and this
14   is the point in time when I started to create the file, the
15   MS Excel file, but I'm looking at the data ahead of that.
16       Q.  Okay.  So if we add up, though, starting from
17   there all the way down to the last one which has the
18   synopsis and the notes I get about 17 to 18 hours,
19   17.6 hours in reviewing the data, populating the data
20   collection, developing the MS Excel spreadsheet.  Does that
21   sound about right?
22       A.  On this particular form?
23       Q.  Yeah.
24       A.  This particular invoice number 280?

43

1        Q.  260.
2        A.  Or 260?
3        Q.  Yeah.
4        A.  Well, do you have a calculator?  I didn't add
5    these numbers up.
6        Q.  I used a calculator, I promise, and I got 17.6.
7        A.  Okay.  I'll trust you.
8        Q.  All right.
9        A.  Okay, yeah.
10       Q.  Then looking at the rest of the invoices that
11   you've provided, so we've got 2B which is 280, is there any
12   line item on there that includes populating -- I mean I
13   guess defining the data, is that right?  You said that's
14   compiling everything and putting it into MS Excel, right?
15       A.  Yeah, and at the same time when you look down
16   under preliminary analysis, a little further down where
17   it's 2.5 hours on October 20th, 2022.
18       Q.  The preliminary data analysis?
19       A.  Yes.  There is a strong chance there that I was
20   adding data at that point too to make sure that everything
21   was accurate.
22       Q.  Okay.  Then what about the one underneath it, the
23   4.5 of data analysis and review?  Would that have been --
24       A.  Go ahead, I'm sorry.

44

1        Q.  Sorry.  Would that have been more inputting data
2    or is that more of the review of the data?
3        A.  Well, that's -- it's a little bit of both, but I
4    would say that there is more on the review side than on the
5    populating side.  At this point when we're talking about
6    doing data analysis we've run through the preliminary
7    analysis, we're checking for data integrity, those kinds of
8    things.  When we get to data analysis, very little is left
9    to populate.
10       Q.  Got it.
11       A.  That's because it's an iterative process.
12       Q.  It's a what process?
13       A.  It's an iterative process.  You look at the data,
14   you transfer it into MS Excel; you go back to the data, you
15   look to Excel, you go back.  Then you make sure all your
16   data is accurate when you have it there and you go back and
17   forth between the two.
18       Q.  Got it.  But is it fair to say that maybe by
19   October of 2024 -- sorry.  Wow, my dates are all sorts of
20   screwed up today.  October 24th of 2022, as you said,
21   there was very little left to populate, the majority of the
22   data was in MS Excel?
23       A.  Yes, I would say that's accurate.  Maybe the
24   25th where you see it says data analysis drafting.  I

45

1    think at this point everything is populated and ready to
2    go.
3        Q.  Okay, great.  Then we have one more invoice at
4    Exhibit 2C.
5            (Remote screen sharing.)
6        A.  What's that one?
7        Q.  So 293 from December 4th, 2022.
8        A.  I just don't have --
9            MS. BONJEAN:  Hold on, we don't have a hard
10   copy of that.
11       A.  Can you scroll up a little?  Okay.
12       Q.  So it looks like at this point you're drafting --
13   no, you're finishing drafting up the report it looks like?
14   Couple entries for drafting, some conference calls with
15   Ms. Bonjean, Ms. Cohen.  Is this the last invoice that you
16   submitted to Ms. Bonjean for your work on the Maysonet
17   case?
18       A.  Well, I don't have them all in front of me.  I
19   believe these are the last three.  I don't have any
20   outstanding, I can tell you that.
21       Q.  So I think this report was issued January 13th,
22   2023.  So you finished up the report that day, sent it off
23   and you were done for then, for that point in time?
24       A.  That's correct.  That's correct.

Jon Shane, 3/10/2023

46

1    Q.  All right, great.  I'm going to show you what
2  I've marked as 3A.
3            (Remote screen sharing.)
4    Q.  I don't know why I did it as an A but I did.
5  This was attached to your expert report and it's titled
6  Exhibits.  Do you see that?
7    A.  Yes.
8    Q.  Is this a list of everything that you reviewed or
9  is this just the exhibits that were cited in your report?
10   A.  No, these are things that I reviewed.
11   Q.  Just out of curiosity, what is the relevance of
12  putting the page numbers on this document for each of the
13  documents that you reviewed?
14   A.  Just so I can have an accurate record of what
15  document I had at that time.
16       MS. BONJEAN:  Object to the form.  Object to
17  the form.  I'm confused too.
18       MS. CARNEY:  Okay.  All right.  We've been
19  going for about an hour.  I'm going to move on to another
20  part.  Do we want to take a quick break or --
21       MS. BONJEAN:  We can take a two-minute break
22  so I can just grab a coffee.
23       MS. CARNEY:  Yeah, that's fine.  Give
24  everybody five so they can get around their offices.

47

1        THE VIDEOGRAPHER:  We're going off the video
2  record at 11:09.
3            (Whereupon a recess was taken.)
4        THE VIDEOGRAPHER:  All right.  We are back
5  on the video record at 11:20 a.m.
6        DIRECT EXAMINATION (cont.)
7  BY MS. CARNEY:
8    Q.  All right, Dr. Shane.  I want to move on to a
9  little bit more broader subject and ask you about empirical
10  studies.  Can you define for me what an empirical study is?
11   A.  An empirical study is one that uses systematic
12  observation to answer a particular question.
13   Q.  When you say systematic observation, what do you
14  mean by that?
15   A.  I mean you just can't look at things haphazardly.
16  You have to have some sort of systematic observation
17  protocol of what you're examining and the rules you've laid
18  down for examining those things.
19   Q.  Based on your resumé, you have conducted
20  empirical studies in the past; is that accurate?
21   A.  Yes.
22   Q.  When you set up an empirical study, are there
23  certain protocols that you need to follow in order to set
24  that study up?

48

1        MS. BONJEAN:  Objection, form.
2    A.  When you say certain protocols, what do you mean
3  exactly?  That's a little unclear.
4    Q.  Yeah.  Well, I guess I'm trying to understand
5  because you said a systematic observation is a protocol to
6  determine what you are examining, right?  You can't do it
7  haphazardly?
8    A.  Correct.
9    Q.  So I'm trying to understand when you are tasked
10  with or are conducting an empirical study, how do you set
11  that up to ensure that you're not doing it haphazardly?
12       MS. BONJEAN:  Objection, form, foundation.
13   A.  Well, you ask a research question.  From the
14  research question you create what is called a testable
15  hypothesis, and from that testable hypothesis you then
16  systematically collect data and those are the observations
17  that you make.  Then you test that hypothesis and you test
18  it to determine whether or not it is supported or it's not
19  supported
20   Q.  Okay.  And then the data that you collect, is
21  that -- is the type and the amount of data you collect
22  dependent on the research question and the hypothesis
23  you're looking to test?
24       MS. BONJEAN:  Objection to the form and

49

1  foundation to that question.
2    A.  You say the type and amount?
3    Q.  Yeah, so -- sorry.  So you want to collect data.
4  So you just gave me four kind of pillars for an empirical
5  study:  Research question, testable hypothesis, collect the
6  data and then you test that hypothesis.
7        I guess my question is how do you determine how
8  much data or what kind of data needs to be collected in
9  order to test that hypothesis?
10   A.  Well, those are two different things.
11   Q.  Got you.
12   A.  The type and the amount are two different things.
13       The type of data is dependent upon what you can
14  access at that moment for that sort of thing.  I mean you
15  might want to look at survey questions, you might want to
16  survey individuals, you might have an existing dataset
17  where some other researcher has already collected the data
18  and you're using their dataset, that's known as secondary
19  data.
20       And the amount of data is dependent upon the type
21  of question that you are looking at and what is called a
22  power analysis, and a power analysis is dependent upon the
23  type of statistical test that you are going to use to make
24  sure you have a sufficient number of cases.

Jon Shane, 3/10/2023

50

1    Q.  Got it.  You had mentioned secondary data.  What
2  is secondary data?
3    A.  Secondary data is some other data you rely on or
4  that you're using that someone else has collected.
5    Q.  In the quantitative research world are there any
6  precautions that need to be taken when using secondary
7  data?
8    A.  You're always subject to limitations with
9  published data, yes.  The limitations, the quality of the
10  data, could be missing data pieces, what's known as missing
11  data.
12    Q.  You said something about definitions.  What do
13  you mean -- what are you referring to with definitions in
14  the secondary data?
15    A.  Well, in the research world you have two types of
16  definitions.  One is called a conceptual definition, and
17  you should think of that as a dictionary type definition,
18  what you mean when you say a word.  Then you have what are
19  known as operational definitions, and operational
20  definitions are how you plan to measure that particular
21  construct.
22    Q.  So, for example, the data collection protocol
23  that we looked at before which was Exhibit 13, would that
24  have been -- that would have been operational definitions;

51

1  is that right?
2        MS. BONJEAN:  Objection, form.
3    A.  Let me just take a look.  Some of these have a
4  little bit of both.
5    Q.  Okay.
6    A.  For example, complaint source, and I call it
7  internal/external.  How I'm measuring that is the presence
8  or absence of those conditions.
9    Q.  So is that conceptual or operational?
10    A.  Well, the conceptual definition for complaint
11  source is whether the complaint source was from an external
12  source or an internal source.
13    Q.  Okay.
14    A.  That's conceptually.  How it's measured is either
15  one or the other.
16    Q.  Got it.  When you -- if you're not using
17  secondary data, if you're using data that you yourself have
18  gathered --
19    A.  That's called primary data.
20    Q.  Primary data, okay.  How do you -- are there any
21  protocols or requirements for how to go about collecting
22  primary data or is it dependent on the research question
23  that you're being asked to answer?
24    A.  That's not -- that's not clear to me what you

52

1  mean by when you say collect the data.
2    Q.  Okay.
3    A.  What do you mean by that?
4    Q.  Yeah.
5    A.  If I'm collecting the data -- I'm not clear on
6  your question.
7    Q.  That's fair.  We were talking about types of data
8  before, right, what you can access versus potentially an
9  existing dataset or secondary data.  If you're starting
10  with primary data, it's -- define for me primary data so I
11  can make sure that I'm saying this right.  How do you
12  define primary data?
13    A.  Primary data is the data that the researcher
14  collects themselves.  Now, if I collect the data and
15  someone else used my data they would be using secondary
16  data.
17    Q.  Okay.  So when you're tasked with a research
18  question and you want to obtain primary data, I guess my
19  question is how do you go about collecting that primary
20  data?  Do you have to set up your own research protocols, a
21  code book?  What are the steps that as a researcher you
22  would go through to collect that primary data for use in
23  answering a research question?
24        MS. BONJEAN:  Objection, form.

53

1    A.  You would do those very things that you're just
2  talking about.  You identify the source, what -- where you
3  can get data, how you plan to collect it, is it going to be
4  surveys, are you going to look through agency records?  How
5  do you plan to get the data.
6        Then, when you have the data, you have to start
7  to extract fields from that data that fit your research,
8  your overall research.  Like, for example, you may want to
9  know what a demographic profile looks like so you collect
10  age, race, sex, things like that.  If you wanted to know
11  some other aspect of the research that helps answer a
12  particular hypothesis, you would collect the data and
13  either it exists or it doesn't exist.
14    Q.  Got it.  When in this setup do you do your power
15  analysis?  I guess I'm trying to figure out is kind of the
16  timeline for how to set up -- how to go from research
17  question to analysis and when the data comes into play,
18  when you define the data.  That's kind of the broad way I'm
19  looking at this.
20        So my question then is, you know, once you do all
21  those steps for the primary data, when does the power
22  analysis come into play?
23    A.  You do that early on in your methodology.  You
24  start to think through -- again, that's an iterative

Jon Shane, 3/10/2023

54

1   process. You go back and forth between the type of method
2   that you're going to use and then you think about the type
3   of statistics that you want to run, and then while you're
4   thinking about the statistics you want to run you go back
5   to the method to make sure you can collect that kind of
6   data. So you go back and forth. Iterative process.
7           The power analysis comes in early on in the
8   methodology stages when you're thinking through it so
9   you're able to determine the number of cases that you need.
10      Q.   That's because you want to have a statistically
11  significant sample to run your analysis; is that accurate?
12      A.   Well, I wouldn't say a statistically significant
13  sample. I would say you want to have the study to have
14  sufficient power.
15      Q.   Got it.
16      A.   And to have sufficient power means to be able to
17  detect an effect when one is present.
18      Q.   What are the impacts -- well, let me ask you
19  this. Are power analysis necessary in qualitative research
20  or just quantitative research?
21      A.   Quantitative.
22      Q.   What's the impact of not having sufficient power?
23      A.   You could potentially have erroneous results that
24  you -- or, inferences that you draw from the data.

55

1       Q.   Is there a particular equation to conduct a power
2   analysis?
3       A.   You can use -- typically most researchers use a
4   power analysis calculator, and you define the parameters
5   inside -- in the calculator and it will give you the number
6   of cases you need.
7       Q.   Got it. Is this where -- well, let me ask it
8   this way. Is there like a power range, you can have like
9   higher levels of power or lower levels of power but it's
10  still sufficient power?
11      A.   Yes, you can do that.
12      Q.   What are those ranges?
13      A.   Well, I'd have to look at a power analysis
14  calculator to do it, but you can plug in different desired
15  power levels, you can plug in what are called different
16  alpha levels, alpha level is where your statistical
17  significance is defined. When you make those adjustments,
18  the power will adjust and you'll either need more cases or
19  fewer cases depending on what it is you've set.
20          If you set load detention levels meaning I want
21  to detect an effect at a relatively low level, you'll need
22  more cases to do that. If you want to say, well, I'm
23  interested in some medium size effect, you'll need fewer
24  cases to do that.

56

1       Q.   Okay. Is that the same as a confidence level
2   analysis or is this different?
3       A.   Are you talking about a confidence interval?
4       Q.   Sure. I guess that's a good question because
5   I've heard it referred to as a confidence level. Is there
6   a difference between confidence level and confidence
7   interval?
8       A.   Okay, I think -- yeah, there is. To answer your
9   question, yes, there is, but I think what you're saying is
10  that your confidence level is the same as your alpha level.
11      Q.   Is that what -- confidence level and alpha level
12  are essentially --
13      A.   The same thing, yes.
14      Q.   Got it. And then --
15      A.   Rarely use that word confidence level. It's
16  usually alpha level. That's why I wanted to make sure I
17  knew what I was --
18      Q.   I'm sorry. I'm making you dig way back in the
19  memory bank.
20      A.   That's all right.
21      Q.   This is maybe another term that's not used very
22  often anymore, but like percentage -- is there a percentage
23  of error that -- I'm blanking on the term I want to use so
24  we'll move past that.

57

1           Sufficient results, okay. Then the amount of
2   data necessary for any given research question depends on
3   the research question and the power levels that you want to
4   establish; is that accurate?
5       A.   It doesn't depend on the -- what do you mean when
6   you say it depends on the research question?
7       Q.   Well, I guess -- let me ask it that way then.
8   Does the number -- does the amount of data -- does the
9   amount of data -- is the -- does the research question
10  impact the amount of data necessary?
11      A.   No. Those two things are separate.
12      Q.   Okay.
13      A.   The research question is the overarching question
14  that you're interested in understanding.
15      Q.   Okay.
16      A.   Let me give you an example. Let's say we wanted
17  to talk about levels of fear in a neighborhood. So the
18  research question might be how do men and women differ on
19  their perceptions of fear in neighborhood. That's the
20  research question.
21      Q.   Okay.
22      A.   Now, how much data you collect depends on your
23  power analysis. If I wanted to run -- let's just --
24  completely illustrative. Let's say I wanted to run what's

Jon Shane, 3/10/2023

---

58

1    called a multiple regression model where I'm interested in
2    knowing the outcome of those perceptions on an ordinal
3    scale, let's say from 1 to 10, 1 being -- or, 0 to 10, 0
4    being no fear, 10 being a lot of fear. I would go out and
5    I would conduct a power analysis based on a multiple
6    regression model with, let's say, 10 or 12 different
7    variables and my power analysis calculator would tell me
8    how many cases I need.
9        Q.  Okay. This is just -- I'm sorry if this is
10   repetitive. This is just for quantitative research, not
11   qualitative research?
12       A.  Well, it depends on what exactly you mean. The
13   answer is yes, you can use this for qualitative research to
14   assure that you get a sufficient number of -- let's say
15   we're doing surveys but we're not going to subject those
16   surveys to statistical analysis. What we want to know is
17   whether or not there are themes that arise.
18       Q.  Got it.
19       A.  So various themes may come up, and one of the
20   things we know about saturation levels is they generally
21   occur at low numbers. So the tendency is to over sample so
22   you have a wide, sufficient sample to be able to draw your
23   inferences from.
24       Q.  In the context of your work in this case, what

---

59

1    was the research question that you were asked to answer?
2        A.  So the first one which appears on page 11 is did
3    the Chicago Police Department fail to supervise its
4    personnel consistent with accepted industry practices when
5    complaints again the Defendant officers were generated?
6        Q.  All right.
7        A.  The second one was did a pattern of complaints
8    emerge against Chicago police officers between 1980 and
9    2008. Those appear on pages 11 and 12 of my report.
10       Q.  So for the first research question, did the
11   Chicago Police Department fail to supervise its personnel
12   consistent with accepted industry practices, how did you
13   set -- where is my steps? What was then -- so you have
14   that research question. What was the testable hypothesis
15   you were looking for or that you created to answer that
16   question?
17       A.  We didn't have a testable hypothesis in this.
18       Q.  Okay. Why not?
19       A.  Because we weren't conducting -- we weren't
20   trying to test any given hypothesis in this. We wanted to
21   look -- we wanted to look at the data to see whether or not
22   the practices were consistent with the -- we wanted to see
23   whether or not the practices of the Chicago Police
24   Department were consistent with industry standards at that

---

60

1    time.
2        Q.  Okay. So is that considered a quantitative
3    research question or a qualitative research question?
4        A.  That's -- that's more -- that's more qualitative.
5    I mean there are some quantitative aspects of it when we
6    started to look at the data.
7        Q.  Okay. And then the next step of collecting data
8    based on what we talked about this would have been -- was
9    this primary data or secondary data that you used in this?
10       A.  This is primary data.
11       Q.  Okay. When answering this research question, did
12   you define the parameters of the data that you needed to
13   answer the question?
14           MS. BONJEAN: Objection to the form of that
15   question.
16       A.  What exactly do you mean did I define the
17   parameters of the data?
18       Q.  So we talked about primary data, identifying the
19   source, how to collect it and then extracting the fields
20   that fit the research, right?
21       A.  Yes.
22       Q.  Okay. So did you follow those steps in order to
23   obtain the primary data that you used to answer this first
24   research question that we just talked about, did the

---

61

1    Chicago Police Department fail to supervise its personnel?
2        A.  Yes, I did.
3        Q.  Okay. Then you said the second research question
4    was --
5        A.  Page 12.
6        Q.  -- did a pattern of complaints emerge against
7    Chicago police officers between 1980 and 2008? Is that
8    qualitative research question or quantitative research
9    question?
10       A.  That's a little bit of both. Primarily
11   quantitative.
12       Q.  Since we're diving right in, we might as well
13   move on to the report and start going through that. So
14   I've marked the exhibits as having the report as Exhibit 3.
15   If you have it in front of you, I don't know that we need
16   to put it up unless somebody else really would like it up?
17           MS. BONJEAN: We have a paper copy here in
18   front of him.
19       Q.  Okay. It's probably easier to work off the paper
20   copy anyway.
21           (Remote screen sharing.)
22       Q.  I've marked as Exhibit 3 your report in this
23   case, Maysonet versus Guevara, et al. You have in front of
24   you a full copy of your report; is that correct?

---

Jon Shane, 3/10/2023

62

1    A.  Yes.
2    Q.  This is a true and accurate copy of the report
3  that you provided in this case?  If you want to flip
4  through it.
5    A.  It is, yes.
6    Q.  Okay.  I'm just going to -- we've gone -- I'm
7  trying not to overlap questions but I'm going to go through
8  the report and ask specific questions about portions of it.
9  So right away on page one in your Statement of
10  Qualifications.
11   A.  Okay.
12   Q.  The first paragraph it says, My expertise is
13  police policy and practice and theoretical underpinnings of
14  the police.  What are theoretical underpinnings of the
15  police?
16   A.  How the police were formed, why they were formed,
17  what their social and sociological tasks were.
18   Q.  Got it.  Moving on to the next line you say, My
19  other teaching and research interests are situational crime
20  prevention, social disorganization theory, routine
21  activities theory.  What is situational crime prevention?
22   A.  Well, I can point you to a good example of that.
23  So the definition of situational crime prevention is to
24  examine the relationship between an offender, a capable

63

1  guardian or the absence of a capable guardian and
2  somebody's motivation for committing a crime, and then
3  manipulating the environment as best as you can to
4  systematically and as permanently as you can to prevent
5  crime from occurring.
6        If you -- I'll tell you where to turn.  If you
7  turn to my CV, page 86.  Tell me when you're there.
8    Q.  I'm here, sorry.
9    A.  So you'll see a couple of entries under
10  Publications, one is 2014 Shane and Magnuson, Successful
11  and Unsuccessful Pirate Attacks Worldwide:  A Situational
12  Analysis.
13   Q.  There it is, okay, yeah.
14   A.  Then the one right above that, Shane, Piza and
15  Mandalla 2015, Situational Crime Prevention and Worldwide
16  Piracy.
17   Q.  Okay.
18   A.  So my interest is not in piracy.  My interest is
19  in situational crime prevention.  And what I was interested
20  in knowing there is based on the things I know about crime
21  prevention.  Could tactics that are applied on land be
22  adapted to prevent worldwide piracy on the high seas, and
23  the answer was yes to those questions.  So I'm interested
24  in how police departments can implement crime prevention

64

1  measures.
2        MS. BONJEAN:  I just asked him if he
3  embedded himself with some pirates.
4        MS. CARNEY:  I was going to ask that but I
5  thought it might be too far afield.
6        THE WITNESS:  The answer is I tried but I --
7  true story, I tried but I couldn't get a ride on a cargo
8  ship.  True story.
9  BY MS. CARNEY:
10   Q.  Social disorganization theory, what's that?
11   A.  Yes.  Social disorganization theory is an
12  ecological theory about how cities are constructed and the
13  conditions that arise within cities, concentrated poverty,
14  disadvantage, a lot of those different things.
15   Q.  Do you study any cities in particular or is it
16  just a --
17   A.  No.  A broad, general overview.  I mean the
18  classic studies have been done in Chicago.  So, for
19  example, a group named Shaw and McKay did what are known as
20  concentric circles and they talked about the arrangement of
21  the city from its inner core which would be the downtown
22  and then they had these concentric zones that go all the
23  way out to residential areas and the stability that plays
24  doubt within certain areas.

65

1        I personally have not studied the City of
2  Chicago, though.  I just want to make that clear.
3    Q.  Then routine activities theory, what's that?
4    A.  Yes.  Routine activities theory is a theory about
5  how humans move about in time and space and how a motivated
6  offender comes in contact with a suitable target in the
7  absence of a capable guardian and that is what is known as
8  the chemistry of crime.  That is when opportunity arises
9  and crime, although not inevitable, is likely to occur.
10   Q.  Okay.  Flipping to page two, we talked already a
11  lot about your employment and your time at the Newark
12  Police Department.  I have one -- a couple more questions
13  about your time there at the police department.
14        When you were employed at the Newark Police
15  Department, did you ever receive a complaint of misconduct
16  against you?
17   A.  No.
18   Q.  All right.  I'm on page six of your report, basis
19  of your opinion.  You say you relied on your experience in
20  criminal justice, police operations and police
21  administration on the accepted standards of care recognized
22  by police organizations and officials throughout the United
23  States.  What standards of care are you referring to?
24   A.  The policies and customs of policing that have

Jon Shane, 3/10/2023

66

1  been in play since at least the 1960s when the
2  International Association of Chiefs of Police began to
3  develop what are known as training keys. Then that's
4  evolved. In 19, I want to say, 87 the IACP was tasked by
5  the U.S. Department of Justice to house their model policy
6  program. So the IACP has created and drafted model
7  policies that have been the standards, as well as another
8  group called CALEA, C-A-L-E-A, which is the Commission for
9  the Accreditation of Law Enforcement Agencies, and they set
10 standards nationwide for policing.
11     Q. So we talked about the -- what was it, the
12 international something of chiefs of police?
13     A. The International Association of Chiefs of Police
14 which is known as the IACP.
15     Q. What was the last one you just --
16     A. CALEA, C-A-L-E-A, Commission for the
17 Accreditation of Law Enforcement Agencies.
18     Q. Then you say you were an active member of the
19 American Society of Criminology, the Police Executive
20 Research Forum and the Academy of Criminal Justice
21 Sciences; is that right?
22     A. Yes, that's correct.
23     Q. Taking these one by one, when did you first
24 become involved in the American Society of Criminology?

67

1     A. I'm not sure. It would have to be at least when
2  I began my PhD program so I would have to say maybe
3  somewhere around 2004.
4     Q. What role do you have in the American Society of
5  Criminology?
6     A. No role. I'm just a member.
7     Q. Just a member? Okay.
8     A. Yes.
9     Q. Not just a member. That's good.
10     The Police Executive Research Forum, when did you
11 become involved there?
12     A. That's been much further along. I mean that
13 probably happened at some point in my police career. I
14 don't know but it's been quite a long time.
15     Q. Do you have an active role in that or is it just
16 membership?
17     A. No. Just a dues paying member.
18     Q. Then the Academy of Criminal Justice Sciences,
19 when did you first become involved in that?
20     A. That was probably around the same time as ASC,
21 2004, late 2004.
22     Q. Got it. Also a member?
23     A. Just a member, correct. I don't hold any office
24 or anything.

68

1     Q. Starting on page six going through page eight you
2  list about 44 various lectures, workshops, research, stuff
3  like that. Based on my review of these, it doesn't appear
4  that any of these involve police misconduct and the
5  analysis of police misconduct, and maybe I'm wrong. So if
6  I'm wrong, can you point me to which ones do?
7     A. Well, when you say police misconduct, I mean,
8  that's a little narrow. So what do you mean by misconduct?
9     Q. Well, I guess what I'm looking for is one of
10 these publications 1 through 44 that --
11     A. Wait, wait. These are not publications. These
12 are workshops --
13     Q. Sorry.
14     A. -- and lectures and things.
15     Q. These lectures, workshops, grants and
16 presentations.
17     A. Okay.
18     Q. So my question is did any of these speak to or
19 involve the same issues that you're opining on in this
20 report?
21     A. Such as like internal affairs or police
22 management --
23     Q. Yeah.
24     A. -- or mismanagement, accountability, oversight,

69

1  things like that?
2     Q. Sure, yeah.
3     A. Okay. Number two when we talk about what
4  happened in Guatemala.
5     Number three, the National Association for
6  Civilian Oversight.
7     Number four, the Commission on Civil Rights, the
8  Office of Civil Rights.
9     Number five, Bridging the Great Divide, Community
10 Partnerships.
11     Number six, we talked about criminal
12 investigations in this course but at the same time we
13 talked about investigative misconduct such as coercing
14 confessions, operating outside the bounds of accepted
15 practice during a criminal investigation, those kinds of
16 things.
17     Q. I guess is it fair to say that the titles might
18 not give a full picture of what was discussed at these
19 various lectures or workshops?
20     A. Well, I -- they're broad titles. There were a
21 lot of other things that were discussed in there.
22     Q. Okay.
23     A. And some of these titles I did not construct,
24 they were constructed by the people who held the

Jon Shane, 3/10/2023

70

1  conference.
2        Q.  No, that's fair.
3        A.  Shall I continue?
4        Q.  No, that's okay.  Unless there is any in
5  particular you want to point me to that --
6        A.  Well, we talked about police legitimacy and
7  performance management in number eight.
8              Back to investigative conduct in number nine.
9              Investigative misconduct in number 10.
10             Investigative misconduct in number 11.
11             Number 12, when we talk about performance
12 management, collecting internal affairs data and reporting
13 on streams of data for internal affairs and the internal
14 management of a police department is something that goes
15 into performance management.
16             Number 13 when we talked about sentinel events we
17 talked about how police-related misconduct can result in,
18 excuse me, wrongful conviction.
19             Number 15 was a performance management discussion
20 similar to the one that you saw in number 12.
21             Number 18 was a discussion on police use of
22 force.
23             Number 21, I delivered an ethics lecture to an
24 international group concerning police-related practices,

71

1  ethical behavior.
2              Number 24, looking at racial disparities in
3  police-initiated stops.  Here we were talking about the
4  implications for unconstitutional stops.
5              I'm moving on to page eight so you can follow.
6        Q.  Okay.
7        A.  The impact of organizational stressors, that's
8  number 29.  That dovetails on a paper that I wrote
9  regarding the organizational -- the stress that
10 organizations create, internal affairs being one of the
11 organizational stressors.
12             Number 30 we talked about police accountability
13 in this lecture to a group at a law school.  When I say we,
14 I mean me.
15       Q.  Fair.
16       A.  I should say I.
17             Number 31, we talked about performance and
18 accountability metrics in Jamaica.  I was talking about the
19 types of data collection, what kind of analyses you
20 collect.
21             Number 33, the use of confidential informants.
22 That also revolves around the ethics concerning informants
23 and the problems that police officers and informants can
24 get into when they have relationship issues and are

72

1  influenced or mismanaged.
2              Number 34 is the Performance Management paper
3  that I wrote.  That also appears on my CV and that is a
4  broad structure about developing performance management in
5  police departments, the types of data that you would want
6  to collect, the statistics that you want to examine so you
7  can track how well you're doing inside the organization.
8              In a broader sense number 36, Implementing and
9  Institutionalizing the Compstat process.  Just a quick
10 aside what the Compstat process is it's a managerial tool
11 that is used by many contemporary police departments, and
12 the idea behind Compstat is to collect streams of data and
13 report on those streams to determine whether you're
14 reaching your goals or if things are going awry, you know,
15 crime patterns that emerge, personnel patterns that emerge,
16 things like that.
17             And that's it.
18       Q.  Just to follow up on a couple of those, you
19 mentioned a handful that had to do with investigative
20 misconduct.  Are you opining at all in this report about
21 the conduct at the underlying criminal investigation that
22 led to Mr. Maysonet's arrest?
23       A.  What do you mean am I opining on the underlying
24 conduct?

73

1        Q.  Well, do you -- are you providing an opinion
2  about how -- about the underlying criminal investigation?
3        A.  No.
4        Q.  And are you providing an opinion in this report
5  regarding any use of force or alleged use of force in the
6  underlying criminal investigation?
7        A.  I'm not clear on your question.  What I've done
8  in here is I've looked at CR files and the complaints that
9  arose from them.
10       Q.  But you're not opining on whether or not use --
11 there was an improper use of force used in the underlying
12 criminal investigation that led to Mr. Maysonet's arrest?
13       A.  No.
14       Q.  Okay.  Kind of talked about your research, we
15 talked about that.
16             Moving on to page 11, digging right into the
17 heart of your opinion here.  The first paragraph says that
18 you conclude the Chicago Police Department failed to
19 properly supervise the Defendants in this matter as
20 required by industry standards in effect at the time.
21       A.  Where are you exactly?
22       Q.  Yeah, I'm sorry.  Your first paragraph on page
23 11.
24       A.  Yes, go ahead.

Jon Shane, 3/10/2023

74

1    Q.   Second sentence, I conclude.
2    A.   Yeah, go ahead.
3    Q.   I conclude the Chicago Police Department failed
4  to properly supervise the Defendants in this matter as
5  required by industry standards in effect at the time.  Do
6  you see that?
7    A.   Yes.
8    Q.   Of the underlying incident.  Do you recall,
9  sitting here today, what year the underlying incident took
10  place in?
11    A.   1990.
12    Q.   And when you say industry standards in effect at
13  that time, which industry standards are you referring to?
14    A.   Internal affairs, supervision, those kinds of
15  things.  I mean those are all the things that I lay out in
16  the report, standards that are laid out in the report,
17  yeah.
18    Q.   Are they -- are specific industry standards that
19  were in effect at the time referenced in your report?
20    A.   There are.  Things like early warning systems,
21  management accountability, supervision.
22    Q.   Were there written standards at this time in
23  regards to early warning systems that you're referring to?
24    A.   What do you mean exactly?

75

1    Q.   When you say something like industry standards
2  that were in effect at the time and then you're talking
3  about early warning systems, I guess I'm wondering if
4  you're referring to an actual written industry standard
5  such as some of those ones we were talking about earlier
6  like --
7    A.   Yeah, I can show you where they appear in here.
8    Q.   Okay.
9    A.   If you look at page 22, you'll look -- I traced
10  some of the history for the early warning standards that
11  were in effect at the time.
12    Q.   Are you talking about footnote 26?
13    A.   Yes, I am.
14       MS. BONJEAN:  26 or 25?
15       THE WITNESS:  26.
16       MS. BONJEAN:  Oh, 26, sorry.
17       THE WITNESS:  I know, that's small.
18  BY MS. CARNEY:
19    Q.   So it's your position that the information that
20  you cite in footnote 26 were written industry standards in
21  place at the time of the underlying incident in 1990?
22    A.   In addition to the agency's policies itself, yes.
23    Q.   What is a dissertation?
24    A.   What is a dissertation?

76

1    Q.   Yeah.
2    A.   You mean a doctoral dissertation or a master's
3  dissertation?  They're used differently.
4    Q.   So in footnote 26 you cite to patterns in police
5  misconduct, citizen complaints against the police, UMI
6  Dissertation Service.
7    A.   Let me just get there.  Yes, okay.
8    Q.   So what --
9    A.   So this was someone's dissertation.  This was
10  someone's dissertation.
11    Q.   So in the way that you're referencing it here is
12  that a doctoral dissertation or something else?
13    A.   I don't remember if it was a doctoral
14  dissertation or if it was a master's thesis dissertation,
15  but the UMI Dissertation Service is -- services is the
16  organization that catalogs dissertations.
17    Q.   Regardless if it's a master's dissertation or a
18  doctoral dissertation, is a dissertation considered to be a
19  written industry standard?
20    A.   It's probably based -- I mean I'd have to look at
21  this, but a dissertation is based on the developing state
22  of the field at that time, yes.
23    Q.   Then moving down to your first research question
24  which we've talked about a little bit.

77

1    A.   What page are you on?
2    Q.   Sorry, I'm jumping around.  Back to page 11.
3    A.   Okay, go ahead.
4    Q.   So you answer your question as, Yes.  The Chicago
5  Police Department supervisory staff knew or should have
6  known what complaints against the Defendant officers were
7  accruing in a manner that signaled the need for
8  intervention and should have taken supervisory measures to
9  stop the behavior and correct the deficiencies --
10    A.   Yes.
11    Q.   -- consistent with their agency policies, right?
12    A.   Yes.
13    Q.   Which supervisors are you referring to in this
14  paragraph?
15    A.   I'm referring to all the supervisors throughout
16  the chain of command.  All of them.  If you look at the
17  responsibilities that I've outlined, all of them have a
18  responsibility for subordinate personnel.  Sergeants are
19  responsible for the officers, the lieutenants are
20  responsible for the sergeants and so on all the way up.  So
21  everyone in the organization has a responsibility to ensure
22  that the policies are being adhered to and that personnel
23  are meeting or exceeding expectations.
24    Q.   Is your opinion contained to the CRs that you

78

1 reviewed or the broader Chicago Police Department
2 supervisory staff?
3    A.   The broader staff.  The implication or the
4 inference that I draw is that this is -- this is a subset
5 in time, cross-section analysis that reflects what's going
6 on in the organization citywide at that time.
7    Q.   I'm going to jump ahead real quick to page 14
8 where it says here that there are 146 CR numbers.  Do you
9 see that on the top of page 14?
10    A.   Yes.
11    Q.   What is your understanding of where those CRs --
12 I'm sorry, let me start over.  The 146 CRs, that was your
13 dataset; is that right?
14    A.   Yes.
15    Q.   What is your understanding of where from the
16 Chicago Police Department those CRs came from?
17    A.   Where did they come from within the Chicago
18 Police Department?
19    Q.   Within the Chicago Police Department.
20    A.   Detectives in Area Five, but I guess the internal
21 affairs division is the one who catalogs them, who has
22 them.
23    Q.   You're right, that was not the best question.
24       What is your understanding of the area within the

79

1 Chicago Police Department that those 146 CR numbers
2 represented?
3       MS. BONJEAN:  Objection to the form of the
4 question.  Understanding of the area like --
5       MS. CARNEY:  Yeah, sorry.  Let me try again.
6 BY MS. CARNEY:
7    Q.   Is it your understanding that those 146 CRs were
8 pulled from detectives department-wide or from a more
9 limited group of detectives?
10    A.   From a more limited group.
11    Q.   What was that limited group that those detectives
12 CRs -- that these CRs were pulled from?
13    A.   Area Five.
14    Q.   Based on your review of 146 CRs out of Area Five
15 you have drawn the conclusion that all supervisors
16 throughout the department knew or should have known that
17 complaints against Defendant officers were accruing in a
18 manner that signaled the need for intervention?
19    A.   Yes.
20    Q.   Why is that?
21    A.   There is no indication anywhere in any of the CR
22 files that any of the supervisory practices were different
23 elsewhere.  They're all operating under the same
24 promulgated policies of the Chicago Police Department.  The

80

1 defendant and non-defendant officers have similar CR files
2 and the findings are similar.
3       MS. BONJEAN:  I'm sorry, this is a late
4 objection.  I'm going to object to the form of that
5 question.  It's pretty broad.  But the answer can stand.
6    A.   Also, the supervisory practices were being
7 funneled into a centralized agency -- agency?
8 Organizational element which is internal affairs, and
9 internal affairs should have been monitoring those
10 complaints, they should have been in routine contact with
11 the upper reaches of the organization.
12    Q.   Okay.  And then you say the Defendant officers.
13 Is there a Defendant officer in particular you're referring
14 to here or is this all the Defendant officers?
15       MS. BONJEAN:  Objection to the form of that
16 question.
17    A.   Well, Paulnitsky and Guevara had the predominant
18 patterns that emerged.
19    Q.   Okay.  Then you say were accruing in a manner
20 that signaled a need for intervention.  What do you mean by
21 signaled a need for intervention?
22    A.   I meant that the complaints were being generated,
23 they were being generated on a relatively consistent basis,
24 frequently enough that it would be virtually impossible for

81

1 anyone in internal affairs to say that they didn't
2 recognize that complaints were coming in against these
3 particular officers, and that is the signal that something
4 has to change.
5    Q.   When you say relatively frequently, what do you
6 mean by that?
7    A.   Well, I have a place in here on the time to a new
8 complaint.  Bear with me and I'll find it.
9       Look at page 55, I have two paragraphs on the
10 time to a new complaint.
11    Q.   Okay.  All right, we'll come back to -- all
12 right.  Then after that paragraph you list out a handful of
13 CPD orders.  Do you see that?
14    A.   Are you back on page 14?
15    Q.   I was back on page 11, actually.  Sorry.
16    A.   Oh.  Okay, yes.
17    Q.   So is it your position that these policies that
18 you list are sufficient and that the supervisors weren't
19 complying, or is it your position that the policies are
20 insufficient?
21       MS. BONJEAN:  Object to the form.  You can
22 answer to the best of your ability.
23    A.   Yeah, what -- what do you mean by were the
24 policies sufficient or insufficient?  What do you mean?

Jon Shane, 3/10/2023

82

1    Q.  Let me ask you this.  Sitting here today and in
2  your report are you opining at all about the
3  appropriateness of the policies that the City of Chicago
4  had in place during this time period as it relates to
5  complaint and disciplinary procedures?
6        MS. BONJEAN:  I'm still going to object.
7  I'm sorry, Theresa, I'm not trying to be difficult.  Are
8  you talking about written policies?
9        MS. CARNEY:  Yes.  Sorry.  Yes.  I'm
10  referring specifically to the policies that he has listed
11  in subsections b through e on page 11.
12  BY MS. CARNEY:
13    Q.  So my question is are these written policies that
14  you're citing to, do you have an opinion about whether or
15  not the written policies were sufficient as it relates to
16  complaints of misconduct and disciplinary procedures for
17  the time frame?
18    A.  Again, I'm struggling with that.  I'm not trying
19  to be difficult.  Do you mean do I believe that these
20  policies were consistent with the industry standards in
21  effect at that time?
22    Q.  Yes.
23    A.  That -- okay.  So the answer is yes to that.  And
24  they were sufficient where the responsibilities were laid

83

1  out to the degree that anybody in this chain of command
2  knew or should have known what to do when complaints were
3  coming in and when they were receiving complaints from
4  these officers.
5    Q.  Okay.  And so based on that then your opinion is
6  that the supervisors were not complying with the written
7  policies at the time?
8    A.  That's correct.
9    Q.  Okay.  I'm moving on to page 12.  Your second
10  research question, Did a pattern of complaints emerge
11  against Chicago police officers between 1980 and 2008?  Do
12  you see that?
13    A.  Yes.
14    Q.  Why did you pick the time frame 1980 to 2008?
15  What's the relevance of that time frame?
16    A.  I think that's the way the data came to me.
17    Q.  Okay.  Then you say, The Chicago Police
18  Department supervisory staff knew or should have known that
19  clear patterns of personnel complaints were emerging across
20  various years and different types of offenses against the
21  defendant and non-defendant officers and should have taken
22  measures to stop the behavior.  Do you see that?
23    A.  Yes.
24    Q.  Okay.  What patterns are you referring to here?

84

1    A.  The type and the frequency of complaints.
2    Q.  What type of complaints were you noticing a
3  pattern for?
4        MS. BONJEAN:  I'm going to object to the
5  form of that question.
6    A.  Bear with me.  I'm getting there.
7        If we go to page 48, you can see the years in
8  question.
9    Q.  Okay.
10    A.  You have the time frames, we can see the
11  complaints by category.
12        We go to page 50, you'll see that I conducted
13  what's called a Pareto Analysis.
14    Q.  Okay.
15    A.  Which is basically the 80/20 rule where 80% of
16  the problem comes from 20% of the category.  If you look on
17  page 51, Table 9, you'll see we look at defendant and
18  non-defendant officers for the types of complaints that
19  were coming in.
20    Q.  Okay.  So those tables, Table 8 and Table 9,
21  you're referencing those patterns when you say on page 12
22  clear patterns of personnel complaints were emerging?
23    A.  Yes.
24    Q.  You also just referenced on page 48 Table 7.  Do

85

1  you see that there?
2    A.  Wait, let me go back.  Hold on.
3        Yes, for the years?
4    Q.  Yes.
5    A.  Yes.
6    Q.  When you say complaints by year, is that the
7  number of CRs that you had by year or is that something
8  else?
9    A.  These are -- I want to make sure I'm clear.
10  You're talking about what the unit of analysis is?
11    Q.  Yes.
12    A.  The unit of analysis is the complaint.  You'll
13  see that under letter a. there is 746 complaints with 84
14  unique categories that come up under Table 8.
15    Q.  So what is your definition of the word complaint
16  in this report?
17    A.  So a complaint is something that someone comes in
18  and alleges or not -- no, that's not the right word.
19        Someone alleges something about an officer.  So
20  there may be two or three different complaints in a single
21  incident.  So there might be assault, coercion and verbal
22  threats or something, three different complaints about one
23  incident captured under one CR number.
24    Q.  Where -- this Table 7, is this -- are these

Jon Shane, 3/10/2023

86

1  complaints coming from the 146 CR files that you reviewed?
2      A.  Yes.
3      Q.  Okay.  And over this 28-year period of 1980 to
4  2008, right?
5      A.  Yes.
6      Q.  Are you aware of how many total CRs there were
7  over this 28-year time period in the Chicago Police
8  Department?
9          MS. BONJEAN:  Objection.  In the department?
10         MS. CARNEY:  In the department.
11         MS. BONJEAN:  None of us are aware.  You
12  won't give us that information.  Objection, foundation.  Go
13  ahead.
14         THE WITNESS:  No, I'm not.
15  BY MS. CARNEY:
16     Q.  Did you review the annual -- the CPD annual
17  reports for the time period of 1980 through 2008?
18     A.  I did see some of them.  I don't remember if I
19  saw all of those specific years, but there are some pages
20  toward, you know, one of the elements of the organization
21  when they talk about internal affairs or complaints against
22  personnel.  I don't remember the exact terminology but they
23  do talk about that.
24     Q.  So are you aware that in the CPD annual reports

87

1  there are sections that talk about the number of complaints
2  received by either internal affairs or the Office of
3  Professional Standards for a given year?
4      A.  Yeah, there is something about that, yes.  A
5  summary number.
6      Q.  Correct.  Did you ever attempt to total up the
7  numbers of complaints that were listed in the annual
8  reports from the years 1980 to 2008?
9      A.  You mean based on that summary data?
10     Q.  Well, based on the data that's compiled in the
11  annual reports.
12     A.  No, I didn't do any analysis on that.
13     Q.  Okay.
14     A.  No.
15     Q.  If I told you that I went through the CPD annual
16  reports and tallied up the number of complaints that were
17  listed in each of those documents from the years 1980 to
18  2008 and I told you I got approximately 200,000 -- I'm
19  sorry, 271,350 CRs during that time period -- so let me
20  start over.
21         I will represent to you that I went through the
22  annual reports from 1980 to 2008 and totaled up the numbers
23  that CPD has for those years and got a total of 271,350 CRs
24  for that time period.  If you were to conduct a power

88

1  analysis on the 146 CRs that you reviewed as it relates to
2  the 271,000 CRs, approximately 271 CRs that were issued
3  during that time period, what would your power score be or
4  would that be a sufficient sample size?
5          MS. BONJEAN:  Objection to the form of that
6  question.
7      A.  It would depend on the type of -- it would depend
8  on the type of statistical procedure I was using.
9      Q.  What do you mean?
10     A.  Because power analysis is predicated upon the
11  type of statistical procedure that you're going to use.
12  I'm doing a descriptive analysis here.  I'm not doing an
13  inferential analysis.
14     Q.  When you say you're doing a -- I'm sorry, you
15  said you're doing a descriptive analysis?
16     A.  Yes.
17     Q.  What does that mean?
18         MS. BONJEAN:  I'm going to object to the
19  form of the question.  When you say -- both as to the
20  question, yeah.  You pointed at something, Jon, so could
21  you --
22     A.  I'm talking about the analysis that you see
23  beginning on page 48.  I'm describing the complaints that
24  we have.

89

1      Q.  Okay.
2      A.  I didn't have access to drawing a broader sample
3  of everything that was going on in the Chicago Police
4  Department at that time.
5      Q.  Okay.
6      A.  This is the data that I was given.
7      Q.  Okay.  You just said descriptive analysis and not
8  something else analysis.  What was that word you said?
9  Sorry.
10     A.  Inferential.
11     Q.  Inferential analysis?
12     A.  Yes.
13     Q.  What's an inferential analysis?
14     A.  That's your ability to draw inferences from a
15  sample to the wider population.
16     Q.  Okay.  Do you conduct an inferential analysis at
17  all in this report?
18     A.  I do not.
19     Q.  Okay.  If you were to conduct an inferential
20  analysis, would 146 samples out of a sample size of over
21  200,000 be sufficient, a sufficient power?
22     A.  It could be, yes.  It could be.
23     Q.  In what circumstances could that be a sufficient
24  power?

Jon Shane, 3/10/2023

---

90

1    A.  Depending on the type of statistical tests I
2  used.
3        I'll give you by way of just one very easy
4  example.  When you conduct a political survey and you're
5  trying to determine who is going to be the next president
6  and you ask 1,000 people across the United States out of
7  350 million.  If you conduct a random sample and your
8  sample is drawn in a valid manner you can typically infer
9  from that random sample what the outcome is going to be.
10   Q.  But that sample would need to be, as you said, a
11  random sample and conducted in a valid manner.  When you
12  say valid manner, what does that mean?
13   A.  That means you have to sample randomly, you have
14  to have a method for how you collect each one of the
15  individuals who is going to partake in the survey.
16   Q.  Got it.
17        MS. BONJEAN:  I'm sorry, Theresa, I don't
18  mean to stop you.  I don't know if you guys wanted to take
19  a quick lunch?  I'm sure Dr. Shane will want to grab a bite
20  to eat at some point.  I don't know when is a good stopping
21  point.  We're an hour in so I'm just putting that out
22  there.
23        MS. CARNEY:  You know what, that's fine.
24  I -- I am fine with stopping and taking a lunch now.

---

91

1        MS. BONJEAN:  Not a long lunch.  Just like,
2  I don't know if 20 minutes would be okay for everybody?
3  You okay with 20, 30 minutes?
4        THE WITNESS:  Yeah.
5        MS. CARNEY:  Let's do 30 minutes to keep it
6  even.
7        MS. BONJEAN:  Sure, 30 minutes is good.
8        MR. ENGQUIST:  Come back at 1:00 our time?
9        MS. BONJEAN:  Yeah, that'd be great.
10        THE VIDEOGRAPHER:  We're off the video
11  record at 12:28 p.m.
12        (Whereupon a recess was taken.)
13        THE VIDEOGRAPHER:  We're back on the video
14  record at 1:04 p.m.
15        DIRECT EXAMINATION (cont.)
16  BY MS. CARNEY:
17   Q.  All right, Dr. Shane.  Let's go back to page 12
18  of your report.
19   A.  Yes.
20   Q.  Okay.  So we were just talking about your second
21  research question and your answer there talking about the
22  clear patterns of personnel complaints.  You had told me
23  that clear patterns are the type and frequency as laid out
24  by you in Tables, I believe, 8 and 9; is that accurate?

---

92

1    A.  Let me find them.  Hold on.
2    Q.  Or is it 7, 8 and 9?
3    A.  7, 8, 9, 10, 11, 12.
4    Q.  Okay.  So going all the way to Table 12?
5    A.  13, 14.  Those are patterns there.
6    Q.  Okay.  And Table 13 which is on page 60, that is
7  a table regarding the complaints against Detective Guevara,
8  right?
9    A.  Yes.
10   Q.  And then Table 14 is a table regarding
11  Detective Paulnitsky; is that right?
12   A.  Yes.
13   Q.  Okay.  When you say clear patterns, other than
14  the type and the frequency -- well, sorry, that's a bad
15  question.
16        When you're talking about clear patterns, when
17  did those -- are there any specific officers that you were
18  referring to that showed these clear patterns of personnel
19  complaints?
20   A.  Those that were analyzed in the data.
21   Q.  Okay.  So this is not referencing any specific
22  detective or officer?
23   A.  Well, I reference Paulnitsky and Guevara in those
24  particular tables.

---

93

1    Q.  Okay.  Any other -- sorry.  Go ahead.
2    A.  Then there is the defendant and the non-defendant
3  officers together in the other tables that I pointed out to
4  you.
5    Q.  Okay.  When did these clear patterns that you are
6  analyzing in the tables start to emerge?  What year?
7    A.  Hold on.  19 -- let's see, hold on.  1980, '84,
8  '85, '86, '87, '88, '89, '90.
9    Q.  Okay.  So looking at Table 7, is that what you
10  were just referring to?
11   A.  Yes.
12   Q.  Looking at Table 7, out of the 21 complaints from
13  1980, do you know how many of those were from a Defendant
14  officer in this case?
15   A.  No, not without going back to the data, no.
16   Q.  1984 -- well, let me ask you this.  Why are 19 --
17  why is there nothing listed for '81, '82, '83?
18   A.  Nothing -- nothing emerged.
19   Q.  Okay.  1984, the four complaints listed in
20  Table 7, can you tell me which Defendant officers those
21  four complaints were for?
22   A.  Not based on this table, no.
23   Q.  Is there anywhere in your report where you can
24  tell --

---

Jon Shane, 3/10/2023

94

1    A.   No.  You'd have to go back to the data.
2    Q.   Okay.  That's -- and that's true for every year
3  that you listed here, '85, '86, '87, '88, '89, '90, I think
4  those were the ones you said out loud?
5    A.   In Table 7, yes.
6    Q.   In Table 7.  Without going back to your MS Excel
7  spreadsheet, you cannot tell us which of those complaints
8  were against the Defendant officers in this case?
9    A.   That's correct.
10   Q.   Okay.  And without going back to your MS Excel
11 spreadsheet you cannot tell us whether or not any of these
12 complaints were against a Defendant officer in this case or
13 were -- let me rephrase that.
14   A.   It does include the Defendant officers, if that's
15 what you mean.
16   Q.   Right.  So the chart includes the Defendant
17 officers; is that right?
18   A.   Yes.
19   Q.   But you can't tell whether or not the four
20 complaints there are actually for a defendant officer or
21 potentially a non-defendant officer?
22   A.   That's right.
23   Q.   And there is a chance that those four complaints
24 are in fact for non-defendant officers?

95

1    A.   It's possible.
2    Q.   But we can't figure that out without going back
3  to your MS Excel spreadsheet that you talked about earlier?
4    A.   Yes.
5    Q.   Okay.  Back to page 12, you say still in that
6  first paragraph the data reveal Chicago Police Department's
7  accountability systems are broadly ineffective for
8  detecting misconduct and holding officers accountable when
9  they violate CPD policy.  Do you see that?
10   A.   Yes.
11   Q.   Then you go on to say, These observations impair
12 the CPD's ability to describe and count internal personnel
13 complaints and do not follow accepted policy standards for
14 complete and thorough investigations.
15   A.   Yes.
16   Q.   What do you mean by describe and count?  How do
17 your observations impair CPD's ability to describe and
18 count internal personnel complaints?
19   A.   The way that the complaints are classified has a
20 series of minute categories that are spread across
21 different types of complaints.  There seems to be a --
22 what's the word I'm looking for?  An overlap of categories.
23   Q.   What do you mean by that?
24   A.   Yeah, let me show you.  Hold on.

96

1    So if you turn to page 32 at the very bottom.
2    Q.   Okay.
3    A.   And you look at how they classify these
4  complaints, it doesn't seem to follow a consistent
5  convention.  I don't see what the difference is between
6  allowing a prisoner escape and allowing a suspect to
7  escape.  I don't see a difference between deceitful conduct
8  and perjury.  And I list 20 different things between pages
9  32 and 34 that have these overlap, and because there is
10 overlapping categories it impairs their ability to identify
11 trends and patterns that are coming up because they don't
12 have a consistent coding scheme.
13   Q.   Okay.  In our -- did you review in preparation
14 for this report the Complaint Category Tables that CPD and
15 internal affairs used back in the --
16   A.   I had seen them, yes.  These broad categories --
17   MS. BONJEAN:  Hold on.  Let her ask a
18 question.  Are you talking about this?
19   MS. CARNEY:  Yeah.
20   MS. BONJEAN:  Yeah, he has a copy of it.
21 BY MS. CARNEY:
22   Q.   So these broad categories that you're describing
23 here on pages 32 through 34, are those CPD complaint
24 categories or are those your own complaint categories?

97

1    A.   No, these come from the CR that are listed right
2  next to them.
3    Q.   Is this how CPD categorizes the initial complaint
4  that was taken in on their face sheet?
5    A.   This is what appears in the body of the report.
6    Q.   Okay.  So --
7    MS. BONJEAN:  I'm sorry.  Objection, form.
8  Go ahead.
9    Q.   As you've already described to me before, there
10 can be several different complaints within one CR, right?
11   A.   Yes.
12   Q.   And each CR is given a designated complaint
13 category for the initial main complaint; isn't that
14 correct?
15   A.   It is, yes.  That's based on this document that
16 we were talking about.
17   Q.   Okay.  So when you're saying that the
18 observations impair CPD's ability to describe and count the
19 internal personnel complaints, you're talking about your
20 own -- the breakdown of the CR into individual complaints
21 from within the CR, right?
22   MS. BONJEAN:  Objection, form.
23   A.   It's not my own.  It's what they wrote in their
24 investigation.

98

1    Q.  Right, but that's not -- sorry.  Go ahead.
2    A.  I didn't create these.
3    Q.  But this is not how CPD classifies their
4  complaints on the face sheets of the CRs, right?
5    A.  Well, they use a combination of these broad
6  categories that you might see here that are entitled
7  Complaint Category Tables.
8    Q.  Correct.
9    A.  Then, when you read the body of the investigation
10  they're not necessarily congruent with that.
11    Q.  Right.  Because there can be more than one, as
12  you've explained, complaint within the overarching CR,
13  right?
14    A.  There might be more than one complaint, yes.
15    Q.  Okay.  So, for example --
16    A.  But the initial code doesn't necessarily reflect
17  what the investigation was about either.
18    Q.  How so?
19    A.  Well, I --
20        MS. BONJEAN:  I'll object to the form and
21  foundation.
22    A.  I saw on more than one example something might be
23  described as miscellaneous or a rule violation and then the
24  body of the investigation goes in to talk about assaults or

99

1  verbal threats or something like that.  They're miles
2  apart.
3    Q.  Are you aware of how OPS or IAD, what the intake
4  process was back in the late '80s, early '90s, when CPD
5  received a personnel complaint?
6    A.  What do you mean was I familiar with the process?
7  How they -- I mean it's laid out in their policies.  I've
8  read that.
9    Q.  Okay.  Is it fair to say that CPD would -- the
10  initial complaint may come in under a certain complaint
11  category and then the investigation may lead it to a
12  different violation?
13    A.  Yeah, that's possible, yes.
14    Q.  Then you say count internal personnel complaints.
15  How are CPD -- how is CPD's ability to count internal
16  personnel complaints impaired?
17    A.  Because when they fragment the categories as they
18  have done here patterns -- it gives them the ability to
19  diffuse these categories to such a degree that patterns
20  would be difficult to emerge, be difficult to detect
21  because they spread them across so many different
22  categories.  So when they're calling one complaint
23  excessive force and another one an assault and another one
24  a battery, they've got three different categories for those

100

1  things when they all relate to the same thing.
2    Q.  If we could pull up what I've marked as
3  Exhibit 14 which is that Complaint Category Tables that we
4  kind of keep talking about so let's just pull it up.
5        (Remote screen sharing.)
6    Q.  Yeah, okay.  Do you have it?
7        MS. BONJEAN:  He has it in paper form.
8    Q.  That's fine.  We have the exhibit tech, we might
9  as well use her.
10        This is that Complaint Category Tables that we've
11  kind of been talking about.  On here you see things like 05
12  Excessive Force, right?
13    A.  I see Group 05, yes.
14    Q.  And then in Group 05 there is a variety of
15  different types of excessive force complaints, right?
16    A.  Yes.
17    Q.  Can you point me to where you see on here a
18  complaint category of assault?
19    A.  I don't know if it's on this particular form but
20  I know that it exists in the investigations.
21    Q.  Okay.  If it exists in the investigation that's
22  more of a description of the event, not necessarily the
23  complaint category that was used, right?
24    A.  No, not necessarily because they find in the

101

1  allegations sustained or not sustained and they'll say not
2  sustained on the assault.  They don't say not sustained
3  regarding excessive force regarding Group 05.
4    Q.  Okay.
5    A.  Not that I recall seeing anything like that.
6    Q.  When you -- well, I'll keep going through here.
7  How do these observations about ability to describe and
8  count the internal personnel complaints impair CPD's
9  ability to hold officers accountable?
10    A.  Because what they do is they -- and I'll show you
11  where I have it written here.  If you look at the bottom of
12  page 34, I describe how -- the answer to the question that
13  you're posing.  When you fragment these categories you
14  build in this plausible deniability about where the
15  complaints come from, what they are, what types of patterns
16  may emerge, and incrementally it takes more time to build
17  complaints in individual categories like all these
18  subcategories you see here before you're able to say, oh, a
19  complaint emerged.
20        When the reality is an assault or a use of
21  excessive force, some kind of altercation with your
22  neighbor or domestic all amount to assaults, but they
23  categorize these things differently and they spread them
24  across the landscape and you don't see a pattern emerge

Jon Shane, 3/10/2023

102

1  because they've broken them down so fine you can't detect
2  anything.
3      Q.  Can you explain to me why -- or how if you are on
4  page 32, these examples that you cite here, we just used a
5  couple of them here, allowing a prisoner to escape is the
6  same as allowing a suspect to escape?
7      A.  That's what they -- that's how they have these
8  things categorized.  I don't see the difference.  There is
9  no description of the differences.
10     Q.  You don't believe there is a difference between
11 allowing a prisoner to escape versus allowing a suspect to
12 escape?
13     A.  No.  They're both suspects.
14     Q.  Okay.
15     A.  And they categorize them in the same way.  And
16 it's not just that one particular one, there is 20
17 different ones that I list here.
18     Q.  I understand.  We'll go through a couple.  Number
19 two for deceitful conduct versus perjury.  It's your belief
20 that deceitful conduct and perjury are the same?
21     A.  As it's categorized.
22     Q.  But are the complaint categories for this
23 CR180229 and the perjury one 237167, do you remember
24 sitting here today what the complaint categories were for

103

1  those CRs?
2      A.  No, I don't recall off the top of my head, but
3  those are listed in the body of the investigation.
4      Q.  Are you aware of how CPD prioritizes the
5  complaints when it comes to the complaint categories that
6  are used?
7      A.  I haven't seen anything that dictated the level
8  of priority.
9      Q.  Would you categorize a complaint of excessive
10 force as more of a priority versus -- than deceitful
11 conduct within a complaint?
12         MS. BONJEAN:  I'm going to object to the
13 form of that question.
14     A.  No.  I mean, it's context specific.  You would
15 have to know what the context is.  If you're telling me
16 that somebody is in court testifying and they're under oath
17 and they're engaged in deceitful conduct or somebody
18 applied a pair of handcuffs too tightly to somebody which
19 is an excessive force claim, I would say the deceitful
20 conduct under oath is more of a priority than somebody's
21 handcuffs that were too tight.
22     Q.  Each of these CRs needs to be viewed in context
23 to what the actual complaint is, right, and allegations
24 are?

104

1      A.  Yes.
2      Q.  They can't be broad-stroked descriptions of
3  deceitful conduct, right?
4      A.  Well, when you're talking about categorizing
5  complaints you should have a consistent coding scheme broad
6  enough to be able to capture all of the things that come
7  under that parent category so you've got a pattern that
8  emerges so you can determine whether or not officers are
9  misbehaving or they're involved in misconduct.  The greater
10 you diffuse those categories across the landscape the less
11 likely you are to detect a pattern.
12     Q.  So if we go back to -- let me ask you this.
13 Nevermind.
14         If we go back to page 12, section 3,
15 justification for your opinion.  We talked a little bit
16 about this before, the source data are CPD internal affairs
17 records known as Complaint Registers, 1980 to 2008, right,
18 that's your source data?
19     A.  Yes.
20     Q.  That includes the Defendant officers and a sample
21 of non-defendant officers, right?
22     A.  Yes, that's correct.
23     Q.  Do you know how many non-defendant officers were
24 included in the source data?

105

1      A.  Yeah, I have it written in here somewhere.  I
2  don't know off the top of my head.
3      Q.  Okay.
4         MS. BONJEAN:  Do you want him to look at --
5         MS. CARNEY:  No -- yeah, if he can point to
6  me where he has it.  I don't need him to count but if he
7  has it listed.
8         THE WITNESS:  I think it's on page 14 in the
9  body of the 80 Defendant officers.
10 BY MS. CARNEY:
11     Q.  80 Defendant officer cases and 66 non-defendant
12 officer cases?
13     A.  Right.
14         MS. BONJEAN:  I'm sorry, hold on.  I'm just
15 looking at something for my own edification.
16         THE WITNESS:  Those are the names of the
17 officers, yeah.
18         MS. BONJEAN:  Yeah, I think that's what
19 she's asking.
20         THE WITNESS:  Were you asking the names of
21 the Defendant officers?
22         MS. CARNEY:  Just how many.  If you don't
23 know off the top of your head, that's fine.
24         MS. BONJEAN:  Point her to the footnote

Jon Shane, 3/10/2023

106

1   where she can find --
2           THE WITNESS:  Page 46.  You can count them
3   on page 46.
4   BY MS. CARNEY:
5       Q.   Okay.  Then this is going to go back -- and we
6   might have to take a break, Jennifer, to talk about this --
7   but the data were analyzed using MS Excel and Statistical
8   Package for the Social Sciences, that's that SPSS we were
9   talking about, right?
10      A.   Where are you exactly?
11      Q.   Back to page 12 in the justification for your
12  opinion.
13          MS. BONJEAN:  Yes.
14      A.   Okay, yes.
15      Q.   So this kind of goes back to what we were talking
16  about in your invoices which is the inputting of the data,
17  right?
18      A.   Well, this is the analysis that was done.
19      Q.   Okay.
20      A.   The data had to be entered into that software, if
21  that's what you're asking.
22      Q.   My question is, and this is where we might need
23  to take a break, is who was tasked with inputting all of
24  the source data into MS Excel and/or SPSS?

107

1           MS. BONJEAN:  Okay.  That I'm going to -- I
2   think we do need to take a break.  I'm not telling him --
3   I'm not opposed to him answering that question but I kind
4   of -- entirely, but I want to make sure there is
5   reciprocity.  We need to have a discussion about what your
6   position will be when your experts, you know, take -- get
7   deposed, you know what I'm saying?
8           MS. CARNEY:  Yeah.  Can we go off the record
9   real quick?
10          MS. BONJEAN:  Yeah.
11          THE VIDEOGRAPHER:  Sure.  We're off the
12  video record at 1:28 p.m.
13          (Whereupon a recess was taken.)
14          THE VIDEOGRAPHER:  All right.  We are back
15  on the video record at 1:52 p.m.
16          MS. CARNEY:  Okay.  So, just for the record,
17  Ms. Bonjean and I just took a break to discuss some issues
18  that arose around the potential work product privileges or
19  no work product privileges surrounding the MS Excel
20  spreadsheet and the Statistical Package for Social Sciences
21  software.
22          The parties have agreed to adjourn the dep until
23  those issues can been resolved and then come back and start
24  again -- not start again but continue.

108

1           THE VIDEOGRAPHER:  We are going off the
2   video record at 1:53, and this concludes the video
3   deposition of Dr. Jon Shane.
4           (Continued sine die.)

109

1
2   STATE OF ILLINOIS :
                        : SS
3   COUNTY OF PEORIA :
4           I, Lea Ruth Cohen, CSR, and Notary Public in and
5   for the County of Peoria, State of Illinois, do hereby
6   certify that heretofore, to-wit, on Friday, March 10, 2023
7   appeared before me via remote audiovisual means:
8
9           JON SHANE, a material witness herein.
10
11          I further certify that the said witness was by me
12  first duly sworn to testify to the truth, the whole truth
13  and nothing but the truth in the cause aforesaid; that the
14  testimony then given by said witness was reported
15  stenographically by me via remote audiovisual means and
16  afterwards reduced to typewriting, and the foregoing is a
17  true and correct transcript of the testimony so given by
18  said witness as aforesaid.
19
20
21
22
23
24

Jon Shane, 3/10/2023

110

1      I further certify that the signature of the
2  witness was not waived.
3
4      I further certify that I am not counsel for nor
5  in any way related to any of the parties to this suit, nor
6  am I in any way interested in the outcome thereof.
7
8      In testimony whereof, I hereunto set my hand and
9  affix my notarial seal on this day, Thursday, March 30,
10 2023.
11
12
13
14  _____
15         Notary Public
16
17
18     Lea Ruth Cohen, Certified Shorthand Reporter
       (State of Illinois License #084-002868)
19     My commission expires 4/12/2026
20
21
22
23
24

JON SHANE, 05/26/2023

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jose Juan Maysonet, Jr.,                )
                                        )
                Plaintiff,              )
                                        )
        vs.                             ) No. 18-CV-2342
                                        )
Reynaldo Guevara, et al.,               )
                                        )
                defendants.             )


VOLUME II, Pages 111 - 333

    The continued videotaped deposition of JON SHANE,

taken under oath on Friday, May 26, 2023, via Zoom,

pursuant to the Rules of the Supreme Court of Illinois

and the Code of Civil Procedure, before Riley A. Moran,

Certified Shorthand Reporter No. 084-004945, commencing

at 9:33 a.m., pursuant to notice.



        APPEARANCES:

                BONJEAN LAW GROUP, PLLC, by
                MS. JENNIFER A. BONJEAN
                (750 Lexington Avenue, 9th Floor
                 New York, NY 10022
                 (718)875-1850
                 jennifer@bonjeanlaw.com)
                    appeared on behalf of the plaintiff;

JON SHANE, 05/26/2023

---

112

1
2     APPEARANCES:  (Cont'd)
3     STEVEN A. GREENBERG, LTD., by
      MR. STEVEN A. GREENBERG
      (53 West Jackson Boulevard, Suite 1260
4     Chicago, IL 60604
      (312)879-9500
5     steve@greenbergcd.com)
        appeared on behalf of the plaintiff;
6
7     THE SOTOS LAW FIRM, P.C., by
      MR. JOSH M. ENGQUIST
8     (141 West Jackson Boulevard, Suite 1240A
      Chicago, IL 60604
9     (630)735-3300
      jengquist@jsotoslaw.com)
10      appeared on behalf of the defendants
        Officers Halvorsen, Mingy, Epplen, Montilla,
11      and Paulnitsky;
12
      ROCK FUSCO & CONNELLY, LLC, by
13    MS. THERESA B. CARNEY
      (333 West Wacker Drive, 19th Floor
14    Chicago, IL 60606
      (312)494-1000
15    tcarney@rfclaw.com)
        appeared on behalf of the defendant City of
16      Chicago;
17
      LEINENWEBER BARONI & DAFFADA, LLC, by
18    MS. MEGAN K. MCGRATH
      (120 North LaSalle Street, Suite 2000
19    Chicago, IL 60602
      (312)663-3003
20    mkm@ilesq.com)
        appeared on behalf of the defendant Officer
21      Reynaldo Guevara;
22
23
24

---

113

1
2     APPEARANCES:  (Cont'd)
3     HINSHAW & CULBERTSON, LLP, by
      MR. ROBERT T. SHANNON
4     (151 North Franklin, Suite 2500
      Chicago, IL 60606
5     (312)704-3000
      rshannon@hinshawlaw.com)
6       appeared on behalf of the defendant Officer
        DiFranco;
7
8     ALSO PRESENT:  Mr. Nick Trotta
                      Legal Videographer
9
                     Ms. Brett Schatzle
10                    Exhibit Technician
11                   Ms. Haley Coolbaugh
                      Paralegal, Bonjean Law
12
13        *  *  *  *  *  *  *
14
15
16
17
18
19
20
21
22
23
24

---

114

1                  I N D E X
2
3     Witness:                        Page
4     Jon Shane
5       Examination by:
6       Ms. Carney [Resumed].............116
7       Mr. Engquist ....................271
8       Ms. Bonjean .....................285
9
10
11               E X H I B I T S
12
13    No.  Description            Marked/Referenced
14    15  Dr. Shane's Supplemental Report .......117
15    16  CPD CR data master file ...............180
16    4   CR 223928 (RFC 3503-3631, Guevara) ....197
17    8   CR 179835 (RFC 2689-2854, Montilla) ...208
18    11  CR 237167 (RFC 4045-4132, Montilla) ...212
19    17  CR 180229 (RFC 12245-12297) ...........230
20    18  General Order 83-3 ....................326
21
22         (Exhibits scanned/attached.)
23
24

---

115

1         THE VIDEOGRAPHER:  Good morning.  This is the
2     beginning of Media Unit 1.  We are now on the video
3     record at 9:33 a.m.  This is the videotaped
4     videoconferenced discovery deposition of Dr. Jon Shane
5     being taken on May 26th, 2023.
6             This deposition is being taken on the
7     behalf of the defendant in the matter of Jose Juan
8     Maysonet versus Reynaldo Guevara, et al.  The case number
9     is 18-CV-2342 filed in the United States District Court
10    for the Northern District of Illinois, Eastern Division.
11            My name is Nick Trotta, legal
12    videographer representing Urlaub Bowen & Associates with
13    offices at 20 North Clark Street, Suite 600, Chicago,
14    Illinois.  The court reporter today is Riley Moran, also
15    of Urlaub Bowen & Associates.
16            Counsel, please identify yourselves for
17    the video record and the parties which you represent.
18    MS. BONJEAN:  Jennifer Bonjean on behalf of the
19    plaintiff.
20    MR. ENGQUIST:  Josh Engquist on behalf of
21    Defendants Halvorsen, Mingy, Epplen, Montilla, and
22    Paulnitsky.
23    MS. MCGRATH:  Megan McGrath on behalf of Defendant
24    Guevara.

---

JON SHANE, 05/26/2023

116

1    MS. CARNEY:  Theresa Carney on behalf of the
2    Defendant City of Chicago.
3    MR. SHANNON:  Bob Shannon on behalf of Defendant
4    DiFranco.
5    MS. CARNEY:  I think that's it.
6    THE VIDEOGRAPHER:  All right.  Will the court
7    reporter please swear in the witness.
8                (Witness sworn.)
9                Jon Shane,
10   called as a witness herein, having been first duly sworn,
11   was examined and testified as follows:
12               EXAMINATION
13   BY MS. CARNEY:
14   Q.   All right.  Good morning, Dr. Shane.  How are
15   you?
16   A.   All right.  Very well.  Good morning.
17   Q.   So this is going to start a little -- this is
18   going to feel a little choppy to start because, if you
19   recall, we got about two and a half hours in last time,
20   and we adjourned, and counsel and I have conferred, and a
21   couple additional things have been produced since that
22   point, including you produced what I've marked as
23   Exhibit 15, a supplement to your report.
24   A.   Yes.

117

1    MS. CARNEY:  Brett, if we could pull that up just
2    to -- there she is.
3                (Deposition Exhibit Number 15,
4                Witness Shane, was marked for
5                identification 5/26/23.)
6    BY MS. CARNEY:
7    Q.   Okay.  Dr. Shane, I've marked this as
8    Exhibit 15, and this is the supplemental report that you
9    issued after we adjourned the last deposition, which
10   deals with -- and we'll talk about it more in depth in a
11   little bit -- but just generally speaking --
12               Brett, if we could go to the first
13   page -- sorry.  The second page.  There we go.
14               This is a supplement opinion based on
15   some additional CRs for Defendant Guevara; is that,
16   generally speaking, accurate?
17   A.   Yes, correct.
18   Q.   Okay.  Counsel also produced --
19               And, Brett, this is the one I'm going to
20   show.  Let's see if I can do this right.  Can you guys
21   see my screen?  Did I do it right?
22   A.   I can see it.
23   Q.   Okay.
24   MS. BONJEAN:  Yep.

118

1    BY MS. CARNEY:
2    Q.   Okay.  Counsel also produced to us a document
3    that's called CPD CR data -- I think it's master
4    spreadsheet.  My thing is a little blocked.  And this is
5    the master spreadsheet of the raw data that we were
6    discussing during part one of your deposition; is that
7    accurate?
8    A.   Yes, correct.
9    Q.   Okay.  We'll come back to this in a little
10   bit, too.
11               Okay.  If we could pull up -- we'll just
12   dive right in -- Exhibit 3, which is your initial report.
13   MS. BONJEAN:  Are you putting it up?  Oh, okay.
14   MS. CARNEY:  Yeah.  Sorry.  I --
15   MS. BONJEAN:  That's all right.  I was going to
16   pull out my own copy if you weren't, but...
17   MS. CARNEY:  We have an exhibit tech today helping
18   me out, so she's --
19   MS. BONJEAN:  Excellent.
20   MS. CARNEY:  Except for the spreadsheet.  I will
21   attempt to do that one on my own, so I apologize in
22   advance.
23   BY MS. CARNEY:
24   Q.   All right.  So we left off around page 12 of

119

1    your report.
2                So if we could head there, Brett.
3    A.   Can you increase the Zoom level for me,
4    please?  Maybe, like -- let's -- yeah.  Let's see what
5    125 looks like.  Can you do maybe, like, 135?  Let's see
6    what that looks like.  Just type -- yeah.  Just type in
7    135.
8    MS. BONJEAN:  You could pull out your paper copy,
9    too, if that's easier but -- if you have one.
10   THE WITNESS:  I have it on my desktop, but then I
11   lose my -- because I'm working off of my laptop here,
12   I'll lose --
13   BY MS. CARNEY:
14   Q.   There.  How's that?
15   A.   -- sight of everybody.
16               Yeah.  That looks good.  Okay.
17   Q.   Okay.  So actually, we need to scroll down a
18   little bit to what's page 12 on the bottom of the page,
19   so one more.
20               Okay.  So this is about where we left
21   off.  Last time, we were talking about paragraph three,
22   justification for your opinion.  And in this paragraph
23   here where it says 3a, this is the source data that we
24   were discussing.  It says, "The data were supplied by

JON SHANE, 05/26/2023

120

1    Plaintiff's counsel in electronic format."  And then next
2    sentence starts, "The source data are CPD internal
3    affairs records known as Complaint Register files from
4    1980 to 19" -- I'm sorry -- "to 2008."  Do you see that?
5        A.    Yes.
6        Q.    Okay.  Hold on.  I lost my spot already.
7    It's hard to start over when you've already got a couple
8    hours in.
9        MS. BONJEAN:  Yes.
10   BY MS. CARNEY:
11       Q.    Sorry.  All right.  And then the next par --
12   so this paragraph here is describing the spreadsheet
13   known as the CPD CR data master file; is that correct?
14       MS. BONJEAN:  Objection --
15   BY MS. CARNEY:
16       Q.    Where you say --
17       MS. BONJEAN:  I'm sorry.
18   BY MS. CARNEY:
19       Q.    -- "the data were analyzed using MS Excel and
20   Statistical Package for Social Sciences"?
21       MS. BONJEAN:  I'm going to object to the form of
22   that question.  Foundation as well.
23           You can answer if you understand, Jon.
24       THE WITNESS:  Are you asking me -- can you -- can

121

1    you say that again?  I wasn't clear.
2    BY MS. CARNEY:
3        Q.    Yep.  Sorry about that.
4            All right.  So this paragraph is talking
5    about the justification for your opinion and the source
6    data that you used in order to form that opinion; is that
7    accurate?
8        A.    Yes, that's correct.
9        Q.    Okay.  And you talk about complete register
10   files from 1980 to 2008 for defendant officers and a
11   sample for non-defendant officers and that you analyzed
12   that data using both MS Excel and what is known as SPSS;
13   is that right?
14       A.    Yes, that's correct.
15       Q.    Okay.  And the MS Excel document that you're
16   referencing here is what I think we're going to need to
17   mark as Exhibit 16, but it's the spreadsheet that I just
18   showed you that was produced to us after we adjourned the
19   last time; is that right?
20       A.    Yes, that's correct.
21       Q.    Okay.  And during the first part of your
22   deposition, we talked a lot about kind of your process in
23   how you -- how you analyzed the CRs and broke them down
24   into that spreadsheet.  Do you remember that?

122

1        A.    Yes, I do.
2        Q.    Okay.
3        A.    Sure.
4        Q.    And is that MS -- is that MS Excel
5    spreadsheet the only spreadsheet that you used when
6    compiling the data for the source data?
7        A.    Well, when you say the "only spreadsheet,"
8    are you differentiating from SPSS?
9        Q.    I am.
10       A.    So the -- the data was -- was coded into
11   Microsoft Excel, and then for one of the -- one of the
12   procedures, I used SPSS.  I just want to make sure we're
13   clear on -- that what I'm answering is correct.
14       Q.    Yep.  That makes sense.  Thank you.  Okay.
15       A.    Okay.
16       Q.    So then moving down, you say here, "The data
17   in the CR files are relational."  Can you explain to me
18   what "relational" means when -- in this paragraph?
19       A.    Well, I go on to explain it right after that.
20   It's relational in the sense that there's what's known as
21   a one-to-many relationship; so you may have one
22   complaint, but you may have many dispositions.  You may
23   have many officers.  Many officers may -- may have many
24   dispositions.  That's -- that's why it says -- the next

123

1    sentence reads, "It's a one-to-many relationship."
2        Q.    Okay.  So you're -- in your report, you're
3    using -- so the incident is the CR; is that accurate?
4        A.    Well --
5        MS. BONJEAN:  Yeah.  I'm going to object to the
6    form of that question.
7            Go ahead.
8        THE WITNESS:  Let's -- let's call it -- let's call
9    it the complaint is the CR for the moment.  I mean, we're
10   going to have to differentiate how we're using some of
11   this terminology.  But let's say someone come -- someone
12   comes in to make a complaint, and the complaint becomes
13   the CR.  From the CR, allegations and officers and
14   dispositions are eventually defined.
15   BY MS. CARNEY:
16       Q.    Okay.
17       MS. BONJEAN:  Can you guys hold on one second?
18   This is where -- I'm sorry -- I need to take a two --
19   (muted).
20       MS. CARNEY:  Yep.  Let's go off the record.
21       THE VIDEOGRAPHER:  All right.  We're going off the
22   video record at 9:44 a.m.
23           (Recess taken.)
24       THE VIDEOGRAPHER:  This is the continuation of

JON SHANE, 05/26/2023

124

1    Media Unit 1.  We are back on the video record at
2    9:49 a.m.
3    BY MS. CARNEY:
4        Q.    Okay.  If we can bring back up Exhibit 3
5    where we were, I think it will make sense to just go to
6    the next page of that -- of your report.  And in this
7    paragraph, Dr. Shane, you actually are talking -- this
8    first paragraph up here, you are talking about the unit
9    of analysis.
10       A.    Yes.
11       Q.    Okay.  And you say, "The unit of analysis was
12   switched when appropriate to accommodate the analysis."
13   When is it appropriate to switch the unit of analysis?
14   What do you mean there?
15       A.    It depends on what type of analysis I'm
16   conducting.  So if I want to look at complaint level
17   data, then I will look at just the complaint level.  But
18   if I want to look at dispositions, then I have to switch
19   the unit to the disposition level.
20       Q.    Okay.  In the next sentence, you said, "The
21   unit of analysis includes incident level, officer level,
22   complaint level and disposition level."  Is that what you
23   were just talking about with how to -- how to break down
24   each CR?

125

1        A.    Yes.
2        Q.    Okay.  So for this report, is it fair to say
3    that you used incident level as your terminology to
4    describe the CR itself?
5        MS. BONJEAN:  Object -- objection.  Form.
6        THE WITNESS:  The -- the complaint level was the
7    CR.  The incidents were the allegations.  The officers
8    were the police officers, and the dispositions were the
9    dispositions.
10   BY MS. CARNEY:
11       Q.    Okay.  Hold on.  I missed that.  So you said
12   the complaint level was the CR itself?
13       A.    That's right.
14       Q.    Incident level was -- what? -- the
15   allegation?
16       A.    The allegations, yes.
17       Q.    And then officer and disposition level are
18   self-explanatory; right?  Officer is the number of
19   officers and the actual officer involved?
20       A.    That's correct.
21       Q.    And the disposition level is the result of
22   the investigation; right?
23       A.    Yes, correct.
24       Q.    Okay.  Okay.  So -- and then that is how you

126

1    broke down the CRs in the spreadsheet that we were
2    looking at before; is that right?
3        A.    Yes.
4        MS. BONJEAN:  Objection.  Form.
5    BY MS. CARNEY:
6        Q.    Okay.  So moving down then to subparagraph b
7    here, "Case" -- "Case Methodology for Process
8    Evaluation."  You say here that your process evaluation
9    consisted of analyzing content from 40 randomly selected
10   internal affairs investigations.  Was this -- is this
11   section discussing your qualitative research or your
12   quantitative research in regards to this report?
13       A.    Well, it's -- it's a little bit of both.  The
14   content that came from the internal affairs records would
15   be qualitative.  That was looking at the various
16   components.  But then that was also put into -- I
17   quantified those.  I counted them up.
18       Q.    Okay.
19       A.    But, generally, it's the qualitative end of
20   it.
21       Q.    Okay.  And we may have brought -- talked
22   about this during the first part of the dep, but are --
23   can you -- are you aware of any research papers where
24   police accountability is analyzed using a qualitative

127

1    approach?
2        MS. BONJEAN:  I'm going to object to the form.
3        But go ahead.
4        THE WITNESS:  Can you be a little more specific?
5    Do you -- do you mean -- what do you mean when you say,
6    "a qualitative approach"?
7    BY MS. CARNEY:
8        Q.    Well, if I'm understanding -- so -- well, let
9    me go -- let's go down a little bit more into this
10   paragraph, and maybe that will help me crystallize my
11   question a little bit better.  So you say, like you just
12   talked about, "The content reflects components of the
13   standard internal affairs investigation."  And then,
14   "Following generally accepted method for saturation and
15   variability, 40 CPD investigations were randomly selected
16   to ensure accurate and objective results."
17       Is saturation and variability -- are
18   those terms that are used for quantitative research or
19   qualitative research?
20       MS. BONJEAN:  Objection.  Form.
21       THE WITNESS:  Generally qualitative.
22   BY MS. CARNEY:
23       Q.    Okay.  So the 40 randomly selected files that
24   you -- that you were analyzing in this section, would

JON SHANE, 05/26/2023

128

1   that have been enough for a qualitative -- or I'm
2   sorry -- a quantitative analysis of the CR files?
3       A.   Well, it -- that's a difficult question the
4   way you pose it.  First -- first of all, it's a -- the
5   report consists of two elements.  It's -- it has
6   qualitative elements, and it has quantitative elements.
7   That's number one.  Number two, when you say is it
8   sufficient -- what did you say?  Is it sufficient for a
9   qual -- quantitative analysis only?
10      Q.   Yes.
11      A.   Well, the answer is it depends on what it is
12  you're trying to examine.  It depends on what you're
13  trying to achieve with that.
14      Q.   Okay.  Is it -- or can you tell me then what
15  in -- in this -- for this case selection methodology that
16  you're discussing in this paragraph, what were you trying
17  to achieve with the 40 randomly selected cases?
18      A.   What I wanted to do is to look at the
19  component pieces of each of the investigations.  I wanted
20  to see what things that they did during investigation to
21  determine if there were any omissions from standard
22  investigation practices.
23      Q.   Okay.  And so then I just want --
24      A.   Those --

129

1       Q.   Oh, sorry.  Were you done?
2       A.   Those components pieces amounted to -- to
3   various themes that came up.
4       Q.   Okay.  So then I guess what I'm trying to
5   figure out is was your -- was your goal in -- in
6   reviewing these component pieces from the 40 randomly
7   selected cases -- was it a -- were you looking to -- I
8   want to phrase it correctly because I know the terms mean
9   different things.  But were you looking to do a
10  qualitative review of those 40 cases or a quantitative
11  review?
12      MS. BONJEAN:  Objection.  Form.
13      THE WITNESS:  Well, it was -- it was qualitative
14  insofar as I wanted to see what themes arose from the
15  data that came from the actual investigations.  I did
16  quantify some of -- some of those themes.
17  BY MS. CARNEY:
18      Q.   Okay.  And when you say you "did quantify
19  some of those themes," what does that mean?
20      A.   It means I counted up the sorts of things
21  that arose from that -- from those themes.
22      Q.   And then did you form any opinions based on
23  that quantitative counting of the things that came from
24  those themes?  Does that --

130

1       MS. BONJEAN:  Object to form.
2       THE WITNESS:  Yes.  My opinion -- my opinion was
3   that the investigations were not complete.  They had a
4   number of missing component pieces.
5   BY MS. CARNEY:
6       Q.   Okay.  So -- so that research question and
7   ultimate answer, is that -- was that a quantitative
8   finding from the 40 cases?
9       MS. BONJEAN:  Object to form.
10      THE WITNESS:  What research question?
11  BY MS. CARNEY:
12      Q.   Sorry.  I was trying to -- so you said that
13  you did -- you did quantify some of those themes by
14  counting out the various things that came from those
15  themes by quantifying them; right?
16      A.   Correct, correct.
17      Q.   Did I understand that right?  Okay.
18      A.   Yes.
19      Q.   And then from that quantifi -- is
20  quantification a word?  From --
21      A.   It is.
22      Q.   Is it?
23      A.   It is, yeah.  Sure.
24      Q.   Okay.  Good.  So from that quantification of

131

1   those -- those component pieces that created those
2   themes -- now I got excited about my new word, and then I
3   lost my train of thought.
4            Okay.  So you -- from that quantification
5   of those themes, you came up with -- to the conclusion in
6   your opinion that the investigations were not complete,
7   and they were missing component pieces; is that right?
8       MS. BONJEAN:  Objection.  Foundation and form.
9       THE WITNESS:  No.  I reached that -- that
10  conclusion based on what I drew from looking at the
11  individual files, not simply because it was quantified.
12  BY MS. CARNEY:
13      Q.   Okay.  So I guess I'm trying to figure out if
14  there was any sort of quantitative research done or
15  quantitative analysis done on just the subset of the
16  40 randomly selected files that led you to your opinion
17  that the investigations were not complete and missing
18  component pieces, or was that a qualitative research
19  analysis?
20      MS. BONJEAN:  I'm going to object.  Asked and
21  answered.  I think he answered that already.
22           But if you -- go ahead.
23      THE WITNESS:  I don't think it's an either/or
24  question.

JON SHANE, 05/26/2023

132

1    BY MS. CARNEY:
2        Q.    Okay.
3        A.    So the -- the -- the answer is when I
4    reviewed these 40 files, I identified component pieces
5    that were missing.  It was a qualitative review to look
6    for various elements of investigative practices.  And
7    then from that, I counted the various pieces that were
8    missing, and that's a quantitative appraisal.
9        Q.    Okay.  And so my question ultimately is for
10   the quantitative appraisal, were -- and I think the
11   word -- the -- the term you used in the beginning of the
12   dep -- the -- part one of the dep was the statistic --
13   like, the power analysis or appropriate power; is that
14   right?  Am I remembering that correctly?
15       A.    Well, you did ask me about a power analysis,
16   yes.
17       Q.    Okay.  And we talked a little bit about
18   confidence level intervals and the term -- the correct
19   terminology for -- for what it means for -- for a study
20   to have enough power.  Is that -- am I remembering that
21   correctly?
22       A.    Yes, yes.  It's -- and if you remember, I
23   said it's predicated upon the test that you use.
24       Q.    Okay.  So I guess my question is the

133

1    quantitative appraisal that you ultimately did on the
2    40 -- the subset of 40 cases, did that have a high enough
3    power to be statistically significant?
4        A.    I wasn't test -- I wasn't testing those for
5    statistical significance.
6        Q.    Okay.
7        A.    They're just percentages, and they're
8    reflected in a -- in a table that's in this -- in this
9    document.
10       Q.    Got it.  All right.  Took me a little while
11   to get there, but maybe I'm getting my flow back here.
12       A.    Okay.
13       Q.    All right.  So we go down the paragraph a
14   little bit.  You say -- it's this -- it says to -- it's a
15   sentence that starts with, "To ensure a better
16   representation of investigations, a larger data" -- "a
17   larger sample" -- "sample of data were selected across
18   the defendant and non-defendant officers." Do you see
19   that?
20       A.    Yes.
21       Q.    Okay.  And then the next sentence is what I'm
22   interested in.  You say, "To ensure proportional
23   representation from each sample, a proportion of the
24   cases were drawn from each strata until reaching

134

1    40 cases."
2        A.    Okay.
3        Q.    So my understanding from this paragraph is
4    that you had two strata, defendant officers and
5    non-defendant officers; is that correct?
6        A.    Yes, that's correct.
7        Q.    Okay.  What is the importance of ensuring
8    that you had two different strata and a proportional
9    representation from each of those strata?
10       MS. BONJEAN:  Objection.  Form.
11       THE WITNESS:  Drawing a proportional sample ensures
12   that you have a generally strong representation from each
13   of -- of the groups.  You don't want to over sample for
14   one or under sample for another, so you draw it
15   proportionately to ensure that you have good
16   representation from each side.
17   BY MS. CARNEY:
18       Q.    Okay.  Moving on to the next page, you say
19   that a "Random selection for the CR files was used to
20   reduce bias by providing each investigation an equal
21   chance of being selected."  Was the random --
22       A.    Where -- can you -- excuse me.  Where are you
23   reading from, please?
24       Q.    Sorry.  It's the second sentence here --

135

1        A.    Okay.  I see.
2        Q.    -- that starts at the -- okay.
3                Was the random selection done -- was
4    there a random selection process done for each strata, or
5    was it after the 40 cases were picked, then a random...
6        A.    No.  The 40 cases come from the random
7    sample.
8        Q.    Okay.  And the 40 cases were picked from
9    the -- the defendant officer strata and the non-defendant
10   officer strata; right?
11       A.    Yes, that's correct.
12       Q.    Okay.  Then you -- the next sentence says,
13   "There are 146 CR numbers."  Do you see that?
14       A.    Yes.
15       Q.    So based on what we talked about before, that
16   unit of analysis is the complaint level; is that correct?
17       A.    Yes, that's correct.
18       Q.    Okay.  Do you know the time period that the
19   146 CR numbers spans?  Do you...
20       A.    I thought it was what we had earlier.  I
21   mean, I don't know off the top of my head, but I thought
22   it was written -- it's written somewhere in here.
23       Q.    Okay.  So that's the 1980 to 2008 --
24       A.    Yes, that's right.

JON SHANE, 05/26/2023

---

136

1    Q.   Okay.

2    A.   Yes.  The non-defendant officers may have --

3   may have had a shorter time frame.

4    Q.   Is that because the defendant officers -- the

5   CR histories for their -- spanned their entire career?

6    A.   I'm not sure if it was the entire career.  I

7   mean, this is the data that I was given.

8    Q.   That's fine.  Okay.  So now we're going to go

9   down to section c here, Methodology for Computing

10  Percentage of Completed Investigative Activities in CR

11  Files.

12   A.   Okay.

13   Q.   Okay.  And I know you have a table in this --

14  this refers to Table 6, which is little bit farther back

15  in your report, so we'll get to that in a second.  Now,

16  it says that you -- so you say here that you were

17  switching to the unit -- sorry.  Let me start over.

18       The first paragraph, first sentence says,

19  "Completed investigative activities were computed by:

20  1) using the incident as the unit of analysis."  So based

21  on what we talked about before, incident level was the

22  allegations; is that right?

23   A.   Yeah.  But I think here, we're -- we're

24  talking about the complaint -- complaint itself -- the

---

137

1   complaint level.

2    Q.   Okay.  Why do you believe that here, incident

3   is complaint level, and before, incident was allegation

4   level?  Is there something that differentiates in the

5   report?

6    A.   No.  I think -- I think what I'm saying here

7   is that this should be the complaint level because

8   there's only 146 files, and we're looking at the -- at

9   the complaints themselves.

10   Q.   Okay.  So here, incident -- the incident as

11  the unit of analysis is the complaint level?

12   A.   Complaint level.

13   Q.   Got it.  And then you say, "Subtracting

14  investigative activities that were not applicable."  What

15  does it mean for an investigative activity to be not

16  applicable?

17   A.   Well, if you look down at footnote number 7,

18  I talk about what it is, and then there's an example in

19  there.  Sometimes -- it's exactly what it says.  It

20  just -- it wasn't applicable.  Like, no -- for example,

21  in the -- in the footnote number 7, there was a CR where

22  the accused officer signed out photography equipment, so

23  there's no victim to contact.

24   Q.   Okay.

---

138

1    A.   So contacting the victim's not an applicable

2   investigative element.

3    Q.   Got it.  So let's actually flip to -- all of

4   these investigative activities are actually in a table

5   that you put together -- right? -- Table 6?

6    A.   I don't know the number offhand, but I can

7   point you to it if you scroll down.

8    Q.   Yeah.  Let me see if I can find the page.

9   Okay.  It's page 46 of your report.  Let's go there.

10   A.   Okay.

11   Q.   Can you see that?

12   A.   Yes.

13   Q.   Okay.  So here it says, "Percentage of

14  Completed Investigative Activities in the CR Files," and

15  you have a list of -- I counted them out --

16  23 investigative activities.  And then some of them have

17  this little star, so footnote 60 down here says, "Those

18  items marked with a star are required by Chicago Police

19  Department General Order 82-14, Complaint and

20  Disciplinary Procedures."

21       If an item doesn't have a little star --

22   A.   Okay.

23   Q.   -- then who created that investigative

24  activity?

---

139

1    A.   Which investigative activity?

2    Q.   Well, for example, the first one there, it

3   says, "cameras located at the scene."

4    A.   You're asking me where did that idea come

5   from?

6    Q.   Correct.

7   MS. BONJEAN:  Objection to the form of the

8   question.

9       You can answer.

10  THE WITNESS:  That comes from basic investigative

11  practices that would take place in an internal affairs

12  investigation, and that's based on my years of experience

13  conducting them, supervising them.

14  BY MS. CARNEY:

15   Q.   Okay.  So taking that one, for example,

16  "cameras located at the scene," what does "located" mean

17  to you?

18   A.   That there would have been cameras at the

19  scene that may have captured the incident.

20   Q.   And for some of the CRs we talked about

21  before -- you know, the time span from the CRs starts in

22  1980; is that correct?

23   A.   Yes.

24   Q.   Okay.  And are you aware of the prevalence of

---

JON SHANE, 05/26/2023

140

1   cameras on -- in nineteen -- on various -- sorry. That's
2   a bad question.
3            Did you go through the CRs based on the
4   year to determine whether or not cameras at the --
5   located at the scene would actually have been applicable
6   to the time period?
7        MS. BONJEAN: Objection to the form and foundation
8   of that question.
9        THE WITNESS: Well, surveillance cameras have been
10  around for -- for decades; so what do you mean did I go
11  through each year?
12  BY MS. CARNEY:
13       Q.   Well, for example, if a CR is from 1980 --
14       A.   Yes.
15       Q.   -- did you look at that CR to determine
16  whether or not the cameras at the scene -- cameras
17  located at the scene was an applicable investigative
18  activity given the time period and the location of the
19  potential investigation?
20       A.   Well, the -- the answer is yes. The -- the
21  surveillance cameras in general have been around for
22  decades. They -- they were around in the '60s and '70s.
23  Their prevalence increased as time wore on.
24       Q.   Okay. But as we discussed before, this

141

1   doesn't have an asterisk next to it, which means that it
2   was not something that was required by the general order
3   at the time; is that correct?
4        A.   Although it wasn't promulgated in the general
5   order, it was certainly an investigative practice at that
6   time. Police departments were canvassing for cameras --
7   surveillance cameras at that time for sure.
8        Q.   Okay. So then moving down to the second one,
9   "communication tapes preserved." Do you see that there?
10       A.   Yes, of course.
11       Q.   Okay. That's another one that doesn't have
12  an asterisk, so does that mean that it's something that
13  came -- it's an investigative -- investigative activity
14  that you included based on your belief of best
15  investigative practices?
16       MS. BONJEAN: Objection to the form. Misstates his
17  earlier testimony on this.
18            But you can answer.
19       THE WITNESS: Well, for example, in 1985, I started
20  my police career in the communication center in the
21  Clifton Police Department, and at that time,
22  communication tapes were used extensively in
23  investigations. And the detectives and police officers
24  that were in the police department that had been there

142

1   for many years previously had been using those tapes for
2   many, many years before my arrival in 1985. So I know
3   from first-hand experience that they were being used.
4   BY MS. CARNEY:
5        Q.   Okay. When you say "communication tapes," I
6   guess what are you -- what are you including in that
7   definition?
8        A.   That includes telephone communications and
9   radio communications.
10       Q.   Okay. And sitting here today, are you aware
11  what the retention schedules were during the relevant
12  time period from the Office of Emergency Management and
13  Communication for the City of Chicago?
14       A.   No, not off the top of my head. I don't know
15  that.
16       Q.   Just flipping back up to the first one,
17  "cameras located at the scene." If you say that -- if
18  you indicate that that activity was not completed, does
19  that mean that cameras were not looked for, or they were
20  ignoring cameras that were available?
21       A.   There was no evidence in the -- in the CR
22  files that they canvased for cameras -- that they
23  conducted that investigative step.
24       Q.   Okay. All right. So then moving down to the

143

1   third one here, "district phone tapes preserved." Do you
2   see that?
3        A.   Yes.
4        Q.   Okay. What are you referring to when you say
5   "district phone tapes"?
6        A.   Communication tapes, telephones between the
7   police precincts and the communication center.
8        Q.   Is it your understanding that CPD had these
9   communication tapes or district phone tapes during the
10  relevant time period?
11       A.   Yes.
12       Q.   Okay. Where does that understanding come
13  from?
14       A.   From my knowledge of the industry.
15       Q.   Okay. The next one down, "referred to Cook
16  County Prosecutor's Office."
17       A.   Okay.
18       Q.   What do -- what do you consider a referral to
19  the Cook County Prosecutor's Office?
20       A.   So if the police department has an
21  investigation underway that is potentially criminal,
22  referring that matter to the -- to the prosecutor's
23  office for direction, guidance, and potentially a joint
24  investigation.

JON SHANE, 05/26/2023

144

1    Q.   So I guess my question is more what do you --
2  what do you consider to be a referral?  Reaching out to
3  the Cook County State's Attorney's Office?  Seeking
4  charges?  What -- when you say "referred," I'm trying to
5  understand what that -- what you're looking for.
6    A.   Contacting them and documenting who you spoke
7  to, what the results were, whether they were willing to
8  participate, whether they declined prosecution.
9    Q.   Okay.  So number five is "photos of the scene
10 obtained."  Do you see that there?
11   A.   I do.
12   Q.   Okay.  I guess my question for this one is
13 what do you mean by "obtained"?  Are you looking for the
14 CR investigators to have been taking their own
15 photographs or looking for them to have gone to CPD to
16 obtain any photographs they took?  What do you mean by
17 this?
18   A.   Whether or not the investigators obtained
19 crime scene photographs or other photographs of the scene
20 of the incident.
21   Q.   So in your -- in your definition, that could
22 have been the CR -- the investigators, in fact, taking
23 their own photos?
24   A.   It would include investigators or somebody

145

1  that previously took them.  It really doesn't matter who
2  took the photographs.  I'm talking about whether or not
3  photographs of the scene were obtained.
4    Q.   All right.  So number six says, "CPD medical
5  form describe complaint of pain or injuries."  Do you see
6  that?
7    A.   Yes.
8    Q.   Okay.  What is this form?  Is it -- is this a
9  form that you are -- is there a form you're thinking
10 of -- that you're referring to here?  What form are you
11 talking about?
12   A.   There is a form that was in the -- in the
13 files.
14   Q.   It's a -- and it's a Chicago Police
15 Department form?
16   A.   Yes.  I saw it in the files, correct.
17   Q.   Do you know -- I'll come back to that one.
18        Number seven down here -- sorry.  My
19 numbers are getting blurry -- "officer identified by
20 victim/witness."  Do you see that there?
21   A.   I do.
22   Q.   Okay.  What does that mean?
23   A.   It means whether or not the victim or witness
24 identified the officer involved and what measures were

146

1  taken to assist that person in doing that.
2    Q.   Okay.  The next one says, "Arrest photos."
3  Arrest photos of who?  Who are you referring to here?
4    A.   Of anybody that was arrested.
5    Q.   The next one says, "Cook County medical form
6  describe complaint of pain or injuries."  Do you see
7  that?
8    A.   I do, yes.
9    Q.   What is that form?
10   A.   Same thing.  There's a -- there's a form that
11 was in some of the CR files that described medical
12 conditions by Cook County.
13   Q.   Okay.  So is this a different form than the
14 CPD form you were talking about?
15   A.   Yes.  It's related to the jail.
16   Q.   Okay.  So this is a record that was created
17 by the jail that you're referring to?
18   A.   I don't recall if it's a Cook County form or
19 if it's a CPD form, but it was produced by the jail.
20   Q.   Okay.  Oh, I messed up my numbers here
21 because number ten was the same one here, pain or
22 injuries, but that's now the same thing.
23        So we'll go down here to "photos of
24 victim taken by IAD."  Do you see that?

147

1    A.   I do, yes.
2    Q.   Okay.  That one's fine.  Okay.  So, actually,
3  we're going to move down to "in-person interview with
4  witness" and "in-person interview with victim."  Do you
5  see that?
6    A.   I do, yes.
7    Q.   Okay.  Where is there -- who -- where is
8  there a requirement that the interview with the witness
9  or victim needs to be in person?
10   A.   It's a common --
11   MS. BONJEAN:  Objection to the form of that
12 question.
13        Go ahead.
14   THE WITNESS:  It's a common investigative practice
15 in internal affairs and criminal investigations to meet
16 with the victim, to meet with the witness, to get a
17 first-hand account, rather than over the phone or by
18 letter, to get a better understanding of what happened.
19 BY MS. CARNEY:
20   Q.   All right.  So the next one down says,
21 "arrest report of the complainant."  Do you see that
22 there?
23   A.   Yes.
24   Q.   What if the complainant wasn't arrested?

JON SHANE, 05/26/2023

148

1    MS. BONJEAN: (Indiscernible.)
2        THE WITNESS: If -- if the person was not arrested,
3    I wouldn't expect to see the arrest form.
4        MS. CARNEY: Okay.
5        THE REPORTER: And I'm sorry. I didn't catch what
6    you said last time, Ms. Bonjean.
7        MS. BONJEAN: Nothing. Objection. Form.
8    BY MS. CARNEY:
9        Q.   Okay. So if you don't expect to see that
10   form -- an arrest report, then would that have been
11   classified as not applicable?
12       A.   Well, there are a few. If you look at --
13       MS. BONJEAN: Jon -- Jon, just answer the question.
14       THE WITNESS: Can you repeat the question?
15   BY MS. CARNEY:
16       Q.   Yeah. Sorry. So -- so I asked you, you
17   know, what about if the -- if the complainant wasn't
18   arrested, and you said if the complainant wasn't
19   arrested, you wouldn't expect to see an arrest report; so
20   I guess I'm trying to figure out if that's one of the
21   files that you would have marked -- or investigative
22   activities that you would have marked as not applicable
23   because the task was not expected to occur?
24       A.   Yes.

149

1        Q.   Okay. All right. And then going down here,
2    it says, "witness contacted." Do you see that?
3        A.   Yes.
4        Q.   What is the difference between this task,
5    "witness contacted," and "in-person interview with the
6    witness"?
7        A.   Well, someone's contacted if they've got --
8    if they've got ahold of them. Someone is interviewed if
9    they -- if they've been interviewed.
10       Q.   So you're creating two different steps of
11   contact versus the actual interview?
12       A.   That's correct.
13       Q.   So the same, then, for the very last one,
14   "victim/complainant contacted." You're creating two
15   different steps here -- well, first of all, this victim
16   and complainant contacted is actually a requirement from
17   CPD's general orders -- right? -- because it has this
18   little asterisk next to it?
19       A.   Yes.
20       Q.   Okay. So then by including the additional
21   investigative step that you made of in-person interview
22   with the victim, you're creating an additional
23   investigative step separate and apart from just
24   contacting them; right?

150

1        MS. BONJEAN: Objection. Form.
2        THE WITNESS: Well, I'm -- I'm not creating
3    anything. These are the -- these are accepted practices
4    in the policing industry. These are things that a police
5    department would be expected to do if they were
6    conducting an internal affairs investigation.
7    BY MS. CARNEY:
8        Q.   Is there somewhere that you can point to or
9    that you can cite to where these 22 investigative
10   activities are outlined by a police agency or an
11   oversight agency as being required for all internal
12   affairs investigations?
13       A.   Well, I think we could probably find policies
14   around the country of various police departments that
15   have these things in place. The US Department of
16   Justice, the COPS Office promulgated internal affairs
17   guidelines.
18       Q.   And were these things in place during the
19   relevant time period of 1980 through 2008?
20       A.   They've -- they've always been elements of --
21   of criminal and -- criminal and administrative
22   investigations.
23       Q.   Okay. But -- all right. So then going back
24   to page 14, just kind of where we started --

151

1        Thanks, Brett. If you could go all the
2    way down to the footnote -- footnote 8.
3        All right. Dr. Shane, here you say,
4    "Unclear means the CR includes a reference to the
5    investigative task, but the investigative task cannot be
6    determined." I guess I'm confused. What do you mean by
7    it "includes a reference to the investigative task, but
8    that task can't be determined"? Can you explain that?
9        A.   They may have said some things about doing
10   one of those investigative tasks, but there was no
11   corroborating information that it actually occurred. I
12   remember seeing on more than one occasion, "We" -- "We
13   tried to contact the victim" or something like that, or
14   "I tried to contact the victim," and it -- that's all it
15   says.
16       How? How did you do that? Did you go to
17   the -- did you go to the person's house? Did you send a
18   letter? Did you telephone them? What phone number did
19   you use? Were the district tapes preserved so you could
20   say, "I called from this number at this date and time"?
21   I couldn't confirm that it actually occurred, but they
22   made reference to it occurring.
23       Q.   In 1980, were -- in 1980, were other
24   departments preserving each and every district tape

JON SHANE, 05/26/2023

152

1    showing a phone call to a victim in an internal invest --
2    internal affairs investigation?
3        MS. BONJEAN:  Objection.  Foundation.
4        THE WITNESS:  They certainly should have been.
5    Yeah.  I mean, it certainly was an approved and accepted
6    investigative practice, yeah.  Yes.
7    BY MS. CARNEY:
8        Q.    Can you --
9        A.    In Clifton where I was working in 1985, the
10   Clifton Police Department was doing it.
11       Q.    In 1985, the Clift -- the Clifton Police
12   Department was preserving all the district tapes making
13   outbound phone calls to victims or complainants in
14   internal affairs investigations?
15       A.    As -- as best as I recall, the answer is yes.
16   In fact, I worked in the communications division, and we
17   were constantly tasked with pulling tapes for that very
18   purpose.
19       Q.    All right.  Page 15, this paragraph is mostly
20   talking about evaluations here.  Mid -- mid-paragraph you
21   say, "Evaluations must be the product of daily
22   observation and close working relationships."  Do you see
23   that?
24       A.    I do, yes.

153

1        Q.    Okay.  When you're talking about evaluations,
2    are you saying that evaluations always need to be
3    written?
4        A.    Well, most police departments conduct written
5    performance evaluations.  Explain -- explain to me what
6    you -- what you're thinking in terms of the way you're
7    differentiating between written and, I guess, some other
8    form of evaluation.
9        Q.    Well, I guess that's my question to you.  Do
10   you know of any other ways that evaluations could have
11   been taking place that weren't necessarily documented?
12       A.    Well, you can -- you're supervising police
13   officers on a daily basis, but that's not what I'm
14   referring to here.  I'm referring to written evaluations.
15       Q.    Okay.  So this paragraph is referring to
16   written evaluations?
17       A.    Yes, written performance evaluations.
18       Q.    Okay.  The next paragraph talks about
19   effective early identification systems, EIS systems?
20       A.    Yes.
21       Q.    Sitting here today, can you think of other
22   examples of departments in the '80s and '90s that had
23   these EIS systems in place?
24       A.    Well, early warning systems, also known as --

154

1    I should say early warning systems, EWS, or early
2    identification systems are -- are the -- are the same
3    thing, and they were pioneered in the 1970s.  I believe
4    the first agency to begin experimenting with them -- with
5    them was Miami.  They diffused throughout the industry in
6    the 1980s.  By the 1990s, most police departments moved
7    from a paper-based system to an electronic system.
8        Q.    And when you say paper-based -- they moved
9    from a paper-based system to an electronic system, what
10   do you mean by that?
11       A.    I mean that computers were not available at
12   that time.  The -- the paper-based system certainly
13   existed prior to 1990, and we -- we knew who was
14   committing offenses.  We had written documentation.
15   Police departments had -- had those things.  They just
16   moved into the electronic era when computers became
17   widely disbursed -- I mean, just throughout American
18   culture in general, not just police departments.
19       Q.    And these early warning systems that
20   you're -- that were being pioneered in the 1970s, what
21   was the process for how those early warning systems --
22   the ones that you're thinking -- the ones that you're
23   describing from Miami, what was a general process of an
24   early warning system?

155

1        MS. BONJEAN:  I'm going to object to the form of
2    that question and foundation.  You're talking
3    specifically Miami or just generally early warning
4    systems?
5    BY MS. CARNEY:
6        Q.    Well, let's start generally, the early
7    warning systems that you're thinking of through the '80s
8    and '90s, the paper-based systems that you're talking
9    about where there was known information and written
10   documentation.  How did that process work?  How is -- how
11   is an early warning system in -- what was the process
12   that was in place for such an early warning system during
13   that time period?
14       MS. BONJEAN:  Objection to the form and foundation
15   of that question.
16            If you can answer, Jon.
17       THE WITNESS:  I just want to make sure I'm clear on
18   what you -- what you mean.  You're asking me what kind of
19   process was in place for -- for what?  Identifying
20   officers that had repeat offenses, or what -- what do you
21   mean specifically?
22   BY MS. CARNEY:
23       Q.    Okay.  That's fair.  So let me back up.  What
24   was the purpose -- in the '80s and '90s in these early

JON SHANE, 05/26/2023

156

1  warning systems that you're talking about in this
2  paragraph, what was the purpose of an effective early
3  identification system or early warning system?
4      A.   The purpose was --
5  MS. BONJEAN:  Objection.  Form.  Foundation.
6  THE WITNESS:  The purpose was to --
7  MS. BONJEAN:  You can answer.
8  THE WITNESS:  I'm sorry.  The purpose was to ensure
9  that police departments would look to their documented
10  records and find out what problems were occurring with
11  police officers, what the repeat -- who the repeating
12  police officers were, what kinds of allegations were
13  coming in, when, where, all sorts -- of all sorts of
14  things related to complaints against personnel.
15  BY MS. CARNEY:
16      Q.   Okay.  And how were those early warning
17  systems being implemented in the '80s and '90s -- in the
18  '80s pre-electronic -- like, precomputers -- the
19  paper-based system that you were just talking about?
20      A.   Well, it just --
21  MS. BONJEAN:  Objection.  Form.
22  THE WITNESS:  It was just --
23  MS. BONJEAN:  I'm sorry.  Give me a sec -- give
24  me -- I'm sorry.  Jon, just give me a second to get my

157

1  objection on the record.
2      Form.  Foundation.
3      You can answer.
4  THE WITNESS:  The -- it was just that.  I guess I'm
5  trying to understand what you mean.  It was a paper-based
6  system.  They had -- they had documented records of which
7  officers were being complained against, who the
8  complainants were, what the allegations were, date, time,
9  location, the officer's assignment.  Chicago had --
10  specifically had the -- Personnel Concerns Program
11  that they were referring officers to.
12  BY MS. CARNEY:
13      Q.   Okay.  So is -- are you giving -- are you
14  opining on -- strike that.
15      Is it your opinion that Chicago did not
16  have an early warning system in the '80s and '90s or that
17  the Chicago Police Department's proced -- hold on.  Bad
18  question.
19      Is your opinion that the City of Chicago
20  Police Department did not have any early warning system
21  in place during the relevant time period?
22      A.   No.  They did have one in place.
23      Q.   Okay.  So is it your opinion that the Chicago
24  Police Department's early warning system was ineffective?

158

1      A.   That's my opinion, correct.  They mentioned
2  that themselves in an article that I referenced in -- in
3  this document.
4      Q.   So then I guess my question to you is what
5  process are you aware of in the '80s that made other
6  early warning systems effective that the Chicago Police
7  Department did not have?
8      A.   Well, there's nothing wrong with a
9  paper-based system.  It just actually has to be
10  implemented.  You have to use it.  You have to -- you
11  have to refer back to the documents in question.
12      Q.   Okay.  All right.  So then the next paragraph
13  here, "Notwithstanding CPD's General Orders."  Do you see
14  that?
15      A.   Yes.
16      Q.   Okay.  So if you go down to, like, the third,
17  fourth sentence --
18      A.   Okay.
19      Q.   -- so the whole sent -- you know, just for
20  context, I'll read the whole thing.  "Notwithstanding
21  CPD's General Order 83-3, there's no evidence in
22  discovery that the Chicago Police Department supervised
23  the defendant officers by identifying and monitoring
24  their behavior through either an electronic or

159

1  paper-based system of agency records, despite the fact
2  they knew or should have known that complaints were
3  accruing and then subsequently initiating and ensuring
4  corrective action was taken."  Do you see that sentence?
5      A.   Yes.
6      Q.   Okay.  When you say "they knew," who -- who's
7  the "they"?  Who are you referring to?
8      A.   The Chicago Police Department and the
9  supervisors in the -- in the department who are
10  responsible for monitoring personnel.
11      Q.   Are you -- is there a specific supervisor
12  that you have -- are you talking about a specific
13  supervisor within the Chicago Police Department or
14  supervisors generally?
15      A.   Well, everybody in the chain of command has
16  responsibility to supervise police officers from the
17  superintendent on down to the -- down to the first-line
18  supervisors, which is typically the sergeant level.  I
19  mean, that -- that's why you have what's known as the
20  chain of command.  You have a very -- a very identifiable
21  supervisory structure in all police departments to ensure
22  that personnel meet or exceed their obligations, that
23  they comply with policy.
24      Q.   Okay.  All right.  Skipping up -- skipping

JON SHANE, 05/26/2023

160

1   ahead to page 21. Okay. You say, "Although the internal
2   affairs process is often triggered by a citizen
3   complaint, all police departments are also required to
4   proactively detect troubling patterns in officer
5   conduct." Do you see that?
6       A.   Yes.
7       Q.   Okay. What do you mean -- is this the early
8   warning system that -- that you were talking about
9   before, or is this something different?
10      MS. BONJEAN: Objection to the form of that
11  quest -- question.
12      THE WITNESS: It's referring both to the early
13  warning system and to supervisory practices.
14  BY MS. CARNEY:
15      Q.   And then moving down here, you say, "Law
16  enforcement agencies" -- there it is -- "have a duty to
17  monitor their employees' behavior, and establish
18  mechanisms that provide the internal affairs function and
19  the law enforcement executive with the ability to track
20  the complainant" -- "the complaint records of individual
21  officers and identify those with a disproportionate
22  number of complaints against them." Do you see that?
23      A.   Yes.
24      Q.   Okay. When you say "disproportionate" --

161

1   "disproportionate number of complaints against them,"
2   what do you mean by that? Do you have a number in mind,
3   or is there...
4       A.   Not a number necessarily, but when patterns
5   emerge, they should be acted upon. Patterns, you know,
6   occur -- occur with general regularity; so if a
7   particular officer is -- let's say -- let's say you have,
8   you know, a number of officers working in the patrol
9   division. If one of those officers is working the day
10  shift under a particular supervisor along with several
11  other officers and that officer continues to receive
12  complaints relative to other officers who are similarly
13  situated, we need to find out what's going on with that
14  particular officer.
15      Q.   Okay. So that actually leads me to my next
16  question. Are there any variables in play when looking
17  at the number of complaints against a particular officer?
18  Because you said "similarly situated." What does that
19  mean?
20      MS. BONJEAN: Okay. Objection. That was two
21  questions there.
22      MS. CARNEY: Yeah. That was two questions. I --
23  you're right.
24

162

1   BY MS. CARNEY:
2       Q.   Would you -- so let me start with this. When
3   you say "similarly situated," what does that mean?
4       A.   Officers working in the patrol division,
5   officers working in the narcotics division, something
6   like that.
7       Q.   Okay. So there are variables at play in
8   regards to this kind of analysis; right?
9       MS. BONJEAN: I'm going to object to the form of
10  that question.
11      THE WITNESS: When you say "analysis," do you -- do
12  you mean how the -- I'm not clear what you mean. How the
13  complaints are coming in?
14  BY MS. CARNEY:
15      Q.   Yeah. So when you're trying to figure out if
16  an officer has a disproportionate number of complaints,
17  are you comparing, say, an officer in the narcotics
18  division with an officer on desk duty?
19      A.   No, I'm not.
20      Q.   Okay. So that's what you mean by "similarly
21  situated." You need to look at officers that are
22  similarly situated in their role in the department?
23      A.   That's correct.
24      Q.   Okay.

163

1       MS. BONJEAN: I'm sorry. And you're still talking
2   about sort of the definition of how you determine
3   disproportionate number; is that right --
4       MS. CARNEY: Yes, yes.
5       MS. BONJEAN: -- Theresa? Okay.
6   BY MS. CARNEY:
7       Q.   All right. And then moving to page 22. The
8   top sentence here says, "Behavioral data compiled by a
9   police department should be analyzed as part of an early
10  intervention system. An early intervention system, also
11  known as an early warning system, is intended as an
12  incident-driven system, not an outcome-driven system."
13  Do you see that?
14      A.   Yes.
15      Q.   What -- what does that mean, to be an
16  incident-driven system, not an outcome?
17      A.   It means that police departments are
18  interested in the source of the complaints themselves.
19  The complaint is the -- is the indicator of performance,
20  not the outcome, meaning the disposition was sustained or
21  not sustained or exonerated or unfounded.
22      Q.   Okay. So these early warning systems are
23  meant, in -- in your opinion, to trigger something based
24  on the number of complaints that come in, not necessarily

JON SHANE, 05/26/2023

164

1   the outcome of the complaints after the fact?
2     A.   That's correct.
3     MS. BONJEAN:  Objection to form.
4     THE WITNESS:  I think I'm too quick on the trigger
5   here.  Jen, did you say something?
6     MS. BONJEAN:  It's all right.  The answer can
7   stand.
8   BY MS. CARNEY:
9     Q.   In the 1980s and 1990s, are you aware of any
10  departments that had early warning systems that were --
11  that had incident -- I'm sorry.  That had outcome -- let
12  me start that completely over.
13        In the 1980s and 1990s, are you aware of
14  any police departments that had incident-driven systems
15  in place?
16     MS. BONJEAN:  Okay.  I'm going to object to the
17  form.
18        But you can answer, Jon.
19     THE WITNESS:  Are you asking me if I'm aware of any
20  police departments that had an early warning system in
21  place?
22   BY MS. CARNEY:
23     Q.   Yeah.  I guess I'm confused in your opinion
24  in this section.

165

1     A.   Okay.
2     Q.   Are you criticizing the fact that these early
3  warning systems were incident-driven versus
4  outcome-driven, or is this just an observation that early
5  warning systems were typically incident-driven?
6     A.   Not were.  Are.
7     Q.   Are.  Okay.
8     A.   Yes.  They -- they are incident-driven
9  systems.  I was just -- I was just trying to be as clear
10  as possible that they're not outcome-driven; so -- so
11  let's say someone -- there's a complaint against a
12  particular police officer, and the investigation is
13  unfounded or not sustained.  And let's say that -- let's
14  say the officer has -- I don't know -- 15 complaints, you
15  know, over the course of, you know, two years or three
16  years or something like that, and all of the -- all of
17  the -- none of them are sustained.  That's not what's
18  important to a police department.  They are -- what's
19  important is that the officer is generating complaints.
20  Then what we do is then -- then we look deeper into the
21  individual investigations, so we find out, well, why are
22  all these investigations not being sustained?
23     Q.   Got it.
24     A.   These are all part of the management

166

1   practices of a police department -- the things that
2  you're mentioning.
3     Q.   Okay.  So then down here a couple sentences,
4  you say, "When personnel complaints arise, it is
5  incumbent upon supervisors and managers to initiate and
6  ensure action is taken to address those complaints,
7  especially when a pattern of complaints accrues."  Do you
8  see that?
9     A.   I see that, yes.
10     Q.   Okay.  We talked about this a little bit last
11  time, so I don't want to go into a dissertation issue,
12  but what -- when you say "pattern of complaints accrues,"
13  what are you -- what are you considering a pattern?
14     A.   The regular or -- or repeated complaints that
15  are being received by a police department from either
16  citizens or internally regarding specific officers or
17  specific divisions.
18     Q.   Okay.  And are you making -- oh, never mind.
19        All right.  So we're going to move to the
20  next page, but I've been going for a little bit now if we
21  want to take a quick break.
22     THE VIDEOGRAPHER:  Everybody good with that?  Yep?
23     THE WITNESS:  Well, you don't have to take a break
24  on my account, but, I mean, if you're breaking for your

167

1   account, that's different.
2     MS. CARNEY:  I would like to take a quick break.
3  Is that okay?
4     THE WITNESS:  All right.  All right.  No.  I'm just
5  saying -- all I was saying is, you know, plow through.
6  That's all.
7     MS. CARNEY:  No.  We will plow through, but I just
8  wanted to take a quick five-minute break.
9     THE WITNESS:  Okay.  Yeah, sure.  Sure.
10     MS. BONJEAN:  Whatever you need, Theresa, is fine.
11  Just -- we're fine.
12     MS. CARNEY:  Let's come back at 11:00, so that's
13  eight minutes.
14     MS. BONJEAN:  Okay.  We'll do that.
15     THE VIDEOGRAPHER:  Going off the video record at
16  10:52 a.m.
17        (Recess taken.)
18     THE VIDEOGRAPHER:  This is the beginning of Media
19  Unit 2.  We are on the video record at 11:01 a.m.
20   BY MS. CARNEY:
21     Q.   Okay.  Back to Exhibit 3.  We're on page 23
22  of your report, subsection e, General Observations of the
23  Chicago Police Personnel Complaint Data and Supervisory
24  Process.

JON SHANE, 05/26/2023

168

1    A.    Okay.
2    Q.    Okay.  So the first sentence here says, "The
3  general observations of the data reveal that the Chicago
4  Police Department's accountability systems (i.e., early
5  warning" -- "early warning, supervision, and personnel
6  investigations) during the relevant time period and
7  beyond were broadly ineffective for detecting misconduct
8  and holding officers accountable when they violate the
9  law or CPD policy."  Do you see that?
10    A.    Yes, I do.
11    Q.    Okay.  So we've talked about this before.
12  The relevant time period, is that still the 1980 through
13  2008 time period that we talked about earlier?
14    A.    Yes.
15    Q.    And then you say, "broadly ineffective for
16  detecting misconduct."  How so?
17    A.    There was no evidence I saw that the police
18  department was using the system that they had in place.
19    Q.    What would you have expected to see in the --
20  in the discovery that would have showed that they were
21  using the systems that were in place?
22    A.    I would have expected to see that supervisors
23  were intervening, personnel were reassigned, that the
24  investigation revealed all those things, Personnel

169

1  Concerns -- people were referred to Personnel Concerns,
2  what the outcome in Personnel Concerns would have been,
3  that the -- the investigations would have been -- some --
4  someone in the chain of command would have looked at the
5  investigation and said, "Wait a minute.  This is missing
6  components.  You need to go back and" -- "and do this."
7  Maybe someone was reassigned.  And explaining along the
8  way, you know, what -- what they found.  I didn't see
9  anything in that regard.
10    Q.    And is that all information that you believe
11  should have been contained in the CR files themselves?
12    MS. BONJEAN:  Objection to the form of that
13  question.
14    THE WITNESS:  I think some of it would have been in
15  the CR file when the investigation was occurring.  Some
16  of it would have been part of the officer's disciplinary
17  history.
18  BY MS. CARNEY:
19    Q.    Okay.  And did you review any disciplinary
20  histories for non-defendant officers?
21    MS. BONJEAN:  Objection to the -- the form of that
22  question.  And foundation -- I'm sorry -- also the
23  foundation of that question.
24    THE WITNESS:  I don't remember seeing that type of

170

1  data in the -- in the non-defendant officers' CR files or
2  the disciplinary histories.
3  BY MS. CARNEY:
4    Q.    And when you're saying "disciplinary
5  histories," what are you referring to?
6    A.    A running total of the disciplinary history
7  of a particular officer.
8    Q.    Okay.  Moving down, you say, "These general
9  observations impair CPD's ability to describe and count
10  internal personnel complaints and do not follow accepted
11  policy standards for complete and thorough
12  investigations."  Do you see that?
13    A.    I do, yes.
14    Q.    Okay.  What do you mean?  What general
15  observations are you talking about here?
16    A.    The list that follows right below.
17    Q.    Okay.  So the general observations are the
18  list that you have starting on page -- well, I see.
19    A.    Are you asking what page it starts on?
20    Q.    No.  I'm sorry.  I confused myself.
21      So you're saying the general observations
22  that you're talking about are -- is the failure to -- the
23  first item is the failure to classify personnel
24  complaints as administrative or criminal?

171

1    A.    I guess I wasn't -- say that again.  Are you
2  asking me --
3    Q.    Yeah.  Sorry.  I think we're -- we're both on
4  the wrong page here.
5      So my question is you say, "These general
6  observations impair CPD's ability to describe and count
7  internal personnel complaints."  What general
8  observations are you referring to?
9    A.    The general observations that are derived
10  from the CR files, and I -- and I list right here a
11  number of things, generally, that I found.
12    Q.    Okay.  Where -- where does that list start?
13    A.    Right here on this page.  I can't see the
14  page numbers from where I am so -- all right.  Now you
15  have it scrolled up to page 23, so starting at lower
16  Roman number i, which is titled "Failure to Classify
17  Personnel Complaints as 'Administrative' or 'Criminal.'"
18    Q.    Okay.  So then if we flip to the next page so
19  I get it, this is a continuation of Roman numeral i --
20  right? -- little i?
21    A.    Yes, right.  Uh-huh.
22    Q.    Okay.
23    A.    Correct.
24    Q.    So then 25, we have little Roman numeral ii?

JON SHANE, 05/26/2023

172

1    A.    Yes.
2    Q.    Okay.  So that's another general observation;
3  right?
4    A.    Yes, correct.
5    Q.    Okay.  So let's keep scrolling through.  All
6  right.  So this is the next little Roman numeral iii,
7  "Failure to Define, Quantify and Address 'Repeated Minor
8  Infractions.'"  Is that another general observation?
9    A.    Yes.
10    Q.    Okay.  So now we're on page 29, and we have
11  little Roman numeral iv, "Allegations Not Necessarily
12  Investigated Against a Defined Customary Standard."  Is
13  that another general observation?
14    A.    Yes, it is.
15    Q.    Okay.  Page 30, we have little Roman
16  numeral v, "Sustained Criminal Complaints are Handled as
17  Administrative."  That's a continuation of the general
18  observations; right?
19    A.    Yes, it is.
20    Q.    All right.  Page 31 has -- what is this? --
21  vi and vii; right?
22    A.    I can only see vi from here.
23    Q.    Okay.
24    A.    Okay.  There's vii, yes.

173

1    Q.    All right.  So those are also general
2  observations that you're referring to that we were --
3    A.    Yes.
4    Q.    -- just talking about; correct?
5    A.    Yes.
6    Q.    Okay.  Now we're on page 32 -- what is
7  this? -- vii -- little Roman -- little Roman numeral vii?
8    A.    Okay.
9    Q.    Is that also a general observation that you
10  were referring to before?
11    A.    Yes.
12    Q.    Okay.  So then I think the next one goes to
13  page 36.  As you're scrolling through, stop me if I'm
14  wrong but...
15    A.    That's number ix.
16    Q.    Okay.
17    A.    I don't know what page that is.  I can't see
18  it, but that's number ix.
19    Q.    That's page 36 of your report.
20    A.    Okay.
21    Q.    All right.  And then I think the last one is
22  on page 37 of your report.  This is x -- little Roman
23  numeral x.
24    A.    Okay.

174

1    Q.    So then let's just scroll through 38 so we
2  can make sure we got them all.  Okay.  Now we're into
3  little f, so that's the next section; so those ten
4  subsections are the general observations that you're
5  referring to on page 23?
6    A.    Yes.
7    Q.    Okay.  I just wanted to make sure I got them
8  all.
9    A.    Okay.
10    MS. CARNEY:  Sorry, Brett.  Can we go back up to
11  page 23?  Okay.  Great.
12  BY MS. CARNEY:
13    Q.    So we just talked about the general
14  observations, and you say they "impair CPD's ability to
15  describe and count internal personnel complaints."  How
16  is it that these ten general observations impair CPD's
17  ability to describe and count internal personnel
18  complaints?
19    MS. BONJEAN:  Object -- objection.  Form.
20    Go ahead.  You can ask again there if you
21  need to.
22    THE WITNESS:  Because what happens here is they --
23  they commingle a few things, and by commingling things,
24  you can't differentiate whether you've got an adequate

175

1  count of administrative complaints or -- or criminal
2  complaints.
3    MS. BONJEAN:  I'm going to -- I'm going to -- I'm
4  sorry.  Are you asking specifically about Roman
5  numeral i, or are you asking more generally about all the
6  general observations?  I'm sorry.  I just don't know if I
7  understand the question.
8    MS. CARNEY:  Yeah.  All ten general observations.
9    MS. BONJEAN:  Yeah.  I'm going to object to the
10  form and foundation of that question.
11    If you can answer, she's talking about
12  all of them.
13    THE WITNESS:  Yeah.  I mean, collectively,
14  that's -- I mean, collectively, that's the conclusion.  I
15  can -- I would have to look at each one of them to
16  explain its contribution, but collectively -- and when I
17  say "collectively," I guess I should say generally,
18  that's what I -- that's what I find.
19  BY MS. CARNEY:
20    Q.    Okay.  And then the next sentence, you say,
21  "do not follow accepted policy standards for complete and
22  thorough investigations."  What policy standards are you
23  referring to there?
24    A.    Well, generally accepted standards in the

JON SHANE, 05/26/2023

176

1   industry of the types that I talked about earlier that
2   police departments follow when conducting internal
3   affairs investigations but also the CPD's policies
4   themselves. I believe -- and don't hold me to this just
5   off the top of my head -- but I thought it was one of the
6   general orders -- it might be 82-14 -- says that
7   investigations must be thorough. I think there was --
8   there -- there may have been an addendum listed to that.
9   Again, I'm -- I'm just speaking off the top of my head,
10  but that is listed in my report here somewhere.
11      Q.   Okay. Okay. So if we go down to footnote 28
12  here, you say, "Criminal misconduct is when there is a
13  reasonable suspicion to believe that a Department member
14  committed a crime. Assault is one such complaint." Do
15  you see that?
16      A.   Yes.
17      Q.   Where is that definition coming from?
18      A.   It's -- well, it's my -- it's my
19  interpretation of police work from having been in the
20  business since 1985. It's also something that is
21  discussed in the US Department of Justice standards. I
22  certainly know as -- as having investigated internal
23  affairs complaints and having supervised internal affairs
24  complaints what constitutes a crime and what does not.

177

1       Q.   When you say "reasonable suspicion" -- I'm
2   sorry. Bad question.
3            Subcategory little i here that we were
4   talking about, "Failure to Classify Personnel Complaints
5   as 'Administrative' or 'Criminal.'" Do you see that?
6       A.   Yes.
7       Q.   Okay. And that -- that first line here is
8   where we get to your definition of criminal misconduct.
9   How does an individual making a complaint such as
10  handcuffs are too tight grounds to say an officer
11  committed a crime?
12      A.   Well, it has to be contextualized. That's
13  what the investigation should disclose. Once you started
14  to interview the complainant, take photographs, collect
15  evidence, you begin to interpret how this crime has
16  occurred. I can use excessive force with my handcuffs.
17      Q.   And is it your opinion that excessive force
18  is always -- should always be considered a criminal act?
19      A.   It should be investigated as such until you
20  confirm or dispel it, yes.
21      Q.   All right. So on the next page, you say at
22  the very top here, "For example, there are 233 complaints
23  against personnel for assault and 1 complaint for perjury
24  found in the data, both of which are criminal offenses."

178

1   Do you see that?
2       A.   Yes, I do.
3       Q.   Okay. And we talked about this at the first
4   part of your deposition. The categoriza -- the
5   qualifying or categorizing the complaints as assault was
6   something that you did based on your interpretation of
7   the -- of the CR; right?
8       A.   Well, they use the -- when I say "they," the
9   investigator used that language. They said that somebody
10  came in and complained that a particular officer
11  assaulted them, or they -- they will use the elements of
12  an assault. They'll say that "Somebody came in and
13  punched me in the face," or "threw me to the ground,"
14  or -- or "hit me in the head," or something like that.
15      Q.   Okay. So when you say there's 233 complaints
16  against personnel for assault, what kind of complaints
17  are you including in that 233?
18      A.   Well, the --
19           MS. BONJEAN: I'm going to object. I don't think
20  he's -- I don't think it says that, though. It says, "of
21  those 234 complaints."
22           MS. CARNEY: No. The -- the line up. 233 -- 233
23  complaints against personnel for assault.
24           MS. BONJEAN: Oh, okay. My apologies. I

179

1   thought -- there are 233. Okay. Carry on. My
2   apologies.
3            THE WITNESS: So you asked me what was included in
4   that to -- to understand how it was an assault?
5   BY MS. CARNEY:
6       Q.   Yeah. What kind of complaints are you
7   including in that 233?
8       A.   Those very things that I just mentioned to
9   you, where an investigator would say the complainant came
10  in and -- "punched me in the head, punched me in the
11  face, knocked me to the ground, put the handcuffs on too
12  tight." There were a number of -- of different things
13  that they described as an assault.
14      Q.   Okay. And when you use the word "complaints"
15  in this paragraph, what is the unit of analysis that
16  you're referring to there? Is that incident level?
17  Officer level?
18           MS. BONJEAN: Hold on. Hold on. Hold on. I'm
19  going to -- I'm going to object to the form of that
20  question.
21           Go ahead.
22           THE WITNESS: Okay. Go ahead, Theresa. Would you
23  restate --
24

JON SHANE, 05/26/2023

180

1    BY MS. CARNEY:
2        Q.    Yeah.
3        A.    -- restate that, please?
4        Q.    What is the unit of analysis that you're
5    using there for complaints?  Is that --
6        A.    We're talking about the allegations.
7        Q.    Okay.  All right.  I'm going to -- sorry.
8    I'm trying to use your spreadsheet.  I'm going to go
9    to -- okay.
10       MS. CARNEY:  I'm going to share my screen now,
11   Brett, if you don't mind.  Let's see if I can make this
12   work.
13                (Deposition Exhibit Number 16,
14                 Witness Shane, was marked for
15                 identification 5/26/23.)
16   BY MS. CARNEY:
17       Q.    Okay.  Can you -- can you see that,
18   Dr. Shane?
19       A.    I do, yes.
20       Q.    Okay.  Okay.  So this is the spreadsheet that
21   was produced as your CR master file -- right? -- that we
22   talked --
23       A.    Okay.
24       Q.    -- about before?  Okay.  And I'm on the

181

1    bottom here in your tab called "complaints by category."
2        A.    Okay.
3        Q.    And if I look at assault, I only see 232
4    complaints for assault here.  Do you know why there's the
5    discrepancy between the spreadsheet and the report?
6        A.    I don't just by looking at it in this way.  I
7    would have to -- I would have to look at the analysis one
8    more time.  We're talking about one -- it's one complaint
9    off, and I don't know if that is because we're looking at
10   complaints or if we're looking at the -- the individual
11   disposition level where you would see the allegations.
12       Q.    Okay.  So then if I go to the "raw data
13   (complaint level)," do you see that I'm clicking on that
14   part of your spreadsheet?  "Raw data --
15       A.    Yes.
16       Q.    -- (complaint level)"?
17       A.    Yes.
18       Q.    Okay.
19       A.    Yes.
20       Q.    So I'm going to go over to type of complaint,
21   and I've got the filters on.  Do you see that?
22       A.    Yes.
23       Q.    So if I drop down "type of" here, there are
24   several different categories for assault.  We've got

182

1    assault, just assault; assault allegations 1, 3, 5, and
2    7; assault allegations 1 through 6; assault McCarthy; and
3    attempted assault.  Do you see that there?
4        A.    I do.
5        Q.    Okay.  Sitting here today, do you know why
6    there's different categories of assault that were used in
7    the type of complaint?
8        A.    It had to do with the way the -- the CRs
9    captured the information.  Some -- sometimes there were
10   different types of assault, you know.  "He punched me in
11   the face, and he knocked me down"; so allegation -- like,
12   if you look at the second one where it says assault
13   allegations 1, 3, 5, and 7, sometimes they had exactly
14   what I'm talking about.  "Somebody punched me in the
15   head," that was number 1.  And number 2 was -- was
16   demeanor, and then number 3 was "punched me in the
17   mouth," and number 4 was something else.  Number 5 was
18   "threw me to the ground."
19       Q.    Okay.  So each --
20       A.    They had a tendency in these CRs to -- to do
21   that -- to list all of these -- all of -- all of the
22   things that it seemed like someone said to them.
23       Q.    Okay.  So if I click on all of these -- so
24   this -- this is your spreadsheet broken down -- the raw

183

1    data broken down by complaint level, which is the unit of
2    analysis of allegations that we just talked about; right?
3        A.    No.  We talked that it was at the allegation
4    level.
5        Q.    Okay.  Is there -- I did not find an
6    allegation level on this spreadsheet.  Can you maybe
7    point me to it?
8        A.    If you go to the dispositions, it's the --
9    it's the same thing.
10       Q.    Okay.
11       A.    So if you remember when we talked earlier
12   about -- remember when we talked about the one-to-many
13   relationships, that sort of thing.
14       Q.    So if I'm in -- so now I'm in the disposition
15   level --
16       A.    Yes.
17       Q.    -- and if I click on this assault filter --
18       A.    Yeah.  Go ahead.
19       Q.    -- I should get -- I should get 233 or 232
20   depending on...
21       A.    That's correct.
22       Q.    Okay.  So within your spreadsheet, when you
23   say "complaint level," what does the -- what does this
24   unit of analysis mean within this spreadsheet?

JON SHANE, 05/26/2023

184

1    A.    That's the complaint that came in.
2    Q.    Got it.  And then disposition level is the
3  allegation unit of analysis?
4    A.    Well, or the disposition level of analysis.
5    Q.    Got it.
6    A.    So let's say, for example, you know, Police
7  Officer Joe Smith had a complaint against him come in
8  today, and the allegations were assault, demeanor --
9  assault, demeanor, and unlawful entry.  You would have
10  three entries for Joe Smith on that particular day
11  because you would have dispositions for each one of those
12  allegations in your investigation.
13    Q.    Okay.  So looking at this, it is broken down
14  by, it looks like, CR number, and then it's got the rest
15  of the data here, but this is broken down then by
16  disposition?
17    A.    That's right, yes.
18    Q.    Final disposition for each individual
19  allegation within the CR.  Am I -- am I understanding
20  that right?
21    A.    Yeah.  That -- that's -- what you're looking
22  at are the dispositions for each of the allegations in
23  the CR.
24    Q.    Okay.  But then the raw data at the complaint

185

1  level is simply the CR?
2    A.    Yes, that's correct.
3    Q.    Got it.  Okay.  All right.  I can stop
4  sharing that for this second -- moment.
5    MS. CARNEY:  Brett, can we bring up Exhibit 3
6  again, please?
7  BY MS. CARNEY:
8    Q.    All right.  Second paragraph, "There's no
9  evidence in discovery that indicates CPD is prohibited
10  from initiating a criminal charge in municipal court for
11  sustained complaints of assault."  Do you see that?
12    A.    I do see that, yes.
13    Q.    All right.  Are you -- first of all, are you
14  aware of the process in Cook County for seeking charges
15  against anybody?
16    A.    The process is that they refer it to the
17  prosecutor's office.
18    Q.    So if a prosecutor rejects charges, what is
19  your expectation or what is it your belief that CPD
20  should do if charges are rejected?
21    A.    Well, it doesn't necessarily have to be an
22  indictable offense, but if the prosecutor's office says,
23  "We're not going to charge any criminal complaints either
24  at the municipal level or at the county level," then the

186

1  police department has to go with administrative only, but
2  I didn't see any complaints that were referred to the
3  prosecutor's office.
4    Q.    Is it your expectation that the CR files
5  should contain documents from the Cook County
6  Prosecutor's Office?
7    A.    Most definitely, yes.  If the -- if a police
8  officer -- excuse me -- if an investigator is conducting
9  an investigation and they are in contact with the -- with
10  the prosecutor's office and the prosecutor's office
11  declines to, what we would say, accept the case, then
12  there should be some sort of letter that comes back from
13  the prosecutor's office.  There should be communication
14  going to and from so there's -- you can close that loop.
15    Q.    Is it your understanding that that was the
16  process that was occurring in the '80s and '90s in the
17  city of Chicago in the Cook County's Prosecutor's Office?
18    MS. BONJEAN:  I'm going to object to the form of
19  that question.  Are you asking whether it's happening in
20  Cook County or it was happening elsewhere?
21  BY MS. CARNEY:
22    Q.    In Cook County.
23    A.    Well, the process was certainly available
24  then for them to do that.  There was nothing prohibiting

187

1  them from doing that.  They certainly -- they certainly
2  should have, as a matter of course, reached out to the
3  prosecutor's office whenever they had a criminal
4  allegation.
5    Q.    Right.  But my question is a little bit
6  different because you were talking about that it was your
7  belief and your expectation that there would be
8  documentation in a CR file regarding, essentially,
9  communications between the investigative agency and the
10  prosecutor's office?
11    A.    Correct.
12    Q.    I guess my question is that how -- is that
13  the process or was that the process in Cook County in the
14  1980s and '90s?
15    MS. BONJEAN:  I'm going to object to the -- to the
16  foundation of that question, the form of that question.
17    You can answer if -- if you're able to.
18    THE WITNESS:  I guess -- I guess -- I guess I'm not
19  clear.  That's an element of -- of accepted practice.  So
20  yes, it should have been occurring in Cook County at that
21  time.  If -- if someone came in and complained of a
22  criminal offense and was explaining to a Chicago Police
23  Department investigator that they were the victim of a
24  crime that occurred at the hands of a police officer, a

JON SHANE, 05/26/2023

188

1  criminal investigation would ensue, and the investigator
2  would be in contact with the Cook County Prosecutor's
3  Office.
4          And if, at some point, the prosecutor's
5  office said, "We're declining the case," or "We don't
6  want the case," whatever -- whatever that -- process that
7  may be, they would issue them some documentation that
8  says, "We're" -- "We've not accepted this case for
9  prosecution.  Handle this administratively."
10 BY MS. CARNEY:
11     Q.   Right.  I understand that that's what you say
12 were elements of accepted practice at the time and it
13 should have been happening --
14     MS. BONJEAN:  I'm going to object.  He didn't say
15 "accepted."  Expected.  Those are two different things,
16 but...
17     MS. CARNEY:  Okay.  Sorry.  You're right.
18 BY MS. CARNEY:
19     Q.   Excepted.  That was what you expected to be
20 happening, and it was expected practice, but was that the
21 process in Cook County in the '80s and '90s?
22     A.   Well, I guess -- I guess I'm not -- I guess
23 I'm not clear on what you're saying.  Was it that -- was
24 that the process?  That --

189

1      Q.   Were state's attorneys --
2      A.   -- that is the investigative process.
3  There's no doubt about that.
4      Q.   Right.  But --
5      A.   And if they weren't doing it, that -- that --
6  that's exactly what the problem is.  That's why I've
7  identified it as the problem.
8      Q.   Were state's attorneys in --
9      A.   They should have been doing those things.
10     Q.   Sorry.  Were you done?
11     A.   I was just saying they should have been doing
12 those things.
13     Q.   Right.  I understand that -- I understand
14 that part, but were Cook County state's attorneys in the
15 '80s and '90s issuing letters of declaration --
16 declination to the police department in regards to
17 internal affairs investigations in the '80s and '90s?
18     MS. BONJEAN:  I'm going to object.  He's answered
19 it.  Clearly not.  I mean, that's the -- that's the
20 problem.
21     MS. CARNEY:  Well, that's the problem.  He hasn't
22 said that.  He said he expects it to be there but --
23     MS. BONJEAN:  Right.
24     MR. SHANNON:  I'm going to object --

190

1      MS. BONJEAN:  I think he said he didn't see it.
2      THE WITNESS:  No.  I --
3      MR. SHANNON:  I'm going to object to the
4  foundation.
5      MS. BONJEAN:  You can answer.
6      THE WITNESS:  What I had said was -- I mean, you're
7  looking -- you're looking for specific words from me.
8  What I had said was that that's part of the problem.  I
9  suppose what I'm -- what I'm including in that is, yes,
10 the investigator wasn't doing it.  They weren't seeking
11 advice from the prosecutor's office.  The prosecutor's
12 office wasn't reciprocating, saying, "We're not taking
13 the case."  That -- that is the problem itself.
14          There's no -- there is no documentation
15 to -- to ensure that the police department was in
16 communication with the prosecutor's office, that there
17 was a reciprocal element of documentation coming back to
18 the -- to the police department from the prosecutor's
19 office about a -- about a particular matter.  They -- if
20 you're asking me were they doing it, no, there's no
21 evidence that they were doing it.
22 BY MS. CARNEY:
23     Q.   Okay.  And what is your basis for the -- your
24 opinion that other police departments and prosecutorial

191

1  agencies were following this process that you've outlined
2  in the '80s and through 1992?
3      A.   Well, I was working in the field at the time.
4  It was happening in police departments all -- all across
5  the country.  Whenever a crime is committed, it's a basic
6  element of investiga -- of investigations.
7      Q.   Can you -- so -- but I'm talking about
8  internal affairs investigations and what police
9  departments at the time had this process in place that
10 you're discussing between the -- sorry.
11     A.   Well, I'll give you -- I'll give you one
12 instance.  In the Clifton Police Department, there was an
13 investigation that was initiated against a particular
14 sergeant who was accused of stealing from a -- from a
15 search -- a search warrant, and the investigation
16 unfolded, and the police department was in contact with
17 the prosecutor's office.  This is, again, a matter of
18 routine investigation.  It happens in all criminal --
19 criminal cases.
20          And the officer was indicted, went to
21 trial, was convicted, and that was in the '80s.  That was
22 when I was working in the -- in the Clifton Police
23 Department.
24     Q.   Okay.

JON SHANE, 05/26/2023

192

1   A.   I wouldn't expect it to be any different
2   anywhere else when a police department learns of a crime,
3   whether that crime was committed by a police officer
4   or -- or anybody else.
5   Q.   Okay.  So is it your opinion that in these
6   233 complaints against personnel for assault that you --
7   that you categorized as assault in the CRs, that each and
8   every one of those should have been criminally charged?
9   A.   No, not charged.
10  MS. BONJEAN:  Objection.  Misstates his testimony.
11  THE WITNESS:  I'm sorry.  What happened?
12  BY MS. CARNEY:
13  Q.   She objected.
14  A.   Oh, okay.  I would not say "charged."  What
15  I'm -- what I'm -- what I'm saying is that each one of
16  those should have been investigated as a crime until
17  confirmed or dispelled, and that should have included
18  consultation with the prosecutor's office and that there
19  should be documentation showing what the police
20  department did in referring it to the prosecutor's office
21  and what the prosecutor did once they had it -- whether
22  they accepted it for prosecution or declined it.
23  Q.   So going back to the hypothetical I had
24  before, each time that an arrestee complains that their

193

1   handcuffs were too tight, it is your opinion that that
2   should have been criminally investigated in consultation
3   with the Cook County State's Attorney's Office?
4   MS. BONJEAN:  I'm going to object to the incomplete
5   hypothetical and the lack of contextualization, as
6   Dr. Shane would say.
7   You can answer, Dr. Shane, if you're
8   able.
9   THE WITNESS:  Well, that's -- that's what I was
10  going to say.  I think it lacks a little context.  Again,
11  if someone comes in and complains about their handcuffs
12  being too tight, we have to figure out, as a matter of
13  course, whether it was done in a criminal manner, or
14  perhaps the officer applied them improperly, and/or the
15  person maybe sat on them with their hands behind their
16  back being -- during the transport, and maybe the
17  handcuffs were ratcheted up too tightly as they were
18  sitting there as a -- as a matter of being moved around
19  inside the radio car on the way back to the precinct.
20  But if -- if somebody comes in and characterizes that as
21  an assault, the answer is yes.  You can certainly assault
22  somebody with your handcuffs.
23  BY MS. CARNEY:
24  Q.   Okay.  So is it your testimony, then, that

194

1   the intent needs to be -- the intent matters, then --
2   right? -- in regards to the investigation?
3   A.   As far as criminal cases are concerned, sure.
4   Q.   All right.  Moving down, you talk about
5   commingling criminal and administrative complaints.  Hold
6   on.  All right.  Actually, we're -- we'll move on.
7   Page 25, this is your little Roman
8   numeral ii, "Promulgating a Permissive Policy on the
9   Internal Affairs Function."  Do you see that?
10  A.   Yes, I do.
11  Q.   Okay.  You say that CPD's policies were
12  "replete with permissive language, and qualified
13  statements to such a degree that it enables and justifies
14  incomplete investigations and of" -- "and of poor
15  quality."  Did you compare CPD's written policies from
16  this time period to any other department policies?
17  A.   No.  But it's based on my experience of
18  policy construction.  I have been writing police policy
19  for the better part of my career -- probably at least
20  50 percent of my career, somewhere around there.
21  Q.   Moving down to subsection b here on page 26.
22  So this is still part of your little Roman numeral ii,
23  "Promulgating a Permissive Policy on Internal Affairs."
24  This is the investigative practices section.  You say,

195

1   "The victim, complainant and witness must be personally
2   interviewed (nothing specified)," and you kind of have
3   that throughout various bullets here.  What do you mean
4   by "nothing specified"?  What are you referring to?
5   A.   I didn't see any language in the policy that
6   dictated what the officers should do so they had -- they
7   had policy guidance and supervisors had guidance on what
8   was expected of them.
9   Q.   Okay.  Page 29, what did we decide this was?
10  Little Roman numeral iv?
11  A.   Okay.
12  Q.   "Allegations are Not Necessarily Investigated
13  Against a Defined Customary Standard."  You say, "The CPD
14  typically does not identify the standard against which
15  the officer's conduct is to be measured (the specific
16  rule and number, specific policy name and number)."
17  What are you referring to here?
18  A.   So when an allegation came in in the CR file,
19  it didn't -- it didn't explain what standard they were
20  investigating against.  I saw -- I didn't see anything
21  that -- at least that I can remember off the top of my
22  head, that said, well, the officer is alleged to have
23  violated policy number ABC123 and what that policy says
24  the officer should have done and then measure that

JON SHANE, 05/26/2023

196

1    against the officer's actual observed behavior.
2        Q.   So is it your -- in your review of the CRs,
3    you didn't -- is it your testimony that you didn't see
4    any rule violations that were listed or specified within
5    the CRs?
6        MS. BONJEAN:  Objection.  Form.
7        THE WITNESS:  I remember seeing some -- sometimes
8    there were things like a Rule 8 violation or something
9    like that, but it wasn't consistent, and a lot of times,
10   the standard was not identified.
11   BY MS. CARNEY:
12       Q.   When you say "the standard wasn't
13   identified," what are you -- what was your expectation or
14   what do you believe should have been in the CR?
15       A.   Whatever policy or rule or regulation or law
16   that the officer was alleged to have violated.
17       Q.   And it's your opinion that that should have
18   been -- that should have been within the CR file?
19       A.   It should be part of the investigation, so
20   the investigator should have identified what standard
21   against which they were measuring the officer's conduct.
22       Q.   Okay.  So is it your belief that the
23   investigative agency wasn't aware of the standards that
24   they were analyzing the conduct under because it wasn't

197

1    documented within the CR?
2        MS. BONJEAN:  Objection to the form, foundation of
3    that question.
4        THE WITNESS:  I can't tell you whether they were
5    aware or not, but what I can tell you is that any
6    investigation that -- that goes forward, whether it's a
7    homicide or a demeanor complaint, has to have a standard
8    of some sort.  There has to be something that the officer
9    violated.  Listing that is just part of the
10   investigation.
11   BY MS. CARNEY:
12       Q.   Okay.  Page 30.  You say, "Sustained Criminal
13   Complaints are Handled as Administrative."  And then
14   you -- in the middle of here, you say, "The data reveal
15   four allegations of assault and one allegation of
16   improper use of a deadly force that were sustained.
17   However, the Cook County Prosecutor's Office was not
18   notified and criminal complaints were not prepared
19   against the accused officers."  Do you see that there?
20       A.   Yes, I see that.
21           (Deposition Exhibit Number 4,
22            Witness Shane, was marked for
23            identification 5/26/23.)
24

198

1    BY MS. CARNEY:
2        Q.   Okay.  So if we pull up Exhibit 4, which is
3    CR 223928, which is one of the four that you found in
4    this paragraph --
5            Oh, sorry, Brett.  We've got to switch to
6    Exhibit 4.
7            Okay.  So this is the CR that we were --
8    one of first CRs -- one of the four CRs that you just
9    listed in this paragraph that was sustained.
10       A.   Okay.
11       Q.   Okay.  We need to go down to -- it's Bates
12   number RFC3549.  I don't know what page it is.  Sorry.
13   It will be about 40 pages past this.  Oh, yeah.  Almost
14   there.  3549.  Okay.  Brett, can you just make it so we
15   can see the full page?
16           Okay.  Can you see that, Dr. Shane?
17       A.   No.  It's too small.  Can you -- can you --
18   can you raise that a little?  I can see it generally, but
19   I can't -- I can't read it.
20       Q.   Okay.  How's that?
21       A.   A little better.  Okay.  Let's try it, I
22   guess.
23       Q.   Okay.  Don't worry.  There's not --
24           If you can just go up a little bit so we

199

1    can see the top.
2            Okay.  Are you aware of what this
3    document is?
4        A.   Not off the top of my head, no.  And when you
5    say "aware of what it is," meaning is it a CPD form, or
6    what do you -- what do you mean?
7        Q.   So if I represent to you that this is a
8    Chicago Police Department general offense case report, do
9    you understand what a general offense case report was for
10   the Chicago Police Department?
11       A.   It's an incident report.
12       Q.   Okay.  And this incident report -- this
13   general offense case report is within the CR; right?
14       A.   Okay.  Yes.
15       Q.   Okay.  And do you understand that in the
16   Chicago Police Department, when you open a general --
17   when you fill out a general offense case report and you
18   have what you see in the top corner, an RD number, that
19   means a criminal investigation was opened?
20       A.   Where -- where does it say RD number?
21       Q.   It's at the very top right hand of the
22   document you're looking at.  It's A-01280 -- it's cut off
23   but...
24       A.   Was this initiated by the internal affairs

JON SHANE, 05/26/2023

200

1  investigator?
2      Q.   Well, we could look down, but it says here
3  victim and offender, and it has -- it is a criminal
4  investigation open that is contained within the CR file
5  in regards to this incident.
6      A.   Okay. Continue. I want to hear what you
7  mean. Continue.
8      Q.   Okay. Well, my quest -- so my question is so
9  based on the evidence within the CR file, it -- it
10  appears that a criminal investigation was opened, as you
11  believe should have been done; right?
12      A.   It should have been initiated by the police
13  department.
14      Q.   Okay. So based on the records that we have,
15  it was.
16      MS. BONJEAN: Objection to the form. That -- that
17  is -- objection to the form. This -- you're saying the
18  records show this was initiated by the police
19  department --
20      MS. CARNEY: I'm saying --
21      MS. BONJEAN: -- as opposed --
22      MS. CARNEY: -- a criminal investigation was opened
23  into the allegations contained within this sustained CR
24  of assault that you are --

201

1      MS. BONJEAN: Okay.
2      MS. CARNEY: -- finding problems with.
3      MS. BONJEAN: I'm going to -- I'm going to object
4  to the form of this question. I think his problem is
5  different than what you're suggesting his problem is.
6      But go -- go ahead, Dr. Shane, if you
7  can -- if you understand the question.
8      THE WITNESS: So -- so the -- the police department
9  should have initiated a criminal investigation, and that
10  should have been in conjunction with the prosecutor's
11  office. Is this -- is this -- was this case investigated
12  as a -- as a criminal incident?
13  BY MS. CARNEY:
14      Q.   When you say "in conjunction with the
15  prosecutor's office," what do you mean?
16      A.   I mean that the police department, having
17  been made aware of a crime that took place involving a
18  police officer, should have notified the prosecutor's
19  office, and they should have proceeded to investigate it
20  as -- as a crime.
21      Q.   Okay.
22      A.   I'm -- I'm asking who -- who initiate -- who
23  initiated it?
24      Q.   Well, let's --

202

1      A.   Is it --
2      Q.   Brett, if we could scroll down a little bit
3  here and see who -- so this initial case incident report
4  looks like has two reporting officers, Molda and Stubit.
5  Do you see that there?
6      A.   Okay.
7      Q.   Those are Chicago Police Department
8  officers -- patrol officers who initiated a criminal
9  investigation into this.
10      A.   Well, they took -- they took his complaint of
11  a criminal investigation; right?
12      Q.   Is that --
13      A.   They didn't -- I mean, correct me if I'm
14  wrong, but the way I interpret this form -- and I think I
15  remember seeing this -- is that the officers took a
16  report of a criminal investigation, but the department
17  itself, through internal affairs, did not initiate a
18  criminal investigation.
19      I'm not saying that this document should
20  not have been prepared. What I am saying is that once in
21  receipt of it, the internal affairs division should have
22  proceeded as a criminal investigation, which would have
23  included notifying the Cook County Sher -- excuse me --
24  the Cook County Prosecutor's Office because a police

203

1  officer was involved.
2      Q.   So is it your test --
3      A.   That's --
4      Q.   -- is it your opinion that the internal
5  affairs organization at the time should have opened a
6  separate criminal investigation in conjunction with the
7  one that was already opened by CPD?
8      MS. BONJEAN: I'm going to object to the -- the
9  facts not in evidence. Just because this guy filed a
10  complaint doesn't mean anything was opened.
11      THE WITNESS: Well, that's what I -- that's what I
12  said just a minute ago. I said it's obvious they
13  reported it. They have the -- they have a -- somebody
14  took a report of it, but there's no evidence that it was
15  investigated as such, and there's certainly no evidence
16  that the -- the internal affairs division did anything to
17  notify the prosecutor's office that a criminal
18  investigation was underway involving a police officer.
19  BY MS. CARNEY:
20      Q.   All right. Do you understand how criminal
21  investigations begin within the Chicago Police
22  Department?
23      MS. BONJEAN: Okay. I'm going to object. Do you
24  understand, Theresa, how -- how they begin? I mean --

JON SHANE, 05/26/2023

204

1    MS. CARNEY:  Jennifer, yes.
2    MS. BONJEAN:  -- I mean -- okay.
3    MS. CARNEY:  And I don't -- we don't need to do
4  this.  Can you -- can you stop testifying for him?  Let
5  him answer.
6    MS. BONJEAN:  I'm not.
7    MS. CARNEY:  You are.  You have several times now,
8  and I've let it go, so just stop.
9    MS. BONJEAN:  You can --
10  BY MS. CARNEY:
11    Q.  Do you, Dr. Shane, understand how a criminal
12  investigation is opened within the Chicago Police
13  Department?
14    MS. BONJEAN:  I'm going to object to the form and
15  foundation of that question.
16    THE WITNESS:  A criminal investigation is opened
17  when a -- when an individual makes the criminal
18  complaint.
19  BY MS. CARNEY:
20    Q.  Okay.  What is this document?  Do you
21  understand what this document is that I'm showing you?
22    A.  Yes.  This -- this document is -- is
23  documenting that someone made a criminal complaint.
24    Q.  Okay.  And if we scroll up again, Brett.

205

1  Sorry.
2        You see that the complaint was assigned
3  an RD number.  Do you see that at the top?  A-01280
4  something that I can't read.
5    A.  Okay.
6    Q.  Do you know what that represents --
7    A.  What is -- what is -- can you tell me what RD
8  stands for?
9    Q.  Records division.
10    A.  Okay.
11    Q.  So do you understand what a records division
12  number is within the Chicago Police Department?
13    A.  Not off the top of my head, I do not.
14    Q.  Okay.  Do you --
15    A.  I mean, is it -- is it a tracking number?
16    Q.  We can -- if you don't understand, that's
17  fine.  But what I'm trying to ask you is you -- your
18  complaint about this sustained CR is that no criminal
19  investigation was opened and no referral was made to the
20  Cook County Prosecutor's Office, or the Cook County
21  Prosecutor's Office was not notified, and a criminal
22  complaint was not prepared.  Do you see that?  Sorry.
23  That was --
24    A.  Yes.  Go ahead.

206

1    Q.  -- that was in your report.
2        Okay.  So I'm showing you that a criminal
3  investigation was opened in regards to this incident.
4    A.  No, I disagree with that.  What this shows is
5  that someone took a report and listed the officer,
6  Guevara, and listed the victim.  I don't see any evidence
7  that it was investigated as a criminal matter, and I
8  don't see any evidence that the prosecutor's office was
9  notified in conjunction with the internal affairs
10  criminal investigation that would have proceeded that
11  way.
12        And I don't see any evidence that the
13  officer or the -- the investigating officer notified the
14  prosecutor's office and explained to them what they had
15  and then the prosecutor's office said, "Yes, we're going
16  to accept that, and we're going to prosecute it," or,
17  "No, we're going to decline it and handle it
18  administratively," which led me to say that this is a
19  sustained complaint that they found, and there's no
20  evidence that a criminal investigation was initiated.
21  I'm not saying they didn't take a report of it.  I'm
22  saying they didn't investigate it as such.
23    Q.  Okay.  So it's your testimony today that
24  simply opening up a criminal investigation is not enough?

207

1  You need to see...
2    MS. BONJEAN:  I'm going object to the --
3    THE WITNESS:  I would need to see --
4    MS. BONJEAN:  -- I'm going to object to the form.
5  I'm going to object to the form of that question.  And it
6  assumes facts not in evidence.  And -- and foundation.
7        Go ahead.
8    THE WITNESS:  I would need to see the criminal
9  investigation, and I would need to see the involvement of
10  the prosecutor's office to understand what -- what
11  transpired.
12  BY MS. CARNEY:
13    Q.  Okay.  And if you don't see that in the CR,
14  you are making the assumption that none of it occurred?
15    A.  There's no evidence --
16    MS. BONJEAN:  Objection to the form of the
17  question.
18    THE WITNESS:  There's no evidence that a criminal
19  investigation was undertaken.
20    MS. BONJEAN:  I'm sorry.  Theresa, can you tell me
21  what CR number this is again?  I don't see the number.
22    MS. CARNEY:  Yeah.  It's 223928.
23    MS. BONJEAN:  223928.  Thanks.
24

JON SHANE, 05/26/2023

208

1  (Deposition Exhibit Number 8,
2  Witness Shane, was marked for
3  identification 5/26/23.)
4  BY MS. CARNEY:
5  Q.  Okay.  All right.  If we can go to what I've
6  marked as Exhibit 8, which is CR 179835.  Okay.  This is
7  one of the CRs that you list in this paragraph as an
8  allegation of improper use of deadly force that was
9  sustained but the prosecutor's office was not notified
10  and criminal complaints were not prepared.  Do you see
11  that?
12  A.  I see the -- I just see 179835.
13  Q.  Okay.
14  A.  That's the CR file.
15  Q.  All right.  Hold on.  I forgot to write the
16  page number I want for this.  Okay.  So, Brett, if you
17  could go to what is page 16 of this document.
18  All right.  So this is a Bureau of
19  Operational Services memo dated October 20th, 1990 --
20  And if you go to the next page, Brett.
21  -- you can see personnel assigned.  And
22  the very last thing here says, "ASA Neal Goodfried" -- do
23  you see that? -- from the State's -- State's Attorney's
24  Office?

209

1  A.  Yes, I see that.
2  Q.  Okay.  So this memo actually shows that a
3  state's attorney was assigned to this sustained CR's
4  investigation; right?
5  A.  Okay.  And -- what did the state's
6  attorney's office do?
7  Q.  That's a good question for the state's
8  attorney's office, isn't?
9  A.  Well, no.  It's a good -- it's a good
10  question for the investigator because the investigator's
11  responsible for coordinating what goes on between the
12  Chicago Police Department and the -- and the prosecutor's
13  office; so if you had an ASA assigned, what did they do?
14  What advice did they give him?  Where are the records?
15  What -- what communication took place?  That -- that --
16  that's what I'm questioning.  Okay.  So they put somebody
17  down.  What does that mean?  Somebody notified
18  that -- that this occurred?  What did they -- what did
19  they do?  What was their involvement?
20  Q.  Do you understand what a U file is?
21  A.  No.
22  MS. BONJEAN:  I'm going to object -- object to the
23  form of that question.  I don't even know what a U file
24  is; so maybe you can use the full --

210

1  THE WITNESS:  No.
2  MS. BONJEAN:  -- what's U stand for instead of
3  using an acronym?
4  MS. CARNEY:  I'm not using an acronym.  It's just
5  called a U file.
6  MS. BONJEAN:  Well, it must stand for something if
7  it's called U -- is it, like, the letter U?
8  MS. CARNEY:  Can you go -- Brett, can you go to
9  page 19, the last paragraph?  "Assistant" -- "Assistant
10  Deputy Superintendent Greenlee ordered the undersigned to
11  have the OPS 'U' number for" -- "converted to a CR number
12  for a thorough and comprehensive investigation."
13  MS. BONJEAN:  I'm going to -- I'm going
14  to -- I see that.  First of all, I want to place on the
15  record I'm going to ask -- and I'll follow up in
16  writing -- that the City produce consistent with the
17  requests that were made many, many eons ago for any
18  policies that relate to the internal affairs function.
19  And, specifically, it would be nice to know what this --
20  what -- you know, it's great that you know it, Theresa,
21  since you represent police officers and the City of
22  Chicago, but part of the problem is is y'all don't
23  produce information that's been requested; so any
24  policies that reflect this whole, A, what a U number is

211

1  and what it means to convert it to a C number, please
2  produce.
3  MS. CARNEY:  We can definitely talk about that.  I
4  mean, I will go back and look and see what has -- what
5  has been --
6  MS. BONJEAN:  Yeah.  I mean, you act like, "Oh,
7  it's just a U number" and roll your eyes like everyone's
8  supposed to know.  You represent these people.  We don't.
9  And you ask our requests to, like, look at things, but you
10  don't produce anything, so yeah --
11  MS. CARNEY:  Okay.  That's just not true, and it's
12  just -- that's just not true.
13  MS. BONJEAN:  Okay.  Well, I'd like to see a
14  policy.  What it means -- what's a U number and what it
15  means to convert it to a C number.  Let's see it.  Go
16  ahead.  Ask your question.
17  MS. CARNEY:  I did, and you've answered for him
18  that he has no idea.
19  MS. BONJEAN:  No.  I don't -- I mean, it's not --
20  it's not -- he didn't answer anything.  He -- he said he
21  didn't know what a U number was, and -- nor do I so --
22  MS. CARNEY:  Okay.  Great.
23  (Simultaneous speaking.)
24  MS. BONJEAN:  -- only you do and maybe -- and maybe

JON SHANE, 05/26/2023

212

1  the -- the fellows you represent.
2      THE WITNESS:  Theresa, I did say I didn't know what
3  a U number was.
4      MS. CARNEY:  Okay.  Thank you.
5          (Deposition Exhibit Number 11,
6          Witness Shane, was marked for
7          identification 5/26/23.)
8  BY MS. CARNEY:
9      Q.   All right.  And finally, let's look at
10  Exhibit 11.  So this is another one.  This is CR -- what
11  is -- which one is this? -- 237167.  And, actually, we
12  need to flip back to Exhibit 3 really quick so you can --
13  I can put this one in context.
14          This is from the second batch that you're
15  talking about down here, Dr. Shane, where you say, "Other
16  sustained complaints have criminal connotation but were
17  not referred to the Cook County Prosecutor's Office."  Do
18  you see that?
19      A.   Okay.  Okay.  Yes.
20      Q.   So this is number four, CR 237167.  Do you
21  see that?
22      A.   Okay.  Yes.
23      Q.   Okay.  So let me see if I can find this page.
24  Okay.  So if you can -- Brett, if you could go to page 49

213

1  of this -- of Exhibit 11.  Okay.  If you can scroll all
2  the way down.
3          Well, let me just put -- so this is a
4  Special Investigation Section memo from June 25th, 1997,
5  and on the very bottom, it says -- so this is talking
6  about some things that happened in court, and if you want
7  to read the whole thing, we can take that time to do
8  that.
9          But it says, "During the hearing,
10  Ms. Miller filed a Motion to Dismiss wherein they
11  formally accused Detective Montilla of falsely testifying
12  before the grand jury related to" -- blank -- "making a
13  positive identification of Wilson.  The motion indicates
14  that an investigator from the Public Defender's Office
15  interviewed" -- the names are redacted -- "and reportedly
16  told him she was unable to pick out anyone, though she
17  thought 'one of the bigger guys might have been the guy,'
18  but he was not certain.  ADP Miller provided the sergeant
19  with a copy."  And then it says the Sergeant spoke with
20  A -- the ASA and informed him it would be necessary to
21  obtain the statements.
22          So in this particular CR where you say
23  they have a criminal connotation but they were not
24  referred to the Cook County Prosecutor's Office, the Cook

214

1  County prosecutor actually knew that there were
2  allegations of perjury in front of a grand jury, and it
3  was, in fact, used in the criminal trial and a motion to
4  dismiss.  Do you see that?
5      A.   I didn't see any documents from the
6  prosecutor's office relative to what they did.
7      Q.   Why would you expect to see documents from
8  the prosecutor's office about what they did in the CR
9  file maintained by the Chicago Police Department?
10      A.   Well, that's --
11      MS. BONJEAN:  Objection to the form of that
12  question.
13          Go ahead.
14      THE WITNESS:  Those are all criminal component
15  pieces of what goes into an internal affairs file.
16  BY MS. CARNEY:
17      Q.   The prosecutor's file is a critical component
18  piece to what goes on -- goes in an internal affairs
19  file?
20      MS. BONJEAN:  Objection to the -- objection to the
21  form of that question.  He didn't say the prosecutor's
22  file.
23      THE WITNESS:  When a -- when a -- when an
24  investigation is undertaken in a criminal context, the

215

1  Chicago Police Department, in conjunction with the
2  prosecutor's office, would have some kind of
3  communication going back and forth.  If the prosecutor's
4  office opened an -- opened an investigation -- a criminal
5  investigation into perjury, they would have whatever
6  their investigation revealed.  That -- those documents
7  would be part of the investigative file at -- at the
8  local police department.
9  BY MS. CARNEY:
10      Q.   What is your basis for saying the
11  investigation that the prosecutor's office did should be
12  in the investigative file at the police department?
13      MS. BONJEAN:  Objection to the form of that
14  question.
15      THE WITNESS:  That is the same as collecting any
16  other document related to an investigation whether
17  you're -- I mean, you could be talking about -- let's --
18  I'm just making this up.  Let's say, hypothetically,
19  medical records.  If someone claimed an injury, you would
20  go get medical records to substantiate the medical -- the
21  person's medical condition relative to the complaint.
22          You would do the same thing here.  If
23  you're telling me that the -- that the CPD, in
24  conjunction with the prosecutor's office, was working a

JON SHANE, 05/26/2023

216

1  criminal matter related to perjury, they would
2  absolutely -- "they" meaning the Chicago Police
3  Department -- would absolutely have the documents that
4  the Chicago -- excuse me -- that the Cook County
5  Prosecutor's Office was working with.  That would all
6  become part of their file so they could say, "Look.  This
7  is exactly what the -- Cook County Prosecutor's
8  Office did."
9  BY MS. CARNEY:
10      Q.   I guess I'm not understanding what your basis
11  is for saying that, other than it's your belief it's good
12  investigative practices.  Is there a policy -- is there
13  some sort of national standard that requires the
14  prosecutor -- the police departments to include the
15  prosecutor's investigation within their file?
16      A.   Yes.  It's -- it's the -- so the answer is
17  yes, and it's no different than collecting any other
18  documents related to an investigation.  That -- that's
19  what I'm saying.
20      Q.   Is it --
21      A.   You would -- you would always expect
22  documentation from police officers -- investigators,
23  rather.  Whatever they went out and collected.
24      Q.   Okay.  But I'm talking about --

217

1      A.   Why would another government agency be any
2  different?
3      Q.   Is it your belief that the Cook County
4  State's Attorney's Office provided the Chicago Police
5  Department with their investigative materials --
6  MS. BONJEAN:  Objection --
7  BY MS. CARNEY:
8      Q.   -- in the '80s and '90s?
9  MS. BONJEAN:  I'm going to object to the form of
10  that question.  It's -- it's misstating what his
11  testimony is.
12  MS. CARNEY:  Okay.  Well, I'm sorry.  I don't
13  understand what his testimony is right now, so I'm trying
14  to figure it out.
15  BY MS. CARNEY:
16      Q.   You keep -- Dr. Shane, I'm sorry, but you
17  keep seemingly commingling this prosecutor's office file
18  with the --
19  MS. BONJEAN:  No.
20  BY MS. CARNEY:
21      Q.   -- police department file.
22           Hold on, Jennifer.
23  MS. BONJEAN:  Objection to the form.  He's not
24  commingling anything.  I know it's a foreign concept,

218

1  Theresa, to the City of Chicago, but he's not commingling
2  anything.  He's being very clear.
3  MS. CARNEY:  Can you stop yelling at me today?  We
4  just want to get -- we've got, like, two hours left.
5  MS. BONJEAN:  Okay.  I'm not yelling.  I'm -- this
6  is just how I'm -- how I'm wired.  I apologize.  Go
7  ahead.
8  BY MS. CARNEY:
9      Q.   I don't understand what you're saying,
10  Dr. Shane, because you seem to be saying to me -- and I'm
11  sure Jennifer will object and tell me I'm wrong, and
12  that's fine.  You can tell me I'm wrong, too.
13           You seem to be saying that there is an
14  obligation that the Chicago Police Department obtains
15  documents that are gathered by the Cook County
16  Prosecutor's Office.  Is that what you are saying?
17      A.   As part of a criminal investigation related
18  to a police officer where an internal affairs
19  investigation is underway, the answer is yes.  It
20  wouldn't be any different -- I'm try -- let me just --
21  let me give you an analogy so you can understand what I'm
22  saying.
23      Q.   Okay.  But hold on.  I -- okay.  Go ahead.
24      A.   It wouldn't be --

219

1      Q.   I guess -- go ahead.
2      A.   Let me finish.  Then you go, and then we'll
3  see if we can have a meeting of the minds here.
4           It wouldn't be any different for a
5  homicide.  Let -- let me just -- let me just give you a
6  complete hypothetical.  Person is killed on the street.
7  Chicago Police Department homicide division comes out and
8  begins the investigation, and they have an assistant
9  state's attorney assigned from Cook County.  Whatever the
10  Cook County Prosecutor's Office has done relative to that
11  investigation would be part of that completed homicide
12  file for the Chicago Police Department.
13           The same -- the same thing translates to
14  an internal affairs investigation.  Police officer in
15  Chicago is accused of perjury.  A State's Attorney's
16  Office -- a member of the State's Attorney's Office is
17  involved in the investigation that was opened by the
18  Chicago Police Department.  Whatever the state's attorney
19  did relative to that investigation against that officer
20  as part of that internal affairs investigation would be
21  documented, and that package of documents that -- that
22  the prosecutor's office developed would be part of the CR
23  file.
24      Q.   Okay.  Is it your understanding --

JON SHANE, 05/26/2023

220

1    A.    That's -- that's a standard practice.
2    Q.    I get that that is what your opinion is in
3  this case, but is it your understanding that that was how
4  the Cook County Prosecutor's Office worked in the 1980s
5  and 1990s, that they would provide their investigation to
6  the Chicago Police Department in a homicide
7  investigation?
8    MS. BONJEAN:   Objection -- objection to the -- to
9  the form of that -- that question.
10   THE WITNESS:   Whether they were doing it and
11 whether they should have done it are two different
12 things.  They absolutely should have been doing that.
13 Now, if they neglected to do it, that's -- that's a poor
14 practice.
15 BY MS. CARNEY:
16   Q.    Okay.  Page 32.  Oh, sorry.  Back to your --
17 Exhibit 3.  I'm sorry.  We're on little Roman
18 numeral vii, "CPD Data Classification Does Not Follow a
19 Consistent Convention."  What does this mean?
20   A.    I saw things that were classified that seemed
21 to have overlapping connotations.  So they -- in one --
22 in one sense, they would call it an assault, or they
23 might call it -- and using a different example, they
24 might call it perjury or deceitful conduct or false

221

1  information.
2        I didn't understand how they were
3  differentiating between these things, and what that does
4  is it enables the department to diffuse these complaints
5  across a broader landscape, and then it doesn't look like
6  patterns are emerging because you might only have a few
7  complaints in any -- in any one category when they all
8  reflect, let's say, integrity -- an integrity violation
9  or -- or candor violation or something like that.
10   Q.    Okay.  And we talked about this a little bit
11 in the first part of your dep.  You reviewed the
12 complaint category tables for the internal affairs
13 division of the Chicago Police Department; right?
14   A.    Yes, correct.
15   Q.    Okay.  And you understood, based on your
16 testimony in the first part, that CRs were categorized by
17 the -- with one initial complaint category, which was
18 typically the more egregious complaint; right?
19   A.    Well, I never understood how they prioritized
20 them because there was no documentation regarding that.
21 I don't know -- and we talked about priority.  If you
22 remember, one of the things you had asked me was what's a
23 bigger priority -- oh, gosh.  I forget -- I forget how
24 the question went.

222

1        But -- but my example to you was that it
2  would be a bigger priority if someone were -- were
3  committing an act of perjury in court under oath as
4  opposed to somebody applying handcuffs too tightly.  I
5  think that's what you had said.  You asked me if -- if
6  the excessive force was more important than, like, false
7  information or something like that.
8        And the point that I'm drawing -- the
9  overriding -- the overriding point I'm drawing from a
10 police management perspective is that there's -- there is
11 nothing in CPD that's defines the -- the cardinal nature
12 of -- of these offenses -- what's more important than the
13 next thing; so I don't know how they categorized those
14 things, you know, in terms of, quote, "more importance."
15   Q.    And I think that one of the things you told
16 me during the last time in regards to that example is
17 that context matters; right?
18   A.    Yeah.  Context is important, of course.  Yes.
19   Q.    Right.  Because as you said, "Well,
20 excessive" -- well, maybe you didn't say it like this,
21 but -- so tell me if I'm generalizing it wrong.  But
22 excessive force -- if excessive force -- if the category
23 of excessive force is handcuffing too tight versus lying
24 under oath at the grand jury, the context of the fact

223

1  that the excessive force is handcuffs are too tight shows
2  that it might not be as high of a priority as, say, lying
3  under oath at the grand jury; right?
4    A.    Well, what -- what I'm saying is how -- how
5  does the -- how does the CPD differentiate priority --
6  the cardinal offenses?  How do they -- how do they order
7  these offenses?
8    Q.    Underneath here, you talk about a variety of
9  different overlapping or vague categories that you --
10 that you believe skewed the results?
11   A.    Can you scroll down, please?
12   Q.    Yeah.  Sorry.
13        Brett, can we go down to the very bottom
14 of page 32?
15   A.    Okay.  Yeah.  We talked about this the first
16 time around.
17   Q.    Yeah.  We talked about this a little bit; so
18 I'm not going to go back to it too much but -- actually,
19 we -- yeah.  We can go -- we don't have to do that right
20 now.
21        All right.  So let's go to page 35, and,
22 actually, we might need to -- so this is a continuation
23 of little Roman numeral viii, "The Classification Does
24 Not Follow a Consistent Convention."

JON SHANE, 05/26/2023

224

1    A.    Okay.
2    Q.    And then you say -- I just want to make sure
3  we get the context here.  The paragraph above where I'm
4  talking about -- we're on page 34 -- "By fragmenting the
5  complaint categories as CPD does, the Department
6  intrinsically builds implausible [sic] deniability into
7  their internal affairs program."  And you say that word
8  again on page 35.  "Plausible deniability also insulates
9  elected officials from the prying eyes of the
10 electorate."  How so?
11   A.    By diffusing these complaints across a
12 broader spectrum of categories so they can build into
13 their narrative the idea that, "Well, we don't have any
14 patterns that emerged."  What you're looking at right
15 here is what I was trying to get across with the
16 overlapping categories above, that different -- you know,
17 different -- there's different categories for sort of
18 same thing.  How do you -- how are they differentiating
19 between perjury and, you know, deceitful conduct or false
20 information?
21   Q.    Okay.  So that actually leads me to -- Brett,
22 if I could share again -- well, actually, hold on.
23 Before -- oh, okay.
24         That actually leads me to my next

225

1  question, which on page 32 of your report -- which,
2  unfortunately, we just took down, which is fine -- you
3  have two --
4         Oh, yes.  Thank you, Brett.
5         You talk about -- because you just said
6  deceitful conduct and perjury.  All right.  So there's
7  that -- that's that number 2 here where you say that
8  these are examples of "overlapping or vague categories
9  including, but not limited to, the following complaints."
10   A.    Okay.
11   Q.    And then you have -- right? -- deceitful
12 conduct and perjury?
13   A.    Okay.
14   Q.    All right.  So if I now share my screen and
15 show you your spreadsheet here -- all right.  So let me
16 show you what I did so it doesn't look sketchy.  I'm in
17 your "raw data (incident level)"; so this is, like we
18 talked about before -- is this the CR level?
19   A.    That's the allegation level.  I believe
20 that's the allegation level.  Go to the bottom, and just
21 show me how many you have there.  Can you just go all the
22 way down to the bottom -- scroll all the way down?
23   Q.    A hundred and forty -- well, it says 147, but
24 the first line is obviously the headers, so I think --

226

1    A.    Okay.  No.  Then -- I'm sorry.  This is
2  the -- this is the complaint level.
3    Q.    Okay.  So I'm going to filter out the
4  complaint register numbers, and I'm just going to look
5  for 180229.  So this is the complaint that we were just
6  looking at here, and if you scroll, you have categories
7  for type of complaint, type of complaint 2, type of
8  complaint 3, and type of complaint 4.  Do you see that
9  there?
10   A.    Yes.  Okay.
11   Q.    Okay.  So this one was classified by you as
12 an assault as the first level -- as the -- as the first
13 complaint?
14   A.    Well, don't -- don't think that this is an
15 ordinal scale.  I don't -- I don't want you to think
16 that.  It's not listed in any matter of priority.  Is
17 that -- is that what you're getting at?
18   Q.    Okay.  So it's not --
19   A.    I just want --
20   Q.    -- this is not listed in any order of
21 priority?
22   A.    No, no.
23   Q.    Okay.
24   A.    It's not in ordinal scale of highest to

227

1  lowest.
2    Q.    Did this -- I don't think it has it on here.
3  Do you recall sitting here today what the complaint
4  category was of this CR?  Did you document that anywhere?
5    A.    No, not off -- I mean --
6    MS. BONJEAN:  Objection to form.
7    THE WITNESS:  -- I don't remember off the top of my
8  head.
9  BY MS. CARNEY:
10   Q.    Okay.  Did you give any weight to the
11 complaint categories that CPD used when classifying these
12 types of complaints?
13   MS. BONJEAN:  I'm going to object to the form of
14 that question and --
15   THE WITNESS:  No.  I never independently assigned
16 an ordinal structure to the data.  That was something I
17 was expecting the CPD to do if they were do -- if they
18 were doing it that way; for example, if they're meting
19 out discipline against an officer, what are -- what --
20 how do they do that?  How do they -- what ordinal level
21 scale do they have that suggests one complaint is more
22 important than the other?  I mean, I didn't see anything
23 like that.
24

JON SHANE, 05/26/2023

228

1  BY MS. CARNEY:
2      Q.   Okay.  So if CPD had assigned this as an
3  excessive force complaint, you didn't -- wouldn't take
4  that into consideration at all about -- in the ordinal
5  scale?
6      MS. BONJEAN:  Objection to the -- to the form of
7  that question.  Consideration how?  I don't -- what's the
8  question mean?  Form.
9      THE WITNESS:  Yeah.  Theresa, I'm not -- I'm not
10 clear on what you mean.  I did -- I did not assign an
11 ordinal ranking to the data anywhere.
12 BY MS. CARNEY:
13     Q.   Okay.  And it's your testimony that CPD
14 didn't either?
15     A.   If -- well, I'm saying that I didn't see any
16 documentation policy-wise, rule, regulation, or anything
17 that described how they differentiate what we would call
18 the cardinal proportionality of these things -- these --
19 these offenses.  I did not do it.  I don't -- and if
20 they're -- if they are doing it, I don't know how they're
21 doing it.
22     Q.   So when you were reviewing the CR files, did
23 you notice that any of the CRs were categorized by
24 complaint category tables?

229

1      MS. BONJEAN:  Objection to the form.
2      THE WITNESS:  Well, I remember that there was --
3  there was a complaint table.  If -- is that what you're
4  asking me?  Did I remember seeing --
5  BY MS. CARNEY:
6      Q.   Yeah.
7      A.   There is -- there is a table of sort of
8  what -- of what they used to describe the complaints.
9      Q.   Okay.  And do you recall in your review of
10 these CRs seeing those complaint categories contained
11 within the CR files?
12     MS. BONJEAN:  Objection.  Form.
13     THE WITNESS:  Well -- well, I think I'm saying the
14 same thing.  Yes, there -- there is a complaint table
15 that lists the -- the complaint categories.
16 BY MS. CARNEY:
17     Q.   Right.  And what I'm asking you is in the --
18 in the individual CRs, do you recall seeing a notation of
19 the category of complaint that that CR fell under?
20     MS. BONJEAN:  Objection.  Form.  Why don't you just
21 show him something?
22     THE WITNESS:  Yeah.  I guess I'm not -- I'm not
23 clear.  I mean, I don't recall off the top of my head.
24

230

1      (Deposition Exhibit Number 17,
2       Witness Shane, was marked for
3       identification 5/26/23.)
4  BY MS. CARNEY:
5      Q.   Hold on.  All right.  Let me -- so this, I
6  think, will be Exhibit 17, and I'll send it around.  But
7  this is the CR -- let me make sure I can do this
8  smoothly.
9      A.   Just bear with me.  I'm going to stand up.
10 I've got to stretch my legs a minute.
11     Q.   Do you want to take a quick break?
12     A.   No, that's okay.  I'm good.
13     Q.   Okay.  All right.  So I have up on the screen
14 the CR we've been talking about that was on that
15 spreadsheet -- 180229.  We'll mark this as Exhibit 17.
16     A.   Can you raise the zoom for me, please?
17     Q.   Yep.  Can you see that?
18     A.   A little -- one more.  Yeah.  That's good
19 right there.
20     MS. BONJEAN:  I'm sorry.  Theresa, did you say you
21 emailed this one to us?
22     MS. CARNEY:  I haven't yet.  You told me to show
23 him something, so I am.
24     MS. BONJEAN:  Oh, okay.  Fair enough.  I didn't

231

1  know that's what you were doing.  Okay.  I won't
2  complain.
3  BY MS. CARNEY:
4      Q.   Okay.  So this is the CR we were just talking
5  about -- 180229.
6      A.   Okay.
7      Q.   If we go down to -- and this is a CR that you
8  reviewed, and if you go down to page 6 here, it says,
9  "Complaint Against a Department Member" --
10     A.   Yes.
11     Q.   -- "Chicago Police Department."  So this is
12 the complaint, and it has up here "Initial Complaint
13 Category 05A."  Do you see that?
14     A.   Yes.
15     Q.   Okay.  Do you know what 05A stands for?
16     A.   No, not off the top of my head.  I do not.
17     Q.   Okay.  Based on the complaint category tables
18 that I showed you last time, and we can --
19     A.   Okay.
20     Q.   -- bring it back up if you want me to, but
21 I'll tell you that that category is excessive force -- 05
22 is excessive force, and A is arrestee during an arrest;
23 so CPD classified this as an excessive force complaint.
24     MS. BONJEAN:  Oh, that's what you're talking about.

JON SHANE, 05/26/2023

232

1    Okay.  I understand now.
2        THE WITNESS:  Okay.
3    BY MS. CARNEY:
4        Q.    Okay.  Did you take those complaint
5    categories and assignments into consideration when
6    conducting your analysis?
7        A.    What -- what -- what do you mean "into
8    consideration"?  What -- what do you mean by that?
9        Q.    Well, you just told me that you didn't put
10   an -- an ordinal structure to the data and that you
11   didn't see that CP -- that they were -- that CPD was
12   doing it that way.
13       A.    Yeah.  Okay.  And how -- how -- how are
14   they -- how is this an ordinal scale?
15       Q.    I'm not saying it is.  I'm asking if you took
16   into consideration the fact that CPD -- the internal
17   agency at the time received this complaint, read the
18   allegations, and classified it first and foremost as an
19   excessive force complaint?
20       A.    Oh, I mean, I'm not doubting that they
21   classified it that way.  Okay.  I mean, I agree with you.
22       Q.    Okay.  So there was some sort of
23   classification being done by CPD in these files in
24   regards to the allegations?

233

1        A.    Well, I never denied that they -- they were
2    not classifying things.  What I was saying is that the
3    classification didn't follow a consistent pattern, and
4    what they were able to do is -- is diffuse across the
5    landscape all of these minute categories.  And by
6    breaking it up that way, which I called fragmenting,
7    patterns don't emerge.
8            It takes -- well, I shouldn't say they
9    don't emerge.  It takes a longer time period for them to
10   emerge because something might be classified as an
11   assault in one case; maybe it's an excessive force in
12   another case.  This one involves an arrestee.  And when
13   you just keep breaking things up like that, you need more
14   data to -- to establish a pattern.
15       MS. BONJEAN:  I'm sorry, Theresa, to bother you.
16   Was the -- I know we looked at the chart, and I know that
17   you referenced it.  Did you attach it as an exhibit
18   earlier --
19       MS. CARNEY:  Yes.
20       MS. BONJEAN:  -- in the deposition?
21       MS. CARNEY:  Yes.  We looked --
22       MS. BONJEAN:  You did?  Can you tell me what
23   exhibit number it is?  I'm sorry.
24       MS. CARNEY:  It was Exhibit 14.

234

1        MS. BONJEAN:  Okay.  Thank you.
2    BY MS. CARNEY:
3        Q.    Okay.  So we can move -- so I guess just one
4    more question on this fragmenting issue.  Is it -- if
5    there was an allegation that somebody -- or a detective
6    misrepresented themselves in a -- in a specific setting
7    versus somebody who falsified testimony in front of the
8    grand jury, is it your testimony that those two things
9    are the same or equal and should be classified the same?
10       A.    Well, I --
11       MS. BONJEAN:  I'm sorry.  I'm going to object to
12   the incomplete hypothetical.
13           But -- but you can answer.
14       THE WITNESS:  Well, what I'm -- what I'm saying is
15   that when -- when you've got all of these minute
16   categories, they all involve dishonesty, or it's -- you
17   know, you can call it integrity.  I don't see much
18   difference in proffering false information or lying in a
19   search warrant affidavit or perjury.  Depending on the
20   setting, obviously, one can be criminal and one might --
21   might not be, but they all involve integrity violations.
22   BY MS. CARNEY:
23       Q.    All right.
24       A.    And remember, this is -- this is --

235

1    implicates supervision and management; so from a police
2    perspective, I want to know which officers are garnering
3    repeated complaints for integrity violations, be they
4    perjury, false information, deceitful conduct.
5        Q.    Brett, if we could go to page -- Exhibit 3,
6    page 38.
7            All right.  So midway through this
8    paragraph, you say, "A best practice is to maintain all
9    records related to these files."  I believe, for context,
10   we're talking about internal investigation files, but
11   correct me if I'm wrong.
12       A.    Yes, internal affairs files.
13       Q.    "As they relate" -- okay -- "As they relate
14   to a particular officer for that officer's entire career.
15   Once the officer is separated from the Department, the
16   complete file is archived indefinitely to accommodate
17   future legal proceedings."  Do you see that there?
18       A.    Yes, I do.
19       Q.    Okay.  What other departments in the '80s and
20   '90s were archiving files -- sorry.  What other
21   departments in the 1980s and '90s were archiving
22   disciplinary files indefinitely to accommodate for future
23   legal proceedings?
24       A.    Well, the Newark Police Department was doing

JON SHANE, 05/26/2023

236

1    that.  They had a massive warehouse where they were --
2    where they were putting those things away because -- so
3    the idea of exonerations, for example, was -- was just
4    emerging.  And they were aware at that time that
5    police-related errors were responsible for those kinds of
6    things.
7        Q.    And was the Newark Police Department under
8    any sort of -- was there any collective bargaining
9    agreement at the time that prevented or that allowed --
10   sorry.  That was a bad question.
11             Are you aware of any contract
12   negotiations and collective bargaining agreements that
13   occurred between the Chicago Police Department and its
14   officers during the '80s and '90s that prevented the
15   maintenance of disciplinary files indefinitely?
16       MS. BONJEAN:  Objection to the form.
17       THE WITNESS:  Somehow I remember seeing something.
18   I thought maybe it was in deposition.  Perhaps -- oh, I
19   don't know if it was Flores or somebody else.  I don't
20   remember.  But there was discussion about purging an
21   officer's particular file, but I don't remember anything
22   that said that the police department had to destroy those
23   records consistent with the labor agreement.
24

237

1    BY MS. CARNEY:
2        Q.    Page 39.  I know it feels like there's a lot
3    left, but we've actually done a good amount of this
4    already, so...
5        A.    We're on the last leg here.  Come on,
6    Theresa.
7        MS. BONJEAN:  I've got some questions.  Sorry.
8        MS. CARNEY:  Oh, no.  I think Josh does, too --
9        MS. BONJEAN:  Not a lot.
10       MS. CARNEY:  -- so you're not -- you're not --
11   you're not up yet, Jennifer.
12       MS. BONJEAN:  No, that's fine.  I'm not -- I'm not
13   rushing.
14   BY MS. CARNEY:
15       Q.    Okay.  Tables -- so this is subsection f, so
16   now we're -- we're out of the general observations that
17   we were discussing before, and we're in a new section,
18   the "Process Evaluation" -- "Evaluation for CPD Personnel
19   Complaints."  Second paragraph here, it says, "Tables 4
20   and 5 present the general recurring themes arising from
21   content analysis of the internal investigation."  What
22   are these recurring themes that you're referring to here?
23       A.    Well, if you -- if you look in Table 4,
24   you'll see where it says "observations."

238

1        Q.    Okay.  So those are your recurring themes --
2    those observations there?
3        A.    Yes.
4        Q.    Okay.  And are you offering any opinions on
5    specific investigations that should have had a different
6    outcome?
7        A.    Well, any one of these investigations were
8    certainly subject to a different outcome had all of this
9    information been obtained.
10       Q.    All right.  So -- and then again you say in
11   here that "The investigations are superficial, not
12   complete, and do not comport with accepted industry
13   standards."  What standards are you referring to there?
14       A.    The investigative practices that we've talked
15   about all along -- that these are the component pieces
16   that you would expect to find in an internal affairs
17   investigation.
18       Q.    We'll try to talk about a couple of these.
19   If we need to bring them up, I can find them, but let's
20   go to Table 4.  The first CR is 123850, and in this
21   second bullet point there, you say, "No officer reports
22   were submitted."  What does that mean?
23       A.    That the individual officers were not
24   required to submit reports documenting their actions -- a

239

1    common investigative practice.
2        Q.    Okay.  And number 3, you say, "No
3    interview with the victims," but you cite to footnote 52,
4    which if we go down, it says, "Although the investigator
5    did attempt to contact the victims/complainants through
6    their attorney, the attorney told the investigator his
7    clients would not give a statement.  There's no customary
8    declination letter from the attorney.  The declination
9    cannot be verified."
10            What else -- if the attorney won't let
11   the investigators talk and the attorney does not provide
12   a declination letter, what else are the internal affairs
13   investigators supposed to do?
14       A.    Well, in this particular instance -- I mean,
15   this one isolated case, I would say that the declina --
16   the dec -- oh, excuse me -- the declination letter would
17   be -- would be documented by the investigator, sent to
18   the attorney.  In that time, it would be done via fax
19   machine.  The attorney would -- would sign it and send
20   it -- and send it back.
21            Now, naturally, the attorney might refuse
22   to do that, but then there would be a documented process.
23   "This is the letter I sent to the attorney.  This is what
24   I said.  Here's the fax sheet" -- or the fax receipt,

JON SHANE, 05/26/2023

240

1    rather; excuse me -- "trying to" -- "to document that."
2        Q.   All right.  Moving on to page 41, Table 5.
3    We'll go all the way down to the -- so it's CR 166878,
4    and the third item you say here is "No canvass at the
5    scene."  And I can pull up the CR if you want, but I took
6    a look at the CR, and this CR was initiated because of a
7    civil suit a year after the incident.  In a case like
8    that, what kind of canvass of a scene would be helpful a
9    year after the incident?
10       A.   Well, you revisit the scene to examine it,
11   take measurements, to see if it's -- if it's any
12   different than it was at the time of the incident.
13   There -- there may be people that were there at the time.
14   I mean, obviously, of course, things may have changed,
15   but it's -- it's an element of -- of corroboration
16   because you want to be able to make sure that what's
17   being told to you actually exists insofar as possible.
18       Q.   And then number 6, you say, "No target letter
19   issued to the officers."  What does that mean?
20       A.   A target letter is a letter that -- informing
21   them that they are under investigation.
22       Q.   I'm going to represent to you, in my review
23   of the file, these officers were served with a summons
24   in -- of the civil suit.  Isn't that sufficient to let

241

1    them know that they're the subject of an investigation?
2        A.   Well, I mean --
3        MS. BONJEAN:  Objection to --
4            Hold on.
5            I'm going to object -- I'm going to
6    object to the form of that question.
7            Go ahead.
8        THE WITNESS:  I mean, if you're telling me that
9    they used that as a proxy, all it tells me is that
10   they're subject to a civil suit.  It doesn't necessarily
11   tell me that they're subject to an internal affairs
12   investigation.
13   BY MS. CARNEY:
14       Q.   Okay.  So this one continues on to the next
15   page, and we have number 7 that says, "No office" --
16   wait.  Yeah -- "No officer statements taken," and you
17   have a little footnote there.  And footnote --
18       A.   And what does the footnote say?
19       Q.   Sorry.  Footnote 55 -- 4 all the way at the
20   bottom says, "The accused officer could not be
21   interviewed because he suffered brain damage in a
22   motorcycle accident."
23            Sorry, Brett.  Can you --
24       A.   I remember seeing that, yeah.

242

1        Q.   Okay.  You remember it.  What else could be
2    done in the -- when an officer has brain damage and
3    cannot be interviewed?
4        A.   Well, again, I mean, if we're talking about
5    this one particular instance, there -- there didn't seem
6    to be anything further at any -- at any other given time.
7    Now, if -- if there's nothing else, then I would concede
8    the point that, you know, that -- that point -- that
9    point in that particular investigation might not be
10   relevant.  But that's also why I -- you know, I put it
11   down there.  I didn't want you to think I was leaving
12   something out.
13       Q.   All right.  Page 43.  You -- so that first
14   full paragraph -- we'll move on from the tables -- third
15   line -- it's, like, the fourth or fifth sentence down
16   here.  It says -- or line down.  It says, "The process
17   evaluation indicates investigations frequently contain
18   missing elements that could change the disposition of the
19   case."  What is your basis for saying that these elements
20   could change the disposition of the case?
21       A.   Well, it's distinctly possible that if the
22   investigation was complete, they would have had more
23   corroborating information, more evidence to sustain the
24   charges.

243

1        Q.   Okay.  And then moving down, you say, "Each
2    investigation that is flawed, but subsequently endorsed
3    by each member of the command staff in the chain is
4    explicit approval of the investigation process."  Do you
5    see that?
6        A.   Yes, I see it.
7        Q.   Okay.  Are there any specific investigations
8    that you are saying were flawed that you reviewed?
9        A.   Well, the list that I -- that I just showed
10   you in Tables 4 and 5.  I think there was another one
11   also that's in this report where an investigator imputed
12   intent on behalf of the particular officer when intent is
13   not an element of police department rules and
14   regulations, and the officer admitted that they
15   proffered -- I think it was fictitious information.  I
16   don't remember exactly.  And then they -- they rendered a
17   not sustained disposition.
18            Now, anybody looking at that would say to
19   themselves, "This investigation has to go back because
20   the disposition is" -- "is incorrect."  But most of these
21   investigations were sent through with these errors in
22   them and endorsed all the way up the chain of command.
23       Q.   Okay.  And when you say that if the
24   investigation was done complete, based on your assessment

JON SHANE, 05/26/2023

244

1  of them, more evidence could have sustained the charges,
2  the opposite could also be true -- right? -- more
3  evidence could have kept the disposition the same?
4      MS. BONJEAN:  Objection.  Form.
5      THE WITNESS:  The answer is yes, it's possible, but
6  that's why we rely on a completed investigation so we can
7  say that we've -- that the process has been reasonably
8  executed and fair.
9  BY MS. CARNEY:
10      Q.  Okay.  Page 44, you talk about -- so this
11  starts with the -- on the page before.  You say,
12  "Supervisory review and approval of police reports at the
13  time they are submitted is an administrative function
14  aimed at accountability and is intended to ensure the
15  reports are complete and reflect the actions and
16  omissions of the submitting officer."
17          Which -- are you talking about specific
18  reports in this subparagraph, or is this a general
19  observation?
20      A.  It's -- it's a general observation that any
21  report that is submitted by a police officer or an
22  investigator -- any report anywhere is what I'm saying --
23  that the reports are supposed to reflect the actions and
24  omissions of that officer; so if we're talking about

245

1  investigative tasks -- the things you did, the things you
2  didn't do.  If we're talking about a particular police
3  officer who was required to submit a report as part of
4  their internal affairs investigations, what is said --
5  contained in that report and what is not contained in
6  that report.
7      Q.  Okay.  But this paragraph in -- this
8  subsection in particular is -- is general observations.
9  You're not pointing out specific reports in the CRs that
10  you looked at that you are saying are incomplete and how
11  they were incomplete; right?
12      A.  No, I'm -- I'm making this as -- as a general
13  observation.
14      Q.  Okay.  In subsection --
15      THE REPORTER:  Did you mute, Jen?  You're on -- did
16  you object?
17      MS. BONJEAN:  Oh, I'm sorry.  Yes.  I apologize.
18  My dogs were barking.  I put myself on mute, but yes, I
19  had an objection to that question.  I think Jon answered,
20  though.
21          Go ahead.
22  BY MS. CARNEY:
23      Q.  Subparagraph ii there, you say, "The approved
24  department forms are utilized, which ensure consistency

246

1  and due process."  Are you -- again, is this -- are you
2  saying specific forms were not being used, or is this a
3  general observation?
4      A.  No.  It's a general observation about --
5  aimed at accountability and supervision.
6      Q.  So in that same vein, on the bottom of 44,
7  you say, "Because the supervisors endorsed the
8  investigations submitted by the internal affairs
9  investigators, the supervisors agreed with the
10  investigator's method even though the method did not
11  comport with accepted industry standards."
12          Are you issuing this opinion on -- in
13  regards to specific supervisors, or is this a general
14  observation?
15      MS. BONJEAN:  Okay.  I'm going to object to -- you
16  keep using the word "general" observation.  I know he
17  used that at one point, but that's not what he says here;
18  so I'm going to object to the form of that question.  I
19  think this is a finding of his.
20          But go ahead.  You can go ahead.
21      THE WITNESS:  So what I'm saying here is that the
22  missing component pieces resulted in incomplete
23  investigations, and all the way through the chain of
24  command, those investigations bearing those missing

247

1  components were endorsed by supervisors.  Those missing
2  components did not comport with accepted practices;
3  therefore, they were not supervising and they were not
4  managing the internal affairs process as they should
5  have.
6  BY MS. CARNEY:
7      Q.  Okay.  So then which supervisors are you
8  talking about?
9      MS. BONJEAN:  I'm going to object --
10      THE WITNESS:  Any one of the supervisors --
11      MS. BONJEAN:  -- object to the form of that
12  question.
13      THE WITNESS:  Any -- any one of the supervisors who
14  endorsed those reports -- those specific reports.
15  BY MS. CARNEY:
16      Q.  So any supervisor on any CR that you've
17  reviewed?
18      A.  That was incomplete.
19      Q.  But you don't have -- okay.  Which CRs are
20  you indicating are incomplete?  The ones just contained
21  in Tables 4 and 5, or are there others?
22      MS. BONJEAN:  Objection to the form.  And asked and
23  answered.
24      THE WITNESS:  I'm specifically referring to 4 and

JON SHANE, 05/26/2023

248

```
1   5.
2   BY MS. CARNEY:
3       Q.   Okay.  So any supervisor that reviewed the
4   investigations contained in Tables 4 and 5 and endorsed
5   those investigations are accountable for incomplete
6   investigations; is that what you're saying?
7       MS. BONJEAN:  Objection to the form of the
8   question.
9            Go ahead.
10      THE WITNESS:  They're -- they're accountable for
11  allowing an incomplete investigation to go forward, and
12  that means that they've endorsed the -- the investigative
13  process as it stands in its incomplete fashion.
14  BY MS. CARNEY:
15      Q.   Okay.
16      A.   Can we take five for a bathroom break?
17      Q.   Absolutely.
18      MR. ENGQUIST:  Actually, why don't we just take ten
19  if we can?
20      THE WITNESS:  Okay.
21      MR. ENGQUIST:  I need a break, too.
22      MS. BONJEAN:  How much time do we have on the
23  record, too?  I'm sorry.
24      THE VIDEOGRAPHER:  Give me just one second.  I can
```

249

```
1   add it up.
2       MS. CARNEY:  Did you go off, Nick?
3       THE VIDEOGRAPHER:  We'll go off the video record at
4   12:55 p.m.
5            (Recess taken.)
6       THE VIDEOGRAPHER:  This is the beginning of Media
7   Unit 3.  We are back on the video record at 1:07 p.m.
8   BY MS. CARNEY:
9       Q.   Okay.  Back to Exhibit 3, which is your
10  initial report, and we're on page 48.  Okay.  And let's
11  look at Table 8, "Complaints by Category," and I think we
12  talked about this a little bit when we started the dep in
13  the initial portion of it, but who created these
14  categories?
15      A.   Well, these are the categories that are
16  reflected in the narrative portion of the CR
17  investigations.
18      Q.   Okay.  Moving on to page 50, subparagraph --
19  oh, sorry.  Got to keep going a little bit.  Thanks,
20  Brett.
21           Subparagraph b here.  I'm going to say
22  this wrong, I'm sure.  Is it the Pareto Analysis?
23      A.   Pareto.
24      Q.   Pareto.  Okay.  Can you explain to me the
```

250

```
1   Pareto Analysis or the Pareto Principle?
2       A.   Yeah.  It's basically what's known as the
3   80-20 Principle.  So you have categories of complaints.
4   You then look at the number of complaints ordered from
5   greatest to least.  You figure out the percentage that
6   each of those -- that each of those complaint categories
7   represents.  Then you have the cumulative percentage, and
8   then you have the cumulative percentage of categories.
9   And if you scroll down, I'll show you exactly what I
10  mean.
11      Q.   Yes.  If we could go to paragraph -- or
12  page 51, Table 9, I think talks about the cumulative
13  percentage and the cumulative percentage of complaint
14  categories.
15      A.   Yeah.  So you're looking at the final
16  product, and what this analysis is intended to do -- and
17  this is a basic descriptive statistic that you would find
18  supervisors in internal affairs doing, presenting this,
19  you know, to police managers to get a handle on which
20  categories of complaints represent the most potentially
21  risky issues.
22      Q.   Okay.  So complaints by category, these
23  categories are the same categories that are in Table 8
24  that we just talked about; right?  They're just sorted
```

251

```
1   into this Pareto Analysis of 80-20?
2       A.   That's correct, yes.
3       Q.   Okay.  And so the little letter n here,
4   that's the number of total complaints --
5            (Simultaneous speaking.)
6       A.   Yes.  That's -- those are the -- that's the
7   frequency of it and, in statistical terms, just stands
8   for frequency.  That's all.
9   BY MS. CARNEY:
10      Q.   Got it.
11      A.   But it's the number, yes.
12      Q.   Okay.  And when we're saying complaints by
13  category, the unit of analysis when we're saying
14  complaints in this context, we're talking, again, about
15  the allegations; right?
16      A.   Yes.  Just -- can you just scroll to the
17  bottom of this table?  Let me see what the -- the sum is.
18  I just want to make sure that I am accurate, but I'm
19  reasonably certain that I am.  All the way down --
20      Q.   So this --
21      A.   -- to the bottom.
22      Q.   Yeah.  It goes all the way to page 53, and
23  the total is 746.
24      A.   Yes, yes.  I'm right.  Uh-huh.
```

JON SHANE, 05/26/2023

252

1      Q.    Okay.  So complaints in this -- the unit of
2  analysis is the allegations?
3      A.    That's right.
4      Q.    Got it.  So the percentage, that's the
5  percentage of total allegations in the data set?
6      A.    Yes.
7      Q.    Okay.  And then cumulative percentage, that's
8  just another way of saying total percentage in the data
9  set?  Because I see that those -- oh, no.  That can't be
10  right because the numbers aren't the same, necessarily.
11      A.    No.  Cumulative percent -- let me just
12  explain this real quickly.  Let me go -- and I gave you
13  this before, but now that we're looking at it, it'll
14  probably be a little clearer.
15            So you start with the category of
16  complaint, and then what you do is sum those by
17  greatest -- and you sum them and then order them greatest
18  to least, which is what you see in column n, as in
19  "Nancy."
20      Q.    Okay.
21      A.    The next column is percentage.  233
22  complaints represent 31.2 percent of the complaints that
23  are shown in this table.
24      Q.    So 31.2 percent of the 746 total

253

1  allegations --
2      A.    Yes.
3      Q.    -- in this table?  Got it.  Okay.
4      A.    Are -- are assaults.  And then the cumulative
5  percentage is the percentage of each of those added
6  together to sum to 100; so you'll notice the first one is
7  31.2 percent, and the second one is 7.2 percent.  If you
8  add those together, the cumulative percentage of those
9  two things by the time you get down to threats is
10  38.5 percent.
11      Q.    Okay.  What is the purpose of -- what does
12  the cumulative percentage show?
13      A.    It shows that -- if you look over to the --
14  to the right-hand side, that 2.4 percent of the
15  categories include 38 percent, which is just those two
16  categories.
17      Q.    Okay.  So 2.4 -- so we're looking at threats;
18  right?
19      A.    So the first two -- the first two categories,
20  assault and threats, you -- you see that; right?
21  Those --
22      Q.    Yes.
23      A.    -- you see those?
24            Okay.  So those two categories make up

254

1  38.5 percent of the allegations that have come in.
2      Q.    Got it.
3      A.    And then right below that, you'll see 45.2
4  and --
5      Q.    Okay.  So each one is basically adding on to
6  the -- to the next?
7      A.    Yes.  That's why it's called a cumulative
8  percentage.
9      Q.    Okay.
10      A.    It's a cumulative total.
11      Q.    And then the cumulative percentage of
12  complaint categories, could you just explain that one to
13  me one more time?
14      A.    Yeah.  So you take the number of categories.
15  You divide by one, and it's 1.2 percent, and then you add
16  1.2 percent to each of those as you go.  As you can see,
17  the first one is 1.2.
18      Q.    Okay.
19      A.    If you add 1.2, that's going to be 2.4, and
20  then if you add 1.2, it's going to be 3.6.
21      Q.    Okay.  So say we go all the way down to
22  unlawful entry and search, and so that includes -- one,
23  two, three, four, five, six, seven -- eight categories.
24  So eight categories are 8.3 percent of the total --

255

1      A.    That's right.  8.3 percent --
2      Q.    -- allegations?
3      A.    Yes.  8.3 percent of the -- of the categories
4  represent 61.5 percent of the complaints that came in.
5      Q.    Got it.  Okay.  Okay.  So then going to
6  page 54, Table 10 is the "Pareto Analysis of Frequency of
7  Complaints by Year."  So this would have been the same
8  type of analysis as Table 9 but broken down by year
9  instead of by complaint category; right?
10      A.    Yes, that's right.
11      Q.    Okay.  And again, when you look down here, it
12  says 746.  This is the unit of analysis' allegations;
13  right?
14      A.    Yes, correct.
15      Q.    Page 57, this is a table talking about
16  sustained complaints by complaint source?
17      A.    Okay.  Yes.
18      Q.    So this -- you say, "Table 11 suggests
19  potential bias in the investigation where there is an
20  intrinsic credibility granted to those inside the
21  organization who initiate a complaint compared to those
22  from outside the organization."
23            Are there any other variables in play
24  here other than internal or external, or is that the only

JON SHANE, 05/26/2023

256

1  variable that you looked at for the sustained -- the rate
2  of sustained -- the sustained rate?
3      MS. BONJEAN: Objection to form. Sorry. Form.
4      THE WITNESS: If you're referring to Table 11, the
5  answer is no. It's only the complaint source and the
6  disposition.
7  BY MS. CARNEY:
8      Q.  Okay. And then on the bottom of this page,
9  it says, "Pattern of Complaints Against the Defendant
10 Officers," and we have subparagraph a, "Between 1980 and
11 2008, the defendant officers accumulated 152 individual
12 complaints arising from 48 different complaint
13 categories." This 152 individual complaints, what is the
14 unit of analysis there? Is that CR, allegation, or
15 something else?
16     A.  I don't -- I don't recall. I think I'd have
17 to look at that another time. But it might be -- I think
18 it's the -- it's the allegations. Can you -- can you
19 raise the zoom level for me, please, just a little bit?
20     Q.  Like, bigger or smaller?
21     A.  Yeah. Raise it to, like -- like, 170 or
22 something. That should do. Yeah. That's -- that's
23 good. Very good. If you scroll down -- let me -- can I
24 see the table below? Scroll -- keep scrolling. Let me

257

1  see -- all the way to the bottom.
2      Q.  Oh, yeah. There's a footnote there, so that
3  might -- so footnote 74 says, "The unit of analysis is
4  complaints, filtered by defendant officers." So again,
5  complaints, that was allegations as the unit of analysis;
6  right?
7      A.  Yes.
8      Q.  And then Table 12 in total is the same
9  analysis that we talked about from Table 9 but sorted by
10 defendant officers; right?
11     A.  Can we go back up and let me see the top,
12 please? Yes, that's right. No, no, no. Table 12 --
13 yeah. There you go. Little higher. Yes.
14     Q.  All right. Good news is I'm done with that
15 report for now. Bad news is I got to go to your
16 supplemental report.
17     A.  Okay.
18     Q.  So we're going to go to Exhibit -- what I've
19 marked previously as Exhibit 15, and this is -- we talked
20 about it briefly at the beginning of the dep. This is
21 the supplemental report that you issued in this case --
22     A.  Yes.
23     Q.  -- regarding some additional CR files for
24 Defendant Guevara; right?

258

1      A.  Yes.
2      Q.  Okay. Just a couple points here. The
3  first -- second paragraph here, you say, "Of particular
4  importance are CR files 124631 and 150473." Are you --
5  do you have any opinion or understanding about whether or
6  not those CR files are complete?
7      MS. BONJEAN: Sorry. Objection to the form and --
8  and also foundation, I guess.
9      THE WITNESS: I don't know if they are complete or
10 incomplete. I mean, I'm presuming that they are complete
11 because I would expect the CPD to have complete records.
12 BY MS. CARNEY:
13     Q.  So I know I used the word, so let me try
14 to -- when you say that the files have complete -- you
15 say "complete records." What does that mean? What
16 records are you assuming are -- sorry. That was a bad
17 question.
18         Do you know whether or not any -- the CRs
19 are missing any information regarding the internal
20 affairs investigation?
21     MS. BONJEAN: Objection to the form and foundation.
22     THE WITNESS: Well, they're missing component
23 pieces, yes. There -- there is -- there's a table at the
24 end of this document. Yes.

259

1  BY MS. CARNEY:
2      Q.  Okay. I guess my question is a little bit
3  different. I'm not asking you if you believe that
4  they're missing component pieces. I'm asking you if you
5  believe that there are pages that were completed that
6  contain information that are no longer in the -- in that
7  file?
8      MS. BONJEAN: Objection to the form. And
9  incomplete hypothetical --
10     THE WITNESS: Oh, in other words --
11     MS. BONJEAN: -- speculation.
12         Go ahead.
13     THE WITNESS: Sorry. Oh, sorry. I stepped on you.
14 Did you want to say that again, Jen?
15     MS. BONJEAN: No. I think she got me. Go ahead.
16     THE WITNESS: So, Theresa, you're asking me
17 hypothetically that the investigation contained 20 pages,
18 but I only saw pages 1 through 10?
19 BY MS. CARNEY:
20     Q.  Correct.
21     A.  I don't know that to be the case.
22     Q.  Further down here, you say, "This
23 investigation is replete with errors and is not as
24 thorough as required and is not impartial." What errors

JON SHANE, 05/26/2023

260

1 are you identifying in the CR 124631?
2      A.   Can you go all the way to the end, please,
3 all the way down to the table that's appended?  Yeah.
4 That's the table.
5           Is this what you're asking, Theresa?
6 These are the missing components.
7      Q.   Okay.  So -- well, let me ask you this.
8 Table 1 here has -- is called "Missing Components," and
9 it lists by CR file.  Are these the same component pieces
10 that you are analyzing in your original report in
11 Tables 4 and 5?
12     A.   Yeah, the same -- same elements.  Yes.
13     Q.   Okay.  So when you say that the investigation
14 is replete with errors, it's that it is missing these --
15 these component pieces as you identify them in Table 1?
16     A.   That's right.
17     Q.   Okay.  And at the very bottom of page 1,
18 you've got a handful of footnotes, and at the very bottom
19 of the footnote -- the last footnote, it says, "Although
20 Officer Guevara cannot have been charged with Ethnic
21 Intimidation for the offense against Ms. Turner since the
22 law had yet to be effective, he fulfilled the elements of
23 the crime by assaulting Ms. Turner based partially on her
24 race."

261

1           Are you crediting Ms. Turner's
2 allegations in the complaint?  Are you finding -- sorry.
3           Are you making a credibility
4 determination regarding the allegations in the Turner
5 complaint, 124631?
6      A.   I'm not making, I guess, a credibility
7 determination as much as I'm -- I believe that the
8 complaint that has -- as you -- as you see it as
9 presented in the CR file is accurate.
10     Q.   Okay.
11     A.   I mean, there's no doubt that the
12 investigation had to be investigated as I'm -- as I'm
13 talking about here.
14     Q.   Page 2, the first full paragraph.  So
15 earlier, you say this -- this complaint was not
16 sustained?  I think that's -- I think I missed
17 that but -- I didn't ask that before, but this complaint
18 was not sustained; is that correct?
19     A.   I believe the next one was sustained.  Yes.
20     Q.   Okay.  So later in this paragraph, though,
21 you say, "There's no evidence in discovery that CPD
22 disciplined Officer Guevara or subjected him to any
23 corrective action."  If the complaint wasn't sustained,
24 what punishments should've CPD imposed on Guevara at the

262

1 time?
2      A.   Well -- well, remember what I had said
3 originally.  First, that internal affairs is a -- is a
4 process-oriented practice.  It's not an outcome-oriented
5 practice.  That's number one.  Number two, given that
6 there are so many errors here, things that were not done,
7 it's difficult -- it's difficult to say that the -- that
8 the outcome wouldn't have been different.  That's number
9 two.  And -- and number three, there's no reason why they
10 could not have monitored him under Personnel Concerns or
11 monitored him with extra supervision or moved him out of
12 an enforcement position.
13     Q.   I believe that complaint was in 1982; is that
14 right?  I think we looked at --
15     A.   I believe it was '82, yes.
16     Q.   Okay.
17     A.   If you just wanted to go back up and put it
18 on the record --
19     Q.   Yeah.  We can just -- sorry.
20     A.   Just go for the date.  Yeah.  Right there.
21 So August 17, 1982, and the second one was July 16, 1986.
22     Q.   Yep.  Okay.  So then moving on to the next
23 paragraph.  You say, "About four years later, Officer
24 Guevara was again involved in an incident that should

263

1 have been classified as a biased crime.  CR investigation
2 150473 concluded with a 'sustained' finding for a
3 'Violation of Rule 8 - disrespect to or maltreatment of
4 any person while on or off duty.'"  Do you see that?
5      A.   Yes.
6      Q.   Okay.  You said -- then you say, "However,
7 CPD did not sustain the complaint for assault, which is
8 precisely what occurred."  Are you making a credibility
9 determination in regards to the allegations in this CR?
10     A.   I'm -- I'm saying that the -- that the CR as
11 presented indicates that an assault occurred and that it
12 was corroborated by witnesses, and they sustained it as
13 such.
14     Q.   Moving on to page 3, footnote 9.  I'm trying
15 to think -- find where it falls in here.  This is for
16 CR 150473, Mr. Warren.  The very bottom of the first
17 paragraph says, "There's also no evidence in discovery
18 that CPD disciplined Officer Guevara or subjected him to
19 corrective action."  But then footnote 9 says, "The CR
20 file indicates that Chief Administrative" --
21 "Administrator David Fogel recommended Officer Guevara
22 receive five days' suspension, but there's no evidence in
23 discovery that this was executed."  Do you see that?
24     A.   Yes.

JON SHANE, 05/26/2023

264

1    Q.   Okay.  Doesn't that show that the CR file
2  itself is not a complete -- is an incomplete CR file
3  since there's no -- since it notes that he was
4  recommended for five days' suspension, but we don't know
5  what happened?
6    MS. BONJEAN:  Objection.  Form.  Foundation.
7  Speculation.
8    THE WITNESS:  Can you repeat that again?  I'm
9  sorry.  Please.
10  BY MS. CARNEY:
11    Q.   Yeah.  Sorry.  So you note here that there is
12  indication in the CR file that he was to -- that it was
13  recommended that Officer Guevara receive five days'
14  suspension, but we don't know what the ultimate
15  suspension was; right?
16    A.   We don't know if there was anything that was
17  carried out by the CPD.
18    Q.   Right.  So my question isn't that evidence
19  that this file is incomplete since we don't know the
20  outcome of the recommendation?
21    MS. BONJEAN:  Objection to the form.  Speculation.
22    THE WITNESS:  I would -- I would say no, that it
23  appears to me that that's -- that's where the
24  investigation ended.

265

1  BY MS. CARNEY:
2    Q.   So it's your understanding that when
3  discipline is recommended, there's no other steps that
4  are taken within internal affairs or the Chicago Police
5  Department?
6    A.   No.  There's --
7    MS. BONJEAN:  Objection.  Misstates his test --
8    Let me -- let me --
9    Objection.  Objection.  Assumes facts not
10  in evidence.  Misstating his testimony.
11    You can answer.
12    THE WITNESS:  No, I'm not -- I'm not saying that
13  there are -- that there are no additional steps.  What
14  I'm saying is that there's no evidence in this file that
15  it was executed.
16  BY MS. CARNEY:
17    Q.   Okay.  Page 4, second sentence of the second
18  full paragraph, you say, "On page 48 of my original
19  report, there are no" -- "Table 7, there are no reported
20  CR complaints for 1982.  However, through the new
21  discovery material, CR 124631 was reported August 17th,
22  1982.  This is an indication that CPD internal affairs
23  recordkeeping function contains missing records that are
24  relevant to the agency's operating practice."  Do you see

266

1  that?
2    A.   Yes.
3    Q.   Okay.  Are you aware of whether or not that
4  CR would have been in the -- sorry.  Bad question.
5    Are you aware of whether or not in 1982
6  that CR was contained within the CPD internal affairs
7  recordkeeping functions?
8    MS. BONJEAN:  Objection to the form.  Foundation.
9    THE WITNESS:  I don't -- I don't think I'm -- I
10  don't think I'm clear on the question.  I mean, this is
11  something -- maintaining records is an organizational
12  function, you know.  Whether, you know, it necessarily
13  belongs to internal affairs or if it's another
14  recordkeeping function elsewhere in the organization,
15  they certainly should have had a record of it.
16  BY MS. CARNEY:
17    Q.   Right.  And I guess what I'm asking you is
18  are you aware of whether or not there was a record of
19  this CR during the relevant time period of, say, 1980
20  through 1992 --
21    MS. BONJEAN:  I'm going to --
22  BY MS. CARNEY:
23    Q.   -- prior to the underlying incident?
24    MS. BONJEAN:  I'm going to object to the form.

267

1  Incomplete hypothetical to the -- and specifically to the
2  relevant time period.  I don't know.  Relevant --
3    MS. CARNEY:  I defined it.
4    MS. BONJEAN:  -- to whom but --
5    MS. CARNEY:  I defined it.  Before the -- 1980
6  through 1992, which would have been prior to the and the
7  year after the underlying incident.
8    MS. BONJEAN:  But relevant -- but relevant how?  I
9  mean, I'm just going to object to the form.  I'm not
10  going to do a speaking objection.
11    But go ahead.
12    THE WITNESS:  So your question was -- can you
13  repeat the question?  I apologize.
14  BY MS. CARNEY:
15    Q.   Yeah.  So my question was do you know whether
16  or not -- so let me back up.  Today, 2023, this
17  particular record, it's your opinion that CPD internal
18  affairs recordkeeping function contains missing records
19  that are relevant to the agency's operating practices;
20  right?
21    A.   That is my position, yes.
22    Q.   Okay.  Do you believe that in -- between
23  1982 -- or I'm sorry -- 1980 and 1992, this particular CR
24  was missing from CPD internal affairs recordkeeping

JON SHANE, 05/26/2023

268

1  functions?
2      A.   Well, given that it wasn't produced in
3  discovery and it's related to Guevara, who is the
4  defendant, that is something that should have come
5  through discovery.  I don't know why it wouldn't have
6  been part of the discovery package at that time.
7      Q.   But that's not my question, though.  My
8  question is whether or not this particular CR was part of
9  the CPD internal affairs recordkeeping function between
10 1980 and 1992?
11     MS. BONJEAN:  Objection -- objection to the form.
12 Foundation.
13          She's asking whether you know whether it
14 existed in '92.
15     THE WITNESS:  It existed in 1982.
16     MS. BONJEAN:  She's asking whether you know whether
17 it was -- the police department had it up until at least
18 '92.  Do you know that?
19          Objection.  Form.
20     MS. CARNEY:  Thank you, Jennifer.
21     THE WITNESS:  I don't know specifically.
22 BY MS. CARNEY:
23     Q.   Okay.  All right.  Page 6.  You reference an
24 Officer Stegmiller.  Do you see that --

269

1      A.   Yes.  Stegmiller.  Yes.  Uh-huh.
2      Q.   -- in the first paragraph?
3           Who's that?
4      A.   CPD officer.  If you -- if you look down to
5  the -- I reference it in -- in one of the footnotes.
6  Actually, it might be up above.  I don't -- no.  Go down
7  a little further.  I'm sorry.  I just don't have -- I
8  don't have a copy of that report.  Can you go back up to
9  the other page?  Maybe it's up above.  Yeah.  Hold it --
10 hold it right here.  Yeah.  So if you look -- Theresa, if
11 you look at footnote -- it's hard for me to see -- I
12 think that's 14 --
13     Q.   Okay.
14     A.   -- you'll see the source data for -- for
15 Stegmiller.
16     Q.   Got it.  Okay.  In regards to your opinion
17 that certain CRs should have been criminally
18 investigated, is the -- is the mere allegation that a CR
19 might implicate a criminal statute enough in your mind
20 that it should be referred to the -- it should be
21 considered a crime and referred to the State's Attorney's
22 Office?
23     A.   It should be undertaken as such, yes.  And as
24 the investigation begins to unfold, there should be a

270

1  discussion between the CPD and the prosecutor's office
2  about what they know, how much evidence they have, and
3  whether or not there's anything to corroborate what
4  occurred.  And as that moves forward, I mean, there
5  absolutely has to be a discussion between the two
6  organizations, and then as they move forward, to
7  determine whether or not the evidence exists or it
8  doesn't.
9      Q.   All right.  I hate to take another break, but
10 I think I'm done; so I just want to quick check my notes
11 so I can pass it on to Josh.  We can probably only take
12 five minutes for this one.
13     THE VIDEOGRAPHER:  You want to take a break?
14     MS. BONJEAN:  Josh, do you think you'll have a lot?
15     MR. ENGQUIST:  No, I don't think I'll have a lot.
16     MS. BONJEAN:  Okay.  Great.
17     THE VIDEOGRAPHER:  All right.  Going off the video
18 record at 1:41 p.m.
19          (Recess taken.)
20     THE VIDEOGRAPHER:  This is the beginning of Media
21 Unit 4.  We are back on the video record at 1:54 p.m.
22     MS. CARNEY:  All right.  Dr. Shane, I am done.  I'm
23 going to pass it on to Josh.  Thank you.
24     THE WITNESS:  Okay.  Thank you.

271

1               EXAMINATION
2  BY MR. ENGQUIST:
3      Q.   Okay, Mr. Shane.  I just want to --
4      MS. BONJEAN:  It's doctor.  It's Dr. Shane.
5  BY MR. ENGQUIST:
6      Q.   I'm sorry, Dr. Shane.  The -- I just want to
7  ask you a quick question, and I don't think we need to
8  break out the whole thing.  But the CPD CR data master
9  file that was sent over, just so I can understand what
10 one thing means -- I understand you have the complaints.
11 You have the complaint categories, and you went through
12 the whole Pareto Analysis of the complaints.  I think I'm
13 good on that.
14          You have one column that says outliers,
15 and then you have false and true.  What does false mean,
16 what does true mean, or do you need me to break it up?
17     A.   No.  It's just the way Excel identifies
18 whether it is or is not outside the parameters.
19     Q.   Okay.  So true would be outside the
20 parameters, and false would be not an outlier; correct?
21     A.   Right.
22     Q.   Okay.
23     A.   And I think in the report that I identify
24 which ones are outliers.

JON SHANE, 05/26/2023

272

1   Q.   Okay.  I just wanted to make sure that I was
2   reading that correctly because true and false just didn't
3   seem to make sense to me.
4   A.   Understood.
5   Q.   Okay.  The other thing is -- do you have a
6   copy of your report with you or not?
7   A.   I do not.
8   Q.   Okay.  Then can I have the -- I might have
9   the -- have to have the report put up just -- but I don't
10   think I --
11   MS. BONJEAN:  You want to pull it up?
12   MR. ENGQUIST:  I might need to; I might not to --
13   might not need to.  I'd rather just kind of go through
14   this quick.
15   MS. CARNEY:  Brett's still here, so we -- it's
16   Exhibit 3 for...
17   MR. ENGQUIST:  Okay.  Thanks.
18   BY MR. ENGQUIST:
19   Q.   There's one part of your complaint --
20   actually, let's put it up.  Exhibit 3, page 61.
21   A.   Did you say a list of my complaints?  What
22   did you say?  I'm sorry.
23   Q.   No.  Paulnitsky's complaint.
24   MS. BONJEAN:  Oh, Paulnitsky's.

273

1   MR. ENGQUIST:  Yeah.
2   BY MR. ENGQUIST:
3   Q.   It's page 61.  If you go down a little bit to
4   the next paragraph.  Right there.
5   In this section, you're talking about
6   Officer Paulnitsky.  That's what I wanted to ask you
7   about.  All right?
8   A.   Okay.
9   Q.   Okay.  In here, if you go down a little
10   further to the footnote, please, footnote number 81.
11   And the footnote -- and it's a lengthy
12   footnote; it goes to the next page -- you're talking
13   specifically about one CR -- CR --
14   A.   Yes.
15   Q.   -- 237040?
16   A.   Yes.
17   Q.   Okay.  This has to do with whether or not --
18   submitting a false official report.  Do you recall that?
19   A.   I do.
20   Q.   Okay.  Now, in what you have in here, and I
21   believe you started touching on it earlier when
22   Ms. Carney was asking questions, that all rule -- all
23   police rules and regulations are strict liability; is
24   that correct?

274

1   A.   Yes, correct.
2   Q.   Okay.  Now, does intent have anything to do
3   with it at all?
4   A.   No.
5   Q.   Okay.  So --
6   A.   Not for -- not for agency rules and
7   regulations, no.
8   Q.   Okay.  So for you, it doesn't make any
9   difference on whether or not he intended to put something
10   false in his report or whether it was accidental; is that
11   correct?
12   A.   Well, not --
13   MS. BONJEAN:  Objection to -- object to the --
14   Hold on, Jon, please.
15   Objection to the -- to the -- to the form
16   of that question and the foundation of that question as
17   to rules and regs.
18   Go ahead.
19   THE WITNESS:  So the -- the answer is no.  In a --
20   in a police department, rules and regulations do not have
21   a mental culpability element.
22   BY MR. ENGQUIST:
23   Q.   Okay.  Further -- further down in that -- in
24   that footnote, you put in here that "Officer Paulnitsky

275

1   evaded becoming Brady eligible because of his
2   dishonesty."  So, sir, were you making a determination
3   that he, in fact, was dishonest when he had an error in
4   this report?
5   A.   Well --
6   MS. BONJEAN:  Objection to form.
7   THE WITNESS:  Excuse me.
8   MS. BONJEAN:  Go ahead.
9   THE WITNESS:  He -- he admitted that -- that he did
10   that.
11   BY MR. ENGQUIST:
12   Q.   Did he admit that he did it on purpose, that
13   it was dishonest, or he made a mistake?
14   A.   No.  That -- that's irrelevant.  In -- in a
15   police department, your state of mind when you violate a
16   rule or regulation is not relevant.
17   Q.   Okay.  And just --
18   A.   And he admitted that he did put that
19   erroneous information, and the investigator found that
20   he -- that he put down erroneous information.
21   Q.   Okay.  And did -- did Officer Paulnitsky
22   say -- was there any indication that he said that -- that
23   he did that on purpose or it was an accident?
24   MS. BONJEAN:  Objection to the form.

JON SHANE, 05/26/2023

276

1    THE WITNESS:  Well, he -- I believe he said that it
2  was a mistake.
3  BY MR. ENGQUIST:
4    Q.   Okay.
5    A.   I don't know the exact language, but again,
6  state of mind is -- is irrelevant.  Intent is irrelevant
7  so --
8    Q.   Okay.
9    A.   -- it doesn't matter.
10   Q.   I'm just -- I'm just -- just making it clear.
11  He said it was a mistake?
12   A.   Oh, okay.  No.  I just -- I want to be -- I
13  want to be clear, too.  Sure.
14   Q.   Okay.  All right.  And the finding of the
15  investigator was that it was human error; correct?
16   A.   Well, if that's what he says.  I don't quite
17  understand what that means.
18   Q.   Okay.  All right.  And now, as I said before,
19  you have down in here and later on that Officer
20  Paulnitsky evaded becoming Brady eligible because of his
21  dishonesty.  So, sir, are you -- are you making a finding
22  that he was dishonest, that it, in fact, wasn't human
23  error?
24   MS. BONJEAN:  Objection.  Form.

277

1    THE WITNESS:  Well, he admitted that -- that he put
2  erroneous information in there.
3  BY MR. ENGQUIST:
4    Q.   Sir, is there something -- is that -- when
5  someone -- when someone has human error and admits that
6  it's a mistake, is that dishonesty that would make
7  someone Brady eligible?
8    A.   It -- it would in a police department, yes.
9    Q.   It would?
10   A.   It would.
11   Q.   So if an officer has an official police
12  report, like an arrest report, and puts down the wrong
13  address and later on admits, "I erroneously put down
14  false information there.  The address was, in fact,
15  wrong.  It should be this address," that person would
16  then be eligible for -- for Brady there?  They would be
17  dishonest; correct?
18   A.   Well, I mean it has to be a material issue.
19  It has to be a material issue that -- that's related to
20  Brady.  I put that in here.  But generally, when it is a
21  material issue, that makes you Brady eligible.
22   Q.   Okay.  So when someone wrote -- in this case,
23  it was a -- it was a -- was a report or a memo he wrote
24  to a superior saying he couldn't do outside training on a

278

1  certain day because he believed he had court, and later
2  on, he said, "I made a mistake.  Court was canceled.  I
3  can do the training"; correct?
4    MS. BONJEAN:  I'm going to object to the form.
5    THE WITNESS:  That's what was said, yes.
6  BY MR. ENGQUIST:
7    Q.   Okay.  And you believe that error is so
8  material that it shows dishonesty, and it should be
9  part -- make him Brady eligible; is that correct?
10   A.   Well, I can tell you that it certainly is an
11  element of dishonesty, and if it's -- if it's determined
12  to be such, yes, absolutely.
13   Q.   Okay.
14   A.   That's what police departments do.  They --
15  they -- they capture these kind of integrity
16  violations --
17   Q.   Okay.  What's --
18   A.   -- and they expect the report to be accurate.
19   Q.   Okay.  And just to be clear, the term
20  "dishonesty," does that have any element of intent in
21  your mind -- to be dishonest?
22   A.   Not in -- not in terms of rules and
23  regulations.  It's -- it's -- it's irrelevant.  If you --
24   Q.   Okay.

279

1    A.   -- establish -- if the rule establishes that
2  you shall not use derogatory language and you do and then
3  you say, "Well, yeah, I did that, but it was a mistake,"
4  well, you -- you violated the rule.
5    Q.   Sir, we're not talking about using derogatory
6  language.  We're specifically --
7    A.   Any rule violation.
8    Q.   Any -- any rules.  Okay.  But my -- but my
9  question goes -- you go a little further than that.  I
10  mean, you say it should be strict liability.  He admitted
11  a mistake; therefore, false report.  It doesn't matter if
12  it's a human error or not.  And then you go on to say --
13  just to make sure it's clear -- that he should become
14  Brady eligible -- Brady eligible because of his
15  dishonesty.  Are you saying that if there's human error
16  in a police report, that that would make someone Brady --
17  somebody Brady eligible, no matter what it is?
18   A.   Potentially, yes.
19   Q.   Potentially?
20   A.   Yeah.
21   Q.   And when -- and when I say -- when you say
22  "potentially," what's the potentially based on?
23   MS. BONJEAN:  I'm going to object to the form
24  because the whole word eligibility is just eligible.  It

JON SHANE, 05/26/2023

280

1  doesn't say someone should be on a Brady list.  I
2  don't -- he's saying eligible.
3      THE WITNESS:  Okay.  The -- the violation itself
4  makes you eligible.
5  BY MR. ENGQUIST:
6      Q.  Okay.  If you --
7      A.  If -- if a rule exists in a police department
8  and -- your -- your mental state of mind does not matter.
9  So if you provide fictitious information or false
10 information, that certainly makes you Brady eligible.  I
11 mean, people are prosecuted for -- excuse me -- they're
12 prosecuted for -- give me a second.  I've got to think of
13 the -- what the terminology is that I'm looking for.
14 They're -- they're -- they're prosecuted for fictitious
15 police reports all the time, things that they did put
16 down and things that they didn't put down --
17     Q.  Okay.
18     A.  -- acts and omissions.
19     Q.  Okay.  You refer to his intent as his
20 dishonesty.  Are you making a finding that he was, in
21 fact, dishonest when he put down the -- the incorrect
22 information in the report?
23     A.  Well, he -- he admitted that he put incorrect
24 information.

281

1      Q.  Sir --
2      A.  Incorrect information is --
3      Q.  -- that's not my question.  My question was
4  are you making a finding that he was dishonest when he
5  put down the incorrect information in the report?
6      A.  Based on his admission, yes.
7      MS. BONJEAN:  I'm going to object to the form.
8  BY MR. ENGQUIST:
9      Q.  Based on his admission that he had human --
10 that it was erroneous, you're finding that's dishonest;
11 correct?
12     A.  It is.  It is, yes.  It's not accurate.
13     Q.  Okay.  So let me ask you.  Do you have the
14 same -- if someone goes on the stand and is under oath
15 and says something and is mistaken when they said it,
16 it's wrong, but they didn't intend to say something
17 wrong.  They just made a mistake.  Would you say that
18 person is dishonest, or would you say just the person
19 made a mistake?
20     A.  I mean, it would have to be taken in its
21 context, but you could certainly investigate that as a
22 matter of perjury, sure.
23     Q.  I'm -- I'm not asking -- I'm asking about a
24 finding, sir, because you made a finding here that he was

282

1  dishonest --
2      MS. BONJEAN:  I'm going to object --
3  BY MR. ENGQUIST:
4      Q.  -- so I'm asking you --
5      MS. BONJEAN:  Objection to --
6          Hold on.
7          Objection to the form of that question.
8      MR. ENGQUIST:  Okay.
9      MS. BONJEAN:  I'm also going to say you are giving
10 him an incomplete hypothetical, and if you want to ask
11 him specifically about this finding in his footnote, if
12 you want to call it a finding, go ahead.  But you're
13 changing up a hypothetical, and it's incomplete.
14     MR. ENGQUIST:  Could you read back my question,
15 please?
16     MS. BONJEAN:  Wait.  Can you read -- oh, read back
17 the question.
18     MR. ENGQUIST:  Yeah.  Please.
19          (Whereupon the question was read
20          back.)
21     THE WITNESS:  How do you differentiate between a
22 mistake and -- and not a mistake -- on purpose?
23 BY MR. ENGQUIST:
24     Q.  Well, that's what I'm asking you, sir.

283

1  Doesn't it go to intent?
2      A.  In -- in a criminal proceeding, but in a --
3  in a police department, that's not the case.  In a police
4  department with an administrative violation, there's no
5  intent required.  If the rules specify something and you
6  do something contrary to the rule, it doesn't matter what
7  the intent is.
8      Q.  But, sir, you used the term "dishonest";
9  correct?
10     A.  Yes.
11     Q.  And doesn't the word dishonest require some
12 form of intent?
13     A.  No.  It requires accuracy.
14     Q.  Okay.  So for your -- for your terminology,
15 dishonest is the same as being incorrect; is that
16 correct?
17     MS. BONJEAN:  Objection to the form of that
18 question.
19     THE WITNESS:  Yes, it does.
20 BY MR. ENGQUIST:
21     Q.  Okay.  So if you had an error in one of your
22 reports, it would be right to call you dishonest;
23 correct?
24     A.  Yeah, sure.

JON SHANE, 05/26/2023

284

```
1    Q.   Okay.
2    A.   Accuracy is important.
3    Q.   Dishonest.  Not -- not inaccurate, not
4  mistaken, but it would be correct to refer to you as
5  dishonest; correct?
6    A.   I would say so, yes.
7    Q.   Okay.
8    A.   I think so.
9    MR. ENGQUIST:  That's all I have.
10   MS. BONJEAN:  Okay.  Hold on one second.  You can
11 take that down.  I'm going to try not to take a break and
12 go right in.  Hold on one second.  One second.
13       Haley, do you have -- Haley, are you
14 there?
15   MS. COOLBAUGH:  Yes, I am.
16   MS. BONJEAN:  Okay.  I may have Haley pull up some
17 things along the way.  Okay.  I may need to be reminded
18 of what the actual exhibit numbers are because I think
19 everything I'm going to be pointing to is already an
20 exhibit.
21       Okay.  Okay.  First of all, can we pull
22 up Dr. Shane's report?  And I'm sorry.  What exhibit --
23 is it 4?  What is it?
24   MS. CARNEY:  3.
```

285

```
1    MS. COOLBAUGH:  That's Exhibit 3.
2        EXAMINATION
3  BY MS. BONJEAN:
4    Q.   Okay.  I'm going to present your report back
5  to you, Dr. Shane, as Exhibit 3, and I want to follow up
6  with a couple questions.  Okay?
7    A.   Uh-huh.
8    Q.   First of all, in your analysis, did you --
9  well, strike that.
10       You were retained by, obviously, my law
11 firm on behalf of the plaintiff to conduct an examination
12 of the Chicago Police Department's internal affairs --
13 internal affairs function; is that generally correct?
14   A.   Yes.
15   Q.   Okay.  And at page 11 of your report, one of
16 the conclusions or opinions that you rendered --
17       11, please.
18       -- is that the Chicago Police Department
19 failed to supervise its personnel consistent with
20 accepted industry practices when complaints against the
21 defendant officers were generated.  Do you see that?
22   A.   Yes.
23   Q.   Okay.  And did you put together a methodology
24 for testing that question that was posed to you?
```

286

```
1    A.   I did.
2    Q.   Okay.  And I'm not going to go through all of
3  it in detail because you have asked -- been asked a lot
4  of questions.  But did you lay out that methodology in
5  your report in a fair amount of detail?
6    A.   I did, yes.
7    Q.   Okay.  And in laying out your methodology,
8  did you rely on certain standards to test this question,
9  again, sir, to use in your determination of whether the
10 answer to this question on page 11 was yes or no?
11   A.   Yes.
12   Q.   Okay.  And can you tell me the different
13 standards to which you looked to determine whether or not
14 the Chicago Police Department failed to supervise its
15 personnel consistent with industry practices during the
16 relevant time period?  And at -- at a high level, you
17 can, you know, answer that question.
18   A.   Yes.  I can point to my own experience at the
19 time, having drafted policy, revised policy, having read
20 policy, being a professor of criminal justice since 2009
21 at John Jay College, and having an understanding of the
22 historical underpinnings of police policy, how they're
23 drafted, the IACP -- which is the International
24 Association of Chiefs of Police -- and their model policy
```

287

```
1  center, looking at policies that were crafted there,
2  examining police policies from other organizations when I
3  drafted policy.
4    Q.   Okay.  And did you look at any policy
5  specific to the Chicago Police Department?
6    A.   Several.  And I've -- I've noted them in this
7  document, yes.
8    Q.   Okay.  And in question 1, did you identify
9  some of the general police department generals orders
10 that you used as standards in reaching your conclusion
11 that the Chicago Police Department did not supervise its
12 personnel consistent with industry practices?
13   A.   Yes.
14   Q.   Okay.  Now I want to ask you specifically as
15 to Chicago Police Department General Order 82-14 which
16 deals with complaint and disciplinary procedures for a
17 thorough investigative process.  Did you look --
18   A.   Before you -- before you continue, can I have
19 somebody raise the zoom level on that for me so I can see
20 it?
21   Q.   Oh, oh, sure.
22       Yeah, Haley.  But let's put up -- well,
23 we don't have to.  Yeah.  Just -- you can put the policy
24 back up and just zoom in for Dr. Shane, please.
```

JON SHANE, 05/26/2023

288

1    MS. COOLBAUGH:  You said put the policy back up or
2    his report?
3        MS. BONJEAN:  No, no, I'm sorry.  His report.  My
4    apologies.
5        MS. COOLBAUGH:  Sure.
6        MS. BONJEAN:  Okay.  You still didn't zoom in,
7    though.  You zoomed in and then zoomed back out.
8    BY MS. BONJEAN:
9        Q.   Okay.  Okay.  Is that good, Jon?
10       A.   It's a little -- go ahead.  Take it from
11   there.
12       Q.   Okay.  So did you look at the Chicago Police
13   Department's General Order 82-14 regarding complaint and
14   disciplinary procedures as part of your analysis?
15       A.   Yes.
16       Q.   Okay.  And you were asked a number of
17   questions about, I think, how you reached the conclusion
18   that the investigative process in internal affairs was
19   not thorough.  Let me start with -- first of all, does
20   the -- did the Chicago Police Department in -- in 1990 or
21   1982 even demand a thorough investigative process of
22   internal affairs complaints?
23       A.   Yes.
24       Q.   Okay.  And tell me based on the -- and,

289

1    again, I want you to think back to this relevant time
2    period.  Were there -- were there policies in place, both
3    at the Chicago Police Department through this general
4    order and other police departments of which you were
5    familiar, that laid out, at least in broad strokes, what
6    was required to conduct a thorough investigation in an
7    internal affairs case?
8        A.   Yes.  Generally, yes.
9        Q.   Okay.  And did you rely on those standards,
10   including the Chicago Police Department's standard, in
11   setting out the investigative actions that you would
12   expect to see in an internal affairs investigation?
13       A.   Yes.
14       Q.   Okay.  And I want to go, if we can -- give me
15   one second.  I'll tell you.  Okay.  I'm going to go to
16   page 39.  Dr. Shane, starting at page 39, you --
17   at lower case Roman -- or not Roman numeral -- lower case
18   f, you said, "Process Evaluation of CB" -- "CPD Personnel
19   Complaints."  Do you see that?
20       A.   Yes, I do.
21       Q.   Okay.  Did you review complaint register
22   files against those -- that standard or methodology that
23   you came up with of what should be in an internal affairs
24   complaint or investigation?  That was a terrible

290

1    question.
2        A.   Yes.
3        Q.   Okay.  Can you explain how you did that --
4    that process that you -- I know you laid it out, but if
5    you could explain how -- the methodology that you used.
6        A.   Well, the component pieces of an
7    investigation are things that you would find in either a
8    criminal or an administrative investigation.  Whether you
9    interview someone, whether you interview the victim,
10   whether you canvass the -- canvass the scene, those are
11   basic investigative elements that you'll find anywhere in
12   any investigation; so those are the standards that I
13   would expect to see having been completed as part of the
14   internal affairs process by Chicago Police Department.
15       Q.   Okay.  And you wrote here, "Tables 4 and 5
16   present the general recurring themes arising from the
17   content analysis of the internal investigation."  Now,
18   you use the -- the language "recurring themes."  Does
19   that mean you just sort of read through these and just
20   got a general sense of them, or did you do a granular
21   analysis of each complaint register investigation?
22       A.   No.  I did a granular analysis, each of which
23   is shown below in Tables 4 and 5.
24       Q.   Okay.  And did you examine every complaint

291

1    register investigation for the same categories of
2    investigative actions?
3        A.   Yes.
4        Q.   Okay.  And does Table 4 and 5 lay out
5    specifically the -- results of that process?
6        A.   That's correct.
7        Q.   Okay.  By the way, you mentioned this.  I
8    want to ask you -- you said -- you said -- strike that.
9             Would you agree that the fundamentals of
10   a thorough investigation -- the fundamentals.  I'm not
11   talking about whether technology is developed or any of
12   those things.  But the fundamentals of an investigation,
13   whether it's criminal, administrative, or otherwise, have
14   they remained the same, for the most part, over the last
15   half century?
16       A.   I would say yes, at least that long.
17       Q.   Okay.  All right.  I want to go to page 23.
18   Okay.  At lowercase e, you wrote, "General Observations
19   of the Chicago Police Complaint Data and the Supervisory
20   Process."  You have that as a -- as a heading italicized.
21   Do you see that?
22       A.   Yes.
23       Q.   Okay.  Can you tell me specifically what this
24   section identifies as -- well, strike that.

JON SHANE, 05/26/2023

292

1    When you said "general observations,"
2  again, do you mean, like, just hunches, or, you know,
3  what did you mean by "general observations"?
4    A.   I mean the ten things that are listed below
5  that the data revealed from the contents of the
6  investigations.
7    Q.   Okay.  And were your -- these observations
8  constitute your findings from looking at the data that
9  you reviewed and the additional materials you were
10 provided in determining whether the Chicago Police
11 Department had an internal affairs function that was
12 consistent with industry standards at the time?
13   A.   Yes.
14   Q.   Okay.  Okay.  I want to look at -- and I want
15 to look at them -- a couple of them real quickly,
16 including this Roman numeral i that says, "Failure to
17 Classify Personnel Complaints as Administrative or
18 Criminal."  Do you see that?
19   A.   Yes.
20   Q.   Okay.  So I believe that we looked at a
21 couple CR files in connection with this, and I do want to
22 go back to those real quickly.  But was it consistent
23 with industry standards at the time that an internal
24 affairs function would have a line of communication with

293

1  a prosecuting agency where allegations came into the
2  department concerning officer conduct that could be
3  construed as criminal in nature?
4    A.   Yes.
5    Q.   Okay.  And is it your opinion that the
6  Chicago Police Department, either in practice or in
7  policy -- however you want to put it -- did not have a
8  sufficient line of communication with the prosecuting
9  agency when a complaint was made against an officer that
10 could be construed, if true, as a criminal act?
11   MS. CARNEY:  Objection to form.
12   THE WITNESS:  Yes.  Sorry.  The answer is yes.
13 BY MS. BONJEAN:
14   Q.   Okay.  And I think the top, I guess, category
15 of allegations that you found in the data was assault;
16 correct?
17   A.   Can you repeat that?  I'm sorry.
18   Q.   Yeah.  The -- top or the highest number
19 of allegations that you found in the data that you were
20 provided and that you looked at, I should say, was, in
21 fact, a claim or allegation of an assault; correct?
22   A.   Yes.  That was the most frequently occurring
23 complaint, yes.
24   Q.   Okay.  Okay.  And I'm just trying to -- okay.

294

1    Haley, I want to -- let's pull up -- I'm
2  sorry.  I'm just trying to do this as efficiently as
3  possible.  I want to pull up -- let's pull up Complaint
4  Register Number 179835, which I think was Exhibit 8.
5    Okay.  I think you -- we looked at this
6  earlier.  This is the one regarding the -- Montilla's
7  shooting or off duty -- I don't know if it was off duty
8  or what.  It was a police shooting.  Do you remember this
9  one?
10   A.   Is this the one for excessive force or
11 unauthorized use of deadly force or something like that?
12   Q.   Yeah, I believe so.  I believe so.
13   A.   Okay.
14   Q.   Okay.  So -- hold on.  Let me pull it up
15 myself so I'm looking at the same thing.  Oh, I have it
16 here.
17   Okay.  Now, fair to say this complaint
18 register investigative file is 166 pages?
19   A.   Okay.  Yes.  I would agree with that.
20   Q.   Okay.  And I believe this is the one where
21 Theresa showed you a page where there was a name of a
22 state's attorney that was listed.  I'm going to find it
23 exactly.  Hold on one second.
24   A.   Yeah.  It was back a little further in that

295

1  document.
2    Q.   Okay.  The fact that there was simply the
3  name of a police officer listed in a mem -- or I'm sorry.
4  Strike that.
5    Does that fact that there was a name of a
6  state's attorney listed in some memo somewhere satisfy
7  you that the department, in connection with this
8  complaint register investigation, was meeting industry
9  standards in terms of its communication and consultation
10 with the prosecuting agency?
11   A.   No.
12   MS. CARNEY:  Objection.  Form.
13   THE WITNESS:  Sorry.
14 BY MS. BONJEAN:
15   Q.   Did you -- did you see anything in this -- at
16 least in this criminal -- strike that -- in this
17 complaint register investigation of coordination with the
18 prosecuting office or the Cook County State's Attorney's
19 Office about how this case should be handled?
20   A.   No, I did not.
21   Q.   And particularly with a police shooting case,
22 would you have expected to see that?
23   A.   Unequivocally, yes.
24   Q.   In fact, in the state of New Jersey, as an

JON SHANE, 05/26/2023

296

1    example, what happens in every police shooting case --
2    every last one?
3        A.    Well, do you want to talk about today or at
4    this time -- during this time?
5        Q.    No.  That's a good -- that's a good point.  I
6    guess, you know, today, every last one goes before a
7    grand jury; is that right?
8        A.    Yeah.  And today, the Attorney General's
9    Office has superceded local police departments and county
10   prosecutors' offices for deadly force investigations or
11   death investigations.  But at this time when police
12   shootings occurred, the local police department in
13   conjunction with the county prosecutor's office would
14   investigate this together --
15       Q.    Okay.
16       A.    -- and the county prosecutor's office would
17   provide the local police departments with the contents of
18   whatever it is they had done relative to the
19   investigation.
20       Q.    Okay.
21       A.    So the -- for example, the Newark Police
22   Department would have a complete -- a complete file --
23   internal affairs file including the documents from --
24   from the prosecutor.

297

1        Q.    Okay.  And I know Ms. Carney asked you a lot
2    of questions about whether you would expect to see the
3    prosecutor's file in here.  Putting aside whether the
4    complete prosecutor's file would have been here, would
5    you have expected to see communications or reports or
6    some type of documents that reflected consultation with
7    the State's Attorney's Office about how this case should
8    be treated?
9        MS. CARNEY:  Objection.  Form.
10       THE WITNESS:  Yes, unequivocally.
11       MS. CARNEY:  Asked and answered.
12   BY MS. BONJEAN:
13       Q.    Okay.  And did you see that?
14       A.    Well, let me just back up.  My answer was,
15   "Yes, unequivocally," to that previous question.
16             And then to your question about did I see
17   that, the answer is no.
18       Q.    Okay.  All right.  Let's go on then to, if we
19   could, I think it's exhibit -- it's Exhibit 4, which is
20   Complaint Register 223928, if you could pull that up,
21   Haley.  Thank you.
22             Okay.  And just to cut to the chase, this
23   is the sustained allegation as it relates to Detective
24   Guevara.  Do -- do you remember us discussing this CR?

298

1        A.    No.  Which -- which sustained complaint is
2    this one?
3        Q.    Okay.  So this is -- I'm going to represent
4    this is -- we're looking at Exhibit 4.  It's 223928.
5    It's sustained -- well, first, I'm going to have you look
6    at -- let's look at Bates stamp 3508, and if you need to
7    look at your report or something, let me know.
8             Okay.  Okay.  Yeah.  Just stop there.
9             Okay.  Do you see the -- the suspension
10   notification?
11       A.    Okay.  Yes, I do.
12       Q.    Okay.  And by the way, was it an industry
13   standard at the time that if a complaint register
14   resulted in some type of suspension, discipline, some
15   consequence in any way, it would be noted somewhere in
16   the internal affairs file or, in this case, what we call
17   the complaint register file?
18       A.    Yes, it would, absolutely.
19       MS. CARNEY:  Objection to form.
20       THE WITNESS:  Oh, sorry.
21       MS. CARNEY:  It's fine.
22       THE WITNESS:  The answer is, "Yes, absolutely."
23   BY MS. BONJEAN:
24       Q.    Okay.  Is it important that an internal

299

1    affairs investigation reflect what actually happened at
2    the conclusion of it?
3        A.    Well, when you say "actually" occurred, do
4    you mean the -- the incident or all of the component
5    pieces related to the investigation?
6        Q.    Okay.  Yeah.  Not a good question.
7             Is it -- was it important back in the
8    relevant time period -- and let's call it the early '90s
9    or late '80s -- that an internal affairs investigative
10   file or complaint register file reflect what the
11   department's formal position was in terms of the
12   officer's conduct and their response to it?
13       A.    Yes.
14       Q.    Okay.  Why is that, and was that important
15   back even during this relevant time period of the late
16   '80s/early '90s?
17       A.    Well, and it continues to be relevant today
18   because that establishes a full accounting of what
19   occurred, what responses the agency took to resolve that,
20   and what was done.
21       Q.    And in this particular CR file, it looks as
22   if there was a recommendation and notification that
23   Detective Reynaldo Guevara, while off duty, he engaged in
24   basically a domestic incident where there was an

JON SHANE, 05/26/2023

300

1  unjustified physical altercation with a female family
2  member.  He -- it looks like by striking her.  Do you see
3  that?
4     A.  Yes, I see that.  Uh-huh.
5     Q.  Okay.  Now, if this was anybody but Detective
6  Guevara, it was just a regular person, is this something
7  that is an arrestable offense?
8     MS. MCGRATH:  Objection to form.
9     MS. CARNEY:  Objection.  Form.
10  BY MS. BONJEAN:
11     Q.  Again, you know, we're going to -- strike
12  that, and let me start over and lay some better
13  foundation.
14       If a complaint came in and someone made
15  this allegation or called the police, 911, and made this
16  allegation, what would happen to the average person if
17  that happened even back in 1990?
18     A.  Well, if the police went to the scene and
19  they developed probable cause, they'd be arrested.
20     Q.  Okay.  And so this particular allegation was
21  sustained as to -- and I'm going to go -- well, strike
22  that.
23       You see there was a disciplinary
24  recommendation of -- for a suspension as to -- to

301

1  Guevara.  Do you see that?
2     A.  Where does it say that on this document?
3     Q.  Well, it says "Suspension notification.
4  Cause of disciplinary action recommended by OPS."  Do you
5  see that?
6     A.  Yeah, but I'm -- I'm just trying to follow
7  along here.  It says that they "Hereby suspends the above
8  member for 1 day."  Is that what you're -- is that what
9  you're referring --
10     Q.  Yeah, yeah.  I'm just saying --
11     A.  Oh, okay.  I'm sorry.
12     Q.  You see that; right?
13     A.  Yeah, yeah.  I see it.  Yeah.
14     Q.  Okay.  Now back to, I think, what we were
15  discussing earlier, did you see anything in this CR
16  investigative file that showed that the Chicago Police
17  Department OPS investigators consulted with the Cook
18  County Prosecutor's Office about whether or not Guevara
19  should be prosecuted for this crime?
20     A.  No, I did not.
21     Q.  Okay.  Now, I know that we looked at a
22  general offense case report, which is at page 3549.
23       Go ahead and go there.
24       Okay.  Now, I think -- I think Theresa

302

1  was asking you -- well, you can see that, you know,
2  the -- the victim in this case made a complaint.  In
3  fact, I think the other officers were disciplined for not
4  arresting him because of this complaint.  But my question
5  is the fact that the victim in this case went and made a
6  complaint that nobody acted on, is that the same as
7  internal affairs consulting with a prosecuting agency
8  about how this case should be handled?
9     MS. CARNEY:  Objection.  Form.
10     THE WITNESS:  No.
11     MR. ENGQUIST:  Objection to the --
12     THE WITNESS:  Sorry.
13     MR. ENGQUIST:  Objection to form.  Also
14  argumentative and leading -- leading nature in the
15  beginning.
16       But go ahead.
17     MS. BONJEAN:  Okay.  Well, fair enough, I suppose.
18  BY MS. BONJEAN:
19     Q.  First of all, did you see anything in --
20  apart from this, you know, that somebody made a
21  complaint -- it looks like the victim in this case -- did
22  you see anything in this file that showed that Detective
23  Guevara was actually investigated for having committed a
24  criminal offense by any -- by the prosecutors at all?

303

1     A.  No, I did not.
2     Q.  Okay.  And did you see any reports or memos
3  or any documentation that suggested that there was any
4  communication from the internal affairs investigators
5  with anyone in the Cook County Prosecutor's Office
6  saying, you know, "There was this complaint.  We have
7  sustained it.  What do you intend to do, or what do you
8  want to do," or anything that showed a line of
9  communication between the two agencies?
10     A.  I did not see anything --
11     MS. CARNEY:  Objection to form.  Asked and
12  answered.
13  BY MS. BONJEAN:
14     Q.  Go ahead.  You can answer.
15     A.  I did not see anything in that regard.
16     Q.  Do you have any reason to believe that just
17  because a complaint is made with a local precinct that
18  that automatically means that there's going to be a
19  criminal investigation conducted?
20     A.  No.
21     Q.  And by the way, I guess here's another
22  question.  Is it problematic that this complaint is being
23  made to the Chicago Police Department about a Chicago
24  police officer?  Well, let me ask you -- I'm sorry.  I'm

JON SHANE, 05/26/2023

304

1  going to ask you this question.  Strike that.
2          If a complaint comes in as a criminal
3  complaint, does the Chicago Police Department have an
4  obligation to investigate it criminally?
5      A.   Can you repeat that?  I'm sorry.  Please.
6      Q.   Yeah.  If -- if someone comes in and makes a
7  complaint with the Chicago Police Department, "I was
8  battered," do they have an obligation to actually do some
9  investigation on it?
10     A.   Yes.
11     Q.   Okay.  Not only did you not see any
12 communications with the Cook County Prosecutor's Office,
13 but did you see anything in this file that showed that,
14 apart from taking this complaint, the Chicago Police
15 Department did anything to even investigate her
16 allegation criminally?
17     MS. CARNEY:  Objection to form.
18     THE WITNESS:  No, I did not.
19 BY MS. BONJEAN:
20     Q.   Now, would you --
21     A.   No, I did not.
22     Q.   Okay.  And if there was a parallel internal
23 affairs investigation and a parallel criminal
24 investigation by the Chicago Police Department, even

305

1  within the same agency, would you expect there to be some
2  overlap or communications between those two divisions of
3  the same agency?
4      A.   Yes, I would.
5      Q.   Would you expect --
6      MS. CARNEY:  Belated -- sorry.  Belated objection
7  to form.
8  BY MS. BONJEAN:
9      Q.   Would this -- would you expect the CR file to
10 contain any supplemental reports or any types of
11 investigative reports that -- that were prepared in
12 connection with the criminal piece of the investigation?
13     A.   Yes, I would.
14     Q.   And, in fact, have you seen that in other
15 cases that you look at or other CRs where they actually
16 have included, like, an arrest report or supplemental
17 reports?  Some of the other CR files do have those
18 reports in -- contained in them?
19     A.   Yes, there are others.  Correct.
20     Q.   And did we see anything like this in
21 connection with the complaint against -- battery
22 complaint against Mr. Guevara?
23     A.   Not in this matter, no.
24     Q.   Okay.  All right.  Let's now look at I

306

1  think -- I think we're at -- I'm sorry.  Okay.  Okay.  I
2  think it's Exhibit 11, 237167.  I don't remember if
3  it's...
4      A.   Can you maximum that window, please?
5      MS. BONJEAN:  Yeah.  Haley, maximize the whole
6  thing.
7      THE WITNESS:  And then -- and then increase the
8  zoom, would you, please?
9      MS. BONJEAN:  Oh, I know what this one is.
10     THE WITNESS:  The -- the plus sign up at the top.
11 The plus sign.
12     MS. BONJEAN:  No, Haley.  The plus sign.  What are
13 you doing?
14     MS. COOLBAUGH:  I'm trying -- I'm trying to move
15 the bar at the top so I can access it.  Right now,
16 this -- it says I'm screen sharing.  It's in the way of
17 the plus sign, so give me one second.
18     MS. BONJEAN:  You're literal -- I don't even know
19 what you're doing right now.
20     THE WITNESS:  One more.
21 BY MS. BONJEAN:
22     Q.   Okay.
23     A.   All right.  That should be good.
24     Q.   Okay.  Okay.  This is Complaint Register

307

1  237167.  I think we looked at this one earlier and,
2  again, regarding Mr. Montilla.  Let's see.
3          Okay.  Let's go to page 4049 or Bates
4  stamp 4049 just to refresh Dr. Shane's recollection about
5  what the allegation is here.
6          Okay.  Okay.  Do you see this is an
7  allegation where the complainant alleged that Montilla
8  falsely testified before the grand jury?  Do you see
9  that?
10     A.   Yes.
11     Q.   Okay.  And I believe you were asked questions
12 about this CR file because you had determined there,
13 again, the Chicago Police Department wasn't
14 differentiating or -- between their administrative
15 investigation or a potential criminal investigation; is
16 that right?
17     A.   Yes.
18     Q.   And I think Theresa showed you some -- a -- I
19 don't know -- a report in here.  Maybe it was a memo.
20 I'm trying to find it.  Let me see.  One second.  That
21 essentially said, well, the -- the state's attorney knew
22 about it because the complaint was made, you know, by one
23 of the attorneys involved in the case.  Do you see that?
24     A.   I remember her saying that.

JON SHANE, 05/26/2023

308

1      Q.   Okay.  Okay.  So let's just assume that's
2   true.  Does your opinion change about whether or not the
3   Chicago Police Department's internal affairs function was
4   adequately treating this as a potential criminal
5   violation versus an administrative violation simply
6   because it happened to have occurred in criminal court?
7      MS. CARNEY:  Objection.  Form.
8      THE WITNESS:  No.  They didn't differentiate
9   between the two.
10  BY MS. BONJEAN:
11     Q.   Okay.  Is it -- and in your mind, is it
12  sufficient that to -- to satisfy your expectation in a
13  complete and thorough -- strike that.
14          For a complete and thorough internal
15  affairs investigation, you'd expect there to be
16  coordination and communication with the prosecutor's
17  office; right?
18     A.   Regarding criminal complaints, yes.
19     Q.   Yes, yes.  Thank you.
20     A.   Yes.
21     Q.   Is that satisfied simply because the state's
22  attorney happens to find out in some other way?
23     MS. CARNEY:  Objection.  Form.  Argumentative.
24     THE WITNESS:  No.  It could be some informality in

309

1   which it occurred.  That doesn't make it a formal
2   communique between the prosecutor's office and the -- and
3   the police department.
4   BY MS. BONJEAN:
5      Q.   Is it your opinion that, consistent with
6   industry standards, that part of an internal affairs
7   investigation should include a protocol by which there is
8   notification and communication with a prosecuting agency
9   where there is an allegation of potential criminal
10  conduct against a police officer?
11     A.   Yes.
12     Q.   And if it just happens to be that a state's
13  attorney or the prosecutor finds out in some other
14  manner, does that mean that the policy or that practice
15  is being complied with?
16     A.   No.  It's not a triggering condition if it's
17  found out informally.
18     Q.   All right.  All right.  Thank you.  We can
19  put that aside.  I'm getting there.  Okay.  I want to
20  have you look at -- hold on.  Give me one second.  Sorry.
21          Okay.  By the way, Dr. Shane, did you
22  also look at the 30(b)(6) deposition of Lieutenant Flores
23  in rendering your decision or opinions here in your
24  report?

310

1      A.   I did, yes.  Yes.
2      Q.   And at page 26 -- I think we went through
3   this; I just want to clarify -- you identified certain
4   investigative practices that you opine were necessary to
5   be consistent with industry practices or industry
6   standards; right?
7      A.   Can you repeat that, please?
8      Q.   Yeah.  At page -- starting at page 25 --
9          If you could pull it up, Haley, please,
10  his report -- Exhibit 3.  Okay.
11          Do you remember this portion of your --
12  your report that we looked at?
13     A.   Yes.
14     Q.   Okay.  And if we could go down to the next
15  page.
16          Okay.  And these investigate practices,
17  you identified; right?
18     A.   Yes.
19     Q.   Okay.  And these investigative practices that
20  you've identified, I believe you previously testified
21  that they were consistent with industry standards and
22  norms even in 1990; right?
23     A.   And before that, yes.
24     Q.   Right.  And are these generally the

311

1   investigative practices that you examined the CR files in
2   this case to determine whether they had been carried out?
3      A.   That's correct, yes.
4      Q.   Okay.  I'm not going to -- we went through
5   all that.  Let me -- let's go down to -- hold on -- okay.
6   I think page 29.
7          Okay.  You -- you opined that the
8   allegations in a complaint register file in Chicago were
9   not necessarily investigated against a defined customary
10  standard.  Do you see that?
11     A.   I see that, yes.
12     Q.   And I think relatedly --
13          We can scroll down.
14          -- but I think you also noted that -- at
15  page 32 that CPD data classifications did not follow a
16  consistent convention; right?
17     A.   I remember saying that, and I remember
18  writing it.  I don't know what the -- yeah.  That's --
19  that's --
20     Q.   Right in front of you.
21     A.   -- that's the exact title there, yeah, that
22  I'm looking at.
23     Q.   Okay.  So I want to go -- I want to focus in
24  a little bit on the -- this classification problem.  Not

JON SHANE, 05/26/2023

312

1  to beat a dead horse, but explain again as best you can
2  why a classification system is important for identifying
3  problem officers.
4        A.   Because when you --
5        MS. CARNEY:  Objection.  Form.  Asked and answered.
6              Sorry, Dr. Shane.  Go ahead.
7        THE WITNESS:  Sorry.
8              Because when you have a system in place
9  like they do here in Chicago which has been -- which has
10 been shown to us, you fragment the data.  And when you
11 fragment the data, it is spread across a larger landscape
12 of classification categories.  And when you have this
13 larger classification of categories, patterns don't
14 emerge as quickly as they would if you had a consistent
15 coding scheme to begin with.
16             So assaults and excessive force are two
17 different categories, and if they appear in two different
18 places, you need more of them to -- to -- to have a
19 pattern emerge.
20 BY MS. BONJEAN:
21       Q.   Right.  So in looking at -- I think we've
22 marked it previously --
23             Haley, could you bring up Exhibit 14?
24             And this is that complaint categories

313

1  table that internal affairs apparently used, I guess.
2  And hold on a second.  Okay.  You remember seeing this;
3  right?
4        A.   I do, yes.
5        Q.   Okay.  So I want to give you a hypothetical
6  and -- well, strike that.
7              First let me ask you do you see that
8  this -- this table appears to have sort of a group that
9  has a complaint category and then subgroups.  Do you see
10 that?
11       A.   Yes.
12       Q.   Okay.  Now, I guess my question is --
13 let's -- I want to give you a hypothetical.  A woman
14 comes in to internal affairs and complains that multiple
15 officers raided her home with no warrant, no probable
16 cause.  One of the officers struck her son.  Another
17 officer falsely arrested another son, and that same
18 officer slapped the mother in the face.  Okay?
19       A.   Yes.
20       Q.   Okay.  Now, looking at this complaint
21 category table that the Chicago Police Department has put
22 together, which group would you put all that in for this
23 complaint?
24       MS. CARNEY:  Objection.  Form.  Incomplete

314

1  hypothetical.
2  BY MS. BONJEAN:
3        Q.   Would you even know where to begin?  Let me
4  ask you that.
5        A.   Based on the way you've defined it, it could
6  go in -- in different places.  It could go under law --
7  unlawful entry.  It could go under assault.  It could go
8  under excessive force.  It could go under improper arrest
9  or unlawful arrest.
10       Q.   Right.  So just to drive home the point, this
11 could be a group 3.  It could be a civil rights
12 violation -- right? -- what I've just provided; correct?
13       A.   Yes, it could be.
14       Q.   It could be a group -- it could be a group 4;
15 correct?
16       A.   Yes, it could.
17       Q.   4D is a -- well, I guess there's a search.
18 It could be a group 5; correct?
19       A.   Well, it could be also 4B -- B, as in
20 "boy" -- arrest, improper.
21       Q.   Right.
22       A.   As well as the search that you were talking
23 about.
24       Q.   Right.  So my question is if a complaint

315

1  comes in to internal affairs or OPS that could qualify as
2  to any number of these categories and -- and would you
3  agree it could be different for each officer; right?
4        A.   Yes, it could be.  Sure.
5        Q.   And is it the duty of the Chicago Police
6  Department not just to keep data for data's sake but
7  actually to keep data to determine whether they have
8  officers who need intervention?
9        A.   Well, that -- that's the point of data to
10 begin with, which is to make decisions.
11       Q.   Right.
12       A.   You -- you collect data so you can make
13 decisions, and one of the decisions would be to intervene
14 in an -- in an officer's career that is exhibiting a
15 pattern of -- of adverse behavior.
16       Q.   Okay.  So if taking -- let's just take
17 Detective Guevara for a second.  Okay?  In your
18 supplemental report, I think you summarized at least
19 three complaints that -- would you agree? -- have a good
20 amount of similarity between them?
21       MS. CARNEY:  Objection.  Form.
22       THE WITNESS:  Well, there -- in the supplemental
23 report, there were two.
24

JON SHANE, 05/26/2023

316

1   BY MS. BONJEAN:
2       Q.   Oh, there were two?  Okay.
3       A.   There -- there were two.  Oh, I think -- oh,
4   I think what you're say -- where there were -- there were
5   three -- there were three complainants.  Is that what you
6   mean or do you mean...
7       Q.   I thought -- for some reason I thought the
8   supplemental report had three different CRs, but whatever
9   the case may be, would you agree that there are, at least
10  in Detective Guevara's complaint history -- I think
11  during the '80s, there were at least three complainants
12  who made allegations that involved essentially an assault
13  and then abusive -- or abusive language?
14      A.   At least that many.  There were -- there were
15  several assaults.
16      Q.   Okay.  So if -- if the internal affairs
17  division or OPS categorized one of those as 5D and one of
18  those as 1A and another as 3G -- okay? -- would a pattern
19  emerge very readily just based on those complaint
20  categories?
21      A.   No.  That's exactly what I was talking about
22  earlier.
23      Q.   Okay.  And yet they all involved some claim
24  of verbal abuse; right?

317

1       A.   Yes.
2       Q.   They all involved some claim of assault;
3   correct?
4       A.   Correct.
5       Q.   And they all would -- again, if found to be
6   the case, would at least be an allegation of a civil
7   rights violation; correct?
8       A.   Yes.  Sure.
9       Q.   And, Haley, scroll up.
10           They could also be a commission of a
11  crime which would be group 8; right?
12      A.   Yes.
13      Q.   Okay.  So if there isn't a -- if the
14  department lacks a procedure by which allegations get
15  categorized with the purpose of detecting patterns in
16  police behavior, would that, in your mind, be consistent
17  with industry practices or national industry standards
18  for police monitoring and discipline or supervision?
19      MS. CARNEY:  Object -- sorry.  Objection.  Form.
20  Outside the scope of his report.
21      MS. BONJEAN:  I mean, I don't think...
22  BY MS. BONJEAN:
23      Q.   You can answer.
24      A.   Can I answer?

318

1       MS. CARNEY:  You can answer.  Sorry.
2       THE WITNESS:  So the -- so the answer is -- I want
3   to make sure I understood you correctly.  The -- you want
4   a consistent coding scheme so a police supervisor or
5   police manager on -- as an end user can identify patterns
6   that are emerging based on the categories of offenses
7   that are coming in.
8   BY MS. BONJEAN:
9       Q.   Right.  And if you use a complaint category
10  table like the one that is here in Exhibit 14 -- okay? --
11  would you say that would lend itself to identifying those
12  patterns of police conduct that you're looking for?
13      A.   No.  It diffuses them.
14      Q.   All right.  And did you see any evidence in
15  the discovery record that you've been provided that any
16  internal affairs investigator was even trained in how to
17  use these complaint category tables?
18      A.   I did not, no.
19      Q.   In looking at the internal affairs complaints
20  that you looked at, did you see any rhyme or reason or
21  logic behind why something might be a group 8B versus a
22  5J or 5H or, you know, any number of categories it could
23  fall into?
24      MR. ENGQUIST:  Objection to the form.

319

1   Argumentative.
2       THE WITNESS:  I did not.
3   BY MS. BONJEAN:
4       Q.   Okay.  That may be all I have here.
5           Oh, let me ask you this.  And so when you
6   were doing your analysis and you had your allegation --
7   when you were coding for the allegations in your report;
8   right?
9       A.   Yes.
10      Q.   Okay.  The allegations -- I think you said
11  that you -- or strike that.
12           The categories of allegations that you
13  used, you derived them generally from the dispositions in
14  the complaint registers; is that right?
15      A.   Well, from the narrative of the
16  investigation.
17      Q.   Okay.
18      A.   What the investigators wrote.
19      Q.   Okay.  So it came from the narrative of what
20  the investigators wrote; right?
21      A.   Yes, correct.
22      Q.   So you were able to do that.  They could have
23  done it that way, too; right?
24      MS. CARNEY:  Objection.  Form.

JON SHANE, 05/26/2023

320

1    THE WITNESS:  Yes.
2  BY MS. BONJEAN:
3    Q.    They could've -- they could've categorized it
4  the way you categorized it?
5    A.    Yes.
6    Q.    They could've; right?
7       And did you see whether or not in any
8  materials you were provided that they -- that they used
9  categories that would allow the supervisory apparatus to
10  identify those officers that had a pattern of
11  particularly -- or a particular type of misconduct?
12    A.    No.
13    Q.    Okay.  So, for example, some officers have
14  problems with use of force; right?
15    A.    Yes.
16    Q.    Okay.  And that can be determined by the
17  number of excessive force complaints, use of force
18  reports; right?
19    A.    Complaints from people, observations from
20  supervisors, complaints from other police officers.  Yes.
21    Q.    Okay.  And whether an excessive force or an
22  assault happens to an arrestee or some guy driving down
23  the street, those might be factually different, but would
24  you agree that, ultimately, the relevant information for

321

1  the purpose of police management is that this is an
2  officer who uses physical force when he's not supposed
3  to?
4    MS. CARNEY:  Objection.  Form.
5    THE WITNESS:  That -- that's exactly what I'm
6  talking about.
7  BY MS. BONJEAN:
8    Q.    Okay.
9    A.    The -- the -- the high level management
10  practice is exactly that.  It's the fact that you've got
11  complaints against police officers for assault.  Now,
12  whether it happened on duty or off duty to an arrestee or
13  to someone in their house or in their car or on a
14  playground is -- is not necessarily the most important
15  thing.  What's important is that the officer's driving
16  complaints for use of force.
17    Q.    So, for instance, taking Detective Guevara as
18  an example.  When he was a patrol officer, he accrued a
19  number of complaints alleging assault, excessive force,
20  physical use of force that was unjustified; right?
21    A.    That's correct, yes.
22    Q.    Okay.  Now, you wouldn't necessarily expect
23  when he's a patrol officer to see an inappropriate use of
24  force in an interrogation room; right?

322

1    A.    You broke up a little bit.  Did you ask me if
2  I had -- if I would expect to see a use of force during
3  an interrogation?
4    Q.    No.  What I'm saying is for someone who is a
5  patrol officer -- okay? -- a patrol officer --
6    A.    Yeah.
7    Q.    -- would you expect to see that they would
8  have an assault or a claim of excessive force in the
9  course of a murder investigation in an interrogation
10  room?
11    MS. CARNEY:  Objection to form.
12    THE WITNESS:  No.
13  BY MS. BONJEAN:
14    Q.    Okay.  So my point is is Detective Guevara
15  also had allegations of coerced interrogations later on
16  in his career; right?
17    A.    Yes, he did.
18    Q.    Okay.  And would you agree that that's
19  because he was conducting interrogations when he was a
20  detective rather than a patrol officer?
21    A.    Yeah.  I think he was in an investigative
22  capacity, yes.
23    Q.    Okay.  So any reason to belie -- or strike
24  that.  Let me ask it this way.

323

1       As a -- if you're a supervisor or someone
2  in the chain of command at the Chicago Police Department,
3  would you be concerned that someone who's accrued
4  multiple assault or excessive force or unjustified uses
5  of force in their capacity as a patrol officer might use
6  that in their capacity as a detective later on if you
7  promote them, for instance?
8    MS. CARNEY:  Objection.  Form.  Incomplete
9  hypothetical.
10    THE WITNESS:  First, the answer is yes.  Second,
11  the answer is I outlined that very -- the answer to that
12  very question in my report.
13  BY MS. BONJEAN:
14    Q.    So --
15    A.    The answer is yes.  I would expect to see a
16  continued pattern because the behavior wasn't corrected
17  to begin with.
18    Q.    And whether -- whether unjustified use of
19  force is happening on the street during patrol or in
20  course of interrogations, would you agree that there's
21  still, again, a fundamental problem with an officer
22  willing to use force to achieve whatever means he wants
23  to depending on what his assignment is?
24    MS. CARNEY:  Objection to form.  Argumentative.

JON SHANE, 05/26/2023

324

1    THE WITNESS: I would -- my answer is yes. If
2    some -- someone is prone to using excessive force,
3    they're going to continue to do that if it's not
4    corrected.
5    BY MS. BONJEAN:
6    Q.    And just as another example, some police
7    officers have problems with stealing; right?
8    A.    Yes.
9    MS. CARNEY: Objection. Form.
10   BY MS. BONJEAN:
11   Q.    Okay. So for instance, in that, you might
12   see someone who has a whole bunch of irregularities in
13   their inventorying procedures; right?
14   A.    Yes.
15   Q.    They're -- sometimes officers will be
16   disciplined multiple times because they screwed up in
17   inventorying and something went missing; right?
18   MS. CARNEY: Objection. Form.
19   THE WITNESS: Yes.
20   BY MS. BONJEAN:
21   Q.    Okay. As a supervisor, a police officer who
22   continues to have problems inventorying evidence that
23   might have value, would that be something that you would
24   say -- that a -- either an early warning system or some

325

1    type of early identification system might say, "Aha," you
2    know. "We've got to look at this person a little more
3    closely for reasons other than just he doesn't know how
4    to inventory things"?
5    MS. CARNEY: Objection to form.
6    THE WITNESS: Yes.
7    MS. CARNEY: Incomplete hypothetical. Calls for
8    speculation.
9    BY MS. BONJEAN:
10   Q.    But in order to do that, do you have -- and
11   this is the point I'm trying to make. In order to do
12   that, is it dependent largely on a department having an
13   efficient and effective categorization procedure of
14   complaints when they come in from either civilians or
15   even from inside the department?
16   A.    The -- the answer is yes, and that should
17   also be coupled with the human element of supervision.
18   MS. BONJEAN: Right. Okay. All right. All right.
19   Let's take a one-minute break. I think I'm done.
20   THE VIDEOGRAPHER: Take a break? We're going off
21   the record at --
22   MS. BONJEAN: Yes. Yeah. Just one minute.
23   THE VIDEOGRAPHER: -- 3:06 p.m.
24   (Recess taken.)

326

1    THE VIDEOGRAPHER: This is the beginning of Media
2    Unit 5. We are going back on the video record at
3    3:09 p.m.
4    BY MS. BONJEAN:
5    Q.    Okay. Lastly -- I had it on my list, but I
6    forgot to get to it. I want to have you look at one of
7    the policies you've identified in your report. I believe
8    it's 83-3. It's a general order called Personnel
9    Concerns --
10   A.    Okay.
11   Q.    -- and did we mark this one?
12   MS. CARNEY: I did not.
13   MS. BONJEAN: Okay. So we'll mark it.
14   MS. CARNEY: That should be 18.
15   MS. COOLBAUGH: Yes. It's Exhibit 18.
16        (Deposition Exhibit Number 18,
17        Witness Shane, was marked for
18        identification 5/26/23.)
19   BY MS. BONJEAN:
20   Q.    Okay. Dr. Shane, is General Order 83-3 one
21   of the general orders you reviewed in connection with
22   your expert report?
23   A.    Yes, I did.
24   Q.    Okay. And is it one of the general records

327

1    that laid out certain standards against which you looked
2    to when examining the data in this case?
3    A.    Yes.
4    Q.    Okay. Now, I want to first ask you to look
5    at the definitions -- well, first, let's look at the
6    purpose of the order. It says to "establish Personnel
7    Concerns Programs for Department members." Do you see
8    that?
9    A.    Yes, I see it.
10   Q.    Okay. And then going down to the -- the
11   definitions, do you see that there is a definition for,
12   quote, "behavioral alert system"?
13   A.    Yes, I do.
14   Q.    And it talks about or defines it as "A
15   systematic review of a Department's member's behavior
16   pattern to alert supervisors to the need for an
17   intervention." Do you see that?
18   A.    Yes.
19   Q.    Okay. Are there -- would you say this is
20   akin to or sounds an awful lot like an early invention
21   system or an early warning system?
22   A.    It does, yes.
23   Q.    Okay. And --
24   A.    They're -- they're identifying some kind of

JON SHANE, 05/26/2023

328

1    process in place.
2        Q.   And -- and the purpose of the process is to
3    identify patterns; right?
4        A.   That's exactly correct, yes.
5        Q.   Okay.  And to alert supervisors of a need for
6    intervention with a particular member of the department;
7    right?
8        A.   Correct, yes.
9        Q.   And then there's also underneath that a
10   definition which talks about Personnel Concerns Program,
11   which says, "A program on intensive supervision of
12   Department members who have been designated as personnel
13   concerns."  Do you see that?
14       A.   Yes, I see that.
15       Q.   And then apparently, a member who is a
16   personnel concern is defined then in number C -- or
17   letter C, which says, "A Department member who has a
18   history of unacceptable performance and who has not been
19   responsive to repeated corrective efforts of supervisory
20   members," and, "This is a formal designation of a
21   Department member which is applied by the Director of
22   Personnel."  Do you see that?
23       A.   Yes.
24       Q.   All right.  And then there's some other

329

1    definitions that I'm sure you've looked at.  First, let
2    me ask this.  In the materials that you received, did you
3    see any evidence that Detective Guevara had ever been
4    identified as a department member who had a personnel
5    concern and needed Personnel Concerns Program?
6        MS. MCGRATH:  Objection to form.
7        THE WITNESS:  I did not.
8    BY MS. BONJEAN:
9        Q.   Okay.
10       A.   I did not.
11       Q.   Did you see any evidence in the records,
12   whether it be any of the CR files we looked at, any of
13   the memos, any of the material you were provided, any of
14   the histories of any of the defendant officers, or any --
15   that Detective Guevara, for example, had alerted the
16   behavioral alert system because of a pattern of behavior?
17       MS. MCGRATH:  Same objection.  Form.
18       THE WITNESS:  I did not see anything that triggered
19   the behavioral -- behavioral alert system.
20   BY MS. BONJEAN:
21       Q.   By the way, have you -- have you seen any --
22   other than this reference -- other than this policy
23   itself, have you ever seen any policies that -- in the
24   Chicago Police Department that elaborate on what the

330

1    behavioral alert system is, what it does, what it's
2    intended to do, how's it worked -- how it works, or
3    anything other than what's in this policy?
4        A.   I have not, no.
5        Q.   Okay.  Now going down to the general
6    responsibilities, which is Roman numeral IV, it indicates
7    here that the general responsibility of the
8    Administrators of the OPS will "review investigations
9    conducted by their office for patterns of behavior which
10   would warrant concern."  Do you see that?
11       A.   Yes, I do.
12       Q.   Okay.  Did you see anything in the materials
13   that you reviewed that administrators of OPS were, in
14   fact, reviewing investigations conducted by their office
15   for patterns of behavior which would warrant concern and
16   documenting that somewhere?
17       A.   I did not see that anywhere.
18       Q.   Did you see anything in the materials that
19   you provided overall that this policy was actually being
20   adhered to by the Chicago Police Department?
21       A.   I did not, no.
22       MS. BONJEAN:  Okay.  I have nothing further for
23   Dr. Shane.
24       MR. ENGQUIST:  I've got nothing based on that.

331

1        MS. CARNEY:  I have no additional questions.
2        MS. BONJEAN:  All right.  Okay.  Everybody enjoy
3    your weekend.  Jon, enjoy the beach.
4        THE WITNESS:  All right.
5        THE VIDEOGRAPHER:  All right.
6        (Simultaneous speaking.)
7        THE REPORTER:  Signature?
8        MS. BONJEAN:  Jon, you want to waive?
9        THE WITNESS:  What does that mean?  (Indicating.)
10       MS. BONJEAN:  Oh, you can -- you can -- you can --
11   you can review the deposition just to make sure the court
12   reporter got everything down right.  It doesn't -- you
13   can still get a copy of your deposition, but you can --
14   either way or --
15       THE WITNESS:  Well, if I find an error, I'll let --
16   I'll let somebody know but -- you know.
17       MS. BONJEAN:  Well, do you want to review -- you
18   want to review it in advance, or do you want to just
19   assume she got it right, or do you want to...
20       THE WITNESS:  No.  I'll assume she got it right.
21       MS. BONJEAN:  Okay.
22       THE WITNESS:  She's a professional.
23       MS. BONJEAN:  All right.  I mean, there's a
24   videographer here, too, so...

JON SHANE, 05/26/2023

332

1     THE WITNESS:  Yeah.

2     THE VIDEOGRAPHER:  All right.  I'll take us off.

3     MS. BONJEAN:  Okay.

4     THE VIDEOGRAPHER:  This concludes Media Unit 5 of

5  today's video deposition of Dr. Jon Shane.  We are going

6  off the video record at 3:16 p.m.

7             (The deposition concluded at

8                3:16 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

333

1

2          REPORTER'S CERTIFICATE

3     I, Riley A. Moran, do hereby certify that JON SHANE
   was duly sworn by me to testify the whole truth, that the
   foregoing deposition was recorded stenographically by me
4  and was reduced to computerized transcript under my
   direction, and that the said deposition constitutes a
5  true record of the testimony given by said witness.
6     I further certify that the reading and signing of
   the deposition was waived by the deponent.
7
     I further certify that I am not a relative or
8  employee or attorney or counsel of any of the parties, or
   a relative or employee of such attorney or counsel, or
9  financially interested directly or indirectly in this
   action.
10
     IN WITNESS WHEREOF, I have hereunto set my hand and
11 affixed my seal of office at Chicago, Illinois, this 8th
   day of June 2023.
12
13
14  _____
     Illinois CSR No. 084-004945
15
16
17
18
19
20
21
22
23
24