Exhibit G

LAW OFFICE
GABRIEL N. ALEXANDER

17000 WEST TEN MILE ROAD · SUITE 123   ·   SOUTHFIELD, MICHIGAN 48075   ·   (313) 552-9301

December 27, 1985

Kenyetta V. Haywood, Esquire
Labor Relations Department
Office of Corporation Counsel
121 North LaSalle Street
Chicago, Illinois 60602

Lee M. Burkey, Attorney
Asher, Pavalon, Gittler and Segall
Two North LaSalle Street
Chicago, Illinois 60602

Re: City of Chicago and F.O.P. (Case No. 710-83-04)

Dear Ms. Haywood and Mr. Burkey:

I transmit herewith my Decision in the above case. Distribution is being made as follows: one copy to Ms. Haywood, three copies to Mr. Burkey and one copy to Mr. Waldhier.

My invoice for fees and expenses is enclosed to F.O.P. in care of Mr. Burkey (per Section 9.5) with an information copy to Ms. Haywood.

Thanking you for your cooperation in this matter, I am

Yours very truly,

Gabriel N. Alexander

GNA/nh
Enc:

cc: Mr. Daniel E. Waldhier, Director
    Department of Police
    1121 S. State Street
    Chicago, Illinois 60605

RFC-Maysonet 048306

In the Arbitration between

The City of Chicago, Illinois
(Police Department)

            and

Lodge No. 7, Fraternal Order of
Police

Date:  December 27, 1985

Grievance No. 710-83-04

Discipline: Management; "Be-
havioral Alert (Counselling)
System", Just Cause.

- - - - - - - - - - - - - - - - - - -

OPINION EXPLAINING DECISION BY GABRIEL N. ALEXANDER, ARBITRATOR

### Introduction and Background

       Pursuant to arrangements and notice, this grievance dis-
pute was brought to hearing before me as Arbitrator in the City of
Chicago, Illinois on August 16, 1985.  Evidence was presented at
that time.  A stenographic record was made which was delivered to
me on October 2, 1985.  Arguments were submitted in post hearing
briefs received by me on October 25 (Lodge No. 7) and November 15
(City).

       Appearances are:  For Lodge No. 7, Lee M. Burkey (Asher,
Pavalon, Gittler and Segall) Chicago, Illinois.  For Chicago City,
Kenyetta V. Haywood, Assistant Corporation Counsel (Carol Poremba,
Assistant Corporation Counsel on the brief).

       Chicago recognizes Chicago Lodge No. 7, Fraternal Order
of Police as the collective bargaining agent for its sworn police
officers below the rank of Sergeant and has executed Agreements as
to conditions of employment.  Exhibit 1-Joint is the 1981-1983 Agree-
ment, the terms of which govern this grievance arbitration.

### Nature Of The Dispute And Positions Of The Parties

                                1.

       As hereinafter more fully described, this dispute concerns
the relationship between "Discipline" as provided for by the Collect-
ive Bargaining Agreement, and a procedure styled "Behavioral Alert Sys

as defined and authorized by Police Department General Order No. 83-3 effective 9 March, 1983.

The position of Lodge No. 7, in essence, is that the Behavioral Alert System (hereinafter the "System", or "BAS") generally, and the application of it to Officer James Bauer in September 1983, constitutes "discipline" which by force of Article 8, Section 8.1 of the Agreement may only be imposed for "just cause". F.O.P. contends further that the City did not have just cause to place Officer Bauer under the System.

Chicago suggests that there are four issues in the case, viz.

"A. Does General Order 83-3 establishing the Behavioral Alert System, violate the contract?

"B. Is General Order 83-3, the Behavioral Alert System, properly developed and promulgated, thereby satisfying the requisite reasonableness test for Employer rules and regulations?

"C. Does the Behavioral Alert System, an Employee Counseling Program, constitute discipline?

"D. Is the Behavioral Alert System, an Employee Counseling Program subject to the "Just Cause" Standard?"

2.

In 1973 the City promulgated a comprehensive set of "Rules and Regulations" for the governance of police department employes, which rules have been since amended. They are in evidence as Exhibit 3-City.

In 1983 the Police Department issued General Order 83-3, Exhibit 2-Joint under the subject title "Personnel Concerns". It is a lengthy document consisting of eight major divisions titled I. PURPOSE, II. DEFINITIONS, III. POLICY, IV. GENERAL RESPONSIBILITIES, V. BEHAVIORAL ALERT SYSTEM, VI. THE PERSONNEL CONCERNS PROGRAM, VII. SPECIFIC RESPONSIBILITIES-BEHAVIORAL ALERT SYSTEM, VIII. SPECIFIC RESPONSIBILITIES - PERSONNEL CONCERNS PROGRAM. Reproduced here are Divisions I, II, III, and IV thereof.

-2-

RFC-Maysonet 048308

I. PURPOSE

This order:

A. establishes the Personnel Concerns Program for Department members.

B. defines specific terms that pertain to the Personnel Concerns Program.

C. states Department policy relating to personnel concerns.

D. identifies general and specific responsibilities associated with the program.

E. establishes the positions of Personnel Concerns Supervisor and Personnel Concerns Program Manager.

II. DEFINITIONS

A. Behavioral Alert System - A systematic review of a Department member's behavior pattern to alert supervisors to the need for intervention.

B. Personnel Concerns Program - A program of intensive supervision of Department members who have been designated as personnel concerns.

C. Personnel Concern - A Department member who has a history of unacceptable performance and who has not been responsive to repeated corrective efforts of supervisory members. This is a formal designation of a Department member which is applied by the Director of Personnel.

D. Personnel Concerns Supervisor - A specially trained supervisor who has the responsibility to closely monitor, evaluate, guide and improve the performance of an assigned personnel concern.

E. Personnel Concerns Program Manager - A sworn supervisor designated by the Director of Personnel to coordinate and oversee the Personnel Concerns Program.

F. Personnel Concerns Conference - A meeting involving the unit commander of exempt rank, the watch/unit commanding officer, the Personnel Concerns Program Manager, a personnel concerns supervisor, and the member designated as a personnel concern. The Personnel Concerns Program Manager will present a written notification to the member designated as a personnel concern informing him of his deficiencies, status, and the fact that his future performance will be closely supervised in an attempt to assist the member to correct his problems. If improvement does not result, the necessary documentation will be provided for presentation to the Police Board.

III. POLICY

An essential element of an effective personnel management system is the early identification of members who engage in conduct which is contrary to the goals of the Department. Routine review of various Department records provides an effective means by which problem members can be identified. Once a member is identified as exhibiting unacceptable behavior, the available resources of the Department can then be directed toward correcting the problem behavior. As each individual will exhibit different behavioral problems, the strategy to address the member's shortcomings must be tailored to the specific problems he (she) is experiencing. The Behavioral Alert System and the Personnel Concerns Program are vehicles by which the Department can address these issues. THESE PROGRAMS ARE NOT INTENDED TO BE USED AS A SUBSTITUTE FOR DISCIPLINARY ACTION.

IV. GENERAL RESPONSIBILITIES

A. The Personnel Division is responsible for overseeing the Behavioral Alert System and Personnel Concerns Program and maintaining liaison with all Department units involved in dealing with Department members exhibiting unacceptable behavior.

B. The Administrators of the Office of Professional Standards will:

1. review investigations conducted by their office for patterns of behavior which would warrant concern.

2. notify the unit commander of exempt rank when a member of his command receives an excessive force complaint.

3. notify the Personnel Concerns Program Manager when their review of investigations identifies a member who has an unacceptable pattern of behavior.

C. The Internal Affairs Division will review disciplinary records to identify those members who display a pattern of behavior that requires further evaluation by the Personnel Concerns Program Manager.

RFC-Maysonet 048309

D. The Traffic Safety and Training Section will review the Department's fleet accident experience to identify patterns of member involvement that should be brought to the attention of the Personnel Concerns Program Manager.

E. The exempt unit commanding officer is responsible for monitoring the performance of all members of his command. In addition, he will direct and support the efforts of his supervisory subordinates in dealing with the problem member. He is further responsible for identifying those members who have not responded to the efforts of supervisory personnel and bringing them to the attention of the Personnel Concerns Program Manager. Exempt members will also be cognizant of the additional responsibilities of personnel concerns supervisors when making unit assignments.

F. Watch/unit commanding officers and supervisory members are responsible for the performance of their subordinates. The performance of all personnel will be continually monitored for both positive and negative aspects. Command and supervisory members are required to take the necessary actions to resolve unacceptable levels of performance. They will ensure that all available Department resources are utilized in this endeavor. The formal designation of a unit supervisor as a personnel concerns supervisor does not relieve other supervisory personnel of exercising their responsibility of taking proper action on transgressions they observe or which are brought to their attention. As future needs arise for personnel concerns supervisors, additional unit supervisors will be selected and trained.

G. The Training Division is responsible for the development of specific training programs to address the needs of the Personnel Concerns Program.

As recited in Paragraph IV. A., it is the Personnel Division of the Police Department (not the Operating (Command) Division) which bears the responsibility for overseeing the administration of the System and the Personnel Concerns Program. Information derived from a computerized personnel data bank is analyzed for indications of "problem" behavior, defined at Paragraph V. A.1 as behavior which "indicates that future disciplinary or performance problems may result unless corrective action is taken." "Behavior Alert Indicators" are defined at Paragraph V. A.2 and consist, among others of

"1. All excessive force complaints".

When an Officer is identified by BAS indicators his watch or unit commanding officer must,

3. meet with the member to discuss the apparent problem. The purpose of the meeting is to:

a. inform the member of the behavior that has been identified as unacceptable.

b. attempt to identify the causes of the member's behavior.

c. provide guidance to prevent recurrence of undesirable behavior.

d. advise the member of Department resources to assist him (e.g., Professional Counseling Service, Chaplain's Unit, Voluntary Medical Program).

e. determine if other action is warranted (i.e., change of partner, change of watch, change of duties).

f. advise the member that his future performance will be closely monitored and continued unacceptable behavior will not be tolerated.

Written records of such meetings must be prepared and kept on file for one year, after which (if no other BAS indicators surface) the

-4-

RFC-Maysonet 048310

record is destroyed. Otherwise (that is if new BAS indicators do
appear) the behavior problem is moved into the second, more rigor-
ous, phase styled "Personnel Concerns Program". Under "worst case"
conditions, that is with respect to an officer whose behavior con-
tinues to be unacceptable, the Personnel Concerns Program "provides
necessary documentation for the Police Board". (Paragraph VI. F.)
Police Board proceedings, appear to be universally regarded as an
instrument of discipline within the meaning of the collective bar-
gaining agreement.

### 3.

In September 1983, Officer James Bauer was summoned to a
BAS counselling session because excessive force complaints had been
lodged against him on ten or eleven occasions since June 1980. All
of those complaints had been investigated by the Police Department
and none of them were found to be valid. Nevertheless, pursuant to
the System, Officer Bauer was counselled by his superior, Police Lt.
Frank Radke in the latter's office about 11:00 a.m. on September 7,
1983. Lt. Radke testified about that session as follows,

> "Well, at first I explained to him what the Behavioral
> Alert indicator was for which I believe is 11 excessive
> force complaints made against him since 1980.

> "And I explained to him that the purpose of the counsel-
> ing session was to make him aware of the complaints --
> excessive force complaints made against him since that
> time and see if there could be possibly some way we could
> change his demeanor or his activity in handling these
> arrest situations that would not cause any other complaints.

> "And I explained to him what consequences that could occur
> if in fact any excessive force complaints were sustained
> against him.

> "I also explained to him that in reviewing the synopsis
> of these excessive force complaints, the -- there were
> two highlights that came to my attention immediately was
> -- first of all, they were all on-duty incidents, basic-
> ally all in arrest situations and some of these excessive
> force complaints were precipitated by the fact that there
> maybe had been verbal abuse used against the arrestees or
> members of the arrestees' families.

"I also brought out the fact that although he had been
working with the same partner several years, his partner
had not been a party to the excessive force Behavioral
Alert indicator. It was just him.

"And there was a possibility that if he changes his de-
meanor in some way, excessive force complaints would not
be made against him."

The file memorandum which Lt. Radke wrote reads in relevant
part as follows,

1. On 7 Sep 83 at 1100 hours Gang Crimes Specialists James
Bauer, star 15292 was counseled by the reporting lieutenant.
This was done in compliance with General Order 83-3, paragraph VII, A-3. He was told
that he has been the subject of a Behavioral Alert Indicator because there has been
eleven excessive force complaints made against him since 27 Jun 80. He was informed
that excessive force will not be tolerated by the Department and that if any allegatio
are sustained it could cause serious consequences for him. These consequences could
result in disciplinary action and the possibility of criminal charges placed against
him. He was told that his performance will be monitored by the supervisors of this
Unit and if any violations are observed they will be dealt with immediately.

Officer Bauer stated that none of the complaints made against
him have been proven. He says that in all these complaints he acted as a professional
police officer and felt it was wrong for the Department to use these false allegations
and attempt to ruin his reputation. He says that he has contact with citizens contin-
ually in his job and also makes numerous arrests. He says that these false allegation
are just a very small percentage to the amount of people he has contact with during
his tour of duty.

It was then re-emphasised that his performance is being monitor
closely and that if he does act as a professional police officer no irregularities wil
be observed. Officer Bauer's supervisors were informed of the Behavioral Alert Indica
and will monitor his activity.

Officer Bauer felt aggrieved by that counselling session
and its aftermath. It is undisputed that Bauer has an excellent
record as a police officer. He has 15 years of service in the de-
partment, four of which were in the Gang Crime South Unit. He is
the F.O.P. Unit representative. In recent years he has made on the
average between 200 and 300 arrests per year. He has never been
reprimanded or otherwise disciplined for misconduct as a police

RFC-Maysonet 048312

officer. As to the untoward aftermath, he testified that in the days and weeks following the September 7 counselling session.

> "...every sergeant in the unit would have conversation with me indicating that I was under close supervision and that if I was involved in another altercation or any type of complaint on the street that I'd probably be fired. Some of them said it kiddingly and others said it very seriously...

> "The impact it had on me was that it made me feel like I could no longer do my job." (R. 103)

In fact, no adverse employment consequences befell Grievant because of the counselling session. During the next twelve months no further System "indicators" manifested themselves, and the counselling file was destroyed.

**4.**

F.O.P.'s brief advances the following main contentions.

A. The Behavioral Alert System is the first step in disciplinary action, because by its terms (Paragraph V.A. 1.) one of its purposes is to notify officers whose behavior indicates that future disciplinary problems may arise and it is a preliminary step towards preparation of documents for Police Board proceedings.

B. Officer Bauer was placed under the Behavioral Alert System on the basis of a series of "unsubstantiated, unsustained or exonerated complaints" of excessive force, many of which were more than one year old, despite the restriction set forth in Section 8.4 of the collective bargaining agreement, which states

**Section 8.4 Use And Destruction Of File Material.**

Disciplinary Investigation Files, other than Police Board cases, will be destroyed by the Internal Affairs Division five (5) years after the date of the incident or the date upon which the violation is discovered, whichever is longer, unless the investigation relates to a matter which has been subject to either civil or criminal court litigation prior to the expiration of the five year period. In such instances, the Complaint Register case files normally will be destroyed five years after the date of the final court adjudication, unless a pattern of sustained infractions exists.

RFC-Maysonet 048313

> Any information of an adverse employment nature
> which may be contained in any unfounded, exonerated
> or otherwise not sustained file, shall not be used
> against the officer in any future proceedings.
>
> Any record of summary·punishment may be used
> for a period of time not to exceed one (1) year and
> shall thereafter not be used to support or as evidence
> of adverse employment action.

C.   The City acted in an arbitrary, capricious and unreasonable manner with respect to Officer Bauer because there are no defined fixed standards for the invocation of System proceedings·and in fact none of the excessive force complaints against Bauer were sustained.

D.   The nature of gang crime police work originates more false claims of excessive force than other categories of police work.

E.   The underlying purpose of the Behavioral Alert System is to avoid civil suits against the City of Chicago under Section 1983 of the Federal Code.   "It is obvious that the whole purpose of the Behavioral Alert System is to begin a disciplinary process that can be used by the Department as a defense in...suits...alleging excessive force or other improper conduct on the part of a police officer." (Brief, Page 7)

F.   James Bauer has an excellent record as a police officer.

5.

The relief requested by F.O.P. is that

"...the Arbitrator sustain the Union's grievance and further rule that Bauer be removed from the Behavioral Alert System and that all reference and records pertaining to his having been subjected to the System be removed from his file."

6.

Chicago's brief advances these principal contentions:

A.   General Order 83-3 establishing the Behavioral Alert System does not violate the Contract as it is a proper exercise of Management rights.   The System comes within the ambit of Chicago's

RFC-Maysonet 048314

right to establish, implement and maintain an effective internal control program as provided in Article 4, Paragraph L, as well as Paragraphs C, E and N of the Collective Bargaining Agreement. The system is an alternative to discipline in that it operates to detect symptoms of faulty behavior and to provide training or other corrective means so as to forestall if possible, resort to discipline. It is an internal control program to effectuate Police Department goals by constructive preventive measures.

B. The developement of the Behavioral Alert System satisfies the test of reasonableness for employer rules and regulations. The information relied on to implement the system is derived from routine department records and all documentation is kept outside of and away from police officers personnel files. Inasmuch as the System does not subject any employes to loss of pay, change in assignment, reprimand or suspension, it does not contravene the prohibition against use of unsubstantiated adverse information, as set forth in Article 8.4 of the Collective Bargaining Agreement.

C. Behavioral alert counselling does not constitute discipline, rather it is a system for constructive employee counselling.

D. Being not discipline, the System should not be judged by the just cause standard prescribed by Article 8, Paragraph 1 of the Collective Bargaining Agreement.

E. The System shields the City of Chicago from liability for failing to identify and address potential problem employe behavior. Under Federal law, Chicago as well as its officers may be held liable in civil damage suits for misconduct by police officers occasioned by improper or negligent training. The System is a constructive means of defense against such claims for both the officers and the City.

## Discussion and Conclusions

### 1.

Insofar as Officer Bauer is concerned, I perceive no pending issue of consequence. The evidence is uncontradicted to the effect that all files and documents pertaining to the Behavioral Alert counselling session to which he was subjected have been destroyed. That portion of the Union's request for relief has already been effectuated. If per chance it has not been, then certainly it must

-9-

RFC-Maysonet 048315

be, forthwith, on the basis of Chicago's own brief.

The other request for relief is that the grievance be
"granted". But the relief as requested in the original grievance
does not differ, and has already been, or forthwith shall be, ef-
fectuated. That is, any and all benefits lost by Officer Bauer
shall be restored and his System record shall be expunged, if it
has not already been expunged. No benefits were proved to have
been lost.

2.

I suppose all else in this opinion may be subsumed under
the heading of "dicta", not necessary for the resolution of Officer
Bauer's complaint. But patently it is the broader aspects of the
situation that moved the parties to write their lengthy briefs (39
pages from the City and a more concise 10 from the Union), and I am
disposed to respond succinctly, I hope, to those expressions of con-
cern.

3.

Looking only at the System as described in General Order
83-3, I would agree with the City that the System as therein defined
is not an instrument for the administration of discipline. Rather,
I would classify it as an instrument for the screening of problems
and the providing of advice and counsel to officers. Nothing in
the screening and consultation procedures can by itself result in
any loss of benefits by, or deterioration of personnel record of,
an officer.

But the System is not merely a separate isolated mechanism
for the counselling and training of officers. It is also a doorway
into the Personnel Concerns Program, which is defined in Paragraph
VI. A. as an "alternative" for dealing with officers who have not
responded to System treatment. And the Personnel Concerns Program,
it is clear (Paragraph VI. F.), is an adjunct to Police Board pro-
ceedings. One of the purposes of the P.C.P. is to provide documenta-
tion for Police Board proceedings. Thus, there exists a perceivable
nexus between the System and the acknowledged discipline system.
Should it follow that the System be struck down in its entirety?
I do not think so. The Collective Bargaining Agreement plainly con-
firms the City's (as Employer) right to set standards for officer

-10-

RFC-Maysonet 048316

performance (Article 4.(c)) to train officers (4.(e)) and to estab-
lish and maintain an internal control program (4.(l)). Moreover,
it is within the City's authority to impose discipline for miscon-
duct. The major limitation on that right is that just cause must
be proved for any challenged disciplinary action.

4.

The problem may also be analyzed from the disciplinary
point of view. Assuming that the interview and counselling steps
applied to Officer Bauer (or others similarly treated) does fall
within the category of discipline, the question arises whether "just
cause" existed for the measure imposed. I take it as axiomatic that
to be "just", cause for discharge must be more compelling than cause
for suspension, which in turn must be more compelling than cause for
reprimand or warning. Viewed in that light, "just cause" for a per-
sonnel session that is intended to be helpful need be only very
slightly compelling. And granting that the "Gang Crime Unit" duty
assignment is more likely to cause rough confrontations and use of
physical force than, say, the bad check detail, any police officer's
career might well be destroyed as a consequence of a jury verdict
against him on an excessive force damage suit under Federal Law.
The admitted fact that the City hopes and intends that civil damage
suits for improper police activity will be lessened as a consequence
of the System does not strengthen the Union's position, in my judge-
ment.

5.

The concerns here expressed by Chicago about the risks of
its exposure under Federal Law to civil suits for damages caused by
improper police behavior are, in my opinion, legitimate. The social
need for skilled police work has been given increased emphasis in
recent years, to a point where it may reasonably be asserted that
police officers not only must act professionally, but also must make
it appear that they are acting professionally.

If police officers act so as to make it appear that they
are using excessive force, they are inviting citizen complaints and
lawsuits. Therefore, in my opinion, it is reasonable for Chicago
to administer a plan such as the Behavioral Alert System to minimize
the appearance of excessive force, even on the assumption or findings
by the department (as in Bauer's case) that the use of excessive force
had not been proved.

-11-

RFC-Maysonet 048317

In that connection I note that during the twelve months following his counselling session, Officer Bauer was not again complained against for excessive force. Nothing in the evidence suggests that his overall performance deteriorated. Rather, the evidence shows that his most recent overall performance rating is the highest ever.

6.

I understand that other grievances are pending the outcome of this case. In denying this grievance I mean to hold only (1) that the System is not per se a contract violation and (2) that its application to Officer Bauer was not unjust. (I would add in that connection that Bauer's sense of aggrievement seems to have been brought on by the utterances of sergeants or others who were not themselves party to the System procedure. I sense the existence of a personnel problem in that area. Guidance counselling is not likely to be effective if "all the world" is notified that the subject is under guidance). I do not mean to pass judgement with respect to other circumstances of applying the system to other officers.

Decision

The Union's requests for relief are denied.

December 27, 1985

Gabriel N. Alexander, Arbitrator

-12-

RFC-Maysonet 048318