**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

| | | | |
|---|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | | |
| | ) | Case No. 18-cv-02342 | |
| Plaintiff | ) | | |
| | ) | | |
| vs. | ) | Honorable Mary M. Rowland | |
| | ) | Magistrate Judge Maria Valdez | |
| | ) | | |
| REYNALDO GUEVARA, et. al | ) | | |
| Defendants, | ) | | |

**DEFENDANT CITY OF CHICAGO'S *DAUBERT* MOTION TO BAR
<u>OPINIONS OF THOMAS J. TIDERINGTON</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

*DAUBERT* STANDARD ...................................................................................................... 3

ARGUMENT ........................................................................................................................ 4

   I.   TIDERINGTON'S OPINIONS LACK PROPER FOUNDATION. ......................................... 4

     a.  Tiderington has no foundation to discuss the *Jones* and *Palmer* litigation from the early 1980s. .................................................................................................................................. 5

     b.  Tiderington has no foundation to discuss the civil trials in *Fields, Rivera* or *Kluppelberg*. 7

     c.  Tiderington lacked a basic understanding of the opinions within his report. ....................... 8

     d.  There is no foundation for the statistical analysis in Tiderington's Report. ......................... 9

   II.  TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE HIS METHODOLOGY IS NON-EXISTENT. ..................................................................................... 11

     a.  Tiderington's opinions on "missing pages" from criminal defense files are not based on sound methodology and therefore unreliable. ........................................................................ 11

     b.  Tiderington's opinions that CPD's policies and practices relating to documentation and the use of GPR's is not based on any articulated methodology and should be barred. ....... 13

     c.  Tiderington's opinions that CPD's policies were not being followed are not based on any articulated methodology and should be barred ..................................................................... 14

     d.  Tiderington's opinion that CPD failed to train its detectives is based on flawed methodology ............................................................................................................................ 16

     e.  Tiderington's opinion that CPD detectives applied tunnel vision during homicide investigations is undeveloped and based on no articulated methodology. .......................... 17

   III. TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NOT HELPFUL TO THE JURY. ........................................................................................................ 17

CONCLUSION .................................................................................................................... 20

## <u>CASES</u>

*Agnew v. Cater,* 2022 U.S. Dist. 18734, (N.D. Ill. 2022) ........................................................ 14, 15

*Agnew v. Cater,* No. 3:18-CV-50035, 2022 WL 313756 (N.D. Ill. Feb. 2, 2022) ....................... 15

*Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ............................................... 18, 20

*Beaman v. Freesmyer,* 776 F.3d 500 (7th Cir. 2015) ................................................................. 14

*Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406 (N.D. Ill. Jan. 24, 2020) 12

*Braun Corp. v. Vantage Mobility Int'l, LLC,* 2010 WL 5287484 (N.D. Ind. June 21, 2010) ....... 11

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) ............................................... 18

*C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827 (7th Cir. 2015) ..................................................... 3

*Carroll v. Otis Elevator Co.,* 896 F.3d 210 (7th Cir. 1990) ............................................................. 5

*Clark v. Takata Corp.,* 192 F.3d 750 (7th Cir. 1999) ................................................................... 19

*City of Canton, OH v. Harris,* 489 U.S. 378, 397 (1989) ........................................................ 18, 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ............................................ 3

*Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 870 (E.D. Wis. 2010) ............................... 11

*Gayton v. McCoy,* 593 F.3d 610 (7th Cir. 2010) ........................................................................... 5

*General Electric v. Joiner,* 522 U.S. 136 (1997) .......................................................................... 16

*Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771 (7th Cir. 2017) ........................................ 2, 4

*Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994 (N.D. Ill. 2009) ................................ 21

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ............................................................. 6, 18

*Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919 (7th Cir. 2000) ..................................................... 18

*Lapsley v. Xtek, Inc.,* 689 F.3d 802 (7th Cir. 2012) ....................................................................... 4

*Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698 (7th Cir. 2009) ............................................ 3, 12

*Loeffel Steel Prods. V. Delta Brands,* 372 F.Supp.2d 1004 (N.D. Ill. 2005) ................................... 5

*Lurry v. City of Joliet*, No. 20 C 4545, 2023 WL 2138763 (N.D. Ill. Feb. 21, 2023) ................... 22

*Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152 (N.D. Ill. Mar. 12, 2024) ........... 14

*Myers v. Illinois Cent. R. Co.,* 629 F.3d 639 (7th Cir. 2010) .................................................... 1, 4

*Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013 (N.D. Ill. 2011) ................................. 6, 7, 8, 21

*Owens v. Auxilium Pharmaceuticals, Inc.,* 895 F.3d 971, 973 (7th Cir. 2018) ............................. 18

*Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ............................................................. 6

*Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ............................................................. 6

*Ruiz-Cortez v. City of Chicago,* 2016 WL 6270768 (N.D. Ill. Oct. 26, 2016) .............................. 15

*Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417 (N.D. Ill. June 11, 2015) .......... 19

*Smith v. Ford Motor Co.,* 215 F.3d 713 (7th Cir. 2000) ................................................................ 17

*Sommerfield v. City of Chicago,* 254 F.R.D 317 (N.D. Ill. 2008) .............................................. 6, 7

*State Farm Fire & Cas. Co. v. Electrolux Home Prods.,* 980 F. Supp. 2d 1031 (N.D. Ind. 2012) 11

*Thompson v. City of Chicago,* 472 F.3d 444 (7th Cir. 2006).......................................................... 22

*United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003)................................................................. 15

## **RULES**

Fed. R. Evid. 702 ............................................................................................................... 3, 4, 17

## INTRODUCTION

Plaintiff disclosed Thomas J. Tiderington as a police procedures expert to opine on the Chicago Police Department's ("CPD") policies and practices concerning documentation and disclosure of documents and information learned during homicide investigations. Expert Report, at Ex. A. Specifically, Tiderington claims to have been asked to assess "whether the Chicago Police Department's policies and practices related to documentation and notetaking, including the creation, preservation, and disclosure of investigative materials in homicide cases, were at the time adequate and consistent with acceptable police practices around the country." Ex. A at 2. Primarily based upon CPD's pre-1983 policies, Tiderington opines that (1) CPD's policies and practices concerning documentation and disclosure in homicide investigations are woefully inadequate and result in the routine failure to document and disclose the documents and information learned during the homicide investigation to criminal defendants, (2) that CPD failed to train its detectives on how to document, maintain and preserve impeaching or exculpatory material *and* failed to train detectives on how to conduct investigations free from tunnel vision and (3) that CPD's policies and practices related to documentation and the use of GPRs were not being followed. Ex. A at 33, 38, 51, 60; City's SOF at ¶4; Tiderington Deposition in *Maysonet v. Guevara,* Ex. B 300:17-301:6; 329:6-13.

Tiderington's opinions should be barred entirely as they are 1) nothing more than inferences that lack a foundation, and when tested, do not withstand scrutiny; 2) lack a reliable methodology, or any methodology for that matter, and instead are based on assumptions as well as data and information curated and provided to him by plaintiff's counsel from other litigation where he was retained to provide the same opinions; and 3) are not relevant. *See generally, Myers v.*

*Illinois Cent. R. Co.,* 629 F.3d 639, 644 (7th Cir. 2010) (internal quotation marks omitted); *see also Gopalratnam v. Hewlett-Packard Co.,* 877 F.3d 771, 779 (7th Cir. 2017).

## BACKGROUND

Tiderington's *Monell* opinions regarding CPD were first disclosed in January 2022, in the consolidated cases of *Solache v. Guevara, et. al,* 18-CV-2312 and *Reyes v. Guevara, et. al.,* 18-CV-1028.  Report in *Solache/Reyes,* Ex. C.  Since that time, and before tendering his opinions in this case, Tiderington provided nearly identical opinions regarding the City's policies and practices, relying upon nearly the same materials, in two additional cases involving Defendant Guevara, *Iglesias v. Guevara, et.al,* 19-CV-06508 and *Sierra v. Guevara et. al,* 18-CV-3029.  Ex. A at p. 11; Ex. B at 300:17-301:6.

Each of Tiderington's reports were prepared largely based upon two spreadsheets (Attachments E and F to this report) created by the law firm of Loevy & Loevy, ("L&L") and provided to him based upon information gathered from Investigative Files and Records Division Files (sometimes referred to as "RD Files" or "permanent retention files")(also collectively referred to as "homicide files") from homicides that were investigated by CPD Area 5 detectives from 1991-1998.  Ex. C at 388:20-24.  Despite relying almost exclusively on these spreadsheets to support his conclusions that the City had a policy of systemically failing to document and disclose exculpatory information (identified in Tiderington's Report as Opinion Number 4), Tiderington was not involved in the decision making or creation of either of the spreadsheets and does not know who or how many people were involved in their preparation.  Ex. C at 389:1-23.  Moreover, while he was provided with the homicide files from which the information contained in the spreadsheets were purportedly derived, he did not review all the files and only "spot-checked" them or "skimmed through" them.  Ex. B at 401:10-402:7.

Tiderington also generically opines that CPD failed to train its detectives on how to document, maintain and preserve impeaching or exculpatory material and that CPDs record keeping policies allowed CPD detectives to apply tunnel vision.  Ex. A at 35-37.  But those opinions are wholly undeveloped and are not supported by any data or derived from a reliable methodology.

## *DAUBERT* STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).  *Lewis v. CITGO Petroleum Corp.,* 561 F. 3d 698, 705 (7th Cir. 2009).  Trial judges act as gatekeepers to screen expert evidence for relevance and reliability.  *Daubert,* 509 U.S. at 589; *see also C.W. ex. rel. Wood v. Textron, Inc.,* 807 F.3d 827, 934 (7th Cir. 2015).  Under Rule 702, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  As recently emphasized by the Advisory Committee Notes to the 2023 Amendments to Rule 702, "[j]udicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support."  Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments.  The Court should "scrutinize proposed expert witness testimony to determine if it

has the same level of intellectual rigor that characterizes the practice of an expert in the relevant field so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.,* 689 F.3d 802, 805 (7th Cir. 2012) (internal quotations omitted).

The Court utilizes a three-part analysis when applying the *Daubert* framework to proposed Rule 702 evidence. The Court determines (1) "whether the witness is qualified;" (2) "whether the expert's methodology is scientifically reliable;" and (3) "whether the testimony will assist the trier of fact to understand the evidence or determine a fact in issue." *Myers v. Illinois Cent. R. Co.,* 629 F.3d, 644 (7th Cir. 2010) (internal quotations omitted); *see also Gopalratnam,* 877 F.3d at 779. The proponent of the expert bears the burden of demonstrating that the testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Gopalratnam,* 877 F.3d at 782; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

## ARGUMENT

### I.      TIDERINGTON'S OPINIONS LACK PROPER FOUNDATION.

Tiderington's report contains two main *Monell* opinions. First, Tiderington claims that CPD's policies and practices concerning the documentation and disclosure of investigative information in homicide investigations are woefully inadequate *and* resulted in the *routine* failure to document and disclose exculpatory documents and information learned during the homicide investigation to criminal defendants, (Opinion 4). Ex. A at 33. A sub-opinion, in Opinion 4 is that detectives were not trained on how to properly document, maintain and preserve impeaching and exculpatory material. *Id.* Second, Tiderington claims that CPDs policies and practices relating to documentation and use of GPRs were not being followed, (Opinion 5). Ex. A at 51. Finally, Tiderington's report includes a cursory opinion that CPD's policies and practices allowed for detectives to conduct their investigations using "tunnel vision." Ex. A at 35-37.

4

In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir. 2010), *quoting Carroll v. Otis Elevator Co.,* 896 F.3d 210, 212 (7th Cir. 1990). And when an expert bases his opinion on information supplied by another, the Court must focus on the reliability of the expert's foundation. *See Loeffel Steel Prods. V. Delta Brands,* 372 F.Supp.2d 1004, 1119 (N.D. Ill. 2005). Contrary to *Daubert's* requirement that expert testimony "rest[] on a reliable foundation," Tiderington's opinions, specifically Opinions 4 and 5 are almost entirely based upon data and information supplied to him by counsel from L&L. Tiderington's sub opinion, that there was a failure to train is based on a review of incomplete and cherry-picked materials. Whereas, Tiderington's tunnel vision opinion, which is not clearly delineated in his report, is not based on any facts or data.

   **a. Tiderington has no foundation to discuss the *Jones*[1] and *Palmer*[2] litigation from the early 1980s[3].**

To form the basis of Opinions 4 and 5, Tiderington opines that CPD had a "historic practice" of permitting detectives to "maintain street files" based upon his purported review and analysis of what he calls the "George Jones Case and the *Palmer* class action." However, Tiderington has no foundation to opine on either of these cases, or their impact on the policies and practices of CPD. Rather, his utter inability to answer the simplest questions regarding his "analysis" of those cases, and his concession that he learned the information about the cases from

---

[1] *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)
[2] *Palmer v. City of Chicago*, 755 F. 2d 560 (7th Cir. 1985) ("*Palmer I*") and *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir. 1987) ("*Palmer II*")
[3] A more complete history and the relevant context of these cases is discussed in the Memorandum of Law in Support of Defendant City of Chicago's Motion for Summary Judgment.

attorneys at L&L[4], leads to the conclusion that this section of his report, and the opinions that stem from it, rely on the summaries of the cases prepared by someone else within the Loevy & Loevy legal team and should be barred. *Obrycka v. City of Chicago,* 792 F. Supp. 2d 1013, 1026 (N.D. Ill. 2011) *citing Sommerfield v. City of Chicago,* 254 F.R.D 317 (N.D. Ill. 2008). When asked about both the *George Jones* and *Palmer* litigation during his deposition, Tiderington admitted that he did not read the *Palmer* case he cites to in any "specific detail." Ex. C at 447:4-15. Tiderington clarified in a later deposition that the summaries set forth in his report were "provided to him" in another "report" drafted by another expert, Mike Brasfield, retained by L&L in a different case. Ex. D, at 293:7-294:14. Though Tiderington was unable to identify which report he was referring to, both of Michael Brasfield's reports are attached to this report as Attachments G or H. But Tiderington also testified that he never had any discussion with Brasfield about his opinions, (Ex. C at 359:23-360:6), thus any information he learned about the *Jones* and *Palmer* cases discussed in Brasfield's reports could only come from reading those reports (whether Tiderington read Brasfield's 300 pages of reports himself or whether it was summarized for him by someone else).

Such uncritical reliance on summaries of information provided by a plaintiff's counsel was found to be impermissible in *Obrycka v. City of Chicago,* wherein the Court observed, an attorney's "single-minded devotion to a client's interests – which 'follows from the nature of our adversarial system of justice-is incompatible with the neutrality and evenhandedness that are necessary if a summarization of deposition testimony is to have the reliability of *Daubert* demands." 492 F. Supp. 2d 1013, 1025 (N.D. Ill. 2011) *citing Sommerfield,* 254 F.R.D. at 322 ("Acceptance of the notion that an expert can reasonably base his opinion on summaries of deposition testimony

---

[4] L&L represented Plaintiff Reyes, the first matter that Tiderington provided *Monell* opinions, as well as Plaintiff Iglesias and Plaintiff Sierra. Each of his reports in these cases included Opinion 4, which he testified were the same across all the cases, including this one. Ex. B 300:17-301:6; 329:6-13.

prepared by a party's lawyer would effectively eliminate *Daubert's* insistence that an expert's opinion be grounded on reliable information.")  The same can be said for Tiderington's blind reliance on the information provided to him by L&L regarding the history of the *Jones* and *Palmer* litigation.  While L&L appears to have produced to Tiderington the primary source documents that were summarized by either counsel themselves or another expert's report, it is clear based upon his inability to discuss the cases at his deposition that he did not review them himself nor did he understand their procedural history, relevance or ultimate findings.  In fact, Tiderington was strikingly unaware of the critical finding in *Palmer* that after the Seventh Circuit reversed the district court's temporary injunction, and the case was remanded, the class plaintiffs were provided an opportunity to review the "street files" and found nothing on which they could base a claim that "any member of the class had been convicted in violation of the constitution," meaning no exculpatory information.  *Palmer II,* 806 F.2d at 1317; Ex. C at 455:18-459:13.

Accordingly, the way Tiderington seems to have uncritically relied solely on the information provided to him by counsel in another case, which was without a doubt L&L's roadmap of the case, and then simply reproducing that information here does not provide a reliable foundation upon which Tiderington can rest his opinions and must be barred.  *Obrycka,* 792 F. Supp. 2d at 1026.

### b. Tiderington has no foundation to discuss the civil trials in *Fields, Rivera* or *Kluppelberg.*

Similarly, Tiderington lacks the foundation to opine on the civil trials in *Fields, Rivera* or *Kluppelberg,* including any purported comparisons drawn between his opinions and the expert opinions in those cases.  Tiderington testified that the only information he had regarding these cases came from reviewing Brasfield's reports in each case.  Ex. C at 384:7-14.  And while he knew that Brasfield reviewed certain information and spreadsheets, he was unable to answer any

questions regarding *what* Brasfield reviewed with any specificity.  In fact, at one point, Tiderington

testified that he believed he and Brasfield worked off the same spreadsheet. Ex. C at 387:1-15.

### c.  Tiderington lacked a basic understanding of the opinions within his report.

This is not the only portion of the report where Tiderington's testimony shows a complete

lack of familiarity with the subject matters discussed.  As another example, to support one of his

two global opinions that CPD had a practice of routinely failing to document information learned

during homicide investigations (Opinion 4), in connection with his report in *Solache/Reyes*,

Tiderington was asked to identify examples of cases identified in his report where detectives failed

to document information they learned during the course of a homicide investigation.  Ex. C at

426:18-427:14.  He identified the RD numbers listed at page 50 of his *Solache/Reyes* report. (*Id*.)

He also identified the spreadsheet, Attachment E, (Ex. C at 428:12-21), but acknowledged that the

spreadsheet does not have a "failure to document" column.  Ex. C at 428:22-429:5.  More

significantly, however, contrary to Tiderington's deposition testimony, the RD numbers listed at

page 50 of his *Solache/Reyes* report are not examples of a failure to document information learned

during a homicide investigation.  Rather, the RD numbers listed at those pages purport to be

examples of:

> [I]nventory sheets [that] do not appear to be contemporaneously updated as each new document is added to the file. Instead, documents were routinely added in bunches, with significant time delays from when the document was created. In addition, there are other ways in which they were simply not useful for their intended purpose of serving as a cross-reference: there are examples where dates are illegible, where dates do not appear at all, where the person who entered the document is not listed, and where the entries are too vague to be able to tell what document it is referring to (e.g., "GPRs," without identifying how many or which dates, etc.).

While the criticism regarding inventory sheets remains in Tiderington's report in this case,

the RD numbers cited as examples do not, an apparent concession that the purported examples

cited were not what he understood them to be and eliminating that data as evidence from which he could conclude that CPD had a practice of failing to document.

Additionally, the analysis of the inventory sheets provides an example of the methodological flaw that permeates Tiderington's report and opinions. Tiderington notes that, "I found that 277 investigative files, approximately 81% of total investigative files, contained inventory sheets that were incomplete.[5]" Ex. A at p. 57. Yet, Tiderington conceded that he, "Certainly [] didn't look at 277, but that's something that was spot-checked and is reflected in the spreadsheet." Ex. C at 503:13-20. But, as will be further discussed *infra* in § I,d., the spreadsheet provides no column tallies, so it is impossible for Tiderington to have looked at the column of the spreadsheet that identified files that contained incomplete inventory sheets to determine that there were 277 of them. And, significantly, Tiderington did not know who created the spreadsheets or how those unknown persons determined that any given inventory sheet was "incomplete." Ex. C 503:21-504:1. Thus, as explained below, any information gleaned from the spreadsheet on this or any other topic in his report is unreliable.

**d. There is no foundation for the statistical analysis in Tiderington's Report.**

As outlined above, Tiderington comes to his conclusions regarding CPD's file keeping practices, specifically Opinion 4, through his purported review and analysis of two spreadsheets, containing over 18,000 separate cells of data. Even though these spreadsheets contain no statistical analysis, percentages, or even tallies, Tiderington testified at his deposition in the *Sierra* case that any of the statistical analysis or numbers identified in his report came from the spreadsheets that were provided by L&L. Ex. E at 367:13-368:1. Specifically, Tiderington's report purports to draw statistical conclusions or tally certain data, which he terms his "findings" on at least 14 different

---

[5] These same findings appear in in Tiderington's report across all cases.

datapoints from the 1991-1995 spreadsheet, and even more from the 1995-1998 spreadsheet. For example, his report states that for the time period of 1991-1995, "Only 424 of the 474 investigative files contained handwritten notes; of those, 213 of the 424 files, or approximately 50%, contained handwritten notes not on GPRs." Ex. A at p. 56. The report further states that for the period of 1991-1995: "47 of the files, or approximately 10%, contained to-from memos not on official police forms." Ex. A at p. 56. He also includes similar "findings" for the years 1995-1998. These types of "findings," that analyze in some way the data that is recorded in the spreadsheets, permeate Tiderington's report. Ex. A at p. 56-57, 59.

But, without access to the spreadsheets in their native format, which, as discussed below, Tiderington did not have, it strains credulity to believe that Tiderington was able to draw any of the statistical conclusions that his report purports to make. Moreover, he admits that he only "did spot checks on probably 30 or 40 cases[]" from the 1991-1998 set though he does not know which cases those were, and he "certainly didn't check every file[]". Ex. E 286:13-14. Moreover, Tiderington does not know anything about the coders. He does not know who they are, how many there were and was not involved in any of the decision making related to the coding. Ex. C at 389:19-23. This renders his statistical analysis unreliable and justifies excluding his opinions that rely on this information. *See, State Farm Fire & Cas. Co. v. Electrolux Home Prods.,* 980 F. Supp. 2d 1031, 1049 (N.D. Ind. 2012). *See also, Fail-Safe, LLC v. A.O. Smith Corp.,* 744 F. Supp. 2d 870, 887 (E.D. Wis. 2010)(stating that the defendant's expert's reliance on the defendant's own data, which he did not independently verify, rendered his opinion unreliable); *Braun Corp. v. Vantage Mobility Int'l, LLC,* 2010 WL 5287484, at *7 (N.D. Ind. June 21, 2010)(recommending exclusion of the portions of the defendant's expert's opinion replying on a histogram prepared by

the defendant where the expert used it without verifying or reviewing the underlying information), *report & recommendation adopted,* 2010 WL 5279974 (N.D. Ind. Dec. 17, 2010).

## II.     TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE HIS METHODOLOGY IS NON-EXISTENT.

Even if Tiderington's opinions were supported by the proper foundation, his methodology is not only unreliable, but also non-existent. The Court must ensure that a proposed expert's methodology is "scientifically valid" and that his conclusions are "based on sufficient facts or data." *Bogathy v. Union Pac. R.R.*, 2020 No. 17-CV-4290, 2020 WL 419406, at *4 (N.D. Ill. Jan. 24, 2020). The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir. 2009). Considering Tiderington's own testimony, that he, in fact, did not utilize "any great methodology" when it came to the review of the hundreds of files he was tasked with reviewing, Plaintiff will be unable to satisfy that burden. Ex. B at 403:1-8.

### a.  Tiderington's opinions on "missing pages" from criminal defense files are not based on sound methodology and therefore unreliable.

In this case, Tiderington opined that his review of five files[6] identified at pages 63-66 of his report demonstrate that certain documents contained in CPD Investigative Files were "withheld" from criminal defendants. Tiderington claims to have done a "case by case" analysis of "what documents are included in the police investigative files but are *missing from criminal defense files[]"* by comparing the investigative files to the corresponding defense attorney files, specifically files produced by the Cook County Public Defender's Office ("CCPDO"). Ex. A at p. 63. At the outset, the CCPDO undermined the foundational assumption that underlies Tiderington's stated methodology: specifically, that by comparing the investigative files to the

---

[6] Each of these files were identified in previous reports issued by Tiderington as the basis for Opinion 4.

CCPDO files one could determine whether documents from the investigative file had been produced. The CCPDO acknowledged that "when its attorneys were creating and maintaining files in the 1990's, those attorneys would not have been carefully maintaining the content of those files for the benefit of civil litigants, who might want to search through their closed files thirty years later." CCPDO's Reply Brief in *Velez v. City of Chicago,* as Ex. F. Tiderington himself acknowledged this phenomenon in his report, when he noted that several CCPDO files contained "no police documents," while others had some records, though appeared to be partial or incomplete."[7] Ex. A at p. 61, fn. 112. Tiderington's admission supports the CCPDO's concession and Tiderington cites to no evidence to establish that the files are in the same condition as they were during the time of the criminal proceedings, and therefore, renders any comparison devoid of any evidentiary meaning.

Finally, and most critically, Tiderington failed to review *any* of the available Cook County State's Attorney's Office ("CCSAO") files available for comparison. Ex. C at 658:7-20. And while he learned of the existence of the CCSAO files in October 2022, he did not analyze them despite his concession that if all the materials in the police department investigative files were turned over to the CCSAO, then "that would have been proper and reasonable conduct on the part of the investigators." Ex. C at 660:7-18.

As such, any comparison to a defense file that ignores available CCSAO files is for naught, because if CPD disclosed all its investigative documents for a case to the CCSAO, and the CCSAO did not, in turn, disclose those documents to the criminal defense attorney, the fault would be with

---

[7] Despite recognizing certain files were partial or incomplete, Tiderington continued to use those files as the basis for his opinion that information was withheld from the criminal defense attorneys. Specifically, Tiderington opines that a multitude of documents were "not disclosed" to the criminal defense team for Linox Jackson, yet, upon review of the CCPDO file, Tiderington admitted that the file had *no* police reports contained within it, and therefore, should not have been used for his assessment. Ex. C at 631:22-632:22.

the CCSAO not CPD. *Beaman v. Freesmyer,* 776 F.3d 500, 512 (7th Cir. 2015) (police officer's *Brady* obligations are discharged by disclosing material, exculpatory evidence to the prosecutor, for it's the prosecutor's responsibility to turn the evidence over to defense counsel); *Mims v. City of Chicago*, No. 18-cv-7192, 2024 WL 1075152, at *8 (N.D. Ill. Mar. 12, 2024) (Police must disclose exculpatory evidence to the prosecutor so that they can disclose the evidence to the defendant).

Tiderington's methodology is so flawed, that it is exactly the type of opinion that *Daubert* and its gatekeeping requirement is designed to keep from the jury. *Agnew v. Cater,* 2022 U.S. Dist. 18734, *8 (N.D. Ill. 2022). Specifically, these opinions are why "it's called 'gatekeeping' and not 'clean up.' The function keeps opinions from being introduced to the factfinder in the first place." *Id.* There is simply too great an analytical gap between the handful of files Tiderington reviewed and the conclusions he drew from that review. *See Ruiz-Cortez v. City of Chicago,* 2016 WL 6270768, at *26 (N.D. Ill. Oct. 26, 2016) (Leinenweber, J.) (expert's misalignment of data makes link between fact and conclusions too tenuous to accept expert's opinion); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (there must be "some link between the facts or data the expert has worked with and the conclusions the expert's testimony is intended to support"). And as such, it is precisely the type of opinions the Court must bar in order to "prevent expert testimony from carrying more weight with the jury than it deserves." *Agnew v. Cater*, No. 3:18-CV-50035, 2022 WL 313756, at *5 (N.D. Ill. Feb. 2, 2022).

> **b. Tiderington's opinions that CPD's policies and practices relating to documentation and the use of GPR's is not based on any articulated methodology and should be barred.**

Tiderington opined that his review of files from 1987-1990 revealed that CPD failed to follow its own policies related to the use of GPRs. Ex. A at 51. However, this opinion is, per his

own admission, based purely on his own say so. Tiderington's report includes a list of nine items that he considers important "case documentation" that should be included in files related to criminal investigations. Ex. A at 51. Tiderington testified that this list simply came from his "years of experience" and could not identify any document or policy from which he created it. Ex. B at 329:14-330:18. When asked about specific documents he opined should be included, such as a "24-hour report" or a "5-day supplemental report," he conceded that those were "his terms" and not terms that were used within CPD or any other identifiable department. Ex. B at 333:7-334:3.

Tiderington further opines that because he reviewed a certain proportion of investigative files that did not have any GPRs, there must have been a "street file[8]" for that case. Ex. A at 52. When asked the what his basis was for that opinion, he stated as a matter of fact "there had to be something[]" because "how else would detectives been able to remember phone numbers, addresses, dates of birth." Ex. B at 338:16-339:3. Based upon his own assumptions, he testified that "it [was] only logical to conclude that there had to have been some other folder, file kept elsewhere that contained this information. Ex. B at 339:9-14. Such circular reasoning shows the inherent flaws with his methodology, which is simply, it must have been because I said so. *General Electric v. Joiner,* 522 U.S. 136, 146 (1997)( "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."

### c. Tiderington's opinions that CPD's policies were not being followed are not based on any articulated methodology and should be barred.

Tiderington also opined that his analysis revealed that CPD's policies generally were "not being followed." Ex. A at p. 55. Tiderington claims that through this review, he was able to

---

[8] Notably, Tiderington testified that he viewed a "street file" as a file that detectives viewed as their personal belongings and felt that they did not have to follow CPD policies. Ex. B at 335:18-336:3.

establish certain statistical "findings" to support this conclusion. Specifically, he claims that 1) a certain percentage of files contained handwritten notes, showing that handwritten notes, not on general progress reports ("GPRs") were still routinely used; 2) a certain percentage of files contained to-from memos, showing that to-from memos were still being used; and 3) a certain percentage of files had missing or incomplete inventory sheets. Ex. A at p. 56-57. However, Tiderington's only explanation for how he arrived at these tallies and percentages is that he "used the spreadsheets." Ex. E at 286:22-288:4. And, there is simply no way he could have utilized the spreadsheet to do so if he only was provided a hard copy or pdf version. An expert cannot "waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

As outlined *supra* at Section I (d), Tiderington admits that all the statistical analysis and tallies that are identified in his report derive from the spreadsheets prepared and provided by L&L. The 1991-1995 spreadsheet is 69 pages long and contains 496 rows and 17 columns of data for a total of 8,432 separate lines of data. (Ex. F to his report). The1995-1998 spreadsheet is 53 pages long and contains 349 rows and 28 columns of data for a total of 9,772 separate lines of data. (Ex. E to his report). Tiderington could not remember if he received the spreadsheets in excel but testified that he did not manipulate the data and did not do his own calculations. Ex. E at 284:11-285:9; 286:15-20. It strains credibility to think that Tiderington physically flipped through these "hard copy large pages" to manually count cells to calculate the 17 plus different data points contained within his report. Not only would it have been incredibly tedious and time-consuming task that Tiderington could not have accomplished in the time he spent preparing his report[9], but

---

[9] Tiderington billed a total of 113.75 hours in connection with the reports that form the basis for Opinion 4. These two reports were his first time analyzing the spreadsheets attached as Attachments E and F. City of Chicago's SOF at ¶¶ 27-28. Tiderington billed 87.65 for his work on *this* case, which includes 22.55 hours

it would have been impossible to do so in a methodologically sound manner. If Tiderington manually counted the cells to calculate the data points, there is simply no way for him to establish that the calculations are accurate. He could not have implemented any quality control over a manual count of over 18,000 separate cells of data. And if he didn't manually count the data to calculate the data points, who did? An "expert's work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff – deploying neither data nor analysis – is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.,* 217 F.3d 919, 924 (7th Cir. 2000).

### d. Tiderington's opinion that CPD failed to train its detectives is based on flawed methodology.

Contained within Opinion 4 is a cursory sub-opinion that CPD failed to train its detectives on its policies related to its record keeping, specifically, documentation, maintenance and preserving impeaching or exculpatory material. Ex. A at 33. However, this opinion is based on flawed methodology, specifically, Tiderington's failure to analyze *any* training that occurred after the implementation policy changes after *Jones* and *Palmer* in 1983. Ex. A at 50. But reliance solely on events that pre-date Plaintiff's arrest by seven years is too remote in time to support such opinions. *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1148-50 (N.D. Ill. 2022) (noting that reports concerning events substantially before or after the events at issue were "immaterial" to *Monell* claim analysis).

Tiderington's report fails to take into account training that occurred with the implementation of superseding policies such as the 1986 directive or the Standard Operating Procedure that was issued in 1988. Ex. A at 50-51. Moreover, despite including training records

___

on his review of the 1987-1990 files that were produced. *Id.* at ¶30. A more detailed breakdown of the time Tiderington billed to his analysis and report writing is included in the City's SOF at ¶¶27-30.

in his list of materials reviewed, his report does not address those records in any way. Nor does it address daily roll call training, the new detective training or the pre-detective training provided as directives were implemented. Ex. A at 50. Such deliberate disregard of the documentation and evidence shows Tiderington's flawed methodology, by providing only an ultimate conclusion with no analysis. *Clark v. Takata Corp.,* 192 F.3d 750, 757 (7th Cir. 1999) ("An expert must substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless.")

> **e. Tiderington's opinion that CPD detectives applied tunnel vision during homicide investigations is undeveloped and based on no articulated methodology.**

Finally, Tiderington's report contains a passing opinion that CPD's policies related to record keeping allowed for detectives to apply tunnel vision during homicide investigations. But this opinion is so lacking in any methodology it is easily missed within the report. In fact, other than his criticisms of the detectives in regard to the investigation into Plaintiff, Tiderington does not rely on *any* articulated methodology to extrapolate these opinions to a CPD practice, and must be barred. *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015) (Plaintiff must present proof of a series of constitutional violations – as well as specific facts regarding the violations – rather than isolated acts of misconduct.).

## III. TIDERINGTON'S OPINIONS SHOULD BE EXCLUDED BECAUSE THEY ARE NOT HELPFUL TO THE JURY.

Expert testimony that is not helpful to the jury is excluded. Fed. R. Evid. 702. And Rule 403 excludes testimony where the potential prejudice of the evidence outweighs the probative value. In this case, Plaintiff claims that the City had notice of a widespread practice by officers within the CPD of not recording investigative information in police reports, disclosing investigative materials to prosecutors and criminal defendants, conducting investigations with tunnel vision and that CPD failed to train its officers on its policies related to its record keeping.

17

Presumably, Plaintiff intends to argue that CPD maintained a "street file" practice during the time of the underlying criminal investigation which led to Plaintiff's arrest and prosecution because (1) of CPD's purported "history" of a "street files practice;" (2) because CPD policies were not being complied with; (3) and because his "review" of criminal defense files showed documents were "regularly withheld" from criminal defendants. Yet, Tiderington cannot identify any documents that were *created* and then *withheld* from the Plaintiff during his criminal prosecution. Accordingly, Tiderington' s opinions cannot establish a causal link between Plaintiff's alleged constitutional violations and this particular *Monell* theory. *See City of Canton, OH v. Harris*, 489 U.S. 378, 397 (1989); *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997). His opinions, therefore, are wholly disconnected from the claim at issue in the case. *See Owens v. Auxilium Pharmaceuticals, Inc.,* 895 F.3d 971, 973 (7th Cir. 2018) (expert opinion testimony does not help the jury understand the evidence or decide an issue in the case when it does not fit the facts of the case).

Starting with CPD's purported "history" of a street files practice, Tiderington attempts to draw a similarity between this case and the information he purports was not documented and therefore not disclosed with the file that was subject to the litigation in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). However, Tiderington's one sided and incomplete dissertation of the history of the *Jones* and *Palmer* litigation is irrelevant to whether Plaintiff suffered a constitutional violation based on CPDs record keeping policies. Moreover, Tiderington provides no evidentiary support for his opinions regarding what policies *should* have been in place during the 1987-1990 time period. In fact, Tiderington's opinions regarding what he has deemed to be "standard police practices" related to a "centralized repository" to collect and store investigative information are

generally *ipse dixit* in its purest form – assertions made but not substantiated – and are *per se* unreliable. *Obrycka,* 492 F. Supp. 2d at 1026.

Next, Tiderington opines that CPD policies were not being complied with and that CPD failed to train its detectives on those policies, and as a result, there was a "failure to document" and thus a "failure to turn over" crucial documents in the underlying criminal investigation which was a direct result of the "failed policies and practices" related to the documentation of homicide investigations. However, these opinions are based on nothing more Tiderington's own say so and a series of speculations. *See Hill v. City of Chicago,* No. 06 C 6772, 2009 WL 174994, *3 (N.D. Ill. 2009) (no *Brady* violation based on plaintiff's mere speculation that a report may have existed). While he believes it is "highly unusual" for a homicide investigative file to not contain any notes, he offers no evidentiary support for his contention that Chicago Police Officers were required to take handwritten notes. Furthermore, even if there was some requirement that notes be taken, violation of internal departmental policies are irrelevant to constitutional standards. *Thompson v. City of Chicago,* 472 F.3d 444, 455 (7th Cir. 2006). Accordingly, whether Tiderington believes that notes *should* have been taken is irrelevant and will not assist the fact finder in understanding the evidence. *Lurry v. City of Joliet*, No. 20 C 4545, 2023 WL 2138763, at *14 (N.D. Ill. Feb. 21, 2023).

Tiderington's opinions that his "review" of criminal defense files showed documents were "regularly withheld" from criminal defendants is likewise irrelevant because he Tiderington cannot identify any exculpatory document that was "withheld" and Plaintiff cannot establish that the City failed to produce documents to him in his underlying criminal prosecution. *Harris*, 489 U+.S. at 385 (when a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of events and circumstances which establish that

19

the "policy of inaction" is the functional equivalent of a decision by the City itself to violate the Constitution); *Brown,* 520 U.S. at 400 (a plaintiff seeking to impose liability on a municipality must identify a "policy" or "custom" that caused the plaintiff's injury).

Finally, Tiderington's opinions related to tunnel vision are not helpful to a jury because they are so undeveloped they simply serve to bolster his own assumption that the City's policies were flawed.

Tiderington's opinions are also inadmissible pursuant to Rule 403 because of their potential to confuse the jury. Rather than establish any culpability on the part of the City for its record keeping policies, Tiderington's opinions fault the City for failing to meet what he has defined as "best practices" without any support. Moreover, Tiderington's opinions offer more confusion than clarity because none of his criticism can establish a link between the policies and the alleged constitutional violations. Rather, the record here establishes that the Investigative File was produced to the CCSAO. There are GPRs in the CCSAO file from the criminal prosecution of Maysonet, and the Investigative File is the only source from which to obtain GPRs. Ex. B at 99:8-100:2. This shows that policies were in fact being followed. Moreover, as explained *supra* Tiderington's opinions on what he believes *should* have been documented are pure speculation, and therefore cannot be linked to any specific policy violation. As such, to allow for Tiderington to opine on what policies may or may not have been followed or what documents may or may not have been disclosed in other, unrelated criminal defense files would only muddy the waters and essentially create multiple mini trials within the trial.

## CONCLUSION

For the foregoing reasons, Defendant, City of Chicago, requests that Thomas J. Tiderington's expert opinions be barred in their entirety.

20

WHEREFORE, Defendant, City of Chicago, Respectfully Request This Honorable Court Grant Its *Daubert* Motion To Bar Opinions Of Thomas J. Tiderington in its entirety, and for any other relief as this Court deems just and reasonable.

Dated: July 15, 2024

Respectfully Submitted,

by: /s/ *Eileen E. Rosen*
Eileen E. Rosen
Special Assistant Corporation Counsel
*One of the Attorneys for City of Chicago*

Eileen E. Rosen
Theresa Berousek Carney
Catherine M. Barber
Austin G. Rahe
Lauren M. Ferrise
Rock Fusco & Connelly, LLC
333 W. Wacker, 19th Floor
Chicago, Illinois 60606
(312) 494-1000
erosen@rfclaw.com