# Exhibit E

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3    THOMAS SIERRA,                 )
                                     )
 4                  Plaintiff,       )
                                     )
 5       vs.                         ) No. 18-cv-3029
                                     )
 6    REYNALDO GUEVARA, ERNEST       )
      HALVORSEN, ANTHONY WOJCIK,     )
 7    JOHN McMURRAY, GEORGE          )
      FIGUEROA, EDWARD MINGEY,       )
 8    ROBERT BIEBEL, FRANCIS         )
      CAPPITELLI, UNKNOWN            )
 9    EMPLOYEES OF THE CITY OF       )
      CHICAGO, and THE CITY OF       )
10    CHICAGO, ILLINOIS,            )
                                     )
11                  Defendants.      )

12

13    VIDEO-RECORDED DEPOSITION OF THOMAS J. TIDERINGTON

14               APPEARING REMOTELY FROM

15               WAYNE COUNTY, MICHIGAN

16

17                 December 8, 2022

                   10:02 a.m. CST
18

19

20

21   REPORTED BY:

22   Suzanne Thalji

23   CSR No. 084-002337

24   APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS
```

THOMAS TIDERINGTON, 12/08/2022                    Page 2..5

---

Page 2

```
 1      REMOTE APPEARANCES:
 2          LOEVY & LOEVY
            BY MR. ANAND SWAMINATHAN
 3          311 North Aberdeen Street, 3rd Floor
            Chicago, Illinois  60607
 4          312.243.5900
            anand@loevy.com
 5              on behalf of the Plaintiff;
 6          LEINENWEBER BARONI & DAFFADA LLC
            BY MR. MICHAEL J. SCHALKA
 7          120 North LaSalle Street, Suite 2000
            Chicago, Illinois  60602
 8          312.380.6635
            mjs@ilesq.com
 9              on behalf of the Defendant
                Reynaldo Guevara;
10
            THE SOTOS LAW FIRM, PC
11          BY MR. JOSH ENGQUIST
            141 West Jackson Boulevard, Suite 1204A
12          Chicago, Illinois  60604
            630.735.3300
13          jengquist@jsotoslaw.com
                on behalf of the Defendants
14              Ernest Halvorsen, Anthony Wojcik,
                John McMurray, George Figueroa,
15              Edward Mingey, Robert Biebel, and
                Francis Cappitelli;
16
            ROCK FUSCO & CONNELLY, LLC
17          BY MS. EILEEN E. ROSEN
            321 North Clark Street, Suite 2200
18          Chicago, Illinois  60654
            312.494.1000
19          erosen@rfclaw.com
                on behalf of the Defendant
20              City of Chicago.
21      ALSO PRESENT REMOTELY:
22          MS. RACHEL SZYMANSKI WELLING,
            Videographer;
23
            MS. ROBYN FALASZ, Deposition Technician.
24
```

Page 3

```
 1              I N D E X
 2  WITNESS
        THOMAS J. TIDERINGTON
 3  EXAMINED BY                              PAGE
        MR. ENGQUIST                          6
 4      MS. ROSEN                           272
                E X H I B I T S
 5  NUMBER   DESCRIPTION                     PAGE
    Exhibit 1  Expert Report                  10
 6
    Exhibit 2  Supplement to Expert Report    11
 7
    Exhibit 3  CV                             12
 8
    Exhibit 4  Fee Schedule                   90
 9
    Exhibit 5  Materials Reviewed            95
10
    Exhibit 6  Invoice No. 22-9-18          103
11
    Exhibit 7  First 76 pages of Tiderington 106
12             Final Report
    Exhibit 8  Listing of Testimony and     101
13             Publications
14  Exhibit 9  Photos, Sierra 0002997-3008  138
15  Exhibit 10 Photos, Sierra 0055885-91    144
16  Exhibit 11 Halvorsen Deposition Excerpt 162
17  Exhibit 12 Answers and Affirmative Defenses 165
18  Exhibit 13 Halvorsen's Answers          171
19  Exhibit 14 Supplementary Report         208
               RFC-Sierra 000013-14
20
    Exhibit 15 Crime Lab Report             210
21             RFC-Sierra 000033-35
22  Exhibit 16 Wojcik Deposition Excerpt    226
23  Exhibit 17 2/6/97 Report of Proceedings 231
24  Exhibit 18 McMurray Deposition Excerpt  262
```

Page 4

```
 1  REPORTED REMOTELY FROM COOK COUNTY, ILLINOIS
 2      THURSDAY, DECEMBER 8, 2022, 10:02 A.M. CST
 3      THE VIDEOGRAPHER:  This is the beginning of
 4  Media Unit 1, and we are now on the video record at
 5  10:02 a.m.  This is the videotaped videoconferenced
 6  deposition of Thomas Tiderington, being taken on
 7  December 8, 2022.  This deposition is being taken
 8  on behalf of the defendants in the matter of Thomas
 9  Sierra versus Reynaldo Guevara, et al.  The case
10  number is 18-cv-3029, filed in the United States
11  District Court for the Northern District of
12  Illinois, Eastern Division.
13          My name is Rachel Welling, certified
14  legal videographer representing Urlaub, Bowen &
15  Associates with offices at 20 North Clark Street,
16  Suite 600, Chicago, Illinois.  The court reporter
17  today is Suzanne Thalji, also of Urlaub, Bowen &
18  Associates.
19          Counsel, please identify yourselves
20  for the video record and the parties which you
21  represent.
22      MR. ENGQUIST:  Josh Engquist on behalf of
23  defendants Halvorsen, Wojcik, McMurray, Figueroa,
24  Mingey, and Biebel.
```

Page 5

```
 1      MS. ROSEN:  Eileen Rosen on behalf of
 2  defendant City of Chicago.
 3      Michael, we can't hear you.
 4      MR. SWAMINATHAN:  Michael?  Why don't I
 5  just -- to keep this moving, Michael Schalka is on
 6  for defendant Guevara, and this is Anand
 7  Swaminathan for plaintiff Thomas Sierra.
 8      THE VIDEOGRAPHER:  All right.  Will the court
 9  reporter please swear in the witness.
10      THE REPORTER:  First I will read the
11  statement.
12          The attorneys participating in this
13  deposition acknowledge that I am not physically
14  present in the deposition room and that I will be
15  reporting this deposition remotely.  They further
16  acknowledge that, in lieu of an oath administered
17  in person, the witness will verbally declare his
18  testimony in this matter is under penalty of
19  perjury.  The parties and their counsel consent to
20  this arrangement and waive any objections to this
21  manner of reporting.
22          Please indicate your agreement by
23  stating your name and your agreement on the record.
24      MR. ENGQUIST:  This is Josh Engquist, and I
```

Page 6

1 agree.

2    MS. ROSEN:  Eileen Rosen and I agree.

3    MR. SWAMINATHAN:  Anand Swaminathan, I agree.

4    MR. SCHALKA:  Michael Schalka and I agree.

5         (Witness sworn.)

6         THOMAS J. TIDERINGTON,

7 called as a witness herein, having been first duly

8 sworn, was examined and testified as follows:

9         DIRECT EXAMINATION

10 BY MR. ENGQUIST:

11    Q.    Sir, could you state your name and

12 spell your last name for the record, please?

13    A.    Yes.  Thomas J. Tiderington,

14 T-i-d-e-r-i-n-g-t-o-n.

15    Q.    Okay.  Sir, you have given a deposition

16 before; is that correct?

17    A.    I have.

18    Q.    I know you gave one fairly recently.

19 How many have you given?

20    A.    In this case or throughout my career?

21    Q.    Throughout your career.

22    A.    Hundreds, if not thousands.

23    Q.    Thousands of depositions, okay.  Well,

24 this shouldn't be -- you should probably already

Page 7

1 know this stuff, but I just want to make sure we're

2 on the same page.  Things are a little bit

3 different sometimes with video.  Just so one thing

4 is that the court reporter only takes down one

5 voice at a time, all right?

6    A.    I understand that, yes.

7    Q.    So we may get some lags or delays here

8 because we're doing it via video.  So I'll do my

9 best to wait till you're done answering the

10 question before I ask another question and if you

11 can do me the favor of waiting till I'm done asking

12 the question before you start answering, all right?

13    A.    I will do that.  Yes, I will.

14    Q.    Okay.  And all your answers have to be

15 oral.  They have to be out loud, all right?

16    A.    I understand that, yes.

17    Q.    Okay.  Now, it's not uncommon that

18 someone uses an uh-huh or an um-hum when they

19 answer a question.  It's not the end of the world,

20 but if you do that, probably someone is going to

21 prompt you is that a yes or is that a no, all

22 right?

23    A.    I understand, yes.

24    Q.    Okay.  Also I know we talked before the

Page 8

1 deposition started.  I know your attorney,

2 Mr. Swaminathan, has a meeting or has to make a

3 phone call at 11:00 o'clock.  So we will be taking

4 a break.  But just so you know, if you need to take

5 a break at any time, as long as there's not a

6 question pending, you can take a break.  If there

7 is a question pending, I just ask that you finish

8 answering the question before we take a break, all

9 right?

10    A.    I understand.  Thank you.

11    Q.    Okay.  If you're confused about any of

12 my questions or anybody else's questions today,

13 whether we're speaking too fast, whether you just

14 didn't catch it, whether the video was bad or

15 whether you just don't understand the question,

16 just let us know, and we will do our best to

17 rephrase it or repeat it in some way, all right?

18    A.    Yes.

19    Q.    Okay.  If you answer a question, we are

20 going to assume you understood it.  Is that fair?

21    A.    That's fair.

22    Q.    Okay.  All right.  Sir, where are you

23 currently at now?

24    A.    I'm currently in Plymouth, Michigan,

Page 9

1 and that's Wayne County.

2    Q.    Okay.  And who is there with you?

3    A.    Anand, and I cannot pronounce his last

4 name, so I refer to him as Anand.

5    Q.    Okay.  Anybody else?

6    A.    No.

7    Q.    Okay.  And do you have your materials

8 with you today?

9    A.    I have my report, and I have access to

10 the attachments and other documents related to this

11 case.

12    Q.    Okay.  And when you said you have your

13 report, is a hard copy in front of you?

14    A.    It is, yes.

15    Q.    Okay.  Can I see it, please?

16    A.    (Witness indicating.)

17    Q.    Okay.  And when you said you have

18 access to the other attachments -- let me just go

19 back.

20         The report you have in front of you,

21 is that -- let me double-check my -- is that like

22 76 pages long?

23    A.    Yes.

24    Q.    Okay.  And all the various attachments

THOMAS TIDERINGTON, 12/08/2022                          Page 10..13

Page 10

1  which make it much longer you said you have access
2  to; is that correct?
3     A.  That's correct.
4     Q.  Okay.  And how do you have access to
5  it, in a computer somewhere?
6     A.  I can presumably pull them up on my
7  computer.
8     Q.  Okay.  So right now you're in front of
9  your computer screen.  Do you have a separate
10 computer to pull up the documents?
11    A.  No, I don't.
12    Q.  Okay.  All right.  I am just going to
13 mark a couple of exhibits and hand them out just so
14 we make sure we're on the same page, and we will
15 kind of work through some of them, all right?
16    A.  Sure.
17       (Tiderington Deposition Exhibit 1 was
18       marked for identification.)
19 BY MR. ENGQUIST:
20    Q.  Okay.  The first exhibit -- and if you
21 can put it up on the screen for us, that would be
22 great -- it's your final combined report in this
23 case.
24    A.  Okay.

Page 11

1     Q.  Now, just to be clear, like we talked
2  about before, the first, I think, 76 pages are your
3  actual report, correct?
4     A.  Yes.
5     Q.  And the next pages up to 912 are your
6  attachments; is that right?
7     A.  That's correct.
8     MR. ENGQUIST:  And we can take that down for
9  now.
10       Can we put up Exhibit No. 2.
11       (Tiderington Deposition Exhibit 2 was
12       marked for identification.)
13 BY MR. ENGQUIST:
14    Q.  Exhibit No. 2 is your two-page
15 supplement to your report.  Do you have access to
16 that there too in hard copy form?
17    A.  Not in hard copy, but I am aware of it,
18 yes.
19    Q.  Okay.  This is your supplement,
20 correct?
21    A.  That's correct.  Well, if you can
22 scroll down so I can see the second page but --
23 yes, it is.
24    Q.  Okay.  Besides these two reports, have

Page 12

1  you generated any other reports involving this
2  case?
3     A.  No.
4     MR. ENGQUIST:  Okay.  You can take that down,
5  please.
6       All right.  Give me one second.
7  Could you put Exhibit No. 3 up, please.
8       (Tiderington Deposition Exhibit 3 was
9       marked for identification.)
10 BY MR. ENGQUIST:
11    Q.  I broke this out from your larger
12 report with the 900 and some pages in it.  This is
13 your CV; is that correct?
14    A.  Yes, it is.
15    Q.  Okay.  And is this up to date?
16    A.  I believe it is, yes.
17    Q.  Okay.  We are going to go through in
18 broad terms some of your employment in the past, if
19 I can have that right.  If you can just give me a
20 thumbnail sketch first of your employment in law
21 enforcement, that would be a great start.
22    A.  Sure.  I started out with the Detroit
23 Police Department in 1978.  I attended the Detroit
24 Police Academy, and then I was assigned to a

Page 13

1  precinct in Detroit where my duties and
2  responsibilities were that of a patrol officer.
3       In 1980 I was laid off along with
4  another approximately 1500 other police officers
5  due to budget problems within the City of Detroit,
6  and for that reason -- or as a consequence of being
7  laid off, I ended up down in Fort Lauderdale,
8  Florida with the Fort Lauderdale Police Department
9  from approximately 1981 until I retired at the end
10 of 2001.
11       From there I became the police chief
12 in Plymouth Township, Michigan for approximately
13 the last 20 years, and I recently retired, I think,
14 at the end of May of this year.
15    Q.  Just going back to your first two years
16 in the police department, sir --
17    A.  Yes.
18    Q.  -- the Detroit Police Department, you
19 were basically a patrol officer; is that correct?
20    A.  That's correct.
21    Q.  Okay.  And were you ever raised in rank
22 at all?  Did you ever make any kind of other rank
23 other than patrol officer, either detective,
24 sergeant, or anything else?

THOMAS TIDERINGTON, 12/08/2022                                    Page 14..17

Page 14

1    A.   In the two years in Detroit, no.
2    **Q.   Okay.  And during that time, your two**
3    **years in Detroit, did you investigate any**
4    **homicides?**
5    A.   I responded to homicides where I would
6    have been the initial responding officer.
7    **Q.   Okay.  So as the initial responding**
8    **officer, what would be your responsibilities in**
9    **responding to a homicide scene?**
10   A.   To secure the scene, to document -- to
11   protect the homicide scene, to document anybody
12   that came or went from the scene, document the
13   contacts that I would have made as a result of my
14   response there and anything else that I would have
15   done on the homicide scene.
16   **Q.   So in essence you would be responding**
17   **to the scene, making sure that the scene is secure,**
18   **and if you find witnesses, you would be, I guess,**
19   **directing them to other investigators later on that**
20   **would be following up; is that right?**
21   A.   There were times where I would have
22   taken initial statements from witnesses or
23   canvassed neighborhoods to try to identify other
24   witnesses.  That would have been again my initial

Page 15

1    response to a homicide investigation.
2    **Q.   And in those two years, how many cases**
3    **did you go and have initial interviews with**
4    **potential witnesses?**
5    A.   I don't know that I recall
6    specifically, but I would say in the two-year
7    period, probably six to 10 homicide investigations.
8    **Q.   Okay.  And in all six or 10 of those**
9    **potential homicide cases in those two years, did**
10   **you actually interview witnesses?**
11   A.   I don't remember specifically.  I'm
12   sure that if I would have responded to a homicide
13   scene, that I would have spoken to somebody.  So my
14   assumption is, yes, that I would have spoken to
15   witnesses.
16   **Q.   Okay.  Or you would be --**
17   A.   Whether it was the caller or whether it
18   was a family member, there would have been some
19   conversation from me as an initial responding
20   officer.
21   **Q.   Okay.  Or you would be handling things**
22   **like crowd control; is that right?**
23   A.   Perhaps.
24   **Q.   Okay.  And during your first two years**

Page 16

1    there in law enforcement in Detroit, did you ever
2    handle an in-person lineup?
3    A.   Well, to make sure that we're talking
4    about the same thing, in-person lineup, no, but I
5    certainly was involved in what are known as
6    show-ups or bringing witnesses to the suspect for
7    identification purposes.
8    **Q.   Okay.  So not like a formal in-person**
9    **lineup as people think of it where, you know, maybe**
10   **the offender or potential suspects and fillers are**
11   **behind a one-way mirror, two-way mirror and then**
12   **there are people on the other side picking them**
13   **out?  Not like that, correct?**
14   A.   I would not have handled it.  I recall
15   being present maybe through one or two of them, and
16   actually I think I even was a filler in one of
17   the -- in a case early on.
18   **Q.   Okay.  But you didn't handle any of**
19   **those in-person lineups; is that correct?**
20   A.   That's correct.
21   **Q.   Okay.  Now, you said as part of your**
22   **identification, things that you did during your**
23   **first two years in law enforcement in Detroit, you**
24   **said show-ups, correct?**

Page 17

1    A.   That's correct.
2    **Q.   Okay.  And just to be clear, a show-up**
3    **would be something that happened if you -- well,**
4    **tell me, what is a show-up?  Can you give me a**
5    **definition of a show-up?**
6    A.   Well, there would have been a time, you
7    know, perhaps -- and, again, I don't know that I
8    can give you a specific example, but generally
9    speaking, if there was, say, for example, an armed
10   robbery where an officer arrested the suspect as he
11   was fleeing from the -- from the CVS or McDonald's,
12   oftentimes we would bring the witness back to
13   identify the suspect as the person that committed
14   the crime.
15   **Q.   Okay.  And it would be not necessarily**
16   **even an arrest situation.  If you saw someone that**
17   **met the description nearby, close in time, close in**
18   **proximity, that show-up could be bringing that**
19   **person back to see if this is the correct person;**
20   **is that correct?**
21   A.   Perhaps, yes.
22   **Q.   Okay.  And you were involved in how**
23   **many show-ups when you were a patrol officer in**
24   **Detroit?**

THOMAS TIDERINGTON, 12/08/2022                                    Page 18..21

Page 18

1    A.   I don't -- I don't -- I don't know if I
2 can give you an exact number, but I do recall being
3 involved with some.  I would say less than 10.
4    Q.   Okay.  And when you say "involved,"
5 what do you mean involved?  Would you be the person
6 actually bringing the potential suspect back to the
7 witness, or would you just happen to be on the
8 scene when someone else was doing it?
9    A.   Well, either-or, or also perhaps I may
10 have been the person with the suspect and the
11 witness is brought back to identify the suspect.
12    Q.   Okay.  Now, let me ask you, when you
13 were at the Detroit Police Department, you were
14 there for two years.  Did they have a probationary
15 period?
16    A.   They did.
17    Q.   And how long was the probationary
18 period for the Detroit Police Department back in
19 1978?
20    A.   I believe it was 12 months.
21    Q.   Okay.  So if you were there for two
22 years, your first year you were a probationary
23 police officer, correct?
24    A.   That's correct.

Page 19

1    Q.   Okay.  And the other half the time you
2 were there, you were a full-fledged patrol officer;
3 is that right?
4    A.   Well, a probationary officer is also a
5 full sworn officer, same duties and
6 responsibilities.  So there was no difference
7 between being a probationary officer or a two-year
8 police officer.
9    Q.   Well, as a probationary officer, did
10 you work with a more senior officer who would be
11 either your training officer or, for lack of a
12 better term, almost your supervisor on the street?
13    A.   Well, he wouldn't have been the
14 supervisor.  Initially, yes, I worked with more
15 experienced officers, but there were also times
16 where I worked with partners that had graduated
17 with -- the police academy with me.
18    Q.   Okay.  So they would put two
19 probationary police officers together back in 1978
20 in Detroit?
21    A.   There were times, yes.  And also there
22 were times that I would work alone as well as a
23 probationary officer.
24    Q.   Okay.  And then you said in 1980 you

Page 20

1 were laid off, kind of last in, first out kind of
2 thing?
3    A.   Correct, based on seniority.
4    Q.   All right.  It looks like then you were
5 from 1981 to 2001 in Fort Lauderdale; is that
6 right?
7    A.   That's correct.
8    Q.   Okay.  And can you give me an idea of
9 the different ranks you had during your period of
10 time you were in the Fort Lauderdale Police
11 Department?
12    A.   It went from a patrol officer -- I was
13 a supervisor.  I was a command officer, and I
14 retired as -- the rank of captain.
15    Q.   Okay.  How long were you a patrol
16 officer at the Fort Lauderdale Police Department?
17    A.   Approximately five years, five or six
18 years maybe.
19    Q.   And during those five to six years as a
20 patrol officer, were you assigned to a specific
21 unit?
22    A.   Well, as a police officer, my initial
23 assignment in Fort Lauderdale was with the patrol
24 division.  I believe I was in the patrol division

Page 21

1 for about a year, year and a half, and then I was
2 assigned to the organized crime division.  My rank
3 was still a police officer, but my assignment was
4 that of a detective.
5    Q.   But you did not have the rank of
6 detective; is that correct?
7    A.   Well, there's really no rank of a
8 detective.  If you're a police officer, if you're
9 detective, the rank is still the same, but the
10 assignment is different.  In other words, I could
11 be assigned to the organized crime division or to
12 the homicide division as a detective, and then the
13 next day I could be assigned back to patrol as a
14 patrol officer.  So the pay grade is the same and
15 the rank is still the same within the chain of
16 command.
17    Q.   Okay.  One other question before I get
18 to that.  I know the Detroit Police Department is a
19 fairly large organization.  You talked about 1500
20 officers being laid off.  Do you know roughly the
21 size of the department back in 1978 to 1980?
22    A.   Yeah.  I believe there was somewhere
23 between 4500 and 5000 police officers at the time.
24    Q.   Okay.  And how big is Fort Lauderdale

THOMAS TIDERINGTON, 12/08/2022                                    Page 22..25

Page 22

1 Police Department when you were there?

2    A.    Somewhere around five or six hundred

3 officers.

4    Q.    So let me just go back.  You were

5 before saying that when you were as a patrol

6 officer, you were assigned to organized crime, and

7 you did work as a detective.  In Fort Lauderdale

8 Police Department, out of those five to six hundred

9 people who worked there, was there anybody who was

10 given the title of detective?

11    A.    Well, anybody that was assigned to the

12 detective bureau would have been given the title as

13 a detective, and we would have been, you know -- me

14 as an example, I would have received a detective

15 badge so they --

16    Q.    Did you receive a detective badge after

17 you were moved to organized crime after the first

18 year?

19    A.    Yes.

20    Q.    Okay.  Was there a test to become a

21 detective?

22    A.    No.  It's a -- again, it's an

23 assignment.  It's a transfer.  You put a letter of

24 intent into where -- the division that you want to

Page 23

1 be transferred to.

2             Unlike a lot of departments that

3 have a rank of detective and once you're detective,

4 that becomes your career, it was not like that.  It

5 actually wasn't like that in Detroit either.  It's

6 an assignment, and while you're assigned, you're

7 considered a detective.

8    Q.    And as you said, you can be a detective

9 one day, and then you can be back on patrol the

10 next day?

11    A.    That's correct.

12    Q.    Okay.  So there's no testing for -- so

13 you said you would send a letter of intent.  You

14 would be, I guess, asking to be in a certain unit,

15 in your case organized crime; is that right?

16    A.    Well, the process was a vacancy would

17 be announced by the department, and anybody that

18 had an interest in that assignment would submit a

19 letter of intent, and then there would be a -- not

20 a testing process but an interview process with the

21 command officers of that division, and you would

22 either be selected or not for that assignment.

23    Q.    Okay.  And would you have to have

24 letters of recommendation or somebody recommending

Page 24

1 you for the position?

2    A.    I think that was part of the package

3 that's often submitted with transfers, so, yes.

4    Q.    Okay.  Can you remember who supported

5 you in your move after one year to organized crime?

6    A.    Perhaps Detective Sergeant John Smith.

7 Oh, there was a number of -- a number of my bosses

8 that I believe would have or may have supported my

9 transfer there.  I don't remember specifically.

10    Q.    Okay.  Now, so you talked about being

11 on a patrol unit for five to six years but being

12 assigned after the first year to organized crime;

13 is that correct?

14    A.    That's correct.

15    Q.    Okay.  And then during those

16 approximately four to five years you were assigned

17 to organized crime, how often of that period of

18 time did you act as, what you said, a detective or

19 how often did you act as a patrol officer during

20 that period of time?

21    MR. SWAMINATHAN:  Objection to form.  Go

22 ahead.

23    THE WITNESS:  Yeah.  I think there is a

24 misunderstanding.  When you -- my assignment, if

Page 25

1 you will, once I was assigned to the organized

2 crime division, I was a detective for the next four

3 or five years.  I never came in and the next day

4 was a patrol officer.  I'm saying theoretically if

5 you -- a detective could be assigned to the

6 detective bureau, to the homicide squad, and then

7 for whatever reason he could be transferred back to

8 the patrol division and assume his responsibilities

9 of patrol officer.

10             In my particular case, once I was

11 transferred to the organized crime division, I

12 served there as a detective until I was promoted to

13 sergeant.

14 BY MR. ENGQUIST:

15    Q.    Okay.  And during those four to five

16 years, you were working -- and that would have

17 been -- so four to five years, so 1981 to 1985 or

18 1986 is when you worked in the organized crime

19 division; is that right?  I'm sorry, 1982 to 1985

20 or 6; is that right?

21    A.    '80 -- yeah, '86 and '87 and that's --

22 that's when I was promoted to sergeant I think was

23 in late 1986, I believe.

24    Q.    Okay.  So 1982 to 1986, you worked in

Page 26

1 organized crime?

2     A.    That's correct.

3     Q.    Okay.  And when you were working in
4 organized crime, did you have a specific area
5 within organized crime you worked, a focus?

6     A.    Yeah.  My assignment changed throughout
7 that time period, but I had a variety of different
8 assignments within the organized crime unit,
9 primarily working narcotic investigations but also
10 other organized criminal activity, investigations
11 of organized cartels, criminal -- the Mafia, if you
12 will, organized crime, those types of assignments,
13 and the criminal activity that occurred with those
14 various organized crime groups.

15     Q.    Okay.  And during that period of time,
16 you said you had cartels and mainly narcotics.  Did
17 any of those involve homicides?

18     A.    All of them -- well, most of them did,
19 yes.

20     Q.    Okay.  Did you specifically investigate
21 homicides?

22     MR. SWAMINATHAN:  Objection to form.

23     THE WITNESS:  I had.

24 BY MR. ENGQUIST:

Page 27

1     Q.    Did you ever consider yourself or did
2 anyone ever consider you as the lead investigator
3 of a homicide?

4     MR. SWAMINATHAN:  Objection to form.  Go
5 ahead.

6     THE WITNESS:  I was not a homicide detective.
7 My assignment involving homicide investigations
8 related to drug-related murders.  If there were
9 drug-related homicides, I would be assigned
10 throughout my career to be -- to participate in
11 those types of investigations.
12 BY MR. ENGQUIST:

13     Q.    Okay.  But my question was specifically
14 were you ever the lead in a homicide investigation?

15     A.    I would say I was the co-lead detective
16 in homicide investigations, but I would -- but the
17 case would specifically be assigned to a homicide
18 detective, which I was not.

19     Q.    Okay.  So would it be fair to say if
20 there was a homicide as part maybe of an organized
21 crime investigation, that a homicide detective
22 would be assigned to lead that part of the
23 investigation about the homicide?

24     A.    Well, when you say "lead," I don't

Page 28

1 know.  I mean, the case would be worked jointly.
2 The case would theoretically be assigned to the
3 homicide detective, but I remember cases where the
4 homicide detective would be assigned out to the
5 organized crime division to assist in the
6 investigation of that homicide.

7         So it's not as clear-cut as you
8 perhaps think it may be.  There were a lot of
9 blurred lines in terms of whose responsibility it
10 was, and a lot of it depended on who had the
11 resources to conduct the specific type of case.

12     Q.    Okay.  When you say there's blurred
13 lines, is that why you use the term theoretically
14 assigned -- the homicide detective would be
15 theoretically assigned as lead?

16     A.    Well, when I say -- I'm sorry.  I
17 didn't let you finish.  Go ahead.

18     Q.    Go ahead.

19     A.    When I say theoretically, I do know
20 that the homicide detectives would be assigned to
21 the organized crime division.  As I sit here today,
22 I can't remember the specifics or the details of a
23 case but -- so that's -- that's why I use the word
24 theoretically.

Page 29

1     Q.    Okay.  Any time there was a homicide
2 that involved an aspect of organized crime, would a
3 homicide detective be assigned as well during the
4 time that you were there, those four or five years
5 back in the early '80s?

6     A.    Well, I'm trying to think.  You know,
7 anytime I -- probably, yes.  I don't know if it was
8 100 percent of the time but perhaps, yes.

9     Q.    Okay.  And during those --

10     THE REPORTER:  I'm sorry.  Excuse me.  I have
11 an unstable connection.  I am at Urlaub Bowen's
12 office, but I didn't get the whole answer.

13     (Discussion off the record.)

14     THE WITNESS:  Yeah.  Let me try to answer
15 that for you.  I don't want to say every time that
16 there was a homicide that a homicide detective
17 would be assigned.  I think there were times
18 where -- the organized crime division was part of
19 the detective bureau.  So we all fell under the
20 same commander.  So the lines aren't necessarily as
21 clear-cut as perhaps -- perhaps you -- as you think
22 they may be.  I can recall times where the homicide
23 detective would work with the narcotics division
24 and vice versa.

Page 30

1 BY MR. ENGQUIST:
2    Q.   All right, sir.  And maybe I wrote it
3 down wrong, but I thought your last answer before
4 you gave the more expanded answer just now was yes,
5 probably.
6       MR. SWAMINATHAN:  Objection to form and
7 foundation.
8 BY MR. ENGQUIST:
9    Q.   Is that correct?
10    A.   Well, I say probably, so it -- and
11 again we're talking about cases 30 or 40 years
12 previous.  So I don't know if it was every case.
13 In all likelihood it was the majority of cases but
14 not every case, I guess, is how I'm trying to
15 explain it.
16       MR. ENGQUIST:  All right.  Suzanne, do you
17 need to work on your connection real fast?
18       THE REPORTER:  I do, yes.
19       MR. ENGQUIST:  All right.  So why don't we go
20 off the record so we can make sure there is a
21 secure connection.  This is the fun of doing
22 remote.
23       THE WITNESS:  Okay.
24       THE VIDEOGRAPHER:  Okay.  We're off the video

Page 31

1 record at 10:33 a.m.
2       (Recess taken.)
3       THE VIDEOGRAPHER:  We are back on the video
4 record at 10:36 a.m.
5 BY MR. ENGQUIST:
6    Q.   All right.  Sir, during your time
7 working organized crime from '82 to approximately
8 1986, during that period of time, did you conduct
9 any in-person lineups?
10    A.   Yes.
11    Q.   How many?
12    A.   Again, I'm trying to think back 30 or
13 40 years, but I would say maybe eight or 10, maybe
14 more than that.  I don't -- I don't really recall.
15    Q.   Okay.  So in the work you did in
16 organized crime, it was not a common occurrence for
17 people that were doing your work to do lineups --
18       MR. SWAMINATHAN:  Objection.
19 BY MR. ENGQUIST:
20    Q.   -- in-person lineups?
21       MR. SWAMINATHAN:  Objection to form.  Go
22 ahead.
23       THE WITNESS:  Well, I guess it depended on
24 the case.  What do you mean was it a -- was it

Page 32

1 common for us to do?  I think you asked me was
2 it -- you know, personally how many did I -- was I
3 involved in or how many did I handle I think was
4 the question, but there certainly were more than
5 that during my time in the organized crime
6 division.
7 BY MR. ENGQUIST:
8    Q.   Okay.  And during that time from '82 to
9 '86 when you were in organized crime acting as a
10 detective, did you ever use -- would you ever
11 handle or actually perform a photo array?
12    A.   There were times -- yeah.  There were
13 many times I did that, yes.
14    Q.   Many times.  How many times do you
15 think you did that during those four -- from 1982
16 to 1986?
17    A.   Again, I would estimate or guess that
18 maybe 15 or 20 times, maybe more than that.
19    Q.   And of those 15, 20 times or
20 potentially more times that you handled a photo
21 array, just to be clear, are those photo arrays
22 that you yourself would have put together or you
23 yourself would have presented to the witness?
24    A.   I would have been personally involved,

Page 33

1 whether it was myself, my partner, or one of the
2 other detectives, yes.  Those -- the number that I
3 gave you was my personal involvement.
4    Q.   Okay.  And just to be clear, what do
5 you mean by "personal involvement"?  Is that you
6 actually handing the photos over, or is it you just
7 being there while someone else did?
8    A.   Well, either preparing the photo array
9 and giving it to another detective to present it to
10 the witness, or if I was the one that was
11 interviewing the witness, that I would present it,
12 or a combination of both, meaning putting it
13 together and presenting it.  So there were many
14 different combinations of -- or situations which I
15 was involved in.
16    Q.   Okay.  So there were times where you
17 would be working on the case as the investigator
18 and presenting the photo array to the witness; is
19 that correct?
20    A.   There were times, yes.
21    Q.   Okay.  Were there any times where you
22 would be presenting a photo array to a witness that
23 you had no involvement in the investigation?
24    A.   No.

THOMAS TIDERINGTON, 12/08/2022

Page 34..37

Page 34

1    Q.   And back in 1982 to 1986 when you were
2 working as a detective in Fort Lauderdale, was
3 there a certain number of photographs that were
4 generally used by you as part of a photo array, or
5 did it vary?
6    A.   I would say it would vary, but I would
7 say that typically it would be six photographs, six
8 or more.
9    Q.   Okay.  Okay.  During those years, 1982
10 to 1986, when you were working as a detective at
11 the Fort Lauderdale Police Department, did you ever
12 use photo books or mug books?
13   A.   Yes.
14   Q.   As part of the unit you were in,
15 organized crime, did the organized crime division
16 back then in 1982 to 1986 keep books of maybe
17 certain cartel members?
18   A.   There was a database kept, yes.
19 Whether they were books or not, I don't recall, but
20 there were various files that we kept photographs
21 of known drug cartel members and organized crime
22 figures.
23   Q.   Okay.  When you say "database," this is
24 1982 to 1986.  I'm assuming it's not a computer

Page 35

1 database in any way; is it?
2    A.   No.  When I -- well, when I said
3 "database," I meant files that had these
4 photographs, not necessarily binders that had the
5 pictures in it.
6    Q.   Okay.  So the pictures could have been
7 in binders.  They could have been in like a card
8 catalog.  They could have been filed away in
9 different files?
10   A.   That's correct.
11   Q.   Okay.  And were those ever used for
12 identification procedures by members of the
13 organized crime unit that you were part of in
14 Fort Lauderdale from 1982 to 1986?
15   A.   Yes, they were.
16   Q.   And was that a common occurrence?
17   A.   I'm sorry.  Was -- to use the -- in
18 what context?  I mean, I guess I just want to make
19 sure I understand your question.
20   Q.   Sure.  Using a large group maybe that
21 you're looking at a cartel, using the cartel
22 pictures as part of a photo -- as part of an
23 identification procedure where a witness would look
24 at the photographs that you have of the cartel

Page 36

1 members.
2    A.   And the question is were they --
3    Q.   Was that a common occurrence?
4    A.   It was an investigative technique that
5 we used.  When you say "common," it was used often,
6 I guess.
7    Q.   Okay.  And when you say "an
8 investigative technique," that would be a way of
9 narrowing, I guess, the playing field of possible
10 suspects; is that right?
11   A.   That would be one of the ways, yes.
12   Q.   Okay.  And what other reason would you
13 be doing that kind of identification procedure?
14 Why would that be an investigative tool?
15   A.   It would be a tool -- I guess it
16 depends on what you're trying to accomplish in the
17 investigation, but it would be a tool to allow
18 investigators to identify possible criminal --
19 individuals that were either alleged to be involved
20 in criminal activity or perhaps informants are
21 trying to provide information about individuals and
22 they would only know their street names or
23 nicknames.  So in that context is where we would
24 often use these photographs to make sure that we

Page 37

1 were talking about the same suspect as either the
2 witnesses or the informants.
3    Q.   As part of the organized crime unit
4 from 1982 to 1986 in the Fort Lauderdale Police
5 Department, did you ever keep track in a different
6 format of nicknames in some kind of way of the
7 different members that you were dealing with?
8    A.   You broke up a little bit, if you could
9 please just ask that question --
10   Q.   Sure.  I'll repeat it.  Going back to
11 the same time frame, 1982 to 1986, when you were
12 acting as a detective in the Fort Lauderdale Police
13 Department, did your unit ever use, for lack of a
14 better term, like a nickname database?
15   A.   Well, I don't know if we had a
16 database, but we had photographs that had the
17 suspect's actual name, and then we would have their
18 street names or gang names or that association,
19 yes.
20   Q.   Okay.  So you might have a photograph,
21 and on the back you would put their identifiers,
22 like who they are, maybe where they live, what gang
23 or organization, criminal organization they belong
24 to, nickname, things like that on the back?

THOMAS TIDERINGTON, 12/08/2022                    Page 38..41

Page 38

1     A.   That's correct.
2     Q.   Okay.  And that was a common
3  investigative tool that you used in the organized
4  crime unit there in Fort Lauderdale, correct?
5     A.   It was, yes.
6     Q.   Okay.  Did you ever have -- and I know
7  you didn't in 1982 to 1986 have a computer database
8  because there was no way you did in Fort Lauderdale
9  back in 1982 to 1986, but did you have a list of
10  nicknames or some other way to search nicknames
11  other than going through the different photographs
12  and looking at the backs?
13     A.   I think we had them sorted perhaps by
14  various criminal activity or various organized
15  crime groups and then -- it was certainly a much
16  more manual process than it is perhaps today.
17     Q.   Okay.  So you might have them separated
18  out like by gang, correct?
19     A.   By gang or by cartel or perhaps by
20  geographical area in which the suspects may have
21  lived.
22     Q.   Yeah.  So you might have, say, a
23  specific gang or cartel, but you could have
24  different sets within that gang or cartel that it

Page 39

1  might be subdivided into?
2     A.   Perhaps, yes.
3     Q.   Okay.  Were you ever responsible for a
4  specific gang or cartel or set?
5     A.   No.
6     Q.   Were any people in the organized crime
7  unit acting as detectives from 1982 to 1986 that
8  were assigned specific cartels or gangs or sets
9  within those organizations to investigate?
10     A.   Not that I can recall, no.  I don't --
11  no.
12     Q.   Okay.  So would it be fair to say that
13  all the members of the organized crime unit acting
14  as detectives from 1982 to 1986 combined their
15  resources for investigative -- I guess for
16  intelligence on the different gangs and cartels?
17     A.   That would be a fair assessment, yes.
18     Q.   And now this unit that we have been
19  talking about, because you said before that you
20  had -- I think you said you had roughly five to six
21  hundred people during the period of time you were
22  at the Fort Lauderdale Police Department.  How many
23  people were assigned approximately to the organized
24  crime unit when you were there from 1982 to 1986?

Page 40

1     A.   Well, within the organized crime unit,
2  there was probably 40 or 50 detectives.
3     Q.   Now, were all those detectives like the
4  organized crime detectives, or were they also the
5  homicide detectives?
6     A.   No.  They were assigned to the
7  organized crime division.  Now, the organized crime
8  division fell under the detective division, all
9  right?  The organized crime unit fell under the --
10  I'm sorry, the detective bureau.  The detective
11  bureau had homicide, property crimes, violent
12  crimes, and organized crime was part of that
13  bureau.
14     Q.   And just the organized crime unit had
15  40 to 50 detectives in it?
16     A.   That's correct.
17     Q.   Okay.  And how big was --
18     A.   The number -- I'm sorry I cut you off,
19  but the number varied.
20     Q.   It's okay.
21     A.   But somewhere between, I would say, 40
22  and 50 detectives, depending on vacancies.
23     Q.   Okay.  And approximately during that
24  time you were there from 1982 to 1986 in the

Page 41

1  organized crime unit, just in general, you said the
2  detective bureau had, you know -- you have
3  organized crime.  You have homicide.  You have
4  property crime.  How many total detectives do you
5  think the Fort Lauderdale Police Department had at
6  that period of time?
7     A.   I would guess somewhere around a
8  hundred.
9     Q.   So the organized crime unit took up
10  roughly half the detectives in the detective
11  bureau?
12     A.   I believe so, yes.
13     Q.   And you said in 1986 you became a
14  sergeant; is that correct?
15     A.   That's correct.
16     Q.   And how did you get that promotion?
17     A.   It was a testing process.
18     Q.   Anything other than testing?
19     A.   It was a testing process to qualify
20  you, and the chief of police had the pick of the
21  top three candidates for each vacant position.  So
22  I would have been selected out of one of the three
23  top qualified individuals.
24     Q.   And who was the chief that picked you

THOMAS TIDERINGTON, 12/08/2022                    Page 42..45

Page 42

1 to become the sergeant, if you recall?

2     A.   I think at that time it was Chief Joe
3 Gerwins.

4     Q.   Let me ask to go back a little bit.
5 When you were assigned to the organized crime
6 division in 1982, did you go through any additional
7 training at that time?

8     A.   Yes.

9     Q.   Okay.  And where was your training at
10 before you went to the organized crime division?

11     A.   Well, there was a variety of different
12 training that -- well, I'm sorry.  Maybe I jumped
13 the gun.  Did I go to any training before I was
14 assigned to it in order to go to the organized
15 crime division?  No.

16     Q.   Yes.

17     A.   Once I was assigned to the organized
18 crime division, there was a variety of in-service
19 training classes that I attended throughout the
20 time period that I was there.

21     Q.   Okay.  So there wasn't any specific
22 detective training.  You just had in-services once
23 you got to the unit; is that correct?

24     A.   That's correct.

Page 43

1     Q.   And the in-services were available to
2 anybody within the unit?

3     A.   Yes.

4     Q.   And were they required?

5     A.   Training was required, yes.

6     Q.   Were all the in-service trainings
7 required?

8     A.   Well, again, I'm thinking back on which
9 classes.  Perhaps some of the classes were required
10 or mandatory.  Others were perhaps voluntary.

11     Q.   Okay.  And when you were promoted to
12 sergeant by the chief there in 1986, did you go
13 through any specific training before becoming a
14 sergeant?

15     A.   Not before I became a sergeant, no.

16     Q.   Was it the same kind of thing that you
17 became a sergeant, started working as a sergeant,
18 and as you were working as a sergeant, you had a
19 variety of different in-service trainings that you
20 could attend?

21     A.   Yes, and also as patrol officer, there
22 were leadership classes that are available for
23 patrol officers or detectives or police officers.
24 I attended some of those training classes as well

Page 44

1 prior to being promoted.

2     Q.   And when you were promoted in 1986 to
3 sergeant, where were you assigned?

4     A.   Initially I was assigned to patrol
5 division.

6     Q.   And you said initially.  How long were
7 you in the patrol division?

8     A.   I think about maybe less than a year,
9 just less than a year.

10     Q.   Okay.  And after that one year where
11 were you assigned?

12     A.   I was assigned back to the organized
13 crime division.

14     Q.   And how long did you act as a sergeant
15 in the organized crime division?

16     A.   Oh, maybe five or six years till I was
17 promoted again.

18     Q.   And where were you promoted after five
19 or six years?

20     A.   I was promoted to the rank of captain.

21     Q.   Okay.  And how did you become -- was
22 there a testing process to become a captain?

23     A.   Yes, similar to the sergeant testing
24 process.  It was contractual.  You had to finish in

Page 45

1 a -- you became best qualified, and then the chief
2 had the ability to select from those best qualified
3 candidates.

4     Q.   And how many times did you take that
5 test to become a captain?

6     A.   Just once.

7     Q.   How many times did you take the test to
8 become a sergeant?

9     A.   One time.

10     Q.   Okay.  And did you have any specific
11 training that was given to you before you took on
12 the role as captain?

13     A.   Again, just as I've described, ongoing
14 in-service training classes, leadership classes,
15 career development classes.  So it would have been
16 a cumulative amount of training that led up to, I
17 believe, my promotion to captain.

18     Q.   But there was no specific training once
19 you became captain to become a captain, correct?

20     A.   Well, once I became a captain, I was
21 sent to in-service training classes for police
22 command and leadership, specifically the Southern
23 Police Institute, which is very similar to the FBI
24 academy if you're familiar with that or

THOMAS TIDERINGTON, 12/08/2022                    Page 46..49

Page 46

1 Northwestern management -- police management
2 school.
3      Q.   And where was that school you said you
4 attended?
5      A.   Well, it was in Fort Lauderdale, but it
6 was put on by the University of Louisville.
7      Q.   So people from the University of
8 Louisville came in to Fort Lauderdale, and you
9 attended their class on leadership?
10      A.   Usually in the winter months, if you
11 can imagine that.
12      Q.   Okay.  And what year was that that you
13 made captain?
14      A.   I was promoted to captain, I think, in
15 1995.
16      Q.   Focusing back on when you were a
17 sergeant, now in -- well, actually, first off in
18 patrol, when you were in patrol, what were your
19 duties as a sergeant in patrol?
20      A.   I was assigned to a district.  The city
21 of Fort Lauderdale was divided up into three
22 districts.  I was assigned to what is known
23 District 1 -- or, I'm sorry, District 2.
24      Q.   And what were your duties?

Page 47

1      A.   To supervise the activity of patrol
2 officers.
3      Q.   And what does that include?
4      A.   It includes ensuring that proper
5 policies are being implemented within the patrol
6 division.  It requires management and supervision
7 of the officers that are responding to calls for
8 service, checking police reports, doing
9 inspections, everything that you would associate
10 with a first-line supervisor, if you will, in a
11 police department.
12      MR. SWAMINATHAN:  Hey, Josh, just before you
13 ask your next question, I need to probably jump off
14 before your next question.
15      MR. ENGQUIST:  That's fine.  How long do you
16 think you're going to be?
17      MR. SWAMINATHAN:  I'm hoping it will be
18 short.  I'm hoping about 10 minutes.
19      MR. ENGQUIST:  Okay.  Why don't we just come
20 back at 11:15, and hopefully we'll all be here,
21 okay?
22      MR. SWAMINATHAN:  Okay.  Thanks.
23      THE WITNESS:  Thank you.
24      MR. ENGQUIST:  We can go off the record.

Page 48

1      THE VIDEOGRAPHER:  Okay.  We are off the
2 video record at 10:57 a.m.
3      (Recess taken.)
4      THE VIDEOGRAPHER:  We are back on the video
5 record at 11:18 a.m.
6      MR. ENGQUIST:  All right.  Can you put back
7 up that exhibit, please, because I know we'll be
8 going through pieces of it pretty soon.  All right.
9      Q.   All right, sir.  I think where we left
10 off, we were talking about your time as a sergeant
11 in the organized crime division, correct?
12      A.   I think we got to captain, but we can
13 go back -- we can go back to sergeant.
14      Q.   Okay.  And --
15      A.   I'm sorry.  If I could just take -- if
16 I could just take a second here.  I got to click
17 out of some things.  There's some noise here for
18 the next -- hold on one second.  Okay.
19      Q.   Do you have other apps open on your --
20      A.   Yeah, yeah.  I had my mail app open.
21      Q.   Okay.  And just to be clear, and I'm
22 sure this is the case, if you're looking at
23 anything other than like the screen or the reports
24 that we're directing you to, could you please let

Page 49

1 me know?
2      A.   I will.
3      Q.   Okay.  Not that I expect you to have,
4 you know, super secret electronic messages going
5 on, but I just have to say it, okay?
6      A.   No worries.
7      Q.   All right.  Just focusing on your time
8 as a sergeant in the organized crime division and
9 that would have been from 1986 to 1990 -- I'm
10 sorry, 1987 to 1991; is that right?
11      A.   Yes, roughly yes.
12      Q.   Okay.  Because you said the first year
13 you worked in the patrol division as a sergeant
14 from 1986, almost a year, correct?
15      A.   Yeah.  No.  That -- no.  Yeah.  It's,
16 you know -- thinking back 20-some years or 30-some
17 years, I just want to make sure it's correct so --
18 but -- and you understand these are approximate
19 dates and years, but to the best of my
20 recollection, that's what my assignments were.
21      Q.   Yeah.  That's why I'm not bringing up
22 the exact date, the exact day, you know, date, time
23 and week or something like that.  That's why I'm
24 keeping it to years, okay?

THOMAS TIDERINGTON, 12/08/2022                                    Page 50..53

Page 50

1    A.   I appreciate that.  Thank you.
2    Q.   All right.  So during that time from
3  1987 to 1991 approximately that you were a sergeant
4  in the organized crime division, what were your
5  responsibilities?
6    A.   My responsibilities were to manage the
7  investigative efforts of the detectives assigned to
8  my -- under my command.
9    Q.   Okay.  Now, the detectives under your
10 command, was part of their job gathering intel on
11 the different criminal organizations that were
12 operating around or near Fort Lauderdale?
13   A.   That's correct, yes.
14   Q.   Okay.  And like is that like a large
15 portion of the work, or can you give me an idea of
16 how big of a portion of the work that was coming
17 out of the detective bureau when you were there as
18 a sergeant, that kind of intel gathering?
19   A.   Well, it would be cases -- intelligence
20 gathering, if I understand.  Perhaps I don't
21 understand your question exactly, but anytime you
22 make an arrest, there's intelligence information
23 that's generated from that.  There's other types of
24 investigations where you go out and you conduct

Page 51

1  surveillance.  You conduct Title 3 investigations.
2  All of our efforts, I believe, are -- come down to
3  intelligence gathering in some respect.
4    Q.   Did some of your intelligence gathering
5  activities for the detective bureau during that
6  period of time, did that involve things that
7  weren't necessarily case specific?
8    A.   Case specific?
9    Q.   That were not case specific.
10   A.   Yeah, yeah.  I'm sure there were, yes.
11   Q.   Okay.  I'm assuming some of the
12 detectives in your bureau at times would be getting
13 information from either confidential informants or
14 people on the street and pass that information
15 along even if it wasn't particular to a specific
16 case?
17   A.   That's correct.
18   Q.   And that's part of, I guess, the good
19 policing that you thought you guys were doing down
20 in Fort Lauderdale at the time, correct?
21   MR. SWAMINATHAN:  Objection to form.  Go
22 ahead.
23   THE WITNESS:  I would say that's pretty much
24 standard with any reasonable police agency, but,

Page 52

1  yes, that's how we operated in south Florida at the
2  time, yes.
3  BY MR. ENGQUIST:
4    Q.   Okay.  Now, during this period of time
5  from approximately 1987 to 1991 when you were a
6  sergeant in the organized crime unit, did you
7  personally investigate any homicide cases?
8    A.   Well, at that point in my career, I was
9  supervising.  So there were homicide cases that I
10 would have been the supervisor in charge of, yes.
11   Q.   Okay.  And as a supervisor in charge of
12 a homicide investigation, did that involve you
13 going out on the street and doing the
14 investigation, or was it more of a supervisory role
15 kind of above everything else?
16   A.   Well, no.  In Fort Lauderdale a
17 sergeant is a working sergeant, meaning he's out
18 there with the troops.  He's out there hand in
19 hand, conducting the investigations.  Certainly
20 again specifically my role was that of a
21 supervisor, but I would certainly be intimately
22 involved in and participate in interviews,
23 participate in various, as you stated,
24 intelligence-gathering scenarios where --

Page 53

1  conducting surveillances and so on.
2    Q.   And about how many homicides do you
3  think you were directly involved with back in 1987
4  to 1991 as a supervisor?
5    A.   In various degrees, probably 50 or so,
6  maybe more.
7    Q.   And you say "various degrees."  Can you
8  tell me what those degrees would be?
9    A.   Well, there were some homicide cases in
10 which we were proactively investigating, and I
11 recall, you know, actually sending undercover
12 operatives or informants in to gather evidence from
13 our suspected targets to conducting surveillance of
14 a homicide suspect, actually doing a wiretap on a
15 suspect, a homicide -- a suspect believed to be
16 responsible for a homicide.
17   Q.   Okay.  Any other times that you can
18 recall?
19   A.   I think that covers most of -- most of
20 what I was doing back in the late '80s and early
21 '90s.
22   Q.   Well, I'm specifically talking about
23 1987 to 1991 as a sergeant.
24   A.   Yeah, and I'm going to have to check

THOMAS TIDERINGTON, 12/08/2022                          Page 54..57

Page 54

1 those dates because I believe I was promoted to
2 captain in 1995, so I would have been --
3     **Q.   Okay.  I'm sorry.**
4     A.   I would have been a sergeant --
5     **Q.   You know what?  That might be my bad**
6 **handwriting on my notes here.  So if you were**
7 **promoted as a captain in 1995, then the time frame**
8 **we're talking about as a sergeant in the organized**
9 **crime division would be from approximately 1987 to**
10 **1995; is that correct?**
11    A.   Yeah.  That sounds more correct.
12    **Q.   Okay.**
13    A.   More accurate.
14    **Q.   During this time frame from**
15 **approximately 1987 to 1995, since we have the**
16 **corrected time frame here -- and I am assuming --**
17 **do you need to change any of your previous answers,**
18 **or were we talking about the same kind of time**
19 **frame before?**
20    A.   No.  We're talking about the same type
21 of time frame but just extending it a few more
22 years.
23    **Q.   Okay.  So still looking at the time you**
24 **were a sergeant in organized crime which we now**

Page 55

1 **narrowed down to 1987 to 1995 or fixed my mistake**
2 **in my handwriting here, 1987 to 1995, were you ever**
3 **personally conducting in-person lineups?**
4     A.   I would have been overseeing lineups,
5 but I would not -- I don't recall if I was
6 specifically the one presenting the suspects or
7 presenting the photo arrays, but it would have been
8 something my detectives would have been doing, and
9 it would have been something that I would have been
10 intimately involved with.
11    **Q.   When you say "intimately involved**
12 **with," what do you mean?**
13    A.   Well, if I had one of my officers that
14 was going to conduct a photo lineup, I would have
15 been right there understanding what photographs we
16 were using, why we were doing it, what did the
17 suspect or the witness or what -- you know, what
18 caused us to believe that the suspect was -- you
19 know, did we have probable cause to believe the
20 suspect was involved in the case or suspected of
21 either, you know, that violent crime or whatever
22 the case may have been.
23    **Q.   Did you believe you had to have**
24 **probable cause before you would put somebody in a**

Page 56

1 **photo array?**
2     A.   I don't know that you had to have
3 probable cause, but we certainly had to have
4 probable cause in order to take an individual into
5 custody.
6     **Q.   I understand that, but you were talking**
7 **about photo arrays just a second ago.  So I just**
8 **want to make sure.  You don't need probable cause**
9 **before you put a potential suspect in a photo**
10 **array; isn't that correct?**
11    A.   That's correct.
12    **Q.   Okay.  Now, you told me before, before**
13 **you take someone into custody, you would need**
14 **probable cause, correct?**
15    A.   That's correct.
16    **Q.   Okay.**
17    A.   So, again, you were asking me about my
18 supervisory responsibilities and what my
19 involvement would have been.  It would not have
20 been sitting in an office and finding out a week
21 later what my detectives were doing.  I would have
22 been out there trying to understand, you know, how
23 did we get the suspect in here, did we arrest him,
24 is he in here voluntarily, what's the basis for

Page 57

1 conducting the lineup.  All of those things would
2 have been not only standard procedure for me but
3 perhaps standard procedure for any supervisor that
4 I was familiar with during that time period.  It
5 would have just been standard operating procedures
6 for us.
7     **Q.   It would have been a standard operating**
8 **procedure for you to be kept informed of what your**
9 **detectives were doing on a day-to-day basis?**
10    A.   Kept informed and also working side by
11 side with them as well, yes.
12    **Q.   Okay.  Did you work side by side with**
13 **detectives in every investigation or only when**
14 **available?  What I mean by that, could detectives**
15 **go forward with, let's say, a photo array if you**
16 **were not there?**
17    A.   Well, certainly I wasn't there every
18 minute of the day, and there was times I was on
19 vacation and certainly -- but we would have acting
20 supervisors that would oversee the activity of our
21 officers.
22    **Q.   Okay.  But I'm assuming, and tell me if**
23 **I'm right, I'm assuming that your detectives would,**
24 **I guess, conduct the investigation without you kind**

THOMAS TIDERINGTON, 12/08/2022                    Page 58..61

Page 58

1  of there on every moment.  You weren't like over
2  their shoulder; is that correct?
3      A.   Oh, no.  I'm not suggesting that I was
4  micromanaging every step of -- every step that they
5  took.  I had a, you know -- certainly was
6  intimately involved with the decision-making
7  process and the investigative tactics that we were
8  using, but the work was actually done by the
9  detectives, yes.
10     Q.   Okay.  And I am assuming another big
11 portion of your job as a supervisor there in the
12 organized crime division would be the
13 administrative things, making sure you have
14 manpower issues taken care of, making sure, you
15 know, questions or reports are being answered and
16 done for the brass above you, things of that
17 nature?
18     A.   That was part of the job of a
19 supervisor, yes.
20     Q.   Okay.  And how big of an administrative
21 load was there when you were supervisor in the
22 organized crime division?
23     A.   What do you mean how big?  I guess I
24 don't understand the question.

Page 59

1      Q.   Sure.  Like what percentage of your
2  work do you think was administrative?
3      A.   Well, I guess you got to define what --
4  again, I'm not trying to be difficult, but I want
5  to be accurate.  You have to define what do you
6  mean administrative?  How much time was spent
7  signing timecards, you know, I consider that to be
8  administrative.  Reviewing police reports, you
9  know, perhaps that was administrative, but I would
10 also consider that to be working side by side with
11 my detectives on cases.
12     Q.   So you consider reviewing reports as
13 part of working side by side your officers?
14     MR. SWAMINATHAN:  Sorry, Josh.  Just a
15 minute.
16     THE WITNESS:  Hold on one second.
17     MR. SWAMINATHAN:  All right.  Go ahead.  I'm
18 sorry.
19     MR. ENGQUIST:  Go ahead, sir.
20     THE WITNESS:  I'm sorry.  I think the answer
21 is do I consider that to be working side by side?
22 Yes.
23 BY MR. ENGQUIST:
24     Q.   Okay.  So did you consider yourself

Page 60

1  like a hands-on supervisor?
2      A.   Yes.
3      Q.   So you were talking about timecards.
4  You had other administrative duties as well as a
5  supervisor, correct?
6      A.   Sergeants do, yes.
7      Q.   Okay.  And can you give me an idea
8  still of the percentage of time you think would
9  roughly be to -- that you would consider
10 administrative compared to, I guess, investigative
11 work that you did as a supervisor there or, as you
12 said, side by side with your investigators --
13     A.   Well, I would say that the
14 administrative work was done during time periods
15 when there was not active surveillances or
16 operational things occurring, you know.  As a
17 supervisor, you would set priorities, and, you
18 know, the priorities would be to make sure that the
19 work was being accomplished appropriately.
20 Administrative things can typically wait, and that
21 would be handled at a different time period.
22          So the way the Fort Lauderdale
23 Police Department was set up then, even later as a
24 group supervisor with the Drug Enforcement

Page 61

1  Administration, the expectation of my command
2  officers was a supervisor would be out there
3  leading from the front, so to speak, and being
4  actively involved in the investigations versus
5  sitting in an office conducting -- you know, moving
6  paper from one side of the table to the other.
7      Q.   Was any of your job moving paper from
8  one side of the table to the other?
9      A.   Certainly.
10     Q.   And just to go back through it again,
11 can you put a percentage of time that you spent, as
12 you put it, moving paper from one side of the table
13 to the other?
14     A.   You know, I don't know if I can put a
15 percentage of time.  I mean, I would say it was a
16 small amount of the time, but then you're going to
17 ask me, well, what does small amount of time mean.
18 It's hard for me to say a percentage.
19          I would tell you this to kind of put
20 it in perspective.  I can't think of instances in
21 which my administrative duties interfered with my
22 obligations of overseeing my detectives.
23     Q.   And then we go to captain was your next
24 position, correct?

THOMAS TIDERINGTON, 12/08/2022                                    Page 62..65

Page 62

1    A.   Well, it was my next rank, but I was
2 also, for approximately five years, assigned to the
3 Drug Enforcement Administration as a group
4 supervisor.
5    Q.   And when were you assigned to the drug
6 administration as a supervisor?
7    A.   Roughly from 1990 to 1995.
8    Q.   Okay.  And is that still in organized
9 crime or something else?
10    A.   It was still assigned to the -- my
11 position was still assigned to the detective
12 division.  I know I am confusing you because we're
13 still talking about the organized crime unit, but
14 by that time -- when I say "that time," from about
15 1985 to -- beginning of 1985, the name was changed
16 from the organized crime unit to the special
17 investigations division.
18    Q.   Okay.  So I just want to -- so
19 organized crime became special investigations
20 division.  That's just a change in name, correct,
21 not change in duties or scope of work?
22    A.   Correct.  It's not a change in
23 function --
24    Q.   Okay.

Page 63

1    A.   -- but it's essentially a change in
2 name, yes.
3    Q.   All right.  So we've been talking about
4 you being a supervisor in organized crime for that
5 unit from 1987 to 1995.  You said in 1990 to 1995
6 you were where?
7    A.   I was assigned to the United States
8 Drug Enforcement Administration.
9    Q.   And where was that?
10    A.   In Fort Lauderdale.
11    Q.   Did you work out of the same office or
12 some other place?
13    A.   No.  I worked out of the DEA office in
14 Fort Lauderdale which was several miles away from
15 the Fort Lauderdale Police Department headquarters.
16    Q.   Okay.  So just to be clear, when we
17 were talking about you working as a sergeant with
18 the organized crime detectives there, that was from
19 1987 to 1990, and then from 1990 to 1995, you were
20 over assigned to the DEA, correct?
21    A.   Right, but I was still -- I was still
22 technically assigned to the special investigations
23 unit --
24    Q.   But your work -- I'm sorry, go ahead.

Page 64

1    A.   But my assignment was -- my assignment
2 within the division was to the Drug Enforcement
3 Administration.
4    Q.   And so when you were assigned to the
5 DEA from 1990 to 1995, what changed in your job
6 duties?
7    A.   Well, I was in charge of a multiagency
8 task force at that point.
9    Q.   Okay.  And you said you were in charge
10 of a multiagency task force.  What did you guys do?
11    A.   Pretty much the same things that we
12 were doing in the organized crime division and
13 special investigations unit, you know, later after
14 the name change, primarily investigating organized
15 drug cartels.
16    Q.   Okay.  You said you were in charge.
17 Was there anybody from the different agencies, like
18 the DEA or the federal agencies, that worked
19 alongside you?
20    A.   I was considered -- as a group
21 supervisor, I was considered to be a task force
22 group supervisor which is a rank within the DEA,
23 and I reported to what is known as an associate
24 special agent in charge of the Fort Lauderdale

Page 65

1 office, the ASAC, if you will.
2    Q.   And during those five years did you
3 investigate, personally investigate any homicides?
4    A.   There were homicide investigations
5 investigated under my command, yes.
6    Q.   Okay.  Were you personally involved in
7 the investigations?
8    A.   I was.
9    Q.   How?
10    A.   As I described earlier, as a
11 supervisor, many of the investigations -- if it
12 involved a drug-related homicide, many times the
13 homicide unit would come to us, and we would
14 participate jointly with them in conducting or
15 assisting in their investigations.
16    Q.   Would it be fair to -- like when the
17 homicide detectives would get the homicide, they
18 would come to you for the specialized intel your
19 group would be able to obtain; is that correct?
20    A.   Well, oftentimes -- and I had officers
21 that would respond to anything that was suspected
22 of being drug related -- a drug-related homicide.
23 We would send our officers or I would send my
24 detectives to respond to that, those cases.

THOMAS TIDERINGTON, 12/08/2022                                    Page 66..69

Page 66

1    Q.   Okay.  So if there was -- I'm sorry.
2    A.   In order to give a different
3  perspective and to gather evidence, whether it be
4  telephones or beepers or any information that we
5  could develop to assist the homicide units in
6  conducting -- in identifying the homicide suspects.
7    Q.   Okay.  So just to be clear, if there
8  was a -- you said drug related.  We're talking
9  about organized kind of gang or cartel activity
10 involving a homicide, correct?
11   A.   That's correct.
12   Q.   Okay.  And when something like that
13 happened, your unit would go out there to help the
14 homicide detectives because they had an expertise
15 in the gangs and cartels; is that correct?
16   A.   That's correct.
17   Q.   Okay.  And then they would work
18 alongside the homicide detectives in hopefully
19 resolving the homicide investigation; is that
20 right?
21   A.   That's accurate, yes.
22   Q.   Okay.  Would it be fair to say the
23 homicide detective would still be the primary on
24 the homicide investigation?

Page 67

1    A.   It would be accurate, yes.
2    Q.   Okay.  And how did it come to be that
3  you were assigned or detailed over to the DEA from
4  1990 to 1995?
5    A.   At that time it was -- the DEA decided
6  that they were going to form a multiagency drug
7  task force.  They solicited candidates from the
8  agencies that were going to be a part of the task
9  force, and my name was submitted, and I was
10 selected by the task force board to be the
11 commander of that unit.
12   Q.   Okay.  And after 1995 where did you go?
13   A.   At that point I was promoted to the
14 rank of captain, and I was initially assigned back
15 to the patrol division.  I believe I was in
16 District 1 at that point.
17   Q.   And how long were you the captain in
18 patrol, District 1?
19   A.   I think I was there for -- I'm sorry.
20 My first assignment -- my first assignment, I
21 believe, was the administrative captain for the
22 department where I served approximately a year.
23 Then I was assigned to District 1 patrol for about
24 six months, and then eventually I was assigned back

Page 68

1  to the special investigations division as the
2  commander in charge of that division.
3    Q.   And the administrative captain, if we
4  can go to -- what page is this on?  I believe it's
5  page 4 of the exhibit here.
6         Keep on going.  Go down some more,
7  the next page.  It would be page, I guess, 5.  Go
8  up a little bit.  All right.  So supervisor and
9  management positions.
10        Okay.  Here, administrative captain,
11 do you see that?  It says budget, purchasing, CALEA
12 manager, accreditation management, grants and
13 planning, and training.
14   A.   Correct.
15   Q.   Okay.  And you did that for how long?
16   A.   I think approximately a year.
17   Q.   And during that time I'm assuming you
18 weren't doing any kind of -- you weren't involved,
19 either supervising or personally involved in any
20 kind of criminal investigations, correct?
21   A.   That's correct, yes, sir.
22   Q.   Okay.  So then you said you were on the
23 patrol force about six months?
24   A.   I think it was about six months.

Page 69

1    Q.   Okay.  And then you said you went back
2  to the special operations unit, which used to be
3  the organized crime unit, correct?
4    A.   That's correct.
5    Q.   Okay.  And this special operations unit
6  that you were involved in, was that just the
7  organized crime unit, or were you a captain over
8  the detectives as well, the entire bureau?
9    A.   I was in charge of the special
10 investigations division, but during that time
11 period there were extended periods of time in which
12 I was -- I acted as the assistant chief in charge
13 of the investigative division.  My boss at the time
14 went out on a long-term injury, and I think for six
15 months or a year -- six months or eight months, I
16 was in charge of the investigative division, which
17 encompassed all of the investigative units within
18 the department, including the special
19 investigations division.
20   Q.   Okay.  Now, I believe it was in 1995,
21 1996, Fort Lauderdale had an issue with the Good
22 Ol' Boys Roundup.  Do you recall that?
23      MR. SWAMINATHAN:  Objection to form.  Go
24 ahead.

THOMAS TIDERINGTON, 12/08/2022                                    Page 70..73

Page 70

1    THE WITNESS: I'm not sure I do.
2 BY MR. ENGQUIST:
3    **Q.   There was a Department of Justice**
4 **investigation report regarding Fort Lauderdale**
5 **police officers involved in the Good Ol' Boys**
6 **Roundup from 1980 to 1995?**
7    MR. SWAMINATHAN: Objection to form and
8 foundation. Go ahead.
9    THE WITNESS: I vaguely recall. Certainly I
10 wasn't involved in it. If you have some document
11 that you could show me to refresh my memory,
12 perhaps I could clarify that for you.
13 BY MR. ENGQUIST:
14   **Q.   Just a Google search on the fact of**
15 **there being some kind of -- there was a Good Ol'**
16 **Boy Roundup which different DEA members, other law**
17 **enforcement officers, including Fort Lauderdale**
18 **Police Department members, being involved in what**
19 **they considered a racist, I guess, convention.**
20   A.   I don't know anything --
21   MR. SWAMINATHAN: Sorry. Objection to form
22 and foundation. Go ahead.
23   THE WITNESS: I don't know anything about
24 that, but I can assure you that I certainly wasn't

Page 71

1 involved in any way, shape, or form.
2 BY MR. ENGQUIST:
3    **Q.   Do you know if any of your officers**
4 **that you supervised were involved in the Good Ol'**
5 **Boy Roundups from 1980 to 1995?**
6    A.   Well --
7    MR. SWAMINATHAN: Objection to form and
8 foundation.
9    THE WITNESS: I'm sorry. Again, I -- you
10 would need to provide me with some more information
11 so I could refresh my memory about that. I vaguely
12 recall, but I don't know any of the details. As I
13 sit here today, I can tell you that I don't believe
14 any of my detectives were involved in any way with
15 that investigation.
16 BY MR. ENGQUIST:
17   **Q.   Okay. What do you vaguely recall about**
18 **it?**
19   A.   Not much more than what you just told
20 me, the headline.
21   **Q.   Okay. You said "not much more." What**
22 **more do you recall?**
23   A.   I don't -- I mean, I guess we're
24 playing word games here, and I don't mean to, but

Page 72

1 I just don't recall exactly what the details were.
2 I know there was some type of -- when you said
3 there was a Department of Justice investigation, I
4 don't recall that. I believe there was some -- a
5 group of -- I thought they were perhaps our
6 motorcycle police officers took a motorcycle trip
7 to Kentucky or something and -- but that's about
8 all I recall about it.
9    **Q.   Okay. So we have you now as a captain**
10 **in the special operations -- special investigations**
11 **section? Is it investigations section or**
12 **operations section? I'm sorry.**
13   A.   Special -- well, I'm not sure what
14 we're talking about, but I was -- if we're talking
15 about captain being in charge of the special
16 investigations, we call it a division at that
17 point.
18   **Q.   Okay. And that was from roughly**
19 **1997-ish, maybe late '96; is that correct?**
20   A.   '97 till probably 2001 when I retired,
21 yes.
22   **Q.   Okay. And from 1997 to 2001, did you**
23 **always have the same rank?**
24   A.   Yes.

Page 73

1    **Q.   And from 1997 to 2001, did you always**
2 **have the same -- were you at the same assignment?**
3    A.   Well, no. Oh, from -- yes, I was, yes.
4    **Q.   Okay. And now that you were a captain**
5 **in the special investigations section, were you**
6 **still, as you put it, like hands-on side by side**
7 **with your investigators, your detectives?**
8    A.   I would say my role as a -- as the
9 captain or the commander of the division was more
10 as you describe it as -- more as an administrative
11 role at that point versus a supervisory role.
12   **Q.   Okay. As you put it, moving paper from**
13 **one side of the desk to the other?**
14   A.   Unfortunately, yes.
15   **Q.   Okay. Now, from that time that you --**
16 **and I think we covered all your time at Fort**
17 **Lauderdale; is that correct?**
18   A.   We did, yes.
19   **Q.   Okay. And during those years from 1981**
20 **to 2001, were you ever a defendant in a civil**
21 **lawsuit involving your work as a law enforcement**
22 **officer?**
23   A.   I believe I was, but I'm not sure, and
24 what I mean by that, I don't know if I was

THOMAS TIDERINGTON, 12/08/2022                    Page 74..77

Page 74

1 individually named or whether my department was
2 named or -- but there were two or three lawsuits
3 that I can recall.
4     Q.   Okay.  And the two or three lawsuits
5 that you recall, do you recall anything about those
6 lawsuits, like what they were about, the nature of
7 them or anything like that?
8     A.   The only one I really recall is the one
9 that occurred while I was with the Drug Enforcement
10 Administration.  It involved an allegation by one
11 of our informants who was kidnapped in Colombia and
12 held by a Colombian cartel, and after being
13 released, she sued -- I don't know if I was named,
14 but she sued the United States, the government, for
15 not protecting her.
16     Q.   And do you know what happened with that
17 lawsuit?
18     A.   I don't know if it -- I believe there
19 was a settlement.  I don't know if it was a -- I
20 don't believe there was a trial.  I believe there
21 may have been some type of a settlement with her.
22     Q.   Okay.  And I know you're unclear
23 whether or not you were a named defendant or not.
24 Do you know if there were any allegations against

Page 75

1 you for any kind of misconduct?
2     A.   No, not misconduct, no.
3     Q.   Okay.  Do you recall -- is this one of
4 your thousands of possibly depositions that you
5 have given?
6     A.   I don't know if I was deposed in that
7 or not.  I believe I was, but when I said hundreds
8 or thousands -- hundreds of depositions, Florida is
9 a deposition state.  So every -- every arrest that
10 was made, whether it was a shoplifting arrest or
11 whether it was a homicide, the officer was
12 deposed in just about every single case where
13 somebody was arrested.  So for that reason
14 depositions were, you know, a routine part of my
15 day.
16     Q.   Okay.  And you thought there might be a
17 couple other lawsuits that you were involved in
18 during that time you were with the Fort Lauderdale
19 police, correct?
20     A.   I believe so, but I don't recall the
21 details.
22     Q.   Okay.  Do you recall whether or not you
23 believe you were a named defendant in any of those?
24     A.   I don't think I was.

Page 76

1     Q.   Do you recall whether or not you were a
2 witness because of something -- being accused of
3 anybody that you managed?
4     A.   It may have been.  I just don't recall
5 the details.
6     Q.   Do you still keep any records of the
7 lawsuits that you have been involved in previously?
8     A.   I'm sorry.  You broke up there, sir.
9     Q.   Sure.  Do you keep any records of the
10 lawsuits you were involved in?
11     A.   No.
12     Q.   Okay.
13     A.   There hasn't been that many.  I mean,
14 it's -- as I said, there was a couple over 40 years
15 ago that I -- you know, that I don't really recall
16 the details of them.
17     Q.   Your short time at the Detroit Police
18 Department, did you have any lawsuits leveled
19 against you as a law enforcement officer?
20     A.   I don't believe so, no.
21     Q.   Do you recall during that period of
22 time from 1978 to 1980 being accused of any kind of
23 misconduct --
24     A.   No.

Page 77

1     Q.   -- either by a civilian or any other --
2 I'm sorry.  By a civilian or by a supervisor?
3     A.   I apologize for not letting you finish
4 your answer -- your question there.
5     Q.   That's fine.
6     A.   But, no, I don't recall any misconduct
7 or accusation of misconduct at all.
8     Q.   During the time you were involved with
9 the Detroit Police Department, were there any
10 motions to suppress based on evidence -- focused on
11 evidence that you had gathered?
12     A.   No, not that I know of.
13     Q.   Okay.  During your time with the Fort
14 Lauderdale Police Department from 1981 to 2001,
15 were there any complaints by civilians against you?
16     A.   I don't believe so.  I don't recall
17 any.
18     Q.   Okay.  What about complaints by people
19 that you supervised or other employees of the Fort
20 Lauderdale Police Department?
21     A.   Not that I know of, no.
22     Q.   During the time you were with the Fort
23 Lauderdale Police Department, did you ever testify
24 in any kind of motions to suppress?

THOMAS TIDERINGTON, 12/08/2022                                Page 78..81

Page 78

1    A.   I'm sure I did.
2    **Q.   Were any of those, that you can recall,**
3    **any of those motions to suppress regarding**
4    **suppressing a confession?**
5    A.   No, not that I recall, not that I can
6    recall anyways.
7    **Q.   Okay.  What kind of items do you recall**
8    **being part of where there was a motion to suppress?**
9    A.   I don't recall specifically, but I know
10   there's been drug cases where they have challenged
11   search warrants or whether or not there was
12   probable cause to submit a search warrant affidavit
13   to a judge but -- those types of things, but I
14   don't remember any specifics.
15   **Q.   What about suppressing identifications?**
16   A.   I don't recall any motion to suppress
17   that I was involved with on those.
18   **Q.   And then you went back to Michigan,**
19   **correct, from 2001 until today, correct?**
20   A.   That is correct.
21   **Q.   Okay.  So when you left Fort**
22   **Lauderdale, you went to where you work currently in**
23   **Michigan.  You became the chief of police at**
24   **Plymouth Township Police Department, correct?**

Page 79

1    A.   That's correct.
2    **Q.   And how did you get the job of chief of**
3    **police there in Fort Lauderdale?  Was that like an**
4    **interview process?  Was it a testing process?  How**
5    **did it work?**
6    A.   I only caught the last part of your
7    question, but I think it was how did I get selected
8    as the police chief in Plymouth Township?
9    **Q.   Yes.**
10   A.   There was an application process of
11   the Plymouth Township Police Department seeking
12   a -- seeking to hire a police chief.  They hired an
13   outside agency.  I think it was called Career
14   Directions in Ann Arbor, Ann Arbor, Michigan, to
15   conduct a national search for a qualified
16   candidate, and I submitted an application, went
17   through the testing process, pretty extensive
18   testing process with Career Directions.  Then it --
19   I was selected as one of the three or four
20   finalists.  There was additional interviews and
21   meetings with elected officials, and I was
22   eventually offered the position.
23   **Q.   You said an extensive testing process.**
24   **What kind of testing took place?**

Page 80

1    A.   As I recall, I believe there was a --
2    initially there was a written examination, and then
3    there was a role playing, various testing, testing
4    that was --
5    MR. ENGQUIST:  You froze, sir.
6    THE WITNESS:  I'm sorry?
7    MR. ENGQUIST:  You froze at the last part.
8    Miss Court Reporter, did you get the
9    last part of that answer?
10   THE WITNESS:  I can repeat it.
11   MR. ENGQUIST:  I just want to make sure if it
12   was just me or not.
13   Miss Court Reporter, did you get --
14   THE WITNESS:  Okay.
15   THE REPORTER:  It wasn't just you.  I can
16   read what I have.  He did freeze for me too.
17   (Answer read.)
18   BY MR. ENGQUIST:
19   **Q.   And, Mr. Tiderington, can you complete**
20   **your answer, please?**
21   A.   Yeah, yes.  So Career Directions, I
22   believe the process was initially I completed a --
23   some type of written testing.  From there they
24   whittled the candidates down, and then they put

Page 81

1    several of us -- I don't know if it was 10 or 12 or
2    whatever the number was -- through an assessment, a
3    workshop, I guess, is how they described it, and
4    that involved a series of interviews and role
5    playing.  And from there they selected the
6    finalists who would -- who then went in and had
7    meetings with the elected officials in Plymouth
8    Township.
9    **Q.   Sir, during the time you were the chief**
10   **of police for Plymouth Township Police Department,**
11   **were you ever directly involved in the**
12   **investigation of a homicide?**
13   A.   Yes.
14   **Q.   How many times?**
15   A.   I think in the time period that I was
16   there, fortunately we only had two or three
17   homicides.
18   **Q.   Okay.  And how were you directly**
19   **involved in the investigations of any of those two**
20   **or three homicides?**
21   A.   Well, in a small agency, they -- unlike
22   a larger agency that I was involved with, obviously
23   Detroit, Fort Lauderdale, and the Drug Enforcement
24   Administration, as a small agency that had very few

THOMAS TIDERINGTON, 12/08/2022                                    Page 82..85

Page 82

1 homicides, my detectives did not necessarily have
2 the experience to conduct homicide investigations.
3 So the homicides that we did have, I was -- again,
4 I use the word intimately involved with but
5 assisting my officers in every step of their
6 investigation.
7     Q.   And how would you assist them on every
8 step of their investigation?
9     A.   Essentially coaching them, discussing
10 the various investigative methods, ensuring that
11 witnesses were properly interviewed, ensuring that
12 reports were done, adequately done, and all the
13 information that was needed would be included in
14 the reports.
15    Q.   Okay.  Would you yourself conduct the
16 interviews?
17    A.   I recall sitting in interviews with
18 some witnesses and some suspects in one particular
19 homicide, but I was not the lead, if you will, not
20 the lead investigator, but I certainly was --
21 participated in the questioning.
22    Q.   How big is the Plymouth Township Police
23 Department?
24    A.   We have approximately 52 employees, and

Page 83

1 of those we have -- at that time I think 35 -- 31
2 or 32 sworn officers.
3     Q.   And I was looking at their Facebook
4 page earlier.  It looks like they have around six
5 people that are detectives or in the detective
6 unit; is that right?
7     A.   I would say five or six, yes.  When I
8 say five or six, sometimes there was -- depending
9 on vacancies, there may be more, and other times
10 there might be a vacancy or two in the detective
11 bureau.
12    Q.   Oh, I understand.  We're talking over a
13 period of 21 years.
14    A.   Correct.
15    MR. ENGQUIST:  Okay.  All right.  If we can
16 move that page up one, please.  Right there is
17 great.
18    Q.   It says areas of instruction provided
19 by Thomas Tiderington.  Do you see that section?
20    A.   I do.
21    Q.   Okay.  What is this section supposed to
22 show?
23    MR. SWAMINATHAN:  Objection to form.  Go
24 ahead.

Page 84

1     THE WITNESS:  If you can scroll up just a
2 little bit more, I haven't looked at this in a
3 while.
4         For most of my career, at least for
5 the last 30-some years, I have been providing
6 training classes for police officers.  I also have
7 on occasion been an instructor at the local
8 community colleges, teaching students about
9 criminal justice.  So this is a reflection of some
10 of the classes that I have typically taught
11 throughout the last 30 or 40 years.
12 BY MR. ENGQUIST:
13    Q.   Okay.  Are any of these areas of
14 instruction that you have listed here involving
15 homicide investigations?
16    A.   Criminal investigations, so the answer
17 would be yes.
18    Q.   Okay.  Which one are you referring to?
19    A.   Well, I don't know if there's a
20 specific one.  Any type of investigations that --
21 there's nothing unique about a homicide
22 investigation.  The principles of criminal
23 investigations are the same, whether you convict --
24 whether you're conducting an investigation of an

Page 85

1 armed robbery or whether you're conducting an
2 investigation of a rape or a homicide.  The
3 principles of the investigation -- of
4 investigations is the same.
5     Q.   Okay.  Sir, earlier when you were
6 talking about providing basically coaching for the
7 detective unit of Plymouth Township on homicide
8 because they didn't have experience in homicides,
9 why did you have to provide coaching if
10 investigations of homicides are not unique to other
11 investigations?
12    A.   Well, you had said you went on the
13 Plymouth Township website.  You must have
14 understood or found out that in Plymouth Township
15 there's a very low crime rate and especially for
16 violent crimes.  So my detectives did not have --
17 although they've had a lot of extensive training,
18 but from a practical matter, they have not
19 typically investigated violent crimes or, you know,
20 serious felony type crimes, in progress, you know,
21 criminal activities so --
22    Q.   Okay.
23    A.   And I think during that period, and I'm
24 talking about the one homicide that occurred

THOMAS TIDERINGTON, 12/08/2022                    Page 86..89

Page 86

1 probably three or four years ago, at that time I do
2 recall that we had a relatively new sergeant
3 assigned to that unit and relatively new
4 detectives.
5        Q.    Are you referring to the homicide that
6 took place in December of 2019, sir?
7        A.    What are you looking at?  I'm just
8 trying to refresh my memory.
9        Q.    I am actually not looking at anything.
10 I am just going from my memory.  I found one
11 homicide in 2017 to 2020.
12        A.    I don't know.  I thought it was more
13 around 2017, but it involved a Craigslist --
14 somebody responded to a Craigslist ad, and he ended
15 up shooting the person in the back of the head and
16 killing them is one of the cases I'm thinking of.
17            The 2019 homicide, I'm not sure
18 what -- I'm not sure exactly what that was.
19            I'm sorry.  Would this be a good
20 time to take like a 10-minute break?  Would that be
21 appropriate?
22        MR. ENGQUIST:  That's absolutely fine, yeah,
23 and just so you know, I mean, I also like to take
24 breaks every roughly an hour or so.  I need to get

Page 87

1 up and move around myself.  So why don't we take a
2 good 10 minutes here and come right back, or if you
3 need longer, let me know.  Do you need to eat or --
4        THE WITNESS:  Ten minutes is fine.  Ten
5 minutes is great.  Thank you.
6        THE VIDEOGRAPHER:  Okay.  We're off the video
7 record at 12:07 p.m.
8            (Recess taken.)
9        THE VIDEOGRAPHER:  We are back on the video
10 record at 12:27 p.m.
11        MR. ENGQUIST:  Okay, sir.  Now that we're all
12 back online here, I just want to go back to -- if
13 you can put back up the exhibit so we can go over
14 the areas of instruction.
15        Q.    Okay.  Sir, were any of these areas of
16 instruction -- were there any specific class just
17 on homicide investigations?
18        A.    No.
19        Q.    Okay.  When is the last time you acted
20 as an instructor?
21        A.    Oh, probably a year ago.
22        Q.    Okay.  And where was that?
23        A.    In the Plymouth Township.
24        Q.    Okay.  And did that involve homicide

Page 88

1 investigations?
2        A.    No.
3        Q.    Okay.  When's the last time you think
4 you instructed on anything that touched upon
5 homicide investigation?
6        MR. SWAMINATHAN:  Objection to form.  Go
7 ahead.
8        THE WITNESS:  Well, criminal investigations,
9 just prior to the COVID, I -- for many years I
10 would teach many training classes involving
11 criminal investigations.  So I would suggest that
12 those classes are again related to homicide
13 investigations, but I haven't taught any classes
14 since -- essentially since COVID for external
15 departments other than my own.
16        MR. ENGQUIST:  Okay.  And if we could move up
17 to the next section, please.
18        Q.    And this is your list of training
19 locations and topics taught and attended, correct?
20        A.    Primarily taught.  I don't know if
21 it -- if it includes classes that I attended or
22 training classes that I attended.
23        Q.    So are you saying that even though it
24 says taught and attended, none of these are just

Page 89

1 attended?
2        A.    I think all of these classes are which
3 I provided instruction at.  I may have attended --
4 say, for example, like international money
5 laundering investigations conference in Rome,
6 Italy, I attended the conference, but I also taught
7 at it.  So I don't think there's anything on this
8 list where I haven't -- wasn't either a keynote
9 speaker or an instructor at.
10        MR. ENGQUIST:  Okay.  Can we move down to the
11 bottom of the list, please.
12        Q.    At the bottom here, there are two in
13 2022, Polaris training, human trafficking and
14 statewide human trafficking Summit slash -- both of
15 those say slash attendee.  Are you saying you also
16 presented at those?
17        A.    As a matter of fact, I did not.  So
18 those I think would be -- let me make sure.  Those
19 would be the exception.
20        Q.    Okay.  Out of this entire list, are any
21 of them specifically on homicide investigations?
22        A.    No.
23        MR. ENGQUIST:  Okay.  All right.  You can
24 take that exhibit down, please.

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 12/08/2022                          Page 90..93

Page 90

1      Okay.  To keep in order, why don't
2 we pull up Exhibit No. 4, please.
3      (Tiderington Deposition Exhibit 4 was
4      marked for identification.)
5 BY MR. ENGQUIST:
6      **Q.   I just want to make sure I have this**
7 **right.  This was as part of the packet you gave us**
8 **for the large combined report.  It's a single page**
9 **having to do with your fee schedule.  Do you see**
10 **that?**
11     A.   I do.
12     **Q.   Okay.  And is that currently your fee**
13 **schedule, sir?**
14     A.   It is, yes.
15     **Q.   Okay.  So it would be 325 per hour for**
16 **case review and expert report; is that right?**
17     A.   Correct.
18     **Q.   $500 an hour with a minimum of three**
19 **hours for any kind of deposition testimony?**
20     A.   That's correct.
21     **Q.   And for trial testimony that's 4500 per**
22 **day; is that right?**
23     A.   Yes, it is.
24     **Q.   Okay.  When did you start acting as an**

Page 91

1 **expert consultant, sir?**
2      A.   And, again, I'm thinking back.  I know
3 I had a case 30 years ago -- actually, it was up
4 here.  I was in Fort Lauderdale, and I was asked to
5 be an expert witness on a case, and I do recall
6 coming up here many, many years ago and being
7 involved in a case, but for the last -- I guess the
8 last two or three years is when I really have
9 considered myself to -- having several cases
10 involved with several expert witness cases, so up
11 until this point maybe one or two cases a year, up
12 until the last couple of years.
13     **Q.   Okay.  And out of your one or two cases**
14 **a year you've been doing for the past two to three**
15 **years, have any of them been for a civil defendant?**
16     A.   Well, I want to make sure you
17 understood me correctly.  Over the last couple
18 years, I've had many cases.  Up until the last
19 couple years, it would have been, you know, only
20 one or two cases a year.  Some cases I didn't -- or
21 some years I didn't have any.  So over the last two
22 years I would say is where I really started
23 becoming an expert witness on multiple cases.
24     **Q.   Okay.  And why the change in the last**

Page 92

1 **two years?**
2      A.   Obviously I've retired from the
3 Plymouth Township Police Department, and I
4 certainly have more time than I once had to do
5 these types of cases.
6      **Q.   How long has this same fee schedule**
7 **been in place?**
8      A.   I think this -- well, since I started
9 working with Loevy & Loevy on these cases, so
10 whenever that time period was.  I think a year and
11 a half.
12     **Q.   Okay.  And what was it before that,**
13 **before you started working with Loevy & Loevy?**
14     A.   Well, I think it's always -- well, it
15 was 325, and my fee is different now is what I'm
16 trying to say but I -- but because of the cases
17 that I'm working with them, it's -- my hourly fee
18 is -- I've maintained my hourly fee for the last
19 couple years.
20     **Q.   Sorry.  You said this has been your fee**
21 **schedule since you started working with Loevy &**
22 **Loevy.  What was it before?**
23     A.   I'm sorry.  It was always that, and
24 it's changed since I started working with them, but

Page 93

1 I have not changed my fee with them.
2      **Q.   I understand that.  What was it before**
3 **you started working with Loevy & Loevy?**
4      MR. SWAMINATHAN:  Objection to form and
5 foundation.  You can explain it.
6      THE WITNESS:  Well, no.  Like I said, I --
7 when I first started working as an expert witness,
8 my fee schedule, I believe, was, you know, in the
9 low 300s, whether it was 300 or 350, and since that
10 time -- and what I'm suggesting is that's been my
11 fee schedule over the last couple years.  My fee
12 schedule now for new clients is different than what
13 it was two years ago.
14 BY MR. ENGQUIST:
15     **Q.   Okay.**
16     A.   I know I'm confusing you, so I --
17     **Q.   Yeah.  I'm sorry.  Is your fee schedule**
18 **now different than the fee schedule in front of me**
19 **right now, in front of us right now?**
20     A.   It is.
21     **Q.   Okay.  What is it now?**
22     MR. SWAMINATHAN:  Hold on.  Let him finish
23 his answer.
24     THE WITNESS:  Right.  For other clients.

THOMAS TIDERINGTON, 12/08/2022                                    Page 94..97

Page 94

1 BY MR. ENGQUIST:

2      Q.   And what is it for other clients?

3      A.   350 to 375 an hour.

4      Q.   And you charge differently for
5 deposition testimony or trial testimony?

6      A.   I do.

7      Q.   And what do you charge the other
8 clients for deposition testimony or trial
9 testimony?

10     A.   Well, no.  My fee schedule for other
11 clients is the same.  The hourly fee is the only
12 thing that's different.

13     Q.   Okay.  And when did you change your fee
14 agreement -- your fee schedule with other clients?

15     A.   I think it changed about a year ago.

16     Q.   Okay.  Was there any period of time in
17 which your fee schedule was less than the 325 an
18 hour here on this exhibit?

19     A.   With Loevy & Loevy?

20     Q.   With anyone.

21     A.   You know, I don't think so.  I would
22 have to look back, but, you know, perhaps that case
23 I talked to you about, you know, 20 or 30 years
24 ago, I don't recall what I was paid on that one,

Page 95

1 but I don't think it was 325 an hour, but I'm not
2 sure what it was.

3      Q.   Okay.  And I'm sorry.  I just don't
4 have it written down.  You may have said this.
5 When did you change your fee agreement for other
6 clients?

7      A.   I think I increased my fee agreement
8 about a year ago.

9      Q.   And why did you increase your fee
10 agreement for other clients but not Loevy & Loevy?

11     A.   Well, the fee agreement was only
12 changed for any new clients.  So any clients that I
13 currently had at that fee, I just maintained the
14 hourly rate that I was already charging them.

15     MR. ENGQUIST:  All right.  We can put that
16 down.  Can you put up Exhibit No. 5, please.

17     (Tiderington Deposition Exhibit 5 was
18       marked for identification.)

19 BY MR. ENGQUIST:

20     Q.   This was also one of the attachments to
21 your combined report is materials reviewed.  Do you
22 have that in front of you, sir?

23     A.   I do.

24     Q.   Okay.  And if you can scan through it,

Page 96

1 it goes one all the way through, if you go to the
2 very end, 145.  Okay.  Is this a complete list of
3 the materials you reviewed, sir?

4      A.   I think there's been some additional
5 materials that I recently reviewed that's not --
6 that's not included on this list.

7      Q.   When you're talking about the
8 additional materials, are those materials having to
9 do with your supplemental report, sir?

10     A.   That and I believe there was a few
11 depositions from either the public defender's
12 office or the prosecutor's office.  There was two
13 or three depositions also that I -- that was sent
14 to me, I think.

15     Q.   And when were these new depositions
16 sent to you?

17          Sir, you're frozen?

18     MS. ROSEN:  He's frozen.

19     MR. ENGQUIST:  Anand, you're moving.  He's
20 not.

21     MS. ROSEN:  And we can't hear you guys.  And
22 he's gone.  We can't hear you.

23     MR. ENGQUIST:  Yeah.  You're on mute, Anand.
24 You're on mute still.

Page 97

1      MR. SWAMINATHAN:  Josh, can you talk right
2 there?

3      MR. ENGQUIST:  I can hear you now.

4      THE WITNESS:  Unmute yourself.

5      MR. SWAMINATHAN:  I'm unmuted.  Can you hear
6 me?

7      MR. ENGQUIST:  I can hear you now.

8      MS. ROSEN:  But he's gone.

9      MR. ENGQUIST:  Yeah, he's completely gone.

10     MS. ROSEN:  Screen is gone.

11     MR. SWAMINATHAN:  Oh, you got booted out.  I
12 see.  Okay.

13     MS. ROSEN:  Can we go off the record?

14     MR. ENGQUIST:  Let's go off the record until
15 this is fixed, please.

16     MR. SWAMINATHAN:  Yes, yeah.

17     THE VIDEOGRAPHER:  We're off the video record
18 at 12:40 p.m.

19     (Discussion off the record.)

20     THE VIDEOGRAPHER:  We're back on the video
21 record at 12:42 p.m.

22 BY MR. ENGQUIST:

23     Q.   Okay, sir.  Where we left off, I was
24 asking you -- because you said you had additional

THOMAS TIDERINGTON, 12/08/2022                          Page 98..101

Page 98

1 materials recently, new depositions from some
2 public defenders, and I'm not sure what else you
3 said.
4     A.   Yes.
5     Q.   I am just trying to figure out when did
6 you receive these additional materials?
7     A.   I don't know the exact date, but it was
8 after I completed my report.  I don't -- I could
9 look at the -- I can figure it out for you, but I
10 don't know the exact date.
11    Q.   Okay.  So they are not on this exhibit
12 here for Exhibit 5, materials reviewed.  You do not
13 have them listed; is that correct?
14    A.   That is correct.
15    Q.   And they were not part of forming your
16 opinions in this case; is that correct?
17    A.   That's correct.
18    Q.   Okay.  Did they alter or change your
19 opinions after you reviewed these additional
20 materials?
21    A.   No.
22    Q.   Okay.  Can you tell me what the
23 additional materials are?
24    A.   Well, the documents related to the

Page 99

1 hearing involving Melendez, that recent court
2 hearing.
3     Q.   I think you're referring to Alberto
4 Rodriguez, sir?
5     A.   I'm sorry, Alberto Rodriguez, and also
6 there were, I believe, three depositions, two from
7 the public defenders and one from the prosecutor's
8 office, Kevin Sheehan, if I remember correctly, and
9 then two other expert reports related to this
10 matter involving the eyewitness identifications.
11 So those were the three documents or the series of
12 documents that I received after completing my
13 report.
14    Q.   Do you intend to rely upon any of those
15 additional materials in your opinions in this case?
16    MR. SWAMINATHAN:  Objection to form.  Go
17 ahead.  Josh, you cut out a little.  Did you say do
18 you intend to?  Is that what you said?
19    MR. ENGQUIST:  Yes, yeah.
20    MR. SWAMINATHAN:  Go ahead.
21    THE WITNESS:  I don't think -- it didn't
22 change any of my opinions.  It may have supported
23 them but I -- there wasn't any change in my
24 thinking or my opinions.

Page 100

1 BY MR. ENGQUIST:
2     Q.   Okay.  You said you looked at some
3 expert reports.  Was that Ms. Dysart's report?
4     A.   I'm sorry?
5     Q.   Was that Ms. Dysart's report?
6     A.   I believe so, yes.
7     Q.   Did you also look at anybody else's
8 expert report other than Dysart's?
9     A.   Steblay, Steblay's, I believe it was.
10    Q.   Steblay's?
11    A.   Yes.
12    Q.   Okay.  Is there any way you could tell
13 when you received those expert reports for your
14 review as you sit here today?  Can you look at
15 anything else on your computer to tell us?
16    A.   No.  I could -- maybe on the break I
17 could go ahead and look at my emails or my Dropbox
18 and see if I can figure that out for you.
19    Q.   Okay.
20    A.   Or if you want to take -- if you would
21 like me to take the time --
22    MR. ENGQUIST:  No.  You can do it on a break.
23 That's absolutely fine, sir.
24        Okay.  All right.  We can put that

Page 101

1 down, please.  Okay.  Let's go to Exhibit No. 8,
2 please.  This will be out of order.
3        (Tiderington Deposition Exhibit 8 was
4         marked for identification.)
5     MR. ENGQUIST:  Do you mind going down?
6     Q.   This is the litigation support
7 experience.  Do you see that, sir?
8     A.   I do.
9     Q.   Okay.  Now, I believe this is, you
10 know, four pages of previous litigation.  Is this
11 an accurate list, sir, as it is today?
12    A.   In cases in which I offered deposition
13 and/or testimony, yes.
14    Q.   Okay.  Sir, do any of these involve --
15    MR. SWAMINATHAN:  Josh, he was just trying
16 to -- were you trying to scroll?
17    THE WITNESS:  Yeah.  I just want to make
18 sure -- I don't know --
19 BY MR. ENGQUIST:
20    Q.   Okay.
21    A.   When you say is it up to date, I'm not
22 sure -- I was just looking to see if the Reyes
23 deposition was listed on here, and if it was not,
24 then I would need -- I would need to add that.

THOMAS TIDERINGTON, 12/08/2022                     Page 102..105

Page 102

1    Q.   Okay.
2    A.   I believe I submitted this prior to
3 providing the -- testifying in that deposition.
4    Q.   Okay.  So other than the Reyes
5 deposition, is there anything missing?
6    A.   I don't think so.
7    Q.   Okay.  For any of these cases, did you
8 work for or give testimony for a civil defendant?
9    A.   Scroll down if you don't mind.  I'm
10 trying to think of what -- so I believe the BBK
11 case -- and I don't know the legal terminology, but
12 I believe the BBK -- they cross-filed the lawsuit,
13 so I don't know if I was -- I believe I was in the
14 civil defendant's side on that case, but I know
15 there was multiple lawsuits filed.  So I don't --
16 technically I don't know what the legal term is.
17    Q.   That's fine.  Is this the only case
18 where you are listed as providing testimony for a
19 civil defendant?
20    A.   And, again, if I could just have you
21 scroll down, but I think so.  Yes.
22    MR. ENGQUIST:  Okay.  Can you go back up to
23 the BBK, please.
24    Q.   And what was that case about where you

Page 103

1 were working for Central Coast Agricultural,
2 Incorporated, a Delaware corporation?
3    A.   It was a trademark infringement case
4 where I was -- where one company was suing the
5 other company for trademark violations and I was
6 asked -- not that I have any experience in
7 trademark violation, but I was asked to review
8 certain products that were being sold by BBK
9 Tobacco and determine whether or not those products
10 could or are or were being used in the consumption
11 of drugs, marijuana, cocaine, and so that's what I
12 was asked to do in that case.
13    MR. ENGQUIST:  Okay.  We can take that down,
14 please.  All right.  Let's go to Exhibit No. 6.
15    (Tiderington Deposition Exhibit 6 was
16    marked for identification.)
17 BY MR. ENGQUIST:
18    Q.   Okay.  Actually, before we get into
19 this, did you prepare for your deposition today?
20    MR. SWAMINATHAN:  You said did you prepare
21 for your deposition today?
22    MR. ENGQUIST:  Yes, that's what I said.
23    THE WITNESS:  I did.
24 BY MR. ENGQUIST:

Page 104

1    Q.   Okay.  And when did you start preparing
2 for your deposition today?
3    A.   Oh, probably a week ago.
4    Q.   Okay.  And did you prepare with anyone?
5    A.   Yes.
6    Q.   Who?
7    A.   Anand.
8    Q.   Anyone else?
9    A.   I don't think so.
10    Q.   And how many times did you meet with
11 Anand?
12    A.   Only met with him once, but I spoke
13 with him a few times.
14    Q.   Okay.  And by "spoke with him a few
15 times," how many times?
16    A.   In that week preparing for the
17 deposition, maybe once or twice.
18    Q.   Okay.  Is that by telephone calls or --
19    A.   But --
20    Q.   I'm sorry, go ahead.
21    A.   But it was primarily to coordinate our
22 meeting time once he got here -- once he got here
23 to Michigan.  So I don't recall having any
24 substantive conversations with him about the actual

Page 105

1 deposition until --
2    Q.   Are you -- I'm sorry.
3    A.   -- until he got here -- I'm sorry.  I
4 know I'm cutting you off.  Until yesterday, when I
5 met with him yesterday here in Michigan.
6    Q.   Okay.  So it's fair to say the only
7 substantive prep you had with Anand would have been
8 yesterday there in Michigan, correct?
9    A.   In the last week or so, yes.
10    Q.   Okay.  And how long was that meeting?
11    A.   Four or five hours.
12    MR. ENGQUIST:  Okay.  All right.  So if we
13 could look at this exhibit here, Exhibit No. 6, if
14 you can go down to the bottom a little bit, please.
15 Just go down to the bottom of this entry.  Stop
16 right there.
17    Q.   Okay.  Right in here you have a sum
18 total of 65.75 hours for a total of $21,368.75.  Do
19 you see that?
20    A.   I do.
21    Q.   Okay.  Is that the sum total of your
22 work that you billed for in this case absent, I
23 guess, the prep time you've had recently with
24 Mr. Swaminathan?

THOMAS TIDERINGTON, 12/08/2022                    Page 106..109

Page 106

1       MR. SWAMINATHAN: Objection to form. Go
2  ahead.
3       THE WITNESS: Yes, I believe so, yes.
4  BY MR. ENGQUIST:
5       Q.   Okay. Is there anything missing from
6  there?
7       A.   I don't think so, no.
8       Q.   Okay. And during this time that you
9  have billed here, was that work all done by you?
10      A.   Yes.
11      Q.   Okay. Did you have assistance from any
12  associates in preparing any of this work?
13      A.   No.
14      MR. ENGQUIST: Okay. All right. You can
15  take that exhibit down, please.
16      Okay. Let's go to Exhibit No. 7,
17  please.
18      (Tiderington Deposition Exhibit 7 was
19      marked for identification.)
20  BY MR. ENGQUIST:
21      Q.   Now, sir, this is the first 70 -- as we
22  talked before, the first 76 pages of your final
23  combined report that was submitted to us?
24      A.   Okay.

Page 107

1       Q.   Okay? Do you have a hard copy in front
2  of you?
3       A.   I do.
4       MR. ENGQUIST: Okay. You can take that
5  exhibit down, please, just so it's not kind of
6  distracting and hopefully maybe not causing any
7  computers to crash. Not that it would. I have no
8  idea.
9       Q.   So let's just kind of -- we'll kind of
10  walk through your report. Is that all right?
11      A.   Sure.
12      Q.   Okay. Your second page talks about
13  your summary of qualifications.
14      A.   It does.
15      Q.   Okay. And that would have been the
16  things that we went over already today, correct?
17      A.   I believe so, yes, for the most part.
18      Q.   Okay. Did we miss anything about your
19  summary of qualifications when we went through your
20  CV --
21      A.   I don't think we did.
22      Q.   -- before?
23      A.   I don't think we did.
24      Q.   Okay. It says in the second paragraph

Page 108

1  here that you're a life member of the International
2  Association of Chiefs of Police.
3       A.   I am.
4       Q.   Okay. And how do you become a life
5  member?
6       A.   My understanding is if you're a chief
7  of police for X number of years, you become a life
8  member. So there's no special -- it's not some
9  special award. You just have to live long enough
10  to be a lifetime member.
11      Q.   It also has a member of PERF?
12      A.   That's correct.
13      Q.   Okay. And how long have you been a
14  member of PERF?
15      A.   Oh, gee. Probably on and off for the
16  last -- when I say on and off, for the last 30 or
17  40 years.
18      Q.   And are you currently a member of PERF?
19      A.   I don't know. I believe so. I don't
20  know if my dues are paid up or -- since I
21  retired -- and my point is since I retired, I don't
22  know that I -- if I have to reapply as a civilian
23  with them. As a police chief, I know I was, but I
24  don't know what my status is right now.

Page 109

1       Q.   And when you say on and off as a member
2  of PERF, what do you mean by that? When were you
3  off as a member of PERF, and when were you on?
4       A.   Well, I don't know -- I know that there
5  were some years where I, you know, may not have
6  subscribed or didn't subscribe. So what I'm saying
7  is on and off for many decades. I know I've been
8  part of the organization, but I can't say that it
9  was a continuous membership.
10      Q.   Okay. It depends on when you were
11  paying your dues and when you weren't paying your
12  dues basically?
13      A.   Probably, yes.
14      Q.   Okay. And you have life member of the
15  Michigan Association of Chiefs of Police?
16      A.   That's correct.
17      Q.   And as a life member, how do you become
18  a life member?
19      A.   Pretty similar to how you become a life
20  member with the IACP.
21      Q.   Okay.
22      A.   Essentially it's reserved for retired
23  police chiefs that have been part of the
24  organization for X number of years.

THOMAS TIDERINGTON, 12/08/2022                    Page 110..113

Page 110

1    Q.   All right.  And are you currently on
2  any kind of board or on any of those -- either of
3  those three -- I'm sorry, on any of those three
4  organizations?
5    A.   No.
6    Q.   Have you ever been on a board of IACP,
7  PERF, or MACP?
8    A.   MACP, I was on a couple boards during
9  my time period as the chief.
10    Q.   Okay.  And what boards were you on for
11  the Michigan Association of Chiefs of Police?
12    A.   I believe I was on the training
13  committee and there was a couple other committees.
14  I don't recall what they were, but election
15  committee, political -- the political -- a
16  political committee where we identified which
17  candidates we were going to identify -- or what we
18  were -- which candidates we were going to support
19  or not support.
20    Q.   Okay.  And when were you on that
21  committee, the one that decides political stuff?
22    A.   That was quite a while ago, maybe 15
23  years ago.
24    Q.   And what about the other boards that

Page 111

1  you talked about being a part of, when were those?
2    A.   That would have been at least five to
3  seven years ago.
4    Q.   Okay.  And for IACP and PERF, you have
5  just been a member, correct?
6    A.   That's correct.
7    Q.   Okay.  Okay.  Let's go to the
8  introduction here.  You list two general questions
9  that you were asked; is that correct?
10    A.   Yes.
11    Q.   Okay.  Can you read them for us,
12  please?
13    A.   Sure.  Question No. 1, whether there
14  were deviations from generally accepted police
15  practices in the investigation into the murder of
16  Noel Andujar that was conducted by various police
17  officers and whether Chicago Police Department's
18  policies and practices related to documentation and
19  note-taking, including the creation, preservation,
20  and disclosure of investigative materials in
21  homicide cases, were at the time adequate and
22  consistent with acceptable police practices around
23  the country.
24    Q.   Okay.  Just focusing on the first part,

Page 112

1  were you ever asked to opine on whether or not
2  Mr. Sierra was guilty or innocent of the crime he
3  was charged with?
4    MR. SWAMINATHAN:  Just hold on one second.
5  You could answer that question yes or no.  You are
6  not to communicate about our -- or refer to our
7  communications, but that question you can answer
8  yes or no.
9    THE WITNESS:  No.
10  BY MR. ENGQUIST:
11    Q.   All right.  Let's go to the next page.
12  You have in here that you reached conclusions on
13  both of them.  If you go to the first paragraph for
14  the sentence that begins -- actually, it's one very
15  long sentence, but in here you have in part, if you
16  can look at about the middle of the paragraph, "the
17  defendants also suppressed evidence that would have
18  shown that Sierra did not commit the murder."  Do
19  you see that?
20    A.   Oh, I'm sorry.  Can you point that back
21  to me, where you read that?
22    Q.   Sure.  It's the middle of the first
23  paragraph on page 4 of your report.
24    A.   Yes.

Page 113

1    Q.   And when you say "the defendants," who
2  are you speaking of?  Are you speaking of all the
3  defendants, or are you speaking of particular
4  defendants?
5    A.   I would be speaking of all of the
6  defendants.
7    Q.   All of the defendants, so that would
8  include Biebel, Mingey, Wojcik, McMurray, Figueroa,
9  everybody?
10    A.   It would include all of those that were
11  involved in the investigation, yes.
12    Q.   And you say that this suppressed
13  evidence would have shown that he did not commit
14  the murder; is that correct?
15    A.   I believe the information was
16  exculpatory and would have demonstrated that he
17  more likely than not did not commit it, yes.
18    Q.   So it's not that he did not commit the
19  murder, but you believed it was exculpatory
20  material that was suppressed?
21    A.   Well, I don't know -- there's no way of
22  knowing whether he committed the murder.  I don't
23  know that.  I can only analyze the investigation
24  and the information that I have.  I don't know

THOMAS TIDERINGTON, 12/08/2022                    Page 114..117

Page 114
1  whether or not he committed the murder.
2      Q.   Okay.  So I know we will be getting to
3  it in some more detail later on, but can you tell
4  me what evidence was suppressed by Sergeant Biebel?
5      A.   I'm sorry.  You broke up.
6      MR. SWAMINATHAN:  You cut out there, Josh.
7      MR. ENGQUIST:  I'm sorry.
8      Q.   Can you tell me what evidence was
9  suppressed by Sergeant Biebel?
10     A.   Well, I looked at the investigation as
11  a whole, and those that were involved in the
12  investigation -- or served in a supervisory role
13  certainly knew or should have known what was
14  occurring.  To simply blame it on perhaps one
15  detective I think is not something that you can do
16  in a reasonable investigation.  Decisions are not
17  made in vacuums, and I don't believe you can just
18  say that there was only one person responsible for
19  the lies that were, you know, perhaps attributed to
20  some of these detectives in this case.
21     Q.   Okay.  There's a lot to unpack there,
22  but let me ask you, can you give me one piece of
23  evidence that Robert Biebel withheld, suppressed,
24  as you said?

Page 115
1      MR. SWAMINATHAN:  Objection to form, asked
2  and answered.  Go ahead.
3      THE WITNESS:  I guess I can explain my theory
4  on what information was withheld from prosecutors,
5  from the defense and the different levels of
6  culpability.  I don't know that I can assign the
7  amount of culpability that each person had in the
8  case, but, you know, certainly some of the problems
9  that I identified in the Sierra case are consistent
10  with many of the other cases that I looked at and
11  consistent with what other experts have determined,
12  so that it's a systemic problem within the Chicago
13  Police Department in terms of holding their
14  employees responsible and ensuring that cases were
15  appropriately investigated and that the -- and
16  documented and the information forwarded to the
17  appropriate people.
18  BY MR. ENGQUIST:
19     Q.   Sir, let me just make this clear.  I am
20  only focusing on your very first opinion, not the
21  second opinion having to do with the policies of
22  the police department.  That would be Ms. Rosen's
23  area.  So I'm only asking about the underlying
24  investigation.  I am not asking about, as you put

Page 116
1  it, systemic problems or policy problems.  I am
2  talking about the individuals in this
3  investigation, okay?
4      A.   I understand, but I don't know that I
5  can answer the question without -- I don't know if
6  I could tie it in to such a neat package without
7  identifying all of the problems which led me to my
8  conclusions.
9      Q.   Are you saying that --
10     A.   But it -- but I will try to stay in --
11  I will try to -- understanding the questions you're
12  asking, I will try to confine it to those
13  questions.
14     Q.   Okay.  Are you saying you can't look at
15  the underlying investigation without looking at the
16  policies of the police department?
17     MR. SWAMINATHAN:  Objection to form,
18  foundation.  Go ahead.
19     THE WITNESS:  Well, no.  I certainly can look
20  at the investigation, but if you're asking me to
21  compare that to policies or perhaps the problems
22  with the investigation, then I have to look at the
23  policies of the Chicago Police Department.  So
24  that's where one is intricately tied into the

Page 117
1  other.
2  BY MR. ENGQUIST:
3      Q.   Okay.  Just focusing on the sentence we
4  were talking about, the suppressed evidence, can
5  you give me the number of pieces of suppressed
6  evidence that were withheld, the exculpatory
7  material that was withheld from Mr. Sierra?
8      MR. SWAMINATHAN:  Objection to form and
9  foundation.  Go ahead.
10     THE WITNESS:  Well, we -- obviously I can go
11  through my report word by word with you, but, you
12  know, certain things -- obviously I did not see any
13  investigative notes in the file whatsoever related
14  to this investigation, and that's certainly a red
15  flag to me as a police chief or as an investigator.
16  How can you conduct a homicide investigation
17  without taking any type of handwritten notes?
18          So one of two things either had to
19  have happened.  Either they took the notes, which
20  theoretically I don't see how you can conduct a
21  case without taking notes, and they simply
22  discarded the notes, which would be a violation of
23  the Chicago Police Department policy and also best
24  practices, certainly a violation of best practices,

THOMAS TIDERINGTON, 12/08/2022                    Page 118..121

Page 118

1  or they didn't take any notes, which would then
2  also be unreasonable.  So I don't know which it
3  was.
4  BY MR. ENGQUIST:
5       Q.   All right.  So you're saying one of the
6  pieces that you identified as suppressed evidence
7  are notes which aren't there; is that correct?
8       A.   I would say that's a fair statement,
9  yes.
10      Q.   Okay.  And whose notes were suppressed?
11  The notes that are not there, whose notes do you
12  believe were suppressed?
13      MR. SWAMINATHAN:  Objection to form.  Go
14  ahead.
15      THE WITNESS:  Well, there were no
16  investigative notes.  So anybody that worked on
17  this case, all right, from the two primary
18  detectives to the supervisor, to anybody else that
19  participated in the investigation, I would have
20  expected to have seen some type of handwritten
21  notes or GPRs as they're called in Chicago Police
22  Department, and the file was absent any notes.
23  BY MR. ENGQUIST:
24      Q.   Okay.  So do you believe that

Page 119

1  Sergeant Biebel created notes that were withheld?
2       MR. SWAMINATHAN:  Objection to form,
3  foundation, asked and answered.  Go ahead.
4       THE WITNESS:  I guess that's part of the
5  problem.  We don't know if he did or not because
6  there's no -- I can't say whether -- whether or not
7  he created notes and then withheld them because
8  there was nothing in the case file.
9  BY MR. ENGQUIST:
10      Q.   Okay.  So is it fair to say that you
11  can't point to any of the named defendants as
12  withholding notes because there are no notes; is
13  that correct?
14      MR. SWAMINATHAN:  Objection to form and
15  foundation.  Go ahead.
16      THE WITNESS:  Well, I can say there's no
17  notes, and I can say that's highly unusual in a
18  homicide investigation, and if there's no notes, I
19  would say that that's a red flag.  And so the
20  detectives, the supervisors, the command officers,
21  all the way up the chain should have recognized
22  perhaps the same thing I recognized by looking at
23  this case file, that it's deficient in many ways
24  and it would cause you to have to look further to

Page 120

1  determine what was being concealed, what was being
2  hidden, why wasn't it being revealed.
3       The supervisors knew, should have
4  known.  The problem stemmed back many, many years.
5  There were court orders mandating that documents be
6  turned over and that they were on notice that their
7  investigative process was not appropriate.
8  BY MR. ENGQUIST:
9       Q.   Okay.  But my question is simply you
10  don't know if Mingey created any notes; do you?
11      A.   I wouldn't know that, no.
12      Q.   Do you believe he did create notes,
13  Sergeant Mingey?
14      A.   I don't know if he did or not.  If he
15  participated in this case, I would have expected to
16  see notes from him.
17      Q.   When you were a sergeant or a captain
18  in the investigation unit that you were involved in
19  in Fort Lauderdale, did you take notes on every
20  case?
21      A.   Probably not on every case, no.
22      Q.   Why not?
23      A.   Well, it depends on whether or not --
24  if I was the -- whether I was the sergeant -- I

Page 121

1  can't think of a time when I did it as a captain,
2  but if I was intricately involved or if there was a
3  situation where I was investigating or talking to a
4  witness and I took notes, I certainly would have
5  documented that in the police report, especially in
6  a homicide.
7       Q.   And --
8       A.   Sorry.
9       Q.   And if you didn't interview the
10  witness, you wouldn't take notes, would you, as a
11  supervisor when you were in the investigations
12  section, correct?
13      A.   Well, if we're talking about taking
14  notes from witness statements, if I didn't
15  interview the witnesses, I would have no way of
16  taking notes.  That's correct.
17      Q.   Yeah, and if you were observing someone
18  else doing the interview and they were taking notes
19  and they wrote a report, would you also take notes?
20      A.   I guess it would depend.
21      Q.   And so maybe or maybe not, correct?
22      A.   Perhaps.  That's correct.
23      Q.   Would you have been derelict in your
24  duties as a supervisor because you were not taking

THOMAS TIDERINGTON, 12/08/2022                    Page 122..125

Page 122

1 notes and putting them in a file?

2     MR. SWAMINATHAN: Objection to form. Go

3 ahead.

4     THE WITNESS: Again, it depends on the facts

5 and circumstances of the case. If it was something

6 that was not going to be documented by one of my

7 detectives, then I believe it would have been my

8 responsibility to take those notes and to complete

9 a police report or supplemental report based on

10 what was told to me or what I did in that case.

11 BY MR. ENGQUIST:

12     Q.   Okay. So you believe it would be your

13 responsibility as a sergeant to document things if

14 it wasn't being documented by your subordinates,

15 correct?

16     A.   I think that's a fair statement, yes.

17     Q.   Okay. And you said earlier that there

18 could be culpability going all the way up. So as a

19 captain, when you were in there, did you add notes

20 to the files?

21     A.   Which files?

22     Q.   Your investigation files in Fort Myers

23 [sic]. You were in charge of the entire

24 investigation unit at one point.

Page 123

1     A.   Well, I guess it would depend on

2 whether or not -- if it was information that was

3 given to me that was relevant to the case, I would

4 have done a supplemental report regardless of

5 whether or not I was a captain or whether I was a

6 sergeant or what my rank was.

7     Q.   So it would depend on the circumstances

8 of the case, right?

9     A.   Well, certainly.

10     Q.   And it would depend on the

11 circumstances of whether or not it was being

12 documented by somebody else, right?

13     A.   That's correct.

14     Q.   Okay. Because just because you might

15 have been told what was going on with a case by

16 your subordinates, it wouldn't mean you would have

17 to double the work and do your own report based on

18 what they told you, correct?

19     A.   I'm not sure I understand your

20 question.

21     Q.   You talked before about -- let's go to

22 your captain days in the township where you retired

23 from. You said you acted as a coach on the couple

24 homicide cases you had, correct?

Page 124

1     A.   That's correct.

2     Q.   Okay. And when you were acting as a

3 coach and giving them ideas of what to go forward

4 on or acting as a sounding board for their

5 investigation, would you take notes that would --

6 or reports that would then become part of the

7 investigative file?

8     A.   I don't think in those cases that I was

9 required to complete any type of report or have

10 taken any notes.

11     Q.   So if you're not required to take

12 notes, you shouldn't be held liable for not

13 creating them, right?

14     MR. SWAMINATHAN: Objection to form and

15 foundation. Go ahead.

16     THE WITNESS: Well, you are required to if --

17 you're required to take notes if it's a relevant

18 factor of the case, but the scenario that you just

19 gave me, I can't think of a situation where it

20 would have been required or even a good practice

21 for me to take notes in those particular cases.

22 BY MR. ENGQUIST:

23     Q.   Do you believe it's required that you

24 take notes or it's required that it's documented?

Page 125

1     MR. SWAMINATHAN: Objection to form and

2 foundation. Required for what?

3     MR. ENGQUIST: I don't know. I'm using his

4 words. Go ahead, sir.

5     MR. SWAMINATHAN: Objection to form and

6 foundation. Go ahead.

7     THE WITNESS: Well, the facts of a case, I

8 believe officers are required to include facts of

9 the case in a police report. So then the question

10 is how do they come with -- how do they develop

11 this information that needs to be placed into a

12 report. So if you're conducting an investigation

13 and you're interviewing witnesses, you know, I --

14 it's been my practice, because I don't have the

15 best memory, that I would have to take notes of

16 what the witness told me. I would have to write

17 down their phone numbers, write down their names,

18 write down where they lived, what was told to me.

19 And at that point obviously officers are trained to

20 understand that once you take these notes, that the

21 notes not only should be included in your police

22 report, but they're also required to be kept and

23 maintained.

24

THOMAS TIDERINGTON, 12/08/2022                          Page 126..129

Page 126

1 BY MR. ENGQUIST:

2    **Q.   Okay.  When you were at the Detroit**
3 **Police Department from 1978 to 1980, did they have**
4 **a policy on retaining notes that are taken by**
5 **officers?**

6    A.   I don't recall if they did or not.

7    **Q.   Okay.  What about when you were -- as a**
8 **patrol officer in Fort Lauderdale, did they have a**
9 **policy that's saying all officers, if they took**
10 **notes, had to maintain the notes?  They couldn't**
11 **just put the notes into a report?**

12    A.   I don't know if there was a policy back
13 then.  I don't recall.

14    **Q.   Okay.  What about when you were first**
15 **assigned for those first I think five years as a**
16 **detective in the organized crime unit, were you**
17 **required to take notes and keep the notes even if**
18 **they're put into reports?**

19    A.   Yes, we were.

20    **Q.   You were?  So that --**

21    A.   We were.

22    **Q.   That was part of your policies back**
23 **then?**

24    A.   I don't know if it was written policy,

Page 127

1 but it certainly was a practice.

2    **Q.   It was your practice?**

3    A.   No.  I think it was -- there may have
4 been a policy.  As we sit here today, I can't
5 remember specifically, but I know it was a practice
6 of mine and any detectives that I worked with.

7    **Q.   Okay.  And those notes were maintained**
8 **in the file; is that what you're saying?**

9    A.   They would be.  They would be, yes.

10    **Q.   Okay.  And you're saying that it may**
11 **not have been a policy, but you believe it was a**
12 **practice for your entire time at the Fort**
13 **Lauderdale Police Department from 1981 to 2001 that**
14 **all notes by all officers are kept and maintained;**
15 **is that right?**

16    A.   I don't know if I said that.

17    **Q.   Okay.  Then what did you say?**

18    A.   Well, I -- you -- from the time that I
19 went into the investigative unit, it's -- my memory
20 is that we would always maintain our notes in our
21 case file.

22    **Q.   That's your --**

23    A.   I'm not sure as a patrol officer.  I
24 think you had asked me about a patrol officer.  I

Page 128

1 don't recall whether there was a policy that
2 mandated that a patrol officer maintain his notes.

3    **Q.   And you said you thought it was a**
4 **practice, but you didn't know if it was a policy,**
5 **correct?**

6    A.   That's correct.

7    **Q.   You said notes were suppressed because**
8 **there were no notes.  So you believe they were**
9 **suppressed.  What other items of evidence were**
10 **suppressed?  Can you name another one?**

11    MR. SWAMINATHAN:  Objection to form.  Go
12 ahead.

13    THE WITNESS:  Well, the circumstances
14 surrounding the photo lineup is highly unusual, and
15 the case file does not explain what actually
16 happened in terms of identifying Sierra in the
17 photo lineup and as well as in the live lineup.

18    So that information I believe should
19 have been documented in a police report and either
20 was documented some place and not put in the case
21 file or it was never documented, but in either
22 situation I think the officers were wrong and
23 supervisors should have mandated that that
24 information was explained in reports.

Page 129

1 BY MR. ENGQUIST:

2    **Q.   What information are you speaking of**
3 **specifically, sir?**

4    A.   The photo array -- in the case file
5 that I reviewed, there were several different
6 pictures.  There were color pictures of Sierra, and
7 there were other pictures.  I don't know from
8 looking at the case file exactly what photographs
9 were used as the basis of the identification of
10 Sierra in this case, and then again the whole
11 question of whether or not the -- Halvorsen and
12 Guevara, whether or not they coached or
13 inappropriately told the witnesses who to select
14 during the photos, while they showed them the
15 photographs.

16    **Q.   Okay.  So let me just break that down.**
17 **Let's talk about the first part about the coaching.**
18 **So you're saying what might have been suppressed is**
19 **if one of the officers -- you said Halvorsen or**
20 **Guevara -- told the person who to pick?  That was**
21 **not told to anybody, correct?**

22    A.   That certainly would have been
23 exculpatory; wouldn't it?  I know you're not here
24 to answer my questions, and I apologize.  Yes.

THOMAS TIDERINGTON, 12/08/2022                                    Page 130..133

Page 130

1    Q.   Okay.  So based on that, you're saying
2 that if that would have happened, it was
3 suppressed?  Is that what you're saying?
4    A.   That's correct.  That's correct.
5    Q.   Okay.  Okay.  And if it didn't happen,
6 it wasn't suppressed, correct?
7    A.   Yeah.  If it didn't happen, then it
8 obviously wasn't suppressed, yes.
9    Q.   And if you mean by suppressed, you're
10 talking about -- let's say Mr. Melendez.
11 Mr. Melendez came out before trial and flipped;
12 isn't that right?
13   MR. SWAMINATHAN:  Objection, form.  Go ahead.
14   THE WITNESS:  I'm sorry.  What do you mean by
15 "flipped"?
16 BY MR. ENGQUIST:
17   Q.   Well, he went from identifying Thomas
18 Sierra to saying he didn't view anything.  He
19 couldn't identify anybody, correct?
20   A.   I would have to look at his testimony.
21 I don't know exactly what he -- what he said during
22 his -- during the trial, but I don't disagree with
23 what you're saying, but to be exact, I would have
24 to look at his testimony, yes.

Page 131

1    Q.   Okay.  If Mr. Melendez came forward
2 before trial or even during trial and accused
3 Detective Guevara of telling him who to pick --
4    A.   Right.
5    Q.   -- would the information still be
6 suppressed?
7    MR. SWAMINATHAN:  Objection to form and
8 foundation to the extent it calls for legal
9 conclusions.  Go ahead.
10   MS. ROSEN:  Anand, I couldn't hear what you
11 said.
12   MR. SWAMINATHAN:  I said objection to form
13 and foundation and to the extent it calls for legal
14 conclusions, and then I said go ahead.
15   THE WITNESS:  Well, if the officers did in
16 fact do that and didn't share that information with
17 the prosecutor, yeah, then it would be suppressed,
18 wouldn't it, is my understanding.
19 BY MR. ENGQUIST:
20   Q.   So your understanding is that if an
21 officer is accused of doing something wrong but
22 doesn't tell anybody he did something wrong, it's
23 suppressed?
24   MR. SWAMINATHAN:  Objection to form,

Page 132

1 foundation, calls for a legal conclusion.  Go
2 ahead.
3    THE WITNESS:  I would think that's obvious
4 and perhaps common sense, yes.
5 BY MR. ENGQUIST:
6    Q.   All right.  The other thing you
7 said is that you were unclear on what photos were
8 used in the photo array; isn't that right?
9    A.   That's correct.
10   Q.   Okay.  Are you aware of -- I mean, you
11 read the trial testimony.  That's part of your
12 review process, correct?
13   A.   I did.
14   Q.   Okay.  And you are aware that the
15 photos that were used in the photo array were
16 actually used in the trial, correct?
17   A.   I believe some of them were, yes.
18   Q.   They all were; weren't they, sir?
19   A.   Well, I don't know.  You would have
20 to --
21   Q.   From your reading did you believe that
22 there were some photos from the photo array that
23 were not used at trial?
24   MR. SWAMINATHAN:  Objection to the extent

Page 133

1 you're referring to the photo array and foundation.
2 Go ahead.
3    THE WITNESS:  I recall -- and, again, I
4 reviewed thousands of documents here, and you're
5 asking me to recall from memory, but I recall
6 seeing multiple photographs in the investigative
7 file with no explanation, and perhaps we've
8 identified what the problem here is because there's
9 no notes or nothing in the police department that
10 explains -- or in the police report that explains
11 why there's various photographs of the -- of Sierra
12 and also some of the other individuals in the
13 lineup.
14   So in looking specifically at the
15 case file, I can't make that determination, and I
16 think the report is deficient because it doesn't
17 articulate why these photographs are in there to
18 begin with.  It would be something that I would
19 have expected -- if I was the detective, I would
20 have articulated what it meant and why they're in
21 the case file, either on a GPR or whether I
22 included that in the police report.  And if I was a
23 supervisor, if it didn't make sense to me when I
24 was reviewing the case file, it would have been

THOMAS TIDERINGTON, 12/08/2022                    Page 134..137

Page 134

1 something that I would have sent back to the
2 detectives and asked them to clarify by doing a
3 supplemental report.
4 BY MR. ENGQUIST:
5      Q.   Okay.  Sir, now, you dealt with using
6 photographs, you know, before there were digital
7 photographs, before you can print them out and
8 things of that nature for photo arrays; isn't that
9 right, sir?
10     A.   I have, yes.
11     Q.   Okay.  And those hard copy photos, did
12 you ever do something like inventory them into
13 evidence so they could be used at trial?
14     A.   I'm sorry?
15     Q.   Did you ever inventory a photo array so
16 it could be used at trial, inventory the evidence?
17     A.   I have, yes.
18     Q.   Okay.  Sir, from looking at this file
19 and all the materials you reviewed, did you see
20 anything showing that in fact the actual photo
21 array, those hard copy photos, were inventoried and
22 used as evidence at trial?
23     MR. SWAMINATHAN:  Objection to form.  Go
24 ahead.

Page 135

1      THE WITNESS:  I would have to review that
2 again.  I believe that there was, but I don't
3 believe that it's -- it was specified and described
4 in the police report is where I would have expected
5 to see such a thing.
6 BY MR. ENGQUIST:
7      Q.   Okay.  Now, the fact that you don't
8 believe it's specified enough for you, the fact
9 that the photo array is inventoried, do you believe
10 that it was suppressed in any way?
11     A.   Well, I don't think it's -- didn't
12 satisfy me I think is what you just asked.  I think
13 standard practice would be for an officer who was
14 conducting a photo array, especially in a homicide
15 case, to detail what photos he or she is using,
16 where the photos are, and the handling of those
17 photos.
18     Q.   So if they use the photos in the photo
19 array, these hard copies, one-off photos and then
20 they inventory them into evidence so they're now in
21 evidence, that's not good enough?
22     A.   Well, I think anything you place in
23 evidence you have to describe in your report what
24 evidence it is, where the evidence came from.  So I

Page 136

1 would have to -- again, you're asking me two
2 questions.  If you could show me the evidence
3 receipt that you're speaking of, I think I would
4 like to review that, and then I would have to
5 review the police report again to see if it was
6 specified in the police report and detailed as far
7 as what the evidence -- where that evidence was
8 collected.
9      Q.   Okay.  Sir, do you have any basis to
10 believe that the photos that were inventoried and
11 used at trial and testified about at trial were not
12 in fact the photos used during the photo array of
13 the witnesses?
14     A.   I don't have -- I don't have any way of
15 knowing that.
16     Q.   Do you have any basis even to make that
17 allegation, sir?
18     MR. SWAMINATHAN:  Objection to form.  Go
19 ahead.
20     THE WITNESS:  Well, I didn't make that
21 allegation.  What I -- I think this line of
22 questioning started out with what was I -- what did
23 I expect to see in a police report, and I am
24 explaining that there were no notes that adequately

Page 137

1 describe where the officers obtained these
2 photographs from.  There's no notes or no reference
3 in the police report on which photos exactly were
4 shown to which witness.  There were multiple
5 photographs shown to the witness.
6          It would be very -- quite frankly,
7 it's very unusual to have the same photograph of a
8 suspect in a photo array, and if you're saying that
9 that's what happened, that would be very unusual
10 and inconsistent with police practices.
11 BY MR. ENGQUIST:
12     Q.   I'm sorry.  Having the same picture of
13 the suspect in a photo array?
14     A.   Multiple pictures of the same suspect
15 and that's what I --
16     Q.   Multiple pictures.
17     A.   That's what I discovered --
18     Q.   What makes you believe there are
19 multiple pictures of Mr. Sierra in the photo array,
20 sir?  What is your basis for that?
21     MR. SWAMINATHAN:  You can go ahead.
22     THE WITNESS:  That's what was contained in
23 the investigative file.  There's at least -- and,
24 again, we're playing a memory game here, but we

THOMAS TIDERINGTON, 12/08/2022                    Page 138..141

Page 138

1  could look at it and I could -- or I could pull it
2  up for you if you want me to.  There's two
3  photographs of him -- two different photographs of
4  him in the investigative file.
5            Which one was used in the lineup?  I
6  don't know that, and I should know that by reading
7  the police report.
8      MR. ENGQUIST:  Okay, sir, and I'm going to
9  share my screen and I guess I will make -- let me
10  just close this out so I can do it again.
11            What exhibit are we on right now?
12  Anybody?  Just so I'm typing.
13      MS. FALASZ:  We had just looked at seven.
14      MR. ENGQUIST:  Okay.
15      MS. FALASZ:  But we had gone up to eight.
16      MR. ENGQUIST:  We did go up to eight?
17      MS. FALASZ:  Yes.
18      MR. ENGQUIST:  So I will make this Exhibit
19  No. 9 and I'll share the screen.  Just give me a
20  second.
21            (Tiderington Deposition Exhibit 9 was
22            marked for identification.)
23  BY MR. ENGQUIST:
24      Q.   All right.  Sir, do you see what is on

Page 139

1  here as -- what I am going to mark as Exhibit
2  No. 9?
3      A.   I do.
4      Q.   It's marked as Sierra 2997 through
5  Sierra 3008.  Okay.  Was this part of your package
6  to review, sir, the impounded photo array?
7      A.   I believe so, yes.
8      Q.   Okay.  And was it your understanding
9  that this was the photo array that was impounded
10  from court that had been sent over from the
11  evidence section?
12      A.   You zoomed through that.  Can I look at
13  those again?  You're only showing me one picture
14  and I don't know that I can --
15      Q.   Sure.  I will flip through all of them.
16  You got them?
17      A.   Yes.
18      Q.   Okay.  Is it your understanding that
19  this is the photo array, sir?
20      A.   I don't --
21      MR. SWAMINATHAN:  Objection to form.  Go
22  ahead.
23      THE WITNESS:  I don't know.  There's another
24  photo, and I don't know if you have it, but there's

Page 140

1  another photo of Sierra, a different photo of
2  Sierra.
3  BY MR. ENGQUIST:
4      Q.   Sir, are you talking about the photos
5  that were contained within the 500 or so pages in
6  the public defender's file?
7      A.   I'm not sure.  I believe -- I thought
8  it was from the investigative file, but I would
9  have to research it and go back and look at that,
10  but there was a different picture of Sierra that is
11  different than what you just showed me.
12      Q.   Okay.  Well, just let's look at this
13  exhibit here, Exhibit No. 9, the very first page,
14  and the back of the picture has a name.  It has a
15  nickname.  Do you see that?
16      A.   I do.
17      Q.   And a gang affiliation.  Do you see
18  that?
19      A.   I do.
20      Q.   Okay.  That's similar to what you guys
21  did back in Fort Lauderdale, correct?
22      A.   I would say --
23      MR. SWAMINATHAN:  Objection to form.  Go
24  ahead.

Page 141

1      THE WITNESS:  I would say it's similar, yes.
2  BY MR. ENGQUIST:
3      Q.   Okay.  And do you see up into the
4  right-hand side there is -- do you see that EH and
5  then the number Z-226760?
6      A.   I do.
7      Q.   Is it your understanding that's for
8  Ernest Halvorsen's initials and then the RD number
9  for the investigation itself?
10      A.   How would I know that, because it
11  wasn't included in the police report or in any
12  investigative notes that I reviewed?
13      Q.   Sir --
14      A.   And that's identified --
15      Q.   Is that the number for the
16  investigative file, sir?
17      A.   Wait.  And perhaps you have identified
18  the same problem that I identified.  We're left
19  with trying to guess about what photographs and who
20  was shown these photographs and when were they
21  shown.
22      Q.   Sir --
23      A.   To answer your question -- hold on.
24      MR. SWAMINATHAN:  Go ahead.  Just finish.

THOMAS TIDERINGTON, 12/08/2022                    Page 142..145

Page 142

1 THE WITNESS: Do you want me to finish?
2 MR. SWAMINATHAN: Yes, go ahead.
3 MR. ENGQUIST: Yes, go ahead.
4 THE WITNESS: I do believe that's the case
5 number, yes.
6 BY MR. ENGQUIST:
7 **Q. Okay. Sir, you know according to even**
8 **the reports that the photo array was inventoried,**
9 **correct?**
10 A. That a photo array was shown, yes.
11 **Q. And you know a photo array was**
12 **inventoried too; don't you, sir?**
13 A. Well, when you say "inventoried,"
14 what -- you mean placed in evidence?
15 **Q. Yes.**
16 A. I would have to look at the evidence.
17 I don't independently remember that at this point.
18 **Q. Well, rather than me going through and**
19 **trying to show you that, if I told you that it was**
20 **placed in evidence, would you believe me on that,**
21 **or would you need to see the evidence that it was?**
22 A. Well, no. I don't think you would lie
23 to me, and I certainly would believe you. You
24 could certainly be wrong also but not intentionally

Page 143

1 lying to me. I don't think you would do that
2 but --
3 **Q. And -- go ahead.**
4 A. I don't know exactly what was contained
5 on the evidence form and how specifically it would
6 relate back to these photos, but if you have it,
7 maybe it does.
8 **Q. Okay. And, sir, you read the trial**
9 **transcripts when these photos were used and**
10 **everyone identified them -- like Mr. Alberto**
11 **Rodriguez identified them as the photos that he**
12 **viewed during the photo array, correct?**
13 A. I would agree that that happened. I
14 don't remember exactly reading that, but I would
15 assume that happened, yes.
16 **Q. Do you have any reason to doubt that**
17 **the photos that were impounded by the Court that**
18 **had previously been inventoried by the police**
19 **department were in fact the photos that were shown**
20 **to Mr. Rodriguez?**
21 A. I don't know. I don't have any reason
22 not to think that they were, no.
23 **Q. Okay.**
24 A. But with that said, just to -- and

Page 144

1 maybe we can close the -- move the -- change the
2 page or turn the page on this, but there are some
3 unexplained photos that I saw that to this day I
4 don't understand.
5 **Q. Okay. And let me see if I can maybe**
6 **help you with that.**
7 **I am going to show you what is**
8 **marked Exhibit 10. I will share the screen. Do**
9 **you see that photo?**
10 (Tiderington Deposition Exhibit 10 was
11 marked for identification.)
12 A. I do.
13 BY MR. ENGQUIST:
14 **Q. Okay. These are from the public**
15 **defender's file. Is this the photo that you're**
16 **talking about?**
17 A. I believe I saw that in the
18 investigative file, but it could be, yes.
19 **Q. Okay. And I will flip through the**
20 **different photos that were there, and by the way,**
21 **this was Bates stamped Sierra 5866 -- 5886, I'm**
22 **sorry, and the next photograph -- let me get to the**
23 **right spot here.**
24 A. I'm sorry. That photograph was --

Page 145

1 you're suggesting that's -- that photograph came
2 from where?
3 **Q. This is from the public defender's**
4 **file.**
5 A. Okay. And what are these --
6 **Q. These are photos from the public**
7 **defender file. I'm just going through them.**
8 A. No, I understand that, but you were
9 asking me a question about it, and I'm just trying
10 to clarify what these photos represent or what they
11 were used for.
12 **Q. Well, I'm asking -- I am just showing**
13 **them to you right now, sir, and here is another**
14 **picture. There's two pictures in this bunch of**
15 **Mr. Sierra. Do you see that?**
16 A. I do.
17 **Q. So, sir, is this what you were talking**
18 **about before as being the problem, having two**
19 **pictures of him in the same photo array?**
20 A. Well, if they had two pictures of him
21 in the same photo array, that would be -- I think
22 we would all agree that would be a problem, yes.
23 **Q. Okay. And do you believe this is the**
24 **photo array?**

THOMAS TIDERINGTON, 12/08/2022                              Page 146..149

Page 146

1    A.   I don't know what it is, and that's
2  part of the -- that's part of the problem.
3    **Q.   Part of your review, sir, if you go to**
4  **the first page of the exhibit, which is 5885, and**
5  **this is from the public defender's file, there is a**
6  **Post-it note.  It says don't know if these are the**
7  **photo array pics.  Do you see that?**
8    A.   And I think that's a question we're
9  trying to answer right now.  I don't think either
10 of us know that.
11   **Q.   Oh, my God.  Okay, sir.  We have the**
12 **photo array because it was inventoried into**
13 **evidence, and it was used at trial and identified**
14 **by the witnesses, correct?**
15   A.   I guess so.  I can't say that
16 definitely but let's -- I'm not going to dispute
17 what you just said, no.
18   **Q.   Okay.  And you wouldn't have any**
19 **evidence to suggest that those photos that were**
20 **identified in court under oath and that were**
21 **inventoried by the police department and then later**
22 **impounded by the Court are not in fact the photo**
23 **array that was used, correct?**
24     MR. SWAMINATHAN:  Objection to form and

Page 147

1  foundation.  Go ahead.
2      THE WITNESS:  Well, I think there's questions
3  about it, and I think you highlight the point.  The
4  stamp right here, "Don't know if these are photo
5  array pics," and that came from the Chicago Police
6  Department apparently so --
7  BY MR. ENGQUIST:
8    **Q.   Sir --**
9    A.   If they don't know, how am I supposed
10 to know?  And we've identified the problem, because
11 there's no documentation that adequately explained
12 what these photographs are or why they're contained
13 in the investigative file.  Were they shown to
14 Rodriguez?  Were they shown to Melendez?  Were they
15 not shown to either one of them?  As we sit here
16 today, neither one of us are going to be able to
17 answer that or at least I can't.
18   **Q.   Well, sir, do you have any evidence**
19 **that the photo arrays that were impounded is not**
20 **the photo array that was shown to both**
21 **Mr. Rodriguez and Mr. Melendez, any evidence**
22 **whatsoever, sir --**
23     MR. SWAMINATHAN:  Objection to form and --
24 BY MR. ENGQUIST:

Page 148

1    **Q.   -- other than questions?**
2      MR. SWAMINATHAN:  Objection to form and
3  foundation, asked and answered.
4      MR. ENGQUIST:  Go ahead, sir.
5      THE WITNESS:  I don't know.
6  BY MR. ENGQUIST:
7    **Q.   Okay.  So that would be a no evidence,**
8  **sir?**
9      MR. SWAMINATHAN:  Objection to form, asked
10 and answered.  Go ahead.
11     THE WITNESS:  I don't know if it would be a
12 no.  I clearly -- we both have questions about
13 those photos -- I can't say what you have, but I
14 certainly have questions about what photo array was
15 actually shown to them, and apparently somebody
16 within the police department has the same questions
17 that I have that probably had more insight into
18 this case than I do.
19 BY MR. ENGQUIST:
20   **Q.   Okay.**
21   A.   I don't know who wrote that -- the
22 stickum there.  I don't know who wrote that.  Was
23 it the sergeant in the case?
24   **Q.   Sir, do you know what a subpoena is?**

Page 149

1    A.   I do.
2    **Q.   Are you aware that criminal defense**
3  **attorneys and prosecutors will sometimes subpoena**
4  **documents to be used in a criminal case?**
5    A.   I understand that that's a practice,
6  yes.
7    **Q.   Okay.  And I'm not sure -- did you know**
8  **that photographs are kept by name in Chicago and**
9  **also by IRR number, which is the fingerprint**
10 **number?**
11   A.   I don't know if I knew that.
12   **Q.   Okay.**
13   A.   But it makes sense -- but it makes
14 sense to me, yes.
15   **Q.   Do you know what a CB number is; sir?**
16   A.   I don't.
17   **Q.   Okay.  It's a central booking number.**
18 **Did you know that Chicago police actually have an**
19 **independent number for every arrest so if a person**
20 **is arrested multiple times, there could be multiple**
21 **pictures of them?**
22   A.   That makes sense.  A lot of police
23 departments have the same process.  They call it a
24 different thing than CB but, yes.

Page 150

1    Q.   Okay.  Is that something that you're
2  familiar with from your time working in Fort
3  Lauderdale, sir?
4    A.   It is.
5    Q.   So if you had an arrestee, that
6  arrestee could have several pictures within the
7  system, correct?
8    A.   Sure, yes.
9    Q.   And when you subpoena those records, if
10  you don't know exactly what CB number was used, you
11  wouldn't know if you had the right picture for the
12  photo array; isn't that right?
13    A.   I think you lost me there.  I think
14  that's a disconnect.  I don't know how we -- how I
15  would be able to figure out whether or not I had
16  the right photos for the photo array based on a
17  subpoena.
18    Q.   Okay.
19    A.   I mean, let me help you.  I mean, my
20  understanding, if somebody is subpoenaed and asks
21  for photographs that were used in a photo array,
22  they would get just that, the photographs that were
23  used in the photo array, not necessarily photos of
24  a defendant that was arrested multiple times,

Page 151

1  because the evidence, sir, is the six photographs
2  that the detective used supposedly to make an
3  identification of the suspect.
4    Q.   And the actual six photographs, if they
5  are in inventory and are in possession by the
6  state's attorney's office, they have been produced,
7  correct?
8    A.   Again, I think we're, you know -- I
9  don't know if I'm going to give you the answer that
10  you're looking for.  The question that I have is
11  the same question that was on that yellow stickum.
12  Are these the photos from the photo array?  And
13  that's the same question that I have by virtue of
14  my review of the investigative file.
15        There may be a logical explanation,
16  and unfortunately since it wasn't included in the
17  police report or on any type of investigative
18  notes, can't answer that question.
19    Q.   Okay.
20    THE WITNESS:  Would this be a good time to
21  take our hourly five- or 10-minute break, or do you
22  want to finish --
23    MR. ENGQUIST:  Sure, that's fine.  Do you
24  want a five-minute break?

Page 152

1    MR. SWAMINATHAN:  Well, I think what actually
2  might make sense is I think we want to get some
3  lunch and we --
4    MR. ENGQUIST:  What was that?
5    MR. SWAMINATHAN:  I assume we're going to
6  want to get some lunch because we're going to be
7  going all day.  It's already -- it's 2:45, so we
8  might want to make this a lunch break rather than a
9  10-minute, you know, shorter break.  I defer to
10  you.
11    MR. ENGQUIST:  How long do you want?
12    THE WITNESS:  I mean, we can go another
13  half -- let's go -- let's take a five-minute break,
14  come back, and we go for another hour.  And then
15  we'll take a break, and we can grab something to
16  eat then.
17    MR. ENGQUIST:  Okay.  Let's take a
18  five-minute break now then.
19    THE WITNESS:  All right.
20    MR. ENGQUIST:  Off the record, please.
21    THE VIDEOGRAPHER:  We are off the video
22  record at 1:43 p.m.
23        (Recess taken.)
24    THE VIDEOGRAPHER:  We are back on the video

Page 153

1  record at 1:57 p.m.
2  BY MR. ENGQUIST:
3    Q.   All right.  All right, sir.  We're
4  still back at the one point we were talking about
5  suppressed evidence.  So far you have identified
6  that there were no notes.  You have questions about
7  the photo array and the officers not telling people
8  of their potential misconduct.  So my question is
9  what other items -- other pieces of evidence were
10  suppressed?
11    MR. SWAMINATHAN:  Objection to the form and
12  foundation.  Go ahead.
13    THE WITNESS:  Well, can I refer to my report?
14  BY MR. ENGQUIST:
15    Q.   Yeah.  You have it in front of you,
16  because I'm just -- we are in the opening part
17  where you said defendants also suppressed
18  evidence --
19    A.   Right.
20    Q.   -- and I just want to know what other
21  evidence was suppressed.
22    A.   If you can go to page 73.
23    Q.   Okay.
24    A.   So clearly there were several

THOMAS TIDERINGTON, 12/08/2022                    Page 154..157

Page 154

1 interviews of the witnesses. There's no notes of
2 what occurred during any of these interviews.
3      Q.   Sir, I don't want to break in, but
4 you've already said notes. So you have a big long
5 section about notes that you think would exist.
6 What else was withheld or suppressed?
7      A.   The fact that during the photo array it
8 took -- there was no document in the police report
9 about how long -- or what the witnesses said when
10 they viewed the photo array. It's my understanding
11 it took five or 10 minutes for Rodriguez to
12 identify the suspect. Again, that's somewhat
13 unusual. That's something that I would have
14 expected to see in a police report.
15          The details concerning the interview
16 with Sierra's girlfriend, Lucy Montalvo, there's no
17 details about that.
18     Q.   There's no details about the interview
19 with Lucy Montalvo?
20     A.   Well, there's -- I know you don't want
21 me to talk about notes, but there's no independent
22 notes about that.
23     Q.   Oh, you're still talking about notes.
24 You have already said categories. You said notes.

Page 155

1 You had a question with the photo array, and you
2 said not talking about their own potential
3 misconduct. What else was suppressed?
4      MR. SWAMINATHAN: Objection to the form and
5 foundation. He just told you some more. Go ahead.
6      THE WITNESS: Information relating to why the
7 photo array was shown and then a photo lineup was
8 conducted. There's no information about that.
9 It's highly unusual for officers to do both.
10 Especially since Sierra was already in custody,
11 there was no reason to show the witness a photo
12 array. It makes no -- it's not logical. Is the
13 witness identifying the photo, or is he identifying
14 the person that was actually -- that actually
15 committed the crime?
16 BY MR. ENGQUIST:
17     Q.   Sir, but I'm still asking you about
18 what was suppressed. We have notes. We have --
19     A.   Well --
20     Q.   You had a question about the photo
21 array and their own misconduct. What other
22 evidence was suppressed?
23     MR. SWAMINATHAN: Objection to form and
24 foundation. Go ahead.

Page 156

1      THE WITNESS: Well, I think that would be
2 suppressed as to why the officers felt it was
3 necessary to show the witnesses both a photo array
4 as well as a photo lineup. Information relating to
5 the suspect vehicle, it made no logical -- it made
6 no sense to me whatsoever not to have impounded the
7 vehicle and had a forensic testing done of the
8 vehicle. Again, it's something that I would have
9 expected in a homicide investigation.
10 BY MR. ENGQUIST:
11     Q.   Anything else that you believe that is
12 in your mind suppressed?
13     A.   The information relating to what
14 Officer Malczyk told the officers in the Gonzalez
15 investigation, that information was never revealed,
16 I don't believe, to the defendant, the fact that
17 his signature was forged, the fact that he claimed
18 that Guevara lied and that -- the statements that
19 were attributable to him, he said he never made. I
20 don't believe that information was ever disclosed.
21     Q.   Anything else that you believe meets
22 your term of suppressed evidence for this case?
23 When I say "this case," I am talking about the
24 underlying criminal case for Thomas Sierra.

Page 157

1      A.   Right. I'm sure there's others, but
2 that's all I can --
3      Q.   Well, sir, take your time then. What
4 else is there, because you put down suppressed
5 evidence and I want a list?
6      A.   All right. You do have a list, though,
7 right, or you want a bigger list or you want a
8 comprehensive --
9      Q.   I have the list you gave me. I said is
10 there anything else.
11     A.   Right. As we sit here, I'm sure
12 there's others, but if you want me to go through my
13 entire report again, I can do that or look at the
14 police report, but I think I covered the main
15 categories.
16     Q.   Okay. Sir, for your understanding, for
17 an officer to meet his obligations that something
18 is not suppressed, a piece of evidence is not
19 suppressed, if it's provided to the State, does
20 that meet the obligation for the police officer?
21     MR. SWAMINATHAN: Objection to form,
22 foundation and calls for a legal conclusion. Go
23 ahead.
24     THE WITNESS: Well, obviously I can't explain

THOMAS TIDERINGTON, 12/08/2022                    Page 158..161

Page 158

1 from a legal standpoint what it means.  From a
2 practical, operational standpoint, that if an
3 officer doesn't prepare the proper documents or
4 doesn't include certain things in his police report
5 that he knows or should have known occurred, then I
6 would believe -- or I -- it's my opinion that
7 that's suppressing evidence, sure.
8 BY MR. ENGQUIST:
9      Q.   Sir, I'm sorry.  I will ask my question
10 again.  What I was asking you is if an officer
11 gives the evidence to the State, is that the extent
12 of his duty?  Does he just have to give it to the
13 State and then it's not suppressed?
14      MR. SWAMINATHAN:  Same objection.
15      THE WITNESS:  Well, I believe if he -- well,
16 again, I don't know exactly what Chicago's policy
17 is.  If he adheres to the policy, if the policy is
18 that the information is to be turned over to the
19 prosecutor's office and that's what was done, then
20 I believe the officer followed policies and
21 procedures.
22          If the policy is that the -- based
23 on the subpoena, that the information is turned
24 directly over to the defendants, then -- and the

Page 159

1 officer didn't do it but merely gave it to the
2 State, I would view that as a policy violation.
3 BY MR. ENGQUIST:
4      Q.   Just moving down in that paragraph
5 where we were, you put in here, "Consistent with my
6 opinions, I also note that Defendants Guevara and
7 Halvorsen, the two detectives at the heart of this
8 investigation, have both pleaded the Fifth when
9 asked about whether they knowingly and
10 intentionally manipulated the eyewitnesses into
11 providing false identifications, fabricated witness
12 statements from others, and suppressed evidence of
13 Sierra's innocence.  In other words, they do not
14 deny committing egregious misconduct in this case."
15 Do you see that?
16      A.   I do.
17      Q.   Okay.  And what's your basis to believe
18 that Mr. Halvorsen continued to take the Fifth in
19 this case?
20      MR. SWAMINATHAN:  Objection to form and
21 foundation.
22      THE WITNESS:  That's my understanding from my
23 review of the documents that were sent to me.
24 BY MR. ENGQUIST:

Page 160

1      Q.   Okay.  I believe what you reviewed was
2 you reviewed his first deposition where he took a
3 blanket five in the Serrano/Montanez case; is that
4 correct?
5      MR. SWAMINATHAN:  Objection to form.  Go
6 ahead.
7      THE WITNESS:  I'm sorry, he took what?
8 BY MR. ENGQUIST:
9      Q.   A blanket five, took five on everything
10 in the Serrano/Montanez case?
11      MR. SWAMINATHAN:  Objection to form.  Go
12 ahead.
13      THE WITNESS:  That's my understanding, yes.
14 BY MR. ENGQUIST:
15      Q.   Okay.  Were you ever provided with his
16 second deposition when he came off five and
17 answered questions and didn't take five at all?
18      MR. SWAMINATHAN:  Objection to form and
19 foundation.
20      THE WITNESS:  I may have been.  I don't
21 recall without refreshing my memory.
22 BY MR. ENGQUIST:
23      Q.   Okay.  You think you may have seen him
24 come off five, but you didn't put it in your

Page 161

1 report, sir?
2      MR. SWAMINATHAN:  Objection to form.  Are you
3 telling him that he testified about the Sierra case
4 in the second deposition?
5      MR. ENGQUIST:  No, no, no.  I said have you
6 been -- know he came off five.  I will get to the
7 next part later on, Anand.  Don't worry.  Go ahead.
8      MR. SWAMINATHAN:  Objection to form and
9 foundation.  Go ahead.
10      THE WITNESS:  I'm sorry.  If you could please
11 ask that question one more time so I'm clear on it.
12 BY MR. ENGQUIST:
13      Q.   Do you believe you actually read his
14 second deposition in Serrano/Montanez where he came
15 off five and answered questions?
16      A.   Well, no, I don't know if he did.  I
17 guess my understanding is is that he refused to
18 answer questions.  If there's -- if I'm mistaken
19 and you can point to it, I certainly will correct
20 my answer.
21      MR. ENGQUIST:  Okay.  I hate to ask this
22 again.  What exhibit are we on, Miss Court
23 Reporter?
24      THE REPORTER:  Eleven is next.  Is that

THOMAS TIDERINGTON, 12/08/2022                                    Page 162..165

Page 162

1 right, Robyn?
2     MS. FALASZ:  That's what I have as well, yes.
3     MR. ENGQUIST:  Give me one second to get
4 these ready.
5     **Q.   Sir, is it your understanding -- tell**
6 **me your understanding.  Is it your understanding**
7 **that Mr. Halvorsen died during the pendency of this**
8 **case?**
9     MR. SWAMINATHAN:  You cut out there, Josh.
10 BY MR. ENGQUIST:
11     **Q.   Okay.  Is it your understanding that**
12 **Mr. Halvorsen died during the pendency of this**
13 **case?**
14     A.   I think he passed away, yes.  I don't
15 know exactly what the time period was.  Yes.
16         (Tiderington Deposition Exhibit 11 was
17          marked for identification.)
18 BY MR. ENGQUIST:
19     **Q.   Okay.  Let me show you what I am going**
20 **to mark as Exhibit No. 11.  It is a couple pages**
21 **from Ernest Halvorsen's February 6, 2019**
22 **deposition.  It is the second deposition in**
23 **Serrano/Montanez.**
24         **First off, I'll just scroll through**

Page 163

1 it.  We have the cover page.  Can you see this,
2 sir?
3     A.   I can.
4     **Q.   Okay.  And here is the heading so you**
5 **know what case we're talking about.  That's the**
6 **second deposition, and there's the date on**
7 **February 6, and I'm skipping to page 111.  Okay.**
8 **And if you want to read this whole page, I will let**
9 **you read it.  Let me know when to scroll.**
10     A.   Okay.  Okay.  I do recall reading this.
11     **Q.   You did read this?**
12     A.   I believe so, yes.
13     **Q.   Okay.  So you were aware when you wrote**
14 **this that Mr. Halvorsen decided in Serrano and**
15 **Montanez and then later on not to assert his Fifth**
16 **Amendment rights; isn't that correct?**
17     A.   Well, no.  It was my understanding that
18 he did refuse to answer questions in not only this
19 case but other cases.
20     **Q.   Really?  What other cases, sir?  Other**
21 **than Serrano and Montanez, where else did he take**
22 **five, sir?**
23     MR. SWAMINATHAN:  Objection to form.  Go
24 ahead.

Page 164

1     THE WITNESS:  You know, as we sit here today,
2 I don't recall specifically.  I would have to
3 review that to make sure I was correct.
4 BY MR. ENGQUIST:
5     **Q.   Does it make any difference to you that**
6 **he gave a deposition once where he took five and he**
7 **was asked a bunch of questions, and then he came**
8 **off five and he answered questions?**
9     MR. SWAMINATHAN:  Objection to form.  Go
10 ahead.
11     THE WITNESS:  If you're saying that's what he
12 did, I'm not going to dispute that.  I know that he
13 refused to answer questions and he took the Fifth
14 Amendment -- you know, based on his Fifth Amendment
15 right not to incriminate himself.  I know that
16 happened, and when he came off it, I don't know
17 exactly when that occurred.
18 BY MR. ENGQUIST:
19     Q.   Okay.
20     A.   And I'm not going to dispute if you
21 tell me --
22     **Q.   You know he did at least by February 6,**
23 **2019, right?**
24     A.   Well, based on what you're showing me

Page 165

1 today, yes.
2     **Q.   Okay.  Sir, I know you saw the -- one**
3 **of your items that you reviewed, and I think you**
4 **probably still have a copy of the items you**
5 **reviewed in preparation for your report in this**
6 **case, was the complaint.  Did you also look at the**
7 **answers that were given by the officers?**
8     A.   The answers, the interrogatory answers?
9     **Q.   The answers to the complaints.**
10     A.   I'm sure I did.  I don't recall exactly
11 what was --
12     **Q.   Okay.**
13     A.   You would have to -- I don't recall
14 exactly all of the questions or all of the answers.
15         (Tiderington Deposition Exhibit 12 was
16          marked for identification.)
17 BY MR. ENGQUIST:
18     **Q.   All right.  So let me show you -- I**
19 **will share the screen.  This was a filed document**
20 **here, and I am going to mark it as Exhibit No. 12,**
21 **and it's defendants Wojcik's, McMurray, Figueroa's,**
22 **Mingey's, Biebel's, and Halvorsen's answers and**
23 **affirmative defenses to the complaint.  Do you see**
24 **that?**

THOMAS TIDERINGTON, 12/08/2022                    Page 166..169

Page 166

1    A.  I do.
2        Q.   Did you review this document before
3    putting in here that Mr. Halvorsen denied
4    committing any egregious misconduct?
5        MR. SWAMINATHAN:  Objection to form and
6    foundation.  Go ahead.
7        THE WITNESS:  I would have to -- I reviewed
8    so many documents, I would have to look at that.  I
9    don't recall specifically.
10   BY MR. ENGQUIST:
11       Q.   Well, sir, this is 60 pages long, but
12   would you take my word on the fact that he denied
13   the misconduct -- he denied allegations of
14   misconduct all throughout this entire answer?
15       MR. SWAMINATHAN:  Objection to form and
16   foundation.
17       MR. ENGQUIST:  Go ahead, sir.
18       THE WITNESS:  I don't know.  Without reading
19   it, I can't answer that question.
20   BY MR. ENGQUIST:
21       Q.   Okay.  Well, we will just take some of
22   the -- maybe the ending ones here.  Next one --
23   okay.  We'll go with Count IV here as an idea,
24   paragraph 154.  It says:  In the manner described

Page 167

1    more fully above, the Defendant Officers, acting in
2    concert with co-conspirators, known and unknown,
3    reached an agreement among themselves to fabricate
4    evidence and to detain, prosecute, and convict
5    Plaintiff of the Andujar homicide, regardless of
6    Plaintiff's guilt or innocence, and thereby deprive
7    him of his constitutional rights.
8            Answering Defendants deny these
9    allegations in this paragraph as they pertain to
10   them and lack knowledge or information to admit or
11   deny the remaining allegations.
12           So you see there he's part of that
13   denying the allegations, right?
14       MR. SWAMINATHAN:  Objection to form and
15   foundation.
16   BY MR. ENGQUIST:
17       Q.   Right, sir?
18       A.   I took that to mean all of the
19   defendants.
20       Q.   Yes, including Mr. Halvorsen, sir.
21       A.   Okay.
22       Q.   Okay.  And were you aware of the fact
23   that there was an answer filed on his behalf while
24   he was still alive denying misconduct in the Sierra

Page 168

1    case, sir?
2        MR. SWAMINATHAN:  Objection to form and
3    foundation.  Go ahead.
4        THE WITNESS:  I'm not sure if I was aware of
5    that or not.
6    BY MR. ENGQUIST:
7        Q.   If you were aware of that, sir, why
8    would you put in here that he's not denying
9    committing egregious misconduct?
10       MR. SWAMINATHAN:  Objection to form and
11   foundation and argumentative.
12       THE WITNESS:  I base that on my understanding
13   that he took the Fifth Amendment on certain --
14   during certain testimony.
15   BY MR. ENGQUIST:
16       Q.   Okay.  Is it your understanding that if
17   a person asserts their Fifth Amendment rights, they
18   can never not assert their Fifth Amendment rights
19   later on?
20       MR. SWAMINATHAN:  Objection to form,
21   foundation, calls for a legal conclusion.
22   BY MR. ENGQUIST:
23       Q.   I'm asking for your understanding, sir.
24   Is that your understanding, that once you do it,

Page 169

1    you can never come off?
2        MR. SWAMINATHAN:  Objection to form and
3    foundation, calls for speculation -- calls for a
4    legal conclusion.  Go ahead.
5        THE WITNESS:  Yeah.  I'm not a -- I'm not a
6    lawyer, but my practical knowledge is that they can
7    come off it once they -- once a person -- if a
8    person decides to answer questions, that they can,
9    even after taking the Fifth.
10   BY MR. ENGQUIST:
11       Q.   Okay.  And if you saw these two
12   exhibits here, Exhibits 11 and 12, you were aware
13   before you wrote this in here that he in fact did
14   deny egregious misconduct, correct?
15       MR. SWAMINATHAN:  Objection to form and
16   foundation.  Go ahead.
17       THE WITNESS:  Well, you're saying "he," but
18   all of the defendants -- my understanding is
19   Guevara never answered any questions.
20   BY MR. ENGQUIST:
21       Q.   I will go to the top again, sir, just
22   so you can be aware.  These are from my clients.  I
23   don't represent Guevara.
24       A.   But I guess I am correct that Guevara

THOMAS TIDERINGTON, 12/08/2022                    Page 170..173

Page 170

1 never -- never answered any questions.
2     Q.   Sir, I am not asking any questions
3 about Mr. Guevara right now on this.  I'm asking
4 specifically about Mr. Halvorsen.
5     A.   Right, but it was confusing because
6 when I asked you all of the defendants, you said,
7 yes, all of the defendants.  So Guevara --
8     Q.   I thought you were taking it from the
9 title.
10    A.   Well, you know, I don't know exactly
11 who you're defending and who the other attorneys
12 are defending.  I don't know that.  So you would
13 have to --
14    Q.   Sir, at the beginning of the
15 deposition, we all introduced ourselves, and we
16 said who we represented, correct?
17    A.   You did, yes, but I -- what I'm saying
18 is I, you know -- for clarification purposes I
19 guess I didn't realize exactly which clients you
20 were representing and when you said --
21    Q.   Okay.  Now that you know that I
22 represent the other defendants, including
23 Mr. Halvorsen, and you have seen the answer to the
24 complaint when he was still alive denying

Page 171

1 misconduct, you know that he denied misconduct,
2 correct?
3     MR. SWAMINATHAN:  Objection to form and
4 foundation.  Go ahead.
5     THE WITNESS:  Well, as you're showing that to
6 me today, I'm not going to dispute that.  I don't
7 know what I knew when I was actually writing the
8 report, no.
9         (Tiderington Deposition Exhibit 13 was
10            marked for identification.)
11 BY MR. ENGQUIST:
12    Q.   All right.  More specifically, let me
13 show you Exhibit No. 13 which I am going to mark.
14 It is defendant Halvorsen's answers to the
15 plaintiff's first set of interrogatories.
16         Okay.  You see the first page there,
17 sir?
18    A.   I do.
19    Q.   Okay.  And it's for Ernest Halvorsen.
20 Do you see that?
21    A.   Yes.
22    Q.   And I can represent to you that this
23 was done before he died.
24    A.   Okay.

Page 172

1     Q.   And actually to prove that, I will go
2 to the very end, and you can see he actually signed
3 off on it personally.  Do you see that?
4     A.   I do.
5     Q.   Did you have copies of these before you
6 came to your opinions and wrote this in here, that
7 he had not denied egregious misconduct?
8     MR. SWAMINATHAN:  Objection to form and
9 foundation.
10    THE WITNESS:  If you can go back up to the
11 top, I'm trying to refresh my memory of whether or
12 not I read this.  I perhaps did.  If you can scroll
13 down --
14 BY MR. ENGQUIST:
15    Q.   Do you have a refreshed recollection,
16 sir?
17    A.   Not really.  If you can scroll up a
18 little bit.
19    Q.   Or down?
20    A.   I guess down.
21    Q.   Okay.
22    A.   There you go.  Is that down or --
23 that's good.
24        I don't independently recall reading

Page 173

1 this, but I may have.
2     Q.   Okay.  Do you think you would have read
3 the interrogatories and still put in the fact that
4 he was refusing to answer questions about this
5 case --
6     MR. SWAMINATHAN:  Objection --
7 BY MR. ENGQUIST:
8     Q.   -- the Sierra case?
9     MR. SWAMINATHAN:  -- form and foundation,
10 yes, and argumentative.  Go ahead.
11    THE WITNESS:  Well, I stand by my report.
12 I'm certainly willing to amend and correct any
13 deficiencies that I have in my report, and looking
14 at thousands of documents, I certainly did the best
15 that I could.
16 BY MR. ENGQUIST:
17    Q.   Well, to be quite honest, sir, your
18 report at several times puts in the fact that
19 defendant Halvorsen, Ernest Halvorsen, is taking
20 five and never denied misconduct.  That's in
21 several places in your report, correct?
22    MR. SWAMINATHAN:  Which sentences in the
23 report are you referring to where he says he never
24 came off the Fifth?

THOMAS TIDERINGTON, 12/08/2022                    Page 174..177

Page 174

1      MR. ENGQUIST:  Oh, I just said it's true
2 throughout -- he can look at it himself, Anand.  He
3 can defend himself on this.
4      MR. SWAMINATHAN:  Where does it say that he
5 never came off the Fifth?
6      MR. ENGQUIST:  They do not deny committing
7 egregious misconduct.  We just went through that
8 sentence in the very beginning of the report on
9 page 4.
10      MR. SWAMINATHAN:  Page 4?
11 BY MR. ENGQUIST:
12     Q.   All right, sir.  Let me just focus your
13 attention --
14      MR. SWAMINATHAN:  Wait, wait, wait, wait.
15 Hold on.  Where on page 4 does he say that?
16      MR. ENGQUIST:  Where does it say, in other
17 words, they do not deny committing egregious
18 misconduct?  The bottom of the -- we have already
19 been talking about this, Anand.  It's the last
20 sentence in the first full paragraph on page 4 of
21 his report.
22      MR. SWAMINATHAN:  Read the sentence right
23 above that.
24      MR. ENGQUIST:  Yes, and knowingly and

Page 175

1 intentionally manipulated, yes.
2     Q.   All right.  Look at number --
3     A.   I'm sorry.  I'm sorry, sir.  Could you
4 really -- I mean could you pull that up and let's
5 make sure I understand what you're asking?
6     Q.   I don't have that.  That's Exhibit
7 number -- the report is -- give me one second.
8 Actually, let me just finish this before I try to
9 go digging back through here.
10          Paragraph No. 12 here on the
11 interrogatories, do you see this?
12     A.   I do.
13     Q.   Can you read it?
14     A.   Yeah.
15     Q.   What does it say?
16     A.   You want me to read it?
17     Q.   Sure.
18     A.   Did you withhold from Thomas Sierra any
19 Exculpatory Evidence of which you were aware prior
20 to his exoneration of January 9, 2018?  If your
21 answer to this question is anything other than
22 unqualified no, please state when you became aware
23 of such Exculpatory Evidence and describe each such
24 piece of Exculpatory Evidence, providing sufficient

Page 176

1 detail so that additional discovery requests can be
2 served.
3     Q.   And you see the answer?
4     A.   I do.
5     Q.   Okay.  And what is the answer?
6     A.   You want me just read -- just keep
7 reading this to you or do you want --
8     Q.   Well, what is the answer?  Is it a yes
9 or a no?
10     A.   His answer is:  Defendant Halvorsen
11 objects to the term exoneration as vague.
12 Subject -- I can't make out those other words
13 because our -- you'd have to move it over so I can
14 see the rest of the answer because our pictures are
15 blocking it.
16     Q.   Okay.
17     A.   Without waiving this objection.
18 Halvorsen states no.
19     Q.   Okay.  All right.  Let me see.  I will
20 find the right exhibit here.  And his report is
21 Exhibit No. 7, and we weren't showing it before
22 because we have a lot of paper here.  If we look at
23 paragraph 4 -- I'm sorry, page 4, you specifically
24 have in here at the bottom of that that he pleads

Page 177

1 Fifth on suppressing evidence, correct?
2     A.   All of that sentence was broken up.  I
3 didn't get any of it.
4     Q.   Sure.
5     A.   Other than "correct."
6     Q.   The last part of that paragraph on page
7 4, the top paragraph.
8     A.   Right.
9     Q.   Without having to read the whole thing,
10 you do in here state that Detective Halvorsen has
11 been taking five on whether or not he suppressed
12 evidence of Thomas Sierra's innocence, correct?
13     A.   I don't know if I see -- I don't know
14 if I'm looking at the same thing that you're
15 looking at to tell you the truth.
16      MR. SWAMINATHAN:  Page 4, the first full
17 paragraph, is that what you're looking at, Josh?
18      MR. ENGQUIST:  Yes.
19      THE WITNESS:  The last sentence?
20 BY MR. ENGQUIST:
21     Q.   And the sentence before.
22     A.   Okay.  You want to read that to me?
23     Q.   Consistent with my opinions, I also
24 note that Defendants Guevara and Halvorsen, the two

THOMAS TIDERINGTON, 12/08/2022                    Page 178..181

Page 178

1  detectives at the heart of the investigation, have
2  both pleaded the Fifth when asked about whether
3  they knowingly and intentionally manipulated
4  eyewitnesses into providing false identifications,
5  fabricated witness statements, and suppressed
6  evidence of Sierra's innocence.  In other words,
7  they do not deny committing the egregious
8  misconduct.  Do you see that?
9      A.  I do.
10     Q.  Based on what you reviewed just
11  recently in Exhibits No. 12 and No. 13 and Exhibit
12  No. 11, do you still stand behind the allegation
13  you have in here that Halvorsen still has not
14  denied egregious misconduct in this case?
15     MR. SWAMINATHAN:  Objection to form and
16  foundation, mischaracterizes the report and his
17  testimony.
18     THE WITNESS:  Well, yeah.
19  BY MR. ENGQUIST:
20     Q.  Yeah what?  I don't know what that
21  means.
22     A.  Well, you know, I apologize.  Halvorsen
23  did take the Fifth, and that's what I said in my
24  report here, all right?  There's no -- and I think

Page 179

1  you're not disputing that.  And Guevara, I believe,
2  took the Fifth and never disputed, never responded.
3  So I think -- I stand by my statement.  I don't
4  think it's incorrect.
5      Q.  And the very last sentence, "In other
6  words, they do not deny committing egregious
7  misconduct in this case," you still stand behind
8  that one, sir?
9      MR. SWAMINATHAN:  Objection to form,
10  foundation, asked and answered.
11     MR. ENGQUIST:  Go ahead.
12     THE WITNESS:  I stand by my report, yes.
13  BY MR. ENGQUIST:
14     Q.  Okay.  Knowing that he did come off
15  five and knowing he did deny egregious misconduct,
16  you are still standing behind that sentence; is
17  that a fair statement?
18     MR. SWAMINATHAN:  Objection to form and
19  foundation.
20     MR. ENGQUIST:  Go ahead, sir.
21     THE WITNESS:  I do.
22  BY MR. ENGQUIST:
23     Q.  Okay.  And are any of your opinions in
24  here based on the fact that Mr. Halvorsen at one

Page 180

1  time took the Fifth?
2      A.  I'm sorry?
3      Q.  Are any of your opinions in here based
4  on the fact that Mr. Halvorsen at one time took the
5  Fifth?
6      MR. SWAMINATHAN:  Objection to form.  Go
7  ahead.
8      A.  Well, I noted that he took the Fifth.
9  BY MR. ENGQUIST:
10     Q.  I understand.  Are any of your opinions
11  based on the fact that at one time he took the
12  Fifth?
13     MR. SWAMINATHAN:  Objection to form.  Go
14  ahead.
15     THE WITNESS:  I don't think it was the basis
16  of my opinions.  I think it was an observation of
17  what actually occurred.  I don't know that it would
18  change my opinion in any way whether he took the
19  Fifth or he did not.
20  BY MR. ENGQUIST:
21     Q.  Okay.  What about Mr. Guevara --
22     A.  Certainly --
23     Q.  Oh, I'm sorry.  I thought you were
24  done.

Page 181

1      A.  Yeah, yeah.  I think it's highly
2  unusual for a police officer to take the Fifth, and
3  quite frankly it's unusual to take the Fifth and
4  then decide to answer questions afterwards.  And I
5  believe that's unusual as well.
6      Q.  Okay.  Other than your observations
7  that you find it unusual for Mr. Halvorsen, it
8  doesn't play any role in your opinions; is that
9  correct?
10     A.  No.
11     Q.  It's not correct?
12     A.  No, no.  You're correct that it doesn't
13  change my opinions.
14     Q.  Does it help form your opinions in this
15  case?
16     MR. SWAMINATHAN:  Objection to form.  Go
17  ahead.
18     THE WITNESS:  No.  I don't -- no, I don't
19  think it helped form my opinion.  I think -- I
20  think I articulated my concerns, and whether he
21  testified or didn't testify I don't think would
22  change what my opinions were whatsoever.
23  BY MR. ENGQUIST:
24     Q.  Okay.  And is that the same with

THOMAS TIDERINGTON, 12/08/2022                    Page 182..185

Page 182

1 Mr. Guevara, the fact that he took the Fifth and is
2 maintaining to take the Fifth, does that impact
3 your opinions -- does that help form your opinions
4 in this case?
5       MR. SWAMINATHAN:  Objection to form.
6       THE WITNESS:  No.  I looked at the specific
7 actions that each of these officers took in this
8 investigation, and my opinion is based on that.
9 BY MR. ENGQUIST:
10      Q.    Okay.  And then you go on to further
11 summarize your opinions.  Do you see that here?
12      A.    I do.
13      Q.    Okay.  All right.  If we look at number
14 (a), you talk about tunnel vision.  Do you see
15 that?
16      A.    Yes.
17      Q.    Okay.  And if you go down to
18 approximately the middle of the paragraph where --
19 it's on the right-hand side.  The sentence starts
20 with "In addition, there is substantial evidence in
21 the record that...."  Do you see that sentence?
22      A.    I'm looking for it.  Hold on one
23 second.  Yes.
24      Q.    Okay, "...in the record that Detective

Page 183

1 Reynaldo Guevara and other defendants used
2 intentionally and willfully" -- I'm sorry.  It says
3 "used intentionally and willfully manufactured and
4 falsified evidence."  See that?
5       A.    I do.
6       Q.    Okay.  All right.  What evidence was
7 intentionally manufactured and falsified?  You can
8 refer to your whole report if you need to go back
9 and forth, but I just want to know specifically
10 which pieces of evidence were willfully
11 manufactured and falsified?
12      A.    Well, I believe the witness statements
13 were manipulated and falsified.
14      Q.    Okay.  Which witness statements?
15      A.    Well, the girlfriend's witness
16 statement, Sierra's statement to the police about
17 his alibi and then the detectives discrediting
18 Lucy, the girlfriend, by providing information in
19 the report that does not appear to be factual or
20 truthful.
21      Q.    Okay.  What are the witness statements
22 that you believe were manufactured or falsified?
23      A.    Well, if the witnesses were told that
24 the suspect was in the lineup or the suspect was in

Page 184

1 the photo array, that would be improper, and if
2 that is what occurred, then it would be
3 manufactured evidence.
4       Q.    So are you speaking about Melendez in
5 that case?  If Melendez is to be believed that he
6 was told who to pick, that would be manufactured,
7 correct?
8       A.    That would be, yes.
9       Q.    What other evidence was manufactured or
10 falsified?
11      A.    Well, the information concerning the
12 vehicle, whether it was a dark blue or silver and
13 the information that Guevara allegedly got from
14 another police officer which apparently is not true
15 based on the officer's testimony.
16      Q.    You're talking about the other
17 investigation, correct?
18      MR. SWAMINATHAN:  Objection to form.  Go
19 ahead.
20      THE WITNESS:  Well, but the Gonzalez
21 investigation was the basis for -- supposedly the
22 basis for identifying Sierra in this case.
23 BY MR. ENGQUIST:
24      Q.    The person who gave the information to

Page 185

1 Halvorsen and Guevara that led them to think that
2 maybe Thomas Sierra was involved, Junito, who was
3 that who gave them that information?
4       MR. SWAMINATHAN:  Objection to -- go ahead.
5       THE WITNESS:  Well, we don't know who gave
6 them the information.  I think the information
7 according to Guevara came from Esther Reyes.
8 BY MR. ENGQUIST:
9       Q.    Okay.
10      A.    And they --
11      Q.    When you say "we don't know," why don't
12 we know?
13      A.    Because it's not clear in the police
14 report, which is part of the problem.
15      Q.    Tell me if I'm wrong.  The police
16 report indicates that Esther Reyes said that that
17 was Lil Hector and Junito, correct?
18      A.    That's what the report says, yes.
19      Q.    Okay.  And what evidence do you have to
20 refute that that's how Mr. Sierra's name got
21 involved in this case?
22      MR. SWAMINATHAN:  Objection to form.
23      THE WITNESS:  Well, wait.  I don't think
24 that's what you asked me.

THOMAS TIDERINGTON, 12/08/2022                    Page 186..189

Page 186

1 BY MR. ENGQUIST:
2    Q.   I'm asking you now.  What evidence do
3 you have --
4    A.   Well --
5    Q.   -- to deny the fact that that's how the
6 information came into their possession, from Esther
7 Reyes?
8        MR. SWAMINATHAN:  Objection to the form and
9 foundation.
10       THE WITNESS:  Well, I think what you had
11 asked, and maybe I misunderstood you, was how did
12 Sierra become a suspect.  He became a suspect
13 according to Guevara because while they were at
14 Esther Reyes's house, that he saw or he recalls
15 seeing a car pull up with two suspects in it, but I
16 don't think Reyes had any insight into whether or
17 not Sierra was involved in any murder.  I don't
18 think that's the information she provided to these
19 detectives.
20 BY MR. ENGQUIST:
21    Q.   Sir, tell me if this jogs your memory.
22 The car seemed familiar to Guevara and Halvorsen,
23 and they remembered the information of who was in
24 the car, who had the car, Junito and Lil Hector,

Page 187

1 came from Esther Reyes, correct?
2    A.   That information did, yes.
3    Q.   Yes.
4    A.   Well, allegedly, yes.
5    Q.   Allegedly.  Do you have any evidence to
6 support the fact that that is not true, that the
7 information of who was in that car that day, Junito
8 and Hector, was untrue?
9        MR. SWAMINATHAN:  Objection, objection to
10 form.  Go ahead.
11       THE WITNESS:  Well, I don't know if it's true
12 or not.  I mean, I don't -- you know, but again,
13 once again, you have identified another problem
14 because there's no notes.  There's no independent
15 information that was documented by these detectives
16 when this occurred.  So if this is what happened, I
17 would have expected to see some type of notes that
18 would have been included in the investigative file.
19 But to answer your question, no, I can't dispute
20 that.
21 BY MR. ENGQUIST:
22    Q.   Okay.  So we have the witness statement
23 from the girlfriend and the witness statement from
24 Sierra you said is manufactured.  What else was

Page 188

1 manufactured and you have the -- what else is
2 manufactured that you have in your report?
3        MR. SWAMINATHAN:  Objection, foundation,
4 mischaracterizes the testimony.  Go ahead.
5        MR. ENGQUIST:  Go ahead, sir.
6        THE WITNESS:  I think those were the main
7 things.  There may be others as we discuss it
8 further.  If my memory is jarred, I'll let you
9 know.
10 BY MR. ENGQUIST:
11    Q.   Do you need to look through your report
12 to figure that part out, what other evidence was
13 manufactured?  Right now we have witness statements
14 and what else?
15    A.   Yeah.  If you --
16       MR. SWAMINATHAN:  Objection to form and
17 foundation, mischaracterizes the testimony.  Go
18 ahead.
19 BY MR. ENGQUIST:
20    Q.   Just so you know, sir, you can go
21 through your -- I have no problem with you going
22 through your 72 pages if you need to refer back.  I
23 mean, you know what the information is.  You wrote
24 it, so go ahead.

Page 189

1    A.   All right.  Well, the statement from
2 Hector Montanez indicates -- well, obviously he
3 recanted what he had allegedly told the detectives.
4 It makes no sense whatsoever that Hector identified
5 himself as the driver of a vehicle that was used in
6 a murder, refused to identify a passenger that was
7 also in the vehicle.
8        Witnesses claim to have seen the
9 driver of the vehicle who theoretically would have
10 been Hector if he -- if Hector was in fact involved
11 in this murder hand the passenger the murder
12 weapon, yet there was no charges or -- there was no
13 information on charging Hector.  And the detectives
14 indicated that there was not enough information to
15 charge that -- to charge Hector for that murder.  I
16 don't understand how that could be possible.
17    Q.   Okay.  So you have identified now
18 Hector's statement.  Any other statements or any
19 other pieces of evidence that you believe were
20 intentionally and willfully manufactured?
21       MR. SWAMINATHAN:  Objection to form.  Go
22 ahead.
23       THE WITNESS:  And then there were statements
24 attributed to the witness about the vehicle.  The

THOMAS TIDERINGTON, 12/08/2022                          Page 190..193

Page 190

1  detectives claim that the witnesses identified the
2  vehicle as it was parked in the parking lot while
3  they claim that -- the statement to the detectives
4  was that the vehicle looked similar, but it wasn't
5  the vehicle.  So if that in fact happened,
6  obviously that would be manufactured evidence
7  against the -- against Sierra.
8  BY MR. ENGQUIST:
9      Q.   Anything else?
10     A.   I think that's most of my opinion.
11     Q.   Anything else, though, about
12  manufactured evidence?
13     A.   I think that -- I think that's it.
14     Q.   Okay.  The statement by the girlfriend,
15  that was actually also taken by a state's attorney;
16  isn't that correct?
17     MR. SWAMINATHAN:  Objection to form.  Go
18  ahead.
19     THE WITNESS:  Which statement?
20  BY MR. ENGQUIST:
21     Q.   The statement from the state's
22  attorney -- Lucy Montalvo, that was the statement
23  that was taken by the state's attorney; isn't that
24  correct?

Page 191

1      MR. SWAMINATHAN:  Objection to form.  Go
2  ahead.
3      THE WITNESS:  Right, but it is my
4  understanding -- it's my understanding there were
5  several interviews prior to the statement being
6  provided.  So we have no way of knowing what she
7  initially told the detectives, and certainly
8  there's no notes.  There's no tape-recordings of
9  the statement.  So we don't know exactly what she
10  told the detectives before she met with the
11  prosecutor.
12  BY MR. ENGQUIST:
13     Q.   And where is your understanding coming
14  that there were several interviews in which she
15  gave a different statement than she did at the
16  state's attorney?
17     A.   I believe it -- well, I'm not saying
18  that -- there's no indication that she gave a
19  different statement, but in the report it says that
20  they interviewed her, and at some point the state
21  attorney came.  I believe it was at, you know, 2:30
22  in the morning or 1:30 in the morning, and so it
23  was obvious and -- it was obvious that they
24  interviewed her before the prosecutor was there.

Page 192

1      Q.   Okay.  And what's your evidence to
2  say -- to suggest or -- what's your evidence to
3  opine that Lucy Montalvo gave them a different
4  statement than she gave to the state's attorney
5  when he did the handwritten statement?
6      A.   Well, I don't have any evidence but --
7  of that, but what I'm suggesting is that this is
8  part of the problem.  We don't know exactly what --
9  if there were -- and we don't know how many
10  interviews they had or who interviewed her, but if
11  there were interviews of her before she met with
12  the prosecutor, what did she tell the detectives?
13  Did she tell them verbatim the same thing during
14  her first meeting that she told the prosecutor
15  hours later?  It's doubtful that that could have
16  happened.
17     Q.   Okay.  I understand you have questions,
18  but as you said, you had no evidence, correct?
19     MR. SWAMINATHAN:  Objection to form.  Go
20  ahead.
21     THE WITNESS:  No, I don't have evidence.
22  BY MR. ENGQUIST:
23     Q.   Okay.
24     A.   I can only review the case file to make

Page 193

1  my determinations, and when there's things missing
2  in the case file that a reasonable detective would
3  expect to see in there, it does raise red flags and
4  questions.
5      Q.   Okay.  And when we talk about Lucy
6  Montalvo and you have -- you don't have any
7  evidence, but who do you have questions about
8  falsifying her statement, which officers?
9      A.   I believe it was -- well --
10     MR. SWAMINATHAN:  Go ahead, go ahead.
11     THE WITNESS:  I believe it was the -- Guevara
12  and Halvorsen are the ones that interviewed her.
13  BY MR. ENGQUIST:
14     Q.   Okay.
15     A.   But I'm not limiting it to only them.
16  There has to be -- again, in a criminal
17  investigation of this nature, there's more people
18  involved.  There's supervisors involved.  There's
19  other detectives, other officers in the unit.  So
20  to simply blame this on one detective and say he
21  made all of these mistakes I don't think is
22  something that you can really do.
23     Q.   Okay.  What evidence do you have that
24  Sergeant Biebel interviewed or was involved in the

THOMAS TIDERINGTON, 12/08/2022                    Page 194..197

Page 194

1 interview of Lucy Montalvo?

2     A.   Well, I don't have any evidence that he

3 was.

4     Q.   Okay.  What evidence do you have that

5 Sergeant Mingey was involved in the interview with

6 Lucy Montalvo?

7     A.   I don't have any evidence that they

8 were, but if they're the supervisor --

9     Q.   What --

10     A.   Well, wait a minute.  If they're the

11 supervisor of the unit, they should be asking the

12 same questions that I'm raising here today.

13     Q.   Okay.  What evidence --

14     A.   And if they did that -- well, wait a

15 minute.  If they did raise these questions or these

16 issues, then perhaps they're part of the problem as

17 well.

18     Q.   What evidence do you have that Gang

19 Crimes Specialist Figueroa interviewed Lucy

20 Montalvo?

21     A.   I don't have any evidence of that.

22     Q.   What evidence do you have that

23 Detective McMurray interviewed Lucy Montalvo?

24     A.   I don't have any evidence of that.

Page 195

1     Q.   What evidence do you have that

2 Detective Wojcik interviewed Lucy Montalvo?

3     A.   I don't have any evidence that that

4 happened.

5     Q.   Okay.  Another issue that you had is

6 that you believe that Mr. Sierra's statement about

7 an alibi was manufactured so it could be, as you

8 put it, like broken or refuted; is that correct?

9     A.   That appears as to what happened, yes.

10     Q.   Okay.  Do you believe that the state's

11 attorney was involved in manufacturing the alibi

12 that Mr. Sierra had given?

13     A.   I'm not sure -- well, No. 1, I'm not

14 sure that he gave an alibi.  I don't think -- I

15 think his testimony was that he wasn't sure where

16 he was at during that time period but that he would

17 typically go over to his girlfriend's house during

18 these hours, and I think the detectives took that

19 statement and indicated that he claimed to have

20 been at the girlfriend's house and because it

21 was -- because she testified that it wasn't

22 possible, then, therefore, he's lying.  So I think

23 that's what happened or at least that's my --

24 that's how I recall it.

Page 196

1     Q.   Okay.  Well, was the state's attorney

2 involved in what you're talking about?

3     A.   Well, no.  I don't know because there's

4 no record in the police report or the case file of

5 whether or not the state attorney was --

6 participated in the first, second, third, or fourth

7 interview of Lucy.

8          We don't know how many interviews

9 there were of her.  So we don't know what she said

10 initially.  We don't know who she said it to.  We

11 don't know if the state attorney was there.  I

12 don't believe he was there.

13     Q.   Sir, I was asking you about the

14 statement from Thomas Sierra to talk to his

15 girlfriend for an alibi.  Are you aware of whether

16 or not the state's attorney was there when he made

17 that statement?

18     A.   Again, I don't mean to be difficult

19 and -- but I think there were several interviews of

20 Sierra as well, and there's no specific details

21 about what occurred during each interview.

22     Q.   Okay.  Do you believe the state's

23 attorney was involved in manufacturing whether or

24 not Sierra said he was with his girlfriend that

Page 197

1 night?

2     A.   I have no way of knowing that.  I

3 don't -- I have no evidence that the state attorney

4 was, no.

5     Q.   Okay.  Do you have any evidence that

6 Sergeant Biebel was involved in any of the

7 interviews with Thomas Sierra?

8     A.   I have no way of knowing that.

9     Q.   Do you have any evidence of whether or

10 not Sergeant Mingey was involved in any interviews

11 with Thomas Sierra?

12     A.   I have no way of knowing that either.

13     Q.   Okay.  Do you have any evidence that

14 Gang Crimes Specialist Figueroa was involved in any

15 of the interviews of Thomas Sierra?

16     A.   I don't know that.

17     Q.   Do you have any evidence on whether or

18 not Detective McMurray was involved in any of the

19 interviews of Thomas Sierra?

20     A.   I don't know.

21     Q.   Do you have any evidence on whether or

22 not Detective Wojcik was involved in any of the

23 interviews of Thomas Sierra?

24     A.   Again, I don't know.

THOMAS TIDERINGTON, 12/08/2022           Page 198..201

Page 198

1   **Q. Okay. With Hector Montanez is it your**
2 **understanding that the first time he was**
3 **interviewed about this case was with both**
4 **Detective Guevara and ASA Farrell?**
5     MR. SWAMINATHAN: Can you read that back? I
6 missed the backup for that.
7     MR. ENGQUIST: Sure.
8   **Q. Is it your understanding that the first**
9 **interview of Hector Montanez about this case was**
10 **conducted by both Detective Guevara and ASA**
11 **Farrell?**
12     MR. SWAMINATHAN: Objection to form. Go
13 ahead.
14     THE WITNESS: I don't know. I don't think
15 so. I think there was interviews before the ASA
16 was there.
17 BY MR. ENGQUIST:
18   **Q. According to the reports, if it was on**
19 **May 30, 1995, at 030 hours the first -- Montanez in**
20 **an interview room -- it says: The first interview**
21 **was conducted with Hector Montanez in an interview**
22 **room at Area 5. Present for the interview were**
23 **Detective R. Guevara and ASA W. Farrell. Would you**
24 **have any reason to doubt that?**

Page 199

1     MR. SWAMINATHAN: Objection to form and
2 foundation. Go ahead.
3     THE WITNESS: I don't have any reason to
4 doubt that, but I certainly don't know if that was
5 the case. I mean, I don't have the report in front
6 of me and I -- it's my recollection was that there
7 were other meetings with him. Certainly there were
8 other meetings with him relating to the Gonzalez
9 case. So I don't know when he first -- they first
10 started talking with him about the Sierra -- the
11 case involving Sierra.
12 BY MR. ENGQUIST:
13   **Q. Do you have any evidence that Detective**
14 **Halvorsen interviewed Hector Montanez?**
15     A. I don't recall if he did or whether it
16 was Guevara. I don't know.
17   **Q. Do you have any evidence whether or not**
18 **Detective Biebel interviewed Hector Montanez?**
19     A. And, again, just to--
20   **Q. I'm sorry, Sergeant Biebel.**
21     A. Just to be clear, when you ask me do I
22 have any evidence, you obviously know the only
23 thing I can base my opinions on is the documents
24 that I have been provided. So if you classify

Page 200

1 those documents as evidence, then -- I'm assuming
2 that's what you're asking about. I don't have any
3 independent -- I didn't do an independent
4 investigation. So when you keep asking whether or
5 not I have evidence, it's only based on the
6 documents that have been provided to me.
7   **Q. Yes. I understand. Do you have any**
8 **evidence that Sergeant Biebel conducted any**
9 **interviews of Hector Montanez?**
10     A. I don't.
11   **Q. Do you have any evidence whether or**
12 **not --**
13     A. Not that I can recall, not that I can
14 recall at this point.
15   **Q. Do you have any evidence whether or not**
16 **Gang Crimes Specialist Figueroa had interviews of**
17 **Hector Montanez about this incident?**
18     A. Not that I can recall, no.
19   **Q. Same question for Detective Wojcik?**
20     A. Same answer, I don't recall.
21   **Q. Same question for Detective McMurray?**
22     A. Once again, I don't recall.
23   **Q. Okay. Okay. Let's go to the next**
24 **paragraph you have there, the subparagraph (b) in**

Page 201

1 **your summary.**
2     MR. SWAMINATHAN: And, Josh, just before you
3 ask a question, let me just check with the
4 witness --
5     MR. ENGQUIST: Sure.
6     MR. SWAMINATHAN: -- are you good to go any
7 longer? Do you want to get lunch?
8     THE WITNESS: Yeah. Can we go till like 4:00
9 o'clock and then take a break for lunch?
10     MR. ENGQUIST: That's in 10 minutes?
11     THE WITNESS: Yeah.
12     MR. SWAMINATHAN: Yeah.
13     MR. ENGQUIST: We might as well just take a
14 break now rather than start into that and break in
15 the middle.
16     THE WITNESS: Okay.
17     MR. SWAMINATHAN: It's up to you.
18     MR. ENGQUIST: All right. How long do you
19 need or how long does anybody else need too, by the
20 way?
21     MR. SWAMINATHAN: Realistically it will take
22 us at least 40, 45 minutes. We will try to be back
23 in 45 minutes.
24     MR. ENGQUIST: All right. Well, then let's

THOMAS TIDERINGTON, 12/08/2022                          Page 202..205

Page 202

1  just say 3:45 our time, just make it even?  Does
2  that sound good?
3       MR. SWAMINATHAN:  Yeah.
4       MR. ENGQUIST:  All right.  I'll see you back
5  in 45 minutes.  We can go off the record.
6       THE WITNESS:  Thank you.
7       THE VIDEOGRAPHER:  Off the video record at
8  2:51 p.m.
9          (Whereupon, a luncheon recess was taken
10         from 2:51 p.m. to 3:48 p.m., after
11         which time the proceedings resumed as
12         follows:)
13      THE VIDEOGRAPHER:  We're back on the video
14  record at 3:48 p.m.
15           THOMAS J. TIDERINGTON,
16  having been previously sworn, was examined and
17  testified further as follows:
18      DIRECT EXAMINATION (Resumed)
19  BY MR. ENGQUIST:
20      Q.   All right.  Sir, picking up where we
21  left off, if we could look at page 4 of your
22  report, look under (b) you have here.
23      A.   Yes.
24      Q.   Do you have that in front of you?

Page 203

1       A.   I do.
2       Q.   Okay.  You have here failed to consider
3  crime scene evidence, which included the recovery
4  of both 9mm and .22 caliber casings, strongly
5  suggesting there was at least two shooters.  Do you
6  see that?
7       A.   I do.
8       Q.   Okay.  Now, you are not trying to
9  suggest here that the fact that you don't believe
10  it was fully considered was withholding evidence,
11  correct?
12      A.   Well, withholding evidence, if they
13  don't -- if they don't fully investigate all of
14  their leads and don't explain where that other
15  round came from, I would suggest that it's
16  withholding of evidence.
17      Q.   Okay.  And do you believe -- let me ask
18  you, when you were a police officer, were you ever
19  made aware of like Brady versus Maryland, the idea
20  of having to disclose exculpatory information?
21      A.   Yes, sure.
22      Q.   Okay.  Based on your understanding in
23  all your years in law enforcement, do you believe
24  not following up, as you put it here, or failing to

Page 204

1  consider the .22 caliber casings withholding --
2  like a Brady violation?
3       A.   Well, I don't know.  I mean, that's, I
4  guess, a legal determination whether or not it's a
5  Brady violation.  I certainly think it would be a
6  violation of -- or deviation from best practices.
7  When you have evidence that there were two
8  different handguns used in a shooting and you do
9  nothing to investigate whether or not that was true
10  or whether there was a second weapon involved and
11  you simply charge somebody when facts don't add up,
12  I think it's a deviation from acceptable police
13  practices, yes.
14      Q.   Okay.  Sir, you're aware that the .22
15  caliber shell casings were found in a different
16  location; aren't you?
17      A.   Different location than --
18      MR. SWAMINATHAN:  Object to the form.  Go
19  ahead.
20  BY MR. ENGQUIST:
21      Q.   The 9mm casings.
22      A.   My understanding, they were all found
23  within the crime scene.
24      Q.   Well, how do you define the crime

Page 205

1  scene?
2       A.   Where the shooting took place.
3       Q.   Okay.  Are you aware there's more than
4  one location where shell casings were recovered?
5       MR. SWAMINATHAN:  Objection to form,
6  foundation.  Go ahead.
7       THE WITNESS:  Well, to answer your question,
8  my understanding is that the shell casings were
9  discovered within the area of the crime scene,
10  where the responding officer believed the crime
11  scene were and that's other -- that's why they
12  collected the evidence and listed the evidence.
13  BY MR. ENGQUIST:
14      Q.   Okay.  But just to be clear, you're
15  aware that the two .22 caliber cartridges were at a
16  different location other than the 9mm cartridges
17  that were recovered, correct?
18      A.   I don't know that, no.  I'm not aware
19  of that.
20      Q.   Okay.  In the report if it gives two
21  different addresses, would you agree that it's two
22  different locations?
23      A.   Sure.  That would make sense.
24      Q.   Okay.  Are you aware of any evidence

THOMAS TIDERINGTON, 12/08/2022                    Page 206..209

Page 206

1 that any witness ever said there was more than one
2 shooter?
3      A.   I think there was evidence that there
4 were eight to nine shots fired and they recovered
5 five or six 9mm rounds.  So I think the witnesses
6 said there were multiple gunshots fired.
7      Q.   Okay.
8      A.   And I believe the officers believe that
9 there were at least possibly two guns used during
10 the shooting.
11     Q.   Okay.  Sir, what evidence can you point
12 to that a witness -- let me go back to my first
13 question.
14          Does any witness ever say there were
15 two shooters?
16     A.   Do you consider police officers to be
17 witnesses or no?
18     Q.   I'm talking about the witnesses to the
19 crime.
20     A.   No, I don't --
21     Q.   Mr. Melendez and Mr. Rodriguez, do
22 either of them say there were two shooters?
23     A.   No --
24     Q.   Okay.

Page 207

1      A.   -- not that I know of.
2      Q.   All right.  And, sir, you're aware that
3 there was actually recovered bullets in this case,
4 correct, that landed in the car and in the victim?
5      MR. SWAMINATHAN:  Did you say in the car?
6      MR. ENGQUIST:  In the car and in the victim.
7      THE WITNESS:  I believe there were rounds --
8 bullet fragments recovered from the victim.  I
9 don't know about the vehicle.  Possibly, yeah.
10 BY MR. ENGQUIST:
11     Q.   Okay.  And do you know what caliber the
12 bullets that were recovered were?
13     A.   No.  I wish we -- I wish that was
14 included in the police report.
15     Q.   Okay.  So based on your exhaustive
16 review of the police report, you didn't see
17 anything indicating what caliber bullets were
18 recovered; is that correct?
19     A.   I thought it said -- my recollection
20 without looking at the police report and if I --
21 perhaps maybe I should look at it, but my
22 recollection is that it said a medium caliber round
23 was recovered.
24

Page 208

1          (Tiderington Deposition Exhibit 14 was
2           marked for identification.)
3 BY MR. ENGQUIST:
4      Q.   All right.  Let me show you what I am
5 going to mark as Exhibit No. 14.  I'll start with
6 that one, I guess.
7      A.   Right, right.  And to be clear, are we
8 talking about casings, or are we talking about the
9 rounds?
10     Q.   I was talking about the rounds here.
11 That's why I didn't say casings.
12     A.   Okay.
13     Q.   We did casings earlier in two different
14 locations.
15     A.   Okay.
16     Q.   I talked about actual bullets or bullet
17 fragments in the car and in the victim.
18     A.   All right.  Just wanted to be clear.
19 Thank you.
20     Q.   We're on the same page, correct?
21     A.   We are, sir.  Thank you.
22     Q.   And you're still -- after your review
23 before you wrote this report and after your prep
24 for this thing, you're unsure whether or not there

Page 209

1 was any indication in the police reports of what
2 was recovered from the body or from the car,
3 correct?
4      MR. SWAMINATHAN:  Objection to form,
5 mischaracterizes his testimony.  Go ahead.
6      THE WITNESS:  No.  I said I would like to
7 refresh my memory by looking at the reports.
8 BY MR. ENGQUIST:
9      Q.   Okay.  Let me first show you what I
10 have marked here as Exhibit No. 14.  It's the
11 supplementary report from the autopsy.  The Bates
12 stamps are RFC-Sierra 13 and RFC-Sierra 14.
13          Sir, this is part of the package of
14 materials that you reviewed; is that correct?
15     A.   It appears to be, yes.
16     Q.   Okay.  Let's go down here.  And you can
17 see here, sir, if you want to look at the paragraph
18 I have -- can you see it?
19     A.   I can.
20     Q.   Okay.  That there was one medium
21 caliber jacketed bullet which was recovered, and
22 that's from the autopsy?
23     A.   That's my understanding that's what
24 it's from, yes.

THOMAS TIDERINGTON, 12/08/2022                    Page 210..213

Page 210

1    Q.   Okay.  So we know we have a bullet
2 recovered from the autopsy, correct?
3    A.   Yes.
4    Q.   And it was turned over by the medical
5 examiner's office.  Is that your understanding from
6 reading this paragraph, sir?
7    A.   It is.
8    Q.   Okay.  All right.
9    A.   But to be clear, because I want to make
10 sure I didn't miss it, but it didn't say it was a
11 9mm.  It said a medium --
12    Q.   No, sir.  I'm going to more reports
13 that you reviewed to show that.
14    A.   Okay.
15       (Tiderington Deposition Exhibit 15 was
16        marked for identification.)
17 BY MR. ENGQUIST:
18    Q.   Okay?  Hold on.  All right.  Let me
19 show you which I am going to mark here as Exhibit
20 No. 15, and this is also from the -- just so you
21 know, it's RFC-Sierra 33 through 35, and these were
22 materials you reviewed as part of your review
23 process before coming to your opinions in this
24 case, correct?

Page 211

1    A.   That's correct.
2    Q.   All right.  Now, this is a crime scene
3 laboratory report.  Do you see that?
4    A.   It is.
5    Q.   Okay.  And you can tell if you wanted
6 to go back and look, but I can just tell you that
7 that's the RD number, the record division number,
8 for this investigation, okay?
9    A.   Correct.
10    Q.   All right.  And here they have the
11 findings of the different bullets and bullet
12 fragments that were recovered.  Do you see that?
13    A.   I do.
14    Q.   Okay.  And you see 9mm?
15    A.   That's correct.
16    Q.   9mm?
17    A.   Yes.
18    Q.   You see part of a lead core?  You see
19 that?
20    A.   Right.
21    Q.   You see 9mm, correct?
22    A.   Correct.
23    Q.   Okay.  And if we go down, you can see
24 the inventory numbers there on the left-hand side?

Page 212

1 Do you see those?
2    A.   I do.
3    Q.   Okay.  Go to the next page and we can
4 see where those came from.
5    A.   Wait, wait, wait.  Can you scroll up a
6 little bit, please?
7    Q.   Sure.  How far?
8    A.   No, right there.  Just go back under
9 permanent retention file, just under that.  I just
10 wanted to see what -- the top page of that crime
11 scene processing report.
12    Q.   You see that?
13    A.   Okay.
14    Q.   Okay.  And we have here 1503752, metal
15 fragments, and we also have 1503753, and that's an
16 envelope containing metal fragments.  Do you see
17 that?
18    A.   I do.  I can't see all of 751, though.
19 No.  Stay there to the right --
20    Q.   It says cartridge case.  So I'm not
21 talking about those because those aren't part of
22 that part.  Do you see that?
23    A.   Well, wait a minute, but I can't see --
24 it says two Super-X -- I can't see what's to the

Page 213

1 right of Super-X cartridges.
2    Q.   It's an FA designation --
3       MR. SWAMINATHAN:  Sorry.  Can you just show
4 that -- can you show what he is trying to look at
5 there?
6       MR. ENGQUIST:  I don't know -- I can't tell
7 what he can and can't see.
8       THE WITNESS:  I can't see after Super-X.
9       MS. ROSEN:  Anand, maybe move where his --
10 where the -- it's being blocked by the photos.
11       THE WITNESS:  Oh, I'm sorry.  Okay.  All
12 right.  I was simply -- okay.  I can see it now.
13 BY MR. ENGQUIST:
14    Q.   Okay.  Are you concerned about the
15 initial destination indication of FA that was put
16 down by the --
17    A.   No, no, no, no.  The two Super-X I
18 believe are the .22s.  So that's just what I wanted
19 to clarify.
20    Q.   Okay.  So that's 52 and 53.  We go up,
21 and you see 52 and 53, 9mm?
22    A.   I do.
23    Q.   Okay.  So we have the fragments being
24 9mm and then part of just a core that's inside the

THOMAS TIDERINGTON, 12/08/2022                    Page 214..217

Page 214

1 car, and the other one you see here is Inventory
2 No. 1480982?
3      A.   Yes.
4      Q.   Okay.  We go down to page 35, I believe
5 it's at, yes, and we have the same inventory
6 number, and it's one sealed bullet from the ME's
7 office.  Do you see that?
8      A.   I do.
9      Q.   Okay.  So based on that, it's clear
10 that the bullet that was taken out of the victim's
11 head was a 9mm, correct?
12     A.   Apparently, yes.
13     Q.   And the only indication that we have
14 for the bullet fragments are 9mm, correct?
15     A.   The ones they examined, yes.
16     Q.   Do you think there's other ones they
17 didn't examine that are out there that would be
18 different?
19     A.   Well, they listed the .22s in this
20 report as well.  Just because they didn't find a
21 .22 round in the guy's head doesn't mean a .22
22 round wasn't fired at him or wasn't fired at the
23 vehicle.
24     Q.   They didn't find any evidence that

Page 215

1 indicated a .22 round anywhere in the car or in the
2 victim; is that correct?
3      A.   Well, I don't know that they looked for
4 that.  They never forensically processed the
5 vehicle, which you've identified yet another
6 problem within their investigation.
7      Q.   Sir, are you saying they didn't process
8 the victim's vehicle that was shot up?
9      A.   No.  I'm sorry.  The suspect's vehicle.
10     Q.   Yeah.  We are talking about the
11 victim's vehicle here --
12     A.   Well, you're talking about that.
13     Q.   -- where the bullets could have gone.
14     A.   Wait a minute.  Wait a minute.  You
15 were talking about that.  I thought we were talking
16 about both vehicles that were used -- the vehicle
17 that was used in the commission of the crime as
18 well as the victim's vehicle.
19     Q.   Sir, why would you ever think that I
20 was talking about the vehicle being driven by
21 Hector when we're talking about bullet fragments
22 recovered in the victim's body?
23     MR. SWAMINATHAN:  Objection to form and
24 argumentative.  You can answer to the extent you

Page 216

1 can.
2      THE WITNESS:  Well, to be clear, you weren't
3 just talking about the single slug that was
4 recovered from the body.  You're talking -- you
5 have asked me to look at 1503752, 1503753, 1480982.
6 All those rounds were not recovered from the body
7 of the victim.
8 BY MR. ENGQUIST:
9      Q.   No.  The other rounds were recovered
10 from the car.
11     A.   Okay.  So now we're talking about the
12 victim's car and also the victim.  I thought we
13 were talking about all of the crime scene,
14 including the suspect's vehicle, but I can follow
15 you, will limit only to the victim's vehicle at
16 this point if that's what you'd like me to do.
17     Q.   Well, sir, that's the evidence that's
18 out there.  The evidence that was recovered the
19 night of the murder, the firearms evidence, when it
20 comes to the fired bullet in the victim and in the
21 car, the only evidence we have is 9mm; isn't that
22 correct?
23     MR. SWAMINATHAN:  Objection to form and
24 foundation.  Are you representing to the witness

Page 217

1 that there's nothing else other than 9mm rounds and
2 casings?
3      MS. ROSEN:  No speaking objections.
4      MR. ENGQUIST:  Yeah.
5      Q.   It's there on the report, sir.  Can you
6 answer the question?
7      MR. SWAMINATHAN:  The same objection,
8 mischaracterizes the evidence, foundation and form.
9      MR. ENGQUIST:  It doesn't.
10     Q.   But go ahead, sir, to the question.
11 You can tell me if I mischaracterizing it.  Is
12 there any evidence of a .22 slug anywhere in the
13 victim's car or in the victim?
14     A.   Not that I can see in these reports,
15 no.
16     Q.   Okay.  And you reviewed the entire
17 record.  As you said before, you reviewed hundreds
18 of pages, and you spent hours according to your
19 billing reviewing those reports, correct?
20     A.   Well, now you talk about all of the
21 reports, and on the one hand, you want me to limit
22 it to only that one victim -- only to the victim's
23 vehicle, but now you want to say that I've reviewed
24 all of the reports associated with this case, but

THOMAS TIDERINGTON, 12/08/2022                    Page 218..221

Page 218

1 you don't want me to answer that.  So I'm confused
2 as to really what you would like me to -- what
3 question you really want me to answer.
4      **Q.  Sir, I want you to answer the question**
5 **of you reviewed all those records, and I can tell**
6 **you these are the records I found having to do with**
7 **the slugs that were pulled out of the body and in**
8 **the victim's car.  Do you know of any other records**
9 **indicating anything else about the firearms**
10 **evidence that were at the crime scene recovered**
11 **that day having to do with the slugs that were**
12 **taken -- you know, the slugs that were fired,**
13 **anything?**
14      A.  Yeah.
15      MR. SWAMINATHAN:  Object to form.
16      THE WITNESS:  Yes.  There's a lot of
17 information about it, the fact that there was
18 additional rounds, different caliber, recovered
19 from the crime scene and listed in the police
20 reports.  I didn't list them.  The officer listed
21 them.  They've also listed --
22 BY MR. ENGQUIST:
23      **Q.  Sir, sir, you are not --**
24      MR. SWAMINATHAN:  Let him finish.  Let him

Page 219

1 finish, Josh.
2      MR. ENGQUIST:  But he is not paying attention
3 to my question at all.  He's just filibustering,
4 for God's sakes.
5      MR. SWAMINATHAN:  Josh, Josh, your question
6 was so convoluted.  You started out by saying
7 slugs.  Then you said something about all evidence
8 at the scene.  And then you went back to saying the
9 word slugs again.
10         You should read back your question
11 before you say the witness is filibustering,
12 seriously.
13      MR. ENGQUIST:  Go ahead, sir.  Keep on going.
14 We have four hours.
15      THE WITNESS:  I'm sorry.  Is there a question
16 pending?
17 BY MR. ENGQUIST:
18      **Q.  All right.  Sir --**
19      A.  Yes.
20      **Q.  -- I understand you that -- we've**
21 **already talked about the fact that we have .22**
22 **caliber casings at a different location than the**
23 **9mm casings.  We know that.  We have talked about**
24 **that.**

Page 220

1      A.  I didn't say that they were at
2 different locations.  You said that.  Yes.
3      **Q.  Yes.  And do you disagree with me?**
4      A.  I don't know.  I wasn't -- I understood
5 it was in the crime scene.  Where specifically in
6 the crime scene -- and granted, it was a moving
7 crime scene.  It didn't just occur at one
8 particular location.  It was a moving crime scene,
9 but I can only go on what the officers listed and
10 what they felt was important when they listed this
11 in their police report, and they listed additional
12 rounds that were -- additional casings that were
13 recovered, and they apparently submitted them for
14 comparison as well.  So that tells me that they
15 believe that there may have been a second gun
16 involved.
17      **Q.  Okay.  But let's go through the**
18 **evidence that we have, sir, just to be clear, and**
19 **tell me if I'm right on this.  Neither eyewitness**
20 **said there was more than one shooter, correct?**
21      MR. SWAMINATHAN:  Objection, asked and
22 answered.
23 BY MR. ENGQUIST:
24      **Q.  Correct?**

Page 221

1      A.  I believe you're correct, yes.
2      **Q.  Okay.  The only firearms evidence found**
3 **in the victim's car and in the victim were 9mm,**
4 **correct?  There's no indication of .22?**
5      A.  I'm not sure that they conducted an
6 investigation of the shooter vehicle, so I can't
7 answer that.
8      **Q.  Of the victim's vehicle, you're not**
9 **sure if they --**
10      A.  I'm sorry.  I'm sorry.  It's late.  I
11 meant the suspect's vehicle.  The rounds in the
12 victim's vehicle apparently were caused by a 9mm
13 casing.
14      **Q.  Okay.  Sir, I mean, in your experience**
15 **if you found shell casings around whatever -- any**
16 **city, could you tell when they were fired?**
17      MR. SWAMINATHAN:  Objection to form.
18      THE WITNESS:  I don't think you could tell --
19 well, I guess if it was immediately after they were
20 fired and they were still warm, I guess you could
21 tell that, but just finding them in the street, no.
22 BY MR. ENGQUIST:
23      **Q.  And what is your understanding of this**
24 **area around Humboldt Park?**

THOMAS TIDERINGTON, 12/08/2022                    Page 222..225

Page 222

1     MR. SWAMINATHAN: Objection to form.
2 BY MR. ENGQUIST:
3     Q.   Was there a lot of shootings in that
4 area?
5     MR. SWAMINATHAN: Objection to the form,
6 foundation. Go ahead.
7     THE WITNESS: I don't know what a lot is, and
8 I don't know that I can answer that question.
9 BY MR. ENGQUIST:
10    Q.   Other than the fact that there are .22
11 cartridges -- casings found in the area where the
12 shooting took place, do you have any other evidence
13 saying that there was a second shooter?
14    A.   Yeah. I think the evidence, the fact
15 of how many shots that were fired and how many were
16 accounted for would be something that the officers
17 would want to investigate to determine if more than
18 one shooter was involved and more than one handgun
19 was involved.
20         I believe in the police report -- I
21 think the initial report said something that the
22 vehicle -- they opened fire on us. So either
23 Melendez or Rodriguez told the responding officer
24 that they opened fire on us. That, I guess means

Page 223

1 more than one person.
2     Q.   Oh, is that your take on it, that they
3 actually were -- they actually gave a statement
4 that there was more than one shooter?
5     A.   I can only tell you what I considered
6 from the police report.
7     Q.   I just want to know is that your
8 understanding?
9     A.   What's that?
10    Q.   Is that your understanding? Is your
11 understanding that either Melendez or Rodriguez
12 said there was more than one shooter?
13    A.   I don't know what they -- no, I've
14 never heard them say that, no.
15    Q.   Okay.
16    A.   But they may not have known either.
17    Q.   There's lots of hypotheticals, but we
18 are going by the evidence we have, correct?
19    A.   Right, right.
20    MR. SWAMINATHAN: Object to the form,
21 objection to form. Go ahead.
22    THE WITNESS: Another hypothetical is that
23 there was only one shooter to be fair, though.
24 BY MR. ENGQUIST:

Page 224

1     Q.   Okay.
2     A.   You keep shaking your head. I don't
3 know if I'm not giving you the correct answers
4 or --
5     Q.   I'll try not to shake my head.
6     A.   Thank you.
7     Q.   All right. In letter (d) here, you
8 have in here that -- you are talking about the
9 lineups here, the photo lineups. Are you talking
10 about both the looking through the different -- the
11 gang books and the photo array or are you talking
12 about just the photo array in number (d) or letter
13 (d)?
14    A.   Well, if a witness tells the officer
15 that he cannot identify the shooter and then they
16 do a photo lineup of a suspect, I think it's
17 inappropriate.
18    Q.   Okay.
19    A.   Should never -- if an officer knows
20 that the suspect cannot identify -- I'm sorry, the
21 witness cannot identify the suspect, I can't think
22 of any circumstance where you would want to do a
23 photo lineup with a witness that has already stated
24 that they can't identify the shooter.

Page 225

1     Q.   Okay. And what are you basing your
2 belief on that the witnesses said I cannot identify
3 anybody -- identify the shooter?
4     MR. SWAMINATHAN: Objection to form,
5 foundation. Go ahead.
6     THE WITNESS: Well, the original police
7 report talks about -- gets a very vague description
8 of the shooter and that there's no other
9 identifying factors from -- and that was the
10 officer that first initially took the report.
11 There was not a specific description of the
12 suspect.
13         More importantly and very unusual --
14 I find it very unusual that there's no indication
15 from the detectives or the officers on whether or
16 not they ever asked the victims if they could
17 identify the shooter. That to me is one of the
18 most standard questions that you would ever ask a
19 victim or a witness, can you identify the person
20 that was shooting at you. That would have been the
21 first question that should have been asked, and
22 perhaps it was.
23 BY MR. ENGQUIST:
24    Q.   Okay. Did you read Detective Wojcik's

THOMAS TIDERINGTON, 12/08/2022                    Page 226..229

Page 226

1 deposition, sir?
2     A.  I'm sure as part of my review, I did.
3         (Tiderington Deposition Exhibit 16 was
4         marked for identification.)
5 BY MR. ENGQUIST:
6     Q.  Okay.  Let me make sure I'm in the
7 right spot here.  Let me show you what I'm going to
8 mark as Exhibit No. 16, make sure it's the right
9 spot there.  Can you see the screen?
10     A.  I can.
11     Q.  Okay.  I will just kind of scroll
12 through so you can see it's defendant Wojcik.
13     A.  And that was in August of 2022,
14 correct?
15     Q.  That's correct.
16     A.  Okay.
17     Q.  I believe that's right.  Let me just
18 double-check.  Yes, August 2022.
19         I'm going to get past the basic
20 parts which shows what case it is.  All right.  On
21 page 268 there's a question and answer.  It says:
22 Okay.  Thank you so much.  And, Mr. Wojcik, is it
23 your belief that those witnesses, specifically
24 Albert Rodriguez and Jose Melendez, could still

Page 227

1 make a possible ID in this case?
2         And then his following answer:  Oh,
3 yeah.  I believed that the way they were talking,
4 they looked intently at these books, you know --
5 you know, sometimes you could tell, you get these
6 guys in there, and they don't want to be involved.
7 They don't want to participate.  They're just
8 flipping pages, you know, because they want to get
9 out of there.  These guys were looking.  They
10 didn't -- they wanted to identify the correct
11 people, you know.  They looked at a lot of people,
12 and it's not like they just wanted to get out or,
13 yeah, it looks like this guy so we can get the hell
14 out of here.  They -- they were upset but -- or but
15 by -- that was their friend and they -- and I think
16 they ascertained he probably was going to die, you
17 know.  We did tell him it was critical or knew
18 we -- knew we that probably was a good potential.
19         Okay.  You see this part here?
20     MR. SWAMINATHAN:  Objection to form.
21     MR. ENGQUIST:  Okay.  I'll go on then.  I was
22 just making sure that he can read it.
23     Q.  And it just happened, fresh in their
24 minds.  I felt that they would -- you know, if we

Page 228

1 showed the suspect or whatever, that there was a
2 good potential that they would at least be able to
3 make an identification.  At least -- do you see
4 that?
5     A.  I do.
6     Q.  Okay.  And you reviewed the deposition
7 about the actual interactions that Mr. Wojcik
8 talked about, correct?
9     A.  I -- yes.
10     Q.  Okay.  Now, do you think a seasoned
11 investigator dealing with the people, going through
12 an identification procedure, like going through
13 photo books, would have a good understanding
14 whether or not the individuals could make an
15 identification before going through that process
16 for hours?
17     MR. SWAMINATHAN:  Objection to form and
18 foundation.
19     THE WITNESS:  Well, you have to consider
20 what -- perhaps what their motives were by going
21 through the gang books, and I would certainly think
22 it's investigative tool, but it certainly should
23 not have been the basis for charging somebody.
24 BY MR. ENGQUIST:

Page 229

1     Q.  Okay.  Was going through the gang books
2 a basis of charging anybody in this case?
3     A.  It was -- they -- they never identified
4 anybody in the gang books, but it was the beginning
5 of the process of trying to do a photo
6 identification of suspects -- of a suspect who the
7 victim -- if you look at it from the logical
8 standpoint, it would have been difficult for him
9 based on the facts and circumstances for him -- or
10 for them to positively identify somebody under the
11 set of circumstances described in the shooting.
12     Q.  Okay.  So based on your review of the
13 record, you don't believe they could make
14 identification; is that correct?
15     A.  I don't believe they -- I think their
16 identification should have been questioned, and it
17 should have been corroborated once they identified
18 somebody.
19     Q.  Okay.  And do you think their
20 identifications were questioned during the trial?
21     A.  I -- well, I think only one person
22 testified.  I think only Melendez testified.
23     Q.  You don't think Alberto Rodriguez
24 testified at trial?

THOMAS TIDERINGTON, 12/08/2022                    Page 230..233

Page 230

1    A.    I may be mistaken about that, but I'd
2 have to refresh my memory.
3    Q.    Okay.
4    A.    I'm sorry.  I'm sorry.  Hector was not
5 called at trial.  I apologize.
6    Q.    Yes.  Hector was not called by either
7 side at trial.  That's correct.  But the witnesses
8 in the case, Alberto Rodriguez and Melendez, both
9 testified at trial, correct?
10   A.    That's correct.
11   Q.    And they were cross-examined on their
12 ability to perceive and whether or not their
13 identification was correct; isn't that right?
14   A.    That's my understanding.
15   Q.    Okay.  And that's when the fact finders
16 decide whether or not to believe the person; isn't
17 that right?
18   A.    At trial that's typically what occurs,
19 yes.
20   Q.    Okay.  Now, you read Alberto
21 Rodriguez's testimony where he talked about the
22 driver of the car, Melendez, telling him to keep an
23 eye on the guys next to him?  Do you recall that?
24   A.    That's correct.

Page 231

1    Q.    And so, therefore, he was focused on
2 watching the driver, watching the people in the
3 other car; isn't that correct?
4    A.    I have no way of knowing that.  There's
5 nothing in the record that said that that's what he
6 focused on.
7    Q.    Well, didn't he say he focused on that?
8    A.    I don't think he said that.
9    MR. ENGQUIST:  All right.  Give me a second.
10 All right.  I'm going to mark this.  So let me see.
11 One second.
12        We're at No. 17, correct,
13 exhibit-wise?
14    MS. FALASZ:  Yes, that's correct.
15    MR. ENGQUIST:  All right.  Let's see if I can
16 pop this up.
17        (Tiderington Deposition Exhibit 17 was
18         marked for identification.)
19 BY MR. ENGQUIST:
20    Q.    Let me share with you Exhibit No. 17,
21 which is testimony from the proceedings on
22 February 6, 1997, in the case of People versus
23 Thomas Sierra.  This is just an excerpt of it, but
24 this is for the direct examination of Alberto

Page 232

1 Rodriguez.  Let me find the right spot here.
2        Okay.  I don't have line numbers,
3 but if you can see in front of you the question
4 "After Macho," do you see that right here?
5    A.    Yes.
6    Q.    I will just read it, and this would be
7 starting on page in the transcript E98.
8        After Macho told you to watch out,
9 did you look inside the car?
10       Yes.
11       Do you see that?
12       What did you see?
13       I'll cut through the objections.
14       Did you look at the car?
15       Yes.
16       What specifically part of the car
17 did you look at?
18       At the passenger, at the passenger
19 in the front seat.
20       Question:  Why were you looking at
21 this person?
22       Because he was throwing up slogans.
23       When you say he was throwing up gang
24 slogans, what was he doing?

Page 233

1        He was doing all types of things
2 with his hands and symbols.
3        Do you see that?
4    A.   I do.
5    Q.   Okay.  So to be clear, there is
6 testimony that he was focusing in on the passenger,
7 correct?
8    A.   I think there's more to it in that
9 testimony than that.  Was he focused on the face of
10 the person, or was he faced on -- or was he focused
11 in on the gang symbols that were being thrown up?
12 And I don't know that you can focus in on both
13 things at once, but perhaps he could.
14   Q.   Okay.  Let me start sharing again.  Now
15 we're at E100.  Let's just go to E101.
16       What part of the defendant's face
17 were you able to see when you were looking at it?
18       Front of his face.
19       Question:  He was looking at you
20 when he was making these signals?
21       Answer:  Yes.
22       Have you ever seen this person
23 before?
24       No.

THOMAS TIDERINGTON, 12/08/2022                    Page 234..237

Page 234

1       Did you know him?
2       No.
3       And he talks about -- to be clear,
4 he says he was looking at the person's face; isn't
5 that correct?
6    A.   That's what it says.
7    Q.   Okay.  And do you have any reason to
8 doubt that?
9    MR. SWAMINATHAN:  Objection to form and
10 foundation.
11    THE WITNESS:  I believe he recanted since
12 that time, and there's additional testimony that
13 that's not what occurred.
14 BY MR. ENGQUIST:
15    Q.   You think Alberto Rodriguez recanted,
16 sir?
17    MR. SWAMINATHAN:  Objection to form.  Go
18 ahead.
19    THE WITNESS:  One of the two.  I would have
20 to refresh my memory, but I know one of them
21 recanted their testimony.
22 BY MR. ENGQUIST:
23    Q.   Okay.  It wasn't Alberto Rodriguez,
24 though; was it, sir?

Page 235

1    A.   I would have to refresh my memory to be
2 sure, but I know it was one of them.
3    Q.   Okay.  I'll let you --
4    A.   I -- and as we sit here today and as
5 you reminded me, yes, I believe Alberto is still
6 maintaining his identification of the suspect.
7    Q.   Okay.  And in fact -- let me see.  Let
8 me go back to the share so we make it clear.  I'm
9 still on page 101, where it says:
10       Question:  Now, did your car
11 eventually pull away from the stoplight?
12       After the light turned green, we
13 pulled away.
14       Were you watching the defendant the
15 entire time after Macho told you to watch?
16       Okay.  Objection, leading.  Okay.
17       And it says:
18       Question:  How long were you
19 watching the defendant before their car pulled
20 away?
21       Since the light turned green, I kept
22 my eye on him.
23       Do you see that?
24    A.   I do.

Page 236

1    Q.   Okay.  I will go further down, and here
2 he's very specific.
3       As the car began to pull away, what
4 happened?
5       He threw up a white hood over his
6 head, and he opened the passenger door and pointed
7 the weapon at us.
8       Do you see that?
9    A.   I do.
10    Q.   Okay.  Sir, what happens when you open
11 a car door?
12    MR. SWAMINATHAN:  Objection to form,
13 argumentative.
14    THE WITNESS:  I'm not sure I understand your
15 question.  What do you mean what happens when you
16 open a car door?
17 BY MR. ENGQUIST:
18    Q.   When you open a car door, does anything
19 activate inside the car?
20    A.   The interior lights could possibly go
21 on, yes.
22    Q.   Okay.  All right.  So --
23    A.   Not always.  I guess it's a
24 hypothetical question but not always, yes.

Page 237

1    Q.   So I guess a person ahead of time could
2 turn off the internal light so it doesn't come on
3 when the doors open; isn't that right?
4    A.   Pretty simple to do, yes.
5    Q.   Okay.  But in this case we know that
6 the shooter in this case who was identified by this
7 witness as Thomas Sierra opened the car door in
8 order to shoot; isn't that right?
9    A.   That's the information, yes.
10    Q.   Okay.  Now, him opening the door to
11 shoot and the fact that he was keeping an eye on
12 him up until that time, do you still believe he
13 didn't have an opportunity to view the person that
14 was shooting the weapon?
15    MR. SWAMINATHAN:  Objection to form and
16 foundation.  Go ahead.
17    THE WITNESS:  Well, his -- you know,
18 obviously he was seated in the passenger side of
19 this vehicle.  He would have had to have looked
20 past the driver, past Melendez, who theoretically
21 had a better view of the shooter than Rodriguez
22 would have had.
23       There's some question of whether or
24 not the windows were tinted.  So I guess I can't

Urlaub Bowen & Associates, Inc.   312-781-9586

THOMAS TIDERINGTON, 12/08/2022                    Page 238..241

Page 238

1 say whether or not he saw him, and I can tell you
2 that it was unreasonable for the officers to simply
3 rely on that identification without any other
4 tangible evidence.
5 BY MR. ENGQUIST:
6    **Q.  Sir, let me ask you, in your experience**
7 **as a police officer, can an officer make an arrest**
8 **based off a victim's identification, a single**
9 **eyewitness identification?**
10      MR. SWAMINATHAN:  You said a victim's
11 identification?
12      MR. ENGQUIST:  A single witness
13 identification or victim.
14      THE WITNESS:  Well, can they or should they,
15 I guess, is two different questions.
16 BY MR. ENGQUIST:
17    **Q.  Can they?**
18    A.  I guess they could.  Should they?  No.
19    **Q.  They shouldn't --**
20    A.  Especially -- especially under these
21 circumstances.
22    **Q.  Okay.  So under these circumstances if**
23 **you have a victim witness saying that's the man who**
24 **shot and if you don't have a gun, like, you know,**

Page 239

1 **the gun, you know, in the person's hand or some**
2 **other kind of physical evidence, you shouldn't make**
3 **an arrest?  Is that your opinion, sir?**
4      MR. SWAMINATHAN:  Objection to form.
5      THE WITNESS:  Well, you have to -- again, the
6 officer should have considered the totality of the
7 circumstances, understanding that they're trying to
8 get a witness statement from a known gang member
9 about a competing or opposing gang member.  There
10 is a great likelihood that as an act of revenge --
11 it doesn't necessarily mean they have to go out and
12 shoot that other gang member, but they could seek
13 revenge by simply identifying some innocent person
14 as being the shooter when in fact he isn't.
15      So the reliability of the witness
16 should have also been taken into consideration.
17 Certainly if it was the fourth-grade schoolteacher
18 that was not a gang member that had this student in
19 her class, that type of identification is far
20 different than an opposing gang member and relying
21 simply solely on the identification and the word of
22 this perhaps known criminal.
23 BY MR. ENGQUIST:
24    **Q.  Okay.  Now, you were talking about**

Page 240

1 reliability --
2    A.  And -- I'm sorry.
3    **Q.  Go ahead.**
4    A.  I do -- I have one other thought.
5 Especially when there was other investigative steps
6 and means that they could have taken, easily have
7 taken to corroborate the information provided by
8 these two witnesses.  They failed to do that.  They
9 didn't do anything.
10    **Q.  They didn't do anything?**
11    A.  Not that I know of.
12    **Q.  And when you say "they," who is the**
13 **they that didn't do anything?**
14    A.  The Chicago Police Department.
15    **Q.  The entire Chicago Police Department?**
16      MR. SWAMINATHAN:  Object to the form, form,
17 foundation, argumentative.  Go ahead.
18 BY MR. ENGQUIST:
19    **Q.  Well, I have individual clients in this**
20 **case, sir.  So when you said they didn't do**
21 **anything to corroborate, okay, that's what you**
22 **said, they.  Does that include all the named**
23 **defendants in this case, that they had a duty to**
24 **corroborate the identification?**

Page 241

1    A.  I think any of those that had a -- had
2 investigative responsibilities in this case should
3 have had done more, absolutely.
4    **Q.  Okay.  And I'll get back to that in a**
5 **second, but you were talking about gang members and**
6 **the fact that gang members could lie for different**
7 **reasons, like you said revenge, correct?**
8    A.  It's certainly a possibility.
9    **Q.  Is that something you saw in your time**
10 **back in the '80s and '90s when you were in Fort**
11 **Lauderdale?**
12    A.  That criminals lie?  Absolutely.
13    **Q.  That different gang members would lie**
14 **for different reasons specifically?**
15    A.  Of course, without question.
16    **Q.  Okay.  Did you ever find that sometimes**
17 **gang members would change their story based on --**
18 **well, let me ask you this.**
19      **Did you ever find that members of**
20 **the gangs or cartels that you dealt with in Fort**
21 **Lauderdale -- that it would be frowned upon for**
22 **those members to cooperate with the police?**
23      MR. SWAMINATHAN:  Objection to form.  Go
24 ahead.

THOMAS TIDERINGTON, 12/08/2022                    Page 242..245

Page 242

1   THE WITNESS: Yes.
2  BY MR. ENGQUIST:
3       Q.   Okay.  And --
4       A.   Unless -- unless they were setting up
5  an opposing gang member, yeah, of course.  Then
6  there might be a badge of merit for them.
7       Q.   Okay.  And did you have cases like that
8  where it was a badge of merit for them to lie --
9       MR. SWAMINATHAN:  Objection.
10  BY MR. ENGQUIST:
11      Q.   -- to frame somebody?
12      A.   Well, to cause grief on other gang
13  members, providing information -- informative
14  information so officers -- so we would do search
15  warrants on drug dealer -- other drug traffickers,
16  yes.  I can tell you that occurred many a -- on
17  many occasions.  That's why it's important for a
18  police officer to corroborate the information, to
19  assess the testimony of that witness and especially
20  when there is other investigative steps that could
21  have been taken to corroborate the information.
22      Q.   Now, did you ever find that gang
23  members would sometimes change their story because
24  of threats of cooperating with the police?

Page 243

1       MR. SWAMINATHAN:  Objection to form.  Go
2  ahead.
3       THE WITNESS:  Not that I can think of.  It
4  sounds reasonable, but I can't think of an instance
5  in which that may have happened.
6  BY MR. ENGQUIST:
7       Q.   Okay.  So the entire time you were down
8  there in Fort Lauderdale, you can't recall a time
9  where either an organized crime member or a gang
10  member, which are basically synonymous, had changed
11  their testimony because of fear from retaliation
12  from a gang or another criminal organization?
13      MR. SWAMINATHAN:  Objection to form and
14  foundation.  Go ahead.
15      THE WITNESS:  I can't as we sit here today
16  recall an instance in which that happened.  It may
17  have, but I don't recall.
18  BY MR. ENGQUIST:
19      Q.   Okay.  Now, you say -- let me ask you,
20  do you know who evaluated the evidence to determine
21  charging in this case?
22      A.   I'm assuming the prosecutor did.
23      Q.   Yes.  Well, do you know what felony
24  review is?

Page 244

1       A.   I think I understand what the concept
2  is, but I don't know exactly what was done in this
3  particular case.
4       Q.   Well, let me ask you, what is your
5  understanding of felony review here in Cook County?
6       MR. SWAMINATHAN:  Objection to form.  Go
7  ahead.
8       THE WITNESS:  Well, I don't know if it's
9  specific to Cook County, but my understanding of
10  felony review is all of the information of a
11  criminal investigation would be turned over to the
12  prosecutor's office and a determination would be
13  made on whether or not there's enough probable
14  cause to make an arrest or to charge somebody.
15  BY MR. ENGQUIST:
16      Q.   Okay.  So is it your understanding by
17  reading these records that a felony review
18  assistant came to the station?
19      A.   My understanding is that is what
20  happened, yes.
21      Q.   Okay.  And is it your understanding
22  this felony review assistant determined if there
23  was going to be charging and what the charging
24  would be?

Page 245

1       A.   I understand that's what occurred, yes.
2       Q.   Okay.  And then after that point is it
3  your understanding a determination of guilt or
4  innocence was done by either a jury or a judge,
5  whether it was bench or a jury trial, correct?
6       A.   That's correct.
7       Q.   Now, you said after the identification
8  of Thomas Sierra, let's just say by Alberto
9  Rodriguez, there was nothing done to corroborate is
10  what you said.  Did I get that right?
11      A.   That's correct.
12      Q.   Okay.
13      A.   You did.
14      Q.   What steps do you believe should have
15  been done to corroborate the identification that
16  was made by Alberto Rodriguez that wasn't done?
17      A.   Well, what else could have been done?
18  They certainly could have conducted surveillances.
19  They could have done search warrants on Sierra's
20  home, looking for the weapon.  I don't know if they
21  ever even asked Hector Montano -- Montan -- I can't
22  pronounce his name, Hector as to what happened to
23  the weapon that was used in the shooting.
24          There's other investigative steps

THOMAS TIDERINGTON, 12/08/2022                    Page 246..249

Page 246

1  that they could have used.  They could have had
2  Hector, who was theoretically cooperating, they
3  could have had him place a controlled phone call in
4  to Sierra and had him talk about the shooting.
5  That would have been something that is commonly
6  done and easily have done -- easily have done --
7  easily could have been done.  And it wasn't.
8      **Q.   Hector was at the police station after**
9  **Mr. Sierra was in custody.  Are you suggesting that**
10 **Hector would have been calling Mr. Sierra while**
11 **they are both in custody to have a controlled phone**
12 **call?**
13     A.   Well, I guess you identified --
14     MR. SWAMINATHAN: Object to form.  Go ahead.
15     THE WITNESS:  I guess you identified another
16 part of the problem is the arrest took place before
17 the investigation.  It seems the -- Sierra was
18 targeted for arrest.  He was arrested, and then it
19 appears that the detectives developed a case in
20 order to fit their description of what they
21 believed happened versus what actually happened.
22 BY MR. ENGQUIST:
23     **Q.   Okay.  Sir, do you know whether or not**
24 **the Cook County State's Attorney's Office has its**

Page 247

1  **own investigators?**
2      A.   I don't know.
3      **Q.   Okay.  Would it surprise you to learn**
4  **that the Cook County State's Attorney's Office does**
5  **have its own investigators?**
6      MR. SWAMINATHAN: Objection to form.  Go
7  ahead.
8      THE WITNESS:  It wouldn't surprise me at all.
9  BY MR. ENGQUIST:
10     **Q.   Okay.  Do you know whether or not the**
11 **Cook County State's Attorney's Office decided to do**
12 **any further investigation, either through their own**
13 **investigators or requesting it from Chicago Police**
14 **Department?**
15     A.   I wouldn't know that.
16     **Q.   Okay.**
17     A.   I would have -- based on what I've seen
18 here, I would have assumed that they would have.
19 It would seem like they would have, and even if
20 they did not request it, I know if I was in charge
21 of that investigation, there would have been a
22 follow-up -- additional follow-up work would have
23 been done on this case, which is -- you don't need
24 me as an expert to tell you, but it certainly makes

Page 248

1  common sense to continue the investigation until
2  you can either develop charges against the guy that
3  claims that he was the driver of a vehicle that
4  murdered another person.  So this case would not
5  have been closed on the same day that Sierra was
6  arrested, which is what the defendants did in this
7  case.
8      **Q.   So you believe that the Chicago**
9  **police -- the investigators in this case should**
10 **have -- even though charges were denied as to**
11 **Hector, they should have continued to investigate**
12 **Hector after that point; is that correct?**
13     A.   Of course, of course.
14     **Q.   Okay.**
15     A.   Let me just say this.  You had asked me
16 a question about when somebody takes the Fifth, you
17 know, can they recant and decide to answer
18 questions.  Just because a prosecutor says we don't
19 have enough to charge that guy doesn't mean we
20 don't have enough to charge him ever.  It means go
21 out and do some more investigative work.
22     So he clearly was involved.  It's
23 not even logical to think that somebody that drove
24 the vehicle and sped up as the witnesses said and

Page 249

1  supposedly handed the gun to the shooter, to not
2  even consider bringing charges against him, and if
3  the prosecutor said we're not going to charge him,
4  well, it doesn't mean we're not going to charge him
5  ever.  Go out and do what a reasonable police
6  agency and reasonable detectives would do.  Develop
7  the information and charge all of those that were
8  involved in that murder.  Why didn't that happen,
9  all right?  I guess -- I guess it's a very telling
10 red flag.
11     **Q.   Do you know if the state's attorney's**
12 **office actually requested any other follow-up**
13 **investigation at all?**
14     A.   It wouldn't have mattered to me whether
15 they did or not.
16     **Q.   I understand it wouldn't matter to you.**
17 **Do you know whether or not they did?**
18     A.   I don't know --
19     **Q.   Okay.**
20     A.   -- which is another problem with the
21 investigative file, because it's absent of any of
22 that such document or that such information.  I
23 would have expected, if they were given
24 instructions by the prosecutor's office to conduct

THOMAS TIDERINGTON, 12/08/2022                          Page 250..253

Page 250

1 further follow-up, that they would have done that,
2 and quite frankly as a detective, I would have --
3 if they told me -- if the prosecutor said don't
4 follow up on this, that would have been documented
5 in my report as well.
6    Q.   Okay.  You also reviewed the state's
7 attorney's file too, correct?
8    A.   I did.
9    Q.   Did you see anything in there about
10 follow-up investigations being requested by the
11 state's attorney's office?
12    A.   I don't recall.  I don't believe there
13 was anything in there either.
14    Q.   Okay.  Let's look at (f).  (F) says:
15 Grossly deviated from basic investigative protocols
16 while conducting photo lineup.  In fact, according
17 to one eyeball -- I'm sorry, one eyewitness in the
18 case, defendant Guevara coached the witness by
19 pointing to the picture of Sierra during the
20 identification process.
21        Do you see that?
22    A.   I do.
23    Q.   And then you follow up with:  And
24 Guevara pleaded the Fifth during the testimony

Page 251

1 about this and related matters.  Do you see this?
2    A.   Yes.
3    Q.   Okay.  And as you said before, the fact
4 that he took the Fifth wasn't a basis for your
5 opinions, correct?
6    A.   It wasn't a basis of my opinions.
7    Q.   Okay.  Now, so I guess we can agree
8 that if Detective Guevara pointed to a picture and
9 said pick this person, that would be improper,
10 correct?
11    A.   It would be.
12    Q.   Okay.  Do you think that's an expert
13 opinion that that would be improper, or do you
14 think that's just common sense?
15    MR. SWAMINATHAN:  Objection to form,
16 foundation, calls for a legal conclusion to be
17 resolved by a court, not by Mr. Tiderington, but go
18 ahead.
19    THE WITNESS:  Well, by virtue of the fact
20 that you asked me the question, so you're asking me
21 from an expert opinion perspective, I guess I would
22 answer from that, but I think it's common sense.  I
23 don't think you need an expert to tell you that if
24 you're conducting a photo lineup, the investigator

Page 252

1 probably should not point at the person that he
2 wants the witness to identify.  I think that's
3 improper.
4 BY MR. ENGQUIST:
5    Q.   Now, you also indicate, without having
6 to go through line by line here, you also indicate
7 later on through -- let's see, in (g) talking about
8 the vehicle in question, Hector's vehicle that was
9 brought in.
10    A.   Okay.
11    Q.   Okay.  What was different from your
12 review of the materials, different from the car
13 that was identified -- the car that was described
14 in the shooting compared to Hector's car that was
15 recovered the night of charging?
16    A.   Well, one of the main things I believe
17 was the tinted windows on the vehicle that -- on
18 the shooter's vehicle, and then the vehicle that
19 was brought to the station clearly shows that there
20 was no tint on the windows.
21    Q.   Okay.  Anything else?
22    A.   I think there may have been something
23 else, but I think that was the major difference
24 between -- I'm just looking through my report, but

Page 253

1 I think that was the major difference.
2    Q.   Okay.  Sir, have you ever heard of tint
3 that's like a peel-on, a stick-on tint for windows
4 in cars?
5    A.   I have.
6    Q.   Okay.  Do you know how that's removed?
7    A.   I'm not sure.  I understand it's a
8 process where you have to heat it.
9        I know my son had his vehicle,
10 tinted windows, and he got a ticket for it.  So it
11 was a process of getting it off.  It wasn't an easy
12 process.
13    Q.   Okay.  What about the tints that were
14 being used back in the mid 1990s as this case was?
15    A.   I don't know.
16    Q.   Okay.  Would it surprise you to learn
17 that there was testimony at the trial about
18 removing tints is as easy as just pulling it off?
19    MR. SWAMINATHAN:  Objection to form and
20 foundation.  Go ahead.
21    THE WITNESS:  I don't recall reading an
22 expert opinion report about the windows being
23 tinted.
24 BY MR. ENGQUIST:

THOMAS TIDERINGTON, 12/08/2022                          Page 254..257

Page 254

1    Q.   Do you recall any testimony about how
2 easy it is to remove tint during the criminal
3 trial?
4    A.   Well, I do remember there was some
5 testimony, but I don't know if it was from anybody
6 that had credentials to opine on how difficult it
7 is to remove tint from -- and I guess a lot of it
8 would depend on what kind of tint it was, how it
9 was put on, how long it was on, whether it was put
10 on by heat, whether it was glued on.  So I do
11 recall there was some testimony about somebody had
12 the idea that could easily be peeled off.
13    Q.   Okay.  And certainly you're not an
14 expert in how -- on the tint on that window; are
15 you?
16    A.   I think I'm an expert now after paying
17 for my son's tint to be removed, that it's not
18 quite that easy.
19    Q.   Okay.  So you consider yourself an
20 expert now -- and when was this tint removed?  Was
21 it in 1995 or was it someplace else -- sometime
22 else?
23    A.   No, no, no.  It was probably within the
24 last 10 years, and I say that somewhat in jest.

Page 255

1    Q.   Okay.
2    A.   I don't really mean that I'm an expert.
3 That was my attempt at humor late on a Thursday
4 afternoon.
5    Q.   Okay.  So do you consider yourself an
6 expert on the tint that was used back in 1995 in
7 Chicago?
8    A.   I do not.
9    Q.   Do you have any experience at all with
10 tint on windows back in the mid '90s --
11    A.   I do.
12    Q.   -- either in Chicago or otherwise?
13    A.   I do.
14    Q.   Did you have tint on your car, put on
15 your car?
16    A.   I absolutely -- I lived in south
17 Florida.  All my vehicles had tinted windows.  All
18 of my undercover vehicles had tinted windows.  And
19 as a matter of fact, I'm not aware of any system
20 where you can easily tint your windows and just
21 simply peel it off.
22        So if you're asking me from my
23 personal experience of having lived in south
24 Florida for 20 years with every vehicle that I

Page 256

1 owned or even operated always had tinted windows,
2 it was a -- it was pretty complex process to do
3 that.
4    Q.   So you had --
5    A.   And there also --
6    MR. SWAMINATHAN:  Hold on, Josh.  Let him
7 finish.
8    THE WITNESS:  And it's also been my
9 experience that if you did try to remove it, there
10 would be some residual or -- residual remnants of
11 the tint still on the windows, would have been my
12 assessment.
13 BY MR. ENGQUIST:
14    Q.   Okay.  Did you ever have after-market
15 tints put on your windows?
16    A.   I did.
17    Q.   Okay.  So your personal experience, you
18 think it would be difficult to remove?
19    A.   I do.
20    Q.   Okay.
21    A.   At least -- at least the type of tint
22 that was being used during the late '80s and '90s
23 that we used during that period of time, yes.
24    Q.   Okay.  Have you yourself ever removed

Page 257

1 the tints on any of the cars that you owned in the
2 mid '90s?
3    A.   I don't think so.  Because it was so
4 complicated and difficult, I think I always hired
5 somebody to do that.
6    Q.   So you did actually pay for removal?
7    A.   I have, yes.
8    Q.   In the mid '90s, sir?
9    A.   I would say somewhere in the '90s, yes,
10 and I can give you -- and not why I remember it,
11 because some of our undercover vehicles, we would
12 lease our cars, and then when we returned them -- I
13 do remember one particular company that we leased
14 from, the tint we used was so dark, it was illegal.
15 So we had to remove it.  So we -- so we sent it to
16 the company to have them remove it.  So I do recall
17 that.
18    Q.   According to your review of the file,
19 one witness before the trial actually came forward
20 and said -- or changed his testimony and said that
21 in fact he did not identify Mr. Sierra, correct?
22 That was Mr. Melendez.
23    A.   That's my understanding, yes.
24    Q.   Okay.  And that testimony was before

THOMAS TIDERINGTON, 12/08/2022                    Page 258..261

Page 258

1 the trier of fact in this case; isn't that right?
2      MR. SWAMINATHAN: Objection to form. Go
3 ahead.
4      THE WITNESS: That's correct.
5 BY MR. ENGQUIST:
6      Q.   Okay. And if you recall from your
7 review of the case here, who did Mr. Melendez say
8 told him who to pick in the case?
9      A.   I don't know -- I think it was Guevara,
10 but I don't know for sure. I don't know if he
11 mentioned -- if he said the detectives or if he
12 mentioned Guevara by name. I don't recall.
13      Q.   Okay. Was there any evidence testified
14 to by Melendez that Detective Halvorsen had
15 anything to do allegedly with telling him who to
16 pick?
17      A.   I don't recall if he did or not.
18      Q.   Was there any evidence or testimony by
19 Mr. Melendez alleging that Sergeant Biebel told him
20 who to pick?
21      A.   I don't recall that there was, no.
22      Q.   Okay. Same question with Sergeant
23 Mingey?
24      A.   No.

Page 259

1      Q.   Same question with Gang Crimes
2 Specialist Figueroa?
3      A.   No.
4      Q.   Same question with Detective McMurray?
5      A.   Not that I can recall, no.
6      Q.   Same question with Detective Wojcik?
7      A.   Not that I know of.
8      Q.   Okay. Now, the identification of the
9 car in the parking lot --
10      A.   Correct.
11      Q.   -- is there any evidence that Sergeant
12 Biebel was involved in the identification process
13 out in the parking lot?
14      A.   I don't believe so. I don't know what
15 he knew or didn't know.
16      Q.   Is there any evidence, same question,
17 as to Sergeant Mingey?
18      A.   Again, I don't -- I don't recall
19 reading what their involvement was in the report.
20 So I have no way of knowing whether they knew or
21 didn't know.
22      Q.   Okay. I'm asking if you have any
23 evidence suggesting that they were involved in
24 that.

Page 260

1      A.   I don't believe any of the documents I
2 reviewed indicated that they were involved or knew
3 or didn't know. I just don't know how to -- I
4 don't have any evidence one way or the other.
5      Q.   Okay. What about Gang Crimes
6 Specialist Figueroa?
7      A.   I don't recall. No, I don't recall if
8 he -- if he knew or didn't know.
9      Q.   Okay. Is there any evidence that Gang
10 Crimes Specialist Figueroa was even at the police
11 station during any of the identification
12 procedures?
13      A.   As we sit here today, I don't know if
14 he was or not.
15      Q.   Okay. Any evidence that Detective
16 McMurray was involved in the identification of the
17 car?
18      A.   I don't know.
19      Q.   Same question with Detective Wojcik?
20      A.   Same answer. I don't know who -- what
21 his involvement was with the identification of the
22 vehicle.
23      Q.   Now, the first identification
24 procedure -- I'm sorry, the first photo array that

Page 261

1 was done in this case, not the mug book but the
2 first photo array that was done in this case was
3 done with Alberto Rodriguez at his home; isn't that
4 correct?
5      A.   That's my understanding, yes.
6      Q.   Okay. And who was involved in that
7 photo array, involved in being there for the photo
8 array, other than Mr. Rodriguez?
9      A.   I would have to look at the police
10 report. I think it's indicated in there. I
11 know -- or I believe it was Guevara. I don't know
12 who he was with. I don't know if he was with
13 Halvorsen or not.
14      Q.   Okay. Do you have the police reports
15 with you?
16      A.   I have like -- I can pull them up on my
17 computer, but I don't have them real handy.
18      Q.   All right. Give me one second. I can
19 get it for you. We don't even have to mark this,
20 but give me one second.
21          I can't find what I wanted to find.
22 Sorry. Just to be clear, you've read Detective
23 McMurray's deposition, correct?
24      A.   I have.

THOMAS TIDERINGTON, 12/08/2022                    Page 262..265

Page 262

1      Q.   Okay.  Is it your recollection -- make
2  sure I get this right -- your understanding that
3  Detective McMurray, Halvorsen, and Guevara were
4  there during the photo identification by Rodriguez
5  in his home?
6      A.   That sounds right.  I would have to --
7  I haven't read McMurray's -- I haven't read that
8  deposition.  I didn't read it in preparation for
9  the -- for this deposition.  I read it many months
10 ago, but I would not -- I would agree with you if
11 that's what you told me occurred.
12     MR. ENGQUIST:  All right.  So let me mark
13 this as Exhibit No. 18, and I'll share my screen.
14     (Tiderington Deposition Exhibit 18 was
15     marked for identification.)
16 BY MR. ENGQUIST:
17     Q.   All right, sir.  I am going to show you
18 what is Exhibit No. 18, which is a section from the
19 deposition in this case taken on June 10, 2021, of
20 John McMurray.  I'll skip down.  All right.  If you
21 want to read this right here or do you --
22     A.   Sure.
23     Q.   -- want me to read it out loud?
24     A.   No.  You can read it out loud if you'd

Page 263

1  like.
2      Q.   I remember we went there -- I think he
3  might have been outside and we -- we went inside
4  with him.  I -- I do specifically recall myself and
5  Detective Hal -- Halvorsen talking to him and him
6  by myself in the kitchen by the kitchen table.  I
7  have some vague recollection of -- of Guevara like
8  standing by the doorway in the living room talking
9  to the mom and some other people in there while we
10 were in the kitchen, and Halvorsen handed them a
11 stack of six photos.  I know for a fact that Sierra
12 wasn't on the top because I was looking at them.
13 And Alberto Rodriguez went through them one at a
14 time, like looking through cards.  So I backed to
15 the first one and he looked at -- took them, laid
16 them down independently on the table, stood there
17 for 15, 30 seconds, picked up the picture
18 of -- of Si -- Sierra -- Thomas Sierra, handed
19 it -- handed it us -- handed it us -- I'm sorry --
20 those and said, This is the guy who shot my friend.
21 I remember that independently and clearly.
22     Do you see that?
23     A.   I do.
24     Q.   Okay.  Do you have any reason to doubt

Page 264

1  that the people that were present during that photo
2  identification procedure with Alberto Rodriguez
3  were McMurray and Halvorsen, and Guevara was also
4  present in the house somewhere?
5      MR. SWAMINATHAN:  Objection to form and
6  foundation.
7      THE WITNESS:  Well, based on that testimony,
8  it also suggests that there were other people other
9  than -- other than -- other people present when
10 Alberto Rodriguez was handed those pictures.
11     So I guess my question would have
12 been how come those people weren't identified; how
13 come there's no notes about who else was present in
14 that kitchen.  They handed them a stack of photos.
15 It's highly unusual to hand multiple -- multiple
16 individuals a stack of photos and say, hey, pick
17 out the guy.  So that's -- and I'm glad you read
18 that to me because that's highly unusual.
19 BY MR. ENGQUIST:
20     Q.   All right.  Sir, by reading this where
21 it says that Guevara like standing by the doorway
22 into the living room and talking to mom and some
23 other people in there while we were in the kitchen
24 and Halvorsen handed them a stack of photos -- it

Page 265

1  says "them."  It probably was him, but anyways it's
2  bad English.
3      A.   Well, wait a minute.  Wait a minute.
4  It was probably --
5      Q.   But just to be clear, when you read
6  this, you believe there was a crowd of people at
7  the table that reviewed the photos?  Is that your
8  understanding, sir?
9      A.   Well, my understanding is what
10 Halvorsen said in the sworn statement.  Halvorsen
11 handed them a stack of six photos, okay?  So that
12 doesn't mean we're at a table alone with -- with
13 the -- with Rodriguez and under controlled
14 conditions we asked him to view this photo lineup.
15 It's even worse than what I even thought when I
16 wrote my report.
17     Q.   Okay.  So based on this, even though
18 you have read other people's testimony, including
19 Alberto Rodriguez, who doesn't talk about his
20 family at the table at all or anything like that or
21 the people at the table other than himself viewing
22 the photo array, you believe that based off this,
23 that in fact there were other people at the table
24 when he viewed the photo array; is that right?

THOMAS TIDERINGTON, 12/08/2022                              Page 266..269

Page 266

1    A.   Unless you're suggesting to me that the
2  detective perjured himself during this testimony, I
3  can only go by what he testified to and --
4      **Q.   You think that if he said "them"**
5  **instead of "him" or that it got taken down wrong,**
6  **that that would be perjury, sir?**
7      MR. SWAMINATHAN:  Objection to form,
8  foundation --
9      A.   No.  If you --
10     MR. SWAMINATHAN:  -- calls for a legal
11  conclusion.  Go ahead.
12     THE WITNESS:  The testimony clearly was that
13  there were multiple people in the home, and the
14  testimony based on what you just read to me was
15  that they -- the photos were shown to them.  They
16  were handed to them.  So if you're asking me -- or
17  if you're suggesting that it was a typo and that's
18  not what actually occurred, then I would consider
19  that or I -- I can only go by what is in the sworn
20  testimony.
21          I don't know if he had an
22  opportunity to read his testimony and correct it or
23  if it was a mistake or if I should just rely on
24  what you're telling me because you know better than

Page 267

1  I do.  I don't know.
2  BY MR. ENGQUIST:
3      **Q.   Sir, did you read anybody else's**
4  **testimony about that incident, like the trial**
5  **testimony and the motion to suppress testimony by**
6  **Alberto Rodriguez or his deposition testimony?**
7      A.   I may have.  I'm sure I had at some
8  point.  I don't recall what was said.
9      **Q.   Okay.  Do you recall any evidence that**
10  **there were multiple people there viewing the photo**
11  **array, or was it just him?**
12     A.   Well --
13     MR. SWAMINATHAN:  Objection to form.  Go
14  ahead.
15     THE WITNESS:  I guess the best evidence is
16  the testimony from the detective that you just
17  read.  So I guess hypothetically are you asking me
18  to discount that testimony and --
19  BY MR. ENGQUIST:
20     **Q.   Oh, dear God.**
21     A.   Well, it doesn't have to be dear God.
22  I'm just trying to answer your question.
23          I can't change the words that are
24  written in the deposition that you asked me to

Page 268

1  consider.  I don't know what else you want me to
2  do.
3      **Q.   Okay.  By the way, has Alberto**
4  **Rodriguez ever said that either Halvorsen, Guevara,**
5  **or McMurray ever told him who to pick out in the**
6  **photo array?**
7      A.   I don't think Rodriguez did, no.
8      **Q.   Okay.**
9      A.   But it doesn't make -- and I know this
10  isn't the question that's pending, but it makes no
11  sense for them to have shown -- to even have shown
12  Alberto Rodriguez the photo array just before they
13  showed him the live lineup.  It's illogical, makes
14  no sense.
15     **Q.   What makes you think that Alberto**
16  **Rodriguez was shown the photo array right before he**
17  **saw a lineup?**
18     MR. SWAMINATHAN:  Objection to form and
19  foundation.  Go ahead.
20     THE WITNESS:  Well, I believe that's what the
21  police report indicates.
22  BY MR. ENGQUIST:
23     **Q.   Okay.  When was the live lineup?**
24     A.   It was the same day that Rodriguez and

Page 269

1  Melendez came to the police station together, and
2  it says that they were shown the photo lineup, and
3  then they were shown the live lineup.
4      **Q.   Okay.  The photo array that was**
5  **discussed in the testimony that we have gone**
6  **through was in Alberto Rodriguez's home, correct?**
7      A.   Initially, yes.
8      **Q.   Yes.  When was that?**
9      A.   I think a couple days -- well, as a
10  point of clarification, a couple days later he was
11  shown the photo -- he was shown the photo array
12  again is my understanding.
13     **Q.   So your understanding is that Rodriguez**
14  **saw the pictures right before he saw the lineup**
15  **anyway?**
16     A.   It's my understanding he was -- I -- as
17  I understand it, it was shown the same time
18  Melendez was shown the photo array.  At least
19  that's what the police report indicates.
20     **Q.   Okay.  So you got that from the police**
21  **report, that you believe that he was shown a photo**
22  **array right before -- the same photo array right**
23  **before he went in there?**
24     A.   Well, I don't know.  I don't know if

THOMAS TIDERINGTON, 12/08/2022                              Page 270..273

Page 270

1 the word right away is correct but I -- my
2 understanding is Melendez and Rodriguez came to the
3 police department together and they -- and they
4 were shown the photo array.  Now, if you have
5 evidence that it was only showed to Melendez, I
6 won't dispute that.
7     Q.   Okay.
8         MR. SWAMINATHAN:  Tom, I think you just said
9 a moment ago that you wanted to take another break.
10        THE WITNESS:  Yes, whenever is a good time
11 for you.
12        MR. ENGQUIST:  Oh, yeah, we can take
13 another -- you need five minutes right now?
14        THE WITNESS:  Yeah, yeah, five minutes.
15        MR. ENGQUIST:  Five minutes is great.
16        THE WITNESS:  Hopefully I won't get logged
17 off here.  Thanks.
18        THE VIDEOGRAPHER:  We're off the video record
19 at 5:01 p.m.
20            (Recess taken.)
21        THE VIDEOGRAPHER:  We are back on the video
22 record at 5:10 p.m.
23 BY MR. ENGQUIST:
24     Q.   Sir, do you consider yourself an

Page 271

1 eyewitness identification expert?
2         MR. SWAMINATHAN:  Sorry, Josh.  Just before
3 you ask, can we get a time update on how long we've
4 been on the record?
5         MR. ENGQUIST:  Sure.  Go ahead.  Anybody,
6 Miss Court Reporter, anybody --
7         THE VIDEOGRAPHER:  It's been five hours and
8 two minutes as of the last stop.
9         MR. ENGQUIST:  All right.
10        MR. SWAMINATHAN:  Okay.  Thank you.
11 BY MR. ENGQUIST:
12     Q.   Sir, do you consider yourself an
13 eyewitness identification expert?
14        MR. SWAMINATHAN:  Objection to form.  Go
15 ahead.
16        THE WITNESS:  No.  I've had training in
17 eyewitness -- what to expect from witness
18 identifications, but I don't believe I'm an expert
19 in eyewitness identifications.
20        MR. ENGQUIST:  Do you know what?  I'm going
21 to pass the torch to Eileen.  Eileen can take it
22 from here, and I may come back depending on what
23 she does, but, Eileen, go for it.
24        MS. ROSEN:  Okey doke.

Page 272

1                    CROSS-EXAMINATION
2 BY MS. ROSEN:
3     Q.   I'm going to ask you some questions
4 focused on the second part of your report having to
5 do with the City's policies and practices, just to
6 orient you.
7     A.   Okay.
8     Q.   I do have a question, though.  Can you
9 take a look at your report at page 6.  I don't
10 remember what exhibit number that was, but I think
11 you have it in front of you.
12    A.   I do.
13    Q.   You see at the bottom in paragraph (k)
14 you indicate, "I have been provided with documents
15 showing that 37 people who were convicted based on
16 investigations Guevara participated in have now had
17 their convictions thrown out"?
18    A.   Yes.
19    Q.   Can you tell me what documents you have
20 been provided?  They're not listed on your
21 materials reviewed.
22    A.   I will have to get back to you on that.
23 As we sit here, I don't recall specifically where I
24 got that information.

Page 273

1     Q.   Were you provided documents for each of
2 the individual 37 cases that you reference here?
3     A.   No, and I don't know the details of
4 each case.
5     Q.   Were you provided some kind of a
6 document that listed the names of the 37 cases?
7     A.   I'll have to get back with you.  I
8 don't recall if I was.  As we sit here today, I
9 don't recall a listing of those cases.
10    Q.   But you were provided some sort of
11 document that informed you that 37 people who were
12 convicted based on investigations Guevara
13 participated in have had their convictions thrown
14 out?
15    A.   That's correct, at some point, yes.
16    Q.   Why didn't you list that document in
17 the materials reviewed?
18    A.   You know, I may have.  That information
19 may be in one of the documents that I have listed,
20 but I will have to research that question for you
21 and provide you an answer when I can figure it out.
22        MS. ROSEN:  Josh, can you tell me what
23 exhibit the materials reviewed attachment is?
24        MR. ENGQUIST:  Give me one second.  Exhibit

Page 274

1 No. 5.
2 BY MS. ROSEN:
3     **Q. Can we take a look at Exhibit No. 5,**
4 **please, and if we can go to the first page of that**
5 **exhibit.**
6     A. Right.
7     **Q. Why don't you take a minute to look at**
8 **it and let me know if you see the document that**
9 **you're referencing at page 6 of your report that**
10 **identifies that 37 people had their convictions**
11 **thrown out, as you put it.**
12     MR. SWAMINATHAN: Objection to foundation.
13 Go ahead.
14     THE WITNESS: Yeah. I'm not saying that I
15 saw a document. I'm saying that there may have
16 been information contained within some of these
17 documents that I learned that. I don't know as we
18 sit here today what I based that number on.
19 BY MS. ROSEN:
20     **Q. So you're saying that it's possible**
21 **that you gleaned the number 37 and the conclusion**
22 **that 37 people had their convictions thrown out**
23 **from some other document contained and listed in**
24 **this materials reviewed portion of your report?**

Page 275

1     A. I may have, yes. The information came
2 from somewhere and I just -- as we sit here, I
3 don't know exactly where to look for it at this
4 point.
5     **Q. And if we go through each of the items**
6 **listed in this Exhibit No. 5, you still won't be**
7 **able to tell me if that information is contained in**
8 **any of these documents that you have listed here?**
9     A. We can. I could -- I could pull up
10 each one of those documents if you -- you want me
11 to do that now?
12     **Q. No. That was not my question. My**
13 **question is by looking at this list of documents,**
14 **if we simply look at the list of documents that**
15 **are --**
16     A. Yeah.
17     **Q. -- contained within Exhibit No. 5,**
18 **simply looking at the list of documents, you would**
19 **not be able to tell me whether or not any of those**
20 **documents contain the list of 37 names, correct?**
21     A. Can you scroll down a little bit,
22 please, just so I -- if you could -- I'm sorry, if
23 you can just keep scrolling down a little bit
24 further. Let me just see -- I can't tell you at

Page 276

1 this point.
2     **Q. We can --**
3     A. It may have been from the depositions
4 of the Chicago Police Department representatives.
5 I don't know. I really don't know as we sit here,
6 but I'm confident that I can respond to your
7 question once I have time to review in greater
8 detail this information.
9     MS. ROSEN: Can we scroll on this page to the
10 top of this page of the document.
11     **Q. Okay. So 1 through 45 appears to**
12 **be -- Items 1 through -- actually, wrong.**
13     **Let's talk about the items below the**
14 **title "Policies." Those are Chicago Police**
15 **Department policies, right?**
16     A. They appear to be, yes.
17     **Q. So certainly there isn't a list of 37**
18 **people's names in the Chicago Police Department**
19 **directives from the '80s and '90s, correct?**
20     A. Probably not, probably that's not where
21 I got that information from.
22     **Q. Okay. And then if we go to file**
23 **comparison files, Items 64 to 68, Item 64 are Area**
24 **5 investigative files from 1995 to 1998, correct?**

Page 277

1     A. I believe so, yes.
2     **Q. And certainly there isn't a list of 37**
3 **names of people who have had their convictions**
4 **overturned contained within those files from the**
5 **1995 to 1998 time period, right?**
6     A. I would agree with that, yes.
7     **Q. And then same with No. 65, which**
8 **is the companion Cook County public defender files,**
9 **correct?**
10     A. That's correct.
11     **Q. And then same with No. 66, which is the**
12 **companion records division files, correct?**
13     A. They are, yes.
14     **Q. Okay. And then Item 67 and 68 are**
15 **respectively the RD files and the investigative**
16 **files from 1991 to 1995, and certainly there is no**
17 **list of 37 names contained within those files,**
18 **right?**
19     A. I would assume not.
20     **Q. Okay. And then looking below to**
21 **additional materials, the Fields expert report, is**
22 **it your understanding that the Fields case had**
23 **anything at all to do with Detective Guevara?**
24     A. I don't believe so. Might have

THOMAS TIDERINGTON, 12/08/2022                      Page 278..281

Page 278

1 something to do with the other -- other wrongful
2 conviction cases, but I don't believe had anything
3 to do with Guevara.
4      **Q.   Okay.  In any event, do you recall in**
5 **that expert report a list of 37 names of people**
6 **associated with Guevara who had their convictions**
7 **thrown out?**
8      A.   No.
9      **Q.   Okay.  And then same with the Brasfield**
10 **report in Rivera, right?  There's nothing in there**
11 **about 37 cases?**
12     A.   I don't know.  That I wouldn't be able
13 to answer without looking at that.
14     **Q.   So it might be there?**
15     A.   It's possible.
16     **Q.   Okay.  And then we have the OIG reports**
17 **from 2020 and 2021.  Do you think maybe they're in**
18 **there, the list of 37 names?**
19     A.   It's possible.  Well, when you say
20 "names," I don't know if I ever saw a list of
21 names.  I told you I didn't ever see a list of
22 names, I don't think.
23     **Q.   Okay.  So when you use the words in**
24 **your report: I have been provided with documents,**

Page 279

1 **plural, showing that 37 people who were convicted**
2 **based on investigations Guevara participated in now**
3 **have had their convictions thrown out, that doesn't**
4 **mean that you have the names of the individuals.**
5 **Is that what you're saying?**
6      A.   I don't know if I do or not.  I don't
7 recall -- like I said, I don't recall seeing a
8 list, and as I mentioned at the beginning of this
9 questioning, I don't know exactly where I got that
10 information from.
11     **Q.   I understand.  I'm trying to see if we**
12 **can figure it out.**
13     A.   Right.  No.  I am here to help.
14     **Q.   But so it is incorrect for me to infer**
15 **that you even know the names of the 37 people based**
16 **on the words that you've used in your report,**
17 **right?**
18     MR. SWAMINATHAN:  Objection to form.  Go
19 ahead.
20     THE WITNESS:  I certainly can't recite their
21 names, no.
22 BY MS. ROSEN:
23     **Q.   I am not asking if you could recite**
24 **their names.  I am asking whether or not it's fair**

Page 280

1 **for me to assume that at some point you were**
2 **provided a list of names based on the words that**
3 **you've written in your report.**
4      MR. SWAMINATHAN:  Objection to form and
5 foundation.
6      THE WITNESS:  Again, I don't know if I saw a
7 list or if I just saw a synopsis of it.  It may
8 have come from 71 and 72.  I don't know as we sit
9 here today.
10 BY MS. ROSEN:
11     **Q.   And if we individually go through each**
12 **one of these items, you won't be able to tell me,**
13 **right, without actually like looking through all of**
14 **the materials so that you can glean it, right?**
15     A.   We can try.  I mean, we can -- we're at
16 72.  We can -- the Rivera permanent retention file,
17 I don't believe it was in there, Rivera criminal
18 defense attorney file, Kluppelberg investigative
19 file.
20          Can you scroll down past 84, please.
21          It's possible it came from
22 deposition of Commander Eric Winstrom, but I can't
23 be sure.
24     **Q.   I can tell you it didn't but --**

Page 281

1      A.   Okay.  I will take you at your word on
2 it.
3          And pass 114, please.
4          Only thing I can tell you is I can
5 do some additional research and let you know.
6      **Q.   Okay, great.  Can we go to Item I think**
7 **it's 88 for a second.  No.  It's 87.  See that**
8 **there, PTP notice, 1 through 3223?  You see that?**
9      A.   I do.
10     **Q.   What is that?**
11     A.   I don't know.  I would have to pull up
12 that item and see what it is.
13     **Q.   As you sit here today, you have no**
14 **recollection of what that is?**
15     A.   Not with that abbreviation, no.
16     **Q.   Okay.  What is the American Judicature**
17 **Society?**
18          We can take this exhibit down.
19     A.   I'm sorry.  What page are you
20 referencing?
21     **Q.   I'm just asking you what is the**
22 **American Judicature, J-u-d-i-c-a-t-u-r-e, Society?**
23     A.   I don't -- as we sit here, I don't
24 recall what -- if you can point me to someplace,

THOMAS TIDERINGTON, 12/08/2022                    Page 282..285

Page 282

1 perhaps it can refresh my memory.
2    Q.    That's not sounding familiar to you as
3 you sit here today?
4    A.    No.
5    Q.    Okay.  Let's go to page 55 of your
6 report.  Are you there?
7    A.    I am.
8    Q.    Okay.  So at the bottom of the page,
9 Item 2, it says, "I reviewed investigative files
10 for 475 different homicide investigations...."  You
11 see that there?
12   A.    I do.
13   Q.    And that is 475 investigative files as
14 distinct from records division files; is that
15 correct?
16   A.    That's correct.
17   Q.    Okay.  And then if we go to the next
18 page of your report, page 56, you have a section
19 regarding handwritten notes, not on general
20 progress reports.  Do you see that?
21   A.    I do.
22   Q.    About midway through that paragraph,
23 you write, "Only 424 of the 475 investigative files
24 contained handwritten notes...."  Do you see that?

Page 283

1    A.    That's correct.
2    Q.    And then it says, "...of those, 213 of
3 the 424 files...contained handwritten notes not on
4 GPRs."  Do you see that?
5    A.    I do.
6    Q.    So does that mean that in 424 of the
7 475 investigative files, there were no notes of any
8 kind?
9    A.    Say that again.
10   Q.    So does that mean that in 424 of the
11 475 investigative files, there were no notes of any
12 kind?
13        MR. SWAMINATHAN:  Objection to form and
14 foundation.
15        THE WITNESS:  No.  It means that 50 percent
16 contained handwritten notes on GPRs.
17 BY MS. ROSEN:
18   Q.    Well, it reads:  Only 424 of the 475
19 investigative files contained handwritten notes; of
20 those --
21   A.    Okay.
22   Q.    -- 213 of the 424, or approximately
23 50%, contained handwritten notes not on GPRs.
24   A.    Okay.  That's --

Page 284

1    Q.    Right?
2    A.    That's -- yes, that's correct.
3    Q.    Okay.  So does that mean that the 424
4 of the 475 that contained handwritten notes -- that
5 means there's 51 that contain no notes?
6        MR. SWAMINATHAN:  Objection to form and
7 foundation, mischaracterizes the testimony.  Go
8 ahead.
9        THE WITNESS:  That's my understanding, yes.
10 BY MS. ROSEN:
11   Q.    What methodology did you use to
12 ascertain the number of files -- the number of
13 investigative files that contain notes?
14   A.    I relied on the -- a chart that was
15 provided from the plaintiff's attorney.
16   Q.    The Excel spreadsheet, right?
17   A.    I don't believe it was an Excel
18 spreadsheet.  It's a -- it's a colored chart.
19   Q.    So they didn't provide it to you in
20 Excel format?
21   A.    I don't recall if I got it in Excel
22 format or not.
23   Q.    Did you get it in a PDF format?
24   A.    I did receive it in a PDF.  I don't

Page 285

1 know if I got an Excel as well, though.
2    Q.    Were you able to manipulate the
3 spreadsheet that you were provided so that you
4 could do your own calculations?
5    A.    I did not do --
6        MR. SWAMINATHAN:  Objection to form and
7 foundation.  Go ahead.
8        THE WITNESS:  I did not do my own
9 calculations.
10 BY MS. ROSEN:
11   Q.    So in order to identify for purposes of
12 your report that 424 of the 475 investigative files
13 contain handwritten notes, what did you do?  Did
14 you just look at the spreadsheet and count up the
15 numbers?
16   A.    No.  I looked at each one of the cases,
17 but I did spot checks on probably 30 or 40 cases
18 and -- to confirm the data that was provided to me
19 in the chart.
20   Q.    Right, but spot-checking 30 or 40 cases
21 isn't going to allow you to draw the conclusion
22 that 424 of the 475 investigative files contained
23 handwritten notes, right?  You'd have to review all
24 the files in order to draw that conclusion

Page 286

1 yourself?

2     MR. SWAMINATHAN:  Objection to form,

3 foundation.  Go ahead.

4     THE WITNESS:  Well, to draw that conclusion

5 myself, I relied on the analysis done by the

6 plaintiff's attorney on that.

7 BY MS. ROSEN:

8     Q.    Right.  So you just looked at the

9 spreadsheet and looked at the column that

10 identified the files that had notes and looked at

11 the total number to come up with 424, right?

12     A.    Yes, and then spot-checked to see if it

13 was consistent with -- I certainly didn't check

14 every file, no.

15     Q.    Okay.  But you did not manipulate the

16 Excel spreadsheet -- that spreadsheet, whatever

17 format it was given to you, in any way to check the

18 numbers or anything like that, right?

19     MR. SWAMINATHAN:  Objection, form.  Go ahead.

20     THE WITNESS:  No.

21 BY MS. ROSEN:

22     Q.    Okay.  And then with respect to your

23 conclusion that 213 of the 424 files contained

24 handwritten notes on GPRs, what methodology did you

Page 287

1 utilize to arrive at that conclusion?

2     A.    The same as I just described.

3     Q.    So you looked at the chart?

4     A.    That's correct.

5     Q.    Okay.  And then you go on to describe

6 the tallies from the 1995 to the 1998 data set, and

7 that's from the Solache/Reyes case, right?

8     A.    That's correct.

9     Q.    And did you utilize the same

10 methodology in Solache/Reyes?  You just looked at

11 the chart?

12     A.    I did.

13     Q.    All right.  Then if we go down to the

14 next section, to-from memos, it says, midway

15 through the paragraph:  From the period 1991 to

16 1995, 47 of the files, or approximately 10%,

17 contained to-from memos not on an official police

18 form.  Do you see that there?

19     A.    I do.

20     Q.    What methodology did you utilize to

21 arrive at that conclusion?

22     A.    I utilized the spreadsheet that was

23 provided to me.

24     Q.    Okay.  And then the next sentence

Page 288

1 refers back to the calculations from Solache/Reyes.

2 Did you use the same methodology in Solache/Reyes?

3 You looked at the chart?

4     A.    I did.

5     Q.    And then you also reference in both of

6 these paragraphs Mr. Brasfield's findings in Rivera

7 and Fields for both the percentage of notes and the

8 percentage of to-from memos, right?

9     A.    That's correct.

10     Q.    The methodology you used for that was

11 simply to look at Mr. Brasfield's report, right?

12     A.    That is correct.

13     Q.    You didn't do any additional analysis

14 of any of the files that Mr. Brasfield had at his

15 disposal, correct?

16     A.    I did not.

17     Q.    And you didn't have those files at your

18 disposal, correct?

19     A.    No.

20     Q.    Then going to missing or incomplete

21 inventory sheets, you conclude at the top of page

22 57:  For the period from 1991 to 1995, I found that

23 115 files or 24% of the total investigative files

24 contained no inventory sheet, correct?

Page 289

1     A.    That's correct.

2     Q.    And was the methodology that you used

3 to arrive at that conclusion the same?  You looked

4 at the chart?

5     A.    Yes, yes, ma'am.

6     Q.    Okay.  And then same for with respect

7 to the Solache/Reyes analysis, you looked at the

8 chart?

9     A.    I did.

10     Q.    Okay.  Then you say:  From the period

11 from 1991 to 1995, I found that 359 investigative

12 files, approximately 88% of total investigative

13 files, contained inventory sheets that were

14 incomplete.  Do you see that there?

15     A.    I do.

16     Q.    How did you determine that 359

17 investigative files contained inventory sheets that

18 were incomplete?

19     A.    That information is contained in the

20 data that was provided to me.

21     Q.    In the chart?

22     A.    Correct.

23     Q.    And when you say that the inventory

24 sheets were incomplete, what do you mean?

THOMAS TIDERINGTON, 12/08/2022                          Page 290..293

Page 290

1    A.  Well, that they either didn't contain
2  certain documents that were found in the case file
3  or that were found in the prosecutor's file is my
4  understanding.
5      MS. ROSEN:  I'm sorry.  Could you read back
6  the --
7      THE WITNESS:  I'm sorry.  Either they did not
8  contain the information that was found in the
9  investigative file, permanent retention file or
10  public defender's files.
11  BY MS. ROSEN:
12     Q.  Okay.  And then for your conclusions
13  from the period 1995 to 1998, that was from
14  Solache/Reyes, right?
15     A.  Yes, it was.
16     Q.  And those conclusions again were drawn
17  from looking at the chart, right?
18     A.  Correct.
19     Q.  All right.  Then it says, "In addition,
20  the inventory sheets do not appear to be
21  contemporaneously updated...."  Do you see that?
22     A.  I do.
23     Q.  What does that mean?
24     A.  Well, some of the sheets I would expect

Page 291

1  that if this material is being put into a -- into
2  the investigative file or permanent retention file,
3  that you would see several entries.  What I believe
4  is unusual is that you might see -- and that, you
5  know -- 10 things deposited into the -- into the
6  file on one particular date when, you know, perhaps
7  an interview occurred three weeks earlier or a
8  witness statement was taken three weeks earlier but
9  all -- in many of these cases, you would see
10  everything was put into the file on a particular
11  date, and then there would be like a date placed in
12  there and then a line drawn down to show that the
13  date was the same for all of the other items.
14     Q.  What was your methodology for
15  concluding that the documents were not being
16  contemporary -- let me try that again.
17         What was your methodology for
18  concluding that the inventory sheet was not
19  contemporaneously updated?  What did you do?
20     A.  Well, just my review of that, as I
21  described.  I would have expected to see witness
22  statement, you know, placed in file on December 15
23  and then another item, December 18, then, you
24  know -- but that's not what was happening.  It

Page 292

1  was -- it seemed a lot of the information was
2  placed in at either the end or near the end of the
3  case, which I believe was not the intention of the
4  policy within the Chicago Police Department.
5      Q.  Yeah.  My question was what did you do
6  to conclude that?  Did you physically go through
7  the files --
8      A.  I did.
9      Q.  -- the 475 files --
10     A.  Oh.
11     Q.  -- and make that comparison?
12     A.  No, I didn't go -- and I'm sorry for
13  interrupting you.  No, I didn't go through every
14  file.  I went through -- spot-checked various
15  files, and I saw a pattern of how these entries
16  were made.  And it appeared to me that it was
17  not -- you know, that they were made again towards
18  the end or near the end of the case.
19     Q.  How many files did you review to arrive
20  at the conclusion that inventory sheets do not
21  appear to be contemporaneously updated?
22     A.  I don't know if I can give you a
23  number, but I know I looked at just about all of
24  the files.  I can't give you a breakdown of how

Page 293

1  many files I looked at that caused me to come to
2  that conclusion, but there were many.
3      Q.  I noticed that in this particular
4  section you don't have specific numbers identified
5  like you do above, right?  You don't say in, for
6  example, 250 of the 475 files, I found that the
7  inventory sheets were not contemporaneously
8  updated.  Why didn't you do that?
9      A.  I was satisfied with my spot-checking
10  of the files.  I -- you know, perhaps the
11  statistical information that you mentioned above
12  was not completed by -- I didn't do it myself.  So
13  I did what I believed was enough to draw that
14  conclusion.
15     Q.  So the statistical information
16  regarding the number of inventory sheets that do
17  not appear to be contemporaneously updated is not
18  in the chart, right?
19     A.  That's correct.
20     Q.  So plaintiff's team didn't do their
21  work on that for you, right?
22     A.  That's correct.
23     Q.  And so in this particular case you
24  provide a couple of examples below.  The RD files

THOMAS TIDERINGTON, 12/08/2022                    Page 294..297

Page 294

1 A242406, Z243035, A276340, A636514, and A744094
2 come out of the Solache/Reyes data set, right?
3     A.   I believe they did, yes.
4     Q.   Okay.  So the three below, P18275,
5 P124971, and Z533574, those are the files that you
6 have provided as examples that come from the Sierra
7 database which is the 1991 to 1995 database, right?
8     A.   There's other examples.  I don't know
9 that I listed all of them, but there's other
10 examples as well.
11     Q.   But you've only listed three from this
12 data set, right?
13     A.   That's correct.
14     Q.   Three from the 475 files that were at
15 your disposal, correct?
16     A.   That's correct.
17     Q.   And you said there were others.  Can
18 you give me the RD numbers as you sit here today?
19     A.   Not as we sit here today.
20     Q.   Do you have them written down anywhere?
21     A.   I don't.  I would have to go back and
22 look at that again.
23     Q.   Okay.  All right.  Let's take a look at
24 page 58 of your report.

Page 295

1     A.   Okay.
2     Q.   The heading here is "Review of
3 permanent retention files," and then it says "all
4 relevant information in unofficial documents is not
5 transcribed in official reports."  You see that
6 there?
7     A.   Yes.
8     Q.   In the bold at the top of the page.
9     A.   Yep.
10     Q.   Okay.  So the permanent retention files
11 are not the investigative files, right?  The
12 permanent retention files are also known as the
13 record division files, right?
14     A.   That's my understanding, yes.
15     Q.   Okay.  And when you say "all relevant
16 information in unofficial documents is not
17 transcribed in official reports," do you see that?
18     A.   I do.
19     Q.   The phrase "unofficial documents," what
20 are you referring to?
21     A.   Investigators' notes, maybe statements,
22 perhaps GPRs.
23     Q.   You're calling a GPR an unofficial
24 report?

Page 296

1     A.   Well, no, I'm not calling it an
2 unofficial report, but it's -- it's not translated
3 into -- and there were many times where information
4 on a GPR should have at least in my opinion been
5 part of a -- the permanent retention file and
6 transcribed into the report based on Chicago PD
7 policy.
8     Q.   Okay.  But you're using the phrase
9 unofficial documents, and when I asked you define
10 it, you said investigators' notes, statements, and
11 GPRs.  So when you say GPRs, are you saying that a
12 GPR is not an official Chicago Police Department
13 document or report?
14     A.   No, I'm not saying it's not an official
15 report, no.
16     Q.   Okay.  And then when you say
17 statements, what are you referring to?
18     A.   If the officer wrote on a sheet of
19 paper in his notebook about something a witness may
20 have told him and did not include that in the
21 report, it may be inappropriate.
22     Q.   You're saying notes are unofficial
23 documents?  Is that what you're saying?
24     A.   They could be.

Page 297

1     Q.   When you say "could be," why are you
2 hedging?
3     A.   I'm not.
4     Q.   Oh.  What makes it unofficial?
5     A.   Well, if it's not on an official
6 document like in accordance with department policy,
7 I would, I guess, consider that to be unofficial.
8     Q.   Okay.  But if it's contained within the
9 investigative file, then it's preserved, right?
10     MR. SWAMINATHAN:  Objection, form.  Go ahead.
11     THE WITNESS:  Well, theoretically it's
12 supposed to be preserved, but if there's no record
13 of it and if it's not on an inventory list, it
14 would be difficult to determine whether it's
15 actually being preserved or whether it's being
16 discarded at the -- essentially at the discretion
17 of the detective.
18 BY MS. ROSEN:
19     Q.   Well, we just talked about that you
20 found 424 files that contained handwritten notes,
21 right?
22     A.   That's correct.
23     Q.   So they're preserved, right?  These are
24 files from 1991 to 1995.  We found them and have

THOMAS TIDERINGTON, 12/08/2022                           Page 298..301

Page 298

1  looked at them and have them available to us in
2  2022, right?  So they're preserved?
3      MR. SWAMINATHAN:  Objection to form and
4  foundation.  Go ahead.
5      THE WITNESS:  Well, we don't know if all of
6  the notes are being preserved because we -- there's
7  parallel files.  We don't know what was being -- we
8  know some of the notes were preserved through that
9  time period, but I don't think either -- I don't
10 think there's any of us can sit here today and say
11 all of the information has been preserved because
12 we have no way of knowing that.
13 BY MS. ROSEN:
14     Q.   We also have no way of knowing a lot of
15 things.  That's really not the question, right?  So
16 the question is --
17     A.   Well, that's -- I would have to agree
18 with you on that because a lot of the reports that
19 I reviewed are deficient in what I would expect to
20 find in a police report.  So you're right.  There's
21 a lot of things that we don't know because it's not
22 properly documented by the investigators.
23     Q.   Okay.  Well, so I'm going to ask you to
24 listen to my question and answer the question that

Page 299

1  I am asking you.  It's late in the day, and I
2  really don't want to be here until 9:00 o'clock at
3  night, and I really don't have that many questions
4  for you.
5      A.   Okay.
6      Q.   So I'm going to ask you to listen to my
7  questions and really focus on answering the
8  questions I am asking you as opposed to
9  hypothesizing about other problems that you've
10 noted in relation to other things you have done in
11 your review, okay?
12         So now we are talking about notes.
13 You're saying notes that aren't on GPRs could be, I
14 think was the word you used, unofficial documents,
15 correct?
16     A.   That's correct.
17     Q.   But we know that at least some notes
18 are maintained in the investigative file as you
19 have noted in your report, correct?
20     A.   That's -- that's correct.
21     Q.   Okay.  And if those notes that are in
22 the investigative file are produced to the criminal
23 defense attorney or the prosecutor, then those
24 notes are not suppressed, correct?

Page 300

1      MR. SWAMINATHAN:  Objection to form.  Go
2  ahead.
3      THE WITNESS:  I guess suppressed is a --
4  maybe a legal term, but I would say that if they
5  were disclosed, if they were provided, if they were
6  classified on the inventory sheet, then they would
7  be in conformance with the Chicago Police
8  Department policy and that they would be -- it
9  would be proper.
10 BY MS. ROSEN:
11     Q.   So I am not really asking about Chicago
12 Police Department policy at this moment.  You used
13 the phrase suppressed in your report, right?  In
14 fact, we started today when Mr. Engquist was asking
15 you questions about your conclusion that the
16 defendants suppressed evidence, right?  So you --
17     A.   Yes, ma'am.
18     Q.   -- have used the word suppressed.  When
19 you use the word suppressed throughout your report,
20 what do you mean?
21     A.   Intentionally not disclosing the
22 information.
23     Q.   Okay.  So if the notes that are put
24 into an investigative file are produced to the

Page 301

1  prosecutor and/or the Cook County public -- let me
2  strike that.
3         If the notes that are put into the
4  investigative file are then turned over to either
5  the prosecutor or the defense attorney, then using
6  your definition of suppressed, they were not
7  suppressed, right?
8      A.   I would agree with you, yes.
9      Q.   Okay.  So as I understand it, the
10 criticism that you have beginning at page 58 of
11 your report is that the information that's written
12 in the notes, whether it's handwritten notes on
13 just pieces of paper or general progress reports,
14 are not transcribed into the typed police reports;
15 is that correct?
16     A.   Well, let's be clear.  There's a policy
17 within the Chicago Police Department that mandates
18 that their employees do these things and if
19 that's -- and my opinion is based on a couple of
20 different things:  what is acceptable police
21 practices and whether or not the officers conform
22 to the policies that were put in place perhaps for
23 good reason by the Chicago Police Department.  So
24 if I see violations of policy, I would think that

THOMAS TIDERINGTON, 12/08/2022                                    Page 302..305

Page 302

1  that's a departure from acceptable police practices
2  and standards.
3      Q.   Okay.  That was not my question.
4      A.   Well, okay.
5      Q.   My question is that as I understand it,
6  your criticism that begins at the top of page 58 is
7  that information that is transcribed on either
8  handwritten notes that are not on GPRs or notes
9  that are on GPRs are not transcribed into official
10 reports, meaning typed reports; is that correct?
11     A.   That -- that is correct.
12     Q.   Okay.  And that criticism is based on
13 what?
14     A.   Well, I think I explained it a couple
15 times, but I'm going to try one more time, that
16 it's an acceptable standard of practice that if
17 there's relevant information, it should be included
18 in police reports.  I think we would all agree on
19 that.
20          There's also a Chicago Police
21 Department policy, and I don't recall specifically
22 what the policy number is, but it directs their
23 employees that they will transcribe the relevant
24 information into police reports, and when that's

Page 303

1  not being done is what my criticism is.
2      Q.   So your recollection is there is a CPD
3  directive that was in effect in 1991 to 1995 or
4  actually in the '90s -- we can make it broader than
5  that -- that required detectives to transcribe
6  information from notes into typed police reports?
7  Is that what you're saying?
8      A.   That's exactly what I'm saying.
9      Q.   Okay.  And you cannot, as you sit here
10 today, identify that directive for me, correct?
11     A.   No, but I can also tell you that it's
12 an acceptable standard of police practices to do
13 that as well.
14     Q.   Is that directive listed on the
15 materials reviewed portion of your report?
16     A.   I'm sure it is.
17     Q.   Okay.  So if we were to look at those
18 directives, I would be able to find a directive
19 from the Chicago Police Department that instructs
20 detectives to transcribe information from their
21 notes and general progress reports into typed
22 supplementary reports.  Is that what you're saying?
23     A.   I believe so, yes, ma'am.
24     Q.   Okay.  All right.

Page 304

1      A.   Did you want to look for that right now
2  or no?
3      Q.   No, because we're not going to find it.
4           So we're going to go to the top of
5  page 59.  Well, let's go to the bottom of page 59
6  just to orient ourselves.  You indicate that you
7  compared and contrasted a number of permanent
8  retention files with their corresponding
9  investigative files, right?
10     A.   That's correct.
11     Q.   Okay.  And then you identified examples
12 of notes that you say were not disclosed to
13 criminal defendants.  Do you see that there?
14     A.   I'm sorry.  Where exactly are you?
15     Q.   The bottom of page 58.
16     A.   Oh, I'm sorry.
17          That's correct.
18     Q.   Okay.  And then you list some examples
19 from the Reyes and Solache case, right?
20     A.   That's correct.
21     Q.   And we went through those at your
22 deposition in Reyes and Solache, correct?
23     A.   Yes, we did.
24     Q.   And in Reyes and Solache, you had

Page 305

1  available to you the criminal defense files,
2  correct?
3      A.   I did.
4      Q.   And then you've added in this section
5  of the report some examples from the Sierra data
6  set, right?  Those begin at the top of page 59?
7      A.   That's correct.
8      Q.   But in Sierra you did not have the
9  corresponding defense files, correct?
10     A.   That's correct.  Only had the permanent
11 retention and investigative files.
12     Q.   So you didn't have the defense files,
13 and you also didn't have the Cook County State's
14 Attorney files, correct?
15     A.   I never seen the Cook County State
16 Attorney files, no.
17     Q.   And you never saw those Reyes either,
18 right?
19     A.   That's correct.
20     Q.   Do you have an understanding of why you
21 were not provided the companion criminal defense
22 files to the Sierra data set?
23     A.   I don't know.
24     Q.   Okay.  So when you say, "In addition to

THOMAS TIDERINGTON, 12/08/2022                    Page 306..309

Page 306

1 other instances discussed below, where such notes
2 were not disclosed to criminal defendants, examples
3 include," and you identify cases from Sierra,
4 examples from Sierra, what is the basis for your
5 conclusion that those examples that you list there
6 were not produced to the criminal defendants when
7 you don't have a criminal defense file to review?
8     MR. SWAMINATHAN: Eileen, where are you
9 looking, which paragraph?
10    THE WITNESS: The bottom of --
11    MS. ROSEN: The bottom of 58, the top of 59.
12    THE WITNESS: Well, my comparison on the
13 Sierra was what was contained in the investigative
14 files that either were not on the inventory sheet
15 that was turned over to the public defender's
16 office or theoretically to the prosecutor. I
17 wouldn't know that. And there was differences
18 between what I found in the investigative files and
19 what I found in the permanent retention files and
20 also what was on the inventory sheets.
21 BY MS. ROSEN:
22    Q.   So how do you know that -- you have
23 cited eight pages --
24    A.   Right.

Page 307

1     Q.   -- RFC-Sierra 121416, 121420, 79168,
2 92370, 109932, 110061, 110043, and 110062, as
3 documents that were not disclosed to criminal
4 defendants. What is the basis for your conclusion
5 that those specific pages were not produced to a
6 criminal defendant?
7     MR. SWAMINATHAN: Objection to foundation.
8 It mischaracterizes the report and his testimony.
9     MS. ROSEN: You can answer.
10    THE WITNESS: I would have to go look at
11 those, and we can do that on a break because I
12 think we'll be taking one shortly, and I can
13 probably more fully answer that question, but
14 primarily I compared the -- what was in the
15 investigative files to what was in the permanent
16 retention files, and I guess one of the assumptions
17 I made, that if it was in the investigative file
18 and not the permanent retention file, that it was
19 not disclosed.
20 BY MS. ROSEN:
21    Q.   What evidence do you have that as a
22 matter of practice investigative files were not
23 produced to criminal defendants?
24    MR. SWAMINATHAN: Objection to form and

Page 308

1 foundation. Go ahead.
2     THE WITNESS: Well, I think there's a long
3 list of evidence, including even a recent inspector
4 general report indicating just that the problem
5 continues today, that the files are -- cannot be
6 properly vetted to determine whether or not
7 documents are being appropriately turned over.
8 BY MS. ROSEN:
9     Q.   So that's not my question. You said
10 that you concluded in part that the reason these
11 documents were not turned over to the criminal
12 defendant is because they came from the
13 investigative file and investigative files aren't
14 being turned over to criminal defendants. So I
15 want --
16    A.   Right.
17    Q.   -- to know the basis for that
18 conclusion that in this 1991 to 1995 time frame,
19 that as a matter of practice, the investigative
20 files were not being turned over to criminal
21 defendants.
22    MR. SWAMINATHAN: Objection to form. Go
23 ahead.
24    THE WITNESS: Well, again, I think it's

Page 309

1 clear. I think it's been identified as a problem
2 from the late '80s up until the present time that
3 it continues to be a problem. I don't know that I
4 can give you a specific example for -- in only the
5 Sierra case other than to anecdotally explain that
6 the problem has -- it's a systemic problem within
7 the Chicago Police Department, that according to
8 the inspector general report is still a problem
9 even today.
10 BY MS. ROSEN:
11    Q.   Was the investigative file that you
12 reviewed in Mr. Sierra's case in the criminal
13 defense file?
14    MR. SWAMINATHAN: Objection to form. Go
15 ahead.
16    THE WITNESS: I don't know.
17 BY MS. ROSEN:
18    Q.   Why not? Why don't you know?
19    A.   Well, I'd have to look. I don't recall
20 as we sit here today. I'm looking at my report,
21 and the only thing I'm looking at is my report, and
22 we're talking about thousands of documents. So
23 certainly I'm going to have to refresh my memory.
24    Q.   So when you concluded that there was

THOMAS TIDERINGTON, 12/08/2022                    Page 310..313

Page 310

1 certain evidence suppressed from Mr. Sierra, if in
2 your review of the documents in preparation from
3 the report you had figured out that the entire
4 investigative file was missing from the PD file,
5 would you have noted that in your report?
6     MR. SWAMINATHAN: Objection to form. Go
7 ahead.
8     THE WITNESS: I may have.
9 BY MS. ROSEN:
10     Q.   But you may not have?
11     A.   I may not have.
12     Q.   In Solache and Reyes, was the
13 investigative file in the PD file?
14     A.   I don't recall as we sit here today.
15 We're talking about tens and thousands of
16 documents. Certainly I can answer that question if
17 I'm given the opportunity to review the documents
18 that you're asking me about, but perhaps I'm going
19 to fail a memory test if that's what we're having
20 here this evening.
21     MR. SWAMINATHAN: I'm sorry. I might fail a
22 bladder test pretty soon, so whenever you guys get
23 to a relatively good stopping point. Go ahead.
24 I'm sorry.

Page 311

1     MS. ROSEN: Yeah, sure. Just give me a
2 couple more -- let me just finish this line here
3 and then we can take a break.
4     Q.   Well, as I understand your opinions,
5 both in this case and Solache/Reyes, they are
6 focused on two things. One is the propriety of the
7 underlying police investigation and whether or not
8 there was deviation from generally accepted police
9 practices and, second, the City's policies and
10 practices related to the retention and storage and
11 production of files, correct?
12     A.   In preparation of those files, yes.
13     Q.   Okay. And certainly if in either
14 Solache/Reyes or Sierra you had determined that the
15 actual investigative file in either one of those
16 cases was missing from the PD file, that would have
17 been something important to note for purposes of
18 your opinions; don't you think?
19     MR. SWAMINATHAN: Objection to form. Go
20 ahead.
21     THE WITNESS: Well, I think I had both those
22 files, but I'm saying I want to check my notes
23 before I answer that question. I believe I have
24 those. I believe I have the public defender's

Page 312

1 file.
2 BY MS. ROSEN:
3     Q.   Neither one of your reports say --
4 neither the Solache/Reyes report or the Sierra
5 report draw the conclusion that the investigative
6 file was not produced to either Mr. Sierra,
7 Mr. Solache, or Mr. Reyes, correct?
8     A.   No. I think there were deficiencies in
9 the information that was contained in the file in
10 both those cases but I -- as I said, and I can
11 quickly confirm this, I believe I received the
12 public defender's file in each of these cases.
13     Q.   And both of those files contained the
14 investigative file, right?
15     MR. SWAMINATHAN: Objection to form,
16 foundation. Go ahead.
17     THE WITNESS: Well, I -- whether it was the
18 permanent retention file, the investigative file or
19 both, I want to confirm that before I answer that
20 for you.
21 BY MS. ROSEN:
22     Q.   Because you don't recall as you sit
23 here today, correct?
24     A.   Yeah. Well, I would rather be sure

Page 313

1 than to answer the question incorrectly. I don't
2 think you would want me to answer it incorrectly.
3 I think you would want me to be factual, and
4 certainly if I'm given the opportunity to refresh
5 my memory, I certainly could be much more factual.
6     MS. ROSEN: Well, I can tell you I have read
7 both of your reports, and it's not noted in either
8 one of your reports, but such is life.
9         We can take a break.
10     MR. SWAMINATHAN: Just a few minutes?
11     MS. ROSEN: Yeah. How much do you want?
12     MR. SWAMINATHAN: I just need a couple. Two
13 minutes? Want to say four or five minutes? Just
14 say five minutes?
15     MS. ROSEN: Okay.
16     MR. SWAMINATHAN: Okay.
17     THE VIDEOGRAPHER: We're off the video record
18 at 6:04 p.m.
19         (Recess taken.)
20     THE VIDEOGRAPHER: We are back on the video
21 record at 6:13 p.m.
22     MS. ROSEN: Okay. Let's take a look at some
23 of the examples that you cite at the top of page 59
24 of your report. If we could pull up what we've

THOMAS TIDERINGTON, 12/08/2022                    Page 314..317

Page 314

1 marked as Monell Exhibit No. 2.

2    Q.   Okay.  Do you see that there,
3 Mr. Tiderington?

4    A.   Yes, ma'am, I do.

5    Q.   Do you recognize this document?

6    A.   Yeah.  Can you -- I just want to see
7 what the Bates -- what the stamp number is on that.
8 121416, yes.

9    Q.   So it's the first example in the Sierra
10 data --

11   A.   Yes.

12   Q.   -- examples, right?

13       Okay.  So if we could go back to the
14 top of the document so we can read it.  So you've
15 identified this as a document that contains
16 potentially exculpatory information, correct?

17   A.   Well, I guess any information could be
18 exculpatory.  So that's why it's not the job of a
19 detective to determine what's exculpatory, what's
20 not.  So I don't know what it is, and there was no
21 explanation as to what it is.  So it's -- it was
22 hard for me to make a determination.

23   Q.   Okay.  So this information identifies
24 an individual by name of Luis Guevara, right?

Page 315

1    A.   That's what it says, yes.

2    Q.   Yeah.  And it's got what looks like a
3 nickname there, and then it provides a phone
4 number, place of employment, and it says last saw
5 victim at 2030 hours.  It looks like Wednesday
6 night.  1530 hours, found victim body; 17 hours,
7 Cub Foods.  And then there's an Evelyn, Claremont
8 Avenue.  Do you see that there?

9    A.   I do.

10   Q.   Okay.  Let's take a look at what we've
11 marked as Monell Exhibit No. 1 and go to page 31 of
12 the PDF.  And this is a supplementary report,
13 right?  It says that at the top there, right?

14   A.   I believe -- I believe so, yes.

15   Q.   Okay.

16       MR. SWAMINATHAN:  What is the Bates number of
17 this page?  Sorry.

18       MS. ROSEN:  The Bates number of this page is
19 121339.

20   Q.   And if we go at the top, there's the
21 name Luis Guevara.  Do you see that?

22   A.   I do.

23   Q.   Same name as on the note, right?

24   A.   It is.

Page 316

1    Q.   And it says -- let's see -- he stated
2 in summary that he learned from other members of
3 another section of the Spanish Lords that Butch and
4 Pote had killed Potato in the clubhouse.  He stated
5 that he knew where the clubhouse was located as it
6 was a place where Potato was staying recently, as
7 he was having problems with his parents who did not
8 want him at home anymore.  He went to the rear of
9 2340 West North and climbed into the third floor
10 apartment through an open window.  Another member
11 of the Spanish Lords came inside with him.  He
12 declined to name this second person at this time as
13 this person had asked him to keep him out of it.

14       Once inside the apartment, they
15 located the victim in the corner.  He had been shot
16 in the head.  They left the apartment the same way
17 they had entered.  Luis and the other Spanish Lord
18 then went to Cub Foods to see if Pote was working.
19 They found him working in an aisle of the store.
20 They told him that they had found Potato's body in
21 an abandoned building.  They asked him why he and
22 Butch had killed him.  They also asked what he
23 intended to do about the body being there.

24       Yes?  Do you see that?

Page 317

1    A.   I do.

2    Q.   Okay.  So this seems to be
3 memorializing the interview of the individual who
4 was noted in the handwritten note that you
5 identified, correct?

6       MR. SWAMINATHAN:  Objection, form,
7 foundation.  Go ahead.

8       THE WITNESS:  Well, obviously there's a lot
9 more detail in the report than what was in the
10 notes, but, yes, I would agree with you.

11 BY MS. ROSEN:

12   Q.   And that's the point, right?  You would
13 expect there to be the more detail in the report
14 than in the notes, right?

15   A.   To a certain degree, yes.

16   Q.   Okay.  And there certainly wasn't
17 anything in the note that wasn't in the report,
18 right?

19       MR. SWAMINATHAN:  Objection to form and
20 foundation.

21       THE WITNESS:  I would have to compare it
22 again.  It's been a while since I looked at it.  So
23 if you want to pull it back up, I could answer that
24 question.

THOMAS TIDERINGTON, 12/08/2022                    Page 318..321

Page 318

1 BY MS. ROSEN:
2    Q.    I don't really want to spend the time
3 going back and forth between the documents. Let's
4 take a look at the next example you provided. It's
5 Monell Exhibit No. 3 out of the same case file.
6           If we scroll to the bottom, you'll
7 see the Bates number is 121420. You see that?
8    A.   I do.
9    Q.    Okay. And then this is another note
10 that you identify was potentially exculpatory
11 information. You see that?
12    A.   Perhaps, yes.
13    Q.    Okay. And --
14       MR. SWAMINATHAN: Eileen, can you scroll to
15 the bottom half of that document. I want to see --
16 great.
17 BY MS. ROSEN:
18    Q.    What was your process for identifying
19 the particular examples that you provide from the
20 Sierra data set at the top of page 59? What
21 methodology did you utilize?
22       MR. SWAMINATHAN: Objection to form. Go
23 ahead.
24       THE WITNESS: Well, I looked at the notes and

Page 319

1 tried to determine whether or not the notes
2 corresponded with what was contained in the police
3 report.
4 BY MS. ROSEN:
5    Q.    Okay. So that means you would have
6 looked at the notes, and then you would have
7 compared it to the police reports to see if the
8 information that's in the notes was in the police
9 reports, right?
10    A.   That's correct.
11    Q.    Okay. And you would try to make sense
12 of whatever information was in the notes in
13 connection with the particular investigation,
14 right?
15    A.   That's correct.
16    Q.    Okay. So when you were doing that with
17 respect to this case and you saw this note, were
18 you able to draw any conclusions about what this
19 note was about?
20       MR. SWAMINATHAN: Objection to form,
21 foundation. You can answer if you think you can.
22       THE WITNESS: Yeah. I was not --
23 BY MS. ROSEN:
24    Q.    You was not what?

Page 320

1    A.   -- able to determine the meaning of it
2 or the importance of it.
3    Q.    Okay. Let's go back to Monell Exhibit
4 No. 1 and if we could take a look at page 23 of the
5 PDF. Okay. So this --
6       MR. SWAMINATHAN: Sorry. Can you give me the
7 Bates number?
8       MS. ROSEN: Yeah, as soon as I get there.
9 I'm not --
10       MR. SWAMINATHAN: I'm sorry. Go ahead.
11 BY MS. ROSEN:
12    Q.    The Bates for this supp report begins
13 at 121331. If we go to the top, it says June 2,
14 1994, page 1, Chicago Police Department, detective
15 division, supplementary report, correct?
16    A.   It does.
17    Q.    Okay. And if we scroll to the bottom
18 of the page, it provides the name of the victim
19 there. You see that?
20    A.   Yes, John Doe.
21    Q.    It identifies the name of the officers
22 involved, a Detective Paulnitsky and a Detective
23 Dorsch. Do you see that there?
24    A.   I do.

Page 321

1    Q.    Detective Dorsch, does that name have
2 any meaning for you?
3    A.   I don't think so.
4    Q.    Okay. Let's go then to page 30 of the
5 PDF, which is page 8 of this same supp report, and
6 let's go to the previous page just for context.
7 This is an interview of an individual by the name
8 of Theresa Robinson, and she related that her
9 boyfriend, Luis Colon, had come home to her house
10 at 2 -- at approximately 9:00 a.m., told her he
11 needed money. See that there? Needed to go to his
12 mom's house in Florida. See that?
13    A.   I do.
14    Q.    And then he told her that he had been
15 with Pote and that they had shot and killed Potato
16 in the clubhouse. Do you see that there?
17    A.   Yes.
18    Q.    Okay. And then if we go to the next
19 page, it says he entered the car and then they left
20 for the bus station. While driving, he continued
21 to speak of the murder and stated that he had to
22 get out of the town to avoid arrest. And then it
23 says, "A summary of the statement of Theresa
24 Robinson is contained in the file."

THOMAS TIDERINGTON, 12/08/2022                    Page 322..325

Page 322

1        And then it says:  Detective
2  Paulnitsky contacted the Greyhound bus station and
3  learned that Bus 1163 had left Chicago at 1100
4  hours on June 2 and was scheduled to stop at
5  Jacksonville, Florida at 1200 hours before
6  continuing on to Orlando at 1515 hours.  You see
7  that there?
8      A.  I do.
9      Q.    And let's go back to Exhibit No. 3.
10  Those notes about the bus being at Macon, Georgia
11  at 5:45 a.m. and whatever other town in Georgia at
12  7:00 and then Jacksonville, that corresponds with
13  what's written in the supp report, right?
14      A.  Well, wait a minute.  Scroll up to the
15  top if you don't mind, please, if I remember this
16  correctly.  There's a lot of other information
17  that's contained in the report that's not contained
18  anywhere in these notes that you would have had to
19  presume had to have come from somewhere else or had
20  to have been recorded.  There's addresses and
21  there's phone numbers that aren't contained in this
22  note that was contained in the report.  So where
23  did those notes come from, and where are those
24  notes at?

Page 323

1      Q.    Well, the investigative file in this
2  case is 118 pages long.
3      A.  Exactly.
4      Q.    Correct.  And so I'm not going to sit
5  here and take the time to do your work for you.
6  You identified this note as being potentially
7  exculpatory, correct?  And now you're complaining
8  that there's information in the police report
9  that's not in the note.  So what exactly is the
10  complaint?  Are you saying that the notes and the
11  typewritten reports have to read exactly the same?
12  Is that the point?
13      A.  No, I didn't say that at all.
14      Q.    Okay.  So the information that's
15  contained on this note that you identified in your
16  report as being potentially exculpatory information
17  that was not transferred over to police reports was
18  in fact transferred over to police reports,
19  correct?
20      MR. SWAMINATHAN:  Objection to form and
21  foundation.
22      THE WITNESS:  Regarding the bus, yes.
23  BY MS. ROSEN:
24      Q.    Is there other information on this note

Page 324

1  that wasn't transcribed?
2      A.  I seem to think that there was some --
3  there was another page to this.  I don't know if
4  there is or not, but if you can just scroll down --
5  I could be wrong.  Maybe this is the total
6  document.
7      Q.    It's the total document you identified
8  in your report.
9      A.  Yeah, Butch's girlfriend.  I don't
10  know.
11      Q.    Okay.  Let's take a look at Monell
12  Exhibit No. 5, and this would be Bates stamp 79168,
13  so the third example in your report, and I'll
14  represent to you that this is a different
15  investigative file now.
16        If we go to the top of the page, do
17  you recall identifying this note as being
18  potentially exculpatory evidence that was withheld
19  from the criminal defendant?
20      MR. SWAMINATHAN:  Objection to form and
21  foundation, mischaracterizes the report.  Go ahead.
22      THE WITNESS:  I recall this document.  This
23  is what's listed in my report, yes.
24  BY MS. ROSEN:

Page 325

1      Q.    What is it an example of?
2      A.  I have to compare it to the report, if
3  you could pull the report up and then I could
4  refresh my memory.
5      Q.    Compare it to what report, your report?
6      A.  No, the report that this is associated
7  with.
8      Q.    Well --
9      A.  The investigative file.
10      Q.    As you sit here today and you're
11  looking at these names, do they mean anything to
12  you?
13      A.  I don't recall.  As you know, I
14  reviewed tens of thousands of documents, and I
15  think it's unfair to ask me just to recall a
16  specific document out of the many thousands of
17  documents that I reviewed without giving me the --
18      Q.    Well, in this --
19      A.  Go ahead.
20      Q.    In this particular report out of the
21  Sierra database, you've identified nine documents.
22  Is it unreasonable for me to expect you to remember
23  the nine documents that you cited as an example?
24      MR. SWAMINATHAN:  Objection to form and

THOMAS TIDERINGTON, 12/08/2022                    Page 326..329

Page 326

1 foundation and argumentative.  Go ahead.

2      THE WITNESS:  Well, if I had the ability to

3 refresh my memory and I think it's appropriate to

4 allow me to do that.

5 BY MS. ROSEN:

6      Q.   Okay.  But this is, just so we're

7 clear, listed in your report under the sentence

8 that says, "In many cases, the information is

9 potentially exculpatory.  In addition to other

10 instances discussed below, where such notes were

11 not disclosed to criminal defendants, examples

12 include...."

13           So this is an example of a note that

14 you claim was not disclosed to a criminal

15 defendant, right?

16      MR. SWAMINATHAN:  Objection to form and

17 foundation, mischaracterizes the report.  You can

18 go ahead --

19      MS. ROSEN:  I'm citing the report.

20      MR. SWAMINATHAN:  Go ahead.

21      THE WITNESS:  Okay.  Let me explain it.

22 Thank you for giving me the opportunity.  It may

23 not be the best sentence or explanation that I

24 could have made in here, but it would have been one

Page 327

1 of two things.  Examples where information on

2 handwritten notes was not transferred into official

3 police reports is what I have listed here as

4 examples, not necessarily that they were not turned

5 over to the -- to the plaintiff or to the

6 prosecutor's office --

7 BY MS. ROSEN:

8      Q.   Okay.

9      A.   -- because as you know, I don't -- I

10 did not have the public defender's files and I did

11 not have the Cook County prosecutor's files.

12      Q.   I see.  So when you wrote at the bottom

13 of page 59, "In many cases, the information is

14 potentially exculpatory.  In addition to other

15 instances discussed below, where such notes were

16 not disclosed to criminal defendants, examples

17 include..." you didn't mean that these documents

18 are illustrative of notes that were not produced to

19 criminal defendants.  They're illustrative of notes

20 where the information was not transcribed into

21 police reports, correct?

22      A.   I think that's more accurate, yes.

23      Q.   Okay.

24      A.   And I wish I would have clarified it

Page 328

1 better in my report, and I apologize.

2      Q.   Okay.  But of course like the note we

3 just looked at about the bus and the note about

4 Luis Guevara actually is transferred into the

5 police report, right?

6      MR. SWAMINATHAN:  Objection to form and

7 foundation.  Go ahead.

8      THE WITNESS:  Well, yes, but again I

9 definitely want to go back and research that,

10 and there may be more to it than I can recall at

11 this time.

12 BY MS. ROSEN:

13      Q.   Okay.  Let's take a look at this one.

14 Maybe this one will be easier.  So we have the

15 names Jorge Garcia and the clothing Mr. Garcia is

16 wearing, Vanessa Garcia, the clothing that

17 Ms. Garcia is wearing, which I note is a pink

18 overall coat, white shoes-tennis, gray sweatshirt,

19 blue-white striped shirt, and then we have

20 Mr. Julio Villanueva, black jacket, green pants,

21 gray-white shirt, square flannel shirt, black-white

22 Converse shoes, and if we can scroll to the bottom

23 of this page, we have Ana Reyes, blue jeans, white

24 T-shirt, red sweater, blue-white tennis shoes,

Page 329

1 right?

2      A.   That's what it says, yes.

3      Q.   Okay.  Let's take a look at Monell

4 Exhibit No. 4.

5      A.   Well, I'm sorry.  Before you leave

6 that, can you scroll up there?  There should be a

7 front page to that, or is this the only page to

8 that exhibit?

9      Q.   This is the only page that you

10 identified in your report.

11      A.   Right, but I note that again there was

12 no case number, no detective's name, no date on

13 this but anyways, yes.

14      Q.   I can tell you that it came out of

15 RD No. X066005, and we're about to look at that

16 file.

17      A.   Okay.

18      Q.   So let's take a look at Monell Exhibit

19 No. 4, and this would be the murder of Jesus

20 Garcia.  And let's take a look at page 37 of the

21 PDF.  This is classified as a death investigation,

22 and then if we scroll down, you'll see it says

23 "Field Investigation/Reclassified/Exceptionally

24 Cleared & Closed/Bar to Prosecution."  You see that

Page 330

1 there?

2    A.   I do.

3       Q.   And do you recall that the Chicago
4 Police Department categorizes certain investigation
5 as exceptionally cleared and closed when there is a
6 certain bar to prosecution like self-defense or the
7 perpetrator is dead or something like that?

8    A.   I believe that's the case, yes.

9       Q.   Okay.  And so in this particular case,
10 it looks like nobody was charged, right, because it
11 was exceptionally cleared and closed?

12    A.   Apparently, yes.

13       Q.   Okay.  If we go to the next page of the
14 report, it shows in custody Julio Villanueva.  So
15 that's one of the names on the note that we just
16 looked at, right?

17    A.   Apparently, yes.

18       Q.   So he was the individual that was
19 originally in custody.  And then it says charges
20 rejected by state's attorney's office via ASA Marty
21 Fogarty, right?

22    A.   That's what it says, yes.

23       Q.   Okay.  And then it says interviewed Ana
24 Reyes, female, 15 years old.  So that's another of

Page 331

1 the individuals in the note, right?

2    A.   I believe so, yes.

3       Q.   Okay.  And then it says that on
4 February 14 Mr. Villanueva came into the area,
5 stated he was turning himself in for shooting Jesus
6 Garcia.  He also surrendered the handgun, placed
7 under arrest, given his rights, et cetera, right?

8    A.   That's what it says, yes.

9       Q.   Okay.  And if we go to the next page,
10 it says he was interviewed by the ASA, and he
11 related the story about going to his sister's
12 apartment with her children and his girlfriend Ana,
13 and his sister felt that if she bought a present
14 for Mr. Garcia, the deceased, that he would be in a
15 better mood and he wouldn't -- they went back, and
16 he knocked on the door.  He wouldn't open the door.
17 So she went down to the manager's apartment and got
18 a key, and then upon entering the apartment, if you
19 read the next paragraph, there was a fight and a
20 dispute, and Mr. Garcia pulled a weapon and fired a
21 shot.

22             And if you keep reading, then you'll
23 see that at some point Mr. Garcia pointed the
24 weapon at Mr. Villanueva's sister, Rosalia, and

Page 332

1 that's when Mr. Villanueva fired his weapon.  See
2 that?

3    A.   I do.

4       Q.   Okay.  Do you recall this --

5    A.   I do, yes.

6       Q.   -- investigation story at all?

7    A.   I do, yes.

8       Q.   Okay.  All right.  And then if we go to
9 page 58 of the PDF, there is an explanation for why
10 the case was cleared, exceptionally closed.  Do you
11 recall reading this?

12    A.   I vaguely recall this, yes.

13       Q.   And so the conclusion was that
14 Mr. Villanueva was acting in defense of another
15 person, right, his sister, right?

16    A.   That's what it says, yes.

17       Q.   Okay.  Did you notice when you were
18 reviewing this file that this cleared,
19 exceptionally closed report appeared -- copies of
20 it appeared five separate times?

21    A.   I don't recall that.

22       Q.   Yeah.  And then let's go to page 17 of
23 the PDF.  If we scroll -- just go to the top there.
24 Jorge Garcia, that's another person whose name was

Page 333

1 listed on that note.  You see that there?

2    A.   Yeah, I do see that there, but I have
3 to look back at the note because I think I know
4 what the question -- or what the concern was, but
5 I'll let you go ahead and go through your
6 description of --

7       Q.   We can go back -- well, is that the
8 name?  Jorge Garcia is one of the individuals,
9 right?

10    A.   I believe that and a phone number and
11 address, yes.

12       Q.   And identified as the son of the
13 deceased, right?

14    A.   Social Security number, yes.

15       Q.   And he's --

16    A.   Date of birth.

17       Q.   -- five years old, right?  You see that
18 there?  He's five years old, and he was the son of
19 the deceased?

20    A.   Yes.

21       Q.   Okay.  Did you want to go back to the
22 note for some reason?

23    A.   Well, I guess I -- I don't know if
24 there's a question pending.

THOMAS TIDERINGTON, 12/08/2022                    Page 334..337

Page 334

1    Q.   Well, there isn't.  You said you wanted
2 to go back to the note for some reason.
3         We can just keep going through it.
4 Let's go to page 26 of the PDF.  Let's go one page
5 up so that we can orient ourselves.  This is the
6 interview of Rosalia Villanueva.  So this is the
7 victim's wife and the shooter's sister, and she
8 describes what happened in the house with respect
9 to when they came home and her husband was drinking
10 and he was angry and he pulled a gun, right?
11    A.   A lot of detail there, yes.
12    Q.   Yeah, um-hum.  And then let's go to the
13 next page, and at the bottom of that paragraph, it
14 identifies that also during this time Rosalia told
15 Julio to take the oldest and youngest child, Jorge,
16 five years old -- so that was Jorge Garcia -- and
17 then Vanessa Garcia, the one that in the note was
18 identified as having the pink overall coat, 16
19 months old, out of the apartment, right?
20    A.   Yes.
21    Q.   Okay.  So by looking at these various
22 reports, we have been able to identify all of the
23 individuals who were involved in this event that
24 were listed in this particular note, right?

Page 335

1         MR. SWAMINATHAN:  Object to the form.  Go
2 ahead.
3         THE WITNESS:  I wouldn't know if you were
4 able to identify all of the individuals.
5 BY MS. ROSEN:
6    Q.   Well, let's go back to the note.
7    A.   Well, you've identified a lot of them.
8 I don't know if they were all of them.
9    Q.   Let's go back to the note.  It is
10 Exhibit 5, Monell Exhibit 5.  So we talked about
11 Jorge Garcia is the five-year-old, right?
12    A.   You did, yes.
13         MR. SWAMINATHAN:  I am going to look over
14 your shoulder because it just kicked me out.
15 Sorry.  It's reloading.  Sorry.  Go ahead.
16 BY MS. ROSEN:
17    Q.   Vanessa Garcia, the 16-month-old,
18 right?
19    A.   That's correct.
20    Q.   Julio Villanueva, the shooter, right,
21 the protector of his sister, right?
22    A.   That's correct.
23    Q.   And Ana Reyes, the girlfriend that was
24 there?

Page 336

1    A.   That's correct.
2    Q.   So that's everybody?
3    A.   That's correct.  Well, apparently, yes.
4    Q.   Okay.  All right.  Let's take a look at
5 the next document that you have identified.  It is
6 Monell Exhibit No. 7.  Do you recall identifying
7 this document as a note that's containing
8 information that was not transcribed into a police
9 report?
10    A.   I do.  Yeah, I do, yes.
11    Q.   Okay.  And you will notice that there
12 there's a street, right?  It says Elston?  You see
13 that?
14    A.   That's what it says, yes.
15    Q.   You're not familiar with that street,
16 are you, in Chicago?
17    A.   No.
18    Q.   And then if you look at the other
19 street, it's upside down, but can you see where it
20 says G-e-o, and then there's notes that make it
21 hard to read, but it looks like George.  You see
22 that?
23    A.   Yeah.  It looks like some type of
24 artwork.  I don't really know -- I don't understand

Page 337

1 what it is to tell you the truth.
2    Q.   Okay.  Let's go to the file, Monell
3 Exhibit No. 6.  This is a 587-page investigative
4 file.  Well, actually, is it an investigative file,
5 or is it a permanent retention file?  Do you know?
6    A.   I think -- I think it contained both of
7 them to tell you the truth.  That came from the
8 public defender's office.
9    Q.   This file came from the public
10 defender's office?
11    A.   Sure.  That's -- I guess I --
12         MS. ROSEN:  Anand, you need to turn off your
13 sound.
14    Q.   So did you say this file came from the
15 public defender's office?
16         And now he's frozen.  Anand, he's
17 frozen.  They can't hear us.
18         MR. SWAMINATHAN:  Tom just got kicked out
19 now.
20         MS. ROSEN:  Yeah.
21         MR. SWAMINATHAN:  I had to disconnect from
22 the Wi-Fi.  It kicked me out of this hotel's Wi-Fi.
23 That's the problem.
24         THE WITNESS:  You don't have a hotspot

THOMAS TIDERINGTON, 12/08/2022                    Page 338..341

Page 338

1 here --
2      MS. ROSEN:  Do you want to go off the record
3 so that you can fix this?
4      THE VIDEOGRAPHER:  We're off the video record
5 at 6:45 p.m.
6      (Discussion off the record.)
7      THE VIDEOGRAPHER:  We're back on the video
8 record at 6:48 p.m.
9 BY MS. ROSEN:
10     Q.    Okey doke.  So we were looking at
11 Monell Exhibit No. 6.  I had asked you if this was
12 the investigative file or the permanent retention
13 file.  I think what you said is it looks like it's
14 combined.  It's from the PD file.  Is that what you
15 said?
16     A.    No.  I originally thought it may be the
17 PD file.  I don't know.  I would have to scroll
18 through it.  At this point I believe it's a -- it
19 says permanent retention file.  So I have no reason
20 not to think it is not the permanent retention
21 file.
22     Q.    And you can see that this is a -- if
23 you just look at the top of the PDF on the left, it
24 says one of 587 pages.  So it's a 587-page file,

Page 339

1 right?
2      A.    That's correct.
3      Q.    And so you reviewed that entire
4 587-page file to find that one particular note with
5 the map that we just looked at, right, that had
6 Elston and then the other notation that you
7 described as artwork?
8      A.    Well, I don't know if I went through
9 every page searching for that.  I was looking to
10 see what investigative notes were in the file.
11     Q.    And the one that you identified as
12 potentially exculpatory with information that was
13 not transcribed was the one that we just looked at,
14 right, the map?
15     MR. SWAMINATHAN:  Objection to form.
16     THE WITNESS:  If you could scroll down, I
17 believe that was the only -- I don't recall what
18 other investigative notes were in there, but I
19 believe that was in there, yes.
20 BY MS. ROSEN:
21     Q.    Well, you have identified in your
22 report page 92370, right?  That was the map we just
23 looked at that has the street Elston --
24     A.    Right, but --

Page 340

1      Q.    -- written on it, right?
2      A.    But there's documents before and after
3 that.  So all I'm asking is for the opportunity to
4 refresh my memory by looking at some of the other
5 documents so I can give you a more clarified
6 answer.
7      Q.    The question is in looking through this
8 file, you identified the one page that you put in
9 your report as an example of potentially
10 exculpatory information that was not transcribed
11 from the note to the supplementary report, right?
12     A.    That's correct, and there could be
13 others but, yes.
14     Q.    Others in this file?
15     A.    Perhaps.
16     Q.    Why didn't you note them in your
17 report?
18     A.    Well, I should have, and I would be
19 happy to point those out to you now if you want to,
20 if we can scroll through there, and I'm just asking
21 to refresh my memory, and if there's other ones
22 that I can quickly identify for you, I would be
23 happy to do that.
24     Q.    Okay.  Well, we're not going to today

Page 341

1 scroll through a 587-page file for you to look for
2 notes that may or may not be potentially
3 exculpatory in your opinion.
4          When you were preparing your report,
5 when you reviewed this file, you identified one
6 page, correct?
7      A.    Sure.  Let's go to that page, but all
8 I'm asking, let's look at the five -- and you can
9 do it -- by the time we're wasting talking about
10 it, we could have already have done it.  If I can
11 look at to refresh my memory the pages before and
12 after that, it would probably be helpful.  It may
13 not be.  I don't know.
14     Q.    Let's go to the PDF, page 58 of the
15 PDF.  We can go up one page to orient ourselves.
16 Go one more because that's just the back side.
17          Okay.  So this is, if we go to the
18 top of this page, a March 3, 1995 supp report,
19 correct?
20     A.    That's what it indicates, yes.
21     Q.    Okay.  And it identifies the address of
22 the original offense as 2538 West George Street.
23 Do you see that there?
24     A.    I do.

THOMAS TIDERINGTON, 12/08/2022                    Page 342..345

Page 342

1    Q.   And with respect to the map that you
2 identified as containing potentially exculpatory
3 information, that one street, the letters begin
4 G-e-o, right?
5    A.   I don't know.  Possibly, yes.  I think
6 that's what you pointed out, yes.
7    Q.   Okay.  And that would be obviously the
8 first three letters of George Street, right?
9    A.   It could mean that, yes.
10   Q.   When you were reviewing this file to
11 identify that particular map as containing
12 potentially exculpatory information that was not
13 transferred over into a supplementary report, did
14 you use Google Maps or anything to figure out where
15 2513 West George Street was?
16   A.   No.  I thought I would -- if something
17 is contained in the investigative file, I thought
18 it would be explained in the police report, and I
19 wasn't able to decipher what that meant and the
20 importance of it or lack of importance of it.
21   Q.   And certainly people in Chicago would
22 be familiar with where 2513 West George Street is,
23 right?
24      MR. SWAMINATHAN:  Objection to form and

Page 343

1 foundation.
2      THE WITNESS:  I don't know if they are or
3 not.  I don't know if it's a popular, common
4 street.  I don't know.
5 BY MS. ROSEN:
6    Q.   Well, I can tell you that I Googled it,
7 and the intersection of George Street and Elston is
8 right near 2513 West George Street.  So it appears
9 that this map seems to be, with just a little bit
10 of careful review of this file, a map of where the
11 scene of this particular shooting occurred, but you
12 didn't do that, right?
13   A.   No, I didn't Google Map -- no, I did
14 not.
15   Q.   Yeah.
16   A.   Frankly I didn't understand that that
17 was what the address was.
18   Q.   All right.  Then let's take a look
19 at -- so the date of the murder was March 3, 1995,
20 right, date of original --
21   A.   Yes.
22   Q.   -- occurrence?
23   A.   Yes.
24   Q.   Okay.  And then let's go to page 453 of

Page 344

1 the PDF.  This is a memorandum dated March 3 -- or
2 May 3, sorry, 2007, so 12 years later, that
3 indicates that this file was exceptionally cleared
4 homicide, right?
5    A.   I think that's what it means, yes.
6    Q.   Which means nobody was charged?
7    A.   That's my understanding.
8    Q.   When you were reviewing this file, did
9 you note that in this 12-year investigation, nobody
10 ended up getting charged?
11   A.   I don't know if I noted that.
12   Q.   Did you note when you were reviewing
13 this investigation that it had to do with
14 motorcycle gangs and that the FBI was involved in
15 the investigation?
16   A.   I knew it was a complicated case.
17   Q.   Okay.  Let's go to the next example.
18 So the next four examples you provide in your
19 report, 109932, 110061, 110043, and 110062, all
20 come from the same homicide investigation, right?
21   A.   I believe that's accurate, yes.
22   Q.   Okay.  So if we take a look at Monell
23 Exhibit No. 9, which is the one you identified with
24 the Bates No. 109932, if we go to the top here,

Page 345

1 there's a note that says "tell you why he was
2 crying," right?
3    A.   Yes.
4    Q.   And what was the import of that note
5 for purposes of your analysis?
6    A.   Well, I guess that's part of the
7 problem.  We don't know what the importance of it
8 is, who made the statement, who said it, what's the
9 context, why is it important, why was it placed on
10 a GPR.
11   Q.   Okay.  So the fact that you have
12 questions about it makes it potentially
13 exculpatory.  Is that what you're saying?
14      MR. SWAMINATHAN:  Objection to form and
15 foundation.  Go ahead.
16      THE WITNESS:  Not necessarily.
17 BY MS. ROSEN:
18   Q.   Okay.  Let's go to the next document
19 that you identify, 110061, and that is Exhibit
20 No. 10.  That says "Get Guns," and then it looks
21 like a plus sign, right?
22   A.   That's what it looks like, yes.
23   Q.   And why did you note that particular --
24 why did you identify that particular note in your

THOMAS TIDERINGTON, 12/08/2022                    Page 346..349

Page 346

1 report?

2    A.    Well, you would -- if I was the
3 supervisor in this case and I saw these notes, I
4 would be asking the investigator to clarify the
5 importance or lack of importance of these notes.
6 Where did they come from?  Who took it?  What was
7 the context that the statement or -- why did he
8 write this down, I guess, is my question.

9    Q.    Okay.  Let's take a look at Monell
10 Exhibit No. 8, which is the file, and let's go to
11 page 55 of the PDF.  And if we go down -- this is a
12 supp report, and it describes an interview with an
13 individual named Hornsby, the middle of the page
14 there, and it says at the bottom, "Chilly then told
15 him to 'go get the missiles.'  Joey knows that when
16 Chilly said missile he knew it to mean guns."  Do
17 you see that?

18   A.    I do.

19   Q.    So it looks like this individual named
20 Joey Hornsby was told by this other individual to
21 go get missiles, which he understood to mean to go
22 get guns, right, which matches the note?

23   A.    Well, I don't know if it matches the
24 note.  That's a stretch.

Page 347

1    Q.    What's a stretch?

2    A.    Well, where is all of this other
3 information contained?

4    Q.    You didn't identify any examples in
5 your report of supp reports that didn't have
6 corresponding notes, did you?

7    A.    That didn't have corresponding notes,
8 I -- I'm not sure I understand what you're saying
9 there.  I'm saying there's a -- that there
10 obviously had to have been notes taken from this
11 detective concerning the details, and those other
12 cases that you skimmed by really quickly, there was
13 a lot of detail in there that was not contained on
14 the notes that had three names on it but in the
15 report had dates of birth, Social Security number,
16 phone numbers, addresses.  So that's what I find to
17 be unusual and deficient in some of these
18 documents.

19   Q.    Could you tell me where in your report
20 you say that the problem actually is that the
21 typewritten reports have too much detail and there
22 aren't notes that provide the detail that's in the
23 typewritten reports?  Where is that opinion?

24   A.    Well, that --

Page 348

1    MR. SWAMINATHAN:  Objection to form and
2 foundation.  Go ahead.

3    THE WITNESS:  No.  I think my opinion is well
4 stated, that part of the problem is that there's --
5 one of two things had to have happened.  Either the
6 detectives took notes and included those in a
7 police report and then discarded the notes, which
8 would have been a violation of policy, or they
9 didn't take any notes but they had some magical way
10 to know and remember all of these phone numbers and
11 addresses and Chilly and Cuba and missiles and all
12 of these things, but there's only two words on the
13 GPR that corresponds with five pages or 15
14 paragraphs of detail.  I think --

15   MR. SWAMINATHAN:  Eileen, just before you ask
16 your next question, can you just give me the
17 Bates -- I didn't see the Bates number on this
18 page.

19       Yeah.  Okay.  I got it.  Go ahead.

20 BY MS. ROSEN:

21   Q.    So are you saying that in this 200-page
22 file, there aren't any other notes other than the
23 notes that you identified in your report?

24   A.    No.  I'm -- no.  I'm saying there's

Page 349

1 other notes but not to the specifics and not to the
2 detail that would have allowed a reasonable
3 explanation how a detective could have written
4 these details from memory.

5    Q.    Where is that in your report, that
6 that's a criticism that you have, that now you're
7 switching it and you're saying -- because your
8 report states that the problem is there are notes
9 and information in the notes is not being
10 transcribed in the police reports.  Now you're
11 saying, oh, the police reports contain too many
12 details that aren't in the notes.  So the police
13 officers are simply making it up.  Where is that in
14 your report?

15   MR. SWAMINATHAN:  Objection to --

16 BY MS. ROSEN:

17   Q.    Tell me what page to look at in your
18 report where that opinion is set forth.

19   MR. SWAMINATHAN:  Objection to form,
20 foundation, and argumentative.  Go ahead.

21   THE WITNESS:  Well, first of all, I don't
22 think you need to yell at me.  I think we're
23 doing -- both of us are doing the best that we can,
24 so I don't think you need to yell and scream at me.

THOMAS TIDERINGTON, 12/08/2022                    Page 350..353

Page 350

1  Maybe that's just my perception of what you're
2  doing and you're not doing it.
3          I think my opinion throughout my
4  report has been consistent is -- and I think I
5  testified earlier in the day about just that issue.
6  Either notes were taken and they were discarded
7  because of the details that are included in the
8  report, or no notes were taken and the detectives
9  simply memorized all of these details.
10         So either way it's a problem, and
11 either way I would say that it's a potential
12 problem that was attempted -- or that the Chicago
13 Police Department has not yet addressed.
14 BY MS. ROSEN:
15     **Q.  You say that about the Sierra case.**
16 **You do not say that anywhere in the portion of your**
17 **report that discusses the pattern and the practices**
18 **of the Chicago Police Department, and you say that**
19 **nowhere in your Solache/Reyes report.**
20         **So it appears to me that you are**
21 **now, when you're being cornered with**
22 **inconsistencies with your report, you are now**
23 **changing your opinion.  So I am going to ask you**
24 **one more time, can you please --**

Page 351

1     A.  Well, wait a minute.
2     **Q.  -- identify --**
3     A.  Wait, wait, wait.
4     **Q.  Can you please identify for me in your**
5  **report, in the portion of your report where you are**
6  **opining about the policies and practices of the**
7  **Chicago Police Department, where it is that you say**
8  **that the supp reports that are prepared, the typed**
9  **supp reports, contain a lot of detail that you**
10 **would expect would be in handwritten notes and**
11 **those handwritten notes are not in the files?  Can**
12 **you direct me to that?**
13    A.  In both the Reyes and the Sierra
14 report?
15    **Q.  No.  In this report, Sierra, can you**
16 **tell me where, when you're discussing not the**
17 **underlying case but the policies and practices of**
18 **the Chicago Police Department, where you opine that**
19 **the supp reports contain a lot of detail that**
20 **should be in handwritten notes and are not?**
21    A.  Well, it is contained when I am
22 describing the deficiencies of the investigation in
23 this case, so I don't know that I'm following your
24 question exactly.  I didn't really look at it as a

Page 352

1  separate issue.  It's a continuous, systemic
2  problem within the Chicago Police Department.
3          I would say that the Sierra -- what
4  I have identified as the problem in the Sierra case
5  is an example, and it's an example that I've seen
6  in many cases, and it's also been identified by
7  Office of the Inspector General as recently as a
8  couple years ago.
9      **Q.  So the Office of the Inspector**
10 **General's report concluded that the Chicago Police**
11 **Department supplementary reports contain an**
12 **inordinate amount of detail.  In order for the supp**
13 **reports to contain all that detail, there must be**
14 **corresponding handwritten notes.  Is that what**
15 **you're saying?**
16         MR. SWAMINATHAN:  Objection, objection to
17 form, foundation, argumentative.
18         THE WITNESS:  I don't think -- not in those
19 words, but I think they've identified and one of
20 the -- one of the actions I believe by the Chicago
21 Police Department was to implement the GPR process
22 and the forms to require that the detectives take
23 handwritten notes of interviews with witnesses and
24 to then -- and I know you told me I was wrong

Page 353

1  earlier, but I did confirm that there is a policy
2  that mandates that they transcribe those notes into
3  the official police reports.  So you are mistaken
4  when you said I was wrong about that.
5  BY MS. ROSEN:
6      **Q.  How did you confirm that?**
7      A.  I looked at the document that --
8      **Q.  What's the directive?  Give me the**
9  **directive number.**
10     A.  I'll have to pull it up again.  Can we
11 take five minutes, and I'll pull it up for you?
12         MS. ROSEN:  Sure.
13         THE WITNESS:  All right.
14         MR. SWAMINATHAN:  Are we going off the
15 record?
16         MS. ROSEN:  Yep.
17         THE WITNESS:  Just got to move it off again.
18         THE VIDEOGRAPHER:  We're off the video record
19 at 7:08 p.m.
20         (Discussion off the record.)
21         THE VIDEOGRAPHER:  We are back on the video
22 record at 7:12 p.m.
23 BY MS. ROSEN:
24     **Q.  Can you provide me the number of the**

THOMAS TIDERINGTON, 12/08/2022                              Page 354..357

Page 354

1  directive?
2      A.   Yes.  It was a policy, investigative
3  files.  It was on page 1803, RFC 117620, and that's
4  the Solache.
5      Q.   Can you give me the number of the
6  directive?
7      A.   It's their standard operating
8  procedures.  I gave you the --
9      Q.   What's the year of the standard
10 operating procedure?
11     A.   1988, but it was my understanding in
12 existence through -- throughout this time period.
13     Q.   Okay.  Can you give me the Bates number
14 again?
15     A.   Sure.  RFC 117620.
16     Q.   117 --
17     A.   620.
18     Q.   RFC 117620 and --
19     A.   Page one thousand eight oh -- well,
20 page 1803 of the policy, investigative files
21 policy.
22     Q.   But the Bates number on that page is
23 117620?
24     A.   Yes, ma'am.

Page 355

1      Q.   And that's where it says that all the
2  information in a GPR has to be transcribed into a
3  supp report?
4      MR. SWAMINATHAN:  Objection to foundation.
5  Go ahead.
6      THE WITNESS:  I don't know if all of it, but
7  any relevant information that's contained in the
8  GPR has to be transcribed into a supplemental
9  police report, yes.
10 BY MS. ROSEN:
11     Q.   Does the directive you're looking at
12 say that information contained in the GPR has to be
13 transcribed into a supplemental report?
14     A.   Relevant information, yes.
15     Q.   It doesn't say relevant information has
16 to be noted in a GPR?
17     A.   No.  It says the -- no, no, no.  You
18 can pull it up so we're not -- if you'd like to
19 pull it up, you can read it yourself and that's --
20 in my view it's very clear.
21     Q.   Okay.  Let's go back to your report.
22 You have identified page 110043, so let's take a
23 look at that, Monell Exhibit No. 11.
24          Robyn?

Page 356

1      MS. FALASZ:  Sorry about that.
2      MS. ROSEN:  No worries.  Just making sure we
3  didn't lose you.
4      Q.   Okay.  This is another document you
5  identified as containing potentially exculpatory
6  material, correct?
7      A.   That's correct.
8      Q.   This is obviously a map?
9      A.   That's what it appears to be, yes.
10     Q.   Okay.  Let's take a look at -- let's go
11 back to Monell Exhibit No. 8 and let's look at page
12 57 of the PDF.  And there it discusses the location
13 of the shooting, which is Kedzie and Diversey --
14 you see that there -- which were two of the streets
15 that were noted in the map, right?
16     A.   I believe so, yes.
17     Q.   Okay.  And then let's go to page 60 of
18 the PDF.  And if we go down a little bit, it shows
19 that this particular witness, Harold Rosado,
20 related that he was in the alley talking to the
21 victim.  They started walking eastbound through the
22 north alley of Diversey when Rosado observed a
23 yellow pickup truck driving southbound through the
24 east alley of Kedzie.  Directly behind the pickup

Page 357

1  truck is another vehicle.  As Rosado reaches the T
2  of the alley, the pickup truck turns its headlights
3  off, and it goes on to describe what happens at
4  that point.
5          Now let's go back to the exhibit of
6  the map, Exhibit 11.  So there we have the streets
7  that are being discussed, Diversey, Kedzie, George,
8  and the T alley that was described as being east of
9  Kedzie, right?
10     A.   That's true.
11     Q.   Okay.
12     A.   But all of the other detail is not
13 contained -- at least I don't recall it being
14 contained in any of the other GPRs.
15     Q.   As you sit here today, you're saying
16 you don't recall any of the other information being
17 contained in any of the GPRs, right?
18     A.   Well, I don't want to say any and all.
19 I just don't have the recollection that the amount
20 of detail that was provided in the report was
21 contained on the GPR, which you would have expected
22 to see if the detective was taking handwritten
23 notes of what a witness was telling him.
24     Q.   All right.  Let's go then --

Urlaub Bowen & Associates, Inc.   312-781-9586

Page 358

1    A.    And quite frankly I don't know if the
2 officer drew this or if the witness drew it or who
3 drew it actually, and I don't believe that
4 information is contained in the police report
5 either.
6    **Q.    And what difference does that make?**
7    A.    Well, I think it's important if they're
8 going to rely on the witness statement, if you ask
9 the witness can you draw exactly where you were
10 standing in order -- if he's claiming that he saw
11 the shooter or witnessed the shooting, and
12 oftentimes an officer will ask the witness to draw
13 a diagram.  And normally what you would find is
14 that you would have the witness initial it and date
15 it, and then that would perhaps become evidence in
16 your investigation.
17         Here it just -- you and I are
18 sitting here looking at this document.  We have no
19 idea what it means, who wrote it, who drew it or if
20 it -- or if there was any significance to it.  And
21 that's typically not what you would find in a
22 professional investigative file.
23    **Q.    Let's take a look at the last page that**
24 **you identify as an example of potentially**

Page 359

1 **exculpatory evidence that was not transcribed into**
2 **a supp report.  That would be Exhibit No. 12.  The**
3 **Bates is 110062, and this is a list of names,**
4 **right?**
5    A.    Well, it's a list of names, but it's a
6 lot of other stuff too.
7    **Q.    Like what?**
8    A.    "Locate & Interview," "Walking on
9 Diversey," "1st Dep Sturm," I don't know what any
10 of this information -- you know, I agree there's
11 names, yes.
12    **Q.    Did you just say 1st Dep Sturm,**
13 **S-t-u-r-m?  Is that what you're picking up on over**
14 **there?**
15    A.    No.
16    **Q.    Is that --**
17    A.    I didn't say that.  I mean, I said
18 "Locate & Interview."
19    **Q.    The information that's contained in the**
20 **lower right corner where it says Zone 2300, Juric**
21 **No. 163, does that mean anything to you?**
22    MR. SWAMINATHAN:  Lower right hand?  What did
23 you just say, Eileen, lower right-hand corner?
24    MS. ROSEN:  Yes.

Page 360

1    MR. SWAMINATHAN:  Okay.  Sorry.  Go ahead.
2    THE WITNESS:  Does it mean anything to me?  I
3 don't know what it means, but it possibly means
4 that this is the officer that wrote that.  That's a
5 possibility.
6 BY MS. ROSEN:
7    **Q.    If you looked at the -- well, let's**
8 **take a look -- never mind.  I withdraw that.**
9         **Fourteen desk 2305, Sergeant Velez,**
10 **No. 1352, does that mean anything to you?**
11    A.    I don't know who the sergeant is.  I'm
12 assuming it's a desk sergeant in either Zone 14 or
13 the 14th Precinct or something along those lines.
14    **Q.    And then 1st Deputy Sturm, you see that**
15 **there, and No. 4489?**
16    A.    I do.
17    **Q.    And then A/5, does that mean anything**
18 **to you, A/5?**
19    A.    Area 5.
20    **Q.    And what does V-C mean?**
21    A.    I don't know.  Maybe violent crimes
22 unit.  Maybe that's what they designate themselves
23 as at that time.
24    **Q.    Uh-huh.  And then Sergeant Cappitelli,**

Page 361

1 is that name familiar to you at all?
2    A.    No.
3    **Q.    All right.  And then did you review the**
4 **whole 200-page file to cross-reference all these**
5 **names in the file to see whether or not the names**
6 **and the information contained therein is in the**
7 **files?**
8    A.    I --
9    MR. SWAMINATHAN:  Object to form --
10    MS. ROSEN:  File, sorry, the file.
11    THE WITNESS:  I don't recall if I
12 cross-referenced all the names, no.  I don't
13 remember doing that.
14 BY MS. ROSEN:
15    **Q.    So if you didn't cross-reference names,**
16 **then you don't know whether or not the information**
17 **is contained in the report, right, in the supp**
18 **report, right?**
19    A.    Well, again, I mean, I would like to
20 refresh my memory by going through it real quickly,
21 but I don't recall specifically why I highlighted
22 this one.  There's, you know, certainly, you know,
23 differences in how GPRs are prepared, and as you
24 pointed out, this might be the -- you know,

THOMAS TIDERINGTON, 12/08/2022                                Page 362..365

Page 362

1 somebody signed this and wrote their name on it.
2 Others are just placed in there. Nobody knows who
3 wrote them, what the date is on them.
4          So there's supposed to be -- in an
5 investigative file, it should be a yellow brick
6 road that you should be able to follow to get you
7 from the beginning to the end of a story, and in
8 many of the investigative files that I look at,
9 there's just unexplained information in them, which
10 perhaps the investigator knows off the top of his
11 head, but that doesn't do us much good when we're
12 looking at it 15 years later.
13     Q.   Okay. Let's take a look at -- let me
14 ask you this. Let's take a look at page 64 of your
15 report. This is the portion of your report where
16 you identified certain cases after comparing them
17 to the criminal defense files in the 1995 to 1998
18 data set, correct?
19     A.   That is correct.
20     Q.   And the examples that you provide here
21 are the exact same examples that you provided at
22 the --
23     A.   Reyes.
24     Q.   During the Reyes dep, right?

Page 363

1     A.   Yes.
2     Q.   And we talked about them, and some of
3 them you said weren't good examples, right?
4     A.   I think I did, yes.
5     Q.   But they're still in this report,
6 right?
7     A.   I believe they are, yes.
8     Q.   Okay. So you did not, when you were
9 preparing this report, catch the problems we
10 identified when we were going through these at your
11 deposition, right, in the Reyes case?
12     A.   Well, I'm sorry. I would have to look
13 at the date. This report may have already been
14 prepared before the deposition. I do recall fixing
15 them, I think, in the Iglesias report. So I would
16 have to look at the dates. I'm not sure.
17     Q.   So did you not catch the errors until
18 your deposition in Solache/Reyes? Is that what you
19 mean?
20     A.   Well, after we talked about it, I
21 understood that, you know, based on some of your
22 questions that I think I could have clarified it or
23 used other examples, and I took note of that, and
24 that's what I did.

Page 364

1     Q.   Okay. So it wasn't until that
2 deposition that you recognized the potential issues
3 with some of the examples, right?
4     A.   Well, I don't believe that they're
5 really serious issues, but, yes, I realized that I
6 could have used better examples, and that's what I
7 set out to do in the future reports.
8     Q.   Okay. But because this report came
9 before the Solache/Reyes dep, you didn't amend that
10 portion of your report, right?
11     A.   Well, I do have to verify the dates on
12 this. Like I say, I don't remember exactly when
13 the depo was or when I submitted this, but I do
14 believe it was before my deposition.
15     MS. ROSEN:  Okay. I think Josh marked your
16 supplemental disclosure. I can't remember what
17 exhibit it was. Josh, do you remember?
18     MR. ENGQUIST:  Give me one second. I have to
19 move files.
20     MS. ROSEN:  Sorry.
21     MR. ENGQUIST:  Exhibit 2.
22     MS. ROSEN:  Can we take a look at Exhibit
23 No. 2? Thank you.
24     Q.   So this is the supplemental report that

Page 365

1 you tendered on November 3, 2020, right -- 2022,
2 sorry.
3     A.   I'm sorry, on what date?
4     Q.   November 30, 2022.
5     A.   Yes, yeah. I'm sorry, yeah. Can you
6 scroll up, please, just so I can --
7     Q.   We can show you the next page of the
8 report.
9     A.   Okay.
10     Q.   That's the only page, right?
11     A.   Yeah.
12     Q.   And you indicate here that: Since the
13 date of my initial report, I received additional
14 transcripts and court orders related to Mr. Alberto
15 Rodriguez and the parties' continued efforts to
16 obtain his testimony. You see that there?
17     A.   I do.
18     Q.   But you don't identify the specific
19 transcripts or court orders. What were those?
20     A.   Can I pull them up or -- I think there
21 was three documents that I received from the
22 plaintiff's attorney.
23     Q.   You don't list them here, right, and
24 they're not in your materials reviewed section of

THOMAS TIDERINGTON, 12/08/2022                    Page 366..369

Page 366

1 the other part of the report, right?

2     A.    That's correct.  They're not.

3     Q.    Okay.  Did you draft this portion of

4 this supplemental to your report?

5     A.    I wrote it, yes.

6     Q.    Do you know Dr. Dysart?

7     A.    No.

8     Q.    Have you ever had a conversation with

9 Dr. Dysart?

10    A.    No.

11    Q.    She also provided a supplement.  Were

12 you aware of that?

13    A.    I don't know if I was aware -- oh, I

14 don't know what she prepared or what she didn't

15 prepare.

16    Q.    Did you have an opportunity to review

17 her supplement?

18    A.    I did not.

19    Q.    And if your supplement and her

20 supplement read exactly the same, do you have an

21 explanation for that?

22        MR. SWAMINATHAN:  Objection to form and

23 foundation, misstates the evidence.  Go ahead.

24        THE WITNESS:  She may have read my supplement

Page 367

1 before she did hers.  I don't know.

2        MS. ROSEN:  Okay.  I think I'm just about

3 done.  We can go off the record for five minutes

4 and I can look at my notes, and then maybe we can

5 be done.

6        THE WITNESS:  All right.  Thank you.

7        THE VIDEOGRAPHER:  We are off the video

8 record at 7:30 p.m.

9        (Discuss off the record.)

10        THE VIDEOGRAPHER:  We are back on the video

11 record at 7:32 p.m.

12 BY MS. ROSEN:

13    Q.    Mr. Tiderington, with respect to any of

14 the statistical analysis or numbers that you

15 identify in your report, am I correct in assuming

16 that all of that information comes from the

17 spreadsheet that was provided to you by plaintiff's

18 counsel?

19    A.    Yes.

20    Q.    Same for Solache/Reyes, all of the

21 statistical information related to any of your

22 opinions or the counting of files or anything like

23 that, that all comes from the spreadsheet that was

24 provided to you by plaintiff counsel, correct?

Page 368

1     A.    That is correct.

2        MS. ROSEN:  Okay.  I don't have any further

3 questions at this time.

4        MR. SWAMINATHAN:  Josh, do you have anything

5 else?

6        MR. ENGQUIST:  First off, Mr. Schalka, do you

7 got anything?

8        MR. SWAMINATHAN:  I'm sorry.

9        MR. SCHALKA:  No, nothing further.

10        MR. ENGQUIST:  I've got nothing further.

11        MR. SWAMINATHAN:  Nothing from me.  Thank

12 you, everybody.

13        MS. ROSEN:  Are you reserving?

14        MR. SWAMINATHAN:  We are.

15        MS. ROSEN:  Okay.  Thanks, everyone.

16        THE WITNESS:  Thank you.

17        MS. ROSEN:  Good night.

18        THE WITNESS:  Good night.

19        THE VIDEOGRAPHER:  Going off the video record

20 at 7:33 p.m.

21        FURTHER DEPONENT SAITH NOT ...

22

23

24

Page 369

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION
3  THOMAS SIERRA,            )
                             )
4           Plaintiff,       )
                             )
5      vs.                   ) No. 18-cv-3029
                             )
6  REYNALDO GUEVARA, ERNEST  )
   HALVORSEN, ANTHONY WOJCIK,)
7  JOHN McMURRAY, GEORGE     )
   FIGUEROA, EDWARD MINGEY,  )
8  ROBERT BIEBEL, FRANCIS    )
   CAPPITELLI, UNKNOWN       )
9  EMPLOYEES OF THE CITY OF  )
   CHICAGO, and THE CITY OF  )
10 CHICAGO, ILLINOIS,        )
                             )
11          Defendants.      )
                             )
12
13      This is to certify that I have read my
   deposition taken on December 8, 2022, in the
14 foregoing cause, and that the foregoing transcript
   accurately states the questions asked and the
15 answers given by me, with the changes or
   corrections, if any, made on the Errata Sheet
16 attached hereto.
17        _____
              THOMAS J. TIDERINGTON
18
19 No errata sheets submitted (Please initial)_____
   Number of errata sheets submitted_____(pgs.)
20
21 Subscribed and sworn to
   before me this_____day
22 of_____ 202__.
23        _____
              Notary Public
24

Urlaub Bowen & Associates, Inc.    312-781-9586

THOMAS TIDERINGTON, 12/08/2022                                    Page 370..371

Page 370

```
 1  STATE OF ILLINOIS   )
                        )  SS:
 2  COUNTY OF C O O K   )
 3          I, Suzanne Thalji, a Certified Shorthand
    Reporter and notary public in and for the County of
 4  Cook and State of Illinois, do hereby certify that
    THOMAS J. TIDERINGTON was duly sworn to testify the
 5  whole truth, and that the foregoing deposition was
    recorded stenographically by me and was reduced to
 6  computerized transcript under my direction, and
    that the said deposition constitutes a true record
 7  of the testimony given by said witness.
 8          I further certify that the reading and
    signing of the deposition was not waived, and the
 9  deposition was submitted to plaintiff's counsel for
    signature.  Pursuant to Rule 30(e) of the Federal
10  Rules of Civil Procedure, if deponent does not
    appear or read and sign the deposition within 30
11  days, or make other arrangements for reading and
    signing, the deposition may be used as fully as
12  though signed, and this certificate will then
    evidence such failure to appear as the reason for
13  signature not being obtained.
14          I further certify that I am not a
    relative or employee or attorney or counsel of any
15  of the parties, or a relative or employee of such
    attorney or counsel, or financially interested
16  directly or indirectly in this action.
17          IN WITNESS WHEREOF, I have hereunto set
    my hand and affixed my seal of office at Chicago,
18  Illinois, this 19th day of December, A.D. 2022.
19
20
21
                Illinois CSR No. 084-002337
22
23
24
```

Page 371

```
 1  Errata Sheet
 2
 3  NAME OF CASE: THOMAS SIERRA vs REYNALDO GUEVARA, et al.
 4  DATE OF DEPOSITION: 12/08/2022
 5  NAME OF WITNESS: Thomas Tiderington
 6  Reason Codes:
 7      1. To clarify the record.
 8      2. To conform to the facts.
 9      3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25                  _____
```