**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | Case No. 18 CV 02342 |
| Plaintiff, | ) | |
| | ) | Hon. Mary M. Rowland |
| | ) | |
| vs. | ) | JURY DEMAND |
| | ) | |
| | ) | |
| REYNALDO GUEVARA, ERNEST | ) | |
| HALVORSEN, EDWARD MINGEY, | ) | |
| FERNANDO MONTILLA, ROLAND | ) | |
| PAULNITSKY, CITY OF CHICAGO. | ) | |
| | ) | |
| Defendants. | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF MAYSONET'S MOTION FOR**
**PARTIAL SUMMARY JUDGMENT**

Jennifer Bonjean
Ashley Cohen
BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Fl
Brooklyn, New York 11231
718-875-1850

Steve Greenberg
GREENBERG TRIAL LAWYERS
Attorneys and Counselors
53 W. Jackson Blvd., Suite 315
Chicago, IL  60604
312-399-2711

# TABLE OF CONTENTS

INTRODUCTION………………………………………………………………….. 1

ARGUMENT

I.   PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS
     COMPELLED SELF-INCRIMINATION CLAIM……………………………. 4

     A. The Undisputed Facts Demonstrate that Plaintiff's Confession Was the
        Product of Coercion…………………………………………………………… 6

     B. Although Not Necessary to Granting Partial Summary Judgment in
        Plaintiff's Favor, this Court Should Draw an Inference Against Guevara
        Based on His Fifth Amendment Invocations……………………………….. 8

     C. Guevara Cannot Rely on His Prior Testimony to Put Any Issue In Dispute
        Since Such Testimony Will Be Inadmissible at Trial……………………… 10

II.  PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS
     *BRADY* CLAIM…………………………………………………………… 11

     A. The Undisputed Facts Demonstrate that Exculpatory, Impeaching
        Evidence, Favorable to the Plaintiff Was Concealed During his Criminal
        Prosecution…………………………………………………………………. 12

     B. The Undisputed Facts Show that the Concealed Evidence Was Material to
        the Outcome of Plaintiff's Criminal Trial……………………………….. 14

     C. Plaintiff Was Prejudiced by the Suppression of this Evidence…………... 14

III. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS
     *MONELL* CLAIM BASED ON THE CITY'S POLICY OF EVIDENCE
     SUPPRESSION………………………………………………………………... 15

     A. Maysonet's *Monell* Theory Regarding Evidence Suppression…………….. 17

     B. The City Lost the Same *Monell* Theory in *Fields*………………………… 19

     C. The City Was Precluded from Relitigating the Issue in *Kluppelberg*……… 22

     D. The City Lost the Same *Monell* Theory In Rivera…………………… 22

     E. The City Is Precluded from Relitigating the Same Issue………………….. 24

1. The Issue Is the Same As That In Fields and Rivera…………………… 24

2. This Case Occurred During the Same Time Period as *Fields* and *Rivera*……………………………………………………………………… 26

3. The Issue Was Actually Litigated In *Fields* and *Rivera*………………… 27

4. The Issue Was Essential to the *Fields* and *Rivera* Judgments………….. 27

5. The City Had a Full and Fair Opportunity to Litigate In Past Cases…... 28

6. There Is No Equitable Reason Not to Apply Issue Preclusion…………. 28

CONCLUSION………………………………………………………………... 29

# TABLE OF AUTHORITIES

**CASES**

*A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996 (7th Cir. 1992) ....................................... 4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ............ 4

*Avitia v. Metro. Club of Chicago*, 924 F.2d 689 (7th Cir. 1991) .................................... 28

*Bellaver v. Quanex Corp.*, 200 F.3d 485 (7th Cir. 2000) .................................... 4

*Brown v. Mississippi,* 297 U.S 278 (1936) .................................... 5

*Brown v. Osmundson,* 38 F.4th 545 (7th Cir. 2022) .................................... 4

*Bunn v. Fed. Deposit Ins. Corp. for Valley Bank III.*, 908 F.3d 290 (7th Cir. 2018) ....................... 4

*Cannon v. Burge,* 2006 U.S. Dist. LEXIS 4040 (N.D. Ill. 2006) .................................... 5

*Celotex Corp., v. Catrett*, 477 U.S. 106 S. Ct. 2548, 91, L. Ed. 265 (1986) .................................... 4

*Chavez v. Martinez,* 538 U.S. 760 (2003) .................................... 5

*Chavez.* 538 U.S. at 770. *Gray v. City of Chi.,* 2022 U.S. Dist. LEXIS 56658 .................................... 5

*Chicago Truck Drivers Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997)……………………………………………………………………….29

*Cho v. Holland,* 2006 U.S. Dist. LEXIS 76054 (N.D. Ill. Oct. 3, 2006) ....................... 9

*Commissioners v. Brown*, 520 U.S. 397 (1997) .................................... 15

*Cooper v. Scroggy,* 845 F. 2d 1385 (6th Cir. 1988) .................................... 6

*Davis v. Carter*, 452 F.3d 686 (7th Cir. 2006) .................................... 15

*Fields v. Chicago,* No. 10 C 1168, 2017 U.S. Dist. LEXIS 146077, 981 F. 3d 534 (7th Cir. 2020) .................................... 2, 19

*Fox v. Hayes,* 600 F. 3d 819 (7th Cir. 2010) .................................... 6

*Gill v. City of Milwaukee,* 850 F. 3d 335 (7th Cir. 2017) ................................................ 6

*Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) ................................ 15

*Goudy v. Cummings,* 922 F. 3d 834 (7th Cir. 2019) .................................................... 12

*Grant v. Trs. Of Ind. Univ.,* 870 F.3d 562 (7th Cir. 2017) ........................................... 4

*Gray v. City of Chi.,* 2022 U.S. Dist. LEXIS 56658 ..................................................... 5

*Gunville v. Walker,* 583 F. 3d 979 (7th Cir. 2009) ...................................................... 10

*Heck v. Humphrey,* 512 U.S. 477 (1994) ..................................................................... 5

*Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385 (7th Cir. 1993) ......................................... 4

*Hill v. City of Chi.,* 2009 U.S. Dist. LEXIS 5951 ........................................................ 5

*Iglesias v. Guevara, et al.,* 19 C 6508 (N.D. Ill.) ........................................................ 3

*J.K.J. v. Polk County*, 960 F.3d 367 (7th Cir. 2020) ................................................... 15

*Jackson v. Denno,* 378 U.S. 368 (1964) ...................................................................... 6

*Jenkins v. Bartlett,* 487 F.3d 482 (7th Cir. 2007) ...................................................... 16

*Johnson v. Winstead,* 900 F. 3d 428 (7th Cir. 2018) .................................................... 5

*Jones v. Chicago*, 87 C 2536 (N.D. Ill.) ..................................................................... 17

*Kluppelberg v. Burge,* 276 F. Supp. 3d 773 (N.D. Ill. 2017) ................................... 2, 22

*LaSalle Bank Lake View v. Seguban,* 54 F. 3d 387 (7th Cir. 1995) .............................. 9

*LiButti v. United States,* 178 F. 3d 114 (2d Cir. 1999) ................................................. 8

*Logan v. Caterpillar, Inc.,* 246 F. 3d 912 (7th Cir. 2001) ........................................... 10

*McGahee v. Massey,* 667 F. 2d 1357 (11th Cir. 1982) ................................................ 11

*Miller v. Fenton,* 474 U.S. 104 (1985) .......................................................................... 5

*Miller v. Fenton,* 796 F. 2d 598 (3d Cir. 1986) ............................................................... 6

*Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013) ...................................................... 9

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ...................................... 15

*Olson v. Cross,* 2024 U.S. Dist. LEXIS 16868 ................................................................ 5

*Padilla v. City of Chicago,* 932 F. Supp. 2d 907 (N.D. Ill. 2013) ................................... 8

*Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.) .......................................................... 17

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) ..................................................... 16

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ..................................................... 15

*Petty v. City of Chicago,* 754 F. 3d 416 (7th Cir. 2014) ................................................. 12

*Rivera v. Guevara,* No. 12-CV-4428, 2019 U.S. Dist. LEXIS 247766
(N.D. Ill. Sept. 20, 2019) ............................................................................................ 2, 22

*S.E.C. v. Ficken,* 546 F. 3d 45 (1st Cir. 2008) ............................................................... 11

*Shakman v. Democratic Organization of Cook County*, 533 F.2d 344 (7th Cir. 1976) ................. 9

*Sierra v. Guevara, et al.,* 18 C 3029 (N.D. Ill.) ............................................................. 3

*Smith v. Burge,* 222 F. Supp. 3d 669 (N.D. Ill. 2016) .................................................... 5

*Sornberger v. City of Knoxville,* 434 F. 3d 1006 (7th Cir. 2006) ................................... 5

*Sornberger v. Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ............................................... 16

*Staats v. Sawyer*, 220 F.3d 511 (7th Cir. 2000) ............................................................. 16

*Stein v. New York,* 346 U.S. 156 (1953) .......................................................................... 6

*United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149 (1923) ....................................... 8

*United States v. Bennett,* 539 F. 2d 45 (10th Cir. 1976) ................................................ 11

*United States v. Jenkins,* 938 F. 2d 934 (9th Cir. 1991) .................................................. 6

*United states v. Kimball,* 15 F. 3d 54 (5th Cir. 1984) ................................................... 11

*United States v. Perez,* 2018 U.S. Dist. LEXIS 31726 ................................................ 6

*United States v. Peterson,* 100 F. 3d 7 (2d Cir. 1996) ................................................ 11

*United States v. Resnick*, No. 05 CR 9-1, 2008 U.S. Dist. LEXIS 142273 (N.D. Ill. Sep. 24, 2008) .................................................................................................................. 9

*Wrice v. Byrne, et al.,* 488 F. Supp. 646 (N.D. Ill. 2020) ......................................... 10

**RULES**

Fed. R. Civ. P. 12(a)(1) .............................................................................................. 9

Fed. R. Civ. P. 56(a) .................................................................................................. 3

Fed. R. Civ. P. 8(b)(6) ............................................................................................... 9

Fed. R. Evid. 804 ....................................................................................................... 10

Plaintiff, JOSE MAYSONET, by his attorneys, Bonjean Law Group and Greenberg Trial Lawyers, pursuant to Federal Rule of Civil Procedure 56, moves for partial summary judgment against Defendant Reynaldo Guevara on Counts I and III of his amended complaint and against the City of Chicago on certain *Monell* claims, for the reasons set out in Plaintiff's Local Rule 56.1 Statement of Undisputed Facts, Exhibits, and the following memorandum:

## **INTRODUCTION**

Plaintiff, Jose Juan Maysonet, Jr., spent 27 years incarcerated in the Illinois Department of Corrections for the murders of Torrence and Kevin Wiley ("the Wiley brothers") – a crime he did not commit. There were no eyewitnesses to the murders, no plausible motive, and no physical evidence connecting Plaintiff to the crime. Plaintiff was convicted based primarily on a physically coerced court-reported confession procured by Defendant Guevara. Indeed, the State's entire case against Plaintiff consisted of statement evidence developed by Guevara with zero corroboration. To ensure Plaintiff's conviction, Guevara also suppressed exculpatory and impeaching material that would have shown he was innocent, including that in the months prior to his arrest, Plaintiff was being extorted by Guevara and his criminal co-conspirator disgraced officer Joseph Miedzianowski who is presently serving life in prison for racketeering and narcotics convictions.

For nearly three decades, Plaintiff fought to prove his innocence while the defendant officers continued to frame Latino men in the Humboldt Park area of Chicago until retiring with their full police pension. On October 19, 2016, Cook County Circuit Court Judge Rickey Jones vacated Plaintiff's convictions without objection from the State. On November 15, 2017, the State moved for an order too *nolle prosequi* the charges against Plaintiff after *all* of the defendant officers represented through counsel that they would exercise their Fifth Amendment rights to

remain silent in response to questions about their investigation of the Wiley brothers' murders. That same day, Plaintiff was released from custody after having spent 27 years of his life in the Illinois Department of Corrections.

In 2018, Plaintiff brought this suit to hold the Defendants and the City of Chicago responsible for violating his constitutional rights and causing his wrongful convictions. Plaintiff now moves for partial summary judgment against Defendant Guevara as to Counts One (Compelled Self-Incrimination) and Count Three (*Brady* Violation) where there are no genuine issues of material fact exist.

Second, this Court should grant partial summary judgment to Maysonet on his *Monell* claim against the City of Chicago in connection with their policy of evidence suppression. The City is precluded from relitigating the issue of whether the City had an official policy or practice of suppressing exculpatory evidence - having litigated and lost the same exact *Monell* theory *twice* in two federal civil rights trial. *Fields v. Chicago,* No. 10 C 1168, 2017 U.S. Dist. LEXIS 146077, *10-11, *affirmed,* 981 F. 3d 534 (7th Cir. 2020), *Rivera v. Guevara,* No. 12-CV-4428, 2019 U.S. Dist. LEXIS 247766 (N.D. Ill. Sept. 20, 2019). The District Court in *Kluppelberg v. Burge,* has already precluded the City of Chicago from relitigating this exact issue. *Kluppelberg v. Burge,* 276 F. Supp. 3d 773 (N.D. Ill. 2017).

If this Court grants Plaintiff's motion for partial summary judgment as to the *Brady* claim against Defendant Guevara, summary judgment must be entered against the City in connection with the evidence suppression *Monell* theory. If this Court declined to grant partial summary judgment in favor of Plaintiff as to his *Brady* claim against Guevara, the City will be able to litigate at trial the causation issue, that is, whether the City's policy and/or practice of evidence suppression contributed to Maysonet's convictions. Under no circumstances should the City be

permitted to relitigate *whether* a policy of evidence suppression existed in 1990 where two separate juries have found as such during the same period of time. The City has had a full and fair opportunity to litigate the issue, including to the Seventh Circuit Court of Appeals. Applying the doctrine of preclusion promotes finality, conserves litigation resources, and prevents a party from taking multiple bites of the apple to create disparate litigation outcomes. The City has litigated its evidence suppression policy exhaustively, including in another Guevara case from 1988 - little more than a year before the case at bar. It has lost repeatedly at trial, and those jury verdicts have been upheld. There is no justification for allowing the City to continue to relitigate the same issue, expending extraordinary resources time and time again. Partial summary judgment should be allowed.

Two motions to apply issue preclusion on this precise *Monell* theory is currently pending in a case before Judge Valderrama, *Iglesias v. Guevara, et al.,* 19 C 6508, Dkts. 244, 245, 248 (N.D. Ill.), and in a case before Judge Blakey, *Sierra v. Guevara, et al.,* 18 C 3029, Dkt. 510 (N.D. Ill.)

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff's incorporates his Local Rule 56.1 Statement of Undisputed Material Facts filed in conjunction with this memorandum of law.

## ARGUMENT

Defendant Guevara has failed to create a genuine dispute as to any material fact in connection with Plaintiff's compelled self-incrimination and *Brady* claims. Considering all admissible evidence and drawing all inferences in favor of Guevara, a jury could never find in his favor as to these counts. Additionally, summary judgment in Maysonet's favor is demanded

where the City is precluded from relitigating its official policy of evidence suppression. Plaintiff's motion for partial summary judgment must be granted.

Summary judgment must be granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the moving party, Maysonet bears the burden. *Celotex Corp., v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91, L. Ed. 265 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank III.*, 908 F.3d 290, 295 (7th Cir. 2018). To determine if a genuine dispute of material fact exists, the Court must consider the pleadings, and assess the proof presented through depositions, admissible documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir. 1993). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson,* 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). But when the non-moving party does not create a factual dispute, there is no inference to be drawn. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000); *Grant v. Trs. Of Ind. Univ.,* 870 F.3d 562, 568 (7th Cir. 2017).

I. **PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS COMPELLED SELF-INCRIMINATION CLAIM.**

Plaintiff's amended complaint alleges that Defendant Guevara violated his constitutional rights under both the Fifth and Fourteenth Amendments when he coerced a confession from Plaintiff that was the lynchpin of the prosecution's case against Plaintiff. [ECF Doc. No. 136, ¶¶163] Specifically, Plaintiff pled that Guevara compelled self-incriminating statements that were used against him at his pretrial suppression hearing and at trial (Fifth Amendment), and that

Guevara's use of physical violence to extract a confession is "conscious shocking" (Fourteenth Amendment) [*Id.* at ¶¶163-164]

As set forth in detail in Plaintiff's Statement of Undisputed Facts, Guevara used physical violence to coerce Plaintiff into making self-incriminating statements that were used by the prosecution at a pretrial suppression hearing and at his trial. Indeed, the state's *entire* case turned on the admission of a court reported statement that was coerced by Guevara. The interrogation was conducted entirely by Guevara. Guevara has pled his Fifth Amendment right against self-incrimination as to each and every question asked of him regarding his interrogation of Plaintiff. No other defendant or witness has offered any testimony to refute Maysonet. Indeed, Defendant Halvorsen has also invoked his Fifth Amendment right against self-incrimination when asked whether he had knowledge that Defendant Guevara employed physical abuse to procure Plaintiff's self-incriminating statements.

The United States Supreme Court held long ago that "[s]tatements compelled by police interrogations of course may not be used against a defendant at trial," *Brown v. Mississippi,* 297 U.S 278, 286 (1936), but it is not until their use in a criminal case that a violation of the Self-Incrimination Clause occurs." *Chavez v. Martinez,* 538 U.S. 760, 767 (2003); *Miller v. Fenton,* 474 U.S. 104, 109-10 (1985); *Sornberger v. City of Knoxville,* 434 F. 3d 1006, 1024 (7th Cir. 2006).[1] To bring a successful claim of coerced confession, a plaintiff must show that he "has

---

[1]     On the question of timeliness, Plaintiff's coerced confession claim did not accrue until his criminal conviction was vacated on November 15, 2017, consistent with the holding of *Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994). Thus, his Complaint filed on April 1, 2018 [ECF Doc. No. 1] was within the two-year limitations period. *Johnson v. Winstead,* 900 F. 3d 428, 434 (7th Cir. 2018). *See also, Smith v. Burge,* 222 F. Supp. 3d 669, 685 (N.D. Ill. 2016) "("[C]ourts in this district 'have concluded that where . . . the plaintiff's conviction rested largely upon the allegedly coerced confession, a coercive interrogation claim necessarily impugns the validity of the conviction.'" *See also, Olson v. Cross,* 2024 U.S. Dist. LEXIS 16868, *39-40 (applying *Heck* deferred accrual rule to Plaintiff's compelled self-incrimination count); *Gray v. City of Chi.,* 2022 U.S. Dist. LEXIS 56658, *21 (same); *Hill v. City of Chi.,* 2009 U.S. Dist. LEXIS 5951, *17); *Cannon v. Burge,* 2006 U.S. Dist. LEXIS 4040, *9 (N.D. Ill. 2006).

been compelled to be a witness against himself in a criminal case." *Chavez.* 538 U.S. at 770.

*Gray v. City of Chi.,* 2022 U.S. Dist. LEXIS 56658, *19. In other words, he must prove (1) that

he was coerced into confessing, and (2) that the confession was used against him in his criminal

trial. *Id.*

The United States Supreme Court has held that confessions obtained through physical

abuse constitute coercion *per se. Stein v. New York,* 346 U.S. 156, 182 (1953), *overruled on other*

*grounds by Jackson v. Denno,* 378 U.S. 368 (1964). *See also, United States v. Perez,* 2018 U.S.

Dist. LEXIS 31726, *10 ("[p]hysically abusive interrogation tactics constitute coercion *per se.*");

*United States v. Jenkins,* 938 F. 2d 934, 938 (9th Cir. 1991) (same); *Miller v. Fenton,* 796 F. 2d

598, 604 (3d Cir. 1986) (same); *Cooper v. Scroggy,* 845 F. 2d 1385, 1390 (6th Cir. 1988) (same).

As the United States Supreme Court held:

> Physical violence or threat of it by the custodian of a prisoner during detention
> serves no lawful purpose, invalidates confessions that otherwise would be
> convincing, and is universally condemned by the law. When present, there is no
> need to weigh or measures its effects on the will of the individual victim. The
> tendency of the innocent, as well as the guilty, to risk remote results of a false
> confession rather than suffer the immediate pain is so strong that judges long ago
> found it necessary to guard against miscarriages of justice by treating any
> confession made concurrently with torture or threat of brutality as too
> untrustworthy to be received as evidence of guilt. *Stein,* 346 U.S. at 182.

Voluntariness of a confession also implicates the Fourteenth Amendment. Interrogation

tactics that "shock the conscience" can support a freestanding due process claim for purposes of

Section 1983. *Gill v. City of Milwaukee,* 850 F. 3d 335, 340 (7th Cir. 2017); *Fox v. Hayes,* 600 F.

3d 819, 841 (7th Cir. 2010). What constitutes "conscience shocking" conduct is open to

interpretation, but courts consider whether the police conduct was "too close to the rack and the

screw." *Id.* at 841. In other words, interrogations that utilize physical abuse "shock the

conscience." *Id.*

**A.** **The Undisputed Facts Demonstrate that Plaintiff's Confession Was the Product of Coercion.**

Defendant Guevara used physical violence during a lengthy interrogation of Plaintiff that resulted in a court-reported confession. [SUMF, ¶¶44-57] That Guevara used physical violence against Maysonet during an interrogation that resulted in his self-incriminating statements is undisputed. [SUMF, ¶¶44-57] Maysonet has consistently testified for decades that Guevara beat him into making self-incriminating statements that were later memorialized by a court-reporter. The physical abuse included slapping Plaintiff, and repeatedly striking him with a flashlight about his head, body, and groin area. To avoid leaving obvious injuries and cuts to Plaintiff, Guevara used a phonebook as a barrier between Plaintiff's body and the flashlight. [SUMF, ¶¶47-53] The beating continued off and on from the afternoon of August 22, 2024 until the morning of August 23, 2024; Guevara entered the room (alone) anywhere from 5 to 10 times. [SUMF, ¶¶46; 54-55] Also undisputed is Plaintiff's contention that he told a female state's attorney that he was being beaten. [SUMF, ¶52] That felony review assistant simply told Plaintiff to cooperate and left the police station. [*Id.*] Guevara continued to beat Plaintiff until he eventually agreed to make a confession before a court reporter and a different assistant state's attorney. [SUMF, ¶¶53-54]

Guevara invoked his Fifth Amendment right against self-incrimination to each and every question regarding his violent interrogation of Plaintiff. [SUMF, ¶56] Guevara has been repeatedly accused of using physical violence against criminal suspects during interrogations and has invoked his Fifth Amendment right against self-incrimination in all of those cases. [SUMF, ¶¶58-59] His partner Defendant Halvorsen also invoked his Fifth Amendment privilege against self-incrimination at a prior deposition when asked whether he had knowledge that Guevara was beating Plaintiff into a confession. [SUMF, ¶57]

No other Defendant officer or witness was present during Guevara's violent interrogation sessions. [SUMF, ¶55] The felony review assistant and the court reporter were not present for the interrogation and could not offer evidence refuting Maysonet's allegations, apart from claiming not to have seen obvious injuries. [*Id.*] Guevara himself, prior to taking the Fifth, admitted at Plaintiff's criminal trial that when he interrogated Maysonet, he did so in Spanish and no one else was present besides the Plaintiff. [*Id.*]

Plaintiff's testimony concerning his physically coercive interrogation is corroborated by his own prior testimony at his suppression hearing. It is also corroborated by various other individuals how have made similar claims of enduring physically coercive interrogations at the hands Guevara. [SUMF, ¶¶58-59]

**B.      Plaintiff' Confession Was Introduced at Trial.**

It is undisputed that the State introduced Plaintiff's statements to Guevara and subsequent court-reported statement into evidence at his trial. [SUMF, ¶60] The State's only evidence against Maysonet was his court-reported confession and alleged oral statements that preceded the court-reported confession. [SUMF, ¶62] No witnesses or physical evidence was offered to corroborate the statements. Indeed, every material witness who testified for the State was a member of law of enforcement or a felony review assistant. [*Id.*]

**C.      Although Not Necessary to Granting Partial Summary Judgment in Plaintiff's Favor, this Court Should Draw an Inference Against Guevara Based on His Fifth Amendment Invocations.**

Guevara has repeatedly invoked his Fifth Amendment right against self-incrimination when answering questions about his role in framing the Plaintiff and coercing a false inculpatory statement against him. A party can only exercise their Fifth Amendment right to silence "when honest answers would tend to subject the answerer to criminal liability." *Padilla v. City of*

*Chicago,* 932 F. Supp. 2d 907, 919 (N.D. Ill. 2013). "Silence is often evidence of the most

persuasive character." *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153-54 (1923);

*LiButti v. United States,* 178 F. 3d 114, 120 (2d Cir. 1999) ("an adverse inference [based on the

invocation of the Fifth Amendment] may be given significant weight because silence when one

would be expected to speak is powerful persuader.").

"The [Seventh Circuit has] made clear that, even on summary judgment, it is permissible

to draw an adverse inference against a party in a civil proceeding who remains silent in the face of

incriminating evidence." *Cho v. Holland,* 2006 U.S. Dist. LEXIS 76054 (N.D. Ill. Oct. 3, 2006).

This Court can and should draw an inference against Guevara that his assertion of the Fifth means

that Plaintiff's version of the events is true.

Even if this Court declines to do so, Guevara's invocation of the Fifth Amendment

cannot put issues into dispute because a Fifth Amendment invocation amounts to the failure to

respond to the accusation. Fed. R. Civ. P. 8(b)(6). The "failure to deny an allegation constitutes

an admission." Fed. R. Civ. P. 12(a)(1); Fed. R. Civ. P. 8(b)(6) ("An allegation — other

than one relating to the amount of damages — is admitted if a responsive pleading is required

and the allegation is not denied."). As the Seventh Circuit has held, "[I]f the party opposing

summary judgment fails to respond to the facts set out by the movant, the court may assume

those facts to be admitted and use them in determining whether the movant is entitled to

judgment as a matter of law." *LaSalle Bank Lake View v. Seguban,* 54 F. 3d 387, 390 n.4 (7th

Cir. 1995). *See also Modrowski v. Pigatto*, 712 F.3d 1166, 1170 (7th Cir. 2013); *Shakman v.

Democratic Organization of Cook County*, 533 F.2d 344,352 (7th Cir. 1976)." *United States v.

Resnick*, No. 05 CR 9-1, 2008 U.S. Dist. LEXIS 142273, at *2 n.3 (N.D. Ill. Sep. 24, 2008).

It is undisputed that Guevara conducted his interrogation of Plaintiff outside the presence of any other individuals. [SUMF, ¶55] Because he is the *only* person who might contradict Plaintiff's account of his interrogation and Guevara's use of physical abuse toward Plaintiff, his refusal to respond to the allegations by invoking his Fifth Amendment rights means that Plaintiff's version of events is the *only* version of events that a jury will have to consider. Put differently, because Guevara can point to no other facts outside of his testimony that puts Plaintiff's claims of a physically abusive interrogation into question, Plaintiff's motion for partial summary judgment should be allowed.

### D. Guevara Cannot Rely on His Prior Testimony to Put Any Issue In Dispute Since Such Testimony Will Be Inadmissible at Trial.

To avoid summary judgment, Guevara must point to *admissible* evidence that puts Plaintiff's statement of facts into dispute. Admissibility is the threshold question because a court may consider only admissible evidence in assessing motion for summary judgment. *Gunville v. Walker,* 583 F. 3d 979, 985 (7th Cir. 2009) (collecting cases). A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *Id. See also, Logan v. Caterpillar, Inc.,* 246 F. 3d 912, 925 (7th Cir. 2001).

As discussed above, Guevara can point to *no* admissible fact that refutes Plaintiff's account of his physically coercive interrogation. To the extent Guevara attempts to rely on his fabricated *prior* testimony at Plaintiff's suppression hearing and/or trial, he may not do so because such testimony is inadmissible. Guevara's prior trial testimony constitutes rank hearsay and is only admissible consistent with the criteria set forth in Fed. R. Evid. 804. But Rule 804 requires that the proponent of the admission of the prior testimony establish that the witness is "unavailable" to testify at trial. While generally a witness is deemed "unavailable" under Rule 804 when that witness asserts his Fifth Amendment rights against self-incrimination, Rule 804

expressly provides that a declarant is not made unavailable "if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the witness from attending or testifying." Fed. R. Evid. 804(a). *See Wrice v. Byrne, et al.,* 488 F. Supp. 646, 658 (N.D. Ill. 2020). Thus, Guevara cannot use his prior testimony by making himself unavailable by invoking his Fifth Amendment right against self-incrimination.

In *Wrice,* the plaintiff brought a coerced interrogation claim against the defendants, alleging they beat him into making self-incriminating statements that were used to convict him. At plaintiff's civil rights trial, Byrne was prohibited from introducing the trial testimony he offered at plaintiff's criminal trial because he invoked his Fifth Amendment right to remain silent in response to all questions related to his interrogation and investigation of the plaintiff. Relying on overwhelming authority in the circuits, the District Court in *Wrice* found that when a "defendant invoked his Fifth Amendment privilege, he has made himself unavailable *to any other party,* but he is not unavailable to himself." *Id. See also, United States v. Peterson,* 100 F. 3d 7, 13 (2d Cir. 1996); *United states v. Kimball,* 15 F. 3d 54, 55-56 (5th Cir. 1984); *S.E.C. v. Ficken,* 546 F. 3d 45, 53 (1st Cir. 2008); *McGahee v. Massey,* 667 F. 2d 1357, 1362 (11th Cir. 1982); *United States v. Bennett,* 539 F. 2d 45, 54 (10th Cir. 1976). Accordingly, Byrne could not introduce his own prior testimony at trial as it constituted inadmissible hearsay.

Clearly, this Court will not, and cannot, allow Guevara to end run Rule 804 by allowing him to introduce his own self-serving prior testimony that Plaintiff has had no ability to test since his wrongful conviction in 1995. As such, Guevara's prior testimony cannot put any issues into dispute for the purpose of summary judgment.

## II. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS *BRADY* CLAIM.

In his amended complaint, Plaintiff alleged that the Defendant Officers, including Defendants Guevara suppressed exculpatory evidence from the defense. [ECF Doc. No. 136, ¶¶181-187] Specifically, Defendant Guevara concealed exculpatory evidence that he arrested Francisco Veras and Efrain Cruz several weeks after the Wiley brothers' murders accused them of murdering the Wiley brothers, placed them in a line-up, told them they were identified, and attempted to force the men to confess to the murders. Veras and Cruz were released after Guevara discovered that Veras and Cruz were in custody at the time of the murders. The evidence is undisputed and constitutes exculpatory evidence of third-party culpability or evidence that Defendant Guevara attempted to frame two other people before framing Plaintiff.

To prevail on a claim for violation of due process under *Brady*, a plaintiff must show the following: "(1) the suppressed evidence is either exculpatory or impeaching and is favorable to the accused; (2) the government, either willfully or inadvertently, suppressed the evidence; and (3) the suppressed evidence resulted in prejudice." *Petty v. City of Chicago,* 754 F. 3d 416, 423 (7th Cir. 2014). To show the suppressed evidence resulted in prejudice, plaintiff must show that it was "material to the outcome of the trial." *i.e.,* "there is a 'reasonable probability' that the result would have been different had the suppressed evidence been put before the jury." *Goudy v. Cummings,* 922 F. 3d 834, 842 (7th Cir. 2019). This standard is "less rigorous" than a preponderance of the evidence standard, plaintiff need only show that "that the cumulative effect of all the suppressed information is to undermine confidence in the verdict." *Id.*

A.     **The Undisputed Facts Demonstrate that Exculpatory, Impeaching Evidence, Favorable to the Plaintiff Was Concealed During his Criminal Prosecution.**

Francisco Veras gave sworn testimony that Guevara (and his partner) arrested him, and another Latin King named Efrain Cruz and detained the men at Area Five in connection with the Wiley brothers' murders. [SUMF, ¶28] Cruz provided an affidavit consistent with Veras's

testimony. [SUMF, ¶¶28, 31] Guevara accused the men of shooting the two Black men on North avenue during the early morning hours May 25, 1990. [SUMF, ¶¶29, 32] Veras and Cruz were both placed into a line-up and told they were identified. [SUMF, ¶¶ 28-29; 32] Veras testified that Guevara attempted to coerce him into implicating Cruz as the shooter and threatened him that whoever pointed the finger at the other first would get a benefit. [SUMF, ¶29] Once the men figured out that they were both in custody at the 14th District, Guevara was forced to release them from custody. [SUMF, ¶¶30; 33]

This evidence was unquestionably impeaching and/or exculpatory and favorable to Plaintiff. Either Veras and Cruz were legitimate third-party offenders who were identified by a witness who viewed a line-up as they were led to believe during their line-up procedure and as Guevara told them during his interrogations of them. Or, and more likely, Guevara attempted to frame Veras and Cruz in the same exact manner that he did Maysonet prior to setting his sights on Maysonet. Evidence that Guevara attempted to frame to other Latin Kings before arresting Plaintiff is exculpatory, impeaching, and favorable to the defense. According to Veras and Cruz, Guevara showed them photos of the victims, accused them of the murders, falsely told them they were identified in a line-up, threatened them, and tried to coax them into falsely pointing the finger at each other to avoid being the shooter - some of the same tactics used by Guevara when interrogating Plaintiff. Veras and Cruz were only released because they had an airtight alibi that even Guevara could not get around, namely they were in the custody of the 14th District at the precise time of the shooting.

Had Guevara prepared any reports or otherwise disclosed to the criminal justice system that he arrested, detained, interrogated, and conducting a line-up procedure with Veras and Cruz (that he claimed was positive), Plaintiff would have been able to present such testimony through

Veras and/or Cruz. Trial counsel would have cross-examined Guevara about whether Veras and Cruz were identified during a line-up or whether he fabricated a line-up - just as he fabricated Plaintiff's confession. The evidence is exculpatory no matter how you cut it which is precisely why Guevara concealed it.

**B.    The Undisputed Facts Show that the Concealed Evidence Was Material to the Outcome of Plaintiff's Criminal Trial.**

It is undisputed that Guevara concealed from the criminal justice system that he arrested, detained, interrogated, and conducted line-up procedures with Veras and Cruz. No report exists that memorializes the investigative actions taken in connection with Veras and Cruz, including a line up report that is expressly required under CPD policy. [SUMF, ¶37] There is no hint that these men were in custody or interviewed in the investigative and permanent retention files. [*Id.*] The CCSAO file is devoid of any such report. [*Id.*] And the assistant Cook County State's Attorney who tried the case has no recollection of any reports related to these individuals and testified that she would have produced such reports if they existed. [SUMF, ¶38]

Guevara cannot point to single fact in this exhaustive discovery record that suggests that information about his arrest, detention, interrogation, and line-up procedures with Veras and Cruz was ever reported or passed along to prosecutors or defense counsel. Notably, both Guevara and Defendant Halvorsen pled the Fifth Amendment when asked whether these investigation actions took place, whether they concealed them, and whether they attempted to frame Veras and Cruz before framing Plaintiff. [SUMF, ¶¶35-36]

**C.    Plaintiff Was Prejudiced by the Suppression of this Evidence**.

Suppression of evidence showing that two other individuals were arrested in connection with the Wiley brothers' murders and allegedly identified as the perpetrators unquestionably undermine confidence in the verdict. The only state evidence against Maysonet at his trial was

statement evidence by the Defendants. [SUMF, ¶62] No occurrence or eyewitness testified. No physical evidence was presented that suggested Plaintiff's involvement. The case turned entirely on Maysonet's alleged confession procured after Guevara interrogated him outside the presence of any other officers.

If defense counsel had the opportunity to cross examine and impeach Guevara with the fact that he arrested two other individuals, accused them of murdering the deceased, told them they were identified as the perpetrators, attempted to coerce them into confession, but ultimately had to release them because they were in custody at the time of the murders, a jury probably would have rejected Guevara's testimony. This exculpatory and impeaching evidence undermines confidence in the verdict where the *only* evidence offered against Maysonet was developed by Guevara. Summary judgment on Plaintiff's *Brady* claim against Guevara should be granted.

## III. PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT AS TO HIS *MONELL* CLAIM BASED ON THE CITY'S POLICY OF EVIDENCE SUPPRESSION.

The City is liable under *Monell v.* The City is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), if the violation of Plaintiff's constitutional rights were caused by: (1) application of an express policy, including a deficient policy that reflects a municipal decision not to adopt or to omit needed policies, *J.K.J. v. Polk County*, 960 F.3d 367, 377-84 (7th Cir. 2020) (*en banc*) (holding that a jury could find a municipality liable for gaps in a jail sexual assault policy when the risk was obvious that male guards might assault female detainees); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379-81 (7th Cir. 2017) (*en banc*) ("[I]n situations that call for procedures, rules or regulations, the v pervades to an extent where acquiescence on the part of policymakers is apparent, *id.* at 379 (citing *Monell*, 436 U.S. 690-

91); *Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006); (3) an action taken by an official who exercises final policymaking authority for the municipality, *Commissioners v. Brown*, 520 U.S. 397, 403-04 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); or (4) a failure to train, supervise, or discipline officers that amounts to deliberate indifference to the rights of individuals with whom they come into contact, *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Sornberger v. Knoxville*, 434 F.3d 1006, 1029-30 (7th Cir. 2006)

Summary judgment is warranted because the City is precluded from relitigating Plaintiff's *Monell* theory that the City had an official policy during the relevant time period of suppressing exculpatory evidence. Whether issue preclusion should be applied is a legal question that this Court considers *de novo*; if the Court encounters a factual issue in resolving that question, it construes the evidence in the light most favorable to the nonmoving party. *Staats v. Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000). Preclusion "has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party . . . and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Among other things, preclusion encourages finality in litigation, avoids inconsistent results, and protects courts against the burdens of repetitious litigation, particularly from parties, like the City, who might otherwise insist on a second, third, fourth try on issues that federal courts have thoroughly considered and decided against them. 18 WRIGHT & MILLER, FED. PRAC. & PROC. JURIS. §§ 4403, 4416 (3d ed.).

For issue preclusion (also called collateral estoppel) to apply in a § 1983 suit, four requirements must be met: (1) the issue must be the same as that involved in the prior judicial proceeding; (2) the issue must actually have been litigated; (3) the issue must have been resolved; and (4) the issue must have been necessary to the judgment in the prior proceeding.

*Bailey v. Andrews*, 811 F.2d 366, 369 (7th Cir. 1987). Each criterion is met for the theory that the City had an official policy of suppressing exculpatory and impeachment evidence.

      **A.**        **Maysonet's *Monell* Theory Regarding Evidence Suppression.**

Maysonet contends in this case that his wrongful conviction of the Wiley brothers was caused, *inter alia,* because material exculpatory and impeachment evidence was suppressed during his prosecution and beyond. Maysonet contends that the Defendants, during the Wiley brothers' investigation, suppressed from state prosecutors and his attorneys a wide array of evidence, including evidence related to Francisco Veras and Efrain Cruz's arrest, interrogation, and alleged positive identification as the perpetrators of the murders. The suppression of this evidence was material to Plaintiff's criminal case. Had the jury heard this evidence, it probably would have acquitted Maysonet. Apart from Guevara's suppression of evidence discussed above, a trial is necessary on the suppression theories against the other Defendant Officers (which will be addressed in opposition papers if the other Defendant Officers move for summary judgment on those theories).

Plaintiff's position is that the concealment of exculpatory evidence in his criminal case was not an isolated incident, but instead was done pursuant to the City's official policy of suppressing investigative information in homicide investigations. [ECF No. 136, ¶¶214-215; ECF No. 347] In support of this claim, Plaintiff has amassed substantial evidence, including the City's past litigation concerning this issue, written policies, testimony of the City's Rule 30(b)(6) designees, and his police practices expert Thomas Tiderington. [SUMF¶¶ 63-130]

The evidence reflects that, starting in the early 1980s, City policymakers, including the Chicago Police Superintendent, received notice in the lawsuits *Jones v. Chicago*, 87 C 2536 (N.D. Ill.), and *Palmer v. City of Chicago*, 82 C 2349 (N.D. Ill.), that the City had a citywide

problem creating, maintaining, and producing investigative information in homicide investigations, which resulted in the suppression of evidence and due process violations. [SUMF ¶¶ 63-66, 69, 72-73] City policymakers responded by promulgating written policies, which were intended to address the widespread evidence suppression problem, but those policies were facially deficient, had limited effect, and did not correct the problem. [SUMF ¶¶ 58-74, 92-101, 102-105, 106-119] Instead, the suppression of evidence in homicide investigations continued unabated. [SUMF ¶¶ 79, 80, 84, 87, 89-91, 95-101, 104-119] The City's Rule 30(b)(6) witnesses testified that an audit of homicide files revealed that evidence suppression issues were present citywide, and that the promulgated policies did not solve the problem. [SUMF ¶¶ 69-71, 74, 77-91, 92-101]

Plaintiff's expert Tiderington concurred that the written policies could not solve the evidence suppression problem. [SUMF ¶¶ 109, 110-119] Tiderington reviewed and analyzed 136 Area Five Investigation filed from 1987-1991; 475 Area Five investigative files from 1991-1995; as well as 344 Area Five files from 1995-1998 that were provided to him for analysis. He compared them to available permanent retention files and where possible criminal defense files. [SUMF, ¶110] Based on his review, Tiderington concluded that the Special Orders did nothing to ameliorate the evidence suppression issues of which the City was aware: (1) detectives consistently used handwritten notes not on GPRs, and also used to-from memos, rather than including that information in GPRs and Supplemental Reports; (2) inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete); (3) not all relevant information in unofficial documents was transcribed in official reports—including potentially exculpatory information contained on handwritten notes, not transferred into official reports– leaving those official reports incomplete; and (4)

criminal defense files revealed that important investigative materials were regularly withheld from criminal defendants. [SUMF, ¶¶ 111-119]. Based on this evidence, Plaintiff contends that the City had an official policy of suppressing exculpatory and impeachment evidence in homicide investigations.

### B.     The City Lost the Same *Monell* Theory in *Fields*

In 2016, the same evidence suppression theory was tried to a verdict against the City in *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.). Nathan Fields was wrongfully convicted and sent to death row for the 1984 murders of Jerome Smith and Talman Hickman on the south side of Chicago. *See* 2017 WL 3987356. After his conviction was reversed and he was acquitted in his 2009 retrial, Fields filed a § 1983 lawsuit, claiming that investigating officers had suppressed exculpatory information throughout his criminal proceedings, and contending that the City of Chicago was liable for its official policy of evidence suppression. *Id.* During discovery in Fields's civil lawsuit, it came to light that investigative information had been suppressed in a clandestine file, which contained highly exculpatory material. *Id.* As in this case, Fields developed evidence that the evidence suppressed in his case was not an isolated incident. The evidence in *Fields* was the same as the evidence in this case, it included past litigation, written policies, Rule 30(b)(6) testimony, and experts on both sides, and it concerned exactly the same City policy of evidence suppression. [SUMF, ¶¶105-108]

In that case, Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas

One, Two, Three, and Four. [SUMF, ¶106-107] Comparison of the CPD homicide files to permanent retention files and criminal defense files demonstrated systematic underproduction of key categories of investigative information—Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. [SUMF, ¶107] Fields thus introduced uncontroverted evidence that the City's policy of evidence suppression persisted from the early 1980s until 2009. *Fields* was tried over the course of five weeks in November and December 2016 before Judge Kennelly. The City was capably defended by attorneys from Dykema Gossett, an experienced litigation firm whose lawyers have been defending the City in countless § 1983 cases for a period of decades. Fields was represented by the law firm of Loevy and Loevy. During trial, both sides presented extensive *Monell* evidence, which is collected in the parties' post-trial submissions. [SUMF, ¶123]

When Fields's *Monell* claim was submitted to the jury, the jury was instructed that, to succeed on his *Monell* claim, Fields had to prove:

1. Material exculpatory and/or impeachment evidence in the possession of the Chicago Police Department was concealed from the prosecutor, and the evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence. . . . .

2. At the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence. The term policy means: (a) an express policy, (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . ., (c) A decision or policy statement made by the Superintendent of Police. This includes the Superintendent's approval of a decision or policy made by someone else, or (d) A practice of failing to train or supervise employees. . . .

3. The policy as described in paragraph 2 caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case.

4. The plaintiff was damaged as a result. [SUMF, ¶122]

At the conclusion of the trial on December 15, 2016, the jury found for Fields on the *Monell* claim (and other claims too), and it awarded $22 million in compensatory damages (as well as punitive damages). [SUMF, ¶¶108, 124] Judge Kennelly entered judgment on the verdict. [SUMF, ¶124]

The City filed a post-trial motion challenging the *Monell* judgment under Rules 50 and 59. [SUMF, ¶¶123-124] Judge Kennelly denied the City's post-trial motion, concluding:

> Fields's evidence, including evidence of systematic underproduction of police reports, was sufficient to show a systemic failing that went beyond his own case. The City and police department were on notice, via the *Jones/Palmer* litigation and the department's own subsequent internal inquiry, of deficiencies in its recordkeeping and record-production practices that, at least in some situations, led to harm. And Fields offered evidence that permitted a reasonable jury to find that the policies instituted to deal with these problems were insufficient to correct them. . . . The gaps here include, but are not limited to, insufficient or unnecessarily subjective instructions regarding what materials had to be maintained, insufficient instructions on producing materials to prosecutors, and the absence of any supervision or after-the-fact auditing. *Fields*, 2017 WL 3987356, at \*3.

The City appealed and the Seventh Circuit affirmed, concluding that the *Monell* verdict against the City regarding its policy of suppressing exculpatory evidence was amply supported. *Fields v. Chicago*, 981 F.3d 534, 563 (7th Cir. 2020). Indeed, the Seventh Circuit decided that the City's knowledge of the risk of constitutional violations caused by its policy was "unquestionable in this case." *Id.* The Seventh Circuit reaffirmed that it had recognized this particular policy of the City, stating, "[i]n *Jones*, 856 F.2d at 996, we recognized that the custom of the maintenance of street files was department-wide and of long standing, and that a jury could therefore conclude it was consciously approved at the highest policy-making level for decisions involving the police department. . . . In fact, the City in *Jones* did not even contest that the use of such a practice presented a due process problem[.]" *Id.*

**C.** **The City Was Precluded from Relitigating the Issue in *Kluppelberg***

In 2017, based on *Fields* alone, Judge Lefkow concluded in *Kluppelberg v. Burge*, No. 13 C 3963 (N.D. Ill.), that the City was precluded from relitigating whether it had an official policy of suppressing exculpatory evidence, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017). Like *Fields*, *Kluppelberg* concerned a claim that the City had a policy of suppressing exculpatory evidence that resulted in the suppression of investigative information in a 1984 homicide arson investigation that led to James Kluppelberg's 1988 arrest and 1989 wrongful conviction, and Kluppelberg advanced that theory with all of the same evidence offered in *Fields*, including an expert analysis of 164 additional homicide files from Area Three. [SUMF, ¶131]

Judge Lefkow granted Kluppelberg's motion to preclude the City from relitigating whether it had a policy of suppressing exculpatory evidence. *Kluppelberg*, 276 F. Supp. 3d at 776; [SUMF, ¶132] The City argued "it is impossible for the court to determine from a general jury verdict whether the issues are the same and whether determination of the issue was essential to the final judgment in the first action" and that it would be unfair to apply issue preclusion, but the court rejected these arguments. *Kluppelberg*, 276 F. Supp. 3d at 776-79; [SUMF, ¶131]

**D.** **The City Lost the Same *Monell* Theory In *Rivera***

In 2018, again the same *Monell* theory was tried and resulted in a jury verdict against the City in *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.) [SUMF, ¶¶121, 127] Rivera was wrongfully convicted of the 1988 murder of Felix Valentin on the northwest side of Chicago. Like Plaintiff, Rivera's conviction was based on false evidence fabricated by Chicago Police officers working out of Detective Area Five. As in this case, the investigation was led by Guevara.

After Rivera's conviction was vacated and charges against him were dropped in 2011,

Rivera, too, filed a § 1983 lawsuit. Like Plaintiff does here, Rivera claimed that the defendants had suppressed exculpatory information throughout his criminal proceedings, and he contended that the City was liable for its official policy of suppressing exculpatory evidence. [SUMF, ¶110] Like Fields before him and Maysonet here, Rivera amassed evidence to show that the suppression of evidence was not an isolated incident but was the result of municipal policy, including evidence of the City's past litigation of the issue, its written policies, its designated Rule 30(b)(6) witness, and expert testimony. [SUMF, ¶128] That evidence used in *Rivera* showed that the Chicago Police Department was aware, based on *Jones* and *Palmer*, that it had a problem of suppressing evidence in 1982, that the reforms the City put in place in response were deficient, and that evidence suppression in homicide investigations continued unabated, throughout the time period that Rivera was prosecuted and convicted. [SUMF, ¶¶ 128; *see also* 97, 98, 100, 115, 121]

As in *Fields*, Rivera's expert, Michael Brasfield, conducted an analysis of 435 Chicago Police Department homicide files, this time from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed. [SUMF, ¶¶119, 131] That analysis was not rebutted by the City's expert; while Fields established the City's policy of evidence suppression from the early 1980s to 2009, Rivera introduced unchallenged evidence that the policy was alive and well between 1985 and 1991. [SUMF, ¶¶ 119, 126-130]

*Rivera* was tried in June 2018 before Judge Gottschall. The City was capably defended

by the same attorneys representing the Defendants here. Rivera was represented by Loevy & Loevy. At trial, both sides presented extensive *Monell* evidence, which is collected in the post-trial submissions in *Rivera*. [SUMF ¶¶128, 131] The jury was instructed that, to succeed on his *Monell* claim, Rivera had to prove:

> 1. The plaintiff's constitutional rights were violated as defined in these instructions;
>
> 2. The City of Chicago has a policy of concealing material exculpatory and/or impeachment evidence. The term policy means: (a) An express policy; or (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . .; or (c) A decision or policy statement, including a decision not to adopt a needed policy, made by the City of Chicago; or (d) A practice of failing to train employees of the City of Chicago or the Chicago Police Department.
>
> 3. The policy as described in paragraph 2 caused the violation of the plaintiff's constitutional rights. [SUMF, ¶110]

At the conclusion of the trial on June 28, 2018, the jury found for Rivera on the *Monell* claim (and other claims), and it awarded $17 million in compensatory damages (and punitive damages). [SUMF, ¶127] Judge Gottschall entered judgment on the verdict. [SUMF, ¶127] The City filed a post-trial motion challenging the *Monell* judgment under Rules 50 and 59. [SUMF, 128-129.] Judge Gottschall denied that motion. *Rivera*, 2019 WL 13249674, at *4; [SUMF, ¶129]

**E.      The City Is Precluded from Relitigating the Same Issue Here.**

The City is precluded from relitigating in this case the issue of whether it had an official policy of suppressing exculpatory and impeachment evidence at the time of Plaintiff's arrest and wrongful conviction. All four criteria for the application of issue preclusion are firmly satisfied, and there is no equitable reason not to apply the doctrine.

**1.      The Issue Is the Same as That In *Fields* and *Rivera.***

On the first factor, Plaintiff's *Monell* theory that the City had an official policy of suppressing exculpatory and impeachment evidence at the time of the Wiley brothers' murder

and investigation into that murder is the same as the issue litigated to judgment against the City in *Fields* and *Rivera*. In fact, the issues are identical in every material respect.

All three cases concern a theory, evidence, and argument that the City's evidence suppression problem was first exposed in *Jones* and *Palmer*, that policymaking officials at the highest levels of City government and the Chicago Police Department were on notice of and investigated the problem, and that new written policies were promulgated in response. Those written policies—Special Orders 83-1, 83-2, 86-3, and the effectively identical 1988 Standard Operating Procedures—are the same in all three cases. In all three, the plaintiffs offered a large volume of evidence that the City's policy response was deficient—the written policies did not end the problem of evidence suppression across the Chicago Police Department during the relevant time period—consisting of written policies, testimony from the City's own designated Rule 30(b)(6) witnesses, legions of cases in which material evidence was suppressed (including *Fields*, *Kluppelberg*, and *Rivera*), and testimony from experts on both sides. Indeed, the categories of evidence in play in each of the three cases are the same. In many instances, the witnesses are the same, the testimony at issue is the same, and the documentary evidence on which both sides rely is the same. Moreover, in each of the cases the plaintiffs' experts have undertaken detailed analyses of hundreds of Chicago Police Department homicide files, which have all reached the same conclusion that the persistent problem of evidence suppression continued without interruption across investigations conducted by the Chicago Police Department at all relevant times. In each of the cases, the City's experts have responded without contesting the accuracy of plaintiffs' experts' data. Fundamentally, there has been no dispute in the exchange of expert viewpoints that the City's policy of evidence suppression continued after the implementation of new policies in the wake of *Palmer* and *Jones.* In fact, that assertion has

been unanimously supported by the City's own Rule 30(b)(6) witnesses. [SUMF, ¶¶92-100; 102-119; 120; 128-132]

The identity of *Monell* issues does not end there. Rivera was implicated in a 1988 shooting in the Humboldt Park neighborhood, which was investigated by Defendant Guevara and others stationed in Area Five, leading to Rivera's prosecution and conviction in 1990. Maysonet was implicated in 1990 shooting that occurred in Humboldt Park which was also investigated by by Guevara and officers from Area Five, resulting in Maysonet's conviction in 1995. It is hard to imagine how the cases could be more analogous for preclusion purposes.

Moreover, the cases are being tried by the same defense attorneys, in the same courthouse, under the same Local Rules, and pursuant to the same federal statutes and constitutional provisions, eliminating any concern that there is something anomalous about one of the cases. Issue preclusion asks whether the issue between a past case and the present one are the same in relevant respects, not in every way possible, *Matter of Magnafici*, 16 B.R. 246, 254 (Bankr. N.D. Ill. 1981), and these cases satisfy that standard. Indeed, *Rivera* and this case are identical in nearly every way.

### 2.     This Case Occurred During the Same Time Period as *Fields* and *Rivera.*

At the outset, the City's policies governing the suppression of evidence in 1990 when Plaintiff was arrested for the Wiley brothers' murders is identical to the policies in place in *Fields* and *Rivera.* In *Fields,* Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files for the relevant time period here, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989. In *Rivera,* Brasfield examined conducted an analysis of 435 Chicago Police Department homicide

files, this time from Area Five, for the years 1985 to 1991, which revealed that, in more than 90% of cases, information in Chicago Police Department files was not produced to prosecutors and criminal defense attorneys in the criminal justice system, and in 100% of cases the written policies promulgated by the City after *Palmer* were not followed.

There is direct overlap between the time period of these cases and Plaintiff's case. Thus, the policies and practices at issue in *Fields* and *Rivera* regarding evidence disclosure are the same policies in effect at the time of Plaintiff's case. [SUMF, ¶¶102-109]

### 3. The Issue Was Actually Litigated In *Fields* and *Rivera*.

Next, the City cannot dispute that the issue was actually litigated in both *Fields* and *Rivera*. In both cases it was the central *Monell* theory contested throughout discovery, at a full jury trial on the merits, in post-trial motions, and in *Fields* on appeal, entailing a huge volume of evidence on both sides. A full trial on the merits is the "situation most clearly contemplated by the 'actually litigated' standard." *In re Tapper*, 123 B.R. 594, 601 (Bankr. N.D. Ill. 1991).

### 4. The Issue Was Essential to the *Fields* and *Rivera* Judgments.

Nor can the City credibly argue that the *Monell* issue on which Maysonet seeks preclusion was not essential to the final judgment in both *Fields* and *Rivera*. The juries in both *Fields* and *Rivera* were each instructed that, to find against the City on the policy claim, the plaintiffs had to prove by a preponderance of the evidence that the City had a policy of concealing material exculpatory evidence. [SUMF, ¶122] (*Monell* Instruction in *Fields*) ("it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence"); [SUMF, ¶126] (*Monell* Instruction in *Rivera*) ("The City of Chicago had a policy of concealing material exculpatory and/or impeachment evidence"). The verdicts and resulting judgments against the City in these cases therefore necessarily required a finding that the City had a policy of

concealing exculpatory evidence, for that was the *Monell* theory on which each jury was instructed. *See Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 777 (N.D. Ill. 2017) ("[T]here is no other policy or practice that would have supported the verdict[.]"). Were there any doubt that the litigation of the issue was essential to the judgment, the City's principal argument in its post-trial motions in *Rivera* and *Fields* and on appeal in *Fields* was that there was not sufficient evidence to support this *Monell* theory and thus the judgments against it. *Rivera*, 2019 WL 13249674, at *4; *Fields*, 2017 WL 4553411, at *3,*aff'd*, 981 F.3d at 563.

## 5. The City Had a Full and Fair Opportunity to Litigate In Past Cases.

On the last factor, it is beyond dispute that the City had a full and fair opportunity to litigate the issue in *Fields* and *Rivera*. Assisted by experienced counsel, the City did so at every stage (summary judgment, motions *in limine*, at trial, in Rule 50 and Rule 59 motions, and appeal), using every type of evidence (including written policies, designated Rule 30(b)(6) witnesses, and expert opinion testimony). [SUMF, ¶¶79-87]; *see also Rivera*, 2019 WL 13249674, at *4 (discussing the litigation of the issue at each stage). A party has a full opportunity to litigate "[o]nce a party is afforded a hearing on an issue that comports with due process," absent circumstances not present. *Avitia v. Metro. Club of Chicago*, 924 F.2d 689, 691 (7th Cir. 1991).

## 6. There Is No Equitable Reason Not to Apply Issue Preclusion

Lastly, there is no equitable reason not to apply issue preclusion in this case. The Supreme Court has expressed concern that issue preclusion might be "unfair to a defendant" if in the first action (1) the defendant was sued for "small or nominal damages" for which the defendant "may have had little incentive to defend vigorously"; (2) the "judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant"; or

(3) "the second action affords the defendant procedural opportunities [e.g., discovery procedures] unavailable in the first action that could readily cause a different result." *Chicago Truck Drivers v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997) (quoting *Parklane Hosiery*, 439 U.S. at 330-31). None of these situations is present here: *Fields* and *Rivera* were each multi-million-dollar lawsuits; the judgments in those cases are consistent, not inconsistent, with past judgments in litigation in this district, including in *Jones* and *Palmer*; and the procedural opportunities in each case were the same in all respects.

All four requirements for applying issue preclusion are satisfied. There is no equitable reason to avoid applying the doctrine. The City is before the Court as a repeat, losing litigant on the question whether it had an official policy of suppressing exculpatory and impeachment evidence. Multiple federal juries have concluded that the City had such a policy; multiple federal judges have found those verdicts amply supported and have entered judgments against the City; the Seventh Circuit has affirmed the City's liability on this ground. This Court should prevent the City's continued misuse of the judicial system and hold that it is precluded from relitigating whether it had an official policy of suppressing exculpatory and impeachment evidence. If the Court decides this motion on preclusion grounds, then it will have no reason to address the alternative argument below that summary judgment should be granted because there are no material disputes on Plaintiff's theory that City policymakers promulgated facially deficient policies in response to the problem of evidence suppression.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for partial summary judgment against Defendant Guevara and the City of Chicago should be granted.

Respectfully Submitted,
PLAINTIFF JOSE MAYSONET

By: /s/ Jennifer Bonjean
One of Plaintiff's attorney

Jennifer Bonjean
Ashley Cohen
Bonjean Law Group, PLLC
303 Van Brunt Street, 1st Fl.
Brooklyn, NY 11231
718-875-1850

Steve Greenberg
GREENBERG TRIAL LAWYERS
Attorneys and Counselors
53 W. Jackson Blvd., Suite 315
Chicago, 60604
312-399-2711