**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSE JUAN MAYSONET, JR. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 CV 02342 |
| | ) | |
| vs. | ) | Hon. Mary M. Rowland |
| | ) | |
| | ) | Magistrate Judge Keri L. Holleb Hotaling |
| REYNALDO GUEVARA, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Jose Juan Maysonet, Jr. ("Maysonet') submits the following statement of undisputed material facts pursuant to Local Rule 56.1 in support of his motion for partial summary against Defendant Guevara and the Defendant City of Chicago:

### PART I

**I.      PARTIES, JURISDICTION AND VENUE**

1.      On August 11, 1995, Plaintiff Maysonet was convicted of the murders of Kevin and Torrence Wiley ("the Wiley brothers"). [Exhibit 1 - Certified Statement of Conviction/Disposition (RFC-Maysonet 138)] On October 16, 1995, he was sentenced to life in prison. [*Id.* at RFC-Mayonet 139]

2.      On October 26, 2016, Plaintiff's convictions were reversed by Cook County Circuit Court Judge Rickey Jones with the consent of the Cook County State's Attorney's Office ("CCSAO"). [*Id.* at RFC-Maysonet 151]

3.      On November 15, 2017, the CCSAO through Assistant State's Attorney ("ASA") Eric Sussman dismissed all charges against Maysonet, citing Guevara, Paulnitsky, Montilla, Halvorsen, and Mingey's intent to invoke their Fifth Amendment privilege against self-incrimination in any criminal proceedings against Maysonet. [Exhibit 2 - 11/15/2017 Dismissal Transcript] [Exhibit 3 - Sgt. Mingey Deposition at pg. 39]

4.      Defendant Guevara was a member of the Chicago Police Department ("CPD") and employed by the Defendant City of Chicago from 1973 until June 15, 2006. [Exhibit 4-Guevara Deposition (*Johnson v. Guevara*, 05 C 1042) at pgs. 7-8 (Serrano_Lassar 22233)] Guevara became a detective in 1990 and worked as gang crimes officer immediately before being promoted to detective. [*Id.* at 19-20 (Serrano_Lassar 22236)]

5.      This Court has jurisdiction over this matter and venue is proper. [Exhibit 5 - Guevara's Answer to Plaintiff's Amended Complaint]

## II.     MAYSONET'S RELATIONSHIP WITH REYNALDO GUEVARA

6.      Mr. Maysonet was born in the United States but moved back to Puerto Rico in his youth to live with his grandmother when he started getting into trouble in elementary school. [Exhibit 6 - Maysonet Deposition pgs. 32; 46-47] He returned to Chicago and attended Junior High School where he took his classes mostly in Spanish, but he had two English classes. [*Id.* at 37-38] Maysonet eventually dropped out of high school so he could start making money, including by selling drugs. [*Id.* at 39: 41-44]

7.      Maysonet became a member of the Latin King street gang even before he entered high school. [*Id.* at 57] He was a member of the Latin Kings set at Kimball and Wabansia. [*Id.* at 61]

8.     Maysonet became familiar with Guevara from the neighborhood when he was kid. He had his first encounter with Guevara after he dropped out of high school when Guevara and Joe Miedzianowski, both gang crimes officers, raided his family home at 1530 N. Kedzie. [*Id.* at 134-137] No drugs were recovered from the raid, but the officers found some baggies and a scale. [*Id.* at 141] Guevara, speaking in Spanish, told Maysonet that he "knew what was going on in there" and "there was a small price to pay if he [Maysonet] did not want to get himself in trouble." [*Id.* at 141-142; 145]

9.     Guevara invoked his Fifth Amendment rights when asked whether he raided Maysonet's home with Joe Miedzianowski and intimated that Maysonet could avoid police interference for a price. [Exhibit 7 - Guevara's Deposition 150-151]

| Page 150 | Page 151 |
|---|---|
| 1   Q. (BY MS. BONJEAN) And in the summer of 1988, you<br>2 and Joseph Miedzianowski raided Jose Maysonet's home; isn't<br>3 that right?<br>4        MR. LEINENWEBER: Objection to form and<br>5 foundation.<br>6   A. Take the Fifth.<br>7   Q. (BY MS. BONJEAN) You were aware that Jose Maysonet<br>8 was associated with the Latin Kings street gang and had been<br>9 selling drugs; isn't that right?<br>10   A. Take the Fifth.<br>11   Q. And when you see someone selling drugs, your goal<br>12 isn't to necessarily try to arrest them so that they'll stop<br>13 selling drugs, right?<br>14        MR. LEINENWEBER: Objection to form,<br>15 foundation, argumentative.<br>16   A. Take the Fifth.<br>17   Q. (BY MS. BONJEAN) Your goal was to profit off of<br>18 them. That was your motivation, right?<br>19        MR. LEINENWEBER: Objection to form,<br>20 foundation, compound. Also argumentative.<br>21   A. Take the Fifth.<br>22   Q. (BY MS. BONJEAN) In fact, you -- you -- you didn't<br>23 make a lot of drug arrests, did you?<br>24        MR. LEINENWEBER: Objection to form and<br>25 foundation. | 1   A. Take the Fifth.<br>2   Q. (BY MS. BONJEAN) So you raided Mr. Maysonet's home<br>3 with Joseph Miedzianowski sometime in spring, summer of<br>4 1988; isn't that right?<br>5   A. Take the Fifth.<br>6   Q. And you searched his home looking for guns, drugs,<br>7 that type of thing, but you didn't find any, correct?<br>8        MR. LEINENWEBER: Objection to form, foundation,<br>9 foundation, compound question.<br>10   A. Take the Fifth.<br>11   Q. (BY MS. BONJEAN) And isn't it true that you told<br>12 him that, "I know what you're up to. And if you want to<br>13 continue selling drugs in this neighborhood, you got to pay<br>14 to do it," right?<br>15        MR. LEINENWEBER: Objection to form and<br>16 foundation.<br>17   A. Take the Fifth.<br>18   Q. (BY MS. BONJEAN) Now, I'm sure you used different<br>19 language because you were speaking in Spanish, right?<br>20        MR. LEINENWEBER: Objection to form and<br>21 foundation.<br>22   A. Take the Fifth.<br>23   Q. (BY MS. BONJEAN) I'm sure you used different words<br>24 to convey that sentiment, correct?<br>25        MR. LEINENWEBER: Same objections. |

10.     Soon after the raid, Maysonet saw Guevara and Miedzianowski in a Cuban restaurant owned by "Yuma" or "Juma" who was involved in drug trafficking activities [Exhibit 6 at pgs. 152-153] [Exhibit 8 - Ramirez Deposition at pg. 50-53]

11.     "Yuma's" real name is Eduardo Ramirez. [*Id.* at 13] In 1989, Ramirez was 30 years old and owned a bar on North and Milwaukee avenues in Humboldt Park. [*Id.* at 48; 166-167] Maysonet was in his early 20s when he became acquainted with Ramirez. [Exhibit 28 - Investigative File at RFC-Maysonet 47]

12.     Maysonet met Miedzianowski and Guevara at in Yuma's establishment where they generally discussed entering into a financial relationship involving Maysonet paying Guevara protection money to engage in drug selling activities. [Exhibit 6 at pgs. 158-160; Exhibit 8 at Vol. II 58-59; 64-65] They didn't discuss specifics at Yuma's restaurant about the deal, but Guevara told Maysonet they would work out the price later. [Exhibit 6 at 160]

13.     Maysonet and Ramirez had a conversation later after the officers left and Maysonet told Ramirez about his financial relationship with Guevara. [Exhibit 8 at Vol I at 180; 191-192; Vol. II 67] Ramirez told Maysonet to be careful "because these were officers who shake down businesses, rob people, sell drugs to people." [*Id.* at Vol. I at 169; Vol. II at 68-70]

14.     A few days later, Maysonet and his close friend Santiago Sanchez were driving in Humboldt Park when Guevara and Miedzianowski pulled them over. [Exhibit 6 at 164-168] Maysonet again spoke to Guevara about the protection payments; Maysonet began paying Guevara a weekly sum of $2000 to keep the police out of his drug dealing business. [*Id.* at 168; 170; 173-174]

15.     Guevara invoked his Fifth Amendment right against self-incrimination when asked whether he and Miedzianowski met with Maysonet at Yuma's Cuban restaurant. [Exhibit 7

at 152-153] Guevara was asked whether he entered into an agreement with Maysonet at the restaurant where Guevara would provide him with police protective in exchange for money so that Maysonet could engage in drug dealing free of police interference. [*Id.* at 153-158] Guevara pled the Fifth when asked questions about whether Maysonet began paying him protection money. [*Id.* at 159]



21  A. Take the Fifth.
22  Q. (BY MS. BONJEAN) And that was you and Joseph
23  Miedzianowski in the kitchen of this Cuban restaurant on
24  North Avenue either in late 1988, maybe very early 1989.
25  Sound right?

Page 154

1       MR. LEINENWEBER: Objection to form and
2  foundation.
3       A. Take the Fifth.
4       Q. (BY MS. BONJEAN) And isn't it true that you told
5  Jose in Spanish that you'd be in contact with him about how
6  he could pay you in order to avoid police interference in
7  his drug dealing?
8       MR. LEINENWEBER: Objection to form,
9  foundation, compound, and argumentative.
10      A. Take the Fifth.
11      Q. (BY MS. BONJEAN) And you later had a conversation
12  with Jose Maysonet about your expectation of being paid
13  money if he was going to sell narcotics in the area,
14  correct?
15      MR. LEINENWEBER: Same objections.
16      A. Take the Fifth.
17      Q. (BY MS. BONJEAN) And isn't it true that Jose then
18  started paying you money from that day forward?
19      MR. LEINENWEBER: Same objections.
20      A. Take the Fifth.
21      Q. (BY MS. BONJEAN) And he paid you what? What,
22  roughly about a thousand dollars a week so that he could
23  continue to engage in drug sales and you would make sure
24  that no police officers arrested him, right?
25      MR. LEINENWEBER: Same objections.

Page 159

1       MR. LEINENWEBER: Objection to form,
2  foundation, compound question. Also argumentative.
3       A. Take the Fifth.
4       Q. (BY MS. BONJEAN) And when you spoke to
5  Mr. Maysonet, you did so in the Spanish language, correct?
6       A. Take the Fifth.
7       Q. Now, Mr. Maysonet paid you this protection money
8  over the course of about a year. Is that fair to say?
9       MR. LEINENWEBER: Objection to form,
10  foundation.
11      A. Take the Fifth.
12      Q. (BY MS. BONJEAN) But eventually you and
13  Mr. Maysonet had a bit of an argument related to one of his
14  friends, Santiago Sanchez, correct?
15      MR. LEINENWEBER: Objection to form,
16  foundation.
17      A. Take the Fifth.
18      Q. (BY MS. BONJEAN) Santiago Sanchez went by the
19  nickname Macho, right?
20      MR. LEINENWEBER: Objection to form and
21  foundation.
22      A. Take the Fifth.
23      Q. (BY MS. BONJEAN) And he was one of the guys that
24  worked with Mr. Maysonet in selling drugs in the area where
25  they sold drugs, which was over on -- is it Pierce -- Pierce

16.    Maysonet did not interact directly with Miedzianowski; Maysonet was mostly a Spanish speaker and Miedzianowski did not speak Spanish. In 1997, the Chicago Police Department initiated a confidential investigation into Miedzianowski related to criminal conduct and corruption. [Exhibit 9 - James Doody Deposition at pg. 17-18] Shortly thereafter, the federal government started investigating Miedzianowski with the assistance of the Internal Affairs

Division ("IAD") of the Chicago Police Department. [*Id.* at 20-23] IAD Sergeant James Doody was deputized to serve as a federal agent in connection with the federal investigation into Miedzianowski. [*Id.* at 18] Miedzianowski was subsequently indicted and convicted of, *inter alia,* racketeering, conspiracy to distribute controlled substance, and distribution of cocaine. [Exhibit 25 - Miedzianowksi Judgment of Conviction] Miedzianowski was sentenced to a term of natural life imprisonment. [*Id.*]

III.    **GUEVARA AND MAYSONET HAVE A FALLING OUT.**

17.    Sometime prior to Maysonet's arrest, Guevara and Maysonet had a heated argument when Guevara arrested and charged his friend Santiago Sanchez for an attempted murder. [Exhibit 6 at 174-175; 177-178]

18.    Guevara invoked his Fifth Amendment right against self-incrimination when asked whether he had an argument with Maysonet after Guevara arrested and charged Santiago Sanchez for a shooting. [Exhibit 7 at pgs. 159-160]

19.    Santiago committed suicide on May 21, 1990, before his case went to trial. [Exhibit 6 at pgs. 181; 184] [Exhibit 10 - Sanchez Funeral Record and Palm Card] Maysonet attended Sanchez's visitation on May 23 and 24, 1990, and his funeral and burial on the morning of May 25, 1990 [Exhibit 6 at 186-187]

duplicate with your changes has been created.



20.     Maysonet identified a number of photographs of himself at Sanchez's funeral on the morning of May 25, 1990. [Exhibit 6 at pgs. 191-200] [Exhibit 11 - Photographs of Maysonet and his other criminal co-defendants at Sanchez's funeral]

## IV.     THE MURDER OF THE WILEY BROTHERS

21.     At roughly 1:00 a.m. on May 25, 1990 (the morning of Sanchez's funeral), Torrence and Kevin Wiley were gunned down on at 3428 West North Avenue for no obvious reason. [Exhibit 3 - Edward Mingey Deposition at pgs. 159; 263] The Africa-American men were in their mid to late 20s and were not from the Humboldt Park neighborhood. [*Id.* at 150; 152]

22.     There were no eyewitnesses to the crime. No motive was immediately discerned. [*Id.* at 267] [Exhibit 28 - Investigative File at RFC-Maysonet 60].

23.     Carmen Macias lived at 3419 West North Avenue [Exhibit 12 - Macias Deposition at pgs. 9-10] Her sister Alma Prececo was lived elsewhere but was spending the night. [*Id.* at 11] The neighborhood was comprised mostly of Hispanic people. [*Id.* at 14-15]

24.     Macias was sleeping with her husband and was awakened by noise of what sounded like people fighting and probably drunk. [*Id.* at 30-31] She could not make out what was being said but she heard one of them saying "Lulu." [*Id.* at 18; 31]

25.     During her deposition, Macias identified a police report that summarized a statement she made to investigators in a report prepared on May 25, 1990, the day of the shooting: [*Id.* at 29-31]

> She was awakened around 2400 Hrs., 24May90 by the sound of two black males having an argument. One had a very calm voice, the second had a loud abrasive voice and sounded as if he may have been drunk. Both subjects referred a number of time to someone called Lulu Dog, and also had some disagreement about the bus. [*Id* - Exhibit 1 to Macias Deposition [Exhibit 12 Macias Dep. Exhibit 1 (RFC-Maysonet 56)]

26.     Kevin and Torrence Wiley's sister had a sister named Johanda Wiley whose nickname was "Lulu." [Exhibit 13 - Affidavit of Richard Wiley Wortham]

27.     Kevin Wiley's Blood Alcohol Content ("BAC") near the time of death was .332. Torrence Wiley's BAC near the time of death was .186. [Exhibit 14 - Toxicology Reports of the Wiley brothers (RFC-Maysonet 25; 29)] Both victims' level of intoxication was highly significant and would have included muscular coordination impairment, exaggerated emotions, mental confusion, and in the case of Kevin Wiley, an inability to walk or stand and impaired consciousness. [Exhibit 15 - Henson Expert Report]

## V.    GUEVARA ARRESTS TWO OTHER LATIN KINGS WHO ARE PLACED IN LINE-UPS (AND ALLEGEDLY IDENTIFIED)

28.    Francisco Veras and Efrain Cruz were arrested shortly after the Wiley brothers' murders by Guevara and his partner (Defendant Halvorsen). [Exhibit 16 - Francisco Veras Deposition at pg. 45] [Exhibit 17 - Efrain Cruz Affidavit (JGS_Maysonet 01719)] [Exhibit 26 - Guevara Trial Testimony Maysonet 966-967] Guevara took them to Area Five detective division at Grand and Central and placed them in separate interview rooms. [*Id.* at 51] Veras and Cruz were placed in a line-up and were each asked to step forward. When Veras stepped forward he heard a knocking sound which indicated to him that he was identified and when Cruz stepped forward, he heard a knocking sound which indicated Cruz was identified. [*Id.* at 54-56]

29.    After the line-up, Veras was interrogated for several hours during which he was accused of committing the Wiley brothers' murder by different detectives. Eventually Guevara came into the interrogation room and tried to persuade Veras to implicate Cruz as the shooter and name himself as a look-out. Guevara threatened Veras that if he did not indicate Cruz as the shooter, Guevara would put Veras down as the shooter. [*Id.* at 61-62] Guevara also told Veras that he was identified as a perpetrator in the line-up and that Cruz was going to implicate him [Veras]. [*Id.* at 62-63]

30.    Veras refused to cooperate with Guevara despite his threats. [*Id.* at 65] As the interrogation continued, Veras figured out that when the Wiley brothers were murdered, Veras and Cruz were in custody at the 14th District. [*Id.* at 66-67] Veras and Cruz were released from Area Five custody. [*Id.* at 71-72; 74]

31.    Cruz provided a similar account as Veras, explaining that he heard about two Black men being shot and killed on the night of May 24, 1990. He learned of the shooting when

he was in custody at the 14 District with Veras. [Exhibit 17] A few weeks later he was arrested by Guevara and his partner and brought to Area Five. [*Id.*]

32.     Guevara showed Cruz photos of two Black men who were deceased and accused Cruz of shooting the men. Guevara told Cruz he was going to charge him, Veras, and two other Latin Kings with the murders. [*Id.*] Cruz was placed in a line-up and Guevara told him he was identified. [*Id.*] Guevara attempted to get Cruz to sign a statement and promised to help him if he signed the statement. [*Id.*]

33.      When Guevara figured out that Cruz was in custody at the time of the murders, he was released with Veras. [Exhibit 17]

34.     Guevera invoked his Fifth Amendment against self-incrimination when asked a series of questions about his arrest, interrogation, and line-up procedures conducted with Veras and Cruz in connection with the Wiley brothers' murders. [Exhibit 7 at pgs. 191-203] Guevara continued to invoke the Fifth when question about whether he placed the men in a line-up and told them they were identified. [*Id.*]

35.     Guevara invoked the Fifth when asked whether he prepared any reports in connection with his interview and line-up procedures conducted with Veras and Cruz. [*Id.* at 195-197] Guevara invoked the Fifth when asked whether he prepared a report about the investigative activity and line-up and concealed them in a different file or whether he simply failed to prepare a report memorializing his investigative activities in connection with Veras and Cruz. [Exhibit 7 at pgs. 196-198] When asked, "whatever your methodology was, your goal was to conceal from the Cook County State's Attorney and/or Mr. Maysonet's attorneys that you had interrogated Efrain Cruz, right?" Guevara pled the Fifth. (*Id.* at 197) He invoked the Fifth to whether he concealed the same information as to Veras. (*Id.* at 198) Guevara pled the Fifth when asked "You

didn't tell the Cook County State's Attorney either orally or via a report that Cruz and Veras had been identified as the offenders in the Wiley brothers' murder, right?" (*Id.* at 199).

36.     Defendant Halvorsen invoked his Fifth Amendment right against self-incrimination when asked in a deposition in another matter whether he and Guevara tried to frame Efrain Cruz and Veras for the murders of the Wiley brothers but had to let them go because they were in custody at the time of the murders. [Exhibit 27 - Halvorsen Deposition in *Montanez v. Guevara,* 17 CV 4560 at pg. 53]

37.     No document exists in any file anywhere that reflects that Veras and Cruz were arrested, detained, or interviewed in connection with the Wiley brothers' murders. No document or report exists that reflects that Veras and Cruz were placed in a line-up in connection with the Wiley brothers' murders or identified as Guevara claimed. [Exhibit 28 - Investigative File (RFC-Maysonet 1-66; Exhibit 29 - Permanent Retention File (RFC Maysonet 67-102)] The CCSAO does not contain any report reflecting Veras and Cruz's arrest, interrogation, and line-up participation. [CCSAO 1-2883]

38.     Assistant Cook County State's Attorney Mandeltort (now Judge Mandeltort) had no recollection of ever learning from any detectives that Veras and Cruz were arrested, interrogated, and placed in a line-up in connection with the Wiley brothers' murders. [Exhibit 30 - Mandeltort Deposition at pg. 157-159] Mandeltort testified that if she had received such information, she would have shared it with defense counsel; she would not have suppressed such information. [*Id.* at 158-59]

## VI.     <u>MAYSONET'S ARREST</u>

39.     Maysonet was arrested by Defendant Paulnitsky on July 15, 1990, in connection with an unrelated shooting. [Exhibit 18 - Paulnitsky Deposition at pg. 196] He was charged with

multiple counts of attempted murder. Maysonet stopped paying Guevara protection money. [Exhibit 6 at pg. 174-175]

40.     Maysonet made bond on the attempted murder case on August 16, 1990. [Exhibit 19 - Mayonset Suppression Hearing Testimony at Maysonet167] On August 22, 1990, Maysonet appeared in Room 101 at 26th street for assignment of his attempted murder case to Judge Loretta Morgan in room 302. [Exhibit 6 at pgs. 258-262]

41.     Prior to Maysonet appearing before Judge Morgan for arraignment on the morning of August 22, 1990, Maysonet encountered Paulnitsky at 26th and California. [Exhibit 18 at 238]

42.     Paulnitsky insists that Maysonet agreed to leave the courthouse to go to Area Five for questioning but conceded that he would not have let Maysonet leave if he tried to. [Exhibit 18 at Maysonet144] Paulnitsky was shocked to see Maysonet out of custody after having arrested him. [*Id.* at Maysonet150] No arrest warrant was obtained for Maysonet. [*Id.* at Maysonet156]

43.     Paulnitsky arranged for Maysonet to be transported to Area Five for questioning in connection with the Wiley Brothers murders. [Exhibit 18 at pg. 238; 253-254] Paulnitsky escorted Maysonet to the third floor of the administrative building at 26th and California and arranged for a police car or squadrol to pick up Maysonet and bring him to Area Five. [*Id.* at 255] Paulnitsky met Maysonet at Area Five and placed him in an interview room. [*Id.* at 265-266]

## VII.    MAYSONET'S INTERROGATION BY REYNALDO GUEVARA

44.     Maysonet was placed in an interview room where he waited for several hours. [Exhibit 6 at 269] He was brought down to the lock up for a while. [*Id.* at 277] Guevara came and got Maysonet out of the lock-up and returned him to the interview room. [*Id.* at 278]

45.     Guevara asked Maysonet if he knew why Maysonet was there and Maysonet said "not really." [*Id.*] Guevara left the interview room and returned. He told Maysonet he was there because of the double murder and began telling Guevara he wanted Maysonet to tell him what he knew about the murder. Maysonet told him he had no knowledge about that shooting. [*Id.* at 278-279] Maysonet told Guevara he had "no clue" about why the men were shot. [*Id.*]

46.     Guevara admitted he went in and out of the interview room on the evening of August 22, 1990, and had anywhere from between 5 to 10 conversations with Maysonet. [Exhibit 19 at Maysonet 277; 281]

47.     Guevara returned to the interview room with a flashlight, yellow phone book, and black gloves. Guevara placed the items on the table and asked Maysonet if he was "ready to talk." [Exhibit 6 at 279] Maysonet told him he had nothing to say and wanted his lawyer. [*Id.* at 279] Guevara left out against telling Maysonet he was "going to talk one way or the other." When Guevara returned he began slapping Maysonet and hit him in the head with the phonebook while Maysonet told him that he had no information about the shooting that resulted in the deaths of the Wiley Brothers. [*Id.* at 279-280] Maysonet repeatedly asked for his lawyer. [*Id.* at 280]

48.     Guevara slapped Maysonet once and then began to hit him with the phonebook. Then Guevara grabbed the flashlight, put the phone book on his head and began to strike Maysonet on the head through the phonebook. [*Id.* at 283-284]

49.     Guevara hit him many times, in the head, on his ribs, on his back and then in his groin - all while Maysonet was cuffed to the wall. [*Id.* at 284-286] Guevara struck Maysonet many times. [*Id.* at 287-288] Maysonet explained that Guevara did not use the phonebook when he struck Maysonet in his groin. [*Id.* at 288] Guevara left out of the room and returned a third time and beat him again in a similar manner. [*Id.* at 288-289]

50.     Eventually Maysonet told Guevara that he would cooperate and say what Guevara wanted him to say. [*Id.* at 295-296] Guevara told Maysonet he wanted him to implicate three other Latin Kings, Lluvia, Tino and Fro. [*Id.* at 304]

51.     A female state's attorney (ASA Borowitz) entered the interview room with Defendant Montilla who was serving as an interpreter. [Exhibit 20 - Montilla Deposition at pgs. 334-335] Montilla was a property crimes detective who was not given any investigate role in the case but was asked to interpret for Maysonet and English-speaking detectives. [*Id.* at 104; 188-189; 198]

52.     The female state's attorney asked Maysonet whether he knew why he was arrested. Maysonet told her he had nothing to do with the shooting and that Guevara was beating her. [Exhibit 6 at 305-306] The female felony review assistant urged Maysonet to cooperate with the police and then left. [*Id.* at 306] She did not return. ASA Borowitz's felony review notes do not reflect an interview with Maysonet. [Exhibit 21 - Felony Review Notes of ASA Borowitz] She had no recollection of speaking to Maysonet. [Exhibit 22 - Deposition of Borowitz at 68-69; 85-86; 89-91]

53.     Guevara returned the interview room and continued beating Maysonet until Maysonet eventually decided to cooperate with Guevara. [Exhibit 6 at 307-309] A second felony review assistant ASA DiFranco arrived at Area Five the morning of August 23, 1990, after his shift started at 6:00 a.m. [Exhibit 23 - DiFranco Deposition at 152] It was his first day on the job. [*Id.* at 151] ASA DiFranco arranged for a court reporter to come to Area Five to take Maysonet's statement. [*Id.* at 205-206]

54.     Maysonet was moved to a conference room where he provided a court reported statement in the presence of ASA DiFranco, a court reporter, and Defendant Montilla. [*Id.* at 208;

210] ASA DiFranco had no idea what transpired between Mayonet and Guevara prior to his arrival [*Id.* at 215-216] Eventually Maysonet provided a court-reported statement implicating himself and others in the Wiley brothers' shooting. The court-reported statement was taken at 9:28 a.m. on August 23, 1990. [Exhibit 31 - Maysonet Court-Reported Statement]

55.     At Plaintiff's criminal trial, Guevara admitted that he was the only person who interrogated Plaintiff prior to him giving a court-reported statement. [Exhibit 26 - Maysonet 936; 962] None of the Defendant Officers or Felony Review assistants were present during Guevara's interrogation of Maysonet. [Exhibit 23 at 215-216] [Exhibit 20 at 227; 331; 339] [Exhibit 18 at 325] [Exhibit 3 at 368-69] The court reporter who transcribed Plaintiff's statement was employed by the Cook County State's Attorney's office. He had no independent recollection of the case and conceded that he had knowledge about occurred during Plaintiff's interrogation prior to his arrival. He agreed that he would have no way of knowing if Plaintiff was beaten about his body. [Exhibit 33 - Jospeh Szybist Deposition at pgs. 66-68]

56.     Guevara pled the Fifth Amendment right against self-incrimination when asked whether he used physical and psychological abuse against Maysonet; whether he beat Maysonet about his body with a flashlight with a phone book; whether he struck him in this genitalia with a flashlight; [Exhibit 7 at 244-245] [Exhibit 6] Guevara pled the Fifth amendment when asked whether he threatened Mr. Maysonet with physical violence if he did not confess to the murders and whether he falsely testified at Maysonet's that he did not abuse Maysonet by striking him about his body with a flashlight. [*Id.* at 279; 304]

57.     Defendant Halvorsen invoked his Fifth Amendment right against self-incrimination when asked whether he possessed knowledge that Guevara physical abused

Plaintiff over the course of 13 hours to extract a false confession from him. . [Exhibit 27 - Halvorsen Deposition in *Montanez v. Guevara*, 17 CV 4560 at pg. 388-390]

58.     The following individuals have alleged that Guevara physically coerced inculpatory statements from them: (1) Victor Vera [Exhibit 34 - Vera Affidavit (JGS-Maysonet 1866-1869)]; (2) David Rivera [Exhibit 35 - Rivera Affidavit (JGS-Maysonet 1883-1884]; (3) Daniel Rodriguez [Exhibit 36 - Rodriguez Affidavit (JGS-Maysonet 1874-1878)]; (4) Elizar Cruzado [Exhibit 37 - Cruzado testimony (Maysonet 2414-2436)]; (5) Adolfo Frias [Exhibit 38 - Frias Testimony (Maysonet 3237-3293)] (6) Arturo Reyes [Exhibit 39 - Reyes Testimony (Maysonet 3349-3436)]; (7) Gabriel Solache [Exhibit 40 - Solache Testimony (Maysonet 3438-3531).

59.     Guevara has invoked his Fifth Amendment privilege against self-incrimination in response to whether he physically coerced these men into making inculpatory statements. [Exhibit 6 at pgs. 324-340]

## VIII.    MAYSONET'S TRIAL

60.     Plaintiff unsuccessfully moved to suppress his statements during a pretrial suppression hearing. At Plaintiff's trial, the prosecution presented testimony from Guevara who claimed that Maysonet confessed to him orally in Spanish before providing a court-reported confession. [Exhibit 26 - Guevara Trial Testimony at Maysonet 936-941; 957] The prosecution then admitted Maysonet's court reported confession into evidence in which he admitted his involvement and knowledge of the Wiley brothers' murders. [Exhibit 24 - DiFranco Trial Testimony at Maysonet 866; 873-885]

61.     The statement reflects that Maysonet stated that Latin Kings named Lluvio, Tino and Fro came to his house to get a pistol because "they got the two guys on Drake and North

Avenue waiting for dope." According to the statement Maysonet stated that he drove with the three other Latin Kings to Drake and North, parked in the alley. Lluvia and the other guys got out of the car and walked toward the guys and were talking for five minutes and then Maysonet heard five or six shots. He saw Lluvia pointing the gun and the two people were laying down. They all then drove away. According to the statement, Maysonet stated that he was later threatened by Lluvia, Fro, Tino, Cisco (Francisco Veras) and King (Efrain Cruz) to keep his mouth shut and they put a gun to his head. [*Id.* at Maysonet 873-885]

62.     The only State evidence presented against Maysonet at his trial was statement evidence presented by the Defendants in this case (detectives and ASA DiFranco). [Exhibit 32 – Trial Transcript at Maysonet1146] No occurrence or eyewitnesses testified. No physical evidence was presented that connected Maysonet to the crime. The case turned entirely on Maysonet's court-reported statement. The trial court acquitted Maysonet's criminal co-defendant Christopher Goosens at a simultaneously held bench trial.

## PART II

### *MONELL* THEORY BASED ON CITY'S POLICE OF EVIDENCE SUPPRESSION

### I.     NOTICE OF EVIDENCE SUPPRESSION

63.     In the early 1980s, City of Chicago final policymakers were made aware that police officers were engaged in an unconstitutional pattern of suppressing investigative materials through two cases: *Palmer v. City of Chicago* and *Jones v. City of Chicago.* In April 1982, Chicago officials, including Chicago Police Department Superintendent Richard Brzeczek, became aware of the circumstances of a 1981 homicide investigation that resulted in charges being brought against George Jones, and the unconstitutional evidence suppression practice that caused his wrongful prosecution. [Exhibit 41 (*Palmer v. City of Chicago*, 562 F. Supp. 1067,

1073 (N.D. Ill. 1983) (J. Shadur) (hereinafter "Shadur Order") (Brzeczek testified at hearing); Exhibit 42 (Hickey Dep. in *Rivera*) at 207:15-209:8, 83:21-84:4 (Brzeczek testified at injunction hearing); Exhibit 43 (2016 Hickey *Fields* Trial Testimony) at 11:9-23, 12:3-7 ("It is true that the City got put on notice that there was a problem with the way it was handling the topics I mentioned a minute ago, correct? A. Correct."); 19:13-22; Exhibit 44 (Winstrom Dep. in *Reyes*), at 159:5-23.

64.     In *Jones*, a detective named Frank Laverty developed strong evidence that Jones could not have committed the murder. But, as stated by the Seventh Circuit, this evidence was placed "not in the police department's regular files but in its 'street files.' These were files that the police did not turn over to the state's attorney's office as they did with their regular investigative files." *Jones v. City of Chicago*, 856 F.2d 985, 995-96 (7th Cir. 1988). In the spring of 1982, Detective Laverty learned that Jones was on trial for the murder; he went to his Commander to tell him that an innocent person was being prosecuted, but his Commander took no action; and Laverty then informed Jones's criminal defense attorney about the information in the undisclosed file. The court declared a mistrial, and the State's Attorney dropped all charges against Jones. Jones then filed a civil lawsuit stemming from the withholding of important investigative information in an undisclosed file, resulting in his wrongful prosecution. His case resulted in a jury verdict finding a custom of maintaining documents with important investigative material that were withheld from the State's Attorney's Office and criminal defendants. *Jones*, 856 F.2d at 988; *see also* Exhibit 42 (Hickey Dep. in *Rivera*) at 61:3-23, 63:6-9, 67:9-68:3.

65.     In 1988, in *Jones v. City of Chicago*, 856 F. 2d 985 (7th Cir. 1988), the Seventh Circuit affirmed the jury verdict in favor of George Jones, including the finding that the City of

Chicago had maintained an unconstitutional practice of evidence suppression, permitting detectives to keep important investigative information undisclosed to criminal defendants. The appellate decision included the following: (a) the case disclosed "frightening abuse of power by members of the Chicago police force and unlawful conduct by the City itself"; (b) Laverty was charged with a disciplinary infraction, "transferred out of the detective division, ostracized by his fellow officers, and assigned to a series of menial tasks culminating in the monitoring of police recruits giving urine samples" while "none of the defendants has been disciplined for misconduct"; (c) there was "enough evidence to enable the jury to infer that [a Chicago Police Department Commander, Lieutenant and Sergeant] had known . . . [and] had approved every false step"; and (d) there was sufficient evidence against the City that the practice of evidence suppression existed, caused Jones injuries, and was "consciously approved at the highest policy-making level." 856 F. 2d 985, at 988, 991, 993, 996.

66.     In April 1982, shortly after the Laverty revelations about the non-disclosure of important investigative materials, a class action lawsuit called *Palmer v. City of Chicago* was filed to challenge the use of informal files to suppress investigative materials, and, days later, the Honorable Judge McMillen issued a temporary restraining order requiring the CPD to preserve all investigative materials not included in formal police files. Exhibit 41 (Shadur Order) at 2. By September 1982, the action was transferred to the docket of the Honorable Milton Shadur, who thereafter granted a preliminary injunction on the matter. *Id.* at 1; Exhibit 42 (Hickey Dep. in *Rivera*) at 69:22-70:12; 79:21-80:6.

67.     James Hickey authored the policies regarding the file disclosure policies for homicide investigations for the City of Chicago in 1983. Exhibit 45 (Hickey Dep. in *Fields*) at

50:12-16 ("I was the primary drafter of this order [83-1] on behalf of the chief of detectives.");
Exhibit 42 (Hickey Dep. in *Rivera*) at 116:22-23 ("When 83-2 was generated you wrote it? A. I
drafted it, yes.").

68.     Hickey was designated by the City of Chicago under Rule 30(b)(6) in subsequent
litigation, including *Fields v. Chicago*, and *Rivera v. Chicago*. *See* Exhibit 45 (Hickey Dep. in
*Fields*); Exhibit 42 (Hickey Dep. in *Rivera*, 5/6/14) at 47:21-48:18.

69.     In his capacity as the City's Rule 30(b)(6) witness, Hickey testified that (a) in
light of *Palmer* and *Jones*, and as early as 1982, City policymakers knew they had a problem
with the practice of evidence suppression and non-disclosure; (b) that he reviewed file disclosure
practices across the department prior to 1983 and determined that the problem as citywide; (c)
that the problem stemmed from a citywide practice of using a "decentralized" file system for
homicide investigations, whereby investigative steps were being documented in informal notes
and internal to-from memoranda between investigators, all of which were treated as the personal
property of the investigators and were stored in parallel files; and (d) entire branches of an
investigation, including investigation into alternate suspects, were not getting documented in
official reports, and were instead sitting in memos and notes that were not disclosed and
eventually destroyed. Exhibit 46 (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) at
2043:22-2044:11, 2044-2045:7; 2048:2- 2052:9; Exhibit 42 (Hickey Dep. in *Rivera*) at 222:11-
22, 228:9-229:3.

70.     As a result of the developments in *Jones* and *Palmer*, Hickey conducted an
internal review of Chicago Police Department practices related to evidence suppression, the
results of which he shared with senior Department officials including Chief of Detectives,

William Hanhardt. Exhibit 42 (Hickey Dep. in *Rivera*) at 200-201, 223:5-225:13; Exhibit 46 (2014 Hickey *Fields* Trial Testimony) at 2049-2051.

71.     Hickey found that there was a citywide practice of using a "decentralized" file system for homicide investigations, whereby investigative steps were being documented in informal notes and internal to-from memoranda between investigators, all of which were treated as the personal property of the investigators and were stored in parallel files that were not subject to disclosure. The information in the memos and notes was not making it into official reports. In addition, official reports often were not written right away, and instead were written only once they had settled on a suspect, at which point investigators might consider alternate suspects and other evidence to be non-pertinent. As a result, entire branches of an investigation, including investigation into alternate suspects, were not getting documented in official reports, and were instead sitting in memos and notes that were not disclosed and eventually destroyed once an investigation was complete. Exhibit 42 (Hickey Dep. in *Rivera*) at 58:10-13, 72:3-15, 95:14-96:20, 204:3-21, 215:10-16:15, 219:9-221:6; Exhibit 46 (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*) at 2043:22-25; 2044-45, 2050-51, 2051:2-5; Exhibit 47 (Hickey Dep. in *Kluppelberg* (pt. 1), at 85-89, 94:14-20 ("Q. Generally speaking, what happened to a detective's notes prior to 1983? A. The detective kept the notes until such time as they prepared the supplementary report, at which time they destroyed their notes, threw them in the garbage can or whatever, including myself.").

72.     City officials were aware of resistance within the Police Department to changing the practice of keeping parallel, "personal" files not available to the criminal justice system, and

of the risk of wrongful prosecutions and convictions if the policy of evidence suppression was not solved.

73. Judge Shadur's April 1982 Order was amended in September 1982 when it was learned that detectives were circumventing the court's order, and Detective Division Notice 82-2 was issued by the Superintendent to preserve all notes. In addition, on March 31, 1983, Judge Shadur issued an order in which he found (a) CPD personnel were applying Detective Division Notice 82-2 "in an improperly restrictive and grudging manner under which detectives could consider their investigative writings as their personal property (and thus not under Detective Division control)"; (b) two Area Commanders interpreted the new directive so that detectives were still free to destroy their own investigative writings under the guise of "personal property"; (c) official reports were sometimes "prepared from the perspective of what fits the preparer's concept of the crime," thereby omitting "highly relevant and sometimes exculpatory" information that "the preparer does not deem 'pertinent.'" Exhibit 41 (Shadur Order) at 5-6, 13; Exhibit 42 (Hickey Dep. in *Rivera*) at 72:9-73:4, 76:9-24, 203:19-204:21, 214:18-24.

74. City officials were aware at the time that the practice of evidence suppression and non-disclosure documented above resulted in wrongful prosecutions and convictions. Exhibit 42 (Hickey Dep. in *Rivera*) at 102:2-23, 205:18-206:12; Exhibit 43 (Hickey 2016 *Fields* Trial Testimony) at 12:3-13:20; *Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983) (finding that the failure to retain documents with investigative information "creates a serious potential of deprivation of defendants' constitutional rights," and that "[s]uch deprivations have in fact occurred in the past.").)

## II. <u>POLICY OF WITHHOLDING EXCULPATORY EVIDENCE</u>

75.    In April 1982, after a Temporary Restraining Order was issued in the *Palmer* litigation, CPD issued a teletype to commanding officers informing them of the TRO, as well as Detective Division Notice 82-2.94. *See* Exhibit 48 (S.O. 82-2 and Memo) at 4; Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 201.

76.    CPD Rule 30(b)(6) designee Hickey explained that Notice 82-2 was "a quick and dirty document" designed to implement the TRO but was "not very workable." Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 221-22, 224-25.

77.    Notice 82-2 and the corresponding teletype did not require detectives to put notes or memos into a central repository, and it did not require detectives to preserve notes or memos that had not already been turned into a police file. Exhibit 48 (S.O. 82-2 and Memo) at 7; Exhibit 47 (Hickey Dep. in *Kluppelberg* ) at 212-13.

78.    Notice 82-2 lacked procedures to gather or inventory notes, memos, or other documents, and did not require that detectives put notes or memos into unit investigative files, or even whether they had to preserve such notes not in the file. Exhibit 48 (S.O. 82-2 and Memo); Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 161, 212-13; *see also* Exhibit 49 (Tiderington Report) at 42.

79.    Six months after Notice 82-2 went into effect, Commander Stibich testified that detectives continued to believe that their notes and memos were personal property, for personal use, and that they were not required to turn them into a department file, or even preserve them at all. Exhibit 41 (Shadur Order), at 12. Commander Stibich acknowledged that "[w]hat's pertinent to one [detective] might not be to another." *Id*. at 6-7.

80. Judge Shadur found that Notice 82-2 responded to the TRO in "an improperly restrictive and grudging manner, under which detectives could consider their investigative writings as their personal property (and thus not 'under Detective Division control') and therefore outside the preservation requirements of Notice 82-2." Exhibit 41(Shadur Order) at 12.

81. In January 1983, Special Order 83-1 replaced Detective Division Notice 82-2. It applied only to detectives assigned to Violent Crimes. Special Order 83-1 defined the term "Investigative File" and created something called an Investigative File Case Folder to secure documents relating to a criminal investigation. Special Order 83-1 also created an "Investigative File inventory sheet," to catalog all the documents placed in the Investigative File, that was to be forwarded to the Records Division when felony charges were approved. Special Order 83-1 also created General Progress Reports ("GPRs"). The GPR forms were to be used by detectives for taking handwritten notes or writing "to-from memos" to their colleagues. Exhibit 50 (S.O. 83-1); Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 170:7-9; Exhibit 42 (Hickey Dep. in *Rivera* ) at 227; Exhibit 49 (Tiderington Report) at 43.

82. Special Order 83-1 created a requirement for detectives to place handwritten GPRs and other investigative materials in the investigative file. It also required detectives to fill out CPD case report forms, such as supplementary reports, documenting relevant information previously recorded on a GPR or other miscellaneous documents. Exhibit 50 (S.O. 83-1); Exhibit 49 (Tiderington Report) at 42-43.

83. Hickey considered S.O. 83-1 a "major change in the way notes were considered within the police department," yet acknowledged there was never a survey or audit about how its implementation went. Exhibit 46 (April 10, 2014 Hickey Testimony, *Fields v. City of Chicago*)

at 2053:24-2054:1; Exhibit 45 (Hickey Dep. in *Fields*) at 43:1-4 ("Q. Was there anything done after the implementation of 83-1 to survey or to audit how the process was going, the new process? A. Not to my knowledge.").

84.     Judge Shadur found Special Order 83-1 to be deficient, including for the following reasons: (1) there was no obligation to create an investigative case file folder until someone was arrested and charges were approved, leaving the risk of selective retention/disclosure during the investigation; (2) it offered no guidance on what information a detective should deem "relevant" information to include in official reports, leaving discretion for detectives to withhold information on their subjective assessment of its relevance; (3) it failed to ensure that any detective receiving information related to an investigation not assumed to him will forward the information to the assigned detective, so that information is included in the investigative file folder; and (4) it omits any provision defining how the CPD responds to a subpoena or request to produce information related to a criminal proceeding. Exhibit 41 (Shadur Order) at 16-17; Exhibit 49 (Tiderington Report) at 43.

85.     Special Order 83-1 was replaced by Special Order 83-2 in May 1983. Exhibit 50, 54 (Special Orders 83-1, 83-2); Exhibit 42 (Hickey Dep. in *Rivera*) at 225, 227:7-229:6.

86.     Special Order 83-2 made a few changes: (1) to require detectives to create records reflecting all relevant information; (2) to require detectives to pass along information they receive about another crime to the detective investigating that other crime; (3) to transmit a copy of the investigative file inventory sheet to either the Office of Legal Affairs or State's Attorney's Office for its proper disclosure to criminal defendants; and (4) to create an Investigative File Control Card.. Exhibit 54 (S.O. 83-2); Exhibit 49 (Tiderington Report) at 44.

87.     S.O. 83-2 still: (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) applied only to detectives, and explicitly excluded from its directives all other officers involved in investigative major crimes; (3) provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant, (4) provided no guidance about how information should be communicated or documented among detectives; (5) provided no policy directive or procedure to ensure production of investigative files; (6) relied on inventory sheets instead of actual file disclosures; and (7) lacked an audit/oversight mechanism. Exhibit 54 (S.O. 83- 2); Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 236-38; Exhibit 49 (Tiderington Report) at 44. The order contained one instruction that only one thing from the investigative file needed to be disclosed: the inventory log. Exhibit 51 (*Rivera* Trial Tr. 6/18/18) at 2247-2248, Exhibit 52 (*Rivera* Trial Tr. 6/21/18) at 3229-3231

88.     Special Order 86-3 replaced S.O. 83-2 in May 1986. It was substantively identical to S.O. 83-2, except for the addition of an auditing provision. *Compare* Exhibit 54 (Special Order 83-2) *with*; Exhibit 53 (Special Order 86-3); Exhibit 42 (Hickey Dep. in *Rivera*) at 100:9-101:12, 227, 245-47, 249.

89.     The modifications in S.O. 86-3 eliminated the requirement that the inventory sheet be forwarded to defense attorneys when a criminal subpoena or discovery motion was received and eliminated the requirement that handwritten notes or other investigative materials be submitted "promptly (normally at the end of each tour of duty)." *Compare* Exhibit 54 (Special Order 83-2) at 4 *with* Exhibit 53 (Special Order 86-3); Exhibit 44 (Winstrom Dep) at 106-07; Exhibit 49 (Tiderington Report) at 45-46.

90.     S.O. 86-3 still (1) did not require a single repository for all investigative information maintained by a lead investigator; (2) permitted detectives to maintain handwritten notes as personal files for longer periods of time, by removing the requirement of "prompt" documentation; (3) still provided no guidance about what information a detective was required to include in a supplementary report beyond information deemed relevant; (4) and left defense attorneys with no mechanisms to determine whether their materials were complete without an inventory sheet. Exhibit 53 (S.O. 86-3); Exhibit 44 (Winstrom Dep. in *Reyes*) at 98-99; Exhibit 49 (Tiderington Report) at 45-47.

91.     In 1988, Standard Operating Procedures (SOP) were created to govern the work of detectives. Chapter 18 of the SOP, the relevant portion of the new SOPs dealing with the documentation and disclosure of investigative information, contains "no substantive changes of any kind" from S.O. 86-3. Exhibit 53; Exhibit 42 (Hickey Dep. in *Rivera*) at 249:19-251:5; Exhibit 44 (Winstrom Dep) at 125:5-126:7 ("Q. And would you agree with me that looking at the [SOP] policy here, it is basically the same policy as what is contained in [S.O.] 86-3? A. I agree."), 208-210.

III.    <u>**THE CITY'S ADMISSIONS REGARDING POLICY DEFICIENCIES**</u>

92.     Despite an auditing requirement added to Special Order 86-3, the City's designated representatives were unaware of a single instance of such auditing ever taking place, or of any document in existence indicating that someone had done the type of inspection required by S.O. 86-3. Exhibit 42 (Hickey Dep. in *Rivera*) at 178:4-13, 244-45, 249:11-17; Ex 44 (Winstrom Dep.) at 208-210, 120-121; Exhibit 43 (Hickey *Fields* Testimony) at 43:1-4.

93.     Detectives were not disciplined for failure to comply with the new Special Orders. Exhibit 42 (Hickey Dep. in *Rivera*) at 178:15-179:2, 187:6-10; Exhibit 45 (Hickey *Fields* Dep) at 10:12- 22.Hickey testified that he had no knowledge whether, after the implementation of S.O. 83-1, there was anything done to survey or audit the implementation of the policy. Exhibit 45 Hickey *Fields* Dep. at 43:1-4.

94.     Hickey admitted that he did not know if every detective followed S.O. 86-3. Exhibit 43 (Hickey *Fields* Testimony) at 37:13-20.

95.     Despite Judge Shadur's guidance regarding the deficiencies in the CPD policies, CPD never included a statement or directive in its policy to produce the entire contents of the investigative files, including the newly created General Progress Reports. Instead, the Special Orders contained only an instruction to forward a copy of the inventory sheet to the CPD's Record Division, without ever stating that the actual police reports in the files must be disclosed to prosecutors and criminal defendants. *See, e.g.*, Exhibit 53 (S.O. 86-3) (lacking any instruction to disclose entire investigative file and/or all supplementary reports and general progress reports to prosecutors and/or criminal defendants); Exhibit 50 (S.O. 83-1) (same); Exhibit 44 (Winstrom Dep.) at 106:7-14, 20-24 ("Q. Is there some document that -- is there some other policy document that says, copy the entire investigative file and distribute this file in response to subpoenas? A. Policy document? Not that I'm aware of, no."), 107:21-24; Exhibit 49 (Tiderington Report) at 41-42.

96.     Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, CPD never updated its policy to stop permitting a system of multiple, parallel files rather than a single centralized file. Exhibit 53 (S.O. 86-3); Exhibit 55 (Noble Testimony) at

4832, 4818- 19 ("[T]he Chicago Police Department has . . . essentially, three separate filing systems"--the investigative file, permanent retention file, and "working file"); Exhibit 42 (Hickey Dep. in *Rivera*) at 192-94; Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 295:20-296:4; Exhibit 44 (Winstrom Dep.) at 110-115.

97.    The City acknowledges that its continued system of having multiple files of a centralized file, coupled with the lack of instruction or directive ordering or ensuring that the entire contents of the investigative files be produced, left detectives and subpoena personnel confused about their disclosure obligations. Exhibit 42 (Hickey Dep. in *Rivera*) at 36-37, 162-64, 253-54 (testifying to subpoena clerks and detectives questioning what they were required to produce in response to subpoenas, including whether investigative files had to be produced); Exhibit 56 (Hickey/Spratte Trial Testimony in *Rivera*) at 3285:5-8; Exhibit 44 (Winstrom Dep.) at 106- 107, 189, 192-94, 209; Ex. 12 (S.O. 86-3); Exhibit 41 (Shadur Order) at 9-10.

98.    Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy applied only to the Detective Division, and not investigators in other divisions and special units, including patrol officers and gang crimes officers. Exhibit 53 (S.O. 86-3); Exhibit 42 (Hickey Dep. in *Rivera*) at 54-55, 86-88; Exhibit 56 (Hickey/Spratte Trial Testimony in *Rivera*) at 3388:9-3389:5.

99.    Despite Judge Shadur's express guidance regarding the deficiencies in CPD's policies, the policy failed to provide any definition of what was "relevant" or "pertinent" information that needed to be documented, thus permitting detectives to make subjective decisions about what was relevant, and could do so based on subsequent information learned during the investigation. The City's designees acknowledged that given this lack of instruction,

detectives could reach different decisions about what needed to be documented. Detectives could, for example, determine that leads and investigative efforts into an alternate suspect could be deemed not pertinent or irrelevant, and thus would not need to be documented or disclosed. Exhibit 53 (S.O. 86-3); Exhibit 41 (Shadur Order) at 5-6; Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 237- 38, 339; Exhibit 44 (Winstrom Dep.) at 64-66, 89-90, 99:6-10 ("Q. Does this policy provide any guidance about what information is to be treated as relevant and not relevant? A. This policy just says relevant information, no.").

100.    The Subpoena Service Unit in the Records Division handled requests for discovery from prosecutors and criminal defendants, but CPD had no policies, procedures, checklists, or other documents requiring, or explaining, how the Subpoena Service Unit staff were supposed to gather all responsive documents, or providing guidance to assist them in requesting material from all the right repositories. As a result, the process of responding to requests for police files was more of an "art," and whether prosecutors and criminal defendants received all of the documents and investigative material associated with a case was primarily a question of luck. Exhibit 56 (Hickey Trial Testimony in *Rivera*) at 3284:17-19; Exhibit 47 (Hickey Dep. in *Kluppelberg*) at 362-63; Exhibit 42 (Hickey Dep. in *Rivera*) at 36:11-37:4, 43-46, 185-87; Exhibit 57 (City of Chicago's Amended Response to Plaintiff's Seventeenth Set of Requests to Produce Documents to the City of Chicago) at 2-3; Exhibit 44 (Winstrom Dep.) at 192-94.

101.    In 2020, the City of Chicago's Office of Inspector General issued a report regarding the CPD's practices concerning the disclosure of police records to criminal defendants and civil plaintiffs, which included a review of case studies from 2010-2013, information

regarding nine instances in which the City was sanctioned by federal judges from May 2011 through February 2018, and interviews with more than a dozen CPD employees. The OIG found that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." Exhibit 58 (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine which of the CPD's units may hold such records"); *see also* Exhibit 59 (Sept. 2021 OIG Follow-Up Report) at 2; Exhibit 49 (Tiderington Report) at 34-35.

## IV.    POLICIES DID NOT MEANINGFULLY CHANGE OVER TIME

102.    The City of Chicago has admitted that its written policies regarding the documentation and disclosure of investigative information did not change between 1986 and 1998. Exhibit 44 (Winstrom Dep.) at 43:7-46:2 (agreeing that the policies applying to documentation in homicide investigations from 1986 to 1998 were "nearly identical," and despite some "difference[s] in wording," the "overall policy is the same"); see also id. at 46:19-23 ("Q. Okay. So in the period from 1986 through 1998, is it correct that the policies with regard to documentation of homicide investigations were the same across all detective areas? A. Correct."); Exhibit 42 (Hickey Dep. in Rivera) at 119:7-9 (testifying that the policy regarding records retention was consistent from 1983 to 2011); see also id. at 123:11-17 (same); Exhibit 45 (Hickey Dep. in Fields) at 43:1-7 (noting that nothing was done after S.O. 83-1, effective in 1983, to review the document retention process, nor was there any new directive as to documentation in investigative or other informal files).

103.     Even though S.O. 83-1 was considered a "major change" in policy, no auditing or other steps were ever taken to ensure that the "major change" required by the Special Order were actually being implemented and followed. Exhibit 46 (April 10, 2014 Hickey Testimony, Fields v. City of Chicago) at 2053:24-2054:1; Exhibit 42 (Hickey Dep. in Rivera) at 244, 247, 249; Exhibit 43 (Hickey Testimony from 2016 Fields Trial) at 35:11-25.

104.     Rather than checking out the investigative file, where all memos and notes were supposed to be stored and preserved (on general progress reports), detectives reverted back to keeping personal files with their own copies of investigative material. Exhibit 47 (Hickey Dep. in Kluppelberg) at 327-29.

105.     The substantively unchanged documentation policy resulted in other wrongful prosecutions and convictions in which relevant investigative information was withheld from criminal defendants, including for example, Nathson Fields, James Kluppelberg, and Jacques Rivera. Exhibit 42 (Hickey Dep. in Rivera) at 250:2-251:5 (testifying to unchanged nature of policy) ; Exhibit 60 (Fields Street File); Exhibit 61 (Rivera Street File); Exhibit 62 (Rivera Permanent Retention File); Exhibit 63 (Order on Kluppelberg Certificate of Innocence); Exhibit 64 (Brasfield Report) Attachment I at 11, Attachment H at 40-45; Fields v. City of Chicago, No. 10 C 1168, 2017 WL 4553411, at *3 (N.D. Ill. Oct. 12, 2017), aff'd, 981 F.3d 534 (7th Cir. 2020); Exhibit 49 (Tiderington Report) at 67-69.

106.     In *Fields*, Fields's police practices expert, Michael Brasfield, conducted a comprehensive analysis of 429 Chicago Police Department homicide files, summaries of which were introduced as substantive evidence, which was almost entirely unrebutted, and which showed that the policy of evidence suppression continued, at minimum, from 1983 to 1989, and

from 1999 to 2009, across the City of Chicago, in Chicago Police Department Detective Areas 1, 2, 3, and 4. Exhibit 65 (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files).

107.    Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. Exhibit 66 (Fields Trial Tr. 11/29/16) at 3:6-4:13 (PM Transcript), 7:7-8:8 (PM Transcript), 126:4-130:19 (AM Transcript, regarding missing documents in permanent retention files).

108.    In December 2016, the jury in Fields found that the failure to disclose the file of investigative information to Mr. Fields was the result of a pattern and practice of the Chicago Police Department, and awarded Mr. Fields compensatory damages of $22 million. Discovery in Fields revealed dozens of other undisclosed files in the Area Central basement. Exhibit 65 (Brasfield Summary of Voluminous Records—Comparing Basement, Criminal Defense and Permanent Retention Files). At the trial in Mr. Fields's case, additional evidence in support of the conclusion that the City had a practice of evidence suppression was presented, including the following: (a) Defendants and other CPD employees testified that there were frequently widespread departures from written policies; that they did not even know new written policies had been put in place in the 1980s; that they considered investigative materials their personal property, and would not transcribe all investigative leads into official reports; and that there was no mechanism for reporting missing investigative materials. *See* Exhibit 67 (*Fields* Trial Tr. 11/23/16) at 78:8-25, 79:1-8; Exhibit 68 (*Fields* Trial Tr. 12/1/16) at 124:25-125:23; Exhibit 69 (*Fields* Trial Tr. 11/17/16) at 103:5-8, 112:3-9; Exhibit 70 (*Fields* Trial Tr. 11/28/16) at 30:23-

31:22, 31:23- 25, 32:14-24, 52:5-112; Exhibit 71 (*Fields* Trial Tr. 12/6/16) at 85:8-86:7, 95:22-96:5, 97:2-19; Exhibit 72 (*Fields* Trial Tr. 12/5/16) at 137:5-22; (b) Files of important investigative information were kept and suppressed in violation of Brady in the cases of Jon Fulton, Timothy Malone, and James Crockett. Exhibit 67 (*Fields* Trial Tr. 11/23/16) at 12:3-14:15, 17:1-21:12, 18:10-17; Exhibit 66 (*Fields* Trial Tr. 11/29/16) at 133-136 (PM Transcript); 111:2-115:18 (AM Transcript); Exhibit 73 (Fields Trial Tr. 12/8/16) at 29:13-31:8, 31:9-34:5, Exhibit 74 (Fields Trial Tr. 12/7/16) at 69:8-21; Exhibit 84 (Fields Trial Tr. 11/30/16) at 31:2-15, 32:11-33:20, 41:8-42:8; 58:1-61:1.

109.   Police practices expert Thomas Tiderington, as discussed further *infra* at ¶¶110-119, confirms that his findings—that the CPD's policies related to the documentation, storage/preservation, and disclosure of information learned during homicide investigations was contrary to generally accepted police practices—are consistent with the findings of the City of Chicago's own Office of Inspector General, whose 2020 report stated that "CPD's records management and production processes are inadequate to meet its constitutional and legal obligations." Exhibit 49 (Tiderington Report) at 34; Exhibit 58 (June 2020 OIG Report) at 4-5 (finding that the units responsible for responding to subpoenas and records requests "cannot ensure that they are identifying and locating all responsive records for production" and that "members [of the Subpoena Unit] routinely do not attempt to identify paper records, as they cannot determine which of the CPD's units may hold such records"); *see also* Exhibit 59 (Sept. 2021 OIG Follow-Up Report) at 2.

V.   **POLICY DEFICIENCIES**

110.     As part of his review, Tiderington reviewed and analyzed all Area Five homicide investigative files and corresponding permanent retention files for 1987-1991. Exhibit 49 (Tiderington Report) at 34; 51. He also reviewed and analyzed 475 Area 5 investigative files from 1991-1995 that were provided to him for analysis, as well as the 344 Area 5 investigative files from 1995-1998 that were provided to him for analysis, and compared them to available permanent retention files for those time periods. Exhibit 49 (Tiderington Report) at 34, 51, 55; *see also* Attachment B to Tiderington Report (materials reviewed). In addition, he compared corresponding criminal defense files to investigative files and permanent retention files from Area 5 homicide investigations for the period from 1995-1998. Id. at 55. The case-by- case comparison of all of these file types is contained in Attachments E and F to Tiderington's Report. Exhibit 49 (Tiderington Report) at 55; see Attachments E and F. Tiderington reached a number of conclusions, including that none of the Special Orders implemented after Jones/ Palmer rectified the problems with filekeeping, documentation, and disclosure within the CPD uncovered during Jones/Palmer. Id. at 56-61.

111.     Tiderington also reviewed the expert reports of Michael Brasfield in *Fields v. City of Chicago* and *Rivera v. City of Chicago*, which involve a similar review of hundreds more homicide files and corresponding files, as well as the police homicide files in *Sierra*, *Reyes/Solache, Rivera, Fields* and *Kluppelberg.* Exhibit 49 (Tiderington Report) at 34.

112.     Tiderington's review of hundreds of files from 1991-1998 confirmed that CPD's policies were not sufficiently addressing the problems with file keeping and documentation of which the City of Chicago was aware. Exhibit 49 (Tiderington Report) at 51-63.

113.     Detectives consistently used handwritten notes not on GPRs, although Judge Shadur had found the practice of keeping investigative information outside of official reports deficient. Exhibit 41 (Shadur Order) at 4-6; Exhibit 49 (Tiderington Report) at 53;56.

114.     A review of Area Five homicide files between 1987-1990 show that 10% of cases did not have any GPRs. Handwritten notes not on GPRs were found in approximately 50% of the investigative files that Tiderington reviewed from 1991-1995, and approximately 46% of the investigative files reviewed from 1995-1998—consistent with Brasfield's findings in Rivera (61%) and Fields (82%). Exhibit 49 (Tiderington Report) at 56; see also Exhibit 49 (Attachments G and H to Tiderington's report) at 8.

115.     Similarly, detectives continued using to-from memos, which were also not included in official forms–despite the City's knowledge of this deficiency. Exhibit 41 (Shadur Order) at 4-6; Exhibit 49 (Tiderington Report) at 56. To-from memos (not on official police forms) were found in approximately 10% of the files reviewed from 1991-1995 and approximately 28% from 1995-1998—consistent with Brasfield's findings in Rivera (20%) and Fields (43%). Exhibit 49 (Tiderington Report) at 57.

116.     Further, inventory sheets were not consistently included in the investigative files (and when they were included, the majority of them were incomplete). From 1991-1995, 24% of total investigative files contained no inventory sheet, and 88% of total investigative files contained incomplete inventory sheets; from 1995-1998, 17% of total investigative files contained no inventory sheet, and 81% contained incomplete inventory sheets. Exhibit 49 (Tiderington Report) at 57.

117.     Second, Tiderington reviewed the permanent retention files, which contain only official reports, standing alone. Not all relevant information in unofficial documents—including potentially exculpatory information contained on handwritten notes—was transcribed in official reports, despite the City's continued awareness of this deficiency. Exhibit 41 (Shadur Order) at 17; Exhibit 49 (Tiderington Report) at 57-59.

118.     Third, Tiderington compared the investigative files to 64 corresponding criminal defense files for the years 1995-1998. Tiderington concluded that important investigative materials were regularly withheld from the criminal defense files for criminal defendants, despite the City's notice of this issue. Exhibit 41 (Shadur Order) at 17; Exhibit 49 (Tiderington Report) at 59-64.

119.     The analysis that Tiderington conducted in this case is the same one he conducted in Reyes/Solache (and other Guevara cases), and the one Michael Brasfield conducted in *Rivera* and *Fields*, and his findings are entirely consistent with Brasfield's. In *Fields*, Brasfield testified that approximately 80% of the criminal defense files were missing handwritten notes from the CPD files, 46% were missing general progress reports (on which detectives take notes), and 36% were missing inventories. Exhibit 66 (Fields Trial Tr. 11/29/16) at 3:6-4:13 (PM Transcript), 7:7-8:8 (PM 29 Transcript), 126:4-130:19 (AM Transcript, regarding missing documents in permanent retention files). In particular, Tiderington's findings that the 1987-1995 Area 5 investigative files demonstrate that the City's problems with filekeeping, documentation, and disclosure of investigative information first identified in *Jones/Palmer* persisted under the policies of the CPD is the same conclusion that he reached with regard to the 1995-1998 Area 5 investigative files, and that Brasfield reached with regard to 1985-1991 Area 5 investigative

files, and 1984-1989 Area 1 (primarily) investigative files. Exhibit 49 (Tiderington Report) at 51; Exhibit 64 (Brasfield Report in *Rivera*) at 43-45; Exhibit 75 (Brasfield Report in *Fields*) at 15-19.

120.     During expert discovery, the Defendants disclosed four retained experts. Among them, they disclosed one former law enforcement practitioner to opine about the underlying investigation in this matter and whether it comported with generally accepted police practices. He is not offering any opinions whatsoever about whether CPD's policies regarding documentation and disclosure generally, and Special Orders 83-1 and its progeny specifically is an adequate or sound policy. In addition, the City also disclosed a former prosecutor, Bernard Murray, to opine about criminal discovery in Cook County; Mr. Murray has never worked in a police department, does not consider himself an expert in police policymaking, and is not offering any opinions about whether the documentation and disclosure policies at issue are adequate or sound policies.

## VI.     ADJUDICATION OF ISSUE IN PAST CASES

121.     The existence of the City of Chicago's official policy of suppressing exculpatory and/or impeaching investigative information was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.); *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.); Palmer v. City of Chicago, 562 F. Supp. 1067 (N.D. Ill.); and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.)

122.     In *Fields*, the jury was instructed that, to find against the City of Chicago on the plaintiff's policy claim, Fields had to prove:

1. Material exculpatory and/or impeachment evidence in the possession of the Chicago Police Department was concealed from the prosecutor, and the evidence was not otherwise available to the plaintiff through the exercise of reasonable diligence. . . .

2. At the time of the concealment, it was the policy of the City of Chicago to conceal material exculpatory and/or impeachment evidence. The term policy means: (a) an express policy, (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . ., (c) A decision or policy statement made by the Superintendent of Police. This includes the Superintendent's approval of a decision or policy made by someone else, or (d) A practice of failing to train or supervise employees. . . .

3. The policy as described in paragraph 2 caused the concealment of material exculpatory or impeachment evidence in the plaintiff's criminal case.

4. The plaintiff was damaged as a result. Exhibit 77 (Fields Final Jury Instructions) at 14-15.

123.     During trial, both sides presented extensive Monell evidence, which is collected in the parties' post-trial submissions in *Fields*. Exhibit 78 (Defs.' Combined Post-Trial Mot. in Fields) at 9-16, 18-24; Exhibit 79 (Pl.'s Resp. to Defs.' Post-Trial Mot. in Fields) at 12-25; Exhibit 80 (Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

124.     The City lost the jury trial in Fields. Exhibit 85 (Fields Verdict Summary). A judgment was entered against the City on the jury's verdict. Exhibit 86 (Fields Judgment). After fully briefing the issues, the City's post-trial motion was denied. *Fields v. City of Chicago*, 2017 WL 3987356 (N.D. Ill. Sep. 11, 2017); Exhibit 78 (Defs.' Combined Post-Trial Mot. in *Fields*) at 9-16, 18-24; Exhibit 79 (Pl.'s Resp. to Defs.' Post-Trial Mot. in *Fields*) at 12-25; Exhibit 80 (Defs.' Reply in Support of Post-Trial Mot.) at 5-10.

125.     The denial of the City's post-trial motion was affirmed on direct appeal, where the U.S. Court of Appeals for the Seventh Circuit concluded that the City had notice of deficient policies with respect to withholding/disclosure of evidence "as a result of prior litigation that the use of street files and the failure to ensure the production of the evidence within those files

presented a constitutional problem," and that in Fields, the evidence presented sufficiently

allowed the jury "to conclude that the City had failed to take the necessary steps to address that

unconstitutional practice." *Fields v. City of Chicago*, 981 F.3d 534, 563 (7th Cir. 2020).

126.     In Rivera, the jury was instructed that to find against the City of Chicago on the policy claim, Rivera had to prove:

1. The plaintiff's constitutional rights were violated as defined in these instructions;

2. 2. The City of Chicago has a policy of concealing material exculpatory and/or 32 impeachment evidence. The term policy means: (a) An express policy; or (b) A widespread practice that is so permanent and well-settled that it constitutes a custom. . . . .; or (c) A decision or policy statement, including a decision not to adopt a needed policy, made by the City of Chicago; or (d) A practice of failing to train employees of the City of Chicago or the Chicago Police Department.

3. The policy as described in paragraph 2 caused the violation of the plaintiff's constitutional rights. Exhibit 81 (Rivera Final Jury Instructions) at 26.

127.     Based on that jury instruction, in June 2018, a federal jury entered a verdict for

Rivera and against the City, and a judgment was entered against the City on the jury's verdict.

Exhibit 82 (Rivera Judgment); Exhibit 83 (Rivera Verdict).

128.     During trial, both sides presented extensive Monell evidence, which is collected

in the parties' post-trial submissions in Rivera. Exhibit 87 (City's Mot. for New Trial) at 2-11;

Exhibit 88 (Pl.'s Resp. to City's Mot. for New Trial) at 78-109; Exhibit 89 (City's Reply In

Support of Mot. for New Trial) at 3-23, 30-34.

129.     The City's post-trial motion was denied. *Rivera v. Guevara*, No. 12-CV-4428,

2019 WL 13249674, at *4 (N.D. Ill. Sept. 20, 2019).

130.     Rivera's expert, Michael Brasfield, conducted an analysis of 435 Chicago Police

Department homicide files, this time from Area Five for the years 1985 to 1991, which revealed

that in more than 90% of cases information in Chicago Police Department files were not

produced to prosecutors and criminal defense attorneys in the criminal justice system, and in a

full 100% of cases the written policies promulgated by the City after Palmer were not followed.

Exhibit 90 (Rivera Trial Tr. 6/15/18) at 2210-15, 2226; Exhibit 91 (Rivera Trial Tr. 6/26/18) at

3912-3919.

131.     In *Kluppelberg v. Burge*, 276 F. Supp. 3d 773, 776 (N.D. Ill. 2017), where

Kluppelberg advanced his theory that the City of Chicago had a policy of suppressing

exculpatory evidence resulting in the suppression of investigative information that led to his

conviction, including with an expert analysis of additional homicide files by Brasfield, *see*

Exhibit 49 (Tiderington Report) at 70, 391 (Brasfield's Report in *Kluppelberg*), the district court

granted Kluppelberg's motion to apply collateral estoppel, stating that:

> To establish that the issues are the same and were necessarily decided,
> Kluppelberg must show that the jury in *Fields*, in order to have reached its
> verdict, had to have found that the City had a policy or practice of withholding
> material exculpatory and/or impeachment evidence, specifically street files.... The
> court finds that Kluppelberg has met that burden. That the jury must have found a
> policy or practice of withholding evidence is clear from the jury instructions in
> *Fields*, which stated that, to succeed on his *Monell* claim, Fields must prove by a
> preponderance of the evidence that 'it was the policy of the City of Chicago to
> conceal material exculpatory and/or impeachment evidence.'.... Kluppelberg's
> motion to apply collateral estoppel barring the City from arguing that it did not
> have a policy or practice of withholding material exculpatory and/or impeachment
> evidence contained in street files is granted." *Kluppelberg*, 276 F. Supp. at 776-
> 79.

Respectfully Submitted,

By: /s/ JENNIFER BONJEAN
Jennifer Bonjean
Ashley Cohen
BONJEAN LAW GROUP, PLLC
303 Van Brunt Street, 1st Fl
Brooklyn, New York 11231

718-875-1850

Steve Greenberg
GREENBERG TRIAL LAWYERS
Attorneys and Counselors
53 W. Jackson Blvd., Suite 315
Chicago, IL  60604
312-399-2711