# EXHIBIT 3

# In The Matter Of:
*Maysonet v.*
*Guevara*

*Edward Mingey*
*September 11, 2019*
*Video Deposition*



RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
     JOSE JUAN MAYSONET, JR.,     )
 4                                )
                                  )
 5            Plaintiff,          )
                                  )
 6       vs.                      ) No. 18-cv-02342
     REYNALDO GUEVARA, ERNEST     )
 7   HALVORSEN, EDWARD MINGEY,    )
     EPPLEN; FERNANDO MONTILLA,   )
 8   ROLAND PAULNITSKY, FRANK     )
     DIFRANCO, CITY OF CHICAGO,   )
 9   COOK COUNTY,                 )
                                  )
10                                )
                                  )
11            Defendants.         )

12

13           The deposition of EDWARD MINGEY, called

14   by the Plaintiff for examination, taken pursuant

15   to notice and pursuant to the Federal Rules of

16   Civil Procedure for the United States District

17   Courts pertaining to the taking of depositions,

18   taken before Alyssa N. Kuipers, Certified

19   Shorthand Reporter, Registered Professional

20   Reporter, at 141 West Jackson Boulevard,

21   Suite 1240A, Chicago, Illinois, commencing at

22   10:14 a.m. on the 11th day of September, 2019.

23

24

25
```

Page 2

```
 1   APPEARANCES:

 2       BONJEAN LAW GROUP
         MS. JENNIFER A. BONJEAN
 3       MS. ASHLEY COHEN
         100 Dean Street
 4       Suite 422
         Brooklyn, New York 11238
 5       Phone:  (718) 875-1850
         E-mail:  jennifer@bonjeanlaw.com
 6
             On behalf of the Plaintiff;
 7
         STEVEN A. GREENBERG, LTD.
 8       MR. KYLE JORGENSEN
         53 West Jackson Boulevard
 9       Suite 1260
         Chicago, Illinois 60604
10       Phone:  (312) 879-9500
         E-mail:  kyle@greenbergcd.com
11
             On behalf of the Plaintiff;
12
         THE SOTOS LAW FIRM
13       MR. JOSH ENGQUIST
         141 West Jackson Boulevard
14       Suite 1240A
         Chicago, Illinois 60604
15       Phone:  (312) 735-3300
         E-mail:  jengquist@jsotoslaw.com
16
             On behalf of the Defendants Ernest
17       Halvorsen, Edward Mingey, Lee Epplen,
         Fernando Montilla, and Roland Paulnitsky;
18
         ROCK, FUSCO & CONNELLY
19       MR. AUSTIN G. RAHE
         321 North Clark Street
20       Suite 2200
         Chicago, Illinois 60654
21       Phone:  (312) 494-1000
         E-mail:  arahe@rfclaw.com
22
             On behalf of the Defendant City of
23       Chicago;

24

25
```

Page 3

```
 1   APPEARANCE:  (continued)

 2       LEINENWEBER BARONI & DAFFADA
         MR. JUSTIN LEINENWEBER
 3       120 North LaSalle Street
         Suite 2000
 4       Chicago, Illinois 60602
         Phone:  (847) 251-4091
 5       E-mail:  justin@ilesq.com

 6           On behalf of the Defendant Reynaldo
         Guevara;
 7
         COOK COUNTY STATE'S ATTORNEY'S OFFICE
 8       MR. EDWARD M. BRENER
         50 West Washington Street
 9       Suite 500
         Chicago, Illinois 60602
10       Phone:  (312) 603-5971
         E-mail:  edward.brener@cookcountyil.gov
11
             On behalf of the Defendants Frank
12       DiFranco and Cook County.

13

14

15   ALSO PRESENT:  Gabriel Martin, videographer

16

17              *    *    *    *    *    *

18

19

20

21

22

23

24

25
```

Page 4

```
 1                   I N D E X

 2   WITNESS:                                   PAGE

 3   Direct Examination by Ms. Bonjean            6

 4

 5

 6              E X H I B I T S

 7   MINGEY DEPOSITION EXHIBIT                  PAGE

 8   Exhibit 1    criminal reports               152

 9   Exhibit 2    photographs                    247

10   Exhibit 3    RFC Maysonet 1-66              249

11   Exhibit 4    permanent retention file       249

12   Exhibit 5    GPRs                           302

13   Exhibit 6    consent to be interviewed      328

14   Exhibit 7    statement                      351

15

16

17

18

19

20

21

22

23

24

25
```

Page 37

1    recent. Fair to say?
2  A. More recent, yes, probably;
3    especially after I retired.
4  Q. Right. Okay. So after you met in
5    the lunchroom at 26th Street -- And, again,
6    this is October of 2017, for the hearing in the
7    Maysonet case, did you ever appear in the
8    courtroom?
9  A. Yes, I did.
10 Q. And was that -- And again, were --
11   Did you go to the courtroom immediately after
12   the lunchroom or did you go to the state's
13   attorney's office? At any point were you in
14   the state's attorney's office?
15 A. I don't believe so.
16   Bless you.
17 Q. Did you wait for your attorney and
18   then go to the courtroom?
19 A. Yeah, right.
20 Q. Okay. And did you -- Did you have
21   an understanding about whether you were going
22   to testify that day?
23 A. Yes.
24 Q. And what was your understanding
25   about whether you were going to be called to

Page 38

1    testify?
2  A. That I wasn't going to testify.
3  Q. Okay. Were you in the courtroom
4    when Judge Joyce was on the bench?
5  A. Yes.
6  Q. And what did you hear Judge Joyce
7    say while you were on the -- while you were in
8    the courtroom?
9  A. I can't recall what he said. I was
10   sitting with the -- everybody else. I wasn't
11   in the "courtroom" courtroom; you could see the
12   proceedings but --
13 Q. You were in the gallery.
14 A. Gallery.
15 Q. Let me ask you this: Were you --
16   did -- Did you go to 26th Street more than once
17   or just once for this -- for this Maysonet
18   situation?
19 A. I can't recall.
20 Q. When you do recall being there in
21   the gallery when Judge Joyce was on the bench,
22   how did that proceeding end?
23 A. You know, I'm not sure; it ended,
24   but nobody testifying.
25 Q. Do you remember whether that was the

Page 39

1    day that Mr. Maysonet's convictions were
2    dismissed?
3  A. I have no idea.
4  Q. Strike that.
5    The day Mr. Maysonet's charges were
6    dismissed?
7  A. No idea. Could have been; I don't
8    know.
9  Q. Okay. You were there -- Were you
10   there when your attorney indicated that you
11   would exercise your Fifth Amendment privilege
12   in response to any questions posed to him if --
13   posed to you if you were called to testify?
14 A. Yes.
15 Q. And you didn't object to that
16   representation that he made to the Court at
17   that time, correct?
18 A. Correct.
19 Q. Why did you want to exercise your
20   Fifth Amendment right?
21 A. After discussions with Mr. Herbert,
22   his advice was that was his advice, and I took
23   his advice.
24 Q. Okay. Had you ever indicated an
25   intent to assert your Fifth Amendment right to

Page 40

1    remain silent in any other case in which you
2    participated in the investigation?
3  A. At the criminal trial.
4  Q. Let me start over. You bring a good
5    point up. Thank you.
6    Can you recall any case in which you
7    were called to testify in a criminal
8    prosecution in which you indicated or did, in
9    fact, exercise your Fifth Amendment right to
10   remain silent?
11 A. This was the only one.
12 Q. So in your -- How long were you --
13   have you been a --
14 A. 37 years.
15 Q. 37 years. Okay. So in your
16   37 years as a Chicago police officer, sworn
17   officer, you can remember a single time when
18   you indicated that you would exercise your
19   Fifth Amendment right to remain silent in the
20   context of a criminal prosecution, correct?
21 A. Could you say that again, please.
22   I'm sorry.
23 Q. Sure. In your 37-year career, there
24   was only a single time in which you were called
25   as a witness in a criminal prosecution and

Page 149

1  we did have, you know, Tony Martinez. Could be
2  anybody.
3  Q. Right. Guevara too, right?
4  A. Could be, sure.
5  Q. I mean, he was at Gang Crimes North
6  and then came to Area 5; so you kind of had a
7  gangs specialist even within Area 5, right?
8  A. Same with Steve Gawrys; and there
9  were a few of them, sure.
10 Q. What other detectives at Area 5 were
11 former gang crime specialists? I know you
12 mentioned Guevara, Gawrys; anybody else come to
13 mind?
14 A. Tony Riccio maybe. And I don't know
15 if Tony was -- I think Tony was a gang -- I'm
16 not -- I think he was in gangs. I don't know
17 which side he was on, but he made dick, went to
18 Area 5; great guy.
19    And there might be a handful of
20 others. At this point I couldn't tell you. I
21 don't know.
22 Q. All right.
23 A. Roman Tedkowsky worked third watch.
24 Roman was a Gangs West guy, but there were gang
25 guys there.

Page 150

1  Q. All right. Now, as you sit here
2  today, you, of course, now know that you
3  recollect the Wiley brothers were two African
4  American men who were murdered on North Avenue,
5  right?
6  A. Yes, right.
7  Q. What is your first memory of the
8  Wiley brothers' murders?
9  A. Probably reading it on the board.
10 It's kind of one of those murders that you kind
11 of don't forget.
12 Q. You don't forget?
13 A. No.
14 Q. Why is it one of those murders you
15 kind of don't forget?
16 A. Two guys not from the neighborhood
17 in that neighborhood for no particular reason,
18 and you get gunned down on the street.
19 Q. And there's two of them, right?
20 A. Two of them.
21 Q. Double murder?
22 A. Sure.
23 Q. And do you have a recollection that
24 they didn't seem to be gang affiliated?
25 A. It's really hard to know at the

Page 151

1  time. You never know whether it's a gang
2  thing, dope thing or what it is. It could be
3  anything, a robbery, you just don't know.
4  Q. Right. But as you sit here today
5  with everything you know now, is it your belief
6  that these fellows were probably not associated
7  with a gang?
8  A. Victims or the offenders?
9  Q. Victims.
10 A. Probably not.
11 Q. They -- they weren't -- they weren't
12 -- They weren't particularly young, right?
13 A. No.
14 Q. They were in their -- 26, 27 years
15 old, right? Is that correct?
16 A. It could be.
17 Q. Yeah. Do you have a recollection of
18 seeing their rap sheets recently?
19 A. No. The Wileys'?
20 Q. Yeah.
21 A. No.
22    MS. BONJEAN: I'm going to mark
23 this.
24    You should have it.
25    THE WITNESS: Thank you.

Page 152

1     MS. BONJEAN: Did you mark it
2  Exhibit 1?
3     THE COURT REPORTER: Yes.
4     (Mingey Deposition Exhibit
5     No. 1 marked as requested.)
6     BY MS. BONJEAN:
7  Q. Okay. I'm handing you what's been
8  marked as Exhibit 1. It's a two-sided sheet.
9  A. Okay.
10 Q. And it's Bates stamped on one side
11 Maysonet 80 -- 1080890 and on the other side
12 10891. These are criminal histories -- reports
13 for Torrence L. Wiley and Kevin G. Wiley. Do
14 you see that?
15 A. Uh-huh. I do.
16 Q. Okay. And if they were murdered on
17 May 25th of 1990, can we agree that they were
18 in their mid to almost late 20s, both of them?
19 A. Yes.
20 Q. All right. And in looking, at least
21 looking at this rap sheet, they're not --
22 they're not -- this is not a -- it's not a
23 particularly significant rap sheet, right, for
24 either one of them?
25 A. No, it's not.

Page 157

1  definitely involved in a gang, right?
2      MR. ENGQUIST: Objection, asked and
3  answered, form.
4      BY THE WITNESS:
5  A. I have no idea. Doesn't look like
6  it.
7  Q. Right.
8  A. But he could be.
9  Q. I'm not asking -- He could be a lot
10 of things. He could be a priest too, right?
11 A. Could be.
12 Q. He could be a scientist too, right?
13 A. Certainly possible.
14 Q. He could be anything.
15 A. Could be anything.
16 Q. I'm guessing, if you were a betting
17 person, you wouldn't bet he was a priest,
18 though, right?
19 A. Right.
20 Q. Okay. So with limited information
21 can we say that this does not look like the rap
22 sheet of a gangbanger?
23 A. No, it doesn't look like it.
24 Q. That's all I'm asking.
25     Now you said that these two young

Page 158

1  men -- men, though, not teenagers -- are gunned
2  down on North Avenue. They do not seem to be,
3  at least by their rap sheets, you know,
4  obviously gang associated. Could be, but not
5  obviously. So it sticks out in your head --
6  right? -- the murders of these two -- two men?
7  A. Yes.
8  Q. And what else do you remember about
9  the murders of these two men?
10 A. When I read it, I thought that it
11 could be a gangbang; it could be a robbery; it
12 could be a dope deal gone wrong; could be
13 really anything.
14 Q. Any number of things, right?
15 A. Yes. Right.
16 Q. Do you remember hearing about these
17 two men being gunned down on North Avenue
18 shortly after it occurred?
19 A. Shortly after what occurred.
20 Q. The murder occurred.
21 A. Could you run that by me again.
22 Q. Sure. Do you remember receiving
23 information that these two black men had been
24 gunned down on North Avenue shortly after it
25 actually happened after May 25th, 1990?

Page 159

1  A. I have no idea when I received the
2  information.
3  Q. Do you remember being on the scene?
4  A. No, I wasn't on the scene.
5  Q. Okay. What -- What do you recollect
6  about the first time you heard about these men
7  being gunned down?
8  A. Just that I read it.
9  Q. Okay. Read it in a report or
10 something?
11 A. In a report.
12 Q. And do you have some impressions
13 that come to mind that -- I think you mentioned
14 -- anything else came to --
15 A. No.
16 Q. What -- what's -- What investigative
17 activity do you recall taking place after May
18 25th of 1990, in connection with these fellows
19 being killed?
20 A. I have no idea. I don't recall what
21 took place. I'm sure something did, but I
22 don't recall.
23 Q. Do you have any memory whatsoever?
24 A. No.
25 Q. What's your -- What's your first --

Page 160

1  what's -- What do you recollect, again, without
2  looking at paper, as you sit here right now,
3  what do you recollect about the --
4  A. Wiley brothers?
5  Q. -- investigation. Yeah.
6  A. I would have been aware of it and
7  read the reports. Wouldn't memorize them, but
8  I would have read roughly what happened. And
9  my first recollection was, when I talked to
10 Paulnitsky at Area 5, he had -- He had Maysonet
11 in custody. And I asked Paulnitsky or his
12 partner, Bongiorno -- I really don't know which
13 one it was -- if he wouldn't mind me debriefing
14 their in-custody offender.
15 Q. Okay. Is that -- As you sit here
16 today, that's really the first time you
17 remember about the investigation as it relates
18 to Mr. Maysonet's involvement in the Wiley
19 brothers' murder?
20 A. Today, yes.
21 Q. Okay. Do you have reason to believe
22 that there was investigative conduct between
23 May 25th, 1990, and the date on which you, as
24 you say, debriefed Mr. Maysonet?
25 A. I'm sure there was interview of

Page 261

1  over, and it says RFC Maysonet 65; and then on
2  the back page is 66.
3     Do you see that?
4  A. Yes, I do.
5  Q. Okay. I would call this a General
6  Offense Case Report. What would you call it?
7  A. General Offense Case Report.
8  Q. Okay. Now it seems to me this says
9  Gloria Sanchez. I don't -- are you -- Do you
10 have any reason to believe there's a Gloria
11 Sanchez that's involved in this case?
12 A. Not to my knowledge, no.
13 Q. Okay. You can put that aside.
14 A. Okay.
15 Q. I'm going to have you now look at
16 RFC Maysonet 64. Do you see that?
17 A. I do.
18 Q. And the page on the other side is
19 RFC 63.
20    Do you see that?
21 A. I do.
22 Q. Okay. And then -- And what do you
23 recognize this to be?
24 A. Progress report. Supplementary
25 progress reports.

Page 262

1  Q. Okay. And whose name -- who is --
2  Whose name is on it?
3  A. Boyle and Brennan. Detectives?
4  Q. Uh-huh.
5  A. Yeah.
6  Q. And can you tell us when this report
7  was submitted?
8  A. They've got the 25th; I signed it on
9  the 26th.
10 Q. So -- And if you just put that right
11 there for a second, I'm going to have you look
12 at this next report here --
13 A. Okay.
14 Q. -- that goes from RFC 59 to 62.
15 A. Okay.
16 Q. Do you see that?
17 A. Uh-huh.
18 Q. Okay. So what do you recognize this
19 report to be?
20 A. Progress.
21 Q. A supplemental report?
22 A. Yeah. Progress -- progress
23 supplemental report.
24 Q. Where do you see "progress" on this?
25 A. Middle right.

Page 263

1  Q. Got it. Progress report. And what
2  does it mean that it says field investigation?
3  A. I'm sorry. Where does it say --
4  Okay. That would be probably part of the
5  format they're using.
6  Q. And who are the detectives that were
7  assigned to this?
8  A. Tapkowski and Boyle.
9  Q. All right. Now, this appears to be
10 a report that was submitted on May 25th of
11 1990, at 8:00 a.m., right?
12 A. Right.
13 Q. Which was not long after the murder,
14 the occurrence, right?
15 A. Apparently so, right.
16 Q. According to the report, the
17 occurrence or the murders happened on May 25th,
18 1990, at 1:00 in the morning, right?
19 A. Right.
20 Q. Now, the fact that Tapkowski and
21 Boyle have prepared this report shortly after
22 the murders have occurred, does that mean that
23 they were the assigned detectives?
24 A. No. They were midnight guys. They
25 wouldn't really be assigned to this job. They

Page 264

1  would -- The job would be reassigned to
2  somebody on the second and third -- or third
3  watch.
4  Q. Why is that?
5  A. Because the midnight guys, their
6  main focus is on current things that happen on
7  midnights. So they -- You would want a team
8  that could give this a lot more work than just
9  a midnight guy. Because he'd be tied up
10 working midnights, be tied up on current stuff
11 that happens on the watch, and also it'd be
12 difficult to locate witnesses and so forth on
13 the midnights. You wouldn't want to disturb
14 people.
15 Q. So are you of the view that these
16 guys were just assigned to go do an initial
17 field investigation?
18 A. They would probably be canvass guys,
19 I would say.
20 Q. Okay. And is that because they
21 happen to be on duty at the time that the
22 murders occurred, the shooting occurred?
23 A. Sure, yeah.
24 Q. So when we talked about trying to
25 figure out who the assigned detectives were --

Page 265

1 And when I say the "assigned detectives," I
2 mean the detectives assigned to investigate the
3 Wiley brothers' murders.
4    You're fairly confident that
5 Tapkowski and Boyle are not the assigned
6 detectives?
7 A. Yeah, I'm pretty confident that they
8 weren't.
9 Q. Excuse me. Okay.
10    Would you think that they probably
11 went to the scene, though?
12 A. Pardon.
13 Q. Would you think they probably went
14 to the scene?
15 A. I would say so.
16 Q. Okay. So let's look at the next
17 page, which is RFC Maysonet 60, which is page 2
18 of this report.
19 A. Okay.
20 Q. Do you see how there's these wanted,
21 injuries, taken to, weapon --
22 A. Right.
23 Q. -- location?
24    Is that the format of the report
25 that we were talking about?

Page 266

1 A. That would be a format, yes.
2 Q. And is that a format for like a
3 canvass report or an initial field
4 investigation?
5 A. Initial field investigation. Yeah,
6 it could be.
7 Q. Okay.
8 A. It certainly could be, but -- It
9 could be.
10 Q. All right. So it -- It indicates
11 that the possible weapon used -- right, which
12 is the 9 millimeter?
13 A. Right.
14 Q. And is this information, I'm
15 guessing, you would have reviewed since your
16 name is the approving sergeant, right?
17 A. Right.
18 Q. Is this maybe where you got the 9
19 millimeter information?
20 A. I don't know. Could be.
21 Q. Okay. One place you could have
22 gotten it from, right?
23 A. Uh-huh, right.
24 Q. Any other possibilities, maybe just
25 talking to somebody?

Page 267

1 A. Certainly could be.
2 Q. All right. And it says the motive
3 is unknown at this time, right?
4 A. Yeah.
5 Q. Nothing about the crime scene or any
6 investigative work that had been done prior to
7 whenever this report was submitted that gave
8 the officers an idea of what the motive was,
9 correct?
10 A. Correct.
11 Q. And it looks as if there was some
12 canvassing of the neighborhood based on this
13 report, right?
14 A. Yes.
15 Q. There's actually a narrative written
16 here; describes the scene, describes the
17 location, right?
18 A. Yes.
19 Q. And some people were interviewed in
20 connection with what they heard or observed on
21 the early morning hours of May 25th, 1990?
22 A. Right.
23 Q. Doesn't appear to be any
24 eyewitnesss; is that right?
25 A. Not to my knowledge, no.

Page 268

1 Q. Pretty busy street, though, correct?
2 A. Pretty busy.
3 Q. As a detective, would you expect
4 that somebody would have heard or seen
5 something?
6 A. I'm sure somebody probably did and
7 just maybe didn't want to come forward, or
8 maybe nobody saw it. It's hard to say.
9 Q. But again, you have to work on
10 plausibilities when you're investigating a
11 case. I know anything's possible; but
12 certainly you have to work with theories. And
13 one theory is that probably somebody saw
14 something, right?
15 A. That's why you canvass.
16 Q. Right. I mean, if someone's
17 murdered in the middle of the woods, there's
18 less of a likelihood it's witnessed than on
19 North Avenue.
20 A. Right.
21 Q. Can we agree on that, at least?
22 A. Sure.
23 Q. Okay. Great. And we can see by
24 this, there were a lot of addresses that had
25 people living in them that were places that

Page 281

1  argumentative.
2     BY THE WITNESS:
3  A. No idea what direction it's going
4  to.
5  Q. You don't draw any inferences from
6  what these witnesses reported?
7  A. Could be anything. Could be a
8  robbery, could be two guys walking in a
9  neighborhood they shouldn't be in, thinking
10 that they were offenders, thinking they were
11 rival gangbangers, could be a dope deal; it's
12 hard to say what it is.
13 Q. Okay. Well, what facts lead you to
14 believe it could have been a dope deal?
15 A. It's just the same as any other
16 fact.
17 Q. Okay. But would it make it more
18 likely if it was a dope deal if the victims
19 were drug users or drug sellers?
20 A. Yeah, sure.
21 Q. Okay. And they weren't, as far as
22 we can tell from their rap sheets at least,
23 right?
24 A. Doesn't look like it.
25 Q. Okay. So again, anything's

Page 282

1  possible, but as a detective, you have to
2  follow leads. Isn't that your job?
3  A. Sure.
4  Q. Okay. And can we agree that the
5  little bit of information that's been developed
6  this far is not leading us in the direction of
7  a -- a gang-related shooting?
8     MR. ENGQUIST: Objection,
9  argumentative, asked and answered.
10    BY THE WITNESS:
11 A. Not leading us in really any
12 direction at this point.
13 Q. I think -- I mean, it's not leading
14 you in any direction?
15 A. No.
16 Q. You have two victims, African
17 Americans, who aren't from the community,
18 arguing potentially or being part of an
19 argument potentially on a street for an hour
20 that have pretty minimal backgrounds that don't
21 suggest that they're gangbangers or drug
22 dealers or even drug users, for that matter,
23 that get shot down, executed on North Avenue on
24 a busy street.
25    That doesn't give you some leads,

Page 283

1  some ideas that you want to follow?
2     MR. ENGQUIST: Objection, form,
3  argumentative, asked and answered.
4     BY THE WITNESS;
5  A. Gang bang, drug deal, robbery, could
6  be anything.
7  Q. Okay. Well, at least according to
8  Carmen Macias, the only voices she heard were
9  male black voices, right?
10 A. Right.
11 Q. She didn't hear anyone with a thick
12 Puerto Rican accent, did she?
13    MR. ENGQUIST: Objection, asked and
14 answered.
15    BY THE WITNESS:
16 A. No.
17 Q. And you had the privilege of
18 speaking to Mr. Maysonet, allegedly; and you
19 heard how -- what his manner of speak is,
20 right?
21 A. I did.
22 Q. And he was speaking Spanish
23 according to you, correct?
24 A. Correct.
25 Q. Pretty thick accent, right?

Page 284

1  A. Very much so.
2  Q. Didn't sound like a male black, did
3  he?
4  A. No.
5  Q. All right. Now you can put that to
6  the side.
7     And that report was submitted on May
8  25th, 1990, approved May 26th, 1990, okay?
9  A. Uh-huh.
10 Q. I would like you to take the rest of
11 the investigative file, as it has been
12 represented by the City of Chicago, and tell me
13 -- and pull out for me any report prepared by
14 any detective that was prepared after May 25th,
15 1990, but before Mr. Maysonet's arrest on
16 August 22nd, 1990?
17 A. That was submitted be -- What are
18 the dates?
19 Q. Okay. The reports we've looked at
20 were all prepared and submitted on the date of
21 the murders, May 25th, 1990.
22 A. Uh-huh.
23 Q. Okay? And Mr. Maysonet was arrested
24 on August 22nd, 1990.
25 A. Any reports submitted within that

Page 365

1  me what he said.
2  A. Which paragraph are you referring to
3  now?
4  Q. It says August 23rd at 4:30 hours.
5     Do you see that? Second to the last
6  paragraph.
7  A. 53?
8  Q. Yeah, second to last paragraph.
9  A. Yeah. Okay.
10 Q. I want you to look at that paragraph
11  and tell me what Jose Maysonet said during that
12  interview or that time period?
13 A. Could have made it a little bit more
14  clear, but it's -- it's apparent what happened,
15  I think. He repeated his admission.
16 Q. The whole thing? You don't know,
17  though.
18 A. No, no. It could be -- could be
19  part, whole of it; but it's clear to me what
20  happened, but --
21 Q. Right. But certainly ASA Borowitz
22  was new to this equation. Confessing to a
23  state's attorney is different than confessing
24  to a cop, right?
25 A. I'm sure she got notes and so forth.

Page 366

1  Q. Okay. You would expect her to,
2  right?
3  A. I would imagine so. I'm sure she
4  would have to document it. I would imagine. I
5  think she might have been new, though,
6  possibly.
7  Q. So you think it's possible that a
8  new state's attorney would maybe think: Huh,
9  somebody just confessed to double murder to me.
10  I need not write that down.
11 A. I'm sure she would.
12    MR. BRENER: Objection, form, calls
13  for speculation.
14    BY MS. BONJEAN:
15 Q. You would expect her -- even being
16  new, a new attorney -- She did go to law
17  school, right?
18    MR. RAHE: Objection, foundation.
19  BY THE WITNESS:
20 A. I assume so.
21 Q. I mean, I think even a six-year-old
22  would probably know if someone confesses
23  murder, you probably should document it, right?
24 A. Right.
25    MR. ENGQUIST: Objection,

Page 367

1  argumentative.
2    BY MS. BONJEAN:
3  Q. Okay. And then we have Jose
4  Maysonet at 6:30 making a court reported
5  statement.
6  A. What page?
7  Q. Yeah, it's the end of the page going
8  into 54.
9  A. Okay.
10 Q. Do you see that?
11    And that -- He makes a
12  court-reported statement, which we looked at
13  earlier, which I believe is marked as
14  Exhibit 7, maybe? The court-reported?
15 A. Yeah, 7.
16 Q. Okay.
17 A. Right.
18 Q. All right. Now it indicates, here,
19  in the middle of the page on the last page of
20  this closing sup that DiFranco requested that
21  Maysonet be driven to the scene of the murder.
22    Did you participate in driving
23  Mr. Maysonet to the scene of the murder?
24 A. No.
25 Q. It says was accompanied by

Page 368

1  Paulnitsky, Montilla; but you don't have any
2  recollection of being present there, do you?
3  A. No. I'm sure I wasn't.
4  Q. Okay.
5  A. Where are you at now?
6  Q. Yeah. I'm in the middle -- in the
7  middle of the last page, page 54.
8  A. Oh, okay.
9  Q. It's probably on the back of
10  something you have in your hand.
11 A. It is. Okay.
12 Q. And it's sort of in the middle of --
13  It looks like kind of the fifth paragraph
14  or fourth or fifth, I guess.
15 A. Uh-huh.
16 Q. Do you see that?
17 A. Yeah.
18 Q. Okay. But you don't -- You weren't
19  present for that, right?
20 A. No, I was not.
21 Q. Now, Mr. Maysonet is charged. And
22  did you have any further conversations with
23  Mr. Maysonet after he makes his court reported
24  statement, as far as you know?
25 A. I don't know if I -- I don't think I

Page 369

1  had a conversation with him when he came into
2  the station. I'm sure I didn't talk to him. I
3  doubt it. I can't recall it.
4  Q. All right. Do you remember any
5  other investigative conduct you may have taken
6  or actions you may have taken in connection
7  with the Wiley brothers' murders after
8  Mr. Maysonet was charged?
9  A. Outside of arresting Gonzalez with
10  Steve Gawrys, no.
11  Q. You do remember arresting him?
12  A. No.
13  Q. You're just assuming it happened
14  from looking at the report?
15  A. Right.
16  Q. What about any other investigative
17  work?
18  A. That I can recall, nothing.
19  Q. What about as it relates to any of
20  the other codefendants?
21  A. I have no idea.
22  Q. Have you seen any reports that show
23  you were approving sergeant on any other sups
24  related to the investigation into this case,
25  other than what we've looked at?

Page 370

1  A. I can't recall anything.
2  Q. Nothing about Justino Cruz or Gosins
3  (phonetic) or Goossens?
4  A. No.
5  Q. Alfredo Gonzalez, nothing?
6  A. Nothing --
7  Q. Um.
8  A. -- that I can recall.
9  Q. And you don't remember there being
10  any inquiry by the Cook County State's
11  Attorney's office about why there are no
12  reports reflecting the July 15th or the August
13  1st statements of Mr. Maysonet?
14      MR. ENGQUIST: Objection, asked and
15  answered.
16      BY THE WITNESS:
17  A. I can't recall any conversation with
18  the State's Attorney's office about that.
19  Q. Okay. Are you aware that those
20  reports are not really missing, but they never
21  were made available to defense counsel even at
22  the time Mr. Maysonet was tried?
23      MR. ENGQUIST: Objection,
24  foundation, calls for speculation.
25      BY THE WITNESS:

Page 371

1  A. I have no idea.
2  Q. You never heard that?
3  A. No.
4  Q. Were you under the assumption that
5  those reports are sort of missing because of
6  the age of the case all these years later?
7  A. They're missing, but I'm sure
8  they're somewhere.
9  Q. Right. I know.
10  A. I would hope.
11  Q. Well, is it -- Is it surprising to
12  you that they were not in the Cook County
13  State's Attorney's office file?
14  A. Yes, it is.
15  Q. Okay. And is it surprising to learn
16  that, according to the transcripts of the
17  proceedings in this case, those were -- No GPRs
18  were tendered to the State or the defense
19  counsel as it relates to that July 15th and
20  August 1st meeting?
21  A. Surprising.
22  Q. And why is it surprising?
23  A. Because this is rather unusual,
24  missing GPRs, especially important ones; if
25  they exist at all, which I'm sure they do.

Page 372

1  Q. You've said that, but it would be
2  strange for GPRs to be missing from the
3  investigative file and the Cook County State's
4  Attorney's file, even -- even -- I mean, we're
5  not talking about 30 years later; we're talking
6  about within months, within weeks, they were
7  never tendered.
8      MR. LEINENWEBER: Objection,
9  foundation, vague.
10      BY THE WITNESS:
11  A. What's the question?
12      MR. ENGQUIST: Object.
13      BY MS. BONJEAN:
14  Q. What I'm saying is, according to the
15  record, the transcripts of the proceedings,
16  there were no GPRs ever given to any party to
17  the criminal prosecution that reflected those
18  statements.
19      What's your explanation for that?
20  A. I have none.
21  Q. So if they were lost, they were lost
22  immediately, not 20 years later or 30 years
23  later.
24  A. I -- I can't answer that. Don't
25  know.