# EXHIBIT 4

REYNALDO GUEVARA     CondenseIt™     JOHNSON v. GUEVARA

**Page 1**

```
1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3

4    JUAN JOHNSON,            )
                             )
5           Plaintiff,        )
                             )
6    vs.                      )  No. 05 C 1042
                             )
7    REYNALDO GUEVARA and     )
     the CITY OF CHICAGO,     )
8                             )
            Defendants.       )
9

10

11          The deposition of REYNALDO GUEVARA, called

12   by the Plaintiff for examination pursuant to notice

13   and pursuant to the Federal Rules of Civil

14   Procedure for the United States District Courts

15   pertaining to the taking of depositions, taken

16   before Cynthia A. Sinkevicz, Certified Shorthand

17   Reporter and Notary Public within and for the

18   County of Cook and State of Illinois, at

19   53 West Jackson Boulevard, Suite 950, Chicago,

20   Illinois, on the 9th day of March 2007.

21

22

23

24
```

**Page 2**

```
1    APPEARANCES:

2

3        GARDINER KOCH & WEISBERG, by
         MR. THOMAS G. GARDINER
4        53 West Jackson Boulevard, Suite 950
         Chicago, Illinois 60604
5        (312) 362-0000
                  -and-
6        LAW OFFICE OF DANIEL J. STOHR, by
         MR. DANIEL J. STOHR
7        222 North LaSalle Street, Suite 200
         Chicago, Illinois 60601
8        (312) 726-1180
            on behalf of the plaintiff;

9

10       JAMES G. SOTOS & ASSOCIATES, LTD., by
         MS. ELIZABETH A. EKL
11       550 East Devon, Suite 150
         Itasca, Illinois 60143
12       (630) 735-3300
            on behalf of the defendants.

13

14

15

16

17

18

19                   ORIGINAL

20

21

22

23

24
```

**Page**

```
1                   I N D E X

2    Witness:                        Page

3    Reynaldo Guevara

4        Examination by:

5           Mr. Gardiner               4

6

7

8

9

10

11

12

13              E X H I B I T S

14    Number                          Page

15        1                            79

16

17

18

19

20

21

22

23

24
```

**Page**

```
1           (Witness sworn.)
2            REYNALDO GUEVARA,
3    called as a witness herein, having been first duly
4    sworn, was examined and testified as follows:
5            EXAMINATION
6            BY
7            MR. GARDINER:
8    Q.  Could you please state your name.
9    A.  Reynaldo Guevara.  That's G-u-e-v-a-r-a.
10   Q.  Mr. Guevara, could you tell us your
11   educational background.
12   A.  I have an Associate's Degree.
13   Q.  Where did you receive that from?
14   A.  Governor State.
15   Q.  Okay.  And what is it in?
16   A.  Just in general.
17   Q.  All right.  And when did you receive that
18   degree?
19   A.  Oh, Jesus.  A long time ago.  I can't even
20   tell you the day -- it's been so long -- because it
21   was correspondence.
22   Q.  Okay.  Could you tell us your employment
23   prior to the Chicago Police Department.
24   A.  Prior to the Police Department I was a
```

Page 5

1 refrigeration, heating and air-conditioning
2 serviceman.
3    Q. When was that?
4    A. Way back when, too.
5    Q. You're not sure of the year?
6    A. (Shaking head.)
7    Q. Okay.
8     THE REPORTER: Was that a "no"?
9     THE WITNESS: No. I don't remember the
10 year, but it was just before I went on the Force.
11     MS. EKL: If we could, just for a second,
12 Ray, because the court reporter is taking it down,
13 it's important for you to say "yes" or "no."
14     THE WITNESS: Yeah, I understand.
15 BY MR. GARDINER:
16    Q. You've testified before; right?
17    A. Yes, I have.
18    Q. And you understand that the court reporter
19 needs to take down whatever you say and you need to
20 orally elicit the answer; right?
21    A. Right.
22    Q. Okay. If there are any questions you
23 don't understand, please let me know and I'll
24 rephrase them. Okay?

Page

1    Q. And what did you administer?
2    A. Actually, nothing, to be honest with you
3 really.
4    Q. You just had an administrative position,
5 but you didn't have an assignment to do anything?
6    A. Correct. I was still going through basic
7 training.
8    Q. Okay. And then they discharged you after
9 that time?
10    A. Correct.
11    Q. And then you became a heating and
12 air-conditioning man?
13    A. That's correct.
14    Q. And then after that you became a police
15 officer?
16    A. Correct.
17    Q. All right. Are you retired from the
18 Police Department now?
19    A. Yes, I am.
20    Q. What was the date of your retirement?
21    A. June 15 of last year.
22    Q. And what have you done since June 15th of
23 2006?
24    A. I work part-time for the Chicago Park

Page 6

1    A. All right.
2    Q. Otherwise, I'll presume that you
3 understand the question.
4    A. Yes.
5    Q. All right. So you said you worked as a
6 heating and air-conditioning man?
7    A. Correct.
8    Q. Okay. Was that before or after you were
9 in the Air Force?
10    A. After.
11    Q. Okay. And you were in the Air Force for,
12 what, about a year?
13    A. Right. Correct.
14    Q. And you were discharged because of a
15 medical condition --
16    A. Yes, I was.
17    Q. -- related to your eye?
18    A. Generally, yeah.
19    Q. Okay. And that was a favorable discharge,
20 right, from the military?
21    A. Correct.
22    Q. What responsibilities did you have in the
23 military?
24    A. I was actually administrative.

Page

1 District.
2    Q. And what do you do for them?
3    A. Security.
4    Q. Where do you do security?
5    A. All over.
6    Q. How did you obtain a position as a person
7 doing security for the Chicago Park District?
8    A. I applied for it.
9    Q. And when you say "all over," all over the
10 City you do security?
11    A. All over the North Region.
12    Q. And how many hours a week do you work?
13    A. 25 hours a week.
14    Q. Do you have any other current employment?
15    A. No, I do not.
16    Q. Do you work days or nights?
17    A. It varies.
18    Q. And how many years did you have with the
19 Police Department at the time that you retired?
20    A. 32 years.
21    Q. Now I want to direct your attention to the
22 time that you joined the Police Department. So
23 that would have been in 1974?
24    A. '73.

SERRANO_LASSAR 22233

Page 17

1   Q. And what was the reason for that?
2     MS. EKL: Objection. Calls for
3 speculation.
4     THE WITNESS: I have no idea.
5 BY MR. GARDINER:
6   Q. So these gang books would have more than
7 just people that were arrested; right?
8   A. That's true.
9   Q. It would have more than people that were
10 convicted; right?
11   A. Yes.
12   Q. All right. And you would -- would you
13 ever take pictures that would be included in these
14 Gang Crime books or would it always be people at
15 the lockup or the picture taking places?
16   A. No. I would take pictures of the people
17 that I have arrested.
18   Q. Would you carry a camera with you?
19   A. No.
20   Q. So where would you take pictures of the
21 people that you arrested?
22   A. At the Area.
23   Q. So when they would come in after your
24 arrest you would take a picture of them?

Page 18

1   A. Correct.
2   Q. Would you take Polaroid pictures?
3   A. Yes.
4   Q. Would you write the name of the person
5 that you were taking a picture of on the Polaroid
6 picture?
7   A. No, on the back.
8   Q. Okay. And what would you do with the
9 pictures then after you took them?
10   A. They would be filed.
11   Q. And that would be filed at the Area?
12   A. Right.
13   Q. Now you mentioned that there were reports
14 relating to confidential informants and that you
15 didn't indicate who the confidential informant was
16 on the reports that you filed; right?
17   A. Right.
18   Q. On those confidential informant reports
19 how would you go back and know what source gave you
20 the information?
21   A. I would know.
22   Q. You would just remember?
23   A. Uh-huh. Yes.
24   Q. And was that true throughout the 30 years

Page 19

1 that you were an officer?
2   A. Well, at one point in time I stopped
3 working with the gangs.
4   Q. Okay. When was that?
5   A. When I became a dick assigned to homicide
6 investigations only.
7   Q. When was that?
8   A. 1990 I believe it was.
9   Q. Okay. But between the time of roughly --
10 was it 19- -- well, between the time you were
11 assigned as a Gang Crime specialist in 1990, you
12 would have these reports, but you wouldn't keep any
13 names on them; right?
14   A. Of the...?
15   Q. Confidential informants.
16   A. Correct.
17   Q. Okay. There's a -- well, let me ask you.
18     After you became a Gang Crime specialist
19 what did you do next?
20   A. We just investigate gang incidents.
21   Q. Would you investigate homicides as a Gang
22 Crime specialist?
23   A. I would help with the detectives on the
24 investigations of the homicides if they were

Page 20

1 gang-related.
2   Q. All right. So you would help another
3 officer who was a detective handling homicides?
4   A. Correct.
5   Q. All right. And then you became a
6 detective at some point; right?
7   A. Yes.
8   Q. And that was before 1989; right?
9   A. After 1989.
10   Q. Oh. After '89 you became a detective?
11   A. Correct.
12   Q. Okay. So as of September of 1989, you
13 weren't a detective and you would assist on
14 homicides; is that right?
15   A. That's correct.
16   Q. So how were you assigned to work on a
17 homicide case?
18   A. Depending on the gang that was involved
19 with it.
20   Q. Who would assign you?
21   A. We would be assigned by a sergeant of the
22 Gang Crime Unit.
23   Q. I see. Okay.
24     And then there were particular gangs that