# EXHIBIT 8

**CONDENSED**

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

# CASE NO. 1:22-CV-06496

## ALFREDO GONZALEZ

## V.

## REYNALDO GUEVARA, ET AL

## VOL. I

## DEPONENT:

## EDUARDO RAMIREZ

## DATE:

## JUNE 20, 2024

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1   IN THE UNITED STATES DISTRICT

2   COURT FOR THE NORTHERN DISTRICT

3   OF ILLINOIS EASTERN DIVISION

4   CASE NO. 1:22-CV-06496

5   JUDGE JOHN F. KNESS

6   MAGISTRATE JUDGE HEATHER K. MCSHAIN

7

8   ALFREDO GONZALEZ,

9   Plaintiff

10

11   V.

12

13   REYNALDO GUEVARA, ET AL,

14   Defendants

15

16

17

18

19

20

21

22

23   DEPONENT:  EDUARDO RAMIREZ VOL. 1

24   DATE:      JUNE 20, 2024

25   REPORTER:  VICTORIA ADAMS

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 2

                    APPEARANCES
ON BEHALF OF THE PLAINTIFF, ALFREDO GONZALEZ:
   Sean Starr, Esquire
   Annie Prossnitz, Esquire (Appeared via videoconference)
   Loevy & Loevy
   311 North Aberdeen
   3rd Floor
   Chicago, Illinois 60607
   Telephone No.: (312) 243-5900
   E-mail: sean@loevy.com
   prossnitz@loevy.com


ON BEHALF OF JOSE JUAN MAYSONET, JR:
   Jennifer Bonjean, Esquire
   Bonjean Law Group
   750 Lexington Avenue
   9th Floor
   New York, New York 10022
   Telephone No.: (718) 875-1850
   E-mail: info@bonjeanlaw.com
   (Appeared via videoconference)


   AND

   Steven Greenberg, Esquire
   Nicholas Burris, Esquire
   Greenberg Trial Lawyers
   53 West Jackson Boulevard
   Suite 1260
   Chicago, Illinois 60604
   Telephone No.: (312) 879-9500
   E-mail: steve@greenbergcd.com
   nicholas@greenbergcd.com
   (Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
   Tim Scahill, Esquire
   Borkan & Scahill, LTD
   20 South Clark
   Suite 1700
   Chicago, Illinois 60603
   Telephone No.: (312) 580-1030
   E-mail: tscahill@borkanscahill.com
   (Appeared via videoconference)

Page 3

ON BEHALF OF THE DEFENDANTS, EDWARD MINGEY, STEVEN
GAWRYS, LEE EPPLEN, FERNANDO MONTILLA, ROLAND
PAULNITSKY, RICHARD SCHAK, ROBERT SMITKA AND ERNEST
HALVORSEN:
   Allison Romelfanger, Esquire
   The Sotos Law Firm, P.C.
   550 Devon Avenue
   Suite 150
   Itasca, Illinois 60143
   Telephone No.: (630) 735-3300
   E-mail: aromelfanger@jsotolaw.com
   (Appeared via videoconference)


ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
   Austin Rahe, Esquire
   Rock Fusco & Connelly, LLC
   333 West Wacker Drive
   19th Floor
   Chicago, Illinois 60606
   Telephone No.: (312) 494-1000
   E-mail: arahe@rfclaw.com
   (Appeared via videoconference)


ON BEHALF OF THE DEFENDANTS, JENNIFER BOROWITZ, FRANK
DIFRANCO, JOHN PERKAUS:
   Michael Iasparro, Esquire
   Hinshaw & Culbertson, LLP
   151 North Franklin Street
   Suite 2500
   Chicago, Illinois 60606
   Telephone No.: (815) 490-4945
   E-mail: miasparro@hinshawlaw.com
   (Appeared via videoconference)


Also Present: Isabel Smith, Rock Fusco & Connelly, LLC;
   Ashley Cohen, Paralegal for Bonjean Law Group

Page 4

                    INDEX

                                                 Page

PROCEEDINGS VOL. I                                 6

DIRECT EXAMINATION BY MR. SCAHILL                  7


                    EXHIBITS

Exhibits                                         Page

A - Declaration                                    91

Page 5

                    STIPULATION


The VIDEO deposition of EDUARDO RAMIREZ was taken at

PREMIER EXECUTIVE CENTER, 1415 PANTHER LANE, NAPLES,

FLORIDA 34109 on THURSDAY the 20th day of JUNE 2024 at

11:11 a.m. (ET); said deposition was taken pursuant to

the FEDERAL Rules of Civil Procedure. It is agreed that

VICTORIA ADAMS, being a Notary Public and Court Reporter

for the State of FLORIDA, may swear the witness and that

the reading and signing of the completed transcript by

the witness is not waived.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 6

1       PROCEEDINGS VOL. I
2       THE REPORTER:  Okay.  We are now on the record.
3  My name is Victoria Adams.  I'm the court reporter
4  and videographer today.  Today is the 20th day of
5  June 2024.  The time is 11:11 a.m.  We are at the
6  offices of Premier Executive Center, 1415 Panther
7  Lane, Naples, Florida 34109 to take the deposition
8  of Eduardo Ramirez in the matter of Alfredo Gonzalez
9  v. Ronald Guevara, et al.
10      pending in the District's Court for the
11 Northern District of Illinois, Eastern Division,
12 Case number 1:22-CV-06496.  Will all counsel please
13 identify themselves for the record, starting with
14 Plaintiff's Counsel?
15      MR. STARR:  Sean Starr from Loevy & Loevy on
16 behalf of plaintiff, Alfredo Gonzalez, attending in
17 person.
18      MS. BONJEAN:  Jennifer Bonjean, B-O-N-J-E-A-N,
19 on behalf of Jose Juan Maysonet, Junior, appearing
20 by Zoom.
21      MS. PROSSNITZ:  I'm Annie Prossnitz on behalf
22 of Plaintiff, Alfredo Gonzalez, appearing via Zoom.
23      MR. STARR:  Sorry.
24      MS. BONJEAN:  Sorry.  Sorry about that, guys. I
25 didn't know anyone else was there.

Page 7

1       MR. SCAHILL:  Timothy Scahill on behalf of
2  Defendant, Guevara.
3       MS. ROMELFANGER:  Allison Romelfanger on behalf
4  of Defendants Mingey, Gawrys, Epplen, Montilla,
5  Paulnitsky, Schak, Halvorsen, and Smitka.
6       MR. RAHE:  Austin Rahe on behalf of the City of
7  Chicago.
8       MR. IASPARRO:  Michael Iasparro with Hinshaw &
9  Culbertson on behalf of former assistant state's
10 attorneys, Frank DiFranco, Jennifer Borowitz, and
11 John Perkaus, attending via Zoom.
12      MR. STARR:  Can we pause for one second?  The
13 front desk is calling this office for some reason.
14      THE REPORTER:  Okay.  Thank you, Mr. Ramirez.
15 Can you please raise your right hand.  Do you
16 solemnly swear or affirm that the testimony you're
17 about to give will be the truth, the whole truth,
18 and nothing but the truth?
19      THE WITNESS:  I do.
20      THE REPORTER:  Okay.  We may begin.
21           DIRECT EXAMINATION
22 BY MR. SCAHILL:
23      Q.  Good morning, Mr. Ramirez.  My name is Timothy
24 Scahill.  I'm one of the attorneys involved in these
25 cases that you're here to give a deposition for.  First

Page 8

1  of all, can I have you state your name and spell it for
2  the record to start?
3       A.  My name is Eduardo Ramirez, E-D-U-A-R-D-O.
4  Last name is R-A-M-I-R-E-Z.
5       Q.  Okay.  And as you heard the court reporter
6  say, and I just want to make sure you understand that
7  this is a deposition that's being taken in a federal
8  court case, pending in the Northern District of
9  Illinois.  Are you aware of that, sir?
10      A.  I'm aware of that.
11      Q.  Okay.  Have you ever given a deposition
12 before?
13      A.  Never.
14      Q.  Okay.  Have you ever testified in court
15 before?
16      A.  Never.
17      Q.  Okay.  So I'm going to give you a couple of
18 the rules.  I don't know if Mr. Starr or anyone else has
19 given you some of the ground rules here, but I just want
20 to make sure you understand the process so we're on the
21 same page, okay?
22      A.  Yes, sir.
23      Q.  All right.  First of all, it's very important
24 that you verbalize all of your answers instead of
25 nodding your head or shaking your head.  Even though

Page 9

1  we're on video, it's important for the court reporter to
2  be able to take those down.  Can you agree to do that?
3       A.  I agree to do that.
4       Q.  Okay.  And you -- you'll probably be asked
5  questions by a number of attorneys today.  As those
6  depositions go, sometimes it takes on a conversational
7  tone, sometimes it doesn't.  But people sometimes have a
8  tendency to maybe talk over each other and, you know,
9  cut off each other's sentences.  It's very important,
10 again, for the court reporter that you just wait until
11 the whole question is out and then answer, and we'll do
12 the same with you, wait and make sure that we get your
13 whole answer out before we start to ask another
14 question, okay?
15      A.  Okay.  I agree.
16      Q.  All right.  If you don't understand the
17 question at any point, please ask us all to rephrase.
18 We're more than happy to do it.  If we don't do that,
19 we're going to assume that you understood the question.
20 Can you agree to that as well?
21      A.  I agree with that.
22      Q.  Okay.  If you need a break at any point to use
23 the washroom or what have you, please let us know.  The
24 only rule on that is that you're not able to take a
25 break when there's a question pending, you have to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 10

1  answer the question, okay?
2      A.  Okay.
3      Q.  All right.  There's probably going to be
4  objections from time to time.  That's what attorneys do
5  in these sometimes.  Unless you've been instructed not
6  to answer by somebody, you do have to go ahead and
7  answer the question, whether there's an objection or
8  not, okay?
9      A.  I agree.
10     Q.  All right.  Did you come to this deposition by
11 yourself today?
12     A.  I came with my wife.
13     Q.  Oh, okay.  She's waiting for you in the lobby
14 or something?
15     A.  Yeah.
16     Q.  Okay.  And you're not represented by counsel
17 here today, are you?
18     A.  No, I'm not.
19     Q.  All right.  And don't take offense to this
20 question.  We ask everybody this question.  But are you
21 under the influence of any drugs or alcohol at this
22 time?
23     A.  No.  No, I'm not.
24     Q.  Okay, good.  You -- you're aware -- I know you
25 said you haven't testified, but you're aware that you're

Page 11

1  giving testimony under oath.  So the same rules would
2  apply to giving testimony here as if you were in court
3  before a judge.  You understand that, right?
4      A.  I understand that.
5      Q.  Okay.  Do you understand that you have been
6  listed as a witness in two federal court cases, one by
7  Alfredo Gonzalez and another by the person by the name
8  of Jose Maysonet?
9      A.  Yes, sir.  I understand.
10     Q.  Okay.  Do you understand that there's a
11 possibility at some point, if these cases go to trial,
12 that you might be required to actually come and testify
13 before a jury in those cases?
14         MS. BONJEAN:  Objection.  Misstates the law.
15         MR. STARR:  Join.
16 BY MR. SCAHILL:
17     Q.  You can answer.
18     A.  Well, I live in Florida.  I don't know how I
19 could go down to Chicago and testify unless it's through
20 the -- through this.  I mean, it is what it is.
21     Q.  All right.  Again, you know, there are
22 objections.  I'm not saying that's a certainty.  I just
23 want you to understand that there's a possibility that
24 you may have to testify in front of the jury, be it
25 remote, be it in person, what have you.  You understand

Page 12

1  that --
2          MS. BONJEAN:  Objection.  Misstates the law.
3          MR. STARR:  Join.
4          THE WITNESS:  Understand.
5  BY MR. SCAHILL:
6      Q.  Okay.  Did you bring any materials with you
7  today?
8      A.  No, I didn't.
9      Q.  Okay.  I understand that you executed an
10 affidavit at some point relating to the Gonzalez case,
11 yes?
12     A.  Yes.
13         MR. STARR:  Objection.  Form.  For the record,
14     it's a declaration.
15 BY MR. SCAHILL:
16     Q.  Well, you executed a document relating to this
17 case?
18     A.  Yes, I did.
19     Q.  Okay.  Do you have a copy of that?
20     A.  I have a copy, but I didn't bring it with me.
21     Q.  Okay.  It just -- you know, we're not there.
22 I just want to make sure you don't have anything in
23 front of you?
24     A.  I don't have nothing.
25     Q.  Okay.  Fair enough.

Page 13

1          Have you ever gone by any names other than
2  Eduardo Ramirez?
3      A.  Yes, I have.
4      Q.  Okay.  What other names have you gone by?
5      A.  I've gone by the name of Yuma, and I've gone
6  by the name of Fast Eddie.
7      Q.  Fast Eddie?
8      A.  Yeah.
9      Q.  All right.  Those are nicknames, obviously?
10     A.  Nicknames.  Yes, sir.
11     Q.  Okay.  There's been some sort of discussion of
12 the Yuma nickname.  Is -- Yuma is with a Y, Y-U-M-A, not
13 J-U-M-A?
14     A.  Y-U-M-A.
15     Q.  Okay.  What -- when did you get that nickname?
16     A.  In the mid-'80s or something like that.
17     Q.  I'm sorry.
18     A.  In the mid-'80s.  I -- I don't recall when.
19     Q.  What does the nickname mean, to your --
20         MS. BONJEAN:  Objection to the form of that
21     question.
22         MR. STARR:  Foundation.
23         THE WITNESS:  Everybody I know, more or less,
24     have nicknames, so most likely our real names are
25     hardly ever revealed unless we put nicknames out

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 14

```
 1      there.  But other than that, that's the nickname
 2      that I --
 3  BY MR. SCAHILL:
 4      Q.   Okay.  Do you know what that means?
 5          MR. STARR:  Objection.
 6          MS. BONJEAN:  Objection.  Form and foundation.
 7          THE WITNESS:  I know there's a Yuma, Arizona,
 8      but I'm not from Arizona, and I'm not -- I didn't
 9      take the name because of that.
10  BY MR. SCAHILL:
11      Q.   What did you take the name for?
12      A.   It's -- I thought it was unique.  I don't
13  know.
14      Q.   Have you ever used any names other than
15  Eduardo Ramirez in any dealings you had with law
16  enforcement in your past?
17      A.   I recall maybe using Alberto.  I recall using
18      maybe Isley Rivera, and that's really it.
19      Q.   I'm sorry, what was the second one?
20      A.   Isley Rivera.
21      Q.   Isley Rivera?
22      A.   Yeah.
23      Q.   All right.  And what were the circumstances
24  under which you used those names?
25          MS. BONJEAN:  Objection.  Form.
```

Page 15

```
 1          THE WITNESS:  I believe it was because I was
 2      stopped, or I was questioned by law enforcement.
 3      And those are the names that I was using.
 4  BY MR. SCAHILL:
 5      Q.   Were you using fake names so the police
 6  officers who you were dealing with wouldn't know your
 7  real name?
 8          MR. STARR:  Objection to form.  Foundation.
 9      Asked and answered.
10          MS. BONJEAN:  Join.  And can we just place on
11      the record that I will be joining any of Mr. Starr's
12      objections throughout this deposition so I don't
13      have to repeatedly say "join"?
14          MR. STARR:  And it's -- the same applies to any
15      objections that Ms. Bonjean makes that I would like
16      to join as well.
17          MR. SCAHILL:  Not a problem.
18          MR. STARR:  Thank you.
19          MS. BONJEAN:  Thank you.
20          THE WITNESS:  Thank you.
21  BY MR. SCAHILL:
22      Q.   You can answer the question.
23      A.   What was the question again?  Why did I use
24  the nicknames?  That's what you asked me?
25      Q.   Well, not the nicknames.  When you used the
```

Page 16

```
 1      names "Alberto" or "Isley Rivera" in dealings with law
 2      enforcement, was your purpose in using those names to
 3      conceal your real identity from the law enforcement
 4      officers you were dealing with?
 5          MR. STARR:  Same objections.
 6          THE WITNESS:  That's correct.
 7  BY MR. SCAHILL:
 8      Q.   Okay.  And what was your purpose for doing
 9  that?
10      A.   To maybe escape the case, I don't know, escape
11      the interrogation I was going through or whatever or the
12      stop, traffic stop.  I can't remember.  They were a long
13      time ago.
14      Q.   On how many occasions did you use the name --
15      well, strike that.  When you used the name, Alberto, was
16      it Alberto Ramirez or Alberto and a different surname?
17      A.   Alberto Ramirez.
18      Q.   Okay.  On how many occasions did you use the
19      name Alberto Ramirez with law enforcement?
20          MR. STARR:  Objection.  Form.  Foundation.
21      Calls for speculation.  You can answer.
22          THE WITNESS:  I really don't remember.
23  BY MR. SCAHILL:
24      Q.   Was it on more than one occasion?
25      A.   Yes, sir.
```

Page 17

```
 1      Q.   Okay.  Was it on more than five occasions?
 2          MR. STARR:  Same objections.
 3          THE WITNESS:  I -- I don't know.  I don't
 4      remember.
 5  BY MR. SCAHILL:
 6      Q.   Okay.  What about the name, Isley Rivera?  On
 7  how many occasions did you use that fake name with law
 8  enforcement?
 9          MR. STARR:  Same objections.
10          THE WITNESS:  Maybe once or twice.
11  BY MR. SCAHILL:
12      Q.   All right.  And in what time frame had you
13  used those names, either of them, with law enforcement?
14      A.   You mean time frame, like what?
15      Q.   Yeah.  The general time frame of the years
16  that you might have used it in dealing with law
17  enforcement.
18          MR. STARR:  Same objections.
19          THE WITNESS:  The '80s, mid-'80s, early '80s.
20  BY MR. SCAHILL:
21      Q.   To your knowledge, do you have any criminal
22  records associated with either of those names?
23          MS. BONJEAN:  Objection.  Form.
24          THE WITNESS:  I really don't know, but I think
25      they might have.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 18

BY MR. SCAHILL:

1 BY MR. SCAHILL:
2     Q.    Was your usage of those names with law
3 enforcement in the state of Illinois, or was it in a
4 different state?
5     A.    One was in Tennessee, and the other ones were
6 in Illinois.
7     Q.    Which one was in Tennessee?
8     A.    Isley Rivera.
9     Q.    Okay.  And the Alberto Ramirez was in
10 Illinois?
11    A.    Yes, sir.
12    Q.    Okay.  Was that with the Chicago Police
13 Department or with another law enforcement agency?
14    A.    Chicago Police Department.
15    Q.    Okay.  What's your date of birth?
16    A.    XX-XX-XX.
17    Q.    All right.  And where were you born, sir?
18    A.    I was born in Cuba.
19    Q.    In Cuba.  Okay.  When did you come over to the
20 states?
21    A.    In '69.
22    Q.    Okay.  So you were a kid when you came over?
23    A.    Right.
24    Q.    Yeah.  Do -- I saw when you put your hand up,
25 you had a little ink on your arm.  Can you tell us what

Page 19

1 tattoos that you have on your body?
2     A.    Well, I've got all kinds of tattoos, my whole
3 body is tattooed.  If you've been to the fed joint, you
4 get good tattoos from a good artists, so I got tattoos.
5     Q.    Do you have any tattoos with any gang
6 significance?
7         MR. STARR:  Objection to form and foundation.
8         THE WITNESS:  Maybe on my back.  I got a lion
9     with crowns and stuff like that, and I got
10    tombstones from guys that have died from the set
11    that I'm from, Whipple and Wabansia.
12 BY MR. SCAHILL:
13    Q.    I'm sorry.  The -- which and Wabansia?
14    A.    Whipple and Wabansia.
15    Q.    I'm sorry.  One more time?  I --
16    A.    Whipple.
17        MS. BONJEAN:  Whipple.
18 BY MR. SCAHILL:
19    Q.    Whipple.  Whipple.  Sorry.
20    A.    Whipple.
21    Q.    Whipple and Wabansia.  Got it.  Okay.  So the
22 -- and the lions and the crowns are tattoos that you
23 have on your body signifying an affiliation with the
24 Latin Kings organization?
25    A.    Yes, sir.

Page 20

1     Q.    Okay.  And you were affiliated with a
2 particular set in the city of Chicago for a time?
3     A.    Particular what?  I don't understand that.
4     Q.    Set.  You used the term.  I'm -- you were
5 affiliated with a particular set of the Latin Kings
6 organization, correct?
7     A.    Correct.
8     Q.    All right.  And that was a set that was
9 operating in the vicinity of Whipple and Wabansia,
10 correct?
11    A.    Humboldt Park area.
12    Q.    All right.  Can you tell us -- well, strike
13 that.  What years were you active in the Latin Kings
14 organization?
15        MR. STARR:  Objection.  Form.  Foundation.
16        THE WITNESS:  When I came out of the military,
17    I -- I grew up with a lot of friends that were --
18    were all from the same neighborhood.  When I came
19    out, I greeted them, and they greeted me, and that's
20    when it started.  I got out of the military, I
21    think, in '82.
22 BY MR. SCAHILL:
23    Q.    All right.  You were in the United States
24 military about -- it's the United States military we're
25 talking about, correct?

Page 21

1     A.    Yes, sir.
2     Q.    Okay.  And what years of service were you in
3 the military?
4     A.    From '77 to '82.
5     Q.    And --
6     A.    But I think I had -- I think I had another
7 year or so of reserves, so it might have been '84,
8 though.  I'm not sure.
9     Q.    And where were you stationed during your time
10 in the military?
11    A.    I was stationed overseas.  I was stationed in
12 Colorado.  I was stationed -- that's actually it.
13    Q.    All right.  Before you went into the military,
14 were you residing in the city of Chicago?
15    A.    Yes, sir.
16    Q.    All right.  When did you start living in the
17 city of Chicago first?
18    A.    When my parents came from Cuba, we moved into
19 the Humboldt Park area, and that's where my life began.
20    Q.    Okay.  Okay.  So you got -- when you got out
21 of the military in 1982, you were how old then, about
22 23?
23        MR. STARR:  Objection to form.
24    Mischaracterizes.  He said it was either '82 or
25    between '82 and '84.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 22

1    THE WITNESS: I was 17 when I joined the
2    military back then, so give four years of that, 17,
3    that's 21. And then two more years of reserves, so
4    23.
5  BY MR. SCAHILL:
6    Q.  Okay. So when you came back after getting out
7  of the military, that's when you first joined the Latin
8  Kings organization?
9    A.  Well, before I went into the military, I was
10 not -- actually, I was -- I was a kid growing up with
11 kids, they were all from the same neighborhoods. We
12 were all Latin Kings, so I mean, nobody actually said,
13 here's your crown or here -- you're this or here, you're
14 that. But I -- I believe that through the years I've
15 learned -- I've gathered my respect with the brothers
16 and -- and actually that's how I live my life.
17   Q.  Do you still consider yourself a member of the
18 Latin Kings organization?
19   A.  Yes, I do.
20   Q.  Okay. Is that why you're wearing the gold and
21 black shirt today to signify that alignment with the
22 Latin King organization?
23   A.  Yes.
24     MR. STARR: Objection to form and foundation.
25 BY MR. SCAHILL:

Page 23

1    Q.  But you said yes, correct?
2    A.  Yes.
3    Q.  All right. So what does that mean for you, as
4  you sit here today, to still be a member of the Latin
5  King organization?
6    A.  I believe things have changed during the
7  years, and the young generation take part in doings that
8  shouldn't be done that certain way. The -- what -- the
9  structure that we put down have been either forgotten,
10 removed, or disrespected, so that's how I feel.
11     MR. SCAHILL: Do you still fraternize with
12   members of the Latin King organization currently?
13     MR. STARR: Objection to form.
14     THE WITNESS: Yes, I do.
15 BY MR. SCAHILL:
16   Q.  Okay. How frequently?
17   A.  Like every week. I -- they call me, and I
18 call them. We're friends. We don't talk about gangs or
19 things like that. We talk about families and structure
20 and businesses, things like that. I'm also a local 150
21 operator, so I'm -- in September, on my birthday, I'm
22 ready to retire. I've had an accident, a stroke, where
23 I have lost movement of my right leg, so there's a lot
24 of things going on with me that I can't, you know, just
25 focus on. I don't live in Chicago. I can't do nothing

Page 24

1  about what's going on in Chicago, so my life is here
2  with my family, my wife. And -- and I'm trying to buy a
3  home right now, so that's where I'm at.
4    Q.  Have you ever tried to extricate yourself from
5  the Latin Kings organization?
6      MS. BONJEAN: Objection. Form. Foundation.
7    Mischaracterize of the misunderstands his prior
8    testimony.
9      MR. STARR: Join.
10     THE WITNESS: No.
11 BY MR. SCAHILL:
12   Q.  Do you have any desire to do that?
13   A.  Not at all.
14   Q.  Okay. Do you intend to remain affiliated with
15 the Latin King organization for the rest of your life?
16   A.  I can't call what I'm going to do tomorrow,
17 but to my beliefs, I am one of the few Latin Kings that
18 I -- I am a Muslim, so I practice Islam. So there's a
19 lot of things that I believe in that I don't question or
20 agree with, so this is how I feel.
21   Q.  Do you feel that your membership in the Latin
22 Kings organization is an important part of your life?
23   A.  Not really. I mean, it's part of my life
24 because I lived -- I lived through it. I've been in
25 prison. I lived through it. I see the young

Page 25

1  generation, what they're doing, and -- and things are
2  not the same.
3    Q.  So when you refer to you getting out of the
4  Army and joining the set on Whipple and Wabansia, what
5  did that -- what did that membership entail to you?
6      MS. BONJEAN: Objection. Form. Foundation.
7      MR. STARR: Join.
8      THE WITNESS: I was given a -- a certain rank
9    in my set. This was done by Gustavo Colon, our
10   chief and leader of Latin Kings. And that's how I
11   started my involvement of going up the ladder of
12   ranking and stuff in the Latin Kings.
13 BY MR. SCAHILL:
14   Q.  All right. What was the first rank that you
15 got in the Latin Kings organization?
16   A.  Well, I've been an Inca. I've been a crown
17 council chairman, and those are actually positions that
18 I've always, you know, had.
19   Q.  What's the highest? I'm not familiar, but
20 what's the highest of those ranks that you achieved --
21   A.  The Inca.
22   Q.  -- in the Latin Kings organization?
23   A.  The Inca position.
24   Q.  Okay. And it -- what are the responsibilities
25 of an individual who's in the Inca position in the Latin

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE: ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 26

1  Kings organization?
2      A.   It is our responsibilities to make sure that
3  his set or his place of holding the rank is held
4  properly, and the law and order is maintained and -- and
5  enforced.
6      Q.   When you say law and order is maintained and
7  enforced, you mean the law and order with respect to the
8  rules of the Latin King organization?
9          MR. STARR:  Objection.
10         THE WITNESS:  Yes, sir.
11         MR. STARR:  Form and foundation.
12         MS. BONJEAN:  Joined.
13 BY MR. SCAHILL:
14     Q.   Okay.  You were not trying to make sure that
15 the subordinate members of the Latin Kings were
16 following the law of the state of Illinois; you were
17 trying to make sure that they were following the laws of
18 the Latin King organization.  Is that a fair
19 characterization?
20     A.   Exactly.
21     Q.   Okay.  And how did the laws of the Latin King
22 organization differ from what your understanding is of
23 the laws of the state of Illinois?
24         MR. STARR:  Objection to form.  Foundation and
25     speculation.  Seeks a legal conclusion.

Page 27

1          MS. BONJEAN:  Yeah.  All join.
2          THE WITNESS:  Well, --
3  BY MR. SCAHILL:
4      Q.   You can answer.
5      A.   The laws of the Latin Kings in Illinois are,
6  well, different than the laws of the Latin Kings in New
7  York.  They go under the blood -- bloodline of the Latin
8  Kings.  We go through Lord Gino as our chief leader or
9  father in the Kings.  The south side had another leader,
10 and there was a little division between that.  But other
11 than that, we all were able to manage our laws.  The
12 laws didn't change.
13     Q.   What were some of the laws of the Latin Kings
14 organization when the time you were in Inca?
15     A.   I can go over --
16         MS. BONJEAN:  Objection.  I'm sorry.  Objection.
17     Form.  Foundation.
18         THE WITNESS:  I can go over a whole day of laws
19     and stuff like that, so let's be realistic.  What
20     are you actually trying to get the question at?
21 BY MR. SCAHILL:
22     Q.   Well, what were your -- what were the more
23 important aspects of your duties as an Inca with respect
24 to administering the laws to the people that were in
25 your set?

Page 28

1          MR. STARR:  Objection to form.  Foundation.
2          THE WITNESS:  Well, like -- like I explained to
3  you before, one of the formal questions in the --
4  before the -- you asked me this, laws didn't change.
5  The Inca's duty was to maintain order, law, and --
6  and -- and -- and duties.  I mean, sometimes laws
7  would have to be violated or things went on that,
8  you know, if -- a if a guy was -- from my set was
9  using, like, heroin or dope and stuff like that,
10 Whipple and Wabansia, we didn't allow it.  Colon and
11 Whipple used to -- started out by selling dope, and
12 that was coming closer -- that -- that's the set
13 closer to us.  So my job was to maintain law and
14 order to that -- to that situation.
15 BY MR. SCAHILL:
16     Q.   When you're saying maintaining law and order,
17 you mean making sure that other sets are not selling
18 drugs within the territory that you were the Inca over?
19         MR. STARR:  Objection.  Form.  Foundation.
20     Mischaracterizes his testimony.  Go ahead.
21         MS. BONJEAN:  Join.
22         THE WITNESS:  I -- I can't dictate what
23 happened like on Spaulding or Cullom Avenue These
24 sets were run by other individuals and those
25 individuals, if they were manipulated because of the

Page 29

1  money or the trade to let their set start selling
2  dope, I mean, I seen the destruction what dope did
3  to people and what they did to families.  And -- and
4  brothers using, you know, dope under the table,
5  hiding from other brothers because they knew that
6  they were out of law.  So these things here are the
7  things that we worried about.
8  BY MR. SCAHILL:
9      Q.   So let's take one step back.  What years were
10 you in Inca in the Latin King organization?
11     A.   Well, ever since I got out of the military,
12 I've held high rank position in the Latin Kings in my
13 neighborhood.  And to this day, still respected, even
14 though I'm not the Inca now because there's a former
15 Inca now.  But I -- if I go and see them, they will
16 respect me like if I was their -- their main Inca
17 because the foundation that we built in the '80s came to
18 --
19     Q.   So you consider yourself still someone who has
20 a leadership role in the Latin Kings organization?
21         MR. STARR:  Objection.  Form.  Foundation.
22         THE WITNESS:  I -- I'm going to be 65-years-
23 old.  I don't -- I don't have time to be taking care
24 of kids.  I have one of my kids died over gang
25 violence, so these things here just don't grow on

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 30

1    trees and just forget one.  I mean, this is
2    something you live with.
3    BY MR. SCAHILL:
4        Q.   Is the Inca role sort of the top role in a
5    particular area of the city?
6        A.   Yes, sir.
7        Q.   Okay.  And you were the Inca for Wabansia and
8    Whipple from what time periods?
9            MR. STARR:  Objection.  Asked and answered.
10           THE WITNESS:  I remember in the '80s, all
11    through the '80s until I went to jail in the '90s,
12    in the '90s in jail, I held high position.  When I
13    was at Stateville, I was started out in F-House.
14    And then from there, I was on the honor -- they put
15    me on the honor dorm, the G-Dorm.  So you know, the
16    people that went to G-Dorm were people with high
17    ranking Latin Kings or high ranking Latin -- chiefs,
18    all the high ranking people went through G-Dorm, and
19    that's where I was -- did my time.
20    BY MR. SCAHILL:
21       Q.   Are you referring to the Illinois Department
22    of Corrections or the Federal Bureau of Prisons?
23       A.   The Illinois Department of Corrections.
24       Q.   Okay.  And we'll get into the time there in a
25    little bit, but so let's go back to the '80s and '90s.

Page 31

1    When did you first get appointed or installed as the
2    Inca for the Whipple and Wabansia area?
3            MR. STARR:  Objection.  Asked and answered.
4            THE WITNESS:  I believe I told you, in the
5    early '80s, the -- the reign could only be given by
6    Lord Gino or be voted on by your members of your
7    set.  My first duty as an Inca was being voted by
8    the members of my set, majority ruled, and that's
9    how I first started my career as a Latin King.
10    BY MR. SCAHILL:
11       Q.   Were you the Inca in the area of Wabansia and
12    Whipple in the year 1989?
13           MR. STARR:  Objection.  Asked and answered.
14           THE WITNESS:  Yes.
15    BY MR. SCAHILL:
16       Q.   Okay.  And you were also then the Inca in the
17    year of 1990, correct?
18           MR. STARR:  Same objection.
19           THE WITNESS:  19 what?
20    BY MR. SCAHILL:
21       Q.   1990?
22           MR. STARR:  Same objection.
23           THE WITNESS:  Yeah.
24    BY MR. SCAHILL:
25       Q.   Okay.  Were part of your duties as the Inca to

Page 32

1    order any acts of violence against any other gangs or
2    gang members?
3            MR. STARR:  Objection.  Form.  Foundation.
4            THE WITNESS:  I don't want to speak on that.
5    BY MR. SCAHILL:
6        Q.   But I don't understand.  I mean, you -- if --
7    you have to answer the questions that we have, I mean,
8    that -- that's --
9        A.   Can you say the question again?
10           MS. BONJEAN:  He's been answering the
11    questions.  What would -- what are you you are you
12    talking about?
13           MR. SCAHILL:  He said -- he said he doesn't
14    want to speak on that.  That's what I'm talking
15    about.  He said, "I don't want to speak on that."
16    That's what I'm talking about.
17           MS. BONJEAN:  What was the question?  What was
18    the question?  Can the court reporter read back the
19    question, please?
20           THE REPORTER:  Yes, just -- starting a little
21    way back just in case I missed it.
22           (REPORTER PLAYS BACK REQUESTED TESTIMONY)
23           MS. BONJEAN:  Form.  Foundation.  Harassing.
24           THE WITNESS:  I believe by you asking me that
25    question, I'm implicating myself and other people

Page 33

1    that actually, if they took place in any kind of
2    violence involved on a case that don't -- involves
3    them or myself because that was a long time ago.
4    That's my -- that's my --
5            MS. BONJEAN:  And it -- this has implications,
6    constitutional implications.
7            MR. STARR:  Correct.  The witness hasn't -- has
8    the right to invoke the Fifth Amendment if he thinks
9    he's going to incriminate himself.
10           MR. SCAHILL:  It -- all I'm -- and again, this
11    -- nobody here is your attorney, but if you feel
12    that, you know, obviously --
13           MS. BONJEAN:  We all have an ethical
14    obligation.  We all have an ethical obligation.  You
15    --
16           MR. SCAHILL:  And you're cutting me off.  I'm
17    explaining -- I'm explaining that to him.
18           MS. BONJEAN:  Okay.
19           MR. SCAHILL:  Yeah.  Okay.
20    BY MR. SCAHILL:
21       Q.   Obviously, you're unrepresented here today.
22    You do have a constitutional right against self-
23    incrimination.  We -- none of us can give you advice on
24    that, but if that's what you feel comfortable doing, I
25    do need you to explicitly invoke that right instead of

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 34

1  saying, "I'm not going to speak on it" because there's
2  different aspects of that. So if, again, you want to
3  invoke your constitutional rights against self-
4  incrimination, you need to do it explicitly by saying
5  you plead the Fifth or something like that.
6      A.   Okay. I would like to say I plead the Fifth
7  on that question there.
8      Q.   All right. While you were an Inca in the
9  Wabansia and Whipple area in 1989 and 1990, were you
10 responsible for overseeing narcotics activity for the
11 Latin Kings organization in that area?
12      MS. BONJEAN:  Objection. Form -- go ahead,
13 Sean.
14      MR. STARR:  No. Form. Foundation.
15      MS. BONJEAN:  Join.
16      THE WITNESS:  I -- I believe that took place.
17 BY MR. SCAHILL:
18      Q.   Okay. Were you directly involved in managing,
19 in any respect, the drug dealing activities in that area
20 of the city at that time?
21      A.   I would like to take the Fifth on that too.
22      Q.   Let's switch gears on another issue. We'll
23 probably come back to that. You are married, sir,
24 correct?
25      A.   Yes, sir.

Page 35

1      Q.   Okay. How long have you been married for?
2      A.   About two-and-a-half years.
3      Q.   Okay. Is this somebody you -- now my
4  understanding is that you did some time in federal
5  prison in the --
6      A.   Yes, sir. Yes, sir.
7      Q.   Okay. When were you released from federal
8  prison?
9      A.   2011. I mean -- 2021, I mean. Hold on.
10      Q.   Okay.
11      A.   '21.
12      Q.   And you got married after you were released,
13 it sounds like?
14      A.   Yes, sir.
15      Q.   Okay. What's your wife's name?
16      A.   Heather Brewer.
17      Q.   Heather Brewer?
18      A.   Yes, sir.
19      Q.   Okay. Do you have any children?
20      A.   I have children, but not with her.
21      Q.   Okay. How many kids do you have?
22      A.   I have three kids.
23      Q.   All right. How old are they?
24      A.   One is almost 30. That's my -- 30, 25, and
25 25. I got a pair of twins.

Page 36

1      Q.   Okay. These are all adult children?
2      A.   Yeah, all adults.
3      Q.   And there -- you said something a few minutes
4  ago that I wanted to take a step back and ask you about.
5  You mentioned that you had had a stroke at some point?
6      A.   Yes, sir.
7      Q.   Okay. Does that impact your ability to
8  remember things in the past or any sort of impact on
9  your memory?
10      A.   Well, I go to therapy. And I went to speech
11 therapy to help me get back my knowledge of talking,
12 movement, and my movement of my left hand, it's
13 numbness. My leg. My leg. Tomorrow, I go to my
14 specialist where they decided they're going to shoot
15 some kind of medicine into my -- my foot. And I go to
16 physical therapy twice a week. So I keep myself busy.
17 I'm trying to get myself in order again.
18      Q.   It sounds like you're describing physical
19 issues. So do you have -- is your understanding that
20 you have any impairments in your ability to remember
21 anything as a result of your medical condition?
22      MS. BONJEAN:  Objection. Calls for a medical
23 conclusion. You can answer if you can.
24      THE WITNESS:  I -- I forget things at home,
25 where I put things and things like that. So about

Page 37

1  asking questions about what happened a week ago,
2  sometimes I don't remember what happens three --
3  like is it three -- 30 years ago. I might remember
4  and I might not. So that's my --
5  BY MR. SCAHILL:
6      Q.   It sounds like you're describing a more acute
7  issue with the short-term memory than the long-term
8  memory?
9      MR. STARR:  Objection. Form. Foundation.
10 Mischaracterizes testimony.
11      MS. BONJEAN:  Join.
12      THE WITNESS:  Well, I go to therapy. I got
13 medical records that I could bring forward. I also
14 have a federal attorney that, if I need to bring her
15 in, her name is Andrea Gambino, and she will be
16 willing to assist me in any kind of mishaps that I'm
17 having here with yourself right now.
18 BY MR. SCAHILL:
19      Q.   Well, I mean, again, I -- so this is the first
20 that I'm hearing of representation, so I'm -- you know,
21 you have a right to have an attorney. Nobody here is
22 your attorney. I -- I'm not --
23      A.   Well, I believe -- I -- I believe I didn't
24 need an attorney because everything I'm going to say is
25 something that I have knowledge of, something I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 38

1  remember, and it's the truth.  When the -- the
2  investigator called me, and I -- I spoke to Mr. Sean,
3  that's the first thing he implied to me: make sure that
4  you tell me the things that you remember and be
5  truthful.  And this is what I'm doing.  Nobody's forcing
6  me to do this.  Nobody's paying me to do this.  I'm
7  doing this on my own free time.  So I mean, that'd be
8  realistic.  Ask what you need to ask from me and let's
9  get this over with.
10      MR. STARR:  And Tim, just for the record, I did
11     tell Mr. Ramirez that he has a right to counsel in
12     advance of the deposition, so he is aware.
13      THE WITNESS:  Yeah, I'm aware.
14  BY MR. SCAHILL:
15      Q.  Okay.  All right.  I mean, again, you brought
16  it up, so I just want to make sure that, you know, you
17  understand that that is -- if you -- and at any point,
18  if you feel uncomfortable where -- with answering
19  questions or what have you, or feel like you need some
20  representation, please let us know because it is your
21  right.
22      A.  Sir, I'm well aware of the laws.  I'm well
23  aware of the federal laws because I've helped a lot of
24  people.  When I was locked up, I went to the library, I
25  studied, and I learned things that, I mean, I --

Page 39

1  sometimes you'd be amazed of the help that I've given
2  all the inmates.  So --
3      Q.  Okay.
4      A.  -- I'm not a -- I'm not a fresh chicken on the
5  -- on the rooster hen.  I know what I'm doing.
6      Q.  Okay.  Understood.
7      A.  Okay.
8      Q.  Just let us know if you change your position
9  on that at any point.
10      A.  I'm okay.  Fine.
11      Q.  All right.  So directing your attention to the
12  year of 1989, where were you living in 1989?
13      A.  In Chicago.
14      Q.  What was your address?
15      A.  I was living on 34 something West Drummond.
16      Q.  What area of the city is that?
17      A.  That's like going towards the Logan Square
18  area.
19      Q.  All right.  And in 1980 -- did you live at the
20  same place the entirety of the year of 1989?
21      A.  Yes, sir.
22      Q.  Okay.  Did you live also at the same address
23  in the year 1990?
24      A.  Yes, sir.
25      Q.  Okay.  Who did you reside with during that

Page 40

1  time period?
2      A.  Who I resided with?  My second wife.
3      Q.  Anyone else?
4      A.  My kids.
5      Q.  All right.  That's it?
6      A.  Yeah, that's it.
7      Q.  Okay.  How long had you lived at that address
8  prior to 1989?
9      A.  Well, that was a family home, so when I got
10  out of the military, that house was still available.  So
11  I took the responsibility of holding down the house,
12  paying the bills, the mortgage and stuff like that.  In
13  the mid '80s.
14      Q.  This was a home that was owned by a relative
15  of yours --
16      A.  My --
17      Q.  -- before you took over it?
18      A.  My father and mother.
19      Q.  Okay.  And how long did you reside in that
20  house for?
21      A.  Six, seven years.  After that, I moved to my
22  mom's house, which I bought.  It was in 520 Rush Street
23  in Roselle.  That's where I was arrested at.
24      Q.  When you say -- well, first of all, what --
25  when did that occur?  Not the arrest, when you moved.

Page 41

1      A.  Early --
2      MR. STARR:  Objection.  Form.  Sorry for --
3      THE WITNESS:  -- early '90s or late '89.
4  BY MR. SCAHILL:
5      Q.  I thought you told me that you lived on
6  Drummond in '89 to '90.
7      A.  Okay, well, not through the whole year.  And
8  now you're asking me another question.  You said, when
9  did you live there?  I said, through the end of '89 and
10  the beginning of '90.
11      Q.  All right.
12      A.  And that's where I was arrested at, at that
13  house.
14      Q.  When you say that's where you were arrested,
15  at that house, what arrest are you referring to?
16      A.  I was arrested for five cans of chili pepper.
17  So I mean, they got me to do like 13 years in the
18  federal -- in the federal penitentiary, just for the
19  intent to delivery and have the knowledge of what I was
20  picking up.  So other than that, they was fake drugs,
21  and -- and that's what I went down for.
22      Q.  Sir, are you -- are you referring to your
23  arrest in 2011?
24      A.  Yes, sir.
25      Q.  Okay.  I think you -- because we were talking


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 42

1  about 1989 to '90 and where you were residing.
2      A.   '89, '90, I was residing in Drummond.
3      Q.   Okay.  All right.
4      A.   Drummond, I went to Rush Street, Roselle.
5  Now, the certain years and dates and stuff like that, I
6  can't remember, but I know that I was arrested in
7  Roselle, which I owned the house.  That's really it.
8      Q.   All right.  So -- but -- I think maybe we were
9  talking past each other, but did you live on Drummond
10  through the entirety of the year of 1990?
11      MR. STARR:  Objection.  Asked and answered.
12      THE WITNESS:  I believe so.
13  BY MR. SCAHILL:
14      Q.   Okay.  And you don't -- I mean, correct me if
15  I'm wrong, but do you remember the approximate time
16  frame when you moved to the Roselle address?
17      A.   I think it was '94 or '95.
18      Q.   All right.  And then you were arrested on a
19  federal drug case and ended up going to the penitentiary
20  for a time, correct?
21      A.   Yes, sir.
22      Q.   All right.  And you were released, I believe
23  you testified, in 2021, right?
24      A.   Yes, sir.
25      Q.   After you got arrested on the federal case,

Page 43

1  were you in pretrial detention through the time that you
2  were convicted?
3      A.   Yes.  I would not -- I would -- they would not
4  give me no bond because of my case and -- and the chance
5  of -- of flight risk.
6      Q.   All right.  And so between 1989 and when you
7  were released from prison, the only places you lived
8  were the Drummond address in Roselle and then either in
9  pretrial detention or in a federal penitentiary; is that
10  an accurate summation?
11      A.   Yes, sir.  Right.  Yes, sir.
12      Q.   Okay.  When you were released in 2021 from
13  federal prison, where did you go to reside?
14      A.   I went to reside -- I stayed in my
15  sister-in-law's house.  That's where I had my probation
16  officer check.  I checked in to that address when I got
17  released.  And that was on Melrose Park.
18      Q.   Melrose Park?
19      A.   Yes, sir.
20      Q.   And that's your -- I'm sorry -- your
21  sister-in-law's address?
22      A.   Yes, sir.
23      Q.   What is her name?
24      A.   Her name is Rosey Alcanzar.
25      Q.   And how long did you stay living there until

Page 44

1  you went somewhere else?
2      A.   I was there until I moved in with
3  ex-girlfriend, Ivette Chacon.
4      Q.   When did that occur?
5      A.   Like four months after I was released.
6      Q.   And was your -- were you on supervised release
7  when you were released?
8      A.   Yes, sir.
9      Q.   Okay.  Do you continue to be on supervised
10  release right now?
11      A.   No.  My -- I terminated my -- my parole.
12      Q.   When did that occur?
13      A.   That occurred like almost three years ago.
14      Q.   So you don't have to check in with a parole or
15  probation officer at all at this point?
16      A.   Not at all.
17      Q.   Okay.  And the -- your supervised release was
18  terminated satisfactorily?
19      A.   Do you mean to say what it was --
20      Q.   Meaning that they terminate -- the government
21  terminated the release to their liking and said you
22  don't have to be supervised anymore?
23      A.   Yes, sir.
24      MR. STARR:  Objection.  Form.
25  BY MR. SCAHILL:

Page 45

1      Q.   Okay.  You're not -- you don't have an
2  outstanding warrant or anything like that going on with
3  respect to your supervised release right now?
4      A.   Not at all.
5      Q.   Okay.  And you do not have to check in with
6  anybody down in Florida?
7      A.   No, I don't.
8      Q.   All right.  When did you move down to Florida?
9      A.   November of last year.
10      Q.   Okay.  And was that -- November of last year.
11  Okay.  And where was the last address you resided at
12  before that?
13      A.   I was resided on Potomac in the west side of
14  Chicago.  51 something West Potomac.  I can't remember
15  the address.
16      Q.   All right.  Are you currently employed?
17      A.   Right now I'm disabled because of my medical
18  situations.
19      Q.   And are --
20      A.   So I'm also -- I'm also going to be retiring
21  from the union on September 30th, the day of my
22  birthday.  I'm also receiving pension from the military.
23  And I believe I get a check from Social Security too, so
24  this is what I'm on.
25      Q.   Have you ever had any employment in the state

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 46

1  of Florida?
2      A.  Any what?
3      Q.  Employment.
4      A.  No, I haven't.
5      Q.  Okay.  After you were released from the
6  federal penitentiary, did you have employment after
7  that?
8      A.  Yes, I did.
9      Q.  Where were you employed?
10     A.  I was employed in O'Hare Airport.  I was
11 employed in different jobs.  The union sends you
12 different jobs places.  But my most recently was for
13 Arrow or K-Five in the airport.
14     Q.  And what trade are you in, or were in?
15     A.  What trade?
16     Q.  Yes.
17     A.  I'm a union operator.  I work machinery, like
18 bulldozers, tire machines, backhoes.  Anything you could
19 think of, I could run.
20     Q.  Okay.  If you could, you -- you've -- you
21 mentioned before you have spent some time in both the
22 state and federal penitentiary.  Can you give me in
23 and out dates for your time that you've been in prison
24 over your life?
25     A.  I mean --

Page 47

1      MR. STARR:  Foundation.  Speculation.
2      THE WITNESS:  I mean, we've gone over more or
3  less what I've done in the history of my life.  Now,
4  you're going back and asking something that -- I --
5  I don't know.  If I had a paper saying what dates I
6  got arrested and what dates I got out, I'd be able
7  to answer that, but I don't know.  I was arrested in
8  the '80s.  Did four years for that.  You probably see
9  the record.  Then I was arrested in '90.  I did
10 almost ten something years for that.  That was our
11 good fellow Jack O'Malley's victory case over the
12 Inglewood drug conspiracy.  I was involved with
13 that.  One of my co- defendants was a chief judge
14 bailiff.  So I was involved with some big
15 individuals on the case.  But to remember the dates
16 that I went to prison and the dates that -- you got
17 the paperwork.  You know when it is.
18 BY MR. SCAHILL:
19     Q.  Did you actually do ten years in the Illinois
20 Department of Corrections, or were you sentenced to ten
21 years and did less than that?
22     A.  No, no, no, no.  I -- I did ten.  I was
23 supposed to do eight years and I believe I did two years
24 over my sentence because of my behavior.
25     Q.  Okay.  I'm sorry.  Did you say that one

Page 48

1  occurred in 1990?
2      A.  I believe.  Yeah, '90 or '91.  Yeah.
3      MR. STARR:  Tim, I'm sorry, could I just -- did
4  you ask him about his ten years in IDOC or ten years
5  in federal prison?
6      MR. SCAHILL:  IDOC.
7      MR. STARR:  Okay.
8      THE WITNESS:  Yeah, I did more than ten years
9  in IDOC.
10 BY MR. SCAHILL:
11     Q.  And then you got out, and I know you did a
12 lengthy stint in federal prison.  But between when you
13 got out from your ten-year stint in IDOC and when you
14 did time in federal prison, did you do any other time in
15 a correctional facility?
16     A.  Not at all.
17     Q.  Okay.
18     A.  Never had a case or nothing like that.
19     Q.  All right.  In the year 1989, what was your
20 employment?
21     A.  I've been a union operator since the mid '80s
22 where I worked in several different places.
23     Q.  Did you generate income in the year 1989 from
24 any illegal sources?
25     A.  I'd like to take the Fifth on that.

Page 49

1      Q.  Okay.  Did you generate any income in the year
2  1990 from any illegal sources?
3      A.  Say, no.
4      Q.  I'm sorry, are you saying, no, or are you --
5  are you pleading the Fifth?
6      A.  I'm pleading the Fifth if you want me to.  I -
7  - I'll do that.
8      Q.  I don't want you to or not want you to.
9      A.  Oh, right.  No.  Perfect.
10     Q.  I just -- I want you to give me --
11     A.  I just don't want to -- I just don't want to
12 be trying to involve myself in something that I'm not
13 involved with.  I'm here to tell the truth about what I
14 know, my knowledge, and that's really all I thought I
15 was going to be into.  I didn't think that my background
16 would -- would count as to what I'm saying being a truth
17 or a lie, because nobody's forcing me to do this.  I
18 haven't even spoke to Maysonet or Gonzalez, none of them
19 people, for over 30 something years.  I didn't even know
20 they had a case.  The involvement that I had was a view
21 operation, view things what I seen.  And then after what
22 I was told by one of your -- Gonzalez, one of your --
23 Maysonet himself.  Other than that, I don't know
24 nothing.  I don't get involved.  I don't talk to them.  I
25 don't even know where they're at.  I know that Lluvia is

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 50

1   in Chicago, but other than that, I have not spoken to
2   them.
3       Q.   So just again, what I want to make clear,
4   because you said, no, and I think you were trying to
5   take Five, but I'm obviously not giving you advice or
6   putting words in your mouth.  If you were going to be
7   pleading the Fifth, I think you need to expressly say
8   that.
9       A.   Okay.  Okay.
10      Q.   "I plead the Fifth," or something along those
11  lines.
12      A.   Okay.  I plead the Fifth on that question,
13  yes.
14      Q.   Okay.  During the years of 1989 and 1990, were
15  you involved in any drug trafficking activities?
16      A.   Yes, I was.
17      Q.   Okay.  When did you get involved in drug
18  trafficking activities prior to 1989?
19      A.   I was involved, like I said, in the Inglewood
20  drug conspiracy.  Was a big case.  I had -- I had rap
21  sheets that I didn't even know they existed because I
22  only seen one guy.  And from one guy, it turned out to
23  be 15 guys.  And my co-defendant owned a bar.  He owned
24  a laundromat.  And he was a chief bailiff in
25  Fitzgerald's courtroom.  So you know, you're talking

Page 51

1   about someone that was being investigated because he was
2   Cook County Sheriff.  So other than that, I fell in the
3   laps of the -- of the -- of the police department that
4   was doing the investigation on something that I had no
5   idea of having.  But when the rope falls down the
6   ladder, somebody's got to grab it.  And I guess I was
7   one of the guys that was supplying the gentlemen there
8   with drugs.
9       Q.   When did you first become involved in drug
10  trafficking?
11      A.   Well, --
12           MS. BONJEAN:  Objection.  Form.  Foundation.
13           THE WITNESS:  I would say --
14  BY MR. SCAHILL:
15      Q.   You can answer.
16      A.   -- in the mid -- in the mid '80s when I got
17  out of the military.
18      Q.   Okay.  And how long did your drug trafficking
19  activities go on for?
20      A.   Until I went to jail.
21      Q.   Until you went to jail in 1990?
22      A.   Yes, sir.
23      Q.   Okay.  And then you got out of jail and
24  resumed those activities again, right?
25           MR. STARR:  Objection.  Form.  Foundation.

Page 52

1           THE WITNESS:  Yes, sir.
2   BY MR. SCAHILL:
3       Q.   Okay.  What was the nature of the types of
4   drug trafficking operations you were involved in in the
5   year 1989 and '90?
6           MR. STARR:  Objection to form.  And I just, you
7      know, from the standpoint of having -- we all have
8      an ethical obligation.  The witness has indicated
9      that he takes the Fifth on questions about drug
10     trafficking.  I think that he did testify about
11     cases he was arrested on.  And I just want to, you
12     know, instruct -- not instruct, but remind the
13     witness that he has a -- he has a right to invoke
14     the Fifth if he -- if he feels like he needs to, if
15     he feels like he's going to implicate himself.
16          MS. ROMELFANGER:  I think he's made clear that
17     he knows that he can do that.  I don't think the
18     speaking objections are proper.
19          THE WITNESS:  Okay.  Go ahead.
20  BY MR. SCAHILL:
21      Q.   I'll ask the question again.  Directing your
22  attention to the years between 1989 and 1990, what types
23  of drug trafficking activities were you personally
24  involved in?
25      A.   The -- the drugs involvement was the ones that

Page 53

1   I went to jail for, the investigation that I was on by
2   the MEG Unit in Chicago.  And that's what I was on.
3       Q.   And so were you involved in selling drugs,
4   supplying drugs, distributing drugs, all of the above?
5   Can you please describe to me what it was that you were
6   actually doing in the drug trafficking business in that
7   time period?
8           MR. STARR:  Asked and answered.
9           MS. BONJEAN:  Join.
10          THE WITNESS:  I would say, supplying drugs.
11  BY MR. SCAHILL:
12      Q.   Supplying drugs to who?
13      A.   That's another thing.  I -- you got the case
14  numbers in front of you, who I was dealing with, and
15  those are the individuals.  I was not dealing in the
16  corners of selling bags -- nickel bags or nothing like
17  that.  My cases involved a large quantity of heroin or
18  cocaine, whatever it was.  And that's what I was on.  I
19  went to Mexico.  I met some people out there.  And
20  that's how I involved myself in getting the second case
21  after I got out of jail the first time.
22      Q.   Was that your primary means of income in the
23  years of 1989 and '90?
24      A.   No, not at all.  I worked.  Like I told you, I
25  worked.  And when I got out, I worked hard.  I bought a

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll-Free 855-MYDEPOS

Page 54

1  house.  I opened up a restaurant, a business restaurant,
2  with my third wife.  And things were going well.  I was
3  working.  She was taking care of the restaurant and
4  things went well.
5      Q.    Directing your attention to the years of 1989
6  and '90, did you have other individuals who were working
7  with you in your drug operation?
8      A.    Yes, I did.
9      Q.    Okay.  And can you identify those persons for
10  us?
11      A.    I take the Fifth on that.
12      Q.    Okay.  Was Jose Maysonet involved in your drug
13  trafficking operation between the years of 1989 and '90?
14      A.    No, he wasn't.
15      Q.    Okay.  Was Alfredo Gonzalez, I believe you
16  referred to him as Lluvia, involved in your drug dealing
17  operations between the years of 1989 and '90?
18      A.    Not at all.  These individuals held a
19  different kind of status in the neighborhoods, in the
20  nation. They were involved maybe if they were selling
21  drugs or robbing people.  Those are things that I was
22  not doing.  I owned a -- a bar and that's where I seen
23  Maysonet. But other than that -- and that's where the
24  bar -- the -- the police officer met with Maysonet on a
25  couple of occasions.

Page 55

1      Q.    Was -- Jose Maysonet is somebody that you knew
2  during this time period of 1989 and '90, correct?
3      A.    Yes.  Yes, I did.
4      Q.    Okay.  And he was also involved with the Latin
5  King organization, right?
6      A.    Yes, he was.
7      Q.    Was he a member of your same set?
8      A.    No, he wasn't.
9      Q.    What set was he involved with?
10      MR. STARR:  Objection.
11      MS. BONJEAN:  Objection.  Foundation.
12      MR. STARR:  Join.
13      THE WITNESS:  I don't know.  Maybe Spalding.
14  I'm not sure.
15  BY MR. SCAHILL:
16      Q.    Okay.  What about Alfredo Gonzalez?
17      MR. STARR:  Objection.  Foundation.  Form.
18      THE WITNESS:  The same thing.  He was maybe
19  involved with Spalding.  I -- I'm not sure.
20  BY MR. SCAHILL:
21      Q.    Okay.  All right.  We'll get back to that in a
22  minute.  Let's just get some more background here.
23  You're -- you have a cell phone, correct?
24      A.    Yes, I do.
25      Q.    What's your cell phone number?

Page 56

1      A.    Actually don't -- don't know it.  I mean, I
2  don't call myself and I don't give out my number to
3  anybody, so I don't know.  Do you have my phone number?
4  Yeah, my number is --
5      Q.    Let me just ask: Do you just have one?
6      A.    Excuse me?
7      Q.    Do you just have one cell phone?
8      A.    Yes, I do.
9      Q.    Okay.  Is it a 239 number?
10      A.    Yeah.
11      Q.    Okay.  Mr. Starr sent us a copy of -- or he
12  advised us last night of a phone number.
13      MS. BONJEAN:  You don't need to put it on the
14  record.  It's a public record.  Why would you put it
15  on there?  You have it.  Just --
16      MR. SCAHILL:  Certainly not public record.
17      MS. BONJEAN:  Okay.  What, wait, a deposition
18  isn't a public record?  I mean --
19      MR. SCAHILL:  Oh, it's -- a phone is not a
20  public -- a phone number is not a public --
21      MS. BONJEAN:  I'm not saying that.  I'm saying
22  like you're asking him -- I'm going to object, just
23  put it out there.  You're asking him -- you're
24  asking him some pretty critical questions that you
25  have the right to know it, but the world doesn't

Page 57

1  have the right to know it necessarily, and it could
2  be construed as harassing. Like you can -- you have
3  his phone number.  You don't need to put it on the
4  deposition record, is all I'm saying.
5      MR. STARR:  Join.
6      MR. SCAHILL:  Well, that's not really an
7  objection, so --
8      MS. BONJEAN:  Yeah.  Yeah.  Yes, it is.  I'm
9  going to object on harassing ground.  And if you're
10  trying to put him in harm's way -- if you're trying
11  to put him in harm's way for some reason, I think
12  that's a problem.
13      MR. SCAHILL:  That's an absurd thing to say.
14  That's --
15      MS. BONJEAN:  Well, he doesn't give out his
16  number for a reason.
17      MR. SCAHILL:  Well, we're putting it on record
18  anyway, just so we have a record.
19      MS. BONJEAN:  Well, you can -- okay.  Maybe he
20  wants to have that portion sealed or confidential.
21      MR. SCAHILL:  I don't care.
22      MS. BONJEAN:  It can be done.
23      MR. SCAHILL:  I don't care.  He can do --
24      MS. BONJEAN:  Okay.
25      MR. SCAHILL:  Do whatever you want.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 58

1    MS. BONJEAN:  You can ask -- Mr. -- Mr.
2  Ramirez, you can ask that just your phone number be
3  marked as confidential on this record if you want.
4  BY MR. SCAHILL:
5    Q.   Okay.
6    A.   Yeah, I want.
7    Q.   Okay.  Is your phone number XXX-XXX-XXXX?
8    A.   I believe so.
9    Q.   Okay.
10    MR. STARR:  And he did indicate that he wants
11  it marked confidential.
12  BY MR. SCAHILL:
13    Q.   Totally fine.  Don't have a problem with that
14  at all.  If there are any other things that you feel are
15  sensitive or would put you in harm's way, I don't have a
16  problem putting that under seal either.
17    MS. BONJEAN:  I have never heard a police
18  officer give his cell phone on a deposition, so I
19  don't
20  --
21    MR. SCAHILL:  I appreciate you saying that, but
22  that has nothing to do with --
23    MS. BONJEAN:  It -- so I mean -- I mean, you
24  understand --
25    MR. SCAHILL:  No, Ms. Bonjean, stop.  Stop.

Page 59

1    MS. BONJEAN:  No.  I'm -- I --
2    MR. SCAHILL:  This has nothing to do with
3  anything.
4    MS. BONJEAN:  You understand.  Don't act --
5  don't act surprised.
6    MR. SCAHILL:  Nobody's surprised.  I'm
7  conducting a deposition and you're just going on and
8  on about other things that have nothing to do with
9  whether -- if you want to ask a police officer their
10  number, ask him the number.  They're not sitting
11  here right now.  He is.  I'm asking the questions.
12  Stop with the speaking objections.
13    MS. BONJEAN:  No, I'm going to -- I'll do what
14  I want.  Thank you.  I don't take direction from
15  you.
16    MR. SCAHILL:  You can't do what you want.
17  You're going to follow the rules.
18    MS. BONJEAN:  I will not take direction from
19  you, Mr. Scahill.  And you're not --
20    MR. SCAHILL:  Well, you're going to follow the
21  rules.
22    MS. BONJEAN:  I am advising him that he can
23  mark it as confidential, which you did not do.  You
24  did not advise him of that.
25    MR. SCAHILL:  I have no obligation to do that.

Page 60

1  If he wants it marked confidential, that is fine.  I
2  have no obligation to affirmatively do that.  None.
3  Zero, okay?  Let's move on and stop with your
4  speaking objections.  You'll have a time to talk,
5  but now is not that time.
6    MS. BONJEAN:  Okay.  You talk down to me one
7  more time, we're going to have problems, okay?
8    MR. SCAHILL:  Counsel --
9    MS. BONJEAN:  Watch it.
10    MR. SCAHILL:  -- stop interfering with the
11  deposition.
12    THE WITNESS:  Sir -- Tim, I believe I came here
13  to give a deposition of what I know.  I'm being
14  questioned for over half an hour or an hour on my
15  background and who I am.  You already know who I am
16  and my background.  If you ask me direct questions,
17  I would answer what I can and help you out with what
18  I can.  Like Ms. Jennifer said, I believe I'm being
19  harassed or -- being questioned on something that
20  don't have nothing to do with this deposition.  I
21  mean, if you want to know who I am, ask me directly.
22  Don't go around years and dates and this and that
23  because you're going in -- you're going in circles.
24  The last 45 minutes, I ain't heard nothing about the
25  case.  I ain't heard nothing about anybody except

Page 61

1  myself.  So if I feel like I'm being harassed?  Yes,
2  I feel like I'm being harassed.  Jennifer had every
3  right to help out and -- and say her point of view
4  on the situation on the phone.  When you asked me for
5  the phone number, I didn't give it out, and that
6  should have been it.  You said the number, so you
7  have the number.  Why would you want me to give you
8  my number if you already have it?  Simple as that.
9  Let's keep going with this.  And let's -- let's roll
10  with this.  This is -- I'm getting hungry now.
11  BY MR. SCAHILL:
12    Q.   How long have you had this number for, the 239
13  number?
14    A.   Since I came to Florida.  Before that I had a
15  Chicago number, which was XXX-XXX-XXXX.  I had that
16  since I got out of jail.  That number no longer operates
17  with me.
18    MR. STARR:  And again, you can -- you can
19  designate that confidential.
20    THE WITNESS:  Yeah.  Confidential.
21  BY MR. SCAHILL:
22    Q.   Totally.  Totally fine.  The 239 number, who
23  was your carrier on that?
24    A.   Well, we had T-Mobile.
25    Q.   T-Mobile.  Okay.  Is it in your name or

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 62

1  someone else's name?

2      A.   My name.

3      Q.   Okay.  And the number -- the 630 number, was

4  that also in your name?

5      A.   Yes, it was.  I've always had iPhone and I

6  always had T-Mobile.

7      Q.   All right.  That was also T-Mobile?

8      A.   Yes, sir.

9      Q.   Okay.  Do you have an e-mail address?

10      A.   Yes, I do.

11      Q.   What's your e-mail address?

12      A.   Is it possible you can keep that confidential

13  too?

14      Q.   Absolutely.

15      A.   All right.  My e-mail address is

16  XXXXXXXXXXXXXXX.XXX.

17      Q.   How long have you had that for?

18      A.   Since I got out of -- since I got out in 2011.

19      Q.   Do you maintain any social media accounts,

20  like a Facebook or anything like that?

21      A.   I got it, but I don't get on that.  I don't do

22  Facebook.  I don't do Instagram or whatever.  I don't do

23  --

24      Q.   What's your -- what's your Facebook profile

25  name?

Page 63

1      A.   I think it's either Yuma or -- or -- I don't

2  know.

3      Q.   All right.  So you understand that you're here

4  to testify in the cases regarding Alfredo Gonzalez and

5  Jose Maysonet, right?

6      A.   Yes, sir.

7      Q.   Okay.  Do you know anything about the cases

8  that you're here to testify about?

9          MR. STARR:  Objection to form.

10          MS. BONJEAN:  Join.

11          THE WITNESS:  What I know is something that I

12  have knowledge and something I was freshened up by

13  Mr. Jean [sic].  And other than that, I went over the

14  statements, I went over what I said, and I made

15  some changes on the affidavit that they had prepared

16  -- the investigator himself had prepared.  And there

17  was things that I didn't agree on, and he advised me

18  to make sure that I tell the truth on what I'm

19  saying, and this is what I did.  I made changes on

20  the -- on the first proffer that I made, whatever it

21  was, with Mr. Jean, and that was it.

22  BY MR. SCAHILL:

23      Q.   When you say Mr. Jean, who are you -- because

24  you said Jean?

25      A.   What's the name?  Jean?

Page 64

1          MR. STARR:  My name is Sean.

2          THE WITNESS:  Sean.  You see what I'm saying?  I

3  -- the communication is so, you know what I'm

4  saying?  I don't really see this guy.  Like, I wish I

5  could have lunch with him every day.  He could pay

6  for the meals and stuff.  But other than that, I

7  really don't -- I mean, shit, he dresses like he

8  belongs in Florida, so let's be realistic.

9  BY MR. SCAHILL:

10      Q.   Is he -- is he wearing shorts and a - and a

11  Hawaiian shirt right now?

12      A.   I don't know.  I didn't look at his legs.

13          MR. STARR:  For the record, I'm not.

14          MR. SCAHILL:  All right.  Is he wearing

15  sandals?

16          MR. STARR:  For the record, I'm not.

17          THE WITNESS:  I didn't look at his feet,

18  though.

19  BY MR. SCAHILL:

20      Q.   Oh, okay.

21      A.   He was wearing sandals yesterday, I think,

22  though.

23          MS. BONJEAN:  He had his chanclas on?

24          THE WITNESS:  Yeah.  He was looking pretty

25  schwifty, yeah.

Page 65

1  BY MR. SCAHILL:

2      Q.   So I guess what I -- and I appreciate you

3  giving me that information.  I want to delve into that

4  in a second here.  The question maybe -- and maybe I

5  wasn't clear on this, so I'm going to ask it in maybe a

6  different way.  You understand there's lawsuits going on

7  with Mr. Maysonet as a party and Mr. Gonzalez as a

8  party?

9      A.   Well, I found out when I met with -- with

10  Sean, and I found out later what was going on.  But

11  other than that, I had no idea.  When -- when Lluvia was

12  in state -- these are cases that actually the -- the

13  inmates don't talk to other inmates about.  So if this

14  was going on, it was kept secret and kept under -- under

15  the rug.  I know the police officers were involved in

16  several cases and several investigations.  There was

17  guys in jail that were arrested by these gentlemen.  So

18  I mean, you find out things when you're in prison,

19  especially in the max joint, when people come in, you

20  have all the backgrounds or information right there in

21  front of you.  So that's what I knew.  Other than that,

22  I didn't know nothing.

23      Q.   What's your understanding about what those

24  cases are about?

25          MR. STARR:  Objection to the form.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 66

1        MS. BONJEAN:  Joined.
2        THE WITNESS:  I read -- I know there's a
3    lawsuit.  I don't know what the lawsuit is about or
4    having gone over what the demands are or defense has
5    for -- to offer these individuals, or the
6    prosecutors like yourself have -- try to make a deal
7    with them or something.  I don't -- I have no idea.
8  BY MR. SCAHILL:
9        Q.   Do you understand that these are civil cases
10   and not criminal cases?
11       A.   Yes, I do.
12       Q.   Okay.  And so do you know what the factual
13   claims are being made by either Mr. Maysonet or
14   Mr. Gonzalez in those lawsuits?
15       MR. STARR:  Objection to form.
16       THE WITNESS:  I believe --
17       MR. STARR:  Foundation.  Speculation.
18       THE WITNESS:  I believe their accusations or
19   cases are about wrongfully imprisonment, harassment,
20   entrapment, and the dealings that they had with the
21   police officers.  Other than that, I really don't
22   know.
23  BY MR. SCAHILL:
24       Q.   Do you know what underlying criminal
25   investigation either of the cases of Mr. Gonzalez or

Page 67

1  Mr. Maysonet relate to?
2        MR. STARR:  Form.
3        THE WITNESS:  Just like I said, I really don't
4    know.  I believe that there was involved entrapment,
5    wrongfully arrest, implicated in robberies or
6    implicated in drug dealing that I had no idea of.
7    I'm just getting the wind of it now after the
8    investigator called me from Chicago and put me on
9    the phone and asked me questions, and I said I would
10   not talk to them on the phone.  If they wanted to
11   talk to me, they would have to come here to Florida,
12   and I would be happy to answer any questions that I
13   can, and I have.
14  BY MR. SCAHILL:
15       Q.   Did you do any of your own research, like on
16   the Internet or on your phone, looking to see kind of
17   what these cases were about?
18       A.   Not at all.
19       Q.   All right.
20       A.   That's not in my -- my concern.
21       Q.   What did you do to prepare for this deposition
22   today?
23       A.   I did nothing but just remember what I
24   remember and tell the truth.  I didn't -- I don't have
25   no papers with me, there's no notes telling me what to

Page 68

1    say.  Mr. Sean has -- all he's done is advise me to just
2    be honest and tell the truth.  I mean, this is not about
3    me, this is about someone else.
4        Q.   So when is the first time you got wind that
5    somebody was -- wanted to talk to you about either one
6    of these cases involving Mr. Maysonet or Mr. Gonzalez?
7        A.   This was, like, a few months ago over the
8    phone.
9        Q.   Okay.  Who called you?
10       A.   Sean's investigator, and then I spoke to Sean
11   on the phone.  I actually believe they got in contact
12   with my sister, that my sister gave him the information
13   to get in contact with me, and that's how that took
14   place.
15       Q.   Your sister -- this is not your sister-in-law;
16   this is your sister?
17       A.   This is my sister that lives here in Florida.
18       Q.   Okay.  What's your sister's name?
19       A.   Ysel Ramirez.
20       Q.   Okay.  And so before an investigator called
21   you, did your sister advise you that somebody was
22   looking for you?
23       A.   Yes, she did.
24       Q.   What -- how did she explain that to you?
25       A.   Oh, well, she didn't really know much.  She

Page 69

1    just said an attorney from Chicago needed to talk to me,
2    and that she had given him my number.  I'm not hiding
3    from no one.  I'm not doing anything illegally.  I'm
4    trying to recuperate from my injuries that I've had in
5    my recovery with my leg and my arm, so I really don't
6    have time to be on the Internet or on the phone or
7    trying to investigate some other people's cases.  That's
8    not what I do.
9        Q.   Did she, your sister, ever tell you what
10   specifically the lawyers were looking for from you?
11       A.   No, she didn't.  I don't believe she knew.  I
12   don't know, did she know?  I -- I don't believe she
13   knew.
14       Q.   So she -- just so I'm clear, she -- your
15   sister calls you up out of the blue and says, hey, some
16   attorneys or investigators called me, and they're
17   looking for you and want to talk to you?
18       A.   That's what she did.
19       Q.   Okay.  And then she -- did she tell you that
20   she had given them your number?
21       A.   Yeah, she did.
22       Q.   Okay.  She didn't ask you whether she could
23   give your number to them first, she just gave it to
24   them, to your understanding?
25       A.   I believe she just gave it to them.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 70

1  Q.  Okay.  And then after that, did you receive a
2  telephone call?
3  A.  Yes, I did.
4  Q.  Okay.  Was that the next time you heard
5  anything about all of this that you got a -- you just
6  got a phone call on your cell phone?
7  A.  Yes, I did.
8  Q.  Okay.  And who was that phone call from?
9  A.  Sean.
10 Q.  Okay.  That's Mr. Starr?
11 A.  Yeah.
12 Q.  Okay.  And what did he say to you?
13 A.  He said that his investigator had come up with
14 my name of maybe knowing something about the case of
15 Maysonet and Gonzalez, and I told him, hey, listen, I
16 don't want to talk about none of this unless you come
17 here and talk to me in person, because I have no idea
18 what -- what's going on here.  So since I didn't know
19 what was going on, I knew that they wanted to question
20 me about Gonzalez and Maysonet.  I know these
21 individuals.  It ain't like I swapped saliva or had
22 dinner with them or something like that, but I -- I knew
23 by them being Latin Kings, it was my responsibility to
24 see what was going on.  So other than that, that was it.
25 Q.  So Mr. Starr referred to both of these

Page 71

1  individuals on the phone call, Mr. Maysonet and
2  Mr. Gonzalez?
3  A.  I think he told me there was a federal
4  investigation involving this individuals with some
5  police officers.  Other than that, he didn't give me no
6  names or -- or anything on the -- in that behalf.  So
7  that was -- that's all that took.  The -- the
8  conversation was short and brief.  You want to talk to
9  me about none of this, you have to come here.
10 Q.  All right.  Did -- when you said that these
11 were individuals that you knew when they were Latin
12 Kings.  Is that -- is that one of the reasons why you
13 had agreed to talk to Mr. Starr?
14     MR. STARR:  Objection.  Form.  Foundation.
15     THE WITNESS:  I believe so.
16 BY MR. SCAHILL:
17 Q.  Is that something that you hold important,
18 loyalty to other Latin King members?
19     MR. STARR:  Objection.
20     MS. BONJEAN:  Objection.  Form.
21     MR. STARR:  Joined.
22     THE WITNESS:  I believe so.
23 BY MR. SCAHILL:
24 Q.  Okay.  Is it -- was it one of the laws or
25 practices of the Latin King organization to help out

Page 72

1  other members in whatever way you can?
2     MR. STARR:  Objection.  Form.
3     MS. BONJEAN:  Objection.  Form.  Foundation.
4     MR. STARR:  Calls for speculation.
5     THE WITNESS:  Yes, and I'm also aware
6  that if I know that you're well aware of our laws
7  and you have our manifesto, you know that making
8  statements and going to court in front of open court
9  is actually a law.  It's not part of our laws.  It
10 could be used against our own reputation and our own
11 doing of becoming an informant or helping the
12 government or helping someone on a federal or case
13 where I have to testify to.  So all these things here
14 shoot back on me because, I mean, I would not like -
15 - I would not like to be called to go to Chicago and
16 sit in front of a judge and say all these things I'm
17 telling you, because nothing's going to change.
18 Whatever you ask me now, it's going to be some
19 questions that I remember and the things that are
20 truthful that I believe in.  Other than that, I have
21 nothing else to say about anything else because I
22 don't know anything.
23 BY MR. SCAHILL:
24 Q.  Okay.
25 A.  It's been 30 years.  Do you remember what

Page 73

1  happened 20 years ago?  Let's be realistic.  When your
2  wife had a baby or someone --
3  Q.  My kids -- my kids aren't that old yet, but --
4  A.  Well, you know, I remember when my wife
5  cheated on me, and I remember that because those are two
6  common things that happen in someone's life.  Other than
7  that, I don't know any specific names or addresses of
8  people and where or when it took place.  I mean, these
9  are situations that are hard to remember.
10    MR. STARR:  Tim, when you get to a point that
11 works for you, I need a restroom break.
12    MR. SCAHILL:  Yeah, just give me -- I'm just
13 going to ask one more question, then you can.
14 BY MR. SCAHILL:
15 Q.  You -- when you were talking about the Latin
16 King laws and cooperation with law enforcement, were you
17 saying that the Latin Kings had a law that you were
18 strictly forbidden from cooperating with law
19 enforcement?
20 A.  Well, you have our manifesto.  Just look into
21 it, and it'll tell you that operating or cooperating
22 with law enforcement is forbidden.  These are things --
23 and for myself having the rank that I have, I know these
24 laws are mandated and enforced.  If -- if I'm put out to
25 be an informant on a case or trying to testify against

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 74

1   someone, it's -- it's forbidden.  What I'm -- I believe
2   what I'm doing is telling the truth of what I know.  I
3   mean, I -- I'm not talking about putting someone in
4   jail.  I don't know what the cop is -- whatever they did
5   -- they did, whatever time they did -- they did, or
6   whatever happened to them that happened to them, I don't
7   know anything.  I don't know about their lives, I don't
8   know what they're doing, I don't know where they're at.
9   Nothing like that.  Same thing with Maysonet and
10  Gonzalez.  You know, other than Gonzalez in Chicago,
11  other than that, I don't know where Maysonet is at, I
12  don't know where they reside and if they're active, I
13  don't see them -- the time I was out there, I never seen
14  them in the neighborhood, I never seen anything from
15  them, so that was all I knew.
16      MR. STARR:  Someone just joined?
17      MR. SCAHILL:  All right.  I mean, we can -- we
18  can take a break now and reconvene.  How long do you
19  want, Sean, just to use the bathroom or --
20      MR. STARR:  Just five minutes, yeah.
21      MR. SCAHILL:  Okay.
22      THE REPORTER:  We are --
23      MR. SCAHILL:  All right.  We're going to take a
24  break and go off the record, and then we will come
25  back and ask you some more questions.

Page 75

1       THE WITNESS:  Okay.
2       THE REPORTER:  We are now off the record.  The
3   time is 12:29 p.m.
4       (OFF THE RECORD)
5       THE REPORTER:  We are back on the record for
6   the deposition of Eduardo Ramirez to be conducted by
7   videoconference.  My name is Victoria Adams.  Today
8   is June 20, 2024.  The time is 12:36.
9   BY MR. SCAHILL:
10      Q.  All right.  Welcome back, Mr. Ramirez.  Did
11  you speak to anybody on the break?
12      A.  No, I didn't.
13      Q.  Okay.
14      A.  Nobody out here.
15      Q.  We left off we were -- I had asked you some
16  questions about the Latin King manifesto and the -- and
17  the laws.  I wanted to ask another question about that.
18  Was one of the laws or the principles that Latin Kings
19  were supposed to abide by is to lie or mislead to police
20  officers in criminal investigations?
21      MR. STARR:  Objection.  Form.  Foundation.
22      MS. BONJEAN:  Objection.  Form.  Foundation.
23      MR. STARR:  Joined.
24      THE WITNESS:  Sir, like I said, you have the
25  manifesto.  You know what the Latin Kings were able

Page 76

1   to do and what we were not able to do.  But laws
2   were made to be broken.  A lot of Latin Kings broke
3   the rules and did what they needed to do to get out
4   of their cases or help themselves in that situation.
5   But other than that, I really don't know.  I can't
6   see you on the -- on the screen, though.  I don't
7   know if you're on there.  I'd like to see who I'm
8   talking to.
9   BY MR. SCAHILL:
10      Q.  What's that?
11      A.  I said, I don't see you on the screen, so --
12      Q.  Oh.  I'm -- are we on now?
13      A.  No, I still don't see you.
14      Q.  Oh, you're back, but --
15      A.  Yeah.  I'd like to see who I'm talking to,
16  though.
17      Q.  Mutual.  I agree.
18      A.  Yeah.
19      Q.  Now, you'd be the first one to say that about
20  me, but, you know, in general, I agree.
21      MR. STARR:  Is there -- Madam Court Reporter,
22  do you know if there's a way to --
23      THE WITNESS:  Yeah.  There you are.  Okay.  Now,
24  I see you.
25      MR. SCAHILL:  All right, good.  I see you.

Page 77

1       THE WITNESS:  Look pretty good with them
2   glasses there, though.
3   BY MR. SCAHILL:
4       Q.  I appreciate that.  I'm sorry.  You were in
5   the middle of an answer, so you can continue on with
6   what you were saying.
7       A.  I don't know.  You said that we couldn't stop
8   during the question or answer, so I don't know what the
9   answer to the question was.
10      Q.  I'll ask the question again.  Okay.  The
11  question was, we were talking about some of the laws
12  governing the Latin King organization as you understood
13  them.  And my question is: Was one of the laws that the
14  Latin Kings were to abide by was to lie or give false
15  information to police officers in order to help other
16  members of the Latin Kings organization?
17      MR. STARR:  Objection to form and foundation.
18  And asked and answered.
19      THE WITNESS:  I mean --
20      MR. STARR:  He just answered it.
21      THE WITNESS:  -- yes.  What Latin Kings did, it
22  was on them, and what they were able to do is one
23  thing, what the law says is another.  So let's move
24  on with a good question that I can answer that I
25  would know about, because I know that I haven't.  So

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 78

1    other than that --
2  BY MR. SCAHILL:
3       Q.   Are you aware of that being a common practice
4  within the Latin King organization to lie to police
5  officers about the activities of other Latin Kings?
6          MR. STARR:  Objection to form.  Foundation.
7     Calls for speculation.
8          MS. BONJEAN:  Joined.
9          MR. STARR:  Assumes facts not in evidence.
10         THE WITNESS:  I -- I can't recall -- I can't
11    say or give an answer to that because I don't know
12    what each individual does under pressure.  Each
13    person has a pressure point in what they are willing
14    to hold on to or what they're able to let go to.  So
15    that question there is up for grabs.
16 BY MR. SCAHILL:
17      Q.   Are you aware of that being condoned by the
18 Latin King organization?
19         MR. STARR:  Objection to form.  Foundation.
20    Asked and answered.  Calls for speculation.  Assumes
21    facts not in evidence.
22         MS. BONJEAN:  Joined.
23         THE WITNESS:  I don't know what to say about
24    that.  Each -- like I said before, each individual
25    makes their own decisions.

Page 79

1  BY MR. SCAHILL:
2       Q.   But I guess the question was, are you
3  generally aware of this being a thing that was common
4  practice within the Latin King organization, not whether
5  everybody did it?
6          MR. STARR:  Same objections.
7          THE WITNESS:  The same answer to that, yeah.
8     Well, the laws were made to be broken, so if each
9     Latin King was under pressure, they gave out their
10    own views of laws or what they did at that certain
11    time, so --
12 BY MR. SCAHILL:
13      Q.   Did the actual laws govern that issue at all?
14         MR. STARR:  Objection.  Asked and answered.
15    Form.  Foundation.  Speculation.
16         THE WITNESS:  I really don't know.
17 BY MR. SCAHILL:
18      Q.   Okay.  Going back to your conversations with
19 Mr. Starr, so Mr. Starr comes down to meet you, right?
20      A.   Yes, sir.
21      Q.   Okay.  Did you set up a meeting place?
22      A.   I think I set up the meeting place.  We met at
23 Chili's.
24      Q.   All right.  And so prior to him showing up,
25 other than the conversation that you referenced before

Page 80

1  we took the break, had you had any other communications
2  with either Mr. Starr or anyone else about what this
3  meeting was to be about?
4       A.   Not at all.
5       Q.   Okay.  So you -- did you go to the meeting by
6  yourself?
7       A.   The first time I was there with my wife.  We
8     sat down, we ate and talked, and he produced affidavit
9     statement of what I believe we have gone over or what I
10    knew of anything that took place, because we didn't have
11    any communications on the phones or text messages or
12    something.  Everything that took place took place on the
13    first day, so --
14      Q.   So when he showed up, did he already have an
15 affidavit typed up?
16      A.   I believe he had something put together that
17    we went over and I didn't agree in several of the
18    things, and I didn't agree of knowing certain of the
19    things that were put on the paper.  From there, he made
20    -- we made corrections on the -- on the affidavit, and
21    then after that, I signed it, and that's all I remember.
22      Q.   So -- but when he -- when you went to meet him
23 at the -- wherever you met, he already had an affidavit
24 with some typewritten words on it?
25         MR. STARR:  Asked and answered.

Page 81

1          THE WITNESS:  I believe he had some kind of
2     paperwork prepared, but I don't know, some of the
3     stuff in there I didn't -- I don't know where it
4     came from or what happened.  I mean, all I know is
5     we made the corrections, I agree on what I said, I
6     agree what went on the paper, and I'm sure that if
7     you guys got a copy of that, you guys are aware of
8     what I said and what I agreed on.  That's the --
9  BY MR. SCAHILL:
10      Q.   Prior to arriving at the meeting with Mr.
11 Starr, had you talked to Mr. Starr or his investigator
12 or anyone else about the -- what was actually in that
13 affidavit?
14         MR. STARR:  Objection.  Form.  Foundation.
15    Asked and answered.
16         THE WITNESS:  I believe we spoke one time
17    before that, and there was not actually a main
18    conversation, because I told him if any of the -- I
19    know what it's going to be about, because there was
20    a case and he told me about the case.  I told him I
21    remember some what -- what these individuals were
22    involved in, and after that, I told him I would not
23    speak no more on this case unless he came in person
24    and spoke to me.  So he had some kind of knowledge
25    of what I knew, so he had some kind of knowledge of

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 82

```
 1    what he put together on the paper, and then after
 2    that, I agreed and added things that I knew about.
 3    So other than that, that's how it went down.
 4  BY MR. SCAHILL:
 5    Q.   So -- but before the meeting where he has the
 6  statement that you made the corrections on, had you
 7  described any of the things that are in that affidavit
 8  to him?
 9         MR. STARR:  Form.  Foundation.
10         THE WITNESS:  To who?  To him?
11         MR. STARR:  Asked and answered.
12  BY MR. SCAHILL:
13    Q.   Correct.
14         MS. BONJEAN:  Joined.
15         THE WITNESS:  I already told you that we sat
16    down the first meeting, I went over what I knew, he
17    made corrections of what I knew, put it on paper,
18    and then from there, we went on.  Other than that, I
19    have not spoken to him about the case, or we don't
20    call each other on a regular basis like we swapping
21    meals or something like that, he's having sex with
22    my wife or something.  You know, these things are
23    talked about, so
24  --
25  BY MR. SCAHILL:
```

Page 83

```
 1    Q.   I -- I'm just trying to make sure that I
 2  understand.
 3    A.   I understand.
 4    Q.   There's one phone call with Mr. Starr, and
 5  then there's an impeding -- in-person meeting, right?
 6    A.   Yes.
 7    Q.   Okay.  On the phone call, can you tell me all
 8  of the factual matters that you said to Mr. Starr?  The
 9  phone meeting?
10    A.   Like I said --
11         MR. STARR:  Objection to form.  Foundation.
12    Calls for speculation.  Asked and answered a couple
13    of times.
14         THE WITNESS:  When -- when he asked about, did
15    I know these individuals, I said, yes, I knew.  Did
16    I know that there was a case or something pending, I
17    said, listen, I'm not going to talk about nothing
18    here unless you come speak to me in person.  If it's
19    important for you guys to speak to me or to know
20    what I -- what I know, come to see me.  I'm not
21    trying to hide.  My address is there.  I'm not
22    trying to hide.  I just don't want to be involved on
23    something that I had to go and testify or go sit
24    down and -- and sit in the jury to testify against a
25    police officer that I had no knowledge where they're
```

Page 84

```
 1    at or don't care what happened to them.  The money's
 2    probably going to come from City of Chicago, so
 3    that's you guys' money.  It ain't my money.  I'm not
 4    getting nothing out of it.  All I'm saying is the
 5    truth of what I know.  If that's not helpful, I
 6    mean, what else can it be?
 7  BY MR. SCAHILL:
 8    Q.   So on that telephone call when you told him,
 9  you know, you're going to have to come speak to me, did
10  you say anything else to him about anything else other
11  than you've already testified?
12         MR. STARR:  Objection.  Form.  Foundation.
13         THE WITNESS:  Nothing --
14         MS. BONJEAN:  My god --
15         MR. STARR:  Calls for speculation.  Asked and
16    answered.  Harassing.
17         THE WITNESS:  Yeah.
18         MS. BONJEAN:  Joined.  Joined.  Joined.
19  BY MR. SCAHILL:
20    Q.   Okay.  What was the answer?
21    A.   I told you already what was said.  It was a
22    short conversation.  He told me about, did I know these
23    individuals?  I said, yeah.  What did I know about them?
24    I said, I don't know much.  Do they -- do you know that
25    there's a case against the officers on their cases or
```

Page 85

```
 1  something like that?  And I said, I have no idea.  If
 2  you want to speak to me or what I know, you would have
 3  to come here to speak to me in person.  I will not speak
 4  my -- no more on the telephone or implicate myself or
 5  anybody else by saying something on the phone that I'm
 6  not seeing who I'm talking to or -- I -- I didn't even
 7  know the man, so for me to agree on seeing him is
 8  something that I did on my own, something that I did
 9  because I felt that I knew things that might help one
10  way or might help the other way.  So other than that,
11  who helps -- who gets helped on this, I don't know.  I
12  don't know what's going to become of this, so --
13    Q.   Okay.  But did you tell him any of those
14  things that you knew before he came down to see you in
15  person?
16    A.   No --
17         MS. BONJEAN:  I'm going to object to -- this is
18    becoming so harassing.  He did his best to --
19         MR. SCAHILL:  Stop with your speaking
20    objections.
21         MS. BONJEAN:  No, he did --
22         MR. STARR:  No.  No.
23         MS. BONJEAN:  -- he did his best --
24         MR. SCAHILL:  Now, you're trying to coach the
25    witness.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 25 of 108 PageID #:10542
Eduardo Ramirez - Edited - Vol. 1 - April 30, 2021

86..89

Page 86

1     MR. STARR:  You don't get to --
2     MS. BONJEAN:  He answered.
3     MR. STARR:  Stop.
4     MS. BONJEAN:  He answered.  He answered.  Asked
5  and answered.  There's my objection.  Asked and
6  answered.
7     MR. SCAHILL:  That's not -- that's actually not
8  an objection, nor is it -- and it -- nor can you --
9     MS. BONJEAN:  Okay.  It's a form objection.
10     MR. SCAHILL:  -- form --
11     MS. BONJEAN:  Form.  Asked and answered.
12     MR. SCAHILL:  Okay.  Please answer the
13  question.
14     MR. STARR:  You don't -- you don't -- I want to
15     make a record as well.  Form.  Asked and answered.
16     You don't get to ask the question six times and hope
17     for him to change his answer.
18  BY MR. SCAHILL:
19     Q.  Answer the question, please.
20     A.  I believe I -- I said already what I said.
21  Nothing was spoken about.  Nothing was said.  There was
22  no text messages between me and him.  So other than
23  that, I've not spoken to the man until the next meeting
24  we had that we had a -- an affidavit in front of open
25  court or through Zoom to go over my statement.

Page 87

1     Q.  Okay.
2     A.  I agreed in doing this, and I'm -- I'm here.
3     Q.  All right.  So the next time you speak to
4  Mr. Starr is an in-person meeting, right?
5     A.  Yes, sir.
6     Q.  And where did -- where did that occur?
7     A.  Same --
8     MR. STARR:  Asked and answered.  Form.
9     THE WITNESS:  -- same place.
10     MS. BONJEAN:  What are we doing here?
11  BY MR. SCAHILL:
12     Q.  Where is -- and where was that?
13     A.  That was in Chili's.
14     Q.  Okay.  In Naples?
15     A.  Yes, sir.
16     Q.  Okay.  You show up with your wife, right?
17     A.  Yeah.
18     Q.  And Mr. Starr is there; is he by himself?
19     A.  Yes, he was.
20     Q.  Okay.  You sit down at a table together?
21     A.  Of course.  We're not going to sit across from
22  each other, like in each other's lap or nothing.  Yeah,
23  he was there and took his seat, very polite and very
24  professional.  So other than that, I don't know what
25  else to say.

Page 88

1     Q.  All right.  And while you were seated at the
2  table, did he take out some paperwork?
3     MR. STARR:  Asked and answered.  Form.
4  Foundation.
5     THE WITNESS:  Did he take out something to work
6  with?  Like --
7  BY MR. SCAHILL:
8     Q.  Paperwork?
9     A.  Yeah, he took out paperwork.  He took out what
10  he had put together and what we were going to go over
11  and what I knew.  And then from there, he -- all changes
12  were made, things were added that I knew about, and
13  that's how it took place.  Other then that, I don't know
14  what happened.
15     Q.  So I'm going to actually put this up here so
16  you can look.  Do you have a laptop in front of you?
17     MR. STARR:  Tim, I have a hard copy -- or a
18  paper copy of it if you want me to give it to -- if
19  you're talking about the declaration, I can give it
20  to him.
21     MR. SCAHILL:  Well, I think -- that -- that's
22  fine, I just want to make sure it's on the -- it's
23  on the screen.  That's the --
24     MR. STARR:  He's in front of a laptop, to
25  answer your previous question.

Page 89

1     MR. SCAHILL:  Just give me one minute here.
2  Okay.
3     MR. STARR:  And Tim, because I'm on Zoom --
4     MR. SCAHILL:  Oh, there we go.
5     MR. STARR:  All right.  Are you showing him the
6  declaration?
7     MR. SCAHILL:  I'm showing him the declaration,
8  correct.
9     MR. STARR:  Okay.  Thanks.
10  BY MR. SCAHILL:
11     Q.  All right.  Mr. Starr has put in front of you,
12  is my understanding, a document that has a case caption
13  that's entitled "Declaration of Eduardo Ramirez"; do you
14  have that, sir?
15     A.  Yes, I have it.
16     Q.  Okay.  This is a document you're familiar
17  with?
18     A.  Yes, sir.
19     Q.  Okay.  Is this the document that Mr. Starr
20  showed you when you met him at the Chili's?
21     A.  More or less, yes, but I don't actually know
22  where Mr. Starr got his beginning questions from or
23  where it came from.  But what I agreed on, there was
24  changes made, and what I knew of, it was added on the
25  paper.  So other than that, on one occasion -- let me

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 90

1   see here.  Yeah, they all met in my establishment
2   shortly after -- had entered into a financial
3   relationship with -- now, that -- entered a financial
4   relationship with Mr. Guevara (phonetic) and Madroski
5   (phonetic), these are things that at -- at first, I
6   didn't know about until afterwards, so --
7       Q.   After what?
8       A.   All this -- after -- I believe after they
9   left. Days later, Maysonet told me about I believe the
10  officers had a robbery or something like that set up and
11  they wanted them to take part in.  I said, man, listen,
12  I don't even want to be involved in this situation
13  listening to your stories, because the -- the sounds --
14  dealing with these cops, everybody knew these cops were
15  dangerous and -- and dirty and crooked.  So other than
16  that, I asked --
17      Q.   So -- I'm sorry, go ahead.
18      A.   -- that the police do these meetings somewhere
19  else, because it does not look good for my business
20  having these police officers come in my establishment
21  and act like they know me or they're my buddies or
22  something when I don't know nothing about them.  So
23  everything that was written here, is true, and to my
24  knowledge, I initialed everything that I agreed on and
25  signed it on the 25th of -- of April of this year.  So

Page 91

1   this is what I agreed, and I -- I went over it, and I
2   know what you're talking about.  So ask away, what do
3   you need to know?
4       Q.   All right.  Are you done with your answer?
5       A.   Excuse me?
6       Q.   You're done with that -- with your answer?
7       A.   Yeah, I'm done with it.
8       Q.   All right, thank you.  So this document --
9            MR. SCAHILL:  -- which, again, I -- I'm marking
10      it as Exhibit A to the deposition so it can be
11      marked as that, Court Reporter.
12            (EXHIBIT A MARKED FOR IDENTIFICATION)
13      BY MR. SCAHILL:
14      Q.   When Mr. Starr showed you this, was the
15  typewritten part of this already written in there?
16      A.   Yes, it was.
17      Q.   Okay.  Do you know where he got that
18  information from?
19      A.   No, I don't.
20      Q.   Okay.  You hadn't given it to him before, he
21  presented it in front of you typewritten, had you?
22      A.   No, we --
23            MR. STARR:  Objection.  Form.  Foundation.
24      THE WITNESS:  -- we only spoke one time.
25            MR. STARR:  Let me -- let me make an objection.

Page 92

1            THE WITNESS:  Go ahead.
2            MR. STARR:  Form.  Foundation.  Asked and
3       answered.
4   BY MR. SCAHILL:
5       Q.   Okay.  Go ahead.  Finish your answer.
6       A.   So we spoke one time, and we went briefly of
7   what I knew about Jose, Maysonet, and Gonzalez.  Other
8   than that, what my relationship of knowing them, that's
9   what we went over.  Have I seen them?  I told them I
10  didn't see them, that the last time I seen him was in my
11  restaurant, and then the other time was Gonzalez in
12  Stateville.  Other than that, I have not seen these
13  individuals or know what their case -- they had a case
14  or they were involved in a case.  I believe later on I
15  found out there was more people involved in this case
16  than I had any idea that was going on.  So other than
17  that, I really don't know anything on that.
18      Q.   Right.  But before he showed you this with the
19  type written information that's on this declaration, you
20  had not provided that information to him, had you?
21            MR. STARR:  Object.
22            THE WITNESS:  I --
23            MR. STARR:  Objection.  Objection.  Hold on.
24      Objection.  Asked and answered.  This is, I think
25      the seventh time that was asked.  Harassing.  Go

Page 93

1   ahead.
2            THE WITNESS:  I believe I answered this before
3       and I'm answering again over and over again.
4   BY MR. SCAHILL:
5       Q.   You can answer again.  Did you give him this
6   information before he showed you that -- the declaration
7   or not?
8       A.   I told you --
9            MR. STARR:  Same objections.
10            THE WITNESS:  I done told you already when I
11      spoke to him the first time on the phone, what took
12      place on the phone, and what that was said on the
13      phone. Other than that, there was nothing else.
14      What he knew is what we -- what I talked about on
15      the phone is me knowing -- mention anything
16      Gonzalez, and did I know that they had a case or
17      something against the City of Chicago?  I said, I
18      didn't know none of this, and that's how it took
19      place.  He put the paperwork together of my
20      knowledge of what I believe.  Someone on the house
21      had spoken to him about me, because my name just
22      didn't come out of a hat.  Somebody had to actually
23      look for me or spend time inquiring what was going
24      on on who I am, and that's how this came about.
25      Other than that, I wouldn't have -- I would not have

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 94

1    been called if I was some kind of a corner junkie or
2    a guy that didn't have no idea what I was saying.
3    I'm here because I know important things about these
4    individuals, and I know that what I've said is the
5    truth, nothing but the truth, and I believe that
6    allow -- be the witness to what I'm saying. I mean,
7    I'm not trying to make up stories here.  I mean,
8    everything that's there is there.  So ask me
9    questions about this affidavit, ask me questions
10   about Jose Gonzalez and how -- and Maysonet.  Asked
11   me these things and you know.
12   BY MR. SCAHILL:
13       Q.   Okay.  I'm going to.  All right, so -- but
14   before Mr. Starr presented this declaration to you with
15   this typewritten words on it, had you spoken to him at
16   all about Mr. Guevara?
17            MR. STARR:  Objection.
18            THE WITNESS:  I've told you already, a long
19   time, three, four or five times, and I told you
20   again, we did not speak about nothing about what I
21   said when I told you the first time when we talked.
22   Other than that, nothing has changed.  I mean, you
23   keep asking me -- do you want me to say, yeah, we
24   went over this, so we made this up, or I told him to
25   put this together?  No, nothing like that was said.

Page 95

1        Q.   Well, so --
2             MR. STARR:  Objection.
3             MR. SCAHILL:  How did -- how did he --
4             MR. STARR:  This late objection to form and
5        foundation.  Asked and answered.  I just said, he
6        started speaking before I was able to make my
7        objections.
8    BY MR. SCAHILL:
9        Q.   That -- did -- do you know how Mr. Starr got
10   all of this information about things that you
11   experienced when you didn't tell him those things?
12       A.   You asked me that before, and I answered.  I
13   don't know where he got it from.  I don't know.
14            MS. BONJEAN:  Okay.  I'm going to object to the
15       form and foundation.
16            MR. SCAHILL:  You can't cut him off in the
17       middle of a question, Counsel.
18            MS. BONJEAN:  Okay.  I'll do what -- listen,
19       I'm getting in a late objection.  He can still
20       answer it.
21            MR. SCAHILL:  You're breaking off his --
22            MS. BONJEAN:  Calm down.
23            MR. SCAHILL:  You're interrupting --
24            MS. BONJEAN:  Calm down.  Calm down.  I'm going
25       to object on form, foundation, harassing.  He may

Page 96

1    answer.  And -- but you've asked it about three
2    times.  I'm sorry you haven't read the record in this
3    case, but he can answer it again.
4    BY MR. SCAHILL:
5        Q.   Go ahead.
6        A.   Like I said --
7        Q.   I'm just going to -- go ahead.
8        A.   -- you asked -- you asked me several times
9    about the same thing, that -- that he asked me about the
10   case or what he asked me to -- so, what we --
11       Q.   Did you ever --
12       A.   -- did together on paper.  There was nothing
13   like that said.  I don't know what was going on.  I
14   don't know if the man was even willing to come down here
15   and talk to me, because I didn't think this was that
16   important or what we talked about, you know -- all I
17   know is that I know these two individuals, and I know
18   the meeting that took place in my establishment with the
19   police officers.  Other than that, I don't know nothing.
20   I don't know nothing.  I don't know nothing, and I'm not
21   going to say nothing that I don't know about.
22       Q.   Before this declaration with the typewritten
23   words was presented onto you, had you mentioned anything
24   to Mr. Starr about this --
25            MS. BONJEAN:  Oh, my God.

Page 97

1             MR. SCAHILL:  -- with Analski (phonetic)?
2             MR. STARR:  Objection.  Form and foundation.
3             THE WITNESS:  I done told you --
4             MR. STARR:  Asked and answered.
5             THE WITNESS:  I done told you --
6             MR. STARR:  Also, speculation.
7             THE WITNESS:  -- from the beginning, it was one
8    phone call.  What we talked about, I already told
9    you.  I mean, you're going back and forth to try to
10   get me to say that he put something together that I
11   told -- that's nothing put together that I had no
12   idea of.  What I do have an idea and what I do
13   testify to, it's what's on paper now.  What's on
14   paper now is something that I have idea, and I told
15   him to do it this way and make changes that way, and
16   that's how it took place.
17   BY MR. SCAHILL:
18       Q.   Did you ever say to Mr. Starr, "How did you
19   know these things to put down in this declaration when I
20   didn't tell you?"  Did you ever say anything about that?
21            MR. STARR:  Objection.  Objection.  Form,
22       foundation --
23            THE WITNESS:  I would not --
24            MR. STARR:  -- assumes facts not in evidence,
25       calls for speculation.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 98

1    THE WITNESS: I was not -- I'm not an attorney
2  trying to cover up for myself and I'm not a person
3  that -- I don't know where he got the information,
4  but --
5    MR. SCAHILL: --
6    MS. BONJEAN: Mr. Scahill, would it be helpful
7  if I sent you some of the discovery? Would it be
8  helpful?
9    MR. SCAHILL: I don't -- I don't want to -- I'm
10 not interested in having this dialogue. I'm taking
11 a deposition here.
12   MS. BONJEAN: Okay. But no, but you're not
13 taking --
14   MR. SCAHILL: Okay. I'm not -- I'm not
15 interested --
16   MS. BONJEAN: You're not taking a deposition.
17   MR. SCAHILL: Just make an objection or don't,
18 but then you -- you'll get your tan -- turn to
19 speak. It's not right now.
20   MS. BONJEAN: Okay. I -- if you would --
21   MR. SCAHILL: You're --
22   MS. BONJEAN: I'm trying to help you out.
23   MR. SCAHILL: -- objection. It's nobody's --
24 I'm not -- I'm not getting involved in a dialogue
25 with you. I'm asking questions.

Page 99

1    MS. BONJEAN: I'm asking if you would like --
2    MR. SCAHILL: -- foundation note for the two
3  proper objections and then --
4    MS. BONJEAN: Okay. Mr. Scahill --
5  Mr. Scahill, I'm going to send you an e-mail because
6  I'm happy to help you out --
7    MR. SCAHILL: I -- I'm not interested
8    MS. BONJEAN: -- since it seems like you may
9  need it, okay? Just a friendly e-mail from me. Go
10 ahead.
11   MR. SCAHILL: Not interested. Not interested.
12 Okay.
13 BY MR. SCAHILL:
14   Q.  Did you ever say to Mr. Starr, "Hey, how did
15 you know to write all of these things about what I said
16 and attribute them to me, when I didn't tell you those
17 things?"
18   MR. STARR: Objection --
19   THE WITNESS: Didn't you ask me that --
20   MR. STARR: Object -- hold on. Hold on.
21 Objection. Form, foundation. I think that's almost
22 the exact same question that you just asked him.
23 Asked and answered.
24   MS. BONJEAN: It also misstates the law,
25 because it can't be attributed to him until he

Page 100

1  adopts it, so that misstates the law.
2    MR. SCAHILL: You're -- you guys are -- this is
3  the most absurd speaking objections that I've ever
4  heard. Okay. Let the man testify. Say, form or
5  foundation. Those are your two objections a --
6    MS. BONJEAN: I'm not --
7    MR. SCAHILL: -- can make and that's it --
8    MS. BONJEAN: Okay.
9    MR. SCAHILL: -- and I think you know that.
10   MS. BONJEAN: No.
11   MR. SCAHILL: I'm mean, if you don't --
12   MS. BONJEAN: And you know -- you know -- you
13 know you're not supposed to continue to harass. You
14 know you're not supposed to continue to harass, but
15 go on.
16 BY MR. SCAHILL:
17   Q.  Did you ever say anything along those lines to
18 Mr. Starr?
19   MR. STARR: Same objections.
20   THE WITNESS: The same thing I told you on the
21 three or four times ago, no.
22 BY MR. SCAHILL:
23   Q.  Was it surprising to you that he was saying
24 things that were being attributed to you in a
25 declaration and asking to sign onto them before you had

Page 101

1  ever even uttered those words to him or said anything
2  about those subject matters to him?
3    MR. STARR: Objection to form. Foundation,
4  vague.
5    MS. BONJEAN: Assumes facts not in evidence.
6  Draws -- calls for a legal conclusion.
7    THE WITNESS: I believe that I spoke -- I spoke
8  clearly in the English language and told you that
9  before we communicated, I had no idea how he got my
10 name. I did not ask him did he get my name out of a
11 hat and who gave him my number? My sister gave him
12 the number, so how he got my sister's number or who
13 got what, I don't know. All I know, that I spoke to
14 him briefly of what I knew, and I spoke to him
15 briefly about if he needed anything, he would have
16 to come down here in person where I could see who
17 I'm talking to and see what I'm agreeing on. So he
18 had an idea, more or less what the idea was about,
19 the knowledge I'd had on -- on these two Latin
20 Kings, if you want to say or the individuals who he
21 was involved with, all that --
22 BY MR. SCAHILL:
23   Q.  He had an idea, but he didn't get the idea
24 about what's in that affidavit from you, though, did he?
25   A.  No. No.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 102

1    MR. STARR:  Objection.
2    THE WITNESS:  No.
3    MR. STARR:  First of all, you cut him off.
4  Second of all, ask and answered.
5    THE WITNESS:  Yeah.
6  BY MR. SCAHILL:
7    Q.   All right.  After -- so, when you're at the
8  Chili's and the -- you signed this declaration, were
9  these handwritten changes to the affidavit made by you,
10  or they were made by him?
11    MR. STARR:  Objection to form.
12    THE WITNESS:  They were going -- we went over
13    them, and I think we took place on making these
14    changes in this declaration on my knowledge of what
15    was on the paper, and that's what I agreed on.
16  BY MR. SCAHILL:
17    Q.   All right.  And these changes were made at the
18  Chili's at the time you were sitting there?
19    A.   Yes, sir.
20    Q.   Okay.  So he presents to you this written
21  affidavit with the typewritten parts, you went over it
22  and you made some changes and initialed them, and then
23  you signed it as the progression of events?
24    A.   Yes, sir.
25    Q.   Okay.  After you signed this -- I'm actually

Page 103

1  done with this now.  We might talk about it later.  You
2  can put that to the side.  Mr. Ramirez.
3    A.   Yes, sir.
4    Q.   Oh, you can put it to the side.  We're going
5  to move onto something else now.
6    A.   Okay.
7    Q.   After you left the Chili's, did you ever speak
8  to Mr. Starr about the subject matter of the affidavit
9  after that?
10    A.   Like I said, I don't believe me and Mr. Starr
11  had spoken in months until I got a -- he got a hold of
12  me now that he came down to Florida, and I agreed to
13  meet with him again, and that's all the meetings and all
14  the conversations I've had with him.  I don't text
15  message him.  He don't text message me, other than I
16  think yesterday, one time, about being on time and
17  today, being on the road, being ten minutes late for
18  myself.  So other than that, we don't text message.  Me
19  and him don't communicate like that.
20    Q.   So going back to the Chili's meeting, can you
21  tell me exactly what it was that you said to him and he
22  said to you at that meeting?
23    MR. STARR:  Objection.  Form, foundation.  Calls
24    for speculation.
25    THE WITNESS:  On the meeting yesterday?

Page 104

1  BY MR. SCAHILL:
2    Q.   No, no.  The one at the Chili's when you
3  signed the declaration.
4    A.   We already -- we already went over that.  I
5  mean, we're saying what we said, we went over the
6  paperwork.  I read it, I understood it, and I signed
7  what I believed was knowledge, my knowledge to what was
8  being said here in the affidavit, so the declaration is
9  all agreeable by me.  I don't believe he made this up,
10  and I don't know how it came about being so precise, but
11  this is how it was.
12    Q.   So did you, when you were meeting with
13  Mr. Starr at the Chili's, you know, talk about kind of
14  what had occurred that you were describing in this
15  affidavit, like the things surrounding those events that
16  you described there?
17    MR. STARR:  Objection to form.
18    THE WITNESS:  No.  I really -- all we talked
19    about is briefly going over the affidavit.  I
20    invited him to go to a strip club, but he said he
21    was married, so he -- he declined going.  So I don't
22    know.
23  BY MR. SCAHILL:
24    Q.   That's a good guy.
25    A.   -- guess so.

Page 105

1    Q.   So -- yeah.  So the -- did -- was the
2  conversation then just him going through the paragraphs
3  that are written in the declaration and saying, is this
4  -- is this true, and saying either it is or it isn't, or
5  it needs some additional changes?
6    MR. STARR:  Objection.  Form, foundation.  Asked
7    and answered.  Go ahead.
8    THE WITNESS:  Yeah.
9  BY MR. SCAHILL:
10    Q.   Okay.  Did Mr. Starr ever explain to you what
11  the purpose of having you sign this declaration was?
12    MS. BONJEAN:  Objection to the form of that
13    question.  Foundation as well.
14    THE WITNESS:  I really don't know.  No.  I
15    don't recall making an agreement or something.  I
16    just agreed on what I set up, put on the paper, and
17    I signed what I believe is my knowledge of what took
18    place.  From the beginning Mr. Starr said, make sure
19    that everything you're saying here is true, because
20    you might be questioned on this in the near future.
21    So I said, listen, I'm not making this up.  The same
22    answers I'm giving you now, I'll give it to you five
23    months from now, a year from now, or whenever it
24    takes place, because these are now that things are
25    being opened up in my mind and able to comprehend on

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 106

1  what I've said and what needs to be said on my
2  declaration. Other than that, I don't have no idea
3  about mentioning that Gonzalez, the cops, Madroski,
4  all, any of them guys, I have no idea where they're
5  at. I've not spoken or communicated with none of
6  them, so that's really it. That's all I can help you
7  with. If you really get on the ball and ask me
8  questions that are helpful for you, the City of
9  Chicago, I mean, I'd be willing to answer it, but
10  other than that, I -- I can't help you on these back
11  and forth questions and stuff that's leading to the
12  same thing, the same answers. If we get on the
13  point and ask me the questions that you need to be,
14  now that you go off, let's do that. I mean, let's
15  keep going and make this fun for everybody.
16  BY MR. SCAHILL:
17     Q.  In any of your conversations with Mr. Starr,
18  did you ever speak to him about your involvement in the
19  narcotics trade back in the '80s and '90s?
20     A.  He never asked me. I never going to put out
21  information that I'm not aware of me having any
22  knowledge of being -- testify or declare anything
23  involving myself, because whatever I was involved with,
24  I'd done the time. Whatever I was involved with, I
25  mean, I was implicated in something that I had no idea.

Page 107

1  If you're wanted to know, I went to jail for five cans
2  of chili pepper, so let's be realistic. I'm not a happy
3  camper.
4        MR. STARR: Did someone just join the Zoom?
5        MR. SCAHILL: I'm sorry. What's that?
6        MR. STARR: Did -- sorry, Tim. Did -- did
7     someone else -- it beeped. Did someone join the
8     Zoom?
9        MR. SCAHILL: I didn't hear a beep, but --
10        THE WITNESS: On my screen is --
11        MR. SCAHILL: I don't see anybody else.
12        THE WITNESS: -- gorgeous Jennifer and --
13        MS. BONJEAN: Aha. It's a Steven.
14        THE WITNESS: And you, Tim Scahill.
15        MR. STARR: Okay. Steve Greenberg. Okay. I
16     just -- I didn't mean to interrupt. I just -- I'm
17     not looking at the Zoom screen, so I just want to
18     know who's on the --
19        MS. BONJEAN: Yeah. That's Greenberg's office.
20        MR. STARR: Okay. Sorry.
21  BY MR. SCAHILL:
22     Q.  You bring up Ms. Bonjean. Have you ever
23  spoken to Ms. Bonjean before today's date about
24  anything?
25     A.  Jennifer? No, no, no, no.

Page 108

1     Q.  Never spoke to her?
2     A.  No.
3     Q.  Have you ever spoken to anybody who purported
4  to be representing Mr. Maysonet?
5     A.  Not at all.
6     Q.  Okay. But before Mr. Starr had reached out to
7  you, had you spoken to anybody about the -- Mr. Maysonet
8  or Mr. Gonzalez at any point in the last, you know, 20
9  years?
10     A.  30. Let's make it 30 years. No.
11     Q.  You hadn't spoken to anybody about anything
12  relating to them in that period of time?
13     A.  Not at all.
14     Q.  Okay. So this call just completely came out
15  of the blue for you?
16     A.  I guess so. Yeah.
17     Q.  All right. So I do have to -- well, let me --
18  let me ask you this question. Did Mr. Starr ever tell
19  you that Mr. Maysonet had implicated you as being
20  involved in the narcotics business?
21     A.  I was not aware that I was implicated with
22  Mr. Maysonet on any kind of doing, because Maysonet
23  would -- was a different type of individual. I had --
24        MS. BONJEAN: I'm going to -- I'm sorry, go
25     ahead. Please, finish.

Page 109

1        THE WITNESS: I don't see Jennifer, though.
2        MS. BONJEAN: I'm right here.
3        THE WITNESS: I'd like to see --
4        MS. BONJEAN: I thought you were finished. Go
5     ahead, Mr. Ramirez.
6        THE REPORTER: It's only going to let you see
7     one --
8        THE WITNESS: Okay. Let's go ahead.
9        MR. STARR: You were in the middle of an
10     answer.
11        MR. SCAHILL: See --
12        THE WITNESS: No.
13        MR. SCAHILL: -- this is -- this is the problem
14     with inter -- with objecting in the middle of
15     questions. I mean, if -- I have no problem agreeing
16     that you haven't waived any objections if you make
17     it after the question, but when you --
18        MS. BONJEAN: I thought he was finished. I
19     thought he was finished. Relax. I thought he was
20     finished. That's it.
21        MR. SCAHILL: You've done it -- you've done it,
22     like, a dozen times. You keep --
23        MS. BONJEAN: I don't think I have, but anyway,
24     he can finish. I'm going to lodge an objection to
25     form, foundation, but he can finish. It's fine.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 110

1    THE WITNESS:  No, I haven't.
2  BY MR. SCAHILL:
3      Q.   Okay.  The establishment that is referred to
4  in your declaration, was that an establishment that was
5  being used in the narcotics business?
6      A.   No.  It was a bar.  I was taking care, owner
7  of the bar, and I believe selling drugs in my own
8  establishment was -- would just create a more problem.  I
9  had --
10     Q.   Because you were --
11     A.   -- problems with the pool table, which I
12 wanted to take out, because brothers who come -- that
13 was the problem that I had when I first picked up the
14 bar.  There was a lot of young guys going in there and
15 minors drinking beer, playing pool all day long for a
16 dollar or something like that, so I took that out the
17 game.  So I had problems with the -- the individuals
18 that were running the pool table and the slot machines.
19 We got into conversation because of that.  They felt
20 that if I took the pool table and things out, they were
21 -- they would lose money.  I said, well, listen, I'm the
22 one paying the bills here.  I don't care about you guys
23 losing money, but get this pool table out of my
24 establishment.  I got other -- I got other things.  I
25 can make this a dance floor, change the view of the bar,

Page 111

1  and change the people that come in the bar.  You know, I
2  didn't want no gang bangers, my own guys sitting there
3  with 3 or $4, drinking a beer all day long.  No, no, I
4  didn't need that kind of crowd, so that was the
5  situation where Maysonet came in and met these officers.
6  He was well aware who these officers were, so even
7  though I didn't have no knowledge of what they were
8  doing there, I know that the conversation was intense
9  because they sat down.  They acted like they were
10 buddies and friends there.  That's how it went down.
11     Q.   All right.  So well, let's actually go down
12 that road for a minute.  So you -- your declaration
13 references an establishment that you operated, right?
14     A.   Yes, sir.
15     Q.   Okay.  Where exactly was this establishment
16 that you operated during the time period of 1990
17 located?
18     A.   It was located on Milwaukee and North Avenue,
19 around that area, six corner type.  It was right next to
20 the methadone clinic that was on Milwaukee, so it was --
21 it was -- it was called Farandula.  So actually, that's
22 really it.  How come I can't see Jennifer on the screen,
23 though?
24     Q.   She's there.
25     A.   Well, she's not here on this screen.

Page 112

1      Q.   Do you -- do you know the address for this
2  establishment?
3      A.   No, I don't.
4      Q.   All right.  But it was Milwaukee and North?
5      A.   Yeah.  Around that area.
6      Q.   And that's the Wicker Park area?
7      A.   Yeah.
8      Q.   And did you say there was an actual name for
9  this establishment?
10     A.   Yes.
11     Q.   What was it?
12     A.   Farandula.
13     Q.   Can you spell that?
14     A.   F-A-R-A-N-D-U-L-A.
15     Q.   What's that mean?
16     A.   I don't know.  First of all --
17     Q.   Is a person's name or is it a -- I don't speak
18 Spanish.
19     A.   No, but then that's the name it was given
20 before I took over.  Because at that time, there was no
21 liquor license being given in the city of Chicago, and a
22 person with my background and stuff like that, they
23 would not -- never give me a liquor license, so I had to
24 buy the liquor license from the gentleman that owned it.
25 He was having problems with the people, the crowd in the

Page 113

1  place, so he felt that selling it to me would be the
2  best thing he could do like that.  And I told him, if I
3  could operate it with his liquor license under his name,
4  that's the only way I could do it because I couldn't do
5  it no other way.  I didn't have nobody to take over and
6  apply for a liquor license.  Liquor license, I believe
7  it was like 20 or $30,000.  I had no idea.  And the only
8  way you could have gotten a liquor license, if you had a
9  restaurant connected to the place, so the liquor license
10 was only given to people with restaurants and stuff like
11 that, so --
12     Q.   So was Farandula a restaurant and a bar?
13     A.   No.  It was just a bar.
14     Q.   Okay.  Did not serve food?
15     A.   No.
16     Q.   Okay.  And was this owned by you on paper or
17 was owned by somebody else on paper?
18     A.   It was owned by someone else.
19     Q.   And who was that someone else?
20     A.   I don't remember his name.  I mean, he moved
21 out to Puerto Rico, so all my payments to him went
22 through one of his daughters that would come by every
23 month and collect what I had to give her.  So other than
24 that, that's all I knew about the old man.
25     Q.   So at no point when you operated this

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 114

1  establishment, did it serve food?
2     A.  No, no food.
3     Q.  Okay.  Just alcohol and --
4     A.  It's alcohol.
5     Q.  -- pool tables and stuff like that?
6     A.  Yeah.
7     Q.  Okay.  And this establishment had a liquor
8  license and was licensed by the -- by the City of
9  Chicago for that?
10    A.  Yes, it was.
11    Q.  Okay.  And did it have employees and workers
12 working there?
13    A.  Everybody that was on there after I took over
14 were my guys, my bartender, and the people I could
15 trust.
16    Q.  Did Mr. Maysonet ever work there?
17    A.  No.
18    Q.  Did he ever perform any services there for
19 you?
20       MR. STARR:  Objection to form.  Foundation.
21       THE WITNESS:  No, no, no, no.
22 BY MR. SCAHILL:
23    Q.  Did this establishment ever have a kitchen?
24       MR. STARR:  Objection to form.  Foundation.
25       THE WITNESS:  It had a small kitchen in the

Page 115

1  back, yeah.  But there was no food being served to
2  anybody, unless it was the workers or myself.  We
3  wanted to eat something special, we just made up
4  whatever we wanted to eat.  That was it, so --
5  BY MR. SCAHILL:
6     Q.  Just like a kitchenette or something?
7     A.  Yeah.
8        MR. STARR:  Objection to form. Mischaracterizes
9  his testimony.
10 BY MR. SCAHILL:
11    Q.  Other than operating as a bar serving alcohol,
12 was -- did this establishment have any other purposes?
13       MR. STARR:  Objection to form and foundation.
14       THE WITNESS:  What do -- what do people go to
15 bar for?  I mean, play slot machines, to drink beer,
16 watch TV on the screen TV.  That's actually what was
17 going on.  Other than that, I have no idea why
18 people went to the establishment.
19 BY MR. SCAHILL:
20    Q.  Was this establishment, the one that you
21 referred to in your declaration, a front for a drug
22 operation?
23       MR. STARR:  Objection.  Asked and answered.
24       THE WITNESS:  I never said that.
25 BY MR. SCAHILL:

Page 116

1     Q.  Well, I'm asking you: Was it a front for a
2  drug operation?
3        MR. STARR:  Objection.  Asked and answered.
4        MS. BONJEAN:  Join.
5        THE WITNESS:  I said I -- I don't have no idea
6  if there was any drugs being sold there.  It was my
7  drugs and I didn't sell no drugs out of my
8  establishment.  My wife at that time didn't want me
9  to keep the bar because she felt I was coming home
10 late, and there was hookers working there and bad
11 people, and she was thinking I was having sex with
12 all the bartenders.  And so you know, it created a
13 problem for me.  That bar there was a headache.  It
14 wasn't like my -- my restaurants where things went
15 smooth and people, you know, enjoyed going there.
16 The people that went there were people that --
17 actually, I don't know.  They would give ten, $20
18 tip to the bartender because she looked good or
19 something like that.  I mean, the drinks weren't all
20 that good, so I mean, that is what it is.
21 BY MR. SCAHILL:
22    Q.  Did -- were you operating a restaurant of some
23 sort during this same time period in 1990, or are you
24 talking about later on in your restaurants?
25    A.  No, later on, later on.

Page 117

1     Q.  Okay.  This was your only establishment that
2  you were running in 1990?
3     A.  Yes, it was.
4     Q.  Okay.  And just so we're clear, you were not
5  using this establishment as a front for any sort of
6  illegal narcotics activity?
7        MR. STARR:  Objection.  Asked and answered
8  multiple times.
9        THE WITNESS:  Not at all.  Now, let me make a
10 clearance on the 1990 situation.  1990, I also owned
11 a food restaurant that was called Little Havana, and
12 that was located on -- on -- Little Havana was
13 located on -- I can't remember, but I -- I do know
14 it was in the -- in the east side of Chicago, right
15 by the hospital, by certain hospitals.  Right where
16 -- Wellington and -- I don't remember.
17 BY MR. SCAHILL:
18    Q.  But that was not in business at the time, in
19 1990, when this establishment on North and Milwaukee,
20 that the interaction with Maysonet and Guevara happened?
21       MR. STARR:  Objection.
22       THE WITNESS:  I believe --
23       MR. STARR:  Form, foundation.  I believe that
24 mischaracterized the testimony, but go ahead.
25       THE WITNESS:  I believe that I -- it was around

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 118

1    the same time I owned that -- the restaurant, but
2    the restaurant was totally a different type of
3    atmosphere. The food was actually good. I had good
4    waitress. I had professional cooks that --
5    BY MR. SCAHILL:
6        Q.   But the establishment where you're saying this
7    interaction between Maysonet and Guevara happened is the
8    establishment that's on North and Milwaukee?
9        A.   Yes, sir.
10       Q.   Okay. And when did you stop operating that
11   establishment?
12       A.   Well, North and Milwaukee, I got rid of it
13   before I got arrested. I gave it to another individual
14   that was involved with the slot machines and -- and the
15   pool table situation that was involved with these so-
16   called mobsters or whatever they want to call them, that
17   ran the slot machines. And I -- through my chief, I
18   handed it over to a Latin King that was going to take
19   over all the -- situations on there. They couldn't
20   do that without me, because I was the one that had the
21   connection of the liquor license. So for them to take
22   over, they had to go through me first, and plus my wife
23   was actually really happy that I got -- that I would get
24   rid of it and just focus on the restaurant that I had on
25   --

Page 119

1        Q.   You said, when you got arrested is -- you
2    stopped operating. Which arrest are you referring?
3        A.   The one, Inglewood drug conspiracy.
4        Q.   And what year was that?
5        A.   I think it was '91 -- '90 or '91 that I got
6    arrested at --
7        Q.   That's the one where you got the ten-year bid
8    for?
9        A.   Yeah.
10       Q.   Okay. When you got arrested for that offense,
11   did you get bond, or did you have to sit in Cook County
12   Jail until the --
13       A.   No, I got bond. I got --
14       Q.   You got bond. Okay.
15       A.   I -- I had to pay $20,000 to get out.
16       Q.   All right. We may come back to that then.
17   All right. So I want to ask you some questions about
18   Mr. Maysonet. Obviously, this is somebody you knew in
19   the past, right?
20       A.   -- sir.
21       Q.   Okay. When did you first meet Mr. Maysonet?
22       A.   I believe, being from one section and having
23   the opportunity to meet other brothers from different
24   sets and know their whereabouts more or less, I believe
25   I met him when we were young, you know, younger than

Page 120

1    when I took the case in the early '80s.
2        Q.   You think you met him in the early '80s?
3        A.   I think so.
4        Q.   Okay. He was a little bit younger than you?
5            MR. STARR: Objection. Form, foundation,
6    speculation.
7            THE WITNESS: I really don't know his age, but
8    he was around my age, though.
9    BY MR. SCAHILL:
10       Q.   And do you recall the first time that you met
11   him?
12       A.   No, not really.
13       Q.   Do you recall there being an incident where he
14   intervened when you were chasing a guy down the street
15   who had stolen something from you?
16       A.   I don't remember that either.
17       Q.   Okay. Do you know whether that happened or
18   didn't happen?
19           MR. STARR: Objection. Asked and answered.
20           THE WITNESS: I don't remember.
21   BY MR. SCAHILL:
22       Q.   Did he ever -- Mr. Maysonet ever intervene in
23   a -- in a -- any conflict that you were having with
24   anybody else?
25           MR. STARR: Objection. Asked and answered.

Page 121

1            MS. BONJEAN: Asked and answered.
2            THE WITNESS: I don't remember.
3    BY MR. SCAHILL:
4        Q.   Okay. And so by the year of 1990, you had
5    known Mr. Maysonet for a number of years?
6            MR. STARR: Objection. Form, foundation. Calls
7    for speculation.
8            THE WITNESS: Yes, I have.
9    BY MR. SCAHILL:
10       Q.   Okay. What was the nature of your
11   relationship with him in the year 1990?
12           MR. STARR: Form.
13           THE WITNESS: Well, that's when I believe he
14   went to the -- bar and met with Mr. Madroski or
15   whatever his name was and the other officer, Schiva
16   -- Schivaire (phonetic) or whatever his name was,
17   the officers where they met in the restaurant -- in
18   the bar, and sat there and had a beer and talked
19   whatever they talked about. I don't know. Later
20   on, I found out what it was all about, but other
21   than that, I had no idea what was taking place.
22   BY MR. SCAHILL:
23       Q.   So by the time that that happened, were you --
24   did you have a friendly relationship with Mr. Maysonet?
25       A.   Of course. I mean, I knew him.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 122

1    Q.   You consider him a friend of yours?

2    A.   No, I wouldn't consider him a friend.  I would

3    consider him my brother that -- that came and was

4    dealing with some -- his dealings were totally different

5    than my situation with my dealings.  My people were

6    people that would sit down and have dinner with you.  His

7    people were most -- would sit down and have a beer with

8    you and talk about -- or whatever they talked about.

9    That's on them.  But that's totally a different

10   atmosphere from one person to another.

11   Q.   Prior to this interaction in 1990 at your

12   establishment, how often would you -- would you

13   communicate with Mr. Maysonet?

14   A.   I can't -- I can't -- I don't remember.  Like,

15   I wouldn't make a -- a date to see him or talk to him or

16   call him because that kind of relationship was not

17   established.

18   Q.   Did you and Mr. Maysonet ever have any

19   dealings in the narcotics trade with each other?

20   A.   No, I -- I don't recall.

21   Q.   You're saying you don't recall or it didn't

22   happen?

23   A.   No, it didn't happen.  I don't recall any kind

24   of dealings with Mr. Maysonet or Mr. Gonzalez at any

25   time.

Page 123

1    Q.   Were you at any point Mr. Maysonet's drug

2    supplier?

3    A.   No, I -- I can't say I did.

4    Q.   When you say you can't say you did, are you

5    saying --

6    A.   No, I can't say I did supply him with any

7    drugs.  I -- I don't recall doing that.  So if that

8    happened, I don't remember.

9    Q.   Okay.

10   A.   But I -- I would say no.

11   Q.   All right.  Did you ever provide mentorship or

12   guidance to Mr. Maysonet in how to conduct himself as a

13   drug dealer?

14        MR. STARR:  Objection to form --

15        MS. BONJEAN:  Objection.

16        MR. STARR:  -- and vague.  Go ahead.

17        MS. BONJEAN:  Join.

18        THE WITNESS:  I believe Maysonet later on told

19   me about his dealings with Mr. -- the officer was --

20   what's the officer's name?  Whatever his name was

21   and whatever the other individual was, he went over

22   what was going on and what they wanted him to do and

23   what he was involved with.  And I told him, man,

24   just, you know what?  Be careful.  Everybody knows

25   these cops are no -- nothing nice.  And they'll use

Page 124

1    you, abuse you, and then throw you to the sharks.

2    And that's all the advice I told him.  Other than

3    that, I didn't want to know nothing.  It wasn't like

4    he made me aware of what is happening.  Like

5    tomorrow it's going to happen, this, or to --

6    nothing like that was taking place.  All I know is

7    that the officers would rob people, give the drugs

8    to Maysonet or dealing with Maysonet, and Maysonet

9    had to pay like a dues to this guy.  So you know,

10   that's all I know.  How much they were paying him, I

11   don't know.  When they were seeing him, I don't know.

12   What was going on, I don't know.  So if we keep

13   going on these questions here, I'm already telling

14   you what I know and what I don't know.  So let's --

15   BY MR. SCAHILL:

16   Q.   Do you -- do you know the names of the

17   officers who were supposedly involved in this illicit

18   relationship with Mr. Maysonet?

19   A.   I forget.  Madroski is one -- one of them, and

20   -- and Chavaro (phonetic), I think.  I really don't

21   know.  I don't even remember their names.

22   Q.   Were those officers that you knew who they

23   were before they came into your bar and met with Mr.

24   Maysonet?

25   A.   Yes.  I -- I knew them by face.  I knew what

Page 125

1    they would -- they would do.  I know they would hassle.

2    I mean, they would hassle, like, myself.  They never got

3    to the point of binding me or asking me for money for my

4    establishment and for protection or for dues or

5    whatever.  But there was cops doing that.  There was

6    cops that went in there and tried to manipulate myself

7    into paying them for protections for having a bar in

8    this neighborhood.  So other than that, I don't agree --

9    I don't even remind myself or think about them two

10   officers coming in and harassing me or asking me for any

11   kind of money.  They never did that.

12   Q.   But they never did that -- did that?

13   A.   No.  I -- I mean, not to -- not to my

14   knowledge.

15   Q.   And we -- we're referring to the two officers

16   that are referenced in your declaration.  You -- they

17   never shook you down for money or anything like that?

18   A.   No, not me.

19   Q.   Did you ever -- were you ever aware of any

20   personal knowledge that you had that either of these two

21   officers had engaged in any illegal conduct?

22   A.   Well, --

23        MR. STARR:  Objection.  Asked and answered.

24        THE WITNESS:  The -- the knowledge that I have

25   is the knowledge that was put on the streets.  These

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 126

1    officers weren't just officers wearing a -- a badge,
2    stopping people for traffic tickets. These officers
3    had informants that would inform them of regular
4    houses where they had drugs or who had the drugs,
5    what, when they were moving the drugs. So all these
6    things here were being thought about through
7    confidential informants, snitches that worked with
8    them. And they will go on and do their thing, and
9    then see Maysonet, I guess, and give him the drugs.
10   Who knows what they were doing. I really don't --
11   like to answer that correctly. I really don't know.
12   BY MR. SCAHILL:
13      Q.   Okay. But do you have any personal knowledge
14   from things that you observed with your own eyes that
15   either of these officers had done anything illegal?
16      MR. STARR: Objection to form, foundation.
17   Asked and answered.
18      THE WITNESS: Like I said, I had no knowledge
19   because I have no communicating established with
20   these officers. If these officers didn't
21   communicate, establish with me. So other than shake
22   me down or take money from me or rob, I didn't do no
23   business in the bar. The bar was in a neighborhood
24   which it was hot. So for me to do any business or
25   any of the people that I dealt with to come there

Page 127

1    will be a scary move for them and -- and a dangerous
2    move for me. So I would keep them situations away
3    from the -- the -- bar.
4    BY MR. SCAHILL:
5       Q.   Right. But you're -- again, you're not saying
6    that either of these officers ever shook you down or did
7    anything illegal that you were aware of?
8       A.   I done told you already, no.
9       MR. SCAHILL: Okay.
10      MR. STARR: Belated objection to form and
11   foundation. Asked and answered.
12   BY MR. SCAHILL:
13      Q.   Did you, in the year 1990, around the time
14   that this interaction with these officers and Mr.
15   Maysonet occurred, were you aware that Mr. Maysonet was
16   involved in the drug trafficking business?
17      MR. STARR: Objection to form, foundation.
18   Asked and answered.
19      THE WITNESS: Yes, I was aware.
20   BY MR. SCAHILL:
21      Q.   How were you aware of that?
22      A.   Because I knew. People didn't talk about
23   prices and who they were dealing with and who they buy
24   stuff from, and conversation would go on about the
25   situation they had with the officers, the communicating

Page 128

1    they had with the officers getting them drugs and the
2    price they were getting it to them. So I was surprised
3    because the prices were actually pretty damn cheap. And
4    there was actually a really, really scary situation that
5    these officers would rob somebody and give the drugs to
6    me so that -- and stuff to sell. So all these things --
7       Q.   But Mr. -- as far as Mr. Maysonet's
8    involvement in the drug business, was that something
9    that was well known to you at the time that this
10   interaction with these officers occurred?
11      MR. STARR: Asked and answered.
12      THE WITNESS: I mean, if someone comes to your
13   bar and you know who they are, you know that they
14   ain't working, and you know they're driving a nice
15   car, or they got gold on them or a situation like
16   that, you would know that they're up to something.
17   So they would make it out -- they would make it
18   noticeable what they were doing, what kind of income
19   they were getting, the -- their income from, how
20   they would pay the bills, if they had any bills, and
21   how they did work day by day. And I really don't
22   know if Maysonet and Gonza- -- and Lluvia had any
23   dealings within themselves with the officer. All I
24   know is Maysonet had the connection with the
25   officers. What Lluvia (phonetic) had, I don't know

Page 129

1    what he had involved with the -- with this case
2    here, or they were even involved themselves together
3    on the case.
4       MR. STARR: Tim, if you could get a point, if
5    we could take a break, I think I'd appreciate a
6    break.
7       MR. SCAHILL: Sure. I mean, we talking about a
8    short break? You talking about a lunch break? I
9    mean, I can go all day.
10      MR. STARR: Well, I was going to ask the
11   witness if he needed any food or anything. I mean,
12   he seems to be kind of tired. His eyes are closing
13   and stuff. I just want to make sure he's okay. But
14   I also need to use the restroom.
15      MS. BONJEAN: I do too.
16      MR. SCAHILL: Whatever you want.
17      THE WITNESS: How come I can't see Jennifer?
18      MS. BONJEAN: I don't know. I'm not hiding.
19      MR. STARR: Okay. Let's take take ten.
20      MR. SCAHILL: All right.
21      THE REPORTER: We are off the record. 1:36
22   p.m.
23         (OFF THE RECORD)
24      THE REPORTER: Okay. We are back on the record
25   for the deposition of Eduardo Ramirez being

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 130

1  conducted by videoconference.  My name is Victoria
2  Adams.  Today is June 20, 2024.  The time is 2:06
3  p.m.
4  BY MR. SCAHILL:
5      Q.  All right.  Welcome back, Mr. Ramirez.  Did --
6  were you able to get something to eat on the break,
7  coffee and all that?
8      A.  Coffee, yeah.
9      Q.  Okay.
10     A.  Food, no.
11     Q.  Did you speak to anyone on the break about
12  your testimony or anything like that?
13     A.  No.  I didn't see anybody.
14     Q.  Did you look at any documents or anything?
15     A.  Nope.  Not at all.
16     Q.  All right.  I want to ask you some questions
17  about Mr. Maysonet.  I think that's sort of where we
18  left off.  In 1990, around the time that this
19  interaction happened at your establishment, can you give
20  me a general physical description of Mr. Maysonet?
21     A.  People change in 30 years.  People change, but
22  what I remember him being around my size, short hair,
23  and actually he was wearing something comfortable.  So
24  that's really what I remember.
25     Q.  How tall are you?

Page 131

1      A.  5'6".
2      Q.  Okay.  And how tall was -- you -- are you
3  saying Mr. Maysonet was your same height?
4      A.  More or less, yes, I would say.
5      Q.  Is it more or less?
6      A.  More.
7      Q.  He was a little bit taller than you?
8      A.  Yeah.
9      Q.  Okay.  Was he slim built or medium built or
10  larger fella?
11     A.  Medium built.
12     Q.  Okay.  Any ballparking on the weight there?
13         MR. STARR:  Foundation.
14         THE WITNESS:  Any -- any what?
15  BY MR. SCAHILL:
16     Q.  Like ballpark what his weight was?
17     A.  No, not really.
18     Q.  All right.  Did he have any facial hair?
19     A.  No.
20     Q.  And how was he keeping his hair back when you
21  saw -- at around the time that this establishment
22  meeting happened, how was he --
23         MR. STARR:  Asked and answered.
24         MS. BONJEAN:  Objection.  Objection.  Asked and
25  answered.  Speculative.  Foundation.

Page 132

1         THE WITNESS:  I really don't remember.  His
2  hair was short.  So other than that, I really don't
3  know what you want me to say on that.
4  BY MR. SCAHILL:
5      Q.  Was he a lighter complected guy or a darker
6  complected guy?
7      A.  Light.
8      Q.  All right.  And obviously a guy of Hispanic
9  origin, yeah?
10     A.  Yes.
11         MR. STARR:  Objection.  Foundation.
12         THE WITNESS:  I would say so.  Yes.
13  BY MR. SCAHILL:
14     Q.  All right.  When you would speak with him,
15  would you speak with him in English?
16         MS. BONJEAN:  Objection to the foundation of
17  that question.
18         THE WITNESS:  In Spanish.
19  BY MR. SCAHILL:
20     Q.  All the time?
21     A.  Yeah.  More or less all the time.
22     Q.  Do you know if he could speak English?
23         MR. STARR:  Objection.  Form, foundation.  Calls
24  for speculation.
25         MS. BONJEAN:  Join.

Page 133

1         THE WITNESS:  I believe he understood English,
2  but actually talking to him in English, I really
3  don't know if we ever talked in English or not.
4  Everything was brief in Spanish and more like a
5  jokative type of situation with him.
6  BY MR. SCAHILL:
7      Q.  Did you ever, before this interaction at your
8  establishment, had you ever before that time spoken to
9  Mr. Maysonet about anything relating to the narcotics
10  business?
11     A.  Not at all.
12     Q.  All right.  I'm going to ask you about a
13  couple of other people.  You -- you've mentioned Lluvia
14  a couple of times.  You understand that that is Alfredo
15  Gonzalez, right?
16     A.  Yes, I do.
17         MR. STARR:  Objection to form, foundation.
18  Assumes facts not in evidence.  Go ahead.
19  BY MR. SCAHILL:
20     Q.  All right.  And Lluvia, that's the Spanish
21  word for river, so it's L-L-U-V-I-A?
22     A.  Lluvia means --
23         MR. STARR:  Rain.
24  BY MR. SCAHILL:
25     Q.  Rain, rain.  I'm sorry, not river, but rain.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 134

1  How long before 1990 did you know Mr. Gonzalez?
2      MR. STARR:  Form, foundation, speculation.
3      THE WITNESS:  I knew him.  I don't even know if
4  him and Maysonet had any kind of dealings together
5  or knew about each other having any kind of drug
6  dealing together.  So I really don't know.
7  BY MR. SCAHILL:
8      Q.   So I'm asking: When did you first meet
9  Mr. Gonzalez?
10     MR. STARR:  Form, foundation.  Calls for
11 speculation.
12     THE WITNESS:  I knew him a few years before
13 that.
14 BY MR. SCAHILL:
15     Q.   All right.  And did you refer to him as Lluvia
16 when you would speak to him?
17     A.   Yes, sir.
18     Q.   And how would he refer to you?
19     A.   Yuma.
20     Q.   Okay.  And so he -- this was somebody who knew
21 who you were and you knew where he -- who he was, right?
22     MR. STARR:  Form, foundation.  Calls for
23 speculation.  Assumes facts not in evidence.
24 BY MR. SCAHILL:
25     Q.   Your answer was yes?

Page 135

1      A.   Yes.
2      Q.   Okay.  How often back, you know, let's say
3  around the 1989, 1990 time frame would you communicate
4  with Mr. Gonzalez?
5      A.   Again, these are people that I knew, but I had
6  no kind of dealings with them or any kind of knowledge
7  of what they were doing.  So --
8      MR. STARR:  Objection to form.  Related
9  objection to form, foundation, and speculation.
10 BY MR. SCAHILL:
11     Q.   Did you know him to be a member of the Latin
12 Kings as well?
13     MR. STARR:  Same objections.
14     THE WITNESS:  Yes, I did.
15 BY MR. SCAHILL:
16     Q.   Did you know Mr. Gonzalez to be involved in
17 drug trafficking in any way?
18     MR. STARR:  Same objections.
19     THE WITNESS:  I knew more or less what he was
20 doing, but I didn't know his whereabouts or how he
21 was doing it or who he was doing it with.
22 BY MR. SCAHILL:
23     Q.   Had Mr. Gonzalez ever come to your
24 establishment before?
25     A.   Yes, he did.

Page 136

1      Q.   Was he there frequently?
2      MR. STARR:  Form, foundation.  Calls for
3  speculation.  Assumes facts not in evidence.
4      THE WITNESS:  I don't -- I don't really know.
5  BY MR. SCAHILL:
6      Q.   When he would come there, would he address you
7  as Yuma?
8      MR. STARR:  Form, foundation.  Calls for
9  speculations.  Assumes facts not in evidence.
10     THE WITNESS:  Yes, I would believe so.
11 BY MR. SCAHILL:
12     Q.   And how did you become aware of his nickname?
13     MR. STARR:  Same objections.
14     THE WITNESS:  How people get their nicknames, I
15 don't know.  I don't know if he was run under water
16 or the river was eating him up or whatever it was,
17 but Lluvia was his nickname.  Everybody knew him as
18 Lluvia. His real name, people actually don't know
19 people's real name sometimes, just only nickname.
20 Like Double J might be Maysonet, but I wouldn't call
21 him Maysonet by his name or something like that.  It
22 was like his nickname.
23 BY MR. SCAHILL:
24     Q.   You said his nickname was Double J?
25     A.   Yeah, I would say so.

Page 137

1      Q.   Did you know him by any other nicknames?
2      A.   No.
3      Q.   What about Lluvia?
4      A.   No.  Lluvia was the name that I would call
5  him.
6      Q.   And so can you estimate for me, before 1990,
7  how many interactions you had with Lluvia --
8      MR. STARR:  Form, foundation.
9  BY MR. SCAHILL:
10     Q.   -- the time that you knew him?
11     MR. STARR:  Calls for speculation.  Assume
12 facts not in evidence.
13     THE WITNESS:  No, I don't.
14 BY MR. SCAHILL:
15     Q.   But he is somebody that you knew pretty well
16 back in those days?
17     MR. STARR:  Objection.  Mischaracterizes his
18 testimony.  Form, foundation.  Calls for
19 speculation.  Assumes facts not in evidence.
20     THE WITNESS:  I really don't know how many
21 times I've seen him, but seen him several times.
22 Every time I would see him, I would see him in the -
23 - the bar or in the streets of the neighborhood or
24 something like that.  But other than that, I didn't
25 know --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 138

```
1   BY MR. SCAHILL:
2       Q.  But you'd know him enough to go up and
3   acknowledge him, say hello to him, yes?
4           MR. STARR:  Same objections.  Form, foundation.
5       Calls for speculation.  Assumes facts not in
6       evidence.  Mischaracterizes his testimony.
7   BY MR. SCAHILL:
8       Q.  I'm sorry.  Your answer was yes?
9       A.  Yes.
10      Q.  Okay.  Do you know an individual named Justino
11  "Tino" Cruz, Tino being the nickname?
12      A.  Tino Cruz?
13      Q.  Yeah.
14      A.  I knew about a Tino, but I don't know his name
15  to be Cruz or anything like that.  So I really don't
16  know who we're talking about.
17      Q.  Is the Tino that we're talking about somebody
18  that you knew to be an associate of Mr. Maysonet or
19  Mr. Gonzalez?
20          MR. STARR:  Form, foundation, speculation.
21          THE WITNESS:  I really don't know what they
22      were, if they knew each other or had dealt with each
23      other.
24  BY MR. SCAHILL:
25      Q.  Did you ever see them together?
```

Page 139

```
1       A.  No, I didn't.
2       Q.  What about Christopher "Fro," it's either
3   Fernandez or Fernandez or Gossens?
4       A.  Gossens.  I knew him very well.
5       Q.  You knew him very well.  How did you know him
6   very well?
7       A.  He grew up right there in the neighborhood.
8   He was a guy that I knew well, and I kept good contact
9   with him.  Matter of fact, I spoke to him a few months
10  ago. He asked me how I was doing from my stroke and
11  things like that.  But other than that, I knew him
12  better than I knew any of the other guys.
13      Q.  He's somebody that you've kept in touch with
14  over the years?
15      A.  Yeah.
16      Q.  And he was a member of the Latin Kings as
17  well?
18      A.  Yes, he was.
19      Q.  Is he still a member of the Latin Kings?
20          MR. STARR:  Form, foundation, speculation.
21          THE WITNESS:  When I greeted him last time I
22      seen him, I greeted him with a handshake, knowing
23      that he's still active with the Latin Kings.  So he
24      lived in the neighborhood.  He lived -- his family
25      lived in the same house for God knows how long.
```

Page 140

```
1   BY MR. SCAHILL:
2       Q.  When you say you greeted him with a handshake,
3   you mean like the Latin King member-to-member handshake?
4       A.  Yeah, sure.
5       Q.  Okay.  And he -- when he -- you saw him, he
6   greeted you with that and returned whatever the gestures
7   were?
8       A.  Yes, it was.
9       Q.  Okay.  So you -- it's your understanding that
10  he still is an active member of the Latin King
11  organization?
12          MR. STARR:  Form, foundation.  Mischaracterizes
13      his testimony.  Calls for speculation.
14          THE WITNESS:  Yeah, I would say so.
15  BY MR. SCAHILL:
16      Q.  Have you ever spoken to Mr. -- I'm sorry, is
17  it Gossens or Gossens?
18      A.  Gossens.
19      Q.  Gossens.  Have you ever spoken to Mr. Gossens
20  about the case that he was charged on for murder back in
21  the -- in 1990?
22      A.  Yes, I have.
23      Q.  Okay.  How many times have you spoken to him
24  about that?
25      A.  Well, I seen him in jail, and I seen him on
```

Page 141

```
1   and off.  I -- I kept contact with him pretty close.
2       Q.  What has he told you about that?
3           MS. BONJEAN:  I'm going to object to the -- I'm
4       going to object to the form and foundation of this
5       question.  You haven't really established the case,
6       so, I mean, I think you should do that.
7           MR. STARR:  Join.
8           MS. BONJEAN:  One he was acquitted of?
9           MR. SCAHILL:  I appreciate the advice, but I'll
10      -- I --
11          MS. BONJEAN:  Well, there -- he was -- do you
12      mean the one he was acquitted of or the one he went
13      to jail on?  So I don't -- I don't really know what
14      you're referencing.
15          MR. SCAHILL:  You know, you need to knock off
16      the feeding information.  You know better than that.
17          MS. BONJEAN:  I -- I'm not feeding anything.
18      You're --
19          MR. SCAHILL:  Yeah, you are.  You -- anytime
20      you say anything other than form or foundation and
21      you interject facts, you're coaching the witness.
22      You know that that's wrong.
23          MS. BONJEAN:  I've never met this man. -- I've
24      never met this man in my life.
25          MR. SCAHILL:  -- going to allow you to do that.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 142

1    MS. BONJEAN: Mr. Scahill, Mr. Scahill, I've
2 never met this man in my life.  I am not trying to
3 coach him.
4    MR. SCAHILL: Stop. --
5    MS. BONJEAN: He does not need to be coached.
6    MR. SCAHILL: And that's -- and that's why
7 you're trying to coach him.
8    MS. BONJEAN: I --
9    MR. SCAHILL: That's why you're trying.
10    MS. BONJEAN: He does not -- he doesn't need to
11 be coached.
12    MR. SCAHILL: Form, foundation.  That's all you
13 say.  You know that.  You know that.
14    MS. BONJEAN: Okay.  Well, I --
15    MR. SCAHILL: And that's enough information.
16    MS. BONJEAN: I need to understand the question
17 too, so that's why I asked.
18    MR. SCAHILL: You are not answering the
19 question, and no, you don't.  You can object.
20    MS. BONJEAN: Yeah, I do.  I do need to
21 understand the question.
22    MR. SCAHILL: And look, if there's no
23 foundation and it's unavailable, you can't use it,
24 okay? You don't interject information.  You know
25 better than that.

Page 143

1    MS. BONJEAN: I'm not interjecting information.
2    MR. SCAHILL: It's completely inappropriate.
3 You think you can interject factual information as
4 an objection?  Do you think you can do that?  No,
5 you cannot.  And you know better than that.
6    MS. BONJEAN: Okay.  I need you to stop with
7 your dad little thing.  It's offensive and sexist.
8    MR. SCAHILL: We need you to follow the rules.
9    MS. BONJEAN: It -- it's sexist.
10    MR. SCAHILL: Follow the rules, Counsel.  Follow
11 the rules, Counsel.
12    MS. BONJEAN: Stop doing that.  Stop doing
13 that.
14    MR. SCAHILL: Follow the rules.  Follow the
15 rules.
16    MS. BONJEAN: Okay, sexist.  Sexist, stop.
17    MR. SCAHILL: What are you talking about?
18 Follow the rule.  What are you -- what on Earth are
19 you talking about?  Follow the rules.  Whether
20 you're a man or a woman, follow the rules.  You're
21 not.
22    MS. BONJEAN: No.  Okay.  You can say that. --
23 The way you're communicating with me is
24 inappropriate. So go ahead.
25    MR. SCAHILL: You're disrupting the deposition.

Page 144

1    MS. BONJEAN: I'm not.  I put an objection on
2 the record.
3    MR. SCAHILL: You're feeding a witness factual
4 information.
5    THE WITNESS: I don't believe she's feeding me
6 anything.  I -- I mean --
7 BY MR. SCAHILL:
8    Q.  No.  Nonetheless, let's --
9    A.  Let's keep going.
10    Q.  -- talk about Mr. -- Mr. Gossens.
11    A.  Yeah.
12    Q.  Okay.  Have you spoken to Mr. Gossens about
13 the murder that he was arrested and charged with back in
14 1990?
15    MR. STARR:  Objection to form, foundation.
16    THE WITNESS:  No.
17 BY MR. SCAHILL:
18    Q.  Are you aware that he was charged with a
19 double murder back in 1990?
20    MR. STARR:  Same objection.
21    THE WITNESS:  Yes, I do.
22 BY MR. SCAHILL:
23    Q.  Okay.  Have you ever had any conversations
24 with him about anything relating to that case?
25    MR. STARR:  Asked and answered.

Page 145

1    THE WITNESS:  No, I didn't.
2 BY MR. SCAHILL:
3    Q.  Okay.  Has he ever shared with you his
4 experience with any police officers relating to that
5 case?
6    A.  No, he didn't.
7    Q.  Has he ever shared with you anything about the
8 disposition of that case?
9    A.  No, he didn't.
10    Q.  Okay.  Has he shared with you anything about
11 the facts of that case?
12    A.  No.  But I do know that I actually believe
13 that he was not involved on the case.
14    Q.  Why do you believe that?
15    A.  Because the evidence that was given out at the
16 -- at the plead or the trial was not the actually
17 evidence that I know actually happened during that case.
18    Q.  And what do you know actually happened during
19 that case?
20    A.  Well, I really don't want to touch that --
21 issue there because it's way past due.  He's done
22 did his time for it, and he kept his mouth shut about
23 what happened.  So let's leave it at that.
24    Q.  Who is the person you're referring to kept
25 their mouth shut about that case?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 146

1    A.   Mr. Gossens.

2    Q.   Okay.  Did Mr. Gossens articulate to you that

3  he knew who had done that, those murders?

4         MR. STARR:  Form, foundation.  Asked and

5    answered.

6         THE WITNESS:  I believe he knew.

7  BY MR. SCAHILL:

8    Q.   Why do you believe he knew?

9    A.   Why are you asking me?  To tell you the name

10 of the person involved?  I don't really know.  I really

11 want to keep that issue there.  It's a close issue to

12 me.  He done did his time.  I mean, his family suffered

13 for that.  He suffered for that.  And let's move on.

14   Q.   So we're referring to murders that occurred on

15 May 25, 1990, that Mr. Gossens was charged at, right?

16   A.   Yes, sir.  Yes, sir.

17        MR. STARR:  Form, foundation.

18 BY MR. SCAHILL:

19   Q.   And I said it -- is it your testimony that you

20 have knowledge about who's responsible for committing

21 those murders?

22        MR. STARR:  Form, foundation.  Mischaracterizes

23   his testimony.  Assumes facts not evidence.  Calls

24   for speculation.

25        THE WITNESS:  I know more or less what took

Page 147

1  place and how it took place.  But other than that, I

2  would like to take the Fifth on any of the questions

3  on that case, of that murder case.

4         MR. STARR:  Tim, I think I want to take a

5  break.

6         MR. SCAHILL:  You want to take a break to --

7         MR. STARR:  Yes.

8         MR. SCAHILL:  Are you intending to speak to the

9  witness?

10        MR. STARR:  I'm not.

11        THE WITNESS:  No.  He's not spoken with me at

12 all.

13        MR. STARR:  I'm -- I've been -- I just want to

14 take a break.

15        MR. SCAHILL:  Okay.  How -- when do you want to

16 come back?

17        MR. STARR:  Five minutes.

18        MR. SCAHILL:  Okay.

19        THE REPORTER:  Okay.  We are now off the

20 record.  The time is 2:23 p.m.

21        (OFF THE RECORD)

22        THE REPORTER:  Okay.  We are back on the record

23 for this deposition of Eduardo Ramirez being

24 conducted by videoconference.  My name is Victoria

25 Adams, and the date is June 20, 2024.  The time is

Page 148

1  2:38 p.m.

2  BY MR. SCAHILL:

3    Q.   Okay.  Mr. Ramirez, we took a longer than

4  five- minute break there.  On that break, did you speak

5  to anyone?

6    A.   No, I didn't.

7         MR. SCAHILL:  Okay.

8         MR. STARR:  Tim, Tim, I'll stipulate that I

9    asked him if he's okay.

10        MR. SCAHILL:  Oh, okay.  I mean, I just mean

11   substantively.

12        MR. STARR:  Okay.  No, I just asked him if he

13   was doing okay because it -- he was closing his eyes

14   a lot during the last series of questions, and I was

15   concerned about his health.

16 BY MR. SCAHILL:

17   Q.   You okay, Mr. Ramirez?

18   A.   Yes, sir.

19   Q.   Okay.  Mr. Ramirez, do you know who's

20 responsible for killing Kevin and Torrance Wiley on May

21 25, 1990?

22        MR. STARR:  Objection.

23        THE WITNESS:  No, I don't.

24        MR. STARR:  Form, foundation.  Calls for

25   speculation.

Page 149

1  BY MR. SCAHILL:

2    Q.   Do you have any information about who is

3  responsible for killing Kevin and Torrance Wiley on May

4  25, 1990?

5         MR. STARR:  Form, foundation.  Calls for

6    speculation.

7         THE WITNESS:  No, I don't.

8         MR. STARR:  Hold on a second.  Mischaracterizes

9    his prior testimony.  Go ahead.

10 BY MR. SCAHILL:

11   Q.   Are you -- are you no longer invoking your

12 Fifth Amendment rights on issues relating to that

13 murder?

14        MR. STARR:  Form, foundation.  Calls for

15   speculation.  Assumes facts not in evidence.  Go

16   ahead.

17        THE WITNESS:  I really would like to keep that

18   part of the testimony out of my situation because

19   I'm not involved, have no idea what happened.  And

20   let's move on with this.

21 BY MR. SCAHILL:

22   Q.   What information do you have about what

23 happened on May 25, 1990, to Kevin and Torrance Wiley?

24        MR. STARR:  Form, foundation.  Calls for

25   speculation.  Assumes facts not in evidence.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 150

1      Mischaracterizes his prior testimony.
2           THE WITNESS:  No, I don't.
3  BY MR. SCAHILL:
4      Q.   What did you mean when you said that the
5  persons responsible had served their time?
6           MR. STARR:  Form, foundation.  Calls for
7      speculation.  Mischaracterizes his prior testimony.
8      Assumes fact -- facts not in evidence.
9           THE WITNESS:  I -- I believe that something
10     like that had just actually happened took place, he
11     did his time, and that was all over with.
12  BY MR. SCAHILL:
13     Q.   Who were you referring to?
14     A.   Mr. Gossens --
15     Q.   Okay.  You're saying that it -- I thought you
16  said that you didn't want to speak on the murders
17  because the person who was responsible had done their
18  time.  Is that not what you said?
19          MR. STARR:  Form, foundation.  Mischaracterizes
20     his prior testimony.  Assumes facts not in evidence.
21          MS. BONJEAN:  Join.
22          THE WITNESS:  Yeah.
23  BY MR. SCAHILL:
24     Q.   Okay.  You did say that, and I'm asking what
25  you meant by that.

Page 151

1           MR. STARR:  Same objections.
2           THE WITNESS:  Same thing to the question.  I
3      really don't know what you're trying to get at for
4      me to say what I know in the case.  I really don't
5      know much in the case, knowing that he did his time
6      for a murder that I believe that wasn't his.
7  BY MR. SCAHILL:
8      Q.   Yeah.  Who are you referring to?  Mr. Gossens?
9      A.   Yes, sir.
10     Q.   Okay.  Do you have any information about what
11  occurred with respect to the murders of Kevin and
12  Torrance Wiley on May 25, 1990?
13     A.   No.
14          MR. STARR:  Form, foundation.
15          THE WITNESS:  No, I don't.
16          MR. STARR:  Calls for speculation.  Asked and
17     answered.
18  BY MR. SCAHILL:
19     Q.   When did you first hear that this had
20  occurred, this murder --
21          MS. BONJEAN:  Objection.  Hold on.  Hold on.
22     I'm sorry, Mr. Ramirez.  Objection to the lack of
23     foundation in that question.
24          MR. STARR:  Go ahead.
25          THE WITNESS:  I really don't know, sir.  I

Page 152

1      don't know what you're trying to get at for me to
2      say who did it.  I don't know actually who did it.
3      But knowing that Mr. Gossens was not involved, that
4      I do hear through grapevines and through his family
5      that he was not involved.
6  BY MR. SCAHILL:
7      Q.   Okay.  And did you hear about these murders
8  that had occurred in 1990, in 1990?
9           MR. STARR:  Form, foundation.  Calls for
10     speculation.  Asked and answered.
11          THE WITNESS:  Yes, sir.
12          MS. BONJEAN:  Join.
13  BY MR. SCAHILL:
14     Q.   Who did you hear it from?
15          MR. STARR:  Same objections.
16          THE WITNESS:  Through the grapevines right
17     there he's from.  Kedzie (phonetic) and Cortez --
18     Cortez and Kedzie and Whipple and Wabansia were a
19     joint sets. They would communicate within
20     themselves, and that's actually what I knew.
21  BY MR. SCAHILL:
22     Q.   And tell me what you -- what you heard.
23     A.   Again --
24          MR. STARR:  Form, foundation.  Calls for
25     speculation.  Asked and answered.

Page 153

1           THE WITNESS:  I -- again, I really don't know
2      what took place, but I knew through the grapevine
3      what was being said.  Other than that, I don't
4      really know nothing.
5  BY MR. SCAHILL:
6      Q.   So are -- is it your testimony you don't have
7  any personal knowledge, either through a conversation
8  with somebody or through witnessing something, about
9  who's responsible for the murders of Kevin and Torrance
10  Wiley on May 25, 1990?
11          MR. STARR:  Form.  Foundation.  Calls for
12     speculation.  Asked and answered several times.
13          MS. BONJEAN:  Join.
14          THE WITNESS:  No, I don't, sir.
15  BY MR. SCAHILL:
16     Q.   Then why did you plead the Fifth before the
17  break, sir?
18     A.   Why did I plead the Fifth?  I didn't plead the
19  Fifth on that question.  I just said I would not be
20  involved in answering something that has nothing to do
21  with me.  That gentleman has done his time.  Really
22  don't want to go through this nightmare over again,
23  having this case investigated or looked into when he did
24  his time.
25     Q.   Do you have any information that Mr. Maysonet

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 154

1  was involved in the murders of Kevin and Torrance Wiley
2  on May 25, 1990?
3       A.  No.
4          MR. STARR:  Form.  Foundation.  Calls for
5  speculation.  Asked and answered.
6          THE WITNESS:  Not at all.
7  BY MR. SCAHILL:
8       Q.  Do you have any information that the Latin
9  Kings were involved in that murder?
10         MR. STARR:  Form.  Foundation.  Calls for
11  speculation.
12         THE WITNESS:  I -- I don't --
13         MR. STARR:  Asked and answered.
14         THE WITNESS:  I really don't know of that
15  either.
16  BY MR. SCAHILL:
17      Q.  Did you hear any rumors or any information on
18  the streets about who was responsible for those murders?
19         MR. STARR:  Form.  Foundation.  Calls for
20  speculation.  Asked and answered.
21         THE WITNESS:  Again, I don't know.
22  BY MR. SCAHILL:
23      Q.  You don't know whether you heard information
24  on the streets about it.  That's your testimony?
25         MR. STARR:  Same objections.

Page 155

1          THE WITNESS:  Yeah.  Well, in the streets, a
2     lot of people talk a lot of different things.  Who
3     knows what's true, what's not true, but, you know --
4  BY MR. SCAHILL:
5       Q.  What were the streets saying about those
6  murders as you recall it?
7          MR. STARR:  Form.  Foundation.  Calls for
8  speculation.  Asked and answered.
9          MS. BONJEAN:  Join.
10         THE WITNESS:  The -- that Froski was not
11     involved in the shooting.
12  BY MR. SCAHILL:
13      Q.  I'm sorry.  That who?
14      A.  Froski.
15      Q.  Oh, Fro.
16         MS. BONJEAN:  Who?
17         THE WITNESS:  Fro.  I call him Froski.
18     Mr. Gossens is known by Froski.
19  BY MR. SCAHILL:
20      Q.  I just heard Fro.  It -- Froski is the full
21  name -- full -- the full version of the nickname?
22      A.  Well, that's the nickname that he went by,
23  Fro, the -- because there was another Fro from Spalding,
24  Big Fro, and Little Fro was Froski.
25      Q.  Did you ever talk to Mr. Maysonet about those

Page 156

1  murders at any time?
2          MR. STARR:  Form.  Foundation.  Calls for
3  speculation.
4          THE WITNESS:  No.  Me and Maysonet did not
5  communicate in those kind of situations or dealings.
6  BY MR. SCAHILL:
7       Q.  You -- did you become aware that Mr. Maysonet
8  had been charged in those murders in addition to
9  Mr. Gossens?
10         MR. STARR:  Form.  Foundation.  Calls for
11  speculation.
12         THE WITNESS:  No, I don't -- I didn't know
13     that.
14  BY MR. SCAHILL:
15      Q.  You're just hearing that information for the
16  first time now?
17      A.  Yeah.
18      Q.  Okay.  Did you -- did you know that
19  Mr. Gonzalez had also been charged in those murders?
20         MR. STARR:  Form.  Foundation.  Calls for
21  speculation.  Asked and answered.
22         THE WITNESS:  Again, I knew that afterwards
23     that they were charged, but other than that, I
24     didn't know what took place or how many people were
25     involved and being charged.  Now, we're talking

Page 157

1     about three, four people involved in a shooting and
2     being charged for a shooting when -- it made no
3     sense.
4  BY MR. SCAHILL:
5       Q.  So we -- you -- trying to understand.  You did
6  become aware at some point before I said -- before I
7  gave you this information, that those two individuals,
8  Mr. Gonzalez and Mr. Maysonet, had, in fact, been
9  charged for those murders?
10      A.  No, I didn't.
11         MR. STARR:  Form.  Foundation.  Asked and
12     answered.
13         THE WITNESS:  I didn't know that until right
14     now.
15  BY MR. SCAHILL:
16      Q.  At any point in time?  So like --
17         MR. STARR:  Same objections.
18         THE WITNESS:  No.
19  BY MR. SCAHILL:
20      Q.  But you knew that Mr. Gossens had been charged
21  in it?
22      A.  Yes, I did.
23      Q.  Okay.  And did you know that he had been
24  charged along with other people?
25         MR. STARR:  Same objections.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 158

```
1        MS. BONJEAN:  Yeah.  Asked and answered.
2        THE WITNESS:  I didn't know that other people
3    were involved in the shooting or joint cases were
4    being investigated or charged.  I had no idea of
5    that until now.
6  BY MR. SCAHILL:
7        Q.  When you were in the Illinois Department of
8    Corrections, were you ever housed in the same facility
9    as Mr. Maysonet?
10       A.  No.  I was involved in the same facility with
11   Froski.
12       Q.  All right.  For what period of time?
13       A.  Maybe six months or something.
14       Q.  What time period was that in?
15       A.  I can't remember, but it was during the
16   pretrial when you wait for your court case to be heard.
17   You -- you're in the same unit.  We were both in
18   Division 1, so we still close to each other.
19       Q.  You're referring to the Cook County Jail?
20       A.  Yes, sir.
21       Q.  Okay.  So you had -- you got arrested in 1990
22   and you were being held there for a time.  And Mr.
23   Gonzalez, who you're referring to as Froski, was also in
24   the Cook County Jail at that time?
25       A.  I think Froski's name was not Gonzalez.  I
```

Page 159

```
1    think his name was Gossens, his last name.
2        Q.  Oh, I'm sorry.  I'm mixing guys up.
3        MR. STARR:  Yeah.
4        THE WITNESS:  Yeah.
5        MR. STARR:  Belated objections to form.
6    Foundation.  Assumes facts not in evidence.  Go
7    ahead.
8        MR. SCAHILL:  That one's well taken.  I mixed
9    the -- I mixed the guys up.
10   BY MR. SCAHILL:
11       Q.  Okay.  So when you were in the Cook County
12   Jail, you overlapped with Mr. Gossens for a time?
13       MR. STARR:  Form.  Foundation.
14       THE WITNESS:  Yes.
15   BY MR. SCAHILL:
16       Q.  While you were both were awaiting trial on
17   your respective cases?
18       A.  Exactly.
19       MR. STARR:  Same objections.
20   BY MR. SCAHILL:
21       Q.  At any time -- so you got convicted and
22   served a lengthy period of incarceration in the '90s,
23   right?
24       A.  Yes, sir.
25       Q.  Okay.  And you were at different IDOC
```

Page 160

```
1    facilities from time to time?
2        A.  Yes.
3        Q.  Okay.  They moved you around, I assume?
4        A.  Yeah.
5        Q.  As they do.  Okay.  Were you ever -- did you
6    ever cross -- strike that.  While you were in IDOC in
7    the '90s, did you ever cross paths there with Mr.
8    Maysonet?
9        MR. STARR:  Asked and answered.
10       THE WITNESS:  No.
11       MR. STARR:  Form.  Foundation.
12   BY MR. SCAHILL:
13       Q.  To your knowledge, was he ever at the same
14   correctional facility as you?
15       A.  Yes, he was.
16       Q.  Which one?
17       A.  In the holding unit in IDOC waiting for trial
18   or waiting to -- to get his case heard or anything like
19   that.
20       Q.  We -- we're talking about when -- again, in
21   the Cook County Jail?
22       A.  Yes, sir.
23       Q.  Okay.  And what period of time were you there
24   when Mr. Maysonet was there?
25       A.  I was there almost --
```

Page 161

```
1        MR. STARR:  Objection.  Form.  Foundation.
2    Calls for speculation.
3        THE WITNESS:  I was there almost for close to
4    two years, I believe.  I don't know.
5    BY MR. SCAHILL:
6        Q.  Did you have regular interactions with him
7    during that period of time when you were in Cook County
8    Jail?
9        MS. BONJEAN:  Objection.  Form.  Foundation.
10       THE WITNESS:  No.
11   BY MR. SCAHILL:
12       Q.  Okay.  What about Mr. Gossens?  Did you have
13   regular communications with him during the time period
14   that you were --
15       MR. STARR:  Form.  Foundation.  Calls for
16   speculation.  Vague as to regular communication.  So
17   go ahead.
18   BY MR. SCAHILL:
19       Q.  You can answer.
20       A.  No.
21       Q.  Okay.  Did you ever speak to Mr. Gossens while
22   you two were in Cook County Jail together about his
23   case?
24       MR. STARR:  Form.  Foundation.  Asked and
25   answered.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 162

1    THE WITNESS:  No, not really.
2 BY MR. SCAHILL:
3    Q.  I'm sorry.  You said not really?
4    A.  No.
5    Q.  What's that mean?
6    A.  That means I didn't speak to him about his
7 case.
8    Q.  Okay.
9    A.  We didn't speak.  I -- I knew about his case.
10   Q.  You knew about his case -- you knew what about
11 his case?
12   A.  What he being charged with.  Other than that,
13 I -- I don't know anything else.
14   Q.  So let's -- I understand what you're saying
15 about Cook County Jail, but let's focus on the
16 Department of Corrections.  You did -- about -- after
17 Cook County Jail, you get convicted.  You go to the
18 Department of Corrections, right?
19   A.  Yes, sir.
20   Q.  Okay.  I assume you probably weren't in the
21 same facility the entire time of your sentence, were
22 you?
23   A.  No.
24   Q.  Okay.  Was there ever a period of time when
25 you were in the same IDOC facility as Mr. Maysonet?

Page 163

1    A.  No.
2    Q.  Okay.  Same question for Mr. Gonzalez, Lluvia?
3    MR. STARR:  Form.  Foundation.
4    THE WITNESS:  I believe --
5    MR. STARR:  Calls for speculation.
6    THE WITNESS:  -- me and Lluvia were in the same
7    prison in Stateville.
8 BY MR. SCAHILL:
9    Q.  And what time period was that?
10   A.  '91 or '92.
11   Q.  Okay.  So this is fairly soon after all of
12 these things happened?
13   A.  Right.
14   MR. STARR:  Form.  Foundation.
15 BY MR. SCAHILL:
16   Q.  Right.  Did you ever speak to him about the
17 case that he was in on?
18   MR. STARR:  Form.  Foundation.
19   THE WITNESS:  No.
20   MR. STARR:  Asked and answered.
21 BY MR. SCAHILL:
22   Q.  But same question for Mr. Gonzalez.  Did you -
23 - were you ever overlapping at the same correctional
24 facility in IDOC with him?
25   A.  No.

Page 164

1    MR. STARR:  Form.  Foundation.  Asked and
2    answered.
3 BY MR. SCAHILL:
4    Q.  All right.  Let's go back in time now and talk
5 about this establishment meeting.  So the -- and I'm
6 referring to the one that's the subject of your
7 declaration, okay?  So just setting the scene here, this
8 is at your establishment on North and Milwaukee in
9 Wicker Park, right?
10   MS. BONJEAN:  Objection.  Foundation.
11   MR. STARR:  Join.
12 BY MR. SCAHILL:
13   Q.  You can answer.  You understand we're talking
14 about the subject that you were talking about in your
15 declaration, right?
16   A.  Yeah.
17   Q.  Okay.
18   MS. BONJEAN:  Objection.  That's form.
19 Foundation.  The declaration covers a lot of things,
20 but foundation.
21   MR. SCAHILL:  Not really, but --
22   MS. BONJEAN:  Yeah, it does.  And clearly your
23 failure to lay a foundation causes a lot of issues
24 as we've just seen, so go ahead.
25   MR. SCAHILL:  I don't know what to say to that.

Page 165

1 That's a silly thing to say.  Anyway, so --
2    MS. BONJEAN:  I know.  So silly.  The little
3 girl saying something silly; is that right, Tim?
4    MR. SCAHILL:  Come on.  You like --
5    MS. BONJEAN:  You would never speak to a man
6 that way.  You would never speak to a man that way.
7 So stop.
8    MR. SCAHILL:  I don't know where you're getting
9 that.  You're disrupting the deposition.
10   MS. BONJEAN:  No, I'm not.  I'm saying lay a
11 foundation for god's sake.  Lay a foundation.
12   MR. SCAHILL:  You -- this is not trial.  We
13 don't have to lay a foundation at a deposition.  We
14 don't.
15   MS. BONJEAN:  You -- if you want it to be
16 admissible someday, you sort of do.
17   MR. SCAHILL:  Okay.  Then object at trial and
18 I'll be -- and I'll be out of luck.
19   MS. BONJEAN:  I have to object here.
20   MR. SCAHILL:  You don't have to --
21   MS. BONJEAN:  I have to object here to preserve
22 it.  That's how -- that's how the law works.  It's
23 silly to suggest otherwise.
24   MR. SCAHILL:  And you say -- and you say -- and
25 you say foundation then and we move on.  But you --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 166

1     MS. BONJEAN:  I did.  And you keep
2  commentating.  You keep giving commentary after I
3  object.
4     MR. SCAHILL:  You're speaking the whole time
5  and disrupting.
6  BY MR. SCAHILL:
7     Q.  Okay.  Mr. Ramirez, the establishment that's
8  referred to in your declaration is the one that is on
9  North and Milwaukee, right?
10     A.  Yes, sir.
11     Q.  Okay.  That's the same establishment that
12  you're saying there was an interaction of some sort
13  between some police officers and Mr. Maysonet, right?
14     A.  Yes, sir.
15     Q.  Okay.  When did this interaction occur in
16  time?
17     MR. STARR:  Objection.  Form.  Foundation.
18     THE WITNESS:  Again, we going back and forth in
19  the same dates and I don't have a calendar reminding
20  me of when this took place, but it took place around
21  the --
22  BY MR. SCAHILL:
23     Q.  Around what?  What year?
24     A.  '89 or the beginning of '90.  So I really
25  don't know.

Page 167

1     Q.  Okay.  Do you -- do you recall what month it
2  was or what season it was?
3     A.  No.
4     Q.  Okay.  Do you recall what time of day this
5  occurred?
6     A.  The afternoon.
7     Q.  I'm sorry, I didn't --
8     A.  Like around 2:00 or something.
9     Q.  2:00 p.m. or 2:00 a.m.?
10     MS. BONJEAN:  He said the afternoon.
11     THE WITNESS:  The afternoon.  2:00 in the
12  afternoon.
13  BY MR. SCAHILL:
14     Q.  Okay.  So -- and you're working there that
15  day?
16     A.  I had workers.  I went in to check out the
17  situation, the order, the liquor, or things like that.
18  Other than that, I did not work behind the bar selling
19  beers or making drinks and stuff like that.  There was a
20  bartender.
21     Q.  And so --
22     A.  You know --
23     Q.  I'm sorry.
24     A.  People taking care of the place.
25     Q.  All right.  So you come in, are either

Page 168

1  Maysonet or the police officers there when you come in?
2     A.  I was already there.
3     Q.  All right.
4     A.  They came in afterwards.
5     Q.  All right.  So who was the first person that
6  comes in of those -- of those two groups?
7     A.  Maysonet.
8     Q.  All right.  Maysonet comes in, and tell me
9  what happens then?
10     A.  He's sitting around drinking a beer, says
11  hello to me, and tells me he's having a meeting real
12  quick.  I asked him, with who?  And he says, such and
13  such names.  I said, be careful with that.  It leads you
14  to no good.  So other than that, that was really it.
15     Q.  So he's having this conversation before any of
16  the police officers had arrived?
17     A.  Yes, sir.
18     Q.  Okay.  And he told you that he had some
19  meetings set up with them?
20     MR. STARR:  Asked and answered.
21     THE WITNESS:  He said he was going to meet
22  someone, which he told me the names, and I
23  recognized the names.  Other than that, I told him
24  be careful with that.  And that's all that took
25  place.

Page 169

1  BY MR. SCAHILL:
2     Q.  What names did -- I'm sorry.  You weren't
3  finished.  Go ahead.
4     A.  Go ahead.  Between me and him, there was a
5  whole conversation there.
6     Q.  What names did he say about the people he was
7  meeting?
8     A.  Madroski, whatever his name is, and Echevarria
9  (phonetic), whatever the officer's name was.
10     Q.  Miedzianowski and Echevarria?
11     A.  Yeah.  Something like that.  I'm not sure.
12     Q.  Okay.  And he said he was having a meeting,
13  and you said be careful with that?
14     A.  Yeah.  Yeah.
15     Q.  Okay.  Did he tell you what he was having a
16  meeting about?
17     A.  No, he didn't.
18     Q.  Why did you tell him to be careful with that?
19     A.  Because when he told me the names, I knew the
20  names off the top, because there was officers that would
21  shake down businesses, rob people, sell drugs to people.
22  When I found out, you know, Maysonet was involved with
23  them, I told him to be careful.
24     Q.  All right.  So does -- did -- do the officers
25  then show up at some point?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 46 of 108 PageID #:10563
Eduardo Ramirez Eduardo 07/02/24 Vol. 4 Page 46 2024

170..173

Page 170

1    A.  Yes, they did.
2    Q.  Okay.  How long after Mr. Maysonet arrived did
3  the officers arrive?
4    A.  About 15, 20 minutes afterwards.
5    Q.  All right.  And where were you when they
6  arrived?
7    A.  Where was I?
8    Q.  Yeah.
9    A.  I was bringing some boxes of beer into the
10  cooler and then I seen them walking in, and I just kept
11  going doing my things.
12    Q.  All right.  And what's the next thing that you
13  observed?
14    A.  I really didn't keep my eyes on them, like,
15  what they were doing and nothing like that.  But they
16  were sitting down, having a conversation like if they
17  knew each other.
18    Q.  Was this in the main part of the bar?
19    A.  There were seats, little tables around the
20  bar. So I guess they sat down on one of the tables.
21    MR. STARR:  He's not asking you to guess.
22  BY MR. STARR:
23    Q.  And they -- were they weren't like in the back
24  in the kitchen or anything, were they?
25    A.  No, the -- I told you there was no kitchen.

Page 171

1  There was just a place for us to cook something and
2  there was no actual kitchen.
3    Q.  The officers and Mr. Maysonet were not back
4  there, were they?
5    A.  No.
6    MR. STARR:  Form. Foundation. Speculation.
7    THE WITNESS:  Not at all.
8  BY MR. SCAHILL:
9    Q.  All right.  You wouldn't allow patrons to go
10  back in that area?
11    A.  No.
12    MR. STARR:  Form. Foundation. Mischaracterizes
13    his testimony.  Assumes facts not in evidence.
14  BY MR. SCAHILL:
15    Q.  Did these police officers ever at any point go
16  in the back part of that part of your restaurant --
17    MR. STARR:  Form. Foundation.
18  BY MR. SCAHILL:
19    Q.  -- behind the bar?
20    A.  No.
21    MR. STARR:  Speculation.
22  BY MR. SCAHILL:
23    Q.  What about Mr. Maysonet?  Did Mr. Maysonet
24  ever go back there, to your knowledge?
25    MR. STARR:  Same objections.

Page 172

1    THE WITNESS:  No, not at all.
2  BY MR. SCAHILL:
3    Q.  Would you have allowed either of those groups
4  of people to go back there?
5    MR. STARR:  Same objections.
6    THE WITNESS:  There was no reason for them to
7    go back there.  There was no reason for them to even
8    talk back there or have a meeting with him, with
9    them in the back.
10  BY MR. SCAHILL:
11    Q.  All right.
12    MS. BONJEAN:  Mister -- Mr. Ramirez, are you
13    okay?  You -- you're like dozing off.  Are you okay?
14    THE WITNESS:  Yeah.  This is -- I've been here
15    since 11:00.  I'm tired, I'm hungry, and I keep
16    going through the same situation over and over.
17    MS. BONJEAN:  Yeah.  But I -- we don't -- we
18    don't want to -- we don't want, you know, you to be
19    dozing during a deposition just because -- you know,
20    I just want to make sure you're okay.  And you can
21    let us know if you need a break, okay?
22    THE WITNESS:  No.  I'm okay.
23    MR. STARR:  Yeah, if you need -- if you need to
24    get food because that will make you more alert, we
25    can take a break and you can get food.  I don't want

Page 173

1  to put you in on a you, you know --
2    THE WITNESS:  I would like to get this over
3    with.
4    MR. STARR:  Understood.  Understood.  But you
5    do seem like you're falling asleep at times.
6    MR. SCAHILL:  You -- are you -- are you okay?
7    THE WITNESS:  Yeah.  I'm okay.
8  BY MR. SCAHILL:
9    Q.  All right.  We're -- I'm getting there so
10  don't -- you know, the light is hopefully at the end of
11  the tunnel, at least with me, so -- All right.  So
12  they're in the front part of the bar at a table.  Do you
13  hear anything that is said?
14    A.  No.
15    MR. STARR:  Form. Foundation. Speculation.
16    THE WITNESS:  I was just in the regular tables
17    in the front.
18  BY MR. SCAHILL:
19    Q.  All right.  Did you hear anything either that
20  Maysonet said or that the police officer said as they
21  were at the table?
22    MR. STARR:  Form. Foundation. Speculation.
23    THE WITNESS:  No, not at all.
24  BY MR. SCAHILL:
25    Q.  The -- what did the officers look like?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 47 of 108 PageID #:10564
Carlos Ramirez, Jr. - Vol. 1 - 6/26/2024

174..177

Page 174

1    A.   Well, Madroski looked like young, built,
2  good-looking guy and stuff.  Maysonet -- the other
3  officer looked like also short hair, built, heavyset,
4  like -- and dressed normally.
5    Q.   In street clothes?
6    A.   Huh?
7    Q.   In street clothes, you mean?
8    A.   Yeah.  Street clothes.
9    Q.   Oh, okay.
10   A.   No officer uniform.
11   Q.   Were they the same race, different races?
12   A.   They were different races.
13   Q.   Okay.  What were the races?
14   A.   I believe one was Irish or Polish, and the
15  other one was like -- he looked Hispanic, but I don't
16  really know if he spoke Spanish or anything like that,
17  but that's how he looked.
18   Q.   What -- did you greet them, the officers?
19   A.   No.  No, I -- I had no dealings with them.  I
20  didn't want to have no dealings with them.  I didn't
21  want them to know me or me to know them, but I knew that
22  they knew me, though.  They, you know --
23   Q.   Did you ever exchange words with either of
24  these officers at any point before that day?
25        MR. STARR:  Objection.  Form.  Foundation.

Page 175

1        THE WITNESS:  No.  I --
2        MR. STARR:  Calls for speculation.  Vague as to
3     exchanged words.
4  BY MR. SCAHILL:
5    Q.   That -- had you ever spoken to either of those
6  officers at any point prior to that day that they were
7  in your establishment that they were meeting with Mr.
8  Maysonet?
9    A.   No.
10        MR. STARR:  Form.  Foundation.  Speculation.
11        THE WITNESS:  Not at all.
12  BY MR. SCAHILL:
13   Q.   Okay.  Did you exchange words with them that
14  day that they were at your -- at your establishment, the
15  officers?
16        MR. STARR:  Form.  Foundation.  Speculation.
17        THE WITNESS:  No, I didn't.
18  BY MR. SCAHILL:
19   Q.   Did you ever have any communications with
20  either of those officers after that day when this
21  interaction with Mr. Maysonet had happened?
22   A.   No.
23        MR. STARR:  Form.  Foundation.  Speculation.
24        THE WITNESS:  Not at all.
25  BY MR. SCAHILL:

Page 176

1    Q.   So just so we're clear and close this out, at
2  no point at any point in time have you ever had any form
3  of communications with either of those officers that
4  were in your establishment that are described in your
5  declaration?
6        MR. STARR:  Form.  Foundation.
7        THE WITNESS:  No.
8        MR. STARR:  Calls for speculation.
9  BY MR. SCAHILL:
10   Q.   All right.  The one that you said is Irish or
11  Polish, can you give me his approximate height and
12  weight?
13        MR. STARR:  Objection to form.
14        THE WITNESS:  He was heavier set.  He must be
15     in the 200 something.  He had a full set of hair,
16     blonde-ish like.  And I can't recall what color his
17     eyes were, but I know he was blonde and heavier set
18     and that's really it.  That's all.
19  BY MR. SCAHILL:
20   Q.   What about his height?
21   A.   He was like almost -- almost -- close to 6'.
22   Q.   And approximately how old did he appear to
23  you?
24   A.   How old?
25        MR. STARR:  Speculation -- form and

Page 177

1  speculation.
2  BY MR. SCAHILL:
3    Q.   Yeah.
4    A.   I think he was like close to -- you said the
5  height or the age?
6    Q.   Age.
7    A.   I think his age was like maybe four or five
8  years older than me or something like that.
9    Q.   I'm sorry.  How old were you in 1989 or '90?
10   A.   Well, if I'm 64-years-old now, in '89, I would
11  believe I was like in my 20s or -- I don't know if I was
12  25, they would be like 32 and they were like six, seven
13  years older than me, so --
14   Q.   All right.  Did both of the officers appear
15  around approximately the same age?
16   A.   Yes.
17        MR. STARR:  Speculation.
18        THE WITNESS:  More or less.
19  BY MR. SCAHILL:
20   Q.   All right.  Can you describe the Hispanic
21  officer to me and -- well, let's actually strike that.
22  The -- with the -- for the Hispanic officer, what was
23  his approximate weight?
24        MR. STARR:  Objection to form.
25        THE WITNESS:  Again, he --

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 178

1         MR. STARR:  Foundation.  Speculation.
2         THE WITNESS:  Again, I believe he was in -- his
3     weight was over 200 something pounds, well-built,
4     shorter hair.  And, you know, I would say he was
5     clean cut.  He was an officer that kept themselves
6     in shape or whatever.
7  BY MR. SCAHILL:
8     Q.   Did he have any facial hair?
9     A.   I believe he had a mustache.  I'm not too
10    sure.
11    Q.   What about glasses?
12    A.   He didn't have no glasses on that day.
13    Q.   What about the white officer?  Any facial hair
14    or glasses?
15    A.   No glasses.  Facial hair, I believe he had --
16    I believe he had a mustache too.
17    Q.   Okay.  Two cops.  Two mustaches.  Got it.
18    A.   Yeah.
19    Q.   All right.  So how long did this -- I
20    apologize if I asked this, but how long did this
21    interaction happen at the table between the officers and
22    the -- and Mr. Maysonet?
23        MR. STARR:  Form.
24        THE WITNESS:  I think they were there for about
25    15, 20 minutes sitting around talking.  They looked

Page 179

1     like they were yapping like if they were friends for
2     life or something like that, you know.  So actually,
3     I believe they -- they knew each other well, from
4     other experiences, meetings, what they went there to
5     do.  But yes, whatever they were doing or planning,
6     they sat down and did it that day.
7  BY MR. SCAHILL:
8     Q.   But you didn't overhear any -- you're just
9     speculating based on their body language.  You didn't
10    hear anything that anyone said?
11    A.   No.  No.
12        MR. STARR:  Form.  Foundation.
13        THE WITNESS:  Not at all.
14        MR. STARR:  Asked and answered.
15 BY MR. SCAHILL:
16    Q.   But it didn't appear to be a tense
17    conversation.  It appeared to be a friendly
18    conversation?
19        MR. STARR:  Form.  Foundation.  Calls for
20    speculation.
21        THE WITNESS:  I believe it was more like a
22    friendly conversation.
23 BY MR. SCAHILL:
24    Q.   All right.  And after the conversation ended,
25    did they just go their separate ways?

Page 180

1         MR. STARR:  Form.  Foundation.  Calls for
2     speculation.
3  BY MR. SCAHILL:
4     Q.   Leave at the same time, leave at different
5     times?
6         MR. STARR:  Speculation.  Compound.
7         THE WITNESS:  The officers left and Maysonet
8     then stayed.  He stayed there having another beer
9     and just relaxed.
10 BY MR. SCAHILL:
11    Q.   All right.  After the officers left, did you
12    have any interaction with Mr. Maysonet that day?
13    A.   Yes.
14    Q.   All right.  Tell me what happened?
15    A.   Well, he told me that there was being -- I --
16    I asked him what's going on with these guys.  He goes,
17    "Well, I have a meeting.  I have a situation where
18    they're going to give me some drugs to sell."  And
19    that's actually what he told me.  Didn't tell me nothing
20    about doing anything or robbing anything.  But I knew
21    later on that he was paying them off to let him sell
22    drugs in a certain area of Humboldt Park.  So actually,
23    that's what took place.
24    Q.   All right.  But in the conversation after the
25    officers left that day, the way that Mr. Maysonet

Page 181

1  described it to you is that he said that they were going
2  to give him some drugs to sell?
3     A.   I guess so, yeah.
4     Q.   All right.  And what was your response to
5  that, if any?
6     A.   I found it kind of weird that the officer
7  would just supply a known gang member with drugs or
8  something like that.  But I guess the relationship was a
9  lot more than just knowing each other there.  They
10 probably have done business in the past and have a
11 relationship with Maysonet would have to pay them
12 monthly to do certain things.  So who knows.
13    Q.   Did Mr. Maysonet appear happy that they were
14 going to be giving him drugs to sell?
15        MR. STARR:  Objection.  Form.
16        MS. BONJEAN:  Objection.  Form.  Foundation.
17    Calls for speculation.  You can answer if you know.
18        THE WITNESS:  I -- I can't tell what -- how --
19    how a person is actually feeling about a certain
20    situation.  All I know is that I would advise him to
21    be careful.  This might not be as good as you think
22    it's going to be.  So that's how the conversation
23    ended.
24 BY MR. SCAHILL:
25    Q.   What was his demeanor when you were speaking

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 182

1  to him about this they were going to give him some drugs
2  to sell situation?
3      A.  Well, I mean, his -- his reaction was he heard
4  what I was telling him and probably went through one ear
5  and came out the other because he already had his mind
6  set up of what was going to happen.  And I don't know.
7  People will feel comfortable if they knew that they were
8  getting drugs from a certain individual that's not going
9  to harass them, have nothing to do with getting them in
10 trouble.  Because he was already in trouble by dealing
11 with these dirty cops or dealing by him doing any kind
12 of dealings with them.  So I -- I don't know.
13     Q.  Did you speak to Mr. Maysonet about the -- him
14 having to pay them to operate in a particular part of
15 the city that day, or you're saying this is a -- some
16 information you got later?
17         MR. STARR:  Objection.  Foundation.
18     Speculation.  Form.
19         MS. BONJEAN:  Join.
20         THE WITNESS:  I -- I really don't know.  I mean
21     --
22 BY MR. SCAHILL:
23     Q.  Was there a -- was there a point in time that
24 you had a communication with somebody about Mr. Maysonet
25 supposedly paying officers to -- so he could sell drugs

Page 183

1  without interference?
2          MR. STARR:  Objection.  Asked and answered.
3          THE WITNESS:  I really don't know that either.
4      All I know is --
5          MS. BONJEAN:  Okay.  Okay.  Mister -- I'm
6      sorry.  Go ahead and answer, Mr. Ramirez, but, like,
7      you're literally dozing off.  Are you okay?
8          THE WITNESS:  Yeah.  I'm okay.
9          MR. SCAHILL:  Also, stop doing -- stop
10     interrupting his answer.
11         MS. BONJEAN:  He is -- he's falling asleep.
12     We're not going to --
13         MR. SCAHILL:  He's responding -- he's
14     responding properly to answers.  He's -- I'm not
15     saying the question --
16         MS. BONJEAN:  I don't have a problem with his
17     responses.  It's fine.
18         MR. SCAHILL:  Then why do you -- then why are
19     you interrupting them?
20         MS. BONJEAN:  Because when someone falls asleep
21     in a deposition, it -- it's probably not a good
22     idea.  I know you're okay with that, but I am not.
23         MR. SCAHILL:  But he's answering questions.
24     He's not falling asleep.  That's just how people
25     like his nonverbal behavior is.  But it's not your

Page 184

1  part to interrupt and answer because you think that
2  you don't like the answer.  He is giving a cogent
3  answer --
4          THE WITNESS:  It's -- it's not about her liking
5      the -- it's not the point of her --
6          MS. BONJEAN:  I want the record to be clear.  I
7      got no problem with Mr. Ramirez's answers
8      whatsoever.
9          MR. SCAHILL:  It's on video.  It's on video.
10         MS. BONJEAN:  I know.  I don't have a problem
11     with his answer.
12         MR. SCAHILL:  Then stop interrupting him
13     mid-answer.  You've done it repeatedly.
14         MS. BONJEAN:  No, I --
15         MR. SCAHILL:  It's totally inappropriate.
16         MS. BONJEAN:  It's -- what's inappropriate is
17     trying to get someone to testify when they're
18     clearly struggling to stay awake.  That is what
19     you're doing.
20         MR. SCAHILL:  He's not.  He's being responsive.
21         MS. ROMELFANGER:  Tim has asked multiple times.
22         MR. STARR:  I want the record to say that
23     Plaintiff --
24         MS. ROMELFANGER:  There's no point -- Tim has
25     asked him multiple times for the record if he's

Page 185

1  okay.  So if this witness feels he's not --
2          MS. BONJEAN:  No, he hasn't.  No, we have.
3          MS. ROMELFANGER:  He has.  It's on the record,
4      Jennifer.
5          MR. STARR:  Okay.  Can I -- can I speak?  I'm
6      in the room with him.  I have -- I have asked him a
7      few times if he's okay and he said he is.  But he is
8      closing his eyes and he is seemingly falling asleep.
9      And you know, I don't -- I don't know how to wake
10     him up.
11         MR. SCAHILL:  Witness is answering questions.
12     You know, I know you two want to kind of diagnose
13     him with something, but like he -- he's giving
14     cogent answers to questions.  So I really don't know
15     what to say about that.  Let's get on with the --
16     with the deposition.
17         MR. STARR:  Well, I mean, Tim, just to your --
18     to your point, he gave -- this same question two
19     times you asked it and he gave two different
20     answers.  So --
21         MR. SCAHILL:  Well, --
22         MR. STARR:  -- I don't know if that's your
23     definition of cogent, but that might -- that may be
24     because he's exhausted or seems --
25         MR. SCAHILL:  Well, that -- I mean, again, this

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE: ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 186

1    is not really appropriate in front of the witness.
2    He's -- he is -- you know, until he tells me he is
3    not -- he doesn't feel, you know, able to continue,
4    then we have to keep -- we have to keep going to get
5    it finished. I mean, I don't know what else to tell
6    you.
7         MS. BONJEAN: We want to get it finished too.
8    We just want -- we want it to be reliable. And
9    that's -- and that's why we're -- why we pointed out
10   that he was dozing, which the -- which the video
11   will show too, so -
12        -
13        MR. SCAHILL: I know. There's a video. Great.
14   There's a video.
15   BY MR. SCAHILL:
16        Q.  All right. Are you ready for the next
17   question?
18        A.  Yes, please.
19        Q.  Okay. Did you have a conversation with
20   Mr. Maysonet at any point about him supposedly having to
21   pay police officers so he could sell drugs in a
22   particular part of the city?
23        MR. STARR: Form. Foundation. Asked and
24   answered.
25        THE WITNESS: No, I didn't take no

Page 187

1    conversations like that with Mr. Maysonet.
2    BY MR. SCAHILL:
3         Q.  Okay. Did you have a conversation with
4    anybody relating to Mr. Maysonet supposedly paying
5    officers so he could sell drugs with their protection?
6         MR. STARR: Form. Foundation. Asked and
7    answered.
8         THE WITNESS: I really don't know if that
9    conversation took place because Maysonet didn't have
10   a spot that he could sell drugs out of. And then my
11   -- my bar, there was no drug selling in the bar. So
12   other than that, I don't know. I don't know what to
13   tell you.
14   BY MR. SCAHILL:
15        Q.  Was anyone allowed to do drugs in your bar?
16        A.  They probably did.
17        Q.  Did you ever see the police officers that day
18   that this interaction happened doing drugs in your bar?
19        A.  No. Not -- no.
20        Q.  They weren't, like, smoking or --
21        A.  They -- they --
22        Q.  -- doing cocaine in your bar that day, were
23   they?
24        A.  These officers were well known. These
25   officers are not, like, someone that came and nobody

Page 188

1    knew who was at. The people in my establishment that --
2    that ran about, they knew about the guy. They knew
3    about officers coming in there and try to shake some --
4    shake me down or shake down the bar -- the bar down, and
5    so it didn't happen. That didn't happen to me. I was
6    in a place where there was a lot of movement, there was
7    a methadone place right next door to myself, so there
8    was a lot of people that I had to make sure they didn't
9    come in the bar and just hang out or do some kind of
10   drugs in the bar, so -- so there was a major part of my
11   establishment trying to keep that order from selling
12   drugs to a business, you know, doing their business.
13        Q.  So I -- I'm not sure you directly answered
14   this. But this -- the day that this interaction with
15   Mr. Maysonet and the officers occurred at your bar, you
16   did not observe the officers using drugs in the bar, did
17   you?
18        MR. STARR: Objection.
19        THE WITNESS: No.
20        MR. STARR: Form. Foundation. Asked and
21   answered.
22        THE WITNESS: No.
23   BY MR. SCAHILL:
24        Q.  And did you observe these officers using drugs
25   at your establishment on any other date?

Page 189

1         A.  No.
2         MR. STARR: Same objections.
3         THE WITNESS: They didn't come on a regular
4    basis to my bar or hang out at my bar or have
5    meetings at my bar. This meeting here was Maysonet
6    and them, a totally different situation there, and
7    what took place, I don't know, other than what
8    Maysonet later on described and told me about what
9    happened. But other than that, it wasn't my
10   business.
11   BY MR. SCAHILL:
12        Q.  Did these two officers that were there on the
13   day that's described in your declaration regularly come
14   to your establishment?
15        A.  No, they didn't.
16        Q.  On how many occasions had they been there,
17   other than that day?
18        A.  They came there other times that I wasn't
19   there because I was not there all the time. I mean, I
20   was there just to get liquor or to make sure they had
21   this, that, to keep things in order. Other than that, I
22   really don't know.
23        Q.  Had you ever seen them in your bar on any
24   other occasion, other than the day that they had the
25   meeting with Mr. Maysonet?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 190

1      A.   I think you asked me that already and I said
2   no.
3      Q.   Okay.  So this is the first time you ever saw
4   them at your place?
5      A.   Yes.
6      Q.   Okay.
7           MR. STARR:  And I need another break, when you
8      get a chance.
9   BY MR. SCAHILL:
10     Q.   So after this conversation that the officers
11  and Mr. Maysonet had at your establishment, did you have
12  any other conversations at all with Mr. Maysonet?
13     A.   I mean --
14          MS. BONJEAN:  Objection.  Form.  Foundation.  He
15     already testified that he had, please.
16          MR. SCAHILL:  You can't -- you can't do that,
17     Counsel.  You can't say --
18          MS. BONJEAN :  He just testified that --
19          MR. SCAHILL:   -- "Objection," and then -- you
20     can't add information.
21          MS. BONJEAN :  He testified to it.  You're
22     asking over and over again.
23          MR. SCAHILL:  Then you can say "Form," or
24     "Foundation."
25          MS. BONJEAN :  Form.  Foundation.

Page 191

1           MR. SCAHILL:  Thank you.
2   BY MR. SCAHILL:
3      Q.   All right.  Can you answer the question?  Did
4   you have any other conversations with Mr. Maysonet after
5   this interaction that occurred at your establishment?
6      A.   Yes, but it was a conversation that -- we
7   didn't talk about drugs or anything like that or killing
8   or robbing or nothing like that.  It was explained
9   later on that these officers were actually giving him
10  drugs from drug dealers that they had robbed or
11  situations where they knew where drugs were and they
12  seized the drugs instead of reporting the drugs, they
13  gave it to Maysonet.
14     Q.   All right.  Did you develop some sort of
15  understanding that there was a financial relationship
16  that these two officers had with Mr. Maysonet where he
17  would sell drugs, he would be allowed to sell drugs
18  without police interference, and they would then pay --
19  he would then pay the officers?
20     A.   Yes.
21     Q.   Okay.  Where'd you get that information from?
22          MR. STARR:  Asked and answered.  Form.
23     Foundation.
24          THE WITNESS:  From Maysonet.  Maysonet revealed
25     that he would pay them from the drugs that he would

Page 192

1      get.  I mean, he was not getting the drugs for free,
2      so actually, there was more involved than what meets
3      the eye.
4   BY MR. SCAHILL:
5      Q.   Well, when did he tell you that, Mr. Maysonet?
6           MR. STARR:  Form.  Foundation.  Calls for
7      speculation.
8           THE WITNESS:  Maysonet told me that, I think,
9      that day, or a few days after that, about the -- the
10     paying off and stuff like that.  I actually didn't
11     get an amount, how much they would have to pay out,
12     but it was -- I don't know if it was paying out the
13     drugs they were getting or just an actual shakedown
14     payout.  But then, later on, Maysonet would say that
15     he would have to pay them monthly for whatever he
16     was doing -- whatever they were doing for him.  So I
17     really don't know what they were doing for him.
18  BY MR. SCAHILL:
19     Q.   Well, how did he describe it to you,
20  Mr. Maysonet?
21          MS. MS. BONJEAN:  Objection.  Asked and
22     answered.
23          MR. STARR:  Join.
24          MS. MS. BONJEAN:  He just answered.
25          THE WITNESS:  You're asking me something when -

Page 193

1      - how they had to pay him.  I don't know how they
2      had to pay him, how much they had to pay him.
3   BY MR. SCAHILL:
4      Q.   I'm saying, how did he describe it to you?
5   You know, you're talking --
6      A.   He described it --
7      Q.   -- what was he saying to you?  The words he
8   used?
9      A.   He -- he described it as he had a hookup.  His
10  hookup was, street language is he had a hookup where he
11  was going to get drugs from this individual, which this
12  individual was the cop, and the cop would give him the
13  drugs, where -- and where he would get the drugs or when
14  he was getting them, I don't really know that part.  I
15  don't know that either.
16     Q.   So -- but did he describe to you ever that he
17  was paying protection money to the officers, or that
18  they were supplying him drugs and he was then selling
19  and giving them some of the proceeds?
20          MR. STARR:  Form.  Foundation.
21          MS. MS. BONJEAN:  I'm going to -- hold on one
22     second.  Mr. Ramirez, let me just object first.  I'm
23     going to object to the form.  Foundation.  He
24     already answered this question.  You can answer it
25     again.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 194

1    MR. STARR: Join.
2        THE WITNESS: Again, like I said, I don't know
3    if it was protection from him being able to sell
4    drugs, because I don't remember Maysonet it having a
5    spot or -- where he would sell drugs or where he
6    had, like, open place or people would come in and
7    cop drugs or have anything to do with drugs, so
8    actually, I don't know. I really don't know what
9    you're trying to get at --
10  BY MR. SCAHILL:
11      Q.  This --
12      A.  -- what the understanding they had between him
13  and the cop, I don't know that. I was not listening to
14  the conversation. Maysonet could have told me anything
15  that he wanted to tell me, but actually, the truth of
16  the matter, I don't really know.
17      Q.  The -- this business that you referred to
18  earlier about robbing a drug dealer and reselling the
19  drugs, what -- what's your understanding of that
20  situation?
21      MS. BONJEAN: Objection. Form. Foundation.
22      THE WITNESS: I believe they mentioned that
23  made it look like he would have to be involved in
24  robbing another drug dealer from opposition or
25  something like that and being able to keep the drugs

Page 195

1    and give the cops a certain amount of money for the
2    information.
3        Now, how Maysonet had it -- had it hooked up,
4    did he have to go rob somebody, that -- that part, I
5    don't know. But I know that -- that was -- being
6    talked about and taking place.
7    BY MR. SCAHILL:
8        Q.  Did Mr. Maysonet ever relate to you that this
9    was something that he had been asked, or agreed to do
10  for the police officers?
11      MS. MS. BONJEAN: -- objection to the form.
12  Foundation. Speculation.
13      THE WITNESS: I -- I really don't know.
14      MR. STARR: Join.
15      THE WITNESS: I really don't know how that came
16  about, but I knew that that was going to happen
17  because Maysonet made it seem like it was important.
18  He was going to come up on a big score. The big
19  score was robbing another drug dealer.
20  BY MR. SCAHILL:
21      Q.  Did he explain that to you, Mr. Maysonet?
22      MR. STARR: Asked and answered.
23      THE WITNESS: Like I said, Maysonet told me
24  what he needed to tell me. What actually the truth
25  of the matter or how it went down, I really don't

Page 196

1    know.
2    BY MR. SCAHILL:
3        Q.  All right. But it -- was he telling you that
4    he had plans to rob another drug dealer, and then resell
5    the drugs that were recovered?
6        MR. STARR: Form. Foundation.
7        MS. BONJEAN: Objection. Form. Foundation.
8        THE WITNESS: I really don't know if the cop
9    was giving them the information, or how that was
10  going to take place, and who it was, or when they
11  were doing it. None of that information was
12  revealed to me. All I know is that Maysonet said he
13  had a come up. That come up meant he was going to
14  be given information where the drugs would be at.
15  And I believe that Maysonet -- had to go and deal
16  with someone else. Maybe it was Lluvia doing it
17  with him or another Latin King. I don't know the
18  names of who actually took place on the robbery, but
19  that was actually going on.
20      MR. STARR: I need that break, Tim, whenever
21  you get a chance.
22      MR. SCAHILL: Oh, sorry. Yeah, we can take a
23  break now.
24      MR. STARR: Thanks.
25      MR. SCAHILL: Fine.

Page 197

1        THE REPORTER: We are --
2        MR. SCAHILL: How long do you want?
3        THE REPORTER: -- off the record. The time is
4    3:25.
5        (OFF THE RECORD)
6        (PROCEEDINGS CONTINUED IN VOL. II)

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900        www.MILESTONEREPORTING.com

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

**$**

**$20** 116:17

**$20,000** 119:15

**$30,000** 113:7

**$4** 111:3

**1**

**1** 158:18

**11:00** 172:15

**11:11** 6:5

**12:29** 75:3

**12:36** 75:8

**13** 41:17

**1415** 6:6

**15** 50:23 170:4 178:25

**150** 23:20

**17** 22:1,2

**19** 31:19

**1980** 39:19

**1982** 21:21

**1989** 31:12 34:9 39:12,20 40:8 42:1 43:6 48:19,23 50:14, 18 52:5,22 53:23 54:5,13, 17 55:2 135:3 177:9

**1990** 31:17,21 34:9 39:23 42:10 48:1 49:2 50:14 51:21 52:22 111:16 116:23 117:2, 10,19 121:4,11 122:11 127:13 130:18 134:1 135:3 137:6 140:21 144:14, 19 146:15 148:21 149:4, 23 151:12

152:8 153:10 154:2 158:21

**1:22-CV-06496** 6:12

**1:36** 129:21

**2**

**20** 73:1 75:8 108:8 113:7 130:2 147:25 170:4 178:25

**200** 176:15 178:3

**2011** 35:9 41:23 62:18

**2021** 35:9 42:23 43:12

**2024** 6:5 75:8 130:2 147:25

**20s** 177:11

**20th** 6:4

**21** 22:3 35:11

**23** 21:22 22:4

**239** 56:9 61:12, 22

**25** 35:24,25 146:15 148:21 149:4,23 151:12 153:10 154:2 177:12

**25th** 90:25

**2:00** 167:8,9,11

**2:06** 130:2

**2:23** 147:20

**2:38** 148:1

**3**

**3** 111:3

**30** 35:24 37:3 49:19 72:25 108:10 130:21

**30th** 45:21

**32** 177:12

**34** 39:15

**34109** 6:7

**3:25** 197:4

**4**

**45** 60:24

**5**

**5'6"** 131:1

**51** 45:14

**520** 40:22

**6**

**6'** 176:21

**630** 62:3

**64-years-old** 177:10

**65-years-** 29:22

**69** 18:21

**7**

**77** 21:4

**8**

**80s** 17:19 29:17 30:10,11, 25 31:5 40:13 47:8 48:21 51:16 106:19 120:1,2

**82** 20:21 21:4, 24,25

**84** 21:7,25

**89** 41:3,6,9 42:2 166:24 177:10

**9**

**90** 41:6,10 42:1, 2 47:9 48:2 52:5 53:23 54:6,13,17 55:2 119:5 166:24 177:9

**90s** 30:11,12, 25 41:3 106:19 159:22 160:7

**91** 48:2 119:5 163:10

**92** 163:10

**94** 42:17

**95** 42:17

**A**

**a.m.** 6:5 167:9

**abide** 75:19 77:14

**ability** 36:7,20

**Absolutely** 62:14

**absurd** 57:13 100:3

**abuse** 124:1

**accident** 23:22

**accounts** 62:19

**accurate** 43:10

**accusations** 66:18

**achieved** 25:20

**acknowledge** 138:3

**acquitted** 141:8,12

**act** 59:4,5 90:21

**acted** 111:9

**active** 20:13 74:12 139:23 140:10

**activities** 34:19 50:15,18 51:19,24 52:23 78:5

**activity** 34:10 117:6

**acts** 32:1

**actual** 79:13 112:8 171:2 192:13

**acute** 37:6

**Adams** 6:3 75:7 130:2 147:25

**add** 190:20

**added** 82:2 88:12 89:24

**addition** 156:8

**additional** 105:5

**address** 39:14, 22 40:7 42:16 43:8,16,21 45:11,15 62:9, 11,15 83:21 112:1 136:6

**addresses** 73:7

**administering** 27:24

**admissible** 165:16

**adopts** 100:1

**adult** 36:1

**adults** 36:2

**advance** 38:12

**advice** 33:23 50:5 124:2 141:9

**advise** 59:24 68:1,21 181:20

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

**advised** 56:12 63:17

**advising** 59:22

**affidavit** 12:10 63:15 80:8,15, 20,23 81:13 82:7 86:24 94:9 101:24 102:9, 21 103:8 104:8, 15,19

**affiliated** 20:1, 5 24:14

**affiliation** 19:23

**affirm** 7:16

**affirmatively** 60:2

**afternoon** 167:6,10,11,12

**age** 120:7,8 177:5,6,7,15

**agency** 18:13

**agree** 9:2,3,15, 20,21 10:9 24:20 63:17 76:17,20 80:17, 18 81:5,6 85:7 125:8

**agreeable** 104:9

**agreed** 71:13 81:8 82:2 87:2 89:23 90:24 91:1 102:15 103:12 105:16 195:9

**agreeing** 101:17 109:15

**agreement** 105:15

**Aha** 107:13

**ahead** 10:6 28:20 34:12 52:19 90:17 92:1,5 93:1 96:5,7 99:10 105:7 108:25

**advised** 109:5,8 117:24 123:16 133:18 143:24 149:9, 16 151:24 159:7 161:17 164:24 169:3,4 183:6

**airport** 46:10, 13

**Alberto** 14:17 16:1,15,16,17, 19 18:9

**Alcanzar** 43:24

**alcohol** 10:21 114:3,4 115:11

**alert** 172:24

**Alfredo** 6:8,16, 22 11:7 54:15 55:16 63:4 133:14

**alignment** 22:21

**Allison** 7:3

**allowed** 172:3 187:15 191:17

**amazed** 39:1

**Amendment** 33:8 149:12

**amount** 192:11 195:1

**Analski** 97:1

**Andrea** 37:15

**Annie** 6:21

**answering** 32:10 38:18 93:3 142:18 153:20 183:23 185:11

**answers** 8:24 105:22 106:12 183:14 184:7 185:14,20

**anymore** 44:22

**anytime** 141:19

**apologize** 178:20

**appeared** 179:17

**appearing** 6:19,22

**applies** 15:14

**apply** 11:2 113:6

**appointed** 31:1

**approximate** 42:15 176:11 177:23

**approximately** 176:22 177:15

**April** 90:25

**area** 20:11 21:19 30:5 31:2,11 34:9, 11,19 39:16,18 111:19 112:5,6 171:10 180:22

**Arizona** 14:7,8

**arm** 18:25 69:5

**Army** 25:4

**arrest** 40:25 41:15,23 67:5 119:2

**arrested** 40:23 41:12,14,16 42:6,18,25 47:6,7,9 52:11 65:17 118:13 119:1,6,10 144:13 158:21

**arrive** 170:3

**arrived** 168:16 170:2,6

**arriving** 81:10

**Arrow** 46:13

**articulate** 146:2

**artists** 19:4

**asleep** 173:5 183:11,20,24 185:8

**aspects** 27:23 34:2

**assist** 37:16

**assistant** 7:9

**associate** 138:18

**assume** 9:19 137:11 160:3 162:20

**assumes** 78:9, 20 97:24 101:5 133:18 134:23 136:3,9 137:19 138:5 146:23 149:15,25 150:8,20 159:6 171:13

**ate** 80:8

**atmosphere** 118:3 122:10

**attending** 6:16 7:11

**attention** 39:11 52:22 54:5

**attorney** 33:11 37:14,21,22,24 69:1 98:1

**attorneys** 7:10,24 9:5 10:4 69:16

**attribute** 99:16

**attributed** 99:25 100:24

**Austin** 7:6

**Avenue** 28:23 111:18

**awaiting** 159:16

**awake** 184:18

**aware** 8:9,10

10:24,25 38:12, 13,22,23 72:5,6 78:3,17 79:3 81:7 106:21 108:21 111:6 124:4 125:19 127:7,15,19,21 136:12 144:18 156:7 157:6

---

**B**

---

**B-O-N-J-E-A-N** 6:18

**baby** 73:2

**back** 19:8 22:2, 6 29:9 30:25 32:18,21,22 34:23 36:4,11 47:4 55:21 72:14 74:25 75:5,10 76:14 79:18 97:9 103:20 106:10, 19 115:1 119:16 129:24 130:5 131:20 135:2 137:16 140:20 144:13, 19 147:16,22 164:4 166:18 170:23 171:3, 10,16,24 172:4, 7,8,9

**background** 49:15 55:22 60:15,16 112:22

**backgrounds** 65:20

**backhoes** 46:18

**bad** 116:10

**badge** 126:1

**bags** 53:16

**bailiff** 47:14 50:24

**ball** 106:7

**ballpark**

131:16

**ballparking**
131:12

**bangers** 111:2

**bar** 50:23
54:22,24 110:6,
7,14,25 111:1
113:12,13
115:11,15
116:9,13
121:14,18
124:23 125:7
126:23 127:3
128:13 137:23
167:18 170:18,
20 171:19
173:12 187:11,
15,18,22 188:4,
9,10,15,16
189:4,5,23

**bartender**
114:14 116:18
167:20

**bartenders**
116:12

**based** 179:9

**basis** 82:20
189:4

**bathroom**
74:19

**beep** 107:9

**beeped** 107:7

**beer** 110:15
111:3 115:15
121:18 122:7
168:10 170:9
180:8

**beers** 167:19

**began** 21:19

**begin** 7:20

**beginning**
41:10 89:22
97:7 105:18
166:24

**behalf** 6:16,19,
21 7:1,3,6,9
71:6

**behavior**
47:24 183:25

**Belated** 127:10
159:5

**beliefs** 24:17

**believed** 104:7

**belongs** 64:8

**bid** 119:7

**big** 47:14 50:20
155:24 195:18

**bills** 40:12
110:22 128:20

**binding** 125:3

**birth** 18:15

**birthday** 23:21
45:22

**bit** 30:25 120:4
131:7

**black** 22:21

**blonde** 176:17

**blonde-ish**
176:16

**blood** 27:7

**bloodline** 27:7

**blue** 69:15
108:15

**body** 19:1,3,23
179:9

**bond** 43:4
119:11,13,14

**Bonjean** 6:18,
24 11:14 12:2
13:20 14:6,25
15:10,15,19
17:23 19:17
24:6 25:6 26:12
27:1,16 28:21
32:10,17,23
33:5,13,18
34:12,15 36:22
37:11 51:12
53:9 55:11
56:13,17,21
57:8,15,19,22,
24 58:1,17,23,

25 59:1,4,13,
18,22 60:6,9
63:10 64:23
66:1 71:20 72:3
75:22 78:8,22
82:14 84:14,18
85:17,21,23
86:2,4,9,11
87:10 95:14,18,
22,24 96:25
98:6,12,16,20,
22 99:1,4,8,24
100:6,8,10,12
101:5 105:12
107:13,19,22,
23 108:24
109:2,4,18,23
116:4 121:1
123:15,17
129:15,18
131:24 132:16,
25 141:3,8,11,
17,23 142:1,5,
8,10,14,16,20
143:1,6,9,12,
16,22 144:1
150:21 151:21
152:12 153:13
155:9,16 158:1
161:9 164:10,
18,22 165:2,5,
10,15,19,21
166:1 167:10
172:12,17
181:16 182:19
183:5,11,16,20
184:6,10,14,16
185:2 186:7
190:14,18,21,
25 192:21,24
193:21 194:21
195:11 196:7

**born** 18:17,18

**Borowitz** 7:10

**bought** 40:22
53:25

**boxes** 170:9

**break** 9:22,25
73:11 74:18,24
75:11 80:1
129:5,6,8
130:6,11 147:5,
6,14 148:4

153:17 172:21,
25 190:7
196:20,23

————————

**C**

**calendar**
166:19

**call** 23:17,18
24:16 56:2
70:2,6,8 71:1
82:20 83:4,7
84:8 97:8
108:14 118:16
122:16 136:20
137:4 155:17

**called** 38:2
67:8 68:9,20
69:16 72:15
94:1 111:21
117:11 118:16

**calling** 7:13

**calls** 16:21
36:22 69:15
72:4 78:7,20
83:12 84:15
97:25 101:6
103:23 121:6
132:23 134:10,
22 136:2,8
137:11,18
138:5 140:13
146:23 148:24
149:5,14,24
150:6 151:16
152:9,24
153:11 154:4,
10,19 155:7
156:2,10,20
161:2,15 163:5
175:2 176:8
179:19 180:1
181:17 192:6

**Calm** 95:22,24

**camper** 107:3

**cans** 41:16
107:1

**caption** 89:12

**car** 128:15

**care** 29:23 54:3
57:21,23 84:1
110:6,22
167:24

**breaking**
95:21

**Brewer** 35:16,
17

**briefly** 92:6
101:14,15
104:19

**bring** 12:6,20
37:13,14
107:22

**bringing** 170:9

**broke** 76:2

**broken** 76:2
79:8

**brother** 122:3

**brothers** 22:15
29:4,5 110:12
119:23

**brought** 38:15

**buddies** 90:21
111:10

**built** 29:17
131:9,11 174:1,
3

**bulldozers**
46:18

**Bureau** 30:22

**business** 53:6
54:1 90:19
108:20 110:5
117:18 126:23,
24 127:16
128:8 133:10
181:10 188:12
189:10 194:17

**businesses**
23:20 169:21

**busy** 36:16

**buy** 24:2
112:24 127:23

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

career 31:9

careful 123:24
168:13,24
169:13,18,23
181:21

carrier 61:23

case 6:12 8:8
12:10,17 16:10
32:21 33:2
42:19,25 43:4
47:11,15 48:18
49:20 50:20
53:13,20 60:25
70:14 72:12
73:25 81:20,23
82:19 83:16
84:25 89:12
92:13,14,15
93:16 96:3,10
120:1 129:1,3
140:20 141:5
144:24 145:5,8,
11,13,17,19,25
147:3 151:4,5
153:23 158:16
160:18 161:23
162:7,9,10,11
163:17

cases 7:25
11:6,11,13
52:11 53:17
63:4,7 65:12,
16,24 66:9,10,
19,25 67:17
68:6 69:7 76:4
84:25 158:3
159:17

cell 55:23,25
56:7 58:18 70:6

Center 6:6

certainty
11:22

Chacon 44:3

chairman
25:17

chance 43:4
190:8 196:21

chanclas
64:23

change 27:12
28:4 39:8 72:17
86:17 110:25
111:1 130:21

changed 23:6
94:22

characterizati
on 26:19

charged
140:20 144:13,
18 146:15
156:8,19,23,25
157:2,9,20,24
158:4 162:12

chasing
120:14

Chavaro
124:20

cheap 128:3

cheated 73:5

check 43:16
44:14 45:5,23
167:16

checked 43:16

Chicago 7:7
11:19 18:12,14
20:2 21:14,17
23:25 24:1
39:13 45:14
50:1 53:2 61:15
67:8 69:1 72:15
74:10 84:2
93:17 106:9
112:21 114:9
117:14

chicken 39:4

chief 25:10
27:8 47:13
50:24 118:17

chiefs 30:17

children 35:19,
20 36:1

chili 41:16
107:2

Chili's 79:23
87:13 89:20
102:8,18 103:7,

20 104:2,13

Christopher
139:2

circles 60:23

circumstance
s 14:23

city 7:6 20:2
21:14,17 30:5
34:20 39:16
84:2 93:17
106:8 112:21
114:8 182:15
186:22

civil 66:9

claims 66:13

clean 178:5

clear 50:3
52:16 65:5
69:14 117:4
176:1 184:6

clearance
117:10

clinic 111:20

close 141:1
146:11 158:18
161:3 176:1,21
177:4

closer 28:12,
13

closing 129:12
148:13 185:8

clothes 174:5,
7,8

club 104:20

co- 47:13

co-defendant
50:23

coach 85:24
142:3,7

coached
142:5,11

coaching
141:21

cocaine 53:18
187:22

coffee 130:7,8

cogent 184:2
185:14,23

collect 113:23

Colon 25:9
28:10

color 176:16

Colorado
21:12

comfortable
33:24 130:23
182:7

commentary
166:2

commentating
166:2

committing
146:20

common 73:6
78:3 79:3

communicate
103:19 122:13
126:21 135:3
152:19 156:5

communicate
d 101:9 106:5

communicatin
g 126:19 127:25
143:23

communicatio
n 64:3 161:16
182:24

communicatio
ns 80:1,11
161:13 175:19
176:3

complected
132:5,6

completely
108:14 143:2

Compound
180:6

comprehend
105:25

conceal 16:3

concern 67:20

concerned
148:15

conclusion
26:25 36:23
101:6

condition
36:21

condoned
78:17

conduct
123:12 125:21

conducted
75:6 130:1
147:24

conducting
59:7

confidential
57:20 58:3,11
59:23 60:1
61:19,20 62:12
126:7

conflict 120:23

connected
113:9

connection
118:21 128:24

conspiracy
47:12 50:20
119:3

constitutional
33:6,22 34:3

construed
57:2

contact 68:11,
13 139:8 141:1

continue 44:9
77:5 100:13,14
186:3

CONTINUED
197:6

conversation
71:8 79:25
81:18 84:22
105:2 110:19



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

111:8 127:24
153:7 168:15
169:5 170:16
179:17,18,22,
24 180:24
181:22 186:19
187:3,9 190:10
191:6 194:14

**conversationa
l** 9:6

**conversations**
79:18 103:14
106:17 144:23
187:1 190:12
191:4

**convicted** 43:2
159:21 162:17

**cook** 51:2
119:11 158:19,
24 159:11
160:21 161:7,
22 162:15,17
171:1

**cooks** 118:4

**cooler** 170:10

**cooperating**
73:18,21

**cooperation**
73:16

**cop** 74:4
193:12 194:7,
13 196:8

**cops** 90:14
106:3 123:25
125:5,6 178:17
182:11 195:1

**copy** 12:19,20
56:11 81:7
88:17,18

**corner** 94:1
111:19

**corners** 53:16

**correct** 16:6
20:6,7,10,25
23:1 31:17 33:7
34:24 42:14,20
55:2,23 82:13
89:8

**correctional**
48:15 160:14
163:23

**corrections**
30:22,23 47:20
80:20 81:5
82:6,17 158:8
162:16,18

**correctly**
126:11

**Cortez** 152:17,
18

**council** 25:17

**counsel** 6:12,
14 10:16 38:11
60:8 95:17
143:10,11
190:17

**count** 49:16

**County** 51:2
119:11 158:19,
24 159:11
160:21 161:7,
22 162:15,17

**couple** 8:17
54:25 83:12
133:13,14

**court** 6:3,10
8:5,8,14 9:1,10
11:2,6 32:18
72:8 76:21
86:25 91:11
158:16

**courtroom**
50:25

**cover** 98:2

**covers** 164:19

**create** 110:8

**created** 116:12

**criminal** 17:21
66:10,24 75:20

**critical** 56:24

**crooked** 90:15

**cross** 160:6,7

**crowd** 111:4
112:25

**crown** 22:13
25:16

**crowns** 19:9,
22

**Cruz** 138:11,
12,15

**Cuba** 18:18,19
21:18

**Culbertson**
7:9

**Cullom** 28:23

**cut** 9:9 95:16
102:3 178:5

**cutting** 33:16

———————

**D**

**dad** 143:7

**damn** 128:3

**dance** 110:25

**dangerous**
90:15 127:1

**darker** 132:5

**date** 18:15
107:23 122:15
147:25 188:25

**dates** 42:5
46:23 47:5,6,
15,16 60:22
166:19

**daughters**
113:22

**day** 6:4 27:18
29:13 45:21
64:5 80:13
110:15 111:3
128:21 129:9
167:4,15
174:24 175:6,
14,20 178:12
179:6 180:12,
25 182:15
187:17,22
188:14 189:13,
17,24 192:9

**days** 90:9
137:16 192:9

**deal** 66:6
196:15

**dealer** 123:13
194:18,24
195:19 196:4

**dealers** 191:10

**dealing** 15:6
16:4 17:16
34:19 53:14,15
54:16 67:6
90:14 122:4
124:8 127:23
134:6 182:10,
11

**dealings** 14:15
16:1 66:20
122:4,5,19,24
123:19 128:23
134:4 135:6
156:5 174:19,
20 182:12

**dealt** 126:25
138:22

**decided** 36:14

**decisions**
78:25

**declaration**
12:14 88:19
89:6,7,13 92:19
93:6 94:14
96:22 97:19
100:25 102:8,
14 104:3,8
105:3,11 106:2
110:4 111:12
115:21 125:16
164:7,15,19
166:8 176:5
189:13

**declare** 106:22

**declined**
104:21

**Defendant** 7:2

**defendants**
7:4 47:13

**defense** 66:4

**definition**
185:23

**delivery** 41:19

**delve** 65:3

**demands** 66:4

**demeanor**
181:25

**department**
18:13,14 30:21,
23 47:20 51:3
158:7 162:16,
18

**deposition** 6:7
7:25 8:7,11
10:10 15:12
38:12 56:17
57:4 58:18 59:7
60:11,13,20
67:21 75:6
91:10 98:11,16
129:25 143:25
147:23 165:9,
13 172:19
183:21 185:16

**depositions**
9:6

**describe** 53:5
177:20 192:19
193:4,16

**describing**
36:18 37:6
104:14

**description**
130:20

**designate**
61:19

**desire** 24:12

**desk** 7:13

**destruction**
29:2

**detention**
43:1,9

**develop**
191:14

**diagnose**
185:12

**dialogue**
98:10,24

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

**dictate** 28:22

**died** 19:10
29:24

**differ** 26:22

**Difranco** 7:10

**dinner** 70:22
122:6

**direct** 7:21
60:16

**directing**
39:11 52:21
54:5

**direction**
59:14,18

**directly** 34:18
60:21 188:13

**dirty** 90:15
182:11

**disabled** 45:17

**discovery**
98:7

**discussion**
13:11

**disposition**
145:8

**disrespected**
23:10

**disrupting**
143:25 165:9
166:5

**distributing**
53:4

**District** 6:11
8:8

**District's** 6:10

**division** 6:11
27:10 158:18

**document**
12:16 89:12,16,
19 91:8

**documents**
130:14

**doings** 23:7

**dollar** 110:16

**door** 188:7

**dope** 28:9,11
29:2,4

**dorm** 30:15

**double** 136:20,
24 144:19

**dozen** 109:22

**dozing** 172:13,
19 183:7
186:10

**Draws** 101:6

**dressed** 174:4

**dresses** 64:7

**drink** 115:15

**drinking**
110:15 111:3
168:10

**drinks** 116:19
167:19

**driving** 128:14

**drug** 34:19
42:19 47:12
50:15,17,20
51:9,18 52:4,9,
23 53:6 54:7,
12,16 67:6
115:21 116:2
119:3 123:1,13
127:16 128:8
134:5 135:17
187:11 191:10
194:18,24
195:19 196:4

**drugs** 10:21
28:18 41:20
51:8 52:25
53:3,4,10,12
54:21 110:7
116:6,7 123:7
124:7 126:4,5,9
128:1,5 169:21
180:18,22
181:2,7,14
182:1,8,25
186:21 187:5,
10,15,18
188:10,12,16,

24 191:7,10,11,
12,17,25 192:1,
13 193:11,13,
18 194:4,5,7,
19,25 196:5,14

**Drummond**
39:15 41:6
42:2,4,9 43:8

**due** 145:21

**dues** 124:9
125:4

**duties** 27:23
28:6 31:25

**duty** 28:5 31:7

———————

E

———————

**E-D-U-A-R-D-
O** 8:3

**e-mail** 62:9,11,
15 99:5,9

**ear** 182:4

**earlier** 194:18

**early** 17:19
31:5 41:1,3
120:1,2

**Earth** 143:18

**east** 117:14

**Eastern** 6:11

**eat** 115:3,4
130:6

**eating** 136:16

**Echevarria**
169:8,10

**Eddie** 13:6,7

**Eduardo** 6:8
8:3 13:2 14:15
75:6 89:13
129:25 147:23

**else's** 62:1

**employed**
45:16 46:9,10,
11

**employees**

114:11

**employment**
45:25 46:3,6
48:20

**end** 41:9
173:10

**ended** 42:19
179:24 181:23

**enforced** 26:5,
7 73:24

**enforcement**
14:16 15:2
16:2,3,19 17:8,
13,17 18:3,13
73:16,19,22

**engaged**
125:21

**English** 101:8
132:15,22
133:1,2,3

**enjoyed**
116:15

**entail** 25:5

**entered** 90:2,3

**entire** 162:21

**entirety** 39:20
42:10

**entitled** 89:13

**entrapment**
66:20 67:4

**Epplen** 7:4

**escape** 16:10

**establish**
126:21

**established**
122:17 126:19
141:5 191:8

**establishment**
90:1,20 96:18
110:3,4,8,24
111:13,15
112:2,9 114:1,
7,23 115:12,18,
20 116:8 117:1,
5,19 118:6,8,11
122:12 125:4

130:19 131:21
133:8 135:24
164:5,8 166:7,
11 175:7,14
176:4 188:1,11,
25 189:14
190:11 191:5

**estimate** 137:6

**et al** 6:9

**ethical** 33:13,
14 52:8

**events** 102:23
104:15

**evidence** 78:9,
21 97:24 101:5
133:18 134:23
136:3,9 137:12,
19 138:6
145:15,17
146:23 149:15,
25 150:8,20
159:6 171:13

**ex-girlfriend**
44:3

**exact** 99:22

**EXAMINATIO
N** 7:21

**exchange**
174:23 175:13

**exchanged**
175:3

**Excuse** 56:6
91:5

**executed** 12:9,
16

**Executive** 6:6

**exhausted**
185:24

**exhibit** 91:10,
12

**existed** 50:21

**experience**
145:4

**experienced**
95:11

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

**experiences**
179:4

**explain** 68:24
105:10 195:21

**explained** 28:2

**explaining**
33:17

**explicitly**
33:25 34:4

**expressly** 50:7

**extricate** 24:4

**eye** 192:3

**eyes** 126:14
129:12 148:13
170:14 176:17
185:8

—————

**F**

—————

**F-A-R-A-N-D-U-L-A** 112:14

**F-HOUSE**
30:13

**face** 124:25

**Facebook**
62:20,22,24

**facial** 131:18
178:8,13,15

**facilities** 160:1

**facility** 48:15
158:8,10
160:14 162:21,
25 163:24

**fact** 139:9
150:8 157:8

**facts** 78:9,21
97:24 101:5
133:18 134:23
136:3,9 137:12,
19 138:5
141:21 145:11
146:23 149:15,
25 150:8,20
159:6 171:13

**factual** 66:12
83:8 143:3

144:3

**failure** 164:23

**fair** 12:25 26:18

**fairly** 163:11

**fake** 15:5 17:7
41:20

**falling** 173:5
183:11,24
185:8

**falls** 51:5
183:20

**false** 77:14

**familiar** 25:19
89:16

**families** 23:19
29:3

**family** 24:2
40:9 139:24
146:12 152:4

**Farandula**
111:21 112:12
113:12

**Fast** 13:6,7

**father** 27:9
40:18

**fed** 19:3

**federal** 8:7
11:6 30:22
35:4,7 37:14
38:23 41:18
42:19,25 43:9,
13 46:6,22
48:5,12,14 71:3
72:12

**feeding**
141:16,17
144:3,5

**feel** 23:10
24:20,21 33:11,
24 38:18,19
58:14 61:1,2
182:7 186:3

**feeling** 181:19

**feels** 52:14,15
185:1

**feet** 64:17

**fell** 51:2

**fella** 131:10

**fellow** 47:11

**felt** 85:9 110:19
113:1 116:9

**Fernandez**
139:3

**financial** 90:2,
3 191:15

**find** 65:18

**fine** 39:10
58:13 60:1
61:22 88:22
109:25 183:17
196:25

**finish** 92:5
108:25 109:24,
25

**finished** 109:4,
18,19,20 169:3
186:5,7

**Fitzgerald's**
50:25

**five-** 148:4

**flight** 43:5

**floor** 110:25

**Florida** 6:7
11:18 45:6,8
46:1 61:14 64:8
67:11 68:17
103:12

**focus** 23:25
118:24 162:15

**follow** 59:17,20
143:8,10,14,18,
19,20

**food** 113:14
114:1,2 115:1
117:11 118:3
129:11 130:10
172:24,25

**foot** 36:15

**forbidden**
73:18,22 74:1

**forcing** 38:5
49:17

**forget** 30:1
36:24 124:19

**forgotten** 23:9

**form** 12:13
13:20 14:6,25
15:8 16:20
17:23 19:7
20:15 21:23
22:24 23:13
24:6 25:6
26:11,24 27:17
28:1,19 29:21
32:3,23 34:12,
14 37:9 41:2
44:24 51:12,25
52:6 55:17 63:9
65:25 66:15
67:2 71:14,20
72:2,3 75:21,22
77:17 78:6,19
79:15 81:14
82:9 83:11
84:12 86:9,10,
11,15 87:8 88:3
91:23 92:2
95:4,15,25
97:2,21 99:21
100:4 101:3
102:11 103:23
104:17 105:6,
12 109:25
114:20,24
115:8,13
117:23 120:5
121:6,12
123:14 126:16
127:10,17
132:23 133:17
134:2,10,22
135:8,9 136:2,8
137:8,18 138:4,
20 139:20
140:12 141:4,
20 142:12
144:15 146:4,
17,22 148:24
149:5,14,24
150:6,19
151:14 152:9,
24 153:11
154:4,10,19
155:7 156:2,10,

20 157:11
159:5,13
160:11 161:1,9,
15,24 163:3,14,
18 164:1,18
166:17 171:6,
12,17 173:15,
22 174:25
175:10,16,23
176:2,6,13,25
177:24 178:23
179:12,19
180:1 181:15,
16 182:18
186:23 187:6
188:20 190:14,
23,25 191:22
192:6 193:20,
23 194:21
195:11 196:6,7

**formal** 28:3

**forward** 37:13

**found** 65:9,10
92:15 121:20
169:22 181:6

**foundation**
13:22 14:6 15:8
16:20 19:7
20:15 22:24
24:6 25:6
26:11,24 27:17
28:1,19 29:21,
21 32:3,23
34:14 37:9 47:1
51:12,25 55:11,
17 66:17 71:14
72:3 75:21,22
77:17 78:6,19
79:15 81:14
82:9 83:11
84:12 88:4
91:23 92:2
95:5,15,25
97:2,22 99:2,21
100:5 101:3
103:23 105:6,
13 109:25
114:20,24
115:13 117:23
120:5 121:6
126:16 127:11,
17 131:13,25
132:11,16,23
133:17 134:2,

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

10,22 135:9
136:2,8 137:8,
18 138:4,20
139:20 140:12
141:4,20
142:12,23
144:15 146:4,
17,22 148:24
149:5,14,24
150:6,19
151:14,23
152:9,24
153:11 154:4,
10,19 155:7
156:2,10,20
157:11 159:6,
13 160:11
161:1,9,15,24
163:3,14,18
164:1,10,19,20,
23 165:11,13,
25 166:17
171:6,12,17
173:15,22
174:25 175:10,
16,23 176:6
178:1 179:12,
19 180:1
181:16 182:17
186:23 187:6
188:20 190:14,
24,25 191:23
192:6 193:20,
23 194:21
195:12 196:6,7

**frame** 17:12,
14,15 42:16
135:3

**Frank** 7:10

**fraternize**
23:11

**free** 38:7 192:1

**frequently**
23:16 136:1

**fresh** 39:4

**freshened**
63:12

**friend** 122:1,2

**friendly** 99:9
121:24 179:17,
22

**friends** 20:17
23:18 111:10
179:1

**Fro** 139:2
155:15,17,20,
23,24

**front** 7:13
11:24 12:23
53:14 65:21
72:8,16 86:24
88:16,24 89:11
91:21 115:21
116:1 117:5
173:12,17
186:1

**Froski** 155:10,
14,17,18,20,24
158:11,23

**Froski's**
158:25

**full** 155:20,21
176:15

**fun** 106:15

**future** 105:20

———————

**G**

———————

**G-DORM**
30:15,16,18

**Gambino**
37:15

**game** 110:17

**gang** 19:5
29:24 32:2
111:2 181:7

**gangs** 23:18
32:1

**gathered**
22:15

**gave** 68:12
69:23,25 79:9
101:11 118:13
157:7 185:18,
19 191:13

**Gawrys** 7:4

**gears** 34:22

**general** 17:15
76:20 130:20

**generally** 79:3

**generate**
48:23 49:1

**generation**
23:7 25:1

**gentleman**
112:24 153:21

**gentlemen**
51:7 65:17

**gestures**
140:6

**Gino** 27:8 31:6

**girl** 165:3

**give** 7:17,25
8:17 22:2 33:23
43:4 46:22
49:10 56:2
57:15 58:18
60:13 61:5,7
69:23 71:5
73:12 77:14
78:11 88:18,19
89:1 93:5
105:22 112:23
113:23 116:17
124:7 126:9
128:5 130:19
176:11 180:18
181:2 182:1
193:12 195:1

**giving** 11:1,2
50:5 65:3
105:22 166:2
181:14 184:2
185:13 191:9
193:19 196:9

**glasses** 77:2
178:11,12,14,
15

**god** 84:14
96:25 139:25

**god's** 165:11

**gold** 22:20
128:15

**Gonza-** 128:22

**Gonzalez** 6:8,
16,22 11:7
12:10 49:18,22
54:15 55:16
63:4 65:7
66:14,25 68:6
70:15,20 71:2
74:10 92:7,11
93:16 94:10
106:3 108:8
122:24 133:15
134:1,9 135:4,
16,23 138:19
156:19 157:8
158:23,25
163:2,22

**good** 7:23
10:24 19:4
47:11 76:25
77:1,24 90:19
104:24 116:18,
20 118:3 139:8
168:14 181:21
183:21

**good-looking**
174:2

**gorgeous**
107:12

**Gossens**
139:3,4 140:17,
18,19 144:10,
12 146:1,2,15
150:14 151:8
152:3 155:18
156:9 157:20
159:1,12
161:12,21

**govern** 79:13

**governing**
77:12

**government**
44:20 72:12

**grab** 51:6

**grabs** 78:15

**grapevine**
153:2

**grapevines**
152:4,16

**Great** 186:13

**Greenberg**
107:15

**Greenberg's**
107:19

**greet** 174:18

**greeted** 20:19
139:21,22
140:2,6

**grew** 20:17
139:7

**ground** 8:19
57:9

**groups** 168:6
172:3

**grow** 29:25

**growing** 22:10

**guess** 51:6
65:2 79:2
104:25 108:16
126:9 170:20,
21 181:3,8

**Guevara** 6:9
7:2 90:4 94:16
117:20 118:7

**guidance**
123:12

**Gustavo** 25:9

**guy** 28:8 50:22
64:4 94:2
104:24 120:14
124:9 132:5,6,8
139:8 174:2
188:2

**guys** 6:24
19:10 50:23
51:7 65:17 81:7
83:19 100:2
106:4 110:14,
22 111:2
114:14 139:12
159:2,9 180:16

**guys'** 84:3

———————

**H**

———————

**hair** 130:22
131:18,20

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

132:2 174:3
176:15 178:4,8,
13,15

**half** 60:14

**Halvorsen** 7:5

**hand** 7:15
18:24 36:12

**handed** 118:18

**handshake**
139:22 140:2,3

**handwritten**
102:9

**hang** 188:9
189:4

**happen** 73:6
120:18 122:22,
23 124:5
178:21 182:6
188:5 195:16

**happened**
28:23 37:1 73:1
74:6 81:4 84:1
88:14 117:20
118:7 120:17
121:23 123:8
130:19 131:22
145:17,18,23
149:19,23
150:10 163:12
175:21 180:14
187:18 189:9

**happening**
124:4

**happy** 9:18
67:12 99:6
107:2 118:23
181:13

**harass** 100:13,
14 182:9

**harassed**
60:19 61:1,2

**harassing**
32:23 57:2,9
84:16 85:18
92:25 95:25
125:10

**harassment**
66:19

**hard** 53:25
73:9 88:17

**harm's** 57:10,
11 58:15

**hassle** 125:1,2

**hat** 93:22
101:11

**Havana**
117:11,12

**Hawaiian**
64:11

**head** 8:25

**headache**
116:13

**health** 148:15

**hear** 107:9
151:19 152:4,7,
14 154:17
173:13,19
179:10

**heard** 8:5
58:17 60:24,25
70:4 100:4
152:22 154:23
155:20 158:16
160:18 182:3

**hearing** 37:20
156:15

**Heather** 35:16,
17

**heavier**
176:14,17

**heavyset**
174:3

**height** 131:3
176:11,20
177:5

**held** 26:3 29:12
30:12 54:18
158:22

**helped** 38:23
85:11

**helpful** 84:5
98:6,8 106:8

**helping** 72:11,
12

**helps** 85:11

**hen** 39:5

**heroin** 28:9
53:17

**hey** 69:15
70:15 99:14

**hide** 83:21,22

**hiding** 29:5
69:2 129:18

**high** 29:12
30:12,16,17,18

**highest** 25:19,
20

**Hinshaw** 7:8

**Hispanic**
132:8 174:15
177:20,22

**history** 47:3

**hold** 35:9 71:17
78:14 92:23
99:20 103:11
149:8 151:21
193:21

**holding** 26:3
40:11 160:17

**home** 24:3
36:24 40:9,14
116:9

**honest** 68:2

**honor** 30:14,15

**hooked** 195:3

**hookers**
116:10

**hookup** 193:9,
10

**hope** 86:16

**hospital**
117:15

**hospitals**
117:15

**hot** 126:24

**hour** 60:14

**house** 40:10,

11,20,22 41:13,
15 42:7 43:15
54:1 93:20
139:25

**housed** 158:8

**houses** 126:4

**Humboldt**
20:11 21:19
180:22

**hungry** 61:10
172:15

———————

**I**

**Iasparro** 7:8

**idea** 51:5 65:11
66:7 67:6 70:17
85:1 92:16 94:2
97:12,14 101:9,
18,23 106:2,4,
25 113:7
115:17 116:5
121:21 149:19
158:4 183:22

**IDENTIFICATI
ON** 91:12

**identify** 6:13
54:9

**identity** 16:3

**IDOC** 48:4,6,9,
13 159:25
160:6,17
162:25 163:24

**II** 197:6

**illegal** 48:24
49:2 117:6
125:21 126:15
127:7

**illegally** 69:3

**illicit** 124:17

**Illinois** 6:11
8:9 18:3,6,10
26:16,23 27:5
30:21,23 47:19
158:7

**impact** 36:7,8

**impairments**
36:20

**impeding** 83:5

**implicate**
52:15 85:4

**implicated**
67:5,6 106:25
108:19,21

**implicating**
32:25

**implications**
33:5,6

**implied** 38:3

**important** 8:23
9:1,9 24:22
27:23 71:17
83:19 94:3
96:16 195:17

**imprisonment**
66:19

**in-person** 83:5
87:4

**inappropriate**
143:2,24
184:15,16

**Inca** 25:16,21,
23,25 27:14,23
28:18 29:10,14,
15,16 30:4,7
31:2,7,11,16,25
34:8

**Inca's** 28:5

**incarceration**
159:22

**incident**
120:13

**income** 48:23
49:1 53:22
128:18,19

**incriminate**
33:9

**incrimination**
33:23 34:4

**individual**
25:25 78:12,24
108:23 118:13

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

123:21 138:10
182:8 193:11,
12

**individuals**
28:24,25 47:15
53:15 54:6,18
66:5 70:21
71:1,4,11 81:21
83:15 84:23
92:13 94:4
96:17 101:20
110:17 157:7

**influence**
10:21

**inform** 126:3

**informant**
72:11 73:25

**informants**
126:3,7

**information**
65:3,20 68:12
77:15 91:18
92:19,20 93:6
95:10 98:3
106:21 141:16
142:15,24
143:1,3 144:4
149:2,22
151:10 153:25
154:8,17,23
156:15 157:7
182:16 190:20
191:21 195:2
196:9,11,14

**Inglewood**
47:12 50:19
119:3

**initialed** 90:24
102:22

**injuries** 69:4

**ink** 18:25

**inmates** 39:2
65:13

**inquiring**
93:23

**Instagram**
62:22

**installed** 31:1

**instruct** 52:12

**instructed**
10:5

**intend** 24:14

**intending**
147:8

**intense** 111:8

**intent** 41:19

**inter** 109:14

**interaction**
117:20 118:7
122:11 127:14
128:10 130:19
133:7 166:12,
15 175:21
178:21 180:12
187:18 188:14
191:5

**interactions**
137:7 161:6

**interested**
98:10,15 99:7,
11

**interference**
183:1 191:18

**interfering**
60:10

**interject**
141:21 142:24
143:3

**interjecting**
143:1

**Internet** 67:16
69:6

**interrogation**
16:11

**interrupt**
107:16 184:1

**interrupting**
95:23 183:10,
19 184:12

**intervene**
120:22

**intervened**
120:14

**investigate**
69:7

**investigated**
51:1 153:23
158:4

**investigation**
51:4 53:1 66:25
71:4

**investigations**
65:16 75:20

**investigator**
38:2 63:16 67:8
68:10,20 70:13
81:11

**investigators**
69:16

**invited** 104:20

**invoke** 33:8,25
34:3 52:13

**invoking**
149:11

**involve** 49:12

**involved** 7:24
33:2 34:18
47:12,14 49:13,
24 50:15,17,19
51:9 52:4,24
53:3,17,20
54:12,16,20
55:4,9,19 65:15
67:4 81:22
83:22 90:12
92:14,15 98:24
101:21 106:23,
24 108:20
118:14,15
123:23 124:17
127:16 129:1,2
135:16 145:13
146:10 149:19
152:3,5 153:20
154:1,9 155:11
156:25 157:1
158:3,10
169:22 192:2
194:23

**involvement**
25:11 49:20
52:25 106:18
128:8

**involves** 33:2

**involving** 68:6
71:4 106:23

**iphone** 62:5

**Irish** 174:14
176:10

**Islam** 24:18

**Isley** 14:18,20,
21 16:1 17:6
18:8

**issue** 34:22
37:7 79:13
145:21 146:11

**issues** 36:19
149:12 164:23

**Ivette** 44:3

_____ J _____

**J-U-M-A** 13:13

**Jack** 47:11

**jail** 30:11,12
51:20,21,23
53:1,21 61:16
65:17 74:4
107:1 119:12
140:25 141:13
158:19,24
159:12 160:21
161:8,22
162:15,17

**Jean** 63:13,21,
23,24,25

**Jennifer** 6:18
7:10 60:18 61:2
107:12,25
109:1 111:22
129:17 185:4

**job** 28:13

**jobs** 46:11,12

**John** 7:11

**join** 11:15 12:3
15:10,13,16
24:9 25:7 27:1
28:21 34:15
37:11 53:9
55:12 57:5

63:10 107:4,7
116:4 123:17
132:25 141:7
150:21 152:12
153:13 155:9
164:11 182:19
192:23 194:1
195:14

**joined** 22:1,7
26:12 66:1
71:21 74:16
75:23 78:8,22
82:14 84:18

**joining** 15:11
25:4

**joint** 19:3 65:19
152:19 158:3

**jokative** 133:5

**Jose** 6:19 11:8
54:12 55:1 63:5
92:7 94:10

**Juan** 6:19

**judge** 11:3
47:13 72:16

**June** 6:5 75:8
130:2 147:25

**Junior** 6:19

**junkie** 94:1

**jury** 11:13,24
83:24

**Justino** 138:10

_____ K _____

**K-FIVE** 46:13

**Kedzie** 152:17,
18

**keeping**
131:20

**Kevin** 148:20
149:3,23
151:11 153:9
154:1

**kid** 18:22 22:10

**kids** 22:11
29:24 35:21,22

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

40:4 73:3

**killing** 148:20
149:3 191:7

**kind** 33:1 36:15
37:16 54:19
67:16 81:1,24,
25 94:1 104:13
108:22 111:4
122:16,23
125:11 128:18
129:12 134:4,5
135:6 156:5
181:6 182:11
185:12 188:9

**kinds** 19:2

**King** 22:22
23:5,12 24:15
26:8,18,21
29:10 31:9 55:5
71:18,25 73:16
75:16 77:12
78:4,18 79:4,9
118:18 140:3,
10 196:17

**Kings** 19:24
20:5,13 22:8,
12,18 24:5,17,
22 25:10,12,15,
22 26:1,15
27:5,6,8,9,13
29:12,20 30:17
34:11 70:23
71:12 73:17
75:18,25 76:2
77:14,16,21
78:5 101:20
135:12 139:16,
19,23 154:9

**kitchen**
114:23,25
170:24,25
171:2

**kitchenette**
115:6

**knew** 29:5 55:1
65:21 69:11,13
70:19,22 71:11
74:15 80:10
81:25 82:2,16,
17 83:15 85:9,
14 88:11,12
89:24 90:14

92:7 93:14
101:14 113:24
119:18 121:25
124:22,25
127:22 134:3,5,
12,20,21 135:5,
19 136:17
137:10,15
138:14,18,22
139:4,5,8,11,12
146:3,6,8
152:20 153:2
156:22 157:20
162:9,10
169:19 170:17
174:21,22
179:3 180:20
182:7 188:1,2
191:11 195:16

**knock** 141:15

**knowing** 70:14
80:18 92:8
93:15 139:22
151:5 152:3
181:9

**knowledge**
17:21 36:11
37:25 41:19
49:14 63:12
81:24,25 83:25
90:24 93:20
101:19 102:14
104:7 105:17
106:22 111:7
125:14,20,24,
25 126:13,18
135:6 146:20
153:7 160:13
171:24

---
**L**
---

**L-L-U-V-I-A**
133:21

**lack** 151:22

**ladder** 25:11
51:6

**Lane** 6:7

**language**
101:8 179:9
193:10

**lap** 87:22

**laps** 51:3

**laptop** 88:16,
24

**large** 53:17

**larger** 131:10

**late** 41:3 95:4,
19 103:17
116:10

**Latin** 19:24
20:5,13 22:7,
12,18,22 23:4,
12 24:5,15,17,
21 25:10,12,15,
22,25 26:8,15,
18,21 27:5,6,7,
13 29:10,12,20
30:17 31:9
34:11 55:4
70:23 71:11,18,
25 73:15,17
75:16,18,25
76:2 77:12,14,
16,21 78:4,5,18
79:4,9 101:19
118:18 135:11
139:16,19,23
140:3,10 154:8
196:17

**laundromat**
50:24

**law** 11:14 12:2
14:15 15:2
16:1,3,19 17:7,
13,16 18:2,13
26:4,6,7,16
28:5,13,16 29:6
72:9 73:16,17,
18,22 77:23
99:24 100:1
165:22

**laws** 26:17,21,
23 27:5,6,11,
12,13,18,24
28:4,6 38:22,23
71:24 72:6,9
73:16,24 75:17,
18 76:1 77:11,
13 79:8,10,13

**lawsuit** 66:3

**lawsuits** 65:6
66:14

**lawyers** 69:10

**lay** 164:23
165:10,11,13

**leader** 25:10
27:8,9

**leadership**
29:20

**leading** 106:11

**leads** 168:13

**learned** 22:15
38:25

**leave** 145:23
180:4

**left** 36:12 75:15
90:9 103:7
130:18 180:7,
11,25

**leg** 23:23 36:13
69:5

**legal** 26:25
101:6

**legs** 64:12

**lengthy** 48:12
159:22

**library** 38:24

**license** 112:21,
23,24 113:3,6,
8,9 114:8
118:21

**licensed** 114:8

**lie** 49:17 75:19
77:14 78:4

**life** 21:19 22:16
24:1,15,22,23
46:24 47:3 73:6
141:24 142:2
179:2

**light** 132:7
173:10

**lighter** 132:5

**liking** 44:21
184:4

**lines** 50:11
100:17

**lion** 19:8

**lions** 19:22

**liquor** 112:21,
23,24 113:3,6,
8,9 114:7
118:21 167:17
189:20

**listed** 11:6

**listen** 70:15
83:17 90:11
95:18 105:21
110:21

**listening** 90:13
194:13

**literally** 183:7

**live** 11:18
22:16 23:25
30:2 39:19,22
41:9 42:9

**lived** 24:24,25
40:7 41:5 43:7
139:24,25

**lives** 68:17
74:7

**living** 21:16
39:12,15 43:25

**Lluvia** 49:25
54:16 65:11
128:22,25
133:13,20,22
134:15 136:17,
18 137:3,4,7
163:2,6 196:16

**lobby** 10:13

**local** 23:20

**located**
111:17,18
117:12,13

**locked** 38:24

**lodge** 109:24

**Loevy** 6:15

**Logan** 39:17

**long** 16:12 33:3

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

35:1 40:7,19
43:25 51:18
61:12 62:17
74:18 94:18
110:15 111:3
134:1 139:25
170:2 178:19,
20 197:2

**long-term** 37:7

**longer** 61:16
148:3 149:11

**looked** 116:18
153:23 174:1,3,
15,17 178:25

**Lord** 27:8 31:6

**lose** 110:21

**losing** 110:23

**lost** 23:23

**lot** 20:17 23:23
24:19 38:23
76:2 110:14
148:14 155:2
164:19,23
181:9 188:6,8

**loyalty** 71:18

**luck** 165:18

**lunch** 64:5
129:8

———————

——— M ———

**machinery**
46:17

**machines**
46:18 110:18
115:15 118:14,
17

**Madam** 76:21

**made** 52:16
63:14,19,20
66:13 76:2 79:8
80:19,20 81:5
82:6,17 88:12
89:24 94:24
102:9,10,17,22
104:9 115:3
124:4 157:2
194:23 195:17

**Madroski** 90:4
106:3 121:14
124:19 169:8
174:1

**main** 29:16
81:17 170:18

**maintain** 28:5,
13 62:19

**maintained**
26:4,6

**maintaining**
28:16

**major** 188:10

**majority** 31:8

**make** 8:6,20
9:12 12:22
26:2,14,17
38:3,16 50:3
63:18 66:6 83:1
86:15 88:22
91:25 94:7 95:6
97:15 98:17
100:7 105:18
106:15 108:10
109:16 110:25
117:9 122:15
128:17 129:13
172:20,24
188:8 189:20

**makes** 15:15
78:25

**making** 28:17
72:7 102:13
105:15,21
167:19

**man** 85:7 86:23
90:11 96:14
100:4 113:24
123:23 141:23,
24 142:2
143:20 165:5,6

**manage** 27:11

**managing**
34:18

**mandated**
73:24

**manifesto**
72:7 73:20

75:16,25

**manipulate**
125:6

**manipulated**
28:25

**mark** 59:23

**marked** 58:3,
11 60:1 91:11,
12

**marking** 91:9

**married** 34:23
35:1,12 104:21

**materials** 12:6

**matter** 6:8
103:8 139:9
194:16 195:25

**matters** 83:8
101:2

**max** 65:19

**Maysonet** 6:19
11:8 49:18,23
54:12,23,24
55:1 63:5 65:7
66:13 67:1 68:6
70:15,20 71:1
74:9,11 90:9
92:7 94:10
108:4,7,19,22
111:5 114:16
117:20 118:7
119:18,21
120:22 121:5,
24 122:13,18,
24 123:12,18
124:8,18,24
126:9 127:15
128:22,24
130:17,20
131:3 133:9
134:4 136:20,
21 138:18
153:25 155:25
156:4,7 157:8
158:9 160:8,24
162:25 166:13
168:1,7,8
169:22 170:2
171:3,23
173:20 174:2
175:8,21

178:22 180:7,
12,25 181:11,
13 182:13,24
186:20 187:1,4,
9 188:15 189:5,
8,25 190:11,12
191:4,13,16,24
192:5,8,14,20
194:4,14 195:3,
8,17,21,23
196:12,15

**Maysonet's**
123:1 128:7

**meals** 64:6
82:21

**Meaning** 44:20

**means** 14:4
53:22 133:22
162:6

**meant** 150:25
196:13

**media** 62:19

**medical** 36:21,
22 37:13 45:17

**medicine**
36:15

**medium** 131:9,
11

**meet** 79:19
80:22 103:13
119:21,23
134:8 168:21

**meeting** 79:21,
22 80:3,5 81:10
82:5,16 83:5,9
86:23 87:4
96:18 103:20,
22,25 104:12
131:22 164:5
168:11 169:7,
12,16 172:8
175:7 180:17
189:5,25

**meetings**
90:18 103:13
168:19 179:4
189:5

**meets** 192:2

**MEG** 53:2

**Melrose** 43:17,
18

**member** 22:17
23:4 55:7
135:11 139:16,
19 140:10
181:7

**member-to-
member** 140:3

**members**
23:12 26:15
31:6,8 32:2
71:18 72:1
77:16

**membership**
24:21 25:5

**memory** 36:9
37:7,8

**mention** 93:15

**mentioned**
36:5 46:21
96:23 133:13
194:22

**mentioning**
106:3

**mentorship**
123:11

**message**
103:15,18

**messages**
80:11 86:22

**met** 53:19
54:24 65:9
79:22 80:23
89:20 90:1
111:5 119:25
120:2,10
121:14,17
124:23 141:23,
24 142:2

**methadone**
111:20 188:7

**Mexico** 53:19

**Michael** 7:8

**mid** 40:13
48:21 51:16

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

mid-'80s 13:16,18 17:19

mid-answer 184:13

middle 77:5 95:17 109:9,14

Miedzianowski 169:10

military 20:16, 20,24 21:3,10, 13,21 22:2,7,9 29:11 40:10 45:22 51:17

Milwaukee 111:18,20 112:4 117:19 118:8,12 164:8 166:9

mind 105:25 182:5

Mingey 7:4

minors 110:15

minute 55:22 89:1 111:12 148:4

minutes 36:3 60:24 74:20 103:17 147:17 170:4 178:25

Mischaracterize 24:7

mischaracterized 117:24

Mischaracterizes 21:24 28:20 37:10 115:8 137:17 138:6 140:12 146:22 149:8 150:1,7, 19 171:12

mishaps 37:16

mislead 75:19

missed 32:21

misstates 11:14 12:2 99:24 100:1

Mister 172:12 183:5

misunderstands 24:7

mixed 159:8,9

mixing 159:2

mobsters 118:16

mom's 40:22

money 29:1 84:3 110:21,23 125:3,11,17 126:22 193:17 195:1

money's 84:1

month 113:23 167:1

monthly 181:12 192:15

months 44:5 68:7 103:11 105:23 139:9 158:13

Montilla 7:4

morning 7:23

mortgage 40:12

mother 40:18

mouth 50:6 145:22,25

move 45:8 60:3 77:23 103:5 127:1,2 146:13 149:20 165:25

moved 21:18 40:21,25 42:16 44:2 113:20 160:3

movement 23:23 36:12 188:6

moving 126:5

multiple 117:8 184:21,25

murder 140:20 144:13,19 147:3 149:13 151:6,20 154:9

murders 146:3,14,21 150:16 151:11 152:7 153:9 154:1,18 155:6 156:1,8,19 157:9

Muslim 24:18

mustache 178:9,16

mustaches 178:17

Mutual 76:17

— N —

named 138:10

names 13:1,4, 24 14:14,24 15:3,5 16:1,2 17:13,22 18:2 71:6 73:7 124:16,21 168:13,22,23 169:2,6,19,20 196:18

Naples 6:7 87:14

narcotics 34:10 106:19 108:20 110:5 117:6 122:19 133:9

nation 54:20

nature 52:3 121:10

necessarily 57:1

needed 69:1 76:3 101:15 129:11 195:24

neighborhood 20:18 29:13 74:14 125:8

126:23 137:23 139:7,24

neighborhoods 22:11 54:19

nice 123:25 128:14

nickel 53:16

nickname 13:12,15,19 14:1 136:12,17, 19,22,24 138:11 155:21, 22

nicknames 13:9,10,24,25 15:24,25 136:14 137:1

night 56:12

nightmare 153:22

nobody's 38:5,6 49:17 59:6 98:23

nodding 8:25

Nonetheless 144:8

nonverbal 183:25

North 111:18 112:4 117:19 118:8,12 164:8 166:9

Northern 6:11 8:8

note 99:2

notes 67:25

nothing's 72:17

noticeable 128:18

November 45:9,10

number 6:12 9:5 55:25 56:2, 3,4,9,12,20 57:3,16 58:2,7

59:10 61:5,6,7, 8,12,13,15,16, 22 62:3 69:2, 20,23 101:11, 12 121:5

numbers 53:14

numbness 36:13

— O —

O'HARE 46:10

O'Malley's 47:11

oath 11:1

object 56:22 57:9 85:17 92:21 95:14,25 99:20 141:3,4 142:19 165:17, 19,21 166:3 193:22,23

objecting 109:14

objection 10:7 11:14 12:2,13 13:20 14:5,6,25 15:8 16:20 17:23 19:7 20:15 21:23 22:24 23:13 24:6 25:6 26:9, 24 27:16 28:1, 19 29:21 30:9 31:3,13,18,22 32:3 34:12 36:22 37:9 41:2 42:11 44:24 51:12,25 52:6 55:10,11,17 57:7 63:9 65:25 66:15 71:14,19, 20 72:2,3 75:21,22 77:17 78:6,19 79:14 81:14 83:11 84:12 86:5,8,9 91:23,25 92:23, 24 94:17 95:2, 4,19 97:2,21

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

98:17,23 99:18,
21 101:3 102:1,
11 103:23
104:17 105:6,
12 109:24
114:20,24
115:8,13,23
116:3 117:7,21
120:5,19,25
121:6 123:14,
15 125:23
126:16 127:10,
17 131:24
132:11,16,23
133:17 135:8,9
137:17 143:4
144:1,15,20
148:22 151:21,
22 161:1,9
164:10,18
166:17 174:25
176:13 177:24
181:15,16
182:17 183:2
188:18 190:14,
19 192:21
194:21 195:11
196:7

**objections**
10:4 11:22
15:12,15 16:5
17:2,9,18 52:18
59:12 60:4 79:6
85:20 93:9 95:7
99:3 100:3,5,19
109:16 135:13,
18 136:13
138:4 151:1
152:15 154:25
157:17,25
159:5,19
171:25 172:5
189:2

**obligation**
33:14 52:8
59:25 60:2

**observe**
188:16,24

**observed**
126:14 170:13

**occasion**
16:24 89:25
189:24

**occasions**
16:14,18 17:1,7
54:25 189:16

**occur** 40:25
44:4,12 87:6
166:15

**occurred**
44:13 48:1
104:14 127:15
128:10 146:14
151:11,20
152:8 167:5
188:15 191:5

**offense** 10:19
119:10

**offensive**
143:7

**offer** 66:5

**office** 7:13
107:19

**officer** 43:16
44:15 54:24
58:18 59:9
83:25 121:15
123:19 128:23
173:20 174:3,
10 177:21,22
178:5,13 181:6

**officer's**
123:20 169:9

**officers** 15:6
16:4 65:15
66:21 71:5
75:20 77:15
78:5 84:25
90:10,20 96:19
111:5,6 121:17
124:7,17,22
125:10,15,21
126:1,2,15,20
127:6,14,25
128:1,5,10,25
145:4 166:13
168:1,16
169:20,24
170:3 171:3,15
173:25 174:18,
24 175:6,15,20
176:3 177:14
178:21 180:7,
11,25 182:25

186:21 187:5,
17,24,25 188:3,
15,16,24
189:12 190:10
191:9,16,19
193:17 195:10

**offices** 6:6

**older** 177:8,13

**one's** 159:8

**open** 72:8
86:24 194:6

**opened** 54:1
105:25

**operate** 113:3
182:14

**operated**
111:13,16
113:25

**operates**
61:16

**operating** 20:9
73:21 115:11
116:22 118:10
119:2

**operation**
49:21 54:7,13
115:22 116:2

**operations**
52:4 54:17

**operator** 23:21
46:17 48:21

**opportunity**
119:23

**opposition**
194:24

**order** 26:4,6,7
28:5,14,16 32:1
36:17 77:15
167:17 188:11
189:21

**organization**
19:24 20:6,14
22:8,18,22
23:5,12 24:5,
15,22 25:15,22
26:1,8,18,22
27:14 29:10,20

34:11 55:5
71:25 77:12,16
78:4,18 79:4
140:11

**origin** 132:9

**other's** 9:9
87:22

**outstanding**
45:2

**overhear**
179:8

**overlapped**
159:12

**overlapping**
163:23

**overseas**
21:11

**overseeing**
34:10

**owned** 40:14
42:7 50:23
54:22 112:24
113:16,17,18
117:10 118:1

**owner** 110:6

———————

**P**

**p.m.** 75:3
129:22 130:3
147:20 148:1
167:9

**pair** 35:25

**Panther** 6:6

**paper** 47:5
80:19 81:6
82:1,17 88:18
89:25 96:12
97:13,14
102:15 105:16
113:16,17

**papers** 67:25

**paperwork**
47:17 81:2
88:2,8,9 93:19
104:6

**paragraphs**
105:2

**parents** 21:18

**Park** 20:11
21:19 43:17,18
112:6 164:9
180:22

**parole** 44:11,
14

**part** 23:7 24:22,
23 31:25 72:9
90:11 91:15
149:18 170:18
171:16 173:12
182:14 184:1
186:22 188:10
193:14 195:4

**parts** 102:21

**party** 65:7,8

**past** 14:16 36:8
42:9 119:19
145:21 181:10

**paths** 160:7

**patrons** 171:9

**Paulnitsky** 7:5

**pause** 7:12

**pay** 64:5
119:15 124:9
128:20 181:11
182:14 186:21
191:18,19,25
192:11,15
193:1,2

**paying** 38:6
40:12 110:22
124:10 125:7
180:21 182:25
187:4 192:10,
12 193:17

**payments**
113:21

**payout** 192:14

**pending** 6:10
8:8 9:25 83:16

**penitentiary**
41:18 42:19
43:9 46:6,22

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**pension** 45:22

**people** 9:7 27:24 29:3 30:16,18 32:25 38:24 49:19 53:19 54:21 65:19 73:8 92:15 111:1 112:25 113:10 114:14 115:14, 18 116:11,15, 16 122:5,6,7 124:7 126:2,25 127:22 130:21 133:13 135:5 136:14,18 155:2 156:24 157:1,24 158:2 167:24 169:6, 21 172:4 182:7 183:24 188:1,8 194:6

**people's** 69:7 136:19

**pepper** 41:16 107:2

**Perfect** 49:9

**perform** 114:18

**period** 40:1 53:7 55:2 108:12 111:16 116:23 158:12, 14 159:22 160:23 161:7, 13 162:24 163:9

**periods** 30:8

**Perkaus** 7:11

**person** 6:17 11:7,25 70:17 78:13 81:23 83:18 85:3,15 98:2 101:16 112:22 122:10 145:24 146:10 150:17 168:5 181:19

**person's** 112:17

**personal** 125:20 126:13 153:7

**personally** 52:23

**persons** 54:9 150:5

**phone** 55:23, 25 56:3,7,12, 19,20 57:3 58:2,7,18 61:4, 5 67:9,10,16 68:8,11 69:6 70:6,8 71:1 83:4,7,9 85:5 93:11,12,13,15 97:8

**phones** 80:11

**phonetic** 90:4, 5 97:1 121:16 124:20 128:25 152:17 169:9

**physical** 36:16,18 130:20

**picked** 110:13

**picking** 41:20

**place** 15:10 26:3 33:1 34:16 39:20 68:14 73:8 79:21,22 80:10,12 87:9 88:13 93:12,19 96:18 97:16 102:13 105:18, 24 113:1,9 121:21 124:6 147:1 150:10 153:2 156:24 166:20 167:24 168:25 171:1 180:23 187:9 188:6,7 189:7 190:4 194:6 195:6 196:10, 18

**places** 43:7 46:12 48:22

**plaintiff** 6:16, 22 184:23

**Plaintiff's** 6:14

**planning** 179:5

**plans** 196:4

**play** 115:15

**playing** 110:15

**PLAYS** 32:22

**plead** 34:5,6 50:10,12 145:16 153:16, 18

**pleading** 49:5, 6 50:7

**point** 9:17,22 11:11 12:10 36:5 38:17 39:9 44:15 61:3 73:10 78:13 106:13 108:8 113:25 123:1 125:3 129:4 157:6,16 169:25 171:15 174:24 175:6 176:2 182:23 184:5,24 185:18 186:20

**pointed** 186:9

**police** 15:5 18:12,14 51:3 54:24 58:17 59:9 65:15 66:21 71:5 75:19 77:15 78:4 83:25 90:18,20 96:19 145:4 166:13 168:1,16 171:15 173:20 186:21 187:17 191:18 195:10

**Polish** 174:14 176:11

**polite** 87:23

**pool** 110:11,15, 18,20,23 114:5 118:15

**portion** 57:20

**position** 25:23, 25 29:12 30:12 39:8

**positions** 25:17

**possibility** 11:11,23

**Potomac** 45:13,14

**pounds** 178:3

**practice** 24:18 78:3 79:4

**practices** 71:25

**precise** 104:10

**Premier** 6:6

**prepare** 67:21

**prepared** 63:15,16 81:2

**presented** 91:21 94:14 96:23

**presents** 102:20

**preserve** 165:21

**pressure** 78:12,13 79:9

**pretrial** 43:1,9 158:16

**pretty** 56:24 64:24 77:1 128:3 137:15 141:1

**previous** 88:25

**price** 128:2

**prices** 127:23 128:3

**primary** 53:22

**principles** 75:18

**prior** 24:7 40:8 50:18 79:24

81:10 122:11 149:9 150:1,7, 20 175:6

**prison** 24:25 35:5,8 43:7,13 46:23 47:16 48:5,12,14 65:18 163:7

**Prisons** 30:22

**probation** 43:15 44:15

**problem** 15:17 57:12 58:13,16 109:13,15 110:8,13 116:13 183:16 184:7,10

**problems** 60:7 110:11,17 112:25

**PROCEEDINGS** 6:1 197:6

**proceeds** 193:19

**process** 8:20

**produced** 80:8

**professional** 87:24 118:4

**proffer** 63:20

**profile** 62:24

**progression** 102:23

**proper** 52:18 99:3

**properly** 26:4 183:14

**prosecutors** 66:6

**Prossnitz** 6:21

**protection** 125:4 187:5 193:17 194:3

**protections** 125:7

**provide** 123:11

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

**provided** 92:20

**public** 56:14, 16,18,20

**Puerto** 113:21

**purported** 108:3

**purpose** 16:2, 8 105:11

**purposes** 115:12

**put** 13:25 18:24 23:9 30:14 36:25 56:13,14, 23 57:3,10,11 58:15 67:8 73:24 80:16,19 82:1,17 88:10, 15 89:11 93:19 94:25 97:10,11, 19 103:2,4 105:16 106:20 125:25 144:1 173:1

**putting** 50:6 57:17 58:16 74:3

**Q**

**quantity** 53:17

**question** 9:11, 14,17,19,25 10:1,7,20 13:21 15:22,23 24:19 27:20 32:9,17, 18,19,25 34:7 41:8 50:12 52:21 65:4 70:19 73:13 75:17 77:8,9, 10,11,13,24 78:15 79:2 86:13,16,19 88:25 95:17 99:22 105:13 108:18 109:17 132:17 141:5 142:16,19,21 151:2,23 153:19 163:2,

22 183:15 185:18 186:17 191:3 193:24

**questioned** 15:2 60:14,19 105:20

**questions** 9:5 28:3 32:7,11 37:1 38:19 52:9 56:24 59:11 60:16 67:9,12 72:19 74:25 75:16 89:22 94:9 98:25 106:8,11,13 109:15 119:17 124:13 130:16 147:2 148:14 183:23 185:11, 14

**quick** 168:12

**R**

**R-A-M-I-R-E-Z** 8:4

**race** 174:11

**races** 174:11, 12,13

**Rahe** 7:6

**rain** 133:23,25

**raise** 7:15

**Ramirez** 6:8 7:14,23 8:3 13:2 14:15 16:16,17,19 18:9 38:11 58:2 68:19 75:6,10 89:13 103:2 109:5 129:25 130:5 147:23 148:3,17,19 151:22 166:7 172:12 183:6 193:22

**Ramirez's** 184:7

**ran** 118:17 188:2

**rank** 25:8,14 26:3 29:12 73:23

**ranking** 25:12 30:17,18

**ranks** 25:20

**rap** 50:20

**reached** 108:6

**reaction** 182:3

**read** 32:18 66:2 96:2 104:6

**ready** 23:22 186:16

**real** 13:24 15:7 16:3 136:18,19 168:11

**realistic** 27:19 38:8 64:8 73:1 107:2

**reason** 7:13 57:11,16 172:6, 7

**reasons** 71:12

**recall** 13:18 14:17 78:10 105:15 120:10, 13 122:20,21, 23 123:7 155:6 167:1,4 176:16

**receive** 70:1

**receiving** 45:22

**recently** 46:12

**recognized** 168:23

**reconvene** 74:18

**record** 6:2,13 8:2 12:13 15:11 38:10 47:9 56:14,16,18 57:4,17,18 58:3 64:13,16 74:24 75:2,4,5 86:15 96:2 129:21,23, 24 144:2

147:20,21,22 184:6,22,25 185:3 197:3,5

**records** 17:22 37:13

**recovered** 196:5

**recovery** 69:5

**recuperate** 69:4

**refer** 25:3 134:15,18

**referenced** 79:25 125:16

**references** 111:13

**referencing** 141:14

**referred** 54:16 70:25 110:3 115:21 166:8 194:17

**referring** 30:21 41:15,22 119:2 125:15 145:24 146:14 150:13 151:8 158:19, 23 164:6

**regular** 82:20 126:3 161:6,13, 16 173:16 189:3

**regularly** 189:13

**reign** 31:5

**relate** 67:1 195:8

**Related** 135:8

**relating** 12:10, 16 108:12 133:9 144:24 145:4 149:12 187:4

**relationship** 90:3,4 92:8 121:11,24 122:16 124:18

181:8,11 191:15

**relative** 40:14

**Relax** 109:19

**relaxed** 180:9

**release** 44:6, 10,17,21 45:3

**released** 35:7, 12 42:22 43:7, 12,17 44:5,7 46:5

**reliable** 186:8

**remain** 24:14

**remember** 16:12,22 17:4 30:10 36:8,20 37:2,3 38:1,4 42:6,15 45:14 47:15 67:23,24 72:19,25 73:4, 5,9 80:21 81:21 113:20 117:13, 16 120:16,20 121:2 122:14 123:8 124:21 130:22,24 132:1 158:15 194:4

**remind** 52:12 125:9

**reminding** 166:19

**remote** 11:25

**removed** 23:10

**repeatedly** 15:13 184:13

**rephrase** 9:17

**reporter** 6:2,3 7:14,20 8:5 9:1, 10 32:18,20,22 74:22 75:2,5 76:21 91:11 109:6 129:21, 24 147:19,22 197:1,3

**reporting**

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

191:12

**representation**
37:20 38:20

**represented**
10:16

**representing**
108:4

**reputation**
72:10

**REQUESTED**
32:22

**required** 11:12

**research**
67:15

**resell** 196:4

**reselling**
194:18

**reserves** 21:7
22:3

**reside** 39:25
40:19 43:13,14
74:12

**resided** 40:2
45:11,13

**residing** 21:14
42:1,2

**respect** 22:15
26:7 27:23
29:16 34:19
45:3 151:11

**respected**
29:13

**respective**
159:17

**responding**
183:13,14

**response**
181:4

**responses**
183:17

**responsibilitie
s** 25:24 26:2

**responsibility**
40:11 70:23

**responsible**
34:10 146:20
148:20 149:3
150:5,17 153:9
154:18

**responsive**
184:20

**rest** 24:15

**restaurant**
54:1,3 92:11
113:9,12
116:22 117:11
118:1,2,24
121:17 171:16

**restaurants**
113:10 116:14,
24

**restroom**
73:11 129:14

**result** 36:21

**resumed**
51:24

**retire** 23:22

**retiring** 45:20

**returned** 140:6

**revealed** 13:25
191:24 196:12

**Rico** 113:21

**rid** 118:12,24

**rights** 34:3
149:12

**risk** 43:5

**river** 133:21,25
136:16

**Rivera** 14:18,
20,21 16:1 17:6
18:8

**road** 103:17
111:12

**rob** 124:7
126:22 128:5
169:21 195:4
196:4

**robbed** 191:10

**robberies** 67:5

**robbery** 90:10
196:18

**robbing** 54:21
180:20 191:8
194:18,24
195:19

**role** 29:20 30:4

**roll** 61:9

**Romelfanger**
7:3 52:16
184:21,24
185:3

**Ronald** 6:9

**room** 185:6

**rooster** 39:5

**rope** 51:5

**Roselle** 40:23
42:4,7,16 43:8

**Rosey** 43:24

**rug** 65:15

**rule** 9:24
143:18

**ruled** 31:8

**rules** 8:18,19
11:1 26:8
59:17,21 76:3
143:8,10,11,14,
15,19,20

**rumors** 154:17

**run** 28:24 46:19
136:15

**running**
110:18 117:2

**Rush** 40:22
42:4

_____

**S**

_____

**sake** 165:11

**saliva** 70:21

**sandals** 64:15,
21

**sat** 80:8 82:15
111:9 121:18
170:20 179:6

**satisfactorily**
44:18

**Scahill** 7:1,22,
24 11:16 12:5,
15 14:3,10
15:4,17,21
16:7,23 17:5,
11,20 18:1
19:12,18 20:22
22:5,25 23:11,
15 24:11 25:13
26:13 27:3,21
28:15 29:8
30:3,20 31:10,
15,20,24 32:5,
13 33:10,16,19,
20 34:17 37:5,
18 38:14 41:4
42:13 44:25
47:18 48:6,10
51:14 52:2,20
53:11 55:15,20
56:16,19 57:6,
13,17,21,23,25
58:4,12,21,25
59:2,6,16,19,
20,25 60:8,10
61:11,21 63:22
64:9,14,19 65:1
66:8,23 67:14
71:16,23 72:23
73:12,14 74:17,
21,23 75:9
76:9,25 77:3
78:2,16 79:1,
12,17 81:9
82:4,12,25
84:7,19 85:19,
24 86:7,10,12,
18 87:11 88:7,
21 89:1,4,7,10
91:9,13 92:4
93:4 94:12
95:3,8,16,21,23
96:4 97:1,17
98:5,6,9,14,17,
21,23 99:2,4,5,
7,11,13 100:2,
7,9,11,16,22
101:22 102:6,
16 104:1,23
105:9 106:16

107:5,9,11,14,
21 109:11,13,
21 110:2
114:22 115:5,
10,19,25
116:21 117:17
118:5 120:9,21
121:3,9,22
124:15 126:12
127:4,9,12,20
129:7,16,20
130:4 131:15
132:4,13,19
133:6,19,24
134:7,14,24
135:10,15,22
136:5,11,23
137:9,14 138:1,
7,24 140:1,15
141:9,15,19,25
142:1,4,6,9,12,
15,18,22 143:2,
8,10,14,17,25
144:3,7,17,22
145:2 146:7,18
147:6,8,15,18
148:2,7,10,16
149:1,10,21
150:3,12,23
151:7,18 152:6,
13,21 153:5,15
154:7,16,22
155:4,12,19
156:6,14 157:4,
15,19 158:6
159:8,10,15,20
160:12 161:5,
11,18 162:2
163:8,15,21
164:3,12,21,25
165:4,8,12,17,
20,24 166:4,6,
22 167:13
169:1 170:22
171:8,14,18,22
172:2,10 173:6,
8,18,24 175:4,
12,18,25 176:9,
19 177:2,19
178:7 179:7,15,
23 180:3,10
181:24 182:22
183:9,13,18,23
184:9,12,15,20
185:11,21,25
186:13,15

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

187:2,14
188:23 189:11
190:9,16,19,23
191:1,2 192:4,
18 193:3
194:10 195:7,
20 196:2,22,25
197:2

**scary** 127:1
128:4

**scene** 164:7

**Schak** 7:5

**Schiva** 121:15

**Schivaire**
121:16

**schwifty** 64:25

**score** 195:18,
19

**screen** 76:6,11
88:23 107:10,
17 111:22,25
115:16

**seal** 58:16

**sealed** 57:20

**Sean** 6:15
34:13 38:2
64:1,2 65:10
68:1,10 70:9
74:19

**Sean's** 68:10

**season** 167:2

**seat** 87:23

**seated** 88:1

**seats** 170:19

**secret** 65:14

**section** 119:22

**Security** 45:23

**Seeks** 26:25

**seemingly**
185:8

**seized** 191:12

**self-** 33:22 34:3

**sell** 116:7

**128:6 169:21
180:18,21
181:2,14 182:2,
25 186:21
187:5,10
191:17 194:3,5

**selling** 28:11,
17 29:1 53:3,16
54:20 110:7
113:1 167:18
187:11 188:11
193:18

**send** 99:5

**sends** 46:11

**sense** 157:3

**sensitive**
58:15

**sentence**
47:24 162:21

**sentenced**
47:20

**sentences** 9:9

**separate**
179:25

**September**
23:21 45:21

**series** 148:14

**serve** 113:14
114:1

**served** 115:1
150:5 159:22

**service** 21:2

**services**
114:18

**serving** 115:11

**set** 19:10 20:2,
4,5,8 25:4,9
26:3 27:25
28:8,12 29:1
31:7,8 55:7,9
79:21,22 90:10
105:16 168:19
176:14,15,17
182:6

**sets** 28:17,24
119:24 152:19

**setting** 164:7

**seventh** 92:25

**sex** 82:21
116:11

**sexist** 143:7,9,
16

**shake** 126:21
169:21 188:3,4

**shakedown**
192:13

**shaking** 8:25

**shape** 178:6

**shared** 145:3,
7,10

**sharks** 124:1

**sheets** 50:21

**Sheriff** 51:2

**shirt** 22:21
64:11

**shit** 64:7

**shook** 125:17
127:6

**shoot** 36:14
72:14

**shooting**
155:11 157:1,2
158:3

**short** 71:8
84:22 129:8
130:22 132:2
174:3

**short-term**
37:7

**shorter** 178:4

**shortly** 90:2

**shorts** 64:10

**show** 87:16
169:25 186:11

**showed** 80:14
89:20 91:14
92:18 93:6

**showing** 79:24
89:5,7

**shut** 145:22,25

**sic** 63:13

**side** 27:9 45:13
103:2,4 117:14

**sign** 100:25
105:11

**signed** 80:21
90:25 102:8,23,
25 104:3,6
105:17

**significance**
19:6

**signify** 22:21

**signifying**
19:23

**silly** 165:1,2,3,
23

**Simple** 61:8

**sir** 8:9,22 11:9
13:10 16:25
18:11,17 19:25
21:1,15 26:10
30:6 34:23,25
35:6,14,18 36:6
38:22 39:21,24
41:22,24 42:21,
24 43:11,19,22
44:8,23 51:22
52:1 60:12 62:8
63:6 75:24
79:20 87:5,15
89:14,18
102:19,24
103:3 111:14
118:9 119:20
134:17 146:16
148:18 151:9,
25 152:11
153:14,17
158:20 159:24
160:22 162:19
166:10,14
168:17

**sister** 68:12,
15,16,17,21
69:9,15 101:11

**sister's** 68:18
101:12

**sister-in-law**
68:15

**sister-in-law's**
43:15,21

**sit** 23:4 72:16
83:23,24 87:20,
21 119:11
122:6,7

**sitting** 59:10
102:18 111:2
168:10 170:16
178:25

**situation** 28:14
61:4 76:4 90:12
111:5 117:10
118:15 122:5
127:25 128:4,
15 133:5
149:18 167:17
172:16 180:17
181:20 182:2
189:6 194:20

**situations**
45:18 73:9
118:19 127:2
156:5 191:11

**size** 130:22

**slim** 131:9

**slot** 110:18
115:15 118:14,
17

**small** 114:25

**Smitka** 7:5

**smoking**
187:20

**smooth** 116:15

**snitches** 126:7

**so-** 118:15

**social** 45:23
62:19

**sold** 116:6

**solemnly** 7:16

**somebody's**
51:6

**someday**
165:16

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

someone's 73:6

sort 13:11 30:4
36:8 116:23
117:5 130:17
165:16 166:12
191:14

sounds 35:13
36:18 37:6
90:13

sources 48:24
49:2

south 27:9

Spalding
55:13,19
155:23

Spanish
112:18 132:18
133:4,20
174:16

Spaulding
28:23

speak 32:4,14,
15 34:1 75:11
81:23 83:18,19
84:9 85:2,3
87:3 94:20
98:19 103:7
106:18 112:17
130:11 132:14,
15,22 134:16
147:8 148:4
150:16 161:21
162:6,9 163:16
165:5,6 182:13
185:5

speaking
52:18 59:12
60:4 85:19 95:6
100:3 166:4
181:25

special 115:3

specialist
36:14

specific 73:7

specifically
69:10

speculating

179:9

speculation
16:21 26:25
47:1 66:17 72:4
78:7,20 79:15
83:12 84:15
97:6,25 103:24
120:6 121:7
132:24 134:2,
11,23 135:9
136:3 137:11,
19 138:5,20
139:20 140:13
146:24 148:25
149:6,15,25
150:7 151:16
152:10,25
153:12 154:5,
11,20 155:8
156:3,11,21
161:2,16 163:5
171:6,21
173:15,22
175:2,10,16,23
176:8,25 177:1,
17 178:1
179:20 180:2,6
181:17 182:18
192:7 195:12

speculations
136:9

Speculative
131:25

speech 36:10

spell 8:1
112:13

spend 93:23

spent 46:21

spoke 38:2
49:18 68:10
81:16,24 91:24
92:6 93:11
101:7,13,14
108:1 139:9
174:16

spoken 50:1
82:19 86:21,23
93:21 94:15
103:11 106:5
107:23 108:3,7,
11 133:8

140:16,19,23
144:12 147:11
175:5

spot 187:10
194:5

Square 39:17

standpoint
52:7

Starr 6:15,23
7:12 8:18 11:15
12:3,13 13:22
14:5 15:8,14,18
16:5,20 17:2,9,
18 19:7 20:15
21:23 22:24
23:13 24:9 25:7
26:9,11,24
28:1,19 29:21
30:9 31:3,13,
18,22 32:3 33:7
34:14 37:9
38:10 41:2
42:11 44:24
47:1 48:3,7
51:25 52:6 53:8
55:10,12,17
56:11 57:5
58:10 61:18
63:9 64:1,13,16
65:25 66:15,17
67:2 70:10,25
71:13,14,19,21
72:2,4 73:10
74:16,20 75:21,
23 76:21 77:17,
20 78:6,9,19
79:6,14,19
80:2,25 81:11,
14 82:9,11
83:4,8,11
84:12,15 85:22
86:1,3,14 87:4,
8,18 88:3,17,24
89:3,5,9,11,19,
22 91:14,23,25
92:2,21,23 93:9
94:14,17 95:2,
4,9 96:24 97:2,
4,6,18,21,24
99:14,18,20
100:18,19
101:3 102:1,3,
11 103:8,10,23
104:13,17

105:6,10,18
106:17 107:4,6,
15,20 108:6,18
109:9 114:20,
24 115:8,13,23
116:3 117:7,21,
23 120:5,19,25
121:6,12
123:14,16
125:23 126:16
127:10,17
128:11 129:4,
10,19 131:13,
23 132:11,23
133:17,23
134:2,10,22
135:8,13,18
136:2,8,13
137:8,11,17
138:4,20
139:20 140:12
141:7 144:15,
20,25 146:4,17,
22 147:4,7,10,
13,17 148:8,12,
22,24 149:5,8,
14,24 150:6,19
151:1,14,16,24
152:9,15,24
153:11 154:4,
10,13,19,25
155:7 156:2,10,
20 157:11,17,
25 159:3,5,13,
19 160:9,11
161:1,15,24
163:3,5,14,18,
20 164:1,11
166:17 168:20
170:21 171:6,
12,17,21,25
172:5,23 173:4,
15,22 174:25
175:2,10,16,23
176:6,8,13,25
177:17,24
178:1,23
179:12,14,19
180:1,6 181:15
182:17 183:2
184:22 185:5,
17,22 186:23
187:6 188:18,
20 189:2 190:7
191:22 192:6,
23 193:20

194:1 195:14,
22 196:6,20,24

Starr's 15:11

start 8:2 9:13
21:16 29:1

started 20:20
25:11 28:11
30:13 31:9 95:6

starting 6:13
32:20

state 8:1 18:3,4
26:16,23 45:25
46:22 65:12

state's 7:9

statement
80:9 82:6 86:25

statements
63:14 72:8

states 18:20
20:23,24

Stateville
30:13 92:12
163:7

stationed
21:9,11,12

status 54:19

stay 43:25
184:18

stayed 43:14
180:8

step 29:9 36:4

Steve 107:15

Steven 107:13

stint 48:12,13

stipulate 148:8

stole 120:15

stop 16:12
58:25 59:12
60:3,10 77:7
85:19 86:3
118:10 142:4
143:6,12,16
165:7 183:9
184:12

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900   www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

**stopped** 15:2
119:2

**stopping**
126:2

**stories** 90:13
94:7

**street** 40:22
42:4 120:14
174:5,7,8
193:10

**streets** 125:25
137:23 154:18,
24 155:1,5

**strictly** 73:18

**strike** 16:15
20:12 160:6
177:21

**strip** 104:20

**stroke** 23:22
36:5 139:10

**structure** 23:9,
19

**struggling**
184:18

**studied** 38:25

**stuff** 19:9 25:12
27:19 28:9
40:12 42:5 64:6
81:3 106:11
112:22 113:10
114:5 127:24
128:6 129:13
167:19 174:2
192:10

**subject** 101:2
103:8 164:6,14

**subordinate**
26:15

**substantively**
148:11

**suffered**
146:12,13

**suggest**
165:23

**summation**
43:10

**supervised**
44:6,9,17,22
45:3

**supplier** 123:2

**supply** 123:6
181:7

**supplying**
51:7 53:4,10,12
193:18

**supposed**
47:23 75:19
100:13,14

**supposedly**
124:17 182:25
186:20 187:4

**surname**
16:16

**surprised**
59:5,6 128:2

**surprising**
100:23

**surrounding**
104:15

**swapped**
70:21

**swapping**
82:20

**swear** 7:16

**switch** 34:22

---

**T**

**T-MOBILE**
61:24,25 62:6,7

**table** 29:4
87:20 88:2
110:11,18,20,
23 118:15
173:12,21
178:21

**tables** 114:5
170:19,20
173:16

**takes** 9:6 52:9
105:24

**taking** 29:23

54:3 98:10,13,
16 110:6
121:21 124:6
167:24 195:6

**talk** 9:8 23:18,
19 49:24 60:4,6
65:13 67:10,11
68:5 69:1,17
70:16,17 71:8,
13 83:17 96:15
103:1 104:13
122:8,15
127:22 144:10
155:2,25 164:4
172:8 191:7

**talked** 80:8
81:11 82:23
93:14 94:21
96:16 97:8
104:18 121:18,
19 122:8 133:3
195:6

**talking** 20:25
32:12,14,16
36:11 41:25
42:9 50:25
73:15 74:3
76:8,15 77:11
85:6 88:19 91:2
101:17 116:24
129:7,8 133:2
138:16,17
143:17,19
156:25 160:20
164:13,14
178:25 193:5

**tall** 130:25
131:2

**taller** 131:7

**tan** 98:18

**tattooed** 19:3

**tattoos** 19:1,2,
4,5,22

**telephone**
70:2 84:8 85:4

**telling** 67:25
72:17 74:2
124:13 182:4
196:3

**tells** 168:11
186:2

**ten** 47:10,19,
20,22 48:4,8
103:17 116:17
129:19

**ten-year** 48:13
119:7

**tendency** 9:8

**Tennessee**
18:5,7

**tense** 179:16

**term** 20:4

**terminate**
44:20

**terminated**
44:11,18,21

**territory** 28:18

**testified** 8:14
10:25 42:23
84:11 190:15,
18,21

**testify** 11:12,
19,24 52:10
63:4,8 72:13
73:25 83:23,24
97:13 100:4
106:22 184:17

**testimony**
7:16 11:1,2
24:8 28:20
32:22 37:10
115:9 117:24
130:12 137:18
138:6 140:13
146:19,23
149:9,18 150:1,
7,20 153:6
154:24 171:13

**text** 80:11
86:22 103:14,
15,18

**that'd** 38:7

**therapy** 36:10,
11,16 37:12

**thing** 38:3
53:13 55:18

57:13 74:9
77:23 79:3 96:9
100:20 106:12
113:2 126:8
143:7 151:2
165:1 170:12

**things** 23:6,19,
20,24 24:19
25:1 28:7 29:6,
7,25 36:8,24,25
38:4,25 49:21
54:2,4,21 58:14
59:8 63:17
65:18 72:13,16,
19 73:6,22
80:18,19 82:2,
7,22 85:9,14
88:12 90:5
94:3,11 95:10,
11 97:19 99:15,
17 100:24
104:15 105:24
110:20,24
116:14 126:6,
14 128:6
139:11 155:2
163:12 164:19
167:17 170:11
181:12 189:21

**thinking**
116:11

**thinks** 33:8

**thought** 14:12
41:5 49:14
109:4,18,19
126:6 150:15

**throw** 124:1

**tickets** 126:2

**Tim** 38:10 48:3
60:12 73:10
88:17 89:3
107:6,14 129:4
147:4 148:8
165:3 184:21,
24 185:17
196:20

**time** 6:5 10:4,
22 16:13 17:12,
14,15 19:15
20:2 21:9 27:14
29:23 30:8,19,
24 33:3 34:20

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

35:4 38:7 40:1
42:15,20 43:1
46:21,23 48:14
53:7,21 55:2
60:4,5,7 68:4
69:6 70:4 74:5,
13 75:3,8 79:11
80:7 81:16 87:3
91:24 92:6,10,
11,25 93:11,23
94:19,21
102:18 103:16
106:24 108:12
111:16 112:20
116:8,23
117:18 118:1
120:10 121:23
122:25 127:13
128:9 130:2,18
131:21 132:20,
21 133:8 135:3
137:10,22
139:21 145:22
146:12 147:20,
25 150:5,11,18
151:5 153:21,
24 156:1,16
157:16 158:12,
14,22,24
159:12,21
160:1,23 161:7,
13 162:21,24
163:9 164:4
166:4,16 167:4
176:2 180:4
182:23 189:19
190:3 197:3

**times** 83:13
86:16 94:19
96:2,8 100:21
109:22 117:8
133:14 137:21
140:23 153:12
173:5 180:5
184:21,25
185:7,19
189:18

**Timothy** 7:1,23

**Tino** 138:11,12,
14,17

**tip** 116:18

**tire** 46:18

**tired** 129:12
172:15

**today** 6:4 9:5
10:11,17 12:7
22:21 23:4
33:21 67:22
75:7 103:17
130:2

**today's** 107:23

**told** 31:4 41:5
49:22 53:24
70:15 71:3
81:18,20,22
82:15 84:8,21,
22 90:9 92:9
93:8,10 94:18,
19,21,24 97:3,
5,8,11,14
100:20 101:8
113:2 123:18,
23 124:2 127:8
141:2 168:18,
22,23 169:19,
23 170:25
180:15,19
189:8 192:8
194:14 195:23

**tombstones**
19:10

**tomorrow**
24:16 36:13
124:5

**tone** 9:7

**top** 30:4 169:20

**Torrance**
148:20 149:3,
23 151:12
153:9 154:1

**totally** 58:13
61:22 118:2
122:4,9 184:15
189:6

**touch** 139:13
145:20

**trade** 29:1
46:14,15
106:19 122:19

**traffic** 16:12
126:2

**trafficking**
50:15,18 51:10,
18 52:4,10,23
53:6 54:13
127:16 135:17

**trees** 30:1

**trial** 11:11
145:16 159:16
160:17 165:12,
17

**trouble** 182:10

**true** 90:23
105:4,19 155:3

**trust** 114:15

**truth** 7:17,18
38:1 49:13,16
63:18 67:24
68:2 74:2 84:5
94:5 194:15
195:24

**truthful** 38:5
72:20

**tunnel** 173:11

**turn** 98:18

**turned** 50:22

**TV** 115:16

**twins** 35:25

**two-and-a-half**
35:2

**type** 92:19
108:23 111:19
118:2 133:5

**typed** 80:15

**types** 52:3,22

**typewritten**
80:24 91:15,21
94:15 96:22
102:21

---

**U**

---

**unavailable**
142:23

**uncomfortable**
38:18

**underlying**
66:24

**understand**
8:6,20 9:16
11:3,4,5,9,10,
23,25 12:4,9
20:3 32:6 38:17
58:24 59:4 63:3
65:6 66:9 83:2,
3 133:14
142:16,21
157:5 162:14
164:13

**understanding**
26:22 35:4
36:19 65:23
69:24 89:12
140:9 191:15
194:12,19

**understood**
9:19 39:6 77:12
104:6 133:1
173:4

**uniform**
174:10

**union** 45:21
46:11,17 48:21

**unique** 14:12

**unit** 53:2
158:17 160:17

**United** 20:23,
24

**unrepresented**
33:21

**usage** 18:2

**uttered** 101:1

---

**V**

---

**vague** 101:4
123:16 161:16
175:2

**verbalize** 8:24

**version** 155:21

**vicinity** 20:9

**Victoria** 6:3
75:7 130:1

147:24

**victory** 47:11

**video** 9:1 184:9
186:10,13,14

**videoconferen
ce** 75:7 130:1
147:24

**view** 49:20,21
61:3 110:25

**views** 79:10

**violated** 28:7

**violence** 29:25
32:1 33:2

**VOL** 6:1 197:6

**voted** 31:6,7

---

**W**

---

**Wabansia**
19:11,13,14,21
20:9 25:4 28:10
30:7 31:2,11
34:9 152:18

**wait** 9:10,12
56:17 158:16

**waiting** 10:13
160:17,18

**waitress** 118:4

**waived** 109:16

**wake** 185:9

**walking**
170:10

**wanted** 36:4
67:10 68:5
70:19 75:17
90:11 107:1
110:12 115:3,4
123:22 194:15

**warrant** 45:2

**washroom**
9:23

**watch** 60:9
115:16

**water** 136:15

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

**ways** 179:25

**wearing** 22:20
64:10,14,21
126:1 130:23

**week** 23:17
36:16 37:1

**weight** 131:12,
16 176:12
177:23 178:3

**weird** 181:6

**well-built**
178:3

**Wellington**
117:16

**west** 39:15
45:13,14

**whatsoever**
184:8

**Where'd**
191:21

**whereabouts**
119:24 135:20

**Whipple** 19:11,
14,16,17,19,20,
21 20:9 25:4
28:10,11 30:8
31:2,12 34:9
152:18

**white** 178:13

**Wicker** 112:6
164:9

**wife** 10:12 24:2
40:2 54:2 73:2,
4 80:7 82:22
87:16 116:8
118:22

**wife's** 35:15

**Wiley** 148:20
149:3,23
151:12 153:10
154:1

**wind** 67:7 68:4

**witnessing**
153:8

**woman** 143:20

**word** 133:21

**words** 50:6
80:24 94:15
96:23 101:1
174:23 175:3,
13 193:7

**work** 46:17
88:5 114:16
128:21 167:18

**worked** 48:22
53:24,25 126:7

**workers**
114:11 115:2
167:16

**working** 54:3,6
114:12 116:10
128:14 167:14

**works** 73:11
165:22

**world** 56:25

**worried** 29:7

**write** 99:15

**written** 90:23
91:15 92:19
102:20 105:3

**wrong** 42:15
141:22

**wrongfully**
66:19 67:5

_____

**X**

**XX-XX-XX**
18:16

**XXX-XXX-
XXXX** 58:7
61:15

**XXXXXXXXX
XXXXX.XXX.**
62:16

_____

**Y**

**Y-U-M-A**
13:12,14

**yapping** 179:1

**year** 21:7
31:12,17 39:12,
20,23 41:7
42:10 45:9,10
48:19,23 49:1
52:5 90:25
105:23 119:4
121:4,11
127:13 166:23

**years** 17:15
20:13 21:2
22:2,3,14 23:7
29:9 35:2 37:3
40:21 41:17
42:5 44:13
47:8,10,19,21,
23 48:4,8 49:19
50:14 52:22
53:23 54:5,13,
17 60:22 72:25
73:1 108:9,10
121:5 130:21
134:12 139:14
161:4 177:8,13

**yesterday**
64:21 103:16,
25

**York** 27:7

**young** 23:7
24:25 110:14
119:25 174:1

**younger**
119:25 120:4

**Ysel** 68:19

**Yuma** 13:5,12
14:7 63:1
134:19 136:7

_____

**Z**

_____

**Zoom** 6:20,22
7:11 86:25 89:3
107:4,8,17

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900   www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

**CONDENSED**

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

# CASE NO. 1:22-CV-06496

## ALFREDO GONZALEZ

## V.

## REYNALDO GUEVARA, ET AL

## VOL. II

## DEPONENT:

## EDUARDO RAMIREZ

## DATE:

## JUNE 20, 2024

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

1  IN THE UNITED STATES DISTRICT

2  COURT FOR THE NORTHERN DISTRICT

3  OF ILLINOIS EASTERN DIVISION

4  CASE NO. 1:22-CV-06496

5  JUDGE JOHN F. KNESS

6  MAGISTRATE JUDGE HEATHER K. MCSHAIN

7

8  ALFREDO GONZALEZ,

9  Plaintiff

10

11  V.

12

13  REYNALDO GUEVARA, ET AL,

14  Defendants

15

16

17

18

19

20

21

22

23  DEPONENT:  EDUARDO RAMIREZ VOL. II

24  DATE:      JUNE 20, 2024

25  REPORTER:  VICTORIA ADAMS

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900     www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

**Page 2**

```
 1                    APPEARANCES
 2   ON BEHALF OF THE PLAINTIFF, ALFREDO GONZALEZ:
     Sean Starr, Esquire
 3   Annie Prossnitz, Esquire (Appeared via videoconference)
     Loevy & Loevy
 4   311 North Aberdeen
     3rd Floor
 5   Chicago, Illinois 60607
     Telephone No.: (312) 243-5900
 6   E-mail: sean@loevy.com
     prossnitz@loevy.com
 7
 8   ON BEHALF OF JOSE JUAN MAYSONET, JR:
     Jennifer Bonjean, Esquire
 9   Bonjean Law Group
     750 Lexington Avenue
10   9th Floor
     New York, New York 10022
11   Telephone No.: (718) 875-1850
     E-mail: info@bonjeanlaw.com
12   (Appeared via videoconference)
13
     AND
14
15   Steven Greenberg, Esquire
     Nicholas Burris, Esquire
16   Greenberg Trial Lawyers
     53 West Jackson Boulevard
17   Suite 1260
     Chicago, Illinois 60604
18   Telephone No.: (312) 879-9500
     E-mail: steve@greenbergcd.com
19   nicholas@greenbergcd.com
     (Appeared via videoconference)
20
21   ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:
     Tim Scahill, Esquire
22   Borkan & Scahill, LTD
     20 South Clark
23   Suite 1700
     Chicago, Illinois 60603
24   Telephone No.: (312) 580-1030
     E-mail: tscahill@borkanscahill.com
25   (Appeared via videoconference)
```

**Page 3**

```
 1   ON BEHALF OF THE DEFENDANTS, EDWARD MINGEY, STEVEN
 2   GAWRYS, LEE EPPLEN, FERNANDO MONTILLA, ROLAND
     PAULNITSKY, RICHARD SCHAK, ROBERT SMITKA AND ERNEST
 3   HALVORSEN:
     Allison Romelfanger, Esquire
 4   The Sotos Law Firm, P.C.
     550 Devon Avenue
 5   Suite 150
     Itasca, Illinois 60143
 6   Telephone No.: (630) 735-3300
     E-mail: aromelfanger@jsotolaw.com
 7   (Appeared via videoconference)
 8
     ON BEHALF OF THE DEFENDANT, CITY OF CHICAGO:
 9   Austin Rahe, Esquire
     Rock Fusco & Connelly, LLC
10   333 West Wacker Drive
     19th Floor
11   Chicago, Illinois 60606
     Telephone No.: (312) 494-1000
12   E-mail: arahe@rfclaw.com
     (Appeared via videoconference)
13
14   ON BEHALF OF THE DEFENDANTS, JENNIFER BOROWITZ, FRANK
     DIFRANCO, JOHN PERKAUS:
15   Michael Iasparro, Esquire
     Hinshaw & Culbertson, LLP
16   151 North Franklin Street
     Suite 2500
17   Chicago, Illinois 60606
     Telephone No.: (815) 490-4945
18   E-mail: miasparro@hinshawlaw.com
     (Appeared via videoconference)
19
20   Also Present: Isabel Smith, Rock Fusco & Connelly, LLC;
     Ashley Cohen, Paralegal for Bonjean Law Group
21
22
23
24
25
```

**Page 4**

```
 1                     INDEX
 2                                                  Page
 3   PROCEEDINGS VOL. II                             6
 4   BY MR. SCAHILL:                                 6
 5   EXAMINATION BY MS. ROMELFANGER                 12
 6   EXAMINATION BY MR. IASPARRO                    21
 7   CROSS-EXAMINATION BY MR. STARR                 23
 8   EXAMINATION BY MS. BONJEAN                     63
 9   REDIRECT EXAMINATION BY MR. SCAHILL            80
10   RECROSS-EXAMINATION BY MR. STARR:              84
11
12                    EXHIBITS
13   Exhibits                                      Page
14   B - Certified Statement of
15       Conviction / Disposition                   73
16   C - Indictment - November 9, 2011              77
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1                    STIPULATION
 2
 3   The VIDEO deposition of EDUARDO RAMIREZ was taken at
 4   PREMIER EXECUTIVE CENTER, 1415 PANTHER LANE, NAPLES,
 5   FLORIDA 34109 on THURSDAY the 20th day of JUNE 2024 at
 6   11:11 a.m. (ET); said deposition was taken pursuant to
 7   the FEDERAL Rules of Civil Procedure. It is agreed that
 8   VICTORIA ADAMS, being a Notary Public and Court Reporter
 9   for the State of FLORIDA, may swear the witness and that
10   the reading and signing of the completed transcript by
11   the witness is not waived.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 6

PROCEEDINGS VOL. II

1             PROCEEDINGS VOL. II
2    THE REPORTER: We are back on the record for the
3    deposition of with Eduardo Ramirez, being conducted
4    by videoconference. My name is Victoria Adams.
5    Today's date is June 20, 2024. The time is
6    currently 3:38 p.m.
7    MR. SCAHILL: All right. Are you okay.
8    Mr. Ramirez?
9    THE WITNESS: Yes, sir.
10    MR. SCAHILL: All right. I am almost done, I
11    promise you. I know there's going to be other
12    attorneys, but we're getting there. And I
13    appreciate your patience and, you know, you have a
14    you have a laid back style now with your backwards
15    baseball cap, so let's get this done.
16    THE WITNESS: Okay. Yeah.
17 BY MR. SCAHILL:
18    Q. Okay. So I want to read -- do you --
19 actually, do you have the declaration still on the
20 table?
21    A. Yes, I do.
22    Q. Okay. Can you -- can you pick that up? We
23 marked it as Exhibit A. If you can pick that up for me.
24 And Paragraph 11, which is on the second page, on the
25 bottom.

Page 7

1    A. Okay, I got it.
2    Q. Okay. It says, "I also learned that they had
3 plans to rob another drug dealer, and then resell the
4 drugs they recovered from that person," right?
5    A. Yes, sir.
6    Q. Okay. When you say, "I also learned," who did
7 you learn that information from?
8    A. Maysonet.
9    Q. Okay. And the "they" in that, when you say,
10 "I also learned that they had plans," who's the "they"
11 referring to?
12    A. Whoever Maysonet was involved with, whoever
13 Maysonet was working with to sell these drugs, that's
14 who he was dealing with in this situation here. Other
15 than that, I don't really know.
16    Q. Okay. Did -- when he -- when Mr. Maysonet
17 described this to you, was he describing that the
18 officers were involved in this, or that he had -- plans
19 with other people to rob another drug dealer?
20    A. The information -- the information came from
21 the officers.
22    MR. STARR: Belated objection to form and
23 foundation. Asked and answered. Go ahead.
24    MS. BONJEAN: And he answered it.
25    MR. STARR: Yeah.

Page 8

1 BY MR. SCAHILL:
2    Q. That -- I'm sorry. That which information
3 came from the officers?
4    A. It came from Officer Guevera and Madroski,
5 whatever his name was.
6    Q. That they --
7    MS. BONJEAN: I'm sorry, did the court reporter
8 -- I'm sorry, did the court reporter get that down?
9    THE REPORTER: Yes.
10    MS. BONJEAN: Okay. Great.
11    MR. SCAHILL: She got everything down.
12    MR. STARR: She's working hard over here.
13 BY MR. SCAHILL:
14    Q. And -- how did he, meaning Mr. Maysonet, like,
15 articulate that to you?
16    MR. STARR: Form. Foundation. Vague.
17    THE WITNESS: How he described that to me, he
18 described that as to the officers left.
19 BY MR. SCAHILL:
20    Q. And just for the record -- this writing on the
21 affidavit, the hand printed as opposed to the
22 typewritten, that is also Mr. Starr's handwriting,
23 right?
24    A. Yes, sir.
25    Q. Okay. You did not hand write that stuff?

Page 9

1    A. No.
2    Q. Okay. All right. I'm done with that for --
3 probably for the remainder of this deposition, so you
4 can put that to the side. I just wanted to very briefly
5 run through your criminal history, not in great detail,
6 but -- and I know we've talked about it a bunch, but you
7 are obviously a convicted felon, correct?
8    A. Yes, sir.
9    Q. All right. And your most recent felony
10 conviction was the one that you did federal time for?
11    A. Yes, sir.
12    Q. And I -- we don't need to get into the facts.
13 You've alluded to it a couple of times, but what was the
14 charge that you were found guilty of committing?
15    A. I believe the government charged me with
16 intent to distribute and -- distribute drugs.
17    Q. All right. And you eventually pled guilty to
18 that?
19    A. Yes, sir.
20    Q. All right. And when were you sentenced?
21    A. When was I sentenced?
22    Q. Correct.
23    A. 2011, I think.
24    Q. All right. And what was the sentence that was
25 imposed?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 10

```
1       A.  I think it was 13 years or -- yeah, 13 years.
2       Q.  And then --
3       A.  13 years, I would say.
4       Q.  All right.  And then I believe you testified
5  that you got out in 2021?
6       A.  Yes, sir.
7       Q.  All right.  And prior -- you have felonies
8  other than that felony conviction as well; is that
9  correct?
10      A.  Yes, sir.
11      Q.  How many other felony convictions, other than
12  your federal conviction, do you have?
13      A.  I really don't remember, but I think there was
14  two or three already.
15      Q.  And what were the nature of the crimes that
16  you were convicted of committing before the federal one?
17      A.  I believe it was intent to deliver and -- and
18  -- the same thing, attempt to deliver.
19      Q.  What type of narcotics were at issue?
20      A.  On both cases, it was heroin.
21      Q.  Is that -- when you were in the drug
22  trafficking business, is that the drug that you would
23  normally deal in, heroin?
24      A.  Not really, but heroin was a major way of
25  doubling up your money, and the opportunity was there to
```

Page 11

```
1  make a lot more money through the heroin dealing.
2       Q.  Have you ever been convicted of any crimes of
3  violence?
4       A.  Any crimes of what?  Violence?
5       Q.  Violence, yeah.
6       A.  I believe I had a couple of, like, domestic
7  violence or something like that with one of my
8  girlfriends.  Other than that -- I was not convicted.  I
9  was charged with it, but never convicted in any other
10  violent cases.
11      Q.  Did you -- I thought I saw somewhere, and we
12  don't have to belabor this point because it was a long
13  time ago, but -- there was a home invasion and a battery
14  charge or something that was -- you got a four year
15  sentence on.  Do you remember that?
16      A.  No, I don't.
17          MR. SCAHILL:  Okay.  Fair enough.
18          Okay.  Well, I think that is all that I have
19  for now.  I know there's going to be some other
20  attorneys that have some questions, hopefully not
21  nearly as long as I went, but I appreciate your
22  patience with all of us.  And I'm going to turn the
23  mic over to, I think, Allison, at this point.
24          THE WITNESS:  Thank you.  You have a good day,
25  sir.
```

Page 12

```
1          MR. SCAHILL:  All right.  Thank you.
2          MS. ROMELFANGER:  Good afternoon, Mr. Ramirez.
3          THE WITNESS:  Good afternoon.
4              EXAMINATION
5  BY MS. ROMELFANGER:
6       Q.  I know you've been here a really long time, so
7  I'm going to try to keep it as short as possible.  Tim
8  covered a lot of questions that I had, so I might skip
9  around a little bit.  That's only because I'm not going
10  to re-go over anything he's already gone over, okay?
11      A.  I can't see you.
12      Q.  Oh, I don't -- can you hear -- can you see me
13  now?
14      A.  I can see you.
15      Q.  Okay.  So I want to ask you about a couple of
16  people, Mr. Ramirez, to see if you know them, okay?  The
17  first one is Fred Rock (phonetic).  Do you know an
18  individual by the name of Fred Rock?
19      A.  No, I don't.
20      Q.  Okay.  The next one is Jondalyn Fields
21  (phonetic).  Do you know an individual by the name of
22  Jondalyn Fields?
23      A.  No, I don't.
24      Q.  Okay.  What about someone with the nickname
25  King?  Do you know an individual with the nickname King?
```

Page 13

```
1          MR. STARR:  Objection.  Form.  Foundation.
2  Calls for speculation.
3          THE WITNESS:  Is there another name connected
4  to King or?
5  BY MS. ROMELFANGER:
6       Q.  What about -- let me see if I can give you
7  something easier.  Do you know an individual with the
8  name Efrain Cruz (phonetic)?
9       A.  Efrain Cruz?  The name sounds familiar, but I
10  can't recall.
11      Q.  Okay.  No worries.  What about an individual
12  with the name Francisco Veras (phonetic)?
13      A.  No.
14      Q.  Okay.  What about someone that goes by the
15  nickname Cisco?
16          MR. STARR:  Objection to form.  Foundation.
17  Calls for speculation.
18          THE WITNESS:  No.  If there -- if there was a
19  face to these -- the names, I might be able to tell
20  you yes and no, no, I don't.  But just giving me a
21  random name like that, it's, like, kind of hard to
22  put --
23  BY MS. ROMELFANGER:
24      Q.  And that's totally -- that's totally fine,
25  Mr. Ramirez.  I'm not asking you to speculate.  I just
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 14

1   want to know, sitting here today, if any of these names
2   sound familiar to you or if you know them, okay?
3        A.   Okay.
4        Q.   Do you know an individual that goes by the
5   nickname Tank?
6        A.   Hm.
7        MR. STARR:  Form.  Foundation.  Calls for
8   speculation.
9        THE WITNESS:  I did -- I did know someone by
10  the name of Tank.
11  BY MS. ROMELFANGER:
12       Q.   Was it --
13       A.   But I can't recall.
14       Q.   Okay.
15       A.   I can't recall --
16       Q.   Was --
17       A.   -- actually who that person is, though.
18       Q.   Okay.  Do you know if Tank was a Latin King
19  back in 1990?
20       MR. STARR:  Form.  Foundation.  Speculation.
21       THE WITNESS:  I would say, yeah.
22  BY MS. ROMELFANGER:
23       Q.   Okay.  Did you know an individual, back in
24  1990, that went by the nickname Peewee?
25       MR. STARR:  Form.  Foundation.  Calls for

Page 15

1   speculation.
2        THE WITNESS:  No.
3   BY MS. ROMELFANGER:
4        Q.   Okay.  And did you know anyone, back in the
5   '80s and '90s, that went by the nickname Macho?
6        MR. STARR:  Form.  Foundation.  Speculation.
7        THE WITNESS:  Yes, I did.
8   BY MS. ROMELFANGER:
9        Q.   Okay.  Do you know Macho's real name?
10       A.   No.
11       Q.   Okay.  Did you know Macho to be a member of
12  the Latin Kings?
13       A.   Yes, I did.
14       Q.   Do you -- do you have any knowledge of what
15  set Macho belonged to in the Latin Kings?
16       A.   Yeah, he was from Leavitt and Schiller.
17       Q.   I'm sorry, I didn't get that, Mr. Ramirez.
18  What was that?
19       A.   Leavitt -- Leavitt and Schiller.
20       MR. STARR:  Belated objection.  Form.
21  Foundation.  Speculation.
22  BY MS. ROMELFANGER:
23       Q.   Do you know if -- do you personally know if
24  Macho held any rank within the Latin Kings?
25       A.   I believe he had some kind of -- he had some

Page 16

1   kind of juice in his set.
2        Q.   Do you know what rank that was?
3        MR. STARR:  Asked and answered.
4        THE WITNESS:  I believe it was -- he was some
5   kind of enforcer or something like that.
6   BY MS. ROMELFANGER:
7        Q.   Okay.  Do you know -- and if you don't know,
8   that's okay.  I'm just asking if you know any of the
9   other individuals that was in Macho's set from the Latin
10  Kings.
11       MR. STARR:  Form.  Foundation.  Speculation.
12       THE WITNESS:  No, I -- no.
13  BY MS. ROMELFANGER:
14       Q.   Okay.
15       A.   Leavitt and Schiller is a set that's been
16  around when actually, the Latin Kings got together in
17  Chicago, so Leavitt and Schiller is, like, a well-known
18  set of Latin Kings.
19       Q.   Okay.  Did Macho ever visit your establishment
20  that you had on Milwaukee and North Avenue?
21       MR. STARR:  Form.  Foundation.  Speculation.
22       THE WITNESS:  I can't remember.
23  BY MS. ROMELFANGER:
24       Q.   Okay.  Did you ever see Macho with Maysonet?
25       MR. STARR:  Form.  Foundation.  Speculation.

Page 17

1   Vague.
2        THE WITNESS:  No, I didn't never see him.
3   BY MS. ROMELFANGER:
4        Q.   And I'm just asking about your
5   recollection.  Do you have any recollection of ever
6   seeing Macho and Alfredo Gonzalez together?
7        MR. STARR:  Form.  Foundation.  Speculation.
8        THE WITNESS:  No, but I knew that they knew
9   each other, but no.
10  BY MS. ROMELFANGER:
11       Q.   Okay.  How did you know that they knew each
12  other?
13       A.   Because they were Latin Kings, and they --
14  Leavitt and Schiller is a well-known area for Latin
15  Kings.  And Macho was the type of guy who would like to
16  go out and drink and party and do his things, so I know
17  that they knew each other.
18       Q.   Okay.  Oh, I forgot to ask you one -- a couple
19  other names.  I apologize, Mr. Ramirez.  Do you know an
20  individual by the name of Mohammad Omar?
21       A.   No.
22       Q.   Okay.  What about anyone that -- went by the
23  nickname Mo?
24       A.   No.
25       Q.   Do you know an individual named Marcos Ramirez

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 18

1  or -- yeah, I'm sorry.  Marcos Ramirez?
2       A.   No.
3       Q.   Do you know anyone by the name Daniel Ramirez?
4       A.   No.
5       Q.   And I think this is the last one about the
6  individuals that you know.  Do you know anyone by the
7  name of Ricardo Rodriguez?
8       A.   No.
9       Q.   Okay.  I know Mr. Scahill asked you a couple
10 questions about this federal case that you had back in
11 2011; you recall those questions?  I'm just asking --
12 I'm trying to orient you to where I'm going to ask you
13 questions next.  So you were federally charged and you
14 talked to Mr. Scahill about those federal charges back
15 in 2011, right?
16      A.   Yes.
17      Q.   Okay.  And you eventually pled guilty to the
18 charges in that case; is that correct?
19      A.   Yes, I did.
20      Q.   Okay.  And as part of your plea of guilty in
21 that case, was it your understanding that you were
22 supposed to give information to the United States'
23 attorneys where they asked you to give information?
24      MR. STARR:  Objection.  Form.  Foundation.
25 Vague.

Page 19

1       THE WITNESS:  I believe, yes.
2  BY MS. ROMELFANGER:
3       Q.   Okay.  At any point in time when you had that
4  understanding with the United States Attorney's office,
5  did you ever tell them about any of the officers that
6  frequented your establishment back in the '80s and '90s?
7       A.   No.
8       Q.   Okay.  Other than your discussions with Mr.
9  Maysonet, was the first time that you told anyone about
10 the information in your declaration when you sat down
11 with Mr. Starr?
12      MR. STARR:  Objection to form.
13      THE WITNESS:  No.
14 BY MS. ROMELFANGER:
15      Q.   Okay.  Who was the first person you told about
16 the information in your declaration, if it was not
17 Mr. Starr?
18      MR. STARR:  Objection.  Asked and answered.
19      THE WITNESS:  I really didn't talk to anybody
20 about it.
21 BY MS. ROMELFANGER:
22      Q.   Okay.  So if you didn't talk to anybody about
23 it, was the first person that you spoke to about what's
24 in that declaration that Mr. Scahill showed you today,
25 was the first person you talked to Mr. Starr?

Page 20

1       MR. STARR:  Form.  Foundation.  Calls for
2  speculation.
3       THE WITNESS:  Yes, it was.
4  BY MS. ROMELFANGER:
5       Q.   Okay.  And I understand that you were asked --
6  you're being asked about people from over 30 years ago
7  today.  Do you have an independent recollection of what
8  those officers' names are?
9       MR. STARR:  Form.  Foundation.
10      THE WITNESS:  I did --
11      MS. BONJEAN:  I'm sorry.
12      THE WITNESS:  I did --
13      MS. BONJEAN:  Objection.  Hold on.  I'm sorry,
14 Mr. Ramirez.
15      THE WITNESS:  I --
16      MS. BONJEAN:  Objection.  Asked and answered.
17 Hold on, sir.  I'm sorry.  Give me one second.
18 Objection.  Asked and answered.  He answered it.  Go
19 ahead.  You can answer again.
20      THE WITNESS:  I believe that people's names and
21 stuff like that, I'm not actually good with pointing
22 out the names or having any knowledge of who is who,
23 unless I see their faces, or I see -- asked directly
24 about that person, if I remember, I'll answer your
25 question, but if I don't, I'll just say, "I don't

Page 21

1  know."
2       MS. ROMELFANGER:  Okay.  I'm just going to
3  check my notes really quick, Mr. Ramirez.  I think I
4  might be done, and I just want to double check
5  really quick.
6       THE WITNESS:  All right.
7       MS. ROMELFANGER:  I told you -- I told you I'd
8  try to keep it quick, so --
9       THE WITNESS:  Okay.
10      MS. ROMELFANGER:  Okay.  That's all I have for
11 you, Mr. Ramirez, I really appreciate your time
12 today.  Thank you so much.
13      THE WITNESS:  Thank you very much.
14      EXAMINATION
15 BY MR. IASPARRO:
16      Q.   Mr. Ramirez, my name is Michael Iasparro.  I
17 represent three former Assistant State's Attorneys in
18 the case brought by Mr. Gonzalez.  And I just have a few
19 questions for you.  I appreciate your time today.
20      A.   Thank you.
21      Q.   Going back to the 1990 time frame, do you --
22 do you have any recollection, as you sit here today,
23 about the Wiley brothers' murder itself?
24      MR. STARR:  Objection.  Asked and answered.
25      THE WITNESS:  No, I don't.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 22

BY MR. IASPARRO:

1  BY MR. IASPARRO:
2       Q.   And as best you can recall today, do you have
3  any knowledge about the investigation conducted by the
4  Chicago Police Department or the Cook County State's
5  Attorney's Office into the Wiley brothers' murder?
6       MR. STARR:  Form.  Foundation.  Speculation.
7       THE WITNESS:  No, I don't.
8       MR. IASPARRO:  That's all I've got.  Thanks.
9       THE WITNESS:  Thank you.
10      MR. RAHE:  I don't have anything.
11      THE REPORTER:  I'm sorry.  Who was that?
12      MR. STARR:  That was Austin Rahe.
13      MR. RAHE:  Austin.
14      MR. STARR:  And that -- is that it from the
15  defendants?  I'm sorry.  I'm not looking at the
16  screen.
17      MS. BONJEAN:  Yes.  That's all from the
18  defendants.
19      MR. STARR:  Okay.  I just want to take a two
20  -- really, really short two-minute break, and then -
21  - and then, I have a couple of questions.
22      MR. SCAHILL:  Two-minute break?  Okay.
23          (OFF THE RECORD)
24      THE REPORTER:  Okay.  We are back on record for
25  the deposition of at Eduardo Ramirez, conducted by

Page 23

1  videoconference.  My name is Victoria Adams.
2  Today's date is June 20, 2024.  The time is 4:04
3  p.m.
4          CROSS-EXAMINATION
5  BY MR. STARR:
6       Q.   Okay.  Good afternoon, Mr. Ramirez.  As I
7  stated previously, my name is Sean Starr, and I
8  represent Alfredo Gonzalez, who's a plaintiff in one of
9  the cases that you're here testifying about.  In the
10  event that you're unable to attend Mr. Gonzalez's trial,
11  there's a chance that we'll be playing this deposition
12  for a jury in that trial.  So I'm going to go over a
13  couple of the same questions you've already been asked.
14  I'm going to try to be brief and succinct, and I can get
15  you out of here as soon as we can.  I -- I'm not asking
16  you to speculate.  I'm asking for what your actual
17  knowledge is, okay, sir?
18      A.   Thank -- yes, sir.
19      Q.   You were asked some questions earlier today
20  about whether myself or any investigator from my firm
21  communicated with you.  I'm going to ask you a few more
22  questions about that.  Do you recall being asked
23  questions about that earlier?
24      A.   Yes, sir.
25      Q.   You spoke to an investigator from my firm by

Page 24

1  the name of Mort; do you remember that?
2       A.   Yes, sir.
3       Q.   Okay.  And Mort called you on the telephone;
4  is that correct?
5       A.   Yes.
6       Q.   And when he called you on the telephone, were
7  you with your sister?
8       A.   Yes.
9       Q.   Okay.  But she wasn't on the phone -- after --
10  she after she answered, she gave the phone to you,
11  correct?
12      A.   Correct.
13      Q.   Okay.  And then Mort explained to you that he
14  worked for an attorney that was representing a man named
15  Alfredo Gonzalez, correct?
16      A.   Yes.  Yes.
17      Q.   Okay.  And you spoke to Mort over the
18  telephone sometime in April of 2024; is that right?
19      A.   Yeah, I believe so, around that time.
20      Q.   Okay.  And then during that conversation, Mort
21  did a three-way call and called me and put me on the
22  phone with you; is that correct?
23      A.   That's correct.
24      Q.   All right.  And do you have a precise memory
25  about every single thing we talked about?

Page 25

1       A.   No, I don't.
2       Q.   Okay.
3       MS. ROMELFANGER:  Objection.
4  BY MR. STARR:
5       Q.   I asked you some questions, correct?
6       A.   Yes, sir.
7       Q.   And you gave me some answers, right?
8       A.   Yes, sir.
9       Q.   I asked you if you ever went by the nickname
10  Yuma.  Do you remember me asking you that?
11      A.   Yes, sir.
12      Q.   I asked you if you remembered a man by the
13  name of Jose Maysonet.  Do you remember that?
14      A.   Yes, sir.
15      Q.   I asked -- I explained to you that there was a
16  -- that a man named Jose Maysonet had testified about
17  someone named Yuma in a -- in a different, unrelated
18  case.  Do you remember that?
19      A.   Yes.
20      Q.   Okay.  So then, I asked you whether or not you
21  ever owned or operated an establishment on North Avenue.
22  Do you remember that?
23      A.   Yes, I did.
24      Q.   And you told me you did, correct?
25      A.   Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**Page 26**

1       MR. SCAHILL:  Objection.  Leading.
2   BY MR. STARR:
3       Q.   And then I asked you if you knew or ever knew
4   a former Chicago Police detective by the name of Rey
5   Guevara, correct?
6       A.   Yes.
7       MR. SCAHILL:  Objection.  Leading.
8       THE WITNESS:  Yeah.
9   BY MR. STARR:
10      Q.   And you indicated that you did know him,
11  correct?
12      A.   Yes, I did.
13      Q.   And then I asked you if you recalled any time
14  when Mr. Guevara and Mr. Maysonet were together in your
15  establishment in the late 1980s; is that correct?
16      MR. SCAHILL:  Objection.  Leading.
17      MS. ROMELFANGER:  Objection to form.
18  BY MR. STARR:
19      Q.   And then you indicated to me you would rather
20  speak with me in person than over the phone, correct?
21      A.   That's correct.
22      MR. SCAHILL:  Objection.  Leading.
23  BY MR. STARR:
24      Q.   Okay.  And on April 25th, I traveled to
25  Florida and met you at a location that you selected,

**Page 27**

1   correct?
2       A.   That's correct.
3       Q.   And where was that location?
4       A.   That was on Chili's on Immokalee Road --
5   Immokalee Boulevard.
6       Q.   It was a Chili's on Immokalee Boulevard?
7       A.   Yes.
8       Q.   Okay.  And that's in Naples, right?
9       A.   Naples, Florida.
10      Q.   And do you remember how long we met for?
11      A.   Maybe 45 minutes, an hour.
12      Q.   And do you recall what I asked you about?
13      A.   Yes, I do.
14      Q.   And generally speaking, what did I ask you
15  about?
16      A.   You asked me about individuals, you know,
17  according to this affidavit I signed about Jose
18  Maysonet, Guevara, and Gonzalez, and these individuals,
19  Madroski, these individuals.
20      Q.   Okay.
21      A.   And this is what I told you is all written
22  down.
23      Q.   Right.  And do you recall that I asked you
24  questions prior to showing you this affidavit?  This
25  declaration?

**Page 28**

1       A.   Yeah.
2       MS. ROMELFANGER:  Objection.  Form.
3       THE WITNESS:  Yeah.
4   BY MR. STARR:
5       Q.   Okay.  And do you recall some of the questions
6   I asked you before I showed you the declarations were
7   about the people you just listed, correct?
8       A.   Yes.
9       MR. SCAHILL:  Objection.  Leading.
10  BY MR. STARR:
11      Q.   Do you recall what you told me what you knew
12  about Detective Guevara, Jose Maysonet, and Joseph
13  Miedzianowski?
14      MS. ROMELFANGER:  Objection.  Form.
15      THE WITNESS:  I do recall where I stated that I
16      knew that Maysonet had dealings with Guevara, and
17      these meetings went as far as talking about drug
18      sales, paying off these individuals, and actually
19      involved in some kind of robbery.
20  BY MR. STARR:
21      Q.   Okay.  And earlier in the deposition, when you
22  were testifying about an officer who you thought was
23  named Echevarria, did you mean Guevara when you answered
24  the question?
25      MS. ROMELFANGER:  Objection --

**Page 29**

1       THE WITNESS:  -- say that.
2   BY MR. STARR:
3       Q.   Do you remember telling me that Detective
4   Guevara came into your establishment a handful of times?
5       A.   Well, I -- at first, I stated when they asked
6   me a little while ago, was that the first time and I
7   started thinking about recalling that he had been there
8   several times.
9       Q.   But my -- just listen to my question.  Try to
10  answer my question.  I'm not asking about what anybody
11  asked --
12      A.   Okay.
13      Q.   -- else asked at this point.  Do you remember
14  telling me that he came into your restaurant on a
15  handful of times?
16      A.   Yes, sir.
17      Q.   Okay.
18      MS. ROMELFANGER:  Form.
19  BY MR. STARR:
20      Q.   And do you remember telling me that some of
21  the times he was with another officer by the name of
22  Joseph Miedzianowski?
23      A.   Yes, sir.
24      MS. ROMELFANGER:  Objection.  Form.
25  BY MR. STARR:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 30

1    Q.   And do you remember telling me other times he
2  came in with another officer you didn't know the name
3  of?
4    A.   Yes, sir.
5         MR. SCAHILL:  Objection.
6         MS. ROMELFANGER:  Objection.  Form.
7  BY MR. STARR:
8    Q.   And you said you also told me that you knew
9  Jose Maysonet from the neighborhood, correct?
10   A.   Yes, I did.
11        MS. ROMELFANGER:  Form.
12 BY MR. STARR:
13   Q.   And during our first meeting at that Chili's
14 on April 25th, did you tell me everything that you could
15 recall about the time that Jose Maysonet met with
16 Detective Guevara and another police officer named
17 Joseph Miedzianowski at your establishment?
18   A.   Yes, I did.
19        MR. STARR:  Okay.
20        MR. RAHE:  Objection to form to that question.
21 BY MR. STARR:
22   Q.   And then I showed you a declaration that I had
23 typed up in advance of our meeting, correct?
24   A.   Yes, you did.
25   Q.   And we've looked at that declaration in this

Page 31

1  deposition a couple of different times, right?
2    A.   Yes, sir.
3    Q.   Okay.  That's Exhibit A, correct?
4    A.   Yes.
5    Q.   Okay.  When I gave you this statement or --
6  strike that.
7         When I gave you this declaration, I asked you
8  to read it over, correct?
9         MR. SCAHILL:  Objection.
10        THE WITNESS:  Yes, I did.
11 BY MR. STARR:
12   Q.   And did you read it over fully?
13   A.   Yes, I did.
14   Q.   Okay.  And did you have any -- and did you
15 take any issue with any of the information that was
16 contained in this declaration?
17        MS. ROMELFANGER:  Objection to form.
18        THE WITNESS:  Yes.
19 BY MR. STARR:
20   Q.   Okay.  And did I allow you to make changes?
21   A.   Yes, you did.
22   Q.   And did you in fact make changes?
23   A.   I certainly did.
24   Q.   And did I ask you to initial those changes so
25 that it was clear that you were the one making the

Page 32

1  changes?
2    A.   Yes, I was.
3    Q.   Okay.  So let's take a look at this.  Do you
4  have this in front of you, sir?
5    A.   Yes, I do.
6    Q.   Okay.  Take a look at it.  Is a -- there's
7  three pages, correct?
8    A.   Yes, sir.
9    Q.   And we -- and it is -- it's -- on the bottom,
10 it says Page 1 of 3, Page 2 of 3, and Page 3 of 3,
11 right?
12   A.   Yeah.  You got it.
13   Q.   Okay.  Take a look at Page 3 of 3.
14   A.   3 of 3.
15   Q.   See at the bottom Page 3 of 3?  The last page?
16   A.   Yeah.
17   Q.   Is that your signature there, sir?
18   A.   Yes, it is.
19   Q.   Did you -- did you sign that in my presence on
20 the date that it says 4-25-24?
21   A.   Yes, I did.
22   Q.   Okay.  And when you looked over this
23 declaration on the 25th of April, did it truly and
24 accurately reflect what you recalled about this
25 incident?

Page 33

1    A.   Certainly.
2         MS. ROMELFANGER:  Objection.  Form.
3  BY MR. STARR:
4    Q.   And you understood that when you signed the
5  statement, you were making a statement that was sworn
6  under oath, correct?
7    A.   Yes, I did.
8    Q.   And you understood that you -- by signing this
9  under oath, you were you were making a sworn statement
10 of the truth of the matter that was in -- contained in
11 this -- in this declaration, correct?
12   A.   Everything that was written there, I agreed
13 that, and I signed it, and I know to be true.
14   Q.   So let's go back to Page 1.
15   A.   Okay.
16   Q.   I want to give you an opportunity to make sure
17 that -- I want to make sure that this documented
18 declaration is correct.  The first paragraph reads, "My
19 name is Eduardo Ramirez.  Some people call me" -- and
20 Juma is crossed out and Yuma is written in; is that --
21 is that the correct --
22   A.   Yes.
23   Q.   Okay.  Is that statement correct?
24   A.   Yes.
25   Q.   And did you make that change from Juma to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Page 34

1  Yuma?
2     A.  Yes.
3     Q.  Okay.  Paragraph 2 says, "I currently live in
4  Naples, Florida"; is that correct?
5     A.  Yes, I do.
6     Q.  Okay.  Did you tell my investigator, Mort,
7  when you spoke to him on the phone that you lived in
8  Naples, Florida?
9     A.  I don't remember him -- me telling him that,
10 but that's what it was.
11    Q.  But that's accurate, correct?
12    A.  That's accurate.
13       MR. STARR:  Okay.  Paragraph number 3 reads,
14    "In 1990, I operated an establishment located on
15    North Avenue in the Humboldt Park" -- and then
16    there's -- underneath it says, "Wicker Park
17    Neighborhood of Chicago Illinois"; did I read that
18    correctly?
19       THE WITNESS:  Yes, sir.
20       MS. ROMELFANGER:  Objection.  Form.
21       MR. STARR:      I asked him if I read it
22    correctly. Is the objection to the form of that
23    question?
24       THE WITNESS:  Yes, I did.
25 BY MR. STARR:

Page 35

1     Q.  Okay.  Did I read that correctly, sir?
2     A.  Yes.
3     Q.  Okay.  And is that is that true?
4     A.  That's true.
5     Q.  And did you make the addition of Wicker Park
6  because you thought the restaurant -- or the
7  establishment was located in Wicker Park and not
8  Humboldt Park?
9     A.  Yes.
10    Q.  Did we talk about how it was located on the
11 border of two different neighborhoods, and you weren't
12 sure which neighborhood it was?
13    A.  Yes, I was.
14    Q.  Okay.  And those are your initials, correct?
15    A.  Yes, it is.
16    Q.  Okay.  And it says in 1990, you operated this
17 establishment.  Is it correct that you operated
18 establishment in -- also in 1998?  I'm sorry, strike
19 that.  Is it also correct that you operated this
20 establishment in 1989?
21       MR. SCAHILL:  Objection.
22       MS. ROMELFANGER:  Objection to form.
23       THE WITNESS:  Yes.
24 BY MR. STARR:
25    Q.  Okay.  And then the next paragraph, Paragraph

Page 36

1  number 4, reads, "In 1990, I was familiar with a person
2  by the name of Jose Juan Maysonet.  Juan Maysonet would
3  spend time at my establishment on North Avenue"; did I
4  read that correctly?
5     A.  Yes, you did.
6     Q.  Is Paragraph number 4 truthful and correct?
7     A.  Yes, it is.
8       MS. ROMELFANGER:  Objection.  Form.
9  BY MR. STARR:
10    Q.  And you told me that was truthful and correct
11 when I met with you in April of 2024, correct?
12    A.  Correct.
13       MS. ROMELFANGER:  Objection to form.
14 BY MR. STARR:
15    Q.  Paragraph number 5 reads, "In 1990, I was also
16 familiar with a Chicago Police Department officer by the
17 name of Rey Guevara.  Rey Guevara would also spend time
18 at my establishment on North Avenue"; did I read that
19 correctly?
20    A.  Yes, you did.
21    Q.  Is that true and accurate?
22       MS. ROMELFANGER:  Objection to form.
23       THE WITNESS:  True.
24 BY MR. STARR:
25    Q.  Okay.  And what is your recollection of how

Page 37

1  many times, approximately, Detective Guevara came into
2  your establishment?
3     A.  That's correct.
4     Q.  And my question is, how many times do you
5  think he came in?
6     A.  Well, I believe that before that time he had
7  come in just several times.  It wasn't like a normal
8  situation where he would come in and have beers there or
9  something.  He would just come in, check around, and see
10 what he had to do and leave.
11    Q.  So he'd come into your establishment before
12 this occasion where he was with Mr. Maysonet, correct?
13    A.  Yes.
14    Q.  And on --
15       MS. ROMELFANGER:  Form.
16 BY MR. STARR:
17    Q.  -- those other occasions, he came in with
18 either Officer Miedzianowski or another officer you
19 didn't know the name of, correct?
20    A.  Yes, correct.
21       MS. ROMELFANGER:  Objection.  Form.
22 BY MR. STARR:
23    Q.  Okay.  Could you please turn to Page 2 of 3?
24    A.  Got it.
25    Q.  And sir, do you see Paragraph number 6 reads

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 38

```
 1   as follows, "Rey Guevara would often be accompanied by
 2   another Chicago Police officer when he would come to my
 3   establishment on North Avenue.  That officer was named
 4   Joe Miedzianowski."  And then there's a handwritten
 5   addition that reads, "He would also come in with another
 6   officer who I do not know the name of.  He was a white
 7   male."  And then there's your initial; is that correct?
 8       A.   That's correct.
 9       Q.   Okay.  Did I read that correctly?
10       A.   Yes.
11       Q.   And did you tell me that when I came and met
12   you in April of 2024?
13       A.   Yes.
14       Q.   And is this true and accurate, this statement,
15   paragraph 6?
16       A.   True.
17           MS. ROMELFANGER:  Form.
18   BY MR. STARR:
19       Q.   Okay.  Taking a look at Paragraph 7, it reads,
20   "Rey Guevara and Joe Miedzianowski were well-known
21   Chicago Police Officers in the Humboldt Park Community
22   where my establishment was located"; did I read that
23   correctly?
24       A.   Correct.
25       Q.   And did you tell me that when I met you on
```

Page 39

```
 1   April 25th of 2024?
 2       A.   Yes.
 3       Q.   Okay.  And is this true and accurate?
 4       A.   Accurate.
 5           MS. ROMELFANGER:  Objection.  Form.
 6   BY MR. STARR:
 7       Q.   Paragraph number 8 reads, "On one occasion" --
 8   and that -- there's some stuff crossed out.  "On one
 9   occasion, Juan Maysonet, Guevara, and Miedzianowski all
10   met in my establishment"; did I read that correctly?
11       A.   That was correct.
12       Q.   And originally the typed version of it read,
13   "On one occasion, I introduced Juan Maysonet to Guevara
14   and Miedzianowski"; isn't that right?
15       A.   That was right.
16       Q.   But you asked me to make a change there; is
17   that correct?
18       A.   That's correct.
19       Q.   And I made the change you asked for, correct?
20       A.   Yes, sir.
21       Q.   And you signed your initials to indicate that
22   you agreed with that change, correct?
23       A.   Correct.
24       Q.   Okay.  And is this statement true and
25   accurate?
```

Page 40

```
 1           MS. ROMELFANGER:  Objection to form.
 2           THE WITNESS:  It is true.
 3   BY MR. STARR:
 4       Q.   Okay.  Paragraph number 9 reads, "Shortly
 5   after I introduced them, I became aware that Juan
 6   Maysonet had entered into a financial relationship with
 7   Guevara and Miedzianowski"; did I read that correctly?
 8       A.   Correct.
 9       Q.   And sir, is that, Paragraph 9, did you tell me
10   that on April 25, 2024?
11       A.   Yes, I did.
12       Q.   And is that statement, Paragraph number 9,
13   true and accurate?
14       A.   Yes.
15           MS. ROMELFANGER:  Objection to form.
16   BY MR. STARR:
17       Q.   Okay.  Paragraph number 10 reads, "My
18   understanding of that financial relationship was that
19   Guevara and Miedzianowski would allow Juan Maysonet to
20   sell drugs without police interference.  In exchange --
21   and in exchange, Juan Maysonet would pay Guevara and
22   Miedzianowski cash.  Essentially, Maysonet made monetary
23   payments to Guevara and Miedzianowski in exchange for
24   protection for Maysonet's drug sales"; did I read that
25   correctly, sir?
```

Page 41

```
 1       A.   Correct.
 2       Q.   And on April 25, 2024, when I met you at that
 3   Chili's restaurant, did you tell me that, sir?
 4       A.   Yes, I did.
 5       Q.   And is that true and accurate?  That paragraph
 6   number 10, is that true and accurate, sir?
 7       A.   It's true.
 8           MR. SCAHILL:  Objection.  Form --
 9           MS. ROMELFANGER:  Objection.
10           MR. SCAHILL:  -- foundation, and leading.  And
11   mischaracterizes wildly his prior testimony.
12   BY MR. STARR:
13       Q.   The last Paragraph --
14           MS. BONJEAN:  -- object to the speaking
15   objection.  Stop with the speaking objections.
16           MR. SCAHILL:  It was a form objection.  What
17   are you talking about?
18           MR. STARR:  Yeah.  Think you editorialized your
19   form objection there.
20           MR. SCAHILL:  Oh, okay.
21   BY MR. STARR:
22       Q.   Moving on.  And then finally Paragraph 11, you
23   see Paragraph 11 there, sir?
24       A.   Yes.
25       Q.   And that's -- it's a handwritten paragraph
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE   ORLANDO, FL 32801
            JACKSONVILLE, FL 32256
            TAMPA, FL 33602

407.423.9900   www.MILESTONEREPORTING.com   Toll Free 855-MYDEPOS

Page 42

1  that did not exist in this document when I came and met
2  you on April 25, 2024 originally, correct?
3      A.  Correct.
4      Q.  Okay.  I'm going to read it to you.  Paragraph
5  number 11, "I also learned that they had plans to rob
6  another drug dealer and then resell the drugs they
7  recovered from that person"; did I read that correctly?
8      A.  Correct.
9      Q.  And did you initial that because that was a
10 addition that you wanted me to include in this affidavit
11 or this declaration?
12     A.  Yes, sir.
13     Q.  Okay.  And is that true and accurate, sir?
14     A.  True.
15         MS. ROMELFANGER:  Objection.
16         MR. SCAHILL:  Objection.  Form, foundation,
17     mischaracterizes.
18 BY MR. STARR:
19     Q.  Finally, to the last page, sir.  There's four
20 more paragraphs here, and you can see that I hand wrote
21 the numbers in.  In the event that you wanted to add
22 anything, I wanted to leave room for you to do that; do
23 you see that, sir?
24     A.  Yes, you did.
25         MS. ROMELFANGER:  Objection to form.

Page 43

1  BY MR. STARR:
2      Q.  All right.  Paragraph number 12 reads, "The
3  declaration is true and accurate to the best of my
4  knowledge and recollection"; did I read that correctly?
5      A.  Correct.
6      Q.  And then we had you -- I had you initial that
7  because I wrote the number 12 in there; do you see that?
8      A.  I see it.
9      Q.  And in -- on April 25, 2024, I had -- I had
10 you read this line, correct?
11     A.  Correct.
12     Q.  And you agree with this line was accurate,
13 correct?
14     A.  Yes, sir.
15         MS. ROMELFANGER:  Objection.  Form.
16 BY MR. STARR:
17     Q.  Paragraph number 13 reads -- again, a
18 handwritten number.  The numeral is handwritten.  "I am
19 giving this declaration of my own free will.  No
20 promises were made to me in exchange to this affidavit."
21 Sir, did I have you read that on April 25, 2024?
22     A.  Yes, you did.
23     Q.  And did you initial it because we added the
24 number 13?
25     A.  Yes, you did.

Page 44

1      Q.  And sir, did you -- did I ask you if this was
2  true and accurate?
3      A.  Yes, you did.
4      Q.  And as we sit here today, is this -- is
5  paragraph 12 and paragraph 13 --
6      A.  Yeah.  Hold on.
7      Q.  Let me ask that again.
8      A.  All right.
9      Q.  Do you need to take that?  Do you need to take
10 a break?
11     A.  No.  No.
12     Q.  Okay.  And as we sit here today, are
13 Paragraphs 12 and Paragraphs 13 true and accurate?
14         MS. ROMELFANGER:  Objection to form.
15         MR. SCAHILL:  Go ahead.
16         MR. STARR:  Did you get his answer?
17         THE WITNESS:  Huh?
18         MR. STARR:  Did you?  Okay.
19         THE WITNESS:  Yeah.
20 BY MR. STARR:
21     Q.  Paragraph number 14, again, the numeral is
22 handwritten.  14, "This statement is totally voluntary.
23 The person who spoke to me" -- do you want to me to turn
24 the -- if you -- if you need to take a call, we can take
25 a break.

Page 45

1      A.  Yeah.  No -- no.  It's Charles Davenport.
2      Q.  Right.  Okay.  I just read you Paragraph 14,
3  correct?
4      A.  14, yeah.
5      Q.  And did I read it correctly?
6      A.  Yes.
7      Q.  Okay.
8      A.  Correct.
9      Q.  And when I met with you in April 25, 2024, did
10 I have you read this sentence?
11     A.  Yes, you did.
12     Q.  And did you -- did you agree that this
13 sentence was true and correct?
14     A.  True.
15         MS. ROMELFANGER:  Objection.  Form.
16 BY MR. STARR:
17     Q.  Paragraph number 15.  Again, I wrote the
18 number in because there was not a number there, and you
19 initialed it, correct?
20     A.  Correct.
21     Q.  Okay.  And it reads, "I understand that the
22 statements in this declaration are given under penalty
23 of perjury pursuant to 28 USC Section 1746.  I declare
24 under penalty of perjury that the foregoing is true and
25 correct"; did I read that accurately, sir?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 46

1     A.  Accurate.
2     Q.  And on April 25, 2024, did I have you read
3  that statement?
4     A.  Yes, you did.
5     Q.  And did you read it when I had you read it?
6     A.  I understood it and read it.
7     Q.  And did you tell me that it was accurate, sir?
8     A.  Accurate.
9        MS. ROMELFANGER:  Objection to form.
10  BY MR. STARR:
11    Q.  Okay.  Is there anything in this declaration,
12  as you sit here today, that you would like to change
13  that you think is not correct?
14       MS. ROMELFANGER:  Objection to form.
15       MR. SCAHILL:  Form of the question.
16       THE WITNESS:  No, not really.
17  BY MR. STARR:
18    Q.  Okay.  I want to give you the opportunity.  If
19  there's something that I misconstrued or misunderstood
20  that you told me, I'd like you -- to give you an
21  opportunity to change it.  Is there anything that you
22  want to change about this affidavit today, sir?
23    A.  No, there isn't.
24    Q.  Is this declaration that you signed on April
25  25, 2024, is it -- is it entirely true and accurate?

Page 47

1        MS. ROMELFANGER:  Objection of form.
2        THE WITNESS:  Very true.
3  BY MR. STARR:
4     Q.  Okay.  Did I pressure you at all to sign this
5  declaration, sir?
6     A.  Not at all.
7     Q.  Did I promise you anything in exchange for
8  signing this declaration, sir?
9     A.  To go to the strip club afterwards.
10    Q.  I didn't -- please.  You have to take this
11  seriously.
12    A.  No.
13    Q.  I -- we didn't -- we didn't never discuss a
14  strip club --
15    A.  No.
16       MR. STARR:  -- did we?
17       THE WITNESS:  No, not at all.
18  BY MR. STARR:
19    Q.  Okay.
20    A.  We didn't.
21    Q.  I don't -- I don't want to, you know -- I
22  don't want to get my -- I don't want to get a bad name,
23  so --
24    A.  Okay.
25    Q.  Did I -- did I -- did I promise you anything

Page 48

1  in exchange for this declaration, sir?
2     A.  Not at all.
3     Q.  All right.  And you -- so you repeatedly
4  testified earlier today that I told you to tell the
5  truth.  Do you remember me telling you to tell the
6  truth?
7     A.  That's the main thing you told me about.
8  Whatever you could remember, make sure that it's
9  something that you're aware of and telling the truth is
10  very important in this case here.
11    Q.  Okay.  And I know you were asked a little bit
12  about yourself earlier, but I want to just ask a couple
13  more questions.  So you were born in 1958; is that
14  correct, sir?
15    A.  '59.
16    Q.  '59.  Okay.  So in 1989, you would've been
17  approximately how old?
18    A.  '59, '69, '79 -- 30-years-old.
19    Q.  Okay.  Okay.  And where were you living?  Do
20  you know for a fact where you were living in 1988 or --
21  so let me ask it -- we'll break it apart.  Do you know
22  for a fact what your address was in 1988?
23    A.  (No verbal response.)
24    Q.  Do you believe you lived on Drummond at that
25  time, given your previous testimony?

Page 49

1        MS. ROMELFANGER:  Objection to form.
2        THE WITNESS:  Yes.
3  BY MR. STARR:
4     Q.  And do you know your address that you were
5  living at in 1989?
6     A.  It was 3435 West Drummond.
7     Q.  Okay.  And did you have employment in 1989?
8     A.  I believe so.
9     Q.  And what was your employment in 1988 -- or
10  sorry, in 1989?
11    A.  I believe I owned a restaurant.  I'm not too
12  sure of the time period.
13    Q.  Yeah.  You indicated, I think, earlier today
14  that you thought you had a two establishments in that
15  period of time; is that correct?
16    A.  Correct.
17    Q.  Okay.  And one of them was called Cafe Cuba or
18  something like that; is that right?
19    A.  Little -- Little Havana.
20    Q.  Little Havana.  I apologize.
21    A.  Yeah.
22    Q.  Okay.  And the other one was the one that was
23  at issue that we've talked about extensively today that
24  was on North Avenue.
25    A.  Yeah.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 50

1  Q.  And that was -- I'm going to bring --
2  A.  Farandula.
3  Q.  Farandula.  Okay.  And that was a restaurant
4  that was primarily a bar, correct?
5  A.  It was a bar, not a restaurant.
6  Q.  Okay.  I understand that.  You did testify
7  that there was a kitchen, correct?  In the back?
8  A.  Yes.
9  Q.  Okay.  But it was a kitchen that was mostly
10  used by the staff and yourself, correct?
11  A.  Yes, sir.
12  Q.  Okay.  Did you ever have any other people that
13  you were friends with or associated with at -- back in
14  that kitchen?
15  A.  No.
16  Q.  Okay.  Would you have remembered if you had?
17  MS. ROMELFANGER:  Objection of form.
18  THE WITNESS:  I wouldn't remember, but it was
19  not important to me.
20  BY MR. STARR:
21  Q.  Okay.  You don't have a specific memory of
22  whether or not you had people in the back kitchen,
23  correct?
24  A.  No -- no -- no, not at all.
25  Q.  Okay.  Do you remember when I asked you about

Page 51

1  whether or not you knew my client Alfredo Gonzalez?
2  A.  Yes.
3  Q.  And initially, you weren't sure about the name
4  Alfredo Gonzalez, correct?
5  A.  That's correct.
6  Q.  But you recall the name Lluvia, correct?
7  A.  Very well.
8  Q.  Okay.  And do you remember telling me that it
9  was a -- you thought it was a unique nickname?
10  A.  Yes.
11  MS. ROMELFANGER:  Objection.  Form.
12  BY MR. STARR:
13  Q.  And that you were aware of him at some point
14  in the late '80s because of that nickname, correct?
15  A.  Yes.
16  MS. ROMELFANGER:  Objection.  Form.
17  BY MR. STARR:
18  Q.  And you said earlier that you had another
19  nickname besides Yuma.  That was Fast Eddie; is that
20  correct?
21  A.  Yes, sir.
22  Q.  Okay.  Did people know you as Fast Eddie?
23  A.  I believe so.
24  Q.  Okay.  And if my client know knew you as Fast
25  Eddie, would you have any way of differentiating between

Page 52

1  your two different -- strike that.  Do you have any way
2  of differentiating between whether or not my client knew
3  you as Fast Eddie or as Yuma?
4  MR. SCAHILL:  Objection.  Foundation.
5  THE WITNESS:  I don't know what time period
6  we're talking about.
7  BY MR. STARR:
8  Q.  The late '80s.
9  A.  I would say Yuma.
10  Q.  You're just making -- is that a guess?
11  A.  I'm not guessing.  I'm trying to think back
12  and give you the correct answer.
13  Q.  Okay.  It's been 30 years, correct?
14  A.  Yeah.  Yeah.
15  Q.  More than 30 years, correct?
16  A.  More than 30 years.
17  Q.  Okay.  So you're not sure if he knew you as
18  Yuma, Fast Eddie, or if he knew you at all, correct?
19  A.  No, he knew --
20  MS. ROMELFANGER:  Objection to form.
21  BY MR. STARR:
22  Q.  Okay.  But you're not sure what nickname he
23  knew you by, correct?
24  A.  Correct.
25  Q.  Okay.  And do you have an actual -- do you

Page 53

1  know what an independent recollection means, sir?
2  A.  Yes.
3  Q.  What is your definition of independent
4  recollection?
5  A.  Something that you're aware of and something
6  you are willing to remember and be actually fact.
7  Q.  Okay.  So just -- let me just define a little
8  more specifically than that.  So when I use the term
9  independent recollection, I'm talking about an actual
10  physical memory that you have without referencing,
11  reading it in a document, or hearing it from someone
12  else, okay?
13  A.  Yes, sir.
14  Q.  Do you remember telling me, when I asked you
15  about your independent recollection of my client,
16  telling me that you remember meeting him in IDOC?
17  MS. ROMELFANGER:  Objection to form.
18  THE WITNESS:  Yeah.
19  BY MR. STARR:
20  Q.  Okay.  And so if you -- if you remembered
21  meeting him in IDOC, is it possible that's the first
22  time you actually met my client?
23  A.  No.  I met him before.
24  MS. ROMELFANGER:  Objection to form.
25  BY MR. STARR:

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Page 54

1    Q.   Okay.  And do you have an -- a -- a
2  independent recollection as to specifically when you met
3  my client prior to meeting with IDOC?
4    A.   Not really.
5    Q.   Okay.  Can you tell me generally when it was?
6    A.   I can't.
7    Q.   Okay.  Can you tell me generally where it was?
8    A.   I can't -- I can't remember.
9    Q.   Okay.
10   A.   But it was in the street somewhere.
11   Q.   In the street somewhere.  Okay.  And I think
12 you testified you thought that he came into your
13 restaurant; is that correct?
14   A.   I knew he would come into the bar.  The
15 restaurant, I don't believe he came into.
16   Q.   Okay.  So you have -- you have -- do you have
17 an independent recollection of him actually coming into
18 your bar?
19   A.   I would say so.
20   Q.   Well, I'm not asking you to speculate.  I'm
21 asking if you have an actual independent recollection.
22        MR. SCAHILL:  Objection to the form of the
23   question.  Asked and answered.
24        THE WITNESS:  Well, I know --
25        MS. ROMELFANGER:  Objection to form.

Page 55

1        THE WITNESS:  -- that he had gone there before
2   then.
3  BY MR. STARR:
4    Q.   Okay.  Do you know when that was?
5    A.   No, I don't.
6    Q.   Okay.  Do you remember anything else about
7  seeing him at the restaurant other than that you saw
8  there at some point in time -- or at the at the bar --
9    A.   No.
10   Q.   -- at some point in time?  Okay.  You were
11 asked some questions about Gossens; do you remember
12 those questions?
13   A.   Yes, I do.
14   Q.   And you said that you met Christopher Gossens
15 when he was in prison, correct?  At some point?
16   A.   Well, I met him.  I knew him from the streets.
17 He was very close.  We had a very close relationship.
18   Q.   Right.  But you were -- you testified to a
19 recollection of talking to him in prison, correct?
20   A.   Yes, sir.
21   Q.   And he told you that he was in prison for
22 something he didn't do?
23        MR. SCAHILL:  Objection.  Leading and
24   mischaracterizes.
25 BY MR. STARR:

Page 56

1    Q.   And do you know what year that was, sir?
2    A.   I really don't remember.
3    Q.   And so is it your testimony that the murder
4  that Christopher Gossens was convicted of was a murder
5  that he claims he was innocent of?
6    A.   Yes, sir.
7    Q.   Okay.  And that's the murder you're talking
8  about, right?
9    A.   Yeah.
10   Q.   The one he was convicted on?
11   A.   Yes, sir.
12        MS. ROMELFANGER:  Objection.  Form.
13 BY MR. STARR:
14   Q.   And do you -- you were asked some questions
15 about being arrested in 1990; do you remember those
16 questions?
17   A.   Yes, I do remember.
18   Q.   Okay.  Do you recall being arrested in -- on
19 July 3, 1990?
20   A.   Yes, I do remember.
21   Q.   Is that the arrest that you were previously
22 talking about when you testified about being arrested in
23 1990?
24   A.   Yes, sir.
25   Q.   Okay.  And do you recall being bonded out on

Page 57

1  that arrest on July 10th -- I'm sorry.  Yes.  July 20,
2  1990?
3    A.   Yes, I remember.
4    Q.   Okay.  And so you were in -- you were in
5  police custody -- or in custody for less than three
6  weeks after that arrest, correct?
7    A.   Yes, sir.
8    Q.   Okay.  You testified earlier that Detective
9  Guevara had a -- was well known.  Is that -- back in
10 1989, 1990; is that correct?
11   A.   Yes, sir.
12   Q.   How was he known?
13   A.   He was --
14        MR. SCAHILL:  Objection.  Foundation.
15        THE WITNESS:  -- being a cop that would shake
16   down people, would actually even put drugs in the
17   person's car or something like that, or he was
18   looking for guns.  So if you gave him a gun and he
19   would look the other way, do whatever he needed to
20   do to clear himself and to get his arrest in order.
21 BY MR. STARR:
22   Q.   How do you know he was looking for guns?
23   A.   Because that's actually what he was actually
24 all the time was looking for.  I don't know if he got
25 time off for getting guns or something like that, but

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 58

1  actually his main thing was looking for guns.
2      Q.  Did he tell you that he was looking for guns
3  from people on the streets?
4      A.  No.  He didn't tell me, but the people he
5  would shake down would tell me this.
6      Q.  Okay.  And in all those times that Detective
7  Guevara came into your restaurant -- or strike that.  All
8  those times that Detective Guevara came into your bar
9  establishment, you didn't talk to him on any of those
10 occasions?
11     A.  No.
12     Q.  Would you recall today, as you sit here 30
13 years later, whether or not you had a conversation with
14 him?
15         MS. ROMELFANGER:  Objection.  Form.
16         THE WITNESS:  No conversations.  No.
17 BY MR. STARR:
18     Q.  But my question is, do you -- do you believe
19 that you could recall whether or not you had a
20 conversation 30 years ago with Detective Guevara?
21         MS. ROMELFANGER:  Objection.  Form.
22         MR. SCAHILL:  Objection.  Form of the question.
23         THE WITNESS:  No.
24 BY MR. STARR:
25     Q.  Okay.  And sir, in your own words, can you

Page 59

1  tell me what you recall about this interaction between
2  Jose Maysonet, Detective Guevara, and Joseph
3  Miedzianowski that happened at the bar that you
4  operated?
5         MS. ROMELFANGER:  Objection.  Form.  Asked and
6      answered.
7         THE WITNESS:  Well, what I recall is them
8      having a meeting there with Maysonet, and the
9      meeting was about some kind of drug dealing or some
10     kind of protection or some kind of situation with --
11     where I believe Maysonet was given information or
12     was given drugs to sell and help himself out at the
13     same time, pay off the officer for whatever drugs he
14     was getting from him.  So I don't know if this had
15     taken part in the -- past or that was a normal
16     situation for them to do, or if it was the first
17     time situation.  But the way Maysonet spoke, I
18     believe it could have been the first time because he
19     was actually very happy that this was going on and
20     very surprised of how it went down.  So I don't
21     know.
22 BY MR. STARR:
23     Q.  Any -- anything else that you recall about
24 that interaction?
25     A.  No, I don't.

Page 60

1      Q.  And this was -- you learned about this
2  immediately after it took place; is that correct?
3      A.  Yes, sir.
4      Q.  And there was no other people present besides
5  Mr. Maysonet, Mr. Guevara and Mr. Miedzianowski during
6  this meeting, correct?
7      A.  No.
8         MR. RAHE:  Objection to form.
9  BY MR. STARR:
10     Q.  Mr. Gonzalez was not present for this meeting,
11 correct?
12     A.  no.
13     Q.  Okay.
14         MS. ROMELFANGER:  Form.
15 BY MR. STARR:
16     Q.  And in fact, you haven't spoken to Mr.
17 Gonzalez in over 30 years; is that right?
18     A.  Yes, sir.
19         MS. ROMELFANGER:  Form.
20 BY MR. STARR:
21     Q.  Since you -- since you were in IDOC; is that
22 correct?
23     A.  That's correct.
24     Q.  And you haven't spoken to Mr. Maysonet in
25 approximately 30 years; is that correct?

Page 61

1         MR. RAHE:  Form.
2         THE WITNESS:  Longer than that.
3  BY MR. STARR:
4      Q.  Longer than that?  Okay.  And do you know when
5  the last time you saw Detective Guevara was?
6         MS. ROMELFANGER:  Objection.  Form.
7         THE WITNESS:  No.  I can't recall when I've
8      seen him or if I've seen him again, nothing like
9      that.
10        MR. STARR:  Okay.  I think that's all the
11     questions I have.  I'm going to take a two-minute
12     break and look at my notes.  We can go off the
13     record.
14        THE REPORTER:  Right.  We are now off the
15     record.  The time is 4:38 p.m.
16        (OFF THE RECORD)
17        THE REPORTER:  Okay.  We are back on the record
18     for the deposition of Eduardo Ramirez being
19     conducted by videoconference.  My name is Victoria
20     Adams.  Today is June 20, 2024.  The time is 4:44
21     p.m.
22 BY MR. STARR:
23     Q.  Sir, I was asking you -- I just have a few
24 more questions.  I was asking you questions earlier
25 about Christopher Gossens.  I believe that I misspoke

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 62

1  and suggested that your conversation with Mr. Gossens
2  was in IDOC. Was your conversation with Mr. Gossens
3  when he told you that he was innocent of the crime that
4  he was later convicted of in IDOC, or was it in Cook
5  County Jail?
6        MS. ROMELFANGER: Object to form.
7        THE WITNESS: Cook County Jail.
8  BY MR. STARR:
9     Q. Okay. And that would've been when you were in
10 Cook County Jail between July 3, 1991 and July 20, 1991,
11 correct?
12       MS. ROMELFANGER: Objection to form.
13       THE WITNESS: Yes, sir.
14 BY MR. STARR:
15    Q. Okay. Sir, do you have any independent
16 knowledge of Jose Maysonet's involvement in any murder
17 in May of 1990?
18    A. No, I don't.
19    Q. Okay. Do you have any independent knowledge
20 whatsoever of Alfredo Gonzalez's involvement in any
21 murder that occurred in May of 1990? Sir, are you
22 sleeping?
23    A. No.
24    Q. Okay. Let me ask that question again.
25    A. No, I don't.

Page 63

1     Q. Sir, you look like you fell asleep. Let me
2  just ask that question again. It's kind of an important
3  one. Sir, do you have any independent knowledge
4  whatsoever that Alfredo Gonzalez was involved in any
5  murder in May of 1990?
6     A. No, I don't.
7        MR. STARR: Okay. I have no further questions.
8  Thank you for your time.
9        THE WITNESS: Thank you.
10       MS. BONJEAN: Best for last.
11              EXAMINATION
12 BY MS. BONJEAN:
13    Q. I have a few questions for you, Mr. Ramirez.
14 It won't be long at all; I promise you. I think
15 Mr. Starr covered mostly everything, okay. So if you
16 could bear with me.
17    A. I got you.
18    Q. Okay. Yes. All right. So as you know, I
19 represent Mr. Maysonet. I have a couple questions that
20 I want to just get some clarification on. You testified
21 that you were born in 1959; is that right?
22    A. Yes, ma'am.
23    Q. Okay. What month of -- in 1959 were you born?
24 I don't need the exact date.
25    A. XX. XX-XX, 1959.

Page 64

1     Q. And is it fair to say that you don't remember
2  specifically how you met Mr. Maysonet?
3     A. That is.
4     Q. Okay. Do you recall how old Mr. Maysonet was,
5  approximately, when you met him?
6     A. I believe late 20s or early 30s.
7     Q. So you remember meeting him when he was an
8  adult; is that fair?
9     A. Oh, for sure.
10    Q. Okay. He wasn't a child, right?
11    A. No.
12    Q. He wasn't a middle school 15-year-old or
13 anything, correct?
14    A. Correct.
15    Q. Now, I want to have you -- I'm not going to
16 have you go through the whole declaration or anything.
17 We've done that many times. But I want to specifically
18 ask you a couple questions based on number 8 that you
19 swore to where it says -- do you have it in front of
20 you?
21    A. Yes, I do.
22    Q. Okay. It says, "On one occasion, Juan
23 Maysonet, Guevara, and Miedzianowski all met in my
24 establishment." Do you see that?
25    A. Yes, I do.

Page 65

1     Q. Okay. To be clear, sir, did -- you saw them
2  meet in the establishment, right?
3     A. Yes, I did.
4        MR. RAHE: Object to form.
5  BY MS. BONJEAN:
6     Q. Did you see them meet in the establishment?
7     A. Did I see them meet in my establishment?
8  That's what you're asking?
9     Q. Yeah. You -- did you see them with your own
10 eyes?
11    A. Yeah. Yeah, for sure.
12    Q. Okay. Did you participate in the meeting, or
13 did you just see the meeting in your establishment?
14       MR. RAHE: Objection to form.
15       THE WITNESS: I continued doing what I was
16    doing in the restaurant, and they were on their
17    situation on a table, and I was actually behind the
18    bar getting stuff together. I don't know.
19 BY MS. BONJEAN:
20    Q. Fair enough. And at some point later on, you
21 had a conversation with Mr. Maysonet; is that right?
22    A. Yes, I did.
23       MR. SCAHILL: Form.
24 BY MS. BONJEAN:
25    Q. Did Mr. Maysonet tell you that he was doing

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 66

1  business with these officers?
2      MR. SCAHILL: Objection. Form. Leading.
3      THE WITNESS: No, he didn't.
4  BY MS. BONJEAN:
5      Q.  Okay.  What did -- what did he say that he was
6  doing with them there?
7      A.  Well, at first, he didn't say anything,
8  really. I -- I didn't find out until after the officers
9  left, and actually more about the case few days
10 afterwards.
11     Q.  But he told you that he had spoken to them
12 about a robbery that was going to go down; is that
13 right?
14     MR. SCAHILL: Objection. Form.
15     THE WITNESS: That didn't happen like right
16 there on the spot.  I mean --
17 BY MS. BONJEAN:
18     Q.  I see.
19     A.  -- that took place afterwards.
20     Q.  Okay.
21     A.  After the officers left and everything was
22 down to I thought it was normal.  Then he opened up and
23 told me what this whole deal was about.
24     Q.  Got it.  So at some point, it is the case that
25 Mr. Maysonet disclosed to you that he was doing

Page 67

1  business, financial dealings, drug dealings with these
2  crooked police officers, right?
3      MR. SCAHILL: Objection. Form and
4  mischaracterizes his testimony.
5      MS. BONJEAN: Let the record reflect that
6  Mr. Ramirez is still, I think -- I --
7  BY MS. BONJEAN:
8      Q.  Did you -- did you tune out for a second,
9  Mr. Ramirez?
10     A.  No, I'm hungry.  Just hungry and tired.
11     Q.  Okay.  So we're almost there.  Just bear with
12 me, and I'll try to get you out of here as soon as
13 possible.
14     A.  I got it.
15     Q.  The information that you set forth in this
16 declaration about Mr. Maysonet's financial relationship
17 with Guevara and Miedzianowski, he told you about that,
18 right?
19     MR. SCAHILL: Objection. Form --
20     THE WITNESS: Sure.
21 BY MS. BONJEAN:
22     Q.  Can you repeat that, sir?  What was the
23 answer?
24     A.  Yes.  Yes, he did.
25     Q.  And you said you observed this meeting between

Page 68

1  Mr. Maysonet, Guevara, and Miedzianowski on one
2  occasion; is that right?
3      A.  Yes, I did.
4      MR. RAHE:  Object -- objection.
5  BY MS. BONJEAN:
6      Q.  Did you ever see Mr. Maysonet meet with any
7  other Chicago police officers on any other occasions in
8  your restaurant?
9      A.  No.
10     MR. SCAHILL:  Object to the form.
11     THE WITNESS:  I don't think that --
12     MR. SCAHILL:  Mischaracterizes.
13     THE WITNESS:  -- took place any time before
14 that.
15 BY MS. BONJEAN:
16     Q.  Okay.  Now, --
17     A.  That was the first time they met there, and
18 about the officers going there to the restaurant before
19 that or after that.  I really don't know because that
20 never took place -- they never met there before that
21 day.
22     Q.  But you -- isn't it true that at some point,
23 and I don't know when, but at some point you told Mr.
24 Maysonet that to be careful doing business with these
25 guys, right?

Page 69

1      MR. SCAHILL:  Objection to form of the
2  question.
3      THE WITNESS:  Afterwards.
4  BY MS. BONJEAN:
5      Q.  Afterwards?  Okay.
6      A.  Yeah.
7      Q.  So that's a yes, right?  Just so the record's
8  clear?
9      A.  Yes.  Yes.
10     MR. SCAHILL:  Objection to the form of the
11 question.
12 BY MS. BONJEAN:
13     Q.  And as someone who lived in the neighborhood,
14 why were you telling Mr. Maysonet, you know, you got to
15 be careful doing business with Rey Guevara and Joseph
16 Miedzianowski?
17     A.  Oh, for sure.  But let's be clear on this
18 matter.  It is not about me telling them one thing.  It's
19 about what people knew about these officers.  These
20 officers were planting drugs in people's car or doing
21 things that a normal officer wouldn't do.  So you know,
22 it's -- if they went out their way to plan or do any
23 kind of dealings with anyone, they would have it their
24 way.  I mean, they were judge, prosecutor, anything --
25 everything all at one time.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Page 70

1    Q.   It was risky business to do business with
2    these guys, right?
3    A.   Yeah, for sure.
4         MR. RAHE:  Objection to form.
5         THE WITNESS:  For sure.
6    BY MS. BONJEAN:
7    Q.   They could hook you up, for instance?
8         MR. SCAHILL:  Objection.  Form and foundation.
9         MR. RAHE:  Objection.  Foundation.
10        THE WITNESS:  They would plant things on people
11   that would destroy people's life from one day to
12   another.  Just even if you were a small-time dealer,
13   they would have their ways of taking your drugs or
14   stop you.  And -- most people don't want to deal
15   with going to court on the cases they don't have
16   nothing to do with because they planted something on
17   your car.  They did something.  They want you to turn
18   in guns and they let don't go -- like, actually,
19   there are ways of doing it.  If they caught you
20   doing something, they would let you go and say,
21   within an hour, I want you to call me back and give
22   me a gun.  Call me back and give me this.  Call me
23   back and give me that.  If not, they'll be seeing
24   you again, but they'll be arresting you.  So this is
25   the kind of dealing they had with individuals.

Page 71

1    BY MS. BONJEAN:
2    Q.   They were kind of like their own gang; would
3    that be fair to say?
4         MS. ROMELFANGER:  Objection to form.
5         MR. SCAHILL:  Object to the form of the
6    question.
7         THE WITNESS:  They had their own gang.
8         MR. SCAHILL:  Foundation.
9         THE WITNESS:  These people here, there was not
10   just them two officers.  I think there was a group
11   of officers.  They united and worked together to
12   have things their way.  Do you understand?
13   BY MS. BONJEAN:
14   Q.   Yes, I do understand.
15   A.   Okay.
16   Q.   Now, real quickly, I want to just go through -
17   - if you could just look at the screen, and we'll go
18   through this real quick.  I want to go through some
19   documents that the defendants provided to us, and I just
20   want to ask if you can recognize these.  All right.
21        MS. BONJEAN:  I'm going to mark a series of
22   documents that were provided by Counsel for the
23   defendant officers that are JGS AG Gonzalez 6784
24   through 67 -- oh, I'm sorry, 6783 through 677 --
25   6782.  Okay.  One more time.  6783 through 6782.

Page 72

1    Okay.  What's that?
2         THE WITNESS:  Got it.
3    BY MS. BONJEAN:
4    Q.   Okay.  Hold on one second.  I'm going to try
5    to show this to you.  I'm not great at sharing things,
6    but bear with me.  Okay.  Here we go.  Okay.  Here we
7    go.  Okay.  We're going to go through some of these real
8    quickly, if we could, okay?
9    A.   Okay.
10        MS. BONJEAN:  All right.  God, I'm trying to --
11   Ashley, how do I expand this?  No.  You scanned it
12   wrong.  You gave it to me wrong.  Oh, maybe not.
13   All right.  That's -- can you just expand this for
14   me, please?  No, I don't need that expanded.  I need
15   that PDF expanded.  I don't need to show my business
16   on that -- what's going on?
17        MS. COHEN:  Here we go.  No, the second one.
18        MS. BONJEAN:  Hold on.  Let me --
19        MS. COHEN:  No idea.
20        MS. BONJEAN:  What do you mean?
21        MS. COHEN:  I don't -- I don't know what --
22        MS. BONJEAN:  Oh, okay.  Here we go.  I got it.
23   See, I don't really need Millennials after all.
24   BY MS. BONJEAN:
25   Q.   Okay.  Can you see what's on the screen, sir?

Page 73

1    A.   Yes, ma'am.
2    Q.   Okay.  So let me be clear.  I messed up the
3    Bates stamps.  I'm going to show you what --
4         MS. BONJEAN:  What exhibit are we on, Madam
5    Court Reporter?
6         THE REPORTER:  I believe  Exhibit B.
7         MS. BONJEAN:  Exhibit what?
8         THE REPORTER:  B.
9         MR. STARR:  A.
10        THE REPORTER:  A? B?
11        MR. SCAHILL:  B.  There's only the affidavit.
12   This is the -- not -- this is the -- only the second
13   one.
14        MS. BONJEAN:  Okay.  So we're going to -- this
15   is Exhibit B as in boy.  It's Bates stamped JGS A
16   Gonzalez 6779 through 6819.  Okay.
17        (EXHIBIT B MARKED FOR IDENTIFICATION)
18        THE REPORTER:  Okay.
19        MS. BONJEAN:  All right.  Here we go.
20   BY MS. BONJEAN:
21   Q.   Okay.  I'm going to draw your attention to --
22   if you're looking -- let's see.  Okay.  Starting at
23   6784, Mr. Ramirez, were you in charge -- were you
24   charged or arrested in 1998 -- I'm sorry, 1989 for a UUW
25   by a felon?  Do you see that?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Page 74

```
1    A.  Yes, I do.
2    Q.  Okay.  And do you remember receiving probation
3  for this case in April 23, 1990?
4    A.  Which case was that now?
5    Q.  The UUW?
6    A.  Yes, I do remember.
7    Q.  Okay.  Does this -- I'm showing you what is a
8  certified statement of conviction with your name on it.
9  I'm just confirming that this is accurate.
10   A.  Yes, it is accurate.
11   Q.  Okay, great.  Okay.  In -- going to the next
12 page, which is Bates stamped JGS A Gonzalez 6788.  Do
13 you see, sir, at the top of this page, it says Certified
14 Statement of Conviction Disposition?
15   A.  Yeah.  Yes.
16   Q.  Do you recall being arrested in connection
17 with a possession of a controlled substance, looks like
18 a Class 4 felony in 1990?
19   A.  Yes, I do.
20   Q.  Okay.  And let's see here.  Let's -- do you
21 remember being acquitted of this account in -- on July
22 30, 1992, a finding of not guilty?
23   A.  Which case was that now?
24   Q.  That's the PCS.  The Class 4 PCS.  Do you
25 remember beating a Class 4 PCS?
```

Page 75

```
1    A.  Yes.  Yes.  Yes.
2    Q.  Okay.  Okay.  I don't know what the date is
3  here, but it looks like at some point in July of 1992,
4  were you charged with what appeared to be a criminal
5  drug conspiracy and a delivery of greater than 100 but
6  less than 400 grams of cocaine?
7    A.  Yes, ma'am.
8    Q.  Okay.  And this is the case -- let's see.
9  Getting to the bottom.  This is the case that you pled
10 guilty on this -- on a charge in March of '94 and was
11 sentenced to ten years in the Illinois Department of
12 Corrections; is that right?
13   A.  Yes, ma'am.
14   Q.  I think earlier, Counsel for Defendant
15 Guevara asked you about, like, a residential burglary or
16 home invasion from 1993; do you remember that?
17   A.  Yes, ma'am.
18   Q.  Okay.  You said -- I think you didn't fully
19 remember that case, right?
20   A.  Yeah.
21   Q.  And do you remember how that case was resolved
22 in terms of whether you pled guilty, whether you were
23 found guilty or anything of that nature?
24   A.  I pleaded not guilty and I believe the case
25 was thrown out.
```

Page 76

```
1    Q.  Okay.  In fact, see -- well, let's see if
2  that's the basis.  Okay.  Okay.  Showing you what is
3  marked as -- I guess we're at -- same document, but at
4  6817.  Do you recall it eventually being dismissed or at
5  least the top count being dismissed?  What -- or is it
6  kind of vague?
7         MS. ROMELFANGER:  Objection to form.
8         MR. SCAHILL:  Objection to the form of the
9  question.
10 BY MS. BONJEAN:
11   Q.  Are you there with me, sir?
12   A.  Yes, ma'am.
13   Q.  Okay.  Do you recall there being a finding of
14 guilty on any of those counts from 1995, or you don't
15 recall as you sit here today?
16   A.  I don't think I was involved in finding myself
17 guilty on any of these accounts because the people all
18 went and signed the statement saying that there was a
19 mistake in the case and threw the case out.
20   Q.  Okay.  Fair enough.  Okay.  I'm going to take
21 this down.  Okay.  And then I just had -- okay.  And
22 hold on one second.  I got just a couple more questions.
23 I just want to ask you about your federal case for a
24 second.  You don't -- you don't deny that you pled
25 guilty to a federal drug case; is that right?
```

Page 77

```
1    A.  No.
2    Q.  Okay.  And I just want to make sure that we're
3  all talking about the correct federal drug case here.
4  And I'm going to share this screen for -- with you, if I
5  could.  Here we go.  Let's see if I can do this.  Bam.
6  All right.  Mr. Ramirez, do you see this?  I'll mark
7  this as Exhibit C.  It looks like an indictment from
8  November 9, 2011, brought in the Northern District of
9  Illinois?
10        (EXHIBIT C MARKED FOR IDENTIFICATION)
11        MR. STARR:  Jenny, can I get that Bates again?
12 I'm sorry.
13        MS. BONJEAN:  Actually, this is -- this is just
14 from the docket.
15        MR. STARR:  Oh, okay.
16 BY MS. BONJEAN:
17   Q.  Do you see that, Mr. Ramirez?
18   A.  Yes, I do.
19   Q.  Okay.  Do you -- and do you remember -- I
20 think you testified, but let me just be clear.  Do you
21 remember being charged with looks like possession with
22 intent to distribute a controlled substance, namely
23 1,000 grams or more of a mixture and substance
24 containing heroin; do you remember that?
25   A.  Yes, I do.
```

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
407.423.9900    www.MILESTONEREPORTING.com
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
Toll Free 855-MYDEPOS

Page 78

1    Q.   Okay.  And ultimately, you pled guilty to this
2    charge and did some fed time for that, right?
3    A.   Yes, ma'am.
4    Q.   How much fed time did you do all in all?
5    A.   It was over ten years, so I really don't know.
6    Q.   Okay.  Over ten years you said?
7    A.   Yeah.
8    Q.   And were you in custody on this federal
9    offense until 2021 when you were released?
10   A.   Yes, I was.
11   Q.   And just to be clear, is this a case where --
12   I just want to make sure it's the same one.  Is this the
13   case where the feds used a CI to do a drug deal with you
14   in Cocula's (phonetic) Restaurant?
15   A.   Yes, ma'am.
16   Q.   Okay.  And where was Cocula's Restaurant?  On
17   2200 South California?
18   A.   That's the address.
19   Q.   Okay.  All right.  Looking at my notes and --
20   oh, Counsel asked you about you -- your obligation to
21   talk to the feds in connection with your plea agreement;
22   do you remember that?
23   A.   Yes, I do.
24   Q.   And she asked you, did you ever disclose to
25   the feds about the misconduct of the police officers Joe

Page 79

1    Miedzianowski and Rey Guevara.  Do you remember that?
2         MS. ROMELFANGER:  Objection to form.  Misstates
3    the question.
4         THE WITNESS:  I don't think I was asked about
5    Guevara and Miedzianowski on my cases.
6    BY MS. BONJEAN:
7    Q.   Do you think the feds were interested in
8    hearing any information you had about dirty cops?
9         MS. ROMELFANGER:  Objection to form.
10        MR. SCAHILL:  Objection.  Foundation.
11        THE WITNESS:  No.  No, not really.
12   BY MS. BONJEAN:
13   Q.   And at the time you were questioned, Joseph
14   Miedzianowski was already in prison for RICO charges
15   serving a life sentence, right?
16   A.   Yes.
17        MS. ROMELFANGER:  Objection to form and
18   foundation.
19   BY MS. BONJEAN:
20   Q.   By the way, Mr. Ramirez, do you know Sam Perez
21   or Spanky?
22   A.   Yeah.
23   Q.   Okay.  And do you know him from the streets or
24   how do you know him?
25   A.   I know him from the streets.  He's from Corden

Page 80

1    (phonetic) and Whipple.  I'm from Whipple and Banchester
2    (phonetic).  We're like the nearest sets, one -- one
3    from the other one.
4         MS. BONJEAN:  Okay.  All right.  All right.  I
5    don't have anything further for you, Mr. Ramirez.
6    Appreciate all of your time and cooperation.  And
7    I'm sorry it took longer than we expected.
8         THE WITNESS:  Well, --
9            REDIRECT EXAMINATION
10   BY MR. SCAHILL:
11   Q.   I only have about two minutes, just real brief
12   clean up, Mr. Ramirez, and then we'll get you out, I
13   promise.  Mr. Starr asked you some questions about his
14   admonition to you to tell the truth here today at your
15   deposition.  Do you remember those questions?
16   A.   Yes.
17   Q.   Okay.  Did you in fact do that today?
18   A.   Yes.
19   Q.   You told the truth to all the questions
20   including my questions, right?
21        MR. STARR:  Objection.  Form, foundation, asked
22   and answered.
23        THE WITNESS:  Sure.
24        MS. BONJEAN:  Objection to the foundation, the
25   form of that question.  And also it's -- calls -- I

Page 81

1    don't -- that's an inappropriate question.
2    BY MR. SCAHILL:
3    Q.   Did you tell the truth to all of the questions
4    that I asked you today, sir?
5         MS. BONJEAN:  Sir, you asked so many bad
6    questions, so I don't even know, like --
7         MR. SCAHILL:  Counsel, stop it.  You know that
8    that's inappropriate.
9         MS. BONJEAN:  Okay.
10        MR. SCAHILL:  I think you know that you know
11   it's inappropriate.
12        MS. BONJEAN:  It's inappropriate to ask someone
13   if they told the truth.
14        MR. SCAHILL:  I'm not -- I'm not having a
15   colloquy with you, Ms. Bonjean.
16        MR. GREENBERG:  Is that even a -- is that even
17   a proper question to ask someone?
18        MR. SCAHILL:  I -- I'm not holding a colloquy
19   with any of you.  I asked the question, say form or
20   foundation, and let him answer the question and stop
21   obstructing the deposition like you've done all day.
22        MS. BONJEAN:  I'm not -- I -- he already said
23   he did his -- he testified to the best of his
24   ability.  So I don't know why --
25        MR. SCAHILL:  I'm not interested in you

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE  ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Page 82

1 testifying.
2      MS. BONJEAN: Okay.
3      MR. SCAHILL: He's going to testify, not you.
4      MR. STARR: I've got a -- I've got an
5 objection.
6 BY MR. SCAHILL:
7      Q.  Did you tell the truth to all of the questions
8 that I asked you today, sir?
9      MR. STARR: Form. Foundation. Asked and
10 answered.
11      MR. GREENBERG: I don't think that you can ask
12 someone who's under oath if they --
13      MR. SCAHILL: It doesn't matter what you think.
14 You can object, and then if it's used at trial, it's
15 not. And if you're right. He still gets to answer
16 the question. And you do not get to object on
17 behalf of the same party, Mr. Greenberg, okay. One
18 party gets to object. Ms. Bonjean has been doing
19 it, so you are not allowed to object at all.
20      MR. GREENBERG: Well, I'm trying to help her.
21      MR. SCAHILL: You're not -- but you're not
22 allowed to do that.
23      MS. BONJEAN: -- help me, Steve.
24      MS. COHEN: She doesn't need Boomers or
25 Millennials.

Page 83

1 BY MR. SCAHILL:
2      Q.  Mr. Ramirez, did you tell the truth to all of
3 the questions that I asked you today?
4      A.  Believe me, yes, I did.
5      Q.  Okay.
6      A.  To the best of my ability.
7      Q.  See, that was simple, wasn't it?
8      A.  Yeah.
9      Q.  Okay. Area number 2, you don't actually have
10 any personal knowledge at all about Mr. Guevara engaging
11 in any illegal acts, do you?
12      MR. STARR: Objection. Form, foundation, asked
13 and answered.
14      THE WITNESS: No.
15 BY MR. SCAHILL:
16      Q.  You never saw him ever engage in anything
17 illegal, did you?
18      MR. STARR: Same objections.
19      THE WITNESS: No.
20 BY MR. SCAHILL:
21      Q.  Everything that you were talking about, about
22 him being a bad cop and, you know, hooking people up,
23 that -- those are things that you heard, not anything
24 that you saw, correct?
25      MR. STARR: Same objections.

Page 84

1      THE WITNESS: Correct.
2 BY MR. SCAHILL:
3      Q.  Okay. And final area. And I -- you know, we
4 beat this horse dead, but I just want to make sure that
5 you did not, at this meeting at your establishment that
6 you say happened with Mr. Maysonet, Mr. Guevara, and Mr.
7 Miedzianowski, you did not hear any part of that
8 conversation, did you?
9      MR. STARR: Objection. Asked and answered.
10      THE WITNESS: No.
11      MR. SCAHILL: Okay. That's all I have.
12      MR. STARR: I just -- I have one follow-up.
13 Does any of the defendants have any follow-ups?
14      MS. ROMELFANGER: No.
15      MR. RAHE: No.
16      RECROSS-EXAMINATION BY MR. STARR:
17      Q.  Mr. Ramirez, I -- well, my last question with-
18 - to you was regarding Mr. Gonzalez and whether or not
19 you had any personal knowledge of his involvement in any
20 murder in May of 1990. Do you remember that question?
21      A.  Yes, I do.
22      Q.  And you said you had no personal knowledge,
23 correct?
24      A.  Correct.
25      Q.  Do you have any personal knowledge of Mr.

Page 85

1 Gonzalez committing any crime whatsoever? Sir, are you
2 --
3      A.  No, not at all. No.
4      MR. STARR: Okay. That's all I have.
5      MS. BONJEAN: All right. So that's the end.
6      MR. STARR: Okay. Mr. Ramirez, at the end of a
7 deposition like this, the witness is given an
8 opportunity to do one of two things. You can either
9 waive signature, which means that you believe that
10 the court reporter did her job and took down
11 accurately the questions that were asked and the
12 answers that were given, or, sir, if you could stay
13 with me for one more moment here.
14      THE WITNESS: No. Yeah.
15      MR. STARR: Or you're -- you are able to
16 reserve, which means you have to come back to the
17 court reporter's office when she's done transcribing
18 it and read the entirety and make sure it's correct.
19 Would you like -- most witnesses waive, but I don't
20 want -- I'm not your attorney. I don't want to give
21 you advice. Would you like to waive or would you
22 like to reserve?
23      THE WITNESS: Reserve.
24      MR. STARR: You want to read it?
25      THE WITNESS: Yeah.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

|  | Page 86 |
|---|---|
| 1 | MR. STARR:  Okay. |
| 2 | THE WITNESS:  The whole thing? |
| 3 | MR. STARR:  You have to read the whole thing. |
| 4 | Yeah. |
| 5 | THE WITNESS:  From the beginning? |
| 6 | MR. STARR:  Yes. |
| 7 | THE WITNESS:  Oh, my God.  No.  Waive. |
| 8 | MR. STARR:  You want to waive? |
| 9 | THE WITNESS:  Yeah. |
| 10 | MR. STARR:  Okay.  We're going to waive. |
| 11 | THE WITNESS:  Waive.  I can't stand the whole |
| 12 | three hours. |
| 13 | (DEPOSITION CONCLUDED AT 5:11 P.M. ET) |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 87 |
|---|---|
| 1 | CERTIFICATE OF OATH |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | I, the undersigned, certify that the witness in the |
| 7 | foregoing transcript personally appeared before me and |
| 8 | was duly sworn. |
| 9 | |
| 10 | Identification:  Produced Identification |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | VICTORIA ADAMS |
| 17 | Court Reporter, Notary Public |
| 18 | Commission Expires: 03/20/2028 |
| 19 | Commission Number: 20244011345 |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

|  | Page 88 |
|---|---|
| 1 | C E R T I F I C A T E |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | I, VICTORIA ADAMS Court Reporter and Notary Public, |
| 7 | do hereby certify that I was authorized to and did |
| 8 | report the foregoing proceeding, and that said |
| 9 | transcript is a true record of the said proceeding. |
| 10 | |
| 11 | I FURTHER CERTIFY that I am not of counsel for, |
| 12 | related to, or employed by any of the parties or |
| 13 | attorneys involved herein, nor am I financially |
| 14 | interested in said action. |
| 15 | |
| 16 | Submitted on: July 3, 2024. |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | VICTORIA ADAMS |
| 23 | Court Reporter, Notary Public |
| 24 | |
| 25 | |

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

**1**

**1** 32:10 33:14

**1,000** 77:23

**10** 40:17 41:6

**100** 75:5

**11** 6:24 41:22, 23 42:5

**12** 43:2,7 44:5, 13

**13** 10:1,3 43:17, 24 44:5,13

**14** 44:21,22 45:2,4

**15** 45:17

**15-year-old** 64:12

**1746** 45:23

**1958** 48:13

**1959** 63:21,23, 25

**1980s** 26:15

**1988** 48:20,22 49:9

**1989** 35:20 48:16 49:5,7,10 57:10 73:24

**1990** 14:19,24 21:21 34:14 35:16 36:1,15 56:15,19,23 57:2,10 62:17, 21 63:5 74:3,18 84:20

**1991** 62:10

**1992** 74:22 75:3

**1993** 75:16

**1995** 76:14

**1998** 35:18 73:24

**2**

**2** 32:10 34:3 37:23 83:9

**20** 6:5 23:2 57:1 61:20 62:10

**2011** 9:23 18:11,15 77:8

**2021** 10:5 78:9

**2024** 6:5 23:2 24:18 36:11 38:12 39:1 40:10 41:2 42:2 43:9,21 45:9 46:2,25 61:20

**20s** 64:6

**20th** 57:1

**2200** 78:17

**23** 74:3

**25** 40:10 41:2 42:2 43:9,21 45:9 46:2,25

**25th** 26:24 30:14 32:23 39:1

**28** 45:23

**3**

**3** 32:10,13,14, 15 34:13 37:23 56:19 62:10

**30** 20:6 52:13, 15,16 58:12,20 60:17,25 74:22

**30-years-old** 48:18

**30s** 64:6

**3435** 49:6

**3:38** 6:6

**4**

**4** 36:1,6 74:18, 24,25

**4-25-24** 32:20

**400** 75:6

**45** 27:11

**4:04** 23:2

**4:38** 61:15

**4:44** 61:20

**5**

**5** 36:15

**59** 48:15,16,18

**5:11** 86:13

**6**

**6** 37:25 38:15

**67** 71:24

**677** 71:24

**6779** 73:16

**6782** 71:25

**6783** 71:24,25

**6784** 71:23 73:23

**6788** 74:12

**6817** 76:4

**6819** 73:16

**69** 48:18

**7**

**7** 38:19

**79** 48:18

**8**

**8** 39:7 64:18

**80s** 15:5 19:6 51:14 52:8

**9**

**9** 40:4,9,12 77:8

**90s** 15:5 19:6

**94** 75:10

**A**

**ability** 81:24 83:6

**accompanied** 38:1

**account** 74:21

**accounts** 76:17

**accurate** 34:11,12 36:21 38:14 39:3,4,25 40:13 41:5,6 42:13 43:3,12 44:2,13 46:1,7, 8,25 74:9,10

**accurately** 32:24 45:25 85:11

**acquitted** 74:21

**acts** 83:11

**actual** 23:16 52:25 53:9 54:21

**Adams** 6:4 23:1 61:20

**add** 42:21

**added** 43:23

**addition** 35:5 38:5 42:10

**address** 48:22 49:4 78:18

**admonition** 80:14

**adult** 64:8

**advance** 30:23

**advice** 85:21

**affidavit** 8:21 27:17,24 42:10 43:20 46:22 73:11

**afternoon** 12:2,3 23:6

**AG** 71:23

**agree** 43:12 45:12

**agreed** 33:12 39:22

**agreement** 78:21

**ahead** 7:23 20:19 44:15

**Alfredo** 17:6 23:8 24:15 51:1,4 62:20 63:4

**Allison** 11:23

**allowed** 82:19, 22

**alluded** 9:13

**answers** 25:7 85:12

**apologize** 17:19 49:20

**appeared** 75:4

**approximately** 37:1 48:17 60:25 64:5

**April** 24:18 26:24 30:14 32:23 36:11 38:12 39:1 40:10 41:2 42:2 43:9,21 45:9 46:2,24 74:3

**area** 17:14 83:9 84:3

**arrest** 56:21 57:1,6,20

**arrested** 56:15,18,22 73:24 74:16

**arresting** 70:24

**articulate** 8:15

**Ashley** 72:11

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 100 of 108 PageID #:10617
Eduardo Ramirez - Eduardo Silva - Vol. II - 6-20-2024

90

asleep 63:1

**Assistant** 21:17

**attempt** 10:18

**attend** 23:10

**attention** 73:21

**attorney** 24:14 85:20

**Attorney's** 19:4 22:5

**attorneys** 6:12 11:20 18:23 21:17

**Austin** 22:12, 13

**Avenue** 16:20 25:21 34:15 36:3,18 38:3 49:24

**aware** 40:5 48:9 51:13 53:5

———————

**B**

**back** 6:2,14 14:19,23 15:4 18:10,14 19:6 21:21 22:24 33:14 50:7,13, 22 52:11 57:9 61:17 70:21,22, 23 85:16

**backwards** 6:14

**bad** 47:22 81:5 83:22

**Bam** 77:5

**Banchester** 80:1

**bar** 50:4,5 54:14,18 55:8 58:8 59:3 65:18

**baseball** 6:15

**based** 64:18

**basis** 76:2

**Bates** 73:3,15 74:12 77:11

**battery** 11:13

**bear** 63:16 67:11 72:6

**beat** 84:4

**beating** 74:25

**beers** 37:8

**beginning** 86:5

**behalf** 82:17

**belabor** 11:12

**Belated** 7:22 15:20

**belonged** 15:15

**bit** 12:9 48:11

**bonded** 56:25

**Bonjean** 7:24 8:7,10 20:11, 13,16 22:17 41:14 63:10,12 65:5,19,24 66:4,17 67:5,7, 21 68:5,15 69:4,12 70:6 71:1,13,21 72:3,10,18,20, 22,24 73:4,7, 14,19,20 76:10 77:13,16 79:6, 12,19 80:4,24 81:5,9,12,15,22 82:2,18,23 85:5

**Boomers** 82:24

**border** 35:11

**born** 48:13 63:21,23

**bottom** 6:25 32:9,15 75:9

**Boulevard** 27:5,6

**boy** 73:15

**break** 22:20,22 44:10,25 48:21 61:12

**briefly** 9:4

**bring** 50:1

**brothers'** 21:23 22:5

**brought** 21:18 77:8

**bunch** 9:6

**burglary** 75:15

**business** 10:22 66:1 67:1 68:24 69:15 70:1 72:15

———————

**C**

**Cafe** 49:17

**California** 78:17

**call** 24:21 33:19 44:24 70:21,22

**called** 24:3,6, 21 49:17

**calls** 13:2,17 14:7,25 20:1 80:25

**cap** 6:15

**car** 57:17 69:20 70:17

**careful** 68:24 69:15

**case** 18:10,18, 21 21:18 25:18 48:10 66:9,24 74:3,4,23 75:8, 9,19,21,24 76:19,23,25 77:3 78:11,13

**cases** 10:20 11:10 23:9 70:15 79:5

**cash** 40:22

**caught** 70:19

**certified** 74:8, 13

**chance** 23:11

**change** 33:25 39:16,19,22 46:12,21,22

**charge** 9:14 11:14 73:23 75:10 78:2

**charged** 9:15 11:9 18:13 73:24 75:4 77:21

**charges** 18:14, 18 79:14

**Charles** 45:1

**check** 21:3,4 37:9

**Chicago** 16:17 22:4 26:4 34:17 36:16 38:2,21 68:7

**child** 64:10

**Chili's** 27:4,6 30:13 41:3

**Christopher** 55:14 56:4 61:25

**CI** 78:13

**Cisco** 13:15

**claims** 56:5

**clarification** 63:20

**Class** 74:18, 24,25

**clean** 80:12

**clear** 31:25 57:20 65:1 69:8,17 73:2 77:20 78:11

**client** 51:1,24 52:2 53:15,22 54:3

**close** 55:17

**club** 47:9,14

**cocaine** 75:6

**Cocula's** 78:14,16

**COHEN** 72:17, 19,21 82:24

**colloquy** 81:15,18

**committing** 9:14 10:16 85:1

**communicate d** 23:21

**Community** 38:21

**CONCLUDED** 86:13

**conducted** 6:3 22:3,25 61:19

**confirming** 74:9

**connected** 13:3

**connection** 74:16 78:21

**conspiracy** 75:5

**contained** 31:16 33:10

**continued** 65:15

**controlled** 74:17 77:22

**conversation** 24:20 58:13,20 62:1,2 65:21 84:8

**conversations** 58:16

**convicted** 9:7 10:16 11:2,8,9 56:4,10 62:4

**conviction** 9:10 10:8,12 74:8,14

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

**convictions**
10:11

**Cook** 22:4
62:4,7,10

**cooperation**
80:6

**cop** 57:15
83:22

**cops** 79:8

**Corden** 79:25

**correct** 9:7,22
10:9 18:18
24:4,11,12,15,
22,23 25:5,24
26:5,11,15,20,
21 27:1,2 28:7
30:9,23 31:3,8
32:7 33:6,11,
18,21,23 34:4,
11 35:14,17,19
36:6,10,11,12
37:3,12,19,20
38:7,8,24
39:11,17,18,19,
22,23 40:8 41:1
42:2,3,8 43:5,
10,11,13 45:3,
8,13,19,20,25
46:13 48:14
49:15,16 50:4,
7,10,23 51:4,5,
6,14,20 52:12,
13,15,18,23,24
54:13 55:15,19
57:6,10 60:2,6,
11,22,23,25
62:11 64:13,14
77:3 83:24
84:1,23,24
85:18

**Corrections**
75:12

**correctly**
34:18,22 35:1
36:4,19 38:9,23
39:10 40:7,25
42:7 43:4 45:5

**Counsel** 71:22
75:14 78:20
81:7

**count** 76:5

**counts** 76:14

**County** 22:4
62:5,7,10

**couple** 9:13
11:6 12:15
17:18 18:9
22:21 23:13
31:1 48:12
63:19 64:18
76:22

**court** 8:7,8
70:15 73:5
85:10,17

**covered** 12:8
63:15

**crime** 62:3
85:1

**crimes** 10:15
11:2,4

**criminal** 9:5
75:4

**crooked** 67:2

**CROSS-
EXAMINATIO
N** 23:4

**crossed** 33:20
39:8

**Cruz** 13:8,9

**Cuba** 49:17

**custody** 57:5
78:8

———————

**D**

**Daniel** 18:3

**date** 6:5 23:2
32:20 63:24
75:2

**Davenport**
45:1

**day** 11:24
68:21 70:11
81:21

**days** 66:9

**dead** 84:4

**deal** 10:23
66:23 70:14
78:13

**dealer** 7:3,19
42:6 70:12

**dealing** 7:14
11:1 59:9 70:25

**dealings** 28:16
67:1 69:23

**declaration**
6:19 19:10,16,
24 27:25 30:22,
25 31:7,16
32:23 33:11,18
42:11 43:3,19
45:22 46:11,24
47:5,8 48:1
64:16 67:16

**declarations**
28:6

**declare** 45:23

**defendant**
71:23 75:14

**defendants**
22:15,18 71:19
84:13

**define** 53:7

**definition** 53:3

**deliver** 10:17,
18

**delivery** 75:5

**deny** 76:24

**Department**
22:4 36:16
75:11

**deposition** 6:3
9:3 22:25 23:11
28:21 31:1
61:18 80:15
81:21 85:7
86:13

**describing**
7:17

**destroy** 70:11

**detail** 9:5

**detective** 26:4
28:12 29:3
30:16 37:1 57:8
58:6,8,20 59:2
61:5

**differentiating**
51:25 52:2

**directly** 20:23

**dirty** 79:8

**disclose** 78:24

**disclosed**
66:25

**discuss** 47:13

**discussions**
19:8

**dismissed**
76:4,5

**Disposition**
74:14

**distribute** 9:16
77:22

**District** 77:8

**docket** 77:14

**document**
42:1 53:11 76:3

**documented**
33:17

**documents**
71:19,22

**domestic** 11:6

**double** 21:4

**doubling**
10:25

**draw** 73:21

**drink** 17:16

**drug** 7:3,19
10:21,22 28:17
40:24 42:6 59:9
67:1 75:5 76:25
77:3 78:13

**drugs** 7:4,13
9:16 40:20 42:6
57:16 59:12,13

69:20 70:13

**Drummond**
48:24 49:6

———————

**E**

**earlier** 23:19,
23 28:21 48:4,
12 49:13 51:18
57:8 61:24
75:14

**early** 64:6

**easier** 13:7

**Echevarria**
28:23

**Eddie** 51:19,
22,25 52:3,18

**editorialized**
41:18

**Eduardo** 6:3
22:25 33:19
61:18

**Efrain** 13:8,9

**employment**
49:7,9

**end** 85:5,6

**enforcer** 16:5

**engage** 83:16

**engaging**
83:10

**entered** 40:6

**entirety** 85:18

**Essentially**
40:22

**establishment**
16:19 19:6
25:21 26:15
29:4 30:17
34:14 35:7,17,
18,20 36:3,18
37:2,11 38:3,22
39:10 58:9
64:24 65:2,6,7,
13 84:5

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

establishments 49:14

event 23:10
42:21

eventually
9:17 18:17 76:4

exact 63:24

EXAMINATION 12:4 21:14
63:11 80:9

exchange
40:20,21,23
43:20 47:7 48:1

exhibit 6:23
31:3 73:4,6,7,
15,17 77:7,10

exist 42:1

expand 72:11,
13

expanded
72:14,15

expected 80:7

explained
24:13 25:15

extensively
49:23

eyes 65:10

F

face 13:19

faces 20:23

fact 31:22
48:20,22 53:6
60:16 76:1
80:17

facts 9:12

fair 11:17 64:1,
8 65:20 71:3
76:20

familiar 13:9
14:2 36:1,16

Farandula
50:2,3

Fast 51:19,22,
24 52:3,18

fed 78:2,4

federal 9:10
10:12,16 18:10,
14 76:23,25
77:3 78:8

federally 18:13

feds 78:13,21,
25 79:7

fell 63:1

felon 9:7 73:25

felonies 10:7

felony 9:9
10:8,11 74:18

Fields 12:20,22

final 84:3

finally 41:22
42:19

financial 40:6,
18 67:1,16

find 66:8

finding 74:22
76:13,16

fine 13:24

firm 23:20,25

Florida 26:25
27:9 34:4,8

follow-up
84:12

follow-ups
84:13

foregoing
45:24

forgot 17:18

form 7:22 8:16
13:1,16 14:7,
20,25 15:6,20
16:11,21,25
17:7 18:24
19:12 20:1,9
22:6 26:17
28:2,14 29:18,
24 30:6,11,20

31:17 33:2
34:20,22 35:22
36:8,13,22
37:15,21 38:17
39:5 40:1,15
41:8,16,19
42:16,25 43:15
44:14 45:15
46:9,14,15 47:1
49:1 50:17
51:11,16 52:20
53:17,24 54:22,
25 56:12 58:15,
21,22 59:5
60:8,14,19
61:1,6 62:6,12
65:4,14,23
66:2,14 67:3,19
68:10 69:1,10
70:4,8 71:4,5
76:7,8 79:2,9,
17 80:21,25
81:19 82:9
83:12

found 9:14
75:23

foundation
7:23 8:16 13:1,
16 14:7,20,25
15:6,21 16:11,
21,25 17:7
18:24 20:1,9
22:6 41:10
42:16 52:4
57:14 70:8,9
71:8 79:10,18
80:21,24 81:20
82:9 83:12

frame 21:21

Francisco
13:12

Fred 12:17,18

free 43:19

frequented
19:6

friends 50:13

front 32:4
64:19

fully 31:12
75:18

G

gang 71:2,7

gave 24:10
25:7 31:5,7
57:18 72:12

generally
27:14 54:5,7

girlfriends
11:8

give 13:6
18:22,23 20:17
33:16 46:18,20
52:12 70:21,22,
23 85:20

giving 13:20
43:19

God 72:10 86:7

Gonzalez 17:6
21:18 23:8
24:15 27:18
51:1,4 60:10,17
63:4 71:23
73:16 74:12
84:18 85:1

Gonzalez's
23:10 62:20

good 11:24
12:2,3 20:21
23:6

Gossens
55:11,14 56:4
61:25 62:1,2

government
9:15

grams 75:6
77:23

great 8:10 9:5
72:5 74:11

greater 75:5

Greenberg
81:16 82:11,17,
20

group 71:10

guess 52:10
76:3

guessing
52:11

Guevara 26:5,
14 27:18 28:12,
16,23 29:4
30:16 36:17
37:1 38:1,20
39:9,13 40:7,
19,21,23 57:9
58:7,8,20 59:2
60:5 61:5 64:23
67:17 68:1
69:15 75:15
79:1,5 83:10
84:6

Guevara 8:4

guilty 9:14,17
18:17,20 74:22
75:10,22,23,24
76:14,17,25
78:1

gun 57:18
70:22

guns 57:18,22,
25 58:1,2 70:18

guy 17:15

guys 68:25
70:2

H

hand 8:21,25
42:20

handful 29:4,
15

handwriting
8:22

handwritten
38:4 41:18
43:18 44:22

happen 66:15

happened
59:3 84:6

happy 59:19

hard 8:12
13:21

Havana 49:19,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 103 of 108 PageID #:10620
328696 Ramirez- Eduardo Silva Vol. II 6-20- 2024

93

20

hear 12:12 84:7

heard 83:23

hearing 53:11 79:8

held 15:24

heroin 10:20, 23,24 11:1 77:24

history 9:5

Hm 14:6

hold 20:13,17 44:6 72:4,18 76:22

holding 81:18

home 11:13 75:16

hook 70:7

hooking 83:22

horse 84:4

hour 27:11 70:21

hours 86:12

Humboldt 34:15 35:8 38:21

hungry 67:10

——————

I

Iasparro 21:15,16 22:1,8

idea 72:19

IDENTIFICATI ON 73:17 77:10

IDOC 53:16,21 54:3 60:21 62:2,4

II 6:1

illegal 83:11,17

Illinois 34:17 75:11 77:9

immediately 60:2

Immokalee 27:4,5,6

important 48:10 50:19 63:2

imposed 9:25

inappropriate 81:1,8,11,12

incident 32:25

include 42:10

including 80:20

independent 20:7 53:1,3,9, 15 54:2,17,21 62:15,19 63:3

indictment 77:7

individual 12:18,21,25 13:7,11 14:4,23 17:20,25

individuals 16:9 18:6 27:16,18,19 28:18 70:25

information 7:7,20 8:2 18:22,23 19:10, 16 31:15 59:11 67:15 79:8

initial 31:24 38:7 42:9 43:6, 23

initialed 45:19

initially 51:3

initials 35:14 39:21

innocent 56:5 62:3

instance 70:7

intent 9:16 10:17 77:22

interaction 59:1,24

interested 79:7 81:25

interference 40:20

introduced 39:13 40:5

invasion 11:13 75:16

investigation 22:3

investigator 23:20,25 34:6

involved 7:12, 18 28:19 63:4 76:16

involvement 62:16,20 84:19

issue 10:19 31:15 49:23

——————

J

Jail 62:5,7,10

Jenny 77:11

JGS 71:23 73:15 74:12

job 85:10

Joe 38:4,20 78:25

Jondalyn 12:20,22

Jose 25:13,16 27:17 28:12 30:9,15 36:2 59:2 62:16

Joseph 28:12 29:22 30:17 59:2 69:15 79:13

Juan 36:2 39:9, 13 40:5,19,21 64:22

judge 69:24

juice 16:1

July 56:19 57:1 62:10 74:21 75:3

Juma 33:20,25

June 6:5 23:2 61:20

jury 23:12

——————

K

kind 13:21 15:25 16:1,5 28:19 59:9,10 63:2 69:23 70:25 71:2 76:6

King 12:25 13:4 14:18

Kings 15:12, 15,24 16:10,16, 18 17:13,15

kitchen 50:7,9, 14,22

knew 17:8,11, 17 26:3 28:11, 16 30:8 51:1,24 52:2,17,18,19, 23 54:14 55:16 69:19

knowledge 15:14 20:22 22:3 23:17 43:4 62:16,19 63:3 83:10 84:19,22, 25

——————

L

laid 6:14

late 26:15 51:14 52:8 64:6

Latin 14:18 15:12,15,24 16:9,16,18 17:13,14

leading 26:1,7, 16,22 28:9 41:10 55:23

66:2

learn 7:7

learned 7:2,6, 10 42:5 60:1

leave 37:10 42:22

Leavitt 15:16, 19 16:15,17 17:14

left 8:18 66:9, 21

life 70:11 79:15

listed 28:7

listen 29:9

live 34:3

lived 34:7 48:24 69:13

living 48:19,20 49:5

Lluvia 51:6

located 34:14 35:7,10 38:22

location 26:25 27:3

long 11:12,21 12:6 27:10 63:14

longer 61:2,4 80:7

looked 30:25 32:22

lot 11:1 12:8

——————

M

Macho 15:5,11, 15,24 16:19,24 17:6,15

Macho's 15:9 16:9

Madam 73:4

made 39:19 40:22 43:20

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

**Madroski** 8:4
27:19

**main** 48:7 58:1

**major** 10:24

**make** 11:1
31:20,22 33:16,
17,25 35:5
39:16 48:8 77:2
78:12 84:4
85:18

**making** 31:25
33:5,9 52:10

**male** 38:7

**man** 24:14
25:12,16

**March** 75:10

**Marcos** 17:25
18:1

**mark** 71:21
77:6

**marked** 6:23
73:17 76:3
77:10

**matter** 33:10
69:18 82:13

**Maysonet** 7:8,
12,13,16 8:14
16:24 19:9
25:13,16 26:14
27:18 28:12,16
30:9,15 36:2
37:12 39:9,13
40:6,19,21,22
59:2,8,11,17
60:5,24 63:19
64:2,4,23
65:21,25 66:25
68:1,6,24 69:14
84:6

**Maysonet's**
40:24 62:16
67:16

**meaning** 8:14

**means** 53:1
85:9,16

**meet** 65:2,6,7
68:6

**meeting** 30:13,
23 53:16,21
54:3 59:8,9
60:6,10 64:7
65:12,13 67:25
84:5

**meetings**
28:17

**member** 15:11

**memory** 24:24
50:21 53:10

**messed** 73:2

**met** 26:25
27:10 30:15
36:11 38:11,25
39:10 41:2 42:1
45:9 53:22,23
54:2 55:14,16
64:2,5,23
68:17,20

**mic** 11:23

**Michael** 21:16

**middle** 64:12

**Miedzianowski**
28:13 29:22
30:17 37:18
38:4,20 39:9,14
40:7,19,22,23
59:3 60:5 64:23
67:17 68:1
69:16 79:1,5,14
84:7

**Millennials**
72:23 82:25

**Milwaukee**
16:20

**minutes** 27:11
80:11

**mischaracterizes** 41:11 42:17
55:24 67:4
68:12

**misconduct**
78:25

**misconstrued**
46:19

**misspoke**

61:25

**Misstates** 79:2

**mistake** 76:19

**misunderstood** 46:19

**mixture** 77:23

**Mo** 17:23

**Mohammad**
17:20

**moment** 85:13

**monetary**
40:22

**money** 10:25
11:1

**month** 63:23

**Mort** 24:1,3,13,
17,20 34:6

**Moving** 41:22

**murder** 21:23
22:5 56:3,4,7
62:16,21 63:5
84:20

———————

**N**

**named** 17:25
24:14 25:16,17
28:23 30:16
38:3

**names** 13:19
14:1 17:19
20:8,20,22

**Naples** 27:8,9
34:4,8

**narcotics**
10:19

**nature** 10:15
75:23

**nearest** 80:2

**needed** 57:19

**neighborhood**
30:9 34:17
35:12 69:13

**neighborhoods** 35:11

**nickname**
12:24,25 13:15
14:5,24 15:5
17:23 25:9
51:9,14,19
52:22

**normal** 37:7
59:15 66:22
69:21

**North** 16:20
25:21 34:15
36:3,18 38:3
49:24

**Northern** 77:8

**notes** 21:3
61:12 78:19

**November**
77:8

**number** 34:13
36:1,6,15 37:25
39:7 40:4,12,17
41:6 42:5 43:2,
7,17,18,24
44:21 45:17,18
64:18 83:9

**numbers**
42:21

**numeral** 43:18
44:21

———————

**O**

**oath** 33:6,9
82:12

**object** 41:14
62:6 65:4 68:4,
10 71:5 82:14,
16,18,19

**objection** 7:22
13:1,16 15:20
18:24 19:12,18
20:13,16,18
21:24 25:3
26:1,7,16,17,22
28:2,9,14,25
29:24 30:5,6,20
31:9,17 33:2

34:20,22 35:21,
22 36:8,13,22
37:21 39:5
40:1,15 41:8,9,
15,16,19 42:15,
16,25 43:15
44:14 45:15
46:9,14 47:1
49:1 50:17
51:11,16 52:4,
20 53:17,24
54:22,25 55:23
56:12 57:14
58:15,21,22
59:5 60:8 61:6
62:12 65:14
66:2,14 67:3,19
68:4 69:1,10
70:4,8,9 71:4
76:7,8 79:2,9,
10,17 80:21,24
82:5 83:12 84:9

**objections**
41:15 83:18,25

**obligation**
78:20

**observed**
67:25

**obstructing**
81:21

**occasion**
37:12 39:7,9,13
64:22 68:2

**occasions**
37:17 58:10
68:7

**occurred**
62:21

**offense** 78:9

**office** 19:4
22:5 85:17

**officer** 8:4
28:22 29:21
30:2,16 36:16
37:18 38:2,3,6
59:13 69:21

**officers** 7:18,
21 8:3,18 19:5
38:21 66:1,8,21
67:2 68:7,18

**MILESTONE | REPORTING COMPANY**
TOMORROW'S TECHNOLOGY TODAY

407.423.9900   www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 105 of 108 PageID #:10622

Edwardo Rivera Ramirez vol. II 6-20-2024

95

69:19,20 71:10,
11,23 78:25

**officers'** 20:8

**Omar** 17:20

**opened** 66:22

**operated**
25:21 34:14
35:16,17,19
59:4

**opportunity**
10:25 33:16
46:18,21 85:8

**opposed** 8:21

**order** 57:20

**orient** 18:12

**originally**
39:12 42:2

**owned** 25:21
49:11

─────────
**P**
─────────

**p.m.** 6:6 23:3
61:15,21 86:13

**pages** 32:7

**paragraph**
6:24 33:18
34:3,13 35:25
36:6,15 37:25
38:15,19 39:7
40:4,9,12,17
41:5,13,22,23,
25 42:4 43:2,17
44:5,21 45:2,17

**paragraphs**
42:20 44:13

**Park** 34:15,16
35:5,7,8 38:21

**part** 18:20
59:15 84:7

**participate**
65:12

**party** 17:16
82:17,18

**past** 59:15

**patience** 6:13
11:22

**pay** 40:21
59:13

**paying** 28:18

**payments**
40:23

**PCS** 74:24,25

**PDF** 72:15

**Peewee** 14:24

**penalty** 45:22,
24

**people** 7:19
12:16 20:6 28:7
33:19 50:12,22
51:22 57:16
58:3,4 60:4
69:19 70:10,14
71:9 76:17
83:22

**people's** 20:20
69:20 70:11

**Perez** 79:20

**period** 49:12,
15 52:5

**perjury** 45:23,
24

**person** 7:4
14:17 19:15,23,
25 20:24 26:20
36:1 42:7 44:23

**person's**
57:17

**personal**
83:10 84:19,22,
25

**personally**
15:23

**phone** 24:9,10,
22 26:20 34:7

**phonetic**
12:17,21 13:8,
12 78:14 80:1,2

**physical** 53:10

**pick** 6:22,23

**place** 60:2
66:19 68:13,20

**plaintiff** 23:8

**plan** 69:22

**plans** 7:3,10,18
42:5

**plant** 70:10

**planted** 70:16

**planting** 69:20

**playing** 23:11

**plea** 18:20
78:21

**pleaded** 75:24

**pled** 9:17 18:17
75:9,22 76:24
78:1

**point** 11:12,23
19:3 29:13
51:13 55:8,10,
15 65:20 66:24
68:22,23 75:3

**pointing** 20:21

**police** 22:4
26:4 30:16
36:16 38:2,21
40:20 57:5 67:2
68:7 78:25

**possession**
74:17 77:21

**precise** 24:24

**presence**
32:19

**present** 60:4,
10

**pressure** 47:4

**previous**
48:25

**previously**
23:7 56:21

**primarily** 50:4

**printed** 8:21

**prior** 10:7
27:24 41:11
54:3

**prison** 55:15,
19,21 79:14

**probation** 74:2

**PROCEEDING
S** 6:1

**promise** 6:11
47:7,25 63:14
80:13

**promises**
43:20

**proper** 81:17

**prosecutor**
69:24

**protection**
40:24 59:10

**provided**
71:19,22

**pursuant**
45:23

**put** 9:4 13:22
24:21 57:16

─────────
**Q**
─────────

**question** 20:25
28:24 29:9,10
30:20 34:23
37:4 46:15
54:23 58:18,22
62:24 63:2
69:2,11 71:6
76:9 79:3 80:25
81:1,17,19,20
82:16 84:17,20

**questioned**
79:13

**questions**
11:20 12:8
18:10,11,13
21:19 22:21
23:13,19,22,23
25:5 27:24 28:5
48:13 55:11,12
56:14,16 61:11,
24 63:7,13,19
64:18 76:22
80:13,15,19,20
81:3,6 82:7
83:3 85:11

**quick** 21:3,5,8
71:18

**quickly** 71:16
72:8

─────────
**R**
─────────

**Rahe** 22:10,12,
13 30:20 60:8
61:1 65:4,14
68:4 70:4,9
84:15

**Ramirez** 6:3,8
12:2,16 13:25
15:17 17:19,25
18:1,3 20:14
21:3,11,16
22:25 23:6
33:19 61:18
63:13 67:6,9
73:23 77:6,17
79:20 80:5,12
83:2 84:17 85:6

**random** 13:21

**rank** 15:24 16:2

**re-go** 12:10

**read** 6:18 31:8,
12 34:17,21
35:1 36:4,18
38:9,22 39:10,
12 40:7,24
42:4,7 43:4,10,
21 45:2,5,10,25
46:2,5,6 85:18,
24 86:3

**reading** 53:11

**reads** 33:18
34:13 36:1,15
37:25 38:5,19
39:7 40:4,17
43:2,17 45:21

**real** 15:9 71:16,
18 72:7 80:11

**recall** 13:10
14:13,15 18:11
22:2 23:22
27:12,23 28:5,
11,15 30:15
51:6 56:18,25
58:12,19 59:1,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 106 of 108 PageID #:10623
Jose Ramirez Eduardo Silva - Vol. 1 - 6-20-2024

96

7,23 61:7 64:4
74:16 76:4,13,
15

**recalled** 26:13
32:24

**recalling** 29:7

**receiving** 74:2

**recent** 9:9

**recognize**
71:20

**recollection**
17:5 20:7 21:22
36:25 43:4
53:1,4,9,15
54:2,17,21
55:19

**record** 6:2 8:20
22:23,24 61:13,
15,16,17 67:5

**record's** 69:7

**recovered** 7:4
42:7

**RECROSS-
EXAMINATIO
N** 84:16

**REDIRECT**
80:9

**referencing**
53:10

**referring** 7:11

**reflect** 32:24
67:5

**relationship**
40:6,18 55:17
67:16

**released** 78:9

**remainder** 9:3

**remember**
10:13 11:15
16:22 20:24
24:1 25:10,13,
18,22 27:10
29:3,13,20 30:1
34:9 48:5,8
50:18,25 51:8
53:6,14,16 54:8

55:6,11 56:2,
15,17,20 57:3
64:1,7 74:2,6,
21,25 75:16,19,
21 77:19,21,24
78:22 79:1
80:15 84:20

**remembered**
25:12 50:16
53:20

**repeat** 67:22

**repeatedly**
48:3

**reporter** 6:2
8:7,8,9 22:11,
24 61:14,17
73:5,6,8,10,18
85:10

**reporter's**
85:17

**represent**
21:17 23:8
63:19

**representing**
24:14

**resell** 7:3 42:6

**reserve** 85:16,
22,23

**residential**
75:15

**resolved** 75:21

**response**
48:23

**restaurant**
29:14 35:6 41:3
49:11 50:3,5
54:13,15 55:7
58:7 65:16
68:8,18 78:14,
16

**Rey** 26:4 36:17
38:1,20 69:15
79:1

**Ricardo** 18:7

**RICO** 79:14

**risky** 70:1

**Road** 27:4

**rob** 7:3,19 42:5

**robbery** 28:19
66:12

**Rock** 12:17,18

**Rodriguez**
18:7

**ROMELFANG
ER** 12:2,5 13:5,
23 14:11,22
15:3,8,22 16:6,
13,23 17:3,10
19:2,14,21 20:4
21:2,7,10 25:3
26:17 28:2,14,
25 29:18,24
30:6,11 31:17
33:2 34:20
35:22 36:8,13,
22 37:15,21
38:17 39:5
40:1,15 41:9
42:15,25 43:15
44:14 45:15
46:9,14 47:1
49:1 50:17
51:11,16 52:20
53:17,24 54:25
56:12 58:15,21
59:5 60:14,19
61:6 62:6,12
71:4 76:7 79:2,
9,17 84:14

**room** 42:22

**run** 9:5

———————
**S**
———————

**sales** 28:18
40:24

**Sam** 79:20

**sat** 19:10

**Scahill** 6:7,10,
17 8:1,11,13,19
11:17 12:1
18:9,14 19:24
22:22 26:1,7,
16,22 28:9 30:5
31:9 35:21
41:8,10,16,20

42:16 44:15
46:15 52:4
54:22 55:23
57:14 58:22
65:23 66:2,14
67:3,19 68:10,
12 69:1,10 70:8
71:5,8 73:11
76:8 79:10
80:10 81:2,7,
10,14,18,25
82:3,6,13,21
83:1,15,20
84:2,11

**scanned** 72:11

**Schiller** 15:16,
19 16:15,17
17:14

**school** 64:12

**screen** 22:16
71:17 72:25
77:4

**Sean** 23:7

**Section** 45:23

**selected** 26:25

**sell** 7:13 40:20
59:12

**sentence** 9:24
11:15 45:10,13
79:15

**sentenced**
9:20,21 75:11

**series** 71:21

**serving** 79:15

**set** 15:15 16:1,
9,15,18 67:15

**sets** 80:2

**shake** 57:15
58:5

**share** 77:4

**sharing** 72:5

**short** 12:7
22:20

**Shortly** 40:4

**show** 72:5,15

73:3

**showed** 19:24
28:6 30:22

**showing** 27:24
74:7 76:2

**side** 9:4

**sign** 32:19 47:4

**signature**
32:17 85:9

**signed** 27:17
33:4,13 39:21
46:24 76:18

**signing** 33:8
47:8

**simple** 83:7

**single** 24:25

**sir** 6:9 7:5 8:24
9:8,11,19 10:6,
10 11:25 20:17
23:17,18,24
24:2 25:6,8,11,
14 29:16,23
30:4 31:2 32:4,
8,17 34:19 35:1
37:25 39:20
40:9,25 41:3,6,
23 42:12,13,19,
23 43:14,21
44:1 45:25
46:7,22 47:5,8
48:1,14 50:11
51:21 53:1,13
55:20 56:1,6,
11,24 57:7,11
58:25 60:3,18
61:23 62:13,15,
21 63:1,3 65:1
67:22 72:25
74:13 76:11
81:4,5 82:8
85:1,12

**sister** 24:7

**sit** 21:22 44:4,
12 46:12 58:12
76:15

**sitting** 14:1

**situation** 7:14
37:8 59:10,16,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 107 of 108 PageID #:10624
328056 Ramirez Eduardo Silva Vol. II 6-20-2024

97

17 65:17

**skip** 12:8

**sleeping** 62:22

**small-time**
70:12

**sound** 14:2

**sounds** 13:9

**South** 78:17

**Spanky** 79:21

**speak** 26:20

**speaking**
27:14 41:14,15

**specific** 50:21

**specifically**
53:8 54:2 64:2,
17

**speculate**
13:25 23:16
54:20

**speculation**
13:2,17 14:8,20
15:1,6,21
16:11,21,25
17:7 20:2 22:6

**spend** 36:3,17

**spoke** 19:23
23:25 24:17
34:7 44:23
59:17

**spoken** 60:16,
24 66:11

**spot** 66:16

**staff** 50:10

**stamped** 73:15
74:12

**stamps** 73:3

**stand** 86:11

**Starr** 7:22,25
8:12,16 13:1,16
14:7,20,25
15:6,20 16:3,
11,21,25 17:7
18:24 19:11,12,
17,18,25 20:1,9

21:24 22:6,12,
14,19 23:5,7
25:4 26:2,9,18,
23 28:4,10,20
29:2,19,25
30:7,12,19,21
31:11,19 33:3
34:13,21,25
35:24 36:9,14,
24 37:16,22
38:18 39:6
40:3,16 41:12,
18,21 42:18
43:1,16 44:16,
18,20 45:16
46:10,17 47:3,
16,18 49:3
50:20 51:12,17
52:7,21 53:19,
25 55:3,25
56:13 57:21
58:17,24 59:22
60:9,15,20
61:3,10,22
62:8,14 63:7,15
73:9 77:11,15
80:13,21 82:4,9
83:12,18,25
84:9,12,16
85:4,6,15,24
86:1,3,6,8,10

**Starr's** 8:22

**started** 29:7

**Starting** 73:22

**State's** 21:17
22:4

**stated** 23:7
28:15 29:5

**statement**
31:5 33:5,9,23
38:14 39:24
40:12 44:22
46:3 74:8,14
76:18

**statements**
45:22

**States** 19:4

**States'** 18:22

**stay** 85:12

**Steve** 82:23

**stop** 41:15
70:14 81:7,20

**street** 54:10,11

**streets** 55:16
58:3 79:23,25

**strike** 31:6
35:18 52:1 58:7

**strip** 47:9,14

**stuff** 8:25 20:21
39:8 65:18

**style** 6:14

**substance**
74:17 77:22,23

**succinct** 23:14

**suggested**
62:1

**supposed**
18:22

**surprised**
59:20

**swore** 64:19

**sworn** 33:5,9

————————

**T**

————————

**table** 6:20
65:17

**taking** 38:19
70:13

**talk** 19:19,22
35:10 58:9
78:21

**talked** 9:6
18:14 19:25
24:25 49:23

**talking** 28:17
41:17 52:6 53:9
55:19 56:7,22
77:3 83:21

**Tank** 14:5,10,
18

**telephone**
24:3,6,18

**telling** 29:3,14,
20 30:1 34:9
48:5,9 51:8
53:14,16 69:14,
18

**ten** 75:11 78:5,
6

**term** 53:8

**terms** 75:22

**testified** 10:4
25:16 48:4
54:12 55:18
56:22 57:8
63:20 77:20
81:23

**testify** 50:6
82:3

**testifying** 23:9
28:22 82:1

**testimony**
41:11 48:25
56:3 67:4

**thing** 10:18
24:25 48:7 58:1
69:18 86:2,3

**things** 17:16
69:21 70:10
71:12 72:5
83:23 85:8

**thinking** 29:7

**thought** 11:11
28:22 35:6
49:14 51:9
54:12 66:22

**three-way**
24:21

**threw** 76:19

**thrown** 75:25

**Tim** 12:7

**time** 6:5 9:10
11:13 12:6
19:3,9 21:11,
19,21 23:2
24:19 26:13
29:6 30:15
36:3,17 37:6
48:25 49:12,15

52:5 53:22
55:8,10 57:24,
25 59:13,17,18
61:5,15,20 63:8
68:13,17 69:25
71:25 78:2,4
79:13 80:6

**times** 9:13
29:4,8,15,21
30:1 31:1 37:1,
4,7 58:6,8
64:17

**tired** 67:10

**today** 14:1
19:24 20:7
21:12,19,22
22:2 23:19
44:4,12 46:12,
22 48:4 49:13,
23 58:12 61:20
76:15 80:14,17
81:4 82:8 83:3

**Today's** 6:5
23:2

**told** 19:9,15
21:7 25:24
27:21 28:11
30:8 36:10
46:20 48:4,7
55:21 62:3
66:11,23 67:17
68:23 80:19
81:13

**top** 74:13 76:5

**totally** 13:24
44:22

**trafficking**
10:22

**transcribing**
85:17

**traveled** 26:24

**trial** 23:10,12
82:14

**true** 33:13 35:3,
4 36:21,23
38:14,16 39:3,
24 40:2,13
41:5,6,7 42:13,
14 43:3 44:2,13

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

Case: 1:18-cv-02342 Document #: 365-8 Filed: 07/16/24 Page 108 of 108 PageID #:10625
3280250 Ramirez- Eduardo Vol. II 6-20-2024

98

45:13,14,24
46:25 47:2
68:22

**truth** 33:10
48:5,6,9 80:14,
19 81:3,13 82:7
83:2

**truthful** 36:6,
10

**tune** 67:8

**turn** 11:22
37:23 44:23
70:17

**two-minute**
22:20,22 61:11

**type** 10:19
17:15

**typed** 30:23
39:12

**typewritten**
8:22

———————

**U**

———————

**ultimately** 78:1

**unable** 23:10

**underneath**
34:16

**understand**
20:5 45:21 50:6
71:12,14

**understanding**
18:21 19:4
40:18

**understood**
33:4,8 46:6

**unique** 51:9

**united** 18:22
19:4 71:11

**unrelated**
25:17

**USC** 45:23

**UUW** 73:24
74:5

———————

**V**

———————

**vague** 8:16
17:1 18:25 76:6

**Veras** 13:12

**verbal** 48:23

**version** 39:12

**Victoria** 6:4
23:1 61:19

**videoconferen
ce** 6:4 23:1
61:19

**violence** 11:3,
4,5,7

**violent** 11:10

**visit** 16:19

**VOL** 6:1

**voluntary**
44:22

———————

**W**

———————

**waive** 85:9,19,
21 86:7,8,10,11

**wanted** 9:4
42:10,21,22

**ways** 70:13,19

**weeks** 57:6

**well-known**
16:17 17:14
38:20

**West** 49:6

**whatsoever**
62:20 63:4 85:1

**Whipple** 80:1

**white** 38:6

**Wicker** 34:16
35:5,7

**wildly** 41:11

**Wiley** 21:23
22:5

**with-** 84:17

**witnesses**
85:19

**words** 58:25

**worked** 24:14
71:11

**working** 7:13
8:12

**worries** 13:11

**would've**
48:16 62:9

**write** 8:25

**writing** 8:20

**written** 27:21
33:12,20

**wrong** 72:12

**wrote** 42:20
43:7 45:17

———————

**X**

———————

**XX** 63:25

**XX-XX** 63:25

———————

**Y**

———————

**year** 11:14 56:1

**years** 10:1,3
20:6 52:13,15,
16 58:13,20
60:17,25 75:11
78:5,6

**Yuma** 25:10,17
33:20 34:1
51:19 52:3,9,18



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900          www.MILESTONEREPORTING.com

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

Toll Free 855-MYDEPOS