# EXHIBIT 9

# In The Matter Of:
*Maysonet v.*
*Guevara*

*James Doody*
*August 28, 2020*



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

Min-U-Script® with Word Index

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT FOR
        THE NORTH EASTERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
             CASE NO.  18 CV 02342
 3
        ----------------------
 4
        JOSE JUAN MAYSONET,
 5      JR.,                           CIVIL ACTION

 6            Plaintiff(s),        Deposition of:
                                    JAMES DOODY
 7      v.

 8      REYNALDO GUEVARA, et
        al.,
 9
              Defendant(s).
10      ----------------------

11

12
               T R A N S C R I P T of the stenographic
13      notes of the proceedings in the above-entitled

14      matter as taken by and before DIANE M. HOLMES, a

15      Certified Court Reporter and Notary Public of the

16      State of New Jersey, held via videoconference on

17      Friday, August 28, 2020, commencing at approximately

18      2 p.m. in the afternoon, pursuant to notice.
```

## Page 2

```
 1  A P P E A R A N C E S:

 2
    BONJEAN LAW GROUP, PLLC
 3  Attorneys for Plaintiff Jose Juan Maysonet, Jr.
          467 Saint Johns Place
 4        Brooklyn, New Jersey 11238
          718.875.1850
 5        Jennifer@bonjeanlaw.com
    BY:   JENNIFER BONJEAN, ESQ.
 6        ASHLEY COHEN, ESQ.
          STEVE GREENBERG, ESQ.
 7

 8
    LEINENWEBER BARONI & DAFFADA, LLC
 9  Attorneys for Defendant Reynaldo Guevara
          1150 Wilmette Avenue, Suite D
10        Wilmette, Illinois 60091
          847.251.4091
11        kevin@ilesq.com
    BY:   KEVIN ZIBOLSKI, ESQ.
12

13
    THE SOTOS LAW FIRM, P.C.
14  Attorneys for Defendants JoAnn Halvorsen, Edward
    Mingey, Lee Epplen, Fernando Montilla and Ronald
15  Paulnitsky
          141 W. Jackson Boulevard, Suite 1240A
16        Chicago, Illinois 60604
          630.735.3303
17        dbrueggen@jsotoslaw.com
    BY:   DAVID A. BRUEGGEN, ESQ.
```

## Page 3

```
 1  A P P E A R A N C E S: (Cont'd)

 2

 3  ROCK, FUSCO & CONNELLY, LLC
    Attorneys for Defendant City of Chicago
 4        321 N. Clark Street, Suite 2200
          Chicago, Illinois 60654
 5        312.494.1000
          erosen@rfclaw.com
 6  BY:   EILEEN E. ROSEN, ESQ.

 7

 8  COOK COUNTY STATE'S ATTORNEY'S OFFICE
    Attorneys for Frank Di Franco and Cook County
 9        50 W. Washington, 5th Floor
          Chicago, Illinois 60602
10        Edward.brener@cookcountyil.gov
    BY:   EDWARD M. BRENER, ESQ.
```

## Page 4

```
 1                   I N D E X

 2  EXAMINATION                              PAGE

 3  JAMES DOODY
    DIRECT EXAMINATION BY MS. BONJEAN           5

 4

 5              E X H I B I T S

 6  NUMBER         DESCRIPTION               PAGE
 7  Doody-1        Mohamed Omar FBI 302        53

 8  Doody-2        Wire tap                    53
```

1 Q. Would it be fair to say that you did
2 not participate in investigating, for instance, the
3 Jon Burge allegations?
4 A. Well, that's not completely true. I
5 was not involved in the original investigation at
6 all, but I did reopen that investigation after I
7 initiated an investigation of Officer Miedzianowski
8 who was a gang crimes officer.
9 Q. Okay. And --
10 A. And that I wanted to see where that
11 would go because it -- I don't believe that I was
12 able to develop anything that would further that
13 along, neither was the bureau. That's all I can
14 tell you about that.
15 Q. Okay. So I would like to ask you some
16 questions, which is the primary purpose of this
17 deposition, about your work in the Miedzianowski
18 investigation and some of the information you
19 developed in the context of that. Okay?
20 A. All right. It's been a long time, but
21 I'll give it my best for you.
22 Q. What were the circumstances under which
23 your department initiated an investigation into
24 criminal or alleged criminal activity of Joe
25 Miedzianowski?

1     MS. ROSEN: I'm just going to have a
2 standing objection to the line of questioning that
3 relates to Mr. Miedzianowski, but you can go ahead
4 and answer the question, and I won't keep
5 interrupting.
6 A. All right. It started when I -- hold
7 on. It started when I received some information
8 from a source and it concerned the conduct of
9 Miedzianowski, criminal conduct, corruption, and
10 when I received that, I initiated a confidential
11 investigation of him.
12     I was not involved with the FBI at that
13 time, and I -- I was a deputized federal officer. I
14 worked a number of federal cases but -- initially,
15 this was a department investigation and the source
16 provided information, and though it was a challenge
17 to assess the source, because I never used him
18 before, I felt that there -- there is -- there was a
19 possibility by the way he presented it that, you
20 know, he could be credible, and I needed to get data
21 on Miedzianowski. So I did -- I did some research
22 and investigation on him.
23 Q. Do you recall what year it was?
24 A. And that's when I became familiar with
25 the -- with the 1992 ATF matter and I reviewed it.

1 Q. Can you estimate what year it was that
2 you initiated the investigation into Joe
3 Miedzianowski?
4 A. I believe -- I can't remember. I
5 believe it was 19 -- oh, Jesus. It was either 1997
6 or 1998 when I got the -- I think it was '98, but I
7 can't remember for sure.
8 Q. Okay. You said that it was initially a
9 Chicago Police Department IAD investigation solely.
10 Is that right?
11 A. Yeah. I knew nothing about whatever
12 the federal government was doing or not doing on
13 that.
14 Q. Putting aside --
15 A. But it was just --
16 Q. Putting aside the Miedzianowski case,
17 did you work as an IAD sergeant with these other
18 agencies on a regular basis?
19 A. Yeah, I did. Over the -- yeah. I had
20 for some time.
21     I had another case where I arrested
22 three officers just before the Miedzianowski case.
23 Their trial was over, but that was a federal case,
24 and I worked that.
25 Q. Okay. Did there come a time when your

1 investigation merged or overlapped with an --
2 A. Yeah. Yeah.
3 Q. -- investigation?
4 A. You know, it's -- there's more
5 resources available with the federal government,
6 obviously, and, also, the Miedzianowski matter, to
7 me, was going to transcend state boundaries, and I
8 felt that it was something where both the bureau and
9 our office should be working together, and I made
10 those assessments on cases before, and, you know, I
11 would consult with my commanding officer to get the
12 okay to approach, and that's -- that's what I sought
13 in this case.
14 Q. How long were you working on the
15 investigation solo before you approached federal
16 agencies?
17 A. Oh, not that long, because once it
18 became clear that there was a connection to someone
19 in Florida, you know, I could -- I could see what
20 was needed enough so that it would go beyond
21 Chicago, you know, in order to most effectively and
22 efficiently address this matter and to -- and that
23 the federal laws would probably be more applicable
24 because of the interstate involvement, and I felt
25 that this was that kind of case, and that was my


Page 21

1  thinking. So I went to my CO with that.
2  Q. Okay. That makes sense.
3     Can you summarize for me what you did
4  as part of your investigation leading up to you
5  approaching the federal agencies?
6  A. I can't remember it all. I just can't,
7  but, you know, I did review some data, and I don't
8  know -- I can't remember who -- you know, whether I
9  had received other information or did any other
10 work, but, you know, once I got information -- once
11 I became aware that there was a Florida connection
12 here that -- that I knew where this was headed, and
13 that's -- I didn't waste time then.
14    You got to move on that because it
15 wouldn't get me anywhere to not move forward at that
16 point once you learned that it's an interstate
17 matter.
18 Q. Okay. That makes sense also. Do you
19 know if you interviewed witnesses, just, again,
20 generally without asking you to identify them, but
21 do you know whether you interviewed witnesses as
22 part of your investigation?
23 A. Throughout the course of the case?
24 Q. Yes.
25 A. Lots. That's all I can tell you. It

Page 22

1  was like a lot of -- most of the conspirators
2  cooperated, you know, and pled out.
3     So we interviewed them, and there were
4  eyewitnesses, or not necessarily eyewitnesses, but
5  witnesses and sources. All kinds of stuff, yeah.
6  There was a lot of people interviewed, a lot.
7  Q. Did you participate in the interviews
8  of the witnesses that were conducted by the federal
9  agents for the most part?
10 A. I did. I did. Yeah.
11 Q. And did you continue assisting with the
12 investigation once you --
13 A. I was one of the case agents.
14 Q. Okay. So you had an investigative role
15 in the case even after you engaged a federal agency?
16 A. Yeah. I was asked to -- I ran the -- I
17 was in charge of the wire room. It was run out of
18 our office.
19 Q. And when you say our office, do you
20 mean the offices Chicago Police Department offices?
21 A. The confidential investigations, it was
22 a private building, not -- so yeah.
23    The wire room was located in there, and
24 we utilized confidential investigations, workers and
25 FBI agents to work the wire room.

Page 23

1  Miedzianowski was -- was known, and we
2  did not want to go beyond just those two units, if
3  possible. I think we used some SIS people too.
4     They're the special investigations
5  section of the IAD. They do similar work to what we
6  do, and so they -- they might have been utilized to
7  some extent. I don't remember, but we kept it --
8  you know, we had to keep it limited.
9  Q. And you said you had conducted a lot of
10 interviews of witnesses. Did you have a case file
11 that you contributed to when you -- that IAD had in
12 connection with the Miedzianowski case?
13 A. There were -- there were mainly 302s
14 done on this. We did not do duplicate reports.
15 That doesn't make sense, but that's the report that
16 would -- that would document or, you know,
17 memorialize the interview was the 302.
18 Q. The 302 is a number that reflects a
19 police report that's prepared by the FBI, right?
20 A. Yes. In these joint inquiries, that's
21 the way it usually went. We would do it that way.
22 I did some of them but not many.
23 Q. And when you say you did some of them,
24 did you do them as 302s?
25 A. Yeah. Yeah, I did. Initially, I did.

Page 24

1  Before I went to the FBI, I did my report, you know.
2  Q. And your report would be in what --
3  it's not a 302, though, right?
4  A. No. We did a to/from type of report.
5  Q. Right.
6  A. The standard. Not a
7  fill-in-the-blank-type report, but, you know, from a
8  blank paper and you type everything on it.
9  Q. Right. Like these to/from memos or
10 to/from reports?
11 A. Yeah.
12 Q. And when you did a to/from report, were
13 you typically doing it to your -- from you to your
14 commanding officer?
15 A. Yeah. That's the only place it went
16 was to the commanding officer.
17 Q. And do you know how those to/from
18 reports were maintained in IAD?
19 A. Yeah. They were maintained in a locked
20 file cabinet, and then eventually -- well, that
21 would be at the close, but that's where they were
22 maintained was in the file, a locked file cabinet,
23 and that was standard procedure.
24 Q. And that was during an active
25 investigation, right?