# EXHIBIT 18

# In The Matter Of:
*Maysonet v.*
*Guevara*

*Roland Paulnitsky*
*September 17, 2019*
*Video Deposition*



RIZMANRAPPAPORT
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

```
 1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   JOSE JUAN MAYSONET, JR.,    )
                                 )
 4              Plaintiff,       )
                                 )
 5        vs.                    )  No. 18-cv-02342
                                 )
 6   REYNALDO GUEVARA, ERNEST    )
     HALVORSEN, EDWARD MINGEY,   )
 7   EPPLEN, FERNANDO MONTILLA,  )
     ROLAND PAULNITSKY, FRANK    )
 8   DI FRANCO, CITY OF CHICAGO  )
     and COOK COUNTY,            )
 9                               )
                Defendants.      )
10

11        The video-recorded deposition of ROLAND

12   PAULNITSKY, taken in the above-entitled case on

13   the 17th day of September, 2019, at the hour of

14   10:17 a.m. at the offices of the Sotos Law Firm,

15   141 West Jackson Boulevard, Suite 1240A, Chicago,

16   Illinois, pursuant to agreement of counsel.

17

18   Reported by: Karen P. Burns, CSR

19   License No.: 084-002615

20

21

22

23

24

25
```

Page 2

```
 1   APPEARANCES:

 2        BONJEAN LAW GROUP
          BY: MS. JENNIFER A. BONJEAN
 3
             100 Dean Street
 4           Suite 422
             Brooklyn, New York 11238
 5           (718) 875-1850
             jennifer@bonjeanlaw.com,
 6
                On behalf of the plaintiff;
 7
          STEVEN A. GREENBERG, LTD.
 8        BY: MR. KYLE JORGENSEN

 9           53 West Jackson Boulevard
             Suite 1260
10           Chicago, Illinois 60604
             (312) 879-9500
11           kyle@greenbergcd.com,

12              On behalf of the plaintiff;

13        THE SOTOS LAW FIRM
          BY: MR. JOSH ENQUIST
14
             141 West Jackson Boulevard
15           Suite 1240A
             Chicago, Illinois 60604
16           (312) 735-3300
             jenquist@jsotoslaw.com,
17
                On behalf of defendants
18              Ernest Halvorsen, Edward Mingey,
                Lee Epplen, Fernando Montilla and
19              Roland Paulnitsky;

20

21

22

23

24

25
```

Page 3

```
 1   APPEARANCES (Continued):

 2        ROCK, FUSCO & CONNELLY, LLC
          BY: MS. EILEEN E. ROSEN
 3
             321 North Clark Street
 4           Suite 2200
             Chicago, Illinois 60654
 5           (312) 494-1000
             erosen@rfclaw.com,
 6
                On behalf of defendant
 7              City of Chicago.

 8        LEINENWEBER BARONI & DAFFADA LLC, by
          MR. JUSTIN LENNON LEINENWEBER,
 9
             120 North LaSalle Street
10           Suite 2000
             Chicago, Illinois  60602
11           (847) 251-4091
             jll@ilesq.com
12
                on behalf of defendant
13              Reynaldo Guevara;

14        COOK COUNTY STATE'S ATTORNEY'S OFFICE, by
          MS. SARA DIXON SPIVY,
15
             50 West Washington Street
16           Suite 500
             Chicago, Illinois  60602
17           (312) 603-5971
             sara.spivy@cookcountyil.gov
18
                on behalf of defendants
19              Frank DiFranco and Cook County.

20

21   ALSO PRESENT:

22        Mr. Gabriel Martin, Videographer;

23        Ms. Gabby Orozco, Legal intern
          (partial proceeding).
24

25
```

Page 4

```
 1               I N D E X

 2   WITNESS                              EXAMINATION

 3   ROLAND PAULNITSKY

 4     By Ms. Bonjean                              6

 5

 6

 7            E X H I B I T S

 8   EXHIBIT NAME   DESCRIPTION                  PAGE

 9   Paulnitsky Exhibit

10     Exhibit 1    Document Bates numbered        69
                    CCSAO000100-101
11
       Exhibit 2    Document Bates numbered       182
12                  MAYSONET 9596-9617

13     Exhibit 3    Document Bates numbered       270
                    RFC-Maysonet 000001-66
14
       Exhibit 4    Document Bates numbered       270
15                  RFC-Maysonet 000067-102

16     Exhibit 5    Document Bates numbered       311
                    CCSAO001145
17
       Exhibit 6    Document Bates numbered       317
18                  CCSAO001145, 1556 and 1557

19     Exhibit 7    Document Bates numbered       356
                    RFC-Maysonet 000378-404
20
       Exhibit 8    Document Bates numbered       358
21                  CCSAO000364-371

22

23        (Exhibits attached to transcript.)

24

25
```

Page 141

1      MS. ROSEN: Object to the form.
2      MR. ENQUIST: And argumentative.
3      BY MS. BONJEAN:
4 Q. No, I'm serious. Do you know what I
5 asked you even?
6      MS. ROSEN: Object to the form. Asked
7 you when?
8      MS. BONJEAN: I don't know what he's
9 even responding to, so I'm wondering what he
10 was responding to.
11      MS. ROSEN: Object to the form. Is
12 there a question?
13      THE WITNESS: Responding to the last
14 couple questions that were the same questions
15 that you asked me.
16      BY MS. BONJEAN:
17 Q. Which you don't even remember?
18      MS. ROSEN: Object to the form.
19      THE WITNESS: I want to make sure.
20      BY MS. BONJEAN:
21 Q. Okay. So let's get on the same page so
22 that the record has some meaning.
23      MS. ROSEN: Object to the argument and
24 editorialize.
25

Page 142

1      BY MS. BONJEAN:
2 Q. You can only report accurately what
3 you've done or heard or seen, correct?
4      MR. ENQUIST: Objection,
5 mischaracterizes previous testimony,
6 argumentative, form.
7      THE WITNESS: I would have recorded
8 what I learned.
9      BY MS. BONJEAN:
10 Q. What you heard?
11 A. If I found it to be something that
12 should be in a report.
13 Q. Okay. So if you heard a witness or a
14 suspect tell you something that you thought was
15 relevant to an investigation, you were trained to
16 prepare a report to memorialize those statements,
17 correct?
18 A. That's fair to say.
19 Q. Okay. And during your career, did you
20 ever assign that responsibility to a fellow
21 detective, and when I say "assign that
22 responsibility," what I mean by that is, did you
23 ever ask another detective to memorialize
24 something that only you heard?
25 A. I could have.

Page 143

1 Q. And why would you ever do that?
2 A. Because that detective was writing the
3 report pertaining to something that we were doing.
4 Q. Okay. So it's possible that you would
5 tell another detective what you heard so that he
6 could include it in a report, is that what you're
7 testifying to?
8 A. That's somewhat accurate.
9 Q. Okay. And if you were the person
10 responsible for actually preparing, for instance,
11 a supplemental report of some type and another
12 detective came to you and said X happened, it
13 would be in keeping with your habits to actually
14 include that if it was relevant to the
15 investigation, right?
16      MR. ENQUIST: Objection, vague and
17 confusing.
18      THE WITNESS: I'm going to answer it as
19 sometimes I would, sometimes I wouldn't.
20      BY MS. BONJEAN:
21 Q. And why would you sometimes do it and
22 sometimes not do it?
23 A. It depends on what type of report I'm
24 writing and if it had anything to do with that
25 particular case.

Page 144

1 Q. Okay. If you were investigating a
2 matter with another detective and that detective
3 told you that a witness had made certain
4 statements that were relevant to the
5 investigation, can you please include that in this
6 report, you would do that from time to time,
7 right?
8 A. I could have had him type on my report
9 what he learned. That wasn't uncommon.
10 Q. So that you would all be typing on the
11 same document, is that right?
12 A. Possible. That happened.
13 Q. Okay. And if you were including a
14 narrative in one of your reports that had been
15 conveyed from another detective, was it your
16 practice to make note that the information came
17 from another detective?
18 A. Could have.
19 Q. Is it something that you were trained
20 to do?
21 A. I don't think I was trained in that
22 aspect.
23 Q. So essentially, report writing could be
24 very much a collaborative enterprise, right?
25 A. Yes.

Page 149

1  write it down on a piece of paper or report.
2  Q.  But eventually you would want to
3  memorialize it within -- you know, maybe not
4  immediately, but within a short period of time,
5  correct?
6  A.  I don't know what you mean by "short."
7  Q.  Well, why don't you tell me what the
8  rule was?  What was the policy?
9  A.  There wasn't a policy.
10      MS. ROSEN: Objection, form,
11  foundation.
12      BY MS. BONJEAN:
13  Q.  So there was no policy of the Chicago
14  Police Department that you had to record pertinent
15  information relative to an investigation within a
16  certain period of time, right?
17  A.  How your question seems to me, I don't
18  have to record something that day, a short period
19  of time.
20  Q.  How about the next day?
21      MS. ROSEN: Objection, form.
22      THE WITNESS: I don't think so.
23      BY MS. BONJEAN:
24  Q.  How about the following day?
25  A.  I don't know.

Page 150

1       MS. ROSEN: Objection, form.
2       BY MS. BONJEAN:
3  Q.  What do you mean, you don't know?
4       MS. ROSEN: Objection, form.
5       THE WITNESS: As long as the facts were
6  fresh in my memory, there was no need for me
7  to rush with a report.
8       BY MS. BONJEAN:
9  Q.  But eventually, facts become less fresh
10  over time, right?
11  A.  They could.
12  Q.  Right.  And since they could, it would
13  be important to, within some reasonable amount of
14  time, record relevant information, right?
15      MS. ROSEN: Objection, form.
16      THE WITNESS: I would say so.
17      BY MS. BONJEAN:
18  Q.  There is other benefits to recording
19  statements or information in and around the time
20  that you received it, right?
21  A.  Could be.
22  Q.  Maybe to defend against some later
23  allegation that you made it up, right?
24      MS. ROSEN: Objection, form.
25      THE WITNESS: I don't know.

Page 151

1       BY MS. BONJEAN:
2  Q.  You don't know?
3       MS. ROSEN: Objection, form,
4  argumentative.
5       BY MS. BONJEAN:
6  Q.  Does that sound logical as a detective
7  of 40 years or 20 years, however long you were a
8  detective?
9       MS. ROSEN: Objection, form,
10  argumentative.
11      THE WITNESS: I could only tell you
12  what I did.
13      BY MS. BONJEAN:
14  Q.  Right.  And I'm asking, is it your
15  understanding that in addition to it being
16  beneficial to record what actions you take in an
17  investigation so it can refresh your recollection
18  years down the line or months down the line, that
19  another reason is to corroborate your eventual
20  testimony, right?
21  A.  It's possible.
22  Q.  Right.  Otherwise defense attorneys
23  might say you're making it up, right?
24      MS. ROSEN: Objection, form, foundation
25  as to what other defense attorneys might say.

Page 152

1       MR. ENQUIST: Join.
2       THE WITNESS: I don't know what they
3  would say.
4       BY MS. BONJEAN:
5  Q.  Right.  But if a defense attorney said
6  Detective Paulnitsky, what you testified to here
7  today, you're testifying to this today but that
8  didn't really happen, if you had a report, you
9  could say no, I made a report at the time; that
10  would be a good way to refute that charge of
11  fabrication, right?
12      MS. ROSEN: Objection, form,
13  foundation, calls for speculation.
14      MR. ENQUIST: Join.
15      THE WITNESS: It's their opinion.
16      BY MS. BONJEAN:
17  Q.  Right.  I mean, it may be their
18  opinion, but did you have a job to do when you
19  were called to testify in criminal prosecutions?
20      MS. ROSEN: Objection, form.
21      THE WITNESS: I did my job.
22      BY MS. BONJEAN:
23  Q.  Okay.  So you don't know the value of a
24  police report, right?  I guess that's what you're
25  saying?

Page 153

1    MS. ROSEN: Objection, form,
2 argumentative.
3    MR. ENQUIST: Objection.
4    THE WITNESS: I know the value of a
5 police report and all reports within the
6 Chicago Police Department.
7    BY MS. BONJEAN:
8 Q. Okay, so now we're getting somewhere.
9    MS. ROSEN: Objection to the editorial
10 commentary.
11    BY MS. BONJEAN:
12 Q. What is the value of a police report?
13    MS. ROSEN: Objection, form.
14    MR. ENQUIST: Could you read the
15 question back, please?
16    (Record read as requested.)
17    THE WITNESS: I think it's very
18 self-explanatory. Police report is a summary
19 of what occurred and what happened, the facts
20 pertaining to the incident.
21    BY MS. BONJEAN:
22 Q. What is the value of it? You said, I
23 know the value of a police report so I'm asking
24 you to explain your answer?
25    MS. ROSEN: That was in response to you

Page 154

1 saying well, I guess you don't know the value
2 of a police report, so objection, form,
3 foundation and argumentative.
4    MS. BONJEAN: Well, whatever it was in
5 response to, it came out of his mouth and I'm
6 asking him, what is the value of a police
7 report?
8    MS. ROSEN: Objection, argumentative.
9    THE WITNESS: The value of a police
10 report is to record certain facts.
11    BY MS. BONJEAN:
12 Q. And why is that valuable?
13    MS. ROSEN: Objection, form.
14    THE WITNESS: Because there is a public
15 report that's public record of what's
16 pertaining to an incident.
17    BY MS. BONJEAN:
18 Q. So the public has an interest in
19 knowing what steps are taken in an investigation?
20    MS. ROSEN: Objection, form,
21 foundation.
22    BY MS. BONJEAN:
23 Q. Is that what you're saying?
24 A. I would think so.
25 Q. Okay. Any other values to a police

Page 155

1 report?
2 A. You're recording alleged allegations
3 and you're conducting an investigation.
4 Q. Yes, and any other value to a police
5 report other than the public has an interest in
6 knowing what happens in an investigation?
7 A. And other police officers.
8 Q. Other police officers have an interest
9 in knowing what happened in an investigation,
10 right?
11 A. Yes.
12 Q. So that they can see what preceded,
13 maybe, work that they are taking up in an
14 investigation?
15 A. Possible.
16 Q. Like if a witness was already spoken
17 to, you might want to know what they said before
18 you speak to them, correct?
19 A. It's possible.
20 Q. A police report might show you whether
21 a particular witness had been spoken to or
22 interviewed, right?
23 A. Yes.
24 Q. I think you agreed to this, but that
25 police reports have the capacity to refresh your

Page 156

1 recollection at some later point?
2 A. They could.
3 Q. Particularly in a case where, for
4 instance this case, the person wasn't prosecuted
5 until five years after their arrest, right?
6 A. I don't recall.
7 Q. Right. But when there is a gap in time
8 from time of arrest to prosecution, a police
9 report serves the purpose of refreshing a
10 detective's recollection about what investigative
11 actions took place, right?
12 A. It's possible.
13 Q. So for instance, today here, when I
14 question you about what happened in this
15 investigation, having a police report would be
16 helpful to refresh your recollection about what
17 happened, right?
18 A. Could.
19 Q. And also a police report could
20 corroborate what a police officer is saying
21 happened in an investigation, right?
22    MR. ENQUIST: Objection, asked and
23 answered.
24    THE WITNESS: It could.
25

Page 193

1    don't want him answering.
2        MS. ROSEN: I don't care. You're
3    talking out of both sides of your mouth. He
4    has answered repeatedly that he had no
5    information before.
6        MS. BONJEAN: Okay, great. Thank you
7    for lodging your objection. Duly noted. The
8    video's got it, the court reporter's got it.
9    I'm going to ask my questions and get
10   clarity, okay?
11       MS. ROSEN: Okay.
12       BY MS. BONJEAN:
13   Q.  Prior to July 15, 1990 -- do you know
14   what "prior" means? It means before, right?
15       MR. ENQUIST: Objection, form,
16   argumentative.
17       MS. ROSEN: Objection, form,
18   argumentative. Did you need a break?
19       MS. BONJEAN: I don't need a break.
20       MS. ROSEN: Is your blood pressure
21   going down or up or something? What's
22   happening?
23       MR. ENQUIST: We're going to get
24   through this question and then we're going to
25   take a break.

Page 194

1        BY MS. BONJEAN:
2    Q.  Do you need a break?
3    A.  I think maybe you do. I don't. I'm
4    fine.
5    Q.  Okay, great.
6    A.  I'm only concerned about you right now.
7        MR. LEINENWEBER: I would actually like
8    a break.
9        MS. BONJEAN: Well, we'll take a break
10   in a few minutes.
11       THE WITNESS: Again, you asked me a
12   couple times. I told you, I did not have any
13   knowledge, other than what I read, about the
14   Wileys, okay, at that time. I --
15       BY MS. BONJEAN:
16   Q.  Stop. That answers my question.
17       So prior to July 15, 1990, all you knew
18   about was what you read in those reports, right?
19   A.  That's correct.
20   Q.  Okay. And you had conversations, you
21   said, with Mingey, about the type of weapon that
22   might have been used in the Wiley brothers'
23   murders, right?
24   A.  Yes.
25   Q.  And that would have been before your

Page 195

1    arrest of Mr. Maysonet, correct?
2    A.  No, that's not correct. As I said
3    before, I didn't know about any connection or
4    possible connection until after my aggravated
5    battery was done, okay, and then I was privy to a
6    couple conversations.
7    Q.  Okay. So all of your conversations
8    with Mingey were after your arrest with
9    Mr. Maysonet -- strike that.
10       All of your conversations about the
11   Wiley brothers' murders were after your arrest of
12   Mr. Maysonet, is that right?
13   A.  I'm sure that we had conversations
14   about it because --
15   Q.  After or before?
16   A.  Probably after they were murdered.
17   Q.  Okay.
18   A.  Okay? But I'm doing this
19   investigation, I'm also listening to what's going
20   on with that homicide that we have, and then I
21   focused more on that murder investigation after he
22   was placed in custody for the shootings.
23   Q.  Okay. What do you remember about your
24   conversations with Sergeant Mingey before
25   Mr. Maysonet was arrested on the unrelated ag bat?

Page 196

1    A.  The exact conversations I don't recall,
2    but it had information pertaining to the murders,
3    a 9 millimeter was used, and then at some point in
4    time I learned that Freddie Montilla and Eddie
5    Mingey had gone to the County Jail to talk to
6    Maysonet when he was in custody.
7    Q.  Okay. So the information about the 9
8    millimeter, did you learn that before or after you
9    arrested Mr. Maysonet?
10   A.  I'm not sure.
11   Q.  Okay. And information that Mingey and
12   Montilla had spoken to Maysonet in the Cook County
13   Jail, did you learn that before or after you
14   arrested Mr. Maysonet on the ag bat?
15   A.  I believe it was after.
16   Q.  So on July 15, 1990, you received
17   information and had a photograph that somebody in
18   that photograph was identified in connection with
19   the shooting of three individuals, is that right?
20   A.  Yes.
21   Q.  And was Mr. Maysonet the individual in
22   that photograph?
23   A.  He was in that photograph.
24   Q.  Okay. And is that what led you to go
25   arrest him?

Page 237

1  approval from felony review to charge him, tell me
2  what happened next with respect to Mr. Maysonet?
3  A.  He was taken down to the lockup.
4  Q.  Okay.  And anything else?
5  A.  I don't know what they do in the
6  lockup.
7  Q.  And did you see Mr. Maysonet again
8  after you brought him to the lockup?
9      MS. ROSEN: Ever?
10     MS. BONJEAN: That day, before he was
11  transported to the County.
12     THE WITNESS: I did not.
13     BY MS. BONJEAN:
14 Q.  Did Sergeant Mingey or any sergeant ask
15  you whether they could speak to Mr. Maysonet?
16 A.  I don't recall if they did or not.
17 Q.  You have no recollection, though, of
18  having a conversation with Sergeant Mingey about
19  interviewing Mr. Maysonet, right?
20 A.  Sergeant Mingey is my supervisor.  All
21  the supervisors are responsible for everything and
22  everybody that's on that floor.
23 Q.  So he would not have to get your
24  permission to speak to Mr. Maysonet, right,
25  correct?

Page 238

1  A.  That's correct.
2  Q.  So to the best of your understanding,
3  after you let Mr. Maysonet know that he was being
4  charged, you sent him off to the lockup and you
5  didn't see him again, is that correct, until maybe
6  months later, a month later?
7  A.  Yes.
8  Q.  And you don't know whether or not
9  Mr. Maysonet had any conversations with any other
10 individuals, detectives, sergeants, et cetera, in
11 Area 5 on July 15, 1990, right?
12 A.  I don't recall if he did or not.
13 Q.  And as you sit here today you don't
14 know whether he did or did not, is that right?
15 A.  You're right.
16 Q.  Okay.  So what do you recall next as it
17 relates to Mr. Maysonet?
18 A.  I recall seeing him on the street at
19 26th and California.
20 Q.  You recall seeing him on the street on
21 August 22, 1990?
22 A.  I'm not sure of the dates.  If I could
23 look at my report, I could tell you.
24 Q.  So you arrested Mr. Maysonet on
25 August 22, 1990, okay?  And what were the

Page 239

1  circumstances under which you encountered
2  Mr. Maysonet on the date that you arrested him?
3  A.  I saw him on the street as I was going
4  into 26th and California, criminal courts
5  building.
6  Q.  Okay.  And what time was it?
7  A.  I'm not sure.  It was in the morning.
8  Q.  Okay.  Were you going into 26th Street
9  for a particular court appearance?
10 A.  I must have.  That's the only reason I
11 would be there.
12 Q.  Do you know where you were going?
13 A.  No.
14 Q.  Is it possible you were going to room
15 101?
16     MS. ROSEN: Objection, calls for
17 speculation.
18     THE WITNESS: I wouldn't know.  I don't
19 recall where I was going that day.
20     BY MS. BONJEAN:
21 Q.  It's possible, though, you were going
22 to room 101, right?
23 A.  No, I wouldn't be going to the chief
24 judge's chambers.
25 Q.  You wouldn't be going to branch 66?

Page 240

1  A.  I thought that was 100.  I may be
2  wrong.
3  Q.  Is it possible you were going to branch
4  66?
5      MS. ROSEN: Objection, calls for
6  speculation.
7      THE WITNESS: I don't know.
8      BY MS. BONJEAN:
9  Q.  So it is possible?
10     MS. ROSEN: Objection, form.
11     THE WITNESS: It's possible, but I
12 don't know why I was there.
13     BY MS. BONJEAN:
14 Q.  But if I, for instance, got the court
15 sheets for branch 66 that day and looked at the
16 homicide cases or the violent crime cases, it's
17 possible that one of those cases could have been
18 your case, right?
19     MS. ROSEN: And it's possible they
20 couldn't have been.  What does that mean?
21 Objection, form.
22     THE WITNESS: I don't recall why I was
23 there.
24     BY MS. BONJEAN:
25 Q.  All right.  And you would have been

Page 253

1 to what time you encountered him, you have no
2 reason to believe that that wouldn't have been
3 accurate?
4 A. If I testified all those years ago, it
5 would be accurate.
6 Q. So after he consented to go back to
7 Area 5 with you, did you take him back to Area 5?
8 A. No.
9 Q. Why not?
10 A. Because I had my private car and I
11 provided transportation for him.
12 Q. He didn't say, I can get there myself?
13 A. No.
14 Q. Did you ask him, do you want to meet me
15 over there?
16 A. No.
17 Q. Why not?
18 A. No reason to. He said that he would go
19 with me to Area 5 in this matter, in this
20 investigation.
21 Q. But he wasn't going with you; he was
22 going in a marked police car not with you, right?
23 A. Well, eventually. He was transported.
24 Q. He wasn't going with you to Area 5,
25 correct?

Page 254

1 A. Not physically.
2 Q. No. You were driving your car there,
3 correct?
4 A. Yes.
5 Q. And he wasn't coming in your car with
6 you, right?
7 A. Correct.
8 Q. And according to you, you arranged for
9 his transportation there?
10 A. I did.
11 Q. And he never said, I'll just meet you
12 there, right?
13 A. Correct.
14 Q. Okay. And how did you arrange for his
15 transportation?
16 A. By telephone.
17 Q. Did you have a cell phone?
18 A. No.
19 Q. Okay. What telephone did you use?
20 A. The one in the police room that was on
21 the third floor of that building.
22 Q. All right. And Mr. Maysonet
23 accompanied you there, as well?
24 A. Yes.
25 Q. So you both went into 26th Street,

Page 255

1 correct?
2 A. Yes.
3 Q. He went through the security, right?
4 A. Security then was not as it is today.
5 Q. Fair enough. And up to the third
6 floor. Again, he was not with any family members,
7 is that right?
8 A. He was by himself, ma'am.
9 Q. And you brought him up there and
10 arranged for a police car to come pick him up,
11 correct?
12 A. A police vehicle. I don't know if it
13 was a car or if it was a squadrol.
14 Q. All right. And again, this was all
15 just as a convenience for Mr. Maysonet so that he
16 would have transportation there?
17 A. Yes.
18 Q. And then did you wait with him until
19 the squadrol showed up or the police car showed
20 up?
21 A. Yes.
22 Q. Okay. Why did you wait with him?
23 A. There was nobody else that could be
24 with him. It was the court sergeant and myself in
25 the room. Other detectives and police officers

Page 256

1 were coming by signing the court logs and they
2 were going to do what they --
3 Q. Why did anyone need to be with him at
4 all?
5 A. I wanted to talk to him.
6 Q. Okay. So what did you talk about?
7 A. Nothing at that time while we were
8 waiting for the squadrol.
9 Q. You said you wanted to talk to him.
10 What did you want to talk to him about?
11 A. I wanted to talk to him about a double
12 murder.
13 Q. Okay. My question was why did you wait
14 with him. You said you wanted to talk to him.
15 A. No. I said I waited with him because
16 there was only a court sergeant there, other
17 people that were detectives or patrolmen in and
18 out of that room. I asked him if he would assist
19 in coming in to Area 5.
20 Q. Right. I thought you asked him that on
21 the street?
22 A. I did.
23 Q. Okay. So you asked him that again in
24 the third floor police office?
25 A. No. You asked me a question, why I was

Page 265

1  conversation I had with him.
2      BY MS. BONJEAN:
3  Q.  That's the only conversation you had
4  with him?
5  A.  Until he -- until the State's Attorney
6  that was reviewing the case wanted to take him for
7  a ride of the murder scene.
8  Q.  So you did not question Mr. Maysonet
9  about the Wiley brothers' murders, is that right?
10 A.  Not that I recall.
11 Q.  And you asked him no questions about
12 his involvement in the Wiley brothers' murders, is
13 that right?
14 A.  I don't recall asking him about it.
15 Q.  And you didn't confront him with any
16 information you had about prior statements he had
17 allegedly made to Sergeant Mingey or Detective
18 Montilla about his knowledge or involvement in the
19 Wiley brothers' murders, is that right?
20 A.  That's correct.
21 Q.  Your conversation consisted of just
22 some pleasantries and nothing more, is that right?
23 A.  We had the conversation about his
24 wellbeing being in the police station.
25 Q.  Right.

Page 266

1  A.  I left the room.  That's all I did
2  until I was asked to take him for a ride.
3  Q.  Okay.  Who asked you to take him for a
4  ride?
5  A.  State's Attorney DiFranco --
6  Q.  And -- I'm sorry, go ahead.
7  A.  -- and Detective Montilla.
8  Q.  All right.  And how were you asked to
9  go for a ride?
10 A.  Verbally.
11 Q.  And did you agree?
12 A.  Yes.
13 Q.  And how many people went on this ride?
14 A.  Detective Montilla, DiFranco, me and
15 Maysonet.
16 Q.  And why was it necessary for two
17 detectives and a State's Attorney to go on the
18 ride?
19     MS. ROSEN: Objection, foundation.
20     THE WITNESS: DiFranco reviewed all
21 submitted facts that were given to him by
22 detectives and DiFranco wanted him to show
23 him what he was talking about on the street.
24     BY MS. BONJEAN:
25 Q.  And what submitted facts were provided

Page 267

1  to ASA DiFranco?
2      MS. ROSEN: Objection, foundation.
3      THE WITNESS: Any police reports that
4  were submitted at that time, conversations
5  with Mingey, with Montilla, any detectives
6  that had any conversation with him at that
7  point.
8      BY MS. BONJEAN:
9  Q.  And how was that information conveyed
10 to DiFranco?  I'm talking about the conversations
11 Mr. Maysonet purportedly had with Mingey and
12 Montilla?
13     MS. ROSEN: Objection, foundation.
14     MR. ENQUIST: Join.
15     THE WITNESS: I guess verbal
16 conversation.
17     BY MS. BONJEAN:
18 Q.  Have you ever seen any police report
19 GPR that memorializes these purported
20 conversations that occurred between Mingey,
21 Montilla and Mr. Maysonet?
22     MS. ROSEN: Object to the form of the
23 question.
24     THE WITNESS: I don't recall seeing.  I
25 don't know if --

Page 268

1      BY MS. BONJEAN:
2  Q.  I'm sorry?
3  A.  I don't recall.
4  Q.  You don't recall seeing them, correct?
5  A.  I don't recall looking at any reports.
6  Q.  Do you recall ever seeing any GPR's
7  that reflect this conversation with
8  Mr. Maysonet -- between Mr. Maysonet and Sergeant
9  Mingey and Montilla at the Cook County Jail?
10 A.  I don't recall if there were.
11 Q.  Your information you received just from
12 hearing conversations, is that right?
13 A.  Yes.
14 Q.  You didn't review any reports prior to
15 seeing Mr. Maysonet on the street on August 22,
16 correct?
17 A.  The only thing I saw, what was hanging
18 up on the board and verbal conversations.
19 Q.  Right.  And the stuff hanging on the
20 board, you don't remember ever seeing any GPR's
21 about the Cook County Jail visit, right?
22 A.  I don't think that any GPR's would have
23 been put up there, just supp reports or original
24 reports.
25 Q.  Did you see that information contained

Page 269

1  in any supp report prior to encountering
2  Mr. Maysonet on the street on August 22, 1990?
3  A. I don't recall if there was or not.
4  Q. Because when you testified earlier, you
5  testified about getting that information through a
6  conversation. Is that what you remember?
7  A. That's what I just said.
8  Q. Okay. Is that the only memory you have
9  of how you got that information?
10 A. I remember hearing a conversation that
11 I was part of and I remember looking at reports.
12 Q. What was contained in the reports about
13 the meeting at Cook County Jail?
14 A. I don't recall. Just other than the
15 conversation, the verbal conversation that I was
16 part of that Montilla and Mingey went there, they
17 were talking to him and he wanted a deal cut for
18 his participation in the murders.
19 Q. And again, just to be clear, you saw a
20 report, you didn't see a report or you don't
21 remember seeing a report about that prior to
22 encountering Mr. Maysonet on the street?
23     MS. ROSEN: Objection, asked and
24 answered.
25     MR. ENQUIST: Join.

Page 270

1     THE WITNESS: Again, I'm talking about
2  a conversation that I was part of.
3     BY MS. BONJEAN:
4  Q. And I'm talking about a report.
5  A. And I said I don't recall if there was
6  one or not at that time.
7     MS. BONJEAN: All right. I'm going to
8  hand you -- would you mark these two
9  exhibits, please? This is all Dropbox.
10    (Whereupon, Paulnitsky
11    Deposition Exhibit No. 3 and 4
12    was marked for identification.)
13    BY MS. BONJEAN:
14 Q. I'm handing you what has been marked as
15 Exhibit 3. Can you look at the first page and
16 tell me if you recognize the first page at all?
17 A. No.
18 Q. No, you don't recognize it?
19 A. This is the first time I saw this page.
20 Q. Okay. Do you recognize it, though?
21 A. Well, it has an RD number, it has the
22 number 190. It says it's Exhibit 3 and then it
23 says RFC-Maysonet 000001.
24 Q. All right. It also has some other
25 information on there, right? It says "Assigned:

Page 271

1  P. Boyle."
2     Do you see that?
3  A. I see Boyle, Tapkowski, Dickinson.
4  Q. And does that mean anything to you?
5  A. This looks like it could be a Xerox
6  copy of a file.
7  Q. Investigative file?
8  A. I don't know.
9  Q. You've seen some investigative files in
10 your 20 years at Area 5, have you not?
11 A. I have.
12 Q. And do they look like this or do they
13 look different than this?
14 A. My recollection, they look different.
15 Q. Yeah? How do they look different?
16 A. They would have a tab that would have
17 some information on it.
18 Q. Like what?
19 A. Who the victims were and the location.
20 Q. Okay. Anything else?
21 A. That's all that I can remember.
22 Q. Where would the index log be that
23 contained all the reports that were part of the
24 investigative file? Would that be inside the
25 investigative file?

Page 272

1  A. Well, if this was the investigative
2  file that you're talking about, you would open it
3  up and it would be on the -- as you open it up, it
4  would be on the left side.
5  Q. So it would be inside the file?
6  A. Yes.
7  Q. Okay. So this doesn't look like an
8  investigative file to you, correct?
9  A. No. There would be two holes here
10 where they would have a clip that would keep the
11 inventory stuff in there.
12 Q. Right. So again, this doesn't look
13 like an investigative file to you, right?
14 A. May I look at it? From the outside it
15 does not to me.
16 Q. I'm going to let you look at it, but I
17 first just want the record to be clear. I'm
18 asking you about the outside of it, does it look
19 like it?
20 A. Not that I remember it being.
21 Q. Okay. So yeah, I would like to go
22 through it with you, okay?
23 A. Fine.
24 Q. RFC-Maysonet number 2 through 6, these
25 are court attendance reports.

Page 277

1  look at it?
2  A.  It would be in the office file.
3  Q.  The office file?
4  A.  Yes.
5  Q.  Is that the same as the investigative
6   file?
7  A.  It is not.
8  Q.  What's the office file?
9  A.  It's the original case reports on a
10   murder, stuff like that.
11 Q.  All right.  And where were those
12   maintained?
13 A.  That would be in a different file
14   cabinet.
15 Q.  Okay.  And what else is contained in
16   the office file?
17 A.  Important papers, documents.
18 Q.  I'm sorry?
19 A.  Documents, important documents and
20   papers.
21 Q.  Important documents and papers?
22 A.  Such as these.
23 Q.  What else, what other types of
24   documents?
25 A.  That's all I can recall.

Page 278

1  Q.  Supplemental police reports?
2  A.  I don't know if they would be in the
3   same thing.  Usually murders, ag bats would be put
4   in the office there.
5  Q.  What office?
6  A.  Violent crimes office.
7  Q.  I know, but when you say "office," what
8   do you mean specifically by that?
9  A.  Oh, behind where sergeant is.
10 Q.  The sergeant's office?
11 A.  Well, the sergeant's office was also
12   considered where files would be kept, yeah.
13 Q.  I see.  And it's also where the
14   lieutenant would also be sometimes, right?  Did
15   they share an office?
16 A.  Not really.  I mean, you had to walk
17   into sergeant's office to walk into the
18   lieutenant's office.
19 Q.  I see.  So in the sergeant's office
20   there was also an office file that would contain
21   reports including, for instance, the report of the
22   postmortem examination, right?
23 A.  Yes.
24 Q.  And the office file was separate and
25   apart from the investigative file, correct?

Page 279

1  A.  Yes.
2  Q.  And what other types of documents were
3   contained in the office file?
4      MS. ROSEN:  Objection, foundation.
5      THE WITNESS:  I don't know.
6      BY MS. BONJEAN:
7  Q.  How did documents get into the office
8   file?
9      MS. ROSEN:  Objection, foundation.
10     BY MS. BONJEAN:
11 Q.  If you know?
12 A.  I don't know.
13 Q.  And how was the office file organized?
14     MS. ROSEN:  Objection, foundation.
15     THE WITNESS:  In numerical order by
16  year.
17     BY MS. BONJEAN:
18 Q.  And were you able to just go in and
19  grab an office file if you found it pertinent to
20  whatever work you were doing?
21 A.  If it wasn't contained in the
22  investigative file, I assume.
23 Q.  Okay.  And was it organized by RD
24  number or --
25 A.  Year and RD number.

Page 280

1  Q.  Year and RD number.
2  A.  Numerical.
3  Q.  So if you couldn't find something in
4   the investigative file, you might go into the
5   office file and see if you could find it in that
6   file, correct?
7  A.  Theoretically.
8  Q.  And did you do that sometimes?
9  A.  I don't know if I did or not.
10 Q.  Well, you just said you thought this
11  would have been in the office file?
12 A.  Yeah, because this is autopsy reports.
13 Q.  I'm sorry?
14 A.  Autopsy reports.
15 Q.  Okay.  So autopsy reports can sometimes
16  be important to investigations, right?
17 A.  Sure.
18 Q.  To find out if some theory is
19  consistent with the manner of death, right?
20 A.  Yes.
21 Q.  And if you wanted to look at a
22  postmortem examination report, you would
23  potentially be able to find that in the office
24  file within the sergeant's office, correct?
25 A.  Yes.

Page 325

1  A. I do not.
2  Q. All right. So really you were at Area
3  5 for at least 36 hours straight, is that right?
4  A. Could have been.
5  Q. Not unusual for you?
6  A. Not at all.
7  Q. Okay. And do you know whether you were
8  working on any other cases while you were at Area
9  5 for approximately 36, maybe more, hours?
10 A. Sure. Could have been clearing up my
11 handouts, catching up on my paperwork.
12 Q. But you are confident you were there;
13 you didn't go home?
14 A. Correct.
15 Q. Did you play any role in questioning
16 Mr. Maysonet about the underlying events while you
17 were there this entire time at Area 5?
18 A. I don't recall talking to him after the
19 initial contact to make sure he was there,
20 everything was okay, and then with driving him. I
21 don't recall any contact.
22 Q. You don't recall conducting any
23 questioning of him about his involvement in the
24 Wiley brothers' murders, is that right?
25 A. I don't remember.

Page 326

1  Q. Okay. Is it possible that you did?
2  A. I don't recall that I did.
3  Q. Do you think you would have prepared a
4  report or a GPR if you had questioned him about
5  the Wiley brothers' murders?
6  A. Well, if I would have talked to him
7  about that, anything that he told me I would have
8  recorded on a GPR, perhaps.
9  Q. Okay. But you don't remember doing so,
10 is that right?
11 A. I don't recall talking to him.
12 Q. Okay. And what was said by you or him
13 or anyone in the car during the field trip to the
14 crime scene?
15 A. Well, I was driving and he was
16 directing me where to go, where to stop, where to
17 go.
18 Q. So Mr. Maysonet was directing you where
19 to go, where to stop?
20 A. Yes.
21 Q. And the purpose of this was to have
22 Mr. Maysonet corroborate his court reported
23 confession, right?
24 A. What he told the State's Attorney.
25 Q. Right. Is that what you understand the

Page 327

1  purpose of this was?
2  A. That's the reason that I drove him.
3  Q. Do you remember where he told you to
4  go?
5  A. I don't remember exactly. I know that
6  it was the scene of the incident and I was just
7  following directions.
8  Q. You don't specifically remember where
9  he said go left, go right, this is where this
10 happened or anything like that?
11 A. No, I do not.
12 Q. Did you prepare a report reflecting
13 what statements Mr. Maysonet allegedly said to you
14 when you drove him to the crime scene?
15 A. No.
16 Q. Why not?
17 A. The State's Attorney was with me. He
18 asked for -- he requested that we go for a ride
19 and I would assume that he would have recorded it
20 in his felony review file.
21 Q. Okay. Did you prepare any additional
22 reports other than what you have had the
23 opportunity to look at in this exhibit -- I don't
24 know what number it is.
25 A. This would be Exhibit 3.

Page 328

1  Q. Okay. Did you see any reports that you
2  prepared -- and when I say "prepared," I mean
3  authored in this --
4  A. As we were going through it I saw court
5  attendances.
6  Q. Right. Any supplemental reports that
7  you prepared?
8  A. I did not see any.
9  Q. Okay. Do you remember preparing any
10 supplemental reports in connection with this case?
11 A. I don't think that I did.
12 Q. Do you remember preparing any GPR's in
13 connection with this case?
14 A. I thought I did. I could have been
15 mistaken. I don't see them here.
16 Q. Have you ever seen any GPR's that you
17 prepared in connection with this case, being the
18 Wiley brothers' murders?
19 A. I don't -- I don't know if I did. I
20 don't recall seeing them in here, so I don't know
21 if I did or not.
22 Q. Have you ever seen any GPR's that were
23 prepared in connection with the Wiley brothers'
24 murders?
25 A. I don't know if I did or not.