# EXHIBIT 22



# Transcript of Jennifer Borowitz

**Date:** August 25, 2020
**Case:** Maysonet -v- Guevara

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF ILLINOIS
 3             EASTERN DIVISION
 4    --------------------------x
 5   JOSE JUAN MAYSONET, JR.,    :
 6          Plaintiff,   :
 7    v.            : Case No. 18-cv-234
 8   REYNALDO GUEVARA, et al.,   :
 9          Defendants.  :
10   --------------------------x
11
12       Deposition of JENNIFER BOROWITZ
13           Conducted Virtually
14         Tuesday, August 25, 2020
15             10:48 a.m. CST
16
17
18
19
20
21
22 Job No.: 315962
23 Pages: 1 - 106
24 Reported by: Paula M. Quetsch, CSR, RPR
```

**2**

```
 1    Deposition of JENNIFER BOROWITZ, held
 2 virtually:
 3
 4
 5
 6
 7
 8    Pursuant to notice before Paula M. Quetsch, a
 9 Certified Shorthand Reporter, Registered Professional
10 Reporter, and a Notary Public in and for the State
11 of Illinois.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1        A P P E A R A N C E S
 2 ON BEHALF OF THE PLAINTIFF:
 3     STEVEN GREENBERG, ESQUIRE
 4     GREENBERG TRIAL LAWYERS
 5     53 West Jackson Boulevard
 6     Suite 1260
 7     Chicago, Illinois 60604
 8     (312) 879-9500
 9
10 ON BEHALF OF THE PLAINTIFF:
11     JENNIFER BONJEAN, ESQUIRE
12     BONJEAN LAW GROUP
13     750 Lexington Avenue
14     9th Floor
15     New York, New York 10022
16     (718) 875-1850
17
18 ON BEHALF OF DEFENDANT GUEVARA:
19     JUSTIN LEINENWEBER, ESQUIRE
20     LEINENWEBER BARONE & DAFFADA LLC
21     120 North LaSalle Street
22     Suite 2000
23     Chicago, Illinois 60602
24     (866) 786-3705
```

**4**

```
 1    A P P E A R A N C E S   C O N T I N U E D
 2 ON BEHALF OF THE DEFENDANT OFFICERS:
 3     DAVID BRUEGGEN, ESQUIRE
 4     THE SOTOS LAW FIRM
 5     141 West Jackson Boulevard
 6     Suite 1240A
 7     Chicago, Illinois 60604
 8     (630) 735-3300
 9
10 ON BEHALF OF DEFENDANT CITY OF CHICAGO:
11     AUSTIN G. RAHE, ESQUIRE
12     ROCK FUSCO & CONNELLY, LLC
13     321 North Clark Street
14     Chicago, Illinois 60654
15     (312) 494-1000
16
17 ON BEHALF OF DEFENDANTS FRANK DiFRANCO and
18 COOK COUNTY:
19     DAVID ADELMAN, ESQUIRE
20     EDWARD M. BRENER, ESQUIRE
21     COOK COUNTY STATE'S ATTORNEY'S OFFICE
22     50 West Washington, 5th Floor
23     Chicago, Illinois 60602
24     (312) 603-8600
```

**5**

ON BEHALF OF THE DEPONENT:

1.     JOHN C. COYNE, ESQUIRE
2.     LAW OFFICES OF JOHN C. COYNE
3.     53 West Jackson Boulevard
4.     Suite 1750
5.     Chicago, Illinois  60604
6.     (630) 929-4308

C O N T E N T S

EXAMINATION OF JENNIFER BOROWITZ    PAGE
  By Mr. Greenberg       7
  By Mr. Brener      102
  By Mr. Greenberg     103

E X H I B I T S

  (Retained by counsel.)

BOROWITZ DEPOSITION EXHIBITS    PAGE

Exhibit 1  CCSAO 2006-2007    31
Exhibit 2  CCSAO 001761-001763    82
Exhibit 3  Borowitz 67, CCSAO 2015    97

**6**

P R O C E E D I N G S

    MR. GREENBERG:  Does everyone want to put their names on the record first?

    We've got Steve Greenberg and Jennifer Bonjean on behalf of Mr. Maysonet.

    MR. COYNE:  On behalf of Jennifer Borowitz, John Coyne.

    MR. BRENER:  On behalf of Frank DiFranco and Cook County, Edward Brener, B-r-e-n-e-r.

    MR. ADELMAN:  Also on behalf of Frank DiFranco and Cook County, David Adelman.

    MR. BRUEGGEN:  Dave Brueggen on behalf of the defendant officers.

    MR. RAHE:  Austin Rahe on behalf of the Defendant City of Chicago.

    MR. LEINENWEBER:  Justin Leinenweber on behalf of Defendant Officer Guevara.

    MR. GREENBERG:  Can you swear the witness in, please.

    (Witness sworn.)

        JENNIFER BOROWITZ,
having been duly sworn, testified as follows:
///
///

**7**

    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. GREENBERG:

    Q Could you state your name.

    A Jennifer Borowitz.

    Q You're going to have to speak up if you're going to have the mask on.

    And, Jennifer, can you tell us --

    A I hit the volume somehow.  Oh, oh.  Oh, oh.  I don't know what I'm pressing.

    (Technical adjustments.)

    Q Jennifer, have you ever been deposed before?

    A In January.

    Q Besides in this case?

    A I believe once.

    Q Okay.  So you understand a deposition.  I'm going to ask you questions.  If you don't understand a question, tell me you don't understand the question.  If you need time to speak with your lawyer, go ahead and speak with your lawyer, and we'll get through this.  Okay?

    A Okay.

    Q All right.  What do you presently do for a living?

**8**

    A Presently I manage the appeals department in the Illinois Department of Employment Security, which is the department that does unemployment hearings for the State of Illinois.

    Q Okay.  How long have you done that?

    A Well, I've been with IDES since March of 2010, first as an ALJ, then I became the assistant manager, then I became the acting manager, and I think I've been -- technically the manager six months.  I think I was the acting for like year and a half.  Does that make sense?  Good enough?

    Q Okay.  So basically, you supervise people.  Do you do hearings, also?

    A No.  I don't do any hearings.

    Q All right.  Do you supervise other lawyers?

    A Yes.

    Q Can you tell us what you did in the time since you left the State's Attorney's Office until you started this position just generally?

    A Okay.  So I became a hearing officer in juvenile court hearing child abuse and neglect cases.  I did that for about 10 years.  And then during the recession our -- that recession in like around 2007 --

**9**

1  Q  Okay.
2  A  -- they disbanded and laid us all off.
3  They disbanded that whole department.  And then
4  ultimately then I got -- I did some contract work
5  in special ed law looking for another job, you
6  know, and then I got the job at the Illinois
7  Department of Employment Security.
8  Q  All right.  And when did you start there?
9  A  At IDES again?
10  Q  Yeah.
11  A  March of 2010.
12  Q  Okay.  Have you ever practiced law as
13 either a -- well, have you ever practiced criminal
14 defense law?
15  A  No.  Well, I clerked in the Public
16 Defender's Office.  Is that what you mean?
17  Q  Okay.  We'll get to that.  Since you left
18 the State's Attorney's Office, did you ever
19 practice as a criminal defense attorney?
20  A  No.  Not that I -- no, no.
21  Q  When did you leave the State's Attorney's
22 Office?
23  A  I believe -- I'm not a hundred percent
24 sure; I don't have any résumé in front of me.  I

**10**

1  believe it was in 19 -- oh, gosh, the '90s.
2  Q  Okay.  When did you start at the State's
3  Attorney's Office?
4  A  The best of my memory -- hang on.  Let me
5  think backwards -- '87.  It could have been 87' or
6  88'.  I think '87.
7  Q  All right.  Well, let's go even further
8  back.  Where did you go to college at?
9  A  University of Utah.
10  Q  Were you a skier?
11  A  Yes.  I was a ski instructor and snowbird.
12  Q  All right.  That must have been very nice.
13  What -- where did you go to law school at?
14  A  Kent.
15  Q  I'm sorry?
16  A  Kent.  Chicago Kent.
17  Q  Did you go directly from college to law
18 school, or did you take any time off in between?
19  A  I got a master's in special education at
20 the University of Utah, so that was graduate
21 school, and then I moved back to Chicago, and I
22 was a special education teacher.
23  Q  So what year did you graduate with your
24 undergrad degree?

**11**

1  A  '80 or '81.
2  Q  You honestly don't remember?
3  MR. COYNE:  If you don't remember, just
4  tell him you don't remember.
5  A  I don't remember exactly.
6  Q  Did you get a copy of the deposition
7  subpoena for today?
8  A  For today?
9  Q  The deposition -- it was attached to the
10 notice -- for documents?
11  A  Did I get -- I got something a year ago,
12 is that what you mean.  Like a year ago.
13  Q  Let me ask this.  Do you have a résumé or
14 a curriculum vitae?
15  A  No.  Not a current one.
16  Q  All right.  Do you have one at all that's
17 accessible?
18  A  No.
19  Q  Okay.  I ask because maybe that would
20 refresh us on this.
21  MR. COYNE:  I'm sorry.  I didn't hear that.
22  MR. GREENBERG:  I thought maybe that would
23 refresh her recollection a little bit.
24  Q  So you think you graduated in '80 or '81 from

**12**

1  college, and then you got your master's?
2  A  Yes.
3  Q  And then you taught for a time?
4  A  Yes.
5  Q  When did you start law school?
6  A  I think -- I think, if memory serves
7  correct, it would be '84 because I think I
8  graduated in '87.
9  Q  Did you go full time or part time?
10  A  Full time.
11  Q  Once you graduated from law school, what
12 was your first job?
13  A  The State's Attorney's Office.
14  Q  Okay.  And how did that come about that
15 you got a job at the State's Attorney's Office?
16  MR. COYNE:  Object to form.
17  Go ahead.
18  A  I applied and I got a job.
19  Q  You said a little bit earlier that you
20 were -- you worked at the Public Defender's
21 Office?
22  A  I clerked.  I clerked.
23  Q  Right.  You clerked there.  Was that in
24 law school?

13

1    A  Yes.
2    Q  Okay.  Did you apply for a job with the
3  Public Defender's Office?
4    A  No.
5    Q  Any reason you didn't apply to the Public
6  Defender's Office?
7        MR. COYNE:  Object to form.
8        I'm sorry; let me just make sure.  Can the
9  court reporter hear me since my volume is off?
10       THE COURT REPORTER:  I did hear you.  Just
11 make sure you keep your voice up when you object.
12       MR. COYNE:  I just wanted to make sure
13 we're all clear.  In combination to the volume, my
14 volume is off, so I just want to make sure the
15 court reporter hears me.  I'll try to speak
16 loudly.
17       Steve, I didn't mean to interrupt.
18       MR. GREENBERG:  That's fine.  We could
19 hear you.  I don't know about the objection.
20       MR. COYNE:  The objection was form.
21       MR. GREENBERG:  Okay.  Can you answer,
22 please.
23       THE WITNESS:  Can you repeat the question?
24    Q  Sure.  Is there any particular reason you

14

1  did not apply to the Public Defender's Office?
2    A  Yes.  Yes, when I clerked, I had the belief
3  that everybody -- I still believe that everyone is
4  innocent until proven guilty, but I thought at that
5  time that everybody was really innocent and being --
6  like it was really bad all these innocent people
7  were being detained and getting locked up.  And my
8  experience when I was clerking was basically all
9  the people that were charged that I was there to
10 represent basically were guilty, they would tell
11 me they were guilty, and all they wanted me to do
12 was figure out the best way to get them out of jail.
13    Q  Okay.
14    A  It wasn't the justice that I thought I
15 wanted to be a part of.  I really was altruistic
16 and this just changed the way I felt.
17    Q  Okay.  So you decided to apply to the
18 State's Attorney's Office?
19    A  I know -- you're just missing one little
20 piece.  I then clerked for the State's Attorney's
21 Office.
22    Q  Okay.  I would have gotten it.
23    A  Okay.  Okay.  Sorry.
24    Q  When you clerked for the Public Defender's

15

1  Office -- I know a little about this because I was
2  also a clerk back then -- were you assigned to a
3  particular courtroom?
4    A  I can't recall.
5    Q  Do you recall being --
6    A  I mean, I was in a courtroom.  I just
7  don't remember like who or if it was just one.
8    Q  Do you remember if it is a big courtroom
9  or what they used to call the fish bowl courtrooms?
10   A  It was in juvenile court.
11   Q  It was what?
12   A  It was in juvenile court.
13   Q  Juvenile court.  Okay.
14   A  And I don't remember -- I think all the
15 courtrooms were physically basically the same.
16   Q  All right.  Then you said that you clerked
17 for the State's Attorney's Office; correct?
18   A  Yes.
19   Q  Okay.
20   A  I'm trying to remember who the judge was.
21 I remember the State's Attorneys were Dean Morask
22 and I think Sophia Lopez.  I don't recall the
23 others.
24   Q  Okay.

16

1    A  And that was at 26th and California.
2    Q  Okay.  And do you remember anything
3  significant about that that made you then want to
4  be a State's Attorney?
5    A  Well, as I said, I'm altruistic, and I
6  believe in justice, and it seemed that that was
7  what you were seeking there.
8    Q  Now, you applied to become a State's
9  Attorney, and you think you started in '86 or '87?
10   A  It's not -- it has to be '87 because if I
11 graduated -- I obviously didn't start until after
12 I graduated.
13   Q  What was your first assignment in the
14 State's Attorney's Office?
15   A  Juvenile court.
16   Q  And do you remember how long you worked
17 there?
18   A  No.
19   Q  More than a year?  Less than a year?
20       (Audio interference.)
21       THE WITNESS:  Do you want to keep going?
22       MR. GREENBERG:  Yeah, let's -- Jennifer,
23 your mic keeps coming on.
24       THE WITNESS:  Mine?

17

1      MR. GREENBERG:  No.  I muted her.
2      THE WITNESS:  I forgot the question; I'm
3 sorry.
4      Q  You worked at juvenile court with the
5 State's Attorney.  Do you remember how long you
6 were there?
7      A  No.
8      Q  Once you left juvenile court, where did
9 you go?
10     **A  I think to the best of my memory I went to**
11 **felony review.**
12     Q  Do you know approximately when you started
13 in felony review?
14     **A  I don't remember.**
15     Q  Do you know how long you were in felony
16 review?
17     **A  I don't remember.**
18     Q  Do you remember what you did after felony
19 review?
20     **A  It's possible that I went to preliminary**
21 **hearings.**
22     MR. COYNE:  Don't guess.  If you don't
23 know, just tell him you don't know.  Don't guess.
24     THE WITNESS:  Okay.

18

1      **A  (Continuing.)  I don't remember.  I don't**
2 **know for sure.  I don't remember for sure.**
3      Q  Where you went after felony review?
4      **A  That's right.**
5      Q  Do you remember whether you were ever
6 assigned to a trial courtroom?
7      **A  Yes, I was.  That I do.  Yes, I was.**
8      Q  And where were you assigned to a trial
9 courtroom?
10     **A  A number of different courtrooms.**
11     Q  Okay.  Tell us about that.
12     **A  Oh, I'm not going to remember all the**
13 **judges.  I remember some of the judges.  Let's**
14 see, Kazmierski, (inaudible).
15     THE COURT REPORTER:  I'm sorry; I didn't
16 hear that one.
17     **A  Polan.**
18     THE COURT REPORTER:  Polan?
19     MR. GREENBERG:  Polan, P-o-l-e-n.
20     THE WITNESS:  P-o-l-a-n.
21     MR. GREENBERG:  Or -a-n, yeah.
22     **A  (Continuing.)  Neville, Kimmel.  I can't**
23 **recall the others.**
24     Q  All right.  So in the three years you were

19

1 in the State's Attorney's Office, just so I'm clear,
2 you made it through -- from juvenile, through
3 felony review, and were assigned to at least
4 four different felony courtrooms?
5      MR. COYNE:  Objection; form.
6      Go ahead.
7      **A  Not in three years.**
8      Q  Well, I thought you said you started in --
9 maybe four years.
10     **A  I don't know -- you went to narcotics at**
11 **some point.**
12     Q  Okay.  Were some of --
13     **A  Night narcotics, there was also**
14 **preliminary hearings, and there was Branch 66.  I**
15 **just don't recall the exact order.**
16     Q  Were you ever assigned to a daytime felony
17 trial room?
18     **A  Yes.**
19     Q  Do you remember who that -- who your judge
20 was in that room?
21     **A  I think that was Kimmel, Neville, and**
22 **Polan -- or wait, and Hett.  Hett, I was also**
23 **in Hett's.**
24     Q  Tom Hett?

20

1      **A  Yes.**
2      Q  I want to talk about your experience with
3 felony review.  You said you think you went there
4 after juvenile court?
5      **A  Yes.**
6      Q  By the way, I have to ask these questions.
7 Have you ever been convicted of a crime?
8      **A  No.**
9      Q  Are you licensed as a lawyer now?
10     **A  Yes.**
11     Q  Have you ever been disciplined as a lawyer?
12     **A  No.**
13     Q  Has your license been in good standing
14 since you graduated from law school?
15     **A  Yes.**
16     Q  Has anyone ever filed any kind of a formal
17 complaint against you alleging any kind of
18 misconduct?
19     **A  Not that I know of.**
20     Q  All right.  And I mean a contempt of
21 court, anything like that.
22     **A  Not that I know of.**
23     Q  Okay.  Good.  What's your date of birth?
24     **A  September 4th, 1956.**

21

1    Q  Happy birthday almost.
2    A  Yes.  Thank you.
3    Q  All right.  So do you recall who was your
4  immediate supervisor when you started in felony
5  review?
6    A  No.
7    Q  Do you recall your first assignment in
8  felony review?  In other words, your first team.
9    A  My first -- pardon.  What?
10   Q  Your first team you were assigned to.
11   A  First team?
12   Q  Well, let me -- I'll withdraw that
13 question.  Let me ask it this way.  Explain to me
14 how felony review was set up when you started
15 there.
16      MR. COYNE:  Objection; form.
17      Go ahead.
18      MR. BRENER:  Form and foundation.  This is
19 Edward Brener.
20      THE WITNESS:  I'm sorry; I didn't hear
21 what he said.
22      MR. GREENBERG:  He objected.
23      THE WITNESS:  Okay.
24    A  So I think I understand.  Like there was a

22

1  group of us, I think, that were like me.
2    Q  Right.
3    A  And then there would have been a
4  supervisor -- I think there was a supervisor for
5  us that was in the trial division that was now
6  not, was supervising us, I believe.
7    Q  Okay.
8    A  When we worked we would do three shifts of
9  days or three shift of nights and then flip-flop,
10 keep flip-flopping.  But you did a month of days
11 and a month of nights, and you were never allowed
12 to take a day off, and you could never call in
13 sick.  That's what I remember.
14   Q  So do you remember what the shifts are?
15   A  I think they were 6:00 in the morning to
16 6:00 at night.
17   Q  All right.  So let me ask -- would you be
18 required -- well, how many days in a row would
19 you work?
20   A  Three.
21   Q  Three days on, three days off?
22   A  Yes.
23   Q  All right.  Like a fireman?
24   A  I don't know how firemen --

23

1    Q  And was that -- was it hard and fast so
2  you started, let's say at noon to midnight, and at
3  midnight you left no matter what?
4      MR. BRENER:  Objection; misstates prior
5  testimony.
6      MR. GREENBERG:  I'm asking the question.
7    Q  How did scheduling work?
8      MR. COYNE:  I'm sorry; what?
9      THE WITNESS:  Scheduling.
10   Q  How did scheduling work?
11   A  Well, you were either the days or the nights.
12   Q  Okay.
13   A  From 6:00 to 6:00.
14   Q  From 6:00 to 6:00?
15   A  Yes.
16   Q  So if you started at 6:00 in the morning,
17 and you ended at 6:00 at night, would you just
18 leave if you were in the middle of something or
19 how did that work?
20      MR. COYNE:  Objection; form.
21      Go ahead.
22    A  I think -- I think you would try to finish
23 if you were in the middle of something, or you
24 would probably make it a continuing investigation

24

1  and come back.
2    Q  All right.  What kind of training did you
3  receive when you started in felony review?
4    A  I don't remember.
5    Q  Do you remember if you received any formal
6  training?
7    A  I don't remember.
8    Q  Do you remember who your supervisor was?
9      MR. COYNE:  Objection; asked and answered.
10      Go ahead.
11    A  I don't -- I don't remember.  There were
12 many different ones because you were on for a
13 period of time, and they would rotate in and out,
14 if I recall.
15   Q  Do you remember who was in charge of felony
16 review, like the supervisor of the entire unit?
17   A  I don't remember.
18   Q  Do you remember the names of anyone who
19 worked with the felony review?
20   A  Yes.
21   Q  Okay.  Please.
22   A  Jerry Bischoff.
23      THE COURT REPORTER:  Bishop?
24      THE WITNESS:  Bischoff, B-i-s-c-h-o-f-f.

25

1    THE COURT REPORTER:  Thank you.
2    **A  (Continuing.)  Let me think who else, if I**
3 **can remember their names.  Laura Morask, Judy**
4 **Greneville, I think.**
5    Q  I'm sorry.  Who was that?
6    **A  Judy Greneville.**
7    Q  Okay.
8    **A  I think.  I'm trying to picture who --**
9    MR. GREENBERG:  Is anyone hearing -- I'm
10 sorry to interrupt you -- hearing that noise like
11 a scraping noise?
12    THE WITNESS:  No.
13    THE COURT REPORTER:  Yes.  It's coming
14 from the witness.
15    MR. GREENBERG:  Can we go off the record
16 for a minute.
17    (An off-the-record discussion was held.)
18    **A  I remembered another name, Toi Houston.**
19 **I'm sure there were others.  I just don't remember**
20 **their names.**
21    Q  Are you friends with anyone who you worked
22 with at the State's Attorney's Office?
23    **A  Yes.**
24    Q  Who is that?

26

1    **A  Dianne Ghaster.**
2    THE COURT REPORTER:  Vester?
3    THE WITNESS:  Ghaster, G-h-a-s-t-e-r.
4    **A  (Continuing.)  Brian Grossman.  That I used**
5 **to work with.  Could you repeat the question again?**
6    Q  Sure.  Is there anyone you worked with at
7 the State's Attorney's Office that you're friends
8 with today?
9    **A  Joan O'Brien, Ann Likovitch, Sally Grave.**
10 **That's basically it.**
11    Q  Okay.  And --
12    **A  If I forget somebody, you know -- but**
13 **basically that would be it.**
14    Q  Okay.  Not with Laura Morask and Gene
15 Morask?
16    **A  No.**
17    Q  Or Jeanette Henshaw?
18    **A  Correct.**
19    Q  And would I be correct all of these people
20 are now retired and Joan O'Brien is a judge;
21 correct?
22    **A  Retired from the State's Attorney's Office**
23 **or retired in general?**
24    Q  Retired from the State's Attorney's Office.

27

1    **A  Okay.  Yes.**
2    Q  Okay.
3    **A  Or not working in the State's Attorney's**
4 **Office.  I don't know if retired is the correct word.**
5    Q  Right.  All right.  So did you have a
6 chance to look at the documents that I provided to
7 Mr. Coyne before your deposition today?
8    **A  Yes.**
9    MR. COYNE:  I'm sorry; can you hang on one
10 second, please.  Someone is knocking on the door.
11    MR. GREENBERG:  Sure.
12    THE WITNESS:  Oh, that's important.
13    MR. COYNE:  Sorry for the interruption.
14 They brought another unit.
15    MR. GREENBERG:  Do you need a second?
16    MR. COYNE:  Yes.  Just one second, please.
17    MR. GREENBERG:  Sure.  Sure.
18    (An off-the-record discussion was held.)
19 BY MR. GREENBERG:
20    Q  I think the last thing I asked was if you
21 had an opportunity to review the documents from --
22 that we sent to Mr. Coyne, your lawyer.
23    **A  Yes.**
24    Q  Okay.  So do you recall the case of

28

1 Mr. Maysonet?
2    **A  No.**
3    Q  When you read those documents, did they
4 refresh your recollection at all as to what
5 happened?
6    **A  I didn't hear your last words.**
7    Q  When you read the documents, did they
8 refresh your recollection at all as to your going
9 out to the police station on that case?
10    **A  On the Maysonet case?**
11    Q  Right.
12    **A  No.**
13    Q  How about on Alfredo Gonzales?
14    **A  I don't have an exact memory of this, but**
15 **a memory based on the documents --**
16    Q  Okay.
17    **A  -- on Gonzales.**
18    Q  Did you keep any records of your own of
19 what you did at felony review?
20    **A  No.**
21    Q  The felony -- do you know what a felony
22 review folder is?
23    **A  Yes.**
24    Q  Can you for the record explain what that is?

29

1    A  Well, you gave me copies of what --
2    Q  Just generally.
3    A  It's a manila folder that, I think it had
4  the paper -- I think it had paper on it that must
5  have carbon backing if I -- -I'm not sure.  I
6  don't remember exactly.  But it documented like,
7  you know, basically what happened.
8    Q  So you could take notes on it; right?
9    A  I don't know if you literally -- I could
10 take notes sort of, yes.
11   Q  Do you have a document that's Borowitz 62?
12   A  Yes.
13   Q  Okay.  And can you pull that out like
14 Borowitz 62 through 64?
15   A  Can I just ask what it is because I --
16   Q  It's the felony review --
17   A  Is it for Gonzales?
18   Q  For Gonzales, yes.
19   A  Okay.  Yes.
20   Q  So taking a look at the page that's
21 Borowitz 62, which is also CCSA 2006 at the bottom --
22   MR. COYNE:  Steve, just real quick.  I can
23 tell you the copy that I have of the documents you
24 forwarded, the Bates stamps that you added are not

30

1  covered.  It appears that it was left off.  It
2  does appear that the Cook County State's Attorney's
3  Office Bates stamps, however, are included.  So
4  just an FYI.
5    MR. GREENBERG:  Okay.  I don't know how
6  that would be because I've got an exact copy of
7  what I gave you.
8    MR. COYNE:  I'm saying this was printed --
9  one was copied, some are printed.  I'm just
10 telling you.
11   MR. GREENBERG:  The ones I dropped off at
12 your office?
13   MR. COYNE:  Well, no, that was the
14 original.  All I'm saying is obviously there were
15 copies made of the original, and I'm saying the
16 copy that I have in front of me has the Cook
17 County State's Attorney's Office Bates stamp, but
18 some of the pages I don't see the Bates stamps you
19 added.  I'm just letting you know that.
20   THE WITNESS:  Can I just say something?
21 So I have a page that has that 62 Bates stamp, but
22 then the other two pages that go with it don't
23 have -- one has Borowitz 67 and one has nothing.
24 But I know it's the felony review folder copy --

31

1  copies.
2    MR. GREENBERG:  Okay.  Let's go through
3  it.  We'll figure it out.
4    MR. BRENER:  Can you use the CCSAO Bates
5  number?
6    MR. GREENBERG:  That's what I was going to
7  do, if you'd just let me talk.
8    (Borowitz Deposition Exhibit 1 marked for
9  identification and retained by Counsel.)
10   Q  You've got the CCSA 2006 in the bottom
11 right-hand corner?
12   A  Yes.
13   Q  What is that?
14   A  I think it's the outside cover of the
15 felony review folder, a copy of it.
16   Q  Do you see handwriting on that?
17   A  Yes.
18   Q  Whose handwriting is -- is it on the --
19 under where it says "Subject to protective order,"
20 do you see that wording?
21   A  Yes.
22   Q  Underneath there it says "Gonzalez, Alfredo"?
23   A  Yes.
24   Q  Whose handwriting is that?

32

1    A  I don't know.
2    MR. BRENER:  Objection; foundation.
3    Q  Okay.  Do you know whose handwriting
4  that is?
5    A  No.
6    Q  It says "Defendant Alfredo Gonzalez" in
7  print at sort of the top of the page.  Do you see
8  where it says that?
9    A  Uh-huh.
10   MR. COYNE:  Yes?
11   A  (Continuing.)  Yes.
12   Q  Do you know whose writing that is?
13   A  Yes.
14   Q  Whose writing is that?
15   A  That's mine.
16   Q  Okay.  Next to it it says "Murder X2."
17 Whose writing is that?
18   A  Mine.
19   Q  And it says "Branch 66."  Whose writing
20 is that?
21   A  Mine.
22   Q  So what does -- what is this document?
23 You said it's the cover of the felony review
24 folder?

33

1    A  I think it's the outside.  I think the
2  felony review folder had some lines on -- you
3  know, it's like closed.  So that was the outside,
4  not the inside.
5    Q  Okay.  So what was a felony review folder
6  back then?
7    A  It was what we were asked to fill out when
8  we went on an assignment.
9    Q  I'm sorry; you have to --
10    A  What we were asked to fill out when we
11  went on an assignment in felony review.
12    Q  Okay.  It was a large 8-by-14 folder;
13  right?
14    A  Yes.
15    Q  And it had a cover where you'd record
16  information; correct?
17    A  Yes.
18    Q  And then it had an inside where you would
19  write things about the investigation and what
20  you did?
21    MR. BRENER:  Objection to form.
22    A  You would write the defendant number; you
23  would write the general investigation information,
24  the -- a general summary of the incident, and

34

1  victims and witnesses.
2    Q  Okay.  So this page 2006, would this be
3  the outside front cover for Alfredo Gonzalez'
4  felony review folder that you used?
5    A  Did you say 2006?
6    MR. COYNE:  That's the Bates stamp.
7    Q  It's Bates-stamped 2006.
8    A  Oh, it appears to be.  It appears to be a
9  Xerox of it.
10    Q  Okay.  Can you turn to the next page which
11  is marked as page 2007?
12    A  Okay.  So mine doesn't -- oh, I have CCSAO
13  and then a bunch of zeros -- I have a magnifying
14  glass so I can see -- then ultimately 2007.
15    Q  Okay.  So do you recognize what these are?
16    A  Yeah.  This is the inside of the folder.
17    Q  All right.  So this would be the -- as you
18  open the folder up like a book, this was the inside?
19    A  Yes.
20    Q  I want to go through what's on these pages
21  with you.  Okay?
22    MR. COYNE:  Steve, let me just interject
23  just so I can make a record.
24    For the record, on behalf of Witness

35

1  Borowitz a motion for protective order was filed
2  precluding any questions regarding Alfredo Gonzalez
3  for the reasons set forth therein.  That motion
4  for protective order was denied.  We hereby object
5  to any questions on Alfredo Gonzalez, which we
6  will obviously allow, but we incorporate by
7  reference all of the arguments, facts, and law set
8  forth therein in response that.
9    Go ahead.  Thank you.
10    Q  So let's start where it says at the top
11  left "66 SUP" it looks like to me.  Do you see that?
12    A  Yes.  Yes.
13    Q  Okay.
14    A  I'm using a magnifying glass.  I can see it.
15    Q  I'm using magnifying glasses.  Do you know
16  whose handwriting that is?
17    A  No.
18    Q  Do you know what it means?
19    A  No.
20    Q  Below that there's a box that appears to
21  be checked which says "Screen felony."
22    A  Yes.  I see that.
23    Q  And there's an X mark there?
24    A  Yes.

36

1    Q  Who would have filled that out?
2    A  I don't recall.
3    Q  Is that something that you would have been
4  required to do?
5    MR. COYNE:  Objection; foundation.
6    Go ahead.
7    A  I don't recall.
8    Q  Next to that it says "8/27/90" with a "BL."
9  Do you know whose writing that is?
10    A  No.
11    Q  Do you have any idea what that means?
12    A  No.
13    Q  Next to that it says "Start time" and
14  "Finish time."
15    A  Yes.
16    Q  Do you know whose writing that is?
17    A  That appears to be my printing.
18    Q  And what does that signify?
19    A  I believe that signifies what time I
20  probably would have arrived at the station and
21  started working on this case.
22    Q  Do you have any independent recollection
23  of working on this case?
24    A  No.

37

1    Q  Can you tell from looking at that whether
2  you were working the 6:00 p.m. to 6:00 a.m. shift
3  or the 6:00 a.m. -- or the -- 6:00 a.m. to 6:00 p.m.
4  or 6:00 a.m. to 6:00 a.m.?
5    **A  Based on this it looks like I was working**
6  **on the night shift, the 6:00 p.m. to 6:00 a.m. shift.**
7    Q  How would you -- it says you started at
8  2300.  Do you recall what would have occurred to
9  have you start on a case?
10   **A  Yes.**
11   Q  Okay.  Could you explain?
12   **A  A dispatcher would either tell you if you**
13 **were there in person that you were assigned a case**
14 **or somehow talk to them on the phone, and you**
15 **would get assigned a case from a dispatcher.**
16   Q  Okay.
17   **A  And then you would get in the car and get --**
18 **and you'd go there.**
19   Q  Did you have a pager?  Or how would you
20 find out?
21   **A  I didn't remember this the last time I**
22 **testified.  I couldn't remember because we didn't**
23 **have cell phones.  I believe it was a pager.**
24   Q  All right.  So you would get a page to

38

1  contact felony review?
2    **A  Yes.  Or you just -- I don't even know if**
3  **it did that, if it just went off and that meant**
4  **you called in.**
5    Q  Do you have any recollection of being
6  assigned the Alfredo Gonzalez case?
7    **A  No.**
8    Q  Do you have any recollection of what
9  Alfredo Gonzalez looked like?
10   **A  No.**
11   Q  Did you ever want to be a judge?
12   **A  No.**
13   Q  When you became -- you said you were an
14 Administrative Law Judge; right?
15   **A  Pardon?**
16   Q  Did you say you were an Administrative Law
17 Judge of some kind?
18   **A  Hearing Referee/Administrative Law Judge.**
19 **They use the term interchangeably.**
20   Q  And in order to do that job, were you
21 required to provide a list of cases that you had
22 worked on?
23   **A  At IDES, no.**
24   Q  What about --

39

1    **A  You had to have -- I know I'm volunteering,**
2  **but you just basically had to have experience**
3  **being a hearing officer, you know, doing -- well,**
4  **you didn't even have to technically have had that**
5  **experience.  That was just beneficial.  Done**
6  **hearings, done trials, things like that.**
7    Q  Okay.  So let's go -- keep going through
8  this.  It says "Defendant No." and there appears
9  to be something written next to that.
10   **A  1.**
11   Q  What does that mean?
12   **A  Defendant No. 1.**
13   Q  Is there any -- I mean, are defendants
14 numbered 1, 2, 3?
15      MR. COYNE:  Objection; form.
16      Go ahead.
17   **A  I'm guessing maybe if you had like two or**
18 **three defendants at the same time there you would**
19 **maybe have this as No. 1 and that one would be**
20 **No. 2, but I don't recall.**
21   Q  Above that it's got some numbers written,
22 also.
23   **A  It does?**
24   Q  It says "8/23/90" it looks like.

40

1    **A  Oh, that's -- if you have a magnifying**
2  **glass, you could actually read that it says "Date."**
3    Q  Okay.  And what does it say next to that?
4    **A  Oh, that's a hard one.  Action number --**
5  **Action No.  It says "Action No."  I assume that**
6  **means number.**
7    Q  Is that your writing next to it?
8    **A  Yes.**
9    Q  What does that signify?
10   **A  I don't remember.**
11   Q  All right.  What about next to that?
12   **A  Okay.  Then it says "Number of**
13 **defendants," 1 -- the triangle means defendants.**
14   Q  Okay.  And what does it say next to that?
15   **A  Oh, boy.  I'm trying.  It's really teeny.**
16 **Hang on, I have to position the magnifying glass**
17 **so I can see it.  It says, "Number of defendants"**
18 **which is -- wait, no.  Am I in the right spot?**
19 **This is hard.**
20   Q  Does it say -- it looks like it says to me --
21   **A  Oh, wait.  Where is the word after the**
22 **1 -- okay.  One second.  Number of victims.**
23   Q  Victims, right.  So it says "2V" and then
24 it's got something that I can't make out.

41

1  A  1W.
2      MR. COYNE:  Steve, can I ask you something
3  real quick?
4      MR. GREENBERG:  Yeah.
5      MR. COYNE:  We have the original felony
6  review folder here.  Do you mind if I give that to
7  the witness so she may have a better view of the
8  text you're asking her about?
9      MR. GREENBERG:  No, I have no --
10     MS. BONJEAN:  Hold on a second.  You have --
11 you have the original?
12     MR. GREENBERG:  Hold on.  Hold on.
13     MS. BONJEAN:  Don't tell me to hold on.  I
14 just want to know who said that.
15     MR. COYNE:  John Coyne.
16     MS. BONJEAN:  Wait.  So you have --
17     MR. GREENBERG:  When you say you have the
18 original, John, are you saying you have the manila
19 folder?
20     MR. COYNE:  Correct.  I'm just wondering
21 if I can give them to her so that she can read
22 from them.  She's having difficulty answering the
23 question.
24     MS. BONJEAN:  Okay.  Well, this is -- I

42

1  want to put on the record -- this is Jennifer
2  Bonjean.  This was something that I attempted to
3  deal with much earlier that Mr. Brener objected
4  to, and then his boss said it was okay.  I'm very
5  confused why the deponent would be able to see the
6  original felony review folder when we had asked to
7  see it, and now we don't even have the benefit of
8  seeing it, and now she does, which would actually
9  prove very helpful except for the fact that Steve
10 doesn't have it in front of him either and hasn't
11 even had an opportunity to compare it against what
12 he does have.
13     MR. COYNE:  Well, let me just say I just
14 received these, first.  Secondly, I happen to be
15 in the building next door to Steve's.  I'd be
16 happy to walk them over and show them to him.
17     MR. BRENER:  Ms. Bonjean, may I reply?
18 It's inaccurate to say that you weren't afforded
19 the opportunity to look at them.  I personally
20 offered to let you come to my office and review
21 them on multiple occasions in writing by email.
22 You declined.
23     As for --
24     MS. BONJEAN:  Hold on, hold on.  I'm in no

43

1  mood for misrepresentations.  I am in no mood for
2  misrepresentations.  You offered to have me look
3  at them, but you did not offer to provide them to
4  the deponent.  Now what you have done is provide
5  them to the deponent.  How would I have known
6  that?  How would we have known that?
7      You know what?  Steve, you decide whether
8  she needs to see it.  I'm not listening to these
9  misrepresentations.  I'm done with it.  Go ahead,
10 Steve.
11     MR. BRENER:  We're not done talking yet.
12 The agreement you reached with my office is that
13 these would be made available to the deponent for
14 the deposition.  They are available for the
15 deponent to review at the deposition.  That was
16 what --
17     MS. BONJEAN:  Are you -- are you --
18 seriously, I know you're a smarter person than
19 this.  That agreement was reached before a
20 pandemic hit us, and we didn't know we weren't
21 going to be in the same room.  So that's
22 absolutely absurd.
23     Now you've provided it to the deponent;
24 we're not in the same room; Steve doesn't have the

44

1  opportunity to compare it against what he has.
2  And anybody who has an interest in seeing this
3  deposition go smoothly, which I realize is not you
4  or your office, you would have at least sent
5  around an email saying, "We provided the felony
6  review folder to Mr. Coyne, and, oh, by the way,
7  if you'd like an opportunity to see it and compare
8  it next to your copy --
9      THE COURT REPORTER:  You're breaking up.
10 Ms. Bonjean, you're breaking up.
11     MR. GREENBERG:  All right.  Hold on.  John --
12 John, where are you guys at?  Are you at the Union
13 League?
14     MR. COYNE:  Yeah, at the Union League Club
15 right next door.
16     MR. GREENBERG:  All right.  I'm going to
17 ask my questions, and then we'll take a 15-minute
18 break at some point, and I'll walk over if I need
19 to, and I'll take a look at it and we'll see
20 what's up.  Okay?
21     MR. COYNE:  That's fine with me.
22     MR. GREENBERG:  All right.
23     MR. COYNE:  The question was -- Steve, the
24 question was do you want me to show it to her now?

---

45

1    MR. GREENBERG:  Yes, she can look at that
2  if it will it be easier for her to see.
3    THE WITNESS:  Yeah, I think.  Because
4  these are so small.
5    MR. COYNE:  Just for the record, I'm
6  tendering the Alfredo Gonzalez felony review folder.
7    THE WITNESS:  Okay.  I have -- do you want
8  me to show you what it looks like?  Can you see?
9    MR. GREENBERG:  I'm going to come over and
10  look at it if it --
11    THE WITNESS:  Okay.  Whoa, whoa, this is a
12  lot bigger.
13    Q  Jennifer, before you look at that --
14  Ms. Borowitz, before you look at that, I'm going
15  to ask a question based on the colloquy that they
16  just had.
17    Did you review any materials to prepare
18  for your deposition?
19    **A  Could you be more specific?**
20    Q  Well, what did you review to prepare for
21  your deposition?
22    **A  You've got to tell me when because it's**
23  **the second part of this deposition.**
24    Q  Either time.

---

46

1    **A  Okay.  So the first time -- I don't**
2  **remember.  Very minimal.**
3    MR. COYNE:  Just for the record, she's
4  already testified she reviewed the materials you
5  sent her.
6    MR. GREENBERG:  Okay.  Right.
7    **A  (Continuing.)  So then it appears to be**
8  **the Xerox of the felony review folder, another --**
9  **a handwritten -- and the court-reported statement,**
10  **and then a Xerox of another felony review folder**
11  **and a court-reported statement, a handwritten**
12  **statement, a transcript, an affidavit, some police**
13  **reports, a transcript for Gonzalez in front of**
14  **Judge Hall, another affidavit, and another**
15  **handwritten.**
16    Q  All right.  Did you speak to anyone other
17  than Mr. Coyne in preparing for your deposition?
18    **A  No.**
19    Q  Did you speak to any of the defense counsel?
20    **A  No.**
21    Q  Did you speak to anyone on behalf of
22  Mr. Maysonet?
23    **A  No.**
24    Q  All right.  So you have the original

---

47

1  felony review folder in front of you now; correct?
2    **A  Yes.**
3    Q  Where it says "1D," the little triangle --
4    **A  Yes.**
5    Q  -- whose handwriting is that?
6    **A  That -- that looks like it would be mine.**
7  **It looks like my handwriting.**
8    Q  And how would you make the determination
9  that there was one defendant?
10    **A  I don't remember.**
11    Q  If someone else had already been charged in
12  the case, let's say a week before hypothetically,
13  would you still write 1D?
14    MR. BRENER:  Objection to --
15    THE COURT REPORTER:  I didn't hear you,
16  Mr. Brener.
17    MR. BRENER:  Objection to form, foundation,
18  and calls for speculation.
19    THE COURT REPORTER:  Thank you.
20    **A  I don't remember.**
21    Q  Well, do you remember if a case that had
22  multiple defendants, would each defendant be
23  numbered then?  There'd be Defendant 1, Defendant 2,
24  Defendant 3, so forth?

---

48

1    **A  I don't -- I don't recall.**
2    Q  Let's go below then.  It says Alfredo
3  Gonzalez?
4    **A  Yes.**
5    Q  Whose handwriting is that?
6    **A  That appears to be my printing.**
7    Q  This particular box has personal information,
8  name, date of birth, all that kind of stuff --
9  right? -- address?
10    **A  Yes.**
11    Q  Does that all appear to be your handwriting?
12    **A  No.**
13    Q  What doesn't appear to be your
14  handwriting?
15    **A  A "31 YOA" and then "County of Birth," I**
16  **believe this says.  It appears to say "Puerto Rico."**
17    Q  Okay.  And then below that it's got a
18  charging section?
19    **A  Yes.**
20    Q  See where it says "Approved per Gary
21  Howard"?
22    **A  Yes.**
23    Q  Who was Gary Howard?
24    **A  He must have been in a supervisory capacity.**

---

49

1 I know he was more senior to me in the State's
2 Attorney's Office, and so he must have been a
3 supervisor of mine at that time.
4   Q  Is that your handwriting?
5   A  Yes.
6   Q  So some of the stuff is printed, and that
7 looks like it's more script.
8   A  Yes.
9   Q  But that's your script?
10   A  Yes.
11   Q  Do you recall taking a statement from
12 Alfredo Gonzalez?
13   A  No.
14   Q  Do you recall the names -- the name Wiley
15 coming up in this investigation?
16   A  No.
17   Q  All right.  You've got in there "Statement
18 Defendant No. 1"; right?
19   A  Yes.
20   Q  Is that your handwriting?
21   A  Yes.
22   Q  Is all this your handwriting in this box?
23   A  Yes, it appears to be.
24   Q  And then it appears to continue over to

50

1 the next page?
2   A  Oh, yes.  There's an arrow, yes.
3   Q  And is that also your handwriting?
4   A  Yes.
5   Q  Do you recall taking a court-reported
6 statement from Alfredo Gonzalez?
7   A  No.
8   Q  Do you recall taking court-reported
9 statements?
10   A  I know I did that, yes.
11   Q  How would you go about taking a court-
12 reported statement?
13   A  I believe you would offer the person you
14 were interviewing a number of ways of taking down
15 a statement, and one would be a court-reported.
16 And then if they said court-reported -- I'm not
17 sure like how the court reporter got notified; I
18 do not recall.  But a court reporter would be
19 notified, and then a court reporter would come to
20 the police station or Area you were at, and then
21 they would set up their court reporter machine,
22 and then you would ask questions, and the witness
23 or person would answer them.
24   Q  Okay.  Did you know -- it says Janet Lupa

51

1 is the court reporter; right?
2   A  Yes, it says that.
3   Q  Do you recall who she was?
4   A  No.
5   Q  Below that it has various information
6 about place of arrest and so forth; right?
7   A  Yes.
8   Q  Is that also your writing?
9   A  Yes.  There's -- it appears -- there's a
10 question mark and one thing I'm not sure what it
11 is but otherwise, yes.
12   Q  The question mark is next to what?
13   A  PBDCM.  I'm just not sure.  It could be;
14 it may not be.
15   Q  When you would go to take a statement from
16 somebody as a felony review assistant, what was
17 the process you would follow?
18   A  I don't understand your question.  I'm
19 sorry; can you rephrase it?
20   Q  When you were assigned a case as a felony
21 review assistant, what would you do?
22   A  I would go there.
23   Q  "Go there" meaning the police station?
24   A  Yes.  I think an Area or a police station,

52

1 whichever you want to call it.  You would meet
2 with whoever -- the police people, whoever was
3 working on the case, and I think they would tell
4 you what was going on basically.  And I think if
5 there were reports or something, I'd be able to
6 review those.  And then if there was -- if there
7 were witnesses or victims, you would interview
8 them.  And then if there was someone that they had
9 in custody that they felt might be responsible,
10 you would interview them.
11   Q  Okay.  So is there any -- do you have any
12 recollection of reviewing reports before you spoke
13 to Alfredo Gonzalez?
14   A  No.
15   Q  Can you tell from this document what day
16 you spoke to Mr. Gonzalez?
17   A  Yes.
18   Q  What day?
19   A  Well, it appears that he gave a court-
20 reported statement on August 24th, 1990, at 2:00 in
21 the morning.  So I actually had to speak with him
22 before that.
23   Q  All right.  So --
24   A  Whether or not it was literally -- because

53

1  we're talking 2:00 in the morning August 23rd, you
2  know, at 11:30 or, you know, 11:59 moving into
3  August 24th midnight, somewhere that's when I
4  would have spoken with him.
5      Q  So you would have spoken to him without
6  the court reporter first?
7      A  Yes.
8      Q  Why?
9      A  Well, you always go in and introduce
10 yourself, you advise them of their rights, and
11 then you ask them to tell you what happened.  That
12 was the procedure.
13     Q  So you would -- you would first take an
14 oral statement from them before you would offer
15 them the chance to give a handwritten statement or
16 a court-reported statement or a recorded
17 statement; is that right?
18     MR. COYNE:  Objection.  That wasn't her
19 testimony.
20     Go ahead.
21     A  No, no, that's not what I said.  First,
22 you actually go in and introduce yourself, advise
23 them of their rights and ask them if they want to
24 talk to you.

54

1      Q  Okay.
2      A  If they want to tell you what happened,
3  then they tell you what happened.  It has nothing
4  to do with whether or not they're giving an oral
5  statement or a court-reported.
6      Q  Okay.
7      A  I would also at some point ask to be left
8  alone with them.  I would go alone.
9      Q  What's the purpose of that?
10     A  To ask them if they were treated okay by
11 the police or if they've been mistreated by the
12 police.
13     Q  Do you have any recollection of doing that
14 with Alfredo Gonzalez?
15     A  Not a specific recollection.  That was
16 just my normal practice.
17     Q  Did anyone ever tell you when you were on
18 felony review that they had ever been mistreated
19 by the police?
20     A  Can you repeat the question?
21     Q  Sure.  Did anyone that you ever met with
22 as a felony review assistant ever tell you that
23 they had been mistreated by the police?
24     A  Yes.

55

1      Q  Do you recall who that was?
2      A  I don't recall the name of the person.
3      Q  Do you recall where that was?
4      A  It was not an Area; it was -- it was a
5  district on the north side.
6      Q  And do you recall what they said?
7      A  Not specifically but I interviewed -- it
8  was a him.  I met with him alone, I asked if he
9  was afraid, but I knew something -- I could tell
10 something was wrong.  And then he told me he had
11 been hit by --
12     Q  I'm sorry to interrupt you.
13     A  I think he said he had been hit by the
14 police.
15     Q  Okay.  And what did you do then?
16     A  I left the room, I found a phone that was
17 sort of away from where the police were, and I
18 called my supervisor.  I told -- I believe it was
19 a him, the supervisor.  I don't remember the name
20 of the supervisor.  I told him what was going on
21 and what had happened, and then I told them that
22 they -- the police that -- the watch commander,
23 whoever was in charge of -- I don't remember the
24 name, to have him take him to the hospital.

56

1      Q  Okay.  Could you actually see injuries on
2  the person?
3      A  I just don't -- I don't remember that I
4  saw injuries.
5      Q  Do you remember what happened in the case?
6      A  I don't think there was a case.
7      Q  So they didn't pursue the case to the best
8  of your recollection?
9      A  No.
10     Q  Did you record that in the felony review
11 folder?
12     A  I don't -- I don't remember.
13     Q  Do you remember what year that was?
14     A  No.
15     Q  Do you remember how long it was approximately
16 before you left the State's Attorney's Office or
17 left felony -- I guess before you left felony
18 review?
19     A  No.  It was while I was on felony review.
20     Q  Do you -- let's go back -- circle back to
21 Alfredo Gonzalez.
22     Do you recall if you spoke to him in
23 English or in Spanish?
24     A  I don't recall.  I don't speak fluent

57

1  Spanish, so --
2     Q  Do you speak any Spanish?
3     A  A little.
4     Q  Did you speak it back then?
5     A  No -- I mean, just the same way I do now.
6     Q  Would it be reflected anywhere on the
7  felony review folder whether you spoke to someone
8  in English or Spanish?
9     A  I don't -- I don't recall.
10     Q  Would you -- would it be reflected anywhere
11  that you used -- well, strike that.
12        If someone didn't speak English, do you
13  recall how or who would interpret for them?
14        MR. BRENER:  Objection to the incomplete
15  hypothetical.
16     A  I don't recall.
17     Q  Do you recall ever using police officers
18  to interpret for somebody, for a defendant?
19     A  I don't recall.
20     Q  Does that -- when you say you don't recall,
21  it may have happened, may not have happened?
22     A  Right.
23     Q  Is there any way you can tell by looking
24  at a court-reported statement whether or not

58

1  someone used an interpreter?
2     A  I don't remember.
3     Q  I'm not asking you specifically.  I'm
4  asking you, would that be reflected on a court-
5  reported statement?
6     A  I don't recall.
7     Q  Do you recall ever taking a statement of
8  somebody and having an independent interpreter
9  there?
10        MR. COYNE:  Objection; form.
11        Go ahead.
12     A  I don't recall.
13     Q  When I say an "independent interpreter,"
14  like the ones they have in court that would
15  interpret.
16     A  I understand your question.  It's the same
17  answer.
18     Q  Okay.  I'd like to go back to this felony
19  review folder for Mr. Gonzalez.  It lists on here
20  "Arrest reason:  Investigation."
21     A  Where are we?
22     Q  We're under "Arrest" on the left.
23     A  On the left, "Evidence:  Investigation"?  No.
24     Q  It says --

59

1     A  Oh, oh, oh, I'm sorry.  I see where you're
2  looking.  I think it's looking right here.
3        MR. COYNE:  Arrest investigation?
4        THE WITNESS:  Yes.
5     Q  Is that your writing?
6     A  Yes.
7     Q  What does that mean?
8     A  What is "Arresting Agency:  Chicago Police
9  Department.  Arresting Officer:  Detective Guave.
10  Arresting Officer:  Detective Halvorsen.
11  Investigator:  Detective Guevara."
12     Q  Do you recall any of those detectives?
13     A  No.
14     Q  Above that it says, "Arrest Reason:
15  Investigation," above their names?
16     A  Oh, yes, "Arrest Reason:  Investigation."
17     Q  That's your writing, isn't it?
18     A  Yes.
19     Q  What does that mean?
20     A  I don't recall.
21        MR. GREENBERG:  Can we take a one-minute
22  break?
23        THE WITNESS:  I'll be more than happy to
24  use the ladies' room.

60

1        MR. GREENBERG:  Let's take a five-minute
2  break right now.
3        (A recess was taken from 11:57 a.m. to
4  12:08 p.m.)
5  BY MR. GREENBERG:
6     Q  All right.  So we were talking about
7  Alfredo Gonzalez.  You said something about you
8  would ask people if they wanted to talk to you
9  when you first got there; is that right?
10     A  I'm not sure if that was the exact words
11  but basically, yes.
12     Q  All right.  Well, what are your words?
13     A  I don't recall the exact words.
14     Q  You would get assigned a case; you would
15  arrive at the station; you would familiarize
16  yourself as best you could with the facts by
17  speaking to the police and looking at any reports;
18  is that right?
19     A  Correct.
20     Q  -- if someone wanted to speak with you; is
21  that a fair statement?
22        MR. COYNE:  Object to form.
23     A  I didn't hear you anyway; I'm sorry.
24     Q  Then you would ask the person, the person

61

1  of interest, the suspect, if they wanted to speak
2  with you?
3  **A  Well, first, you'd have to -- first you'd**
4  **advise them of their rights and then you would.**
5  Q  So these people would be in what they like
6  to call an interview room; right?
7  **A  Yes.**
8  Q  And those were -- if I recall correctly,
9  they're usually smaller rooms with a table and a
10 couple of chairs.
11 **A  Sometimes.  I think sometimes they were a**
12 **bigger room.  I'd say a mixed bag.  A mixed bag.**
13 Q  So tell us how you would approach somebody
14 who was the suspect.
15 **A  I would go in and introduce myself, and I**
16 **would read them their rights.**
17 Q  Okay.  I understand that.
18 **A  And then I'd say, "Would you like to speak**
19 **to me?  Do you want to tell me what happened?"**
20 **Basically that.**
21 Q  So when -- if someone told you they didn't
22 want to speak to you hypothetically, what -- then
23 what would you do?
24 **A  Then I would leave.**

62

1  Q  When you would first go into the room,
2  would you go in by yourself or with the officers?
3  **A  No, first with the officers.**
4  Q  If somebody told you that they would speak
5  to you, then what would you do?
6  **A  I don't remember exactly but at some**
7  **point, obviously, I would speak with them.  But at**
8  **some point -- I know I always did this -- I made**
9  **sure that there were no police officers in the**
10 **room.  And then I'd ask them if they were treated --**
11 **"Did anyone do anything to you; were you treated**
12 **okay?"  I'd always ask that.**
13 Q  Did you ask that of people who did not
14 want to speak with you?
15 **A  I don't recall.**
16 Q  Okay.  Did you ask that of anybody who did
17 speak with you?
18 **A  Yes.**
19 Q  When you would go into that room, would
20 you bring a pad of paper with you to take notes?
21 **A  I brought something.  I always had the --**
22 **I had something that had the rights on it that I**
23 **read.**
24 Q  Just -- the rights aren't really what I'm

63

1  trying to find out.  Okay?
2       THE COURT REPORTER:  You broke up,
3  Mr. Greenberg.
4       Q  I'm not concerned with anyone -- whether
5  you gave someone their rights.  I'm more concerned
6  with the procedure just in general.  Okay?
7       So when you would go in the room, would
8  you bring something to take notes on?
9       MR. COYNE:  Objection; form.
10      Go ahead.
11 **A  I -- I don't remember a hundred percent.**
12 **I don't remember a hundred percent.**
13 Q  If -- if you were at a police station, and
14 you were there to determine as a felony review
15 assistant whether or not -- typically whether or
16 not charges should be approved; right?
17 **A  Correct.**
18 Q  And by that, that means whether or not
19 felony charges should go ahead, the person should
20 be charged with a felony?
21 **A  Right.**
22 Q  As part of that, if someone did not want
23 to speak with you, does that mean you would not
24 approve felony charges?

64

1       MR. BRENER:  Object to form.
2  **A  That's correct.**
3  Q  What was your procedure if someone did not
4  want to speak with you?
5       MR. COYNE:  Objection; form.
6       Go ahead.
7  **A  I've already answered that.  I'd leave the**
8  **room.**
9  Q  Okay.  You would leave the room.  But what
10 would you do afterwards with the case?
11 **A  Continue the investigation.  I mean, were**
12 **there were witnesses, were there -- is there**
13 **sufficient to charge this case, to approve felony**
14 **charges.**
15 Q  All right.  So it wasn't, for lack of a
16 better term, a contingency that someone speak with
17 you in order for you to decide to approve felony
18 charges?
19      MR. COYNE:  Objection; form.  John Coyne.
20      Go ahead.
21 **A  Correct.**
22 Q  You could approve felony charges regardless
23 of whether someone spoke with you; is that right?
24 **A  Correct.**

---

65

1    Q  Did you -- do you -- strike that.
2        What was your procedure if someone spoke
3  to you but said they didn't want to do a court-
4  reported, or handwritten, or recorded statement?
5    **A  And I believe I would -- to the best of my**
6  **memory, I believe I would record it on the felony**
7  **review folder as an oral statement.**
8    Q  Okay.  So you would still record that
9  statement on the felony review folder?
10   **A  Yeah.**
11      MR. GREENBERG:  Would you -- could you
12 turn that computer a little bit so we can see you?
13 We're way off in the corner.
14      THE COURT REPORTER:  Yeah, we can't see you.
15      THE WITNESS:  And I just touched a button.
16 Oh, no.
17      MR. GREENBERG:  We can hear you.
18      THE WITNESS:  Oh, okay.
19      MR. GREENBERG:  Like Mission Impossible.
20      THE WITNESS:  This isn't my computer.
21   Q  Would you create a felony review file for
22 each case you were assigned to?
23   **A  To the best of my memory, yes.**
24   Q  Was that what was required, to the best of

---

66

1  your memory?
2    **A  Yep.**
3    Q  All right.  Can we go back to Mr. Gonzalez
4  now?  Underneath the section we just looked at,
5  the arrest, there's something that says
6  "Evidence/Investigation:  Additional investigation
7  requested."  Do you see that?
8    **A  Yes.**
9    Q  What does it say next to that?
10   **A  "Bella Rosa (W1) to go to grand jury**
11 **8/24/90."**
12   Q  Okay.  What does that mean?
13   **A  It means Witness No. 1 would go to the**
14 **grand jury on August 24, 1990.**
15   Q  Is that your handwriting?
16   **A  Yes.**
17   Q  And below that it says, "Officer Receiving
18 Request."
19   **A  Yes.**
20   Q  There's nothing written there?
21   **A  Correct.**
22   Q  What -- what is that asking for?
23   **A  It's blank.  I don't know.**
24   Q  Do you recall what information would

---

67

1  typically go in there?
2    **A  I don't recall.**
3    Q  Below that it says "Physical Evidence."
4    **A  Yes.**
5    Q  And it has a bunch of information there.
6  Can you tell us what it says?
7    **A  "Four .9 millimeter shells," then it has a**
8  **number.  Do you want me to read the numbers?**
9    Q  No, that's all right.
10   **A  Okay.  "One bullet slug, photos of scene,**
11 **beer can, 3420 West North from Victim 1" -- oh,**
12 **boy.  Undershorts.**
13      THE COURT REPORTER:  I'm sorry?
14      MR. GREENBERG:  Underscore.
15   **A  Undershorts, s-h-o-r-t-s.**
16   Q  Is that all your writing?
17   **A  Appears to be, yes.**
18   Q  And would I be correct that refers to
19 physical evidence that was found at the scene or
20 connected to the case?
21   **A  That would be my best recollection.**
22   Q  Do you recall where you would have gotten
23 that information from?  Below that it says
24 "incident."

---

68

1    **A  Yes.**
2    Q  Is that your writing in that section, also?
3    **A  Yes, it appears to be.  I'm just not sure**
4  **about what's a type .9 millimeter pistol.  I don't**
5  **know whether that's mine or not.**
6    Q  Okay.  Rest of it is yours?
7    **A  Yes.**
8    Q  And it says at the bottom, "Co D
9  previously charged José Maysonet"?
10   **A  Correct, I think.**
11   Q  Is that your writing?
12   **A  Yes.**
13   Q  Do you recall ever creating a felony
14 folder for José Maysonet?
15   **A  No.**
16   Q  Do you recall ever interviewing José
17 Maysonet?
18   **A  No.**
19   Q  Had you interviewed José Maysonet and had
20 he spoken to you, would you have -- would it have
21 been your practice to create a felony review folder?
22   **A  If I was assigned the case, yes.**
23   Q  If José Maysonet had confessed to you, had
24 you that he committed this crime, would you

---

**69**

1  have created a felony review folder?
2  **A I'd say, again, if I was assigned the case**
3  **and assigned to interview him, yeah -- yes. To**
4  **the best of my memory, yes. I mean, I don't have**
5  **a specific memory of what happened 30 years ago,**
6  **and I have no specific memory of José Maysonet,**
7  **but I clearly was assigned the case of Alfredo**
8  **Gonzalez, and I have a felony review folder here**
9  **showing that.**
10  Q  If you had spoken to José Maysonet, and he
11 had confessed to committing this murder to you,
12 would you have then offered him an opportunity to
13 give a memorialized statement?
14  MR. RAHE: Objection; form.
15  MR. COYNE: I'm going to object to
16 foundation and speculation.
17  Go ahead.
18  **A Okay. So you're giving me a hypothetical**
19 **question?**
20  Q  Yes, yes.
21  **A So I'm hypothetically assigned the case**
22 **just like I was assigned on this case of Alfredo**
23 **Gonzalez. I advise him of his rights; he gives me**
24 **a statement, and then he says he wants to make a**

**70**

1  **court-reported statement. I would follow the same**
2  **procedures it appears that I would have followed**
3  **for Gonzalez.**
4  Q  Okay. So you would have reached out to
5  get a court reporter and then taken the statement?
6  **A Yes.**
7  Q  If you had, in fact, spoken to José Maysonet,
8  and he had confessed committing this murder to
9  you, would you have reflected that information
10 anywhere in the Alfredo Gonzalez felony review
11 folder?
12  MR. COYNE: Objection; foundation, go ahead.
13  MR. RAHE: Form. Austin Rahe.
14  **A If I was assigned the Maysonet case, I**
15 **would have a Maysonet felony review folder.**
16  Q  Okay. So would it say anywhere --
17 strike that.
18  You've got in front of you the Gonzalez
19 felony review folder, the original; correct?
20  **A Correct.**
21  Q  Is there anywhere on that folder where you
22 would make a notation that you had spoken to one of
23 the other co-offenders?
24  MR. COYNE: Objection; form.

**71**

1  Go ahead.
2  **A I can't recall.**
3  Q  Okay. In other words, if you were --
4  let's say -- I'm going to give you a hypothetical.
5  Let's say you spoke to three different offenders
6  on a case. Would you create three different
7  felony review folders?
8  MR. COYNE: Objection; foundation.
9  Go ahead.
10  **A I honestly can't recall. I don't recall;**
11 **sorry.**
12  Q  Let's go to the next page. Okay? It's
13 got "Defendant No." See at the top of the page?
14  **A Yes.**
15  Q  And then it's got "charges, actions, and
16 statement"; right?
17  **A Yes.**
18  Q  And then it's got "Arrest" under that;
19 right?
20  **A Yes. Yes, I see what you're saying.**
21  Q  Okay. So it appears to me -- and I was
22 never a State's Attorney, so that's why I ask. It
23 appears to me that what's on the left side of the
24 folder and what at least starts at the top of the

**72**

1  right side of the folder are similar.
2  MR. COYNE: Objection; form.
3  Go ahead.
4  **A Yes.**
5  Q  Except for the very top corner of the left
6  side where it's got the information about when you
7  started and when you finished and so forth?
8  **A Yes.**
9  Q  All right. Do you recall that when you
10 had multiple offenders on the same case that you
11 would have a Defendant No. 1, and then you would
12 put Defendant No. 2 on the next side?
13  MR. BRENER: Objection to form.
14  **A It's been 30 years ago, but based on the**
15 **form, that would appear logical.**
16  Q  And if, in fact, you needed more, then you
17 would put a second felony review folder inside;
18 correct?
19  **A That appears to be a logical conclusion.**
20  Q  But you would just generally write on the
21 inside where you would have Defendant 3, Defendant 4?
22  **A That I can't recall. I can't recall**
23 **exactly.**
24  Q  But would it be a fair statement that had

73

1  you spoken to José Maysonet before you spoke to
2  Alfredo Gonzalez that you would have created a
3  felony review folder for that interaction?
4       MR. BRENER: Objection to foundation.
5       **A  If I was assigned to the Maysonet case, I**
6  **believe I would have had a felony review folder**
7  **for him. I would have followed the same**
8  **procedures that I followed for Alfredo Gonzalez.**
9       Q  You spelled José Maysonet -- Maysonet
10 M-a-s- -- M-a-i-s-o-n-e-t?
11      **A  Yes.**
12      Q  Okay. Do you know where you got that
13 spelling from?
14      **A  No.**
15      Q  When you would put someone's -- when you
16 would put someone's name -- like you put Alfredo
17 Gonzalez in this felony review folder?
18      **A  Yes.**
19      Q  Where would you typically get that
20 information if the person spoke -- agreed to speak
21 to you?
22      MR. COYNE: Objection; foundation.
23      Go ahead.
24      **A  Where would I get his name?**

74

1       Q  Where would you get his name, his address,
2  all that? Let me ask, would you get it from
3  asking him, or would you get it from the police?
4       **A  I don't recall.**
5       Q  Okay. Give me one second because I can't
6  see as well as you.
7       Would you -- when you would speak to
8  someone --
9       THE COURT REPORTER: You broke up,
10 Counsel.
11      MR. GREENBERG: Sure.
12      (Technical adjustments.)
13 BY MR. GREENBERG:
14      Q  When you would go in an interview room to
15 speak to somebody, would you ask them their name?
16      **A  I don't remember.**
17      Q  When you would speak to someone, would you
18 ask them to spell their name if they agreed to
19 give a statement?
20      **A  I don't remember. I don't recall.**
21      Q  If you prepared a felony review folder for
22 someone, would you make sure to spell their name
23 correctly?
24      MR. BRENER: Objection to form and

75

1  foundation.
2       **A  Well, I would hope so but I don't really**
3  **know a hundred percent. I would hope I spelled**
4  **their name correctly.**
5       Q  If I were to tell you that Mr. Maysonet's
6  name is actually spelled M-a-y-s-o-n-e-t, would
7  that indicate to you that perhaps you hadn't
8  spoken to him, and that's why you didn't spell his
9  name correctly?
10      MR. COYNE: Objection; foundation, calls
11 for speculation. This is John Coyne objecting.
12      THE WITNESS: Okay. Now you're going to
13 have to repeat the question.
14      MR. GREENBERG: I'm going to turn these
15 off because they're not working.
16      Q  If I were to tell you that --
17      THE WITNESS: Now we can't hear you.
18      THE COURT REPORTER: Now we can't hear you
19 at all. They were working.
20      (Technical adjustments.)
21 BY MR. GREENBERG:
22      Q  If I were to tell you that Mr. Maysonet
23 spelled his name M-a-y-s-o-n-e-t, and on your
24 felony review folder you spelled it M-a-i-s-o-n-e-t,

76

1  would that lead you to believe that you had or had
2  not spoken to him?
3       MR. COYNE: Objection; form, foundation,
4  speculation. John Coyne.
5       MR. BRENER: Join. This is Edward Brener.
6  I'll join all the objections.
7       THE WITNESS: They keep doing this and I
8  miss the question.
9       MR. GREENBERG: Can you read it back,
10 Ms. Reporter?
11      THE COURT REPORTER: I'll try. I'm not
12 hearing you very well, counsel.
13      (Technical adjustments.)
14 BY MR. GREENBERG:
15      Q  If you had met Mr. Maysonet and taken a
16 statement from him, and he had provided his name
17 to you, would you have misspelled his name on
18 Mr. Gonzalez' felony review folder?
19      MR. COYNE: Objection; form, foundation,
20 speculation, compound question. That's Coyne.
21      MR. BRENER: I'll join in the objections.
22      **A  You have to ask that question again. I**
23 **don't even understand your question I don't think.**
24      Q  You misspelled Mr. Maysonet's name on the

---

**77**

1  Alfredo Gonzalez felony review folder.

2  **A  Okay.**

3  Q  Do you believe you would have misspelled

4  his name if he had confessed the day before to you

5  that he had committed this murder?

6  MR. COYNE:  Objection; form, foundation,

7  speculation, assumes facts the witness hasn't

8  testified to.

9  Go ahead.

10  **A  I don't know.**

11  Q  Would you -- if he had confessed committing

12  this murder to you the day before, would you have

13  written down his name anywhere?

14  **A  If I had been assigned the case, I believe**

15  **I would have followed the same procedures I**

16  **followed with Alfredo Gonzalez and created a**

17  **felony review folder and done the same thing.**

18  Q  Would you then have had that felony review

19  folder with you when you spoke to Mr. Gonzalez?

20  MR. COYNE:  Objection; foundation,

21  requires speculation.

22  Go ahead.  That's Coyne.

23  MR. BRENER:  Join.

24  **A  I don't believe you brought a felony review**

---

**78**

1  **folder into an interview room with a witness.**

2  Q  Okay.  I thought you said earlier sometimes

3  you would take notes on the felony review folder.

4  **A  I don't believe I said that.**

5  Q  All right.  You would bring a pad of paper

6  in then?

7  **A  I don't even know that I brought in a pad**

8  **of paper.  I brought in something that had their**

9  **rights on them.**

10  MR. COYNE:  For the record, her testimony

11  was she doesn't recall if she took notes in the

12  interview room.

13  Q  When you would finish with a case, what

14  would you do with the felony review folder?

15  **A  My recollection -- granted, it's 30 years**

16  **ago, but to the best of my recollection is that**

17  **you drive the car -- - say it was the end of your**

18  **shift.**

19  Q  Right.

20  **A  So you drive the car back to -- I think it**

21  **was usually 26th and California, and you turn in**

22  **keys to the car, your felony review folder, and**

23  **the beeper.**

24  Q  Okay.

---

**79**

1  **A  And then you would go back and go get your**

2  **own car and go home.**

3  Q  So when you would start a shift, you would

4  pick up the beeper and a State's Attorney car?

5  **A  Yes.**

6  Q  What would you do with the felony review

7  folder if -- well, do you know what it means to

8  "CI" an investigation?

9  **A  Continue investigation?**

10  Q  Yeah.

11  **A  Continue an investigation.**

12  Q  What would you do with the felony review

13  folder if you had started one when an investigation

14  was CI?

15  **A  I don't remember.**

16  Q  Do you recall if you would just leave it

17  at the police station?

18  MR. COYNE:  Objection; foundation.  She

19  said she doesn't remember.

20  Go ahead.

21  **A  I don't remember but I think that would be**

22  **unlikely.**

23  Q  Do you recall ever working with Detective

24  Guevara?

---

**80**

1  **A  No.**

2  Q  Do you recall ever working with Detective

3  Halvorsen?

4  **A  No.**

5  Q  Did you become friends with any police

6  officers?

7  **A  Did -- sorry; I didn't hear the word.**

8  Q  Are you friends with any police officers?

9  **A  Any police officers?  Right now?  In my**

10  **life?  I don't think so.**

11  Q  Okay.

12  **A  Not that I recall.  Not that I know of.**

13  Q  Is there a back page on the felony review

14  folder you've got there?

15  **A  It's blank.**

16  Q  Is there a front page?

17  **A  Yeah.  That's the one that you have noted**

18  **as --**

19  Q  That's the one that ends in 2006?

20  **A  No, you have Borowitz 000 -- I think it's**

21  **four zeros and 6.**

22  Q  Yes.

23  **A  That's the front page, the front of the**

24  **folder.  Can I hold -- I can hold it up.**

---

81

1    Q  No, no, I get what you're saying.  And you
2  said for us that Alfredo Gonzalez is -- this is
3  your handwriting at the top where it says "Murder
4  X2, Alfredo Gonzalez"?
5    **A  Yes, yes.**
6    Q  Have you got a page that -- I don't have a
7  State's Attorney's Bates stamp on it, but it's
8  Borowitz 64, and it's the felony review folder for
9  Maysonet, the first page.
10   **A  What's the date again?**
11   Q  It says Borowitz 64.
12   **A  Borowitz 64?  Hang on.**
13      MR. COYNE:  Is it 1761?
14      MR. GREENBERG:  Mine doesn't have that but
15 it's got Maysonet on it, John.
16      THE WITNESS:  Is it Maysonet's felony
17 review folder?
18      MR. GREENBERG:  Yes.
19      MR. COYNE:  Is this it, Steve?
20      MR. GREENBERG:  You've got to raise it up,
21 John.  Yes.
22      MR. COYNE:  Okay.  We have that.
23      THE WITNESS:  Okay.  Now I found it.  I
24 found what you're talking about.

82

1    Q  Okay.  You see where it says José Maysonet
2  at the top?
3    **A  Yes.**
4      MR. BRENER:  Before you ask a question,
5  are you planning to offer any of this into
6  evidence as an exhibit?
7      MR. GREENBERG:  I'm sorry.  Sure.  Why
8  don't we call the first one, the Gonzalez one
9  Exhibit 1, and we'll call this one Exhibit 2.
10      MR. COYNE:  Steve, can I suggest you call
11 it Borowitz 1 and 2?
12      MR. GREENBERG:  Sure.  We'll call this
13 Borowitz Exhibit 1 and Borowitz Exhibit 2.
14      MR. COYNE:  Which is Exhibit 1?
15      MR. BRENER:  Steve, what is Exhibit 1?
16      MR. GREENBERG:  Exhibit 1 is our 62 and
17 63, which are State's Attorney 2006-2007.
18      I'm sorry; this is only my fourth deposition
19 in my life.  I think I've sat for more than I've
20 taken.
21      (Borowitz Deposition Exhibit 2 marked for
22 identification and retained by Counsel.)
23   Q  Okay.  So Borowitz Exhibit 2 --
24      MR. BRENER:  What are the Bates numbers

83

1  for Borowitz Exhibit 2?
2      MR. GREENBERG:  There are none on the
3  one I've got.  It's got 64, Borowitz 64.
4      MR. ADELMAN:  If I may, Steve, Borowitz 64 is
5  part of the group that you emailed out.  On the
6  extreme right-hand side up and down it says
7  CCSAO 001761.
8      MR. GREENBERG:  Oh, it does.  You're right.
9  I can see that.  Thank you.
10      MR. ADELMAN:  You're welcome.
11      MR. GREENBERG:  You got that, Ed?
12      MR. BRENER:  Yes.
13      MR. GREENBERG:  I didn't catch that.  Did
14 you find it, Ed?
15      MR. BRENER:  Yes, I did.  Thank you.
16 BY MR. GREENBERG:
17   Q  All right.  Ms. Borowitz, you've got what
18 we're calling Borowitz 2 in front of you.
19   **A  Okay.**
20   Q  Do you recognize whose handwriting that is
21 that says "Maysonet, José"?
22   **A  No.**
23   Q  Do you recognize whose handwriting it is
24 where it says "Murder"?

84

1    **A  No.**
2    Q  Is any of the handwriting on this page yours?
3    **A  Doesn't appear to be.**
4    Q  Do you recognize what this is?
5    **A  Yes.  It is a Xerox of part of a felony**
6  **review folder, it looks like.**
7    Q  So --
8    **A  And I'll be honest with you, I haven't**
9  **looked at it but here it is.  Here is the original,**
10 **so I can tell you whose it is.  Yes, it looks like**
11 **the felony review folder.**
12   Q  And have you got the original felony review
13 folder there?
14   **A  Yes.  But I'm looking at your document.**
15   Q  Right, right, but have you got this
16 original felony review folder?
17   **A  Yes.  That's what's here.  I haven't**
18 **reviewed it but here it is.**
19   Q  Okay.  Can you take a moment to take a
20 look at that -- the entirety of that folder and
21 tell me if you recognize your handwriting anywhere
22 on that folder?
23      MR. COYNE:  You're talking about the
24 original; correct?

---

85

1    THE WITNESS: Or the copy that looks like
2 the original.
3    MR. COYNE: Just so I'm clear, which
4 document are you asking her to review, the
5 original felony review folder?
6    MR. GREENBERG: The original because it's
7 easier for her to see.
8    MR. COYNE: That's fine. I just want to
9 be clear on that.
10    **A I don't see my handwriting on this folder.**
11    Q Nowhere on that folder does it reflect
12 that you interviewed José Maysonet; is that correct?
13    **A Correct.**
14    Q And nowhere on that folder does it reflect
15 that you were present with Detectives Guevara and
16 Montea when José Maysonet made a statement
17 implicating himself in this case, in this murder?
18    **A Correct. There's nothing on this file**
19 **that says that.**
20    Q Does it reflect anywhere on that file that
21 José Maysonet in your presence agreed to provide a
22 court-reported statement?
23    **A I've got to read the writing.**
24    Q No, a court-reported statement to you?

---

86

1    **A No.**
2    Q And is the front of that folder the same
3 front as what we marked as Borowitz Exhibit 2?
4    MS. BONJEAN: Steve, can you just clarify?
5 When you say, "the front of that folder," do you
6 mean the original?
7    Q Is the original -- does the front of the
8 original folder match the photocopy of Borowitz
9 Exhibit 2?
10    **A Yes. Yes, it does. It's shrunk so much**
11 **that some stuff is hard to read but --**
12    MR. GREENBERG: Right. Okay. Perhaps I
13 can then -- I'll make a larger copy of it, unless
14 someone has some objection, and replace what I
15 marked as Exhibit 2 with that after the deposition.
16 I'll walk over and make a copy, if that's all right.
17    MR. COYNE: That's fine with me.
18    THE WITNESS: It looks like if you did it
19 like landscape versus portrait -- you know what I
20 mean? So you're at least printing it long way.
21    MR. GREENBERG: Right. I got it.
22    Q So, Ms. Borowitz, I may have asked this
23 already but I don't think I did. What would the
24 procedure be if -- well, strike that.

---

87

1    Do you recall what the policy was for
2 felony review if you started an investigation --
3 started speaking to a suspect, were you supposed
4 to stay past the end of your shift, or were you
5 supposed to leave when your shift ended?
6    MR. COYNE: Objection to form and
7 foundation.
8    **A I don't recall.**
9    Q Do you recall ever staying beyond the end
10 of your shift to finish?
11    **A I don't recall.**
12    Q Do you recall ever leaving at the end of
13 your shift when you weren't done?
14    **A I don't recall.**
15    Q Do you ever recall taking an inculpatory
16 statement from an individual and then calling
17 someone else to take a handwritten or court-
18 reported statement from that person?
19    **A I don't recall.**
20    Q Would it be a fair statement that they
21 wanted the same State's Attorney to continue when
22 they were taking a statement because they built up
23 a rapport with the individual?
24    MR. COYNE: Objection; foundation,

---

88

1 requires speculation. That's Coyne.
2    Go ahead.
3    **A I don't know.**
4    Q Do you recall ever working past the end of
5 a shift?
6    **A I don't recall.**
7    Q Do you recall the longest you ever worked
8 on a shift?
9    **A I don't recall.**
10    Q Is there anything that would refresh your
11 recollection as to whether you actually spoke to
12 Mr. Maysonet and he told you that he had committed
13 this crime?
14    **A A felony review folder, my felony review**
15 **folder like the one I have on Gonzalez, or a**
16 **court-reported statement with me like the one I**
17 **did with Mr. Gonzalez that you provided.**
18    Q And if he had done that, you would have
19 created a felony review folder to memorialize
20 that; correct?
21    MR. COYNE: Objection; foundation.
22    Go ahead.
23    **A I said this like three or four times**
24 **already. If I was assigned the case, I would have**

89

1 gone there and started -- and followed the
2 procedures that I followed with Alfredo Gonzalez
3 if I was assigned the case. But based on the
4 documents that I've been provided, it doesn't
5 appear I was assigned this case.
6    Q  I'm sorry; what?
7    A  It doesn't appear that I was assigned to
8 the Maysonet case.
9    Q  Okay. You've still got that felony review
10 folder on Maysonet with you; correct?
11   A  Yes. Okay. Yes.
12   Q  Can you take a look at the inside of that --
13 the left-hand side of that folder --
14   A  Yes.
15   Q  -- which is Borowitz Exhibit 2?
16   A  Yes.
17   Q  Does it reflect anywhere in there that you
18 ever spoke to Mr. Maysonet?
19   A  You already asked and I've already
20 answered but no.
21      MR. COYNE:  To be clear, I have Maysonet --
22 Exhibit 2 for Borowitz I have listed as a file
23 front for Maysonet.
24      MR. BRENER:  That was going to be my

90

1 comment, as well. Steve, if there's more than
2 one page as part of this exhibit, can you give us
3 Bates stamps that you're considering as Borowitz
4 Exhibit 2?
5      MR. GREENBERG:  1762 is the page I'm
6 talking about now, CCSA 1762.
7      MR. BRENER:  So is the exhibit 1761 and
8 1762 or is this Exhibit 3?
9      MR. GREENBERG:  No, no, it's 1761, 1762
10 and 1763. That's the entirety of the folder.
11     MR. COYNE:  It's a group exhibit; right?
12     MR. GREENBERG:  Well, it's the folder.
13 We're going to substitute the folder. It's a
14 group exhibit, yeah, if you want to call it that.
15 That is correct.
16   Q  So, again, it doesn't reflect anywhere on
17 here that you spoke to him; right?
18   A  Right.
19     MR. GREENBERG:  Okay. Can I have one
20 minute, please?
21     MR. COYNE:  Sure.
22     (An off-the-record discussion was held.)
23 BY MR. GREENBERG:
24   Q  Did you ever work on a case where there

91

1 was more than one felony review assistant assigned
2 to the same case at the same time?
3    A  Probably but I can't recall.
4    Q  Do you know who Frank DiFranco is?
5    A  I know who he is.
6    Q  Do you recall ever working on a case with
7 Frank DiFranco?
8    A  I don't recall but I believe he might have
9 been on felony review when I was on felony review
10 at some point.
11   Q  When you were on felony review, were you
12 assigned to a team?
13   A  I don't have a hundred percent memory of
14 this. To the best of my memory, and you're
15 jogging it by saying we are on a team, I think
16 there were a few of us. I just don't remember
17 how many.
18   Q  Right. My understanding is you would be
19 assigned to a team, and each team would have a
20 supervisor for that team. Right?
21   A  That makes sense.
22   Q  And do you recall if you were assigned to
23 the same team as Frank DiFranco?
24   A  I don't recall.

92

1    Q  Because you didn't mention him when you
2 were talking about the other people you worked with.
3      If more than one State's Attorney were
4 assigned to the same investigation, do you recall
5 whether that information would be reflected
6 anywhere?
7      MR. BRENER:  Objection.
8    A  I don't recall.
9    Q  Would that be reflected anywhere on a
10 felony review folder?
11     MR. COYNE:  Objection; foundation. Coyne.
12   A  I don't recall.
13   Q  If Mr. Maysonet had given a court-reported
14 statement before you spoke to Mr. Gonzalez, would
15 that be one of the documents that you would have
16 reviewed before speaking to Mr. Gonzalez?
17     MR. COYNE:  Foundation.
18     Go ahead.
19   A  I don't recall.
20   Q  If that were -- would you write down anywhere
21 what documents you reviewed before talking to an
22 individual?
23   A  I don't recall.
24   Q  If you look at the Maysonet felony review

93

1  file where it says "Evidence Investigation," that
2  section --
3     **A  Okay.**
4     Q  -- it indicates that -- "Bella Rosa to go
5  to grand jury."  Do you see that?
6     **A  Yes.**
7     Q  That's the same thing you had put except
8  you put Rosa Bella?
9     **A  Correct.**
10    Q  How would that decision be made that a
11 witness should go to the grand jury?
12       MR. BRENER:  Objection to foundation.
13    **A  My memory is not a hundred percent because**
14 **this is 30 years ago.  I think one of the reasons**
15 **you would recommend someone go to the grand jury**
16 **is they thought -- if you thought that they -- the**
17 **common term would be flipped later.**
18    Q  Okay.  So if you were afraid they would
19 change their testimony, you wanted to lock them
20 in; right?
21    **A  Yes.**
22    Q  Do you know who would make that decision?
23 Would it be a felony review assistant?
24    **A  I don't remember.**

94

1     Q  By the way, had you -- and I'm sorry if I
2  already asked this but if someone -- if you stuck
3  your head in the room -- you would sometimes --
4  would you actually go in the room to see if
5  someone wanted to talk to you, or would you just
6  open the door and stand in the doorway?
7     **A  I don't remember.**
8     Q  Would you do both?
9     **A  I don't remember.**
10    Q  You don't remember?
11    **A  I don't remember how that went.**
12    Q  Would you always before you asked someone
13 if they wanted to talk to you read them their
14 rights?
15    **A  Yes.**
16    Q  That was your procedure; right?
17    **A  Yes.**
18    Q  And you would always tell them you were a
19 State's Attorney and not their attorney; right?
20    **A  Yes.**
21    Q  And you would ask them if they wanted to
22 talk to you?
23    **A  Yes.**
24    Q  And you don't recall if you would actually

95

1  go in a room and sit down with the officer or
2  sometimes just open the door and stand in the
3  doorway?
4        MR. COYNE:  Objection; asked and answered.
5        Go ahead.
6     **A  Correct.**
7     Q  It's possible that you did both?
8     **A  Correct.**
9     Q  If someone was a suspect but they did not
10 want to speak to you, would you write that down in
11 the felony review folder?
12    **A  Again, if I was assigned a case, and I had**
13 **a felony review folder, and I went to talk to a**
14 **suspect, and they said they didn't -- and I**
15 **advised them of their rights, and they said, "I**
16 **don't want to talk to you," yes.**
17    Q  Okay.  And would you ever talk to a
18 suspect in a case that you were not assigned?
19       MR. COYNE:  Objection; form.
20       Go ahead.
21    **A  I don't recall.**
22    Q  Do you recall ever just being at a police
23 station and being asked by the officers to talk to
24 someone who is a suspect in a murder?

96

1     **A  I don't recall.**
2     Q  You don't recall that happening?
3     **A  I don't remember.  I don't remember.**
4     Q  If that -- if that occurred, would you --
5  would the procedure have required you to call it
6  in before speaking with somebody?
7        MR. BRENER:  Objection; calls for
8  speculation.
9     Q  Would you have to get approval?
10    **A  I don't recall.**
11       MR. GREENBERG:  What I'd like to do, guys,
12 unless someone has an objection is take about
13 10 minutes, run over and make that copy just to
14 see if there's anything else.  He's right across
15 the street and we can resume -- it's 1:00,
16 1:15 and we're close to done anyway.
17       MR. COYNE:  Okay.  I'll meet you in the
18 lobby.
19       MR. GREENBERG:  That's fine.  I can get
20 in, too.  I have a membership.  We can go off the
21 record.
22       (Recess taken, 12:59 p.m. to 1:29 p.m.)
23       MR. GREENBERG:  So a couple of things I
24 was asked to clarify.

**97**

1       Borowitz Deposition Exhibit 1 is pages
2   CCSA 2006 and 2007.  That's the Gonzalez felony
3   review folder, so it's -- those are the stamps.
4   It's a few pages long.
5       Borowitz Exhibit 2 is CCSA 1761, 62, and
6   63.  So that's also three pages.  It may be four
7   when it's photocopied and the others substituted.
8       MR. COYNE:  Steve, just to confirm for the
9   record that during the break I gave to Mr. Greenberg
10  four felony review folders of the names Cruz,
11  Maysonet, Gonzalez, and Gothins.  One of those felony
12  review folders had a piece of paper CCH stapled to
13  them.  I just wanted to confirm I gave those to
14  Mr. Greenberg so he could copy them, and we'll make
15  arrangements for me to get them back from him later.
16      MR. GREENBERG:  Right.  Today, yes.
17  BY MR. GREENBERG:
18      Q  Do you have -- it was Borowitz 67, CCSA 2015?
19      A  Yes.  I happen to have that sitting right
20  on top.
21      MR. GREENBERG:  And I would ask that that
22  be Borowitz Deposition Exhibit 3.
23      (Borowitz Deposition Exhibit 3 marked for
24  identification and retained by Counsel.)

**98**

1   BY MR. GREENBERG:
2       Q  That appears to me to be a page from a
3   felony review folder.  Would that be correct?
4       A  Correct.
5       Q  Can you tell by looking at this what
6   felony review folder this is from?
7       A  Looks like it goes to Alfredo Gonzalez.
8       Q  And how can you tell that?
9       A  Well, it's my handwriting, first of all.
10  And then if you look at -- if you look at -- if
11  you look at Alfredo Gonzalez' felony review
12  folder, it says page 1 of 2.
13      Q  Okay.
14      A  This is page 2 of 2 and -- well, let's
15  see.  "May 24th, 1990, get the .9 millimeter gun,
16  live-in girlfriend of codefendant José Maysonet,"
17  and now you've alerted me to the fact that I
18  spelled his name incorrectly; it's spelled
19  incorrectly there, too, and that she was a
20  circumstantial witness.  And then I have in the --
21  I have in the folder that she's the one to go to
22  the grand jury.
23      Q  Okay.  Do you actually have this original
24  folder also in front of you, this portion of it?

**99**

1       A  These -- if I remember correctly -- now,
2   this is 30 years ago --
3       MR. COYNE:  He's asking you if you have
4   this.
5       A  (Continuing.)  Oh, no, I don't have an
6   original.  I have a Xerox.
7       Q  What were you going to say?
8       A  I think what you did, if I remember
9   correctly, is you had the felony review folders --
10  and you had like a bunch of them.  Right?  So then
11  you start filling out one, and I think in the
12  felony review folder, if I remember correctly,
13  they were like white pieces of paper that look
14  like what's the writing, you know, and it was a
15  carbon on top or a carbon backing or something.  I
16  may be wrong.  This is just sort of my memory.
17  And then I think you pull off -- if you needed to
18  add on another sheet, you pull off a piece from a
19  second just like blank folder that you weren't
20  using.  That's how you would get your page 2 here.
21  I'm waving it around; you can't see me.
22      Q  Or sometimes you would actually use just a
23  second folder?
24      A  I imagine you could use a whole second

**100**

1   folder and attach them, something like that.
2       Q  Did the carbon also have a pink sheet?
3       A  I don't remember.
4       Q  But you recognize the writing on this
5   Borowitz Deposition Exhibit 3 as your writing?
6       A  That's the -- that's the Rosa Bella thing?
7       Q  Yes.
8       A  Okay.  Yes, because mine is not marked as
9   an exhibit.
10      Q  What would have caused you to write this
11  information down?
12      A  Well, she's a witness.  She's a
13  circumstantial witness.  It says it right here.
14      Q  Okay.  Would you have spoken to her?
15      A  I don't know.  I don't recall.
16      Q  Can you tell if this means you spoke
17  to her?
18      A  I can't -- I can't recall.  It does say,
19  "Notes: See handwritten."
20      Q  Would you have asked the police to take a
21  witness to the grand jury without first speaking
22  to the witness?
23      MR. COYNE:  Objection; foundation.
24      Go ahead.

101

1    MR. BRENER:  Argumentative.
2    A  I can't recall.
3    Q  Do you recall if there was a procedure to
4  follow when you wanted someone to go to the grand
5  jury?
6    A  I can't recall.
7    Q  Where it says in "Notes:  See handwritten,"
8  does that mean that you would have taken a
9  handwritten statement from her?
10    A  Not necessarily.  There is a handwritten
11  from her.  It's in some of the documents you
12  provided.
13    Q  Uh-huh.
14    A  Frank DiFranco took a handwritten from
15  her, it looks like the day before I was on the
16  Alfredo Gonzalez case or the day of, the day
17  before.  It's hard to say when.  It's midnight
18  going into the next day.
19    MR. GREENBERG:  Give me one minute.
20    Q  Okay.  And you've seen that -- so Frank
21  DiFranco would have taken that?
22    A  I see it.  I have -- you have a copy of it.
23    Q  Right.
24    A  It's taken on May 23 at 2:10 p.m. per this

102

1  handwritten by Frank DiFranco.
2    MR. GREENBERG:  Okay.  I don't have any
3  other questions unless I get a text message saying
4  that I need to ask another one.
5    MR. COYNE:  Anybody else?
6    MR. GREENBERG:  So I'm opening the floor
7  up to the text message.
8    MS. BONJEAN:  No text.
9    MR. COYNE:  Anybody have any questions?
10    MR. BRENER:  Steve, are you done?
11    MR. GREENBERG:  Unless I'm told to ask
12  another question, yes.
13    MR. BRENER:  Let's give you a minute.
14    MS. BONJEAN:  If you're waiting for me,
15  Steve, I don't have anything to contribute.
16    MR. GREENBERG:  Okay.  Then I'm done.
17    MR. BRENER:  I do have a question,
18  Ms. Borowitz.
19    EXAMINATION BY COUNSEL FOR DEFENDANTS
20    FRANK DiFRANCO and COOK COUNTY
21  BY MR. BRENER:
22    Q  You were asked some hypothetical questions
23  about what you would have done when you sat down
24  with a suspect you were assigned to on felony

103

1  review.  Do you remember hearing those questions
2  and answering them?
3    A  Yes.
4    Q  If you hadn't sat down with a suspect on
5  felony review, advised that suspect of his rights,
6  and then the suspect told you, "I'm invoking my
7  right to counsel," would you have recorded that in
8  a felony review folder?
9    A  Yes.  It would go right in the felony
10  review folder under the --
11    MR. BRENER:  I have no further questions.
12    THE WITNESS:  Oh, okay.  I was going to
13  just tell you where you write it.
14    Q  Sure.  Please finish your answer.
15    A  Where you would write "Statement,
16  defendant" there, you'd write "Advised of rights
17  and invoked," something like that.  You'd write it
18  right in that little section.
19    MR. BRENER:  Thank you.
20    MR. COYNE:  Anybody else?
21    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
22  BY MR. GREENBERG:
23    Q  I'm sorry; where would you have written
24  it, Ms. Borowitz?

104

1    A  On the felony review folder -- I'm using
2  Gonzalez' as an example.  That's the one I've got
3  in front of me, the copy.  Where it says,
4  "Statement, Defendant No. 1," if -- say it was
5  him, and I had advised him of his rights and he
6  invoked.  I would write, "Advised of rights and
7  then invoked."  I would write that, wants his
8  lawyer or requested a lawyer.
9    Q  And you would do that if you actually spoke
10  to someone who was a suspect; right?
11    A  If I was assigned a case like I was for
12  Gonzalez, yes.  If I was assigned a case, and I
13  interviewed him like this, yes.  But clearly he
14  didn't.
15    Q  Okay.  And if you had spoken to José
16  Maysonet, and he had done that, he said, "I want a
17  lawyer," you would have written that on a felony
18  review folder?
19    A  Yes, correct.
20    Q  And if you had spoken --
21    A  I also said if I was assigned the case and
22  he invoked, I would write that.  But then you'd
23  also have all the other stuff, the victim, the
24  witness, the things like that.

105

1    Q  And if you had spoken to Maysonet, and he
2  had told you that he was involved in the murder,
3  you would have written that down?
4    **A  If I was assigned a case, and I**
5  **interviewed him yes, I believe that's what I'd**
6  **write down.**
7    Q  Okay.
8    **A  My procedure.**
9    MR. GREENBERG:  I don't have anything
10 else.  Thank you.
11   MR. COYNE:  Anybody else?
12   (No response.)
13   MR. COYNE:  Reserve signature.
14   (Off the record at 1:40 p.m. CST.)
15
16
17
18
19
20
21
22
23
24

106

1    CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2
3      I, Paula M. Quetsch, Certified Shorthand
4  Reporter No. 084-003733, CSR, RPR, and a Notary
5  Public in and for the County of Kane, State of
6  Illinois, the officer before whom the foregoing
7  deposition was taken, do hereby certify that the
8  foregoing transcript is a true and correct record
9  of the testimony given; that said testimony was
10 taken by me stenographically and thereafter reduced
11 to typewriting under my direction; that reading and
12 signing was requested; and that I am neither
13 counsel for, related to, nor employed by any of
14 the parties to this case and have no interest,
15 financial or otherwise, in its outcome.
16     IN WITNESS WHEREOF, I have hereunto set my
17 hand and affixed my notarial seal this 15th day of
18 May, 2021. My commission expires:  October 16, 2021
19
20
21 _Paula Quetsch_
22 _____
23 Notary Public in and for the
24 State of Illinois