# EXHIBIT 23

# In The Matter Of:
*Maysonet v.*
*Guevara*

*Frank DiFranco*
*September 12, 2019*
*Video Deposition*



Rizman Rappaport
Certified Court Reporters
66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

Min-U-Script® with Word Index

## Page 1

```
 1
 2           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4
    JOSE JUAN MAYSONET, JR.,    )
 5                              )
                                )
 6           Plaintiff,         )
                                )
 7      vs.                     ) No. 18-cv-02342
                                )
 8  REYNALDO GUEVARA, ERNEST    )
    HALVORSEN, EDWARD MINGEY,   )
 9  EPPLEN; FERNANDO MONTILLA,  )
    ROLAND PAULNITSKY, FRANK    )
10  DiFRANCO, CITY OF CHICAGO,  )
    COOK COUNTY,                )
11                              )
                                )
12           Defendants.        )
13
14        The deposition of FRANK DiFRANCO, called
15  by the Plaintiff for examination, taken pursuant
16  to notice and pursuant to the Federal Rules of
17  Civil Procedure for the United States District
18  Courts pertaining to the taking of depositions,
19  taken before Alyssa N. Kuipers, Certified
20  Shorthand Reporter, Registered Professional
21  Reporter, at 141 West Jackson Boulevard,
22  Suite 1240A, Chicago, Illinois, commencing at
23  10:12 a.m. on the 12th day of September, 2019.
24
25
```

## Page 2

```
 1  APPEARANCES:
 2       BONJEAN LAW GROUP
         MS. JENNIFER A. BONJEAN
 3       MS. ASHLEY COHEN
         100 Dean Street
 4       Suite 422
         Brooklyn, New York 11238
 5       Phone:  (718) 875-1850
         E-mail: jennifer@bonjeanlaw.com
 6
             On behalf of the Plaintiff;
 7
         STEVEN A. GREENBERG, LTD.
 8       MR. KYLE JORGENSEN
         53 West Jackson Boulevard
 9       Suite 1260
         Chicago, Illinois 60604
10       Phone:  (312) 879-9500
         E-mail: kyle@greenbergcd.com
11
             On behalf of the Plaintiff;
12
         THE SOTOS LAW FIRM
13       MS. CAROLINE J. GOLDEN
         141 West Jackson Boulevard
14       Suite 1240A
         Chicago, Illinois 60604
15       Phone:  (312) 735-3300
         E-mail: cgolden@jsotoslaw.com
16
             On behalf of the Defendants Ernest
17           Halvorsen, Edward Mingey, Lee Epplen,
             Fernando Montilla, and Roland Paulnitsky;
18
         ROCK, FUSCO & CONNELLY
19       MR. AUSTIN G. RAHE
         321 North Clark Street
20       Suite 2200
         Chicago, Illinois 60654
21       Phone:  (312) 494-1000
         E-mail: arahe@rfclaw.com
22
             On behalf of the Defendant City of
23           Chicago;
24
25
```

## Page 3

```
 1  APPEARANCE:  (continued)
 2       LEINENWEBER BARONI & DAFFADA
         MR. JUSTIN LEINENWEBER
 3       MR. MICHAEL SCHALKA (via telephone)
         120 North LaSalle Street
 4       Suite 2000
         Chicago, Illinois 60602
 5       Phone:  (847) 251-4091
         E-mail: justin@ilesq.com
 6
             On behalf of the Defendant Reynaldo
 7           Guevara;
 8       COOK COUNTY STATE'S ATTORNEY'S OFFICE
         MR. EDWARD M. BRENER
 9       50 West Washington Street
         Suite 500
10       Chicago, Illinois 60602
         Phone:  (312) 603-5971
11       E-mail: edward.brener@cookcountyil.gov
12           On behalf of the Defendants Frank
             DiFranco and Cook County.
13
14
15  ALSO PRESENT:  Gabriel Martin, videographer
16
17           *   *   *   *   *   *
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              I N D E X
 2  WITNESS:                             PAGE
 3  Direct Examination by Ms. Bonjean       6
 4
 5
 6              E X H I B I T S
 7  DiFRANCO DEPOSITION EXHIBIT          PAGE
 8  Exhibit 1    criminal history         233
 9  Exhibit 2    criminal history         234
10  Exhibit 3    photographs              261
11  Exhibit 4    investigative file       262
12  Exhibit 5    felony review folder     297
13  Exhibit 6    part of felony review file  311
14  Exhibit 7    statement                313
15  Exhibit 8    handwritten statement    327
16
17
18
19
20
21
22
23
24
25
```

Page 149

1 west and the south side.
2 Q. Right. So if you were on felony
3 review and you were on west or south, you knew
4 you were going to probably be getting called
5 out rather than being maybe in east or north,
6 right?
7 A. Yep.
8 Q. Was there a particular geographic
9 north, south, east team that -- was one of
10 those locations more desirable than the others
11 when you were on felony review?
12 A. People wanted to be closer to their
13 house normally. But not really. You just
14 rotated more. So it didn't -- it never really
15 became much of an issue, unless you wanted to
16 be at a certain location for another reason,
17 like you wanted to be closer to home or you
18 wanted to be closer to a Cub game or whatever.
19 Q. Right. Were there people who wanted
20 to be closer to the activity in the sense of
21 more -- you know, I want to be out there taking
22 statements of murderers?
23 A. No.
24     MR. BRENER: Foundation.
25     BY THE WITNESS:

Page 150

1 A. I never saw anybody say that they
2 wanted more work.
3 Q. Okay.
4 A. It was so busy that it didn't
5 matter. Wherever you were, wherever you were
6 assigned you were getting work because there
7 was only six of you and there was so much going
8 on.
9 Q. Okay. So in your six to
10 eight months on felony review, how many cases
11 do you think you were called to?
12 A. I have no idea, you know. You could
13 get anywhere from one to two to five or six in
14 a day. But of course they would not all be --
15 when you say "called to," they would not all be
16 personals. Some of them would be phone cases.
17 Remember we talked about that, property crimes
18 and --
19 Q. Yes, I do recall that.
20     How many -- let's talk about where
21 you personally have to show up, okay?
22 Actually, let's make it easy. Let's talk about
23 homicides.
24 A. Okay.
25 Q. Okay? In your six to eight months

Page 151

1 on felony review, how many homicides do you
2 think you responded to?
3 A. I really have no idea. This was
4 kind of freak that I got assigned this one, to
5 be honest with you. It was my first day. For
6 whatever reason the trial supervisor didn't
7 want it or they didn't -- normally, a trial
8 supervisor would pick it up, I would think, you
9 know, but for whatever reason, they gave it to
10 me.
11 Q. So this one sticks out?
12 A. Well, it was my first case I ever
13 did. It's the first case I did on my own. I
14 just got done with doing a couple ride-alongs.
15 I call in, and they said: Okay, you got a
16 homicide at Grand and Central.
17     And I'm like: Okay.
18     So, yeah, it sticks out as far as
19 being the first case you ever did and it ends
20 up being a homicide.
21 Q. Do you know how many statements you
22 took from murder suspects while you were in
23 felony review?
24 A. I have no idea.
25 Q. Is it 100 or is more like ten?

Page 152

1 A. No, it would not be near 100. Could
2 be maybe 20. I mean, I don't know, though. I
3 really -- a lot of cases they didn't give
4 statements. I mean, made our job easier. They
5 said they don't want to make a statement, fine,
6 boom. We're done. We interview the witnesses.
7 Supervisor makes the decision, and I'm done.
8 Q. Okay. So the shift that you were
9 working when you were called to Area 5 for the
10 Wiley brothers' murder investigation started on
11 August 22nd or August 23rd?
12 A. I don't know. I would have to look
13 at my paperwork. It started at 6:00 a.m.
14 Q. Okay.
15 A. So if I took the statement on the
16 23rd, it's the 23rd.
17 Q. So August 23, 1990, that's what I
18 would have expected?
19 A. Right. If that's what the statement
20 was, yes.
21 Q. I'm going to let you look in a
22 minute, but I still want to try to find out
23 what you remember.
24 A. Sure.
25 Q. And so you would have started your

Page 205

1  A. Okay. I don't agree with you.
2  Q. So then you don't think it's a
3  necessary procedure. Is that true?
4  A. No. No, I don't think it's a
5  necessary procedure.
6  Q. Okay. Very good. Even if there are
7  different people present for the court-reported
8  versus the preceding oral?
9  A. I'm just telling you what I did in
10  filling out the felony review folder. When I
11  took my interview, whatever I wrote in the
12  folder is what I wrote. I don't have
13  independent recollection of what was in my
14  folder as far as his statement. I do recall
15  recording his statement in the summary. I
16  don't know if I said: This was his oral, this
17  was his court-reported, whatever.
18     But I recorded his statement.
19  Q. Okay. We'll look at it. Maybe we
20  can figure it out. So -- but before we do
21  that, I'll move off your practice and get back
22  to what was actually occurring in the Maysonet
23  investigation.
24     You said that you allegedly left the
25  room and you called up a supervisor to get

Page 206

1  approval for a court reporter to come?
2  A. Correct.
3  Q. Same supervisor, Howard?
4  A. Yes.
5  Q. And that was approved?
6  A. Yes.
7  Q. And what did you -- in the interim
8  while you were waiting for the court reporter,
9  did you do anything that you remember?
10  A. I would fill out my felony review
11  folder, don't -- I don't remember what I did
12  that day.
13  Q. Okay. Anything else --
14  A. Nope.
15  Q. -- that you recall?
16  A. Not that I recall.
17  Q. Talk to any other witnesses in the
18  interim?
19  A. Not on this case, no.
20  Q. Okay. And do you know whether Rosa
21  Bello was in the area at the time?
22  A. No.
23  Q. You don't know or?
24  A. I don't know if she was in the area
25  at the time. I did not see her at the time.

Page 207

1  Q. And again, you're really relying on
2  information you're getting through the
3  detectives to know who is there, right?
4     MR. LEINENWEBER: Objection, form.
5     BY THE WITNESS:
6  A. Right. From what I see and observe.
7  And they didn't tell me she was there. I mean,
8  I didn't have any information that she was
9  there at the time.
10  Q. Okay. And the court reporter
11  eventually shows up, I assume?
12  A. Correct.
13  Q. What was the court reporter's name?
14  A. Paul Serbrist (phonetic) or Seebrist
15  (phonetic) or something, Siebrist (phonetic).
16  Q. Did you know him?
17  A. No.
18  Q. What did he look like?
19  A. I don't have any independent
20  recollection of what he looked like.
21  Q. White guy?
22  A. I think so. But I really don't have
23  independent recollection.
24  Q. Do you have a vague recollection of
25  how old he was? Young guy? Old guy?

Page 208

1  A. No, I have no -- I mean, it was the
2  first time I met the guy, and I didn't -- I
3  really don't.
4  Q. Okay. And so what happened when he
5  got there?
6  A. We set up. We moved to a different
7  location. He set up his machine, and I brought
8  Mr. -- or they brought Mr. Maysonet out. We
9  sat down, and we began the court-reported
10  statement.
11  Q. Where did you move to?
12  A. I don't remember. I don't have -- I
13  can't remember where we moved to.
14  Q. Larger conference room?
15  A. It had to be a larger interview
16  room, I'm guessing. But I don't know. I just
17  can't remember.
18  Q. Okay. And Mr. Maysonet was brought
19  in?
20  A. Yes.
21  Q. Who was present in this larger room?
22  A. Myself, Fred Montilla and Jose
23  Maysonet and the court reporter.
24  Q. Was Guevara present?
25  A. No.

Page 209

1 Q. And tell me what happened once you
2 got into this larger room with the court
3 reporter, Mr. Maysonet and Montilla.
4 A. I identified myself and everybody
5 for the record, started the time, read him his
6 Miranda warnings. And you could read from the
7 court-reported word for word what happened; my
8 questions and his responses.
9 Q. Yet it's the first time you had ever
10 done this, right?
11 A. Yes.
12 Q. Had you ever taken a statement from
13 a suspect in any case prior to August 23, 1990?
14 A. Not that I --
15   MS. GOLDEN: Asked and answered.
16   BY THE WITNESS:
17 A. Not that I have independent
18 recollection of, no.
19 Q. So the first statements that you're
20 taking of a suspect in any case in a prosection
21 is a double homicide case, right?
22 A. That's right.
23 Q. Did that make you nervous?
24 A. I can't remember whether I was
25 nervous or not.

Page 210

1 Q. Don't want to mess up a double
2 murder prosecution, do you?
3 A. Well, I would hope not.
4 Q. Might get sued later on, right?
5 A. You never know.
6 Q. So tell me how it went. Well, were
7 you speaking English or --
8 A. I only speak English. I don't speak
9 any foreign languages, including Spanish.
10 Q. So you were speaking in English and
11 he was responding in English?
12 A. Correct.
13 Q. And Mr. Montilla was not acting as
14 an interpreter?
15 A. Correct.
16 Q. He wasn't, for instance, translating
17 what you said in English to Spanish to
18 Mr. Maysonet and then vice versa, translating
19 what Mr. Maysonet said in Spanish to you in
20 English?
21 A. Absolutely not.
22 Q. Okay. And again, at no point did
23 you even notice whether or not Mr. Maysonet had
24 any difficulty speaking English, correct?
25 A. Correct.

Page 211

1 Q. Do you know if we can get a video --
2 strike that -- an audio recording of this
3 court-reported statement?
4 A. Do I know?
5 Q. Yeah.
6 A. I have no idea.
7 Q. Did you see an audio recorder there?
8 A. To be honest with you, I have no
9 independent recollection of seeing an audio
10 recorder there.
11 Q. In your years in felony review or in
12 the prosecutor's office, did you ever notice
13 court reporters with audio recordings?
14 A. In court, I do all the time.
15   MR. LEINENWEBER: Objection,
16 foundation.
17   BY THE WITNESS:
18 A. I mean, more than that I see them in
19 court. But I don't have any independent
20 recollection of whether this court reporter
21 used a recorder or not.
22 Q. Was there a policy about that?
23 A. None that I was aware of.
24   MR. BRENER: Objection, foundation.
25   BY MS. BONJEAN:

Page 212

1 Q. I mean, in the Cook County State's
2 Attorney's Office, did you ever come across a
3 scenario where a court-reported statement also
4 was accompanied with audio?
5 A. No, not myself personally.
6 Q. Ever heard of it?
7 A. I'll get back again. Later on,
8 after I left, they started using audio and
9 video and stuff, but when I was there, no.
10 Q. I'm not talking about when it became
11 legal in the late '90s; I'm talking about in
12 the early '90s, mid '90s.
13 A. No.
14 Q. Not legal; when it became required.
15   Because obviously if there was an
16 audio recording, that would be discoverable,
17 you'd agree, right?
18 A. Sure.
19   MR. LEINENWEBER: Objection,
20 foundation.
21   BY THE WITNESS:
22 A. I guess. Why not?
23 Q. Or a defense attorney would
24 certainly have the right to try to get it,
25 correct?

Page 213

1  A. I would think so.
2  Q. And have you ever heard of that
3  happening? Again, we will put the time frame
4  in the early '90s or first half of the '90s?
5  A. No.
6  Q. And in your experience in felony
7  review, you never observed a court reporter in
8  an area with a recording device; is that right?
9  A. Correct.
10 Q. Because if Mr. Maysonet filed a
11 motion to suppress his statements at trial,
12 which he did, and alleged, which he did, at
13 trial that his statement was the product of
14 physical coercion, would you agree that the
15 prosecutor might want to get the audio
16 recording to try to rebut that inference?
17    MR. BRENER: Objection, form,
18 foundation.
19    BY THE WITNESS:
20 A. If it exists. I have no idea.
21 Q. Right. I understand. I'm just
22 saying, if it existed --
23 A. Well, not for coercion necessarily.
24 But if you claim that he didn't speak English,
25 I guess it would be pretty relevant.

Page 214

1  Q. Well, why not for coercion?
2  A. Well, why would coercion? The guy
3  never says he was coerced. He never says he
4  was injured. He never said there was any
5  difficulty whatsoever.
6  Q. Well, he did later on, though.
7  A. Well, of course later on he did.
8  What else is he going to do? He made an
9  inculpatory statement to double murder on
10 accountability. What's he going to do? He's
11 got a choice of natural life or death. He's
12 just going to say okay? He's got to find a way
13 to get out of it.
14 Q. Well, he's walking around right now.
15 A. Well -- yeah, well ...
16 Q. But he did make an allegation of
17 coercion. And you can dismiss it all you want
18 and act as if it never happens, which
19 apparently is your view.
20    MR. BRENER: Objection,
21 argumentative.
22    MS. GOLDEN: Object to the commentary.
23    BY MS. BONJEAN:
24 Q. Okay. Do you think people get
25 coerced sometimes into making statements?

Page 215

1     MR. LEINENWEBER: Objection,
2  foundation.
3     BY THE WITNESS:
4  A. I'm sure that it happens.
5  Q. Okay. So -- and you have no idea
6  what preceded your involvement in this case
7  when you showed up with your little briefcase
8  at 27 years old and have never taken a homicide
9  statement, right?
10    MR. BRENER: Excuse me. Form --
11 form --
12    BY THE WITNESS:
13 A. Why are you --
14    MR. BRENER: Hold on one second.
15    Form, foundation, argumentative.
16 If you're going to treat him the way you
17 are treating him --
18    MS. BONJEAN: Excuse my frustration.
19 I'll withdraw the question.
20    MR. BRENER: Thank you.
21    BY MS. BONJEAN:
22 Q. You do not know what preceded your
23 -- what preceded in the interrogation prior to
24 your arrival at Area 5, right?
25    MR. LEINENWEBER: Objection, asked

Page 216

1  and answered.
2     BY THE WITNESS:
3  A. I told you that. Of course not.
4  Q. Okay.
5  A. I wasn't there. How could I
6  possibly know?
7  Q. Okay. So when you -- you act like
8  -- you were very dismissive of that: What's he
9  going to do?
10    What's anyone going to do?
11 A. Absolutely. It's the most common
12 thing in the world. The guy's only got one
13 out. If his statement is true, he's going --
14 he's going to be convicted, so the only thing
15 he can do is try to suppress that statement.
16 The only way he can suppress that statement is
17 to try to allege coercion or force.
18 Q. Okay. I'm not sure I agree with
19 you. But let's just say that's true. All
20 right?
21 A. Okay.
22 Q. Let's just say it's the only way to
23 challenge a statement that's going to be used
24 against you, correct? You still have to deal
25 with that allegation as a prosecutor, correct?