# EXHIBIT 24

```
 1     STATE OF ILLINOIS    )
                            )   SS:
 2     COUNTY OF C O O K     )

 3          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
                 COUNTY DEPARTMENT - CRIMINAL DIVISION
 4
       THE PEOPLE OF THE          )
 5     STATE OF ILLINOIS,         )
                                  )
 6              Plaintiff,        )
                                  )
 7              vs.               )   No. 92 CR 10146
                                  )
 8     JUAN MAYSONET a/k/a        )
       JOSE MAYSONET,             )
 9                                )
                Defendant.        )
10

11                REPORT OF PROCEEDINGS at the jury

12     trial of the above-entitled cause, before the

13     HONORABLE LORETTA HALL MORGAN on the 10th day of

14     August 1995.

15
       A P P E A R A N C E S:
16          MR. JACK O'MALLEY
            State's Attorney of Cook County
17          BY:  MS. ELLEN MANDELTORT and
                 MR. FRANK MAREK
18               Assistant State's Attorneys
                 Appeared on behalf of the Plaintiff;
19
            MR. RICHARD BEUKE
20               Appeared on behalf of the Defendant.

21

22

23
       JO ANN KROLICKI, CSR
24     Official Court Reporter
```

FILED

MAR 15 1996

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

0-2

MAYSONET 849

1    or whatever, we're going to break just for five

2    minutes.

3                        (WHEREUPON, a recess was had in

4                        the above matter.)

5            THE COURT:  Very well.  You may be

6    seated.

7            THE COURT:  Please swear the witness.

8                        (Witness sworn.)

9            THE CLERK:  You can be seated.

10   WHEREUPON,

11                   FRANK DI FRANCO,

12   called as a witness on behalf of the People of

13   the State of Illinois, having been first duly

14   sworn, under oath was examined and testified as

15   follows:

16                   DIRECT EXAMINATION

17                   BY MS. MANDELTORT:

18       Q.   Good afternoon, sir.  Can you please

19   introduce yourself to the ladies and gentlemen of

20   the jury?

21       A.   Hi.  My name is Frank DiFranco,

22   D-i-F-r-a-n-c-o.

23       Q.   And, sir, what is your occupation or

24   profession?

O-112

```
 1          A.    I'm an attorney.
 2          Q.    Are you licensed to practice in the State
 3     of Illinois?
 4          A.    Yes.
 5          Q.    How long have you been so licensed?
 6          A.    Over eight years.
 7          Q.    And where do you work now, sir?
 8          A.    I have a private practice in Park Ridge,
 9     Illinois.
10          Q.    Directing your attention back to
11     August of 1990, were you employed as an attorney
12     then?
13          A.    Yes.
14          Q.    And by whom?
15          A.    Cook County State's Attorney's Office.
16          Q.    And specifically, on August 23rd of 1990,
17     where specifically within the State's Attorney's
18     Office were you assigned?
19          A.    I was assigned to the Felony Review
20     Unit.
21          Q.    Could you briefly explain to the ladies
22     and gentlemen what the Felony Review Unit is?
23          A.    The Felony Review Unit is a unit of the
24     State's Attorney's Office that has state's
```

O-113

MAYSONET 855

1    attorneys available 24 hours a day.  We work 12

2    hours shifts.  So we start at 6:00 a.m., and we

3    end at 6:00 p.m.

4                We're assigned a car.  There's a

5    police radio in there; there's a

6    state's attorney's radio in there.  And when there

7    are certain cases, felonies, that Chicago Police

8    are involved with -- because that's the area we

9    handled in Cook County -- we would be notified

10   through a dispatcher.

11               The detective would call the

12   dispatcher, which is the main office.  He would

13   get ahold of us, and we were segmented into

14   different areas of the city.  I was on the north

15   side.  I would get a call.  I would go to that

16   area or that crime scene or wherever the detective

17   needed me.  Or by phone, if possible.

18       Q.   And did you talk to people as part of the

19   Felony Review Unit?

20       A.   Oh, absolutely.  That was part of your

21   job.  You would go out and interview victims.  You

22   would interview witnesses, and you would interview

23   suspects.

24       Q.   Now, directing your attention to about

O-114

MAYSONET 856

1    6:20 in the morning on the 23rd of August 1990,

2    were you taken -- or did you go to Area 5

3    Violent Crimes at 555 West Grand in the City of

4    Chicago?

5        A.   Yes.

6        Q.   And how is it that you were directed to

7    that location at that time?

8        A.   When I arrived at work at 6:00 a.m., I

9    called in, and they informed me that there was a

10   job waiting.  And they told me that it was at Area

11   5 and what type of case it is, and which detective

12   to see.

13       Q.   And, in fact, were you, in fact, going to

14   Area 5 with regards to the double homicide

15   involving Torrence Wiley and Kevin Wiley?

16       A.   Yes.

17       Q.   Now, directing your attention to about

18   6:30 in the morning, did you have the occasion at

19   Area 5 to be in an interview room?

20       A.   Yes.

21       Q.   And other than yourself, was anyone else

22   in that room?

23       A.   Yes.

24       Q.   Who was in the room at that time?

O-115

MAYSONET 857

1      A.    Two Area 5 detectives.   It was Montilla

2    and Guevara.

3      Q.    And other than yourself and the two

4    detectives, was anyone else in the room?

5      A.    Yes.

6      Q.    And who was that?

7      A.    Jose Maysonet.

8      Q.    Now, the person that you saw in the room,

9    who you spoke to and knew as Jose Maysonet, do you

10   see him in court today?

11     A.    Yes.  He's sitting at the bench next to

12   counsel, to the left of Mr. Beuke wearing a green

13   or olive suit (indicating.)

14          MS. MANDELTORT:  Your Honor, may the

15   record reflect the in-court identification of the

16   defendant, Jose Maysonet.

17          THE COURT:  Very well.

18   BY MS. MANDELTORT:

19     Q.    And did you have the occasion at 6:30 to

20   have a conversation with Mr. Maysonet in the

21   presence of those police officers regarding the

22   murder of the Wiley brothers?

23     A.    Yes.

24     Q.    Now, before you ever spoke -- well, let

O-116

1   me put it this way. When you went in the room,

2   what's the first thing you said to Mr. Maysonet?

3      A.   The first thing I do is I go in and

4   introduce myself. I tell him my name is Frank

5   DiFranco. I'm an assistant state's attorney.

6   That's an attorney that works with the police.

7   And I told him that I am not his attorney.

8      Q.   And after that, did you say anything else

9   to him?

10      A.   I asked him if he was read his Miranda

11   warnings previously from the police officers, and

12   he told me that he was. I asked him if he

13   understood those warnings. He told me that he

14   did. And I told him that I still have to read him

15   his warnings again.

16      Q.   And did you do that, sir?

17      A.   Yes, I did.

18      Q.   Now, the conversation that you were

19   having, was that in English or in Spanish?

20      A.   In English.

21      Q.   Sir, do you speak Spanish?

22      A.   No.

23      Q.   Was anybody translating for you during

24   this conversation?

O-117

MAYSONET 859

```
 1        A.    No.

 2        Q.    Was the defendant responding to you in

 3   English?

 4        A.    Yes.

 5        Q.    And were his answers responsive to the

 6   questions that you were asking?

 7        A.    Yes.

 8        Q.    And he acknowledged to you that he

 9   understood his rights, and he was willing to talk

10   with you?

11        A.    Yes.

12        Q.    And did you have a conversation with

13   him?

14        A.    Yes.

15        Q.    And did you speak with him at that time

16   about his knowledge of what happened in regards to

17   the murders of Torrence and Kevin Wiley that had

18   happened on the 25th of May 1990?

19        A.    Yes.

20        Q.    After that conversation, did there come a

21   time, sir, when you were alone with Mr. Maysonet?

22        A.    Yes.  After I spoke with Mr. Maysonet

23   with the detectives present, I asked the

24   detectives to leave the room, and at that time, I
```

O-118

MAYSONET 860

1    talked to the individual in this case,

2    Mr. Maysonet, by myself.

3                    I asked him how he was treated by

4    the police.  I asked him if he was threatened,

5    if he was promised anything.  And pretty much

6    just to see that it was a free and voluntary

7    statement.

8        Q.    And how did he respond to those questions

9    when you asked him how he had been treated by the

10   police when you were outside the presence of the

11   police?

12       A.    He said he was treated fine by the police

13   and that he wasn't threatened or promised

14   anything.

15       Q.    Did you have occasion then to have the

16   detectives, Guevara and Montilla, come back in the

17   room?

18       A.    Yes.  After I had the conversation with

19   him alone and I felt comfortable that everything

20   was fine, I asked the detectives to come back in

21   the room.

22       Q.    Then, sir, did you have a conversation

23   with the defendant somewhere after 7:00 o'clock

24   that morning in terms of memorializing his

O-119

1    statement to you that he had given you earlier?

2        A.    Right.    I talked to Mr. Maysonet, and I

3    explained to him the different ways that we can

4    record his statement.    And I explained to him that

5    one way is to do what's called a handwritten

6    statement.    That's where I write down everything

7    that Mr. Maysonet told me regarding what

8    happened.

9              The other way of doing it is to

10   call in a court reporter, and I explained to him

11   a court reporter is like what we have today,

12   someone who types down everything you say, and the

13   court reporter will type it up, and then we can

14   review it and make any changes that you want to

15   do.

16       Q.    And did the defendant indicate to you at

17   that time what type of statement he would be

18   willing to give to you?

19       A.    Yes.    He indicated that he wanted to do

20   the court-reported statement.

21       Q.    At that time, sir, did you make any sort

22   of notifications for a court reporter?

23       A.    I called back to my office to the

24   dispatcher, informed them that we need a

O-120

1    court reporter sent to the area.

2         Q.   Sometime later, did a court reporter by

3    the name of Joe Szybist arrive at Area 5 pursuant

4    to your notification?

5         A.   Yes, he did.

6         Q.   I'd like to talk to you about 9:28 in

7    the morning.  Were you then in a room with the

8    defendant for purposes of taking a court-reported

9    statement?

10        A.   Yes.

11        Q.   Now, other than yourself and the

12   defendant and the court reporter, were any police

13   personnel present for that statement?

14        A.   Yes, Detective Montilla.

15        Q.   And could you tell the ladies and

16   gentlemen of the jury how that court-reported

17   statement was taken at that time?

18        A.   The court-reported statement is almost a

19   mirror image of the statement when I first talked

20   to him.  I start out the same way.  I just tell

21   everyone that we're here in an interview room, say

22   who's present in the interview room, inform him

23   that I'm not his attorney, but a state's attorney,

24   ask him if he's been read his Miranda warnings

O-121

1    before, and I begin reading the Miranda

2    warnings again.  And then it's just

3    question-answer.  I ask him a question, and he

4    gives me the answer.

5        Q.   Now, after that statement was completed,

6    after you were done asking the questions and

7    Mr. Maysonet was done answering those questions,

8    what was the next thing that happened?

9        A.   Then the court reporter would leave or

10   just go out of the interview room and type up the

11   statement that we just took.

12       Q.   And was that statement, in fact, typed

13   up on to regular paper for you by the

14   court reporter?

15       A.   Yes.

16       Q.   And was it returned back to you?

17       A.   Yes.

18       Q.   And when you received it, sir, what is

19   the next thing you did with the actual

20   court-reported statement that had been typed up by

21   the court reporter?

22       A.   We had the statement in the interview

23   room with Mr. Maysonet, myself, and the detective,

24   and the first thing I do is ask him to read aloud

O-122

1    the beginning portion so I'm sure that he can read

2    and understand the statement.

3        Q.   And did he do that?

4        A.   Yes.

5        Q.   And did he read that statement in English

6    to you?

7        A.   Yes.

8        Q.   And what happened after that?  In regards

9    to reviewing the statement, what happened?

10       A.   Well, then we continued through the

11    statement page by page, and he's informed -- or I

12    told him that he can make any additions or

13    corrections that he wished, and we would go

14    through and make additions or corrections, initial

15    the addition or correction until we completed the

16    whole statement.

17       Q.   And were corrections made by the

18    defendant during the course of the reviewing of

19    that court-reported statement?

20       A.   Yes.

21       MS. MANDELTORT:  Judge, I'm showing

22    counsel what's previously been marked and shown to

23    him, People's Exhibit Number 29 for

24    identification.  May I approach, Judge?

O-123

MAYSONET 865

1           THE COURT:  Yes, you may.

2    BY MS. MANDELTORT:

3        Q.    Sir, I'm showing you what's been marked

4    as People's Exhibit Number 29 for identification.

5    Could you tell the ladies and gentlemen of the

6    jury if you recognize that document?

7        A.    Yes.

8        Q.    And what is that document, sir?

9        A.    This is the original court-reported

10   statement that we took on that day.

11       Q.    And, sir, do any signatures appear on the

12   first page of that court-reported statement?

13       A.    Yes.

14       Q.    And whose signatures appear there?

15       A.    My signature, Detective Montilla's

16   signature, and Jose Maysonet's signature.

17       Q.    And were those signatures placed there

18   after the reviewing of the court-reported

19   statement as you described to the ladies and

20   gentlemen of the jury?

21       A.    Yes.  After we got completely done with

22   the statement, with all the changes, we'd initial

23   the changes first.  Then we would sign the first

24   and last page.


                         O-124

1      Q.   And did the defendant sign the front of

2  that statement in your presence?

3      A.   Yes.

4      Q.   I'd like to take you now to the last

5  page; that is, Page 7 of that statement.  Does

6  the defendant's signature again appear on that

7  page?

8      A.   Yes.

9      Q.   And did the defendant sign that in your

10  presence?

11      A.   Yes.

12      Q.   And likewise, did you and Detective

13  Montilla sign as witnesses at that point?

14      A.   Yes.

15      Q.   Now, directing your attention, sir, to

16  Page 3, is there, in fact, a correction on

17  Page 3?

18      A.   Yes.

19      Q.   Could you tell the ladies and gentlemen

20  of the jury how that correction came to be made?

21      A.   Mr. Maysonet had used a word, and then

22  he wanted to change it.  He said, can I change

23  that?  And I said, yes.  And we put a line

24  through it.  He told me what he wanted to write

O-125

MAYSONET 867

1   down.   I printed it in, and we all initialed the
2   change.
3        Q.    And likewise, on Page 4, is there a
4   similar change with the initials?
5        A.    Yes.
6        Q.    And Page 5?
7        A.    Page 5 has two changes, yes.
8        Q.    And Page 6?
9        A.    Yes.
10       Q.    And did the defendant initial those
11  changes, sir, in your presence upon your making
12  those corrections at his direction?
13       A.    Yes.   Except the one on Page 6 was a
14  misspelled word or a typo.   They spelled force.
15  It was F-o-r, and we inserted the c-e, so that
16  wasn't at his direction.   That was just a
17  misspelled word.
18       Q.    Now, during the course of that
19  court-reported statement, sir, did you show the
20  defendant anything?
21       A.    I showed the defendant exhibits,
22  photographs.
23            MS. MANDELTORT:   Showing counsel
24  what's marked as People's Exhibits Number 29A

O-126

1    and 29B.

2                    May I approach, Judge?

3              THE COURT:  Yes, you may.

4    BY MS. MANDELTORT:

5         Q.   Sir, I'm showing you what's been marked

6    as People's Exhibit Number 29A.  Do you recognize

7    that photograph, sir?

8         A.   Yes.

9         Q.   And what is that photograph?

10        A.   This is a photograph that I had marked as

11   People's Exhibit Number 1 of the statement in

12   regards to an individual that he had mentioned

13   during his statement, to identify that individual,

14   and he identified this individual.

15        Q.   And likewise, People's Exhibit 29B for

16   identification, do you recognize that photograph?

17        A.   Yes.

18        Q.   And what is that a photograph of?

19        A.   That's -- again, it's an individual in

20   the statement that he was telling about, and he

21   identified this photograph as the person that he

22   was talking about.

23        Q.   And during the course of that statement,

24   he actually referred -- you showed him those


                           O-127


MAYSONET 869

1    actual photographs during the course of the

2    statements and marked them as Exhibits 1 and 2 as

3    you have stated?

4    A.   Yes.  Well, the court reporter marks

5    them, but right.

6    Q.   They were marked in your presence?

7    A.   Right.

8    Q.   Likewise, sir, after the taking of the

9    court-reported statement, and it was reviewed and

10    signed, were any photographs taken of the

11    defendant?

12    A.   Yes.

13    Q.   And could you tell the ladies and

14    gentlemen how that happened?

15    A.   We always take a picture of the

16    individual after we take a statement.  It's a

17    Polaroid camera just in the room.  You ask if they

18    can -- you can take their picture, and you take

19    their photograph.

20    MS. MANDELTORT:  May the record reflect

21    I'm showing counsel what is marked as People's

22    Exhibit 29C for identification.

23    BY MS. MANDELTORT:

24    Q.   Sir, I'm showing you People's Exhibit

O-128

MAYSONET 870

1    Number 29C for identification.  Could you tell the

2    ladies and gentlemen if you recognize that

3    photograph?

4    A.   Yes.  This is a photograph of Jose

5    Maysonet taken after the statement.

6    Q.   Does that photograph truly and accurately

7    show the way the defendant appeared after the

8    review -- after the taking, review, and signing of

9    that court-reported statement?

10    A.   Yes.

11    Q.   And does his signature appear anywhere on

12    that photograph?

13    A.   Yes.  His signature appears, then my

14    signature, and then Detective Montilla's

15    signature.

16    Q.   Sir, after the court-reported statement,

17    did you have the occasion to leave Area 5 with the

18    defendant?

19    A.   Yes.

20    Q.   And for what purpose did you leave Area 5

21    with the defendant after the court-reported

22    statement?

23    A.   We actually went to the scene.  He agreed

24    to take us to where the murders took place, and he

O-129

MAYSONET 871

1    directed us, and we drove to the actual scene to
2    corroborate his statement to what he explained to
3    me happened.
4        Q.   And when you were out at the scene, did
5    that happen?  Did he explain to you what happened
6    and what he was able to see?
7        A.   Yes.  We actually had the police car
8    parked where he said he had parked the car at the
9    time of the shooting, and we could see the angle
10   that he was looking at at the time of the
11   shooting, and we could see that it was an
12   unobstructed view.
13       Q.   Sir, I'd like to direct your attention
14   back to People's Exhibit Number 29, that
15   court-reported statement.  That is the actual
16   statement that was taken that evening; is that
17   correct?
18       A.   Yes.
19       Q.   And is that a true and accurate copy,
20   sir, of the questions you asked the defendant and
21   the answers that he gave you?
22       A.   Yes.
23       Q.   And is that statement in substantially
24   the same condition as when it was taken on August

O-130

1    23, 1990?

2         A.   Yes.

3              MS. MANDELTORT:   Judge, if I could just

4    have one moment?

5                        (Brief pause.)

6              MS. MANDELTORT:   Your Honor, at this

7    time, I would offer People's Exhibit Number 29

8    into evidence, ask that the identification marks

9    be stricken, and that the witness be allowed to

10   publish that statement to the jury subject, of

11   course, to counsel's cross-examination.

12             MR. BEUKE:   No objection.

13             THE COURT:   Very well.   The witness may

14   publish the statement.   That's People's Number 29

15   which has been received by the Court into

16   evidence.

17                       (WHEREUPON, People's Exhibit

18                       Number 29 was received in

19                       evidence.)

20             THE WITNESS:   Do you wish me to publish

21   it now, Judge?

22             THE COURT:   Yes, sir.

23             THE WITNESS:   The top page of the

24   statement: "Re:  Investigation (shooting deaths

O-131

MAYSONET 873

1 of Torrence and Kevin Wiley)

2   "Statement of Jose Maysonet,

3 taken in an interview room, second floor,

4 Area 5 Violent Crimes Headquarters, 5555

5 West Grand Avenue, Chicago, Cook County,

6 Illinois, on Thursday, August 23, 1990, at

7 the hour of 9:28 a.m.

8   "Present:  Mr. Frank DiFranco,

9 Assistant State's Attorney; Detective Fred

10 Montilla, Star Number 16410, Area 5 Violent

11 Crimes.

12   "Reported by:  Joseph A.

13 Szybist, CSR.  Book Number 9008-23."

14   It says:  "Ms. DiFranco:  Let the

15 record reflect that we are in an interview

16 room at Area 5 Violent Crimes.  Today's

17 date is August 23, 1990.  The time is 9:28

18 a.m.  Present in the room with me,

19 Assistant State's Attorney Frank DiFranco,

20 are Detective Frank Montilla, the court

21 reporter, and Jose Maysonet.

22   "We are here to take the

23 statement of Jose Maysonet concerning the

24 investigation of the shooting deaths which

O-132

MAYSONET 874

1     occurred on May 25, 1990, at 3428 North

2     Avenue, Chicago, Illinois.

3     "By Mr. DiFranco:

4     "Question:  Now, I talked to you

5     earlier and explained that I am an

6     assistant state's attorney, a lawyer

7     working with the police and not your

8     lawyer; is that correct?

9     "Answer:  Yes.

10     "Question:  And before we spoke,

11     I advised you of your constitutional

12     rights; is that correct?"

13     Bottom of the page, there's three

14     signatures.

15     "Answer:  Yes.

16     "Question:  I am going to advise

17     you of your rights again.

18     "Do you understand you have a

19     right to remain silent?

20     "Answer:  Yes.

21     "Question:  Do you understand

22     that anything you say can be used against

23     you in a court of law?

24     "Answer:  Yes.

O-133

MAYSONET 875

1              "Question: Do you understand

2     you have a right to talk to a lawyer and

3     have him present with you while you are

4     being questioned?

5              "Answer: Yes.

6              "Question: Do you understand if

7     you cannot afford to hire a lawyer, one

8     will be appointed by the court to represent

9     you before any questioning if you wish

10    one?

11            "Answer: Yes.

12            "Question: Understanding these

13    rights, do you wish to talk to us now?

14            "Answer: Yes.

15            "Question: On May 20, 1990, at

16    approximately 12:45 p.m., where were you?

17            "Answer: Home.

18            "Question: Where do you live?

19            "Answer: 1302 North Homan.

20            "Question: Did anything unusual

21    happen at that time?

22            "Answer: Yes. Lluvia came to

23    my house. He told me that if I can hide a

24    pistol for him.

O-134

MAYSONET 876

1                   "Question:  What did you say to

2       Lluvia?

3                   "Answer:  I told him I can hide

4       the pistol for you, but you can go to get

5       it back as soon as possible.

6                   "Question:  What did Lluvia say

7       then?

8                   "Answer:  He said, don't worry

9       about it.  I will pick it up as soon as

10      possible.

11                  "Question:  What kind of pistol

12     or gun did Lluvia give?

13                 "Answer:  Nine millimeter.

14              "Question:  On May 24, 1990,

15     about 11:30 p.m. to 12:00 p.m., where were

16     you?

17                 "Answer:  Home.

18                 "Question:  What if anything

19     happened about that time?

20                 "Answer:  Lluvia, Fro, Tino came

21     to my house.

22                 "Question:  All right.  Now, I

23     ask you to look at Exhibit 1.  Can you

24     please identify who that is in this

MAYSONET 877

```
1          picture?

2                   "Answer:  Lluvia.

3                   "Question:  And I will ask you

4          to look at Exhibit 2.  Can you please tell

5          us who is in that picture?

6                   "Answer:  Fro.

7                   "Question:  Do you know Fro by

8          any other names?

9                   "Answer:  Christopher.  I forget

10         his last name.

11                  "Question:  Hernandez?

12                  "Answer:  Yeah, Hernandez.

13                  "Question:  Okay.  And do you

14         know what Tino's real name is?

15                  "Answer:  Tino Cruz.

16                  "Question:  Are these

17         individuals the member of any gang?

18                  "Answer:  Latin Kings.

19                  "Question:  Were you a member of

20         the Latin Kings?

21                  "Answer:  I was a member.

22                  "Question:  What happened when

23         Lluvia and Tino came over?

24                  "Answer:  They came over that
```

O-136

MAYSONET 878

1        night, and they told me they needed the

2        pistol.

3               "Question:  What did they say

4        they needed the pistol for?

5               "Answer:  They got the two guys

6        on Drake and North Avenue waiting for

7        dope."

8               And the "dope" is scratched off.

9  There's a line across it, and he wanted it changed

10  to "waiting for something."  And then we all

11  initialed it.

12               "Question:  What was Lluvia

13        wearing that evening?

14               "Answer:  A black hooded sweat

15        shirt.

16               "Question:  What significance

17        does it have when a Latin King wears a

18        black hooded sweat shirt?

19               "Answer:  Kill somebody, rob

20        somebody, or rob a car.

21               "Question:  All right.  And what

22        were they going to do that evening?

23               "Answer:  What they were going

24        to do that evening is they were going to go

O-137

MAYSONET 879

```
1              to the two guys that were waiting for

2              dope."

3                          Again, he asked to change it.  We

4      crossed it off.  It now says "something," and it's

5      initialed.

6                          "Question:  When you left, who

7              drove?

8                          "Answer:  I drove.  Lluvia was

9              in the front passenger's side.

10                         "Question:  Where was Fro?

11                         "Answer:  In the back of

12             Lluvia.

13                         "Question:  Where was Tino?

14                         "Answer:  In my back, in the

15             back behind the driver's seat.

16                         "Question:  Who had the gun at

17             that time?

18                         "Answer:  Lluvia.

19                         "Question:  Where did you go?

20                         "Answer:  I go -- I took Homan

21             to Potomac, Potomac all the way to

22             St. Louis, St. Louis all the way to North

23             Avenue, North Avenue to Drake, and parked

24             in the alley.
```

O-138

MAYSONET 880

1    "Question:  When you parked in

2    the alley, what happened then?

3    "Answer:  Lluvia got out of the

4    car.  He put the hood on his head and put

5    the front seat front -- to the front.  Fro

6    came out of the car, and Tino came out of

7    the car.

8    "Question:  Was anyone else

9    around at the time?

10    "Answer:  Two guys.

11    "Question:  Where were those two

12    guys?

13    "Answer:  By the corner.

14    "Question:  Okay.  Where was the

15    gun at this time?

16    "Answer:  Lluvia got the gun in

17    his front pocket.

18    "Question:  Okay.  What did

19    Lluvia, Fro, and Tino do then?

20    "Answer:  They started walking

21    towards the guys.

22    "Question:  What happened next?

23    "Answer:  They waited.  They

24    were talking about five minutes, and then

O-139

MAYSONET 881

1    the shooting happened.  Shot about five to

2    six times.

3              "Question:  What did you see

4    when you heard the five or six shots?

5              "Answer:  I looked, and when I

6    looked, the two guys was on the floor

7    laying down, and Lluvia had -- had the nine

8    millimeter in his hand pointing it at the

9    guy to see if he was going to move or not.

10             "Question:  What happened next?

11             "Answer:  And then when he

12   didn't see --" and then it's crossed off,

13   and it says:  "-- them move, he started

14   walking towards my car with the pistol in

15   his hand.

16             "Question:  Where was Tino and

17   Fro?

18             "Answer:  They started walking

19   towards my car, too.

20             "Question:  All right.  And what

21   happened then?

22             "Answer:  And they went inside

23   the car.  So then I drove all the way to

24   1302 North Homan.

O-140

MAYSONET 882

1     "Question:  What happened when

2  you got back home?

3     "Answer:  When I got back home,

4  I got out of the car.  Lluvia jumped in the

5  driver's side, and he left with the car."

6     And then it's inserted, printed in

7 on defendant's instructions to add in:  "And the

8 gun.  They left with the car and the gun."  It's

9 initialed.

10     "Question:  Approximately what

11  time was it when Lluvia shot the two men?

12     "Answer:  About 12:30.  I didn't

13  have no watch.  About 12:30.

14     "Question:  All right.  When did

15  you next see Lluvia that day?

16     "Answer:  I seen Lluvia that day

17  at 11:00 a.m.

18     "Question:  Where did you see

19  Lluvia?

20     "Answer:  At LeMoyne and

21  Spaulding.

22     "Question:  What if anything did

23  Lluvia say to you?

24     "Answer:  I killed two black

O-141

MAYSONET 883

1   motherfuckers.

2     "Question: What happened next?

3     "Answer: Then they told me, you

4   are not going to say nothing; right? I

5   said, no, I wasn't going to say nothing.

6   They said, keep it under your hat. Keep my

7   mouth shut.

8     "Question: On August 16, 1990,

9   about 10:00 p.m., where were you?

10     "Answer: Home.

11     "Question: What if anything

12   happened then?

13     "Answer: Lluvia, Fro, Tino,

14   Cisco, King, they came out to my house.

15     "Question: What happened when

16   they came to your house?

17     "Answer: They put a nine

18   millimeter to my head.

19     "Question: Who put the nine

20   millimeter to your head?

21     "Answer: King.

22     "Question: What did he say?

23     "Answer: You know about the two

24   murders. If you talk, we're going to put

MAYSONET 884

1           you six feet under.
2                    "Question:  Did anyone force or
3           threaten you to make this statement?"
4                    That's where the correction is
5    with the force.  We added the c-e and initialed
6    it.
7                    "Answer:  No.
8                    "Question:  Are you giving this
9           statement freely and voluntarily?
10                   "Answer:  Uh-huh, yes.
11                   "Question:  How have you been
12          treated by the police?
13                   "Answer:  Good.
14                   "Question:  How have you been
15          treated by myself?
16                   "Answer:  Good.
17                   "Question:  Has anyone made any
18          promises to you for your statement?
19                   "Answer:  No.
20                   "By Mr. DiFranco:  It is now
21          9:38 a.m., and this concludes the statement
22          of Jose Maysonet."
23                   And then it's signed by Jose
24   Maysonet.  Witnesses to the signatures, myself and

                         O-143


MAYSONET 885

1    Detective Montilla.

2    BY MS. MANDELTORT:

3        Q.    Mr. DiFranco, when you went out to

4    the scene at the direction of Mr. Maysonet after

5    the court-reported statement, were you parked

6    in an alley behind a vacant lot by North and

7    Kimball?

8        A.    Yes.

9        Q.    And it's at that point that the defendant

10   described to you, as he had in the court-reported

11   statement, what happened at the time that Torrence

12   and Kevin Wiley were shot?

13       A.    Yes.

14           MS. MANDELTORT:    Judge, I have no

15   further questions.    I would tender the witness.

16           THE COURT:    Very well.    Mr. Beuke?

17           MR. BEUKE:    Thanks, Judge.

18               CROSS EXAMINATION

19               BY MR. BEUKE:

20       Q.    Good afternoon, Mr. DiFranco.

21       A.    Good afternoon, Mr. Beuke.

22       Q.    Sir, I think you told the ladies and

23   gentlemen of the jury that you have been an

24   attorney -- I'm sorry -- for how many years?

O-144

MAYSONET 886

1          A.    Eight years.

2          Q.    And you obviously have had the benefit of

3     graduating from high school, graduating from

4     college, going to law school and successfully

5     completing that and becoming a licensed attorney

6     in the State of Illinois; correct?

7          A.    Yes.

8          Q.    You had -- after you left -- or after you

9     graduated law school, Mr. DiFranco, did you

10    immediately begin your career as a lawyer in the

11    State's Attorney's Office?

12         A.    Yes.

13         Q.    So you came right out of law school into

14    the State's Attorney's Office?

15         A.    Yes.

16         Q.    There is a kind of a procedure for

17    younger assistants as they work their way through

18    the office.  Did you follow that typical

19    procedure?

20         A.    Yes.

21         Q.    Begin your career in the Appellate

22    Division?

23         A.    Correct.

24         Q.    And then got promoted to another

O-145

MAYSONET 887

1    division, First Municipal or Juvenile Division?

2        A.    Actually, I went to traffic first.

3        Q.    Traffic.  After you finished in traffic,

4    did you get promoted to the next step in the

5    office?

6        A.    First Municipal.

7        Q.    And at some point, you went into the

8    Felony Review Unit; correct?

9        A.    Yes.

10       Q.    Did you spend any time in the Felony

11   Trial Division prior to going into the Felony

12   Review Unit when you were there in 1990?

13       A.    No.

14       Q.    You had obviously had the benefit prior

15   to going into the Felony Review Unit of

16   prosecuting cases, had you not?

17       A.    Yes.

18       Q.    You certainly were aware of the elements

19   of the prosecution of a number of different

20   crimes; correct?

21       A.    Yes.

22       Q.    You were familiar with different theories

23   of prosecution; is that fair to say?

24           MS. MANDELTORT:  Objection, Judge, to

O-146

MAYSONET 888

1    the form of the question.

2              THE COURT:  Sustained.

3    BY MR. BEUKE:

4         Q.   Well, Mr. DiFranco, how long had you

5    spent in the Felony Review Unit prior to May of

6    1990?

7              MS. MANDELTORT:  Objection, Judge.

8    BY THE WITNESS:

9         A.   You mean prior to the statement?  I came

10   in felony review, May of 1990.  This actually was

11   my first day on the street.

12   BY MR. BEUKE:

13        Q.   Okay.  So this would have been your first

14   experience as a felony review assistant

15   state's attorney; is that correct?

16        A.   On my own.  Previously, before you go out

17   on the street, you have what's called ride-alongs

18   where you go with another assistant

19   state's attorney that's already in the unit, and

20   they show you the ropes or teach you how you do

21   the case.  But, yes, this was the first time I was

22   alone or on my own.

23        Q.   So you were trained by another assistant

24   state's attorney prior to May -- or I'm sorry --

O-147

MAYSONET 889

1    prior to August 23rd of 1990 as to how to do your

2    job; fair to say?

3    A.   Yes.

4    Q.   Okay.  You had -- had you taken

5    court-reported statements prior to that August

6    23rd of 1990 day?

7    A.   No.  This was the first court-reported

8    statement I had ever taken.

9    Q.   Had you been present when other

10    court-reported statements had been taken?

11    A.   No.

12    Q.   Did you receive any training from any of

13    your supervisors as to the process of taking

14    court-reported statements?

15    A.   Not at this time, no.

16    Q.   Okay.  When you originally -- I think you

17    talked about coming to work that morning, and you

18    were notified of an assignment of a pending case

19    at Area 5; is that correct?

20    A.   Yes.

21    Q.   And you got that notification, am I

22    correct, by calling in to the dispatcher who sits

23    up on the 14th floor across the way, and they told

24    you, Frank, you've got a case?

O-148

MAYSONET 890

```
 1        A.    Correct.

 2        Q.    At that point, the dispatcher in the

 3   felony review office, he didn't tell you anything

 4   about the case, did he?

 5        A.    No, no specifics at all.

 6        Q.    He told you that there's a murder or

 7   something to that effect?

 8        A.    Right.  He told me there's a double

 9   homicide and which detective to call or ask for.

10        Q.    Did he tell you the detective to call?

11   Do you remember who that was?

12        A.    Right now, no.

13        Q.    Anyway, you got in your car, and you went

14   immediately to Area 5; is that correct?

15        A.    Yes.

16        Q.    You got there, I think you said, sometime

17   around 6:20; correct?

18        A.    Right.

19        Q.    When you got there at 6:20, did you

20   review or did you speak with a detective?

21        A.    Yeah.  Whoever was on the case, I spoke

22   with the detective.

23        Q.    All right.  Do you recall which

24   detective -- do you recall speaking with a
```

O-149

MAYSONET 891

1    Detective Paulnitsky?

2        A.    Not at -- I don't recall if it was

3    Paulnitsky at this time.  I think that

4    Montilla and Guevara were the two detectives

5    that I spoke to that were working on the case

6    at this time.

7        Q.    Okay.  You got there at 6:20, and by

8    6:30, you were in the interview room with

9    Mr. Maysonet; correct?

10       A.    Yes.

11       Q.    The conversation that you had with either

12   Guevara or Montilla, would it be fair to say that

13   it was a very brief conversation?

14       A.    Yes.

15       Q.    And they were the only people you spoke

16   with prior to going in and seeing Maysonet;

17   correct?

18       A.    That I recall, yes.

19       Q.    Okay.  Did Guevara or Montilla brief you

20   as to the status of the investigation at that

21   point, or did they just ask you to come on in and

22   talk to this guy?

23       A.    Well, I guess if you -- brief me, we

24   talked for a couple of minutes about the case, you

O-150

1    know, what type of case it was.

2        Q.    I mean, you knew at that point --

3            MS. MANDELTORT:  Objection, Judge.

4            THE COURT:  Sustained.  Let him finish.

5            MR. BEUKE:  I'm sorry, Judge.

6    BY THE WITNESS:

7        A.    Just basically that it was a double

8    murder and who was in custody, who wasn't in

9    custody, and that this individual was making a

10   statement.

11   BY MR. BEUKE:

12       Q.    So as to anything that transpired, either

13   other witness testimony or other parts of this

14   investigation that transpired before you got

15   there, you really weren't told anything about that

16   at that point?

17       A.    No.

18       Q.    You obviously didn't have an opportunity

19   to read or review any police reports prior to

20   going in to talk to Maysonet, did you?

21       A.    If I did, it was briefly.  I don't -- I

22   don't recall.  It was --

23       Q.    You don't recall if you read anything?

24       A.    Normally what you would do is you'd

O-151

MAYSONET 893

1    look at whatever report they had, and they would

2    brief you, tell you what the case was about,

3    and then you would go in and meet him and talk

4    to him.

5        Q.   Well, in this case, Mr. DiFranco, it's

6    fair to say, is it not, that when you got there,

7    you talked briefly with the detectives, and you

8    went in to talk to him?

9        A.   Correct.

10       Q.   Do you recall seeing any -- do you know

11   what general progress report notes are?

12       A.   Yes.

13       Q.   Okay.  They are notes that are used by

14   the detectives in the Chicago Police Department

15   for the purposes of compiling different

16   portions of their investigation; is that fair

17   to say?

18            MS. MANDELTORT:  Objection, Judge.

19            THE COURT:  Sustained.

20   BY MR. BEUKE:

21       Q.   Did you see any general progress report

22   notes before you went in to talk to Maysonet?

23            MS. MANDELTORT:  Objection, relevance.

24            THE COURT:  If he can answer.

O-152

MAYSONET 894

```
 1     BY THE WITNESS:

 2         A.   No, no, I don't recall reviewing any

 3     progress notes.

 4     BY MR. BEUKE:

 5         Q.   So I'm clear, Mr. DiFranco, when the

 6     felony review assistant state's attorney generally

 7     is called is at some point in time when the

 8     detectives are asking you for either your approval

 9     of their case to that point or some advice; is

10     that correct?

11             MS. MANDELTORT:  Objection, Judge.

12             THE COURT:  Sustained to what is

13     generally done.  Ask him what he did in this

14     case.

15     BY MR. BEUKE:

16         Q.   Well, ultimately, the decision as to

17     whether or not --

18             MS. MANDELTORT:  Objection, Judge, ask

19     for a sidebar.

20                         (WHEREUPON, the following was

21                          had outside the

22                          hearing of the jury:)

23             MS. MANDELTORT:  My concern at this

24     point -- and for the record, my understanding is
```

O-153

1  the whole process of charging, of approving

2  charges or rejecting charges is not a proper

3  inquiry either for the state or the defense.

4        MR. MAREK:  There's case law to that,

5  that we can't bring that out.

6        THE COURT:  What's the point?

7        MR. BEUKE:  Judge, he has a purpose in

8  being there.  I'm trying to get to his purpose for

9  being there.

10        THE COURT:  His purpose was to take a

11  statement.

12        MR. BEUKE:  Well, his purpose is also to

13  evaluate the status of the detective's case.

14        THE COURT:  I'm not going to let you get

15  into that.  Now, you know better than that.

16              (WHEREUPON, the following was

17              had in open court, in the

18              presence of the jury:)

19        MR. BEUKE:  May I proceed, Judge?

20        THE COURT:  Sure.

21  BY MR. BEUKE:

22     Q.   Mr. DiFranco, when you went in and talked

23  with Maysonet at 6:30 in the morning, the other

24  two detectives came in with you; correct?

O-154

1     A.   Yes.

2     Q.   And when you talked to Maysonet in that

3  conversation, you indicated to the ladies and

4  gentlemen, I believe, that you originally

5  introduced yourself, told him you were a

6  prosecutor, I'm working with the police, I'm not

7  your lawyer; correct?

8     A.   Correct.

9     Q.   Did you -- or were you given any

10  information about Maysonet by the detectives

11  insofar as whether or not he had a lawyer on

12  another case at that time?

13         MS. MANDELTORT:  Objection, Judge.

14         THE COURT:  Sustained.

15  BY MR. BEUKE:

16     Q.   Did you ask Mr. Maysonet during the

17  course of your conversation with him as to whether

18  or not he had an attorney?

19     A.   I asked him if he wanted an attorney.  I

20  didn't ask him if he had an attorney.  I asked him

21  if he wanted an attorney.

22         I told him that the attorney could

23  be present for his -- before the questioning, but

24  I never -- I guess I didn't phrase it, do you have

O-155

MAYSONET 897

1    an attorney.  Just do you want an attorney or do

2    you want one present.

3         Q.   Mr. DiFranco, when you went in and spoke

4    to him, it's your recollection that you did not

5    use either of the two detectives to translate for

6    you; is that correct?

7         A.   Absolutely.

8         Q.   You did not ask -- Guevara wasn't sitting

9    there relating your questions to Mr. Maysonet or

10   Mr. Maysonet's answers to you?

11        A.   No.

12        Q.   And Montilla, likewise, wasn't doing that

13   either?

14        A.   No.

15        Q.   So the entire conversation that you had

16   with this individual was in English; correct?

17        A.   Correct.

18        Q.   You had an opportunity to sit with him

19   for about, fair to say, maybe ten minutes?

20        A.   The first -- the first time I spoke with

21   him 10-to-15 minutes, yes.

22        Q.   And initially, your conversation with him

23   after the introductions and the rights, as to the

24   conversation about what you were there for, the

O-156

1    double homicide, would it be fair to say that that

2    occupied maybe half that time, a little more, a

3    little less?

4         A.   Probably a little more.

5         Q.   And during the course of that time that

6    you had to spend with him, that ten-or-so-minute

7    period of time, did you ever ask him how far he

8    had gone in school?

9         A.   I don't recall.

10         Q.   Did you ever make any -- did you have any

11    problem understanding him?  I mean -- I don't

12    mean -- strike that, Judge.

13              Did he speak with a Spanish

14    accent, Hispanic accent?

15         A.   To be honest with you, I don't -- I don't

16    remember what his accent was.

17         Q.   Okay.  The conversation that you say you

18    had with him, after it was over, you left the

19    room; correct?

20         A.   The first conversation I had with him, I

21    asked the detectives to leave the room.  I stayed

22    in the room alone with him.

23         Q.   All right.  When the detectives left the

24    room, you and Mr. Maysonet were there alone

O-157

1     together; correct?

2         A.    Yes.

3         Q.    And you told the ladies and gentlemen

4     that was for the purpose of you assuring yourself

5     that Mr. Maysonet was talking to you freely and

6     voluntarily; correct?

7         A.    Right, and that there was no force or

8     coercion or threats.

9         Q.    You asked him that; correct?

10        A.    Yes.

11        Q.    And he didn't tell you that there was any

12    force or coercion; right?

13        A.    Correct.

14        Q.    And the detectives came back in the room?

15        A.    There was a short period of time.  I

16    don't know exactly how many minutes, if it was

17    ten, 20 minutes, or what it was, and then I called

18    the detectives back into the room, yes.

19        Q.    Well, is it your testimony that you

20    remained in the room with Mr. Maysonet alone for

21    ten-or-20 minutes after the detectives left?

22        A.    No, I can't -- I can't remember if I

23    stayed in there the whole time, or if I came out

24    of the interview room from him and looked for the

O-158

MAYSONET 900

1     detectives to tell them to come back in.

2         Q.    If I understand you correctly,

3     Mr. DiFranco, your purpose in doing that was to

4     make sure for your own benefit if he was telling

5     you what he told you freely and voluntarily?

6             MS. MANDELTORT:  Objection.

7             THE COURT:  Sustained, Counsel.  He's

8     answered that question.

9     BY MR. BEUKE:

10        Q.    Well, did that take any more than one or

11    two questions?

12        A.    Well, yeah.  It's not just a matter of

13    just saying two words.  I mean, you ask him how

14    he's doing, if he wants something to eat or drink,

15    are you okay, how have you been treated by the

16    police, has anyone threatened you, forced you.  I

17    mean, it's a little conversation.

18    BY MR. BEUKE:

19        Q.    Did you ask him when the last time it was

20    that he had slept?

21        A.    No.

22        Q.    Did you ask him how long he had been at

23    the police station?

24        A.    I don't recall.

                        O-159

MAYSONET 901

1    Q.    Did you ask him whether or not -- or how

2   he had got to the police station?

3    A.    No, I don't remember that.

4    Q.    Did you ask him whether or not he had had

5   an opportunity to speak with his family?

6    A.    No, I didn't.

7    Q.    Did you -- or were you ever told,

8   Mr. DiFranco, that Mr. Maysonet had been given

9   pills the prior evening for a nervous

10  condition?

11          MR. MAREK:  Objection.

12          THE COURT:  Sustained.

13  BY MR. BEUKE:

14   Q.    Well, did you ever ask him if he was

15  taking any medication?

16   A.    No, I never asked him if he was under

17  medication.

18   Q.    In any event, Mr. DiFranco, at some

19  point, you had him moved to a different room;

20  correct?

21   A.    To accommodate the court reporter, yes,

22  I'm sure we did.

23   Q.    You at that point made a decision to take

24  a statement from him; correct?  If he wanted to

O-160

1    give one?

2        A.    You mean -- are you talking about the

3    court-reported statement now?

4        Q.    Let me make it clear.  After you had this

5    alone conversation with him, at some point,

6    Mr. Maysonet was taken out of that interview room;

7    correct?

8        A.    Well, no, not at that time.  I mean, he's

9    left in the interview room.  We have the

10   subsequent conversation with the two detectives

11   where we determine or ask whether he would like to

12   memorialize the statement and the different type

13   of statements, and that's when he agreed to do a

14   court-reported statement.

15                   And when the court reporter came,

16   normally, we move to a different room to

17   accommodate the court reporter because these

18   interview rooms aren't as big, and there's not

19   enough room to fit the people and the court

20   reporter.  So, yes --

21       Q.    So it's your recollection the second

22   conversation was at 7:10; correct?

23       A.    I couldn't tell you the exact time.

24       Q.    Would that be about approximately

                         O-161

1    correct?

2    A.   If I got there -- if I started the

3    first one around 6:20 or 6:30, I imagine it would

4    be.

5    Q.   And that second conversation, let's

6    assume for the purposes of our conversation, that

7    that was at 7:10.  Your recollection is that that

8    occurred in the same interview room that you had

9    talked to him earlier?

10        MS. MANDELTORT:  Objection, Judge, as to

11    counsel's assumption.

12        THE COURT:  Sustained as to assumptions.

13    BY MR. BEUKE:

14    Q.   Where did that conversation take place,

15    Mr. DiFranco?

16    A.   I believe that was the same room.

17    Q.   And that conversation, Montilla and

18    Guevara were present again; correct?

19    A.   Yes.

20    Q.   And your recollection of that

21    conversation is there wasn't any interpreting

22    going on by either Montilla or Guevara?  You were

23    talking directly to Maysonet?

24    A.   Yes.

MAYSONET 904

1       Q.   And that conversation, if I'm --

2   correct me if I'm wrong, was just to determine if

3   he wanted to give a court-reported statement or

4   not?

5       A.   Well, that was the main purpose of it.

6   We still talked about what had happened, but, yes,

7   that was the --

8       Q.   All right.  There was nothing

9   substantially different in terms of what he was

10   telling you about what he knew about this -- these

11   homicides that changed from 6:30 to 7:10; fair to

12   say?

13       A.   Yes.

14       Q.   And I think you told Miss Mandeltort that

15   the court-reported statement that you took at

16   9:28, that was essentially the same thing he told

17   you at 6:30 and at 7:10; correct?

18       A.   Yes.

19       Q.   Okay.  Now, you told the ladies and

20   gentlemen of the jury a little bit about the

21   different types of statements that you explained

22   to Mr. Maysonet, one of them being a handwritten

23   statement; correct?

24       A.   Yes.

O-163

MAYSONET 905

1    Q.    And that would be where you wrote out

2    everything; correct?

3    A.    Correct.

4    Q.    And you explained to him about a

5    court-reported statement?

6    A.    Correct.

7    Q.    And it was Mr. Maysonet's decision

8    to have a court-reported statement taken;

9    correct?

10    A.    Yes.

11    Q.    Now, Mr. DiFranco, did you between

12    7:10 -- or strike that.

13              When you left the interview room

14    at 7:10, what did you do?

15              MS. MANDELTORT:  Objection, Judge, as to

16    the times, assuming facts not in evidence.

17              THE COURT:  I don't remember at which

18    point he's talking about.

19              MR. BEUKE:  After 7:10, Judge.

20              THE COURT:  Has he testified he left

21    at 7:10?  I don't remember that being his

22    testimony.

23    BY MR. BEUKE:

24    Q.    How long were you in the interview room

O-164

MAYSONET 906

1     when the 7:10 conversation lasted?

2        A.   The second conversation was ten minutes.

3     It was not very long.

4        Q.   After the 7:10 conversation ended, did

5     you leave the interview room?

6        A.   Yes.

7        Q.   And what did you do?

8        A.   I called my office to the dispatcher to

9     call for a court reporter.

10        Q.   Okay.  After you made that phone call --

11    fair to say that took a minute or so?

12       A.   Yeah.

13       Q.   What did you do then?

14       A.   Then I imagine I was -- I would review

15    anything I had, reports.  I would talk to

16    Mr. Maysonet.

17       Q.   Did you have another conversation with

18    Maysonet between seven, say, twenty and 9:30 or

19    9:28?

20       A.   I'm sure I did before the court-reported

21    statement.  I mean, I can't remember exactly, but

22    I'm sure I did.  I'm sure I did when we moved.

23       Q.   Mr. DiFranco, was it your practice when

24    you interviewed people, either witnesses,

MAYSONET 907

1    suspects, police -- well, not police officers, but

2    witnesses or suspects, to take notes?

3    A.  No.

4    Q.  You didn't take any notes concerning your

5    conversations with Mr. Maysonet at 6:30 or 7:10;

6    correct?

7    A.  No.

8    Q.  And you made no written notes of any

9    subsequent conversation that you may have had

10    prior to the court-reported statement;

11    correct?

12    A.  Do you mean did I make notes subsequent

13    to the court-reported?

14    Q.  No, prior to?

15    A.  Prior to the court-reported statement,

16    no.

17    Q.  So you were talking to him kind of cold;

18    fair to say?

19    MS. MANDELTORT:  Objection, Judge.

20    THE COURT:  Sustained to the form of the

21    question.

22    BY MR. BEUKE:

23    Q.  Well, did you ever ask the detectives

24    prior to the court reporter coming to go with you

O-166

1 and Mr. Maysonet out to the scene?

2  A. Yes.

3  Q. And that was prior to the court reporter

4 coming?

5  A. Oh, prior to the court reporter, no.

6 That would have been after the court reporter.

7  Q. There was nothing to prevent you from

8 going to the scene prior to the court-reported

9 statement; is that fair to say?

10  A. Sure.

11  Q. You could have -- you had the authority

12 to ask the detectives at that point to do anything

13 that you saw fit for the purposes of advancing

14 this investigation; is that fair to say?

15   MS. MANDELTORT: Objection to the form

16 of the question.

17   THE COURT: Counsel, where are you

18 going?

19   MR. BEUKE: I'll tie it up, Judge.

20   THE COURT: He said he did not do that.

21   MR. BEUKE: I'll tie it up, Judge.

22   THE COURT: In the next question, tie it

23 up.

24

O-167

1    BY THE WITNESS:

2        A.    I don't know if I have -- we don't order

3    the police.  We more assist.  So we can suggest or

4    recommend, but I have no control over Chicago

5    policemen or a detective.  I'm not his boss or

6    supervisor.

7                    I can't tell him what to do, but I

8    certainly can suggest things or ask him things

9    that I think that would help the investigation or

10   the case, yes.

11   BY MR. BEUKE:

12       Q.    Okay.  When you spoke to Maysonet, you

13   knew that the bodies were found in a certain

14   location; is that correct?

15       A.    Me personally know?

16       Q.    Yes.

17       A.    No, I didn't know before I had spoke to

18   him where the bodies were found.

19       Q.    Okay.  When did you learn where the

20   bodies were found by the police?

21            MS. MANDELTORT:  Objection, Judge.  It

22   assumes facts not in evidence.

23            THE COURT:  Sustained.

24


                        O-168


MAYSONET 910

1    BY MR. BEUKE:

2      Q.   Did you ever learn where the bodies were

3  found from the police?

4      A.   When we went to the scene after the

5  court-reported statement, we actually went to the

6  location, but that wasn't from the police,

7  per se.  That was Mr. Maysonet showing me where

8  the bodies were or would have been.

9      Q.   All right.  So I'm clear -- again, I

10  don't want to belabor the point, but the

11  court-reported statement was -- I think you

12  described it as kind of a mirror image of the

13  conversation that you had with him at 6:30?

14      A.   Well, the court-reported is a mirror

15  image in that it's the way I read who I tell him I

16  am, the rights, and the questions answered, you

17  know, who is who, what time, where were you, what

18  happened next, like that form, question-answer,

19  yes.

20      Q.   There is nothing to prevent you from

21  asking any question you want once the

22  court-reported statement is started; is that fair

23  to say?

24      A.   Sure, I can ask any question I want.

O-169

MAYSONET 911

```
 1        Q.    You can control basically the tone or the
 2   tenor of the conversation by your questions?
 3              MS. MANDELTORT:  Objection to the form
 4   of the question.
 5              THE COURT:  Sustained.
 6   BY MR. BEUKE:
 7        Q.    Well, you have an opportunity once the
 8   court reporter starts typing to ask this young man
 9   anything you want; correct?
10              THE COURT:  Sustained, asked and
11   answered.  He just answered that question.
12   BY MR. BEUKE:
13        Q.    Well, do you have the statement in front
14   of you, Mr. DiFranco?
15        A.    Yes.
16        Q.    Can you turn to Page 3 at the bottom.  Do
17   you see this question and answer?
18                   "Question:  What happened when
19           Lluvia and Tino came over?
20                   "They came over that night, and
21           they told me they needed the pistol.
22                   "Question:  What did they say
23           they needed the pistol for?
24                   "Answer:  They got the two guys
```

O-170

1              on Drake and North Avenue waiting for

2              dope."

3                        Do you recall that?

4         A.    Yes.

5         Q.    And so it's clear, when you took the

6    court-reported statement, Mr. Maysonet's response

7    was "dope."  It wasn't "something"; right?  That's

8    not a typo?

9         A.    Right.  His response was "dope," and then

10   he wanted to change it.

11        Q.    Now, your next question was:

12                  "What was Lluvia wearing that

13            evening"; correct?

14        A.    Yes.

15        Q.    And after that, the answer was:

16                  "A black hooded sweat shirt";

17   correct?

18        A.    Yes.

19        Q.    Did you ever ask Mr. Maysonet if Lluvia

20   and Tino or Fro ever told him that they were going

21   over to North Avenue and Drake to go shoot two

22   guys?

23        A.    Did I ever ask him that question?

24        Q.    Yes.


                         O-171

1          A.    In this statement or previously?

2          Q.    Well, your testimony is that this

3     statement basically mirrors what your conversation

4     with him was earlier; correct?

5          A.    The form that the statement is in,

6     question, answer.  The questions and the answers

7     aren't mirrored.  I didn't ever, like, write down

8     what I was going to ask him and then do the same

9     thing.  But just the form of the way the statement

10    would go, question-answer format.

11         Q.    Did you ever ask him that question in

12    this statement?

13         A.    In this statement?

14         Q.    Yes.

15         A.    Did I ever ask him if he knew he was

16    going to kill them?

17         Q.    Yes.

18         A.    I didn't ask him in that form, but he

19    said that he knew when they wore the sweat shirt,

20    that's what they did.  They either killed

21    somebody, robbed somebody, or robbed a car.  I

22    mean --

23         Q.    Well, did you follow that up with a

24    question, what did you think you were going over

O-172

MAYSONET 914

1    there for?  Did you ask him that question?

2    A.   No, I didn't ask him.  It just says:

3            "All right.  What were you -- and

4    what were they going to do that evening?"

5    Q.   And what was his answer?

6    A.   "That they were going to go to the two

7    guys that were waiting for some dope."

8    Q.   And did you ever then follow that up with

9    a question, well, did you know they were going

10    over there to shoot somebody?

11    A.   No, that's not the next question I

12    asked.

13    Q.   Well, it's not anywhere in this

14    statement, is it?

15    A.   No.

16    Q.   Mr. DiFranco, a little further down on

17    Page 4, you go through -- you spend maybe four or

18    five questions as to where everybody is sitting in

19    the car; is that correct?

20    A.   Yes.

21    Q.   And did you think that was important,

22    where everybody was sitting in the car?

23    MS. MANDELTORT:  Objection, Judge.

24    THE COURT:  Sustained to the form of the

O-173

1    question.

2    BY MR. BEUKE:

3        Q.    Why did you ask those questions?

4            MS. MANDELTORT:  Objection, Judge.

5            THE COURT:  Basis?

6            MS. MANDELTORT:  Withdrawn.

7    BY THE WITNESS:

8       A.    Why did I ask those questions?

9    BY MR. BEUKE:

10      Q.    Yes.

11      A.    Well, the reason I asked those questions

12    is to understand exactly what happened.  I mean,

13    detail and description is kind of important.  The

14    way they went there, who was sitting where, who

15    had the gun, I mean, it paints a picture.

16             I could understand what he was

17    telling me, what happened, that he was telling me

18    the truth.  I mean, that's why I asked those

19    questions, and then it could be corroborated

20    later.

21      Q.    Was it more important than asking him the

22    question, did Lluvia --

23            THE COURT:  Sustained.  Sustained.

24

O-174

MAYSONET 916

1    BY MR. BEUKE:

2        Q.    -- or Tino ask you or tell you --

3            THE COURT:  Counsel, sustained.  That's

4    argumentative.  Sustained.  Now move on.

5    BY MR. BEUKE:

6        Q.    Now, a little further down, Mr. DiFranco,

7    Mr. Maysonet goes through his route with you;

8    correct?

9        A.    Yes.

10       Q.    Homan to Potomac, Potomac all the way to

11   St. Louis, St. Louis all the way to North Avenue,

12   North Avenue to Drake, and parked in the alley;

13   correct?

14       A.    Yes.

15       Q.    Now, you say that after you took this

16   statement and after it was signed, you went out to

17   the scene; correct?

18       A.    Yes.

19       Q.    Did you drive that route, Mr. DiFranco,

20   with the detectives?

21       A.    No.  This was the route he took from his

22   house.  We left from Area 5, Grand and Central.

23   We didn't -- we didn't drive from Homan or his

24   house.

O-175

MAYSONET 917

1      Q.   Well, I mean, this was another part of

2   the statement that he made.  When you were out on

3   the street, was there anything to prevent you from

4   corroborating that?

5        MS. MANDELTORT:  Objection, Judge.

6        THE COURT:  Sustained.

7   BY MR. BEUKE:

8      Q.   Anything to prevent you from telling the

9   detectives, let's take Homan to Potomac, Potomac

10  to St. Louis?

11       MS. MANDELTORT:  Objection.

12       THE COURT:  Sustained as to anything

13  that prevented him.

14  BY MR. BEUKE:

15     Q.   How far was 1300 North Homan from 3428

16  West North Avenue?

17     A.   I don't know.

18     Q.   Did you ever ask during the course of the

19  court-reported statement Mr. Maysonet, where in

20  the alley did you park?

21     A.   No.

22     Q.   You mean, he told you he turned off Drake

23  into the alley; correct?

24     A.   In the statement?

O-176

1      Q.   Yes.

2      A.   He said North Avenue, Drake, and that he

3  parked in the alley.

4      Q.   Later on, a couple of questions down, you

5  say: "Where were those two guys?" Do you recall

6  that question?

7      A.   Yes.

8      Q.   His answer was what?

9      A.   "By the corner."

10     Q.   Did you learn where the bodies were when

11  you went out to the scene?

12     A.   Yes. He showed me where they were.

13     Q.   They were in the middle of the block;

14  correct?

15         MS. MANDELTORT: Objection, Judge.

16  BY MR. BEUKE:

17     Q.   Between Homan and St. Louis?

18     A.   Well, they're actually at the corner.

19         THE COURT: Hold on. There's an

20  objection.

21         MS. MANDELTORT: Judge, I'll withdraw.

22         THE COURT: When there's an objection,

23  you need to wait until the Court rules.

24         THE WITNESS: I'm sorry, Judge.

O-177

MAYSONET 919

1              THE COURT:  Sustained.

2              MS. MANDELTORT:  Judge, I'll withdraw my

3      objection.

4              THE COURT:  Well, if he remembers the

5      question.

6      BY THE WITNESS:

7          A.   The corner that he was speaking of was

8      the corner of the empty lot, is what I inferred is

9      what he meant.

10     BY MR. BEUKE:

11         Q.   Where in that statement, Mr. DiFranco,

12     does it say that the corner I'm referring to is

13     the corner of the empty lot?

14         A.   It doesn't.

15         Q.   Did you ever ask him the question, what

16     corner are you referring to, Juan?

17         A.   No.

18         Q.   Mr. DiFranco, when you went out to the

19     scene -- or strike that.

20             MR. BEUKE:  Judge, can I approach the

21     witness?

22             THE COURT:  Sure.

23     BY MR. BEUKE:

24         Q.   I'm going to show you, Mr. DiFranco,


                       O-178

1    what's been marked People's Exhibit Number 30 and

2    ask you to take a look at that.  Does that

3    photograph accurately depict the view from the

4    alley looking back through the vacant lot?

5        A.    Yes.

6        Q.    There's some snow on the ground in that

7    picture?

8        A.    Right.

9        Q.    That wasn't there in May or in August?

10       A.    No.

11       Q.    Where you and the detectives and

12   Maysonet sat in the car, is that shown in that

13   photograph?

14       A.    Where -- no, it doesn't show the

15   alley.  It's taken from the view of where you

16   would be.

17       Q.    Okay.  Would it be fair to say that the

18   right portion of the photograph is to the west and

19   the left portion to the east?  Is that your

20   recollection?

21       A.    This would be east.

22       Q.    No, this would be west.

23       A.    This would be east, this would be south,

24   and that would be north.  Yes, I believe so.


O-179

1      Q.    How far from the west to east portion of

2   the lot did Mr. Maysonet direct you?  I mean, were

3   they on the west end, middle, east end?  Where

4   were they, or where did he direct you and the

5   detectives?

6      A.    As I recall, it was on the west side.  It

7   was over towards this -- it would be this side

8   looking straight that way (indicating.)

9      Q.    Okay.  Can you take my pen, and if you

10  would --

11         THE COURT:  That photograph, as far as I

12  know, is not in evidence, so it should not be

13  displayed to the jury.

14         THE WITNESS:  I'm sorry, Judge.

15  BY MR. BEUKE:

16      Q.    Judge, I'm going to ask him to place an X

17  in the area where Mr. Maysonet directed him, or

18  where he said that their car was parked.

19      A.    (Indicating).

20         MS. MANDELTORT:  Judge, I would object

21  to him marking -- well, withdrawn.

22         THE COURT:  Mr. Beuke, just because I

23  was distracted by the clerk, he's marking the

24  photograph to reflect what?

O-180

1          MR. BEUKE:  I believe, Judge, he's

2     marking the photograph depicting where

3     Mr. Maysonet directed him and the detectives that

4     Mr. Maysonet's car was at when this incident

5     occurred.

6     BY MR. BEUKE:

7          Q.    Fair to say, Mr. DiFranco?

8          A.    That's the question.  I understand the

9     question.  But actually, if you see the

10    photograph, there's no place in the photograph

11    where the car would be.  You can't see it.

12         Q.    Okay.  But your recollection is, it

13    was at the furtherest west end of the lot;

14    correct?

15         A.    That's what I remember.  I mean, it was

16    five years ago.

17         Q.    Okay.  In the statement, Mr. DiFranco,

18    Mr. Maysonet in response to one of your questions

19    indicates:

20              "Question:  Okay.  What did

21         Lluvia, Fro, and Tino do then?

22              "Answer:  They started walking

23         towards the guys.

24              "Question:  What happened next?

O-181

1           "They waited, they were talking

2       about five minutes, and then shooting

3       happened.  Shot about five-to-six times."

4           Do you recall that question and

5    answer?

6       A.   Yes.

7       Q.   Did you ever ask Mr. Maysonet if he saw

8    the shooting?

9       A.   In the statement, no.

10      Q.   Yes.  You never asked him that question?

11      A.   Not in the statement, no.

12      Q.   Did you ever ask Mr. Maysonet in the

13   statement if he saw who did the shooting?

14      A.   He just said that Lluvia had the gun

15   right as he heard the shots and the two bodies

16   were laying on the ground.

17      Q.   Well, he told you in the statement, am I

18   correct, that he was able to see the two bodies on

19   the ground?

20      A.   Yes.

21      Q.   Mr. DiFranco, I'm going to show you

22   what's been marked as People's Exhibit Number 2

23   and ask you to take a look at that photograph and

24   ask you if you have ever seen that photograph

O-182

1    before?

2    A.   No, I don't recall ever seeing that

3    photograph.

4    Q.   Did you ever have any conversation with

5    the detectives either prior to going out to the

6    scene or subsequent to going out to the scene

7    about where the second body was recovered or

8    found?

9    A.   No.  Because this -- the shooting was in

10    May, and this was in August.  I never saw any

11    crime photos or anything.

12    Q.   Mr. DiFranco, just a couple other

13    questions.  At one point, Mr. Maysonet is asked to

14    identify a photograph or -- I'm sorry.  You

15    indicated that he identified two photographs for

16    you?

17    A.   Yes.

18    Q.   Do you recall which individual is which

19    in 29A or B?

20    A.   Do I?

21    Q.   Yes.

22    A.   A was Lluvia.

23    THE COURT:  Sir, please don't display

24    those.

O-183

MAYSONET 925

1          THE WITNESS:  I'm sorry, Judge.

2     BY THE WITNESS:

3          A.   Yes.

4     BY MR. BEUKE:

5          Q.   A is who?

6          A.   Is Lluvia.  I thought he pronounced it

7     Juvia or Lluvia.  I don't know how you pronounce

8     the name.

9          Q.   And B is Tino?

10         A.   B is Fro.

11         Q.   And when you went on to question him

12    about Christopher, he told you Christopher's --

13    he didn't remember Christopher's last name;

14    correct?

15         A.   Yes.

16         Q.   And then you gave a last name to him;

17    correct?

18         A.   Yes.

19         Q.   Fernandez?

20         A.   Yes.

21         Q.   And he said something like, yes, that's

22    it or something?

23         A.   He said, yeah, Hernandez.

24         Q.   That was -- well, strike that.


                    O-184


MAYSONET 926

1          Mr. DiFranco, when you went out to

2    the scene, so I'm clear, the detectives went with

3    you; correct?

4          A.   Yes.

5          Q.   And the court reporter was at Area 5

6    typing up the statement, or did the court reporter

7    finish typing up the statement?

8          A.   The court reporter -- we didn't -- I

9    believe the court reporter was done.  That was

10   signed and done.

11         Q.   What time did you go out to the scene

12   with Mr. Maysonet?

13         A.   Well, whatever the ending time was on the

14   court-reported, I can't remember.  I don't know if

15   it was, like, 10:00 o'clock -- it ended at 9:40.

16   The court reporter typed it up, and then we went

17   through it, and that would have probably been at

18   least an hour.  So it was sometime between, I

19   would imagine, 11:00 and 12:00.

20         Q.   You're not sure, though?

21         A.   No.

22         Q.   Mr. DiFranco, did you ever request the

23   detectives to get an evidence technician to come

24   with you and Mr. Maysonet to photograph your

                         O-185

1    observations out at the scene with him?

2        A.   No.

3        Q.   That was certainly something that the

4    detectives or you could have requested; fair to

5    say?

6        A.   I guess you could request anything, yes.

7        Q.   The court-reported statement that you

8    took from Mr. Maysonet, it never -- Mr. Maysonet

9    never told you that when he turned into the

10   alley off Drake, he went all the way down that

11   alley, across St. Louis, halfway down the alley

12   between St. Louis and Homan and parked the car,

13   did he?

14       A.   He told me he drove in the alley and

15   stopped.

16       Q.   Okay.  So my question is, he didn't

17   tell you that in the court-reported statement;

18   correct?

19           MS. MANDELTORT:  Objection, Judge, asked

20   and answered..

21   BY THE WITNESS:

22       A.   What he told me is in here.

23   BY MR. BEUKE:

24       Q.   Well, what does he say?


                        O-186


MAYSONET 928

```
 1          A.   I can't remember it.
 2               THE COURT:  Counsel, Counsel, that is in
 3     evidence, and it speaks for itself.
 4     BY MR. BEUKE:
 5          Q.   All right.  He told you:  "I go -- I took
 6     Homan to Potomac, Potomac all the way to
 7     St. Louis, St. Louis all the way to North Avenue,
 8     North Avenue to Drake and parked in the alley";
 9     correct?
10          A.   Yes.
11          Q.   So I'm clear now, Mr. Maysonet had
12     described for you when you went out to the scene
13     something in addition to that; correct?
14               MS. MANDELTORT:  Objection, Judge.
15     BY MR. BEUKE:
16          Q.   Well, he told you where he parked;
17     correct?
18          A.   He showed us where he parked.
19          Q.   He showed you where he parked?
20          A.   Yes.
21          Q.   Did you ever make any written memorandum
22     of that subsequent trip out to the scene?
23          A.   No.  I don't fill out any reports for --
24     I don't fill out, like, police reports or anything
```

O-187

MAYSONET 929

1    like that, no.

2        Q.   Well, you're familiar with what is called

3    a felony review memorandum, are you not?

4        A.   No.

5        Q.   Have you ever seen a felony review

6    memorandum?

7        A.   We have felony review folders, and I have

8    heard of murder memos, but I have never heard of a

9    felony review memorandum.

10       Q.   Tell the ladies and gentlemen of the jury

11    what murder memos are?

12       A.   A murder memo, on certain types of cases,

13    normally, it's on a murder case, the

14    state's attorney will fill out a murder memo, it's

15    called, and it usually depends.  If it's a

16    handwritten statement or it's an oral statement,

17    you're more likely going to have a murder memo.

18    It will explain what would probably be in a

19    court-reported statement, or it's just some other

20    way to memorialize the statement.

21          Besides having the handwritten and

22    the oral, you would have something substantive

23    like a murder memo, which is you would just write

24    down everything that would be in the

MAYSONET 930

1    court-reported or what you said before.

2        Q.    Well, am I clear that a murder memo is a

3    memorandum to your supervisor?

4            THE COURT:  Counsel, Counsel, he has

5    already testified.  We don't need you to repeat

6    what he just said.  We're all here, and we all

7    heard it.  Put another question.

8    BY MR. BEUKE:

9        Q.    Who is the memo to?

10            MS. MANDELTORT:  Objection, Judge,

11    relevance.

12            THE COURT:  I'm sorry.  I didn't hear

13    the question.

14            MR. BEUKE:  Who is the memo to?

15            MS. MANDELTORT:  Objection, Judge.  He

16    said he didn't do one.

17            THE COURT:  He didn't do one.

18    Sustained.

19    BY MR. BEUKE:

20        Q.    Did you make any written documentation of

21    anything you did that day to your supervisors or

22    to the ultimate state's attorneys who would be

23    handling this case?

24        A.    Yes.  I fill out what's called a felony

O-189

MAYSONET 931

1    review folder, and in the felony review folder,

2    it's all preprinted form, and you write down all

3    the information, all the witnesses, any victims,

4    their cause of death, their injuries, and you

5    would write down the oral statement, or if

6    it's a court-reported statement, you would just

7    make a notation of that, and you'd write down the

8    facts.

9               And then it would go to the next

10   state's attorney that would handle the case, which

11   is preliminary hearings or the grand jury unit

12   depending on what type of felony or what type of

13   case it is.

14       Q.    Who did you write down as witnesses in

15   this case?

16               MS. MANDELTORT:  Objection, Judge.

17               THE COURT:  Sustained.

18   BY MR. BEUKE:

19       Q.    Did you write anything down as to

20   witnesses?

21               MS. MANDELTORT:  Objection, Judge.

22               THE COURT:  Counsel, sustained.

23   BY MR. BEUKE:

24       Q.    That was all you wrote down; is that

O-190

MAYSONET 932

1    correct?

2              MS. MANDELTORT:  Objection.

3              THE COURT:  Sustained.

4    BY MR. BEUKE:

5        Q.    Did you ever talk to Mr. Maysonet

6    again after you got back from the scene,

7    Mr. DiFranco?

8        A.    No, I don't think I have talked to him

9    since or seen him since.

10             MR. BEUKE:  Thank you, sir.

11             MS. MANDELTORT:  Judge, I have no

12   redirect based on that cross.

13             THE COURT:  Very well.  Mr. DiFranco,

14   you are excused.

15             THE WITNESS:  Thank you, Judge.

16                  (Witness excused.)

17             THE COURT:  I'm not going into recess,

18   but anybody who needs to step out for five minutes

19   may do so.

20                  (WHEREUPON, a recess was had

21                   in the above matter.)

22             THE COURT:  Everyone be seated.

23                  Call your next witness.

24             MS. MANDELTORT:  Thank you, Judge.

O-191

MAYSONET 933