# EXHIBIT 38

1

2                              ADOLFO FRIAR,

3      called as a witness on behalf of the

4      Petitioners-Defendants, having been first duly sworn,

5      was examined and testified as follows:

6

7                          DIRECT EXAMINATION

8                          BY MS. SIELING:

9

10          Q      Can you please state your name and spell

11     your last name for the record.

12          A      Adolfo Frias, Adolfo, A-D-O-L-F-O,

13     Frias, F-R-I-A-S.

14          Q      And, Mr. Frias, do you know Gabriel

15     Solache or Arturo Reyes?

16          A      No, I have never seen them.

17          Q      And how old are you?

18          A      Forty-eight years old.

19          Q      Where were you born?

20          A      In Mexico.

21          Q      What is your first language?

22          A      Spanish.

23          Q      Did you attend school in Mexico?

24          A      Yes.

```
 1        Q       And how old were you when you stopped
 2   attending school?
 3        A       Like nine years old.
 4        Q       And what did you do after you stopped
 5   attending school?
 6        A       I worked in the fields with my father.
 7        Q       When did you come to the United States?
 8        A       At 16 years old.
 9        Q       What year was that?
10        A       '81.
11        Q       And why did you come to the US?
12        A       Well, I would imagine for a better life.
13        Q       Where did you live when you first
14   arrived in the United States?
15        A       In Orange County in California.
16        Q       Did you work in California?
17        A       Yes.
18        Q       And when did you come to Chicago?
19        A       In '92.
20        Q       Did you work in Chicago?
21        A       Yes.
22        Q       And when you first arrived in the United
23   States, were you fluent in English?
24        A       No, nothing.
```

1        Q      And when you first arrived in Chicago,

2  were you fluent in English?

3        A      No, just a little bit.

4        Q      Mr. Frias, I want to draw your attention

5  to July 29th, 1993.  Did anything unusual happen that

6  afternoon?

7        A      Yes.

8        Q      What happened?

9        A      When I was sitting down, when I was

10  about to start eating, three officers arrived asking

11  for Rudolfo, but I told them my name was Adolfo.

12       Q      And, Mr. Frias, do you know the names of

13  those officers?

14       A      I just remember one.

15       Q      And what was that officer's name?

16       A      Reynaldo Guevara.

17       Q      And what did the officers want?

18       A      They came asking for -- investigating

19  the death of Dora Alva.

20       Q      And did the officers take you anywhere?

21       A      Yes.

22       Q      Where did they take you?

23       A      They took me to the department, Area 5.

24       Q      What happened when you arrived at Area

1    5?

2              A        They took my fingerprints.

3              Q        And where did they take you after they

4    took your fingerprints?

5              A        They put me in an interrogation room.

6              Q        Can you describe that interrogation

7    room?

8              A        It was small.  A door with a window and

9    with newspaper covering it.

10             Q        And was there anyone else in the room

11   with you?

12             A        The detectives.

13             Q        How many detectives?

14             A        The beginning, it was Guevara and the

15   other one.  I don't know.

16             Q        You don't know the name of the other

17   officer?

18             A        I don't remember.

19             Q        Were you asked questions about the

20   murder?

21             A        Yes, they were interrogating me; yes.

22             Q        Were the questions in Spanish or in

23   English?

24             A        In Spanish.

1      Q     And who was speaking in Spanish to you?

2      A     Detective Guevara.

3      Q     How long were you kept in that

4 interrogation room?

5      A     I don't remember.

6      Q     Was it morning or night when you were

7 brought to the station?

8      A     It was like at 2:00 o'clock in the

9 afternoon.

10     Q     And was it later that afternoon or in

11 the evening that you left the interrogation room?

12     A     Until night.

13     Q     And where were you taken after the

14 interrogation room?

15     A     To a cell.

16     Q     And was that cell located in Area 5?

17     A     Yes, I believe it was the lower part of

18 it.

19     Q     And how long did you stay in that cell?

20     A     Until the next day, late.

21     Q     So you stayed overnight in that cell?

22     A     Yes.

23     Q     And where were you taken after you left

24 the cell?

```
 1          A       Again, to the interrogation room.

 2          Q       Is that the same interrogation room as

 3    the day before?

 4          A       I think, yes.  They looked the same.

 5          Q       Were you handcuffed?

 6          A       Yes.

 7          Q       What were you handcuffed to?

 8          A       To a ring that was on the wall.

 9          Q       Was it your left hand or your right hand

10    that was handcuffed?

11          A       The right.

12          Q       And were you sitting or standing?

13          A       Sitting.

14          Q       Who else was in the interrogation room

15    with you?

16          A       The next day?

17          Q       That second day that you were in the

18    interrogation room, who was in the room with you?

19          A       That day, three detectives entered.

20          Q       Was it the same three detectives as the

21    ones that had come to your house the day before?

22          A       No, just two and one was different.

23          Q       Was Detective Guevara one of the

24    officers that was in the interrogation room on the
```

1    second day?

2         A    Yes.

3         Q    And what happened after they handcuffed

4    you to the wall?

5         A    Well, they started to beat me.

6         Q    Can you say specifically what Detective

7    Guevara did to you?

8         A    He was hitting me with his hand, and he

9    was yelling.

10        Q    Where was he hitting you?

11        A    In my face.

12        Q    And how many times did he hit you?

13        A    I don't remember exactly.

14        Q    Was it more than once?

15        A    Yes.

16        Q    And you said that Detective Guevara was

17   yelling at you.  What was he saying?

18        A    He said that I was guilty; that I had

19   done it.

20        Q    And did the -- did both of the other two

21   officers hit you as well?

22        A    Yes, almost at the same time the three

23   would hit me.

24        Q    Can you describe what those officers

1    were doing?

2        A      One of them came with his foot, placing

3    it here (indicating), on my private parts really hard.

4    And the other one -- the other one just hit me in my

5    stomach.

6        Q      And how long did the beating last?

7        A      It didn't last long.

8        Q      And after the detectives hit you, did

9    you become aware that any of your family was at the

10    station?

11        A      Yes, they brought over a nephew of mine,

12    and they put him in front of the door.

13        Q      When you say they put him in front of

14    the door, was that the door to the interrogation room?

15        A      Yes, they were there.  My nephew was

16    there, and also it seemed like they had beat him up in

17    the face.

18        MS. STACK:  Objection, Judge.

19        THE COURT:  I will allow the answer to stand.

20    You will be able to go into it on cross.

21    BY MS. SIELING:

22        Q      Did you see your nephew in the

23    interrogation room?

24        A      Yes.

| | | |
|---|---|---|
| 1 | Q | And how did he appear? |
| 2 | A | What do you mean -- how he appeared? |
| 3 | Q | How did he look? |
| 4 | A | He looked like a red face. |

5    Q    You said your nephew was there.  Was any
6 of your other family at the station?

7    A    I heard -- I heard my wife and one of my
8 children screaming and crying outside.

9    Q    Did you ever see your wife?

10    A    No, I just heard her.

11    Q    Did you hear what she was saying?

12    MS. STACK:  Objection, Judge.

13    THE COURT:  Overruled.

14    THE WITNESS:  No, I couldn't manage to hear.

15  BY MS. SIELING:

16    Q    Now, did you see your nephew before or
17 after you had been hit by the detectives?

18    A    After they battered me.

19    Q    And did you hear your wife before or
20 after you were hit by the detectives?

21    A    I heard it afterwards, almost like when
22 my nephew came in.

23    Q    And did Detective Guevara say anything
24 to you about your wife and family?

1          MS. STACK:  Objection, Judge.

2          THE COURT:  It could be relevant, overruled.

3          THE WITNESS:  What did Detective Guevara tell

4     me?

5     BY MS. SIELING:

6          Q     About your wife and family.

7          A     He was pointing at my nephew, and he

8     said this is going to happen to your wife also.  And

9     your wife and you are going to go to prison, and we

10    are going to take your children away and you are never

11    going to see your children.

12         Q     Mr. Frias, did you agree to confess to

13    the murder?

14         A     After I saw that, I said that I would

15    say I was guilty.

16         Q     And after you agreed to say you were

17    guilty, did Detective Guevara hit you again?

18         A     No.

19         Q     And after you agreed to say you were

20    guilty, did Detective Guevara threaten your family?

21         MS. STACK:  Objection, Judge.

22         THE COURT:  Sustained.

23    BY MS. SIELING:

24         Q     Mr. Frias, did you ever sign a

1     confession?

2          A     Yes.

3          Q     When did you sign that confession?

4          A     After Detective Guevara told me what I

5     had to say.

6          Q     Was that the same day you were hit in

7     the interrogation room?

8          A     Yes, but later.

9          Q     And who was in the room when you signed

10    that confession?

11         A     Detective Guevara and I would imagine it

12    was the gentleman from the State.

13         Q     And did you speak to that State's

14    Attorney in Spanish or in English?

15         A     I would imagine I spoke a few things in

16    Spanish, but the rest was interpreted by Detective

17    Guevara.

18         Q     Did you speak any English to the State's

19    Attorney?

20         A     I think I just said who I was in

21    English, yes.

22         Q     And were you asked to sign anything?

23         A     After they came back with a letter, then

24    yes.

1        Q      Was that letter in Spanish or in

2 English?

3        A      In English.

4        Q      At that time were you able to read

5 English?

6        A      No.

7        Q      How did you know what was in the letter?

8        MS. STACK:  I am sorry, a letter?

9        THE COURT:  He described it as a letter.

10       MS. STACK:  Okay.  Sorry, I missed that part.

11 BY MS. SIELING:

12       Q      Sorry, can you repeat that?  How did you

13 know what was in the letter?

14       A      Because Guevara had told me that it was

15 just what him and I had agreed upon.

16       Q      Did you sign that letter?

17       A      Yes.

18       Q      Did you ever tell the State's Attorney

19 that Detective Guevara had hit you?

20       A      No.

21       Q      Why not?

22       A      Well, for me, it was like he was one of

23 them.

24       Q      And who was the first person you told

1  about Detective Guevara hitting you?

2      A    An attorney who handled my case about a

3  month later.

4      Q    Mr. Frias, were you convicted of the

5  murder that was the subject of the confession you

6  signed?

7      A    Yes.

8      Q    Are you currently serving a sentence of

9  85 years for murder and 10 years for home invasion in

10  that case?

11      A    Yes.

12      Q    And are you currently an inmate at

13  Stateville Correctional Center?

14      A    Yes.

15      Q    And besides this case, have you ever

16  been arrested or convicted of a crime?

17      A    No.

18      MS. SIELING:  No further questions.

19      MS. DANIEL:  If I may, just one moment.

20      MS. SIELING:  No further questions.

21      THE COURT:  All right.  Cross examination.

22      MR. SMITKO:  Judge, we do have that matter with

23  Judge Biebel at 3:00.  Do you want to break now or

24  start now?

1          THE COURT:  Okay.  You want to get started?

2          MS. STACK:  I can do a few minutes and get

3     started.

4          THE COURT:  Okay.  Might as well.  Then

5     somebody remind me when it's time.

6

7                    CROSS EXAMINATION

8                    BY MS. STACK:

9

10         Q     Mr. Frias, good afternoon.

11         A     Good afternoon.

12         Q     You have been in the country for --

13    since 1981?

14         A     Yes.

15         Q     Thirty-three years, correct, about?

16         A     Yes, I think; yes.

17         Q     So you should have a -- you have much

18    better English today than you did in 1981 when you

19    first came here; right?

20         A     Yes.

21         Q     And this case we are talking about was

22    20 years ago, so your English is much better than it

23    was 20 years ago; right?

24         A     Yes.

1          Q        And when you met with my colleague,

2    Mr. Smitko, here and an investigator, you had a

3    conversation in English; correct?

4          A        Yes.

5          THE COURT:  And the question, when that

6    occurred, was that today or --

7          MS. STACK:  I am sorry.

8    BY MS. STACK:

9          Q        In June of last year, does that sound

10   right when you spoke to Mr. Smitko and Mr. McGreal?

11         MS. DANIEL:  I am sorry, did you say June?

12         THE WITNESS:  I think it was in October.

13         MS. STACK:  October?

14         THE COURT:  All right.  The answer from the

15   witness was he believes it was in October.

16               Of last year?

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Okay.

19   BY MS. STACK:

20         Q        Now, the murder that you are serving

21   time for, as you answered earlier, was the murder of a

22   woman in her apartment; correct?

23         A        In her apartment, yes.

24         MS. DANIEL:  Objection, beyond the scope.

1          THE COURT:  The answer may stand.

2    BY MS. STACK:

3          Q      And you knew that woman and her husband;

4    correct?

5          A      Yes.

6          Q      And the day that you were brought into

7    the station and questioned, you had been working;

8    correct?  The day you were arrested?

9          A      Yes.

10          Q      And they brought you in in the early

11    afternoon?

12          A      At 2:00 o'clock in the afternoon.

13          Q      Did Detective Guevara or any police

14    officer ask you questions at 2:00 o'clock when you

15    came in, right away?

16          A      They just told me they came to look for

17    me.  They were looking for me.

18          Q      As opposed to Rudolfo; correct?

19          A      Yes.

20          Q      And they came in and they asked you some

21    questions, and you gave them permission to search your

22    car; correct?

23          MS. DANIEL:  Objection, relevance and beyond

24    the scope.

1          MS. STACK:  This is --

2          THE COURT:  Overruled.

3          THE WITNESS:  Not at the moment.

4     BY MS. STACK:

5          Q     Okay.  At some point you gave them

6     permission, though, to let them look at your car?

7          A     Yes.

8          Q     And who was it that brought your car to

9     the police station for you?

10         A     My nephew, Miguel Regalato [phonetic].

11         Q     So -- and that's the nephew whose face

12    you said was red; correct?

13         A     Yes.

14         MS. STACK:  Your Honor, I am afraid to cut it

15    any closer.  There are about 15 attorneys down there.

16         THE COURT:  Do you have any idea how long you

17    will be down there?

18         MS. STACK:  It is supposed to be just a ruling

19    on a conflict.

20         THE COURT:  About 20 after, you think,

21    hopefully?

22         MS. STACK:  I would hope so.

23         THE COURT:  I mean, I am just trying to give

24    the Illinois Department of Corrections' officers some

1    information here, I guess.

2                    All right.  We will take a break at this

3    point.

4                    And, officers, kindly indulge us by

5    keeping the witness and petitioner here, Mr. Solache,

6    somewhere in the back there until we ask you to bring

7    him back out again.

8                    Are you going to be able to stay up here

9    with both of them, or do you have to take somebody

10   down?

11       THE OFFICER:  We will be on five.

12       THE COURT:  All right.  Well, whatever you have

13   to do, wherever you have to go.

14                   Somebody here in the courtroom will be

15   able to alert you when it is that we need both

16   gentlemen brought back.

17                   All right.  Thank you.  Short break.

18       MS. STACK:  Thank you, Judge.

19

20                       ( WHEREUPON a brief recess was

21                         had, after which the proceedings

22                         continued as follows: )

23

24       THE COURT:  All right.  Miss Stack, you may

1    proceed.

2          MS. STACK:  Okay.

3    BY MS. STACK:

4          Q      Back at the time that you were arrested,

5    you were married; correct?

6          A      Yes.

7          Q      You had a child, two or three?

8          A      Three years old, yes.

9          Q      Boy?

10         A      Yes.

11         Q      And did your family socialize with the

12    family of the victim?

13         MS. DANIEL:  Objection, Judge.  I am just going

14    to object to the relevance of going into the crime or,

15    you know, really his guilt or innocence.  I mean, the

16    issue here is Guevara's conduct, but not the

17    underlying facts related to this crime for which he

18    was convicted.

19         THE COURT:  How would it be relevant to the

20    issues that I have to decide?

21         MS. STACK:  This?

22         THE COURT:  Yes.

23         MS. STACK:  Well, because what you heard was a

24    very condensed version of what happened at the police

1    station and the investigation. And for years, we have

2    been working on paper as opposed to credibility. He

3    has made statements today that contradict other

4    statements. This is the first chance that we get to

5    explore the credibility of the allegations against

6    Detective Guevara. And this is foundational, Judge.

7            There are things that happened in the

8    station concerning his family members and the victim's

9    family that shed light on his credibility.

10   THE COURT: All right. I don't intend to

11   eliminate your ability to attack the credibility of

12   the witness. That's what cross examination is. And I

13   will give you latitude to explore that.

14           But with respect to, perhaps, going into

15   the specific events of the alleged criminal behavior,

16   I think that would be objectionable and more

17   prejudicial than probative of the issue here. So get,

18   you know, to your points where you want to attack his

19   credibility as to perhaps inconsistent statements

20   or -- in the past or something inconsistent with what

21   he said today based on what you can show, so -- but

22   that particular question, I am going to sustain the

23   objection.

24   MS. STACK: Your Honor, I was simply trying to

1    show --

2              THE COURT:  I know.  That's all right.  You

3    don't have to -- I will sustain that objection.  I am

4    just trying to let you know where I am at.  I am not

5    trying to stop you from being able to cross examine,

6    but just not on that unique sort of specific issue

7    here.

8    BY MS. STACK:

9         Q     Did your wife know the victim of the

10   crime?

11             MS. DANIEL:  Objection.  It is the same

12   question.

13             MS. STACK:  No, it is not.

14             THE COURT:  I can see possibly an area where

15   that could be a basis of why his wife was there, so

16   overruled.

17             THE WITNESS:  Yes.

18             MS. STACK:  Thank you.

19             THE COURT:  Don't thank the witness.

20   BY MS. STACK:

21        Q     So before we took our break, you had

22   explained that you were at the station and the police

23   asked to search your car and you said, fine, and

24   Miguel brought the car to the station; correct?

1        A     Yes.

2        Q     And along with the car, Miguel brought

3 your wife and son; correct?

4     MS. DANIEL: I am going to object to the

5 foundation of this. I don't know that he has any

6 basis of knowing while he is at the station how his

7 wife got there or what -- who his nephew brought in

8 the car.

9     THE COURT: I will sustain the objection. It

10 is a compound sort of question.

11       He did earlier state that the nephew

12 brought the car to the station presumably based on the

13 consent to search that he had provided.

14     MS. STACK: If I may have a moment, your Honor,

15 to find his prior testimony on the exact point.

16     THE COURT: But his prior testimony is not

17 necessarily going to be admissible because he is not

18 being impeached. I sustained the objection to the

19 question --

20     MS. STACK: Okay.

21     THE COURT: (CONTINUING) -- so --

22 BY MS. STACK:

23        Q     Do you know how your wife got to the

24 station?

1          A      I have an understanding that she came

2     with my nephew.

3          THE COURT:  That would be what they call

4     hearsay, but I will let it in because I don't think it

5     is prejudicial.

6               But that is why I always have my antenna

7     up when I hear any lawyer ask do you know how

8     something happened because usually that means you are

9     trying to avoid the more obvious form of the question

10    that clearly establishes the answer.  Just a point of

11    reference for everyone.

12    BY MS. STACK:

13         Q      Were you fingerprinted after Miguel

14    showed up at the station?

15         A      No.

16         Q      You were not fingerprinted?

17         A      Yes.

18         Q      What happened after Miguel showed up at

19    the station?

20         MS. DANIEL:  Objection.  I guess maybe we

21    should lay a little foundation.  I am not sure -- he

22    was there two days.  I am not sure when we are talking

23    about.

24         THE COURT:  Well, do you understand the

1    question, Mr. Frias?

2              THE WITNESS:  When Miguel Regalato got there?

3              THE COURT:  Do you understand the question?

4                   You'd better rephrase.

5              THE WITNESS:  No.

6    BY MS. STACK:

7         Q    Okay.  Were you fingerprinted before

8    Miguel got there or after Miguel got there?

9         A    Before he arrived.

10        Q    Okay.  At what point in time did the

11   police find the knife in your car?

12             MS. DANIEL:  Objection, Judge.

13             THE COURT:  Sustained.

14                  Rephrase.

15   BY MS. STACK:

16        Q    Did the police find the knife in your

17   car before or after Miguel -- I will withdraw that.

18                  The orange-handled knife that the police

19   found in your car, was that your knife?

20             MS. DANIEL:  Objection.

21             THE COURT:  Sustained.

22             MS. STACK:  Your Honor, may I offer some

23   defense of myself here?

24             THE COURT:  All right.  Go ahead, go ahead.

1    MS. STACK:  We are talking -- you are hearing

2    about the time spent in custody, which I assume is

3    going to be argued is a factor in whether the

4    statement was voluntary and whether -- and I am not

5    here to litigate the motion to suppress again, but

6    there are facts of the investigation here that, again,

7    you know, this is the -- they are saying that this

8    police officer manufactured evidence, pulled this man

9    off the street, put a vicious murder on him for which

10   he is still in custody.  They are very serious

11   allegations.

12           You know, this is -- these are matters

13   of record.  These are matters that he has discussed

14   about the investigation.  And I certainly think they

15   are relevant to show that there was a legitimate

16   investigation going on here, a legitimate reason to

17   talk to this man and to keep him in custody.

18      MS. DANIEL:  Judge, may I respond?

19      THE COURT:  Yes.

20      MS. DANIEL:  The issue here is not the

21   voluntariness of the statement.  It is not whether

22   there is probable cause.  It is not whether the

23   gentleman is guilty or innocent.

24           The issue is the conduct of Guevara

1    during the investigation, and whether the arrest is

2    well-founded or not is not relevant to that.  The

3    issue is of whether the gentlemen is guilty or not is

4    not relevant to the question of whether Guevara had

5    hit him on the second day that he was in the police

6    station.

7         MS. STACK:  Your Honor --

8         MS. DANIEL:  The nature of my objection is

9    these questions about the investigation and about the

10   crime are not relevant to this hearing.

11        THE COURT:  Well, I would disagree with

12   something that you are saying and -- because you said

13   that it is not about the voluntariness of the

14   confession, but I think it is in some ways about the

15   voluntariness of the confession.  It is one of the

16   issues that will be dealt with here.

17             Your -- your sort of theory is that

18   Guevara was obtaining involuntary confessions by

19   various means, which your witnesses are describing, so

20   I think that is an issue.

21             Where I don't -- I am trying to thing --

22   or where I am thinking that your question -- your

23   question, Miss Stack, is objectionable is that you are

24   not asking him about -- you are not asking him

1  questions directly about issues that he was

2  necessarily confronted with.  I mean, you are not

3  asking him what Guevara said to him or what Guevara's

4  partner said to him or what they asked him.

5  You are asking him different ultimate

6  sort of issue questions about, you know, they found a

7  knife in his car.  Well, I know he wasn't there when

8  they searched his car based on the tone of the

9  examination, and so what he is confronted with,

10  perhaps, what he was asked, what his answers were, the

11  fact that they, you know, may be impeached by

12  statements made or something like that, I think that's

13  relevant.

14  MS. STACK:  Okay.

15  THE COURT:  But not as to what happened outside

16  his presence, what he wasn't confronted with, and

17  about the -- you know, the -- you know, perhaps the

18  details of the loss of life here of this other person

19  may be going a little bit too far.

20  So I will sustain the objection to the

21  question.

22  BY MS. STACK:

23  Q  Mr. Frias, when you were first picked

24  up, did you know why you were being picked up and

1   brought to the station?

2          A       Detective Guevara told me.

3          Q       Okay.  And they brought you to the

4   station.  Did they question you immediately?

5          A       No.

6          THE COURT:  Okay.  What was it that Detective

7   Guevara told you?  What did he tell you?

8          THE WITNESS:  He told me that they wanted me to

9   go with them to Area 5 to investigate more on the

10  murder of Dora Garcia.

11  BY MS. STACK:

12         Q       And at some point they asked to see your

13  car and you agreed to that; correct?

14         A       Yes.

15         Q       Did Officer Guevara confront you with

16  the evidence that they found in your car?

17         A       What I told him what he was going to

18  find there, yes.

19         Q       Okay.  He confronted you with an

20  orange-handled knife; correct?

21         A       Yes.

22         Q       And an open package of blades that were

23  in your car; correct?

24         A       Yes.

1      Q      Then later, in your time at Area 5, they

2   confronted -- Detective Guevara or one of the other

3   officers confronted you with a phone call made from

4   your place to the victim's place; correct?

5      A      Yes.

6      Q      And at some point Detective Guevara

7   asked to take your fingerprints; correct?

8      A      Once he arrived, yes.

9      Q      And once you arrived, Detective Guevara

10  informed you that a bloody fingerprint had been found

11  in the bathroom of the victim; correct?

12     A      No.

13     Q      Did he tell you about a fingerprint?

14     A      Yes.

15     Q      What did he tell you about the

16  fingerprint?

17     A      He said that that one seemed like it was

18  mine.

19     Q      Which one was he talking about?

20          THE COURT:  Rephrase, rephrase.

21  BY MS. STACK:

22     Q      Okay.  Can you explain your answer to

23  me, Mr. Frias?

24     A      He just said they found a fingerprint.

1      Q      He didn't tell you where?

2      A      Yes, in a place by the toilet.

3      Q      Thank you.

4           When you -- when did Detective Guevara

5 tell you you were under arrest?  Can you explain?

6     A      I would imagine that -- since the moment

7 they took me from my house.

8      Q      Okay.  That's what you believe; correct?

9      A      Yes.

10     Q      Now, when you gave the statement -- can

11 you describe what Guevara told you about this process

12 of giving a confession to a State's Attorney?

13     A      Well, after he hit me and they hit my

14 nephew and then he told me that the same thing would

15 happen to my wife and they would take away my children

16 and I would never see them again, I told them that I

17 was going to take the blame for everything but to

18 leave my family alone.  Afterwards, he told me what --

19 how it happened.

20     Q      Describe for the Court and I how

21 Detective Guevara did that.

22     A      He told me that he was going to tell me

23 what I had to say.  I told him I had never been there,

24 and he said that he was going to help me so the judge

1    could believe me; that he just wanted that.

2         Q    You told Detective Guevara that you had

3    never been to your friend's apartment?

4         MS. DANIEL:  I am going to object.  I would

5    like a little more foundation.  I am not sure what the

6    relationship is that she is referring to.

7         THE COURT:  The important thing is do you

8    understand the question?

9         THE WITNESS:  Can you repeat it?

10        MS. STACK:  Sure.

11        THE COURT:  Be a little bit more specific so

12   that will resolve the objection.

13        MS. STACK:  All right.  Actually, my mind just

14   went blank.  Hang on.

15        THE COURT:  You were talking about the --

16   whether or not he told him that he had ever been in

17   the apartment.

18   BY MS. STACK:

19        Q    And I am paraphrasing, but you just said

20   that you told Detective Guevara I've never been there

21   before, how am I going to confess; right?

22        A    Yes, because I had not been there.

23        Q    You had never been to the apartment

24   where this murder occurred?

1        A      Not the day that -- that the murder

2  happened.

3        Q      Right.  You had been there previously,

4  though; right?

5        A      Yes.

6        Q      All right.  Now, did Detective Guevara

7  or any other officer give you Miranda warnings?

8        A      No, no, they just took me from my house.

9      THE COURT:  So that everybody is on the same

10  page here, meaning you and the witness, could you be

11  more clear as to what Miranda warnings are.

12      MS. STACK:  Okay.

13      THE COURT:  We are not dealing with a lawyer.

14      MS. STACK:  Okay.  That's a good point.

15  BY MS. STACK:

16        Q      I am sorry, Mr. Frias, do you understand

17  when I use the term Miranda warnings what I am talking

18  about?

19        A      Today, yes.  At that time, no.

20        Q      And just so we are all clear, Miranda

21  warnings are the warnings an officer is supposed to

22  give when you are arrested that tell you that you have

23  a right to remain silent, a right to stop questioning,

24  a right to have an attorney present for questioning,

1    and a right to have an attorney appointed for you if

2    you don't have the money for one.

3             Is that what you understand Miranda

4    warnings to be?

5        A      Today, yes.

6        Q      Now, going back to the day that you were

7    in Area 5 under arrest, did the detectives give you

8    Miranda warnings?

9        A      No.

10        Q      They didn't tell you you had the right

11    to remain silent?

12        A      No.

13        Q      And they didn't tell you you had a right

14    to an attorney or to stop the questioning; correct?

15        A      No.

16        Q      When the State's Attorney came, did you

17    tell the State's Attorney what Detective Guevara --

18    did you tell the State's Attorney that Detective

19    Guevara had hit you?

20        A      No.

21        Q      Did you talk to the State's Attorney at

22    all?

23        A      When he arrived, yes, we introduced

24    ourselves to each other.

1        Q     Okay.  Did that State's Attorney try and

2  give you Miranda?

3        A     I don't remember.

4        Q     So it is possible that the State's

5  Attorney gave you Miranda warnings?

6        A     I don't think so.  I don't remember.

7        Q     Do you remember expressly -- I will

8  start over.

9              Do you remember giving away those

10  rights?

11        A     No.

12        Q     Do you remember giving up your right to

13  an attorney?

14        A     I don't remember that.

15        Q     I am going to show you what I have

16  marked as People's Number 13.

17     MS. DANIEL:  Judge, I am going to have an

18  objection here.  If it is what I think it is, which is

19  a document, that I have never seen before.  And I

20  would like to explain that.  At the end of the day

21  yesterday, I spoke to a State's Attorney and I

22  specifically ask them that if they were going to use

23  any documents related to this case that my office had

24  not provided to them in the discovery -- and I

1    explained that all the documents from this case that

2    we had I had provided in discovery and I wanted to

3    know if they had any documents or photos or anything

4    of that nature from this case that they were going to

5    use. Miss stack said she did not think so, but she

6    would let me know in advance if there were going to be

7    such documents used.

8             I have not received the statement. It

9    is not in my documents. And I object to its use in

10   this hearing.

11        MS. STACK: Well, Judge --

12        MS. DANIEL: Well, unless --

13        MS. STACK: (CONTINUING) -- I can't believe --

14        THE COURT: Wait one second. Just wait one

15   second.

16        MS. STACK: I'm sorry, I have no --

17        THE COURT: Just wait one second.

18        MS. DANIEL: You know what, I might be out of

19   line here. I am so sorry.

20        THE COURT: Do you want a couple of minutes?

21        MR. SMITKO: Judge, we do have a discovery

22   receipt from --

23        THE COURT: Do you want a few minutes?

24        MS. DANIEL: Yes.

```
 1              THE COURT:  All right.  Take a couple of minute
 2      break.  Let me know as soon as you are ready again.
 3      You can discuss the discovery amongst yourselves.
 4                      How long do you need do you think?
 5              MR. SMITKO:  Shouldn't be long, Judge.
 6              MS. STACK:  I am ready.
 7              THE COURT:  Do you want me to leave the witness
 8      here, Ms. Daniel?
 9              MS. DANIEL:  I am so sorry --
10              THE COURT:  Miss Daniel, do you want me to
11      leave the witness here for -- do you think it is only
12      going to be a short period?
13              MS. DANIEL:  Yes, let me just take one moment.
14              THE COURT:  All right.
15
16                      ( WHEREUPON a discussion was had off
17                        the record. )
18
19                      All right.  We are on the record.
20              MS. DANIEL:  I apologize.  Apparently, this is
21      floating around our team.  I really deeply apologize
22      to the State's Attorney --
23              THE COURT:  An honest mistake.  It's an hones
24      mistake.  Nobody take anything personally.
```

1    MS. DANIEL:  Right.

2              If I can just have maybe two minutes to

3    just take a quick look at it, and then I will be

4    ready.  I apologize.

5         THE COURT:  All right.  No problem.

6         MS. STACK:  Just for the record, there is a

7    discovery receipt in possession of Northwestern --

8         THE COURT:  She is admitting she got it.  She

9    made a mistake.  You know --

10        MS. STACK:  Well, she asked me yesterday --

11        THE COURT:  What --

12        MS. STACK:  She asked me yesterday --

13        THE COURT:  Well, how would she know -- if she

14   didn't think she had it, how would she know yesterday?

15        MS. STACK:  Well, she obviously knew what she

16   was missing and could have asked for it yesterday.

17        THE COURT:  I don't think you can ever really

18   know what you are missing.

19              Let me know when you are ready.

20

21              ( WHEREUPON a brief recess was had,

22                after which the proceedings

23                continued as follows: )

24

1          All right.  Remain seated, and you may

2     resume your questioning.

3          MS. STACK:  Thank you, Judge.

4     BY MS. STACK:

5          Q     Just a couple of quick questions about

6     when you were arrested.

7               Whatever time it occurred, when they

8     arrested you, they patted you down and they took your

9     wallet; right?

10         A     When they took me from the apartment,

11    no.

12         Q     No?

13         A     No.

14         Q     After you were at Area 5 and you were in

15    custody at Area 5, they took belongings from your

16    person; correct?

17         A     Yes.

18         Q     And they found cocaine on your person;

19    correct?

20         MS. DANIEL:  Objection.

21         THE COURT:  Basis?

22         MS. DANIEL:  Relevance.

23         MS. STACK:  It is in the statement, too, Judge,

24    and he did testify that, you know, he was brought in

1   under arrest right away and held all of these hours

2   and it was featured in the direct about the time in

3   custody.

4                  Again, there are -- there are

5   constitutional bases for what happened during

6   Mr. Frias' --

7           THE COURT:  All right.  For that purpose, I

8   will allow it, overruled.

9           MS. STACK:  It is just a brief point.

10                  Moving on --

11          MR. PAPA:  He didn't answer.

12          MS. STACK:  Oh, I am sorry.  I guess I better

13  let you answer it.

14  BY MS. STACK:

15          Q       Did they find cocaine -- a small amount

16  of cocaine on your person?

17          A       Yes.

18          Q       And you were definitely under arrest

19  when that happened; right?

20          A       I would imagine since the time they took

21  me from my house.

22          Q       When you were first brought into Area 5,

23  you had been working; correct?

24          MS. DANIEL:  Asked and answered.

1          THE COURT:  Sustained.

2     BY MS. STACK:

3          Q     You got off work at 1:00 PM that day?

4          A     1:00, 1:30.  I don't remember it very

5     well.

6          Q     Mr. Frias, I am going to show you what

7     we are marking People's Number 13, which is a copy of

8     the five-page handwritten statement that is at issue

9     here.

10         MS. DANIEL:  Objection to the characterization

11    of this as what is at issue here.

12         THE COURT:  I am aware of what's at issue.

13    BY MS. STACK:

14         Q     Mr. Frias, if you can take a moment and

15    look at it.

16

17              ( Witness peruses document. )

18

19              At first --

20         A     What does it say, though?

21         Q     The statement?

22         THE COURT:  Can you read English?

23         THE WITNESS:  Yes, but it will take a while for

24    me to read all of this.

1        MS. STACK:  Okay.  Your Honor -- let me just
2    ask you.
3    BY MS. STACK:
4        Q      On the first page there that you are
5    holding, in the middle of the page --
6        A      Okay.
7        Q      (CONTINUING) -- is a part that's typed;
8    correct?
9        A      Yes.
10       Q      And then there is a second paragraph
11   that's typed; correct?
12       A      Yes.
13       Q      And that's something that I can't read.
14   It is in Spanish; correct?
15       A      Yes.
16       Q      And is what is written in Spanish
17   there -- are those those things that we talked about
18   called Miranda warnings?
19       A      I never read it.  I just signed it.
20       Q      Okay.  But you signed it; right?
21       A      Yes.
22       Q      And you are reading it now; right?
23       A      I do see that there is Spanish, yes.
24       Q      And can you confirm for me that what you

1    signed there are those Miranda warnings?

2        A       Yes, but I did not read it.

3        Q       When are you talking about?

4        A       When they arrested me.

5        Q       Back when you signed it -- I am sorry?

6        A       When they arrested me.

7        Q       As a matter of fact, your signature

8    appears on all five pages and there are corrections

9    with your initials on -- one, two -- three pages.  Is

10   that correct?

11       A       Yes.  I remember when Guevara told me

12   that what was written here was the same thing that him

13   and I had spoken about.  I didn't take time to read

14   it.  I didn't know how to read in that time English,

15   but I do remember that I did put my initials and I

16   signed it.

17       Q       Okay.  And you did this with the

18   Assistant State's Attorney present?

19       A       No, they made the letter somewhere else

20   and then they brought it.

21       Q       When they -- when you say "they", you

22   mean the State's Attorney and Detective Guevara?

23       A       Yes.  The State's Attorney came first

24   and then they went out and then they returned with the

1    letter already made.

2          Q        Okay.

3          A        And then afterwards, by myself I signed.

4          Q        When you signed, was anybody in the room
5    with you?

6          A        Guevara.

7          Q        Just Guevara?

8          A        And the other gentleman from the State.

9          Q        Okay.  And those were the only two that
10   worked on this statement; correct?

11         THE INTERPRETER:  I am sorry, for the
12   interpreter.

13   BY MS. STACK:

14         Q        The State's Attorney and Guevara were
15   the only two that put together this statement with
16   you?

17         A        Yes.

18         Q        There were no other officers or State's
19   Attorneys, just Guevara and the one State's Attorney?

20         A        At that moment, yes.

21         Q        Okay.  Can you tell the judge and myself
22   how this came about, this statement?  Guevara beat
23   you, threatened your family, and then a State's
24   Attorney showed up; right?

1          MS. DANIEL: Objection. That

2    mischaracterizes --

3          THE COURT: Rephrase, rephrase.

4    BY MS. STACK:

5          Q     Okay. I guess, I would like to

6    understand when the State's Attorney showed up -- when

7    you met the State's Attorney, explain what happened

8    next.

9          A     After they hit me, after I agreed that I

10   would take the blame if they would let my family go --

11        Q     Right.

12        A     (CONTINUING) -- afterwards -- and he

13   asked me to explain how it had happened. And I told

14   him I wasn't there. Then afterwards, I told him --

15        MS. STACK: Judge, I am going to object. My

16   question -- it is nonresponsive. And my question is

17   what happened when the State's Attorney arrived. I am

18   trying to find out how this was taken.

19        THE COURT: You asked a big open-ended question

20   about what happened, and now you are going to have to

21   live with the answer. Overruled.

22          Continue with your answer, sir.

23        THE WITNESS: Then afterwards, when he told me

24   what I had to say, he said -- I said I am just going

1    to take the blame.  He said, no.  If you don't tell me

2    specifically what happened, then the judge is not

3    going to believe you; so you have got to tell me so I

4    can let you go.

5              I told him that I had never been in that

6    apartment.  Then he said, I'm going to help you.  At

7    that moment I already knew how they had found the

8    victim because I went with my cousin to go identify

9    the victim.

10             So then after, he said how did you

11   enter?  And I said I don't know.  We will say that the

12   door was open.  And how are you going to say -- how

13   are you going to explain how you found her?  I don't

14   know.  And then he told me everything I had to say.

15        Q       And when you met the State's Attorney,

16   what happened then?

17        A       They -- we met.  We spoke like a minute

18   or two.  And he said, okay, he's the one that's going

19   to write the confession or the letter.  And then they

20   went outside, and then they returned back with the

21   written letter.

22        Q       Okay.  So back when you first saw the

23   State's Attorney, was there anybody else in the room

24   besides you and the State's Attorney and Detective

1       Guevara?

2               A       At that moment it was just them two.

3               Q       Did you speak to the State's Attorney?

4               MS. DANIEL:  Objection, asked and answered.

5               THE COURT:  Overruled.

6               THE WITNESS:  Yes, when he arrived; yes.

7       BY MS. STACK:

8               Q       Did he speak Spanish?

9               A       No.  He didn't speak to me.

10              Q       Did the State's Attorney ask you any

11      questions whatsoever?

12              A       I don't remember what kind of questions,

13      but I know he said something and everything was

14      interpreted on behalf of Guevara.

15              Q       When you exchanged the conversation that

16      you did with the State's Attorney, did you tell him

17      that you were -- you had been beaten?

18              A       No.

19              Q       When you were sent to Cook County Jail,

20      did you tell the medical person that processed you

21      that you had been beaten?

22              A       No.

23              Q       When you went to bond court, the court

24      for the first time, did you tell anybody in that

1      courtroom that you had been beaten?

2          A      No, because it wasn't my attorney yet.

3          Q      There was no attorney for you there in

4      bond court?

5          A      They assigned one, but he told me that

6      he was not going to be my attorney.

7          Q      So he didn't represent you at bond

8      court?

9          A      He only came one more day until another

10     person showed up.

11         Q      And on that second day, did you tell

12     your attorney?

13         A      No.  I don't remember.

14         Q      Okay.  Did you ask your wife to bring a

15     camera and photograph you?

16     MS. DANIEL:  Objection.  I am going to object

17     to asking when there may not have been an opportunity

18     to speak to his wife.

19     THE COURT:  I am going to sustain the

20     objection.  He has never said that there was anything

21     photographed.

22     BY MS. STACK:

23         Q      Did you have any visible injuries?

24         A      Just red face, yes.

1        Q      And the red face went away after a

2  while; right?

3        A      Yes.

4        Q      And as far as Miguel, you said that that

5  night in the station he had a red face; right?

6        A      Yes.

7        Q      But you -- you did not see Detective

8  Guevara slap or hit Miguel; did you?

9        A      No.

10       Q      And you could only hear your wife and

11  child crying; correct?

12       A      Yes.

13       Q      You didn't see anybody hitting your wife

14  or your child; did you?

15      THE COURT:  He has already -- you have

16  established he could only hear, so how could he?

17  Don't insult my intelligence or lack thereof.

18  BY MS. STACK:

19       Q      Mr. Frias, you litigated a motion on

20  this, correct, on your statement?

21       A      What is that?

22       Q      Did you testify before a different judge

23  about what Detective Guevara did to you to get that

24  statement?

1        A      I remember that I was -- I was speaking,

2 but I don't know if that's what you're -- what you

3 mean.

4        THE COURT:  Rephrase, rephrase.

5 BY MS. STACK:

6        Q      Okay.  Mr. Frias, before your trial,

7 there was another hearing and you were allowed to come

8 to court and testify about what happened in the police

9 station that night; correct?

10       A      I think it was with the attorneys.  I

11 don't know -- I don't remember -- I don't know if it

12 was like here talking with the judge or if it was just

13 with the attorneys.

14       Q      You don't remember testifying in court?

15       A      At the end, yes.

16       Q      Okay.  And you were obviously convicted;

17 correct?

18       A      Yes.

19       Q      And there was an appeal filed for you;

20 correct?

21       MS. DANIEL:  Objection.

22       THE COURT:  Sustained.

23 BY MS. STACK:

24       Q      Mr. Frias, you have not filed any PC's;

1    have you?

2         MS. DANIEL:  Objection.

3         THE COURT:  Overruled.  I will allow the

4    answer.

5         THE INTERPRETER:  I am sorry, for the

6    interpreter.

7    BY MS. STACK:

8         Q    I am sorry, have you filed any

9    postconviction petitions alleging that you were beaten

10   by Detective Guevara?

11        MS. DANIEL:  Objection.

12        THE COURT:  Overruled.

13        THE WITNESS:  No.

14   BY MS. STACK:

15        Q    One more thing.  Back to your statement,

16   I am going to show you once again -- did you ever try

17   in English to tell the State's Attorney this

18   confession?  Did you speak directly about the facts of

19   the murder to the State's Attorney at all?

20        THE COURT:  In English?  In English?

21        MS. STACK:  In English.

22        THE WITNESS:  No, no, because Guevara was there

23   and he was interpreting everything.

24

1 BY MS. STACK:

2    Q  Okay.  When the statement was taken, you

3 already testified that you signed it; correct?

4    A  Yes.

5    Q  And Detective Guevara and the State's

6 Attorney, they signed it, too?

7    A  That, I don't remember.

8    Q  Do you remember the fourth person that

9 was there in addition to you, Detective Guevara, and

10 ASA Fogarty?

11    MS. DANIEL:  Objection.  That assumes a fact

12 not in evidence that there was a fourth person there.

13    THE COURT:  Rephrase.

14 BY MS. STACK:

15    Q  Do you -- looking at Number 13, your

16 confession, do you remember whose signature that is on

17 all of the pages?

18    MR. VAIL:  Objection.

19    THE COURT:  Rephrase.

20 BY MS. STACK:

21    Q  All right.  Referring to Detective -- on

22 the bottom -- was there any other police officers

23 there when this statement was taken?

24    MS. DANIEL:  Objection, asked and answered.

1          MR. VAIL:  Join.

2          THE COURT:  No, overruled.  I mean, what your

3  original objections were for, she has now asked the

4  appropriate question, so overruled.

5          THE WITNESS:  I don't remember if there was

6  another -- a second person.

7  BY MS. STACK:

8          Q     A second person?

9          A     Or a third person.

10         Q     Okay.  So now you remember there was a

11  third person present.

12        MR. VAIL:  Objection, your Honor.

13        MS. DANIEL:  Objection, mischaracterizes the

14  answer.

15        THE COURT:  Sustained, sustained, sustained.

16  BY MS. STACK: .

17         Q     Who was it?

18        MR. VAIL:  Objection.

19        THE COURT:  Rephrase.

20  BY MS. STACK:

21         Q     Do you remember any other persons being

22  present for the taking of your confession?

23         A     A third person?

24         Q     Besides Guevara and the State's Attorney

1   and yourself, was there someone else for the taking of

2   your statement?

3        A     I don't remember that.

4        MS. STACK:  Thank you.

5        THE COURT:  All right.  Any other questions?

6        MS. DANIEL:  No further questions.

7        THE COURT:  No questions.

8        MR. VAIL:  No, your Honor, thank you.

9        THE COURT:  All right.  Then, Officers, this

10  witness, Mr. Frias, you may take back.  His writ will

11  not be extended, so he has completed everything here.

12

13             ( Witness excused. )

14

15             All right.  Thank you, Officers.

16             Now, no witnesses for tomorrow?

17       MS. DANIEL:  No, Judge.

18       THE COURT:  All right.  Have you folks decided

19  on the next date?

20       MS. DANIEL:  Have we --

21       MS. STACK:  I am sorry, what day?

22       MR. SAUNDERS:  The 6th --

23       THE COURT:  As to -- I am going to continue the

24  case.

As to Mr. Solache, I don't see any need for him to be writ back here for the next part of your case. There may come a time when you want him back again, but I am not going to extend his writ. I think it is -- we have kind of extended it liberally here this week beyond his testimony, but I don't think we want to bring him back just for -- so that he can sit there.

It is obviously difficult with the Department of Corrections and ties up the interpreter for an entire day, so we won't extend his writ. But in the event that he is needed in the future, you can bring it to my attention and possibly discuss it to bring him back.

But what date is agreeable?

MR. VAIL: 21st of May.

THE COURT: May 21st. And that is what, a Tuesday? That's probably fine.

MS. STACK: 1:00 o'clock.

THE COURT: All right. By agreement, May 21st, commenced and continued. Writ not extended.

Again, thank you, Officers.

1    ( WHEREUPON the above-entitled cause
2    was continued to 5-21-13 in
3    Courtroom 706. )
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1

2  STATE OF ILLINOIS )
   ) SS.
3  COUNTY OF C O O K )

4

5

6         I, SANDRA BATTAGLIA, Official Shorthand

7  Reporter of the Circuit Court of Cook County, County

8  Department, Criminal Division, do hereby certify that

9  I reported in shorthand the proceedings had at the

10 hearing of the above-entitled cause, and that the

11 foregoing is a true and correct transcript of the

12 proceedings had.

13

14

15

16                    _____
                      Official Shorthand Reporter
17                    C.S.R. #084-003168
                      Circuit Court of Cook County
18                    County Department
                      Criminal Division
19
                      Dated this 16th day of
20                    April 2013.

21

22

23

24

MAYSONET 3293