# EXHIBIT 39

1          IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
              COUNTY DEPARTMENT-CRIMINAL DIVISION
2

3    THE PEOPLE OF THE STATE OF        )
     ILLINOIS,                         )
4                                      )
             Plaintiff,                )
5                                      )
     vs.                               )    No. 98 CR 12440
6                                      )
     ADRIANA MEJIA,                    )
7    ARTURO REYES and                  )    Charge:  Murder
     GABRIEL SOLACHE,                  )
8                                      )
             Defendants.               )
9    --------------------------------)

10                 REPORT OF PROCEEDINGS had at the hearing

11   of the above-entitled cause before the Honorable

12   STANLEY SACKS, judge of said Court, on the 4th day of

13   February, 2000, at the hour of 12:30 p.m.

14        PRESENT:

15            HON. RICHARD DEVINE
              State's Attorney of Cook County, by
16            MR. ARTHUR HILL and
              MS. MERCEDES LUQUE-ROSALES
17                 Appearing on behalf of the Plaintiff;

18            HON. RITA FRY
              Public Defender of Cook County, by
19            MS. VIOLA ARMIJO ROUSE
                   Appearing on behalf of Mr. Solache;
20            MS. MARY DANAHY
                   Appearing on behalf of Ms. Mejia;
21            MR. THOMAS VERDUN
                   Appearing on behalf of Mr. Reyes.
22
     Paul W. O'Connor
23   Official Court Reporter
     Circuit Court of Cook County
24   County Department


     Y-1                      533

MAYSONET 3294

1    the Petitioner herein, called as a witness on his own behalf,

2    having been first duly sworn, was examined and testified through

3    the Interpreter as follows:

4                        DIRECT EXAMINATION

5                        BY MR. VERDUN:

6    THE COURT:  Have a seat.  Keep your voice up.

7    MR. VERDUN:  Q.  Sir, state your name for the record and

8    spell your last name.

9    A.  Arturo.

10   THE COURT:  Arturo DeLeon Reyes.  Go ahead please.

11   MR. VERDUN:  Q.  And how old are you now, Mr. Reyes?

12   A.  25.

13   Q.  And directing your attention to April of 1998, you were

14   23 then?

15   A.  Correct.

16   Q.  Where were you born?

17   A.  Mexico.

18   Q.  What nationality are you?

19   A.  Mexican.

20   Q.  How long have you been in the U -- as of -- strike that.

21        When did you come to the United States?

22   A.  In December of '97.

23   Q.  Had you ever been arrested in Mexico prior to coming to

24   the United States?

811

```
 1      A.  Never.

 2      Q.  Prior to April the 3rd of 1998 had you ever been arrested

 3   in the United States?

 4      A.  No.

 5      Q.  In April of 1998 were you -- were you employed?

 6      A.  Yes.

 7      Q.  Where were you working, sir?

 8      A.  In a meat packing company.

 9      Q.  And as of April of 1994, how long had you been working

10   there?

11      A.  Month and-a-half.

12      Q.  Now, directing your attention to April the 3rd of 1998

13   did you know -- strike that.

14          Were you arrested on that day?

15      A.  Can you rephrase that question?

16      Q.  On April the 3rd of 1998 in the early morning hours, did

17   you go to a police station?

18      A.  Yes.

19      Q.  And were you taken from that police station to a second

20   police station where you were locked in a room?

21      A.  Yes.

22      Q.  On that date did you know that you had the right to

23   contact or have -- contact the Mexican consul?

24      A.  No.
```

1     Q.  Did you know that you had the right to have someone on

2   your behalf contact the Mexican consul?

3     A.  No.

4     Q.  Had you been aware of that would you have done so?

5   MS. LUQUE-ROSALES:  Judge, objection, speculation.

6   MR. VERDUN:  Judge --

7   THE COURT:  Overruled.  Let him answer it.  You can answer

8   the question, Mr. Reyes.

9     A.  Yes.

10   THE COURT:  Why would you have done that, Mr. Reyes?

11     A.  To first find out what was happening.

12   THE COURT:  They would be able to tell you what was

13   happening.

14     A.  I imagine so.

15   THE COURT:  All right.  Go on.

16   MR. VERDUN:  Q.  Sir, keeping your attention directed to

17   April the 3rd of 1998 in the early morning hours at approximately

18   5:00 a.m. is that when you arose -- arise -- excuse me, arrived

19   at the police station?

20     A.  Yes.

21     Q.  Who did you -- who did you go there with?

22     A.  Me, Gabriel, Isauro (sic) and a little boy.

23     Q.  And when you arrived at the police station, was there

24   anyone that -- strike that.

213

MAYSONET 3297

1     Do you speak English?

2  A. No.

3  Q. Was there anyone that was able to communicate with you

4 when you first arrived at that police station?

5  A. At first no.

6  Q. At some point did a Spanish speaking police officer

7 arrive?

8  A. Yes, after a while.

9  Q. And did that individual speak to you directly at that

10 time?

11  A. No.

12  Q. Who did he speak to, if anyone?

13  A. With Isauro.

14  Q. And who is Rosauro?

15  A. The -- Adriana's husband.

16  Q. When you say Adriana, you mean Adriana Mejia?

17  A. Yes.

18  Q. After -- excuse me.  After Rosauro had the conversation

19 with this police officer, were you taken anywhere?

20  A. No.  He later asked me questions, the officer did.

21  Q. Do you know that officer's name?

22  A. No.

23  Q. Have you seen him testify here in court?

24  A. No.

1    Q.  And what did this officer ask you?

2    A.  First he asked me if it was true that I rented the house

3    with Isauro.

4    Q.  Did he ask you anything else at that time?

5    A.  Yes.

6    Q.  What else?

7    A.  If I had a job.

8    Q.  Anything else?

9    A.  How many -- how old I was.

10   Q.  Tell us -- tell us everything he asked you.

11   A.  He asked me how old I was.  I told him I was 23.  He

12   asked me if I had known Isauro before and I told him no.  And he

13   told me that he -- they would take me to another police station

14   to ask me more questions.  And that's all he asked me.

15   Q.  After that conversation did you, in fact, go to another

16   police station?

17   A.  Yes.

18   Q.  How did you get to the second police station?

19   A.  In a patrol car.

20   Q.  And when you got to the second police station, tell the

21   judge what happened.

22   A.  When I arrived at the second police station?

23   Q.  Yes.

24   A.  We arrived at the second police station and they put all

1    three of us in a room, me, Gabriel and Isauro and we were there

2    for a while in that one room.  And then later they left me alone

3    in that room.

4        Q.  When they left you alone in the room, was the door to

5    that room opened or closed?

6        A.  Closed.

7        Q.  And did you remain in that room for some period of time?

8        A.  Yes.

9        Q.  At some point did a police officer come into that room?

10       A.  Yes.

11       Q.  And do you know today what that police officer's name was

12    or is?  Excuse me.

13       A.  Yes.

14       Q.  And what is that name?

15       A.  Guevara.

16       Q.  Is that the individual that testified here in court on

17    the last court date?

18       A.  Yes.

19       Q.  When that -- when Detective Guevara came into the room,

20    was he by himself?

21       A.  Yes.

22       Q.  Did you have a conversation with Detective Guevara at

23    that time?

24       A.  Later, yes.

1    Q. Well, did Detective Guevara say something to you when he

2    came into that room the first time?

3    A. When he entered the first time, he took off a cap that I

4    was wearing on my head.

5    Q. Did he do anything else?

6    A. Yes. He slapped me very hard in my face.

7    Q. And at the time that he slapped you in the face, did you

8    have handcuffs on?

9    A. No.

10   Q. Did you ever have handcuffs on while you were in that

11   room with Detective Guevara?

12   A. Yes, afterwards he handcuffed me.

13   Q. And did he handcuff both hands?

14   A. Yes, with both hands.

15   Q. When Detective Guevara handcuffed you, is this during

16   this first conversation that you had with him?

17   A. Yes.

18   Q. After you were handcuffed and slapped, did Detective

19   Guevara have a further conversation with you?

20   A. He asked me why did I do it.

21   Q. Were you -- did you know what he was talking about at

22   that time?

23   A. No.

24   Q. And did you tell him that?

1      A.  I told him.

2      Q.  Did he make any kind of response when you said you didn't

3  know what he was talking about?

4      A.  At that moment he asked me two or three more questions.

5      Q.  After he asked you those questions, did he stay in that

6  room with you?

7      A.  He left.

8      Q.  And were you -- were you still handcuffed at that time?

9      A.  Yes.

10      Q.  Did someone come back into that room at some later time?

11      A.  Another officer, yes.

12      Q.  When you say another officer, someone other than

13  Detective Guevara, is that what you mean?

14      A.  Yes.

15      Q.  Do you know that officer's name?

16      A.  No.

17      Q.  Do you recall what he looked like?

18      A.  Not exactly.

19      Q.  Did you have a conversation with that officer that came

20  in the room?

21      A.  No.

22      Q.  Did that officer say anything to you?

23      A.  No.  He just covered the window that was on the door.

24      Q.  Did he leave the room after he covered the window?

318

MAYSONET 3302

```
 1      A.  Yes.

 2      Q.  And did you remain in that room then by yourself for a

 3  period of time?

 4      A.  Yes, it was a while.

 5      Q.  After sometime passed did someone else come back into the

 6  room?

 7      A.  Yes, the Detective Guevara.

 8      Q.  And when Detective Guevara came into the room, did you

 9  have a conversation with him?

10      A.  Yes.

11      Q.  And during that conversation did Detective Guevara in any

12  way physically touch you?

13      A.  Not at that moment.

14      Q.  While -- at any time that he was in the room that second

15  time, did he physically touch you?

16      A.  No.

17      Q.  At some point did he then leave the room again?

18      A.  Yes.

19      Q.  And did you remain in that room by yourself again?

20      A.  Yes.

21      Q.  Later did anyone else come into the room?

22      A.  Yes, him.

23      Q.  When you say him, are you talking about Detective Guevara

24  again?
```

MAYSONET 3303

1      THE WITNESS:  Yes.

2      A.  Yes.

3      Q.  And did Detective Guevara have any papers with him when

4  he came in the room this time?

5      A.  He brought a piece of paper.

6      Q.  And did he give that piece of paper to you?

7      A.  Yes.  First he let go of my third --- of my right hand.

8      Q.  When you say he let go of it, do you mean he took the

9  handcuff off?

10     A.  Yes.

11     Q.  And after he took the handcuff off and gave you that

12  piece of paper, tell the Judge what happened.

13     A.  He handed it to me and he asked me to read it and I read

14  it.

15     Q.  Was it in Spanish?

16     A.  Yes.

17     Q.  Did he ask you to do anything after you read that letter?

18     A.  Yes, to sign it.

19     Q.  And did you do that?

20     A.  Yes.

21     Q.  Why?

22     A.  Because he told me to sign it.

23     Q.  After you signed the piece of paper, what did Detective

24  Guevara do?                          320

1    A.  Nothing.  He went -- handcuffed me again.

2    Q.  Did he stay in the room?

3    A.  He left.

4    Q.  And again did you remain in that room for a period of

5    time by yourself?

6    A.  Yes.

7    Q.  And after sometime had passed, did someone else come into

8    the room?

9    A.  Yes.

10   Q.  And who was that, if you know?

11   A.  Detective Guevara.

12   Q.  When he came into the room this time -- excuse me.  When

13   he came into the room this time, did he remove the handcuffs?

14   A.  Yes.

15   Q.  And did he have a conversation with you?

16   A.  No.  He changed -- changed me from one room to the next.

17   Q.  Okay.  He took you to another room?

18   A.  Yes.

19   Q.  When you got to this second room, were there other people

20   there or was it just you and Detective Guevara?

21   A.  There was two other people.

22   Q.  Do you know the names of those persons?

23   A.  One of them was Detective Trevino and the other one was a

24   man -- a man, an American officer.

824

MAYSONET 3305

1      Q.  And what happened while you were in that room with those

2  three people?

3      A.  The Detective Guevara, he started writing something on

4  the chalkboard.

5      Q.  And after he wrote something on the chalkboard, what

6  happened?

7      A.  He asked me if I recognized what he was writing.

8      Q.  And did you recognize what he was writing?

9      A.  No.

10     Q.  After you told him that you didn't recognize what was on

11 the blackboard, what, if anything, happened?

12     A.  Then Detective Guevara left and Detective Trevino

13 continued writing things on the chalkboard.

14     Q.  How long did you stay in the room -- strike that.

15         Did the American officer stay in the room too?

16     A.  Yes.

17     Q.  About how long did you stay in that room with Detective

18 Trevino and the American officer?

19     A.  Little time.

20     Q.  And were they asking you questions while you were in that

21  room?

22     A.  No.  Just Detective Trevino would ask me if I recognized

23 that part that he was drawing on.

24     Q.  What he was drawing on the blackboard?

1    A.  Yes.

2    Q.  And did you recognize what he was drawing on the

3    blackboard?

4    A.  No.

5    Q.  When Detective Trevino finished drawing on the

6    blackboard, did you stay in that room with Detective Trevino and

7    the American officer or did you go someplace else?

8    A.  Later Detective Guevara returned again.

9    Q.  And when he returned, what happened?

10   A.  He said that I wasn't helping myself, that I was letting

11   other people blame me.

12   Q.  Did he say anything else to you?

13   A.  That -- yes.  That if I didn't say something that most

14   likely I was going to get the electrical chair.

15   Q.  After he said that to you, did he say anything else to

16   you?

17   A.  No.  He returned me to the room that I was at.

18   Q.  When he said those things to you, what you've just told

19   us, was he physically touching you?

20   A.  No.  He just said it very close to my face.

21   Q.  Was he talking in a loud voice or a regular

22   conversational voice?

23   A.  At that moment he was using a low -- low -- low tone of

24   voice.

3

1     Q.  Now, you said Detective Guevara took you back to the room

2  that you had been in, is that right?

3     A.  Yes.

4     Q.  And did he leave you in that room alone?

5     A.  Yes.

6     Q.  Did someone come back to that room after a period of

7  time?

8     A.  Yes.

9     Q.  And who came back to that room, if you know?

10     A.  Detective Trevino and another officer, the one that was

11  in the room before.

12     Q.  The American officer?

13     A.  Yes.

14     Q.  You don't -- do you know that person's -- the American

15  officer's name?

16     A.  No.

17     Q.  Do you recall what he looked like?

18     A.  No.  Not really, no.

19     Q.  When they came into the room, tell the Judge what

20  happened.

21     A.  Detective Trevino said that he would help me.  He took a

22  chair and he sat in front of me.  He asked me first what did I

23  want, did I want a glass of water, Coke, some candy and I told

24  him that I wanted a Coke.

1     Q.  Did you -- in fact, did he get you a Coke?

2     A.  Yes.

3     Q.  Up until this time when you received that Coke had you

4  had any food to drink -- excuse me or any food to eat?

5     A.  No.

6     Q.  Had you had anything to drink prior to receiving this

7  Coke?

8     A.  No.

9     Q.  Do you know how long had you been at the police station

10  up until this time?

11     A.  It was a good while.  It had -- a good while had passed.

12     Q.  Do you know if more than a day had passed?

13     A.  Yes.

14     Q.  After you received the Coke from Detective Trevino,

15  what -- what happened?

16     A.  He started -- he asked me to tell -- to tell him the

17  truth and I told him the truth.

18     Q.  Did you tell him that you knew who the Sotos were at that

19  time?

20     A.  No.

21     Q.  Did you tell him that you didn't know what had happened

22  to the Sotos?

23     A.  I told him that I didn't know why I was being accused,

24  that I didn't know what had happened.

1     A.   The same time -- the same amount of time that he lasted

2   there with Detective Trevino.

3     Q.   Okay.   And did -- did the conversation with Detective

4   Trevino continue after the explanation of why you were there?

5     A.   Yes.

6     Q.   Let me ask you this, Mr. Reyes:   Up until this -- the

7   point that we're at had anyone ever said to you -- strike that.

8   Let me break it down.

9          In any of the conversations that Detective Guevara had

10  with you, did he ever tell you that you had the right to remain

11  silent?

12    A.   No.

13    Q.   Did Detective Guevara ever tell you that anything you

14  said could be used against you?

15    A.   No.

16    Q.   Did he tell you that you had the right to have a lawyer

17  present with you and if you couldn't afford a lawyer that they

18  would get one for you?

19    A.   No.

20    Q.   Did Detective Trevino ever tell you any of those things?

21    A.   No.

22    Q.   After your conversation with Detective Trevino, tell the

23  Judge what happened.

24    A.   Of the conversation?

1    A.  Not exactly.

2    Q.  While he was in the room during this conversation did he

3    ever physically touch you?

4    A.  Yes.

5    Q.  How did he touch you?

6    A.  Every time that I would say the word no.

7    Q.  What --

8    THE COURT:  What did he do supposedly according to you?

9    A.  He would ask me if I did this or that and then I would

10   say no and every time I said no he would.

11   THE COURT:  Finish the answer.  He would do what according to

12   you?

13   A.  Every time he would ask me a question I would give him

14   the correct answer and he would tell me not to be lying to him.

15   MR. VERDUN:  Q.  Did he ever physically touch you?

16   A.  Yes.

17   Q.  Where on your body?

18   A.  On my face.

19   Q.  With what part of his body did he touch you on the face?

20   A.  With his open hand.

21   Q.  Did he slap you?

22   A.  Yes.

23   Q.  How many times, if you know, during this conversation?

24   A.  I don't remember but it was several times at that moment.

330

MAYSONET 3311

1    Q.  After you had that conversation with Detective Trevino,

2    did he -- he and the other officers stay in the room?

3    A.  Yes.

4    Q.  And what happened while they were in the room?

5    A.  Detective Trevino started to explain to me what I was

6    being accused of.

7    Q.  After that explanation, did you have a further

8    conversation with him?

9    A.  Yes.

10   Q.  By the way up until this point when Detective Trevino

11   gave you this explanation had anyone given you a full explanation

12   of why you were there?

13   MS. LUQUE-ROSALES:  Objection to the form of the question as

14   to full explanation.

15   THE COURT:  Overruled.  Go ahead.  Ask the question again.

16   He can answer it.

17   MR. VERDUN:  Q.  Up until this point when Detective Trevino

18   gave you the explanation did anyone explain to you while -- why

19   you were there?

20   A.  No.

21   Q.  At some point then did Detective Trevino leave the room?

22   A.  Yes, later.

23   Q.  How long about did he stay in that room with you with the

24   American officer?

MAYSONET 3313

1    that time?

2        A.  He brought me a pair of pants.  He told me to go to the

3    bathroom, to change pants and to take off my shoes with a jacket

4    that he had brought.

5        Q.  And after you had done that, did you go back to the room

6    that you had been in?

7        A.  Yes.

8        Q.  And did Detective Guevara come back into that room with

9    you?

10       A.  No.

11       Q.  And at that point you were in the room by yourself?

12       A.  Yes.

13       Q.  Did you ever -- did someone else come to that room after

14   a period of time?

15       A.  Yes.

16       Q.  And who came to the room after a while?

17       A.  Detective Guevara.

18       Q.  And what happened when Detective Guevara came into the

19   room at this time?

20       A.  He asked me questions.

21       Q.  And what was his tone of voice when he was asking you

22   those questions?

23       A.  It was a little loud.

24       Q.  And do you recall what he said to you?

1    cross.  We'll go from there.

2                              (Lunch recess taken)

3        THE COURT:  We don't need Solache at this point.  We're going

4    to have the cross examination of the other fellow.  Just bring

5    out Reyes.

6        THE SHERIFF:  Are we done with Solache?

7        THE COURT:  No.

8        MS. ROUSE:  No.

9        THE SHERIFF:  Oh, okay.

10       THE COURT:  Have a seat up there please.  Defendant Arturo

11   Reyes is present also known as Arturo DeLeon Reyes.  Mr. Hill,

12   will it be you?

13       MR. HILL:  Yes, your Honor.

14       THE COURT:  Go ahead.

15           (Petitioner Arturo Reyes recalled to witness stand.)

16                          CROSS EXAMINATION

17                          BY MR. HILL:

18       Q.  Mr. Reyes, you testified on direct examination that you

19   had a job for a period of time before you were arrested.

20       A.  Yes.

21       Q.  Where did you work?

22       A.  By 159th and Kedzie and to this side.

23       Q.  That was at a meat packing place?

24       A.  Yes.

1     THE COURT:  Okay.  Go ahead.

2     MR. HILL:  Q.  And you spoke with --- it was one person?

3     A.  With both.

4     Q.  Okay.  Two people.  You spoke with two people.

5     A.  Yes.

6     Q.  And what did you tell them?

7     A.  They asked me questions such as when did I arrive from

8  Mexico, how much schooling I had, if I had family members in

9  Mexico.

10     Q.  And you told them.

11     A.  Yes.

12     THE COURT:  One second.  You been in custody give or take

13  about 22 more months since you saw them, correct?

14     A.  I'm sorry?

15     THE COURT:  You were arrested in March -- the end of March of

16  1998 or April of 1998, correct?

17     A.  Yes, correct.

18     THE COURT:  You saw the people from the Mexican consulate at

19  the jail you said about a month or two after you got arrested,

20  correct?

21     A.  Correct.

22     THE COURT:  You haven't seen anybody from the consulate since

23  then, correct?

24     A.  Correct.

MAYSONET 3316

1      THE COURT:  So you -- it's been about 21 or two months since

2   you saw anybody from the Mexican consulate, correct?

3      A.  Correct.

4      THE COURT:  What have they done for you in that 21 or two

5   months?

6      A.  You could say nothing.

7      THE COURT:  When you talked to them at the jail a month or

8   two after you got arrested, what did you ask them to do for you?

9      A.  To please help me.

10     THE COURT:  Help you do what?

11     A.  To find out what was happening and what the laws of the

12  United States are like.

13     THE COURT:  You didn't ask him to get you a lawyer.

14     A.  I didn't know that I could ask for that.

15     THE COURT:  You already had a lawyer, correct, by that time a

16  month or two after you got arrested?

17     A.  I don't remember.

18     THE COURT:  All right.  Go on.

19     MR. HILL:  Q.  Mr. Verdun asked you questions about you

20  coming to the police station in early April.

21     A.  Correct.

22     Q.  You came to the police station voluntarily.

23     A.  Correct.

24     Q.  You got in a car with Gabriel and Rosauro and a little

5

1    boy to come to the police station.

2        A.  No.

3        Q.  How did you get to the police station?

4        A.  In a patrol car but it was myself, Gabriel and Rosauro.

5        Q.  I'm talking about before the patrol car when you first

6    came to the police station.

7        A.  Oh, I'm sorry.  Yes.

8        Q.  So you came to the police station voluntarily.

9        A.  Yes.

10       MR. HILL:  May I have a moment, Judge?

11       THE COURT:  Sure.

12                          (Brief pause)

13       MR. HILL:  Your Honor, I seek leave to mark this next exhibit

14   as People's Exhibit Number A.

15       THE COURT:  Okay.

16       MR. HILL:  For March 3rd and for identification, March 3rd,

17   2000.  May I approach the witness?

18       THE COURT:  Sure.

19       MR. HILL:  Q.  I'm showing you what has been marked as

20   People's Exhibit letter A for March 3rd for identification.  Do

21   you recognize what that is?

22       A.  I'm sorry.  Can I read this?

23       Q.  You've seen it before, haven't you?

24       A.  No.  I -- I don't remember.

                          36

MAYSONET 3318

1      A.  Yes.

2      Q.  And they spoke with you.

3      A.  Yes.

4      Q.  How many times did you meet with the representatives from

5  the Mexican consulate?

6      A.  That was the only time that I have seen them.

7      Q.  What did you tell them?

8      MR. VERDUN:  Judge, I'm going to interpose an objection.

9      THE COURT:  Not about the facts of the case but what did he

10  talk about as far as them helping him or whatever.

11     MR. VERDUN:  Judge, my objection is I don't know that Mr.

12  Reyes has ever said it was persons from the Mexican consulate.

13     THE COURT:  Ask him who they were then.

14     MR. HILL:  Q.  Were you visited by representatives from the

15  Mexican consulate?

16     A.  No.

17     Q.  Well, who was it that you were referring to that visited

18  you?

19     A.  It was only one time that the Mexican consulate visited

20  me.

21     Q.  And when was that?

22     A.  After I arrived here at Cook County.

23     THE COURT:  When after, how long?

24     A.  I don't remember if it was one month or two months.

1     Q.  Do you --- do you remember the name of it?

2     A.  Yes.

3     Q.  What's the name?

4     A.  Minel.

5     Q.  Did you get placed there through a temporary agency?

6     A.  I was sent there by a labor office.

7     Q.  And did that labor office send you to other places before

8 that place?

9     A.  That office sent me only there.

10    Q.  Were there other labor offices that sent you other

11 places?

12    A.  First I had another job.

13    Q.  Where was that?

14    A.  By 47th and Western.

15    Q.  And what kind of place was that?

16    MR. VERDUN:  Judge, I'm going to object at this point.

17    THE COURT:  Another question or two.  Overruled.

18    MR. HILL:  Should I repeat the question?

19    THE COURT:  What kind of place did you work at at 47th and

20 Western?

21    A.  That was a labor office.

22    MR. HILL:  Q.  How many jobs did you have here in this

23 country before you got arrested?

24    A.  Two.

1    Q.  And had you ever been to this country before 1997?

2    A.  No.  That was the first time in December.

3    Q.  Of 1997?

4    A.  Yes.

5    Q.  Now, you mentioned on direct examination that you weren't

6  told that you could contact the Mexican consulate.

7    A.  That is correct.  That's correct.

8    Q.  Were you contacted by the Mexican consulate shortly after

9  you were arrested?

10    MR. VERDUN:  Objection, Judge, shortly after.

11    THE COURT:  If he doesn't understand the question, he'll say

12  he doesn't.  Overruled.

13    A.  No.

14    MR. HILL:  Q.  In November of 1998 here in this courtroom,

15  you were advised that you could contact the Mexican consulate, do

16  you remember that?

17    A.  Yes.

18    Q.  Did you contact the Mexican consulate?

19    A.  No.  He came with me.

20    Q.  Who came with you?

21    A.  A man and a woman.

22    Q.  And they came to the -- to the Cook County Jail?

23    A.  Yes.

24    Q.  And you spoke with them.

1      THE COURT: Now, you can read it if you like. Go ahead.

2                    (Brief pause)

3      MR. HILL: Q. I'm sorry. Did you finish reading that?

4      A. Yes.

5      Q. And you recognize what it is, don't you?

6      A. Yes.

7      Q. That is a consent to search form that Detective Guevara I

8 think you said gave to you.

9      A. Yes, but I never read it.

10      Q. Didn't you testify on direct examination that you read

11 the document that Detective Guevara gave you?

12      A. He told me sign it. All I did is -- all I did was sign

13 it.

14      Q. So my question is did you just testify earlier today that

15 you read it before you signed it?

16      A. Detective Guevara let go of my hand, gave me the paper.

17 I couldn't really read too. He just told me -- he screamed at me

18 sign it and that's what I did. I signed it.

19      Q. You read it just now. You'll have to answer out loud.

20 Did you -- did you read it just now?

21      A. Yes, the -- the top part.

22      Q. On the top part, you signed your name.

23      A. Yes.

24      Q. And on the bottom part, you signed your name.

1    A.  No.  I'm sorry.  The top part I didn't sign it.

2    Q.  You signed the bottom part?

3    A.  Yes, bottom.

4    Q.  And you're telling us today on cross examination that you

5 didn't read this before you signed it?

6    MR. VERDUN:  Judge, I'm going to object.

7    THE COURT:  That's what he's telling us.  Ask the next

8 question please.

9    MR. VERDUN:  Judge, excuse me.  That's not what he said.

10    THE COURT:  Whatever he said it's in the record.  I heard it.

11 Move on please.

12    MR. HILL:  Q.  I want to go back to the representatives from

13 the Mexican consulate just for a moment.  Did they ask you more

14 than your name and where you were from?

15    MR. VERDUN:  Objection, Judge.  He's already said that they

16 did.

17    THE COURT:  This is cross examination.  It's not a high

18 school debate.  Overruled.  Go on.

19    A.  They gave me a piece of paper.

20    MR. HILL:  Q.  And what -- what did you do with it?

21    A.  Answered the questions that the piece of paper had.

22    Q.  What questions were on the piece of paper?

23    A.  Only about if I was advised of my rights before being

24 arrested, that if I was told that I had a right to an attorney

MAYSONET 3324

1    Q.  At some point did he again leave the room, Detective

2  Guevara?

3    A.  Yes.  He was very bothered.

4    MS. LUQUE-ROSALES:  Judge, I am going to object to that, move

5  to strike.

6    THE COURT:  Overruled.

7    MR. VERDUN:  Q.  At some point after that, were you taken out

8  of that room again?

9    A.  No.

10   Q.  Did other people then come into that room to speak to

11  you?

12   A.  Yes, Detective Guevara and he had Adriana.

13   Q.  And did Adriana come into the room that you were in?

14   A.  Yes.

15   Q.  And what happened when Adriana came into the room?

16   A.  Adriana said that I had done all this.

17   Q.  Did she stay in the room at that point?

18   A.  After she said that to me, she went outside.  The

19  detective took her.

20   Q.  And did anyone else come back into the room with you

21  after a while?

22   A.  Yes.

23   Q.  Who came back in at that point?

24   A.  Trevino.

831

1    Q.  And what happened when detective -- Officer Trevino came

2    in?

3    A.  He changed rooms.

4    Q.  Did he take you to a room where other people were?

5    A.  No.

6    Q.  He did take you to another room though?

7    A.  Yes.

8    Q.  And what happened when you got to that other room?

9    A.  He gave me a sandwich.

10   Q.  After you ate -- you ate the sandwich?

11   A.  Yes.

12   Q.  And that's the first food you'd had since being at the

13   police station?

14   A.  Yes.

15   Q.  After you ate the sandwich, what happened?

16   A.  I was there for a very short time in that room.

17   Q.  And did you go somewhere after that?

18   A.  No.

19   Q.  You stayed in that room?

20   A.  Yes.

21   Q.  Did more people come to speak to you?

22   A.  Yes, yes.  Detective Trevino came in and then another

23   American officer came in.

24   Q.  Did you have a conversation with those two people?

1        A.  Yes.

2        Q.  And during that conversation -- strike that.

3            After that conversation, did someone write down

4   something on a piece of paper?

5        A.  Yes.

6        Q.  And do you know who wrote on the piece of paper?

7        A.  Yes, the American man.

8        Q.  Now, did that American man tell you he was a State's

9   Attorney?

10       A.  Yes.

11       Q.  When the statement was written out -- or strike that.

12           After the statement was written out, did Detective

13  Trevino read that statement to you?

14       A.  No.

15       Q.  After the statement was written out, were you told --

16  strike that.

17           Did you sign the statement?

18       A.  Yes.

19       Q.  And why did you sign the statement?

20       A.  Because he told me to put my initials where he would tell

21  me to and to sign the bottom of each sheet.

22       Q.  Did anyone ever read those pages to you?

23       A.  No.

24       THE COURT:  Just so I'm clear you had no idea what was on the

853

1   paper, is that what you're saying?

2       A.  No.

3       THE COURT:  Was the paper in English or Spanish?

4       A.  In English.

5       THE COURT:  Okay.  Go ahead.

6       MR. VERDUN:  Judge, can I have just one second here please.

7       THE COURT:  Sure.

8                        (Brief pause)

9       THE COURT:  While you're checking your notes or whatever just

10  a couple of questions, Mr. Reyes.  You said that Guevara slapped

11  you according to you whenever you answered the question no, is

12  that correct?

13      A.  Correct.

14      THE COURT:  So if he asked you did you murder Jacinta Soto,

15  you said no and he would slap you?

16      A.  Yes.

17      THE COURT:  When he asked according to you if you murdered

18  Mariano Soto and you said no, he slapped you?

19      A.  Correct.

20      THE COURT:  And when he asked if you kidnapped the two little

21  children, you also said no, is that correct?

22      A.  Yes.

23      THE COURT:  And then he slapped you again according to you?

24      A.  Yes.

1     THE COURT: Okay. Go on.

2     MR. VERDUN: Q. Just to follow up on those questions. After

3 you had been slapped by Detective Guevara, at some point did you

4 give a statement to Detective Guevara?

5     A. Can you repeat the question?

6     Q. After being slapped by Detective Guevara, did you at some

7 point say, yes, I was involved in the incident with the Sotos or

8 words to that effect?

9     A. No. I told him that I wasn't involved in anything, that

10 I didn't know what had happened.

11     MR. VERDUN: Judge, I am going to ask if I could approach the

12 witness please.

13     THE COURT: Sure.

14     MR. VERDUN: I'm going to ask if I can have this document

15 marked Defendant's Exhibit Number 6 for identification.

16     THE COURT: Sure.

17     MR. VERDUN: Q. Mr. Reyes, have you ever seen this eight

18 page document before?

19     A. Yes.

20     Q. Is this the statement that was written out by the

21 American while you were in the room?

22     A. Yes, that's what he was writing.

23     Q. Is this the document that you were told to put your

24 name -- sign your name on?

1    A.  Yes.

2    Q.  Was this document ever read to you?

3    A.  No.

4    Q.  By the way, can you read or write English?

5    A.  No.

6    MR. VERDUN:  Judge, can I have one moment.  I may be done.

7    THE COURT:  Sure.

8                        (Brief pause)

9    THE COURT:  Mr. Reyes, what did you think you were signing,

10   sir?

11   A.  He told me that in order for him to help me I had to sign

12   those papers so I signed them.

13   THE COURT:  And according to you you had no idea what was on

14   the paper?

15   A.  No.

16   THE COURT:  Who was it that told you that would help you to

17   sign it?

18   A.  Detective Trevino.

19   THE COURT:  Go on.

20   MR. VERDUN:  Judge, I have no other questions.  Thank you.

21   THE COURT:  You think this is going to be long whoever is

22   going to question?

23   MR. HILL:  Yes, your Honor.

24   THE COURT:  We'll give everybody a little break.  Miss Rouse,

1   possible you could wind up in the electric chair for this case

2   why did you sign the paper not knowing what it said according to

3   you?

4       A.  Because Detective Trevino told me in order for him to

5   help me I had to sign that paper.

6       Q.  But since you didn't know what the paper said according

7   to you how did you know it would help you?

8       A.  I'm sorry.  Can you repeat the question?

9       Q.  Since Trevino had told you he was trying to help you and

10  since Guevara according to you had told you you might get the

11  electric chair for these crimes how did you think it would help

12  you to sign something you didn't know what it was?

13      A.  Investigating or something similar to that.

14      THE COURT:  All right.  Fine.  Anything else?

15      MR. VERDUN:  No.

16      THE COURT:  All right.  You can step back down.  Mr. Verdun,

17  any additional witnesses you want to present?

18      MR. VERDUN:  Judge, there is one other piece of evidence I

19  would like to bring out.

20      THE COURT:  What's that?

21      MR. VERDUN:  It has to do with Ms. Mejia being brought into

22  the room so I would need her here.

23      THE COURT:  You need her here because there's some dispute as

24  to who Adriana Mejia is?

1    A. I didn't sleep any.

2    Q. And did you have -- you had something to drink, didn't

3  you?

4    A. One Coke.

5    Q. How far did you go in school?

6    A. High school.

7    Q. Did you graduate?

8    A. No.  Just the first grade.

9    Q. You finished the ninth grade, didn't you?

10    A. Correct.

11    MR. HILL: May I have just a moment, Judge?

12    THE COURT:  Sure.

13                  (Brief pause)

14    MR. HILL:  Judge, we have no further questions at this time.

15    THE COURT:  One or two questions then we'll get it back to

16  Mr. -- the Defense.  Can I see the exhibit please.  Not that.  I

17  mean the statement, not the photograph.  Exhibit 6 I think,

18  statement of the Defendant supposedly.  I'll give it back to you

19  in a moment.

20    MR. VERDUN:  Okay.

21                  EXAMINATION

22                BY THE COURT:

23    Q. Mr. Reyes, when the statement, Exhibit Number 6, was

24  taken, there was you, Trevino, and the person you said is the

1    American man, correct?

2        A.  Correct.

3        Q.  Guevara was not there, correct?

4        A.  No.  Correct.

5        Q.  You had said sometime earlier before this statement that

6    Guevara had said to you -- just a moment.  I'll start that again.

7    These might be long questions.  If you wait until I'm finished

8    with the entire thing you won't get them.

9        THE INTERPRETER:  Okay.

10       Q.  Mr. Reyes, you had said that sometime before this

11   statement was given that Detective Guevara had said to you

12   something along the lines of if you don't say something you'll

13   likely get the electric chair.

14       A.  That is correct.

15       Q.  According to you, correct?

16       A.  Correct.

17       Q.  You're saying you did not know what you were signing when

18   you signed Exhibit Number 6?

19       A.  That is correct.

20       Q.  And you say that Trevino had told you he would try and

21   help you in some way or another, correct?

22       A.  Correct.

23       Q.  Since you say you did not know what you were signing in

24   Exhibit Number 6 and Guevara had told you earlier that it was

1    you questions about your health.

2        A.  Yes, correct.

3        Q.  You didn't complain to the attendant that you had been

4    slapped, did you?

5        A.  No, I didn't complain.

6        MR. HILL:  May I have a moment, Judge?

7        THE COURT:  Yes.

8                              (Brief pause)

9        MR. HILL:  May I proceed again, Judge?

10       THE COURT:  Yes, go ahead.

11       MR. HILL:  Q.  I want to go back to the police station.

12       THE COURT:  Don't go back there for long, Mr. Hill.

13       MR. HILL:  I promise, Judge.

14       Q.  At some point in the police station you were

15   fingerprinted.

16       A.  Yes.

17       Q.  And you didn't complain to the person who did the

18   fingerprinting that you had been slapped or abused in any way,

19   did you?

20       A.  No.

21       Q.  During the time that you were in police custody, you had

22   had sandwiches to eat, had you -- didn't you?

23       A.  Just one.

24       Q.  You were allowed to sleep?

1    A.  I'm sorry.  What page?

2    Q.  Okay.

3    THE COURT:  Well, show it to him.  Step up and show it to

4    him.

5    MR. HILL:  Sorry, your Honor.

6    Q.  On the front page of -- of Defense Exhibit Number 6, the

7    top paragraph is in Spanish.

8    A.  Yes.

9    Q.  And there are two requests that follow that and they are

10   also in Spanish, is that correct?

11   A.  Correct.

12   Q.  You put your initials on -- near the first and the second

13   question, is that right?

14   A.  Correct.

15   Q.  You read that paragraph and you read those two sentences.

16   A.  Not at that moment.

17   Q.  But you read them later.

18   A.  Afterwards, yes.

19   Q.  So you did read them.

20   A.  Afterwards when my attorney showed me this paper.

21   THE COURT:  You mean some days later, is that what you mean?

22   A.  Yes, days after.

23   MR. HILL:  Q.  You didn't have any trouble understanding

24   Officer Trevino, did you?

                                860

MAYSONET 3335

1    A.  No.

2    Q.  And you --

3    THE COURT:  He spoke -- he spoke Spanish, correct?

4    A.  Correct.

5    THE COURT:  You spoke Spanish to him.

6    A.  Correct.

7    THE COURT:  All right.  Go on.

8    MR. HILL:  Q.  And you didn't have any trouble understanding

9    Detective Guevara, did you?

10    A.  Two or three words.

11    Q.  Aside from that you didn't have any trouble understanding

12    him.

13    A.  No, not that I remember.

14    Q.  When Detective Trevino -- I am sorry.  When Officer

15    Trevino and the other American were done writing that paper

16    that -- that you have in front of you -- of you, they took a

17    picture of you, didn't they?

18    A.  I think so.

19    MR. HILL:  Your Honor, I'd like to -- first off, I'm going to

20    show it to opposing counsel from a previous hearing.

21    THE COURT:  All right.

22    MR. HILL:  This was marked as People's Exhibit Number C for

23    February 4th.  I just like to keep that same marking if I can.

24    THE COURT:  Sure.

1    MR. HILL:  And may I approach?

2    THE COURT:  Sure.

3    MR. HILL:  Q.  Do you recognize what that is?

4    A.  Yes.

5    Q.  That's a picture of you, isn't it?

6    A.  Yes.

7    Q.  It's a picture of you after -- during the time period --

8    strike that.

9         That's a picture of you during the time period that

10   Officer Trevino and the white American were in the room with you.

11   A.  I'm sorry.

12   Q.  That is the way you looked, that's a picture of you when

13   Trevino was in the room with you and the American was in the room

14   with you.

15   A.  Yes.

16   Q.  Sometime after that you were taken down to the lockup.

17            (Question translated)

18   Q.  I'll rephrase the question, your Honor.

19        You were taken to another part of the police station

20   where a police officer asked you questions about your health.

21   A.  No, not that I remember.

22   Q.  Okay.  At some point you got to Cook County Jail.

23   A.  Yes, afterwards.

24   Q.  And there was an attendant there at the jail that asked

1     A. Yes.

2     Q. You put those there, right?

3     A. Yes.

4     Q. Have you looked at -- take a look at the other pages.

5     A. I'm sorry. One by one?

6     Q. Let's look at Page 3. Aren't there four places there

7 where you put your initials?

8     A. Yes.

9     Q. Page 5 --

10    THE COURT: Before you go on, what were you initialing those

11 for?

12    A. Because Trevino told me to put my initials only where he

13 was indicating.

14    THE COURT: You had no idea what the paper said.

15    A. No.

16    MR. HILL: Q. And is it your testimony that Trevino did not

17 read the pages to you?

18    A. He never read them.

19    Q. The person that -- strike that.

20      Who wrote up that document?

21    A. The American man.

22    Q. And did he write it there in front of you?

23    A. Yes.

24    Q. And were you talking to Trevino while he was writing it

58

1    up?

2        A.  Yes.

3        Q.  And what were you telling Officer Trevino?

4        A.  He would ask me questions.

5        Q.  Like?

6        A.  What part of Mexico I was from, if I had a wife, work, my

7    age, if I had brothers or sisters.

8        THE COURT:  When Trevino was questioning you and the American

9    man was there, you said that Trevino asked you personal questions

10   like where you lived, things like that, correct?

11       A.  Yes, only personal.

12       THE COURT:  The subject never came up during this

13   conversation with Trevino and the American man about the two

14   murders and the kidnappings of the two little children?

15       A.  He just told me not to worry, that he was going to help

16   me.

17       THE COURT:  The subject of the murders of the two people and

18   the kidnapping of the children never came up in this

19   conversation?

20       A.  Not that I remember.

21       THE COURT:  Not that I can remember.  Okay.  Go on.

22       MR. HILL:  Q.  On the -- on the front page of Defendant's

23   Exhibit Number 6, the top paragraph and two questions that follow

24   that --

1  A.  That is correct.

2  Q.  That is your signature towards the top of that document,

3  Defense Exhibit Number 6?

4  A.  Yes, that is.

5  Q.  And at the bottom of each page there -- there's -- there

6  are your signature and/or your initials?  I'm sorry.  Your --

7  your -- your name is on the bottom of each page.

8  A.  That is correct.

9  Q.  You put your name there.

10  A.  Yes.

11  Q.  There are a couple of places in the document where there

12  were some mistakes and there was a cross out.

13  A.  I don't know.

14  Q.  If you look at Page 2, the second page of that document,

15  please turn to it, on the right-hand side close to the top.

16  A.  Yes.

17  Q.  You see your initials there, ADL?

18  A.  Yes.

19  Q.  You put that there.

20  A.  Yes.

21  Q.  Towards the bottom on the left-hand side of that same

22  page.

23  A.  Yes.

24  Q.  You see your initials down there?

1    Q.  And was he sitting or standing when you say he hit you?

2    A.  He was standing.

3    Q.  I want you to stand up and show us how he swung at your

4    face.

5    A.  Like where?  Every time he would ask me questions he

6    would be facing me.

7    Q.  Okay.  And then what happened?

8    A.  And I would answer his question and he would incline a

9    little bit and he would hit my face.

10    Q.  Show -- please -- may the witness please remain standing?

11    THE COURT:  All right.  Remain standing please.

12    MR. HILL:  Q.  Show me how he swung at you.

13    MR. VERDUN:  Judge, for the record he's already moved his

14    right hand in a slashing motion across his body.

15    THE COURT:  Do it again.  I didn't see it.  Show us again,

16    Mr. Reyes.  All right.  Indicating a sideward motion with his

17    open hand.  You can sit down.

18    MR. HILL:  Q.  When you did that sideward motion, was that

19    about the force with which you say Detective Guevara slapped you?

20    A.  That's the way he would do it.  I don't remember how much

21    force he used.

22    Q.  But it hurt, didn't it?

23    A.  Of course, it stung.

24    Q.  It stung pretty good?

1    got hit every time you said no?

2        A.  Yes.

3        Q.  How many times did Detective Guevara hit you?

4        A.  I don't remember.

5        Q.  Was it more than three?

6        A.  Yes.

7        Q.  Was it more than five?

8        A.  I don't remember.

9        Q.  Can you remember how many times you said no?

10       A.  It was several times.

11       Q.  And he would always hit you with an open hand?

12       A.  Yes.

13       Q.  On both sides of your face.

14       A.  Yes.

15       Q.  Can you demonstrate on the table for us how Detective

16   Guevara -- strike that, how hard Detective Guevara hit you?

17       MR. VERDUN:  Objection, asked and answered.

18       THE COURT:  That was regarding something else slightly

19   different before.  Overruled.  He can answer no again if that's

20   his answer.

21       A.  No.

22       MR. HILL:  Q.  Were you sitting or standing when you say

23   Detective Guevara hit you?

24       A.  I was sitting on a bench.

1    A. Open hand.

2    Q. And he hit you pretty hard.

3    A. Yes, somewhat.

4    Q. Can you demonstrate on the table in front of you how hard

5  he hit you.

6    A. I don't remember exactly.

7    Q. You don't remember how hard he hit you.

8    A. No.

9    Q. Well, did he hit you hard enough for you to pass out?

10   A. No, it wasn't that way.

11   Q. Did he hit you hard enough for it to sting?

12   A. Yes.

13   Q. And you can't show us how hard he hit you?

14   A. No. No. I don't know how hard he hit me.

15   Q. But it was hard enough to hurt.

16   A. Yes.

17   Q. And you testified later on about more times that

18  Detective Guevara hit you.

19   A. Yes, correct.

20   Q. I believe you said every time you said no he slapped you.

21   A. Correct.

22   Q. And would he always hit you with an open hand or a closed

23  fist?

24   A. With his open hand.

50

MAYSONET 3343

1   Q.  What side of your -- would he hit your face?

2   A.  Yes.

3   Q.  And what side of your face would he hit you on?

4   A.  On both sides.

5   Q.  So both your right side and your left side.

6   A.  Correct.

7   Q.  How many times did he hit you that time?

8   MR. VERDUN:  Objection.  What time?

9   THE COURT:  Sustained.  I'm not sure what you mean by that

10  time.

11  MR. HILL:  Okay.  That's actually -- I apologize.

12  Q.  How many -- how many times did he hit you -- how many

13  times did you say no that followed up with a hit?

14  MR. VERDUN:  Judge, I'm going to have the same objection.

15  There's been testimony of at least four or five different

16  conversations.

17  THE COURT:  It was my impression he said there was one

18  conversation where he was asked various things.  He said no.  At

19  that point he said Detective Guevara hit him.  I think we're

20  talking about the same time.  Overruled.  Ask it again please.

21                      (Brief pause)

22  THE COURT:  Mr. Hill, you can ask the question again.

23  MR. HILL:  Okay.

24  Q.  You remember the conversation when you said on direct you

MAYSONET 3344

1    A.  My face, yes.

2    Q.  Did you ever touch your face to see -- to feel the warmth

3  in your cheek?

4    A.  I would just feel some hotness in my cheeks.

5    Q.  And after you say Detective Guevara slapped you, you

6  still didn't admit to participating in any crime, is that right?

7    A.  Correct.

8    Q.  When you're answering questions from your lawyer, you

9  talked about conversations you had with Detective Trevino.

10    A.  Correct.

11    Q.  And I believe you said on direct examination that Trevino

12  was the first police officer to tell you why you were still

13  there -- still there at the police station.

14    A.  That is correct.

15    Q.  By the way, at some point before Trevino told you that,

16  you'd already had a conversation with Detective Guevara or some

17  other detectives?

18    A.  Yes, several times.

19    Q.  Okay.  And -- and some of those detectives -- someone

20  asked you to empty your pockets.

21    A.  Yes, once.

22    Q.  In your pocket -- one of your pockets was a piece of

23  paper with a name Norma Salazar and a telephone number.

24    A.  Correct.

1    Q.  You told this Court on direct examination that when
2  Trevino told you what was going on -- it's going to be a long
3  question.  You probably better do that.

4                    (Question translated)

5    Q.  Trevino said that you're being accused of being a part of
6  the killing of the Sotos and that you were paid money for it.

7    A.  Correct.

8    Q.  That's all he said.

9    A.  That's all he said.

10  THE COURT:  Well, I'm not sure if he was -- if he was asking
11  a question back so ask it so his answer is clear as to what he
12  means.  It sounded to me like he was saying is that all he said
13  and you need a question back.

14  MR. HILL:  Okay.  I'm sorry.

15    Q.  Isn't that all that Detective Trevino told you?

16    A.  It's that and two or three words more.

17    Q.  And what were the two or three words more?

18    A.  I don't remember.

19    Q.  Did the two or three words have anything to do with the
20  crime?

21    A.  I don't remember.

22    Q.  Later on you said that Detective Guevara brought Adriana
23  to the room you were in, do you remember that?

24    A.  Yes.

1    Q.  And what did Adriana say?

2    A.  That I had done all this.

3    Q.  And that's all that she said, right?

4    A.  That's all, correct.

5    MR. HILL:  Can I have a moment, Judge?

6    THE COURT:  Sure.

7                        (Brief pause)

8    MR. HILL:  Your Honor, may I approach the witness?

9    THE COURT:  Sure.

10   MR. HILL:  Q.  I'd like to show you what has already been

11   marked as Defendant's Number 6 for the purposes of today's

12   hearing.  You recognize what that is, right?

13   A.  Yes.

14   Q.  Mr. Verdun showed you that earlier today.

15   A.  Yes.

16   Q.  That is a handwritten statement that you say you didn't

17   give.

18   A.  Correct.

19   Q.  And did you say words about the crime to Detective

20   Trevino and the other man that was in the room with you?

21   A.  No.

22   Q.  So if that document has words that you supposedly said

23   about committing the crime, then you're saying that you didn't

24   say those words, is that correct?

350

MAYSONET 3348

1   STATE OF ILLINOIS )
                ) SS:
2   COUNTY OF C O O K )
       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
3         COUNTY DEPARTMENT - CRIMINAL DIVISION
   THE PEOPLE OF THE         )
4   STATE OF ILLINOIS,       )
            Plaintiff,   )
5                    )
      -vs-           ) No. 98-CR-12240
6                    )
   ARTURO REYES and       )
7   GABRIEL SOLACHE,       )
          Defendants.  )
8            POST-CONVICTION HEARING

9        REPORT OF PROCEEDINGS had before the

10  HONORABLE JAMES M. OBBISH, Judge of the Criminal

11  Division, heard on the 14th day of February, 2013.

12    APPEARANCES:
          HON. ANITA M. ALVAREZ,
13        State's Attorney of Cook County, by:
          MR. JAMES PAPA,
14        MR. KURT SMITKO, and
          MS. CELESTE STACK,
15        Assistant State's Attorneys,
            Appeared for the People;
16
          MR. DAVID SAUNDERS and
17        MR. ANDREW VAIL,
          Attorneys at Law,
18          Appeared for Defendant Reyes;

19         MS. KAREN DANIEL,
          MS. JANE RALEY, and
20        MS. ERIN TOPP,
          Attorneys at Law,
21           Appeared for Defendant Solache.

22  Lisa M. Hughes, CSR
   Official Court Reporter
23  2650 South California, Room 4C02
   Chicago, Illinois 60608
24  License No. 084-004240

-1-

MAYSONET 3349

1                    I N D E X

2        IN RE:  People vs. Arturo Reyes
                  & Gabriel Solache
3             CASE NO:  98-CR-12240
            DATE:  February 14, 2013
4                  PAGES:  1-88

5        COURT REPORTER LISA M. HUGHES, CSR

6

7    DEFENSE WITNESSES:          DX   CX   RDX   RCX

8    ARTURO DELEON REYES

9    By Mr. Saunders            4

10   By Ms. Stack                    28

11

12   REPORTER'S CERTIFICATE:   P. 88

13

14

15

16

17

18

19

20

21

22

23

24

——————————————— 2 ———————————————

MAYSONET 3350

1    THE CLERK:  Gabriel Solache and Arturo Reyes.

2    THE COURT:  This is the case of Solache and

3    Reyes, a third stage post-conviction hearing.

4        The Court would like the two gentlemen

5    from Jenner to identify yourselves, please.

6    MR. SAUNDERS:  David Saunders, S-a-u-n-d-e-r-s,

7    on behalf of Arturo Reyes.

8    MR. VAIL:  Andrew Vail, last name V-a-i-l.

9    THE COURT:  We will be resuming the hearing.

10   Both of the petitioners are present in court.  All

11   the attorneys previously identified at the start of

12   yesterday's hearing are here as well today.

13       We have an official court interpreter who

14   will assist both of the defendants or petitioners,

15   rather.  One of whom is going to be the next witness.

16       So if you could raise your right hand so

17   that you might be sworn, please.

18           (Christina Deleon was sworn as

19            interpreter to translate all questions

20            and answers and statements by the

21            witness, Court, and counsel from

22            English to Spanish and from Spanish to

23            English.)

24   THE INTERPRETER:  For the record, Christina

—3—

MAYSONET 3351

1    Deleon.

2         THE COURT:  Thank you again for your help

3    today.

4              Next witness, please.

5         MR. SAUNDERS:  We would call Arturo Reyes to

6    the stand.

7                   (Witness duly sworn through

8                   interpreter.)

9         THE COURT:  Mr. Solache, can you hear the

10   interpreter?

11        DEFENDANT SOLACHE (Through Interpreter):  Yes.

12        THE COURT:  You may proceed.

13                   ARTURO DELEON REYES,

14   a witness called herein, having been first duly

15   sworn, was examined and testified through interpreter

16   as follows:

17                   DIRECT EXAMINATION

18                        BY

19                   MR. SAUNDERS:

20   Q.   Good morning, Mr. Reyes.

21             Please state your name and spell your

22   last name for the record.

23   A.   Arturo Deleon Reyes, R-e-y-e-s.

24   Q.   I would like to briefly cover some

                         — 4 —

1   background.

2              How old are you?

3   A.   38.

4   Q.   What was the highest level of school that

5   you finished?

6   A.   First year of high school.

7   Q.   How old were you in April of 1998?

8   A.   23.

9   Q.   When did you come to the United States?

10  A.   December of 1997.

11  Q.   Where did you live before coming to the

12  United States?

13  A.   Mexico.

14  Q.   Had you ever been arrested in Mexico?

15  A.   No.

16  Q.   Why did you come to the United States?

17  A.   So I can get my family ahead and also so I

18  can build my own home.

19  Q.   When you came to the United States, did your

20  family stay in Mexico?

21  A.   Yes.

22  Q.   Did you stay in touch with them while you

23  were here?

24  A.   Yes, through letters and also by phone.

-5-

MAYSONET 3353

```
1        Q.   Did you send them anything?

2        A.   Yes, money from my work.

3        Q.   When you came to the United States, were you

4   able to speak English?

5        A.   No.

6        Q.   When you came to the United States, were you

7   able to read English?

8        A.   No.

9        Q.   While in the United States, were you

10  employed?

11       A.   Yes.

12       Q.   Where were you employed?

13       A.   A meat packing company.

14       THE INTERPRETER:   I'm not picking up, your

15  Honor, the name.

16  BY MR. SAUNDERS:

17       Q.   Mr. Reyes, was the name of the meat packing

18  plant Miniat?

19       A.   Yes.

20       THE COURT:   How do you spell that?  Can you

21  spell it, Mr. Saunders.

22       MR. SAUNDERS:   I believe M-i-n-i-a-t, Miniat.

23       THE COURT:   Okay.

24
```

MAYSONET 3354

1  BY MR. SAUNDERS:

2      Q.  How long were your work shifts at Miniat?

3      A.  Nine or plus hours.

4      Q.  Did you go to work at Miniat on March 27,

5  1998?

6      A.  Yes.

7      Q.  Do you remember approximately when your

8  shift ended on that day?

9      A.  I don't remember, but I got out at night.

10     Q.  When you got off your shift the night of

11 March 27, 1998, what did you do next?

12     A.  I went home from where I was renting, and

13 then I went to sleep.

14     Q.  Did you leave your apartment the night of

15 March 27th or the morning of March 28, 1998?

16     A.  No.

17     Q.  Prior to April 3, 1998, had you ever been

18 arrested in the United States?

19     A.  No.

20     Q.  Now, I want to take a step back and talk

21 about some of the other individuals associated with

22 your case.  Do you know Gabriel Solache who is here

23 in the courtroom today?

24     A.  Yes.

—7—

1    Q.  How did you come to know Mr. Solache?

2    A.  We lived in the same house.

3    Q.  Do you know Adrianna Mejia?

4    A.  Yes.

5    Q.  How did you come to know Ms. Mejia?

6    A.  I met her for the first time when I started

7  renting at her house.

8    Q.  Did you know a Mariano Soto?

9    A.  No.

10    Q.  Ever met him?

11    A.  No.

12    Q.  Did you know a Jacinta Soto?

13    A.  No.

14    Q.  Ever met her?

15    A.  No.

16    Q.  Do you know a Detective Reynaldo Guevara?

17    A.  Yes.

18    Q.  How did you come to know Detective Guevara?

19    A.  He interrogated me at the police station,

20  Area 5.

21    Q.  Now, Mr. Reyes, I would like to talk about a

22  statement that the State alleges you voluntarily gave

23  after interrogation by Detective Guevara.

24    MR. SAUNDERS:  Let the record reflect I am

—8—

MAYSONET 3356

1     sharing with the State a document which has been

2     premarked as Reyes Exhibit 1.

3         MS. STACK:  Acknowledge receipt.

4         MR. SAUNDERS:  May I approach?

5         THE COURT:  You don't need to ask my permission

6     to approach.

7         MR. SAUNDERS:  Thank you.

8              I am also handing the witness and if your

9     Honor would like a copy.

10         THE COURT:  That is No. 1?

11         MR. SAUNDERS:  Yes, your Honor.

12     BY MR. SAUNDERS:

13         Q.  Mr. Reyes, I just handed you what has been

14     premarked for identification as Reyes Exhibit 1.  Do

15     you recognize this document.

16              And please, if the interpreter could

17     help you recognize it, if necessary.

18         THE COURT:  I don't know exactly what you mean

19     by that.  I don't know that the interpreter does

20     either.

21              The question right now is does he

22     recognize the document?

23         MR. SAUNDERS:  Correct.

24         THE WITNESS:  Yes.

—9—

BY MR. SAUNDERS:

Q.   What is it?

A.   It is the papers that I signed at the police station.

Q.   Is the document marked for identification as Reyes Exhibit 1 an original or a copy?

A.   It is a copy.

Q.   Do you believe that is a fair and accurate copy of the original?

MS. STACK:   We will stipulate that is a copy of the statement.

THE COURT:   Accept the stipulation?   All right.

MR. SAUNDERS:   Thank you, your Honor.

At this time, we would ask that Reyes Exhibit 1 be admitted into evidence.

MS. STACK:   No objection.

THE COURT:   It will be admitted.

(Reyes Exhibit No. 1 was received in

evidence.)

BY MR. SAUNDERS:

Q.   Mr. Reyes, do you recall testifying in a suppression hearing and trial for your criminal case?

A.   Yes.

Q.   Prior to today, did you have a chance to

—10—

1    review your testimony from those prior times?

2        A.   Yes.

3        Q.   If you recall, what did you say regarding

4    whether you had, in fact, said the statements

5    contained in Reyes Exhibit 1?

6        MS. STACK:   Objection, Judge.

7        THE COURT:   Sustained.

8             No question is pending.  He will ask

9    another question.

10   BY MR. SAUNDERS:

11       Q.   Do you recall testifying at your trial

12   regarding Exhibit 1?

13       MS. STACK:   Objection.  What is the relevance

14   whether he recalls testifying?

15       THE COURT:   I will allow that.

16       THE WITNESS:   Yes.

17   BY MR. SAUNDERS:

18       Q.   What did you say about your knowledge of the

19   content of Reyes Exhibit 1?

20       MS. STACK:   Objection, Judge.

21       THE COURT:   That I would sustain.

22       THE WITNESS:   I denied saying --

23       THE COURT:   There is no question pending right

24   now.

—11—

1    BY MR. SAUNDERS:

2        Q.  Mr. Reyes, was the testimony that you gave

3    at trial regarding Reyes Exhibit 1 accurate?

4            MS. STACK:  Objection, Judge.

5            THE COURT:  Sustained.

6            MR. SAUNDERS:  One moment, Judge.

7    BY MR. SAUNDERS:

8        Q.  Mr. Reyes, did you understand certain

9    portions of Reyes Exhibit 1 when you signed the

10   document?

11           MS. STACK:  Judge, I am going to object.

12           THE COURT:  Overruled on that one.

13           THE WITNESS:  Yes.

14   BY MR. SAUNDERS:

15       Q.  Did you, in fact, say some of the statements

16   in Reyes Exhibit 1?

17           THE INTERPRETER:  I'm sorry?

18   BY MR. SAUNDERS:

19       Q.  Did you, in fact, say some of the statements

20   in Reyes Exhibit 1?

21           MS. STACK:  Objection.  He is leading.  This is

22   his own witness.  These are things he has testified

23   about before and given testimony under oath.  If he

24   is going to change it today, there is a way to put it

MAYSONET 3360

1   in.

2           THE COURT:  I will overrule the objection.

3           THE WITNESS:  Yes.

4   BY MR. SAUNDERS:

5       Q.  Now, I would like to walk through parts of

6   your statement and ask you whether you, in fact, said

7   some of those things.

8       A.  Yes.

9           MR. SAUNDERS:  Okay.  Your Honor, because the

10  document marked as Reyes Exhibit 1 is in English, I

11  will ask the interpreter to help Mr. Reyes to follow

12  along.

13          THE COURT:  Well, I think all she can really do

14  is interpret questions that you ask.

15          MR. SAUNDERS:  Yes, your Honor.  I understand.

16  BY MR. SAUNDERS:

17      Q.  Now, on the second page, Mr. Reyes, of the

18  document marked as Reyes Exhibit 1, Mr. Reyes, on

19  February 27, 1998, did Adrianna Mejia offer you $600

20  to steal a baby?

21      A.  No.

22      Q.  Did you tell that to the police?

23      A.  Yes.

24      Q.  Now, Mr. Reyes, did you tell the police that

—13—

1 on March 26, 1998, Adrianna Mejia told you that she

2 had found a friend with a pretty baby?

3   MS. STACK: I am sorry. I couldn't hear the

4 last part of Mr. Saunders' question.

5   MR. SAUNDERS: I would be happy to repeat it.

6 BY MR. SAUNDERS:

7   Q. Mr. Reyes, did you tell the State that on --

8 tell the police that on March 26, 1998, Adrianna told

9 you that she found a friend with a very pretty baby?

10   A. Yes.

11   Q. Was that true?

12   A. No.

13   Q. Now, early in the morning -- Mr. Reyes, did

14 you tell the police that early in the morning on

15 Saturday, March 28, 1998, around 1:30 a.m. Gabriel

16 Solache picked you up behind the house on Mozart?

17   A. I'm sorry. I didn't understand the

18 question.

19   Q. Did you tell the police that Mr. Solache

20 picked you up behind the house on Mozart on March 28,

21 1998?

22   A. Yes.

23   Q. Did Mr. Solache, in fact, pick you up behind

24 the house on Mozart on March 28, 1998?

—14—

```
 1      A.   No.

 2      Q.   Mr. Reyes, on that same night, March 28,

 3  1998, did you and Mr. Solache pick up Adrianna Mejia

 4  at around 2:00 a.m.?

 5      A.   No.

 6      Q.   Did you tell that to the police?

 7      A.   Yes.

 8      Q.   Mr. Reyes, on the evening of March 27, 1998,

 9  or the morning of March 28, 1998, did you stab a lady

10  to quiet her down?

11      A.   No.

12      Q.   Did you tell that to the police?

13      A.   Yes.

14      Q.   Mr. Reyes, on that same night of March 27th

15  and the morning of March 28, 1998, did you grab a

16  baby or grab a boy?

17      A.   No.

18      Q.   Did you tell that to the police?

19      A.   Yes.

20      Q.   Mr. Reyes, did you kidnap any children the

21  night of March 28, 1998?

22      A.   No.

23      Q.   Now, Mr. Reyes, the back of what has been

24  marked as Reyes Exhibit 1 you will see some
```

—15—

1  photographs.  Did you identify these photos for the

2  police?

3      A.   Yes.

4      Q.   Why?

5      THE COURT:  Is there a multiple number of

6  photos.

7      MR. SAUNDERS:  Yes, there are several

8  photographs at the back.

9      THE COURT:  Does your question pertain to all

10  of them?

11      MR. SAUNDERS:  Yes, your Honor.

12          If I can, your Honor?

13      THE COURT:  Go ahead.

14  BY MR. SAUNDERS:

15      Q.   Why did you identify these photos to the

16  police?

17      A.   Detective Trevino told me to sign them.

18      Q.   Had you ever seen Mariano Soto before being

19  shown the picture?

20      A.   No, never.

21      Q.   Mr. Reyes, did you tell the police that you

22  were treated very well by them and by Assistant

23  State's Attorney O'Malley much more than you

24  expected?

—16—

1    A.   Yes.

2    Q.   Was that statement true?

3    A.   No.

4    Q.   What was the truth?

5    A.   I was mistreated by the police.  I was

6  slapped in the face.

7    Q.   Who slapped you in the face?

8    A.   Detective Guevara.

9    Q.   Mr. Reyes, you went through a number of

10  statements which were in Reyes Exhibit 1 that you

11  testified did not actually happen.  Why did you say

12  those things?

13    A.   Because Detective Guevara slapped me.

14    Q.   Now, Mr. Reyes, if you understood the

15  majority of Reyes Exhibit 1, why did you sign it?

16    MS. STACK:  Objection, asked and answered.

17    THE COURT:  Overruled.

18    THE WITNESS:  Detective Trevino told me that in

19  order for him to be able to help me, I needed to sign

20  those documents.

21  BY MR. SAUNDERS:

22    Q.   Mr. Reyes, why are you telling us this

23  today?

24    A.   Because that's the truth.

—17—

MAYSONET 3365

1    Q.   Now, Mr. Reyes, you mentioned previously

2    that Detective Guevara slapped you.  I would like to

3    talk about some of the interrogations that you had

4    with Detective Guevara.

5          MS. STACK:  Is that a question?  Objection.

6          THE COURT:  Rephrase.

7    BY MR. SAUNDERS:

8    Q.   Mr. Reyes, where were you the morning of

9    April 3, 1998?

10         THE INTERPRETER:  What year?

11         MR. SAUNDERS:  1998.

12         THE WITNESS:  At the house where I was renting.

13   BY MR. SAUNDERS:

14   Q.   What happened that morning?

15   A.   I woke up because there was an argument in

16   the house.

17   Q.   What did you do?

18   A.   I went to the living room.

19   Q.   What did you see?

20   A.   I saw Adrianna crying and asking Rosauro not

21   to do anything or harm the child.

22   Q.   What happened next?

23   A.   I grabbed the little boy so Rosauro would

24   not do anything to him.

-18-

MAYSONET 3366

1   Q.   What ultimately happened?

2   A.   We went to the police station.

3   Q.   Did you do that voluntarily?

4   A.   Yes.

5   Q.   Which police station did you go to?

6   A.   District 8.

7   Q.   What happened when you got to the police

8   station?

9   A.   A police officer asked me questions.

10  Q.   After he asked you questions, what happened?

11  A.   They moved us to Area 5.

12  Q.   What happened when you arrived at Area 5?

13  A.   They put me in a small room.

14  Q.   Can you describe that room for us.

15  A.   Yes.  It was a small room with a chair and a

16  bench like up in the corner so one can sit down.

17  Q.   Approximately how long did you sit in that

18  room in Area 5 by yourself?

19  A.   Some hours.

20  Q.   When was the first time someone came to talk

21  to you?

22  A.   Detective Guevara.

23  Q.   What happened when Detective Guevara came

24  in?

—19—

MAYSONET 3367

1    A.  First thing was that he slapped me.  He

2 asked me why did I do it, and then he handcuffed me.

3    Q.  Where did he slap you?

4    A.  In my face.

5    Q.  How many times did he hit you?

6    A.  At that moment, once.

7    Q.  You testified that Detective Guevara asked

8 you why you did it.  Do you know what Detective

9 Guevara was referring to?

10    A.  No.

11    Q.  After Detective Guevara handcuffed you, what

12 happened?

13    A.  He asked me one or two questions, and then

14 he left.

15    Q.  When did you next see Detective Guevara?

16    A.  Right after that, he came back with the

17 paper, and he told me to sign it.

18    Q.  What happened next?

19    A.  I signed the paper and he left.

20    Q.  Who was the next person to come into the

21 room?

22    A.  Detective Trevino.  He came into the room

23 and changed me to another room.

24    Q.  Who was in this new room?

—20—

MAYSONET 3368

1      A.   Detective Guevara and another police.

2      Q.   What happened in this room?

3      A.   Detective Guevara started writing on the

4  board, and he asked me if I recognized what he was

5  writing on the board.

6      Q.   What did you say?

7      A.   I said no.

8      Q.   Did Detective Guevara say anything else to

9  you?

10     A.   Yes.

11     Q.   What did he say?

12     A.   That I was defending other people, and more

13 than likely, they were going to give me the electric

14 chair.

15     Q.   What was your reaction to Detective Guevara

16 telling you that you might get the electric chair?

17     A.   I got scared because I didn't do anything.

18     Q.   If you were innocent, why did the threat of

19 the electric chair scare you?

20     MS. STACK:   Objection.  If you were innocent,

21 why would you --

22     THE COURT:   Sustained.

23 BY MR. SAUNDERS:

24     Q.   Why did the threat of the electric chair

— 21 —

1  scare you?

2       MS. STACK:  Objection, Judge.

3       THE COURT:  Sustained.

4  BY MR. SAUNDERS:

5       Q.   What happened next, Mr. Reyes?

6       A.   They brought me back to the room where I was

7  at.

8       Q.   What was the next time you saw Detective

9  Guevara?

10      A.   He came back with some pants.  He told me to

11  empty out my pocks and to change my pants.

12      Q.   Did you?

13      A.   Yes.

14      Q.   What happened then?

15      A.   He left.

16      Q.   When was the next time you saw Detective

17  Guevara?

18      A.   He came back a bit upset.  He started asking

19  me questions, and every time that I would say no, he

20  would give me a hard slap in the face.

21      Q.   How long did Detective Guevara question you

22  this time?

23      A.   For a good time.

24      Q.   What kind of questions was Detective Guevara

—22—

MAYSONET 3370

1  asking you?

2       A.  He would ask me about the Soto family.

3       Q.  How many times did Detective Guevara hit

4  you?

5       A.  Many times.

6       Q.  When Detective Guevara finished asking you

7  questions, what happened?

8       A.  He left.

9       Q.  What was the next time you saw Detective

10  Guevara?

11      A.  He came back with Adrianna Mejia.

12      Q.  What happened then?

13      A.  Adrianna Mejia said that I had done

14  everything.

15      Q.  Did you know at the time what Ms. Mejia

16  meant when she said that you had done everything?

17      A.  No.

18      Q.  What happened next?

19      A.  They left.

20      Q.  Who was the next person to come into your

21  room?

22      A.  Detective Trevino came and put me in another

23  room.

24      Q.  What happened in this other room?

—23—

MAYSONET 3371

1      A.   After awhile, a state's attorney came.

2      Q.   When both Officer Trevino and the state's

3  attorney were in the room, what happened?

4      A.   Trevino started interpreting things that he

5  gave me examples of what I could say.

6      Q.   What was the state's attorney doing in this

7  room?

8      A.   Writing.

9      Q.   Other than writing, was the state's attorney

10 doing anything else?

11     A.   No.

12     Q.   You said Officer Trevino was interpreting.

13 Who was he interpreting?

14     A.   Me.

15     Q.   Who were you talking to?

16     A.   With the state's attorney.

17     Q.   Was the state's attorney asking you

18 questions?

19     A.   Yes.

20     Q.   Were you able to read what the state's

21 attorney wrote on this piece of paper?

22     A.   No, I never saw those papers.

23     Q.   By the time Officer Trevino moved you into

24 this room with the state's attorney, do you have any

—24—

1   idea how long you had been in Area 5?

2       A.   Yes, almost three days.

3       Q.   Now, when the state's attorney finished

4   writing, what happened?

5       A.   The state's attorney read the document, but

6   I don't remember if Detective Trevino said one word

7   or didn't say anything at all.

8       Q.   What did you do?

9       A.   Then Detective Trevino asked me to sign

10  those papers.

11      Q.   Was the document you signed at the police

12  station and that the state's attorney wrote down what

13  we previously marked as Reyes Exhibit 1?

14      A.   Yes.

15      Q.   Prior to signing Reyes Exhibit 1, did you

16  ever tell anyone that you had killed the Sotos?

17      A.   No.

18      Q.   Prior to signing Exhibit 1, Reyes Exhibit 1,

19  did you ever tell anyone that you had kidnapped the

20  Soto children?

21      A.   No.

22      Q.   At your trial, did you tell anyone that you

23  ever killed the Sotos?

24      A.   No.

—25—

1    Q.  At your trial, did you ever tell anyone that

2  you kidnapped the Soto children?

3    A.  No.

4    Q.  After your trial, have you told anyone that

5  you killed the Sotos?

6    MS. STACK:  Objection, Judge.  What is the

7  relevance of prior consistent statements with

8  whatever he is trying to say?

9    THE COURT:  Sustained.

10  BY MR. SAUNDERS:

11    Q.  Arturo, were you involved in the kidnapping

12  of the Soto children?

13    A.  No.

14    Q.  Were you involved in the death of Mariano or

15  Jacinta Soto?

16    A.  No.

17    MR. SAUNDERS:  One moment, your Honor.

18    Nothing further at this time.

19    THE COURT:  All right.  What about counsel for

20  Mr. Solache; do you intend to ask any questions?

21    MS. DANIEL:  No, your Honor, not at this time.

22    THE COURT:  How long do you anticipate?

23    MS. STACK:  There is a lot here.

24    THE COURT:  I am contemplating whether it is

—26—

1    time to take a break.

2         MS. STACK:  It might be.  Plus I have to take

3    some medicine.

4         THE COURT:  Why don't we take a lunch break

5    now.  The officers can use that time as well.

6              We will resume at ten after 1:00 then so

7    that everybody has a one-hour lunch.

8              (A luncheon recess was taken.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

—27—

MAYSONET 3375

1      THE CLERK:  Arturo Reyes and Gabriel Solache.

2      THE COURT:  The record will reflect all parties

3  are present again.  Again, we have the assistance of

4  the court interpreter.

5      State, if you are ready, you may have in

6  cross-examination.

7      MS. STACK:  Thank you, judge.

8                CROSS-EXAMINATION

9                      BY

10               MS. STACK:

11    Q.  Mr. Reyes, you came to the United States

12  when you were 23 years old, correct?

13    A.  Yes.

14    Q.  And you came here to support your family who

15  stayed behind in Mexico, correct?

16    A.  Yes.

17    Q.  Who were you supporting?

18    A.  My wife that was nine months pregnant, my

19  daughter that was three years old, my brothers, and

20  my father.

21    Q.  How many brothers do you have?

22    A.  I have seven brothers and three sisters.

23    Q.  You were supporting all seven brothers?

24    A.  I wanted them to try and go to school.

—28—

MAYSONET 3376

1    Q.   So they were younger than you?

2    A.   Yes.  I don't have a mother.

3    Q.   Are you the oldest?

4    A.   From the men, yes.

5    Q.   When you were arrested, you had been living

6 here a little over a year?

7    A.   No.

8    Q.   How long have you been living here?

9    A.   Only months.

10    Q.   Only months?

11    A.   Yes.

12    Q.   Today how much -- strike that.

13          Can you speak English today?

14    A.   A part of it, but it's not perfect.

15    Q.   Can you read English today?

16    A.   Very little.  I still have problems.

17    Q.   Are you able to read the transcripts from

18 the trial?

19    A.   I only understand parts.

20    Q.   What parts do you have trouble with?

21    A.   Well, reading the majority of the parts.

22    Q.   After you were convicted, you filed a

23 post-conviction petition, correct?

24    A.   Yes.

MAYSONET 3377

1      Q.   I am going to show you what I will mark as

2    Respondent's No. 3.  I will give copies for counsel.

3         MS. STACK:  If counsel needs them.

4              For the record, this is just the written

5    portion and not the exhibits.

6              May I give a copy to the witness, Judge.

7         THE COURT:  Sure.

8    BY MS. STACK:

9      Q.   Mr. Reyes, here is a copy of the petition

10   that you filed.  Can you take a moment and review it.

11     A.   Yes.

12     Q.   Do you recognize it?

13     A.   Yes.

14     Q.   Is that your signature on the front page?

15     A.   I don't see any -- I don't see anything on

16   the front.

17     Q.   Mr. Reyes, I am going to give you a copy

18   that has the proof of service attached to the front.

19        THE COURT:  Do you want to substitute that as

20   Exhibit No. 3?

21        MS. STACK:  Yes, please, Judge.

22        THE COURT:  Do the parties have a consistent

23   copy?

24        MR. SAUNDERS:  No, your Honor.

—30—

1        THE COURT:  Ms. Stack, make sure that counsel

2    has them.

3        MS. STACK:  Yes, Judge.  I made multiple

4    copies.

5        THE COURT:  Give them the same copy of what you

6    are showing the witness and which is going to be

7    offered into evidence.

8        MS. STACK:  Judge, we have two copies.  What is

9    missing are five pages; proof of certification,

10   notice of filing, motion for leave to file and

11   proceed in forma pauperis, motion for evidentiary

12   hearing, and motion for appointment of counsel.  We

13   will get some copies made.

14       THE COURT:  There is a Xerox machine in the

15   back.

16       Before you begin, if you want to take a

17   look at what they have shown your client.

18       MR. SAUNDERS:  Yes, please.

19       THE COURT:  Is that identical?

20       MS. STACK:  Yes, Judge.

21       THE COURT:  Why don't you take a quick look at

22   that so she can go ahead with the cross.  If it is

23   agreeable to you --

24       MS. STACK:  I can move to a different part of

-31-

MAYSONET 3379

1   the document.

2       MR. SAUNDERS: Your Honor, if we could have a

3   moment.

4       THE COURT: Just give him a moment.

5       MS. STACK: Sure.

6       MR. SAUNDERS: That is fine, Judge.

7   BY MS. STACK:

8     Q. Could you turn to what is marked page No. 3,

9   statement of facts it is entitled.

10      MR. SAUNDERS: Your Honor, this is outside the

11   scope of the direct examination.

12      MR. VAIL: More troubling, your Honor, may be

13   the fact that he has already testified that in

14   response to her questions that he does not read

15   English. So it is giving him a document that is in

16   English and pointing him to it. I don't know, but I

17   assume there is going to be questions asked about

18   what is in the document. That doesn't work, your

19   Honor.

20      MS. STACK: Your Honor, this is a pro se

21   petition. It is the reason we are here today. It is

22   signed and attested to by Mr. Reyes in about ten

23   places. Those first set of pages are all signed and

24   sworn to by him. This is a document he created while

MAYSONET 3380

1   a pro se inmate, and it is the reason that we are

2   here today, and it is his signature that is attested

3   to, sworn to all through this.  This is his version

4   of events.

5           THE COURT:  All right.  The objection is

6   overruled.

7           MR. VAIL:  Who is going to translate the

8   document to him that she is referring to?

9           THE COURT:  Well, we will deal with the

10  questions on a question by question basis.

11          MS. STACK:  Right.

12          MR. VAIL:  Thank you, your Honor.

13  BY MS. STACK:

14      Q.  Mr. Reyes, were you able to find the

15  statement of facts page that you drafted?

16          MR. VAIL:  Objection as to whether he drafted.

17  That is not his testimony.

18          THE COURT:  Overruled.

19          THE WITNESS:  Page No. 3?

20  BY MS. STACK:

21      Q.  Yes.  This is page No. 3 that has your name

22  on the top.  I, Arturo D. Reyes, pro se, do attest to

23  the following statement as factual and true.

24          MR. VAIL:  I am going to have a standing

—33—

1   objection for the record to ask him to acknowledge

2   what this says in English when he has already

3   testified he does not read English.

4        THE COURT:  He has also testified this is the

5   petition he signed, post-conviction petition that he

6   filed.

7        MS. STACK:  He also testified that he reads

8   partial English.

9        MR. VAIL:  The question should be do you

10  understand this first sentence and could you read it

11  for us and have him try to do it if he can, I guess,

12  your Honor.

13       THE COURT:  That may not be her first question.

14       Ask the question and see where we go.

15       MS. STACK:  What I will do, Judge, is separate

16  out as part of Respondent's No. 3 the three pages.

17  They are page Nos. 3, 4, and 5.  In English it is

18  entitled statement of facts, and it has -- the first

19  sentence has already been translated.

20  BY MS. STACK:

21       Q.   I will get you back to where you were.

22       MS. STACK:  For the record, I have directed

23  Mr. Reyes who has a complete copy of his filing to

24  the three pages that he filed in the Circuit Court

—34—

1    and that is the basis for our presence here today.

2    BY MS. STACK:

3        Q.   Mr. Reyes, will you examine those three

4    pages that are your statement of facts and --

5            THE COURT:  Just so the record is clear, these

6    are three pages within his petition which have been

7    identified as a statement of facts, and it goes on

8    for three pages.

9            MS. STACK:  Right.  Judge, I can give you a

10   copy since it is part of the Court record already.

11           THE COURT:  That is fine.  I just want to make

12   sure he understands and everyone is on the same page

13   as to what he is looking at.  You can give me a copy

14   as well if you would like.

15           MS. STACK:  Let the record reflect that

16   Mr. Reyes is examining the document.

17           THE COURT:  He has it in front of him.

18   BY MS. STACK:

19       Q.   Did you file this document, this

20   post-conviction petition?

21       A.   Yes.

22       Q.   Explain to myself and the Court how you put

23   together this rather voluminous pleading.

24       A.   These three pages, I first wrote them in

-35-

1    Spanish.   I went to the library.   Somebody translated

2    them in English, and then they put them on the

3    machine.

4          Q.   How did you ensure that this document that

5    you were filing with the Court was accurate?

6          A.   They explained to me what could be put in.

7          Q.   Who is they?

8          A.   People that work in the library.

9          Q.   Do you remember their names?

10         A.   No.

11         Q.   Were they employees of the library?

12         A.   Yes, temporary.

13         Q.   What do you mean by temporary?

14         A.   There is workers that either work certain

15   months or weeks to give the opportunity to other

16   people that want to work in the library.

17         Q.   So these are inmates that work at the

18   library?

19         A.   That is correct.

20         Q.   So other inmates helped you put this

21   together?

22         A.   Yes.

23         Q.   You realized that when you prepared this

24   document with their assistance that it was going to

---36---

1  be filed in a court of law?

2      A.   Yes.

3      Q.   And I am going to show you -- going back to

4  the first few pages that are stapled -- I just want

5  to make sure we have the same.

6           Is that your signature on the bottom of

7  the first five pages?

8      A.   Can I check them?

9      Q.   Please do.  That is what I want you to do.

10     A.   Yes.

11     Q.   Explain to the judge how you ensured that

12 what you were filing with the Court was true and

13 accurate.

14     MR. VAIL:  Objection, asked and answered.

15     THE COURT:  Sustained.

16 BY MS. STACK:

17     Q.   How did you make sure that these documents

18 which were specific legal documents -- for the

19 record, proof of service is the first page, notice of

20 filing with affidavit of service signed by Arturo D.

21 Reyes being sworn on oath and deposed.  The third

22 page is motion for leave to file to proceed.

23          The fourth page is motion for an

24 evidentiary hearing again signed, and it is notarized

— 37 —

1   by a Regina Summers.   The fifth page is motion for

2   appointment of counsel.   Each of these five documents

3   has a different legal purpose.

4          MR. VAIL:  Objection to the testimony, your

5   Honor, by counsel.

6          THE COURT:  I don't think she is testifying.  I

7   think she was in the process of formulating the

8   question.

9          MS. STACK:  Thank you, Judge.

10          I am simply asking Mr. Reyes how he went

11   about filing these five different documents.

12          THE COURT:  Filing or ensuring their accuracy?

13          MS. STACK:  Ensuring their accuracy.  Thank

14   you.

15          MR. VAIL:  Objection.

16          MS. STACK:  That was the original question.

17          THE COURT:  He did answer, I believe, that

18   question when he said that he wrote these matters out

19   in Spanish, went to the library.  They were

20   translated by other inmates and then placed on the

21   machine, which I assume he meant he had them copied.

22   I think the question was asked and answered.

23          MS. STACK:  Your Honor, I am not trying to be

24   difficult.  It was my understanding that that answer

—38—

1    was specific to the statement of facts which has its

2    own significance.   I will accept that answer.

3          THE COURT:  It is not my answer.

4          MR. VAIL:   I will withdraw the objection for

5    the record.

6          THE COURT:  You can ask him a question.

7    BY MS. STACK:

8          Q.   The process you described where the people

9    in the library helped you, is that the process you

10   used for all the papers that you filed with your

11   petition?

12         A.   In the first pages, at the library they also

13   have them in Spanish for those who don't know how to

14   read English.   It gives the explanation on how to do

15   it, and it helps people.

16         Q.   So you did those yourself?

17         A.   Parts of it, yes; parts of it, no.

18         Q.   The ones that were in Spanish you were able

19   to do by yourself?

20         A.   Yes.

21         Q.   And you are the one that decided what issues

22   to bring in your petition, correct?

23         A.   No.

24         Q.   Okay.  Describe for the Court who decided

—39—

MAYSONET 3387

1   what issues you should raise in your petition.

2       A.   People that work in the library and, you

3   know, what they could help me with.  That is how the

4   process went.

5       Q.   How did they learn the facts of your case?

6       A.   Because they have worked in the library for

7   a long time.

8       Q.   How did they learn the facts of your case?

9       A.   I asked them for help.

10      Q.   So you were the person that explained what

11  happened in your trial, correct?

12      A.   No.  They read what happened in your trial.

13      Q.   They knew what happened in your trial?

14      A.   No.  They asked for the briefs of what

15  happened in your trial, and then they base it on

16  that.

17      Q.   So you gave them your appellate briefs?

18      A.   That is correct.

19      Q.   Did you know what was in your appellate

20  briefs?

21      A.   No.

22      Q.   When you signed your name on this petition

23  and had it filed in this court, did you know what was

24  in the petition?

—— 40 ——

1    A.    I have --

2         MS. STACK:  Let the record reflect the witness

3  is nodding.

4         THE WITNESS:  I have somewhat of an idea.

5         THE COURT:  Number one, I did not observe what

6  the defendant was doing because I am taking my own

7  notes here.  But it is again important that you try

8  not to interrupt the answer because it makes it

9  impossible, I believe, for the interpreter to

10  continue on with allowing the witness to answer the

11  question.

12         The last thing I am really certain of what

13  I heard is that he did not know what was in his

14  appellate briefs.

15         MS. STACK:  Right.

16  BY MS. STACK:

17    Q.    Did you know what you were filing when you

18  filed your post-conviction petition?

19    A.    Give or take.

20         THE COURT:  I'm sorry?  What was the answer?

21         THE INTERPRETER:  Give or take.

22  BY MS. STACK:

23    Q.    What were you aware of that you were filing?

24    A.    Well, who is in charge of that is the person

—41—

1   that knows about the law because I didn't know about

2   the system of the law.

3       Q.   But you know the facts of your own case,

4   right?

5       A.   No.

6       Q.   So let's go back to the statement of facts,

7   those first three pages that I asked you to look at.

8   Again, this is part of the court record.

9           Who typed up this document?

10      A.   Somebody that works in the library.

11      Q.   What is their name?

12      MR. VAIL:  Asked and answered, your Honor.

13      THE COURT:  Overruled.

14      THE WITNESS:  That was a long time ago.  I

15   don't know.

16  BY MS. STACK:

17      Q.   Today as you sit here, are you telling the

18  Court that you don't know what you filed with the

19  Court?

20      MR. VAIL:  Objection.  The answer said he more

21  or less knew what was in the petition.

22      THE COURT:  He may answer.  Overruled.

23      THE WITNESS:  Part of it, yes.

24

---

**42**

1   BY MS. STACK:

2      Q.  When you signed your name, did somebody

3  stamp and sign it at the same time?

4      MR. VAIL:  Objection.

5      THE COURT:  Sustained.  What do you mean by

6  stamp?

7      MS. STACK:  The notarization.  Every signature

8  has a notary.

9      THE COURT:  You didn't say that.  I am trying

10  to be clear.  I'm not trying to fight with you.  I am

11  just trying to bring out what you meant by stamped.

12        Rephrase the question.

13      MS. STACK:  I am sorry, your Honor.

14  BY MS. STACK:

15      Q.  Mr. Reyes, do you remember -- drawing your

16  attention to the notice of filing which I am handing

17  to the witness -- your signature on that legal

18  document?

19      A.  Yes.

20      Q.  And you remember the lady that stamped it?

21      A.  That is correct.

22      Q.  That is also known as notarization to try

23  and clarify?

24      MR. VAIL:  Objection.

-43-

1      THE WITNESS:  Yes.

2  BY MS. STACK:

3      Q.   So there are four stamped and notarized

4  signatures of yours, correct?

5      A.   Yes.

6      Q.   So when you went through that process, you

7  knew you were swearing to the Court that these

8  documents were true, correct?

9      A.   Yes.

10     Q.   Thank you.

11          Now, today you testified for the third

12  time in this matter, correct?

13     A.   Yes.

14     Q.   Do you remember testifying the prior times?

15     A.   Yes.

16     Q.   And do you remember that when you testified

17  before that you testified to some things that were

18  different?

19          MR. VAIL:  Objection, your Honor.  This line of

20  questioning was cut off for the petitioner.

21          THE COURT:  Overruled.

22          MS. STACK:  Judge, I am giving him an

23  opportunity to explain.

24          THE COURT:  I said overruled.

—44—

MAYSONET 3392

1          THE WITNESS:  Can you repeat the question.

2    BY MS. STACK:

3          Q.  Do you remember the parts that were

4    different when you testified before than when you

5    testified today?

6          A.  Yes.

7          Q.  So when you came here today and testified

8    differently, you knew that there were transcripts of

9    sworn testimony that would contradict what you

10   testified today under oath, correct?

11         MR. VAIL:  Objection that there has been

12   testimony that has been different that has been

13   established yet, your Honor, and the specifics of

14   that testimony.

15         THE COURT:  All right.  Sustained.  I believe

16   he has already answered the question.  Ask a

17   different question.

18   BY MS. STACK:

19         Q.  When you testified at your motion to

20   suppress, you told the Court that Officer Trevino and

21   the American officer made up the statement and you

22   signed it?

23         MR. VAIL:  Could I have the page and line from

24   that transcript if we are going to quote from the

—45—

MAYSONET 3393

1   transcript.

2        THE COURT:  Do you have it?

3        MS. STACK:  Sure.  There is lots of pages,

4   Judge.

5        MR. VAIL:  I just need it for the questioning.

6        MS. STACK:  It is a significant variance today.

7   I thought he would want to explain it.

8   BY MS. STACK:

9        Q.   Okay.  Drawing your attention to the 2000

10  motion to suppress, pages --

11       MS. STACK:  It starts around 615, 616.  It is

12  the transcript of the motion to suppress where

13  Mr. Reyes testified under oath, and the significant

14  parts of his transcript start around 616, 617.  I

15  believe we gave copies.

16            I don't want to start this unless you have

17  the same pages.

18       MR. VAIL:  I agree.

19            Just so we are clear, for the record, I

20  believe we have the same document with different page

21  numbers on the bottom.  Yours appear to be

22  handwritten page numbers, and we have Bates stamp

23  numbers and then also transcript page numbers on ours

24  too.

MAYSONET 3394

1    MS. STACK:  Judge, for the record, we have

2    bound copies that have -- the volumes have the

3    official designations and numberings from the

4    Appellate Court like this is out of Volume 4 of

5    the -- it is actually stamped by the Supreme Court

6    clerk.

7         The transcript that I have has handwritten

8    numbers at the bottom that are in the 600 series.

9    Counsel has Bates stamped copies.  I don't know if

10   you want to describe them.  Obviously there is one

11   transcript from the motion, but there is different

12   bound versions.

13   THE COURT:  Off the record for a minute.

14        (Discussion held off the record.)

15   THE COURT:  Back on the record.

16   MR. VAIL:  My understanding of the record at

17   least that we submitted, it would have these numbers.

18   I think we can deal with this later.

19        Just so it is clear, there is two

20   different sets of numbers on the versions that have

21   been submitted into the record of the same document.

22   MS. STACK:  If they have a copy for me, I will

23   work off their copy.

24   THE COURT:  Whichever you prefer.

— 47 —

1    When I went off the record briefly, it

2  appeared to be that counsel for the other petitioner

3  was able to provide counsel for Mr. Reyes here with

4  the brief, I guess, or the record related to the

5  state's attorney was referring to so that everybody

6  would have a copy of the same transcript of

7  testimony.

8    But now if you are going to switch it

9  around a little bit --

10    MS. STACK:  My concern was for you, Judge, that

11  if now we are going to have three different sets of

12  numbers, that it is going to be hard to try and put

13  it all together later.

14    THE COURT:  Let's try to get some unanimity.

15    MS. STACK:  I am going to use the Bates stamped

16  numbers that are in the version that Mr. Reyes'

17  attorney has used.  I believe that the problem is

18  that one defendant had a direct appeal to the Supreme

19  Court, had a death sentence.  The other one went to

20  the Appellate Court.

21    You know, some of the transcripts were

22  generated simultaneously.  Then they get split up,

23  and they end up with different numbers.  But there

24  was obviously only one motion to suppress when

---
**48**

1    Mr. Reyes testified so I will work off this.

2         THE COURT:  All right.

3    BY MS. STACK:

4         Q.  Okay.  Mr. Reyes, today when you testified,

5    did you testify that the reason that you gave a

6    confession in this double murder was because

7    Detective Reynaldo Guevara slapped your face?

8         A.  That is correct.

9         Q.  And that the statement that you gave which

10   is Reyes Exhibit 1 -- do you have a copy of it up

11   there, sir?

12        A.  No.

13        MS. STACK:  Your Honor, do you mind if I give

14   him a copy?  I'm not sure if I am going to ask him

15   anything out of it.

16        THE COURT:  I don't mind.  He has already

17   identified it.

18   BY MS. STACK:

19        Q.  So the record is clear, Reyes Exhibit No. 1

20   is a handwritten statement by Arturo Deleon Reyes

21   taken April 5, 1998, at 2:00 a.m. at Area 5 which is

22   5555 West Grand.  Present:  ASA Tom O'Malley and

23   Investigator Daniel Trevino.  That is Star No. 40052.

24             Do you remember Investigator Trevino?

───49───

MAYSONET 3397

1    A.   Yes.

2    Q.  Do you remember ASA Tom O'Malley?

3    A.   Yes.

4    Q.  You remember giving that statement, correct?

5    A.   Yes.

6    Q.  Drawing your attention back to when you

7 first testified about the statement -- and that would

8 be the year 2000, I believe it was March 4, 2000.

9       MS. STACK:  Do you have the date, gentlemen?

10       February 4th of the year 2000.

11 BY MS. STACK:

12    Q.  Do you remember testifying that you, your

13 co-defendant Mr. Solache, and Rosauro Mejia went to

14 the police station at the 8th District at about 3:30

15 a.m. on April 3, 1998?

16    A.   Yes.

17    Q.  Then your attorney asked you a series of

18 questions about what happened while you were with the

19 police, correct?

20    A.   Yes.

21    Q.  In addition to your co-defendant and

22 Mr. Mejia, there was another person that went with

23 you to the police station that night, correct, a

24 little three-year-old boy?

MAYSONET 3398

1    A.   It was a little boy that I had with me.

2    Q.   Why did you go to the station?

3    A.   To ask for help.

4    Q.   Why were you asking for help?

5    A.   Because that child was in problems.

6    Q.   Will you explain what you mean by the child

7 was problems.

8    A.   For some reason, Rosauro wanted to do harm

9 to him.

10   Q.   Rosauro wanted to do harm to him?

11   A.   Yes.

12   Q.   Can you explain what you mean to the Court.

13   A.   Yes.  When I woke up, Adrianna Mejia was

14 arguing and telling her husband to please not to do

15 anything to the child.

16   Q.   What happened next?

17   A.   I stayed and I was listening.  When I saw

18 that Rosauro was mad and looking bad at the child, I

19 told him not to do that.

20   Q.   So you protected that --

21      MS. STACK:  I am sorry, Ms. Interpreter.

22 BY MS. STACK:

23   Q.   So you protected the child?

24   A.   Yes.

—51—

MAYSONET 3399

1    Q.   What happened next?

2    A.   After that, we went to the police station.

3    Q.   Whose idea was that?

4    A.   Mine.

5    Q.   Who drove to the police station?

6    A.   Rosauro Mejia.

7    Q.   How were you able to convince him?

8    A.   Calming him down.

9    Q.   Why did you take the child to the police?

10    A.   Because I thought he needed help.

11    Q.   Who was this boy?

12    A.   At that moment, I didn't know who the child

13 was.

14    Q.   Was that the first time you saw him?

15    A.   No.  He had been watched beforehand.

16    Q.   How long beforehand?

17    A.   Days.

18    Q.   How many days?

19    A.   It was a Monday that I didn't go to work.

20    Q.   Why didn't you go to work?

21    A.   Because Adrianna Mejia had asked me if I

22 could watch that child.

23    Q.   What did she tell you about the child?

24    A.   That his mother was sick and that they

MAYSONET 3400

1    didn't have anybody to watch that child, and she kept

2    pleading with me to please watch him.

3        Q.   Was that the only child that was in the

4    apartment with you?

5        A.   Seemed to be that there was another one in

6    the house.

7        Q.   There seemed to be?

8        A.   Well, they were in the room so I didn't go

9    into the room.

10       Q.   Did you see another child in the apartment

11   those same days?

12       A.   On one occasion I saw Adrianna.  She had

13   something or somebody in her arms.

14       Q.   Are you telling the Court that you never saw

15   the baby?

16       A.   I am guessing it was a baby because of, you

17   know, the bundle, but I never stopped to see.

18       Q.   The baby was there for three or four days as

19   well?

20       A.   That is correct.

21       Q.   How do you know it was there for that long

22   if you only saw it the one time?

23       A.   Because you could hear somebody crying in

24   the room.

—53—

MAYSONET 3401

1    Q.  So you did hear the baby crying?

2    A.  Yes.

3    Q.  How many times did you hear the baby crying?

4    A.  To tell you the truth, I don't remember.

5    Q.  You have children yourself, correct?

6    A.  Yes.

7    Q.  And your wife you said was nine months

8 pregnant when you left for the USA?

9    A.  That is correct.

10    Q.  So what did you think about the fact that

11 Adrianna was pretending to be pregnant?

12    MR. VAIL:  Objection, your Honor.

13    THE COURT:  Sustained.

14 BY MS. STACK:

15    Q.  You knew that Adrianna was pretending to be

16 pregnant, correct?

17    MR. VAIL:  Objection.  At what time?

18    THE COURT:  Overruled.

19    THE WITNESS:  No.

20 BY MS. STACK:

21    Q.  You didn't know that?

22    A.  No.

23    Q.  Going back to the first time you testified

24 in 2000, I am going to ask to go back and ask a few

—54—

1  preliminary questions before we start.

2          In late March, early April of 1998, will

3  you tell the Court who you lived with and where.

4      A.  I lived with Rosauro Mejia, with Adrianna

5  Mejia, with Gabriel Solache, and Carlos Martinez.  I

6  rented with them.

7      Q.  Are you related to any of them?

8      A.  No.  I had never met them before.

9      Q.  How did you come to live with them?

10     A.  Somebody took me there so I could rent a

11  room.

12     Q.  While you were living there, you had a job?

13     A.  Yes.

14         THE COURT:  If he has already answered the same

15  questions, they are in evidence.

16  BY MS. STACK:

17     Q.  About how long were you at Area 5 before you

18  saw Detective Guevara?

19     A.  Couple hours.

20     Q.  And the first time you saw him, you

21  testified that he walked in the room, took a cap off

22  your head, and slapped you once very hard in the

23  face, correct?

24         MR. VAIL:  Objection, your Honor.

─── 55 ───

1    THE COURT:  All right.  Basis?

2    MR. VAIL:  I believe that was not the testimony

3    today.  That was another instance testimony.  We

4    should identify it and use it as proper impeachment

5    if that is where we are going.

6    THE COURT:  Are you asking the question is that

7    what he said today?

8    MS. STACK:  I will go back to the motion in

9    2000.

10    THE COURT:  I am trying to be sure.  Are you

11    asking him is that what he testified today or is that

12    something he testified on this earlier occasion?

13    MS. STACK:  I was actually asking if that

14    really occurred.

15    THE COURT:  All right.  Then go ahead.

16    MR. VAIL:  Let's get that question in, your

17    Honor.

18    THE COURT:  Go ahead.  Rephrase your question.

19    Just ask your question.

20    BY MS. STACK:

21    Q.  Are you testifying today that the first time

22    you saw Reynaldo Guevara, he walked in, grabbed your

23    hat, and slapped you in the face without asking you

24    any questions?

—56—

MAYSONET 3404

1    A.   No.   I testified today that when Detective

2   Guevara came in, the first thing he did was slap me

3   in the face.   I didn't give explanations about the

4   hat.

5    Q.   I know.

6         In 2000 when you testified at the

7   motion, did you not tell that Court that when he

8   entered the first time --

9    MS. STACK:   Drawing counsel's page to 643.

10  BY MS. STACK:

11   Q.   Mr. Reyes, were you asked this question, and

12  did you give this answer:

13        "Well, did Detective Guevara say something

14         to you when he came into that room the first

15         time?"

16   MR. VAIL:   Objection, not impeaching.

17   THE COURT:   Finish the question.

18  BY MS. STACK:

19   Q.   "When he entered that first time, he took

20  off a cap that I was wearing on my head."

21   THE COURT:   Can you answer that question, sir?

22   THE WITNESS:   Yes.

23   THE COURT:   Go ahead and answer it.   Is that

24  what you testified to back in 2000?

—57—

MAYSONET 3405

1    THE WITNESS:  To tell you the truth, I don't

2 remember.

3 BY MS. STACK:

4    Q.  But today you are testifying that he did not

5 take off your cap?

6    A.  I didn't explain that detail.

7    THE COURT:  I think there is some confusion,

8 Ms. Stack, because when he testified on direct, my

9 recollection is there was no reference to the hat.

10    MS. STACK:  Right.

11    THE COURT:  When you asked him the question, it

12 was potentially confusing because you added the hat.

13 I think it is possible the witness is trying to

14 answer your question as to what he had testified to

15 earlier on direct as opposed to -- because we got

16 lost a little bit there.

17    The form of the question didn't really

18 make it clear that you were trying to ask him exactly

19 what happened back in 1998.  I know you had said that

20 at one time in one of your remarks that that is what

21 you are seeking.  That is when I said go ahead and

22 ask the question and you withdrew the objection.

23 When the question was asked, it wasn't so specific

24 that it couldn't have caused confusion.

—58—

1          You may ask another question.

2    BY MS. STACK:

3          Q.   Mr. Reyes, we will stick with your testimony

4    at the motion in 2000.  When you testified in the

5    year 2000, you testified that you gave your

6    confession because Investigator Trevino told you to

7    sign the document because it would help you?

8          MR. VAIL:  Objection, your Honor.  It is not

9    impeaching.

10         THE COURT:  Where are you going with this?

11         MS. STACK:  Well, Judge, there is a significant

12   difference here today.  Mr. Reyes has testified at

13   his motion and his trial on appeal that he was

14   tricked into signing a document that he couldn't read

15   that was a full blown detailed confession to a double

16   murder.

17         THE COURT:  With respect to the question, be a

18   little more specific in your question.  If you are

19   trying to impeach him with statements that he has

20   made on a prior occasion, just provide the page and

21   line and ask that question and ask him whether or not

22   he was asked that question and gave that answer on a

23   prior occasion.

24         MS. STACK:  Judge, I will do the standard

—59—

1    impeachment. It is clear he has made a decision. I

2    was going to let him explain himself.

3         THE COURT: You need to educate me.

4         MS. STACK: I will, Judge. I am sorry.

5         MR. VAIL: Can we take a short bathroom break?

6    Is now a good point to do that?

7         THE COURT: I won't deny you that.

8              We will take about a five-minute break.

9              (A recess was taken.)

10        THE COURT: All right. We can resume the

11   cross-examination then.

12             The record will reflect all parties,

13   petitioners are present.

14             Go head, State.

15             Now, I did inform some of the court

16   personnel that we will work until 5:00.

17        MS. STACK: Okay.

18   BY MS. STACK:

19        Q. Let me ask you to look at Reyes Exhibit

20   No. 1 again, your handwritten confession. Today you

21   testified about why you signed this statement. Will

22   you please reiterate that.

23             Why did you sign this statement?

24        A. Detective Trevino told me that in order for

—60—

1    him to be able to help me, I needed to sign these

2    documents.

3         Q.   Okay.  So it was Detective Trevino who told

4    you to sign the document?

5         A.   Yes.

6         Q.   You didn't know what was in the document

7    because it was in English, correct?

8         A.   No.  I never saw these documents.  I just

9    signed them.

10        Q.   You never saw it?

11        A.   No.

12        Q.   You signed it though?

13        A.   Yes.

14        Q.   What did it look like when you signed it?

15        A.   Well, at that moment, Officer Trevino just

16   rushed me so I could sign the document.  So that is

17   why I didn't see it.

18        Q.   Did you initial it as well in places?

19        A.   Yes.

20        Q.   But you never looked at what was on the

21   pages?

22        A.   They never gave me that chance.

23        Q.   I swear I am going to get these questions

24   out.  I am asking you about that motion in 2000

—**61**—

1  again, February 4th.

2      MS. STACK:  This is page 661, gentlemen, which

3  is the alternate universe number 635 in case that

4  copy gets into the record somehow.

5  BY MS. STACK:

6      Q.  I am going to back up again.

7          Did you confess to Detective Guevara?

8      A.  No.

9      Q.  You never told him that you committed any

10 murders, correct?

11     A.  That is correct.

12     Q.  He was not with Officer Trevino when you

13 signed the confession, correct?

14     A.  That is correct.

15     Q.  It has been your contention all these years

16 that Officer Trevino made up this confession and

17 tricked you into signing it, correct?

18     A.  Yes.

19     Q.  You have also testified that during the 30

20 hours or so you were in custody that Detective

21 Guevara came in a couple times and slapped you in the

22 face, correct?

23     A.  That is correct.

24     Q.  But he did not slap you right before you

—62—

MAYSONET 3410

1  gave that the confession, correct?

2      A.  No.  He slapped me before.

3      Q.  Right.  And you testified about that before,

4  correct?

5      A.  Yes.

6      Q.  And you are not changing that testimony

7  today, correct?

8      A.  That part, no.

9      Q.  So the part you are changing is that you

10 told the police that you received $600 from

11 co-defendant Adrianna Mejia to help her steal a baby?

12     A.  Yes.  But that was explained to me by the

13 Detective Trevino, and I just repeated it.

14     Q.  So who did you repeat it to, the state's

15 attorney?

16     A.  Detective Trevino just asked me to repeat

17 what he was saying, and that is what I did.

18     Q.  Did you repeat what he was saying at the

19 same time that this was being done (indicating)?

20     A.  Yes.

21     Q.  So at that same session where Trevino and

22 ASA O'Malley were present, Officer Trevino also had

23 you say out loud that Adrianna had told you she had

24 found a very pretty baby?

—63—

MAYSONET 3411

1    A.    That is correct.

2    Q.    Okay.  Good.

3          Did you also repeat out loud what

4    Trevino told you to say which was that Solache picked

5    you up at the house on Mozart Street?

6    A.    Yes.

7    Q.    Did Trevino also tell you to state out loud

8    that you stabbed Mrs. Soto?

9    A.    Yes.

10   Q.    Did Office Trevino also tell you to say that

11   you grabbed the baby?

12   A.    Yes.

13   Q.    Is that also true about grabbing the

14   three-year-old boy as well?

15   A.    Yes.

16   Q.    Now, you testified that Office Trevino was

17   nice to you, correct?

18        MR. VAIL:  Objection.

19        THE COURT:  Overruled.  When?  Be more

20   specific.  When?

21        MS. STACK:  Well, that was exactly his

22   testimony.

23        THE COURT:  What are you referring to?  Are you

24   talking about today?  He testified today that Officer

—64—

MAYSONET 3412

1    Trevino was nice to him.

2         MS. STACK:  He testified on two occasions that

3    Officer Trevino treated him --

4         THE COURT:  Well, just in your question, that

5    is what needs to be clear.

6         MS. STACK:  Judge, I am sorry.  I apologize.

7    But if he admitted it, then I wouldn't have to go

8    through the process and impeach him.  It is kind of a

9    fact that is in this record.

10        THE COURT:  But you are not asking him to admit

11   it.  You are asking him if he testified.  If you want

12   to ask him was Officer Trevino nice to you at the

13   time, okay.  But when you throw in the word testify,

14   I am just trying to figure out are you talking about

15   the motion, the trial?

16        MS. STACK:  Oh, I know.  All right.  I will

17   withdraw that.

18   BY MS. STACK:

19        Q.   Mr. Reyes, was Officer Trevino nice to you?

20        A.   No.

21        Q.   Did you testify on February 4, 2000, that he

22   was nice to you?

23        MR. VAIL:  Page, line?

24        MS. STACK:  He might not deny it.  If he denies

—65—

1    it, I will have the page number.

2         MR. VAIL:  Okay.

3         THE COURT:  Do you have the page and line?

4         MS. STACK:  Judge, I will withdraw it until I

5    get the page here.

6         THE COURT:  Your associates are looking for it.

7         MS. STACK:  I didn't intend to go there really.

8    BY MS. STACK:

9         Q.  Today do you have any family in the USA?

10        A.  No.

11        Q.  Today are you aware of what is written in

12   Reyes No. 1?

13        A.  Yes.

14        Q.  And it is your testimony that you signed it

15   because Officer Trevino told you to?

16        MR. VAIL:  Asked and answered, your Honor.

17        THE COURT:  Overruled.

18        THE WITNESS:  That is correct.

19   BY MS. STACK:

20        Q.  And he also told you that he would help you,

21   correct?

22        A.  Yes.

23        Q.  And you believed him, correct?

24        A.  Yes.

—66—

1     Q.   Now, Reynaldo Guevara did not tell you to

2 sign it, correct?

3     A.   He only slapped me in the face. That's what

4 he did.

5     Q.   And he slapped you in the face on two

6 separate occasions?

7     A.   Yes.

8     Q.   The first time he slapped you once?

9     A.   That is the first time that I saw him, the

10 first time.

11     Q.   And the second time he slapped you every

12 time you denied committing the murder?

13     A.   That is correct, when he was very upset.

14     Q.   And he slapped you several times?

15     A.   Yes.

16     Q.   Okay. Just a couple more things, Mr. Reyes.

17          So we were talking about when Reynaldo

18 Guevara would ask you a question and you would say no

19 and he slapped you. He then left the room again,

20 right?

21     A.   Yes.

22     Q.   And you were alone for a while?

23     A.   Yes.

24     Q.   And then some other people came in?

—67—

MAYSONET 3415

1    A.   Yes.

2    Q.   And then you were moved to a different room?

3    A.   Yes.

4    Q.   And so several hours went by before Officer

5 Trevino promised to help you and had you sign this

6 document, correct?

7    A.   Yes, a long time.

8    Q.   A long time passed between when Reynaldo

9 Guevara slapped you and when you signed this?

10   A.   That is correct.

11   MS. STACK:   If I may have one moment.

12        I have nothing further at this time.

13   MR. VAIL:   One moment, your Honor.

14   THE COURT:   Take your time.

15   MR. VAIL:   We will have no redirect

16 examination.

17        THE COURT:   All right.   Then the witness may

18 step down.

19        Any additional live testimony on behalf of

20 Mr. Solache?

21        MS. DANIEL:   May I approach, your Honor?   I can

22 talk from here.

23        After yesterday's proceedings and the

24 various discussions we had, the concerns that

—68—

1   Ms. Stack raised about not calling live witnesses,

2   and the fact that assuming transcripts to be

3   admissible that they should be accorded less weight,

4   your Honor expressed some similar concerns. So I

5   believe I am speaking on behalf of the Reyes team as

6   well as the Solache team. It is our intention now to

7   call live witnesses.

8          We would actually -- originally we had

9   planned to go forward with transcripts of witnesses

10  just as a matter of expediency and efficiency. But

11  again, just based on yesterday's proceedings, we feel

12  like we should go ahead and call live testimony. So

13  we would be requesting a couple dates to do that and

14  continue the case so that we can do that.

15         THE COURT: You are on the same page,

16  gentlemen?

17         MR. VAIL: I think so, your Honor. What I

18  would say rather is I think that we are confident in

19  the written record. However, if the Court were to

20  suggest that live testimony is appropriate and

21  preferred, then we will certainly as Ms. Stack

22  suggested make sure to do all we can to get those

23  folks here. We will put them on the stand in this

24  courtroom.

-69-

1       Otherwise, at least on behalf of Reyes, we

2  feel very confident in the record that your Honor

3  will have to review. So we frankly look for some

4  guidance from the Court.

5       MS. STACK: We would object to that.

6       THE COURT: Were you finished?

7       MS. DANIEL: I am -- yes, I am finished for the

8  moment, yes. I mean, I have some other things if we

9  decide to go forward as planned.

10       THE COURT: About that issue?

11       MS. DANIEL: Yes.

12       MS. STACK: I don't object to them calling live

13  witnesses. I think that is great. Then let your

14  Honor see these witnesses and make the

15  determinations.

16       But what I do object to is asking your

17  Honor to rule on an advisory opinion. Your Honor, we

18  argued this strenuously yesterday. They argued

19  strenuously against calling live witnesses. I won't

20  belay. You were there. And they got what they

21  wanted.

22       They were allowed to proceed in the manner

23  that they have been asking to proceed for two years.

24  So if they want to change it now, we are not going to

-70-

MAYSONET 3418

1   object or complain unfair surprise or anything.  That

2   is fine.  We will work with them to get this done.

3         But we do object to them asking you to

4   rule in advance so they know how to proceed.  Either

5   they want to call live witnesses or they want to

6   stick to the game plan they have had for three years.

7         THE COURT:  All right.  I am not going to

8   render any kind of opinion here at this point.  But I

9   will certainly provide you with an opportunity to

10  call additional live witnesses.

11        MS. DANIEL:  Thank you.

12        THE COURT:  I had mentioned to -- when I came

13  back from lunch yesterday, I meant to mention it to

14  all parties.  Then we got started right away, and I

15  didn't.

16        Although I did mention it to some of the

17  petitioners' attorneys after the State had walked out

18  of the room that it is my understanding that what the

19  State was arguing yesterday with respect to the

20  Illinois Codified Rules of Evidence applying to the

21  post-conviction hearing because they weren't excluded

22  in any way in committee comments or in the rules as

23  they now exist.

24        Apparently that is very much a subject of

---

MAYSONET 3419

1    discussion and was even yesterday completely

2    unrelated to our hearing.  But apparently the

3    committee is undergoing and planning on I think

4    addressing that very issue, which way I have no idea.

5              But I think they probably realize that one

6    way or another it needs to be addressed so that all

7    of us, the attorneys and the judges, will all have

8    direction as to how these hearings should be

9    conducted, whether that particular Post-Conviction

10   Act will be separate and excluded or whether or not

11   they will not be.

12             MS. STACK:  So this was yesterday late, Judge?

13             THE COURT:  It was right after you walked out

14   of the room.

15             MS. STACK:  After we were done with evidence?

16             THE COURT:  After you were done with evidence.

17   If you believe it was an ex parte communication, you

18   can say so.  That is why I am saying it to you now

19   though so that --

20             MS. STACK:  We just want the record to show,

21   your Honor.  There is no complaint here.  As far as

22   the evidentiary ruling, we want the right result.  We

23   believe there is a bona fide issue on this claim, and

24   what I said yesterday was sincere that I would

---72---

MAYSONET 3420

1  certainly hate to do this, go forward on the

2  transcripts -- which the case law does support.

3        But with this conflict between the

4  Codified Rules and what supercedes what, it looks as

5  if the Rules of Evidence do apply here.  I would

6  certainly hate to be back here, if I am still alive,

7  in three years to litigate this again.  That is why

8  we did sincerely leave --

9        THE COURT:  I don't think you are the only

10  person that feels that way.  I assume -- hopefully

11  you are not saying that anything that I have said now

12  indicates something that I'm not being sincere about

13  what I just said.

14        MS. STACK:  Oh, no.

15        THE COURT:  I am just pointing out to you

16  something that I learned yesterday after we had the

17  morning discussion in being able to speak to somebody

18  else that has knowledge of what the committee is

19  doing as we speak.  And it was not something that --

20  I didn't contact a committeeman.  Judges are allowed

21  to discuss certain issues with other judges.  I

22  happened to talk with somebody that was aware of

23  that.  I just wanted to put it on the record.

24        MS. STACK:  Can I clarify that that is what

-73-

1  happened to me a few weeks ago.  I was ignorant that

2  the Supreme Court Rules had the power that they did.

3  When I found out -- because the reason why I

4  mentioned my sincerity was, as you saw, there were

5  not only vehement arguments, but written motions

6  about the --

7      THE COURT:  I hope you don't think I was

8  questioning your sincerity.  It was a valid argument.

9      All right.  Let's move on.

10     The State obviously strongly argued

11  yesterday that live witnesses should be put forth as

12  opposed to some other way, or certainly did initially

13  when this entire hearing was sort of being planned

14  for.

15     Originally the petitioners claimed there

16  would be many witnesses, many more obviously than

17  ultimately have testified so far.  Then it seemed

18  like it was getting paired down.  Then I think it

19  went to six and ultimately it went to two.

20     So if I seemed like I was somewhat

21  concerned about it yesterday, it is perhaps because

22  so few live witnesses were being called as opposed to

23  what originally would have been at least three times

24  as many or if not multiple to that.

-74-

1      Be that as it may, I will allow you to

2  proceed how you wish to.  If you want to go ahead and

3  call live witnesses now rather than submit the other

4  matters, that is how you will be allowed to proceed.

5      MS. DANIEL:  Thank you, Judge.  I think the one

6  thing I should say for the record is that for the

7  record, we are not conceding that the new Rules of

8  Evidence disallow the transcript witnesses.  We just

9  don't want to concede that as a legal matter.

10      THE COURT:  I don't think anybody is conceding

11  anything.

12      MS. DANIEL:  Fair enough.

13      THE COURT:  I don't think anybody is conceding

14  anything.  Everybody is just looking for the

15  direction so that we can all do the right thing for

16  the right reasons.

17      MS. DANIEL:  Absolutely.  I agree with that.

18      THE COURT:  It may very well be that the

19  committee will recommend that they be excluded, that

20  these type of hearings be excluded from the Rules of

21  Evidence.  I don't know.  They may actually do that.

22      I think quite frankly, they just missed it

23  and didn't address it.  It wasn't intentional.  They

24  didn't want to place it in one category or not.

—75—

1    But as you know, we start going through

2    something like Rules of Evidence, there is no way in

3    the world you are going to cover all the situations

4    because there are so many statutes out there trying

5    to rewrite the Criminal Code.  As everyone who has

6    been around, Judges who have been around as long as I

7    have or state's attorneys, we always talk about how

8    when we were young prosecutors or defense lawyers,

9    when we first started, Chapter 38 which was the

10   Criminal Code at the time was about the size of your

11   little finger.  Now you need two people to lift it.

12      MS. DANIEL:  They really need to rewrite it.

13      THE COURT:  And murder was actually against the

14   law even back then.

15      Now, if you are going to be calling live

16   witnesses, you first of all need a status date to

17   determine when they are going to be available.  You

18   have figured sort of a schedule out?

19      MS. DANIEL:  So we had a couple ideas on that.

20      Maybe before we get to that, there is a

21   couple housekeeping things I didn't want to forget

22   about.  One is that I think we need to collect back

23   the volumes of prior testimony that we provided to

24   your Honor.

—76—

1    THE COURT:  Absolutely.

2    MS. DANIEL:  And to the state's attorney.

3    THE COURT:  You can go collect them

4 immediately.

5    MS. DANIEL:  Thank you.

6         I did have a question regarding since we

7 are going to try to comply with the Rules of

8 Evidence, regarding out of state witnesses, there are

9 some witnesses who are we believe out of state and,

10 therefore, beyond normal subpoena power.

11        I wondered if we wanted to have a

12 discussion about whether we would treat those

13 witnesses as unavailable and, therefore, subject to

14 the admission of prior testimony under

15 cross-examination or whether the State in those

16 instances would be seeking certificates of material

17 witness and trying to get at them out of state?

18    MS. STACK:  Judge, we can work it out.  As I

19 said yesterday, there is people in IDOC that need to

20 be brought up, can be writted.  I don't want to give

21 an advisory opinion like I was just suggesting about

22 when I don't know who they are asking for or what.

23 There are material witness rules that apply, and also

24 I believe that even in criminal trials if a witness

—77—

1    is deemed unavailable by you, that they can -- we can

2    work out an evidence deposition or something.

3              I would rather not cross that bridge until

4    I see where the new game is going.  We can work on

5    those things, Judge.  We will be amenable and

6    professional to getting this hearing done and

7    allowing both sides to present their case the way

8    they see fit.

9              And I am sure that you, Judge, will

10   enforce that kind of professional courtesy.  We will

11   work it out.

12             MS. DANIEL:  We will come in with a motion

13   then.

14             THE COURT:  You are going to have to go on a

15   witness by witness basis when that exists.  Before

16   you come in on a motion, contact Ms. Stack, and they

17   will use their best efforts to try to resolve the

18   issues one way or the other as well.

19             MS. STACK:  That does bring up another issue

20   about relevancy too.  At some point, we are going to

21   have to talk about that.  If there are witnesses that

22   we believe --

23             THE COURT:  How many witnesses do you

24   anticipate?

-78-

MAYSONET 3426

1    MS. DANIEL:  Well, I think we are at around ten

2    on the list.  The list is about a year old now at

3    this point.  We will have to recheck if they were

4    findable and if they are living and so forth.  I

5    think that is probably our estimate right now is

6    about ten.

7          So my suggestion was going to be that we

8    perhaps reserve a couple of dates or two- or

9    three-day periods like we did this time.  And since

10   we have a lot of witnesses to choose from, we can

11   figure out who is available the soonest and get them

12   here, have a couple of choices to get them here if

13   your Honor is amenable to that.

14          We had been thinking about a particular

15   week in March and one in April.  If we had some --

16   but however your Court's calendar is.  If we had some

17   dates, then we could issue subpoenas for dates and

18   work toward getting people here for those dates and

19   filling up the time.

20          THE COURT:  This not being Federal Court, I

21   don't have a minute clerk, nor do I have the ability

22   yet to use what ultimately will be the clerk's system

23   that we will all have access to supposedly starting

24   soon.  They have been talking about that for years.

MAYSONET 3427

1   Where we can sort of look out and see exactly how

2   many cases are on the call on a particular date.

3        The calendar that we do have to try and

4   keep track of when cases are going to be is

5   maintained now for the convenience of the Court by

6   the state's attorney's office.  However, it is

7   naturally the state's attorneys assigned to the

8   courtroom as opposed to any of the three state's

9   attorneys that are sitting at the table right now.

10       I am sure April.  I wouldn't want to do

11  anything in March.  I am wondering if it will be

12  better to kind of plan a witness, writ them in, make

13  sure we can get to that witness.

14       The setting aside the days and sort of

15  getting -- like tomorrow where there is going to be a

16  day where there's hardly anything I can do because of

17  what has occurred here.

18       I am sure nobody has a witness they can

19  possibly call tomorrow?  You don't have anybody -- do

20  you have anybody that is out there possibly?  Use up

21  our time tomorrow?  I would be surprised if you did.

22       MS. DANIEL:  No.

23       THE COURT:  We can't writ anybody in.  It

24  takes, I think, ten business days or something for

—80—

MAYSONET 3428

1   even the State to writ.

2          MS. STACK:  May I suggest that we can pick some

3   dates like we did this time in April or whatever.

4   But have us come here at 12:30 or 1:00, start the

5   hearing after lunch?

6          THE COURT:  That probably makes more sense.

7   Even today we had more cases that were added to the

8   call today because of bail bond and probation

9   violations that were not on the call.  So --

10         MR. VAIL:  I like that proposal by counsel --

11         MS. STACK:  I think it is best for everybody.

12              Judge, we would do a status date, and

13  maybe you could even excuse counsel for Reyes if they

14  are tied up somewhere just for us to be here the same

15  time as your book.

16         THE COURT:  I can get the book back here.

17         MS. STACK:  I can call upstairs.

18         THE COURT:  With respect to the petitioners, I

19  don't believe there is any reason for the officers to

20  have to remain here any longer.  They don't need

21  whatever continuance date that we choose.  Their

22  writs will not be extended.

23              So, officers, you are free to take both

24  Mr. Reyes and Mr. Solache back.

─── 81 ───

MAYSONET 3429

1    MS. DANIEL:  While we are waiting for the book,

2  I always ask permission in post-conviction cases --

3    THE COURT:  Go ahead.

4    MS. DANIEL:  In a post-conviction matter, I

5  always ask for subpoena power because I don't think I

6  automatically have it.  I would just request

7  permission to issue necessary subpoenas for

8  witnesses.  Not all of them are in IDOC.

9    MR. SMITKO:  Can we have some indication when

10  we are going to get this new witness list?

11    MS. DANIEL:  The witness list is not new.

12    MR. SMITKO:  You are calling everybody on

13  there, all 19?

14    MS. DANIEL:  Everybody we can find.

15    MS. STACK:  It is difficult to prepare, Judge,

16  for 19 people.  We have been --

17    MR. VAIL:  We will be glad to provide a list in

18  advance of that hearing date.

19    THE COURT:  Whatever date we are going to

20  select, you are going to be notified.

21    MS. STACK:  If we have an idea who they are

22  calling first.

23    THE COURT:  You are probably going to be

24  writting in so I have a hunch you are going to know.

—82—

MAYSONET 3430

1      MR. SMITKO:  I don't know about that, Judge.

2      MR. VAIL:  We would ask the same, your Honor.

3 Like I mentioned yesterday, we got their list

4 yesterday morning.  So just the same.

5      THE COURT:  Everybody, take a breath.

6      MS. DANIEL:  We have a couple other issues.  I

7 have one more and then pass to Ms. Raley.

8           I am sure the state's attorney would do

9 this anyway.  So I will just put on the record to the

10 extent that -- they have interviewed some of the

11 witnesses on our list.  Just to make sure that they

12 keep us updated on giving us in discovery their

13 investigator notes.

14      THE COURT:  Both sides, make sure you do that.

15 Any new witness summaries, witness statements taken,

16 equal discovery.

17      MS. STACK:  I don't believe we have received

18 any from you.  Same goes if you get some new --

19      MS. DANIEL:  Absolutely.  We haven't had any

20 new ones lately.

21      MS. RALEY:  Your Honor, Adrian Duta is one of

22 our witnesses.  He testified many years ago at a

23 suppression hearing.  I read that transcript in the

24 clerk's office.

—83—

MAYSONET 3431

1    For the past couple years, I have been

2  trying to check out the transcript.  You signed

3  orders giving us permission to do so so we can copy

4  it and give a copy to the State.  The clerk's office

5  cannot find the transcript.  It is there because I

6  have touched it.  I have looked at it.

7    I think if we maybe we could have

8  permission to subpoena it.

9    MS. STACK:  Who are you dealing with?

10    MS. RALEY:  The clerk's office.  I have talked

11  to Gary/Jerry Smith.  I have talked to Luz.  I have

12  talked to Peggy Anderson.  I have asked no less than

13  10 to 15 times for them to find the record.  They

14  cannot.

15    I think we need to help them out a little

16  bit, and I am sure a subpoena would do the trick.  I

17  am asking for permission to subpoena the clerk's

18  office to find the record.

19    THE COURT:  All right.  You may do that then.

20  Luz has been usually excellent.

21    MS. RALEY:  She is wonderful.  She is striking

22  out.

23    THE COURT:  I don't know that a subpoena is

24  going to be any more effective.  If you wish to go

————— 84 —————

MAYSONET 3432

1    ahead and do that, you have my permission. I will

2    give you permission to subpoena witnesses, but

3    provide the State with copies of who you are

4    subpoenaing so that they are aware.

5        MS. DANIEL:  Absolutely.

6            I think the last thing I have is that

7    yesterday the state's attorney provided us with a

8    supplemental witness list with three witnesses that

9    don't appear -- I could be wrong -- to have had any

10   prior relationship with this case.  We don't have any

11   notes or summaries of their proposed testimony.  So

12   we ask that they provide us with a summary of their

13   testimony or any interview memos they have on these

14   witnesses.

15       MS. STACK:  That is fine, Judge.  I really

16   think the idea of coming back in here for a status

17   date in the next couple weeks -- we can go ahead and

18   pick some dates in April if you like, but we have to

19   look at our witness list too so we are not doing last

20   minute shuffles like we did.

21           There are some new witnesses we have

22   added.  I would be happy to disclose what we know of

23   them or what we have.  But we might have a few extra

24   witnesses too.  Whatever you want to do, but I am

MAYSONET 3433

1  putting them on notice that we might have some more

2  witnesses that are not really new but we didn't have

3  on our witness list before, I think.

4      THE COURT:  The question before me is -- the

5  direction I am going to give you is that please

6  provide their side with some idea of who these

7  witnesses are and what it is that you expect them to

8  testify to so that if they wish to have some sort of

9  an objection or whatever or interview them themselves

10  or whatever, they can do so.

11      We are all here based on rulings of Courts

12  of this state which we are all obligated to obey.  So

13  let us all cooperate and do what our respective

14  duties are with respect to this case pursuant to that

15  directive.  The more cooperation there is, the sooner

16  we can be done with at least this stage of the

17  hearing and then move on.

18      MS. DANIEL:  We would ask permission to writ

19  our client Mr. Solache here for any evidence taken in

20  this hearing.

21      THE COURT:  I will writ him in for a day so he

22  can testify, but I'm not going to have him here for

23  the other days.  Once you decide what day you -- if,

24  in fact, you are going to call him as a witness, I

—86—

1   will have the State bring him in.  You got to give

2   them two weeks notice, but I don't think it is

3   necessary for him to be present for the entirety of

4   the hearing.

5       MS. STACK:  So are we setting an interim date

6   to get any motions out of the way or just come back

7   on April 9th?

8       MS. DANIEL:  I think we should --

9       THE COURT:  Pick a date.

10      MS. DANIEL:  March 12th.

11      THE COURT:  That is fine.

12          So March 12th both matters for the hearing

13  will be commenced and continued until that date.

14  Then remind me on that date in the event that those

15  April days change so that we can reopen all the

16  afternoons.

17          All right.  March 12th.  That is just for

18  status.

19              (Which were all the proceedings had in

20              the above-entitled cause on this

21              date.)

22

23

24

MAYSONET 3435

```
1   STATE OF ILLINOIS )
                      )  SS:
2   COUNTY OF C O O K )

3       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

4         COUNTY DEPARTMENT - CRIMINAL DIVISION

5

6           I, LISA M. HUGHES, an Official Court

7   Reporter for the Circuit Court of Cook County, County

8   Department - Criminal Division, do hereby certify

9   that I reported in shorthand the proceedings had in

10  the above-entitled cause; that I thereafter caused

11  the foregoing to be transcribed into typewriting,

12  which I hereby certify to be a true and accurate

13  transcript of the Report of Proceedings had before

14  the HONORABLE JAMES M. OBBISH, Judge of said Court.

15

16

17  _____
    Lisa M. Hughes, CSR
18  License No. 084-004240
    Circuit Court of Cook County

19

20

21  Dated this 19th day of

22  February , 2013.

23

24
```

—88—

MAYSONET 3436