# EXHIBIT 41



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

REUBEN PALMER, et al., )
)
    Subclass A Plaintiffs, )
)
    and )
)
EDWARD NEGRON, et al., )
)
    Subclass B Plaintiffs, )
)
    v. )    No. 82 C 2349
)
CITY OF CHICAGO, et al., )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Two sets of plaintiffs have filed this class action seeking, among other relief, a preliminary injunction. This Court has conducted an evidentiary hearing on the motion for preliminary injunctive relief. In accordance with Fed. R. Civ. P. ("Rule") 52(a) this memorandum opinion and order reflects this Court's findings of fact and conclusions of law. To the extent (if any) that matters stated in the "Conclusions of Law" section of this opinion contain factual statements, those statements shall be considered findings of fact as well. For the reasons stated in this opinion, plaintiffs' motion for a preliminary injunction is granted.

### Findings of Fact ("Findings")

#### Parties and Proceedings

1. On April 16, 1982 plaintiffs filed this class action under 42 U.S.C. §1983 ("Section 1983") on behalf of two subclasses

of persons arrested by the Chicago Police Department and

charged with felonies under Illinois law:

>        (a)   those persons convicted of criminal offenses in
> the Circuit Court of Cook County and sentenced to probation
> or imprisonment ("Subclass A"); and

>        (b)   those persons awaiting trial in the Circuit Court
> of Cook County ("Subclass B").

Defendants in this action are: 1/

>        (c)   "City Defendants":  City of Chicago ("City"),
> Superintendent of Police Richard Brzeczek ("Brzeczek") and
> Detective Division Area 2 Commander Milton Deas ("Deas");
> and

>        (d)   "County Defendants":  Cook County State's
> Attorney Richard M. Daley and various of his deputies and
> assistants:  Chief Deputy William Kunkle ("Kunkle"),
> former Assistant in charge of the Felony Review Division
> Lawrence Hyman, and Assistants Daniel Locallo and James
> Varga.

>        2.   Immediately on filing this action plaintiffs moved for

an emergency temporary restraining order ("TRO") before the

Honorable Thomas McMillen, to whom the case was originally

assigned.  After hearing arguments from all parties, on April 20,

1982 Judge McMillen issued a TRO that provided in part:

> Defendants shall preserve all police department
> investigative office or working files, sometimes known
> as "street files," together with all contents of such
> files....

------

1/   On October 24, 1982 this Court granted County Defendants'
Motion To Dismiss the damage claims against the prosecutors
named in plaintiffs' Amended Complaint (the "Complaint")
and dismissed the State's Attorney's Office of Cook County
because it was not a suable entity.  For the same reason
the Chicago Police Department is also dismissed as a
defendant.

That TRO took effect upon plaintiffs' filing of the required bond April 26, 1982. By agreement of the parties, the TRO has been continued beyond its ten-day limitation and, as amended, still remains in force and effect.

3. In September 1982, after all parties had engaged in discovery, plaintiffs moved to amend the TRO, claiming (a) Chicago police detectives were violating both the letter and spirit of the TRO by maintaining investigative writings and files as their personal property and (b) that practice had been adopted and was being carried on to avoid the mandate of the TRO for preservation of such writings and files. On September 24, 1982 Judge McMillen amended the TRO to provide (emphasis added):

> Defendants shall preserve intact all police department investigative, office or working files, <u>sometimes</u> known as "street files," together with all the contents of such files, and all other papers and documents <u>formerly put in such files</u>....

4. Shortly thereafter this action was transferred to the docket of this Court, which promptly scheduled and thereafter held a hearing on plaintiffs' motion for a preliminary injunction. 2/ That hearing took place October 25-27 and 29, 1982 and (after a delay occasioned by the nature of Brzeczek's testimony—see Finding 18) was concluded January 3, 1983. All

---

2/ Judge McMillen had also contemplated holding such an early hearing but then became the transferee of another action (from which this Court had recused itself) that required similar expedited scheduling. This action was transferred to this Court in exchange for that other action.

NF-L 005607

the remaining Findings are based on the evidence adduced at the hearing.

## City and County Defendants' Practices and Procedures

5. City's Police Department ("Department") is responsible for investigation of crimes occurring within City and for apprehension of persons who commit such crimes. Department comprises the following Bureaus: Technical Services, Field Tactical Services, Community Services, Administrative Services, Operational Services and Investigative Services. Its Detective Division, within the Bureau of Investigative Services, is administratively divided into six geographical Areas, each headed by an Area Commander directly subordinate to a Deputy Superintendent. Each Area detective facility contains an Administrative Unit, a Property Crimes Unit and a Violent Crimes Unit.

6. Violent Crimes Units are responsible for the investigation of crimes against the person, such as homicide, rape, kidnapping, battery, robbery and assault. Members of Subclasses A and B have been charged with offenses as the result of such investigations.

7. Detectives investigating the types of crimes described in Finding 6 record the results of their investigations in documents that may be classified in two categories, "Unofficial Reports" and "Official Reports":

> (a) "Unofficial Reports" comprise documents usually prepared contemporaneously with the obtaining of the information (such as detectives' notes, typed witness

statements or interviews, and major crime incident worksheets, normally prepared at the initiation of an investigation) and documents that convey information to or request assistance from another shift of detectives working on the same investigation (such as "To-From Memos," "To All Watch Memos" and "Memos").

> (b) "Official Reports" comprise standardized incident, opening, supplementary and closing reports.

Only the Official Reports were and are marked with the Records Division ("RD") number assigned to an investigation and were and are transmitted from the Area detective facility to the Records Division at Police Headquarters, 1121 S. State Street, for storage in the correspondingly numbered file.

8. Department has never provided its detectives or other personnel with directives or guidelines as to the extent to which Official Reports had to embody material obtained in the course of investigations and reflected in Unofficial Reports. City Defendants contend (Prop. Finding 17):

> At all times relevant hereto the policy of the Chicago Police Department has been that all official reports prepared in the course of a violent felony investigation must be complete and accurate; that is, such reports must contain all information known to the preparer(s) which pertains to the offense or to the person(s) accused thereof.

In practice, however, Official Reports have sometimes been prepared from the perspective of what fits the preparer's concept of the crime, so they omit information that--though highly relevant and sometimes exculpatory of the defendant charged with the offense--the preparer does not deem

"pertinent." 3/ Retention of Unofficial Reports is essential so that all exculpatory material may be made available to criminal defendants in the regular course of discovery procedures. Consequently any failure to retain Unofficial Reports creates a serious potential of deprivation of defendants' constitutional rights. Such deprivations have in fact occurred in the past and were the subject of testimony during the hearing.

9. Existence of Unofficial Reports was well known throughout Department before the institution of this action. 4/ However, before the promulgation of Detective Division Notice 82-2 ("Notice 82-2") on April 20, 1982: 5/

    (a) Department took no official cognizance of and had no official policy concerning Unofficial Reports.

    (b) There was no uniform practice within Department as to the preparation, retention, use or storage of Unofficial Reports.

_____

3/   As Department's Area 3 Commander John Stibich acknowledged in this context on cross-examination, "What's pertinent to one [detective] might not be to another."

4/   Indeed, there is nothing inherently wrong in maintaining such documents, which are a useful adjunct to the investigative process. What has created the potential for, and actuality of, deprivation of criminal defendants' constitutional rights has been the non-disclosure of the existence of such Reports and of the exculpatory material they contain, coupled with the lack of procedures assuring their preservation.

5/   Notice 82-2 was generated in response to the institution of this action and Judge McMillen's issuance of the TRO referred to in Finding 2.

Unofficial Reports were regularly maintained at the Areas' detective facilities during the course of an ongoing investigation. Files containing Unofficial Reports during the course of investigation are variously referred to as "street files," "running files," "office files" or "working files" (for convenience these Findings and Conclusions will use the term "street files"). Because of the absence of any official policy or uniform practice:

> (a')  At one Area headquarters Unofficial Reports were kept in a joint file with the Official Reports, while in others they were maintained in a separate file.

> (b')  In some Areas and on some watches Unofficial Reports were considered the property of the individual detective, who could maintain them in his personal possession and retain them or discard them as he wished.

> (c')  In what appear to be a significant number of cases the Unofficial Reports were destroyed, sometimes upon the submission of a closing report, sometimes upon completion of the prosecution and sometimes after appeal.

10.  In addition to materials contained in the street files, other types of police reports are not given RD numbers and are not kept in the Central Record Division. Those include crime lab notes and writings, which are placed in files with crime lab rather than RD numbers. Similarly investigative reports generated at the Central Records Division, such as reports concerning internal investigations and firearm use reports, are not given RD numbers.

NF-L 005611

11.  As a result of the procedures described in the
preceding Findings, not all potentially exculpatory 6/
information contained in the various investigative materials is
necessarily included in the Official Reports.  There has been
and is no police rule, regulation, procedure or practice that
specifically required all exculpatory information learned in a
criminal investigation to be placed in Official Reports and
transmitted to Central Records.  Nor was or is there any
satisfactory procedure for monitoring whether in fact all
exculpatory information is transmitted to Central Records
through Official Reports.

12.  Officers of the Department do not charge a person
with commission of a violent felony except with approval of the
State's Attorney's Office, a procedure known as "felony
review."  At the felony review stage and at various other times
before trial of a person charged with a violent felony, it has
been and is the practice of Department to have officers meet
with Assistant State's Attorneys to prepare a case for trial.

13.  Before institution of this action both County
Defendants and Assistant State's Attorneys engaged in the
felony review procedure were aware that Department detectives

---

6/  Plaintiffs' Prop. Findings 12.I and 12.J also refer to
"discoverable" information and material, presumably
adverting to items discoverable under Illinois Supreme
Court Rule 412, Ill. Rev. Stat. ch. 110A, §412.  But a
violation of Rule 412 would not of itself implicate
Section 1983, which is of course limited to infringement
of federal rights.

NF-L 005612       Hampton v. City of Chicago
                          12 C 5640

investigating violent felony cases prepared and used documents
of the kind encompassed within Finding 7(a)'s definition of
Unofficial Reports.  Awareness of that practice was established
by substantial testimony during the hearings.  However,
evidence during the hearings was insufficient to prove County
Defendants' awareness of the city-wide existence of street
files as such.

    14.  Discovery efforts by criminal defendants in the
Circuit Court of Cook County take two forms (either or both of
which may be availed of by any defendant):

        (a)  subpoenas directed to Department and

        (b)  discovery motions served on County Defendants
and other members of the State's Attorney's Office.
Before institution of this action neither the existence of
street files nor the separate maintenance (apart from Official
Reports) of other potentially exculpatory materials was a
matter of public knowledge, so that counsel for criminal
defendants were wholly unaware of any need to draft requests
for subpoenas and discovery motions broadly enough to encompass
documents not contained with the Official Reports.

    15.  Before institution of this action Department and
members of the State's Attorney's Office responded to discovery
efforts by criminal defendants in the following manner (even
though the language of a subpoena or motion may have been broad
enough--such as a reference to "any and all" documents--to
encompass Unofficial Reports and other documents not given RD

NF-L 005613
Hampton v. City of Chicago
12 C 5640

numbers, such as the types of documents referred to in

Finding 10):

    (a) In response to a defendant's subpoena, Department produced only the Official Reports maintained at Police Headquarters, 1121 South State Street, together with photographs and laboratory reports on analysis of physical evidence, and not (1) the Unofficial Reports maintained at Area detective facilities or in the possession of an individual detective or (2) the documents described in Finding 10 as not given RD numbers.

    (b) In response to a defendant's discovery motion, trial assistants in the State's Attorney's Office simply ordered by telephone the Official Reports maintained at the Central Records Division. They made no effort to inquire of the individual detective Areas whether there were or had been investigative writings maintained there that were not included in the Official Reports. As for the documents described in Finding 10, (1) the information in crime lab files was neither revealed to nor produced for defendants during discovery unless an Assistant State's Attorney specifically requested that the crime lab write an official report incorporating its analysis and findings and (2) the other investigative reports were similarly neither revealed nor produced unless specifically requested by such an Assistant.

Department practice did not insure that the appropriate

prosecutors would be informed of the existence of the

undisclosed and unproduced documents, nor did the State's

Attorney's Office's practices insure that they would make

inquiry as to the possible existence of such documents. No

Department procedure or regulation existed providing for the

systematic retention or production of such documents even when

they contained exculpatory material. These problems have not

been corrected by any regularized procedures or requirements

even today.

16.  At the hearing plaintiffs established, by presenting
Official and Unofficial Reports and other non-RD documents in
15 sample cases, that the exclusion of potentially exculpatory
information from Official Reports was not a random or
infrequent occurrence.  Some examples were these:

>    (a)  In People v. Jones, a death penalty case in
> which the existence of street files was first publicly
> revealed, a substantial amount of exculpatory information
> never found its way into the Official Reports (and was
> therefore not disclosed during discovery).  Such exculpa-
> tory information included the contents of a detailed
> factual memo written by investigator Detective Frank
> Laverty, suggesting that the wrong man had been charged
> and stating a persuasive basis for that view (in fact the
> charges against Jones were ultimately dropped as entirely
> unfounded).

>    (b)  In In re Baker the information contained only in
> Unofficial Reports consisted of an eyewitness identification
> of someone other than the defendant by a witness who knew
> the defendant, and who also told the investigators that
> the defendant was not present at the scene of the crime.

>    (c)  In People v. Williams information in an
> unofficial "File Note" was followed by the notation:

>> "We did not put this in the supp. [Supplementary
>> Report] because it would just cloud the issue."

> Information omitted from the Official Reports consisted of
> an eyewitness description of persons apparently fleeing
> the crime scene--a description dissimilar to the descrip-
> tions given by the prosecution witnesses.

By the City's own admission, over 300 additional street files
still exist at the various police Areas.

17.  In response to Judge McMillen's issuance of the TRO
in this action, Notice 82-2 prohibited destruction of documents
"maintained and stored under Detective Division control within
a unit."  Department personnel applied that directive in an

improperly restrictive and grudging manner, under which
detectives could consider their investigative writings as their
personal property (and thus not "under Detective Division
control") and therefore as outside the preservation
requirements of Notice 82-2.  At the hearing Area Commanders
Deas and Stibich testified that under their interpretation of
Notice 82-2, and despite the language of the amended TRO in
this action, detectives were still free to destroy their own
investigative writings under the guise of "personal property."

18.  Immediately following the testimony referred to in
Finding 17, Superintendent Brzeczek (Department's chief
executive and administrative officer) testified for defendants.
Brzeczek's testimony was candid and forthright and substantially
undercut the testimony of his subordinates referred to in
Finding 17, and particularly their improper reading of
Notice 82-2:

(a)  Brzeczek specifically stated any failure to
preserve all detective investigative documents (a concept
that includes all items encompassed within Finding 7(a))
was improper.

(b)  Brzeczek also testified his interpretation of
the TRO and the intent of Notice 82-2 (which was a major
step taken to implement the TRO, and was intended to have
the identical scope) was that all investigative documents
become part of the investigative file and must be preserved.

(c)  Brzeczek further testified Notice 82-2 did away
with any distinction between personal and departmental
files, so that any detective who fails to retain any notes,
or who retains any notes outside of Department's files,

violates the TRO and Notice 82-2. [7]

(d)  Brzeczek stated any failure to implement Notice 82-2 in the manner described in this Finding would be a violation of its provisions, and he had been unaware of any contrary views or action within Department.  To his knowledge, though there had been earlier discussion of compliance with Notice 82-2 being an "overwhelming task," there was no indication it had posed any burden in practice.

(e)  Brzeczek confirmed that any police recordkeeping system that did not effectuate both the Illinois Supreme Court Rules as to criminal case discovery and the constitutional principles exemplified by Brady v. Maryland was "flawed."

(f)  Brzeczek stated Department had issued no directives as to the reasons for issuing Notice 82-2, nor had there been any changes in Department's manuals to comply with the TRO (though such matters were under consideration).

(g)  Finally Brzeczek stated the entire problem of street files and the preservation of investigative documents was Department's responsibility.  All such documents were to be turned over by Department in response to document requests, whether emanating from criminal defendants or from the State's Attorney's Office, after which the remaining responsibility was that of the latter.

Because Superintendent Brzeczek's testimony (binding on City Defendants) effectively conceded the propriety of the injunctive relief sought by plaintiffs, it appeared to this Court (and the parties appeared to agree) a consent decree was likely to be capable of development and, if so, would be the most expeditious way to proceed.  Accordingly the hearing was recessed so that proposals and counter-proposals could be

---

[7]  By the same token, any Department supervisory personnel who had or were aware of the kind of improper reading of Notice 82-2 referred to in Finding 17, and who failed to cause all notes and other investigative documents to be retained as part of Department's files, have also violated the TRO and Notice 82-2.

submitted by all parties. <u>8</u>/

19. Upon resumption of hearings after the recess had
failed to produce a consent decree, City Defendants presented
no additional evidence, and County called Deputy State's
Attorney Kunkle. Kunkle's testimony supported that of
Superintendent Brzeczek and basically confirmed the propriety
of the injunctive relief sought by plaintiffs:

> (a) Kunkle agreed all police investigative documents
> should be maintained for discovery purposes. Kunkle also
> testified an order requiring such maintenance in a specific
> location, together with a checklist identifying such docu-
> ments as they are made or entered in the file, would
> substantially assist the State's Attorney's office in
> meeting its constitutional discovery obligations.

> (b) Kunkle also confirmed it was the State's
> Attorney's office's responsibility under the Constitution
> and the Illinois rules as to discovery (1) to keep itself
> informed of the method and location of file-keeping by
> Department and (2) to assure the proper flow of any
> exculpatory materials in such files to criminal defendants.
> Accordingly Kunkle testified an order requiring the State's
> Attorney's office to maintain such knowledge as to
> Department, and requiring Department to inform the State's
> Attorney's office of any changes in Department's methods,
> would be appropriate and would impose no burden on the
> State's Attorney's office.

---

<u>8</u>/ Initially such proposals were submitted both by plaintiffs
and by City Defendants, with the latter's proposals
incorporating part of the relief requested by plaintiffs.
After this Court had provided all parties with a suggested
synthesis of the parties' proposals, City Defendants'
counsel originally indicated a number of the suggested
revisions were acceptable to their clients. Then City
Defendants essentially changed their position by rejecting
any form of consent. By contrast, County Defendants have
accepted a substantial portion of the relief relevant to
them as proposed by plaintiffs and synthesized by this
Court. Absent consent by all parties, however, this Court
was compelled to resume hearings January 3, 1983.

(c)  Finally Kunkle testified the current methods employed by the State's Attorney's office to obtain files kept at the police Area facilities are limited to a phone call to administrative personnel at the Area facility and a discussion with the Chief Investigator before trial.  No follow-up of that informal process is undertaken, nor is any check made of Department's responses to the Assistant State's Attorney's questioning.

Because of the variations that now exist in file-keeping methods and locations (both from Area facility to Area facility and from case to case), the procedure referred to in Finding 19(c) does not satisfactorily assure that any exculpatory material is produced at all, or is produced at a time sufficiently in advance of trial to be useful to the defendant. 9/

20.  On February 3, 1983 Department issued Detective Division Special Order 83-1 ("Special Order 83-1"), dealing with the subject matter of this action.  Special Order 83-1 (Exhibit 1 to these Findings and Conclusions) implements a

---

9/  After Kunkle's testimony was completed plaintiffs stated they planned to introduce no rebuttal evidence.  County Defendants some time later tendered their Group Ex. 1, a series of affidavits by Assistant State's Attorneys as to their alleged practices and procedures (including assertions as to some cases that had been the subject of plaintiffs' proof during the hearings).  Plaintiffs have objected to those affidavits, stating "cross-examination would prove many of the assertions false as well as explaining them in a way consistent with Plaintiffs' assertions in this lawsuit" (Pl. Jan. 19, 1983 Mem. at 3).  County Defendants dispute that vigorously as well as making the technical argument (which this Court rejects) that plaintiffs' objections should not be considered at all because filed five days late.  In the view this Court takes of the case, the disputed affidavits would not affect the result even if plaintiffs' objections (which appear to have some validity) were overruled and the affidavits were fully credited.

number of the proposals made by City Defendants following Superintendent Brzeczek's testimony, together with some modifications that had then been suggested by this Court and were initially indicated by City Defendants to be acceptable revisions (see n.8). Special Order 83-1 is substantially deficient, however, in the following respects: 10/

(a) To avoid any possible confusion on this score, the term "street files" should be added to Paragraph I ("Introduction") as one of the previously-existing common designations of investigative documents and files.

(b) Paragraph V.A. fails to provide for immediate initiation of an Investigative File Case Folder in all violent crime field investigations. As that paragraph is now drafted, crimes other than those designated in Paragraph V.A.1 will not require the initiation of an Investigative File unless and until someone is arrested and felony charges are approved. That would mean all the controls intended to be established by this whole Investigative File procedure would be lacking in those cases until the arrest and the approval of felony charges. That would continue to pose the very risks of violations of constitutional rights this lawsuit was brought to prevent. There would be nothing to protect against the kind of selective retention referred to in Finding 8 and other Findings. Accordingly Paragraph V.A.1 must be revised, and corresponding changes will be required in Paragraphs V.A.2 and 4 and B.3.

(c) Nothing in Paragraph V.B defines (as it should) the necessity for detectives to record all relevant investigative information, for precisely the reasons already discussed in these Findings. Consequently the following new Paragraph V.B.1 should be inserted (renumbering the present subparagraphs accordingly):

---

10/ As n.8 reflects, before issuing Special Order 83-1 City Defendants had shifted ground on the entire subject of their acting voluntarily in this lawsuit to protect the constitutional rights of the plaintiff subclasses. Some of the matters next itemized in the text were things to which City Defendants had agreed before that basic rejection of any consented-to action on their part.

in line with the investigator's obligations to record
and preserve all relevant information as fully and
accurately as possible, take and maintain complete
notes of all relevant matters during the course of
their investigation (this requirement is intended to
serve the purposes of Department directives to assure
not only that information and materials indicating
the possible guilt of the accused are preserved, but
also that the accused may ultimately be granted access
to any information and materials that may tend to
show his possible innocence or aid in his defense).

(d)  To avoid confusion created by the language of
present Paragraph V.B.2, it should be revised to begin:

promptly (normally at the end of each tour of duty)
submit all handwritten notes and investigative
documents....

(e)  Although Department may have intended to imply
such a duty by including the words "or received" in
present Paragraphs V.B.2 and B.3, Special Order 83-1 omits
an explicit statement of the nature initially proposed by
City Defendants themselves as a proper means for
implementing the preservation of defendants' constitutional
rights.  Such a provision (the following language is taken
verbatim from City Defendants' original proposal) must be
added:

Any detective who has or receives information
relating to a violent crime field investigation not
assigned to him will promptly forward the information
to the assigned detective for investigation and
inclusion in the Investigative File Case Folder.

(f)  Special Order 83-1 also omits any provision
defining Department's duties in response to defendants'
discovery efforts (again City Defendants' own proposals
had recognized the need for such a provision).

Although Special Order 83-1 itself may not be the appropriate
vehicle for including provisions as to training, City Defendants
must also be required to implement a program of instruction to
assure detectives' awareness of the reasons for, and the
procedures regarding, the protection of the criminal defendants'
rights referred to in these Findings and Conclusions.  This too

had been part of City Defendants' initial proposals from which they later backed away. Finally, nothing in Special Order 83-1 addresses the problem posed by the situation described in Findings 10 and 15.

<h3 style="text-align:center">Conclusions of Law ("Conclusions")</h3>

1. This Court has jurisdiction of this action under Section 1983 and 28 U.S.C. §1331.

2. This is a proper action for maintenance as a class action under Rule 23(b)(2) for the following reasons:

> (a) Members of each of Subclass A and Subclass B are so numerous that joinder of all members is impracticable (Rule 23(a)(1)).

> (b) As shown by the Findings and these Conclusions, there are many questions of law and fact common to each subclass and to the class as a whole (Rule 23(a)(2)).

> (c) As shown by the Findings, the claims of the representative parties are typical of the claims of the respective subclasses (Rule 23(a)(3)).

> (d) Plaintiffs' counsel are experienced practitioners, both in the areas of criminal substantive and procedural law and in class actions. In this action both they and the representative parties have admirably protected the interests of each subclass, and they will continue fairly and adequately to protect those interests (Rule 23(a)(4)).

> (e) Defendants, as the parties opposing the class, have both acted and refused to act on grounds generally applicable to the class. Accordingly this preliminary injunction and final injunctive relief are entirely appropriate with respect to the class as a whole (Rule 23(b)(2)).

3. Our Court of Appeals has regularly repeated the standards applicable to the grant or denial of preliminary injunctive relief. In accordance with the priority as defined in O'Connor v. Board of Education, 645 F.2d 578, 580 (7th Cir.),

NF-L 005622

cert. denied, 454 U.S. 1084 (1981), the Court has most recently

restated the standards in Syntex Ophthalmics, Inc. v. Tsuetaki,

Nos. 82-1837 et al., slip op. at 7 (7th Cir. March 2, 1983):

> [I]n order to justify the district court's exercise of
> discretion in issuing the preliminary injunction, the
> plaintiff must show: "(1) it has at least a reasonable
> likelihood of success on the merits, (2) it has no
> adequate remedy at law and will otherwise be irreparably
> harmed, (3) the threatened injury to it outweighs the
> threatened harm the preliminary injunction may cause
> the defendants, and (4) the granting of the preliminary
> injunction will not disserve the public interest."

These Conclusions will address the factors in that sequence.

4. Plaintiffs have demonstrated far more than a reasonable

likelihood of success on the merits:

> (a) Department's practices before this action was
> instituted (see Findings 7-16) unquestionably created a
> grave risk of non-disclosure of exculpatory materials and
> hence of the violation of constitutional rights of members
> of Subclasses A and B. Despite Judge McMillen's issuance
> of the TRO and Department's conforming issuance of
> Notice 82-2, those practices and the corresponding risks
> have continued to exist.

> (b) Department's most recent issuance of Special
> Order 83-1, though a step in the right direction, does not
> accord plaintiffs the full rights to which they are
> entitled. None of defendants disputes the entitlement of
> the class members to the substantive protection
> involved--their quarrel is rather with the need for
> injunctive relief to assure that protection.

5. Plaintiffs have also established the existence of

irreparable damage and the inadequacy of remedies at law. Only

by assuring the availability of exculpatory material for

production (upon any reasonable request therefor) can the

constitutional rights of class members be protected. Under the

circumstances disclosed during the hearings, injunctive relief

is necessary for that purpose:

    (a)  Even after Judge McMillen's issuance of the TRO and Department's conforming issuance of Notice 82-2, both line and supervisory personnel in Department engaged in distorted readings of those orders in a manner that would continue to thwart their purposes of making the constitutionally required disclosures to criminal defendants (see Finding 17).  Then despite Superintendent Brzeczek's forthright testimony that should have caused City Defendants to confess error and consent promptly to issuance of an appropriate injunction (see Finding 18), they have refused to do so.  It is clear that without such an injunction criminal defendants will continue to be subject to the discretion of Department personnel who have effectively rebutted the presumption that public officials, once aware of the requirements of law, will comply with them.

    (b)  Although County Defendants have not been shown to have colluded with City Defendants in the violations of constitutional rights of class members (both those demonstrated in the past and those that would continue in the future absent injunctive relief), the preservation of such constitutional rights depends on the effective interaction of Assistant State's Attorneys with Department personnel.  In at least some instances such Assistant State's Attorneys have not acted to assure full and proper disclosure to criminal defendants despite their knowledge of Department personnel's practices (see Finding 13).  Past experience demonstrates it cannot be assumed that the knowledge and intentions of top-level personnel in the State's Attorney's office will also be effectively communicated to and acted upon by the Assistant State's Attorneys who have the responsibility for implementation of basic policies in real world terms.  Kunkle's own testimony (see Finding 19) confirmed that an order of the nature being issued by this Court would be useful in that respect in assuring the preservation of constitutional rights that are the subject of this action.

6.  Without question the harm to plaintiffs if a preliminary injunction were not issued (see Conclusion 5) would outweigh the harm to defendants if a preliminary injunction were wrongfully issued, for on defendants' own uncontroverted evidence no such harm would exist at all in the latter case.

City Defendants' basic argument is that they should be permitted to tailor the means to arrive at concededly proper and constitutionally required goals, without being directed to do so by this Court--an argument demonstrating no harm whatever from such issuance. County Defendants have acknowledged issuance of an order would be helpful and not harmful.

7. Finally the preliminary injunction clearly would not disserve the public interest. Of course preservation of individuals' constitutional rights affirmatively serves the public interest. And as for the arguments advanced by defendants against interference with state criminal procedures, that is a wholly false issue. Nothing in this Court's order would in any way affect state criminal procedures, either at trial or post-conviction. All this Court's order will do is to assure that any exculpatory material will be preserved and therefore readily available, so that the state judicial remedies will go forward with the availability to defendants of what the Constitution requires. This Court is not second guessing or preempting the state court system in any respect.

*          *          *

These Findings and Conclusions are accompanied by a suggested form of preliminary injunction order. Each of the parties is ordered to submit comments on the suggested order (including proposals for modifications or additions) on or before April 11, 1983. In addition, as the parties will note, the suggested order is silent on the subject of security,

required by Rule 65(c) to be addressed by this Court, because of the assumption that the present security arrangements for the TRO would be appropriate for the preliminary injunction, or that the absence of potential harm to defendants is such that they would waive the giving of security altogether. This subject of security should also be addressed in the parties' comments (including a statement of the reasons that other security is necessary, and the appropriate amount thereof, if this Court has misread defendants' position in that respect).

Milton I. Shadur
United States District Judge

Date: March 31, 1983