# EXHIBIT 42

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,                )
            Plaintiff,    )
      -vs-            ) No. 12 CV 4428
REYNALDO GUEVARA, ET AL.,    )
            Defendants.    )

    The deposition of JAMES HICKEY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before KIMBERLY J. KARAS, a notary public within and for the County of Cook and State of Illinois, at 375 East Chicago Avenue, 8th Floor, Chicago, Illinois, on the 6th day of May, 2014, commencing at the hour of 1:08 o'clock p.m. and terminating at the hour of 4:54 o'clock p.m.

Reported by:  Kimberly J. Karas
License No.:  084-003548

1

---

1    APPEARANCES:
2
3        RODERICK AND SOLANGE MacARTHUR JUSTICE
4        CENTER, by
5        MR. LOCKE BOWMAN
6        Northwestern University School of Law
7        357 East Chicago Avenue
8        8th Floor
9        Chicago, Illinois  60611
10        (312) 503-1336
11        ereana-hart@law.northwestern.edu
12        j-bowman@law.northwestern.edu
13            and
14        LOEVY & LOEVY, by
15        MR. STEVE ART
16        MR. RUSSELL AINSWORTH
17        MR. ANAND SWAMINATHAN
18        312 North May
19        Suite 100
20        Chicago, Illinois  60607
21        (312) 243-5900
22        art@loevy.com
23            Representing the Plaintiff;
24

2

---

1    APPEARANCES CONTD:
2
3        ROCK, FUSCO & CONNELLY, LLC, by
4        MS. EILEEN ROSEN
5        321 North Clark Street
6        Suite 2200
7        Chicago, Illinois  60654
8        (312) 494-1000
9        erosen@rockfuscoconnelly.com
10            Representing the City of Chicago;
11
12        THE SOTOS LAW FIRM, P.C., by
13        MR. JEFFREY N. GIVEN
14        550 East Devon
15        Suite 150
16        Itasca, Illinois  60143
17        (630) 735-3300
18        jgiven@jsotoslaw.com
19            Representing named Defendant Chicago
20            Police Officers.
21
22
23
24

3

---

1                I N D E X
2    WITNESS                EXAMINATION
3    JAMES HICKEY
4        By Mr. Bowman            5
5
6
7            E X H I B I T S
8    NUMBER                IDENTIFICATION
9    Hickey Exhibit
10        No. 1            48
11        No. 2            70
12        No. 3            77
13        No. 4            88
14        No. 5            108
15        No. 6            122
16
17
18
19
20
21
22
23
24

4

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

Page 5

1    (Whereupon, the witness
2    was duly sworn.)
3    JAMES HICKEY,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6    EXAMINATION
7  BY MR. BOWMAN:
8    Q.  Tell us your name please.
9    A.  James K. Hickey, H-i-c-k-e-y.
10   Q.  Mr. Hickey, we've met before.  Indeed
11 we've been through this process before.  And I know
12 you're an experienced witness.
13   Do be careful with me, I'm very slow of
14 speech.  Make sure that I finish asking the
15 question before you start to answer even if you
16 know what I'm going to ask you.
17   And yes's, no's rather than -- rather than
18 ambiguous sounds are required.
19   If you need to take a break at any point
20 just let me know.  Please answer the question
21 pending before we stop, that's the only caveat.
22 Other than that whenever you need to stop we can
23 stop.
24   I owe you clear questions.  So if I've

Page 6

1  asked you something that is not clear for any
2  reason, doesn't make sense to you, please tell me.
3  I will keep rephrasing the question until I've got
4  it to the point where you can understand it.  And
5  if -- if I -- if you don't tell me that you haven't
6  understood a question I'm going to assume that it
7  was clear, that you did understand it, and that
8  you're responding to the question that I've asked.
9    Is that fair?
10   A.  Yes, it is.
11   Q.  All right.  Again, you know, I know you've
12 been around this before not only with me but with
13 others.  I have to apologize there will be some
14 repetition simply because we need to create a clear
15 record for this case.
16   So with apologize if you could begin by
17 giving me your educational background please?
18   A.  Bachelors in History, 1971.  A Masters in
19 Urban Studies, 1975.  A Doctorate in Public
20 Administration, 1978.
21   Q.  Is that a DPA?
22   A.  DPA, yes.
23   Q.  And that was in '78?
24   A.  Correct.

Page 7

1    Q.  What institutions awarded you these
2  degrees?
3    A.  Loyola, Loyola, and Nova, N-o-v-a.
4    Q.  Okay.  What is Nova?
5    A.  It's an institution in Florida.  It was a
6  regional training.  I would call it the -- it was
7  nontraditional at the time, 1978.
8    Q.  Got it.  And could you also please give me
9  a resume of your experience with the Chicago Police
10 Department beginning at the point of your being
11 sworn in?
12   A.  14 June, 1971, I was appointed to the
13 Chicago Police Department.  I served in various
14 sworn capacities over the year.  I was a police
15 officer assigned to the Englewood Community.  I
16 subsequently was assigned to the youth division
17 where I worked in the juvenile court.  Subsequent
18 to that I was given another assignment in the youth
19 division to the special investigations unit which
20 specialize in child pornography type of cases and
21 narcotics.
22   In August 1977 I was appointed to
23 detective.  I was assigned to the Area 1 homicide
24 and sex unit, that's 51st and Wentworth.

Page 8

1  Subsequent to that I was assigned to detective
2  headquarters.
3    Q.  Is that 11th and State?
4    A.  At that time it was 1121 South State
5  Street, 5th Floor.
6    And subsequent to that, about 1983, I was
7  assigned to the crime lab.  I worked in the crime
8  lab for four years.  I made sergeant while I was
9  there.
10   I was promoted to lieutenant in 1988.  I
11 was assigned to the Englewood Community again, 007
12 District.  From there I went to patrol headquarters
13 at 11th and State.
14   After patrol headquarters I was assigned
15 to Midway Airport.  After Midway Airport I was
16 assigned to create a unit called random drug
17 testing unit.  It tested police officers on an
18 unannounced basis for illicit controlled
19 substances.
20   After that I was assigned to the Bureau of
21 Investigative Services at 1121 South State Street.
22   Subsequent to that I was assigned to the
23 3rd District, 7100 South on Cottage Grove known as
24 the Grand Crossing Community, I was a watch

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

commander there.

Q. Did you say Cottage Grove, I'm sorry?

A. Cottage Grove.

Q. Grand Crossing?

A. The Grand Crossing Community, right.

I was there for I think three years or three Bulls celebrations as I recall.

Q. So this would have been in the 1990's?

A. Yes. Some things you remember.

Then I was assigned as a watch commander to the 11th District at Harrison and Kedzie. And subsequent to that in 1997 I was assigned to research and development.

Q. I'm sorry, 1997?

A. 1997.

And September 30th, 1999 I retired and was rehired as a civilian on October 1st, 1999. I stayed in research and development.

I subsequently was assigned to the -- I was assistant director of research and development and then I became assistant director of the records division. Then I was the assistant director of the information technology group. And in 2008 I was back in research and development where I remain

today.

Q. Okay. Thank you.

A. You're welcome.

Q. So have you ever held any exempt rank?

A. I have not.

Q. Just a couple of questions by way of follow-up. Focusing on your experience as a detective can you tell me how long you were assigned at Area 1, I have August 1977 down as a start?

A. Until Fall 1982 -- I'm sorry, Fall -- Fall 1980, I'm sorry. Fall 1980.

Q. Okay. And then was it in the Fall of 1980 that you transferred to detective headquarters at 11th and State?

A. Correct.

Q. So during these events involving the street file controversy you were the detective assigned to the headquarters at 11th and State?

A. Yes, sir.

MS. ROSEN: Objection to the form of the question.

BY MR. BOWMAN:

Q. In your three years at Area 1 did you

concentrate on homicide and sex crimes in terms of your investigative responsibilities?

A. That was the name of the unit, yes. But we also handled aggravated batteries and other types of assaults including simple assaults.

Q. Would it be fair to say that you were personally involved in a large number of homicide investigations in the three years that you were assigned to homicide and sex in Area 1?

MS. ROSEN: Object to the form.

You can answer.

THE WITNESS: Yes.

BY MR. BOWMAN:

Q. Can you approximate the number? I mean -- and I realize that that's a completely unfair question be just in terms of order of magnitude would it be more than 50?

A. As to my -- we're assigned a homicide investigation every day. Sometimes they were scenes and sometimes they were simple follow-up. I would have to do some math before I answered that. It was regularly.

Q. Well, if I understand your answer correctly it would be fair to say that on a daily

basis for the three years between August of '77 and the Fall of '80 you were working homicide investigations in one fashion or another?

A. That's correct.

Q. So in that process you gained personal experience regarding the note taking, investigation recording, files keeping practices of the detectives around you on the job?

A. Correct.

Q. All right. What -- do you have any personal knowledge of why you were moved to detective headquarters, was this a request on your part or a decision that was made above your level?

MS. ROSEN: Objection, form.

THE WITNESS: A decision made above my level. We were in the process as an organization reorganizing the detective structure and I was probably viewed as a strong writer.

BY MR. BOWMAN:

Q. Who was the chief of detectives when you were moved to the detective headquarters?

A. William Handhardt.

Q. And what were your responsibilities at detective headquarters in the years between your

**Page 13**

1 transfer there in the Fall of 1980 and your move to
2 the crime lab at some point in 1983?
3     A. My morning duties were simply to gather
4 the reports from the then six areas which describe
5 the crime and major developments on cases which had
6 occurred in the past 24 hours. I would try to
7 synthesize it and summarize it for the chief of
8 detectives, that was my morning duties.
9         And then I would describe my other duties
10 pretty much as special assignments.
11     Q. Were the reports that you gathered from
12 the six areas for summarization, reports that I've
13 heard described as major incident reports?
14     A. They would be included, yes.
15     Q. Okay. So can you tell me what reports you
16 were gathering and reviewing and summarizing on a
17 daily basis in those years?
18     A. Each area was divided into six watches of
19 eight hours a piece. And each watch in each of the
20 areas had to leave a report at the end of their
21 tour of duty. Whether something significant
22 happened or not. Negative reports were required.
23 So we have a status from each of the watches from
24 each of the detective areas. And the specialized

**Page 14**

1 units like bomb and arson.
2         Attached to these logs might be major
3 incident worksheets, it might be a supplementary
4 report, it might include pattern identification
5 where perhaps a burglary had been resolved in which
6 ten victims cases were resolved, fixed, solved.
7 Yes.
8     Q. As part of the same arrest?
9     A. Right. But certainly focusing on the
10 violent crimes.
11     Q. All right. And what was the -- to the
12 extent it was explained to you what was the purpose
13 for your preparing this summary for Chief
14 Handhardt?
15     A. There was a morning meeting with the
16 superintendent of police. And superintendent had
17 each of his major division represented at this
18 meeting and wanted to know what was going on in the
19 department citywide.
20     Q. Now, can you give me some examples of the
21 special assignments that you were tasked with over
22 the course of these three years?
23     A. Sure. I can think of at least three. One
24 was the reorganization of the detective division

**Page 15**

1 from what I would describe as a speciality
2 organization where we had citywide burglary units,
3 robbery units, homicide, sex, general assignments.
4 And we redesigned the structure to be more
5 geographically centered. Really going from crime
6 specific to a geography or a population center
7 service organization. That was one.
8         Another was crime statistics. We --
9 that's always been an issue in -- for police
10 departments. It's not new today.
11     Q. Meaning that police departments are fairly
12 or not sometimes judged by the politicians and the
13 public based on the level of crime and the
14 effectiveness of the department in closing cases?
15     A. It's the entire subject of victimization
16 and our service and our effectiveness.
17         And a third topic, a major topic, was the
18 investigative files.
19     Q. Right. Now, do you have a recollection of
20 how that came to be assigned to you -- actually let
21 me -- let me strike that question and ask you a
22 given one.
23         How did it come to your attention first
24 that there was an issue regarding investigative

**Page 16**

1 files that was going to require attention?
2     MS. ROSEN: Objection, form.
3         You can go ahead and answer.
4     THE WITNESS: There was the now rather
5 well-known case in Area 2 I believe the -- the case
6 was the George Jones case. That certainly received
7 the attention of the detective division. And at
8 issue was a memorandum. And almost any time a
9 subject comes up an organization inherently asks
10 itself is this a policy question. It's -- and that
11 is how at the beginning it came to our attention.
12     Q. All right. And then -- and we'll talk
13 about it later but you were assigned to undertake
14 some investigation and participate in the process
15 of reacting to the Jones case on a policy basis
16 within the department, fair summary?
17     A. Yes, sir.
18     Q. All right. Do you know -- okay. And so
19 then in 1983 you moved over to the crime lab, what
20 precipitated that move?
21     A. I was offered an assignment there, it
22 involved promise of a little more money.
23     Q. What was your assignment in the crime lab?
24     A. I went as a detective and I -- my title

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

subsequently changed after a while there, it was a police lab technician title.

Q. What were your duties in the crime lab?

A. I would describe myself as the administrative person in the crime lab. I would fill in occasionally for crime scene processing but mostly was administrative.

Q. Did you have any expertise in forensics, crime scene processing?

A. No, I did not.

Q. Okay. When you moved in 1983 from the detective division to the crime lab was there a change in administration in the -- in the ranks above you at all?

MS. ROSEN: Objection.

MR. BOWMAN: That's a terrible question. That's an awful question. Forget it.

BY MR. BOWMAN:

Q. When you moved did Handhardt remain as chief of detectives?

A. No, he did not.

Q. Okay. When did Handhardt -- as I recall it Handhardt was demoted from the exempt ranks by Fred Rice, is that correct?

17

A. That is correct.

Q. And are you aware of the circumstances, the reasons for that demotion?

A. No, I'm not.

Q. Was Handhardt's demotion -- and who replaced Handhardt?

A. George McMann.

Q. Okay. When McMann replaced Handhardt was that the point at which you moved over to the crime lab?

A. Not immediately.

Q. But was it shortly thereafter?

A. Probably two months.

Q. Was this a function of McMann wanting to put his own team in?

A. No, it wasn't. I told you I was offered a position with the promise of a little more money.

Q. So this was your initiative as opposed to something that came down from one high?

A. I accepted the offer, it was not my initiative.

Q. Who made the offer to you?

A. Paul Gall the director of the crime lab.

Q. And you stayed there for five years?

18

A. Four for sure, I'm a little fuzzy on the exit date.

Q. Okay. Did you become -- I'm having trouble deciphering my notes. Did you become a sergeant while you were in the crime lab?

A. I did.

Q. You took the exam?

A. Yes.

Q. And then in 1988 you became a lieutenant?

A. Correct.

Q. Was that as a result of an exam also?

A. Yes.

Q. And as a lieutenant did you then move over into the patrol division?

A. I did.

Q. When you became a sergeant did you stay in the crime lab?

A. I did.

Q. Okay. Is that unusual?

A. Yes.

Q. Is there any particular reason that you're aware of why that happened?

A. My bosses wanted to keep me where I was.

Q. And then you spent a short amount of time

19

in the 7th District which is Englewood as a lieutenant?

A. Correct.

Q. Is that a watch commander position?

A. It was as field lieutenant.

Q. Meaning you were out in a car --

A. Right.

Q. -- supervising people who were on the street?

A. Sergeants and police officers.

Q. How many sergeants were under your command?

A. Typically three or four on any given day.

Q. How long after your promotion to lieutenant did you move back to headquarters?

A. Relatively short period of time, I would say three months.

Q. Any particular reason for that move that you're aware of?

A. The chief of the -- chief of patrol requested that I work for him.

Q. And who was that?

A. George Ruckrich, R-u-c-k-r-i-c-h.

Q. What duties did you have at patrol

20

| | |
|---|---|
| 1   headquarters? | 1   Bureau of Investigative Services at 11th and State, |
| 2      A.  I was in charge of the assignment of | 2   what was your set of responsibilities there? |
| 3   personnel.  Not that I would have final say but in | 3      A.  I was the administrative lieutenant to a |
| 4   patrol adequate manpower evenly distributed is an | 4   deputy superintendent and I -- one of the things I |
| 5   important matter.  And I worked on the budget. | 5   worked on was reducing the number of detective |
| 6   Again I didn't prepare the final budget but when | 6   areas I think from six to five areas.  We also |
| 7   you do the budget in patrol division you're -- you | 7   tried to foster closer working relationships |
| 8   take -- it's a big chunk of the police department | 8   between the detective division and the organized |
| 9   budget.  So I worked on the issues that pertain to | 9   crime division. |
| 10   that.  And I also worked on again special projects. | 10      Q.  Is organized crime related in any way to |
| 11      Q.  How long did you remain in headquarters | 11   gang crimes or is that a different -- |
| 12   before you moved to Midway Airport? | 12      A.  Gang crimes has traveled in the |
| 13      A.  Two and a half, three years. | 13   organization from one bureau to another over the |
| 14      Q.  What was the year, if you remember, that | 14   decades.  So you'd have to almost phrase your |
| 15   you moved to Midway? | 15   question as to what year and -- you know, at this |
| 16      A.  I'm sorry.  I made lieutenant in '88. | 16   time they were not in the Bureau of Investigative |
| 17      Q.  Early 90's? | 17   Services. |
| 18      A.  Might be '89.  I don't know, I'm sorry. | 18      Q.  At any point over the course of your years |
| 19      Q.  And what duties did you have at Midway? | 19   in the police department have you ever had any |
| 20      A.  Actually my job was to create the airport | 20   assignments that caused you to interface with gang |
| 21   unit of the police department.  Up until that time | 21   crimes in any way? |
| 22   O'Hare Airport was part of the 16th District on the | 22      MR. GIVEN:  Object to the form. |
| 23   northwest side, Midway was part of the 8th District | 23      You can answer. |
| 24   on the southwest side, and Meigs Field was part of | 24      MS. ROSEN:  Go ahead. |

21

23

| | |
|---|---|
| 1   the 1st District. | 1      THE WITNESS:  When I was working detective |
| 2      So my first duty was to prepare -- make it | 2   there was a gang unit at Area 1. |
| 3   a unified command where the commander would have | 3   BY MR. BOWMAN: |
| 4   but one subject matter, one area of responsibility, | 4      Q.  Other than that? |
| 5   the airports.  Everyone can't be an expert in | 5      A.  I can't recall of any hands-on workings |
| 6   everything.  And at the end of that I was the -- | 6   with gang crimes. |
| 7   given the assignment for Midway and Meigs | 7      Q.  Who was the deputy superintendent for whom |
| 8   Field. | 8   you served as administrative lieutenant at the |
| 9      Q.  And how long were you involved in that? | 9   Bureau of Investigative Services? |
| 10      A.  Probably only a year. | 10      A.  That's the same name as former patrol -- |
| 11      Q.  And then was it at that point that you | 11   Ruckrich. |
| 12   moved into this random drug testing business? | 12      A.  George Ruckrich. |
| 13      A.  Right.  Superintendent Martin, Leroy | 13      Q.  All right.  Then you had a series |
| 14   Martin had picked me for this unit which I did not | 14   of assignments at the 3rd District and the |
| 15   volunteer for. | 15   11th District and were these in the patrol |
| 16      Q.  I appreciate that. | 16   division? |
| 17      A.  It happens. | 17      A.  Yes. |
| 18      Q.  You were not a popular person in the | 18      Q.  Okay.  And then you reported that in 1997 |
| 19   police department when you -- | 19   you went into research and development.  Tell me |
| 20      A.  No, I think the subject matter was not | 20   about that -- that assignment, what your |
| 21   popular.  I'm sure I was -- always had my same | 21   responsibilities were and how you came to be in it? |
| 22   popularity rating whatever it might be. | 22      A.  I actually interviewed for that |
| 23      Q.  All right.  And then after some period of | 23   assignment.  The position I interviewed for and the |
| 24   time with drug testing you moved back into the | 24   position that I -- the duties I fulfilled were as |

22

24

McCorkle Litigation Services, Inc.<br>Chicago, Illinois (312) 263-0052

the commanding officer of the policy and the
procedures section. In that section we draft
directives on behalf of the superintendent of
police. There is a development process, a review
process, and a request process they have the
superintendent sign the order.

Q. How many folks did you have on your staff?

A. I believe 16 was the number.

Q. And I'm guessing from the way you describe
it that the job requires a strong logical mind,
good writing skills, and the like?

A. An understanding of the organization
helped as well.

Q. Right. And were -- can you describe the
folks who worked for you what -- what were they
line detectives, line patrol officers who were just
randomly pulled in, how did that work?

A. I think I had three sergeants and the rest
police officers all were educated.

Q. Meaning they -- some of them had gotten
degrees under the auspices of the police
department?

A. Correct.

MS. ROSEN: Object to the form.

25

BY MR. BOWMAN:

Q. Other than the preparation of policy and
procedure directives were there any other
responsibilities that the research and development
office had under your supervision?

A. In that time period one of our other
responsibilities it comes under the form of a
directive but it -- something that takes up a lot
of time, uniforms. Our uniform standards, all our
equipment, personal equipment. We're like a
military, we have a lot of books describing those
items.

Q. All right. Anything else?

A. At that time that's what it was.

Q. Well, to be clear my question spans your
role in the position from 1997 post your 1999
retirement and as a civilian, would the answer be
the same throughout that period?

A. To '99 for sure, yes.

Q. And did it change in some way thereafter?

A. In 2008.

Q. Okay. Right. I see. So you're -- I get
you. So you came back after --

A. Right.

26

Q. -- after 2008?

A. Right.

Q. So why don't we move ahead then to 2008
and can you tell me what your responsibilities are.
And by you're I mean the responsibilities of
yourself and those under your jurisdiction in the
research and development unit?

A. I returned to research and development as
the commanding officer, policy and procedures, for
a second time. And a couple years later my boss
left the police department -- actually more than a
couple. This is '14, she left in about '11. So my
responsibilities have widened a little bit. It
also includes the statistics for the Chicago Police
Department. There has to be one voice, one single
authority on the subject of statistics otherwise it
gets very confusing.

Q. Are you familiar with an article that
appeared recently in Chicago Magazine relating to
statistics?

A. By Mr. Bernstein, yes, I am.

Q. And has -- is that article talking about
issues under your jurisdiction in terms of how
murders and other violent crimes are counted and so

27

forth?

A. Yes.

MS. ROSEN: Object to the form.

BY MR. BOWMAN:

Q. Who was your boss who resigned or retired
a couple years ago?

A. Rachel Johnston, J-o-h-n-s-t-o-n.

Q. All right. There was a period of time
when you were in charge of records, what years was
that?

A. I was assistant director for -- and I
worked for our director of records James Piper. He
retired and I remained in charge, the year escapes
me, I'm sorry.

Q. About how long were you in that area?

A. Probably two and a half years.

Q. Okay. And is this the area of the police
department that we refer to as the records
division?

A. It is.

Q. And what were your responsibilities as
assistant director and -- as assistant director in
the records division?

A. I would -- when we had a director and I

28

would assist him in whatever duties he wanted to give me. But primarily it's trying to supervise the various subunits and personnel within those units.

Q. And that's a little generic and vague. Can you relate -- relate that to particular duties and responsibilities of the division itself?

A. Sure. The records division at that time was comprised of the identification section. The identification section literally processes all the fingerprints from all the arrestees, manages all the rap sheets, all the criminal history records, maintains the archives for all mugshots, latent fingerprints that are recovered. It also at that time accepted all the paper case reports and processed them. By that I mean they would make copies and disseminate them to the unit of investigative authority for follow-up. The records division also has a public service arm where the public would literally walk in looking for copies of reports. Probably the most often distributed copy is traffic crash reports.

Q. Been there, done that.

A. Right.

29

So some of the issues that would come up during this time was automation. You know, how can we do it better for less.

Q. All right. And has there in the recent years been a transition to digitalize all of this process to make it much less file dependent?

A. They are -- they continue to strive for that goal. I don't know if it's ever going to be reachable but, yes, there has been efforts made.

Q. Okay. All right. Now, I wrote down something you listed among the responsibilities of the records division and that was acceptance of paper case reports. And then the making of copies of those reports and the dissemination of them to the unit of investigative authority for follow-up. What does that mean?

A. In this era a beat -- before I go on I forgot one other unit within the responsibilities that would be the subpoena unit, the subpoena service unit. We can talk about that in a little bit but.

Now I go back to what does that mean regarding the paper -- the paper case reports would be written by the beat officer. The beat officer's

30

sergeant may approve the report. The original of that report was sent down to records processing section. They would make copies. They would send the original for storage, for filing. And they would disseminate those copies that they made. And frankly detective division would require three and four, five copies of every one. You know, one for the detective, one for the unit, one for the supervisor. I was always amazed as just to how many copies were made.

Q. Okay. Now, so this is just -- is the function that you're describing basically has to do with the general offense case report and the funneling of those papers to the particular area and unit within the detective division for follow-up?

A. Yes.

MS. ROSEN: Objection to the form.

BY MR. BOWMAN:

Q. As a general --

A. For the general offense case reports, yes, sir.

Q. All right. Now, let's talk about the subpoena service unit. What are the -- what does

31

that unit do?

A. That is the unit within the Chicago Police Department that subpoenas are delivered for service. They fill as if it's a work order and cause a search of different units, files to obtain the requested information.

Q. Okay. So, in other words, if I'm a criminal defense lawyer and I have a case in the Circuit Court of Cook County in some branch, somewhere and I subpoena the -- all the materials in the police department's possession relating to the case that comes to the subpoena service unit for fulfillment?

A. Yes, sir.

Q. And does that -- is there a process within the police department that ensures that the subpoena service unit actually gets the subpoena?

A. I don't think I understand the question.

Q. Well, suppose I walk over to 51st and Wentworth and drop off a subpoena there. Is there a process to get it to 35th and Michigan to this subpoena service unit?

A. I think -- using your hypothetical I think you would be directed to drop it off at the

32

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

headquarters building. I don't think they're even going to accept it. But that's -- depending upon what employee you meet.

Q. Are you aware of any procedural mechanism within the police department to ensure that all subpoenas are directed, delivered, or otherwise received by the subpoena service unit for processing?

A. It's probably in a directive on the description of the duties and responsibility of the records division in our organizational description of various units.

Q. When the records division subpoena service unit receives a subpoena say for all documents and materials relating to a particular pending criminal case what is the process whereby the unit goes about fulfilling that -- fulfilling that request?

A. The person assigned to the subpoena unit will read the court order for the information, the subpoena, and try to decipher what is it they want.

Q. Okay.

A. Obviously the key variable is the records division case number, that seems to be a fundamental key to obtain other documents and

33

reports. They will go to a subunit in the records division for a copy of the police reports, the original, and the supplementary reports which are on file in the records division. They will make a copy of the subpoena and send it out to the detective area in which the crime occurred and ask if they have any investigative files under -- for that RD number. They will read it and again trying to decipher what it is that the individual requester wanted.

If it's a driving under the influence case they'll probably direct a copy of the subpoena to the traffic court records asking for any and all records that they have.

If there is an interrogation where the individual went to the polygraph unit for examination they would direct a copy to the forensic services division asking for that polygraph report. Or other units which specialize in services and create reports and retain reports.

Q. Okay. And those other areas could be the evidence recovered property section?

A. Certainly, it could be research and development looking for copies of old policies.

34

Q. Could be. It could be -- I guess it's no longer -- there's no longer a crime lab in the police department but there could be evidence tech type materials, right, that --

A. The crime scene processing reports. And just to correct a little bit we do now have a firearms unit within the forensic services. It was restarted within the last year.

Q. So -- and there are probably other units, divisions, centers within the police department that we haven't put on our list, right, where records might repose relating to a particular case?

A. That's correct.

Q. Now, in terms of fulfillment of the subpoena does it depend on the precision and the drafting skill of the lawyer who prepared the subpoena which repositories of records within the police department are going to be searched in response to the subpoena. Or is there some mechanism whereby the subpoena service unit attempts to search proactively for any pertinent documents within the department?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I think it's a combination of

35

both. Obviously the more explicit the requester is the less likely the service provider will omit that unit for a search of their records. But I've seen the service -- subpoena service unit work and I think they tend to give them more than is requested because of their own insights. You know what I mean. After a while you know what they really mean is this as well. And let's save myself the trouble they'll probably come back next week and ask for the same thing.

Q. Is there a policy, a procedure, or a directive of some kind that -- that governs the manner in which the subpoena service unit is supposed to conduct itself in terms of proactively looking for documents in response to a subpoena or does it depend instead on the individual person assigned the fulfillment responsibilities for the subpoena?

MS. ROSEN: Object to the form.

MR. GIVEN: Also time frame to the extent you're asking him for then, now, I wasn't quite sure.

MR. BOWMAN: Well, I mean, I think that we're talking about a period of time for which Mr. Hickey

36

Page 37:

1 has personal knowledge.
2 MR. GIVEN: Same objection.
3 He can answer.
4 THE WITNESS: No directive.
5 MR. BOWMAN: Okay. I'm going to stop for just
6 a couple of minutes and just take a break and
7 stretch our legs.
8 (Whereupon, a short break was
9 taken.)
10 BY MR. BOWMAN:
11 Q. Okay. We've been talking, Mr. Hickey,
12 about the subpoena service unit. Was that unit in
13 existence to your knowledge in the 1980's?
14 A. I wasn't there, I don't know. Somebody
15 had to perform the function. I just don't know if
16 the unit formally existed.
17 Q. Do you have any --
18 A. It's a basic service.
19 Q. Right. So whether it was called the
20 subpoena service unit or something else would it be
21 fair to say that the process that we've been
22 talking about relating to the fulfillment of
23 subpoenas was conducted in more or less the same
24 fashion in the 1980's as what you've described in

37

Page 38:

1 your testimony?
2 A. Yes, there's both the formal subpoena
3 request and then, you know, of course there are the
4 telephone requests from the prosecutors. I don't
5 believe they were always formally submitted. Some
6 are more in a rush than others. You know, I need a
7 copy of what can you get me on and -- you know.
8 Q. But in terms of requests by a subpoena
9 from defense counsel this process that you've been
10 describing was in play in 1980 through 1989 to the
11 best of your memory?
12 A. Yes. I mean, with one qualification. I
13 mean, should the defense counsel be concerned about
14 what he got or the absence of something there's
15 always the telephone. I mean, it's -- to clarify
16 the request or to make it a bit more clear as to
17 what I think I'm missing.
18 Q. Can you describe the personnel who were
19 assigned to this duty of subpoena fulfillment, are
20 they sworn personnel?
21 A. They tended not to be. In the era when I
22 was actually there I think there was five of them.
23 I think there was one police officer, the rest
24 were --

38

Page 39:

1 Q. Clerks?
2 A. Well, I mean, one I remember having a
3 college degree and -- you know, I don't know the
4 background of the others.
5 Q. What training is provided -- I'm sorry.
6 During the period that you have personal
7 familiarity within the 90's what training was
8 provided to the police personnel who performed the
9 function of subpoena fulfillment?
10 A. On-the-job training.
11 Q. So nothing formal?
12 A. No.
13 Q. And to the best of your knowledge and
14 understanding was that also the case in the 1980's?
15 A. I can only presume so.
16 Q. Do you have any reason to doubt it?
17 A. I do not.
18 Q. Now, the way you've described the
19 procedure the person fulfilling a subpoena might or
20 might not have occasion to make requests from
21 various locations within the police department for
22 documents in response to a subpoena, right?
23 A. Correct.
24 Q. And in doing that the documents presumably

39

Page 40:

1 would come in at various different points in time
2 from these different locations, right?
3 A. Correct.
4 Q. Is there a procedure -- was there in the
5 period that you're personally familiar with was
6 there a procedure for delivering the records in
7 response to the subpoena on a rolling basis or were
8 they all gathered together and shipped in response
9 to the subpoena at one time?
10 A. I understand the question. It was date
11 organized, when is it due and that's how they -- it
12 was -- their primary basis was date and of course
13 the RD number --
14 Q. Okay.
15 A. -- within the date.
16 Q. Are you saying that the subpoenas would be
17 filed in some way based on date due and the
18 documents would then be collected and placed into a
19 folder and then on the -- when a particular date
20 came up that then those documents would go out?
21 A. I saw a lot of rubber bands holding
22 documents together.
23 Q. Is there any -- to your knowledge is there
24 any document of any kind that constitutes a paper

40

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

trail of the request from the subpoena service unit
to the various areas within the police department
for the documents that might exist in response to a
particular subpoena?

A. To my knowledge there's an absence of this
type of internal tracking.

Q. Do you know if there's some informal
mechanism by which things were kept track of?

A. I've seen subpoena officers annotate on a
form to whom they sent the request. And it's
probably more standard practice. I mean, because
you have to know who you sent it to. But they tend
not to keep it once the information has been
returned to them.

Q. How -- let's -- let's take a particular
example of a case like the one that brings us here
today in which the investigations conducted jointly
by the detective division and gang crimes officers?

MS. ROSEN: Object to the form of your
question.

MR. BOWMAN: Can I correct the form, is there
something -- what did I say that was wrong.

MS. ROSEN: Well, I don't know that I would
characterize it as jointly.

41

MR. BOWMAN: All right. Well, let me do this.
Let me see if this works.

BY MR. BOWMAN:

Q. Consider a case like the one that brings
us here today in which both the detective division
and gang crimes officers participated in the
investigation. In that circumstance if a defense
lawyer subpoenas all documents related to the
investigation and provides an RD number presumably
the clerk or the officer within the subpoena
service unit as you've described the first thing
that he would do is he would go to the records
division file, obtain the original report and
supplementary reports from that file, yes?

A. Yes, sir.

Q. And then he would then presumably know
that a request to a particular area was warranted
for detective division investigative file relating
to the matter, yes?

A. Yes, sir.

Q. Okay. So then he would make an internal
request for that document?

A. Correct.

Q. Or set of documents, yes?

42

A. Yes, sir.

Q. Then how -- what would be the process by
which the subpoena fulfillment officer would know
to look elsewhere within the police department for
additional documents such as a gang crimes unit?

A. Perhaps only the mention of the type of
case it is. Again DUIs might have DUI records, you
know, detective -- homicides certainly would have
an investigative record.

Q. Right. Well, if it's a homicide case then
-- then there might be a protocol, a more report,
something of that nature that the individual would
know would be part of the case of that nature,
right?

A. Correct.

Q. And so he would request that from a
different location within the police department?

A. If they didn't get it from the -- the
detective area inside the investigative file they
might refer to the Cook County Medical Examiner's
office.

Q. All right. In terms of the question that
I posed a few minutes ago relating to gang crimes
whether the subpoena fulfillment officer would know

43

to ask gang crimes for documents would literally
depend on whether that individual noticed from
review of reports that it was a gang involved
matter, fair?

MS. ROSEN: Object to the form of the question.

THE WITNESS: They'd have to be reading beyond
Page 1 I think to see a motive or the type of
manner that person was killed.

Q. Right.

A. And these are disinterested, neutral -- I
don't mean disinterested in a negative way, they
are fulfilling a clerical function. And for fun
they're probably not reading the 25 pages of
reports.

Q. Well, that's what I was going to suggest
to you, Mr. Hickey, that these individuals as you
point out they're fulfilling a clerical function,
right?

Yes?

A. Yes, sir.

Q. And they're busy?

A. Yes, sir.

Q. Everything is date driven and they've got
a lot of subpoenas, yes?

44

11 (Pages 41 to 44)

1    A. Yes, sir.
2    Q. And the police reports are not inherently
3 fascinating reading for any of us, right?
4    A. That's correct.
5    Q. So the truth of the matter is that it's
6 entirely likely in practice that the -- that the
7 request to the gang crime unit for gang crime
8 documents which is simply not happening --
9    MS. ROSEN: Object to the form of the question.
10 BY MR. BOWMAN:
11    Q. -- unless the defense lawyer was savvy
12 enough to know that he needed to include that
13 specifically in his subpoena --
14    MS. ROSEN: Object to the form of the question.
15 BY MR. BOWMAN:
16    Q. -- right?
17    A. I don't know what other type of record
18 might be available from the gang crimes unit. I
19 mean, they don't --
20    Q. That's not my question.
21    A. Yeah, okay.
22    Q. That's not my question.
23    MS. ROSEN: Well, actually it kind of is your
24 question. So maybe --

45

1    MR. BOWMAN: No, it is not my question. My
2 question -- I get to decide what my question is and
3 you can ask questions later.
4    MS. ROSEN: Okay.
5 BY MR. BOWMAN:
6    Q. But my question is is -- as a practical
7 matter in light of the circumstances here unless
8 the particular defense lawyer was savvy enough to
9 include a reference to gang crimes in the subpoena
10 as a practical matter there would be no request for
11 gang crimes documents in response to a subpoena
12 that's simply asked for records under a certain RD
13 number, fair?
14    MS. ROSEN: Object to the form of the question.
15    THE WITNESS: Fair.
16 BY MR. BOWMAN:
17    Q. And you have no reason to doubt that the
18 answer you just gave applies to the period of time
19 of the 1980's, 1980 to 1989, right?
20    MS. ROSEN: Same form, objection.
21    THE WITNESS: Correct.
22 BY MR. BOWMAN:
23    Q. Okay. Now, let me just go back here to --
24 and look at my notes. You said that you were

46

1 involved in information technology as well for a
2 period of time?
3    A. Yes, sir.
4    Q. What were your duties and responsibilities
5 there?
6    A. My primary duty was to act as outreach or
7 liaison to other police departments. Certainly
8 all -- all towns in Cook County and throughout most
9 of the state and some towns in Wisconsin and
10 Indiana to share with them our computerized
11 information.
12    Q. And what period of time were you involved
13 with that project, I mean date wise?
14    A. I'm really good on the old years. Right
15 after I left the records division I was moved to --
16 I don't know the year, I'm sorry.
17    Q. Okay.
18    MR. BOWMAN: All right. Now let me mark an
19 exhibit.
20 BY MR. BOWMAN:
21    Q. This is a notice of Rule 30(b)(6)
22 deposition that we sent to the lawyers in this
23 case. I'll mark it for identification as Hickey
24 Exhibit Number 1.

47

1    (Whereupon, Hickey Deposition
2    Exhibit No. 1 was marked for
3    identification.)
4 BY MR. BOWMAN:
5    Q. My reason for showing this to you,
6 Mr. Hickey, is to ask you to focus on certain
7 paragraphs as to which we've been informed that you
8 will be testifying on behalf of the City of
9 Chicago.
10    And the first of those paragraphs is on
11 the second page of Exhibit 1 and it's Numbered C.
12 If you can just read that silently to yourself.
13    A. Okay.
14    Q. Can you -- is it your belief that you're
15 in a position to testify authoritatively on behalf
16 of the police department with respect to the
17 matters that are described in this paragraph?
18    A. It is.
19    Q. Did you review any documents to prepare
20 yourself to testify regarding the use and conduct
21 of in-person and photographic lineups by the police
22 department?
23    A. I did.
24    Q. Can you tell me what you looked at?

48

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 A. Department directive I think it was 83
2 something. 838 maybe.
3 Q. Is it possible that it's --
4 A. The title is lineups.
5 Q. -- 83-5.
6 A. 83-5, thank you.
7 Q. Anything else?
8 A. I looked at our -- our current order just
9 briefly.
10 Q. Other -- did you have any role in the --
11 in the drafting of the current order?
12 A. I did not. Oh, the current order, yes, I
13 did.
14 Q. Okay. And that was during your time in
15 the records division?
16 A. No.
17 Q. I'm sorry, in the research and development
18 area?
19 A. Right.
20 Q. Other than your involvement with the
21 creation of directives as the head of research and
22 development is there anything else that qualifies
23 you to testify on behalf of the City with respect
24 to lineups?

49

1 A. The fact that I was a detective and
2 conducted -- personally conducted lineups.
3 Q. And your involvement in the -- as in the
4 detective division dates back into the 1980's,
5 correct?
6 A. Late 70's, 1980's, yes, sir.
7 Q. Anything else?
8 A. That would be about it.
9 Q. Okay. You've also been designated in
10 response to Subparagraph D the documentation and
11 preservation of information learned during a
12 homicide investigation. Is it your belief that you
13 are in a position to testify authoritatively on
14 behalf of the Chicago Police Department with
15 respect to this matter?
16 A. It is.
17 Q. Did you review any documents to prepare
18 yourself to testify regarding the documentation and
19 preservation of information learned during a
20 homicide investigation on the part of the Chicago
21 Police Department?
22 A. Not specifically for this deposition but I
23 am intimately familiar with the subject matter.
24 Q. And that -- to be clear and we've talked

50

1 about it already but that -- that has to do with
2 the assignments that you received relating to
3 documentation retention and filing back in 1982 and
4 1983?
5 A. Yes. And my testifying in various
6 litigation that subject since.
7 Q. And I think I know the answer to this but
8 just to be clear you've testified on this subject
9 in the -- in the Palmer case, correct?
10 A. I did.
11 Q. And in the Michael Evans case in which you
12 and I meet each other years ago?
13 A. 2005.
14 Q. And we're not getting any younger either
15 obviously.
16 A. No.
17 Q. And then recently in the Fields case?
18 A. Nathan Fields case, right.
19 Q. Right. Is there any other matter in which
20 you testified on this subject?
21 A. I don't recall at this moment.
22 Q. As part of preparing yourself generally
23 for your testimony you have familiarized yourself
24 with the various orders that the detective division

51

1 has promulgated through the years?
2 A. Yes, sir.
3 Q. And you have personal knowledge of the
4 circumstances leading to the 1982 and the 1983
5 orders on this subject that we'll talk about in a
6 minute, right, because of your own involvement?
7 A. Yes, Mr. Bowman.
8 Q. Is there anything else about your career
9 in the police department and obviously you were a
10 detective yourself for several years and have
11 firsthand knowledge as you've already testified.
12 Is there anything else that qualifies you to
13 testify on this subject?
14 A. That should be about it.
15 Q. Okay. And then you've also been
16 designated with respect to Item E. You want to
17 just read that silently to yourself.
18 A. Okay.
19 Q. And you also consider yourself qualified
20 to testify authoritatively for the Chicago Police
21 Department with respect to these matters?
22 A. I do.
23 Q. And it's basically the same circumstances
24 of your career, background as a testifying witness

52

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

and so forth that you've just talked about that
qualifies you with respect to this paragraph,
right?

A. Yes, sir.

Q. And then if -- if you could take a minute
to look at subparagraph F which is right below the
one I just asked you about.

A. Okay.

Q. All right. It would be fair to say that
your experiences, the assistant director and acting
director of the records division is part of what
gives you the background to testify authoritatively
for the police department on this subject as well?

A. Yes, sir.

Q. Anything else?

A. That would be it.

Q. Okay. All right. And you've also been
designated with respect to Paragraph 3 on Page 3.
If you just read that silently to yourself, that's
a short one.

A. Okay.

Q. And, you know, this is just lawyer's
abundance of caution. This is basically the same
subject matter as the -- as the issues laid out in

53

subparagraph D and E on Page 2, right?

A. Yes, sir.

Q. So your answer is in terms of your
qualifications to testify and the basis for your
testimony would be about the same, right?

A. That's correct.

Q. All right. And then finally in Paragraph
4 which relates to training on a number of subjects
you've been designated with respect to Subparagraph
J?

A. Okay.

Q. And do you believe yourself to be in a
position to testify authoritatively on behalf of
the Chicago Police Department with respect to the
training provided to detectives in particular with
respect to the 1982, 1983, and 1986 police orders
relating to the street files problem?

A. I do.

MS. ROSEN: Object to the form of that
question.

BY MR. BOWMAN:

Q. Now other than detectives to your
knowledge were any other police officers provided
any training relating to those '82, '83, and '86

54

orders on street files?

A. Youth officers because they were part of
the Bureau of Investigative Services were also
included in the training.

Q. Okay. And were you involved in the
training of youth officers?

A. I was.

Q. What about gang crimes specialists to your
knowledge were they provided any training?

A. No, they were not in the Bureau of
Investigative Services.

Q. So it's based on that you could be
confident that they did not get trained?

A. Correct.

MS. ROSEN: On Palmer.

MR. BOWMAN: Oh, yes. No, I didn't mean to --

BY MR. BOWMAN:

Q. To be very clear when I said that they did
not get trained in that last question I was asking
they did not get trained with respect to the issues
arising out of Jones and Palmer and the problem of
street files, correct?

MS. ROSEN: Object to the form.

THE WITNESS: Correct.

55

BY MR. BOWMAN:

Q. Other than youth officers are there any
other Chicago police officers other than detectives
who did receive that training?

A. The sergeants, lieutenants and exempt
commanding officers in the Bureau of Investigative
Services.

Q. Anyone else?

A. That was it.

Q. All right. It's not -- I mean, it may or
may not be specifically covered in these paragraphs
of the deposition notice that we've been
discussing. I wanted to ask you one specific
question, are you knowledgeable concerning the
policies and procedures at the present time in the
Chicago Police Department with respect to the
filing, storage, and retention of investigative
documents in the detective division?

MS. ROSEN: Can you read back the question.

(Whereupon, the record was read
as requested.)

THE WITNESS: I would say I'm not. I've not
actively sought out information as to what's going
on today.

56

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

BY MR. BOWMAN:

Q. All right. Do you know who would be?

A. The detective area commanders.

Q. Okay. Would that be the best -- the best source of information in your judgment on that subject?

MS. ROSEN: Objection, form.

THE WITNESS: I don't know who the Bureau of Detectives would assign. It's certainly an important topic. I would expect the command staff whether they be a deputy chief or the chief or the commanders to be familiar with the practices. And the lieutenants. The lieutenants would truly have hands-on understanding. They have direct administrative control.

BY MR. BOWMAN:

Q. Okay. All right. I want to take you back to 1982. And you've testified that the -- that the George Jones case came to your attention and to the attention of others in the department at the time of its unfolding, correct?

A. Correct.

Q. As the -- after -- after Laverty went into the courtroom of Judge Cousins and presented the

parties to the proceedings there involving George Jones with the files in his possession is it -- is it fair to say that there was concern within the Chicago Police Department about what had happened?

MS. ROSEN: Object to the form of the question.

THE WITNESS: Yes.

BY MR. BOWMAN:

Q. And can you describe the nature of the concern?

A. As an investigative unit that had a decentralized structure we wanted to make sure that all the areas violent crime units were operating using the same guidelines.

Q. And specifically using the same guidelines with respect to the creation, control, management of documents in the course of an investigation?

A. That's correct.

Q. Now, it's my understanding that Detective Laverty was disciplined on what I would characterize as a technicality for not informing his supervisor that he would be testifying in court, do you recall that?

A. Actually I'm sorry, I don't.

Q. Okay. All right. Other than issues

relating to how Mr. Laverty himself -- how Mr. Laverty conducted himself was there any discussion in which you personally participated with either Chief Handhardt or anyone else in the command staff as to what should be done as a result of the publicity and the notoriety that the George Jones prosecution generated?

MS. ROSEN: Object to the form of the question.

THE WITNESS: There was a meeting in the deputy superintendent's office, deputy superintendent in charge of investigative services a fellow by the name of Thomas Lyons, he was Handhardt's supervisor. And at the meeting where it was the command staff of the detective division and there were a few others in the room including myself.

BY MR. BOWMAN:

Q. When did this meeting take place?

A. Oh, I don't -- 1982. I couldn't give you a date at this time.

Q. Was this before the temporary restraining order in April of 1982?

A. Close but I -- honestly, I don't know if it was prior to or - it might have been prior to. I can't remember. Close in time.

Q. All right. Other than Lyons and Handhardt and yourself who was else was present?

A. Oh, I -- the various commanders.

Q. Commanders from the various areas?

A. Right, right. Six of them.

Q. I know it's been many years, what was the -- what was the gist of the conversation of that meeting?

MS. ROSEN: Objection, relevance.

THE WITNESS: I say the -- one of the primary questions was terminology. There seemed to be a wide variance to what people referred to as detective notes, running files, working files, and where they might be kept. That seemed to be a question that was facing the group.

Q. So would it be fair to say that the -- the group was -- was convening together to provide Deputy Superintendent Lyons and the other brass in the room with an explanation as to what was going on on the ground?

A. Yes, sir.

Q. All right. Now, there was an objection to a question I asked -- and several objections, I referred to the street files problem. And I want

to be clear with you what I'm referring to and see
if we can reach a common understanding.

In the George Jones case would it be
consistent with your understanding based on your
personal involvement with the response to this case
that what happened was that there were materials in
a file that Detective Laverty possessed that others
involved in the investigation may have possessed at
some time that were not part of the documentation
that was provided to the State's Attorney and the
defense lawyers and the -- and directly the judge
in George Jones's prosecution, is that consistent
with your understanding?

A. Fair. But I don't know if there were
multiple documents. I know of only one.

Q. And the one document would be the memo
recording an interview with the key witness?

A. That's correct.

Q. And in that memo the account of the
interview was substantially different than the
account that was provided in an official
supplementary report, right?

A. That is correct.

Q. And that discrepancy between what was in

61

the file memo and what was in the official
supplementary report lead to the dismissal of the
charges against Mr. Jones, it lead to the filing of
the Palmer litigation, it lead to George Jones's
civil case, it lead ultimately to an opinion from
the 7th Circuit saying that the police department
had a policy of placing exculptory materials
outside of the official record, right?

MS. ROSEN: I'm going to object to the form of
the question. And state affirmatively that you're
misstating what the 7th Circuit concluded as a
result of the Palmer litigation.

MR. BOWMAN: That's not what I'm referring to.
I'm referring to what the 7th Circuit concluded as
a result of the George Jones litigation.

MS. ROSEN: I'm going to maintain my objection
even with that clarification.

MR. BOWMAN: All right. Just to be clear.

BY MR. BOWMAN:

Q. Now, you've heard the objection, in your
understanding did I get it right?

A. I don't know honestly why the George Jones
case was dismissed or I -- I don't even know the
disposition of that case. I mean, I truly don't.

62

And I don't know about the conclusion of
the 7th Court -- appellate court was it.

I do know in the end I thought it was a
favorable decision for the City, one of the
appellate courts.

But you are absolutely right, the
document, the Laverty memo was the -- the cause of
concern and our -- brought attention of the Chicago
Police Department to this issue.

Q. On behalf of the Chicago Police Department
today do you acknowledge that the -- that the
failure to place what you've referred to as the
Laverty memo relating to the interview with Pervy
Pointer in the Jones case, the failure to place
that memo in the official file was a failure of
policy. And a failure of policy that resulted in a
violation of Mr. Jones's constitutional rights?

MS. ROSEN: Object to the form of the question.

THE WITNESS: It was problematic. We have an
obligation to truth. I mean -- and we are -- all
policies can be improved, sharpened, strengthened.
I don't know if one memo a policy makes. But
certainly any example of this is an example that we
haven't done all we can to preserve the facts on a

63

particular case.

BY MR. BOWMAN:

Q. Okay. Well, let me break it down. Do you
acknowledge today on behalf of the Chicago Police
Department that in the specific case of George
Jones that the failure to include the Laverty memo
in the official file that was produced to the
participants in the criminal justice system
resulted in a violation of George Jones's
constitutional rights?

MS. ROSEN: Can you read back the question.

(Whereupon, the record was read
as requested.)

MS. ROSEN: I'm going to object to the form of
the question.

MR. BOWMAN: What's wrong with it?

MS. ROSEN: What's wrong with the form.

Okay, can you read it back again.

(Whereupon, the record was read
as requested.)

MS. ROSEN: I'm objecting to your use of the
phrase official file. I'm objecting to your use of
the term -- now I lost it.

I'm sorry, can you read it back one more

64

16 (Pages 61 to 64)

1 time.
2 (Whereupon, the record was read
3 as requested.)
4 MS. ROSEN: Okay. So my objection is to the
5 phrase to include the Laverty memo in the official
6 file, that's my form objection.
7 MR. GIVEN: I'm also not sure that it doesn't
8 call for a legal conclusion. I'll object on that
9 basis as well.
10 MR. BOWMAN: All right.
11 MS. ROSEN: I mean, I don't mean to make this
12 more difficult than it is.
13 MR. BOWMAN: No, no, you're fine. And I
14 appreciate your explaining the reason for your
15 objection. I wanted to -- wanted to know it. And
16 you're courteous to provide it. And I've got no
17 problem at all.
18 I'll stand on the question and ask for an
19 answer please.
20 THE WITNESS: Up until this time memos were not
21 placed in files. A detective who wants to write on
22 the subject should have included it on a
23 supplementary report. If you feel that strongly
24 about it here's the document.

65

1 But as to the topic, to the information,
2 if a member of the Chicago Police Department -- any
3 member of the Chicago Police Department has
4 information that would be of excultpory nature it
5 should be included -- it should be preserved.
6 BY MR. BOWMAN:
7 Q. All right. I'm going to ask that my
8 question be read back one more time. And I
9 appreciate that you may not be able to answer it
10 yes or no. If you can't, fair enough. But if you
11 could answer it yes or no I would appreciate a yes
12 or no?
13 A. Okay.
14 (Whereupon, the record was read
15 as requested.)
16 THE WITNESS: I don't know how to answer that,
17 I'm sincere.
18 BY MR. BOWMAN:
19 Q. All right. I gather though that from your
20 previous testimony that you would acknowledge on
21 behalf of the Chicago Police Department that there
22 is a responsibility of police officers to place all
23 information that's developed in the course of an
24 investigation into the official departmental

66

1 reports that are produced to the parties in the
2 criminal justice system, right?
3 MS. ROSEN: Object to the form.
4 THE WITNESS: Certainly all relevant
5 information. I mean, there might be something that
6 is generated but it is not at all pertinent to the
7 investigation.
8 BY MR. BOWMAN:
9 Q. But to the extent the information is
10 pertinent to the investigation in any way, shape,
11 or form you would agree that if it's generated in
12 the course of the investigation it belongs in the
13 -- in the body of documentation whether you called
14 it official or something else that is produced to
15 the participants in the criminal justice system?
16 A. I fully agree.
17 Q. And you would agree that that did not
18 happen in the George Jones case, right?
19 A. Yes, sir.
20 Q. And would you agree that in the particular
21 circumstances of the George Jones case because of
22 the nature of the excluded information that the
23 failure to have included this particular memo was
24 particularly egregious?

67

1 MS. ROSEN: Object to the form of the question.
2 THE WITNESS: It caused deep concern within the
3 organization.
4 BY MR. BOWMAN:
5 Q. Okay. And did the -- and did the concern
6 within the organization include the concern that
7 similar problems might exist in the files of other
8 cases?
9 A. We wanted to conduct a fact finding
10 review. We didn't know.
11 Q. Were you concerned that that might, might
12 actually be the case?
13 A. It could be but it might not be as well.
14 Q. Okay. Were the participants in the
15 meeting that you've just described with Deputy
16 Superintendent Lyons, Chief of Detectives Handhardt
17 and others concerned about the need to determine
18 whether a problem such as the problem that occurred
19 in the Jones case might exist in the files of other
20 Chicago police detective division investigations?
21 A. That was one of the concerns expressed.
22 Q. And was any action ordered or requested of
23 you in the course of this meeting?
24 A. I was directed with others to conduct a

68

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 site visit to the detective violent crimes units to
2 determine which units and what type of files were
3 being maintained or in existence they weren't being
4 maintained, that was our problem, outside the
5 normal files maintained by the violent crimes unit.
6 Q. Okay. Who in addition to yourself was to
7 undertake these visits?
8 A. There were a couple of sergeants and a
9 couple of detectives and we split up the six areas.
10 I don't know -- I think on day one or the first two
11 days I might have gone -- personally gone to three
12 areas.
13 But upon coming back it was determined
14 that I and I alone would actually visit the areas
15 that I hadn't visited. They wanted one set of eyes
16 to look at all the areas. Because again we had
17 this problem of terminology and consistently of
18 interpretation.
19 Q. So ultimately the responsibility fell to
20 you?
21 A. It did.
22 Q. Okay. Now, did you undertake these site
23 visits before or after the temporary restraining
24 order in the Palmer case?

69

1 MS. ROSEN: Object to the form and just in
2 terms of -- you mean, the issuance of the order,
3 just for timing.
4 MR. BOWMAN: Yes. Yes.
5 BY MR. BOWMAN:
6 Q. The -- it's my understanding that the
7 order was issued on or about April 20, 1982. Did
8 you undertake the site visits before the order came
9 down or after?
10 A. I don't know. It's -- same month, within
11 a week. I don't remember if it was before or
12 after. It was very close in time and place.
13 Q. Okay. Well, let's just look at some of
14 the documents.
15 MR. BOWMAN: I'll mark for identification as
16 Exhibit 2 a teletype order, this will take us back
17 to yesterday, dated April 20, 1982 and signed by
18 Superintendent Brzeczek.
19 (Whereupon, Hickey Deposition
20 Exhibit No. 2 was marked for
21 identification.)
22 BY MR. BOWMAN:
23 Q. Are you familiar with this document?
24 A. I am.

70

1 Q. Do you recall the process, the
2 preparation, and the distribution of this
3 particular order?
4 A. Yes, I was working with a sergeant from
5 legal affairs, Terry Gaynor. And I remember he was
6 the better typist than I. And I think he actually
7 typed out the draft of this. He was assigned to
8 the office of legal affairs.
9 And mechanically to get a message like
10 this out -- this is a quick message, this is not a
11 published general order or a special order or
12 department notice which goes to the print shop.
13 This literally goes to a central location where
14 there was a teletype -- a central teletype, it's
15 old technology, and it's given a number and it is
16 disseminated to all units in the police department.
17 Q. Okay. Did you witness Brzeczek's
18 signature on this?
19 A. I did not.
20 Q. Okay. Did you walk it over to the
21 teletype operator?
22 A. Yes, I did.
23 Q. And then it gets blasted out by teletype
24 to every affected unit within the police

71

1 department?
2 A. Yes, sir.
3 Q. And the object here is to make sure that
4 the information is disseminated immediately?
5 A. Yes, sir.
6 Q. Or as immediate as possible given the
7 technological limitations of the day, right?
8 A. Yes, sir.
9 Q. And the order requires the preservation of
10 everything generated in the course of any detective
11 divisional investigation, fair summary?
12 A. All contents of all police departments
13 investigative files will be kept in contact --
14 intact. I do remember there being confusion even
15 with this.
16 Q. What is the confusion that you recall?
17 A. It talks about all contents in these
18 files. The notes of detectives were never kept.
19 Q. In the files?
20 A. So therefor never kept in any file.
21 Q. Okay. So are you saying that there was a
22 loophole within this directive?
23 A. I would --
24 MS. ROSEN: Object to the form of the question.

72

1    THE WITNESS: I wouldn't call it a loophole.
2  It's -- it's just a topic that was not included.
3  It had never been included. And it would almost
4  assume something not in record.
5  BY MR. BOWMAN:
6    Q. Well, and I guess I didn't mean to be
7  suggesting something nefarious by my use of the
8  term loophole. But what I'm interested in knowing
9  is at the time this order was issued had sufficient
10  investigation been done at that point to ascertain
11  that some, if not all, detectives participating in
12  investigations had a practice of keeping their own
13  personal files separate from any recognized
14  official area repository for files?
15    A. No, I don't think that's a fair -- you
16  said personal files. Frankly I think a lot of
17  detectives did not keep personal files. They would
18  use a working file that was laying on the coat
19  rack. You know, they're not going to be taking it
20  home with them.
21    Q. You know, I've been around this more than
22  once myself. And this -- this terminology can get
23  to the point of being -- really being maddening.
24    But what you said in your early -- earlier

73

---

1  answer describing this teletype message was that
2  the contents of police department investigative
3  files known in various -- but under various
4  nomenclature, office file, unit file, working file,
5  sometimes referred to as a street file, sometimes
6  referred to as a running file, all of these files
7  will be kept intact, that's what the teletype
8  message says in summary, right?
9    A. Right.
10    Q. Now, I understood your earlier answer to
11  mean that -- that even in the context of this
12  message there was some unclarity as to whether
13  files that were not, quote-unquote, police
14  department investigative files were subject to this
15  directive, did I mishear you or misunderstand you?
16    A. No, I was -- yes, but I was also referring
17  to personal notes.
18    Q. Right.
19    A. Yes.
20    Q. And with respect to personal notes some
21  detectives kept them, some detectives kept them
22  from any police department investigative file, they
23  simply retained them as their own in their personal
24  possession, yes?

74

---

1    A. I'm not aware of detectives keeping
2  handwritten notes any longer than they absolutely
3  had to until they wrote a report.
4    Q. Right. And then they would throw them
5  away?
6    A. Absolutely.
7    Q. Right. And that was problem, yes?
8  MS. ROSEN: Object to the form of the question.
9  THE WITNESS: No, there's no constitutional
10  requirement to preserve --
11  BY MR. BOWMAN:
12    Q. From the point of --
13    A. -- notes.
14    Q. -- view of the Chicago Police Department
15  was it in 1982 a problem in the aftermath of George
16  Jones that some detectives were keeping notes in
17  their personal possession and throwing them away
18  after -- after completing the supplementary
19  reports?
20  MS. ROSEN: Object to the form of the question.
21  THE WITNESS: At this moment I truly believe
22  there was not clear instructions on the handwritten
23  notes.
24    However, when Superintendent Brzeczek

75

---

1  testified in front of Milton Shader as I did I
2  don't know even know what hearing it was, it became
3  rather crystal clear to us that he wanted to
4  preserve all handwritten notes as well. And that's
5  when I wrote the policy -- drafted the policy that
6  was signed by the chief.
7    Q. Okay. The 1983 policy?
8    A. Right.
9    Q. This point it was unclear whether the
10  preservation of handwritten notes was something
11  that the police department should strive to insist
12  upon?
13    A. It wasn't clear enough.
14    Q. Are you aware of feedback from commanders
15  in the area based on your site visits in response
16  to the teletype message that's marked for
17  identifications as Exhibit 2 that there was
18  unclarity as to whether it applied to the working
19  notes, the working memorandum of individual police
20  detectives?
21  MS. ROSEN: Object to the form of the question.
22  THE WITNESS: I was aware that there was
23  various interpretations regarding the topic of
24  handwritten notes.

76

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

BY MR. BOWMAN:

Q. Specifically in the response to this teletype message?

A. Correct.

Q. All right. Now the date on the teletype message is April 20, right?

A. Correct.

Q. Okay. Let's look next at a detective division notice with the Number 82-2 on it. Which I just marked for identification as Exhibit 3 to your deposition.

(Whereupon, Hickey Deposition Exhibit No. 3 was marked for identification.)

BY MR. BOWMAN:

Q. Did you write this?

A. I did.

Q. And did you -- tell me what the process is, it appears from the date that this came out shortly on the heels of the teletype message?

A. It looks like it came out the day before.

Q. It does. But that's not likely, right.

A. I'd say it's exactly right, I mean.

Q. All right. So did you write the teletype

message, I didn't ask you that?

A. No, I memorized that Sergeant Gaynor was a better typist.

Q. The other thing I didn't ask you was to whom did the teletype message go, to what units?

A. It went out to all citywide units. All units within the Chicago Police Department that actually had a facsimile machine to receive it.

Q. Did it go to the gang crimes units?

A. I don't know if they had a facsimile machine. I'm not being facetious, I really don't know.

Q. I understand. Did it go to all of the detective division units?

A. Yes, it did.

Q. Did it go to the patrol division units?

A. Yes.

Q. Are there any units other than the detective division units and the patrol division units that you can be sure it went to?

A. Legal affairs, the office of the superintendent. Wherever there was a physical machine, I don't know how many we had.

Q. Okay. Now, is it fair to say that the

Exhibit 3 the detective division notice was a more formalized document that reiterated the same message as a teletype?

A. It -- very similar. It seemed to -- the detective division file control, if I were to critique it, did not describe what made up the investigative file. Whereas the later order was very definitive.

Q. Is it likely now that your recollection -- start over.

Has your recollection been refreshed that you wrote and caused Exhibit 3 to be disseminated before you had conducted the site visits and learned about the actual practices on the ground in various areas?

A. No. Just from the sequence of it all I would say the fact finding was first, the site visit was first and then when we agreed upon what to do the order came out, that would make more sense to me.

Q. Well, if you look at Exhibit 2 it says that the teletype message is coming about as a result of a temporary restraining order issued by Judge McMillen, you see that?

A. Okay.

Q. And you know that McMillen was presiding at that point in the Palmer litigation, right?

A. Okay.

Q. Yes?

A. Yes.

Q. Okay. So does that suggest to you that -- that the teletype message and the detective division notice 82-2 were sent out as a result of developments in the Palmer litigation as opposed to being a result of site visits that you were conducting --

MS. ROSEN: Object to the form of the question.

BY MR. BOWMAN:

Q. -- in the detective areas?

A. They were so close in time. I'm sorry, I don't know the dates of the site visits and I don't know the date of the TRO hearing.

Q. All right. Let's look at notice 82-2. It contains a definition of something called a unit investigative file. This is Roman II on Page 1, you see it there, right?

A. Yes, sir.

Q. And the definition reads as follows: A

1 unit investigative file is any document or group of
2 documents the subject of which relates to criminal
3 incidents and which are maintained and stored under
4 detective division control with any unit, right?
5    A. Yes, sir.
6    Q. And you'll agree that that definition
7 appears not to the cover documents that are not
8 maintained and not stored under detective division
9 control, right?
10    A. That's what it says.
11    Q. Right. Right. And you'll agree with me
12 that that is to the extent detectives might
13 perceive their own memo files and their own note
14 files as not being under detective division
15 control, it creates an ambiguity and a potential
16 problem in terms of keeping control of the
17 documents, fair?
18    MS. ROSEN: Object to the form of the question.
19    THE WITNESS: The written word is subject to
20 some further follow-up questions.
21 BY MR. BOWMAN:
22    Q. Well, do you agree with my statement?
23    MS. ROSEN: Object to the form of the question.
24    THE WITNESS: Could you repeat it one more time

81

1 please.
2    MR. BOWMAN: I'll just repeat it rather than
3 imposing on our court reporter.
4    THE WITNESS: Okay.
5 BY MR. BOWMAN:
6    Q. Will you agree with me that the way the
7 definition of unit investigative file is drafted
8 here there is a ambiguity in that the definition
9 appears not to apply to documents that are not
10 maintained and stored under detective division
11 control with any unit and therefor if detectives
12 perceive their personal notes and memos not to be
13 under detective division control but to be under
14 their control that the -- that the notice is
15 ambiguous and may not -- and may not keep control
16 over the documents?
17    MS. ROSEN: Object to the form.
18    MR. GIVEN: Also competence and foundation to
19 answer the question in the way you phrased it.
20    THE WITNESS: I can see it could be interpreted
21 so therefor ambiguous to some but perhaps not all.
22 BY MR. BOWMAN:
23    Q. Now, do you have any personal information
24 based on your site visits or other feedback that

82

1 you got as you were investigating this problem of
2 document control and document retention and
3 document storage, did you get any personal feedback
4 that the teletype message and the notice Exhibits 2
5 and 3 were indeed ambiguous and were being
6 misunderstood?
7    A. Perhaps not immediately but over the next
8 couple of months.
9    Q. Okay. And was it your intention in
10 drafting Exhibit 3 to obligate detectives to
11 maintain and keep intact all documents relating to
12 investigations?
13    A. All documents. Documents mostly were
14 interpreted as interwatch memoranda, to do lists,
15 notes being passed from watch to watch between
16 investigative teams. I remember myself being
17 confused as to whether or not personal notes should
18 or should not be maintained.
19    Q. Under Exhibit 3?
20    A. Under Exhibit 3.
21    Q. And if I understood you correctly you
22 learned during Brzeczek's testimony before Judge
23 Shader at the preliminary injunction hearing that
24 indeed they should be?

83

1    A. That was his --
2    MS. ROSEN: Object to the form.
3       Go ahead.
4    THE WITNESS: That was his policy preference.
5 BY MR. BOWMAN:
6    Q. Yes. Did you observe his testimony at the
7 hearing?
8    A. I did not, I believe I was excluded.
9    Q. But you learned of it?
10    A. Yes, sir.
11    Q. Okay. Now, among other things Exhibit 3
12 establishes a unit file control logbook, what is
13 that?
14    A. That's nothing more than that last
15 document. It's a multi-lined sheet of paper trying
16 to institutionalize control over a file folder
17 which contained miscellaneous documents.
18    Q. All right. Did this format remain in
19 effect after the creation of 83-6?
20    A. It did not.
21    Q. So it ended at that point?
22    A. Yes, sir.
23    Q. Okay.
24    MR. BOWMAN: All right. I'm going to propose

84

21 (Pages 81 to 84)

1 another short break.
2 (Whereupon, a short break was
3 taken.)
4 BY MR. BOWMAN:
5 Q. In 1982, Mr. Hickey, when you attended the
6 meeting with Deputy Superintendent Lyons and Chief
7 Handhardt and others was the gang crimes unit in
8 existence?
9 A. Yes.
10 Q. Were they -- was gang crimes housed within
11 the Bureau of Investigations at that time?
12 A. No, it was not.
13 Q. Where were they?
14 A. They were in a bureau called Bureau of
15 Field Tactical Services. They were in a division
16 of that called special functions group.
17 Q. And was any representative from gang
18 crimes in the room for the meeting that you've
19 described with Deputy Superintendent Lyons and
20 others?
21 A. No, sir.
22 Q. To your knowledge did anyone conduct any
23 site visits, audits, investigations with respect to
24 the manner in which the gang crimes units would

85

1 were keeping maintaining and storing documents from
2 investigations --
3 MS. ROSEN: Objection, form.
4 BY MR. BOWMAN:
5 Q. -- in response to the George Jones case?
6 A. Not in regards to the detectives site
7 visit, no.
8 Q. Well, obviously not in regards to a
9 detective site visit but for any other reason, any
10 other purpose related to Jones did somebody go to
11 the gang crimes specialists and ask them what they
12 were doing with relation to the preservation of
13 notes and documents?
14 MR. GIVEN: Let me get in my objection before
15 you answer. Objection to form and -- form,
16 foundation, and competence.
17 You can answer if you can.
18 THE WITNESS: I'm not aware of any.
19 BY MR. BOWMAN:
20 Q. Do you have any knowledge as to whether
21 anyone in the police department undertook in any
22 way to ensure that gang crimes investigators
23 maintained their notes, memoranda, interoffice
24 memos of any kind generated in the course of an

86

1 investigation in the manner that was done with
2 respect to the detective division?
3 MS. ROSEN: Objection, form.
4 THE WITNESS: No, Mr. Bowman.
5 MR. BOWMAN: Could I have my question and
6 answer back, I'm so sorry.
7 (Whereupon, the record was read
8 as requested.)
9 BY MR. BOWMAN:
10 Q. Do you know who should be asked that
11 question --
12 MS. ROSEN: Objection, form.
13 BY MR. BOWMAN:
14 Q. -- in order to get an answer?
15 A. Whoever may have been in charge of gang
16 crimes in that era.
17 Q. Okay. Do you have any reason to believe
18 that -- that anybody did that?
19 MR. GIVEN: Objection, asked and answered.
20 MS. ROSEN: Did what?
21 BY MR. BOWMAN:
22 Q. Do you have any reason to believe that
23 anybody undertook to ensure that gang crimes
24 responded to the George Jones situation by

87

1 preserving notes, to-from memos, interwatch memos,
2 those sorts of things?
3 MS. ROSEN: Objection, asked and answered.
4 THE WITNESS: I do not.
5 BY MR. BOWMAN:
6 Q. Let me hand you next a memo dated April
7 21, 1982 authored by the commander of the Area 3
8 detective division, a man named John Stibich and
9 directed to Raymond Clark acting chief of the
10 detective division. I've marked it for
11 identification as Exhibit 4.
12 (Whereupon, Hickey Deposition
13 Exhibit No. 4 was marked for
14 identification.)
15 BY MR. BOWMAN:
16 Q. After you've taken all the time you need
17 to read Exhibit 4 through just look up at me and
18 I'll ask you some questions about it.
19 A. Okay.
20 Yes, sir.
21 Q. Are you familiar with this memo?
22 A. I recall seeing it.
23 Q. What was the occasion in your
24 understanding that prompted the creation of this

88

22 (Pages 85 to 88)

memo?

A. The continuing discussion amongst the exempt as to what is a working file and should they be kept.

Q. In your recollection did the chief of the detective division request the input of the various area commanders on those subjects?

A. By virtue of -- I don't remember the actual assignment. But by virtue of this memo it suggests so.

Q. Was a copy of this memo directed to you for your review in connection with the duties that you were under -- assigned to undertake in relation to investigating the filing that was taking place in the areas at this time?

A. I'm quite certain it was shared with me. I don't remember it precisely but yes.

Q. Is it your understanding that Commander Stibich is describing the use of working files in Area 3 where he was in charge?

A. Yes, sir.

Q. Now, what he indicates is that a working file contains not only official reports but also documents, memos, requests from one detective to

another, crime scene photographs, and other pertinent information necessary for the conduct of an investigation, yes?

A. Yes, sir.

Q. And Stibich reports that having a working file is essential to conduct a competent major investigation, right?

A. Yes, sir.

Q. His point is that when there's more than one team of detectives working on the same matter that the detectives need to be in touch with one another in writing regarding the progress of the investigation, right?

A. Yes, sir.

Q. And is that consistent with your experience as a detective?

A. It is.

Q. So he says that the working file serves as a means of communication from one detective to another when an official supplementary report is not prepared, is that consistent with your experience as a detective?

A. Yes, sir.

Q. And then Stibich goes on to list a series

of reasons why it's necessary to maintain a working file in a case. And there's a series of bullet points on Page 1 and 2 of the exhibits, do you see that?

A. I do.

Q. And among other things the working file might contain a running account of things accomplished and future things to be done, that's what Stibich reports here, yes?

A. Yes, sir.

Q. And is that consistent with your experience as a detective?

A. Yes, sir.

Q. And is that what you found in your investigation of activities in the various areas in your work in 1982 and 1983?

A. In some but not all cases.

Q. All right. And when you say in some but not all cases do you mean in some but not all areas?

A. No. All the above -- no, in cases.

Q. Some cases might have this -- this --

A. And others may not. There are some cases that there didn't seem to be a written word other

than the supplementary reports.

Q. But there were some where there did?

A. Yes, sir.

Q. Okay. Stibich says that the working file in his words can serve as a, quote, forum for different detectives to give their respective viewpoints, opinions, conjectures, suppositions, and, quote-unquote, gut feelings regarding a specific investigation, closed quote, do you see that?

A. I do see that.

Q. And is that consistent with your experience as a detective?

A. No, it's not. Mostly it was a to do list or a request for someone to follow-up on a certain aspect of the crime. It really -- I didn't see evidence that there were dueling opinions as to the theory of a crime.

Q. Okay. Well, do you think Stibich has this wrong?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I don't think it speaks to all units, all cases. I mean, we already said not all cases.

BY MR. BOWMAN:

Q. With respect to some of the cases in Area 3 will you concede that Stibich's description here of a forum for different viewpoints, opinions, and so forth is accurate?

MS. ROSEN: Object to the form of the question, it's vague. Are you saying that --

Can you read back the question.

(Whereupon, the record was read as requested.)

MS. ROSEN: When you say accurate do you mean accurate as in that's what's happening or accurate as a reason for justifying the use of working files.

MR. BOWMAN: Accurate as --

BY MR. BOWMAN:

Q. First of all, will you concede that with respect to some files at Area 3 that Stibich is accurately describing the use in practice of working files when he says that the file is a forum for different viewpoints, opinions, conjectures, and so forth?

MS. ROSEN: Object to the form.

THE WITNESS: My review, my assessments I

93

didn't see this. But he wrote it so he must believe it. So I cannot challenge his -- his now dead man's written word.

BY MR. BOWMAN:

Q. He also says that the working file may contain documentation of the credibility of witnesses and of suspects, do you see that?

A. I do.

Q. And would you agree with me that the Laverty memo in the Jones case would be an example of such information in a working file?

A. I think this is speaking -- no, I don't. I haven't seen the Laverty memo in a number of decades. I don't know at this moment what was in it. I think you're speaking as detectives would speak to one another. I don't know what the witness saw from his vantage point.

Q. Those kinds of things?

A. Yeah, and it's --

Q. In your experience is that information that might be contained in the notes and memoranda of a detective in a working file?

A. It could be but it wasn't very often.

Q. Sometimes it was?

94

A. It could be, yes, sir.

Q. Skipping over the reference to the file as a safeguard. The last bullet point on the bottom of Page 1 reads that the working file may function, quote, as a guide for a detective entering the specific investigation whereby he can immediately be brought up to date as to the progress of the investigation. Is that consistent with your experience as a detective?

A. No, because to understand the case you really did have to read the file. It may have told you what was done last night but I wouldn't call it a summary of the investigation.

Q. Okay. Stibich says that the working file may be a means of eliminating witnesses and/or suspects, is that consistent with your experience?

A. Yes, I think as I originally mentioned in the site visit my observations were too often tracks of the investigation were not documented. They, in fact, looked at Suspect A and found it not -- found him to be innocent and then went on to a second suspect and that story of elimination was not included in the official reports and sometimes it was included in a memo.

95

Q. Got it. And that you'll agree with me is problematic, right?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I believe that more than less should be put into supplementary investigation reports. How did you get to the final chapter. It's not always a straight line.

BY MR. BOWMAN:

Q. Right. And would you agree in general with the proposition that an investigator may not at the time of an investigation appreciate what does and what does not have exculptory value with respect to the steps taken in the investigation? Let me rephrase that.

Will you agree with the proposition that as an investigation is unfolding the investigator may not know what aspects of the unfolding investigation may or may not have exculptory value?

A. In most cases they probably do but there are cases and situations where they don't.

Q. Right. And would you agree that that is a reason why it is important to put all of the investigative process into the official supplementary report as opposed to just leaving

96

some of it out?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I disagree. I don't know if every single person interviewed has to be reduced to a supplementary report but certainly the major ones.

BY MR. BOWMAN:

Q. Well, you described in your testimony a few minutes ago learning during your site visits that -- that too often in your judgment detectives were not recording certain story lines from an investigation where those story lines did not lead to the --

A. Right.

Q. -- result that was documented in the official report, right?

A. Yes, sir.

Q. And all I'm asking is whether you'll agree that that circumstance carries with it the risk that exculptory information will not be in the official report?

A. No, I don't totally agree. If you rule someone out some can argue does it matter if they're part of the story. You just lost a day

97

investigating that person.

Q. Well, it may not be exculptory in the least but it -- but it also might be, right?

A. Well --

MS. ROSEN: Object to the form of the question.

THE WITNESS: I don't think it's exculptory for the person you've just not charged. I mean, you freed them from suspicion. You've cleared them as a subject of investigation.

But I do understand and I more agree than not, sir, that the story, the investigation, should be fuller than it was.

BY MR. BOWMAN:

Q. Well, there are a couple of points that Stibich makes at the top of Page 2 that bear directly on this. Stibich writes that the working file may contain a listing of leads undertaken, sometimes false, that are not included in the official reports, right?

A. Yes, sir.

Q. And that, in fact, was consistent with what you found on your site visits?

A. Yes, sir.

Q. And was that consistent with your

98

experience as a detective?

A. Yes.

Q. And then going down to the bottom of the list Stibich writes that a working file may contain a listing of information that later proves to be worthless and does not become an integral part of the investigation, court presentation. And that was consistent with what you found in your site visits?

A. I don't know what he's referring to as a listing of information. Again, most of the interwatch memo were requests for members of the different watches to perform a function on their behalf, take someone down to the polygraph, re-canvass, go back to the room where nobody answered on the night of the murder, whatever it might be. But is that a listing that proves to be worthless. I don't recall ever seeing a listing of information.

Q. But you did see memos of the sort that you just described?

A. Yes, sir.

Q. That were in working files and not in the official reports?

99

A. Yes, sir.

Q. Okay. It was Stibich's conclusion that -- and he writes this at the very end of his memo, at the conclusion of the investigation by clearing and closing and arrest all pertinent information and documentation should be transferred to the official file and then the working file can be discarded?

A. I see that.

Q. And in -- I mean, obviously the procedure is a little bit more complicated as it came to be written down in the 1983 order but the bottom line is pretty much that that's -- that's what should happen, right?

MS. ROSEN: Object to the form of the question.

THE WITNESS: There never was a requirement for the investigative file to mirror that of the unit file or the official file.

It was simply an obligation if you took notes to preserve them in the investigative file. If you prepared an interoffice memorandum on a general progress report or any other way preserve it and this is how and where you should keep it in the investigate file. But there was not an obligation to create two identical files.

100

25 (Pages 97 to 100)

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

BY MR. BOWMAN:

Q. But the bottom line point was that as of 1983 there was an official recognition at least on the part of the detective division that any officer notes generated in the course of an investigation, any memorandum of an investigatory nature that came into being as a result of the investigation, lists of things that should be done, and the like should all be kept and preserved and maintained as a part of the official file of the case, accurate?

A. Yes, sir.

MS. ROSEN: I'm going to object to the form.

MR. BOWMAN: Can I have an explanation of what I did wrong in phrasing that question.

MS. ROSEN: Well, because you -- you've -- maybe it's I'm just confused. I thought you started this with what he said should be done at the conclusion is what got memorialized in '83, isn't that what --

MR. BOWMAN: No, my question didn't relate back to any other question that I asked.

MS. ROSEN: Well, I am maintaining my objection.

BY MR. BOWMAN:

Q. Do you acknowledge on behalf of the Chicago Police Department that if what we've just agreed is the official responsibility of investigators in the department is if that is not done that there is an unacceptable risk that exculptory information may not be included in a file as happened in the George Jones case?

MS. ROSEN: Object to the form.

THE WITNESS: I would like a clarification on the use of the word investigator. Are you referring to anyone in the Chicago Police Department who investigates --

MR. BOWMAN: Yes.

THE WITNESS: -- or are you referring to detectives?

MR. BOWMAN: Anyone.

THE WITNESS: The investigative file procedures were designed to enforce detective division procedures. It was localized within the detective division.

So I would say you're right if you're using the word detective. But, no, if it pertains to the general investigating officers wherever they

may be in the Chicago Police Department.

BY MR. BOWMAN:

Q. And is that simply because of the limits on your expertise or are you saying that -- that the proposition is inaccurate outside of the detective division?

A. It's inaccurate outside of the -- it's a technical -- I disagree with you on technical. It's -- it was a detective division special order issued to the detective division members for violent crime field investigations.

Q. All right. What I intended to ask is whether if notes and memoranda generated by an investigator in the course of an investigation are not kept and included in the official file, if there is an unacceptable risk that exculptory Brady material will not be part of the file as it must be under the constitution.

I'm not asking, you know -- I'm not intending to ask anything technical, I'm just asking as a general proposition speaking on behalf of the police department in your opinion is that an accurate statement?

MS. ROSEN: Object to the form of the question.

MR. GIVEN: Also incomplete hypothetical and foundation objection as well.

MS. ROSEN: And can I just get a clarification, when you make reference to an official file are you -- what are you referencing?

MR. BOWMAN: I'm referencing the file that is made available to the participants in the criminal justice system.

MS. ROSEN: Okay.

THE WITNESS: I don't think there is a danger of losing exculptory material or information if the general police officer investigating a crime submits a supplementary report.

One of the nicer things about our report procedures in the police department is that we do not have a prohibition against writing a supplementary report. If you feel that you have uncovered something you have an obligation to report it. You know, it's -- all people in the Chicago -- all sworn members of the Chicago Police Department are potentially contributors to an investigation. And they all have an obligation to preserve information that exonerates or involves an individual. If they learn that he was in Indiana

on the night and they know that this is pertinent
they have an obligation.
BY MR. BOWMAN:
Q. Well, let me be more specific then. We've
learned in this case that in 1988 gang crimes
specialists prepared on a daily basis something
that was colloquially referred to as a humper and
more -- less colorfully described as a daily
activity report listing their -- all their
activities on an investigation on a particular day.
But it appears to us since we've never
seen it that these reports were not preserved.
They were not included in the file that was
provided to the participants in the criminal
justice system.
What I'm asking is specifically with
respect to those documents on behalf of the Chicago
Police Department do you have acknowledge that the
failure to preserve those documents and the failure
to include them in the file provided to the
participants in the criminal justice system creates
as unacceptable risk that exculptory material that
may have developed in the course of an
investigation and not been included in an official

report will not be in the file?
MS. ROSEN: Object to the form of the question
and foundation with respect to establishing that
this witness has any knowledge about what
information is contained in a daily activity
report.
MR. GIVEN: Also incomplete hypothetical.
THE WITNESS: This daily activity humper report
I don't know what it is. I'm not at all surprised
that we have a daily activity report in various
enforcement units. If it existed we could probably
find the form. The form, maybe not the individual
report. I mean, I'm just --
BY MR. BOWMAN:
Q. Where would we look for the form?
A. Research and development.
Q. Does research and development maintain the
formats from old forms --
A. Yes.
Q. -- that were in use dating all the way
back into the 80's?
A. Yes.
Q. Okay.
A. We've learned something today.

But that -- that's not about any one
investigation. I mean, it -- I don't pretend to
have knowledge of what this form looks like. But
it's about what you did today, you know. It's your
boss wanting to know if you made arrests, it's --
you know.
Q. Well, if I what did today includes talking
to a witness in a particular case and mysteriously
there is no report about the conversation with that
witness --
A. If it's important. Sorry.
Q. -- if it's a -- will you accept the
proposition that if it's an important witness that
the failure to preserve and include these reports
in the file provided to the participants in the
criminal justice system contains a risk that
exculptory information may not be included in the
documentation?
MS. ROSEN: Objection, form, foundation, calls
for speculation.
MR. GIVEN: I'm not sure it was a question.
THE WITNESS: If the information is important
that a gang crimes specialist should have recorded
it on a supplementary report or at the least picked

up the phone and called the detective and shared
the information. I mean, that's --
BY MR. BOWMAN:
Q. Let me hand you another memo which I
believe was written in the context of your 1982
activities. I've marked it for identification as
Exhibit 5.
(Whereupon, Hickey Deposition
Exhibit No. 5 was marked for
identification.)
BY MR. BOWMAN:
Q. The title of this document is memo to
discrepancies between detective area unit files and
the records division reports of the same records
division number. It appears that you authored
it --
A. Yes, it does.
Q. -- based on your name at the bottom of the
Page 2?
A. That is correct. I recognize this. It's
been a while since I've seen it though.
Q. Can you tell me the context in which it
was written please?
A. This was written after my having conducted

1  the site visit to the six detective areas.
2      Q.  And was --
3      A.  Probably in April of 1982.
4      Q.  Was this a report for the benefit of the
5  chief of detectives?
6      A.  Yes, sir.
7      Q.  And was it transmitted to him to the best
8  of your information?
9      A.  It was, I prepared it for him.
10      Q.  And in summary you're reporting to the
11  chief of detectives that you had learned of
12  discrepancies between what you referred to as the
13  unit files of an area and the records division file
14  of official reports at police headquarters?
15      A.  Yes, sir.
16      Q.  And you indicate that often times there
17  are additional pieces of paper in the unit files
18  and assorted miscellaneous documents included in
19  unit files that are not in the official record
20  suppository, yes?
21      A.  Yes, sir.
22      Q.  And this would be documents of the nature
23  we've been talking about before including notes, to
24  from memos of an investigatory nature, to do lists,

109

1  and the like?
2      A.  Phone books, personal phone books, just
3  scraps of paper.
4      Q.  Is my --
5      A.  Yes, sir.
6      Q.  The question that I asked is accurate?
7      A.  Yes, sir.
8      Q.  It included the notes and the memos that
9  we've been talking about?
10      A.  Yes.
11      Q.  And then you also report that each violent
12  crime unit states that they routinely upon the
13  clearing of a homicide case purge the file of
14  miscellaneous documents but only in Area 3 and Area
15  5 is this purging actually done, can you tell me
16  what the meaning of that is?
17      A.  These documents that existed were not
18  placed into an official file.
19      Q.  And when you write that the files were
20  purged of the miscellaneous documents does that
21  mean that they were thrown away?
22      A.  Yes.
23      Q.  Okay.  And that this, in fact, happened in
24  Area 3 and Area 5?

110

1      A.  Yes.
2      Q.  Now, there's also a reference here to
3  major incident worksheets.  And they've come up
4  before in our deposition, right, we've talked about
5  them in the context of your morning duties in terms
6  of preparing the summary for Chief Handhardt?
7      A.  Yes, sir.
8      Q.  And you write here that the major incident
9  worksheets contain material which may be
10  detrimental to the prosecution of arrested
11  offenders including remarks by detectives which
12  often question either the validity of the victim's
13  complaint or the veracity or moral virtues of the
14  victims themselves you refer to this as poetic
15  license that could serve to undermine the
16  prosecution of the case, what are you referring to
17  there?
18      A.  Descriptions of victims that were not
19  complimentary.
20      Q.  Disparaging their credibility for example?
21      A.  Probably speaking more to their moral
22  character than -- I don't know about their
23  credibility but.
24      Q.  But in any event you conclude here that if

111

1  these -- if such language were to be placed into
2  the hands of a competent defense lawyer that it
3  could be used in and exculptory way to cast doubt
4  upon the credibility of the witness and the
5  viability of a prosecution?
6      MS. ROSEN:  Objection, form.
7      THE WITNESS:  The use of slang rarely helps in
8  an objective criminal justice review.
9  BY MR. BOWMAN:
10      Q.  Do I have that right?
11      A.  Yes, sir.
12      Q.  Were the major incident worksheets
13  eliminated in 1983, was that the intention?
14      A.  Oh, no.  No.
15      Q.  Do they continue to be used?
16      A.  I don't know about today.  But they were
17  continued to be used for, you know, at least a
18  decade or more afterwards.
19      Q.  Were they in use in the -- throughout the
20  1980's?
21      A.  Yes.
22      Q.  80's?
23      A.  Yes.
24      Q.  Including in 1988?

112

28 (Pages 109 to 112)

A. Yes. It's two sides, side one is nothing
more than a series of data fields, we used to call
them boxes, right. And it simply was there to
facilitate note taking. Firearm description, vin
number of the automobile, address, driver's license
number. Things you couldn't possibly remember when
you went to prepare your report.

And on the back side was a brief summary
of the events. You know, I'm going home in 45
minutes, I can't tell you the whole story, but it's
a he said, she said type of crime or whatever slang
they might have used.

Q. And the narrative on the back side in your
estimation was sometimes problematic --

A. Yes, sir.

MS. ROSEN: Object to the form.

BY MR. BOWMAN:

Q. -- as you have described in your memo?

A. Yes, sir.

Q. Now, if there were a murder in 1988 that
were -- that was investigated in one of the
detective divisions would the procedure and the
expectation be that there would be a major incident
worksheet created for that investigation?

A. No.

Q. Okay. Explain?

A. It's a -- you can say a fielder's choice
here but it's the detective's option to write -- in
1988 write everything down on the general progress
report freehand, okay, just notes. Victim, date
and time, weather, weather conditions, the vin
number, whatever you think is important. Or to use
the handy dandy note facilitator called the major
incident worksheet. There's not a requirement to
use the back side. I could use one the major
incident worksheet to help me legibly write down my
notes from the crime scene and go back and begin
the official report and never having written
anything on the back side of the major incident
worksheet. We skipped a step.

Q. Okay. So let me ask it this way, would it
be the expectation and the procedure with respect
to a murder investigation occurring in 1988 that
the detective would either generate a major
incident worksheet or would create freehand notes
either on the back of the general offense case
report or elsewhere characterizing and describing
the case?

MS. ROSEN: He didn't say the back of a general
offense case report he said on a general progress
-- a GPR.

MR. BOWMAN: Oh, I misunderstood. Okay.

THE WITNESS: Yes.

MR. BOWMAN: Let me ask the question again.

THE WITNESS: If I did I certainly meant --

MS. ROSEN: No, you said general progress
report.

BY MR. BOWMAN:

Q. So would it be -- would it be the
expectation that the detective would either create
the major incident worksheet or would use a GPR to
document the circumstances of a crime and the data
regarding the crime for official purposes?

MS. ROSEN: But don't answer that because
they're going to fix the problem in the question.

THE WITNESS: Only for notes, the taking of
notes. The general progress report and the major
incident worksheet are notepads.

BY MR. BOWMAN:

Q. Right. All I'm asking is would you
expect --

A. Yes, I would.

Q. -- in a murder investigation from 1988
that either there would be a GPR with the
information that you've described or a major
incident worksheet with the information, one or the
other in the file?

A. Yes.

Q. Okay. Now, suppose it were not a murder
investigation but an aggravated battery
investigation, would you have the same expectation
with respect to a 1988 investigation namely that
there would be either a major incident worksheet or
comparable notes on the GPR?

A. Yes, because I don't know how you can
conduct an investigation without some note taking.
I mean, eventually you have to write a report.

Q. Okay. Now, I want to skip ahead since our
time today is limited. I just got a couple of
questions I want to ask you about filing that
extends into today. And if you need some guidance
from the official directives you let me know and I
think I can provide them.

When 83-2 was generated you wrote it?

A. I drafted it, yes.

Q. Okay. And one of the provisions in 83-2

1 is that in a case where a homicide investigation
2 remains open or cleared slash open in the
3 circumstance where one offender is apprehended and
4 the other is remained either unidentified or at
5 large that the retention procedure is for the file
6 to remain at the area for a period of ten years at
7 which point it is transferred to the records
8 division warehouse, is that consistent with your
9 understanding of what 83-2 called for?
10    A.  That's accurate.
11    Q.  And when the SOP manual for the detective
12 division was created in 1988 it contained the same
13 requirement with respect to open and cleared open
14 files namely that they stayed at the area for ten
15 years then go to records division, right?
16    A.  Yes, sir.
17    Q.  And that remained the case until very
18 recently in 2011 when the procedure was changed and
19 open or cleared open cases are now permitted to
20 remain at the -- at the area indefinitely, right?
21    A.  I don't know that but.
22    Q.  Okay.  Well, let me ask you this question,
23 it has -- it has come to our notice in this
24 particular case that at Area North there are some

117

1 35 filing cabinets in a room on the first floor
2 that contain -- supposedly contain cleared open and
3 open investigations -- start over.
4        It's come to our attention that at Area
5 North there are 35 filing cabinets that supposedly
6 contain open and cleared open homicide files dating
7 all the way back to 1961, have you been made aware
8 of that fact?
9    MS. ROSEN:  Object to the form of the question
10 and your use of the word supposedly.
11    THE WITNESS:  I have no knowledge of that.
12 BY MR. BOWMAN:
13    Q.  All right.  If what I've just told you is
14 accurate and at Area North there are filing
15 cabinets with open homicide files and cleared open
16 homicide files and potentially some closed homicide
17 files dating all the way back to 1961 is there any
18 -- to your knowledge any Chicago Police directive
19 or policy that justifies the maintenance of those
20 files at that location?
21    MS. ROSEN:  Object to the form of the question.
22    THE WITNESS:  Let me speak to 1983.  Prior to
23 1983, this 1961 file or others.  When I drafted the
24 order never in my wildest dreams did I think I was

118

1 writing a policy retroactively.  I thought it was
2 from this day forward, all right.  You know, it's
3 -- you know, it's certainly everyone's experience
4 that things retroactive don't work out well.
5 Whether they be laws or filing procedures.
6        But in regards to what you've just told
7 me, something I didn't know, in 2011 changed.
8 Everything I would expect from 1983 up to 2011 the
9 order calls for it to be moved after ten years.
10        Now there are reasons it may stay on the
11 floor.  It may be called back.  And that probably
12 has more to do with what is going on an
13 individual case basis.  It might be the anniversary
14 of a major case, someone might be assigned to look
15 at all cold cases that are five to ten years of
16 age.  I don't know the inner workings of the
17 detective division.
18        But, yes, would be my answer.  I would
19 think that those cases between 1983 up to 2011
20 should have been sent to the records division
21 warehouse.
22 BY MR. BOWMAN:
23    Q.  And then might one or -- or a handful of
24 files might be called back for a specific reason

119

1 but to store them if that is, in fact, happening at
2 a location in the area would it best be
3 inconsistent with the expectations of 83-2?
4    A.  I think proportion is important here.
5 Remember that the '83 directive called for the
6 creation of an investigative file for every violent
7 crime field investigation, every robbery, every
8 aggravated battery, every criminal sexual assault,
9 murder.  And I don't know how many of those types
10 of cases were all the districts that comprise Area
11 North over a ten year period of time.
12    Q.  Time out.  My question pertained just to
13 homicide files?
14    A.  Okay.
15    Q.  Okay.  So -- and if I wasn't clear about
16 that --
17    A.  No, I'm sorry.
18    Q.  What's come to our attention is that the
19 -- is that the 35 file cabinets of files dating
20 back to 1961 are exclusively homicide files.
21        Now, with that information and focus will
22 you agree that the maintenance of such a large
23 number of homicide files in a location where
24 they're not supposed to be is inconsistent with the

120

1 expectations of 83-2 and department policy?
2     MS. ROSEN:  Object to the form.
3     THE WITNESS:  You said 82 but I know you meant
4 83.
5     MR. BOWMAN:  Sorry.
6     THE WITNESS:  And it would be inconsistent.
7 BY MR. BOWMAN:
8     Q.  And do you have any explanation of -- from
9 why such a large number of homicide files would be
10 located at Area North?
11     MS. ROSEN:  Object to the form of the question.
12     THE WITNESS:  You mentioned a couple times 35
13 filing cabinets.
14 BY MR. BOWMAN:
15     Q.  Right.
16     A.  I don't know how large any one individual
17 file is.  It could be a box, it could be, you know,
18 two folders, I don't know.  So, again, I don't know
19 at this moment how many homicides they've had in
20 their jurisdiction.  I mean, some cases -- you
21 know, the Tylenol case would have a lot of files.
22 I don't know what's in there or how large any one
23 is.
24     Q.  Well, if you assume as we've learned in

121

1 this case that the files are not particularly
2 massive.  That actually we're not talking about the
3 Browns Chicken case, we're not talking about the
4 Tylenol case?
5     A.  Is that up there.
6     Q.  We're talking about the files of typical
7 size described in the deposition as, you know, one
8 or two Redwell folders.  So with that information
9 and focus do you know of any reason why consistent
10 with department policy these files were being kept
11 at Area North?
12     MS. ROSEN:  Objection, form, foundation.
13     THE WITNESS:  I don't know the reason.  But you
14 informed me in 2011 the policy changed so now it's
15 all legally there.
16 BY MR. BOWMAN:
17     Q.  Well, that was actually a question I was
18 going to ask you as the representative of the
19 department.  Let's look at the 2011 order.  I'm
20 going to mark it for identification as Exhibit 6 to
21 the deposition.
22         (Whereupon, Hickey Deposition
23         Exhibit No. 6 was marked for
24         identification.)

122

1 BY MR. BOWMAN:
2     Q.  Exhibit Number 6 to be clear for the
3 record is a detective division special order
4 bearing number -- bearing number 11-01 issued on
5 May 5, 2011 together with a set of addenda numbered
6 1 through 4.
7         You should take all the time you need to
8 look through this.  My question is going to be
9 about Addendum 4 relating to file storage.
10     A.  All right.
11     Q.  Okay.  So you'll see that the 2011 order
12 changes the procedure from what you had drafted in
13 83-2 and which in my understanding carries through
14 up to 2011 by providing that the cleared open and
15 open homicide cases stay at the area indefinitely,
16 right?
17     A.  Yes, sir.
18     Q.  Now, as the representative of the police
19 department with respect to file storage and the
20 like you're not saying that when the 2011 order
21 went into effect that the records division started
22 giving back a bunch of open and cleared open cases
23 that would otherwise have been stored with them
24 under the old procedure to the areas, right?

123

1     MS. ROSEN:  Object to the form of the question
2 with respect to the records division sending it
3 back.
4     THE WITNESS:  I am not saying that.
5 BY MR. BOWMAN:
6     Q.  Right.  Because that would make no sense
7 at all, right?
8     MS. ROSEN:  Object to the form of the question.
9 BY MR. BOWMAN:
10     Q.  Right?
11     A.  It would make little sense.
12     Q.  Okay.  And it would -- it would -- I mean,
13 you know, based on your own experience as a drafter
14 of these things and specifically the drafter of
15 83-2 the expectation of the drafter is that this
16 new procedure is going forward and it's not
17 re-creating history with respect to the storage of
18 files that went before, right?
19     A.  Yes, sir.
20     Q.  Okay.
21     MR. BOWMAN:  Now, let's go off the record for a
22 minute.
23         (Whereupon, a discussion was
24         had off the record.)

124

## Page 125

BY MR. BOWMAN:

Q. The -- earlier this afternoon I was asking you a series of questions about subpoenas and the fulfillment of subpoenas within this particular unit of the records division, you recall those questions and your answers, right?

A. Yes, sir.

Q. When the State's Attorney's Office would request documents from the police department relating to a pending matter in the criminal courts would the State's Attorney's request go to the same unit?

A. Yes.

Q. And would it be handled in generally the same way?

A. Yes. It might be a different form but it's the same people providing the service.

Q. Would the State's Attorneys typically submit subpoenas or would they do it in a less formal way?

A. I don't know what they did more of to be honest with you. I'm -- I thought they had a separate form in which they requested information but I cannot speak authoritatively on that, I'm

## Page 126

sorry.

MR. BOWMAN: All right. So we're concluded for today.

We agreed that we'll come back again on the 10th of June at 10:00 o'clock.

(Whereupon, the deposition was continued sine die.)

## Page 127

STATE OF ILLINOIS  )
                   )  SS:
COUNTY OF C O O K  )

KIMBERLY J. KARAS, being first duly sworn, on oath says that she is a court reporter doing business in the State of Illinois; and that she reported in shorthand the proceedings of said hearing, and that the foregoing is a true and correct transcript of her shorthand notes so taken as aforesaid, and contains the proceedings given at said hearing.


_Kimberly J. Karas_
KIMBERLY J. KARAS, CSR
LIC. NO. 084-003548

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA,           )
          Plaintiff,      )
     -vs-                 ) 2012 CV 4428
REYNALDO GUEVARA, ET AL., )
          Defendants.     )

The continued deposition of JAMES HICKEY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before KIMBERLY J. KARAS, a notary public within and for the County of Cook and State of Illinois, at 375 East Chicago Avenue, 8th Floor, Chicago, Illinois, on the 10th day of June, 2014, commencing at the hour of 10:16 o'clock a.m. and terminating at the hour of 4:07 o'clock p.m.

Reported by: Kimberly J. Karas
License No.: 084-003548

127

---

1       APPEARANCES:
2
3       RODERICK AND SOLANGE MacARTHUR JUSTICE
4       CENTER, by
5       MR. LOCKE BOWMAN
6       Northwestern University School of Law
7       357 East Chicago Avenue
8       8th Floor
9       Chicago, Illinois  60611
10      (312) 503-1336
11      ereana-hart@law.northwestern.edu
12      l-bowman@law.northwestern.edu
13          and
14      LOEVY & LOEVY, by
15      MR. STEVE ART
16      MR. RUSSELL AINSWORTH
17      312 North May
18      Suite 100
19      Chicago, Illinois  60607
20      (312) 243-5900
21      art@loevy.com
22          Representing the Plaintiff;
23
24

128

---

1       APPEARANCES CONTD:
2
3       ROCK, FUSCO & CONNELLY, LLC, by
4       MS. EILEEN ROSEN
5       321 North Clark Street
6       Suite 2200
7       Chicago, Illinois  60654
8       (312) 494-1000
9       erosen@rockfuscoconnelly.com
10          Representing the City of Chicago;
11
12      THE SOTOS LAW FIRM, P.C., by
13      MS. ELIZABETH A. EKL
14      MR. JEFFREY N. GIVEN
15      550 East Devon
16      Suite 150
17      Itasca, Illinois  60143
18      (630) 735-3300
19      eekl@jsotoslaw.com
20      jgiven@jsotoslaw.com
21          Representing named Defendant Chicago
22          Police Officers.
23
24

129

---

1                    I N D E X
2       WITNESS                        EXAMINATION
3       JAMES HICKEY
4           By Mr. Bowman (continued)        131
5           By Ms. Rosen              279
6           By Mr. Bowman (Further)       291
7
8                  E X H I B I T S
9       NUMBER                    IDENTIFICATION
10      Hickey Exhibit
11          No. 7               133
12          No. 8               133
13          No. 9               164
14          No. 10              164
15          No. 11              167
16          No. 12              200
17          No. 13              215
18          No. 14              223
19          No. 15              225
20          No. 16              228
21          No. 17              245
22          No. 18              250
23          No. 19              255
24          No. 20              276

130

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

| | |
|---|---|
| 1     (Whereupon, the witness | 1     MS. ROSEN: Oh, I don't care. |
| 2     was duly sworn.) | 2     They're just a blank form, right. |
| 3     JAMES HICKEY, | 3     THE WITNESS: Yes. |
| 4 called as a witness herein, having been first duly | 4     MR. BOWMAN: All right. |
| 5 sworn, was examined and testified as follows: | 5     MS. ROSEN: We will mark them. |
| 6     CONTINUED EXAMINATION | 6     THE WITNESS: This is the '83. |
| 7 BY MR. BOWMAN: | 7     MR. BOWMAN: Yeah. |
| 8   Q. Mr. Hickey, have you looked at any | 8 BY MR. BOWMAN: |
| 9 documents since the last session of your deposition | 9   Q. Thank you for handing me these two |
| 10 that we had in May? | 10 documents. |
| 11   A. I have. | 11     What I'm going to do is mark for |
| 12   Q. Can you tell me what you looked at? | 12 identification as Exhibit 7 to your deposition the |
| 13   A. The transcript from my deposition. | 13 version of the gang specialist daily activity |
| 14   Q. Okay. Anything else? | 14 summary that was created in 1983. And as Exhibit 8 |
| 15   A. A gang crimes activity report. | 15 the version that went on-line in 1993. |
| 16   Q. Which one? | 16     (Whereupon, Hickey Deposition |
| 17   A. 1983 version I believe. And I think there | 17     Exhibit No. 7 and No. 8 were marked |
| 18 was a 1993 version. | 18     for identification.) |
| 19   Q. Okay. And was this just a blank format? | 19     MR. ART: And, Locke, for the record Exhibit 7 |
| 20   A. Yes, it was. | 20 is Bates stamped. |
| 21   Q. Okay. So there was a 1983 and a 1993 | 21     MS. ROSEN: You have it? |
| 22 version that you looked at? | 22     MR. ART: Yes. |
| 23   A. Right, they're about ten years apart. | 23     MS. ROSEN: Oh, all right. |
| 24   Q. Did you happen to bring those with you? | 24     MR. ART: RFC20172. And Exhibit 8 is Bates |
| 131 | 133 |

| | |
|---|---|
| 1   A. I did. | 1 stamped RFC20173. |
| 2   Q. May I see them? | 2     MR. BOWMAN: Great. |
| 3   MS. ROSEN: They were produced yesterday. | 3     And this is -- and the Bates numbers that |
| 4   MR. BOWMAN: Oh, they were. | 4 Mr. Art just read off were from yesterday's |
| 5   MR. ART: Oh, really. | 5 production of these two documents. |
| 6   MS. ROSEN: Well, you asked for them. | 6 BY MR. BOWMAN: |
| 7   MR. BOWMAN: There's a lot of e-mails, Eileen. | 7   Q. So I don't have extra copies. I don't |
| 8   MS. ROSEN: They were part of the production | 8 think I'm going to need to read over your shoulder |
| 9 response from yesterday. | 9 but we'll see. |
| 10   MR. ART: Oh, yeah, yeah, we saw that for sure. | 10     Let's look first at Exhibit 7 which -- why |
| 11   MR. BOWMAN: Well, if you have them. | 11 don't you begin by just telling us what that is? |
| 12   MS. ROSEN: That's fine. I'm just saying you | 12   A. This is an 8 and a half by 11 lined |
| 13 guys asked for them and I actually thought it was | 13 report. The title of it of which is the gang |
| 14 convenient that they were -- the production was due | 14 specialist daily activity summary. And it has a |
| 15 the day before the dep. | 15 CPD form number of 21.382. And it was created in |
| 16   MR. ART: That was convenient. | 16 December 1983. |
| 17   MS. ROSEN: Yep. | 17   Q. And you can tell that by the -- by the |
| 18   This is obviously the un-Bates stamped | 18 numbers that appear in parentheses in the lower |
| 19 version. | 19 left-hand corner -- |
| 20   MR. BOWMAN: Right. | 20   A. That's correct. |
| 21   MS. ROSEN: We can figure out what that is at a | 21   Q. -- portion of the page? |
| 22 break or something. | 22     Can you tell me what the process was -- |
| 23   MR. BOWMAN: Sure. Do you mind if I mark | 23 and let me ask you a foundational question first. |
| 24 these. | 24 I'm assuming you had no personal role in the |
| 132 | 134 |

1 creation of Exhibit 7?
2     A.   I did not.
3     Q.   Can you tell me generically what the
4 process was for the creation of this form?
5     A.   In the Chicago Police Department all forms
6 are created in a central location and they are
7 assigned a form number.  Functionally this activity
8 takes place in the Research and Development
9 Division.  And as a result we have a historical
10 listing of the forms that we have officially
11 created over the years.  It also includes printing
12 records and things of that nature.
13     Q.   So you were able to locate this by just
14 going back to the list and looking for the activity
15 summary form for gang crimes?
16     A.   Correct.
17     Q.   This I'm assuming is an official form of
18 the Chicago Police Department?
19     A.   It is.
20     Q.   The document when it is completed by a
21 gang crimes specialist becomes the property of the
22 police department?
23     A.   That's correct.
24     Q.   And the expectation is that it will be

1 filed and kept in the ordinary course of business
2 in the Chicago Police Department?
3     A.   For whatever the form retention calls for.
4     Q.   Okay.  Now, since you've brought that up
5 let me get a little bit ahead of myself and follow
6 you along.  Is there a way to determine the form
7 retention period that applies with respect to this
8 particular form?
9     A.   There would be a way.  It would be to go
10 back to R and D and find out what the retention
11 form -- or what the retention period was for this
12 form.
13     Q.   Okay.
14     A.   For every form there is an established
15 retention form -- retention period, excuse me.
16     Q.   All right.  What, if you know, was the
17 procedure for filing and retaining these particular
18 forms when they had been completed by gang crimes
19 specialists?
20     A.   I do not know the specific filing for this
21 form but it is an activity report.  Probably didn't
22 go beyond the unit level.
23     Q.   Meaning that your informed belief is that
24 this particular form when it was submitted by an

1 officer at the conclusion of a tour of duty would
2 be filed and maintained in that officer's unit?
3     A.   Correct.
4     Q.   And that would be in this -- in the case
5 of gang crimes it would be a field unit?
6     A.   Yes, sir.
7     Q.   Okay.  And then the expectation of the
8 police department is that the form having been
9 filled out and submitted, approved by the
10 supervisor would then be kept and maintained in
11 that unit for whatever period of time was called
12 for with respect to this particular form?
13     A.   Yes, sir.
14     Q.   And then what would happen at the -- at
15 the end of that time period?
16     A.   There's established procedures to destroy
17 any form in the Chicago Police Department.
18     Q.   Is there ever any process of transferring
19 the contents of forms onto microfiche or current
20 parlance putting it -- scanning it in to retain it
21 or a permanent basis?
22     A.   I am not --
23     MS. ROSEN:  This form or forms generally.
24     MR. BOWMAN:  Forms generally.

1     THE WITNESS:  The only form I know that we
2 microfiche I think are traffic crash reports.
3 Nothing else.
4 BY MR. BOWMAN:
5     Q.   All right.  So when these things are
6 destroyed they're gone.  They're just destroyed and
7 there contents of them are not available to anyone
8 anymore?
9     A.   Correct.
10     Q.   All right.  Is there any accompanying this
11 form at the time of its creation is there any set
12 of instructions, rules, procedures with respect to
13 how to fill it out?
14     A.   There is no directive but there is
15 description on the form itself as to how it should
16 be used.
17     Q.   Okay.  Why don't you just read that into
18 the -- into the record?
19     A.   About a third way down on the report
20 itself there's a description that reads as
21 follows:  Activity, colon, briefly describe the
22 nature of any investigation either assigned or
23 self-initiated including arrest and other activity,
24 period.  This is not an investigative report and

Page 139:

1  will not include information normally contained on
2  official department reporting documents, period.
3  Attach copies of any initiated reports and submit
4  to the supervisor at the conclusion of the tour of
5  duty.
6      Q.  Okay.
7      A.  End.
8      Q.  So the testimony that we've heard from
9  others is that -- that informally on the street the
10  understanding was that -- that this activity report
11  which was colloquially known as a humper would --
12  would provide supervisors with a complete record of
13  the way an individual gang crimes specialist had
14  spent his eight hour tour of duty every day, is
15  that consistent with the instruction that you've
16  just read?
17      MS. ROSEN:  Objection form, misstates the prior
18  testimony.
19      THE WITNESS:  I don't think it was ever
20  intended to record every activity they performed
21  but a summary, a broad summary.
22  BY MR. BOWMAN:
23      Q.  Sure.  So with that correction I'm right?
24      A.  Yes.  Yes, sir.

139

Page 140:

1      Q.  Okay.  Now, the form was modified in 1993
2  and you have Exhibit 8 in front of you as well.
3  Can you, first of all, tell me when Exhibit --
4  well, why don't you just tell me what Exhibit 8 is?
5      A.  The title of this report even though it
6  has the same number, i.e., CPD-21.382 was revised
7  in February 1993 and also had a revised title.
8  Instead of saying gang specialist daily activity
9  summary it said daily assignment and activity
10  report special functions group patrol division.  So
11  anyone working in that organizational subunit would
12  be filling that out not just gang crimes
13  specialist.
14      Q.  Would gang crimes specialists also fill
15  out Exhibit 8?
16      A.  Yes, they would if they were part of that
17  group in 1993.
18      Q.  And you were able to determine the
19  identity of the form number as between Exhibit 7
20  and 8 as well as the time that Exhibit 8 was
21  initiated again by looking in the lower left-hand
22  portion of the document?
23      A.  Yes, sir.
24      Q.  Why was the form revised?

140

Page 141:

1      A.  I have no personal knowledge.  My looking
2  at it is that it was broadened from one reporting
3  unit, i.e., the gang crimes section to a broader
4  group of units for their use, the special functions
5  group.
6      Q.  You need to help me out because I'm --
7      A.  Sure.
8      Q.  -- looking upside down at it.
9          Is there any change in the instructions
10  for completing the form?
11      A.  It's verbatim the same is for the
12  instructions.  This is not -- okay, there's the
13  second sentence where as it used to say this is not
14  an investigative report and will not include
15  information normally contained on official
16  department reporting documents now reads this is
17  not a case report and will not include information
18  normally contained on official department reporting
19  documents.  So a minor change in words.
20      Q.  Do you have any understanding as to the
21  reason for that change?
22      A.  No, I don't.  No.
23      Q.  Other than that is -- are there any other
24  changes of substance?

141

Page 142:

1      A.  For some reason there was a -- in the
2  later version of the form there was a daily
3  performance checkbox presumably filled out by the
4  supervisor to describe the activity as of the
5  officers submitting the report on a continuum
6  ranging from poor to outstanding.  And there is a
7  comments space which was provided.  Again intended
8  for the supervisors use.
9      Q.  All right.  And once again do you know the
10  reason for providing that format for the supervisor
11  to use?
12      A.  I do not know the exact reason.  It looks
13  as if they wanted to evaluate the officers as often
14  as possible.
15      Q.  Do you know whether Exhibit 8 remains in
16  use in the patrol division today?
17      A.  I do not.  I do not.
18      Q.  Okay.  Is there a way to find out?
19      MS. ROSEN:  Objection relevance.
20      THE WITNESS:  I will -- I can check our
21  Research and Development historical form records
22  and current existing forms to see if this form
23  number continues or if it has been revised since
24  then.

142

4 (Pages 139 to 142)

BY MR. BOWMAN:

Q. Okay. So, in other words, you could just -- you would just go back into the same records source and you can determine if there had been a superseding version at some time or if there had been a distinction of the form that would also be noted?

A. Many times the form is officially rescinded and sometimes it languishes.

Q. Okay. All right. So -- thanks for that explanation.

We were discussing what you had reviewed in the period since your last testimony here. Is there anything in addition to these two forms and the transcript of your deposition?

A. No, sir.

Q. When you reviewed the transcript of your deposition did you find any substantive inaccuracies or erroneous statements in your testimony. And I know that there are typographical errors in the -- in the transcript that we have a procedure for dealing with that, I'm asking for substantive issues.

A. None jumped out at me.

143

Q. Okay. So you --

A. I mean, there may be some concerns about my wording or phrasing that I might not be personally satisfied with but I can't think of it at this moment.

Q. You stand by your answers?

A. Yes, sir.

Q. Okay. So I wanted to focus with you for a few minutes on the period of time when you served as assistant director of the Records Division. And I think you weren't completely confident of the years. But I want to make sure that I've done the best job that I can of asking you to specify when you served in that position.

A. Early 2000s. I'm sorry, again I don't know the exact time frame.

Q. Well, I may have miss -- misread it or misunderstood. I had the impression from your testimony that it was around 1997 that you were --

A. No, because I was still lieutenant through 1999.

Q. So it was early in the -- in the first decade of this --

A. Yes, sir.

144

Q. -- Century.

Early 2000s?

A. Sounds rather historical.

Q. And what -- for how long were you in the position of assistant director of the Records Division?

A. Probably two and a half years. I don't think it was three but it might have been.

Q. And in addition to yourself were there any other assistant directors?

A. No, there was not.

Q. Okay. So the duties of the assistant director generally speaking would have been to be the hands-on implementor of the directors intentions for the supervision and functioning of the department?

MS. ROSEN: Objection, form.

THE WITNESS: For the Records Division, correct.

BY MR. BOWMAN:

Q. For the Records Division.

And you indicated that an individual named James Piper was the director --

A. He was.

145

Q. -- under whom you served?

And was that for the entire two and a half year period?

A. He left toward the end of it, probably the last six months of it.

Q. Who succeeded him?

A. It was left vacant.

Q. So in the six month period you functioned as the de facto director?

A. Correct.

Q. Now, you testified about something called the subpoena service unit?

A. Yes, sir.

Q. Okay. That was under your jurisdiction as assistant director of the Records Division for your two and a half year term?

A. Yes, sir.

Q. And can you explain to me to the extent it's possible what the organizational chart of the Records Division was and where the subpoena service unit fit in that chart?

A. Certainly. The Records Division consisted of multiple units, subunits. One was the identification section. Two was the records

146

McCorkle Litigation Services, Inc.
Chicago, Illinois (312) 263-0052

1 processing section. Three was the gun registration
2 unit. Four was freedom of information inquiries.
3 Five was the subpoena service unit. I may have
4 missed a unit but it's most -- that's the bulk of
5 it.
6 Q. And the chain of command I am assuming but
7 correct me if I'm wrong would be that there would
8 be the director, immediately below the director in
9 the chain would be the assistant director, and then
10 there would be section or unit heads all of whom
11 reported to you as assistant director and then
12 indirectly through you to the director, fair?
13 A. Correct.
14 Q. Okay. What was the title of the person
15 who was directly responsible for the -- for the
16 subpoena services unit?
17 A. A sergeant.
18 Q. So it simply would be a sergeant. Was he
19 chief or?
20 A. No, just sergeant.
21 Q. Just sergeant.
22 And then I believe you indicated in your
23 testimony that there were unsworn personnel who
24 actually performed the functions of responding to

147

1 subpoenas and other requests for information?
2 A. There were unsworn -- mostly unsworn but I
3 do remember at least one sworn member.
4 Q. And what was the title of these folks?
5 A. They had various clerical titles,
6 different pays. But their function was fulfilling
7 the subpoena. They did not have a common title.
8 Q. So there would be like --
9 A. Clerk 3.
10 Q. Clerk 3, clerk 4, whatever?
11 A. Right. Right.
12 Q. But you generically refer to these as
13 clerks?
14 A. Correct.
15 Q. All right. Did you say there were five or
16 six of them?
17 A. I think four or five might be more
18 accurate.
19 Q. All right. And then the Records Division
20 -- and I'm just dunderheaded about this so bear
21 with me. The Records Division is part of the
22 bureau within the police department?
23 A. It was part of the Bureau of
24 Administrative Services at that time.

148

1 Q. Bureau of Administrative Services is of
2 course separate from the Bureau of Investigative
3 Services in which the detectives are situated?
4 A. Yes, sir.
5 Q. And also different from the -- the bureau
6 in which the patrol officers, the patrol division
7 is situated?
8 A. Correct.
9 Q. And where do the -- just for my benefit
10 since I might as well ask it, where was the patrol
11 division in the --
12 A. Operational services.
13 Q. Operational services, okay.
14 All right. Now, we looked last time at
15 this -- and it was Exhibit 1 for identification.
16 I've got -- I will just hand you this. I'm going
17 to hand you a set of the six exhibits we marked
18 last time. I may or may not need you to refer to
19 them.
20 But I do want you to look at Exhibit 1
21 which is the Rule 30(b)(6) notice of deposition,
22 it's at the top of the stack I just handed you and
23 refer you to Page 2 of Exhibit 1.
24 Our understanding is that you have been

149

1 designated to speak for the City of Chicago with
2 respect to the City's written and unwritten
3 policies, practices, and customs in effect from
4 1980 to 1990 relating to several topics including
5 Subparagraph F which reads responding to subpoenas
6 from criminal defendants requesting records
7 concerning a homicide investigation and there's
8 more language after that but that's the essence of
9 it. And it's -- you're aware of that designation
10 and you believe that you're -- you're qualified to
11 do that?
12 A. I am aware and I do believe.
13 Q. Okay. Now, you provided -- and the record
14 is not completely clear about this. You provided
15 some testimony in our first deposition or the first
16 session of your deposition regarding the operations
17 on the ground of the subpoena services unit as it
18 -- as it operated when you were in charge in the
19 early 2000s. And I know that with respect to some
20 questions I asked you of your testimony would be
21 accurate as a description of the functioning of the
22 unit in the 1980's but I may not have been
23 completely clear.
24 Is there -- here comes my question. Is

150

1 there as you sit here today any specific change in
2 the nature of the operation, any difference in the
3 processing of subpoenas, and other requests for
4 information as between the way the unit functioned
5 in the 1980's and the way it functioned under your
6 command in the early 2000s?
7    A. Yes.
8    Q. Okay. Can you tell me as completely as
9 possible what changes there were?
10    A. First of all, I think my last deposition
11 with you or the earlier part of this deposition on
12 a prior date was not as informative on this topic
13 as I would like it to have been. So I would like
14 -- it's one of the areas that I was not pleased
15 with my explanation as I reviewed my transcripts.
16    We've always kept records. Always, i.e.,
17 certainly during this time period. The primary
18 difference between the 1980's and the present is
19 that those subpoenas received today are more
20 electronically processed. There is a database
21 which was created in the year 2005. And it has
22 those data fields that you might anticipate. You
23 know, the defendant's name and all the numerical
24 identifiers associated with the case.

151

1    And it also spells out many of the Chicago
2 Police Department units that normally receive
3 requests, routinely receive requests from the
4 subpoena unit directing them to search their files
5 for records which have been subpoenaed.
6    And the clarification I'd like to make is
7 that in the paper world there was a similar but not
8 the same attempt to document the receipt and the
9 servicing of subpoenas.
10    In the pre-electronic world the police
11 department recorded many activities in what would
12 almost be the equivalent of a -- we call them a CO
13 book, a commanding officer's book. It's a leather
14 bound book oversized in nature more of the physical
15 size of a legal pad but thicker. And the pages are
16 not detachable. And what they did was create their
17 own columns and entered many of the same data
18 fields that are in the electronic application
19 today. And again it was organized by date. I
20 don't know if it was organized by date but
21 certainly a key feature was the date that it was
22 due in court. So that was -- I don't think I made
23 that clear enough in our earlier conversations.
24    Q. Okay. When you were the commanding

152

1 officer of the subpoena services unit in the early
2 2000's had the unit transitioned into the digital
3 world or were you still functioning on paper?
4    A. In regards to subpoena processing paper is
5 the answer.
6    Q. Okay. So as -- between your experience as
7 the commanding officer in I think we've now
8 established the period between 2000 and 2005,
9 right?
10    A. Yes.
11    Q. In that period of time did the unit to the
12 best of your information function any differently
13 than it did in the 1980's?
14    A. I don't know how it could have.
15    Q. Okay. So to the best of your information
16 and understanding the answers that you gave last
17 time, you know, is clarified just now in your
18 answer a moment ago are accurate with respect to
19 the functioning of the unit in the 1980's?
20    A. Yes, sir.
21    Q. All right. Do you have a specific
22 recollection of a commanding officer's book being
23 in use in the subpoena services unit during your
24 tenure there?

153

1    A. I do.
2    Q. Okay. And who is the keeper of that book?
3    A. Those in the subpoena unit. It was a
4 dynamic type of book and when it got filled you
5 went on to the next one.
6    Q. And were they kept?
7    A. Yes.
8    Q. Where were they kept?
9    A. I don't know if it was in the record's
10 division headquarters or in the warehouse but they
11 were kept.
12    Q. Okay. And what about the commanding
13 officer's books from the 1980's would it be a
14 fool's errand to go look for those?
15    MR. BOWMAN: You want to object to the form of
16 the question.
17    MS. ROSEN: I'd like to object to the form of
18 that.
19    MR. BOWMAN: I'll rephrase it.
20 BY MR. BOWMAN:
21    Q. Would it be possible to find the
22 commanding officer's book from 19 -- from some
23 period say 1988 or 1990 for the subpoena services
24 unit?

154

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois (312) 263-0052**

A. I personally believe it may exist.

Q. Where -- where would it -- what would be the process to look for it based on your knowledge and understanding?

A. It would possibly be in the records warehouse under the control of the records division.

Q. Okay. And if you were to -- and I'm not suggesting it's of any interest of yours to find it. But if you were looking for it and you were to, you know, pick up the phone or write an e-mail or whatever to the person in the records division who you would be asking to look for it how would you describe this thing, this book?

MS. ROSEN: I'm going to just object to the form of the question in the context of you're referring to this book in the singular -- like there might be a book over 1988 and I'm not sure you've established that foundation so.

MR. BOWMAN: Oh, sure.

BY MR. BOWMAN:

Q. No, I'm -- I'm understanding your testimony that there would be -- for any year would there be multiple books?

155

A. There may be.

Q. Okay. Depending on how many subpoenas and how big the book was and how fast they got filled up?

A. Right.

Q. Okay. So if you were looking for the book or books that were in use in the period of time we're talking about in this case how would you describe the books?

A. Asking for that book in which the subpoena service unit documented the receipt and service of subpoenas.

Q. All right. And this was colloquially referred to as the commanding officer's book or the CO book?

A. I use that to describe it physically because that same book was used in the patrol division by every watch in the City to make announcements, you know. So it was -- it's a means of communication. They simply used that same product. I don't know what the commodity description is for this large book.

Q. Got it.

Now, you believe that in this book the

156

personnel in the subpoena services unit would record the particular case in which there had been a subpoena or a request for documents, yes?

A. Yes, sir.

Q. And they would record the date on which that request was due in court?

A. That certainly was a key date for them.

Q. Okay. And what else would be recorded based on your experience in this book, if anything?

A. I -- I don't know what the actual columns on the piece of paper were. It certainly -- the RD is presumed to be there, defendant's name.

Q. RD, defendant's name. Any description of the nature of the request?

A. I don't know. I presume the requester.

MS. ROSEN: The name of the requester.

THE WITNESS: The name of the requester.

BY MR. BOWMAN:

Q. Would that be a lawyer's name or just a reference to defense request?

A. I don't know. I don't know.

Q. Okay. And then we talked about the -- the due date. Can you state with confidence whether any other information was recorded in this book on

157

a regular basis?

A. No, I can't. I would be speculating.

Q. Do you know whether any improvements were made to streamline -- to make more efficient, to make more transparent, any improvements of any nature made in the functioning of the subpoena services unit in the period between 1990 and when you took command in the early 2000's?

MS. ROSEN: I'm going to object to the form.

THE WITNESS: I am not aware of any until the later time of 2005.

BY MR. BOWMAN:

Q. Referring to the -- to the creation of electronic data?

A. Correct.

Q. Was there a particular point in 2005 when the subpoena services unit went on-line?

A. I don't know the date. I talked to the programmer and said it was 2005.

Q. So you did some investigation --

A. I did.

Q. -- in between --

A. Right.

Q. -- to find this information?

158

**159**

```
 1        Who did you talk with about this?
 2     A.   Oh, I -- Alfansa, I don't know his last
 3   name.
 4     Q.   Who was the person and I -- I think I'm
 5   looking for a title rather than a name.
 6        Who was the person in charge of setting
 7   the policy to be followed by the subpoena services
 8   unit in the 1980's?
 9     MS. ROSEN:  I'm going to object to the form of
10   the question and foundation.
11     THE WITNESS:  Obviously the day-to-day SOP
12   would be established by the director of the records
13   division.  If there were any other directives it
14   may come from what was then the executive assistant
15   to the superintendent now referred to as the
16   general counsel, the lawyer.
17        But I -- I can't think of anything that
18   they might have directed.
19   BY MR. BOWMAN:
20     Q.   Would it be a fair statement to say that
21   the policy was set and implemented by the director
22   of the Records Division?
23     MS. ROSEN:  Object to the form of the question.
24     THE WITNESS:  It's the director of the Records
```

**161**

```
 1   the -- if you know, in the late 1980's through --
 2   let me start over.
 3        From 1988 to 1991, if you know, who was
 4   the director of the Records Division at the Chicago
 5   Police Department?
 6     A.   I don't know.  I'm -- I would be guessing.
 7     Q.   What informal unwritten safeguards,
 8   policies, procedures existed in the 1980's --
 9   strike that.  Let me start over.
10        In the period between 1988 and 1991 what
11   informal safeguards, procedures, policies existed
12   to ensure that when a subpoena or informal request
13   for documentation relating to a particular case
14   came in that all responsive documentation including
15   exculpatory information was provided in response to
16   the request?
17     MS. ROSEN:  Objection, form.
18     THE WITNESS:  The personnel assigned to the
19   subpoena processing unit, subpoena service unit,
20   received on-the-job training.  For the time period
21   in question certainly the topic of investigative
22   files had become common -- common terminology.  So
23   the -- those handling the request would give the
24   requester, prosecutor, or defense attorney the
```

**160**

```
 1   Division's responsibility so yes.
 2   BY MR. BOWMAN:
 3     Q.   My last question referred to the
 4   operations of the subpoena services unit, you
 5   understood that, right?
 6     A.   I did.
 7     Q.   Now, in the 1980's what policies, safe
 8   checks, procedures existed first in writing to
 9   ensure that when a request came in either by a
10   subpoena or by an informal request from an
11   Assistant State's Attorney, when the request came
12   in in a particular case that all of the necessary
13   information including exculpatory information was
14   provided by the subpoena services unit in response
15   to that request?
16     MS. ROSEN:  Can you read back the question.
17        (Whereupon, the record was read
18              as requested.)
19     MS. ROSEN:  Object to the form.
20     THE WITNESS:  At this time I can't think of any
21   directives that were written specifically to
22   address this matter.
23   BY MR. BOWMAN:
24     Q.   Before I forget let me ask you this, in
```

**162**

```
 1   information that they asked for.  And also strive
 2   to, you know, add some value.  I mean, these are
 3   humans performing a clerical task and they don't
 4   want to do it a second time, they don't want to do
 5   it again next week.  So they would use the
 6   knowledge that they have gathered.  Oh, if you're
 7   looking for a traffic crash record make sure -- you
 8   know, they didn't ask for it but send it to the
 9   traffic record section they may something as well.
10   So it's an artful -- it's both technical and an art
11   form.  I'm trying to read and understand what it is
12   you're requesting.
13     Q.   So if I understand your answer correctly
14   what you're saying is that the -- that the training
15   that personnel received was not formal, right?
16     A.   Right.
17     Q.   If we were to look in the Chicago Police
18   Department for any training course records, any
19   manuals, any written procedures, any general
20   orders, anything of that nature relating to this
21   issue of how to respond to subpoenas and other
22   requests to ensure that exculpatory information was
23   provided in the period from '88 to '91 we wouldn't
24   find anything?
```

9 (Pages 159 to 162)

```
 1      MS. ROSEN:  Object to the form of the question.
 2      THE WITNESS:  I don't think you would.
 3   BY MR. BOWMAN:
 4      Q.  It was purely a matter of a clerk being
 5   assigned a file and having had experience with
 6   similar assignments of that nature?
 7      A.  They also had a resource of a sergeant to
 8   ask for direction when they were confused or unable
 9   to understand a subpoena request.
10      Q.  Okay.  And that's it?
11      MS. ROSEN:  Object to the form of the question.
12      THE WITNESS:  They could probably ask the
13   assistant director of records as well for some
14   help.
15   BY MR. BOWMAN:
16      Q.  Right, they probably could.  But I mean
17   realistically in your experience I mean that wasn't
18   part of your job duties, right, to help deal with
19   individual subpoenas in cases, right?
20      A.  Correct.
21      Q.  And in your experience the assistant
22   director didn't get asked those kinds of questions
23   except in the most unusual circumstances, fair?
24      A.  Fair.
```

163

```
 1      Q.  You don't have any reason to believe it
 2   was any different in the period in question '88
 3   through '91, right?
 4      A.  I do not.
 5      MR. BOWMAN:  All right.  Now, I want to mark
 6   for identification as Exhibits 9 and 10.
 7           (Whereupon, Hickey Deposition
 8            Exhibit No. 9 and No. 10 were marked
 9            for identification.)
10   BY MR. BOWMAN:
11      Q.  All right.  Let me just explain for the
12   record what I've handed you, Mr. Hickey.
13           Exhibit 9 is a copy that we made at the
14   conclusion of the first session of your deposition
15   of the folder that you indicated was the permanent
16   retention file relating to a particular RD Number
17   K371955 which happens to be the RD Number for the
18   investigation into the murder of an individual
19   named Felix Valentin, did I get that right?
20      A.  Yes, sir.
21      Q.  And then you don't know this and I'm just
22   making a representation for the record.  And I'm
23   not asking you to believe anything that I say as
24   far as the way I describe this file, okay,
```

164

```
 1   Mr. Hickey.  But I'm going to tell you what I've
 2   marked for the record as well.
 3           Exhibit 10 bears Bates Numbers RFC 00507
 4   through 535.
 5      A.  Do I have that in front of me.
 6      Q.  Yeah, you do.
 7      A.  Which one.
 8      Q.  I marked it for identification as Exhibit
 9   10 to your deposition.
10      A.  Okay.
11      Q.  And it is a set of supplementary reports,
12   a general offense case report, an arrest report,
13   and some criminal history information.  The
14   supplementary reports have the same base number
15   that I just read with respect to Exhibit 9.
16      MS. ROSEN:  Have the same Bates number.
17      MR. BOWMAN:  I'm sorry, the same Records
18   Division number as does the general offense case
19   report.
20      MS. ROSEN:  Okay.
21   BY MR. BOWMAN:
22      Q.  And the documents within Exhibit 10 came
23   from the file of the lawyer a gentleman by the name
24   of Ken Wadas who represented the man I represent
```

165

```
 1   Jacques Rivera in his criminal case that resulted
 2   in his conviction for the Felix Valentin murder.
 3           And I'm going to further represent to you
 4   that Mr. Wadas has testified under oath that
 5   Exhibit 10, this set of documents here, are the
 6   entirety of what he ever received in response to
 7   his discovery requests in the criminal case?
 8      MS. ROSEN:  I object to the form of the
 9   question.
10      MR. BOWMAN:  It's actually not a question, it's
11   just a representation.
12      MS. ROSEN:  Okay.  Well, I'm going to object to
13   the representation as misstating the record.
14           But you can go ahead and -- go ahead and
15   finish your question.
16      MR. BOWMAN:  Okay.  Can I -- I don't want it to
17   -- if it's -- if you want to tell me how it's
18   inaccurate and I may actually agree with you and
19   acknowledge it.  What's wrong about what I said.
20      MS. ROSEN:  Well, I don't think that you've
21   summarized Judge Wadas's testimony entirely
22   accurate.
23      MR. BOWMAN:  In what respect.
24      MS. ROSEN:  I don't think he said that these --
```

166

that this is the sum total of -- I don't remember
what words you used but I think he said to the best
of his knowledge the file we received for him was
complete. However, we know that that can't
possibly be true based on the receipt that he --
that was prepared by somebody at Northwestern in
2002 so.
    MR. BOWMAN: Okay. Well, all right. I think
we'll just -- I think we'll just agree to disagree
and I would stand by the representation that I
made.
BY MR. BOWMAN:
    Q.  Okay. That these are all the police
reports in Mr. Wadas's file and he said that in his
-- in his deposition under oath that these are all
the police reports he ever got.
    Now, I think I should mark another file
for identification so that you will have it for
reference.
    MR. BOWMAN: And this is going to be Exhibit
11.
    (Whereupon, Hickey Deposition
    Exhibit No. 11 was marked for
    identification.)

167

BY MR. BOWMAN:
    Q.  The document -- the set of documents that
I just handed you marked for identification as
Exhibit 11 to your deposition bear Bates Numbers
WRON 0001 through 69.
    And then make a representation to you also
with respect to Exhibit 11 this is the
investigative file at least according to Detective
Wronkowski who testified under oath in a deposition
in this case relating to the same RD Number and
relating to the investigation of the homicide of
Felix Valentin.
    And without getting into the weeds of
detail as you just thumbed through Exhibit 11 you
will see that Exhibit 11 contains police records
that are not contained in Exhibit 9, right?
    A.  Right.
    Q.  I mean, we don't need for purposes today
to make an exhaustive list but just among other
things there are some general progress reports in
Exhibit 11 that aren't in Exhibit 9, right?
    A.  Correct.
    Q.  Okay. And then indeed if you looked at
Exhibit 10 the Wadas file you will see that the

168

general progress reports are not there either?
    A.  Correct.
    Q.  Right, you've already checked that.
    And the -- and there are other materials
in Exhibit 11 that also weren't in the Wadas file
as well in addition to the PR's, right?
    A.  Yes.
    Q.  Now, I want to just ask you to take a
closer look at one of the supplementary reports in
Exhibit Number 9. And I'm going to direct your
attention specifically to the page that bears Bates
Number Hickey 0007. Which is the first page of a
supplementary report that appears to have been
signed by a detective named Gillian McLaughlin,
you're on that page, right?
    A.  I am.
    Q.  Now, there is -- if you turn the page
upside down there is a stamp that appears at the
bottom pretty much in the center of the document
that says 30 August, right, do you see that?
    A.  Yeah.
    Q.  Okay. Let's look at a different document
that's probably not the best --
    MS. ROSEN: He wasn't looking at the right

169

place.
    THE WITNESS: I'm sorry. I do see 30 and it
looks like August. I don't know what -- probably
the year but I don't know what it -- I can't read
it.
BY MR. BOWMAN:
    Q.  Why don't we look -- since it comes up
more clearly why don't we look at Page 11. And
turn Page 11 upside down and you'll see a similar
stamp, right?
    A.  Yes, sir.
    Q.  31 August, 1988. And then it looks like
1621 which may be 4:21 for those of us in the
civilian world, possible?
    A.  Or it could mean 1621 hours.
    Q.  Right, that's what I was thinking, 4:21.
    MS. ROSEN: 4:21 p.m.
    THE WITNESS: I'm sorry, yes. I'm sorry, yes.
BY MR. BOWMAN:
    Q.  So you're not familiar with 4:21 any more
than I'm familiar with 1621, right?
    A.  Correct.
    Q.  Okay. So it's -- it's a very precise
record of the receipt somewhere of this document.

170

11 (Pages 167 to 170)

1 Can you explain what -- what that stamp is and
2 where and how it's put on?
3    A.  I cannot.  I -- I think it's a reasonable
4 inference that it's the receipt that it was date
5 stamped upon arrival at the records processing
6 section of the Records Division.
7    Q.  Okay.  And what is the basis on which you
8 make that reasonable assumption?
9    A.  The Chicago Police Department likes
10 receipting documents.  I sent it, no, you didn't.
11 The usual clerical exchanges.
12    Q.  Okay.  If you look through Exhibit 9 at
13 this set of supplementary reports and other
14 documents you can see that pretty much every page
15 has got a similar stamp on it, right?
16    A.  Not every page -- oh, no.  09 does not.
17    Q.  Right, 09 doesn't for some reason.  Maybe
18 just a clerical error, sir?
19    A.  Yes, sir.
20    Q.  Other than that it appears to be there,
21 right?
22    A.  Yes, it does.
23    Q.  Now, if you compare Exhibit 9 with the
24 Wadas documents, Exhibit 10, look at Bates Number

171

1 507 on the top that matches Hickey Page 7, I think.
2    MS. ROSEN:  Matches.
3    MR. BOWMAN:  507 is the first page in Exhibit
4 10.
5    THE COURT:  Okay, thank you.
6    MS. ROSEN:  And when you say matches you mean
7 it's the same report.
8    MR. BOWMAN:  I mean, it appears to be the same
9 document.
10    MS. ROSEN:  Well, I'm going to object to the
11 form of the question.
12    MR. BOWMAN:  Right.
13    MS. ROSEN:  Because it can't be the same
14 document.  If you mean a copy --
15    MR. BOWMAN:  It's copies of the same document.
16    MS. ROSEN:  Right.
17 BY MR. BOWMAN:
18    Q.  And to state the question more precisely
19 does it not appear to you that the -- the first
20 three pages of Exhibit 10 are a copy of Pages 7
21 through 9 of your Exhibit 9 minus the permanent
22 retention file stamp?
23    A.  They're similar but not the same.  And
24 what I see different and I don't know the

172

1 explanation for is the supervisor's signature which
2 happens to have a date stamp below it, they're
3 different.
4    Q.  Really.
5    A.  If I'm looking at the same document.
6    Q.  Are you comparing Page 507 the first page
7 of Exhibit 10 with Hickey Page 7 within Exhibit --
8    A.  Oh, I'm looking at Hickey 10, I'm sorry.
9    MS. ROSEN:  He's looking at the wrong one, I'm
10 sorry.
11    THE WITNESS:  Yes, they are the same.  It's a
12 photocopy minus the permanent retention stamp.
13 BY MR. BOWMAN:
14    Q.  And the reason I'm lead to believe
15 personally that they're the same is if you look at
16 Page 508 within Exhibit 10 the Wadas documents and
17 you see very faintly the date stamp at the bottom
18 of the page that appears at the bottom of Page 8 of
19 the permanent retention file, right?
20    A.  Yes, sir.
21    Q.  And then if you turn to Page 9 of the
22 permanent retention file the date stamp is missing
23 and indeed it's also missing on the next page from
24 the Wadas documents, right?

173

1    A.  Right.
2    Q.  So it appears that somebody has copied and
3 provided to Mr. Wadas documents from the permanent
4 retention file, right?
5    A.  Yes, sir.
6    Q.  There are of course documents in the
7 permanent retention file that Mr. Wadas did not
8 receive, right?
9    MS. ROSEN:  Object to the form of the question,
10 foundation.
11    MS. EKL:  Objection.
12 BY MR. BOWMAN:
13    Q.  There are, of course, documents in the
14 permanent retention file that are not in Exhibit
15 10, right?
16    A.  I have not cataloged but there appears to
17 be differences.
18    Q.  And, for example, there's an investigative
19 file summary Pages 27 and 28?
20    A.  Correct.
21    Q.  And 29 and 30 that's in the permanent
22 retention file Exhibit 9 and not in Exhibit 10,
23 right?
24    A.  Yes, sir.

174

Q. Now, were there circumstances in which a clerk in the subpoena services unit would make a copy of the documents in the permanent retention file and provide those to defense counsel and not make a copy of documents in the area file and provide -- and fail to provide the investigative file to defense counsel?

MS. ROSEN: Object to the form of the question.

BY MR. BOWMAN:

Q. In addition to this case?

MS. ROSEN: Objection to the form of the question, foundation.

MS. EKL: Same.

THE WITNESS: No, because those in the subpoena service unit didn't actually fill the request themselves. They were the middle men. They were the gathers -- they made requests of these subunits including a subunit of the Records Division where the permanent retention cases were stored.

BY MR. BOWMAN:

Q. Right.

A. So they themselves did not make copies.

Q. Oh, sure, I mean --

A. That was your question.

175

Q. Yes.

But you recognize that the danger exists given the complete absence of written policies, the lack of formal training, that the danger exists that individual clerks would fail in their function of gathering records causing a defense lawyer to get just the permanent retention file in some cases and not the investigative file, you recognize that danger exists, right?

MS. ROSEN: Object to the form of the question, argumentative, foundation.

THE WITNESS: I recognize in any paper gathering system there is room for human error.

BY MR. BOWMAN:

Q. Right.

A. Certainly nothing by design. You know, it's -- if something is missing or has not been stamped the most likely suspect is human error.

Q. Right.

And what audits have ever been done at any point in time by the Chicago Police Department to evaluate the completeness of the records that were gathered in response to subpoenas and other requests by the subpoena services unit?

176

A. I am not aware of any but interestingly enough there is almost built-in a self service audit by the requester. I'm aware of cases in which someone said I don't think that's all and we've gone back and looked and found something.

Q. But that's not my question, Mr. Hickey.

A. Yeah, okay.

Q. I mean, it's one thing to say look it's the responsibility of the defense lawyer to figure this out. But what I'm asking is within the police department is your answer correct that -- that to the best of your knowledge and understanding there has never been an audit of the functioning of the subpoena services unit that has evaluated whether that unit is in fact providing all responsive documents in response to subpoenas --

MS. ROSEN: Object to the form.

BY MR. BOWMAN:

Q. -- and other requests for information in particular cases?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I am unaware of any formal audit. Supervision of those personnel is a responsibility of the supervisor who are in charge of them to see

177

if they're fulfilling their mission properly.

BY MR. BOWMAN:

Q. Well, when you were --

A. But everyday supervisor's function.

Q. Okay. Well, when you were the supervisor of the subpoena services unit what actions did you take to ensure in particular cases that the subpoena services unit was, in fact, providing all responsive documents in response to individual subpoena and other requests for information in cases?

MS. ROSEN: Object to the form of the question.

THE WITNESS: I directed no special audit.

BY MR. BOWMAN:

Q. Okay. Have -- to your knowledge has any clerk or sergeant within the subpoena services unit ever been subject to discipline of any kind for negligence or other failure to provide all responsive documents in response to subpoenas or other requests for information?

MS. ROSEN: Object to the form of the question, foundation.

THE WITNESS: I'm not aware of any discipline regarding these personnel. The sergeant in charge

178

13 (Pages 175 to 178)

of the unit was an attorney. I -- he's a pretty
good person. I'm not aware of any.
BY MR. BOWMAN:
Q. Who was the sergeant in charge of the unit
under your supervision?
A. Sergeant Riley. Riley.
Q. First name?
A. Challenge. Fred. Fred, I think -- no, I
don't know, I'm sorry. I'm embarrassed. Please
don't show him.
Q. How long had Riley been in that position
at the point when you came in as assistant director
of the Records Division?
A. Oh, probably seven or eight years.
Q. Do you know who was the sergeant -- I may
have asked this but maybe not. Do you know who the
sergeant was in charge of the subpoena services
unit in the period from 1988 to 1991?
A. I don't. I would speculate.
Q. I'm going to ask for your speculation?
A. Okay, Sergeant Cronin comes to mind. He
was the sergeant in records.
Q. What was Sergeant -- what is Sergeant
Cronin's first name?

179

A. Don't know but he had red hair.
Q. Irish guy.
A. I don't know.
Q. Do you know if Sergeant Cronin is still
living?
A. I do not.
Q. Okay.
MS. ROSEN: Can we take a break.
MR. BOWMAN: Sure.
(Whereupon, a short break was
taken.)
BY MR. BOWMAN:
Q. So you pointed out, Mr. Hickey, that the
responsibility for completeness in responding to
subpoenas and other requests resides not just with
the subpoena service unit but also with the person
or persons within the various units of the police
department who actually maintained the documents
and I want to ask you a few questions about that.
First, in 1988 through 1991 is it -- is it
accurate that the Records Division file and the
subpoena services unit were both located at 11th
and State?
A. Yes.

180

Q. And what was the procedure in that period
of time for the permanent retention file to be
submitted to the subpoena services unit as part of
the request fulfillment process, how did that
happen?
MS. ROSEN: Objection, form, foundation.
MR. BOWMAN: As to the form I'll second that
objection. Let me try again.
BY MR. BOWMAN:
Q. In the period 1988 to 1991 who -- and I'm
not looking for a name, I'm looking for a position,
within the Records Division was responsible for
locating and copying or otherwise making available
to the subpoena services unit a particular
permanent retention file from the case in response
to a subpoena or other request for information?
MS. ROSEN: Object to the form. And just so --
for purposes of clarification are you talking only
about permanent retention files.
MR. BOWMAN: Yes.
MS. ROSEN: Not other crimes, right.
MR. BOWMAN: Not other crimes.
MS. ROSEN: Correct. Because not all crimes
are permanent retention.

181

MR. BOWMAN: Yes, my question is limited to
permanent retention files, yes.
MS. ROSEN: Okay.
THE WITNESS: I don't know. I mean the
supervisor in charge of the --
BY MR. BOWMAN:
Q. File room?
A. File room.
Q. But the procedure would be that the
subpoena service unit would do what, send out some
kind of a form?
A. Right. Normally they made photocopies of
the subpoena, circled what was asked for. If it
was to the crime lab and they wanted crime scene
photos they would circle photos.
Q. Let's talk about the permanent retention
files since that was my question.
A. Okay.
Q. What would the subpoena service unit do to
obtain the permanent retention file?
A. Send a photocopy to that subunit within
the Records Division that maintained control over
the master file.
Q. When you say a copy you mean a copy of the

182

14 (Pages 179 to 182)

| | |
|---|---|
| 1 subpoena or other request, right? | 1 I'm just -- just trying to figure out whether the |
| 2     A.   Correct. | 2 files in -- for whatever reason had either had |
| 3     Q.   Okay.  And that was a matter of just | 3 migrated to the custody of the Records Division, |
| 4 forwarding a request upstairs or downstairs? | 4 whether those files were all physically kept at |
| 5     A.   Correct. | 5 11th and State or whether in this period of time |
| 6     Q.   At 11th and State at that time? | 6 '88 to '91 there was an off-site warehouse where |
| 7     A.   Yes, sir. | 7 some of the files were stored? |
| 8     Q.   All right.  And then whoever gets that | 8     A.   I don't know.  I'm sorry to say I don't |
| 9 circled copy of the subpoena is then responsible | 9 know. |
| 10 for pulling the file, copying it, and sending it | 10     Q.   Okay.  And you've answered my question |
| 11 back to the subpoena service unit? | 11 with respect to the permanent retention file with |
| 12     A.   Yes, sir. | 12 respect to the investigative file about the process |
| 13     Q.   Okay.  So now let's talk about the -- | 13 for actually gathering the paper.  And I'm assuming |
| 14 about the investigative file in the area, what's | 14 that your answer would be essentially the same for |
| 15 the procedure there? | 15 gathering any evidence tech materials, any property |
| 16     A.   This same subpoena would be photocopied | 16 receipts, any ballistics testing results or any |
| 17 and again the words investigative file would be | 17 kind of other documents that might reside within |
| 18 circled or highlighted and it would be sent to the | 18 the jurisdiction of other units of the police |
| 19 investigative area in the -- within the Detective | 19 department, basically the same? |
| 20 Division. | 20     A.   Yes, sir. |
| 21     Q.   And again by job title can you tell me the | 21     Q.   Now, do you know of any rule, policy, |
| 22 person responsible for receiving the copy of the | 22 procedure, directive, any kind of formal document |
| 23 subpoena or other request and comply? | 23 of any kind that governed the -- and guided the |
| 24     MS. ROSEN:  The person at the area. | 24 responsibilities of the clerks or other officials |

183

185

| | |
|---|---|
| 1     MR. BOWMAN:  Yes. | 1 in the Records Division, at the areas, in other |
| 2     THE WITNESS:  The lieutenant in charge of | 2 places of the police department where documents |
| 3 violent crimes is the one who by definition has | 3 resided to clarify the procedures to be followed |
| 4 direct administrative control over the | 4 and to ensure that all responsive documents |
| 5 investigative files so that would be the person. | 5 including exculpatory material were provided in |
| 6 But, frankly, I don't know as I previously have | 6 response to subpoenas or other requests for |
| 7 indicated in on a daily basis they sent it to the | 7 documentation? |
| 8 clerk, Susan, John, or George if their working | 8     A.   I'm not aware of any written policy.  I am |
| 9 relationship was that close, I just don't know. | 9 only aware of the training that all the members of |
| 10     Q.   All right.  In this period from 1988 to | 10 the Detective Division received on this subject of |
| 11 1991 was there a separate warehouse for files or | 11 investigative files which is they at least would |
| 12 contrary wise were all of the files in the custody | 12 know what should be in there. |
| 13 of the Records Division maintained at 11th and | 13     Q.   Well, right.  And when you say that are |
| 14 State? | 14 you referring to the training that detectives |
| 15     MS. ROSEN:  Object to the form of the question. | 15 received in the aftermath of the George Jones |
| 16     THE WITNESS:  I'm sorry, what year was this. | 16 problem? |
| 17 BY MR. BOWMAN: | 17     MS. ROSEN:  Object to the form of the question. |
| 18     Q.   '88 to '91? | 18     THE WITNESS:  Yes, sir. |
| 19     A.   The investigative files that were at | 19 BY MR. BOWMAN: |
| 20 records were stored in records and those that were | 20     Q.   Anything else? |
| 21 not were maintained -- | 21     A.   No. |
| 22     Q.   Right. | 22     Q.   Are you aware of any reviews, audits, or |
| 23     A.   -- at the area. | 23 other processes of any kind that were employed by |
| 24     Q.   And actually it wasn't a trick question. | 24 the police department at any time to audit or |

184

186

otherwise evaluate whether, in fact, all responsive documents were being provided by the clerks or other officials in the Records Division, the areas, and other places in the police department?

A. I am not.

Q. Are you aware of anyone in the police department ever having been disciplined for negligence or other failure to provide responsive documents?

A. I am not.

Q. I wanted to ask you a specific question about Exhibit 9. It does have this red stamp permanent retention file on many of the documents.

When was that stamp placed on permanent retention file records?

A. I do not know the time it was placed.

Q. Is there --

MS. ROSEN: On this particular record or generally.

MR. BOWMAN: Generally.

BY MR. BOWMAN:

Q. I'm asking generally speaking.

A. I do not know. What I do know is that permanent retention files were integrated with

the run of the mill files until a point in time years later and then they were called out and separated.

Q. Can you identify that point in time?

A. Normally seven years later.

Q. I see. So this particular case was investigated -- and I'm referring to Exhibit 9. This particular case was an event that occurred in August of 1988, right?

A. Yes, sir.

Q. So are you saying that -- that the procedure was that the permanent retention file designation was made seven years later in 1995?

A. No, I'm not. Like I say I don't know when the actual stamp was placed on it. It could be on the day it was received, I just don't know. But it was separated from the other RD master file of all the reports in the police department seven years. So in this case it would be in January of 2006 there would have been a reduction of the routine case reports.

MR. BOWMAN: Can I have that answer read back.

(Whereupon, the record was read as requested.)

BY MR. BOWMAN:

Q. Okay. Now I'm confused.

A. Okay.

Q. We have received information in this -- in discovery in this case that in 1988 the year of this particular investigation the police department did not use the term permanent retention file, is that consistent with your understanding?

A. No.

Q. Is that inaccurate?

A. That is inaccurate.

Q. Okay. What was the process of calling out or reducing and designating as a permanent retention file, this is not clear to me, I didn't understand your answer?

A. The case reports of the Chicago Police Department are numerically numbered -- sequentially numbered. And there is no attempt to categorize them by mundane or very important. It's the number that drives the file.

Q. Right. And to be clear just for the record those files that are permanently retained are homicide investigations and perhaps a few others?

A. Homicides and other crimes without statutes of limitations. Treason.

Q. Okay.

A. I don't think we get a lot but nonetheless it would qualify.

Q. So you were saying that the initial filing in 1988 through 1991 in the Records Division was just simply number by number as the files came in?

A. Correct.

Q. Okay. But then subsequent to the initial filing there would be a process by which -- or there was a process by which the police department segregated those files that were for permanent retention from those that were -- you know, again where there was statute of limitations -- statutes of limitation and not a need to retain the material permanently?

A. That is correct.

Q. And you say that happened in 2006?

A. Sometime after the 7th year was completed. They didn't go each day to do this. It was kind of a January activity for all cases that would have expired had their seven years expired the year before.

Q. All right. Now -- and I realize you don't have knowledge of this but at least one possibility is that the permanent retention file stamp would be placed on the -- on the permanently retained documents at that seven year point, I mean, that's possible?

A. I suspect it was earlier than that.

Q. And why do you suspect that?

A. We tend to mark things as they come in and -- but I'll stand by my earlier answer, I don't know. I don't know.

Q. We just -- is there any kind of a written policy that would govern when that stamp gets put on?

A. No. And look at this particular case, it comes in as an aggravated battery.

Q. Right.

A. Not as a permanent retention case.

Q. Right.

A. The individuals dies sometime later. So at the first moment this radio call card of a man shot doesn't mean it's permanent retention. So it's subsequent but I don't know when. It might be at the first classification that -- of the incident

is now permanent retention or a homicide.

Q. Okay. Now, explain to me, if you could, in 1988, this is post Jones, post Palmer, after the 83-6 order has gone on-line? What is the process by which certain reports from the file go to the Records Division and other reports remain at the area?

MS. ROSEN: Object to the form of the question.

BY MR. BOWMAN:

Q. Do you understand my question?

A. I do. The Records Division historical mission is to preserve the original case report and any supplementary reports generated with that RD number. Never in its design since 1961 has it been the place where miscellaneous police reports are kept physically in the same filing cabinet. We go no further to look than, you know, forensic services, evidence technician reports.

Q. General progress reports?

A. General progress reports after 1983.

So there was -- there's been a historical precedence not to put everything in one place.

Q. Okay. And now if I understand the situation correctly at the present time the Records

Division does maintain custody of two separate files, the Records Division file which is the stripped down original case report plus the supplementary reports plus the arrest report and the -- at least in Exhibit 9 also the file inventory, that's kept in one place. And then the Records Division keeps in a second place the investigative files after they're cleared and closed?

MS. ROSEN: I'm going to object to the form of the question. Because I don't believe actually -- you included an arrest report and I don't believe that's accurate.

MR. BOWMAN: You're right. So let me ask the question again.

BY MR. BOWMAN:

Q. The Records Division at the present time stores the paired down Records Division file with the original -- I'm sorry, with the general offense case report and the supplementary reports in a -- for want of a better term a small folder and then separately the Records Division also keeps the investigative file after the case has been cleared and closed at least in theory, right?

MS. ROSEN: I'm going to object one more time to form specifically with your use of the word paired down.

MR. BOWMAN: Okay. I'll stand on the question.

MS. ROSEN: Okay.

THE WITNESS: We'll call that the master file is kept by the Records Division. The official case report is prepared by the beat officer and/or anyone else who has submitted a supplementary report, yes, sir.

BY MR. BOWMAN:

Q. Okay. And so there are two different locations within the Records Division?

A. And even more if you want to add the arrest report, right.

Q. And the arrest report would be kept in a third place?

A. Correct.

Q. At the present time?

A. Now they're in a computer now. So are they -- they're digitally separated but in the same computer. They're accessed in a decentralized manner today.

Q. Okay. So -- and I think that, you know,

this is an historical case.

A. Right.

Q. So let's leave out digital and just talk about pre-2005 and I think we will be covered for present purposes?

A. Yes, sir.

Q. And so with that clarification my question is -- I've accurately stated it?

A. Yes, sir.

Q. All right.

MR. BOWMAN: Let's go off the record for a minute.

(Whereupon, a discussion was had off the record.)

(Whereupon, a lunch break was taken.)

BY MR. BOWMAN:

Q. I think this is probably clear from what you've said already but I want to make sure that this is accurate. The investigator obviously has certain responsibilities with respect to his documentation of an investigation, right?

MS. ROSEN: Object to the form of the question.

MR. BOWMAN: I mean, I'm just - that's just a

195

foundational question.

MS. ROSEN: I'm still objecting to the form of the question.

THE WITNESS: I'm confused as I was previously asked about investigator. Are we generally speaking anyone who investigate anything or a detective.

BY MR. BOWMAN:

Q. Generally speaking anybody who investigates anything. An evidence technician has responsibilities to document what he does?

A. Sure.

Q. A detective has responsibilities to document his work --

A. Right.

Q. -- and so forth, right?

A. Correct.

Q. Obvious point.

Now, in terms of transmitting the documentation to a request or response to a subpoena or other request that responsibility resides with the subpoena services unit and the clerks or other officials who are in that chain of responsibility that you've testified about already,

196

right?

A. Yes, sir.

Q. It does not reside with the investigating officer?

A. Right, Mr. Bowman.

Q. All right. I asked you in the earlier session of your deposition about the -- about the role of the State's Attorney in requesting information. In your experience when you were in charge of the subpoena services unit in the early 2000's was it your understanding that the State's Attorney's Office from time to time would submit a form requesting the documents relating to a case?

A. When we last spoke I was not sure of my answer. I've talked to the subpoena unit since then and I've come to learn that more often than not the request from the prosecutor comes in the form of a subpoena as opposed to this informal last minute phone call. I'm not ruling out such last minute phone call request but more often than not it's through the normal subpoena process.

Q. Is there -- and are you aware of occasions in which the State's Attorney's Office would request the documents by form as opposed to by

197

formal subpoena?

A. I have no independent knowledge of a worksheet or a form that they used.

Q. But in any event whether the request comes from the State's Attorneys by subpoena or otherwise whether the request comes on the other hand from the defense side in the criminal process the responsibilities of the police department are the same, right?

A. Absolutely.

Q. And the requests are treated the same way?

A. They are.

Q. And the obligation to provide the exculptory material is the same, right?

A. It is.

Q. In your answers this morning you mentioned that there is -- I think you used the term an external corrective process in the form of defense lawyer requests for additional information?

A. Or prosecutor. If someone believes that something else exists, you know, they might be disappointed in what we provide them and they pick up the phone and ask are you sure.

Q. Is there something else?

198

A. Is there possibly something else. What about the crime scene diagram or whatever it might be.

Q. And in your experience as the head of -- I'm sorry, I'll start over.

In your experience as the assistant director in the Records Division were you aware of circumstances from time to time where defense lawyers, prosecutors would pick up the phone and make complaints in the form of I think there must be something that I haven't gotten.

MS. ROSEN: Object to the form.

THE WITNESS: I am.

BY MR. BOWMAN:

Q. And would it be your informed belief that that likely also happened in the period from 1988 -- in the 1980's?

A. I don't know why it wouldn't, yes.

Q. It's -- I don't want to suggest that it's regular but it's something that happens not infrequently?

A. Yes, sir.

Q. Okay. And your answer would be the same for the 1980's it happens not infrequently?

199

A. Correct.

If I could clarify that, not infrequently, it happens -- it happens, I don't know how often.

Q. But it's certainly something that you've made note of through the years?

A. Yes, sir.

Q. All right. We left off last time at which I mean in May talking about the process that you went through in 1982 to evaluate and audit investigative record keeping, you remember that line of questioning generally, right?

A. I do.

Q. Let me hand you something that I've marked for identification as Exhibit 12.

(Whereupon, Hickey Deposition Exhibit No. 12 was marked for identification.)

BY MR. BOWMAN:

Q. It says Memo 3 at the top. And just below that it says violent crime unit commanding officers meeting, 27 April, 1982. What is Exhibit 12?

A. I'm sorry, it's a minutes of a meeting, so to speak, of a meeting that occurred in the detective Area 5 conference room dated the 27th of

200

April, 1982. It was prepared by myself.

Q. The -- and it appears to me from the list of those present that there were representatives of each of the areas on hand?

A. Correct.

Q. Who are these people on the list of being present. From Area 1 it was Sergeant Michael Hencke?

A. Hencke.

Area 2, Lieutenant John Burge. Area 3, Lieutenant Joseph Curtin. Area 4, Lieutenant John Regan, R-e-g-a-n. Area 5, Lieutenant Paul Minogue. Area 6, Lieutenant August Locallo. And a couple of sergeants, Thomas Sadler and Bob Becker and myself Detective James Hickey.

Q. And what was the purpose of this meeting?

A. To talk about a plan from this day forward what would be appropriate to put into an investigative file.

Q. Now the first paragraph reads the issue of working files was thoroughly discussed. What -- what do you mean when you say working files?

A. Working files were those documents that were placed in a folder. Normally available to all

201

three watches within a unit. It almost became a common file. Usually it was the name of the victim on the exterior and documents were placed in there. Over this period of time there was some confusion as to what the term of reference should be.

Q. All right. Whether these -- whether these should be called street files, personnel files, working files, or unofficial files or given some other name?

A. Correct.

Q. But the idea was that by whatever name these were files that were not formalized and provided to the participants in the criminal justice system when a case was filed, right, that's what you're talking about?

A. Yes, sir.

Q. And I wanted to - so then is it accurate for me to assume based on the next sentence in your memo that -- that this meeting early on there was kind of a round table where the representatives from each of the six -- at the time the six detective areas provided a summary of practices in their particular location?

A. I don't think it was a meeting in which

202

**203**

```
 1   the areas presented.  But where a message was being
 2   sent as to what should be some limits on the use of
 3   interoffice or inter watch memoranda.
 4       Q.  And who was delivering that message?
 5       A.  I was.
 6       Q.  Okay.  What was the role of Sadler and
 7   Becker in the meeting?
 8       A.  You know, I can't remember Tom Sadler's
 9   role.  Sergeant Bob Becker was from Research and
10   Development.  I don't know where Sadler --
11       Q.  Those guys were with you at the meeting?
12       A.  They were.  The others were all from
13   violent crime units in the detective areas.
14       Q.  And, you know, for example Burge shows up
15   from Area 2 and he's there because he's the -- what
16   the person in charge of Area 2 or the person
17   capable of speaking on behalf of Area 2?
18       A.  Right, violent crimes.
19       Q.  And you write all present were in
20   agreement that the Detective Division has probably
21   abused its use of memorandums, i.e., too much
22   material which could and should be placed in the
23   supplementary case report was not making it to
24   supplementary case reports?
```

**204**

```
 1       A.  Correct.
 2       Q.  Explain that?
 3       A.  In a criminal investigation successful
 4   clearance of a case is always -- it's not always a
 5   straight line.  And on day one we may think a
 6   certain person is responsible but only later learn
 7   that person has an alibi or was out of the country
 8   or has a twin brother or whatever the case might be
 9   but we've ruled that individual out.  And we go on
10   to suspect two or lead two.  The person with the
11   red hood is now our focus.
12       But too often in my opinion as a detective
13   back in 1982 we did not memorialize that first
14   branch of the investigation.  It turns out that the
15   real offender was the person in the red hood and
16   that person was identified and prosecuted.  But
17   when the -- the final or any of the supplementary
18   reports were prepared that aspect of the story was
19   not included in the investigation.  So it isn't
20   wrong but it's -- it's not a complete retelling of
21   the investigation.
22       Q.  All right.  And Mr. Hickey you and I have
23   had this debate before.  But since it's come up
24   again I can't resist the opportunity to try one
```

**205**

```
 1   more time.
 2       Will you acknowledge the point that
 3   depending on the circumstances of a particular case
 4   that the failed lead or the circumstance that
 5   you're describing could be exculptory, even highly
 6   exculptory if it turns out that the police
 7   department has ultimately selected and charged the
 8   wrong person?
 9       MS. ROSEN:  I'm going to object to that form of
10   that question on multiple levels.
11       THE WITNESS:  In my prior responses to you on
12   this same subject, same theme, I've indicated that
13   we have ruled them out, that person, subject A for
14   a very good reason or series of reasons.  So what
15   is exculptory about that, they didn't do it, you
16   know.
17   BY MR. BOWMAN:
18       Q.  Well, in my question I'm -- I'm -- I mean,
19   you realize, Mr. Hickey, it has happened that the
20   police department has charged the wrong guy, right?
21       MS. ROSEN:  Object to the form of the question.
22       THE WITNESS:  I fully --
23       MS. ROSEN:  In what circumstance, every?
24       MR. BOWMAN:  From time to time over the course
```

**206**

```
 1   of time on actually scores of occasions.
 2       MS. ROSEN:  I'm going to object to the form of
 3   that question.
 4       THE WITNESS:  I fully appreciate that people
 5   not responsible for crime have been found guilty by
 6   the criminal justice system.
 7   BY MR. BOWMAN:
 8       Q.  Including in cases that were investigated
 9   by the Chicago Police Department?
10       A.  Including cases investigated by the
11   Chicago Police Department.
12       Q.  Okay.  So in those circumstances the
13   official record presumably on the face evidence
14   shows good and sufficient reason to include that
15   person as the perpetrator of the crime, right?
16       MS. ROSEN:  Object to the form of the question,
17   calls for speculation, incomplete hypothetical.
18       THE WITNESS:  I -- could you repeat that
19   please.
20   BY MR. BOWMAN:
21       Q.  In cases like the kind that -- in cases of
22   this kind which you've acknowledged do exist the --
23   the official file on the face of it shows good and
24   sufficient reason to find the individual committed
```

20 (Pages 203 to 206)

## Page 207

1 the crime, right, even though he didn't.
2    MS. ROSEN: Object to --
3    THE WITNESS: Enough for probable cause, right.
4 BY MR. BOWMAN:
5    Q. Right. Enough for charging, right?
6    A. Correct.
7    Q. And sometimes conviction, right?
8    MS. ROSEN: Object to the form of the question,
9 incomplete hypothetical.
10      And don't try and write over my objection,
11 okay.
12    MR. BOWMAN: I'm sorry.
13    THE WITNESS: Yes.
14 BY MR. BOWMAN:
15    Q. Yes. And, I mean, George Jones is an
16 example of that, right?
17    MS. ROSEN: Object to the form of the question.
18    THE WITNESS: George Jones was found not
19 guilty.
20 BY MR. BOWMAN:
21    Q. Yes. And George Jones was also charged
22 based on an official file that on the face of it
23 appeared to contain all the information needed to
24 support probable cause that he committed the

## Page 208

1 offense, right?
2    A. That is correct.
3    Q. And the problem was that there was
4 actually a memorandum that substantially undercut
5 that, right?
6    MS. ROSEN: Object to the form of the question
7 and asked and answered at his first deposition and
8 now it's bordering on argumentative.
9      Because as you suggest you and Mr. Hickey
10 have had this debate time and time again and so.
11    THE WITNESS: It's been so many years I -- at
12 this day and hour I don't know what was in the
13 Laverty memo about the particulars of the details
14 of the George Jones case other than he suggested
15 someone else. And, yes, that part is true.
16 BY MR. BOWMAN:
17    Q. All right. But, in any event, how you
18 characterize it whether you say it's exculptory or
19 not exculptory there wasn't any doubt at this
20 meeting on April 27, 1982 that memorandums that had
21 material in them that weren't in the supp reports
22 existed on a widespread basis?
23    A. On a basis that we thought was
24 unacceptable. We -- we wanted a more complete

## Page 209

1 memorialization of the investigation.
2    Q. Right. And whatever your memory and
3 however you characterize it this was all prompted
4 by the George Jones case?
5    MS. ROSEN: Object to the form of the question.
6 BY MR. BOWMAN:
7    Q. Right?
8    A. Yes, sir.
9    Q. And you'll agree with me I assume that as
10 a general proposition it is not the responsibility
11 of the police investigator or the officials
12 producing records from the police department to
13 make their own determination of whether something
14 is or isn't exculptory the responsibility is to
15 produce the stuff, right, without regard to
16 exculptory or not, let the chips fall where they
17 may --
18    MS. EKL: Objection.
19 BY MR. BOWMAN:
20    Q. -- fair summary?
21    A. No, I disagree. I think any investigating
22 officer must during the course of an investigation
23 use their discretion and error on the side of being
24 conservative but the -- the information -- not all

## Page 210

1 the information garnered in the course of an
2 investigation is important and certainly not
3 exculptory. But that which they believe is
4 important should be saved.
5    Q. Speaking on behalf of the Chicago Police
6 Department is it your testimony that an individual
7 police officer does and should have the discretion
8 to make a determination of whether something is or
9 isn't important and/or exculptory in deciding
10 whether to include it in the file?
11    MS. ROSEN: Object to the form, compound,
12 incomplete hypothetical.
13    THE WITNESS: Yes, I believe detectives and
14 investigating personnel require the discretion.
15 That the ability to differentiate between routine
16 and important.
17 BY MR. BOWMAN:
18    Q. Okay. And do they -- do they get to make
19 the call on whether something is exculptory or not?
20    MS. ROSEN: Object to the form of the question.
21    THE WITNESS: The detectives don't record in
22 their notes or remember the conversations they have
23 with people, interviews, with exculptory
24 categorizations. You know, it's -- the story is

21 (Pages 207 to 210)

told by a witness, it's a story is told by an
interviewee. I think only later sometimes you
appreciate whether it's excultory or not.
    Q. All right. So is it the investigator's
call as to whether to put the record of that
interview in the file or not?
    A. Yes.
    Q. Based on his judgment as to whether it may
or may not be exculptory?
    A. Yes.
    MS. ROSEN: Object to the form of the question.
BY MR. BOWMAN:
    Q. Does the police department -- did the
police department in 1988 through 1991 have any
policy or procedure to inform detectives of their
-- actually to inform investigators of any stride
of their responsibilities in connection with
including material in the -- in the file?
    A. Detectives and virtually all sworn members
through their initial training when they come on
the police department and through their specialized
training later depending upon their title are
trained on, you know, Mary versus -- Brady versus
Maryland and the exculptory material but the

211

importance of truth to preserve the truthfulness of
the story whether it helps or hurts a particular
prosecution. It's our obligation.
    Q. All right. You refer in the third
paragraph of Exhibit 12 to something called a unit
file. Will you tell me what that is or what that
was as of April 1982?
    A. The unit file at this particular time was
the RD file the -- that which is kept in the
interoffice with all the other cases that are
assigned to that investigative unit. The
difference being with the investigative file or the
working file they were not maintained physically in
the unit file.
    Q. Okay. So, first of all, let me ask you
this, does the unit file continue to exist after
the promulgation of 83 --
    A. You mean the investigative file.
    Q. No, my question is about the unit file.
Does it continue to exist after the promulgation of
83-1?
    MS. ROSEN: For what kind of case.
    MR. BOWMAN: For any kind of case.
    THE WITNESS: It does but it now includes the

212

investigative file.
BY MR. BOWMAN:
    Q. Okay. What in addition to the
investigative file does the unit file include?
    A. What in addition to the investigative
file -- nothing.
    Q. Okay. So is the investigative file the
new name for the unit file after 83-1?
    A. For these type of cases, yes.
    Q. And when you say these kind of cases what
do you mean?
    A. Homicides -- homicides, police shootings,
things of that nature that which would be kept a
long time.
    Q. All right. So the so-called permanent
retention cases?
    A. Yes, sir.
    Q. All right. Before we leave Exhibit 12
there's a sentence I wanted to ask you about, each
unit commanding officer was further of the opinion
that memorandums should have but a relatively brief
retention period, only a few days.
        So this point of view is attributable to
Hencke, Burge, Curtin, Regan, Minogue, and Locallo?

213

    A. Where is that in the --
    Q. It's in Paragraph 2.
    A. Okay.
    Q. Last sentence in Paragraph 2.
    A. Yes, it was a collective or majority, I
can't remember if there was minority opinions or
not.
    Q. Well, it says each unit commanding
officer?
    A. Okay.
    Q. So does that indicate that there was
unanimity on this idea?
    A. The wording seems to suggest, yes.
    Q. And were you delivering any messages with
respect to the retention period for memos in this
meeting?
    A. Not regarding retention periods, no.
    Q. Did any unit commanding officer to
your recollection explain the reason for his
opinion that the memo should be tossed after a few
days?
    MS. ROSEN: Object to the form of the question.
    THE WITNESS: I have no recollection of that
topic at that meeting in 1982.

214

BY MR. BOWMAN:

Q. All right. Let's take a look at another memo that I'm going to mark for identification as Exhibit 13.

(Whereupon, Hickey Deposition Exhibit No. 13 was marked for identification.)

BY MR. BOWMAN:

Q. Could you tell us what this is please?

A. This is a memorandum authored by two sergeants Thomas Brady and John Tolley.

Q. One is from Field Group South and one is from Field Group North?

A. Right. That just for your own information were the two major subgroups that oversaw the six areas. And it is as simple as you think it is, north and south.

Q. Three in the north and three in the south?

A. Yes, sir.

Q. And did you receive Exhibit 13 at about the time that it was created?

A. I did although I don't see a date on here but yes.

Q. And this was part of your process of --

part of your process of inventorying or auditing the practices that were in existence in the -- in the period more or less immediately following the George Jones case?

A. Yes, sir.

Q. And without belaboring it the finding was that every area had different systems that were quirky to the area but there tended to be a procedure by which informal communications be they memos, street files, memo boards, or whatnot were being retained outside of the official filing system?

A. Yes, it identified the commonalities, the similarities, and the differences in the practices in the six areas.

Q. Right. And it identifies different kinds of files. First of all, there's the RD file, the numerical sequence file, and that's -- that's the paired down version at records central at 11th and State at the time, right?

MS. ROSEN: Object to the form of the question.

THE WITNESS: This is the copy of the report that was sent to the investigative area by the Records Division.

BY MR. BOWMAN:

Q. Sent to the -- oh, and kept at the area?

A. Right.

Q. Okay. And then what is the MO file?

A. Modus operandi. Some of the areas had -- you know, what was their style of committing a particular crime, with a knife, with a gun, with a candlestick in the ballroom.

Q. Okay. And then unit files was limited to just open homicides and cleared homicides?

A. I think the -- what that basically is telling us is some of the units segregated their homicides from their numerical sequence files. They just physically moved them to another drawer.

Q. Okay. Now, this memo board, explain that?

A. Memo board is a two-hole punch board sturdy in composition. Probably two to three inch clip on the top of it. Easy to open, easy to put documents on it. It may contain major incident worksheets, copies of major incident worksheets or the originals, and/or any memo that someone has written on a particular case to another watch. It's kind of advising the supervisor on duty not only what has happened in the last 24 hours or so

or the last couple of days when they were off, the status of maybe a developing case.

Q. And the memo board is the kind of thing that can be picked up and carried with by the investigator who is working on the case on his tour of duty?

A. No, this pretty much stayed on the supervisor's desk. It was the ready reference.

Q. The ready reference for anybody with an interest in the case?

A. Right. What's new.

Q. Including the new shift when there was a change of shift and the investigation was passed from one set of hands to the next?

A. Correct.

Q. And including supervisors?

A. Especially supervisors.

Q. All right. And this is something that as of this point in 1982 was in use at Area 5 among other places?

A. Yes, sir.

Q. All right. And then street files it says here utilized by each area with the exception of Area 4.

A. That's the comment of these two reporting
sergeants, that was their opinion.
Q. Okay. And did you have a reason to
disagree with that?
A. I thought the running files were in all
the areas.
Q. Including Area 4?
A. Yes.
Q. And the idea was that this street file was
something that unlike the memo board it actually
did go out on the street with the investigators was
passed from hand to hand during the course of the
investigation and then was disposed of when the
case had been -- had -- the investigation had been
completed?
A. Sometimes not disposed of but accurate all
the other things you just said.
Q. And in George Jones is an example of a
case which it was not disposed of?
A. Correct.
Q. And the court file, what is that?
A. That's just a completed -- it's not -- I
didn't view it as a separate file. But it looks
like in their findings at three areas used it --

219

two violent crime areas, one in 5, and one in
property crimes in Area 6 used a filing -- had a
filing practice which made it a little bit easier
for the detectives who were going to court. They
would simply pull out the file with the RD Number
and presumably there was nothing new in it. It's a
case as it was at the time of closing.
Q. Just a thing you can take to court with
you?
A. Right.
Q. Now, the authors of this memo identify a
problem and they say at present the main component
of a street file is the memorandum sheet or memo
which often contains opinions, conclusions, and
investigative direction of the detectives assigned
to the case.
Additionally the street files contained
other cases, supplementary reports pertaining to
non-related cases which were utilized in suspect
elimination and identification. Detectives will
also insert into the street file victim's personal
papers such as telephone books, driver's license,
or photos of the victim or suspects. Personal
notes of the detective used to compile the

220

investigation and also insert it into the street
file.
And that is consistent with your findings
and your understanding as a result of the work that
you did in the aftermath of George Jones in 1982?
A. Yes, Mr. Bowman.
Q. And then the next paragraph here says at
present these memos, notes, non-related case
reports, and victim's personal papers are subject
to disclosure to defense attorneys if they are
maintained by the investigative unit --
investigating unit. And the point here is that
these things if they're maintained need to be
turned over to the defense?
A. Correct.
Q. And is this a problem?
MS. ROSEN: Object to the form of the question.
BY MR. BOWMAN:
Q. Was this a problem in 1982?
MS. ROSEN: Object to the form of the question.
THE WITNESS: It's -- it's a lack of -- it's a
problem insofar that it spoke to our nonuniformity
in practice. You know, some would save more than
others. You know, I'd get a rap sheet for someone

221

I once was considered as subject A, suspect A. I
ruled them out. That guy's rap sheet is still in
the file. It's messy. And after a time you may
not even know why it's there. I mean, you just --
there's not even an assurance that what was in a
street file was actually related to that particular
investigation. It became a catchall.
So it was problematic insofar that we were
struggling to establish more uniformity.
BY MR. BOWMAN:
Q. Right. And it would be fair to say that
you were also working to establish safeguards and
assurances that materials relating to investigation
were turned over without exception, right?
A. Correct.
Q. And that wasn't happening in 1982, right?
MS. ROSEN: Object to the form of the question.
THE WITNESS: In 1982 we did not keep nor was
there any policy to keep personal notes or
memoranda. It was not considered part of the file
until 1983 when Superintendent Brzeczek said it
should be.
BY MR. BOWMAN:
Q. And the issue that's addressed in this

222

1 memorandum and there are various alternatives to --
2 that are discussed here is how to address that
3 problem, what to do about it?
4     A.  Yes, sir.
5     Q.  I'll mark for identification as Exhibit 14
6 an updated memorandum.
7         (Whereupon, Hickey Deposition
8         Exhibit No. 14 was marked for
9         identification.)
10 BY MR. BOWMAN:
11     Q.  With the caption elimination with unit
12 cleared closed homicide cases.  There's no
13 indication of the author of this.
14         The first question is did you write this?
15     A.  I don't know.  I have admitted to a lot up
16 to now, I just don't -- I don't know if this is one
17 that I wrote.
18     Q.  So --
19     A.  I'm looking for some buzz words that I
20 might have used.
21     Q.  Well, why don't you continue your review
22 and see if your recollection is refreshed by
23 carefully reading it over.
24     A.  Okay.  I cannot say with certainty that I

223

1 wrote this but it sounds like me.
2     Q.  For what purpose was it written, if you
3 know?
4     A.  I think it's a part of the -- the thought
5 process of what we should do.  How do we maintain
6 -- how do we get a institutionalized control.  I
7 think it's -- it's almost expor -- how do you say
8 that word, exporanous (sic).
9     Q.  Extemporaneous.
10     A.  Extemporaneous, thank you.
11     Q.  It was just you were putting down --
12     A.  My thoughts.
13     Q.  -- on paper your thoughts including
14 concerns about discrepancies between what's in the
15 memos and what's in the official files and so
16 forth?
17     A.  Yes, sir, it looked like a self
18 examination.
19     Q.  Okay.  And will you acknowledge that --
20 that your description in Exhibit 14 of the state of
21 affairs as it existed in 1982 based on your
22 investigation is accurate?
23     A.  I do.
24     Q.  Now, who received this?

224

1     A.  It may -- I was working for the chief of
2 detectives, he saw the documents that I wrote on
3 this subject.  But it clearly is not a formal
4 report, it's --
5     Q.  And so this was Thomas Lyons?
6     A.  No, this was William Hanhardt.
7     Q.  William Hanhardt.  And you can say that
8 William Hanhardt received this memo?
9     A.  He saw everything else I wrote on this
10 subject and I worked for him so.
11     Q.  And I think that Hanhardt is spelled
12 H-a-n-h-a-r-d-t, is that right?
13     A.  Correct.
14     Q.  Okay.  Let's mark this as Exhibit 15.
15         (Whereupon, Hickey Deposition
16         Exhibit No. 15 was marked for
17         identification.)
18 BY MR. BOWMAN:
19     Q.  Tell me what Exhibit 15 is please?
20     A.  This is another stream of consciousness
21 memos by myself thinking or recognizing that not
22 everything made it to the department's records
23 division file.  I think we've struggled with this
24 issue for a long time.  A decentralized record

225

1 keeping practice.
2     Q.  Okay.  And specifically with respect to
3 memos the issue was are they kept, are they not
4 kept, right?
5     A.  Correct.
6     Q.  And by memos we're referring to -- to
7 those memorandums that are prepared in the course
8 of an investigation not on an official format that
9 are -- that at least in 1982 were not making it
10 into the departmental files?
11     A.  That and we would even have review of
12 police shootings for instance done by the highest
13 ranking member in the police department whoever is
14 on the street at the time.  And they would write a
15 to/from subject report about whether or not in
16 their opinion the officer developed followed the
17 policies of a Chicago Police Department.  But even
18 that report didn't make it to the Records Division.
19 And the thought was, well, that's an administrative
20 report.
21     Q.  Right.
22     A.  You know, and again --
23     Q.  So one issue was do you keep such
24 documents and if so for what period, right?

226

25 (Pages 223 to 226)

| | |
|---|---|
| 1     Yes?<br>2   A. Yes, right.<br>3   Q. And another issue was do you file such<br>4 documents in some recognizable retrievable way<br>5 within the official records of the department?<br>6   A. Correct.<br>7   Q. Now, were -- first of all, was there<br>8 subsequent to your authorship of these notes in<br>9 Exhibit 15 was there a change in policy whereby<br>10 memos were required to be retained and I<br>11 say memos I mean as we've defined that term<br>12 previously?<br>13   A. Yes, in 1983 we established the -- we did<br>14 not prohibit memos but then required them to be<br>15 placed on general progress reports.<br>16   Q. Okay. And kept in the official file?<br>17   A. And kept in the investigative file.<br>18   Q. Did Exhibit 15 find its way also to Chief<br>19 Hanhardt?<br>20   A. Yes.<br>21   MS. ROSEN: Let's go off the record for just a<br>22 minute.<br>23     (Whereupon, a discussion was<br>24     had off the record.)<br><br>227 | 1 and take on certain words -- the use of certain<br>2 words. So I drafted it but in consultation with<br>3 many.<br>4   Q. This, of course, is a special order<br>5 applicable open to the Detective Division, right?<br>6   A. Yes, sir.<br>7   Q. And I think you've commented on this<br>8 already but in terms of investigators such as gang<br>9 crime specialists who were within the patrol<br>10 division this order did not apply to them?<br>11   A. It did not.<br>12   Q. Was any effort made by anyone within the<br>13 Chicago Police Department to address the issues of<br>14 file maintenance and preservation. Specifically<br>15 the maintenance and preservation of notes and<br>16 informal memos by investigators in the patrol<br>17 division such as gang crime specialists that<br>18 paralleled Exhibit 16?<br>19   A. I'm not aware of any.<br>20   Q. I mean, is there somebody else who would<br>21 know of such a thing?<br>22   A. I don't think so.<br>23   Q. Okay. Is there any reason why these<br>24 issues were not addressed with respect to the gang<br><br>229 |
| 1 BY MR. BOWMAN:<br>2   Q. Let's mark for identification as Exhibit<br>3 16.<br>4     (Whereupon, Hickey Deposition<br>5     Exhibit No. 16 was marked for<br>6     identification.)<br>7 BY MR. BOWMAN:<br>8   Q. Detective Division Special Order 83-1.<br>9   All right. So I wanted to ask --<br>10 obviously, I mean, let's be clear on the record,<br>11 this is a document that you authored, 83-1?<br>12   A. I drafted it and it was signed by the<br>13 chief of detectives.<br>14   Q. And that was Mr. Hanhardt?<br>15   A. Mr. Hanhardt. And the document was<br>16 actually typed by Patricia Johnson secretary to<br>17 William Hanhardt.<br>18   Q. And I wanted to ask you a couple of<br>19 questions about wording.<br>20   A. Let me clarify, I drafted it. I didn't<br>21 draft it in a vacuum. This is a major issue to the<br>22 police department. There had already been a court<br>23 appearance or two. Plaintiff's attorney were<br>24 involved. And I think we had a real sense of give<br><br>228 | 1 crime specialists and other patrol division<br>2 investigators?<br>3   A. In the organization of the Chicago Police<br>4 Department it's the Detective Division that has<br>5 responsibility for follow-up criminal investigation<br>6 and the classification of crimes. So it was mostly<br>7 viewed as a detective matter.<br>8   Q. Well, in January of 1983 when Exhibit 16<br>9 was issued was it generally known within the police<br>10 department that, in fact, gang crimes specialists<br>11 were engaging in the follow-up investigation of<br>12 crimes either in collaboration with the detectives<br>13 or on their own?<br>14   MS. ROSEN: Object to the form of the question,<br>15 foundation.<br>16   THE WITNESS: Most of the gang crimes work was<br>17 dabbling in narcotics and shootings and -- the<br>18 emphasis was more on gangs than it was an<br>19 individual case.<br>20 BY MR. BOWMAN:<br>21   Q. Would it surprise you to learn that gang<br>22 crimes investigators participated with detectives<br>23 in the investigation of the Felix Valentin case<br>24 that brings us here today?<br><br>230 |

1    MS. ROSEN:  Object to the form of the question.
2    THE WITNESS:  I'm happy to learn that.  I mean,
3    I -- yes.
4    BY MR. BOWMAN:
5    Q.  Well, is that surprising for you to hear?
6    A.  No.
7    Q.  Right.  And the reason it's not surprising
8    is because you and others in the police department
9    knew as a general matter in 1983 and thereafter
10   that gang crimes specialists in addition to their
11   other work also sometimes participated in criminal
12   investigations and follow-up, right?
13   MS. ROSEN:  Object to the form of the question.
14   THE WITNESS:  Again organizationally we
15   assigned all follow-up responsibilities to the
16   Detective Division.  But certainly any assistance
17   they could offer to help resolve a criminal
18   investigation was accepted.  Whether it's by the
19   public transportation section or gang investigation
20   section or whatever speciality unit there may be.
21   BY MR. BOWMAN:
22   Q.  My question is in practice from time to
23   time gang crimes investigators assisted and
24   participated in follow-up investigations of serious

1    crimes --
2    MS. ROSEN:  Object to the form of the question.
3    MS. EKL:  And foundation.
4    BY MR. BOWMAN:
5    Q.  -- right?
6    A.  They are knowledgeable and they assisted,
7    yes.
8    Q.  Other than what you've testified to
9    already is there any other reason why a similar --
10   a directive similar to Special Order 83-1 was not
11   promulgated for the benefit of persons in a patrol
12   division who might have occasion to participate in
13   follow-up investigations of crime?
14   A.  There is nothing issued but we already
15   have a reporting mechanism called a supplementary
16   report.
17   Q.  I'd appreciate it if you could listen to
18   my question and attempt to answer it to the best of
19   your ability.
20   And I'll ask the court reporter to read it
21   back again and ask if you can answer that question,
22   yes or no.
23   (Whereupon, the record was read
24   as requested.)

1    MS. ROSEN:  That's not a yes or no question.
2    Is there another reason, he gave you the other
3    reason.  So I don't think the way you've now
4    recapped it.
5    MR. BOWMAN:  You know, I don't think that's an
6    objection --
7    MS. ROSEN:  Okay.
8    MR. BOWMAN:  -- really.
9    I'm going to restate the question.  If you
10   can do it yes or no I would appreciate it.  If you
11   can't I'll accept that and we'll move on.
12   BY MR. BOWMAN:
13   Q.  Other than what you've said already is
14   there any other reason yes or no why the police
15   department elected not to promulgate an order
16   similar to 83-1 for the benefit of personnel in
17   patrol who might have occasion to participate in
18   follow-up investigations?
19   A.  It was -- I know of no other reason.  I
20   worked in the Detective Division.  My focus was
21   working only in the Detective Division.  Maybe if I
22   had worked in Research and Development at time I
23   could have made an argument for a broader
24   directive.  I -- fix what you can control.

1    Q.  All right.  Turn to Page 3 of Exhibit 16.
2    Section 5, responsibilities of procedures,
3    Subsection A concerns the initiation of the
4    investigative filed case folder in certain kinds of
5    cases as distinguished from other kinds of cases,
6    you see that?
7    A.  Yes, sir.
8    Q.  To be clear in -- in the more serious
9    cases including homicides, batteries likely result
10   in death, rapes, the investigative file case folder
11   is initiated immediately under this order, right?
12   A.  Yes, sir.
13   Q.  On the other hand in other violent crime
14   investigations not on the list of serious cases the
15   investigative case file folder is -- I'm sorry, the
16   investigative file case folder is initiated only at
17   the time of arrest?
18   A.  Yes, sir, Number 2, right.
19   Q.  Now, can you, first of all, explain to me
20   the reasons for that distension?
21   A.  Frankly, it's a clerical consideration.
22   You know, given the thousands of RD numbered cases
23   that are referred to the investigative area for
24   follow-up we didn't want them to have to literally

and figuratively physically create this awkward
file.

Again this thing was not neat.  It had two
prongs.  It had a miscellaneous document
repository.  But previously was one or two pieces
of paper now became an eighth of an inch and
sometimes a half an inch and two inches.  It got
messy and the clerks didn't like it.

But -- so we thought it through and said
when do we really need them, it's for those cases
that are -- for which may lead to these important
cases described in A-1 and those which eventually
have felony charges approved.

Q.  There may be any number of investigations
that don't result in an arrest at all?

A.  Our clearance rate is not perhaps what it
should be.  So kind of an efficiency aspect to
this.

Q.  Okay.  Suppose as happened in this case
that a matter starts out as a battery or an
aggravated battery such that it would fall under
Paragraph 2.  I mean, that's what happened -- is
that your understanding of what happened here?

A.  It is.

MS. ROSEN:  Object to the form of the question.
BY MR. BOWMAN:

Q.  It is?  Is that a yes?

A.  Yes.

Q.  And then the victim dies and then it falls
in Paragraph 1 as a homicide case.

What would be the procedure in that
circumstance for changing the -- changing the
protocol with respect to the creation of the file
folder?

A.  There is no difference.  Physically
someone has to assemble an investigative file
folder.

Q.  I've asked a bad question.

At what time in this circumstance would
the investigative case file be created?

A.  When that clerical person in charge of the
office probably working days realizes this is a
serious shooting likely to result in death or they
wait until the medical examiner's office calls and
says we got one here that's a delayed death.

Q.  All right.  So in this particular matter
there is a period between I think it's the 25th of
August, 1988 and September 15 or thereabouts when

the individual dies.  And so it's for some portion
of that span of time there would not be an
investigative case folder in the circumstances
assuming that the procedures that you envisioned in
this form were followed?

MS. ROSEN:  Object to form, foundation,
misstates the record.

MR. BOWMAN:  In what respect.

MS. ROSEN:  In what respect is you actually
have the folder and you've seen that the original,
you've seen that it was created actually initially
so that's my objection.

BY MR. BOWMAN:

Q.  Well, so you have a different
understanding from what counsel just said?

A.  The requirements to utilize the general
progress report remain constant.

Q.  No, no, that's not my question.  I get
that.

A.  Okay.

Q.  And I'm not trying to suggest anything
else.  I'm just trying to get an understanding of
-- I'm trying to clarify whether there was in a
circumstance like this assuming that policy was

followed a gap, if you will, a period of time
during which the case was being investigated but
there was no investigative case file folder?

MS. ROSEN:  And just for point of clarification
it says batteries likely to result in death, it's
part of the --

MR. BOWMAN:  I'm not arguing with you, Eileen.
I'm not interested in having an argument with you
about it.

MS. ROSEN:  Well, you're interested in
obscuring the record.

THE WITNESS:  There could well be a gap.

BY MR. BOWMAN:

Q.  And what happens to the documents in that
gap period?

MS. ROSEN:  Objection, form, foundation,
misstates the evidence.

MS. EKL:  Calls for speculation.

BY MR. BOWMAN:

Q.  Well, I don't mean to be asking you to
speculate.  And, I mean, you must have thought of
this in some cases the case file folder is not
going to be created until the time of the arrest.
Where do the documents -- what's the repository for

| | |
|---|---|
| 1 the documents under CPD policy in that period of<br>2 time?<br>3     A.  As in any other follow-up investigation --<br>4 believe it or not all these criminal investigations<br>5 are assigned to one individual detective.  There's<br>6 only one detective of record.  Even though I have a<br>7 partner it's -- I'm the assigned detective.  And if<br>8 something comes in of pertinence to that case they<br>9 would say Hickey this is one of your cases.  It's a<br>10 handout somebody got shot a while ago, how he's<br>11 doing.  I don't know, I guess I'll have to call,<br>12 you know, see if he's living.  I don't mean to be<br>13 facetious.  But it was the individual detectives.<br>14 If anything important came in it should be sent to<br>15 their direction -- or sent -- given to them for<br>16 their attention and inclusion in the investigative<br>17 file.<br>18     Q.  All right.  So what I'm -- should the file<br>19 ever come into existence, right?<br>20     A.  Correct.<br>21     MS. ROSEN:  Object to the form.<br>22 BY MR. BOWMAN:<br>23     Q.  Okay.  So, in other words, in the case of<br>24 a violent crime that did not fall within the<br><br>239 | 1     A.  Yes, sir.<br>2     Q.  And it's possible that somebody could<br>3 figure out that agg batt had been written in under<br>4 the crossed out portion, right?<br>5     A.  Yes, sir.<br>6     Q.  And then homicide is written in, correct?<br>7     A.  Yes, sir.<br>8     Q.  Okay.  Now, then -- and I think that the<br>9 -- that the record is --<br>10     MS. ROSEN:  He has the file here.<br>11     MR. BOWMAN:  Oh, you have the original file<br>12 here.<br>13     MS. ROSEN:  Uh-huh.<br>14     MR. BOWMAN:  Okay.  So let's look at the<br>15 original file.<br>16 BY MR. BOWMAN:<br>17     Q.  And we can look and see the -- you've just<br>18 handed me the original of Exhibit 11.  And what we<br>19 can see is that the exhibit in front of us at Page<br>20 1 contains a copy of a file designation that has<br>21 been scotch taped over the file designation that<br>22 we've just been looking at on Page 4 of the<br>23 exhibit, right?<br>24     MS. EKL:  No, 5.<br><br>241 |
| 1 parameters of Section Roman IV A-1 of 83-1 the<br>2 investigative documents that were generated in the<br>3 -- in the case would be in the possession of the<br>4 assigned detectives until such time as an official<br>5 investigative file was created?<br>6     A.  Yes, sir.<br>7     MS. ROSEN:  Objection, form.<br>8 BY MR. BOWMAN:<br>9     Q.  Now, let me go ahead and see if I can get<br>10 an understanding of what is upsetting Eileen.<br>11     Why don't we have a look at Exhibit 11<br>12 again which you should have in your pile.<br>13     Do you have it?<br>14     A.  Number 11.<br>15     Q.  All right.  If you look at Page 5 you'll<br>16 see that it is a copy of a file jacket from what<br>17 has been represented to us to be an investigative<br>18 file for the Felix Valentin matter, okay.  You see<br>19 that?<br>20     A.  Yes, sir.<br>21     Q.  There is an RD Number on the little file<br>22 tab, there's the victim's name, and then there's a<br>23 space where the crime has been typed in and I want<br>24 to -- and it's been crossed out, right?<br><br>240 | 1     MS. ROSEN:  Page 5.<br>2     MR. BOWMAN:  5, sorry.<br>3     MS. ROSEN:  Page 5 of the exhibit.  Just so<br>4 we're clear it's the label.  So there's a label --<br>5     MR. BOWMAN:  It's actually the label on the<br>6 file jacket.<br>7     MS. ROSEN:  Here.  I'm sorry.  So there's a<br>8 label and then there's a label -- another label<br>9 over it and it's scotch taped.  And the first label<br>10 is photocopied is WRON 5 and the top label is at<br>11 Exhibit WRON 1.<br>12     THE WITNESS:  Yes, sir.<br>13 BY MR. BOWMAN:<br>14     Q.  Is there any way that you with reference<br>15 to policy can interpret when this file jacket was<br>16 created initially with respect to this matter?<br>17     A.  No, there is not.<br>18     Q.  All right.  Let's turn to Page 5.  And we<br>19 talked about this before.  But in the final section<br>20 -- I'm actually back on exhibit -- I'm back on<br>21 Exhibit 16 now.  Last page.<br>22     The rules with respect to file retention<br>23 are set out in this section, right?<br>24     A.  Yes, sir.<br><br>242 |

McCorkle Litigation Services, Inc.<br>Chicago, Illinois  (312) 263-0052

1    Q.   And with the exception of homicides every
2    cleared felony file is purged at the time of final
3    court disposition, is that the policy?
4        A.   You asked for felonies?
5        Q.   Right.
6        A.   Three years but it's suspended.  Suspended
7    three years.  I don't see something -- oh, cleared
8    felony, I'm sorry.  Yes, cleared felony until final
9    court disposition, yes, sir.
10       Q.   And then purged?
11       A.   Yes, sir.
12       Q.   Meaning destroyed?
13       A.   Yes, sir.
14       Q.   And then homicides the cleared closed
15   homicides following final court disposition get the
16   investigative file then gets forwarded to the
17   records division for permanent retention, right?
18       A.   Correct.
19       Q.   And in the case both of unsolved homicides
20   and cleared open homicides the procedure was for
21   them to remain only for ten years in the unit of
22   investigation and then at the completion of that
23   ten year period they should be forwarded to Records
24   Division for permanent retention?

243

1        A.   Yes, sir.
2        Q.   All right.  And that was your expectation
3    going forward, right?
4        A.   Yes, sir.
5        Q.   Okay.  All right.  Following the
6    promulgation of Detective Division as Special Order
7    83-1 what auditing process monitoring process or
8    other oversight was conducted from the top down to
9    ensure that these new requirements with respect to
10   the preservation and filing and maintenance of
11   memos and notes was actually being followed?
12       A.   I know of no special audit procedures that
13   were implemented.  But for every directive and even
14   for things that we don't have directives it's a
15   function of a supervisor, it's a responsibility
16   ever supervisors to make sure that the employees,
17   the members of the Chicago Police Department are
18   doing their job and following the department
19   directives.
20       Q.   Sure, I understand that.  And my question
21   is -- is -- let me clarify my use of the term top
22   down.
23            What mechanisms of a formal nature did the
24   chief of detectives use following the

244

1    implementation of 83-1 at any point to ensure that
2    these new directives were actually being followed?
3        A.   I think in 1986 a subsequent chief to
4    Hanhardt, William -- or George McMahon inserted an
5    audit procedure or requirement and identified that
6    command staff members should be conducting these
7    audits --
8        Q.   Okay.
9        A.   -- or inspections of these files.
10       Q.   And did that, in fact, happen to your
11   knowledge?
12       A.   I have no knowledge that it did or did
13   not.
14       Q.   Okay.  Let's have a look at what I'll mark
15   for identification as Hickey Exhibit 17.
16            (Whereupon, Hickey Deposition
17            Exhibit No. 17 was marked for
18            identification.)
19   BY MR. BOWMAN:
20       Q.   If you could identify what Exhibit 17 is?
21       A.   This also is a Detective Division Special
22   Order Numbered 86-3 on the subject of investigative
23   files.  It rescinds previously issued Detective
24   Division directives on the same topic.

245

1        Q.   Right.  Did you have any -- including
2    83-1?
3        A.   Including 83 --
4        MS. ROSEN:  Actually it doesn't say.
5        THE WITNESS:  It says 2 here.
6        MR. BOWMAN:  83-2.
7        THE WITNESS:  But we've been known occasionally
8    to make clerical errors.
9    BY MR. BOWMAN:
10       Q.   The intention was to rescind 83-1, right?
11       A.   I believe so.
12       Q.   All right.  Well, we won't trouble
13   ourselves with that.
14       A.   Yes.
15       Q.   Now, did you have any role in creating
16   86-3?
17       A.   I did not.
18       Q.   Speaking on behalf of the Chicago Police
19   Department if I were to pose the same series of
20   questions regarding why this applied only to the
21   Detective Division and not to the investigators
22   within the Patrol Division who might have occasion
23   to participate in investigative follow-up would
24   your answers be the same as they were with respect

246

to 83-1?

    A.  Yes, sir.

    Q.  When you testified a few minutes ago that George McMahon, Chief of the Detective Division, implemented a process of inspection and command staff review of files were you referring to Section 6 on page -- on the final page of Exhibit 17?

    A.  I was.

    Q.  Is there anything else?

    A.  No, it looks pretty much the same.

    Q.  Is -- other than that it's basically the same order, right?

    A.  Yes, sir.

    Q.  And what I intended to ask by my question is is there any other directive or policy or procedure of a formal nature of any kind that anybody in the Chicago Police Department has done at any time since 83-1 was promulgated other than this particular provision of Exhibit 17 to ensure that the requirements with respect to file maintenance and the like that are set out in 83-1 are in fact adhered to?

    A.  I am not aware of any.

    Q.  Okay.  Are you aware of any documentation

247

that exists anywhere within the police department documenting that the conduct of periodic unscheduled inspections that are called for under Section 6 of the 86 order?

    MS. ROSEN:  I'm sorry.

    THE WITNESS:  What was the lead into that.

    MS. ROSEN:  Yeah, you lost me.

    MR. BOWMAN:  Yeah, I lost myself too.  Let me try that again.

    THE WITNESS:  Okay.

BY MR. BOWMAN:

    Q.  Are you aware of any documentation in the Chicago Police Department memorializing inspections that were actually conducted as --

    A.  I'm aware that there is -- there was a report which could be used to document this.  We had a report form kept by Research and Development.  It was called exempt off hours inspections.  And they were required to go into their area of responsibility whether it be a district or a detective area and to say what they did and found.  You know, is the parking lot okay.  Are -- you know, fire extinguishers working.  Is everyone at work.  You know, are things being done properly.

248

So that might be a vehicle, a means by which they could communicate any -- anything which was not being followed or anything that needed attention. I'm just -- you asked me if there was and that's the only thing that comes to mind.

    Q.  Well, that's the reward you get for asking an unclear question.

    A.  Right.

    Q.  Let me try it again.

    A.  Try it again.

    Q.  I'm wanting to know if you know of any document that exists showing that in fact somebody has actually done the specific kind of inspection that is supposedly required by Subsection 6 of Detective Division order 86-3?

    MS. ROSEN:  Object to the form.

    THE WITNESS:  I am not aware of any.

BY MR. BOWMAN:

    Q.  We've been provided with a copy of Chapter 18 of a Detective Division manual that it's my understanding was put on-line at some point in 1988.

    I'm marking coincidentally as Exhibit 18 a copy of this particular chapter of the manual.  At

249

least that's my understanding of what that is.

    (Whereupon, Hickey Deposition Exhibit No. 18 was marked for identification.)

    THE WITNESS:  I am familiar with this chapter.

BY MR. BOWMAN:

    Q.  You're familiar with this chapter?

    A.  I am.  It's --

    Q.  Did I accurately describe the document?

    A.  Close.  It is a standard operating procedure of the Detective Division and it was never put on-line, it was a paper based --

    Q.  Oh, sure.

    A.  -- hard book.

    Q.  Yeah, and I was speaking colloquially?

    A.  Yes.

    Q.  When I use the term going on-line I meant -- I meant when it --

    A.  Became effective.

    Q.  -- became effective?

    And that's your understanding of the document?

    A.  Yes, sir.

    Q.  And without going through this is it your

250

understanding that Exhibit 18 basically says the
same thing as the prior exhibit the 86-3 order?
    A.  It does.
    Q.  No substantive changes of any kind, right?
    A.  Correct.
    MR. BOWMAN:  Okay.  We're going to take a break
at this point in time.
    MS. ROSEN:  Okay.
BY MR. BOWMAN:
    Q.  Mr. Hickey, you indicated that you made
some inquiry of personnel in the police department
about the way in which Assistant State's Attorneys
would request information in the course of a case.
    Did you -- since the first session of your
deposition make inquiry in the police department --
and you've also talked about the -- also talked
about the format for the activity reports.
    Other than those two things did you make
any other inquiries in the police department in
order to prepare yourself for your testimony?
    A.  No, sir.
    Q.  You testified earlier this afternoon that
from time to time and you -- I think we agreed that
it was something that happened if not frequently

then at least from time to time that there would be
follow-up inquiries and complaints from
participants in the criminal justice system
indicating that the subpoena service unit had not,
in fact, provided all the documentation that they
had been expecting in response to a request for
information, right?
    MS. ROSEN:  Object to the form.
    THE WITNESS:  Yes, sir.
BY MR. BOWMAN:
    Q.  And when these matters came to your
attention from time to time what, if anything,
apart from providing the information in the
individual case did you do to follow-up in terms of
implementing corrective action or the like?
    A.  I didn't find any individual case that
rose to the level of a pattern or practice.  In
those cases --
    Q.  No, no, no.
    A.  No.  What I didn't -- I tried to resolve
the case at hand.
    Q.  Okay.  And I understand that.  And apart
from resolving the case at hand did you at any
point ever take any kind of corrective action in

terms of having a meeting, suggesting some kind of
a procedure, or policy corrective?
    A.  I don't recall anything.
    Q.  Are you aware of anyone in the police
department ever having done such a thing in
response to complaints that the full materials were
not provided in a particular case?
    A.  No.  There has been meetings over the
years -- I'm sorry.  Conversations over the years
about investigative files, you know.  I mean, I --
    Q.  What do you mean by that?
    A.  When are they given, you know, do they
have to be explicitly asked for, you know, it's --
    Q.  What conversations are you recalling?
    A.  I just remember general conversations with
both subpoena unit personnel and detectives
wondering -- well, asking a question does this
include.  Does this include everything on
everything.  If someone doesn't ask for it how far
do we have to go giving them extra.
    Q.  Okay.  And are these -- are these
conversations conversations that you recall taking
place in the early 2000s when you were in charge in
the Records Division?

    A.  Yes.
    Q.  Specifically whether the investigative
file had to be turned over or not?
    A.  I do remember some conversations on that
subject, yes.
    Q.  Now, when these questions arose and when
complaints in particular cases arose to your
knowledge at any time has there ever been a
transmission of these issues up the chain of
command to the deputy superintendent in charge of
the Bureau of Administrative Services?
    MS. ROSEN:  Object to the form of the question.
    THE WITNESS:  No.
BY MR. BOWMAN:
    Q.  Okay.  Is there a formalized mechanism
whereby that could have been brought through the
chain of command?
    A.  To administration or legal affairs, yes.
    Q.  But it was not done?
    A.  Not that I'm aware of.
    Q.  All right.  Let's turn to the subject of
lineups.
    You understand that you've been designated
to speak for the department with respect to

policies, procedures, and practices concerning the
conduct of lineups in the period of time that's at
interest in this case in late 1980's, right?

A. Yes, sir.

Q. And are you familiar with the departmental
policies with respect to the conduct of lineups in
that particular period of time?

A. I am.

Q. Let me hand you what I'll mark for
identification as Exhibit 19.

(Whereupon, Hickey Deposition
Exhibit No. 19 was marked for
identification.)

BY MR. BOWMAN:

Q. A copy of the Chicago Police Department
general order with the Number 83-5. It's subject
is lineup procedures. You're familiar with this
document?

A. I am.

Q. It's our understanding that this
particular general order was in force in the period
of time between August 30 and September 15 when one
or more lineups may or may not have been conducted
in the Felix Valentin murder investigation, is that

255

consistent with your understanding?

A. Yes, Mr. Bowman.

Q. Are you personally familiar with the
circumstances that lead to the promulgation of
General Order 83-5?

A. I am not.

Q. You'll see that on the first page of the
order there is a series of requirements or
expectations of departmental personnel with respect
to the conduct of lineups, right?

A. Yes, sir.

Q. For example, in 2-A on Page 1 of Exhibit
19 the departmental personnel are advised that it
is appropriate to compel a person to participate in
a lineup against his wishes, right?

A. Yes.

Q. And then the general order also covers the
issue of whether or not the person participating in
the lineup is entitled to have counsel present,
right, depending on the period, the point in the
criminal process at which a lineup occurs, right?

A. That's correct.

Q. And there's also some discussion about the
importance of keeping the victim or the witnesses

256

separate from the lineup participants prior to the
lineup, right?

A. Yes, sir.

Q. And there are rules and requirements
regarding what may be asked of suspects during a
lineup, right?

You can't ask for their addresses for
example, right?

A. I don't see that one but is it in here.

Q. No, I thought it was.

MS. ROSEN: Subparagraph F.

BY MR. BOWMAN:

Q. Any previous arrests of any person or the
fact that any person in the lineup has been
arrested as a suspect will not be mentioned to
victims or witnesses, right?

A. Correct.

Q. And this is as a general matter designed
to improve the integrity of a lineup process,
right?

A. Yes, sir.

MS. ROSEN: Just for clarification you had
asked about addresses and that's the second
sentence of Paragraph F, you didn't read that.

257

That was your original question.

MR. BOWMAN: And thank you for that
clarification.

BY MR. BOWMAN:

Q. Also suspects are not to be asked for
their addresses in the presence of the victims or
the witnesses, right?

A. Yes, sir.

Q. Also, to -- I mean, made possibly for
reasons of personal privacy or safety, right?

A. Yes, sir.

Q. Okay. Now -- and then the general order
goes on to talk about the composition of lineups,
right?

A. Yes, sir.

Q. Specifically the need for some similarity
between the -- the participants in the lineup to
the extent that can be arranged for them?

A. Yes, sir.

Q. And there is also a requirement here it
says police officer should not be used unless other
alternatives have been exhausted, do you see that?

A. Yes, sir.

Q. And what are the other alternatives to the

258

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

1  use of police officers as fillers in the lineups?
2     A.  Mostly we use people who are already in
3  our lockups.  But there are certain districts,
4  neighborhoods of the city who -- lockups
5  interestingly enough are not filled with equally or
6  similarly described individuals.  And we can ask
7  for volunteers from the community, go to a local
8  restaurant and ask for the wait staff.
9     Q.  And that sometimes happens?
10    A.  Yes, it does.
11    Q.  And that sometimes happened in the 1980's,
12 right?
13    A.  Yes, sir.
14    Q.  Now, all of these requirements that are
15 set forth in the general order indicate that there
16 was in 1983 at the time this was promulgated a
17 process of review and evaluation of which the
18 Chicago Police Department lineup practices, is that
19 a fair summary?
20    A.  I don't know if it's evaluation.  But
21 setting forth expectations about the procedures.
22    Q.  And what is the reason why those
23 expectations were set forth at this particular
24 time?

259

1     A.  It's all about fairness, it's -- you
2  want --
3     Q.  I understand that the point is to be fair
4  to the greatest extent possible that -- and my
5  question was poorly phrased.
6        Is there any particular circumstance or
7  event that prompted the department to review and
8  evaluate lineup procedures in 1983 and to clarify
9  for the benefit of departmental personnel how to be
10 fair?
11    A.  I am not aware of the actual reason this
12 was issued.
13    Q.  Okay.  But it does appear that -- let me
14 ask you this, who has policy making authority
15 within the Chicago Police Department with respect
16 to the manner in which lineups are conducted?
17    MS. ROSEN:  Object to the form.
18    THE WITNESS:  Policy is issued by the
19 superintendent of police.  We've tagged the members
20 of the Bureau of Detectives with the functional
21 responsibility to conduct lineups.
22 BY MR. BOWMAN:
23    Q.  So in other words the policy making
24 authority resides with the superintendent but in

260

1  practice that authority has been delegated to the
2  chief of detectives?
3     A.  Yes, sir.
4     Q.  And that was the case in 1988?
5     A.  '83, yes, sir.  Oh, in '88?
6     Q.  I'm asking in '88?
7     A.  I'm sorry, yes.
8     Q.  And that was the case in 1983?
9     A.  Yes, sir.
10    Q.  All right.  Now, I want to focus with you
11 on Subsection H which relates to the photographing
12 of lineups.  And the policy as I understand it
13 draws a distension between whether the suspect has
14 been identified or not with respect to the
15 requirement that a photograph record be made of the
16 lineup?
17    A.  Yes, sir.
18    Q.  Okay.  What is the reason for that
19 distinction?
20    A.  To preserve the lineup maybe not in real
21 time but as close as possible.  And without wasting
22 the evidence technician's time on coming in on all
23 lineups.
24    Q.  Okay.  So to be clear if a witness or a

261

1  victim were to come in to the police station in
2  1988 when this policy was in effect and select a
3  filler from the participants in the lineup no
4  photographic record would be made of that
5  transaction?
6     A.  That's correct.
7     Q.  And is there any -- and the reason is is
8  that the selection of the filler is not evidence
9  that needs to be preserved?
10    A.  It's -- it's not going to court.  It's --
11 we're not going to be using it against anyone.
12    Q.  Right.  Speaking on behalf of the Chicago
13 Police Department will you agree with the
14 proposition that when a witness selects a filler
15 from a lineup that the witness's selection of the
16 filler as opposed to the suspect is exculptory?
17    MS. ROSEN:  Object to the form of the question.
18    THE WITNESS:  In -- today in retrospect I think
19 the selection of a filler should be noted as part
20 of the story.
21 BY MR. BOWMAN:
22    Q.  Would you agree that it's exculptory?
23    MS. ROSEN:  Object to the form of the question.
24    THE WITNESS:  It could be.

262

BY MR. BOWMAN:

Q. Okay. Now, the -- separate from photographs Subsection J of Exhibit 19 lists requirements relating to the documentation of lineups, right?

A. Yes, sir.

Q. And one question that I had is the supplementary report that's referred to here is this a speciality format at lineup report or is it something different?

A. No, it's just an average department supplementary report.

Q. Okay. There are sometimes supplementary reports that start out with a phrase like this is a lineup report, is that -- is that what's --

A. I think that's usually included in the narrative on this report. This is a standard supplementary report.

Q. Okay. So the officer is required to document the date, time, and location of the lineup, right?

A. Yes, sir.

Q. And the name of those participating in the lineup and so on, right?

263

A. Yes, sir.

Q. And then Subparagraph 6 says that the report is to document the names of persons identified in the lineup?

A. Yes.

Q. Okay. What happens under this policy if the -- if the witness is unable to make an identification?

A. It's simply a listing of those that participated. There is no one identified.

Q. Okay. Well, is the -- does this policy provide any guidance to the participants in the -- to the police participants in the lineup process as to how they should document the absence of an identification?

A. No, but it's I suppose presumed that you would say no one was selected or no -- the suspect was not selected.

Q. Suppose the -- suppose the witness identifies a filler as opposed to the suspect. Under this report what is the obligation of the member of the department?

MS. ROSEN: Under this order you mean.

MR. BOWMAN: I'm sorry, under this order,

264

right.

THE WITNESS: I would say the clearest direction it's in Subsection H which -- which results in the identification of a suspect by definition the filler is a non-suspect, you know.

BY MR. BOWMAN:

Q. So this would be the member of the department then would -- would in his report indicate that there was not an identification?

A. There was not an identification of the suspect.

Q. That would be the way that would be recorded?

A. At that time in 1988.

Q. Okay. And that was -- speaking on behalf of the Chicago Police Department that was the -- the procedure in practice that was followed in 1988?

A. Yes, sir.

Q. All right. Now, the document here does not provide the members of the department who conduct lineups with guidance as to what they should say or not say to the witness after the -- after the witness has made an identification, is

265

that right?

A. It is silent on that matter.

Q. Okay. And the report -- I'm sorry, I keep saying report.

The general order does not provide a requirement that the person or officers administering the lineup be unaware of the identity of the offender, right?

A. That's correct.

Q. And it does not provide a requirement that the administrators of the lineup be -- I'm sorry, I'm losing my train of thought. It's been a long day.

MS. ROSEN: You lost me there too.

BY MR. BOWMAN:

Q. It doesn't require the administrators of the lineup to inform the witness that the offender may or may not be in the lineup, correct?

A. That is correct.

Q. Okay. Now, with respect to the practice in 1988 are you aware whether or not members of the Chicago Police Department as a matter of practice inform suspects -- I'm sorry, inform witnesses that the suspect might not be in the lineup?

266

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**

A. We were silent on the issue.

Q. Okay. Are you aware as a matter of practice whether in 1988 the administrators of the lineup were unaware of who the suspect was?

A. I would say they mostly were aware of --

Q. As a matter of practice they were aware?

A. Right. Right.

Q. The opposite in other words?

A. Yes, sir.

Q. And are you aware as a matter of practice in 1988 whether administrators of a lineup refrained in 1988 from confirming for the witness's benefit the accuracy of an identification of those cases where the suspect was selected?

A. You're asking me if the person -- if the detective conducting the lineup told the person viewing the lineup that, yes, you picked the right person.

Q. Yes. That generally happened in 1988, isn't that correct?

A. I think that happens more often than not. A big smile on their face or whatever.

Q. As a matter of practice?

A. Right, yes, sir.

267

MR. BOWMAN: Okay. I'm sorry, but I need to take another break. Sorry.

(Whereupon, a short break was taken.)

BY MR. BOWMAN:

Q. I just have a few more questions for you. Are you familiar with an Area 5 detective by the name of Serafini?

A. There's a couple Serafinis. One is a present employee. And I presume his father was an Area 4 detective. Not in the -- I'm not familiar with the person but I am familiar with the fact that he is credited with designing a note taking -- not advice. He diagrammed, he created, he drafted a one-page note taking report. It was not an official police report, it's just something that made his life better. So he could record in the same place, in the same manner, the same repetitive information that comes up. The firearm serial number, the vin on the automobile, you know, people you have canvassed, victim's name. And that form he is credited with creating became widespread in use. And back in the day when the only forms of duplication was by the photocopy machine. I'm

268

pretty sure I used that and other variations of it when I created the original major incident worksheet in January 1981 when we reorganized the Detective Division.

Yes, I am.

Q. Well, that's what I wanted to hear. And this is called the Serafini report.

A. Yes.

Q. All right. And --

A. Ancestral heritage.

Q. And to be clear despite its widespread usage the Serafini report was not an official Chicago Police report?

A. It was not.

Q. Another question that I wanted to clarify, if you could, and I've -- I've asked you about this before but I haven't -- I haven't been as clear about it as I should have been.

Where -- in the organizational chart can you describe for me where organizationally the gang crimes unit was located over time beginning, if you could, at a point prior to 1988 and going forward from there?

A. In the Richard Brzeczek administration

269

which ended in 1983 he first moved the gang crimes section from the Special Functions Division and created an entire bureau called Special Functions Bureau.

Q. What was in the Special Functions Bureau in addition to the gang crimes unit?

A. The then task force their equivalent of a special operations group, the mobile type of force that was deployed at different parts of the city. I can't remember if public housing was the -- the airport. There was specialized units with highly specialized missions.

Q. So this -- this special --

A. Special Functions Division became a bureau --

Q. Okay.

A. -- in the late Jane Byrne administration, Richard Brzeczek administration.

Q. Okay. And that was prior to Brzeczek's departure in 1983?

A. Yes, it was.

Q. All right. And going forward from the point when Brzeczek put gang crimes and other functions in the Special Functions Bureau how long

270

did -- how long did it remain that way?

A. I would be speculating but a few years.
And then that entire bureau was reduced from a
bureau and returned to the Patrol Bureau, the
bureau -- Patrol Division.

Q. And when did that take place?

A. Probably with Leroy Martin which was the
successor superintendent.

Q. Well, actually Fred Rice was in there?

A. I'm sorry, did I say Leroy Martin. Fred
Rice.

Q. So Fred Rice ended the Special Functions
Bureau and moved all of those special functions
into patrol?

A. Back into patrol.

Q. All right. And what year did he do that
approximately?

A. It would be early 80's, Harold Washington
administration, '83 to '87.

Q. I asked you a number of questions earlier
in the deposition about gang crimes and other
investigators and my questions assumed that at the
point in 1983 when the 83-1 Detective Division
special order was implemented that gang crimes was

271

in the Patrol Division. Your answers wouldn't
change if, in fact, it was in the Special Functions
Bureau at that particular point in time, would
they?

A. They would not.

Q. Okay. And then how long after
Superintendent Rice made that change in the '83 to
'87 period did gang crimes stay in the Patrol
Bureau?

A. I'd say probably to Phil Cline's era and
then it went to Organized Crime Bureau.

Q. And organized crime was its own bureau?

A. Yes.

Q. And what else was in organized crime other
than gang crimes?

A. Narcotics, vice, and licensing.

Q. And in terms of the year can you specify
when Cline made that organizational change?

A. No, I cannot. It was early in his
administration and -- I'm sorry.

Q. Okay. And then subsequent to that has
there been any relocation of gang crimes?

A. No, it's -- it remains in organized crime
today.

272

Q. Has it become -- is it still known as gang
crimes?

A. No, they created two units out of it, one
is gang enforcement and one is gang investigations.

Q. When did that happen?

A. This was Garry McCarthy's administration.
So within the last three years. And probably three
years ago, it happened right away.

Q. All right. Now -- and I have the
same questions for you with respect to the
physical location of the gang crimes officers.
Starting back at the time that Brzeczek moved
gang crimes into a Special Functions Bureau prior
to his departure in 1983 where was gang crimes
located?

A. It was decentralized. If my memory serves
me correct and I think it does, it was in three
locations, north, south, and west. You know, we
had five detectives -- excuse me, six detective
areas at the time. But I'm pretty sure we only had
three gang crimes units. And then it became
centralized. It's --

Q. At what point did it become centralized?

A. I'd have to look at organizational charts.

273

Our organizational charts tend to be month --
issued months after the change actually occurs.
I'm sorry, I --

Q. Okay. Where are -- what documents would
show where they were located?

A. Our organization for command, general
orders maintained by Research and Development.

Q. All right. And has gang crimes remained
decentralized?

A. It has broken into two units and they are
-- they have headquarters at Homan Square on the
west side. I don't think they have any satellite
offices. I think -- for operational purposes I
think sometimes they meet and pull out of
Englewood. But I don't think they have a permanent
home. I should know that one but, I'm sorry, I
don't.

Q. All right. After gang crimes was moved
from Maxwell Street do you know where the files
from that unit went?

MS. ROSEN: Object to the form, foundation.

THE WITNESS: I do not.

BY MR. BOWMAN:

Q. Do you know where they are today?

274

| | |
|---|---|
| 1    MS. ROSEN: Objection, form, foundation,<br>2  assumes facts not in evidence.<br>3    THE WITNESS: I don't know -- you know, form --<br>4  where -- what files you're referring to. But<br>5  they're administrative files, any files.<br>6  BY MR. BOWMAN:<br>7    Q. To be clear I'm referring to the files<br>8  from investigations that gang crimes might have<br>9  participated in?<br>10    MS. ROSEN: Object to the form of the question,<br>11  foundation.<br>12    MS. EKL: Assumes facts not in evidence.<br>13    THE WITNESS: Any unit that is in the business<br>14  of creation of files should maintain files and<br>15  there's a procedure to destroy them. And if you<br>16  can't keep them in your unit you send them to the<br>17  Records Division. And the Records Division may in<br>18  fact have boxes of files that are marked gang or<br>19  gang crimes. Gang crimes north, south, or west<br>20  back by their unit number. Whatever their<br>21  organizational unit number was and it's changed<br>22  over the years too.<br>23  BY MR. BOWMAN:<br>24    Q. Will you agree with the proposition | 1  BY MR. BOWMAN:<br>2    Q. This is a general order on lineup<br>3  procedures bearing Number 88-18. I'm showing an<br>4  effective date of September 24, 1988, I've marked<br>5  it as Exhibit 20.<br>6    And you'll agree with me that this is very<br>7  similar to Exhibit 19, right?<br>8    A. It's very similar.<br>9    Q. And I think the -- you'll see that in<br>10  Paragraph 3 there is a new Number 9 which requires<br>11  as part of the documentation of a lineup that any<br>12  additional information with unusual circumstances<br>13  occurring during the lineup and it gives some<br>14  examples that those unusual circumstances be<br>15  recorded as part of the report, you see where I am?<br>16    A. No, I don't. Where are you?<br>17    Q. At the bottom of the second page of<br>18  Exhibit 20. Maybe it was in Exhibit 19 and my<br>19  notes are wrong in which case I will just withdraw<br>20  the question.<br>21    MS. ROSEN: It's any comments made by counsel<br>22  is that what you said?<br>23    MR. BOWMAN: No, Number 9, any additional<br>24  information or unusual circumstances occurring. |
| 275 | 277 |
| 1  generally speaking that gang crimes was a unit<br>2  within the police department that was in the<br>3  business of generating reports of documents?<br>4    MS. ROSEN: Object to the form of the question.<br>5    THE WITNESS: They're a field and they create<br>6  and utilize all the reports general offense case<br>7  reports, supplementary reports, any -- yes, they<br>8  create reports.<br>9  BY MR. BOWMAN:<br>10    Q. Are you familiar with the phrase negative<br>11  identification used to document the results of a<br>12  lineup procedure?<br>13    A. I am not. I think it's subject to<br>14  interpretation. A negative identification, I don't<br>15  know what it means.<br>16    Q. Well, it's just it's a -- it's a phrase<br>17  that we've seen on some reports over the years<br>18  that's why I asked the question?<br>19    A. Its meaning is not apparent to me.<br>20    Q. Okay. I wanted to show you what I'll mark<br>21  for identification as Exhibit 20.<br>22    (Whereupon, Hickey Deposition<br>23    Exhibit No. 20 was marked for<br>24    identification.) | 1    THE WITNESS: I'm sorry.<br>2    MR. BOWMAN: Yes.<br>3    THE WITNESS: I see that and what's the<br>4  question.<br>5  BY MR. BOWMAN:<br>6    Q. I think that's the -- the only change of<br>7  substance between these two general orders, right?<br>8    A. Yes, sir. Just for your own information<br>9  at that time when we introduced new material we<br>10  tried to highlight it with that vertical line.<br>11    Q. Right.<br>12    A. So it would be one of three changes.<br>13    Q. Right. And do you know why that was --<br>14  why that change was made?<br>15    A. No, I do not.<br>16    Q. Was there any review or -- of policies and<br>17  procedures, any triggering event that caused this<br>18  change?<br>19    A. I don't know. But in the bottom left of<br>20  the report where it says 87-114.<br>21    Q. Yes.<br>22    A. You got me -- I'm calling it a report now<br>23  also. It's a -- of the general order. That's the<br>24  task to create this order or make the changes. |
| 276 | 278 |

Now if I were to locate this task file I might see and I might not why someone wanted it revised. And sometimes directives are simply revised because a certain length of time has passed. And there's been legal mandates and changes.

Q. So someone could go back and look in the folder for task file 87-114 and possibly find an answer to my question?

A. You might find the smoking gun as to -- and you might not.

Q. Got it.

MR. BOWMAN: I don't have any further questions for you, Mr. Hickey. I appreciate your patience with me today and in May.

THE WITNESS: Thank you, Mr. Bowman.

MS. ROSEN: I have a couple questions for him just to follow-up.

EXAMINATION

BY MS. ROSEN:

Q. Let's take a look at what was marked as Exhibit Number 16 which is Special Order 83-1.

A. Okay.

Q. And if we look at Section 5 A-1 you were

279

asked questions about the creation of the investigative file case folder?

A. Yes, ma'am.

Q. And then it -- in Subsection C there's a reference to one of the circumstances where an investigative file case folder should be initiated at the outset would be in connection with the battery likely to result in death, correct?

A. Correct.

Q. And the case that brings us here today the aggravated battery and then death of Felix Valentin. I'm going to show you what was previously marked as Exhibit Number 9 and direct your attention to the Bates stamp page Hickey 00026 which is a copy of the protocol from the ME's office. And can you see there at the bottom that indicates how many gunshot wounds the victim received in the course of this event, do you see that there?

A. I do. It indicates -- this report indicates there were 11 gunshot wounds to the victim.

Q. And would that be the type of battery that would likely result in a death that would trigger

280

Section 5 A-1 and the opening of an investigative case file folder at the outset of the case?

A. Yes, it would. Especially noting that these were all torso shots.

Q. And you're noting the torso shots from the photo that's in the exhibit, correct?

A. Correct.

Q. Okay.

MR. AINSWORTH: In the drawing?

MS. ROSEN: The drawing, yes, sorry. The drawing.

BY MR. BOWMAN:

Q. The drawing at -- in Exhibit 9 on Hickey 0026.

A. Yes, ma'am.

Q. Okay. And then with respect to the Serafini report did you say that that was something along with other things that you utilized to create a report that you participated in the preparation of in 1981?

A. Right, January of 1981.

Q. And so then is it safe to assume that that -- upon the creation of the report you were talking about that that Serafini report was no longer in

281

use?

A. It was no longer -- we encouraged the officers or detectives to use the official major incident worksheet to gather their notes.

Q. Okay. And then could you just explain so it's clear when an incident occurs, there's an event, let's take an aggravated battery, can you describe how the official reporting for the Chicago Police Department begins?

A. The assigned beat officers from the Patrol District in which it occurs respond, conduct a preliminary investigation, and record their findings on a general offense case report describing an aggravated battery as in this case. They complete their usually handwritten report at this -- in this particular era. Give it to their supervising sergeant. The sergeant approves of it. The report is then turned in at the district station. District station clerical staff breaks it up. Sends the original to the Records Division specifically the Records Processing Division. They actually had a specific colored vinyl pouch just to place all these reports in each watch, each day and send it to the Records Division. And the copy of

282

which -- the pink copy of which was kept in the
district review office for their information. The
records processing section within the Records
Division which received the original report then
began to duplicate it and sent photocopies to the
assigned bureau or, excuse me, Detective Division
area. And in the -- honestly, you know, I'm always
surprised how many copies they needed. It was four
or five copies per each case. You know, one for
the file, one for the supervisor, one for the
detective, you know, they're multiple copies.
    Q. Let me ask you just -- you talked about
breaking apart the form. So we're talking circa
1988 the general offense case report was that some
kind of form set?
    A. It is a form set.
    Q. And when you say break it apart what do
you mean?
    A. Literally, physically detach it from a --
it was a -- originally at that time it was -- we
still had carbon paper and -- you know.
    Q. Okay. So then today did you bring with
you again the original of the file that's marked
permanent retention the RD file that's kept at the

283

Records Division?
    A. I did.
    Q. And so if we look at the photocopy that's
been made an exhibit here today, Exhibit Number 9,
and we look at Bates stamped Hickey 0003, if you
pull -- look at the original of that --
    A. Okay.
    Q. -- in the file that you have is that the
general offense case report that you're talking
about?
    A. It is.
    Q. And the original of that is that a
two-sided document?
    A. Yes.
    Q. Okay. And if you look at the -- there's
some stamps on it, if you take a look at the stamps
specifically that say extra copy forwarded on the
document, can you explain what that means?
    A. Extra copy, sometimes more the -- more
than the assigned investigative unit may be
interested or have need for information that's
contained in a report. If the incident occurred on
Park District property we might send a copy to
someone in the Park District on the security side.

284

If they broke a lamppost we might send a copy to
the Department of Revenue or Finance. Again people
who have logical needs to know about certain
events.
    Q. Okay. And so then the original of that
document once it gets sent to records that's where
it remains until the end of time in a case that's
permanently retained, correct?
    A. That is correct.
    Q. Okay. Then are -- there are also
supplementary reports, correct?
    A. There are.
    Q. Okay. And is there just one form of
supplementary reports or are there multiple forms
of supplementary report utilized by the Chicago
Police Department?
    A. For this time period up to 1984 there were
two -- excuse me, two types of report, the original
general offense case report and second would be the
supplementary report.
        Then in February 1984 we came up with a
second type of supplementary report and it used the
same CPD number as the -- the normal supplementary
report. But the critical difference is a line

285

right above the -- the narrative portion which
talks about the status. And that's intended --
this second type of supplementary report was
intended as the report and the title says for BIS
personnel only.
    Q. And who are BIS personnel?
    A. Bureau of Investigative Services personnel
only, the Detective Division and the Youth
Division. They are the ones who had the authority
to clear, close, unfound, suspend a case, whatever
the status might be. They give it its final case
disposition.
    Q. Okay. And then if we take a look at again
Exhibit Number 9 if you go to what we've marked as
Hickey 0012 which would be the --
    A. I have it.
    Q. Okay. And now is that the same type of
supplementary report or is that a different
supplementary report, a different form?
    A. That is a different form. This is CPD
11.411-A. The BIS supplementary report is CPD
11.411-B. And this one is intended for general
audience use.
    Q. Okay. So in this -- the particular one

286

McCorkle Litigation Services, Inc.
Chicago, Illinois  (312) 263-0052

1 we're looking at this one is prepared by some
2 officers out of 14th District tac. So that's the
3 type of supplemental report that a tactical officer
4 would use?
5     A.  For an existing crime that was already
6 reported, right.
7     Q.  Okay.  And when a tactical officer
8 prepares a supplementary report do you know the
9 procedure that follows once the report is filled
10 out and how that paperwork gets distributed?
11     A.  They would, first of all, fill out the A
12 version, the general use version, the supplementary
13 report.  And it too would be approved by their
14 supervisor.  And at their unit they would break it
15 up physically because this was a form set.  Break
16 it up and send the original to the records
17 processing section.  Which would again make copies
18 and disseminate it to the area of investigative
19 responsibilities.
20     Q.  And you're looking at the original file
21 again and so that supplementary report of the
22 Letrich report that we were just talking would
23 which is Bates stamped Hickey 0012 is contained in
24 that file --

1     A.  It is.
2     Q.  -- correct?
3         Now going back to the supplementary report
4 for the Bureau of Investigative Personnel can you
5 describe in 1988 was that form a form set?
6     A.  It was not.  It actually was a -- good, I
7 had to look.  A one-page report.  And it was on a
8 pad of paper, it was 100 per pad.
9     Q.  Okay.
10     A.  It didn't have a backside.
11     Q.  Okay.  And so when the detectives prepared
12 that report the original of that --
13     A.  It was not a form set, excuse me.
14     Q.  Okay.  And so when a detective prepared a
15 supplementary report can you describe the process
16 by which that report would get distributed?
17     A.  Detective would --
18     MR. AINSWORTH:  Which number are you?
19     MR. BOWMAN:  B.
20     THE WITNESS:  It would be the B form.
21     MS. ROSEN:  The B form.
22         I was speaking generally, yeah.
23     MR. AINSWORTH:  Got you.
24     THE WITNESS:  The creating detective would

1 write the report, have his supervisor sign off, and
2 the supervisor would send the original to the
3 records processing section.  And I never asked this
4 but I suppose they already -- they would send us a
5 copy back of what we already sent them but that
6 doesn't make much sense.  But a rule is a rule.
7 Yes.
8 BY MS. ROSEN:
9     Q.  Okay.  And then with respect to -- if you
10 have to take one more look at -- there's another
11 one of these supp reports -- well, let me back up
12 for a second.  The BIS version on CPD 11.411-B,
13 that form, is that for detective use only?
14     A.  It is.
15     Q.  Okay.  And then if we go -- if you look at
16 what -- in Exhibit 9 what's Bates stamped Hickey
17 00017 which is at the bottom signed by Gang
18 Specialist Gawrys.
19     A.  Gawrys, I'm sorry, yes.
20     Q.  So which form is that one, is that
21 the BIS form or the other one?
22     A.  This is the general use supplementary
23 report CPD 11.411-A.
24     Q.  And so the process that you described with

1 respect to a tactical officers use of a
2 supplementary report does that apply equally to a
3 gang specialist use of that same form supplementary
4 report?
5     A.  The process is exactly the same.
6     Q.  And so each of those originals of the
7 general offense case report and the supplementary
8 report that we've been talking about get sent
9 almost contemporaneous with their completion to the
10 Records Division, is that correct?
11     A.  Right, they're a few hours separating
12 their arrival versus delivery.
13     Q.  Okay.  And then do you know what's the --
14 looking at Pages 1 and 2 which are the front and
15 back side of Hickey 00001 and 00002 of Exhibit
16 Number 9, do you know what that is?
17     A.  This is the radio call card.  Officially
18 it's known as the radio dispatch card.  It was
19 filled out by the call taker at the 911 center.
20     Q.  So this predates obviously the computer
21 age of call taking?
22     A.  Yes, this is the original call, the
23 original description of the call.
24     Q.  Okay.  So this is actually the person at

| | |
|---|---|
| 1 the 911 center taking the call filling this card | 1 negative to the prosecution, I think that's how I |
| 2 out and then they have to send that to the records | 2 framed it. Meaning the same. |
| 3 division, is that how that works? | 3     Q. Meaning the same, right. |
| 4     A. Yes, they do. | 4     MR. BOWMAN: Okay. I'm done. |
| 5     Q. Oh, I want to go back to what was | 5     MS. ROSEN: Okay. |
| 6 previously marked as Hickey Exhibits Number 7 and | 6     Yes, reserved. |
| 7 Number 8. Which are the 1983 and 1993 versions of | 7     (FURTHER DEPONENT SAITH NAUGHT.) |
| 8 the activity reports. Is there any place on that | 8 |
| 9 report for an RD number? | 9 |
| 10     A. There is no data field or space for a | 10 |
| 11 Records Division number. | 11 |
| 12     Q. Do you know why that is? | 12 |
| 13     A. Because this is not a supplementary | 13 |
| 14 report, this is an activity report -- activity | 14 |
| 15 summary. | 15 |
| 16     MS. ROSEN: That's all I have. | 16 |
| 17     MS. EKL: I have nothing. | 17 |
| 18     MR. BOWMAN: I just had one follow-up question, | 18 |
| 19 possibly more, depending on Mr. Ainsworth's | 19 |
| 20 counsel. | 20 |
| 21     FURTHER EXAMINATION | 21 |
| 22 BY MR. BOWMAN: | 22 |
| 23     Q. You testified I believe that the major | 23 |
| 24 incident worksheet supplanted the Serafini report? | 24 |
|                                 291 |                                 293 |

| | |
|---|---|
| 1     A. Yes. | 1     IN THE UNITED STATES DISTRICT COURT |
| 2     Q. And the major incident worksheet was also | 2     NORTHERN DISTRICT OF ILLINOIS |
| 3 not a report that as a routine matter was included | 3     EASTERN DIVISION |
| 4 in the investigative file prior -- at any time, | 4 JACQUES RIVERA,     ) |
| 5 right? | 5     Plaintiff,   ) |
| 6     A. Prior in 1983 it was simply a note taking | 6     -vs-     ) No. 12 CV 4428 |
| 7 document. | 7 REYNALDO GUEVARA, ET AL.,   ) |
| 8     Q. Right. And what about subsequent to 1983, | 8     Defendants.   ) |
| 9 I may have asked you this already? | 9     This is to certify that I have read the |
| 10     A. If it was generated it should be retained. | 10 transcripts of my deposition taken in the |
| 11     Q. And where would it be retained? | 11 above-entitled cause by KIMBERLY J. KARAS, |
| 12     A. In the investigative file if there was an | 12 Certified Shorthand Reporter, on May 6, 2014 and |
| 13 investigative file. | 13 June 10, 2014, and that the foregoing transcripts |
| 14     Q. And -- okay. And in 1983 or in 1982 in | 14 accurately states the questions asked and the |
| 15 the course of your investigation of the use of the | 15 answers given by me as they now appear. |
| 16 major incident worksheets you determined and made | 16 |
| 17 some notes to the effect that the form often | 17 |
| 18 contained ill-considered comments of detectives | 18 _____ |
| 19 possibly disparaging victims or otherwise recording | 19     JAMES HICKEY |
| 20 information that would be potentially useful to the | 20 SUBSCRIBED AND SWORN TO |
| 21 defense in cross-examination, right? | 21 before me this _____, day |
| 22     MS. ROSEN: Object to the form. | 22 of _____ 2014. |
| 23     THE WITNESS: I think I said something -- just | 23 _____ |
| 24 the opposite. I mean, those comments but possibly | 24     Notary Public |
|                                   292 |                                 294 |

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois (312) 263-0052**

1    STATE OF ILLINOIS  )
2              ) SS:
3    COUNTY OF C O O K  )
4        I, KIMBERLY J. KARAS, a notary public
5    within and for the County of Cook County and State
6    of Illinois, do hereby certify that heretofore,
7    to-wit, on May 6, 2014 and June 10, 2014,
8    personally appeared before me, at 750 North Lake
9    Shore Drive, 8th Floor, Chicago, Illinois, JAMES
10   HICKEY, in a cause now pending and undetermined in
11   the United States District Court of Illinois,
12   wherein JACQUES RIVERA is the Plaintiff, and
13   REYNALDO GUEVARA, et al., are the Defendants.
14        I further certify that the said JAMES
15   HICKEY was first duly sworn to testify the truth,
16   the whole truth and nothing but the truth in the
17   cause aforesaid; that the testimony then given by
18   said witness was reported stenographically by me in
19   the presence of the said witness, and afterwards
20   reduced to typewriting by Computer-Aided
21   Transcription, and the foregoing is a true and
22   correct transcript of the testimony so given by
23   said witness as aforesaid.
24        I further certify that the signature to

295

1            McCorkle Litigation Services
2          200 N. LaSalle Street Suite 2900
3            Chicago, Illinois 60601-1014
4    June 16, 2014
5    MS. EILEEN ROSEN
      ROCK, FUSCO & CONNELLY
6    321 North Clark Street, Suite 2200
      Chicago, Illinois  60654
7
      IN RE:  Rivera vs Guevara, et al.
8    COURT NUMBER:  12 CV 4428
      DATE TAKEN:  May 6, 2014 and June 10, 2014
9    DEPONENT:  James Hickey
10   Dear Ms. Rosen,
11   Enclosed is the deposition transcript for the
      aforementioned deponent in the above-entitled
12   cause. Also enclosed are additional signature
      pages, if applicable, and errata sheets.
13
      Per your agreement to secure signature, please
14   submit the transcript to the deponent for review
      and signature.  All changes or corrections must be
15   made on the errata sheets, not on the transcript
      itself.  All errata sheets should be signed and all
16   signature pages need to be signed and notarized.
17   After the deponent has completed the above, please
      return all signature pages and errata sheets to me
18   at the above address, and I will handle
      distribution to the respective parties.
19
      If you have any questions, please call me at the
20   phone number below.
21
      Sincerely,
22
      Margaret Setina
23   Court Reporter Present:
      Signature Department      Kimberly J. Karas
24

297

1    the foregoing deposition was reserved by counsel
2    for the respective parties.
3        I further certify that the taking of this
4    deposition was pursuant to notice and that there
5    were present at the deposition the attorneys
6    hereinbefore mentioned.
7        I further certify that I am not counsel
8    for nor in any way related to the parties to this
9    suit, nor am I in any way interested in the outcome
10   thereof.
11      IN TESTIMONY WHEREOF:  I have hereunto set
12   my hand and affixed my notarial seal this 15th day
13   of June, 2014.
14
15
16
17
18
19   NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20   LIC. NO. 084-003548
21
22
23
24

296

**McCorkle Litigation Services, Inc.**
**Chicago, Illinois  (312) 263-0052**