# EXHIBIT 43

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 2 of 59 PageID #:30543
***REALTIME UNEDITED TRANSCRIPT ONLY***

1

01:30:29    1   Judge Kennelly, November 23, 2016, 1:40 p.m., Fields v. City

01:31:17    2   of Chicago trial.

01:40:07    3           THE COURT:  We are back on the record.  Are there any

01:40:10    4   issues to take up before we get going?

01:40:12    5           MR. LOEVY:  Yes, your Honor.  We would like to now to

01:40:15    6   walk the jury out into the hall.  We have measured out 80

01:40:19    7   feet.

01:40:20    8           THE COURT:  Oh, this is the 80-foot thing.

01:40:22    9           MR. LOEVY:  And 155.  We have measured both.  You

01:40:22   10   should instruct us on the protocol you want to use.  We had a

01:40:24   11   guy standing at 80 feet and then we had hoped he would move

01:40:26   12   back to 155, and then we wouldn't talk.

01:40:30   13           THE COURT:  And so, in other words, we are going to

01:40:32   14   have a line somewhere?

01:40:34   15           MR. LOEVY:  Right outside the courtroom is the

01:40:35   16   starting line.

01:40:36   17           THE COURT:  Where outside?  There is going to be a

01:40:38   18   person standing at one end?

01:40:42   19           MR. ART:  The line, Judge, is right to the doorway

01:40:46   20   out here is where we started from and then down the hall we

01:40:49   21   have a marker at 80 and we have a marker at 155.

01:40:51   22           THE COURT:  So somebody is going to go stand down

01:40:54   23   there?

01:40:56   24           MR. ART:  We figured we'd put the guy at 80 and then

01:41:00   25   we could bring the jury out if it works for the Court and move

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 3 of 59 PageID #:30544

| | |
|---|---|
| 01:41:00 | 1 |
| 01:41:02 | 2 |
| 01:41:04 | 3 |
| 01:41:05 | 4 |
| 01:41:06 | 5 |
| 01:41:08 | 6 |
| 01:41:12 | 7 |
| 01:41:18 | 8 |
| 01:41:21 | 9 |
| 01:41:22 | 10 |
| 01:41:25 | 11 |
| 01:41:28 | 12 |
| 01:41:31 | 13 |
| 01:41:33 | 14 |
| 01:41:35 | 15 |
| 01:41:40 | 16 |
| 01:41:44 | 17 |
| 01:41:47 | 18 |
| 01:41:50 | 19 |
| 01:42:18 | 20 |
| 01:42:19 | 21 |
| 01:42:27 | 22 |
| 01:42:58 | 23 |
| 01:43:02 | 24 |
| 01:43:05 | 25 |

1  him back to 155.

2          THE COURT:  That's fine.  I'll talk to them before we

3  go out there.

4          MR. LOEVY:  Great.

5          Then we are going to call Mr. Hickey, and there is an

6  issue about the proffer, although Dan is talking to Mr. Hickey

7  right now.  We do need to get some guidance about how far you

8  are going to let us go on Jones Palmer.

9          THE COURT:  I haven't talk about that yet?

10          MR. LOEVY:  They said they wanted more of a proffer.

11  I think we could take it one question at a time.  We are going

12  to stay within the bounds we talked about in opening

13  statement.  I think it's amenable to --

14          THE COURT:  The opening statement was within the

15  bounds that I thought were appropriate.

16          MR. LOEVY:  We would like to ask question, answer,

17  objection, answer.  When Dan comes back out --

18          THE COURT:  Let's wait for Mr. Noland to come back

19  in.  The two distances are 80 and 150.

20          MR. LOEVY:  155.

21          THE COURT:  Okay.  We are just waiting on Mr. Noland

22  at this point.  We were having a brief discussion or starting

23  to have a brief discussion about Mr. Hickey and thought it

24  made sense for you to be here before we talked about that.

25          MR. NOLAND:  Thank you.  Sorry, I was out, Judge.

11/23/16 PM   Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 4 of 59 PageID #:30545
***REALTIME UNEDITED TRANSCRIPT ONLY***

3

| 01:43:07 | 1 | THE COURT: That's no problem. |

01:43:07  1   THE COURT:  That's no problem.

01:43:09  2   So why don't you tell me, Mr. Loevy, what you're

01:43:12  3   proposing to go into regarding the Jones Palmer.

01:43:15  4   MR. LOEVY:  Mr. Hickey was the guy that after Jones

01:43:18  5   made the existence of the situation known was the one who went

01:43:22  6   to the various areas, gathered information, did fact finding,

01:43:25  7   reported back to the policy makers Breczyek and Hanhardt and

01:43:30  8   discovered the existence of a problem, then he enacted 83-1 to

01:43:34  9   address it.  Judge Shadur, that was in early '83.  In March of

01:43:39  10  '83, Judge -- and I understand I think that's not within the

01:43:43  11  objection part.  The objection part is in March 31st, 1983

01:43:46  12  Judge Shadur issued his opinion in Palmer where --

01:43:52  13  THE COURT:  Preliminary injunction?

01:43:53  14  MR. LOEVY:  Yes.

01:43:53  15  THE COURT:  And his opinion indicated to the city

01:43:56  16  that it was a step forward but it was still deficient in two

01:43:59  17  respects that we'd like to elicit.

01:44:01  18  THE COURT:  What were the two respects.

01:44:04  19  MR. LOEVY:  One, they weren't recording all of the

01:44:06  20  relevant information, and two, that the subpoena unit, there

01:44:08  21  was no provision defining the department duty in response to

01:44:12  22  discovery efforts to ensure that the production of the

01:44:14  23  investigative materials were making it to the defendants.  A

01:44:19  24  few months later, Mr. Hickey wrote 83-2 which was a

01:44:25  25  modification of '83-1 but then remained in force through the

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 5 of 59 PageID #:30546

4

| | | |
|---|---|---|
| 01:44:29 | 1 | relevant period. |
| 01:44:30 | 2 | THE COURT: Okay. What is it that you want to elicit |
| 01:44:31 | 3 | about judge shade you're ruling? |
| 01:44:35 | 4 | MR. LOEVY: That the city was put on notice on March |
| 01:44:38 | 5 | 31st, 1983, that while 831 was a step in the right direction |
| 01:44:43 | 6 | but it was still deficient in the two respects that I |
| 01:44:47 | 7 | identified. |
| 01:44:47 | 8 | THE COURT: All right. Mr. Noland. |
| 01:44:49 | 9 | MR. NOLAND: Judge, I thought we had dealt with the |
| 01:44:52 | 10 | proffer both before opening and at the sidebar and nothing |
| 01:44:54 | 11 | about this was said so this comes as a surprise. Right now I |
| 01:44:58 | 12 | have my witness outside. |
| 01:44:59 | 13 | THE COURT: Which part TV? |
| 01:45:00 | 14 | MR. NOLAND: Specifically Judge Shadur's opinion and |
| 01:45:03 | 15 | the change from 83-1 to 83-2, nothing was said about that |
| 01:45:08 | 16 | previously to the Court or us with respect to this proffer |
| 01:45:10 | 17 | that the Court had suggested that they do. |
| 01:45:12 | 18 | THE COURT: Okay. |
| 01:45:13 | 19 | MR. NOLAND: That also that would. |
| 01:45:16 | 20 | THE COURT: So deal with the merits, though. I |
| 01:45:19 | 21 | understand the point you are making. |
| 01:45:20 | 22 | MR. NOLAND: Mr. Hickey, I don't believe has any |
| 01:45:22 | 23 | foundation to talk about what Judge Shadur did or didn't do. |
| 01:45:25 | 24 | What I believe he would say is he is aware that there were |
| 01:45:28 | 25 | discussions between the plaintiff's counsel in the case and |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 6 of 59 PageID #:30547

01:45:33   1   corporation counsel's office to try to make the best policy
01:45:37   2   available.  And so would he be able to have any foundation to
01:45:40   3   say that it went from 83-1 to 83-2 because of something Judge
01:45:46   4   Shadur did, he can't say that.  He didn't have that
01:45:48   5   information.
01:45:48   6          THE COURT:  He knows there was an 83-1 and there was
01:45:51   7   an 83-2 and probably he has some explanation for that,
01:45:54   8   whatever it is.  You are just saying he probably doesn't know
01:45:57   9   about all the whys and wherefores, the extent to which Judge
01:46:02  10   Shadur's ruling had anything to do with it.
01:46:04  11          MR. NOLAND:  Yes, exactly.  And he -- I don't know if
01:46:07  12   he has a huge recollection of exactly, you know, why things
01:46:10  13   were changed.  Generally speaking, there were these
01:46:13  14   discussions.
01:46:14  15          THE COURT:  Look, here's the deal.  I am not going to
01:46:17  16   permit you, the plaintiff, to put in Judge Shadur's ruling by
01:46:22  17   way of a question unless and until there's -- we know that
01:46:27  18   there is a foundation for the witness to talk about it it's a
01:46:30  19   pretty big thing.  And, yeah, I can tell the jury disregard
01:46:34  20   the question, questions aren't evidence, but this one thing I
01:46:37  21   am not going to do that.  I am instructing you on that.  You
01:46:41  22   can say that there was a court case, you can bring out that
01:46:43  23   there were rulings, you can ask him if he was familiar with
01:46:45  24   the ruling, when you get into the discussion about how it went
01:46:48  25   from 83-1 to 83-2, you know, you can try to elicit that, but

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 7 of 59 PageID #:30548
***REALTIME UNEDITED TRANSCRIPT ONLY***

6

01:46:53   1   you are not going to be permitted to ask a question which

01:46:55   2   discloses the contents of Judge Shadur's ruling unless and

01:46:59   3   until there is a foundation laid for this witness' aware of

01:47:02   4   it.

01:47:03   5          MR. LOEVY:  He did write 83-1 and 83-2.

01:47:06   6          THE COURT:  I am not asking for a response.  That's

01:47:07   7   an order.  It sounds like to me that it doesn't look like

01:47:11   8   there are going to a whole lot of other real problems that I

01:47:14   9   at least are popping off the page at me at this point.  Is

01:47:17  10   there anything significant, Mr. Noland, that you're concerned

01:47:20  11   about aside from the thing you just talked about?

01:47:23  12          MR. NOLAND:  That's really it, Judge.  To the extent

01:47:24  13   be that if they get into Judge Shadur's ruling, that would

01:47:28  14   open the door to things the Court said it didn't want to open

01:47:31  15   the door.

01:47:31  16          THE COURT:  Are you looking at my one of my rulings

01:47:34  17   there?

01:47:36  18          MR. NOLAND:  I am not.  I am looking at the special

01:47:38  19   order.

01:47:38  20          MR. LOEVY:  Years later, the Seventh Circuit we

01:47:41  21   versed Palmer.  We argued that doesn't affect anything.

01:47:45  22   Notice was the issue.

01:47:46  23          THE COURT:  I think I said something about this.

01:47:49  24          MR. LOEVY:  I think you agreed with that.

01:47:51  25          MR. SWAMINATHAN:  You addressed this in your motion

11/23/16 PM      Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 8 of 59 PageID #:30549
***REALTIME UNEDITED TRANSCRIPT ONLY***

7

01:47:53   1   in limine about the Monell motions in limine.

01:47:55   2         THE COURT:  That's what I thought.  Let me page

01:47:57   3   through it.  It's pages -- I don't have the docket number, the

01:48:00   4   date is November 7th, I think and it's pages 6 -- a lot of it

01:48:09   5   is just a recitation of the case, 6 through 11.  I said at

01:48:13   6   page 10 that the later Seventh Circuit rulings, I said that

01:48:22   7   the Seventh Circuit's ruling on the partially overturned

01:48:30   8   preliminary injunction is likely not relevant, and I said that

01:48:32   9   the still later ruling overturning the grant of an interim fee

01:48:36  10   award is not relevant either.  So it came after the relevant

01:48:42  11   events.

01:48:43  12         If you think that something has happened that causes

01:48:46  13   you to want to go into that, just ask for a sidebar.

01:48:50  14         MR. NOLAND:  One other thing, when they're

01:48:53  15   characterizing this litigation, if you are talking about

01:48:56  16   problems in the department in the plural, this was one case,

01:48:59  17   it was the Jones case that brought about the change with

01:49:02  18   respect to the policy and that there's no evidence that there

01:49:06  19   was any exculpatory material withheld in any other specific

01:49:10  20   case.  So I would object to potentially misleading or

01:49:14  21   mischaracterizations of the actual --

01:49:16  22         THE COURT:  Let's just call it a problem, a problem.

01:49:18  23   Okay?  And then we will worry about the rest of it later.  I

01:49:23  24   am getting the jury back out here.

01:49:24  25         The jurors are going to need to be able to get out

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 9 of 59 PageID #:30550

01:49:27  1   and around.  So the young lady who is sitting at the end of

01:49:31  2   the table.  I am going to lead them out there.  Nobody is

01:49:34  3   going to be saying anything in the hallway other than me.

01:49:39  4   Everybody understand?  If you want to say something, come and

01:49:41  5   ask my permission.  The court reporter is not going to be

01:49:45  6   going out because there is not going to be any testimony.  I

01:49:48  7   am simply going to take the jurors out.  I am going to

01:49:51  8   describe on the record out here what we are going to do, I am

01:49:54  9   going to point out to them where the starting point is, there

01:49:57  10  is going to be someone starting off 80 feet and then I am

01:50:02  11  going to get them to move 155 feet away, give the jurors an

01:50:07  12  opportunity to observe that and we will go from there.  And

01:50:11  13  then we will come back.

01:50:13  14      (The jury enters the courtroom.)

01:50:29  15          THE COURT:  Okay.  Everybody can have a seat.  We are

01:50:32  16  going to take a field trip to the hallway.  Have a seat.  I

01:50:36  17  need to explain the field trip to you.

01:50:38  18          You heard testimony about distances.  You heard some

01:50:41  19  testimony about 80 feet and you heard some testimony about 155

01:50:45  20  feet and so what we are going to do is we are going to go out

01:50:47  21  in the hallway and there is going to be a person standing at a

01:50:50  22  particular place, I am going to point that person out to you,

01:50:53  23  there is another person going to be standing 80 feet away and

01:50:56  24  then I am going to tell the person to go to 155 feet away,

01:51:00  25  they have measured this in advance, the lawyers have vetted

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 10 of 59 PageID #:30551
***REALTIME UNEDITED TRANSCRIPT ONLY***

9

| | |
|---|---|
| 01:51:03 | 1 | it. I will give everybody an opportunity to see those |
| 01:51:05 | 2 | distances and how long they are and then we are going to come |
| 01:51:08 | 3 | back in here. I want to say one thing in caution first. |
| 01:51:11 | 4 | First of all, this isn't intended to duplicate |
| 01:51:14 | 5 | whatever the conditions were at the scene of the Hickman and |
| 01:51:19 | 6 | Smith murders because they weren't committed in the hallway. |
| 01:51:22 | 7 | So nothing about the lighting, the angles of view, you know, |
| 01:51:26 | 8 | how dark or how light it was and other things like that, it's |
| 01:51:29 | 9 | just purely to illustrate the distance, 80 feet and 155 feet. |
| 01:51:35 | 10 | The way this is going to work is I am coming down there, you |
| 01:51:38 | 11 | are going to follow me, we are going to go out there. It's |
| 01:51:41 | 12 | going to take no more than five minutes. The court reporter |
| 01:51:44 | 13 | isn't going to come. The lawyers are going to come. They |
| 01:51:48 | 14 | won't get to say anything. The parties can come. Mr. Murphy, |
| 01:51:54 | 15 | Mr. O'Callaghan, and Mr. Fields. |
| 01:51:58 | 16 | (Demonstration in the hallway outside the presence of the |
| 01:52:33 | 17 | court reporter.) |
| 01:53:57 | 18 | THE COURT: Okay. You can call the next witness. |
| 01:53:59 | 19 | MR. LOEVY: Your Honor, plaintiff calls Mr. Hickey. |
| 01:55:40 | 20 | (Witness sworn.) |
| 01:55:44 | 21 | THE COURT: Please have a seat. Okay. Can go ahead. |
| 01:55:44 | 22 | - - - |
| 01:55:44 | 23 | JAMES K. HICKEY, DIRECT EXAMINATION |
| 01:55:52 | 24 | BY MR. NOLAND: |
| 01:55:52 | 25 | BY MR. LOEVY: |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 11 of 59 PageID #:30552
***REALTIME UNEDITED TRANSCRIPT ONLY***

10

| | | |
|---|---|---|
| 01:55:53 | 1 | Q. Tell the jury your name, please? |
| 01:55:54 | 2 | A. James K hickey. |
| 01:55:55 | 3 | Q. And your professional career if you could explain? |
| 01:55:58 | 4 | A. Chicago Police Department, 45 years. |
| 01:56:00 | 5 | Q. And you rose your way up through the ranks? |
| 01:56:03 | 6 | A. Yes, sir. |
| 01:56:03 | 7 | Q. A little bit, if you would, about your background. |
| 01:56:06 | 8 | A. I started in June 1971, police officer, detective in 1977 |
| 01:56:17 | 9 | to area one homicide, sergeant in the crime laboratory, and |
| 01:56:28 | 10 | lieutenant in a couple districts, and some administrative |
| 01:56:36 | 11 | assignments in patrol, headquarters, detective headquarters |
| 01:56:41 | 12 | and the bureau of investigative services and research and |
| 01:56:45 | 13 | development. |
| 01:56:46 | 14 | Q. And you're presently retired? |
| 01:56:47 | 15 | A. I am. |
| 01:56:48 | 16 | Q. And you mentioned area one. You were a homicide detective |
| 01:56:51 | 17 | around 1980 in area one, correct? |
| 01:56:53 | 18 | A. I was. |
| 01:56:54 | 19 | Q. And you mentioned the administrative stuff. You worked |
| 01:56:57 | 20 | for the chief of detectives out of headquarters? |
| 01:56:59 | 21 | A. I did. |
| 01:57:00 | 22 | Q. Who was that at the time? |
| 01:57:01 | 23 | A. William Hanhardt. |
| 01:57:04 | 24 | Q. In the 2000s, you had some experience running the subpoena |
| 01:57:09 | 25 | services unit? |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 12 of 59 PageID #:30553

***REALTIME UNEDITED TRANSCRIPT ONLY***

01:57:09  1   A.  Correct.

01:57:09  2   Q.  In fact, you had some managerial responsibility in the

01:57:13  3   records division?

01:57:13  4   A.  I did.

01:57:14  5   Q.  And you developed would it be fair to say familiarity with

01:57:18  6   the policies and the practices of the Chicago Police

01:57:21  7   Department?

01:57:21  8   A.  Yes, sir.

01:57:21  9   Q.  All right.  In this case, you were designated by the City

01:57:25 10   of Chicago to testify about some of the city's policies and

01:57:28 11   practices related to homicide investigations, correct?

01:57:30 12   A.  Correct.

01:57:30 13   Q.  That would include the policies and practices related to

01:57:33 14   the creation of documents and files, the storage and

01:57:37 15   preservation of documents and files and the disclosure of

01:57:41 16   homicide files to prosecutors and the criminal justice system,

01:57:44 17   correct?

01:57:44 18   A.  Correct.

01:57:44 19   Q.  Are those subjects you know a lot about?

01:57:47 20   A.  They are.

01:57:47 21   Q.  In fact, in the 1980s, you were involved personally in

01:57:51 22   writing some of the city's new policies, were you not?

01:57:54 23   A.  I was.

01:57:55 24   Q.  And the general order that got written in 1983,you were

01:57:59 25   the author, right?

11/23/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

12

01:58:00   1   A.  Technically, it was a special order, but, yes, I drafted

01:58:03   2   it.

01:58:03   3   Q.  All right.  I'd like to turn your attention back to the

01:58:05   4   early 1980s.  It is true that the city got put on notice that

01:58:09   5   there was a problem with the way it was handling the topics I

01:58:13   6   mentioned a minute ago, correct?

01:58:14   7   A.  Correct.

01:58:16   8   Q.  That was about 1982?

01:58:17   9   A.  Yes, sir.

01:58:18  10   Q.  There was a case called Jones, correct?

01:58:23  11   A.  Correct.

01:58:25  12        MR. LOEVY:  Should I lead at this point, your Honor?

01:58:27  13        THE COURT:  Sure.

01:58:27  14   BY MR. LOEVY:

01:58:27  15   Q.  There was a case called Jones where a homicide detective

01:58:30  16   disclosed the existence of a street file practice, correct?

01:58:33  17   A.  He submitted a report coming up with an alternative

01:58:43  18   suspect.

01:58:43  19   Q.  And he grew concerned because that report didn't get

01:58:46  20   produced and then he found out about that and he was upset,

01:58:49  21   right?

01:58:50  22   A.  Correct.

01:58:50  23   Q.  And then he made it publicly known that there was an

01:58:53  24   investigative file practice that was problematic, would you

01:58:56  25   agree with that?


        ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 14 of 59 PageID #:30555
***REALTIME UNEDITED TRANSCRIPT ONLY***

13

01:58:56  1    MR. NOLAND:  Objection, your Honor.

01:58:58  2    THE COURT:  Overruled.  You can answer that question.

01:59:01  3    THE WITNESS:  I don't think his objection was to the

01:59:06  4  practice of the Chicago Police Department, but to this

01:59:10  5  particular case in which he had a strong opinion, legitimate

01:59:15  6  strong opinion as to the alternative suspect.

01:59:17  7  BY MR. LOEVY:

01:59:18  8  Q.  And the fact that the document didn't make it into the

01:59:20  9  criminal justice system, right?

01:59:21  10  A.  Correct.

01:59:23  11  Q.  And that put the city on notice?

01:59:25  12    THE COURT:  The document being his report.

01:59:26  13    MR. LOEVY:  Yes.

01:59:27  14  BY MR. LOEVY:

01:59:28  15  Q.  That put the city on notice that there was a problem in

01:59:30  16  need of reform in 1982, correct?

01:59:32  17    MR. NOLAND:  Objection, asked and answered.

01:59:33  18    THE COURT:  Overruled.  You can answer.

01:59:37  19    THE WITNESS:  We became aware of a problem and

01:59:42  20  attempted to address it.

01:59:45  21  BY MR. LOEVY:

01:59:45  22  Q.  And the problem, would it be fair to characterize it, is

01:59:49  23  pertinent information developed in the course of

01:59:52  24  investigations wasn't making it into official police reports?

01:59:55  25  A.  Sometimes.


***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 15 of 59 PageID #:30556

| | | |
|---|---|---|
| 01:59:56 | 1 | Q.  It was being instead in memos and notes that were sort of |
| 02:00:00 | 2 | outside the official system, correct? |
| 02:00:02 | 3 | A.  Sometimes. |
| 02:00:02 | 4 | Q.  Tell the jury what a street file is. |
| 02:00:05 | 5 | A.  Up until 1982, 1983, detectives would take notes, that's |
| 02:00:19 | 6 | what they do, they take notes and they're in the car and |
| 02:00:23 | 7 | they're at crime scenes taking notes, interviewing people |
| 02:00:30 | 8 | taking notes and they put that in a folder.  It's sometimes |
| 02:00:35 | 9 | called a street file or a working file or a running file, but |
| 02:00:42 | 10 | they would prepare an official supplementary report based upon |
| 02:00:50 | 11 | their notes. |
| 02:00:52 | 12 | Q.  Why was that a problem?  The problem was the stuff in the |
| 02:00:57 | 13 | notes wasn't making it into the reports, right? |
| 02:00:59 | 14 | A.  Some of the items in notes were not making it into |
| 02:01:06 | 15 | supplementary reports. |
| 02:01:08 | 16 | Q.  All right.  And you mentioned a minute ago that detectives |
| 02:01:12 | 17 | take notes.  That is what detectives do, right? |
| 02:01:15 | 18 | A.  Yes, sir. |
| 02:01:16 | 19 | Q.  Explain. |
| 02:01:17 | 20 | A.  Taking notes is terribly important.  We all start out with |
| 02:01:31 | 21 | identifiers, you know, what's your name, what's your birthday, |
| 02:01:34 | 22 | what's your address, what's your phone number, what apartment, |
| 02:01:36 | 23 | what floor, what apartment number, how can I find you again, |
| 02:01:41 | 24 | where do you work.  And obviously, no one person can remember |
| 02:01:47 | 25 | the details, so you take notes and it helps you prepare your |

11/23/16 PM   ***REALTIME UNEDITED TRANSCRIPT ONLY***

15

| 02:01:54 | 1 | report at a later time. |
| 02:01:55 | 2 | Q.  And then part of the problem that you were confronting |
| 02:01:58 | 3 | before you made these changes is the detectives were keeping |
| 02:02:01 | 4 | their notes in their locker, the trunk of their car, in |
| 02:02:05 | 5 | miscellaneous places, right? |
| 02:02:06 | 6 | A.  Up until 1983, detectives could keep notes in their locker |
| 02:02:16 | 7 | or in their car or in the trunk of the car or anyplace because |
| 02:02:21 | 8 | the Chicago Police Department had no yet directed that the |
| 02:02:26 | 9 | detectives to preserve notes. |
| 02:02:29 | 10 | Q.  All right.  Another part of the problem I want to focus on |
| 02:02:33 | 11 | is that if the notes were -- if the detectives were allowed to |
| 02:02:37 | 12 | keep their notes, too often the detectives were waiting to see |
| 02:02:41 | 13 | which way the investigation was going to go before they locked |
| 02:02:44 | 14 | in on the paper is that an accurate characterization of the |
| 02:02:47 | 15 | problem in the early '80s? |
| 02:02:49 | 16 | A.  I would disagree with that.  They kept their notes to help |
| 02:02:56 | 17 | them write a report at a later time, not to steer an |
| 02:03:00 | 18 | investigation. |
| 02:03:00 | 19 | Q.  I am not suggesting any steering.  But it was a problem |
| 02:03:04 | 20 | that the notes were not getting into official reports until |
| 02:03:07 | 21 | the arc of the investigation was becoming clearer, would you |
| 02:03:10 | 22 | agree with that characterization? |
| 02:03:12 | 23 | A.  Sometimes, yes. |
| 02:03:13 | 24 | Q.  Obviously, not every time, right? |
| 02:03:15 | 25 | A.  Obviously, not every time. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 17 of 59 PageID #:30558
***REALTIME UNEDITED TRANSCRIPT ONLY***

16

| | | |
|---|---|---|
| 02:03:17 | 1 | Q. But the reason we needed to reform the policies was |
| 02:03:19 | 2 | sometimes in these early '80s in the investigations, the |
| 02:03:25 | 3 | detectives would keep their notes in the file, wait to see |
| 02:03:27 | 4 | which way the wind was blowing with the investigation and only |
| 02:03:30 | 5 | then create reports.  That was a problem that happened |
| 02:03:32 | 6 | sometimes, correct? |
| 02:03:32 | 7 | MR. NOLAND:  Objection. |
| 02:03:33 | 8 | THE COURT:  Sustained, asked and answered. |
| 02:03:34 | 9 | BY MR. LOEVY: |
| 02:03:35 | 10 | Q. When that happened, whole areas of the investigation would |
| 02:03:38 | 11 | be closed off from the official file, would you agree with |
| 02:03:40 | 12 | that? |
| 02:03:40 | 13 | A. What I observed looking at multiple files is that |
| 02:03:49 | 14 | sometimes solid investigative work in the early days, first |
| 02:03:57 | 15 | couple days of an investigation did not make it into the |
| 02:04:02 | 16 | official report. |
| 02:04:06 | 17 | Q. And under the old system, detectives were allowed to |
| 02:04:09 | 18 | destroy their notes, correct? |
| 02:04:11 | 19 | A. Correct. |
| 02:04:13 | 20 | Q. And under the old system, pre 82, 83, would it be fair to |
| 02:04:20 | 21 | say that detectives were treating their notes as sort of their |
| 02:04:22 | 22 | own work product, their own personal property that they didn't |
| 02:04:25 | 23 | have to share? |
| 02:04:26 | 24 | A. Absolutely. |
| 02:04:27 | 25 | Q. And that was something that needed to change, right? |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 18 of 59 PageID #:30559
***REALTIME UNEDITED TRANSCRIPT ONLY***

02:04:30    1    A.  It changed not so much out of need as because of a

02:04:43    2    decision made by the superintendent of police.

02:04:46    3    Q.  Let's focus in on that.  That's around 1982, correct?

02:04:49    4    A.  Yes, sir.

02:04:50    5    Q.  And that's when you got involved in the situation, right?

02:04:52    6    A.  Correct.

02:04:53    7    Q.  Did you go around then and meet with all the commanders in

02:04:57    8    the areas to better understand the scope of the problem?

02:04:59    9    A.  I did.

02:05:00   10    Q.  Can you explain?

02:05:01   11    A.  I personally visited each of these six detective areas

02:05:10   12    because, frankly, there was confusion as to the terminology.

02:05:17   13    Some members called it personal notes, others called it a

02:05:22   14    running file, others simply said, well, it's a copy, it's a

02:05:27   15    copy of a file, oh, it's a street file, so we had this tower

02:05:32   16    of babble as to terminology, and my job was simply to try to

02:05:38   17    get a grasp of what was out there and the fact of the matter

02:05:43   18    is we are talking about the same phenomenon, the need to take

02:05:47   19    notes.

02:05:47   20    Q.  And when you talked about the tower of babble of

02:05:51   21    terminology, I think you meant it might refer to something

02:05:53   22    here, different there, but the practices were also disparate,

02:05:57   23    correct?

02:05:57   24    A.  Everywhere there is a need to take notes.  I don't

02:06:04   25    understand your question.

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 19 of 59 PageID #:30560
***REALTIME UNEDITED TRANSCRIPT ONLY***

18

| | | |
|---|---|---|
| 02:06:05 | 1 | Q.  In other words, in some areas, maybe they would produce |
| 02:06:09 | 2 | certain files, in other areas they might not produce certain |
| 02:06:13 | 3 | files, there is no uniformity and no good system? |
| 02:06:17 | 4 | A.  Regarding notes? |
| 02:06:18 | 5 | Q.  Regarding the production of notes and in the information |
| 02:06:20 | 6 | in the notes to the criminal justice system? |
| 02:06:22 | 7 | A.  There is a very strong policy in place that all the |
| 02:06:27 | 8 | official reports when subpoenaed on when asked for were |
| 02:06:33 | 9 | delivered to the criminal justice system. |
| 02:06:35 | 10 | Q.  That is the permanent retention file of the official |
| 02:06:38 | 11 | signed police reports, right? |
| 02:06:39 | 12 | A.  Correct. |
| 02:06:40 | 13 | Q.  That would get turned over, right? |
| 02:06:42 | 14 | A.  Correct. |
| 02:06:42 | 15 | Q.  But the problem was the investigative materials sometimes |
| 02:06:46 | 16 | weren't getting turned over, right? |
| 02:06:47 | 17 | A.  Correct. |
| 02:06:48 | 18 | Q.  All right.  When you went around to understand the scope |
| 02:06:53 | 19 | of the problem, did you share your analysis with the chief of |
| 02:06:57 | 20 | detectives? |
| 02:06:57 | 21 | A.  I did. |
| 02:06:57 | 22 | Q.  And did you share it with the superintendent? |
| 02:07:00 | 23 | A.  I don't remember having a personal conversation with him, |
| 02:07:06 | 24 | but I know he was briefed. |
| 02:07:08 | 25 | Q.  And so in the early '80s, were the policy makers at the |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 20 of 59 PageID #:30561
***REALTIME UNEDITED TRANSCRIPT ONLY***

19

| | | |
|---|---|---|
| 02:07:12 | 1 | police department aware that there was a problem that needed a |
| 02:07:15 | 2 | fix? |
| 02:07:15 | 3 | A.  Correct. |
| 02:07:16 | 4 | Q.  And was it Breczyek at the time, Richard Breczyek? |
| 02:07:20 | 5 | A.  Richard Breczyek, right. |
| 02:07:23 | 6 | THE COURT:  I am going to ask you to attempt to spell |
| 02:07:25 | 7 | that. |
| 02:07:25 | 8 | THE WITNESS:  B-r-e-c-z-y-e-k-. |
| 02:07:30 | 9 | THE COURT:  Thank you. |
| 02:07:30 | 10 | THE WITNESS:  I think. |
| 02:07:33 | 11 | THE COURT:  Close enough. |
| 02:07:34 | 12 | BY MR. LOEVY: |
| 02:07:34 | 13 | Q.  All right.  The exact problem that you have described what |
| 02:07:39 | 14 | the record keeping was there was a danger that exculpatory |
| 02:07:42 | 15 | materials sometimes weren't getting to the criminal |
| 02:07:44 | 16 | defendants, not always, but sometimes? |
| 02:07:46 | 17 | A.  That exculpatory -- I am having -- could you repeat that, |
| 02:07:56 | 18 | please? |
| 02:07:56 | 19 | Q.  Sure. |
| 02:07:56 | 20 | Information pertinent to an investigation might point |
| 02:08:01 | 21 | at the suspect, it might point away from the suspect, right? |
| 02:08:04 | 22 | A.  Correct. |
| 02:08:04 | 23 | Q.  And you don't know when you write it down, which way |
| 02:08:07 | 24 | that's going to go, right? |
| 02:08:08 | 25 | A.  Correct. |

| | | |
|---|---|---|
| 02:08:08 | 1 | Q.  Because investigations happen linearly, you start at the |
| 02:08:13 | 2 | beginning, and something that seemed totally irrelevant at the |
| 02:08:16 | 3 | beginning might be the key to the case? |
| 02:08:18 | 4 | A.  Correct. |
| 02:08:19 | 5 | Q.  Is that why the Chicago Police Department required all |
| 02:08:20 | 6 | details to be written down? |
| 02:08:21 | 7 | A.  They didn't want to be hiding anything.  They wanted |
| 02:08:32 | 8 | anything that had been taken, recorded, written down to be |
| 02:08:38 | 9 | preserved. |
| 02:08:38 | 10 | Q.  And produced? |
| 02:08:40 | 11 | A.  Produced. |
| 02:08:41 | 12 | Q.  Because that's really the other half of it, isn't it? |
| 02:08:43 | 13 | It's not good enough to just write it down if you don't figure |
| 02:08:46 | 14 | out a way to get it to the defendants, would you agree? |
| 02:08:49 | 15 | A.  I agree. |
| 02:08:49 | 16 | Q.  All right.  Do you remember if Breczyek issued a teletype |
| 02:08:55 | 17 | in 1982? |
| 02:08:56 | 18 | A.  He did. |
| 02:08:57 | 19 | Q.  Tell the jury what the teletype said? |
| 02:08:59 | 20 | A.  First of all, a teletype is the predecessor of a fax |
| 02:09:08 | 21 | machine. |
| 02:09:08 | 22 | THE COURT:  Which is a predecessor of four other |
| 02:09:11 | 23 | things. |
| 02:09:11 | 24 | THE WITNESS:  But it was the state of the art |
| 02:09:14 | 25 | communication mechanism for the Chicago Police Department to |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 22 of 59 PageID #:30563
***REALTIME UNEDITED TRANSCRIPT ONLY***

21

| | | |
|---|---|---|
| 02:09:19 | 1 | make the superintendent of police to make a quick announcement |
| 02:09:24 | 2 | regarding a policy or a procedure. |
| 02:09:26 | 3 | BY MR. LOEVY: |
| 02:09:27 | 4 | Q. And what was Breczyek's announcement in 1982? |
| 02:09:29 | 5 | A. Preserve all investigative files. |
| 02:09:33 | 6 | Q. And what precipitated that, if you know? |
| 02:09:36 | 7 | A. It was a result of a policy decision he announced at a |
| 02:09:47 | 8 | temporary restraining order hearing. |
| 02:09:48 | 9 | Q. That was in court, the city was put on notice, we got to |
| 02:09:52 | 10 | do a better job, right? |
| 02:09:54 | 11 | A. We were in court in this building and he decided to go a |
| 02:10:02 | 12 | step further then what was required. |
| 02:10:04 | 13 | Q. All right. Would you agree that organizations can be |
| 02:10:10 | 14 | resistant to changes? |
| 02:10:11 | 15 | A. Yes, I do. |
| 02:10:12 | 16 | Q. And detectives, the division was not immune to that |
| 02:10:16 | 17 | sentiment, was it? |
| 02:10:17 | 18 | A. Correct. |
| 02:10:18 | 19 | Q. Because they had throughout the '70s and early '80s, they |
| 02:10:22 | 20 | had gotten used to treating their notes as something they |
| 02:10:24 | 21 | didn't have to share, that was ingrained, was it not? |
| 02:10:27 | 22 | A. It was. |
| 02:10:27 | 23 | Q. Can you explain the problem to the jury; the phenomenon |
| 02:10:33 | 24 | that there was this ingrained entrenched problem? |
| 02:10:36 | 25 | MR. NOLAND: Objection, argumentative. |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 23 of 59 PageID #:30564

| | |
|---|---|
| 02:10:38 | 1 |
| 02:10:40 | 2 |
| 02:10:45 | 3 |
| 02:10:47 | 4 |
| 02:10:48 | 5 |
| 02:10:52 | 6 |
| 02:10:57 | 7 |
| 02:11:00 | 8 |
| 02:11:01 | 9 |
| 02:11:08 | 10 |
| 02:11:16 | 11 |
| 02:11:18 | 12 |
| 02:11:18 | 13 |
| 02:11:19 | 14 |
| 02:11:26 | 15 |
| 02:11:33 | 16 |
| 02:11:38 | 17 |
| 02:11:41 | 18 |
| 02:11:46 | 19 |
| 02:11:50 | 20 |
| 02:11:53 | 21 |
| 02:12:00 | 22 |
| 02:12:07 | 23 |
| 02:12:13 | 24 |
| 02:12:17 | 25 |

1    THE COURT:  Well, I think he just explained.  I think
2  he just explained it to the answer to his last question.  If
3  you want to ask another question, go ahead.
4  BY MR. LOEVY:
5  Q.  All right.  There was also problems that the department
6  had with subpoenas not resulting in the information making it
7  to the criminal defendants, correct?
8    MR. NOLAND:  Objection, foundation.
9    THE COURT:  Overruled.  You can answer it.
10    THE WITNESS:  The reports were all being delivered,
11  they customarily had them.
12  BY MR. LOEVY:
13  Q.  The official reports?
14  A.  The official reports.  Up until 1983, there was no
15  requirement to preserve any investigative notes or memoranda,
16  so you couldn't produce that which we never had control over.
17  Q.  I mean, you could sometimes if somebody was sitting there
18  and a subpoena came in, they might produce a file, right?
19  They weren't prohibited from producing the file, right?
20  A.  No, but the Chicago Police Department had not even
21  acknowledged that we had such a reciprocal or such a record.
22  Q.  Was there a decentralization problem?
23  A.  Records in the Chicago Police Department have been
24  decentralized but that does not necessarily mean there was a
25  problem.

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 24 of 59 PageID #:30565

***REALTIME UNEDITED TRANSCRIPT ONLY***

23

| | | |
|---|---|---|
| 02:12:17 | 1 | Q. All right. But the police department would you agree was |
| 02:12:20 | 2 | not doing a very good job of ensuring that if a criminal |
| 02:12:23 | 3 | defendant sent a subpoena that all the possible areas for |
| 02:12:26 | 4 | documents were being checked? |
| 02:12:27 | 5 | A. I would think we did a fairly good job of responding to |
| 02:12:35 | 6 | subpoenas if someone wanted a crime scene photo, we would |
| 02:12:40 | 7 | deliver that. If they wanted reports, we would deliver that. |
| 02:12:44 | 8 | Q. It was kind of ad hoc, though, was it not? |
| 02:12:47 | 9 | A. No, it was very formalized, but ditch records were kept in |
| 02:12:54 | 10 | different units. |
| 02:12:56 | 11 | Q. That's what I think I meant by decentralized, right? |
| 02:12:59 | 12 | A. Correct. |
| 02:12:59 | 13 | Q. So one clerk might not know what's going on over there, |
| 02:13:04 | 14 | another clerk might not know what's going on over there, that |
| 02:13:07 | 15 | was problem? |
| 02:13:07 | 16 | A. An individual clerk might not know, but the subpoena |
| 02:13:10 | 17 | officer did know. |
| 02:13:11 | 18 | Q. All right. In any event, when you got involved, there was |
| 02:13:14 | 19 | a problem that needed to be solved in 1983, correct? |
| 02:13:17 | 20 | A. Correct. |
| 02:13:17 | 21 | Q. And you were the one who authored a written policy change? |
| 02:13:22 | 22 | A. Correct. |
| 02:13:22 | 23 | Q. Did the policy change in 1983 make any changes about notes |
| 02:13:26 | 24 | and memos? |
| 02:13:27 | 25 | A. It for the first time made a statement that notes were to |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 25 of 59 PageID #:30566
***REALTIME UNEDITED TRANSCRIPT ONLY***

24

| | | |
|---|---|---|
| 02:13:36 | 1 | be considered the work product of the Chicago Police |
| 02:13:41 | 2 | Department and that they were to be preserved and to be |
| 02:13:45 | 3 | preserved in a certain procedural manner.  You will do this |
| 02:13:51 | 4 | with them. |
| 02:13:52 | 5 | Q.  Are detectives, if they're doing a long investigation and |
| 02:13:58 | 6 | they're talking to people, is it required now under your new |
| 02:14:02 | 7 | policy that they take notes? |
| 02:14:03 | 8 | A.  No. |
| 02:14:04 | 9 | Q.  I am going to show you 83-2. |
| 02:14:11 | 10 | THE COURT:  What's the exhibit number? |
| 02:14:12 | 11 | MR. LOEVY:  I'm sorry.  This is Exhibit 209. |
| 02:14:14 | 12 | BY MR. LOEVY: |
| 02:14:14 | 13 | Q.  This is your special order, the second version, 83-2, |
| 02:14:17 | 14 | correct? |
| 02:14:18 | 15 | A.  Correct. |
| 02:14:18 | 16 | Q.  I am going to hand you a copy so you can have it at your |
| 02:14:24 | 17 | disposal as well.  Now, I want to turn your attention to three |
| 02:14:31 | 18 | here, the policy.  Additionally, it is the policy of the |
| 02:14:34 | 19 | Chicago Police Department to record and preserve any relevant |
| 02:14:37 | 20 | information obtained by any detective during the course of a |
| 02:14:42 | 21 | violent crime field investigation.  Do you see that, sir? |
| 02:14:46 | 22 | A.  Yes, I do. |
| 02:14:48 | 23 | Q.  Why did you under line any and any? |
| 02:14:50 | 24 | A.  To stress the point that we wanted most everything that |
| 02:15:04 | 25 | was relevant saved. |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 26 of 59 PageID #:30567
***REALTIME UNEDITED TRANSCRIPT ONLY***

25

02:15:07  1   Q.  And when assigned to violent crimes?

02:15:11  2   A.  Any detective, whether it be detective was assigned to

02:15:15  3   auto case or came across information that was not theirs.

02:15:18  4   Q.  And this also added the requirement to preserve and record

02:15:22  5   information and materials obtained in the course of the

02:15:25  6   investigation, correct?

02:15:26  7   A.  Correct.

02:15:27  8   Q.  To assure not only that the materials indicating the guilt

02:15:32  9   are preserved but also information that may tend to show

02:15:36  10  possible innocence or aid in the defense, correct?

02:15:39  11  A.  Correct.

02:15:39  12  Q.  Now, if two, three, four, five days are going to go by

02:15:45  13  between when a detective interviews a bunch of people and they

02:15:48  14  write a report, do they have to take notes in by the way, when

02:15:54  15  I say they have to, I am saying in the policies and practices

02:15:58  16  of the Chicago Police Department, did they contemplate a

02:16:00  17  detective would take notes if, say, four days were going to go

02:16:03  18  by between interviews and a report?

02:16:06  19  A.  Sure.  The field interview is conducted early in the day

02:16:15  20  or late in the day, and it's time to go home.  It might be

02:16:20  21  their days off for the next couple days by the time they come

02:16:24  22  back, they will get back on the case.

02:16:26  23  Q.  So it was contemplated that people would record notes,

02:16:31  24  correct?

02:16:32  25  A.  To record notes.  If I can remember everything from an

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 27 of 59 PageID #:30568
11/23/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

26

| 02:16:38 | 1 | interview, then I don't have to write things down.  I |
| 02:16:42 | 2 | personally am a note taker. |
| 02:16:44 | 3 | Q.  Well, I want to know what the policies and practices of |
| 02:16:46 | 4 | the police department was.  Let's say a detective is going to |
| 02:16:49 | 5 | make a report three days later, was there an expectation that |
| 02:16:53 | 6 | the detective had to take notes or not?  What was the policy? |
| 02:16:56 | 7 | A.  Take notes on day one? |
| 02:16:57 | 8 | Q.  Yes. |
| 02:16:58 | 9 | A.  If it was something that should be recorded, I've talked |
| 02:17:05 | 10 | to you and you've told me nothing, I haven't heard before. |
| 02:17:10 | 11 | Q.  Let's limit it because it's late in the day to relevant |
| 02:17:12 | 12 | information, a person gets relevant information, they are not |
| 02:17:15 | 13 | going to be able to write a report until three or four days |
| 02:17:19 | 14 | later, are they supposed to take notes? |
| 02:17:20 | 15 | A.  Correct, yes. |
| 02:17:21 | 16 | Q.  Is there any equivocation that the policy of the police |
| 02:17:25 | 17 | department required that? |
| 02:17:26 | 18 | A.  If the information is relevant, notes should be taken. |
| 02:17:31 | 19 | Q.  And that's the practice as well, policy and the practice? |
| 02:17:34 | 20 | A.  Yes. |
| 02:17:35 | 21 | Q.  All right.  The notes under your new special order, there |
| 02:17:39 | 22 | was a specific format by which the notes were going to be |
| 02:17:43 | 23 | taken, correct? |
| 02:17:44 | 24 | A.  Correct. |
| 02:17:44 | 25 | Q.  Explain to the jury what a GPR is, a general progress |

11/23/16 PM  Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 28 of 59 PageID #:30569
***REALTIME UNEDITED TRANSCRIPT ONLY***

27

| | | |
|---|---|---|
| 02:17:48 | 1 | report.  This is E,.  Without looking at the definition, you |
| 02:17:53 | 2 | can probably explain it faster than we can read it. |
| 02:17:57 | 3 | A.  It's an 8 and a half piece of paper, multiple lines on it, |
| 02:18:03 | 4 | in the upper right-hand corner it has the case number, the |
| 02:18:09 | 5 | case identifier, and at the bottom, it has the detective's |
| 02:18:14 | 6 | name and the date that it was generated or submitted, I forget |
| 02:18:22 | 7 | which, and then lastly, there is a space for a supervisor to |
| 02:18:27 | 8 | acknowledge receipt. |
| 02:18:29 | 9 | Q.  All right.  And I put on the screen Plaintiff's Exhibit |
| 02:18:33 | 10 | which I believe is Defendant's Exhibit 70.  This is an example |
| 02:18:36 | 11 | of a general progress report, correct? |
| 02:18:38 | 12 | A.  It is. |
| 02:18:38 | 13 | Q.  And you are supposed to record the date and then you talk |
| 02:18:43 | 14 | about the bottom, that's when the supervisor receives it and |
| 02:18:46 | 15 | then dates it, correct? |
| 02:18:47 | 16 | A.  Correct. |
| 02:18:47 | 17 | Q.  Now, after 83-1, were detectives supposed to take notes on |
| 02:18:55 | 18 | these forms? |
| 02:18:56 | 19 | A.  They were. |
| 02:18:56 | 20 | Q.  And the reason they were supposed to take notes on these |
| 02:19:00 | 21 | forms is because then their notes became part of the actual |
| 02:19:03 | 22 | file, right? |
| 02:19:03 | 23 | A.  Correct. |
| 02:19:03 | 24 | Q.  Was that practice followed, did detectives take notes on |
| 02:19:06 | 25 | this GPR or did the old ways persist? |

11/23/16 PM    Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 29 of 59 PageID #:30570
***REALTIME UNEDITED TRANSCRIPT ONLY***

28

| | | |
|---|---|---|
| 02:19:09 | 1 | A.  For the great, great great majority of times, the practice |
| 02:19:19 | 2 | was to use the general progress reports.  I have seen examples |
| 02:19:25 | 3 | and sometimes they will just use a blank piece of paper as |
| 02:19:29 | 4 | opposed to the official lined note pad. |
| 02:19:32 | 5 | Q.  But this is what -- this was actually followed, when |
| 02:19:37 | 6 | detectives took notes, they took notes on this kind of form is |
| 02:19:41 | 7 | your understanding of the practice, right? |
| 02:19:42 | 8 | A.  Yes, sir. |
| 02:19:42 | 9 | Q.  And then the GPRs, general progress reports, were provided |
| 02:19:49 | 10 | to the criminal defendants in criminal discovery, correct? |
| 02:19:52 | 11 | A.  As part of the investigative file turnover. |
| 02:19:55 | 12 | Q.  All right.  There's a signature thing at the bottom you |
| 02:20:00 | 13 | said for the officer and then received by a supervisor.  You |
| 02:20:03 | 14 | described that? |
| 02:20:04 | 15 | A.  Yes. |
| 02:20:04 | 16 | Q.  Is it supposed to be the same person? |
| 02:20:08 | 17 | THE COURT:  Why don't you put the document up. |
| 02:20:11 | 18 | THE WITNESS:  It's intended to be a supervisor. |
| 02:20:15 | 19 | Received by a supervisor. |
| 02:20:17 | 20 | BY MR. LOEVY: |
| 02:20:18 | 21 | Q.  On a police report, it's got to be two separate people, |
| 02:20:22 | 22 | right, on an official supp report? |
| 02:20:25 | 23 | A.  On a supplementary report, we have the author, one of the |
| 02:20:29 | 24 | detectives, and then approved by their supervisor. |
| 02:20:35 | 25 | Q.  So a supp report really needs two signatures, right? |

11/23/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

                                                                29

02:20:38   1   A.  It does.

02:20:38   2   Q.  And on a GPR, you can sometimes get away with one

02:20:41   3   signature, is that kind of what you're suggesting?

02:20:43   4   A.  Only if the submitter is the supervisor.

02:20:47   5   Q.  All right.  Are GPRs substitutes for official supp

02:20:54   6   reports?

02:20:54   7   A.  They are not.

02:20:55   8   Q.  If you create notes on a GPR and it's pertinent to your

02:21:00   9   investigation, do the policies and practices require you to

02:21:04  10   transform your notes into an official police report?

02:21:06  11   A.  Not all of them.

02:21:09  12   Q.  Well, I did put the qualifier on, pertinent.  Let's call

02:21:14  13   relevant information, if you agree that it must, and I use the

02:21:17  14   word must, relevant and pertinent information must go from a

02:21:21  15   GPR into a supp report under the policy that you enacted or

02:21:25  16   you drafted?

02:21:25  17   A.  I would agree that relevant information so long as it's

02:21:32  18   still relevant at the time the report is prepared, yes.

02:21:35  19   Q.  Must, must be put into a police report?

02:21:37  20   A.  Yes.

02:21:38  21   Q.  Where did the GPRs, the notes, where did the notes go once

02:21:51  22   they are created?

02:21:52  23   A.  The notes which are placed on the GPR go into an

02:21:59  24   investigative file for that particular case.

02:22:06  25   Q.  And then how does the investigative file get produced to

                   ***REALTIME UNEDITED TRANSCRIPT ONLY***

| | | |
|---|---|---|
| 02:22:11 | 1 | the criminal defendant? |
| 02:22:12 | 2 | A.  Through the prosecutor. |
| 02:22:19 | 3 | Q.  How does the police department get the investigative file |
| 02:22:22 | 4 | to the prosecutor? |
| 02:22:22 | 5 | A.  The prosecutor would either request or orally request or |
| 02:22:31 | 6 | submit a subpoena and the Chicago Police Department would fill |
| 02:22:38 | 7 | the subpoena request or the telephonic request and physically |
| 02:22:44 | 8 | deliver the requested documents to the prosecutor. |
| 02:22:49 | 9 | Q.  Now, the GPRs in the investigative file are kept in a |
| 02:22:53 | 10 | different place than the official supp reports that go to the |
| 02:22:57 | 11 | permanent retention, correct? |
| 02:22:58 | 12 | A.  They are. |
| 02:22:58 | 13 | Q.  So when you make an official supp report, it gets |
| 02:23:01 | 14 | submitted, right? |
| 02:23:02 | 15 | A.  Yes. |
| 02:23:03 | 16 | Q.  And it gets a date stamp, correct? |
| 02:23:06 | 17 | A.  Whatever the records division does, yes. |
| 02:23:08 | 18 | Q.  They do what they do.  Then it goes into the permanent |
| 02:23:11 | 19 | retention file? |
| 02:23:12 | 20 | A.  Correct. |
| 02:23:12 | 21 | Q.  The GPR notes don't follow that track? |
| 02:23:15 | 22 | A.  They do not. |
| 02:23:15 | 23 | Q.  They stay in the detective division until the |
| 02:23:19 | 24 | investigative file gets produced in criminal discovery, |
| 02:23:22 | 25 | correct? |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 32 of 59 PageID #:30573

| | | |
|---|---|---|
| 02:23:22 | 1 | A.  Correct. |
| 02:23:22 | 2 | Q.  How quickly are detectives supposed to transfer the |
| 02:23:28 | 3 | relevant and pertinent information in their GPR notes into |
| 02:23:32 | 4 | supp reports? |
| 02:23:32 | 5 | A.  Promptly, normally by the end of their shift. |
| 02:23:38 | 6 | Q.  Are they allowed to sit on important notes and not put |
| 02:23:42 | 7 | them into supp reports? |
| 02:23:43 | 8 | A.  You are not always going to be writing a supplementary |
| 02:23:50 | 9 | report every tour of duty. |
| 02:23:52 | 10 | Q.  I understand. |
| 02:23:53 | 11 | You know, if it's really relevant, like, hey, |
| 02:23:56 | 12 | somebody confessed to a crime, or, you know, something that |
| 02:23:59 | 13 | relevant, end of the shift is the expectation? |
| 02:24:02 | 14 | A.  Yes, sir. |
| 02:24:02 | 15 | Q.  That that becomes a supp report. |
| 02:24:05 | 16 | The permanent retention file, those are, as the same |
| 02:24:20 | 17 | suggests, permanent, right? |
| 02:24:22 | 18 | A.  Correct. |
| 02:24:22 | 19 | Q.  That can't be altered or changed after the fact, right? |
| 02:24:27 | 20 | A.  Correct. |
| 02:24:27 | 21 | Q.  Are GPRs supposed to be altered or changed after the fact? |
| 02:24:31 | 22 | A.  No, they are not. |
| 02:24:32 | 23 | Q.  But the GPRs are kept in a manner that they're more |
| 02:24:38 | 24 | amenable to being rewritten, would you agree with that? |
| 02:24:42 | 25 | MR. NOLAND:  Objection, Judge. |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 33 of 59 PageID #:30574
11/23/16 PM        ***REALTIME UNEDITED TRANSCRIPT ONLY***

32

| 02:24:44 | 1 | THE COURT:  Sustained. |
| 02:24:45 | 2 | BY MR. LOEVY: |
| 02:24:45 | 3 | Q.  The GPRs are kept in a file folder in the detective's |
| 02:24:48 | 4 | division, right? |
| 02:24:49 | 5 | A.  They are. |
| 02:24:49 | 6 | Q.  So if a detective wanted to rewrite his notes, it would be |
| 02:24:52 | 7 | easier to do that than to get the official police report out |
| 02:24:55 | 8 | of the records division, do you agree with that? |
| 02:24:57 | 9 | MR. NOLAND:  Objection. |
| 02:24:58 | 10 | THE COURT:  Overruled.  He can answer. |
| 02:25:00 | 11 | THE WITNESS:  Once the GPR notes are submitted, you |
| 02:25:06 | 12 | are not going to get them back from the supervisor knowingly. |
| 02:25:12 | 13 | BY MR. LOEVY: |
| 02:25:12 | 14 | Q.  Unless you are the supervisor, I guess, right? |
| 02:25:15 | 15 | MR. NOLAND:  Objection, Judge.  Argumentative. |
| 02:25:17 | 16 | THE COURT:  Sustained. |
| 02:25:17 | 17 | BY MR. LOEVY: |
| 02:25:19 | 18 | Q.  All right.  In the GPR -- in the investigative file, there |
| 02:25:22 | 19 | is an inventory, is there not? |
| 02:25:23 | 20 | A.  There is. |
| 02:25:25 | 21 | Q.  Tell the jury quickly what the inventory is. |
| 02:25:29 | 22 | A.  The inventory is another 8 and a half by 11 piece of |
| 02:25:37 | 23 | paper.  It says -- it's supposed to function, it has a lot of |
| 02:25:43 | 24 | lines on it, and it's supposed to function as a case index. |
| 02:25:48 | 25 | In other words, that which you might find.  And the |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 34 of 59 PageID #:30575

| | | |
|---|---|---|
| 02:25:55 | 1 | investigative file inventory in the investigative file is |
| 02:25:59 | 2 | actually on the left-hand side of the file as you open it up |
| 02:26:04 | 3 | and all of these documents are on the right-hand side. |
| 02:26:08 | 4 | Q. I have put on the screen, sir, Plaintiff's Exhibit 194. |
| 02:26:11 | 5 | This is an example of an inventory from the Smith/Hickman |
| 02:26:14 | 6 | case. Do you see it? |
| 02:26:15 | 7 | A. From whatever case, yes. |
| 02:26:18 | 8 | Q. Whatever case. You don't know -- |
| 02:26:20 | 9 | A. No, I don't. |
| 02:26:21 | 10 | Q. All right. But these are GPRs and supp reports supposed |
| 02:26:26 | 11 | to be indexed on this type of inventory? |
| 02:26:28 | 12 | A. Yes. |
| 02:26:28 | 13 | Q. Is it mandatory? |
| 02:26:29 | 14 | A. Yes. |
| 02:26:29 | 15 | Q. Was that practice followed? |
| 02:26:31 | 16 | A. I have seen evidence that it's followed, yes. |
| 02:26:38 | 17 | Q. Have you seen evidence that it hasn't been followed? |
| 02:26:41 | 18 | A. There are occasional omissions. |
| 02:26:45 | 19 | Q. Would you characterize that as a pretty extraordinary |
| 02:26:48 | 20 | exception? |
| 02:26:49 | 21 | MR. NOLAND: Objection, foundation. |
| 02:26:50 | 22 | THE COURT: Sustained. |
| 02:26:52 | 23 | BY MR. LOEVY: |
| 02:26:53 | 24 | Q. You have reviewed and under taken an analysis of the |
| 02:26:56 | 25 | situation, have you not? |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 35 of 59 PageID #:30576

| | | |
|---|---|---|
| 02:26:57 | 1 | A. Not post. I have looked at multiple files over the years, |
| 02:27:06 | 2 | but not like 1983 where I was really digging into them. |
| 02:27:11 | 3 | Q. In '83, was the practice followed uniformly? |
| 02:27:14 | 4 | A. I think we gave it a pretty good shot. |
| 02:27:18 | 5 | Q. All right. Your policy was enacted in February of '83, |
| 02:27:25 | 6 | correct? |
| 02:27:25 | 7 | A. Yes, sir. |
| 02:27:27 | 8 | Q. And then it was rewritten in May, correct? |
| 02:27:31 | 9 | A. Yes. |
| 02:27:31 | 10 | Q. And in between, do you have knowledge of what precipitated |
| 02:27:36 | 11 | the change? |
| 02:27:37 | 12 | A. It was an early new procedure. We were in regular |
| 02:27:47 | 13 | communication with our attorneys in the Chicago department of |
| 02:27:52 | 14 | law, as well as with the plaintiff's attorneys, and also the |
| 02:28:01 | 15 | outside counsel hired by the City of Chicago. So multiple |
| 02:28:07 | 16 | people were making suggestions, and as a result, we made some |
| 02:28:14 | 17 | tweaks to it in May of 1983. |
| 02:28:17 | 18 | Q. Are you aware of any litigation in this building in |
| 02:28:20 | 19 | between the two versions that had any effect on your |
| 02:28:23 | 20 | revisions? |
| 02:28:24 | 21 | A. No, I am not. Conversations continued. |
| 02:28:28 | 22 | Q. All right. Let's talk about audits. Your policy also |
| 02:28:31 | 23 | contemplated that there would be an audit to see if it was |
| 02:28:34 | 24 | working, right? |
| 02:28:35 | 25 | A. I don't know if I put audit in there. I had that the |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 36 of 59 PageID #:30577
***REALTIME UNEDITED TRANSCRIPT ONLY***

35

02:28:45   1   files were under the direct administrative control of the

02:28:49   2   violent crimes lieutenants.

02:28:52   3   Q.  Do you remember giving testimony at an earlier hearing in

02:28:55   4   this case, April 2014, this is page 2057, lines 16 through 19.

02:29:01   5   Oh, that's the wrong page.

02:29:06   6          Did I give you the copy of '831?  Do you have it up

02:29:09   7   there?

02:29:10   8   A.  I do not.

02:29:10   9          THE COURT:  He has 83-2.

02:29:13  10   BY MR. LOEVY:

02:29:14  11   Q.  Here is 83-1.  Can you take a look at 83-1.

02:29:33  12          In any event -- it's in '86-3, different policy.

02:29:39  13   That's why you can't find it.  Was there an audit provision in

02:29:42  14   '86-3?

02:29:43  15   A.  In 1986, a section was added making it a requirement for

02:29:50  16   exempt commanding officers to conduct random inspections of

02:29:57  17   the investigative files.

02:29:58  18   Q.  All right.  And audits are important because if you have

02:30:05  19   policies on the books, you have to make sure they are being

02:30:07  20   followed, right?

02:30:08  21   A.  Right.

02:30:08  22   Q.  And you are not aware of any -- although the provision

02:30:12  23   provided for audits, you are not aware of any audits that

02:30:18  24   actually happened?

02:30:18  25   A.  Correct.

11/23/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

36

02:30:19   1   Q.  As you sit here today, you don't know if the department

02:30:22   2   took your suggestion to make audits, correct?

02:30:24   3   A.  I don't know if I ever made an audit recommendation.

02:30:29   4   Q.  All right.  This is Plaintiff's Exhibit 5, page 3.  This

02:30:40   5   is 86.3.  Inspection.  The instructions contained in this

02:30:46   6   directive will be strictly adhered to except members of the

02:30:50   7   detective division will conduct periodic, unscheduled

02:30:53   8   inspections of the subject files to ensure compliance.  That

02:30:56   9   was included in the 86 version, correct?

02:30:59  10   A.  Correct.

02:30:59  11   Q.  Now, there was some training when you made the change in

02:31:06  12   '83, correct?

02:31:07  13   A.  Yes, there was.

02:31:07  14   Q.  It was a three-hour training, one per detective, correct?

02:31:12  15   A.  Every detective was required to attend.

02:31:14  16   Q.  Was that three-hour training enough to change the culture

02:31:19  17   and the practices that we have talked about?

02:31:20  18   A.  I think it did change the way we handled notes and the way

02:31:31  19   we controlled enter watch memoranda.  I think the message was

02:31:37  20   delivered.

02:31:38  21   Q.  Would it be accurate that between 83 and you changed all

02:31:44  22   the way through the 2000s, the subpoena response system

02:31:47  23   basically stayed the same?

02:31:50  24   A.  The subpoena response system evolved insofar as they added

02:32:00  25   investigative files as part of their services, investigative

                     ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 38 of 59 PageID #:30579
***REALTIME UNEDITED TRANSCRIPT ONLY***

37

02:32:05  1  file retrieval.  Prior to that, it didn't exist.  And then

02:32:11  2  after that, it was part of our culture.

02:32:13  3  Q.  And the culture didn't change on a dime overnight, would

02:32:16  4  you agree with that?

02:32:17  5  A.  I disagree because this was a major change.  This idea

02:32:26  6  that you would have, you know, the work product, your notes

02:32:30  7  are no longer your personal property, so as of a certain date,

02:32:37  8  it's now work product of the Chicago Police Department, and we

02:32:40  9  have an obligation to preserve it and deliver it when asked

02:32:44  10  for.

02:32:45  11  Q.  And create it, preserve it and deliver it, right?

02:32:49  12  A.  When it's relevant information, yes.

02:32:50  13  Q.  All right.  But I want to return to the question.

02:32:54  14  Although that was the policy you wrote and it was on the

02:32:57  15  books, you don't have a foundation to say that every detective

02:33:00  16  immediately changed their practices, do you?

02:33:03  17        MR. NOLAND:  Objection, argumentative.

02:33:04  18        THE COURT:  Overruled.

02:33:06  19        THE WITNESS:  Of course, I don't know if every

02:33:11  20  detective followed it.

02:33:11  21  BY MR. LOEVY:

02:33:12  22  Q.  All right.  I am going to show you a copy of Plaintiff's

02:33:14  23  Exhibit 1.  This is a file you've seen at a deposition in this

02:33:16  24  case, correct?

02:33:17  25  A.  Yes, sir.

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 39 of 59 PageID #:30580
***REALTIME UNEDITED TRANSCRIPT ONLY***

38

| | | |
|---|---|---|
| 02:33:20 | 1 | Q. And in it there are notes and there are memos, are there |
| 02:33:24 | 2 | not? |
| 02:33:24 | 3 | A. Yes. |
| 02:33:31 | 4 | Q. And like this memorandum, for example, this undated hem |
| 02:33:43 | 5 | dumb, Plaintiff's Exhibit 104, this is an example of the bad |
| 02:33:48 | 6 | kind, right? |
| 02:33:52 | 7 | MR. NOLAND: Objection. |
| 02:33:52 | 8 | THE COURT: Why don't you rephrase that. |
| 02:33:56 | 9 | BY MR. LOEVY: |
| 02:33:56 | 10 | Q. The in old days, detectives were communicating with each |
| 02:34:00 | 11 | other with to/froms that weren't making it into the initial |
| 02:34:04 | 12 | supps? |
| 02:34:05 | 13 | A. Correct. |
| 02:34:05 | 14 | Q. And your policy was to change that? |
| 02:34:08 | 15 | A. The policy of the police department. |
| 02:34:10 | 16 | Q. The one you offered? |
| 02:34:10 | 17 | A. Yes. |
| 02:34:11 | 18 | Q. And the kind of handwritten notes that you talked about, |
| 02:34:17 | 19 | this is Plaintiff's Exhibit 1, page 69, the Edward brothers |
| 02:34:21 | 20 | were heard in the stairwell that they're going to put on masks |
| 02:34:26 | 21 | and then being placed in an investigative file, that was |
| 02:34:29 | 22 | another kind of thing that was supposed to have stopped in |
| 02:34:32 | 23 | '83, correct? |
| 02:34:32 | 24 | A. Correct. |
| 02:34:33 | 25 | Q. And you have seen this file, have you not? |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 40 of 59 PageID #:30581
11/23/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

39

| | | |
|---|---|---|
| 02:34:34 | 1 | A.  I have. |
| 02:34:34 | 2 | Q.  And it doesn't have an inventory, does it? |
| 02:34:39 | 3 | A.  That particular file doesn't have an inventory. |
| 02:34:42 | 4 | Q.  This is an example of the kind of street file that your |
| 02:34:44 | 5 | policy was supposed to have prohibited, isn't it? |
| 02:34:47 | 6 | A.  We wanted it in a different format. |
| 02:34:54 | 7 |         MR. LOEVY:  I have no further questions. |
| 02:34:55 | 8 |         THE COURT:  Mr. Noland. |
| 02:34:57 | 9 |                     - - - |
| 02:34:57 | 10 |         JAMES K. HICKEY, CROSS-EXAMINATION |
| 02:34:57 | 11 | BY MR. NOLAND: |
| 02:35:12 | 12 | Q.  Mr. Hickey, I'm going to show you Plaintiff's Exhibit 86. |
| 02:35:24 | 13 | Can you explain to the ladies and gentlemen of the jury what |
| 02:35:26 | 14 | that is? |
| 02:35:26 | 15 | A.  This is the permanent retention file for a homicide which |
| 02:35:32 | 16 | occurred on the 28th of April 1984. |
| 02:35:37 | 17 | Q.  And what's a permanent retention file?  Would that also be |
| 02:35:41 | 18 | called the records division file? |
| 02:35:42 | 19 | A.  It would. |
| 02:35:43 | 20 | Q.  And can you explain what that file is? |
| 02:35:46 | 21 | A.  This file is a copy -- excuse me.  This file contains the |
| 02:35:53 | 22 | original reports, the original beat officer reports, the |
| 02:35:59 | 23 | reports written by the officers in blue.  Normally, printed, |
| 02:36:07 | 24 | and then any supplementary reports written by other unit |
| 02:36:12 | 25 | personnel such as the detectives. |

| | | |
|---|---|---|
| 02:36:14 | 1 | Q. And Mr. Loevy spent a significant amount of time talking a |
| 02:36:23 | 2 | policy if place before the policy you wrote, before our case. |
| 02:36:28 | 3 | Do you remember those questions? |
| 02:36:29 | 4 | A. Yes, I do. |
| 02:36:30 | 5 | Q. Now, Mr. Hickey, was there anything wrong with a detective |
| 02:36:35 | 6 | before the new policy, before 83-1, taking notes, using those |
| 02:36:41 | 7 | notes to record relevant information about the case into a |
| 02:36:45 | 8 | supplementary report and submitting that supplementary report |
| 02:36:49 | 9 | to the records division for inclusion in a file to be tendered |
| 02:36:54 | 10 | in discovery? |
| 02:36:54 | 11 | A. Nothing. |
| 02:36:55 | 12 | Q. Is it your understanding that was the way it was commonly |
| 02:36:58 | 13 | done through other major municipalities in the 1970s time |
| 02:37:04 | 14 | frame before Chicago changed in January 1983? |
| 02:37:08 | 15 | A. Correct. |
| 02:37:08 | 16 | Q. In 1982, 1983, when you got involved with this and you |
| 02:37:16 | 17 | were tasked with writing a new policy on behalf of the City of |
| 02:37:19 | 18 | Chicago, the Chicago Police Department? |
| 02:37:21 | 19 | A. Yes, sir. |
| 02:37:21 | 20 | Q. Now, were there any other policies nationwide that you |
| 02:37:26 | 21 | could crib off of and kind of use as a cheat sheet and say New |
| 02:37:31 | 22 | York is doing this, San Francisco is doing this, I can just |
| 02:37:35 | 23 | take their where they are keeping all their notes so I can |
| 02:37:37 | 24 | save myself some time, was there anything like that? |
| 02:37:40 | 25 | MR. LOEVY: Objection, relevance. |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 42 of 59 PageID #:30583
***REALTIME UNEDITED TRANSCRIPT ONLY***

41

| | | |
|---|---|---|
| 02:37:41 | 1 | THE COURT: Overruled. |
| 02:37:42 | 2 | THE WITNESS: I was unaware of any and I wrote this |
| 02:37:46 | 3 | from scratch. I did visit the FBI office here in Chicago and |
| 02:37:55 | 4 | looked at their record keeping practices. |
| 02:37:59 | 5 | BY MR. NOLAND: |
| 02:38:00 | 6 | Q. And you developed special order 83-1; is that right? |
| 02:38:05 | 7 | A. I did. |
| 02:38:05 | 8 | Q. Could you pull up Defendant's Exhibit 54. Is this the |
| 02:38:20 | 9 | special order that you wrote, special order 83-1? |
| 02:38:24 | 10 | A. It is. |
| 02:38:25 | 11 | Q. And could you highlight at the bottom there, section 3, |
| 02:38:33 | 12 | policy. And then if you go to the next page, is that possible |
| 02:38:38 | 13 | to bring that up too and the top. The first two paragraphs |
| 02:38:48 | 14 | there. |
| 02:38:49 | 15 | A. Okay. |
| 02:38:49 | 16 | Q. There you go. |
| 02:38:53 | 17 | So could you read for the ladies and gentlemen of the |
| 02:38:57 | 18 | jury what is the policy that you wrote on behalf of the |
| 02:39:00 | 19 | Chicago Police Department in late 1982? |
| 02:39:06 | 20 | A. It is the policy of the Chicago Police Department to |
| 02:39:08 | 21 | conduct all criminal investigations in an impartial and |
| 02:39:11 | 22 | objective manner and to maintain the integrity of its |
| 02:39:15 | 23 | investigative files to ensure that the due process rights of |
| 02:39:18 | 24 | the accused are not compromised during the subject |
| 02:39:21 | 25 | investigation, initial court hearing, or any subsequent |

11/23/16 PM    Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 43 of 59 PageID #:30584
***REALTIME UNEDITED TRANSCRIPT ONLY***

42

| | | |
|---|---|---|
| 02:39:25 | 1 | reviews.  Additionally, it is the policy of the Chicago Police |
| 02:39:30 | 2 | Department to record and preserve any relevant information |
| 02:39:36 | 3 | obtained by any detective during the course of a violent crime |
| 02:39:41 | 4 | field investigation. |
| 02:39:44 | 5 | When assigned to violent crime field investigations, |
| 02:39:47 | 6 | detectives will preserve and record information and materials |
| 02:39:52 | 7 | obtained in the course of the investigation to assure not only |
| 02:39:57 | 8 | that the information and the materials indicating the possible |
| 02:40:02 | 9 | guilt of the accused are preserved, but also that any |
| 02:40:06 | 10 | information and materials that may tend to show his possible |
| 02:40:12 | 11 | innocence or aid in his defense is preserved. |
| 02:40:15 | 12 | Q.  And that is the official policy of the Chicago Police |
| 02:40:19 | 13 | Department? |
| 02:40:19 | 14 | A.  It is. |
| 02:40:20 | 15 | Q.  There was a word four lines down, all relevant |
| 02:40:37 | 16 | information.  So the policy is to preserve any relevant |
| 02:40:40 | 17 | information obtained by any detective? |
| 02:40:42 | 18 | A.  Correct. |
| 02:40:42 | 19 | Q.  It doesn't mean everyone hundred percent of the |
| 02:40:46 | 20 | information that comes into the detective needs to be |
| 02:40:50 | 21 | recorded; is that right? |
| 02:40:52 | 22 | A.  These are notes taken by detectives trying to do the best |
| 02:40:59 | 23 | they can.  It's not reality TV with a camera.  It's taking |
| 02:41:06 | 24 | notes. |
| 02:41:06 | 25 | Q.  And what would be -- what's the overall key of this policy |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 44 of 59 PageID #:30585
***REALTIME UNEDITED TRANSCRIPT ONLY***

43

| | |
|---|---|
| 02:41:09 | 1 |
| 02:41:14 | 2 |
| 02:41:14 | 3 |
| 02:41:24 | 4 |
| 02:41:29 | 5 |

1  that you designed, 83-1, what is the over arcing goal of this
2  policy?
3  A.  To preserve the information that has been gathered, to put
4  this information under the control of the Chicago Police
5  Department.
6  Q.  All right.  And without respect to how it's written down,
7  where it's written down, would you grow the could he is that
8  the information is provided into notes or reports so that it's
9  available to be the prosecutors and the criminal defense
10  attorneys?
11  A.  Correct.  It's not the norm.  As a matter of fact,
12  superintendent Breczyek in his testimony said save it if it's
13  on the back of a match book, save it, preserve it.
14  Q.  And you then, this policy that you wrote invented the
15  investigative file and the general progress report; is that
16  right?
17  A.  Correct.
18  Q.  All right.  I am going to show you -- I believe the
19  investigative files are defendants' 58.  Mr. Hickey, showing
20  you the originals of defendants' 58, can you take a look and
21  tell the ladies and gentlemen of the jury what these are?
22  A.  These are investigative files for the double murder which
23  occurred on East 39th Street in the CHA buildings, but since
24  there are two dead, there were two followers.  That's how we
25  counted the murders.  Each dead person got their own file.

11/23/16 PM                ***REALTIME UNEDITED TRANSCRIPT ONLY***

44

02:43:15  1   Q.  And so was this the manner in which, there is a bracket, I

02:43:23  2   think you were explaining earlier the inventories is on the

02:43:29  3   left; is that right?

02:43:30  4   A.  Correct.

02:43:31  5   Q.  And then there is a green card here.  What's this green

02:43:33  6   card?

02:43:34  7   A.  That's an inventory control card.  It's nothing more than

02:43:42  8   a place holder.  Think about a drawer full of files.  If

02:43:47  9   someone removes it, I simply wanted to put something visible

02:43:53  10  to let others know the file had been removed and when the file

02:43:58  11  was returned, it would be easier to refile.  It's about the

02:44:04  12  clerks.  It's about those that have to file things.

02:44:07  13  Q.  Again, on the left, there is the investigative file

02:44:10  14  inventory that Mr. Loevy showed you on his questions.  Do you

02:44:12  15  remember that?

02:44:12  16  A.  I do.

02:44:13  17  Q.  And that's essentially a listing of the documents that are

02:44:17  18  on the right side of the file, the actual investigation?

02:44:20  19  A.  Correct.

02:44:21  20  Q.  And so with the goal of the policy, was it the goal of the

02:44:27  21  policy that these documents, the investigation were the

02:44:33  22  documents that are turned over in the criminal discovery

02:44:36  23  process?

02:44:36  24  A.  That file was turned over, correct.

02:44:39  25  Q.  That file was turned over.

                    ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 46 of 59 PageID #:30587
***REALTIME UNEDITED TRANSCRIPT ONLY***

45

| | | |
|---|---|---|
| 02:44:45 | 1 | If you could look at this file, are there general |
| 02:44:48 | 2 | progress reports in this file? |
| 02:44:49 | 3 | A. Yes, there are. |
| 02:45:04 | 4 | Q. And describing it to the ladies and gentlemen of the jury, |
| 02:45:17 | 5 | there is a place for a supervisor to sign; is that right? |
| 02:45:22 | 6 | A. Correct. |
| 02:45:22 | 7 | Q. And if you could identify who is the name of the |
| 02:45:27 | 8 | supervisor who signed off on this report? |
| 02:45:29 | 9 | A. J. Murphy, star number 8991. |
| 02:45:34 | 10 | Q. That would be Sergeant Murphy? |
| 02:45:35 | 11 | A. I don't know his star number. There's probably more than |
| 02:45:39 | 12 | one Murphy in the police department. |
| 02:45:42 | 13 | Q. And is there another GPR in this file that's signed off by |
| 02:45:49 | 14 | a Sergeant Murphy? |
| 02:45:49 | 15 | A. J. Murphy, 8991. |
| 02:45:56 | 16 | Q. And I am going to show you another piece of paper that has |
| 02:45:59 | 17 | some notes that begin with 730 East 39th Street. These notes |
| 02:46:09 | 18 | are not on a general progress form. Do you see that? |
| 02:46:14 | 19 | A. Yes. |
| 02:46:14 | 20 | Q. But they are included in the investigative file for this |
| 02:46:16 | 21 | case? |
| 02:46:16 | 22 | A. That's right. |
| 02:46:17 | 23 | Q. Now, I think we talked about the goal -- what was the goal |
| 02:46:20 | 24 | with respect to the use of general progress reports? |
| 02:46:25 | 25 | A. To institutionalize the means by which we could save our |

| | | |
|---|---|---|
| 02:46:32 | 1 | notes. |
| 02:46:34 | 2 | Q.  And it would appear in this particular note, it's not on a |
| 02:46:38 | 3 | general progress note.  Is that a huge problem, Mr. Hickey? |
| 02:46:41 | 4 | A.  It's a (^ ), in other words, it's a procedural error.  It |
| 02:46:48 | 5 | should have been on the right form, but it's on a blank piece |
| 02:46:53 | 6 | of paper. |
| 02:46:53 | 7 | Q.  And it's turned in and included in the investigative file? |
| 02:46:57 | 8 | A.  It is. |
| 02:46:58 | 9 | Q.  Now, Mr. Hickey, after you wrote this policy, was there a |
| 02:47:18 | 10 | series of training that you provided personally to the Chicago |
| 02:47:22 | 11 | police detectives? |
| 02:47:23 | 12 | A.  Yes, sir. |
| 02:47:23 | 13 | Q.  Can you explain to the ladies and gentlemen of the jury |
| 02:47:26 | 14 | the extent of the training that you provided in summary form? |
| 02:47:30 | 15 | A.  Because it was so new, we wanted to get the message out |
| 02:47:37 | 16 | not just by issuing a directive, but actually calling in each |
| 02:47:43 | 17 | and every member of the detective division, their supervisors, |
| 02:47:49 | 18 | their exempt commanders, their deputy chiefs, everyone, and I |
| 02:47:54 | 19 | personally conducted this training to introduce not only the |
| 02:47:59 | 20 | directive but the forms and delivered the new message.  This |
| 02:48:05 | 21 | is how business is going to be conducted. |
| 02:48:08 | 22 | Q.  And I don't know if you have an estimate on how many |
| 02:48:14 | 23 | detectives there were at the time that you actually personally |
| 02:48:17 | 24 | trained? |
| 02:48:18 | 25 | A.  About a thousand in groups of about 30 or 40 in a |

11/23/16 PM
Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 48 of 59 PageID #:30589
***REALTIME UNEDITED TRANSCRIPT ONLY***

47

| | | |
|---|---|---|
| 02:48:24 | 1 | classroom. |
| 02:48:24 | 2 | Q.  So this was a process that took a period of months or |
| 02:48:28 | 3 | certainly weeks? |
| 02:48:29 | 4 | A.  Yes. |
| 02:48:30 | 5 | Q.  And where was the training actually conducted? |
| 02:48:32 | 6 | A.  At the education and training division of the Chicago |
| 02:48:35 | 7 | Police Department. |
| 02:48:35 | 8 | Q.  So a thousand detectives were taken out of service |
| 02:48:39 | 9 | investigating all the homicides and other violent crimes that |
| 02:48:42 | 10 | were going on in our city to go down to the police academy in |
| 02:48:45 | 11 | order to train them on this new policy? |
| 02:48:47 | 12 | MR. LOEVY:  Objection, your Honor.  Leading. |
| 02:48:49 | 13 | THE COURT:  Sustained. |
| 02:48:51 | 14 | THE WITNESS:  Correct. |
| 02:48:52 | 15 | THE COURT:  The objection was sustained.  That means |
| 02:48:54 | 16 | the answer is stricken as was the question. |
| 02:48:58 | 17 | BY MR. NOLAND: |
| 02:48:58 | 18 | Q.  Mr. Hickey, Mr. Loevy asked you some questions about an |
| 02:49:01 | 19 | audit, and I think you said you did not use the word audit in |
| 02:49:04 | 20 | this special order that you wrote is that right? |
| 02:49:08 | 21 | A.  Right. |
| 02:49:08 | 22 | Q.  Were there command responsibilities with respect to making |
| 02:49:11 | 23 | sure 83-1 was complied with? |
| 02:49:13 | 24 | A.  Every supervisor by virtue of their responsibility is to |
| 02:49:24 | 25 | follow up and to make sure their members are doing things |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 49 of 59 PageID #:30590

02:49:31   1   correctly and that directives are being adhered to.  It's an
02:49:35   2   everyday responsibility.  We cannot write down everything that
02:49:40   3   a supervisor is supposed to do.  It's make sure that your
02:49:47   4   people do it.
02:49:47   5   Q.  And Mr. Hickey, you probably don't know this off the top
02:49:55   6   of your head, but you had previously done some research -- let
02:49:58   7   me back up.
02:49:58   8        You are retired now?
02:50:01   9   A.  Three weeks.
02:50:01  10   Q.  Congratulations.
02:50:02  11        And before you were retired, you worked for the
02:50:06  12   research and development unit of the Chicago Police
02:50:09  13   Department?
02:50:09  14   A.  I did.
02:50:10  15   Q.  And in that capacity, did you have access to records to
02:50:13  16   see how many forms had been ordered back in the early '80s
02:50:17  17   relative to this new policy you wrote?
02:50:19  18   A.  I did.
02:50:20  19   Q.  And this general progress report form, did you take a look
02:50:23  20   at how many of the general progress report forms were being
02:50:27  21   ordered after you wrote the new policy?
02:50:29  22   A.  The Chicago Police Department controls the printing of
02:50:34  23   forms.  It creates all the forms, we put a little control
02:50:39  24   number on, and we also are the conduit by which requests for
02:50:49  25   reprints are done and within the first 15 months of this

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 50 of 59 PageID #:30591

| | | |
|---|---|---|
| 02:50:51 | 1 | order, there were four separate requests for additional |
| 02:50:56 | 2 | printing of GPRs, these general progress reports, to the total |
| 02:51:04 | 3 | of 150,000 copies. |
| 02:51:05 | 4 | Q.  Would that be evidence to you that detectives were |
| 02:51:08 | 5 | ordering and using over and over again these GPR forms? |
| 02:51:12 | 6 | MR. LOEVY:  Objection. |
| 02:51:13 | 7 | THE COURT:  Overruled.  You can answer. |
| 02:51:14 | 8 | THE WITNESS:  Certainly an indicator. |
| 02:51:18 | 9 | BY MR. NOLAND: |
| 02:51:18 | 10 | Q.  And throughout the years since you wrote special order |
| 02:51:23 | 11 | 83-1, have you seen investigative files in the format that we |
| 02:51:29 | 12 | discussed throughout the years? |
| 02:51:32 | 13 | A.  In all of my years since that time, I see them regularly. |
| 02:51:42 | 14 | They have been institutionalized. |
| 02:51:46 | 15 | Q.  Another thing that I had asked you to take a look at was |
| 02:51:50 | 16 | the volume of investigative files that the CPD will be |
| 02:51:56 | 17 | handling around that time frame.  Did you look into the crime |
| 02:52:00 | 18 | statistics around the event in this case, 1984? |
| 02:52:04 | 19 | MR. LOEVY:  Objection, relevance, your Honor. |
| 02:52:06 | 20 | THE COURT:  Sustained. |
| 02:52:08 | 21 | THE WITNESS:  In 1984 -- |
| 02:52:10 | 22 | THE COURT:  I sustained the objection. |
| 02:52:11 | 23 | THE WITNESS:  Sorry. |
| 02:52:12 | 24 | BY MR. NOLAND: |
| 02:52:14 | 25 | Q.  Mr. Loevy had talked to you about street files or working |

11/23/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

50

02:52:23    1 | files, would you agree that that's what this looks like?

02:52:26    2 | A.  Yes, sir.

02:52:29    3 |          THE COURT:  This being Exhibit, Plaintiff's Exhibit

02:52:30    4 | 1.

02:52:31    5 |          MR. NOLAND:  Plaintiff's Exhibit 1, thank you, your

02:52:32    6 | Honor.

02:52:33    7 | BY MR. NOLAND:

02:52:36    8 | Q.  The use of -- after 83-1, did 83-1 prohibit detectives

02:52:42    9 | from using working files to assist them in their

02:52:45   10 | investigations?

02:52:46   11 | A.  It did not.  It was silent on that issue.

02:52:49   12 | Q.  And did you come to learn that if working foils were used,

02:52:59   13 | would the key be that the documents this them turn in for

02:53:02   14 | inclusion in the investigative files?

02:53:05   15 | A.  Not the documents within, but any information generated or

02:53:11   16 | received by the detective to be turned in.  What that tends to

02:53:17   17 | be is a copy or a duplicate of what's in the office

02:53:23   18 | investigative file, a select number of copies.  But any

02:53:28   19 | information that is new or has been generated or received, the

02:53:32   20 | detectives have an obligation to turn it in.

02:53:34   21 | Q.  And when they turn it in, there's nothing wrong with a

02:53:39   22 | detective turning in a supplementary report and the general

02:53:44   23 | progress reports and making copies of those for herself to use

02:53:46   24 | out on the street to conduct the investigation?

02:53:48   25 | A.  There's nothing wrong with that.

                      ***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM          ***REALTIME UNEDITED TRANSCRIPT ONLY***

51

| 02:53:51 | 1  | Q.  As a matter of fact, you could argue that -- well, would |
| 02:53:54 | 2  | there be some potential benefits of it with respect to not |
| 02:53:58 | 3  | losing the original investigative file? |
| 02:54:00 | 4  | MR. LOEVY:  Objection to relevance, your Honor. |
| 02:54:01 | 5  | THE COURT:  Sustained.  I just want to let everybody |
| 02:54:05 | 6  | know, we are five minutes from stopping. |
| 02:54:08 | 7  | BY MR. NOLAND: |
| 02:54:20 | 8  | Q.  Mr. Hickey, you worked in the crime lab for a time? |
| 02:54:23 | 9  | A.  I did. |
| 02:54:23 | 10 | Q.  Showing Mr. Hickey what we are going to mark as Exhibit |
| 02:54:41 | 11 | 380, what is that, Mr. Hickey? |
| 02:54:43 | 12 | A.  This is a sleeve, a folder, small, small sleeve of crime |
| 02:54:53 | 13 | lab photographs. |
| 02:54:54 | 14 | Q.  And can you explain to the jury quickly how these photos |
| 02:55:02 | 15 | would be developed and produced in a criminal case? |
| 02:55:06 | 16 | A.  In a criminal case, they're not printed unless requested. |
| 02:55:13 | 17 | The mobile crime lab technician comes out and takes pictures. |
| 02:55:18 | 18 | This is back in the day of negatives.  The crime lab -- the |
| 02:55:25 | 19 | photography unit of the crime lab takes the negative and puts |
| 02:55:29 | 20 | it in an envelope half this size just wide enough for a |
| 02:55:33 | 21 | negative, a sleeve, puts it in there, and that's it until |
| 02:55:38 | 22 | there is a request for them to be produced.  When they're |
| 02:55:45 | 23 | requested to be produced, the photography unit of the crime |
| 02:55:48 | 24 | lab goes to that file, pulls up the appropriate case number |
| 02:55:51 | 25 | and prints the cases and delivers them. |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM      Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 53 of 59 PageID #:30594
***REALTIME UNEDITED TRANSCRIPT ONLY***

52

02:55:53    1    Q.  So if a subpoena comes in hypothetically to the subpoena

02:55:57    2    unit and the subpoena unit sends it to the crime lab to get

02:56:01    3    these photographs; is that right?

02:56:03    4    A.  Yes.

02:56:03    5    Q.  And the crime lab then develops the photographs and sends

02:56:06    6    them back to the subpoena unit, correct?

02:56:08    7    A.  Correct.

02:56:09    8            MR. LOEVY:  Objection, asked and answered.

02:56:10    9            THE COURT:  Sustained.

02:56:13   10    BY MR. NOLAND:

02:56:13   11    Q.  And the photos, there's some photos in here of a lineup

02:56:17   12    dated June 14th, 1985, that have pictures of a lineup and then

02:56:24   13    behind them is a picture of one of the subjects in the lineup

02:56:28   14    with his shirt sleeve being pulled down.  Mr. Hickey, would it

02:56:33   15    be -- if the lineup photos are produced and the other crime

02:56:36   16    scene photographs are reproduced by the crime lab, would all

02:56:40   17    of the photographs in this packet be tendered during the

02:56:45   18    criminal process?

02:56:46   19            MR. LOEVY:  Objection to foundation.

02:56:47   20            THE COURT:  Sustained.

02:56:48   21    BY MR. NOLAND:

02:56:50   22    Q.  When the request is made for crime lab photographs, what

02:56:56   23    photographs does the crime lab techs get in order to respond

02:57:00   24    to the subpoena?

02:57:00   25            MR. LOEVY:  Same objection, your Honor.

11/23/16 PM        Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 54 of 59 PageID #:30595
***REALTIME UNEDITED TRANSCRIPT ONLY***

53

| | | |
|---|---|---|
| 02:57:01 | 1 | THE COURT:  Sustained.  You got to lay the |
| 02:57:03 | 2 | foundation.  You're probably not going to today. |
| 02:57:08 | 3 | BY MR. NOLAND: |
| 02:57:08 | 4 | Q.  Mr. Hickey, do you have familiarity with the process at |
| 02:57:12 | 5 | the crime lab with respect to developing the photographs in |
| 02:57:16 | 6 | response to subpoenas that come into the crime lab? |
| 02:57:19 | 7 | MR. LOEVY:  It's. |
| 02:57:21 | 8 | THE COURT:  Question number two is how do you have |
| 02:57:23 | 9 | that familiarity. |
| 02:57:24 | 10 | THE WITNESS:  I was assigned to the crime lab for |
| 02:57:27 | 11 | three years. |
| 02:57:28 | 12 | MR. LOEVY:  Time frame. |
| 02:57:30 | 13 | BY MR. NOLAND: |
| 02:57:31 | 14 | Q.  When was that time frame? |
| 02:57:32 | 15 | A.  83 to 87 when I made lieutenant. |
| 02:57:38 | 16 | THE COURT:  You can ask the question. |
| 02:57:40 | 17 | BY MR. NOLAND: |
| 02:57:40 | 18 | Q.  Mr. Hickey, can you explain to the ladies and gentlemen of |
| 02:57:42 | 19 | the jury if the subpoena came in to the crime lab to copy the |
| 02:57:45 | 20 | crime scene and lineup photographs, which of the photographs |
| 02:57:47 | 21 | in this packet would be sent off? |
| 02:57:50 | 22 | A.  All of them. |
| 02:57:51 | 23 | Q.  And can you explain why that is? |
| 02:57:54 | 24 | MR. LOEVY:  Objection, your Honor. |
| 02:57:55 | 25 | THE COURT:  Sustained.  The point has been made.  How |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM     Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 55 of 59 PageID #:30596
***REALTIME UNEDITED TRANSCRIPT ONLY***

54

| 02:58:02 | 1 | much longer do you have? |
| 02:58:03 | 2 | MR. NOLAND: That's it, Judge. Thank you very much. |
| 02:58:06 | 3 | THE COURT: Mr. Kulwin, do you have questions? |
| 02:58:24 | 4 | MR. NOLAND: Thank you, Mr. Hickey. |
| 02:58:26 | 5 | THE COURT: Mr. Loevy. |
| 02:58:28 | 6 | MR. NOLAND: The crime scene photographs was Exhibit |
| 02:58:31 | 7 | 381, not 380. |
| 02:58:34 | 8 | THE COURT: 381. |
| 02:58:34 | 9 | - - - |
| 02:58:34 | 10 | JAMES K. HICKEY, REDIRECT EXAMINATION |
| 02:58:34 | 11 | BY MR. LOEVY: |
| 02:58:36 | 12 | Q. Mr. Noland showed you this file which is an investigative |
| 02:58:40 | 13 | file with a control card and an inventory? |
| 02:58:41 | 14 | A. Correct. |
| 02:58:42 | 15 | Q. Is there supposed to be a parallel file, Plaintiff's |
| 02:58:45 | 16 | Exhibit 1, with GPRs in it like the Rodell Banks GPR that are |
| 02:58:49 | 17 | not in the official investigative file? Is there supposed to |
| 02:58:53 | 18 | be a parallel file with GPRs that are not logged? |
| 02:58:57 | 19 | A. No. |
| 02:58:57 | 20 | Q. And if this is the investigative file that was |
| 02:59:02 | 21 | contemplated by your system, this being Defendant's Exhibit |
| 02:59:09 | 22 | 58, then what is Plaintiff's Exhibit 1? |
| 02:59:11 | 23 | A. Some case reports and some material, some materials that |
| 02:59:24 | 24 | did not get into the investigative file. |
| 02:59:26 | 25 | Q. This file, applicability 1, is completely not contemplated |

| | |
|---|---|
| 02:59:30 | 1 by the written policy of the Chicago Police Department, would |
| 02:59:34 | 2 you agree, sir? |
| 02:59:34 | 3 A. If it had information which was relevant, it was not |
| 02:59:41 | 4 contemplated. |
| 02:59:42 | 5 MR. LOEVY: I have no further questions, your Honor. |
| 02:59:44 | 6 THE COURT: Anything else, Mr. Noland? |
| 02:59:45 | 7 MR. NOLAND: No. |
| 02:59:45 | 8 THE COURT: Do any of the jurors have any questions |
| 02:59:47 | 9 for witness? You didn't have anything, right, Mr. Kulwin? |
| 02:59:50 | 10 MR. KULWIN: I decided not to. |
| 02:59:51 | 11 THE COURT: Do any of the jurors have any questions. |
| 02:59:53 | 12 I see nobody writing. It is exactly 3:00 o'clock. |
| 02:59:56 | 13 So we are going to stop for the day. Have a nice |
| 02:59:59 | 14 Thanksgiving, everybody. I will see you at 9:30 on Monday. |
| 03:00:37 | 15 (The jury leaves the courtroom.) |
| 03:00:37 | 16 THE COURT: Okay. So here's the deal. I alluded to |
| 03:00:46 | 17 this other the day. There's only one thing that I need filed |
| 03:00:51 | 18 and that is a response to the -- hang on a second. A response |
| 03:01:05 | 19 to the motion for curative instruction and to bar future |
| 03:01:08 | 20 testimony about witness intimidation. So you tell me when you |
| 03:01:11 | 21 want to file it. I give you two choices, Friday and Saturday. |
| 03:01:15 | 22 MR. KULWIN: Okay. Saturday. |
| 03:01:16 | 23 THE COURT: You might want to ask the person who is |
| 03:01:18 | 24 going to write it. |
| 03:01:19 | 25 MR. KULWIN: She is going to help me. She is not |

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 57 of 59 PageID #:30598
***REALTIME UNEDITED TRANSCRIPT ONLY***

56

| | | |
|---|---|---|
| 03:01:21 | 1 | going to write it.  Saturday. |
| 03:01:25 | 2 | THE COURT:  All right.  So here's the deal.  Aside |
| 03:01:26 | 3 | from that, if anybody files something over the weekend, it had |
| 03:01:32 | 4 | better gosh darn be like a dire, you know, world ending |
| 03:01:36 | 5 | emergency.  Okay? |
| 03:01:38 | 6 | MR. LOEVY:  Your Honor, we have some designation |
| 03:01:41 | 7 | deposition stuff that we are still hopeful to meet and confer |
| 03:01:44 | 8 | about. |
| 03:01:44 | 9 | THE COURT:  When you say designation deposition. |
| 03:01:46 | 10 | MR. LOEVY:  There's some defendant depositions that |
| 03:01:48 | 11 | we have been exchanging back and forth.  You are going to |
| 03:01:51 | 12 | probably have to make some calls. |
| 03:01:52 | 13 | THE COURT:  Okay. |
| 03:01:53 | 14 | MR. LOEVY:  What is the time frame where you would |
| 03:01:55 | 15 | want the spreadsheets with the objections. |
| 03:01:56 | 16 | THE COURT:  Let me make sure I am understanding what |
| 03:01:58 | 17 | you are talking about.  This is deposition testimony that you |
| 03:02:00 | 18 | want to read, basically. |
| 03:02:01 | 19 | MR. LOEVY:  That they want to read. |
| 03:02:02 | 20 | THE COURT:  That the defendants want to read. |
| 03:02:04 | 21 | MR. LOEVY:  Yeah, actually one that we want to read |
| 03:02:06 | 22 | too. |
| 03:02:06 | 23 | THE COURT:  Well, the answer is as to the answer to |
| 03:02:12 | 24 | most legal question is it depends.  It depends on when you |
| 03:02:15 | 25 | want to do it.  When is the first thing that -- first thing in |

***REALTIME UNEDITED TRANSCRIPT ONLY***

11/23/16 PM | ***REALTIME UNEDITED TRANSCRIPT ONLY***

57

| | |
|---|---|
| 03:02:18 | 1 this packet that anybody wants to have read. |
| 03:02:21 | 2 MR. LOEVY: On Tuesday we would want to read Beseth |
| 03:02:24 | 3 which I believe is going to be so; is that right that you |
| 03:02:27 | 4 could probably make a call from the bench. |
| 03:02:30 | 5 THE COURT: If it's going to be Tuesday, I want it |
| 03:02:32 | 6 Monday. |
| 03:02:32 | 7 MR. LOEVY: Then they could tell you when they want |
| 03:02:33 | 8 to read hunter and Davis. |
| 03:02:35 | 9 THE COURT: I suppose it probably depends on when you |
| 03:02:39 | 10 are going to finish calling witnesses. |
| 03:02:42 | 11 MR. LOEVY: We are moving slower than we hoped. |
| 03:02:44 | 12 Tuesday is our hope. |
| 03:02:44 | 13 THE COURT: What I will tell you on the defense side |
| 03:02:49 | 14 is that again it kind of depends on how much there is. I |
| 03:02:54 | 15 don't want a whole boatload of it dumped on me at once saying |
| 03:02:58 | 16 we want to do this tomorrow. It would be better if you could |
| 03:03:00 | 17 put them in some sort of sequence and give them to me -- |
| 03:03:04 | 18 MR. KULWIN: Seriatim. |
| 03:03:05 | 19 THE COURT: -- seriatim, exactly. What I would like |
| 03:03:08 | 20 to get from you is something that says designation, a |
| 03:03:13 | 21 spreadsheet or whatever, designation, objection, tell me what |
| 03:03:15 | 22 the objection is, and then I want a hard copy of the |
| 03:03:19 | 23 deposition and the four to a page is perfectly fine. That's |
| 03:03:23 | 24 what I prefer. |
| 03:03:24 | 25 MR. KULWIN: Did I hear they are going to close their |

***REALTIME UNEDITED TRANSCRIPT ONLY***

Case: 1:10-cv-01168 Document #: 1185-15 Filed: 02/24/17 Page 59 of 59 PageID #:30600

58

| | | |
|---|---|---|
| 03:03:27 | 1 | case on Tuesday. |
| 03:03:28 | 2 | THE COURT:  I am not going to beholding my breath on |
| 03:03:31 | 3 | that. |
| 03:03:31 | 4 | MR. KULWIN:  Derrick Kees on Wednesday.  I don't |
| 03:03:35 | 5 | think we would want to read our designations until they close |
| 03:03:38 | 6 | their case. |
| 03:03:39 | 7 | THE COURT:  I would imagine not. |
| 03:03:41 | 8 | MS. KATZ:  Is there a specific time on Saturday? |
| 03:03:43 | 9 | THE COURT:  No.  If you would like a time. |
| 03:03:45 | 10 | MR. KULWIN:  No, no. |
| 03:03:46 | 11 | THE COURT:  Because, honestly, if you don't have a |
| 03:03:48 | 12 | time, that means you are going to work on it until 11:59 and |
| 03:03:52 | 13 | 58 seconds, it might be better if I could say, no, 6:00. |
| 03:03:57 | 14 | MS. KATZ:  I would like to sleep late on Saturday. |
| 03:04:00 | 15 | THE COURT:  You're filing it, your call. |
| 03:04:16 | 16 | (The trial was adjourned at 3:05 p.m. until 9:30 a.m. on |
| 03:04:29 | 17 | November 28, 2016.) |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |