# EXHIBIT 44



# CASE NO. 1:18-CV-1028

# ARTURO DeLEON-REYES V. REYNALDO GUEVARA, ET AL.

-------------------------------------------------------------

# CASE NO. 1:18-CV-2312

# GABRIEL SOLACHE V. CITY OF CHICAGO, ET AL.

## DEPONENT:

## COMMANDER ERIC WINSTROM, 30(b)(6)

## DATE:

## DECEMBER 17, 2021



schedule@kentuckianareporters.com

877.808.5856 | 502.589.2273

www.kentuckianareporters.com

LOUISVILLE   LEXINGTON   LONDON   FLORENCE   CINCINNATI   INDIANAPOLIS   ORLANDO   JACKSONVILLE   TAMPA

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3
   ARTURO DeLEON-REYES,
 4 Plaintiff                    CASE NO. 1:18-CV-1028

 5
   V.                          Hon. Steven C. Seeger
 6                             District Judge

 7

 8
   REYNALDO GUEVARA, ET AL.,
 9 Defendants                   Hon. Sunil R. Harjani
                              Magistrate Judge
10
   ------------------------------------------------------
11
   GABRIEL SOLACHE,
12 Plaintiff                    CASE NO. 1:18-CV-2312

13
   V.                          Hon. Steven Seeger
14                             District Judge

15

16
   CITY OF CHICAGO, ET AL.,
17 Defendants                   Hon. Sunil K. Harjani,
                              Magistrate Judge
18

19

20

21

22

23

24
   DEPONENT:  COMMANDER ERIC WINSTROM, 30(b)(6)
25 DATE:       DECEMBER 17, 2021
   REPORTER:  VICTORIA JADICK
```



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 2

```
1                    APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, ARTURO DELEON REYES:

4    Anand Swaminathan

5    Loevy & Loevy

6    311 North Aberdeen Street

7    Chicago, Illinois 60607

8    Telephone No.: (312) 243-5900

9    E-mail: anand@loevy.com

10   (Appeared via videoconference)

11

12   ON BEHALF OF THE PLAINTIFF, GABRIEL SOLACHE:

13   Jan Susler

14   People's Law Office

15   1180 North Milwaukee Avenue

16   Third Floor

17   Chicago, Illinois 60642

18   Telephone No.: (773) 235-0070

19   E-mail: jsusler@peopleslawoffice.com

20   (Appeared via videoconference)

21

22

23

24

25
```

Page 4

```
1                 APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, THE CITY OF CHICAGO:

4    Theresa Carney

5    Eileen Rosen

6    Katie Barber

7    Jessica Zehner

8    Rock Fusco & Connelly, LLC

9    321 North Clark Street

10   Suite 2200

11   Chicago, Illinois 60654

12   Telephone No.: (312) 494-1000

13   E-mail: tcarney@rfclaw.com

14         erosen@rfclaw.com

15         cbarber@rfclaw.com

16         jzehner@rfclaw.com

17   (Appeared via videoconference)

18

19

20

21

22

23

24

25
```

Page 3

```
1               APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANTS, DETECTIVES HALVORSEN,

4    DICKINSON, RUTHERFORD, STANKUS, NAUJOKAS KARALOW,

5    HARVEY, TREVINO, MINGEY, BIEBEL:

6    Caroline Golden

7    Josh Engquist

8    The Sotos Law Firm

9    141 West Jackson Boulevard

10   Suite 1240A

11   Chicago, Illinois 60604

12   Telephone No.: (630) 735-3300

13   Facsimile No.: (630) 735-3303

14   E-mail: jengquist@sotoslaw.com

15         cgolden@jsotoslaw.com

16   (Appeared via videoconference)

17

18

19

20

21

22

23

24

25
```

Page 5

```
1               APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, REYNALDO GUEVARA:

4    Megan K. McGrath

5    Leinenweber Baroni & Daffada, LLC

6    120 North Lasalle Street

7    Suite 200

8    Chicago, Illinois 60602

9    Telephone No.: (866) 786-3705

10   E-mail: mkm@ilsq.com

11   (Appeared via videoconference)

12

13   ON BEHALF OF THE DEFENDANTS, ASSISTANT STATES ATTORNEYS

14   O'MALLEY, VARGA, BRUALDI, WEHRLE:

15   Brette Bensinger

16   Hinshaw & Culbertson, LLP

17   151 North Franklin Street

18   Suite 2500

19   Chicago, Illinois 60606

20   Telephone No.: (312) 704-3000

21   E-mail: bbensinger@hinshawlaw.com

22   (Appeared via videoconference)

23

24

25
```

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 6

1                    APPEARANCES (CONTINUED)

2

3    ON BEHALF OF THE DEFENDANT, DAVID NAVARRO:

4        Dan Burns

5        Reiter Burns LLP

6        311 South Wacker Drive

7        Suite 5200

8        Chicago, Illinois 60606

9        Telephone No.: (312) 982-0090

10       E-mail: dburns@reiterburns.com

11       (Appeared via videoconference)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                          INDEX

2                                                    Page

3    PROCEEDINGS                                       9

4    DIRECT EXAMINATION BY MR. SWAMINATHAN            11

5

6                        EXHIBITS

7    Exhibit                                         Page

8    1 - Amended Notice of Deposition                 28

9    2 - Detective Special Division Order 86-3        44

10   3 - Standard operating Procedure                122

11   4 - Training Document                           165

12   5 - Detective Division Training Lesson Plan     168

13   6 - Homicide Data Format                        169

14   7 - Cleared exceptionally and Street Files      170

15   8 - Memo dated January 13, 1983                 172

16   9 - Preservice Detective In-Service Training    173

17      Manual

18   10 - General Order 87-7                         210

19   11 - Violent Crimes Practicum                   266

20   12 - Department Special Order Foreign           271

21      Nationals and Aliens

22

23

24

25

Page 8

1                       STIPULATION

2

3    The video deposition of COMMANDER ERIC WINSTROM,

4    30(b)(6) was taken at KENTUCKIANA COURT REPORTERS, 30

5    SOUTH WACKER DRIVE, 22ND FLOOR, CHICAGO, ILLINOIS 60606,

6    via videoconference in which all participants attended

7    remotely, on FRIDAY the 17th day of DECEMBER, 2021 at

8    approximately 10:52 a.m. CST; said video deposition was

9    taken pursuant to the FEDERAL Rules of Civil Procedure.

10   The oath in this matter was sworn remotely pursuant to

11   FRCP 30.

12

13   It is agreed that VICTORIA JADICK, being a Notary Public

14   and Court Reporter, may swear the witness and that the

15   reading and signing of the completed transcript by the

16   witness is not waived.

17

18

19

20

21

22

23

24

25

Page 9

1                       PROCEEDINGS

2        COURT REPORTER:  We are now on the record.

3    Will all parties present -- parties, except for the

4    witness, please state your appearance, how you are

5    attending, and your location?

6        MR. SWAMINATHAN:  I'm Anand Swaminathan for

7    Plaintiff Arturo Deleon Reyes from Chicago.

8        MS. SUSLER:  Jan Susler on behalf of plaintiff

9    Gabriel Solache by Zoom from Chicago.

10       MS. ROSEN:  Eileen Rosen on behalf of

11   defendant, city of Chicago, along with Katie Barber

12   and Theresa Carney all from Chicago.

13       MS. GOLDEN:  Caroline Golden -- oh, sorry.

14   Go ahead.

15       MR. BURNS:  Good morning.  Dan Burns on behalf

16   of Defendant David Navarro from Zoom in Chicago.

17       MS. GOLDEN:  Caroline Golden by Zoom from

18   Chicago for the individual officer defendants.

19       MS. BENSINGER:  Brette Bensinger on behalf of

20   the individual state's attorney defendants.

21   In Chicago, on Zoom.

22       MR. SWAMINATHAN:  Is Megan McGrath joining or

23   is somebody from Leinenweber's firm?

24       MS. ROSEN:  Are they not on yet?

25       MR. SWAMINATHAN:  I don't see them.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 10

1     MS. SUSLER:  I'll text her.
2     MS. ROSEN:  Oh, she didn't have the link.
3  We just -- give us one minute.
4     COURT REPORTER:  Mr. Swaminathan, do you want
5  to go off the record and then we restart when Ms.
6  McGrath joins us?
7     MR. SWAMINATHAN:  If counsel thinks we can go
8  ahead and get started, given we've got hard stop I
9  think we probably can.  But let me let counsel weigh
10  in.
11     MS. ROSEN:  Yeah, let's just go.
12     MR. SWAMINATHAN:  Okay.  Okay.  Let's go then.
13  Okay.
14     COURT REPORTER:  Apologies one moment.  All
15  right.  Okay.  And Mr. Winstrom, would you please
16  state your full name for the record, please?
17     THE WITNESS:  Eric Winstrom.
18     COURT REPORTER:  And would you please hold your
19  driver's license up to the camera, sir?  And wait
20  until it is focused.  Perfect.  Thanks, sir.  You
21  may put that away.  Do all parties present agree
22  that the witness is in fact, Mr. Eric Winstrom?
23     MR. SWAMINATHAN:  For Plaintiff Reyes, so
24  stipulated.
25     MS. SUSLER:  Yes.  So stipulated for Solache.

Page 11

1     MR. BURNS:  So stipulated for Navarro.
2     MS. BENSINGER:  So stipulated for the or --
3  assistant state's attorneys.
4     MS. GOLDEN:  So stipulated for Guevara.
5     COURT REPORTER:  Mr. Winstrom, would you please
6  raise your right hand?  Do you solemnly swear or
7  affirm that the testimony you're about to give will
8  be the truth, the whole truth and, but the truth?
9     THE WITNESS:  I do.
10     COURT REPORTER:  Thank you, sir.  Counsel, you
11  may proceed.
12              DIRECT EXAMINATION
13  BY MR. SWAMINATHAN:
14     Q   All right.  Thank you.  Sir, you're a
15  commander in the Chicago Police Department?
16     A   Yes.
17     Q   Okay.  Right.  And I will -- if I refer to you
18  as Commander Winstrom or, or Mr. Winstrom, are those
19  both respect -- respectful ways to -- to refer to you,
20  sir?
21     A   So is Eric.
22     Q   Well I need a --
23     A   I said yes and so is Eric.
24     Q   Okay.  All right.  Thank you.  I'll try to
25  show you the respect you deserve and use one of those

Page 12

1  too.  But I appreciate that.  My apologies starting a
2  little late here today.  I hate to waste your time.  My
3  kids are wild animals.  That's all.  That's all I will
4  say, but -- but thank you.  And my apologies.
5  Okay, please state and spell your name for the record,
6  sir.
7     A   Eric Winstrom.  W-I-N-S-T-R-O-M.
8     Q   And where are you currently employed?
9     A   City of Chicago Police Department.
10     Q   Okay.  And you're a commander?
11     A   That is correct.
12     Q   And can you tell us what unit or area or
13  assignment you have as a commander at the Chicago Police
14  Department?
15     A   Yes, I am the commander of Area Five
16  detectives.
17     Q   And for how long have you held that position?
18     A   I've been the commander of Area Five
19  detectives since February of 2020.
20     Q   Okay.  Have you ever given a deposition
21  before?
22     A   I have.
23     Q   And how many times have you been deposed?
24     A   Approximately 12.
25     Q   And how many of those were -- strike that.

Page 13

1  Were all 12 of those -- were all approximately 12
2  instances in your capacity as a law enforcement officer?
3     A   Yes.
4     Q   Have you ever been deposed in your personal
5  life, putting aside your work as a Chicago police
6  officer?
7     A   No.
8     Q   Okay.  In how many of those 12 depositions
9  were in your capacity as a commander of detectives in
10  Area Five?
11     A   I believe six.
12     MS. ROSEN:  I have a belated form of objection.
13     Q   Sir, you understand that today you're here to
14  testify as a designee of the city of Chicago pursuant to
15  a Rule 30(b)(6) notice, correct?
16     A   Yes.
17     Q   Have you provided a testimony as a designee
18  the city of Chicago for Rule 30(b)(6) purposes in the
19  past?
20     A   Yes.
21     Q   In how many instances?
22     A   I think -- maybe seven.
23     Q   Oh, you cut off for a moment there, did you
24  say seven?
25     A   Approximately seven?  It could be six.  It





Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 14

1    could be eight, could be seven.
2        Q    And in those instances, did you testify on the
3    same topics that you, you'll be testifying about today?
4        A    I have never provided 30(b)(6) testimony on
5    topics related to translation or arrest of foreign
6    nationals.  The other topics have come up in previous
7    30(b)(6)'s.
8        Q    Okay.  All right.  I, I appreciate that you
9    have been deposed before and that you have been deposed
10   -- as a 30(b)(6) witness.  Let me just go through a
11   couple ground rules anyway, just so we're clear on them,
12   okay?
13       A    Yes.
14       Q    Okay.  This is obviously a question and answer
15   session.  I'm asking you questions.  You're answering
16   them to the best of your ability and we have a court
17   reporter taking it down.  So please make sure that you
18   let me finish my question before you answer, okay?
19       A    Yes.
20       Q    And likewise, I will let you finish your
21   answer before I ask my next question.  And if I
22   mistakenly believe you have finished your answer and
23   I've cut you off, just tell me and I'll let you finish
24   your answer, okay?
25       A    Okay.

Page 15

1        Q    There will be times in the deposition where
2    you, where you will know where my question's going. Just
3    let me finish my question before you, before you answer,
4    okay?
5        A    Okay.
6        Q    If I ask you a question and you don't
7    understand the question, please tell me, and I will
8    rephrase.  Is that fair?
9        A    That is fair.
10       Q    Okay.  And similarly, if you answer my
11   question, I'll assume you understood my question.  Also
12   fair?
13       A    That is also fair.
14       Q    Okay.  We'll take a break anytime you need,
15   just let us know and we can do that.  Just please answer
16   any pending question before we take a break, okay?
17       A    Understood.
18       Q    All right.  Are you -- medication that would
19   prevent -- from being able to provide accurate and
20   truthful testimony today?  Are you taking any
21   medications that would prevent you from being able to
22   understand my questions and answer them?
23       A    No.
24       Q    Do you have any medical issues that would
25   prevent you from understanding my questions and

Page 16

1    answering them?
2        A    No.
3        Q    Do you have any medical issues that would
4    prevent you from providing accurate, truthful, testimony
5    today?
6        A    No.
7        Q    I don't want to spend a lot of time on your
8    background, but I want you to just do me the kindness of
9    walking me through your history with the Chicago Police
10   Department.  When you joined the department and the
11   positions you've held.
12       A    Sure.  Joined the Chicago Police Department in
13   August of 2000.  I was the patrolman in the 2nd district
14   and the 13th district.  I left the Chicago Police
15   Department for one year in October of 2002 I believe.
16   And returned in November 2000 -- October of 2003. During
17   that time, I was briefly a detective for the Morris
18   County Sheriff's -- I mean, I'm sorry, Morris County
19   Prosecutor's Office in Morris County, New Jersey. When I
20   returned to the Chicago Police Department, I taught law
21   at the Chicago police recruits.  I then was transferred
22   to the 13th district, from the 13th district in December
23   of 2005.  I was promoted to detective where I was
24   assigned to Area One detective division, as both a
25   robbery detective and a special victims unit detective.

Page 17

1    I was then promoted to Sergeant in July of 2008, where I
2    went to -- was assigned to the 25th district.  In
3    October of 2010, I returned to the detective division as
4    a Sergeant in Area One every oversight office.  So that
5    would include homicide, violent crimes, robbery, and
6    special victims at various times.  So that was in --
7        Q    Sorry, did you, the area one -- you were a
8    Sergeant over detectives at Area One in October 2010?
9        A    That is correct.
10       Q    Okay.  Keep going.  Sorry.
11       A    For the year 2013, I was Sergeant and
12   commanding officer of the special investigations unit.
13   Special investigations unit is a citywide unit, which
14   investigate -- investigates all child sex crimes in the
15   city.  2014, I was assigned to legal affairs where I was
16   -- governmental affairs section liaison with Mayor
17   Emmanuel's office.  2015, I was promoted to legal
18   officer two, where I took over as -- in charge of the
19   discovery unit and became an advisor -- superintendent.
20   In 2017 --
21       Q    Hold on for a second there, you became a legal
22   officer two over the discovery unit, and advisor to who
23   did you say?
24       A    Superintendent of police, who at the time was
25   Garry McCarthy.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 18

1    Q    Uh-huh.
2    A    February of 2017, I was promoted to Lieutenant
3  and I was assigned to the 18th district.  In October of
4  2017, I was reassigned as a Lieutenant to the office of
5  reform management, create that unit -- which it was
6  created to both negotiate and implement the impending
7  consent decree with the Attorney General's office.  2018
8  I took over as Head of Policy for the research and
9  development division as a Lieutenant.  In November 2019,
10  I became a captain of the 9th district.  That brings us
11  to February of 2020 when I was promoted to commander of
12  Area Five detectives.
13    Q    Okay.  Thank you for walking me through that.
14  The 9th district.  What area is that in?
15    A    The 9th district is located in the Bridgeport
16  neighborhood at 35th and Halstead.
17    Q    And is there -- what detective division is --
18  has authority or is assigned in that area?
19    A    That is covered by Area One at this time.
20    Q    And the -- when you were in the 18th district,
21  what detective division area covered that district?
22    A    When I was in the 18th district, it was
23  covered by the Area Central detectives, which at the
24  time was -- so -- this one I could cover by Area Five
25  while I was assigned there.

Page 19

1    Q    And in the 13th district of what, what
2  detective division area covered that district?
3    A    13th district was covered by Area Four.  When
4  I was assigned there.
5    COURT REPORTER:  I'm sorry to interrupt,
6  Counsel.  My audio just cut out.  Right as he was
7  explaining that he was in the -- that he covered
8  Area One.  My apologies.
9    MR. SWAMINATHAN:  What's the last thing you
10  have written down?  I thought you said you, you
11  have.  Yeah.  What is the last thing you have?
12    COURT REPORTER:  Yes, sir.  It said that's what
13  area he had been -- had authorized and assigned to.
14  And he said that he covered here.  Let me one
15  moment, please.  I will do a playback.  Apologies,
16  Counsel.
17    (REPORTER PLAYS BACK REQUESTED TESTIMONY)
18  BY MR. SWAMINATHAN:
19    Q    Okay.  All right.  When you were -- so I'm
20  going to have to ask a couple questions over again
21  there, Commander.  When you were in the 25th district,
22  what area covered over that district?
23    A    Area Five.
24    Q    And when you were in the 13th district, what
25  area covered that district?

Page 20

1    A    Area Four.
2    Q    Okay.  Your position teaching law in the
3  academy.  When you came back from your time in Morris
4  City, New Jersey.  Can you tell us what law you were
5  teaching in the academy?
6    A    Mostly criminal law.
7    Q    And what's -- sorry, go ahead.
8    A    I also taught jurisdiction and constitutional
9  law, and I also taught patrol procedures as needed.
10    Q    Okay.  Do you have a legal degree?
11    A    I do.
12    Q    And where did you attend law school?
13    A    Brooklyn Law School in Brooklyn, New York.
14    Q    Okay.  I lived very close to Brooklyn Law
15  School for some years.  What year did you graduate?
16    A    2000.
17    Q    You said 2000?
18    A    Yes.
19    Q    Okay.  And where'd you go to college?
20    A    Rutgers University.
21    Q    And when did you graduate?
22    A    1997.
23    Q    Did you go straight to law school?
24    A    I did.
25    Q    And when you say you taught criminal law at

Page 21

1  the academy, what subjects of criminal law did you
2  teach?
3    A    Mostly the class was focused on the proper
4  charging of cases.  So because it's a basic recruit
5  class, we would go over the elements to a variety of
6  crimes, mostly referenced in the Illinois compiled
7  statutes.
8    Q    Did you teach about Brady obligations?
9    A    I don't specifically remember teaching about
10  Brady obligations.  However, I had -- I shared teaching
11  responsibility with two other instructors and I did
12  occasionally use lesson plans and taught their
13  constitutional law class and it may have been in the
14  curriculum at the time.  It would depend on what classes
15  I covered, but I don't have any independent recollection
16  of it.
17    Q    And between you and the other two instructors,
18  was information about Brady obligations taught at the
19  academy?
20    A    Yes.
21    Q    Did you teach about Miranda warnings at the
22  academy?
23    A    Yes.
24    Q    Did you provide any law related teaching with
25  regard to interrogations of suspects?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 22

1   A   I don't recall that I taught those classes.
2   The subject of interviews and interrogations was taught
3   at the police academy during that time.
4       Q   Okay -- all right.  When you went to Legal
5   Affairs as a government liaison -- strike that.  All
6   right.  Is there a subpoena service unit in the Chicago
7   Police Department currently?
8       A   Yes.
9       Q   And what group or area or division is that
10  within?
11      A   A Subpoena unit is organized under the Records
12  division.
13      Q   Okay.  Did you ever have any command or
14  authority over that unit?
15      A   I interacted with them, but I did not command
16  them.
17      Q   In what positions that you held with Chicago
18  Police Department did you interact with the Subpoena
19  Service Unit?
20      A   While I was in charge of discovery,
21  occasionally our duties mingled.  We had some of the
22  same issues.  So the discovery unit handled almost all
23  civil litigation.  The unit would sometimes get
24  subpoenas related to civil cases.  So we -- I -- I also
25  worked with them because at the time we were both

Page 23

1   upgrading our software to Sub UA (phonetic).  So we
2   shared a lot of the same interests.
3       Q   Okay.  So if I understand you correctly, you
4   said while you were in the Discovery unit, the Discovery
5   unit handled discovery and civil cases and the Subpoena
6   Service Unit handled discovery and criminal cases, is
7   that correct?
8       A   Yes.  More or less, yes.  Generally speaking,
9   yes.  There's some crossover.
10      Q   Okay.  And when you say there's some
11  crossover, in what way with their crossover?
12      A   For example, if an internal affairs request
13  for an open investigation comes in for a criminal case,
14  it would not immediately be filled.  It would go to
15  legal affairs first to examine.  If a subpoena came in
16  that the city intended to fight for a lack of a better
17  word, it would go to legal affairs to review.
18      Q   Okay.  And so with regard to subpoenas from
19  prosecutors or criminal defense attorneys, those were
20  primarily handled by the Subpoena Service Unit, correct?
21      A   Yes.
22      Q   And informal requests from prosecutors or
23  criminal defense attorneys were handled by the Subpoena
24  Service Unit, correct?
25      A   Did you say informal requests?

Page 24

1       Q   Yes.  Informal requests, you know, a phone
2   call or some other request other than a subpoena for
3   files would be addressed by the Subpoena Service Unit,
4   if it came from prosecutors or defense attorneys; is
5   that correct?
6       A   No.
7       Q   Okay.  How would those be handled?
8       A   A Subpoena unit handles subpoena requests.  So
9   it would be a physical piece of paper.  Now it can be an
10  electronic request.  During the relevant time period, it
11  would be a piece of paper.  An informal request, for
12  example, if something's needed at court, if the state's
13  attorney has a relationship with a detective that -- or
14  if there's some sort of emergency that they need the
15  detective there and to bring the file right away, that
16  would be an interaction between not the Subpoena unit,
17  but the State's attorney and the detective.
18      Q   And so, did you have any involvement -- strike
19  that.  You indicated that in your role in Legal Affairs
20  in -- strike that.  In your role, as in the Discovery
21  unit in '20 -- approximately 2015 and on, you had
22  interactions with the Subpoena Service Unit, correct?
23      A   Yes.
24      Q   Did you have interactions or work with the
25  Subpoena Service Unit in any prior positions?

Page 25

1       A   We, for example, when I was the head of the
2   Special Investigations Unit, I was in charge of
3   operations and administrations.  And so on a regular
4   basis, I would receive subpoena requests for information
5   from the Subpoena unit that I would fill and return to
6   them.
7       Q   Okay.  And when you say you would get those
8   requests that this is when you, this was in your
9   position as a Sergeant over the SIU unit?
10      A   Correct.
11      Q   Okay.  And so -- would you personally be
12  involved in fulfilling those subpoena requests?
13      A   Correct.
14      Q   Okay.  And did you have any prior interactions
15  with the Subpoena Service Unit prior to 2013 when you
16  were a Sergeant in the Special Investigations Unit?
17      A   Not that I can recall.
18      Q   Okay.  All right.  Fair to say, sir, you
19  worked in several different areas of the Chicago Police
20  Department?  What I say by areas, I mean, locations
21  within the Chicago Police Department?
22      A   That is fair to say.
23      Q   Okay.  Fair to say that you have some
24  understanding of the practices across different
25  districts and areas of the Chicago Police Department?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 26

1     A    That is also fair to say.
2     Q    Okay.  In any of your positions with the
3  Chicago Police Department, did you ever train
4  detectives?
5     A    Yes.
6     Q    In what positions did you train detectives?
7     A    I was the commanding officer of the Special
8  Investigations Unit.  I trained pre-service detectives
9  in child abuse investigations and criminal sexual
10  assault against children investigations, as well as the
11  supervisor in Area One and in special investigations.  I
12  trained my subordinates in roll call training as well as
13  on the job training.
14     Q    And did you train detectives in any of your
15  prior positions before that?
16     A    I did not.
17     Q    All right.  I'm just going to pull up the
18  notice of amended notice of 30(b)(6) deposition.  Give
19  one moment.  All right, sir.  Are you able to -- are you
20  able to see this document on my screen?
21     A    Yes.
22     Q    Entitled Amended Notice of Rule 30(b)(6)
23  Deposition.  Yes?
24     A    Yes.
25     Q    Okay.  I have marked this document is Exhibit

Page 27

1  1.  Its title is Amended notice of Rule 30(b)(6)
2  deposition of city of Chicago.  It is eight pages and
3  I'm just sort of scrolling through the pages here.
4  Sir, you've seen this documente in advance of today's
5  deposition?
6          (EXHIBIT 1 MARKED FOR IDENTIFICATION)
7     A    Yes.
8     Q    Okay.  And this 30(b)(6) notice identifies
9  various topics, and topic -- I'm not going to read the
10  topics, but sir, are you here to provide binding
11  testimony on behalf of the city today on topic 1A in
12  this notice?
13          MS. ROSEN:  I object to the form and your use
14       of the word, finding the rule is what the rule is
15       and Commander Winstrom is going to be providing
16       30(b)(6) testimony.
17     A    Yes.
18     Q    And sir, are you prepared to provide binding
19  testimony today on behalf the city, Chicago with regard
20  to topic 1B?
21          MS. ROSEN:  Same objection.
22     A    Yes.
23     Q    Are you prepared to provide by any testimony
24  on behalf of the city of Chicago with regard to topic
25  1D?

Page 28

1          MS. ROSEN:  Objection.
2     A    Yes.
3     Q    Are you prepared to provide by any testimony
4  on behalf of the city of Chicago with regard to topic
5  1E?
6          MS. ROSEN:  Same objection.
7     A    Yes.
8     Q    Are you prepared to provide binding testimony
9  on behalf of the city of Chicago with regard to topic
10  1F?
11          MS. ROSEN:  Same objection.
12     A    Yes.
13     Q    Are you prepared to provide binding testimony
14  on behalf the city of Chicago with regard the topic 2A?
15          MS. ROSEN:  And I'm just going to have a
16       standing objection to all these questions with
17       respect to paragraph two.
18     Q    Thank you.  Sir, are you prepared to provide
19  binding testimony today with -- on behalf of the city of
20  Chicago with regard to topic 2B?
21     A    Yes.
22     Q    Are you prepared to provide binding testimony
23  on behalf of the city of Chicago with regard to topic
24  2D?
25     A    Yes.

Page 29

1     Q    And are you prepared to provide binding
2  testimony on behalf of the city of Chicago today with
3  regard to topic 2E?
4     A    Yes.
5     Q    Are you prepared to provide binding testimony
6  behalf the city of Chicago with regard to topic 2F?
7     A    Yes.
8     Q    And are you prepared provide binding testimony
9  on behalf of the city of Chicago with regard to topic
10  2G?
11     A    Yes.
12     Q    Okay, sir, can you tell me what you did to
13  prepare for today's deposition?
14     A    I met with my lawyers.  I reviewed some orders
15  from the relevant time period.  I reviewed some training
16  material from the relevant time period, my accumulative
17  knowledge of my 20 plus years on the Chicago Police
18  Department.  And I did speak to one individual also.
19     Q    All right.  Putting aside your conversation
20  with lawyers, who is that individual you met with?
21     A    I spoke briefly to Bonita Lee.
22     Q    Who is Bonita Lee?
23     A    Bonita is a civilian who works in research and
24  development and is one of the longest serving members of
25  the police department.  And for -- that I use for older

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1  orders, make sure that I didn't miss orders for
2  preparation for this.
3      Q     Okay.  Were you involved -- and I'm sorry, go
4  ahead.
5      A     Didi just confirmed the knowledge that I
6  already had.
7      Q     Okay.  Did you learn any new information from
8  Bonita Lee?
9      A     No.
10     Q     And if I understand correctly, your
11 conversation with Bonita Lee was to make sure that you
12 had identified all of the relevant policies and training
13 documents.  Is that correct?
14     A     Policies, yes.
15     Q     Okay.
16     A     She is not a -- a resource that I used for
17 training.
18     Q     Okay.  Were you involved in the production of
19 -- strike that.  Were you involved in identifying the
20 documents to be -- strike that.  Were you involved in
21 identifying the policies to be produced in this case?
22     MS. ROSEN:  Object and instruct him not to
23 answer, I think that invades attorney client.
24     MR. SWAMINATHAN:  I'm not asking for the
25 content of any communications.  I'm just asking him

1  if he was -- had a role in identifying documents to
2  be produced in discovery.
3      MS. ROSEN:  I still have an objection to that
4  based on attorney-client and attorney work product.
5  Instruct him not the answer.
6  BY MR. SWAMINATHAN:
7      Q     I think that that's an inappropriate use of
8  work product privilege, but -- and attorney-client
9  privilege, but we'll come back to it, sir.  Have you
10 reviewed policies that were produced in this case?
11     A     Yes.
12     Q     Okay.  In your role with the Chicago Police
13 Department, do you have involvement in the production of
14 policies in discovery, in civil cases?
15     MS. ROSEN:  Objection, form.
16     A     Since I have worked in legal affairs, I have
17 been involved in the production of this.
18     Q     Okay.  When you spoke with Bonita Lee, were
19 you aware of what policies were being produced in this
20 case?
21     A     I don't think I was.
22     Q     When you spoke with Bonita Lee, did you ask
23 her if there were any additional policies you should be
24 aware of?
25     A     What I asked Bonita Lee is that I -- I told

1  her that my understanding of our interpreter policy was
2  that it didn't come to be until 2009, and I wanted to
3  make sure because prior to that time frame, the -- our
4  database isn't electronic, it's on paper, and I wanted
5  to make sure that I had that right.  So I was going off
6  memory and I wanted to make sure my memory was correct.
7  And she confirmed that my memory was correct.
8      Q     Okay.  So she confirmed -- strike that.  So
9  it's your understanding that there was no CPD policy
10 with regard to interpreters until 2009; is that correct?
11     A     There's not nothing on point.  Interpreters
12 may have been mentioned at some point in time, there's a
13 -- a mention of how to get a sign language interpreter.
14 But as far as this case, there's nothing on point that
15 an order, which would be responsive to this, came about
16 in 2009.
17     Q     Okay.  And when you say that would be
18 responsive to this, what you're referring to is --
19 strike that.  Prior to 2009, there was no specific
20 policy addressing the use of interpreters in interviews
21 and interrogations of witnesses and suspects.  Is that
22 correct?
23     A     Correct.
24     Q     Okay.  All right.  How many meetings did you
25 have with Counsel in preparation for today's deposition?

1      A     I believe I met with them three times.
2      Q     And how many total hours approximately would
3  you say you spent preparing with Counsel?
4      A     I would have to estimate nine.
5      Q     Okay.  And did you spend any additional hours
6  preparing with Counsel over the phone?
7      A     (No verbal response.)
8      Q     Your answer cut out there, sir.
9      A     The answer is no.
10     Q     Thank you.  In those meetings with Counsel,
11 did you review any documents?
12     A     Yes.
13     Q     And tell me what documents you reviewed.
14     A     We reviewed the notice, which is currently on
15 the screen.  We reviewed some training materials.  We
16 reviewed the detective division SOPs in this time frame.
17 I believe they're dated 1988.  We reviewed the detective
18 division special orders, which preceded the detective
19 division SOPs.  And we looked at some general orders
20 and/or special orders.  I can't remember how they were
21 all classified, but on interviews and interrogations.
22     Q     Other than the -- oh, I'm sorry, go ahead.  Did
23 you have more to say?
24     A     That's all -- that's all I can think of at
25 this time.  Oh, I'm -- I'm sorry.  We also reviewed the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 34

1  rules and regulations.
2      Q    Did you review any --
3      A    Just other files in the department.
4      Q    Did you review any of the files or documents
5  related to the underlying homicide investigation in this
6  case?
7      A    Yes, I did.  Yes.  I left that one out.  Yes,
8  we did review the investigative file.
9      Q    Okay.  In your review of the investigative
10  file, did you find any violations or deviations from
11  policy?
12          MS. ROSEN:  Object to the form.
13      A    I'm -- well -- the short answer is no.
14  However, I did not do as thorough of a job looking at
15  that file as I would have if I was -- as a supervisor
16  looking to see if it was in compliance.  I didn't study
17  the file as I generally would for that specific
18  question.
19      Q    Okay.  Did you review any transcripts of prior
20  depositions?
21      A    Oh, yes, I did.  Which I read -- I read a
22  transcript from Jim Hickey, I heard from the Chicago
23  Police Department.  In fact, I think I read two
24  transcripts from Jim Hickey.  One of them was in the
25  Jacques Rivera case.  And the other one may have been in

Page 35

1  the Jacques Rivera case as well.  I don't -- I don't
2  remember.
3      Q    Did you review a transcript of Mr. Hickey from
4  the Nathson Fields case at all?
5      A    I am familiar with that case, just because of
6  my time in Legal Affairs, but I don't -- I don't think
7  that I did, but it's possible that I did.  I thought
8  they were both Jacques Rivera, but I'm not sure.
9      Q    The transcripts that you reviewed from -- of
10  Mr. Hickey, did you have any disagreement with any of
11  the testimony when he provided his -- in those
12  transcripts you reviewed?
13          MS. ROSEN:  Object to the form.
14      A    I can't recall off the top of my head anything
15  I -- I disagreed on him with, it's possible I did.
16      Q    Okay.  Sitting here today, when -- can you say
17  there's anything you read in those transcripts for
18  Mr. Hickey that you would say you disagree with?
19      A    Not that I can remember, but I -- yes, not
20  that I can remember.
21      Q    When you reviewed those transcripts for
22  Mr. Hickey, did you make any note to yourself indicating
23  that you had a disagreement with anything that you had
24  read in his testimony?
25      A    No.

Page 36

1      Q    Okay.  Did you review the transcripts of any
2  other of 30(b)(6) witnesses -- strike that.  Did you
3  review any defendant transcripts of an individual named
4  Karen Sullivan?
5      A    I -- I had Karen Sullivan's deposition for a
6  case.  I had reviewed that deposition for a previous
7  case.  I don't think I deeply went into that for that,
8  but I am familiar with her deposition as well.
9      Q    So you reviewed Karen Sullivan's deposition in
10  the past; is that correct?
11      A    I had four previous 30(b)(6) testimony.
12      Q    Okay.  And when you've reviewed Karen
13  Sullivan's deposition testimony in the past, did you
14  have any disagreement with her prior deposition?
15          MS. ROSEN:  Object to the form.
16      A    Not that I can remember.
17      Q    And is one of the deposition transcripts of
18  Karen Sullivan that you've reviewed from her testimony
19  in the Nathson Fields' case?
20      A    It could be, but I don't know.
21      Q    Okay.
22          MS. ROSEN:  I'm going to -- object to the form.
23  And are you sure she testified in Fields?
24          MR. SWAMINATHAN:  I believe so.
25          MS. ROSEN:  Objection.

Page 37

1  BY MR. SWAMINATHAN:
2      Q    Mr. Winstrom, have you reviewed -- prior to
3  your recent review of two transcripts from Mr. Hickey,
4  have you previously reviewed any deposition testimony
5  for Mr. Hickey?
6      A    I believe I have.
7      Q    Okay.  And in those prior instances, did you
8  review additional transcripts of Mr. Hickey other than
9  just the two that you reviewed recently?
10      A    It's possible, but if I have, I don't
11  remember.
12      Q    Okay.  In any of the prior instances and --
13  how many total times do you think you've reviewed
14  testimony of Mr. Hickey?
15      A    Deposition in maybe two previous depositions.
16      Q    You cut out there.  Sorry, could you repeat
17  that?
18      A    Possibly two other depositions.
19      Q    Okay.  So you reviewed two other depositions
20  of Mr. Hickey.
21      A    In preparation for two other depositions, I
22  may have read transcript of Jim Hickey.
23      Q    Got it.  And in either of those instances,
24  when you reviewed transcripts of Mr. Hickey, did you
25  identify any areas in which you disagreed with his

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 38

1  testimony?
2      MS. ROSEN:  Objection, form.
3      A    Not that I can remember.
4      Q    Okay.  Have you reviewed any of your prior
5  30(b)(6) deposition testimony?
6      A    I actually have not for the purpose of this
7  case.  I have reviewed previous testimony for previous
8  depositions.
9      Q    Okay.  So each time you have previously
10 testified as a 30(b)(6) deponent for the City of
11 Chicago, have you subsequently reviewed that testimony?
12     MS. ROSEN:  Object to the form.
13     A    Correct, like to prepare an errata sheet? Yes.
14     Q    Okay.  And in any of those instances, when you
15 reviewed your deposition testimony in preparing your
16 errata sheet, did you identify any testimony that you
17 believed you had gotten wrong or incorrect?
18     MS. ROSEN:  Object to the form.
19     A    I don't believe it was any testimony I believe
20 I had gotten wrong, but I did see some mistakes in
21 inscribing.
22     Q    Okay.  In other words, there was --
23     A    It was possible that I misspoke as well.
24     Q    Okay.  In those instances, did you then
25 correct those errors in the errata sheet?  Did you find

Page 39

1  any instances when you provided testimony in those prior
2  cases where you found that your substantive testimony
3  about the City of Chicago's policies, practices or
4  training was incorrect or false?
5      MS. ROSEN:  Objection, form.
6      A    Not that I can remember.
7      Q    Do you stand by your testimony in those prior
8  depositions?
9      MS. ROSEN:  Objection, form.
10     A    Yes.
11     Q    Okay.  You said you reviewed orders in
12 preparation for today's deposition, correct?
13     A    Correct.
14     Q    And other than the orders that were produced
15 in this case you reviewed in preparation for today's
16 deposition, are you aware of any other orders of the
17 Chicago Police Department that are relevant to the
18 topics you're testifying about today?
19     A    No.
20     Q    And other than the training materials that you
21 reviewed, and were produced in this case, are you aware
22 of any other training materials that are relevant to, to
23 the topics you were testifying about today?  Topics 1
24 and 2.
25     MS. ROSEN:  Objection, form, foundation.

Page 40

1      Q    Oh, okay.  And would it be fair to say -- so
2  strike that.  So your testimony today, sir, would it be
3  fair to say, it is based in part on your review of
4  Chicago Police Department orders and training materials?
5      A    Yes.  That is fair to say.
6      Q    And would you say your testimony today is
7  based in part as well on your cumulative experience and
8  knowledge as a Chicago Police Officer?
9      A    That is correct.
10     Q    Okay.  And would it be fair to say that you
11 have also done additional work to prepare on on these
12 topics for prior depositions?
13     A    I have prepared for prior depositions, yes.
14     Q    Okay.  And have you prepared for prior
15 depositions with regard to these same topics?
16     MS. ROSEN:  Objection, form, misstates his
17 prior testimony.
18     A    I have prepared -- I have never prepared for
19 testimony about translation or the arrest of a foreign
20 national.
21     Q    Okay.  Thank you for that.  So, other than the
22 -- the topic of interviews and interrogations of foreign
23 nationals, each of the other topics in topic 1 and topic
24 2 are topics in which you have previously prepared to
25 also provide testimony for the City of Chicago, correct?

Page 41

1      A    I don't know that I have prepared to testify
2  about our CPD unit practices, but I believe it has come
3  up in the past.
4      Q    Okay.  And with regard to the other topics in
5  topic 1 and topic 2, you have engaged in preparations
6  for those topics, correct?
7      A    That is correct.
8      Q    Okay.  And did those preparations for prior
9  depositions with regard to some of the topics in topics
10 1 and 2, did you also speak to other people to help you
11 get prepared?
12     A    Yes.
13     Q    Okay.  And do you feel, sitting here today,
14 based on the documents you reviewed and your experience
15 and your preparations, that you are in a position to
16 provide testimony on behalf of the City of Chicago on
17 topics 1 and 2?
18     A    Yes.
19     Q    Okay.  I want to ask you about CPD
20 documentation and file keeping preservation policies
21 with regard to documentation in investigations.  And
22 let's focus obviously on homicide investigations, given
23 that that is the relevant subject in this case -- are
24 you -- you with me?  We'll focus on homicide
25 investigations?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 42

1    A    I am with you.
2    Q    Okay.  With regard to documentation in
3    homicide investigations, is it correct to say that there
4    were specific policies that applied to that subject
5    matter.
6    A    Yes.
7    Q    And there were policies that applied in the
8    period from 1986 through 1998 with regard to
9    documentation, correct?
10   A    Yes.
11   Q    Okay.  Going to pull up a file -- see that --
12   here -- one moment.  Are you able to see my screen, sir?
13   A    Yes.
14   Q    Okay.  And you -- are you able to see the
15   document I'm showing on the screen, Detective Division
16   Special Order 86-3?
17   A    Yes.
18   Q    Okay.
19        MS. ROSEN:  Can you, Anand, can you give us the
20   Bates range, which you didn't share advance.
21        MR. SWAMINATHAN:  I'm going to do that right
22   now.  So for the record, I have -- I am now sharing
23   my screen to show the document we've marked as
24   Exhibit 2, its title is Detective Division Special
25   Order 86-3.  And the Bates range for this document

Page 43

1    is RFC Saloche Reyes 117535 through 117537.
2        (EXHIBIT 2 MARKED FOR IDENTIFICATION)
3    BY MR. SWAMINATHAN:
4    Q    Sir, you reviewed this document in preparation
5    for today's deposition, correct?
6    A    Correct.
7    Q    And is it fair to say that this was the
8    detective division's policy that applied to
9    documentation in homicide investigations in the period
10   from 1986 through 1998?
11        MS. ROSEN:  Objection, form foundation.
12   A    Most of this is nearly identical to the 1988
13   Detective Division SOPs.  However, when the '88 SOPs
14   went to -- went into effect, they would've rescinded
15   this specific policy.
16   Q    Okay.  Thank you.  So this 86-3 policy that
17   I'm showing you, Exhibit 2, was rescinded and replaced
18   by Special Orders in 1988, correct?
19        MS. ROSEN:  Objection form foundation.
20   A    They were actually SOPs.  This is a -- a
21   detective division Special Order.  They were replaced by
22   detective division Standard Operating Procedures.
23   Q    Thank you.  So this detective division
24   Standard Operating Procedures went into place in 1988,
25   correct?

Page 44

1    A    Yes.
2    Q    And there was a SOP specifically with regard
3    to documentation for homicide investigations, correct?
4    A    Yes.
5    Q    And that, SOP enacted in 1988 was in effect
6    through 1998, correct?
7    A    It was to revise that, I believe, in 1992.
8    However, the substance is nearly identical on this
9    topic.
10   Q    Were -- are there any substantive changes from
11   what is written in Special Division Order 86-3 in the
12   period from nine -- from this order being enacted
13   through 1998?
14        MS. ROSEN:  Objection, form.
15   A    I would have to look at them side by side.  And
16   -- well, unless you have a specific section of this and
17   then ask me if they're the same.
18   Q    Did you review the SOP from 1988 in
19   preparation of today's deposition?
20   A    Yes.
21   Q    Are you -- and did you review this?  You said
22   -- you had indicated you reviewed this Special Order
23   86-3 as well, correct?
24   A    Yes.
25   Q    Did you notice any changes substantively

Page 45

1    between the two policies?
2        MS. ROSEN:  Objection, form.
3    A    There is a difference in wording.  There may
4    be something substantive procedurally that I didn't pick
5    up on, the overall policy theme is the same.
6    Q    Okay.  Other than some wording changes, are
7    you aware of anything that changed in terms of the
8    policy that applied to how detectives were to conduct
9    their documentation?
10        MS. ROSEN:  Objection, form.
11   A    I would have to compare these side by side to
12   look at exactly what changed procedurally.  In general,
13   the policy remains the same throughout the whole time,
14   like sections through the policy is the same.
15   Q    Okay.  And in -- and then in the period from
16   this policy being enacted 86-3, through 1998, would you
17   say that procedurally the policy was the same -- it was
18   the same with regard to documentation of homicide
19   investigations throughout?
20        MS. ROSEN:  Objection, form.
21   A    It was very similar.  However, procedurally,
22   orders like this contain things such as citations to CPD
23   forms, which may change over a period of time.  So they
24   would be different.  They may be renamed over a period
25   of time.  There may be some other procedural step that's

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 46

1 changed. I would have to look at them side by side, but
2 the overall policy is the same.
3     Q    Okay. All right. This Special Order 86-3,
4 did it apply to specific areas of the Chicago -- of the
5 detective division or did it apply across all areas?
6     A    This applied to the entire detective division.
7     Q    Okay. So that would be city-wide?
8     A    City-wide, as far as the detective division
9 goes. Yes.
10    Q    Thank you. And is that also true of the 1988
11 Special -- or SOPs?
12    A    That is correct.
13    Q    Okay. Were there -- in the period from 1986
14 through 1998, were there ever any Special Orders or SOPs
15 that -- that were applicable only to specific areas?
16    A    During that time period, areas could have had
17 unit level SOPs, however, they could not conflict with
18 this order.
19    Q    Okay. So in the period from 1986 through
20 1998, is it correct that the policies with regard to
21 documentation of homicide investigations were the same
22 across all detective division areas?
23    A    Correct.
24    Q    Okay. And are you aware of any unit level
25 policies with regard to documentation that were

Page 47

1 different at different detective division areas?
2     A    No. Any detective division area that wanted
3 to have their own SOP would have to be a clerical issue,
4 not in -- not in conflict with this would -- for
5 example, keep files in room A instead of room B,
6 something like that. None of their unit level
7 directives could conflict from detectives division
8 policy.
9     Q    And you cut out for a moment, none of their
10 unit level policies could conflict with the over -- with
11 these detective division Special Orders and SOPs, is
12 that correct?
13    A    That is correct.
14    Q    And to the extent the unit levels could have
15 their own orders within their units, are you aware of
16 any detective division areas period from 1986 through
17 1998, having any unit level orders with regard to
18 documentation?
19    A    No.
20    Q    Okay. And so would it be fair to say, sir,
21 that the policies with regard to documentation of
22 homicide investigations in the period from 1986 through
23 1988 -- '98, was the same across all detective division
24 areas?
25    A    It would be fair to say, as long as you're

Page 48

1 saying the policy is in like the policy stated in
2 section 2 here. There could be differences in, like, as
3 I mentioned, clerical level procedures, however, the --
4 this active Division Special Order applied to all areas.
5 So the -- the information in this is continued across
6 the city.
7     Q    And -- and to the extent there could be
8 clerical differences at any given area, you're not aware
9 of even those clerical level unit orders at all with
10 regard to this documentation policy, correct?
11    A    Correct.
12    Q    Okay. Other than this Detective Division
13 Special Order 86-3, and in the -- strike that. In the
14 period that this policy was in effect, are you aware of
15 any other detective division policies that applied to
16 the documentation of homicide investigation?
17    A    This is the one that is most on point far as
18 investigative files. If you look at all of the DDSOs,
19 it's possible that some of them touch on documentation
20 in a way that is not as on point as this. I mean, when
21 you discuss crime lab report or something like that, it
22 touches on investigative files overall, but specific to
23 investigative files, this is the wholly authority on the
24 subject.
25    Q    Okay. And so, for example, there's a policy

Page 49

1 with regard to the conduct of lineups and that policy
2 requires documentation under certain circumstances,
3 correct?
4     A    That is correct.
5     Q    Okay. So that policy would refer to potential
6 documentation under certain circumstances, but that's
7 not an overall policy with regard to documentation in
8 homicide investigations there.
9     A    That is correct.
10    Q    The only policy overall with regard to
11 documentation and homicide investigations is the
12 Detective Division Special Order on investigative files
13 like this 86-3 order. Correct?
14    A    I would word it a little differently. So the
15 only policy that's not the documentation of homicides,
16 because there's a lot of policies which touch on
17 documentation, but this is the policy on investigative
18 files.
19    Q    Okay. And is -- are there any other policies
20 that talk about the documentation that should be taken
21 in a homicide investigation other than this one,
22 acknowledging that this one refers to investigative
23 file?
24    A    Sure. Well, for example, the orders on
25 interviews and interrogation have requirements to



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 50

1  document certain things that wouldn't necessarily be in
2  a homicide, but if the homicide involved an interview
3  and interrogation, the detective would look to that
4  order to guide the documentation. And of course that
5  documentation would end up in a homicide file. So there
6  are other orders that touch on -- on these subjects.
7      Q   Are there any other Detective Division Special
8  Orders that talk about the maintenance of investigative
9  files, other than this one?
10     A   I don't believe so. No. No.
11     Q   Are there any other Detective Division Special
12 Orders that talk about the disclosure of information in
13 -- learned in homicide investigations, to the criminal
14 justice system, other than this one?
15     MS. ROSEN:  Object to the form.
16     A   This is definitely the one most on point, it's
17 possible that there is some procedural section of
18 another order which indicates transmittal or where a
19 form has to go. So I won't say that this is the only
20 one, but this is the one most on point on that subject.
21     Q   Are you aware of any other policy that makes
22 reference to the disclosure of investigative material
23 from a homicide investigation, other than this one?
24     MS. ROSEN:  Object to the form. You're saying
25     investigative material, you broadened it beyond file

Page 51

1  -- investigative files, right?
2      MR. SWAMINATHAN:  Yeah. But -- let's -- I
3      didn't mean to, so let's -- I don't mean to talk
4      about something different, so like I can clarify the
5      question.
6  BY MR. SWAMINATHAN:
7      Q   Sir, are you aware of any Detective Division
8  Special Order that applies to the disclosure of
9  investigative docu -- investigative records or files
10 other than this one?
11     MS. ROSEN:  Objection, form.
12     A   This is the most on point. It's possible that
13 in that SOP, as, as they talk about other subjects,
14 there's information directing where documents need to
15 go. But as far as the overall complete file, this is
16 the most on point.
17     Q   Okay. And to the extent you say that it's
18 possible that there's some other reference, you're not
19 able to identify any specific instance in which there's
20 such a reference; is that correct? Is that correct?
21     A   Not without looking at the SOPs.
22     Q   Okay. And in terms of -- strike that. To the
23 extent the city of Chicago put in place some policies to
24 guide detectives and their commanders with regard to the
25 disclosure of information and investigative files, this

Page 52

1  was the policy that is intended to do that, correct?
2      A   You are correct.
3      Q   Okay. And then the subsequent version of this
4  policy in the SOPs was also the policy intended to
5  provide that guidance to detectives and their
6  supervisors, correct?
7      A   That is also correct.
8      Q   Sir, would you agree that documentation is a
9  critical aspect of a homicide investigation?
10     A   Yes.
11     Q   And why is documentation critical to a
12 homicide investigation?
13     A   Documentation -- it further -- through the
14 criminal justice process.
15     Q   You cut out there, I'm sorry. In the middle
16 of your answer.
17     A   Documentation of a homicide investigation is
18 required to move the case through the criminal justice
19 process.
20     Q   Okay. And why is that documentation required?
21     MS. ROSEN:  Object to the form.
22     A   Documentation is required for court. It's
23 required to be organized, for the detective. It's kind
24 of an existential question. So I could probably write
25 an essay on it, but it is very important.

Page 53

1      Q   There's lots of reasons why it's important,
2  correct?
3      A   Yes.
4      Q   It's also important as a means of
5  communication with fellow detectives and supervisors,
6  correct?
7      A   Well, I will agree that it's a -- a tool for
8  the supervisor to supervise as well. Communication with
9  other detectives, that would be on a case by case basis.
10     Q   Okay. One of the reasons -- strike that.
11 Would you agree that one of the reasons that
12 documentation is critical is as a memory aid, correct?
13     A   It can be helpful as a memory aid, that is
14 correct.
15     Q   During your time as a detective, did you take
16 notes?
17     A   I did.
18     Q   And did you view notes as a critical aspect of
19 your work?
20     A   Again, it's on a case by case basis. There
21 were cases that I investigated that I did not take notes
22 and there were cases that I investigated that I took
23 many notes.
24     Q   And why did you -- and why did you take notes
25 as a detective?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 54

1    A    For inclusion in documentation for the future,
2  to help me aid in creating my closing sup report, so
3  that I wouldn't forget things.  To write down things
4  such as phone numbers, that I couldn't memorize.  Host
5  of reasons to.
6    Q    And so did you use notes as a memory aid to
7  assist in your documentation of investigations as a
8  detective?
9    A    There are times that I did that.
10   Q    Okay.  And did you expect detectives that you
11 supervised, when you were in your supervisory
12 capacities, to use notes as an aid to assist them in
13 preparing thorough and accurate reports?
14   A    I did not require my detectives to take notes.
15 If they sounded helpful in a specific investigation,
16 they were expected to do so.  But as I said, there are
17 cases that I worked on that I took no notes and there
18 were cases that I took lots of notes.
19   Q    And what were the kind of -- oh, go ahead.
20   A    And my subordinates, the same.
21   Q    Okay.  What were the kind of circumstances in
22 which you found that you could write thorough and
23 accurate reports without the need for any notes?
24   A    Again, a case by case basis.  Sometimes it
25 would be that the case was a simple case, for example, a

Page 55

1  retail theft, that I thought I could keep the whole case
2  in my head.  Other times it was a complex case. However,
3  it was extremely memorable that the -- the incident that
4  I was not taking the notes for, and I knew that I could
5  recall it thoroughly.  And then other times I would know
6  that I was going to be close enough to a computer that I
7  wouldn't have to take notes, I could report it in a
8  supplementary report instead of note taking.
9    Q    So you guys actually go directly to a computer
10 and type it up quickly?
11   A    I don't know how quickly, but if it -- if it
12 was something that I thought that I could recall until I
13 got to the computer, then I wouldn't necessarily take
14 notes.  Every case is different, I would say.
15   Q    Okay.  Would you agree, sir, that a case
16 doesn't end with the arrest, but instead continues
17 through a criminal -- potential criminal prosecution and
18 trial?
19   A    I would -- I would like to say I agree,
20 because it seems like a simple thing to agree to, but I
21 guess it depends on what you mean by case.
22   Q    Okay, fair enough.  Actually --
23       MS. ROSEN:  Sorry.  Sorry to interrupt, but
24 Carrie lost the zoom feed, so could we pause?
25       MR. SWAMINATHAN:  Why don't we just -- why

Page 56

1  don't we take a quick five minute break anyway and
2  then we can use the bathroom and all that.
3       MS. ROSEN:  Okay, great.
4       COURT REPORTER:  Off the record.
5       (OFF THE RECORD)
6       COURT REPORTER:  We are back on the record.
7  BY MR. SWAMINATHAN:
8    Q    All right, Commander.  Fair to say that
9  detectives would often use their reports and notes as an
10 aid to prepare for testimony at trials?
11   A    Yes.
12   Q    Okay.  And so documentation was critical to
13 being able to remember facts, to be able to testify in
14 criminal trials, correct?
15       MS. ROSEN:  Objection, form.
16   A    Again, that's a case by case basis.  There
17 were cases that I worked on that I could tell you, that
18 just stuck in my memory, that I could tell you
19 everything that happened on them.  And I did so at
20 probable cause hearings without having to -- to review
21 paperwork.  Sometimes paperwork is very helpful to
22 review -- to refresh recollection, and sometimes it's
23 not necessary, but that would be just a case by case.
24   Q    Okay.  Would you agree that overall
25 documentation is critical to one re -- strike that.

Page 57

1  Would you agree that one reason documentation is
2  critical is as a memory aid for use at trial?
3    A    Again for it -- it -- that is often the case.
4    Q    Okay.  And you don't know in advance whether
5  you're going to need the assistance of documentation,
6  you know, a year later or whenever trial occurs.  So you
7  -- you got a document and you may or may not end up
8  needing it there.
9    A    Again, as I said, there are cases that I've
10 worked on that are seared into my memory that I could
11 testify on today as I did 15 years ago.  But it's a case
12 by case.
13   Q    Were detectives trained that their own
14 accurate documentation was critical as a memory aid to
15 help testify truthfully at trial?
16       MS. ROSEN:  Objection, form.
17   A    They were trained that.
18   Q    Okay.  Would you agree that another reason
19 that documentation is critical is because it is a method
20 of communication to supervisors?
21   A    I would rephrase that.  As having been a
22 supervisor, it's not necessarily when I hear a method of
23 communication, it's a way that my subordinate is telling
24 me, "Hey, I need something.  This is what's going on." I
25 would reword that if I was writing that document to say

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 58

1  that it can be, but it's also helpful for a supervisor
2  to supervise using the documentation.
3       Q    Right.  I mean -- go ahead.
4       A    And you can see what your detective did in the
5  case.
6       Q    Okay.  So in other words, documentation is
7  critical because it allows the sergeants and other
8  supervisors to keep abreast of the progress of homicide
9  investigations, correct?
10      A    Well, again, that's a case by case basis. I've
11 worked homicides that's in custody the same -- minutes
12 after the homicide, and there's no time to document and
13 your supervising without any document whatsoever.
14 However, when there is documentation and you're not -- I
15 mean, you're not actually witnessing or supervising the
16 individual, it is a tool.  Documentation is a tool to
17 supervise your subordinates, yes.
18      Q    Okay.  And was it the case that it was the
19 expectation of sergeants that as a general matter,
20 detectives were using documentation as a tool to keep
21 the sergeants and supervisors abreast of their progress
22 in investigations?
23      MS. ROSEN:  Objection, form.
24      A    So was your question, is it generally the
25 case?

Page 59

1       Q    Yes.  Is it generally the case that the
2  expectations of sergeants and other supervisors that
3  detectives would use documentation as a tool to keep
4  those supervisors abreast of their progress?
5       A    Yeah.
6       MS. ROSEN:  Objection.  I have an objection to
7       the form of that question.
8       A    So to clarify, I would say when it is
9  appropriate, yes because you're talking about keeping me
10 up to date on an investigation.  There might not be a
11 keeping me up to date.  I had a murder a week ago that I
12 knew the status and it was charged.
13      Q    Were detectives trained as a general matter
14 that documentation was critical to allow sergeants and
15 supervisors to stay abreast of the progress of
16 investigations?
17      MS. ROSEN:  Object to form.
18      A    Yes.
19      Q    Okay.  Another reason that documentation is
20 critical is that is because you don't always know what
21 information is going to turn out to be important in
22 solving a crime, correct?
23      A    That is sometimes the case.
24      Q    Okay.  And would you agree that in
25 investigations, including homicide investigations,

Page 60

1  information that may not seem all that important at one
2  point can prove to be very important down the road?
3       MS. ROSEN:  Object to the form.
4       A    That is sometimes the case.
5       Q    Okay.  And is that one of the reasons that it
6  was important to document as thoroughly as possible the
7  information a lawyer would learn during an
8  investigation?
9       MS. ROSEN:  Object to form and foundation.
10      A    So the question is -- can you repeat the
11 question?
12      Q    Yes.  The fact that information that may not
13 seem important today may become important down the road
14 in an investigation.  Is that one of the reasons that it
15 is important to document as thoroughly as possible the
16 information learned during an investigation?
17      MS. ROSEN:  I have the same objections, form
18      and foundation.
19      A    It could be.  I would say again, that's a case
20 by case basis as to what the facts are of the specific
21 murder.
22      Q    Was it a requirement that detectives record
23 information that the supports their case against a
24 particular suspect or subject?
25      MS. ROSEN:  Object to form.

Page 61

1       A    I think that's fair to say.
2       Q    And was it a requirement that detectives
3  record information if it supports a case against a
4  different subject or suspect?
5       MS. ROSEN:  Object to form and foundation.
6       A    If that's the case, I think that's also fair
7  to say.
8       Q    Okay.  And was it a requirement that
9  detectives record information if it undermines the case
10 against particular suspect or subject?
11      MS. ROSEN:  Object to form, foundation, and
12      incomplete hypothetical.
13      A    Yeah.  I would have to hear specifically what
14 it is you're referring to, but if you're just simply
15 making a question of, if they're required to include
16 exculpatory information, then the answer is yes.
17      Q    Okay.  The detectives were required to
18 document exculpatory information, correct?
19      A    Correct.
20      Q    And why was it important to do that?
21      A    For fairness or protecting the individual's
22 rights.
23      Q    When you say "Their rights," you're referring
24 to their constitutional rights, correct?
25      A    That is correct.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 62

1    Q    Detectives, were they trained that part of
2  their role is not just to close cases, but to actually
3  get to the truth?
4    A    That is correct.
5    Q    Were detectives trained about tunnel vision
6  and about avoiding television?
7    A    That is correct.
8    Q    And what were they trained about the subject
9  of tunnel vision?
10   A    Training is to keep an open mind in your
11 investigation.
12   Q    And what training or guidance is provided to
13 detectives about things they should be doing to avoid
14 tunnel vision in an investigation?
15   A    As far as specific training curriculum, that
16 includes that information, I can't recall exactly what
17 was said.  I do remember the overall theme being to keep
18 an open mind.
19   Q    Okay.  And were detectives trained to document
20 all of the various leads and directions that an
21 investigation goes?
22        MS. ROSEN:  Object to form and foundation.
23   A    So you have to be careful because detectives
24 are trained to document relevant information, so that's
25 what's important to be documented.

Page 63

1    Q    Right.  And if the detectives get a lead
2  pointing towards a person, that's something that is
3  relevant and should be documented, correct?
4        MS. ROSEN:  Object to form and foundation.
5    A    If it's determined to be relevant, it should
6  be documented.
7    Q    Okay.  So the detective had the ability --
8  strike that.  The detectives had the ability to say,
9  "Well, sure, that's a lead that somebody has given me,
10 but I don't like it, or I don't agree with it, or I
11 don't think it's relevant," and then they could choose
12 not to document it.  Is that right?
13        MS. ROSEN:  Object to form.  Mischaracterizes
14 his testimony.
15   A    I think that's a very cynical way of changing
16 what I said, but I would say that detectives are
17 required to include relevant information.  Just because
18 you have a lead does not mean that necessarily it is a
19 relevant lead.
20        You've got an anonymous tip that a space alien
21 killed Eric Winstrom, I wouldn't say that that should be
22 documented.
23   Q    Okay.
24   A    If I got an anonymous tip that Eric Winstrom
25 is the killer, and I found out that Eric Winston has

Page 64

1  been in the morgue for a year, it's definitely a case by
2  case basis.  So that's why the question is not a hard
3  rule of if you get a lead, put it in.  It's detectives
4  look at the case, what's relevant, put it in the case.
5  If there's exculpatory information, that's required to
6  be in the case.
7    Q    All right.  If audit makes a call and says,
8  Detective Winstrom was kidnapped by space aliens, is
9  that relevant information because even if it doesn't
10 tell us anything about Eric Winstrom, it tells us
11 something about the credibility of audit?
12   A    And it could be.  It very well could be, which
13 is why I'm saying it's a case by case basis.
14   Q    Okay.  So detectives on a case by case basis
15 could determine whether or not a lead was worthy of
16 being documented, included in investigative files?  Is
17 that fair?
18        MS. ROSEN:  Objection, form.
19   A    I will say the detectives were required to
20 include relevant information.  So if you're asking
21 whether a detective determines what is relevant and what
22 is not, I suppose that would be fair to say.
23   Q    Okay.  So detectives determine what
24 information is relevant or not, correct?
25        MS. ROSEN:  Object to form.

Page 65

1    A    That is part of their job.
2    Q    Okay.  And detectives were required to
3  document the information they deemed relevant, correct?
4    A    That is correct.
5    Q    And with regard to the subject of leads,
6  detectives would make a determination of whether or not
7  that particular lead was relevant or not, correct?
8    A    On a case by case basis.
9    Q    And based on that determination, they would
10 decide whether or not to document that lead, correct?
11        MS. ROSEN:  Object to form.
12   A    I think we went too far.  On a case by case
13 basis, they would make what determination to decide
14 whether to document a lead?
15   Q    Detectives would make a case by case
16 determination whether a they considered a lead relevant
17 and then whether they would, therefore, document it,
18 correct?
19   A    If a lead is relevant, it needs to be
20 documented.
21   Q    And if a detective had the authority to, if
22 they so deemed, they could find a lead to be not
23 relevant and then not document it under policy, correct?
24   A    If a detective -- well, see, you have to be
25 careful here because really it's not really a lead then,

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 66

1  it's just not relevant.  It is deemed not relevant it's
2  not a lead.  So instead of mixing words, I'd just like
3  to stick on that if it's a relevant fact, it should be
4  documented.  We require relevant information to be
5  documented.
6      Q   Okay.  So maybe I should try to understand
7  what relevance means a little bit better.  So
8  information that has to do with this investigation, this
9  crime, is that information that's considered relevant
10  and to be documented?
11      MS. ROSEN:  Objection, form.
12      A   So it's a case by case basis.  If I'm a
13  detective and I'm documenting a homicide and I get out
14  at the scene, I might document that the weather is 45
15  degrees, that the wind is blowing.  I'm not going to
16  document that I stepped out with my leg first and then
17  my right leg and then I blinked twice.  I mean, you can
18  document all day long.  What we require of detectives is
19  to document what's relevant in an investigation.
20      Q   Okay.  If detectives get information, which
21  would point to a potential alternate suspect to the
22  person that they've been currently investigating, is
23  that something that is to be documented?
24      A   If they received information that actually
25  there could be an alternate subject, and that's

Page 67

1  legitimate information, and it's a legitimate
2  possibility, then of course it should be documented.
3      Q   Okay.  And detectives had the authority under
4  the policy to say if they got some information about an
5  alternate suspect, they could determine whether they
6  considered that to be legitimate information or not
7  before deciding whether to document it, fair?
8      A   What's fair to say is that they are required
9  to document relevant material, so there's no policy,
10  which says if a subject is identified, you get to
11  determine whether or not, if it's relevant, it needs to
12  be documented.
13      Q   Okay.  And what training were detectives
14  provided about what constitutes relevant information in
15  this investigation?
16      A   The overall training for detectives, of
17  course, starts with their recruit training, which,
18  during this time period, was anywhere from four to six
19  months, and it's basic police work training.  Prior to
20  becoming a detective who had several years, at least,
21  minimum, of being a patrol officer.  So with the recruit
22  training during that time as a patrol officer, you are
23  exposed to, in the City of Chicago, many, many crime
24  scenes, many crimes, you witness first-hand the criminal
25  justice process in the court system, you work on scenes

Page 68

1  with detectives, and you get an understanding of cases
2  and an understanding of, even just a basic
3  understanding, of a homicide of the basics of an
4  investigation.  You then go to pre-service detective
5  training, which during this time was four to six weeks,
6  where you get more in depth training on how to
7  investigate cases.  During that investigation, for
8  example, homicide investigations, where you learn the
9  sorts of evidence that's available to you, what's
10  important to collect.  And then the detectives go into
11  the detective area and their partners, usually with a
12  more experienced detective.  They would go through a
13  short period of training where they're paired with a
14  senior detective and then throughout their career, as a
15  detective, they learn by doing.  I, myself, started out
16  as a burglary detective, which is a more simple crime,
17  so as you get better at that, you move on to more
18  serious crimes.  And the homicide detectives, by the
19  time they reach that position, have all those years of
20  experience in investigating cases to determine what's
21  relevant and what's not relevant.
22      Q   For sergeants supervising homicide detectives,
23  was it the expectation that they would be tracking the
24  progress of homicide investigations?
25      A   Generally speaking, yes.

Page 69

1      Q   And those communications -- strike that.
2  And the process of keeping track of the progress of
3  homicide investigations, that was done in part orally in
4  communications directly with the detectives, correct?
5      A   Correct.
6      MS. ROSEN:  Form.
7      Q   It was also done through review of the reports
8  and other documents being generated by the detectives,
9  correct?
10      A   On a case by case basis, that is correct.
11      Q   And would supervisors, sergeants, and other
12  supervisors participate, in giving detectives guidance
13  on what additional investigative steps should be taken
14  during the course of an investigation?
15      MS. ROSEN:  Object to foundation.
16      A   On a case by case basis, supervisor's often
17  coach and mentor detectives, but it depends on the case.
18      Q   In fact, one of the overall responsibilities
19  of sergeants and supervisors was to ensure that homicide
20  investigations were being pursued thoroughly, correct?
21      MS. ROSEN:  Object to foundation and form.
22      A   I guess I'm uncomfortable with the term,
23  "pursued thoroughly," but I would say part of the
24  requirements of a supervisor is to ensure that a
25  homicide is properly investigated.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 70

1    Q    And part of that is to understand what
2 investigative steps have been taken and what additional
3 investigative steps could or should be taken, correct?
4    A    Those are things that a supervisor who was
5 reviewing their subordinate's activity definitely look
6 towards.
7    Q    Okay.  And so it was important for homicide
8 detectives to document the investigative steps that they
9 took during an investigation, correct?
10    MS. ROSEN:  Object to form.
11    A    As a general statement, that seems correct,
12 but it doesn't necessarily apply to every investigative
13 step you would take.  You don't document every single
14 thing you're doing, as I described earlier, so it's the
15 important things, the things that are going to be needed
16 for court you would want to document.
17    Q    So what was the detectives' trained about the
18 kind of investigative steps they would take that they
19 could document versus the ones they didn't have to
20 document?
21    A    Detectives were trained that they were to
22 document relevant investigative steps that were taken.
23 They were -- (Inaudible) and trained (Inaudible) -- and
24 I knocked on doors, I talked to everyone, and nobody saw
25 anything, it's possible I wouldn't document that.  So if

Page 71

1 it's something relevant, it should be documented.
2    Q    Okay.  So under the policies and training for
3 detectives, they could interview somebody and if that
4 person indicated that they didn't see it, or don't have
5 any information, that wouldn't have to be documented,
6 correct?
7    A    On a case by case basis, and it would depend
8 because the example that you're giving sounds like that
9 information may be relevant.  If it's relevant, it
10 should be included.  If it turns out that you
11 interviewed an individual on this block because he
12 thought a murder took place there, and then you realized
13 that the body had been moved, it's possible that it's
14 not relevant.  So it would depend on the specifics of
15 the case.
16    COURT REPORTER:  And Counsel, I'm sorry to
17 interrupt, but my internet cut out once again.  I do
18 apologize.
19    MR. SWAMINATHAN:  Okay.  Is there something we
20 can do?  So, I mean, where did we leave off?  Do you
21 know?
22    COURT REPORTER:  Yes, sir.  I can play back the
23 last thing I heard, and I do apologize, but it's
24 because of the bad weather where I am.
25    MR. SWAMINATHAN:  Okay.

Page 72

1    COURT REPORTER:  Give me one moment, sir, and
2 I'll do a playback.  I don't believe I was gone for
3 very long.
4    (REPORTER PLAYS BACK REQUESTED TESTIMONY)
5    COURT REPORTER:  That is the last I had, sir.
6    MR. SWAMINATHAN:  All right.  Let me see where
7 I got to go back to, and while I do that, I got to
8 go get my computer charger.  So just give me one
9 second here.
10    COURT REPORTER:  Okay.
11 BY MR. SWAMINATHAN:
12    Q    I think the question that we missed and I will
13 re-ask.  So we try to have it on the record is so
14 detectives were trained that under the policies, if they
15 spoke to a witness who indicated that they had
16 information about the crime, or indicated that they do
17 not have information about the crime, detectives could
18 determine whether that information was relevant and
19 needed to be documented, correct?
20    MS. ROSEN:  Object to form.
21    A    If the detective spoke to someone who stated
22 they had information related to a crime, I would say
23 that would likely to be relevant unless, as I suggested,
24 there were 30 or 40 other individuals who gave the same
25 information and it wasn't necessary.  It's really on a

Page 73

1 case by case basis.  And again, if they spoke to someone
2 who did not have information to a crime, it's possible
3 that would be very relevant if they were standing right
4 next to the individual who got murdered, and they said,
5 "No, I didn't see Mr. Winstrom get murdered even though
6 I was standing there," then it would be probably very
7 relevant to document it.  But again, it would be a case
8 by case basis because it's possible that I speak to
9 someone in a murder investigation that I determined it
10 was a complete mistake on my part, waste of time,
11 irrelevant to the investigation, and it wouldn't be
12 necessary to document.  So it's a definitely a case by
13 case basis for these.
14    Q    If somebody was in the area where the crime
15 occurred, or was in a position to be able to see the
16 crime, it doesn't -- it isn't able to provide any
17 information.  Why are you saying that that could be
18 potentially important or relevant information to be
19 documented?
20    A    You're saying is the example I said that if
21 someone's standing next to me and saw it?
22    Q    Exactly.
23    A    Well, if they're standing next to me, it's
24 likely that they saw or heard something and that they're
25 not telling truth.



Kentuckiana Reporters                    502.589.2273 Phone
30 South Wacker Drive, 22nd Floor              502.584.0119 Fax
Chicago, Illinois 60606          schedule@kentuckianareporters.com
                                 www.kentuckianareporters.com

Page 74

1    Q    And so it's important that you document that?
2    A    In my scenario, if I was murdered and there
3  was someone standing next to me, I would expect the
4  person standing next to me, that interview to be
5  documented, yes.
6    Q    People who were in a position to be
7  eyewitnesses or potential eyewitnesses to a murder, is
8  the expectation that those interviews of those
9  individuals be documented?
10   A    Generally speaking, eyewitnesses to a murder
11 are very important to document.
12   Q    Okay.  Would you agree that another reason to
13 have an accurate documentation is critical is because
14 police records can become evidence used by the
15 prosecution and defense?
16   A    I agree.
17   Q    And were detectives trained that they should
18 thoroughly and accurately document their investigative
19 steps, knowing that it could become evidence at trial?
20        MS. ROSEN:  Object to form.
21   A    Yes.
22   Q    Okay.  Consistent with all of the above, was
23 it CPD policy that detectives should document their
24 progress through a homicide investigation?
25        MS. ROSEN:  Object to form.

Page 75

1    Q    Were detectives trained -- I'm sorry.
2  Go ahead.
3    A    Yes.
4    Q    And was the policy that an overall
5  investigative file should provide a reader with guidance
6  about the various steps that the detectives took to
7  solve that crime detective form?
8        MS. ROSEN:  Object to form.
9    A    That was the expectation.
10   Q    And was the expectation that a reader of an
11 investigative file, a homicide case, would be able to
12 see the various directions that that homicide
13 investigation took over the course of its life?
14        MS. ROSEN:  Object to form, foundation.
15   A    That's a confusing question.
16   Q    Was it the expectation that a reader of an
17 investigative file would know what all of the leads were
18 that were pursued in that investigation?
19        MS. ROSEN:  Object to form and foundation.
20   A    I'm going to have to go back and say it would
21 be an expectation that you would document the relevant
22 information to that investigation.  So, as I said, if
23 you thought that Eric Winstrom was a killer and Eric
24 Winstrom has been in the morgue for a year, it wouldn't
25 surprise me if you didn't include "At first, I thought

Page 76

1  that Eric Winston was a killer."
2    Q    Putting aside this sort of hypothetical, I'm
3  asking about is leads that are actually pursued in an
4  investigation.
5    A    Right, sure, and same answer because you may
6  have gone out and looked and followed up and sent
7  somebody to Eric Winstrom's house, and they said,
8  "Oh no, he's been dead for a year."  So it's really a
9  case by case situation.  If you determine that something
10 isn't relevant, I would not necessarily expect it to be
11 in there.
12   Q    Okay.  So with regard to the question of
13 whether an investigative file should provide information
14 about all of the leads that were pursued in an
15 investigation, the answer is it's a case by case basis,
16 maybe, maybe not.  Is that correct?
17        MS. ROSEN:  Object to form, mischaracterizes
18    his testimony.
19   A    No.  The answer is relevant leads should be
20 included.
21   Q    Okay.  Anybody who is interrogated as a
22 suspect in a homicide investigation, should you see that
23 in the investigative file?
24        MS. ROSEN:  Objection, form.
25   A    If there are -- now, are you talking about a

Page 77

1  custodial interrogation?
2    Q    Let's start there.  Any custodial
3  interrogations during the homicide investigation should
4  be documented, correct?
5    A    During this relevant period of time, I would
6  expect, if a person was placed in custody and/or part of
7  our electronic system.  During this period of time, if a
8  person had been arrested for a murder and determined not
9  to be the offender, I would agree that that should be
10 documented.
11   Q    Okay.  So anybody who was the subject of a
12 custodial interrogation in that homicide investigation,
13 that interrogation should be documented during the
14 relevant period from 1986 through 1998, correct?
15        MS. ROSEN:  Object to form.
16   Q    Go ahead.
17   A    Most likely, yes.  And that now you're kind of
18 going off of detective procedure and going to general
19 processing persons under department control procedures,
20 which when you arrest an individual, it should be
21 documented.
22   Q    Okay.  The substance of any interview,
23 somebody treated as a suspect in a homicide
24 investigation should be documented in the investigative
25 file; is that correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 78

1      MS. ROSEN:  Object to form, foundation.
2  Leading.
3      A    Again, if you arrest an individual in a
4  homicide investigation and determine that that
5  individual arrested, the information is irrelevant, I
6  don't know how much as a detective I would put in, if
7  anything.  But if your question is when you arrest an
8  individual, should that be documented?  It most likely
9  should be documented.
10     Q    So if an individual is brought to an
11 interrogation room or interview room in the detective
12 division area and questioned about a murder, whether or
13 not that needs to be documented is a case by case
14 decision.  Do I have that right?
15     A    It needs to -- well, if by case by case, you
16 mean if it's relevant because if it's relevant, it
17 should be documented.
18     Q    Okay.  And the detective could determine
19 whether or not they thought the information that the
20 witness was giving them in an interview room in a
21 homicide investigation was relevant or not relevant,
22 correct?
23     MS. ROSEN:  Objection, form.
24     A    The detective investigating the murder is
25 making a determination about the relevancy.  Is that

Page 79

1  what your question is?
2      Q    I'm asking detectives had the option of
3  determining that information provided by somebody
4  interviewed, in an interview room, in the division area,
5  in a murder case, they could determine if they so chose
6  that it was not relevant and didn't need to be
7  documented, correct?
8      MS. ROSEN:  Objection, form.
9      A    No.  They are required to document relevant
10 information.  There's not a choice to be made.  They are
11 required to.
12     Q    Okay.  And so somebody who they have decided
13 to bring into an interview room at the detective
14 division area and question about a murder is relevant
15 information in a homicide investigation, correct?
16     MS. ROSEN:  Objection, form.
17     A    That obviously depends on the answers to the
18 questions asked.  It's possible that the first question
19 answered is, "I was on a plane during the time of this
20 incident," and you realize that you are clearly not the
21 offender.  I have brought you in erroneously.  So it's
22 possible that that is not relevant information.
23     Q    And a detective could then determine that that
24 interview, that individual in an interview room about a
25 murder didn't need to be documented, correct?

Page 80

1      A    In the scenario that I described, where it was
2  determined that Eric Winstrom definitely could not
3  humanly have done this incident, I don't know that that
4  would be determined to be relevant.  It still possibly
5  could be.  But in my scenario, I wouldn't be surprised
6  to not document that because I wouldn't be -- I wouldn't
7  expect that to be considered relevant information.
8      Q    Okay.  Thank you for that.  And that was
9  consistent with detective division policy practice and
10 training, correct?
11     A    Correct.
12     Q    Were detectives trained that they should
13 document eyewitness descriptions of suspects or could
14 they choose not to do that?
15     MS. ROSEN:  Object to the form.
16     A    Again, this is a case by case basis.
17 Generally, that information is very important.  However,
18 there are some times that that information is not so
19 important, or there's times that you would not document
20 that.
21     Q    Were detectives trained that they were
22 required to document eyewitness statements about whether
23 or not they could make an identification of a
24 perpetrator, or could they choose not to document that?
25     MS. GOLDEN:  Object to foundation.

Page 81

1      A    The question is on training, sir?
2      Q    Yes.
3      A    Detectives were trained that that could be
4  very important information to acquire.
5      Q    Were detectives trained that they should ask
6  eyewitnesses to provide descriptions of suspects?
7      MS. ROSEN:  Objection, form.
8      MS. GOLDEN:  Well, I'm going to object to the
9  line of questioning.  We don't have -- I think
10 you're conducting discovery in this case for another
11 case, and so I think that -- well, I object to that.
12     MR. SWAMINATHAN:  Go ahead.  You can answer.
13     MS. GOLDEN:  I'm sorry, what did you say?
14 BY MR. SWAMINATHAN:
15     Q    Go ahead, Commander.
16     A    So the question is, are detectives trained to
17 document eyewitness --
18     Q    That's what I'm getting to, but I'm breaking
19 it into its two pieces.  So the first question is, were
20 detectives trained to ask eyewitnesses if they could
21 provide descriptions of suspects?
22     A    Are you asking if they could or to, because I
23 think that's a fair component here.
24     Q    I'll ask it again so it's clear.  Were
25 detectives trained that they should ask eyewitnesses if

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 82

1  they could provide a description of a suspect?
2      A    Right.  Generally speaking, an eyewitness
3  description of a suspect is important information and a
4  detective would have been trained that that is an
5  important piece of evidence to obtain.
6      Q    Okay.  And I think you started answering my
7  next question.  Were detectives trained that they should
8  document any eyewitness descriptions of suspects?
9      A    Detectives were trained to document all
10 relevant information so that in your scenario would
11 likely be relevant information.  And should --
12     Q    Okay.  And should be what?  You cut out there
13 at the end.
14     A    It should be documented if it is relevant
15 information.
16     Q    And putting aside the extraordinary, unusual,
17 rare circumstance, that is the information that should
18 be deemed relevant and documented, correct?
19         MS. GOLDEN:  Object to form.
20     A    And by that you mean eyewitness description of
21 the offender?        Q    Yes.
22     A    Generally speaking, that information should be
23 documented.
24     Q    Okay, and that's the phrase, I think generally
25 speaking, I think is a useful phrase for me to use so

Page 83

1  that I'm not intending to force you account for every
2  possible unusual circumstance.  I'll try to do that in
3  my questions.  Same basic concept.  Let me ask you: were
4  detectives trained that eyewitness state -- strike that.
5  Were detectives trained to ask eyewitnesses about
6  whether or not they could make an identification of a
7  perpetrator?
8      A    I don't know that they were trained whether or
9  not they could, I think the training would probably be,
10 "Can you describe the individual?"  So, I think that
11 would be more specific.  Yeah, but eyewitnesses will be
12 asked to provide a description of the offender if they
13 are able to.
14     Q    Okay, and then I'm saying if the next step is
15 -- were detectives also trained that they should find
16 out from that individual whether that person believes
17 basically that they had a good view of the offender to
18 be able to identify them or not?
19     A    Again I can't say that that's exactly what
20 they were trained to do.  That's an interesting
21 question, but I think the training would be to try and
22 obtain information that's very specific.  You know, were
23 you -- how far away were you?  Was your view obstructed?
24 That's something that you definitely learn as a
25 detective to ask for, but I don't know that the

Page 84

1  training, like pre-service training they would say that
2  it's -- ask them what your vision is and things like
3  that.
4      Q    Okay.  If a witness -- strike that.  If an
5  eyewitness provided a statement about whether or not
6  they'd be able to make an identification of the
7  perpetrator, is that information, generally speaking,
8  that should be documented?
9          MS. GOLDEN:  Object to the scope.
10     A    Generally speaking, that sounds like relevant
11 information that should be documented.
12     Q    Okay.  Were detectives trained that generally
13 speaking, they should document any interviews of the
14 suspect?
15     A    Generally speaking, a suspect document -- a
16 suspect interview?
17     Q    Yes.
18     A    Whether it's a custodial interview of an
19 individual we already discussed should be documented, a
20 relevant suspect should be documented.
21     Q    Okay.  And were detectives trained that any
22 interviews in the field of a potential suspect should be
23 documented, generally speaking?
24         MS. GOLDEN:  Object to form.
25     A    Well, now you're talking about -- now you're

Page 85

1  talking about potential suspects.  So I would say not
2  necessarily, because unless you've got the murder
3  solved, everyone's a potential suspect and what you're
4  doing is you're seeking to document relevant
5  information.
6      Q    Were detectives trained that they should
7  document any inculpatory statements by suspects?
8          MS. GOLDEN:  Objection, form.
9      A    If it seemed -- if it seemed relevant.  I
10 mean, if the -- you're talking about an admission and a
11 confession, those certainly would be relevant.  I'm not
12 sure, you'd have to give me more of the scenario for me
13 to make a determination.
14     Q    If an individual provided an inculpatory
15 statement but it was totally far-fetched, impossible,
16 for example.  Is that something that was to be
17 documented or was a case-by-case determination?
18     A    Definitely a case-by-case determination.
19     Q    And so detectives in that instance could
20 essentially decide whether or not they felt they should
21 document the information being provided by that suspect?
22     A    So this is not -- to be clear, not a feeling.
23 It's not an opinion.  Our detectives were required to
24 document relevant information and they're very well
25 trained at this point in their career to determine what

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 86

1  is or is not relevant.  So that's what needs to be
2  documented.
3      Q   If ultimately, it turns out that detectives
4  pursue a certain suspect, and somebody else who they had
5  previously pursued is obviously not the person they
6  believe has committed the crime, does that make the
7  evidence that they developed against the alternate
8  suspect less relevant?
9      A   Which one is the alternate suspect?  The one
10  that's the --
11      Q   Yeah, let's --
12      A   True killer?
13      Q   Yeah, let's do that -- let's do it a better
14  way.  It's a good question.  So, let's say the
15  detectives ultimately determine that the person who
16  committed the crime is suspect A.  With me so far?
17      A   I am.
18      Q   And previously in the investigation, they had
19  for a period of time believed that suspect B was the
20  perpetrator of the crime.  Still with me?
21      A   Yes.
22      Q   Okay.  If ultimately the detectives determined
23  at the end of the investigation that suspect A committed
24  the crime, does it make the evidence and information
25  they learned pointing to suspect B less relevant?

Page 87

1          MS. ROSEN:  Objection, form.
2      A   Well, I mean it certainly could if it -- it
3  probably wasn't -- it may not have been actually
4  relevant at all.
5      Q   And so, ultimately that information related to
6  suspect B wouldn't necessarily need to be documented
7  because it turned out it wasn't all that relevant,
8  correct?
9          MS. ROSEN:  Objection, form.
10      A   If it was not relevant, it not necessarily
11  would have been documented.
12      Q   Okay, and the fact that the information
13  pointing to suspect B turned out to be incorrect, that
14  could make that information not relevant and not need to
15  be documented.  Fair?
16      A   Non-relevant information does not necessarily
17  need to be documented.
18      Q   Okay, and non -- and the fact that the
19  information turned out to be inaccurate or point to the
20  wrong suspect could make it not relevant, fair?
21          MS. GOLDEN:  Form.
22          MS. ROSEN:  Form.
23      A   That would depend.  I mean, we got to get into
24  specifics, so it's not necessarily what makes it not
25  relevant.  It would depend on what the entire facts of

Page 88

1  the case are.
2      Q   Okay, so -- but just generally speaking.  If
3  ultimately the detectives charged suspect A, and earlier
4  in the investigation they pursued meaningfully suspect
5  B, generally speaking was that pursuit of suspect B to
6  be documented or not documented?
7          MS. GOLDEN:  Foundation
8          MS. ROSEN:  Objection, form.  And quite
9      frankly, I'm not following.  You know, I'm giving
10      you some leeway here because the 30(b)(6) notice is
11      on documentation generally, but this is very
12      factually specific in a way that's not relevant to
13      Solache Reyes so, obviously I'm going to allow him
14      to answer the questions, but I'm just lodging that
15      objection at this.
16      Q   Go ahead.
17      A   So, that's an interesting question.  And what
18  you -- I mean, the most common example of that is when -
19  - a media case where a wife goes missing.  Media case
20  where a wife goes missing, statistically, the husband,
21  boyfriend, whatever, a Drew Peterson situation,
22  statistically, when you have nothing else to go on,
23  you're saying, okay, I'm going to look at the wife. Now,
24  if you determine shortly thereafter, she was abducted by
25  a stranger and murdered, et cetera, how much do you

Page 89

1  document?  So we thought that it was the husband who was
2  on the news holding a prayer vigil the night before,
3  because that's what they always do in these cases where
4  they actually murder their wife.  You would document
5  what's relevant, whether you would spend the first ten
6  pages of your case report saying, "We first thought it
7  was Eric Winstrom because we look at husbands first."  I
8  wouldn't put that in my report at all.
9      Q   Okay.  That information eliminating somebody
10  as the suspect, was that to be documented or was that
11  case-by-case information?
12      A   It would be documented if it was helpful and
13  relevant.
14      Q   Okay.  So, were detectives trained that
15  information that allowed the detectives to determine
16  that somebody who's then a potential suspect could be
17  eliminated as a suspect.  Was that information that they
18  were trained to document, generally speaking?
19          MS. GOLDEN:  Form.
20          MS. ROSEN:  Form.
21      A   And again, it's a case-by-case basis.  These
22  cases are so detailed and confusing that if you wanted
23  to lay out a specific murder case for me, I could go
24  through and tell you what's appropriate and what's not,
25  but I can't make a blanket statement like that.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

1    Q    Okay.  Would you agree that information -- any
2  tips or other information that provides information
3  about a potential alternate suspect to the person who's
4  charged is potential exculpatory information in a
5  homicide investigation?
6        MS. ROSEN:  Objection, form.
7    A    I would agree only that it could be.
8    Q    Okay.  And it's --
9    A    We get anonymous tips all the time that are
10 deemed not relevant at all, but then we sometimes get
11 tips that are relevant.  So again, it's a case-by-case
12 basis.
13   Q    So alternate tips pointing to -- strike that.
14 Anonymous tips pointing to alternate suspects were
15 sometimes documented and sometimes not documented,
16 correct?
17       MS. ROSEN:  Objection, form.
18   A    Correct.
19   Q    Okay.  Any time photos were shown to a
20 witness, was that to be documented?
21       MS. ROSEN:  Objection, form.
22   A    Depends on what you mean by photos.
23   Q    Photos of suspects, or photos of individuals
24 who were potentially the people involved in the crime.
25 When photos are shown to somebody with the purpose of

1  having them try to identify that individual as being
2  potentially involved, was that to be documented?
3        MS. ROSEN:  Objection, form.
4    A    Okay, so during the time period, are you
5  specifically talking about a photo array or a photo
6  lineup?
7    Q    Any type of photo identification procedure.
8  So, let's start with photo arrays.  If an individual is
9  -- strike that.  If a witness is shown a photo of
10 somebody and asked if that person was involved in the
11 crime as part of a photo array, was that to be
12 documented?
13   A    During the time period, photo arrays were to
14 be documented.  Yes.
15   Q    Okay.  And if that photo array ultimately
16 resulted in no identification, it was still to be
17 documented, correct?
18   A    Documented in that -- that it was shown.  Since
19 it was negative, it would just be mentioned as a
20 negative.
21   Q    And if there was documentation -- strike that.
22 If a single photo is shown to a witness and the
23 individuals asked if that single photo was a person
24 involved, was that to be documented?
25   A    Now, that you're again getting into something

1  that would be very case-specific.  If it's a photo of a
2  known person, that necessarily would be documented.  If
3  you're asking me what my wife looks like, and you show
4  me a picture of her and say, "Is this her?", that's not
5  necessarily something that would be documented.  If
6  you're showing a single photo to an individual saying,
7  "Is this the person that killed somebody?", then you
8  probably have a flawed not suggestive identification
9  procedure.  So there's a lot of issues with that.  So,
10 struggling with why you would be showing a photo.  If
11 again, if this scenario that you're talking about was
12 deemed to be relevant in the case, then it should be
13 documented.
14   Q    Okay.  Now, if I look at a homicide -- strike
15 that.  If I look at an investigative file, should I see
16 documentation of all the individuals that were suspects
17 in the investigation?
18       MS. ROSEN:  Objection, form.
19   A    If you look at a homicide file, you should see
20 all individuals that were determined at the conclusion
21 of the case to be suspects and offenders.  If you're
22 talking about, when the case started we thought maybe it
23 was person A, B, C and D, and through investigations
24 determined it was person C, you wouldn't -- like my
25 example with the husband and wife scenario, you wouldn't

1  necessarily see that much documentation or any
2  documentation at all about your -- your original
3  theories on the case aren't something that we train or
4  expect detectives to really include in their final
5  reports.
6    Q    Should I see documentation of the basis for --
7  strike that.  If you look at the homicide file, should
8  you see documentation of the basis for arrest of any
9  suspect?
10   A    If you look at an investigative file, you
11 should see the probable cause for the arrest of the
12 individual.
13   Q    Okay.  If you look at the investigative file
14 on homicide, should you see documentation of the basis
15 for seeking charges?
16   A    You should -- that would also be included in
17 the investigative file.
18   Q    And if you look at a homicide file, generally
19 speaking, should you see documentation of the
20 investigative steps that were taken in that case?
21       MS. ROSEN:  Objection, form.
22       MS. GOLDEN:  Form.
23   A    If you look at an investigative file, the
24 supplementary report would and other reports would
25 generally contain the steps taken to get to probable

Kentuckiana Reporters
30 Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 94

1 cause and to get to charging.
2      Q   And if you look at an investigative file,
3 generally speaking, should it include documentation of
4 investigative steps that may not have ultimately led to
5 charges against this particular individual?
6      MS. ROSEN:  Form.
7      A   Are you talking about the individual that was
8 eventually arrested?
9      Q   Yeah, exactly.
10      A   So if they were arrested for, say, murder and
11 robbery, but you determined that robbery wasn't the
12 motive and why you're not charging them with robbery?
13      Q   I didn't mean that like that.  That's not what
14 I meant.  I'm going to ask a better question, my
15 apologies.  Generally speaking, should you see
16 documentation of the investigative steps that were
17 taken, that were pursued with regard to somebody who
18 didn't end up being the person who was charged?
19      MS. ROSEN:  Objection, form.
20      A   Oh, and again, not necessarily.  Like the
21 example I gave you about the husband and wife scenario,
22 I could have spent three days figuring that Eric was the
23 real killer, but once I realize that Eric's not the real
24 killer, I'm not going to document too much about that.
25      Q   Okay.  What was the policy regarding what

Page 95

1 information must go into a supplementary report?
2      A   Depends on what supplementary report you're
3 talking about.  Are you talking about the clear to close
4 supplementary report?
5      Q   So, you're saying through different types of
6 supplementary reports, there's different obligations in
7 terms of what must go into it.  Is that fair?
8      A   Correct.
9      Q   Okay.  If you conduct a lineup, there's a
10 particular type of sup report for that, correct?
11      A   Correct.
12      Q   And so there was particular documentation that
13 was to be included in lineup supplementary reports,
14 fair?
15      A   Correct.
16      Q   Okay, and with regard -- there was a scene
17 supplementary report that's to be created in homicide
18 investigations, correct?
19      A   During this time there was most likely a scene
20 sup, yes.
21      Q   And there was a clear, closed report as
22 another type of supplementary report created during this
23 time period, correct?
24      A   Clear, closed report was used for when all
25 offenders in a case were charged.

Page 96

1      Q   As a general matter with regard to
2 supplementary reports, understanding there's different
3 types of supplementary reports, what was the policy with
4 regard to what information was supposed to go into
5 supplementary reports documenting a homicide
6 investigation?
7      A   Well, there's quite a few.  So the general
8 offense case report is the initial report that's
9 documented the original incident.  It's where the first
10 UCR code is documented, it's where the record's division
11 number is recorded, and that gives a preliminary summary
12 of the events.  So moving forward from that, on a
13 homicide you might have patrol supplementary reports,
14 which if a patrol officer takes some steps, they would
15 be included in the patrol supplementary report.  You
16 might have a lineup.  There might be a lineup report
17 that needs to be in there.  You might not solve the case
18 for a couple years, which would mean that there might be
19 a few progress reports just updating the case as to what
20 steps or what new evidence has been discovered.  And
21 then finally, assuming that the case was reached to a
22 complete conclusion with a clear, closed arrest and
23 prosecution case report, that last case report would
24 include the steps leading up to the charging.
25      Q   In terms of the policy that applied with

Page 97

1 regard to what information should go into supplementary
2 reports, is the policy that applied to that subject
3 matter special order 86-3 and its subsequent SOP
4 iteration?
5      A   I would have to scroll down to see how much is
6 in supplementary report.  It would be further down --
7 might not be the best order on this subject.
8      Q   So that's my question.  Is there any other
9 order -- strike that.  Is there any other detective
10 division special order about what information is
11 supposed to go into supplementary reports?
12      A   If you just scroll down so I can see the
13 contents of C to see what the detectives are required --
14 I mean, it doesn't specifically say what to put in the
15 supplementary report.  This is more about what to put
16 into the file as a whole.  So the specifics of what to
17 put in the supplementary report, would've been a subject
18 of training.  I am not positive whether if we look to
19 the SOPs, if there's more specific -- what to include in
20 the supplementary report, but I know that it was trained
21 on for several hours.
22      Q   Okay.  So, looking -- I guess the first point
23 is the special order 86-3 does not provide specific
24 guidance about what information is supposed to go into
25 supplementary reports, agreed?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 98

1    A    Well, you could argue that CT One that
2 requires relevant information be fully and accurately
3 reported as possible during the course of the
4 investigation would be on point, because the detective's
5 primary use of reporting is the supplementary report.
6 Now granted, during this time there was also general
7 progress reports, so it doesn't -- I mean, it does not
8 specifically say supplementary reports, but again, I
9 know it was a subject of training.  It's possible
10 there's something more on point in the SOPs if I was to
11 look through all of them, I didn't bring anything with
12 me today.
13    Q    Okay.  I'm going to pull up the SOP next so
14 we'll go to that in one moment.  With regard to 86-3,
15 this document does not provide specific guidance about
16 what information is to go into supplementary reports.  Do
17 you agree?
18         MS. GOLDEN:  Object to form.
19    A    Well, I tend to disagree just because overall
20 C1 requires what it requires and you have two choices as
21 a detective really, the sup report and the GPR report.
22 So it's got to get in there one way or the other, but it
23 doesn't specifically use the word supplemental report,
24 you see.
25    Q    Okay.  But if basically under this policy

Page 99

1 though it was required that the information learned
2 during the homicide investigation is to be documented
3 fully and accurately either in a supplementary report or
4 in general progress reports, fair?
5    A    In relevant information, fair.
6    Q    Does this policy provide any guidance about
7 what information is to be treated as relevant and not
8 relevant?
9    A    This policy just says relevant information,
10 no.
11    Q    Okay.  And does -- is there any other policy
12 that you're aware of that provides guidance to
13 detectives about what information they're to include in
14 supplementary reports?
15         MS. GOLDEN:  So then what he just testified to
16 about possibly the SOP?
17         MR. SWAMINATHAN:  I was thinking about outside,
18 like before the SOP comes into existence, we're
19 going to do the SOP next.  So let me ask it again.
20 BY MR. SWAMINATHAN:
21    Q    So, in the period which this policy was
22 active, approximately 1986 to part of 1988, okay?  In
23 that period, other than this document, is there any
24 other policy that applies or provides guidance to
25 detectives about what information is to be included in

Page 100

1 supplementary reports?
2    A    So I suspect that there is more information in
3 the SOPs, which as you pointed out was 1988.  If I had
4 made a determination by looking at that, that it did
5 exist, I would expect there to be a precursor, a
6 previous DDSO as well.  I'm not aware of it, but what
7 happened in 1988 when they created the SOPs was they
8 merged these DDSOs into the SOPs.  So it is possible it
9 exists.  Sitting here today, I couldn't tell you either
10 way.
11    Q    Okay.  And are you in a period that this
12 policy was in effect?  Was there any other document that
13 provided guidance -- strike that.  Was there any other
14 policy in the period from 1986 to 1988, when this
15 special order was active, that provided guidance to
16 detectives about what constituted relevant information?
17    A    Oh, the other DDSOs would have that because
18 there's plenty of information available in the SOPs as
19 far as investigations go.  And if you wanted to get more
20 specific, it would be the training.  But I suspect that
21 if you took the DDSOs as a whole, you would see plenty
22 of information which would guide a detective to
23 understand what was expected as relevant.  I don't know
24 that the specific words, "This is what's relevant,"
25 is spelled out.

Page 101

1    Q    Okay.  Let's take a look at this order.  This
2 order applied to the -- strike that.  This order,
3 special order 86-3, that we're looking at, Exhibit 2 to
4 this deposition, applied to homicide investigations,
5 correct?
6    A    Correct.
7    Q    Okay.  Under this policy, detectives were
8 required to document both exculpatory and inculpatory
9 information, correct?
10    A    Correct.
11    Q    Okay.  Under this policy, detectives were
12 required to record and preserve information obtained by
13 any detective department member during the course of the
14 investigation, correct?
15    A    Are you reading directly from this?
16    Q    Yes.  So the policy specifically says it is
17 the policy of the Chicago Police Department to record
18 and preserve information obtained by any department
19 member during the course of an investigation, correct?
20    A    Yes, I do that.
21    Q    And what was the expectation of this policy
22 that detectives would record?  In other words, document
23 the information that they learned during the course of
24 an investigation?
25         MS. GOLDEN:  Object to form.  And the record



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 102

1  should reflect that you've marked the exhibit and
2  are showing it to the witness.
3        MR. SWAMINATHAN:  Okay.
4  BY MR. SWAMINATHAN:
5        Q    Go ahead.
6        A    The question is, does it state here?  Is the
7  policy of the Chicago Police Department to record and
8  preserve information obtained by any department member
9  during the course of an investigation?
10       Q    So let ask you a different question.  When
11 this document says to record information, it's referring
12 to documenting the information, right?
13       MS. GOLDEN:  Object to form.
14       Q    Go ahead.
15       A    Correct.
16       MR. SWAMINATHAN:  What was the objection to
17 form there, Carrie?
18       MS. GOLDEN:  Because you're just trying to get
19 him to say that one word means the same as another.
20 That's my objection.
21 BY MR. SWAMINATHAN:
22       Q    Okay.  And this policy document indicates --
23 strike that.  This policy document provides guidance to
24 detectives that documenting both inculpatory and
25 exculpatory information is necessary to ensure the due

Page 103

1  process rights of accused, correct?
2        A    Yes.
3        Q    And this document provides guidance to
4  detectives -- strike that.  This policy provides
5  specific guidance to detectives that documenting the
6  information they learned during an investigation is
7  necessary to protecting the rights of the accused,
8  correct?
9        MS. GOLDEN:  Object to form.
10       Q    Go ahead.
11       A    Correct.
12       Q    Okay.  And under this policy, in order to
13 protect the rights of accused individuals, it was a
14 requirement that detectives actually document the
15 information they learned during the course of their
16 investigation.  Even if it might be exculpatory
17 information, correct?
18       MS. GOLDEN:  Object to form and foundation.
19       A    You are to document exculpatory information.
20 It's not even an if, that you're expected to document
21 it.
22       Q    And alternate suspects do you agree, could be
23 exculpatory information?
24       MS. GOLDEN:  Object to form.
25       MS. ROSEN:  Could be -- you broke up, you said

Page 104

1  could be, right?
2        MR. SWAMINATHAN:  An alternate suspect could
3  be.
4  BY MR. SWAMINATHAN:
5        Q    And what are the circumstances in which an
6  alternate suspect would not be exculpatory information?
7        A    When they were determined not to actually be a
8  relevant subject -- suspect.
9        Q    And what are the circumstances in which an
10 alternate suspect could be determined to not be a
11 relevant suspect?
12       A    When the result of your investigation
13 indicates that the individual is not a relevant suspect.
14       Q    Right.  This document identifies -- strike
15 that.  It defines a series of different types of files
16 and other documents, correct?
17       A    It does.
18       Q    Okay.  And it identifies a file called an
19 investigative file, which essentially is to be a
20 repository for the reports and notes and other
21 information learned -- gathered by the detective
22 division, correct?
23       A    Yes.
24       Q    Okay.  And was the idea that the investigative
25 file was to be the file that was to be ultimately

Page 105

1  provided to criminal defense attorneys and prosecutors?
2        A    Yes.
3        Q    Okay.  And this document provides some
4  information about a document called an inventory sheet.
5  You see that?
6        A    Yes.
7        Q    Okay.  What is the purpose of the inventory
8  sheet?
9        A    I guess it has several purposes, but let me
10 just make sure the purpose isn't defined here.  I mean,
11 the purpose as they define it, to identify and record
12 each document that is placed in the file.  It's like a
13 table of contents for the investigative file.
14       Q    And this policy expressly requires that the
15 inventory sheet be forwarded to the Records Division,
16 correct?
17       A    Yes, I don't see it on here but I know that
18 that was our practice.  Oh, yes, it does.  Okay, yes.
19 That is correct.
20       Q    Okay, I'm just going to -- you want me to make
21 it a little bigger here?
22       A    I see it.
23       Q    You see it?  Okay.  And this policy expressly
24 requires that the inventory sheet be provided to the
25 Records Division and made available to the states



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 106

1 attorney's office, and the courts, and defense counsel,
2 correct?
3      A    Well, it's sent to the Records Division and
4 it's to ensure -- it's not that the sheet is to be made
5 available to the state attorney, it's to ensure the
6 entirety of the file is made available.
7      Q    Okay.  And is there any indication in this
8 document that provides specific direction that the
9 entire investigative file is to be copied and turned
10 over to prosecutors and criminal defenders?
11      A    I don't think that that would be included
12 here.  I don't know that it is included here, I'd have
13 to read it again.  I don't believe that it states those
14 words.
15      Q    Okay.  So is this document --
16      A    Let me clarify.  This isn't where that would
17 take place.  It wouldn't say in this -- it's not
18 complete the investigative file and send it here. That's
19 not the role of this document.
20      Q    Okay.  Is there some document that -- is there
21 some other policy document that says, copy the entire
22 investigative file and distribute this file in response
23 to subpoenas?
24      A    Policy document?  Not that I'm aware of, no.
25      Q    Okay.  Is there any -- strike that.  Is there

Page 107

1 any directive or other written instruction that is
2 provided to detectives that says copy the entire
3 investigative file and turn it over in response to a
4 subpoena?
5      A    Yes.  And that would be the actual contents of
6 the subpoena.  They would actually physically get a copy
7 of the subpoena, which they would --
8      Q    Anything else other than the subpoena that
9 would provide that direction?
10      A    During this time period, not that I am aware
11 of, no.
12      Q    Okay.  So no internal policy or practice
13 document that provides specific instruction to copy the
14 entire investigative file and produce it to the
15 prosecutor?
16      A    Not that I'm aware of.  This order does make
17 mention of turning over all exculpatory info, or
18 including all exculpatory information, but it doesn't
19 specifically say, "Photocopy both pages and send it
20 here."
21      Q    There is no internal policy document that says
22 the detectives copy the entire investigative file and
23 produce it in response to a subpoena, correct?
24      A    Not during this time.  No.
25      Q    Okay, but.  Okay.  Looking at page 2, it

Page 108

1 indicates here -- let me just highlight this so you can
2 see where I am looking.  It says "notes, memoranda, and
3 other documents gathered, and all other cases will be
4 submitted by the detective and will be fixed to the copy
5 of the case report in the unit RD numerical sequence
6 file."  What is the unit RD numerical sequence file?
7      A    Well -- so in homicides, we would just call it
8 an investigative file.  Or other cases, for example,
9 robberies, burglaries, aggravated batteries, et cetera,
10 they would not be kept -- kept with the homicide.  They
11 would be kept in just a sequential file by RD number.
12 So, all that -- all unit RD numerical sequence file is
13 what we would call the file cabinets, which hold the --
14 all the investigative reports.
15      Q    Okay.  In the period from 1986 to 1998, there
16 were files detective division that were referred to as
17 unit files.  Correct?
18      MS. ROSEN:  Right.  Say that again?  You broke
19 up, Anand.
20      Q    Right.  There were files in this period from
21 1986 to 1998 that were kept in the detective division
22 that were referred to as unit files, correct?
23      MS. ROSEN:  Objection, form.
24      A    So, just to me, this case is really confusing.
25 I will tell you what I am talking about investigative

Page 109

1 files, investigative files.  So, unit RD numerical
2 sequence -- sequence file.  During this time period and
3 still to this day, generally speaking homicides were --
4 were kept in a separate file system, then everything
5 other than homicides.  So, when we speak of unit RD
6 numerical sequence file, we mean the file cabinets that
7 hold everything other than homicides.  However, those
8 files are still investigative files.  The homicide files
9 are still investigative files.  Yeah.  You said during
10 this time period, there were -- there was something
11 called unit files and that I'd have to have you explain
12 to me what it is that -- that -- that you are defining
13 that as before I -- I'd agree that something like that
14 exists.
15      Q    Yeah.  So let me let ask you other than
16 investigative files, putting those to the side.
17      A    Sure.
18      Q    Within the detective division areas, was there
19 also some set of files that were referred to as unit
20 files?
21      A    Unit files?  So that's not what this is,
22 that's not what -- what this is saying.  And, there is
23 not -- like -- I don't -- if you asked me at the time if
24 I was in area five at the time in 1986 to '98.  Say,
25 hey, where is the unit file?  I guess I would assume

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 110

1  that you were talking about the investigative file, but
2  there is not like a split file system.
3      Q    Okay --
4      A    And --
5      Q    Go ahead.  So we can refer to the homicide
6  investigation at the detective division area.  Is there
7  any file that is kept with regard to that homicide
8  investigation other than the investigative file?
9      A    So there could be -- so the investigative
10 files are repository for all the original notes, all the
11 -- you know -- the case report.  Everything --
12 everything needs to end up in that investigative file.
13 So, that is the file.  If -- if you are talking about,
14 could there be copies of that information someplace
15 else?  And, in a folder, if the detectives had to go
16 out, if the detective and his partner working on a
17 homicide were going to interview a witness and I needed
18 some documents from the file to aid me and witness in --
19 in conducting that interview, it is possible that I
20 would take some copies with me.  So it is possible there
21 is copies of the information running around, but it is
22 important to that the everything original needs to end
23 up in that investigative file.
24     Q    In the period from 1986 to 1998, were there
25 also files in the detective division referred to as area

Page 111

1  files?
2      A    You would have to define what an area file is.
3      Q    That -- that's what I'm asking.  Is there,
4  were there, another type of document that was being kept
5  called an area file?
6      A    No, I think it's probably what you are
7  referring is to the investigative file.
8      Q    Okay.  Putting inside the question of what is
9  in detective division with regard to that specific
10 homicide investigation.  Because I understand you saying
11 that the originals of everything related to the homicide
12 investigation should be in the investigative file,
13 correct?
14     A    And I won't say everything because there is
15 other -- you know -- there is forensic documents.  You
16 might not have the negative to pictures in there and
17 things like that.  You might not have some of the crime
18 scene processing stuff.
19     Q    So, that's fair, and we will come back to that
20 point in a little bit.  I guess my question is just, are
21 there unit files kept in the areas that may not even be
22 related to homicide investigation documents?  That might
23 be personnel documents, or daily tracking documents or
24 anything else like that?
25     A    Sure.  Like administrative files and stuff

Page 112

1  like that.  Yeah, absolutely.
2      Q    Okay.  And, in that overall category of non-
3  homicide investigative files, but we will call them
4  administrative files.  Were there files that were
5  referred to as unit files or area files on those topics?
6          MS. ROSEN:  On what topics?
7      Q    Essentially, anything in the administrative
8  file.  I guess what I am trying to understand is I know
9  there to be -- I have heard these terms, right?  Unit
10 files, area files, and I've heard the term investigative
11 file.  And so what I am trying to understand is what I
12 have heard, those terms like unit files or area files,
13 are those referring exclusively to investigative files
14 or are there other documents that are also kept in the
15 detective division that are sometimes referred to as
16 unit files or area files?  Then I want to understand
17 what the contents are of those things, but that is --
18 that is the context of what I am asking here, okay?  So
19 I will ask the question again, cause I just -- I want to
20 be totally clear about what I am asking.
21          MS. ROSEN:  Sure.
22 BY MR. SWAMINATHAN:
23     Q    So, were there documents that were kept in the
24 detective divisions, potentially administrative
25 documents or otherwise, that were referred to as unit

Page 113

1  files in this period?
2      A    During this period every unit -- true unit
3  would have its own personnel files.  Those would be
4  called unit files.  There is a human resources personnel
5  file and a unit level personnel file, which during this
6  period, if you received a complimentary letter through
7  the mail or something, you would throw it in there.  You
8  know, now it's all automated, that is as far as any unit
9  files.  Now I -- as I explained to you here that their
10 termination unit RD numerical sequence file is just a
11 fancy way of explaining that for the non-homicide files
12 we literally kept them in numerical order in file
13 cabinets.  But, the investigative file -- for homicide,
14 the investigative file is that file.  And like I said,
15 that doesn't mean that some copies of some of the
16 documents in that file could not exist.  However, we --
17 the final investigative file is the -- that is a
18 repository for the whole file.
19     Q    Okay.  So to the -- there were unit files in
20 the detective division area, but those were not files
21 containing investigative information.  They were files
22 containing personnel information.  Is that right?
23     A    Yes.  Because the proper term for these is not
24 unit files.  Some, maybe in the past somebody would have
25 referred to them as unit file.  I don't know why, but I

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 114

1 would refer to this as the investigative file. And that
2 is the official name for the investigative file.
3     Q    Okay. And the unit file would contain
4 information about combinations or discipline for
5 officers; is that correct?
6     A    Correct.
7     Q    And then, was there something that was an
8 administrative file of some kind in the detective
9 division areas in this time period referred to as an
10 area file?
11    A    I am not -- I am not familiar with that term.
12 Like, as how it's used. I could see somebody calling
13 the investigative file an area file, but it's not the
14 term that I would ever use.
15    Q    Okay. All right. Let us go back to this
16 special order. This detective division special order
17 indicates that under the detective division unit
18 commanding officers obligations, it indicates that one
19 of their obligations is to ensure that all notes,
20 memoranda and miscellaneous documents of potential
21 evidentiary value are retained in the unit files or area
22 files. Right? Sorry. Are the investigative files,
23 correct?
24    A    Correct.
25    Q    Okay. In other words, just to clear up the

Page 115

1 terminology, one of the obligations, the commanding
2 officers and the detective division units was to ensure
3 that all of the notes, and memoranda, and other
4 documents were being kept in the investigative files,
5 correct?
6     A    Correct.
7     Q    And that was to include all information that
8 was a potential evidentiary value, correct?
9     A    So, evidentiary value. That is what this
10 says.
11    Q    Okay, and potential -- and documents that
12 could be of potential -- and so this policy is not
13 specific to a detective's determination of what is
14 relevant or not relevant. But in fact, what they were
15 required to document they include in the investigative
16 file is everything that that was potentially relevant is
17 that fair?
18        MS. ROSEN: Objection. Form. Back to this
19    policy.
20    A    And I would -- I would simply said that it's -
21 - I believe that if something is of potential
22 evidentiary value, then it's relevant.
23    Q    Okay.
24    A    I do not -- I do not think there is a conflict
25 there.

Page 116

1     Q    Okay. And so you would agree that anything
2 that is a potential evidentiary value in the case should
3 be documented.
4     A    I would agree that that that's relevant and
5 should be documented.
6     Q    Okay.
7        MS. ROSEN: Layer objection to form.
8     Q    Okay. And then looking here at the detective
9 division, looking at the bottom of this page here,
10 section 4C this provides instruction in terms of the
11 requirements with regard to documentation for
12 detectives, correct?
13    A    Correct.
14    Q    Okay. And other than this -- sorry, this is
15 the primary set of policies that provide guidance to
16 detectives about what information needs to be documented
17 and preserved in the investigative files for their
18 investigations, correct?
19    A    Correct.
20    Q    Okay. And this -- this policy indicates that
21 detectives, we talked about this, are required to
22 basically record essentially document and preserve all
23 of the relevant information they learned during the
24 course of their investigation, correct?
25    A    Record and preserve relevant information.

Page 117

1     Q    Okay.
2     A    As fully and accurately as possible.
3     Q    Thank you. And then it identifies various
4 types of documents that they are to use to record and
5 document the relevant information, correct?
6     A    It does identify -- well, it doesn't
7 necessarily document what they use. It documents what
8 needs to go in the file. They use some of these, some
9 of them are not used by detectives.
10    Q    Okay. And essentially indicates that all of
11 these various sources of information on which
12 information is documented need to get into the
13 investigative file, correct?
14        MS. GOLDEN: Objection, form.
15    A    That is correct.
16    Q    And it indicates it provides specific
17 instruction to detectives that they should be thorough
18 and accurate in terms of what they document and
19 preserve, correct?
20        MS. ROSEN: Objection, form.
21    A    I want to see -- any chance you could point me
22 to the wording?
23    Q    Oh, I think I am looking at that first
24 sentence again. It says fully and accurately.
25    A    Fully and accurately. Yes. Yes. I did not

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 118

1   see --
2        Q    My point, so same that this consists of what
3   we talked about the training was to be thorough and
4   accurate in documenting the investigation, correct?
5        MS. ROSEN: Objection, form.
6        A    Yes.
7        Q    Okay.  The training was to be thorough and
8   accurate in writing your supplementary report, correct?
9        MS. ROSEN: Objection. Form.
10       A    Thorough and accurate in writing your in -- in
11  yes -- well, that is true.
12       Q    Okay.  And then it -- this doc -- this policy
13  provided specific construction to detectives that
14  ultimately they are to submit all handwritten notes and
15  investigative documents to their unit supervisors or
16  inclusion ultimately in the investigative file, correct?
17       A    That is correct.
18       Q    And then page 3 of this document essentially
19  provides guidance about the retention of material,
20  correct?
21       A    I see that section five has file retention as
22  the subject.
23       Q    And then there is a, there is a last section
24  here, section six that says inspection.  The inspection
25  -- the instructions contained in this directive will be

Page 119

1   strictly adhered to exec -- exempt members of the
2   detective division will conduct periodic unscheduled
3   inspections of the subject files to ensure compliance.
4   Do you see that?
5        A    I do.
6        Q    Okay.  And what was done in with regard to
7   section six of this policy regarding inspection to
8   satisfy that requirement?
9        A    During this time, detective areas were, as
10  they are now.  Supervised by a commander.  Commander is
11  an exempt rank and commanders were expected to
12  physically inspect a random sample of cases to ensure
13  that this policy was adhered to.
14       Q    Okay.  And do you have any personal knowledge
15  of that?
16       MS. ROSEN: Objection, form.
17       A    I was in grammar school at the time so I was -
18  - I do not.
19       Q    Okay.  In the period from 1986 to 1988, has
20  anybody provided you with any in -- in preparation for
21  this deposition, were you provided with any information
22  indicating that periodic unscheduled inspections of
23  subject files occurred?
24       A    I did learn that that happened at some point
25  in time.

Page 120

1        Q    Who did you learn that from?
2        A    I believe I learned it from my lawyer.  So, I
3   don't know if I'm not supposed to tell you that, but I
4   just did.
5        Q    Okay.  So we -- we will put that aside.
6   Putting aside any conversations you have had with
7   Counsel.  Have you learned of any information indicating
8   to you that inspections occurred in the period from 1986
9   to 1988?
10       A    No.  And I did not seek out the answer to that
11  question.
12       Q    Have you -- have -- are you aware of any
13  documentation reflecting the performance of any audits
14  or inspections pursuant to section six of this policy?
15       A    No.
16       Q    Have you seen any of audit reports, reflecting
17  audits?
18       A    I have not seen them.  I didn't look for them
19  either.
20       Q    Are you aware of any such audit reports
21  existing with regard to inspection of investigative
22  files?
23       A    I am not aware of it.  As I said, I did not
24  look.
25       Q    Putting aside whether you looked, have you

Page 121

1   come to learn at any point in your time as a -- as a
2   police -- Chicago police officer, that there are any
3   audit reports for the period from 1986 to 1998, with
4   regard to the investigative file inspections?
5        A    Putting aside the fact that I have not looked,
6   no.
7        Q    Okay.  So you are not aware of any audit
8   report, with regards to the investigative files from
9   1986 to 1998?  Fair?
10       A    Audits that took place during that time?  That
11  is correct.
12       Q    Okay.  And you -- are you aware of any
13  documents reflecting any training that was provided to
14  commanders or other supervisors to conduct audits of
15  investigative files?
16       A    No.
17       Q    Okay.  Are you aware of any correspondence or
18  other communications that reflect audits that occurred
19  in the period from 1986 to 1998 of investigative files?
20       A    No.
21       Q    Right.  Let us look at the 1988 SLP and then
22  why don't we take a -- take a break after that?  Can
23  people go that long?  A little bit longer.
24       MS. ROSEN: Okay.  Well, yeah.
25       Q    Commander that is okay you said?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 122

1    A    Yep.

2    Q    All right.  Going to mark this first.  Are you
3  able to see on my screen, this detective division
4  standard operating procedure document?

5    A    Yes.

6    Q    Okay.  And for the record I have, I marked as
7  Exhibit 3, the document entitled, 'Detective Division
8  Standing Operating Procedures.'  It is Bates stamped
9  RFC.  Selection date is 117553 through 117587.  Okay.
10  Did you read this document in preparation for today's
11  deposition?

12         (EXHIBIT 3 MARKED FOR IDENTIFICATION)

13    A    Yes.

14    Q    Okay.  And these were standard operating
15  procedures that were in place beginning in 1988,
16  correct?

17    A    Correct.

18    Q    And they applied to the detective divisions,
19  correct?

20    A    Correct.

21    Q    And how long did these policies apply?

22    A    I think they ended in -- they were revised
23  again in 2002, I believe.

24    Q    Okay.

25    A    Maybe 2003.

Page 123

1    Q    Okay.  In the period from 1988 when this went
2  into effect through 1998, were these -- did this
3  document contain the policies that applied to detectives
4  in the areas?

5    A    Yes.

6    Q    Okay.  And all of the special -- all that were
7  formerly special orders to the extent they were
8  incorporated, were incorporated into these standard
9  operating procedures, correct?

10    A    The detective division special orders.  Yes.

11    Q    Okay.  So there are no other policy documents
12  that apply specifically to detectives other than these
13  then -- other than this standard operating procedure,
14  Exhibit 3 in the period from 1988 to 1998, correct?

15         MS. ROSEN:  Oh, Objection, form.  Misstates
16    prior testimony about the 1992 outlook.

17    Q    Okay.  So let me ask a little differently,
18  possibly a good point.  So other than the standing
19  standard operating procedures that were in effect for
20  the period from 19 -- 1988 through 1998, were there any
21  other policy documents applying specifically to
22  detectives in that period?

23    A    Not on the subject that I am testifying on.

24    Q    Okay.  And there was a lot --

25    A    Go ahead.

Page 124

1    Q    Go ahead.  I didn't mean to cut you off.

2    A    There were other -- there were general orders
3  and special orders of the department, which had
4  information just for their detective division, but not
5  on these subjects.

6    Q    Okay.  The -- I lost my train of thought,
7  okay.  Sorry.  In 1992, this standard operating
8  procedure was updated, correct?

9    A    Correct.

10    Q    Were there any substantive changes in terms of
11  detective division policies that applied to the
12  detective division in that 1992 revision that you are
13  aware of?

14    A    Oh boy.  Yeah.  Yes.  And I cannot remember.  I
15  believe there was a subject that was added, but it was
16  not one of these -- was not any of the issues that I am
17  testifying about today.

18    Q    You foreshadowed my next question.  So, with
19  regard to the topics for this deposition in the case --
20  topics, 1A.  Strike that.  For the topics in categories
21  1 and 2 of our deposition notice in this case, there are
22  no changes between the standard operating procedures in
23  1988 to the revision in 1992, correct?

24    A    Correct.

25    Q    So the standard operating procedures with

Page 125

1  regard to the topics in 1 and 2 of our amended notice
2  of Rule 30(b)(6) deposition were the same for the period
3  from 1988 through 1998, correct?

4    A    Yes.

5    Q    Okay.  Now I am going to go to chapter 18 of
6  this.  Okay.  I'm looking at chapter 18 of this Exhibit
7  3, which is RFC selection date 117582.  And it -- the
8  title of this chapter is investigative files.  Do you
9  see that that's there?

10    A    Yes.

11    Q    Okay.  So this is the policy with regard to
12  note taking and documentation applicable to detectives
13  in the period from 1990 -- 1988 to 1998, correct?

14    A    While it's investigative files, I believe note
15  taking, I don't know if note taking is specifically
16  stated here, but notes are talked about in here.  This
17  is the policy for the -- like putting together the
18  investigative file and what needs to be in it.

19    Q    Okay.  So this is, and maybe another way to
20  put it is --this chapter 18 in the SOP that we're
21  looking at now, this is what the special order 86-3
22  turned into, correct?

23    A    That is correct.

24    Q    And would you agree with me that looking at
25  the policy here, it is basically the same policy as what



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 126

1  is contained in 86-3?
2      A    I agree.
3      Q    And it provides the same guidance about the
4  various types of documents that are to be preserved
5  during the course of a homicide investigation.  Do you
6  agree?
7      A    I do agree.
8      Q    Okay.  And as with the prior version 86-3, it
9  indicates that detective members will quote, "Preserve
10 and record information and materials obtained, including
11 that, which might aid in the defense of the queues."
12 That's the same guidance provided in 86-3, correct?
13     A    Correct.
14     Q    Okay.  And ultimately this policy in the SOP
15 indicates that the information learned during the
16 homicide investigation is to be documented and preserved
17 in the investigative file, correct?
18     A    I don't know that it uses the -- those words.
19 It -- it tells you what information should be included
20 in the file.
21     Q    And nothing changes in this policy in terms of
22 what is to be documented, do you agree?
23     A    Right.  I don't think there's a substantive
24 change.
25     Q    Okay.  And nothing changes in terms of what is

Page 127

1  to be preserved in this policy, correct?
2      A    You are Correct.
3      Q    Okay.  And the various -- this document
4  identifies, defines various types of documents,
5  including the investigative file, investigative file
6  case folder, and so on.  Do you agree with me this
7  document doesn't change from 86-3 with regard to the
8  various types of documents and files that are to be used
9  in a homicide investigation?
10     A    I agree.
11     Q    Okay.  And then this document, just like 86-3
12 provides guidance to various members of detective
13 division about their responsibilities with regard to
14 investigative files, correct?
15     A    Correct.
16     Q    Okay.  And would you agree that the guidance
17 that's provided in this -- strike that.  Would you agree
18 that the responsibilities that are identified in this
19 SOP are the same as the responsibilities identified in
20 86-3?
21     A    Yes.
22     Q    Okay.  So there are no changes in terms of the
23 responsibilities of detective division commanding
24 officers, supervisors, and detectives between 86-3 and
25 this policy, correct?

Page 128

1      A    Correct.
2          MS. ROSEN:  Form.
3      Q    And -- and the requirements of what detectives
4  are required to document and to preserve.  Those all
5  remain the same in this SOP from 86-3, correct?
6      A    Correct.
7      Q    Okay.  There are no changes in terms of what
8  information detectives are required to document and
9  preserve from 86-3 to this policy, correct?
10     A    Correct.
11     Q    And you're not aware of any substantive
12 changes from the 86-3 policy to this policy, correct?
13     A    Correct.
14     Q    Okay.  And you agree consi -- just as the old
15 pile -- strike that.  Same with 86-3, this document
16 doesn't provide specific instruction to detectives to
17 copy the entire investigative file and produce it to
18 prosecutors and criminal defendants, correct?
19     A    It does not include those specific
20 instructions.
21     Q    Okay.  It does provide specific instruction to
22 copy the investigative file inventory and send it to the
23 reference division, correct?
24     A    Correct.
25     Q    Okay.  And I think we already covered this,

Page 129

1  but during the period that this -- the special standard
2  operating procedures were in effect from 1988 to 1998,
3  you're not aware of any other internal policy document
4  of the Chicago Police Department that instructed
5  detectives to copy the entire investigative file and
6  produce it to prosecutors and criminal defendants,
7  correct?
8          MS. ROSEN:  Objection, form.
9      A    The only thing they would get was, which was
10 internal, was the internal communication of the subpoena
11 indicating what was required as a subpoena.
12     Q    Okay.  So other than the subpoena itself and -
13 - and whatever was correspondence was sent with the
14 subpoena, there's no internal policy or directive
15 instructing the detectives to copy the entire
16 investigative file to produce it, correct?
17     A    (No verbal response.)
18     Q    We lost your answer.
19     A    That is correct.
20     Q    Okay.  All right now let's -- I think we can
21 let me just check if anything else on this policy, and
22 then we'll take a break.  Looking at the last page.  I
23 think we covered this, but looking again at the last
24 page of this chapter 18 RFC 117587, there's again, the
25 inspection section.  You're not aware of any audits or

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 130

1  inspections that occurred in the period from 1988 to
2  1998, correct?
3      A   I am still unaware.
4      Q   Okay.  All right.  Okay.  I'm looking at
5  chapter eight of this document, which begins on 117566,
6  and this identifies the procedures required of all
7  detectives.  You see that?
8      A   Yes.
9      Q   Okay.  And it talks about obviously the
10  functions of a detective and their role, correct?
11      A   Yes.
12      Q   Okay.  And were detectives trained on these
13  standard operating procedures?
14      A   Yes.
15      Q   Okay.  And so they were trained to -- strike
16  that.  These standard operating procedures were they
17  provided to the detectives?
18      A   Yes.
19      Q   Okay.  And then in addition to having copies
20  of these directives, were they expected to read them?
21      A   So, these new detectives, the answer is yes.
22  If you were an existing detectives when this rolled out,
23  you were still provided a copy of it.  You would've been
24  trained as aspects of it change.
25      Q   Okay.  And then in addition to that -- oh,

Page 131

1  strike that.  Anybody who came new to the detective
2  division would be specifically trained on the contents
3  of these standard operating procedures, correct?
4      A   It would've been provided this and the
5  contents of it would also have been trained on.
6      Q   Okay.  And then this section looking at page
7  803 -- oh see, this is RFC 117568.  It indicates that
8  one of the responsibilities of detectives was to prepare
9  supplementary reports, correct?
10      A   Yes.
11      Q   Okay.  And it indicates that under this policy
12  -- strike that.  Under this policy detectives are
13  required to report all substantive information learned
14  in the investigation, correct?
15      A   Correct.
16      Q   Okay.  And what is meant by the term
17  substantive information in this policy?
18      A   Relevant.
19      Q   Okay.  And were detectives provided any
20  training on what was meant by the term substantive
21  information?
22      A   I don't know that they were trained on the
23  meaning of that word.
24      Q   Okay.  Were they trained to understand this
25  policy to mean that they were to determine what

Page 132

1  information was relevant and then document that relevant
2  information?
3      A   Yes.  This is, you're asking me about this
4  specific policy.  The subject of supplementary report
5  writing is several hours in pre-service training, so
6  there would've been in-depth discussions on what should
7  and should not be documented in the supplementary report
8  in that training.
9      Q   Okay.  And was there a policy on how soon
10  after events occurred that supplementary reports were to
11  be created?
12      A   There is.
13      Q   And what was the problem --
14      A   Yes, there was.
15      Q   Go ahead.  What was the -- what is the policy
16  guidance in the period from 1986 to 1998 about how soon
17  after events that supplementary reports are to be
18  created?
19      A   Sure.  Well, it depends on the crime.  So,
20  during this time period, supplemental reports were
21  expected within ten days.  However, for a case such as a
22  homicide, that requirement would've been met with a
23  scene sup.  So, the detective was expected usually to
24  produce a sup that day before they'd go home.  24 hours
25  or 36 hours, they would drop their first initial

Page 133

1  supplementary report.  So, the ten-day -- oh, it's right
2  here.  I should have just read it.  The ten -- as you
3  see in L, to submit to the watch commander within ten
4  days of receiving the assignment a complete package of
5  reports.  So, that is for what we would call a handout.
6  If I was assigned a burglary that happened the day
7  before, as I came to work, I'm expected to act upon that
8  investigation and provide a sup within ten days.  A
9  homicide investigation is different.  You wouldn't
10  follow this set of guidelines for this ten days.  You
11  would expect a scene report as soon as possible.
12      Q   Okay.  So, for homicide, it's not written in
13  the policy, but the practice was that a scene report
14  should be prepared even faster in a homicide
15  investigation?
16      A   Correct.
17      Q   Okay.  And with regard to homicides, scene
18  reports were to be created even faster, but overall this
19  policy still applied, which is that within 10 days you
20  were to submit supplementary reports and general
21  progress reports and notes that had been prepared so
22  far.  Is that correct?
23      A   That is not correct.
24      Q   Okay.
25      A   Again --



Kentuckiana Reporters                        502.589.2273 Phone
30 South Wacker Drive, 22nd Floor                 502.584.0119 Fax
Chicago, Illinois 60606              schedule@kentuckianareporters.com
                                     www.kentuckianareporters.com

Page 134

1    Q    Yeah, go ahead.

2    A    Again, this would be appropriate for the file
3    or for a handout for a in-custody retail theft felony
4    upgrade.  For a homicide, this is not applicable.  Most
5    detectives would submit, for example, general progress
6    reports towards the end or at the end of their
7    investigation.  They might need them to reference.  They
8    might need them to help create the final report, which
9    could at times be quite lengthy.  So, this is definitely
10   on point for other investigations, but not for a
11   homicide investigation.

12   Q    Okay.  So, for homicide investigations, the
13   practice was typically to keep the general progress
14   reports or notes with the detective until the
15   investigation was completed, correct?

16   A    That would be the practice, not necessarily
17   so.  You could turn the progress reports in at any time
18   to be submitted to be held in the investigative file,
19   but it depends on if there was some utility in keeping
20   them.  As with homicide investigations, sometimes
21   there's a lot of notes.  Sometimes there's not a lot of
22   notes, but it would be a case-by-case basis.

23   Q    Okay.  And that was a practice that was
24   applicable to homicide detectives in terms of when they
25   would choose to turn in their notes, correct?

Page 135

1    A    That is correct.

2    Q    Okay.  And there was no -- there's no policy
3    document that indicates that the policy's different with
4    regard to homicide detectives.  That was just a
5    difference in practice.  Is that correct?

6    A    Yes, it's not just a difference in practice,
7    it's a difference in practicality because if you're
8    talking a regular burglary report, even a robbery
9    report, any supervisor can review it, and understand it,
10   and comprehend it, and sign off on it.  Homicide
11   investigations are much more in-depth, so you would want
12   a homicide sergeant to review everything, sort of in
13   total.  You wouldn't want us to submit your GPRs to the
14   Sergeant Winstrom when your sergeant is Sergeant Swami-
15   Nathan, because you would have a better understanding of
16   what's going in.  So, this, although it doesn't say so
17   here, these requirements, those reporting requirements
18   are for other than homicide investigations.

19   Q    Okay.  And the requirement that applied to
20   detectives -- sorry.  The policy document says that
21   investigative steps that result in information learned
22   that needs to be documented, that should be documented
23   and submitted within ten days, correct?

24   A    All right.  Where are you reading?

25   Q    I'm talking about that same thing.  So, if we

Page 136

1    look at -- where were we looking at here?  Yeah, here we
2    are.

3    A    So, can you scroll up to 8.3 just to see what
4    the title is?  Because I believe it's

5    Q    Conducting a field investigation.

6    A    Conducting a field investigation.  Yeah, okay.
7    All right.

8    Q    Okay.  So, when it said under the policy, once
9    a certain investigative step is taken and information is
10   learned that it's substantive or relevant, that's to be
11   documented in ten days.  That's the policy, correct?

12        MS. ROSEN:  Objection from.

13   A    Where -- I don't see that it says that.

14   Q    That's what I'm saying.  Doesn't this say --
15   doesn't this policy say here that -- where did we just
16   look at the ten-day requirement?  Okay.  L says, "Submit
17   to the watch supervisor within ten days of receiving the
18   assignment a complete packet of reports that includes
19   the following", right?  So, this policy says that within
20   ten days of performing the -- or doing the investigative
21   work, the policy is you're to submit the supplementary
22   report and related other reports.  Is that correct?

23   A    So --

24        MS. GOLDEN:  Object to form.

25   A    So, this is within ten days not of completing

Page 137

1    some stuff.  This is ten days of completing the
2    assignment.  You may do -- you may submit a sup before
3    then.  This -- the expectation of this is within ten
4    days.  Generally, if you're given an assignment, you'll
5    be able to submit all this together.

6    Q    Okay.

7    A    Obviously, it wouldn't hold true for a
8    homicide investigation, but it would for a burglary,
9    most armed robberies, most any other thing.

10   Q    So, this is saying within ten days of when you
11   get assigned the matter you're to have submitted the
12   supplementary report and related documents?

13   A    That is correct.

14   Q    Okay.  And then looking at 8.7, this section
15   is reporting the results of an investigation.

16   A    Right.

17   Q    This indicates that on completion of the
18   investigation, but at no later than ten days after being
19   assigned a case, the detective will submit to the
20   supervisor the original case report, supplementary
21   report, and so on.

22   A    Okay.

23   Q    So, this portion of the policy requires that
24   detectives submit their supplementary reports within ten
25   days of completing those investigative steps, correct?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 138

1     MS. GOLDEN: Form.

2     MS. ROSEN: Objection. Form.

3     A    This is when the case is complete, so it's

4  completion of investigation. So, when you're closing

5  out your case, say I had a burglar, I made the arrest,

6  it's expected that I complete all of the paperwork

7  within ten days. And again, this does not hold true for

8  homicide investigations, which oftentimes the paperwork

9  could go -- could not be completed for weeks or even

10 months later. The expectation during this time, and

11 even to today in modern times, is that this paperwork

12 for homicide investigations is completed when

13 practicable, but the drop-dead date is when it is needed

14 for court.

15    Q    Okay.

16    A    So, when the court proceedings start, when

17 it's subject to subpoena discovery, that's when it

18 absolutely has to be completed by then.

19    Q    You just described to me was the practice with

20 regard to homicide investigation, correct?

21    A    Right. And again, I will concede that is not

22 how -- that doesn't compile this as written, but that's

23 been the practice since '86, and it's the practice

24 today.

25    Q    Okay. So, let me clarify those two points.

Page 139

1  So, with regard to the policy, the policy was that

2  within ten days of completing the investigation with

3  charges the report should be submitted, correct?

4     A    I would argue that the understanding of, even

5  since I became a detective in 2005, was that this policy

6  does not apply. This particular policy does not apply

7  to homicides because it's not practical. And so, I

8  would say if you asked any detective, they would say the

9  same thing.

10    Q    Okay. So, the policy for non-homicide cases

11 was that detectives were required to submit the reports,

12 supplementary reports, and any related reports within

13 ten days of closing the case, correct?

14    A    Correct.

15    MS. GOLDEN: Object to form.

16    Q    And then for homicide cases, the practice was

17 different, correct?

18    MS. ROSEN: Object to the form.

19    A    For homicide cases, the detectives are

20 required to have their paperwork completed by the time

21 the paperwork is required for court purposes.

22    Q    Okay. Okay. And that difference in practice

23 is not documented in any policy, correct?

24    MS. ROSEN: Objection. Form.

25    A    It is not.

Page 140

1     Q    Okay. I think we can take a little pause

2  right there. It's 1:00. Do we want to take like 20, 30

3  minutes from lunch? Mr. Winstrom, you want some grab

4  some lunch? However long you think you need.

5     A    Yes, please.

6     Q    Okay. You want -- is 30 minutes enough time?

7     MS. ROSEN: If that's -- if you're going to

8  have enough time -- if we take a 30-minute break and

9  you still think you're on track for being done at

10 5:00, 5:30, then that's fine.

11    MR. SWAMINATHAN: I think I'm on track, but I

12 would -- can we shoot for -- well, let's take --

13 I'll think we'll be fine if we take 30 minutes.

14 Let's keep it to 30. So, 1:30 we'll come back?

15    COURT REPORTER: Okay. We're going off the

16 record.

17    (OFF THE RECORD)

18    COURT REPORTER: We are back on record.

19 BY MR. SWAMINATHAN:

20    Q    Okay. Commander Winstrom, I want to go back

21 to the subject of supplementary reports for a moment. In

22 writing supplementary reports, were detectives expected

23 to write supplementary reports of their own work?

24    A    Well, that depends. The supplementary reports

25 could be what other people did or what they did.

Page 141

1     Q    Okay. So, a detective could -- if a detective

2  did not conduct an -- let's say there's going to be

3  documentation of an interview that was done with a

4  witness. Okay? Could a detective write a supplementary

5  report for that interview if they were not one of the

6  detectives who participated in the interview?

7     A    They could potentially. Sure.

8     Q    Okay. So, that was accepted under the policy?

9     A    That is correct.

10    Q    And was that a common practice?

11    A    I don't know how common it was, but it

12 certainly wouldn't be against policy to do that.

13    Q    Okay.

14    MS. GOLDEN: I delay an objection to form.

15    Q    Were detectives trained that they could write

16 reports for interviews or other investigative steps

17 taken by other detectives?

18    MS. ROSEN: Object to form.

19    A    You said write reports. Is that correct?

20    Q    Yeah, write reports.

21    A    Yeah. Yeah. Certainly. Yeah.

22    Q    Okay. And in your mind, does it pose any risk

23 for one detective to write supplementary report about

24 somebody else's work?

25    A    My own opinion?



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 142

1    MS. ROSEN: Objection. Form.
2    A    Yeah. No, it depends on the circumstances. I
3 mean, a lot of times detectives will write a GPR and
4 provide the GPR to the detective that's doing the report
5 writing, so they don't do any reports. Or a lot of
6 times they'll say, "Hey, can you go knock on the door?"
7 And you just walk back in and say, "I knocked on the
8 door. There's nobody home." "Okay. I'll put it on my
9 report." So --
10    Q    Let's use the example of somebody being
11 interviewed, and so substantive information is going to
12 be reported about the interview of somebody. Okay? In
13 that circumstance, does it pose a risk for the
14 detectives -- for a detective to write, to document what
15 a witness said in an interview if a different detective
16 conducted the interview?
17    MS. ROSEN: Objection. Form.
18    A    So, there's no rule. There's no rule to
19 taking contemporaneous notes while you're interviewing
20 an individual. And it's at the discretion of the
21 detective, what they're comfortable with. Sometimes
22 taking notes during an interview isn't the appropriate
23 thing to do, so whether that detective then told the
24 individual who's writing the report, the content of the
25 interview, or whether they wrote it down themselves is

Page 143

1 just a -- could the interview have been eight hours long
2 and contained so much meaningful material that I'll get
3 it right, but you know, it would've made more sense to
4 write it down? Potentially, but it would just depend on
5 the circumstances of the individual case.
6    Q    Generally speaking, would you agree that if
7 one detective writes a report that a witness said in
8 an interview that that detective didn't participate in
9 it poses risks in terms of the ability of writing a
10 thorough and accurate report?
11    MS. ROSEN: Objection. Form.
12    A    I wouldn't call that a risk necessarily. It's
13 just -- I mean, we -- not only detective work. Police
14 officers have common knowledge sharing all the time like
15 when I have a -- be on a lookout for a red car. I don't
16 know anything about the red car. All I know is another
17 detective, another officer in another jurisdiction said
18 that this red car is involved in something. So, it's
19 something that's very common to share information like
20 that, and it would be on a case-by-case basis, as I
21 said. If it was a very in-depth interview that required
22 -- or that a conversation? Hypothetically, but it's
23 just hypothetical.
24    Q    Would you agree that it's harder to write a
25 thorough and accurate report of an interview you didn't

Page 144

1 conduct or participate in?
2    MS. ROSEN: Objection. Form.
3    A    I would only agree if the circumstances
4 dictated that it to be so. It's very possible that you
5 can go interview someone, come out, and say, "Hey, Eric,
6 this is what happened," and I can write a complete and
7 thorough and accurate report about it.
8    Q    And the more detailed the interview, the
9 harder that would be, correct?
10    MS. ROSEN: Form.
11    A    Potentially.
12    Q    And if a detective writes a supplementary
13 report about investigative work conducted by a different
14 detective, should the supplementary report be clear that
15 it was the other detective who conducted that step?
16    MS. GOLDEN: Form and foundation.
17    Q    Go ahead.
18    A    If it's an important part of the narrative of
19 the case, sure. If it's something that's insignificant,
20 it might not be.
21    Q    In other words, the supplementary reports
22 should -- supplementary reports are supposed to document
23 the investigation in chronological order, correct?
24    MS. ROSEN: Object to form. Withdraw the
25    objection.

Page 145

1    Q    Go ahead.
2    A    They're supposed to document the investigation
3 in a clear order. Whether or not that's chronological,
4 not all reports are done chronologically.
5    Q    Okay. And supplementary reports should
6 identify who did the work, correct?
7    MS. GOLDEN: Object to foundation.
8    A    Where that is an important aspect of the
9 report, then -- if it's an important aspect of the
10 report, it should be documented. But these are all
11 hypothetical, so I'd have to talk about the actual
12 report to determine whether or not it's appropriate.
13    Q    Okay. In it period from 1986 to 1998, I think
14 you indicated that detectives were trained on note-
15 taking. Correct?
16    A    Detectives were trained. Note-taking was part
17 of pre-service training. Immediately prior to '86,
18 there was an in-service class. Not immediately prior. I
19 think in 1983, there was an in-service class once the
20 department introduced general progress reports, and so
21 that was something that existed from 1980.
22    Q    Okay. When you say 1983 there was in-service
23 training, what do you mean by that?
24    A    So, sometimes changes are made in the police
25 department, it's something small and insignificant that

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 146

1  can just be told at roll call or handed out in a new
2  revised order. But sometimes there's major changes,
3  such as when recently we changed our entire use of force
4  policy. And back in the early '80s, we changed how we
5  documented homicide investigations or investigations, in
6  general, so that we retained all notes. Introduced to
7  something called the GPR, which is a general progress
8  report, which was just a one-page note-taking kind of
9  blank form that you could jot notes down. And because
10  it was a major change and something that the department
11  was concerned about, they held a in-service training for
12  all current detectives during that time. Similarly to
13  how they addressed our use of force changes recently.
14  And they had every detective come down headquarters for
15  half a day for a class to discuss it. So, this time
16  period is past when that happened, but since that
17  happened, the use of GPRs has been part of training for
18  detectives.
19     Q   Okay. So, after those changes in 1983, all
20  the detectives were required, including current
21  detectives, to come to the headquarters for training
22  sessions, correct?
23     MS. ROSEN: Object to the form.
24     A   Correct.
25     Q   And what the contents of that training?

Page 147

1     A   I believe it was a three-hour training. It
2  was split with Legal Affairs and with the Bureau of
3  Detective's administrative office. That's it,
4  generally, put into effect.
5     Q   Okay. Did it include training on what
6  information should be included in those reports?
7     A   I -- you know, they say it did. I think the
8  goal of the training was to ensure that the change that
9  was put into effect was that all notes are retained in
10  investigative files and not the substance of those
11  reports.
12     Q   I see. So, training was focused on the use of
13  general progress reports and retaining general progress
14  reports, correct?
15     A   Correct.
16     Q   Okay. In terms of what information should be
17  put into notes, that was not part of the training,
18  correct?
19     A   It may have been. It was, I believe, a three-
20  hour block, and since the report itself was new, I'm
21  sure it was described, "Hey, this is what you can use it
22  for." But note-taking was never -- I mean, note-taking
23  was not a new thing that was being introduced. Notes
24  had been taken probably for decades or a hundred years
25  before.

Page 148

1     Q   The -- what information was to go into
2  supplementary reports, that was not part of the
3  training, was it?
4     A   Correct.
5     Q   Okay. And was it part of the training that
6  detectives were required to document all of the
7  information they learned during the investigation?
8     A   I'm sorry.
9     MS. GOLDEN: Form.
10     A   Just to be clear -- I'm sorry, and just to be
11  clear, the previous question was in reference to that
12  specific 1983 training, correct?
13     Q   Correct.
14     A   Yeah. The 1983 training was not about
15  supplementary reports. It was just about note-taking.
16     Q   Okay. And then in the trainign, did it
17  provide any guidance to detectives about what they
18  should consider relevant or not relevant information?
19     A   I don't believe so.
20     Q   Okay. Did it provide any guidance to
21  detectives that they should document all the information
22  they learned during an investigation?
23     MS. GOLDEN: Object to form.
24     MS. ROSEN: In the notes?
25     MR. SWAMINATHAN: No, period.

Page 149

1  BY MR. SWAMINATHAN:
2     Q   Did -- strike that. Was part of the training
3  instruction to the detectives that they should document
4  everything they learned during the investigation?
5     A   I don't believe so, but I haven't -- I don't
6  believe so.
7     Q   Okay. Have you seen any documents -- were
8  there any documents handed out in that training?
9     A   I believe that the department notice would've
10  been handed out in that training, which I have seen. I
11  think it's dated -- I don't know if it's an '82 series
12  or an '83 series. So, when we do things like that we
13  generally train with the policy at the same time, so the
14  policy would've been handed out, and would've been
15  reviewed, and discussed at the -- so, unless those
16  topics were included in the policy, I don't think it
17  would've been a topic of special.
18     Q   Other than the policy itself and the notice --
19  that was a notice of the superintendent, right? Is that
20  what you're referring to, the notice?
21     A   It may have been signed by the superintendent.
22  It may have been signed by the chief of detectives. You
23  know what? It probably was signed by the sup.
24     Q   Okay. So, other than that -- what did you
25  call it? I'm forgetting the name. Directive? What was

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 150

1  it called?
2      A    Department notice.
3      Q    Department notice. I'm sorry. Other than the
4  department notice and the policy document itself, was
5  anything else, any other documents used in that or
6  handed out in that trading?
7      A    Oh, boy. I believe that the DPR itself was
8  handed out as an example, as it was a new form. And I
9  don't believe there was anything else, but it may be
10 Legal Affairs handed out case law. I don't know. I
11 wish I would've been there.
12     Q    Have you seen any documents indicating that
13 anything was handed out other than, example, GPR, the
14 policy itself, and the department notice?
15     A    No.
16     Q    In that -- strike that. In that training,
17 what were detectives told about -- were they trained on
18 what the purpose of notes were?
19          MS. ROSEN: Are you talking about -- just so
20     that we're clear here. Are you talking about the
21     training that occurred in '82 and '83, or are you
22     talking about the training that occurred post '86?
23          MR. SWAMINATHAN: Yeah, that's -- I'm starting
24     with the '82 and '83 just -- i'm going to move to
25     the

Page 151

1  '86.
2  BY MR. SWAMINATHAN:
3      Q    So, in that '82, '83 training, was there any
4  training given about what the purpose was of those GPRs
5  or notes?
6      A    Yes. The whole training was about coming up
7  with a somewhat uniform way of note-taking because the
8  department had moved away from destroying notes and put
9  a policy in place that required retaining notes in the
10 investigative file.
11     Q    Okay. So, after the '82, '83 training, was
12 there any subsequent in-service training with regard to
13 the investigative files policy?
14     A    After that training, the detectives who were
15 trained on it likely wouldn't have received another in-
16 service training like that. As new detectives were
17 promoted, they would've received training on the use of
18 GPRs and retaining notes and investigative files in
19 their service detective training.
20     Q    After Special Order 86-3 had come out, was
21 there any in-service training?
22     A    Not that I'm aware of in the form that it --
23 in the same form that it took place as in having all
24 detectives come down to headquarters.
25     Q    Okay. Go ahead. Let me ask a question. I

Page 152

1  think you just said it. What training, if any, was
2  given on 86-3 when it came -- when it went into effect?
3          MS. ROSEN: Objection, form.
4      A    86-3, if you were already a detective,
5  would've been presented to you in a hard copy form at
6  the area and discussed at roll calls, and any changes
7  that were in place from 86-3 and its predecessor
8  would've been addressed.
9      Q    When you say discussed at roll call, what do
10 you mean?
11     A    Every day when detectives report for work,
12 they have to report to a supervisor, usually a Sergeant.
13 That Sergeant has, at the time, used what was called a
14 commanding officer book, a CO book, with important notes
15 of the day and includes such things as who has court.
16 And they would check attendance, and then if there was
17 anything that required addressing at roll call, any --
18 an order like that would come over with the knowledge
19 that it was to be read for seven straight days or five
20 straight days, so the Sergeant would say there's a new
21 revision to whatever it was revising. "There's a new
22 order. DDSO 86-3. This is the change in it. If
23 anybody has any questions, let me know." That's roll
24 call training.
25     Q    Okay. Once the new 1980 -- strike that. After

Page 153

1  -- between the -- strike that. In the period from 1986
2  to 1998, for new detectives, they would get training on
3  the 86-3 policy over the subsequent standard operating
4  procedure during their sort of pre-detective training.
5  Correct?
6      A    Correct.
7      Q    Okay. What -- in those trainings, in that
8  period from 1986 to 1998, what were detectives trained
9  was the purpose of notes?
10     A    Well, the purpose of notes, I'm sure if I had
11 the training to review, there's probably an actual quote
12 of what the purpose of notes is, but I don't have
13 memorized what the training would have been. So, if you
14 asked me today what the purpose of notes was for
15 training, I would have to imagine something myself.
16     Q    Okay. So, you don't -- as you sit here today,
17 you're not able to say what training detectives were
18 given on the purpose of note-taking?
19     A    Correct.
20     Q    Okay. Were they given training about what are
21 the circumstances in which they need to take notes?
22     A    Yes.
23     Q    And were they trained were the type
24 circumstances to take notes?
25     A    Well, the training was it's a very useful tool



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 154

1 and that it can be extremely helpful in your
2 investigation.
3    Q    Were detectives trained that it was a tool
4 that could help them write their own accurate reports?
5    A    Certainly.
6    Q    Were detectives trained that it was a tool
7 they should use to write their own accurate reports?
8    A    I would stick with the word could.
9    Q    Okay.
10   A    Sometimes they -- if it was useful and a good
11 utility to them, they should.  But it depends on the
12 detective and on the specifics of --
13   Q    That they should never destroy their notes?
14   A    Correct.
15       MS. GOLDEN:  We have a belated objection to
16 foundation.
17       COURT REPORTER:  And I'm sorry to --
18   Q    Over the course of your career, would you say
19 you worked with or supervised potentially of hundreds of
20 detectives?  Okay.
21   A    Yeah.
22   Q    In -- over the course of your career, have you
23 worked with any detectives who did not ever take notes?
24       MS. GOLDEN:  Object the foundation.
25       COURT REPORTER:  I'm sorry, Counsel.  I did not

Page 155

1 hear your witness's response.  Could you say that
2 again, sir?
3       MR. SWAMINATHAN:  I don't think he answered
4 yet.  I think he was thinking.
5       COURT REPORTER:  Oh, I'm sorry then.
6       THE WITNESS:  I did not answer.
7       COURT REPORTER:  My apologies.  I -- that's on
8 me.  Apologies.
9 BY MR. SWAMINATHAN:
10   A    I may have -- I guess I would answer it's
11 possible, but there -- I've worked with many detectives
12 who took a lot of notes and some who took next to no
13 notes.  I don't know if I could say for 100 percent
14 certain that few detectives ever wrote notes.
15   Q    So, sitting here today, you cannot say, "I can
16 recall any detective I ever worked with or supervised
17 who just never took notes."  Is that fair?
18       MS. GOLDEN:  Object to foundation
19       MS. ROSEN:  I'm going to object to beyond the
20 scope, also the 30(b)(6) notice.
21   A    Yeah.  It obviously would depend on what
22 they're spending their time doing.
23   Q    Sorry.  You said -- I don't think I understood
24 the answer.  Was that -- is that yes?  You -- let me ask
25 it again.  And I'll lead with a different question.

Page 156

1 Sorry.  So, sitting here today you're --j are you able
2 to identify any detective you can recall from your
3 career who just had a policy of never taking notes?
4       MS. GOLDEN:  Object to foundation.
5    A    Yeah.  It's possible, but I can't think of any
6 by name.  I mean, it's -- as a supervisor, you get
7 reports to approve and many of the reports have GPRs
8 attached to them.  Many of the reports don't have GPRs
9 attached to them, so depending on if I had kept a
10 record, I guess I could make that determination, but
11 it's not something that would be easy to speculate.
12   Q    You said you took notes when you were a
13 detective, correct?
14   A    I did.
15   Q    You had partners while you were a detective,
16 correct?
17   A    I did.
18   Q    Your partners, did they all take notes?
19       MS. ROSEN:  I'm going to again object.  Beyond
20 the scope of the 30(b)(6) notice.  Commander
21 Winstrom's personal experiences are not relevant to
22 the topics that he's been designated for by the city
23 of Chicago line of inquiry.  Definitely not policy-
24 oriented at all.
25   A    I worked with detectives who would take notes,

Page 157

1 and then I worked on detectives who would rely on others
2 to take notes, and I worked on detectives who shied away
3 from taking notes at all.
4    Q    Okay.  And the detectives who shied away from
5 taking notes, would you say that any of those detectives
6 were individuals who never took notes?
7    A    I don't know that -- I don't believe I could
8 possibly say for certain that a detective never took
9 notes.  At some point in time, there's probably going to
10 be a reason because you have to be really good at
11 memorizing numbers for -- a lot of times you'll need
12 birth dates and things like that.  I think it would
13 probably illogical to think.  However, when people work
14 in pairs, a lot of times one gets the default note-taker
15 role, so.
16   Q    Okay.  Do you remember the -- strike that.  Did
17 you work -- strike that.  During your time as a
18 detective partnership where neither detective took
19 notes?  The detective's other partner.
20       MS. ROSEN:  Objection.  Beyond the scope.
21       MR. SWAMINATHAN:  All right.
22       COURT REPORTER:  I'm sorry.  Counsel, could you
23 repeat that question again, please?
24 BY MR. SWAMINATHAN:
25   Q    Yeah.  I'll ask again then I'm going to move

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 158

1 on. So, during your time as a detective and as a
2 supervisor of -- do you recall any detective
3 partnerships where neither partner took notes?
4          MS. ROSEN: Objection. Beyond the scope.
5          MS. GOLDEN: And foundation.
6     A    And you're talking about through their whole
7 time? No. Not just for one particular instance, right?
8     Q    Yeah. Okay. Did you get the answer?
9          MS. ROSEN: And let me -- oh, sorry.
10         COURT REPORTER: Yes. Sorry, did I --
11         MS. ROSEN: Can we just take one minute? I
12 need to plug in my computer.
13         MR. SWAMINATHAN: Yeah.
14         MS. ROSEN: Okay. One second.
15         MR. SWAMINATHAN: The court reporter, did you
16 get the answer? No?
17         COURT REPORTER: Yes, sir. I got -- I believe
18 I did. Let me do it one more time. Said during the
19 whole time -- I'll do a playback before we go back
20 on, but I had -- I believe I got it. I've got you
21 on audio. Can you all hear me?
22         MR. SWAMINATHAN: Yeah.
23         COURT REPORTER: Perfect. Okay. Sorry about
24 that. All righty.
25         MS. ROSEN: Sorry about that, thanks.

Page 159

1          MR. SWAMINATHAN: Okay. We're ready to keep
2 going?
3          MS. ROSEN: Yep.
4 BY MR. SWAMINATHAN:
5     Q    Okay. Sir, you were talking about some policy
6 changes and training the trading that took in 1983.
7 You've -- fair to say that that policy change and the
8 training that occurred, stemmed from events that
9 occurred in 1981, the case of George Jones?
10    A    It had to do with Jones. I think there was
11 another case, maybe Palmer.
12    Q    Palmer? Okay. And you saw in the amended
13 notice of 30(b)(6) deposition, you saw that some of the
14 -- one of the topics here today is that Jones Palmer
15 litigation and the policy changes that that came from
16 it, correct?
17    A    Yes.
18    Q    Okay. And so with regard to the Jones Palmer
19 litigation, would you agree that the issues that arose
20 in 1981 and 1982 related to the notes and file keeping,
21 were issues that were made aware to the top officials in
22 the Chicago Police Department?
23    A    Yes.
24    Q    It was addressed all the way up to the
25 superintendent level, correct?

Page 160

1     A    Correct.
2     Q    Was addressed with the chief of detectives,
3 correct?
4     A    Correct.
5     Q    Superintendent and chief of detectives were
6 involved in the policy making around the issues that
7 came up in 1981 and 1982 related to notes and file
8 keeping, correct?
9     A    Correct.
10    Q    Okay. And in fact, the superintendent
11 testified in the Jones Palmer litigation, correct?
12    A    Correct.
13    Q    Okay. And ultimately it was the
14 superintendent and chief of detectives who were involved
15 in the ultimate policies that were put in place in 1983
16 related to investigative files, correct?
17    A    Correct.
18    Q    And they were involved in the setting of those
19 policies in 1983 that continued in the form of the
20 1986-3 [sic] special order and subsequently the standard
21 operating procedures, correct?
22    A    Correct.
23    Q    Okay. And the policies around ensuring that
24 investigative files were being disclosed -- the policies
25 around ensuring that notes were being retained at around

Page 161

1 file keeping as set forth in those 86-3 and standard
2 operating procedures. Those are policies that have
3 continued to be on the radar of the superintendent and
4 senior officials of the detective division, through 1986
5 through 1998; is that true?
6          MS. ROSEN: Objection to the form.
7     A    I can -- I mean, I guess I can't speak to the
8 other superintendents, but I could say that the policy
9 stays in effect.
10    Q    Okay. And the policies provided specific
11 instruction for -- strike that. The policy, would you
12 agree, from 1986 through 1998 related to investigative
13 files, claim specific requirements at the commander
14 level, for responsibilities that they had with regard to
15 those issues, correct?
16    A    Correct.
17    Q    And was it the responsibility of the
18 commanders to report to the chief of detective?
19    A    At this period of time, the commanders
20 reported, I believe to a field group, deputy chief.
21    Q    Okay. And then from there, who did they
22 report to?
23    A    Field group deputy chief would've reported to
24 the chief of detective.
25    Q    And chief of detectives reported to the

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 162

1 superintendent?

2      A    Chief of detective likely reported to the
3 deputy superintendent of administrative services at the
4 time.

5      Q    Okay.  Yeah.  If -- in cases during the time
6 period from 1986 to 1998, if there were instances in
7 which it was learned that information had not been
8 turned over to the criminal justice system, essentially,
9 if there had been a Brady violation.  Is that
10 information that would get to the commanders?

11      MS. GOLDEN:  Object to form.

12      A    So during this time period, if there was a
13 Brady violation would that information, get to the
14 commanders?

15      Q    Yep.

16      A    It would.

17      Q    And if that occurred -- I'm sorry.  If that
18 occurred, would the expectation that in cases where that
19 occurred, detectives would be -- detectives involved in
20 the case or that occurred would be communicating that
21 information off the chain?

22      MS. ROSEN:  Object to the form.

23      A    Yeah, I guess as you're saying if they were in
24 court and the judge told them, "Hey, this is Brady
25 violation."  Were they expected to go back and tell

Page 163

1 somebody?

2      Q    Yeah.  In other words if it gets -- in a case
3 where a detective was, you know, the lead detective
4 involved in the investigation and you know, obviously
5 works with the prosecutors in the criminal prosecution,
6 right?  And their job is to come to trial and prepare to
7 testify in that case right?  And if ultimately it turns
8 out the case is dismissed or some other problem, or you
9 know, otherwise there's an acquittal or whatever it is,
10 that result from a Brady violation then that would be
11 known to the detective, right?

12      MS. GOLDEN:  Object to form.

13      MS. ROSEN:  Foundation.  What's the foundation
14 for that?  That it would be --

15      Q    So let me ask in a different way.  If the
16 detective -- in a case where a detective involved and
17 there's a Brady violation.  Okay?  The added information
18 that detective might learn because they're involved in
19 the investigation itself, right?

20      MS. ROSEN:  Objection.  Form.

21      A    You mean at court, like they would be told at
22 court there was a -- I mean, if they were told at court,
23 they'd be told at court, just being a part in an
24 investigation, I don't know that they would become aware
25 of it.

Page 164

1      Q    Detectives would work -- in a criminal
2 prosecution once there's been charges, detectives work
3 and communicate regularly with the prosecutors involved
4 in those prosecutions, correct?

5      MS. ROSEN:  Objection, form.  Foundation.

6      A    Prosecution is moving forward unless there's
7 a, you know, an immediate plea, if it's actually moving
8 to trial at some point in time, detectives would be
9 involved.

10      Q    Okay.  And so prosecutor communicate directly
11 with the detectives who are involved in an investigation
12 that's being prosecuted, correct?

13      MS. GOLDEN:  Objection.  Form.

14      A    The detectives may or may not communicate
15 directly with the prosecutor.  Now, if it's to the point
16 where it's actually going to trial and they're expected
17 to testify, they would likely be called the 26 and Cal
18 notified within a court notification.  And it would
19 appear in 26 and Cal and likely interact prosecutor at
20 some point in time prior to testifying.

21      Q    And so that's another mechanism by which --
22 they might hear from the prosecutor if the judge ruled
23 that there's been a Brady violation case, correct?

24      MS. ROSEN:  Objection, form.  Foundation.  Calls
25 for speculation.  Also, I think beyond the scope of

Page 165

1 the 36 notice.

2 BY MR. SWAMINATHAN:

3      A    So I would say it's possible.

4      Q    In -- where a detective learned that a case
5 has been suspended or has been, otherwise there ruled as
6 a Brady violation, with that information detectives were
7 expected to pass up the chain to their sergeants and
8 other supervisors?

9      A    It would depend on the certain circumstances.
10 We are required by rule 22 to disclose.  If you're
11 saying, if there's some allegation of actual misconduct,
12 our members are required to report misconduct.  I don't
13 know if there's violation, that's accidental or a
14 technicality or something, if that would necessarily get
15 around, or if either the prosecutor would've pulled
16 away, this would definitely depend on actual specifics
17 of the case we're talking about.

18      Q    Let's see.  Would that been on the screen
19 here.  Let me check.

20      MS. ROSEN:  We're up to four?

21      MR. SWAMINATHAN:  I think we're up to four.

22 Yeah.

23      COURT REPORTER:  We are at four.

24 BY MR. SWAMINATHAN:

25      Q    I'm showing you a document marked as Exhibit



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 166

1  4, Bates stamp RFC Solache Reyes 118094 through 118096.
2  And at the top it says, Chicago police training division
3  course lesson plan. Sir, is this one of the documents
4  you reviewed in preparation for today's deposition?
5           (EXHIBIT 4 MARKED FOR IDENTIFICATION)
6      A   I've seen this before.
7      Q   Okay. This is a essentially a document that
8  was used in the training of detectives, correct?
9      A   Correct. If possible -- would it be possible
10  to make it a little bigger?
11     Q   Yep. That big enough or a little bigger?
12     A   Yeah. That's okay. I'm familiar with this.
13     Q   Okay. And in this training that was provided
14  to detectives, with regard to application of the
15  standard operating procedures around investigative
16  files.
17          MS. ROSEN: Object to the form. Flip through
18      the rest of it, so we can see what it is.
19          MS. GOLDEN: Did you say investigative files or
20      staff reports?
21  BY MR. SWAMINATHAN:
22     Q   Oh, I said investigative files, but I did mean
23  staff reports. So is this the policy -- strike that. Is
24  this -- was this training -- maybe a better one. This
25  training it references the detective division SOPs. Do

Page 167

1  you see that?
2      A   Yes.
3      Q   Okay. So what detective division SOPs was
4  this training supposed to be about?
5      A   What number it is would have to flip through,
6  but I can tell you what the training's about.
7      Q   Okay. So tell what the training is about.
8      A   Okay. So it's a violent crimes format. So
9  when you lead a case as a detective, for example, let's
10  say it's a unsolved retail theft, somebody ran out the
11  door with a pack of toilet paper. It's a low level
12  crime. You are expected to investigate it, but you're
13  not expected to produce a lengthy report because it's
14  probably not needed. So this is for violent crime
15  format. And format is a term that we use to describe
16  when a detective is going to document in the narrative,
17  certain things, for example, daytime location of
18  offense, victim, property, evidence suspect. So there's
19  different formats, for different crimes. An arson
20  format, a missing person format would be different than
21  a homicide format. So this is a violent crimes format,
22  which could be used for a shooting, potentially a murder
23  and others. And that's what this is teaching, what
24  needs to be included and why you need to do a full
25  format for certain crimes.

Page 168

1      Q   Okay. But this ultimately -- this training is
2  ultimately with regard to the supplementary report
3  writing to violent crimes cases. Correct?
4      A   Correct.
5      Q   Okay. And that includes homicides, correct?
6      A   Correct.
7      Q   Okay. And this -- what is the period of time
8  which this training was given? Strike that. I guess
9  the other easy way to maybe consistent with this 36
10  notice is, was this training in Exhibit 4, training that
11  was provided to detectives in the period from 1986 to
12  1998?
13     A   Yes. This is. If not this exact training,
14  something similar.
15     Q   Okay. And this training is training that
16  would apply to homicide investigations and report
17  writing homicide investigations, correct?
18     A   Yes.
19     Q   Okay. Showing you a document, marked as
20  Exhibit 5. This is RFC Solache Reyes 117714 through
21  117723. Its title is, detective division training,
22  lesson plan, supplementary report writing. You see
23  that, sir?
24          (EXHIBIT 5 MARKED FOR IDENTIFICATION)
25     A   I do.

Page 169

1      Q   Okay. And is this training that was provided
2  to detectives at a period from 1986 to 1998?
3      A   Yes.
4      Q   Okay. And when is this training provided? Is
5  it part of the pre-training for detectives or is it a --
6  is it something that's done as part of their sort of
7  ongoing training? When is it provided?
8      A   In pre-service detective training.
9      Q   Were there other -- was there other training
10  that was given with regard to supplementary report
11  writing other than this one, in that pre-service
12  training?
13          MS. ROSEN: Object to the form.
14     A   Other than this one, the one before. I mean,
15  supplementary report writing is discussed several ways.
16  They would've, for example, when they're taught about
17  missing persons, they would've an opportunity as a
18  practical to write a missing persons report. When
19  they're taught about burglaries, they'd have an
20  opportunity to write a burglary supplemental report. So
21  supplemental report writing is something that is
22  addressed many different days of pre-service.
23     Q   Showing you a document I marked Exhibit 6,
24  this is RFC Solache Reyes 117964 through 117972. And
25  the title is, homicide data format. Sir, is this

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 170

1  training that was provided to homicide detectives from
2  the years 1986 to 1998?
3           (EXHIBIT 6 MARKED FOR IDENTIFICATION)
4      A    It's -- so this is an example of a format. I
5  don't know if it necessarily would've been -- let me
6  see. I think this is the actual very long procedure. So
7  that's the actual format. It might have been discussed
8  with the other format, but less of a training and more
9  of the actual tool you would use. So you would -- this
10 is more of a material of reference that you would use
11 when you're actually filling out the format. You look to
12 that to fill in the boxes were appropriate.
13     Q    This was part of -- this was part of the
14 training, a tool or a handout that was part of the
15 training. Is that right?
16     A    Right. It may have just been provided as you
17 kind of, here you go. It's not -- it's just because
18 it's self-explanatory. It's not -- they wouldn't
19 necessarily have to go in and talk about, let's talk
20 about the sibling interviews, you know and stuff. So
21 it's more of, "Hey, here's a tool for you to use when
22 you're reporting on homicide."
23     Q    Showing you a document marked as Exhibit 7,
24 RFC Solache Reyes 118000 through 118006. Titled -- the
25 title, it just says, cleared exceptionally and street

Page 171

1  files. Are you familiar with this document?
2           (EXHIBIT 7 MARKED FOR IDENTIFICATION)
3      A    I have reviewed it.
4      Q    And the first part of this talks about
5  exceptionally clear cases, that's not relevant to our
6  discussion. I will skip that. Part three of this
7  document, starting on RFC Solache Reyes 118004 talks
8  about street files. Do you see that?
9      A    Yes.
10     Q    A says, "show the Peter Carl film," what is
11 that?
12     A    I am unfamiliar with that.
13     Q    This document, was this part of detective
14 division training in some way?
15     A    It was. This was used as guidelines for the
16 instructor. This is actual instructor materials.
17     Q    Okay.
18     A    So you wouldn't say show the Peter Carl film.
19 He would look at this and be like, "Oh, this is where I
20 show the Peter Carl film."
21     Q    So this is sort of a -- does it provide
22 some sort of roadmap for what the instructor is teaching
23 in the training?
24     A    Correct.
25     Q    Okay. And when was this the training or was

Page 172

1  the instruction was given about these files? Where was
2  it occurring? Was it the 1983 training? Was it the
3  subsequent in-service training or? I mean, that in-
4  service training or was it subsequent, you know, pre-
5  detective training? When is this -- when was this used?
6      A    This curriculum is from post 1983. Pre-
7  service detective training.
8      Q    Okay. So this was what sort of got
9  incorporated into the pre-service detective training
10 after the incident training that occurred in 1983,
11 correct?
12     A    That is correct.
13     Q    Okay. And this information was part of the
14 training throughout the period from 1986 through 1998,
15 correct?
16     A    Correct.
17     Q    Okay. I'm showing you a document I have
18 marked as Exhibit 8. This is RFC Solache Reyes 118090
19 through 118093. And the title is -- it's a memo that
20 says, "to the director of the training division from the
21 commanding officer" and it references in-service
22 detective division investigating file training program
23 and dated January 13, 1983. Do you see that, sir?
24          (EXHIBIT 8 MARKED FOR IDENTIFICATION)
25     A    Yes.

Page 173

1      Q    Can you tell us, is this a training that was
2  provided to detectives with regard to investigate files?
3      A    Yes. Yes. This is the in-service training
4  from 1983 that I referenced, that all active detectives
5  were required to attend in-person.
6      Q    Okay. So this is the training that was done
7  in 1983 when the detectives all came to headquarters
8  based on the Jones Palmer case, correct?
9      A    That is correct.
10         MR. SWAMINATHAN: I am pulling up a document.
11 We're up to nine, right?
12         COURT REPORTER: Yes, sir. We are.
13 BY MR. SWAMINATHAN:
14     Q    Right. I'm showing you document that marked
15 Exhibit 9, it's Bates stamp RFC Solache Reyes 117962
16 through 118398. I'm just going to ask for one specific
17 piece of this, but can you tell us what this document
18 is?
19          (EXHIBIT 9 MARKED FOR IDENTIFICATION)
20     A    This is more training material used in
21 in-service training, to teach case reporting to
22 detectives. Pre-service detectives.
23     Q    This is pre-service detective in-service
24 training, correct?
25     A    Yes.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 174

1    Q   And is the training that was provided in the
2 series from 1986 to 1998, correct?
3    A   That is correct.
4    Q   All right.  Up to 118076, necessary changes to
5 proposal is implemented.  And then it has a section on
6 concerns and resolution.  You see that?
7    A   I do.
8    Q   What is this session about?
9    A   I have no idea.
10   Q   Okay.  What is, this next page 118078?
11   A   You scroll to the top there.
12   Q   Concerns and resolution and it says
13 operational effectiveness and efficiency.
14   A   Yeah.  This -- so this material, which
15 would've been -- it was located within all the training
16 material that I located for a previous case.  And so
17 it's grouped in there, but I don't know what this has to
18 do with the training material and.
19   Q   Okay.  And do you have any understanding of
20 whether this -- do you know, whether this is something
21 that was included as part of the actual training for
22 detectives in pre-service training?
23   A   No, I'm certain it wasn't because this all has
24 to do with workflow of paperwork at the time, mostly in
25 district law enforcement.  So it doesn't really pertain

Page 175

1 to detective operations.
2    Q   Okay.  And does this pertain to by the work of
3 the subpoena service units at all?
4    A   I suppose it could touch it -- it could touch
5 on it, but this isn't -- it pertains to records, which
6 during this time everything was paper.  So literally
7 almost any report that you did pertained to records and
8 the subpoena unit was organized under records made --
9 you know.  Partly for efficiency because they were
10 there, they easily could obtain the records because they
11 were in the same unit, but it wasn't -- you know, this
12 isn't specific to the subpoena unit.  This is just
13 moving reports around the police department, as far as I
14 can tell.
15       MR. SWAMINATHAN:  Okay.  I have a couple of
16 pages on my end that did not print, so I need to
17 print those.  Let me take a five minute break
18 anyway.  And I'll be right back.
19       COURT REPORTER:  Okay.  We are going off the
20 record.
21       (OFF THE RECORD)
22 BY MR. SWAMINATHAN:
23   Q   Okay.  Commander, under the orders regarding -
24 - strike that.  Under the policies in place regarding
25 investigative files, for 1986 through 1998, under the

Page 176

1 policy by design, there were documents related to
2 homicide investigations that were in different places,
3 correct?
4    A   In -- now you said in as far as the policy or
5 do you mean in practical matters different documents are
6 located in different units?
7    Q   Yeah.  I think understand your confusion so
8 let me try to clear up.  So in that period from 1986 to
9 1998, was it the case that documents related to a given
10 homicide investigation were housed these different
11 places within the police department?
12   A   Yes.
13   Q   Okay.  So some of the investigate -- some of
14 the documents related to a homicide investigation were
15 in the investigative file itself at the area, which
16 we've talked about, right?
17   A   Yes.
18   Q   And then additionally documents related to the
19 same homicide investigation.  There were some items in
20 the record division, correct?
21   A   That is true.
22   Q   In what file were the records division?
23   A   The records division, they would maintain the
24 RD file.  What the RD file would contain -- would be
25 copies of the general defense case report, which would

Page 177

1 also be in the investigative file.  The detective
2 division supplementary reports.  Likely the crime scene
3 processing report, but it would not have the GPR or
4 notes in it though.  So, but
5    Q   So by design there were documents that would
6 be the investigative file that are not in the record
7 file, correct?
8    A   That's correct.
9    Q   And another name for the records division file
10 or RD file is permanent retention file.  Correct?
11   A   I have heard of it referred to that.  I've
12 probably have referred to it myself.
13   Q   And is it also the case that there are
14 documents that would be in the permanent retention file
15 that may not be in the investigation file?
16   A   Probably the only example of that would be the
17 -- no, crime scene processing report would be in there
18 too.  So I don't think that there'd be anything in the
19 RD file that wouldn't be in the investigative file.
20   Q   Other than the RD file and the investigative
21 file, what are other places where that needs to be for a
22 single homicide investigation?
23   A   Well, depending on the facts of the case,
24 there could be something -- for example, if a car got
25 towed, there could be a something in the auto pound

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 178

1  section.  There could be forensics -- they have
2  documents regarding evidence and also photographic, like
3  negatives.  If possible, if the -- if there's a police
4  officer offender, there could be a prepared file too.
5  And most of the stuff is in the investigative file, but
6  depending on the specifics of cases, you see where you
7  would look.
8      Q    Okay.  Photos, you said, could be the forensic
9  division; is that correct?
10     A    Yes.  And during this time period, it may have
11  changed names.  It might be the crime lab.  It might be
12  the crime processing unit, but it would probably be
13  off-site there.  Yeah.  The least if there was a
14  homicide there would probably be negatives, stored
15  there.  Even if pictures would be stored in the --
16     Q    You cut out at the, if the pictures would be
17  stored in the
18     A    Even if the pictures were in the investigative
19  file, the negatives wouldn't be in there, the negatives
20  would be housed at the photo lab over in the forensic
21  section.
22     Q    Okay.  Now, is it the case that pictures were
23  always in the investigative file or was it the case that
24  sometimes you have to get those from the forensic
25  division or whatever name you called it then?

Page 179

1          MS. ROSEN:  Objection, form.  Say as to what
2      you're referencing, when you say.
3      A    Yeah, I would be hesitant to say that they
4  were always in the investigative file, but generally
5  speaking by the time -- if it was going to court,
6  generally speaking by the time.
7          COURT REPORTER:  I'm sorry.  Counsel, did the
8      witness cut out for you as well?  I'm sorry,
9      Counsel.  One moment, please.  Bear with me.  I
10     apologize.  Okay. Counsel, I didn't catch the
11     witness' last statement made on the record.  You cut
12     out for a second.
13         MR. SWAMINATHAN:  I think he asked about --
14         COURT REPORTER:  Good.  I think he said last
15     that he was hesitant and that was the last word I
16     captured.
17         MR. SWAMINATHAN:  Okay.
18         MS. ROSEN:  And what was the question?
19  BY MR. SWAMINATHAN:
20     Q    The question was where was the -- strike that.
21  Crime scene photos, the originals of those were in the
22  forensic division.  Is that correct?
23     A    Okay.  And the negatives would be in the
24  forensic division, the photos themselves, if they
25  printed off one copy or two copies, they may have a copy

Page 180

1  there.  But it generally would be included.  The thing I
2  said I was hesitant to say, was, always in the
3  investigative file.  Depending on the timing and at the
4  time things weren't digital.  So it wasn't an
5  instantaneous thing.  It was actually the development
6  lab that did it, so.  But generally speaking the photos
7  as well would be in the investigative file.
8          MS. GOLDEN:  Excuse me, excuse me.  One second.
9      I would like to lay a objection to form and
10     foundation.  I just didn't want to interrupt the
11     witness.
12     Q    And there were photos that are at the line-up
13  taken.  Would those be in the forensics division?
14         MS. GOLDEN:  Object to foundation.
15     A    Now we're talking about the line-up in a
16  homicide investigation, correct?
17     Q    Yes.
18     A    Okay.  So those would all -- so the negatives
19  would be in the forensics division and it's likely that
20  a copy of the pictures would be included in the file.  As
21  I said, it was a slower process at the time so I would
22  be hesitant to say always, but normally they would be
23  made available for court.
24     Q    And if you wanted to make sure that you would
25  receive all of the photos, whether they're crime scene

Page 181

1  photos, line-up photos, or otherwise, for a case you
2  would need to make sure you get them from the forensics
3  division, correct?
4          MS. GOLDEN:  Object to form and foundation.
5      A    Okay.  Well, there's other ways to ensure that
6  the case -- if you were familiar with the case you could
7  -- and if it was the state that was looking to get them,
8  they could talk to the detective or just look at the
9  report and look at the report and determine, "Hey, what
10 photographs were taken?" and maybe they'd be able to
11 tell that they had them all.  But you certainly could
12 request them under that RD number.  "Give me all photos
13 from front," and you could get them that way, as well.
14 That's not the only way to get them.
15     Q    And if there were arrest reports related to
16 the investigation, the homicide investigation, where
17 would those be?
18         MS. ROSEN:  Objection to form.
19     A    The arrest report would actually be located in
20 several different places, one of which would be the
21 investigative file, one of which would be the court,
22 because you would send the arrest report with the body
23 to court.  One of which would be in the records division
24 because a copy will go to the records division.  And I
25 feel like I'm missing one, but it would definitely be --



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 182

1  well, the definite one is definitely would be in court
2  with the body.  It would likely be in the investigative
3  file and the records division has a permanent copy of
4  every arrest report really ever made.
5      Q    And if you wanted to get specialized units
6  that were involved in the investigation, where would
7  those files be?
8      A    Generally, if they were pertinent to the case,
9  they would also be included in the investigative file.
10  I'm trying to think of an investigative unit that might
11  have something pertinent that wouldn't be.  Maybe if you
12  got the marine unit to do something.  I mean, as a
13  detective, generally speaking, if it's -- you would put
14  it in the investigative file, but I guess if it was
15  something technical like the helicopter or the marine
16  unit, potentially, depending on the case.  If I had a
17  case in front of me with some quirky aspects to it, I
18  might be able to tell you where else to look.
19      Q    If there was an arson unit, for example, was
20  involved, you maybe get files you do not consider
21  before, right?
22      A    Correct.
23          MS. ROSEN:  Objection to form and I'm thinking
24      beyond scope of the 30(b)(6).
25      A    That's a good example because arson is a UCR

Page 183

1  that's sent from the UCR hierarchy rule, so that
2  requires a separate report altogether, so that would --
3  yeah, that would also be a place I would look for that
4  in such a case.
5      Q    And if gang crime officers were involved there
6  could be documents relating to the gang crimes unit,
7  right?
8      A    Correct.
9          MS. GOLDEN:  Objection to form and foundation.
10          MS. ROSEN:  And beyond the scope of this
11      30(b)(6).  That's specifically negotiated out of
12      this 30(b)(6), though.
13      A    So gang crimes is a different type of
14  scenario.  For example, I have many teams that work for
15  me now and they work for me, so it depends on what year
16  you're talking about, who they were organized under, and
17  what the function was at the time.  Their documents
18  could go directly into the file.  So I'd have to know
19  more about the circumstances.
20      Q    And from 1996 to 1998, would those always be
21  in the investigative files?
22          MS. GOLDEN:  Same objections.
23          MS. ROSEN:  And same, it's beyond the scope of
24      the 30(b)(6) notice and he's not prepared to answer
25      these questions.

Page 184

1      A    Same answer, I don't know.
2      Q    Okay.  In terms of the youth investigators,
3  would they have documents in their own set of files?
4          MS. GOLDEN:  Object to foundation.
5      A    Not for homicide, if that's the question.
6  Youth investigations was organized during this period of
7  time under the bureau of detectives, so there wouldn't
8  be a separate -- they wouldn't like maintain a separate
9  parallel file or anything like that.
10      Q    Okay.  If you had a case where -- strike that.
11  If you have a case where there's parallel investigations
12  related to the arson investigations so, for example in
13  the homicide case there's a file and there was the
14  kidnapping component, correct?
15      A    I --
16          MS. GOLDEN:  Object to form.
17      Q    And I believe the kidnapping might have had
18  its own RD number for some period of time.  Did you see
19  that in the file?
20          MS. ROSEN:  Objection to form and misstates the
21      record.  That's not at all what is related here.
22      A    I recall seeing a couple of MRAIs and I saw --
23  I didn't know -- you know, it's my fault that I didn't
24  see that the UCR was kidnapping.  I thought it was a
25  missing person's report.  Either way, once the

Page 185

1  individuals were located, that would've been merged into
2  the homicide file.  There wouldn't be like something,
3  like, you know, ongoing investigation for the kidnapping
4  or the missing, the MRAI was wrapped into it too.  It
5  all became one investigation.
6      Q    When you say MRAI, what are you referring to?
7      A    Sorry.  A Minor Requiring Authority
8  Intervention.  Authoritative intervention is a form that
9  we use when a child is taken into custody by the police
10  department and needs to be placed like overnight, either
11  with DCFS or some other safe home.  And those are
12  completed by, usually by youth officers so --
13      Q    And what was the process for -- strike that.
14  In terms of producing documents to the criminal justice
15  system from an outside investigation, what was the
16  process for doing that?
17      A    Okay, so there's --
18      Q    Moving forward and from 1986 to 1998.
19      A    Okay, and we're talking about a murder.
20          MR. SWAMINATHAN:  Okay, yeah.
21          MS. ROSEN:  Yeah.  We're getting feedback, too.
22          THE WITNESS:  How about now?
23  BY MR. SWAMINATHAN:
24      Q    Okay.  Gone now.  Okay.  In the period from
25  1986 to 1998 for homicide investigations, what was the



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 186

1  process by which documents from the homicide
2  investigation would get disclosed to the criminal
3  justice system?
4      A    Two ways.  The first way is through the
5  subpoena process, which I can describe to you.
6  Essentially, the subpoena gets delivered to police
7  headquarters.  It gets delivered to the subpoena unit.
8  Subpoena unit examines it, makes a determination what
9  unit would have response of record.  Send it through the
10 police mail to that unit, which is required to fulfill
11 the request and send it back to the subpoena unit.  And
12 then the subpoena unit sends the completed subpoena
13 returnable to the court, not to the requester.  And then
14 the second process is oftentimes state's attorneys would
15 request detectives to bring the files to court with them
16 so that they could make photo copies in a more efficient
17 manner.
18     Q    So basically in this period there was a formal
19 process using subpoenas and an informal process of the
20 prosecutor reaching out to detectives, right?
21     MS. ROSEN:  Object to the form.
22     A    I would say they're both formal.  Even to this
23 day, it's -- although it could have been made to be
24 informal, they're an officer of the court, it's part of
25 the criminal justice system, we, in fact, oftentimes

Page 187

1  will make it a formal court notification that Detective
2  Winstrom is to report to the courtroom, whatever, with
3  the file because the state's attorney requested.  So
4  we'll comply with that if they request it.  I would say
5  it is -- they're both formal.
6      Q    Okay.  Did the process of disclosing the
7  documents from a homicide investigation to the criminal
8  justice system change at all in the period from 1986 to
9  1998?
10     A    No.
11     Q    Okay.  And so throughout the period from 1986
12 to 1998, the policies we're going to be talking about
13 here remained the same, correct?
14     A    Correct.
15     Q    And the process remained the same, correct?
16     A    Correct.
17     Q    All right.  So when -- let's start with the
18 subpoena, the formal -- let's start again.  When a
19 subpoena would come into the -- you said into the
20 records division, correct?  When it would be taken to
21 headquarters, sorry.
22     A    If it's delivered to headquarters, it's as
23 simple as if an attorney or a process server walks off
24 the street and tries to hand it to the front desk.
25 They'll say that there's the subpoena window over there

Page 188

1  and they can drop it off and that's how it gets started.
2  Still to this day, that's how it works.
3      Q    But you had said it goes through that.  It's
4  called a subpoena service unit.  Is that right?
5      A    Well, today we just call it the subpoena unit,
6  but it was probably called subpoena services at the
7  time.
8      Q    Okay.  And then the individuals -- and then
9  who are the individuals who are responsible for then
10 taking that subpoena and getting the documents gathered?
11     A    There's a group of anywhere from six to eight
12 individuals who act as clerks.  Over the years, it would
13 be a mix of civilians and sworn and they would be
14 supervised by one or two sergeants assigned to the
15 records section.
16     Q    The clerks -- if the clerks are civilians, I
17 take it that means that they are not people who had
18 previously served as Chicago police officers in any
19 capacity, correct?
20     A    Most likely that is correct.
21     Q    Okay.  And in the period from 1986 to 1998,
22 was it civilians who were working as clerks in the
23 subpoena unit, or were there also sworn officers?
24     A    It was a mix.
25     Q    Okay, and then the individuals who were in

Page 189

1  that unit -- the person that would be assigned a
2  specific subpoena would be the individual responsible
3  for gathering the material.  Is that correct?
4      A    That is correct.
5      Q    Okay.  And then what was the process for them
6  to then go about gathering the materials that exist in
7  the various places for the homicide investigation?
8      A    The process is for the individual to read the
9  subpoena and to make a determination by the contents of
10 the subpoena of where that subpoena should be delivered
11 to via police mail, to obtain the records needed, and
12 put it in police mail and send it off.
13     Q    So the decision on where to go to gather the
14 records would be made by the subpoena clerk, correct?
15     A    Exactly.
16     Q    And the clerk would make the determination
17 about where they needed to gather materials from by
18 reading the subpoena itself.  Is that right?
19     A    That is correct.
20     Q    Okay.  And then would they rely on any other
21 information in terms of determining where they needed to
22 gather materials from?
23     A    Information from, at a minimum, that general
24 classification report, would be available to them.  So
25 for example, if it was a very vague subpoena that just

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 190

1  said any and all records from RD Adam Adam 123456,
2  that's a very vague request.  However, because they work
3  in the records unit, the actual record of that RD number
4  is available to them so they could then look and see,
5  you know, for example, "Oh, that's a traffic crash
6  report.  I know I have to send it to major accidents,"
7  or whatever.  Or, they could see it's a homicide report,
8  so send it to the detective division.  Regular places
9  that they would send it to.  The more specific the
10 subpoena is the simpler it would be, and if it's a very
11 specific subpoena, they wouldn't have to go through that
12 process.
13     Q    Okay.  So would you agree that in your
14 experience in homicide cases, in particular, the
15 subpoenas that would come in were typically sort of
16 broad subpoenas saying, "Give me all of the documents
17 related to this homicide investigation"?
18        MS. ROSEN:  Objection, form.
19     A    I would say the opposite because generally the
20 attorneys dealing with homicides are more experienced
21 attorneys who deal with the Chicago Police Department on
22 a regular basis.  So in my experience, those are the
23 easier ones to get because they know exactly what
24 they're looking for and they ask exactly what they want.
25     Q    Okay.

Page 191

1     A    And it would be more likely the personal
2  injuries attorneys who aren't used to dealing with the
3  police department who would send a subpoena over just
4  for an RD number, any and all records, kind of thing.
5     Q    So when you have a subpoena in a homicide
6  investigation, the subpoena clerk, when they get that,
7  is making the determination of where to get a record
8  based on the face of what's requested on subpoena, and
9  you're saying they might additionally be able to get a
10 general classification report to help them determine
11 where they need to get the documents from, correct?
12     A    And if there's any gray to it, that general
13 classification report is available to them and it's
14 possible because they do maintain the RD file, if it's
15 an advanced homicide investigation, that there's sup
16 reports that have been completed on that so you would
17 have more of the RD file to look at even further if it
18 was helpful.
19     Q    So was that part of the process?  Were they
20 told that they're supposed to look at the permanent
21 retention files already filed before they --
22     A    That's where the -- that's where the RD, the
23 general classification form would be.  They're used to
24 dealing with are the ones, the permanent retention ones,
25 the homicides which stay forever.  You know, you can't

Page 192

1  find a retail theft case report from 1989 if you go look
2  for it now because they don't exist.
3     Q    Okay.  SO let me take a step back.  So for the
4  subpoena clerks who are responding to a subpoena in a
5  homicide file, in a homicide case, first, is there a
6  policy that -- a policy document that sets forth the
7  policies around responding to those subpoenas?
8     A    No.
9     Q    And then for those subpoena clerks in
10 responding to a subpoena in a homicide investigation,
11 were there any directives or written orders in place?
12     A    Not that I'm aware of.  There could have been
13 unit level, you know, something tacked on the wall or
14 something to help direct them, but not that I discovered
15 or have access to.
16     Q    Okay.  Are you aware of any guidelines or
17 instructions that were provided to subpoena clerks in
18 any written form?
19     A    No.
20     Q    Are you aware of any checklists that were
21 provided to the subpoena clerks to assist them in
22 gathering documents?  I don't think we had the answer.
23     A    No.
24     Q    Okay.  Are you aware of any training materials
25 that were provided to the subpoena clerks to assist them

Page 193

1  in responding to subpoenas in homicide investigations?
2     A    No.
3     Q    Are you aware of any indexes of all the
4  various file locations that were provided to the
5  subpoena clerks for purposes of responding to homicide
6  investigation subpoenas?
7        MS. ROSEN:  Objection, form.
8     A    They would've had the department organization
9  command which comes out every year, so if you're asking
10 is there an index with every unit in the police
11 department, yes, there is.
12     Q    All right.  But, okay.  Were there any special
13 forms that listed for the subpoena clerks all the places
14 where records were kept for a given case?
15     A    Not that I'm aware of.
16     Q    Okay.  Was there any database that listed all
17 the places where records were kept for a given case?
18     A    Again, not that I'm aware of, and that's --
19 we're not talking before the computer age.
20     Q    All right.  Was there any list or form that
21 listed all the places where documents were housed for
22 homicide investigations available to the subpoena
23 clerks?
24     A    There may have been, but I don't have a copy
25 of it if there was.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 194

1    Q   You were not aware of any, correct?
2    A   Right.
3    Q   Okay.  Now once -- you indicate -- were
4 subpoena clerks expected to gather the relevant
5 retention file in any homicide cases where they got a
6 subpoena?
7        MS. ROSEN:  Objection to form, vague, subpoena
8 request.
9    A   If the subpoenas was for the RD file, I
10 suppose they would but if it's that early in the
11 process, I mean I suppose they could have gotten a
12 subpoena for the RD file, but I would think that the
13 investigative file would probably be more appropriate.
14 It's, I guess, it depends on the subpoena order, that's
15 my answer.
16    Q   Okay.  And if the subpoena clerk was getting a
17 subpoena for all of the reports and notes and files for
18 a given homicide investigation, was the subpoena clerk
19 expected to gather the permanent retention file?
20    A   If the subpoena clerk determined that there
21 was something in the permanent retention file that
22 wasn't in the investigative file on return, I suppose,
23 but otherwise it would just be two copies of that same
24 small packet.
25    Q   So the subpoena clerks, their process, was

Page 195

1 unless they were specifically requested the RD file,
2 they would be -- they would be requesting the
3 investigative file, not the RD file.  Is that right?
4    A   Exactly right.
5        MS. GOLDEN:  Can we take a brief pause here so
6 the court reporter can let Josh in?
7        MR. SWAMINATHAN:  Yeah.
8        MS. ROSEN:  Okay.
9        MS. GOLDEN:  Oh, great.
10 BY MR. SWAMINATHAN:
11    Q   Okay.  If the -- okay.  And then when the
12 subpoena clerk -- would the subpoena clerk send out the
13 request -- okay, if you got this subpoena for all the
14 reports and notes and everything else related to the
15 homicide investigation, other than gathering the
16 investigative file, was there any other place the
17 subpoena clerk was expected to send the request to?
18        MS. ROSEN:  Objection, form.  Vague.
19    A   If they got -- if the subpoena was for the
20 investigative file, they would send it to the
21 investigative unit.
22    Q   Okay.  If the subpoena was for all the reports
23 and notes in the case, where would they send it?
24        MS. ROSEN:  Objection, form.
25    A   Yeah.  That would depend on what the case was.

Page 196

1    Q   Again, homicide investigation.
2    A   Okay, well a homicide, now you're sending it
3 to the -- you're sending it for the investigative file,
4 getting any and all report for a homicide, they very
5 well may then send out, you know, as many as seven other
6 copies of the subpoena to the regular places which would
7 be forensics -- yeah.  See there's a lot of other places
8 like you could send it to.  If it's for the defense
9 attorney, they might want, you know, policies and
10 procedures or something to see if a mistake was made, so
11 now you're talking what's relevant, what's not relevant.
12 That's going to go to have to go to research and
13 development, so it really depends on what basis, and for
14 a homicide is difficult, but you know you're going to
15 get the investigative file and whatever forensics has.
16    Q   Okay.  So the subpoena clerk would essentially
17 make an assessment based on the face of what the
18 subpoena requests.  Might not have to make requests to
19 additional departments other than the investigative
20 file, correct?
21    A   Well, as far as the RD file, as well, to help
22 guide them.  But if it's not, you know, and if it's
23 early on in the stage -- so it really depends on what
24 that subpoena says, what the case is.  Yeah, that's my
25 answer.

Page 197

1        MR. SWAMINATHAN:  And then --
2        COURT REPORTER:  Counsel, I'm sorry.  If I
3 could have him repeat his answer just one more time.
4 He cut out briefly on me.
5        THE WITNESS:  It depends on what the subpoena
6 says and depends on what's in the RD file, and I
7 think I said that's it.  That's my answer.
8        COURT REPORTER:  Thank you, sir.
9        THE WITNESS:  Sure.
10 BY MR. SWAMINATHAN:
11    Q   Okay.  So once the request goes out to the
12 detective division for the investigative file, does the
13 subpoena clerk send any kind of -- do they just send the
14 subpoena or do they send any specific instructions?
15    A   Usually they just send the subpoena and the
16 subpoena -- yeah, it's the same process as it was for
17 decades.  So, well, I shouldn't say that because now
18 it's more automated with Sub UA, but as early as 10
19 years ago in police mail you received the subpoena, you
20 read the subpoena, you make photocopies, you put it back
21 in the envelope and you send it back to subpoena unit.
22 So we get it, a routine thing, hundreds, if not
23 thousands, every day, we do them.
24    Q   When the subpoena -- so you got a subpoena
25 that eventually gets to the detective division, who does

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 198

1  go to in the detective division, yes, both on homicide
2  cases in 1986 and 1998.
3      A    During that period of time, it would've gone
4  to the commander's office.  They would've opened it up,
5  saw that it was for a homicide and handed it to the --
6  usually a detective is responsible for homicide file
7  keeping, and it would've been that detective who's
8  responsible for the maintenance of the homicide file
9  that would be responsible for filling these subpoenas.
10  Again, it's a very common thing so they're used to it.
11  Still in effect to this day.
12      Q    So the person who is actually collecting the
13  investigative files and gathering those documents is a
14  detective within the detective division in that area,
15  correct?
16      A    That's correct.
17      Q    Okay.  And you said -- is it a detective who's
18  typically like an office detective who's just like a
19  file -- who's handling like files, like a desk job, or
20  is it usually a detective who's actually involved in the
21  investigation?
22      A    No, it is not a detective involved in the
23  investigation.  It's the first.  It's a detective who
24  generally is a detective who's towards the end of their
25  career, who's trying to wind down their career without

Page 199

1  getting too much court under their thing, so we utilize
2  them because of their expertise to be a file clerk.
3      Q    And how does that detective clerk gather the
4  materials necessary to be produced?
5      A    When a homicide happens?  No, well, I should
6  say this.  That same detective who's responsible for
7  filling the subpoenas, it's also the detective who's
8  responsible for creating the homicide file.  Homicide
9  files, unlike some other investigative files, are not
10  created by the investigative detective.  That detective
11  turns their reports into the supervisor, but it's
12  another individual who's actually maintaining and
13  creating the physical file, punching the holes,
14  assembling it, you know, filling out the inventory sheet
15  and all that.  And that same individual is the
16  individual who fills the subpoena.
17      Q    Okay.  And so that individual basically just
18  grabs the investigative file from wherever it's sitting
19  in the area, correct?
20          MS. ROSEN:  Objection, form.
21      A    That individual is the one who files it and
22  they take it out of filing and make a copy and refile
23  it.
24      Q    Okay.  And where are the files sitting in the
25  detective division area?  Are they sitting with the

Page 200

1  detective, the detective who investigated the case
2  themselves, or are they sitting in some other central
3  place?
4      A    So they're sitting in the central place where
5  the homicide files are kept.  So in this case, this --
6  well, in this time period in area five, probably in the
7  homicide office, so not on the floor but in one of the
8  offices with a door.
9      Q    Where a sergeant would sit or somebody else,
10  or a supervisor.
11      A    Exactly.
12      Q    So basically the process was that once the
13  subpoena came to the detective who was serving in the
14  clerical role, that person would basically go to the
15  file cabinet in the supervisor's office and grab the
16  investigative file.
17      A    That's right.  That person actually likely
18  worked in that same office with the sergeant as well.
19      Q    Okay.  And then they would copy that file and
20  send it back to the subpoena unit, correct?
21      A    That's it.
22      Q    That's the process.
23      A    That's the magic.
24      Q    Okay.  So the process by which the subpoenas
25  were responded to in '86, '98 that you have now

Page 201

1  described for us, that was the same across all areas,
2  correct?
3      A    That is correct.
4      Q    So there are no differences in the process for
5  gathering the documents to be produced in response to a
6  homicide case subpoena between the areas, correct?
7      A    Process is the same.  The only difference is
8  the people.
9      Q    Okay.  And then the detective at the detective
10  division who gathered the file, you indicated that
11  person pulled the investigative file and copied it.  So
12  what instructions, if any, are they given about what
13  portion of the investigative file should be copied?
14      A    Well, their instructions are simply to follow
15  the rule of law which is whatever the subpoena says.
16  It's a court document so you're getting an order from
17  the court.  So if the subpoena says, "Give me a copy of
18  the clerical arrest and prosecution case report," that's
19  what they get.  Generally for these type of
20  investigations, it would be a subpoena for the
21  investigative file, so you're being ordered by the court
22  to copy the whole file and send it in.
23      Q    Okay.  And so was there -- other than the face
24  of the subpoena, was there any instruction or directive
25  to the clerk about what part of the investigative file



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 202

1  to be copied?
2        MS. ROSEN:  Objection, form.
3     A    Not that I'm aware of, but as I said, this is
4  a -- it was an extremely common thing, happened on a
5  daily basis so -- maybe not for homicides, but a, you
6  know, daily basis throughout the city so, yeah,
7  obviously they were getting it right on a regular basis,
8  I guess.
9     Q    Is there any part of the process that requires
10 the clerk to check in with the detectives who were
11 actually were leading that investigation to make sure
12 that all the documents are in the investigative file?
13    A    The only thing something like that would
14 happen is -- now you're saying just as a random check or
15 are you saying if there was a problem?
16    Q    Well, I'm saying as part of the process.  Like
17 was it part of the process they were supposed to check
18 in with the detective --
19    A    Well, they send the subpoena, the detective
20 reads the subpoena and complies with the subpoena and
21 sends it back.  That's the process.
22    Q    So in the routine course, the detectives who
23 were involved in that underlying homicide investigation
24 are not at all involved in the process of responding to
25 subpoenas, correct?

Page 203

1     A    No.  I mean, I could see a situation where,
2  you know, the subpoena comes in the same day that the
3  detective was ordered to bring the file to the judge's
4  chamber or something like that, so it could be.  But in
5  general, it's not their responsibility to fulfill those
6  subpoenas.
7     Q    Were there any policy documents that gave
8  instruction to the detective in a clerical capacity
9  about what documents should be copied from the
10 investigative files in a subpoena?
11    A    No.
12    Q    Just in the subpoena, itself, you said.
13    A    That is correct.
14    Q    No policy document, correct?
15    A    No, I mean unless you want to say that the
16 policy governing -- you know, all the policies that
17 we've discussed that say that it's important to turn
18 over exculpatory material, but specific to the
19 fulfillment of the subpoena, the subpoena is the
20 controlling document.
21    Q    And so if there's a subpoena request for the
22 entire investigative file, the expectation's that the
23 entire file is being sent over to the prosecution,
24 correct?
25    A    That is correct.

Page 204

1     Q    And the expectation is that detectives in the
2  area are not picking and choosing which documents to
3  send over, correct?
4     A    That is correct.
5     Q    Okay.  And so the expectation is that the
6  prosecutor will have all of the documents that are in
7  the investigative file up to that point in time,
8  correct?
9     A    That is correct.
10    Q    Even if those documents are -- is there any
11 process in which there can be a determination of whether
12 the documents in the investigative file is really all
13 that important or relevant?
14    A    No.  Whatever the subpoena says, that's what
15 you do.
16    Q    Okay.  And if it says the entire investigative
17 file, can you pick out the administrative material that
18 doesn't seem like it's investigative in nature?
19    A    If it's -- well, I mean, it depends.  I don't
20 know what you mean by administrative material.
21    Q    Like for example, inventory sheets.  Not
22 really the actual investigative documents.  The
23 inventory sheet or inventory file control cards.  Could
24 those things be skipped?
25    A    Well, the inventory file control card isn't

Page 205

1  really part of the investigative file by definition.  It
2  would not be because when you take the file out, you put
3  the card in.  So you could take the whole file.  You
4  wouldn't make a copy of that to take with you so the
5  control card, I don't know.  As far as the kind of the
6  table of contents that exists, I would expect that to be
7  copied.
8     Q    Okay.  If there things in the file -- go
9  ahead.
10    A    I was going to -- I said the table of
11 contents, but that's just how I talk.  I apologize.  I
12 meant the inventory listing.
13    Q    Understood.  Sometimes in homicide files
14 there's things like a homicide file checklist sometimes,
15 and sometimes there's court attendance sheets and those
16 kinds of things.  You've seen that before, correct?
17    A    Well, and even subpoenas that come for the
18 file usually a copy is left in the file, and if you
19 subsequently subpoena the file, you're going to get a
20 copy of the last subpoena, too.
21    Q    In other words --
22    A    So including that sort of thing, yeah.  Just
23 as far as the control file, it's not -- you know, that
24 I'm struggling with, but generally speaking you'd copy
25 everything.



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 206

1    Q    Okay.  And so if the request comes in for the
2  entire investigative file, the expectation is that
3  you're copying everything in that file, whether it's
4  administrative in nature or investigative, correct?
5         MS. ROSEN:  Objection, form.
6    A    Generally speaking, that's true.  And so,
7  yeah, I'll just say generally speaking, that's true.
8    Q    Okay.  Was there any written document
9  instructing that detectives who were responding to
10 subpoenas to copy and produce the entire investigator
11 file when those were requested?
12   A    The subpoena, itself.
13   Q    Anything else?
14   A    Not that I'm aware of.
15   Q    Was there any document that instructed the
16 subpoena detectives -- strike that.  Was there any
17 document that instructed the detectives responding to
18 subpoenas to check in with the lead detective on the
19 case to make sure that they've got all the documents for
20 that investigation?
21   A    I'm not aware of such a document.
22   Q    Okay.  Was there any formal training provided
23 to the detectives who are responsible for responding to
24 subpoenas?
25   A    If by formal training you mean training with a

Page 207

1  written curriculum or some sort of in-service training,
2  no.  However, anybody that's assigned to that spot gets
3  on-the-job training before they can do it.  It's a
4  clerical task and you wouldn't know how to do it unless
5  you were trained, so they have to be trained to do it.
6    Q    Was there any expectation that the detective
7  who's responding to subpoenas to the area, reach out to
8  other departments to see if -- to gather documents that
9  they might have?
10   A    That would be unlikely unless there's
11 something in the subpoena which would indicate that
12 that's something they should do, but that's really a
13 function of the subpoena unit.
14   Q    Okay.  So that was not the responsibility of
15 the detectives to gather files from other divisions.  It
16 was just to gather what was at the area in the
17 investigative file.
18   A    Unless the subpoena specifically directed
19 otherwise, that's correct.
20   Q    Are you aware of any audits that were done to
21 see if the material that was in the investigative files
22 was getting to the prosecution and criminal defense?
23        MS. ROSEN:  Object to form.
24   A    I mean that's an interesting question is
25 you're talking about some sort of scientific audit.  I'm

Page 208

1  not aware, but I would think -- not I would think, but
2  it is a self-regulating system that's in place.  You
3  have thousands and thousands of cases going out every
4  year that get in the hands of prosecutors and defense
5  attorneys.  So it's self-regulating in a way that if
6  something's missing, it could be easily discovered to be
7  brought to the attention of us.
8    Q    Something could be missing and nobody would
9  every worry about it because they didn't know it?
10        MS. ROSEN:  Objection to form and foundation.
11 Calls for speculation.
12   A    Is it possible?  Yes, it's possible.
13   Q    Putting aside the question of self-regulating,
14 you're knowing that there's the possibility of self-
15 regulation in terms of whether or not documents are
16 being investigated or getting to the criminal justice
17 system, correct?
18   A    You know what, you broke up, I didn't hear you
19 for a second there.
20   Q    Let me ask again.  Let me ask a better
21 question anyway.  Are you aware of any actual audits
22 that were done to ensure that the entire investigative
23 file was getting to the criminal justice system?
24        MS. ROSEN:  Object to form.
25   A    I'm aware that we had an inspection division,

Page 209

1  a court inspector, I'm not aware of any specific
2  auditing as you describe.  But I'll --
3    Q    Are you aware of any of the inspection group
4  that you're referring to, are you aware of them ever
5  doing an inspection where they checked, random checked
6  the file to make sure that the subpoena you had was
7  receiving all of the documents of the investigative
8  file?
9    A    I am not aware of such an inspection.
10   Q    Are you aware of any audit or inspection to
11 ensure that all the documents related to homicide
12 investigations were being produced in response to
13 subpoenas for all of the homicide files?
14        MS. ROSEN:  Objection to form.
15   A    Not by a CPD unit if that's what you mean.
16   Q    Are you aware of any audits or inspections
17 within CPD to ensure that all documents that exist in
18 different places within CPD were being gathered and
19 produced in criminal investigations?
20        MS. ROSEN:  Objection to form.
21   A    Not an audit and inspection by CPD for that
22 purpose.
23   Q    Are you aware of any instances in which there
24 was ever any discipline for failing to produce
25 responsive documents in response to a subpoena?

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 210

1      A    I'm -- I did not --
2           MS. GOLDEN:  Object to form.
3      A    -- catch that question.
4           MS. GOLDEN:  Outside the 30(b)(6).  Can we just
5      take a quick pause.  I'm going to leave the
6      deposition and Josh Engquist will be appearing for
7      the individual plaintiffs for the balance of the
8      deposition.
9           MR. SWAMINATHAN:  Do you want to take a five
10     minute break?
11          MS. GOLDEN:  We don't need to, Josh is here.  If
12     you want to take a break for other reasons, it's up
13     to you.
14          MR. SWAMINATHAN:  I --
15          MS. GOLDEN:  What did you say?
16          MR. SWAMINATHAN:  Everyone's ready to keep
17     going.  Fine if we keep going?
18          MS. GOLDEN:  No, we're fine.
19          MR. SWAMINATHAN:  All right.
20          MS. GOLDEN:  Thank you, Commander.
21          MR. SWAMINATHAN:  Thank you.
22     BY MR. SWAMINATHAN:
23     Q    All right, let's turn to the topic of
24     interviews and interrogation.  We're going to do 10.  I'm
25     going to show you a document we've marked as Exhibit 10.

Page 211

1      It's been Bates stamped RP Reyes 1117350 through
2      1117354.  And it's titled General Order 87-7
3      Interrogations Field and Custodial.  Do you see that,
4      sir?
5           (EXHIBIT 10 MARKED FOR IDENTIFICATION)
6      A    Yes.
7      Q    Okay.  Was this the policy that was in place
8      in the period from 1987 through 1998 with regard to
9      interrogations?
10     A    Yes.  This was a general order on subject.  I
11     believe there's also a section in the detective division
12     SOPs that are also on point.
13     Q    This policy document, was there a prior
14     version of this document that was in effect prior to
15     1987 and put into effect?
16     A    82-3, yes.  Published in 1982.
17     Q    Okay.  And in terms of -- did this document,
18     for purposes for detectives conducting interrogation,
19     was this policy applicable to them throughout the period
20     from '86 -- '87 through 1998?
21     A    Yes.
22     Q    Then the instructions that are contained in
23     these SOPs beginning in 1998, were those also applicable
24     to them with regard to interrogations?
25     A    Yes.

Page 212

1      Q    And so actually there were two sets of
2      policies that applied with regard to interrogations of
3      suspects in the period from 1987 to 1998?
4      A    Right.  The general order covers all
5      department employees and the DD to SOP covers just the
6      detective division.
7      Q    Okay.  This general order, I think you just
8      indicated, applied across for all different types of
9      officers, not just detectives, right?
10     A    That is correct.
11     Q    And in this general order, did it apply to
12     specific areas or did it apply department-wide?
13     A    Department-wide.  Every member of the police
14     department that it was applicable.
15     Q    Okay.  Were there any policies regarding
16     interrogation that were specific to specific areas?
17     A    No.
18     Q    Were there any differences in the policies
19     that applied to the different detective divisions with
20     regard to interrogation?
21     A    There were no differences between areas, no.
22     Q    Were there any differences in terms of the
23     expectations about how interrogations were to be
24     conducted between the different areas?
25     A    No.

Page 213

1      Q    Were there any differences in terms of dos and
2      don'ts about what was prohibited and what was acceptable
3      conduct in interrogations between the different areas?
4      A    No.
5      Q    Is it the case the detectives -- strike that.
6      Wouldn't detectives sometime move from one detective
7      division to another over the course of their career?
8      A    Yes.
9      Q    And I think I misspoke.  But move from
10     different, move in different areas of the detective
11     division, correct?
12     A    Transfer you mean, yes.  Yes, that is correct.
13     Q    And -- strike that.  As detectives moved from
14     area to area, the policy that applied to them stayed the
15     same, felt like the same, correct?
16     A    On this subject, absolutely.
17     Q    And with the right interrogation, in terms of
18     training, what training were detectives provided with
19     regard to interrogations from the period 1996 to 1998?
20     A    Detectives received several hours of interview
21     and interrogation training in their crew training when
22     they were hired.  They then received several hours in
23     their pre-service training before being promoted to
24     detective.  Then, of course, after being made detective,
25     they received on-the-job training as they actually took



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 214

1  part in custodial interviews.
2      Q    So there was both pre-service training for
3  detectives and subsequently on-the-job training for
4  detectives regarding interrogation; is that right?
5      A    That is correct.
6      Q    Okay.  What were detectives trained on about
7  the conduct of interrogation in their pre-service
8  detective training?
9      A    Well, they received several hours.  So it
10  would be difficult for me to answer it in one sentence.
11  But they discussed Miranda, conditions being held that
12  any discussions or admissions had to be knowing,
13  voluntary, intelligent to be admissible, the treatment
14  of individuals.  So there was a whole list of things --
15  all the things you would think would involving custodial
16  interrogation.
17      Q    Was there any training on how to go about
18  conducting the interrogation?
19      A    At various times throughout this relevant time
20  period there were different interrogation techniques
21  that were discussed in class.  It wasn't taught as a
22  policy.  For example, it wasn't taught that this is the
23  re-technique, this is what you should do.  The
24  techniques of interrogation were brought up as
25  discussions to see that the detectives had various

Page 215

1  options and what worked best for them in their style to
2  connect with people for communication.
3      Q    So as part of the detectives pre-service
4  detective training, were detectives trained under re-
5  technique?
6      A    When I located all of the training material in
7  reference to interviews and interrogation, there was a
8  mention of the re-technique in there.  I'm not aware
9  that the re-technique was discussed in training.  It may
10  have been discussed, as well as other techniques, I'm
11  not positive.
12      Q    Were techniques for interrogation taught as
13  part of the detective pre-service training?
14      A    Yes, I found specific -- yes, there was
15  specific curriculum.  And I am aware that techniques
16  such as rationalization, projection and minimization,
17  minimalization were taught as part of the curriculum.
18      Q    And can you explain -- you said
19  rationalization, projection, and minimization; is that
20  correct?
21      A    Yes.  Both minimalization --
22      Q    Wait, I just want to be sure.  You said, do I
23  have that right, rationalization, projection and
24  minimization?
25      A    That is correct.

Page 216

1      Q    Okay.  Any other technique other than those?
2      A    There were other techniques discussed, such as
3  the re-technique, or referenced I should say, which --
4  but as far as the curriculum, which I'm aware of, I
5  don't know for certain what other techniques were
6  discussed?
7      Q    Okay.  And what is the technique of
8  rationalization?
9      A    Rationalization is so that an individual that
10  you are in a custodial interview with, doesn't feel that
11  you're being judgmental and may better off open up to
12  you as far as telling the truth about what they did.  It
13  helps them rationalize, for example, say that you
14  understand that they must have been angry and that's why
15  they killed this person, something like that.  Just as
16  an example.
17      Q    And what is projection?
18      A    Projection is simply blaming somebody else.
19  Helping that -- altogether blaming somebody else, but
20  saying you and me robbed a store and you shot somebody.
21  Well, your co-offender, he's a real bad guy, you're not
22  a bad guy, you just did a bad thing, something like
23  that.  Just examples.
24      Q    So the idea of projection is to sort of help
25  them lay the blame somewhere else?

Page 217

1      MS. ROSEN:  Objection, form.
2      A    The whole idea is -- not appear, for most of
3  these, is to not appear to be judgmental to allow them
4  to have a lay of the land, to tell the truth without
5  losing all of their self-respect.
6      Q    And what about minimization?  What is that
7  technique?
8      A    The same thing.  For example, I'm
9  interrogating someone who shot someone in the leg and I
10  say, "Shoot them in the head," to try to make them feel
11  better about telling me the truth that shot the
12  individual in the leg.  Those were techniques that were
13  discussed in training curriculum.
14      Q    And then you said there's a reference to the
15  re-teching, what is the re-teching?
16      A    Well, when I was going through the training
17  material that we found, I don't think it was
18  specifically laid out as a curriculum item, but the re-
19  technique, it may change some of those rationalization,
20  projection, minimization.  But I believe the re-
21  technique starts out with a strong statement from the
22  detectives that they know that the individual that
23  they're talking to is guilty.  And that's really a
24  technique that's never -- it's never been lifestyle or
25  anything that I found effective and I don't know any

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 218

1  detectives that would agree. I don't know how helpful
2  it was or how much it was used, but I know that it was
3  somewhat well-known in police popular culture to have
4  been something popular so I thought. In the documents
5  that I found, I saw it mentioned, which is why I'm
6  bringing it up, but I don't know to what extent it was
7  included in curriculum during this time period.
8      Q   I see. And you said in your experience it was
9  something that you didn't use.
10     A   Correct.
11     Q   I wasn't clear what you said about other
12  detectives. You said that it was your belief that other
13  detectives also --
14     A   Right. Detectives that I work with and made
15  it -- it's a stylistic thing. Everyone can connect with
16  other humans in different ways. I've never found that
17  sort of attitude helpful, and the people that I've
18  worked with agree, it's always been better for me to
19  just talk to people. People do well when talked to.
20  Just different styles. Some people may react better to
21  walking in and telling them, "I know that you killed
22  somebody," and some people they just want to sit around
23  and have me be nice to them before they talk to me. It's
24  style.
25     Q   Then subsequent to the in-service training --

Page 219

1  strike that. Any other techniques that you've seen
2  referenced or indicated as being taught as far as the
3  detective pre-service training?
4      A   Not I can recall off the top of my head,
5  again, it wasn't that long, it might have been four
6  hours, interviews and interrogations, and quite of bit
7  of it, as you can see, would be training on the order
8  such as this and the SOPs. More legal information
9  techniques.
10     Q   Was there training in the initial detective
11  pre-service training about prohibited techniques?
12     A   Right, yes, sure.
13     Q   What training was provided about prohibited
14  techniques?
15     A   Well, for example, in the pre-service
16  training, this order would've been handed out and gone
17  through and taught on and this order has prohibitive
18  techniques in it. As well, the curriculum itself
19  essentially said don't beat people, don't hit people.
20  You're not allowed to threaten people. Just basic
21  stuff.
22     Q   The curricula itself specifically said don't
23  hit people, don't physically abuse people, that kind of
24  thing?
25     A   Right.

Page 220

1      Q   Since we're referencing the order itself, I
2  think you're referring to, let's see if I've got this
3  right, I think on page 3 of this document, RSD 1117352,
4  in Section, let's see, Section starts on page 4. It's
5  entitled "Custodial Interrogation Advising the
6  Individual of His Rights."
7      A   I see that.
8      Q   Then looking at page 3 of the document, on G,
9  is that the portion that you were referring to about the
10  order's instructions about what was prohibited
11  techniques?
12     A   That is correct. There may be one other
13  statement in here as well. But G is a perfect example
14  of that. "Any circumstances of lengthy incommunicado
15  custody, deception, promises, suggestion of benefits,
16  other forms of psychological pressure." Yes. I believe
17  also when it refers to providing Miranda warnings,
18  there's something else about threats. I believe there's
19  another statement in here about threats, but I'd have to
20  look through it. This is what I was talking to as well.
21     Q   Okay.
22     A   I feel like there's something more in here.
23  There's another statement about you can still question a
24  person in the presence of their lawyer, but you're not
25  allowed to threaten them or something like that. There's

Page 221

1  some threat mentioned somewhere else, but this, I
2  believe, is the main section I was referring to.
3      Q   Right. I'm not seeing a policy. All right,
4  so under the policies applicable in the period from 1986
5  through 1998 --
6      A   Sorry, 10(C) also. "Any indication that the
7  person was tricked, threatened, or cajoled into a waiver
8  of their rights," is another example.
9      Q   Let's see here, you said you were going to
10  10(C)?
11     A   That is correct.
12     Q   I see, okay. So 9(G) and 10(C) in this order
13  both identify specific prohibitions in terms of
14  techniques that can be used during interrogation,
15  correct?
16     A   That is correct. And if I had the order in
17  front of me, I could go through it. Like I said,
18  there's that one other about if they're with their
19  attorney, but those maybe -- essentially, the idea is no
20  threats, no coercion. You see no form of physical or
21  psychological pressure may be exerted in 11(D).
22     Q   Okay. So 11(D) is another point that may have
23  gone over, correct?
24     A   Yes.
25     Q   And we'll just work backwards since we're



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 222

1  looking at 11(D).  But under the Chicago Police
2  Department orders, it appeared from 1986 to 1998 any
3  form of physical pressure was prohibited, correct?
4     A   Correct.
5     Q   And under CPD policies in that time period,
6  any form of psychological pressure was prohibited,
7  correct?
8     A   "Physical or psychological pressure.  May no
9  form of physical or psychological pressure," whatever
10 that means, right?
11    Q   So --
12    A   And that means coercion, threatening.
13    Q   So I think we were talking over each other.
14 I'll ask you the question.  What training were
15 detectives provided about what sources or what types of
16 psychological pressure were prohibited?
17    A   Coercion, threats.
18    Q   And then looking back at 10(C), it indicates
19 that -- so in the period from 1986 to 1998, officers,
20 including detectives, were prohibited from using threats
21 in interrogations, correct?
22    A   That is correct.
23    Q   And they were prohibited from using -- they
24 were prohibited from trying to trick the defendant
25 during the course of an interrogation, correct?

Page 223

1     A   Well, not necessarily.  The wording of this is
2  actually, "You can't trick someone into waiving their
3  rights."  So that would go to knowing, voluntary
4  intelligence test for voluntary waived Miranda.  Trickery
5  and lying is not expressly prohibited in an
6  interrogation itself, but certainly would be to -- you
7  can't trick them into waive their Miranda rights.
8     Q   You can't use trickery, threat, or threats to
9  try to get somebody to waive Miranda rights under CPD
10 policy, correct?
11    A   That is correct.
12    Q   Okay.  Then going back to 9(G), that does
13 layout prohibition with regard to the interrogation
14 itself, correct?
15    A   That is correct.
16    Q   And under CPD policy, it was prohibited to
17 hold people for lengthy periods of custody
18 incommunicado, correct?
19    A   Correct.
20    Q   And what was the training on what was
21 considered to be a lengthy period of custody
22 incommunicado?
23    A   That is an excellent question and I'm trying
24 to think if -- unfortunately, that's a very good
25 question and I can't think off the top of my head

Page 224

1  thinking through that -- I mean I'm sure I could come up
2  with an answer that sounds great, but thinking back to
3  the curriculum, I would have to go through the
4  curriculum to find out what specific references were
5  made to timelines.  It would probably be a cop out to
6  say 48 hours, but incommunicado custody is obviously
7  more complex than that.
8     Q   Okay.  And so is there any express statement
9  in the training material, that you recall, that sets
10 forth the amount of time that was considered a lengthy
11 custodial interrogation?
12    A   I don't know.  I don't know that a specific
13 time was set out.  I know that it's referenced so that
14 any -- the longer period of time it's going to go to the
15 voluntariness of the confession, if a confession is
16 obtained.  It's something that will be taken into
17 account to determine voluntariness of the statement.
18    Q   Okay.  And ultimately the policy, however --
19 so putting aside the question exactly how long it would
20 become a prohibited interrogation, that wasn't set forth
21 in the order itself, correct?
22    A   Correct.
23    Q   And so far as you're aware, there's no set
24 amount of time that's set forth in the training
25 materials, correct?

Page 225

1     A   That is correct.
2     Q   But the training did essentially -- strike
3  that.  The policy and the training essentially accept
4  the idea that the longer the interrogation goes, the
5  more likely that the person being questioned may not be
6  offering statements voluntarily, correct?
7         MS. ROSEN:  Objection to the form of the
8  question.
9     A   And I wouldn't necessarily say it's the longer
10 the interrogation goes.  This specifically refers to an
11 incommunicado custody.  So if the person wants to spend
12 eight hours telling me how they murdered someone, that
13 might not be bad at all.  That might be absolutely fine.
14 This specifically just refers to, for example, I want to
15 make a phone call, and, no, you have to sit there kind
16 of thing.
17    Q   And incommunicado here doesn't mean any human
18 being.  The detectives are coming in and out, it's still
19 incommunicado meaning not with an attorney or family
20 member so on, correct?
21    A   It's like being incommunicado, yes, I don't
22 think you can say that because this individual spoke to
23 detectives that that would be incommunicado.
24    Q   All right.  And so the policy contemplates the
25 idea that the longer you hold somebody without being

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 226

1 able to communicate with attorneys or family members or
2 others, that they become more susceptible to any
3 voluntary confession, correct?
4     MS. ROSEN: Object to form.
5     A    I would say that the policy contemplates that
6 the longer held incommunicado, the more likely that it
7 will invalidate the confession, if one is given.
8     Q    Okay. And then the policy prohibits the use
9 of deception in interrogation, correct?
10     A    Well, it doesn't prohibit it, it just says,
11 "That any circumstances of deception will invalidate the
12 acceptability of anything the person questioned states
13 or writes," so that's less clear.
14     Q    Okay. So that's what I'm asking you. Does
15 the policy prohibit the use of deception? Or does it
16 say you can use deception, but it may have a risk that
17 you're not going to be able to use the confession?
18     MS. ROSEN: I'm sorry, point of clarification.
19 Can you direct me to the point in the order where
20 it's talking about deception?
21     MR. SWAMINATHAN: I'm looking at 1(G). Looking
22 here.
23     MS. ROSEN: And then can you give us the
24 heading on that part of the --
25     MR. SWAMINATHAN: Can we pull this up? This is

Page 227

1 the section on Custodial Interrogation. The limited
2 scope of person and then a section says "Custodial
3 Interrogation Advising the Individual of His
4 Rights." Then there's an A under there and that went
5 to C, D, E,
6 F, G.
7     MS. ROSEN: Thank you.
8     A    I see where it says deception and I see how
9 it's worded. I think it's poorly worded because, again,
10 we're trained lying is not prohibited. Deception here,
11 I think, means something more than lying. I think it
12 means deceiving them in an unconstitutional way. I see
13 the word as it's written, but the training, and I
14 believe even the detective division SOP is different.
15 It's always been the fact that some lies are prohibited,
16 some lies are not prohibited.
17 BY MR. SWAMINATHAN:
18     Q    Okay. So what are the types of lies that
19 detectives are trained -- strike that. What were the
20 types of lies or deception that detectives were trained
21 or prohibited?
22     A    A lie that would be prohibited would be a lie
23 that would tend to elicit an untrue response from an
24 individual. For example, I can think of lies that are
25 allowed a lot easier than I can think of lies that are

Page 228

1 not allowed. A lie that would be allowed is something
2 like there's a surveillance camera there, so I'm going
3 to watch the surveillance camera. No. If the
4 individual knew that there was a surveillance camera
5 there, if the individual believed that lie, it wouldn't
6 encourage them to tell a lie in response, if that makes
7 sense. A lie that would probably be not allowed is
8 you're going to get -- I don't know. Everyone I think
9 of is also a threat.
10     Q    Things like you're going to get the electric
11 chair, these types of lies would be improper?
12     A    That would be improper.
13     Q    And it would be improper -- that would also be
14 a form of threat, which is also prohibited under the
15 order, correct?
16     A    That is correct. Not to say that you can't
17 always factually inform someone of the possible
18 consequences of their criminal conduct when that's not
19 exactly a threat.
20     Q    Okay. So what's the difference between
21 telling somebody that they could be locked up for a very
22 long time? At what point does it become a threat?
23     A    Well, a threat would be like, "You better
24 confess, otherwise, I'm going to make sure you get the
25 chair," that sounds more like a threat. But telling

Page 229

1 you, "Hey, look, if you did commit this murder, there's
2 a chance you're going to do life in prison." It
3 wouldn't necessarily be a threat depending on the
4 situation. It'd be the truth.
5     Q    Okay. And, similarly, in a murder case if you
6 said, "If you don't confess, you're going to get life in
7 prison." Is that considered a threat in that
8 circumstance, or is that the truth, if you can say it?
9     A    Well, if it was true, it might not be a
10 threat. But the way you're phrasing it it sounds more
11 like a threat to get a confession, like a deal. "If you
12 just confess, you'll be out in five. If you don't
13 confess, I'm going to make sure you spend life in
14 prison." That sounds to me more like a threat and would
15 be prohibited.
16     Q    Okay. And then promises are also prohibited,
17 correct?
18     A    Right. It's here, it's nothing like, "Why
19 don't you just confess to me and I'll let you go home
20 tonight." That's the sort of thing that's prohibited.
21 Or, "I promise I'll get you a low bond and you can do
22 just a short period of time." Those sorts of things,
23 again, are the sort of things that would elicit a false
24 response and they are prohibited.
25     Q    And when you say would elicit a false



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 230

1  response, what do you mean?
2      A    You never want to encourage someone to lie to
3  you.  The whole goal of an interview is to get to the
4  truth.  The whole goal of a custodial interview is not
5  to get a confession to get to the truth.  So the second
6  you start with a threat or a promise or something like
7  that, you've deviated from the best practice of how to
8  elicit the truth.
9      Q    So one of the things detectives were trained
10  on was that the use of threats and promises can cause
11  people to lie to you?
12      A    Correct.
13      Q    And this -- strike that.  So put another way,
14  detectives were trained that one of the reasons promises
15  and threats were prohibited is because it could cause
16  people to give you false information, correct?
17      A    Correct.
18
19
20      Q    And is one of the reasons that threats and
21  promises were prohibited because they can cause people
22  to lie and just tell you whatever they think you want to
23  hear?
24      A    Correct.
25      Q    And were detectives trained on the phenomena

Page 231

1  of false confession?
2      A    Detectives were trained on false confessions.
3      Q    And what were they trained on with regard to
4  false confessions that appeared from 1986 to 1998?
5      A    The curriculum contained information such as
6  this, such as no threats, no promises.  It showed
7  constitutional rights of the individual are respected
8  because if you don't, there's a potential for a false --
9  that was the training.
10      Q    Okay.  And what kind of guides were detectives
11  provided about things that they should do to avoid the risk
12  of false confession?
13      A    Follow the policies and procedures set out for
14  them.
15      Q    In other words, don't use threats and
16  promises, and promises of benefits, and so on?
17      A    Exactly right.
18      Q    Okay.  Were they -- were detectives trained
19  that they shouldn't feed the facts of the crime to
20  suspects during interrogation?
21      A    So that is a more case by case basis.  I
22  understand the question.  It's a very good question, but
23  it's not an easy question to answer because depending on
24  the circumstances of the investigation, it is possible
25  that some non-public facts may be helpful during the

Page 232

1  interview process.  Feed an individual the entire set of
2  circumstances, and then ask them to, you know, confess
3  and repeat them back to me.  It could be problematic,
4  but again, it's a case by case basis where it may be
5  beneficial for you to use a few non-public facts to let
6  the person know how much you know, that you know a
7  little bit more than they think they do to get the case
8  on the right track.  So, it depends on the circumstances
9  of the specific interview.
10      Q    Okay.  Would it be fair so say that detectives
11  were trained that there may be circumstances when it
12  might be useful to share some limited set of non-public
13  facts?
14      A    That is a reasonable thing to say.
15      Q    And were detectives trained that they should
16  not share all of the facts of the non-public facts that
17  they know about the crime.
18      A    Yes.  Under very limited circumstances, would
19  that be appropriate.  It could be appropriate under
20  certain circumstances, but very limited.  So in general,
21  the training would be, it's not appropriate to share all
22  of the non-public facts.
23      Q    And were detectives trained that one of the
24  things that they're supposed to be doing during the
25  course of this interrogation is not only trying to

Page 233

1  obtain a confession, but try to assess whether the
2  confession you're getting is the truth?
3      A    Yeah.  That's fair to say.
4      Q    In other words, they were --
5      A    In fact I would -- in fact, I have to disagree
6  with you because I don't think the detectives were
7  trained that they're supposed to get the confession. The
8  detectives were trained they're supposed to get the
9  truth.
10      Q    Okay.  Thank you.
11      A    As far as not inconsistent with what you said
12  that we agree.
13      Q    Okay.  That's fair.  So in other words, to put
14  it in your words, detectives were trained that when they
15  were getting statements, including inculpatory
16  statements from a suspect during an interrogation, they
17  should be assessing those statements to see if they were
18  in fact the truth.
19      A    So just to be clear, since we're in a
20  deposition, it's not that during the actual interview
21  they're going to be assessing.  You know, it's possible
22  that they take the statement, they confer, they discuss
23  with other investigators to try and corroborate.  But
24  the goal is to listen to the statement and if there are
25  other ways to corroborate it, yes, that's true.  But

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

Page 234

1  it's not necessarily during, in real time that they have
2  to stop it, go outside and check with, you know, the
3  evidence guy or whatever.  So --
4      Q    Got it.  But part of the point is once they --
5  at some point in the process of these interrogations,
6  part of the process is to assess whether what the person
7  has said that's inculpatory matches up with the
8  information you know about the actual crime.  Correct?
9      A    Right.  It would be very rare that your
10 investigation would end with a confession.
11     Q    Because there would be subsequent steps that
12 the detective would be taking.
13     A    Right.
14     Q    One of which is to see if the statement that's
15 been given can be corroborated by the evidence and other
16 information, non-public information?
17     A    That is correct.  Unless you have every aspect
18 of the case memorized you'd probably still have to go
19 over some stuff before you're done.
20     Q    And then -- then so the -- so it's a -- with
21 the case that in order for detectives to be able to make
22 that kind of assessment about the truthfulness of the
23 statement given by the suspect, that they could not --
24 you wouldn't share all of the facts of the crime?
25     A    Again, if you're talking about during an

Page 235

1  interrogation, it may be helpful to share some non-
2  public facts.  Generally speaking, it's not appropriate
3  to share all non-public facts and then have the person
4  say, "Hey, is this what you did?  Yes or no?"  And then
5  and call that the end of it.  It's under limited
6  circumstances.  It may be necessary to share all non-
7  public facts, but generally speaking, you would to want
8  elicit some facts from them.
9      Q    Now, after -- as you indicated, after an
10 interrogation was complete, you know, that wasn't the
11 last step that there were these additional steps to
12 occur.  One of the things you mentioned was seeing if
13 the statement could be corroborated by other evidence.
14 What other steps would be taken after the interrogation?
15     A    Confer with a partner, run by -- if they
16 weren't in the interview, just run by the results of the
17 interview with them.  See if, you know, maybe you're --
18 "Is there a different angle and I'm missing something?"
19 It's just -- if appropriate, you might want to, again,
20 you might know your case, or it might be a fairly
21 straightforward case that you don't need to do all this
22 stuff.  But, it might be that you would review evidence
23 again, might want to review with the evidence, the crime
24 scene report or something.  There might be something
25 else.  But it's possible you have the case so locked

Page 236

1  down that you're ready.  I mean, it's -- especially if
2  you work quite a bit on the case, you might already know
3  -- have it all in your head.  So --
4      Q    And what about in cases -- sorry, go ahead.
5      A    I said case by case basis.
6      Q    And what about in cases involving co-
7  defendants?  If you get a statement from one person,
8  what are the kind of subsequent steps detectives were
9  expected to take?
10     A    Again, that's on a case by case basis, but if
11 you've got two people in -- I mean, if you've got them
12 in custody, now you have -- obviously you're having two
13 different interviews.  So, it's important to hear what
14 one person says.  There might be something that's
15 corroborated, but case by case basis.
16     Q    And was there an understanding that when you
17 got all the people you'll -- one of the expectations was
18 after a statement, detectives would then be talking to
19 each other to see if the statements that are coming from
20 each of these people are similar?
21     A    That's a reasonable thing to assume.
22     Q    Okay.  That's a step detective's should be
23 engaged in, trying to compare the various statements to
24 see if they actually match up?  That might be part of
25 assessing the truthfulness of the statements?

Page 237

1      A    It could be.  I mean, eventually the lead
2  detective is going to have to write a final report.  So
3  it's the lead detective will have to put all this
4  together to make sure it makes sense.
5      Q    Okay.  During the course of interrogation,
6  what is -- well not during the course of the
7  interrogation itself, but in terms of documentation of
8  the interrogation.  What is the expectation of
9  detectives in regards to what they document about their
10 interrogation suspect?
11     A    The expectations are that the detective
12 documents what's necessary for that detective.  So for
13 example, I said before, the use of GPRs.  Use GPRs in
14 real time contemporaneously while they're having an
15 interview.  And some won't even take a notepad in with
16 them because they, for example, they don't want to break
17 the report that the film by taking notes.  So as far as
18 note taking goes, it's whatever works for the detective.
19 Eventually you are going to have to get the results of
20 the interview or custodial interview interrogation on
21 paper in some form.
22     Q    Okay.  So the interrogation's got to get
23 documented.  It may be in notes, but it may just be in a
24 report; is that fair?
25     A    It -- right.  Assuming it's relevant as we've

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 238

1  -- as I've already said. I assume you're talking about
2  the person that's getting charged. Yes.
3      Q   Got it. Exactly. I thought with the person
4  that gets charged, there's going to be documentation of
5  any interrogation to that individual, correct?
6      A   Yes. And I should clarify, for example, I
7  know this isn't the type of ERI, but if, for example,
8  our sex cases, which are all recorded, we would -- there
9  are times when you say, "See videotapes for the complete
10 story." And you would just write a tiny brief summary
11 of it. So it's somehow it's got to get recorded.
12     Q   And back in the period from '90 -- from '86 to
13 1998, you agree, they were not recording interrogating
14 at that time?
15     A   We -- we were not. Occasionally state
16 attorneys would have a court reporter, which would
17 create a recording.
18     Q   Okay. And then, what was the role of the
19 detectives in coordinating with the state's attorneys in
20 terms of obtaining statements?
21     A   Prior to obtaining charges, if you were
22 seeking charges on homicide investigation, you would
23 contact felony review. They're available 24 hours. You
24 would inform them that you had an individual in custody
25 for a murder. They would send out a felony review

Page 239

1  assistant, and you would coordinate with them. At that
2  point in time you defer to them whether they want to do
3  a handwritten statement, which is the state's attorney
4  actually writing down the statement of the individual,
5  either a witness or a suspect giving a statement. Like
6  I said, they had the opportunity, sometimes they would
7  bring a court reporter out with them. And so -- but it
8  would really be their show.
9      Q   Okay. In terms of whether a handwritten
10 statement would be done or a court reported statement,
11 were those decisions that were -- would be decided by
12 the state's attorney?
13     A   Correct.
14     Q   And I guess, I just add one more. The
15 decision of whether or not to take a statement, is that
16 a decision that's decided by the state's attorney?
17     A   Well, either the state's attorney --
18         MR. BURNS: Objection, foundation.
19     A   Either the state's attorney or the individual
20 in custody. If they refused to provide a statement,
21 then you're done.
22     Q   Understood. But the states, they would
23 decipher if whether they want to be able to get a
24 statement from the witness, correct?
25     A   Correct.

Page 240

1          MS. BENSINGER: Objection, foundation.
2      Q   And then if the state's attorney decided they
3  want to get a statement, obviously if the witness
4  refused to do it, then there wouldn't be a statement.
5  Correct?
6      A   Correct.
7          COURT REPORTER: I'm --
8      Q   And if the state's attorney, if the witness
9  willing to do the statement, the state's attorney would
10 determine whether they wanted to do a handwritten
11 statement or a court reported statement. Is that
12 correct?
13         MS. BENSINGER: Objection, foundation. Former.
14     A   Correct.
15         COURT REPORTER: I'm sorry. This is the court
16 reporter.
17         THE WITNESS: And then --
18         COURT REPORTER: May I ask who objected the
19 last couple of times? I didn't recognize who that
20 was.
21         MS. ROSEN: It was Brette.
22         MS. BENSINGER: Yeah, it was me.
23         COURT REPORTER: Yes, ma'am. And the gentleman
24 who objected earlier?
25         MR. BURNS: Me, Dan Burns.

Page 241

1          COURT REPORTER: Thank you, sir. Sorry,
2  Counsel. You may proceed.
3          MS. ROSEN: And where we are, is it good if we
4  could take a short break.
5          MR. SWAMINATHAN: Do you want to do it now?
6          MS. ROSEN: If that works for you, it's fine.
7          MR. SWAMINATHAN: I mean, we can, we can do it
8  right now.
9          COURT REPORTER: Okay. We are going off the
10 record.
11         (OFF THE RECORD)
12         COURT REPORTER: We are back on record.
13 BY MR. SWAMINATHAN:
14     Q   And to continue where we left off. And it's
15 related to the hand-off. It's illegal after that, by
16 that point. What was the detective's role in terms of
17 supporting the state attorneys, you know, in cases where
18 they've called felony review after obtaining a
19 confession or a inculpatory statement?
20         MS. ROSEN: Objection, form.
21     A   So --
22         MS. BENSINGER: Objection, foundation.
23     A   So state attorneys would arrive, and they
24 would inform the detective during this time frame what
25 procedures would be required to move forward with



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 242

1  charging. And the detective would try to get whatever
2  those items were done, whether it was interview a
3  witness, or a suspect, or some other piece of evidence
4  that needed to be worked up. Or you know, track down
5  somebody else. So they would let us know what was left
6  for them to move forward with charging. And we would
7  just do what we could to comply with that, to get to the
8  point where it was charged.
9      Q    If in the example of a homicide investigation
10  where you've got an inculpatory statement from a
11  suspect, when the state's attorney shows up is the
12  expectation that the detective shares the information
13  about what they've learned over the course of their
14  investigation with the state's attorney?
15     A    That is correct.
16     Q    Okay. And the detective would share with the
17  state's attorney, whatever information they got from the
18  suspect in the form of a confession or inculpatory
19  statement, correct?
20     A    Yeah. That's -- I mean, that's a very
21  reasonable thing to say. It depends on sometimes two
22  state's attorneys will come out. It depends on the
23  case. But generally speaking in an average run of the
24  mill homicide case, if there's such a thing, that
25  state's attorney arrives and you give them a breakdown,

Page 243

1  "This is what's happening. I've got Eric Winstrom in
2  custody. We talked to him, this is what he said."
3      Q    Okay. And then in terms of the, "This is what
4  he said." That can be done orally. Correct?
5      A    Right. Yeah.
6      Q    And if there's notes, or a report that's been
7  written about it, you'd provide those written materials.
8  Is that correct?
9      A    Yeah, sure. If they want it, absolutely.
10     Q    Okay. And then the state's attorneys would
11  then be making decisions at that point about whether
12  they wanted to interview the person, due to get a
13  statement, those kinds of things, correct?
14         MR. BURNS: Objection, foundation.
15     A    Correct.
16         MS. BENSINGER: Joint.
17     Q    Okay. Now the detective sharing information
18  with the state's attorney, would they have any
19  involvement in subsequently working with the state's
20  attorney to obtain any handwritten statements? And I am
21  focusing on handwritten statements as opposed to court
22  reported statements, because that's what we have in this
23  case. So I'm going to focus on handwritten statements.
24         MS. BENSINGER: I'm going to object to form.
25     Q    All right. Let me -- I'll ask a question, and

Page 244

1  you can have an objection. I'll just notice an
2  objection to form for my question. What involvement
3  were the detectives authorized and trained to have in
4  terms of supporting the state's attorney in any
5  handwritten statement?
6          MS. ROSEN: So, I'm going to object at this
7  point, because I think that you are -- have moved
8  beyond the scope of the 30(b)(6) notice, unless I'm
9  missing something.
10         MR. SWAMINATHAN: This is related to the --
11  this is part of the interrogation, because we have a
12  whole section on interrogation.
13         MS. ROSEN: So you think that communications
14  with the state's attorney and what -- how they --
15  what information they provide is under the label of
16  interrogation?
17         MR. SWAMINATHAN: Well I'm trying to indicate
18  who you've got a confession, and we're talking about
19  their path to taking the information from their
20  interrogation. What are they doing with it? That's
21  what I'm asking about.
22         MS. ROSEN: Okay. Well, I have an objection,
23  but he can go ahead and answer. But, we'll see how
24  far you're going to go. Because at some point, I
25  might cut it off.

Page 245

1      A    So the process then is if the state attorney
2  indicates that they would like to create a handwritten
3  with the individual in custody. Generally they're going
4  to want at least one detective in there with them, for
5  safety and because the detective usually has already
6  established a rapport. So they will join the -- at
7  least one detective would then join the state's attorney
8  in the interview room to, I said to complete the
9  handwritten, but it's not the detective who would
10  generally be writing it out, it would be the state.
11  BY MR. SWAMINATHAN:
12     Q    And typically --
13         MS. BENSINGER: I'm just going to -- a belated
14  objection on foundation.
15     Q    The handwritten statement, I think you just
16  indicated, were typically written by the state's
17  attorney, not the detectives, correct?
18     A    Correct.
19     Q    And the detective's knowledge of what they'd
20  learned during the course of their interrogations, is
21  that information that they were permitted to share
22  during the course of any subsequent interviews with the
23  state's attorney of the suspect?
24     A    You -- okay. So, it's the knowledge that the
25  detective gained in -- during the investigation, can



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 246

1 they give it to the state's attorney? Is that --
2     Q    I -- sort of, but I think I'm asking four
3 questions. So in other words, once the detective's in
4 the room with the state's attorney, are they allowed to
5 share information from their prior interrogation, "Hey,
6 you know, suspect so and so, you said this to me
7 earlier. You said that to me earlier." That kind of
8 information?
9     MS. ROSEN: Objection, form.
10    A    I mean, whether they were allowed to I could
11 see a potential, like, a conversation taking place.
12 Like, however the -- so the content of the information
13 provided to the detective in the initial interview
14 would've been told to the state's attorney. When they
15 get in there, I could see where, because the rapport had
16 been established with the detective that the detective
17 saying something like, "Share, you know, tell them what
18 you told me." Kind of thing. I guess it would be a
19 case by case basis. It's possible that if they said,
20 "Hey, why don't you tell them about the, you know, he
21 shot that guy in the head." That I guess there's
22 nothing wrong with it. So would it be permitted? I
23 suppose so, but would it be practical? I don't know.
24    Q    In cases where detectives have conducted
25 interrogation and obtained confession, and then a

Page 247

1 handwritten statement is taken, in your experience would
2 detectives sometimes participate in preparing the
3 handwritten statement outside the room with the
4 prosecutor away from the suspect?
5     MS. ROSEN: Objection, form.
6     A    Not in my experience. No.
7     Q    In other words, the handwritten statements
8 you're saying were typically written out at what point?
9     A    Typically, they're written out in the room.
10    Q    Okay. The role -- what is the role of
11 supervisors of detectives in terms of -- so I'm stepping
12 away from the handwritten statement question. I'm just
13 sort of moving back to sort of interrogations, and the
14 technique and process for interrogation. So
15 transitioning, what is the responsibility of supervisors
16 with regard to the conduct of interrogation by
17 detectives?
18    A    Supervisors have a responsibility to monitor
19 the actions of their subordinates on a day to day basis.
20 And it's a very specific question as to what role they
21 have in interrogations. They may have no role in the
22 actual interrogation. What they have a role in is
23 making sure that their subordinate is present for work.
24 They would check in with them, monitor the status of
25 their cases. See things like, "Did you call the state's

Page 248

1 attorney?" If they need to. Make sure it's going in
2 the right direction. And then after the case report is
3 completed, say post interrogation, they would review the
4 --
5     MS. ROSEN: Did we lose the court reporter?
6     THE WITNESS: Are we still on the record?
7     MR. SWAMINATHAN: I think her phone is on
8 still, but she could be off -- are you back,
9 Victoria?
10    COURT REPORTER: I've been here the whole time.
11    MR. SWAMINATHAN: Okay.
12    COURT REPORTER: Thank you.
13    MR. BURNS: So that the -- Jan is now the --
14 that's why I think for that.
15    MS. ROSEN: It says Jan is now the host. So I
16 just was just --
17    MS. SUSLER: Yeah, I'm -- I'm here, but I don't
18 know anything about hosting.
19    MR. SWAMINATHAN: Well, Jan, you're now a host.
20 I expect, I expect treats and stuff.
21    MS. ROSEN: Charcutier board would be good too.
22    MR. SWAMINATHAN: Yeah, that would be nice at
23 about this hour.
24 BY MR. SWAMINATHAN:
25    Q    All right Captain go -- all right Commander.

Page 249

1 Go ahead please. I'm sorry. Commander. Please go
2 ahead.
3     A    No problem. Captains made more over time. So
4 I -- oh, okay. So the supervisors then would review, as
5 far as interviews and interrogations go, they'd review
6 the report that was done, the supplemental report. And
7 that would give them some insight in what happened
8 during the interrogation. So to say that they supervise
9 is accurate. To say that they supervise during the
10 interrogation, it would be unusual for a Sergeant to
11 kind of peek his head in during an interrogation, unless
12 you know that something was wrong, somebody yelled or
13 something. So the actual interrogation itself, you're
14 not necessarily going to see a Sergeant there, unless
15 the detective wants the Sergeant in there for, you know,
16 for assistance or for a different perspective or
17 something, or if there's a better rapport. So
18    Q    Okay. So there's no -- in terms of during the
19 interrogation, there was no specific role or requirement
20 for the Sergeant or supervisor to be as involved in the
21 interrogation or moderate the interrogation in any way?
22 Is that fair?
23    A    That is fair. Now you are, as a supervisor
24 monitoring the status of who's up in the area, what
25 civilians are on your floor. So as far as that, but

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 250

1  actually the what's going on in the interrogation
2  itself, no there's no -- there's no expectation that a
3  Sergeant would be that involved.
4     Q    Okay. And typically -- strike that. The
5  interrogation rooms themselves, did they have --
6  typically have like a window or something you could look
7  out through, even those interrogation rooms?
8     A    Interrogation rooms did have a window. Whether
9  that window was covered or not, would depend on what,
10  you know, what the status is, sometimes it's -- yeah --
11     Q    Okay. So, you anticipated my next question.
12  So, the interrogation rooms in the area deliberately had
13  a window on them, correct?
14     A    They do. Yes. Yeah. So you can look in
15  without opening the door, it's a safety concern.
16     Q    Okay. In other words, and that I was going to
17  add next. So that window is there in primarily as a
18  safety concern, so that you have the ability to look in
19  and check on a person who's in that room. Correct?
20     A    Without being surprised. You don't want to
21  open up, you know, the person could be ready to pounce
22  on you or something. So, you can easily look in, make
23  sure they're okay. Make sure that they're not in a
24  position to commit a battery against you. Right.
25     Q    Okay. So that window is there both in terms

Page 251

1  of safety of the person in the room and sort of security
2  and safety for the officer?
3     A    Exactly right, yes, sir.
4     Q    Thank you. And then you made a reference to
5  this idea that sometime those windows to the
6  interrogation rooms would be covered, correct?
7     A    Yes. You could. You could cover it if you
8  wanted that privacy.
9     Q    Okay. And what were the circumstances in
10  which detectives would cover that window?
11     A    Well, for example, you know, the areas aren't,
12  they're -- some of them are bigger than others, Area
13  Five, where this took place isn't huge. So, you would
14  want it if you had a suspect in custody and you also had
15  victims walking around the floor. So you wouldn't want
16  that if the suspect could be on their feet, you know,
17  staring out the window when there's a potential witness
18  or a victim walking by.
19     Q    So it was not uncommon to have a paper over
20  the window into an interrogation room, correct?
21     A    Correct.
22     Q    Okay. And if somebody was walking by, saw
23  paper over window, that would be sufficiently common
24  that that wouldn't raise any red flags, correct?
25     A    Correct.

Page 252

1     COURT REPORTER: And Counsel, just to let you
2  know, I may be appearing to go in and out of the
3  room for some reason, but I assure you, I am still
4  here via my phone and I'm hearing everything.
5     MR. SWAMINATHAN: Okay, good.
6     COURT REPORTER: Thank you, sir.
7  BY MR. SWAMINATHAN:
8     Q    Okay. One other question related to
9  documentation of interrogation during the course of
10  interrogation, you might often have somebody, you know,
11  you may come in, in and out at different times and
12  conduct an interrogation over sort of multiple sessions,
13  right? Coming in and out of the room, is that fair?
14     A    Sessions is an interesting way to put it. But
15  I could see that you, having a conversation with an
16  individual, leaving and coming back. Yes.
17     Q    And there was no rules or policies around how
18  often you could, you know, go in and go out, have
19  different conversations with the witness. Correct?
20     A    Well, as we've discussed earlier, you know,
21  the length of their stay, that ends up going to the
22  voluntariness of any statements. So there will be
23  concerns with length, but as far as, you know, going in,
24  going out and talking to the state's attorney, going
25  back in with the state's attorney, that's very common.

Page 253

1     Q    Okay. In terms of a person who's being
2  charged, in terms of documentation of the various
3  conversations with the individual, is the expectation
4  that for somebody who's being charged each of the
5  conversations is to be documented in the supplementary
6  reports?
7     A    The expectation, not to the point that it's so
8  specific that, "Eric walked in at 10:15, and then walked
9  out at 10:30, and walked in at 10:45." The expectation
10  is that the relevant portions of that were recorded. If
11  there's some -- something out of the ordinary that
12  happens, it should be documented, that's important. You
13  know, that -- it should be documented, but I would not
14  go so far as to say that every time I walk in and out of
15  an interview room, that that information needs to be
16  documented.
17     Q    It's to the extent the interred person is
18  providing information, either denying involvement in the
19  crime, or acknowledging some information about the
20  crime. Each of those instances in which they're
21  providing that substantive information, was that to be
22  documented?
23     MR. BURNS: Objection, form.
24     MS. BENSINGER: I'm going to object to the
25  form. Doc -- pursuant to the Chicago Police



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 254

1  Department, or what is the, kind of, premise of the
2  question?
3      MR. SWAMINATHAN: Who -- sorry. Who is that? I
4  can't --
5      MS. BENSINGER: Oh, it's Brette, it's Brette
6  Bensinger.
7      MR. SWAMINATHAN: What is the premise of the
8  question?
9      MS. BENSINGER: Yes. I think initially you had
10 mentioned like for charging decisions to be made.
11     MR. SWAMINATHAN: No, we're not talking at all
12 about the prosecutor portion at all right now.
13 We're talking exclusively about the detective's
14 interrogation into the documentation.
15     MS. BENSINGER: Okay, thank you.
16 BY MR. SWAMINATHAN:
17     Q   Yeah. So, go ahead. Now that it's clear.
18     A   Oh boy. Okay, I -- okay, so
19     Q   Let me ask differently. I'm sorry. Do you
20 want me to ask it a little differently?
21     A   Yeah, I kind of forgot.
22     MR. SWAMINATHAN: Yeah, if there's a particular
23 fact. You know, you've got a fact pattern, like you
24 go in and you talk to a witness, and they deny
25 involvement the first time you go talk to them.

Page 255

1  Fair? Where it's definitely --
2      MR. BURNS: Object to form the question.
3  BY MR. SWAMINATHAN:
4      Q   Yeah. So you may have a scenario where a
5  detective goes in and talks to a witness, and the first
6  time they go in the person denies any involvement in the
7  crime. You with me so far?
8      A   I'm with you.
9      Q   Okay. And then you might go in later and they
10 might actually tell you some information admitting some
11 actual involvement in the crime. With me?
12     A   With you.
13     Q   Okay. Now in that example, so far, is the
14 expectation that the detective will document both the
15 initial statement denying involvement, and the
16 subsequent conversation in which they've now said
17 something inculpatory?
18     A   No, not necessarily.
19     Q   Okay. So if --
20     A   If it --
21     Q   Go ahead.
22     A   If it was something helpful, if they provided
23 an alibi the first time or something, and it was
24 something that's important and relevant, you might
25 document that. If it's just, "I walked in and Eric

Page 256

1  Winstrom says, 'I didn't do it.' Then I come back 10
2  minutes later, I walked in Eric Winstrom says, 'Okay,
3  I'll tell you the truth. I did it.'" That first
4  statement may never make it into a report. You know,
5  not that relevant, I'd say.
6      Q   Okay. And what about changes in a person's
7  story over time? So, what if you go in and interview
8  them, and they're telling you one story, and then the
9  story changes to something dramatically different, you
10 know, hours and hours or a day later? Do those both --
11 any of those earlier versions of the story have to be
12 documented?
13     A   So to say they have to be documented, I would
14 fall short of that. To say if it's helpful to document
15 them, it could. Like I said, especially if an initiate
16 needs -- initially an alibi was given and said I was
17 someplace else. Like, if it's relevant information
18 that's important to the narrative of the story, I would
19 definitely include it. But to say it has to be, I would
20 have to look at the actual specifics of the case to say
21 whether or not it should be.
22     Q   So there is no expectation that detectives
23 document, you know, changes in stories from suspects
24 through the court of interrogation. Is that true?
25     MS. ROSEN: Object to form.

Page 257

1      A   Only if it's helpful or necessary to help tell
2  the truthful story.
3      Q   So what is the circumstances in which it would
4  be necessary to tell it?
5      MS. ROSEN: Objection, form.
6      Q   For example, if you broke an alibi and you
7  said that, "You know, I didn't do it because I was at my
8  mom's house." And then I subsequently went and
9  interviewed the mom and she said, "Absolutely not true.
10 Eric was not there he was, you know, at his friend's
11 house who was subsequently murdered." You would --
12 necessary to document that sort of inform --
13     A   Okay, I mean --
14     Q   Go ahead.
15     A   So, in --
16     Q   As far as -- sorry, go ahead. Go ahead.
17     A   Okay. As far as just walking in and saying,
18 "You know, I didn't do it, I didn't do it." ten times in
19 a row, and then say, "Okay, I did it." I would not
20 expect the detective to document, "Eric Winstrom said
21 ten times in a row that he didn't do it. Then I walked
22 back in and he said he did it." So case by case basis.
23 So
24     Q   Now going back to the subject of false
25 confessions, that we talked about earlier. You



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 258

1  indicated that detectives got training on the phenomenon
2  of false confessions.  Did detectives get training on
3  the susceptibility of certain types of individuals to
4  commit false -- to falsely confess?
5      A    There was training on that subject, yes.  To
6  the specifics, I think I may have mentioned, youth, like
7  maybe intoxication.  I would have to really review the
8  material.  But I know that was a subject in the
9  curriculum.
10      Q    All right.  So I think you, again,
11  anticipated.  Say, anticipated my question.  So
12  detectives got training on the susceptibility -- strike
13  that.  Detectives got training that -- on the idea that
14  juveniles in particular could be more susceptible to
15  giving false confessions.  Correct?
16      A    I believe that that was in the training.
17      Q    Okay.  And detectives were trained -- were
18  detectives trained that people who were mentally
19  impaired, or intoxicated, may also be more susceptible
20  to false confessions?
21      A    Yes.
22      Q    And were detectives trained that people whose
23  -- were from foreign countries and foreign language
24  speakers, didn't understand English, could be more
25  susceptible to false confessions?

Page 259

1      A    I don't think that was included in the
2  training.  If it -- I mean, it's possible that it was,
3  but it doesn't seem logical to follow.  So I would have
4  to review the training to make that determination.
5      Q    What training were detectives given about --
6  strike that.  I think you said earlier that there was no
7  policy in place in the period from 1986 to 1998
8  regarding the use of interpreters, correct?
9      A    Correct.
10      Q    Okay.  And that there was no policy in place
11  in the period from 1986 to 1998 regarding interrogation,
12  specifically of people who are non-English speakers,
13  correct?
14      A    Correct.
15      Q    Okay.  Now what about training?  Was there any
16  training for detectives about the interrogation of
17  individuals who are non-English speakers?
18      A    I -- I don't believe there was a training
19  curriculum about that subject.  So, I will say that
20  training definitely took place, on the job training.  As
21  we have, you know, a lot of foreign speakers in this
22  city.
23      Q    Was on the job training one of the critical
24  forms of training in particular, with regards to the
25  idea of issue of interrogations and how to conduct

Page 260

1  interrogations?
2          MS. BENSINGER:  Objection, form.
3      A    Well, I would say one of them over the basics
4  of interviews, interrogation, as I said, are both used.
5  You started the academy with the constitutional issues,
6  and the pre-service training, but you wouldn't take a
7  brand new detective out of detective school and say,
8  "Okay, get in there, and there's somebody in custody for
9  a murder, go get a confession out of them."  You would
10  pair that individual up and you'd start with custodial
11  interviews, burglars, and robbers before you -- or, pair
12  you up with a seasoned detective that sort of on the job
13  training is vital.
14      Q    Okay.  So would you say that, on the job
15  training was an important part of training detectives to
16  conduct interrogation?
17      A    Yes.
18          COURT REPORTER:  I'm sorry, Ms. Bensinger was
19      that you who objected earlier?  Or was that Ms. --
20          MR. BURNS:  It was --
21          COURT REPORTER:  Ms. Rosen?
22          MR. BURNS:  I think it was Brette, yeah, who
23      objected earlier.
24          COURT REPORTER:  Thank you.
25  BY MR. SWAMINATHAN:

Page 261

1      Q    Okay.  Were detectives given training on the
2  use of polygraph tests in the course of -- as an
3  interrogation or interview technique?
4      A    They were.  They were trained in pre-service
5  detective training.  The polygraphs were an option that
6  they could use.  It was a tool that they could use.
7      Q    And what were they trained about what the use
8  of polygraphs testing was in the context of the
9  interviews interrogation?
10      A    Training was that polygraphs were inadmissible
11  to criminal court.  However, they could be useful as an
12  investigative tool, if it suited your needs to gain the
13  cooperation of the subject.
14      Q    Okay.  And what were they trained on?  What
15  was the way in which they -- a polygraph test could be
16  used as a tool to assist in getting information from a
17  suspect?
18      A    Well, although not admissible in court,
19  polygraphs are -- they're somewhat reliable, more than
20  50 percent reliable.  So detectives were taught that
21  they were a tool to be used to see if an individual was
22  telling the truth, for example, to help exclude possible
23  a suspect or to utilize for a suspect.  If they failed,
24  it to indicate to that suspect that they did in fact
25  fail it, and sometimes that would encourage a further

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 262

1  conversation that would elicit the truth from an
2  individual.
3      Q    And were detectives also permitted to use
4  rumors or lies about polygraph test results in order to
5  try to get cooperation from witness?
6      A    I would --
7      MS. ROSEN:  I'm going to object at this point.
8  Beyond the scope.  But you can go ahead.
9      A    In my opinion, that would a -- for example,
10  you failed the polygraph, but you actually passed the
11  polygraph?  I would say that that would be a lie, which
12  would be prohibited by our orders.  It would be a bad
13  idea.
14      Q    Okay.  With regard to -- for non-English
15  speakers, were there any policies in place around who
16  could be used as translators or interpreters for those
17  interrogations?
18      A    There was no written policy.
19      Q    Was there any -- were there any practices that
20  were followed in that area?
21      A    Yes.  The practices at the time were attempt
22  to use a sworn police officer, for the reason being that
23  the individual who translated would likely be required
24  to testify in court, depending on the circumstances.  If
25  you were unable to find a -- if it was a uncommon

Page 263

1  language that was spoken, from 1986 to 1998, operations
2  come in, had a 24 hour line that they kept a list of
3  interpreters that could be used, of city authorized
4  interpreters.  And yeah, that was the practice to first
5  look internally and, then, if nothing else worked out,
6  you could call operations command to have an interpreter
7  assigned.
8      Q    Okay.  So the priority was to try to -- the
9  practice was to ideally get somebody who was within the
10  department first, correct?
11      A    Correct.
12      Q    And then was there any practice in terms of
13  trying to avoid having somebody who was within the same
14  department, or group, or just deliberately try to have
15  somebody who was in the same department or group or
16  anything that in that area?
17      MS. ROSEN:  Objection, form.
18      A    Did you have practice or policy?
19      Q    I think you -- we already talked about policy.
20  I think there's no policy.  So just talking about prep.
21      A    Okay.  So the practice would've been -- for
22  efficiency.  So for example, this case took place in
23  area five, so you would seek an area five detective.  If
24  that didn't pan out, you would probably look to the 25th
25  district, which is attached to Area Five, and then move

Page 264

1  outward from there.  So the practice was for efficiency.
2      Q    Was there any concern about using -- having
3  people service translators who were part of the same
4  investigative team?
5      A    No.
6      Q    Was there a practice of using youth officers
7  to be brought into assist an homicide investigation
8  translator?
9      A    So, as I described it, I said the area and
10  then the 25th district, so youth officers were part of
11  the area.  So during this, for example, this was a
12  homicide investigation, they'd probably first looked to
13  see if there were any Spanish speakers in the homicide
14  team.  If there was not that the youth detectives were
15  in the same -- they were literally on the same floor.  So
16  they would -- that would be the next closest group.  They
17  share office space with them so that would be a proper
18  next best choice.
19      Q    In terms of the practices around
20  interrogation, was it -- was there a -- was the typical
21  practice to have detectives interrogate suspects on
22  their own or usually with partners?
23      A    That's a case by case basis.  There's nothing
24  prohibited interrogation on their own.  Oftentimes, if
25  it's a safety issue, there would be two individuals.  But

Page 265

1  sometimes, either there's not a safety issue or there's
2  a rapport issue that an individual wants to talk to you
3  but not to me.  So there's nothing to prohibit the one-
4  on-one interview, even custodial interview of the
5  subject.
6      Q    What training were you provided about when or
7  whether they should go in by themselves or with a
8  partner?
9      A    So training about officer safety is ingrained
10  from the first season police academy.  And so that's the
11  primary concern is that there's not a safety issue.  And
12  so that's step one.  And then step two, as I said, is
13  training that whatever works.  Kind of like note taking,
14  if it works better, if the individual wants to talk to
15  you, but not to me, it's appropriate for you to do it.
16  So it's just on a case by case basis, whatever works
17  best for the specific situation is what they're trained.
18      Q    Getting a document here.  One second.  Right.
19  Pulling up the SOP we looked at earlier.  This is
20  Exhibit 3 in deposition.
21      MS. ROSEN:  And I'm handing him a hard copy of
22  that, just because it's easier on his eye.
23      MR. SWAMINATHAN:  Yep.  I'm looking at page 815
24  of the document RD 117580.
25      MS. ROSEN:  I am there.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 266

BY MR. SWAMINATHAN:

2    Q    So that -- at the bottom of that page is a
3    section that begins 8.11 admissions, confessions, and
4    written statements.  You see that?
5    A    Yes.
6    Q    And it continues through the next page,
7    correct?
8    A    Yes.
9    Q    Okay.  So that section has to do with its
10   detective division, SOP, regarding information to be
11   documented by detectives with regard to admission and
12   confessions, correct?
13   A    Yes.
14   Q    Okay.  Now, Guy [sic], you referenced earlier
15   that there was detective admission SOPs that had to do
16   with the subject of interrogations.  Is this the section
17   you're referring to?
18   A    Yes.
19   Q    Okay.  You're not -- are you -- you're not
20   aware of any other sections of the SOP that have to do
21   with interrogations of suspects, correct?
22   A    No.
23   Q    Okay.  I have the next.  I'm going to exhibit
24   11.
25        MS. ROSEN:  Yep.

Page 267

1        MR. BURNS:  We are.
2        MR. SWAMINATHAN:  All right.  I'm showing you a
3    document.  We'll mark as Exhibit 11 -- well, I have
4    marked as exhibit 11.  It is RFC Reyes 118427
5    through
6    118432.
7        (EXHIBIT 11 MARKED FOR IDENTIFICATION)
8    BY MR. SWAMINATHAN:
9    Q    And first page of this document is entitled
10   Violent Crimes Practicum, Part One.  Do you see that?
11   A    I do.
12   Q    Okay.  Is this a training that was provided to
13   detectives?
14   A    This was a training.  Yes, a practical
15   training since they had the chance to write a -- it
16   looks like an armed robbery case report.
17   Q    Okay.  And this training was provided as what
18   part of the detective training?  Was it in-service?  Was
19   it part of their pre-service detective training?  What
20   was it?
21   A    This was not in-service.  This was part of
22   their pre-service detective training.
23   Q    All right.  And this goes through some example
24   interviews; is that correct?
25   A    Yes, it does.  As I recall it.

Page 268

1    Q    Right.  And in terms of the conduct of
2    interrogations of suspects, one thing I noticed is that
3    this -- these interviews largely seem to involve the
4    detectives asking open-ended questions.  Do you see
5    that?
6    A    Say that again?  You said it generally has
7    them asking open-ended questions?
8    Q    Yes.
9    A    Okay.
10   Q    You agree?  You see that?  "Tell me what
11   happened.  Go on."
12   A    That is an open-ended question.  Yep.
13   "Why the video store?"  Yep.  "Go on."  Yeah, I see
14   that.
15   Q    Yeah.  Page 4.  Looking at page 4,
16   "then what happened?"  So on.  So in this -- in these
17   training materials, I see that there's a -- the
18   training, at least examples here, focused on the use of
19   open-ended questions.  Was that a technique that
20   detectives were taught to use in their training and
21   interrogation?
22   A    Okay.  Well just -- and just to be clear, so
23   this -- these practicums-
24   Q    This isn't a training on how to interview
25   someone.  This is a training on report writing.

Page 269

1    A    So you would go through this practicum and
2    then you would have the form set of writing this up
3    report and fill it out.  However, I do agree that this
4    includes open-ended questions, and I agree that open-
5    ended questions we're trained as a good tool as part of
6    basic interrogation or interview techniques.
7    Q    Okay.  Were detectives trained that it was the
8    best practice to try to use open-ended questions if
9    possible?
10   A    Well, "if possible," is the important thing to
11   say there, because there are times that it is
12   appropriate to flat out ask very specific questions.  So
13   it depends on the circumstances of the case and the
14   individual you're speaking to.
15   Q    Okay.  And so would it be a fair summary and
16   only a summary to say detectives were trained to try to
17   use open-ended questions if you could, at least as a
18   starting point?
19   A    That's fair.
20   Q    Okay.  And was one of the -- one of the things
21   that detectives were trained on, especially in relation
22   to feeding facts, the idea that when you ask more
23   leading questions, you can -- that can be a way in which
24   you may be feeding facts to somebody?
25        MS. ROSEN:  Objection, form.

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 270

1    A    I don't know that that was specifically
2  trained, but it is true that, in general, you are not to
3  feed facts, feed not public facts, unless it's helpful
4  for specific purpose in your investigation.  But
5  generally speaking, we don't feed not public facts
6  unless it's for a reason.
7    Q    All right.  In terms of interrogations of, not
8  just non-English speakers, but people who were foreign
9  nationals, from different countries, were there any
10  policies in place in the period from 1986 to 1998?
11    A    During that time period, the general order, I
12  think it's called Foreign Nationals or Interactions With
13  Foreign Nationals, was in place.  The general, the
14  overall theme of the policy is dealing with consular
15  officials and diplomats.  It does reference foreign
16  nationals as people with allegiance to another country,
17  permanent allegiance to another country, I believe.
18  However, it also prohibits Chicago Police Department
19  members, as we are still today in inquiring, about a
20  person's status.  So if you look at the order -- I don't
21  have in front of me, but the overall theme is that if
22  you're presented with diplomatic credentials, or if
23  you're informed that the person's a foreign national or
24  a consular official, that there's certain processes that
25  need to be, there it is.

Page 271

1    MR. SWAMINATHAN:  Okay.  Let me just -- let me
2  just mark -- I forgot to mark it.  Hold on, put it
3  back up.  I'm showing you a document I've marked as
4  Exhibit 12.  This is RFC 118448 through 118454.  And
5  the title is "Department Special Order 84-7, Subject
6  Foreign Nationals and Aliens."
7    (EXHIBIT 12 MARKED FOR IDENTIFICATION)
8  BY MR. SWAMINATHAN:
9    Q    Have you -- you've seen this order before,
10  correct, sir?
11    A    I have.  Do you mind making it a little bit
12  bigger?
13    Q    And is this a policy document you were just
14  referring to a moment ago with regard to foreign
15  nationals?
16    A    Yes.
17    Q    Okay.  All right.  So there was a -- and this
18  is -- this has department special order.  Is this
19  applicable to detectives or all the officers?
20    A    All officers.
21    Q    And this policy document contains some
22  guidance about how to handle people who are from
23  different foreign nationals, correct?
24    A    Yes.
25    Q    And that would include people who are

Page 272

1  citizens, but essentially of different countries,
2  correct?  Not -- non-US citizen.
3    A    Correct?  Well, it defines foreign national as
4  any person owing permanent allegiance to a foreign
5  state.
6    Q    For purposes of a detective trying to
7  understand what that means, if somebody essentially is a
8  non-US citizen, are they to understand they're a foreign
9  national under this policy?
10    A    A non-US citizen owing permanent allegiance to
11  a foreign state.  Yeah, I assume that's probably true.
12    Q    Okay.  And so fair to say that the training
13  would've been that this policy applies where you're
14  talking about somebody who's not a US citizen and not
15  claiming to be a legal current resident or otherwise?
16    MS. ROSEN:  Objection, form.  Foundation.
17  Misstates the document.
18    A    Yeah.  So the basis of this policy and is like
19  -- see, this wasn't trained to be a tool to be used for
20  undocumented immigrants or day to day interactions with
21  police.  This policy was used as tool for consular
22  officials diplomat responses to consulate.  I understand
23  that the policy itself contains language which talks
24  about foreign nationals, which could include
25  undocumented immigrants.  Some however, in practice and

Page 273

1  in training, officers were trained not to make inquiries
2  on documentation status.  So during the time period in
3  question, there were thousands, if not tens of thousands
4  or more people that would technically be considered
5  foreign nationals.  However, the training and the
6  practice during this time was not to call the consulate
7  of the countries that they're from, unless they produce
8  some in indication of allegiance to a foreign country, a
9  passport, some sort of diplomatic paperwork.
10    Q    Okay.  So step one is this -- as a matter of
11  practice, the police officers were taught that they were
12  not to ask individuals for their documentation status in
13  the United States, correct?
14    A    Correct.
15    Q    Now, to the extent the detectives learned that
16  a person was a citizen of a different country, then this
17  policy would apply, correct?
18    A    Theoretically, but as I said, the training on
19  the policy was only surrounding diplomatic officials,
20  consular officials, people that provided you with
21  indication that they were -- a visa or a passport.  So
22  I'm not sure in practice, if any detectives having, even
23  if they were familiar with this would expect that this -
24  - like I said, we've had tens of thousands, if not more,
25  probably hundreds of thousands of arrests in this time

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 274

1 period where this would come into play, if it was
2 interpreted in such a way that any foreign national we
3 should call their consulate and I -- because of how this
4 was trained on, it -- that those calls did not get made.
5     Q    Okay.  So let's just break that down a little
6 bit.  Okay.  So I'm looking at, this is page 11854, page
7 3 of the policy.  Section C talks about the arrest of
8 foreign nationals, correct?
9     A    Correct.
10    Q    This is the section you were talking about,
11 where there is some reference, at least in the policy,
12 to what you do when you arrest somebody who is a citizen
13 of a different country, correct?
14    A    Yes.
15    Q    And the -- at least, just starting with the
16 policy, the policy says that when somebody was a citizen
17 of a foreign country is arrested or detained, a
18 determination should first be made to see that is a
19 factor that they are of a foreign country.  And if so,
20 not notify the consular post immediately.  Correct?
21    A    Well, I want to clarify it says foreign
22 national, not a citizen of a foreign country.
23    Q    And then we said earlier, the definition of
24 what constitutes foreign national would include somebody
25 who's a citizen of a different country, correct?

Page 275

1     A    Probably not a dual.
2     MS. ROSEN:  Object to form.
3     A    Probably not a dual citizen.  Yeah.  I assume
4 it would, but it's not as clear to me.
5     Q    Okay.  And then if it is a determination that
6 somebody is a foreign national, under the policy, the --
7 a consular -- a communication to the consulate office to
8 be made, correct?
9     A    That is what this policy says.  Yes.
10    Q    Okay.  Now, as a practical matter, as a matter
11 of -- strike that.  As a matter of practice, is it fair
12 to say that this policy in section C regarding the
13 arrest of foreign nationals was not followed in
14 practice?
15    A    It is fair to say that this was not followed.
16    Q    Okay.  And in terms of the training of Chicago
17 police officers, is it fair to say the training was that
18 this policy in section C was not to be followed?
19    A    With the caveat that it was to be followed
20 under the circumstances that the individual provided you
21 indication that they were a foreign national.
22    Q    And the policy, as you described it -- the
23 policy written here was in place in the period from 1986
24 to 1998, correct?
25    A    Correct.

Page 276

1     Q    And the practice you just described, about
2 applying the policy only to people who were actual
3 diplomatics or dignitaries, was also the practice for
4 the period from 1986 to 1998, correct?
5     A    Correct.
6     Q    Okay.  And the policy and practice that you
7 just described applied across the entire city, not just
8 the specific areas, correct?
9     A    That is correct.
10    Q    Okay.  Why don't we take a five minute break?
11 I'm getting close to the end here.  Real quick.  Okay.
12 Thanks.
13    COURT REPORTER:  Okay.  We're going off the
14 record.
15    (OFF THE RECORD)
16    COURT REPORTER:  We are back on the record.
17 BY MR. SWAMINATHAN:
18    Q    Just the last couple of questions I have.  So
19 I want to go back to the subject of the length of
20 interrogation again.  I won't pull up the policy again.
21 But you recall, we talked about a port for the policies?
22 I talked about, I think it was, lengthy interrogation
23 incommunicado.  I think something like that.  You recall
24 what I'm referring to as the policy?
25    A    Yes.

Page 277

1     Q    Okay.  So my question for you is with regard
2 to the role of supervisors.  Did supervisors have any
3 role in keeping an eye on how long individuals were kept
4 in custody?
5     A    Yes.  So supervisors --
6     Q    Go ahead.
7     A    As I may have already testified, supervisors,
8 although they may not stick their head in during an
9 interrogation, they have a responsibility to generally
10 know who is -- what civilians are on the floor and that
11 would include the status of the individuals, how long
12 they've been there, et cetera.
13    Q    So when somebody was going -- was being taken
14 into an interrogation room, the expectation was that
15 sergeants would be told who's coming up to the floor and
16 what their -- who they are and why they're in the
17 interrogation room?
18    A    That is correct.
19    Q    And so then, obviously, they would know when
20 that person -- when somebody is out -- no longer on the
21 -- no longer civilian on the floor.  Correct?
22    A    Correct.
23    Q    And so was there some expectation that
24 supervisors would be keeping track of how long people
25 were in these interrogation rooms in the area?


Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

Page 278

1  A    Correct.
2       MR. SWAMINATHAN:  I have nothing else, Jan.
3  Anybody else have any questions other than Jan
4  Susler?
5       MS. SUSLER:  No.  No, I don't have any
6  questions.  Thanks, Commander.
7       MR. SWAMINATHAN:  Anyone else?
8       COURT REPORTER:  I'll take that as --
9       MR. SWAMINATHAN:  We've got nobody.
10      COURT REPORTER:  I'll take that as a no.
11 In that case --
12      MR. SWAMINATHAN:  I think we're -- Commander,
13 thank you very much for your time.
14      COURT REPORTER:  Ms. Rosen -- conclude.
15 Oh, I'm sorry.  Yes.  Ms. Rosen.  You would like to
16 read and sign?
17      MS. ROSEN:  We would like to.  Yeah, we are
18 reserving signature.  Yeah.
19      COURT REPORTER:  Yes, ma'am.  This concludes
20 the deposition.  We are going off the record.
21      (DEPOSITION CONCLUDED AT 6:09 P.M.)
22
23
24
25

Page 279

1  CERTIFICATE OF REPORTER
2
3  I do hereby certify that the witness in the foregoing
4  transcript was taken on the date, and at the time and
5  place set out on the Title page hereof by me after first
6  being duly sworn to testify the truth, the whole truth,
7  and nothing but the truth; and that the said matter was
8  recorded by me and then reduced to typewritten form
9  under my direction, and constitutes a true record of the
10 transcript as taken, all to the best of my skills and
11 ability. I certify that I am not a relative or employee
12 of either counsel, and that I am in no way interested
13 financially, directly or indirectly, in this action.
14
15
16
17
18
19
20
21
22 VICTORIA JADICK,
23 COURT REPORTER / NOTARY
24 COMMISSION EXPIRES ON: 01/28/2023
25 SUBMITTED ON: 01/04/2022

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

Kentuckiana
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

## Exhibits

**EXHIBIT 1_ WINSTROM**
26:25 27:1,6

**EXHIBIT 2_ WINSTROM**
42:24 43:2,17 101:3

**EXHIBIT 3_ WINSTROM**
122:7,12 123:14 125:6,7 265:20

**EXHIBIT 4_ WINSTROM**
165:25 166:1,5 168:10

**EXHIBIT 5_ WINSTROM**
168:20,24

**EXHIBIT 6_ WINSTROM**
169:23 170:3

**EXHIBIT 7_ WINSTROM**
170:23 171:2

**EXHIBIT 8_ WINSTROM**
172:18,24

**EXHIBIT 9_ WINSTROM**
173:15,19

**EXHIBIT 10_ WINSTROM**
210:25 211:5

**EXHIBIT 11_ WINSTROM**
266:23,24 267:3,4,7

**EXHIBIT 12_ WINSTROM**
271:4,7

-

**--j** 156:1

**--this** 125:20

**1**

**1** 27:1,6 39:23 40:23 41:5,10, 17 124:21 125:1

**1(G)** 226:21

**10** 133:19 197:18 210:24, 25 211:5 256:1

**10(C)** 221:6,10, 12 222:18

**100** 155:13

**10:15** 253:8

**10:30** 253:9

**10:45** 253:9

**11** 266:24 267:3,4,7

**11(D)** 221:21, 22 222:1

**1117350** 211:1

**1117352** 220:3

**1117354** 211:2

**117535** 43:1

**117537** 43:1

**117553** 122:9

**117566** 130:5

**117568** 131:7

**117580** 265:24

**117582** 125:7

**117587** 122:9 129:24

**117714** 168:20

**117723** 168:21

**117962** 173:15

**117964** 169:24

**117972** 169:24

**118000** 170:24

**118004** 171:7

**118006** 170:24

**118076** 174:4

**118078** 174:10

**118090** 172:18

**118093** 172:19

**118094** 166:1

**118096** 166:1

**118398** 173:16

**118427** 267:4

**118432** 267:6

**118448** 271:4

**118454** 271:4

**11854** 274:6

**12** 12:24 13:1,8 271:4,7

**123456** 190:1

**13** 172:23

**13th** 16:14,22 19:1,3,24

**15** 57:11

**18** 125:5,6,20 129:24

**18th** 18:3,20,22

**19** 123:20

**1980** 145:21 152:25

**1981** 159:9,20 160:7

**1982** 159:20 160:7 211:16

**1983** 145:19,22 146:19 148:12, 14 159:6 160:15,19 172:2,6,10,23 173:4,7

**1986** 42:8 43:10 46:13,19 47:16,22 77:14 99:22 100:14 108:15,21

109:24 110:24 119:19 120:8 121:3,9,19 132:16 145:13 153:1,8 161:4, 12 162:6 168:11 169:2 170:2 172:14 174:2 175:25 176:8 185:18, 25 187:8,11 188:21 198:2 221:4 222:2,19 231:4 259:7,11 263:1 270:10 275:23 276:4

**1986-3** 160:20

**1987** 211:8,15 212:3

**1988** 33:17 43:12,18,24 44:5,18 46:10 47:23 99:22 100:3,7,14 119:19 120:9 121:21 122:15 123:1,14,20 124:23 125:3, 13 129:2 130:1

**1989** 192:1

**1990** 125:13

**1992** 44:7 123:16 124:7, 12,23

**1996** 183:20 213:19

**1997** 20:22

**1998** 42:8 43:10 44:6,13 45:16 46:14,20 47:17 77:14 108:15,21 110:24 121:3,9, 19 123:2,14,20 125:3,13 129:2 130:2 132:16 145:13 153:2,8 161:5,12 162:6 168:12 169:2 170:2 172:14 174:2 175:25

176:9 183:20 185:18,25 187:9,12 188:21 198:2 211:8,20,23 212:3 213:19 221:5 222:2,19 231:4 238:13 259:7,11 263:1 270:10 275:24 276:4

**1:00** 140:2

**1:30** 140:14

**1A** 27:11 124:20

**1B** 27:20

**1D** 27:25

**1E** 28:5

**1F** 28:10

**2**

**2** 39:24 40:24 41:5,10,17 42:24 43:2,17 48:2 101:3 107:25 124:21 125:1

**20** 24:21 29:17 140:2

**2000** 16:13,16 20:16,17

**2002** 16:15 122:23

**2003** 16:16 122:25

**2005** 16:23 139:5

**2008** 17:1

**2009** 32:2,10, 16,19

**2010** 17:3,8

**2013** 17:11 25:15

**2014** 17:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**2015** 17:17
24:21

**2017** 17:20
18:2,4

**2018** 18:7

**2019** 18:9

**2020** 12:19
18:11

**22** 165:10

**24** 132:24
238:23 263:2

**25th** 17:2 19:21
263:24 264:10

**26** 164:17,19

**2A** 28:14

**2B** 28:20

**2D** 28:24

**2E** 29:3

**2F** 29:6

**2G** 29:10

**2nd** 16:13

————————

**3**

**3** 118:18 122:7,
12 123:14
125:7 220:3,8
265:20 274:7

**30** 72:24 140:2,
6,13,14

**30(b)(6)** 13:15,
18 14:4,10
26:18,22 27:1,
8,16 36:2,11
38:5,10 88:10
125:2 155:20
156:20 159:13
182:24 183:11,
12,24 210:4
244:8

**30(b)(6)'s** 14:7

**30-minute**
140:8

**35th** 18:16

**36** 132:25 165:1
168:9

————————

**4**

**4** 166:1,5
168:10 220:4
268:15

**40** 72:24

**45** 66:14

**48** 224:6

**4C** 116:10

————————

**5**

**5** 168:20,24

**50** 261:20

**5:00** 140:10

**5:30** 140:10

————————

**6**

**6** 169:23 170:3

**6:09** 278:21

————————

**7**

**7** 170:23 171:2

————————

**8**

**8** 172:18,24

**8.11** 266:3

**8.3** 136:3

**8.7** 137:14

**803** 131:7

**80s** 146:4

**815** 265:23

**82** 149:11
150:21,24
151:3,11

**82-3** 211:16

**83** 149:12

**150**:21,24
151:3,11

**84-7** 271:5

**86** 138:23
145:17 150:22
151:1 200:25
211:20 238:12

**86-3** 42:16,25
43:16 44:11,23
45:16 46:3
48:13 49:13
97:3,23 98:14
101:3 125:21
126:1,8,12
127:7,11,20,24
128:5,9,12,15
151:20 152:2,4,
7,22 153:3
161:1

**87** 211:20

**87-7** 211:2

**88** 43:13

————————

**9**

**9** 173:15,19

**9(G)** 221:12
223:12

**90** 238:12

**98** 47:23 109:24
200:25

**9th** 18:10,14,15

————————

**A**

**abducted**
88:24

**ability** 14:16
63:7,8 143:9
250:18

**abreast** 58:8,
21 59:4,15

**absolutely**
112:1 138:18
213:16 225:13
243:9 257:9

**abuse** 26:9
219:23

**academy** 20:3,
5 21:1,19,22
22:3 260:5
265:10

**accept** 225:3

**acceptability**
226:12

**acceptable**
213:2

**accepted**
141:8

**access** 192:15

**accidental**
165:13

**accidents**
190:6

**account** 83:1
224:17

**accumulative**
29:16

**accurate** 15:19
16:4 54:13,23
57:14 74:13
117:18 118:4,8,
10 143:10,25
144:7 154:4,7
249:9

**accurately**
74:18 98:2 99:3
117:2,24,25

**accused**
103:1,7,13

**acknowledging** 49:22 253:19

**acquire** 81:4

**acquittal** 163:9

**act** 133:7
188:12

**actions** 247:19

**active** 48:4
99:22 100:15
173:4

**activity** 70:5

**actual** 107:5
145:11 153:11
165:11,16
170:6,7,9
171:16 174:21
190:3 204:22
208:21 233:20
234:8 247:22
249:13 255:11
256:20 276:2

**Adam** 190:1

**add** 239:14
250:17

**added** 124:15
163:17

**addition**
130:19,25

**additional**
31:23 33:5 37:8
40:11 69:13
70:2 196:19
235:11

**additionally**
176:18 191:9

**addressed**
24:3 146:13
152:8 159:24
160:2 169:22

**addressing**
32:20 152:17

**adhered** 119:1,
13

**administrations** 25:3

**administrative**
111:25 112:4,7,
24 114:8 147:3
162:3 204:17,
20 206:4

**admissible**
214:13 261:18

**admission**
85:10 266:11,
15

**admissions**
214:12 266:3

**admitting**
255:10

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

advance 27:4
42:20 57:4

advanced
191:15

Advising
220:5 227:3

advisor 17:19,
22

affairs 17:15,
16 22:5 23:12,
15,17 24:19
31:16 35:6
147:2 150:10

affirm 11:7

age 193:19

aggravated
108:9

agree 10:21
52:8 53:7,11
55:15,19,20
56:24 57:1,18
59:24 63:10
74:12,16 77:9
90:1,7 98:17
103:22 109:13
116:1,4 125:24
126:2,6,7,22
127:6,10,16,17
128:14 143:6,
24 144:3
159:19 161:12
190:13 218:1,
18 233:12
238:13 268:10
269:3,4

agreed 97:25

ahead 9:14
10:8 20:7 30:4
33:22 54:19
58:3 75:2 77:16
81:12,15 88:16
102:5,14
103:10 110:5
123:25 124:1
132:15 134:1
144:17 145:1
151:25 205:9
236:4 244:23
249:1,2 254:17
255:21 257:14,

16 262:8 277:6

aid 53:12,13
54:2,6,12 56:10
57:2,14 110:18
126:11

alibi 255:23
256:16 257:6

alien 63:20

aliens 64:8
271:6

allegation
165:11

allegiance
270:16,17
272:4,10 273:8

allowed 89:15
219:20 220:25
227:25 228:1,7
246:4,10

alternate
66:21,25 67:5
86:7,9 90:3,13,
14 103:22
104:2,6,10

altogether
183:2 216:19

amended
26:18,22 27:1
125:1 159:12

amount
224:10,24

Anand 9:6
42:19 108:19

and/or 33:20
77:6

angle 235:18

angry 216:14

animals 12:3

anonymous
63:20,24 90:9,
14

answering
14:15 16:1 82:6

answers 79:17

anticipated

250:11 258:11

anytime 15:14

apologies
10:14 12:1,4
19:8,15 94:15
155:7,8

apologize
71:18,23
179:10 205:11

appearance
9:4

appeared
222:2 231:4

appearing
210:6 252:2

applicable
46:15 125:12
134:4,24
211:19,23
212:14 221:4
271:19

application
166:14

applied 42:4,7
43:8 45:8 46:6
48:4,15 96:25
97:2 101:2,4
122:18 123:3
124:11 133:19
135:19 212:2,8,
19 213:14
276:7

applies 51:8
99:24 272:13

apply 46:4,5
70:12 122:21
123:12 139:6
168:16 212:11,
12 273:17

applying
123:21 276:2

approve 156:7

approximately
12:24 13:1,25
24:21 33:2
99:22

area 12:12,15,
18 13:10 16:24

17:4,7,8 18:12,
14,18,19,21,23,
24 19:2,3,8,13,
22,23,25 20:1
22:9 26:11 47:2
48:8 68:11
73:14 78:12
79:4,14 109:24
110:6,25 111:2,
5 112:5,10,12,
16 113:20
114:10,13,21
152:6 176:15
198:14 199:19,
25 200:6 204:2
207:7,16
213:14 249:24
250:12 251:12
262:20 263:16,
23,25 264:9,11
277:25

areas 25:19,20,
25 37:25 46:4,
5,15,16,22
47:1,16,24 48:4
109:18 111:21
114:9 119:9
123:4 201:1,6
212:12,16,21,
24 213:3,10
251:11 276:8

argue 98:1
139:4

armed 137:9
267:16

arose 159:19

array 91:5,11,
15

arrays 91:8,13

arrest 14:5
40:19 55:16
77:20 78:3,7
93:8,11 96:22
138:5 181:15,
19,22 182:4
201:18 274:7,
12 275:13

arrested 77:8
78:5 94:8,10
274:17

arrests 273:25

arrive 241:23

arrives 242:25

arson 167:19
182:19,25
184:12

Arturo 9:7

aspect 52:9
53:18 145:8,9
234:17

aspects
130:24 182:17

assault 26:10

assembling
199:14

assess 233:1
234:6

assessing
233:17,21
236:25

assessment
196:17 234:22

assigned
16:24 17:2,15
18:3,18,25
19:4,13 133:6
137:11,19
188:14 189:1
207:2 263:7

assignment
12:13 133:4
136:18 137:2,4

assist 54:7,12
192:21,25
261:16 264:7

assistance
57:5 249:16

assistant 11:3
239:1

assume 15:11
109:25 236:21
238:1 272:11
275:3

assuming
96:21 237:25

assure 252:3

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**attached**
156:8,9 263:25

**attempt** 262:21

**attend** 20:12
173:5

**attendance**
152:16 205:15

**attending** 9:5

**attention**
208:7

**attitude** 218:17

**attorney** 9:20
18:7 24:13,17
30:23 31:4
106:5 187:3,23
196:9 221:19
225:19 239:3,
12,16,17,19
240:2,8,9
242:11,14,17,
25 243:18,20
244:4,14 245:1,
7,17,23 246:1,
4,14 248:1
252:24,25

**attorney's**
106:1

**attorney-client**
31:4,8

**attorneys** 11:3
23:19,23 24:4
105:1 186:14
190:20,21
191:2 208:5
226:1 238:16,
19 241:17,23
242:22 243:10

**audio** 19:6
158:21

**audit** 64:7,11
120:16,20
121:3,7 207:25
209:10,21

**auditing** 209:2

**audits** 120:13,
17 121:10,14,
18 129:25
207:20 208:21

209:16

**August** 16:13

**Authoritative**
185:8

**authority**
18:18 22:14
48:23 65:21
67:3 185:7

**authorized**
19:13 244:3
263:3

**auto** 177:25

**automated**
113:8 197:18

**average**
242:23

**avoid** 62:13
231:11 263:13

**avoiding** 62:6

**aware** 31:19,24
39:16,21 45:7
46:24 47:15
48:8,14 50:21
51:7 99:12
100:6 106:24
107:10,16
120:12,20,23
121:7,12,17
124:13 128:11
129:3,25
151:22 159:21
163:24 192:12,
16,20,24 193:3,
15,18 194:1
202:3 206:14,
21 207:20
208:1,21,25
209:1,3,4,9,10,
16,23 215:8,15
216:4 224:23
266:20

_____

**B**

**back** 19:17
20:3 31:9 56:6
71:22 72:4,7
75:20 111:19
114:15 115:18
140:14,18,20

142:7 146:4
158:19 162:25
175:18 186:11
192:3 197:20,
21 200:20
202:21 222:18
223:12 224:2
232:3 238:12
241:12 247:13
248:8 252:16,
25 256:1
257:22,24
271:3 276:16,
19

**background**
16:8

**backwards**
221:25

**bad** 71:24
216:21,22
225:13 262:12

**balance** 210:7

**Barber** 9:11

**based** 31:4
40:3,7 41:14
65:9 173:8
191:8 196:17

**basic** 21:4
67:19 68:2 83:3
219:20 269:6

**basically**
83:17 98:25
116:22 125:25
186:18 199:17
200:12,14

**basics** 68:3
260:3

**basis** 25:4
53:9,20 54:24
56:16 58:10
60:20 64:2,13,
14 65:8,13
66:12 69:10,16
71:7 73:1,8,13
76:15 80:16
89:21 90:12
93:6,8,14
134:22 143:20
190:22 196:13
202:5,6,7

231:21 232:4
236:5,10,15
246:19 247:19
257:22 264:23
265:16 272:18

**Bates** 42:20,25
122:8 166:1
173:15 211:1

**bathroom** 56:2

**batteries**
108:9

**battery** 250:24

**Bear** 179:9

**beat** 219:19

**beginning**
122:15 211:23

**begins** 130:5
266:3

**behalf** 9:8,10,
15,19 27:11,19,
24 28:4,9,14,
19,23 29:2,6,9
41:16

**belated** 13:12
154:15 245:13

**belief** 218:12

**believed** 38:17
86:19 228:5

**believes** 83:16

**beneficial**
232:5

**benefits**
220:15 231:16

**Bensinger**
9:19 11:2
240:1,13,22
241:22 243:16,
24 245:13
253:24 254:5,6,
9,15 260:2,18

**big** 166:11

**bigger** 105:21
166:10,11
251:12 271:12

**binding** 27:10,
18 28:8,13,19,

22 29:1,5,8

**birth** 157:12

**bit** 66:7 111:20
121:23 219:6
232:7 236:2
271:11 274:6

**blame** 216:25

**blaming**
216:18,19

**blank** 146:9

**blanket** 89:25

**blinked** 66:17

**block** 71:11
147:20

**blowing** 66:15

**board** 248:21

**body** 71:13
181:22 182:2

**bond** 229:21

**Bonita** 29:21,
22,23 30:8,11
31:18,22,25

**book** 152:14

**bottom** 116:9
266:2

**boxes** 170:12

**boy** 124:14
150:7 254:18

**boyfriend**
88:21

**Brady** 21:8,10,
18 162:9,13,24
163:10,17
164:23 165:6

**brand** 260:7

**break** 15:14,16
56:1 121:22
129:22 140:8
175:17 210:10,
12 237:16
241:4 274:5
276:10

**breakdown**
242:25



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**breaking**
81:18

**Brette** 9:19
240:21 254:5
260:22

**Bridgeport**
18:15

**briefly** 16:17
29:21 197:4

**bring** 24:15
79:13 98:11
186:15 203:3
239:7

**bringing** 218:6

**brings** 18:10

**broad** 190:16

**broadened**
50:25

**broke** 103:25
108:18 208:18
257:6

**Brooklyn**
20:13,14

**brought** 78:10
79:21 208:7
214:24 264:7

**bureau** 147:2
184:7

**burglar** 138:5

**burglaries**
108:9 169:19

**burglars**
260:11

**burglary** 68:16
133:6 135:8
137:8 169:20

**Burns** 9:15
11:1 239:18
240:25 243:14
248:13 253:23
255:2 260:20,
22 267:1

———
C
———

**C1** 98:20

**cabinet** 200:15

**cabinets**
108:13 109:6
113:13

**cajoled** 221:7

**Cal** 164:17,19

**call** 24:2 26:12
64:7 108:7,13
112:3 133:5
143:12 146:1
149:25 152:9,
17,24 188:5
225:15 235:5
247:25 263:6
273:6 274:3

**called** 104:18
105:4 109:11
111:5 113:4
146:7 150:1
152:13 164:17
178:25 188:4,6
241:18 270:12

**calling** 114:12

**calls** 152:6
164:24 208:11
274:4

**camera** 10:19
228:2,3,4

**capacities**
54:12

**capacity** 13:2,
9 188:19 203:8

**captain** 18:10
248:25

**Captains**
249:3

**captured**
179:16

**car** 143:15,16,
18 177:24

**card** 204:25
205:3,5

**cards** 204:23

**career** 68:14
85:25 154:18,
22 156:3
198:25 213:7

**careful** 62:23
65:25

**Carl** 171:10,18,
20

**Carney** 9:12

**Caroline** 9:13,
17

**Carrie** 55:24
102:17

**case** 23:13
30:21 31:10,20
32:14 34:6,25
35:1,4,5 36:6,7,
19 38:7 39:15,
21 41:23 52:18
53:9,20 54:24,
25 55:1,2,14,
15,21 56:16,23
57:3,11,12
58:5,10,18,25
59:1,23 60:4,
19,20,23 61:3,
6,9 64:1,2,4,6,
13,14 65:8,12,
15 66:12 69:10,
16,17 71:7,15
73:1,7,8,12,13
75:11 76:9,15
78:13,15 79:5
80:16 81:10,11
88:1,19 89:6,23
92:12,21,22
93:3,20 95:25
96:8,17,19,21,
23 108:5,24
110:11 116:2
124:19,21
127:6 132:21
137:19,20
138:3,5 139:13
143:5 144:19
150:10 159:9,
11 162:20
163:2,7,8,16
164:23 165:4,
17 167:9 173:8,
21 174:16
176:9,25
177:13,23
178:22,23
181:1,6 182:8,
16,17 183:4
184:10,11,13

192:1,5 193:14,
17 195:23,25
196:24 200:1,5
201:6,18
206:19 213:5
229:5 231:21
232:4,7 234:18,
21 235:20,21,
25 236:2,5,10,
15 242:23,24
243:23 246:19
248:2 256:20
257:22 263:22
264:23 265:16
267:16 269:13
278:11

**case-by-case**
85:17,18 89:11,
21 90:11
134:22 143:20

**case-specific**
92:1

**cases** 21:4
22:24 23:5,6
31:14 39:2
53:21,22 54:17,
18 56:17 57:9
62:2 68:1,7,20
89:3,22 108:3,8
119:12 139:10,
16,19 162:5,18
168:3 171:5
178:6 190:14
194:5 198:2
208:3 236:4,6
238:8 241:17
246:24 247:25

**catch** 179:10
210:3

**categories**
124:20

**category**
112:2

**caveat** 275:19

**central** 18:23
200:2,4

**cetera** 88:25
108:9 277:12

**chain** 162:21
165:7

**chair** 228:11,25

**chamber**
203:4

**chance** 117:21
229:2 267:15

**change** 45:23
126:24 127:7
130:24 146:10
147:8 152:22
159:7 187:8
217:19

**changed** 45:7,
12 46:1 146:3,4
178:11

**changing**
63:15

**chapter** 125:5,
6,8,20 129:24
130:5

**Charcutier**
248:21

**charge** 17:18
22:20 25:2

**charged** 59:12
88:3 90:4 94:18
95:25 238:2,4
242:8 253:2,4

**charger** 72:8

**charges** 93:15
94:5 139:3
164:2 238:21,
22

**charging** 21:4
94:1,12 96:24
242:1,6 254:10

**check** 129:21
152:16 165:19
202:10,14,17
206:18 234:2
247:24 250:19

**checked** 209:5

**checklist**
205:14

**checklists**
192:20

**Chicago** 9:7,9,
11,12,16,18,21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

11:15 12:9,13
13:5,14,18
16:9,12,14,20,
21 22:6,17
25:19,21,25
26:3 27:2,19,24
28:4,9,14,20,23
29:2,6,9,17
31:12 34:22
38:11 39:17
40:4,8,25 41:16
46:4 51:23
67:23 101:17
102:7 121:2
129:4 156:23
159:22 166:2
188:18 190:21
222:1 253:25
270:18 275:16

**Chicago's**
39:3

**chief** 149:22
160:2,5,14
161:18,20,23,
24,25 162:2

**child** 17:14
26:9 185:9

**children** 26:10

**choice** 79:10
264:18

**choices** 98:20

**choose** 63:11
80:14,24
134:25

**choosing**
204:2

**chose** 79:5

**chronological**
144:23 145:3

**chronological
y** 145:4

**circumstance**
82:17 83:2
142:13 229:8

**circumstance
s** 49:2,6 54:21
104:5,9 142:2
143:5 144:3
153:21,24

165:9 183:19
220:14 226:11
231:24 232:2,8,
11,18,20 235:6
251:9 257:3
262:24 269:13
275:20

**citations** 45:22

**citizen** 272:2,8,
10,14 273:16
274:12,16,22,
25 275:3

**citizens** 272:1

**city** 9:11 12:9
13:14,18 17:15
20:4 23:16
27:2,11,19,24
28:4,9,14,19,23
29:2,6,9 38:10
39:3 40:25
41:16 48:6
51:23 67:23
156:22 202:6
259:22 263:3
276:7

**city-wide** 46:7,
8

**citywide** 17:13

**civil** 22:23,24
23:5 31:14

**civilian** 29:23
277:21

**civilians**
188:13,16,22
249:25 277:10

**claim** 161:13

**claiming**
272:15

**clarification**
226:18

**clarify** 51:4
59:8 106:16
138:25 238:6
274:21

**class** 21:3,5,13
145:18,19
146:15 214:21

**classes** 21:14
22:1

**classification**
189:24 191:10,
13,23

**classified**
33:21

**clear** 14:11
81:24 85:22
95:3,21,24
96:22 112:20
114:25 144:14
145:3 148:10,
11 150:20
171:5 176:8
218:11 226:13
233:19 254:17
268:22 275:4

**cleared** 170:25

**clerical** 47:3
48:3,8,9 200:14
201:18 203:8
207:4

**clerk** 189:14,16
191:6 194:16,
18,20 195:12,
17 196:16
197:13 199:2,3
201:25 202:10

**clerks** 188:12,
16,22 192:4,9,
17,21,25 193:5,
13,23 194:4,25

**client** 30:23

**close** 20:14
55:6 62:2 95:3
276:11

**closed** 95:21,
24 96:22

**closest** 264:16

**closing** 54:2
138:4 139:13

**co-** 236:6

**co-offender**
216:21

**coach** 69:17

**code** 96:10

**coercion**
221:20 222:12,
17

**collect** 68:10

**collecting**
198:12

**college** 20:19

**combinations**
114:4

**comfortable**
142:21

**command**
22:13,15 193:9
263:6

**commander**
11:15,18 12:10,
13,15,18 13:9
18:11 19:21
27:15 56:8
81:15 119:10
121:25 133:3
140:20 156:20
161:13 175:23
210:20 248:25
249:1 278:6,12

**commander's**
198:4

**commanders**
51:24 119:11
121:14 161:18,
19 162:10,14

**commanding**
17:12 26:7
114:18 115:1
127:23 152:14
172:21

**commit** 229:1
250:24 258:4

**committed**
86:6,16,23

**common** 88:18
141:10,11
143:14,19
198:10 202:4
251:23 252:25

**communicate**
164:3,10,14
226:1

**communicatin
g** 162:20

**communicatio
n** 53:5,8 57:20,
23 129:10
215:2 275:7

**communicatio
ns** 30:25 69:1,4
121:18 244:13

**compare**
45:11 236:23

**compile**
138:22

**compiled** 21:6

**complete**
51:15 73:10
96:22 106:18
133:4 136:18
138:3,6 144:6
235:10 238:9
245:8

**completed**
134:15 138:9,
12,18 139:20
185:12 186:12
191:16 248:3

**completing**
136:25 137:1,
25 139:2

**completion**
137:17 138:4

**complex** 55:2
224:7

**compliance**
34:16 119:3

**complies**
202:20

**complimentar
y** 113:6

**comply** 187:4
242:7

**component**
81:23 184:14

**comprehend**
135:10

**computer**

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

55:6,9,13 72:8
158:12 193:19

**concede**
138:21

**concept** 83:3

**concern**
250:15,18
264:2 265:11

**concerned**
146:11

**concerns**
174:6,12
252:23

**conclude**
278:14

**CONCLUDED**
278:21

**concludes**
278:19

**conclusion**
92:20 96:22

**conditions**
214:11

**conduct** 45:8
49:1 95:9 119:2
121:14 141:2
144:1 213:3
214:7 228:18
247:16 252:12
259:25 260:16
268:1

**conducted**
142:16 144:13,
15 212:24
246:24

**conducting**
81:10 110:19
136:5,6 211:18
214:18

**confer** 233:22
235:15

**confess**
228:24 229:6,
12,13,19 232:2
258:4

**confession**
85:11 224:15

226:3,7,17
229:11 230:5
231:1,12 233:1,
2,7 234:10
241:19 242:18
244:18 246:25
260:9

**confessions**
231:2,4 257:25
258:2,15,20,25
266:3,12

**confirmed**
30:5 32:7,8

**conflict** 46:17
47:4,7,10
115:24

**confusing**
75:15 89:22
108:24

**confusion**
176:7

**connect** 215:2
218:15

**consent** 18:7

**consequences**
228:18

**consi** 128:14

**considered**
65:16 66:9 67:6
80:7 223:21
224:10 229:7
273:4

**consistent**
74:22 80:9
168:9

**consists** 118:2

**constituted**
100:16

**constitutes**
67:14 274:24

**constitutional**
20:8 21:13
61:24 231:7
260:5

**construction**
118:13

**consular**
270:14,24
272:21 273:20
274:20 275:7

**consulate**
272:22 273:6
274:3 275:7

**contact** 238:23

**contained**
118:25 126:1
143:2 211:22
231:5

**contemplates**
225:24 226:5

**contemporane
ous** 142:19

**contemporane
ously** 237:14

**content** 30:25
142:24 246:12

**contents** 97:13
105:13 107:5
112:17 131:2,5
146:25 189:9
205:6,11

**context** 112:18
261:8

**continue**
241:14

**continued**
48:5 160:19
161:3

**continues**
55:16 266:6

**control** 77:19
204:23,25
205:5,23

**controlling**
203:20

**conversation**
29:19 30:11
143:22 246:11
252:15 255:16
262:1

**conversations**
120:6 252:19
253:3,5

**cooperation**
261:13 262:5

**coordinate**
239:1

**coordinating**
238:19

**cop** 224:5

**copied** 106:9
201:11,13
202:1 203:9
205:7

**copies** 110:14,
20,21 113:15
130:19 176:25
179:25 186:16
194:23 196:6

**copy** 106:21
107:2,6,13,22
108:4 128:17,
22 129:5,15
130:23 152:5
179:25 180:20
181:24 182:3
193:24 199:22
200:19 201:17,
22 205:4,18,20,
24 206:10
265:21

**copying** 206:3

**correct** 12:11
13:15 17:9
23:7,20,24
24:5,22 25:10,
13 30:13 32:6,
7,10,22,23
36:10 38:13,25
39:12,13 40:9,
25 41:6,7 42:3,
9 43:5,6,18,25
44:3,6,23
46:12,20,23
47:12,13 48:10,
11 49:3,4,9,13
51:20 52:1,2,6,
7 53:2,6,12,14
56:14 58:9
59:22 61:18,19,
24,25 62:4,7
63:3 64:24
65:3,4,7,10,18,
23 69:4,5,9,10,
20 70:3,9,11

71:6 72:19
76:16 77:4,14,
25 78:22 79:7,
15,25 80:10,11
82:18 87:8
90:16,18 91:17
95:8,10,11,15,
18,23 101:5,6,
9,10,14,19
102:15 103:1,8,
11,17 104:16,
22 105:16,19
106:2 107:23
108:17,22
111:13 114:5,6,
23,24 115:5,6,8
116:12,13,18,
19,24 117:5,13,
15,19 118:4,8,
16,17,20
121:11 122:16,
17,19,20 123:9,
14 124:8,9,23,
24 125:3,13,22,
23 126:12,13,
17 127:1,2,14,
15,25 128:1,5,
6,9,10,12,13,
18,23,24 129:7,
16,19 130:2,10
131:3,9,14,15
133:16,22,23
134:15,25
135:1,5,23
136:11,22
137:13,25
138:20 139:3,
13,14,17,23
141:9,19 144:9,
23 145:6,15
146:22,24
147:14,15,18
148:4,12,13
153:5,6,19
154:14 156:13,
16 159:16,25
160:1,3,4,8,9,
11,12,16,17,21,
22 161:15,16
164:4,12,23
166:8,9 168:3,
4,5,6,17 171:24
172:11,12,15,
16 173:8,9,24
174:2,3 176:3,
20 177:7,8,10



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

178:9 179:22
180:16 181:3
182:22 183:8
184:14 187:13,
14,15,16,20
188:19,20
189:3,4,14,19
191:11 194:1
196:20 198:15,
16 199:19
200:20 201:2,3,
6 202:25
203:13,14,24,
25 204:3,4,8,9
205:16 206:4
207:19 208:17
212:10 213:11,
12,15 214:5
215:20,25
218:10 220:12
221:11,15,16,
23 222:3,4,7,
21,22,25
223:10,11,14,
15,18,19
224:21,22,25
225:1,6,20
226:3,9 228:15,
16 229:17
230:12,16,17,
24 234:8,17
238:5 239:13,
24,25 240:5,6,
12,14 242:15,
19 243:4,8,13,
15 245:17,18
250:13,19
251:6,20,21,24,
25 252:19
258:15 259:8,9,
13,14 263:10,
11 266:7,12,21
267:24 271:10,
23 272:2,3
273:13,14,17
274:8,9,13,20,
25 275:8,24,25
276:4,5,8,9
277:18,21,22
278:1

**correctly** 23:3
30:10

**corresponden
ce** 121:17
129:13

**corroborate**
233:23,25

**corroborated**
234:15 235:13
236:15

**counsel** 10:7,9
11:10 19:6,16
32:25 33:3,6,10
71:16 106:1
120:7 154:25
157:22 179:7,9,
10 197:2 241:2
252:1

**countries**
258:23 270:9
272:1 273:7

**country**
270:16,17
273:8,16
274:13,17,19,
22,25

**County** 16:18,
19

**couple** 14:11
19:20 96:18
175:15 184:22
240:19 276:18

**court** 9:2 10:4,
14,18 11:5,10
14:16 19:5,12
24:12 52:22
56:4,6 67:25
70:16 71:16,22
72:1,5,10
138:14,16
139:21 140:15,
18 152:15
154:17,25
155:5,7 157:22
158:10,15,17,
23 162:24
163:21,22,23
164:18 165:23
173:12 175:19
179:5,7,14
180:23 181:21,
23 182:1
186:13,15,24
187:1 195:6
197:2,8 199:1
201:16,17,21
205:15 209:1

238:16 239:7,
10 240:7,11,15,
18,23 241:1,9,
12 243:21
248:5,10,12
252:1,6 256:24
260:18,21,24
261:11,18
262:24 276:13,
16 278:8,10,14,
19

**courtroom**
187:2

**courts** 106:1

**cover** 18:24
251:7,10

**covered** 18:19,
21,23 19:2,3,7,
14,22,25 21:15
128:25 129:23
250:9 251:6

**covers** 212:4,5

**CPD** 32:9 41:2,
19 45:22 74:23
209:15,17,18,
21 222:5 223:9,
16

**crash** 190:5

**create** 18:5
134:8 238:17
245:2

**created** 18:6
95:17,22 100:7
132:11,18
133:18 199:10

**creating** 54:2
199:8,13

**credentials**
270:22

**credibility**
64:11

**crew** 213:21

**crime** 48:21
59:22 66:9
67:23 68:16
72:16,17,22
73:2,14,16 75:7
86:6,16,20,24

90:24 91:11
111:17 132:19
167:12,14
177:2,17
178:11,12
179:21 180:25
183:5 231:19
232:17 234:8,
24 235:23
253:19,20
255:7,11

**crimes** 17:5,14
21:6 67:24
68:18 167:8,19,
21,25 168:3
183:6,13
267:10

**criminal** 20:6,
25 21:1 23:6,
13,19,23 26:9
50:13 52:14,18
55:17 56:14
67:24 105:1
106:10 128:18
129:6 162:8
163:5 164:1
185:14 186:2,
25 187:7
207:22 208:16,
23 209:19
228:18 261:11

**critical** 52:9,11
53:12,18 56:12,
25 57:2,14,19
58:7 59:14,20
74:13 259:23

**crossover**
23:9,11

**CT** 98:1

**culture** 218:3

**cumulative**
40:7

**current**
146:12,20
272:15

**curricula**
219:22

**curriculum**
21:14 62:15
172:6 207:1

215:15,17
216:4 217:13,
18 218:7
219:18 224:3,4
231:5 258:9
259:19

**custodial** 77:1,
2,12 84:18
211:3 214:1,15
216:10 220:5
224:11 227:1,2
230:4 237:20
260:10 265:4

**custody** 58:11
77:6 185:9
220:15 223:17,
21 224:6
225:11 236:12
238:24 239:20
243:2 245:3
251:14 260:8
277:4

**cut** 13:23 14:23
19:6 33:8 37:16
47:9 52:15
71:17 82:12
124:1 178:16
179:8,11 197:4
244:25

**cynical** 63:15

———

**D**

**daily** 111:23
202:5,6

**Dan** 9:15
240:25

**data** 169:25

**database** 32:4
193:16

**date** 59:10,11
122:9 125:7
138:13

**dated** 33:17
149:11 172:23

**dates** 157:12

**David** 9:16

**day** 66:18
109:3 132:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

133:6 146:15
152:11,15
186:23 188:2
197:23 198:11
203:2 247:19
256:10 272:20

**days** 94:22
132:21 133:4,8,
10,19 135:23
136:11,17,20,
25 137:1,4,10,
18,25 138:7
139:2,13
152:19,20
169:22

**daytime**
167:17

**DCFS** 185:11

**DD** 212:5

**DDSO** 100:6
152:22

**DDSOS** 48:18
100:8,17,21

**dead** 76:8

**deal** 190:21
229:11

**dealing** 190:20
191:2,24
270:14

**decades**
147:24 197:17

**deceiving**
227:12

**December**
16:22

**deception**
220:15 226:9,
11,15,16,20
227:8,10,20

**decide** 65:10,
13 85:20

**decided** 79:12
239:11,16
240:2

**deciding** 67:7

**decipher**
239:23

**decision** 78:14
189:13 239:15,
16

**decisions**
239:11 243:11
254:10

**decree** 18:7

**deemed** 65:3,
22 66:1 82:18
90:10 92:12

**deeply** 36:7

**default** 157:14

**defendant**
9:11,16 36:3
222:24

**defendants**
9:18,20 128:18
129:6 236:7

**defenders**
106:10

**defense** 23:19,
23 24:4 74:15
105:1 106:1
126:11 176:25
196:8 207:22
208:4

**defer** 239:2

**define** 105:11
111:2

**defined** 105:10

**defines** 104:15
127:4 272:3

**defining**
109:12

**definite** 182:1

**definition**
205:1 274:23

**degree** 20:10

**degrees** 66:15

**delay** 141:14

**Deleon** 9:7

**deliberately**
250:12 263:14

**delivered**

186:6,7 187:22
189:10

**denies** 255:6

**deny** 254:24

**denying**
253:18 255:15

**department**
11:15 12:9,14
16:10,12,15,20
22:7,18 25:20,
21,25 26:3
29:18,25 31:13
34:3,23 39:17
40:4 77:19
101:13,17,18
102:7,8 124:3
129:4 145:20,
25 146:10
149:9 150:2,3,
4,14 151:8
159:22 175:13
176:11 185:10
190:21 191:3
193:8,11 212:5,
14 222:2 254:1
263:10,14,15
270:18 271:5,
18

**department-
wide** 212:12,13

**departments**
196:19 207:8

**depend** 21:14
71:7,14 87:23,
25 143:4
155:21 165:9,
16 195:25
250:9

**depending**
156:9 177:23
178:6 180:3
182:16 229:3
231:23 262:24

**depends** 55:21
69:17 79:17
90:22 95:2
132:19 134:19
140:24 142:2
154:11 183:15
194:14 196:13,
23 197:5,6

204:19 232:8
242:21,22
269:13

**deponent**
38:10

**deposed** 12:23
13:4 14:9

**deposition**
12:20 15:1
26:18,23 27:2,5
29:13 32:25
36:5,6,8,9,13,
14,17 37:4,15
38:5,15 39:12,
16 43:5 44:19
101:4 119:21
122:11 124:19,
21 125:2
159:13 166:4
210:6,8 233:20
265:20 278:20,
21

**depositions**
13:8 34:20
37:15,18,19,21
38:8 39:8
40:12,13,15
41:9

**depth** 68:6

**deputy** 161:20,
23 162:3

**describe** 83:10
167:15 186:5
209:2

**description**
82:1,3,20 83:12

**descriptions**
80:13 81:6,21
82:8

**deserve** 11:25

**design** 176:1
177:5

**designated**
156:22

**designee**
13:14,17

**desk** 187:24
198:19

**destroy** 154:13

**destroying**
151:8

**detailed** 89:22
144:8

**detained**
274:17

**detective**
16:17,23,24,25
17:3 18:17,21
19:2 24:13,15,
17 33:16,17,18
42:15,24 43:8,
13,21,22,23
46:5,6,8,22
47:1,2,11,16,23
48:12,15 49:12
50:3,7,11 51:7
52:23 53:15,25
54:8 58:4 63:7
64:8,21 65:21,
24 66:13 67:20
68:4,11,12,14,
15,16 72:21
75:7 77:18
78:6,11,18,24
79:13,23 80:9
82:4 83:25 97:9
98:21 100:22
101:13 104:21
108:4,16,21
109:18 110:6,
16,25 111:9
112:15,24
113:20 114:8,
16,17 115:2
116:8 119:2,9
122:3,7,18
123:10 124:4,
11,12 126:9
127:12,23
130:10 131:1
132:23 134:14
137:19 139:5,8
141:1,4,23
142:4,14,15,21,
23 143:7,8,13,
17 144:12,14,
15 146:14
151:19 152:4
154:12 155:16
156:2,13,15
157:8,18 158:1,
2 161:4,18,24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

162:2 163:3,11, 16,18 165:4 166:25 167:3,9, 16 168:21 169:8 171:13 172:5,7,9,22 173:23 175:1 177:1 181:8 182:13 187:1 190:8 197:12, 25 198:1,6,7, 14,17,18,20,22, 23,24 199:3,6, 7,10,25 200:1, 13 201:9 202:18,19 203:3,8 206:18 207:6 211:11 212:6,19 213:6, 10,24 214:8 215:4,13 219:3, 10 227:14 234:12 237:2,3, 11,12,18 241:24 242:1, 12,16 243:17 245:4,5,7,9,25 246:13,16 249:15 255:5, 14 257:20 260:7,12 261:5 263:23 266:10, 15 267:18,19, 22 272:6

**detective's**
98:4 115:13 147:3 157:19 236:22 241:16 245:19 246:3 254:13

**detectives**
12:16,19 13:9 17:8 18:12,23 26:4,6,8,14 45:8 47:7 51:24 52:5 53:5,9 54:10,14 56:9 57:13 58:20 59:3,13 60:22 61:2,9,17 62:1, 5,13,19,23 63:1,8,16 64:3, 14,19,23 65:2, 6,15 66:18,20 67:3,13,16

68:1,10,18,22 69:4,8,12,17 70:8,21 71:3 72:14,17 74:17, 23 75:1,6 79:2 80:12,21 81:3, 5,16,20,25 82:7,9 83:4,5, 15 84:12,21 85:6,19,23 86:3,15,22 88:3 89:14,15 93:4 97:13 99:13,25 100:16 101:7, 11,22 102:24 103:4,5,14 107:2,22 110:15 116:12, 16,21 117:9,17 118:13 123:3, 12,22 125:12 127:24 128:3,8, 16 129:5,15 130:7,12,17,21, 22 131:8,12,19 134:5,24 135:4, 20 137:24 139:11,19 140:22 141:6, 15,17 142:3,14 145:14,16 146:12,18,20, 21 148:6,17,21 149:3,22 150:17 151:14, 16,24 152:11 153:2,8,17 154:3,6,20,23 155:11,14 156:25 157:1,2, 4,5 160:2,5,14 161:25 162:19 164:1,2,8,11,14 165:6 166:8,14 168:11 169:2,5 170:1 173:2,4, 7,22 174:22 184:7 186:15, 20 202:10,22 204:1 206:9,16, 17,23 207:15 211:18 212:9 213:5,6,13,18, 20 214:3,4,6,25 215:3,4 217:22 218:1,12,13,14

222:15,20 225:18,23 227:19,20 230:9,14,25 231:2,10,18 232:10,15,23 233:6,8,14 234:21 236:8, 18 237:9 238:19 244:3 245:17 246:24 247:2,11,17 251:10 256:22 258:1,2,12,13, 17,18,22 259:5, 16 260:15 261:1,20 262:3 264:14,21 266:11 267:13 268:4,20 269:7, 16,21 271:19 273:15,22

**detectives'**
70:17

**determination**
65:6,9,13,16 78:25 85:13,17, 18 100:4 115:13 156:10 186:8 189:9,16 191:7 204:11 259:4 274:18 275:5

**determine**
64:15,23 67:5, 11 68:20 72:18 76:9 78:4,18 79:5,23 85:25 86:15 88:24 89:15 131:25 145:12 181:9 191:10 224:17 240:10

**determined**
63:5 73:9 77:8 80:2,4 86:22 92:20,24 94:11 104:7,10 194:20

**determines**
64:21

**determining**
79:3 189:21

**developed**
86:7

**development**
18:9 29:24 180:5 196:13

**deviated** 230:7

**deviations**
34:10

**dictated** 144:4

**Didi** 30:5

**difference**
45:3 135:5,6,7 139:22 201:7 228:20

**differences**
48:2,8 201:4 212:18,21,22 213:1

**differently**
49:14 123:17 254:19,20

**difficult** 196:14 214:10

**digital** 180:4

**dignitaries**
276:3

**diplomat**
272:22

**diplomatic**
270:22 273:9, 19

**diplomatics**
276:3

**diplomats**
270:15

**direct** 11:12 192:14 226:19

**directed**
207:18

**directing**
51:14

**direction**
106:8 107:9 248:2

**directions**

62:20 75:12

**directive** 107:1 118:25 129:14 149:25 201:24

**directives**
47:7 130:20 192:11

**directly** 55:9 69:4 101:15 164:10,15 183:18

**director**
172:20

**disagree** 35:18 98:19 233:5

**disagreed**
35:15 37:25

**disagreement**
35:10,23 36:14

**discipline**
114:4 209:24

**disclose**
165:10

**disclosed**
160:24 186:2

**disclosing**
187:6

**disclosure**
50:12,22 51:8, 25

**discovered**
96:20 192:14 208:6

**discovery**
17:19,22 22:20, 22 23:4,5,6 24:20 31:2,14 81:10 138:17

**discretion**
142:20

**discuss** 48:21 146:15 233:22

**discussed**
84:19 149:15 152:6,9 169:15 170:7 203:17 214:11,21

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

215:9,10 216:2,
6 217:13
252:20

**discussion**
171:6

**discussions**
132:6 214:12,
25

**dismissed**
163:8

**distribute**
106:22

**district** 16:13,
14,22 17:2
18:3,10,14,15,
20,21,22 19:1,
2,3,21,22,24,25
174:25 263:25
264:10

**districts** 25:25

**division** 16:24
17:3 18:9,17,21
19:2 22:9,12
33:16,18,19
42:15,24 43:13,
21,22,23 44:11
46:5,6,8,22
47:1,2,7,11,16,
23 48:4,12,15
49:12 50:7,11
51:7 78:12
79:4,14 80:9
96:10 97:10
104:22 105:15,
25 106:3
108:16,21
109:18 110:6,
25 111:9
112:15 113:20
114:9,16,17
115:2 116:9
119:2 122:3,7
123:10 124:4,
11,12 127:13,
23 128:23
131:2 161:4
166:2,25 167:3
168:21 171:14
172:20,22
176:20,22,23
177:2,9 178:9,
25 179:22,24

180:13,19
181:3,23,24
182:3 187:20
190:8 197:12,
25 198:1,14
199:25 201:10
208:25 211:11
212:6 213:7,11
227:14 266:10

**division's** 43:8

**divisions**
112:24 122:18
207:15 212:19

**doc** 118:12
253:25

**docu** 51:9

**document**
26:20,25 42:15,
23,25 43:4 50:1
57:7,25 58:12,
13 60:6,15
61:18 62:19,24
63:12 65:3,10,
14,17,23 66:14,
16,18,19 67:7,9
70:8,13,16,19,
20,22,25 73:7,
12 74:1,11,18,
23 75:21 79:9
80:6,13,19,22,
24 81:17 82:8,9
84:13,15 85:4,
7,21,24 89:1,4,
18 94:24 98:15
99:23 100:12
101:8,22
102:11,22,23
103:3,14,19,20
104:14 105:3,4,
12 106:8,15,19,
20,21,24
107:13,21
111:4 115:15
116:22 117:5,7,
18 118:18
122:4,7,10
123:3 127:3,7,
11 128:4,8,15
129:3 130:5
132:1 135:3,20
142:14 144:22
145:2 148:6,21
149:3 150:4

165:25 166:7
167:16 168:19
169:23 170:23
171:1,7,13
172:17 173:10,
14,17 192:6
201:16 203:14,
20 206:8,15,17,
21 210:25
211:13,14,17
220:3,8 237:9
255:14,25
256:14,23
257:12,20
265:18,24
267:3,9 271:3,
13,21 272:17

**documentatio
n** 41:20,21 42:2,
9 43:9 44:3
45:9,18 46:21,
25 47:18,21
48:10,16,19
49:2,6,7,11,15,
17,20 50:4,5
52:8,11,13,17,
20,22 53:12
54:1,7 56:12,25
57:1,5,14,19
58:2,6,14,16,20
59:3,14,19
74:13 88:11
91:21 92:16
93:1,2,6,8,14,
19 94:3,16
95:12 116:11
120:13 125:12
141:3 237:7
238:4 252:9
253:2 254:14
273:2,12

**documente**
27:4

**documented**
62:25 63:3,6,22
64:16 65:20
66:4,5,10,23
67:2,12 71:1,5
72:19 73:19
74:5,9 77:4,10,
13,21,24 78:8,
9,13,17 79:7,25
82:14,18,23
84:8,11,19,20,

23 85:17 86:2
87:6,11,15,17
88:6 89:10,12
90:15,20 91:2,
12,14,17,18,24
92:2,5,13 96:9,
10 99:2 116:3,
5,16 117:12
126:16,22
132:7 135:22
136:11 139:23
145:10 146:5
237:23 253:5,
12,13,16,22
256:12,13
266:11

**documenting**
66:13 96:5
102:12,24
103:5 118:4

**documents**
30:13,20 31:1
33:11,13 34:4
41:14 51:14
69:8 104:16
108:3 110:18
111:15,22,23
112:14,23,25
113:16 114:20
115:4,11 117:4,
7 118:15
121:13 123:11,
21 126:4 127:4,
8 137:12 149:7,
8 150:5,12
166:3 176:1,5,
9,14,18 177:5,
14 178:2 183:6,
17 184:3
185:14 186:1
187:7 188:10
190:16 191:11
192:22 193:21
198:13 201:5
202:12 203:7,9
204:2,6,10,12,
22 206:19
207:8 208:15
209:7,11,17,25
218:4 237:12

**don'ts** 213:2

**door** 142:6,8
167:11 200:8
250:15

**doors** 70:24

**dos** 213:1

**DPR** 150:7

**dramatically**
256:9

**Drew** 88:21

**driver's** 10:19

**drop** 132:25
188:1

**drop-dead**
138:13

**dual** 275:1,3

**due** 102:25
243:12

**duties** 22:21

---

**E**

**earlier** 70:14
88:3 240:24
246:7 252:20
256:11 257:25
259:6 260:19,
23 265:19
266:14 274:23

**early** 146:4
194:10 196:23
197:18

**easier** 190:23
227:25 265:22

**easily** 175:10
208:6 250:22

**easy** 156:11
168:9 231:23

**effect** 43:14
44:5 48:14
100:12 123:2,
19 129:2 147:4,
9 152:2 161:9
198:11 211:14,
15

**effective**
217:25

**effectiveness**
174:13

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**efficiency** 174:13 175:9 263:22 264:1

**efficient** 186:16

**Eileen** 9:10

**electric** 228:10

**electronic** 24:10 32:4 77:7

**elements** 21:5

**elicit** 227:23 229:23,25 230:8 235:8 262:1

**eliminated** 89:17

**eliminating** 89:9

**else's** 141:24

**emergency** 24:14

**Emmanuel's** 17:17

**employed** 12:8

**employees** 212:5

**enacted** 44:5, 12 45:16

**encourage** 228:6 230:2 261:25

**end** 50:5 55:16 57:7 82:13 86:23 94:18 110:12,22 134:6 175:16 198:24 234:10 235:5 276:11

**ended** 122:22 269:5

**ends** 252:21

**enforcement** 13:2 174:25

**engaged** 41:5 236:23

**English** 258:24

**Engquist** 210:6

**ensure** 69:19, 24 102:25 106:4,5 114:19 115:2 119:3,12 147:8 181:5 208:22 209:11, 17

**ensuring** 160:23,25

**entire** 46:6 87:25 106:9,21 107:2,14,22 128:17 129:5, 15 146:3 203:22,23 204:16 206:2, 10 208:22 232:1 276:7

**entirety** 106:6

**entitled** 26:22 122:7 220:5 267:9

**envelope** 197:21

**ERI** 238:7

**Eric** 10:17,22 11:21,23 12:7 63:21,24,25 64:10 75:23 76:1,7 80:2 89:7 94:22 144:5 243:1 253:8 255:25 256:2 257:10, 20

**Eric's** 94:23

**errata** 38:13, 16,25

**erroneously** 79:21

**errors** 38:25

**essay** 52:25

**essentially** 85:20 104:19 112:7 116:22

117:10 118:18 162:8 166:7 186:6 196:16 219:19 221:19 225:2,3 272:1,7

**established** 245:6 246:16

**estimate** 33:4

**events** 96:12 132:10,17 159:8

**eventually** 94:8 197:25 237:1,19

**everyone's** 85:3 210:16

**evidence** 68:9 74:14,19 82:5 86:7,24 96:20 167:18 178:2 234:3,15 235:13,22,23 242:3

**evidentiary** 114:21 115:8,9, 22 116:2

**exact** 168:13

**EXAMINATIO N** 11:12

**examine** 23:15

**examines** 186:8

**examples** 216:23 268:18

**excellent** 223:23

**exceptionally** 170:25 171:5

**exclude** 261:22

**exclusively** 112:13 254:13

**exculpatory** 61:16,18 64:5 90:4 101:8 102:25 103:16, 19,23 104:6

107:17,18 203:18

**excuse** 180:8

**exec** 119:1

**exempt** 119:1, 11

**exerted** 221:21

**exhibit** 26:25 27:6 42:24 43:2,17 101:3 102:1 122:7,12 123:14 125:6 165:25 166:5 168:10,20,24 169:23 170:3, 23 171:2 172:18,24 173:15,19 210:25 211:5 265:20 266:23 267:3,4,7 271:4,7

**exist** 100:5 113:16 189:6 192:2 209:17

**existed** 145:21

**existence** 99:18

**existential** 52:24

**existing** 120:21 130:22

**exists** 100:9 109:14 205:6

**expect** 54:10 74:3 76:10 77:6 80:7 93:4 100:5 133:11 205:6 248:20 257:20 273:23

**expectation** 58:19 68:23 74:8 75:9,10, 16,21 101:21 137:3 138:10 162:18 204:1,5 206:2 207:6 237:8 242:12 250:2 253:3,7,9

255:14 256:22 277:14,23

**expectation's** 203:22

**expectations** 59:2 212:23 236:17 237:11

**expected** 54:16 100:23 103:20 119:11 130:20 132:21, 23 133:7 138:6 140:22 162:25 164:16 165:7 167:12,13 194:4,19 195:17 236:9

**experience** 40:7 41:14 68:20 190:14, 22 218:8 247:1, 6

**experienced** 68:12 190:20

**experiences** 156:21

**expertise** 199:2

**explain** 109:11 215:18

**explained** 113:9

**explaining** 19:7 113:11

**exposed** 67:23

**express** 224:8

**expressly** 105:14,23 223:5

**extent** 47:14 48:7 51:17,23 123:7 218:6 253:17 273:15

**extraordinary** 82:16

**extremely** 55:3 154:1

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

202:4

**eye** 265:22
277:3

**eyewitness**
80:13,22 81:17
82:2,8,20 83:4
84:5

**eyewitnesses**
74:7,10 81:6,
20,25 83:5,11

―――――――

**F**

**face** 191:8
196:17 201:23

**fact** 10:22
34:23 60:12
66:3 69:18
87:12,18
115:14 121:5
160:10 186:25
227:15 233:5,
18 254:23
261:24

**factor** 274:19

**facts** 56:13
60:20 87:25
177:23 231:19,
25 232:5,13,16,
22 234:24
235:2,3,7,8
269:22,24
270:3,5

**factually** 88:12
228:17

**fail** 261:25

**failed** 261:23
262:10

**failing** 209:24

**fair** 15:8,9,12,
13 25:18,22,23
26:1 40:1,3,5,
10 43:7 47:20,
25 55:22 56:8
61:1,6 64:17,22
67:7,8 81:23
87:15,20 95:7,
14 99:4,5
111:19 115:17

121:9 155:17
159:7 232:10
233:3,13
237:24 249:22,
23 252:13
255:1 269:15,
19 272:12
275:11,15,17

**fairly** 235:20

**fairness** 61:21

**fall** 256:14

**false** 39:4
229:23,25
230:16 231:1,2,
4,8,12 257:24
258:2,4,15,20,
25

**falsely** 258:4

**familiar** 35:5
36:8 114:11
166:12 171:1
181:6 273:23

**family** 225:19
226:1

**fancy** 113:11

**far-fetched**
85:15

**faster** 133:14,
18

**fault** 184:23

**February**
12:19 18:2,11

**feed** 55:24
231:19 232:1
270:3,5

**feedback**
185:21

**feeding**
269:22,24

**feel** 41:13
181:25 216:10
217:10 220:22

**feeling** 85:22

**feet** 251:16

**fellow** 53:5

**felony** 134:3
238:23,25
241:18

**felt** 85:20
213:15

**field** 84:22
136:5,6 161:20,
23 211:3

**Fields** 35:4
36:23

**Fields'** 36:19

**fight** 23:16

**figuring** 94:22

**file** 24:15 34:8,
10,15,17 41:20
42:11 49:23
50:5,25 51:15
75:5,11,17
76:13,23 77:25
92:15,19 93:7,
10,13,17,18,23
94:2 97:16
104:18,19,25
105:12,13
106:6,9,18,22
107:3,14,22
108:6,8,11,12,
13 109:2,4,6,25
110:1,2,7,8,12,
13,18,23 111:2,
5,7,12 112:8,11
113:5,10,12,13,
14,16,17,18,25
114:1,2,3,8,10,
13 115:16
117:8,13
118:16,21
121:4 125:18
126:17,20
127:5 128:17,
22 129:5,16
134:2,18
151:10 159:20
160:7 161:1
172:22 176:15,
22,24 177:1,6,
7,9,10,14,15,
19,20,21 178:4,
5,19,23 179:4
180:3,7,20
181:21 182:3,9,
14 183:18

184:9,13,19
185:2 187:3
191:14,17
192:5 193:4
194:5,9,12,13,
19,21,22 195:1,
3,16,20 196:3,
15,20,21 197:6,
12 198:6,8,19
199:2,8,13,18
200:15,16,19
201:10,11,13,
21,22,25
202:12 203:3,
22,23 204:7,12,
17,23,25 205:1,
2,3,8,14,18,19,
23 206:2,3,11
207:17 208:23
209:6,8

**filed** 191:21

**files** 24:3 34:3,
4 47:5 48:18,
22,23 49:12,18
50:9 51:1,9,25
64:16 104:15
108:16,17,20,
22 109:1,8,9,
11,16,19,20,21
110:10,25
111:1,21,25
112:3,4,5,10,
12,13,16 113:1,
3,4,9,11,19,20,
21,24 114:21,
22 115:4
116:17 119:3,
23 120:22
121:8,15,19
125:8,14 127:8,
14 147:10
151:13,18
160:16,24
161:13 166:16,
19,22 171:1,8
172:1 173:2
175:25 182:7,
20 183:21
184:3 186:15
191:21 194:17
198:13,19
199:9,21,24
200:5 203:10
205:13 207:15,
21 209:13

**filing** 199:22

**fill** 25:5 170:12
269:3

**filled** 23:14

**filling** 170:11
198:9 199:7,14

**fills** 199:16

**film** 171:10,18,
20 237:17

**final** 93:4
113:17 134:8
237:2

**finally** 96:21

**find** 34:10
38:25 65:22
83:15 192:1
224:4 262:25

**finding** 27:14

**fine** 140:10,13
210:17,18
225:13 241:6

**finish** 14:18,
20,23 15:3

**finished** 14:22

**firm** 9:23

**first-hand**
67:24

**fixed** 108:4

**flags** 251:24

**flat** 269:12

**flawed** 92:8

**flip** 166:17
167:5

**floor** 200:7
249:25 251:15
264:15 277:10,
15,21

**focus** 41:22,24
243:23

**focused** 10:20
21:3 147:12
268:18

**focusing**
243:21

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**folder** 110:15
127:6

**follow** 133:10
201:14 231:13
259:3

**force** 83:1
146:3,13

**foreign** 14:5
40:19,22
258:23 259:21
270:8,12,13,15,
23 271:6,14,23
272:3,4,8,11,24
273:5,8 274:2,
8,17,19,21,22,
24 275:6,13,21

**forensic**
111:15 178:8,
20,24 179:22,
24

**forensics**
178:1 180:13,
19 181:2 196:7,
15

**foreshadowed**
124:18

**forever** 191:25

**forget** 54:3

**forgetting**
149:25

**forgot** 254:21
271:2

**form** 13:12
27:13 31:15
34:12 35:13
36:15,22 38:2,
12,18 39:5,9,25
40:16 43:11,19
44:14 45:2,10,
20 50:15,19,24
51:11 52:21
56:15 57:16
58:23 59:7,17
60:3,9,17,25
61:5,11 62:22
63:4,13 64:18,
25 65:11 66:11
69:6,21 70:10
72:20 74:20,25
75:7,8,14,19

76:17,24 77:15
78:1,23 79:8,16
80:15 81:7
82:19 84:24
85:8 87:1,9,21,
22 88:8 89:19,
20 90:6,17,21
91:3 92:18
93:21,22 94:6,
19 98:18
101:25 102:13,
17 103:9,18,24
108:23 115:18
116:7 117:14,
20 118:5,9
119:16 123:15
128:2 129:8
136:24 138:1,2
139:15,18,24
141:14,18
142:1,17
143:11 144:2,
10,16,24 146:9,
23 148:9,23
150:8 151:22,
23 152:3,5
160:19 161:6
162:11,22
163:12,20
164:5,13,24
166:17 169:13
179:1 180:9
181:4,18
182:23 183:9
184:16,20
185:8 186:21
190:18 191:23
192:18 193:7,
20 194:7
195:18,24
199:20 202:2
206:5 207:23
208:10,24
209:14,20
210:2 217:1
221:20 222:3,6,
9 225:7 226:4
228:14 237:21
241:20 242:18
243:24 244:2
246:9 247:5
253:23,25
255:2 256:25
257:5 260:2
263:17 269:2,
25 272:16

275:2

**formal** 186:18,
22 187:1,5,18
206:22,25

**format** 167:8,
15,20,21,25
169:25 170:4,7,
8,11

**formats** 167:19

**forms** 45:23
193:13 220:16
259:24

**forward** 96:12
164:6 185:18
241:25 242:6

**forwarded**
105:15

**found** 39:2
54:22 63:25
215:14 217:17,
25 218:5,16

**foundation**
39:25 43:11,19
60:9,18 61:5,11
62:22 63:4
69:15,21 75:14,
19 78:1 80:25
88:7 103:18
144:16 145:7
154:16,24
155:18 156:4
158:5 163:13
164:5,24
180:10,14
181:4 183:9
184:4 208:10
239:18 240:1,
13 241:22
243:14 245:14
272:16

**frame** 32:3
33:16 241:24

**frankly** 88:9

**friend's** 257:10

**front** 181:13
182:17 187:24
221:17 270:21

**fulfill** 186:10
203:5

**fulfilling** 25:12

**fulfillment**
203:19

**full** 10:16
167:24

**fully** 98:2 99:3
117:2,24,25

**function**
183:17 207:13

**functions**
130:10

**future** 54:1

———

**G**

**Gabriel** 9:9

**gain** 261:12

**gained** 245:25

**gang** 183:5,6,
13

**Garry** 17:25

**gather** 189:13,
17,22 194:4,19
199:3 207:8,15,
16

**gathered**
104:21 108:3
188:10 201:10
209:18

**gathering**
189:3,6 192:22
195:15 198:13
201:5

**gave** 72:24
94:21 203:7

**general** 33:19
45:12 58:19
59:13 70:11
77:18 96:1,7
98:6 99:4 124:2
133:20 134:5,
13 145:20
146:6,7 147:13
176:25 189:23
191:10,12,23
203:5 211:2,10
212:4,7,11

232:20 270:2,
11,13

**General's** 18:7

**generally** 23:8
34:17 58:24
59:1 68:25
74:10 80:17
82:2,22,24
84:7,10,12,15,
23 88:2,5,11
89:18 93:18,25
94:3,15 109:3
137:4 143:6
147:4 149:13
179:4,6 180:1,6
182:8,13
190:19 198:24
201:19 205:24
206:6,7 235:2,7
242:23 245:3,
10 268:6 270:5
277:9

**generated**
69:8

**gentleman**
240:23

**George** 159:9

**give** 10:3 11:7
26:18 42:19
72:1,8 85:12
181:12 190:16
201:17 226:23
230:16 242:25
246:1 249:7

**giving** 69:12
71:8 78:20 88:9
239:5 258:15

**goal** 147:8
230:3,4 233:24

**Golden** 9:13,
17 11:4 80:25
81:8,13 82:19
84:9,24 85:8
87:21 88:7
89:19 93:22
98:18 99:15
101:25 102:13,
18 103:9,18,24
117:14 136:24
138:1 139:15
141:14 144:16



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

145:7 148:9,23
154:15,24
155:18 156:4
158:5 162:11
163:12 164:13
166:19 180:8,
14 181:4 183:9,
22 184:4,16
195:5,9 210:2,
4,11,15,18,20

**good** 9:15
83:17 86:14
123:18 154:10
157:10 179:14
182:25 223:24
231:22 241:3
248:21 252:5
269:5

**governing**
203:16

**government**
22:5

**governmental**
17:16

**GPR** 98:21
142:3,4 146:7
150:13 177:3

**GPRS** 135:13
146:17 151:4,
18 156:7,8
237:13

**grab** 140:3
200:15

**grabs** 199:18

**graduate**
20:15,21

**grammar**
119:17

**granted** 98:6

**gray** 191:12

**great** 56:3
195:9 224:2

**ground** 14:11

**group** 22:9
161:20,23
188:11 209:3
263:14,15
264:16

**grouped**
174:17

**guess** 55:21
69:22 97:22
105:9 109:25
111:20 112:8
155:10 156:10
161:7 162:23
168:8 182:14
194:14 202:8
239:14 246:18,
21

**Guevara** 11:4

**guidance** 52:5
62:12 69:12
75:5 97:24
98:15 99:6,12,
24 100:13,15
102:23 103:3,5
116:15 118:19
126:3,12
127:12,16
132:16 148:17,
20 271:22

**guide** 50:4
51:24 100:22
196:22

**guidelines**
133:10 171:15
192:16

**guides** 231:10

**guilty** 217:23

**guy** 216:21,22
234:3 246:21
266:14

**guys** 55:9

---

**H**

---

**half** 146:15

**Halstead**
18:16

**hand** 11:6
187:24

**hand-off**
241:15

**handed** 146:1
149:8,10,14

150:6,8,10,13
198:5 219:16

**handing**
265:21

**handle** 271:22

**handled** 22:22
23:5,6,20,23
24:7

**handles** 24:8

**handling**
198:10

**handout** 133:5
134:3 170:14

**hands** 208:4

**handwritten**
118:14 239:3,9
240:10 243:20,
21,23 244:5
245:2,9,15
247:1,3,7,12

**happen** 202:14

**happened**
56:19 100:7
119:24 133:6
144:6 146:16,
17 202:4 249:7
268:11,16

**happening**
243:1

**hard** 10:8 64:2
152:5 265:21

**harder** 143:24
144:9

**hate** 12:2

**head** 18:8 25:1
35:14 55:2
217:10 219:4
223:25 236:3
246:21 249:11
277:8

**heading**
226:24

**headquarters**
146:14,21
151:24 173:7
186:7 187:21,
22

**hear** 57:22
61:13 155:1
158:21 164:22
208:18 230:23
236:13

**heard** 34:22
71:23 73:24
112:9,10,12
177:11

**hearing** 252:4

**hearings**
56:20

**held** 12:17
16:11 22:17
134:18 146:11
214:11 226:6

**helicopter**
182:15

**helpful** 53:13
54:15 56:21
58:1 89:12
154:1 191:18
218:1,17
231:25 235:1
255:22 256:14
257:1 270:3

**Helping** 216:19

**helps** 216:13

**hesitant** 179:3,
15 180:2,22

**hey** 57:24
109:25 142:6
144:5 147:21
162:24 170:21
181:9 229:1
235:4 246:5,20

**Hickey** 34:22,
24 35:3,10,18,
22 37:3,5,8,14,
20,22,24

**hierarchy**
183:1

**highlight**
108:1

**hired** 213:22

**history** 16:9

**hit** 219:19,23

**hold** 10:18
17:21 108:13
109:7 137:7
138:7 223:17
225:25 271:2

**holding** 89:2

**holes** 199:13

**home** 132:24
142:8 185:11
229:19

**homicide** 17:5
34:5 41:22,24
42:3 43:9 44:3
45:18 46:21
47:22 48:16
49:8,11,21
50:2,5,13,23
52:9,12,17
58:8,12 59:25
66:13 68:3,8,
18,22,24 69:3,
19,25 70:7
74:24 75:11,12
76:22 77:3,12,
23 78:4,21
79:15 90:5
92:14,19 93:7,
14,18 95:17
96:5,13 99:2
101:4 108:10
109:8 110:5,7,
17 111:10,11,
22 112:3
113:13 126:5,
16 127:9
132:22 133:9,
12,14 134:4,11,
12,20,24 135:4,
10,12,18 137:8
138:8,12,20
139:16,19
146:5 167:21
168:16,17
169:25 170:1,
22 176:2,10,14,
19 177:22
178:14 180:16
181:16 184:5,
13 185:2,25
186:1 187:7
189:7 190:7,14,
17 191:5,15
192:5,10 193:1,
5,22 194:5,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606



502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

195:15 196:1,2,
4,14 198:1,5,6,
8 199:5,8
200:5,7 201:6
202:23 205:13,
14 209:11,13
238:22 242:9,
24 264:7,12,13

**homicides**
49:15 58:11
108:7 109:3,5,7
133:17 139:7
168:5 190:20
191:25 202:5

**host** 54:4
248:15,19

**hosting** 248:18

**hour** 147:20
248:23 263:2

**hours** 33:2,5
97:21 132:5,24,
25 143:1
213:20,22
214:9 219:6
224:6 225:12
238:23 256:10

**house** 76:7
257:8,11

**housed** 176:10
178:20 193:21

**huge** 251:13

**human** 113:4
225:17

**humanly** 80:3

**humans**
218:16

**hundred**
147:24

**hundreds**
154:19 197:22
273:25

**husband** 88:20
89:1 92:25
94:21

**husbands**
89:7

**hypothetical**

61:12 76:2
143:23 145:11

**Hypothetically**
143:22

---

**I**

**idea** 104:24
174:9 216:24
217:2 221:19
225:4,25 251:5
258:13 259:25
262:13 269:22

**ideally** 263:9

**identical** 43:12
44:8

**identification**
27:6 43:2 80:23
83:6 84:6 91:7,
16 92:8 122:12
166:5 168:24
170:3 171:2
172:24 173:19
211:5 267:7
271:7

**identified**
30:12 67:10
127:18,19

**identifies** 27:8
104:14,18
117:3 127:4
130:6

**identify** 37:25
38:16 51:19
83:18 91:1
105:11 117:6
145:6 156:2
221:13

**identifying**
30:19,21 31:1

**illegal** 241:15

**Illinois** 21:6

**illogical**
157:13

**imagine**
153:15

**immediately**
23:14 145:17,

18 274:20

**immigrants**
272:20,25

**impaired**
258:19

**impending**
18:6

**implement**
18:6

**implemented**
174:5

**important**
52:25 53:1,4
59:21 60:1,2,6,
13,15 61:20
62:25 68:10
70:7,15 73:18
74:1,11 80:17,
19 81:4 82:3,5
110:22 144:18
145:8,9 152:14
203:17 204:13
236:13 253:12
255:24 256:18
260:15 269:10

**impossible**
85:15

**improper**
228:11,12,13

**in-** 151:15
172:3

**in-custody**
134:3

**in-depth** 132:6
135:11 143:21

**in-person**
173:5

**in-service**
145:18,19,22
146:11 151:12,
21 172:3,21
173:3,21,23
207:1 218:25
267:18,21

**inaccurate**
87:19

**inadmissible**
261:10

**inappropriate**
31:7

**Inaudible**
70:23

**incident** 55:3
79:20 80:3 96:9
172:10

**include** 17:5
61:15 63:17
64:20 75:25
93:4 94:3 96:24
97:19 99:13
115:7,15
128:19 147:5
256:19 271:25
272:24 274:24
277:11

**included** 64:16
71:10 76:20
93:16 95:13
96:15 99:25
106:11,12
126:19 147:6
149:16 167:24
174:21 180:1,
20 182:9 218:7
259:1

**includes** 62:16
136:18 152:15
168:5 269:4

**including**
59:25 107:18
126:10 127:5
146:20 205:22
222:20 233:15

**inclusion** 54:1
118:16

**incommunica
do** 220:14
223:18,22
224:6 225:11,
17,19,21,23
226:6 276:23

**incomplete**
61:12

**inconsistent**
233:11

**incorporated**
123:8 172:9

**incorrect**
38:17 39:4
87:13

**inculpatory**
85:7,14 101:8
102:24 233:15
234:7 241:19
242:10,18
255:17

**independent**
21:15

**index** 193:10

**indexes** 193:3

**indicating**
35:22 119:22
120:7 129:11
150:12

**indication**
106:7 221:6
273:8,21
275:21

**individual**
9:18,20 29:18,
20 36:3 58:16
71:11 73:4
77:20 78:3,5,8,
10 79:24 83:10,
16 84:19 85:14
91:1,8 92:6
93:12 94:5,7
104:13 142:20,
24 143:5 189:2,
8 199:12,15,16,
17,21 210:7
216:9 217:12,
22 220:6
225:22 227:3,
24 228:4,5
231:7 232:1
238:5,24 239:4,
19 245:3
252:16 253:3
260:10 261:21
262:2,23 265:2,
14 269:14
275:20

**individual's**
61:21

**individuals**
72:24 74:9
90:23 91:23



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

92:16,20
103:13 157:6
185:1 188:8,9,
12,25 214:14
258:3 259:17
264:25 273:12
277:3,11

**info** 107:17

**inform** 228:17
238:24 241:24
257:12

**informal**
23:22,25 24:1,
11 186:19,24

**information**
21:18 25:4 30:7
48:5 50:12
51:14,25 59:21
60:1,7,12,16,23
61:3,9,16,18
62:16,24 63:17
64:5,9,20,24
65:3 66:4,8,9,
20,24 67:1,4,6,
14 71:5,9
72:16,17,18,22,
25 73:2,17,18
75:22 76:13
78:5,19 79:3,
10,15,22 80:7,
17,18 81:4
82:3,10,11,15,
17,22 83:22
84:7,11 85:5,
21,24 86:24
87:5,12,14,16,
19 89:9,11,15,
17 90:1,2,4
95:1 96:4 97:1,
10,24 98:2,16
99:1,5,7,9,13,
25 100:2,16,18,
22 101:9,12,18,
23 102:8,11,12,
25 103:6,15,17,
19,23 104:6,21
105:4 107:18
110:14,21
113:21,22
114:4 115:7
116:16,23,25
117:5,11,12
119:21 120:7
124:4 126:10,

15,19 128:8
131:13,17,21
132:1,2 135:21
136:9 142:11
143:19 147:6,
16 148:1,7,18,
21 162:7,10,13,
21 163:17
165:6 172:13
189:21,23
219:8 230:16
231:5 234:8,16
242:12,17
243:17 244:15,
19 245:21
246:5,8,12
253:15,18,19,
21 255:10
256:17 261:16
266:10

**informed**
270:23

**ingrained**
265:9

**initial** 96:8
132:25 219:10
246:13 255:15

**initially** 254:9
256:16

**initiate** 256:15

**injuries** 191:2

**inquiries**
273:1

**inquiring**
270:19

**inquiry** 156:23

**inscribing**
38:21

**inside** 111:8

**insight** 249:7

**insignificant**
144:19 145:25

**inspect** 119:12

**inspection**
118:24 119:7
120:21 129:25
208:25 209:3,5,
9,10,21

**inspections**
119:3,22 120:8,
14 121:4 130:1
209:16

**inspector**
209:1

**instance** 51:19
85:19 158:7

**instances**
13:2,21 14:2
37:7,12,23
38:14,24 39:1
162:6 209:23
253:20

**instantaneous**
180:5

**instruct** 30:22
31:5

**instructed**
129:4 206:15,
17

**instructing**
129:15 206:9

**instruction**
107:1,13
116:10 117:17
128:16,21
149:3 161:11
172:1 201:24
203:8

**instructions**
118:25 128:20
192:17 197:14
201:12,14
211:22 220:10

**instructor**
171:16,22

**instructors**
21:11,17

**intelligence**
223:4

**intelligent**
214:13

**intended** 23:16
52:1,4

**intending** 83:1

**interact** 22:18

164:19

**interacted**
22:15

**interaction**
24:16

**interactions**
24:22,24 25:14
270:12 272:20

**interesting**
83:20 88:17
207:24 252:14

**interests** 23:2

**internal** 23:12
107:12,21
129:3,10,14

**internally**
263:5

**internet** 71:17

**interpreted**
274:2

**interpreter**
32:1,13 263:6

**interpreters**
32:10,11,20
259:8 262:16
263:3,4

**interred**
253:17

**interrogate**
264:21

**interrogated**
76:21

**interrogating**
217:9 238:13

**interrogation**
49:25 50:3
77:1,12,13
78:11 210:24
211:18 212:16,
20 213:17,21
214:4,7,16,18,
20,24 215:7,12
220:5 221:14
222:25 223:6,
13 224:11,20
225:4,10 226:9
227:1,3 231:20

232:25 233:16
235:1,10,14
237:5,7,8,10,20
238:5 244:11,
12,16,20 246:5,
25 247:14,16,
22 248:3 249:8,
10,11,13,19,21
250:1,5,7,8,12
251:6,20 252:9,
10,12 254:14
256:24 259:11,
16 260:4,16
261:3,9 264:20,
24 268:21
269:6 276:20,
22 277:9,14,17,
25

**interrogation'
s** 237:22

**interrogations**
21:25 22:2
32:21 33:21
40:22 77:3
211:3,9,24
212:2,23 213:3,
19 219:6
222:21 234:5
245:20 247:13,
21 249:5
259:25 260:1
262:17 266:16,
21 268:2 270:7

**interrupt** 19:5
55:23 71:17
180:10

**intervention**
185:8

**interview** 50:2
71:3 74:4 77:22
78:11,20 79:4,
13,24 84:16,18
110:17,19
141:3,5,6
142:12,15,16,
22,25 143:1,8,
21,25 144:5,8
213:20 216:10
230:3,4 232:1,9
233:20 235:16,
17 237:15,20
242:2 243:12
245:8 246:13

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

253:15 256:7
261:3 265:4
268:24 269:6

**interviewed**
71:11 79:4
142:11 257:9

**interviewing**
142:19

**interviews**
22:2 32:20
33:21 40:22
49:25 74:8
84:13,22
141:16 170:20
210:24 214:1
215:7 219:6
236:13 245:22
249:5 260:4,11
261:9 267:24
268:3

**intoxicated**
258:19

**intoxication**
258:7

**introduced**
145:20 146:6
147:23

**invades** 30:23

**invalidate**
226:7,11

**inventory**
105:4,7,15,24
128:22 199:14
204:21,23,25
205:12

**investigate**
17:14 68:7
167:12 173:2
176:13

**investigated**
53:21,22 69:25
200:1 208:16

**investigates**
17:14

**investigating**
66:22 68:20
78:24 172:22

**investigation**

23:13 34:5
48:16 49:21
50:23 52:9,12,
17 54:15 59:10
60:8,14,16
62:11,14,21
66:8,19 67:15
68:4,7 69:14
70:9 73:9,11
74:24 75:13,18,
22 76:4,15,22
77:3,12,24
78:4,21 79:15
86:18,23 88:4
90:5 92:17 96:6
98:4 99:2
101:14,19,24
102:9 103:6,16
104:12 110:6,8
111:10,12,22
116:24 118:4
126:5,16 127:9
131:14 133:8,9,
15 134:7,11,15
136:5,6 137:8,
15,18 138:4,20
139:2 144:23
145:2 148:7,22
149:4 154:2
163:4,19,24
164:11 176:10,
14,19 177:15,
22 180:16
181:16 182:6
185:3,5,15
186:2 187:7
189:7 190:17
191:6,15
192:10 193:6
194:18 195:15
196:1 198:21,
23 202:11,23
206:20 231:24
234:10 238:22
242:9,14
245:25 264:7,
12 270:4

**investigations**
17:12,13 25:2,
16 26:8,9,10,11
41:21,22,25
42:3 43:9 44:3
45:19 46:21
47:22 49:8,11
50:13 54:7

58:9,22 59:16,
25 68:8,24
69:3,20 92:23
95:18 100:19
101:4 116:18
134:10,12,20
135:11,18
138:8,12 146:5
168:16,17
176:2 184:6,11,
12 185:25
193:1,22
201:20 209:12,
19

**investigative**
34:8,9 48:18,
22,23 49:12,17,
22 50:8,22,25
51:1,9,25 64:16
69:13 70:2,3,8,
12,18,22 74:18
75:5,11,17
76:13,23 77:24
92:15 93:10,13,
17,20,23 94:2,
4,16 104:19,24
105:13 106:9,
18,22 107:3,14,
22 108:8,14,25
109:1,8,9,16
110:1,8,9,12,23
111:7,12 112:3,
10,13 113:13,
14,17,21 114:1,
2,13,22 115:4,
15 116:17
117:13 118:15,
16 120:21
121:4,8,15,19
125:8,14,18
126:17 127:5,
14 128:17,22
129:5,16
134:18 135:21
136:9,20
137:25 141:16
144:13 147:10
151:10,13,18
160:16,24
161:12 166:15,
19,22 175:25
176:15 177:1,6,
19,20 178:5,18,
23 179:4 180:3,
7 181:21 182:2,

9,10,14 183:21
194:13,22
195:3,16,20,21
196:3,15,19
197:12 198:13
199:9,10,18
200:16 201:11,
13,21,25
202:12 203:10,
22 204:7,12,16,
18,22 205:1
206:2,4 207:17,
21 208:22
209:7 261:12
264:4

**investigator**
206:10

**investigators**
184:2 233:23

**involve** 268:3

**involved** 25:12
30:3,18,19,20
31:17 50:2
90:24 91:2,10,
24 143:18
160:6,14,18
162:19 163:4,
16,18 164:3,9,
11 182:6,20
183:5 198:20,
22 202:23,24
249:20 250:3

**involvement**
24:18 31:13
243:19 244:2
253:18 254:25
255:6,11,15

**involving**
214:15 236:6

**irrelevant**
73:11 78:5

**issue** 47:3
259:25 264:25
265:1,2,11

**issues** 15:24
16:3 22:22 92:9
124:16 159:19,
21 160:6
161:15 260:5

**it.'** 256:3

**item** 217:18

**items** 176:19
242:2

**iteration** 97:4

---

**J**

**Jacques** 34:25
35:1,8

**Jan** 9:8 248:13,
15,19 278:2,3

**January**
172:23

**Jersey** 16:19
20:4

**Jim** 34:22,24
37:22

**job** 26:13 34:14
65:1 163:6
198:19 259:20,
23 260:12,14

**join** 245:6,7

**joined** 16:10,
12

**joining** 9:22

**joins** 10:6

**Joint** 243:16

**Jones** 159:9,
10,14,18
160:11 173:8

**Josh** 195:6
210:6,11

**jot** 146:9

**judge** 162:24
164:22

**judge's** 203:3

**judgmental**
216:11 217:3

**July** 17:1

**jurisdiction**
20:8 143:17

**justice** 50:14
52:14,18 67:25
162:8 185:14

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

186:3,25 187:8
208:16,23

**juveniles**
258:14

---

### K

**Karen** 36:4,5,9,
12,18

**Katie** 9:11

**keeping** 41:20
59:9,11 69:2
134:19 159:20
160:8 161:1
198:7 277:3,24

**kidnapped**
64:8

**kidnapping**
184:14,17,24
185:3

**kids** 12:3

**killed** 63:21
92:7 216:15
218:21

**killer** 63:25
75:23 76:1
86:12 94:23,24

**kind** 52:23
54:19,21 70:18
77:17 114:8
146:8 170:17
191:4 197:13
205:5 219:23
225:15 231:10
234:22 236:8
246:7,18
249:11 254:1,
21 265:13

**kindness** 16:8

**kinds** 205:16
243:13

**knew** 55:4
59:12 228:4

**knock** 142:6

**knocked** 70:24
142:7

**knowing** 74:19

208:14 214:12
223:3

**knowledge**
29:17 30:5 40:8
119:14 143:14
152:18 245:19,
24

---

### L

**lab** 48:21
178:11,20
180:6

**label** 244:15

**lack** 23:16

**laid** 217:18

**land** 217:4

**language**
32:13 258:23
263:1 272:23

**largely** 268:3

**late** 12:2

**law** 13:2 16:20
20:2,4,6,9,12,
13,14,23,25
21:1,13,24
150:10 174:25
201:15

**lawyer** 60:7
120:2 220:24

**lawyers** 29:14,
20

**lay** 89:23 180:9
216:25 217:4

**Layer** 116:7

**layout** 223:13

**lead** 63:1,9,18,
19 64:3,15
65:7,10,14,16,
19,22,25 66:2
155:25 163:3
167:9 206:18
237:1,3

**leading** 78:2
96:24 202:11
269:23

**leads** 62:20
65:5 75:17
76:3,14,19

**learn** 30:7 60:7
68:8,15 83:24
119:24 120:1
121:1 163:18

**learned** 50:13
60:16 86:25
99:1 101:23
103:6,15
104:21 116:23
120:2,7 126:15
131:13 135:21
136:10 148:7,
22 149:4 162:7
165:4 242:13
245:20 273:15

**leave** 71:20
210:5

**leaving** 252:16

**led** 94:4

**Lee** 29:21,22
30:8,11 31:18,
22,25

**leeway** 88:10

**left** 16:14 34:7
205:18 241:14
242:5

**leg** 66:16,17
217:9,12

**legal** 17:15,17,
21 20:10 22:4
23:15,17 24:19
31:16 35:6
147:2 150:10
219:8 272:15

**legitimate**
67:1,6

**Leinenweber's**
9:23

**length** 252:21,
23 276:19

**lengthy** 134:9
167:13 220:14
223:17,21
224:10 276:22

**lesson** 21:12
166:3 168:22

**letter** 113:6

**level** 46:17,24
47:6,10,17
48:3,9 113:5
159:25 161:14
167:11 192:13

**levels** 47:14

**liaison** 17:16
22:5

**license** 10:19

**lie** 227:22
228:1,5,6,7
230:2,11,22
262:11

**lies** 227:15,16,
18,20,24,25
228:11 262:4

**Lieutenant**
18:2,4,9

**life** 13:5 75:13
229:2,6,13

**lifestyle**
217:24

**likewise** 14:20

**limited** 227:1
232:12,18,20
235:5

**line-up** 180:12,
15 181:1

**lineup** 91:6
95:9,13 96:16

**lineups** 49:1

**link** 10:2

**list** 193:20
214:14 263:2

**listed** 193:13,
16,21

**listen** 233:24

**listing** 205:12

**literally** 113:12
175:6 264:15

**litigation** 22:23

159:15,19
160:11

**lived** 20:14

**located** 18:15
174:15,16
176:6 181:19
185:1 215:6

**location** 9:5
167:17

**locations**
25:20 193:4

**locked** 228:21
235:25

**lodging** 88:14

**logical** 259:3

**long** 12:17
47:25 66:18
72:3 121:23
122:21 140:4
143:1 170:6
219:5 224:19
228:22 277:3,
11,24

**longer** 121:23
224:14 225:4,9,
25 226:6
277:20,21

**longest** 29:24

**looked** 33:19
76:6 120:25
121:5 264:12
265:19

**lookout** 143:15

**lose** 248:5

**losing** 217:5

**lost** 55:24
124:6 129:18

**lot** 16:7 23:2
49:16 92:9
123:24 134:21
142:3,5 155:12
157:11,14
196:7 227:25
259:21

**lots** 53:1 54:18

**low** 167:11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

229:21

**lunch** 140:3,4

**lying** 223:5 227:10,11

---

**M**

**made** 79:10 100:4 105:25 106:4,6 138:5 143:3 145:24 159:21 175:8 179:11 180:23 182:4 186:23 189:14 196:10 213:24 218:14 224:5 249:3 251:4 254:10 274:4,18 275:8

**magic** 200:23

**mail** 113:7 186:10 189:11, 12 197:19

**main** 221:2

**maintain** 176:23 184:8 191:14

**maintaining** 199:12

**maintenance** 50:8 198:8

**major** 146:2,10 190:6

**make** 14:17 30:1,11 32:3,5, 6 35:22 65:6, 13,15 80:23 83:6 84:6 85:13 86:6,24 87:14, 20 89:25 105:10,20 107:16 156:10 166:10 180:24 181:2 186:16 187:1 189:9,16 196:17,18 197:20 199:22 202:11 205:4 206:19 209:6 217:10 225:15

228:24 229:13 234:21 237:4 248:1 250:22, 23 256:4 259:4 273:1

**makes** 50:21 64:7 87:24 186:8 228:6 237:4

**making** 61:15 78:25 160:6 191:7 243:11 247:23 271:11

**management** 18:5

**manner** 186:17

**marine** 182:12, 15

**mark** 122:2 267:3 271:2

**marked** 26:25 27:6 42:23 43:2 102:1 122:6,12 165:25 166:5 168:19,24 169:23 170:3, 23 171:2 172:18,24 173:14,19 210:25 211:5 267:4,7 271:3,7

**match** 236:24

**matches** 234:7

**material** 29:16 50:22,25 67:9 118:19 143:2 170:10 173:20 174:14,16,18 189:3 203:18 204:17,20 207:21 215:6 217:17 224:9 258:8

**materials** 33:15 39:20,22 40:4 126:10 171:16 189:6, 17,22 192:24 199:4 224:25 243:7 268:17

**matter** 42:5 58:19 59:13 96:1 97:3 137:11 273:10 275:10,11

**matters** 176:5

**Mayor** 17:16

**Mccarthy** 17:25

**Mcgrath** 9:22 10:6

**meaning** 131:23 225:19

**meaningful** 143:2

**meaningfully** 88:4

**means** 53:4 66:7 102:19 188:17 222:10, 12 227:11,12 272:7

**meant** 94:14 131:16,20 205:12

**mechanism** 164:21

**media** 88:19

**medical** 15:24 16:3

**medication** 15:18

**medications** 15:21

**meetings** 32:24 33:10

**Megan** 9:22

**member** 101:13,19 102:8 212:13 225:20

**members** 29:24 119:1 126:9 127:12 165:12 226:1 270:19

**memo** 172:19

**memorable** 55:3

**memoranda** 108:2 114:20 115:3

**memorize** 54:4

**memorized** 153:13 234:18

**memorizing** 157:11

**memory** 32:6,7 53:12,13 54:6 56:18 57:2,10, 14

**mentally** 258:18

**mention** 32:13 107:17 215:8

**mentioned** 32:12 48:3 91:19 218:5 221:1 235:12 254:10 258:6

**mentor** 69:17

**merged** 100:8 185:1

**met** 29:14,20 33:1 132:22

**method** 57:19, 22

**middle** 52:15

**mill** 242:24

**mind** 62:10,18 141:22 271:11

**mingled** 22:21

**minimalization** 215:17,21

**minimization** 215:16,19,24 217:6,20

**minimum** 67:21 189:23

**Minor** 185:7

**minute** 10:3 56:1 158:11 175:17 210:10 276:10

**minutes** 58:11 140:3,6,13 256:2

**Miranda** 21:21 214:11 220:17 223:4,7,9

**miscellaneous** 114:20

**mischaracteri zes** 63:13 76:17

**misconduct** 165:11,12

**missed** 72:12

**missing** 88:19, 20 167:20 169:17,18 181:25 184:25 185:4 208:6,8 235:18 244:9

**misspoke** 38:23 213:9

**misstates** 40:16 123:15 184:20 272:17

**mistake** 73:10 196:10

**mistakenly** 14:22

**mistakes** 38:20

**mix** 188:13,24

**mixing** 66:2

**moderate** 249:21

**modern** 138:11

**mom** 257:9

**mom's** 257:8

**moment** 10:14 13:23 19:15 26:19 42:12 47:9 72:1 98:14 140:21 179:9

**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273** Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**KENTUCKIANA**
COURT REPORTERS

271:14

**monitor**
247:18,24

**monitoring**
249:24

**months** 67:19
138:10

**morgue** 64:1
75:24

**morning** 9:15

**Morris** 16:17,
18,19 20:3

**motive** 94:12

**move** 52:18
68:17 150:24
157:25 213:6,9,
10 241:25
242:6 263:25

**moved** 71:13
151:8 213:13
244:7

**moving** 96:12
164:6,7 175:13
185:18 247:13

**MRAI** 185:4,6

**MRAIS** 184:22

**multiple**
252:12

**murder** 59:11
60:21 71:12
73:9 74:7,10
77:8 78:12,24
79:5,14,25 85:2
89:4,23 94:10
167:22 185:19
229:1,5 238:25
260:9

**murdered**
73:4,5 74:2
88:25 225:12
257:11

———————

**N**

———————

**named** 36:3

**names** 178:11

**narrative**
144:18 167:16
256:18

**Nathan** 135:15

**Nathson** 35:4
36:19

**national** 40:20
270:23 272:3,9
274:2,22,24
275:6,21

**nationals** 14:6
40:23 270:9,12,
13,16 271:6,15,
23 272:24
273:5 274:8
275:13

**nature** 204:18
206:4

**Navarro** 9:16
11:1

**necessarily**
50:1 55:13
57:22 63:18
70:12 76:10
85:2 87:6,10,
16,24 92:2,5
93:1 94:20
117:7 134:16
143:12 165:14
170:5,19 223:1
225:9 229:3
234:1 249:14
255:18

**needed** 20:9
24:12 70:15
72:19 110:17
138:13 167:14
189:11,17,21
242:4

**needing** 57:8

**negative**
91:19,20
111:16

**negatives**
178:3,14,19
179:23 180:18

**negotiate** 18:6

**negotiated**
183:11

**neighborhood**
18:16

**news** 89:2

**nice** 218:23
248:22

**night** 89:2

**non-** 112:2
235:1,6

**non-english**
259:12,17
262:14 270:8

**non-homicide**
113:11 139:10

**non-public**
231:25 232:5,
12,16,22
234:16 235:3

**Non-relevant**
87:16

**non-us** 272:2,
8,10

**note** 35:22 55:8
125:12,14,15
237:18 265:13

**note-** 145:14

**note-taker**
157:14

**note-taking**
145:16 146:8
147:22 148:15
151:7 153:18

**notepad**
237:15

**notes** 53:16,
18,21,23,24
54:6,12,14,17,
18,23 55:4,7,14
56:9 104:20
108:2 110:10
114:19 115:3
118:14 125:16
133:21 134:14,
21,22,25
142:19,22
146:6,9 147:9,
17,23 148:24
150:18 151:5,8,
9,18 152:14

153:9,10,12,14,
21,24 154:13,
23 155:12,13,
14,17 156:3,12,
18,25 157:2,3,
5,6,9,19 158:3
159:20 160:7,
25 177:4
194:17 195:14,
23 237:17,23
243:6

**notice** 13:15
26:18,22 27:1,
8,12 33:14
44:25 88:10
124:21 125:1
149:9,18,19,20
150:2,3,4,14
155:20 156:20
159:13 165:1
168:10 183:24
244:1,8

**noticed** 268:2

**notification**
164:18 187:1

**notified** 164:18

**notify** 274:20

**November**
16:16 18:9

**number** 96:11
108:11 167:5
181:12 184:18
190:3 191:4

**numbers** 54:4
157:11

**numerical**
108:5,6,12
109:1,6 113:10,
12

———————

**O**

———————

**object** 27:13
30:22 34:12
35:13 36:15,22
38:12,18 50:15,
24 52:21 59:17
60:3,9,25 61:5,
11 62:22 63:4,
13 64:25 65:11

69:15,21 70:10
72:20 74:20,25
75:8,14,19
76:17 77:15
78:1 80:15,25
81:8,11 82:19
84:9,24 98:18
101:25 102:13
103:9,18,24
136:24 139:15,
18 141:18
144:24 145:7
146:23 148:23
154:24 155:18,
19 156:4,19
162:11,22
163:12 166:17
169:13 180:14
181:4 184:4,16
186:21 207:23
208:24 210:2
226:4 243:24
244:6 253:24
255:2 256:25
262:7 275:2

**objected**
240:18,24
260:19,23

**objection**
13:12 27:21
28:1,6,11,16
31:3,15 36:25
38:2 39:5,9,25
40:16 43:11,19
44:14 45:2,10,
20 51:11 56:15
57:16 58:23
59:6 64:18
66:11 76:24
78:23 79:8,16
81:7 85:8 87:1,
9 88:8,15 90:6,
17,21 91:3
92:18 93:21
94:19 102:16,
20 108:23
115:18 116:7
117:14,20
118:5,9 119:16
123:15 129:8
136:12 138:2
139:24 141:14
142:1,17
143:11 144:2,
25 152:3

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

154:15 157:20 158:4 161:6 163:20 164:5, 13,24 179:1 180:9 181:18 182:23 183:9 184:20 190:18 193:7 194:7 195:18,24 199:20 202:2 206:5 208:10 209:14,20 217:1 225:7 239:18 240:1, 13 241:20,22 243:14 244:1,2, 22 245:14 246:9 247:5 253:23 257:5 260:2 263:17 269:25 272:16

**objections** 60:17 183:22

**obligations** 21:8,10,18 95:6 114:18,19 115:1

**obstructed** 83:23

**obtain** 82:5 83:22 175:10 189:11 233:1 243:20

**obtained** 101:12,18 102:8 126:10 224:16 246:25

**obtaining** 238:20,21 241:18

**occasionally** 21:12 22:21 238:15

**occur** 235:12

**occurred** 73:15 119:23 120:8 121:18 130:1 132:10 150:21,22 159:8,9 162:17, 18,19,20

**occurring** 172:2

**occurs** 57:6

**October** 16:15, 16 17:3,8 18:3

**off-site** 178:13

**offender** 77:9 79:21 82:21 83:12,17 178:4

**offenders** 92:21 95:25

**offense** 96:8 167:18

**offering** 225:6

**office** 16:19 17:4,17 18:4,7 106:1 147:3 198:4,18 200:7, 15,18 264:17 275:7

**officer** 9:18 13:2,6 17:12, 18,22 26:7 40:8 67:21,22 96:14 121:2 143:17 152:14 172:21 178:4 186:24 251:2 262:22 265:9

**officers** 114:5, 18 115:2 127:24 143:14 183:5 185:12 188:18,23 212:9 222:19 264:6,10 271:19,20 273:1,11 275:17

**offices** 200:8

**official** 114:2 270:24

**officials** 159:21 161:4 270:15 272:22 273:19,20

172:10

**oftentimes** 138:8 186:14, 25 264:24

**older** 29:25

**on-one** 265:4

**on-the-job** 207:3 213:25 214:3

**one-** 265:3

**one-page** 146:8

**ongoing** 169:7 185:3

**open** 23:13 62:10,18 216:11 250:21

**open-** 269:4

**open-ended** 268:4,7,12,19 269:4,8,17

**opened** 198:4

**opening** 250:15

**operating** 43:22,24 122:4, 8,14 123:9,13, 19 124:7,22,25 129:2 130:13, 16 131:3 153:3 160:21 161:2 166:15

**operational** 174:13

**operations** 25:3 175:1 263:1,6

**opinion** 85:23 141:25 262:9

**opportunity** 169:17,20 239:6

**opposed** 243:21

**opposite** 190:19

**option** 79:2 261:5

**options** 215:1

**orally** 69:3 243:4

**order** 32:15 42:16,25 43:21 44:11,12,22 46:3,18 48:4,13 49:12,13 50:4, 18 51:8 97:3,7, 9,10,23 100:15 101:1,2,3 103:12 107:16 113:12 114:16 125:21 144:23 145:3 146:2 151:20 152:18, 22 160:20 194:14 201:16 211:2,10 212:4, 7,11 219:7,16, 17 220:1 221:12,16 224:21 226:19 228:15 234:21 262:4 270:11, 20 271:5,9,18

**order's** 220:10

**ordered** 201:21 203:3

**orders** 29:14 30:1 33:18,19, 20 39:11,14,16 40:4 43:18 45:22 46:14 47:11,15,17 48:9 49:24 50:6,8,12 123:7,10 124:2, 3 175:23 192:11 222:2 262:12

**ordinary** 253:11

**organization** 193:8

**organized** 22:11 52:23 175:8 183:16 184:6

**oriented** 156:24

**original** 93:2 96:9 110:10,22 137:20

**originals** 111:11 179:21

**outlook** 123:16

**outward** 264:1

**overnight** 185:10

**oversight** 17:4

**owing** 272:4,10

___

**P**

**P.M.** 278:21

**pack** 167:11

**package** 133:4

**packet** 136:18 194:24

**pages** 27:2,3 89:6 107:19 175:16

**pair** 260:10,11

**paired** 68:13

**pairs** 157:14

**Palmer** 159:11, 12,14,18 160:11 173:8

**pan** 263:24

**paper** 24:9,11 32:4 167:11 175:6 237:21 251:19,23

**paperwork** 56:21 138:6,8, 11 139:20,21 174:24 273:9

**paragraph** 28:17

**parallel** 184:9, 11

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

**part** 40:3,7 62:1
65:1 69:3,23
70:1 73:10 77:6
91:11 99:22
144:18 145:16
146:17 147:17
148:2,5 149:2
163:23 169:5,6
170:13,14
171:4,6,13
172:13 174:21
186:24 191:19
201:25 202:9,
16,17 205:1
214:1 215:3,13,
17 226:24
234:4,6 236:24
244:11 260:15
264:3,10
267:10,18,19,
21 269:5

**participate**
69:12 143:8
144:1 247:2

**participated**
141:6

**parties** 9:3
10:21

**Partly** 175:9

**partner** 110:16
157:19 158:3
235:15 265:8

**partners** 68:11
156:15,18
264:22

**partnership**
157:18

**partnerships**
158:3

**pass** 165:7

**passed** 262:10

**passport**
273:9,21

**past** 13:19
36:10,13 41:3
113:24 146:16

**path** 244:19

**patrol** 20:9

**67:21,22 96:13,
14,15

**patrolman**
16:13

**pattern** 254:23

**pause** 55:24
140:1 195:5
210:5

**peek** 249:11

**pending** 15:16

**people** 41:10
74:6 90:24
121:23 140:25
157:13 188:17
201:8 215:2
218:17,19,20,
22 219:19,20,
23 223:17
230:11,16,21
236:11,17,20
258:18,22
259:12 264:3
270:8,16
271:22,25
273:4,20 276:2
277:24

**percent** 155:13
261:20

**perfect** 10:20
158:23 220:13

**performance**
120:13

**performing**
136:20

**period** 24:10
29:15,16 42:8
43:9 44:12
45:15,23,24
46:13,16,19
47:16,22 48:14
67:18 68:13
77:5,7,14 86:19
91:4,13 95:23
99:21,23
100:11,14
107:10 108:15,
20 109:2,10
110:24 113:1,2,
6 114:9 119:19
120:8 121:3,19

**123:1,14,20,22
125:2,13 129:1
130:1 132:16,
20 145:13
146:16 148:25
153:1,8 161:19
162:6,12 168:7,
11 169:2
172:14 176:8
178:10 184:6,
18 185:24
186:18 187:8,
11 188:21
198:3 200:6
211:8,19 212:3
213:19 214:20
218:7 221:4
222:5,19
223:21 224:14
229:22 238:12
259:7,11
270:10,11
273:2 274:1
275:23 276:4

**periodic** 119:2,
22

**periods** 223:17

**permanent**
177:10,14
182:3 191:20,
24 194:19,21
270:17 272:4,
10

**permitted**
245:21 246:22
262:3

**perpetrator**
80:24 83:7 84:7
86:20

**person** 63:2
66:22 71:4 74:4
77:6,8 83:16
86:5,15 90:3
91:10,23 92:2,
7,23,24 94:18
167:20 189:1
198:12 200:14,
17 201:11
216:15 220:24
221:7 225:5,11
226:12 227:2
232:6 234:6
235:3 236:7,14

**238:2,3 243:12
250:19,21
251:1 253:1,17
255:6 272:4
273:16 277:20

**person's**
184:25 256:6
270:20,23

**personal** 13:4
119:14 156:21
191:1

**personally**
25:11

**personnel**
111:23 113:3,4,
5,22

**persons** 77:19
169:17,18

**perspective**
249:16

**pertain** 174:25
175:2

**pertained**
175:7

**pertains** 175:5

**pertinent**
182:8,11

**Peter** 171:10,
18,20

**Peterson**
88:21

**phenomena**
230:25

**phenomenon**
258:1

**phone** 24:1
33:6 54:4
225:15 248:7
252:4

**phonetic** 23:1

**photo** 91:5,7,8,
9,11,13,15,22,
23 92:1,6,10
178:20 186:16

**photocopies**
197:20

**Photocopy**
107:19

**photographic**
178:2

**photographs**
181:10

**photos** 90:19,
22,23,25 178:8
179:21,24
180:6,12,25
181:1,12

**phrase** 82:24,
25

**phrasing**
229:10

**physical** 24:9
199:13 221:20
222:3,8,9

**physically**
107:6 119:12
219:23

**pick** 45:4
204:17

**picking** 204:2

**picture** 92:4

**pictures**
111:16 178:15,
16,18,22
180:20

**piece** 24:9,11
82:5 173:17
242:3

**pieces** 81:19

**pile** 128:15

**place** 43:24
51:23 71:12
106:17 121:10
122:15 151:9,
23 152:7
160:15 175:24
183:3 192:11
195:16 200:3,4
208:2 211:7
246:11 251:13
259:7,10,20
262:15 263:22
270:10,13
275:23

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**places** 176:2, 11 177:21 181:20 189:7 190:8 193:13, 17,21 196:6,7 209:18

**plaintiff** 9:7,8 10:23

**plaintiffs** 210:7

**plan** 166:3 168:22

**plane** 79:19

**plans** 21:12

**play** 71:22 274:1

**playback** 19:15 72:2 158:19

**PLAYS** 19:17 72:4

**plea** 164:7

**plenty** 100:18, 21

**plug** 158:12

**point** 32:11,12, 14 48:17,20 50:16,20 51:12, 16 60:2 66:21 85:25 87:19 97:22 98:4,10 111:20 117:21 118:2 119:24 121:1 123:18 134:10 157:9 164:8,15,20 204:7 211:12 221:22 226:18, 19 228:22 234:4,5 239:2 241:16 242:8 243:11 244:7, 24 247:8 253:7 262:7 269:18

**pointed** 100:3

**pointing** 63:2 86:25 87:13 90:13,14

**points** 138:25

**police** 11:15 12:9,13 13:5 16:9,12,14,20, 21 17:24 22:3, 7,18 25:19,21, 25 26:3 29:17, 25 31:12 34:23 39:17 40:4,8 67:19 74:14 101:17 102:7 121:2 129:4 143:13 145:24 159:22 166:2 175:13 176:11 178:3 185:9 186:6,10 188:18 189:11, 12 190:21 191:3 193:10 197:19 212:13 218:3 222:1 253:25 262:22 265:10 270:18 272:21 273:11 275:17

**policies** 30:12, 14,21 31:10,14, 19,23 39:3 41:20 42:4,7 45:1 46:20,25 47:10,21 48:15 49:16,19 51:23 71:2 72:14 116:15 122:21 123:3 124:11 160:15,19,23, 24 161:2,10 175:24 187:12 192:7 196:9 203:16 212:2, 15,18 221:4 222:5 231:13 252:17 262:15 270:10 276:21

**policy** 18:8 32:1,9,20 34:11 43:8,15,16 45:5,8,13,14, 16,17 46:2 47:8 48:1,10,14,25 49:1,5,7,10,15, 17 50:21 52:1,4 65:23 67:4,9

74:23 75:4 80:9 94:25 96:3,25 97:2 98:25 99:6,9,11,21,24 100:12,14 101:7,11,16,17, 21 102:7,22,23 103:4,12 105:14,23 106:21,24 107:12,21 115:12,19 116:20 118:12 119:7,13 120:14 123:11, 21 125:11,17, 25 126:14,21 127:1,25 128:9, 12 129:3,14,21 131:11,12,17, 25 132:4,9,15 133:13,19 135:2,20 136:8, 11,15,19,21 137:23 139:1,5, 6,10,23 141:8, 12 146:4 149:13,14,16, 18 150:4,14 151:9,13 153:3 156:3 159:5,7, 15 160:6 161:8, 11 166:23 176:1,4 192:6 203:7,14,16 211:7,13,19 213:14 214:22 221:3 223:10, 16 224:18 225:3,24 226:5, 8,15 259:7,10 262:18 263:18, 19,20 270:14 271:13,21 272:9,13,18,21, 23 273:17,19 274:7,11,16 275:6,9,12,18, 22,23 276:2,6, 20,24

**policy's** 135:3

**policy-** 156:23

**polygraph** 261:2,15 262:4,

10,11

**polygraphs** 261:5,8,10,19

**poorly** 227:9

**popular** 218:3, 4

**port** 276:21

**portion** 137:23 201:13 220:9 254:12

**portions** 253:10

**pose** 141:22 142:13

**poses** 143:9

**position** 12:17 20:2 25:9 41:15 68:19 73:15 74:6 250:24

**positions** 16:11 22:17 24:25 26:2,6,15

**positive** 97:18 215:11

**possibility** 67:2 208:14

**possibly** 37:18 80:4 99:16 123:18 157:8

**post** 150:22 172:6 248:3 274:20

**potential** 49:5 55:17 66:21 74:7 84:22 85:1,3 89:16 90:3,4 114:20 115:8,11,12,21 116:2 231:8 246:11 251:17

**potentially** 73:18 90:24 91:2 112:24 115:16 141:7 143:4 144:11 154:19 167:22 182:16

**pounce** 250:21

**pound** 177:25

**practicable** 138:13

**practical** 139:7 169:18 176:5 246:23 267:14 275:10

**practicality** 135:7

**practice** 80:9 105:18 107:12 133:13 134:13, 16,23 135:5,6 138:19,23 139:16,22 141:10 230:7 263:4,9,12,18, 21 264:1,6,21 269:8 272:25 273:6,11,22 275:11,14 276:1,3,6

**practices** 25:24 39:3 41:2 262:19,21 264:19

**practicum** 267:10 269:1

**practicums-** 268:23

**prayer** 89:2

**pre-** 172:4,6

**pre-detective** 153:4

**pre-service** 26:8 68:4 84:1 132:5 145:17 169:8,11,22 172:9 173:22, 23 174:22 213:23 214:2,7 215:3,13 219:3, 11,15 260:6 261:4 267:19, 22

**pre-training** 169:5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

preceded 33:18

precursor 100:5

predecessor 152:7

preliminary 96:11

premise 254:1, 7

prep 263:20

preparation 30:2 32:25 37:21 39:12,15 43:4 44:19 119:20 122:10 166:4

preparations 41:5,8,15

prepare 29:13 38:13 40:11 56:10 131:8 163:6

prepared 27:18,23 28:3, 8,13,18,22 29:1,5,8 40:13, 14,18,24 41:1, 11 133:14,21 178:4 183:24

preparing 33:3,6 38:15 54:13 247:2

presence 220:24

present 9:3 10:21 247:23

presented 152:5 270:22

preservation 41:20

preserve 101:12,18 102:8 116:22, 25 117:19 126:9 128:4,9

preserved

116:17 126:4, 16 127:1

pressure 220:16 221:21 222:3,6,8,9,16

prevent 15:19, 21,25 16:4

previous 14:6 36:6,11 37:15 38:7 100:6 148:11 174:16

previously 37:4 38:9 40:24 86:5,18 188:18

primarily 23:20 250:17

primary 98:5 116:15 265:11

print 175:16,17

printed 179:25

prior 24:25 25:14,15 26:15 32:3,19 34:19 36:14 37:2,7,12 38:4 39:1,7 40:12,13,14,17 41:8 67:19 123:16 126:8 145:17,18 164:20 211:13, 14 238:21 246:5

priority 263:8

prison 229:2,7, 14

privacy 251:8

privilege 31:8, 9

probable 56:20 93:11,25

problem 132:13 163:8 202:15 249:3

problematic 232:3

procedural 45:25 50:17

procedurally 45:4,12,17,21

procedure 77:18 91:7 92:9 122:4 123:13 124:8 153:4 170:6

procedures 20:9 43:22,24 48:3 77:19 122:15 123:9, 19 124:22,25 129:2 130:6,13, 16 131:3 160:21 161:2 166:15 196:10 231:13 241:25

Procedures.' 122:8

proceed 11:11 241:2

proceedings 9:1 138:16

process 52:14, 19 67:25 69:2 103:1 180:21 185:13,16 186:1,5,14,19 187:6,15,23 189:5,8 190:12 191:19 194:11, 25 197:16 200:12,22,24 201:4,7 202:9, 16,17,21,24 204:11 232:1 234:5,6 245:1 247:14

processes 270:24

processing 77:19 111:18 177:3,17 178:12

produce 107:14,23 128:17 129:6, 16 132:24 167:13 206:10 209:24 273:7

produced 30:21 31:2,10, 19 39:14,21 199:4 201:5 209:12,19

producing 185:14

product 31:4,8

production 30:18 31:13,17

program 172:22

progress 58:8, 21 59:4,15 68:24 69:2 74:24 96:19 98:7 99:4 133:21 134:5, 13,17 145:20 146:7 147:13

prohibit 226:10,15 265:3

prohibited 213:2 219:11, 13 220:10 222:3,6,16,20, 23,24 223:5,16 224:20 227:10, 15,16,21,22 228:14 229:15, 16,20,24 230:15,21 262:12 264:24

prohibition 223:13

prohibitions 221:13

prohibitive 219:17

prohibits 226:8 270:18

projection 215:16,19,23 216:17,18,24 217:20

promise 229:21 230:6

promises 220:15 229:16 230:10,14,21 231:6,16

promoted 16:23 17:1,17 18:2,11 151:17 213:23

proper 21:3 113:23 264:17

properly 69:25

property 167:18

proposal 174:5

prosecuted 164:12

prosecution 55:17 74:15 96:23 163:5 164:2,6 201:18 203:23 207:22

prosecutions 164:4

prosecutor 107:15 164:10, 15,19,22 165:15 186:20 204:6 247:4 254:12

Prosecutor's 16:19

prosecutors 23:19,22 24:4 105:1 106:10 128:18 129:6 163:5 164:3 208:4

protect 103:13

protecting 61:21 103:7

prove 60:2

provide 15:19 21:24 27:10,18, 23 28:3,8,13, 18,22 29:1,5,8 40:25 41:16 52:5 73:16 75:5

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

76:13 81:6,21
82:1 83:12
97:23 98:15
99:6 107:9
116:15 128:16,
21 133:8 142:4
148:17,20
171:21 239:20
243:7 244:15

**provided**
13:17 14:4
35:11 39:1
62:12 67:14
79:3 84:5
85:14,21
100:13,15
105:1,24 107:2
118:13 119:20,
21 121:13
126:12 127:17
130:17,23
131:4,19
161:10 166:13
168:11 169:1,4,
7 170:1,16
173:2 174:1
192:17,21,25
193:4 206:22
213:18 219:13
222:15 231:11
246:13 255:22
265:6 267:12,
17 273:20
275:20

**providing** 16:4
27:15 220:17
253:18,21

**psychological**
220:16 221:21
222:6,8,9,16

**public** 235:2,7
270:3,5

**Published**
211:16

**pull** 26:17
42:11 98:13
226:25 276:20

**pulled** 165:15
201:11

**pulling** 173:10
265:19

**punching**
199:13

**purpose** 38:6
90:25 105:7,10,
11 150:18
151:4 153:9,10,
12,14,18
209:22 270:4

**purposes**
13:18 105:9
139:21 193:5
211:18 272:6

**pursuant**
13:14 120:14
253:25

**pursue** 86:4

**pursued**
69:20,23 75:18
76:3,14 86:5
88:4 94:17

**pursuit** 88:5

**put** 10:21 51:23
64:3,4 78:6
89:8 97:14,15,
17 120:5
125:20 142:8
147:4,9,17
151:8 160:15
182:13 189:12
197:20 205:2
211:15 230:13
233:13 237:3
252:14 271:2

**putting** 13:5
29:19 76:2
82:16 109:16
111:8 120:6,25
121:5 125:17
208:13 224:19

———————

**Q**

**question**
14:14,18,21
15:3,6,7,11,16
34:18 51:5
52:24 58:24
59:7 60:10,11
61:15 64:2
72:12 75:15
76:12 78:7

79:1,14,18
81:1,16,19 82:7
83:21 86:14
88:17 94:14
97:8 102:6,10
111:8,20
112:19 120:11
124:18 148:11
151:25 155:25
157:23 179:18,
20 184:5
207:24 208:13,
21 210:3
220:23 222:14
223:23,25
224:19 225:8
231:22,23
243:25 244:2
247:12,20
250:11 252:8
254:2,8 255:2
258:11 268:12
273:3 277:1

**question's**
15:2

**questioned**
78:12 225:5
226:12

**questioning**
81:9

**questions**
14:15 15:22,25
19:20 28:16
79:18 83:3
88:14 152:23
183:25 246:3
268:4,7,19
269:4,5,8,12,
17,23 276:18
278:3,6

**queues** 126:11

**quick** 56:1
210:5 276:11

**quickly** 55:10,
11

**quirky** 182:17

**quote** 126:9
153:11

———————

**R**

**radar** 161:3

**raise** 11:6
251:24

**ran** 167:10

**random** 119:12
202:14 209:5

**range** 42:20,25

**rank** 119:11

**rapport** 245:6
246:15 249:17
265:2

**rare** 82:17
234:9

**rationalization**
215:16,19,23
216:8,9 217:19

**rationalize**
216:13

**re-** 215:4
217:18,20

**re-ask** 72:13

**re-teching**
217:15

**re-technique**
214:23 215:8,9
216:3

**reach** 68:19
207:7

**reached** 96:21

**reaching**
186:20

**react** 218:20

**read** 27:9
34:21,23 35:17,
24 37:22
106:13 122:10
130:20 133:2
152:19 189:8
197:20 278:16

**reader** 75:5,10,
16

**reading** 101:15

135:24 189:18

**reads** 202:20

**ready** 159:1
210:16 236:1
250:21

**real** 94:23
216:21 234:1
237:14 276:11

**realize** 79:20
94:23

**realized** 71:12

**reason** 57:1,18
59:19 74:12
157:10 252:3
262:22 270:6

**reasonable**
232:14 236:21
242:21

**reasons** 53:1,
10,11 54:5
60:5,14 210:12
230:14,20

**reassigned**
18:4

**recall** 22:1
25:17 35:14
55:5,12 62:16
155:16 156:2
158:2 184:22
219:4 224:9
267:25 276:21,
23

**receive** 25:4
180:25

**received** 66:24
113:6 151:15,
17 197:19
213:20,22,25
214:9

**receiving**
133:4 136:17
209:7

**recent** 37:3

**recently** 37:9
146:3,13

**recognize**
240:19



**Kentuckiana Reporters**
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

**502.589.2273 Phone**
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

The Deposition of COMMANDER ERIC WINSTROM, taken on December 17, 2021
30(b)(6)                                                                    306

recollection
21:15 56:22

record 9:2
10:5,16 12:5
42:22 56:4,5,6
60:22 61:3,9
72:13 101:12,
17,22,25 102:7,
11 105:11
116:22,25
117:4 122:6
126:10 140:16,
17,18 156:10
175:20,21
176:20 177:6
179:11 184:21
186:9 190:3
191:7 241:10,
11,12 248:6
276:14,15,16
278:20

record's 96:10

recorded
96:11 238:8,11
253:10

recording
238:13,17

records 22:11
51:9 74:14
105:15,25
106:3 175:5,7,
8,10 176:22,23
177:9 181:23,
24 182:3
187:20 188:15
189:11,14
190:1,3 191:4
193:14,17

recruit 21:4
67:17,21

recruits 16:21

red 143:15,16,
18 251:24

refer 11:17,19
49:5 110:5
114:1

reference
50:22 51:18,20
128:23 134:7
148:11 170:10

215:7 217:14
251:4 270:15
274:11

referenced
21:6 173:4
216:3 219:2
224:13 266:14

references
166:25 172:21
224:4

referencing
179:2 220:1

referred
108:16,22
109:19 110:25
112:5,15,25
113:25 114:9
177:11,12

referring 32:18
61:14,23
102:11 111:7
112:13 149:20
185:6 209:4
220:2,9 221:2
266:17 271:14
276:24

refers 49:22
220:17 225:10,
14

refile 199:22

reflect 102:1
121:18

reflecting
120:13,16
121:13

reform 18:5

refresh 56:22

refused 239:20
240:4

regard 21:25
23:18 27:19,24
28:4,9,14,20,23
29:3,6,9 32:10
40:15 41:4,9,21
42:2,8 44:2
45:18 46:20,25
47:17,21 48:10
49:1,7,10 51:24
65:5 76:12

94:17 95:16
96:1,4 97:1
98:14 110:7
111:9 116:11
119:6 120:21
121:4 124:19
125:1,11 127:7,
13 133:17
135:4 138:20
139:1 151:12
159:18 161:14
166:14 168:2
169:10 173:2
211:8,24 212:2,
20 213:19
223:13 231:3
247:16 262:14
266:11 271:14
277:1

regular 25:3
135:8 190:8,22
196:6 202:7

regularly
164:3

regulation
208:15

regulations
34:1

related 14:5
21:24 22:24
34:5 72:22 87:5
111:11,22
136:22 137:12
139:12 159:20
160:7,16
161:12 176:1,9,
14,18 181:15
184:12,21
190:17 195:14
209:11 241:15
244:10 252:8

relating 183:6

relation 269:21

relationship
24:13

relevance 66:7

relevancy
78:25

relevant 24:10
29:15,16 30:12

39:17,22 41:23
62:24 63:3,5,
11,17,19 64:4,
9,20,21,24
65:3,7,16,19,23
66:1,3,4,9,19
67:9,11,14
68:21 70:22
71:1,9,14
72:18,23 73:3,
7,18 75:21
76:10,19 77:5,
14 78:16,21
79:6,9,14,22
80:4,7 82:10,
11,14,18 84:10,
20 85:4,9,11,24
86:1,8,25 87:4,
7,10,14,20,25
88:12 89:5,13
90:10,11 92:12
98:2 99:5,7,8,9
100:16,23,24
104:8,11,13
115:14,16,22
116:4,23,25
117:5 131:18
132:1 136:10
148:18 156:21
171:5 194:4
196:11 204:13
214:19 237:25
253:10 255:24
256:5,17

reliable
261:19,20

rely 157:1
189:20

remain 128:5

remained
187:13,15

remains 45:13

remember
21:9 33:20
35:2,19,20
36:16 37:11
38:3 39:6 56:13
62:17 124:14
157:16

renamed
45:24

repeat 37:16
60:10 157:23
197:3 232:3

rephrase 15:8
57:21

replaced
43:17,21

report 48:21
54:2 55:7,8
89:6,8 93:24
95:1,2,4,10,17,
21,22,24 96:8,
15,16,23 97:6,
15,17,20 98:5,
21,23 99:3
108:5 110:11
118:8 121:8
131:13 132:4,7
133:1,11,13
134:8 135:8,9
136:22 137:12,
20,21 139:3
141:5,23 142:4,
9,24 143:7,10,
25 144:7,13,14
145:9,10,12
146:8 147:20
152:11,12
161:18,22
165:12 167:13
168:2,16,22
169:10,15,18,
20,21 175:7
176:25 177:3,
17 181:9,19,22
182:4 183:2
184:25 187:2
189:24 190:6,7
191:10,13
192:1 196:4
201:18 235:24
237:2,17,24
243:6 248:2
249:6 256:4
267:16 268:25
269:3

reported 98:3
142:12 161:20,
23,25 162:2
239:10 240:11
243:22

reporter 9:2
10:4,14,18

11:5,10 14:17
19:5,12,17
56:4,6 71:16,22
72:1,4,5,10
140:15,18
154:17,25
155:5,7 157:22
158:10,15,17,
23 165:23
173:12 175:19
179:7,14 195:6
197:2,8 238:16
239:7 240:7,15,
16,18,23 241:1,
9,12 248:5,10,
12 252:1,6
260:18,21,24
276:13,16
278:8,10,14,19

**reporting** 98:5
135:17 137:15
170:22 173:21

**reports** 54:13,
23 56:9 69:7
93:5,24 95:6,13
96:2,3,5,13,19
97:2,11,25
98:7,8,16 99:4,
14 100:1
104:20 108:14
120:16,20
121:3 131:9
132:10,17,20
133:5,18,20,21
134:6,14,17
136:18,22
137:24 139:11,
12 140:21,22,
23,24 141:16,
19,20 142:5
144:21,22
145:4,5,20
147:6,11,13,14
148:2,15 154:4,
7 156:7,8
166:20,23
175:13 177:2
181:15 191:16
194:17 195:14,
22 199:11
253:6

**repository**
104:20 110:10
113:18

**request** 23:12
24:2,10,11
181:12 186:11,
15 187:4 190:2
194:8 195:13,
17 197:11
203:21 206:1

**requested**
19:17 72:4
187:3 191:8
195:1 206:11

**requester**
186:13

**requesting**
195:2

**requests**
23:22,25 24:1,8
25:4,8,12
196:18

**require** 54:14
66:4,18

**required**
52:18,20,22,23
61:15,17 63:17
64:5,19 65:2
67:8 79:9,11
80:22 85:23
97:13 99:1
101:8,12
115:15 116:21
128:4,8 129:11
130:6 131:13
139:11,20,21
143:21 146:20
148:6 151:9
152:17 165:10,
12 173:5
186:10 241:25
262:23

**requirement**
60:22 61:2,8
103:14 119:8
132:22 135:19
136:16 249:19

**requirements**
49:25 69:24
116:11 128:3
135:17 161:13

**requires** 49:2
98:2,20 105:14,
24 137:23

183:2 202:9

**Requiring**
185:7

**rescinded**
43:14,17

**research** 18:8
29:23 196:12

**reserving**
278:18

**resident**
272:15

**resolution**
174:6,12

**resource**
30:16

**resources**
113:4

**respect** 11:19,
25 28:17

**respected**
231:7

**respectful**
11:19

**responded**
200:25

**responding**
192:4,7,10
193:1,5 202:24
206:9,17,23
207:7

**response** 33:7
106:22 107:3,
23 129:17
155:1 186:9
201:5 209:12,
25 227:23
228:6 229:24
230:1

**responses**
272:22

**responsibilitie
s** 69:18 127:13,
18,19,23 131:8
161:14

**responsibility**
21:11 161:17
203:5 207:14

247:15,18
277:9

**responsible**
188:9 189:2
198:6,8,9
199:6,8 206:23

**responsive**
32:15,18
209:25

**rest** 166:18

**restart** 10:5

**result** 104:12
135:21 163:10

**resulted** 91:16

**results** 137:15
235:16 237:19
262:4

**retail** 55:1
134:3 167:10
192:1

**retained**
114:21 146:6
147:9 160:25

**retaining**
147:13 151:9,
18

**retention**
118:19,21
177:10,14
191:21,24
194:5,19,21

**return** 25:5
194:22

**returnable**
186:13

**returned**
16:16,20 17:3

**review** 23:17
33:11 34:2,4,8,
9,19 35:3 36:1,
3 37:3,8 40:3
44:18,21 56:20,
22 69:7 135:9,
12 153:11
235:22,23
238:23,25
241:18 248:3
249:4,5 258:7

259:4

**reviewed**
29:14,15 31:10
33:13,14,15,16,
17,25 35:9,12,
21 36:6,9,12,18
37:2,4,9,13,19,
24 38:4,7,11,15
39:11,15,21
41:14 43:4
44:22 149:15
166:4 171:3

**reviewing** 70:5

**revise** 44:7

**revised** 122:22
146:2

**revising**
152:21

**revision**
124:12,23
152:21

**reword** 57:25

**Reyes** 9:7
10:23 43:1
88:13 166:1
168:20 169:24
170:24 171:7
172:18 173:15
211:1 267:4

**RFC** 43:1 122:9
125:7 129:24
131:7 166:1
168:20 169:24
170:24 171:7
172:18 173:15
267:4 271:4

**rights** 61:22,
23,24 103:1,7,
13 220:6 221:8
223:3,7,9 227:4
231:7

**righty** 158:24

**risk** 141:22
142:13 143:12
226:16 231:11

**risks** 143:9

**Rivera** 34:25
35:1,8

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

road 60:2,13

roadmap
171:22

robbed 216:20

robberies
108:9 137:9

robbers
260:11

robbery 16:25
17:5 94:11,12
135:8 267:16

role 24:19,20
31:1,12 62:2
106:19 130:10
157:15 200:14
238:18 241:16
247:10,20,21,
22 249:19
277:2,3

roll 26:12 146:1
152:6,9,17,23

rolled 130:22

room 47:5
78:11,20 79:4,
13,24 245:8
246:4 247:3,9
250:19 251:1,
20 252:3,13
253:15 277:14,
17

rooms 250:5,7,
8,12 251:6
277:25

Rosen 9:10,24
10:2,11 13:12
27:13,21 28:1,
6,11,15 30:22
31:3,15 34:12
35:13 36:15,22,
25 38:2,12,18
39:5,9,25 40:16
42:19 43:11,19
44:14 45:2,10,
20 50:15,24
51:11 52:21
55:23 56:3,15
57:16 58:23
59:6,17 60:3,9,
17,25 61:5,11
62:22 63:4,13

64:18,25 65:11
66:11 69:6,15,
21 70:10 72:20
74:20,25 75:8,
14,19 76:17,24
77:15 78:1,23
79:8,16 80:15
81:7 87:1,9,22
88:8 89:20
90:6,17,21 91:3
92:18 93:21
94:6,19 103:25
108:18,23
112:6,21
115:18 116:7
117:20 118:5,9
119:16 121:24
123:15 128:2
129:8 136:12
138:2 139:18,
24 140:7
141:18 142:1,
17 143:11
144:2,10,24
146:23 148:24
150:19 152:3
155:19 156:19
157:20 158:4,9,
11,14,25 159:3
161:6 162:22
163:13,20
164:5,24
165:20 166:17
169:13 179:1,
18 181:18
182:23 183:10,
23 184:20
185:21 186:21
190:18 193:7
194:7 195:8,18,
24 199:20
202:2 206:5
207:23 208:10,
24 209:14,20
217:1 225:7
226:4,18,23
227:7 240:21
241:3,6,20
244:6,13,22
246:9 247:5
248:5,15,21
256:25 257:5
260:21 262:7
263:17 265:21,
25 266:25
269:25 272:16

275:2 278:14,
15,17

routine 197:22
202:22

row 257:19,21

RP 211:1

RSD 220:3

rule 13:15,18
26:22 27:1,14
64:3 125:2
142:18 165:10
183:1 201:15

ruled 164:22
165:5

rules 14:11
34:1 252:17

rumors 262:4

run 235:15,16
242:23

running
110:21

Rutgers 20:20

_____

S

safe 185:11

safety 245:5
250:15,18
251:1,2 264:25
265:1,9,11

Saloche 43:1

sample 119:12

satisfy 119:8

scenario 74:2
80:1,5 82:10
85:12 92:11,25
94:21 183:14
255:4

scene 66:14
95:16,19
111:18 132:23
133:11,13,17
177:2,17
179:21 180:25
235:24

scenes 67:24,
25

school 20:12,
13,15,23
119:17 260:7

scientific
207:25

scope 84:9
155:20 156:20
157:20 158:4
164:25 182:24
183:10,23
227:2 244:8
262:8

screen 26:20
33:15 42:12,15,
23 122:3
165:18

scroll 97:5,12
136:3 174:11

scrolling 27:3

seared 57:10

season 265:10

seasoned
260:12

section 17:16
44:16 48:2
50:17 116:10
118:21,23,24
119:7 120:14
129:25 131:6
137:14 174:5
178:1,21
188:15 211:11
220:4 221:2
227:1,2 244:12
266:3,9,16
274:7,10
275:12,18

sections 45:14
266:20

security 251:1

seek 120:10
263:23

seeking 85:4
93:15 238:22

selection
122:9 125:7

self- 208:14

self-
explanatory
170:18

self-regulating
208:2,5,13

self-respect
217:5

send 106:18
107:19 128:22
181:22 186:9,
11 189:12
190:6,8,9 191:3
195:12,17,20,
23 196:5,8
197:13,14,15,
21 200:20
201:22 202:19
204:3 238:25

sending 196:2,
3

sends 186:12
202:21

senior 68:14
161:4

sense 143:3
228:7 237:4

sentence
117:24 214:10

separate 109:4
183:2 184:8

sequence
108:5,6,12
109:2,6 113:10

sequential
108:11

sergeant 17:1,
4,8,11 25:9,16
135:12,14
152:12,13,20
200:9,18
249:10,14,15,
20 250:3

sergeants
58:7,19,21
59:2,14 68:22
69:11,19 165:7
188:14 277:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

series 104:15
149:11,12
174:2

served 188:18

server 187:23

service 22:6,
19 23:6,20,24
24:3,22,25
25:15 151:16,
19 172:4,7
175:3 188:4
264:3

services 162:3
188:6

serving 29:24
200:13

session 14:15
174:8

sessions
146:22 252:12,
14

set 109:19
116:15 133:10
161:1 184:3
224:13,20,23,
24 231:13
232:1,12 269:2

sets 192:6
212:1 224:9

setting 160:18

sex 17:14
238:8

sexual 26:9

share 42:20
143:19 232:12,
16,21 234:24
235:1,3,6
242:16 245:21
246:5,17
264:17

shared 21:10
23:2

shares 242:12

sharing 42:22
143:14 243:17

sheet 38:13,16,
25 105:4,8,15,

24 106:4
199:14 204:23

sheets 204:21
205:15

Sheriff's 16:18

shied 157:2,4

shoot 140:12
217:10

shooting
167:22

short 34:13
68:13 229:22
241:4 256:14

shortly 88:24

shot 216:20
217:9,11
246:21

show 11:25
42:23 92:3
171:10,18,20
210:25 239:8

showed 231:6

showing 42:15
43:17 92:6,10
102:2 165:25
168:19 169:23
170:23 172:17
173:14 267:2
271:3

shown 90:19,
25 91:9,18,22

shows 242:11

sibling 170:20

sic 160:20
266:14

side 44:15
45:11 46:1
109:16

sign 32:13
135:10 278:16

signature
278:18

signed 149:21,
22,23

similar 45:21

168:14 236:20

similarly 15:10
146:12 229:5

simple 54:25
55:20 68:16
187:23

simpler 190:10

simply 61:14
115:20 201:14
216:18

single 70:13
91:22,23 92:6
177:22

sir 10:19,20
11:10,14,20
12:6 13:13
19:12 25:18
26:19 27:4,10,
18 28:18 29:12
31:9 33:8 40:2
42:12 43:4
47:20 51:7 52:8
55:15 71:22
72:1,5 81:1
155:2 158:17
159:5 166:3
168:23 169:25
172:23 173:12
197:8 211:4
241:1 251:3
252:6 271:10

sit 153:16
200:9 218:22
225:15

sitting 35:16
41:13 100:9
155:15 156:1
199:18,24,25
200:2,4

situation 76:9
88:21 203:1
229:4 265:17

SIU 25:9

skip 171:6

skipped
204:24

slower 180:21

SLP 121:21

small 145:25
194:24

software 23:1

Solache 9:9
10:25 88:13
166:1 168:20
169:24 170:24
171:7 172:18
173:15

solemnly 11:6

solve 75:7
96:17

solved 85:3

solving 59:22

someone's
73:21

someplace
110:14 256:17

something's
24:12 208:6

SOP 44:2,5,18
47:3 51:13 97:3
98:13 99:16,18,
19 125:20
126:14 127:19
128:5 212:5
227:14 265:19
266:10,20

SOPS 33:16,19
43:13,20 46:11,
14,17 47:11
51:21 52:4
97:19 98:10
100:3,7,8,18
166:25 167:3
211:12,23
219:8 266:15

sort 24:14 27:3
76:2 135:12
153:4 169:6
171:21,22
172:8 190:15
205:22 207:1,
25 216:24
218:17 229:20,
23 246:2
247:13 251:1
252:12 257:12
260:12 273:9

sorts 68:9
229:22

sounded 54:15

sounds 71:8
84:10 224:2
228:25 229:10,
14

sources
117:11 222:15

space 63:20
64:8 264:17

Spanish
264:13

speak 29:18
41:10 73:8
109:5 161:7

speakers
258:24 259:12,
17,21 262:15
264:13 270:8

speaking 23:8
68:25 74:10
82:2,22,25
84:7,10,13,15,
23 88:2,5 89:18
93:19 94:3,15
109:3 143:6
179:5,6 180:6
182:13 205:24
206:6,7 235:2,7
242:23 269:14
270:5

special 16:25
17:6,12,13
25:2,16 26:7,11
33:18,20 42:16,
24 43:18,21
44:11,22 46:3,
11,14 47:11
48:4,13 49:12
50:7,11 51:8
97:3,10,23
100:15 101:3
114:16 123:6,7,
10 124:3
125:21 129:1
149:17 151:20
160:20 193:12
271:5,18

specialized

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

182:5

**specific** 32:19
34:17 42:4
43:15 44:16
46:4,15 48:22
51:19 54:15
60:20 62:15
83:11,22 88:12
89:23 97:19,23
98:15 100:20,
24 103:5 106:8
107:13 111:9
115:13 117:16
118:13 128:16,
19,21 132:4
148:12 161:10,
13 173:16
175:12 189:2
190:9,11
197:14 203:18
209:1 212:12,
16 215:14,15
221:13 224:4,
12 232:9
247:20 249:19
253:8 265:17
269:12 270:4
276:8

**specifically**
21:9 44:2 61:13
91:5 97:14
98:8,23 101:16
107:19 123:12,
21 125:15
131:2 183:11
195:1 207:18
217:18 219:22
225:10,14
259:12 270:1

**specifics**
71:14 87:24
97:16 154:12
165:16 178:6
256:20 258:6

**speculate**
156:11

**speculation**
164:25 208:11

**spell** 12:5

**spelled** 100:25

**spend** 16:7
33:5 89:5

225:11 229:13

**spending**
155:22

**spent** 33:3
94:22

**split** 110:2
147:2

**spoke** 29:21
31:18,22 72:15,
21 73:1 225:22

**spoken** 263:1

**spot** 207:2

**staff** 166:20,23

**stage** 196:23

**stamp** 166:1
173:15

**stamped** 122:8
211:1

**stand** 39:7

**standard**
43:22,24 122:4,
14 123:8,13,19
124:7,22,25
129:1 130:13,
16 131:3 153:3
160:20 161:1
166:15

**standing** 28:16
73:3,6,21,23
74:3,4 122:8
123:18

**staring** 251:17

**start** 77:2 91:8
138:16 187:17,
18 230:6
260:10

**started** 10:8
68:15 82:6
92:22 188:1
260:5

**starting** 12:1
150:23 171:7
269:18 274:15

**starts** 67:17
217:21 220:4

**state** 9:4 10:16
12:5 83:4 102:6
106:5 181:7
238:15 241:17,
23 245:1,10
272:5,11

**state's** 9:20
11:3 24:12,17
186:14 187:3
238:19 239:3,
12,16,17,19
240:2,8,9
242:11,14,17,
22,25 243:10,
18,19 244:4,14
245:7,16,23
246:1,4,14
247:25 252:24,
25

**stated** 48:1
72:21 125:16

**statement**
70:11 84:5
85:15 89:25
179:11 217:21
220:13,19,23
224:8,17
233:22,24
234:14,23
235:13 236:7,
18 239:3,4,5,
10,15,20,24
240:3,4,9,11
241:19 242:10,
19 243:13
244:5 245:15
247:1,3,12
255:15 256:4

**statements**
80:22 85:7
225:6 233:15,
16,17 236:19,
23,25 238:20
243:20,21,22,
23 247:7
252:22 266:4

**states** 105:25
106:13 226:12
239:22 273:13

**statistically**
88:20,22

**status** 59:12

247:24 249:24
250:10 270:20
273:2,12
277:11

**statutes** 21:7

**stay** 59:15
191:25 252:21

**stayed** 213:14

**stays** 161:9

**stemmed**
159:8

**step** 45:25
70:13 83:14
136:9 144:15
192:3 235:11
236:22 265:12
273:10

**stepped** 66:16

**stepping**
247:11

**steps** 69:13
70:2,3,8,18,22
74:19 75:6
93:20,25 94:4,
16 96:14,20,24
135:21 137:25
141:16 234:11
235:11,14
236:8

**stick** 66:3
154:8 277:8

**stipulated**
10:24,25 11:1,
2,4

**stop** 10:8 234:2

**store** 216:20
268:13

**stored** 178:14,
15,17

**stories** 256:23

**story** 238:10
256:7,8,9,11,18
257:2

**straight** 20:23
152:19,20

**straightforwar
d** 235:21

**stranger** 88:25

**street** 170:25
171:8 187:24

**strictly** 119:1

**strike** 12:25
22:5 24:18,20
30:19,20 32:8,
19 36:2 40:2
48:13 51:22
53:10 56:25
63:8 69:1 83:4
84:4 90:13
91:9,21 92:14
93:7 97:9
100:13 101:2
102:23 103:4
104:14 106:25
124:20 127:17
128:15 130:15
131:1,12 149:2
150:16 152:25
153:1 157:16,
17 161:11
166:23 168:8
175:24 179:20
184:10 185:13
206:16 213:5,
13 219:1 225:2
227:19 230:13
250:4 258:12
259:6 275:11

**strong** 217:21

**struggling**
92:10 205:24

**stuck** 56:18

**study** 34:16

**stuff** 111:18,25
137:1 170:20
178:5 219:21
234:19 235:22
248:20

**style** 215:1
218:24

**styles** 218:20

**stylistic**
218:15

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606


KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

subject 22:2
41:23 42:4
48:24 50:20
60:24 61:4,10
62:8 65:5 66:25
67:10 77:11
97:2,7,17 98:9
104:8 118:22
119:3,23
123:23 124:15
132:4 138:17
140:21 211:10
213:16 257:24
258:5,8 259:19
261:13 265:5
266:16 271:5
276:19

subjects 21:1
50:6 51:13
124:5

submit 118:14
133:3,20 134:5
135:13 136:16,
21 137:2,5,19,
24 139:11

submitted
108:4 134:18
135:23 137:11
139:3

subordinate
57:23 247:23

subordinate's
70:5

subordinates
26:12 54:20
58:17 247:19

subpoena
22:6,11,18
23:5,15,20,23
24:2,3,8,16,22,
25 25:4,5,12,15
107:4,6,7,8,23
129:10,11,12,
14 138:17
175:3,8,12
186:5,6,7,8,11,
12 187:18,19,
25 188:4,5,6,
10,23 189:2,9,
10,14,18,25
190:10,11
191:3,5,6,8

192:4,9,10,17,
21,25 193:5,13,
22 194:4,6,7,
12,14,16,17,18,
20,25 195:12,
13,17,19,22
196:6,16,18,24
197:5,13,14,15,
16,19,20,21,24
199:16 200:13,
20 201:6,15,17,
20,24 202:19,
20 203:2,10,12,
19,21 204:14
205:19,20
206:12,16
207:11,13,18
209:6,25

subpoenas
22:24 23:18
106:23 186:19
190:15,16
192:7 193:1,6
194:9 198:9
199:7 200:24
202:25 203:6
205:17 206:10,
18,24 207:7
209:13

subsequent
52:3 97:3
151:12 153:3
172:3,4 218:25
234:11 236:8
245:22 255:16

subsequently
38:11 160:20
205:19 214:3
243:19 257:8,
11

substance
44:8 77:22
147:10

substantive
39:2 44:10 45:4
124:10 126:23
128:11 131:13,
17,20 136:10
142:11 253:21

substantively
44:25

sufficiently

251:23

suggested
72:23

suggestion
220:15

suggestive
92:8

suited 261:12

Sullivan 36:4,
18

Sullivan's
36:5,9,13

summary
96:11 238:10
269:15,16

superintenden
t 17:19,24
149:19,21
159:25 160:5,
10,14 161:3
162:1,3

superintenden
ts 161:8

supervise
53:8 58:2,17
249:8,9

supervised
54:11 119:10
154:19 155:16
188:14

supervising
58:13,15 68:22

supervisor
26:11 34:15
53:8 57:22 58:1
69:24 70:4
135:9 136:17
137:20 152:12
156:6 158:2
199:11 200:10
249:20,23

supervisor's
69:16 200:15

supervisors
52:6 53:5 57:20
58:8,21 59:2,4,
15 69:11,12,19
118:15 121:14

127:24 165:8
247:11,15,18
249:4 277:2,5,
7,24

supervisory
54:11

supplemental
98:23 132:20
169:20,21
249:6

supplementar
y 55:8 93:24
95:1,2,4,6,13,
17,22 96:2,3,5,
13,15 97:1,6,
11,15,17,20,25
98:5,8,16 99:3,
14 100:1 118:8
131:9 132:4,7,
10,17 133:1,20
136:21 137:12,
20,24 139:12
140:21,22,23,
24 141:4,23
144:12,14,21,
22 145:5 148:2,
15 168:2,22
169:10,15
177:2 253:5

supporting
241:17 244:4

supports
60:23 61:3

suppose 64:22
175:4 194:10,
11,22 246:23

supposed
96:4 97:11,24
120:3 144:22
145:2 167:4
191:20 202:17
232:24 233:7,8

surprise 75:25

surprised 80:5
250:20

surrounding
273:19

surveillance
228:2,3,4

susceptibility
258:3,12

susceptible
226:2 258:14,
19,25

Susler 9:8
10:1,25 248:17
278:4,5

suspect 60:24
61:4,10 66:21
67:5 76:22
77:23 82:1,3
84:14,15,16,20,
22 85:3,21
86:4,8,9,16,19,
23,25 87:6,13,
20 88:3,4,5
89:10,16,17
90:3 93:9
100:2,20 104:2,
6,8,10,11,13
167:18 233:16
234:23 237:10
239:5 242:3,11,
18 245:23
246:6 247:4
251:14,16
261:17,23,24

suspects
21:25 32:21
80:13 81:6,21
82:8 85:1,7
90:14,23 92:16,
21 103:22
212:3 231:20
256:23 264:21
266:21 268:2

suspended
165:5

Swami- 135:14

Swaminathan
9:6,22,25 10:4,
7,12,23 11:13
19:9,18 30:24
31:6 36:24 37:1
42:21 43:3
51:2,6 55:25
56:7 71:19,25
72:6,11 81:12,
14 99:17,20
102:3,4,16,21
104:2,4 112:22



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

**talk** 49:20 50:8,
12 51:3,13
145:11 170:19
181:8 205:11
218:19,23
254:24,25
265:2,14

**teams** 183:14

**technical**
182:15

**technicality**
165:14

**technically**
273:4

**technique**
215:5 216:1,7
217:7,19,21,24
247:14 261:3
268:19

**terminology**
115:1

**terms** 45:7
51:22 95:7
96:25 112:9,12
116:10 117:18
124:10 126:21,
25 127:22
128:7 134:24
143:9 147:16
184:2 185:14
189:21 208:15
211:17 212:22
213:1,17
221:13 237:7
238:20 239:9
241:16 243:3
244:4 247:11
249:18 250:25
253:1,2 263:12
264:19 268:1
270:7 275:16

**tests** 261:2

**text** 10:1

**theft** 55:1 134:3
167:10 192:1

**theme** 45:5
62:17 270:14,
21

**Theoretically**
273:18

**theories** 93:3

**there'd** 177:18

**Theresa** 9:12

**thing** 19:9,11
55:20 70:14
71:23 129:9
135:25 137:9
139:9 142:23
147:23 180:1,5
191:4 197:22
198:10 199:1
202:4,13
205:22 216:22
217:8 218:15
219:24 225:16
229:20 232:14
236:21 242:21,
24 246:18
268:2 269:10

**140:**11,19
148:25 149:1
150:23 151:2
155:3,9 157:21,
24 158:13,15,
22 159:1,4
165:2,21,24
166:21 173:10,
13 175:15,22
179:13,17,19
185:20,23
195:7,10 197:1,
10 210:9,14,16,
19,21,22
226:21,25
227:17 241:5,7,
13 244:10,17
245:11 248:7,
11,19,22,24
252:5,7 254:3,
7,11,16,22
255:3 260:25
265:23 266:1
267:2,8 271:1,8
276:17 278:2,7,
9,12

**swear** 11:6

**sworn** 188:13,
23 262:22

**system** 50:14
67:25 77:7
109:4 110:2
162:8 185:15
186:3,25 187:8
208:2,17,23

**T**

**table** 105:13
205:6,10

**tacked** 192:13

**takes** 96:14

**taking** 14:17
15:20 55:4,8
125:12,15
142:19,22
145:15 156:3
157:3,5 188:10
234:12 237:17,
18 244:19
246:11 265:13

**talked** 70:24
116:21 118:3
125:16 176:16
218:19 243:2
257:25 263:19
276:21,22

**talking** 59:9
76:25 84:25
85:1,10 91:5
92:11,22 94:7
95:3 108:25
110:1,13 135:8,
25 150:19,20,
22 158:6 159:5
165:17 180:15
183:16 185:19
187:12 193:19
196:11 207:25
217:23 220:20
222:13 226:20
234:25 236:18
238:1 244:18
252:24 254:11,
13 263:20
272:14 274:10

**talks** 130:9
171:4,7 255:5
272:23 274:7

**task** 207:4

**taught** 16:20
20:8,9,25
21:12,18 22:1,2
169:16,19
214:21,22
215:12,17
219:2,17
261:20 268:20
273:11

**teach** 21:2,8,21
173:21

**teaching** 20:2,
5 21:9,10,24
167:23 171:22

**team** 264:4,14

**techniques**
214:20,24
215:10,12,15
216:2,5 217:12
219:1,9,11,14,
18 220:11
221:14 269:6

**television** 62:6

**telling** 57:23
73:25 216:12
217:11 218:21
225:12 228:21,
25 256:8
261:22

**tells** 64:10
126:19

**ten** 89:5 132:21
133:2,3,8,10
135:23 136:11,
17,20,25 137:1,
3,10,18,24
138:7 139:2,13
257:18,21

**ten-day** 133:1
136:16

**tend** 98:19
227:23

**tens** 273:3,24

**term** 69:22
112:10 113:23
114:11,14
131:16,20
167:15

**termination**
113:10

**test** 223:4
261:15 262:4

**testified** 36:23
38:10 99:15
160:11 277:7

**testify** 13:14
14:2 41:1 56:13
57:11,15 163:7
164:17 262:24

**testifying** 14:3
39:18,23
123:23 124:17
164:20

**testimony**
11:7 13:17 14:4
15:20 16:4
19:17 27:11,16,
19,23 28:3,8,
13,19,22 29:2,
5,8 35:11,24
36:11,13,18
37:4,14 38:1,5,
7,11,15,16,19
39:1,2,7 40:2,6,
17,19,25 41:16
56:10 63:14
72:4 76:18
123:16

**testing** 261:8

**things** 45:22
50:1 54:3 62:13
70:4,15 84:2
111:17 112:17
149:12 152:15
157:12 167:17
180:4 204:24
205:8,14,16
214:14,15
228:10 229:22,
23 230:9
231:11 232:24
235:12 243:13
247:25 269:20

**thinking** 99:17
155:4 182:23
224:1,2

**thinks** 10:7

**thought** 19:10
35:7 55:1,12
71:12 75:23,25

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

78:19 89:1,6
92:22 124:6
184:24 218:4
238:3

**thousands**
197:23 208:3
273:3,24,25

**threat** 221:1
223:8 228:9,14,
19,22,23,25
229:3,7,10,11,
14 230:6

**threaten**
219:20 220:25

**threatened**
221:7

**threatening**
222:12

**threats** 220:18,
19 221:20
222:17,20
223:8 230:10,
15,20 231:6,15

**three-** 147:19

**three-hour**
147:1

**throw** 113:7

**time** 12:2 16:7,
17 17:24 18:19,
24 20:3 21:14
22:3,25 24:10
29:15,16 32:3,
12 33:16,25
35:6 38:9
45:13,23,25
46:16 53:15
58:12 67:18,22
68:5,19 73:10
77:5,7 79:19
86:19 90:9,19
91:4,13 95:19,
23 98:6 107:10,
24 109:2,10,23,
24 114:9 119:9,
17,25 121:1,10
132:20 134:17
138:10 139:20
140:6,8 143:14
146:12,15
149:13 152:13

155:22 157:9,
17 158:1,7,18,
19 161:19
162:4,5,12
164:8,20 168:7
174:24 175:6
178:10 179:5,6
180:4,21
183:17 184:7,
18 188:7 197:3
198:3 200:6
204:7 214:19
218:7 222:5
224:10,13,14,
24 228:22
229:22 234:1
237:14 238:14
239:2 241:24
248:10 249:3
253:14 254:25
255:6,23 256:7
262:21 270:11
273:2,6,25
278:13

**timelines**
224:5

**times** 12:23
15:1 17:6 33:1
37:13 54:9
55:2,5 80:18,19
134:9 138:11
142:3,6 157:11,
14 214:19
238:9 240:19
252:11 257:18,
21 269:11

**timing** 180:3

**tiny** 238:10

**tip** 63:20,24

**tips** 90:2,9,11,
13,14

**title** 27:1 42:24
125:8 136:4
168:21 169:25
170:25 172:19
271:5

**titled** 170:24
211:2

**today** 12:2
13:13 14:3
15:20 16:5

27:11,19 28:19
29:2 35:16
39:18,23 40:2,6
41:13 57:11
60:13 98:12
100:9 124:17
138:11,24
153:14,16
155:15 156:1
159:14 188:5
270:19

**today's** 27:4
29:13 32:25
39:12,15 43:5
44:19 122:10
166:4

**toilet** 167:11

**told** 31:25
142:23 146:1
150:17 162:24
163:21,22,23
191:20 246:14,
18 277:15

**tonight** 229:20

**tool** 53:7 58:16,
20 59:3 153:25
154:3,6 170:9,
14,21 261:6,12,
16,21 269:5
272:19,21

**top** 35:14
159:21 166:2
174:11 219:4
223:25

**topic** 27:9,11,
20,24 28:4,9,
14,20,23 29:3,
6,9 40:22,23
41:5 44:9
149:17 210:23

**topics** 14:3,5,6
27:9,10 39:18,
23 40:12,15,23,
24 41:4,6,9,17
112:5,6 124:19,
20 125:1
149:16 156:22
159:14

**total** 33:2 37:13
135:13

**totally** 85:15
112:20

**touch** 48:19
49:16 50:6
175:4

**touches** 48:22

**towed** 177:25

**track** 69:2
140:9,11 232:8
242:4 277:24

**tracking** 68:23
111:23

**trading** 150:6
159:6

**traffic** 190:5

**train** 26:3,6,14
93:3 124:6
149:13

**trained** 26:8,12
57:13,17 59:13
62:1,5,8,19,24
70:17,21,23
72:14 74:17
75:1 80:12,21
81:3,5,16,20,25
82:4,7,9 83:4,5,
8,15,20 84:12,
21 85:6,25
89:14,18 97:20
130:12,15,24
131:2,5,22,24
141:15 145:14,
16 150:17
151:15 153:8,
23 154:3,6
207:5 214:6
215:4 227:10,
19,20 230:9,14,
25 231:2,3,18
232:11,15,23
233:7,8,14
244:3 258:17,
18,22 261:4,7,
14 265:17
269:5,7,16,21
270:2 272:19
273:1 274:4

**trainign** 148:16

**training** 26:12,
13 29:15 30:12,

17 33:15 39:4,
20,22 40:4
62:10,12,15
67:13,16,17,19,
22 68:5,6,13
71:2 80:10 81:1
83:9,21 84:1
97:18 98:9
100:20 118:3,7
121:13 131:20
132:5,8 145:17,
23 146:11,17,
21,25 147:1,5,
8,12,17 148:3,
5,12,14 149:2,
8,10 150:16,21,
22 151:3,4,6,
11,12,14,16,17,
19,21 152:1,24
153:2,4,11,13,
15,17,20,25
159:6,8 166:2,
8,13,24,25
167:4,7 168:1,
8,10,13,15,21
169:1,4,7,8,9,
12 170:1,8,14,
15 171:14,23,
25 172:2,3,4,5,
7,9,10,14,20,22
173:1,3,6,20,
21,24 174:1,15,
18,21,22
192:24 206:22,
25 207:1,3
213:18,21,23,
25 214:2,3,8,17
215:4,6,9,13
217:13,16
218:25 219:3,7,
10,11,13,16
222:14 223:20
224:9,24 225:2,
3 227:13 231:9
232:21 258:1,2,
5,12,13,16
259:2,4,5,15,
16,18,20,23,24
260:6,13,15
261:1,5,10
265:6,9,13
267:12,14,15,
17,18,19,22
268:17,18,20,
24,25 272:12
273:1,5,18

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

KENTUCKIANA
COURT REPORTERS

275:16,17

**training's**
167:6

**trainings**
153:7

**transcript**
34:22 35:3
37:22

**transcripts**
34:19,24 35:9,
12,17,21 36:1,
3,17 37:3,8,24

**Transfer**
213:12

**transferred**
16:21

**transitioning**
247:15

**translated**
262:23

**translation**
14:5 40:19

**translator**
264:8

**translators**
262:16 264:3

**transmittal**
50:18

**treated** 77:23
99:7

**treatment**
214:13

**treats** 248:20

**trial** 55:18 57:2,
6,15 74:19
163:6 164:8,16

**trials** 56:10,14

**trick** 222:24
223:2,7

**tricked** 221:7

**trickery** 223:4,
8

**true** 46:10
86:12 113:2
118:11 137:7

138:7 161:5
176:21 206:6,7
229:9 233:25
256:24 257:9
270:2 272:11

**truth** 11:8 62:3
73:25 216:12
217:4,11 229:4,
8 230:4,5,8
233:2,9,18
256:3 261:22
262:1

**truthful** 15:20
16:4 257:2

**truthfully**
57:15

**truthfulness**
234:22 236:25

**tunnel** 62:5,9,
14

**turn** 59:21
107:3 134:17,
25 203:17
210:23

**turned** 87:7,13,
19 106:9
125:22 162:8

**turning** 107:17

**turns** 71:10
86:3 163:7
199:11

**type** 55:10 91:7
95:10,22 111:4
153:23 183:13
201:19 238:7

**types** 95:5 96:3
104:15 117:4
126:4 127:4,8
212:8 222:15
227:18,20
228:11 258:3

**typical** 264:20

**typically**
134:13 190:15
198:18 245:12,
16 247:8,9
250:4,6

239:22

———
**U**
———

**UA** 23:1 197:18

**UCR** 96:10
182:25 183:1
184:24

**Uh-huh** 18:1

**ultimate**
160:15

**ultimately**
86:3,15,22 87:5
88:3 91:15 94:4
104:25 118:14,
16 126:14
160:13 163:7
168:1,2 224:18

**unable** 262:25

**unaware** 130:3

**uncomfortable**
69:22

**uncommon**
251:19 262:25

**unconstitution
al** 227:12

**underlying**
34:5 202:23

**undermines**
61:9

**understand**
13:13 15:7,22
23:3 30:10 66:6
70:1 100:23
111:10 112:8,
11,16 131:24
135:9 176:7
216:14 231:22
258:24 272:7,8,
22

**understanding**
15:25 25:24
32:1,9 68:1,2,3
96:2 135:15
139:4 174:19
236:16

**understood**
15:11,17
155:23 205:13

undocumente
d 272:20,25

**unfamiliar**
171:12

**uniform** 151:7

**unit** 12:12
16:25 17:12,13,
19,22 18:5
22:6,11,14,19,
22,23 23:4,5,6,
20,24 24:3,8,
16,21,22,25
25:2,5,9,15,16
26:8 41:2
46:17,24 47:6,
10,14,17 48:9
108:5,6,12,17,
22 109:1,5,11,
19,21,25
111:21 112:5,9,
12,16,25 113:2,
4,5,8,10,19,24,
25 114:3,17,21
118:15 175:8,
11,12 178:12
182:10,12,16,
19 183:6 186:7,
8,9,10,11,12
188:4,5,23
189:1 190:3
192:13 193:10
195:21 197:21
200:20 207:13
209:15

**United** 273:13

**units** 47:15
115:2 175:3
176:6 182:5

**University**
20:20

**unlike** 199:9

**unscheduled**
119:2,22

**unsolved**
167:10

**untrue** 227:23

**unusual** 82:16
83:2 249:10

**updated** 124:8

**updating**
96:19

**upgrade** 134:4

**upgrading**
23:1

**utility** 134:19
154:11

**utilize** 199:1
261:23

———
**V**
———

**vague** 189:25
190:2 194:7
195:18

**variety** 21:5

**verbal** 33:7
129:17

**version** 52:3
126:8 211:14

**versions**
256:11

**versus** 70:19

**victim** 167:18
251:18

**victims** 16:25
17:6 251:15

**Victoria** 248:9

**video** 268:13

**videotapes**
238:9

**view** 53:18
83:17,23

**vigil** 89:2

**violation**
162:9,13,25
163:10,17
164:23 165:6,
13

**violations**
34:10

**violent** 17:5
167:8,14,21



Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com

168:3 267:10

**visa** 273:21

**vision** 62:5,9, 14 84:2

**vital** 260:13

**voluntarily** 225:6

**voluntariness** 224:15,17 252:22

**voluntary** 214:13 223:3,4 226:3

_____

**W**

_____

**W-I-N-S-T-R-O-M** 12:7

**wait** 10:19 215:22

**waive** 223:7,9

**waived** 223:4

**waiver** 221:7

**waiving** 223:2

**walk** 142:7 253:14

**walked** 253:8,9 255:25 256:2 257:21

**walking** 16:9 18:13 218:21 251:15,18,22 257:17

**walks** 187:23

**wall** 192:13

**wanted** 32:2,4, 6 47:2 89:22 100:19 180:24 182:5 240:10 243:12 251:8

**warnings** 21:21 220:17

**waste** 12:2 73:10

**watch** 133:3 136:17 228:3

**ways** 11:19 169:15 181:5 186:4 218:16 233:25

**weather** 66:14 71:24

**week** 59:11

**weeks** 68:5 138:9

**weigh** 10:9

**well-known** 218:3

**whatsoever** 58:13

**where'd** 20:19

**wholly** 48:23

**wife** 88:19,20, 23 89:4 92:3,25 94:21

**wild** 12:3

**wind** 66:15 198:25

**window** 187:25 250:6,8,9,13, 17,25 251:10, 17,20,23

**windows** 251:5

**Winston** 63:25 76:1

**Winstrom** 10:15,17,22 11:5,18 12:7 27:15 37:2 63:21,24 64:8, 10 73:5 75:23, 24 80:2 89:7 135:14 140:3, 20 187:2 243:1 256:1,2 257:20

**Winstrom's** 76:7 156:21

**Withdraw** 144:24

**witness'** 179:11

**witness's** 155:1

**witnesses** 32:21 36:2

**witnessing** 58:15

**word** 23:17 27:14 49:14 98:23 102:19 131:23 154:8 179:15 227:13

**worded** 227:9

**wording** 45:3,6 117:22 223:1

**words** 38:22 58:6 66:2 100:24 101:22 106:14 114:25 126:18 144:21 163:2 205:21 231:15 233:4, 13,14 246:3 247:7 250:16

**work** 13:5 24:24 31:4,8 40:11 53:19 67:19,25 133:7 136:21 140:23 141:24 143:13 144:13 145:6 152:11 157:13, 17 164:1,2 175:2 183:14, 15 190:2 218:14 221:25 236:2 247:23

**worked** 22:25 25:19 31:16 54:17 56:17 57:10 58:11 154:19,23 155:11,16 156:25 157:1,2 200:18 215:1 218:18 242:4 263:5

**workflow** 174:24

**working** 110:16 188:22 243:19

**works** 29:23 163:5 188:2 237:18 241:6 265:13,14,16

**worry** 208:9

**worthy** 64:15

**would've** 43:14 97:17 130:23 131:4 132:6,22 143:3 149:9,14,17 150:11 151:17 152:5,8 161:23 165:15 169:16, 17 170:5 174:15 185:1 193:8 198:3,4,7 219:16 246:14 263:21 272:13

**wrapped** 185:4

**write** 52:24 54:3,22 140:23 141:4,15,19,20, 23 142:3,14 143:4,24 144:6 154:4,7 169:18, 20 237:2 238:10 267:15

**writes** 143:7 144:12 226:13

**writing** 57:25 118:8,10 132:5 140:22 142:5, 24 143:9 168:3, 17,22 169:11, 15,21 239:4 245:10 268:25 269:2

**written** 19:10 44:11 107:1 133:12 138:22 192:11,18 206:8 207:1 227:13 243:7 245:16 247:8,9 262:18 266:4 275:23

**wrong** 38:17, 20 87:20 246:22 249:12

**wrote** 142:25 155:14

_____

**Y**

_____

**year** 16:15 17:11 20:15 57:6 64:1 75:24 76:8 183:15 193:9 208:4

**years** 20:15 29:17 57:11 67:20 68:19 96:18 147:24 170:2 188:12 197:19

**yelled** 249:12

**York** 20:13

**youth** 184:2,6 185:12 258:6 264:6,10,14

_____

**Z**

_____

**zoom** 9:9,16, 17,21 55:24

Kentuckiana Reporters
30 South Wacker Drive, 22nd Floor
Chicago, Illinois 60606

KENTUCKIANA
COURT REPORTERS

502.589.2273 Phone
502.584.0119 Fax
schedule@kentuckianareporters.com
www.kentuckianareporters.com