# EXHIBIT 46

1    MR. NOLAND:  No, your Honor.

2    THE COURT:  You're excused.  Thanks, Mr. Carter.

3  You're excused.  You can take off.

4    (Witness excused.)

5    THE COURT:  Next witness, please.

6    MS. GORMAN:  We call James Hickey.

7    (Brief interruption.)

8    THE COURT:  Right up here.  Please raise your right

9  hand.

10    (Witness sworn.)

11    THE COURT:  Please have a seat.

12    JAMES K. HICKEY, PLAINTIFF'S WITNESS, DULY SWORN

13    DIRECT EXAMINATION

14  BY MS. GORMAN:

15  Q   Good morning, Mr. Hickey.

16  A   Good morning, Ms. Gorman.

17  Q   Can you please state your name for the record and spell

18  your name, your last name?

19  A   James K. Hickey, H-i-c-k-e-y.

20  Q   Mr. Hickey, you testified in a deposition in this case, is

21  that true?

22  A   Correct.

23  Q   And you testified as a 30(b)(6) witness?

24  A   Yes, ma'am.

25  Q   As a 30(b)(6) witness, that means that you were designated

1  by the City to talk about certain subjects, is that true?

2  A   That's correct.

3  Q   And you were designated to talk to the -- to discuss

4  matters regarding file retention, the street files, and other

5  matters regarding investigative notes back in the period of

6  1984, 1985, is that correct?

7  A   Yes, ma'am.

8  Q   In 1982 you were a detective assigned to headquarters, is

9  that correct?

10  A   Yes, ma'am.

11  Q   And prior to that time, you were a detective in Area 1, is

12  that true?

13  A   Yes, ma'am.

14  Q   And you were a detective at Area 1 from approximately 1977

15  to 1982, is that correct?

16  A   Correct, '81 probably.

17  Q   And then '82 you moved to corporate headquarters?

18  A   Right.

19      THE COURT:  Police headquarters.  You said corporate.

20      MS. GORMAN:  Sorry, police headquarters.

21  BY MS. GORMAN:

22  Q   Sometime around 1982, it was publicly learned that

23  detectives considered their investigative notes in homicide

24  cases to be their own personal property, is that correct?

25  A   Yes, ma'am.

1  Q   And it was learned that some investigative notes were not

2  being turned over to the State's Attorney and defendants in

3  homicide prosecutions, is that correct?

4  A   Yes, ma'am.

5  Q   And it was learned that some investigative notes were

6  being destroyed, is that correct?

7  A   There was no prohibition against it.

8  Q   My question is that you learned in 1982, it was publicly

9  learned that some investigative notes were being destroyed,

10 isn't that correct?

11 A   Yes.

12 Q   Now, your boss at that time was the Superintendent of

13 Police Brezak, is that true?

14 A   My direct supervisor was the chief of detectives.

15 Q   Your ultimate boss was the Superintendent of Police,

16 Mr. Brezak?

17 A   Correct.

18 Q   And Superintendent Brezak was the top official in the

19 police department in 1982, is that correct?

20 A   Yes, ma'am.

21 Q   And did you come to learn that Superintendent Brezak

22 wanted these practices to stop?

23 A   I did.

24 Q   And those were the practices of the investigators -- I'm

25 sorry -- the detectives considering notes to be their own

1  personal property and destroying notes, is that correct?

2  A   Yes, ma'am.

3  Q   And the superintendent actually issued an order in April

4  of 1982 by teletype to stop the practices of detectives in

5  Violent Crimes of withholding or destroying their notes, isn't

6  that correct?

7  A   I don't remember what month it was, but it was 1982.

8  Q   And isn't it true that there was litigation ongoing

9  about --

10            MR. NOLAND:  Objection, your Honor.

11            THE COURT:  I just need to refresh my memory on

12  something, so let me see the court reporter and lawyers at

13  sidebar.

14     (The following proceedings were had at sidebar in the

15  presence but out of the hearing of the jury:)

16            THE COURT:  You know, people have to remake

17  objections to preserve them, but isn't that pretty much the

18  way I said you could do it the first time around?

19            MS. GORMAN:  I took the quote exactly from the

20  transcript.

21            MR. NOLAND:  I didn't think you could reference any

22  litigation, your Honor.

23            THE COURT:  I think that's the way it ended up.  Now

24  I'm going to need to go get my --

25            MS. GORMAN:  Can I pull mine, too?

1    (Brief interruption.)

2        THE COURT:  He testified pretty early in the first

3    one.  I'm just going to find it here.

4    (Brief interruption.)

5        THE COURT:  So this all takes place, and the

6    discussion -- most of the discussion and the ruling takes

7    place on the morning, the beginning of the day on March 17th.

8    And I'm pretty sure -- I'm going to get to the question in a

9    second, but I'm pretty sure that Ms. Gorman was right on the

10   money.  Maybe I went past it.

11       So I said on page:

12       "Isn't it a fact that there was litigation ongoing

13   about this at the time?" if that question could be asked.  I

14   said that on page 1,366.  "The superintendent ordered you to

15   do this, yes or no?  Isn't it a fact that there was litigation

16   ongoing about this at the time?"  I said that could be asked.

17       There was an objection either before or after that

18   that shouldn't be discussed.  I overruled that.

19       And then I don't know whether it was actually asked.

20   Yes, okay.  "Did you come to learn that Superintendent Brezak"

21   -- this is page 1,371.

22   "Q   Did you come to learn that Superintendent Brezak wanted

23   the practices to cease regarding investigative notes being

24   considered personal property of the detectives?

25   A   I did.

1  Q   Isn't it a fact there was litigation ongoing at the time
2  83.1 was entered?
3  A   Yes.
4  Q   The mandate from Superintendent Brezak, entered an order,
5  for detectives to no longer consider those notes to be their
6  own personal property, is that true?
7  A   Yes.
8  Q   As a result of that mandate, you were asked to draft 83.1?
9  A   Yes."
10         That's appropriate and I'm making the same ruling.
11  So you can back up a couple of questions to get into it.
12         MS. GORMAN:  Okay.
13         THE COURT:  If I were you, does somebody at your
14  table have 1,371?
15         MS. GORMAN:  I have it on my computer.  I had written
16  down the page on my handwritten notes, but it didn't make it
17  on to my typed ones.
18         THE COURT:  You wrote it down correctly.
19         MS. GORMAN:  Thank you.
20         MR. NOLAND:  Thank you.
21   (The following proceedings were had in the presence and
22  hearing of the jury:)
23         THE COURT:  I apologize for the longer than usual
24  interruption.  I'm going to ask Ms. Gorman to back up a couple
25  of questions so that the jury has context in mind.

BY MS. GORMAN:

Q    Superintendent Brezak was the top official in the police department at the time?  That was in 1982, is that correct?

A    Yes, Ms. Gorman.

Q    And did you come to learn that Superintendent Brezak wanted these practices to stop?

        And when I am referring to "these practices," I'm talking about the destruction of investigative notes and detectives considering it their own personal property.

A    Yes, ma'am.

Q    Superintendent Brezak actually first issued an order by teletype sometime in 1982 to put a stop to the practices of detectives in Violent Crimes withholding or destroying their notes, isn't that correct?

A    Correct.

Q    And isn't it true that there was litigation ongoing about this issue at the time the superintendent issued the order to stop the practices of detectives withholding or destroying their notes?

A    There was some litigation.

Q    And based on the superintendent's order, you were asked to draft special order 83.1, is that correct?

A    Right.  83. -- 83-1, just for the record.  The last time that was an issue.

Q    Yes, and I apologize.  I've got it my notes as a dot, so I

1  will try to remember.
2          THE COURT:  83-1, we're good.
3          MS. GORMAN:  83-1.
4  BY MS. GORMAN:
5  Q   And you were directed to draft that by Superintendent
6  Brezak because there was litigation going on about the
7  practices, isn't that correct?
8  A   That's correct.
9  Q   Before you drafted 83.1 --
10         THE COURT:  Dash.
11  BY MS. GORMAN:
12  Q   Thank you.  Before --
13         THE COURT:  She's going to say "point" more times and
14  you will know what she's talking about.
15         THE WITNESS:  Yes.
16  BY MS. GORMAN:
17  Q   Before you drafted 83-1, you did an audit, a review, of
18  the different detective areas, is that correct?
19  A   I was part of a team that went to the sixth detective
20  area.
21  Q   And you actually went to all six of those areas, isn't
22  that correct?
23  A   I can't remember.  I went to at least three.  I don't know
24  if I went to all six.
25  Q   Isn't it true that at the time you referred to your

1  assignment as the street file project?

2  A   My assignment was that of a detective working at detective

3  headquarters.

4  Q   Correct.  But you yourself referred to your assignment as

5  the street file project, isn't that true?

6  A   I don't recall that classification, but it certainly was

7  something I worked on.  It took a lot of my time.

8  Q   And the project was to get a handle on the unofficial

9  records, isn't that correct?

10  A   That's correct.

11  Q   And by unofficial records, you meant documents that did

12  not make it into the official file production that went to the

13  state's attorneys and defendants, isn't that correct?

14  A   That's correct.

15  Q   And as part of your review, you found the same

16  recordkeeping procedures in the areas that you visited that

17  led to the special order, or to the order, is that correct?

18  A   I found various practices that each one, each area, did a

19  little bit differently.  That's what I found.

20  Q   And you found that the areas that you went to, the

21  detectives considered their notes to be their own personal

22  property?

23  A   Correct.

24  Q   And you found the detectives were routinely destroying

25  their notes?

1  A    Correct.

2  Q    And you found that sometimes there was material and notes

3  and memos that did not make it into official reports, is that

4  correct?

5  A    I did.

6  Q    And, in fact, you discovered in your review audit that the

7  practices that you were reviewing in these various areas were

8  consistent with your own personal observations when you were a

9  detective at Area 1, isn't that correct?

10 A    Yes, ma'am.

11 Q    And that's why special order 83-1 was enacted, is that

12 correct?

13 A    To implement the superintendent's direction to maintain or

14 to establish institutional control over our investigative

15 files.

16 Q    So that the notes would no longer be the detectives'

17 notes, but now they would be the Chicago Police Department's

18 notes?

19 A    It would be the work product of the Chicago Police

20 Department.

21 Q    Would it be fair to say that with the implementation of

22 special order 83.1, for the first time the detective divisions

23 were recognizing the existence of documents that were other

24 than official CPD forms and reports?

25 A    I don't think it would be the first time.  We have always

1    had notes of some sort.

2    Q   But this was the first time they were being -- there was

3    institutionalized control over those notes, is that correct?

4    A   Yes.  Yes, ma'am.

5    Q   And now with 83.1, the Chicago Police Department was not

6    only claiming control over those notes, but they were

7    identifying procedures on how to handle the notes from

8    investigations, isn't that correct?

9    A   That's correct.

10   Q   Was there a second purpose of 83.1 besides the

11   institutionalizing of the notes?

12   A   It's also to establish a means by which we could inform

13   those who looked at the files, what was in the files.  It

14   served as a listing of documents and notes.  It served as a

15   notice.

16   Q   And it also identified by definition certain terms so that

17   they would be consistent across the areas?

18   A   Right.  We tried to standardize the use of terminology as

19   well as documents.

20   Q   Isn't that because the police, actually their role is of a

21   fact finder and they're supposed to gather all the facts and

22   then turn those over; would that be fair?

23   A   Well, the turnover part doesn't occur until after

24   charging, but along the way, preserve all information, all

25   relevant information, that may be pertinent or relevant to the

1  case, you know, whether it proves or disproves a person's
2  guilt or innocence.
3  Q   So all the facts they find, whether they're good or bad,
4  they're all supposed to be preserved and then ultimately
5  turned over when someone is charged, is that correct?
6  A   The relevant facts, right.
7  Q   And the police cannot make the determination as to what is
8  relevant?
9  A   I think they almost have to.  There has to be some common
10  sense here.
11  Q   So is it your testimony that the police detectives
12  themselves can review the notes and determine what they think
13  are relevant?
14  A   No.  If they record the notes on their notepad, they're
15  supposed to keep it.  They're supposed to keep that which they
16  record.
17  Q   I mean, that was one of the purposes, right?
18  A   Yes, ma'am.
19  Q   To make sure that they're retained?
20  A   Yes, ma'am.
21  Q   Was 83.1 also enacted to establish guidelines for the
22  inconsistency in note-taking practices?
23  A   Correct.
24  Q   Is it fair to say that 83.1 was -- 83-1 was a major change
25  in the way notes were considered within the police department?

1  A    It was.

2  Q    Isn't it true that you were also trying to discourage what

3  you referred to in a previous proceeding as to/from memos

4  within an area?

5  A    A to/from memo is a memorandum, and we're not trying to

6  discourage the use of these to/from subjects because sometimes

7  you have to write to police department units outside your own

8  unit.  So there's a protocol going.  If you want to write

9  something to the crime lab, it should go through the chain of

10  command.

11         So we didn't discourage the total use of memorandum,

12  but what we tried to discourage was the use of memoranda

13  between detectives from one watch or one shift to the next.  I

14  did this today, you know, or please do that for me today.

15  Q    So you were --

16         As part of 83.1 and the training that went along with

17  it, you were trying to discourage the detectives from sending

18  an all watches memo out?

19  A    No.  There is still a place for notes.  They're a

20  necessary form of communication.  But we tried to standardize

21  the piece of paper on which these notes were shared.

22  Q    Isn't it fair to say that you were trying to discourage

23  to/from memos from one shift to the next shift?

24  A    No, it's not.

25  Q    Mr. Hickey, do you recall giving your testimony in another

1   proceeding?

2   A    I do.

3        MS. GORMAN:  Counsel, page 1,375.

4   BY MS. GORMAN:

5   Q    This question and this answer were asked of you:

6   "Q    So you were trying to discourage something like this, a

7   memorandum to Hood and Evans, who were on the second shift,

8   from Minogue and Bogdalek, who were the third shift?

9   A    I don't see the date on that.  If it preceded, yes.  That

10  is the type of memo we would be discouraging."

11       Was that answer -- was that question and that answer

12  given by you?

13  A    It was.

14       I think the crime --

15       THE COURT:  You have answered the question.

16  BY MS. GORMAN:

17  Q    So after 83.1 was enacted, you did training, is that

18  correct?

19  A    That's correct.

20  Q    You did training for all of the detectives over a course

21  of a couple weeks or a couple of months?

22  A    I did.  I instructed the members of the bureau or

23  detective division and youth division on the investigative

24  file procedures, the newly created procedures.

25       MS. GORMAN:  Exhibit 4, Plaintiff's Exhibit 4.

Excerpts from 2014 Trial Transcript

1    (Brief interruption.)

2  BY MS. GORMAN:

3  Q    I'm showing you what has been marked Plaintiff's Exhibit 4

4  for identification.  Is this the first page of the special

5  order 83-1?

6  A    It is.

7  Q    And it talks about the introduction.  We have gone through

8  the introduction with the witnesses, but this includes the

9  instruction and the purpose of the order, is that correct?

10  A    Yes, ma'am.

11  Q    And the purpose, as we have already discussed, is to have

12  proper retention policies in place and to make more uniform

13  note taking and definitions of terms of art within the

14  detective division?

15  A    Correct.

16  Q    We see in Section 4 the investigation -- the definition

17  section defines the investigative file, the folder, the

18  document repository and the inventory sheet, is that correct?

19  A    Yes, ma'am.

20  Q    It also identifies the general progress report, is that

21  correct?

22  A    Yes, ma'am.

23  Q    And then in Section 5, the responsibilities and procedures

24  are delineated according to the rank of the individual.  The

25  supervisors have some responsibilities outlined in A; the

1  detectives have some responsibilities which are outlined in B;
2  and then the commanding officer has responsibilities that are
3  outlined in C, is that correct?
4  A   Yes, ma'am.
5  Q   And then on the last page, we have the retention schedule.
6  And going down to felonies, there are four categories for the
7  files within the felonies, is that correct?
8  A   That is correct.
9  Q   We have cleared, cleared/closed, unsolved and
10 cleared/open, is that correct?
11 A   Yes, ma'am.
12 Q   And for the unsolved and the cleared/open, the policy was
13 that after ten years, even if they're still open or unsolved,
14 they go to the records division, isn't that correct?
15 A   Yes, ma'am.
16 Q   Now, would you agree that it's important not only to put
17 the policy in writing, but also to make sure it's actually
18 being followed?
19 A   I agree.
20 Q   Do you know if any monitoring or auditing was done after
21 83.1 went into effect?
22 A   Monitoring and auditing is a function of a -- of all
23 supervisors.  We have an awful lot of directives in the police
24 department, and supervisors' responsibilities include to make
25 sure that the officers and the detectives fulfill their

1    responsibilities.

2    Q    That would be the sergeant?

3    A    Correct.

4    Q    Do you not agree that even the best intentioned detectives

5    could revert back to their old ways if there's not some kind

6    of consistent monitoring going on?  This was a -- strike that.

7          You can go ahead and answer that.

8    A    Could you repeat the question?

9          MR. NOLAND:  Objection to form.

10         THE COURT:  Put the question again, if you would.

11   BY MS. GORMAN:

12   Q    Let me try to put it better.

13         Let me ask you this.  Are you aware of anyone

14   checking to see if the policy that you drafted, 83-1, was

15   actually being followed?

16   A    I cannot name names, but it's the responsibility of

17   supervisors to ensure that procedures are being followed.

18   It's an everyday responsibility.  It's a business.  It's

19   serious business.  We have to follow the orders.

20         MS. GORMAN:  Page 1,383.

21   BY MS. GORMAN:

22   Q    Do you recall this question and this answer in a previous

23   proceeding:

24   "Q    Do you know if anyone else went back, just say over the

25   next 18 months after 83.1 went into effect, to see if there

1  were problems or if it was being followed?

2  A   I'm not aware of any."

3       Was that your answer to that question?

4  A   And it's consistent because I said I'm not aware of anyone

5  by name.

6  Q   So would you say --

7       Is it fair to say that the responsibility to making

8  sure all the materials made it into the file is the

9  responsibility of the sergeants?

10 A   It's actually delegated to the unit commanding officer, a

11 lieutenant, who has direct administrative control over the

12 investigative files.

13      The sergeant's responsibility is to sign for receipt

14 of things like the general progress report and to ensure their

15 place in the file.  They may not personally put them in the

16 file.

17 Q   But it's the sergeant's responsibility to make sure they

18 get put in the file, is that correct?

19 A   Yes, ma'am.

20 Q   And the investigative file was -- the investigative files

21 were kept in the sergeant's office, is that correct?

22 A   Yes, ma'am.  The sergeant's office was a common office.

23 It's open.

24 Q   And under 83-1, the detectives were required to transcribe

25 their GPRs, the general progress report form notes, and other

1  miscellaneous notes if they took them on other pieces of paper
2  onto an official department case report form such as the
3  supplementary report, is that correct?
4  A   No.  They're not required to put all their notes that they
5  take into a supplementary report, that which they believe are
6  relevant.
7  Q   And, again, we have that issue of relevancy.  The police
8  themselves are not supposed to be determining what is relevant
9  in their notes, are they?
10 A   When they're preparing their supplemental report, I mean,
11 they may have written extraneous notes or something they
12 themselves realized 20 minutes later or half an hour later
13 have nothing to do with the case.
14        You know, I wrote it down, but I'm not going to
15 include it in my typed report.
16 Q   When you talk about relevant notes, would relevant notes
17 include anything that they learned from witnesses or people on
18 the scene that might be related to the crime?
19 A   If they write it down.  I mean, it's just common sense
20 that you do write things down because you can't remember, you
21 know, who said what, who said what when.
22        I'm not sure I understand your question, though.
23 Q   Okay.  What I'm getting at, Mr. Hickey, is what kind of
24 discretion the detectives have for putting information from
25 their notes into official form.

1    A    They have discretion.  You don't memorialize every single

2    conversation.  You write down that which is pertinent,

3    relevant, to the investigation.

4    Q    Pertinent --

5         I'm sorry?

6    A    Reports are pretty long, and, you know, you can't write

7    down everything that you have taken a note on.  You can't

8    include everything in an official report.

9    Q    Pertinent, relevant information would be information that

10   might lead to the arrest of someone involved in the crime, is

11   that correct?

12   A    That's correct.

13   Q    So that information should be put into official form?

14   A    It should.

15   Q    Now, we talked about the fact that files, investigative

16   files, are only supposed to stay at the area for 10 years, is

17   that correct?

18   A    That's the policy.

19   Q    And then they're supposed to move to the records division

20   for permanent retention, is that correct?

21   A    Correct.

22   Q    Are you aware that in the basement of 51st and Wentworth

23   there are files, file cabinets, going back from the 1940s to

24   2009, 2009 or 2010?

25   A    I was not aware, but I presently am aware.

1  Q   And those files that predate 2003 should not be in the
2  basement of 51st and Wentworth, isn't that correct?
3  A   There's some possible reasons why they might be there.
4  Q   But under the policy, 83-1, and the subsequent policy,
5  86.3, those files are supposed to be sent to the record
6  division, isn't that correct?
7  A   That is correct, but there are still some reasons why they
8  may be physically at the area.
9  Q   Do you know how many file cabinets there are in the
10 basement at 51st and Wentworth?
11 A   I have no idea.
12 Q   Would it surprise you to learn that there were more than
13 20 file cabinets in the basement of 51st and Wentworth with
14 these old files?
15 A   We're a big organization.  25 filing cabinets does not
16 surprise me.
17 Q   It doesn't surprise you that 25 file cabinets would be in
18 the basement in violation of 83-1?
19 A   It's a large volume.  25 filing cabinets sounds like a
20 lot.  Given 150 to 160 homicides a year in Area 1, times 10
21 years, that's 1,500.  So I suppose given the number of
22 murders, it may not be that large of a number.
23 Q   Do you have any idea what is in those file cabinets?
24 A   I do not.
25 Q   Do you know if there is any inventory for those file

1  cabinets?

2  A    I have no knowledge.

3  Q    Are you aware that the City believes that maybe the

4  missing street file in Mr. Fields' case was in one of those

5  file cabinets?

6  A    Could you repeat that, please?

7  Q    Are you aware that the City believes -- they're not

8  sure -- but they think maybe Mr. Fields' street file that was

9  missing for 26 years was in one of those file cabinets?

10  A    I am aware.

11  Q    That would be a violation of 83.1, isn't that correct?

12  A    If, in fact, the information should have been in the

13  investigative file, you know, if it's not duplicative or, you

14  know.

15  Q    I'm showing you a photo from the basement of 51st and

16  Wentworth showing some of the file cabinets that are down in

17  that basement.

18           Have you ever seen these yourself?

19  A    They look pretty standard.  I don't recognize the site,

20  but I believe you.  51st Street.

21  Q    The basement?

22  A    Yes.

23  Q    The boiler room.  There's the boiler.  There's some more

24  cabinets that aren't visible in the first photo.

25           THE COURT:  What are these exhibit numbers?

1    MR. GOODMAN:  These were just demonstratives, your

2    Honor.

3         THE COURT:  Okay.

4         MS. GORMAN:  We do have it, I think.  We do have an

5    exhibit, but I'm not bringing those out yet.

6    BY MS. GORMAN:

7    Q    These are other file cabinets that were not shown in those

8    photos?

9    A    These are filing cabinets.

10   Q    A lot of filing cabinets, isn't that correct?

11   A    A lot may be rel- -- might be subject to debate.

12   Q    But, again, under 83.1, investigative files are supposed

13   to go to the records division and ultimately probably to the

14   warehouse, isn't that correct?

15   A    Correct.

16   Q    After 10 years?

17   A    Correct.

18   Q    Mr. Fields' file was from a murder that took place in

19   1984; so approximately 1994 that file should have made it to

20   the warehouse, isn't that correct?

21   A    That's correct.

22   Q    What about the file cabinets that predate Section 83-1;

23   for example, the file cabinets that have files going back to

24   the forties, the fifties, the sixties and the seventies?

25   A    When I drafted this order in 1983, my intent was not to

1  write a policy to be retroactive.  I wasn't even thinking of
2  1940s.
3      I was thinking from this day forward, this is our
4  policy and we would do such and such with them.  Anything
5  retroactive doesn't work in my mind.  I mean, something's
6  already been filed.  It's gone, I mean.
7  Q  So under 83.1, the way you drafted it, the files from '82
8  on back would never make their way to the warehouse, is that
9  correct?
10  A   It was not my -- it was not my focus.  Frankly, I don't
11  remember even thinking about prior years.  I was thinking in
12  the present for the future.
13  Q  Do you know if there was any directive or policy to figure
14  out what files existed prior to the enaction of 83.1, again,
15  the '82 on back to see what even existed?
16  A   I'm not aware of any, but it's the responsibility of all
17  detective areas to look at cold cases.  I'm presuming here
18  these are unsolved cases that are in the 1940s and fifties.  I
19  don't know that.  Maybe they're solved.
20      But I would think -- you know, we have an obligation
21  to look occasionally back in the past and see if you can solve
22  an old one.
23  Q  Do you know if anyone has gone back to look to see what
24  these files are, whether they're unsolved homicides?
25  A   I do not know that personally.

1  Q   Do you know whether or not there might be other files in

2  those cabinets like Mr. Fields' where people were charged and

3  convicted?

4  A   I have no reason to know that.

5  Q   And, again, after 83.1 went into effect, you're not aware

6  of any audit or review process to see if 83-1 was being

7  followed correctly?

8  A   Again, review and audit is a function of command.  It's

9  the responsibility of supervisors to make sure that those

10 subordinates are performing their jobs in the manner as

11 prescribed.  I'm not aware of any outside audit.

12 Q   I'm showing you what has been marked as Plaintiff's

13 Exhibit 1 for identification.

14        THE COURT:  Actually before we start with that, we're

15 about half-way through the morning, so we're going to take our

16 mid-morning break for 10 minutes, and then we'll resume.

17        All rise.  The jurors can come with me.

18        (Brief recess.)

19    (The following proceedings were had in the presence and

20 hearing of the jury:)

21        THE COURT:  Okay.  Everyone can have a seat.

22        Ms. Gorman, you can go ahead.

23        MS. GORMAN:  Thank you, your Honor.

24 BY MS. GORMAN:

25 Q   Mr. Hickey, just so that I make sure that I understand --

1  strike that.

2  　　　　In a previous testimony, you stated that files found

3  in the basement at 51st and Wentworth that predate 2003

4  should, in fact, be at the warehouse, isn't that correct?

5  A  That's correct unless there's a reason for their being

6  actively investigated.

7  Q  So if I understand you, if all of those files in the

8  basement of 51st and Wentworth are being actively investigated

9  right now, then maybe they're properly down in the basement?

10  A  It's a possibility.

11  Q  Do you have any reason to believe that all those files and

12  all those cabinets in the basement at 51st and Wentworth are

13  being actively investigated right now?

14  A  I have no reason to believe that.

15  Q  Mr. Hickey, at one point in your career at the police

16  department, you actually worked in the records division, isn't

17  that correct?

18  A  I did.

19  Q  What was your position in the records division?

20  A  I was the assistant director.

21  Q  In the records division, when files are sent from the

22  areas into the records division for permanent retention, are

23  they logged somehow into a system?

24  A  No.  This was the paper world.  They simply arrived and

25  they are filed by the case number of the investigation.

1  Q   So if someone is looking for a file in the permanent -- in

2  the warehouse, they would go by the case year or RD number, is

3  that correct?

4  A   It's really the same for every year.  We're very clever.

5  We have a different alpha beginning.  So one means the same.

6  A letter means the same as a year, if you are familiar with

7  the filing system.

8  Q   So, for example, in the file of the Hickman-Smith murders,

9  you have an RD number that is F151922.  F stands for the year

10 1984, is that correct?

11 A   Is it '84 or '85, whenever this --

12 Q   '84.

13 A   Okay.  Then it's '84.

14 Q   And G would be '85 and H would be '86?

15 A   Right.  At that time, right.

16 Q   And so if you go to the records division, you would go and

17 look for the F files?

18 A   Correct.

19 Q   And then you would go and you would look for the rest of

20 the RD number, and it should be in there sequentially, is that

21 correct?

22 A   Correct.

23 Q   Is there any record anywhere that is kept within the

24 police department to show if the file has actually made its

25 way to the warehouse?

1    A    There is not.

2    Q    So the way you would find out that it's in the warehouse

3    would be by looking at the permanent retention policy, isn't

4    that correct?  If it was an open file and it was from 1984,

5    then it should have been in the warehouse by approximately

6    1994, isn't that correct?

7    A    Correct.

8    Q    Mr. Hickey, I believe you testified previously that you

9    didn't think you ever saw Exhibit 1 until you were preparing

10   for trial, is that correct?

11   A    I saw copies of it.  I don't recall seeing the original

12   document.

13   Q    And isn't it true that you also said previously that you

14   would not call Exhibit 1 an investigative file?

15   A    I did.

16   Q    What would you call Exhibit 1?

17   A    A running file, a working file, a duplicate file.

18   Q    Do you understand that there's original documents in

19   Exhibit 1?

20   A    I would have to look at it again.  Are you telling me

21   that?

22   Q    I will let you look at it.

23   A    Yeah, no.

24        (Brief interruption.)

25            THE WITNESS:  I do see a couple original files, a

1  telephone message.  And it looks like a bond slip and a

2  photograph and a computerized report on a name check and some

3  original arrest cards predating the computer age.  Yes, so

4  there are some original documents in here.

5  BY MS. GORMAN:

6  Q   And, in fact, if you look at the envelope that is in

7  there, there's actually a manila envelope within the envelope.

8  There are a number of photographs, isn't that correct?

9  A   Yes, ma'am.

10  Q   And the photographs have information on the backs of them

11  for identification purposes, is that correct?

12  A   Some have names, some do not.

13  Q   Thank you.

14      I don't want to take responsibility for it.

15  A   Thank you.

16  Q   So you would not call this a duplicate file, would you?

17  A   No.

18  Q   Wasn't one of the purposes of 83.1 to do away with running

19  files and working files, to have one consistent file?

20  A   The real purpose was to gain institutional control where

21  we could find in one place all the notes, all the work

22  products of the different detectives working on the different

23  watches but working on the same case.  You should be able to

24  find it in one place.  You shouldn't have to go to multiple

25  files.

1  Q   And do you understand that the materials that are in this
2  file were never turned over to Mr. Fields?
3  A   I don't know that, but if they were not turned over, they
4  were not turned over.
5  Q   No matter what you call this file, whether you call it a
6  running file or whatever you call it, the name doesn't really
7  matter, does it?  It's what inside it that matters, isn't that
8  correct?
9  A   Correct.
10 Q   The materials that are inside it.
11        And pursuant to 83-1, these materials should have
12 been turned over as part of the investigative file, isn't that
13 correct?
14 A   Some of that -- some of those documents are pretty
15 innocuous.  But if it was pertinent to the investigation, it
16 should have been included in the file, in the investigative
17 file.
18 Q   In fact, you recently testified that anything related to
19 the investigation should go in that file, isn't that correct?
20 A   Correct.
21 Q   These are the types of materials that should have been
22 listed on the inventory sheet that is part of 83-1, isn't that
23 correct?
24 A   I don't know which of those are duplicates versus the
25 investigative file, so I -- but, yes, those documents would

1  normally be contained in an investigative file.

2  Q   Well, that does raise the question, though, if these are

3  duplicates, where are the originals, isn't that correct?

4  A   The original general progress report, that thing which is

5  the document we take our handwritten notes on, should be in

6  the investigative file.

7  Q   Shouldn't the originals of many of these documents that

8  are in this file, because they were pertinent to the

9  investigation, have been part of the official file?

10 A   No.  I think the --

11      Like there's a form in there I think for graphic arts

12 to get a mugshot reproduced.  We -- it's a formset, and we

13 give the original formset to the graphic arts section

14 requesting that this photo be reproduced or produced.

15 Q   So you don't think there is any requirement to put the

16 request for photos of people of interest into the

17 investigative file?

18 A   Well, the original wouldn't be there for sure because

19 another unit in the police department required it for its

20 business tracking purposes.

21 Q   But there's multiple copies of that document, right?

22 A   Right, right.

23 Q   It's a multi-layered document that when you send off the

24 original, you would have a copy for your own file?

25 A   Correct.

1   Q   And that copy should be in the investigative file, isn't
2   that correct?
3   A   Yes, if it's relevant to the investigation.  You know,
4   what part does it play in the investigation?  I don't know.  I
5   can't speak to all those photographs.
6   Q   But isn't it true that anything that is relevant to the
7   investigation should be turned over whether or not the police
8   officer is not exactly sure how relevant it might be later on?
9   A   Right.  I mean, that's a pretty substantive grouping of
10  photographs there, I mean, 20 of them or I don't know how
11  many.  But I can't imagine there are that many players in this
12  investigation.
13          It might have been from another case.  I mean, I
14  don't know what's in that working file.
15  Q   Do you have any indication, any information, to suggest
16  that the names in the photos are not related to this file?
17  A   I didn't look at the names.  I'm sorry.
18  Q   And, in fact, isn't it true that there are documents
19  within this file that relate to all of those photographs?
20  A   I don't know.
21  Q   Again, I want to get back to the original versus copy
22  because some of the documents in this file are copies and some
23  are originals.
24          And if the copies were never -- if the original of
25  the copy was never turned over, then that suggests that they

1    were destroyed at some point, doesn't it?

2    A    If the original of the copy?

3    Q    Yes.

4         THE COURT:  He's asking -- there is a little bit of a

5    contradiction in terms there -- the original of the copy.

6    BY MS. GORMAN:

7    Q    Well, some of these are photocopies, correct?

8    A    Right.

9    Q    And if the original handwritten document no longer exists

10   and there is only a photocopy, doesn't that suggest that the

11   original handwritten was somehow destroyed along the way?

12   A    Well, it never made it to where it should have been in the

13   investigative file, if it's a general progress report.

14   Q    Other documents besides general progress reports are

15   supposed to be included in the investigative file, too, isn't

16   that correct?

17   A    Yes, but think about this.  The crime lab sends you a copy

18   of a report that they said the latent fingerprint belongs to

19   X, Y and Z.  Well, I know for a fact that the crime lab has

20   the original.  Then why am I beholden to keeping a copy even

21   though it's important, I suppose?  You know, is it a

22   requirement to keep it?

23        It can be reproduced by the ones who have the

24   original.  The police department keeps records in various

25   places.

1  Q   You're the person that wrote 83-1?

2  A   Right, yes, I am.

3  Q   Isn't it true that in 83.1, the detectives are required to

4  submit all handwritten notes and investigative documents

5  generated or received to the unit supervisor for review and

6  inclusion in the investigative file case folder?

7  A   That is correct.

8  Q   The fact that these materials, the materials in 83 -- I'm

9  sorry -- the materials in the missing street file were never

10 tendered, and I'm showing you now a photocopy of the file,

11 doesn't that suggest noncompliance with special order 83.1--

12 -1?

13 A   At the least, sloppy filing.

14 Q   Well, it is not in compliance with 83.1, isn't that

15 correct?

16 A   Yes.

17 Q   83.1 requires these materials to be turned over?

18 A   Yes, ma'am.

19 Q   Other than conversations with your attorney, have you

20 learned any information regarding where this file was found?

21 A   From the deposition, I believe -- from talking to you over

22 the months, but, no, I have no independent knowledge.

23 Q   When you say from the deposition, are you referring to

24 what the City -- where the City thinks it might have been

25 found?

1  A    When you crossed me, I think the topic may have come up.

2          MR. NOLAND:  Objection, your Honor.

3          THE COURT:  Can I see the lawyers and court reporter

4  at sidebar, please?

5      (The following proceedings were had at sidebar in the

6  presence but out of the hearing of the jury:)

7          THE COURT:  Remind me what the question was you

8  objected to.

9          MR. NOLAND:  Actually, I was going to say Ms. Gorman

10  was simply asking him, did you learn something from me, Ms.

11  Gorman.  He already testified he had no personal knowledge of

12  this.

13          THE COURT:  Right, right.

14          So whatever he learned from you isn't going to be

15  important, and I'm just --

16          This is not the real reason for the sidebar.

17          MR. GORMAN:  Yes.

18          THE COURT:  The real reason for the sidebar is there

19  are only so many times you can plow over the same ground with

20  the same witness.  I mean, seriously.  You have gone over all

21  this stuff about the sixth time with this guy at this point,

22  and I'm about to start butting in even if I don't get an

23  objection.  So let's get done with it.

24          MS. GORMAN:  Okay.

25      (The following proceedings were had in the presence and

1   hearing of the jury:)

2        THE COURT: You can put another question.

3   BY MS. GORMAN:

4   Q   Mr. Hickey, are you familiar with 86.3, special order

5   86.3?

6   A   I am.

7   Q   86.3 also deals with investigative files, is that correct?

8   A   Yes, ma'am.

9   Q   In fact, 86.3 mirrors 83.1, isn't that correct?

10   A   It appears to.

11   Q   Except there is one change in 86.3, isn't that correct?

12   A   At least one.

13   Q   Actually two changes.

14   A   Yes.

15   Q   The first change is that the introduction is taken out of

16   page 1, isn't that correct?

17   A   Correct.

18   Q   And the other change is that there's a new Section 6, is

19   that correct?

20   A   That's correct.

21   Q   And the new Section 6 is called Inspection, and it states:

22        "The instructions contained in this directive will be

23   strictly adhered to. Exempt members of the detective division

24   will conduct periodic unscheduled inspections of the subject

25   files to ensure compliance."

1       Is that what it says?

2   A   Yes, ma'am.

3   Q   And it's signed by George McMahon?

4   A   Correct.

5   Q   He was the chief of the detective division, is that

6   correct?

7   A   At that time he was, yes.

8   Q   And do you know what led Mr. McMahon to insert this

9   inspection provision into what was previously 83.1?

10  A   I did not work for him at this time.  I don't know what

11  motivated him.  I can speculate.

12  Q   That they found there were some problems?

13          MR. NOLAND:  Objection.

14          THE COURT:  Sustained, given the prior answer.  The

15  objection is sustained, given the prior answer.

16  BY MS. GORMAN:

17  Q   Well, is it fair to say that the only substantive change

18  to 86.3 was adding the provision mandating strict compliance

19  and periodic unscheduled inspections to ensure compliance?

20  A   It established a responsibility for exempt commanding

21  officers who were in charge of the area detective units.  That

22  was the substantive change.

23  Q   It instructed them to go out and do periodic reviews?

24  A   Correct.

25  Q   Do you know if that was ever done?

1   A    I do not.  Again, it's a function of command.  If it's in
2   an order, it should be done.
3   Q    Now, Mr. Fields was arraigned more than two years after
4   special order 83 went into effect, isn't that correct?
5   A    I don't know when he was arraigned.
6   Q    If it was in 1985 --
7   A    Yes.
8   Q    -- would you agree that it was two years, more than two
9   years after?
10  A    Yes.
11  Q    And we know that 83-1 was not complied with in Mr. Fields'
12  case, is that true?
13  A    It appears that some of the documents did not make it to
14  the official investigative file.
15  Q    And isn't it also true that no matter what we call
16  Exhibit 1, it does not comply with the physical layout of
17  investigative files that's called for in 83-1?
18  A    It does not match the physical requirements of an
19  investigative file.
20  Q    Isn't it true, Mr. Hickey, that what happened to Mr.
21  Fields represents a de facto policy of noncompliance with
22  83.1?
23  A    I don't think one example ever constitutes a total
24  practice or proof of noncompliance by an entire department.
25  Q    Don't these file cabinets in the basement that predate,

1  that go from 1983 -- if we ignore the ones prior, all the way
2  up to 2003, doesn't that establish noncompliance, a de facto
3  policy of noncompliance?
4          MR. NOLAND:  Objection, asked and answered.
5          THE COURT:  Overruled.
6  BY THE WITNESS:
7  A   No, because I can think of some reasons some of these
8  files are in the basement.
9  BY MS. GORMAN:
10 Q   And you stated some of those reasons could be an ongoing
11 investigation, is that correct?
12 A   Correct.
13 Q   Mr. Fields was not an ongoing investigation, was it?
14 A   I don't know enough about the Fields case.  I'm sorry.  I
15 don't know.
16 Q   I will take that back.
17          You don't know if any of these files down in the
18 basement are ongoing investigations, are related to ongoing
19 investigations, isn't that correct?
20 A   I have no idea what's in these files.
21 Q   Isn't it fair to say that no one has any idea what's in
22 these files?
23          MR. NOLAND:  Objection.
24          THE COURT:  Sustained, given the way it's worded.  He
25 only knows what he knows or doesn't know, not what other

1  people don't know.

2  BY MS. GORMAN:

3  Q   Do you have any explanation as to how these documents from

4  Exhibit 1 failed to make it into the investigatory file in Mr.

5  Fields -- in the Hickman-Smith murders?

6  A   I think a couple of the documents were never turned in to

7  the supervisor, and that explains to me why they didn't get

8  into the file.  Other documents could be duplicative, and some

9  documents may have been thought by the detectives to be of

10 such insignificance that they didn't bother to put it into the

11 investigative file.

12 Q   Now, you said some of these documents may have been

13 duplicative, but we went over that part already, correct, that

14 these documents were never turned over to Mr. Fields.  So if

15 they were duplicative, those still weren't turned over.

16            MR. NOLAND:  Objection to form.

17            THE COURT:  The objection is sustained.  You're

18 telling him; you're not asking him.

19            MS. GORMAN:  Just one minute, your Honor.

20            THE COURT:  Yes.

21     (Brief interruption.)

22 BY MS. GORMAN:

23 Q   Mr. Hickey, I'm going to show you a few documents, just a

24 very few documents, from the original file.  The first one is

25 Bates stamped 1062.

1     (Brief interruption.)

2  BY MS. GORMAN:

3  Q    This is from Exhibit 1, and it's Bates stamped 1062.  What

4  I handed you are handwritten notes in pencil, is that correct?

5  A    That's correct.

6  Q    It appears to be an original document, isn't that correct?

7  A    It does.

8  Q    And do you have any --

9     This document should have been tendered or tendered

10  to the original investigative file, isn't that correct?

11  A    What I don't know, if this was generated in this

12  particular homicide investigation.

13  Q    Well, you see where it says, "sister of Jerome Smith, one

14  of our victims," do you see that?

15  A    I'm sorry.  "Sister of Jerome Smith," right.

16  Q    And the murder investigation that this file relates to is

17  Jerome Smith and Talman Hickman, is that correct?

18  A    I had forgotten Smith was the second victim.  Okay.

19  Q    So this one is a document that was generated in the

20  investigation and should have been turned over to Mr. Fields,

21  isn't that correct?

22  A    It should have been on the general progress report.  It

23  should --

24  Q    But even if --

25     I'm sorry.  Go ahead.

1    A    It should have been turned over to the sergeant to be
2    placed in the investigative file.
3    Q    Even if it was never put on a general progress report, the
4    notes were supposed to be included in the file, isn't that
5    correct?
6    A    That's correct.
7    Q    I'm going to show you what's been marked Exhibit 1075 for
8    identification.  That's a to/from memo, is that correct?
9    A    It is.
10   Q    From Hood and Evans to Minogue and Bogdalek?
11   A    Correct.
12   Q    The copy that I handed you, does that appear to be an
13   original?
14   A    It does.
15   Q    And that file -- and that document also should have been
16   included in the investigative file, isn't that correct?
17   A    That is correct.
18   Q    The next one I'm going to show you is marked 1077.  Do you
19   see that document?
20   A    I do.
21   Q    That appears to be an original document as well, doesn't
22   it?
23   A    It does.
24   Q    And that was not turned over.  That should have also been
25   turned over as part of the investigative file?

1    A    It should have been submitted to the supervisor for
2    inclusion in the investigative file.
3    Q    And you're saying that because there is no supervisor's
4    signature, is that correct?
5    A    Yes, ma'am.
6    Q    So you're making the assumption it was not turned over to
7    the supervisor?
8    A    It's a pretty good one.  Yes, I'm making that assumption.
9    Q    In another proceeding, didn't we go through the actual
10   area file, the file that had documents in it that did not have
11   supervisor signatures on it that were missing?
12          THE COURT:  I need to talk to the lawyers at sidebar
13   here.  I don't need you, Laura.  Just turn the thing on.
14          (Brief off-the-record discussion.)
15   BY MS. GORMAN:
16   Q    This document should have been included in the
17   investigative file, isn't that true?
18   A    Yes, ma'am.
19   Q    There's two more, Mr. Hickey.  This is 1069.  Again, that
20   appears to be an original document, is that correct?
21   A    Yes, ma'am.
22   Q    And that document should have been included in the
23   investigative file?
24   A    Right.  Yes, ma'am.
25          MS. GORMAN:  I have nothing more, your Honor.

1    THE COURT:  Mr. Noland.

2    THE WITNESS:  Would you like these back?

3    THE COURT:  You should probably get your documents

4  back.

5    MS. GORMAN:  Thank you.

6                    CROSS EXAMINATION

7  BY MS. GORMAN:

8  Q    Mr. Hickey, how are you?

9  A    Fine, Mr. Noland.

10 Q    Mr. Hickey, can you just briefly describe your assignments

11 with the Chicago Police Department?  And we don't need

12 anything detailed, just a thumbnail.

13 A    I've worked for the Chicago Police Department for

14 43 years.  The first 29 were as a sworn member.  I was a

15 police officer, a detective, sergeant and lieutenant.

16        I retired after 29 years, and I became a civilian

17 working for the police department for the -- and I have been

18 such for the last 14 years.

19 Q    And is that currently in the research and development

20 section of the Chicago Police Department?

21 A    Correct.

22 Q    What is your highest level of education, Mr. Hickey?

23 A    I have a doctorate degree in public administration.

24 Q    On direct examination you talked about how back in 1983,

25 you were directed by the superintendent of the Chicago Police

1  Department to write 83-1, is that right?

2  A   Correct.

3  Q   And in doing that assignment, were there any other

4  policies out there with any other cities that you could

5  essentially crib from or plagiarize so to save you time, or

6  did you have to create this from scratch?

7  A   It was created from scratch.

8  Q   Was there any other municipality, city, major city, that

9  you were aware of that had anything like 83-1?

10  A   No, sir.

11  Q   And in putting the 83-1 together, did you consult with

12  other units in the Chicago Police Department?

13  A   I visited at least three of the six detective areas.  I

14  worked with research and development.  I worked with our

15  Office of Legal Affairs.  I worked with my boss and I worked

16  with his boss in kind of a collective draft.

17  Q   And that was to come up with a new state of the art policy

18  that wasn't, as far as you were aware of, in use in the United

19  States?

20  A   I also visited the FBI.  I don't know if it was this

21  building or across the street, looked at their filing

22  practices.

23  Q   So you could come up with the best policy that you could

24  possibly come up with at that time, is that right?

25  A   Tried.

1  Q   And then after you put 83-1 together, did you train all
2  the detectives in the Chicago Police Department?
3  A   Yes, I did.  There's about 1,200 of them.  So I definitely
4  remember the eight hours at a time.
5  Q   That was you personally who did all this training of all
6  the detectives in the Chicago Police Department?
7  A   Yes.
8  Q   And were there others in addition to detectives that had
9  to be trained, youth officers?
10  A   Detectives, youth officers, sergeants, lieutenants and
11  their exempt commanding officers.
12          MR. NOLAND:  Laura, can you pull up Plaintiff's 4 or
13  Defendants' 54, please?
14          Your Honor, could I ask you to switch?
15          THE COURT:  Yes, thanks.  Sorry.
16      (Brief interruption.)
17  BY MR. NOLAND:
18  Q   And, again, Defendants' Exhibit 54 is the same thing as
19  Plaintiff's Exhibit 4 that Ms. Gorman was just going over with
20  you, is that right?
21  A   Yes, sir.
22          MR. NOLAND:  Laura, if you could turn to the third
23  page here?
24      (Brief interruption.)
25  BY MR. NOLAND:

1  Q   Mr. Hickey, I'm directing your attention to the third page

2  and specifically in reference to the word "Audits" and

3  supervisory responsibility of ensuring compliance.

4          Can you please just read what this section that you

5  wrote says?

6  A   "Section C.  The Violent Crimes Unit commanding officer

7  will ensure that:

8          1.  The proper maintenance of the unit's RD numerical

9  sequence files and direct administrative control of all

10 investigative file case folders are achieved."

11 Q   The first, letter C, who is the Violent Crimes Unit

12 commanding officer?

13 A   That's a lieutenant who is in charge of the Violent Crimes

14 Unit.

15 Q   That is not a sergeant?

16 A   It is not a sergeant.

17         MR. NOLAND:  Laura, if you could go to the page

18 before, please?

19     (Brief interruption.)

20 BY MR. NOLAND:

21 Q   Mr. Hickey, I'm showing you 83-1, Section 5A and

22 Section 3.  And does that say that the responsibilities and

23 procedures section, and specifically A says the Violent Crimes

24 Unit supervisors will ensure that?  Supervisors there, are you

25 talking about the sergeants?

1  A   Sergeants.

2       MR. NOLAND:  Laura, can you just highlight

3  paragraph 3, All Submitted Documents?

4      (Brief interruption.)

5  BY MR. NOLAND:

6  Q   And in this section, this Section 3 here is All Submitted

7  Documents, and this deals with what the sergeants have to do?

8  A   That's correct.

9  Q   And can you just read it, please?

10 A   "Number 3.  All submitted documents are reviewed and

11 inserted into the investigative file case folder and logged on

12 the investigative file inventory sheet when an investigative

13 file case folder exists."

14      MR. NOLAND:  Thank you, Laura.

15 BY MR. NOLAND:

16 Q   In Ms. Gorman's questions, she showed you documents,

17 originals of some general progress reports; do you remember

18 that?

19 A   I do.

20 Q   Showing you an original of a general progress report, is

21 that signed off on by a supervisor?

22 A   It is not.

23 Q   Is that an original document?

24 A   It is.

25 Q   And this is the -- this general progress report form, did

1   you actually invent this form as well?

2   A   I designed it in 1983.

3   Q   And the place at the bottom that you wrote, or when you

4   invented this GPR forms, says "received by supervisor's

5   signature" right at the bottom, is that correct?

6   A   In the bottom right-hand corner.

7   Q   And "received by," what is the purpose of that?  What does

8   that mean in terms of what is the sergeant's job

9   responsibility as to a general progress report form?

10  A   We're trying to establish some accountability that it was

11  received by a supervisor, so, therefore, on its way to the

12  investigative file.

13  Q   And so when you don't --

14          At least for this particular original and the other

15  general progress reports, they were all originals that Ms.

16  Gorman showed to you, is that right?

17  A   That's correct.

18  Q   And none of them had a sergeant's signature on there, is

19  that right?

20  A   That's correct.

21  Q   So at least that, as you said, would be some indication

22  that those GPRs were never turned in to the sergeant?

23  A   Correct.

24  Q   Now, Ms. Gorman asked you --

25          We'll explain it now.  You designed the office

1   investigative file; that's what 83-1 had to do with, right?

2   A   Correct.

3   Q   And I'm showing you Plaintiff's Exhibit 194, the original,

4   which are two --

5        Well, maybe you can tell the ladies and gentlemen of

6   the jury what these are, please.

7   A   These are two investigative files that are maintained in

8   the detective area. They were numbered 84 for the year, the

9   44th person murdered, and 84 for the year and the 45th person

10   murdered that year up to this date.

11   Q   And that would be murdered in Area 1, just in that

12   particular area of the City of Chicago?

13   A   Correct.

14   Q   And how many areas were there in the City of Chicago at

15   that time? By area I mean detective division areas.

16   A   Six.

17   Q   And this was as of --

18        These murders, as you have seen from before, were on

19   April 28th of 1984, is that right?

20   A   Correct.

21   Q   What is the --

22        You explained, I think, the RD number earlier for the

23   ladies and gentlemen of the jury.

24        Can you please explain again what that is?

25   A   The RD number simply means records division number. It's

1    our oldest filing system.  We have used it since 1961.  And

2    every year it's a different letter, and the year corresponds

3    to a specific year.  At this time it was Frank.

4    Q    Showing you Exhibit 194, the investigative files, what is

5    the RD number for those two homicides?

6    A    Frank 151922.

7    Q    And, again, there's two investigative files created for

8    this case because there were two victims, is that right?

9    A    That's correct.

10   Q    And then showing you Plaintiff's Exhibit 1, the original,

11   which could be characterized as a working file, is that right?

12   A    Yes, sir.

13   Q    And what is the RD number for that?

14   A    Frank 151922.

15   Q    And 83-1 didn't prohibit detectives from having a working

16   file, did it?

17   A    No, it did not.

18   Q    So that, in fact, it would make sense that so long as the

19   documents got turned in, that a detective who might be working

20   on the case or who takes it out in his police car doesn't lose

21   it, thereby losing the whole investigation; is that fair?

22   A    It's more than fair.  Multiple people work on homicides on

23   some days, especially when they're new.  You might have two

24   teams.  And if you only have one file, unless you have a

25   really good memory, you have got to make a copy.  You know,

1    what address am I going to, just to help them get through
2    their day.
3    Q    But the essential goal of 83-1 was to make sure that
4    everything, information pertinent and relevant to the case,
5    did get turned in for inclusion in the office investigative
6    file?
7    A    It's the responsibility of the detectives at the
8    conclusion of their tour of duty to submit their general
9    progress reports.
10   Q    And this investigative file that you created through 83-1,
11   Plaintiff's Exhibit 194, has clips and inventory.  Please
12   explain to me some of the features of the file for the jury,
13   please.
14   A    For those who do filing for a living, we knew it was going
15   to be hard.  And the general progress report, that which we
16   take our notes on, I had the general progress reports filled
17   or printed with the two holes already prepunched simply to
18   make it easier for someone to throw it on the file.
19   Q    So, for instance, I'm showing from Exhibit 1 what we have
20   been calling the working file, one of those general progress
21   report forms.  So this is what you're talking about, the pre-
22   two-hole punch?
23   A    Correct.
24   Q    You designed it that way so that when these GPRs got to
25   the area, that they wouldn't have to two-hole punch them;

1    they're already done?

2    A    Somebody's job has to be easy, right?

3    Q    And then there's also some clips that you designed on the

4    file folder, is that right?

5    A    Not designed.  I simply took some office metal clips to

6    hold them in place.  And on the left-hand side, it's supposed

7    to be a case index of the documents that are on the right-hand

8    side.

9    Q    And that would be called the investigative file inventory,

10   is that correct?

11   A    Correct.

12   Q    And then there's a green card in there?  Could you just

13   show that up to the jury, please?

14   A    (Indicating.)

15   Q    And what's that?

16   A    It's nothing more than a library place card.  As the file

17   was removed by the working detectives or the supervisor to

18   look at it, to read it, to make a copy of something, to make

19   sure it landed back in the right place, we literally

20   created -- I literally created this file simply to put it in

21   the folder.  It is a place holder to make it easier for the

22   next person to file.

23   Q    Mr. Hickey, in your job with research and development, did

24   you have the occasion to look at the numbers of general

25   progress report forms that were created and reordered in the

1  first year or so of the implementation of 83-1?

2  A   I did.

3  Q   Can you please explain how many there were and how many

4  times in the time period you looked at where these general

5  progress reports were getting reordered over and over again?

6  A   Research and development is a place where all the forms

7  are created that are used by the police department.  It's also

8  the place where we keep records of how many of a form have

9  been printed.

10       In the first 15 months since the order was issued,

11  there were 140,000 general progress report forms printed on

12  four separate orderings, you know, 25,000 one time, and rather

13  inconsistent, but there were four.  And there were 80,000

14  investigative file inventory sheets, the multilined thing.

15  That only had three printings.

16  Q   And the investigative --

17       I'm showing you 84-45, Plaintiff's 196.  Again,

18  you're talking about the sheet on the left-hand side of the

19  folder?

20  A   Yes, sir.

21  Q   And that had three printings of 80,000, is that right,

22  over that year?

23  A   Right.  Again, multiple -- different numbers each time.

24  Q   That would indicate to you that, in fact, 83-1 was being

25  utilized out in the areas?

1  A   Absolutely.

2  Q   Mr. Hickey, approximately how many homicides were there in

3  the City of Chicago in 1984?

4  A   I believe it was around 750, 740.  Area 1 had 20 percent

5  of them.  It was 150.

6  Q   And approximately how many --

7          And you have looked at these numbers recently, right?

8  A   Yes.

9  Q   You don't have a photographic memory?

10 A   I looked at the annual reports.

11 Q   And area -- the detective division areas, the six

12 detective division areas, also would investigate violent

13 crimes, other violent crimes besides murder, right?

14 A   Right.  The investigative files were supposed to be

15 created not only for homicides, but all violent crime field

16 investigations.  There were 60,000 violent crimes in 1984.

17 Q   Approximately how many in Area 1?

18 A   About 20 percent, so that would leave 12,000 violent crime

19 field investigations.

20 Q   One of the things in 83-1 is something called -- and you

21 came up with the term "miscellaneous document repository," is

22 that right?

23 A   Probably a little too clever of a word but, yes.  It's an

24 interoffice envelope.

25 Q   And in 83-1, it was an interoffice envelope,

1  eight-and-a-half-by-eleven, that would, you know, fit with an

2  eight-and-a-half-by-eleven folder like Plaintiff's

3  Exhibit 196, is that right?

4  A   Yes, sir.

5  Q   And so this folder with some photographs that was in the

6  working file is not what you were talking about in 83-1, is

7  that right?

8  A   That's correct.  It is not.

9  Q   Finally, Mr. Hickey, I'm going to show you the original of

10 Plaintiff's Exhibit 86.  Can you explain to the jury what

11 Plaintiff's 86 is?

12 A   This is the records division permanent retention file.

13 Again, back in the day, everything was paper.  We're not in

14 the computer age here in 1984.

15        And all the original documents of the case report

16 from the original beat officer, usually hand-printed, to the

17 detective supplementary reports, which were typewritten, and

18 they all have the same RD number, and they are marked for

19 permanent retention.

20 Q   What is that RD number on this pile?

21 A   Frank 151922.

22 Q   The same RD number as the office investigative file I just

23 showed you?

24 A   It is.

25 Q   And the supplementary reports and the case report, the

1  original case report, are those in triplicate in the formset
2  as utilized in the department?
3  A  Duplicate.
4  Q  Duplicate, okay.
5      And so the original -- the design is to keep
6  institutional control that the original goes outside the area
7  right to the records division for personal retention, is that
8  right?
9  A  Yes, sir.
10 Q  So the goal there would be to make sure that none of those
11 get lost and that they -- just in case something happens, that
12 at least outside the area, there is always going to be a
13 complete set of the permanent retention file?
14 A  Yes.  I mean, that is the one place you can always get
15 copies of the official case reports.
16 Q  Mr. Hickey, before this case, before you were asked to
17 give a deposition in this case, had you ever heard of the
18 murders of Smith and Hickman?
19 A  No.
20 Q  Was that a case you worked on?
21 A  It was not.
22 Q  Had you heard of Nathson Fields?
23 A  No, I had not.
24 Q  So everything you learned about this case was in
25 conjunction with getting involved with your deposition and why

1    you're here today, is that right?

2    A    That's correct.

3            MR. NOLAND:  One moment, your Honor.

4            THE COURT:  Yes.

5        (Brief interruption.)

6            MR. NOLAND:  No further questions, your Honor.  Thank

7    you.

8            MS. MEADOR:  No questions, Judge.

9            THE COURT:  Redirect.

10           MS. GORMAN:  Thank you, your Honor.

11                    REDIRECT EXAMINATION

12   BY MS. GORMAN:

13   Q    Mr. Hickey, the fact that there are documents in the

14   street file, Exhibit 1, that do not have a supervisor's

15   signature on it, that doesn't mean they were not submitted to

16   the supervisor, does it?

17   A    It absolutely, positively does not mean what you said.  It

18   suggests it was not submitted.

19   Q    Well, isn't it true, Mr. Hickey, that in the file that

20   counsel was showing you, the one with the 84-44 on the

21   outside --

22   A    Right.

23   Q    -- isn't it true there are multiple documents in that file

24   that do not have a supervisor's signature on them?

25   A    There are.

1  Q    In fact, we have a supplementary report Bates stamped 7579

2  and -- sorry.  Again, this is Exhibit 194 for identification.

3          THE COURT:  I'm sorry.  We have got to switch back to

4  the other thing.  Thanks.

5      (Brief interruption.)

6  BY MS. GORMAN:

7  Q    It's Bates stamped 7579, which has a place for a

8  supervisor's signature.  The supervisor's signature is not on

9  there, is that correct?

10 A    I'm just looking.  That is correct.  It's by the marine

11 unit, right.

12 Q    And, in fact, this document Bates stamped 7591 also has no

13 supervisor's signature on it, is that correct?

14 A    I can suggest I know the reason, but you're right.

15         THE COURT:  Mr. Hickey, I'm going to suggest that you

16 just answer the question and not volunteer things, sir.

17         THE WITNESS:  Yes.

18 BY MS. GORMAN:

19 Q    In fact, this GPR from the first day of the investigation,

20 one of the eight pages of notes that was tendered to Mr.

21 Fields, this one doesn't have a supervisor's signature on it,

22 does it?

23 A    It does not.

24 Q    And Bates stamp 7601, another GPR dated the initial day of

25 the murders, also has no supervisor's signature on it, does

1   it?

2   A   It does not.

3   Q   So, in fact, having a supervisor's signature on it is not

4   going to tell us one way or the other why documents got into

5   the reports -- into the official file or not into the official

6   file, isn't that correct?

7   A   An original, you are correct.

8   Q   In fact, many of the documents in Exhibit 1 don't even

9   have a place for a signature because there are other notes

10   other than GPRs, isn't that correct?

11   A   That's correct.

12   Q   One last thing. You said there is no prohibition to

13   having working files for the detectives to carry around

14   something, but those are only supposed to have photocopies in

15   it, isn't that correct?

16   A   Well, they can have what they're generating that day.

17   Q   And then they turn it over?

18   A   Right.

19   Q   And only walk around with day to day with copies; every

20   day they're supposed to turn over the originals, isn't that

21   correct?

22   A   Of their investigative notes, correct.

23   Q   And investigative materials as well, isn't that correct?

24   A   If it's relevant to the case, right, yes.

25   Q   Now, you stated there were 140,000 GPRs printed and that

1  that suggested to you compliance with using it?

2  A    Yes.

3  Q    Do you know how many of those were thrown away?

4  A    I do not.

5          MS. GORMAN:  I have nothing more, your Honor.

6          MR. NOLAND:  Very briefly, your Honor.

7                    RECROSS EXAMINATION

8  BY MR. NOLAND:

9  Q    Mr. Hickey, I'm showing you Plaintiff's 194, the office

10 investigative file for the Smith-Hickman case.

11         I'm going to show you three GPRs in the office

12 investigative file.  Can you tell me whose sergeant signature

13 is on there?

14 A    J. Murphy.

15 Q    Please turn to the next page.

16 A    J. Murphy.

17 Q    Please turn to the next page.

18 A    J. Murphy.

19 Q    So, Mr. Hickey, at least these three GPRs that were

20 submitted, these were submitted for a supervisor because

21 they're in the office investigative file, right?

22 A    Yes, sir.

23 Q    And it appears to be Sergeant Murphy?

24 A    With his star number, yes.

25 Q    And these GPRs were, therefore, then submitted or put into