# EXHIBIT 47

# Transcript of the Testimony of **James Hickey (pt1)**

**Date:** July 29, 2014

**Case:** James Kluppelberg v. Jon Burge, et al.

Printed On: September 2, 2014

Siebert and Associates Court Reporters, Inc.
Phone:773 851-7779
e-mail:cmsreporters@comcast.net

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| JAMES KLUPPELBERG | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.13 CV 03963 |
| | ) | |
| JON BURGE, LEONARD ROLSTON | ) | |
| #11935, JOHN SCHMITZ #14634, | ) | |
| WILLIAM FOLEY #8108, WILLIAM | ) | |
| KELLY #3644, DETECTIVE URBON | ) | |
| #15400, THOMAS PTAK #6029, | ) | |
| MICHAEL DUFFIN #13596, GEORGE | ) | |
| JENKINS #11828, DETECTIVE | ) | |
| NELSON #16164, DETECTIVE VEGA | ) | |
| #3464, DETECTIVE W. MICEK | ) | |
| #4645, DETECTIVE GUEST | ) | |
| #10600, DETECTIVE L. TUIDER | ) | |
| #5648, FRANCES BURNS, WILLIAM | ) | |
| ALLETTO, as-of-yet UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO and THE CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

The deposition of JAMES HICKEY taken under oath at 311 North Aberdeen Street, Suite 100, Chicago, Illinois, at 11:50 a.m. on Tuesday, July 29, 2014 pursuant to the Rules of the United States District Court, Northern District of Illinois, before Jamye Giamarusti, C.S.R. No. 084.004183 in and for the County of Cook and State of Illinois, pursuant to Notice.

1    APPEARANCES:

2

3        LOEVY & LOEVY, by

4        MS. ROSHNA KEEN

5        312 North May, Suite 100

6        Chicago, Illinois  60607

7            Appeared on behalf of the Plaintiff;

8

9        THE SOTOS LAW FIRM, P.C., by

10       MR. JEFFREY R. KIVETZ

11       550 East Devon, Suite 150

12       Itasca, Illinois  60143

13            Appeared on behalf of the

14            Individually named Defendants;

15

16       JONES DAY, by

17       MR. CHAKA M. PATTERSON

18       77 West Wacker Drive, Suite 3500

19       Chicago, Illinois  60601

20            Appeared on behalf of the Defendant,

21            The City of Chicago.

22

23                    * * * * *

24

```
 1                    (WHEREUPON, Deposition Exhibit
 2                     No. 1 was marked for
 3                     identification.)
 4                    (Witness sworn.)
 5                   JAMES HICKEY,
 6    called as a witness herein, having been first
 7    duly sworn, was examined and testified as
 8    follows:
 9                   EXAMINATION
10    BY MS. KEEN:
11        Q.    Good morning.
12        A.    Good morning.
13        Q.    My name is Roshna Keen, and I
14    represent the plaintiff, James Kluppelberg in
15    this matter.
16              Could you please state and spell
17    your name?
18        A.    James K. Hickey, H-I-C-K-E-Y.
19        Q.    Are you currently employed?
20        A.    I am.
21        Q.    By whom?
22        A.    Chicago Police Department.
23        Q.    What is your rank at the CPD?
24        A.    My title is assistant director.
```

1      Q.   Of any particular unit?

2      A.   Of Research and Development Division.

3      Q.   How long have you held that position,

4  sir, as the Director of R&D?

5      A.   I first had it in 1999.  And two or

6  three years later, I left for other

7  assignments, and I returned in 2008.  So, I've

8  had it twice.  And this time it's been for the

9  last six years.

10     Q.   Before we go any further, I want to

11 show you what's been marked as Exhibit 1.

12          This is the copy of the Notice of

13 Rule 30(b)(6) Deposition pursuant to which we

14 have convened here today.

15          Can you let me know when you

16 finished reviewing it, please.

17     A.   I have previously looked at this

18 document, yes.

19     Q.   Are you here today to testify as the

20 Rule 30(b)(6) representative of the City of

21 Chicago on the topics that are contained in

22 this notice?

23     A.   For topics one through five.

24     Q.   Are you saying that you're not going

1    to be testifying about topic six in the notice?

2              MR. PATTERSON:  That's correct.

3              MS. KEEN:  My understanding from your

4    e-mail was that he was going to be testifying

5    as to one through six.

6              MR. PATTERSON:  No.  I said one

7    through five.  I'm certain of it.  I said one

8    through five, and we were evaluating six

9    through eight.

10             MS. KEEN:  Okay.  What is your

11   position today on six through eight?

12             MR. PATTERSON:  We are looking for

13   somebody to testify on the first half of six,

14   and we are still evaluating what to do about

15   the second half of six, seven and eight.

16   BY MS. KEEN:

17        Q.   So, let me ask you this question, sir.

18             Have you made any efforts to look

19   for documents that are responsive to any

20   discovery requests that were issued in this

21   litigation?

22             MR. PATTERSON:  Objection.  He's not

23   here to testify about six.

24             MS. KEEN:  Well, if he, just in an

1   individual capacity as an employee of the

2   police department, did take steps to obtain any

3   documents that were produced in this

4   litigation, then I want to ask him about that.

5           And if what you're saying is I

6   would have to do that not in his capacity as a

7   30(b)(6) witness, but just independently, then

8   I guess I can do that at the end.

9           But in order to even know that, I

10  have to ask him the predicate question of

11  whether he took any steps.  I don't want him to

12  have to come back twice, and I assume you don't

13  either.

14          MR. PATTERSON:  No, I don't.  So,

15  let's do this.  If you want to ask him about

16  that in his individual capacity, that's fine.

17          MS. KEEN:  Well, the question of

18  whether he looked for everything, I mean, as

19  just a human being who took the steps to look

20  for something.  That's what I'm asking about

21  first.

22          If he did, then I would ask him

23  about his efforts individually, not as a

24  representative of the city.  Do you understand

1    what I'm saying?

2            MR. PATTERSON:  Yeah.  Okay.  That's

3    fine.  Go ahead.

4    BY MS. KEEN:

5        **Q.    Is it Mr. Hickey or Officer Hickey?**

6        **A.    James.**

7        **Q.    That's easy.**

8              **James, did you take any steps to**

9    **look for documents for the purpose of providing**

10   **them to the attorneys in this Kluppelberg**

11   **litigation?**

12       **A.    And I'm speaking as an individual.**

13       **Q.    Right.  On that question.**

14       **A.    Regarding the Ramos case -- no,**

15   **Research and Development does not maintain**

16   **information regarding specific criminal**

17   **investigations or death investigations and we**

18   **don't have anything to do with filing cabinets,**

19   **where they are maintained, or where they are**

20   **located.**

21       **Q.    How about any of the policy documents**

22   **that were produced in this case?  Did you go**

23   **out and pull any policy documents?**

24       **A.    I oversaw some gathering of some**

1    documents that were requested.

2         Q.    Okay.  For this Kluppelberg case?

3         A.    Yes.

4         Q.    And around when did you oversee that

5    process?

6         A.    In the last few months.  I don't know.

7              MS. KEEN:  Okay.  So, I think maybe

8    the easiest way to do it is at the conclusion

9    of the 30(b)(6) deposition, I'll ask him about

10   whatever steps he took, you know, to oversee or

11   directly obtain documents for this case.

12             MR. PATTERSON:  Well, I would object

13   to that.  I think it's fair to ask him

14   personally what steps he took.

15             MS. KEEN:  Right.

16             MR. PATTERSON:  But not what steps he

17   oversaw because I think that bleeds into

18   Topic 6, and he is not the person to testify on

19   Topic 6.

20             Like I said, we will definitely

21   produce somebody on the part of 6 that requests

22   what steps were taken to produce documents in

23   this case, but Jim Hickey is not that person.

24             MS. KEEN:  Okay.  My position is we

1   get to ask him about what he did.

2           MR. PATTERSON:  Yes.  I agree with

3   that.

4           MS. KEEN:  And if he oversaw by

5   talking to somebody, that's what he did.

6           MR. PATTERSON:  Okay.  That's fine.

7   I'm not going to make a big deal out of it.

8   That's fine.

9           MS. KEEN:  We can always talk further

10  about that at a break because that's going to

11  be at the end anyway.

12          MR. PATTERSON:  Okay.  That's fine.

13          MS. KEEN:  Okay.

14  BY MS. KEEN:

15      **Q.   So, your understanding is that you're**

16  **here to testify on behalf of the City of**

17  **Chicago as to topics 1 through 5 of this**

18  **notice, correct?**

19      **A.   Correct.**

20      **Q.   Now, there is a typo in my notice.**

21          **In topic No. 2, it relates to**

22  **Area 3 Violent Crimes.  And at the very last**

23  **sentence of that topic it says:**

24          **"This request includes but is not**

1    limited to the use, storage, location and

2    preservation of police reports, memos, notes,

3    witness statements, worksheets, general offense

4    reports, general progress reports,

5    supplementary reports, lineup reports, evidence

6    logs, inventory reports, and any other means of

7    reporting information learned during an arson

8    investigation?"

9                    Do you see that?

10       A.    Yes, I do.

11       Q.    It should say Violent Crimes

12   Investigation.

13       A.    The last word should be Violent

14   Crimes?

15       Q.    Rather than arson, it should say

16   Violent Crimes.

17       A.    Okay.

18       Q.    With that correction, are you still

19   the representative the 30(b)(6) representative

20   for the city on Topic 2?

21            MR. PATTERSON:  With the exception of

22   line-up reports, he is.

23            THE WITNESS:  Yes.

24

1   BY MS. KEEN:

2       **Q.   So, the entirety of Topic 2 as it**

3   **relates to Violent Crimes with the exception of**

4   **line-up reports, correct?**

5           MR. PATTERSON:  Yes.  Oh, sorry.

6           MS. KEEN:  No, that's okay.

7   BY MS. KEEN:

8       **Q.   And that's your understanding as well?**

9       **A.   Yes, ma'am.**

10      **Q.   And then the same correction needs to**

11  **be made to topic four.  I apologize.  I**

12  **realized this last night.**

13          **Because topic four relates to**

14  **Area 3, the word arson should be replaced with**

15  **Area 3 Investigations.**

16          MR. PATTERSON:  In topic four?

17          MS. KEEN:  Yeah.

18  BY MS. KEEN:

19      **Q.   With that correction, are you the**

20  **representative of the City on the entirety of**

21  **topic four?**

22      **A.   Yes.**

23      **Q.   Did you review any documents to**

24  **prepare for your deposition?**

1      A.   I did.

2      Q.   Tell me what documents you reviewed.

3      A.   Let's see.  Prior depositions I've

4  given.  I think it was -- no -- in the Fields

5  testimony.

6      Q.   From the trial?

7      A.   From the trial.  I did look at the

8  death investigation that turned into a homicide

9  investigation.

10      Q.   You mean for this case?

11      A.   Yes, ma'am.  I looked at a couple of

12  annual police reports.

13      Q.   What was the relevance of those annual

14  police reports?

15      A.   I was trying to refresh my memory

16  regarding the volume of crimes, violent crime

17  field investigations that were assigned to

18  Area 3 in 1984.

19      Q.   Based on your review of those reports,

20  what was your impression of the volume of

21  crime?

22      A.   It's pretty busy.  There was no

23  surprises.

24      Q.   What else did you look at, if

1  anything?

2       A.   That's about all.

3       Q.   Did you review any special orders?

4       A.   Oh, I'm sorry.  Yeah.  The Detective

5  Division Special Orders on the topic of

6  investigative files, but didn't look at them

7  very hard because I'm pretty familiar with the

8  topic.

9       Q.   You wrote some of them, correct?

10      A.   I wrote all of them -- not all of

11 them.  But, yes, I have written some of them.

12      Q.   If you are able to recall, sir, which

13 special orders specifically did you review?

14      A.   Detective Division Notice 82-2,

15 Detective Division Special Order 83-1, as well

16 as 83-2, and one special order Detective

17 Division Special Order from 1986, and I forgot

18 the number on it.

19      Q.   Did you review any memoranda regarding

20 the subject of files and reports?

21      A.   Yes.  I did look at memoranda that

22 were generated on the subject of surveying the

23 violent crime areas and recommendations and

24 discussions that were ongoing that were reduced

1   to a form of a memoranda, several memorandum.

2       Q.   Is it your understanding that all of

3   the documents you reviewed to prepare for

4   today's deposition have been produced in this

5   litigation?

6       A.   Yes.

7       Q.   And that's a question for you or your

8   attorney.  I just want to make sure that if

9   you've looked at something, that I have a copy

10  of it as well.

11          MR. PATTERSON:  Yeah.  Everything that

12  he reviewed has been produced.

13          MS. KEEN:  Okay.  Great.

14  BY MS. KEEN:

15      Q.   Anything else you reviewed?

16      A.   I think that was it.

17      Q.   Okay.  And part of what I'm going to

18  get your help with today is just identifying

19  the different documents, who wrote them, when

20  were they written, that kind of stuff.

21      A.   Okay.

22      Q.   I know you've given some deposition

23  testimony in other cases, correct?

24      A.   Correct.

1      Q.   On some similar subjects to what are

2  contained in our notice here.

3           What other cases have you given

4  deposition testimony in on the subject of

5  reports or file keeping within the police

6  department?

7      A.   Evans case, Rivera, Fields.  I'm

8  starting to lose track to be honest with you.

9           I probably have given depositions

10  on the subject of investigative files to

11  multiple attorneys, Peoples Law Office and

12  others.

13      Q.   You gave testimony at the Palmer

14  hearing, correct?

15      A.   Right.  Early '80s, right.

16      Q.   As you sit here today, do you recall

17  giving that testimony?

18      A.   Right.  It was Judge Shader's

19  courtroom, Milton Shader.

20      Q.   Did you review any transcripts from

21  your Palmer testimony any time recently?

22      A.   Not for this.

23      Q.   Okay.  Have you testified?

24      A.   I mean, for the other ones, I looked

1    at it, but I -- not for this one.

2        Q.    You gave the Rivera deposition

3    somewhat recently, correct?

4        A.    Correct.

5        Q.    And the Fields deposition as well was,

6    relatively speaking, recently, correct?

7        A.    Correct.

8        Q.    In the last year or two or couple of

9    years?

10       A.    Last few months.

11       Q.    Last few months.  Okay.

12            MR. PATTERSON:  Let me just interject.

13   To be clear, Roshna, I think the Fields

14   testimony at trial was given in the last couple

15   months.

16            MS. KEEN:  Okay.

17            MR. PATTERSON:  The Fields deposition

18   was like maybe 2012.

19            MS. KEEN:  Okay.

20            MR. PATTERSON:  2011, 2012, something

21   like that.

22            THE WITNESS:  Thank you.

23   BY MS. KEEN:

24       Q.    So, let's return back to your career

1    with the department.  I know you've been with

2    them a long time.  I just want you to briefly

3    walk me through the various posts you had.

4         A.    Sure.  I started the Chicago Police

5    Department in June 1971.  After the training

6    academy, I was assigned to the Englewood

7    community, 61st and Racine.  I spent a couple

8    years there and was assigned to work as a

9    police officer in the juvenile court where I

10   worked until about 1975.

11              And in 1975, I began working for

12   the Special Investigations Unit of the Youth

13   Division, which concentrated its investigations

14   on child pornography and school narcotics.

15        Q.    What rank did you have if you were in

16   the Special Investigations Unit?

17        A.    I was police officer at that time.

18        Q.    Was Special Investigations within --

19        A.    Within the Youth Division.

20        Q.    And what was the Youth Division

21   within?

22        A.    The Bureau of Investigative Services.

23        Q.    So, was that, like, a specialized unit

24   within the Bureau of Investigative Services?

1     A.   Yes, it was.

2     Q.   Okay.

3     A.   In August 1977, I was appointed to

4  detective -- appointed as a detective, and I

5  was assigned to Area 1 Homicide and Sex Unit

6  that worked out of 51st and Wentworth and was

7  responsible for crimes which occurred south of

8  the Chicago River to 75th Street, Dan Ryan to

9  the Lake.

10     After that, about 19 -- late

11  1980, I was assigned to detective headquarters.

12     Q.   What did that mean that you were

13  assigned to detective headquarters in terms of

14  your responsibilities?

15     A.   My responsibilities changed

16  dramatically from that of a field detective to

17  that of a detective working downtown at the

18  headquarters building.  I worked for the Chief

19  of Detectives.

20     Q.   Who was the chief at that time?

21     A.   William Hanhardt, H-A-N-H-A-R-D-T.

22     Q.   What were your responsibilities for

23  the Chief of Detectives?

24     A.   In the morning, I would come in early

1    and review all the major crimes which occurred

2    citywide and then brief the chief in the

3    morning.

4        Q.   What documents were you looking at to

5    permit you to review all the major crimes that

6    had occurred citywide?

7        A.   There was a requirement that each of

8    the then six areas in Bomb & Arson would create

9    a 24-hour log.  And each day on each of the

10   three watches or shifts, the supervisor in

11   charge would have to simply summarize the

12   highlights of major investigations that had

13   just occurred or developments, major

14   developments on other cases.

15       Q.   What was the log called?

16       A.   Detective area, 24-hour log, something

17   similar to that.

18       Q.   Was it ever called the Major Incident

19   Log?

20       A.   That's it.  Yeah.  Major Incident Log.

21   That's it.  24-hour log.

22       Q.   Just so that I am clear, do you recall

23   what it looks like?

24       A.   Sure.  It had two columns.  On the top

1    of it, it had the normal unit identifier.  And

2    on the left-hand column, it had the hours for

3    the shift.  And in the right-hand column, there

4    was space, free entry, where the supervisor had

5    to write the event, describe the event, usually

6    in less than a paragraph, and so on and so

7    forth.

8                 For each of the watches at the

9    end of 24 hours, usually at 5:00 o'clock in the

10   morning, they were hand-carried down to

11   headquarters.

12                 We're talking about an era before

13   the fax machine.  Hard to imagine, I know.

14   But, yes.

15        Q.   I have worked at places where they

16   have interoffice mail envelopes, so I'm

17   picturing something like that.  It was

18   hand-carried to the Chief of Detectives office?

19        A.   Right.

20        Q.   Where was the Chief's office located

21   at that time?

22        A.   1121 South State Street on the 5th

23   floor at the headquarters building.

24        Q.   At that time, what other unit or areas

1  were in 1121 South State Street?

2      A.   All the major leadership was there,

3  including the Superintendent of Police.

4      Q.   When you said that the supervisor in

5  charge had to fill out the Major Incident Log,

6  are you referring to the sergeant supervising

7  each shift?

8      A.   Correct.

9      Q.   Did lieutenants or captains or

10 commanders have any responsibility in filling

11 out that list?

12     A.   Lieutenants tended not to fill it out

13 unless there was no sergeant around.  There

14 were no captains assigned to the Detective

15 Division in this era.  And commanders didn't do

16 it.

17     Q.   How long did you work for the Chief of

18 Detectives after starting in the late '80s?

19     A.   Oh, about three years.

20     Q.   So, what you're describing for me now

21 is your daily routine from about late '80 to

22 sometime in '83?

23     A.   Yes.  And that was simply my morning

24 activities.

1      Q.   Okay.  What is your understanding as

2  to whether copies of the Major Incident Log

3  remained at some point in time?

4      A.   Okay.  Now, we've shifted from the

5  Major Incident Log to the Major Incident

6  Worksheet, or no?

7      Q.   No.  We're not talking about that yet.

8      A.   Okay.

9      Q.   I know that exists.  I have questions

10  about that, but I'm still talking about this

11  24-hour log.

12      A.   Okay.  The original was sent downtown,

13  a copy went to the deputy chief, a copy went to

14  the area commander, a copy stayed with the area

15  Violent Crimes Unit.

16      Q.   What if we're talking about

17  Bomb & Arson?

18      A.   They submitted their own and a copy

19  went to the -- the original went to the chief,

20  a copy went to the deputy chief, a copy went to

21  their commander, and I presume they had an

22  office copy.

23      Q.   Why do you presume that?

24      A.   It's a document that sometimes is

 1    informative, especially for one that has been

 2    off for the last two days.  They can come in

 3    and see what happened.

 4         Q.   Okay.  As of the three years that you

 5    were first working in the Chief of Detectives

 6    office, what was the retention schedule for the

 7    Major Incident Log?

 8         A.   I believe it was one year.

 9         Q.   Was it one year for all of the copies,

10    or did some copies stick around longer than

11    this?

12         A.   It's the original.  You really can't

13    control, you know, copies of copies.  It speaks

14    to the original and any copies.

15         Q.   Are you saying that the police

16    department's policy was to purge all Major

17    Incident Logs after one year of their

18    existence?

19         A.   Yes.

20         Q.   Were Major Incident Logs or copies of

21    the logs ever placed in individual police files

22    relating to a specific case?

23         A.   I don't believe so.  Could they have

24    been?  Yes, they could have been.  It was not

1    viewed as pertinent to the subject

2    investigation.

3              It's simply a summary to inform

4    the leadership of events that occurred.  And

5    there are more than -- frequently more than one

6    event per page.

7         Q.   Okay.  So, you're saying it wasn't --

8    well, let me -- I guess let me give you an

9    example and that may -- your answer may be the

10   same and that's fine, but I'll just ask you.

11             If the Major Incident Log

12   contained references to three different

13   homicides that had all occurred within a span

14   of a 24-hour period within the same district,

15   would you expect to see a copy of that Major

16   Incident Log placed into either the permanent

17   retention file or let's call -- let me re-ask

18   that.

19             Would you expect to see in a case

20   where a Major Incident Log had referenced three

21   different homicides that had all occurred

22   within the same 24-hour period in the same

23   geographic area placed into either the RD file

24   or the unit file for each of the three

1  **homicides?**

2          MR. PATTERSON:  Objection, foundation,

3  incomplete hypothetical.

4          MS. KEEN:  Just so that we're clear,

5  I'm talking about this time period of '80 to

6  '83 when you were working in the Chief of

7  Detectives.

8          MR. PATTERSON:  Same objection.

9          THE WITNESS:  I would not expect it to

10 be placed in individual files.

11 BY MS. KEEN:

12      **Q.   Okay.  For the reasons that you stated**

13 **a moment ago?**

14      **A.   It's a management information sheet,**

15 **and it was not part of the individual**

16 **investigation.**

17      **Q.   Have you ever seen a copy of a Major**

18 **Incident Log in a unit file?**

19          MR. PATTERSON:  Objection, foundation.

20          MS. KEEN:  Just so that I understand,

21 what's the foundation objection?

22          MR. PATTERSON:  You haven't

23 established that there are unit files, what

24 they are, what they contain, et cetera.

1          MS. KEEN:  Okay.  I guess I'm --

2     that's fine.  That's such a --

3          MR. PATTERSON:  Where they're kept.

4          MS. KEEN:  Because of his position,

5     you know, his extensive experience on the

6     subject, which we can get into, but I'm sure

7     he's going to be asked questions in his

8     position as the designee on these topics.

9               I'm going to ask him about

10    whether he's ever seen something occur, you

11    know, in the course of his career.  I'll define

12    unit file, and you can let me know if that

13    addresses your concern.

14    BY MS. KEEN:

15         **Q.   Let me take a step back.**

16              **Have you ever seen a Major**

17    **Incident Log placed into any police file**

18    **relating to a specific police investigation?**

19         **A.   I can't recall there being such an**

20    **event.  There may have been.  I just can't**

21    **recall.**

22         **Q.   Okay.  So, other than reviewing the**

23    **24-hour log, or Major Incident Log, what were**

24    **your responsibilities?**

1    A.    Attached to these 24-hour logs,

2  sometimes were supplemental reports, sometimes

3  there were Major Incident Worksheets.

4    Q.    What is a supplemental report?

5    A.    A supplemental report is a -- was at

6  that time a form set, a paper document.  And it

7  was the investigation that was submitted by

8  detectives or others that was pertinent to an

9  already reported crime.

10              And just to clarify, I did not

11  get the originals, but only photocopies of

12  those.

13    Q.    Did the Chief of Detectives office get

14  a copy of every Major Incident Worksheet that

15  was prepared?

16    A.    No.

17    Q.    Just ones that were attached to the

18  Major Incident Logs?

19    A.    Correct.

20    Q.    In what circumstances would the Major

21  Incident Worksheet get submitted to the Chief

22  of Detectives as opposed to not submitting it?

23    A.    In the opinion of the supervisor who

24  prepared it.

1    Q.   Who prepared the log?

2    A.   The log, would make a judgment call,

3  perhaps the Chief would like to know more about

4  this particular event.

5    Q.   At that time, in other words, from the

6  late '80s to sometime in '83, when you left,

7  was there a requirement that any particular

8  police reports or police documents were

9  supposed to be submitted to the Chief of

10 Detectives other than the Major Incident Log?

11   A.   No.

12   Q.   So, that was the only document that

13 the various areas or specialized units were

14 supposed to submit to the Chief of Detectives

15 as far as --

16   A.   Supplemental reports.  I mean, they

17 would give it, but not all supplemental

18 reports.

19   Q.   Can you explain what you mean by that?

20 Or, just tell me more about that.

21   A.   Well, when you do 100,000 case

22 reports, not all of them have the same level of

23 interest.  Some crimes simply may be more

24 serious in nature.  There's a difference

1    between a stalking case and a murder case.

2                    And the leadership of the police

3    department tended to want to know more about

4    the more serious crimes that occurred.  And

5    sometimes the detailed information was -- has

6    been submitted on a supplementary report.  And

7    they were simply provided a copy.

8        Q.    Okay.  So, I guess there's two

9    categories of information.  There's one

10   category of information which was, as a matter

11   of course, required to be submitted to the

12   Chief's office.

13                   And then it sounds like there was

14   a second category of information that the chief

15   would request on a case-by-case basis; is that

16   accurate?

17       A.    I would say no.  I would say most of

18   these additional documents were determined by

19   those that created the area log.  If they had

20   it, they would attach it.

21                   So, it wasn't so much a request

22   from the Chief, nor was it a requirement from

23   the Chief.

24       Q.    But the practice was to submit --

1  well, what was the practice in terms of

2  submitting supplemental reports from an area or

3  specialized unit to the Chief of Detectives?

4      A.   When they thought the Chief would be

5  interested and when they thought the -- if the

6  case report was done, the supplementary report

7  was completed.

8              Most of the time the

9  supplementary report is done hours after the

10  investigation is completed.  So, there's a lag,

11  you know.  The paperwork is the last thing

12  done.

13      Q.   So, you're saying based on the lag,

14  it's unlikely that the supplementary report

15  would have even been completed by the time the

16  Major Incident Log was sent to the Chief?

17      A.   Correct.

18      Q.   But in those cases where there was a

19  supplemental report prepared and it was of a

20  crime or alleged crime that the supervisor

21  thought would be of interest to the Chief,

22  you're saying the practice department-wide was

23  to submit that supplementary report to the

24  Chief; is that accurate?

1     A.   If it was available, and if the

2   individual supervisor determined he was going

3   to send it.  There was no requirement to.

4     Q.   What about handwritten notes during

5   this '80 to '83 period?  What did you tend to

6   see as far as handwritten notes being sent to

7   the Chief's office?

8     A.   None.

9     Q.   You never saw handwritten notes

10  attached to a supp report?

11        MR. PATTERSON:  Objection, asked and

12  answered.

13        MS. KEEN:  You can answer.

14        THE WITNESS:  No.

15  BY MS. KEEN:

16     Q.   Was there a prohibition against

17  submitting handwritten notes to the Chief's

18  office?

19         I don't mean that to be cute at

20  all.  I'm just saying in terms of the filing

21  system.

22     A.   We were silent on the issue.

23     Q.   Okay.  I'm sure you had numerous other

24  responsibilities working at the Chief's office,

1    can you just go over what the remaining

2    responsibilities were that you had?

3         A.    Very simply stated, they tended to be

4    special projects.

5         Q.    What were some of the special projects

6    you had done?

7         A.    Crime statistics.  It was certainly a

8    considerably large one.  The veracity of our

9    crime statistics.  Sometimes we get challenged.

10   And investigative files certainly took up a lot

11   of my time.  And some things as mundane as

12   personnel evaluation, what methods should we

13   use by detective supervisors.

14        Q.    At some point in time, the department

15   began dealing with a street files problem,

16   correct?

17             MR. PATTERSON:  Objection, foundation.

18   BY MS. KEEN:

19        Q.    In the '80s, the department had to

20   deal with the accusation that there was a

21   street files problem, correct?

22             MR. PATTERSON:  Objection, foundation.

23   BY MS. KEEN:

24        Q.    You can answer.

1      A.    Yes.

2      Q.    And you were one of the people that

3  began the task of looking at street files,

4  correct?

5      A.    At the direction of my supervisors.

6      Q.    In connection with that work on street

7  files, you ended up drafting several special

8  orders, correct?

9           MR. PATTERSON:  Objection, foundation.

10          THE WITNESS:  Correct.

11 BY MS. KEEN:

12     Q.    Were you doing all that work on the

13 street files project while you were at the

14 Chief's office in the position you just

15 described to me?

16     A.    Yes.

17     Q.    Okay.  So, that was the investigative

18 file special project you were talking about?

19     A.    Yes.

20     Q.    That's obviously going to be the

21 subject of some of our -- at least some of our

22 questions today, but let me go to your

23 chronology and get that finished.

24     A.    Sure.

1      Q.   After you left the Chief of

2  Detectives, where did you go next?

3      A.   I went to the crime laboratory in

4  1983.  I stayed in the crime lab until probably

5  '87, during which time I made sergeant and

6  lieutenant.

7           When I made lieutenant in 1987, I

8  was reassigned to the Englewood community.

9      Q.   What area was that?

10     A.   This is 61st and Racine.

11     Q.   Was there an area number?

12     A.   No.  007 is the unit number for the

13  Englewood District.

14     Q.   Okay.  So, you were a lieutenant

15  detective, or no?

16     A.   No, no.  They're separate.  Detective

17  is one title; sergeant is another title;

18  lieutenant is a third title.

19           So, in '87, I made lieutenant,

20  went to Englewood.  And really shortly

21  thereafter, probably six months later, I was

22  reassigned to work for the Chief of Patrol.

23     Q.   Okay.  What year would that be?

24     A.   It's still '87.

1      Q.   What were your -- going to the

2  Englewood District when you were lieutenant,

3  just briefly, what were your duties there?

4      A.   Mostly I was a field lieutenant, and I

5  was the fill-in watch commander.

6      Q.   Did you have occasion to investigate

7  crimes while you were a lieutenant in the

8  Englewood District?

9      A.   Oversee.  Patrol is responsible for

10  the preliminary investigation of all crimes and

11  detectives have to follow-up to those reported

12  crimes.

13      Q.   Who were you supervising as the

14  lieutenant in Englewood?

15      A.   Those people in blue shirts and the

16  white shirt sergeants.

17      Q.   Okay.  So, you didn't have any

18  supervisory responsibility over the detectives

19  at that point?

20      A.   No, I did not.

21      Q.   And just briefly, what were you doing

22  in the crime lab?

23      A.   I was administrative sergeant.  I did

24  a lot of budget work and a little crime scene

1    processing.

2         Q.   Did you have occasion to do any actual

3    casework, in other words, investigation of

4    specific crimes while you were in the crime

5    lab?

6         A.   No.  I went to a few crime scenes.

7    But, no.  My job was mostly administrative.

8         Q.   In '87, when you went to the Chief of

9    Patrol, you said?

10        A.   Yes, ma'am.

11        Q.   What was your title then?

12        A.   Lieutenant.

13        Q.   Oh, you stated lieutenant.

14             Okay.  What did you have to do as

15   lieutenant?

16        A.   I did the budget, I made the

17   personnel -- I drafted the personnel movement.

18   We move a lot of people in the Patrol Division.

19   And participated in the planning and the set-up

20   for special events, including those major

21   festivals, such as Puerto Rican Festival,

22   Bud Billiken, et cetera, and any protests that

23   may have arisen, abortion clinics at the time.

24   Those that required some type of special

1  response.

2      Q.   Did you have occasion to oversee a

3  patrol officer's initial investigation into an

4  alleged crime when you were in the Chief of

5  Patrol?

6      A.   No.

7      Q.   Where did you go after that?

8      A.   I went to create -- assist in the

9  creation of a new unit, the Airport Law

10  Enforcement Section.

11           Up until that time, O'Hare

12  Airport was part of the 16th District and

13  midway was part of the 8th District on the

14  southwest side.  And the 1st District had

15  administrative control over Meigs Field, which

16  was previously on the lakefront near McCormick

17  Place.

18           At that time, it became a unified

19  command, and it was separated from the

20  districts.  I was in charge of creating a new

21  unit at Midway and at then Meigs Field for

22  just -- oversee, you know, police officers and

23  work with the Department of Aviation.

24      Q.   Okay.  And you completed that

1   successfully?

2       A.   Yes.  And then my next assignment

3   was -- I was directed to create another new

4   unit called the Random Drug Testing Unit.

5            Random Drug Testing tests police

6   officers on an unannounced basis.  It is a

7   program which is pretty much verified by the

8   integrity of the police officers.  By that I

9   mean, we catch very few police officers who

10  have abused narcotics.

11      Q.   Who asked you to work on the Airport

12  Section and the Random Drug Testing, was that

13  directly from the superintendent?

14      A.   No.  The second one was.  The Random

15  Drug Testing was from the superintendent.  The

16  other one was from the first deputy

17  superintendent.

18      Q.   Is that person the next in command

19  after superintendent?

20      A.   Yes.

21      Q.   I'm sorry.  What did you say?  That

22  was the first deputy?

23      A.   First deputy.

24      Q.   Do you know how it came about that you

1   got tapped to create these two projects?

2       A.   I was considered a strong writer,

3   organizer, and I think the superintendent liked

4   my involvement in some other activities and he

5   just -- I had no choice.  It was not something

6   I volunteered for.

7       Q.   What did you do after the Random Drug

8   Testing Unit?

9       A.   I was assigned to work for a deputy

10  superintendent of the Bureau of Investigative

11  Services.

12      Q.   And at this point in time, what year

13  are we talking?

14      A.   Probably '90 or '91.

15      Q.   Did the organizational structure of

16  the Bureau of Investigative Services change at

17  any point between when you started with the

18  department and when you started working for the

19  deputy superintendent of the Bureau of

20  Investigative Services?

21      A.   It did.  It used to only have the

22  Detective Division and the Youth Division.  And

23  somewhere along the line, the organization

24  changed and it added Organized Crime Division

1   in the Superintendent Brzeczek era, early

2   1980s.

3      Q.   Is Organized Crime gang crimes?

4      A.   That is one of the subsidiaries,

5   right.

6      Q.   Of Organized Crime?

7      A.   Narcotics, gangs are the two primary.

8   Vice, vice control.

9      Q.   So, organized crime was added

10  during Brzeczek --

11      A.   Common spelling.  I don't know.

12      Q.   No, no.  I can give it to you later.

13  I never know how to pronounce it to be honest.

14      A.   Brzeczek.

15      Q.   But, in any event, that addition was

16  made when?

17      A.   1981, '82.

18      Q.   You're saying that became part of the

19  Detective Division?

20      A.   No.  The Bureau of Investigative

21  Services grew from two divisions of Detective

22  Division and the Youth Division and picked up a

23  third division called Organized Crime.

24      Q.   Once that picked up the third division

1   of Organized Crime, did it change at all prior

2   to or until up you began working for the deputy

3   superintendent of the Bureau of Investigative

4   Services?

5          A.   Did what change?

6          Q.   The organizational structure of the

7   Bureau of Investigative Services.

8          A.   That was the only change I could think

9   of.

10         Q.   Now, where does Bomb & Arson fit?  And

11  I have a chart here somewhere.  I mean, if you

12  need to look at one, let me know.

13         A.   No.  In the Detective Division.

14         Q.   Okay.  So, Bomb & Arson has always

15  been in the Detective Division?

16         A.   During this era, yes.

17         Q.   When did that change?

18         A.   Under Superintendent Jody Weis, a few

19  years ago.  And then it has since been returned

20  to the Bureau of Detectives since that time.

21         Q.   But for all of the '70s, '80s and

22  '90s, obviously only once Bomb & Arson was

23  created?

24         A.   Right.

1      Q.   But for as long as Bomb & Arson

2  existed -- although, I guess, let me back up.

3           Do you recall the year that

4  Bomb & Arson was created?

5      A.   I don't recall the exact year.  Either

6  the late '80s or late 1980, '81, in that time

7  era.

8      Q.   From when Bomb & Arson was created

9  until the 2000s when Superintendant Weis made a

10  change, Bomb & Arson was always part of the

11  Detective Division, correct?

12     A.   Yes, ma'am.

13     Q.   And the Detective Division was always

14  part of the Bureau of Investigative Services?

15     A.   Correct.

16     Q.   Now, there are a number of areas,

17  correct, in the department?

18     A.   Yes.

19     Q.   And each area in the '80s had a

20  Violent Crimes Section, correct?

21     A.   The Violent Crimes format was created

22  in January, 1981.  So, from 1961 to 1981, there

23  was a crime specific format.  Each of the

24  detective areas each had their own homicide

1  unit, robbery unit, general assignment unit,

2  burglary unit, auto theft.

3             And their bosses -- they each had

4  a separate supervisor, and that supervisor was

5  downtown at the headquarters building.

6             In January of 1981, it, the

7  Detective Division, moved to a geographic

8  centered model where the areas did not

9  specialize so much in individual crimes, but in

10  community crimes.  All the crimes that occurred

11  in a certain geographical area.

12             And each of the detective areas

13  at that time were broken into three sub units;

14  Violent Crimes, Property Crimes, and Youth

15  Crimes.

16      Q.   This was the '81 change?

17      A.   Correct.

18      Q.   So, the detectives working in Violent

19  Crimes within an area were considered part of

20  the Detective Division?

21      A.   Correct.

22      Q.   Just by going back to the change where

23  you added Organized Crime to the Bureau of

24  Investigative Services.

1          MR. PATTERSON:  And just so the record

2  is clear, not him, but when the Chicago Police

3  Department did that?

4          MS. KEEN:  Right.  Sorry.

5          THE WITNESS:  Beyond my pay rate.

6  BY MS. KEEN:

7     **Q.   That was unintended.  I meant when the**

8  **City added the Organized Crime Section, who was**

9  **working those cases prior to the formal**

10  **creation of Organized Crime?**

11          **Was it going back to this crime**

12  **specific format you were talking about where it**

13  **was area detectives that was dealing with the**

14  **Narcotics, Vice, Gangs?**

15     **A.   You're losing me.  Who was working**

16  **what cases?**

17     **Q.   So, you said that in '80 or '81 when**

18  **the area detectives changed their model and now**

19  **went from a crime specific format to actually**

20  **having Violent Crimes, Property and Youth, it**

21  **sounds like around that same time is when the**

22  **Bureau of Investigative Services created a**

23  **third division which is Organized Crime; is**

24  **that correct?**

1      A.    Yes.

2      Q.    So, what I was wondering is, who was

3  working the Narcotics, Vice, Gang Crimes prior

4  to the creation of the Organized Crime

5  Division --

6      A.    Oh, there had been a Narcotics Section

7  prior to that and a Vice Section prior to that.

8            I'm a little fuzzy as to when the

9  Gangs Unit were created.  I don't know if we

10  had one before then.

11      Q.    But it's your understanding that as to

12  all of the topics -- strike that.

13            It's your understanding that area

14  detectives were investigating Narcotics, Vice,

15  and Gang Crimes issues before --

16      A.    No.

17      Q.    Oh.  So, which set of detectives were

18  dealing with those three areas before the

19  Organized Crime Unit was created?

20      A.    The detectives are primarily

21  responsible for Part 1, UCR Crimes, Uniform

22  Crime Report category crimes.  And they are

23  responsible for others, but not so much.

24            Part 1, just so we get a sense of

1  what their investigative jurisdiction is,

2  homicide, rape, robbery, burglary, assault,

3  auto theft and in 1979, they added arson, which

4  probably explains when Bomb & Arson came in.

5        So, traditional crimes, these

6  other crimes, Narcotics and Vice, have all been

7  a specialty unit of enforcement and not part of

8  the Bureau of Detectives.

9     Q.   When you say Bureau of Detectives, are

10  you referring to the current name for what used

11  to be Detective Division?

12     A.   Yes, yes.  That's the current name.

13     Q.   And you don't know what the deal was

14  with the gangs; is that right?

15     A.   No, I don't.  I would have to do some

16  research on that.

17     Q.   But you know that once the Organized

18  Crime Unit was created, those detectives dealt

19  with Gang Crimes?

20     A.   Right.  They weren't detectives.

21     Q.   Oh, they weren't?

22     A.   No.  In the Organized Crime, Organized

23  Crime had no detectives.  They had police

24  officers and they had gang specialists, and the

1    normal sergeants and lieutenants.

2                Detectives only worked in the

3    Detective Division, and youth officers at that

4    time only worked in Youth Units.

5        Q.    Also not detectives?

6        A.    Same pay, but different title.

7        Q.    So, who was investigating arson before

8    Bomb & Arson?

9        A.    I don't positively know.  I don't

10   know.  I would say it would be one of the

11   Part 2 crimes.

12               There is a category of crimes in

13   the Uniform Crime Reporting Program that are

14   not Part 1, those eight or nine crimes that I

15   just described, but are Part 2 crimes that are

16   serious, but a little lesser in volume.

17               For instance, kidnappings,

18   arsons.

19       Q.    I see what you're saying.

20            MR. PATTERSON:  Roshna, just to be

21   clear, because I think we perhaps got a little

22   bit far afield.

23               There was a lot of questions on

24   the creation of the Gang Unit, Organized Crime,

1  Narcotics, and so on.

2              Were you asking those questions

3  in his capacity as the Chicago Police

4  Department or in his individual capacity?

5       MS. KEEN:  Yeah, I mean, I think that,

6  you know, especially to your objection on

7  foundation, I'm trying to understand what the

8  organizational structure is and establish what

9  his familiarity was with the organizational

10 structure, where documents and reports were to

11 go.

12             This is really just foundational.

13 I was actually going to turn to another subject

14 now.

15      MR. PATTERSON:  Okay.  That's fine.

16 BY MS. KEEN:

17     Q.   I guess the last question is, what was

18 the command structure in the Bureau of

19 Investigative Services?

20     A.   The Bureau of Investigative

21 Services --

22     Q.   I'm sorry.  My question relates to the

23 1980s time period.

24     A.   Okay.

1      Q.   Was it the same throughout the 80s?

2      A.   For this time period.

3      Q.   Okay.  Because if it wasn't, I can

4  break it up.

5      A.   No.  It was a tad different in

6  January 1980 -- January 1981 on through '88,

7  anyhow, the Bureau of Investigative Services

8  was headed by a deputy superintendent.

9            The Detective Division, which

10  reported to the Bureau of Investigative

11  Services was headed by a chief.

12            The Organized Crime Division was

13  headed also by a chief and the Youth Division

14  was headed by a commander.

15      Q.   So, when you worked in the Chief of

16  Detective Division, you reported to the Chief

17  of Detectives, correct?

18      A.   Correct.

19      Q.   And he in turn reported to the deputy

20  superintendent of Bureau of Investigative

21  Services?

22      A.   Yes.

23      Q.   And who did the deputy superintendent

24  of BIS, just to use fewer words, report to?

1    A.    The Superintendent of Police.

2    Q.    Within the Detective Division, what

3  was the command structure?

4    A.    Reporting to the Chief of Detectives

5  were three deputy chiefs.  One deputy chief was

6  in charge of the south areas, the second deputy

7  chief was in charge of the north areas, and the

8  third deputy chief was in charge of Special

9  Activities.  And it included Bomb & Arson.

10   Q.    Okay.  So, I've heard the terms Area

11  North and Area Central --

12   A.    That's it.

13   Q.    -- and Area South.

14         Is that what you're talking about

15  in here?

16   A.    No.

17   Q.    Okay.  Those are different?

18   A.    Similar, but not the same.

19   Q.    Can you explain.

20   A.    Field Group North and Field Group

21  South were the existing terms.  Each was

22  composed of three separate detective areas.

23   Q.    I got you.

24         MR. PATTERSON:  And, Roshna, just so

1    the record is clear, what time frame?

2    BY MS. KEEN:

3        Q.   January '81 until, you know, the

4    period of -- at least the end of '88, let's

5    say.  Is that your understanding, too?

6        A.   Yes.

7        Q.   Okay.

8        A.   Then there was the Special Activities

9    Group that was in charge of Bomb & Arson, and I

10   am forgetting who else reported to them.

11   Financial Crimes, and I'm at a loss at the

12   moment.

13       Q.   Okay.  What's the deal with Field

14   Group A and B?  Because I've seen that in the

15   documents.

16       A.   Same.  A was south; B was north.

17       Q.   Okay.  So, when you said that there

18   were three deputy chiefs reporting to the

19   Chief, one was Area South, one was Area North.

20            That's the same way of saying one

21   was Field Group South or Field Group B?

22       A.   South was the original term in 1981,

23   and somewhere over the years it morphed into A

24   and B.

1          Q.    But north was A and south was B?

2          A.    North was B; south was A.  I believe.

3    I don't know.

4          Q.    You're not sure about that?

5          A.    I'm not sure.  A or B.

6          Q.    Okay.  Who at that time reported to

7    the deputy chief?

8          A.    Detective commanders.  Each of the six

9    detective areas was led by a commander, and the

10   Bomb & Arson Section was led by a commander.

11         Q.    Detective commander, or is it the same

12   thing?

13         A.    Detective.  Commander is a commander.

14         Q.    And then who reported to the

15   commander?

16         A.    Lieutenants, Violent Crimes

17   lieutenant, Property Crimes lieutenant, Youth

18   lieutenant in the detective areas.

19         Q.    And Bomb & Arson detectives?

20         A.    There was a lieutenant or two, and

21   they had technical titles of explosive

22   technicians.  They had various pay grades.

23         Q.    But the command structure that you've

24   described is the same for Bomb & Arson at this

1   time period?

2       A.   Yes.

3       Q.   And then below lieutenant was

4   sergeant?

5       A.   Sergeant.

6       Q.   And then followed by detective?

7       A.   Correct.

8       Q.   In the case of Bomb & Arson, I'm aware

9   from other depositions in this case, there's,

10  you know, arson detectives, and then there's

11  explosive technicians?

12      A.   Right.

13      Q.   Now, within Bomb & Arson were there

14  people called office detectives or

15  administrative detectives that you're aware of

16  working in this '80s time period?

17      A.   I was not aware of that title.  I

18  don't think you'll find it in the literature or

19  directives.

20      Q.   What's the title?

21      A.   It's probably a description of a

22  detective assigned to perform administrative

23  duties.

24      Q.   What was the name of the people who

1  were in charge of filing inside Bomb & Arson?

2  What was their title or rank?

3      A.   Detective.

4      Q.   So, there were certain detectives who

5  had no case investigative obligations and were

6  only required to handle administrative work; is

7  that correct?

8      A.   Correct.

9      Q.   At any given time, did Bomb & Arson

10 have any such administrative detectives who

11 were there?

12     A.   I don't know.

13     Q.   What about supervisors of those

14 administrative detectives I'm calling them,

15 were there any, and if so, what was their rank?

16     A.   On each watch or shift there tended to

17 be one, sometimes two sergeants who supervised

18 both the working detectives, street detectives,

19 and those performing administrative duties.

20     Q.   For purposes of this deposition, is it

21 okay with you if I call them field detectives

22 and administrative detectives, or what

23 nomenclature would you prefer?

24     A.   Field gets a little confusing because

1   we have a term of art and you'll probably look

2   them up later.

3          Q.   Okay.

4          A.   Just detectives assigned to

5   investigate crimes.

6          Q.   Okay.  As opposed to --

7          A.   And administrative personnel.

8          Q.   Okay.  Before you went to the Chief's

9   office, you were a detective at Area 1,

10  correct?

11         A.   Correct.

12         Q.   What kinds of work did you do as an

13  Area 1 detective?

14         A.   I was a homicide and sex detective.

15  In addition, we investigated -- I investigated

16  aggravated batteries and simple assaults.

17              Even though the title of the unit

18  said homicide and sex, there were other crimes

19  that we investigated, the personal crimes.

20         Q.   I see.

21         A.   With the exception of robbery.

22         Q.   Did you attend detective training

23  prior to working as a detective in Area 1?

24         A.   I did.

1      Q.   How many cases would you say you

2   investigated when you were an Area 1 detective?

3      A.   I don't know.  Because Area 1 was such

4   a high volume unit, I think it was the second

5   busiest of the six areas.

6            And because homicides tend to

7   occur afternoons, and I was working afternoons,

8   I probably had a homicide once every ten days.

9            In addition, every day that I

10  came into work, I received one or two other

11  assignments, whether it be a shooting or a

12  stalking or whatever it might be.

13     Q.   Do you think you worked on thousands

14  of cases while you were --

15     A.   Probably.

16     Q.   I'm just asking you this so that I

17  know the answer, but I'm guessing the answer is

18  no.

19            Have you ever been the subject of

20  any disciplinary proceedings while you were at

21  the department other than for, like, being late

22  for work or something?

23     A.   No.

24     Q.   All right.  Now, turning to --

1       A.    I mean, I received at least one

2    complaint, but no disciplinary.

3       Q.    When was that complaint?

4       A.    12 years ago.

5       Q.    Briefly what was the nature of the

6    complaint?

7       A.    Did I speak to a subordinate about

8    someone else's CR investigation.

9       Q.    All right.  So, turning to the subject

10   of some of the memos and special orders that

11   you prepared.  I just want to --

12            MR. PATTERSON:  Would this be a good

13   time to take a short break?

14            MS. KEEN:  Any time you want.

15            MR. PATTERSON:  Is that okay?

16            MS. KEEN:  Yes.

17                    (WHEREUPON, a short break was

18                     taken.)

19            MS. KEEN:  Back on the record.

20   BY MS. KEEN:

21       Q.    When you were an Area 1 detective you

22   had occasion to prepare police reports,

23   correct?

24       A.    Yes, ma'am.

1     Q.   What kinds of police reports were

2  available to you as a detective that you filled

3  out regarding a police investigation you were

4  doing?

5          And just so that the record is

6  clear, I think the date range we're talking is

7  from '77 until you started at the Chief of

8  Detectives office in late '80s.

9     A.   Sure.  There was an original case

10  report.  I could fill that out.  I could fill

11  out a supplementary report and those were

12  department forms.  There was a variety of

13  non-department forms used to facilitate the

14  taking of notes.

15          Usually they had the word major

16  crime or major something on the title, but that

17  was not a CPD form.

18          It was just something someone or

19  a group of people had devised over the years to

20  help them record notes.

21     Q.   Generally speaking, was there a

22  process by which CPD would issue a form?  In

23  other words, would that have to come out of a

24  certain part of the department?

1      A.   Right.   All forms of the Chicago

2  Police Department are created in Research and

3  Development.   They are each assigned a unique

4  number, usually in the bottom left-hand corner

5  of the page, and it also has the date that they

6  were created or revised.

7      Q.   Was it unusual for a non-department

8  issued form to become used by area detectives?

9           MR. PATTERSON:   Objection, foundation.

10           MS. KEEN:   That was a bad question.

11  BY MS. KEEN:

12      Q.   I guess what I mean is, were there

13  other instances besides this major form -- I'm

14  going to ask you more details about that major

15  form, but were there other instances where a

16  need would arise, and so people working in the

17  department would take it upon themselves to

18  create a form that they could use on a regular

19  basis?

20      A.   I've seen forms created for

21  administrative purposes, where they're trying

22  to count something or keep track of something.

23  Yes, there are other occasions.

24      Q.   So, the major form you were talking

 1   about, are you -- is Major Incident Worksheet

 2   one of the major forms you were referring to?

 3        A.   No, but I have knowledge about when it

 4   became an official form.

 5        Q.   When it became an official form, what

 6   was it called?

 7        A.   A Major Incident Worksheet.

 8        Q.   What was the process of going from

 9   unofficial to official?

10        A.   All we have to do is make the request,

11   strangely enough, and put it through the chain,

12   make sure it gets -- chain as in chain of

13   command, show your supervisor, they sign off on

14   a request for a new form.

15             We have a form to request a new

16   form.  And when it's approved, it goes to the

17   Records Division to be edited, some suggestions

18   made, perhaps you want certain boxes larger

19   than others.  And after it's made, it goes to

20   the print shop for printing and distribution.

21        Q.   So, even an individual detective could

22   fill out a form requesting a form?

23        A.   If it gets approved by their

24   supervisor, yes.

1     Q.   Who was behind the creation of the

2  formal sheet called Major Incident Worksheet?

3     A.   I was.

4     Q.   What was your reason -- or strike

5  that.

6          When did you create something

7  called a Major Incident Worksheet?

8     A.   In late 1980, I was part of a special

9  projects group that was working on the

10  reorganization of the Detective Division into

11  this geographical model.

12          And one of the things I thought

13  there was a need for was more standardization,

14  and a better product.  I took the best of the

15  existing forms that I could find and created a

16  standardized form.

17     Q.   Where did you call your sample of

18  forms from, from various areas?

19         MR. PATTERSON:  Objection, foundation.

20         THE WITNESS:  I don't recall from the

21  various areas.  I just seen a few over the

22  years, picked them up and looked at them.  Most

23  had the same information.

24

1  BY MS. KEEN:

2      Q.   So, are you saying that you noticed

3  that detectives across the department were

4  starting to come up with their own similar

5  looking forms to use in the course of recording

6  investigation about crimes?

7      A.   In the Detective Division, yes.

8      Q.   What did these forms have in common in

9  terms of what they looked like?

10     A.   8.5-by-11 pieces of paper with a lot

11 of boxes, pre-identified by those things which

12 most frequently come up in the course of a

13 criminal investigation; the victim's name,

14 address, whether or not there was a gun

15 involved, a place for the serial number, a car,

16 what type of car, VIN number, Vehicle

17 Identification Number, personnel assigned to

18 the crime scene by other units, who was there?

19 Items like that.

20     Q.   How about blank space?  Would you

21 frequently see a blank space on there for

22 people to write down their thoughts?

23     A.   No.  Mostly it was just filled with

24 boxes.  Again, it was really for the purpose of

1    recording those things.  You're not real likely

2    to remember in a couple of hours.

3         Q.    What about descriptions, witness

4    descriptions?  Were there boxes for witness

5    descriptions that you ever saw?

6         A.    No.

7         Q.    So, one of the things you did as part

8    of the special project was to create

9    standardized reporting processes; is that

10   correct?

11        A.    No.  Special projects, I do whatever

12   the bosses told me to, but I was part of this

13   group for the reorganization of the Detective

14   Division.  But along the way, we had to change

15   various forms.

16        Q.    Okay.

17        A.    Existing forms and think of --

18   anticipate what some needs might be.

19        Q.    So, let me just back up, so that I

20   guess I understand.

21              Was the reorganization of the

22   Detective Division project separate from the

23   special project you had described earlier

24   involving investigative files?

1    A.    Separate.

2    Q.    They were separate.  Okay.

3    A.    It preceded it.

4    Q.    What started first?

5    A.    The reorganization.

6    Q.    Tell me what was the genesis of that

7 reorganization project?

8    A.    The Superintendent of Police and the

9 Chief of Detectives had decided for a new

10 model.

11    Q.    And this was in '80?

12    A.    '80, right.

13    Q.    Because it was after you got to the

14 Chief of Detectives?

15    A.    It was just about the same time.

16    Q.    And what was their reason for wanting

17 a new model?

18    A.    It wasn't explained to me.  It was

19 best practices.  I heard that a few times.

20    Q.    What was your understanding though as

21 you were working on a project as to why a

22 change needed to be made?

23        MR. PATTERSON:  Objection, form,

24 foundation.

BY MS. KEEN:

    Q.   And I'm asking based on the totality of your conversations with people, your personal experience working on the project.

    A.   I think there was a genuine effort to make the Detective Division more responsive to the communities in which we worked, you know, more accountability, more geographical accountability, moving away from overspecialization.

    Q.   What do you mean by overspecialization?

    A.   Again, those units that I previously identified, the Homicide and Sex Unit, the Robbery Unit, the Burglary Unit, the Auto Theft Unit, it goes on.

           Oh, I'm here to report a crime; oh, you got to go next door.

    Q.   So, it was taking out some of the over-compartmentalization and making it more community based; is that fair?

        MR. PATTERSON:  Objection.

BY MS. KEEN:

    Q.   Is that fair to say?

1       A.   It's one of the benefits of the

2   geographic model.

3       Q.   What changes did you make to -- strike

4   that.

5               Who was part of the

6   reorganization group?

7       A.   The Chief of Detectives, the deputy

8   chiefs.

9       Q.   Of what?

10       A.   Deputy chiefs of detectives, and there

11   was an individual who formerly was of the

12   Detective Division, but had been moved to the

13   Personnel Division, a commander by the name of

14   Joseph Beasley.  He was involved in it as well.

15   And there were some, you know, lieutenants and

16   sergeants.  It was a pretty large undertaking.

17       Q.   Were there people in the Patrol

18   Division involved with this group?

19       A.   Not as much, no.

20       Q.   Were there people involved from the

21   Youth Division?

22       A.   They had to be affected.  I don't

23   remember their participation as much.

24       Q.   Why did they have to affected?

1      A.    Well, they were part of the Bureau of

2    Investigative Services, and they work out of

3    the same building.  It was a pretty natural

4    fit.

5      Q.    So, was this really a reorganization

6    of the Bureau of Investigative Services, or was

7    it really just relating to the Detective

8    Division?

9      A.    That's a good question.

10            I only worked on that which

11    pertained to the Detective Division.  The

12    Bureau of Organized Crime had just been

13    created, so they weren't going to remodel it.

14            I don't remember much about the

15    Youth Division.  Again, it was beyond my

16    assignment.

17      Q.    But it was your sense that at least

18    some members of the Bureau of Investigative

19    Services outside of the Detective Division were

20    at least involved in the discussions, correct?

21      A.    They knew what was going on.

22    Certainly, the deputy superintendent and the

23    Bureau of Investigative Services was involved.

24      Q.    Okay.  And so other than the

1    structural change you described wherein it went

2    from crime specific assignments to the Area 3

3    Violent Crimes, Property --

4        A.    And Youth.

5        Q.    -- and Youth, were there any other

6    changes that the department made in connection

7    with this reorganization project?

8        A.    I'm sure we changed forms that needed

9    to be changed.

10       Q.    Do you remember which forms you looked

11   at?

12       A.    Well, one of them was the -- I call it

13   the 24-hour log, but the Major Incident

14   Worksheet.

15                Prior to that, each of the crime

16   specific sections used to create their own

17   24-hour report, the homicide report, the

18   robbery report, the burglary report, so on and

19   so forth.  And this did away with that and put

20   it on one form.

21       Q.    I guess I didn't appreciate that.

22                So, how was it supposed to be

23   created then?  Was it the Area 3 supervisor who

24   did it for all the crimes that occurred within

1    **Area 3 in that shift?**

2           MR. PATTERSON:  Objection, vague.

3           THE WITNESS:  If we're talking about

4    the Major Incident Worksheet.

5           MS. KEEN:  Yes.

6           THE WITNESS:  I'm sorry.  The

7    area 24-hour report.  I know that's not the

8    official name.

9    BY MS. KEEN:

10       **Q.   I think we discussed earlier that it**

11   **was called the Major Incident Log?**

12       **A.   Right.  The one with the columns on**

13   **it.**

14       **Q.   Right.**

15       **A.   The area incident log previously had**

16   **been separate 24-hour reports from the crime**

17   **specific sections.**

18       **Q.   Right.  And then what did it change**

19   **to?**

20       **A.   And then it became an area specific**

21   **with the exception of Bomb & Arson, which**

22   **created its own.**

23       **Q.   So, in the area specific format, in**

24   **other words, post-change, what information**

1  **would a supervisor put on the Major Incident**

2  **Log regarding any given shift?**

3  　　　　　MR. PATTERSON:  Objection, foundation.

4  　　　　　MS. KEEN:  But this is the 30(b)(6)

5  witness on the topic of creation of forms.

6  　　　　　MR. PATTERSON:  Yeah.  You haven't

7  established that a supervisor did anything with

8  the forms.

9  　　　　　MS. KEEN:  He testified at length that

10 it was a supervisor who filled out the form.

11 　　　　　MR. PATTERSON:  Same objection.

12 　　　　　MS. KEEN:  Well, I mean, if we're

13 going to have to lay a foundation every time we

14 talk about the same topic, it's going to be way

15 long.  But if you're asking me to do that, then

16 I reserve the right to go way past seven hours.

17 BY MS. KEEN:

18 　　**Q.   Okay.  Is it your testimony, sir, and**

19 **I apologize for asking you again, that it was**

20 **supervisors who filled out the Major Incident**

21 **Log?**

22 　　**A.   Yes.**

23 　　**Q.   When -- and this is both**

24 **pre-reorganization of the Detective Division**

1  and post-reorganization of the Detective

2  Division, correct?

3       A.    In the pre-world, the one I was most

4  familiar with, was the homicide report because

5  I worked in a homicide unit.

6            When we would have a homicide or

7  a major violent type of crime, we, the

8  supervisor in the area, in each of the areas,

9  would call downtown to the Homicide Section and

10  say:  Hello, Pat Conway, I would like to speak

11  to you and tell you about something new that

12  occurred.

13            That person would take the notes

14  down and create a log, a running log all day

15  long.

16            And in the morning, we finished

17  the report from what happened the night before

18  simply by recording the information from the

19  telephone calls.

20            In the January 1981 post on, it

21  was removed from downtown, no more telephone

22  calls.  It was simply -- the responsibility was

23  given to the area supervisor to record what

24  happened of a major incident in the last eight

1    hours for their shift.

2              And at the end of a 24-hour

3    period it was hand-carried downtown.

4        Q.   How would the supervisor go about

5    selecting which of the many crimes that had

6    occurred on his watch to put on the Major

7    Incident Log?

8        A.   All the homicides got on there.  Some

9    but not all of the death investigations made

10   it.

11       Q.   What was the dividing -- strike that.

12              How did you determine death

13   investigations?

14       A.   If there was something curious about

15   it, something that may be of interest.

16       Q.   This case involves deaths caused by a

17   fire.  At the time that the fire was set, it

18   was unknown whether or not the fire was arson.

19              So, in that are scenario, would

20   you expect the area supervisor to have recorded

21   information about the deaths on the Major

22   Incident Log?

23       A.   Yes.

24              MR. PATTERSON:  Objection, foundation,

```
 1   form.
 2              MS. KEEN:  What's the foundation
 3   objection?
 4              MR. PATTERSON:  You haven't given
 5   him -- well, first of all, you said this case.
 6   You haven't identified which case.  We got at
 7   least three fires associated with this case.
 8              MS. KEEN:  But only one caused the
 9   deaths, right?
10              MR. PATTERSON:  And then you didn't
11   give any facts related to whichever of the
12   three fires you're discussing.
13              MS. KEEN:  Well, there's only one fire
14   that caused deaths, correct?
15              MR. PATTERSON:  Well, how about we use
16   an address, that will be helpful, and a date,
17   since we have those, right?
18              MS. KEEN:  But, you know -- I mean, I
19   appreciate that, but if the witness is clear
20   about what I'm talking about, then these are
21   just objections for a grievance sake.
22              MR. PATTERSON:  No, they're not,
23   because this would not be admissible at trial.
24              MS. KEEN:  It would be admissible.
```

1          MR. PATTERSON:  It would not because

2    you haven't laid the foundation.

3          MS. KEEN:  It would only be

4    inadmissible if you made a sustained foundation

5    objection.

6          MR. PATTERSON:  Right.  And that's why

7    I need to put it on the record because if you

8    want to introduce this testimony at trial,

9    Judge Lefkow will then make a ruling on the

10   foundation objection.

11         MS. KEEN:  That's fine.  We will go

12   through this painstakingly and state what is

13   obvious to all of us.

14   BY MS. KEEN:

15        **Q.   There is a fire that occurred at**

16   **4448 South Hermitage, that's the subject of**

17   **this case, correct?**

18        **A.   Yes.**

19        **Q.   You were aware that this case involves**

20   **a fire on Hermitage, correct?**

21        **A.   Yes.**

22        **Q.   And you're aware that the fire**

23   **resulted in the deaths of a mother and her five**

24   **children, correct?**

1      A.    Yes.

2      Q.    Okay.  So, for purposes of this

3  deposition, if it's okay with you, I'll call

4  that the Hermitage fire; is that okay?

5      A.    Okay.

6      Q.    Would you have expected something

7  about the Hermitage fire to be written on a

8  Major Incident Log by an area supervisor?

9      A.    Yes.

10      Q.    Why?

11      A.    Multiple deaths.

12      Q.    Would you have expected something

13  about the Hermitage fire to have been written

14  on the Major Incident Log by the Bomb & Arson

15  supervisor?

16            MR. PATTERSON:  Objection, vague.

17            THE WITNESS:  Yes.

18  BY MS. KEEN:

19      Q.    Would you have expected the fact that

20  a fire had occurred on Hermitage and was under

21  investigation by Bomb & Arson to be recorded on

22  the Major Incident Log by a Bomb & Arson

23  supervisor?

24      A.    Yes.

1    Q.   And why would you expect that?

2    A.   The Bomb & Arson Unit and the area

3  detective have two separate but related

4  responsibilities.

5         One is to conduct a -- the

6  detective area is to conduct a death

7  investigation, whereas the Bomb & Arson

8  detectives are responsible to determine the

9  cause and origin of the fire.

10   Q.   And, therefore, are you testifying

11 that you would expect both units to have

12 created a summary of the incident on the Major

13 Incident Log?

14   A.   I don't know if it would be a summary

15 so much as a -- certainly a high level summary.

16 Okay.  Address, what's known, who from the fire

17 department responded, one house, two house,

18 three houses, how many dead, ages of the

19 deceased.

20   Q.   Okay.  Now, going back to the forms

21 that were modified as part of the

22 reorganization project, when you said that --

23 sorry.  I just need to remind myself.

24        Are you saying that you also

1  created a separate document called a Major

2  Incident Worksheet as distinct from the Major

3  Incident Log?

4       A.   Yes.

5       Q.   And that's the document that -- well,

6  the predecessor to that was the document that

7  various detectives were using informally to

8  record crime scene information that would have

9  been hard to recall several hours later,

10 correct?

11      A.   They weren't all using it.  Some

12 elected to.  Others just used the old-fashioned

13 blank piece of paper.

14      Q.   So, what other forms did you change or

15 create as part of the reorganization?

16           MR. PATTERSON:  I'm sorry.  Roshna,

17 I'm not trying to be difficult.  But you keep

18 saying you, are you asking him from his

19 personal knowledge, or are you asking him as a

20 representative of the City in the Chicago

21 Police Department.

22           MS. KEEN:  All of this deposition

23 unless otherwise noted is in his capacity as a

24 30(b)(6) witness.

BY MS. KEEN:

    Q.   So, I will rephrase the question to say what other forms did the City change?

    A.   I don't know what the name of the form was.  But certainly crime statistics is, believe it or not, it was pretty much a hand count back in this era.

          A crime would come in as one thing, let's say, a robbery, and then it's reclassified to a theft, or maybe unfounded. And we would -- there would be someone in the areas who had to count all of these.  And there was a form to facilitate the counting of crime.

          So many crimes came in, so many were reclassified to something else, to another type of crime, some were unfounded, how many of these cases do we make arrests.

          So we had forms.  It would just make it easier to read than a narrative.

    Q.   Did you or anyone working on behalf of the City create any forms regarding substantive information about a case as part of this reorganization effort?

          MR. PATTERSON:  Objection, vague.

1    BY MS. KEEN:

2         Q.   And by substantive, I mean,

3    information that would help solve the crime?

4         A.   No.

5         Q.   So, none of the forms regarding

6    detectives' mental impressions about the crime

7    that they were investigating were altered or

8    created during this reorganization project; is

9    that correct?

10        A.   He never had a form to capture

11   detectives' mental impressions.  I mean, I'm at

12   a loss there.

13        Q.   So, the two forms that you had

14   available to you that were department issued

15   when you were a homicide detective were the

16   general case report?

17        A.   Very good.

18        Q.   And the supplementary report, right?

19        A.   Yes.  And there's a variety of general

20   offense case reports, but you're very close.

21        Q.   So, the general case report is one

22   that beat officers might fill out as well,

23   correct?

24        A.   Right.  For the sake of argument,

1  let's call it -- not argument -- information,

2  the original case report.

3       Q.   The original case report.

4       A.   The original case report and

5  supplementary case reports.

6       Q.   Now, was the original case report

7  something that detectives might prepare?

8       A.   In certain circumstances.

9       Q.   What circumstances?

10      A.   In the event of a double crime, a bank

11 robber just commits the bank robbery, he aims

12 the gun at the police officer, the police

13 officer kills the bank robber.  Those are two

14 different crimes.  One is the bank robbery, and

15 the second is the justifiable murder.

16           So, the beat officer in all

17 likelihood would have prepared the bank robbery

18 one, and the second one, even though they're

19 the same place and the same time, you know, our

20 protocol suggested that -- or required that two

21 different reports be made.

22      Q.   So, in the justifiable homicide --

23      A.   And to do that, every report starts

24 with an original report.  So, sometimes the

1     detectives created original reports.

2          Q.   In the case of supplementary reports,

3     who used those forms, detectives, beat

4     officers, both?

5          A.   Both.

6          Q.   This is now while you were a homicide

7     detective, in other words, pre-reorganization.

8               Why did detectives use

9     supplementary reports?

10         A.   Well, we don't want -- first of all,

11    we want to find all reports that are created

12    and there's a common denominator between an

13    original report and the supplementary report.

14              And believe it or not, it may not

15    even be the victim's name because that might

16    change when you learn more information.

17              So, the common denominator is the

18    case identifier, the number, the records

19    division number.  We call it the RD number.

20         Q.   And so supp reports were, at least

21    from the department's perspective, ways of

22    recording information that could then be filed

23    with the correct RD number, correct?

24         A.   Absolutely.

1    Q.   Okay.  What kinds of information were

2  detectives supposed to create -- strike that.

3              What kind of information were

4  detectives supposed to record in supp reports

5  pre-'81?

6    A.   Anything that was new to the

7  investigation that was not originally reported

8  on the original case report.  It can be

9  additional information, new information.

10    Q.   Were there any general or special

11  orders that related to the use of supp reports

12  prior to 1981?

13              MR. PATTERSON:  Objection, form.

14  BY MS. KEEN:

15    Q.   Let me start with the general orders.

16              Were there any general orders

17  that related to the use of supp reports prior

18  to '81?

19    A.   No.

20    Q.   How about special orders?

21    A.   No.  Well, we had a general order on

22  the subject of preliminary investigations, but

23  mostly the instructions on how to fill it out

24  were found on the cover of the booklet.

1     We would have 25 or 30 blank

2  original case reports and then the cover of

3  this packet of forms was Box 1, victim's name,

4  instructions.  Box 2, put last name first, you

5  know, first name second.  Those type of

6  instructions.

7     Q.   What about for the supplementary

8  report?

9     A.   I don't recall instructions so much.

10  But on the subject of supplementary reports,

11  something everyone must appreciate is that any

12  sworn member of the Chicago Police Department

13  can write a supplementary report on any crime,

14  you know, so long as their supervisor signs off

15  on it, it is an official report that will be

16  retained.

17     Q.   Did you ever have occasion to fill out

18  supp reports when you were an Area 1 detective?

19     A.   Every day.

20     Q.   And that's probably true of the other

21  Area 1 detectives as well, correct?

22          MR. PATTERSON:  Objection, form.

23          THE WITNESS:  Correct.

24  BY MS. KEEN:

1        Q.   What kind of information did

2   detectives tend to put on supplementary reports

3   regarding an investigation of a serious crime

4   prior to '81?

5             MR. PATTERSON:  Objection, form.

6             THE WITNESS:  The information did not

7   change.  I mean, it's information which is

8   pertinent to the investigation.

9   BY MS. KEEN:

10       Q.   You said that detectives took notes in

11  a variety of ways prior to '81, correct?

12       A.   Prior to '83.

13       Q.   Prior to '83.  Okay.  And prior to

14  '83, what kinds of pieces of paper would

15  detectives take notes on?

16       A.   Blank pieces, lined paper.

17       Q.   No particular form that was designed

18  for notetaking, correct?

19       A.   No.

20       Q.   And detectives need to take notes in

21  the course of their work on a serious

22  investigation, right?

23             MR. PATTERSON:  Objection, form.

24             MS. KEEN:  Let me rephrase that.

BY MS. KEEN:

  Q. **Taking notes is part of the job of being a detective, correct?**

  A. **Recording information, taking notes. I don't know how one can conduct a complex investigation without some notetaking.**

  Q. **Why is that?**

  A. **It's simply too hard to remember everyone's contact, telephone information, date of birth, their address, their zip code, their middle name, whatever that might be pertinent to the investigation.**

  Q. **Notes were also used pre-'83 to record mental impressions of a detective, correct?**

    MR. PATTERSON: Objection, vague.

    THE WITNESS: I don't recall notes or anyone being required to write down mental impressions.

BY MS. KEEN:

  Q. **Okay. Sorry. I'm not asking about what was required. I'm just asking about the kinds of documents that detectives created in the course of an investigation pre-'83. And we had talked a little bit about notes. And I'm**

1  just trying to understand the kinds of things

2  that detectives would take notes about pre-'83.

3      A.   It's the same thing they would take

4  notes on post-'83.

5              Did they use an exclamation point

6  after somebody's comment recording a note?

7  They might have had their own style of

8  notetaking or maybe an asterisk next to

9  something they thought more important.  But

10  it's of a personal nature how you take your

11  notes.

12      Q.   So, there was variety in terms of the

13  kinds of notes that detectives would create

14  regarding an investigation correct?

15              MR. PATTERSON:  Objection.

16  BY MS. KEEN:

17      Q.   You can answer.

18      A.   Of course.

19      Q.   And is it fair to say that

20  detectives -- at least some detectives who were

21  working on complex investigations would write

22  down thoughts or impressions they had about the

23  case in the form of notes?

24      A.   No.  I don't think we wrote down

1  impressions.  The notes were to facilitate

2  report writing.

3       Q.   So, you're saying that detectives

4  didn't write down notes about their impressions

5  of the case?

6            MR. PATTERSON:  Objection, asked and

7  answered.

8            THE WITNESS:  That almost sounds like

9  a diary, you know.  I think so-and-so was mean

10 to me.  I don't know.  I mean, that's -- record

11 what they say.  You might put a question mark

12 down on it, like, this doesn't sound right.

13 But I don't recall anyone writing down an

14 impression.  I think he's lying.

15 BY MS. KEEN:

16      Q.   I think I understand what you're

17 saying.  Would detectives write down -- strike

18 that.

19           Would detectives create notes

20 about what a witness told them in the course of

21 an investigation?

22      A.   Yes.  Frequently, but not all the

23 time.

24      Q.   Frequently, but not all the time.

1          And what was one of the reasons

2    that notes were created regarding witness

3    interviews?

4          MR. PATTERSON:  Objection, asked and

5    answered.

6          THE WITNESS:  So, they could recall

7    later when they wrote their report more

8    accurately what the witness actually said.

9    BY MS. KEEN:

10   Q.   And you're saying that sometimes a

11   detective may indicate something about what the

12   witness said in his own personal shorthand,

13   say, an exclamation point or asterisk or

14   something like that, but that would be the

15   extent of his reflecting his personal

16   impressions in his notes; is that right?

17         MR. PATTERSON:  Objection, asked and

18   answered.

19         THE WITNESS:  Yes.

20   BY MS. KEEN:

21   Q.   In addition to writing down what

22   witnesses said -- strike that.

23              Would detectives take notes

24   regarding names of suspects that they felt

1    should be investigated in connection with a

2    crime?

3            MR. PATTERSON:  Objection, asked and

4    answered.

5            MS. KEEN:  Actually, I haven't asked

6    that.

7            THE WITNESS:  Could you repeat that

8    question, please?

9    BY MS. KEEN:

10       Q.   Would detectives write down names of

11   suspects that they believed should be

12   investigated in connection with a particular

13   crime?

14           MR. PATTERSON:  Same objection.

15   BY MS. KEEN:

16       Q.   You can answer.

17       A.   Certainly, they can write down names.

18   Are they required to?  I suppose no is the

19   answer, but why wouldn't you.

20       Q.   Right.  And so what kinds of

21   information based on your experience throughout

22   the department and also as a homicide

23   detective, what kinds of information did

24   detectives tend to write down about suspects in

1  their notes?

2      A.   It starts with, do you know who did

3  it?  A name is preferred.  Physical description

4  is a near second.  Nicknames.  What kind of car

5  do they drive?  Have you seen them before?

6  Have you seen them with someone you know

7  before?  Anything that might connect the

8  information to the suspect.

9      Q.   What about if a suspect allegedly made

10 a statement incriminating himself in the crime

11 that's being investigated, would something

12 about the fact of that statement or the content

13 of that statement be jotted down in the notes

14 based on your experience?

15         MR. PATTERSON:  Objection, incomplete

16 hypothetical.

17         THE WITNESS:  Is someone telling the

18 detectives they said this, or is this something

19 the detective heard?

20 BY MS. KEEN:

21     Q.   Yeah.  I'm sorry.  I was just kind of

22 working from your scenario, but I'll give you

23 one.

24             If a detective learns that there

1    is a suspect out there and a suspect may have

2    made statements incriminating himself in the

3    crime, would you expect to see the detective

4    make a note of not just the suspect's identity,

5    but also the fact that the suspect may have

6    made an incriminating statement?

7              MR. PATTERSON:  Objection, form,

8    incomplete hypothetical.

9    BY MS. KEEN:

10        Q.   You can answer.

11        A.   If they believe the person who is

12   telling them this -- again, I don't know from

13   the example if it is something the detective is

14   talking to the suspect, or if it's being

15   relayed to the detective.

16        Q.   In the first category, or the first

17   scenario, the detective is talking to the

18   suspect, and the suspect makes a statement

19   that's incriminating.

20        A.   Sure.

21        Q.   Would you expect the detective to take

22   notes reflecting that incriminating statement?

23              MR. PATTERSON:  Objection, asked and

24   answered.

BY MS. KEEN:

    **Q.   Go ahead.**

    **A.   It's part of the story, I think.**

    **Q.   So, yes?**

    **A.   Yes.**

    **Q.   What if the detective learned information through a witness interview about the identity of a possible suspect and the witness relayed that the suspect had made incriminating statements?**

               **Would you expect the detective to create notes reflecting not just the identity of the suspect, but also the fact of the incriminating statement?**

    MR. PATTERSON:  Objection, vague, incomplete hypothetical.

        And, Roshna, again, I'm not trying to be difficult, but you asked him would you expect.  Is that, would the Chicago Police Department expect?

    MS. KEEN:  Yes.  In all cases, I'm asking him.  And I mean --

    MR. PATTERSON:  Okay.  I don't want to disrupt your flow.  So, just so the record is

1  clear, unless you say otherwise, if you ask him

2  a "you" question, you're talking the global you

3  as in "you, the Chicago Police Department."

4          MS. KEEN:  Yes.

5          MR. PATTERSON:  Okay.  Fair enough.

6          THE WITNESS:  Sorry.  And the question

7  on the floor is?

8  BY MS. KEEN:

9      Q.  **So, if you were talking to a witness**

10 **and the witness gave you information about a**

11 **suspect and said that the suspect may have made**

12 **an incriminating statement, would you expect**

13 **notes reflecting the incriminating statement?**

14         MR. PATTERSON:  Same objections.

15         THE WITNESS:  Yes, if.  And my

16 qualifier there is, if I believe the witness.

17 I believe the witness is not crazy, you know.

18 If there's something credible, a better word,

19 credible.

20             But I think it would happen.  I

21 mean, you're helping me here.  I mean, someone

22 is helping me with information that will help

23 me resolve the case potentially.  So, yes.

24         MS. KEEN:  Okay.  Can we go off the

1    record for a minute?

2                        (WHEREUPON, a short break was

3                         taken for lunch.)

4              MS. KEEN:  Back on the record.

5    BY MS. KEEN:

6         Q.    Was there any requirement prior to

7    1983 that notes that a detective created had to

8    be submitted to a supervisor?

9         A.    No.

10        Q.    Was there any requirement that a

11   detective's notes had to be submitted to

12   anybody?

13        A.    No.

14        Q.    Generally speaking, what happened to a

15   detective's notes prior to 1983?

16        A.    The detective kept the notes until

17   such time as they prepared the supplementary

18   report, at which time they destroyed their

19   notes, threw them in the garbage can or

20   whatever, including myself.

21        Q.    And doing so was not in violation of

22   any existing policy at the time, correct?

23        A.    Correct.

24        Q.    Whose job was it to make sure that all

1    of the relevant information from the notes made

2    their way into the supp report?

3        A.    The detectives.

4        Q.    Was there any written directives in

5    existence prior to '83, whether it be a special

6    order or general order that discussed the

7    process of migrating information from a note

8    into a supp report?

9               MR. PATTERSON:  Objection, compound.

10              THE WITNESS:  Not directives, but

11   training.

12   BY MS. KEEN:

13       Q.    Okay.  Was there any written

14   material -- I'm going to re-ask the question

15   just to fix it.

16              Were there any written statements

17   of policy pre-'83 that required a detective

18   to -- sorry.

19              Were there any written statements

20   of policy pre-'83 that dealt with the subject

21   of recording information from a detective's

22   notes into a police report that actually gets

23   submitted to somebody?

24       A.    No.

1      Q.   Now, you said there was some training

2   pre-'83 on the subject?

3      A.   Correct.

4      Q.   When was the training on that subject

5   offered to detectives?

6      A.   Pre-service training is for detectives

7   and specifically it's impressed upon

8   detectives.  They are supposed to preserve

9   information, which is both good and bad for the

10  prosecution.  I mean, it's their requirement to

11  find out the truth.  It's their obligation.

12     Q.   So, you're saying that pre-'83, there

13  was training on the subject of recording all

14  relevant information about an investigation?

15     A.   No.  I said not recording information.

16  I said to find out the truth.

17     Q.   Was there any training on the subject

18  of a detective or other officer's obligation to

19  record information relevant to a case on a

20  document that actually gets submitted for file?

21          MR. PATTERSON:  Objection, foundation,

22  form.

23          THE WITNESS:  The detective is

24  expected and was trained on his obligation to

1  record information, which is pertinent and

2  relevant to the investigation.  Not everything,

3  but that which is relevant, that which is

4  important.

5  BY MS. KEEN:

6      Q.   Prior to 1983, when did detectives

7  receive the training you've just described?

8      A.   Prior to their assignment as a

9  detective.

10     Q.   So, in the detective training program?

11     A.   Right.  Pre-service, detective

12  training.  Usually it's about four weeks long,

13  and it was before their assignment to an

14  investigative unit.

15     Q.   Were detectives trained specifically

16  on the subject of putting relevant information

17  into a supp report?

18     A.   It's almost presumed that that which

19  you put in a case report or a supplementary

20  report is relevant.

21          I mean, were they trained?  As a

22  police officer and, again, as a detective,

23  they're trained as to the forms and the

24  narrative.

1          And in the detective training,

2     they were given formats, recommended formats.

3          Why?  To make sure that you

4     address certain factors, date, time, location,

5     perhaps even the weather if it's pertinent,

6     personnel responded.

7          There was a definite -- as a

8     matter of fact we called it the format, the

9     format report.

10          Be as thorough as you can and

11     make sure you try to answer the who, what, and

12     where questions.

13     Q.   Was the format as you call it in place

14     prior to 1983?

15     A.   Yes.

16     Q.   So, even when you were a homicide

17     detective, you were doing supp reports

18     according to the format that you received

19     training on?

20     A.   Even back in the day.

21     Q.   Okay.  Was there training provided to

22     the detectives on the format, or is that

23     something they just figured out on the job?

24     A.   Oh, it was training.  We were given

1    samples.

2        Q.    In that training, was it told to

3    detectives that they had to put all information

4    relevant to the case in the report and that

5    they had an obligation to do so?

6            MR. PATTERSON:  Objection, compound.

7    BY MS. KEEN:

8        Q.    In that training, was it told to

9    detectives that they had to put all relevant

10   information in that report?

11       A.    Put relevant information in there.

12   What is relevant, of course, is oftentimes

13   subject to honest debate.  I don't want to get

14   caught up in this all relevant.  But if it's

15   relevant, yes, it should be recorded.

16            If it's pertinent and relevant to

17   the investigation, to the person, to the

18   accused, to the suspect's guilt or innocence,

19   it should be recorded.

20       Q.    During the training, were detectives

21   informed that they were obligated to

22   preserve -- strike that.

23            During the detective training,

24   were detectives informed that they were

1   obligated to record all relevant information?

2       A.   Yes.

3       Q.   This is pre-'83, correct?

4       A.   Right.  Brady vs. Maryland was what

5   year?

6       Q.   '63.

7       A.   Yeah.  So, yes.  That was part of the

8   training?

9       Q.   Was that the training provided not

10  only just to detectives but also to beat

11  officers?

12      A.   Yes.

13      Q.   At some point, the City became aware

14  that in some cases, all relevant information

15  was not being submitted for inclusion in the

16  official police file regarding an

17  investigation, correct?

18      A.   In some investigations, correct.

19      Q.   When did you personally first become

20  aware of the practice of withholding relevant

21  information from the police file that gets

22  turned over to the State's Attorney?

23          MR. PATTERSON:  Objection.  So,

24  Roshna, just help me out.  You now asked him

1     when he personally became aware.  So, is this

2     now a personal question versus a Chicago Police

3     Department question?

4               MS. KEEN:  It's just exactly what I

5     meant it as.  I'm just asking this witness'

6     personal knowledge, when did he personally

7     first become aware.

8               MR. PATTERSON:  Okay.  So, my

9     objection is that the witness has been asked a

10    personal knowledge question and, therefore, is

11    not answering it in capacity as the Chicago

12    Police Department.

13              Go ahead, Jim.

14              THE WITNESS:  I am not personally

15    aware it has ever been the practice.

16              You asked me if it was the

17    practice not to include relevant information in

18    investigations.  I mean, our policy and our

19    practice is to include information, which is

20    relevant.

21              Are there and have there been

22    occasions when some relevant information didn't

23    make it into investigations?  Yes.

24    BY MS. KEEN:

1      Q.   When did the City first become aware

2   that not all -- strike that.

3              When did the City first become

4   aware that there were occasions when detectives

5   or other investigators for the police

6   department were not disclosing all relevant

7   information through the channels that would

8   allow that information to get into the hands of

9   the prosecutor or the defense attorney?

10             MR. PATTERSON:  Objection, form.

11             THE WITNESS:  The one case that I

12   certainly can remember is a case of George

13   Jones.  And there was a detective by the name

14   of Frank Laverty who submitted a memoranda

15   which appeared to be relevant, yet did not make

16   it into the department supplementary report.

17   So, that's an example of such a case.

18   BY MS. KEEN:

19      Q.   Is it your testimony that the Laverty

20   memorandum was the first memoranda that the

21   City became aware of that was withheld from an

22   official police report that made it into the

23   Permanent Retention Records Division file?

24             MR. PATTERSON:  Objection, foundation,

1  mischaracterizes testimony.

2  BY MS. KEEN:

3      Q.   All right.  Do you have knowledge of

4  when the City became aware of the fact that on

5  some occasions relevant information was not

6  becoming part of the official police file?

7           MR. PATTERSON:  Objection, asked and

8  answered.

9           THE WITNESS:  The George Jones

10  investigation was the first time I was aware

11  that the City was aware of a potentially

12  difficult aspect of investigations.

13  BY MS. KEEN:

14      Q.   What was the potentially difficult

15  aspect?

16      A.   That not all relevant information made

17  it into a supplementary report.  And the City,

18  the police department, caused a review of its

19  practices at that time.

20      Q.   In the specific case of the Laverty

21  memo, did Frank Laverty create a memo that had

22  relevant information in it?

23      A.   Yeah.  I recall he did.

24      Q.   And do you know what's your

1    understanding as to -- strike that.

2              What was the allegation as to why

3    his memorandum wasn't part of the official

4    police file?

5        A.   Are you asking me if I know why that

6    memo did not get included in the official file?

7        Q.   Yeah.

8        A.   I understand that it was held at the

9    level of the area commander, detective

10   commander.

11       Q.   Who was the detective commander at the

12   time?

13       A.   Milton Deas, D-E-A-S, I believe.

14             MR. PATTERSON:  That's right.

15   BY MS. KEEN:

16       Q.   If things had worked as they were

17   supposed to, how would the information

18   contained in that memo have been made a part of

19   the official file?

20       A.   As I said previously, anyone in the

21   Chicago Police Department who has relevant

22   information to add to the investigation not

23   only has the right, but has the obligation to

24   record this on a supplementary report.  And if

1  this report is approved, it goes and becomes

2  part of the Records Division file.

3                What was the second part of your

4  question?

5       Q.   I think that answered it.

6                So, it's not so much that his

7  memo necessarily had to be part of the file,

8  but that a supplementary report reflecting the

9  relevant parts of the memo had to be created

10 and put in the official file, is that how it

11 was supposed to work?

12      A.   Yes.

13      Q.   And in the case of the Laverty memo,

14 the deputy commander --

15      A.   No.  He was a detective commander.

16      Q.   Detective commander held onto the memo

17 and didn't ensure that a supplementary report

18 was created about it, correct?

19           MR. PATTERSON:  Objection, foundation.

20           THE WITNESS:  I understand that he

21 held the memo and it did not become at that

22 time part of the supplementary report or any

23 supplementary report.

24 BY MS. KEEN:

1      Q.   Okay.  I'm going to ask you a few

2   questions about working files prior to '83.

3                 So, what are working files in

4   this pre-'83 time period?

5      A.   A working file was known by a few

6   names, running file, working file, street file.

7   It was nothing more than a manila folder which

8   normally contained photocopies of perhaps the

9   original report, perhaps one, two, or all of

10  the supplementary reports, perhaps a rap sheet,

11  criminal history record of someone that they

12  have interviewed or suspected, perhaps some

13  crime scene photographs, mugshots of suspects

14  or people they are looking for to interview.

15                 This working file could also

16  contain inter-watch memoranda, memoranda

17  written by one team of detectives to another

18  team of detectives on another watch asking them

19  to do something.  Could you, for example,

20  re-canvas that building?  Could you take a

21  certain person down to the polygraph for

22  examination?

23      Q.   Go talk to a witness?

24      A.   Talk to a witness, talk to a witness

1    again.  There was no format.

2                      A working file is more likely to

3    exist when there are multiple teams of

4    detectives working on the same case.

5         Q.   Multiple teams within the police

6    department?

7         A.   Within the detective area.

8         Q.   Within an area?

9         A.   Right.

10        Q.   Were memoranda created by a single

11   detective who wanted the detective taking over

12   the case on the next shift to do certain

13   things?

14        A.   That's what I discovered most often

15   that was the case.

16        Q.   Some of the investigations that area

17   detectives did were complex and required

18   multiple shifts to be solved, correct?

19        A.   Correct.

20        Q.   And so it was the practice of the

21   department to assign a detective from each

22   shift to work the case?

23        A.   Normally not midnights.

24        Q.   You don't want to knock on people's

1    doors at night?

2         A.    Right.  They get irritated.

3         Q.    So, with the exception of the midnight

4    shift?

5         A.    Right.  But even on midnights, if it's

6    important enough or hot enough, it will go

7    24 hours a day.

8                   Those cases, when they first come

9    in, they are worked pretty heavily, but a few

10   days later, there's normally a new case that

11   has come in and that gets a higher priority.

12        Q.    What other types of documents would

13   you see -- or strike that.

14                  What other types of documents

15   might be contained in a working file?

16        A.    There might be a medical examiner's

17   report, but not all that often.  You would find

18   information in there and documents in there

19   that they thought was needed by the detective

20   on the street in their cars instead of having

21   to call the office and say:

22                  What was the address of the

23   second witness?  I knew it was somewhere on

24   Western.  The longest street in Chicago.  Tell

1  me the address.

2          But those items which were not

3  really all that important you probably wouldn't

4  find in there.

5          For instance, I said the medical

6  examiner's report might be in there, but

7  frankly, how important is that to the working

8  detective who's really more interested in

9  finding the next witness or searching for the

10 suspect as opposed to the cause of death.  I

11 don't care if he was stabbed or shot.  He's

12 dead.

13      Q.   I understand what you mean.

14      A.   But, you know, can I use it in the

15 next eight hours?  Do I need it in the next

16 eight hours?  If so, can I make copy of it?

17      Q.   Can I use it to solve the case?

18      A.   Right.

19      Q.   That's the kind of information that

20 would go in a working file?

21      A.   Yes.

22      Q.   And the genesis of the working file

23 practice, was that something that -- I mean,

24 how did it come about?

1      A.    Out of need.  You can't go in -- a

2  working detective prefers not going into work

3  every day and making a copy of the same report,

4  of the same case that he worked on yesterday.

5              Anything new in the case?  I

6  don't want to see the address.  I just want to

7  see the narrative.  People have different

8  unusual approaches.  I just want to see what

9  so-and-so said.  Make me a copy of Page 3.

10     Q.    You're saying that's an example of how

11 a document would come into the working file?

12     A.    Right.  Did you photocopy something?

13     Q.    Okay.  And that was going to be my

14 next question.  Not to get too bogged down in

15 details, but how does a detective get a working

16 file?

17             So, for example, in the team of

18 detectives example that you had, let's say

19 there's two Area 3 detectives working on a

20 case.

21             Would you have expected pre-'83

22 for each of the two area detectives to have his

23 own working file or would they share one?

24     A.    Share one.

1   Q. And who would hold the area file?

2   A. Put it on the car seat in between

3 them.

4   Q. And how would people from a preceding

5 or a subsequent shift get information into that

6 actual working file?

7   A. It may be a hand-to-hand trade at the

8 end of the watch.

9      Anybody working on the case that

10 I was working on today?  I'm working on it.

11 Okay.  Here's what I have.

12      Oh, by the way, some of the

13 communications can be oral as well and probably

14 most of them were.

15      I went out there, I couldn't find

16 anybody on that canvas.  Nobody answered the

17 door.  Okay.

18      Not everything was written

19 either.  Was it important?  I suppose.  But it

20 didn't get written down.

21   Q. Would you ever expect the receiving

22 detective, in other words, the one picking up

23 the new shift to write down, jot down a summary

24 of what the preceding detective told him --

1      A.    No.

2      Q.    -- as a note?

3      A.    No.  Imagine the situation when you're

4   coming in on days when no one worked on the

5   case on midnights.  You look around and say, I

6   don't want to make a copy of that entire office

7   file.

8            Oh, on top of the coat rack:

9   What was the homicide victim's name?  Jones.

10  Okay.  This one says Jones.  Oh, it has the

11  same the RD number.  I'll take that, see if

12  there's anything interesting.

13     Q.    And the "that" in your sentence was

14  the file that existed within the unit or the

15  area, correct?

16     A.    Before we called it investigative

17  file, the running file in response to your

18  question.  There was no formal place to keep

19  it.  Sometimes it was left on a table;

20  sometimes it was left on a coat rack; out in

21  the open in the working area of the detectives.

22     Q.    Separate from the working files and

23  still pre-'83, did the area or unit have a more

24  official file for a particular investigation?

1      A.   Right.

2      Q.   Wait.  You're saying -- did you

3  answer?

4      A.   I said yes.

5      Q.   Okay.

6      A.   Again, paper driven world.  And the

7  Records Division would literally make three or

8  four copies, maybe more, four or five copies,

9  and each day, a couple of times a day, would

10  send them to the Area Investigative Unit.

11          The Area Investigative Unit would

12  give one copy to their case management.  We're

13  talking about all cases now.  Then there would

14  be one file, whether it was a Property Crime or

15  a Violent Crime, which would be RD number

16  based.  The Records Division number sequence

17  file.

18      Q.   That was one of the questions I had to

19  ask you.  I couldn't figure out what that was.

20          So, the unit RD numerical

21  sequence number?

22      A.   Right.  It's simply all the cases that

23  had been referred to that detective area for

24  investigation.

1      Q.   So, was that the predecessor to the

2   investigative file?

3      A.   No.  I mean, it was always the -- this

4   RD file was the primary file.  It was the file

5   that you would go to if you wanted information.

6            However, because homicides and

7   death investigations receive more attention

8   than just a shooting, they receive more

9   investigative time, frequently the detective

10  areas would pull those more serious crimes and

11  put them in their own filing cabinet drawer

12  right alongside it, still inside the office.

13     Q.   So, you're saying, in a -- let's call

14  it a serious homicide.

15     A.   Right.

16     Q.   Because all homicides are serious, but

17  this is high profile.  I've read the term

18  "heater case" here.  Let's say it's a heater

19  case.

20           Are you saying that in a heater

21  case the detective might actually pull the unit

22  RD numerical sequence number file and put it in

23  a different file cabinet that he had more

24  readily access to?

1          MR. PATTERSON:  Objection, form.

2          THE WITNESS:  The detective wouldn't

3    do it, whatever person was assigned to the

4    clerical unit, maintained the RD sequence file.

5    That same clerical unit personnel also made a

6    copy.  They called it the homicide drawer, the

7    death investigation drawer, the justifiable

8    homicide drawer.  And, again, those were the

9    drawers most often used.

10   BY MS. KEEN:

11      Q.   I see.  So, it would be a copy of the

12   contents of the unit RD file, not the actual

13   unit RD file that would go into the homicide

14   drawer, correct?

15      A.   The RD file normally would just

16   maintain the original report and maybe a supp

17   report, but in the homicide drawer is

18   everything that was sent to the area of

19   investigative responsibility on that homicide.

20              For instance, you might receive

21   something from the crime laboratory evaluating

22   the latent fingerprints that were recovered, or

23   the crime lab may send photographs.

24              And that would go into the

1   homicide drawer.  I don't know what else to

2   say.

3        Q.   So, then in that scenario, a copy of

4   the crime lab or fingerprint report would not

5   also be placed in the unit RD numerical

6   sequence number?

7        A.   Right.  Again, it's about thickness of

8   the file.

9        Q.   So, unit RD file is really just a slim

10  file to identify that there is a case number

11  open?

12       A.   Right.

13       Q.   It's got this number, and here's one

14  or two reports on it?

15       A.   Right.

16       Q.   The every day use, the meaty file is

17  the one that would have been in the homicide

18  drawer or other appropriate drawer?

19       A.   Right.

20       Q.   And how did the meaty file in the

21  homicide drawer relate to the working file?  Is

22  it the same file, or is it the copy of a same

23  file?

24            MR. PATTERSON:  Objection, vague,

1    compound.

2              THE WITNESS:  It's not the same file.

3    It is sometimes photocopies of selected

4    portions.

5    BY MS. KEEN:

6         Q.   Which is, the working file or the

7    homicide drawer file?

8         A.   The working file would be copies of

9    select information and the homicide -- excuse

10   me.  The working file might also contain

11   something that's not in the homicide drawer,

12   and that might be a victim's telephone book.

13              You know, back in the day when

14   they still had paper, you would find a personal

15   telephone book.  Not knowing what it means, but

16   the person's name may come up during the course

17   of the investigation.  Look him up.  Maybe

18   you'll get lucky and get a good address or

19   phone number.

20        Q.   Wait.  Are you -- who's telephone book

21   was it?

22        A.   It might be the victim's.

23        Q.   Oh, you mean something that was

24   recovered --

1        A.    At the scene.

2        Q.    And that might be in the working file?

3        A.    Yes.

4        Q.    Because it might have names of people

5    she knew, people -- I don't know why I made the

6    victim a female, but...

7        A.    Right.

8        Q.    So, what other kinds of things would

9    be in the working file but you might not see in

10   the homicide drawer file?

11           MR. PATTERSON:  Objection, foundation.

12           THE WITNESS:  It might be forms.

13   BY MS. KEEN:

14       Q.    Let me just back up.

15              In the time period of pre-'83,

16   what types of documents would you -- strike

17   that.

18              In the pre-1973 period, what

19   types of documents might exist in the working

20   file that a detective used that wouldn't also

21   be seen in the file that was kept in the drawer

22   in the area or unit?

23       A.    It might be a form, one particular

24   form.  You know, we're a large organization and

1    we have forms for personnel like detectives who

2    are requesting mugshots, you know, from graphic

3    artists.

4                I would like a picture of the

5    next door neighbor or the suspect.  I also

6    would like the rap sheet of the victim.  I

7    would like to see who he previously was

8    arrested or who she was previously arrested

9    with.

10               It --

11        Q.    What about handwritten -- or, sorry.

12        A.    It's just items that are generated in

13   the course of having to do business.  Some of

14   it might be receipts, you know, requests.

15        Q.    Some are original evidence that a

16   detective might have gathered on the shift?

17        A.    If it raised to the level of evidence,

18   it should have been inventoried.  When you

19   truly don't know its significance, like that

20   phone book, the victim's phone book, that might

21   have simply been placed in the working file.

22        Q.    There was no such thing as an

23   investigative file according to the police

24   department pre-'83, correct?

1      A.   We did not recognize that term until

2   1983.  But, frankly, we had a problem with that

3   term, and I think that was part of our issue in

4   1983.  There was a lack of common nomenclature

5   to describe what may exist in certain cases.

6      Q.   And that's what I want to go to.  I

7   just want to quickly ask you, would you tend to

8   see -- strike that.

9            Would Major Incident

10  Worksheets -- or, actually, strike that.

11           Was the predecessor to the Major

12  Incident Worksheets, in other words, was the

13  form the detectives used kept in working files?

14      MR. PATTERSON:  Objection, asked and

15  answered.

16  BY MS. KEEN:

17      Q.   Go ahead.

18      A.   They could.

19      Q.   The unit RD numerical sequence number

20  is different from the RD numbered file that the

21  Records Division kept over at the headquarters,

22  correct?

23      A.   They mirrored each very closely, but

24  the detective one was a photocopy.  The Records

1  Division had the original general offense case,

2  the original supplementary reports.

3      Q.   Now, you said that the working files

4  filled a need, that there was a need for the

5  working files.

6          If I understand you correctly,

7  one of the needs of a working file was to relay

8  information among different detectives who were

9  both working on the same case, correct?

10     A.   Correct.

11     Q.   I'm trying to figure out a clear way

12 to distill my thoughts.

13          So, would you expect to see

14 working files shared between detectives in

15 different units?  So, for example, in this

16 case, you have Area 3 folks working on one as

17 aspect of this fire death at Hermitage, and

18 then you have Bomb & Arson working on another

19 aspect of this fire and death.

20          Would you expect to see the

21 working file exchanged between the Area 3 and

22 the Bomb & Arson detectives pre-'83?

23          MR. PATTERSON:  Objection, foundation,

24 form, incomplete hypothetical.

1          THE WITNESS:  First of all, there

2    would not have to be a working file.  I mean,

3    it doesn't have to be one.

4    BY MS. KEEN:

5        Q.   I understand.

6        A.   But, no, because they are physically

7    at two different locations.  Information should

8    be shared, detectives and all police officers

9    have that same obligation.

10            If I have some information on a

11   case that you're working, I am supposed to

12   notify your unit.

13            We have means of doing that.  It

14   could be perhaps submitted in an information

15   report; pick up the telephone.  Pass the

16   information on.

17       Q.   So, it's really the primary use you

18   would -- strike that.

19            The primary -- or strike that.

20            The majority of the instances in

21   which working files were used were in cases in

22   which there were different investigators within

23   the same unit working the same case, correct?

24            MR. PATTERSON:  Objection, form,

1  foundation.

2          MS. KEEN:  Go ahead.

3          THE WITNESS:  It's more of an

4  intramural than intra-department.

5  BY MS. KEEN:

6      Q.   So, in other words, is it fair to say

7  that --

8      A.   Same unit is the answer, yes.

9      Q.   So, is it fair to say that you would

10  tend to see working files used to exchange

11  information between investigators within the

12  same unit?

13      A.   Yes.

14      Q.   So that the need for working files

15  existed whenever you had people investigating a

16  serious crime; is that fair to say?

17          MR. PATTERSON:  Objection, form.

18  BY MS. KEEN:

19      Q.   You can answer.

20      A.   A serious crime with multiple teams of

21  detectives assigned to it, over a period of

22  time.  If it's resolved in the first 24 hours,

23  you may not see an investigative file, even if

24  it was a serious crime.

1    Q.   So, if an investigation is ongoing and

2  it's taking several days to complete and,

3  therefore, there are multiple different

4  detectives, or investigators I guess is a

5  better word, working on that same

6  investigation, would you have expected to see a

7  working file in that scenario pre-'83?

8          MR. PATTERSON:  Objection, form,

9  foundation, speculation, incomplete

10 hypothetical.

11         MS. KEEN:  I'll just keep refining my

12 question until it passes muster.

13 BY MS. KEEN:

14    Q.   And I'm not trying to be confusing

15 here.  I'm just saying in an example -- talking

16 about working files and the kinds of instances

17 where there was a need for working files and

18 you would tend to see working files being used

19 pre-'83?

20         Is it your understanding that

21 working files were used to exchange information

22 in cases in which there were multiple

23 investigators investigating the same case over

24 the span of multiple shifts?

1          MR. PATTERSON:  Same objections.

2          THE WITNESS:  Yes.  But this

3   subsequent team, or the team that's picking up

4   the investigation is under no obligation to

5   pick up or find a working file.

6               It could simply -- this person's

7   preferred style may be looking at something

8   neater and going to the office file and making

9   a copy for himself of what he needs.

10  BY MS. KEEN:

11       Q.   Okay.  So, I understand your

12  clarification is that there was no requirement

13  to have working files in the first place,

14  correct?

15       A.   Correct.

16       Q.   And there was certainly no obligation

17  for a detective to consult the working file,

18  correct?

19       A.   Correct.

20       Q.   Or to keep a working file?

21       A.   Correct.

22       Q.   So, I'm asking about what your

23  understanding is as to what those instances in

24  which working files were used?

1      A.   Yes.

2      Q.   In cases where cases working files --

3  strike that.

4           Is it your understanding that

5  working files were generally used, not always,

6  but frequently when -- or strike that.

7           Was it your understanding that in

8  at least some cases in which there was an

9  ongoing investigation involving multiple shifts

10  and multiple investigators, that a working file

11  was kept?

12          MR. PATTERSON:  Objection, foundation,

13  speculation, incomplete hypothetical.

14          MS. KEEN:  What are your objections to

15  foundation and speculation given that he's a

16  30(b)(6) witness?

17          MR. PATTERSON:  My objection is you've

18  got a lot of somes, generalities.  And it seems

19  like the -- the right question seems to be that

20  as a 30(b)(6) witness, he can testify to what

21  the policy, practice and procedure of the

22  Chicago Police Department was at that time.

23          MS. KEEN:  That's what I'm asking,

24  What was the practice?

1         MR. PATTERSON:  That's not what you

2  asked him.  Let's read the question back.

3                (WHEREUPON, said Record was read

4                 as requested.)

5         MS. KEEN:  That's a perfectly normal

6  question based on this fact, yes.

7          I mean, if you're going to

8  object, then we can't have a 30(b)(6)

9  deposition.

10         MR. PATTERSON:  It's your call,

11  Roshna.

12         MS. KEEN:  No.

13         MR. PATTERSON:  I'm lodging the

14  objection for Judge Lefkow.

15         MS. KEEN:  If you're going to keep

16  objecting, then we're going to call the judge

17  now.  Because you're not letting me take a

18  30(b)(6) deposition.

19         MR. PATTERSON:  Let's call her and

20  read that question and see what she thinks

21  about that question.

22         MS. KEEN:  Fine.  Tell me when you're

23  ready.  And read it back to him so he's really

24  clear.

1          You want to call the judge on

2    this?

3          MR. PATTERSON:  You said you wanted to

4    call the judge.  I'm making an objection.

5          MS. KEEN:  You're not letting me

6    ask --

7          MR. PATTERSON:  He's going to still

8    answer the question, right?

9          MS. KEEN:  Hold on.  This is a

10   30(b)(6) witness.  So, these objections matter.

11          You've been making a lot of

12   foundation objections, more so than I've ever

13   seen in a 30(b)(6) deposition, given that

14   you've presented him as the City's

15   representative.

16          So, I actually think it's

17   inappropriate to be making so many foundation

18   objections.  But let's take this specific

19   question here.

20          I ask him whether he has seen in

21   at least some cases the practice of working

22   files in a particular scenario.

23          If you're going to --

24          MR. PATTERSON:  That is not what you

1   asked him.  Let's read the question back.

2          MS. KEEN:  Why don't you tell me what

3   is infirm about the question so that I can --

4          MR. PATTERSON:  I told you.  You

5   have -- you asked -- you said some general --

6          MS. KEEN:  No, no.  I struck the

7   general.

8          MR. PATTERSON:  Okay.  Let's read the

9   question back so I can understand it.

10                  (WHEREUPON, said Record was read as

11                   requested.)

12          MS. KEEN:  I think that question is

13   fine.

14          MR. PATTERSON:  Okay.  If you think

15   you're fine, then you should go forward.

16          MR. KIVETZ:  For the record, you think

17   the question is fine.  He's made his objection.

18   You keep going on.

19          MR. PATTERSON:  You keep going.

20          MS. KEEN:  No, I can't risk --

21          MR. KIVETZ:  -- move forward.

22          MS. KEEN:  No.  Because I can't --

23   this may be his trial testimony.

24                  I mean, so what is your -- are

1  you still launching your objection?

2              I know that that question is a

3  little muddled because I started over a few

4  times.  But now having heard the final aeration

5  of the question, and I can read it again, do

6  you have an objection?

7              MR. PATTERSON:  Yeah.  I still have

8  the same objection because you are asking him

9  as a 30(b)(6) witness an incomplete

10  hypothetical.  You're asking him to speculate.

11  He's already testified that it was not official

12  policy to have working files, nobody was

13  required to have working files.  Some

14  detectives had working files; others preferred

15  to communicate orally.

16              So, to then say, well, working

17  files were used here and there and elsewhere,

18  it's -- you're asking the City to speculate --

19  you're asking the City to react to an

20  incomplete hypothetical or an incomplete

21  example.

22              But if you think the question is

23  okay, then you should go forward.  He's going

24  to answer the question.  I'm not instructing

 1    him not to answer.

 2           MS. KEEN:  You can't just protect

 3    yourself by throwing an objection out there

 4    just in case it sticks.  That's not

 5    appropriate.

 6           MR. PATTERSON:  Roshna, you can go --

 7    he's going to answer the question.

 8           MS. KEEN:  I know what I'm allowed to

 9    do.  You know that I know what I'm allowed to

10    do.

11           MR. PATTERSON:  So, then why we having

12    this conversation?  I'm just putting an

13    objection on the record.

14           MS. KEEN:  I'm giving you an

15    opportunity to explain your objection for the

16    record so that I can cure if there's a

17    deficiencies.

18           MR. PATTERSON:  I've explained it.

19           MS. KEEN:  So, is your objection

20    foundation or form or all of the above?

21           MR. PATTERSON:  It is foundation and

22    form.

23           MS. KEEN:  Are you saying that this

24    witness is the representative on Topic 3,

 1    which, for the record is:

 2                    "The use, creation, contents of,

 3    storage, location, movement and preservation of

 4    investigative files kept by and/or at the

 5    Chicago Police Department, Bomb & Arson Unit,

 6    including but not limited to so-called

 7    permanent retention files, area files, official

 8    files, unit files, working files street files,

 9    running files, clipboard files and Seraphine

10    reports."

11                    That's just one topic.  Is he

12    your witness on that topic?

13            MR. PATTERSON:  Yes, he is.  But he's

14    still entitled to questions that have

15    foundation and that are in proper form.

16            MS. KEEN:  What is the lack of

17    foundation objection?

18            MR. PATTERSON:  The lack of foundation

19    is you have not established with this witness

20    when working files are used, what they're used

21    for, when he would expect to see them, etc.

22            MS. KEEN:  I have been asking him

23    about -- if that's your objection, I'm fine.

24    BY MS. KEEN:

1          Q.   Go ahead.  I'll read you back the

2     question.   You can answer.

3          A.   Yes.

4          Q.   Okay.  Sorry about that long pause.

5               MR. KIVETZ:  Just so the record is

6     clear, his entire objections remain on the

7     record.  You're still choosing to continue to

8     go forward; is that correct?

9               MS. KEEN:  Of course.

10               MR. KIVETZ:  Okay.  Well, there was

11     other objections before you said, oh, well if

12     that's the reason for you objection --

13               MR. PATTERSON:  You just asked about

14     the foundation objection.

15               MR. KIVETZ:  That's correct.  You've

16     only determined one thing and decided to move

17     on.  I just wanted to make sure his entire

18     objection is preserved before we move forward

19     and continue to go forward.

20               MS. KEEN:  I didn't go in there and

21     delete the transcript.

22               MR. KIVETZ:  Okay.  Great.  Well, then

23     you --

24               MS. KEEN:  You know what?  What is

1  your form objection?

2          MR. PATTERSON:  The form objection is

3  it's speculative, it's vague, and it's

4  compound.  Because you're asking him to

5  speculate as to what any individual detective's

6  practice is.  And he's already said that as the

7  Chicago Police Department, we don't require

8  working files, we don't, you know -- some

9  officers -- some detectives use them, some

10 didn't.

11          It was a personal style thing.

12 You can communicate orally.  So, he can't sit

13 here and say, oh, this was the standard way to

14 do things or this is the standard situation --

15         MS. KEEN:  No.  That's not what I

16 asked him.

17         MR. PATTERSON:  You did.  Read back

18 the question.

19         MS. KEEN:  I said in at least some

20 cases.

21          Do you know what you're doing?

22 You're actually doing an objection to me being

23 able to ask a 30(b)(6) witness these questions.

24          That's the implication of what

1  you just said.  What you have purported to

2  present and said multiple times in court today

3  in front of Judge Valdez that you're producing

4  someone to answer all of these questions.

5          But at every turn I attempt to

6  ask this witness who knows, is extremely

7  knowledgeable -- the cat is out of the bag.

8  There's all these memos.  No one is pretending

9  that there weren't working files pre-'83.  I'm

10  just trying to ask him about them.

11          You're saying --

12          MR. PATTERSON:  And I'm saying that

13  he's entitled to --

14          MS. KEEN:  Let me finish.

15          MR. PATTERSON:  -- a question that has

16  foundation --

17          MS. KEEN:  Let me finish.

18          MR. PATTERSON:  -- and a question that

19  is in proper form.

20          MS. KEEN:  No.  Stop.  Stop

21  interrupting me on the record.  Stop

22  interrupting me on the record.

23          My -- I mean, that's actually

24  quite rude.

1          What I was getting ready to

2   finish saying was that you -- I have asked for

3   somebody on working files on whether they

4   exist, how were they used.

5          This individual is extremely

6   knowledgeable and, therefore, I think quite

7   rightly you have identified him as your

8   30(b)(6) witness.

9          I have asked him in certain --

10  you know, based on his testimony about why

11  working files were needed, why they were used,

12  the kinds of things that they contained, who

13  would hand-off working files.

14         Based on all of that, I asked if

15  he would expect to see in at least some cases

16  fitting the following criteria that working

17  files were used.

18         You've objected as speculative

19  and lacks foundation.  And that's not well

20  taken.

21         Now, I don't really know if you

22  are trying to prevent me from being able to

23  conduct my 30(b)(6) deposition, or you're

24  saying no, I don't get to ask him questions

1    because I'm going to say they're hypothetical

2    even though they're actually corporate

3    representative testimony questions.

4              Then I don't want -- do we call

5    the judge?  You could revisit your objection,

6    or we can file a motion and say you're not

7    really in good faith allowing me to do this

8    30(b)(6) dep.

9              So, what is your position at this

10   point?

11        MR. PATTERSON:  My position is that my

12   objection is on the record.  He's going to

13   answer the question.  We should move forward.

14        MS. KEEN:  I am going to reserve the

15   right, once the transcript is available, to, if

16   I think I need to, file a motion for protective

17   order and reconvene your dep to be able to ask

18   some of these questions without inappropriate

19   objections so that I don't have to -- I mean,

20   because otherwise this is dragging on and on.

21              With each question, you're making

22   foundation objections, speculation objections,

23   and I just don't think that's the way to go.

24              So, I'll go forward now.  And I

1   know you're not going to agree to that, but I'm

2   just making it known for the record that that's

3   my intention to take with the transcript and

4   maybe have to go into court on.

5          MR. PATTERSON:  I absolutely object.

6          MR. KIVETZ:  And so do the individual

7   defendants.

8          MS. KEEN:  Okay.  Somewhere in there

9   was my question.

10          THE COURT REPORTER:  Do you want it

11  read back?

12          MS. KEEN:  No.  I think I know it.

13  BY MS. KEEN:

14      Q.   Go ahead.  You remember my question?

15      A.   Yes.

16      Q.   The answer is yes, you would expect to

17  see working files.  Okay.  Thank you.

18              So, that's true for multiple

19  teams of investigators whether they be

20  Bomb & Arson or Area 3 -- or area detectives,

21  correct?

22      A.   The situation that you described is

23  somehow being a very important case, more

24  important than others, worked on by multiple

1  watches.  It's more likely than not that a

2  working file might be used.

3      Q.   Okay.  And your answer is true for

4  investigators in Bomb & Arson?

5      A.   I did not work in Bomb & Arson.  So, I

6  am hesitant to speak to that, but it makes

7  sense.

8      Q.   In other words, the reasons for

9  keeping a working file as you described them,

10  existed just the same for Bomb & Arson

11  investigators as for area investigators,

12  correct?

13      A.   Correct.

14      Q.   And while you do not specifically work

15  in Bomb & Arson, do you have any reason to

16  believe that investigators in other specialized

17  units, not just within the areas, were not

18  keeping working files?

19          MR. PATTERSON:  Objection, vague.

20  BY MS. KEEN:

21      Q.   Go ahead.

22      A.   Detectives.  We're talking about

23  detectives within the Detective Division.  I

24  have reason to believe that they may have used

1    some form of a working file.

2         Q.    Everybody -- or all units within the

3    Detective Division?

4         A.    Right.

5         Q.    Okay.  The reason I am shying away

6    from the word detective is because there are

7    people within the Bomb & Arson Unit that aren't

8    detectives, but are still investigators.

9              For example, the explosive

10   technicians, right?

11        A.    Okay.  But --

12        Q.    I guess what I'm asking is putting

13   aside whether or not they were a detective or

14   in the Detective Division, do you believe that

15   investigators in the department working on an

16   investigation of importance that stand in

17   multiple shifts may have used working files?

18        A.    No.

19        Q.    Okay.

20        A.    The only thing that I've ever seen is

21   detective's notes, memoranda being placed in a

22   folder.  You're talking other units.  You're

23   talking public transportation, airport, you

24   know, narcotics, gangs, youths.  I mean,

1  there's a lot of units.

2      **Q.   Do you have personal knowledge of**

3  **whether or not there was a working files**

4  **practice in the Bomb & Arson Unit at any point**

5  **in time since it was created?**

6          MR. PATTERSON:  Objection, calls for

7  personal knowledge.  Just so the record is

8  clear, he's not testifying as to the Chicago

9  Police Department.

10          THE WITNESS:  When I conducted

11  training for the detectives, not only were the

12  detective area personnel present, but Youth

13  Division was there, and detectives and

14  explosive technicians from the Bomb & Arson

15  Unit were in this training.

16          So, at least from '83 on, they

17  were using investigative files.

18  BY MS. KEEN:

19      **Q.   Training regarding the new special**

20  **orders that were ruled out?**

21      **A.   Correct.**

22      **Q.   So, who all was in attendance at the**

23  **training?  Let me back up.**

24          **Was there one training or were**

 1    there multiple trainings on the use of

 2    investigative files?

 3         A.   There were multiple trainings.  At

 4    that time, there were probably a thousand

 5    members in the Bureau of Investigative

 6    Services, Youth Division, and Detective

 7    Division.

 8         Q.   I think there was a --

 9         A.   Organized Crime was not part of it at

10    that point.

11         Q.   Was not part of a Bureau of

12    Investigative Services?

13         A.   It was part of Investigative Services,

14    but they were not required for investigative

15    files.

16         Q.   Oh, okay.

17              So, they weren't at the training?

18         A.   No, they were not.

19         Q.   But Bomb & Arson were at the

20    trainings?

21         A.   Yes.

22         Q.   Okay.

23         A.   And it was multiple sessions in

24    three-hour blocks.  And it started in January,

1  1983, and went on probably for a couple of

2  months.  And I, myself conducted all of the

3  training.

4          MS. KEEN:  Sorry.  I'm a little

5  unorganized.  We've got about 200 documents

6  from the City, which I have tried to organize

7  on-site here.

8          MR. PATTERSON:  For the record then,

9  we were never asked to move or reschedule the

10  deposition.

11  BY MS. KEEN:

12     Q.   Okay.  Well, let's just get into the

13  documents we have here and you can help me

14  figure them out.

15              So, as a result of this Laverty

16  memo business, there was departmental -- there

17  was some reaction to it, right, in the

18  department?

19     A.   Correct.

20     Q.   What was the first thing that happened

21  in reaction to the Laverty memo?

22     A.   There was a meeting of exempt members

23  of the police department -- excuse me, exempt

24  members of the Detective Division of the police

1    department to discuss the issue and to

2    determine what, if anything, it means.

3              And as part of that -- or from

4    that meeting, there were some site visits.  And

5    also from this meeting, it was apparent that

6    there was a lack of common understanding as to

7    the terminology being used to describe the

8    working files, street files, et cetera.

9         Q.   Okay.  And was this meeting held

10   before or after the Brzeczek teletype?

11        A.   Before.

12        Q.   Who was present at the meeting?

13        A.   Exempt members, the detective area

14   commanders, the detective deputy chiefs, the

15   Chief of Detectives, the deputy superintendent

16   of the Bureau of Investigative Services.

17        Q.   Was the commander of Bomb & Arson

18   present?

19        A.   He was a detective commander.  I don't

20   know if he was invited to the initial meeting

21   or not.

22        Q.   Were there any documents created that

23   reflected when the meeting was held?

24        A.   No.

1    Q.   Are there any documents that were

2  created out of this -- strike that.

3              Were there any documents that

4  memorialized what was discussed at the meeting?

5    A.   I think some of the documents that I

6  may have prepared afterwards make reference to

7  it, but the site visits were done within

8  24 hours of this meeting.

9              So, if you find a memo on a site

10  visit, assume a day or two before is when this

11  exempt meeting occurred.

12    Q.   Okay.  So, I'm going to start showing

13  you some documents and you can tell me if

14  they're the right --

15                    (WHEREUPON, Deposition Exhibit

16                     No. 2 was marked for

17                     identification.)

18  BY MS. KEEN:

19    Q.   I'm handing you Exhibit No. 2, which

20  is P 2457 through P 2461.  What is this

21  document?

22    A.   This document is -- it was co-authored

23  by Sergeant Tom Brady and Sergeant John Tolley.

24  They worked directly for the deputy chiefs of

1   the Field Group South and the Field Group North

2   detective areas.

3            It was the first attempt to

4   summarize site visits that had been made and to

5   identify a couple alternative strategies as to

6   what should be done or could be done.

7       Q.   Does this document refresh your

8   recollection -- strike that.

9            This document appeared to be

10  undated, correct?

11      A.   I would say it's the result of

12  photocopies that have run off the date in the

13  top right-hand corner where it normally is, but

14  these documents are undated.

15           But this is exactly the document

16  I was referring to that was done within a day

17  or two of the original exempt meeting.

18      Q.   Okay.  And I'm going to show you what

19  I'm marking as Exhibit No. 3.

20                    (WHEREUPON, Deposition Exhibit

21                     No. 3 was marked for

22                     identification.)

23  BY MS. KEEN:

24      Q.   This is P 2464 and 2465.

1     A.    Right.

2     Q.    Is this another summary of -- what is

3 this document?

4     A.    This document is not a site survey,

5 nor did it attempt to be a site survey of the

6 different units.

7          What it is is a meeting of those

8 who were in charge of the Violent Crime Units

9 in the different areas, areas 1 through 6.

10          And I don't know why the two

11 other sergeants were there, Thomas Sadler and

12 Robert Becker.

13          Robert Becker was from Research

14 and Development.

15          Sergeant Sadler may have been

16 from the Bureau of Investigative Services, and

17 myself.

18          But this was the meeting in which

19 was a follow-up to the exempt meeting.  It was

20 a follow-up to the site surveys.

21          It was a meeting at which the

22 Violent Crime Unit commanding officers were

23 called in, and we discussed the issue and

24 specifically included whether or not more

1   should have been written on supplementary

2   reports.

3       Q.   Okay.  I'm going to ask you about the

4   content of that shortly.  I just want to first

5   understand all of the documents.

6       A.   Okay.

7                 (WHEREUPON, Deposition Exhibit

8                 No. 4 was marked for

9                 identification.)

10  BY MS. KEEN:

11      Q.   Then, of course, Exhibit 4 is the

12   teletype that came out in response to the TRO,

13   correct?

14      A.   Correct.  I believe it was Judge

15   McMillen issued the TRO on this one.

16      Q.   As a result of the Laverty memo,

17   correct?

18      A.   The Area 2 case, right.

19      Q.   Okay.  So, this teletype came after

20   the site visit, correct?

21      A.   Correct.

22      Q.   Now, there's a series of documents

23   that are dated all on April 21st, 1982.

24      A.   Okay.

1          (WHEREUPON, Deposition Exhibit

2          No. 5 was marked for

3          identification.)

4    BY MS. KEEN:

5          Q.   I'm going to show you Exhibit 5, which

6    is CITY-KLUP 3022.

7               Are you familiar with this

8    document?

9          A.   I have seen it before.

10         Q.   Can you just explain what this

11   document is?

12         A.   This document is from John Hinchy, a

13   Deputy Chief in charge of the Special

14   Activities Group.  And it's in the subject of

15   file control, but it references the newly

16   issued Detective Division Notice, 82-2.

17               It seems to reiterate the

18   superintendent of police's instructions that

19   all police department investigative files known

20   as office unit or working files and sometimes

21   referred to as street or running files will be

22   kept intact.

23         Q.   What was the Special Activities Group?

24         A.   Again, there were three deputy chiefs.

1   Two of them were the geographical areas, north

2   and south, and this was the Special Activities

3   Group.  The Bomb & Arson Unit was part of the

4   Special Activities Group.

5       Q.   And we weren't able to recall the

6   other one, right?

7       A.   Yeah.  Financial Crimes was one, and

8   my memory is shaky.

9       Q.   It's been a while.

10          What was the reason for needing

11   to do an additional memorandum after the

12   Detective Division notice came out?

13       A.   I know of none.  Reinforcement.

14       Q.   Reinforcement?

15       A.   This deputy chief's preferred

16   managerial style.

17       Q.   I see.  So, it wasn't from someone

18   higher up than him directing him to reinforce

19   the requirement through additional memorandum,

20   correct?

21       A.   Correct.

22       Q.   What was your -- strike that.

23          How, if at all, did the section

24   commanders of -- strike that.

1          How, if at all, did anyone who

2    supervised the detectives within -- strike

3    that.

4          I'm just going to continue

5    soldiering on with organizing the documents and

6    we'll go over it that way.

7          So 82-2 came out before the

8    teletype?

9    A.   I doubt it.  It probably was after, an

10   hour or two after.

11   Q.   Oh, okay.

12                    (WHEREUPON, Deposition Exhibit

13                     No. 6 was marked for

14                     identification.)

15   BY MS. KEEN:

16   Q.   I'm showing you Exhibit No. 6.  It is

17   Plaintiff 2455 through 2456.

18          What is this document?

19   A.   This document is dated the 21st of

20   April, 1982.  It is a memorandum from John

21   Stibich the Commander of Area 3 Detective

22   Division.  The subject is Working Files.

23          It has a couple subtitles,

24   questions, all three questions:

1          Should working files be kept?

2          What should be included in the

3    working files?

4          What should be done with the

5    working files?

6          It's three topics, and

7    recommendations or reasonings were made to

8    support the area commander's thoughts on these

9    subjects.

10   Q.  So, why did Commander Stibich want to

11   provide the Acting Chief with his

12   recommendations on the subject of Working

13   Files?

14   A.  Each of the detective areas submitted

15   a similar report.  I don't know what caused

16   them to do it.  I suspect it was an oral

17   instruction from the Chief.

18   Q.  How, if at all, does this relate to

19   the document we marked as Exhibit 2, which were

20   also -- it looks like some -- oh, I'm sorry.

21          That was really just a summary of

22   the site visit, right?

23   A.  Right.

24

1           (WHEREUPON, Deposition Exhibit

2               No. 7 was marked for

3               identification.)

4   BY MS. KEEN:

5       Q.   **Exhibit 7 is Plaintiff 2882 to 2885,**

6   **and I don't know if these are actually part of**

7   **the same document.**

8       A.   **The John Stibich memo in Exhibit 7,**

9   **and the William --**

10          **MR. PATTERSON:  6.**

11          THE WITNESS:  I'm sorry.  Exhibit 6.

12  And the William Murphy Commander report and the

13  Milton Deas Commander report in Exhibit 7 seem

14  to be written to respond to the same question

15  or instruction from the Chief.

16  BY MS. KEEN:

17      Q.   **Tell me what's actually happening and**

18  **what you think should be done.**

19      A.   **Right.  We had a problem with**

20  **terminology.**

21      Q.   **Now, when you did your audit, was that**

22  **before or after the site survey and memos you**

23  **prepared?**

24      A.   **I was part of the original site**

1    survey.  I believe I went to -- well, I don't

2    know what -- I went to Area 3 for sure.

3    There's a report around here somewhere.

4                    And when I came back, these two

5    sergeants wrote this summary report.  And there

6    was some frustration with that because

7    different people, different detectives and

8    sergeants went to different areas.

9                    And after all is said and done,

10   they sent me out to the areas that I hadn't

11   been to so one person could see the same thing

12   at each of the areas.  And you come back at

13   least using the same language to describe what

14   it is they saw.

15       Q.    So, that audit as it's been called was

16   done after the initial site survey?

17       A.    Well, the first one was done on day

18   one by myself.  I did two of the areas.

19       Q.    Okay.

20       A.    And then the summary report.  And then

21   I did a site survey of all four, the remaining

22   four areas.

23

24

1          (WHEREUPON, Deposition Exhibit

2              No. 8 was marked for

3                  identification.)

4    BY MS. KEEN:

5        **Q.   Let me show you what I've marked as**

6    **Exhibit 8.   2462 to Plaintiff's 2463.**

7              **What is this document?**

8        **A.   This is a memo that's entitled:**

9    **"Discrepancies Between Detective Area Unit**

10   **Files and the Records Division Reports of the**

11   **Same Records Division Number."**

12             **It's a page and a half -- it's a**

13   **page and a third memo written by myself.  It is**

14   **undated, but it talks about my site visits to**

15   **each of the six areas and the sampling of**

16   **working files, et cetera, that I conducted.**

17       **Q.   When did you prepare this memo?**

18       **A.   Immediately upon having gone over the**

19   **course of a couple of days.  I don't know if it**

20   **was two or three days.**

21       **Q.   Was this a memorialization of that**

22   **first visit of two or the last visit of --**

23       **A.   This is of all the areas.**

24       **Q.   So, after you had done your final**

1   audit, you prepared this report?

2       A.   Correct.

3            MR. PATTERSON:  Objection to the term

4   audit.

5            THE WITNESS:  In the report, I

6   actually use the word sampling.  And there is

7   still another document around here that gives

8   some explicit examples of some of my findings.

9   BY MS. KEEN:

10      Q.   Okay.  So, I'll call it a sampling.

11           So, was Exhibit 8 created after

12  you completed that final sampling of files?

13      A.   Yes.

14                  (WHEREUPON, Deposition Exhibit

15                   No. 9 was marked for

16                   identification.)

17  BY MS. KEEN:

18      Q.   Okay.  Exhibit 9 is Plaintiffs 2466 to

19  2467.  What is this document?

20      A.   This is an unsigned memo, which I had

21  prepared on the subject of Elimination Of Unit

22  Cleared/Closed Homicide Cases.

23           It discussed my interactions with

24  each of the detective areas and what they

1    **thought about the informal communication of the**

2    **working files.  It talks about discrepancies**

3    **that existed between the running files and the**

4    **RD files, the Records Division file.**

5        **Q.   One of the solutions that you're**

6    **exploring in this document eliminating the unit**

7    **file, correct?**

8            MR. PATTERSON:  Take your time.  Read

9    the whole thing if you need to.

10           MS. KEEN:  Please.

11           THE WITNESS:  All right.  Okay.

12           Paragraph 3 of the memo talks

13   about a possible solution that would terminate

14   the issue of discrepancy is simply not to keep

15   cleared/closed homicide files in the Violent

16   Crimes Units.

17           It suggested the possibility of

18   sending them directly to their Records

19   Division.  End of Paragraph 3.

20   BY MS. KEEN:

21       **Q.   Do you believe that you prepared this**

22   **memo in '82 around the time that you were**

23   **preparing the other document?**

24       **A.   Yes.**

1       Q.   What was your reason that you --

2   strike that.

3            It appears from earlier in the

4   memo that you were concerned that there would

5   always be discrepancies between the areas unit

6   file and the file in the Records Division,

7   correct?

8       A.   Correct.  One of my observations is

9   that part of the problem was the physical

10  location of files on the same case.  And no

11  matter how well we monitored the placement of

12  information into these files, given time and

13  given volume, they're not going to all

14  perfectly match one another.

15           I'm asking the question in a

16  rhetorical manner.  Maybe we should move the

17  cleared/closed cases out of the detective area

18  and perhaps send them for safekeeping in the

19  Records Division.

20      Q.   Now, why were cleared/closed files --

21  strike that.

22           Let me just back up and ask you,

23  what does cleared/closed mean?

24      A.   The detective has the responsibility

1  for case classification.  For all the crimes

2  that they investigate, there's one of seven, I

3  think there's seven dispositions.

4          One is that the case is cleared.

5  We know who did it.

6          Closed means everyone responsible

7  for that crime has been arrested.  If three

8  people were responsible, it's cleared and

9  closed.

10          If the case is cleared and open,

11  we know who did it, they're being prosecuted,

12  but only one of the three responsible people

13  has been arrested.  So, we're still sort of

14  working on it.  It's still open.

15          And then there are other

16  classifications of unfounded, suspended,

17  clearly exceptionally.  Something bars us from

18  arresting or prosecuting the individual.

19          The State's Attorney won't

20  approve charges, the offender died, or the

21  offender has moved to a country without

22  extradition treaty, an agreement with the

23  United States. So, those are the types of

24  dispositions.

1           Cleared/closed means resolved and

2    everyone responsible has been arrested.

3        Q.   At what point in the investigation --

4    or strike that.

5           When you were doing the sampling

6    of cleared/closed cases in these areas, what

7    stages were the investigations at for the files

8    you looked at?  Were they cleared/closed at

9    that point, or were they still being worked on?

10       A.   All of the above.

11       Q.   So, this memo deals specifically with

12   cleared/closed, right?

13       A.   Sure.

14       Q.   So, can you explain why there would be

15   a discrepancy between the unit file for a

16   cleared/closed case and the Records Division

17   file for that same case?

18       A.   There may well be a memo.  Memos

19   didn't make it to the Records Division file.

20       Q.   Did do this sampling after 82-2 was

21   issued?

22       A.   No.  Before.

23       Q.   Did you do any sampling after 82-2 was

24   issued?

1          A.    No.

2          Q.    Has the City undertaken any sampling

3     of any kind to determine whether relevant

4     information is being withheld from the official

5     file for a case after 82-2 Special Order was

6     issued?

7               MR. PATTERSON:  Objection, form,

8     foundation.

9               THE WITNESS:  It is a function of

10    supervision to review the work of their

11    subordinates and make sure the files are

12    maintained properly.  But you're speaking to

13    something rather deep here.  Relevance.  If

14    something relevant may not have made it.

15                   That's a pretty high bar, you

16    know.  I would have to look pretty close.

17                   In 82-2, we still did not have

18    General Progress Reports.  And up until there

19    was -- we still didn't have to keep our notes

20    either.

21                   So, as a supervisor, I would say,

22    Everything relevant in there?  Yes.  Everything

23    that needs to be in there is in there.  Okay.

24                   How do you do that?  How do you

1  sample something like that?  I mean, it's a

2  challenge.

3  BY MS. KEEN:

4       Q.   Right.  How would you even go about

5  checking that everything relevant from a note

6  went into a supp report without an individual

7  review of each supp report and corresponding

8  note, correct?

9            MR. PATTERSON:  Objection, form,

10 foundation.

11 BY MS. KEEN:

12      Q.   Is that what your point was?

13      A.   Right.

14      Q.   So, let me take a step back and just

15 ask you, you did a sampling wherein you

16 compared the contents of the areas

17 cleared/closed file with the Records Division

18 file for that same case, correct?

19      A.   I didn't sample the Records Division.

20 I know exactly what's in the Records Division

21 file.  The original general offense case

22 report, the original supplementary reports,

23 plural.  Nothing else.

24      Q.   So, what documents did you look at to

1   prepare Exhibit 9?

2       A.   I went to the areas and I looked at

3   those documents that I found that were called

4   running files, street files, working files and

5   saw that in some of these files, there was

6   miscellaneous documents, sometimes to-froms,

7   subject reports, that I know were not in the

8   Records Division file.

9       Q.   And you knew that because that

10  information was not in the supplementary

11  reports, correct?

12      A.   No.  The memos were never placed in

13  the Records Division file without even reading

14  the report; or the memo, I would know, it's not

15  the same.

16      Q.   Right.

17      A.   Now, did the substance of that get in

18  there?  I don't know.

19      Q.   I believe that you testified in Palmer

20  that one of the things that you observed in the

21  course of your work on this issue was that

22  information that was in a document in the

23  working files sometimes didn't make it into the

24  supplementary reports, even though that

1    information was relevant, correct?

2             MR. PATTERSON:  Objection, improper

3    impeachment.

4    BY MS. KEEN:

5        Q.   I'm not attempting to impeach you.

6    I'm just asking you a question about whether

7    you recall giving that testimony.

8        A.   I believe my comment was oftentimes,

9    sometimes, substantive investigative activity

10   never made it into the official report.

11            For instance, the clearing of

12   suspect A and all the work that went in to even

13   find suspect A.

14            In some instances, there were

15   examples of two reports in a file; the original

16   and the closing arrest report.  And they're

17   separated by ten days.  And one wonders what

18   happened in that ten days.

19       Q.   Right.  And so you would see cases

20   where there was some documentation regarding

21   the work that had been done in the intervening

22   ten days that wasn't made part of the permanent

23   retention file, correct?  Or, the Records

24   Division file, I should call it.

1    A.    Correct.

2    Q.    So, you became aware of a practice in

3  some instances of substantive information about

4  a case investigation not being put into the

5  supplemental report, correct?

6    A.    Correct.  It wasn't wrong in and of

7  itself but it also raised questions.  How did

8  you get to suspect B?  How did that story

9  develop?

10   Q.    So, let's take the example of the

11  suspect A being a suspect and then being

12  eliminated.

13   A.    Right.

14   Q.    Can you tell me -- I mean, how often

15  did you see something like that happening, if

16  you can recall?

17   A.    I have no idea to put it in terms of

18  numbers.  But genuine, substantive, good

19  detective efforts were going undocumented as

20  part of the investigative story line.

21   Q.    In that example, the identity of

22  another suspect that had been ruled out by that

23  detective was completely omitted from the

24  official police reports, correct?

1    A.    Correct.

2    Q.    So, say, there was some evidence to

3  later rule that suspect back in, how would that

4  information -- let me re-ask the question.

5                Unless that suspect later

6  became -- unless the suspect who was ruled out

7  later became a suspect again, that suspect's

8  identity would never be disclosed via official

9  police reports for that investigation, correct?

10   A.    Pre-1983, correct.

11   Q.    After the special order 82-2 was

12  issued, did you do sampling of any kind on the

13  subject of files?

14   A.    No.  I had a lot of conversations, a

15  lot of meetings, but no complete effort to

16  sample again.

17   Q.    Did anybody on behalf of the

18  department do any sampling of actual files

19  after the special order 82-2 came out?

20   A.    I'm not aware of any.

21   Q.    Is that something you would have been

22  aware of given your role in the project?

23   A.    Had it been done at the direction of

24  the Chief, I would have heard about it, I would

     1    have known about it.  But there's nothing to

     2    prohibit anyone below that to order one of

     3    their subordinates to do further sampling, and

     4    I would not have known about it.

     5         Q.   Did the department take any steps to

     6    find out if the working file practice had

     7    actually stopped at any time after Special

     8    Order 82-2 was issued?

     9         A.   Well, we saw Deputy Chief Hinchy's

    10    effort to reinforce the message.

    11         Q.   That the day after the order, right?

    12         A.   Right.  Right.

    13         Q.   I'm just asking the question, because

    14    I don't know the answer.

    15              Did the City of Chicago Police

    16    Department or anyone within the department take

    17    any steps to determine whether the working

    18    files practice had actually stopped as a result

    19    of the efforts the department had taken to

    20    issue a Special Order on the subject in '82?

    21              MR. PATTERSON:  Objection, asked and

    22    answered.

    23              THE WITNESS:  All the files that were

    24    intact should remain intact as of the temporary

1   restraining order.  And the issuance of an

2   order by the superintendent.

3              Then came the gray area.  What

4   about my personal notes?  They don't mean that,

5   do they?  Well, neither the temporary

6   restraining order nor the superintendent's

7   direction made mention of personal notes.

8              And there was discussion -- well,

9   it couldn't possibly mean notes, because they

10  didn't say notes.

11             They must be referring to those

12  memoranda and those to do lists.

13             We'll keep them, just as they

14  were.  But if there was a genuine, sincere,

15  what do you think he means, what do they mean

16  about notes?

17  BY MS. KEEN:

18      Q.   And so what was done about that

19  confusion?

20      A.   We had meetings and then we had -- oh,

21  then we went to court.  Milton Shader's

22  courtroom, and Superintendent Brzeczek

23  clarified his standing.  And he said anything

24  generated in the course of an investigation,

1   notes, even if they're written on the back of a

2   notebook should be preserved.

3               Notes?  Yes, notes.  That was our

4   marching orders to change and clarify what to

5   do with personal notes.  They're the

6   work-product related to the investigation.

7        Q.   So, it sounds like in response to the

8   practice of working files and this Laverty memo

9   lawsuit, the department responded by issuing

10  its Special Order and then these substance

11  special orders regarding the use of

12  investigative files, correct?

13       A.   Well, the first one is 82-2,

14  Department Notice 82-2.  Preserve those things.

15  We still didn't have a name for them.  Preserve

16  them.  You know what I'm talking about.

17              Later, after the hearing in

18  federal court, it was clear that the

19  superintendent is announcing a new policy.

20       Q.   This is 83-1?

21       A.   83-1.

22       Q.   And then 83-1 spelled out the filing

23  system and created some names for the file and

24  associated ancillary documents, correct?

1      A.    Correct.

2      Q.    And then there were some subsequent

3  orders, which I'll mark at this point, that

4  related to the same subject of investigative

5  files and those ancillary documents, correct?

6      A.    Correct.

7      Q.    And then the GPR form was created as

8  well, correct?

9      A.    As part and parcel of 83-1.

10     Q.    Did the department take any other

11  steps to ensure that all of the information in

12  working files was getting produced to -- let me

13  ask that question.

14              Other than the special orders

15  that I just talked about regarding

16  investigative files, did the department take

17  any steps to ensure that working files were

18  being kept intact and not being destroyed?

19     A.    We go back to the supervisory

20  responsibility.  The Superintendent of Police

21  has issued his policy.  The Chief of Detectives

22  has issued a division level order.  It's to be

23  followed.

24              Now, I'm not aware of what you're

1  suggesting, what City-wide uniform action items

2  were there.  I imagine there was a lot of

3  action items done at the commander, lieutenant,

4  sergeant level.  Give me a general progress

5  report with your supp.

6           I know you didn't write that supp

7  using your imagination.  Really?  Yes.  We

8  never used to.  Right.  We never used to.  But

9  do it now.  It was a change of a mindset.

10     Q.   The mindset was that -- the earlier

11  mindset was this very familiar practice of not

12  turning over notes, right?

13     A.   Correct.

14     Q.   And keeping information working files

15  that didn't get made part of the Records

16  Division file, correct?

17     A.   Not keeping.  Okay.  There was no

18  uniform practice of getting rid of running

19  files, street files, working files.  Some might

20  just take the entire file and throw it in the

21  garbage.

22     Q.   Right.  I just mean of not submitting

23  information from the working files in the

24  permanent file, into the Records Division file,

1  that was a mindset that existed before January

2  of '82, correct?

3       A.    Correct.  Before '83.

4       Q.    Before '83.

5             So, I guess all I'm asking is

6  other than direct supervisors to the extent

7  they may have taken steps that you're not

8  personally aware of, did the department

9  management or command staff take any steps to

10  determine whether the working file practice had

11  actually changed as a result of the Special

12  Orders?

13       A.   We had a training program.  There was

14  the 1986 Detective Division Special Order

15  issued by George McMahon, which for the first

16  time introduces the word in Section 6, I

17  believe, audit.

18             Exempt commanding officers will

19  audit these records, these investigative files.

20  But I think that is after the fact.

21             I'm not backing down from the

22  fact that supervisors made sure that the

23  Superintendent of Police's direction and the

24  Chief of Detective's direction were being

1  followed.

2      Q.   I appreciate that.  I'm just trying to

3  understand if anything was done besides that.

4  And I think the answer is, there was some

5  initial training to explain the new rules of

6  83-1, correct?

7      A.   Correct.

8      Q.   And then there was a special order in

9  '86 correct?

10     A.   Correct.

11     Q.   Other than that, you're not aware of

12 any steps taken by anyone at the management

13 level in the department to make sure that the

14 working files practice had ceased, correct?

15     A.   Right.

16     Q.   Now, as far as whether sergeant

17 supervisors, in other words, front line or

18 first line supervisors, if you will, were

19 actually making sure that the Laverty problem

20 didn't happen again and that relevant

21 information wasn't being kept from the official

22 police reports, what steps are you aware of did

23 these front line supervisors take?

24     A.   The front line supervisor had to sign

1  off on the general progress report.  In the

2  bottom right-hand corner of the general

3  progress report is the supervisor's name and

4  signature.

5           But you know what's interesting

6  about that, and it's different from original

7  case reports and supplementary case reports.

8           An original case report and in

9  supplementary case reports, it says approved.

10  On the general offense case report, it says

11  received.

12       MR. PATTERSON:  The general offense

13  case report or general progress report?

14       THE WITNESS:  General progress report.

15  Excuse me.  Thank you for that clarification.

16  The general progress report says received.

17  BY MS. KEEN:

18       Q.   What's the reason for the difference?

19       A.   I remember there being a discussion

20  when I created the form.  You can't expect

21  someone to read someone's chicken scratch of

22  handwriting and, who knows, personal codes.  I

23  don't know how people take their notes.  To

24  read them with the same intensity as you do the

1 supplementary report.

2     So, if I were to really place

3 responsibility, I would place responsibility on

4 that individual detective to ensure that that

5 which is relevant, that which is important to

6 the case makes it to the supplementary report.

7  Q. So, if a GPR did not have a

8 supervisor's signature on this, does that mean

9 that the GPR was never turned into a

10 supervisor?

11  A. That's a very good assumption.

12  Q. Are you aware of any reason why a

13 supervisor would receive a GPR but not sign the

14 GPR?

15  A. No. We're very good at signing

16 things. Reading has its challenges, but we're

17 very good at signing.

18  Q. I appreciate that.

19     Let me make sure I know what all

20 these other documents are quickly.

21    MR. PATTERSON:  Would this be a good

22 time for a break?

23    MS. KEEN:  You know when would be a

24 great time for a break?  If you give me -- I'll

1    try to do it quickly in five minutes.

2              As soon as I mark these, then I'm

3    going to organize them during the break.

4         MR. PATTERSON:  Okay.  Sure.

5              (WHEREUPON, Deposition Exhibit

6                   No. 10 was marked for

7                   identification.)

8    BY MS. KEEN:

9         Q.   This is Exhibit 10 and it's

10   Plaintiff's 2468 through 2471.  Can you tell me

11   what this document is and who wrote it?

12        A.   This is a document on the subject of

13   To-From Subject Memorandums, sic, s-i-c.

14              I now know that the plural of

15   memorandum is "a."  I didn't know that in 1983

16   when I wrote this.  So, I apologize.

17        Q.   You said in 1983?

18        A.   1982.  I'm sorry.

19        Q.   Do you remember when in '82?

20        A.   It's probably April.  Obviously, it's

21   undated, but it's written very close after the

22   time the site visits were conducted.

23        Q.   Okay.  And I'm sorry.  I didn't mean

24   to interrupt you.

1          A.    It was my way of thinking something

2     out and sharing my thoughts in writing.

3          Q.    Who did you share this document with?

4          A.    The Chief of Detectives.

5          Q.    Anybody else?

6          A.    The Deputy Chiefs of Detectives.

7          Q.    Anybody else?

8          A.    Those are the ones I know received it.

9          Q.    I forgot to ask you that about

10    Exhibit 9.  Who did you give Exhibit 9 to?

11         A.    The same people.

12         Q.    Chief of Detectives?

13         A.    And the Deputy Chiefs.

14         Q.    All right.

15         A.    At issue here, it's a discussion of

16    what to do with to-from subject reports and

17    points out the irony that, by our own

18    directives, we have the requirement to generate

19    memoranda on certain types of investigations.

20         Q.    Right.

21         A.    And ask the question, you know, on the

22    last page, should these items become part of

23    the Records Division?  Should these To-From

24    Subject Reports become part of the Records

1  Division?

2                    (WHEREUPON, Deposition Exhibit

3                     No. 11 was marked for

4                     identification.)

5  BY MS. KEEN:

6      Q.   So, this is Exhibit No. 11.  It's

7  really badly Bates stamped.  This is

8  Plaintiff's, I believe, 6307, 6308, 6309 and

9  6310, all the way through 6312.

10             But just so that the record is

11  clear in case I got that Bates numbers wrong,

12  it's hard to read, it's a document entitled

13  Chapter 18 Investigative Files.

14             What is this document, sir?

15     A.   This is Chapter 18 of the Detective

16  Division Standard Operating Procedures.

17     Q.   What year is this from?

18     A.   1988.

19     Q.   Did you write this?

20     A.   I did not.

21     Q.   Who wrote this?

22     A.   The Chief of Detectives was John

23  Townsend.  I don't know who drafted it for him.

24  But you will see that it closely mirrors the

1     previous Detective Division Special Orders from

2     1983.  In any organization, there is at

3     different times, different schools of thought.

4              In one era they say write special

5     orders on special topics.  Someone else says

6     let's put it all in one place, a couple of

7     years later.  Let's create a manual, a standard

8     operating procedure.

9              Frankly, I'm against standard

10    operating procedures because when you revise

11    them, you have to go into page -- Chapter 18,

12    Page 3, revise Paragraph 2.  It gets very messy

13    and usually it's bound and you rip pages out

14    and you try to insert something on a three-ring

15    notebook as opposed to stand alone topics,

16    which are smaller in size.

17         Q.   Right.

18         A.   But in this era, it was the decision

19    of the Detective Division Chief to have one

20    large bound set of Standard Operating

21    Procedures.

22         Q.   Do you have a copy of the '83 Standard

23    Operating Procedures for the Detective

24    Division?

1    A.    There wasn't one.  And that's my

2  point.

3    Q.    Oh, you're saying it was -- okay.

4  Because I was just thinking to myself, I hadn't

5  seen that.

6    A.    Right.

7    Q.    You're saying it was the Special

8  Orders?

9    A.    Special Orders were the governing

10  document.

11    Q.    So, this is the first time it got

12  integrated into this larger document?

13    A.    Right.

14                    (WHEREUPON, Deposition Exhibit

15                     No. 12 was marked for

16                     identification.)

17  BY MS. KEEN:

18    Q.    And I think the last one of this batch

19  is Exhibit 12, which is CITY-KLUP 3140 through

20  3164.  And there's several documents in here.

21              I don't know if I incorrectly

22  combined multiple unrelated documents.  Maybe

23  you can -- oh, yeah, I did.  Sorry.

24              So, I guess the first three pages

1  of this exhibit are one document, right?

2      A.   Correct.

3      Q.   So, let's actually make Exhibit 12B

4  CITY-KLUPP 3140, 41 and 42.

5      A.   Okay.  What are you calling that one?

6      Q.   The first three pages are Exhibit 12.

7      A.   Okay.

8      Q.   What is this document?

9      A.   This document is one of my earliest

10 attempts to articulate what I thought our

11 procedures should be.

12     Q.   So, did this precede the Special Order

13 82-2?

14     A.   Yes.

15     Q.   Okay.

16     A.   You know what?  I don't know if it

17 preceded the April 1, but it certainly preceded

18 the January, 1983.

19     Q.   Who did you send this to?

20     A.   Again, the Chief of Detectives for

21 sure.  And this probably went also to the

22 Deputy Superintendent Bureau of Investigative

23 Services.

24     Q.   Was the Patrol Division ever involved

1    in any of these discussions about the whole

2    investigative file and working file issue?

3        A.    No.

4        Q.    The next in this batch that I handed

5    you is actually not -- you can just put that to

6    the side.  I don't need to ask you about it.

7            MR. PATTERSON:  Which one are we

8    putting to the side?  3143.

9            MS. KEEN:  Yes.  Sorry.  These are

10   some of the new documents.  I think I

11   accidentally had these all stapled together.

12   BY MS. KEEN:

13       Q.    Can you just tell me which documents

14   go together?  So, there's a memo on 3144?

15       A.    3144 is a stand alone directive.

16                    (WHEREUPON, Deposition Exhibit

17                     No. 13 was marked for

18                     identification.)

19

20   BY MS. KEEN:

21       Q.    Let's mark that one as 13.

22       A.    This next one, if it is to be

23   Exhibit 14, I think should start with this

24   Investigative File Case Folder on 3148.  That

1    should be the first document.

2        Q.    Okay.

3        A.    That should be the first document.

4        Q.    Okay.

5              MR. PATTERSON:  So, Jim, would 3148

6    comes first then immediately followed by 3145?

7                  MS. KEEN:  We can go off the record.

8                        (WHEREUPON, a discussion was held

9                         off the Record.)

10                       (WHEREUPON, a short break was

11                        taken.)

12                       (WHEREUPON, Deposition Exhibit

13                        No. 14 was marked for

14                        identification.)

15                 MS. KEEN:  Back on the record.

16   BY MS. KEEN:

17       Q.    You testified earlier, I believe, that

18   the first meeting within the police department

19   involving --

20                 MR. KIVETZ:  I'm sorry.  Can we go off

21   the record for a second.

22                       (WHEREUPON, a discussion was held

23                        off the Record.)

24   BY MS. KEEN:

1    Q.   Before the break, sir, I had asked you

2  some questions about the initial meeting among

3  the command staff regarding the Laverty memo

4  and the potential problem of working files.

5            Do you recall those questions?

6    A.   I do.

7    Q.   And you said that there was a meeting

8  of the Chief of the Detective Division, as well

9  as all of the area commanders, correct?

10           Correct.

11   Q.   So, at the time there was six areas?

12   A.   Correct.

13   Q.   And then subordinate to the area

14 commanders were the area chiefs, correct?

15   A.   No.

16   Q.   I got that backwards.

17   A.   It's chief, deputy chief, and

18 commanders going top to bottom.

19   Q.   So, at this meeting was the Chief of

20 the Detective Division, as well as the area

21 chiefs of all six areas, correct?

22   A.   Three deputy chiefs.

23   Q.   Three deputy chiefs.  We've been over

24 this.  Right.  Okay.  Sorry.

1    So, there's the Chief, the three
2 deputy chiefs the six area commanders.
3    A.    Right.
4    Q.    And then was there anyone of a lower
5 rank than commander at this meeting?
6    A.    I don't believe there was.  There was
7 one other higher and that's Deputy
8 Superintendent of Investigative Services.
9    Q.    Right.  And you don't recall whether a
10 specific presence from Bomb & Arson was there,
11 correct?
12    A.    I would tend to think not because at
13 first blush this was viewed as an Area Violent
14 Crime issue and not larger than that.
15    Q.    Do you have an independent
16 recollection today as to whether someone from
17 Bomb & Arson was there or not at this initial
18 meeting?
19    A.    I do not.
20    Q.    So, it's possible, but you're not
21 sure?
22    A.    It's possible, and I don't know.
23    Q.    Do you recall what month this meeting
24 was held in 1982?

1    A.   It was probably April, but I don't

2  know.

3    Q.   Now, you said generally what the topic

4  of the meeting was.  What was the discussion?

5  What was the substance of the discussion at the

6  meeting?

7    A.   I wasn't there.  As it was relayed to

8  me, they were talking about the Laverty

9  memorandum and the question of other files.

10 And at that point, I'm told it became a

11 confusing topic because no one agreed upon

12 terminology.

13   Q.   When you say other files, you mean

14 whether there were other similar Laverty memo

15 types out there?

16   A.   No.  Just whether or not there were

17 working files, street files, running files.

18   Q.   Okay.  Around this time, what was the

19 confusion over nomenclature?

20   A.   The term.  I mean, one person would

21 call it a personal file, someone else would

22 call it a running file, someone else said, no,

23 no.  I think you mean street files.  I think

24 you mean working file.

1      They're all talking around one

2  another trying to describe what possibly is an

3  issue.  And then, of course, it was an

4  agreement that there should be a site survey.

5      Q.   Okay.  Was it your understanding that

6  while the different names might have been used

7  within the different areas, they all had a

8  practice of keeping what you have described or

9  defined as working files?

10     A.   A practice of using, not always

11 keeping.

12     Q.   Okay.  Right.  Fair enough.  In fact,

13 sometimes not keeping?

14     A.   Right.

15     Q.   They all had a practice of using

16 working files but they might have called it

17 something other than working files, correct?

18     A.   Correct.

19     Q.   Okay.  And how far back did the

20 working file practice go among police folks

21 doing investigations?

22     A.   I don't know.  When I arrived at

23 Area 1 Homicide in August, 1977, it was there.

24     Q.   When you were homicide detective, were

1    you aware of the possibly that important

2    information from the working files would not

3    make it into the official file or official

4    police report for a particular investigation?

5        A.   I never gave it much thought.  I mean,

6    I was just worried about my investigation and

7    my notes, taking the best notes I could to make

8    the best report I could.

9        Q.   You never personally engaged in the

10   practice of keeping important information about

11   the case out of the supplementary report, I

12   would assume, correct?

13       A.   I have left memos for other watch

14   personnel, but nothing I thought should have

15   been included in a supplemental report.

16       Q.   And you made an effort to include

17   everything relevant to a case in the

18   supplemental report as you understood the term

19   relevant?

20       A.   I think most people did.  The practice

21   is mostly favorable and good.  Yes.

22       Q.   So, it's mostly favorable and good,

23   but it had the -- there was the opportunity for

24   mishandling of information if one wanted to

1  mishandle; is that fair to say?

2          MR. PATTERSON:  Objection, vague.

3          THE WITNESS:  I think there is -- in

4  files, there needs to be some discipline, some

5  commonality of investigation.  I think if

6  everyone had their own file on every

7  investigation, it would become very confusing.

8  We would become less efficient.

9  BY MS. KEEN:

10     Q.  It's not just confusing and efficient,

11 but it sounds like the practice of working

12 files created the opportunity for the

13 occasional person to actually withhold evidence

14 that was relevant to an investigation?

15          MR. PATTERSON:  Objection, foundation.

16 BY MS. KEEN:

17     Q.  I mean, isn't that what happened in

18 the Laverty case?

19     A.  To this moment, I don't know why Frank

20 Laverty did not put it on a supplementary

21 report and dare the supervisor to sign it.

22 That was his right.  That was his duty.

23          Why put it on a piece of paper?

24 If you believe this is part of the

1    investigation, include it in your supplementary

2    report.

3            Almost anything that's in a

4    supplementary report that's not true can be

5    discounted.  You know, it may be troublesome

6    for a day or two, but it may require further

7    leg work to prove or disprove this suspect A.

8        Q.    Right.  But when going to your point

9    about Laverty not putting the information in

10   the supp report, my understanding of our

11   discussion earlier about the process of putting

12   information into a supp report was that you saw

13   cases where substantive information about the

14   investigation wasn't being put in the supp

15   report?

16       A.    Substantive activity, investigative

17   activity was not included.  And needlessly, in

18   my opinion, not included.

19       Q.    But doesn't that just speak to the

20   fact that it was the mindset of detectives to

21   use these memos and turn the memos in as

22   opposed to bothering to create supp reports

23   that contained all of the information in the

24   memos?

1      A.   No.  Most of the report writing was on

2   supps.  I mean, sometimes we get a

3   misunderstanding of these memoranda.  The

4   memoranda tended to be to-do lists.  I want you

5   to, you know, communication to the next watch

6   even if it's eight hours from now.

7      Q.   To-do lists have sort of a pedestrian

8   sound to them, but to-do lists can be quite

9   important for a homicide investigation,

10  correct?

11     A.   Certainly.

12     Q.   So, to-do lists could include the name

13  of suspects that need to be interviewed,

14  correct?

15     A.   You could say I want you to

16  re-interview someone.  I don't like his looks,

17  you know.  Somebody is not telling us the

18  straight story.  That's why I would like you to

19  re-interview this person.  Tell me what you

20  think.

21     Q.   Given that at least some detectives

22  were of the mindset that they didn't put

23  information that was germane to the case into a

24  supp report if it was already written in a

1    **memo, was there an opportunity for important**

2    **information to be withheld from the official**

3    **police reports that got disclosed to**

4    **prosecutors and criminal defense attorneys?**

5            MR. PATTERSON:  Objection, form,

6    foundation.

7            THE WITNESS:  Opportunity sounds like

8    something we want to do or taking advantage of

9    the moment.  I agree with the thought that

10   important parts of an investigation and

11   sometimes even relevant parts of an

12   investigation may not have been included in a

13   supplementary report, but I think to say that

14   it gives certain detectives the opportunity to

15   withhold, I mean, that's down right sinister,

16   and I don't think the average person is like

17   that.

18   BY MS. KEEN:

19       Q.   Fair enough.

20            **I guess maybe I should have said**

21   **it creates the potential, whether deliberate or**

22   **not, for information to not make it from a**

23   **detective's personal notes or memos into an**

24   **official police report?**

1      A.   I like that.

2      Q.   Okay.  Thank you.

3              So, then as a result of the

4 meeting, what happened?  What happened next on

5 this project?  And by project, I mean, the

6 problem of figuring out whether there was a

7 street files problem and what to do about it?

8      A.   Day one after the meeting, I don't

9 know the date, individuals detectives and

10 sergeants went to the individual six areas and

11 came back and reported their findings.  And

12 those two sergeants wrote a summary report.

13              The summary report still did not

14 satisfy the Chief of Detectives who said, you

15 know, I don't like reports.  They're written by

16 two.  I want one report written by one person

17 who has seen everything and may be able to

18 better evaluate.

19              And I was assigned to be that

20 person, and I made some observations.  And then

21 for the weeks that went on after that, it was

22 what do you want to do about it?

23      Q.   Okay.  So, starting with the first two

24 detectives, that's the Exhibit 2 document we've

1    already looked at, correct?

2         A.   Correct.

3         Q.   And just looking at that briefly as

4    far as the content of the memo, Page 2 talks

5    about a memo board?

6         A.   Right.

7         Q.   And in the case of Area 3, it talks

8    about a hot board.  What was the hot board?

9         A.   Probably the same thing just a

10   different name.  It's a clipboard normally,

11   two-hole punched sitting on the supervisor's

12   desk with copies of case reports, supplementary

13   reports, memos, and Area 3 says, additional

14   bits of information are stapled to the original

15   report.

16              I, for the life of me, can't

17   remember what the additional bits of

18   information might be.

19        Q.   It goes on to say, perhaps this is

20   enlightening:  "This is a duplication of the

21   street file."

22        A.   Right.  It might be a to-do list, it

23   might be a memo.  Even telephone messages are

24   included in an investigative file or street

1     file.  That's something I failed to mention

2     earlier.

3                    Hickey, you got a message from

4     someone who doesn't wish to be identified, but

5     he says the guy with the red hood is the one

6     you're looking for.  Okay.  Thank you.

7     Whatever it might be.

8          Q.   Would that have been a phone message

9     slip?

10         A.   Literally.

11         Q.   And that would have been stuck in the

12    working file?

13         A.   Right.

14         Q.   So, there was information being

15    exchanged informally among detectives on a

16    day-to-day basis?

17         A.   Right.

18         Q.   And that's normal of any police

19    department I would assume, right?

20         A.   Or simply call this number.  I don't

21    have a clue what it's about, but here's this.

22    Oh, yeah.  I remember giving you my business

23    card.  Thanks for calling.

24         Q.   Now, at the time that there was --

1    sorry.  Let me just strike that and go back to

2    this.

3             Now, it then talks about street

4    files, also called running files in Area 3 and

5    unit file in Area 4; do you see that?

6       A.   Yes, I do.

7       Q.   And it says that areas using "street

8    files" keep various notes, memos and bits of

9    information on the case in these files, which

10    are used to communicate steps taken, steps to

11    be taken and personal opinions of one detective

12    to another, do you see that?

13       A.   I do.

14       Q.   And was that your experience as well

15    in terms of understanding what street files

16    were?

17       A.   Personal opinions.  I agree with the

18    first couple.  Rare is the instance.  When

19    someone says, I have a personal opinion that

20    the motive is robbery and not sex.

21       Q.   Do you believe that the authors of

22    this memo had a good faith basis for describing

23    street files in the way that they just did in

24    that paragraph?

1        MR. PATTERSON:  Objection, form.

2        THE WITNESS:  The authors compiled

3   this report based on information provided to

4   them by others.

5   BY MS. KEEN:

6        Q.   And this report was actually prepared

7   as a direct result of a decision made at that

8   meeting to go out and do a survey, correct?

9        A.   Correct.

10       Q.   And so they were intending to report

11  back -- or excuse me.  Their assignment was to

12  report back accurately about what they were

13  seeing as the actual practice of working files

14  in the various areas, correct?

15       A.   Correct.

16       Q.   So, do you have -- I mean, I guess --

17  you're saying you haven't seen documents

18  reflecting personal opinions of one detective

19  to another, but you have no reason to dispute

20  that they observed that, correct?

21       A.   I do not.

22       Q.   But you agree with the remainder of

23  this definition of street files?

24       A.   Yes, I do.

1      Q.   And it also says that the street file

2  was maintained for the lifespan of the

3  investigation.

4               Was that your understanding as

5  well?

6      A.   Lifespan of the investigation means

7  until the time of arrest.  That was the term of

8  art, you know.  Not forever.

9      Q.   Was that your understanding as well?

10     A.   Yes.  Disposed of by the detective

11 making the cleared/closing report.

12     Q.   Right.  Now, at the bottom here, it

13 just says Violent Crime Units under the street

14 files heading?

15     A.   Yes.

16     Q.   What's the significance of that.

17     A.   I don't know.

18     Q.   Were there working files kept --

19     A.   I would say, as I look at this memo

20 further, it is under the heading of street

21 files.  They're utilized in each area, they're

22 maintained by detectives, they're maintained

23 until the case is closed, and it looks like

24 they're maintained in Violent Crimes Units.

1    Q.   Was that your understanding as well?

2    A.   Yes.

3    Q.   Now, it goes on to propose some

4    methods of addressing the problem, correct?

5    A.   There are some -- there are two

6    alternative approaches to resolve it, yes.

7    Q.   And those were just recommendations by

8    the authors, correct?

9    A.   Correct.

10   Q.   What happened -- and I know you've

11   talked generally about it, but after they came

12   back, you had -- excuse me.

13              After these two authors, in other

14   words, Brady and Tolley reported their

15   findings, the superintendent or the Chief of

16   Detectives --

17   A.   Chief of Detectives.

18   Q.   -- wanted the same person to do the

19   whole survey, correct?

20   A.   Right.

21   Q.   And so what conversation did you have

22   with the Chief about that?

23              MR. PATTERSON:  Objection, foundation.

24   BY MS. KEEN:

1      Q.   Did you have a conversation with the

2  Chief about that?

3      A.   I did.

4      Q.   Was anyone else present?

5      A.   I don't recall.  I'm sure someone was

6  around, but I don't recall who may have been

7  there, but I was directed to go to each of the

8  areas.

9      Q.   Were you told to go anywhere besides

10  each of the six areas?

11      A.   Not at this time, no.

12      Q.   At some point were you?

13      A.   I recall going to the Youth Division,

14  but I went to other places as well.

15      Q.   Where?

16      A.   I went to the FBI to see how they

17  maintained investigation files.

18      Q.   Within the department, did you go to

19  Bomb & Arson?

20      A.   I don't recall.  Certainly not

21  initially.

22      Q.   Organized Crime?

23      A.   No.

24      Q.   You don't recall or you did not go?

1      A.   I don't recall.  Sorry.  I mean, the

2  conversations went on for months, and I

3  remember vividly the site surveys at the very

4  beginning.

5      Q.   And then when does the teletype

6  happen?  After you finish all of your site

7  surveys?

8      A.   It happened immediately after the

9  temporary restraining order was issued.

10      Q.   I'm just trying to put together --

11      A.   A timeline.

12      Q.   -- my own timeline.

13          MR. KIVETZ:  You're referring to

14  Exhibit 3, correct?

15          MS. KEEN:  Exhibit 4.  Thank you.

16  BY MS. KEEN:

17      Q.   Was the teletype, which we marked as

18  Exhibit 4, before or after Brady and Tolley did

19  a survey?

20      A.   It was after.

21      Q.   Where is your summary of your survey?

22      A.   I don't know.  I saw it yesterday, but

23  I don't see it here.  Let's take a look.

24          MR. PATTERSON:  It's 8 or 9.

1          THE WITNESS:  8 would be the best --

2   yeah, because 8 on Page 2 talks about a

3   sampling by area.

4   BY MS. KEEN:

5       **Q.   Were there any documents you looked at**

6   **yesterday that I haven't provided you with?**

7       **A.   No.  This -- yeah, there was one.**

8   **There was one.  It had some RD numbers and by**

9   **area.**

10          MS. KEEN:  Do you remember what Bates

11   number that is?

12          MR. PATTERSON:  Let me try to find it.

13          THE WITNESS:  It would have been in

14   the smaller notebook.

15          MS. KEEN:  Let's go off the record.

16                  (WHEREUPON, a discussion was held

17                   off the Record.)

18   BY MS. KEEN:

19       **Q.   I guess in the meantime, I can ask you**

20   **about Exhibit 8 and Exhibit 9.**

21          **So, Exhibit 9 was one of the**

22   **memos summarizing your sampling?**

23       **A.   Okay.**

24       **Q.   Is that right?**

1      A.    That's correct.

2      Q.    Okay.   When you said that in Page 2

3  that the Detective Division Violent Crimes Unit

4  needs to both improve its file maintenance

5  procedures and upgrade the quality of written

6  Major Incident Worksheets and memoranda, what

7  did you mean by upgrade the quality of written

8  Major Incident Worksheets and memoranda?

9      A.    I thought they were not as

10 professionally written as they should be.

11 Sometimes they used slang, sometimes there was

12 a character assassination of victim or

13 offender.

14          It was almost street vernacular

15 sometimes.   Other times it was professionally

16 done, but it wasn't as well done or

17 professional as it should be.

18     Q.    Okay.  And based on a review of your

19 memo, it appears that you determined that there

20 were discrepancies wherein information in the

21 unit file of a particular area was not also

22 contained in the Records Division file for that

23 case, correct?

24     A.    Correct.

1      **Q.   Okay.  And then --**

2              MS. KEEN:  Did you find the --

3              MR. PATTERSON:  I think the only thing

4      that we haven't seen so far, I think, is the

5      Special Orders.

6              MS. KEEN:  Is that what you were you

7      talking about?

8              THE WITNESS:  No.  There's a document

9      that I looked at yesterday.  I probably have

10     it.  Not with me unfortunately.  I'll let you

11     know if I can't find it.  And, I mean, I'll

12     bring it.

13             MR. PATTERSON:  Let's not get into it

14     on the record.  Maybe we'll take a short break.

15     You can describe it if it's not coming to mind.

16             THE WITNESS:  Okay.

17     BY MS. KEEN:

18     **Q.   So, as a result of your sampling --**

19     **well, it seems, like, you were doing sampling**

20     **not all in one fell swoop, but you were sort of**

21     **doing it over the span of multiple days; is**

22     **that right?**

23     **A.   Multiple days, but not seven days.  It**

24     **was more of a rush, two or three days.**

1    Q.   And then what happened after you were

2    done with the sampling?  Who did you talk to

3    about it?

4    A.   The Chief of Detectives.

5    Q.   Did you talk to anyone higher than the

6    Chief of Detectives in the Bureau of

7    Investigative Services?

8    A.   I don't know if the deputy was

9    present.  Again, this is fact-finding.

10   Q.   You were doing fact-finding?

11   A.   Right.  Of our existing practices and

12   realizing that not everyone not only doesn't

13   call them by the same names, but there's

14   different levels of quality of report writing.

15   Q.   When you reported your findings to the

16   Chief of Detectives, was he concerned by what

17   you were telling him with regard to the

18   discrepancies between the files?

19        MR. PATTERSON:  Objection as to

20   testifying to someone else's knowledge.

21        THE WITNESS:  The department was

22   concerned, so therefore he was.

23   BY MS. KEEN:

24   Q.   What makes you think the department

 1    was concerned?

 2         A.   By the number of meetings, the

 3    high-level nature of the meetings, involvement

 4    of Department of Law.

 5         Q.   How did the Department of Law get

 6    involved?

 7         A.   They represent the City in temporary

 8    retraining orders.  The hiring of special

 9    outside counsel.  Hopkins & Sutter on Madison

10    Street.

11         Q.   How many meetings would you say in the

12    spring, you know, from January until -- or

13    strike that.

14              How many meetings would you say

15    you had in '82 and '83 with command staff about

16    the working files issue?

17         A.   I don't know.  Many.

18         Q.   More than 10?

19         A.   Yes.

20         Q.   More than 50?

21         A.   Probably not.

22         Q.   25?

23         A.   On different days, 25 different days,

24    the topic was certainly discussed.

1      Q.   And at all of these meetings, it

2    always with the Chief of the Detective

3    Division?

4      A.   If he wasn't present, he was involved;

5    met with our legal affairs from the Chicago

6    Police Department, met with Department of Law

7    counsel, met with outside.  This had our full

8    attention.

9      Q.   It was a big deal?

10     A.   Yes.

11     Q.   Was there any attempt to look outside

12   the Detective Division and figure out whether

13   you had a department-wide problem, or was

14   everyone really just looking only at the

15   Detective Division?  And by Detective Division,

16   I'm including Bomb & Arson.

17          MR. PATTERSON:  Objection, compound.

18          MS. KEEN:  Let me re-ask that.

19   BY MS. KEEN:

20     Q.   Did the department make any effort to

21   look at whether they had a working files

22   problem outside of the Detective Division?

23     A.   No.  The issue was brought to us

24   framed in terms of a Detective Division issue.

1   And I raised it, but frankly it remained a

2   Detective Division level problem.

3       Q.   When you say you raised it, what do

4   you mean?

5       A.   At one point in one of these memos, I

6   said perhaps our Research and Development and

7   Auditing Internal Controls Division may get

8   involved or should get involved in the future,

9   because they may have department-wide

10  implications.

11      Q.   So, you were concerned that the street

12  files practice was not limited to the Detective

13  Division folks; is that correct?

14      A.   No.  But I realized that we have so

15  many people, so many units writing reports.  I

16  think I was as much concerned about our Records

17  Division practices, you know, shouldn't there

18  be a more whole statistic.

19               And then you realize it's a

20  difficult topic to put -- it's certainly a

21  challenge to put everything in one filing

22  cabinet.

23      Q.   When you conveyed this idea that maybe

24  we should look at the whole department or maybe

1    there is department-wide ramifications of these

2    practices, what response did you receive from

3    the higher ups?

4          A.    I don't remember any response to it.

5    But after all is said and done, I was a

6    detective working in the Detective Division.  I

7    worked on that which we could resolve.

8          Q.    Okay.  So, the teletype comes out.  Is

9    the teletype the first official directive to

10   police employees regarding the working files?

11         A.    Yes, it is.  That goes out in the name

12   of the superintendant.  We directed from the

13   police department, yes.

14         Q.    And it's sent to supervisor, correct?

15   That's the To line.

16         A.    I'd have to look at it.

17               MR. PATTERSON:  Exhibit 4.

18               THE WITNESS:  Oh, I see.

19   BY MS. KEEN:

20         Q.    So I was looking at the teletype, and

21   it says To: Supervisor.

22         A.    Right.  I can explain that.

23               Given the technology of the

24   era --

1    Q.   Oh, I get it.  It was the supervisor

2  at the teletype room?

3    A.   Right.

4    Q.   So, it's actually addressed to all the

5  commanding officers?

6    A.   Correct.

7    Q.   And who were the commanding officers

8  this was directed to?

9    A.   Officers are all those unit commanding

10  officers.  It's rather vague in general.  It

11  means to everyone.

12    Q.   Department-wide?

13    A.   It does.  It does say that.

14    Q.   So, this teletype went to all the

15  supervisors in the entire Chicago Police

16  Department?

17    A.   The teletype was state of art.  It was

18  our best and fastest means to get a message to

19  all units in the police department.  There was

20  a teletype machine in every unit in the police

21  department.  And we didn't have e-mail, we

22  didn't have fax machines.  This was the way.

23    Q.   So, this went to all supervisors in

24  the whole department?

1          A.    It did.  Yes, it did.

2          Q.    Then following the teletype is when

3    Hinchy sent a reinforcing memo to the Special

4    Activities Group?

5          A.    Correct.

6          Q.    We looked at that, Exhibit 5?

7          A.    Yes, ma'am.

8                          (WHEREUPON, Deposition Exhibit

9                           No. 15 was marked for

10                          identification.)

11   BY MS. KEEN:

12         Q.    Now, take a look at Exhibit 15.  This

13   is Detective Division Notice 82-2.

14               Oh, you know, I looked at the

15   date on here actually.

16         A.    Yeah, the day before.

17         Q.    And this looks like it came out the

18   day before the teletype; is that right?

19         A.    That is correct.

20         Q.    In any event, this was the first --

21   so, this was actually the first written

22   directive on the subject of working files?

23         A.    Right.  But as the title document

24   tells us, it goes to the Detective Division.

1     Q.   Right.  It didn't go to anyone besides

2  the Detective Division?

3     A.   Right.

4     Q.   So, 82-2, would you say it created an

5  official term called Unit Investigative File?

6     A.   It says it defines it and it does.

7  Yes, it does.

8     Q.   Okay.  And it sounds like the thrust

9  of the order is that all Unit Investigative

10  Files that currently exist had to be preserved

11  intact, correct?

12     A.   Yes.

13     Q.   And it then said that it was the

14  Detective Division Unit supervisor's

15  responsibility to monitor the removal,

16  destruction or alteration of any such files,

17  correct?

18     A.   Correct.

19     Q.   There was nothing in 82-2 that

20  required detectives to keep notes that were not

21  in the unit files, correct?

22     A.   Correct.

23     Q.   And it also did not at this time

24  require detectives to submit their notes for

1   inclusion in the Unit Investigative File,

2   correct?

3      A.   Correct.

4      Q.   What was -- did you do any sampling --

5   I know I asked you this before, but having now

6   looked at the date of this Special Order 82-2,

7   did you do any -- strike that.

8           Did the City do any sampling or

9   auditing of any kind regarding contents of

10   files after 82-2 was issued?

11      A.   Nothing that I'm aware of from the

12   Chief of Detectives.  Individual commanders may

13   have.

14      Q.   If they did, it was of their own

15   volition, correct?

16      A.   Correct.

17      Q.   Following the issuance of 82-2, you

18   have some memoranda coming in, some various

19   folks about the working files issue, correct?

20      A.   Correct.

21      Q.   So, if you would, sir, turn to

22   Exhibit 6, again.  Exhibit 6, I think, is a

23   two-page document, correct?

24      A.   Yes, it is.

1        Q.    2455 to 2456.

2              Here you have Commander Stibich

3  who ran Area 3 Detective Division providing

4  memorandum on working files, correct?

5        A.    Correct.

6        Q.    Now, it says that working files are

7  useful for a number of reasons, right?

8        A.    Yes.

9        Q.    Do you agree with Commander Stibich

10 that working files were useful for the purposes

11 of inner-office correspondence?

12       A.    Yes.

13       Q.    Did you agree that working files were

14 useful as a form for different detectives to

15 give their representative viewpoints, opinions,

16 conjectures, suppositions, and "gut feelings"

17 regarding a specific investigation?

18       A.    I disagreed with him.

19       Q.    So, you disagreed in your experience

20 using working files as a homicide detective,

21 correct?

22       A.    I disagreed as to whether it should be

23 a forum.  I mean, this is not a chat room.

24 This is not an early chat room.  This is --

1     Q.   I understand your point, and I get it.

2  Let me clarify.

3          You agree with him that it was at

4  least in some cases used as such a forum even

5  though you may disagree that it should have

6  been used as a forum; fair to say?

7     A.   Fair.

8     Q.   And you also agree with Stibich that

9  working files were being used to document the

10  credibility of witnesses and/or suspects?

11     A.   Yes.  Sometimes there was evaluations,

12  assessments again of who they thought to be

13  more credible than others.

14     Q.   Now, it also says that working files

15  were useful as a means of eliminating witnesses

16  and/or suspects.  Do you see that?  This is on

17  Page 2.

18     A.   Yes, I do.

19     Q.   And you agree with Stibich's

20  assessment?

21        MR. PATTERSON:  I'm just quickly going

22  to lodge an objection to the form of the

23  question, you agree.

24          If you're asking if the witness

1  agrees, I'm assuming that is in his individual

2  capacity, not as the Chicago Police Department.

3            MS. KEEN:  Well, I guess as to that

4  question, I will rephrase it.  I didn't hear an

5  objection to the preceding question.

6            MR. PATTERSON:  No, that's fine.

7  BY MS. KEEN:

8       Q.   **Staying in your corporate capacity as**

9  **a 30(b)(6) representative, is it your**

10 **understanding that one use of working files was**

11 **as a means of eliminating witnesses and/or**

12 **suspects?**

13      A.   **It sometimes was used as that.  And I**

14 **thought it should not have been, that more**

15 **substantive investigations, part of the**

16 **investigations, even if it led to a dead end,**

17 **should be part of the investigation story.**

18      Q.   **Should be in the supp report?**

19      A.   **Yes.**

20      Q.   **Okay.  Understood.**

21            **So, talking about what working**

22 **files are being used for, they were also being**

23 **used as a listing of leads undertaken,**

24 **sometimes false, correct?**

1      A.    Correct.

2      Q.    We've talked about that.

3            I mean, is there -- sorry.

4            We're were working files -- is it

5      your understanding, as well as Stibich's, as he

6      has in his memo here, that working files would

7      contain a listing of information, which later

8      proved to be erroneous or was given to

9      detectives for self-serving purposes?

10            MR. KIVETZ:  I want to interject here,

11     and I apologize.  But I just want to make sure

12     that we're still staying in his corporate

13     capacity.

14            MS. KEEN:  Yes.

15            MR. KIVETZ:  Because you've gone now

16     back and forth.  So, I wanted to make sure.

17     So, these questions that are continuing forward

18     are solely to his corporate capacity; is that

19     correct?

20            MS. KEEN:  Yeah.  I'm saying what's

21     his position.

22     BY MS. KEEN:

23     Q.    Is that accurate, what Stibich wrote

24     in this memo?  I can ask it that way.

1    A.   It was my observations.  I did not see

2    a lot of this.  I saw some of this.

3    Information that later proves to be erroneous

4    can be disproven through a second supplementary

5    report.

6    Q.   So, I think where we're getting caught

7    up is in what should have been done versus what

8    was being done.

9         I understand your position that

10   supplementary reports were, in your view and

11   the City's policy, the appropriate place for

12   these kinds of things; in other words, leads,

13   opinions, and things to be memorialized,

14   correct?

15   A.   Correct.

16   Q.   I'm asking you something different,

17   which is, Stibich makes a statement here that

18   working files were used or could be used for,

19   among other things, containing a listing of

20   information which later proves to be erroneous

21   or was given to detectives for self-serving

22   purposes.

23        Do you dispute that statement in

24   Stibich's memo or do you accept it as true?

 1          MR. PATTERSON:  In your corporate

 2   capacity, correct?

 3          THE WITNESS:  It sometimes was used

 4   for this purpose.  I think overall that this

 5   listing, this entire listing gives the

 6   misimpression of the extent to which these

 7   memos were being prepared.

 8                I mean, it suggests that there

 9   was a lot of them on every case.  And it's

10   simply not the case.

11   BY MS. KEEN:

12      Q.   Well, then to be fair, the best person

13   to know how often working files was being used

14   would have been the commander of that area,

15   correct?

16      A.   Correct.

17      Q.   And someone from a different area or

18   from another office altogether would be more

19   removed from the day-to-day filing and report

20   writing practices of that area; fair to say?

21      A.   That is fair.

22      Q.   Now, I mean, this memo to me suggests

23   that the practice of working files in the area,

24   or at least some of the areas, was somewhat

1  entrenched; do you agree?

2      A.    It was a citywide practice and it was

3  used on a regular basis.  Entrenched -- there

4  are probably some who just didn't write

5  anything, just only wrote supps, just their

6  personal notes and supps.  That's all.

7      Q.    So, was there some pushback or

8  resistance to 82-2 after it got issued?

9          MR. PATTERSON:  Objection, vague.

10          MS. KEEN:  Let me be more specific.

11  BY MS. KEEN:

12      Q.    Did anyone from the commander all the

13  way down to the street detective vocalize

14  displeasure with the thrust of the 82-2 Special

15  Order?

16      A.    I think the intent of the preservation

17  order was understood.  You know, preserve.

18  It's pretty clear.  Keep intact.  It's pretty

19  clear.

20          I think where the questions came

21  were in the follow-up.  You don't mean my

22  notes?  That's my personal property.  And it

23  was a genuine misunderstanding of whether or

24  not notes should be included.  But as far as

1    memoranda, like Laverty's, everybody knew what

2    that was.

3         Q.   So, I guess what I'm saying is, it's

4    sounds like the requirement was clear, but was

5    there resistance to it?  In other words, was

6    there this expression of I don't like having to

7    preserve these documents?

8         A.   It was discussed at all of the coffee

9    tables.  It was the subject of staff meetings.

10   It was the subject of roll call training.  I'm

11   sure there were some who voiced their opinions,

12   but it matters not.  This was a decision of the

13   court.

14        Q.   So, why was 83-1 promulgated despite

15   the fact that 82-2 had come out?  How did that

16   83-1 come about?

17        A.   83-1 is a better document.  It

18   explains procedures.  It is a step-by-step

19   process as to how we were going to implement

20   our new policy expressed by the superintendent

21   which said we were going to save all of our

22   notes.

23             The 82-2 was not very workable.

24   One common control log book was signed every

1   time you took a file in and out.

2       Q.   So, how did -- so, what were the

3   requirements -- actually, hold on.  Let's take

4   a break.

5                     (WHEREUPON, a short break was

6                      taken.)

7   BY MS. KEEN:

8       Q.   We were on Exhibit 8, I believe.  So,

9   there's a paragraph here about this Major

10  Incident Worksheets.

11      A.   Yes.

12      Q.   At this point in time, was the actual

13  Major Incident Worksheet form being used?

14      A.   Yes.

15      Q.   It states that it contains a lot of

16  information -- or strike that.

17            It states that it contains

18  remarks which could "well serve to undermine

19  the prosecution of the case."  Do you see that?

20      A.   Yes, I do.

21      Q.   Can you explain what you meant by

22  that?

23      A.    I said the form, the Major Incident

24  Worksheet, 8.5-by-11 on page -- on the front

1     side of it is nothing but boxes to be filled in

2     of information, most frequently asked types of

3     information.

4                 On the back side we would take a

5     typewriter, roll it in our typewriter and type

6     up a brief summary.  I went to the crime scene,

7     the victim was gone.  She was taken to the

8     hospital.  Can't talk to her.  She's

9     unconscious.  She looks bad.  By the way, I

10    pulled her rap sheet.  She looks like a whore.

11                You know, whatever it might be.

12    I mean, provide the information, but in a

13    somewhat callous manner, unprofessional.

14        Q.   On the back of a Major Incident

15    Worksheets?

16        A.   Yes.

17        Q.   And that's something you observed when

18    you were doing the sampling?

19        A.   It's some of the cases.

20        Q.   So, 83-1, again, it covered everybody

21    within the Detective Division, correct?

22        A.   Correct.

23        Q.   And did anyone outside of the

24    Detective Division receive -- or strike that.

1          **Was anyone outside of the**

2    **Detective Division governed by 83-1?**

3          **A.    No.**

4          **Q.    Were there any comparable orders for**

5    **outside of the Detective Division that has the**

6    **same thrust as 83-1?**

7          **A.    No.**

8          **Q.    83-1 covered Bomb & Arson as of**

9    **January 13, 1983, correct?**

10         **A.    Correct.**

11         **Q.    I had a couple of questions about it.**

12               **It adds in some requirements that**

13   **82-2 did not have, correct?**

14         **A.    There's a couple differences.**

15               MR. PATTERSON:  Roshna, have you

16   passed out 83-1?

17               MS. KEEN:  Oh, sorry.  No.

18                    (WHEREUPON, Deposition Exhibit

19                     No. 16 was marked for

20                     identification.)

21   BY MS. KEEN:

22         **Q.    Exhibit 16 is Plaintiff's 2472 to**

23   **2476.  One thing that 83-1 does is it actually**

24   **explains why it's relevant and so important to**

1  preserve all information obtained in the course

2  of a Violent Crime Field Investigation,

3  correct?

4       A.   Correct.

5       Q.   And I don't believe that was in 82-2,

6  correct?

7       A.   Oh, no.  No, it was not.

8       Q.   Another thing it does is it actually

9  creates an affirmative requirement to submit

10  handwritten notes, correct?

11       A.   Correct.

12       Q.   And that is a new requirement that was

13  not present in 82-2?

14       A.   Right.  82-2 was to implement -- to

15  make sure that we were implementing and doing

16  what we could so the temporary restraining

17  order would be respected.

18       Q.   Got you.

19       A.   I mean, it was a quick and dirty

20  document.

21       Q.   Right.

22       A.   But it came out quickly.

23       Q.   Okay.  So, who is the unit commanding

24  officer that puts responsibility for file

1  keeping and maintenance of the investigative

2  file basically on the commanding officer?

3       A.   Where are you referring?

4       Q.   If you go to Plaintiff 2475,

5  Subsection VC.  I mean, Roman Numeral V,

6  Subsection C.

7       A.   Right.  That's the lieutenant in

8  charge of the Violent Crimes Unit.

9       Q.   The lieutenant?

10       A.   Right.

11       Q.   And then if you flip back to the

12  preceding page, it says supervisors were

13  required to ensure that an Investigative File

14  Case Folder was initiated for each violent

15  crime investigation which culminated with the

16  arrest of the offender and the approval of

17  felony charges, correct?

18       A.   Where are you in this?

19       Q.   Roman Numeral V, Subsection A(2).

20       A.   Okay.  That is correct.

21       Q.   And why was that responsibility placed

22  with the supervisor?

23       A.   They wanted to make sure that any of

24  these cases that are going the felony route

1    have one prepared even if there wasn't one

2    prepared earlier.  So, just assigning

3    accountability for this clerical function.

4         Q.   Okay.  In Subsection 4 of that same

5    section, it talks about cases where there is no

6    Investigative File Case Folder.

7         A.   Right.

8         Q.   Can you just explain briefly why you

9    would have someone submitting a supplementary

10   report where there was no Investigative File

11   Case Folder?

12        A.   Sure.  These are the lesser crimes.

13   It might be a simple battery.  And it's

14   certainly not being worked on by all three

15   watches.  It's a minor investigation.

16        Q.   Okay.  So, you would expect if

17   Bomb & Arson was working on an arson

18   investigation wherein the fire had caused

19   multiple deaths, that based on 83-1, an

20   Investigative File Case Folder would have been

21   initiated?

22        A.   Yes.

23        Q.   Immediately, correct?

24        A.   Correct.

1              (WHEREUPON, Deposition Exhibit

2              No. 17 was marked for

3              identification.)

4    BY MS.  KEEN:

5         Q.   Okay.  Now, I'm going to ask you about

6    83-2, because it looks like almost five months

7    later, you revised 83-1, correct?

8         A.   The Chief of Detectives issued a new

9    one, and I drafted it, correct.

10        Q.   Okay.  Right.  So, here, sir, is

11   Exhibit 17.  So, 17 is CITY-KLUP 3149 through

12   3153.  Can you tell me -- strike that.

13              What was your understanding as to

14   why a revised special order was being

15   requested?

16        A.   Tighten up on the procedures and

17   actually improve it where possible.

18        Q.   What feedback was the Chief of

19   Detectives getting after 83-1 was issued

20   regarding compliance with that Special Order?

21        A.   I don't know all the feedback he got,

22   but one of the improvements was the

23   introduction of the 2K instructions for the --

24   the introduction of the Investigative File

1  Control Card.

2            It's really nothing more than a

3  fancy library card.  It allowed for the removal

4  of these investigative files while still

5  maintaining some accountability for them.

6       Q.   Whose idea was this control card?

7       A.   I don't know who actually came up with

8  it, but i designed the form.

9       Q.   It's fair to say that some feedback

10 was getting to the Chief following issuance of

11 83-1 that caused him to believe that a perhaps

12 more strict or at least revised special order

13 was warranted; is that correct?

14      A.   Stronger.  At this time, there's a lot

15 of communication going on between the

16 Department of Law, the outside counsel and the

17 Plaintiff's Counsel, and there was a lot of

18 communication.

19            And, okay, we can do this, we can

20 do that.  We weren't trying to duck it.  We're

21 trying to tighten it and make it better.

22      Q.   Right.  And that's why I was asking

23 because it seems like -- what I wanted to know

24 was, was there a determination by the higher

1    ups that 83-1 didn't go far enough, and that's

2    why we needed to add some provisions in 83-2?

3         A.   No.  I think it's more tweaking.

4         Q.   Sir, there was some substantive

5    changes in 83-2, and I want to ask you about

6    that.

7              One is -- if you go to Page 3 of

8    the document, under Subsection Roman Numeral

9    VB(1).

10        A.   Yes.  We seem to have inserted a new

11   one, a new No. 1.

12        Q.   Yeah.  And it actually requires

13   detectives to create records reflecting all

14   relevant information, correct?

15        A.   To take and maintain complete notes of

16   all relevant --

17        Q.   Where are you?

18        A.   Second Line, No. 1.

19        Q.   Right.

20        A.   Take and maintain complete notes of

21   all relevant matters.

22        Q.   And earlier in that section, it says

23   "record and preserve all relevant information

24   as fully and accurately as possible."

1          Do you see that?

2     A.    Yes.

3     Q.    So, was the intent of this order to

4 actually mandate that detectives start taking

5 and creating notes that reflected relevant

6 information they were gathering in the course

7 of their investigation?

8     A.    I don't think the emphasis was on

9 creating more notes.

10    Q.    It was to create documents that

11 reflected the relevant information they were

12 gathering, whether it be in a note or in

13 another document, correct?

14          MR. PATTERSON:  Take your time.  Read

15 the whole paragraph.

16          THE WITNESS:  Roman Numeral VB(1) is a

17 new statement that was not in 83-1.

18 BY MS. KEEN:

19    Q.    And what did Roman Numeral VB(1) mean?

20    A.    It says -- I can read it.

21    Q.    Yeah.

22    A.    Detectives are required to, record and

23 preserve all relevant information as fully and

24 accurately as possibly -- possible.  It's

1    misspelled, mistyped.

2                Take and maintain complete notes

3    of all relevant matters during the course of

4    their investigation.  This requirement is

5    intended to serve the purposes of department

6    directives to assure that only -- to assure

7    something only that information and materials

8    indicating -- not only.  That's the word.

9    That's the word.  Okay.

10               To assure not only that

11   information and materials indicating the

12   possible guilt of the accused are preserved,

13   but also that the accused may ultimately be

14   granted access to any information and materials

15   that may tend to show his possible innocence or

16   aid in his defense.

17       Q.   So, the one purpose of Special Order

18   83-2 was to create this new affirmative

19   requirement to create records containing

20   relevant information?

21               MR. PATTERSON:  Objection, asked and

22   answered.

23               THE WITNESS:  I would say that this

24   language was suggested to us by someone,

1  whether it be legal counsel, or whoever, I

2  don't know.  But we put it in there.

3  BY MS. KEEN:

4      Q.   And this went out, right?  83-2

5  actually was issued?

6      A.   Absolutely.

7      Q.   And it governed all members of the

8  Detective Division as of May 2nd, 1983,

9  correct?

10     A.   Correct.

11     Q.   There's another paragraph I wanted to

12  ask you about on the next page.  And it says on

13  Paragraph 6, "Any detective who has or receives

14  information relating to a Violent Crimes field

15  investigation not assigned to him will properly

16  forward the information to the assigned

17  detective for investigation and inclusion in

18  the Investigative File Case Folder."

19          Do you see that?

20     A.   I do.

21     Q.   Why was that paragraph necessary?

22     A.   It reinforces our longstanding, but

23  unwritten policy that everyone has an

24  obligation to pass on information.

1          I mean, it's not just one person.

2   We are all part of this team called the Chicago

3   Police Department.

4          Q.   I mean, would it happen at times that

5   a detective working a case would obtain

6   information that could have been relevant to

7   another case?

8          A.   I would be surprised if it didn't.

9          Q.   So, based on your experience and

10  knowledge of how things worked in the

11  department, that happened, right, where

12  detectives would work a case and learn

13  something about another case, correct?

14         A.   Certainly.  I'm investigating a

15  violent crime and someone wants to tell me

16  about a narcotics.  Thank you.

17         Q.   Or, how about I'm investigating a

18  crime, the person I suspect may have done this

19  other crime that Detective Joe over there is

20  investigating?

21         A.   Sure.

22         Q.   Did that scenario happen?

23         MR. PATTERSON:  Objection, incomplete

24  hypothetical.

BY MS. KEEN:

     Q.   **Well, anyway, I think you answered**
**that question.**

               **Was this Paragraph No. 6 designed**
**to obligate detectives in that scenario to**
**disclose information they learned in their**
**investigation to the detective assigned to the**
**investigation about which of that information**
**was relevant?**

          MR. PATTERSON:  Objection, vague.

          THE WITNESS:  I'll answer it.  And
I'll say all detectives have the
responsibility, even though they're not
assigned to a particular case, to forward
information that they have received.

BY MS. KEEN:

     Q.   **Now, even though this says Violent**
**Crimes Field Investigation, were Bomb & Arson**
**detectives governed by this requirement that if**
**a Bomb & Arson detective obtained information**
**in the course of his Bomb & Arson investigation**
**that was relevant to another Bomb & Arson**
**investigation, that the first Bomb & Arson**
**detective would have to disclose that**

1   **information to the detective assigned to the**

2   **other investigation?**

3          MR. PATTERSON:  Objection, form.

4          MS. KEEN:  Let me re-ask because

5   that's an important question.

6   BY MS. KEEN:

7      **Q.   Just extrapolating from what you said**

8   **a moment ago.**

9          **If a Bomb & Arson detective**

10  **received information that related to a**

11  **Bomb & Arson investigation that another**

12  **detective was assigned to, was the first**

13  **Bomb & Arson detective obligated under Special**

14  **Order 83-2 to turn that information over to the**

15  **detective assigned to the Bomb & Arson**

16  **investigation?**

17     **A.   Yes.**

18     **Q.   Was the first Bomb & Arson**

19  **investigator, in other words, the one who**

20  **received the information, required to create a**

21  **document memorializing the information he had**

22  **learned for purposes of providing it to the**

23  **detective assigned to the case?**

24     **A.   I believe he could use his discretion**

1   and simply communicate that to the individual.

2       Q.   Now, when the receiving detective got

3   the information, in other words, the detective

4   assigned to that Bomb & Arson investigation,

5   when that assigned detective got the

6   information, was he obligated to put that

7   information if it was relevant into a

8   supplementary report pursuant to Special Order

9   83-2?

10      A.   Yes, if it was relevant.  He may have

11  already disproved that information.

12              Yeah.  Thanks.  We already

13  checked that out.  Thank you very much.

14      Q.   Okay.

15      A.   So, at that point, there's no need to

16  document.

17      Q.   Although, in the vain of eliminating

18  possible suspects and running down leads, was

19  it the policy of the department to require

20  eliminated suspects to be identified in supp

21  reports?

22      A.   It was not.

23      Q.   As of 83-2?

24      A.   If a suspect was seriously considered

1    and was ruled out through investigative

2    activity, there should be some mention of it.

3        Q.   In the supp report?

4        A.   Correct.

5        Q.   Okay.  Does 83-2 say anything about

6    what's supposed to go into a supplementary

7    report?

8            MR. PATTERSON:  Why don't you review

9    it.

10           THE WITNESS:  No, it does not.  It

11   talks about placing it in the Investigative

12   Case Folder.

13   BY MS. KEEN:

14       Q.   Given that the department was aware

15   that information of substance about cases

16   wasn't going into supplementary reports prior

17   to the temporary restraining order, why didn't

18   the department prepare a special order that

19   told detectives to start putting that

20   information in their supplementary reports if

21   they weren't already doing so?

22       A.   I'm sorry.  My mind is starting to

23   wander.  Can you repeat that.

24           MS. KEEN:  Can you just read that

1  back.

2                    (WHEREUPON, said Record was read

3                    as requested.)

4          THE WITNESS:  Not every bit of

5  information merits inclusion in the

6  supplementary report.  Otherwise, it would be a

7  recording.

8                The detectives have discretion to

9  put down the most relevant parts of their

10  investigation.

11  BY MS. KEEN:

12      Q.   And I understand and I accept actually

13  the premise that the average run of the mill

14  detective was doing his best to record

15  information, you know, in an accurate and

16  comprehensive way.

17                I'm talking about the scenarios

18  that you saw that you testified about at the

19  Palmer hearing wherein some detectives weren't

20  putting information of substance, or important

21  information in the supp report.

22                And my question to you is given

23  that the department is aware that that was

24  happening, and they have this Palmer litigation

1   **and they're revising their Special Orders, why**
2   **didn't they create some written directive that**
3   **said you got to put all this information into**
4   **your supp reports?  You can't keep leaving it**
5   **out.**
6           MR. PATTERSON:  Objection, asked and
7   answered, form.
8           THE WITNESS:  You know, sometimes
9   there were competing needs.  One of the reasons
10  detectives use the back side of a Major
11  Incident Worksheet to describe the narrative is
12  because the supervisor is telling him to go
13  home because it's overtime.
14          And writing a supplementary
15  report takes longer than cranking out a one
16  paragraph synopsis.  And you come into work two
17  days after your days off and you kind of go,
18  well, it wasn't so important.
19  BY MS. KEEN:
20      Q.  **So, the department felt that it would**
21  **be too overinclusive or onerous to create a**
22  **special order requiring -- ensuring that there**
23  **weren't these gaps in the supplementary**
24  **reports?**

1          A.    I don't know why we didn't hammer home

2     writing more supplementary reports.  But to

3     have a supplementary report requirement for

4     every day you work on every case, you're going

5     to get a lot of saw nothing, it rained a lot,

6     and no one was home.

7          Q.    What about just saying a supplementary

8     report has to contain all relevant

9     information that's pertinent to the --

10         A.    We have that.

11         Q.    So, where is that?  What's that order?

12         A.    If you have additional information,

13    it's not an order.  That's the purpose of a

14    supplementary report.  If you have something

15    important, relevant to add to the

16    investigation, please share it.

17         Q.    Were there any changes from 1983,

18    January, onwards -- or strike that.

19              Were there any changes from

20    January, 1982, onwards to any of the written

21    orders that dealt in whole or in part with

22    supplementary reports?

23         A.    I'm not aware of any.

24         Q.    Okay.  Can I ask you one last

1    question.

2              This one document because it's

3    related, and I just don't want to -- this is a

4    previously marked Exhibit 13 so you have it.

5    It should be pretty quick.

6              Take a minute and let me know

7    when you're done?

8         A.    I know what this is.

9         Q.    What is this document?

10        A.    This is simply a memo from the Chief

11   of Detectives to the deputy chiefs and exempt

12   members of the Detective Division and to the

13   unit commanding officers of the Detective

14   Division on the subject of investigative files

15   and telling them there's a new order out and

16   the order applies to Violent Crime Field

17   Investigation, but also to all nonviolent

18   felony crimes assigned to field investigation.

19              In other words, a major safe

20   burglary, s-a-f-e, a property crime, a credit

21   card, a major one that's going to result in

22   felony charges -- or, excuse me, a field

23   investigation.

24        Q.    Because it specifically says

1  Bomb & Arson Section in there, I was wondering

2  if that was a change from the scope of 83-1?

3      A.   No.  I'll tell you why.  In another

4  document here, Bomb & Arson was specifically

5  brought in for the January, 1983 training.  So,

6  I thought the same thing when I looked at it.

7  And I said, oh, no, they were part of the

8  training originally.  So, they were part of

9  this from the beginning.

10     Q.   So, did this apply -- well, did this

11 apply to the Organized Crime Unit?

12     A.   No, it does not.

13     Q.   It then says a separate directive for

14 nonviolent felony crimes assigned to a field

15 investigation that's forthcoming.  What does

16 that mean?

17     A.   I don't know.  For nonviolent -- I

18 don't know.

19     Q.   Are you aware of a separate directive

20 for Bomb & Arson and other nonviolent felony

21 crimes regarding the subject of an

22 investigative files?

23     A.   No, I'm not.

24         MS. KEEN:  Okay.  I think we're going

1  to conclude now.

2                    (Whereupon, the deposition was

3                    concluded to July 31, 2014.)

4                         -0-o-0-

1  STATE OF ILLINOIS  )

2                     )  SS:

3  COUNTY OF C O O K  )

4          The within and foregoing deposition

5  of the aforementioned witness was taken before

6  Jamye Giamarusti, C.S.R, at the place, date and

7  time aforementioned.

8          There were present during the taking

9  of the deposition the previously named counsel.

10         The said witness was first duly sworn

11  and was then examined upon oral interrogatories;

12  the questions and answers were reported in

13  shorthand by the undersigned and transcribed

14  via computer-aided transcription.

15         The within and foregoing is a true,

16  accurate and complete record of all of the

17  questions asked of and answers made by the

18  aforementioned witness at the time and place

19  hereinabove referred to.

20         The signature of the witness was not

21  waived and the deposition was submitted

22  pursuant to Rules 207 and 211 (d) of the Rules

23  of the Supreme Court of Illinois to the

24  deponent per copy of the attached letter.

1           The undersigned is not interested in

2    the within case, nor of kin or counsel to any

3    of the parties.

4           Witness my official signature in and

5    for Cook County, Illinois on this September 2,

6    2014.

7

8                    *Jamye Giamarusti*

9           Jamye Giamarusti

10          C.S.R. No. 084.004183

11

12

13

14

15

16

17

18

19

20

21

22

23

24

C O R R E C T I O N   P A G E

I made the following changes for the following reasons:

PAGE LINE  CHANGE:

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON: _____

____ ____  _____

REASON:

(Signed)_____

SIEBERT & ASSOCIATES COURT REPORTERS, INC.
(773) 851-7779 cmsreporters@comcast.net

WITNESS CERTIFICATION

I hereby certify that I have read the foregoing transcript of my deposition consisting of Pages 1 through 252, inclusive. Subject to the changes set forth on the preceding pages, the foregoing is a true and correct transcript of my deposition taken on July 29, 2014.

(Signed) _____

SUBSCRIBED AND SWORN TO

Before me this _____ day of

_____, 2014.


_____

Notary Public

SIEBERT & ASSOCIATES COURT REPORTERS, INC.
(773) 851-7779 cmsreporters@comcast.net

     SIEBERT & ASSOCIATES COURT REPORTERS, INC.

                  3768 North Oleander Avenue

                    Chicago, IL  60634


September 2, 2014


JONES DAY, by

Mr. Chaka M. Patterson

77 West Wacker Drive

Chicago, Illinois 60601

Re:  Kluppelberg vs. The City of Chicago, et al.

     Dep:  JAMES HICKEY


Dear Mr. Patterson:

     The deposition testimony given on

July 29, 2014 in the above captioned case has

been transcribed, and inasmuch as signature was

not waived, this is to advise that the

deposition will be available in our office for

30 days for reading and signing.

     If you choose to read and sign the

deposition at our offices, please call the

undersigned for an appointment.  Our office

hours are from 9:00 a.m. to 4:00 p.m., Monday

          SIEBERT & ASSOCIATES COURT REPORTERS, INC.
            (773) 851-7779 cmsreporters@comcast.net

1  thru Friday.

2         If you choose to make other

3  arrangements for the reading and signing of the

4  deposition, please advise us of the

5  arrangements you have made in writing with 30

6  days from the date of this letter.

7

8         Sincerely yours,

9

10        Carol Siebert-LaMonica

11

12  CC: Ms. Roshna Keen (Original)

13     Mr. Chaka Patterson (copy)

14     Ms. Elizabeth Ekl (copy)

15

16

17

18

19

20

21

22

23     SIEBERT & ASSOCIATES COURT REPORTERS, INC.

24        (773) 851-7779 cmsreporters@comcast.net

I N D E X

Witness:
Examination

 JAMES HICKEY

        By Ms.  Keen                           3

E X H I B I T S

Number                                       Page

            No. 1                              3
            No. 2
                                              145
            No. 3
                                              146
            No. 4
                                              148
            No. 5
                                              149
            No. 6
                                              151
            No. 7
                                              153
            No. 8
                                              155
            No. 9
                                              156
            No. 10
                                              176
            No. 11
                                              178
            No. 12
                                              180
            No. 13
                                              182
            No. 14
                                              183
            No. 15
                                              211
            No. 16
                                              224

252

No. 17

228

SIEBERT & ASSOCIATES COURT REPORTERS, INC.

(773) 851-7779 cmsreporters@comcast.net

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779    cmsreporters@comcast.net

# Transcript of the Testimony of **James Hickey (pt2)**

**Date:** July 31, 2014

**Case:** James Kluppelberg v. Jon Burge, et al.

Printed On: October 17, 2014

Siebert and Associates Court Reporters, Inc.
Phone:773 851-7779
e-mail:cmsreporters@comcast.net

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| JAMES KLUPPELBERG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 13 CV 03963 |
| | ) | |
| JON BURGE, LEONARD ROLSTON | ) | |
| #11935, JOHN SCHMITZ #14634, | ) | |
| WILLIAM FOLEY #8108, WILLIAM | ) | |
| KELLY #3644, DETECTIVE URBON | ) | |
| #15400, THOMAS PTAK #6029, | ) | |
| MICHAEL DUFFIN #13596, GEORGE | ) | |
| JENKINS #11828, DETECTIVE | ) | |
| NELSON #16164, DETECTIVE VEGA | ) | |
| #3464, DETECTIVE W. MICEK | ) | |
| #4645, DETECTIVE GUEST | ) | |
| #10600, DETECTIVE L. TUIDER | ) | |
| #5648, FRANCES BURNS, WILLIAM | ) | |
| ALLETTO, as-of-yet UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO and THE CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

The CONTINUED deposition of JAMES HICKEY
taken under oath at 311 North Aberdeen Street,
Chicago, Illinois, at 9:49 a.m. on Thursday,
July 31, 2014 pursuant to the Rules of the
United States District Court, Northern District
of Illinois, before Jamye Giamarusti, C.S.R.
No. 084.004183 in and for the County of Cook
and State of Illinois, pursuant to Notice.

1  APPEARANCES:

2

3      LOEVY & LOEVY, by

4      MS. ROSHNA KEEN,

5      312 North May, Suite 100

6      Chicago, Illinois  60607

7          Appeared on behalf of the Plaintiff;

8

9      THE SOTOS LAW FIRM, P.C., by

10     MS. JACLYN L. McANDREW,

11     550 East Devon, Suite 150

12     Itasca, Illinois  60143

13         Appeared on behalf of the

14         Individually named Defendants;

15

16     JONES DAY, by

17     MR. CHAKA PATTERSON

18     77 West Wacker Drive, Suite 3500

19     Chicago, Illinois  60601

20         Appeared on behalf of the Defendant,

21         the City of Chicago.

22

23              * * * * *

24

1                    JAMES HICKEY,

2       called as a witness herein, having been

3       previously duly sworn, was examined and

4       testified as follows:

5                    EXAMINATION (CONT'D)

6       BY MS. KEEN:

7            Q.    Good morning, sir.

8            A.    Good morning.

9            Q.    We'll just pick up right where we left

10      off on Tuesday.

11           A.    Okay.

12           Q.    We've been talking a lot about file

13      keeping, correct?

14           A.    Working files, including file keeping,

15      right.

16           Q.    And then we started talking about

17      creation of a new system involving

18      investigative files, correct?

19           A.    Correct.

20           Q.    And that system was implemented

21      following our realization that -- well, strike

22      that.

23                    The system of investigative files

24      was implemented in response to a court order

1  regarding the Laverty memo, among other things,

2  correct?

3       A.   Correct.  And the superintendent's

4  policy proclamation.

5       Q.   Right.  The teletype.

6            Is that what you're talking

7  about?

8       A.   No.  Actually, it was a little bit

9  later than the teletype.  It was some testimony

10  that he gave in Milton Shader's courtroom.

11       Q.   Okay.  So, regarding the

12  implementation of the investigative file

13  system, a checklist was created to reflect the

14  types of forms that may be included in the

15  investigative file, correct?

16       A.   It was.

17                      (WHEREUPON, Deposition Exhibit

18                       No. 18 was marked for

19                       identification.)

20  BY MS. KEEN:

21       Q.   I'm handing you what I've marked as

22  Exhibit 18.  What is this document?

23       A.   This was a document that I prepared in

24  the process of trying to come up with a

1    procedure to institutionalize control over the

2    working files, running files, street files.  It

3    is an attempt, but it did not materialize.  It

4    never became an official document.

5         Q.   I see.

6         A.   It was part of my developmental

7    thinking on the topic.

8         Q.   Who did you show this checklist to?

9         A.   I'm sure I showed it to the Chief of

10   Detectives.

11        Q.   Do you believe any of the area command

12   staff would have seen this checklist?

13        A.   I don't know if they saw it.

14        Q.   Although the checklist itself didn't

15   become a formal form, is it your understanding

16   that the types of reports listed on this

17   checklist were, in fact, the types of forms and

18   reports that may be included in an

19   investigative file?

20        A.   A listing of possible development

21   forms, yes.

22        Q.   Okay.  So, the forms that are listed

23   here are forms that may be included in an

24   investigative file, correct?

1      A.    Correct.

2      Q.    So, I guess I'm just going to ask you

3   a few questions about the specifics on here.

4                  The Arrest Record, does that

5   referred to the arrest report?

6      A.    Correct.

7      Q.    Okay.  And the case or supplementary

8   report is the supp report we talked about at

9   length on Tuesday, correct?

10     A.    Right.  The case is the original

11  report prepared by the beat officers.  The

12  supplementary report is that report which is

13  normally created by detectives but can be

14  created by anyone in the police department who

15  is sworn.

16     Q.    The arrest record was required to be

17  placed in the investigative file for a

18  particular investigation, correct?

19     A.    No.

20     Q.    Okay.  Was the arrest record required

21  to be placed in any police file?

22     A.    The arrest record, the arrest report

23  is maintained by the Identification Section of

24  the Records Division.

1    Q.   Okay.  So, a copy doesn't necessarily

2  even have to go in the Records Division

3  permanent file?

4    A.   Correct.

5    Q.   How about the case report?  Was that

6  required to be placed in the investigative

7  file?

8    A.   Not required, but certainly -- mostly

9  expected if you needed that information.

10 Again, it's information that you need to work

11 the investigation.

12   Q.   And let me be clear.  I guess I'm

13 going to ask -- the questions that I'm asking

14 about the records that would be in the

15 investigative file relate to the time period

16 following the issuance of Special Order 83-1.

17 Okay?

18   A.   Yes.

19   Q.   Was it the requirement of the

20 department that a supplementary report for a

21 particular case go into the investigative file

22 for that case if there was an investigative

23 file for that case?

24   A.   No.

1      Q.   That was not a requirement?

2      A.   No.  There is no requirement to put

3  anything in there except that information which

4  the individual detective generated or acquired

5  in the course of the investigation.

6      Q.   Okay.  So, maybe my question should be

7  more precise.

8            I'm not asking if there was a

9  requirement that one should create a

10  supplementary report.  I'm asking that if a

11  supplementary report was created by a

12  detective, was there a requirement by the

13  department to place a copy of that

14  supplementary report into the investigative

15  file for that case if an investigative file

16  existed at any time subsequent to the issuance

17  of Special Order 83-1?

18      A.   No.

19      Q.   Why was there no requirement to place

20  a copy of the supplementary report into the

21  investigative file?

22      A.   The investigative file is a working

23  file and the detectives can determine what

24  documents they need.  There might be a report

1  that is in the office file or the Permanent

2  Retention File that the detectives already know

3  the information that is contained in it.

4              And it means nothing to the

5  investigation, or they know it well enough that

6  they don't even want a copy of it.

7              Yeah, yeah.  Thank you very much.

8  I know about that.  However, I'm going to make

9  a copy of something else that has addresses on

10 it of places I need to go to today.

11      Q.   When you said office file in your

12 response just now, what were you referring to?

13      A.   The RD file maintained in the

14 individual offices, investigative offices.

15      Q.   Okay.  Let me take a quick step back.

16              Following the issuance of 83-1,

17 so at all times in the '80s after 83-1 was

18 rolled out, how many files for a particular

19 investigation would exist within the area or

20 Bomb & Arson Unit in the case of bomb and

21 arson?

22      A.   There may be the RD file.

23      Q.   That's the unit numerical RD sequence

24 number?

1     A.    Very good.  Very good.

2     Q.    When you say may be, that's not

3 required?

4     A.    Well, it can be supplemented by this

5 specialty drawer of just homicides or just

6 death investigations.  And that file would be

7 pretty clean by just the general offense case

8 report and the supplementary reports.

9     Q.    So, was there a requirement to create

10 a unit RD file for any given investigation

11 within the area or specialized unit after 83-1

12 came out?

13     A.    Yes.

14     Q.    And that is the clean file?

15     A.    Right.

16     Q.    Which would contain a few official

17 police reports, correct?

18     A.    It would contain all the known

19 official police reports.

20     Q.    So, the original case report and any

21 supplementary reports?

22     A.    Right.  It may also contain reports

23 that were sent to the Investigative Unit from

24 support units.

1      Q.   I believe you gave the example of

2  fingerprint analysis?

3      A.   Fingerprint analysis, something from

4  the crime lab.

5      Q.   Then there's a separate file which is

6  called the investigative file, correct?

7      A.   Correct.

8      Q.   And that is also maintained by the

9  area or the specialized unit, correct?

10     A.   It is, yes.

11     Q.   And by specialized unit, I'm giving,

12  for example, the Bomb & Arson Unit --

13     A.   Correct.

14     Q.   -- which was within the Detective

15  Division?

16     A.   Correct.

17     Q.   So, the specialty drawer would contain

18  the investigative file, correct?

19     A.   Correct.

20     Q.   And the investigative file would

21  contain documents about the case, correct?

22     A.   That the individual detectives

23  assigned to investigate that case may determine

24  should be placed in there.

1      Q.   So, you don't read 83-2 as requiring a

2  copy of supp reports to go into the

3  investigative file for an area or specialized

4  unit?

5      A.   No.  It was never my intent.

6      Q.   Okay.  And so where, if at all, was

7  the supplementary report required to be placed?

8      A.   In the office file would be a copy.

9      Q.   By office file, you mean --

10      A.   By the office file, I mean, the RD

11  unit numerical sequence file.

12           The original would be kept in the

13  Records Division and the original of any

14  supplementary report would be kept in the

15  Records Division.

16      Q.   So, if a detective created a memo

17  regarding his investigation, is it fair to say

18  that there is no requirement to place that memo

19  into the investigative file?

20      A.   No.

21      Q.   That's an incorrect statement?

22      A.   That is an incorrect statement.  It

23  should be placed in the investigative file.

24  Again, it's something that they created.  It's

1    pertinent to the investigation and that's what

2    we wanted to gain institutional control over.

3         Q.   So, you're saying supp reports were

4    treated different from the other types of

5    records?

6         A.   No.

7         Q.   I'm being dense here I think.

8         A.   No.  Not all supplementary reports had

9    to be in the investigative file.  The original

10   supplementary report might be five pages long.

11   I'm not interested in it.

12            The only thing I need to know is

13   the addresses on Page 2 of the witnesses.

14   They're the ones I have to re-interview.  So,

15   I'll just make a copy of Page 2 and throw it in

16   there.

17            There is no requirement for a

18   complete copy or duplicate set of supplementary

19   reports, because we know the originals are in

20   the Records Division and a copy of the complete

21   set is in the unit RD sequential file.

22        Q.   So, what if a detective created a memo

23   regarding information about the case and didn't

24   feel that he needed to put it in the

1    investigative file, could he keep it out of the

2    investigative file in conformity with Special

3    Order 83-2?

4         A.   No.

5         Q.   And what is the requirement in 83-2

6    that would have mandated his placement of that

7    memo into the investigative file?

8         A.   The memo by 83-2, by that time memos

9    should have been prepared and drafted on a

10   General Progress Report and submitted to the

11   supervisor for review for inclusion in the

12   investigative file.

13        Q.   I guess where I'm getting confused is

14   how come GPRs have to go in the investigative

15   file, but supp reports don't have to go into

16   the investigative file?  And where in 83-2 does

17   it differentiate between those?

18        A.   Which is 83-2?

19             MR. PATTERSON:  Exhibit 17.

20             THE WITNESS:  Okay.  Well, in Roman

21   Numeral V, B, as in boy, Page 3, it says

22   detectives are required to do a series of

23   things and there are six items.

24             Without reading them all --

1          MR. PATTERSON:  Why don't you read

2     them, Jim.  Take your time.

3          MS. KEEN:  He's read them to himself.

4          THE WITNESS:  Detectives are required

5     to:  record and preserve all relevant

6     information as fully and accurately as

7     possible, take and maintain complete notes of

8     all relevant matters during the course of their

9     investigation.

10               (This requirement is intended to

11    serve the purposes of the department

12    directives, to assure not only that information

13    and materials indicating the possible guilt of

14    the accused are preserved, but also that the

15    accused may ultimately be granted access to any

16    information and materials that may tend to show

17    his possible innocence or aid in his defense.)

18               It goes on, No. 2, transcribe

19    relevant information which initially had been

20    recorded on General Progress Reports, Violent

21    Crimes, Major Incident Worksheets, and other

22    miscellaneous investigative documents on an

23    official case report form (Supplementary

24    reports, General Offense reports, et cetera)

1    consistent with the Detective Division Violent

2    Crimes reporting format.

3                    3, promptly (normally at the end

4    of each tour of duty) --

5    BY MS. KEEN:

6        Q.    I'm sorry.  I don't mean to interrupt

7    you.  I don't need you to read all of this into

8    the record.

9        A.    Okay.

10       Q.    What were you going to say about the

11   import of this?

12       A.    I was going to say there's no mention

13   of making a copy of a supplementary report and

14   putting it into the investigative file.

15       Q.    Did anybody have responsibility for

16   putting a copy of a supplementary report into

17   the investigative file?

18       A.    No.

19       Q.    So, it was the kinds of documents that

20   were nonofficial police reports that had to be

21   placed in the investigative file, correct?

22                MS. McANDREW:  Object to form.

23                MS. KEEN:  Let me re-ask that.

24

1   BY MS. KEEN:

2       Q.   It was the kinds of documents that

3   were not either the case report or

4   supplementary reports that had to go into the

5   investigative file, correct?

6       A.   Certainly the notes.

7       Q.   What about memos if detectives

8   continue to use those?

9       A.   Notes by this time would be required

10  to be placed on General Progress Reports.

11      Q.   There's nothing in here to outline the

12  use of memoranda, is there?

13      A.   Yes, there is.

14      Q.   What is that?

15      A.   Roman Numeral II on Page 1, Roman

16  Numeral II says, Purpose.  This order provides:

17  A, guidelines for the proper retention of

18  official department reports, notes, memoranda,

19  and miscellaneous documents of potentially

20  evidentiary value, accumulated during the

21  course of a particular violent crime field

22  investigation.

23      Q.   But to me that doesn't say you tell a

24  detective that you can't use memoranda anymore,

1   would you agree?

2       A.   Absolutely.

3       Q.   It doesn't outlaw the use of

4   memoranda, correct?

5       A.   No.  It does not.

6       Q.   So, was there any requirement that

7   said memoranda had to be placed in the

8   investigative file?

9       A.   Yes.

10      Q.   Where is that?

11      A.   Roman Numeral IV, Item E on Page 3.

12      Q.   So, I've read this and it doesn't tell

13  me that you have to use a GPR in place of

14  another type of document.

15          Am I reading that correctly?

16      A.   Well, let's read the definition of a

17  General Progress Report.

18          A General Progress Report is a

19  department form 8.5-by-11 in size which will be

20  utilized by all detectives assigned to violent

21  crime field investigations.  This document is

22  designed to standardize the recording of

23  handwritten notes and memoranda (the

24  investigative work-product) including:

1    Inter-watch memoranda (whether handwritten or

2    typewritten).

3         Q.    Would you agree that on the face of

4    this definition it does not state that you can

5    no longer create inter-watch memoranda?

6         A.    I think it says just the opposite.

7    It's saying what this General Progress Report

8    would be used for, inter-watch memoranda.

9         Q.    Was there any communication other than

10   Special Order 83-1 and its iterations that

11   advised detectives about whether or not they

12   could create memoranda?

13        A.    The training.

14        Q.    What was said in the training about

15   that?

16             Sorry.    Was this training that

17   you did?

18        A.    Yes, it is.

19        Q.    So, this was in early '83?

20        A.    Starting in January, 1983.

21        Q.    What groups of individuals did you

22   give this training to?

23        A.    To all members of the Detective

24   Division from detective to all exempt members

1    of the Detective Division.

2        Q.    What did you say on the subject of

3    memoranda?

4        A.    If you write them, put them on a

5    General Progress Report.

6        Q.    Was this a one-time training or were

7    there repetitive trainings for the same

8    individuals?

9        A.    One-time training to about a thousand

10   people.

11       Q.    All in a big room?

12       A.    No.  In groups of 30 or 40 at a time.

13       Q.    How long did the training last?

14       A.    A couple months.

15       Q.    How long did each training session

16   last?

17       A.    Three hours.

18       Q.    And the subject of the three hours was

19   this new special order?

20       A.    83-1.  And I went over each document

21   that had just been created, each form, and

22   literally the entire order and tried to explain

23   the rationale for it all.

24

1          (WHEREUPON, Deposition Exhibit

2              No. 19 was marked for

3              identification.)

4    BY MS. KEEN:

5        Q.   I'm going to show you a Crime Analysis

6    Pattern because it's one of the documents in

7    this checklist.  This is Exhibit 19.  It's

8    CITY-KLUP 2990.

9              Is this one of the kinds of

10   documents that, if created, had to go into the

11   investigative file for a particular

12   investigation?

13       A.   If created, it could be.  It didn't

14   have to be.

15       Q.   There was no requirement to put it in

16   the investigative file?

17       A.   No.

18       Q.   If it was created, in other words, if

19   the Crime Analysis Pattern was created

20   regarding a particular crime, where, if at all,

21   did that document have to go under the Chicago

22   Police Department rules?

23       A.   It was sent to units throughout the

24   City to inform them of a Crime Analysis

1   Pattern, including the Patrol Division and the

2   Detective Division and the Traffic Division.

3            Normally at this time, they were

4   placed either in what we refer to as CO books,

5   commanding officer books, or posted on a

6   bulletin board.

7        Q.   Was there any requirement to place it

8   in a file associated with a particular case?

9        A.   No.  And, again, think about this, by

10  its very nature, a pattern is multiple.  So, it

11  isn't about one case.

12       Q.   Right.  But let's say there was three

13  different fires listed on here.

14            While it may be not be required,

15  would you expect to see a copy of this Crime

16  Analysis Pattern document placed into each of

17  the three investigative files for each of the

18  three fires?

19       A.   It could be, but there was no

20  requirement for it.

21       Q.   What would you expect to see based on

22  how the detectives were using the investigative

23  files post 83-1?

24            MS. McANDREW:  Objection, calls for

1  speculation.

2          MS. KEEN:  Well, it's a 30(b)(6)

3  witness.

4          THE WITNESS:  What would I expect?  I

5  think their feeling would be, I think they

6  would expect, maybe I'm going to get some help

7  on this case from someone else.  This Crime

8  Pattern document informs others.  I would

9  expect the detective to know about it.

10 BY MS. KEEN:

11     **Q.   Exactly.  Okay.**

12          **So, you would expect there to**

13 **be -- if there was three fires listed on a**

14 **Crime Analysis Pattern, you would expect the**

15 **detectives assigned to all three fires to be**

16 **aware of this Crime Analysis Pattern document,**

17 **correct?**

18          MR. PATTERSON:  Objection.

19          THE WITNESS:  Correct.

20 BY MS. KEEN:

21     **Q.   And was it the kind of document that a**

22 **detective would cause to be stuck into the**

23 **investigative file for his fire?**

24     **A.   It could be, but there's no**

1    requirement.

2         Q.   I understand there's no requirement.

3    But based on how investigative files were being

4    used, is it the kind of document that you would

5    expect to be stuck into the investigative file?

6         A.   Not necessarily.

7         Q.   What would be the reason for keeping

8    it out of the investigative file?

9         A.   They already know about it.  The

10   investigative file is supposed to be for

11   documents to help them work on a particular

12   case.

13             And while interesting, carrying

14   it around with them is not going to help them

15   solve the case that they're assigned to.

16        Q.   Were detectives carrying around the

17   investigative files post 83-1?

18        A.   Yes.

19        Q.   They were taking them onto the street

20   with them?

21        A.   That was the design.  There was a

22   process for them to sign the investigative file

23   out.

24        Q.   On the unit control card?

1      A.    Correct.  Very good.

2      Q.    I'm trying to follow along here.

3            So, you would expect the

4  detectives working on each of the potentially

5  related crimes to know about the Crime Analysis

6  Pattern, but you wouldn't require a copy of the

7  document to be placed in each of the associated

8  investigative files; is that right?

9      A.    Correct.

10                     (WHEREUPON, Deposition Exhibit

11                      No. 20 was marked for

12                      identification.)

13  BY MS. KEEN:

14      Q.    Is that same for the General

15  Information Bulletin, which I'm going to show

16  you quickly as Exhibit 20?

17      A.    Even more so.

18      Q.    Can you just explain what you mean,

19  even more so?  Sir, what do you mean by even

20  more so?

21      A.    A Crime Analysis Pattern is something

22  that is tightly related in, whether it be the

23  crime itself, the neighborhood, the described

24  offender, the modus operandi, the MO.

1          A General Information Bulletin is

2    more about a neighborhood and perhaps not so

3    similar crimes.  One might be an armed robbery,

4    one might be a damage to property, but they

5    have something in common.  All the victims are

6    old ladies, you know, whatever it might be.

7    And they kind of go, oh.  But it's not as

8    obvious.

9          Q.    Right.  Last question about Crime

10   Analysis Pattern.

11          Was there somebody within the

12   this police department who was getting a copy

13   of these Crime Analysis Patterns for the

14   purpose of doing a crime pattern analysis?

15          A.    The Detective Headquarters Unit had a

16   Crime Analysis Unit, and it was their primary

17   purpose to review incoming case reports and to

18   look for patterns.

19          Q.    By case reports, do you include

20   supplementary reports?

21          A.    Mostly case reports.

22          Q.    Did they look at arson patterns?

23          A.    You know what?  I don't know the

24   answer to that.

1      Q.   Okay.

2      A.   It's such a specialty that I don't --

3      Q.   Arson you mean?

4      A.   Arson, yeah.  I just don't know.  I

5    would think they did, but I'm not sure.

6                         (WHEREUPON, Deposition Exhibit

7                          No. 21 was marked for

8                          identification.)

9    BY MS. KEEN:

10     Q.   I have a quick question about this

11   Supplementary Report-Temp Form, which is

12   Exhibit 21 I handed you.

13             Well, what I handed you actually

14   was Group Exhibit Special Order 83-7, Bates

15   numbered CITY-KLUP 3112 through 3120.

16             And if you turn to the last three

17   pages, the third from the back, 3118, this is a

18   Supplementary Report-Temp Form.  What's the

19   deal with this form?

20     A.   This was about the time that the

21   Bureau of Investigative Services got its own

22   supplementary report to differentiate it from a

23   supplementary report that can be used by anyone

24   in the police department.

1    Q.   Was the Supplementary Report Temp

2  treated the same as other supplementary reports

3  in terms of their filing?

4    A.   Correct.

5    Q.   So, there's no difference in terms of

6  the handling or use of the Supplementary

7  Report-Temp Form other than the fact that it

8  was a new format intended specifically for

9  Bureau of Information Service detectives,

10 correct?

11          MR. PATTERSON:   Investigative

12 Services.  You said information.

13          MS. KEEN:  Sorry.  Right.  Thank you.

14 BY MS. KEEN:

15   Q.   Investigative Services; is that right?

16   A.   That's correct.

17   Q.   Are you familiar with something called

18 Bomb & Arson Worksheets?

19   A.   I am not.

20   Q.   I don't have a copy.  The Major

21 Incident Worksheets, we talked a lot about

22 those before.

23          Were those still around after

24 83-1?

1      A.    Major Incident Worksheet, yes.

2      Q.    Were they used the same way; in other

3 words, were they still used to create -- or

4 populated using a typewriter?

5      A.    Yes.

6      Q.    Was it your understanding that

7 detectives used that Major Incident Worksheet

8 the same way as before; in other words,

9 information on the front and typing more of a

10 narrative on the back?

11      A.    Correct.

12      Q.    Where were those supposed to go after

13 83-1 came out?

14      A.    In the investigative file.

15      Q.    Was there a requirement that Major

16 Incident Worksheets be placed into the

17 investigative file?

18      A.    Yes.

19      Q.    Was there a requirement that Major

20 Incident Worksheets be placed in the Records

21 Division file?

22      A.    Yes.

23      Q.    There was?

24      A.    Sure.  If it's generated in the course

1    of an investigation and it is not a

2    supplementary report, then it's unique and it

3    should be preserved.

4        Q.   Just so we're clear though, GPRs did

5    not go into the Records Division file, correct?

6        A.   Correct.

7        Q.   GPRs did not go into the unit RD

8    numerical sequence file, correct?

9        A.   Correct.

10       Q.   If a to-from memo was created,

11   notwithstanding the use of a GPR form, was the

12   to-from memo supposed to go into the Records

13   Division file?

14       A.   No.

15       Q.   Was the to-from memo supposed to go in

16   the unit RD numerical sequence file?

17       A.   No.

18       Q.   Was the to-from memo supposed to go in

19   the investigative file?

20       A.   Correct.  Yes.

21       Q.   Once the investigative file system

22   came out, were detectives still also keeping

23   their own working file separate and apart from

24   the investigative file?

1      A.   The investigative file process was

2  designed so that they would be kept in the

3  office and be able to be pulled out temporary

4  for a tour of duty and signed out at that time

5  and then returned at the end of the tour of

6  duty and signed in.

7             In other words, it was in the

8  design that these investigative files would

9  become dirty, you know, spilled coffee on it or

10  lunch or whatever, because they're in the car.

11             What I did see over time though

12  is that these investigative files in some

13  places, some units, more and more remained in

14  the office in a clean state, and some

15  detectives had information that they carried

16  around.

17             But the obligation remains at the

18  end of their tour of duty, they are to turn in

19  anything that they have generated to be placed

20  in the investigative file.  It's all about

21  retention.

22      Q.   Right.  I think I understand.

23             So, you're saying the obligation

24  was put into place to turn in your documents?

1      A.    Right.

2      Q.    Or turn in things that you had

3  collected or created regarding the

4  investigation that had some evidentiary value,

5  correct?

6      A.    Correct.

7      Q.    But as far as while the case was being

8  investigated, where those documents were being

9  stored, you did see in some units detectives

10  start to revert, for lack of a better word, to

11  carrying their own file out on the street that

12  was separate from the file that was kept in the

13  office; is that correct?

14      A.    I have seen that, yes.

15      Q.    Did you tend to see that in some areas

16  more than others?

17      A.    No.   I didn't see any pattern or

18  practice to it, nor did I conduct any audit of

19  it.

20      Q.    Right.  We talked about that last

21  time.

22            So, how did it come about --

23  because you're kind of the office guy, right?

24  So, how would you, you know, go about -- how

1  **would it even come to your attention that**

2  **people were -- you started to notice fewer and**

3  **fewer dirty files in the office leading you to**

4  **believe that there were more and more street**

5  **files?**

6          MR. PATTERSON:  I'm going to object

7  here.  Are you asking him in his individual

8  capacity now or are you asking him as the

9  Chicago Police Department?

10         MS. KEEN:  Yeah.  This is still in his

11 corporate capacity.

12         MR. PATTERSON:  Okay.

13         THE WITNESS:  Well, it's a topic that

14 I've had countless conversations with working

15 detectives and supervisors with over the

16 decades, and I kept informed -- not informed, I

17 have an interest in the topic.

18              But I would disagree with your

19 terminology in the use of street files.  As of

20 1983, we did not have any street files.  We had

21 one investigative file.

22 BY MS. KEEN:

23     **Q.   Well, it sounds like you might have**

24 **multiple investigative files while the case is**

1  ongoing, correct?

2      A.    No.   There's no investigative file.

3      Q.    So, what were you calling the folder

4  containing documents that a detective might

5  start for himself and take out into the street

6  while the investigative file was staying in the

7  office?

8      A.    Notes.   It doesn't even have to be a

9  file, right, it could be a couple pieces of

10  paper.

11      Q.    Right.   But let's create a term so

12  that we can know what we're talking about for

13  this definition.

14            What term would you like to call

15  that collection of documents that a detective

16  might have taken with him out on the street

17  while the office file was staying in the

18  office?

19      A.    Copies.

20      Q.    How about his own copies?

21      A.    His own copy.

22      Q.    Okay.   So, when I say his own copy,

23  I'm referring to documents or materials of any

24  kind that he was keeping his own copy of and

1  taking with him out on the street instead of

2  actually checking out the investigative file

3  that was sitting in the area office, okay?

4      A.   Okay.

5      Q.   So, how did it come to your

6  attention -- or strike that.

7           Was the practice of keeping his

8  own copies a violation of any of the special

9  orders that had been enacted on the subject?

10     A.   No.  The investigative file order, the

11 primary obligation is to turn in anything you

12 generate.  Preserve that which you generate.

13 Get it to your supervisor so it can be placed

14 in the file.

15     Q.   Did it concern you to see that after

16 some time had passed that detectives started

17 keeping their own copies rather than checking

18 out the investigative file?

19     A.   Some detectives.

20     Q.   Some detectives?

21     A.   Right.

22     Q.   Of course.  I'm saying did that

23 concern you at all?

24     A.   I was kind of surprised because after

1    all, I thought it was obvious that that's what

2    the file Inventory Control Card was.  This

3    library card was to facilitate the removal and

4    the return of investigative files.

5        Q.   Around what time period are we talking

6    when you started to see some detectives in

7    various areas keeping their own copies?

8        A.   Ten years later.  I mean, it was not

9    immediate.

10       Q.   So, could it have been five years

11   later, or is that just a real --

12            MR. PATTERSON:  Objection.

13   BY MS. KEEN:

14       Q.   I'm not trying to put words in your

15   mouth.  I'm trying to understand how confident

16   you are about the ten years.

17       A.   It was a long time after 1983.

18       Q.   Was there some specific event that

19   comes to mind when you think about seeing

20   people keeping their own copies?

21       A.   When I have testified in other events,

22   other dispositions or trials, I talked to

23   practitioners, and I listen to them and some of

24   my knowledge is gained through those

```
 1    conversations.
 2         Q.    Okay.  Did you have any conversations
 3    with your supervisors about the fact that there
 4    was, at least in some areas, some detectives
 5    starting to keep their own copies?
 6               MR. PATTERSON:  Objection, foundation.
 7               THE WITNESS:  No.
 8    BY MS. KEEN:
 9         Q.    You never talked to anybody about
10    that?
11               MR. PATTERSON:  Same objection.
12    BY MS. KEEN:
13         Q.    Go ahead.
14         A.    I left the Detective Division in 1983
15    and have never gone back.
16         Q.    Did anyone from the department become
17    aware of, besides you, of individuals working
18    in the Detective Division keeping their own
19    copies of files or file materials --
20               MR. PATTERSON:  Objection, foundation.
21    BY MS. KEEN:
22         Q.    -- after 83-1?
23               MS. KEEN:  Well, this is the 30(b)(6)
24    witness on the topic.
```

1          MR. PATTERSON:  No, no.  You cleaned

2     it up when you said after 83-1.

3          MS. KEEN:  Okay.

4          THE WITNESS:  Department members are

5     aware that sometimes some detectives are not

6     signing out the investigative file and have

7     personal copies of some of the documents.  Yes.

8     BY MS. KEEN:

9     **Q.   In response to this discovery that**

10    **detectives were keeping their own personal**

11    **copies in some cases, did any of the special or**

12    **general orders get modified?**

13    **A.   No.**

14    **Q.   Was there any steps taken on a**

15    **department-wide basis or a management level to**

16    **ensure that the material amassed in the**

17    **personal copies was actually getting turned in**

18    **at the end of the investigation?**

19    **A.   That has been and remains a**

20    **supervisory issue with the detectives, the**

21    **order stands on investigative files.  It's all**

22    **about the inclusion of information in the**

23    **investigative file.**

24    **Q.   When you say it's a supervisory issue,**

1    you mean supervisors are responsible for doing

2    that?

3         A.   Supervisors are responsible for

4    ensuring that their subordinates follow the

5    procedures.

6         Q.   Are they doing it?  Does the

7    department know if the supervisors are actually

8    doing it, actually making sure that the

9    information that was amassed by the detectives

10   and placed in their own copies of the materials

11   was actually getting turned in and made part of

12   the investigative file that was at the office?

13        A.   By the fact that we have tens of

14   thousands of these files, I think that suggests

15   they're doing their job.

16        Q.   Well, but there were tens of thousands

17   of files before Special Order 83-1 came out,

18   right?  There were tens of thousands of office

19   files?

20        A.   And there was no requirement to turn

21   in notes prior to 1983.

22        Q.   But there was a requirement prior to

23   1983 that all pertinent information relating to

24   a case had to get turned over to the prosecutor

 1  for a given case, correct?

 2      A.   All reports that were pertinent --

 3  excuse me.

 4              All information that was

 5  pertinent, relevant to an investigation, if it

 6  exists, is discoverable and should be turned

 7  over to both the prosecutor and those who asked

 8  for that information.

 9      Q.   And that requirement was in place

10  governing the detectives pre 83-1, correct?

11      A.   Absolutely.

12      Q.   But it wasn't being followed in all

13  cases, right, and hence the problem with the

14  Laverty memo?

15      A.   There are examples when it was proven

16  that we had a couple instances in which not

17  everything was turned over as it should be.

18      Q.   Okay.  Let me ask you about in 83-2,

19  which was 17, you might not even need to look

20  at it.

21              Do you remember how we talked

22  about the requirement that if Detective A found

23  out information that related to Detective B's

24  investigation, that Detective A had to tell

1   **Detective B about it?**

2   **We can look at the specific**

3   **language.  It's Page 4, Roman Numeral VB(6).**

4   **I just wanted to ask you a couple**

5   **questions about that.  Let me know when you're**

6   **done reading it.**

7   **A.    Okay.**

8   **Q.    So, how is that supposed to work?**

9   **Let's say Detective A learned something that's**

10  **relating to a crime that Detective B is working**

11  **on.**

12  **Is Detective A supposed to write**

13  **that information down and give it to Detective**

14  **B or communicate it orally to Detective B?**

15  **What's required by the order?**

16  MR. PATTERSON:  Objection, form.

17  THE WITNESS:  There's a range of

18  communication options.

19  The first is the easiest, simply

20  orally inform the individual.

21  Second might be to simply leave a

22  telephone message, call someone or call me.

23  I'll tell you something about your case if

24  they're working different watches or different

1  day off groups.

2          The third might be for the

3  detective to prepare a supplemental report,

4  supplementary report, or create a General

5  Progress Report, or even pass on the

6  information through an Information Report.  We

7  have a document called that as well.

8  BY MS. KEEN:

9     Q.    Information Report is what?

10    A.    Information Report is a document that

11 can be used by anyone in the police department

12 to pass on information that they have acquired.

13          It may or may not be related to

14 an existing case.  There might be a school

15 walk-out on Friday afternoon, the popular

16 teacher is being fired.

17    Q.    Did the information report have to go

18 in the official file, if one was created and if

19 there was an official file?

20    A.    Correct.

21    Q.    Oh, it did.  It had to go into in the

22 RD file if it was created?

23    A.    The investigative file.  I'm sorry.

24 Not the official.

1      Q.   Okay.

2      A.   Most of the time an Information Report

3  does not have an RD number.  It's general

4  information.

5      Q.   But if it was relating to a specific

6  crime and there were an investigative file for

7  that crime, it would have to go into the

8  investigative file?

9      A.   Correct.

10      Q.   But not into the RD file?

11      A.   Right.

12      Q.   If in the scenario of Detective A

13  learning information about a crime that

14  Detective B was investigating and that

15  information was pertinent to the crime, would

16  Detective B have to create a document

17  reflecting that information?

18      A.   No.

19      Q.   If Detective B learned information

20  that was pertinent to a crime from any channel,

21  whether from another detective or elsewhere,

22  would he have to make sure that that pertinent

23  information got into a supplementary report

24  pursuant to Detective Division Special Order

1  83-2, Subpart 5B2, which states that detectives

2  are required to transcribe relevant information

3  into an official Department Case Report form?

4       A.   Obviously, there's a possibility that

5  when Detective or Person A, Police Department

6  Member A, tells the assigned detective

7  something which is pertinent to the

8  investigation, I can say as Detective B, thank

9  you very much, I knew that.

10      Q.   What if it was new information that

11  Detective B didn't know and it was pertinent to

12  the case, would he have to make sure that that

13  information got into an official police report

14  such as a supplementary report?

15      A.   No.  No requirement to take a note,

16  but there is a requirement to include it in

17  their investigation.  I'm not going to forget

18  what you just told me.  You know, it's the

19  red-haired hooded individual who committed the

20  crime.  Okay.  Got it.

21      Q.   But why is it only -- that's got to be

22  memorialized somewhere other than the

23  detective's memory, right?  I mean, surely

24  that's exactly the kind of information that's

1  supposed to go in that supp report because it

2  could be germane to the defendant when he's

3  trying to defend himself.

4          MR. PATTERSON:  Objection, form.

5          THE WITNESS:  Could you repeat the

6  question?

7  BY MS. KEEN:

8      Q.   Yeah.  Isn't information that's

9  pertinent to a case supposed to go in a police

10  report?  Isn't that what this provision means?

11     A.   What item are you referring to now?

12     Q.   Page 3 of Special Order 83-2,

13  detectives are required to transcribe relevant

14  information which had originally been

15  recorded -- wait a minute.  Okay.  Sorry.  Let

16  me take a step back.

17          If a detective learned something

18  pertinent to a case like, say, the identity of

19  a possible suspect, does he have to record that

20  information in a document that gets made part

21  of the Records Division file?

22     A.   I can reasonably expect that they

23  would, but there's not a requirement that they

24  write it down.  I mean, obviously, the more

1   detailed the information is, the more likely

2   I'm going to write it down.

3       Q.   But if there's no requirement to write

4   that kind of thing down, then how does the

5   department ensure that a prosecutor or a

6   criminal defense attorney litigating that case

7   two years from then would know that there was

8   another suspect?

9       A.   I understand what you're saying.  But

10  in the course of an investigation, a detective

11  may talk to 10, 20, 30 different people who are

12  offering something and most of the time they

13  write it down.

14          But the General Progress Report

15  is designed to facilitate and memorialize

16  notetaking, but it's not an absolute

17  requirement.

18      Q.   Wouldn't you agree that that can

19  create major gaps in the preservation of

20  pertinent information?

21          MR. PATTERSON:  Objection.

22          MS. KEEN:  Sorry.

23  BY MS. KEEN:

24      Q.   For there not to be a requirement to

 1  write pertinent information down into a police

 2  report?

 3          MR. PATTERSON:  Objection, form.

 4          THE WITNESS:  Their obligation is to

 5  include that pertinent information in an

 6  official supplementary report.

 7  BY MS. KEEN:

 8      Q.   Because I thought you just were saying

 9  that there's no obligation to put that

10  information in a supplementary report?

11      A.   In their official supplementary

12  report, there is an obligation to include

13  pertinent information.

14      Q.   So, then let me just try to take a

15  step back and re-ask.

16      A.   Sure.

17      Q.   Detective A is working on an arson and

18  he's interviewing a suspect and the suspect

19  says something to him that potentially

20  inculpates her and connects her with a fire

21  that Detective B is investigating.

22              What obligation, if any, is there

23  subsequent to the issuance of Special Order

24  83-1 for Detective A to relay that information

 1    about that suspect's statement to Detective B?

 2              MR. PATTERSON:  Objection, incomplete

 3    hypothetical.

 4              MS. McANDREW:  Object to form.

 5    BY MS. KEEN:

 6        Q.    Are there any other facts that you

 7    would need from me to be able to answer that

 8    question?

 9        A.    I sort of get it.

10              To inform the assigned detective,

11    whether it be through his supervisor or somehow

12    pass the information on.

13        Q.    What requirement, if any, does

14    Detective B have to write that information down

15    in a document that becomes part of the official

16    Records Division file for Detective B's

17    investigation?

18              MR. PATTERSON:  Objection, form.

19              THE WITNESS:  The information, if

20    pertinent, if relevant, should be included in

21    an official report.  The official report is the

22    supplementary report.

23              The means by which the

24    information comes from you to me and is

1    eventually placed into the report can vary.

2    And honestly there is nothing to preclude

3    Detective A from creating a supplementary

4    report on Detective B's case.

5        **Q.   I'm asking specifically in this**

6    **question about Detective B's obligation.  It**

7    **sounds like Detective B was required to put**

8    **that information into a supplementary report;**

9    **is that correct?**

10            MR. PATTERSON:  Objection;

11   mischaracterizes the testimony.

12            MS. McANDREW:  Object to form.

13            THE WITNESS:  I believe I answered

14   that as a yes.  If it's relevant and it's

15   pertinent and certainly if it has to do with

16   the guilt or innocence of someone, I would

17   expect it to appear in the final report.

18   BY MS. KEEN:

19       **Q.   Was it required to go in the final**

20   **report under Special 83-1 or any of its**

21   **iterations?**

22       **A.   Not if I discounted it.**

23       **Q.   What if you were wrong when you**

24   **discounted it, doesn't the criminal defense**

1    attorney get to know about that person?

2            MR. PATTERSON:  Objection, form,

3    speculation.

4            THE WITNESS:  Detective B is doing the

5    best job a person can in having talked to

6    multiple people.  I find some people more

7    credible than others.  Not every conversation

8    is memorialized.  It's simply not.

9    BY MS. KEEN:

10      Q.   So, if Detective B heard that a woman

11   had made statements to the affect that she may

12   have committed the crime that Detective B is

13   investigating, but he discounted it, to use

14   your word, her involvement in the crime he was

15   investigating, would he have to put her name or

16   anything about her statements into a

17   supplementary report?

18            MR. PATTERSON:  Objection, form,

19   incomplete hypothetical.

20            THE WITNESS:  No.

21   BY MS. KEEN:

22      Q.   I have a few quick questions about

23   retention schedule.

24            MR. PATTERSON:  Could we take a quick

1   break?

2                              (WHEREUPON, a short break was

3                        taken.)

4   BY MS. KEEN:

5        Q.   Retention schedules, in 1984, in an

6   area, if an area detective closed/cleared a

7   case as noncriminal, how long would that

8   investigative file for that case exist for

9   before it got purged?

10       A.   One year.

11       Q.   And then how does it get purged, it

12  gets thrown in the garbage or sent to somebody

13  for purging?

14       A.   I know our Records Division has a

15  contract with our records disposal company.  I

16  honestly don't know how the individual area

17  does it.  I don't know if they send it downtown

18  for destruction or not.

19       Q.   Okay.  So, there was a -- I mean, I

20  don't know how familiar you are with the facts

21  of this case.  But very briefly, there were two

22  fires that happened in '84.  One on Marshfield

23  and one on Hermitage.

24

1          On Hermitage there was some

2    investigation done in '84 by some Bomb & Arson

3    folks and then work done by Area 3 folks.

4         **A.   Okay.**

5         **Q.   The Area 3 folks in '84 closed/cleared**

6    **the case as accidental.**

7               **So, under those set of facts as**

8    **I've represented them to you, would you expect**

9    **that we would no longer have today a copy of**

10   **the investigative file from the work that the**

11   **'84 Area 3 detectives had done on that case?**

12          MS. McANDREW:  Objection, misstates

13   the facts in the record.

14          MR. PATTERSON:  Same.

15          THE WITNESS:  It should have been

16   purged according to the retention schedule.

17   BY MS. KEEN:

18        **Q.   If an area file -- now, I'm not**

19   **talking specifically about this case.  I'm just**

20   **asking how the schedule worked.**

21              **So, if there was an area**

22   **investigative file opened regarding a possible**

23   **crime and that file was closed/cleared as**

24   **criminal, and the word closed and the word**

 1  cleared have the definitions you gave to those

 2  terms on Tuesday, then where would that file go

 3  once the case had been closed/cleared?

 4          MR. PATTERSON:  Objection, incomplete

 5  hypothetical.

 6  BY MS. KEEN:

 7      Q.   What other facts do you need to know

 8  to answer that question, if any?

 9      A.   If it's a misdemeanor versus a felony.

10      Q.   Okay.  Let's talk felony.

11      A.   It would be three years for felonies.

12      Q.   Okay.  Now, what if the case was

13  closed/cleared as a homicide?

14      A.   It would be Permanent Retention.

15      Q.   Okay.  Who's responsible for retaining

16  that investigative file from the area?

17      A.   It depends at this time on the status

18  of the case.  The investigative file would

19  remain in the detective area until the case was

20  resolved in court.

21              And that's a rather vague term

22  because I wasn't thinking of appeals and so on

23  and so forth.

24              When the case is finished in

 1    court, the area is supposed to send that

 2    investigative file to the Records Division for

 3    these homicide cases for Permanent Retention.

 4         Q.   And where does it say finished in

 5    court?  I didn't see that language.

 6         A.   Roman Numeral VI, G, Cleared/Closed

 7    Homicides:  Until final court disposition.

 8         Q.   Okay.  Would you intend that to mean

 9    either a conviction or acquittal at the

10    criminal trial level?

11         A.   Yes.

12         Q.   Was that how you explained it in your

13    training on the subject?

14         A.   Yes.

15         Q.   Something you forgot to add or no?

16         A.   No.

17         Q.   All right.  Now, let's say

18    Bomb & Arson, 1984, Bomb & Arson opens an

19    investigative file regarding an arson

20    investigation it's doing.  It doesn't close the

21    investigation.  It's still open.

22              How long would the file for that

23    open investigation have stayed in Bomb & Arson?

24              MR. PATTERSON:  Objection, foundation.

1          MS. KEEN:  Is there something about

2    the question that you believe lacks foundation,

3    or are you saying this witness doesn't have

4    foundation?

5          MR. PATTERSON:  The question.  I

6    think -- I mean, you can go through the same, I

7    guess.  You know, there's either -- well, I'm

8    sorry.  Read back the question.  Maybe I got it

9    wrong.

10                    (WHEREUPON, said Record was read as

11                     requested.)

12          MR. PATTERSON:  I withdraw the

13   objection.

14          THE WITNESS:  The case that you are

15   describing is a suspended incident.  There's

16   been no resolution of the investigation.

17              If it was a misdemeanor, it would

18   be 18 months; if it was a felony type of case,

19   it would be three years.  If it's a noncriminal

20   incident, it would be one year.

21   BY MS. KEEN:

22      **Q.    Why would it be treated as suspended**

23   **as opposed to open?**

24      **A.    An open case is a suspended case.**

1    Suspended means we've gone as far as we can,

2    and barring additional information, we're going

3    to suspend it.

4                    And all these suspended cases

5    are, in fact, open, you know.  They're not

6    solved.

7        Q.   But even down in I, where it says:

8    Cleared/Open Homicide:  Ten (10) years.

9        A.   Right.

10       Q.   I mean, I guess this Special Order

11   doesn't -- it talks in terms of Violent Crimes,

12   not in terms of Bomb & Arson, right?

13       A.   Correct.

14       Q.   So, what was Bomb & Arson's retention

15   schedule?  Was it what's outlined in VI or was

16   there a different one?

17       A.   There was not a different one.  But

18   you brought attention to Item I, Cleared/Open.

19   That means we resolve the case in which there

20   are multiple offenders, and at least one of the

21   people has been charged.

22                    However, an unknown second

23   offender or third offender or a named second

24   offender or third offender is still at large

1    and, therefore, the case remains open.

2              When everyone is arrested on a

3    particular case, it's closed.

4        Q.   Were areas and specialized units

5    purging precisely at the end of the time period

6    for which they were supposed to retain their

7    files?

8        A.   Precisely, probably not.

9        Q.   What was the reality in terms of when

10   things were going to be purged?

11       A.   Probably January of each year.  That's

12   been my experience in different units.  From a

13   very practical matter, they don't look at the

14   date and it's probably a calendar exercise.

15       Q.   Was that true for Bomb & Arson as

16   well?

17       A.   I don't know the individual practices.

18       Q.   But it's your understanding, just

19   based on seeing how people did it across the

20   department, that purgings at the individual

21   areas and units have been at the beginning of

22   each new year?

23       A.   I know that's what the Records

24   Division does.

1     Q.   So, then so it sounds like -- we can

2  go off the record.

3                      (WHEREUPON, a discussion was held

4                       off the Record.)

5           MS. KEEN:  Back on the record.

6  BY MS. KEEN:

7     Q.   It sounds like under no circumstance

8  were areas supposed to hold onto their

9  investigative files past ten years from the

10  date of the crime according to the retention

11  schedule in 83-2 and its duration?

12     A.   Correct.

13     Q.   Have you heard about all these file

14  cabinets being found in Area Central?

15           MR. PATTERSON:  Objection.

16  BY MS. KEEN:

17     Q.   Go ahead.

18     A.   I testified in the Fields case in

19  federal court and I did hear about them.

20     Q.   Okay.  So, were there bomb and arson

21  files that were more than ten years old that

22  had not made their way to the Records Division

23  in any part of the police department, not

24  limited to Area Central, as far as you're

1    aware?

2              MR. PATTERSON:  Objection.

3              THE WITNESS:  I have no idea.

4    BY MS. KEEN:

5       Q.   Did you review the contents of the

6    file cabinets that were found in Area Central?

7              MR. PATTERSON:  Objection.

8              THE WITNESS:  No.

9    BY MS. KEEN:

10      Q.   Who did?  Did anyone review all the

11   files?

12             MS. McANDREW:  Object to foundation.

13             THE WITNESS:  I have no idea.

14   BY MS. KEEN:

15      Q.   Were there other collections of old

16   investigative files that should have but didn't

17   make their way to Records Division besides the

18   collection of files in the Area 3 file

19   cabinets?

20             MR. PATTERSON:  Objection.

21             THE WITNESS:  I don't know.

22   BY MS. KEEN:

23      Q.   The fact that there were old

24   investigative files in Area Central is

1   **inconsistent with the retention schedule that's**

2   **laid out in 83-2 and its iterations, correct?**

3              MR. PATTERSON:  Objection.

4              MS. McANDREW:  I'm sorry.  Can you

5   repeat the question?

6                       (WHEREUPON, said Record was read

7                        as requested.)

8              MR. PATTERSON:  Objection.

9              THE WITNESS:  Yes.  But since you

10  raised the issue, one might take the

11  interpretation that the retention schedule was

12  for any and all investigative files.

13  Investigative files weren't created until 1983.

14             So, anything before that may not

15  fall under that retention schedule.  You know,

16  something from 1949, I don't know.

17  BY MS. KEEN:

18      **Q.   Do you know whether there were files**

19  **that were created after '83 but more than 10**

20  **years old in the Area Central file cabinets?**

21             MR. PATTERSON:  Objection.

22             THE WITNESS:  I have no personal

23  knowledge.

24  BY MS. KEEN:

1     Q.   Who would know that?

2     A.   I would imagine the area commander of

3 Detective Area Central.

4     Q.   At any time did the department become

5 aware that files that should have been sent to

6 Records Division weren't being sent to Records

7 Division?

8          MR. PATTERSON:  Objection.  I feel

9 like we're getting into Topic 6 or later, 7 or

10 8, and he's not qualified to talk as the

11 department --

12          If you want to ask him

13 personally, that's fine.

14          But I feel like, Roshna, we're

15 getting into 6, 7 or 8.

16          MS. KEEN:  Well, 3 and 4 talk about

17 the location, movement, and preservation of

18 files.

19          MR. PATTERSON:  Well, these Area 3

20 Bomb & Arson files.

21          MS. KEEN:  But Area 3 is part of Area

22 Central.  So, that's what I'm asking about.  I

23 mean, Area 3 became part of Area Central.  So,

24 I'm asking about -- this is retention schedule.

1   This is 4.

2              If you're saying this is not his

3   topic, then I think we have a problem.  But, I

4   mean, if you want to take another look at the

5   notice.

6              MR. PATTERSON:  No.  Go ahead.

7                   Read the question back.

8              MS. KEEN:  Yes, for all of us.

9                   (WHEREUPON, said Record was read

10                    as requested.)

11             MR. PATTERSON:  Objection as to time

12  frame.  Do you want to say post 83-1?

13             MS. KEEN:  Thank you.  Yes.

14  BY MS. KEEN:

15     **Q.    Subsequent to the rolling out of the**

16  **Special Order 83-1?**

17     **A.    A couple of years ago, I noticed the**

18  **Detective Division issued an order which allows**

19  **for the replacement of investigative files at**

20  **the areas, which is a change in the retention**

21  **period.**

22             **You know, space has always been**

23  **an issue and access is an issue.  You know,**

24  **detectives like having access to open cases,**

1 especially when a tip comes in from years gone

2 by.  So, I don't know if that's responsive to

3 your question.

4      Q.   Are you saying it was retroactively

5 applied so that area files got pulled back from

6 Records Division to Area Central?

7      A.   I don't know what they did.  I do know

8 a couple of years ago they changed the

9 retention schedule regarding the placement of

10 these files.

11      Q.   But prior to that, the retention

12 schedule that's laid out in 83-2 was in effect,

13 correct?

14      A.   You are right.

15      Q.   Where did Bomb & Arson Investigative

16 Files go -- let me re-ask the question.

17           Have you heard anything about

18 whether there's a Bomb & Arson investigative

19 file relating to the Hermitage fire at issue in

20 this case?

21      A.   I believe there is one, yes.

22      Q.   Where is it?

23      A.   I thought I saw a copy.  You know what

24 then?  I'm getting confused.  I don't know what

I've seen.

    Q.   Okay.  If there was a Bomb & Arson investigative file created regarding this fire, and the result of the investigation ultimately lead to an arrest and a conviction, where was that Bomb & Arson investigative file supposed to go after the conviction?

    A.   To the Records Division.

    Q.   And who was supposed to get it from the Bomb & Arson Unit to the Records Division?

    A.   The Bomb & Arson Unit commanding officer.

    Q.   Was there a systemic problem of area or unit files -- strike that.

        Was there a systemic problem of investigative files being maintained by an area or specialized unit not getting sent to the Records Division at any time during the '80s or '90s?

        MR. PATTERSON:  Objection, form.

        MS. McANDREW:  Join.

        THE WITNESS:  I have no personal knowledge of that.

BY MS. KEEN:

1    Q.   And you're not able to testify on

2  behalf of the department about that?

3    A.   I just have no knowledge.  I mean,

4  I've conducted no audits of the areas.

5    Q.   Are you aware of anyone who has

6  conducted any audits of the areas?

7    A.   I have not.

8                    (WHEREUPON, Deposition Exhibit

9                     No. 22 was marked for

10                     identification.)

11  BY MS. KEEN:

12    Q.   I'm going to show you a document which

13  we marked as Exhibit 22.

14                    The Bates number is

15  CPD ORIG-File 3-0008 and 0009.  This is a

16  two-page police report and it was prepared by

17  Detective Micek of the Bomb & Arson Unit in

18  March of 1984.

19                    Now, if you go to the second

20  page -- have you seen this report before?

21    A.   I don't know.  I may have.  I don't

22  know.

23    Q.   If you go to the second page under the

24  Investigation narrative, it says:

1          On March 23rd, 1984 at

2     2315 hours, there was a garage fire at 1840

3     West 46th Street, RD No.  F105358.

4               Do you see that?

5          A.   Yes, I do.

6          Q.   It also states, and I'm summarizing

7     here, that there was a fire on March 24th at

8     4454 South Hermitage in which there were six

9     fatalities as a result of the fire, correct?

10         A.   Yes.

11         Q.   Finally it states that there was a

12    third fire at 4504 South Marshfield, correct?

13         A.   Yes.

14         Q.   It notes that these two fires

15    referring probably to the Hermitage and

16    Marshfield fires, the last two fires listed in

17    the narrative, are within a few blocks of one

18    another.  Do you see that?

19         A.   I do.

20         Q.   The report then goes on to describe a

21    conversation that the detective had with a

22    woman named Isabel Ramos.  Okay?

23         A.   Okay.

24         Q.   And in the report, it states that --

1    if you look at the last couple sentences of

2    that huge paragraph, it states, "Because she

3    had been drinking for several hours, she stated

4    that she did not remember anything after seeing

5    her building burn down, except that she was

6    walking around a lot and somehow ended up at

7    her aunt's apartment at 4640 South Marshfield.

8            At this time she did not remember

9    setting any other fires other than the one in

10   her apartment, but she said she may have set

11   some after viewing her burned down building.

12           Because of her intoxicated

13   condition, she does not remember what happened

14   after finding her building burned down."

15           Did existing police department

16   policy require a copy of this supplementary

17   report to be placed in the official Records

18   Division police file for the 4454 South

19   Hermitage fire?

20        MR. PATTERSON:  I don't want to

21   object.  That's a fine question.  But I would

22   just ask that he be given an opportunity to

23   read the entire narrative before he answers

24   that question.

1              MS. KEEN:  Of course.

2              THE WITNESS:  No.

3    BY MS. KEEN:

4        Q.    Why not?

5        A.    Because this report is for RD No. F,

6    as in Frank, 104537, for the incident which

7    occurred.  I don't know the address here.

8        Q.    4504 South Marshfield.

9        A.    Thank you.

10       Q.    If you accept my premise, you don't

11   have to, but just for purposes of this

12   question, if you accept my premise that

13   information contained in this report was

14   relevant to solving the 4454 South Hermitage

15   investigation, would that change your answer

16   about whether a copy of this report had to go

17   in the Hermitage Records Division file?

18             MR. PATTERSON:  Objection.

19             MS. McANDREW:  Object to form.

20             THE WITNESS:  No, it does not.

21   BY MS. KEEN:

22       Q.    So, the way that things got filed was

23   based on the RD number, not based on the

24   content of the report, correct?

1      A.   Correct.

2      Q.   How did information get to a

3 prosecutor for a particular criminal

4 investigation after 83-1 was issued?

5      A.   The request for information lands in

6 the Records Division, Subpoena Processing Unit,

7 or the Subpoena Service Unit.  The members of

8 the Records Division assigned to that unit read

9 the request for information.  They make copies,

10 as many copies as they think are needed to be

11 sent to the various units of the police

12 department.

13      Q.   Copies of the subpoena?

14      A.   Copies of the subpoena, which may have

15 file information or case information under this

16 RD number, the subject RD number.

17      Q.   How does the RD get on -- I mean, what

18 if the prosecutor doesn't know the RD number,

19 so, therefore, it's not on the subpoena?

20      A.   They know it.

21      Q.   The prosecutor knows it?

22      A.   Yes.

23      Q.   And why are you so confident about

24 that?

1       A.   Because for every criminal case that

2  someone is arrested, there is an RD number.

3       Q.   And because the state's attorneys do

4  this all the time, they know that there's an RD

5  number for every criminal investigation?

6       A.   Right.

7       Q.   And this is true in the '80s and the

8  '90s?

9       A.   Correct.

10      Q.   So, the prosecutor puts the RD number

11  on the subpoena, correct?

12      A.   Yes.

13      Q.   And who does the subpoena processing

14  unit send the subpoenaed copies to?

15      A.   Depending upon what is requested, if

16  the subpoena requests for crime scene

17  photographs, they'll send it to the Crime

18  Laboratory, attention to the Photography Unit;

19  or if it's a request for DUI records, they'll

20  send it to the Traffic Division Records Unit.

21      Q.   What if it asks for any and all police

22  reports and witness statements?

23        MS. McANDREW:  Objection, incomplete

24  hypothetical.

1          THE WITNESS:  We go to a subunit of

2     the Records Division.  They would pull the

3     Records Division report, the original and any

4     supplementaries that are on file.

5               They would look to see if any

6     arrest reports were submitted, and they would

7     get a copy from the identification section of

8     the Records Division.

9               For this type of case, they would

10    also send a copy of the subpoena to the

11    investigative unit.

12    BY MS. KEEN:

13        Q.    That's what I was going to ask you.

14               What was the policy of the

15    Subpoenaing Processing Unit for when to send,

16    if at all, a copy of the subpoena to the area

17    or specialized unit working on the case?

18        A.    They would look at the type of case.

19    If it's a Bomb & Arson case, they would send it

20    to Bomb & Arson.  If it's an investigative file

21    from the area, they would send it to the area.

22        Q.    How would the Subpoena Processing Unit

23    know who to send to it to?

24        A.    From reading and interpreting the

1    subpoena.

2         Q.    Can you be more specific?

3         A.    When a subpoena comes in for any and

4    all reports generated under RD number blank,

5    blank, then the subpoena processing member will

6    make copies and send them to those units they

7    think are likely to have reports.

8         Q.    Would the Subpoena Processing Unit

9    simply make a copy of the Records Division file

10   for that RD number and not send it to the

11   investigative unit?

12        A.    Not at this time.  After '83, they

13   were sending it to the investigative unit on a

14   routine basis.

15        Q.    How do you know that?  Was that

16   pursuant to a policy?

17        A.    I worked in the Records Division, and

18   I supervised the Subpoena Processing Unit.  So,

19   I was aware of their practices.

20        Q.    If it was a homicide -- and this case,

21   for example, involved a fire that caused the

22   deaths of six people.

23              So, if the request was for any

24   and all police reports regarding this crime

1    under that RD number, do you know one way or

2    the other with any certainty whether the

3    Subpoena Processing Unit would have sent a copy

4    of the subpoena to the area or the Bomb & Arson

5    Unit?

6           MR. PATTERSON:  Objection, form.

7    BY MS. KEEN:

8        Q.   I guess what I'm asking is in a case

9    like this where it's a homicide, also treated

10    as an arson, how would the Subpoena Processing

11    Unit have processed a request for information

12    from the prosecutor?

13        A.   It's not a science.  It's an art.  And

14    these are working -- these are people who have

15    working relationships with the file clerks in

16    all the units.  And they would send a copy to

17    those units requesting, if they have

18    information.  And they also kept a record of

19    the places or the units that they sent this

20    request to.

21        Q.   What's the retention schedule on that

22    record?

23        A.   I don't know.  In this particular,

24    era, it was a handwritten record.  Today -- not

1    today.  In 2006, it was an automated electronic

2    application.

3         Q.   Okay.

4         A.   But it's a large ledger book.

5         Q.   What it's called?

6         A.   Processing -- subpoena -- the subpoena

7    book.

8         Q.   Okay.  Like a log book?

9         A.   It's a log book.  The date it was

10   received, who requested it, the units to which

11   the information was -- request for information

12   was sent, and more importantly, the date that

13   it's due in the branch court.

14        Q.   Is it possible that in this case, the

15   Subpoena Processing Unit would have sent a

16   request for information to Area 3 Violent

17   Crimes, but not to Bomb & Arson?

18        A.   It's possible.

19        Q.   Do you know one way or the other what

20   happened in this case?

21        A.   I do not.

22        Q.   Other than through the Subpoena

23   Processing Unit, were there any other

24   interfaces between the police department and

1  the prosecutor in terms of sharing information

2  relating to a criminal case?

3          MS. McANDREW:  Object to form.

4          MR. PATTERSON:  Same.

5  BY MS. KEEN:

6      Q.   Go ahead.

7      A.   In the event that a prosecutor or

8  defense attorney receives information and they

9  believe there is something missing or whatnot,

10 they could pick up the phone and ask, that

11 might be an additional form of communication.

12                  (WHEREUPON, Deposition Exhibit

13                   No. 23 was marked for

14                   identification.)

15 BY MS. KEEN:

16     Q.   Okay.  I just want to mark something

17 for the record just because we had talked about

18 it yesterday.  It's CITY-KLUP 2969 through

19 2974.

20          This is what we were talking

21 about yesterday, sir.  I marked it as Exhibit

22 No. 23.

23          What is that document, and when

24 did you create it?

1      A.   This document was created when I did

2  site surveys of the various areas.  It is

3  related to Exhibit No. 8.  It probably was an

4  attachment to Exhibit No. 8.

5      Q.   What were the collection of documents

6  that you were listing for each area in that

7  exhibit?

8      A.   I was trying to make the point or

9  trying to establish the fact that there were,

10  in fact, miscellaneous documents in what was

11  then called running files or street files under

12  an RD number, and I pulled examples from

13  various areas.

14      Q.   Sorry.  I don't think I understand.

15           So, you're saying that you were

16  trying to show that there were documents in the

17  working files that had RD numbers on them?

18      A.   That were not supplementary reports.

19  These are documents.  These are notes that were

20  not supplementary reports.

21      Q.   Were the documents that you listed in

22  that exhibit not in the Records Division file

23  for those specific RD numbers?

24      A.   Correct.

1              (WHEREUPON, Deposition Exhibit

2                 No. 24 was marked for

3                 identification.)

4

5    BY MS. KEEN:

6       Q.   Okay.  This is Exhibit No. 24.  I'm

7    also really just trying to make sure I get it

8    quickly authenticated by you before we move on,

9    if you're able to.

10             This is CITY-KLUP 3032 through

11   3036.  What is this document?

12      A.   I don't know.  It might be part of the

13   1988 Detective Division SOP manual.  I would

14   have to look at that manual to see if it is.

15      Q.   Do you see on the front page it says

16   Goals & Objectives?  Does that help you out at

17   all?

18      A.   Not at all.

19      Q.   Okay.  So, you don't know what this

20   is.

21             (WHEREUPON, Deposition Exhibit

22                 No. 25 was marked for

23                 identification.)

24   BY MS. KEEN:

1      Q.   So, this is Exhibit 25.  It's

2  CITY-KLUP 2955.  Take your time and look at

3  this.

4      A.   I am prepared to respond.

5      Q.   Okay.  What is this document?

6      A.   This is an interoffice communication

7  document.  It used to be a form set.  Again,

8  pre-photocopy era.

9             This is a document from the

10  Director of Research and Development to the

11  Commanding Officer of the Office of Legal

12  Affairs of the Chicago Police Department.

13      Q.   Was an answer provided?

14      A.   I don't know if an answer was

15  provided.

16      Q.   This document reflecting these

17  questions was prepared after 82-2 came out,

18  correct?

19      A.   Correct.

20      Q.   How is it that the Research and

21  Development Division Director came up with this

22  set of questions?

23      A.   You're asking me how is it?

24      Q.   Yes.  Were these questions that

1    reflected things that various members of the

2    department wanted to know, questions that had

3    been percolating in the meetings?

4        A.   I met with the author of this memo a

5    couple of times, and I'm sure there were

6    conversations that he had with myself and

7    others that caused him to want a legal opinion.

8        Q.   Okay.  And you don't know if an answer

9    was provided?

10       A.   I do not.

11       Q.   Did you attempt to address these

12   topics -- or answer these topics one way or the

13   other in the subsequent special orders that you

14   drafted numbered 83-1 and the various

15   iterations of that?

16           MS. McANDREW:  Object to form.

17           MR. PATTERSON:  Same.

18           THE WITNESS:  I don't think these

19   topics were specifically addressed in the

20   Detective Division Special Order that I helped

21   draft.

22   BY MS. KEEN:

23       Q.   I just have a quick question going

24   back to the Special Order 83-2 and the various

1    iterations of it.

2              That provision about one

3    detective telling another detective about

4    information relating to that second detective's

5    case, it uses the phrase assigned detective.

6              If there were multiple detectives

7    working that crime, who was the detective

8    supposed to inform?

9              MR. PATTERSON:  Objection, form.

10             MS. KEEN:  Let me rephrase it.  It's

11   pretty straightforward.

12   BY MS. KEEN:

13       Q.   If Detective A had information on a

14   crime that Detectives B, C, and D were all

15   working on, who was Detective A supposed to

16   tell to satisfy his obligations under 83-2 or

17   its iterations?

18       A.   For every reported crime, regardless

19   of how many detectives work on the case, there

20   is but one detective name and star number

21   assigned to that RD number.

22             So, administratively there's one

23   detective.  So, that Detective B would be that

24   detective assigned to investigate that RD

1    number.

2        Q.    And where would that information be

3    memorialized; in other words, the identity of

4    the assigned detective?

5        A.    Today it's in our computer system.

6    Then it was in an exceptionally large ledger

7    book that put the victim's name alphabetically

8    and the Records Division number of the case and

9    identified the assigned detective to that case.

10        Q.    Practically speaking, if a detective

11    got information that was relating to someone

12    else's case and that someone else's case had

13    multiple detectives all working that case,

14    would the first detective actually go to the

15    ledger book, look up the name of the assigned

16    detective, and only speak to that person, or

17    would he discharge his obligations under the

18    special order by telling any of the detectives

19    who had worked on that crime?

20        A.    If he didn't know who the assigned

21    detective was, he could fulfill his obligation

22    by simply informing the on-duty supervisor.

23        Q.    Okay.  What if he didn't know who was

24    the assigned detective, but he knew that Joe,

1    Jack and Matt were all working on the crime?

2                    Would it be okay under the

3    special order for him to tell any one of the

4    three guys, Joe, Jack or Matt?

5         A.    Right.

6         Q.    That would be okay?

7         A.    Sure.

8         Q.    He didn't need to make sure he was

9    relating it directly to the assigned detective?

10        A.    The information sharing seemed

11   important as part of that.

12        Q.    And in that scenario, whoever received

13   the information, whether it be Joe, Jack or

14   Matt, had to follow the order in the way we

15   talked about previously as far as memorializing

16   relevant information regardless if the

17   recipient was indeed the "assigned detective,"

18   correct?

19        A.    Correct.

20             MS. KEEN:  Can we just take a

21   two-minute break?

22                    (WHEREUPON, a short break was

23                     taken.)

24

1          (WHEREUPON, a discussion was held

2                 off the Record.)

3          MS. KEEN:  I have no questions at this

4    time.

5          MS. McANDREW:  I have no questions.

6                 EXAMINATION

7    BY MR. PATTERSON:

8      **Q.   I have a few questions for you,**

9    **Mr. Hickey.**

10               **Taking you back to the first part**

11   **of your deposition on Tuesday, you were asked a**

12   **number of questions about unsigned General**

13   **Progress Reports.  Do you have those in mind?**

14     **A.   I do.**

15     **Q.   A General Progress Report is unsigned**

16   **but ends up in the investigative file anyway,**

17   **does that document still comply with 83-1 or**

18   **83-2?**

19     **A.   Yes, it does.  The important thing is**

20   **getting that information and including it in**

21   **the investigative file.**

22     **Q.   While we're on the topic of General**

23   **Progress Reports, you've been asked a number of**

24   **questions today about what needs to be**

1    memorialized and where it needs to be

2    memorialized.

3              Do you have those questions in

4    mind?

5         A.   I do.

6         Q.   My question to you is, first, are

7    detectives post 83-1 required to memorialize

8    all investigative activity on a General

9    Progress Report?

10        A.   No.

11        Q.   If a detective post 83-1 memorializes

12   investigative activity on any piece of paper,

13   and that piece of paper makes its way into the

14   investigative file, has the detective satisfied

15   the dictates of 83-1 and 83-2?

16        A.   Yes.

17        Q.   You were asked a number of questions

18   today about auditing procedures post 83-1 to

19   ensure that 83-1 was being followed.

20              Do you have those questions in

21   mind?

22        A.   I do.

23        Q.   Can you take a look for me at

24   Exhibit 11.

1          MS. KEEN:  Which one is that?

2          MR. PATTERSON:  It's entitled

3    Chapter 18 Investigative Files.

4    BY MR. PATTERSON:

5        **Q.   Do you have that in front of you,**

6    **Mr. Hickey?**

7        **A.   I do, sir.**

8        **Q.   Now, you testified in the first part**

9    **of your deposition that this document was**

10   **created in 1988, and it was given to the Chief**

11   **of Detectives at that time who was John -- and**

12   **I cannot read my handwriting.**

13       **A.   Townsend.**

14       **Q.   Thank you.  If you would turn to the**

15   **very last page of Exhibit 11 for me.**

16            **Are you there?**

17       **A.   I am there.**

18          MS. KEEN:  I'm not there.

19          MR. PATTERSON:  Sorry.

20          MS. KEEN:  That's okay.

21            Do you mind if I just stand

22   there?

23          MR. PATTERSON:  Why don't you stand

24   over my shoulder.

1    BY MR. PATTERSON:

2         Q.   Are you there, Mr. Hickey?

3         A.   I am, sir.

4         Q.   So, we're on the last page of

5    Exhibit 11.  I want to draw your attention to

6    Section 18.5, Inspection.

7              Do you see that paragraph?

8         A.   I do.

9         Q.   It reads "Exempt members of the

10   Division will conduct periodic, unscheduled

11   inspections of the files to ensure that members

12   of their command follow these procedures."

13              Do you see that?

14        A.   I do.

15        Q.   Do you know whether exempt members of

16   the Division conducted periodic unscheduled

17   inspections of the files to ensure that members

18   of their command followed those procedures post

19   the creation of this document in 1988?

20        A.   I have no personal knowledge.  They

21   were instructed to do so.  They're command

22   members of the Chicago Police Department.

23        Q.   So, is it your expectation that given

24   that they are exempt members, command members

1   of the Chicago Police Department, that they

2   would have fulfilled whatever duties they were

3   assigned?

4          A.   Yes, sir.

5          Q.   Now, you were also asked a number of

6   questions today about investigative files

7   versus -- and I can't remember what terminology

8   we were using, but I think it was copies of

9   documents that detectives would take out on the

10  streets with them.

11               Do you have those questions in

12  mind?

13         A.   I do.

14         Q.   The question I have for you is --

15  well, let me start with this.

16               The investigative file has an

17  Inventory Control Card, correct?

18         A.   It does.

19         Q.   As a detective, I can use that

20  Inventory Control Card to check out the

21  investigative file; is that right?

22         A.   Correct.

23         Q.   Do I also have the option of making

24  copies of documents that are in the

1 investigative file?

2     A.   Yes, sir.

3     Q.   If I take copies of documents in

4 investigative file out onto the street with me,

5 I take -- I do investigative activity, I take

6 notes on those copies.

7          When I return at the end of my

8 tour, if I turn my notes into my sergeant, have

9 I satisfied my obligations under 83-1 and 83-2?

10     A.   Yes, sir.

11     Q.   And if my sergeant then takes those

12 notes and places them into the investigative

13 file, has my sergeant complied with 83-1 and

14 83-2?

15     A.   Yes, he has.

16     Q.   Mr. Hickey, when you were talking

17 about the practice post 83-1 of detectives

18 having copies of documents that they took out

19 into the street with them, were you referring

20 to the practice I just described, detectives

21 making copies of documents that were in the

22 investigative file?

23          MS. KEEN:  Objection, mischaracterizes

24 his prior testimony.

1          THE WITNESS:  Yes, but I would qualify

2     it.  I think my prior response was some

3     detectives sometimes would do that.

4     BY MR. PATTERSON:

5          **Q.   You were also asked about the**

6     **retention schedule for documents.  Do you have**

7     **those questions in mind?**

8          **A.   I do.**

9          **Q.   You were asked about closed/cleared**

10    **noncriminal investigations.**

11               **Do you have that category of**

12    **investigations in mind?**

13         **A.   I do.**

14         **Q.   You testified that the retention**

15    **schedule for closed/cleared noncriminal**

16    **investigations is one year; is that correct?**

17         **A.   Yes, sir.**

18         **Q.   Is that retention schedule true for**

19    **all cases, even those resulting in death?**

20         **A.   I don't understand the question.**

21         **Q.   So, if I have a closed/cleared**

22    **noncriminal investigation that was a death**

23    **investigation, but it's closed/cleared**

24    **noncriminal, is the retention still one year**

1    for that investigative file?

2         A.   Yes, sir, it is.

3              MR. PATTERSON:  I have no further

4    questions.

5              MS. KEEN:  I have very briefly I think

6    just two questions.

7                        FURTHER EXAMINATION

8    BY MS. KEEN:

9         Q.   In the scenario that Chaka gave you

10   about detectives having their personal copies

11   of documents on which they took their own

12   notes, you're not testifying that you know one

13   way or the other whether detectives were

14   submitting those notes to their sergeants,

15   correct?

16             MS. McANDREW:  Object to form.

17             MR. PATTERSON:  Same.

18             THE WITNESS:  I have no personal

19   knowledge but they're required to submit them.

20   BY MS. KEEN:

21        Q.   Right.  Yes.

22                   You're also not saying that

23   personal copies, which is the term we came up

24   with, for the materials that detectives would

1  take with them out onto the street instead of

2  bringing the actual office investigative file

3  with them were limited to photocopies of

4  documents that they obtained from the office

5  investigative file, correct?

6          MS. McANDREW:  Objection,

7  mischaracterizes his testimony.

8          THE WITNESS:  It can be both

9  photocopies of something that they have copied

10 from the investigative file, or it could be

11 something brand-new that they generated and

12 placed on a General Progress Report hopefully.

13 BY MS. KEEN:

14     Q.   Okay.  And then the purging, I know

15 you don't know who was used to purge the

16 materials, but whose responsibility was it to

17 do the purging in each of the areas of

18 specialized units?

19     A.   The directive clearly states that the

20 Violent Crimes Unit Commanding Officer has

21 direct administrative responsibility for the

22 investigative files.  So, therefore, the

23 investigative files would be under their

24 purview.

1     **Q.   Who was the Unit Commanding Officer, a**

2  **lieutenant?**

3     **A.   A lieutenant.**

4     **Q.   And though the order speaks in terms**

5  **of Violent Crimes, was it the intent of the**

6  **order and the content of your training about**

7  **the order, that the Unit Commanding Officer of**

8  **Bomb & Arson would be responsible for purging**

9  **as well?**

10     **A.   Yes, ma'am.**

11     MS. KEEN:  Thank you.  That's all I

12  have.

13     MR. PATTERSON:  We reserve.

14           (WHEREUPON, a discussion was held

15            off the Record.)

16     MS. KEEN:  Exhibit 14 is a document,

17  Group Exhibit 14, CITY-KLUP 3148, 3161, then a

18  document that has no Bates number.  It's black,

19  and has a sticker called Miscellaneous Document

20  Repository RD Number.  Then the CITY-KLUP 3164,

21  then CITY-KLUP 3162.

22         And Mr. Hickey put these

23  documents together in order.  So, they are a

24  group exhibit, but we didn't ask him any

1    questions about them.

2              MR. PATTERSON:  Agreed.

3                        (Whereupon, the deposition was

4                         concluded at 12:01 p.m.)

5         (FURTHER DEPONENT SAITH NAUGHT.)

6                    -0-o-0-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   STATE OF ILLINOIS   )

2                          ) SS:

3   COUNTY OF C O O K  )

4           The within and foregoing deposition

5   of the aforementioned witness was taken before

6   Jamye Giamarusti, C.S.R, at the place, date and

7   time aforementioned.

8           There were present during the taking

9   of the deposition the previously named counsel.

10          The said witness was first duly sworn

11   and was then examined upon oral interrogatories;

12   the questions and answers were reported in

13   shorthand by the undersigned and transcribed

14   via computer-aided transcription.

15          The within and foregoing is a true,

16   accurate and complete record of all of the

17   questions asked of and answers made by the

18   aforementioned witness at the time and place

19   hereinabove referred to.

20          The signature of the witness was not

21   waived and the deposition was submitted

22   pursuant to Rules 207 and 211 (d) of the Rules

23   of the Supreme Court of Illinois to the

24   deponent per copy of the attached letter.

1          The undersigned is not interested in

2     the within case, nor of kin or counsel to any

3     of the parties.

4          Witness my official signature in and

5     for Cook County, Illinois on this September 2,

6     2014.

7

8

9          Jamye Giamarusti

10         C.S.R. No. 084.004183

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    C O R R E C T I O N   P A G E

2         I made the following changes for the

3    following reasons:

4    PAGE LINE  CHANGE:

5    ____ ____ _____

6              REASON: _____

7    ____ ____ _____

8              REASON: _____

9    ____ ____ _____

10             REASON: _____

11   ____ ____ _____

12             REASON: _____

13   ____ ____ _____

14             REASON: _____

15   ____ ____ _____

16             REASON: _____

17   ____ ____ _____

18             REASON: _____

19   ____ ____ _____

20             REASON: _____

21   ____ ____ _____

22             REASON:

23

24   (Signed)_____

25

26        SIEBERT & ASSOCIATES COURT REPORTERS, INC.
          (773) 851-7779 cmsreporters@comcast.net

1                    WITNESS CERTIFICATION

2

3

4              I hereby certify that I have read

5      the foregoing transcript of my deposition

6      consisting of Pages 290 through 389, inclusive.

7      Subject to the changes set forth on the

8      preceding pages, the foregoing is a true and

9      correct transcript of my deposition taken

10     on July 31, 2014.

11

12

13              (Signed) _____

14

15

16

17     SUBSCRIBED AND SWORN TO

18     Before me this _____ day of

19     _____, 2014.

20

21     _____

22     Notary Public

23

24          SIEBERT & ASSOCIATES COURT REPORTERS, INC.
              (773) 851-7779 cmsreporters@comcast.net

1        SIEBERT & ASSOCIATES COURT REPORTERS, INC.

2            3768 North Oleander Avenue

3              Chicago, IL  60634

4

5  September 2, 2014

6

7  JONES DAY, by

8  Mr. Chaka M. Patterson

9  77 West Wacker Drive

10  Chicago, Illinois 60601

11  Re:  Kluppelberg vs. The City of Chicago, et al.

12      Dep:  JAMES HICKEY

13

14  Dear Mr. Chaka Patterson:

15      The deposition testimony given on

16  July 31, 2014 in the above captioned case has

17  been transcribed, and inasmuch as signature was

18  not waived, this is to advise that the

19  deposition will be available in our office for

20  30 days for reading and signing.

21      If you choose to read and sign the

22  deposition at our offices, please call the

23  undersigned for an appointment.  Our office

24  hours are from 9:00 a.m. to 4:00 p.m., Monday

25

26      SIEBERT & ASSOCIATES COURT REPORTERS, INC.
        (773) 851-7779 cmsreporters@comcast.net

1  thru Friday.

2          If you choose to make other

3  arrangements for the reading and signing of the

4  deposition, please advise us of the

5  arrangements you have made in writing with 30

6  days from the date of this letter.

7

8          Sincerely yours,

9

10          Carol Siebert-LaMonica

11

12  CC:  Ms. Roshna Keen (Original)

13       Mr. Chaka Patterson (copy)

14       Ms. Elizabeth Ekl (copy)

15

16

17

18

19

20

21

22

23  SIEBERT & ASSOCIATES COURT REPORTERS, INC.

24    (773) 851-7779 cmsreporters@comcast.net

                    I N D E X

Witness:                         Examination

 JAMES HICKEY (pt2)


        By Ms. Keen (Cont'd)
                                    292

        By Mr. Patterson            372

        By Ms. Keen (Further)       379


                E X H I B I T S

Number                              Page


        No. 18
                                    293
        No. 19
                                    310
        No. 20
                                    314
        No. 21
                                    316
        No. 22
                                    354
        No. 23
                                    364
        No. 24
                                    366
        No. 25
                                    366

        (773) 851-7779  Fax (773) 625-7254
    SIEBERT & ASSOCIATES COURT REPORTERS, INC.

Siebert & Assocs. Court Reporters, Inc.
(773) 851-7779   cmsreporters@comcast.net