# EXHIBIT 51

2229

1                IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3  JACQUES RIVERA,                   ) No. 12 CV 4428
                             )
4          Plaintiff,       )
    vs.                      ) Chicago, Illinois
5                           )
    Rey GUEVARA, STEVE GAWRYS, DANIEL NOON,)
6  JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS, )
    PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN )
7  LEONARD, EDWARD MINGEY, RUSSELL WEINGART, ) June 18, 2018
    ESTATE OF ROCCO RINALDI, City OF CHICAGO, )
8                             )
         Defendants.      ) 9:25 o'clock a.m.
9

                    VOLUME 10 A
10               TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE JOAN B. GOTTSCHALL
11                 and a jury

12  APPEARANCES:

13  For the Plaintiff:    LOEVY & LOEVY
                    BY:  MR. JONATHAN I. LOEVY
14                      MR. STEVEN E. ART
                      MR. ANAND SWAMINATHAN
15                311 North Aberdeen Street
                3rd Floor
16                Chicago, Illinois  60607

17                MACARTHUR JUSTICE CENTER
                Northwestern University School of Law
18                BY:  Locke E. Bowman, III
                357 East Chicago Avenue
19                Chicago, Illinois 60611
                (312) 503-0844
20

21
    Court reporter:       Blanca I. Lara
22                Official Court Reporter
                219 South Dearborn Street
23                   Room 2504
                Chicago, Illinois 60604
24                 (312) 435-5895
                blanca_lara@ilnd.uscourts.gov
25

```
 1   Appearances  (continued:)

 2

 3

 4   For the Individual      THE SOTOS LAW FIRM
     Defendants:             BY:  MR. JEFFREY N. GIVEN
 5                                MR. JAMES G. SOTOS
                                  MS. CAROLINE P. GOLDEN
 6                                MR. JOSEPH M. POLICK
                                  MR. DAVID A. BRUEGGEN
 7                           550 East Devon Avenue
                             Suite 150
                             Itasca, Illinois  60143
 8

 9   For the Defendant       ROCK FUSCO & CONNELLY, LLC
     City of Chicago:        BY:  MS. EILEEN E. ROSEN
10                                MS. CATHERINE M. BARBER
                                  MS. THERESA B. CARNEY
11                           321 North Clark Street
                             Suite 2200
12                           Chicago, Illinois  60654

13

14   For the Defendant       LEINENWEBER BARONI & DAFFADA, LLC
     Guevara:                BY:  MR. THOMAS E. LEINENWEBER
15                                MR. JAMES V. DAFFADA
                             120 North LaSalle Street
16                           Suite 2000
                             Chicago, Illinois  60602

17

18

19

20

21

22

23

24

25
```

```
 1              (The following proceedings were had out of the
 2        presence of the jury in open court:)
 3          THE COURT:  On the record?
 4          THE COURT REPORTER:  Yes.
 5          THE COURT:  Starting over.
 6          Let me just say quickly because we don't have a lot of
 7   time, but I put on the record that juror Ciccarelli,
 8   C-i-c-c-a-r-e-l-l-i, told the courtroom deputy that she saw a
 9   headline about the case in the Tribune over the weekend.  Just
10   closed it up without reading it.
11          Mr. Sotos is just going on about how inflammatory it
12   was.  And Mr. Loevy added that it's exactly what happened in
13   court.  And let's not spend a lifetime on it, but is there
14   something you want to say?
15          MR. SOTOS:  I said it.
16          THE COURT:  Okay.
17          MR. SOTOS:  You know, in terms of it being exactly
18   what occurred in court, it was an inflammatory headline.
19          THE COURT:  All right.  And the other thing is, one of
20   our jurors got a sprained ankle over the weekend and is here,
21   but will be slow coming in and going out.  Okay?
22          Anything anyone needs to pick up with me in the next
23   five minutes?
24          MR. LOEVY:  Not for the first witness, Your Honor.
25          MR. SOTOS:  Not for the first witness either.
```

09:25:45

09:26:10

09:26:27

09:26:35

09:26:51

```
 1              THE COURT:  Well, we got nothing over the weekend.  So
 2    when you say "not for the first witness" what does that mean?
 3              MR. LOEVY:  Well, Your Honor, we have a short motion
 4    that we're going to file.  We haven't given to the other side.
 5    We haven't given it to them, so ....
 6              THE COURT:  So is this something I'm going to decide
 7    in a hurry at some point today?
 8              MR. LOEVY:  Well, before tomorrow.
 9              THE COURT:  Oh.  Okay.
10              MR. SOTOS:  We have one of those, too.
11              THE COURT:  All right.  So I'm going to have it at
12    tonight?
13              MR. SOTOS:  Yes.  For sure.
14              THE COURT:  Okay.
15              MR. SOTOS:  It's just practically done.
16              THE COURT:  Okay.  As long as, you know, I don't have
17    to do it in five minutes over the break.
18              Okay.  So let me leave you alone.  I'll just wait.
19    I'm not going to go back there.
20              MR. SOTOS:  Oh, Judge, there is one other issue.
21    Maybe I can bring it up now since we have a few minutes.
22              I would just ask the Court to caution plaintiff.  When
23    he had damages witness on the stand, there was a bit of like an
24    embrace afterwards between him and his daughter.  And we would
25    just ask that that be reserved for outside the presence of the
```

09:27:06 (line 5)
09:27:13 (line 10)
09:27:24 (line 15)
09:27:54 (line 20)
09:28:09 (line 25)

```
 1   jury, those kind of public displays of affection during trial.
 2              THE COURT:  Right.  I think that would be a good idea.
 3              MR. LOEVY:  Okay, Your Honor.
 4              MR. SOTOS:  Thank you.
 5              (Brief pause).
 6              COURT SECURITY OFFICER:  Everybody is here.
 7              THE COURT:  Everybody is here.  Tell me when you want
 8   to get started.
 9              MR. LOEVY:  We're ready.
10              Is Mr. Brasfield here?
11              MR. SWAMINATHAN:  Yes.  He's outside.  I'll go get
12   him.
13              MR. LOEVY:  Anand, why don't you finish what you're
14   doing and someone else can ....
15              (Brief pause).
16              THE WITNESS:  Your Honor.  Good morning.
17              THE COURT:  Shall we start or do you want to break?
18              MR. LOEVY:  Thirty seconds?
19              THE COURT:  Sure.  Sure.
20              (Brief pause).
21              COURT SECURITY OFFICER:  Ready, Your Honor?
22              THE COURT:  Not quite.  Very soon.
23              (Brief pause).
24              THE COURT:  Now is it time?
25              MR. LOEVY:  We're ready.
```

09:28:22  (line 5)
09:28:34  (line 10)
09:29:13  (line 15)
09:29:50  (line 20)
09:32:51  (line 25)

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 7 of 225 PageID #:42895
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2234

|         |    |                                                                        |
|---------|----|------------------------------------------------------------------------|
|         | 1  | THE COURT:  Okay.  Yes.                                                 |
|         | 2  | COURT SECURITY OFFICER:  All rise.                                      |
|         | 3  | (The following proceedings were had in the                             |
|         | 4  | presence of the jury in open court:)                                    |
| 09:33:11| 5  | THE COURT:  Would you be more comfortable not climbing                  |
|         | 6  | into that jury box?                                                     |
|         | 7  | JUROR CICCARELLI:  Actually, I'm okay.                                  |
|         | 8  | THE COURT:  Okay.                                                       |
|         | 9  | JUROR CICCARELLI:  I just realized how short I am.                      |
| 09:33:29| 10 | (Brief pause).                                                          |
|         | 11 | THE COURT:  Good morning, ladies and gentlemen.                        |
|         | 12 | Please be seated.                                                       |
|         | 13 | Mr. Loevy, whenever you're ready.                                       |
|         | 14 | MR. LOEVY:  Thank you, Your Honor.                                      |
| 09:33:41| 15 | MICHAEL BRASFIELD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN               |
|         | 16 | DIRECT EXAMINATION (resumed)                                            |
|         | 17 | BY MR. LOEVY:                                                           |
|         | 18 | Q.  Mr. Brasfield, good morning.                                        |
|         | 19 | A.  Good morning.                                                       |
| 09:33:45| 20 | Q.  One of the subjects that you mentioned last week was               |
|         | 21 | detectives taking notes when they talked to witnesses like              |
|         | 22 | eyewitnesses.  And I think you gave us some perspective on              |
|         | 23 | whether those notes are supposed to be in the file or not               |
|         | 24 | supposed to be in the file.  Which is the answer?                       |
| 09:33:58| 25 | A.  The notes are supposed to be transcribed into the GPRs.            |

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 8 of 225 PageID #:42896
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2235

1    Q.  Give the jury a little more context for what kind of notes

2    homicide detectives are supposed to take when they talk to

3    eyewitnesses and get their accounts.

4    A.  They should include the date, time, location, individuals

5    present, the identity of the individual being interviewed, and

6    the synopsis, if you ill, a Reader's Digest version of what was

7    discussed.

8         In the case of a witness that was of significant

9    importance to an investigation, such as an eyewitness, victim,

10   whatever.  For an, assault, obviously, not homicide, but you

11   would expect a written signed statement.

12   Q.  And what kinds of details would that include?

13   A.  That would include everything from the position of, in a

14   case of a witness, their location relative to what they

15   observed, any description of clothing, the time of day or

16   night, lighting conditions, whether they knew or had been

17   acquainted or had seen in the past the individual that they

18   were -- had said to be observed.

19   Q.  How about their level of certainty if it's an eyewitness

20   situation?

21   A.  That would also be an important factor to include.  You

22   would want to know, "Now you say that this is the person you

23   saw, you've given me the description, do you feel quite

24   confident that you'd be able to identify this person in the

25   future if you were to see them again?"  Or if not confident,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 9 of 225 PageID #:42897
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2236

1   what their level of confidence was.

2        You would probably -- not "probably," you should also

3   take note of any indication that the detective observed that

4   might affect the reliability of the witness, that could include

09:36:20   5   whether they wore eyeglasses, their age, how well they're able

6   to articulate what they observed, that type of thing.

7   Q.  Now, each time an eyewitness is re-interviewed or speaks to

8   the police again, do you need to make notes again or is it

9   sufficient to rely on the first notes?

09:36:39   10   A.  No -- (coughing).  Pardon me.  I'm sorry.

11        No, it's important to continue taking notes.  There

12   may be -- and, again, I think I testified to it on Friday --

13   you never know during the course of an investigation what will

14   be important later.

09:36:52   15        So if you're re-interviewing a witness, you want to

16   make sure that if there is any change, or alteration, or

17   addition, or subtraction to what you had learned earlier from

18   that witness, you want to make notes of that.

19        And if they add something that they may have seen the

09:37:16   20   suspect subsequent to the last time they were interviewed,

21   whether they remembered something else about the individual or

22   whatever it was that was different than the first time.

23   Q.  And all that should be memorialized?

24   A.  Yes, it should.

09:37:33   25   Q.  How about if there is an identification procedure, either

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 10 of 225 PageID #:42898
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2237

1  photographs or otherwise, and the person makes an

2  identification, are those details supposed to be materialized?

3  A.  Yes, they are.  Whether it is a photographic lineup, a

4  montage, gang book, whatever, or a more formalized physical

09:37:52  5  lineup in person, the information should be memorialized as to

6  who was there, who conducted it, who was with the witness that

7  was observing the lineup, or picking photos out of a photo

8  array, whatever.

9  Q.  All right.  And leaving aside this case but talking

09:38:14  10  systemically on all the files that you looked at, did the City

11  of Chicago's investigators do a good job of complying with the

12  standard for the kinds of memorialization you've been talking

13  about?

14  A.  I would have to characterize, based on the files that I

09:38:29  15  have reviewed over a number of cases, including this one, that

16  they were very lackadaisical.

17       There would be sometimes some information about who

18  was present, but the nuts and bolts of what you would expect to

19  be in that were not there.

09:38:48  20  Q.  Did that deviate from the standard that you observed in

21  other departments and all the work you described yesterday on a

22  national level?

23       MS. ROSEN:  Objection, Judge.  This is beyond the

24  scope of the 26(a) disclosures.

09:39:00  25       THE COURT:  Is this subject -- I would like the report

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 11 of 225 PageID #:42899
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2238

1   if I need to.

2          MR. LOEVY:  I mean, it's really the whole gist of his

3   whole report of how Chicago didn't meet up to the national

4   standards.

5          THE COURT:  Well, this is the subject about taking

6   notes and keeping notes?

7          MR. LOEVY:  Yes.

8          THE COURT:  Does somebody have the disclosure that you

9   can hand to me or do I need to get it?

10         MR. LOEVY:  I can hand one to you, Your Honor.

11         (Document tendered to the Court.)

12         MR. LOEVY:  Your Honor, I guess it's like maybe 58

13   referred to --

14         THE COURT:  Well, let me see.  Where is the disclosed

15   according to the plaintiff?

16         MR. LOEVY:  I gave it to you.

17         THE COURT:  Oh, I'm sorry.

18         MR. LOEVY:  No, it's our fault, Your Honor.  It's all

19   the cases, which is basically the second half of it.

20         MS. ROSEN:  Well --

21         THE COURT:  Hold on.  Hold on.

22         Hand this back to counsel so he can direct me to the

23   page so we can move this along.

24         THE LAW CLERK:  Yes.

25         MR. SWAMINATHAN:  Let me do it this way.  We'll give

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 12 of 225 PageID #:42900
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2239

1   you this which lists all the cases they aren't turning over

2   notes.

3         MS. ROSEN:  Well, Judge, this is a different issue,

4   all the cases they're talking about right now about not turning

09:40:02   5   over notes.  What he's talking about just right now is the

6   quality of the notes --

7         THE COURT:  Let me see it and then we'll talk about

8   it.

9         (Document tendered to the Court.)

09:40:28   10         THE COURT:  Thank you.  That's perfect.  Give me a

11   second.

12         (Brief pause).

13         THE COURT:  Okay.  Let me see counsel at the side.

14         (Proceedings heard at sidebar on the record).

09:41:00   15         THE COURT:  This is all about the files?

16         MR. SWAMINATHAN:  Are you looking at page 58?

17         THE COURT:  Yeah.

18         THE COURT REPORTER:  Mr. Swaminathan, if you're going

19   to be on the record, I'm not hearing you.

09:41:12   20         MR. SWAMINATHAN:  Yes.  Sorry.

21         So starting on page 59.

22         THE COURT:  Oh, 59?

23         MR. SWAMINATHAN:  Yes.  It starts talking about --

24         THE COURT:  Okay.  I thought it was 58 and 59.  Hold

09:41:27   25   on.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 13 of 225 PageID #:42901
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2240

1      MR. SWAMINATHAN:  Yes.

2      THE COURT:  Hold on.

3      (Brief pause).

4      THE COURT:  So what this is about is information that

09:42:00   5   was not put in the official files.

6      MR. LOEVY:  Uh-huh.

7      THE COURT:  He seems to be testifying that what he is

8   looking for was in note files.

9      MS. ROSEN:  Right.  The way I heard it, Judge, was

09:42:13  10   that even the notes that were taken were insufficient by

11   standards.  He's not saying -- he's not making the comparison

12   between what notes were in one file, or the ones in another

13   file, or the ones in the criminal defense attorney files, which

14   is the whole thrust of it.  What he is now saying is they

09:42:33  15   should've put this detail in the note, they put that detail in

16   the note, they should put that detail in the note, and that's

17   not -- he didn't make that comparison.

18      THE COURT:  I get it.  I get it.

19      MR. SWAMINATHAN:  There's a section in the report

09:42:43  20   where he specifically discloses opinions about a comparison of

21   these notes versus what's in --

22      THE COURT:  Show it to me.

23      MR. SWAMINATHAN:  That's the file, which is exactly

24   what he's talking about now.

09:42:53  25   MR. LOEVY:  That was the blue column on the chart.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 14 of 225 PageID #:42902
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2241

 1          THE COURT:  Just show me.

 2          MR. SWAMINATHAN:  All of the pertinent information --

 3          THE COURT:  Yes, it's got to be disclosed.  So telling

 4   me does not do me any good.

09:43:15
 5          MR. SWAMINATHAN:  Just to explain to you what this is,

 6   he's saying information on the notes is not in the permanent

 7   retention files.  It's not going into the reports, it's not

 8   going into the permanent retention files --

 9          THE COURT:  Well, it seems to me that if what he is

09:43:33
10   saying is that -- well, he just saw the permanent retention

11   files and it wasn't in there, is that what he's saying?

12          MR. LOEVY:  He saw both.  He saw the permanent

13   retention and the investigative files.

14          THE COURT:  So where is a critique of what's kept in

09:43:46
15   the investigative files?

16          MR. SWAMINATHAN:  That's what he's saying here, the

17   handwritten notes and so on, found in the investigative files

18   and they're not put into the retention files.

19          THE COURT:  That's not what he said.  That's not what

09:44:04
20   he said.  He said that the detectives were not recording all

21   kinds of things.

22          MR. LOEVY:  You know what it is?  It's that the murder

23   book chapters are missing -- remember yesterday he was talking

24   about the blue column?  He's saying that Chicago investigations

09:44:14
25   read like there's only one chapter, and the murder book is

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 15 of 225 PageID #:42903
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2242

1   supposed to have all chapters that goes in all difference

2   directions.  So it's limited -- he's what they memorialized is

3   not what he would expect to see.  It's less than they expect to

4   see.  One reason it's hard to show a specific thing is because

09:44:31   5   he's like saying he went through case by case, by case, and

6   he's like saying in this case they --

7           THE COURT:  Show me just one example where he's

8   critiquing the failure to record like witness interviews,

9   that's what he's talking about.

09:44:44   10           MR. SWAMINATHAN:  I'll find it.

11           (Brief pause)

12           MR. LOEVY:  I tell you what.  We've lost a lot of

13   time.  I'm ready to move on.  I appreciate that.

14           THE COURT:  Okay.

09:44:50   15           (Proceedings resumed within the hearing of the

16           jury.)

17           MR. LOEVY:  Ready, Your Honor?

18           THE COURT:  Yes.

19   BY MR. LOEVY:

09:45:16   20   Q.  Sir, you had a chance to review Mr. Wadas' file in this

21   case, correct?

22   A.  The criminal defense attorney's file during the --

23           MR. LOEVY:  Your Honor, we did not yet moved

24   Exhibit 43 into evidence, Mr. Wadas' file.  We'd like to do so

09:45:30   25   now.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 16 of 225 PageID #:42904
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2243

1     THE COURT:  Any objection?

2     MS. ROSEN:  No, Judge.

3     THE COURT:  It is received.

4     (Plaintiff's Exhibit No. 43 was received in

09:45:35   5     evidence.)

6  BY MR. LOEVY:

7  Q.  And you also had the copy of what we've been calling the

8  investigative file.  This is Plaintiff's Exhibit 19, which is

9  also in evidence, correct?

09:45:41   10  A.  That's the one referred to as Wronkowski 1 to 69?

11  Q.  Exactly.

12  A.  Yes.

13  Q.  And what's your understanding of where the investigative

14  file turned up and how?

09:45:51   15  A.  That it was eventually discovered or provided after, long

16  after the criminal prosecution and conviction and during the

17  course of civil litigation, as I recall.

18  Q.  And is it your understanding that in both the Jacques

19  Rivera case and in others, that there were documents in the

09:46:10   20  investigative file that were not in the criminal defense file?

21  A.  That's my experience with the material I've reviewed over

22  the years.

23  Q.  In fact, you've reviewed a lot of cases and found similar

24  results, correct?

09:46:21   25  A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 17 of 225 PageID #:42905
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2244

1   Q.  All right.  I'd like to show you a copy of Plaintiff's

2   Exhibit 269.

3          And your exercise in this case was to do a comparison

4   between what was in the criminal defense file and what was

09:46:39   5   available at the police department either because they found it

6   in the basement, or on the pallet, or in the file cabinets,

7   right?

8   A.  That's correct.

9   Q.  So what is Plaintiff's Exhibit 269?

09:46:46  10   A.  This would be the investigative file as I recall -- or

11   excuse me, what I'm referring to as --

12   Q.  And I want to focus your attention on the subset of pages

13   that are missing from --

14          MS. ROSEN:  Can he identify that?  He didn't identify

09:47:08  15   what Plaintiff's Exhibit 269 is.

16          MR. LOEVY:  He might not know what Plaintiff's Exhibit

17   269 is.

18          MS. ROSEN:  Would you identify it?

19          MR. LOEVY:  Yeah.

09:47:12  20   BY MR. LOEVY:

21   Q.  Plaintiffs 269 were the pages that were in the

22   investigative file that were not in Mr. Wadas' file or the

23   permanent retention file?

24   A.  Yes, I understand.  This is the -- normally I've seen it as

09:47:26  25   a whole complete set.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 18 of 225 PageID #:42906
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2245

1  Q.  Right.  So this is a subset that was created that you were

2  not part of creating?

3  A.  That's correct.

4  Q.  All right.  Now, you were not -- in this case and others,

09:47:36  5  is every page that didn't make it into Mr. Wadas' file

6  important or the kind of thing that would've been a

7  constitutional problem?

8  A.  Not necessarily --

9         MS. ROSEN:  Objection.

09:47:47  10        THE COURT:  What's the objection?

11        MS. ROSEN:  Judge, I think this is going to what you

12  barred --

13        THE COURT:  Overruled.

14        MS. ROSEN:  -- if I heard the question correctly.

09:47:58  15        THE COURT:  Overruled.  Overruled.

16  BY THE WITNESS:

17  A.  Not necessarily.  Although, it is still my position in

18  investigations that everything should be turned over.

19  BY MR. LOEVY:

09:48:09  20  Q.  All right.  But in this case and others, some of the

21  documents that didn't get turned over are relatively benign,

22  correct?

23  A.  That's correct.

24  Q.  I'm going to show you Plaintiff's Exhibit 268, which is a

09:48:20  25  subset of the subset.  All right.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 19 of 225 PageID #:42907
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2246

                 1       These are documents that were not turned over to

                 2   Mr. Wadas, didn't make it into his file that may or may not

                 3   have had significance.  And this is page 2.

                 4       MR. LOEVY:  If we could have the Elmo, please.

09:48:33         5   BY THE WITNESS:

                 6   A.  I'm sorry?

                 7   BY MR. LOEVY:

                 8   Q.  I'm going to just put these in the Elmo and just ask you to

                 9   identify them.  I'm not going to ask you to comment on them or

09:48:43        10   give an opinion about whether or not they're exculpatory, but I

                11   just want to identify them.

                12   A.  Okay.  I hope they're a little dryer than this set.

                13   Q.  Yes.  Sorry about that.  I spilled on them.

                14       MS. ROSEN:  Do you have a copy for me?

09:48:56        15       MR. LOEVY:  Yes.

                16       (Said item tendered.)

                17   BY MR. LOEVY:

                18   Q.  All right.  Can you identify page 2 of 268?

                19   A.  Yes, this is a Chicago Police Department investigative file

09:49:09        20   inventory form.  It was the first of two pages, I believe.

                21   Q.  All right.  And were inventory forms the kinds of documents

                22   that you found missing in all the other files you reviewed,

                23   too?

                24   A.  In most of my files.

09:49:26        25   Q.  Do you remember the number?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 20 of 225 PageID #:42908
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2247

1   A.  I don't have it right here in front of me, but I think I

2   testified to it Friday.  50% of the permanent retention files

3   didn't have inventories.

4   Q.  All right.  And then --

09:49:42   5       MS. ROSEN:  Mr. Loevy, I'm sorry to interrupt, but is

6   this 268 that you're showing him or 269?

7           MR. LOEVY:  268.

8           MS. ROSEN:  You gave me 269.

9           MR. LOEVY:  Sorry.

09:49:52   10      (Said item tendered.)

11  BY MR. LOEVY:

12  Q.  Why are inventories important to get turned over to

13  criminal defense attorneys?

14  A.  Well, in Chicago's system since there isn't this central

09:50:05   15  single investigative discovery file that contains everything,

16  since they chose to have a permanent retention folder, their

17  initial effort was to allude to, for lack of a better word, by

18  use of an inventory form what could be found in the parallel

19  investigative file.

09:50:30   20      And so it became critically -- or it becomes

21  critically important that everything that could be found in an

22  investigative file is inventoried and put into the permanent

23  retention file.  So that as the criminal defense attorney or

24  the assistant state's attorney gets the permanent retention

09:50:53   25  file also has this file inventory and can see, "oh, here's

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 21 of 225 PageID #:42909
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2248

1    something that's mentioned that's in an investigative file,

2    I'll ask for that, too."

3    Q.  And that was an important part of the policy changes that

4    the City enacted after Jones and Palmer, right?

09:51:10    5    A.  That was an attempt to do that, yes.

6    Q.  And what proportion of the criminal defense attorney files

7    did they actually get the inventories?

8    A.  Again, I don't have it right in front of me.

9    Q.  Do you have that cheat sheet that you made?

09:51:27    10    A.  Yes.

11    Q.  At the bottom.

12           Looks like 3 out of 38 cases, according to your

13    report, the criminal defense attorney didn't get the

14    inventory?

09:51:43    15    A.  6 out of 38 was to-from memos.

16    Q.  Not the to-from memos, the inventory.  The last two lines.

17    Only 8 percent of cases did criminal defense attorneys even

18    receive --

19    A.  Yes.  I'm sorry to have to work my way down so slowly, but

09:52:03    20    my last bullet point at only 8% did the criminal defense

21    attorney even received the inventory.

22    Q.  That's on page 43 --

23    A.  92% of the time they didn't, yeah.

24    Q.  All right.  You did not memorize all the statistics?

09:52:16    25    A.  No.  I'm sorry to fumble there, but ....

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 22 of 225 PageID #:42910
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2249

1  Q.  All right.  Showing you a copy of page 4, another document

2  that was not in Mr. Wadas' file but was in the investigative

3  file.

4           Can you identify for the jury what kind of document

09:52:29  5  that is?

6  A.  This is a general progress report.  It is an official

7  police form designed by the Chicago Police Department but is

8  not required to be included in the permanent retention file.

9  And in this case, it is a general progress report from the --

09:52:54  10  Q.  Without commenting on the significance for it in this case,

11  was this the kind of document that you saw missing from the

12  criminal defense attorney files in the review that you

13  performed?

14  A.  Yes.

09:53:04  15  Q.  Showing you page 5, a rap sheet of a Jose Rios, which also

16  has Jacques's name on it, issued on inquiry.

17           This is another document that was in the investigative

18  file but not in Mr. Wadas' file.  Was this typical of the kind

19  of document that criminal defense attorneys were not receiving?

09:53:25  20  A.  That's correct.

21  Q.  And showing you page 6 and page 8, two arrest reports with

22  Mr. Guevara's name on it of arrest of Jacques Rivera.

23           Those also were documents that Mr. Wadas did not

24  receive?

09:53:38  25  A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 23 of 225 PageID #:42911
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2250

1    Q.  And showing you page 11, 268.

2         This document we've been talking about here in the

3    last couple of weeks with Mr. Villafane, Mr. Olivero, Mr.

4    Rivera.  Was this the kind of document that also was not turned

09:53:53   5    over to criminal defense attorneys?

6    A.  That's correct.

7    Q.  Showing you page 12.

8         Macho Lopez has not been interviewed as of the 27.

9    This also is the kind of GPR we've been discussing, correct?

09:54:05   10   A.  That is correct.

11   Q.  Now, showing you this page 9, would it be fair to call this

12   an administrative document?

13   A.  This would be, in normal police parlance, would be

14   considered, intended to be an administrative-type document.

09:54:19   15   Q.  All right.  And was this typical of the kind of documents

16   that you found in the investigative files but not making it to

17   the criminal defense attorneys?

18   A.  That's correct.

19   Q.  And it says here:

09:54:30   20        "... It's expected the prisoner will be charged

21             with aggravated battery when the investigation

22             is completed on September 2nd ..."

23          talking about someone other than the suspect.

24         Even though this is an administrative document, not

09:54:40   25   talking generally but -- not talking specifically but

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 24 of 225 PageID #:42912
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2251

1    generally, can administrative documents be important to

2    criminal defense attorneys?

3    A.   Right.   Again, I mentioned that I think on Friday, that

4    since you never know what could be important, either for

09:54:56    5    prosecution or defense, it may -- this type of document, in

6    general circumstances, could be used to either discount or

7    disprove something that was a companion issue.

8    Q.   All right.   Let's talk about some of the cases.

9         You looked at a number of cases, right?

09:55:19    10    A.   Yes.

11    Q.   And not just in Jacques Rivera, but in prior cases as well,

12    right?

13    A.   That's correct.

14    Q.   And you were paid for your time to do that review,

09:55:26    15    correct?

16    A.   I was.

17    Q.   Do you know how many total hours you spent on this project

18    over the course of the 3, 4, 5 cases you've done?

19    A.   I honestly don't -- I've been deposed and I provided those

09:55:40    20    hours in each of the cases.   They run into the hundreds.

21    Q.   And how about in the Jacques Rivera case, how many hours

22    did you bill for?

23    A.   Up until the deposition by the City, I believe somewhere in

24    the neighborhood of close to 100 hours.

09:55:56    25    Q.   All right.   And do you know approximately how much you

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 25 of 225 PageID #:42913
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2252

1    billed in this case?

2    A.  No.  In excess of 100 hours.

3    Q.  All right.  So somewhere between 30- and 40,000 dollars?

4    A.  That sounds about right.

09:56:11  5    Q.  And did you do a lot of work for that?

6    A.  I did.

7    Q.  And do you have any other -- in your entire professional

8    career as a consultant, have you ever done a project that was

9    this time-consuming and this resource-intensive?

09:56:24  10   A.  As an aggregate of all the three cases?

11   Q.  Yes.

12   A.  No.  Never.

13   Q.  All right.  I'm going to show you not all of the files you

14   reviewed, but some of them.

09:56:32  15        I want to start with the Samuel Robinson case, and

16   show you an example of a document.  This is Bates stamped 13648

17   in the Robinson file?

18        MR. LOEVY:  Anand, do you know the exhibit number?

19        MR. SWAMINATHAN:  Plaintiff's Exhibit 154.

09:56:49  20   BY MR. LOEVY:

21   Q.  This is Plaintiff's Exhibit 154.

22        Can you tell the jury the kind of document we're

23   looking at here.

24   A.  This is a document not on --

09:56:59  25        MR. LOEVY:  Oh, the jury screen is not up, Your Honor.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 26 of 225 PageID #:42914
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2253

1       And, Your Honor, we move this into evidence.

2       THE COURT:  Any objection?

3       MS. ROSEN:  Can you identify what that document is?

4  Bates number?

09:57:09    5       MR. LOEVY:  It is 13648.  It is a memo that was in the

6  investigative file but not the permanent retention or criminal

7  defense attorneys file.

8       MS. ROSEN:  Well, you know?  I'm going to object to

9  you testifying.

09:57:22    10      MR. LOEVY:  You asked me to identify it.

11      THE COURT:  You asked.  Can the witness identify the

12  document?

13      MR. LOEVY:  I believe so.

14      THE COURT:  All right.  Do it that way.

09:57:29    15  BY MR. LOEVY:

16  Q.  Mr. Brasfield?

17  A.  I cannot give you the specific case file that it came from,

18  but I've had occasion to look at this from the original

19  material that I reviewed and I have relied on it, in part, in

09:57:47    20  forming my opinions.

21      MR. LOEVY:  All right.  We would move this into

22  evidence, Your Honor.

23      THE COURT:  All right.  Is there an objection to

24  this?

09:57:52    25      MS. ROSEN:  There's an objection until I know what the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 27 of 225 PageID #:42915
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2254

1    RD number is.

2          MR. LOEVY:  The RD number is 581836.  581836.

3          MS. ROSEN:  All right.

4          THE COURT:  It's received.

09:58:15    5          (Plaintiff's Exhibit No. 154 was received in

6            evidence.)

7          MR. LOEVY:  Your Honor, we would ask permission to

8    publish this memo.

9          THE COURT:  You may.

09:58:22    10   BY MR. LOEVY:

11   Q.  Can you tell us what we're looking at here?

12   A.  This is what I would refer to as a to-from memo.  Sometimes

13   the to-from memos are somewhat antiquated printed to-from

14   memos, but this one is obviously a typewritten note from one

09:58:44    15   detective or one police employee to another regarding what's

16   self-evident on the face of it, that a citizen called, an

17   anonymous citizen, and provided information about a possible

18   alternative suspect.

19   Q.  All right.  Is this the kind of information that should've

09:59:08    20   been turned over to the criminal defense attorney?

21   A.  Yes.

22   Q.  And it wasn't?

23   A.  No.

24   Q.  All right.  Is that -- that is an example of a systemic

09:59:19    25   problem?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 28 of 225 PageID #:42916
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2255

1  A.  This is the type of thing, this would be an example that's

2  indicative of the types of things that I would find in

3  reviewing investigative files that would be generally missing

4  from the permanent retention file.

09:59:32   5  Q.  All right.  Let's talk about another case, the Fields case.

6  This is Plaintiff's Exhibit 146, page 950.

7       MR. LOEVY:  Your Honor, permission to show this to the

8  witness before we show it to the jury.

9       MS. ROSEN:  Judge, I have a standing objection to all

09:59:52  10  of the documents as to the Fields case for the reasons that

11  we've expressed.  And, quite frankly, I think the Court

12  sustained the objection to the documents from the Fields case

13  in the ruling.

14       MR. LOEVY:  Your Honor, these are the files he

10:00:02  15  reviewed to form his opinions.

16       THE COURT:  If you want to make it more specific to

17  me, it would be great, but I don't know that I made any

18  categorical ruling about --

19       MS. ROSEN:  Judge, the City objected to the entry of

10:00:15  20  the documents from Fields because Mr. Brasfield did not rely on

21  the documents from Fields in rendering the opinions in this

22  case.  He simply relied on the Fields report.

23       THE COURT:  Well, let me ask you this, were these

24  documents given to Mr. Brasfield?

10:00:30  25       MR. LOEVY:  Absolutely.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 29 of 225 PageID #:42917
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2256

1      THE COURT:  And did they lead to a conclusion?

2      RIGHT SIDE:  Absolutely.

3      MS. ROSEN:  But, Judge, they were given to him in the

4  Fields case.  He expressly said he wasn't relying on the

10:00:39  5  underlying --

6      THE COURT:  You know what?  If you want to show me the

7  ruling, show it to me, because I'm not following.

8      Is it a motion in limine?

9      MS. ROSEN:  It is, Judge.

10:00:57  10      THE COURT:  And which motion in limine is it, because

11  maybe we can find it.

12      MR. SWAMINATHAN:  City's motion in limine number 6, I

13  believe.  Your ruling is docket 552, and the ruling is on

14  page 15.

10:01:11  15      THE COURT:  All right.  Let me just take a look at

16  this.

17      (Brief pause).

18      THE COURT:  We've got it.  So let me get it printed

19  out.

10:01:26  20      (Brief pause).

21      THE COURT:  I want to just remind the lawyers that I

22  said that I need to see the motions if you're going to rely on

23  some ruling.  And it wastes our time if you don't have them and

24  we got to find them and print them out.

10:01:52  25      (Brief pause).

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 30 of 225 PageID #:42918
6-18-18 (Ex 10)
Brasfield - direct by Loevy

2257

1          THE COURT:  Is it coming?

2          COURT'S LAW CLERK:  Yes.

3          MR. LOEVY:  Your Honor, can I back up and lay a better

4     foundation?

10:02:05   5          THE COURT:  I have no idea, because I don't know what

6     the ruling says.  I don't have them all committed to memory.

7          (Brief pause).

8          THE COURT:  How many pages do I need?

9          MS. ROSEN:  Judge, page 14 of the ruling, docket 552.

10:02:44  10          THE COURT:  I've got 552, but I don't have 14.

11          MS. ROSEN:  I'll hand it up to you --

12          THE COURT:  Wait.  I have it now.

13          MS. ROSEN:  Okay.

14          (Said item tendered.)

10:03:07  15          THE COURT:  Can you stop the printing, if you can.

16          COURT'S LAW CLERK:  Yes.

17          (Brief pause).

18          MS. ROSEN:  It's the middle paragraph.

19          THE COURT:  Yeah, I'm reading it.

10:03:25  20          MS. ROSEN:  Okay.

21          (Brief pause)

22          THE COURT:  Well, let me ask you this, there was no

23     categorical bar.  It was just a request of counsel to alert

24     everyone to anything that he intended to use.  And I think we

10:03:43  25     now know it's being used, and it's being used the way other

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 31 of 225 PageID #:42919
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2258

1   documents were used.  I don't know if you gave notice or not.

2   It would've been helpful.

3            MR. LOEVY:  Well, it's page 67 and 68 of his report,

4   that he relied on this, you know, heavily.

10:03:57  5            MS. ROSEN:  Judge, and these documents were not

6   produced in discovery in the case.  The Fields documents were

7   not produced in discovery in this --

8            THE COURT:  Well, if he refers to it in this report, I

9   think that's adequate.

10:04:06  10            MS. ROSEN:  But if he expressly says that he's not

11  relying on the underlying source document and he's simply

12  relying on his whole opinion --

13            THE COURT:  This ruling does not give any kind of

14  prohibitive bar.  It simply says there needs to be notice

10:04:22  15  because there's been a lack of specificity in terms of how much

16  he's going to use from these cases.

17            MR. LOEVY:  And it's not much, Your Honor.

18            THE COURT:  I'm going to overrule the objection.

19            MR. LOEVY:  All right.  We would ask permission to

10:04:28  20  show Plaintiff's Exhibit 146, page 950.

21            THE COURT:  Okay.

22            MR. LOEVY:  And we can call this 146 A.

23            THE COURT:  And there's an objection to 146 A, I

24  assume, but I'm overruling it and it will be received.

10:04:47  25

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 32 of 225 PageID #:42920
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2259

1          (Plaintiff's Exhibit No. 146 A was received in

2      evidence.)

3          MR. LOEVY:  All right.  And if we could publish this

4  then to the witness, please.

10:04:50    5  BY MR. LOEVY:

6  Q.  Can you provide some context for the kind of document we're

7  talking about -- first of all, is this a document that was in

8  the criminal defense attorney file or not in the criminal

9  defense attorney file?

10:04:58   10  A.  This would've been not in the criminal defense attorney's

11  file.

12  Q.  All right.  Can you give us some context for why this is

13  the kind of document that's important?

14  A.  This is a general progress report produced on a City of

10:05:12   15  Chicago Police Department form.  And as I've mentioned, other

16  than the requirement that GPRs be inventoried, they're not

17  included in the permanent retention for discovery.

18          This is an example of one that was not produced.  And

19  it describes receiving a phone call who the caller indicated

10:05:36   20  that a Rodell Banks was the person who had shot the people on

21  39th Street.  This would be the type of information, however

22  eventually it turned out to be true or not true, would be the

23  type of thing that a criminal defense attorney would need, the

24  defendant would need to mount an effective defense.

10:05:57   25  Q.  And to be clear, the criminal defendant in this case was

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 33 of 225 PageID #:42921
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2260

1  not Rodell Banks, it was a man named Nate Fields, correct?

2  A.  That's correct.

3  Q.  All right.  Showing you Plaintiff's Exhibit 146 B, which is

4  page 921 of the same exhibit.

10:06:09  5        Can you identify the kind of document we're talking

6  about here?

7  A.  This is what's been referred to obviously as a handwritten

8  memo.  And it refers to --

9        MS. ROSEN:  Judge, I have an objection.

10:06:24  10        This is a different exhibit, correct?

11        MR. LOEVY:  Yes.  146 B.

12        MS. ROSEN:  Okay.  So it's on the screen.  I have an

13  objection to it.

14        THE COURT:  So this is for the same reason?

10:06:33  15        MS. ROSEN:  For the same reason.

16        THE COURT:  Okay.  That objection is overruled.  You

17  may publish it.

18  BY THE WITNESS:

19  A.  And it indicates that about 0900 hours in a stairwell, he

10:06:47  20  said that he was going to get a gun and that he would put on

21  masks.  And Lawrence also said he would -- wouldn't live

22  through the night, and Marshall said he would be jumping --

23  "won't be jumping on you anymore."  This, again, is referring

24  to someone other than Mr. Fields.

25  Q.  Is this the kind of information that Mr. Fields should've
10:07:04

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 34 of 225 PageID #:42922
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2261

1   had in the criminal defense trial?

2   A.  Yes, I would expect that to be.

3           MS. ROSEN:  Judge, just for purposes of the record,

4   this document I've never seen it before.  It's never been

10:07:17  5   produced.

6           MR. LOEVY:  It's a plaintiff's exhibit, Your Honor.

7           MS. ROSEN:  It's never been --

8           THE COURT:  Hold on.

9           It's never been produced?

10:07:22  10          MS. ROSEN:  Never produced in discovery in this case

11  at all.

12          MR. LOEVY:  Your Honor, it's a plaintiff's trial

13  exhibit.  They have all our trial exhibits.

14          MS. ROSEN:  But --

10:07:29  15          THE COURT:  Okay.  Let's not have a fight about it.

16  You're telling me that it was made available with other

17  exhibits?

18          MR. LOEVY:  We gave them all our trial exhibits, Your

19  Honor.

10:07:39  20          MS. ROSEN:  Before trial.  Just before trial.

21          THE COURT:  Overruled.

22  BY MR. LOEVY:

23  Q.  All right.  This one is not on a GPR, correct?

24  A.  That's correct.

10:07:46  25  Q.  Does that show evidence of compliance with the rules?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 35 of 225 PageID #:42923
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2262

1  A.  No, it is clear, noncompliance with the rules.

2  Q.  All right.  Showing you 146 C.

3          MR. LOEVY:  And same type of document, Your Honor.

4  Last one from the Fields case.  We'd ask permission to move 146

10:08:06   5  C into evidence.

6          MS. ROSEN:  Same objection.

7          THE COURT:  And I will also overrule that objection.

8  It will be received.

9          (Plaintiff's Exhibit No. 146 C was received in

10:08:13   10         evidence.)

11  BY MR. LOEVY:

12  Q.  All right.  This is another document that did not make it

13  to the criminal defense attorney's file, correct?

14  A.  Yes.

10:08:19   15          THE COURT:  How are you marking this?

16          MR. LOEVY:  C.  It says "A" but it should be "C."

17          THE COURT:  Okay.  All right.

18  BY MR. LOEVY:

19  Q.  Can you explain what this document is?

10:08:25   20  A.  In police parlance, it's a rap sheet.  It's the

21  identification section listing of an arrest of an individual.

22  In my review of these hundreds of cases, that when it's

23  produced by the ID or record section to whoever it's asked for,

24  it's date stamped.  This one is April 27, '84.  What this

10:08:55   25  refers to is Earl Hawkins.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 36 of 225 PageID #:42924
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2263

1  Q.  Now, without getting into too much detail about the Fields

2  case, could it be exculpatory if this guy, Hawkins, was a

3  suspect on April 27th, that might play into the chronology of

4  the case, correct?

10:09:09   5  A.  That's correct.

6  Q.  Now, can you know from looking at all these files whether

7  this date turned out to be important in the Fields case as

8  being before he was supposed to be a suspect?

9  A.  I can't --

10:09:20   10       MS. ROSEN:  Objection.

11       THE COURT:  Wait a minute.  Wait a minute.

12       What's the objection?

13       MS. ROSEN:  He's making an analysis of whether or not

14  it's important in the Fields case.

10:09:27   15       MR. LOEVY:  I'm asking if he can.

16       Could I ask a better question, Your Honor?

17       THE COURT:  Well, I thought we weren't going to do

18  that.

19       MR. LOEVY:  This is the Fields cases.  May I ask a

10:09:36   20  different question?

21       THE COURT:  Sure.

22  BY MR. LOEVY:

23  Q.  When you review these files, is it hard to know if a

24  particular document like this one had significance on the

10:09:44   25  Fields fact pattern?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 37 of 225 PageID #:42925
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2264

1  A.  It's very difficult to, but it would require considerable

2  time to cross-check.

3  Q.  All right.  So this might be a benign document or it might

4  be a smoking-gun document, it's hard for you to know, correct?

10:09:58    5  A.  That's correct.

6  Q.  All right.  Let's talk about the Kluppelberg case.

7       This is another example of a file that turned up after

8  the criminal trial and included documents that didn't make it

9  to the criminal defense attorney, correct?

10:10:13   10  A.  That's correct.

11       MR. LOEVY:  All right.  I'd like to introduce at this

12  time Plaintiff's Exhibit 145 A, which is a handwritten note

13  from the investigative file that was found on the pallet.

14       MS. ROSEN:  Judge, I have the same objection to the

10:10:27   15  Kluppelberg documents.

16       THE COURT:  Was this also a trial exhibit?

17       MR. LOEVY:  Yes, Your Honor, Plaintiff's Exhibit 145.

18       THE COURT:  I will receive it.

19       (Plaintiff's Exhibit No. 145 A was received in

10:08:05   20       evidence.)

21  BY MR. LOEVY:

22  Q.  All right.  Can you give us some context for what we're

23  looking at here.

24  A.  Again, this would be a handwritten memo that would've been

10:10:40   25  in the investigative file that did not make it into the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 38 of 225 PageID #:42926
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2265

1  permanent retention file for discovery.

2  Q.  And just to be clear for the context, Mr. Kluppelberg was

3  accused of an arson murder, correct?

4  A.  That's correct.

10:10:51    5  Q.  So why is this kind of information important?

6  A.  Well, Mr. Kluppelberg was accused and eventually convicted

7  of a fire that occurred in 1984 that killed six people.  It was

8  originally investigated and determined by both bomb and arson

9  and Violent Crimes as unknown origin or accidental and laid

10:11:18   10  dormant for a number of years.

11        And then -- but in the original investigation, there

12  were several things that were -- that came to light that were

13  included in the investigative file.

14  Q.  Such as this document?

10:11:33   15  A.  Such as this that alludes to the fact that a Minerva Herst

16  (phonetic) had indicated to the investigators that there were

17  extension cords all over the basement floor and that it was a

18  hazardous condition.

19  Q.  All right.  Showing you 145 B.

10:11:51   20        This is another handwritten note.  It looks like an

21  interview of some kind of with a name and a date?

22  A.  Yes.

23  Q.  Was this a document that was in the investigative file but

24  not in the official file?

10:12:02   25  A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 39 of 225 PageID #:42927
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2266

1  Q.  Is this problematic that this kind of information didn't

2  get turned over?

3  A.  Yes, because, on its face, that there was an individual who

4  had had an argument with the victim of the fire, and would lead

10:12:18  5  an individual to whether it was a criminal defense attorney or

6  investigator, that there may be -- if it was, in fact, a

7  malicious crime, that it might have a different suspect.

8  Q.  All right.  Do you remember -- this is a case you worked

9  on, the Kluppelberg case, correct?

10:12:35  10  A.  Yes.

11  Q.  Do you remember another suspect named Isabela Ramos and a

12  reason the police had to suspect she may have been involved?

13  A.  There was information came during the original 1984

14  investigation and contained in the investigative file that

10:12:49  15  there was a lady that had set fires in that immediate vicinity,

16  had a drug alcohol problem, as I recall, and could possibly

17  have set the fires and couldn't quite remember whether she

18  might have or not.

19  Q.  All right.  Was that the kind of information that should've

10:13:06  20  been turned over?

21  A.  Yes.

22  Q.  And when you reviewed the files, did you see other

23  information like that that should've been turned over and

24  wasn't?

10:13:13  25  A.  Yes, that's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 40 of 225 PageID #:42928
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2267

1    Q.  All right.  And showing you -- I'm not going to go through

2    all the files.  Obviously, some of the files contained

3    information that was more important than others that wasn't

4    turned over, correct?

10:13:26    5    A.  That's correct.

6    Q.  And some of them were sort of cryptic some of the

7    information that didn't get turned over, names, phone numbers,

8    license plates, that kind of thing?

9    A.  Yes.  There were several examples of just a one-line note

10:13:40   10    that could've been important, might not have been important,

11    but evidently the person that wrote it down, who did not

12    identify themselves in each occasion, thought it was important

13    enough to include in the investigative file.

14    Q.  All right.  I want to show you only one more file, the

10:14:00   15    Demetrius Johnson file, which is part of Plaintiff's

16    Exhibit 154.

17         And showing you a copy of a report from the permanent

18    retention file --

19         MR. LOEVY:  And, Your Honor, we'd move 154 J into

10:14:22   20    evidence.

21         THE COURT:  Any objection?

22         MS. ROSEN:  No objection.

23         THE COURT:  It is received.

24         (Plaintiff's Exhibit No. 154 J was received in

10:14:26   25         evidence.)

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 41 of 225 PageID #:42929
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2268

BY MR. LOEVY:

Q.  It looks like this is a lineup report that was in the permanent retention files, Guevara report, dated 12th of June, 2300 hours, conducted by a Mr. Guevara.  And it looks like the person viewing the lineup was Aby Gonzalez.  You've seen this document, right?

A.  Yes, I have.

Q.  And the important thing here is that it was 11:00 o'clock at night on June 12th, 1991, correct?

A.  That's correct.

Q.  Now, it looks like, based on this police report, that was in the permanent retention file.  Does that mean this police report was turned over?

A.  Yes.

Q.  It looks like the suspect here -- I just want to -- it looks like it's a negative lineup.  And it says:

        "... after four witnesses viewing this lineup,
        the results were negative.  Because the results
        of the lineup was negative, the subject was
        released without charging."

    It looks like Brian Jones is the guy they were interested in, do you see that?

A.  Brian Jones, yes.

Q.  And showing you a copy of a report that was in the investigative file that was not turned over.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 42 of 225 PageID #:42930
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2269

1    MR. LOEVY:  This is Plaintiff's Exhibit 154 K, Your

2  Honor.

3  BY MR. LOEVY:

4  Q.  And this one was created looks like a day later on the

10:15:50    5  13th of June of 1991 at 1700 hours.  Do you see that?

6  A.  Yes.

7    MS. ROSEN:  Judge, I'm going to object to the term

8  "created."  There's no foundation for that.

9    THE COURT:  Sustained.

10:15:59    10  BY MR. LOEVY:

11  Q.  Well, it's dated 13th of June at 1700 hours, correct?

12  A.  Yes; referring to an event on June 12th.

13  Q.  All right.  Referring to an event that happened on

14  June 12th at what time?

10:16:10    15  A.  2230 hours.  10:30 p.m.

16  Q.  All right.  So that would be about a half hour before this

17  lineup that we just talked about, correct?

18  A.  That's correct.

19  Q.  And in this report, it looks like Aby Gonzalez, same person

10:16:24    20  doing the lineup, right?

21  A.  It's the same name, yes.

22  Q.  And, again, we have Brian Jones as one of the volunteers in

23  the lineup, right?

24  A.  Brian Jones, yes.

10:16:33    25  Q.  All right.  This report that was in the investigative file

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 43 of 225 PageID #:42931
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2270

1 contains different information than the one in the permanent

2 retention file, does it not?

3 A.  The highlighted section indicates that he did, in fact,

4 identify the participant as the offender.

10:16:49  5 Q.  All right.  As a professional in your field, why is it

6 important that the document that says he did identify this

7 alternate offender, why does that have to get turned over, too,

8 in addition to the one where he said he didn't?  Same person.

9 A.  Ah, I don't know how to explain why -- why you wouldn't.  I

10:17:11 10 mean, it is -- it is some conflicting information that it needs

11 to be.  It just calls out for further investigation and

12 explanation.

13 Q.  In other words, if the permanent retention file contained a

14 lineup report saying that 11:00 o'clock at night Aby Gonzalez

10:17:28 15 failed to identify the alternate suspect, and then there was

16 another report --

17        MS. ROSEN:  Objection to the phrase "alternate

18 suspect," Your Honor.

19        THE COURT:  Sustained to the form.

10:17:37 20 BY MR. LOEVY:

21 Q.  Brian Jones was not the person on trial in People of

22 Illinois versus Demetrius Johnson, correct?

23 A.  Correct.

24 Q.  All right.  So if there was another report half hour

10:17:47 25 earlier that said that the same witness, Aby Gonzalez, had

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 44 of 225 PageID #:42932
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2271

1  identified the alternate suspect, Brian Jones, as the offender,

2  that's the kind of thing that should've been turned over,

3  right?

4  A.  Absolutely.

10:18:05  5  Q.  Even if the first lineup was created by -- the first report

6  was created by Detective Guevara and the second report was

7  created by Detective Erickson, does that reduce the requirement

8  to turn this kind of information over?

9  A.  Absolutely not.

10:18:24  10  Q.  All right.  Were there other examples in the file you

11  reviewed, without going through file by file, by file, by file?

12  A.  Yes.  Of similar instances, yes.

13  Q.  All right.  And if Ms. Rosen was to show you file by file,

14  by file, by file, there would be a lot of examples of documents

10:18:45  15  that weren't necessarily important, would you agree with that,

16  too?

17  A.  I would.

18  Q.  So why did you list the documents also that weren't as

19  important along with documents that were as important when you

10:18:54  20  were describing what was missing?

21  A.  I'm sorry, would you --

22  Q.  Sure.

23  A.  -- state that again.

24  Q.  Did you make any editorial decision about only list the

10:19:02  25  important missing stuff or did you list all the missing stuff

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 45 of 225 PageID #:42933
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2272

1  when you compiled your statistics?

2  A.  With the spread sheet that we demonstrated on Friday, that

3  was everything objectively, whether it was valuable or not

4  valuable, or potentially important or not potentially

10:19:15  5  important.

6  Q.  Why was it important in your analysis not to make a value

7  judgment about whether it was important or it wasn't

8  important?

9  A.  I was trying to illustrate the theme or the pattern of

10:19:29  10  noncompliance with the orders for discovery, and to emphasize

11  the fact that there was a systemic pattern of parallel files.

12  Q.  All right.  Were you -- like if you saw a note with a

13  license plate or a phone number or a name in a given

14  investigation, were you necessarily in a position to know how

10:19:58  15  much significance it always had?

16  A.  No, I was not.

17  Q.  All right.  You also included in your analysis

18  administrative documents.  Can you list the kinds of

19  administrative documents we're talking about?

10:20:11  20  A.  There were court attendance, there were -- there's a form

21  that is required that's kind of like a library check-out card

22  for when a file has been taken out of a particular location.

23  While you can call it an administrative file, the inventory was

24  certainly there as an administrative effort as opposed to an

10:20:42  25  investigative effort.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 46 of 225 PageID #:42934
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2273

1  Q.  Could those kinds of, quote, administrative documents, also

2  turn out to be exculpatory?

3  A.  Yes.

4  Q.  For example, a court record or an attendance record, you

10:20:52  5  never know when it might become important in a case whether a

6  person was on duty or off duty, correct?

7  A.  That's correct.

8  Q.  And were those the kinds of documents that were or weren't

9  making into the file that got turned over?

10:21:05  10  A.  They were not making it into the files.

11  Q.  All right.  Approximately -- based on your numbers and your

12  report, and I think it's on page 43 of your report, bullet

13  point 4 of your cheat sheet, approximately what percent of the

14  time were the files you reviewed missing investigative

10:21:22  15  materials of the 38 cases?

16  A.  Well, of the -- I'm sorry, if you can speed the process up

17  here.  If you'll direct me to it.

18  Q.  It's --

19  A.  Page what?

10:21:33  20  Q.  Page 43 of your report or it's the first bullet point under

21  4 A in the bottom third of your summary.

22  A.  Well, on page -- I'm sorry to interrupt, but on page 43 of

23  my report the handwritten notes and general progress report,

24  74% were missing on official handwritten notes.  10% -- I'd go

10:21:56  25  down the stats here if you want but --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 47 of 225 PageID #:42935
6-18-18 (Ex 10)
Brasfield - direct by Loevy
2274

1    Q.  Well, the sort of summary stat, how many out of 38 we

2    missing at least some investigative materials?

3    A.  I believe that was 100%.

4    Q.  All right.  So in wrapping it up, you talked yesterday

10:22:15    5    about the policies of the police department and whether you

6    thought they were sufficient and insufficient.  And I believe

7    you said that you thought that it was an insufficient solution,

8    right?

9    A.  Yes.

10:22:26    10    Q.  But based on the fact on the file-by-file document review

11    that you did and gave some examples for, do you believe that

12    the police department had a problem in practice as far as

13    implementing these supposed rules that were supposed to fix

14    things?

10:22:40    15    A.  Yes, the material that I reviewed in hundreds and hundreds

16    of cases, that the actual practice was such that it was not --

17    that it indicated there were parallel files and that the

18    material was not -- significant material was not being turned

19    over to discovery.

10:22:57    20            MR. LOEVY:  I have no further questions, Your Honor,

21    thank you.

22            THE COURT:  Okay.  Cross-examination.

23            MS. ROSEN:  Your Honor, if I understood correctly,

24    Mr. Brasfield is using some kind of summary or bullet points

10:23:08    25    assistance in his testimony.  So if I heard that correctly, I

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 48 of 225 PageID #:42936
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2275

1    don't have --

2              MR. LOEVY:  I have a copy here.

3              THE COURT:  Okay.  Thank you.

4              (Said item tendered.)

10:23:33  5    MS. ROSEN:  Judge, are we going to take a break soon

6    or are you --

7              THE COURT:  Well, yeah, we haven't been going for an

8    hour.  I've been trying to push to an hour and a quarter.

9              MS. ROSEN:  Yeah.  So there's some stuff we need to

10:23:45  10   set up, but I can wait and then do that at the break.

11             THE COURT:  Let's try to push on for at least 10

12   minutes, 15 minutes.

13             MS. ROSEN:  Yes.  Thank you.

14                        CROSS EXAMINATION

10:23:58  15   BY MS. ROSEN:

16   Q.  Good morning, Mr. Brasfield.  How are you?

17   A.  Very good, Ms. Rosen.  Thank you.

18   Q.  I want to start with your global opinions.  And if I

19   understood your testimony on Friday and this morning, you hold

10:24:29  20   an opinion that the Chicago Police Department's policies and

21   practices, both written policies as well as how they played out

22   in practice, were deficient because they didn't provide the

23   criminal defense attorneys or criminal defendant with the

24   discovery that they're entitled to, do I have that generally

10:24:47  25   correct?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 49 of 225 PageID #:42937
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2276

1    A.  Generally correct, yes.

2    Q.  Okay.  And in an effort to evaluate the City's policies and

3    procedures, if I understand your testimony correctly, you

4    looked four sets of files, correct?

10:25:05    5    A.  The investigative files, the permanent retention files, the

6    criminal defense attorney files, and, to a lesser extent, a few

7    of the assistant state's attorney files.

8    Q.  Okay.  And for purposes of your opinions in this case, you

9    looked at 138 investigative files, is that correct?

10:25:38    10    A.  Actually there were 52 Area North files, there were 138 in

11    the central area, or Area 5, that would total 190.  As I said,

12    I think in my testimony on Friday, there were some that had

13    multiple defendants and there were some that were redacted.  So

14    the base universe, as I referred to it, was around 190.

10:26:16    15    Q.  So the total number of investigative files that you had at

16    your disposal in this case was 190, right?

17    A.  That's correct.

18    Q.  And 52 of those files, it was your understanding, came from

19    the police facility called Area North, correct?

10:26:32    20    A.  That is my understanding, yes.

21    Q.  And those 52 Area North investigative files, you had no

22    companion permanent retention or records division files,

23    correct?

24    A.  There were eventually files that produced to correspond

10:26:52    25    with the 180 or so that I looked at.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 50 of 225 PageID #:42938
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2277

1    Q.  Well --

2    A.  But some were not available.

3    Q.  Okay.  So let me just -- listen to my question.  Okay?

4         So with respect to the total 190, the 52 Area North

10:27:09    5    files did not have the companion permanent retention or records

6    division files, is that correct?

7    A.  That may be my recollection.  I'm not sure.

8    Q.  And we can take a look at your attachments --

9    A.  Okay.

10:27:24    10    Q.  -- in a minute, if that would help you.

11         But regardless, with respect to the total number of

12    investigative files, 52 were from Area North and 138 were from

13    records division storage facility, correct?

14    A.  Where they would normally be, yes.

10:27:44    15    Q.  Okay.  And then you also received what you're calling

16    permanent retention files.  And that's because in homicide

17    cases, when you're looking at those files years later, they

18    have that permanent retention stamp on it, correct?

19    A.  They eventually receive that stamp, yes.

10:28:02    20    Q.  Okay.  And that stamp, your understanding is based on your

21    review of the depositions in this case and everything else,

22    doesn't go on those documents immediately, correct?

23    A.  No, it does not.

24    Q.  And, in fact, I think it goes on.  I think the testimony

10:28:13    25    is, some 6 or 7 years after the case is closed, correct?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 51 of 225 PageID #:42939
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2278

10:28:35

10:28:48

10:29:03

10:29:20

10:29:37

1  A.  I don't recall reading specifically the time.  It's when

2  the cases close, if you will.

3  Q.  Okay.  And so that's why you're calling those documents in

4  homicide cases permanent retention files, right?

5  A.  That's the terminology that I've seen the City's designated

6  experts refer to it as.

7  Q.  Sure.  And they're also referred to by those same people as

8  records division files, correct?  You've seen that?

9  A.  I've seen that, yes.

10 Q.  All right.  And in the process, you've talked about your

11 criticism of the Chicago Police Department as it relates to its

12 use of centralized files, and we'll get to that more

13 particularly in a minute.

14       But you understand that pursuant to the City of

15 Chicago's processes probably going back all the back to the

16 early 1960's, the records division is where original general

17 offense case reports and supplementary reports are funneled for

18 any investigation regardless of whether it's a homicide or not,

19 correct?

20 A.  That's my understanding.

21 Q.  Okay.  And the records division is the unit of the Chicago

22 Police Department that's required to maintain all of those

23 original documents, correct?

24 A.  All of the documents the Chicago Police Department deems to

25 go there.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 52 of 225 PageID #:42940
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2279

1    Q.  Sure.

2    A.  But not all of the records.

3    Q.  Correct.  But my question was specific to general offense

4    case reports and supplementary reports; correct?

10:29:46    5    A.  That's correct.

6    Q.  And you have an understanding, don't you, based on your

7    review in this case and other cases where you've testified

8    against the City of Chicago, that the initial document that's

9    created at the inception of any crime is a document called the

10:29:59    10    general offense case report, correct?

11    A.  That's correct.

12    Q.  Okay.  And it's at that point that the investigation is

13    given a particularized identification number and that's the

14    thing we've all been calling the RD number, correct?

10:30:15    15    A.  The records division number, that's correct.

16    Q.  Correct.  And there's a letter and there's some numbers

17    after it, like N12345, correct?

18    A.  Correct.  Alphanumeric system, yes.

19    Q.  Okay.  And then you are also aware through the work that

10:30:31    20    you've done in connection with your opinions related to the

21    Chicago Police Department, that once a general offense case

22    report is prepared, if there's any follow-up investigation, any

23    document that's created should have that special records

24    division number, correct?

10:30:47    25    A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 53 of 225 PageID #:42941
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2280

1    Q.  And you also know that the typewritten reports that either

2    patrol division officers do, or tactical officers do, or Gang

3    Crimes Specialists do, or even detectives, those typewritten

4    reports go on something called a supplementary report, correct?

10:31:05    5    A.  They're supposed to, yes.

6    Q.  Okay.  But there's also, as you pointed out, post-events

7    that transpired as it relates to Mr. Jones and the Palmer

8    class-action litigation.  The Chicago Police Department created

9    new documents and new forms, correct?

10:31:22    10    A.  That's correct.

11    Q.  And one of the premiere forms, the identifying feature of

12    the new forms is a document called the general progress report,

13    correct?

14    A.  That is a form that was put into existence.  I don't know

10:31:41    15    the exact date.

16    Q.  Sure.  And that began, I think initially, with special

17    order 3-1, if I have that, correct, right?

18    A.  That's my recollection.

19    Q.  Okay.  And the general progress report was the Chicago

10:31:54    20    Police Department's attempt to, for purposes of the Detective

21    Division, standardize note-taking in the course of any criminal

22    investigation, correct?

23    A.  Limited to the Detective Division, yes.

24    Q.  Correct.  And you've seen through your review of all of

10:32:09    25    these files examples of general progress reports where notes

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 54 of 225 PageID #:42942
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2281

1    have been taken on them, is that correct?

2    A.  Yes, I have.

3    Q.  Okay.  And with respect to the review that you conducted in

4    this case, you looked at the -- we talked about the 52 Area

10:32:31    5    North files, the 138 files that came out of the records

6    division warehouse, and that's the set of investigative files

7    in this case, right?

8    A.  That's correct.

9    Q.  And contained within those investigative files are lots of

10:32:45    10    documents related to the investigation.  The sort of the

11    characteristic document that let's anybody know that it's an

12    investigative file, it's the general progress report, correct?

13    A.  I'm sorry, would you restate that?

14    Q.  Sure.  And you've reviewed lots and lots and lots of

10:33:02    15    investigative files not only in this case but in other cases,

16    correct?

17    A.  Yes.

18    Q.  And the sort of signature feature of the investigative file

19    is that it contains general progress reports, correct?

10:33:12    20    A.  Not necessarily.

21    Q.  They don't all contain --

22    A.  They do not all contain general progress reports.  I would

23    expect them to, but they do not.

24    Q.  Okay.  So the majority contained general progress reports?

10:33:25    25    A.  There are -- there are a number that contain general

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 55 of 225 PageID #:42943
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2282

1   progress reports, as to be expected.

2   Q.  Okay.  But in your review of all of the records division

3   files or permanent retention files, isn't it true that you

4   found zero general progress reports?

10:33:44   5   A.  In which?

6   Q.  The permanent retention file or the records division file,

7   isn't it true that there are zero general progress reports in

8   those files?

9   A.  In the permanent retention file, correct.

10:33:56   10   Q.  Correct.  Okay.  And that's by design, correct?

11   A.  They're supposed to be included on the inventory that goes

12   with the permanent retention file.

13   Q.  There's supposed -- there's supposed to be a reference to

14   them in the inventory log that would list out GPRs on that log

10:34:14   15   that we've seen and that you've already discussed, correct?

16   A.  There should be, yes.

17   Q.  Okay.  But, in fact, there are no actual hard copies of the

18   general progress reports in the permanent retention or RD file,

19   correct?

10:34:30   20   A.  That's the way it was designed, yes.

21   Q.  That's expressly by design and the City has never said

22   otherwise, correct?

23   A.  That would be correct.

24   Q.  Okay.  Also in your review you talked about the documents

10:34:41   25   to-from memos and then the handwritten notes that didn't appear

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 56 of 225 PageID #:42944
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2283

1    on the general progress report.  Do you recall that testimony?

2    A.  That they did end up on general progress reports?

3    Q.  No.  Let me slow that down a little bit and get to my

4    point.

10:34:55    5    A.  Please.

6    Q.  You've testified that in addition to finding general

7    progress reports in investigative files, you've also found what

8    we call to-from memoranda, correct?

9    A.  That's correct.

10:35:09    10    Q.  And the characteristic feature of a to-from memorandum is

11    that at the top of the document it says "to" and it's addressed

12    to somebody, and then it says "from" and it's from the person

13    who's typing up the memorandum and then it has information,

14    correct?

10:35:24    15    A.  If it's on a Chicago to-from memo, but, yeah, in general,

16    that's one of the examples that were shown a little earlier

17    this morning.  The essence of the to-from memo was "George,"

18    "Bob," "Jim" subject matter, and the end.

19    Q.  Well, actually in a to-from memorandum there is no Chicago

10:35:46    20    Police Department to-from memorandum form, right?

21    A.  In my review of the files over the last several years,

22    there have been where it says "to:" "from:" "subject:" That's

23    what I would refer to as a to-from memo.

24    Q.  Okay.  But it's not on a preprinted form.  It's somebody

10:36:09    25    saying "to" and the addressee "from" and the -- I mean, you've

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 57 of 225 PageID #:42945
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2284

                1    seen no evidence to suggest that it's some official form from

                2    the Chicago Police Department, right?

                3    A.  Not that I recall.

                4    Q.  Okay.  And so your criticism of the continued use of the

10:36:22        5    to-from memorandum after the changes that were made, after

                6    Jones and Palmer, is that, in your opinion, because the Chicago

                7    Police Department created the standardized general progress

                8    report form, any information that was being prepared on a

                9    to-from memo should've actually been prepared on a general

10:36:45       10    progress report, correct?

               11    A.  That's correct, because it has to be available.  And if

               12    it's not -- if it's a reference to a general progress report,

               13    it's on the inventory sheet.  And you'd have a handwritten

               14    memo, or a handwritten to-from, or typewritten, and it's not on

10:37:06       15    a general progress report, you may or may not have on the

               16    inventory sheet a reference to this informal document.

               17    Q.  Okay.  But you did those to-from memorandum in those

               18    investigative files, right?

               19    A.  I did, yes.

10:37:21       20    Q.  Okay.  And then the other criticism that you have with

               21    respect to the contents of the investigative file is that there

               22    are notes that are handwritten out that are not on the general

               23    progress report form.

               24            And it's your opinion that those notes should've been

10:37:38       25    transferred over to the general progress report form because

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 58 of 225 PageID #:42946
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2285

 1    that's the standardized form for note-taking, correct?

 2    A.  That's correct.

 3    Q.  Okay.  And so what should the police officer do with the

 4    original handwritten note?  If they do what you think they

10:37:54  5    should be doing, if they take the information that's on a blank

 6    piece of paper that's not on the form, they transfer that

 7    information over to the general progress report, what should

 8    they do with that note that was taken on a non-GPR form?

 9    A.  Well, as I testified to on Friday, since there is no clear

10:38:14  10    guidance from the Chicago Police Department as to what they

11    should do with it, the importance of a handwritten note is

12    going to be represented in the -- in the reference in the

13    general progress report.

14           And if -- if everything contained on the handwritten

10:38:40  15    note, and in a case of a license plate number --  many, many,

16    times I'd see a piece of paper that just had a license plate

17    number or a name.  And if that information, for instance a

18    license plate number, was on the general progress report

19    explaining what it represented, who acquired it, and when, then

10:39:06  20    if that piece of scratch paper was destroyed, shredded,

21    whatever, I would find no problem with that.

22    Q.  Okay.  Well, I'm talking about the circumstance of so

23    police officers, detectives, out on the field, for whatever

24    reason they don't have their general progress report forms,

10:39:26  25    they're interviewing a witness, they take a bunch of notes on a

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 59 of 225 PageID #:42947
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2286

1    piece of paper, it's your view in that scenario that that

2    information should be transferred from that slip of paper over

3    into a general progress report, right?

4    A.   That was also as I understand in reading the material in

10:39:44    5    Jones and Palmer, that was not only something that they were

6    supposed to do, it was required to do, and they didn't do.

7    Q.   Okay.  So in that scenario, it's your opinion that the

8    Chicago Police Department, post-Jones and Palmer, required

9    Chicago police officers to transfer the information that's on a

10:40:03    10    note on to a general progress report, correct?

11    A.   That information should be placed in a general progress

12    report that can be put on an inventory sheet that will go into

13    the permanent retention file and lead to discovery.

14    Q.   Okay.  What should happen, in your opinion, should the

10:40:21    15    police officer do with that note after they've transferred that

16    information over to the general progress report?

17    A.   I would -- I would even be able to -- to feel the minimum

18    requirement was met if that information was -- was placed on a

19    general progress report and a copy of that entire general

10:40:48    20    progress report, with the note, was inventoried on the

21    inventory sheet and went to the file, but you have this

22    separate piece of paper floating around there.

23         But if, in fact, everything that was on that

24    handwritten note, depending on what it contained, was on a

10:41:05    25    general progress report, that would meet the criteria.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 60 of 225 PageID #:42948
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2287

1    Q.  Okay.  But, in fact, what you found, actually, is that

2    those notes were retained in the investigative file, correct?

3    That's how you located --

4    A.  They were -- for lack of a better word, they were hidden in

10:41:20    5    there.  No one knew they were there based on the permanent

6    retention file.

7    Q.  When you say "they were hidden in there," that presupposes,

8    doesn't it, that criminal defense attorneys did not get

9    investigative files, right?  That's the premise for that

10:41:35    10    conclusion?

11    A.  Based on the number of cases I reviewed, that's my

12    conclusion, generally speaking.  I'm not saying that each and

13    every criminal defense attorney failed to get an investigative

14    file.

10:41:48    15    Q.  Okay.  In the course of your review in this case, you

16    compared investigative files to criminal defense attorney

17    files, correct?

18    A.  That's correct.

19    Q.  Okay.  And you compared 44 investigative files to 48

10:42:11    20    criminal defense attorney files, correct?

21    A.  That's what I was provided, yes.

22    Q.  And that's what the number -- I think you told us on Friday

23    that the criminal defense attorney files that we obtained in

24    this case were the only ones that were available that were

10:42:26    25    related to the number of -- the RD numbers that we had for

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 61 of 225 PageID #:42949
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2288

```
            1   investigative files.  So the total universe that we had, the

            2   parties could only locate 48 criminal defense attorney files,,

            3   correct?

            4   A.  That's correct.

10:42:39    5   Q.  Okay.  And it's 48 criminal defense files against 44

            6   investigative files because some of those cases involved

            7   multiple defendants, right?

            8   A.  Right.

            9   Q.  Okay.  So in your Attachment F to your report, isn't it

10:42:57   10   true that in every single criminal defense attorney file you

           11   identified documents from the investigative file?

           12   A.  That there were -- there were some documents from the

           13   investigative file.

           14   Q.  Well, let's talk about Mr. Sherman Addison.

10:43:15   15           Isn't it true that there were 69 pages of documents

           16   from the investigative file in the criminal defense attorney's

           17   file?

           18   A.  Given the sheer volume of material that I've looked at, I

           19   would have to have it here in front of me.

10:43:29   20   Q.  Okay.  So would you like to have your Attachment F?

           21   A.  No, I have Attachment F.

           22   Q.  Okay.  Well, take a look at page 4 of Attachment F.

           23   A.  Okay.  I'm sorry.

           24   Q.  And it says "Sherman Addison," right?

10:43:42   25   A.  Yes.
```

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 62 of 225 PageID #:42950
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2289

1    Q.  RD number G063126, right?

2    A.  Right.  With the corresponding Bates numbers.

3    Q.  Okay.  And in your comparison you list investigative files

4    69 pages, right?

10:43:53    5    A.  That's correct.

6    Q.  And the only thing that you note missing from the Sherman

7    Addison file is that ME body chart, right?

8    A.  Medical examiner's body chart, yes.

9    Q.  Okay.  And you know that the Medical Examiner body chart is

10:44:11    10    a document that's created not by the Chicago Police Department,

11    but by the Medical Examiner's Office, correct?

12    A.  And provided to the police department to be put in their

13    investigative file.

14    Q.  And provided to do the state's attorney, correct, in the

10:44:23    15    course of a criminal prosecution?

16    A.  The state's attorney would get that information from the

17    police department.

18    Q.  What's your basis for saying that?

19    A.  Well, in my experience and in the testimony and the

10:44:34    20    depositions I've reviewed, that the state's attorney would

21    request and get information from the police department

22    pertaining to their criminal homicide investigation.

23    Q.  And that's the sole place that the prosecutors went to for

24    their information?

10:44:48    25    A.  No.  I am sure, depending on the prosecutor, they might

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 63 of 225 PageID #:42951
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2290

1    seek it from other places.

2    Q.  Are you suggesting that there are criminal prosecutions

3    that happened in Cook County in 1985 to 1991 on homicide cases

4    where the medical examiner's report was not provided in the

5    criminal case to either the state's attorney or the criminal

6    defense attorney?

7    A.  That's not what I'm suggesting at all.

8    Q.  Okay.  Now, let's take a look at the next one on your list,

9    Joaquin Gonzalez.

10         You list there investigative file, 52 pages, right?

11   A.  Yes, that's correct.

12   Q.  And the only thing you note missing from the criminal

13   defense attorney file that was in the investigative file is the

14   MD body charts, correct?

15   A.  That's correct.

16   Q.  And you know, before we proceed, isn't it also true that in

17   your review of all of these documents, particularly the

18   criminal defense attorney files, that you do not know and

19   cannot represent that the criminal defense attorney files that

20   we got in connection with the discovery in this case are

21   actually complete files, right?

22   A.  It was put to me that the criminal defense Public

23   Defender's Office provided everything that they had in their

24   files.

25   Q.  But you have seen no evidence in any of the records that

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 64 of 225 PageID #:42952
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2291

1  the files, as they existed in 2015 or 2016 when we received

2  them in this case, were in the same condition that they were in

3  back in the 1980's or '90s when the criminal prosecutions were

4  going forward, correct?

10:46:23  5  A.  I have no independent knowledge of that, no.

6  Q.  Okay.  So as we sit here today when we're looking at files

7  that are 30 years old, none of us can say that they're in the

8  same condition that they were in when the criminal prosecution

9  was going forward, correct?

10:46:36  10  A.  I can only say that they should be, but I don't know

11  whether they were or not.

12  Q.  And you have no idea what -- and let me back up for a

13  second.  These criminal defense files all came from the Cook

14  County Public Defender's Office, right?

10:46:52  15  A.  That's my understanding, yes.

16  Q.  Okay.  And you have seen no testimony from anybody from the

17  Cook County Public Defender's Office that indicates that these

18  files were in the same condition that they were in back at the

19  time of the criminal prosecution, correct?

10:47:04  20  A.  I recall maybe one or two depositions or one or two source

21  documents where a criminal defense attorney at the time

22  represented that the file contained what they had, but I don't

23  recall independently.

24  Q.  Okay.  Well, I'm going to focus your attention actually on

10:47:21  25  these files that we're talking about.  They're listed in your

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 65 of 225 PageID #:42953
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2292

1    Attachment F.

2         And with respect to the criminal defense attorney

3    files that are listed in Attachment F, isn't it true that there

4    is zero testimony from any criminal defense attorney related to

10:47:35    5    these particular criminal defense files?

6    A.   These specific ones I don't recall, no.

7    Q.   Okay.  So now taking a look at the next name on the list at

8    page 4, Jesus Hernandez and Jipolito Torres.  It's

9    investigative file, 63 pages, correct?

10:48:00    10   A.   That's correct.

11   Q.   And then the documents that you list as being missing from

12   the criminal defense file is the investigative file inventory

13   that we've talked about, correct?

14   A.   Yes.

10:48:11    15   Q.   Okay.  The felony case computer printout, that's a document

16   that's created and prepared by the Cook County State's

17   Attorney's Office, right?

18   A.   That's my understanding, yes.

19   Q.   And subpoenas that were issued by the criminal defense

10:48:25    20   attorney to the police department, right?

21   A.   Correct.

22   Q.   So certainly the criminal defense attorney should've had

23   copies of his own subpoenas in his file, right?  If it were in

24   the same condition it had been in back in the 1980 and '90s?

10:48:42    25   A.   I was comparing them what was in the investigative file and

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 66 of 225 PageID #:42954
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2293

1    what wasn't in the criminal defense attorney files, so ...

2    Q.  I appreciate that.  But in the context of evaluating

3    whether or not these files are in the same condition that they

4    were in back in the 1980s, isn't it true that you would expect

10:48:55    5    a criminal defense attorney to keep a copy of a subpoena that

6    that criminal defense attorney issued in his file or her file?

7    A.  They may or may not.  But, again, I'm not evaluating what

8    should or should have been practice.  I was looking objectively

9    at what was in the file and what wasn't.

10:49:14    10    Q.  Right.  But if -- you would expect, wouldn't you, and if

11    you're looking at a criminal defense attorney's files, that

12    that criminal defense attorney would maintain copies of

13    subpoenas that that criminal defense attorney issued?

14              MR. LOEVY:  Objection, asked and answered, Your Honor.

10:49:30    15              THE COURT:  Overruled.

16    BY THE WITNESS:

17    A.  I have no way of knowing.

18    MS. ROSEN:

19    Q.  And so when you noticed that there were subpoenas missing

10:49:38    20    -- subpoenas that were prepared by criminal defense attorneys

21    and that there were no copies of those subpoenas in those

22    criminal defense attorney files, that did not inform your

23    opinions in any way regarding whether or not these files were

24    in the same condition they had been in during the time of the

10:49:57    25    criminal prosecution, right?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 67 of 225 PageID #:42955
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2294

1    A.  That's correct.

2            THE COURT:  Ms. Rosen, it's 10 to.  Is this a good

3    time?

4            MS. ROSEN:  Sure.

10:50:06  5            THE COURT:  Let's take our mid-morning break, ladies

6    and gentlemen.

7            COURT SECURITY OFFICER:  All rise.

8            (The following proceedings were had out of the

9            presence of the jury in open court:)

10:50:34  10           THE COURT:  Okay.  10 minutes, everybody.

11           THE WITNESS:  Your Honor, may I just stay here?  Is

12   that all right?

13           THE COURT:  Sure.  Sure.

14           (Recess.)

11:00:05  15           THE COURT:  Ready, everybody?

16           (Brief pause).

17           THE COURT:  Got to say, at least the air-conditioning

18   is working here.  It's not working in chambers.

19           COURT SECURITY OFFICER:  All rise.

11:01:52  20           (The following proceedings were had in the

21           presence of the jury in open court:)

22           THE COURT:  Please be seated, everyone.

23           Ms. Rosen, as soon as you're ready.

24   MS. ROSEN:

11:02:31  25   Q.  Okay.  Mr. Brasfield, so we were talking about your

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 68 of 225 PageID #:42956
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2295

1   Attachment F to your report.  And we had talked about the first

2   three criminal defense files that you have listed here.

3           And you would agree with me, wouldn't you, that with

4   respect to every single case, every single criminal defense

11:02:57   5   file that you reviewed in connection with this comparison,

6   contained information that was exclusively found in the

7   investigative file, correct?

8   A.  I'm sorry, I have to ask you to repeat that.

9   Q.  Sure.  We were talking about your Attachment G -- I mean,

11:03:22   10   Attachment F, which is your comparison of 44 investigative

11   files to 48 criminal defense files.  And in every single one of

12   the 48 criminal defense files that you reviewed in this case

13   you found materials that are contained solely in the Chicago

14   Police Department's investigative files, correct?

11:03:45   15   A.  That there -- there are documents contained within the

16   investigative files, some, that are not in either the permanent

17   retention or the criminal -- I'm sorry, but --

18   Q.  Maybe I'm not being clear in my question.

19           So we're looking at your Attachment F, which is your

11:04:08   20   comparison between investigative files and criminal defense

21   files, in part, correct?

22   A.  Well, in the first page on page 1 of Attachment F, I

23   attempt to lay out exactly what that was.

24   Q.  Okay.  But I'm just asking you the question.  The jury

11:04:28   25   doesn't have it in front of them at this time, and the jury is

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 69 of 225 PageID #:42957
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2296

1    not reading it.  So it is true, is it not, that Attachment F is

2    your comparison of 44 investigative files to 48 criminal

3    defense files?

4    A.   And 43 corresponding permanent retention files.

11:04:47   5    Q.   Correct.  And I'm going to put that analysis to the side

6    for a moment.

7    A.   All right.

8    Q.   I just want to talk about your comparison between the 44

9    investigative files and the 48 criminal defense files.  Okay?

11:05:00   10   A.   As a portion of all of the comparisons I did, yes, that's

11   true.

12   Q.   Okay.  And when you compared the 44 investigative files to

13   the 48 criminal defense files, isn't it true that in every

14   single one of the 48 criminal defense files you found documents

11:05:17   15   that are solely contained in the investigative files?

16   A.   Yes.

17   Q.   Okay.  And so that is at least some indication that

18   documents from the investigative files are actually making

19   their way into the criminal defense attorney files?

11:05:37   20   A.   Some, yes.

21   Q.   Okay.  And your criticism is that there are pages from the

22   investigative file that don't appear in the criminal defense

23   files as they existed, correct?

24   A.   Yes; but taking it as a total group that there's a pattern

11:05:56   25   of certain types of documents not appearing in the criminal

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 70 of 225 PageID #:42958
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2297

1   defense file.

2   Q.  Okay.  So the pattern, if we're looking at your Attachment

3   F, if we're calling it a pattern, you identify the document

4   from the investigative file that's missing from the criminal

5   defense attorney file, right?

11:06:16

6   A.  Yes.  And each and every one will not be identical, but,

7   generally speaking, you will find handwritten notes, property

8   inventory sheets that are consistently, not entirely, but

9   consistently as a pattern missing.

11:06:39

10  Q.  And when you're talking about handwritten notes -- what was

11  the other thing?  Handwritten notes and what?

12  A.  Inventory sheets.

13  Q.  The inventory -- you mean the inventory, not property

14  inventory, right?

11:06:50

15  A.  No.

16  Q.  You're talking about evidence?

17  A.  I'm talking about the investigative file inventory sheets

18  as an example.

19  Q.  That log that we've been talking about?

11:06:57

20  A.  Yes.

21  Q.  So those -- so it's handwritten notes and the log that are

22  the things that you see that are -- have some pattern of being

23  missing from the criminal defense files?

24  A.  And the to-from memos, yes.

11:07:10

25  Q.  And the to-from memos.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 71 of 225 PageID #:42959
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2298

1        Okay.  Take a look the Sherman Addison, the first one

2   there.  Is the to-from memo, or handwritten notes, or the

3   inventory log missing from that one?

4   A.  No.  As I said, it's not consistent with each and every

11:07:24   5   one, but taken as a group, as often as not, they're missing.

6   Q.  Okay.  Well, take a look at number 2, Joaquin Gonzalez.

7   You don't identify that there's notes, or to-from memorandum,

8   or the inventory log missing there, right?

9   A.  That's correct.

11:07:44   10   Q.  Okay.  And number 3, Mr. Hernandez's file.  That one you do

11   note the inventory log, so that's one?

12   A.  And handwritten notes.

13   Q.  And handwritten notes --

14   A.  And a number of other things.

11:07:55   15   Q.  And handwritten notes that are missing from the permanent

16   retention file?

17   A.  From the permanent retention file.

18   Q.  Okay.  Well, I'm not focusing on the permanent retention

19   file.

11:08:01   20   Q.  All right.

21   Q.  I'm looking at the criminal defense attorney file.

22   A.  I apologize.  Yes.

23   Q.  So the criminal defense attorney file, right, because

24   that's where this stuff needs to go, right?

11:08:07   25   A.  I'm sorry?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 72 of 225 PageID #:42960
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2299

1    Q.  This information, the information that's contained in the

2    permanent retention file and the information that's contained

3    in the investigative file needs to go to the criminal defense

4    attorney file, right?

11:08:13    5    A.  Yes.

6    Q.  Okay.  And the City has consistently said that, by design,

7    the documents that are in the investigative file and the

8    documents that are contained in the permanent retention file

9    are distinct, usually, correct?

11:08:32    10    A.  That's correct.

11    Q.  Okay.  So if both of those files get produced, then there

12    isn't a problem, right?

13    A.  If, if, -- that's a big if -- if both were produced, if

14    everything that was available that was produced during the

11:08:47    15    course of an investigation were discovered, produced to the

16    criminal defense, that would be fine.

17    Q.  Okay.  So now if we go down the list some more.  If we look

18    at the fourth one, the document that you identified missing

19    from the criminal defense attorney file is the Enmy report

11:09:04    20    (phonetic), right?

21    A.  That's correct.

22    Q.  Okay.  And then with respect to Mr. Marino on the next

23    page, that one you couldn't compare it to the criminal defense

24    file because it looked like the case was transferred to a

11:09:17    25    different attorney, so you couldn't make the comparison because

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 73 of 225 PageID #:42961
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2300

1    the file appeared, on its face, incomplete, correct?

2    A.  It was unavailable, yes.

3    Q.  Okay.  And then if you look at the next one, the document

4    that you say of the 34 pages of documents contained within the

11:09:30    5    investigative file, the document that you say is missing is the

6    arrest supplementary report, correct?

7    A.  That's correct.

8    Q.  Okay.  And if we go down the line, Mr. Devalle, no page is

9    missing from the criminal defense file, right?

11:09:44    10    A.  That's correct.

11    Q.  Okay.  The next one, Mr. Boyd, that one you couldn't review

12    the criminal defense file because the case was transferred.  So

13    in it's face, it was an incomplete file, correct?

14    A.  That's correct.

11:09:54    15    Q.  Okay.  And then when we get to Michael Green, which is on

16    page 6, that's 389 pages from the investigative file that are

17    found in Mr. -- in the criminal defense attorney's file from

18    Mr. Green's case.  You have a list of information there that

19    you say isn't found in the criminal defense attorney's file,

11:10:22    20    correct?

21    A.  That's correct.

22    Q.  Okay.  And in that one there's handwritten notes, there's a

23    supplementary report, there's request for photo

24    identifications, there's form 101's, there's a request to hold

11:10:38    25    prisoners, there's an arrest report and an arrest warrant.  All

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 74 of 225 PageID #:42962
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2301

1    those kinds of documents you have listed that are missing from

2    the 389 pages?

3    A.   That's correct.

4    Q.   Okay.  And then if we go to the next one, Mr. Slack.

11:10:53    5    Missing from the criminal defense file, you have identified

6    here a subpoena, a latent fingerprint examination report, an

7    arrest report, and one page of handwritten notes, right?

8    A.   And photographs, yes.

9    Q.   And photographs.

11:11:11    10        And the photographs you understand as it relates to

11   the Chicago Police Department back in the 1980's.  You're

12   aware, aren't you, that Mr. Wadas testified that typically they

13   weren't provided copies by the State of photographs?  They were

14   simply brought to court and the criminal defense attorney was

11:11:29    15   allowed to just review the photographs.  So they didn't

16   actually get copies back then because it was difficult and

17   costly to photograph the copies?

18   A.   I've seen the deposition information that there was some

19   material that was provided to the defense counsel in court.

11:11:46    20   Q.   Okay.  And photographs specifically, right?  I mean, that's

21   what Mr. Wadas testified to in connection with this case,

22   right?  You reviewed --

23   A.   Generally speaking, as I recall the testimony, it had to do

24   with crime scene or autopsy photographs, not necessarily

11:12:04    25   photographs pertaining to lineups or suspects or gang material.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 75 of 225 PageID #:42963
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2302

1   There are a lot of other types of photographs.

2   Q.  Sure.  And you don't identify here what type of photograph,

3   right, in this list?

4   A.  No, I did not.

11:12:17   5   Q.  Okay.  And I'm not going to spend the time to go all the

6   way through each of these, but, generally speaking, your review

7   indicated to you that at least some documents that are

8   contained solely in an investigative file appeared in criminal

9   defense attorney files, right?

11:12:39   10   A.  That's correct.

11   Q.  Okay.  And you also had available for your review in

12   connection with this case Cook County state's attorney files,

13   right?

14   A.  I believe there were 6 of those, yes.

11:12:51   15   Q.  Well, you looked at 6, right?

16   A.  That's correct.

17   Q.  There were more available for your review, weren't here?

18   A.  That's my understanding, there may have been.  I reviewed

19   6.

11:13:02   20   Q.  But you also had more at your disposal, right?

21   A.  I did not have them, no.

22   Q.  They weren't -- they weren't provided to you?

23   A.  No.

24   Q.  But you knew they were available?

11:13:16   25   A.  Ah, they may have been.  I don't know.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 76 of 225 PageID #:42964
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2303

1  Q.  You can't recall?

2  A.  I don't recall.  I do know that the state's attorney files,

3  the 6, when compared to the criminal defense files, were

4  missing the same information.

11:13:34  5  Q.  In the 6 that you reviewed, right?

6  A.  That's correct.

7  Q.  Okay.  But as I indicated, you knew there were more?  You

8  don't remember as you sit here today how many more state's

9  attorney files were available?

11:13:50  10  A.  I was not provided that information.

11  Q.  Were you told there were 26 state's attorney files

12  available that matched 26 of the criminal defense attorney

13  files, 26 of the permanent retention files, and 26 of the

14  investigative files?

11:14:15  15  A.  I don't recall that, no.

16  Q.  Okay.  How did you choose to look at only 6?

17  A.  Those wee the 6 that were provided to me.

18  Q.  By plaintiff's counsel?

19  A.  Yes.

11:14:26  20  Q.  All right.  You testified earlier about the work that you

21  did in connection with two other cases that relate to this

22  particular issue regarding the Chicago Police Department's

23  record-keeping policies in the 1980's, that was Kluppelberg

24  case and Fields case, correct?

11:14:54  25  A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 77 of 225 PageID #:42965
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2304

1  Q.  And in connection with the work that you did in Fields, you

2  looked at zero state's attorney files, right?

3  A.  That's correct.

4  Q.  And you looked at 28 criminal defense files that compared

11:15:15  5  to 89 total files that were found or located, stored in the

6  basement at Area 1 from 1983 to 1989, is that right?

7  A.  I don't have it in front of me, but that's what you have

8  there, yes.

9  Q.  You don't have your Fields report in front of you?

11:15:35  10  A.  It was contained in my -- in my submitted report.  I don't

11  have it in the folder in front of me.

12  Q.  Okay.  But you'll take my word for it that in connection

13  with the work that you did in Fields, for the time period 1983

14  to 1989, there were a total of 89 investigative files, right?

11:15:54  15  A.  I will take your word for it.

16  Q.  Okay.  And you did not have any state's attorney files for

17  those 89 files, right?

18  A.  That's correct.

19  Q.  And you had 28 criminal defense attorney files for those 89

11:16:08  20  files, right?

21  A.  I'll take your word for that.

22  Q.  Okay.  And you had 27 permanent retention or records

23  division files for those 89 files, right?

24  A.  I'll take your word for that, too.

11:16:19  25  Q.  Okay.  And then the other set of materials that you looked

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 78 of 225 PageID #:42966
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2305

1    at in Fields were for files that were from 1999 to 2006, right?

2    A.  I believe that was the date range.

3    Q.  Okay.  And that particular date range was of interest to

4    you because it had to do with the facts of the Fields case.

11:16:34    5    And it's 10 years later than any of the issues that we're

6    dealing with in this case, right?

7    A.  I believe I -- you're asking if I thought they were

8    relevant, is that the short version or --

9    Q.  No, I'm just asking you if I have the facts correct.

11:16:51    10    So 1999 to 2006 was another database that you looked

11    at in Fields, and that database was relevant to the facts in

12    the Fields case, right?

13    A.  Yes.

14    Q.  Okay.  And in this case you know that Mr. Rivera was

11:17:04    15    arrested in 1988 and he was prosecuted in 1990.  So the files

16    that are available from 1999 to 2006 is a whole another decade

17    later, right?

18    A.  That's correct.  In the specific case here with Rivera, I

19    looked at 3 years before and 3 years after.

11:17:25    20    Q.  Right.  So it was 1985 to 1991, that was the dataset?

21    A.  That's correct.

22    Q.  Okay.  And in Fields, that 1999 to 2006 timeframe, there

23    were 340 investigative files that were a part of that dataset,

24    right?

11:17:41    25    A.  As I recall that number.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 79 of 225 PageID #:42967
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2306

1    Q.  And, again, zero SAO files, Cook County state's attorney

2    files available in that review, right?

3    A.  That's correct.

4    Q.  And only 23 criminal defense attorney files and no

11:17:55    5    permanent retention files, right?

6    A.  Again, I'll take your word for it.

7    Q.  Okay.  And then in the Kluppelberg case, you also reviewed

8    files from 1983 without an end date, right?

9    A.  The event occurred, I believe, in 1984.  So that would've

11:18:22    10    been the time period.

11    Q.  Okay.  And the documents that were available for your

12    review comprised, I think, 619 or so files, RD files, right?

13    Permanent retention files?

14    A.  Again, since I don't have the report right in front of me,

11:18:43    15    but that's --

16    Q.  Actually, I misspoke.  619 investigative files.

17    A.  Yes.

18    Q.  Okay.  And you only reviewed, in connection with the work

19    in Kluppelberg, 25 percent of those files?

11:18:53    20    A.  That sounds right.

21    Q.  Okay.  And, again, in Kluppelberg there were zero state's

22    attorney files, right?

23    A.  That's correct.

24    Q.  And zero criminal defense attorney files, right?

11:19:04    25    A.  That's my recollection.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 80 of 225 PageID #:42968
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2307

1    Q.  And only 15 permanent retention files?

2    A.  Again, without the report.

3    Q.  So you looked at -- you'll take my word for it, that was

4    15?

11:19:18    5    A.  Yes.

6    Q.  And so you looked at, in Kluppelberg, 164 investigative

7    files, which represents the 25 percent of the total versus 15

8    permanent retention files, correct?

9    A.  Again, I would be much more comfortable if I had the

11:19:35    10    spreadsheet here in front of me.  But you're an officer of the

11    court, if that's what's in the report, I'll take your word for

12    it.

13    Q.  Well, I never had your spreadsheet from Kluppelberg, but I

14    had your report.

11:19:48    15    A.  All right.

16    Q.  So I gleaned it from your report.

17    A.  Okay.

18    Q.  Okay.  So you testified on Friday that you had physically

19    examined, I think the number you said was 2,000 homicide cases

11:19:59    20    in connection with your review of these 3 -- in connection with

21    the review you done in these 3 civil cases, is that right?

22    A.  I added them up and I think they were 2,216-or-something.

23    I think I testified on Friday that there were probably 2200.

24    Q.  Okay.  And does that represent investigative files, RD

11:20:23    25    files, criminal defense attorney files, and SAO files, or is

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 81 of 225 PageID #:42969
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2308

1    that just 220-something homicides?

2    A.  It's 2,200-some homicide investigations.  There may have

3    been more than one victim, but those are distinct homicide

4    investigations.

11:20:45   5    Q.  So you looked at 2,200, and whatever the number is,

6    investigative files?

7    A.  Homicide --  you asked if they were distinct homicides.

8    Q.  Okay.  So that number is distinct homicides, right?  That's

9    what you're saying?

11:21:05   10    A.  Yes.

11    Q.  So you had available for your review 2,200 homicide

12    investigations?

13    A.  Electronic format, yes.

14    Q.  How many did you have available for your review in this

11:21:17   15    case?

16    A.  As I mentioned, in the neighborhood of 190.

17    Q.  So the rest, the other 2,000 came from Kluppelberg and

18    Fields?

19    A.  That's correct.

11:21:27   20    Q.  Where you had zero state's attorney files available for

21    your review, right?

22    A.  That's correct.

23    Q.  And a total of 51 criminal defense files, right, that came

24    from the Fields case because you had zero in Kluppelberg?

11:21:49   25    A.  Right.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 82 of 225 PageID #:42970
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2309

1    Q.  Right?

2    A.  There were a total of 48 criminal defense files in Rivera.

3    Q.  Yeah, I'm not asking about Rivera.  So of the 2,200 and

4    whatever, 190 came out of this case, right?

11:22:08    5    A.  Yes.

6    Q.  So that leaves 2,000 homicides that you reviewed in

7    connection with your work in Kluppelberg and Fields, right?

8    A.  That's correct.

9    Q.  Okay.  And in Kluppelberg and Fields you reviewed zero

11:22:22    10    state's attorney files?

11              MR. LOEVY:  Objection, asked and answered, Your Honor.

12              THE COURT:  Overruled.

13    BY THE WITNESS:

14    A.  That's right.

11:22:27    15    MS. ROSEN:

16    Q.  And in Kluppelberg and Fields combined, you reviewed of

17    those 2,000 homicide files, 51 criminal defense attorney

18    files?

19    A.  I believe that's correct.

11:22:40    20    Q.  And those 51 criminal defense attorney files were only

21    available to you in the Fields cases because you reviewed zero

22    criminal defense attorney files since Kluppelberg, right?

23    A.  That's my recollection.

24    Q.  Okay.  Now, let's talk a little bit about your background

11:23:02    25    and your expertise.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 83 of 225 PageID #:42971
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2310

1          You've never been a homicide detective, correct?

2     A.  That's correct.

3     Q.  In fact, what you did do, what you did work in as a

4     detective, you worked something that you called, I think,

11:23:17    5     traffic homicides.  Is that what you called it?

6     A.  Traffic homicide, yes.  One of the assignments.

7     Q.  One of the what?  I'm sorry.

8     A.  One of the assignments.

9     Q.  As a detective?

11:23:26    10    A.  Yes.

11    Q.  Okay.  And traffic homicides is obviously some kind of car

12    accident that leads to a death, right?

13    A.  Right.  A car striking a pedestrian, hit-and-run, fleeing,

14    whatever.

11:23:40    15    Q.  Okay.  And that is the extent of the work you did related

16    to homicide investigations, right?

17    A.  As far as a hands-on detective in the deaths, yes.

18    Q.  Okay.  And in the course of your work as a traffic homicide

19    investigator, you had occasion to interview suspects, right?

11:24:01    20    A.  That's correct.

21    Q.  And when you interviewed suspects, you would jot down the

22    interview on notes, right?

23    A.  It would depend on where the interview was held.  If it was

24    held in the office, quite often I would type it as I went or

11:24:18    25    take a handwritten statement.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 84 of 225 PageID #:42972
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2311

1    Q.  And that would be handwritten notes, right?

2    A.  It would be either a handwritten statement, or if I was in

3    the field it could be, depending on the individual, jotted

4    notes.

11:24:32    5    Q.  When you say "handwritten statement," that's not you taking

6    notes, if I'm understanding the distinction you are making.

7    That's a formal handwritten statement of the suspect, right?

8    A.  It's either a formal handwritten statement written by the

9    witness, or suspect, or victim, or it is a verbatim handwritten

11:24:57    10    statement by the investigative detective, in this case me.

11    Q.  Okay.  So you're aware, though, aren't you, that in Cook

12    County in the 1980's, those types of handwritten statements are

13    taken by assistant state's attorney, right?

14    A.  I've seen in the material that I've reviewed in the cases

11:25:21    15    that in a formal setting within the police facility, that was

16    the case.  In the field, no.

17    Q.  Okay.  But did you ever -- well, let me back up for a

18    second.

19        So it's your understanding that during the time period

11:25:39    20    and actually even to today, Cook County state's attorneys would

21    come out to the police facility and they were the ones that

22    memorialized either witness or suspect statements either in

23    handwritten form or court reported form, or sometimes just

24    orally, right?

11:25:59    25    A.  I've seen it done by the detectives, I've seen it by the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 85 of 225 PageID #:42973
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2312

1  state's attorney, I've seen it transcribed by a court

2  stenographer, I've seen it handwritten by the suspect, I've

3  seen it handwritten by a detective, I've seen it -- I've seen

4  it in multiple ways.

11:26:15  5  Q.  In Cook County?

6  A.  In Cook County.

7  Q.  So you're claiming that you have, through your review of

8  the documents, seen handwritten statements written in the hand

9  of the suspect?

11:26:28  10  A.  Yes.

11  Q.  What cases were those?

12  A.  I can't identify them with that volume, but I have seen

13  because it was -- well, anyway, I can't point you to the

14  specific case, but I have seen it.

11:26:44  15  Q.  And what's the foundation for your belief that the

16  statement was written by the suspect as opposed to the state's

17  attorney?

18  A.  The handwritten statement would be signed by the suspect.

19  Q.  By all --

11:27:01  20  A.  Or the witnesses, or whatever.

21  Q.  Aren't they all -- isn't it true that in Cook County in

22  handwritten statements every single page of the handwritten

23  statement is signed at the bottom by the suspect?

24  A.  That may be the policy.  In the material that I've

11:27:21  25  reviewed, it is not consistently applied.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 86 of 225 PageID #:42974
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2313

1   Q.  How do you know -- you're just reviewing the record,

2   right?

3   A.  I'm reviewing copies of the physical documents in the file.

4   Q.  Okay.  So how have you drawn your conclusion simply from

11:27:37   5   your review of the documents that a certain handwritten

6   statement was written in the hand of the suspect?

7   A.  In the vernacular, in many times that is used where it

8   says, "I went," "I saw," "I did this," "I did that," in some

9   instances, for lack of a better word, the dialect or the

11:28:10   10   language would indicate that it was being put down on paper by

11   the individual that was giving the statement.

12   Q.  Well, isn't it true that the practice of Cook County

13   state's attorneys doing Felony Review in Cook County were the

14   ones that actually talked to the suspects and handwrote their

11:28:29   15   statements?

16   A.  I think I answered that question, but in the police

17   facility I have seen many instances where the assistant Cook

18   County attorney or a stenographer was conducting the interview

19   and taking the statement.  I have seen other statements that

11:28:50   20   have been taken in the field by either the primary

21   investigator, or an investigator, or some other police employee

22   that was not taken by the State's Attorney's Office.

23   Q.  And you're distinguishing between notes of interviews and

24   formalized handwritten statements, right?

11:29:08   25   A.  I am.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 87 of 225 PageID #:42975
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2314

1    Q.  Okay.  And --

2    A.  But the ones -- I'm sorry, maybe I misunderstood your last

3    question.  I have seen in the material that I have reviewed

4    handwritten statements acquired by Chicago police officers that

11:29:25    5    were taken in the field, not notes.

6    Q.  Okay.  And it's on that formalized form that the Cook

7    County State's Attorney's Office --

8    A.  Not necessarily.  They're generally all over the board.

9    They can be on blank pieces of paper, they can be on general

11:29:45    10    progress reports.  There's a lack of consistency.

11    Q.  And are you distinguishing whatever it is you claim to be

12    seeing in these files from simply notes of an interview?

13    A.  Yes.

14    Q.  And how are you making that distinction?

11:30:00    15    A.  If I understand your question correctly, is that I have

16    seen what are ascribed and understood by police officers to be

17    statements from a witness or a suspect that has been

18    handwritten, and sometimes an indication of where or some

19    reference in another document that said the statement was taken

11:30:30    20    by me at such and such a place, but, generally, just a

21    handwritten statement.

22    Q.  And as you sit here today, you can't identify a single one

23    of those files for us to take a look at?

24    A.  I would not have any difficulty spending a few hours and

11:30:46    25    finding the samples, I'm confident of that.  But as I sit here

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 88 of 225 PageID #:42976
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2315

1    right this moment, I can't give you a page number or a Bates

2    number.

3    Q.   Okay.  So going back to your note-taking practices when you

4    were a traffic homicide investigator.  It is true, isn't it,

11:31:02    5    that you would sometimes jot down notes of an interview so that

6    when you later prepared your typewritten report it would jog

7    your memory, right?

8    A.   In the sense of just a short note or two, yes.

9    Q.   Okay.  And most investigators that you were familiar with

11:31:23    10   back at the time that you were a traffic homicide investigator

11   did the same thing, right?

12   A.   It was -- it was a practice that was common, yes.

13   Q.   Okay.  And the notes that you took when you were -- when

14   were you a traffic homicide investigator, by the way?

11:31:40    15   A.   I was promoted to the Detective Division in 1971, '72.

16   Q.   And how long did you remain a traffic homicide

17   investigator?

18   A.   I was there for, I think, a little over a year, then I went

19   to vice narcotics, and then I went to burglary theft.

11:31:57    20   Q.   Okay.  So in this time period, you took notes sometimes of

21   interviews.  And in that time period the Seattle Police

22   Department had no standardized form for taking notes, right?

23   A.   That's correct.  We had standardized formats, such as

24   Chicago's general progress reports, for transcribing any notes

11:32:25    25   on to.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 89 of 225 PageID #:42977
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2316

1    Q.  Okay.  And so the notes that you didn't take on those forms

2    were on a note pad or a legal pad, right?

3    A.  That's correct.

4    Q.  And sometimes detectives that you worked with had really

11:32:39    5    good memories and took no notes at all, right?

6    A.  They were considered poor detectives, but ....

7    Q.  I'm sorry, what?

8    A.  Poor detectives.

9    Q.  With great memories?

11:32:52    10   A.  (Laughing.)

11   Q.  Well, those are your words, right?

12   A.  I have attested to the fact that detectives have claimed to

13   have excellent photographic memories.

14   Q.  Well --

11:33:06    15   A.  But have never claimed that they were supposed to wait more

16   at the end of shift to transcribe that memory on to an official

17   police report.

18   Q.  Okay.  We're not talking about when they're transcribing

19   from memory.  My point is that sometimes you're aware of

11:33:21    20   detectives with great memories who would conduct an interview

21   without taking any notes at all, and then eventually, whatever

22   the time period is, prepared their typewritten report, right?

23   A.  I'm aware of detectives that did that.  They were not

24   classified, in my professional opinion, as great detectives.

11:33:37    25   Q.  Okay.  But other detectives like yourself took notes,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 90 of 225 PageID #:42978
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2317

1    right?

2    A.  That's correct.

3    Q.  And that legal pad or note pad that you took the notes on

4    was not an official Seattle Police Department record, right?

11:33:50    5    A.  That's correct.

6    Q.  And, in fact, you referred to that procedure as sloppy

7    procedure, right?

8    A.  I'm sorry?

9    Q.  I said you have described that procedure of taking photos

11:33:58    10    on a legal pad as a sloppy procedure, right?

11    A.  I may have.  I don't recall that.

12    Q.  Okay.  And then after you used the information from the

13    notes and typed it into your reports, you would destroy those

14    notes, right?

11:34:11    15    A.  Depending upon the format and the context of the

16    investigation.  If it was, as I've testified to in other

17    depositions or in trial, if it was just a memory jog that

18    someone had approached me on the street corner and I wrote down

19    "John Smith," then transcribed that into an official form that

11:34:41    20    said on such-and-such a date on such-and-such location I was

21    with my partner and we were approaching someplace, and then the

22    name that was on the piece of paper contacted me, I would not

23    keep the scratched paper that said "John Jones" or "Bill

24    Smith," or however.

11:35:00    25         If, however, it was an extensive note having to do

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 91 of 225 PageID #:42979
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2318

1    with things that I saw and observed, I would introduce that

2    into the case as a piece of evidence.

3    Q.  Okay.

4    A.  And it would get an evidence number.

11:35:10    5    Q.  But there was no universal prohibition against shredding

6    notes, right?

7    A.  Against what?

8    Q.  Shredding notes.

9    A.  Within the parameters and the context of what I testified

11:35:23    10    to, no.

11    Q.  Well, if you're shredding the notes, then we don't know,

12    right?  Exactly what you wrote on the note, right?

13    A.  Yes, I do, because contemporaneous with the taking of the

14    note I detail on an official police form the date, time, all

11:35:37    15    the relevant material that I've just previously testified to,

16    that would've been fully encompassing everything well beyond

17    what was on the note.

18    Q.  But we have to take your word for it, right?  Because you

19    destroyed the note?

11:35:53    20    A.  (Laughing).  You'd have to take the detective's word for

21    what was on the official police document.  And I think you're

22    holding the detective far more accountable having them detail

23    the date, time, place, location, who, what, when, why, where

24    and how, than on a piece of paper that just ends up in an

11:36:19    25    investigative file.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 92 of 225 PageID #:42980
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2319

1  Q.  Well, I'm not sure if you answered my question, but we can

2  move on.

3          With respect to the note-taking generally, there is no

4  requirement, right, no national generally accepted police

11:36:39    5  practices requirement that investigators, detectives, take

6  notes, right?

7  A.  I believe that in my report is a supplemental that

8  indicates a long list of bibliography of police textbooks and

9  publications contemporaneous to the time period of the cases

11:37:05   10  that I reviewed that indicated that that was what would be the

11  advisable practice.

12          I cannot, as we sit here, point you to a specific page

13  on a particular document, but as early as when I started

14  college in 1962 or '63 and I was taking criminal justice

11:37:31   15  courses, from V. A. Leonard who published a text even before

16  that, it's just the things that you learn in the police

17  academy, and it's in the published literature about taking

18  notes, what you do with them, that type of thing.

19  Q.  And the materials that you are citing are your Attachment

11:37:54   20  E, right, to your report?

21  A.  Yes.

22  Q.  And you list a bunch of reference materials, right?

23  A.  That's correct.

24  Q.  And these reference materials, you don't identify within

11:38:07   25  the reference material any particular citation to support the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 93 of 225 PageID #:42981
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2320

1    proposition that the taking of notes is required or in what

2    form or fashion the taking of notes should be recorded,

3    correct?

4    A.   No.  And in a two-paragraph preface to that, it describes

5    generally accepted policing practices during the relevant time

6    period, that it's not exhaustive and it's supplemental to my

7    experience with police practices, et cetera.  It's just -- it's

8    the way things were done, should be done.

9    Q.   Well, my question is more specific.  I'm not focusing on

10   your experience or what you believe should be done.  My

11   question is specific to the source materials that you listed in

12   your report for us to look at.

13          And isn't it true that there is not a single citation

14   in your source materials to a particular page or chapter of any

15   of these source materials to support the proposition that notes

16   have to be taken, and if they do have to be taken, in what

17   format, is that right?

18   A.   That's correct.  I did not give you page and line, or in my

19   report did I give you page and line, but I gave you an ample

20   bibliography to put in context my opinion.

21   Q.   And some of the books that you identified are homicide

22   investigations, right, by Mr. Franco?

23   A.   There are some that go back into the 19th Century.  My

24   attempt there was to show that this was not a new invention.

25   That for well over 100 years police detectives, police

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 94 of 225 PageID #:42982
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2321

1    investigators have been expected to document, take notes, and

2    provide a single source for information.  And some of them were

3    even tongue-in-cheek because they were from military manuals

4    and French publications, the point being that there's a great

5    body of literature.

6    Q.  So the Franco that I have in my hand is published,

7    copyrighted in 1931, right?

8    A.  I don't have it in front of me, but I'll take your word for

9    it.

10   Q.  Okay.  It's listed in your Attachment E on the third page.

11   So you don't need to take my word for it.

12          (Brief pause).

13   BY MS. ROSEN:

14   Q.  Do you see it there?

15   A.  I'm sorry, which one is it?

16   Q.  It's the Franco publication.

17   A.  Harold A. Franco?

18   Q.  Yes.

19   A.  1931?

20   Q.  Yes.

21   A.  Yes.

22   Q.  Correct.  And there's no citation.  It's a reference to

23   this homicide investigation, but there's no citation in this

24   book about the requirements regarding notes, right?

25   A.  That's correct.  On all of the documents.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 95 of 225 PageID #:42983
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2322

1    Q.  There's not a single reference from any of these materials

2    that you list to a particular page or policy, model policy or

3    anything as it's relates to notes, right?

4    A.  No.  As I said, this is to provide a universe of what kind

11:41:31    5    of literature and information that a confidant homicide

6    investigator, or in this case a police department, should be

7    aware of, and to point out that it wasn't a narrow body of

8    information.  But I did not, in my additional information or

9    bibliography, give you a page and line number.

11:41:50    10    Q.  Okay.  And the body of literature you alluded to it

11    before -- I think you said it's sort of tongue-in-cheek --

12    included publications that are completely in French, right?

13    A.  I gave an example of a 1938 publication on scientific

14    police homicide investigations.  I gave one from the Judge

11:42:10    15    Advocate General's Office of the law on Belligerent Occupation

16    in 1945.  That is not to takeaway from the more relevant

17    documents that are cited here for the time period in question.

18    My attempt, again, was to point out that this was a historical

19    knowledge base.

11:42:32    20    Q.  And yet not a single specific citation to support the

21    proposition --

22            MR. LOEVY:  Your Honor, asked and answered.

23            THE COURT:  Sustained.

24    BY THE WITNESS:

11:42:41    25    A.  I've given you my answer on that.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 96 of 225 PageID #:42984
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2323

1          THE COURT:  Sustained.

2    BY MS. ROSEN:

3    Q.  Okay.  And included in all these materials that we've been

4    talking about, there is also no specific citation to the

11:42:50   5    requirement that files need to be centralized or centrally

6    located, right?

7    A.  And I've acknowledged that there can be other systems

8    besides just a single centralized one.  But if you don't have a

9    centralized one, then you need to have safeguards and specific

11:43:10  10    guidelines to affect the same outcome.

11    Q.  Okay.  Now, let's talk about the guidelines and the

12    directives.  So if we could look at what's been marked as City

13    Exhibit No. 34, which I believe is already in evidence.

14          So we can go ahead and publish it to the jury.

11:43:36  15    BY MS. ROSEN:

16    Q.  You can look at it up on your screen.

17          That's special Order 86-3, right?  So that's the

18    version of the investigative file special order that was in

19    place at the time of Mr. Rivera's arrest and prosecution,

11:43:52  20    correct?

21    A.  Yes, this is a copy of Special Order 863, May 29th, 1986.

22    Q.  Okay.  And your understanding is -- I think you testified a

23    little bit about it on Friday -- is that after the Jones and

24    Palmer cases came to light, that the Chicago Police Department

11:44:17  25    created new procedures as they related to recordkeeping and

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 97 of 225 PageID #:42985
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2324

1    file maintenance, retention, and production, right?

2    A.  This was the latest in a series of attempts by the police

3    department, yes.

4    Q.  Okay.  And in your view, the written policy, in and of

11:44:47    5    itself, is insufficient, right?

6    A.  That's correct.

7    Q.  And can you identify for us an example of a written policy

8    that would be sufficient from a law enforcement agency from the

9    time period of the mid 1980's?

11:45:08    10    A.  I'm sorry, would you repeat that?

11    Q.  Sure.  Are you able to identify for us any written policy

12    that is sufficient, in your view, from any law enforcement

13    agency from the 1980's?

14    A.  I did not provide one within my report, no.  I was asked to

11:45:28    15    examine the Chicago Police Department's.

16    Q.  And in connection with your review of the Chicago Police

17    Department, you're critical of the -- separate and apart from

18    the criticisms that you have about how it played out in

19    practice, you are critical of the written policy, correct?

11:45:47    20    A.  In the context of the outcome of the George Jones case and

21    the Palmer case, and the criticisms that the respective courts

22    had with the deficiencies in these, coupled with the criticisms

23    of that particular order and the earlier orders that are

24    contained in my report on page 55, yes, I'm still critical of

11:46:14    25    it.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 98 of 225 PageID #:42986
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2325

1   Q.  So you're only critical of it because of the context, is

2   that what I'm understanding you to say?

3   A.  I'm critical of it because it does not accomplish what the

4   courts put the Chicago Police Department on notice that they

11:46:31   5   needed to do as the result of specifically the Jones and Palmer

6   cases.

7        And I outlined in detail over several pages what some

8   of those criticisms were.  And they were concurrent or

9   consistent, I should say, with the self-assessment of

11:46:55   10   depositions that I found from employees of the Chicago Police

11   Department, as well as excerpts from the decisions in the Jones

12   and Palmer cases.

13   Q.  Okay.  So if I understood what you just said correctly, the

14   reason that you believe that Special Order 86-3 is insufficient

11:47:18   15   is because of what occurred in Jones and Palmer, is that

16   correct?

17   A.  No.  What I'm trying to convey is that the Chicago Police

18   Department was put on notice that their practices and their

19   policies were leading to events, up to and including wrongful

11:47:46   20   convictions, and that their policies and their practices needed

21   to change.  That their attempts to create that change in the

22   culture of the Chicago Police Department were, on their face,

23   just looking at the policy itself, failing to address the

24   underlying issues.

11:48:09   25   Q.  Okay.  So let's de-construct that a little bit.  So you

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 99 of 225 PageID #:42987
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2326

1    said because the City's policies before the cases of Jones and

2    Palmer came to light, it led to wrongful convictions, right?

3    Is that what you said?

4    A.   The material I reviewed indicated, historically, that was

11:48:28    5    the case, yes.

6    Q.   And isn't it true, actually, that factually what happened

7    was, Mr. Jones never was convicted because the information came

8    to light during the course of his criminal case, right?

9    A.   That's correct.  He was, through no effort of either the

11:48:43    10    Chicago Police Department or the state's attorney, he was

11    narrowly spared a wrongful conviction.

12    Q.   Okay.  And then, in fact, in Palmer, that was a class

13    action lawsuit, right?

14    A.   That's correct.

11:48:57    15    Q.   And zero plaintiffs in the class action lawsuit were

16    wrongfully convicted, right?

17    A.   In the context of my response, that's correct.

18    Q.   Okay.  So in terms of the City's policies before Jones and

19    Palmer, it's your understanding, isn't it, that the City's

11:49:19    20    record-keeping policies at that time were that there was the

21    records division file that we've been talking about in pretty

22    much the same condition and with the same materials contained

23    in it as we've been talking about, right?

24    A.   Yes.

11:49:35    25    Q.   And then --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 100 of 225 PageID #:42988
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2327

1    A.   That's a long question.

2    Q.   And there was not pre-Jones and Palmer any direction to the

3    Detective Division about how to maintain, how to record, how to

4    produce investigative files, or materials like that, right?

11:49:55  5    A.   That's correct.

6    Q.   And that's the issue that created the problem in Jones and

7    the issue that created potential problems in Palmer, right?

8    A.   Within the confines of what I was asked to do, that's

9    correct.

11:50:11  10    Q.   Okay.  And after the Palmer class-action litigation was

11    filed and the Chicago Police Department was put on notice that

12    there were these records that were being maintained in the

13    Detective Division, they drastically changed their policy,

14    right?

11:50:29  15    A.   They wrote some policies.

16    Q.   Which was a drastic change, right?  It now detailed and

17    required these files to be maintained and produced in

18    discovery, right?

19    A.   Ah, on the face, if you pay attention to the policy

11:50:49  20    language, that was what was an attempt to accomplish.  As far

21    as an actual, viable policy with specific steps and the scope,

22    or limited scope, and other criticisms within my report, it did

23    not have the desired effect.

24    Q.   But going back to my question.  The changes that were made

11:51:18  25    from the pre-Jones-Palmer policies to the post-Jones/Palmer

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 101 of 225 PageID #:42989
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2328

1    policies were drastic.  They were now acknowledging and

2    requiring that these files be maintained in a certain fashion

3    so that they could be available for criminal cases, right?

4    A.  They -- I might quibble with the term "drastic."  I think

11:51:43    5    the policies were an attempt to bring the Chicago Police

6    Department into compliance with general accepted police

7    practices around the country at the time.

8    Q.  And you cannot identify for us a single policy from around

9    that time that matches or exceeds the policy that was written

11:52:05    10    by the Chicago Police Department in 1983, correct?

11    A.  I have not provided that, that's correct.

12    Q.  Okay.  Now, taking a look at Special Order 83-3.

13         If you take a look at the second page where it

14    discusses the general progress report:

11:52:22    15         "... the general progress report is a department

16         form that's 8 1/2 by 11 in size, which would be

17         utilized by all division members."

18         Do you see that there?

19    A.  Yes.

11:52:33    20    Q.  And it says:

21         "... this document is designed to standardize

22         the recording of handwritten notes and

23         memorandum."

24         Do you see that?

11:52:41    25    A.  Yes.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 102 of 225 PageID #:42990
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2329

1  Q.  So that's the general progress report that we've seen in

2  court and that you've been discussing, right?

3  A.  Yes.

4  Q.  Okay.  And if you go down to the bottom of that page, 4C,

11:52:53    5  where it says?

6          "... detectives are required to ... "

7          take a look at paragraph 3.  Do you see that it says:

8          "... detectives are required to submit all

9          handwritten notes and investigative documents

11:53:09   10          generated or received by unit supervisor for

11          review and inclusion in the investigative file

12          case folder."

13          Do you see that there?

14  A.  Yes.

11:53:15   15  Q.  So that is not a prohibition from including notes in the

16  investigative file, right?

17  A.  No, I don't believe I testified that it was a prohibition.

18  Q.  Okay.  All right.  Now, let's take a look at some of the

19  files that you looked at in this case.

11:53:45   20          So first let's put up the demonstrative.  You saw on

21  Friday the chart that was here --

22  A.  I'm sorry.  Yes, I did.

23  Q.  That was your Attachment G?

24  A.  G.

11:54:01   25  Q.  Yeah.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 103 of 225 PageID #:42991
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2330

1    MS. ROSEN:  This is our demonstrative.  You don't have

2    an objection to it?

3         MR. LOEVY:  No.

4    BY MS. ROSEN:

11:54:15   5    Q.  So we're going to look at City Demonstrative Number 1.

6         Do you see that there on your screen?

7    A.  I see it labeled Brasfield Attachment G.

8    Q.  Okay.

9    A.  It's illegible but --

11:54:31   10    Q.  Well, there's a lot of data there, right?

11    A.  Yes, there is.

12    Q.  And there's lots of colors, right?

13    A.  Yes.

14    Q.  Okay.  And this reflects each of the pages, right, that

11:54:43   15    compromise Attachment G, right?

16    A.  I would assume that's the case, yes.  Since it is

17    illegible --

18    Q.  Okay.  And if you look at two pages all the way to the far

19    right, do you see that there?  Where it's just in blue?

11:55:03   20    A.  Yes.

21    Q.  Those are the Area North files, right?

22    A.  I'm sorry, your question again?

23    Q.  The two pages that are all the way to the right on the

24    screen --

11:55:16   25    A.  And whoever is running the Elmo or device, I actually have,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 104 of 225 PageID #:42992
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2331

1  even though they're a lot smaller, I actually have those pages

2  in front of me, if you can give me --

3  Q.  I think it's probably the last -- in your attachment, is

4  take what you mean?

11:55:34  5  A.  My exhibit G.  The far left-hand corner of those two pages

6  in the light gray column you'll see a series of sequential

7  numbers.  If you can tell me what those numbers are, I can turn

8  to the correct page.

9      MS. ROSEN:  Can you tell me the first number on that?

11:55:55  10      MS. CARNEY:  G340106.

11  BY THE WITNESS:

12  A.  No, I mean in the very far left-hand column under "in

13  identifying information," it runs 1 to 90.

14  BY MS. ROSEN:

11:56:03  15  Q.  Oh, that number you mean?

16  A.  Yeah.

17      MS. CARNEY:  145.

18  BY MS. ROSEN:

19  Q.  145.

11:56:25  20  A.  All right.  That's the upper left-hand column, first

21  number.

22  Q.  Right.  So the pages --

23  A.  Okay.

24  Q.  Those two sheets there, right?

11:56:34  25  A.  We're on the same page.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 105 of 225 PageID #:42993
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2332

| | |
|---|---|
| 1 | Q. Okay. Great. So those are the Area North files, right? |
| 2 | A. Yes. |
| 3 | Q. And so the only information that you have is information |
| 4 | related to the investigative files that were found at Area |
| 11:56:48  5 | North? |
| 6 | A. This is a compilation of all 190 files. |
| 7 | Q. The entirety of your attachment, right? |
| 8 | A. Yes. |
| 9 | Q. But focusing on the last two pages, which begin at 145 and |
| 11:57:03  10 | go down, those two pages. |
| 11 | A. That includes on the two pages a column, the blue column |
| 12 | for investigative files, the purple column for permanent |
| 13 | retention, and the next page, which is the green, is the |
| 14 | criminal defense attorney files. |
| 11:57:20  15 | Q. Correct. But when you're looking at that attachment and |
| 16 | you're looking at those last two pages, all that you have |
| 17 | written in the blue -- actually, let me back up for a second. |
| 18 | Did you prepare this attachment? |
| 19 | A. I did not specifically make the Excel spreadsheet, but I'm |
| 11:57:38  20 | familiar with its contents and I've looked at it and compared. |
| 21 | Q. Okay. So you did not actually go through the files |
| 22 | yourself, extract the information, and put it on to the Excel |
| 23 | spreadsheet, correct? |
| 24 | A. No, I believe I testified to on Friday that the sheer |
| 11:57:58  25 | volume here that either contract or permanent employees with |

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 106 of 225 PageID #:42994
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2333

1   the retaining law firm did the initial screening and made notes

2   when things were either contained or not contained within a

3   category or contained or not contained cross-reference between

4   investigative versus permanent retention, and then using what

11:58:23   5   was developed I would go through and see if, in fact, that was

6   an accurate reflection.

7   Q.  Okay.  So going back to my question.  You weren't the one

8   that reviewed the files and then took the information from

9   whatever comparisons were being made and included it in the

11:58:41   10   attachment.  That was done for you and you utilized that then

11   for your purposes, right?

12       MR. LOEVY:  Objection, that's exactly what he's been

13   talking about.

14       THE COURT:  Sustained.

11:58:49   15   BY THE WITNESS:

16   A.  Yeah, that is correct.  However, I had an electronic

17   format, an exact copy of the investigative file, the permanent

18   retention file, and the criminal defense file available to me.

19   BY MS. ROSEN:

11:59:05   20   Q.  But not the state's attorney files, right?

21   A.  Other than the 6.

22   Q.  Okay.  So going back to my original question.  So the ones

23   that begin at 145, that if you look at the screen that we have

24   an arrow in, so there's two pages.  Those are files that relate

11:59:26   25   to the investigative files that were found at Area North for

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 107 of 225 PageID #:42995
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2334

1    which you made no comparison to any other file, right?

2    A.  That's -- if I understand your question correctly, yes.

3    Q.  Okay.  So for purposes of evaluating just the one simple

4    question of whether or not these documents are contained in a

11:59:49    5    criminal defense attorney file, they don't help us, right?

6    A.  Say that again.

7    Q.  Since you compared the investigative files from Area North

8    to no other files, and you simply looked at them on their face

9    for whatever information it was that would be helpful to you in

12:00:08    10   your global opinions --

11   A.  That's correct.  I was limited to looking in that group at

12   just what was contained and what wasn't contained within the

13   investigative file.

14   Q.  Okay.  So it gives us, those files give us zero information

12:00:25    15   about whether or not any of this information or all of this

16   information was in the companion criminal defense attorney

17   files it, right?

18   A.  As I understand your question, that's correct.

19   Q.  Okay.  So now if we take a look at City Demonstrative

12:00:49    20   Number -- I think I have mine out of order.

21         Actually, wait.  We're not done with this yet.

22         I think you told us on Friday that the blue columns

23   reflected information from the investigative files, right?

24   A.  That's correct.

12:01:05    25   Q.  And the purple reflected information that you -- that was

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 108 of 225 PageID #:42996
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2335

1    found and that you compared to the permanent retention file,

2    right?

3    A.   That's correct.

4    Q.   And so looking at that simply on its own, that does not

12:01:22    5    help us or inform whether or not these materials actually are

6    contained in any particular in criminal defense attorney file?

7    That's your evaluation about whether or not the policies were

8    being followed as they were written, right?

9    A.   Within the context of its limitation, yes.

12:01:46    10    Q.   Okay.  And then across the top of the attachment there is

11    color-coding that just lines up with green for criminal defense

12    attorney file, blue for investigative file, and purpose for

13    permanent retention file, right?

14    A.   Yes.

12:02:06    15    Q.   Okay.  So now if we move to City exhibit -- Demonstrative

16    Exhibit Number 2.

17             MS. ROSEN:   I assume no objection?

18             MR. LOEVY:   No objection, Your Honor.

19    BY MS. ROSEN:

12:02:19    20    Q.   So now the next page you'll see we sort of grayed out the

21    purple color, and we grayed out the blue color.  So we can

22    focus our attention now on the green, which represents

23    information that you found that's contained within the criminal

24    defense attorney file, right?

12:02:40    25    A.   Again, the corresponding number in the upper left hand --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 109 of 225 PageID #:42997
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2336

1    Q.  Just generally.  So you can look at any one of your pages

2    that you have there, and you can compare it to the

3    demonstrative that's on your screen.  And you'll see that

4    what's been done is that the blue column and the gray -- the

12:03:02    5    blue column and the purple column has been grayed out.  And so

6    that way we can see the green, which is what represents --

7    which represents what's contained or not contained in the

8    criminal defense files, right?

9    A.  I think I understand what you're saying.  It's not what I

12:03:18    10    had.  It's something that you produced, but if what you're

11    saying is the green represents criminal defense files, then I

12    would agree with that.

13    Q.  Yeah.  I mean, it's your green.  We didn't change the

14    green.

12:03:32    15    A.  I realize that, but the darkened-out portions which have

16    some relevance, they're not there, so ....

17    Q.  Okay.  And the green represents the cases, the files where

18    you found and determined that there were pages missing from the

19    criminal defense file that appeared in the investigative files,

12:03:55    20    right?

21    A.  I'm not trying to be obtuse, but the spreadsheet I have is

22    the spreadsheet that I included with my report.  This is

23    something that you have done.  I can't read it, and I don't

24    understand what you're trying to ask me.

12:04:10    25    Q.  Okay.  So let me see if I can be a little more clear.  In

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 110 of 225 PageID #:42998
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2337

1    the demonstrative what we've done is we've eliminated the blue

2    color and we've eliminated the purple color and made it all

3    gray like the rest of your background.

4            And so then what's there, so that we can focus in on

12:04:28    5    the criminal defense files is the green cells as they appeared

6    in your attachment.

7            So all those green cells represent, if I understand

8    your attachment correctly, criminal defense files that purport

9    to have missing documents, right?  Isn't that what the green

12:04:53    10    cells represent?

11    A.   The green cells in the original report referred to the

12    criminal defense files.  And I'm not -- I'm not arguing that or

13    denying that.  It's just still unclear to me because what I

14    have on the screen in front of me could be anything.  I can't

12:05:12    15    tell what it is.

16    Q.   Okay.  So if you'll take my word for it, hypothetically

17    speaking --

18    A.   Certainly.  If that's the preface.

19    Q.   -- that the green cells match your green cells, and that I

12:05:23    20    haven't changed any green cells --

21    A.   Okay.

22    Q.   -- and all we've done is make all the other colors gray.

23    A.   Okay.

24    Q.   Are you with me?

12:05:30    25    A.   Yes, ma'am.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 111 of 225 PageID #:42999
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2338

1  Q.  Okay.  So now we've got the green cells, and the green

2  cells represent documents that are missing from the criminal

3  defense attorney files, right?

4  A.  Okay.

12:05:37  5  Q.  Okay.  So now each of those lines --

6        MS. ROSEN:  And if we can give him an example.

7        (Brief pause).

8  MS. ROSEN:

9  Q.  If we look at your Attachment G in your form, if you take a

12:06:04  10  look at Line 3.

11  A.  And since Line 3 corresponds to three different sections,

12  the green, the purple, and the blue, and they're found on

13  different pages, just the green.

14  Q.  Just the green.

12:06:26  15  A.  All right.

16  Q.  Okay.  So now we're on the same page.

17  A.  Yes.

18  Q.  So Line 3, just the green.  The first column or cell,

19  what's written at the top of that?

12:06:35  20  A.  In the green part?

21  Q.  The green, at the very top, what is that?

22  A.  (Reading:)

23        "... has a criminal defense attorney file been

24        produced?"

12:06:42  25  Q.  Okay.  And that's a "yes" or a "no," right?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 112 of 225 PageID #:43000
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2339

1    A.  That's "yes" or a "no."

2    Q.  Okay.  And in this particular case, Line 3, the answer is

3    "yes," right?

4    A.  And I'm sorry.  It's a little small.

12:06:52    5          (Brief pause.

6    BY THE WITNESS:

7    A.  "Yes."  It is a "yes."

8    BY MS. ROSEN:

9    Q.  And if we go next to the cell right next to it, same line,

12:07:05    10   at the top.

11   A.  It says:

12          "Is there any investigative material missing

13          from the defense attorney file."

14   Q.  And the answer is "yes" or "no," right?

12:07:16    15   A.  Yes, that's correct.  The answer in this specific column is

16   "yes."

17   Q.  And then if we move further to the right, what's the

18   question asked at the top of that cell?

19   A.  Referring to the just mentioned column is:

12:07:31    20          "If, in fact, there is material missing, what is

21          the Bates number for the missing material?"

22   Q.  Okay.

23   A.  And in this case there was a single Bates number.

24   Q.  So a single page was missing from that particular file?

12:07:44    25   A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 113 of 225 PageID #:43001
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2340

1    Q.  Okay.  And then if we move further to the right, what's

2    there?

3    A.  (Reading:)

4            "Does the defense attorney file contain an

12:07:50    5            inventory sheet?"

6             "Yes" or "no."

7              In this case "yes."

8    Q.  Okay.  And then if we move further to the right, what's

9    that column?

12:07:57   10    A.  (Reading:)

11            "If "yes," i.e., the inventory in the defense

12            attorney file, does it match the inventory in

13            the investigative file?"

14    Q.  And then in this case?

12:08:11   15    A.  It was not applicable because there was no inventory in the

16    investigative file.

17    Q.  Okay.  And then the next cell over, what is that one?

18    A.  (Reading:)

19            "Are GPRs from the investigative file --"

12:08:31   20             (Laughing.)  I'm really sorry, but it would help if I

21    had a bigger one.

22            MR. SWAMINATHAN:  I have a bigger one.  Can I give

23    that to him?

24            MS. ROSEN:  Sure.

12:08:45   25            THE WITNESS:  Thank you, sir.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 114 of 225 PageID #:43002
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2341

|     |     |
| --- | --- |
| 1 | MR. SWAMINATHAN:  Would it help you if you have a |
| 2 | bigger copy, Judge? |
| 3 | THE COURT:  Is this a bigger copy (indicating)? |
| 4 | MR. SWAMINATHAN:  We have a bigger one.  Do you want |
| 5 | that? |
| 6 | THE COURT:  Well, this wasn't big enough. |
| 7 | MR. SWAMINATHAN:  Judge, you have two options, |
| 8 | actually. |
| 9 | THE COURT:  Oh, that's nice and big. |
| 10 | (Document tendered to the Court.) |
| 11 | BY MR. LOEVY: |
| 12 | Q.  Okay. |
| 13 | A.  It is a little bit better: |
| 14 | "... are GPRs from the investigative file |
| 15 | missing from the attorney file?" |
| 16 | And that be "yes" or "no."  And in this particular |
| 17 | case of row three: |
| 18 | "Not applicable because no GPRs in the |
| 19 | investigative file." |
| 20 | Q.  And then moving further to the right? |
| 21 | A.  (Reading:) |
| 22 | "If, in fact, there are GPRs missing, what are |
| 23 | the Bates numbers?" |
| 24 | And since that's not the case here, it's marked "NA," |
| 25 | not applicable. |

Timestamps in left margin:
12:08:55 (line 5)
12:09:17 (line 10)
12:09:26 (line 15)
12:09:35 (line 20)
12:09:47 (line 25)

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 115 of 225 PageID #:43003
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2342

1    Q.  Okay.  And then further to the right?

2    A.  (Reading:)

3            "Are handwritten notes from the investigative

4            file missing from the attorney file?"

12:09:57    5            And then in this, not applicable, no handwritten

6    notes in the investigative file.

7    Q.  Okay.  And then one more?

8    A.  (Reading:)

9            "Bates numbers from missing handwritten notes."

12:10:04    10            Not applicable since there were none.

11    Q.  And then finally one more.

12    A.  (Reading:)

13            "Are to-from memos from the investigative file

14            missing from the attorney file?"

12:10:15    15            This is "NA," "no, there are no to-from in

16            investigative file."

17    Q.  Okay.  So now if we're interested in simply isolating from

18    this giant chart here that's too small to read, just the

19    information that's missing from the criminal investigative

12:10:35    20    file, it would be appropriate to look at this third cell,

21    right, where it says "missing documents"?

22    A.  Right.

23    Q.  So if we could move then to City Demonstrative Number 3?

24            MR. LOEVY:  Judge, these aren't the same read from his

12:10:51    25    chart, right?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 116 of 225 PageID #:43004
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2343

1     MS. ROSEN:  Same.

2     MR. LOEVY:  No objection.

3     BY MS. ROSEN:

4     Q.  So if we move to City Exhibit 3.  If you'll take a look

12:10:59   5     there.  Take a look just on the screen.

6           So the green that's there on your cell, I'm going to

7     represent to you represents each cell that identifies the list

8     of missing documents in the criminal defense attorney files

9     that were available for your review.  Okay?

12:11:20  10     A.  Just limited to the criminal defense files, yes.

11     Q.  Correct.  Okay.

12           MS. ROSEN:  Judge, if we're going to take a lunch

13     break, now might be a good time.

14           THE COURT:  Yes.  Very good.

12:11:32  15           Let's take an hour, ladies and gentlemen.  We'll start

16     at ten after 1:00.

17           COURT SECURITY OFFICER:  All rise.

18           (The following proceedings were had out of the

19           presence of the jury in open court:)

12:12:11  20           THE COURT:  Can anyone give me any sense of how we're

21     doing?

22           MS. ROSEN:  Yes.  I mean, I think I have about half an

23     hour, and then I think Mr. Loevy is estimating at this moment

24     about half an hour, and then I think we're moving through the

12:12:24  25     remaining witnesses today and tomorrow.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 117 of 225 PageID #:43005
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2344

1        MR. LOEVY:  I think so, Your Honor.  We have some hope

2   that we're going to close our case tomorrow, subject to one

3   witness who is not available tomorrow.

4        THE COURT:  It's longer than anticipated.  But, okay.

12:12:41   5   And then what?

6        MS. ROSEN:  And then we're anticipating three or

7   4 days, depending.

8        THE COURT:  Okay.  All right.  Very good.  That's not

9   terrible news.

12:12:56  10        (Laughter in the courtroom).

11        MS. ROSEN:  We'll go with that.

12

13

14        (Luncheon recess taken from 12:13 o'clock p.m.

15         to 1:10 o'clock p.m.)

16

17              *     *     *     *     *     *     *     *

18

19

20   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21        RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

22

23   /s/Blanca I. Lara                    June 18, 2018

24

25

Brasfield - cross by Rosen

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2345

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3   JACQUES RIVERA,                    ) No. 12 CV 4428
                                        )
 4             Plaintiff,               )
                                        )
 5   vs.                                ) Chicago, Illinois
                                        )
 6   REYNALDO GUEVARA, STEVE GAWRYS,    )
     DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
 7   JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN   )
     MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
 8   RUSSELL WEINGART, ESTATE OF ROCCO  )
     RINALDI, CITY OF CHICAGO,          ) June 18, 2018
 9                                      )
               Defendants.              ) 1:12 o'clock p.m.
10
                         VOLUME 10-B
11           TRANSCRIPT OF PROCEEDINGS - Trial
           BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                     and a Jury

13   APPEARANCES:

14   For the Plaintiff:    LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
15                              MR. STEVEN E. ART
                                MR. ANAND SWAMINATHAN
16                         311 North Aberdeen Street
                           3rd Floor
17                         Chicago, Illinois  60607

18                         MacARTHUR JUSTICE CENTER
                           Northwestern University School of Law
19                         BY:  LOCKE E. BOWMAN III
                           357 East Chicago Avenue
20                         Chicago, Illinois  60611
                           (312) 503-0844
21

22   Court reporter:            Blanca I. Lara
                             Official Court Reporter
23                          219 South Dearborn Street
                                  Room 2504
24                          Chicago, Illinois 60604
                                (312) 435-5895
25                      blanca_lara@ilnd.uscourts.gov
```

```
 1    APPEARANCES:   (Continued)

 2

 3    For the Individual        THE SOTOS LAW FIRM
      Defendants:               BY:  MR. JEFFREY N. GIVEN
 4                                   MR. JAMES G. SOTOS
                                     MS. CAROLINE P. GOLDEN
 5                                   MR. JOSEPH M. POLICK
                                     MR. DAVID A. BRUEGGEN
 6                               550 East Devon Avenue, Suite 150
                                 Itasca, Illinois  60143
 7

 8    For the Defendant         ROCK FUSCO & CONNELLY, LLC
      City of Chicago:          BY:  MS. EILEEN E. ROSEN
 9                                   MS. CATHERINE M. BARBER
                                     MS. THERESA B. CARNEY
10                               321 North Clark Street, Suite 2200
                                 Chicago, Illinois  60654
11

12    For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
      Guevara:                  BY:  MR. THOMAS E. LEINENWEBER
13                                   MR. JAMES V. DAFFADA
                                 120 North LaSalle Street, Suite 2000
14                               Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

1    (Jury out.  Witness in.  Proceedings heard in open court:)

2         MR. SOTOS:  Judge, we have an issue we have to address

3    before the jury comes in.

4         THE COURT:  Well, the jury is on its way in, so quick.

5         MR. SOTOS:  Okay.  Well, we've been just told that

6    they're planning on calling two of the defendants.

7         MR. LOEVY:  Just one.  Actually, not Mr. Noon.  He

8    told me he has some health issues in the afternoon.

9         MR. SOTOS:  Well, Mr. Guzman isn't even here, and

10   didn't have notice that he's going to testify today.

11        THE COURT:  All right.

12        MR. SOTOS:  And there's --

13        THE COURT:  Well, what can I do about that?  You have

14   to figure that out.

15        MR. LOEVY:  Well, I thought we had it figured out this

16   afternoon.

17        MR. SOTOS:  No.  I mean, I think you have to figure

18   something out, because we have an agreement that you give 24

19   hours' notice.  We didn't get it.  He's just --

20        THE COURT:  Well --

21        MR. SOTOS:  -- coming back.

22        THE COURT:  Well, wait.

23        MR. SOTOS:  Here's the problem.  I'm just saying

24   there's a problem.

25        THE COURT:  Right.  Calm yourself.  Yes.

1          MR. LOEVY:  Ms. Rosner was supposed to testify today.

2    She's had a family emergency.

3          We don't want to have a gap.  We had a conversation

4    this morning.  They explained to me Mr. Noon doesn't do as good

5    in the afternoon.  Fine.  Mr. Guzman has no memory of these

6    events, none.  He's been listening to the --

7          THE COURT:  But he's not here.

8          MR. LOEVY:  -- entire trial.  Well, he will be here.

9    I assume he --

10         MR. SOTOS:  He's coming at some point.  He's out of --

11   he lives in Albuquerque.  He's flying in today.

12         MR. LOEVY:  Has he been here today?

13         MR. SOTOS:  No.

14         MR. LOEVY:  Oh.  Then I apologize, then.  And I --

15         THE COURT:  Okay.  All right.

16         MR. LOEVY:  -- misunderstood the situation.

17         THE COURT:  So I don't have to deal with something

18   before the jury comes in.  Thank you.

19         MR. SOTOS:  Appears we don't.  Thank you, Judge.

20         THE COURT:  If you talk to each other --

21         MR. LOEVY:  I thought we had an understanding.

22         THE COURT:  -- you know, you'd save me a lot of

23   aggravation.

24         So are we going to have a gap?

25         MR. LOEVY:  I don't think so, Your Honor.  We're

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 123 of 225 PageID #:43011
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2349

1    getting a witness.

2         THE COURT:  Okay.

3    (Jury in.)

4         THE COURT:  Please be seated, everyone.

5         Ms. Rosen, whenever you are ready.

6         MS. ROSEN:  Thank you, Judge.

7    MICHAEL BRASFIELD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

8              CROSS-EXAMINATION (Resumed)

9    BY MS. ROSEN:

10   Q.  Okay, Mr. Brasfield.  Let's take a look at your Attachment

11   G again.  And what we've done now for this portion is we've

12   actually blown up portions of your file.  See where I am?

13        MS. ROSEN:  I'll mark this one City's Demonstrative

14   Exhibit No. 4.  This is a blow-up/highlight of -- you have no

15   objection to this, right?

16        MR. LOEVY:  Right.

17        MS. ROSEN:  Of an entry at line 27 of your Attachment

18   G.

19        MS. ROSEN:  Your Honor, may I approach?

20        THE COURT:  Yes.

21   BY MS. ROSEN:

22   Q.  This is an RD file, H167635.  And I have a folder here for

23   you, if you need it, which contains the public defender's file

24   and the state's attorney file.  And you can see we've tabbed

25   for you the Bates numbers, if that comes up, of the questions

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 124 of 225 PageID #:43012
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2350

 1   that we may have for you, so we can speed it along.

 2        If you take a look at what is at line 27 of your

 3   chart, you have the Records Division, No. H167635, and that is

 4   the homicide investigation related to the homicide of an

 5   individual named Mr. Whims which occurred in April of 1986.

 6        And you note on your exhibit that Bates number where

 7   the missing material is is RFC4150.

 8        Do you see that there?

 9   A.  Yes.

10        MS. ROSEN:  We can actually put --

11   BY THE WITNESS:

12   A.  I'm sorry.  Yes.

13        MS. ROSEN:  -- that up on the screen.  And then --

14   actually not for the jury yet, though.

15   BY MS. ROSEN:

16   Q.  If you can take a look at what's up on your screen.  That's

17   a supplementary report.  The first page is RFC4149 and then the

18   next page is RFC4150.

19        Do you see that there?

20   A.  Yes, I do.

21   Q.  And that 4150 is the Bates number on your spreadsheet,

22   right?  RFC4150 is the document that's missing from the

23   criminal defense attorney file, right?

24   A.  Yes.  What I have on the spreadsheet, yes.

25   Q.  Okay.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 125 of 225 PageID #:43013
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2351

 1              MS. ROSEN:  At this time, we seek to admit -- what

 2    number is the investigative file?

 3              MS. BARBER:  What number are you on?

 4              MR. LOEVY:  We need a letter, too.

 5              MS. ROSEN:  Yeah, I know.  So we'll make it --

 6              MS. BARBER:  19.

 7              MS. ROSEN:  -- 19-Q, yeah.

 8              THE COURT:  Any objection?

 9              MR. LOEVY:  No, Your Honor.  Well, same objection they

10    were making, but -- so -- no objection.

11              THE COURT:  It's received.

12        (Said City Exhibit 19-Q received in evidence.)

13    BY MS. ROSEN:

14    Q.  Okay.  So taking a look at that second page, that's a

15    second page of a supp. report, right?

16    A.  Yes.

17    Q.  And according to your chart, that page is missing.

18    A.  That's --

19    Q.  But if we -- actually, if we take a look at the criminal

20    defense attorney file that I have for you -- so it's the PD

21    file and you can see the pages there are tabbed JRL24061 --

22    A.  Yes.

23    Q.  -- and 062.  Do you see those there?

24    A.  Yes.

25    Q.  And, in fact, JRL204062 is contained within the PD file,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 126 of 225 PageID #:43014
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2352

1  and that's the same page as the document that you've identified

2  as missing, RFC4150.  Let me know when you're there.

3  A.  Right.  It's in the folder that you handed me.  It's

4  printed on the back of that.

5  Q.  Yeah.  And let me just say, we photocopied all of these

6  files double-sided to save on volume.

7  A.  Okay.

8  Q.  So I am not -- I'm not making any representation that

9  they're originally kept double-sided or single-sided.  It's

10  just how we photocopied them.

11  A.  Very good.

12  Q.  So we don't have as much paper.

13        Okay.  So you're with me, right, that, in fact, the

14  report that's identified on your chart -- the second page of

15  the report that's identified on your chart as missing is also

16  on -- in the PD file, which is Bates-stamped JRL204062?  Do you

17  see that?

18  A.  Yes.  It's in this folder that you handed me.

19  Q.  Okay.  So that is just an error in the chart, right?

20  A.  Well, it is in this folder that you handed me.  I made a

21  notation on the spreadsheet that it wasn't there.

22  Q.  Okay.  But the folder I handed you is a photocopy of the

23  public defender's file in this case in the same RD number.

24  A.  Oh, I'll take your word for it.

25  Q.  If you take a look at it -- look at the -- I gave you the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 127 of 225 PageID #:43015
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2353

1   whole file.

2   A.  Right.

3   Q.  Do you recognize it from --

4   A.  Yes.

5   Q.  -- your review?

6   A.  Well, from my electronic review, yes.  I don't -- I'm not

7   disputing it at all.

8   Q.  Okay.  All right.  Now I'm going to ask you to take a look

9   at N262285 and hand you that.

10          And the same application here.  There's a PD file and

11  an SAO file in there.

12  A.  And is there a line number?

13  Q.  Yeah, just one second.

14  A.  Oh, I'm sorry.

15  Q.  I'm going to get it for you.

16  A.  I'm sorry.

17  Q.  That's okay.  And now we're going to take a look at line

18  No. 110 on your chart, which is Records Division No. N262285,

19  right?  Do you have that matched up there with the file I gave

20  you?

21  A.  Let me find the 110 first.

22          MS. ROSEN:  Okay.  And this -- the board that we have

23  up now is City Exhibit No. 5.

24  BY THE WITNESS:

25  A.  262285, okay.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 128 of 225 PageID #:43016
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2354

1    BY MS. ROSEN:

2    Q.  Right.  So we're looking at line 110, right?

3    A.  Yes.

4    Q.  Of Attachment G.  And it says on your -- on the spreadsheet

5    that there are several pages missing, right, from the criminal

6    defense attorney's file?

7    A.  Right.  In the second column, is there any investigative

8    material missing from the defense attorney file?  Answer is --

9    on my spreadsheet is yes and then a series of one, two, three,

10   four, five, six, seven.

11          MS. ROSEN:  Okay.  So if we could put RFC12640 and 41,

12   which we're going to mark as City 19-R.  Just for Mr. Brasfield

13   and counsel and the Court.

14   BY MS. ROSEN:

15   Q.  If you take a look at RFC12640, that's a two-page document,

16   right?

17   A.  Yes.  It's labeled 12640, 12641.

18   Q.  And those are the two pages that you identified as being

19   missing from the criminal defense file --

20   A.  That's correct.

21   Q.  -- right?  Okay.

22          MS. ROSEN:  The City seeks to admit RFC12640 and 41 as

23   City 19-R.

24          THE COURT:  Any objection?

25          MR. LOEVY:  No objection, Your Honor.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 129 of 225 PageID #:43017
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2355

1        THE COURT:  It is received.

2    (Said City Exhibit 19-R received in evidence.)

3    BY MS. ROSEN:

4    Q.  And then if you take a look at now the state's attorney's

5    file --

6    A.  This is the state's attorney's file?

7    Q.  You have both in there, both the public defender's file and

8    the state's attorney's file.

9        So you can -- you see which one is the state's

10   attorney's file?

11   A.  I -- the one that's rubberbanded together.

12   Q.  Of SAO?

13   A.  SAO, yes.

14   Q.  Okay.  If you take a look at the SAO file and look at the

15   page that's Bates-stamped 18941.  Do you see that there?

16   A.  Yeah, I see the tab, yes.

17   Q.  Oh, I'm sorry.  18996.  Oh.  No, no, no.  18969, 18970.

18   I'm sorry.

19   A.  I'm sorry.  So which one it is you want me --

20   Q.  So -- yeah, my mistake.  So take a look at the SAO file and

21   look at 18969 --

22   A.  All right.

23   Q.  -- to 18970.  So if you look at the backside, which would

24   normally -- of 69.

25   A.  I'm sorry.  This is a little awkward.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 130 of 225 PageID #:43018
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2356

 1   Q.  I know.

 2   A.  Okay.  I have the 18969, which is the stick-em tab on it,

 3   and then I have 18970 here.

 4   Q.  Okay.  And is that the same rap sheet that you've

 5   identified as missing from the criminal defense attorney's

 6   file?  Can you tell --

 7   A.  This is from the public -- this is from the state's

 8   attorney file.

 9   Q.  Correct.

10   A.  Yeah.  So I had no reference to this at all.

11   Q.  Okay.  But my question is if you look at the documents, are

12   they the same?

13         MS. ROSEN:  And maybe we can make it easy for you.

14   Why don't you put that up on the screen, SA018969 and 18970.

15         MS. CARNEY:  And the jury hasn't seen it?

16         MS. ROSEN:  The jury hasn't seen it yet, but I would

17   like Mr. Brasfield to look at it first.

18   BY MS. ROSEN:

19   Q.  You can take a look at the screen.  Does that look like the

20   same rap sheet?

21   A.  It is the same rap sheet that's in the state's attorney's

22   file.

23   Q.  Okay.

24   A.  Which I have not seen.

25   Q.  Right.  So if you can --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 131 of 225 PageID #:43019
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2357

1     MS. ROSEN:  If we -- the City seeks to admit these two

2  pages from the SAO file, City Exhibit 21-A.

3     MR. LOEVY:  No objection, Your Honor.

4     THE COURT:  It is received.

5  (Said City Exhibit 21-A received in evidence.)

6  BY MS. ROSEN:

7  Q.  And then if we put them side by side, you can see that

8  12640 is identical to SAO18969, right?

9  A.  I have -- they keep changing on the screen here.  I

10  currently have 12641 and state's attorney subpoena 18970.

11  Q.  Okay.  So you take a look at both of those documents and

12  those are the same, correct?

13  A.  Superficially, they appear to be the same, yes.

14     MS. ROSEN:  Okay.  And then if we can flip back to the

15  first two pages.

16  BY MS. ROSEN:

17  Q.  And if you could take a look at that, those look like

18  copies of the same document, right?

19  A.  They appear to be, yes.

20  Q.  Okay.  So you have said that you did not see this state's

21  attorney file, right?

22  A.  That's correct.

23  Q.  Okay.

24  A.  Unless this was one of the six, which I don't believe it

25  was.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 132 of 225 PageID #:43020
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2358

1  Q.  It is not one of the six.

2  A.  Right.

3  Q.  But it was -- you knew that they were -- that other state's

4  attorney files were available, right?

5  A.  I would have assumed they would have been.

6  Q.  Well, available to us in this case, like that we had

7  received them.

8  A.  I -- I would believe that to be the case, yes.

9  Q.  Okay.  And despite the fact that you looked at a couple SAO

10  files, you didn't ask to review all the SAO files?

11  A.  That's correct.

12  Q.  Okay.  And in this particular case, that rap sheet that you

13  identified as missing from the criminal defense attorney file

14  actually exists in the SAO file?

15        MR. LOEVY:  Your Honor, I think we've established that

16  point.  Asked and answered.

17        THE COURT:  Well, overruled if you don't think you've

18  gotten that answer.

19        MS. ROSEN:  Yeah, I don't think I have.

20  BY THE WITNESS:

21  A.  I -- ask your question again.  I'm sorry.

22  BY MS. ROSEN:

23  Q.  Sure.  And isn't it true, based on what we've just done

24  here in court, that the criminal -- that the rap sheet that you

25  said was missing from the criminal defense attorney's file, the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 133 of 225 PageID #:43021
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2359

1    exact copy of it exists in the SAO file?

2    A.  That's -- that's correct.  Based on the material you've

3    shown me today, there is this rap sheet that was contained in

4    the state's attorney's file.  On my spreadsheet, I've made a

5    note that it does not -- they are not contained within the

6    criminal defense file.

7    Q.  Okay.  And then let's take a look at -- in the same file,

8    you identify RFC12644 as missing.

9         MS. ROSEN:  If we can put that up on the screen just

10   for Mr. Brasfield.

11   BY THE WITNESS:

12   A.  This is in the set of three sequential, 12742 through

13   12745, and you're referring to 744.

14   BY MS. ROSEN:

15   Q.  No.  What I'm saying -- what I'm asking you to take a look

16   at on the computer screen here --

17   A.  I'm sorry.

18   Q.  -- is RFC12644.

19   A.  Yes.

20   Q.  Which is a document that you have identified as being

21   missing in your attachment at line 110, right?

22   A.  Yes.

23   Q.  Okay.  And it's missing from, in your review, the criminal

24   defense attorney's file?

25   A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 134 of 225 PageID #:43022
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2360

1  Q.  Okay.  So now I'm going to ask you to take a look at that

2  same SAO file that you have there at page 18941.

3  A.  It appears to be the same one that's on the screen here.

4  Q.  Okay.  And so the document that you identified as missing

5  from the criminal defense attorney's file, the -- another

6  document from the same file is actually an SAO file, right?

7  A.  That's correct.  Apples and oranges, but yes.

8  Q.  Okay.  Now, let's move to --

9    (Counsel conferring.)

10        MS. ROSEN:  Actually, the City would like to admit --

11  I didn't do that.  So let's put up SAO18941, which we'll mark

12  as City 21-B, and seek to admit that for identification.

13        THE COURT:  Any objection?

14        MR. LOEVY:  No, Your Honor.

15        THE COURT:  It is received.

16    (Said City Exhibit 21-B received in evidence.)

17        MS. ROSEN:  Okay.  If we could just put those up side

18  by side --

19        MS. CARNEY:  Sure.

20        MS. ROSEN:  -- since we didn't do that.

21  BY MS. ROSEN:

22  Q.  Those are the documents we were just talking about, right?

23  The two lineup reports?

24  A.  That's correct.

25  Q.  And there's a copy in the criminal defense -- there's a

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 135 of 225 PageID #:43023
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2361

1    copy missing from the criminal defense attorney file in the

2    City's investigative file, also in the City -- in the state's

3    attorney's file, right?

4    A.  I have -- what you're showing me is -- I'll just say yes.

5    Q.  Okay.  All right.  Now, if we can take a look at, also from

6    this same file, RFC12646.

7           And this is a document that you've identified on line

8    110 as being missing from the criminal defense attorney's file,

9    right?

10   A.  Yes.

11   Q.  And it's a bunch of handwritten notes that we've been

12   talking about, right?

13   A.  That's correct.

14           MS. ROSEN:  City seeks to -- moves to admit City 19-S.

15           THE COURT:  Any objection?

16           MR. LOEVY:  No, I don't think so, Your Honor.

17           THE COURT:  19-S is received.

18      (Said City Exhibit 19-S received in evidence.)

19   BY MS. ROSEN:

20   Q.  And so these -- this is an example, right, of handwritten

21   notes not on a GPR that you had such concern about in your

22   testimony, right?

23   A.  Generally speaking.  Because I don't have the whole file in

24   front of me.  I'm -- if you're saying that these handwritten

25   notes weren't on a GPR, I'll take your word for it.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 136 of 225 PageID #:43024
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2362

1  Q.  Well, do they appear to be on a GPR?

2  A.  Well, this is not, no.

3  Q.  Oh, okay.  So, yeah, just that document is not on a GPR,

4  right?

5  A.  That's correct.

6  Q.  And you --

7  A.  That's correct.

8  Q.  -- identified that particular page as missing on your

9  chart?

10  A.  Missing from the criminal defense file, yes.

11  Q.  Okay.  So now I would like you to take a look at SAO18946.

12  A.  A quick scan would indicate that it is the same document.

13  Q.  Okay.

14        MS. ROSEN:  The City seeks to move SAO18946 as City's

15  21-C.

16        THE COURT:  Any objection?

17        MR. LOEVY:  No, Your Honor.

18        THE COURT:  It is received.

19   (Said City Exhibit 21-C received in evidence.)

20        MS. ROSEN:  If we could put those up side by side.

21  Oh, wrong one.

22        MS. CARNEY:  Sorry.

23  BY MS. ROSEN:

24  Q.  Okay.  So the same document that you identify as missing

25  from the criminal defense attorney file is in the SAO file,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 137 of 225 PageID #:43025
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2363

 1   right?

 2   A.  That's correct.  Again, having not examined it.

 3   Q.  The SAO file?

 4   A.  Right.

 5   Q.  Okay.  Now, if we can take a look at the same case.  You

 6   identify RFC12647, which is a general progress report as

 7   missing from the criminal defense attorney's file.

 8            MS. ROSEN:  If we could put that up on the screen just

 9   for Mr. Brasfield.

10   BY MS. ROSEN:

11   Q.  See that there?

12   A.  Yes.

13   Q.  Okay.

14            MS. ROSEN:  City seeks to -- moves to admit RFC12647

15   as City T.

16            MR. LOEVY:  No objection, Your Honor.

17            THE COURT:  T?

18            MS. ROSEN:  T, as in Tom.

19            THE COURT:  Okay.  It is received.

20   (Said City Exhibit T received in evidence.)

21            MS. ROSEN:  Okay.  Thank you.  If we could publish

22   that to the jury.

23   BY MS. ROSEN:

24   Q.  So, now, this is a general progress report that you've

25   identified in your chart as missing from the criminal defense

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 138 of 225 PageID #:43026
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2364

1  attorney's file, right?

2  A.  That's correct.

3  Q.  And it's just a single page, right, of the general progress

4  -- of a progress report?  It's not a whole cache of them.  It

5  is just one general --

6  A.  Right.  It's not numbered as page 1 of 2 or 1 of 3.

7  Q.  Okay.

8  A.  It's just a standalone.

9  Q.  And then if you can take a look at SAO file 18867.  And do

10  you see that same GPR in the state's attorney file?

11  A.  Appears to be the same.

12       MS. ROSEN:  Okay.  And the City seeks to admit

13  SAO189 -- no, 18867 as City 21-Z.

14       THE COURT:  Any objection?

15       MR. LOEVY:  No, Your Honor.

16       THE COURT:  It is received.

17  (Said City Exhibit 21-B received in evidence.)

18  BY MS. ROSEN:

19  Q.  And they're the same other than the redaction that should

20  have happened on the other one as well?

21  A.  Right.  There is a redaction on the one on the left.

22  Q.  Yeah.  I'll represent to you that we redacted it because it

23  should have been redacted.

24  A.  Because we don't want to share Social Security numbers.

25  Q.  Correct.  And we should --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 139 of 225 PageID #:43027
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2365

 1  A.  Correct.  Okay.

 2  Q.  -- have redacted the other one.  So we can take those down.

 3  But those are the same documents --

 4  A.  Yes.

 5  Q.  -- right?  Okay.

 6  A.  Appear to be.

 7  Q.  And so if we do one more from this file, the last one on

 8  your list that's identified in the -- in line 110 is RFC12724

 9  and 12725.

10          MS. ROSEN:  Get that up on the screen for Mr.

11  Brasfield.

12  BY MS. ROSEN:

13  Q.  That's a GPR, RFC12724 and then RFC12725.

14          Do you see that there?

15  A.  I'm -- unless I'm looking in the wrong place on the

16  spreadsheet, I don't see 1272 -- what was it?

17  Q.  127 -- well, it's 12725 that's missing, right?  That's

18  what's there?

19  A.  That's correct.

20  Q.  Okay.  So 12725 has got two words on it, right, "of

21  offender"?

22  A.  Yes.

23  Q.  Okay.  And then if we go back to 12724, that's a GPR,

24  right?

25  A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 140 of 225 PageID #:43028
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2366

 1   Q.  And if you read the line at the bottom there, does it make

 2   sense that the two words on the other page follow from that

 3   sentence?  Can you tell?

 4   A.  I don't have the second page in front of me now.

 5   Q.  Okay.  There it is.

 6   A.  Thank you.  And "made possible I.D." and then that would

 7   flow "of offender."

 8           MS. ROSEN:  Okay.  City seeks to move RFC12724 and

 9   12725 as City Exhibit U.

10           THE COURT:  Any objection?

11           MR. LOEVY:  No, Your Honor.

12           THE COURT:  It is received.

13     (Said City Exhibit U received in evidence.)

14           MS. ROSEN:  Okay.  And then if we take a look at -- if

15   we could put those up side by side.

16   BY MS. ROSEN:

17   Q.  And have you in your review of the files noticed that

18   sometimes people write on the back of a GPR, that detectives

19   write on the back of a GPR?

20   A.  I have seen that occur, yes.

21   Q.  Okay.  So is it likely, based on that, that this "of

22   offender" is on the backside of that GPR?

23   A.  I would have -- entirely possible, but it's not the way to

24   independently tell from that.

25   Q.  Unless you were to look at the original file or something,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 141 of 225 PageID #:43029
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2367

1    right?

2    A.  If you had that original piece of paper, yes.

3    Q.  Okay.  And now if we take a look at -- if you look at the

4    SAO file that you have and take a look at pages SAO18873 and

5    18874.

6    A.  18873?

7    Q.  18873, yeah.  And 74.

8    A.  All right.  They appear to be the same two pages that you

9    showed me.

10          MS. ROSEN:  Okay.  And the City would seek to admit

11   SAO18873 and 74 as City 21-E.

12          MR. LOEVY:  No objection, Your Honor.

13          THE COURT:  It is received.

14   (Said City Exhibit 21-E received in evidence.)

15   BY MS. ROSEN:

16   Q.  So the first pages of the document are the same, same

17   copies, same document, and then the second pages are the same,

18   same copies, same document, right?

19   A.  That's correct.

20   Q.  Okay.  So each of the documents that you've identified at

21   line 110 of your attachment as being missing all exist in the

22   copy that we've obtained in the state's attorney's file, right?

23   A.  In the material that you've just given me, assuming that

24   the source is correct, that's -- that is correct.

25   Q.  Okay.  So that's some indication, don't you think, that

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 142 of 225 PageID #:43030
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2368

1  perhaps the criminal defense attorney's files are not in the

2  same condition as they were back at the time of the criminal

3  prosecution?

4          MR. LOEVY:  It's one file, Your Honor.

5          THE COURT:  Excuse me?

6          MR. LOEVY:  Objection to the foundation for that

7  question.  One file.

8          THE COURT:  I think the witness can answer if he has

9  any idea.

10 BY THE WITNESS:

11 A.  I'm sorry.  Would you --

12 BY MS. ROSEN:

13 Q.  Sure.  Based on this exercise that we've just gone through,

14 isn't it true that the fact that all of the documents that

15 you've identified as missing from the criminal defense

16 attorney's file at line 110, since they're all in the SAO file,

17 isn't that some indication to you that perhaps the criminal

18 defense attorney files that we've obtained in this case are not

19 in the same condition as they were in the criminal prosecution?

20 A.  I would have to make a guess without foundation.  I would

21 say unequivocally that the documents are contained in the

22 state's attorney's file.

23 Q.  Okay.

24 A.  I can say unequivocally that they were not in the criminal

25 defense file.  Whether they were or they were not was not what

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 143 of 225 PageID #:43031
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2369

1    I was asked to do, and I can't form a speculation as to it.

2    Q.  Do you have an understanding, based on the work that you've

3    done in this case and your experience, about whether or not

4    prosecutors have an obligation to turn over the police reports

5    that they have in their file?

6    A.  It's my understanding that that is the expectation, yes.

7    Q.  Okay.  All right.  Now --

8    A.  Ms. Rosen, are we done with this --

9    Q.  We are done --

10   A.  Thank you.

11   Q.  -- with this one.  We'll take a look at now N133637.

12   A.  Thank you.

13   Q.  Uh-huh.  And this is line 103 on your attachment.  Let me

14   know when you're there.

15   A.  Referring to N133637?

16   Q.  Right.

17   A.  Okay.

18   Q.  And you have listed there a series of six or seven pages of

19   documents that are missing, right?

20   A.  Right.  The first column indicates that it's yes, but with

21   an investigative file incomplete.

22   Q.  Meaning that the investigative file that you received from

23   the police department is missing?

24   A.  That's correct.

25   Q.  And how do you know that?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 144 of 225 PageID #:43032
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2370

 1  A.  That there are -- it varies from case to case.  I'd have to

 2  see the whole file.

 3  Q.  And you don't know why it said that?

 4  A.  I don't recall independently right now why.

 5  Q.  In any event, from the file that you have, you've

 6  identified the pages that are listed at line 103 as missing,

 7  right?

 8  A.  Right.

 9  Q.  If you'd take a look at RFC11884.  That's the first page of

10  a supplemental report that you identified as missing from the

11  criminal defense attorney's file, right?

12  A.  That's correct.

13  Q.  And then the second page is also missing, according to your

14  report, 18 -- 11885.  Do you see that there?

15  A.  That's correct.

16          MS. ROSEN:  City seeks to move City V.

17          THE COURT:  Any objection?

18          MR. LOEVY:  No objection, Your Honor.

19          THE COURT:  It is received.

20  (Said City Exhibit V received in evidence.)

21  BY MS. ROSEN:

22  Q.  Okay.  And then if you take a look at the SAO file that we

23  have for you, take a look at 103839.

24          MS. ROSEN:  If we could put that on the screen just

25  for Mr. Brasfield.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 145 of 225 PageID #:43033
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2371

1    BY MS. ROSEN:

2    Q.  And that's the same two-page supplemental report, right?

3    A.  It appears to be.

4         MS. ROSEN:  Okay.  And City seeks to move 21-F into

5    evidence.

6         THE COURT:  Any objection?

7         MR. LOEVY:  No, Your Honor.

8         THE COURT:  It is received.

9    (Said City Exhibit 21-F received in evidence.)

10        MS. ROSEN:  And if we can put them up side by side for

11   the jury.

12   BY MS. ROSEN:

13   Q.  Other than the redaction problem again, they're the same

14   document, right?

15   A.  That's correct.

16   Q.  Now, let's take a look at another document that you've

17   identified as being missing, 11890.

18        MS. ROSEN:  Did I skip one?

19        MS. CARNEY:  You skipped 11886.

20        MS. ROSEN:  Okay.  Let's do -- I'm sorry.

21   BY MS. ROSEN:

22   Q.  Take a look at 11886.  Do you have that up?

23   A.  Now, what number was it?

24   Q.  11 --

25   A.  18 --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 146 of 225 PageID #:43034
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2372

1  Q.  -- 886 --

2  A.  -- 86.

3  Q.  -- is on the screen for you.  It's a two-page supplemental

4  report.

5  A.  Yes.

6  Q.  So according to your chart, you have 11886 and 11887 as

7  missing, right?

8  A.  Actually, 84 through 87, yes.

9  Q.  Okay.  So that would encompass --

10  A.  This 86 --

11  Q.  -- 886?

12  A.  -- yes.

13       MS. ROSEN:  Okay.  City seeks to move 11886 and 11887

14  as City W.

15       MR. LOEVY:  No objection, Your Honor.

16       THE COURT:  It is received.

17   (Said City Exhibit W received in evidence.)

18  BY MS. ROSEN:

19  Q.  And, like I said, that's a two-page supplementary report,

20  right?

21  A.  That's correct.

22  Q.  And, now, if I can ask you to take a look at the SAO file,

23  exact page 1036 to 1037.

24       Do you see that same supplementary report in the SAO

25  file?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 147 of 225 PageID #:43035
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2373

1   A.  Appears to be the same.

2        MS. ROSEN:  Okay.  The City seeks to admit 1036 to

3   1037 as 21-G.

4        MR. LOEVY:  No objection, Your Honor.

5        THE COURT:  It is received.

6   (Said City Exhibit 21-G received in evidence.

7   BY MS. ROSEN:

8   Q.  And, once again, those are the same documents, so one --

9   the one that you say is missing or identified as missing from

10  the criminal defense attorney file can be found in the SAO

11  file?

12  A.  Again, without having seen the state's attorney file, it's

13  contained within the state's attorney file.

14  Q.  Okay.  And you never saw the state -- you didn't review the

15  state's attorney's file in the analysis you did?

16  A.  I don't believe this was one that I did, no.

17  Q.  Okay.  Now let's take a look at RFC11890, which is another

18  document that you say was missing from the criminal defense

19  attorney file.  And this is a one-page supplementary report

20  dated March 26th, 1990.

21        Do you see that there?  Yes.

22  A.  Yes.  11890 is here on the screen.

23        MS. ROSEN:  Okay.  And City seeks to admit City X.

24        THE COURT:  Any objection?

25        MR. LOEVY:  No, Your Honor.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 148 of 225 PageID #:43036
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2374

1       THE COURT:  X is received.

2    (Said City Exhibit X received in evidence.)

3  BY MS. ROSEN:

4  Q.  And then if you take a look at your SAO file and look at

5  page 1057.

6  A.  It appears to be the same one.

7       MS. ROSEN:  Okay.  City seeks to admit SAO1057 as

8  21-H.

9       THE COURT:  Any objection?

10      MR. LOEVY:  No, Your Honor.

11      THE COURT:  It is received.

12   (Said City Exhibit 21-H received in evidence.)

13      MS. ROSEN:  If you could put those side by side.

14  BY MS. ROSEN:

15  Q.  So the document that's in the criminal defense attorney

16  file, this particular supplementary report, is contained in the

17  SAO file that we've provided for you, correct?

18  A.  That's correct.

19  Q.  And then if we look at 11904 to 11905, that's an example of

20  a general offense case report, correct?

21  A.  That's correct.

22  Q.  Okay.  And that's the first page of the document.  Look at

23  the second page of the document.

24      And you have identified both of those pages as missing

25  from the criminal defense attorney file, right?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 149 of 225 PageID #:43037
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2375

1  A.  That's correct.

2  Q.  And the criminal -- the general offense case report is a

3  document that you would expect to find in the permanent

4  retention file as well, the original of that document, right?

5  A.  I would expect it to be in the permanent retention file.

6  Q.  Okay.  And then if we take -- if you can take a look at

7  SA01030 to 1031, can you tell me if that's the same exact

8  report in the state's attorney's file that you've identified as

9  being missing from the criminal defense attorney's file?

10  A.  I'm sorry.  It's upside down.

11  Q.  Oh, sorry.

12  A.  Just a second.  And I'm not trying to prolong the agony

13  here.  I just --

14  Q.  No.

15  A.  -- want to make sure that that's what it appears to be.

16        MS. ROSEN:  And the City seeks to admit SA01030 to

17  1031 as City I -- 21-I.

18        THE COURT:  21-I.  Any objection?

19        MR. LOEVY:  No objection, Your Honor.

20        THE COURT:  It is received.

21  (Said City Exhibit 21-I received in evidence.)

22        MS. ROSEN:  If we could put those up side by side.

23        MS. CARNEY:  Are they in?

24        MS. ROSEN:  Yeah, they're both in.  And that's the

25  first page of the report and then the second page of the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 150 of 225 PageID #:43038
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2376

1   report.

2   BY MS. ROSEN:

3   Q.  So each of the documents that you've identified at line 103

4   as being missing from the criminal defense attorney file are in

5   this SAO file as well, correct?

6   A.  That's correct.

7           And I should have mentioned, whether it's relevant or

8   not, but I have no idea when these documents came into

9   possession of the state's attorney, so --

10  Q.  Okay.

11  A.  And they're not stamped "permanent retention," so --

12  Q.  And presumably, though, your understanding of how that

13  works with respect to permanent retention is that "permanent

14  retention" stamp comes later, right?

15  A.  Later in the process.

16  Q.  Right.  So presumably, most of the time, that stamp's not

17  going to be on documents contemporaneously with a criminal

18  prosecution, assuming the criminal prosecution is not going for

19  years and years and years and years, right?

20  A.  That's -- yes.

21  Q.  Okay.

22  A.  Kind of a mixed bag, but generally speaking.

23  Q.  Okay.  And then I am going to ask you to take a look at one

24  more document in the SAO file that is -- I mean -- yeah.  No.

25  In the PD's file, actually.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 151 of 225 PageID #:43039
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2377

1        So take a look at -- you also have the PD file there.

2   And if you take a look at what's flagged as JRL208557, 558, and

3   559.  There should be a tab on it for you.  Let me know if --

4   A.  Just to make it a little easier, this is the state's

5   attorney's file.  This is what the police have.

6   Q.  That's the public defender's file, right?

7   A.  This?

8   Q.  That big one is the public defender's file.

9   A.  Okay.  I thought you indicated it was the police file.

10  Q.  No, no, no.  It's --

11  A.  I'm sorry.

12  Q.  -- the public defender's file.

13  A.  All right.

14  Q.  So the smaller one --

15  A.  So we have -- I'm sorry.

16  Q.  Yeah.  The smaller one is the SAO file.  The bigger one is

17  the public defender's file.

18        So take a look at JRL208557.

19  A.  All right.

20        MS. ROSEN:  Put that up on the screen.

21  BY MS. ROSEN:

22  Q.  And do you see there that it is a to/from memorandum to the

23  director of the Records Section from James Fruin, the commander

24  at Area 5?

25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 152 of 225 PageID #:43040
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2378

1  Q.  Okay.  This -- and then let's look at the next page, 58 and

2  59.  Do you see those there?  Those are subpoenas, correct?

3  A.  That's correct.

4  Q.  Okay.  Now, if we can --

5      MS. ROSEN:  The City seeks to admit JRL208557 to 559

6  as City 22-A.

7      THE COURT:  Any objection?

8      MR. LOEVY:  No, Your Honor.

9      THE COURT:  22-A is received.

10  (Said City Exhibit 22-A received in evidence.)

11      MS. ROSEN:  All right.  If we could get that up on --

12  the first page of the memo up there.

13  BY MS. ROSEN:

14  Q.  So let's take a look at this to/from memorandum, which

15  everybody can see now on the screen.

16      So it's dated April 16, 1990, correct?

17  A.  Yeah, April 16th, 1990.

18  Q.  Yeah.

19  A.  Yes.

20  Q.  And it's a to/from memorandum that we've talked about.

21  It's to the director of the Records Section from the commander

22  at Area 5 of the Detective Division.

23      And you understand that in 1990, there were multiple

24  police Areas, right?

25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 153 of 225 PageID #:43041
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2379

1  Q.  And its subject is "Subpoena for 'street files,'" right?

2  A.  Yes, correct.

3  Q.  And your understanding -- you have an understanding, don't

4  you, based on the work you did in this case and the other

5  cases, that the files that were being maintained at the Area

6  police stations that caused the issues in Jones and Palmer were

7  commonly referred to as street files, among other names, right?

8  A.  Among other things, yes.

9  Q.  Okay.  And based on your review of all of these materials

10  and your review of numerous subpoenas in many of these files,

11  you noticed, didn't you, that both the State's Attorney's

12  Office and the PD's Office and other criminal defense

13  attorneys, when they were issuing subpoenas to the state's --

14  to the Chicago Police Department and asking for all of the

15  documents, would include a request for the RD file and then a

16  whole list of names, street file, running file, working file,

17  all of that, right?

18  A.  The more experienced -- in just looking at it from a police

19  practices perspective, some would and some would not.

20          MR. LOEVY:  What's the Bates number, Eileen, on that?

21          MS. ROSEN:  It is JRL208557 --

22          MR. LOEVY:  Thank you.

23          MS. ROSEN:  -- to 559.

24          MR. LOEVY:  Thank you.

25          MS. ROSEN:  Uh-huh.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 154 of 225 PageID #:43042
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2380

1   BY MS. ROSEN:

2   Q.  Okay.  So -- and you can tell from the subpoena that this

3   is the commander directing in this memorandum to the director

4   of the Records Section, and then the next two pages, which we

5   showed -- we'll show in a minute again -- are the subpoenas,

6   right, that were issued in the criminal case?

7           And it's an indication that the commander is

8   responding to the subpoena.  They searched their current files

9   at Area 5, and they're sending the documents to the Records

10  Division.  Do you see that there?

11  A.  Yes.

12  Q.  And your understanding of how the Subpoena Unit operated

13  back in the 1980s and the 1990s was that a subpoena would come

14  into the Subpoena Unit at the Chicago Police Department and

15  there would be a clerk or a police officer, depending on who

16  was handling it, that would be charged with the responsibility

17  of responding to the subpoena, correct?

18  A.  That's correct.

19  Q.  And it's your understanding from reading the depositions

20  and the records in this case that what would happen is that the

21  person that was handling that particular subpoena would make

22  photocopies of the subpoena and then they would write on each

23  of those photocopies the unit that they were going to send the

24  subpoena to, the unit within the Chicago Police Department that

25  they were going to send the subpoena to for a response,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 155 of 225 PageID #:43043
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2381

1   correct?

2   A.  It was a mixed bag.

3   Q.  Well, you understood that was how the process was supposed

4   to work at a minimum, right?

5   A.  There was no training and there were no guidelines and

6   there were no policies for the Subpoena Unit, which I think the

7   court recognize -- not this court, but the court in other

8   matters recognized.

9           MS. ROSEN:  Your Honor, I'm going to move to strike

10  the what courts in other matters recognized.

11          MR. LOEVY:  I think he meant Jones and Palmer, Your

12  Honor.

13          MS. ROSEN:  Well --

14          THE COURT:  Well, the witness may need to do that to

15  answer -- to talk about that to answer the question.  I just

16  don't know.

17  BY MS. ROSEN:

18  Q.  All right.  Let me focus your attention on my question.

19  Okay?

20          THE COURT:  Okay.

21  BY MS. ROSEN:

22  Q.  So it's your understanding that, according to the Chicago

23  Police Department and their expectation of how it worked with

24  the Subpoena Unit, the subpoena would go to the Subpoena Unit,

25  correct?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 156 of 225 PageID #:43044
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2382

1    A.  As I've said, I've read depositions from Mr. Hickey and

2    from others that indicated that there was, at times, some

3    confusion, that they had received no training.  Depending on

4    the experience of the clerk, it would handled -- be handled

5    different ways, and there was no printed guideline.

6    Q.  Okay.  So that's -- you're answering not my question,

7    respectfully.

8    A.  Well --

9    Q.  But let me address that for a second.

10   A.  All right.

11   Q.  You're saying that information that you just testified to

12   comes from Mr. Hickey?

13   A.  It comes from dep -- within depositions that I have read,

14   whether it was specifically to Mr. Hickey in all regards or

15   only in portions.  But based on all of the depositions and

16   statements that I have seen, I think that's a fair reflection

17   of the practice.

18   Q.  Okay.  So let's take a look at the second page of this

19   document.

20            This is the subpoena, right?

21   A.  Yes.

22   Q.  A copy of the subpoena.  And you see at the top there, it

23   says A/5?  Do you see that --

24   A.  A copy of what?

25   Q.  -- handwriting at the top of the subpoena?  It's

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 157 of 225 PageID #:43045
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2383

1    highlighted.

2    A.  Oh, up at the top, A/5.  Area 5, yes.

3    Q.  Area 5.  And so that conforms with the idea that somebody

4    sent that subpoena to Area 5, right?  Because the memo -- the

5    attached memo is from the commander at Area 5, right?

6    A.  I'm not arguing that that was the intent or what the case

7    was, but I can't independently tell because there's nothing

8    that I can gauge it as a baseline as to what that's supposed to

9    mean.  But I must -- I would say that could be a safe

10   assumption.

11   Q.  Okay.  Let's look at the next page, and that indicates

12   there that the person that issued the subpoena was the

13   assistant public defender in the case.

14          Do you see --

15   A.  Yes.

16   Q.  -- that there?

17   A.  Assistant Public Defender Sorensen.

18   Q.  Okay.  And so that is at least one example of a subpoena

19   being sent to the Area to be fulfilled by the appropriate

20   people at the Area for the documents that they might have that

21   are related to the case, right?

22   A.  Following that process, if it went to Area 5, it was

23   limited to Area 5.  Did not include Gang squad members or

24   anyone else.  But yes.

25   Q.  There's no indication in this file that you're aware of

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 158 of 225 PageID #:43046
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2384

1    that the Gang Crimes squad is involved in this criminal

2    prosecution, right?

3    A.  The Subpoena Unit would have no way of knowing it.

4    Q.  I'm not asking you about whether or not the Subpoena Unit

5    would know or would not know.  I'm asking you from the file

6    that's in front of you and the file that you've reviewed in

7    connection with the work in this case, can you say that the

8    Gang Crimes squad or Gang Crimes specialists or any gang unit

9    was involved in this particular criminal investigation?

10   A.  Not as I sit here, no.

11   Q.  Okay.

12        MS. ROSEN:  If we could take that down.

13   BY MS. ROSEN:

14   Q.  Now I'm going to ask you to take a look at RD number

15   K575912.

16   A.  Thank you.

17   Q.  Here you go.

18        MR. LOEVY:  What's the RD number?

19        MS. ROSEN:  K575912.

20   BY MS. ROSEN:

21   Q.  That matches with line 74 of your attachment, right?  Oh,

22   give you a chance to get there.

23   A.  I have it.

24   Q.  Okay.  So K575912 is the same as -- is the RD file that's

25   referenced at line 74 of your attachment, right?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 159 of 225 PageID #:43047
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2385

1  A.  That's correct.

2  Q.  And you list a series of documents there that are missing

3  from the criminal defense attorney's file, right?

4  A.  That's correct.

5  Q.  Okay.  So if we look at 8844 through 8852 --

6       MS. ROSEN:  If we could just put those individually on

7  the screen for Mr. Brasfield.

8  BY MS. ROSEN:

9  Q.  -- those are a series of --

10       MS. ROSEN:  You can just flip through them.

11  BY MS. ROSEN:

12  Q.  -- court attendance reports, right?

13  A.  So far.

14  Q.  We'll go all the way through to 8852.

15  A.  Yes.

16  Q.  Okay.  And then if we take a look at 8862, 63, and 64,

17  those are also court attendance reports, correct?

18  A.  That's correct.

19  Q.  Okay.  And those were the -- they're -- you agree with me

20  that those are administrative documents, right?

21  A.  In the context of my previous testimony, they were designed

22  to be, yes, but could be investigatory.

23  Q.  Right.  And you're -- I think, if I understood your

24  testimony --

25       MS. ROSEN:  And we can -- the City seeks to admit this

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 160 of 225 PageID #:43048
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2386

1   as a group exhibit, City Y, City -- which one is it?  19-Y.

2            THE COURT:  Any objection?

3            MR. LOEVY:  No, Your Honor.

4            THE COURT:  19-Y is received.

5    (Said City Exhibit 19-Y received in evidence.)

6   BY MS. ROSEN:

7   Q.  So if I understood your testimony earlier, the reason a

8   court attendance report might be relevant to a criminal

9   investigation was because the police officer might have been in

10  court when he said he was doing something else?  Do I have that

11  right?

12  A.  That was just an example.  Or in this particular 8864, it's

13  referenced a "further line up is necessary."

14           And I've -- I think I've made it fairly clear that

15  oftentimes these forms are -- can be innocuous, but that they

16  may contain information that would be useful to follow up on.

17  That's not what they were designed for.

18           But part of that comes from my two years as an

19  investigative sergeant within Internal Affairs and two years as

20  the captain in Internal Affairs.  You can glean all sorts of

21  things.  Maybe 9 times out of 10, you can't.  But they're

22  produced for a purpose, and they have value.

23  Q.  Okay.  So taking a look at this one, RFC8864, it's your

24  understanding, isn't it, that the way that the Chicago Police

25  Department uses these forms is after a case gets charged,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 161 of 225 PageID #:43049
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2387

1    whenever a police officer is notified to go to court on that

2    particular case, they're required to prepare this report,

3    right?  That's your understanding?

4    A.  That would be my understanding.

5    Q.  Okay.  So in this particular one that you've identify --

6    that you've pointed out this idea about "further line up

7    necessary" -- do you see that language there?

8    A.  Yes.

9    Q.  Okay.  Isn't that further -- that the continuance was

10   granted by the court because a further lineup was necessary,

11   correct?

12   A.  That could be.

13   Q.  Well, it says Reason for Continuance:  "Further line up

14   necessary."

15   A.  Right.

16   Q.  Okay.  So the fact that the court continued the case and

17   the police officer had to put that on his report doesn't impact

18   the police officer's activity, right?

19   A.  No, I -- you may be reading too much into my answer.  All

20   I'm indicating is that other than the design of the form to

21   document court attendance, there may be other information that

22   may or may not be of assistance in pursuing a defense.  This

23   may have absolutely no relevance at all.

24   Q.  Okay.  And you agree with me, don't you, that these court

25   attendance reports that you've seen in these files that you've

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 162 of 225 PageID #:43050
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2388

1    reviewed are prepared after the investigation is complete by

2    the Chicago Police Department?

3    A.  I have not been privy to the policy and procedures that

4    pertains to the utilization of court attendance reports.  It

5    would be my assumption that the court attendance report, as all

6    reports, would be filled out contemporaneous to the event.

7    Q.  Right.  And unnecessarily, a police officer isn't called to

8    court on a case until the criminal prosecution is underway and

9    the crim -- and the Chicago Police Department's role in the

10   investigation is complete?

11   A.  I understand your question better now.  Yes.

12   Q.  Okay.  And can you identify any other files that you've

13   reviewed for any other law enforcement agency where court

14   attendance reports of this nature are required to be produced

15   to the criminal defendant absent a request?

16   A.  My experience in general terms is that anything that has

17   been written up involving a homicide case or any felony case

18   would be discoverable and disclosed, regardless of later on

19   someone deciding it's relevant or not relevant.  Makes it

20   easier for everyone.

21   Q.  So my question's a little bit different.  I'm asking you to

22   identify any law enforcement agency that you're familiar with

23   that would require the police department to produce court

24   attendance reports of the type that we're discussing here right

25   now absent a specific request for court attendance reports.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 163 of 225 PageID #:43051
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2389

1   A.  If it was contained in the centralized file, it would be

2   auto -- the expectation and the fulfilment would be that it

3   would be automatically disclosed.

4   Q.  Well, let me try it one more time.

5        Can you identify for us a specific agency in the

6   United States of America that requires these court attendance

7   reports to be produced in criminal discovery absent a specific

8   request for criminal attendance reports?

9   A.  I am not aware of any specific agency right now that uses

10  court attendance reports in the manner that the Chicago Police

11  Department does.  But since they are in the Chicago Police

12  Department file, I would expect it to be disclosed.

13       But no, I cannot point you to another agency that does

14  it like Chicago does it.

15  Q.  Okay.  Requires police officers to prepare a report when

16  they go to court?  Is that what you're saying?

17  A.  They fill out --

18  Q.  That's --

19  A.  They fill out overtime reports or an overtime slip if

20  they're off-duty that a supervisor would sign, and it would go

21  to Payroll.

22  Q.  So should that also be produced in discovery?

23  A.  It would not be included in the file.

24  Q.  Okay.  So let's take a look at 8880 to 8882, which is

25  another document you've identified on line 74 as being missing.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 164 of 225 PageID #:43052
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2390

1          And that's a two -- three-page supplementary report

2    detailing a canvass that was conducted in this case, right?

3    A.  Yes.

4    Q.  Okay.  I'm going to ask you to take a look at the state's

5    attorney file, 26557 to 26559.

6          Those are the same reports, right?

7    A.  They appear to be, yes.

8          MS. ROSEN:  Okay.  The City seeks to admit RFC8880 to

9    8882 as City Y -- City 19-Y.

10          THE COURT:  I think 19-Y was already used.

11          MS. ROSEN:  Okay.  Then City 19-Z.  You're right.  I

12    lost track of my list.

13          THE COURT:  Any objection?

14          MR. LOEVY:  No, Your Honor.

15          THE COURT:  It is received.

16    (Said City Exhibit 19-Z received in evidence.)

17          MS. ROSEN:  And then we seek to admit SA026557 to

18    26559 as SAO21 -- as City 21-J.

19          THE COURT:  Any objection?

20          MR. LOEVY:  No, Your Honor.

21          THE COURT:  It is received.

22    (Said City Exhibit 21-J received in evidence.)

23    BY MS. ROSEN:

24    Q.  So both of those reports are -- both of those documents are

25    copies of the same report, correct?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 165 of 225 PageID #:43053
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2391

1    A.  They appear to be, yes.

2    Q.  And the one that's missing in the criminal defense

3    attorney's file is in the state's attorney's file?

4    A.  That's correct.

5    Q.  And this is another one of the state's attorney files that

6    you did not review in connection with your analysis?

7    A.  That's correct.  Again, with the caveat I don't know when

8    it got into the state's attorney's file.

9    Q.  Okay.  If we can take a look at the next one.  We're almost

10   done.  I promise.  It's K417078, which is line 67 of your

11   attachment.

12   A.  Thank you very much.  You got it?

13   Q.  Yes.  Here's one for you.

14   A.  Okay.  And you indicated row 67?

15   Q.  Yes, K417070.

16   A.  I have it.

17   Q.  You have it?

18   A.  Yes.

19   Q.  Okay.  So I am going to ask you to first take a look at

20   RFC8153.  And that's one of the documents you identified as

21   being missing, right, from the criminal defense attorney's

22   file?

23   A.  Yes.

24   Q.  And do you recognize that to be a screenshot of a criminal

25   court docket?  Do you see that?  Got the court number on it.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 166 of 225 PageID #:43054
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2392

1   A.  It is a -- I'm sorry to interrupt.

2   Q.  Yeah, no.  It's got, like, the court number on it and the

3   name of the case and the disposition.  Do you see that there?

4   A.  Yeah.  And it includes a heading on the computer software

5   for the screen that -- defendant's name, other information,

6   software commands.  But, yeah, appears to be a screenshot.

7        MS. ROSEN:  Okay.  So the City would seek to admit

8   RFC8153 as City 19-AA.

9        THE COURT:  Any objection?

10        MR. LOEVY:  No, Your Honor.

11        THE COURT:  It is received.

12   (Said City Exhibit 19-AA received in evidence.)

13   BY MS. ROSEN:

14   Q.  And that's a document of a public record, right?  I mean,

15   it's a computer that has the criminal court information on it,

16   right?

17   A.  I would hesitate.  I don't have sufficient information to

18   tell you what system it's from, whether it's a law enforcement

19   system or a court system or from the State's Attorney's Office,

20   but it's some type of a criminal-justice-related, it would

21   appear.

22   Q.  Okay.  And then if we look at the other documents that you

23   have identified -- we have 8154, 55, 56, and 57.

24        MS. ROSEN:  If we could put those up sequentially.

25   BY MS. ROSEN:

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 167 of 225 PageID #:43055
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2393

 1   Q.  Those are all -- some more court attendance reports.  And

 2   ask you to take a look at those.  Is that correct?

 3   A.  Yes.

 4        MS. ROSEN:  And the City seeks to admit the series

 5   RFC8154 through 57 as City 19-BB.

 6        THE COURT:  Any objection?

 7        MR. LOEVY:  No, Your Honor.

 8        THE COURT:  It is received.

 9   (Said City Exhibit 19-BB received in evidence.)

10   BY MS. ROSEN:

11   Q.  Okay.  So these are some more of those court attendance

12   reports that we've already talked about, right?

13   A.  Yes, that is correct.

14   Q.  Okay.  And then if we take a look at RFC8158 to 8161,

15   that's a report of a postmortem examination from the Office of

16   Medical Examiner?

17   A.  That's.

18   Q.  Do you see that there?

19   A.  Yes.

20        MS. ROSEN:  If we could -- City seeks to admit that as

21   City 19-CC.

22        THE COURT:  Any objection?

23        MR. LOEVY:  No, Your Honor.

24        THE COURT:  It is received.

25   (Said City Exhibit 19-CC received in evidence.)

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 168 of 225 PageID #:43056
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2394

1   BY MS. ROSEN:

2   Q.  And then you can see from the top of that document that the

3   document is actually created by the -- it's on the letterhead

4   of the Office of the Medical Examiner for Cook County, right?

5   A.  Right.  Handwritten above that is "Area 5."

6   Q.  Right.  And so doesn't that indicate to you that a copy was

7   made from -- of the document by the Cook County Medical

8   Examiner's Office and sent to Area 5?

9   A.  That would be the assumption.

10  Q.  Okay.  And do you have any idea how that process works in

11  Cook County when a -- when the medical examiner prepares their

12  postmortem report, in the process, when it is that they send a

13  copy of that postmortem report to the detectives?

14  A.  In my experience and in looking at the material in other

15  cases, that's done in a very timely manner, within a short

16  period of time, depending on the workload at the Medical

17  Examiner's Office, after the autopsy was conducted.

18  Q.  That's based on your experience in Cook County?

19  A.  No, no, of course not.

20  Q.  Oh, okay.  So you don't know in Cook County how long the

21  process is or at what point in time the copy gets sent to the

22  detectives?

23  A.  Based on my review of the files and entries, on occasion,

24  where received, a notation will have been made in the -- in a

25  general progress report or a supplemental report that a medical

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 169 of 225 PageID #:43057
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2395

1   examiner's report was received, it was generally within a short

2   period of time from the death.

3   Q.  Okay.  And if we can take a look at now 8162.  That's

4   another document from the Medical Examiner's Office, right?

5   A.  Yeah.  Commonly referred to as a tox screen, yes.

6   Q.  And then if we move to 8174, that's a supplementary report,

7   correct?

8   A.  Yes.

9   Q.  And if you take a look at SAO29730, a copy of that report

10  is also in the SAO file, right?

11  A.  Yes.  It appears to be the same one.

12  Q.  Okay.

13          MS. ROSEN:  The City would seek to admit RFC8174 as

14  City 19-DD.

15          THE COURT:  Any objection?

16          MR. LOEVY:  No, Your Honor.

17          THE COURT:  It is received.

18  (Said City Exhibit 19-DD received in evidence.)

19          MS. ROSEN:  And City SAO29730 as City 21-H.  No.  K.

20          THE WITNESS:  The only -- I might point out, the only

21  difference here is the absence of the signature in the state's

22  attorney's subpoena one.

23          THE COURT:  Any objection to 21-K?

24          MR. LOEVY:  No, Your Honor.

25          THE COURT:  It is received.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 170 of 225 PageID #:43058
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2396

1    (Said City Exhibit 21-K received in evidence.)

2    BY MS. ROSEN:

3    Q.  So the state's attorney version does not have the signature

4    on the bottom, right?

5    A.  Right.  There's a Sergeant Gralak signature.

6         And I only commented on it that they're not totally

7    identical, but they're --

8    Q.  Okay.

9    A.  -- the same document.

10   Q.  Okay.  And then if we take a look at the other document

11   that you have noted as missing as RFC8178 and 8179, and that's

12   another -- that's a copy of one of the investigative file

13   inventories that we've been talking about, right?

14   A.  That's correct.

15        MS. ROSEN:  The City would seek to admit 8178 --

16   RFC8178 to 79 as City 19-EE.

17        THE COURT:  Any objection?

18        MR. LOEVY:  No, Your Honor.

19        THE COURT:  19-EE is received.

20   (Said City Exhibit 19-EE received in evidence.)

21   BY MS. ROSEN:

22   Q.  And in this particular case, you see that there's a stamp

23   on it that says that a copy of the inventory file -- the

24   investigative file inventory is to be sent to Records, right,

25   for processing on September 30th, 1988, right?

1    A.  That's correct.

2    Q.  And that's what you would expect pursuant to the written

3    policies, right?

4    A.  Yes.

5    Q.  Supposed to happen?  And, in fact, in the permanent

6    retention file in this case, that document is there; is that

7    correct?

8    A.  I have to look at the other chart.

9    Q.  Okay.  There's something -- you have the chart there,

10   right?

11   A.  Yeah.  8178.

12         And does the Bates file -- or does the investigative

13   file contain an inventory?  Yes.

14   Q.  Okay.  And then if we take a look at RFC8180, RFC8180.  I

15   think this is probably one of the first times the jury has seen

16   this.

17         This is one of those investigative file control cards,

18   right?

19   A.  Yes.

20         MS. ROSEN:  The City seeks to admit RFC8180 as City

21   19-FF.

22         THE COURT:  Any objection?

23         MR. LOEVY:  No, Your Honor.

24         THE COURT:  It is received.

25   (Said City Exhibit 19-FF received in evidence.)

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 172 of 225 PageID #:43060
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2398

1  BY MS. ROSEN:

2  Q.  And this is the thing that you described earlier as sort of

3  like a library card?

4  A.  Yes.

5  Q.  Where the document is supposed to -- your understanding,

6  right, is that the way that this is -- this document is

7  supposed to work is that where the file is kept at the Area or

8  if it's kept at Records Storage, if the file is removed,

9  whoever's removing the file is supposed to fill it out so if

10  somebody later goes looking for the file, they know where it

11  is, right?

12  A.  That was the intent, yes.

13  Q.  Okay.  If we take a look at RFC8183, this is a document

14  you've identified as being missing from the criminal defense

15  attorney's file, right?

16  A.  You're directing my attention where?

17  Q.  On the screen.  So RFC8183 and then, if you look at your

18  report, it -- I mean, your attachment, it's one of the

19  documents that are missing.

20  A.  That's correct.

21  Q.  And if you take a look at now the PD file, there's three

22  documents I'd like you to take a look at, JRL206808 and

23  JRL206810 and JRL206812.

24  A.  Okay.  I have 808 and 812.  What was the other one?

25  Q.  808, 810, 812.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 173 of 225 PageID #:43061
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2399

1  A.  I am not finding them by --

2          THE COURT:  Can you explain --

3  BY THE WITNESS:

4  A.  -- Bates numbers.

5          THE COURT:  -- please?

6          MS. ROSEN:  Yeah, sure.

7  BY MS. ROSEN:

8  Q.  This one is 812 and 808.  Oops.

9    (Counsel drops paper, witness retrieves it.)

10          MS. ROSEN:  Thank you.  I don't know why it's not

11  tabbed.  Let's do it on the screen to save time.

12          THE WITNESS:  Okay.

13  BY MS. ROSEN:

14  Q.  So if you take a look at your screen, JRL206808 --

15          MS. ROSEN:  Is that what's up there now?

16          MS. CARNEY:  Yes.

17  BY MS. ROSEN:

18  Q.  -- and then take a look at -- and then just take a look at

19  that.  The inventory number there, do you see it as 524768?

20  A.  Yes.

21  Q.  And it matches the inventory number 524768 on the evidence

22  report, right?

23  A.  That's correct.

24  Q.  Okay.  So that inventory that's in the PD's file that you

25  have is -- matches the inventory number that's on this report,

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 174 of 225 PageID #:43062
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2400

1    right?

2    A.  The --

3    Q.  So the --

4    A.  The inventory file number as opposed to the Bates files,

5    which I've referred to?

6    Q.  Yes, so -- yes.  So what I'm saying is take a look at -- if

7    you look at the inventory number -- right?  You understand that

8    when the Chicago Police Department inventories evidence,

9    there's an inventory sheet that's prepared, if that --

10   A.  Yes.

11   Q.  -- that number?

12   A.  That's my understanding.

13   Q.  Okay.  And so if you look at the document on your right,

14   which is JRL206808 from the PD's file, it indicates that the

15   inventory number for that particular piece of evidence is

16   524768, right?

17   A.  Yeah, I would agree completely.  There is a -- two

18   documents, a preliminary evidence report and a property

19   inventory form, two different types of form.  They both make

20   reference to an inventory number.

21   Q.  And the same --

22   A.  They match.

23   Q.  So it's the same inventory number, right?

24   A.  Yes.

25   Q.  They match?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 175 of 225 PageID #:43063
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2401

1    A.  That's correct.

2    Q.  Okay.  And then if we can go to 206810.  That one is

3    524766, and that matches the next item on the Preliminary Fired

4    Evidence Report, right?

5    A.  That's correct.

6    Q.  Okay.  And then if we go to 206812, 553001 is the inventory

7    number, and that also matches the final number on that report,

8    the fired -- the evidence report?

9    A.  That's correct.

10   Q.  Okay.  So each of the -- so the document that you say is

11   missing is the preliminary report, but the evidence that's

12   being discussed in that report, that evidence is in the PD's

13   file via the inventory forms, right?

14   A.  Right.

15   Q.  Or reference to them?

16   A.  But what I indicated in the spreadsheet was missing is

17   missing.

18   Q.  Right.  But the information that it's referencing appears

19   in a different form in the report?

20   A.  That's correct.

21   Q.  I mean, in the file, in the PD's file.

22        Okay.  If we take a look at RFC8213, these are some

23   handwritten notes.  And that's one of the items that you say is

24   missing from the PD's file, right?

25   A.  Yeah.  If I could ask you to give me the line number again.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 176 of 225 PageID #:43064
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2402

1  I've shuffled enough papers here that I lost --

2  Q.  Oh, sorry.

3  A.  -- track of --

4  Q.  The line number --

5  A.  -- which row.

6  Q.  -- on your attachment?

7  A.  No.  The row.

8  Q.  Yes.

9  A.  The case.

10  Q.  67.

11  A.  All right.  Thank you.

12  Q.  Sure.  Do you see that?  Are you with me yet?

13  A.  Yes.  I have it.  I'm sorry.

14  Q.  Okay.  No problem.

15      So that handwritten note, you say, is missing, right?

16  A.  Right.

17  Q.  And if we take a look -- have you take a look at the SAO

18  file, page 29800.

19      MS. ROSEN:  And we can put it up side by side on the

20  screen, if that's easier.

21  BY MS. ROSEN:

22  Q.  This is an example, isn't it, of information that was in

23  the note that also is contained in the GPR?

24  A.  And your question is what?

25  Q.  So if you compare the handwritten note to the GPR, the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 177 of 225 PageID #:43065
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2403

1  information is the -- is information that appears in both

2  documents, right?

3  A.  Without taking the court's time to read through the whole

4  thing, this appears to be an example of what was intended to

5  transcribe notes into the general progress report.

6  Q.  Okay.  And then if you take a look at SAO29974 --

7      MS. ROSEN:  And we can just do that on the screen,

8  29974.

9  BY MS. ROSEN:

10  Q.  Again, the information about the Susan Sweat person is in

11  that report as well, right?  If you look at the middle -- the

12  body of the report.

13  A.  Again, I -- the screen is filled -- entirely full of the

14  reference to Susan Sweat.  The one on the other was --

15      MS. ROSEN:  You can flip back to the first -- the GPR.

16  BY MS. ROSEN:

17  Q.  Susan Sweat, right?

18  A.  That -- now you have corresponding documents.

19  Q.  Okay.  All right.  And then the last one, which we're not

20  going to take the time to go through, because I think we've

21  done enough of this, is if you just take a look at your chart

22  line 85, it is M381429.

23      And maybe we can quickly flip through those on the

24  screen for you, if you want, but I can tell you that each and

25  every one of the documents that you identify as missing are all

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 178 of 225 PageID #:43066
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2404

 1   court attendance reports.

 2        Do you want me to flip them for you or --

 3   A.  No, no.  I'm -- I'll accept your representations.

 4   Q.  Okay.

 5   A.  That's correct.

 6   Q.  Okay.  All right.  So just a couple more things.

 7        Were you aware that after -- shortly after the court

 8   entered its order in the *Palmer* litigation regarding the City's

 9   policies and practices that a memo was issued in the State's

10   Attorney's Office detailing the State's Attorney's Office's

11   responsibility as it related to obtaining documents, obtaining

12   materials, making sure that documents were turned over to

13   criminal defense attorneys?

14   A.  I have no independent recollection of seeing that.  I may

15   have.  I don't recall.

16   Q.  Okay.  And do you -- maybe if I ask you this question -- do

17   you recall that specifically in that memo that was dated June

18   13th, 1983, the chief of the Criminal Prosecutions Bureau

19   instructed all of their trial assistants to not only

20   familiarize themselves with all of the documents that are

21   available from the Chicago Police Department, but specifically

22   instructed them to provide to the defendant a copy of the

23   investigative file inventory sheet where it existed?  Do you

24   have any recollection of that?

25   A.  I have no independent recollection, but I -- it still would

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 179 of 225 PageID #:43067
6-18-18 (Ex 10)
Brasfield - cross by Rosen

2405

1    not fulfill the issue or address the problem.

2           Excuse me while I get my report, but --

3    Q.  You don't recall that that happened?

4    A.  I don't recall that.  But since many of the times, there

5    were no -- there was no inventory in the permanent retention

6    file, that would make it problematic.

7    Q.  But if it were in the investigative file, it wouldn't be

8    problematic, right?  Because the state's attorney could just

9    get it from the investigative file.

10   A.  It's possible.

11   Q.  Because the state's attorneys were aware of investigative

12   files, right?

13   A.  They should have been, yes.

14   Q.  And certainly, if they're prosecuting a criminal

15   prosecution for a murder, and they were charged with this

16   responsibility of making sure that they knew all the documents

17   that the Chicago Police Department had in connection with such

18   an investigation, they would -- you would expect them to go get

19   those documents for the criminal defendant?

20   A.  I was not asked to evaluate the State's Attorney's Office.

21   Q.  Okay.  In connection with the work that you did for this

22   case, information I have is that through -- up until, I guess,

23   yesterday and -- or Friday and today, your invoices total

24   $58,900?  Is that --

25   A.  I'm sorry.  How much?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 180 of 225 PageID #:43068
6-18-18 (Ex 10)
Brasfield - cross by Rosen
2406

1   Q.  $58,900.

2   A.  On this case?

3   Q.  Yeah.

4   A.  The last ones that I have looked at were up until the

5   deposition by the City, and because that includes cross-country

6   travel, hotel, so on and so forth.

7        But the last one that I've documented was, I think, in

8   the neighborhood of 30,000.  But I won't -- it's objective.

9   Whatever it is, it is.

10  Q.  Okay.  I'm just totaling up the invoices --

11  A.  Okay.

12  Q.  -- that I was provided.  Okay.  And then in connection with

13  the work that you did in *Fields* where you looked at files

14  there, do you recall what the total was for that review?

15  A.  No, I -- I have no idea right now in any of my cases what

16  the totals were.

17  Q.  Do you think it was less or more than the 58,000 or so that

18  you charged here?

19  A.  It probably was more.

20  Q.  Okay.  And then in connection with the work that you did in

21  *Kluppelberg*, how much did you charge there?

22  A.  Again, I'm -- I have no -- no idea.

23  Q.  Do you think it was less or more than what you charged in

24  this case?

25  A.  It was rather intensive.  I -- it could very well have been

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 181 of 225 PageID #:43069
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2407

1   more.

2   Q.  Okay.  And those are the three cases, right, *Kluppelberg*,

3   *Fields*, and this case, *Rivera*, those are the three cases that

4   you examined the City's policies as it related to file

5   creation, maintenance, storage, and production?

6   A.  As they pertain to a *Monell* issue, yes.

7   Q.  Okay.  And you have -- I think you told us about it on

8   Friday that you have been hired in other cases by other

9   plaintiffs against the City, but they're not these *Monell*

10  issues, as you described them?

11  A.  Generally speaking, that's correct.

12  Q.  And can you tell us how much, approximately, you've made

13  for those other cases in opining against the City?

14  A.  No, I -- in the context of -- I think I testified to

15  probably 150 cases over the last ten years or so.  I -- that's

16  not something I've kept track of.

17          MS. ROSEN:  Okay.  I don't have any further questions.

18          THE COURT:  Any further defense questions?

19          MR. GIVEN:  None, Your Honor.

20          THE COURT:  Okay.  Mr. Loevy.

21          MR. LOEVY:  Thank you, Your Honor.

22                       REDIRECT EXAMINATION

23  BY MR. LOEVY:

24  Q.  You were asked about your compensation.  Is your

25  compensation commensurate with the experts in your field, sir?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 182 of 225 PageID #:43070
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2408

1  A.  It's -- I've seen it as high as 450 to 500 dollars as down

2  to about 2, 250.  So it's probably in the mid range.

3  Q.  In fact, the defendants in this case hired two experts to

4  rebut you, correct?

5  A.  That's my understanding.

6  Q.  And do you know their names?

7  A.  I blank them out right at the moment.  I'm sorry.  Murray,

8  I think --

9  Q.  It's Murray and --

10  A.  -- Nolan.  Or not Nolan.

11  Q.  And Noble.

12  A.  Noble.

13  Q.  And Mr. Murray, in fact, would it surprise you, made more

14  than a hundred thousand dollars in --

15        MS. ROSEN:  Judge, that's a little --

16        MR. LOEVY:  It's commensurate with the --

17        THE COURT:  You know, I -- go ahead.

18  BY MR. LOEVY:

19  Q.  Is that reasonable, if Mr. Murray, just in the *Fields* and

20  the *Kluppelberg*, billed more than a hundred thousand dollars

21  before he even got to this case?  Do you quibble with that for

22  the kind of -- amount of work done?

23  A.  No.

24        MS. ROSEN:  Objection, foundation for whether he knows

25  how much Mr. Murray charged in the other cases.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 183 of 225 PageID #:43071
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2409

1         THE COURT:  I think that's -- sustained.

2         MR. LOEVY:  All right.

3  BY MR. LOEVY:

4  Q.  You were asked quite a bit about some documents and were

5  they in this file.  Do you remember the stuff on the board and

6  all that?

7  A.  Yes.

8  Q.  As far as actual mistakes that you made, as distinct for

9  were there documents in the state's attorney's file -- do you

10 understand what I'm asking now?  Just whether there were

11 mistakes in your spreadsheet.  How many mistakes did you count

12 Ms. Rosen identified?

13 A.  I don't think I recall --

14 Q.  She identified the rap sheet and the supp. report, right?

15 A.  Yes.

16 Q.  Two mistakes out of how many documents would you say you

17 looked at?

18 A.  Out of 190 files, thousands of pages.

19 Q.  All right.  And to be clear, she identified a lot of other

20 documents that were not in the criminal defense files but were

21 in the state's attorney's files.

22         That is not a mistake that you made in any way, is it?

23 A.  No.

24 Q.  Did you even purport to make the comparison she was making?

25 A.  No.  I'm -- my report makes that very clear.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 184 of 225 PageID #:43072
6-18-18 (Ex 10)
Brasfield - redirect by Loevy

2410

1    Q.  All right.  So let's just focus on the errors that she

2    identified, that rap sheet and the supp. report.

3         That was a coding mistake, I guess?

4    A.  Yes.  That would be my recollection.

5    Q.  All right.  Do you -- what do you have to say for yourself

6    for making those two mistakes, sir?

7    A.  Shame on me.

8    Q.  All right.  Do you feel confident that the global set of

9    data is, in fact, reliable?

10   A.  Yes.

11   Q.  And do you feel confident that if Ms. Rosen could have

12   found three mistakes, she would have identified a third one?

13        MS. ROSEN:  Objection, leading, Judge.

14   BY MR. LOEVY:

15   Q.  Do you have confidence in the adversarial process to ferret

16   out mistakes in the data?

17   A.  I do.  I think if I had erred beyond the two, I would have

18   been cross-examined on it quite a bit.

19   Q.  All right.  And you had some expectation that your work

20   would be cross-checked not only by the defense counsel, but by

21   their experts as well, correct?

22   A.  That's correct.

23   Q.  Now, in the *Kluppelberg* and the *Fields* data, there was not

24   a hundred percent without mistakes either, was it?

25   A.  No, it was not.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 185 of 225 PageID #:43073
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2411

1  Q.  All right.  But was the numbers roughly comparable in terms

2  of there was a few mistakes, but for the most part, the data

3  was reliable?

4  A.  That's correct.

5  Q.  All right.  Let's talk about what she did talk about for

6  most of that time, which was documents that were not in the

7  criminal defense files, but some of the documents or the

8  information was in the state's attorney's files.

9          That's what she asked you about, right?

10  A.  Generally, yes.

11  Q.  Do you remember approximately how many files she was

12  talking about?

13  A.  Half a dozen, maybe.

14  Q.  About a half dozen.  And maybe she identified how many

15  documents?  20?  Somewhere around there?

16          MS. ROSEN:  Objection to the leading, Judge.

17          MR. LOEVY:  All right.

18          THE COURT:  Sustained.

19  BY MR. LOEVY:

20  Q.  I don't know how many documents.  Do you know how many

21  documents?

22  A.  No, I don't.

23  Q.  All right.  Now, you do not dispute that for at least some

24  of the documents missing from the public -- from the criminal

25  defense attorney files, there were copies in the state's

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 186 of 225 PageID #:43074
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2412

1    attorney's files, right?

2    A.  Absolutely.

3    Q.  Now, the first question I have for you on that is, do you

4    know when those documents got into the state's attorney file?

5    And how does that affect your analysis?

6    A.  No.  And I think I -- I mentioned once or twice during my

7    responses to Ms. Rosen that I have -- the state's attorney's

8    files can grow through the civil litigation, totally

9    independent of preparation for a criminal defense file.

10            MS. ROSEN:  Objection, Judge, foundation for that.

11            MR. LOEVY:  No.  He has foundation, Your Honor.

12            THE COURT:  Overruled.

13   BY MR. LOEVY:

14   Q.  So, in other words, some of the state's attorneys' files

15   might have -- are -- was there post-conviction proceedings for

16   some of the files, for example?

17   A.  That -- that's correct.  And that an effort may have been

18   made years after the criminal file -- or criminal file was put

19   together to gather files that may have not been located at the

20   time, may have been moved from one area to another, and they

21   may show up in those state's attorney files years after the

22   fact.

23            MS. ROSEN:  Objection, Judge.  This is pure

24   speculation.

25            THE COURT:  You know, this whole area on both sides is

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 187 of 225 PageID #:43075
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2413

1    speculation.  Okay?  So it seems to me that it was opened up.

2    BY MR. LOEVY:

3    Q.  So all the documents Ms. Rosen showed you, there's no way

4    to know if those got into the file later or if they were truly

5    in the file at the time of the criminal proceeding?  Would you

6    agree with that?

7    A.  I would agree with that.  That's correct.

8    Q.  All right.  Let's say some of the documents she showed you

9    were in the state's attorney's file at the time of the criminal

10   proceeding.

11          Does that mean that the criminal defense attorney

12   files are invalid?

13   A.  No.  They -- the criminal defense files were -- are what

14   they are.

15   Q.  And maybe the state's attorneys gave them the documents;

16   maybe they didn't, correct?

17          MS. ROSEN:  Objection, Judge.

18          THE COURT:  That's leading.

19          MR. LOEVY:  All right.

20   BY MR. LOEVY:

21   Q.  Do you have any way to know whether the state's attorneys

22   withheld documents from the criminal defense attorneys?

23   A.  No, I do not.

24   Q.  What did you compare?

25   A.  I compared what was objectively physically able to be

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 188 of 225 PageID #:43076
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2414

1    examined as being contained in the criminal defense attorneys'

2    files and that those criminal defendants' attorneys were from

3    the Public Defender Office.

4    Q.  All right.  And as far as files for which there was a

5    state's attorney's file, did you see plenty of material that

6    was in neither the criminal defense file nor the public -- the

7    state's attorney's file?

8    A.  That's correct.  I -- that I found cases like that, yes.

9    Q.  All right.  So does anything about the fact that some of

10   the material that is listed in your report was or was not found

11   in the state's attorney's file, does that change anything about

12   any of your opinions, sir?

13   A.  No, it does not.

14   Q.  All right.  Ms. Rosen asked you about things that were

15   missing, and she brought you to Attention F -- your Attachment

16   F before lunch.

17           Do you have Attachment F up there?

18   A.  Yes, I do.

19   Q.  All right.  I think she stopped at Mr. Green on page 6,

20   correct?

21   A.  Yes.

22   Q.  All right.  And there's quite --

23           MR. LOEVY:  If I could just publish this, Your Honor?

24   Permission to publish Attachment F.

25           THE COURT:  It's in evidence?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 189 of 225 PageID #:43077
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2415

1      MR. LOEVY:  We move it into evidence if it's not.

2      THE COURT:  Okay.  As what?  Sorry.

3      MR. LOEVY:  This is Plaintiff's Exhibit 253-F is how

4  it's labeled.

5      THE COURT:  Any objection?

6      MS. ROSEN:  No, Judge.

7      THE COURT:  It is received.

8  (Said Plaintiff's Exhibit 253-F received in evidence.)

9  BY MR. LOEVY:

10  Q.  All right.  There was quite a bit of material in the *Green*

11  case -- let's see if I can focus it -- that was missing from

12  the criminal defense file, correct?

13  A.  That's correct.

14  Q.  Handwritten notes, investigator business statements,

15  supplementary reports, et cetera.

16      Showing you another file here on the next page, the

17  *Quinones* case.  Also a lot of stuff missing, correct?

18  A.  That's correct.

19  Q.  Showing you the next page.  This *Pitchfork* case, quite a

20  bit of stuff missing, correct?

21  A.  Quite a bit.

22  Q.  And same with the *Rodriguez* case?

23  A.  Yes.

24  Q.  And, you know, she did show you four where there wasn't

25  that much missing.  Do you remember those questions?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 190 of 225 PageID #:43078
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2416

 1    A.  I do.

 2    Q.  All right.  Does that mean that there wasn't other files

 3    where there was quite a bit missing?

 4    A.  No.  There were -- there were -- had we gone through all of

 5    the pages, there would have been some very substantive

 6    examples.

 7    Q.  All right.  I want to show you the sorting that Ms. Rosen

 8    did.  I don't remember what exhibit she labeled this one.

 9         MR. LOEVY:  Do you remember, Eileen?  This is your

10    graphic here with the green.

11    BY MR. LOEVY:

12    Q.  Do you remember Ms. Rosen asking you about that?

13    A.  Yes.

14    Q.  Now, it looks like there's not a lot of green on this page,

15    correct?

16    A.  Visually, that's the impression you get.

17    Q.  Now, all this gap here (indicating), does that imply that

18    there were criminal defense files that didn't have stuff

19    missing?

20    A.  No.

21    Q.  Can you explain why?

22    A.  Because if you look at the actual source document that was

23    prepared, there will be indications where -- that the original

24    column would be "No" so that when you have -- there's no way to

25    show that the other material that was missing would be.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 191 of 225 PageID #:43079
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2417

 1   Q.  All right.  So, in other words --

 2          MR. LOEVY:  And we've re-sorted -- we'll call this

 3   demonstrative -- give me a number that we're on.

 4          MR. ART:  20, Plaintiff's 20.

 5          MR. LOEVY:  Plaintiff's 20 is probably another

 6   corresponding.

 7          MR. SWAMINATHAN:  Demonstrative?  Are you saying a

 8   demonstrative exhibit?

 9          MR. ART:  Demonstrative 20.

10   BY MR. LOEVY:

11   Q.  Demonstrative 20.  Showing you the same data but sorted in

12   a different way.  Let me get some white paper.

13          If we compiled just the cases for which you were able

14   to do criminal defense comparisons -- so, in other words, this

15   is the files -- all the files, including ones for which you

16   were not able to do the comparison.  That's what Eileen -- Ms.

17   Rosen showed you, right?

18   A.  Yes.

19   Q.  But if we were to show you just the cases where you were

20   able to do comparisons -- showing you the first page of

21   Plaintiff's Exhibit 20 -- Demonstrative 20, showing you the

22   second page of Plaintiff's Demonstrative Exhibit 20, and

23   showing you the third page of Plaintiff's Demonstrative Exhibit

24   20.  There'd be a whole lot more green on there, would there

25   not?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 192 of 225 PageID #:43080
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2418

1  A.  Yes.  The presentation, I would -- the original one that

2  was given to me by Ms. Rosen I would consider as not a true

3  representation and skewed.  But if you looked at it just from

4  the green standpoint, you get a different impression.

5  Q.  And, in fact --

6  A.  And --

7  Q.  -- without characterizing it, if all the -- only the

8  criminal-defense-file-available comparisons were used, would

9  the column be entirely green or was it -- there might have been

10 one exception?

11 A.  There might have been one or possibly two exceptions, but

12 it would be entirely green.  I think that points out the

13 importance of taking the report in total.

14 Q.  All right.  Talking about the charts.

15       Now, you did not put the numbers into the boxes,

16 correct, sir?

17 A.  That's correct.

18 Q.  But what did you do to make sure -- Ms. Rosen was asking

19 you about how the boxes got created.  What did you do to make

20 sure the boxes were accurate?  And how did -- and who analyzed

21 the data?

22 A.  Well, as I -- I believe I testified to either yesterday or

23 earlier today, the spreadsheet came to me and I would look at

24 an example on row 9 where it indicated there was a criminal

25 defense attorney file and then X number of these things were

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 193 of 225 PageID #:43081
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2419

 1    missing.

 2            I would then go into electronically that particular

 3    homicide file and see if, in fact, the ones that had been put

 4    on the spreadsheet were missing, and that's how I'd verify it.

 5            And if anything -- that made it an absolute, it wasn't

 6    there.  I looked at it, and it wasn't there.  It gave the

 7    benefit of the doubt to the City in the fact that had I myself

 8    gone and looked at each and every page, I may or may not -- I

 9    don't think I would have, but it's conceivable that I could

10    have found other omissions.  But I did verify, in fact, that

11    the omissions were true.

12    Q.  So you verified that there were omissions and you didn't

13    even look for more omissions?

14    A.  That's correct.

15    Q.  All right.  Now, we've been talking a lot about whether

16    there was information in the criminal defense file that was or

17    wasn't in the investigative file.

18            And this is going to be a hard question to ask, but do

19    you have any way to know either way for any part of your

20    analysis if there was information that didn't even make it into

21    the investigative file at all?

22    A.  By inference, there will be things that in the various

23    cases that I looked at where there will be reference to someone

24    having talked to an individual or that be sure that something

25    happens.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 194 of 225 PageID #:43082
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2420

1       I'm saying this badly, but there is -- you can infer

2   from some of the information that was contained in the file

3   that something else happened, but there is nothing in the file

4   to show what it was.  You know, did they go talk to somebody

5   that they said they were going to go talk to?  That type of

6   thing.

7   Q.  All right.  So you were limited to what actually got

8   reduced to paper --

9   A.  Yes.

10  Q.  -- in the investigative file?  You're not saying that the

11  police department, based on what you observed, didn't have

12  other information that didn't get reduced to paper?

13          MS. ROSEN:  Objection, Judge, calls for speculation.

14          THE COURT:  As I said, this whole area is speculative

15  on both sides.  Overruled.

16  BY THE WITNESS:

17  A.  I think it -- I think an individual with experience in

18  examining police investigative files could draw strong

19  inferences that material did not make it in there.

20          And in particular, for example, the whole area of gang

21  squad members where they have forms that are supposed to be

22  filled out on a daily activity as to what they did and who they

23  talked to and so forth, and, as I've testified before, those

24  are routinely just never there.

25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 195 of 225 PageID #:43083
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2421

1    Q.  All right.  Ms. Rosen asked you most of the exam about the

2    comparison between the green column, which is the criminal

3    defense files, and the blue column, which was the investigative

4    file, correct?

5    A.  That's correct.

6    Q.  Does that -- anything that she talked about affect the

7    opinions you gave about the blue column as a standalone?

8    A.  No.  And that's where I feel the strongest.  I'm very

9    comfortable, objectively, what was in the criminal defense file

10   was either or wasn't.

11           Now, when it was or when it wasn't, I can't say.  But

12   when I'm comparing investigative files as standalone items,

13   just doing a straightforward audit and looking at it, very

14   comfortable about the deficiencies in that.

15           And the same with the permanent retention file.

16   Q.  That was my next question.

17   A.  I'm sorry.

18   Q.  Did anything that she asked you about affect any of your

19   opinions at all about the purple column?

20   A.  No, it did not.

21   Q.  Can you explain?

22   A.  The -- without even comparing the investigative files

23   vis-a-vis the permanent retention files, if a permanent

24   retention file is supposed to have an inventory sheet, absolute

25   requirement, and it didn't have an inventory sheet, which was a

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 196 of 225 PageID #:43084
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2422

1   basis for legitimate discovery, that's a standalone issue.  But

2   when it also is supposed to contain certain other things,

3   supplementary reports that the City very clearly says are

4   supposed to be in there, and they're in the investigative file,

5   but they're not in the permanent retention file, you can look

6   at that as a standalone deficiency.

7   Q.  All right.

8   A.  It's a very objective issue.

9   Q.  Then sort of summary, then you had a number of opinions

10  that you didn't talk about with Ms. Rosen.  But as far as the

11  opinion that she did ask you about, blue versus green,

12  notwithstanding having been shown that at least some documents

13  were in the state's attorney's file, does that change your

14  opinion about whether the criminal defense attorneys were

15  getting the investigative materials?

16  A.  No, it does not change my opinion.

17          MR. LOEVY:  All right.  Your Honor, we've been going a

18  long time without a break.  I don't know what your plan is.  I

19  can keep going.

20          THE COURT:  Well, my plan was -- I was promised about

21  how long this was going to take on both sides, and we weren't

22  even going to get close to the break.

23          MR. LOEVY:  Yeah.

24          THE COURT:  But now that we're at ten to 3:00, unless

25  we're very close, I'd like --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 197 of 225 PageID #:43085
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2423

1     MR. LOEVY:  We're not.

2     THE COURT:  -- to take a break.  Okay.  Ten minutes,

3  ladies and gentlemen.

4    (Jury out.)

5     THE COURT:  Okay.  So I was promised 30 minutes by Ms.

6  Rosen, and I think it took an hour and a quarter, and we're

7  already close to a half -- I don't know where we are, Mr.

8  Loevy, with you, but --

9     MR. LOEVY:  Well, my estimate was based on, you know,

10  on the estimate.  But I probably only have 15 minutes.

11     THE COURT:  You're only 20 minutes in, actually.

12     MR. LOEVY:  All right.

13     THE COURT:  All right.  Ten minutes.

14    (Recess 2:51 p.m. until 3:01 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 198 of 225 PageID #:43086
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2424

1        THE COURT:  Am I getting briefs at any point?

2        MR. LOEVY:  Yes.

3        Steve, do we have the O'Brien brief to give the Judge?

4        MR. ART:  Anand has it.

5        MR. LOEVY:  All right.  Well, give the O'Brien brief

6   to the Judge.

7        We've already given it to the defense, Your Honor.

8        THE COURT:  And when will I get it?

9        MR. LOEVY:  As soon as Anand brings it in the

10  courtroom.

11       THE COURT:  Okay.

12   (Jury in.)

13       THE COURT:  Are you going to file it electronically?

14       MR. LOEVY:  Yes, Your Honor.

15       Have we filed it yet?

16       MR. ART:  We'll do it now.

17       MR. LOEVY:  Now.

18       THE COURT:  Thank you.

19       Please be seated, ladies and gentlemen.

20  BY MR. LOEVY:

21  Q.  All right.  Sir, this morning, which I know seems like a

22  long time ago, but this morning you were asked by Ms. Rosen

23  about the Sherwin -- Sherman Addison file that -- where you had

24  listed something -- only one thing missing or two things

25  missing.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 199 of 225 PageID #:43087
6-18-18 (Ex 10)
Brasfield - redirect by Loevy

2425

1          Do you remember her asking you about that?

2    A.  Vaguely.

3    Q.  All right.  I'd like to show you Plaintiff's Exhibit 157-N.

4    This is a document from that file.

5          MR. LOEVY:  Your Honor, we'd move that into evidence.

6          THE COURT:  Any objection?

7          MS. ROSEN:  Can I see which one it is?

8          MR. LOEVY:  It is a -- here's a copy for you.

9          It's a document from the file, Your Honor.

10         THE COURT:  157-E, did you say?

11         MR. LOEVY:  N.

12         THE COURT:  N.

13         MR. LOEVY:  Or maybe it's Z.  I think I'm out of

14   letters.

15         In any event, Your Honor, we move it into evidence.

16         THE COURT:  Any objection?

17         MS. ROSEN:  No, Judge.

18         THE COURT:  It is received.

19    (Said exhibit received in evidence.)

20   BY MR. LOEVY:

21   Q.  Showing you a transcript from the Sherwin Addison file, it

22   looks like the defense attorney is saying, "The only thing that

23   I can see that is still outstanding now is apparently there is

24   or I don't know if there is, but usually there's an

25   investigative file.  We never had that, never had it for the

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 200 of 225 PageID #:43088
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2426

1    first trial."

2          And then he says a little bit later:  "As far as

3    talking to Detective Jedlowski, she only talked to him for

4    about five minutes and had him bring any reports that he had.

5    All he had is the typed police report, which is the normal

6    police report that is always issued in the cases, the

7    noninvestigative type of police report.  No notes, no GPRs, and

8    that is what she was shown by him.  She noted she didn't have a

9    copy of the street file or the investigator file, so that is

10   why she subpoenaed the investigative file.  But she was not

11   tendered anything by the detective, and, in fact, the detective

12   happened to be in the building yesterday, so I spoke with him,

13   and he verified that all he had was they typewritten reports."

14         Do you see that, sir?

15   A.  Yes, I do.

16   Q.  So this was cited by Ms. Rosen as an example of where you

17   couldn't find anything missing from the file or you found one

18   document that wasn't missing.  Do you remember that?

19   A.  Yes.

20   Q.  All right.  Were there indications like this throughout

21   these files that the investigative materials were missing?

22   A.  Yes.

23   Q.  All right.  You were shown by Ms. Rosen before we broke

24   this document, and I don't remember what exhibit number she

25   labeled it, but it is on -- it's the Susan Sweat thing.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 201 of 225 PageID #:43089
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2427

1        And I asked you during the break to take a look at

2    this, by agreement of Ms. Rosen.

3        Did you have a chance to take a look at it?

4    A.  Yes.

5    Q.  All right.  Showing you the GPR that she showed you --

6    remember she put it on the screen, and she said, "Isn't it true

7    this information's in here, and isn't it true it's in here?"

8        Do you remember those questions?

9    A.  Yes.

10   Q.  Now that you've had a chance to review at little more

11   carefully, is the information in this note -- did it make it

12   into the GPR or the report?

13   A.  No, there is information that is missing and -- the car,

14   the address, and a name and a phone number --

15   Q.  So the --

16   A.  -- another address.

17   Q.  So the example she gave you where the state's attorney file

18   has a GPR but the state's attorney nor the criminal defense

19   attorney has the notes, is that an acceptable situation?

20   A.  No, it is not.

21   Q.  Now, you were shown some court attendance sheets as being

22   missing from the criminal defense files, and Ms. Rosen asked

23   you a number of questions about those, correct?

24   A.  Yes.

25   Q.  I'm going to show you -- what number are we on --

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 202 of 225 PageID #:43090
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2428

1          MR. LOEVY:  154, I'll call it, AA, Your Honor.

2      154-AA, we move that into evidence.

3          THE COURT:  Any objection?

4          MS. ROSEN:  No, Judge.

5          THE COURT:  It is --

6  (Plaintiff's Exhibit No. 154-AA received in evidence.)

7  BY MR. LOEVY:

8  Q.  This is from one of the files you were shown, a court

9  attendance record in the Borotto case showing that Detective

10 Guevara -- R. Guevara was present in court with his overtime

11 book.

12          That could on certain fact patterns be exculpatory,

13 could it not?

14 A.  Yes, very definitely.

15          MS. ROSEN:  Objection, calls for speculation.

16          THE COURT:  All right.  That was implicit in the

17 question.  Overruled.

18 BY MR. LOEVY:

19 Q.  All right.  Let me give you a hypothetical.

20          Let's say there's a question about whether Officer

21 Guevara brought Orlando Lopez to court for the first

22 proceeding, and then Orlando Lopez started saying there was

23 something different about the hair than he had previously said

24 before.

25          This is the kind of document that a criminal defense

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 203 of 225 PageID #:43091
6-18-18 (Ex 10)
Brasfield - redirect by Loevy

2429

1  attorney could use to cross-examine; would you agree?

2        MR. SOTOS:  Objection --

3        MS. ROSEN:  Objection --

4        MR. SOTOS:  -- Objection, Your Honor.  That's rampant

5  speculation, and it's speculation in regard to this actual

6  case.

7        THE COURT:  I think you're basically asking a

8  hypothetical, right?

9        MR. LOEVY:  Right.

10        THE COURT:  Overruled.

11  BY THE WITNESS:

12  A.  Absolutely.  And that was what I was trying to convey in

13  one of my earlier responses.

14        It purports to say a factual thing occurred that an

15  officer was in such and such a place at such and such a time.

16        And it may be generally not important, but if you need

17  to either verify or impeach the veracity, you have a document

18  here that might show, hypothetically, that a detective was

19  claiming to be in one place when he could not have been because

20  he was in another.

21  BY MR. LOEVY:

22  Q.  And Ms. Rosen asked you about, are there other departments

23  that create these documents?  And I understood it's not a

24  document you were too familiar with?

25  A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 204 of 225 PageID #:43092
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2430

1  Q.  You're used to seeing it in the -- in the payroll and

2  overtime context, is what you said?

3  A.  Yes, that's my -- that's -- that's the way that you usually

4  see it and not only in my -- one of my previous agencies but

5  others that I'm familiar with.

6          I'm not saying that this isn't -- that this could not

7  be found in another jurisdiction, but it's normally something

8  that's a -- that's a fiscal.

9  Q.  All right.  So that brings me to my question.

10         If the City of Chicago has this document and it is in

11 the investigative file, should it be withheld or turned over?

12 A.  It should be turned over, because it is an -- it is an

13 official document.  It's part of the file.

14         And if it's not a part of a file in San Francisco or

15 New York, that's San Francisco and New York.  But if it's a

16 part of a file in Chicago, it should be disclosed.

17 Q.  All right.  You were asked some questions about To/Froms

18 and whether those were, you know, administrative or

19 investigative.

20         Do you remember those questions?

21 A.  Yes.

22 Q.  I'm going to show you another document from the *Fields*

23 case.  And then this is 146-E.  This is a To/From.

24         MR. LOEVY:  We move this into evidence, Your Honor.

25         THE COURT:  Any objection?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 205 of 225 PageID #:43093
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2431

1          MS. ROSEN:  Same objection that I have to all the

2    *Fields* documents.

3          THE COURT:  Okay.  Overruled.  It will be received.

4    (Plaintiff's Exhibit 146-E received in evidence.)

5    BY MR. LOEVY:

6    Q.  All right.  Is this an example of an informal To/From?

7    A.  Yeah, and this is where I was making the comment on the

8    typed form.  It's not an official form, but it's "To:  From:

9    Subject:"  It's a To/From memo.

10   Q.  All right.  Can a To/From memo be relevant and discoverable

11   and exculpatory?

12   A.  Yes.

13   Q.  Does this one give an example?

14   A.  Yes.  And this is a situation where a witness is describing

15   that the offenders were wearing skull caps, had them pulled

16   over their faces to conceal their identity, and it goes on to

17   talk about a vehicle and other information.

18          But that's -- that could impugn or support, but

19   whether the witness was actually able to identify someone.

20   Q.  And, in fact, if James Langston went ahead and testified

21   that Nate Fields committed the murder, this could have been

22   very exculpatory, could it not have?

23   A.  Absolutely.  If -- if the -- Langston was saying that he'd

24   seen their face or saw his face and knew who it was when they

25   actually had their faces covered.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 206 of 225 PageID #:43094
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2432

1  Q.  All right.  Ms. Rosen asked you some questions about your

2  work in the *Fields* case and the *Kluppelberg* case.  And you were

3  asked whether in the *Fields* case you reviewed the criminal

4  defense files or the state's attorney files.

5       Do you remember those questions?

6  A.  Yes.

7  Q.  Okay.  Which did you review or which did Mr. Murray review

8  in that case?

9  A.  I reviewed the criminal defense files and the investigative

10  files and the permanent retention files.

11  Q.  Do you remember which -- if Mr. Murray reviewed the state's

12  attorney files, or you don't remember either way?

13  A.  I don't remember either way.  My recollection, which I'm

14  uncomfortable with winging it, is that he did not.

15  Q.  All right.  You seem to be someone who prefers to be

16  precise and not guess?

17  A.  As much as possible, yes.

18  Q.  All right.  The permanent retention file, I just want to

19  establish quickly.

20       Showing you a copy of Plaintiff's Exhibit 20, this is

21  part of Plaintiff's Exhibit 20, which I believe is already in

22  evidence, right?  That's the permanent retention file from the

23  Rivera case.

24       We know it's the permanent retention file because it's

25  got a big stamp on it, correct?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 207 of 225 PageID #:43095
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2433

1   A.  Yes, we call that a clue in the trade.

2   Q.  And -- if you're a detective.

3       And it has a stamp reflecting Records Division?

4   A.  Yes, it's --

5   Q.  Can you explain --

6   A.  -- a date and timestamp.

7   Q.  All right.  Now, showing you the same document from

8   Mr. Wadas' criminal defense file, this is Plaintiff's Exhibit

9   43.

10      MS. ROSEN:  Judge, objection, scope.  Scope.  I didn't

11  talk about the Valentin file at all.

12      THE COURT:  How is this within the scope?

13      MR. LOEVY:  She talked about whether the criminal

14  defense attorney's has got the permanent retention file or some

15  other file.  And so this is just tying up that point.

16      THE COURT:  Overruled.

17  BY MR. LOEVY:

18  Q.  And showing you Mr. Wadas' copy of the same report, it has

19  the same stamp, does it not?

20  A.  Yes, it's the same location, the same angle, the same date,

21  and the same time.

22  Q.  All right.  Did you form opinions about whether criminal

23  defense attorneys got the investigative file or the permanent

24  retention file?

25  A.  I'm -- the conclusion I'm drawing from that objective piece

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 208 of 225 PageID #:43096
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2434

1    of evidence in the document is that they got a copy of the

2    permanent retention file and not the investigative file.

3    Q.  All right.  The stamp itself, do you know how many years

4    down the process that the documents get stamped in Records

5    Division when they -- when they get stored?

6    A.  It -- it can be quite a -- quite some time after the

7    closure of the case.

8    Q.  All right.  You were asked about -- by Ms. Rosen about the

9    inventory, and you've already testified that in many, many

10   cases the inventory was not reflected in the criminal

11   defendant's files, correct?

12   A.  That's correct.

13   Q.  And -- actually, I already asked that.  I'm going to move

14   on to notes.

15            You were asked a number of questions about whether

16   homicide detectives should take notes.  Do you remember that?

17   A.  Yes.

18   Q.  And whether they could wing it.

19            And you were asked for your support about why you

20   believe detectives have to take notes?

21   A.  Yes.

22   Q.  Is that an open question in your field, sir?

23   A.  No, it's not.

24   Q.  Can you put that into context for us?

25            MR. LOEVY:  Eileen, can I have the book?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 209 of 225 PageID #:43097
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2435

1   BY THE WITNESS:

2   A.  In the context of taking notes?

3   BY MR. LOEVY:

4   Q.  Yeah.  I mean, what -- like is there any disagreement in --

5   even in the 1980s that you could conduct a homicide

6   investigation and keep it all in your head?  Or is this

7   something reasonable minds could disagree about or not?

8   A.  No, that is not something that was accepted practice among

9   your peers as an investigator.  It certainly was not an

10  accepted practice from a supervisory standpoint.

11          These forms, which we all have -- most all have a

12  space for supervision, sergeant, or lieutenant or a captain to

13  sign, and that's part of the process to ensure that the case is

14  complete and conducted appropriately.

15  Q.  All right.  Some things are just your opinion, you know,

16  and you feel strongly.

17          I mean, if we had other people in your field, would

18  anybody disagree with you that you have to take notes if you

19  learn information from eyewitnesses and -- during a homicide

20  investigation?

21          MS. ROSEN:  Objection, Judge.  Would anybody disagree

22  with that?

23          THE COURT:  Sustained.

24  BY MR. LOEVY:

25  Q.  All right.  How much of a consensus is there in your field

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 210 of 225 PageID #:43098
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2436

1    that you have to take notes?

2    A.  I would say there's a very strong consensus and expectation

3    that that's what you need to do and that's what's required.

4    Q.  And when you say "required," does that have anything to do

5    with respecting the constitutional rights of someone accused?

6    And can you explain?

7            MS. ROSEN:  Objection, Your Honor.

8            THE COURT:  Well, if the witness knows.  Overruled.

9    BY THE WITNESS:

10   A.  I'm sorry.  Would you ask the question again?

11   BY MR. LOEVY:

12   Q.  When you said you have to take notes, does that have

13   anything -- the requirement, does that have anything to do with

14   protecting constitutional rights?  And can you explain?

15   A.  Partially.  It is to ensure that the prosecution and the

16   defense and the jury and the judge, that the process is as fair

17   as can be and that that's an expectation --

18   Q.  All right.

19   A.  -- for that.

20   Q.  And the people accused of crimes have a right to all of the

21   notes and all of the information about the witnesses against

22   them?

23   A.  Yes.

24   Q.  All right.  You were asked -- a couple more areas.

25           You were asked about the wrongful convictions of

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 211 of 225 PageID #:43099
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2437

1   Mr. Jones, and she pointed out that he wasn't actually

2   convicted, right?

3   A.  That's correct.

4   Q.  But what was discovered during the *Jones* prosecution, the

5   existence of what practice?

6   A.  Parallel files, separate files, investigative street area,

7   whatever you want to call them, but that there were parallel

8   files.

9   Q.  And that parallel set of files, not in the *Jones* case but

10  in other cases, does that create the risk of wrongful

11  convictions?

12  A.  Yes, it does.

13  Q.  And they -- the city made a policy, and Ms. Rosen tried to

14  get you to sign on that it was a drastic change.

15        Were you -- were you pushing back on whether it was a

16  drastic change?

17  A.  I was.

18  Q.  Can you explain?

19  A.  The policy as written still failed to address some of the

20  key issues that were found to be causing the underlying

21  problems.  And that pertained to -- and, in fact, one of the

22  iterations of the policies, it actually institutionalized

23  separate files and investigative files.

24        It also was restricted -- those various attempts at

25  the policies restricted only to the Detective Division, so that

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 212 of 225 PageID #:43100
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2438

1    if you work anywhere else in the police department and had any

2    involvement with the investigation, you were not bound, at

3    least under the policy as written, to adhere to the policies.

4         Those are a couple of examples.

5    Q.  How about discretion?  Did the policies cover discretion?

6    A.  It created two other issues.  One, it allowed the

7    individual detectives -- literally hundreds of detectives in

8    their own independent discretion as to what was relevant to be

9    put into the file, so that if you had someone who was very,

10   very effective and very efficient, they would feel that

11   everything that was generated need to go in the file.

12        Others might say, well, this doesn't support who we've

13   got our tunnel vision or our focus on, so it's not relevant.

14   We're not going to put it into the file.

15        And the policy needs to be very specific with

16   guidelines telling you this goes in, this may be optional.  But

17   that failed to do that.

18   Q.  And did you see from reviewing the Hickey testimony that

19   Ms. Rosen was asking you about and a Commander Stibich that

20   there actually were recommendations to make better changes that

21   didn't get implemented?

22   A.  Yes, there was a recognition at the line level with the

23   people that were -- that were working on these policies that

24   those deficiencies existed and that they should consider --

25   that the command staff should consider making it

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 213 of 225 PageID #:43101
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2439

1  department-wide for everyone and to provide guidelines --

2  specific guidelines as to what type of thing went in there and

3  some other recommendations about the need of additional

4  training for change of cultural patterns and so forth.

5  Q.  And did those recommendations get implemented?

6  A.  No, they did not.

7  Q.  All right.  Showing you Defendants' Exhibit 34, which is

8  the policy, and I'm -- I don't mean -- I'm not being silly

9  about it, but it is sort of hard to read; the print's so small,

10  right?

11  A.  That's -- that is a difficulty even at my age.

12  Q.  All right.  So what I'm asking you, sir, is, is it

13  sufficient for a police department to write up a policy, put it

14  in the books, and just hope it's just going to get implemented?

15  A.  No.  And I've -- I've said facetiously in depositions that

16  they spend some amount of time describing that it's supposed to

17  be an 8-1/2-by-11-inch folder, and it's supposed to have 2-hole

18  metal punch designed to do such and such and such and such,

19  which completely ignores the substantive issue of do this

20  specifically, make it department-wide, eliminate discretion,

21  that type of thing.

22  Q.  And the "do this specifically" -- I'm not sure this is

23  clear yet -- but does this policy actually say that you have to

24  turn over the investigative files?

25  A.  No, that is another glaring deficiency.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 214 of 225 PageID #:43102
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2440

1    Q.  And I can't believe we've had you all day and haven't

2    gotten to that yet, but it provides for the creation of

3    investigative files, right?

4    A.  Yes.

5    Q.  Is there anything in here that says once you create

6    investigative files, you're supposed to give them to criminal

7    defendants?

8    A.  No.

9    Q.  All right.  I apologize for taking so long to getting to

10   the point, but just a few more questions.

11            You were asked about this document.  I don't remember

12   Ms. Rosen's exhibit, but it was the one that's Bates 208557,

13   and it's dated April 1990, correct?

14   A.  Yes.

15   Q.  And she asked you, isn't it true that savvy people knew to

16   subpoena street files, right, subpoena for street files?

17   A.  Yes.

18            MS. ROSEN:  Objection to the form of the question,

19   savvy.

20   BY MR. LOEVY:

21   Q.  All right.  Some people subpoenaed street files, right?

22   A.  In the material I've reviewed, there were -- there were

23   indicators that -- and I don't know whether they were more

24   experienced or they just were more thoughtful or whatever, but

25   some specifically recognized the existence of a parallel file

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 215 of 225 PageID #:43103
6-18-18 (Ex 10)
Brasfield - redirect by Loevy
2441

1    system and would ask for street files.

2    Q.  All right.  If the policy on the books was working, should

3    it have taken until April -- I mean, by April of 1990, how many

4    years after that was the policy -- was it that the policy --

5    A.  The last one 86-3 -- not the last one, but the last one we

6    talked about would have been four years earlier.

7    Q.  And then actually, the first change was seven years

8    earlier, right?

9    A.  That's correct.

10   Q.  All right.  Does this suggest that somebody wasn't getting

11   the message?

12   A.  It appears to be --

13            MS. ROSEN:  Objection, calls for speculation --

14            THE COURT REPORTER:  I'm sorry, one more time, please.

15            MS. ROSEN:  Calls for speculation, form of the

16   question.

17            THE COURT:  Could you ask it in a way that doesn't

18   call for speculation?

19            MR. LOEVY:  I'll just -- I'll move on, Your Honor.

20   BY MR. LOEVY:

21   Q.  Ms. Rosen asked you if -- isn't it true that the GPRs and

22   the investigative material was not supposed to go into the

23   permanent retention file by design, that it was supposed to be

24   in the separate file by design.

25            Do you remember those questions?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 216 of 225 PageID #:43104
6-18-18 (Ex 10)
Brasfield - recross by Rosen
2442

1  A.  Yes.

2  Q.  Okay.  Is that a good design?

3  A.  No, that's -- that's further institutionalizing what was

4  supposed to be a cultural change.

5  Q.  And you were asked -- the final area.  You were asked about

6  your work in the *Fields* case.

7      Do you remember the time period was -- involved 1983

8  to '89 and then again '99 to 2006, correct?

9  A.  Yes.

10  Q.  And in this case -- what was the time period that you

11  looked at in this case?

12  A.  From -- this was 1988.  So it was three years earlier,

13  three years after, '85 to '91, I think.

14  Q.  And then *Kluppelberg* was '83 to '91?

15  A.  I believe so, yes.

16  Q.  All right.  In all of those years in all of those files, do

17  you see any evidence that the City of Chicago fixed the problem

18  identified in the *Palmer* and *Jones* litigation?

19  A.  I saw no indication of that.

20      MR. LOEVY:  All right.  I have no further questions,

21  Your Honor.

22      THE COURT:  Ms. Rosen.

23      MS. ROSEN:  Yeah, I have a couple.  Just a couple more

24  questions.

25                          RECROSS-EXAMINATION

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 217 of 225 PageID #:43105
6-18-18 (Ex 10)
Brasfield - recross by Rosen
2443

1  BY MS. ROSEN:

2  Q.  Just so that I'm clear, is it your opinion that the

3  investigative files, as a general matter, do not get produced

4  to the criminal defendants?

5  A.  I'd say it's very erratic and sporadic.

6  Q.  Okay.  So if we could take a look at your Attachment F.

7  A.  When I -- as a caveat, in their totality.

8  Q.  Well, that's a different issue, right?

9  A.  Well, when I say do they get produced, I'm talking about

10  the whole animal.

11      Now, do -- do portions of them get produced in certain

12  cases?  Absolutely.

13  Q.  Okay.  So let's take a look at your Attachment F.

14      And isn't it true -- I think we went over this -- that

15  you've looked at 44 investigative files, compared it to 48

16  criminal defense files, and in each and every criminal defense

17  file, you found documents that solely were contained in the

18  investigative file?

19      And you can flip through each of the pages if you

20  want.

21      MR. LOEVY:  Object to asked and answered, Your Honor.

22  This is what her exam was.

23      MS. ROSEN:  I'm rebut -- he just went back to it,

24  Judge.

25      THE COURT:  Well, you know, we're going to be here for

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 218 of 225 PageID #:43106
6-18-18 (Ex 10)
Brasfield - recross by Rosen

2444

1    weeks.

2              MS. ROSEN:  I've got five questions on this.

3              THE COURT:  Okay.

4    BY MS. ROSEN:

5    Q.  Right?  You compared a total of 48 criminal defense files

6    to 44 career spending -- investigative files, and if you page

7    through -- do you have the attachment up there with you?

8    A.  Yes, I do.

9    Q.  Okay.  If you look through every page of that -- page 4,

10   page 5, page 6, page 7, page 8, page 9, page 10, page 11, page

11   12, page 13, page 14, page 15, page 16, page 17, and page 18 --

12   every single one of those files contained documents that

13   existed only in the investigative file, correct?

14   A.  And I've -- I have answered and testified to earlier that

15   90 percent of the time there were investigative materials

16   missing.

17              The reverse of that is is that there may very well be

18   some material from the investigative files, and I've never

19   disputed that.  But what I am saying, that the totality of what

20   was in the investigative files in 90 percent of the time, 37

21   out of 38 of them were not there.

22   Q.  Okay.  And let's take a look at the prefatory language that

23   you have in Attachment F on page 1.

24              And if we could highlight the line that says, "I did

25   not make any inferences about what documents were turned over

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 219 of 225 PageID #:43107
6-18-18 (Ex 10)
Brasfield - recross by Rosen
2445

1    to criminal defendants."  Is that correct?

2    A.  That's what I've tried to emphasize, yes.

3    Q.  Okay.  So all of your opinions today, based on the criminal

4    defense attorney files that you've reviewed and the 2,200 files

5    that you've reviewed in all the cases, you are not making a

6    single inference about what documents were turned over to the

7    criminal defendant, correct?

8    A.  I've drawn a number of inferences in the 72-page report and

9    footnoted and highlighted why I formed that opinion and that

10   there is material consistently indicating that there is a

11   parallel set of files and that material that should be

12   discoverable is not getting turned over to the defense bar.

13   Q.  But you're not making any inferences about what documents

14   were turned over to criminal defendants?

15          MR. LOEVY:  Your Honor, it's only half the sentence.

16   It's not fair --

17   BY THE WITNESS:

18   A.  I would --

19          THE COURT:  Sustained.

20   BY THE WITNESS:

21   A.  I would read that in its entirety.  And I can either read

22   it for you or you can highlight the whole thing.

23   BY MR. ROSEN:

24   Q.  You want the whole paragraph highlighted for you?

25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 220 of 225 PageID #:43108
6-18-18 (Ex 10)
Brasfield - recross by Rosen
2446

1   Q.  Okay.  And we can read it.

2       "The following listing provides a case-by-case account

3   of what documents are included in the investigative files but

4   are missing from criminal defense files," right?

5   A.  Yes.

6   Q.  And when you say "missing," all you're saying is the copy

7   that you had in front of you -- you're not vouching for the

8   fact that the file is in the same condition as it was during

9   the criminal prosecution?

10  A.  And that's where the second sentence:  "I did not make any

11  inferences about what documents were turned over to criminal

12  defendants.  I based my conclusions on observations about

13  actual differences between files.  For each homicide

14  investigation, each set of files, whether the investigative

15  file, the criminal defense file, or the permanent retention

16  file, is labeled with the CPD Records Division (RD) number and

17  the criminal defendant's name."

18      Now, that is a preface to an attachment to my report.

19  Q.  Right.

20  A.  But the report has to take -- be taken in its entirety.

21  Q.  And the entirety is what you've been testifying to --

22  A.  Yes.

23  Q.  -- over the last couple days?

24      Okay.  And now you have an opinion that the policies

25  as set forth in 86.3 are not a good design, right?

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 221 of 225 PageID #:43109
6-18-18 (Ex 10)
Brasfield - recross by Rosen
2447

1    A.  That's correct.

2    Q.  Because they institutionalize this notion of a parallel

3    file, which is now officially entitled an investigative file,

4    correct?

5    A.  In part.

6    Q.  And the reason for that is you believe that a centralized

7    file is a better system?

8              MR. LOEVY:  Objection, asked and answered.  I

9    didn't --

10             THE COURT:  You know, I think if we're ever going to

11   end this, we're going to have to not go over what we've already

12   gone over.  So I'm going to sustain the objection.

13   BY MS. ROSEN:

14   Q.  Okay.  Your opinion that it's not a good design that you

15   just testified to with Mr. Loevy -- that opinion that 86-3 is

16   not a good design, is that because it institutionalizes the use

17   of parallel files?

18   A.  No, not entirely.  I gave four or five other -- testified

19   just a few minutes ago to four or five other things that --

20   that were flawed.

21   Q.  And part of it is this idea about giving police officers

22   discretion, correct?

23   A.  That's -- that's one thing.

24   Q.  I said part of it is --

25   A.  Part of it.

Case: 1:12-cv-04428 Document #: 736-10 Filed: 11/20/18 Page 222 of 225 PageID #:43110
6-18-18 (Ex 10)
Brasfield - recross by Rosen
2448

1   Q.  -- this idea of giving police officers and detectives

2   discretion, correct?

3   A.  Right.

4   Q.  And isn't it true that as a police officer you're always

5   utilizing discretion in your work?

6   A.  I believe I testified to that very thing in -- on Friday

7   but in different circumstances when we're -- when we're

8   composing and putting together something that someone's life

9   depends on, it's an entirely different matter.

10  Q.  And so can you point to us an example of how it is that you

11  removed discretion from writing a report, any policy --

12          MR. LOEVY:  Objection to writing a report.  He wasn't

13  talking about writing a report.

14          THE COURT:  Yes, sustained.

15  BY MS. ROSEN:

16  Q.  Can you point us to any written policy that describes

17  eliminating the discretion that you're concerned about based on

18  86-3?

19  A.  Other than I have testified repeatedly that the general

20  practice in my field of expertise is that if you want

21  specificity, you need to have detailed examples, a checklist

22  training to that, and then auditing, and if failure to pass the

23  audit, some sort of discipline in the process.

24          That's a glaring inadequacy of the Chicago Police

25  Department's policies.

Brasfield - recross by Rosen

1   Q.  And you can't identify a model policy for us to review?

2   A.  I don't -- as I've said -- and I'll have to rely on my

3   previous answers.  I've done the best I can to answer that.

4           MS. ROSEN:  Okay.  Thank you.

5           MR. LOEVY:  No questions, Your Honor.

6           THE COURT:  Okay.  Thank you, sir.  You may step down.

7           THE WITNESS:  Thank you, Your Honor.  It's a pleasure.

8           THE COURT:  Watch your step.

9           THE WITNESS:  Okay.  In all matters.

10   (Witness excused.)

11           THE COURT:  I think we have a little time.

12           MR. LOEVY:  Your Honor, at this time, we'd like to

13   start the video testimony of Orlando Lopez.  We won't finish it

14   up, but we should use it.

15           Thanks for coming.

16           THE COURT:  Okay.

17           THE WITNESS:  Thank you very much.  Appreciate it.

18   (Said audio-video recording played in open court.)

19           THE COURT:  Counsel, when we get to a place to stop.

20   (Said audio-video recording played in open court.)

21           MR. LOEVY:  Keep going just a little bit.

22   (Said audio-video recording played in open court.)

23           THE COURT:  Okay.  9:30, ladies and gentlemen.

24           COURT SECURITY OFFICER:  All rise.

25   (Jury out.)

1      THE COURT:  Okay.  So I suspect we ought to get

2  together by about 20 after, I would think, in the morning and

3  try to resolve --

4      MR. SOTOS:  Judge, can I give you some reading

5  material?  That's a motion we filed about 45 minutes ago, just

6  a courtesy copy.

7      THE COURT:  Yes, that would be very helpful.

8      MR. SOTOS:  Okay.  The motion itself is short.  It's

9  the exhibits.

10      THE COURT:  This is also being filed electronically?

11      MR. SOTOS:  It already was.  I just wanted you to have

12  the copy.

13      THE COURT:  Thank you.

14    (Adjournment at 4:01 p.m. until 9:20 a.m., 6-19-18.)

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3           We, Colleen M. Conway and Nancy L. Bistany, do

 4   hereby certify that the foregoing is a complete, true, and

 5   accurate transcript of the Trial proceedings, Volume 10-B, had

 6   in the above-entitled case before the HONORABLE JOAN B.

 7   GOTTSCHALL, one of the Judges of said Court, at Chicago,

 8   Illinois, on June 18, 2018.

 9

10      /s/ Colleen M. Conway, CSR, RMR, CRR        06/18/18

11

12      /s/ Nancy L. Bistany, CSR, RPR, FCRR        06/18/18

13            Official Court Reporters              Date
             United States District Court
14          Northern District of Illinois
                  Eastern Division
15

16

17

18

19

20

21

22

23

24

25
```