# EXHIBIT 52

2978

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3    JACQUES RIVERA,                      ) No. 12 CV 4428
                                          )
4              Plaintiff,                 )
     vs.                                  ) Chicago, Illinois
5                                         )
     REY GUEVARA, STEVE GAWRYS, DANIEL NOON, )
6    JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS, )
     PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN )
7    LEONARD, EDWARD MINGEY, RUSSELL WEINGART, ) June 21, 2018
     ESTATE OF ROCCO RINALDI, CITY OF CHICAGO, )
8                                         )
               Defendants.                ) 9:25 o'clock a.m.
9
                          VOLUME 13 A
10                  TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JOAN B. GOTTSCHALL
11                       and a jury

12   APPEARANCES:

13   For the Plaintiff:     LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
14                               MR. STEVEN E. ART
                                 MR. ANAND SWAMINATHAN
15                          311 North Aberdeen Street
                            3rd Floor
16                          Chicago, Illinois  60607

17                          MACARTHUR JUSTICE CENTER
                            Northwestern University School of Law
18                          BY:  Locke E. Bowman, III
                            357 East Chicago Avenue
19                          Chicago, Illinois 60611
                            (312) 503-0844
20

21
     Court reporter:            Blanca I. Lara
22                         Official Court Reporter
                           219 South Dearborn Street
23                                Room 2504
                           Chicago, Illinois 60604
24                             (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov
25
```

```
 1   Appearances   (continued:)

 2

 3

 4   For the Individual        THE SOTOS LAW FIRM
     Defendants:               BY:   MR. JEFFREY N. GIVEN
 5                                   MR. JAMES G. SOTOS
                                     MS. CAROLINE P. GOLDEN
 6                                   MR. JOSEPH M. POLICK
                                     MR. DAVID A. BRUEGGEN
 7                             550 East Devon Avenue
                               Suite 150
 8                             Itasca, Illinois  60143

 9   For the Defendant         ROCK FUSCO & CONNELLY, LLC
     City of Chicago:          BY:   MS. EILEEN E. ROSEN
10                                   MS. CATHERINE M. BARBER
                                     MS. THERESA B. CARNEY
11                             321 North Clark Street
                               Suite 2200
12                             Chicago, Illinois  60654

13

14   For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
     Guevara:                  BY:   MR. THOMAS E. LEINENWEBER
15                                   MR. JAMES V. DAFFADA
                               120 North LaSalle Street
16                             Suite 2000
                               Chicago, Illinois  60602

17

18

19

20

21

22

23

24

25
```

```
 1              COURT SECURITY OFFICER:  All rise.
 2              (The following proceedings were had out of the
 3          presence of the jury in open court:)
 4              THE COURT:  Is everybody here so I can just do two
09:28:10  5   short things that I have?
 6              MS. ROSEN:  Actually, no, Judge.  I think there's some
 7   issue with plaintiff's counsel getting here on time.
 8              MR. SOTOS:  Mr. Loevy is here, but --
 9              MS. ROSEN:  I guess it's Mr. Bowman who is not here.
09:28:22 10              THE COURT:  I think it's enough if Mr. Loevy is here.
11              MS. ROSEN:  Yeah.  Okay.  I think he's out in the
12   hallway.
13              THE COURT:  This is of great consequence what I'm
14   going to say, so ....
09:28:36 15              MS. ROSEN:  I'm sure.
16              (Laughter in the courtroom)
17              THE COURT:  Nobody knows where he is?
18              MS. ROSEN:  Mr. Art went to get him, Your Honor.
19              THE COURT:  Thank you.
09:28:53 20              (Brief pause)
21              MR. SOTOS:  You can just tell us.  We'll tell him.
22              THE COURT:  Right.
23              (Brief pause)
24              THE COURT:  Actually --
09:29:05 25              MR. SOTOS:  I was kidding, for the record.
```

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
|          | 1  | THE COURT:  No, actually this is just for you.  It's a                 |
|          | 2  | just note.                                                             |
|          | 3  | MR. SOTOS:  All right.                                                  |
|          | 4  | THE COURT:  It's actually for Mr. Leinenweber.                         |
| 09:29:18 | 5  | MR. SOTOS:  Oh.  Nobody wants to hear that.                            |
|          | 6  | THE COURT:  No, but it's not bad news.  Just a minor                   |
|          | 7  | thing.                                                                 |
|          | 8  | This is really minor, everybody.                                       |
|          | 9  | Mr. Art is here.  So that's good.                                      |
| 09:29:28 | 10 | Okay.  I just want to tell you, No. 1, the CSO got a                   |
|          | 11 | jury note this morning:                                                |
|          | 12 | "... Judge, the jury cannot see the easel.  Can                        |
|          | 13 | it be moved."                                                          |
|          | 14 | MR. LEINENWEBER:  I'm abandoning the easel, Judge.                     |
| 09:29:44 | 15 | I'd be happy to accommodate.                                           |
|          | 16 | THE COURT:  All right.  That's No. 1.                                  |
|          | 17 | No. 2 is, we did look at the pretrial conference                       |
|          | 18 | transcript to see what was said about scope.  And Mr. Polick is        |
|          | 19 | speaking, and he says:                                                 |
| 09:29:56 | 20 | "Judge, just to circle back for clarification."                        |
|          | 21 | And we couldn't find what we were circling back to,                    |
|          | 22 | so --                                                                  |
|          | 23 | MR. LOEVY:  We did, Your Honor.  We're going to get                    |
|          | 24 | those pages.                                                           |
| 09:30:05 | 25 | THE COURT:  All right.  Well, let me go on.  I don't                   |

1    we need to because I say:

2          "Yes."

3           And Mr. Polick says:

4           "In terms of the order of the examination.  So

09:30:14    5           once the witness is up there, just to move this

6           along, we are going to -- each side is going to

7           do their examination and we are going to waive

8           scope objections?"

9           And I just said, "yes."  And Mr. Loevy said:

09:30:29    10          "We will waive scope."

11          And then I said:

12          "And waive scope.  Thank you.  Thank you.

13          Because I cannot keep track of scope when we are

14          doing that."

09:30:38    15          And then we talk about our little jury instructions,

16   so they knew we weren't following the usual rules.

17          So apparently there were no limitations put on that.

18   There was just an agreement.  So to that extent, I think what

19   the plaintiffs told me yesterday was correct.

09:30:58    20          I also just want to say that there's been kind of

21   madness in terms of this hostile witness business, because

22   nobody is giving me what I need to make any kind of a finding.

23          So after deciding what I can decide, I listened to the

24   witness and it's really unclear.  With Ms. Rosner, I don't

09:31:20    25   think there is any basis for treating her as a hostile witness

2983

1  by any side.  We're going back decades, and she's been like

2  with the EEOC.  So I think that was a little goofy.

3        And then with our current witness, I don't know if the

4  manner of the defense questioning created the hostility, but I

09:31:47  5  certainly don't see any basis for the plaintiff finding that --

6  or arguing that this witness is adverse.

7        So, you know, I can't fix this, though, after the fact

8  very easily.  I mean, I can't fix it at all.  So I'm just going

9  to say, if anybody anticipates wanting to examine a witness as

09:32:07  10  adverse when that is not otherwise acceptable, otherwise not

11  something that's clear, let's put it that way, I need something

12  from you in advance, otherwise I'm just not going to let

13  anybody do that.

14        MR. LOEVY:  Your Honor, but for this witness, can we

09:32:23  15  stay with the same grounds we have been doing with this

16  witness?

17        THE COURT:  Well, I don't know -- what's the rule when

18  one side calls an adverse witness, okay, which you've done.

19        MR. SOTOS:  Correct.

09:32:40  20        THE COURT:  And then the other side cross examines,

21  but then also does their own examination.  I mean, I'm not

22  quite sure what the rules provide for this.

23        MR. SOTOS:  It seems to me, Judge, that if we're

24  proceeding under a scenario in which then the other side is

09:32:54  25  going into an area that's not cross-examination --

1          THE COURT:  That's not within the scope.

2          MR. SOTOS:  Right.  Then they can't lead unless it's

3     an adverse witness.

4          THE COURT:  That makes sense.  And until I find

09:33:03    5     something -- and that's what you've been doing, right?

6          MR. LOEVY:  Well we were leading.  And you gave us

7     permission to lead.  And we'd ask that you don't reverse your

8     decision on that.

9          THE COURT:  Well, I don't think it's right.  I mean,

09:33:14   10     I've seen this witness and he seems to be largely in your

11     corner.

12          MR. LOEVY:  Yes and no.  I mean, he is the guy who

13     participated in the criminal investigation that led to our

14     conviction.

09:33:23   15          THE COURT:  Well --

16          MR. LOEVY:  He's telling the truth about --

17          THE COURT:  -- I'm not going to reverse myself on what

18     you can do when you're within the scope.

19          MR. LOEVY:  All right.

09:33:29   20          THE COURT:  But when you're using him as your witness,

21     I think you better directly examine him.

22          MR. LOEVY:  All right.  Well, Mr. Sotos brought up

23     this issue.

24          THE COURT:  But, as I'm saying, you know, there's law

09:33:38   25     out there, and I don't know it by heart.  And if anybody wants

1  to give me anything, just show me that this ought to be done

2  differently, fine.  But I think we should get the jury.

3       MR. LOEVY:  Well, one other thing, Your Honor, is that

4  we have said that there wasn't going to be attacking in

09:33:53  5  cross-examination, and that has been respected in this trial,

6  but Mr. Leinenweber is going over the same subject that Mr.

7  Sotos went over comprehensively and aggressively.  I didn't get

8  a chance to ask Tom if he intends to keep talking about the

9  Jimenez case, but Mr. Sotos exhausted everything that was to

09:34:06  10  exhaust on the Jimenez case, and then Mr. Leinenweber just

11  started it all over.

12       THE COURT:  Quick.

13       MR. LEINENWEBER:  Judge, I don't believe that's

14  correct.

09:34:14  15       THE COURT:  You're not going to be with him for a long

16  time, anyway.

17       MR. LEINENWEBER:  Honestly, Judge.  You know me, I

18  probably won't be more than 20 minutes or half hour; promise

19  you.

09:34:20  20       MR. LOEVY:  Well, if it's 20 minutes to half hour on

21  what Mr. Sotos just spent 45 minutes on, there's nothing new to

22  talk about there.

23       THE COURT:  I don't know.  This gets very complicated

24  when there are two lawyers with different interests

09:34:30  25  representing clients with different interests.  I'm not sure

|  | 1 | that this is where I want to jump in and start setting rules, |
|---|---|---|

1   that this is where I want to jump in and start setting rules,

2   especially when Mr. Leinenweber promises me --

3           And actually you're more reliable than anybody else on

4   this --

09:34:41   5           (Laughter in the courtroom)

6           THE COURT:  -- if you're going to be short.

7           MR. LOEVY:  But Your, Honor, they are aligned on this.

8   Mr. Soto -- it wasn't even Mr. Sotos' issue.  I mean, Mr.

9   Dorsch is making allegation against Mr. Guevara --

09:34:55   10           THE COURT:  You know, I'm not -- let's get the jury.

11           MS. ROSEN:  Judge, can I just ask a scheduling

12   question?

13           THE COURT:  Yeah.  But let's get a jury.

14           MS. ROSEN:  So you still intend to have another jury

09:35:01   15   instruction conference?

16           THE COURT:  We probably will have to.

17           MS. ROSEN:  Yes.  So what we're looking at right now

18   is that we should be done with evidence on Monday.  So I don't

19   know where you want to put that in.

09:35:11   20           THE COURT:  Is that all of you?

21           MS. ROSEN:  That's the defense.

22           THE COURT:  And when on Monday do you anticipate --

23           MS. ROSEN:  Well, it depends on how quickly we move

24   along.  Hopefully Monday noon'ish is the best guess right now.

09:35:27   25           THE COURT:  All right.  So I need to know from you a

1    little in advance how many issues we have to resolve so that I

2    can figure out how much time I should allow.

3          I mean, I can send the jury home early Monday, I can

4    have them come in late on Tuesday.  I can do any of those

09:35:44    5    things.

6          MS. ROSEN:  So you're going to want to do it -- I

7    guess that's the point, you're going to want to do it at the

8    conclusion of the evidence, is what you're envisioning?

9          THE COURT:  Well, I don't want to have to do it twice.

09:35:51    10    If we're ready to do it --

11          MR. LOEVY:  We made a lot of progress, as you recall,

12    at the pretrial conference.  I mean, there wasn't that many

13    unresolved issues.

14          THE COURT:  Yeah, I know that.  I don't know -- I

09:36:00    15    mean, it seems to me, you can tell me if you think I'm wrong,

16    but that it's more efficient to do it at the close of all the

17    evidence but before the arguments.  And to give the jury an

18    amount of time off based on what you tell me about how many

19    issues we have to resolve.  There's no point in the jury

09:36:17    20    sitting, waiting.

21          MR. LOEVY:  Well, it sounds like it's going to break

22    naturally.  On Monday, if we're going to run out of witnesses

23    on Monday --

24          THE COURT:  We're ready.

09:36:23    25          MR. LOEVY:  If we're going to run out of witnesses on

6-21-18 (Ex 13)

2988

1    Monday, that's when we ought to do it.

2         COURT SECURITY OFFICER:  All rise.

3         (The following proceedings were had in the

4         presence of the jury in open court:)

09:36:42    5         THE COURT:  Good morning, ladies and gentlemen.

6         (Jurors responded.)

7         THE COURT:  You look dryer than I am.  I don't know if

8    it's just the way you appear, right?  Did not bring an

9    umbrella.  Big mistake.

09:36:54    10        Please be seated.  The lawyers have been informed that

11   the easel needs to be turned around so that you can see it.

12   And I think it is turned around so you can see it.  But I

13   appreciate that.  Anytime you are having trouble seeing

14   anything, just let me know.

09:37:10    15        Mr. Leinenweber, I think we just need the witness.

16        MR. LEINENWEBER:  Correct, Judge.

17        (Brief pause)

18        THE COURT:  And, ladies and gentlemen, I have on

19   pretty good authority, based on what I understand, which is

09:37:39    20   never completely certain, that you'll have the case sometime --

21   I can't say it's at the beginning of next week, but early next

22   week.  I'm hoping -- we have to go through closing arguments of

23   which there will be a number, and instructions, and that takes

24   kind of day.  My guess is is that the evidence is probably

09:38:02    25   going take us well into Monday, and then we'll be able to do

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 13 of 278 PageID #:43657
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

2989

1    those other things on Tuesday.

2              (The witness enters the courtroom)

3              THE COURT:  It's my hope that you will have the case

4    on Wednesday.  That is not a complete promise.  And when on

09:38:17  5    Wednesday, I'm not sure, but we're making progress and we're

6    getting there.

7              Counsel, do we have a witness?

8              Ah, Mr. Dorsch.

9              THE WITNESS:  Good morning, Your Honor.

09:38:31  10             THE COURT:  Good morning.

11        WILLIAM DORSCH, DEFENSE WITNESS, PREVIOUSLY SWORN

12                  REDIRECT EXAMINATION (resumed)

13   BY MR. LEINENWEBER:

14   Q.  Good morning, Mr. Dorsch.

09:38:45  15   A.  Good morning.

16   Q.  To make things easier, you'll be happy to know that I'm

17   abandoning the easel since I'm going to use the Elmo.

18             MR. LEINENWEBER:  So, Judge, I'll try not to reinvent

19   the wheel, but I just like to establish a couple of things that

09:38:57  20   we talked about yesterday.

21   BY MR. LEINENWEBER:

22   Q.  We talked about two cases.  We talked about the umbrella

23   case.  And by that, you know, I'm referring to the case where

24   you state that Mr. Guevara basically put the finger on the

09:39:08  25   picture of the witness, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 14 of 278 PageID #:43658
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2990

1    A.  Yes.

2    Q.  When I say "umbrella," that's what I mean.

3    A.  Understood.  And Mingey referred to that case always as the

4    umbrella case.

09:39:18    5    Q.  Correct.  So, but you know what I'm talking about when I

6    saw umbrella, right?

7    A.  Yes, I do.

8    Q.  Okay.  And then second case I believe you were talking

9    about was the Jimenez case.

09:39:26    10            MR. LEINENWEBER:  And if I could approach the witness?

11            THE COURT:  Yes.

12            (Document tendered to the Court and the

13            witness.)

14    BY MR. LEINENWEBER:

09:39:36    15    Q.  Sir, I'm going to show you what's been marked as

16    Defendants' Exhibit 70.  If you could just take a look at that,

17    please.

18            (Brief pause)

19            THE COURT:  I do not have realtime.  Should I --

09:40:48    20            THE COURT REPORTER:  I'll fix it, Judge.

21            THE COURT:  Hold on one second.  A little technical

22    glitch.

23            (Brief pause)

24            THE COURT:  That's fine.  Thank you.

09:40:50    25            Don't wait for me, I'm just plugging things in.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 15 of 278 PageID #:43659
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2991

BY MR. LEINENWEBER:

Q.  That exhibit, that appears to be the part of the criminal file of the Jimenez case, is that fair to say?

A.  Yes.

09:40:57 Q.  And if you look -- I put a little sticker on it to make it easier.  If you look at that page where the sticker is on, you're listed there as the detective and the arresting officer, is that correct?

A.  No, it's for a lineup report.

09:41:09 Q.  But at least your name, your signature is on that document?

A.  Well, my -- it's not my signature.

Q.  But your name is on it?

A.  My name is on it, yes.

Q.  And also your partner at the time, Bill Johnson, is that 09:41:19 correct?

A.  Well, apparently we were working that day on that case.

Q.  Okay.  And I understand you've worked on a lot of cases, and it's been a long time since you've been on the police department.  And no one here expects you to remember every 09:41:37 detail, but seeing your name and your partner's name on that pretty much indicates to you that you were working on that case, correct?

A.  Yes.

Q.  Okay.  And you were one of arresting officers, correct?

09:41:46 A.  Apparently.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 16 of 278 PageID #:43660
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2992

1   Q.  Okay.  And we can tell by that date, that says the date of

2   the murder.  I think we established yesterday was December 19th

3   of 1991, correct?

4   A.  Right.

09:41:55   5   Q.  Okay.  And then going back to the umbrella case.  You had

6   said yesterday, on further thought, that you believe that that

7   happened around Mother's Day of 1989, correct?

8   A.  Yes.

9   Q.  Now, again, because memory is memory, you said different

09:42:12   10   dates on different occasions, is that fair to say?

11   A.  Oh, sure.

12   Q.  Yeah.  At your deposition you said it may have been '88,

13   may have been '89, may have '90, is that correct?

14   A.  Correct.

09:42:23   15   Q.  Okay.  And at one point you actually had a blurb about this

16   case on your website for your private business, correct?

17   A.  On this case?

18   Q.  No.  No.  On the umbrella case.

19   A.  I don't know that -- I don't know.

09:42:37   20   Q.  Okay.  So I believe you had that on your website and you

21   stated the date of that was 1992.  Does that sound, correct?

22          MR. BOWMAN:  Objection.  Foundation.

23          THE COURT REPORTER:  I'm sorry, who's objecting?

24          MR. LOEVY:  Mr. Bowman.

09:42:51   25          THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 17 of 278 PageID #:43661
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2993

1  BY THE WITNESS:

2  A.  I don't recall that case being on my website.

3  BY MR. LEINENWEBER:

4  Q.  Okay.  Do you remember you gave a deposition on this

09:42:56  5  matter?

6  A.  Yes.  I've given, I think, with court testimony, about 8

7  times.

8  Q.  Right.  But at least in terms of this case, you gave a

9  deposition a couple of years ago, is that right?

09:43:10  10  A.  Well, I think the first people that came out to me were

11  from the Sotos law firm.  They came to my home.

12  Q.  Understood.  Understood.  But you sat down, you were sworn

13  in, you answered --

14  A.  Right.

09:43:13  15  Q.  -- questions, correct?

16  A.  Sure.

17  Q.  Okay.  Same type of oath you took today, to tell the

18  truth --

19  A.  Yes.

09:43:25  20  Q.  - - correct?

21      And you told the truth to the best of your ability, is

22  that correct?

23  A.  Yes.

24      MR. LEINENWEBER:  Counsel, I'm referring to page 350,

09:43:33  25  Lines 1 to 6.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 18 of 278 PageID #:43662
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2994

1          MR. BOWMAN:  Thank you.

2    BY MR. LEINENWEBER:

3    Q.  Were you asked this question and did you give this

4    answer -- excuse me.  That's the wrong page.

09:43:41    5          MR. BOWMAN:  Page number?

6          MR. LEINENWEBER:  I'm sorry, it's 321, lines 16 to 24.

7          MR. LOEVY:  321?

8          MR. LEINENWEBER:  321, 16-24.

9    BY MR. LEINENWEBER:

09:43:58   10   Q.  And the next paragraph -- at Line 16, 321, this is

11   question:

12          "Question:  The next paragraph starts in 1992

13          while working as a detective in Area 5."

14          And then you went on to describe the case in

09:44:10   15          which you were uncomfortable with

16          identification:

17          "...  the witnesses agreed that they've been

18          paid by a third-party to finger the person who

19          was arrested."

09:44:17   20          Am I right in believing that the case you were

21          describing in your MLIS frequently asked

22          questions is the same murder investigation you

23          were talking about in the post-conviction

24          proceedings?

09:44:27   25          "Answer:  Yes."

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 19 of 278 PageID #:43663
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

2995

```
 1              And now I'm on Line 5, on page 322:
 2              "Question:  Okay.  So when you created your
 3         website page, you knew that or you wrote that
 4         the case occurred in 1992, correct?
 5              "Answer:  From --"
 6              "I asked if --"
 7              "Answer:  I wrote that, yes.
 8              "Question:  Okay.  Why did you believe when you
 9         wrote that that it was in 1992, but in the
10         post-conviction proceedings you said it was the
11         best recollection, '88 or '89.
12              "Answer:  Because I didn't know when Guevara
13         became a detective.
14              "Question:  Okay.  So you were guessing?
15              "Answer:  I was guessing at that time and at
16         that time also."
17              Was that what --
18    A.  That's correct.
19              MR. LOEVY:  Objection.  Not impeaching, Your Honor.
20              THE COURT:  That is true, but -- -
21              MR. LEINENWEBER:  I'm sorry, judge.  I'll keep going.
22    BY MR. LEINENWEBER:
23    Q.  (Reading:)
24              "So when you wrote the web page, you were
25         guessing?
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 20 of 278 PageID #:43664
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2996

1          "Answer:  Yeah.

2           "... it was 1992?

3          "Answer:  Yeah."

4          Was that the question and those answers?

09:45:14    5   A.  If you're repeating from that, but I don't -- I'm having

6   difficulty with the web page because that was created so many

7   years ago and I haven't seen it probably since this was

8   created.

9   Q.  Understood.  But you have no reason to doubt that when you

09:45:27   10   have that answer, that you had it on your web page and you

11   wrote it in 1992, correct?

12   A.  I don't recall it on the web page, but I don't disagree

13   with the dates.

14   Q.  Fair enough.  I'll move on.

09:45:38   15          So at least if we go here (indicating).  So I'm not

16   using the paper anymore.  It says date of incident for Jimenez,

17   December 19th, 1991.  The umbrella case 1988, 1989 and 1990,

18   and I forgot to put 1992.

19          And we also know from the questions yesterday that the

09:46:00   20   victim's name in the Jimenez case was, obviously, Jose Jimenez,

21   is that correct?

22   A.  In that case, yes.

23   Q.  But in the umbrella case, we don't know who the name is,

24   correct?

09:46:08   25   A.  I do not recall.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 21 of 278 PageID #:43665
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2997

1    Q.  Okay.  So I had put down "I don't remember," but "I don't

2    recall" is kind of the same thing.

3           And the location of the incident for the Jimenez case

4    was at, I think, Sawyer and Wabansia.  And so that location

09:46:26    5    would be 3231 West Wabansia, correct, for the Jimenez case?

6           And you can check that report, if you'd like.  I think

7    actually it says 1700 North Sawyer.

8    A.  Yes.

9    Q.  Sawyer and Wabansia.

09:46:40    10   A.  Well, wait.  I think it says 1200 here.

11   Q.  I'll take a look.

12   A.  The Jimenez case -- oh, 1700?  Where did I see 1200?

13          This says 1700.  Yes; consistent.

14   Q.  So I'm going to actually change this because I was wrong.

09:47:01    15   I have Wabansia here.

16          But 1700 North Sawyer.

17          And for the umbrella case, it's fair to say, you don't

18   remember where it happened, correct?

19   A.  No, it happened right near the viaduct on Bloomingdale, but

09:47:14    20   I don't remember the exact north/south street, but it was in

21   the area of Kedzie.

22   Q.  Okay.  So Kedzie and Bloomingdale.  I'll put that down.

23   A.  Right.

24   Q.  And the nature of the incident in both cases was, I believe

09:47:28    25   we established yesterday, a drive-by shooting, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 22 of 278 PageID #:43666
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2998

1  A.  It was common.

2  Q.  Okay.  And then I believe you said in the umbrella case,

3  you believed it was a white car in which the shooter was in,

4  correct?

09:47:46  5  A.  I know it was a white car.

6  Q.  Okay.  But in the Jimenez case, it's a yellow car, correct?

7  A.  Correct.

8  Q.  Okay.  So that's a little difference of yellow and white,

9  correct?

09:47:58  10  A.  (No response.)

11  Q.  And there was a passenger in the car in the Jimenez case, a

12  girl named Maureen Clausen.  Does that name sound familiar?

13  A.  Yes.

14  Q.  And she was a 17-year-old girlfriend of Mr. Jimenez,

09:48:16  15  correct?

16  A.  And her name is familiar to me from reviewing the reports,

17  as are the two witnesses.

18  Q.  But in the umbrella case, you don't recall what the girl's

19  name is, correct?

09:48:22  20  A.  Only that she was about 13 years old and she was a cousin

21  of the person driving the car.  And that she was from Puerto

22  Rico.  And after the shooting, the family immediately sent her

23  back to Puerto Rico.  So we were not able to find her and

24  interview her.

09:48:36  25  Q.  Okay.  But Maureen Clausen is the one in Jimenez, unknown

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 23 of 278 PageID #:43667
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2999

1    person in umbrella, right?

2          MR. LOEVY:  Objection "unknown," Your Honor.  He

3    described the person.

4    BY MR. LEINENWEBER:

09:48:46    5    Q.  You don't know her name, right?

6    A.  I don't know her name.

7    Q.  So it's unknown, correct?

8    A.  It would've been in the report.

9    Q.  Correct.  But you don't know her name, right?

09:48:52    10   A.  Yes.

11   Q.  And I think you said that you believed that the girl in the

12   umbrella case was 13, is that right?

13   A.  She was young.  She was 13, 14 years old.

14   Q.  But Maureen in the Jimenez case, she's 17, correct?

09:49:07    15   A.  That's correct.

16   Q.  Okay.  And I think you just said that after the incident,

17   she moved away to Puerto Rico, the girl in the umbrella case?

18   A.  Well, she didn't move away to Puerto Rico.  She was sent

19   back to Puerto Rico.

09:49:26    20   Q.  She was gone.  She went to Puerto Rico, right?

21   A.  Right.  I never talked to her.  I only remember that from

22   the report.

23   Q.  But in the Jimenez case, Maureen -- Maureen moved to

24   Philadelphia, correct?

09:49:35    25   A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 24 of 278 PageID #:43668
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3000

1    Q.  Okay.  And in both cases, there were two young teenage

2    witnesses, correct?

3    A.  Yes.

4    Q.  And I think yesterday you agreed with me, you said in both

09:49:53    5    of those cases the two young witnesses were of Hispanic origin,

6    correct?

7    A.  That's correct.

8    Q.  And the witnesses' names, at least in the Jimenez case,

9    were a Mr. Vargas and a Mr. Nelson, correct?

09:50:09    10    A.  In the Jimenez case?

11    Q.  Can you take a look.

12        (Brief pause)

13    BY THE WITNESS:

14    A.  That's correct.

09:50:30    15    BY MR. LEINENWEBER:

16    Q.  And in Jimenez, witness one, Mr. Vargas, picked the suspect

17    out of a photo array and picked a suspect out of a lineup,

18    correct?

19    A.  That's what it says, yes.

09:50:44    20    Q.  And Mr. Nelson, the second witness, he didn't make an ID

21    either from a lineup or from the -- excuse me, from a photo

22    array or a lineup, correct?

23    A.  I would have to review it.

24    Q.  Take a look.

09:50:55    25        (Brief pause)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 25 of 278 PageID #:43669
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3001

1    BY THE WITNESS:

2    A.  You have to forgive me.  Maybe you can help me find it,

3    because -- I apologize, but --

4    BY MR. LEINENWEBER:

09:51:34    5    Q.  I know it's a lot.  Take my word, it's in there.

6    A.  Okay.

7    Q.  And in the umbrella case, Witness No. 1 picked out a photo

8    array, ID' d the defendant -- I mean, the suspect out of the

9    lineup, but Witness No. 2 made neither, is that correct?

09:51:51    10    A.  I'm going on your word, sir.  I told you, I couldn't find

11    it.

12    Q.  That's what you testified to previously, correct?  You said

13    that -- I think actually Mr. Bowman asked you.  You had said

14    that Rey Guevara brings in two witnesses, hustles one over to

09:52:03    15    you, you're doing a photo array, the kid's taking his time, and

16    Rey is like, "Yeah, that's the guy, right there," right?  And

17    then that guy later, witness one, later made up an ID of the

18    lineup, isn't that what you said yesterday?

19    A.  In the umbrella case?

09:52:16    20    Q.  Yes.

21    A.  Yes.

22    Q.  Okay.  So similarly in Jimenez and umbrella, you have one

23    Witness No. 1 does both, picks out of the ID and picks out of a

24    lineup.  Witnesses No. 2, "Nah, can't do it either," right?

09:52:33    25    They're exactly the same?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 26 of 278 PageID #:43670
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3002

1    A.  The same.

2    Q.  And it came to be that you found out, at least in the

3    umbrella case, that these kids had been bribed, right?

4    A.  Yes.

09:52:43    5    Q.  And you know in the Jimenez case that Vargas and Nelson had

6    admitted to being bribed, too, correct?

7    A.  No, I never knew that, sir.

8    Q.  Okay.  Well, let me show you what I've marked as

9    Defendants' Exhibit No. 71.

09:52:56    10            MR. LEINENWEBER:  If I might approach, Judge.

11   BY MR. LEINENWEBER:

12   Q.  You were shown this document from your deposition, correct?

13            (Document tendered to the witness)

14   BY THE WITNESS:

09:53:04    15   A.  Okay.

16   BY MR. LEINENWEBER:

17   Q.  You answered questions about that in your deposition?

18   A.  I don't recall.  I would have to read it to --

19   Q.  Go ahead.  Read it.

09:53:12    20            But while you're reading it, I'll tell you what it

21   says.  It says:

22            "Witness Nelson and Vargas --"

23            MR. LOEVY:  Your Honor, I object to foundation.

24            MR. LEINENWEBER:  Judge, if you want, we can sit here

09:53:19    25   and wait --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 27 of 278 PageID #:43671
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3003

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
|           | 1  | THE COURT:  Wait a minute.  Wait.  What's the            |
|           | 2  | objection?                                               |
|           | 3  | MR. LOEVY:  It's a foundation objection.  This is a      |
|           | 4  | document created by somebody else for a witness interview with |
| 09:53:30  | 5  | somebody else.                                           |
|           | 6  | THE COURT:  And what are you using it for?               |
|           | 7  | MR. LEINENWEBER:  Impeachment.                           |
|           | 8  | MR. LOEVY:  Well, it's for the truth of what's in it,    |
|           | 9  | Your Honor.                                              |
| 09:53:37  | 10 | MR. LEINENWEBER:  No, it's an impeachment, Judge.        |
|           | 11 | THE COURT:  Well, is it possible for me to see it so I   |
|           | 12 | know what you're talking about?                          |
|           | 13 | MR. LEINENWEBER:  Sure.                                  |
|           | 14 | This is a terrible copy.  If I can approach, Judge.      |
| 09:53:47  | 15 | THE COURT:  I don't care, as long as I can read it.      |
|           | 16 | MR. LEINENWEBER:  You can sort of read it.               |
|           | 17 | (Document tendered to the Court.)                        |
|           | 18 | THE COURT:  Yeah, that does look pretty bad.             |
|           | 19 | MR. LEINENWEBER:  Yeah.                                  |
| 09:54:00  | 20 | THE COURT:  All right.  Hold on a second.                |
|           | 21 | (Brief pause)                                            |
|           | 22 | THE COURT:  So is there any basis for -- I guess I'm     |
|           | 23 | kind of figuring out, if the witness didn't write this report, |
|           | 24 | what can be the basis for impeaching him on this report? |
| 09:54:14  | 25 | MR. LEINENWEBER:  That he's answered questions about     |

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 28 of 278 PageID #:43672
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3004

1   this report.  He's read this report before.  And I believe he

2   knows, having read that report, what these witnesses did.

3           MR. LOEVY:  Your Honor, but they can't impeach him

4   with somebody else's report.

09:54:25  5           THE COURT:  You know, if he testified at his

6   deposition about this report and is saying anything different

7   about the report, I don't see what's wrong with that.

8           But what is the pending question?

9           MR. LEINENWEBER:  The pending question is, did the

09:54:39  10  witnesses, Nelson and Vargas, admit to being bribed.

11          MR. LOEVY:  See, that's the truth.  I mean, if --

12          THE COURT:  Hold on.  Hold on.

13          MR. LOEVY:  Sorry.

14          THE COURT:  So in a deposition, was the witness just

09:54:48  15  testifying to what was in the report?

16          MR. LEINENWEBER:  He was shown the report to refresh

17  his recollection.

18          THE COURT:  So you are asking him whether it refreshes

19  his recollection now?

09:54:58  20          MR. LEINENWEBER:  Correct.

21          THE COURT:  All right.  So you're using it to refresh

22  recollection.

23          So does it refresh your recollection?

24          THE WITNESS:  I've never seen this report.  It's not

09:55:03  25  mine.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 29 of 278 PageID #:43673
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3005

1  BY MR. LEINENWEBER:

2  Q.  You were shown that report at your deposition, correct?

3  A.  Which deposition?

4  Q.  At the deposition in this case, sir.

09:55:10  5  A.  Which time?

6  Q.  There was only one, sir.

7  A.  I've only had one deposition?

8  Q.  You only had one deposition --

9       THE COUR REPORTER:  I'm sorry.

09:55:15  10  BY THE WITNESS:

11  A.  I've given depositions numerous times.

12       THE COURT:  You know, you can't both talk at once.  I

13  mean --

14       THE WITNESS:  I've been in numerous depositions, Your

09:55:23  15  Honor.

16  MR. LEINENWEBER:

17  Q.  You were deposed in this case, correct?  I just asked you

18  some --

19  A.  Yes.

09:55:28  20  Q.  -- questions --

21  A.  Yes, in the Rivera case.

22  Q.  And at that deposition you understood that these witnesses

23  had been bribed, correct?

24       MR. LOEVY:  Objection, Your Honor.  He just --

09:55:37  25       THE WITNESS:  In the Rivera case?  No.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 30 of 278 PageID #:43674
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3006

```
 1              THE COURT:  Sustained.
 2    MR. LEINENWEBER:
 3    Q.  No, in the umbrella case, sir.
 4              In the umbrella case, you said that they were bribed,
 5    correct?
 6    A.  Yes.
 7    Q.  Okay.  And in the Jimenez case, they were bribed, too,
 8    correct?
 9              MR. LOEVY:  Objection, Your Honor.
10              THE COURT:  Sustained.
11              THE WITNESS:  That is what that report says.
12              THE COURT:  Sustained.
13              THE WITNESS:  Sorry.
14              MR. LEINENWEBER:  If I could have just one moment,
15    Judge.
16              THE COURT:  Sure.
17              (Brief pause)
18    BY MR. LEINENWEBER:
19    Q.  And you understood in the umbrella case, that -- you
20    understood in the umbrella case that the witnesses admitted to
21    you that they had been bribed because the ex-boyfriend wanted
22    to set up the kid, correct?
23    A.  Yes.
24    Q.  Okay.  And, similarly, that's what happened here, too,
25    correct, in the Jimenez case?
```

09:55:44 (line 5)
09:55:49 (line 10)
09:56:02 (line 15)
09:56:44 (line 20)
09:57:00 (line 25)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 31 of 278 PageID #:43675
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3007

1    A.  That's what it says.

2    Q.  All right.  And we know from the paperwork on the Jimenez

3    case --

4         MR. LOEVY:  Objection, Your Honor.  Same objection.

09:57:17    5    He's still working off the Jimenez paperwork.

6         MR. LEINENWEBER:  That's the one that he was the

7    arresting --

8         THE COURT:  Let me hear the witness.

9    BY MR. LEINENWEBER:

09:57:23    10   Q.  We know from Exhibit 70 in which you said you were the

11   arresting officer in the Jimenez case, right?  That the suspect

12   who was arrested in that case was a man named Robert Ramos,

13   correct?

14   A.  Yes.  From reviewing the reports I see that, yes.  And I

09:57:40    15   recall the names.

16   Q.  Right.  However, in the umbrella case, you do not recall

17   the name of the defendant or suspect, correct?

18   A.  Well, I only recall these names because they were handed to

19   me.  If I would gladly have the other report, it probably would

09:57:52    20   enhance my memory.

21   Q.  Of course.  And if that other report existed, sir, I would

22   give it to you.  You'd be sure of that.  And if I didn't, you'd

23   be sure Mr. Bowman would, correct?

24   A.  At that time --

09:58:01    25   Q.  That's correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 32 of 278 PageID #:43676
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3008

1    A.  Repeat, please.

2    Q.  Sure.  Of course.

3            If that report existed, you would have a copy of it

4    either from us or Mr. Bowman, correct?

09:58:10    5            MR. LOEVY:  Objection.

6            MR. BOWMAN:  Objection.

7            THE COURT:  What is the question?

8            MR. LOEVY:  He should be able to answer.

9            MR. LEINENWEBER:  It's a "yes" or "No" question.

09:58:16    10           THE COURT:  Well, you're not giving him an

11   opportunity, then.

12           MR. LEINENWEBER:  Of course.

13   BY THE WITNESS:

14   A.  Repeat, please.

09:58:19    15   BY MR. LEINENWEBER:

16   Q.  Of course.

17            If that report existed, you would have been given it,

18   correct?

19   A.  It doesn't always happen that way, sir.

09:58:30    20   Q.  Okay.  But you've never seen this report, right?

21   A.  Reports have disappeared numerous times within the Chicago

22   Police Department.

23   Q.  So -- Okay.  But you haven't seen it, correct?

24   A.  I -- '70?

09:58:44    25   Q.  '70 you've seen.  That's the one you were the arresting

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 33 of 278 PageID #:43677
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3009

1    officer on.  The umbrella case, you've never seen a report on

2    that, right?

3    A.  Although I've asking for it.

4    Q.  You've never seen that report, right?

09:58:54    5    A.  No.  Reports were typewritten --

6    Q.  My question, sir, is, you've never seen the report, right?

7    A.  I would've loved to, yes.

8    Q.  My question --

9    A.  I have not seen it.

09:59:03    10    Q.  Correct.  Thank you.

11         So we know Robert Ramos is a suspect.  In Jimenez,

12    umbrella man, we don't know who that suspect is, correct?

13    A.  Correct.

14    Q.  And I think you said you spoke -- yesterday we talked a

09:59:25    15    little bit about it.  You spoke to Mr. Ramos' father, "Good

16    kid.  Wouldn't do this."  He had a previous gun charge, right?

17    A.  I never said I talked to Mr. Ramos' father.

18    Q.  Sorry.  You're correct.

19    A.  We were talking about the umbrella case, sir.

09:59:37    20    Q.  You talked to unknown umbrella guy person, right?

21    A.  That's correct.

22    Q.  We don't know his name either, right?

23    A.  It would've been senior.

24    Q.  All right.  So senior.

09:59:45    25    A.  Father.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 34 of 278 PageID #:43678
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3010

```
          1   Q.  Father.  He comes in, says, "This is a good kid.  He

          2   would've done something."  Basically convinces you, correct?

          3   A.  Convinced me to take a look at it.  I already had doubts,

          4   so I was willing to go that route.

09:59:57  5   Q.  Understood.  Understood.

          6          And you found out that umbrella suspect had a gun

          7   charge, but the dad explained it, right?

          8   A.  And the report explained it, too.

          9   Q.  Correct.  And in the Jimenez case, as you answered my

10:00:09  10  question yesterday, you knew that Mr. Ramos had a gun charge

          11  that had been dismissed, too, correct?

          12  A.  No.

          13  Q.  Let's take a look.

          14         Excuse me.  Yesterday you said you had, do you

10:00:20  15  remember that question?

          16  A.  Oh, if we're talking about Ramos, you brought out the fact

          17  that he had a defaced firearm.

          18  Q.  Correct.  And it was a gun charge, right?

          19  A.  But I wasn't shown any paper.

10:00:31  20  Q.  I didn't show you any paper, correct.

          21  A.  Right.

          22  Q.  But there was a gun charge, right?  And you admitted it?

          23  A.  As you said.

          24  Q.  Correct.  So in both umbrella man and Ramos, there's a

10:00:39  25  prior gun charge, right?
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 35 of 278 PageID #:43679
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3011

1   A.  According to what you described for Mr. Ramos, they both

2   would've had gun charges.

3   Q.  And when you investigated umbrella man, you found out he

4   worked at Walgreens, correct?

10:00:52   5   A.  Yes.

6   Q.  And if you look at your report there in Jimenez, Mr. Ramos

7   worked at Walgreens, too, correct?

8   A.  In this report, but I wouldn't have known that at the time.

9   Q.  Right.  But in your report, it says he worked at Walgreens,

10:01:07   10   correct?

11   A.  Yes.

12   Q.  And it also says, umbrella man and Mr. Ramos were both

13   DePaul students, correct?

14   A.  I want to change something.  I would not say "in my

10:01:17   15   report," sir.  I'm going to say, "in this report it says that."

16   Q.  Fair enough.  We obviously know that lots of officers, Gang

17   Crime Specialists, police officers, detectives, they all work

18   on these reports; fair enough?

19   A.  Correct.

10:01:29   20   Q.  Okay.  But those reports indicated that both umbrella man

21   and Mr. Ramos worked at Walgreens and went to DePaul, correct?

22   A.  I believe so.

23   Q.  And in the umbrella case, as you indicated, it was Rey

24   Guevara that brought the witnesses in, correct?

10:01:50   25   A.  Mr. Guevara and Mr. Gawrys.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 36 of 278 PageID #:43680
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3012

1   Q.  But in the Ramos case, the Jimenez case, those witnesses

2   came in on their own, correct?

3   A.  I don't know.

4   Q.  Let's see Exhibit 70 just to make sure you got the right

10:02:15   5   page there.  Just take a look at that, please.

6           (Said item tendered.)

7   BY MR. LEINENWEBER:

8   Q.  I'm going to ask you to look at page 46 -- excuse me.

9           MR. LEINENWEBER:  This is Exhibit 70, Judge, the page

10:02:39   10   is listed as RFC024682.

11           If I can approach the witness?

12           THE COURT:  Sure.

13           (Document tendered to the witness)

14   BY MR. LEINENWEBER:

10:02:50   15   Q.  Just take a look at that and see if that refreshes your

16   recollection.

17           (Brief pause)

18           MR. LOEVY:  Your Honor, we object to foundation.

19   BY MR. LEINENWEBER:

10:03:08   20   Q.  This is your report, is it not, sir?

21           This is in evidence.

22   A.  This is a report that bares my name, yes.

23   Q.  Correct.

24           MR. LOEVY:  All right.  Then we withdraw the

10:03:15   25   objection, Your Honor.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 37 of 278 PageID #:43681
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3013

```
 1    BY MR. LEINENWEBER:
 2    Q.  And in that report where I put in yellow it says:
 3             "Vargas heard in the neighborhood that police
 4             needed the witness to the offense, and he
 5             presented himself along with Nelson to the
 6             police station to help."
 7             Does that refresh your recollection?
 8    A.  No.
 9    Q.  It doesn't?
10    A.  No.
11    Q.  Is that what the report says?
12    A.  That's what the report says.
13    Q.  You have no reason to doubt that report?
14    A.  Oh, I have many reasons to doubt the report, sir.
15    Q.  Okay.  Well, at least that's what the report says, though,
16    correct?
17    A.  That's what the report says.
18    Q.  Okay.  So at least according to this report, which you
19    signed, it says:
20             "Witnesses Vargas and Nelson presented
21             themselves to help."
22             Correct?  Isn't that what it says?
23    A.  That's what this report says.
24    Q.  Thank you.
25             So the difference here between umbrella man and
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 38 of 278 PageID #:43682
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3014

1   Jimenez Ramos is, in umbrella man, Rey and Steve Gawrys bring

2   the witnesses in.  In Jimenez, the witnesses volunteer and come

3   in, right?  That's the difference between them two, as you sit

4   there today, correct?

10:04:12   5   A.  That is one of the differences, yes.

6   Q.  At least that's the difference of how the witnesses came to

7   your attention, right?

8   A.  According to the report, yes, that would be the difference.

9   Q.  And I believe you said yesterday, in the umbrella case you

10:04:26   10   eventually went to Branch 66, and you told the state's attorney

11   there to get rid of the case, correct?

12   A.  Yes.

13   Q.  Okay.  And that report indicates that you went to Branch 66

14   for Mr. Ramos, correct?

10:04:37   15   A.  No.

16   Q.  Take a look.

17   A.  Well, we would've gone to Branch 66 for Mr. Ramos several

18   years later on a similar shooting, yes.

19   Q.  But I'm just talking about this shooting.

10:04:50   20   A.  Okay.  This shooting?

21   Q.  Right.

22   A.  Yeah.

23   Q.  You went to Branch 66 on both cases?

24   A.  That's what we would do, yes.

10:05:02   25   Q.  And the assistant state's attorney that's listed in your

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 39 of 278 PageID #:43683
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3015

1    Robert is Donna Nelson, correct?

2    A.  If he's listed, it's in the report.

3    Q.  I think it's a she.

4    A.  Or she.

10:05:11    5    Q.  She's listed in the report as the state's attorney.

6            However, in the umbrella case, as you sit here, you

7    don't know the name of the assistant, correct?

8    A.  There were two, because it was two nights, one for the

9    photo ID's and the second one for a lineup.

10:05:24    10    Q.  But you don't know the names of those state's attorneys,

11    correct?

12    A.  Unfortunately, I do not recall.

13    Q.  So we have Donna Nelson and I don't remember the state's

14    attorney.

10:05:39    15            And then finally, you've seen the Jimenez case file,

16    we've gone through this, but you haven't seen an umbrella man

17    case file, correct?

18    A.  That's correct.

19    Q.  So it appears from my little cheat sheet here, that if we

10:05:59    20    take your date of Mother's Day and we go -- Mother's Day 1989,

21    and we go to a little before Christmas of 1991, that's a span,

22    I think you agreed with me yesterday, that's 30 months,

23    correct?

24    A.  Yes.

10:06:16    25    Q.  So in the span of 30 months while working as a Chicago

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 40 of 278 PageID #:43684
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3016

1  police detective, you had not one, but two cases involving a

2  DePaul student, working at Walgreens --

3         MR. LOEVY:  Objection.  Argumentative, Your Honor.

4         THE COURT:  I think so.  I think it's been

10:06:33   5  established.

6         MR. LEINENWEBER:  Yes.

7  BY MR. LEINENWEBER:

8  Q.  Two very, very, very similar cases, right?

9  A.  At the time that I was a detective --

10:06:41  10  Q.  No, I'm just asking if they're very similar cases.

11  A.  As they appear today, there are similarities and many

12  discrepancies.

13  Q.  Right.  And the biggest discrepancy, I suppose, as you sit

14  there would be, there's a Jimenez file, but there isn't an

10:06:58  15  umbrella file, right?  That's the biggest difference.

16  A.  To me the biggest difference?

17  Q.  Well, let's say --

18  A.  Is that your question?

19  Q.  I'll take that back.

10:07:09  20         That's a big difference, right?

21  A.  That's a big difference.

22  Q.  Yes.

23         MR. LEINENWEBER:  And I'm running against my time,

24  Judge.  I'm almost done, I promise.

10:07:22  25         (Brief pause)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 41 of 278 PageID #:43685
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3017

1    BY MR. LEINENWEBER:

2    Q.  And I think you stated yesterday -- or I know you stated

3    yesterday, that at one point you thought Bill Johnston was your

4    partner on the umbrella case, but on further reflection you

10:07:37    5    said it was John Boyle, correct?

6    A.  In the early conversations about my recall of the events,

7    trying to pinpoint when Guevara was a Gang Crimes specialist,

8    that was the unknown to me.  That's why there was some conflict

9    for me to determine who my partner was at the time.

10:07:56   10    Q.  Sure.  But now after you thought about it, and as you

11    testified yesterday truthfully, it was John Boyle, correct?

12    A.  In '89?  Yes.

13    Q.  In the umbrella case.

14    A.  Yes.

10:08:06   15    Q.  He was your partner?

16    A.  Yes.

17    Q.  And would it surprise you to learn that John Boyle denies

18    this ever happened?

19         MR. LOEVY:  Objection, Your Honor.  Is Mr. Boyle going

10:08:13   20    to come to court?

21         MR. LEINENWEBER:  He is going to come to court.

22         MR. LOEVY:  All right.  We'll hear from Mr Boyle,

23    then.

24    BY MR. LEINENWEBER:

10:08:17   25    Q.  Would it surprise you, sir?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 42 of 278 PageID #:43686
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3018

1  A.  No, it wouldn't surprise me.

2  Q.  Okay.  And I believe you stated that --

3       MR. LEINENWEBER:  If I could have one moment, Judge,

4  if I could?

5       THE COURT:  Sure.

6       (Brief pause)

7       MR. LEINENWEBER:  Judge, a few more questions.  I

8  promise.

9  BY MR. LEINENWEBER:

10  Q.  So, sir, I think you stated your role, at least in Mr.

11  Rivera's case, you don't recall it.  But apparently from like

12  4:30 to 7:30 on the day of September 1988, you did a lineup,

13  correct?

14  A.  Apparently, yes.

15  Q.  Okay.  And the way you do a lineup, we're not going to go

16  through the whole song and dance, but most likely you're in a

17  room with a witness and they're looking at a two-way mirror or

18  two-way glass, right?

19  A.  Correct.

20  Q.  Okay.  So you're in there with the witness, Orlando Lopez,

21  correct?

22  A.  I don't recall which side of the class I would've been on.

23  Q.  Okay.  But it's possible you spoke with Mr. Lopez that day?

24  A.  I'm sure I did.

25  Q.  Okay.  And at the time, I take it, was your hair color a

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 43 of 278 PageID #:43687
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3019

1   different color than it is now?

2   A.  I was 30 years younger, sir.

3   Q.  So was it dark?

4   A.  Yes.

10:09:43   5   Q.  Did you have a mustache at that time?

6   A.  Yes.

7   Q.  And were you wearing glasses at that time?

8   A.  Yes.

9          MR. LEINENWEBER:  Has this been marked (indicating)?

10:10:05   10         (Counsel conferring.)

11         MR. LEINENWEBER:  Judge, if I can approach?

12         THE COURT:  You may.

13         MR. LOEVY:  Is this on the pretrial order?

14         MR. LEINENWEBER:  It's not.

10:10:07   15         MR. LOEVY:  All right.  Then, Your Honor, we object.

16   They're showing an exhibit that is not on the pretrial order.

17         THE COURT:  Okay.  I haven't seen the exhibit.  I

18   don't know what it's being used for.

19         What are you using it for?

10:10:18   20         MR. LEINENWEBER:  It's a picture of this witness from

21   the Chicago police file.

22         THE COURT:  Overruled.

23         MR. LEINENWEBER:  If I can approach, Judge.

24         .  I've marked this as exhibit --

10:10:30   25         What number?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 44 of 278 PageID #:43688
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3020

```
          1              MR. SOTOS:  229.

          2              MR. LEINENWEBER:  290?

          3              MR. SOTOS:  2-2-9.

          4    BY MR. LEINENWEBER:

10:10:34  5    Q.  229.  If you can take a look at that, sir.

          6              (Document tendered to the witness:)

          7    BY MR. LEINENWEBER:

          8    Q.  That's your picture, isn't it?

          9    A.  Yes, it is.

10:10:39  10   Q.  That picture was taken, do you recall when?

          11             Sometime in the '80s?

          12   A.  Pardon?

          13   Q.  Sometime in the '80s?

          14   A.  I think it was in an award ceremony.

10:10:48  15   Q.  But it was sometime in the '80s?

          16   A.  Yes.

          17             MR. LEINENWEBER:  Judge, I would move that as an

          18   exhibit into evidence.

          19             MR. LOEVY:  No objection, Your Honor.

10:10:54  20             THE COURT:  It's received.

          21             (Defense Exhibit 229 was received in evidence)

          22   BY MR. LEINENWEBER:

          23   Q.  So is it fair to say--I know it's 30 years ago--that you

          24   looked approximately like that?

10:11:03  25   A.  Yes.
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 45 of 278 PageID #:43689
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3021

1  Q.  We all get old, but that's what you probably looked like?

2  A.  Yes.

3  Q.  And I think yesterday you had said that you met with Jane

4  Raley from Northwestern.  You asked her about whether you were

10:11:21  5  involved in cases.  She told you about Rey.  And then you

6  offered -- she talked this case that you were involved in,

7  correct?

8  A.  That's not how it went, sir.  And I didn't testify to that.

9  Q.  You met with Jane Raley --

10:11:33  10  A.  Yes.

11  Q.  -- sometime, correct?

12  A.  Yes.

13  Q.  Okay.  And you were meeting her about the -- and I'm going

14  to mispronounce his name, and forgive me, Echeveria (phonetic).

10:11:41  15  A.  Echeveria (phonetic.)

16  Q.  That was a case that you believe the person was innocent

17  from Wisconsin, I think?

18  A.  From where?

19  Q.  Wisconsin?

10:11:49  20  A.  No, it's a Chicago case.  And I'm still working on it, sir.

21  Q.  And that was the reason for your meeting with Ms. Raley was

22  to see if Northwestern would be interested in taking up this

23  person's cause, fair to say?

24  A.  That's right.

10:12:02  25  Q.  And during the conversation, it came up that you asked are

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 46 of 278 PageID #:43690
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3022

1    there any cases that Northwestern was working on that you might

2    be involved in, is that correct?

3    A.  No, I believe she said to me, "Do you know Rey Guevara?"

4    And I said, "Yes, I do."

10:12:18    5    Q.  And you talked about the Guevara case, this case, correct?

6    A.  Yes.  She said she had a case that was his case, and my

7    name was also on that case, and would I have any objection to

8    talking to her at that moment about the case --

9    Q.  And you did --

10:12:32    10    A.  -- and I told her I have no problem.

11    Q.  Okay.  And you did.  Let me ask --

12        THE COURT:  One person at a time.

13    BY MR. LEINENWEBER:

14    Q.  Yeah, let me ask the question, sir.

10:12:36    15        And you did, you told her.  And you said, "Hey, by the

16    way, I got some information on Rey Guevara," correct?  And you

17    told her about the umbrella story, right?

18    A.  We did talk about the umbrella story and --

19    Q.  You talked about the umbrella story --

10:12:47    20    A.  -- we talked about other events.

21    Q.  Okay.  But the umbrella story was a big part of it, right?

22    A.  It was a part of the conversation, sir.

23    Q.  That was the trade, right?

24    A.  That was the what?

10:12:54    25    Q.  That was the trade.  You traded that story, you traded the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 47 of 278 PageID #:43691
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3023

1  umbrella story so you weren't sitting over there (indicating),

2  isn't that fair to say?

3  A.  There was no lawsuit, as I understood.

4  Q.  Fair enough.

10:13:03  5       MR. LEINENWEBER:  Judge, I have no further questions.

6  Thank you, sir.

7       THE COURT:  Let's see.  That's all the defense

8  questioning, right?

9       Who was examining for the plaintiff?

10:13:12  10       MR. LOEVY:  Mr. Bowman, Your Honor.

11       THE COURT:  Okay.  Mr. Bowman, do you have anything

12  else?

13       MR. BOWMAN:  I do.  Thank you.

14            RECROSS EXAMINATION

10:13:21  15  BY MR. BOWMAN:

16  Q.  Good morning, Mr. Dorsch.

17  A.  Good morning.

18  Q.  You've been asked this morning and yesterday a number of

19  questions about whether the case you recall is the Jimenez case

10:13:33  20  or some other case.

21       MR. BOWMAN:  I'm just setting the stage, Judge.

22  BY MR. BOWMAN:

23  Q.  Just putting aside which case it was.  Just leave that

24  issue aside.

10:13:45  25       Whatever case it was, did what you say Rey Guevara

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 48 of 278 PageID #:43692
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3024

1  did, did it happen?

2  A.  Yes.

3  Q.  You talked yesterday about how the memory works.  And you

4  said some things stick in a person's mind, some things don't.

10:14:09  5  Is your memory of Rey Guevara putting a finger on a photograph

6  something that falls in the category of "sticks in the mind" or

7  something that falls in the other category of what one tends to

8  forget?

9  A.  It's vivid in my memory.

10:14:36  10  Q.  You were asked some questions about whether you had seen

11  this old file.  Have you undertaken efforts to look for it?

12  A.  Years of trying to find it.  Asking for it.

13  Q.  Can you tell the jury the steps that you've taken to

14  attempt to find the file that you remember.

10:14:52  15  A.  Well, because I'm not a police officer at the time of my

16  interest in finding the file, I have to take the general steps

17  that normal people take and file FOIA requests, Freedom of

18  Information Act, requesting that not because I didn't know the

19  name of the file, requesting all homicide files by name from

10:15:16  20  the area.

21  Q.  And have those efforts bore fruit?  Were you able to obtain

22  the file from the Chicago Police Department using those

23  channels?

24  A.  No.

10:15:34  25          (Counsel conferring.)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 49 of 278 PageID #:43693
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3025

1  BY MR. BOWMAN:

2  Q.  Did they give you any files in response to your request?

3  A.  No, but they did send me a chronological event of

4  homicides.

10:15:52  5  Q.  And was that helpful to you in locating the file?

6  A.  It wasn't helpful to me in locating the file, but in 1989,

7  and I have it in my file here, it shows that they had 130 named

8  homicide victims.  And they were all named, location and dates,

9  but yet the total for the Area 5 was 129.  So that meant there

10:16:23  10  was one homicide reported but not credited by the police

11  department as one of theirs.

12  Q.  Okay.

13  A.  So there's one missing in my review.

14  Q.  Mr. Dorsch, what is it like for you as a former police

10:16:47  15  officer to step forward and accuse a fellow veteran of the

16  Chicago Police Department of wrongdoing?

17        MR. LEINENWEBER:  Objection, Judge.  Relevance, scope.

18        THE COURT:  Overruled.

19  BY THE WITNESS:

10:16:59  20  A.  It's huge.  I've given testimony on this case, and every

21  case I do no longer as a police officer.  In this case, I've

22  never had an attorney present at depositions that represent me,

23  at a deposition or in a courtroom --

24        MS. ROSEN:  Objection.  Violates a motion in limine.

10:17:19  25  If we could have a sidebar?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 50 of 278 PageID #:43694
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3026

1              THE COURT:  All right.

2              (Proceedings heard at sidebar on the record)

3              MS. ROSEN:  There was a motion in limine on code of

4     silence.  On code of silence, Your Honor.

10:17:34   5      THE COURT:  You mean whether he had an attorney

6     present is a code of silence question?

7              MR. LOEVY:  It was a generalized ruling on code of

8     silence.  You said you were going to see how the evidence goes

9     and see if it becomes relevant.  This code of silence has

10:17:46  10    become injected into the case.  He is a whistleblower.

11             THE COURT:  No, no, no, no.  I think it was the

12    terminology.

13             MR. LOEVY:  Yes.  Not the concept.

14             THE COURT:  So he shouldn't use the terminology --

10:17:59  15    MR. BOWMAN:  I haven't spoken with him about it.  I

16    don't know that -- I don't know what he's going to say, but I

17    don't intend to use it in a question.  My point is just to have

18    him clarify --

19             THE COURT:  Do you have the ruling?  Because normally

10:18:14  20   I don't keep witnesses from saying what they want to say.

21             MR. LOEVY:  It becomes very relevant.

22             THE COURT:  I want to proceed my way, and I've asked

23    for the ruling.

24             MS. ROSEN:  These are the motions and that's the

10:18:37  25   order.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 51 of 278 PageID #:43695
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3027

```
            1        (Document tendered to the Court)
            2        THE COURT:  There was no ruling.  It's granted until I
            3    reconsider it.  You know, I'm not going to prevent him from
            4    saying what he wants to say.  But you better not ask him about
10:18:51    5    that.
            6        MR. LOEVY:  Don't use that word.
            7        MR. BOWMAN:  I'm not going to use that word.
            8        THE COURT:  All right.
            9        (Proceedings resumed in open court)
10:19:30   10    BY MR. BOWMAN:
           11    Q.  Could you tell the jury, Mr. Dorsch, whether or not it's
           12    easy to provide evidence of wrongdoing against a fellow cop?
           13    A.  No, it's not.
           14    Q.  Can you say why, please?
10:19:41   15    A.  When you're working, it's like a family.  You go to
           16    breakfast, you go to lunch, you go to dinner.  You spend
           17    endless also hours in courtrooms or waiting to testify at a
           18    court hearing.  You work 24, 30 hours straight sometimes with
           19    partners.  You trust each other greatly.  You depend on each
10:20:06   20    other greatly.  And basically pretty much all your friends are
           21    policemen.
           22    Q.  When you came forward with the information that Rey Guevara
           23    had committed misconduct, did it affect your relationships
           24    within the Chicago Police Department?
10:20:27   25    A.  Well, I wasn't really expecting when I met with Jane Raley
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 52 of 278 PageID #:43696
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3028

1  what the conversation was going to be about, but later when it

2  became known that I had talked about the incident, it greatly

3  affected me.  I mean, I've had threats.

4  Q.  Have you -- have there been affects for you on your

10:20:51  5  personal relationships?

6  A.  Oh, I no longer associate with very many people in the

7  Chicago Police Department, even partners.  I give them space.

8  I don't want them to have to answer.  But mostly when I would

9  run into people, they would want to know what was going on.

10:21:07  10  Q.  Have you been subjected to scorn, Mr. Dorsch, as a result

11  of coming forward with your information against Rey Guevara?

12  A.  Oh, yes --

13          MR. SOTOS:  Objection.  Relevance, Judge.

14          THE COURT:  Overruled.

10:21:19  15  BY THE WITNESS:

16  A.  I even had a ranking officer telling me, "Why aren't you

17  dead yet."

18  BY MR. BOWMAN:

19  Q.  Have you been subjected to ridicule, Mr. Dorsch, because

10:21:30  20  you came forward with information against Rey Guevara?

21  A.  Yeah.  People are misunderstanding.  A lot of people think

22  that I work for Northwestern Law School.  And I never have.

23  I've never been an employee.  Everything I've done has been

24  independent.

10:21:44  25          And I still get cases from Cook County Public

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 53 of 278 PageID #:43697
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3029

1    Defender's Office.  I get cases from the Illinois Appellate

2    Public Defender's Office.  The federal government has retained

3    me on investigations.  But because of that kind of work, now

4    being seen as being on the other side, I'm the bad guy.

10:22:00  5    Q.  Is it easy for you, Mr. Dorsch, to come into this courtroom

6    and be subjected to cross-examination by Mr. Sotos and Mr.

7    Leinenweber the way it was yesterday afternoon and this

8    morning?

9            MR. LEINENWEBER:  Objection, Your Honor.

10:22:15  10           MR. SOTOS:  Objection, your Honor.

11           THE COURT:  Overruled.

12    BY THE WITNESS:

13    A.  I understand their position.  I know what their job is, and

14    I understood from previous court appearances in my career that

10:22:24  15    their job is to -- is on behalf of their client.  I'm the bad

16    guy.

17    BY MR. BOWMAN:

18    Q.  Is that a position you'd prefer to be in, Mr. Dorsch?

19    A.  Well, there was a time when I was considered their guy,

10:22:38  20    when I'm talking about when I was a policeman.  I was trusted

21    to testify.  They considered you an expert witness every time

22    you went up there and gave testimony.  Now they question your

23    qualifications.

24    Q.  Mr. Dorsch, you brought up in one of your answers yesterday

10:22:55  25    afternoon the subject of bravery.  Is there any bravery

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 54 of 278 PageID #:43698
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3030

1  involved in making an accusation against Rey Guevara?

2       MR. SOTOS:  Objection, Your Honor.  Leading,

3  relevance.

4       THE COURT:  Overruled.

10:23:11  5  BY THE WITNESS:

6  A.  When you're a detective, the sole purpose of your job is to

7  get to the truth.  Anything short of that is a failure.

8  BY MR. BOWMAN:

9  Q.  Does it go against the grain, Mr. Dorsch, for one cop, such

10:23:33  10  as yourself, to make an allegation of wrongdoing against

11  another cop?

12       MR. LEINENWEBER:  Objection.  Leading, repetition.

13       MR. SOTOS:  Objection.  Leading.

14       THE COURT:  Overruled.

10:23:43  15  BY THE WITNESS:

16  A.  Against another cop?  People sitting in this courtroom were

17  my friends.  I am responsible for what I know and what I say.

18  I have no control of what they will say if they were sitting in

19  this seat.

10:24:04  20  BY MR. BOWMAN:

21  Q.  You were asked some questions about who you told about this

22  and when you told folks.  Did I hear you say you told Sergeant

23  Mingey.

24  A.  Well, certainly.  Sergeant Mingey went to the house to pick

10:24:28  25  up the umbrella boy, which is a name he gave to that case, the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 55 of 278 PageID #:43699
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3031

1   one where we don't know the name, and we don't recall where it

2   was, and he no longer recalls.  He gave it that name.

3   Q.  Did it -- would it surprise you, Mr. Dorsch, to learn that

4   when Ed Mingey was asked in this courtroom about whether you

10:24:53   5   had, in fact, informed him of this incident, that Ed Mingey

6   Fifth Amendment and didn't answer the question?

7   A.  Does it surprise me?  No.

8   Q.  And would it surprise you to learn that before Mr. Mingey

9   started Fifth Amendment, when he was asked in his deposition

10:25:13   10   that he acknowledged that, indeed, you had told him about Rey

11   Guevara's wrongdoing?

12   A.  Ah --

13   Q.  Would that surprise you to learn that?

14   A.  That he told the truth?  No.

10:25:26   15   Q.  Now, you were asked about John Boyle.  And you testified

16   that it wouldn't surprise you either to learn that Mr. Boyle is

17   expected to deny that he was involved in this or that you told

18   him, and that doesn't surprise you?

19   A.  No.

10:25:48   20   Q.  Can you tell the jury why that doesn't surprise you.

21   A.  Well, we're individuals, we all stand-alone.  And for

22   whatever reason, you do what you do, it's your choice.  I can't

23   control his choice.

24   Q.  There were a number of years between the incident and your

10:26:10   25   conversation in 2010 with Jane Raley.  And in those years, can

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 56 of 278 PageID #:43700
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3032

1    you tell us what you were doing.  Were you a Chicago police

2    officer?

3    A.  With Jane Raley?

4    Q.  No.  When did you retire from the Chicago Police

10:26:29    5    Department?

6    A.  I retired in August of 1994.  As soon as I turned 50 years

7    of age I left.

8    Q.  And between 1994 and 2010, where were you?

9    A.  Well, I retired to northern Wisconsin where I built a new

10:26:42    10    home.  And worked part-time for the Sawyer County Sheriff's

11    Department.  Was given a job where I was training police

12    officers for the State of Wisconsin for 2 years.

13          Obtained my private investigator license up there and

14    was working cases in Wisconsin.  And then I eventually returned

10:27:01    15    to Chicago, and got my private investigator license here and

16    began picking up cases from many attorneys that had one time

17    been state's attorneys who were now doing defense work.

18    Q.  Is it fair to say that in that period of time you were

19    moving on, leaving the Chicago Police Department behind?

10:27:20    20    A.  Oh, yes.

21    Q.  Now, you were asked about a conversation that you had with

22    Jane Raley.  Can you tell us what Jane Raley said to you about

23    the interest in Guevara that prompted her to -- that prompted

24    you to provide her this information?

10:27:46    25          MR. GIVEN:  Objection, Your Honor.  Hearsay.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 57 of 278 PageID #:43701
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3033

1          MR. BOWMAN:  It's for the effect on the witness,

2     Judge.

3          THE COURT:  Just hold on one second.

4          (Brief pause)

10:28:06  5          THE COURT:  Okay.  So why is that not hearsay?

6          MR. BOWMAN:  Because the issue, that has been the

7     subject to a great deal of cross-examination, has been why this

8     witness didn't tell other people earlier about the

9     circumstance.

10:28:24  10         THE COURT:  And what Jane Raley said to him is going

11    to -- I think I'm going to sustain the objection.

12    BY MR. BOWMAN:

13    Q.  Well, the work that Jane Raley was doing was looking at

14    wrongful convictions, right?

10:28:46  15    A.  Yes.

16         UNIDENTIFIED SPEAKER:  Leading.  No foundation.

17         THE COURT:  Overruled.

18         MS. ROSEN:  Who is objecting?  I'm sorry.

19         MR. BOWMAN:  Mr.  Daffada.

10:29:04  20    BY MR. BOWMAN:

21    Q.  And did Jane Raley's focus on wrongful convictions

22    influence your decision to inform her about your information on

23    Rey Guevara?

24         MR. SOTOS:  Objection, Your Honor.  Leading.

10:29:16  25         THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 58 of 278 PageID #:43702
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3034

1    BY THE WITNESS:

2    A.  Well, that wasn't the purpose of why I went there.  I had

3    no idea she was going to bring up Rey Guevara to me.

4    BY MR. BOWMAN:

10:29:26    5    Q.  But she brought it up to you?

6    A.  Yes.

7    Q.  Now, you were asked a number of the questions about

8    testimony that you provided in the years since 2010 yesterday

9    afternoon when Mr. Sotos was asking you questions.  Do you

10:29:44    10    remember that?

11    A.  Yes.

12    Q.  How many times did you say you've testified under oath

13    about this?

14    A.  At trials and in depositions, at least 8 times.

10:29:53    15    Q.  Have you been asked to provide this testimony?

16    A.  Well, I've been subpoenaed to courts and depositions, yes.

17    Q.  And one of the cases that Mr. Sotos asked you about was

18    your testimony in a case called People of the State of Illinois

19    against Armando Serrano and Jose Montanez.

10:30:17    20    A.  Yes.

21    Q.  That was a post-conviction hearing?

22    A.  Yes.

23    Q.  And did you testify in that case on May 15, 2013?

24    A.  Well, I don't recall the date, but I did testify in that

10:30:30    25    case.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 59 of 278 PageID #:43703
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3035

             1   Q.  And do you recall that the subject of that case was whether
             2   Mr. Guevara had physically abused a witness?
             3               MS. ROSEN:  Objection.  Foundation.
             4               MR. LEINENWEBER:  Objection.
10:30:44     5               THE COURT:  Okay.  Tell what is the objection.  I
             6   think I heard two at the same time.
             7               MS. ROSEN:  Foundation as to the content of the
             8   question.  How would he know.
             9               MR. LEINENWEBER:  Objection also on relevance, Judge.
10:30:54    10               THE COURT:  On what?
            11               MR. DAFFADA:  Relevance and scope.
            12               THE COURT:  Hold on a second.
            13               (Brief pause)
            14               MR. DAFFADA:  Relevance, scope, compound.  Violates
10:31:05    15   Rule 404(b).
            16               THE COURT:  The question is, did the witness know,
            17   right?
            18               MR. BOWMAN:  Right.
            19               THE COURT:  So the foundation objection is overruled.
10:31:10    20               MR. DAFFADA:  404(b) objection, Your Honor.
            21               THE COURT:  I'm sorry what?
            22               MR. DAFFADA:  404(b) objection, Your Honor.
            23               MR. BOWMAN:  Mr. Sotos brought it up, Judge.
            24               THE COURT:  I think it was brought up yesterday.  I
10:31:26    25   don't remember the exact context, but I think counsel can go

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 60 of 278 PageID #:43704
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3036

        1   into anything that was opened up.

        2   BY MR. BOWMAN:

        3   Q.  So to be clear, Mr. Dorsch, do you know that the Serrano

        4   and the Montanez case was a case in which the allegation

10:31:47  5   against Mr. Guevara was that he had physically abused a

        6   witness?

        7           THE COURT:  Well, this is going to be leading.  I

        8   don't think you can even ask the question this way.

        9           MR. BOWMAN:  Okay.

10:31:58 10   BY MR. BOWMAN:

       11   Q.  Do you know what the allegations were against Mr. Guevara

       12   in that case?

       13           MR. DAFFADA:  Same objection, Judge, 404(b).

       14           THE COURT:  Overruled.

10:32:10 15   BY THE WITNESS:

       16   A.  I remember being asked in a case, if it was that one, if I

       17   ever witnessed or knew of Guevara using physical force against

       18   someone.

       19   BY MR. BOWMAN:

10:32:24 20   Q.  And do you know what the outcome of that case was?

       21           THE COURT:  Let me talk to you at the sidebar.

       22           Do you have the question you asked about this

       23   yesterday?

       24           MR. SOTOS:  I know exactly what it was, Judge.

10:32:47 25           (Proceedings heard at sidebar on the record).

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 61 of 278 PageID #:43705
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3037

|  | 1 | MR. SOTOS:  I asked him whether he's testified in |
|---|---|---|
|  | 2 | prior proceedings about this story he's telling.  And -- |
|  | 3 | THE COURT:  What story he's telling? |
|  | 4 | MR. SOTOS:  The story about Rey Guevara. |
| 10:32:58 | 5 | THE COURT:  About this incident? |

MR. SOTOS:  I asked him whether he's testified in
prior proceedings about this story he's telling.  And --

THE COURT:  What story he's telling?

MR. SOTOS:  The story about Rey Guevara.

10:32:58    THE COURT:  About this incident?

MR. SOTOS:  Yes.

THE COURT:  Yeah.  Okay.

MR. SOTOS:  And I asked him whether he testified in
three specific cases involving six specific individuals.

10:33:08    THE COURT:  Right.

MR. SOTOS:  Whether he did that.  And that's all we
talked about.  Now he's asking about the allegations.

THE COURT:  Okay.  Correct.  I don't think that opens
404(b) up.

10:33:15    MR. LOEVY:  All right.  Then what we would like to
establish is, and we can leave out the 404(b) at this point --

THE COURT:  That would be good.

MR. LOEVY:  He brought up the Serrano case, he brought
up the Montanez case --

10:33:20    And the third case?

MR. ART:  Selache (Phonetic.)

MR. LOEVY:  Selache (Phonetic).  And he's implying
that Mr. Dorsch did this for personal gain to try to get
Northwestern to pay him money, you know, that kind of thing.

10:33:34    He should just be able to establish what those cases were.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 62 of 278 PageID #:43706
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3038

1     Those were exoneration cases.

2          THE COURT:  No, I think that's beyond the pale.

3          MR. LOEVY:  Your Honor, while we're at sidebar before

4     we go back, since we're here, there's been a lot of hearsay

10:33:43    5     about the Jimenez case.  You know, what other people are saying

6     happened in Jimenez.

7          THE COURT:  Right.

8          MR. LOEVY:  So, you know, I think we're done with the

9     Jimenez subject, but if not, I don't want argue in front of the

10:33:53   10     jury, no more hearsay about Jimenez is our objection.  I don't

11     know if they're intending to do it on redirect, but --

12          MR. SOTOS:  I'm going to ask him about what he knew

13     about the Jimenez case on redirect after that.  I'm definitely

14     going to do that.

10:34:02   15          MR. LOEVY:  You already did that all that, and then he

16     did all that --

17          THE COURT:  Well, it's actually been done twice.

18          MR. LOEVY:  And he asked the questions --

19          MR. SOTOS:  No, Judge.  He just asked him all sorts of

10:34:13   20     questions about what he remembers testifying to.  I want to ask

21     him whether he -- about what my job is on cross-examination to

22     paint him out to be a bad guy, and how what he said as to

23     Jimenez about the umbrella case was the truth, and about how

24     the City appears to be hiding a file, and I want to ask him

10:34:38   25     whether he testified about those things before --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 63 of 278 PageID #:43707
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3039

```
 1          THE COURT:  Well, the objection was to going into a
 2   lot of hearsay about Jimenez.
 3          MR. SOTOS:  I'm not going to go into the back and
 4   forth.
 5          THE COURT:  All right.
 6          MR. SOTOS:  I'm not going to ask any hearsay
 7   questions, Judge.  I won't ask a single hearsay objection.
 8          THE COURT:  All right.  So make an objection.
 9          (Proceedings resumed in open court)
10   BY MR. BOWMAN:
11   Q.  In any event, Mr. Dorsch, you have had -- you have been
12   called upon under subpoena to testify on multiple occasions
13   about what you know about Rey Guevara, right?
14   A.  Yes.
15   Q.  Has your testimony been truthful?
16   A.  Yes.
17   Q.  Has it been easy for you to be repeatedly placed under
18   subpoena and called upon to provide testimony --
19          MR. DAFFADA:  Objection.  Asked and Answered,
20   cumulative.
21          THE COURT:  It's a little different question, but it's
22   pretty cumulative.
23   BY MR. BOWMAN:
24   Q.  Let me move on to one other subject.  You were shown a
25   photograph of yourself from the late '80s, which you appeared
```

10:34:44

10:34:51

10:35:38

10:35:53

10:36:03

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 64 of 278 PageID #:43708
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3040

 1 | to be a much younger man with some different looking glasses

 2 | and some darker hair and darker mustache.  Do you remember

 3 | seeing that?

 4 | A.  Yes, I remember the photo.

10:36:25  5 | Q.  So let me put it to you, Mr. Dorsch, are you the guy to

 6 | whom Orlando Lopez said, "Wrong guy.  Wrong guy.  This isn't

 7 | the guy"?  Did Orlando Lopez say that to you?

 8 | A.  Never.

 9 | Q.  What would you have if he had, sir?

10:36:45 10 | A.  Certainly would not have charged anyone.

11 | MR. BOWMAN:  That's all I have.

12 | THE COURT:  Okay.  Mr. Sotos.

13 | MR. SOTOS:  Thank you, Judge.

14 | FURTHER REDIRECT EXAMINATION

10:36:57 15 | BY MR. SOTOS:

16 | Q.  Good morning, sir.

17 | You testified just now that it's our job to make you

18 | the bad guy, correct?

19 | A.  From experience in the courtroom, yes.

10:37:13 20 | Q.  Do you understand that it's our job to probe the truth of

21 | the testimony that you give to the jury?

22 | A.  Yes.

23 | Q.  You understand that it's for the jury to decide whether or

24 | not what you're saying is truthful or not.  Regardless of

10:37:32 25 | whether you testified repeatedly that it's truthful, it's

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 65 of 278 PageID #:43709
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3041

1   ultimately for the jury to decide whether, in fact, it's true,

2   correct?

3   A.  Most definitely, it is theirs.

4   Q.  So do you understand that the reasons we ask you about the

10:37:47  5   Jimenez file, which was disclosed, is to probe whether or not

6   that was, in fact, the file that you were talking about rather

7   than the umbrella file?

8   A.  I understand why you did the that, yes.

9   Q.  Okay.  And you're certainly aware of many incredible

10:38:07  10   similarities between the two cases, is that true?

11   A.  Oh, yes.

12   Q.  So many similarities that would you agree with me that

13   unless you were sitting in your shoes, it would be very

14   difficult to believe that there was another case that was so

10:38:23  15   similar but still different?

16   A.  I stated that, the first time I read that report.

17   Q.  You were shocked at the similarities?

18   A.  I was astounded.

19   Q.  Still knowing that there was some other case out there --

10:38:35  20   A.  Oh, I knew there were other cases similar.

21   Q.  Right.  But you were shocked when you --

22          MR. LOEVY:  Asked and answered, Your Honor.

23          THE COURT:  Sustained.

24   MR. SOTOS:

10:38:47  25   Q.  You just testified that something about a chronology of

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 66 of 278 PageID #:43710
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3042

1   130 cases that you tried to look at -- before we do that, you

2   testified that you've been trying to find this other file for

3   4 years?

4   A.  Well, over a period of time, yeah.  Yeah.  Various ways.

5   Q.  And you're aware, from your discussions with attorneys,

6   that a lot of people have been looking for this file, correct?

7   A.  That was why it was astounding that it was found 4 years

8   later.

9   Q.  And when Northwestern gave you the file, the Jimenez file,

10  they told you that they had --

11      MR. LOEVY:  Objection.  Hearsay, Your Honor.  "They

12  told you," hearsay.

13      THE COURT:  Well, I have no idea if it's hearsay.

14      Why are you asking it for?

15      MR. SOTOS:  I want to know about his knowledge at the

16  time.  Not about whether or not -- whether it was actually a

17  file.  It's about what he was told about it and what he

18  thought.

19      MR. LOEVY:  Your Honor, hearsay.  Objection.

20      MR. SOTOS:  Not for the truth, Judge.

21      THE COURT:  Let me hear the question.

22      Don't answer the question.

23  BY MR. SOTOS:

24  Q.  When you were -- you were provided the Jimenez file by

25  Northwestern, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 67 of 278 PageID #:43711
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3043

1    A.  Yes.

2    Q.  And they told you that they had found the file you've been

3    talking about?

4         MR. LOEVY:  Same objection, Your Honor.

5         THE COURT:  I don't see why that would be relevant

6    except for the truth.  I'm going to sustain the objection.

7    MR. SOTOS:

8    Q.  In any event, they provided you with the Jimenez file?

9    A.  Yes.

10   Q.  Okay.  And then you looked at it and you were astounded at

11   the similarities?

12        MR. LOEVY:  Objection.  Asked and Answered, Your

13   Honor.

14        THE COURT:  Sustained.

15   BY MR. SOTOS:

16   Q.  You knew at the time you looked at the Jimenez file that

17   the State's Attorney's Office --

18        MR. LOEVY:  Objection to Hearsay.  He's going to start

19   saying the State's Attorney's Office --

20        THE COURT:  I have to hear the question.

21        MR. SOTOS:  He testified --

22        THE COURT:  No, just ask the question.

23   BY MR. SOTOS:

24   Q.  You knew at the time that you reviewed the Northwestern

25   file that the Cook County State's Attorney's Office had

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 68 of 278 PageID #:43712
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3044

1    interviewed the witness in the Jimenez case, correct?

2             MR. LOEVY:  Objection, Your Honor.

3             THE COURT:  So at the time -- the question is, when

4    the witness was provided the Jimenez file, did he know of his

10:41:06   5    own knowledge?

6             MR. SOTOS:  Yes.

7             THE COURT:  Okay.  Overruled.

8             MR. SOTOS:  That was it.

9    BY MR. SOTOS:

10:41:10  10    Q.  So at the time you reviewed the Jimenez file when

11    Northwestern provided it to you, you knew that the Cook County

12    State's Attorney's Office had interviewed the witness who you

13    were claiming Mr. Guevara -- no, that's not a fair question,

14    because he says it's a different case.

10:41:30  15             You knew at the time you were provided the file that

16    the Cook County State's Attorney's Office had interviewed the

17    witness in the Jimenez case, correct?

18    A.  No, I didn't know.

19    Q.  Do you recall giving a deposition in this case?

10:41:47  20    A.  I recall depositions in this case.

21    Q.  Well, let me ask you this, do you remember when you were

22    provided the Jimenez file?

23    A.  (No response)

24    Q.  Do you remember when you were provided the Jimenez file?

10:42:17  25    If I told you it was April 25, 2015, does that make sense to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 69 of 278 PageID #:43713
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3045

1    you?

2    A.  I have no recollection at all when I got it.

3            MR. LOEVY:  Objection.  Foundation, Your Honor.

4            THE COURT:  The question --

10:42:26   5    BY THE WITNESS:

6    A.  I don't remember.

7    BY MR. SOTOS:

8    Q.  You don't remember?

9    A.  I don't remember, no.

10:42:29  10    BY MR. SOTOS:

11    Q.  You remember giving a deposition in the Rivera lawsuit in

12    2015?

13    A.  I'm sure I did.

14    Q.  April 14, 2015?

10:42:42  15    A.  I don't remember the dates.

16    Q.  You take my word for it?

17    A.  Yes.

18    Q.  Do you recall -- page 398, Line 6 -- do you recall being

19    asked in April 2015:

10:42:55  20          "Question:  Have you seen, are you aware

21          that --"

22            MR. LOEVY:  Objection, Your Honor.  This is the

23    hearsay he just wants to read.  There's no foundation for it.

24            MR. SOTOS:  It's not hearsay.  It's about what he was

10:43:07  25    aware of.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 70 of 278 PageID #:43714
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3046

1          THE COURT:  You know, again, you have this, I don't.

2  I don't know what's coming.  You seem to know.  If you want to

3  give me that so I can look at it, maybe I'll have a better

4  idea.

10:43:19    5          MR. LOEVY:  All right.  There's no time frame on the

6  question at all.

7          THE COURT:  There's what?

8          MR. LOEVY:  No timeframe on the question at all.

9          MR. SOTOS:  Your Honor, I said it was a different --

10:43:23   10          MR. LOEVY:  Your Honor --

11          MR. SOTOS:  Can we show the witness --

12          THE COURT:  You know, just stop arguing.

13      So the objection is that there needs to be a

14  timeframe?

10:43:30   15          MR. LOEVY:  No, the objection is, he's just trying to

16  do what he said he wouldn't do at sidebar.

17          THE COURT:  And what I just told you was, I don't

18  know.  So let me see it.

19          MR. SOTOS:  I got it right here.

10:43:38   20      (Mr. Sotos brushing against microphone, loud

21      noise)

22      (Document tendered to the Court.)

23          THE COURT:  Come on, people.  Let's just try to get

24  some kind of professionalism in here.

10:44:07   25      (Brief pause)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 71 of 278 PageID #:43715
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3047

1        THE COURT:  Okay.  So this is in a deposition, and the

2   witness read something?

3        MR. SOTOS:  He had received a Northwestern file.

4        THE COURT:  It doesn't say that.

10:44:20   5        MR. SOTOS:  Well, there's a lot of --

6        THE COURT:  Hold on.

7        (Brief pause)

8        THE COURT:  Look, I'm going to sustain the objection.

9   You're talking about documents from Northwestern, documents

10:44:32  10   from the State's Attorney's Office.  I don't know what you're

11   talking about, and I don't know why it isn't hearsay, but --

12        MR. SOTOS:  Can I answer?

13        THE COURT:  Sure.  Sure.

14        MR. LOEVY:  Could we go to sidebar?

10:44:45  15        THE COURT:  All right.  We'll go to sidebar.

16        (Proceedings heard at sidebar on the record.)

17        MR. SOTOS:  May I?

18        THE COURT:  Yeah.

19        MR. SOTOS:  Because this goes specifically to why he

10:45:00  20   is continuing to -- it goes specifically to why he is trying to

21   claim that the umbrella file is not the Jimenez file because he

22   knew the witness had been interviewed by the Cook County

23   State's Attorney's Office and that he had told the State's

24   Attorney's Office that he was bribed by another person and he

10:45:19  25   was not -- and that Rey Guevara did not do anything --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 72 of 278 PageID #:43716
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3048

1       THE COURT:  This is the witness in the Jimenez case?

2       MR. SOTOS:  Judge, this is -- yes.

3       MR. LOEVY:  Yes.

4       MR. SOTOS:  That the witness in the Jimenez case had

10:45:33   5   been interviewed by the Cook County State's Attorney's Office

6   and had told him that he was bribed by another person and that

7   Rey Guevara did not do anything to him.  And it was because --

8       THE COURT:  And what is the basis for -- I'm getting

9   confused.  He was in the Jimenez case?

10:45:52  10     MR. SOTOS:  Judge, let me explain it to you again.

11  Northwestern gave him the Jimenez file.  I tried to ask him,

12  they told him they thought that was the case.

13      THE COURT:  Right.

14      MR. SOTOS:  He looked at it, and learned that this

10:46:09  15  witness had been interviewed by the State's Attorney's Office

16  in the Jimenez case.

17      THE COURT:  Yeah, but I'm trying to figure out why

18  we're building this whole structure on Jimenez.

19      MR. SOTOS:  Because -- because it explains --

10:46:22  20     MR. LOEVY:  Well, if I can --

21      THE COURT:  Shh.

22      Go ahead.

23      MR. SOTOS:  Because it explains why he is lying about

24  his, his umbrella case not being the Jimenez case.

10:46:36  25     MS. ROSEN:  He did work on it.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 73 of 278 PageID #:43717
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3049

1          MR. SOTOS:  If I could finish!

2          MR. LOEVY:  But he did --

3          THE COURT:  One person at a time.

4          MR. SOTOS:  He now just blamed the Chicago Police

10:46:44    5  Department for hiding one file in the chronology when there is

6  no other file --

7          THE COURT:  Let me.

8          MR. SOTOS:  -- it's the Jimenez file.

9          THE COURT:  Well, let me ask a question --

10:46:50   10          MR. DAFFADA:  To answer your last question, Mr. Dorsch

11  was involved in the Jimenez case.

12          THE COURT:  Yeah, I got that.  I was already told

13  that.

14          Did he make an accusation in the Jimenez case about

10:47:02   15  bribery by Guevara?

16          MR. SOTOS:  No.

17          MR. LOEVY:  That's the point --

18          MR. SOTOS:  The witnesses in the Jimenez case said

19  they were bribed by an individual --

10:47:12   20          THE COURT:  Yeah, I know, but why is this on his

21  doorstep?

22          MR. LOEVY:  It's not, Your Honor.

23          THE COURT:  Could I hear this?  Because I'm doing fine

24  on my own at this point.

10:47:20   25          MR. LOEVY:  All right..

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 74 of 278 PageID #:43718
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3050

1           MR. SOTOS:  What's the question?

2           THE COURT:  My question is, this whole thing is about

3    the fact that there's similar allegations in the Jimenez case.

4    Did he make an accusation in the Jimenez case against Guevara?

10:47:36  5           MR. SOTOS:  No, because he made an accusation about an

6    unknown unidentified file which everybody knows is the Jimenez

7    case.  And he's saying it isn't because of the fact that the

8    witness was interviewed by the State's Attorney's Office and

9    said it never happened, that's why he's lying.

10:47:54  10          THE COURT:  But he never said it happened.

11          MR. SOTOS:  He did.

12          MR. LOEVY:  Your Honor, when am I going to get a turn?

13          THE COURT:  When did he say it happened?

14          MR. SOTOS:  What did he say?

10:48:02  15          THE COURT:  When did he say that Guevara bribed

16    somebody in the Jimenez case?

17          MR. SOTOS:  He said --

18          MR. LOEVY:  He didn't.

19          MR. SOTOS:  No, Judge, he said --

10:48:09  20          MR. LOEVY:  Your Honor, I think you're going to -- you

21    know --

22          MR. SOTOS:  Judge, this is the most serious of error

23    after what he just said about this case and about the Chicago

24    Police Department hiding files.

10:48:22  25          THE COURT:  All right.  Let me hear you.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 75 of 278 PageID #:43719
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3051

1       MR. LOEVY:  What they're trying to do is, Jim wants to

2  tell the jury, "isn't it true that witnesses said things, isn't

3  it true the state's attorney said things."  Bring the witnesses

4  in.  They said they were going to do their rebuttal case.  They

10:48:33    5  want to short-circuit the rebuttal case and just do hearsay.

6  They just want to tell this witness, didn't the state's

7  attorney say this, didn't the witnesses say that.

8       Now I'm yelling.  I'm sorry.

9       THE COURT:  Yeah, you are.

10:48:42   10       MS. ROSEN:  And, Your Honor, if I can --

11       THE COURT REPORTER:  Ms. Rosen, I'm sorry, you're

12  rubbing up against my machine and I can't write.

13       MS. ROSEN:  Sorry!

14       THE COURT REPORTER:  That's Okay.

10:48:48   15       MS. ROSEN:  The chronology is is that he comes forward

16  with this event that he says happened and gives all the

17  descriptives.  So then the City and Northwestern start looking

18  through files to look for the case that matches that.

19       THE COURT:  Yeah.  I got that.

10:49:02   20       MS. ROSEN:  We identified the Jimenez file.

21  Northwestern believes it's the file, the City believes it's the

22  file.

23       THE COURT:  Right.

24       MS. ROSEN:  He is told while this is happening that

10:49:11   25  the State's Attorney's Office has interviewed the witnesses who

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 76 of 278 PageID #:43720
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3052

```
 1    were bribed.

 2            THE COURT:  Right.

 3            MS. ROSEN:  And those witnesses say, "Yes, we were,

 4    but Rey Guevara had nothing to do with that."

 5            THE COURT:  Okay.

 6            MS. ROSEN:  So then the point is that once he learns

 7    that, all of a sudden the Jimenez file is not the file that

 8    he's talking about.  It's some other unknown file with no

 9    descriptives.  That's the point that we are trying to make, is

10    that once he's confronted with  --

11            THE COURT:  Okay.  Let me ask you this, I don't

12    believe I'm hearing this for the first time, I mean the fact

13    that there was an allegation of bribery in the Jimenez case.

14            MR. SOTOS:  There was, Judge.

15            THE COURT:  That didn't involve him.

16            MR. SOTOS:  It did not involve him.

17            MR. LEINENWEBER:  And, Judge, if I may.  On my

18    cross-examination he admitted that he knew that.  He knew it in

19    both cases.

20            THE COURT:  That's what I thought.  That's what I

21    thought.  I think we've beat this horse to death.

22            MR. LOEVY:  So let's move on.

23            THE COURT:  What are you trying to do now?

24            MR. LOEVY:  Except for hearsay.

25            MR. SOTOS:  I'm trying to demonstrate that this idea
```

10:49:19 (line 5)
10:49:32 (line 10)
10:49:48 (line 15)
10:49:55 (line 20)
10:50:03 (line 25)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 77 of 278 PageID #:43721
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3053

1  that the -- he just testified for the first time that --

2        THE COURT:  You know, all you're allowed to do in

3  examination of a witness is get what you need for closing

4  argument.

5        MR. SOTOS:  Correct.

6        THE COURT:  What more do you want to get than you

7  already have?

8        MR. SOTOS:  I'm trying to impeach his credibility on

9  his testimony that the City of Chicago withheld or buried a

10  file when everybody knows it's not true.

11        MR. LOEVY:  Then ask him about --

12        MR. SOTOS:  That was the file.  So he doesn't have any

13  foundation for saying that.

14        THE COURT:  So if Mr. Leinenweber already established

15  that there was an allegation of bribery in the Jimenez case

16  that -- did you bring out what the state's attorney's position

17  was?

18        MR. LOEVY:  No, Mr. Sotos did.  Mr. Sotos did

19  yesterday.  He did yesterday.

20        MR. SOTOS:  He denied it today, Judge.

21        THE COURT:  Well, if you go over it like 20 times, who

22  knows.  We've spent enough time on this.

23        MR. SOTOS:  Wait.  No, no, no.  No, no.  Judge, he

24  denied it today.  The deposition impeaches what he just said,

25  that he didn't know the state's attorney had interviewed the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 78 of 278 PageID #:43722
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3054

1    witness.

2          MR. LOEVY:  But there's no timeframe on when he knew

3    it.

4          THE COURT:  Wait.  Wait.  Wait.  Wait.

10:51:12    5          Okay.  So if we know that by April of 2015 he had seen

6    the Jimenez file and he knew that the witnesses said what they

7    said.

8          MR. SOTOS:  Yes.  And that's the time we're talking

9    about, the time of the dep.

10:51:29    10          THE COURT:  You know, you can make your point with the

11   date, you can't argue it.  I've heard enough on this subject,

12   make your point --

13          MR. SOTOS:  That's all I want to do.

14          MR. LOEVY:  He already asked him what the date of the

10:51:41    15   deposition was.

16          THE COURT:  Well, I just said what you can do, but I

17   want the question that has the date in it --

18          MR. SOTOS:  Well, can I just ask that question?

19          MR. LOEVY:  And then we move on?

10:51:50    20          THE COURT:  Yeah.  Yeah.  If you make the date clear.

21          MR. LOEVY:  But then, Your Honor, we're not going to

22   hear hearsay about what the investigators --

23          THE COURT:  I don't know what we're going to hear.

24          MR. LOEVY:  Well, Your Honor, we object to opening

10:51:59    25   this can of worms.  I was trying to --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 79 of 278 PageID #:43723
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3055

1          THE COURT:  Well, it's been opened for the whole darn

2     examination.  So we're not opening anything.

3          (Proceedings resumed in open court)

4     BY MR. SOTOS:

10:52:40    5     Q.  Sir, you testified this morning that you were not aware

6     that the State's Attorney's Office had interviewed the witness

7     in the Jimenez?

8               MR. LOEVY:  Objection to timeframe, Your Honor.

9               THE COURT:  Sustained.

10:52:49   10     BY MR. SOTOS:

11     Q.  As you sit here today, are you aware that the Cook County

12     State's Attorney's Office interviewed the witness in the

13     Jimenez case?

14     A.  Am I aware?

10:52:58   15     Q.  Yes.

16     A.  Now I am.

17     Q.  Were you aware of that at the time you reviewed the

18     documents you received from Northwestern?

19     A.  No.

10:53:08   20     Q.  When did you become aware of that?

21     A.  If I did become aware of it, I probably learned it while

22     being at trials or depositions.

23     Q.  Okay.  So were you aware --

24               MR. LOEVY:  Objection, Your Honor.  That's what you

10:53:24   25     allowed us to do.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 80 of 278 PageID #:43724
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3056

|        | 1  | THE COURT:  Let me hear the question. |

1     THE COURT:  Let me hear the question.

2     MR. LOEVY:  It's hearsay, Your Honor.

3  BY MR. SOTOS:

4  Q.  Were you aware on April 14th, 2015, that the Cook County

10:53:37   5  State's Attorney's Office had interviewed the witness, Mr.

6  Vargas, in the Jimenez case?

7  A.  If somebody told me, then I would be aware.  I don't know

8  that somebody told me.  I don't know --

9  Q.  You --

10:53:53   10  A.  The State's Attorney's Office never came to me and told me

11  they interviewed anybody.

12  Q.  Different question, sir.  I'm not asking if the State's

13  Attorney's Office told you.  I'm asking you whether at the time

14  you gave this deposition in this lawsuit in April 2015, whether

10:54:09   15  you were aware that the Cook County State's Attorney's Office

16  had interviewed the witness in the Jimenez case?

17  A.  I do not recall which deposition.

18  Q.  If I showed you something from the deposition, would it

19  refresh your recollection?

10:54:27   20  A.  Yes.

21     MR. SOTOS:  What exhibit is this?

22     MS. GOLDEN:  67.

23     (Document tendered to the witness)

24  BY MR. SOTOS:

10:54:42   25  Q.  Sir, I'm showing you what has been marked Defendants'

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 81 of 278 PageID #:43725
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3057

1    Exhibit 67, page 398.  Can you to review the highlighted

2    portion, please.

3              (Document tendered)

4    BY THE WITNESS:

10:55:11    5    A.  Yes.

6    BY MR. SOTOS:

7    Q.  Does that refresh your recollection as to whether you knew

8    at the time of the deposition that the Cook County State's

9    Attorney's Office had interviewed the witness in the Jimenez

10:55:20   10    case?

11    A.  Well, I think it's even unclear to me reading what is my

12    answer.  It says, "I think that was part of what I saw."  "I

13    think."  So do I really know?  "I think."

14    Q.  So you believe, at least at the time you gave your

10:55:32   15    deposition, that the -- that you knew that the Cook County

16    State's Attorney's Office had interviewed the witness --

17              MR. LOEVY:  Objection.  Asked and Answered.

18              THE COURT:  Sustained.

19    BY MR. SOTOS:

10:55:44   20    Q.  Did you know that the witness had told --

21              MR. LOEVY:  Objection, Your Honor.  Now he is

22    testifying.

23              MR. SOTOS:  I'm going to ask him what he knew.  If he

24    knew about this, I'm going to ask him what he knew about it.

10:55:56   25              THE COURT:  He says he thinks.  Okay.  "Knew," there's

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 82 of 278 PageID #:43726
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3058

1    no basis for that.  The witness just said that's what he

2    thought.

3    BY MR. SOTOS:

4    Q.  Do you think he knew --

10:56:08  5         MR. LOEVY:  Objection, Your Honor.  He just wants to

6    testify --

7         THE COURT:  Da-da-da.  This is the question that I

8    thought you were going to ask, and I thought it's just been

9    answered.  So I don't know what else you're going to do.

10:56:20  10         MR. SOTOS:  I want to probe what he actually knew at

11   the time before he started saying that there was another file

12   other that the Jimenez case.  I want to ask him what he knew

13   when he knew.

14         MR. LOEVY:  That's what we talked at sidebar, Your

10:56:30  15   Honor.

16         THE COURT:  So you're going to ask what he knew from

17   other sources at the time of the deposition about this other

18   case?

19         MR. SOTOS:  Right.  To probe why he is saying that the

10:56:42  20   Jimenez file is not --

21         THE COURT:  You know, I think you're going to need to

22   do this some other way.  I'm going to sustain the objection.  I

23   said you could do what you said you wanted to do.  Now I don't

24   know what you're doing.  I'm not going to do another sidebar.

10:56:54  25         MR. SOTOS:  I was just going to ask him about his

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 83 of 278 PageID #:43727
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3059

1  knowledge, Judge.

2       THE COURT:  Yeah, I can't even imagine, but the

3  question has been asked and answered.

4  BY MR. SOTOS:

10:57:05   5  Q.  Well, sir, you testified on direct examination that there

6  was a chronology of -- that you were trying to find the other

7  file that's like the Jimenez case, you were trying to get that

8  from the Chicago Police Department?

9  A.  No, I wasn't trying to find a case that was similar.  I was

10:57:28  10  trying to find the case that I was talking about, sir.

11  Q.  Right.  Right.  Which is different from the Jimenez case?

12  A.  I had no knowledge of the Jimenez case when I was

13  requesting the file to the case I'm talking about.

14  Q.  But you were on Jimenez case, right?

10:57:41  15  A.  Yes.

16  Q.  Right.  So, I mean, you worked that case, too?

17       MR. LOEVY:  Objection.  Asked and Answered, Your

18  Honor.

19       THE COURT:  Overruled.

10:57:46  20  BY THE WITNESS:

21  A.  Yes.

22  BY MR. SOTOS:

23  Q.  All right.  And so you were trying to find the other file,

24  the umbrella file from the Chicago Police Department?

10:57:59  25       MR. LOEVY:  Objection.  Asked and Answered, Your

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 84 of 278 PageID #:43728
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3060

1    Honor.  That subject has been covered.

2         THE COURT:  Yeah.  We covered this for a long time.

3    Let's get on to something new.

4         MR. SOTOS:  No, this was actually just brought up by

10:58:11    5    Mr. Bowman on direct.  And he suggested that the file is

6    missing.  It was a chronology.  He hasn't been crossed on it at

7    all, Judge.

8         THE COURT:  Well, I'm pretty sure I heard it before.

9         MR. SOTOS:  No, it just came up for the first time.

10:58:23    10        THE COURT:  Go ahead.

11        MR. SOTOS:  In fact, let me ask him that.

12   BY MR. SOTOS:

13   Q.  You testified in response to Mr. Bowman's question that

14   there was 129 files listed in the chronology you received from

10:58:37    15   the Chicago Police Department, correct?

16   A.  Yes.

17   Q.  And you said that there were 130 murders committed in that

18   same period, did I get that right?

19   A.  I think we have it backwards, but I have it, if you want to

10:58:52    20   see it.

21   Q.  You have the chronology?

22   A.  What I received.

23   Q.  Okay.  Yeah.  Can you show that?  Can you hand that to me,

24   please?

10:58:59    25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 85 of 278 PageID #:43729
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3061

1  Q.  You have other documents that you brought with you today?

2  A.  No.  Personal documents.

3       Well, actually I have 2 years, '89 and '88, because

4  those were the years I was looking at because Guevara was a

10:59:22  5  Gang Crimes specialist at that time.

6       In '89 with the Chicago Police --

7  Q.  Wait a minute.  Before you start reading it, maybe you

8  better hand it to me so we can figure out what it is.

9  A.  Sure.

10:59:34  10       (Said item tendered)

11  BY MR. SOTOS:

12  A.  Thank you, sir.

13       MR. SOTOS:  Judge, I'll mark this as Defendants'

14  Exhibit 230.

11:00:12  15       THE COURT:  How much do you have, Mr. Sotos?

16       MR. SOTOS:  Well, I'm going to have to explore this

17  area.

18       THE COURT:  I know that, but I'm trying to figure out

19  when to take a break.

11:00:25  20       MR. SOTOS:  We should probably take a break.

21       THE COURT:  All right.  Let's take 10 minutes.

22       COURT SECURITY OFFICER:  All rise.

23       (Recess.)

24       COURT SECURITY OFFICER:  All rise.

11:11:24  25

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 86 of 278 PageID #:43730
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3062

1          (The following proceedings were had out of the

2          presence of the jury in open court:)

3              MR. LOEVY:  Your Honor --

4              THE COURT:  Yes.

11:11:34  5              MR. LOEVY:  -- if we could have permission to

6      complain.  Mr. Bowman's exam was maybe 10 minutes and we've

7      already like tripled that on the re-redirect.

8              THE COURT:  Well, I don't know what to do.

9              MR. SOTOS:  Judge, I've got two things to bring up.

11:11:45 10     First of all, I didn't anticipate all that new stuff coming in

11     about the City.  We just asked that this document that he

12     relied on --

13             THE COURT:  You know, I don't know what he meant to

14     state.

11:11:55 15             MR. SOTOS:  And the other thing is, you know, when I

16     knocked over the microphone, you made a comment about the

17     lawyers being unprofessional.  And the people who were sitting

18     back there thought it was directed at me.  I don't know that it

19     was, but it was right on the heels --

11:12:09 20             THE COURT:  So you want me to say that I didn't mean

21     that knocking over the microphone was unprofessional?

22             MR. SOTOS:  No, I'm just --

23             THE COURT:  I mean, the court reporter can't even

24     figure out who's objecting.  And I can't keep it all straight.

11:12:22 25     You're talking over each other.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 87 of 278 PageID #:43731
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3063

1     MR. SOTOS:  I just felt the need to bring it up

2  because that was the context in which it occurred.

3     THE COURT:  Well, you don't bring it up unless you

4  want me to do something.  Because I'll be happy to do

5  something, but I don't know what it is you want me to do.

6     MR. LOEVY:  Well, hopefully we can get going --

7     THE COURT:  I'd be happy to do something, but I don't

8  think anybody looking at this could possibly think it was

9  anything other than lawyers yelling over each other.  So the

10  court reporter and I can't figure out what's going on.

11     MR. SOTOS:  Maybe if you said something along the

12  lines, you think the attorneys are all being professional and

13  you weren't trying to imply otherwise because of the back and

14  forth that was occurring.

15     THE COURT:  I don't think the lawyers are being

16  professional.  I think everybody is -- it's chaos in here.  But

17  I need to get the court reporter -- I mean, get the CSO because

18  I don't know where he is.

19     (Brief pause)

20     MR. LOEVY:  Judge, here he is.

21     THE COURT:  Oh, here you are.

22     MR. SOTOS:  Judge, we're waiting for your --

23     MR. GIVEN:  I asked your clerk to make some extra

24  copies of he documents.

25     THE COURT:  And he's doing it.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 88 of 278 PageID #:43732
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3064

1    MR. SOTOS:  That's what we need.

2    THE COURT:  Well, I think it takes a little while for

3  the jury to get in here.  We won't start until we have copies.

4    (Brief pause)

11:13:46    5    THE COURT:  And, you know, if everybody just calms

6  down, you'll be making objections that the court reporter can

7  hear, that I can understand, and people won't be tripping over

8  things, because that's all part of the chaos that this has

9  erupted into.

11:14:01   10    MR. SOTOS:  Just when I handed you the paper, Your

11  Honor, and I caught --

12    THE COURT:  Well, everybody just needs to slow down.

13    (Brief pause)

14    THE COURT:  Here he comes.  Everybody is getting their

11:14:14   15  copies.

16    No more speaking objections, but objections ought to

17  have a basis.  I mean, you can't just say "object."  I'm going

18  to ignore that; okay?

19    MR. LOEVY:  We understand.

11:14:45   20    THE COURT:  But I don't need speaking objections, and

21  I don't want them.

22    MR. LOEVY:  While the jury is out, can we make a

23  standing objection that they've already gone twice what Mr.

24  Bowman has redirected and we think it's all been covered during

11:15:01   25  the last exams.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 89 of 278 PageID #:43733
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3065

1      THE COURT:  Okay.  It's not common in this courthouse

2  to want anybody to be bloodied at the end of cross-examination,

3  and I suppose other people have different experiences.

4      MR. SOTOS:  Judge, you know, we have a view on that

11:15:32    5  based on what we believe occurred as part of our motion with

6  respect to Mr. Guevara and Mr. Mingey.  This witness is giving

7  very important testimony, and we think we ought to be able to

8  probe and --

9      THE COURT:  I'm not stopping you.

11:15:47   10      We're ready.  We're ready.  Where is the CSO?

11      (Brief pause)

12      THE COURT REPORTER:  I'll get him, Your Honor.

13      (Brief pause)

14      COURT SECURITY OFFICER:  All rise.

11:16:17   15      (The following proceedings were had in the

16          presence of the jury in open court:)

17      THE COURT:  Please be seated, everyone.

18      Mr. Sotos.

19      MR. SOTOS:  Thank you, Your Honor.

11:16:41   20  BY MR. SOTOS:

21  Q.  Mr. Dorsch, before we talk about the document that you just

22  handed to me, I just wanted to make one thing clear.  After you

23  talked to Ms. Raley in 2010 or 2011, sometime after that Mr.

24  Rivera filed a post-conviction petition.  Are you aware of

11:17:03   25  that?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 90 of 278 PageID #:43734
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3066

1   A.   Nobody kept me informed about Mr. Rivera's case.

2   Q.   So you never testified about this story in connection with

3   any proceedings involving Mr. Rivera until yesterday when Mr.

4   Bowman asked you some questions about it, correct?

11:17:19   5   A.   Correct.

6   Q.   All right.  So now I want to ask you some questions about

7   the document that you just gave me.  And it's been marked as

8   Defendants' Exhibit 230.

9        And before I ask you about the substance of it, I want

11:17:35   10   to ask you, have you shared this with the attorneys for Mr.

11   Rivera?

12   A.   No.

13   Q.   Because you've been trying to find this file for several

14   years now, right?

11:17:47   15   A.   Yes.

16   Q.   And you knew that a lot of people have been trying to find

17   this file, right?

18   A.   No.

19   Q.   You knew that at the time that you were provided the

11:17:56   20   Northwestern file -- I'm sorry, the Jimenez file by

21   Northwestern in 2015, that people had thought they had found

22   the file, right?

23   A.   I had hoped people were looking for the file.  I wanted it

24   found.

11:18:10   25   Q.   But you knew when people gave it to you that people had

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 91 of 278 PageID #:43735
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3067

1   been looking for it?

2         MR. LOEVY:  Objection.  Asked and Answered, Your

3   Honor.

4         THE COURT:  I mean, I don't even -- you can ask the

11:18:21  5   question, but let's make it clearer.

6   BY MR. SOTOS:

7   Q.  When Northwestern gave you the file in 2015, the Jimenez

8   file, you knew that they had been looking for it?

9   A.  I hoped they had.

11:18:34  10   Q.  Right.  And you knew lawyers for the City had been looking

11   for it?

12   A.  I hoped they had.

13   Q.  Because you had given the story about what happened with

14   Mr. Rivera?

11:18:43  15   A.  Well, I was looking for the file myself, yes.  I wanted

16   verification.

17   Q.  And you said you testified about this story on several

18   occasions, as many as 8.

19         MR. LOEVY:  Objection, your Honor.

11:18:57  20         THE COURT:  Sustained.

21   BY MR. SOTOS:

22   Q.  Well, in all the occasions when you did testify about it,

23   some of the attorneys from Mr. Loevy's firm were the lawyers in

24   those case, right?

11:19:07  25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 92 of 278 PageID #:43736
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3068

1    Q.  And there were other lawyers from Northwestern who were

2    lawyers, at times, in those cases too, is that correct?

3    A.  Yes.

4    Q.  So were you talking to them during that time about this

11:19:19    5    other file and where it might be?

6    A.  No.

7    Q.  Were they telling you that they were trying to find the

8    file, too?

9    A.  I had asked for help from anyone that could find it,

11:19:32    10   Chicago Police Department or anybody who could help me find the

11   file.

12   Q.  Including the attorneys --

13   A.  Through my own efforts.

14   Q.  Including the attorneys in those other cases that were

11:19:42    15   discussed.

16   A.  No.  No.

17   Q.  You didn't talk to them about --

18            MR. LOEVY:  Objection, Your Honor.  Asked and

19   answered.

11:19:47    20            THE COURT:  Sustained.

21   BY MR. SOTOS:

22   Q.  When you asked people for help, like who did you ask?

23            MR. LOEVY:  Objection.  Asked and Answered, Your

24   Honor.

11:19:59    25            MR. SOTOS:  I didn't ask that.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 93 of 278 PageID #:43737
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3069

```
 1              THE COURT:  Overruled.
 2   BY MR. SOTOS:
 3   Q.  Who were you asking for help?
 4   A.  Well, I asked, personally, maybe Jane Raley, Karen Daniel.
11:20:13  5   Anybody who can find a file and my own records with FOIA.
 6   Q.  And did any of them -- did anybody ever tell you, the
 7   people that you asked --
 8              MR. LOEVY:  Objection.  Hearsay.
 9              MR. SOTOS:  Just in terms --
11:20:24 10              THE COURT:  I didn't hear the question.
11   BY MR. SOTOS:
12   Q.  Did the people that you were talking to tell you that they
13   were continuing to look for a different file after they had
14   given you the Northwestern file --
11:20:34 15              MR. LOEVY:  Your Honor --
16              MR. SOTOS:  -- the Jimenez file?
17              THE COURT:  And the objection?
18              MR. LOEVY:  Hearsay, Your Honor.
19              THE COURT:  Your Honor, I don't think it's really for
11:20:41 20   the truth.  Overruled.
21              MR. LOEVY:  And relevance, Your Honor.
22              THE COURT:  Overruled.
23   BY THE WITNESS:
24   A.  No, nobody told me.
11:20:46 25   BY MR. SOTOS:
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 94 of 278 PageID #:43738
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3070

1  Q.  That they were still looking for another file?

2  A.  No.

3  Q.  All right.  But you continued to look?

4  A.  No.

11:20:52  5  Q.  You stopped looking, too?

6  A.  I only had 2 years that I looked at, '88 and '89.

7  Q.  Okay.  So because that's the years you think that this

8  other incident occurred?

9  A.  Those are the years that I knew occurred -- should've

11:21:07  10  occurred.

11  Q.  And so this is what I want to get to, so you testified

12  earlier that you got this chronology.  So you handed me a

13  document that's been marked as Defendants' Exhibit number 230.

14  And that's a document that you, in fact, have written all over,

11:21:25  15  correct?

16  A.  Yes.

17  Q.  Okay.

18         MR. SOTOS:  Your Honor, we would move to admit

19  Defendants' Exhibit 230 at this time.

11:21:32  20         MR. LOEVY:  We would object to relevance, Your Honor.

21         THE COURT:  Overruled.  I will receive it.

22         (Defendants' Exhibit 230 was received in

23         evidence)

24         MR. SOTOS:  Okay.  May I publish, Judge?

11:21:41  25         THE COURT:  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 95 of 278 PageID #:43739
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3071

1    BY MR. SOTOS:

2    Q.  So I'm going to show you the first page of the document.

3    This is a document that you received from the Chicago Police

4    Department, is that correct?

5    A.  No, you can get that off the website by just going for the

6    Chicago Police Annual Report which will give you a summary.

7    Q.  Okay.  And you got a "42" up the upper left-hand corner.

8    What is that?

9    A.  I believe for that year there were 42 homicides in the 14th

10   District.

11   Q.  Okay.  So to try to move through this quickly.  At the

12   bottom you write, "Report 130 homicide listed 129," correct?

13   A.  Right.

14   Q.  All right.  And that's what you testified to in response to

15   Mr. Bowman, that there was one missing file, right?

16   A.  That's always been a question in my mind, why would there

17   be 130 names but the police department only said there were 129

18   total homicides in Area 5.  And maybe it's not important, but I

19   just never, in my own mind, could understand why there was a

20   difference of one.

21   Q.  So what is the report that says there were 130 homicides?

22   A.  If you go further on, you'll find the names of homicide

23   victims that were returned to me from one of my FOIA requests.

24   One of the only things I got back from Chicago.

25   Q.  Okay.  And that actually was attached to the same exhibit,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 96 of 278 PageID #:43740
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3072

1    and that is this page (indicating).  This is the first page,

2    those, right?  These are homicide victims from 1989?

3    A.  Correct.

4    Q.  Correct?

11:23:38    5    A.  Yes.  Reported by the police department.

6    Q.  And then some other ones, correct?

7    A.  Right.

8    Q.  And then there's another one.  So you counted up a total of

9    129, is that right?

11:23:57    10    A.  No, from those pages there's 130 names.

11    Q.  130 on these pages.  And so where does the 129 number come

12    from?

13    A.  If you go back to the police summary for districts, you'll

14    find it's broken down in areas.  In the 14th, 15th, 16th, 17th,

11:24:14    15    and 25th districts total 129 homicides.

16    Q.  Okay.  That's this document that was part of the --

17    A.  Right.  You'll see 14th, 15th, 16th, and so on, lists the

18    number of homicides, as the police report for that year coming

19    out to only 129, where there's 130 names.  Maybe it's not

11:24:36    20    important, I don't know.  Maybe I'm misreading it.

21    Q.  By the way, you've never shared this document with anybody

22    prior to you giving it to me this morning?

23    A.  No.

24    Q.  Okay.  So correct me if I'm missing something, and I just

11:24:52    25    read it, but you said there's 130 names, 130 names that are

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 97 of 278 PageID #:43741
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3073

1   listed in these three pages?

2   A.  That's the police listing them, it comes out to 130.

3   Q.  But this report says there's 129.

4   A.  Right.  And that's a summary for the same year.

11:25:13   5   Q.  So there's more names listed than --

6   A.  No, which is --

7   Q.  -- than the index?  It's the opposite?

8   A.  Yeah.  That's why I don't understand it.

9   Q.  But you -- so if had this list, you could go through all

11:25:28   10   130 cases and then find out whether one of these is the case

11   that's just like the Jimenez case?

12   A.  I tried to do that.

13   Q.  You went through them all?

14   A.  Well, from looking at it.

11:25:39   15   Q.  Were any of them the case --

16   A.  Only by location.

17        I don't know.  I would have to get the individual

18   files.

19   Q.  You never --

11:25:47   20   A.  Unless I have success getting returns of anything from the

21   Chicago Police Department from my FOIA's.

22   Q.  All right.  And then, just so we're clear, were you

23   attempting to testify on direct examination that because there

24   was a difference between 129 and 130 of the people listed and

11:26:07   25   the index here, that somebody in the City of Chicago police

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 98 of 278 PageID #:43742
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3074

1  department or City itself was trying to hide the other file

2  that the umbrella file that you said that you were involved in?

3  A.  Was that what I was trying to say?  I was trying to

4  understand the difference.  I didn't know what to say.

11:26:29   5  Q.  But you don't think that what you just handed me in any way

6  suggests that anybody who was trying to -- trying to withhold a

7  file from you, right?

8  A.  As I'm not the author of either of those totals, I don't

9  know what it is.

11:26:44  10       MR. LOEVY:  Your Honor, we object.  This topic has

11  been covered scanned.

12       MR. SOTOS:  I'm just about done, Judge.

13       THE COURT:  Overruled.

14  BY MR. SOTOS:

11:26:52  15  Q.  But you would agree with me that you don't have any reason

16  to think that the list of all the people is complete?

17  A.  I don't know what to think.

18  Q.  You don't have any reason to doubt it?

19  A.  No.  No.  I don't know what it means, the difference.  I

11:27:10  20  don't.

21  Q.  You're not trying to say it's incomplete?

22  A.  No.

23  Q.  All right.  So if you wanted to --

24  A.  I'm saying that's what was returned to me per my request

11:27:22  25  for information, because you asked me what attempts did I make

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 99 of 278 PageID #:43743
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3075

1  no find it, that's all.

2  Q.  And you never discussed your list with any of the attorneys

3  here or any other attorneys anywhere --

4          THE COURT:  Definitely asked and answered.

11:27:37  5          MR. SOTOS:  If I could have one minute, Judge.

6          (Brief pause)

7          MR. SOTOS:  I'm done, Judge.  Thank you.

8          THE COURT:  Okay.  Mr. Leinenweber.

9          MR. LEINENWEBER:  One, I promise.

11:27:51  10          THE COURT:  Go ahead.

11                      CROSS EXAMINATION

12  BY MR. LEINENWEBER:

13  Q.  Thanks for your patience, Mr. Dorsch.

14          Just to bring you back to the case we're here for.  I

11:28:04  15  think you said, and you've already said it, you don't really

16  have any memory of the Juan Rivera, your work on the Juan

17  Rivera case, correct?

18  A.  Correct.

19  Q.  And so you have no memory or knowledge of any mistakes or

11:28:15  20  errors made by any of the Chicago police officers in the case,

21  would that be fair to say?

22  A.  Correct.

23  Q.  And I think you were asked by Mr. Bowman, you know, if --

24  if a witness did say to you, "Hey, wrong guy.  Wrong guy," you

11:28:24  25  would remember that and you would have done something about it,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 100 of 278 PageID #:43744
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3076

1    right?

2  A.  You bet.

3  Q.  Okay.  And it wouldn't have been unusual at that time in

4    your work as a police officer, as a detective, for a witness to

11:28:33    5    express fear, correct?

6         MR. LOEVY:  Objection to scope and relevance, Your

7    Honor.

8         MR. LEINENWEBER:  Judge, I think it goes directly

9    to --

11:28:39    10         THE COURT:  You know what?  I can rule on it without

11    help.

12         I'm going to overrule the objection.  It is beyond the

13    scope but we have an issue about that.  Go ahead.

14         MR. LEINENWEBER:  Thanks, Judge.

11:28:46    15  BY MR. LEINENWEBER:

16  Q.  It would've been unusual in your position as a detective

17    when you're dealing to a witness for a witness to express fear,

18    correct?

19  A.  Sure.

11:28:55    20  Q.  And that would be something, I'm assuming, the Chicago

21    police would say, "Don't worry about it, we're going to protect

22    you," is that fair to say?

23  A.  Protect would be -- I would be lying to them if I said we

24    were going to protect them.

11:29:09    25  Q.  You would comfort them, is that fair to say?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 101 of 278 PageID #:43745
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3077

1  A.  Right.  Well, I would try to express the importance of

2  their doing the right thing.

3  Q.  Okay.  And that wouldn't be something you would even note

4  in a report.  I take it witnesses would express trepidation,

11:29:21  5  fear, whatever word, constantly to you right, when you're

6  dealing with them?

7  A.  Well, you would explain that the procedure for a lineup

8  that they were protected by a one-way glass.

9  Q.  Right.  But my question was, if someone did express some

11:29:34  10  anxiety or fear, that's a common occurrence, right?  It happens

11  all right?

12        MR. BOWMAN:  Objection.  Asked and Answered.

13        THE COURT:  Overruled.

14  BY THE WITNESS:

11:29:41  15  A.  Well, it doesn't happen all the time, sir, but it happens

16  on occasion.

17  BY MR. LEINENWEBER:

18  Q.  On occasion.  Okay.

19        And it would happen enough, though, that it's not

11:29:48  20  something you would ever note in a report, correct?

21  A.  I don't think I ever have.

22  Q.  Okay.  And the one last question.  Do you understand that

23  with regard to the umbrella case and the Jimenez case, it's Mr.

24  Mingey's contention that they're the same one; do you

11:30:05  25  understand that?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 102 of 278 PageID #:43746
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3078

1    A.  No, I don't.

2    Q.  Okay.  You very much, sir.  Appreciate your patience.

3              MR. LEINENWEBER:  Thank you, Your Honor.

4              MR. BOWMAN:  Nothing further, Your Honor.

11:30:14   5              THE COURT:  Okay.  Thank you, sir.  You may step down.

6    Watch your step.

7              THE WITNESS:  Thank you, Your Honor.

8         (Witness excused)

9              MR. LOEVY:  At this time, Your Honor, we would call

11:30:22   10   Mr. Victorson.

11             THE COURT:  This is the witness who was not able to

12   come before the plaintiff closed.  So we're reopening the

13   plaintiff's case for this one witness.

14             MR. LOEVY:  Thank you, Your Honor.

11:30:53   15             THE WITNESS DORSCH:  Just want to get my umbrella.

16   Sorry, Your Honor.

17             THE COURT:  No, that's fine.

18        (Brief pause)

19         (Witness enters the courtroom.)

11:31:18   20             THE COURT:  Is this the witness?

21             MR. LOEVY:  I believe that is.

22        Okay.  Is this the witness?

23             THE COURT:  Is this the witness?

24             MR. ART:  Yes, Your Honor.

11:31:21   25             THE COURT:  Okay.  Sir, could you step down here,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 103 of 278 PageID #:43747
6-21-18 (Ex 13)
Victorson - direct by Loevy
3079

1    please.

2              (Brief pause)

3              THE COURT:  Please raise your right hand.

4              (Witness duly sworn.)

11:31:33   5              THE COURT:  You may be seated.

6              LARRY VICTORSON, PLAINTIFF'S WITNESS, SWORN

7                   DIRECT EXAMINATION

8    BY MR. LOEVY:

9    Q.  All right.  Sir, if you would state your name, please.

11:31:48   10   A.  Larry Victorson.

11   Q.  And what do you do for a living, sir?

12   A.  I'm retired.  I'm in New York City.

13   Q.  All right.  You have kids there?

14   A.  Yes, I do.

11:31:55   15   Q.  What did you do before you retired?

16   A.  I was in private practice here in Chicago.  I was a state's

17   attorney here in Chicago.  I was in private practice in El

18   Paso, Texas.  I was a prosecutor in El Paso, Texas.  And for

19   6 months I was with the federal Justice Department in

11:32:13   20   Washington, D.C., Strike Force.

21   Q.  All right.  And how long were you with the Cook County

22   State's Attorney's Office?

23   A.  25 1/2 years.

24   Q.  And one of cases you prosecuted there was the People of

11:32:23   25   Illinois versus Jacques Rivera, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 104 of 278 PageID #:43748
6-21-18 (Ex 13)
Victorson - direct by Loevy

3080

1    A.  Yes.

2    Q.  All right.  And you haven't probably seen Mr. Rivera in

3    more than 30 years?

4    A.  No.

11:32:30    5    Q.  Do you have any recollection at all about the case?

6    A.  Zero.

7    Q.  To prepare for the deposition, I saw you've been given a

8    transcript?

9    A.  Yes.

11:32:38    10    Q.  Do you remember who gave it to you?

11    A.  The -- whoever that is.  Jim Sotos.

12    Q.  And nothing wrong with that.  He was trying to help you

13    remember, which is perfectly normal, right?

14    A.  Yes.

11:32:48    15    Q.  All right.  In reviewing that transcript, does that bring

16    back any memory of the case?

17    A.  No.

18    Q.  All right.  Having reviewed the transcripts, would you

19    agree that as prosecutions go and murder cases go, this was not

11:33:03    20    a particularly strong case for the state?

21    A.  Absolutely not.

22    Q.  You would agree with me?

23    A.  Yeah.

24    Q.  Because it was single-fingered child?

11:33:09    25    A.  It was.  And I'm sure I tried to get rid of it.  I'm sure I

Victorson - direct by Loevy

1    tried to plea bargain the case, but I don't know -- I don't

2    remember exactly what happened.  But I would not voluntarily

3    wanted to try a case like this.

4    Q.  Well, let me understand your answer.  You're saying when

11:33:23    5    you looked at this file, you would've said to yourself, "Boy, I

6    really wish I could make a deal and not have to go through with

7    this," right?

8    A.  Sure.

9    Q.  All right.  Was Ken Wadas a person that you knew and were

11:33:34    10    friends with?

11    A.  He was.

12    Q.  All right.  Was Mr. Wadas willing to take any deal

13    whatsoever to plead guilty?

14    A.  I don't know.

11:33:40    15    Q.  Well, you do know, don't you?

16    A.  No.

17    Q.  You went to trial.

18    A.  Listen, I'd have to see my file.  The file has disappeared,

19    right?

11:33:47    20    Q.  I see.

21    A.  All right.

22    Q.  But the case did go to trial, right?

23    A.  Yes, it did.

24    Q.  So Mr. Wadas accepted no deals, we know that.

11:33:53    25    A.  We know that for sure.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 106 of 278 PageID #:43750
6-21-18 (Ex 13)
Victorson - direct by Loevy

3082

1    Q.  All right.  You were put on a case.  You put on a witness

2    and Israel Valentin to say that his brother had been shot,

3    right?

4    A.  Yes.

11:34:03   5    Q.  Just to establish death.  He wasn't claiming to be an

6    eyewitness.  He just said, "this is my brother.  He's dead"?

7    A.  I don't think I put him on.  I think Mike Christ put him

8    on.

9    Q.  All right.  Usually there's one witness to prove that the

11:34:12   10   victim is dead, right?

11          MR. SOTOS:  Objection. Leading.

12          THE WITNESS:  Yeah.

13          MR. SOTOS:  Objection.  We talked about the leading.

14          THE COURT:  I think this is an adverse witness.  So I

11:34:20   15   will overrule that objection.

16   BY MR. LOEVY:

17   Q.  All right.  Then came Orlando Lopez, the boy who did point

18   his finger at Jacques, correct?

19   A.  I put him on.  I didn't put the first guy on, I don't

11:34:29   20   believe.

21   Q.  Oh, you had a partner, right?  So maybe that was --

22   A.  Mike Christ.

23   Q.  And he is no longer with us?  He's deceased, I think or --

24   A.  No, he's not.

11:34:36   25   Q.  All right.  My mistake.  I apologize to Mr. Christ.  I got

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 107 of 278 PageID #:43751
6-21-18 (Ex 13)
Victorson - direct by Loevy
3083

1   confused.  I'm glad to hear he's doing well.

2        But he was -- who was the lead, you or Mr. Christ?

3   A.  I was.

4   Q.  All right.  And then basically you put on -- somebody put

11:34:47   5   you on the kid, there was a stipulation, and then you rested,

6   right?

7   A.  Yeah, I put on the kid.

8   Q.  All right.  Then Jacques' lawyer, Ken Wadas, put in a

9   defense, right?

11:34:56   10   A.  Uh-huh.

11   Q.  He put on Mr. Letrich, who was trying to establish that the

12   victim had identified somebody else, right?

13   A.  Yes, he did.

14   Q.  And you know that because you reviewed the transcript,

11:35:07   15   today, right?

16   A.  Right.

17   Q.  And then you put on Jacques who denied the shooting?

18   A.  Yes.

19   Q.  And Jacques actually testified that he had alibi, didn't

11:35:14   20   he?

21   A.  He did.

22   Q.  All right.  And at the end of your case, you had a choice,

23   whether to end it right there or call a rebuttal, right?

24   A.  Right.

11:35:20   25   Q.  And, by the way, just to be clear about alibi.  He put

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 108 of 278 PageID #:43752
6-21-18 (Ex 13)
Victorson - direct by Loevy

3084

1   himself on, and said, "I wasn't there.  I was home with my

2   family," right?

3   A.  Yes.  And he put in his alibi that he was with these

4   people.  And I figured if he was really with them, he would've

11:35:33   5   called them as witnesses.

6   Q.  And, of course, Mr. Wadas said he had so much respect for

7   you that if he put a witness up there to say, "I remember at

8   3:00 o'clock on a random Saturday where I was," you would've

9   shredded that witness, is that accurate?

11:35:45   10   A.  I don't know.

11   Q.  Well, were you good at what you did?

12   A.  Very.

13   Q.  If someone came in here and claimed to remember on a benign

14   day that they remembered exactly what time it was, even though

11:35:53   15   it was an uneventful day to them, you had a field day with

16   that, right?

17   A.  I don't know.  I would've tried.

18   Q.  All right.  You had a choice when the case ended to put on

19   a rebuttal case, right?

11:36:03   20   A.  Yeah.

21   Q.  And what witness did you put on in rebuttal?

22   A.  I have to -- you can -- who did I put on?  I put on Guevara

23   the cop, right?

24   Q.  Right.

11:36:14   25   A.  Okay.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 109 of 278 PageID #:43753
6-21-18 (Ex 13)
Victorson - direct by Loevy

3085

1        (Counsel conferring.)

2            THE COURT:  The witness answered.  You heard the

3    answer from the witness.

4            MR. LOEVY:  Yeah.

11:36:37   5            THE COURT:  Okay.

6    BY MR. LOEVY:

7    Q.  All right.  What was Guevara called as a witness for?

8    A.  Rebuttal.

9    Q.  Do you remember that he was going to corroborate that the

11:36:43  10    victim saw from behind a gold ponytail, right?

11    A.  In the park, yes.

12    Q.  And I said "victim," I meant witness.

13    A.  He knew him from the park, right.

14    Q.  I'm not asking about he knew him.  I'll get to that.

11:36:51  15    A.  Okay.

16    Q.  The guy claimed to see a gold ponytail, right?

17    A.  Yes -- well, I don't know about a ponytail.  Part of his

18    hair was dyed gold.

19    Q.  All right.  Let's take a look at Mr. Guevara's testimony.

11:37:09  20    This is page 4 of Plaintiff's Exhibit 35.  If we could have the

21    Elmo.

22    A.  Elmo?  Boy oh boy.

23    Q.  This is Mr. Guevara's testimony in rebuttal.  He did put on

24    like a little pigtail dyed in gold, right?

11:37:25  25    A.  Right.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 110 of 278 PageID #:43754
6-21-18 (Ex 13)
Victorson - direct by Loevy
3086

1    Q.  All right.  And that corroborated the kid who also at the

2    trial described that the shooter supposedly had this gold

3    ponytail, right?

4    A.  I think so.

11:37:32    5    Q.  That's good for you as the prosecutor, right?  Now you got

6    some corroboration.

7    A.  Exactly.

8    Q.  Now, there was no police report from back in 1988, 2 years

9    before the trial, that talked about a gold ponytail, correct?

11:37:42    10    A.  I don't know.

11    Q.  All right.  Let me ask you hypothetically, since your

12    memory is, you know -- it's been a long time.

13          Would you have caused some concern if both the kid and

14    Guevara were saying, "Yeah, the shooter had a gold ponytail,"

11:37:54    15    and none of the police reports, none of the notes, nothing that

16    you had said anything about a gold ponytail, would you have

17    inquired about that?

18    A.  Absolutely.

19    Q.  All right.  Would you have asked Mr. Guevara about that?

11:38:04    20    A.  Did I?

21    Q.  You don't remember if you did, but would you have?

22    A.  Whatever I did, I would've done.  I did what I would've

23    done.

24    Q.  And you obviously had to learn from Guevara somehow that he

11:38:18    25    was claiming to remember that Jacques had a gold ponytail

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 111 of 278 PageID #:43755
6-21-18 (Ex 13)
Victorson - direct by Loevy
3087

1    right?

2    A.  If it wasn't in the police reports, I guess I did learn it

3    that way.

4    Q.  All right.  So you would've been discussing this with

11:38:32    5    Guevara before you put him on the witness stand, right?

6    A.  Yes.

7    Q.  Now, did you coach the kid to say that he had a gold

8    ponytail?

9    A.  I didn't coach anybody.  I told him to tell the truth.  I

11:38:46   10    didn't coach anybody.

11    Q.  And I didn't mean to --

12    A.  I'm sure you didn't.

13    Q.  What I'm saying is, when that kid got to you --

14    A.  Uh-huh.

11:38:50   15    Q.  -- was he already saying "gold ponytail"?

16    A.  I'm sure he was.

17    Q.  That's what I'm asking.  So you were not the one who helped

18    him remember gold ponytail?

19    A.  No, I didn't.

11:39:00   20    Q.  Do you know how the kid got to court that day?

21    A.  No idea.

22    Q.  It was not uncommon to have members of the Chicago Police

23    Department to participate in preparing witnesses, correct?

24    A.  Yes, it was.  I never -- I didn't have a cop in with me

11:39:20   25    when I prepare a witness, I don't believe.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 112 of 278 PageID #:43756
6-21-18 (Ex 13)
Victorson - direct by Loevy

3088

11:39:28

11:39:40

11:39:55

11:40:04

11:40:17

1    Q.  All right.  You were present for the interview, right?

2    A.  Right.

3    Q.  So, in other words, when the trial is getting ready, you'd

4    speak with the witness without the cops around, right?

5    A.  I believe so.  Normally, yes.

6    Q.  All right.  But have no personal knowledge either way about

7    what was said before the witnesses were brought to you, right?

8    A.  Of course I don't.

9    Q.  All right.  And sometimes the witnesses would get brought

10   to you by Chicago police officers, right?

11   A.  I don't know.  We had our own investigators who would go

12   out and bring them in, Cook County Sheriff's investigators.

13   Q.  So there really would have been no reason for Chicago

14   police officers to be driving the witnesses if you had your own

15   investigators, right?

16   A.  I don't know who brought them and why.  I don't know.

17   Q.  All right.  Well, you're saying that -- but my question

18   was, there would've been no reason for Chicago police officers

19   to have to transport witnesses if you guys had your own

20   transport, right?

21   A.  Right.

22   Q.  All right.  And if Mr. Guevara testified that he did it

23   routinely--he testified on an earlier proceeding, at a

24   deposition--that they would bring witnesses, would you say you

25   didn't know that, or that's not true, or which way --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 113 of 278 PageID #:43757
6-21-18 (Ex 13)
Victorson - direct by Loevy
3089

1   A.  I don't know.

2   Q.  All right.  You said it was a weak case because it was a

3   kid pointing his finger, right?

4           MR. SOTOS:  Objection, Judge.  Asked and answered.

11:40:32   5           THE COURT:  Sustained.

6   BY MR. LOEVY:

7   Q.  You had more than just the kid, though, you also had a

8   Chicago police officer, right?

9   A.  Guevara?

11:40:39   10   Q.  Right.

11   A.  Yes.

12   Q.  And were you intending to vouch for the credibility of the

13   case by putting a Chicago police officer on the stand?

14   A.  I used them in rebuttal, right?

11:40:49   15   Q.  Yes.

16   A.  All right.

17   Q.  Okay.  You said that you also called Guevara -- you also

18   called Guevara to say something about a park, right?

19   A.  The hair.

11:41:02   20   Q.  No; remember you said about the park, too?  Baseball in the

21   park?

22   A.  Yeah.  He saw him play baseball in the park and he knew him

23   because of the hair.

24   Q.  And do you remember that you called Guevara -- this is the

11:41:13   25   same page I showed you before.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 114 of 278 PageID #:43758
6-21-18 (Ex 13)
Victorson - direct by Loevy
3090

```
 1          MR. LOEVY:  And if I could get the next page.  I'm
 2   sorry about that, Anne.
 3   BY MR. LOEVY:
 4   Q.  But you asked Guevara about summer in the park playing
 5   baseball, too, right?
 6   A.  Right.
 7   Q.  And Guevara confirmed that he had seen Jacques in the park,
 8   right?
 9   A.  Yes.
10   Q.  So that also helped your case, right?
11   A.  Yeah.  I guess, yes.
12   Q.  Because the idea was, the kid wouldn't have been believable
13   unless he said, "Maybe I've seen this guy armed," right?
14   A.  I'm not going to say that.
15   Q.  All right.  Showing you the next page, page 5.  What
16   Guevara said was:
17          "... did you ever see the defendant in the park?
18          And Guevara said:
19           " Numerous times."
20           Right?
21   A.  Yes.
22   Q.  All right.  So that also helped corroborate the kid that
23   when the kid was asked, "Hey, you're 13, how do you know this
24   23 year old?  Did you see him in the park?"  And maybe he said,
25   "yeah, yeah, I've seen him in the park," then Guevara
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 115 of 278 PageID #:43759
6-21-18 (Ex 13)
Victorson - direct by Loevy
3091

1    corroborates that?

2    A.  Exactly.

3    Q.  All right.  Did you give the closing argument when it was

4    time to give the closing argument?

11:42:14   5    A.  I'm sure I did.

6    Q.  Well, you waived it, sir.  Isn't that a little unusual?

7    A.  No.  It's a bench trial?

8    Q.  Yes.

9    A.  Is that unusual?  No.

11:42:25   10   Q.  But you did waive closing argument?

11   A.  I didn't speak in closing argument?

12   Q.  That's what I'm telling you.  I'll show you.  This is page

13   15 of the criminal trial.

14   A.  Didn't I say just:  Just briefly, this, that, and the

11:42:35   15   other?

16   Q.  Here's how it ended here:

17          "... at this time we would rest our

18          surrebuttal."

19          And then the court asked for an identification,

11:42:39   20         and you said:

21         "We waive opening argument."

22   A.  Exactly.  I made a closing argument.

23         Wait a minute.  Did I make closing argument?

24   Q.  You did.

11:42:48   25   A.  Okay.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 116 of 278 PageID #:43760
6-21-18 (Ex 13)
Victorson - direct by Loevy

3092

1    Q.  And it was about from page 21 to 22, it was about 12 lines

2    here.

3    A.  Maybe -- maybe less.

4    Q.  This is your closing argument here.  It starts about --

11:42:58    5    let's see if I can find where it is.

6           Oh, here.  I apologize, it was longer.  It starts at

7    the top of page 21.  You said, We got the Humboldt Park, he got

8    impeached, and then continue on the next page.  A little more

9    than a page of closing, right?

11:43:17    10    A.  Right.

11           MR. DAFFADA:  Objection, Judge.  There's no question

12    asked.

13           MR. LOEVY:  A little more than closing, a page of

14    closing.

11:43:19    15           THE COURT:  Wait.  Wait.  I can't hear you.  Say

16    again.

17           MR. DAFFADA:  He is not asking a question.  He's

18    testifying.

19           THE COURT:  Well, he's allowed to lead and I don't

11:43:29    20    think that is improper.

21           MR. DAFFADA:  There is no question.

22           MR. LOEVY:  A little more than a page of closing

23    argument, was the question, Your Honor.

24           THE COURT:  Well, you know, maybe part of the problem

11:43:38    25    is you're going so fast.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 117 of 278 PageID #:43761
6-21-18 (Ex 13)
Victorson - direct by Loevy
3093

1    MR. LOEVY:  All right.  I am trying to be respectful

2    of the time.  I will slow down.

3    THE COURT:  Well, that's great, but we need to hear

4    and understand.

5    MR. LOEVY:  Very good.  I will slow down.

6    BY MR. LOEVY:

7    Q.  Mr. Wadas fought vigorously, did he not?

8    A.  Fought vigorously.

9    Q.  In other words, you and him were friends and courtroom

10   adversaries, right?

11   A.  Right.

12   Q.  And you were in the same office together for at least some

13   period of time?

14   A.  Absolutely.

15   Q.  "Absolutely"?  Yes, right?

16   A.  Yes.

17   Q.  All right.  And you knew him to be a good attorney, I take

18   it?

19   A.  Yes.

20   Q.  He was a diligent attorney, was he not?

21   MR. SOTOS:  Objection, Your Honor.  Relevance.

22   MR. LOEVY:  They've asked --

23   THE COURT:  Overruled.

24   BY THE WITNESS:

25   A.  From what I know, sure.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 118 of 278 PageID #:43762
6-21-18 (Ex 13)
Victorson - direct by Loevy
3094

BY MR. LOEVY:

Q.  And he was very passionate in his Defense of Jacques
Rivera, wasn't he?

A.  Yes.

Q.  In fact, he put on more witnesses than you did, didn't he?

A.  I guess he did.

Q.  And he actually put on a surrebuttal case, didn't he?

        Do you remember from the transcript?

A.  If you say he did, he did.

Q.  Do you remember from reading the transcript this morning
that he put on --

A.  No, no.  Tell me who the witness is and what he said and
I'll tell you.

Q.  He brought in after the gold ponytail thing came up, he
went out and found Rivera's a pastor named --

A.  Yes.  Yes.  Yes.  After reading the transcript, I do
remember this.

Q.  And he called another guy, and they both said, "What are
you talking about?  There's no gold ponytail on this guy"?

A.  Yeah.

Q.  All right.  And, in fact, there was no pictures or
photographs or reports about a gold ponytail.

A.  I think there was a picture.

Q.  Do you remember a picture of a gold ponytail?

A.  I don't know.  It would be in the transcript.  If there

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 119 of 278 PageID #:43763
6-21-18 (Ex 13)
Victorson - direct by Loevy
3095

1  was, I would've showed it to somebody.  Did I?

2  Q.  Exactly.  If you had such a photo, you would've used it at

3  trial?

4  A.  Right.

11:45:26  5  Q.  All right.  And if you didn't use it at trial, then you

6  didn't have such a photo?

7  A.  Exactly.

8  Q.  All right.  Mr. Rivera was found guilty, correct?

9  A.  He was.

11:45:33  10  Q.  And the judge gave him 80 years?

11  A.  I don't remember that.

12  Q.  All right.  Take a look at page 8 of the sentencing

13  transcript, and page 13.

14      And the part I've highlighted there with a pen, does

11:46:01  15  that refresh your recollection that the judge said he was

16  sentencing him to, "like a caged animal at the Illinois

17  Department of Corrections"?

18  A.  That's what it says.

19  Q.  And it also looks like, the next page, that Mr. Wadas

11:46:16  20  asked, "Can he see his family and say goodbye?"  And the judge

21  wasn't having that either, right?

22  A.  It says there wasn't enough security in the building, I

23  think.  Right.

24  Q.  All right.  Let's back up a little bit.  You reviewed the

11:46:34  25  kid's testimony for what he said, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 120 of 278 PageID #:43764
6-21-18 (Ex 13)
Victorson - direct by Loevy
3096

1   A.  Yes.

2   Q.  And he told a story about having come out of his house.

3   Saw three shots.  Saw the back of a guy.  Ran to the store a

4   half block away.  Talked to the clerk.  The clerk wasn't going

5   to call the police, so he ran back and hid, and saw the next

6   eight shots.  That was the story you put on at trial, right?

7   A.  If that's what it says, yes.

8   Q.  And you had a chance to review that this morning?

9   A.  Yes.  Yes.

10   Q.  All right.  Were you concerned that that story wasn't

11   reflected in the original police reports?

12   A.  If it wasn't reflected in the original police reports, I

13   would've been concerned, so ....

14   Q.  All right.

15   A.  Well, wait a minute.  Did he change -- I don't know.  Yeah,

16   I would've been concerned if I saw in the police reports.  I

17   didn't see it.

18   Q.  All right.  When the kid came to you, and you said you have

19   a protocol where you go in the room and you talk to the kid

20   without anybody else present, right?

21   A.  Uh-huh.

22   Q.  Right?

23   A.  Yes.

24   Q.  Okay.  Was the kid saying he was by the store or was he

25   saying the story he told at trial?

1   A.  I don't know.

2   Q.  Did you coach him to say --

3   A.  I did not coach him.

4   Q.  All right.  So let me ask it very clearly then.  The story

5   he told at trial, was that the same story he told you when you

6   first talked to him?

7           MS. ROSEN:  Objection, Judge.  Foundation.  He says he

8   doesn't remember.

9           THE COURT:  I think we have to hear that from the

10  witness.

11  BY THE WITNESS:

12  A.  I don't remember.

13  BY MR. LOEVY:

14  Q.  All right.  Would you have helped him to change his story?

15  A.  No, I wouldn't.

16  Q.  All right.  Can you infer, then, that the story he told you

17  the first time you met him is the story he told?

18  A.  Yeah.

19  Q.  Did you coach this kid to say --

20  A.  I did not coach him.

21  Q.  All right.  And you don't know either way whether somebody

22  coached him before he met you?

23  A.  I sure don't.

24  Q.  And when you say you would not coach him, is this something

25  you did not do as a prosecutor?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 122 of 278 PageID #:43766
6-21-18 (Ex 13)
Victorson - direct by Loevy
3098

1    A.   Yeah.   I tell them to tell the truth, you know.

2    Q.   And you have no recollection of your conversation with Mr.

3    Lopez?

4    A.   No.

11:48:28   5    Q.   All right.   In deciding to whether to put the kid on -- you

6    know, he was 13 by the time at trial, but he just turned 12 at

7    the time of the incident, right?

8    A.   Right.

9    Q.   Did you put some faith in the Chicago Police Department

11:48:40   10   that they were bringing you a case that was legit?

11              MR. SOTOS:   Objection, Judge.

12              THE COURT:   The basis?

13              MR. SOTOS:   Argumentative.

14              THE COURT:   Overruled.

11:48:41   15              MR. SOTOS:   Bringing a legit case.

16              THE COURT:   Overruled.

17   BY THE WITNESS:

18   A.   I didn't think either way about it.   I mean, the case was

19   approved by Felony Review.   I got it for trial.   I took it as

11:49:04   20   it was.   I had no reason to think the kid was lying to me.   The

21   state's attorney in Felony Review apparently didn't think so

22   either.

23   BY MR. LOEVY:

24   Q.   All right.   But it's a very serious thing to prosecute a

11:49:13   25   guy for murder, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 123 of 278 PageID #:43767
6-21-18 (Ex 13)
Victorson - direct by Loevy
3099

1    A.  Exactly.

2    Q.  And obviously if you had been told about problems in the

3    case, you would've taken those very seriously, right?

4    A.  Sure.

11:49:20    5    Q.  So, for example, if Mr. Guevara had told you, "You know

6    what?  I gotta be straight with you.  There was a point in time

7    where the kid was saying, the wrong guy.  It's not that guy.

8    It's the wrong guy," how would you have reacted to that?

9            MR. SOTOS:  Objection, Your Honor.

11:49:31    10            THE WITNESS:  I would've made --

11            THE COURT:  What's the objection?

12            MR. SOTOS:  No foundation for any conversation between

13    him and Mr. Guevara about that.

14            MR. LOEVY:  We're saying this conversation didn't

11:49:40    15    happen.

16            THE COURT:  Overruled.  Overruled.

17    BY THE WITNESS:

18    A.  It did not happen.  If that conversation would have

19    happened, yes, I would've done something.

11:49:42    20    BY MR. LOEVY:

21    Q.  All right.  But you can infer that you would've had

22    conversations with Guevara, right?

23    A.  Maybe not about that.  He was a rebuttal witness.

24    Q.  All I'm establishing is, you and Guevara would have been

11:49:54    25    talking about the case at some point in time, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 124 of 278 PageID #:43768
6-21-18 (Ex 13)
Victorson - direct by Loevy

3100

1    A.   Absolutely.

2    Q.   And you are 100 percent sure in your mind that he never

3    told you that the kid ever expressed doubts about Jacques

4    Rivera?

11:50:02    5    A.   Without a doubt, I'm sure.

6    Q.   And if you had learned anything about that, you would have

7    had to disclosed that to the defense, correct?

8    A.   I would have done more.  Yes, I would've.

9    Q.   What do you mean?  Not only would you have disclosed it to

11:50:14    10   the defense, what more would you have done?

11   A.   It probably would've been over.

12   Q.   What do you mean?

13   A.   I would have dismissed it, probably.

14   Q.   If Mr. Guevara had shared with you that there had been a

11:50:28    15   first lineup -- you had an understanding that the kid picked

16   out Jacques at a lineup, right, at some point?

17   A.   Yes.

18   Q.   If he had shared with you that there had been a first

19   lineup, where the kid had pointed his finger at a filler and

11:50:41    20   picked the wrong guy, picked a filler before he picked out

21   Jacques in a different lineup, that would've changed your view

22   of the case, too, would've it have?

23   A.   Yes.

24   Q.   In fact, you would had to disclose that immediately to Ken

11:50:54    25   Wadas?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 125 of 278 PageID #:43769
6-21-18 (Ex 13)
Victorson - direct by Loevy
3101

1    A.  Absolutely.

2    Q.  And regardless of -- it sounds like you're not sure if you

3    would've prosecuted.  You might've?  You might not have?

4            MR. SOTOS:  Objection.  He's testifying for him.

11:51:05    5            THE COURT:  I'm sorry, I can't hear you.

6            MR. SOTOS:  He's testifying for him.  He can ask him

7    questions.

8            MR. LOEVY:  It's a leading question, Your Honor.

9            THE COURT:  It's a leading question.  Overruled.

11:51:07    10   BY MR. LOEVY:

11   Q.  You want me to ask it again?

12   A.  Sure.

13   Q.  I thought I was reading your body language that -- well,

14   you tell us.  Mr. Sotos is right.  If you had learned that he

11:51:14    15   had picked out a kid -- that the kid had picked out a filler at

16   a first lineup, he pointed his finger and got the wrong person,

17   and before he picked out Jacques, would you have gone forward

18   with the prosecution maybe?

19           MR. DAFFADA:  Objection.  Asked and answered.

11:51:30    20           THE COURT:  Overruled.

21   BY THE WITNESS:

22   A.  I don't think so.

23   BY MR. LOEVY:

24   Q.  All right.  But at a minimum, you would've disclosed that

11:51:35    25   to Mr. Wadas, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 126 of 278 PageID #:43770
6-21-18 (Ex 13)
Victorson - direct by Loevy

3102

1    A.  Yes.

2    Q.  And why is that?

3    A.  I think it's the rules.

4    Q.  What's that?

11:51:40  5    A.  I think it's under the rules you do that.  It's called

6    Brady.

7    Q.  All right.  And you're being facetious.  That's an

8    important rule, right?  That's an important rule?

9    A.  Yes, it is.

11:51:50  10   Q.  All right.  Do you remember that contemporaneously, even as

11   far back as September 16th, 1988, Mr. Wadas was complaining

12   that there was a first lineup where he wasn't picked, do you

13   remember that?

14   A.  No.

11:52:02  15   Q.  All right.  Showing you the transcript.  This is page 35 --

16   I'm sorry.  Plaintiff's Exhibit 35, page 4.  There was a bond

17   hearing, right?

18   A.  Right.

19        MR. SOTOS:  Judge, objection.  Foundation, whether he

11:52:13  20   was there at a bond hearing.  He wasn't involved a that point.

21        THE COURT:  Well, do we know if Mr. Victorson was

22   there?

23        MR. LOEVY:  I don't know if he was there.  This is in

24   evidence, Your Honor.

11:52:19  25   BY THE WITNESS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 127 of 278 PageID #:43771
6-21-18 (Ex 13)
Victorson - direct by Loevy

3103

1     A.  But I don't know who this is.  He must have been the

2     state's attorney, but I was not there at a bond hearing.

3          MR. LOEVY:  All right.  Well, it is in evidence and

4     I'd like to show him the relevant parts, Your Honor.

11:52:28   5          THE COURT:  Well, if he wasn't there, I don't know

6     what he can tell us.

7     BY MR. LOEVY:

8     Q.  Was it your understanding that Mr. Wadas was making

9     contemporaneous complaints that, "Hey, there was an earlier

11:52:39  10     lineup and my guy got to let go after that"?

11     A.  I never heard that.

12     Q.  All right.  If Mr. Wadas was asking you, "Where are the

13     reports where my client was not picked," you would've taken

14     that seriously, right?

11:52:50  15     A.  Absolutely.

16     Q.  And what would you have done?

17     A.  I would've given him the reports.

18     Q.  Well, you didn't have the reports, right?

19     A.  Exactly.

11:52:59  20     Q.  So how would you have gone about getting them?

21     A.  I didn't know they existed.

22     Q.  All right.  Did you take steps as the prosecutor --

23          MR. LOEVY:  Can I get Plaintiff's Exhibit 1.

24     BY MR. LOEVY:

11:53:09  25     Q.  Did you take steps as a prosecutor to make sure that you

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 128 of 278 PageID #:43772
6-21-18 (Ex 13)
Victorson - direct by Loevy
3104

1  got the stuff that existed?

2  A.  As far as I know I did.

3  Q.  What was your protocol and procedure to do that?

4  A.  Subpoena all reports, all police reports of the case, this,

11:53:19  5  that, and the other.

6  Q.  But you subpoenaed them?

7  A.  Me and my partner.  Someone did.

8  Q.  All right.  So is it 100 percent clear that the Chicago

9  Police Department was under a subpoena obligation to produce

11:53:31  10  all their records in the case?

11        MS. ROSEN:  Objection.  Foundation.

12  BY THE WITNESS:

13  A.  I'm sure they were.

14        THE COURT:  Overruled.

11:53:36  15  BY MR. LOEVY:

16  Q.  And even without a subpoena, just a request should've been

17  enough, right?

18  A.  I don't know.

19  Q.  I'm trying to understand your answer.  If you said --

11:53:46  20  A.  We always did it by subpoenaed.  We didn't call them and

21  say, "Please send us police reports."  We said, "You're ordered

22  to bring us police reports."

23  Q.  All right.  Well, let me show you a motion for discovery.

24  This is Plaintiff's Exhibit 39.  These were -- this is the

11:54:03  25  motion that Mr. Wadas filed in Mr. Rivera's case.  It's already

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 129 of 278 PageID #:43773
6-21-18 (Ex 13)
Victorson - direct by Loevy
3105

1    in evidence.

2    A.  Okay.

3    Q.  All right.  These were filed rather typically, right?

4    A.  Absolutely.

11:54:10    5    Q.  And this is the criminal defense attorney saying to the

6    state, "Hey, give us everything that exists," right?

7    A.  Absolutely.

8    Q.  And you took these motions seriously, right?

9    A.  I do.

11:54:19    10   Q.  Now, you didn't physically walk over to the police

11   department and empty out their files, did you?

12        MR. SOTOS:  Objection, Judge, to the nature of the

13   question.  You didn't walk over to the police department and

14   empty out their files?

11:54:32    15        THE COURT:  Overruled.  But let's try to be more

16   efficient.

17   BY MR. LOEVY:

18   Q.  So what did you do?

19   A.  I issued a subpoena to the police to send us the files.

11:54:41    20   Q.  All right.  Was it typical for you to make requests to the

21   police department?

22   A.  It was.

23   Q.  Some cases you probably didn't send subpoenas, correct?

24   A.  I don't know of any.

11:54:48    25   Q.  All right.  Now I'm going to show you a police report that

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 130 of 278 PageID #:43774
6-21-18 (Ex 13)
Victorson - direct by Loevy

3106

1    was -- you would've reviewed the police reports before you put

2    on the criminal case, right?

3    A.  Yes.

4    Q.  All right.  I'm going to show you page 2 of Plaintiff's

11:55:08    5    Exhibit 1.

6            And can you see it on your screen, sir?

7    A.  Yeah.

8    Q.  This is a report signed by Mr. Guevara and Mr. Gawrys.  And

9    it says in here that the victim picked out your guy, Jose Rios,

11:55:26    10    who is supposedly a/k/a Jacques Rivera; do you see that?

11    A.  Yes.

12    Q.  All right.  Did Mr. Guevara ever tell you, or Mr. Gawrys,

13    or anybody else, that this was inaccurate?

14    A.  No.

11:55:35    15    Q.  If Mr. Guevara had told you, "You know what?  I gotta be

16    frank with you, Mr. Prosecutor, when we told you that the

17    victim picked out the guy you're prosecuting, actually we meant

18    he didn't pick out the guy you're prosecuting," you would've

19    had a Giglio or a Brady obligation to disclose if that was a

11:55:57    20    false report, correct?

21    A.  Yes.

22    Q.  And explain what that means.

23    A.  I would say, "The cop just told me the report is not

24    accurate."

11:56:02    25    Q.  And Mr. Wadas would've been entitled to that information,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 131 of 278 PageID #:43775
6-21-18 (Ex 13)
Victorson - direct by Loevy
3107

1    right?

2    A.   Absolutely.

3    Q.   And then when Mr. Guevara took the stand, Mr. Wadas

4    would've been able to impeach him with, "Mr. Guevara, you just

11:56:13    5    said that, but isn't it true you also wrote a false report,"

6    right?

7    A.   Right.

8    Q.   Right?

9    A.   Yes.

11:56:17    10   Q.   And in a case like that, that's important and material

11   impeachment evidence, would you agree?

12   A.   Sure.

13   Q.   And that never happened.  He never told you that report was

14   false?

11:56:27    15   A.   He never told me that report was false.

16   Q.   And even though you have no memory, how do you know that?

17   A.   Because if he would've, I would've done something about it.

18   I would've told the defense lawyer.

19   Q.   All right.  Do you have any memory about the scenario that

11:56:42    20   Jacques supposedly got picked out by the victim from looking at

21   photo books?

22   A.   I read it in the transcript.

23   Q.   All right.  If you had been told that prior to the gang

24   book identification on August 29th -- do you see that?

11:57:00    25   A.   Yeah.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 132 of 278 PageID #:43776
6-21-18 (Ex 13)
Victorson - direct by Loevy
3108

1   Q.  If you had been told that Guevara had showed photos of

2   Jacques before the kid randomly went through the book and

3   stopped on Jacques' photos, that would've changed your view of

4   the case, right?

11:57:17   5   A.  Yeah.

6   Q.  Because the theory you put on at trial was, "Hey, you

7   should believe Jacques is guilty because this kid was just

8   looking through books and stopped on Jacques' photo," right?

9        MR. SOTOS:  Objection to the leading, Judge.

11:57:30   10        THE COURT:  The leading is fine.  Overruled.

11   BY MR. LOEVY:

12   Q.  So that would've been material if the kid had seen photos

13   of Jacques before the gang book identification, correct?

14   A.  Yes.

11:57:38   15   Q.  And that would've been something you would've disclosed to

16   Mr. Wadas?

17   A.  Yeah.

18   Q.  And Mr. Wadas is a fine attorney.  He could've made good

19   use of that, wouldn't he have?

11:57:48   20   A.  Yes, he's a fine attorney.

21   Q.  He might've impeached Guevara, impeached the child?

22   A.  He would have.

23        MR. SOTOS:  Judge, objection to this witness

24   testifying what Mr. Wadas might have done with anything.

11:57:57   25   There's no foundation for that.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 133 of 278 PageID #:43777
6-21-18 (Ex 13)
Victorson - direct by Loevy
3109

1          THE COURT:  Well, it's already been answered.  When

2     you make the objection when the question is pending, I will be

3     responsive.

4     BY MR. LOEVY:

11:58:09  5     Q.  All right.  Do you recall that Mr. Wadas was asking you,

6     "Mr. Victorson --"

7          He didn't call you "Mr. Victorson."  What did he call

8     you?

9     A.  Mr. Victorson.

11:58:20  10    Q.  All right.  Did Mr. Wadas ask you, "I'm not getting any

11    GPRs.  Where are all the GPRs?  Where are all the reports"?

12    A.  I absolutely don't remember that.

13    Q.  All right.  Mr. Wadas says you told him, "Look, you've got

14    everything that I have"?

11:58:32  15    A.  I did.

16    Q.  And is that something that you would've said if it wasn't

17    true?

18    A.  No.

19    Q.  Would you explain.

11:58:39  20    A.  What?

21    Q.  Can you explain?

22    A.  You want me to explain that?

23    Q.  Yes.

24    A.  I don't lie.  I don't withhold evidence.  That's my

11:58:48  25    explanation.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 134 of 278 PageID #:43778
6-21-18 (Ex 13)
Victorson - direct by Loevy

3110

1  Q.  So you have every degree of confidence that whatever you

2  had, you gave to Ken Wadas?

3  A.  100 percent.

4  Q.  And whatever you didn't have, you couldn't give to Ken

11:59:00  5  Wadas?

6  A.  Well, let me think.  That's right.  That's right

7  (laughing).

8  Q.  And Mr. Wadas kept his file all these years, and he says

9  there are missing reports.  Are you the one who didn't give it

11:59:10  10  to him?

11  A.  No.

12  Q.  Was there a phone number for records at the Chicago Police

13  Department that you would call and talk to the clerk?

14  A.  Absolutely.

11:59:31  15  Q.  And what was the clerk's name?

16  A.  I don't know the clerk's name, but it was a 744 number.

17  Q.  All right.  So every trial you would call up the clerk and

18  say, "I need the records for my case," right?

19  A.  Yeah.  And we'd also issue a subpoena, too.  Do it by phone

11:59:44  20  and issue --

21  Q.  There were times when you felt like you weren't getting all

22  the investigative materials, right?

23  A.  Never.

24  Q.  All right.  This is your deposition.  Remember giving a

11:59:53  25  deposition in this case?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 135 of 278 PageID #:43779
6-21-18 (Ex 13)
Victorson - direct by Loevy

3111

```
 1    A.  Sure.
 2    Q.  This is page 65, lines 15, through 66, lines 2:
 3             "Question:  If you had called Ms. Hudson to ask
 4             for an investigative file regarding a homicide
 5             in 1988, and that file that you received did not
 6             contain any GPRs, you would have called Ms.
 7             Hudson and asked for them, is that correct?
 8             "Answer:  No.  Call the area, call the detective
 9             area.
10             "Question:  I see.  And can you tell us how that
11             process would work?
12             "Answer:  I would call the detective who is
13             involved in the case and say, I need your GPRs
14             in the case, do you have them?"
15             Did you give those answers?.
16             MR. SOTOS:  Objection, Judge.  There's nothing
17    impeaching about that.
18             THE COURT:  Overruled.
19    BY MR. LOEVY:
20    Q.  Did you give those answers?
21    A.  Does it say I did?
22    Q.  Yes, it does.
23    A.  Then I did.
24    Q.  But you know that I have to ask that because you're an
25    attorney.  You impeach people, too, right?
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 136 of 278 PageID #:43780
6-21-18 (Ex 13)
Victorson - direct by Loevy

3112

1    A.  Just like you.

2          MR. SOTOS:  Objection, Judge.  He wasn't impeached in

3    any way.

4          MR. LOEVY:  That objection was ruled on, Your Honor.

12:00:50    5          THE COURT:  I can go back and figure this out, but --

6          MR. LOEVY:  Let me ask another question.

7          THE COURT:  Yeah.  Go ahead.  I don't think it's a

8    good use of our time.

9    BY MR. LOEVY:

12:01:00   10    Q.  There were times when you'd get the file and you say, "You

11    know what?  There's some GPRs, I don't think I got all the

12    GPRs."  You'd call the detectives and say, "Hey, I want all the

13    GPR's," right?

14    A.  If I knew there were GPRs, absolutely, yes.

12:01:10   15    Q.  All right.  So that would happen from time to time?

16    A.  I'm sure it did.

17    Q.  All right.  In this case, if Mr. Wadas was telling you, "I

18    got zero GPRs, I got no GPRs," you're sure you would've called

19    up and made inquiries, right?

12:01:26   20    A.  If he said, "Hey, there's GPR's here ..."

21    Q.  No, I said there's no GPRs.  Sorry to interrupt you.  He

22    said, "got no GPRs."

23    A.  If he would have said to me, "I have no GPRs, but there are

24    GPRs, call the area," I would've called the area.

12:01:38   25    Q.  What if he was saying, "I got no GPRs, I have no idea if

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 137 of 278 PageID #:43781
6-21-18 (Ex 13)
Victorson - direct by Loevy
3113

1   there's GPRs because I wasn't part of the investigation, all I

2   know is, I got no GPRs."

3   A.  I would've called the area.

4   Q.  All right.  And would you have satisfied yourself that you

12:01:54   5   had exhausted the efforts?

6   A.  Yeah.  If they'd told me there are no GPRs, I wouldn't go

7   there and search myself.

8   Q.  All right.  But it was your job, not Mr. Wadas's job, to

9   make sure the police department was on adequate notice that you

12:02:03   10   needed their records, right?

11   A.  Absolutely.

12   Q.  Did Mr. Wadas have a right to rely on you to do that job?

13   A.  Sure did.

14   Q.  Did you take that responsibility seriously?

12:02:11   15   A.  Yes.

16   Q.  Would it have been diligent of Mr. Wadas to take your word

17   for it that you had exhausted the efforts to get the GPRs?

18   A.  Absolutely.

19        MR. SOTOS:  Objection, Judge, this witness commenting

12:02:27   20   on another's diligence.  Not disclosed for that purpose.

21        THE COURT:  Sustained.

22   BY MR. LOEVY:

23   Q.  From the context of your interactions with Mr. Wadas -- and

24   you had experience with the criminal justice system, correct?

12:02:39   25   A.  I did, yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 138 of 278 PageID #:43782
6-21-18 (Ex 13)
Victorson - direct by Loevy
3114

1    Q.  And with a criminal defense attorney, too?

2    A.  Yes.

3    Q.  All right.  Was it diligent for a criminal defense attorney

4    to rely on what a prosecutor is telling them or does the

12:02:52    5    criminal defense attorney have to assume --

6                MR. SOTOS:  Objection.

7                MR. LOEVY:  -- that the prosecutor is lying?

8                THE COURT:  I think that this ultimate issue is for

9    the jury.  So you can get the facts you need, but let's not do

12:03:03    10   legal conclusions.

11               MR. LOEVY:  All right.

12   BY MR. LOEVY:

13   Q.  You would not have proceeded with this prosecution unless

14   you believed that the police department had given you all the

12:03:11    15   documents, right?

16   A.  Yes.

17   Q.  And that required a measure of trust on your part, right?

18               MR. DAFFADA:  Objection.  Asked and Answered.

19               THE WITNESS:  On my part?

12:03:20    20              THE COURT:  Sustained.  I think we've been over this.

21               MR. LOEVY:  All right.

22   BY MR. LOEVY:

23   Q.  Was it the practice in the courts for Mr. Wadas, if you

24   told him there's no more documents, to file a motion to hold

12:03:36    25   the police department in the contempt?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 139 of 278 PageID #:43783
6-21-18 (Ex 13)
Victorson - direct by Loevy

3115

1   A.  I don't know.

2   Q.  All right.  That wasn't something that you routinely

3   encountered, right?

4           MR. SOTOS:  Judge, objection.  Asked and answered.

12:03:45  5   BY THE WITNESS:

6   A.  No, it's not.

7           THE COURT:  Overruled.

8   BY MR. LOEVY:

9   Q.  And how about filing a motion.  You know, if Mr. Wadas

12:03:52  10  filed a motion for discovery, you told Mr. Wadas, "Ken, you got

11  everything there is," would it be routine practice that Mr.

12  Wadas would accept your word?

13          MR. DAFFADA:  Objection.  Asked and Answered.

14          THE COURT:  Sustained.

12:04:13  15  BY MR. LOEVY:

16  Q.  You have since learned that this was a wrongful

17  prosecution, correct?

18          MR. SOTOS:  Objection, Judge.  Objection --

19          THE COURT:  Overruled.

12:04:20  20          MR. SOTOS:  -- to the phrase --

21  BY THE WITNESS:

22  A.  I know about this lawsuit, right here (indicating).

23          THE COURT:  Okay, wrongful conviction.

24          MR. SOTOS:  If his point is that he was released and

12:04:30  25  he didn't commit the crime, that's one thing, but asking him

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 140 of 278 PageID #:43784
6-21-18 (Ex 13)
Victorson - direct by Loevy
3116

1    whether he learned it's a wrongful prosecution --

2         THE COURT:  Well, that's why i said --

3         MR. LOEVY:  All right.  Maybe I can clarify.

4         THE COURT:  Rephrase it, yes.

12:04:37   5    BY MR. LOEVY:

6    Q.  Your job as a prosecutor is not just to get convictions,

7    right?

8    A.  Yes.

9    Q.  You want to convict the guilty people and not the not

12:04:45   10   guilty people, right?

11   A.  Yes.

12   Q.  And you have some regret that apparently something went

13   wrong in this process?

14   A.  No, I don't have any regret.  I had nothing to do with it

12:04:55   15   if something did.  I have no regrets.  I did the right thing,

16   period.

17   Q.  You did the right thing with the information you had,

18   right?

19   A.  Yes.

12:05:04   20   Q.  And this was not your fault, was it?

21        MR. SOTOS:  Objection, Judge.

22        THE COURT:  Overruled.

23   BY THE WITNESS:

24   A.  No -- or what's not fault?

12:05:12   25   Q.  All right.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 141 of 278 PageID #:43785
6-21-18 (Ex 13)
Victorson - direct by Loevy
3117

1    A.  But what's not my fault?

2    Q.  It was or wasn't?

3    A.  What -- what are you talking about is not my fault?

4         THE COURT:  Are you withdrawing the question?

12:05:20    5         MR. LOEVY:  Yes, Your Honor.

6         THE COURT:  Okay.  The question is withdrawn.

7         THE WITNESS:  Good idea.

8         THE COURT:  Cross-examination.

9         MR. SOTOS:  Judge, I have quite a bit.  I don't know

12:05:29    10   if you want to break, but --

11         THE COURT:  Okay.  Five after 1:00, ladies and

12   gentlemen.

13         COURT SECURITY OFFICER:  All rise.

14         (The following proceedings were had out of the

12:06:15    15         presence of the jury in open court:)

16         MR. GIVEN:  Judge, I do have a copy, a courtesy copy

17   of the motion that was filed.

18         THE COURT:  Excellent.  Thank very much.

19

20         (Luncheon recess taken from 12:06 o'clock p.m.

21         to 1:05 o'clock p.m.)

22

23

24

25

Victorson - direct by Loevy

0

1                *      *      *      *      *      *      *      *

2

3    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

4         RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

5

6       /s/Blanca I. Lara                    June 20, 2018

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3118

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    JACQUES RIVERA,                      ) No. 12 CV 4428
                                          )
 4              Plaintiff,                 )
                                          )
 5    vs.                                  ) Chicago, Illinois
                                          )
 6    REYNALDO GUEVARA, STEVE GAWRYS,      )
      DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
 7    JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN )
      MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
 8    RUSSELL WEINGART, ESTATE OF ROCCO     )
      RINALDI, CITY OF CHICAGO,            ) June 21, 2018
 9                                         )
                Defendants.                ) 1:06 o'clock p.m.
10
                              VOLUME 13-B
11                  TRANSCRIPT OF PROCEEDINGS - Trial
                  BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                            and a jury

13    APPEARANCES:

14    For the Plaintiff:      LOEVY & LOEVY
                              BY:  MR. JONATHAN I. LOEVY
15                                 MR. STEVEN E. ART
                                   MR. ANAND SWAMINATHAN
16                            311 North Aberdeen Street
                              3rd Floor
17                            Chicago, Illinois  60607

18                            MacARTHUR JUSTICE CENTER
                              Northwestern University School of Law
19                            BY:  LOCKE E. BOWMAN III
                              357 East Chicago Avenue
20                            Chicago, Illinois  60611
                              (312) 503-0844
21

22    Court reporter:             Blanca I. Lara
                              Official Court Reporter
23                            219 South Dearborn Street
                                   Room 2504
24                            Chicago, Illinois 60604
                                 (312) 435-5895
25                            blanca_lara@ilnd.uscourts.gov
```

3119

```
 1    APPEARANCES:   (Continued)

 2

 3    For the Individual        THE SOTOS LAW FIRM
      Defendants:               BY:   MR. JEFFREY N. GIVEN
 4                                    MR. JAMES G. SOTOS
                                      MS. CAROLINE P. GOLDEN
 5                                    MR. JOSEPH POLICK
                                      MR. DAVID A. BRUEGGEN
 6                              550 East Devon Avenue, Suite 150
                                Itasca, Illinois  60143
 7

 8    For the Defendant         ROCK FUSCO & CONNELLY, LLC
      City of Chicago:          BY:   MS. EILEEN E. ROSEN
 9                                    MS. CATHERINE M. BARBER
                                      MS. THERESA B. CARNEY
10                              321 North Clark Street, Suite 2200
                                Chicago, Illinois  60654
11

12    For the Defendant         LEINENWEBER BARONI & DAFFADA, LLC
      Guevara:                  BY:   MR. THOMAS E. LEINENWEBER
13                                    MR. JAMES V. DAFFADA
                                120 North LaSalle Street, Suite 2000
14                              Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

1    (Jury out.  Proceedings heard in open court:)

2         COURT SECURITY OFFICER:  All rise.

3         THE COURT:  Ready?

4         MS. ROSEN:  Judge, just one thing before we put

5    Mr. Hickey on.

6         We discussed the issue about the -- how to deal with

7    the Palmer -- the conclusion of the Palmer litigation.

8         THE COURT:  Yes.

9         MS. ROSEN:  We have reached an agreement.  But for

10   purposes of the record, it's the city's position that they

11   should be allowed to go into the conclusion as we argued in our

12   motions *in limine*.  But for purposes of dealing with it today,

13   we have --

14        THE COURT:  You reached an agreement?

15        MS. ROSEN:  -- crafted the question, and we'll go

16   forward without waiving the city's original --

17        THE COURT:  Okay.

18        MR. SOTOS:  And -- oh, I'm sorry.

19        MS. ROSEN:  -- without waiving the city's original

20   position.

21        THE COURT:  Okay.  That's helpful.

22        Yes?

23        MR. SOTOS:  Judge, normally we would be moving for

24   directed verdict under Rule 50 -- judgment as a matter of law

25   under Rule 50 after the -- Mr. Victorson testified, because we

1    had thought that they were going to close their case after

2    that.

3          But in light of the Court's rulings on scope, I'm not

4    sure that that's still something -- I don't know that their

01:07:26   5    case is ever really closed until all the evidence is in if the

6    Court --

7          THE COURT:  Well, that's an interesting question.  But

8    there aren't going to be any other witnesses called for the

9    plaintiff.

01:07:34   10         MR. LOEVY:  Not --

11         THE COURT:  So unless you're calling witnesses --

12         MR. SOTOS:  We should --

13         THE COURT:  -- because I assume the plaintiffs want

14   to -- is going to want to post some substantive evidence, I

01:07:44   15   think we're done.

16         MS. ROSEN:  Right.

17         MR. SOTOS:  All right.  Then we'll be moving after

18   Mr. Victorson under Rule 50.

19         THE COURT:  Okay.  All right.  We're going to continue

01:07:51   20   with Mr. Victorson, right?

21         MR. SOTOS:  Yes.

22         THE COURT:  And is he here?  Okay.

23         MR. LOEVY:  Mr. Sotos said we're done.  We don't know

24   who their other witnesses are, just so we're clear.

01:07:57   25         MR. SOTOS:  No, no.  We're -- not -- the case isn't

1    done.  But, I mean, usually, you know, we want to move --

2          THE COURT:  Mr. Victorson, you can retake the witness

3    stand.

4      (Witness resumes the stand.)

5          MR. SOTOS:  We want to make a Rule 50 motion, and I'm

6    just --

7          THE COURT:  I understand, but I'm saying that I left

8    the case open for Mr. Victorson.

9          MR. SOTOS:  Right.

10         THE COURT:  It would be nice for us to know who these

11   witnesses are, okay, so we can call this, and you'll know.

12         MR. SOTOS:  We've given them -- given them our

13   witnesses.  Now we're going to add --

14         THE COURT:  Oh, okay.

15         MR. LOEVY:  Oh, I didn't know that was a final list.

16         MS. ROSEN:  No, no, it's not a final --

17         MR. SOTOS:  It's not a final list.  We have to add a

18   couple now as a result of what happened with Mr. Dorsch, but --

19         THE COURT:  Well, I can't -- I can't advise you on

20   what to do with the Rule 50, because I don't know what -- who

21   these witnesses are or what kind of issues they're going to

22   raise or anything.

23         MR. SOTOS:  All right.

24         THE COURT:  But you probably want to make your record,

25   because the Court of Appeals is not as generous with these

```
 1    things as I am, as I'm sure you know.

 2              MR. SOTOS:  Understood, Judge.  Thank you.

 3              THE COURT:  I don't care when you make the motion.

 4    It's mostly because I don't know the rules.

 5       (Discussion off the record.)

 6              THE COURT:  And do we know who is going to examine Mr.

 7    Victorson?  Will it just be you?

 8              MR. SOTOS:  Yes.

 9              THE COURT:  Just you?

10              MR. SOTOS:  Yes, Judge.

11              THE COURT:  Okay.

12              MR. LEINENWEBER:  Judge, I just have, like, two

13    questions.

14              THE COURT:  Okay.  Two of you.  Thank you.

15              MR. SOTOS:  Do you have any questions of

16    Mr. Victorson?

17              MS. ROSEN:  Oh, I'm sorry.  I do not.

18              THE COURT:  Okay.

19              MS. ROSEN:  Not -- well, not at this time.  I suppose

20    something could come up that would change that, but --

21              COURT SECURITY OFFICER:  All rise.

22       (Jury in.)

23              THE COURT:  Please be seated, everyone.

24              Mr. Sotos.

25              MR. SOTOS:  Thank you, Your Honor.
```

01:08:51 (line 5)
01:09:13 (line 10)
01:09:19 (line 15)
01:09:24 (line 20)
01:09:59 (line 25)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 149 of 278 PageID #:43793
6-21-18 (Ex 13)
Victorson - cross by Sotos

3124

1    LARRY VICTORSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

2                CROSS-EXAMINATION

3  BY MR. SOTOS:

4  Q.  Good afternoon, Mr. Victorson.

01:10:01    5  A.  Good afternoon.

6  Q.  I know -- we know you have to be someplace.  We'll do our

7  best to get you out of here as quickly as possible.

8  A.  I canceled that appointment.

9  Q.  Oh, I'm sorry you had to --

01:10:12  10       THE COURT:  Sorry about that.

11  BY MR. SOTOS:

12  Q.  All right.  Let's get to it, then.

13       So during the direct examination, Mr. Loevy asked you

14  whether or not the police brought you a weak case.  And you

01:10:23  15  said something about Felony Review, correct?

16  A.  Right.

17  Q.  Could you explain to the jury what that Felony Review

18  process is?

19  A.  Before this case was approved for -- to be sent to the

01:10:34  20  trial courts -- to the State's Attorney's Office for trial,

21  there's something called Felony Review.  And it's an assistant

22  who is on call and especially for murders, armed robberies,

23  rapes, that type of stuff.

24       Before they charge a case, before it's approved for

01:10:51  25  trial, the felony assistant goes out, talks to the police

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 150 of 278 PageID #:43794
6-21-18 (Ex 13)
Victorson - cross by Sotos

3125

1  officers, talks to the witness, talks to the defendant, if the

2  defendant is willing to talk, then makes a decision and, I

3  guess, whether to approve the case or not, and probably calls

4  the supervisor of Felony Review to run that decision by the

01:11:10   5  supervisor.

6  Q.  So it's your --

7        MR. LOEVY:  Your Honor, we move to strike that.  We

8  already heard from Ms. Rosner about Felony Review.

9        THE COURT:  Well, I think unless we're going to do

01:11:20   10  something different from what Ms. Rosner's done --

11        MR. SOTOS:  I was just following up on what he

12  elicited from him on direct.  That's it.  We're not going to go

13  anymore into Felony Review.

14        THE COURT:  Okay.  Because -- because it is

01:11:23   15  repetitive.

16        MR. SOTOS:  Of course.  We're moving right -- right

17  beyond that.

18  BY MR. SOTOS:

19  Q.  So the point here is that when you got the case, it had

01:11:30   20  already been approved by the Felony Review Division?

21  A.  Correct.

22  Q.  Okay.  And so once you get the case, in terms of whether

23  it's a weak case or a strong case or somewhere in the middle,

24  the decision about whether to go forward with that case is a

01:11:49   25  decision that's made by the State's Attorney's Office, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 151 of 278 PageID #:43795
6-21-18 (Ex 13)
Victorson - cross by Sotos

3126

        1              MR. LOEVY:  Your Honor, leading.  Objection, leading.
        2              THE COURT:  Sustained.
        3    BY MR. SOTOS:
        4    Q.  So who -- who makes the decision whether or not to go
01:12:00  5    forward with a prosecution?
        6    A.  The State's Attorney's Office.
        7    Q.  Okay.  And does that apply whether the case is weak,
        8    strong, or somewhere in the middle?
        9    A.  Yes.
01:12:13 10              MR. SOTOS:  And -- and, Your Honor, I thought that the
       11    rule on leading was that --
       12              THE COURT:  The rule on leading --
       13              MR. SOTOS:  -- if they called the witness that --
       14              THE COURT:  No.  Let me make it clear, because I think
01:12:21 15    I did, but if I didn't, the rule on leading is that I'm not
       16    going to find anybody adverse to one side or the other unless I
       17    have a foundation in advance before we get into this process.
       18              MR. SOTOS:  Understood, Judge.
       19              THE COURT:  So this is your witness, and so you
01:12:37 20    wouldn't lead but --
       21              MR. SOTOS:  Okay.
       22              THE COURT:  No, no, I'm sorry.  Plaintiff called this
       23    witness.
       24              MR. SOTOS:  Plaintiff called the witness, Judge.  I
01:12:44 25    thought --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 152 of 278 PageID #:43796
6-21-18 (Ex 13)
Victorson - cross by Sotos

3127

|  | 1 | THE COURT: I'm sorry. My mistake. |
|--|---|-----------------------------------|

```
                      THE COURT:  I'm sorry.  My mistake.

                      No, you may lead.

                      MR. SOTOS:  Okay.  Thank you.

                      THE COURT:  I'm sorry about that.

01:12:49              MR. SOTOS:  That's fine.  Thank you.  I appreciate

          that, Your Honor.

                      THE COURT:  Forgot where we were.

                      MR. SOTOS:  We've got a lot going on in here.

                      THE COURT:  Yeah, we do.

01:12:56  BY MR. SOTOS:

          Q.  So the -- so then that's a decision that's made by your

          office -- regardless of the strength of the case, you have to

          decide whether it's strong enough that your office decides to

          prosecute?

01:13:08  A.  Correct.

          Q.  And so once you get the case, there's a process that occurs

          that's called the discovery process, right?

          A.  Yes.

          Q.  And in this case, you served on -- typically, there's a

01:13:24  motion for discovery that the defendant will file in the case?

          A.  Yes.

          Q.  And then you'll file a response to that?

          A.  Yes.

          Q.  All right.  And I'm going to put up on the screen for you a

01:13:38  document that's in evidence as Defendants' Exhibit 23-L.
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 153 of 278 PageID #:43797
6-21-18 (Ex 13)
Victorson - cross by Sotos
3128

1        And I'm going to represent to you that this is an

2    answer to discovery that was filed in Mr. Rivera's case

3    during -- during the pretrial phase of the case.  It's kind of

4    small.  I don't know if we can get that -- I don't think we

01:14:07    5    really need to.

6        Just to move it along, do you see all of the names

7    that are under No. 2?

8    A.  Yes.

9    Q.  Can you see them?

01:14:13    10    A.  Yes.

11    Q.  All right.  There's a number of individuals, including the

12    witness, Orlando Lopez, correct?

13    A.  Yes.

14    Q.  Several hospital personnel?

01:14:24    15    A.  Yes.

16        MR. LOEVY:  Your Honor, we object.  It's been shown to

17    Mr. Wadas and read to -- by the defense to Mr. Wadas, too.

18    This is cumulative.  We should go to new areas.

19        THE COURT:  Overruled.  I don't know where we're going

01:14:38    20    with this.

21    BY MR. SOTOS:

22    Q.  And several police officers, correct?

23    A.  Correct.

24    Q.  All right.  Mr. Loevy asked you a number of questions

01:14:43    25    during direct examination about what Mr. Wadas did during the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 154 of 278 PageID #:43798
6-21-18 (Ex 13)
Victorson - cross by Sotos

3129

```
 1  case.
 2          Do you know whether he interviewed the people on that
 3  list or any of the people on the list?
 4  A.  No, I don't.
 5          MR. LOEVY:  Objection, foundation, Your Honor.
 6          THE COURT:  Overruled.
 7  BY MR. SOTOS:
 8  Q.  You don't know one way or the other?
 9  A.  I do not know.
10  Q.  And if he didn't, you don't know why that would be, right?
11          MR. LOEVY:  Same objection, Your Honor.
12  BY THE WITNESS:
13  A.  No.
14          THE COURT:  Overruled.
15  BY MR. SOTOS:
16  Q.  And the purpose of providing this information to the
17  defense is so that the defendants have information -- that the
18  defendant's lawyer has information that he can follow up on if
19  he feels that any of its worth following up on, correct?
20  A.  Yes.
21  Q.  And the discovery process doesn't just involve the answer
22  that you filed to the motion for discovery, correct?
23  A.  No, it's a continuing duty.
24  Q.  It's an ongoing process?
25  A.  Yes.
```

01:14:52 (line 5)
01:14:56 (line 10)
01:15:05 (line 15)
01:15:17 (line 20)
01:15:30 (line 25)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 155 of 278 PageID #:43799
6-21-18 (Ex 13)
Victorson - cross by Sotos
3130

1    Q.  A lot of back and forth between the prosecution and the

2    defense lawyer?

3    A.  A lot.

4    Q.  Okay.  Is it uncommon for there to be situations in which

01:15:38    5    it takes more than one attempt or two attempts to get all the

6    information that's needed?

7    A.  It's common.

8    Q.  Okay.  So you're trying to get information from police

9    departments?

01:15:48    10   A.  Anywhere we can get it.

11   Q.  Hospitals?

12   A.  Ab -- yes.

13   Q.  Especially in a murder case, right?

14   A.  Yes.

01:15:55    15   Q.  So you're going to be getting medical reports from

16   hospitals and things of that nature?

17   A.  Yes.

18   Q.  Okay.  And aside from the answer to discovery that's filed,

19   there's a number of police reports that are provided to the

01:16:10    20   defendants as well, correct?

21   A.  Yes.

22   Q.  All right.  I'm going to direct your attention to a couple

23   of those.

24        Have you had a chance to look at any -- I know I gave

01:16:18    25   you the -- I gave you the criminal trial transcript this

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 156 of 278 PageID #:43800
6-21-18 (Ex 13)
Victorson - cross by Sotos

3131

1   morning when I first met you outside of court, correct?

2   A.  That's right.

3   Q.  All right.  And have you had a chance to review any police

4   reports beyond that transcript?

01:16:30   5   A.  No.

6   Q.  All right.  So I'm going to show you a couple of documents

7   that were used in the criminal case and ask you a few questions

8   about those.

9       So do you recall Mr. Loevy asking you some questions

01:16:51   10   about if you had known that there was a lineup in which a

11   filler had been identified, would you then have, like, done

12   something different with the case, correct?

13   A.  I'd have told Mr. Wadas for sure.

14   Q.  You would have told him -- pardon me?

01:17:07   15   A.  Mr. Wadas, I would have told the defense --

16   Q.  You would have made sure you let him know if somebody had

17   said that --

18   A.  Yes.

19   Q.  -- Mr. Rivera identified a filler?

01:17:15   20   A.  Yes.

21   Q.  So I'm placing in front of you on the screen Defendants'

22   23-F and ask to turn to the second page.

23       So this is a Supp. Report that the parties agree was

24   in Mr. Wadas' file.  And so if it was in Mr. Wadas' file, you

01:17:39   25   would have had it, too, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 157 of 278 PageID #:43801
6-21-18 (Ex 13)
Victorson - cross by Sotos

3132

1    A.  I better of.

2    Q.  All right.  I'm going to try to move through this quickly

3    so I don't take up too much time with it, but counsel will

4    correct me if -- what it essentially details is a situation two

01:17:52    5    weeks before Mr. Rivera was charged when he was placed into

6    custody along with another individual named Rodriguez, and

7    police attempted to do a lineup and were unable to find a

8    witness.  Do you see --

9    A.  Yes.

01:18:07    10    Q.  Do you see that from your quick review of it?

11    A.  I do.

12         THE COURT REPORTER:  I'm sorry.  I can't hear you.

13    BY THE WITNESS:

14    A.  Yes, I do.  They couldn't find the eyewitness, Lopez.

01:18:15    15    BY MR. SOTOS:

16    Q.  And then after they couldn't find the eyewitness, they

17    decided to try a photo array with the victim who was still --

18    who was still alive in the Cook County Hospital?

19    A.  Right.

01:18:26    20    Q.  And do you see at the bottom of that page where it says,

21    the R/Ds -- and R/Ds stands for reporting detectives, right?

22    A.  Yes.

23    Q.  It says, R/Ds returned to Cook County Hospital with six

24    photos, and then there's an inv. number next to that?

01:18:42    25    A.  Yes.

1    Q.  Do you know what that inv. number stands for?

2    A.  Inventoried those photos under that number.

3    Q.  Okay.  And what does that mean when it says that the photos

4    were inventoried?

01:18:53    5    A.  They put them in an envelope and marked them as the -- the

6    photos that were used for the photo lineup, and they kept them.

7    Q.  All right.  And then if you turn to the next page -- you

8    don't have to turn.  We have to wait for it to get turned here.

9         So do you see where it lists those six individuals?

01:19:20    10   And it says above that that the following is the numerical

11   order and names of the subjects in the photos?

12   A.  I do.

13   Q.  All right.  And with the addresses there, too?

14   A.  Uh-huh, yes.

01:19:31    15   Q.  All right.  So if -- if Mr. Wadas thought it was important

16   enough to follow up on the information in that report, in light

17   of his client having told him that he was in a lineup, he could

18   have interviewed the police officers who were listed on the

19   report, correct?

01:19:48    20   A.  Yes.

21   Q.  And by the way -- well, he also could have interviewed the

22   eyewitness, Mr. Lopez, right?

23        MR. LOEVY:  Your Honor, the only objection we make is

24   that this is a Wasilewski issue, you know, the exact issues.

01:20:02    25        THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 159 of 278 PageID #:43803
6-21-18 (Ex 13)
Victorson - cross by Sotos
3134

01:20:11

01:20:21

01:20:27

01:20:43

01:20:54

```
 1          MR. LOEVY:  Okay.
 2   BY MR. SOTOS:
 3   Q.  He could have interviewed the eyewitness, too, if he wanted
 4   to ask about a prior lineup, correct?
 5   A.  He could have, yes.
 6   Q.  Or had an investigator interview him, either way?
 7   A.  Yes.
 8   Q.  And by the way, he had said something about if he would
 9   have tried to interview the witness, that you would have
10   blocked him in some way.  Is that --
11   A.  I don't --
12   Q.  Is there any truth to that?
13   A.  I don't -- explain that.  I don't know what you're talking
14   about.  Let me hear that.
15   Q.  So if a defense attorney told you that they wanted to
16   interview an eyewitness in a case that you were prosecuting, is
17   that something that you would try and keep from happening?
18   A.  No, no.
19   Q.  Would you facilitate it if they asked you to?
20   A.  No.
21   Q.  So what would be your position on that?
22   A.  Go out and talk to him.  If he wants to talk to you, he'll
23   talk to you.  If he doesn't -- if he doesn't want to talk to
24   you, he doesn't have to.
25   Q.  Basically his call?
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 160 of 278 PageID #:43804
6-21-18 (Ex 13)
Victorson - cross by Sotos

3135

1    A.  Yes.

2    Q.  Okay.  And you see those six people who were listed on that

3    report.  Is there anything, as far as you know, that would have

4    prevented Mr. Wadas from interviewing any of those individuals

01:21:07    5    and asking them whether they were in a lineup?

6    A.  Nothing I would know of.

7            MR. SOTOS:  Can you put Plaintiff's 1 up?

8    BY MR. SOTOS:

9    Q.  So we're going to put in front of you in a second an

01:21:32    10   exhibit that's been entered into evidence as Plaintiff's

11   Exhibit 1.

12            It's a document that Mr. Loevy asked you about during

13   the -- his direct examination?

14   A.  Yes.

01:21:41    15   Q.  And he asked you about the statement on the bottom of that

16   page -- excuse me -- on the second page at the top where it

17   says, "Numerous attempts were made to interview the victim at

18   Cook County Hospital.  R/i's were able to have the victim view

19   the gang photo book where then an identification was made of

01:22:10    20   Jose Rios as the person that shot the victim."

21            Do you see that?

22   A.  I do.

23   Q.  Okay.  Now, you've looked at the trial transcript in the

24   case, correct?

01:22:17    25   A.  I have.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 161 of 278 PageID #:43805
6-21-18 (Ex 13)
Victorson - cross by Sotos

3136

01:22:27

01:22:48

01:22:55

01:23:08

01:23:16

1  Q. And you've testified on direct that this case was a

2  single-witness identification case, correct?

3  A. Yes.

4  Q. So you didn't present any evidence in the criminal

5  prosecution that the victim had ever made an identification?

6  A. Sure, I did. I mean, didn't -- didn't the victim say -- or

7  didn't -- wasn't there testimony someone made an identification

8  of this guy?

9  Q. Yeah. Maybe we're talking past each other.

10         So the eyewitness made an identification of

11  Mr. Rivera, correct?

12  A. Right.

13  Q. And that was basically what the case was that was

14  presented?

15  A. Absolutely.

16  Q. That witness, and then I think the -- the victim's father,

17  Israel Valentin, testified very briefly, right?

18  A. Life and death, right.

19  Q. That's what you saw from reviewing the transcripts?

20  A. Right.

21  Q. All right. So you didn't present any evidence that there

22  was any other identification of Mr. Rivera that was made by the

23  victim or anybody else?

24  A. No. Whatever --

25  Q. So --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 162 of 278 PageID #:43806
6-21-18 (Ex 13)
Victorson - cross by Sotos
3137

1   A.  No.

2   Q.  So the information that's in this report, that didn't in

3   any way impact on Mr. Rivera's conviction?

4   A.  How do I know that?

01:23:27  5   Q.  Well, because you didn't present the evidence of it, right?

6         MR. LOEVY:  Objection, argumentative, Your Honor.

7         THE COURT:  Overruled.

8   BY THE WITNESS:

9   A.  Repeat the question.

01:23:38  10  BY MR. SOTOS:

11  Q.  Okay.  Let me just ask it more simply.

12         Other than the identification that Mr. -- that the

13  eyewitness, Mr. Lopez, made of Mr. Rivera and the brief

14  testimony of the victim's father who described his life and

01:23:56  15  death, you didn't present any other evidence in the case at

16  trial, correct?

17  A.  No.  Right.  Correct.

18  Q.  All right.  Thank you.

19         And when I met you this morning, I gave you a copy of

01:24:09  20  the transcript of the criminal trial, correct?

21  A.  Correct.

22  Q.  And so were you able to review that during the time you

23  were waiting this morning?

24  A.  I did.

01:24:16  25  Q.  Okay.  It was a very short transcript, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 163 of 278 PageID #:43807
6-21-18 (Ex 13)
Victorson - cross by Sotos

3138

1  A.  It was.

2  Q.  And the whole thing is about 80 pages or so?

3  A.  What -- yes.

4  Q.  You didn't count them?

01:24:26  5  A.  No, I didn't.

6  Q.  Okay.  And -- so I'm going to ask you about that trial in a

7  few minutes.

8      Before we get to that, I want to ask you a couple

9  other questions following up about Mr. Loevy's questions about

01:24:47  10  what Mr. Wadas did and your impression of him as an attorney.

11  Okay?

12  A.  Yes.

13  Q.  I'm not asking you for an opinion.  I just want to ask you

14  about some of the things that occurred in the case.

01:24:58  15  A.  Okay.

16  Q.  We've talked about whether he could have interviewed the

17  witness or the police officers or the people in those pictures.

18      Oh, by the way, when the report disclosed that there

19  were photos that had been inventoried of the people in that

01:25:15  20  photo array, that was also something that Mr. Wadas could have

21  gotten rather easily, correct?

22  A.  Yes.

23  Q.  He could have asked you to get them?

24  A.  Yes.

01:25:26  25  Q.  Or could he have just gotten them himself directly?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 164 of 278 PageID #:43808
6-21-18 (Ex 13)
Victorson - cross by Sotos

3139

1   A.  We'd have gotten them and given them to him.

2   Q.  You would have gotten them for him if he thought they were

3   important and wanted them?

4   A.  Yes, or he could have subpoenaed them, but we get them.  We

01:25:39   5   give them.

6   Q.  Okay.  And Mr. Loevy asked you about a motion to -- a

7   motion to hold somebody in contempt.

8        Short -- short of that, if -- if Mr. Wadas had a

9   belief that there was a lineup that occurred before the lineup

01:26:01   10   at which Mr. Rivera was identified and arrested and that -- as

11   Mr. Loevy said, that in that lineup a filler was picked out,

12   would that have been something that would have allowed him to

13   file a motion to suppress his -- his actual identification on

14   the grounds that it was unreliable?

01:26:21   15        MR. LOEVY:  Objection, Your Honor.

16        THE COURT:  What's the objection?

17        MR. LOEVY:  All right.  We'll withdraw it, Your Honor.

18        THE COURT:  Okay.

19        THE WITNESS:  Repeat it.

01:26:30   20   BY MR. SOTOS:

21   Q.  Is that something Mr. Wadas could have done if he thought

22   that there was --

23        THE COURT:  The witness asked you to repeat the

24   question.

01:26:37   25        MR. SOTOS:  Oh, that's going to be tough.  I'd have to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 165 of 278 PageID #:43809
6-21-18 (Ex 13)
Victorson - cross by Sotos

3140

1    remember it.

2      (Laughter.)

3            THE COURT:  I think the court reporter can find it for

4    us.

01:26:40    5            Can you find it for us?

6            THE COURT REPORTER:  Yes, Judge.

7            MR. SOTOS:  Thank you for your help.

8      (The record was read.)

9            MR. LOEVY:  Your Honor, I remember my objection.

01:27:20   10    Vague and confusing.

11            MR. SOTOS:  Completely.  I hated hearing it back.

12      (Laughter.)

13            MR. SOTOS:  Let me ask another question.

14    BY MR. SOTOS:

01:27:28   15    Q.  A motion to suppress an identification is something that a

16    criminal defense lawyer can file during a case, correct?

17    A.  Correct.

18    Q.  So if he believes that an identification that has been made

19    was unreliable, then he can file the motion to suppress and ask

01:27:42   20    the court to suppress the identification?

21    A.  That's right.

22    Q.  One reason to do that would be to say that in a prior

23    lineup, the eyewitness identified somebody other than my

24    client, correct?

01:27:55   25    A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 166 of 278 PageID #:43810
6-21-18 (Ex 13)
Victorson - cross by Sotos

3141

1    Q.  All right.  And there's nothing that would have prevented

2    Mr. Wadas from filing such a motion if he felt that was worth

3    pursuing, correct?

4    A.  Nothing I know of.

01:28:05    5    Q.  Again, focusing on the fact that this was a

6    single-eyewitness case, do you know whether or not Mr. Wadas

7    interviewed the Felony Review assistant who was present at the

8    police station on the night the charges were approved?

9    A.  I have no idea.

01:28:20    10    Q.  And when that process occurs, the Felony Review process we

11    talked about before, is it -- was it your experience that the

12    Felony Review --

13            MR. LOEVY:  Your Honor, I do object.  He doesn't

14    remember, and we already heard from Felony Review.

01:28:36    15            THE COURT:  Again, I need to hear the question.

16    BY MR. SOTOS:

17    Q.  Was it your experience that when a Felony Review Assistant

18    State's Attorney would interview a witness, they would create

19    what are called Felony Review notes of that interaction?

01:28:48    20    A.  Yes.

21            THE COURT:  Overruled.

22    BY MR. SOTOS:

23    Q.  And to the extent that those notes provide a summary of

24    that conversation, that's something that you commonly disclose

01:29:00    25    to criminal defendants' attorneys during criminal prosecutions,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 167 of 278 PageID #:43811
6-21-18 (Ex 13)
Victorson - cross by Sotos
3142

1  correct?

2  A.  Yes.

3  Q.  So those -- we don't have those notes today 30 days

4  later -- 30 years later, but if at the time that your case was

01:29:15  5  ongoing, if Mr. Wadas wanted to review those notes, is that

6  something he could have asked you for?

7  A.  He'd have had -- he'd have had his own copy of them.  We'd

8  have given him a copy of those notes.

9  Q.  Without any hesitation?

01:29:32  10  A.  Without any hesitation.

11  Q.  And if after reviewing those notes he wanted to talk to the

12  Felony Review assistant who was there that night, would your

13  answer for that be the same as for the witnesses?  That's up to

14  him?

01:29:43  15  A.  Let him go out there and talk.

16  Q.  You wouldn't try and interfere with something like that?

17  A.  No, no.

18  Q.  When you reviewed the transcript this morning, did you see

19  that Orlando Lopez was describing a situation in which he saw a

01:29:58  20  shooter, and then he ran to a store, talked to a store owner,

21  and then ran back and still saw the shooter shooting?

22  A.  Yes.

23  Q.  And it looked like a little corner store, right?

24  A.  I didn't see it.

01:30:12  25  Q.  Okay.  You don't whether or not Mr. Wadas went and talked

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 168 of 278 PageID #:43812
6-21-18 (Ex 13)
Victorson - cross by Sotos
3143

1    to the store owner and asked him whether any of those things

2    occurred, right?

3    A.  I do not know.

4    Q.  But nothing would have prevented him from doing that,

5    correct?

6    A.  Nothing.

7    Q.  And let me ask you about that.

8         You did have a chance to review Orlando -- excuse

9    me -- Orlando Lopez's testimony this morning?

10   A.  I did.

11   Q.  All right.  Is it too much to ask you to kind of just

12   briefly review it for the jury or --

13   A.  You want me to read it to the jury?

14   Q.  Well, you don't have to read it.  Let me know if I'm

15   summarizing it correctly.

16        Did he essentially say that he came out of his

17   apartment and then saw someone shooting at the victim; and then

18   he ran down to a store, talked to a store owner, asked him to

19   call the police; and the store owner blew him off, and then he

20   came back out, went into, like, an area where there's an

21   indentation and then saw the final shot or shots?

22   A.  That's correct.

23   Q.  Okay.  And Mr. Loevy asked you questions during direct

24   examination as to -- about whether or not there was information

25   to -- to impeach that story, whether that would have been

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 169 of 278 PageID #:43813
6-21-18 (Ex 13)
Victorson - cross by Sotos

3144

1    something that would have been useful for Mr. Wadas to have,

2    correct?

3    A.  Absolutely.

4    Q.  Okay.  I'm going to direct your attention to page --

01:31:42    5         MR. SOTOS:  And, you know, before I do that, Judge, we

6    would move for the admission of Defendants' Exhibit No. 5,

7    which is the entire transcript of the criminal trial.

8              THE COURT:  Any objection?

9              MR. LOEVY:  Just subject to any motions *in limine*,

01:31:53    10   Your Honor.  No objections.

11             THE COURT:  Subject to any --

12             MR. LOEVY:  Any motions *in limine*.  No objections,

13   though.

14             THE COURT:  Five is received.

01:32:00    15     (Defendants' Exhibit No. 5 received in evidence.)

16   BY MR. SOTOS:

17   Q.  So I'm going to direct you to page -- it says JR1038.

18             You know what, maybe I should just give you a copy so

19   you can do it that way, and then we can put it up on the screen

01:32:22    20   as well.

21             So I'm handing you Defendants' Exhibit 5 and ask you

22   to turn to page 1038.

23             MR. LOEVY:  I guess our pages are numbered

24   differently.  Which exhibit are you using, Jim?

01:32:30    25             MR. SOTOS:  What?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 170 of 278 PageID #:43814
6-21-18 (Ex 13)
Victorson - cross by Sotos

3145

1        MR. LOEVY:  Which exhibit number so we can --

2        THE WITNESS:  I don't see any page numbers like that.

3        MR. LOEVY:  Mine don't have page numbers either.

4        MR. SOTOS:  I think we have two different --

01:32:37    5        THE WITNESS:  Up on top, Robert, right?

6   BY MR. SOTOS:

7   Q.  Yes, it's up on top.

8   A.  The little numbers.

9        MR. LOEVY:  Yeah, the same as him.

01:32:44   10   BY THE WITNESS:

11   A.  1038?

12   BY MR. SOTOS:

13   Q.  1038.  So do you see there that Mr. Wadas states that

14   before he calls his next witness, "I believe we will proceed by

01:32:56   15   stipulation and that if Detective Jack Lerner" -- do you know

16   that that's -- name "Lerner" is not typed correctly there?

17   A.  Probably Jack Leonard.

18   Q.  You knew Jack Leonard?

19   A.  Absolutely.

01:33:09   20   Q.  Okay.  So let's say if detective Jack Leonard were called

21   to testify, he would testified that he was one of the

22   investigating officers, that he had occasion to interview

23   Orlando Lopez, and that he prepared a report that he had with

24   Lopez and that his report reads as follows:

01:33:28   25        "After talking to Lopez, Lopez stated to him, not

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 171 of 278 PageID #:43815
6-21-18 (Ex 13)
Victorson - cross by Sotos

3146

01:33:47

1   verbatim but in essence, that Lopez was coming from the store
2   at the corner of Kimball and Cortland.  Lopez observed the
3   copper colored car coming out of the alley.  The vehicle turned
4   eastbound.  Lopez stated that the vehicle contained two male
5   whites.  The male white began to run.  Lopez noticed a gun."
6          And it goes on to the next page to say that he
7   heard -- believes he heard three shots, but they were not very
8   loud and that Lopez indicated that Lopez saw the victim lean
9   forward into the right in the vehicle which victim had been

01:34:05

10  seated.  He said he could not -- he could identify the shooter
11  because he recognized him as someone who played baseball at
12  Humboldt Park and observed him there on a few occasions.
13         Do you see that?
14  A.  I do.

01:34:17

15  Q.  So I'm going to ask you to take a look at Defendants'
16  Exhibit --
17         MR. BRUEGGEN:  23-J.
18  BY MR. SOTOS:
19  Q.  -- Defendants' Exhibit 23-J.

01:34:31

20         MR. SOTOS:  Can we have a -- can you put it up or give
21  me a clean copy?
22         MR. BRUEGGEN:  I'll put it up.
23         MR. SOTOS:  Okay.  And -- okay.  Can we turn to the
24  next page, please?

01:34:52

25  BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 172 of 278 PageID #:43816
6-21-18 (Ex 13)
Victorson - cross by Sotos
3147

1    Q.  So I've placed in front of you Defendants' Exhibit -- what?

2           MR. BRUEGGEN:  23-J.

3    BY MR. SOTOS:

4    Q.  -- 23-J, which is already in evidence.

01:35:03
5           And I'll just represent to you that this is the

6    document that -- to save time, that Detective Leonard was --

7    that was being read into court during the criminal trial.

8           And that's a Chicago Police Department Supplementary

9    Report, correct?

01:35:22
10   A.  Correct.

11   Q.  And so based on what we've read and what this report says,

12   the story that Mr. Lopez was coming from the store at the

13   moment that he heard the shooting, according to this report

14   that was read into evidence at the criminal trial, that's quite

01:35:41
15   a bit different from what Mr. Lopez actually testified to at

16   the criminal trial, correct?

17   A.  How?  I'm not --

18   Q.  Well, I guess what I'm saying is in the criminal trial he

19   said that he first saw the shooting when he came out of the

01:36:00
20   building, right?

21   A.  Right.

22   Q.  And then he ran all the way down to the store, presumably

23   while the shooting's still going on, goes to the store, talks

24   to the store owner, and then comes back, and he's still seeing

01:36:12
25   the shooting, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 173 of 278 PageID #:43817
6-21-18 (Ex 13)
Victorson - cross by Sotos
3148

1   A.  Yes.

2   Q.  So that's -- that's a bit different from what's in the

3   report that I just showed you where it says Lopez was coming

4   from the store when he first saw things, correct?

01:36:25   5   A.  Yeah, I guess so.

6   Q.  And that was information that Mr. Wadas had available to

7   him in the criminal trial, correct?

8   A.  Yes.

9   Q.  And he was able to use it to impeach Mr. Lopez's testimony

01:36:38   10   by basically saying, "Well, this is what he said today at

11   trial, but the story that he told the police was different" --

12   A.  Correct.

13   Q.  -- correct?

14   A.  That's what we stipulated to, right?

01:36:50   15   Q.  That was -- it was actually stipulated by you --

16   A.  Right.

17   Q.  -- because you had the police report that said that?

18   A.  Yes.

19   Q.  So you were asked a number of questions about GPRs.

01:37:06   20       MR. SOTOS:  You can leave that up there.  Yeah, maybe

21   you can find it.

22   BY MR. SOTOS:

23   Q.  And you were asked questions about whether there were or

24   weren't GPRs in the handwritten documents, correct?

01:37:19   25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 174 of 278 PageID #:43818
6-21-18 (Ex 13)
Victorson - cross by Sotos

3149

1  Q.  Okay.  Whether they were in the file.

2       And while they're looking for it, if I told you that

3  there was a GPR that said that the witness was by the store as

4  opposed to coming from the store, in your estimation, does that

01:37:34  5  make any substantial additional difference that could have

6  impeached Mr. Lopez any more than he already was?

7  A.  For what it's worth.

8  Q.  For --

9  A.  For what it's worth.  I mean, he says he saw the shooting.

01:37:48  10  Whether he's coming from the store, going to the store,

11  whatever.  It could -- for what it's worth, it could impeach

12  him a little bit, right?

13  Q.  All right.  So you can -- in terms of impeaching him, is it

14  uncommon in a criminal prosecution where you have witnesses and

01:38:03  15  whether they're prosecution witnesses or defense witnesses,

16  telling stories that vary from stories that they've previously

17  told?

18  A.  Depending on what degree they vary.

19  Q.  But not that unusual, correct?

01:38:17  20  A.  No, little minor things, absolutely not.

21  Q.  And in this case, the judge was able to hear the difference

22  between Lopez's trial story, which is that he saw the shooter,

23  ran to the store, talked to the guy in the store, the store

24  owner blew him off, turned around, came back, ran out, and went

01:38:34  25  and hid in an indentation and then saw the last shots -- the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 175 of 278 PageID #:43819
6-21-18 (Ex 13)
Victorson - cross by Sotos

3150

1    judge was able to hear that story, correct?

2    A.  If he could hear, yes.

3    Q.  And then they were able to hear that he had told Detective

4    Leonard that he was coming back from the store at the first

01:38:52   5    time that he saw any shooting, correct?

6    A.  If -- yeah, if that's what the stipulation said, yes.

7    Q.  And the difference in those two stories, though

8    significant, wasn't enough to convince the court to not convict

9    Mr. Rivera, correct?

01:39:09   10   A.  I wasn't the court, but apparently not.

11   Q.  All right.  But from your perspective as a prosecutor, you

12   put on the story, and he's told another story and he gets

13   impeached with the prior report, you let the evidence go where

14   it goes, and the judge makes the decision?

01:39:27   15   A.  That's right.

16   Q.  You're not going to dismiss the case because a witness who

17   gets on the stand and describes seeing a shooting has

18   previously said something that's different than what he said on

19   the stand?

01:39:38   20   A.  Well, if he said -- if he previously said "I didn't really

21   see the shooting," that would be big.

22   Q.  That -- that would be enough of a difference where you

23   would say, "Oh, wait a minute here.  If this guy is saying he

24   didn't see the shooting, then this is something I have to do

01:39:53   25   something about," correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 176 of 278 PageID #:43820
6-21-18 (Ex 13)
Victorson - cross by Sotos
3151

1    A.  Yes.  Yes.

2    Q.  Okay.  But in a case like this where you have a witness who

3    describes something one way at trial, but there's a police

4    report that says he described it differently before, that's a

01:40:05   5    matter you leave to the trier of fact, correct?

6    A.  Exactly, yes.

7    Q.  And when I say "the trier of fact," I use that phrase

8    because there can be two different trier of facts in a case,

9    right?

01:40:16   10   A.  Yes.

11   Q.  Sometimes it's the jury who is the trier of fact, correct?

12   A.  Correct.

13   Q.  And sometimes it's the judge?

14   A.  That's right.

01:40:23   15   Q.  And when a jury is present like in this case, the judge has

16   a different function in terms of the overall progress of the

17   trial, correct?

18   A.  Correct, yes.

19   Q.  But in a bench trial, the judge is the sole person who's

01:40:39   20   actually making the decision about what he believes, doesn't

21   believe, and what he's deciding should happen?

22   A.  Correct.

23   Q.  Okay.  And in this case, the reason that you were

24   proceeding before a judge was because Mr. Wadas had opted

01:40:53   25   for -- to proceed before a judge rather than a jury, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 177 of 278 PageID #:43821
6-21-18 (Ex 13)
Victorson - cross by Sotos
3152

01:41:08

1  A.  Mr. Wadas, in conjunction with his client, yes, they

2  decide.

3  Q.  Okay.  And did you view that to be a somewhat unusual

4  decision in a case like this?

5  A.  No.

6  Q.  No?

7  A.  No.

8  Q.  Do you remember the sentencing process in this case?

9  A.  I -- just from what I read.

01:41:20

10  Q.  Because after a -- a defendant is convicted, then there's a

11  separate proceeding at which the judge has to set the sentence,

12  correct?

13  A.  Correct, yes.

14  Q.  So whether it's a bench or a jury trial, the judge is the

01:41:35

15  one who sets the sentence?

16  A.  In Illinois, yes.

17  Q.  It's not like that in other places?

18  A.  Not when I was in Texas.  You had a choice.  Jury could do

19  sentencing, a bifurcated trial.

01:41:46

20  Q.  I wasn't aware of that.

21        MR. SOTOS:  Give me one second.

22  BY THE WITNESS:

23  A.  Maybe no longer.

24        MR. SOTOS:  Give me one second.

01:41:53

25  BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 178 of 278 PageID #:43822
6-21-18 (Ex 13)
Victorson - cross by Sotos
3153

1  Q.  Sir, I'm going to place in front you -- I'm going to hand

2  you a document that's been marked as Defendants' Exhibit 23-M.

3  It's a 15-page -- 17-page document, ask you to take a look at

4  it and let me know when --

01:42:16  5  A.  All right.

6  Q.  Let me know when you're done reading.  And tell us what it

7  is.

8  A.  (Examining document.)

9       Well, the first thing is about a motion to revoke

01:43:09  10  bail, and there's another transcript here.

11  Q.  Well, do you see -- do you see the portion of the exhibit

12  that's related to the sentencing?  You want me to direct you --

13  A.  I'm here.  I'm here.  I haven't read it, but it starts on

14  page 2, right?

01:43:23  15  Q.  Well, maybe I can take you through it more quickly.

16  A.  All right.

17  Q.  Do you see that it's a sentencing transcript from the case

18  that -- in which Mr. Rivera was convicted?

19  A.  I see a Report of Proceedings.  I don't know if it's the

01:43:36  20  sentencing transcript, but it's the sentencing -- it was when

21  he was sentenced, I think.

22  Q.  I did give you the right transcript, didn't I?

23  A.  I hope.  Let's see.

24  Q.  I did?

01:43:46  25  A.  I think you did.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 179 of 278 PageID #:43823
6-21-18 (Ex 13)
Victorson - cross by Sotos

3154

1  Q.  Okay.  So that is the sentencing transcript?

2  A.  Yes.

3  Q.  Okay.

4  A.  But it -- it doesn't say it on there, sentencing

01:43:53  5  transcript, right?

6  Q.  I don't know if it actually says that.

7  A.  All right.  It doesn't.

8  Q.  It's a pretty short document, isn't it?

9  A.  It is.

01:44:00  10  Q.  Okay.  Did you see in looking through that -- and the

11  sentencing transcript is the time when the defendant's

12  lawyer -- lawyer can present evidence in relation to how long

13  of a sentence he's going to get for the crime that he's been

14  convicted of, correct?

01:44:15  15  A.  Yep.  Yes, sir.

16  Q.  All right.  And is that a proceeding that typically a

17  defendant will present witnesses on his behalf?

18  A.  Sometimes, yes; sometimes, no.

19  Q.  Do you see that in this case that Mr. Wadas didn't call any

01:44:31  20  family members of Mr. Rivera to testify at the sentencing?

21      MR. LOEVY:  Objection to relevance, Your Honor.

22      THE COURT:  Overruled.

23  BY THE WITNESS:

24  A.  Well, I'll take your word for it.  I mean --

01:44:43  25  BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 180 of 278 PageID #:43824
6-21-18 (Ex 13)
Victorson - cross by Leinenweber
3155

1  Q.  You don't -- you don't see in the transcript that there's

2  any witnesses that were called?

3  A.  I don't.

4  Q.  And that he made a brief argument of about a page?

01:44:56  5  A.  He made an argument.

6  Q.  And then the judge imposed sentence?

7  A.  Yes.

8  Q.  Okay.  Thank you.

9         MR. SOTOS:  One moment.

01:45:08  10    (Counsel conferring.)

11         MR. SOTOS:  Nothing further.  Thank you, Judge.

12         THE COURT:  Mr. Leinenweber?

13         MR. LEINENWEBER:  Very briefly, Judge.  Thank you.

14                    CROSS-EXAMINATION

01:45:18  15  BY MR. LEINENWEBER:

16  Q.  Good afternoon, Mr. Victorson.

17  A.  Good afternoon.

18  Q.  There were, like, some crime scene photos and some pictures

19  from the lineup taken in this case?

01:45:34  20  A.  I guess --

21  Q.  Would those -- would those documents have been given over

22  to Mr. Wadas?

23  A.  Absolutely.

24  Q.  And similarly, if there were Felony Review notes from a

01:45:44  25  Felony Review prosecutor, you would have turned those over to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 181 of 278 PageID #:43825
6-21-18 (Ex 13)
Victorson - cross by Leinenweber
3156

1    Mr. Wadas, too, correct?

2    A.  Absolutely.

3         MR. LOEVY:  Objection, asked and answered, Your Honor.

4         THE COURT:  Overruled.

01:45:52  5    BY MR. LEINENWEBER:

6    Q.  And finally, you had indicated, I think, that by reviewing

7    the transcript that you had called Officer Rey Guevara in

8    rebuttal in the case; is that correct?

9    A.  Correct.

01:46:04  10   Q.  And I think it's been established that Mr. Lopez, the

11   witness, had testified at the trial that he had seen the

12   defendant, Mr. Rivera, playing baseball in Humboldt Park,

13   correct?

14   A.  That's right.

01:46:22  15   Q.  And then in rebuttal, you had -- you had questioned Mr.

16   Guevara, and he said he spent a lot of time himself in Humboldt

17   Park for work, and Mr. Guevara said he also played softball

18   himself in Humboldt Park.  Do you recall that?

19   A.  I do.

01:46:38  20   Q.  And then on cross-examination, Mr. Wadas asked Mr. Guevara

21   and said, "Had you ever seen Mr. Rivera playing softball?"

22        Do you remember that question?

23   A.  I do.

24   Q.  And Officer Guevara said, no, he'd never, ever seen Jacques

01:46:59  25   Rivera playing baseball.  Do you remember that testimony?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 182 of 278 PageID #:43826
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3157

1    A.  He said he had seen him in the park but didn't remember

2    seeing him play baseball, yes.

3            MR. LEINENWEBER:  Thank you very much, sir.  I have no

4    further questions.

01:47:12   5            Thank you, Judge.

6            THE COURT:  Plaintiffs.

7                        REDIRECT EXAMINATION

8    BY MR. LOEVY:

9    Q.  Sir, Mr. Sotos asked you, it was your decision to proceed,

01:47:16  10   right?

11   A.  Yes.

12   Q.  All right.  But you also said you tried not to proceed,

13   right?

14   A.  I did not.

01:47:22  15   Q.  You did not --

16   A.  I did not say that.

17   Q.  All right.  What steps were you -- available to you to not

18   proceed?

19   A.  If I thought there was -- if I thought the guy wasn't

01:47:30  20   guilty or we couldn't prove the case, I would have dismissed it

21   or I would -- I would have dismissed it.

22   Q.  Or you would have tried to get a plea, right?

23   A.  Yeah.

24   Q.  All right.  And that's what you tried to do, right?

01:47:40  25   A.  I don't know.  I don't have the file.  I don't know.  I

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 183 of 278 PageID #:43827
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3158

1    don't remember.

2    Q.  All right.  Did you say this morning that you're quite

3    confident you would have tried to plead this case out?

4    A.  Absolutely.

01:47:49    5    Q.  All right.  You were shown a police report by Mr. Sotos

6    about representing that we tried to have the lineup, but we

7    couldn't find the kid.

8         Do you remember those questions he asked you?

9    A.  I do.

01:48:01    10    Q.  Okay.  That's what the police reports represented to you,

11    right?

12    A.  Right.

13    Q.  Did you rely on those police reports as truthful?

14    A.  Yes.

01:48:08    15    Q.  Was it reasonable of you to take the Chicago police reports

16    as true?

17    A.  Yes.

18    Q.  Was it reasonable of Mr. Wadas to rely on the Chicago

19    police police reports?

01:48:19    20         MR. SOTOS:  Objection, Your Honor, asked and answered.

21         THE COURT:  Overruled.

22    BY THE WITNESS:

23    A.  Yes.

24    BY MR. LOEVY:

01:48:23    25    Q.  All right.  People didn't in your -- in your time in that

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 184 of 278 PageID #:43828
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3159

1  building, people didn't come into the courtroom assuming that

2  police officers were fabricating and writing untrue things,

3  right?

4  A.  Correct.

01:48:31  5  Q.  Did attorneys all the time rely on what was written in

6  police reports?

7  A.  I'm sure they did.

8  Q.  All right.  Did you interview all the people in the lineup

9  to see if this was true or false?

01:48:40  10  A.  No.

11  Q.  Why not?

12  A.  I don't know.

13  Q.  All right.  Did you rely on -- let me ask you this.

14      Was it unreasonable of you not to interview all the

01:48:51  15  lineup people?

16  A.  No.

17  Q.  All right.  Was it unreasonable of Mr. Wadas not to

18  interview all the lineup people?

19      MR. SOTOS:  Objection, Your Honor.

01:48:56  20      THE COURT:  Overruled.

21  BY THE WITNESS:

22  A.  I don't think so.  If you're talking about the mis -- the

23  lineup where the misidentification was?  Which lineup are you

24  talking about?

01:49:05  25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 185 of 278 PageID #:43829
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3160

1   Q.  Well, was it -- did you interview anybody on any lineup?

2   A.  No, I did not.

3   Q.  And the one where the -- supposedly they couldn't find the

4   victim, you didn't interview the people on that lineup either?

01:49:12   5   A.  Not a one of them.

6   Q.  And it was -- it was reasonable for you not to do that?

7   A.  Yes, it was.

8   Q.  And it was reasonable for Mr. Wadas not to do that?

9   A.  Yes, it was.

01:49:19   10   Q.  All right.  This "by the store business," my team has me on

11   a very short leash on this, but I just want to establish a

12   couple quick points.

13          At trial he was coming from the store, right?  That

14   was --

01:49:32   15   A.  I --

16   Q.  -- at least for part of it?

17          In the report, it says "coming from the store."

18   That's what Mr. Sotos read you?

19   A.  Yes.

01:49:39   20   Q.  Now, if you had a contemporaneous note that put him 191

21   feet away at the store, I think you acknowledged to Mr. Sotos,

22   that's some impeachment, right?

23   A.  Yeah, some impeachment.

24   Q.  All right.  Now, in a case where the entire case -- there's

01:49:54   25   no evidence at all except a little boy pointing his finger,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 186 of 278 PageID #:43830
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3161

1   then that impeachment becomes very important, right?

2   A.  It becomes important.

3   Q.  I mean --

4   A.  I don't know very important.

01:50:06   5   Q.  What's that?

6   A.  It becomes important.

7   Q.  All right.  And the reason it's actually very important is

8   because there's literally nothing to convict Jacques Rivera but

9   this kid claiming he wasn't by the store when he saw the

01:50:20  10   shooting, right?

11  A.  What's "by the store" mean?  How many feet?

12  Q.  Well, coming from the -- all right.  I'm past my time.  I'm

13  done.  We're not going to argue about the store anymore.

14     (Laughter.)

01:50:32  15  BY MR. LOEVY:

16  Q.  All right.  At the sentencing, you were -- you were asked

17  about what Mr. Wadas did, right?

18  A.  Yes.

19  Q.  And then showing you page 2 of the same transcript --

01:50:43  20        MR. LOEVY:  If I could have the Elmo, please.

21  BY MR. LOEVY:

22  Q.  -- you -- you didn't do anything at the sentencing

23  saying -- but say, "I'm not going to go over the facts.  You've

24  heard it.  I would just remind the court that this was a

01:50:56  25  shooting, and I believe the nature of the offense, we should

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 187 of 278 PageID #:43831
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3162

1    give him an extended term"?  That's all you said, right?

2    A.  Well, I also said he was shot 10 or 11 times at point --

3    nearly point-blank range while the victim sat in the car.

4    Q.  Right.  I didn't mean to -- I was paraphrasing.

5         But this -- everything you said is between lines 1 and

6    9, right?

7    A.  It is.

8    Q.  All right.  So Mr. Wadas and you obviously had some kind of

9    either implicit or express understanding that you were both

10   going to stand down, right?

11   A.  You're kidding, right?

12   Q.  Sir, you sometimes at sentencing go a lot harder than

13   saying, "Oh, you know, this is a bad shooting.  You know, give

14   him -- give him some years"?  You sometimes go harder than

15   that, right?

16   A.  This is a bench trial.  The judge heard it.

17   Q.  All right.

18   A.  He knows what happened.

19   Q.  All right.  You sometimes go harder than that, right?

20   Never?  Okay.

21   A.  Not --

22   Q.  In any event, if Mr. Wadas would have started calling

23   witnesses, you might have started calling witnesses, right?

24   A.  It would depend on what his witnesses said.

25   Q.  All right.  You don't fault Mr. Wadas for the decisions he

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 188 of 278 PageID #:43832
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3163

1    made in this case, do you?

2            MR. SOTOS:  Objection, Judge.

3            THE COURT:  Overruled.

4    BY THE WITNESS:

01:51:56    5    A.  Listen, I wasn't there when he made whatever decisions he

6    made.  So, no, I don't.

7    BY MR. LOEVY:

8    Q.  All right.  Let's talk about his diligence.

9            Mr. Sotos showed you a list of a whole bunch of people

01:52:10    10    on the list that -- the state discovery, right?

11    A.  Yes.

12    Q.  All right.  Did you interview all those people?

13    A.  Probably not.

14    Q.  All right.  That's a long list, right?

01:52:18    15    A.  Yes, but that's not why -- yes, it's a long list.

16    Q.  All right.  And you had the burden of proof, not Mr. Wadas,

17    right?

18    A.  That's -- yes, yeah.

19    Q.  But you tried to focus on what mattered, right?

01:52:29    20    A.  Right.

21    Q.  All right.  So the stuff that the police report said wasn't

22    as relevant, you didn't focus on that, right?

23    A.  The police report didn't say anything's not relevant.

24    Q.  Well, when you're determining which of the names to look at

01:52:40    25    on Plaintiff's Exhibit 40, where did you decide what was

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 189 of 278 PageID #:43833
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3164

01:52:49

1  relevant?  You either talked to Guevara or you looked at the

2  reports, right?

3  A.  That's right.

4  Q.  The boy didn't know, right?

5  A.  The reports -- I decided who to call because of the

6  reports.

7  Q.  All right.  So you -- you and Mr. Wadas both relied on the

8  police reports to focus on what mattered, right?

9  A.  I did.

01:52:59

10 Q.  All right.

11 A.  I don't know what he did.

12 Q.  Was it unreasonable for him if he did the same thing you

13 did?

14 A.  No.

01:53:02

15         MR. SOTOS:  Objection, Judge, not disclosed for that

16 purpose.

17         THE COURT:  I didn't even hear the answer.

18         MR. SOTOS:  Well --

19         THE COURT:  I just heard an objection.

01:53:09

20         MR. SOTOS:  -- that's why I objected.

21         MR. LOEVY:  Your Honor, the objection was Mr. Sotos

22 did the exact converse.  He kept --

23         THE COURT:  Wait, wait, wait.  Overruled.

24 BY MR. LOEVY:

01:53:15

25 Q.  Okay.  Now, Mr. Sotos asked you, "Hey, all Mr. Wadas had to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 190 of 278 PageID #:43834
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3165

1   do was interview the eyewitness," right?  Remember those

2   questions he was asking you?

3            MR. SOTOS:  Objection, Your Honor.  I don't think I

4   said it that way.

01:53:27  5            THE COURT:  Overruled.

6   BY MR. LOEVY:

7   Q.  Do you remember that line of questioning?

8   A.  No.

9   Q.  All right.  You don't -- Mr. Wadas was in the prosecutor's

01:53:32  10  office for a long time, right?

11  A.  Yes, sir.

12  Q.  All right.  He said that -- and tell me if you agree or

13  disagree -- that, you know what, the prosecutors would try to

14  guard their witnesses, and if at all possible, they preferred

01:53:42  15  that the defense attorneys didn't talk to them.

16            MR. SOTOS:  You know --

17  BY MR. LOEVY:

18  Q.  Was there such a practice?

19            MR. SOTOS:  Objection.  He just made up the testimony.

01:53:50  20  That's not what Mr. Wadas said.

21            MR. LOEVY:  We were all in court, Your Honor.

22            MR. SOTOS:  He said he would have blocked it.

23            THE COURT:  No, no, no.  I don't want any more

24  speaking objections from anybody.

01:53:57  25            And the objection is overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 191 of 278 PageID #:43835
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3166

1      THE WITNESS:  Repeat the question.

2   BY MR. LOEVY:

3   Q.  All right.  Were the prosecutors at the time -- if they had

4   a witness who was an important witness, would they sort of do

01:54:06   5   what they could do to keep the defense attorneys away from that

6   witness?

7   A.  Absolutely not.  We would --

8   Q.  Do you know why -- excuse me.

9   A.  We would tell the witness "You can talk to him if you want

01:54:15   10   to.  You don't have to."

11   Q.  All right.  Maybe I'm focusing on that part.

12      So you made it very clear to the witnesses that they

13   had no obligation to speak to the defense attorney?

14   A.  I have no idea if that came up in this case.

01:54:26   15   Q.  I'm not asking you about this case, because you don't

16   remember this case.

17      I'm saying, isn't it true there was a practice in the

18   State's Attorney's Office at the time, if not today, to

19   strongly encourage prosecution witnesses that, "Hey, you

01:54:37   20   don't -- if Mr. Wadas comes and knocks on your door, you have

21   no obligation to talk to him.  If you slam that door in his

22   face, you're perfectly allowed to do that"?  You tell them

23   that, right?

24   A.  Absolutely not.  I say, "You don't have to talk to him if

01:54:50   25   you don't want to.  Don't slam your door."

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 192 of 278 PageID #:43836
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3167

1    (Laughter.)

2    BY MR. LOEVY:

3    Q.  All right.  The corner store guy, you didn't go interview

4    the guy at the corner store, did you?

01:55:01    5    A.  No.

6    Q.  Was that incompetent of you?

7    A.  I hope not.

8    Q.  All right.  Was it incompetent of Mr. Wadas?

9    A.  I don't know.

01:55:08    10    Q.  You don't think so, do you?

11             MR. SOTOS:  Objection, Judge, asked and answered.

12             THE COURT:  Sustained.

13    BY MR. LOEVY:

14    Q.  All right.  How about filing a motion to suppress, the

01:55:14    15    other question he asked you about, or a motion -- some kind of

16    motion, he could have filed a motion about Orlando Lopez, was

17    the questions he asked you?

18    A.  He could have filed any motion he wanted to.

19    Q.  All right.  What question was Mr. Sotos suggesting --

01:55:25    20    asking you about, do you remember?

21    A.  No.

22    Q.  All right.  Whatever motion it was, was Mr. Wadas

23    incompetent for not filing it?

24             MR. SOTOS:  Objection, Judge, to the opinion.  It's

01:55:33    25    not a --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 193 of 278 PageID #:43837
6-21-18 (Ex 13)
Victorson - recross by Sotos
3168

01:55:47

01:55:55

01:56:01

01:56:09

01:56:18

```
 1              THE COURT:  Sustained.
 2   BY MR. LOEVY:
 3   Q.  All right.  You -- you thought Mr. Wadas fought valiantly
 4   and vigorously and passionately for his client, right?
 5   A.  I thought he tried to represent his client.  I don't know
 6   if it was valiant, vicious, whatever you said.
 7              What's the other word?
 8   Q.  I'll ask another one.
 9              This isn't Mr. Wadas' fault, is it, sir?
10              MR. SOTOS:  Objection, Judge.
11              THE COURT:  Sustained.
12              MR. LOEVY:  The -- all right.  I have no further
13   questions.
14              THE COURT:  Anything further?
15              MR. SOTOS:  Judge, I have -- actually, I have one
16   other area that I neglected to go into.  It's only going to
17   take three, four minutes, at the most.
18              THE COURT:  Go ahead.
19              MR. SOTOS:  Okay.
20              MR. LOEVY:  And we would object if it's outside the
21   scope, Your Honor.
22              THE COURT:  I haven't heard it, but I'm inclined to
23   overrule it if it's going to be brief.
24                        RECROSS-EXAMINATION
25   BY MR. SOTOS:
```

Victorson - redirect by Loevy

3169

1  Q.  When you reviewed the transcript this morning, did you see

2  that an Officer Craig Letrich had also testified for

3  Mr. Rivera?

4  A.  Yes.

01:56:26  5  Q.  Okay.  In relation to a police report that he had prepared

6  that indicated that a man named Rodriguez and a man named

7  Nieves had both been identified by the victim as -- as the

8  shooter or the shooter and the driver?

9  A.  If that's what it says, yes.

01:56:45  10  Q.  Okay.  And so did -- reading the transcript didn't refresh

11  your recollection about that, correct?

12  A.  Oh, no, no.

13  Q.  But you saw that Letrich testified generally to something

14  involving a Mr. Rodriguez?

01:56:57  15  A.  Right.

16  Q.  All right.  And that wasn't something that caused you to

17  say, "Well, we're not going to go forward with this case"?

18  A.  It was not.

19  Q.  Okay.  And it wasn't something to change the outcome of the

01:57:07  20  trial either, correct?

21  A.  I don't -- no.

22          MR. SOTOS:  That's all I have, Judge.  Thank you.

23          THE COURT:  Okay.  Anything further?

24                  REDIRECT EXAMINATION

01:57:12  25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 195 of 278 PageID #:43839
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3170

1    Q.  You didn't investigate that, right?

2    A.  Investigate what?

3    Q.  What Letrich had seen on the street?

4    A.  Did I investigate it?

01:57:21    5    Q.  You didn't do any investigation, right?

6    A.  You mean, did I go out on the street and stuff?

7    Q.  Yeah.

8    A.  No, I didn't.

9    Q.  You relied on the police department to do that, correct?

01:57:28    10    A.  Correct.

11              MR. LOEVY:  I have no further questions, Your Honor.

12              THE COURT:  Anything further?

13              MR. SOTOS:  No, Judge.

14              THE COURT:  Thank you, sir.  You may step down.

01:57:35    15              THE WITNESS:  Thanks.

16              Am I excused?

17              THE COURT:  You are excused.

18         (Witness excused.)

19              MS. ROSEN:  Judge, could we do a quick sidebar?

01:57:56    20              THE COURT:  Okay.

21         (Proceedings heard at sidebar on the record:)

22              MS. ROSEN:  Judge, we just for the record want to move

23    under Rule 50 orally for judgment as a matter of law.  We have

24    written pleadings to file later, but --

01:58:27    25              THE COURT:  Okay.

1   MS. ROSEN:  -- since we're not clear about exactly

2   what the timing is, we just wanted to make sure we're doing

3   it --

4   MR. SOTOS:  All defendants want to preserve the

01:58:34   5   record.

6   THE COURT:  Okay.  That's fine.  And I'm reserving

7   ruling and --

8   MR. LOEVY:  Plaintiff makes the same motion.

9   THE COURT:  Okay.  Also reserving ruling.

01:58:42   10   Why don't we just make an agreement that since there's

11   some ambiguity about this, if you make it at the end of the

12   day, you have a continuing -- I mean, I'd like to have to avoid

13   taking these sidebars after every witness.

14   MR. SOTOS:  Yeah, and we don't want to take up the

01:59:00   15   time arguing it.

16   THE COURT:  Right.

17   MR. SOTOS:  So --

18   THE COURT:  But as I think about it, I don't know what

19   the 27th floor will think, so I don't know.

01:59:03   20   MR. SOTOS:  Me neither, Judge.

21   THE COURT:  Well, why don't --

22   MR. LEINENWEBER:  Judge, I just have a continuing

23   objection -- continuing motion.

24   THE COURT:  Why don't you just say, like, "Same

01:59:11   25   motion," and we don't have to have a sidebar.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 197 of 278 PageID #:43841
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3172

1    MS. ROSEN:  Okay.  Thanks, Judge.

2    (End of sidebar proceedings.)

3    (Witness enters courtroom.)

4         THE COURT:  Sir, you must be the witness?  Yes.

01:59:36    5         THE WITNESS:  Yes.

6         THE COURT:  Could you come up here, please?

7         Please raise your right hand.

8    (Witness duly sworn.)

9         THE COURT:  You may be seated.

10             RAMON LOPEZ, DEFENSE WITNESS, SWORN

11                 DIRECT EXAMINATION

12   BY MS. GOLDEN:

13   Q.  All right.  Could you please state your name and introduce

14   yourself to the ladies and gentlemen of the jury.

02:00:07   15   A.  Hi.  My name is Ramon Lopez.

16   Q.  And, Mr. Lopez, where do you live?

17   A.  I live in Elgin.

18   Q.  Okay.  And are you employed?

19   A.  Yes.

02:00:16   20   Q.  You're missing work to be here today?

21   A.  Yes.

22   Q.  Thank you, sir.  You're not alone.

23         I'm going to cut to the chase -- I'm hoping we get an

24   award for the quickest witness today -- and show you on your --

02:00:27   25   on the screen in front of you, we're going to pop up something

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 198 of 278 PageID #:43842
6-21-18 (Ex 13)
R. Lopez - direct by Golden

3173

1  that we're calling Defendants' Exhibit 1.13.

2          And going back to August of 1988 --

3          THE COURT:  Wait a minute.  I don't have anything on

4  my screen.

02:00:48  5          MS. GOLDEN:  I'm going to ask him a few questions

6  until it gets up.

7          THE COURT:  Oh, sorry.

8          MS. GOLDEN:  Defense table 1.

9  BY MS. GOLDEN:

02:00:57  10  Q.  I'm going to take you back to about 30 years, then, to

11  1988.

12          You lived in the Humboldt Park area?

13  A.  Yes.

14  Q.  And what was your address, sir?

02:01:05  15  A.  1424 North Washtenaw.

16  Q.  And you lived there with whom?

17  A.  My father, my mom, and my brothers and sisters.

18  Q.  Okay.  And in this case we've heard -- the jury has heard a

19  lot of testimony about a person by the name of Felix Valentin.

02:01:20  20          Did you know Felix?

21  A.  Yes.

22  Q.  And how did you know him?

23  A.  I went to school with his brothers -- older brothers, and

24  his older brother was my best friend.

02:01:27  25  Q.  Okay.  His brothers' name were?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 199 of 278 PageID #:43843
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3174

1    A.  Israel Valentin, Jr.

2    Q.  And his other brother --

3    A.  And Harry -- Harry Valentin.

4    Q.  And the name that you knew Felix's brother by was?

02:01:37    5    A.  Mo.

6    Q.  Okay.  The two of you were best friends?

7    A.  Yes.

8    Q.  You and Mo?

9    A.  Yes.

02:01:43    10    Q.  And do you remember the day that Felix was shot?

11    A.  Not really.  I'm sorry.

12    Q.  Okay.  Do you remember getting a call from one of the

13    brothers about it?

14    A.  Yes.

02:01:52    15    Q.  Okay.  And did I ask you what your birthday was?

16    A.  No.

17    Q.  Okay.  What's your birthday?

18    A.  9/22/68.

19    Q.  So that's September 22nd?

02:02:05    20    A.  Yes, ma'am.

21    Q.  Okay.  All right.  So now if you can look at the screen,

22    and I'm going to point you, sir, to -- do you see your name on

23    that page -- this is a police report, Supplement -- Chicago

24    Police Department Supp. Report, dated September 1st that the

02:02:21    25    jury has seen before, and ask you, sir, if you see your name on

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 200 of 278 PageID #:43844
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3175

1    the document?

2    A.  Yes, ma'am.

3    Q.  And that's the way you spell your name, Ramon Lopez?

4    A.  Yes.

02:02:29   5    Q.  And you were -- in September of 1988, give or take, you

6    were 19 years old, but it says 20 here, right?

7    A.  I can't understand.  I'm sorry, ma'am.

8    Q.  So how old were you in September of 1988?

9    A.  Oh, I was 20.

02:02:45  10    Q.  Okay.  And your birthday here is September 22nd, 1968?

11    A.  Yes, ma'am.

12    Q.  And this was the address that you were living at in August

13    and September of 1988?

14    A.  Yes.

02:02:55  15    Q.  Okay.

16          MS. GOLDEN:  And can you do a side by side with this?

17    BY MS. GOLDEN:

18    Q.  I'm going to show you what we've marked as Defendants'

19    Exhibit No. 96.  And do you recognize that?

02:03:18  20    A.  Yes.

21    Q.  And what is that?

22    A.  That's a picture of me.

23    Q.  And how old do you look in the picture?

24    A.  Wow.  Probably like 18, 19.  I don't know.

02:03:29  25    Q.  Do you remember when the picture was taken?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 201 of 278 PageID #:43845
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3176

1  A.  Not really, sorry.

2  Q.  Do you remember where it was taken?

3  A.  That was 14th District.

4  Q.  Okay.  And how do you know that?

02:03:37  5  A.  I think.  That was the only place I've been arrested years

6  back.

7  Q.  Okay.  How many times have you been arrested back in the

8  day?

9  A.  Maybe like four or five.

02:03:48  10  Q.  Okay.  All right.

11        MS. GOLDEN:  Can we see Defendants' Exhibit 96 -- I'm

12  sorry -- Defendants' Exhibit 95.

13  BY MS. GOLDEN:

14  Q.  And do you recognize -- showing you what we've marked as

02:04:06  15  Defendants' Exhibit 95 and ask you, Mr. Lopez, if you recognize

16  the person that's shown in this picture?

17  A.  Yes.

18  Q.  And who is that?

19  A.  That's George.

02:04:15  20  Q.  And how -- did you know George back in September and August

21  of 1988?

22  A.  Yes, ma'am.

23  Q.  And how did you know George?

24  A.  We went to school together from grammar to high school, and

02:04:26  25  we grew up in the neighborhood.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 202 of 278 PageID #:43846
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3177

1  Q.  Did you play sports together?

2  A.  Yes, we did.

3  Q.  Okay.  Were you also both gang members?

4  A.  Yes.

02:04:33  5  Q.  Were either of you a member of the Latin Kings?

6  A.  No.  No, ma'am.

7  Q.  And do you remember being present when this picture of

8  George was taken?

9  A.  No.

02:04:46  10  Q.  Let me ask you, sir, are -- so at the time back -- taking

11  you back to the time when Felix was shot, do you remember ever

12  standing in a physical lineup?

13       You know what a physical lineup is, right?

14  A.  Yes.

02:05:02  15  Q.  And that's where you -- well, what is it?

16  A.  A lineup is when they put, like, four or five people in a

17  room, and somebody's behind the window -- I'm sorry -- saying

18  whoever did it.  You know, they point them out like that.

19  Q.  You step forward --

02:05:16  20  A.  Right.

21  Q.  -- sometimes they turn to the side?

22  A.  Right.  They tell you No. 1, No. 2, No. 3, No. 4, come

23  forward.

24  Q.  Have you ever been in a physical lineup with your friend,

02:05:26  25  George Ruiz?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 203 of 278 PageID #:43847
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3178

1   A.  No, never, ma'am.

2   Q.  And George has a nickname?

3   A.  Froggie, yes.

4   Q.  And back in September of 1988, how long had you known

5   Froggie?

6   A.  Oh, since we were, like, maybe eight, nine, ten.  We were

7   kids.

8   Q.  Do you think that you would remember being in a lineup with

9   him?

10  A.  Yes, yes, I would.

11  Q.  Have you ever been in a lineup?

12  A.  Yes.

13  Q.  And how many times?

14  A.  One time in my life.

15  Q.  And what happened after that lineup?

16  A.  They accused me for the -- for the case they were charging

17  me for.

18  Q.  You were arrested after the one lineup you --

19  A.  Yes, I was only 15 years old when that happened.

20  Q.  And so you were arrested after the only one lineup you've

21  ever been in?

22  A.  Yes, that's the only time, yes.

23          MS. GOLDEN:  I don't have any other questions.

24          THE COURT:  Okay.  Anybody else on the defense side

25  have questions?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 204 of 278 PageID #:43848
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3179

 1    MR. LEINENWEBER:  No.  Thank you, Judge.

 2    THE COURT:  Plaintiff.

 3                    CROSS-EXAMINATION

 4  BY MR. LOEVY:

02:06:40   5  Q.  Okay.  All right, sir.  You do not know Jacques Rivera,

 6  right?

 7  A.  Excuse me?

 8  Q.  You don't know -- the name Jacques Rivera doesn't mean

 9  anything --

02:06:49  10  A.  No, no.

11  Q.  You don't know anything really about what this lawsuit is

12  like?

13  A.  No.

14  Q.  You got a subpoena from the defense, and here you are to

02:06:56  15  testify?

16  A.  I believe so.  I'm here.

17  Q.  All right.  You are not sure how many times in the mid-'80s

18  you were at the police station; is that fair to say?

19  A.  Under -- when I was 20, at least twice -- three times.

02:07:07  20  Three times.

21  Q.  Well, didn't you say four or five?

22  A.  But from 15 years old.  So that's about four or five.

23  Q.  All right.  So -- but in the -- then focusing on the late

24  '80s, it would have been three arrests?

02:07:17  25  A.  Around there, yes.  It's a long -- I mean --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 205 of 278 PageID #:43849
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3180

1    Q.  You mentioned the murder thing.  You had some drugs, some

2    drug stuff, but, yeah, it's been so long you can't remember --

3            MS. ROSEN:  Objection, Judge.  He didn't say anything

4    about a murder.

02:07:28   5            MR. SOTOS:  Objection.

6            MR. LOEVY:  Attempted murder.

7            THE COURT:  Not -- not in this proceeding.

8    BY MR. LOEVY:

9    Q.  No, I thought you said -- I thought you told her that was

02:07:33   10   the lineup.

11           THE COURT:  No, I think you --

12           MR. SOTOS:  Objection.

13           THE COURT:  Sustained.

14   BY MR. LOEVY:

02:07:36   15   Q.  All right.  You were here for a murder --

16           MR. SOTOS:  He's talking about offenses.

17           THE COURT:  Now, wait a minute.  I don't need piling

18   on.

19           MR. SOTOS:  All right.  All right.

02:07:40   20   BY MR. LOEVY:

21   Q.  All right.  What were you in the lineup for?

22           If you didn't answer that question, don't answer that

23   question.

24           Did you tell Mr. Rosen -- Ms. Golden what you were in

02:07:43   25   the lineup for?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 206 of 278 PageID #:43850
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3181

1          MS. GOLDEN:  Well, this is way longer than 10 years.

2          THE COURT:  Wait, wait.  The witness said he wasn't in

3     the lineup.

4          MR. LOEVY:  No, I think he said he was in a lineup.

02:07:51     5          THE COURT:  Oh, on another occasion?

6          MR. LOEVY:  Yes, yes.  And if I missed -- if I

7     missed --

8          THE COURT:  No, no, no, if that's what you're going

9     into, but the question is --

02:07:58     10          MR. LOEVY:  All right.  I'm going to move on, Your

11     Honor.

12          THE COURT:  No, I don't -- all right.  Fine.  I think

13     we're just a little confused.

14     BY MR. LOEVY:

02:08:03     15     Q.  All right.  Fair to say that you're not exactly sure how

16     many times you would have been at the police station in the

17     late '80s, right?

18     A.  Yes.

19     Q.  All right.  Now, I'm going to show you Plaintiff's Exhibit

02:08:13     20     14.

21          MR. LOEVY:  If I could have the Elmo, please.

22     BY MR. LOEVY:

23     Q.  This is the Felix Valentin shooting, this document here.

24     You didn't create this.  Have you seen it?

02:08:26     25     A.  No.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 207 of 278 PageID #:43851
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3182

1    Q.  All right.  You're not Angel Villafane, right?

2    A.  No.

3    Q.  You're not Carlos Olivero?

4    A.  No.

02:08:35    5    Q.  You're not Jacques Rivera?

6    A.  No.

7    Q.  Are you George Ruiz?

8    A.  No.

9    Q.  But you are Ramon Lopez?

02:08:43    10   A.  Yes.

11   Q.  All right.  Do you dispute that you were at the police

12   station on the 31st of August, 1988?

13   A.  Say that again.  I'm sorry?

14   Q.  Do you dispute that you were at the police station that

02:08:52    15   day?

16   A.  That I wasn't in the police station?

17   Q.  You tell us.

18   A.  I wasn't.  Not that day.

19   Q.  You're saying -- in fact, you're here because your claim is

02:08:56    20   you were not taken to a police station, right?

21   A.  Not that day on the lineup with those persons.  I was not

22   there that day.

23   Q.  And you would remember, you say, because Felix was your

24   friend --

02:09:05    25   A.  No, no.  I'm telling the truth because George had told me

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 208 of 278 PageID #:43852
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3183

1  when he got arrested --

2  Q.  Who was saying what?  Okay.  We don't a hearsay.

3  A.  Okay.  I'm sorry.

4          MS. GOLDEN:  Objection.

02:09:14  5          THE COURT:  No, wait.

6  BY MR. LOEVY:

7  Q.  We don't want a hearsay.

8          THE COURT:  Wait a minute.

9          MS. GOLDEN:  Well --

02:09:17  10          THE COURT:  Let's let the witness answer the question,

11  and then you can go back and clarify.

12  BY MR. LOEVY:

13  Q.  All right.  Here's the question.

14          MS. GOLDEN:  Could you ask -- Your Honor, could you --

02:09:20  15          THE COURT:  What?

16          MS. GOLDEN:  -- could you ask Mr. Sloevy -- Mr.

17  Sloevy -- (phonetic) -- Mr. Loevy to slow down just a bit?

18          THE COURT:  That would be helpful.

19  BY MR. LOEVY:

02:09:29  20  Q.  All right, sir.  After Felix was died -- died --

21  A.  Okay.

22  Q.  -- within that week, did you ever get taken to the police

23  station?

24  A.  No.  No, sir.

02:09:39  25  Q.  In two weeks of Felix's death, were you ever in the police

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 209 of 278 PageID #:43853
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3184

1    station?

2    A.  No.

3    Q.  All right.  I'm going to show you some pictures that were

4    allegedly taken on the 31st of August.

5            Do you know this person?

6            MS. GOLDEN:  Object to foundation.

7            THE COURT:  Yeah, is there any --

8            MR. LOEVY:  This is Plaintiffs' Exhibit 62, Your

9    Honor.  This is --

10           THE COURT:  But what is the basis for believing the

11   date that you --

12           MR. LOEVY:  Because Ms. McLaughlin and probably

13   Mr. Gawrys say these are the pictures of the lineup that they

14   tried to take and then couldn't find the victim, and then he

15   was at the hospital.

16           MR. GIVEN:  Objection to --

17           MS. GOLDEN:  There's been other testimony from other

18   witnesses that there were other sources of photo array

19   photographs.

20           MR. LOEVY:  No, this exhibit --

21           THE COURT:  Well, you know, I don't know.

22           This is obviously going to be a big fight unless

23   somebody's got transcripts --

24           MS. GOLDEN:  If he just asked him about the picture, I

25   have no problem with it.  But if he inserts into his question

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 210 of 278 PageID #:43854
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3185

1    the date that --

2         THE COURT:  Yeah, I'm trying to say that.  That's what

3    I was trying to say.

4         MS. GOLDEN:  Correct.

02:10:27  5         THE COURT:  Excuse me.

6    BY MR. LOEVY:

7    Q.  All right.  The police report -- well, all right.  I'm just

8    going to ask the questions.

9         Is this you here with this wall?

02:10:33  10  A.  No, that's not me.

11   Q.  Is that you?

12   A.  Nope.

13   Q.  Is that you?

14   A.  No.

02:10:39  15  Q.  Is that you?

16   A.  No.

17   Q.  Is that you?

18   A.  Yes.

19   Q.  All right.  And you're saying you were not present with

02:10:46  20  these six people being photographed against this same wall on

21   that day?

22   A.  Right.

23   Q.  Is it possible that you just don't remember?

24   A.  No, because I would have remembered.  Trust me, I would

02:11:00  25  have remembered.  If I was in a lineup with those persons, I

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 211 of 278 PageID #:43855
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3186

1   would have remembered.

2   Q.  Well, it sounds like if you were even in the police station

3   at all you would have remembered, you're saying, right?

4   A.  No, not that day.  I'm telling you I wasn't there that day.

02:11:10  5   Q.  Okay.  And I think you told Ms. Golden you think it was the

6   14th District where that picture was taken of you?

7   A.  It should be.  That's the only police station I've been in.

8   Q.  All right.  Do you recognize the wall as this being the

9   14th District wall, or are you just --

02:11:21  10  A.  I cannot remember.  I cannot tell you that.  I don't --

11  Q.  All right.  But you believe that was taken in the 14th

12  District, not where this investigation happened?

13  A.  I guess.  I believe.

14  Q.  All right.  You said that -- that you actually knew another

02:11:44  15  boy in the lineup.  That's this guy?  Was it this guy or this

16  guy?

17  A.  That one, George.

18  Q.  All right.  Did you -- you knew Little Orlando Lopez,

19  right?

02:11:53  20  A.  Excuse me?

21  Q.  Did you know Orlando Lopez?

22  A.  No.

23  Q.  Wasn't he the brother of Felix?

24  A.  Oh, the little kid?  Yes.

02:11:59  25  Q.  So he knew you?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 212 of 278 PageID #:43856
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3187

1   A.  Yes.

2           MS. ROSEN:  Objection.  He's not the brother of Felix.

3           THE COURT:  I think you misspoke.

4   BY MR. LOEVY:

02:12:06    5   Q.  All right.  Orlando Lopez -- oh, all right.  I did

6   misspeak, and I got confused, and I'm on a wrong track.

7           THE COURT:  Well, we all -- I think we're all in that

8   position.

9   BY MR. LOEVY:

02:12:11   10   Q.  All right.  But you knew the victim, right?

11  A.  Which victim?

12  Q.  And this person knew --

13          THE COURT:  Mr. Loevy, you've got to slow down and

14  just make clear to the witness what you're asking him, please.

02:12:24   15  BY MR. LOEVY:

16  Q.  All right.  This person, did he know the victim?

17  A.  Yes.

18          MS. GOLDEN:  Your Honor --

19  BY MR. LOEVY:

02:12:30   20  Q.  And this person, that's you.  You also knew the victim?

21  A.  Yes.

22  Q.  And you -- you're saying you were not in any lineup that

23  day?

24  A.  That's right.

02:12:39   25          MR. SOTOS:  Objection, Judge, asked and answered

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 213 of 278 PageID #:43857
6-21-18 (Ex 13)
Crawford - direct by Carney
3188

```
 1    several times.
 2              THE COURT:  Sustained.
 3              MR. LOEVY:  All right.  I have no further questions.
 4              THE COURT:  All right.  Anything further?
 5              MS. GOLDEN:  No, Your Honor.  Thank you, Mr. Lopez.
 6              THE COURT:  Thank you very much.
 7              THE WITNESS:  Thank you.
 8      (Witness excused.)
 9              MR. LOEVY:  Thank you, sir.
10              MS. CARNEY:  Your Honor, at this time the defense
11    calls Cathryn Crawford.
12      (Witness enters courtroom.)
13              THE COURT:  Is this the witness?
14              MS. CARNEY:  I believe so.
15              THE COURT:  Could you step down here, please?
16              Please raise your right hand.
17      (Witness duly sworn.)
18              THE COURT:  You may be seated.
19                 CATHRYN CRAWFORD, DEFENSE WITNESS, SWORN
20                         DIRECT EXAMINATION
21    BY MS. CARNEY:
22    Q.  Good afternoon, Ms. Crawford.
23              Could you please introduce yourself to the jury and
24    spell your first name for the court reporter.
25    A.  Sure.  My name is Cathryn, C-a-t-h-r-y-n, Crawford.
```

02:12:46
02:13:14
02:14:58
02:15:10
02:15:20

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 214 of 278 PageID #:43858
6-21-18 (Ex 13)
Crawford - direct by Carney

3189

1    Q.  And are -- where do you currently live?

2    A.  I live in Chicago.

3    Q.  So you moved back from Texas, was it?

4    A.  Yes, ma'am.

02:15:33    5    Q.  Okay.  And where are you currently employed?

6    A.  I work for the Lawndale Christian Legal Center.

7    Q.  And how long have you been an attorney?

8    A.  Since -- for 20 -- close to 22 years.

9    Q.  So you got your license around 1996?

02:15:48    10    A.  Yes, ma'am.

11    Q.  And at some point after you became an attorney, did you

12    begin to work for the Northwestern School of Law?

13    A.  Yes, ma'am.

14    Q.  Okay.  And when was that?

02:15:55    15    A.  In 1998.

16    Q.  Can you explain briefly for the jury what some of your job

17    duties were while you were working at Northwestern?

18    A.  So as -- at Northwestern, I was essentially a clinical

19    professor.  I had various titles, depending on what stage of my

02:16:13    20    career I was at, but I basically supervised clinical students

21    in helping represent people in juvenile and criminal court.

22    Q.  At some point were you also -- did you also hold the

23    position of a senior lecturer, or was that all within the

24    global --

02:16:31    25    A.  So I started as a senior lecturer, and I was doing research

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 215 of 278 PageID #:43859
6-21-18 (Ex 13)
Crawford - direct by Carney

3190

1    on an abuse and neglect -- on the abuse and neglect court.  And

2    then I moved into -- I think I was an assistant clinical

3    professor and then an associate clinical professor.

4    Q.  In any of those roles, did you teach any classes?

02:16:53    5    A.  I taught the clinical class, and then I had some -- a

6    seminar every once in a while I'd also teach.

7    Q.  Can you explain to the jury a little bit about what a

8    clinical class is.

9    A.  So a clinical class, usually I had eight students who would

02:17:11    10    assist me in representing juveniles in juvenile court,

11    juveniles in adult court, adults in adult court.

12        We would accept representation, and the students acted

13    as sort of associates in a law firm.  So they would assist me

14    in client counseling, witness interviewing, legal research.

02:17:34    15        The third-year law students had what I liked to call

16    their learner's permit, and so they could go into court with me

17    and perform functions that lawyers would perform under my

18    supervision.

19    Q.  And approximately when did you leave your job at the

02:17:51    20    Northwestern School of Law?

21    A.  So I left permanently in 2011.

22    Q.  Did you leave for a period of time before that?

23    A.  I did.  I had a leave from 2008 to 2010 when I worked at

24    the John D. and Catherine T. MacArthur Foundation.

02:18:13    25    Q.  And that is a separate entity from the Northwestern School

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 216 of 278 PageID #:43860
6-21-18 (Ex 13)
Crawford - direct by Carney

3191

1   of Law, correct?

2   A.  Yes, ma'am.

3   Q.  Okay.  I'm going to jump ahead a little bit.

4           During your tenure as an associate professor and

02:18:25   5   senior lecturer, did you have an occasion to speak with Mr.

6   Jacques Rivera?

7   A.  Yes, ma'am.

8   Q.  Okay.  And how would you describe your relationship with

9   Mr. Rivera while you were working at Northwestern?

02:18:35   10   A.  I am not quite sure I understand that question.

11   Q.  Okay.  Well, let me ask you this.

12           When did you first speak to Mr. Rivera during your

13   tenure at Northwestern?

14   A.  I'm -- I believe it was in 2001 or 2.

02:18:49   15   Q.  And how frequently would you speak with Mr. Rivera while

16   you were working at Northwestern?

17   A.  Well, Mr. Rivera, when I spoke with him, was in prison.  So

18   I know that I went to see him on one occasion.  I don't recall

19   more than one.  And I may have spoken to him on the telephone.

02:19:12   20   Q.  Did you correspond with him at all with letters?

21   A.  Yes, ma'am.

22   Q.  At the time you were working at Northwestern School of Law,

23   would you consider yourself as representing Mr. Rivera?

24   A.  No, ma'am.

02:19:27   25   Q.  Okay.  Then let me try then my first question again.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 217 of 278 PageID #:43861
6-21-18 (Ex 13)
Crawford - direct by Carney
3192

1          So how would you have described your working

2    relationship with Mr. Rivera while you were at Northwestern

3    School of Law?

4    A.  So I was -- I would describe it as I was conducting an

5    investigation into his case.

6    Q.  And when you're conducting an investigation into a case

7    such as Mr. Rivera's, what does that entail, just the basics?

8    A.  As Mr. Rivera's or what I did in Mr. Rivera's case?

9    Q.  If you're comfortable talking about Mr. Rivera's case --

10   A.  I mean, from -- actually, you're right, because it was a

11   really long time ago.

12         So essentially in conducting an investigation of the

13   type that I was conducting in Mr. Rivera's case, it generally

14   involved trying to obtain the records relating to the case,

15   looking at the court opinions that were issued on appeal,

16   trying to get copies of transcripts, any police reports, the

17   file of the defense lawyer, any press or clippings that

18   related -- just anything that existed in the universe that

19   related to his criminal case.

20   Q.  So you had mentioned that you would have tried to get the

21   file of his criminal defense attorney?

22   A.  Yes.

23   Q.  Typically you would have attempted to get the file of the

24   criminal defense attorney.

25         Did you attempt to get the file from Mr. Rivera's

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 218 of 278 PageID #:43862
6-21-18 (Ex 13)
Crawford - direct by Carney
3193

1   criminal defense attorney?

2   A.  Yes, ma'am.

3   Q.  Okay.  And do you know when you first reached out to

4   Mr. Rivera's criminal defense attorney?

02:21:06   5   A.  I believe it was in February of 2002.

6           MS. CARNEY:  If I could have one moment, Your Honor.

7           THE COURT:  Yes.

8       (Brief interruption.)

9           MS. CARNEY:  May I approach, Your Honor?

02:21:32   10          THE COURT:  Sure.

11          MS. CARNEY:  DX 26.

12          MR. LOEVY:  Defendants' 26?

13          MS. CARNEY:  26.

14          MR. LOEVY:  Thank you.

02:21:43   15   BY MS. CARNEY:

16   Q.  Ms. Crawford, I've handed you what has been previously

17   marked as Defendants' Exhibit 26.

18          Do you recognize this document?

19   A.  Yes, ma'am.

02:21:51   20   Q.  Okay.  And is that your signature on the bottom?

21   A.  I am not sure if it's my signature or if my secretary

22   signed it.  I had recently gotten married, so I was trying out

23   all sorts of signatures, so -- and her initials are underneath

24   it, but it's one or the other.

02:22:08   25   Q.  I can tell you, I understand that pain.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 219 of 278 PageID #:43863
6-21-18 (Ex 13)
Crawford - direct by Carney
3194

02:22:20

1              The date on this letter is February 6th of 2002.  So
2      when you said it was early February of 2002, you would have
3      reached out to Mr. Wadas who was Mr. Rivera's criminal defense
4      attorney, correct?
5      A.  Yes, ma'am.
6      Q.  Okay.
7              MS. CARNEY:  Your Honor, I'd ask that we admit Defense
8      Exhibit 26.
9              THE COURT:  Any objection?

02:22:28

10             MR. BOWMAN:  No, no objection.
11             THE COURT:  It is received.
12        (Defendants' Exhibit No. 26 received in evidence.)
13             THE WITNESS:  Your Honor, may I have a tissue?
14             THE COURT:  Yes, yes, absolutely.  They're there for

02:22:38

15     you, actually, as is the water.
16             THE WITNESS:  Thank you.
17     BY MS. CARNEY:
18     Q.  So just really quickly in regards to this letter, the first
19     sentence is:  "Per our telephone conversation on Friday,

02:22:47

20     February 1st, 2002, enclosed please find a signed
21     authorization."
22             So would you have first -- was February 1st of 2002,
23     would that have been the first time you reached out to
24     Mr. Wadas?

02:22:56

25     A.  Based on this letter, yes, ma'am.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 220 of 278 PageID #:43864
6-21-18 (Ex 13)
Crawford - direct by Carney
3195

1  Q.  And then your letter says that you've included a signed

2  authorization form.  Can you explain what that is?

3  A.  So on the second page of this exhibit is an authorization

4  for release of information.  And this is essentially Mr. Rivera

02:23:16  5  giving me permission to obtain his file from his prior counsel.

6        We would -- any time you want to get records from a

7  lawyer or a hospital or any place that requires consent from

8  the person whose file it is, you would get one of these signed.

9  Q.  And did you ultimately receive Mr. Wadas' file?

02:23:44  10  A.  Yes, ma'am.

11  Q.  Okay.  And you have no independent recollection of how you

12  went about obtaining the file; is that correct?

13  A.  No, ma'am.

14  Q.  Okay.  So you could have gone -- sent somebody to his

02:23:56  15  office to pick up the original and copied it and returned it to

16  him?

17  A.  Yes, ma'am.

18  Q.  And you also could have gone to his office, picked up a

19  copy, and brought it back?

02:24:07  20  A.  I personally don't think that I would have gone to his

21  office to pick it up, but I think that somebody from my office

22  would -- would have -- that would -- the normal procedure would

23  be our clerk would have gone and picked it up.

24  Q.  Understood.  So you would have sent -- somebody would have

02:24:23  25  gone on your behalf to pick up either the original or some copy

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 221 of 278 PageID #:43865
6-21-18 (Ex 13)
Crawford - direct by Carney
3196

1    of the file?

2    A.  Yes.

3    Q.  Okay.  And you have no memory of how that actually

4    occurred, though, do you?

02:24:34    5    A.  No, ma'am.

6    Q.  Okay.

7          MS. CARNEY:  DX 27.  May I approach, Your Honor?

8          THE COURT:  You may.

9    BY MS. CARNEY:

02:24:55    10    Q.  Ms. Crawford, I'm handing you a copy of what has been

11    marked as DX 27.

12          MS. CARNEY:  And I believe this has been previously

13    admitted, Your Honor.

14          MR. BOWMAN:  I believe it has.  There's no objection

02:25:06    15    in any event.

16          THE COURT:  Okay.  So if it has not been, it will be

17    received.

18      (Defendants' Exhibit No. 27 received in evidence.)

19    BY MS. CARNEY:

02:25:14    20    Q.  Ms. Crawford, do you recognize this document?

21    A.  I recognize it because -- yes, I do.

22    Q.  Okay.  And why do you recognize it?

23    A.  This was shown to me in my deposition.

24    Q.  Okay.  And then we have talked about working on your

02:25:28    25    signature back around 2002, but does that look like what you

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 222 of 278 PageID #:43866
6-21-18 (Ex 13)
Crawford - direct by Carney
3197

1  were attempting to have your signature look like in 2002?

2  A.  Yes, ma'am.

3  Q.  Okay.  And can you explain to the jury a little bit about

4  what this document is?

02:25:40  5  A.  It's called a "Receipt for documents contained in Jacques

6  Rivera's file."

7  Q.  And do you recall -- have any recollection who created this

8  document?

9  A.  I do not.

02:25:52  10  Q.  Would somebody working on your behalf have created this

11  document?

12  A.  It's quite likely.

13  Q.  And would that have been in conjunction with the copying of

14  the file that Mr. Wadas had provided for you?

02:26:03  15  A.  Either if we -- I don't know if we actually copied the file

16  or if we received a copy of the file, so -- but it would have

17  been prepared -- presumably it's a catalog of the different

18  categories of the files' contents.

19  Q.  Okay.  If you were provided a copy of the file, what would

02:26:28  20  the purpose be to have created a receipt after the fact?

21  A.  I -- I could only guess at this point.  I don't actually

22  have an independent recollection of this.

23      There are a whole host of different reasons that you

24  might create an index for -- of a file, which I could -- I

02:26:49  25  could guess some of them, but I don't recall specifically why

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 223 of 278 PageID #:43867
6-21-18 (Ex 13)
Crawford - direct by Carney
3198

1  one was created in this case.

2  Q.  But it's also a possibility that you had Mr. Wadas'

3  original file, and as you -- you or someone on your behalf was

4  copying it, you were counting pages and indexing what was in

02:27:05  5  there so that you can ensure it was all returned to Mr. Wadas,

6  correct?  Is that a possibility?

7  A.  I think it --

8          MR. LOEVY:  Objection, Your Honor.

9          THE COURT:  Sustained.  I think anything is possible.

02:27:16  10          MS. CARNEY:  Understood, Your Honor.

11  BY MS. CARNEY:

12  Q.  Did you provide a copy of this receipt back to Mr. Wadas?

13  A.  I don't have an independent recollection of it, but I would

14  presume that I did.

02:27:27  15  Q.  Okay.  Did you maintain a -- when you were investigating

16  the facts of Mr. Rivera's case back in 2001, 2002 -- do you

17  think it went into 2003 that you were working on Mr. Rivera's

18  case?

19  A.  It might have.

02:27:43  20  Q.  Okay.  What about 2004?

21  A.  I don't think so, but I don't recall.  This was so long

22  ago.

23  Q.  Okay.  Would you have created your own file for

24  Mr. Rivera's case?

02:27:54  25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 224 of 278 PageID #:43868
6-21-18 (Ex 13)
Crawford - direct by Carney
3199

1   Q.  And what kind of things, generally speaking, would you have

2   put in such a file?

3   A.  Well, I mean, let me just say it depends on what you mean

4   by a file.  Like everything relating to Mr. Rivera's case would

02:28:07   5   be in a single file --

6   Q.  All right.

7   A.  -- that's correct.

8   Q.  So you would have created one master file.

9          Would it have included things like your correspondence

02:28:15   10   with Mr. Rivera?

11   A.  Yes, it would have correspondence, memos from students

12   on -- about legal issues.  Sometimes the students and I would

13   come up with action items.

14          So anything that either dealt with what we -- action

02:28:31   15   we were going to take on the case, things that we had done on

16   the case, or the results of our investigation.

17   Q.  Okay.  And do you still have a copy of that file?

18   A.  No, ma'am.

19   Q.  When was the last time that you saw your -- what you had

02:28:44   20   put together as your master file for Mr. Rivera's case?

21   A.  I don't remember.

22   Q.  When you -- and I believe you had testified that you kind

23   of moved around Northwestern School of Law in various

24   capacities.  Did that file move with you?

02:28:59   25   A.  Well, I wasn't physically moving.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 225 of 278 PageID #:43869
6-21-18 (Ex 13)
Crawford - direct by Carney

3200

1    Q.  Okay.

2    A.  I mean, when we moved into our new building, I moved, but

3    in general -- and I think we were already in the new building.

4    But I --  the file was always -- belonged to me while I was

02:29:12    5    there.

6    Q.  What happened to the file when you left Northwestern in

7    2011?

8    A.  So all of my files were -- with one exception of a case

9    that I was still working on, all of my files were boxed up and

02:29:26    10   indexed and placed into storage or, you know, somewhere on-site

11   or off-site.

12   Q.  Do you have an index of those files anywhere?

13   A.  I don't have an index of those files.

14   Q.  Did Northwestern ever provide you with an index of what was

02:29:46    15   boxed up and sent to storage?

16   A.  I'm -- I don't know if -- I don't know if -- I don't know

17   if I kept a copy or if they kept the copy there, because from

18   my recollection, my secretary or, you know, people were helping

19   me box things up and then writing on the outside, and -- but I

02:30:07    20   just don't remember.  I'm sorry.

21   Q.  So when do you think the last time that you saw your

22   physical file from Mr. Rivera's case was?

23   A.  I cannot tell you specifically with respect to Mr. Rivera's

24   case.  I can tell you that when I was leaving for Texas, I made

02:30:23    25   sure that everything was boxed up.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 226 of 278 PageID #:43870
6-21-18 (Ex 13)
Crawford - direct by Carney
3201

1  Q.  Okay.  When was the last time that you took any action

2  investigate -- looking into the facts of Mr. Rivera's case?

3  A.  It was in the early 2000s.

4  Q.  So, again, 2003, maybe 2004?

02:30:44  5  A.  Yeah, I don't -- I don't remember specifically.

6  Q.  Okay.

7          MS. CARNEY:  Can I have one moment, Your Honor?

8          THE COURT:  Sure.

9     (Counsel conferring.)

02:31:00  10  BY MS. CARNEY:

11  Q.  And, Ms. Crawford, just if I asked you this already, I

12  apologize.

13          When did you move to Texas?

14  A.  So I moved to Texas in 2012.

02:31:13  15  Q.  2012?

16  A.  Yes, ma'am.

17  Q.  And so when you left Northwestern in 2011, did you have

18  another job in between, or did you take some time off?

19  A.  So I was basically sticking around Chicago for this single

02:31:29  20  case that I was working on involving a juvenile in adult court.

21  And so I was working on that case and literally moved the day

22  after it came -- a hearing came to a conclusion.

23  Q.  And you didn't take any of your files with you to Texas,

24  right?

02:31:47  25  A.  Just that one that I just referred to.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 227 of 278 PageID #:43871
6-21-18 (Ex 13)
Crawford - cross by Bowman
3202

1    MS. CARNEY:  I have no further questions.

2    THE COURT:  Anything further from the defense side?

3    MR. LEINENWEBER:  No, Judge.  Thank you.

4    THE COURT:  Plaintiff.

02:31:57    5                    CROSS-EXAMINATION

6    BY MR. BOWMAN:

7    Q.  Good afternoon, Ms. Crawford.

8        You were describing where you currently work.  It was

9    Christian Legal Services, did you say?

02:32:05    10   A.  Lawndale Christian Legal Center.

11   Q.  And what is Lawndale Christian Legal Center?

12   A.  Lawndale Christian Legal Center is a community-based

13   holistic law firm.  We represent people from the Lawndale

14   community, which is on the Chicago's West Side, and we provide

02:32:27    15   what we call holistic defense.

16       So anybody from the neighborhood 24 and under will --

17   who gets in conflict with the law, either in juvenile court or

18   adult criminal court, we -- they get a lawyer and then also a

19   case manager.  So the lawyer addresses their legal needs, and

02:32:44    20   the case manager addresses their social needs.

21   Q.  Thank you.

22       I want to ask you some questions about the obtaining

23   of Mr. Wadas' file.  Okay?

24   A.  Yes.

02:32:58    25   Q.  You're not saying here, are you, that Mr. Wadas gave you

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 228 of 278 PageID #:43872
6-21-18 (Ex 13)
Crawford - cross by Bowman

3203

1    his original file, right?

2    A.  No.  No, sir.

3    Q.  What you're saying is because of the passage of time, you

4    have no idea what version he gave you?  Was it his original

02:33:17    5    file or -- or a copy of the file, you wouldn't be in a position

6    to say, correct?

7    A.  That's correct.

8    Q.  And, Ms. Crawford, would you defer to Mr. Wadas'

9    recollection that his original file never left his possession?

02:33:32    10   A.  Absolutely.

11           MS. ROSEN:  Objection, Judge.

12           THE COURT:  It's really too late, because it's been

13   answered.

14   BY MR. BOWMAN:

02:33:42    15   Q.  Ms. Crawford, would you ever destroy a document?

16   A.  No.

17   Q.  Would you ever secret a document?

18   A.  No.

19           MR. SOTOS:  Objection.  Objection.  Nobody is making

02:33:55    20   any such accusations.

21           MR. LOEVY:  All right.  Then we're done.

22           MR. BOWMAN:  Then we're done.  I have no further

23   questions.

24           THE COURT:  All right.  Anything further?

02:34:02    25           MS. CARNEY:  Yeah, I have just a couple short

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 229 of 278 PageID #:43873
6-21-18 (Ex 13)
Crawford - redirect by Carney
3204

1  follow-ups.

2              REDIRECT EXAMINATION

3  BY MS. CARNEY:

4  Q.  Ms. Crawford, just to follow up on -- in regards to your

02:34:18  5  file and what I believe -- sorry.

6              You would have put a copy of the Wadas file that you

7  received into your file, correct?

8  A.  Yes, ma'am.

9  Q.  Okay.  Are you aware that -- of any searches that have been

02:34:29  10  conducted to find the copy of your file?

11  A.  Yes, ma'am.

12  Q.  Okay.  And those searches have borne no fruit, correct?

13  A.  Yes, ma'am.

14              MS. CARNEY:  Okay.  Thank you.

02:34:39  15              THE COURT:  Anything further?

16              MR. BOWMAN:  No.  Thank you, Judge.

17              THE COURT:  Thank you, Ms. Crawford.  You may step

18  down.

19    (Witness excused.)

02:34:46  20              THE COURT:  And I think it's break time, ladies and

21  gentlemen.

22    (Jury out.)

23              THE COURT:  Ten minutes.

24              Dan, I forgot to tell the jury.  Could you just

02:35:20  25  mention to them that my call at 9:30 is going to take 10

1 minutes tomorrow, so we can start at 9:40.  I'll try to remind

2 them, too.

3          9:40 tomorrow, everybody.  My call is very short.

4          MS. ROSEN:  Judge, I just have one quick question.

02:35:34  5          THE COURT:  Yes.

6          MS. ROSEN:  On Judge -- the Wasilewski motion to

7 reconsider --

8          THE COURT:  Yes.

9          MS. ROSEN:  -- are -- do we -- are we going to expect

02:35:40 10 a ruling?  He's on the list for tomorrow, so --

11          THE COURT:  Oh, okay.  We'll try to have one to you --

12 I don't think -- I don't know that I can promise it tonight,

13 but it's in progress.

14          MR. LOEVY:  And, Your Honor, we would supplement our

02:35:53 15 argument with, a lot of topics he was going to say Mr. Sotos

16 elicited, if we're talking about Wasilewski.

17          THE COURT:  I don't think that's a reason for

18 anything.  I'm ruling on the motion.

19          MS. ROSEN:  Okay.

02:36:05 20          THE COURT:  He's not the first witness?

21          MS. ROSEN:  We can arrange -- we can move it.

22          THE COURT:  Yeah, I think -- I think the best I can do

23 is promise that you'll have it before we start tomorrow

24 morning.

02:36:14 25          MS. ROSEN:  Okay.  Great.  Thanks, Judge.

1        MR. LOEVY:  Thank you.

2        MR. ART:  Thank you, Judge.

3        MR. LOEVY:  Would you call him if that happens or --

4        MS. ROSEN:  Yes.

5        MR. LOEVY:  So we should get ready for him not

6    knowing?  You'll call him if he's in, right?

7        MS. ROSEN:  We're calling him either way.

8      (Recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Witness enters.  Jury out.)

2         THE COURT:  Okay.  Are we ready?  Are we ready?

3         MR. LOEVY:  Yes, Your Honor.

4         MS. ROSEN:  I believe we are.

02:46:06    5    MR. LOEVY:  Although, we need Mr. Bowman.

6         MS. ROSEN:  Oh.  I guess we don't have Mr. Bowman.

7    Sorry.

8         THE COURT:  Okay.

9    (Messrs. Bowman and Art reenter.)

02:46:38    10   THE COURT:  Okay.  We're ready?

11        MR. BOWMAN:  We are, Judge.

12   (Pause.)

13        THE COURT:  Who's next?

14        MS. ROSEN:  Mr. Hickey.  Do you want him to take the

02:48:03    15   stand or --

16        THE COURT:  Sure, if he's here.

17        MS. ROSEN:  Yeah.  If you want to come up?  Save the

18   extra 30 seconds.

19        THE COURT:  Yeah.  I'll swear you in as soon as the

02:48:12    20   jury is in the box.

21        We're ready.

22   (Jury in.)

23        THE COURT:  Please be seated, everyone.

24        And I asked Dan to tell you, but I'll repeat it, since

02:48:48    25   I am remembering, that I have just one brief matter in court

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 233 of 278 PageID #:43877
6-21-18 (Ex 13)
Hickey - direct by Rosen
3208

1   tomorrow at 9:30, so we'll be able to start by 9:40 at the

2   latest.

3          Okay, sir.  Would you please raise your right hand.

4      (Witness duly sworn.)

02:49:02   5          THE COURT:  You may be seated.

6          MS. ROSEN:  Do we need to clean up up there a little

7   bit --

8          THE WITNESS:  Yes.

9          MS. ROSEN:  -- for you?  Sorry.

02:49:15   10          THE WITNESS:  Thank you.

11        JAMES K. HICKEY, DEFENDANT CITY'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13   BY MS. ROSEN:

14   Q.  Good afternoon, Mr. Hickey.

02:49:22   15          Could you please introduce yourself to the ladies and

16   gentlemen of the jury.

17   A.  My name is James K. Hickey.

18   Q.  And what is your current occupation?

19   A.  Retired.

02:49:33   20   Q.  What was your former occupation?

21   A.  I was a member of the Chicago Police Department.

22   Q.  Okay.  And, sir, you've been designated, have you not, as a

23   spokesperson for the City of Chicago on certain issues related

24   to this case; is that correct?

02:49:49   25   A.  That is correct.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 234 of 278 PageID #:43878
6-21-18 (Ex 13)
Hickey - direct by Rosen
3209

1  Q.  And so you're able to provide testimony on behalf of the

2  City of Chicago, is that correct?

3  A.  Yes, ma'am.

4  Q.  Okay.  Why don't we talk about -- just a little bit about

02:49:57  5  your background.

6          When did you start with the Chicago Police Department?

7  A.  June 1971.

8  Q.  And just briefly, tell us a little bit about your career

9  through the 1990s.

02:50:12  10  A.  For the first 29 years, I was a sworn member of the Chicago

11  Police Department.  I was a police officer.  I worked in a

12  district.  Subsequently worked in the Youth Division.  Then I

13  made detective.  Then I went to Area 1 Homicide and Sex

14  Investigations Unit.

02:50:34  15          I worked in detective administration for the chief of

16  detectives and then I worked in the crime laboratory of the

17  police department.

18          And I made sergeant and lieutenant along the way, and

19  I worked in -- returned to patrol in the Englewood district.

02:51:02  20  And from there, I went to work for the chief of patrol.

21          And subsequent to that, I started a new unit for the

22  airports.  We consolidated the airport units into one unified

23  command.

24          After that, Superintendent Martin selected me for the

02:51:26  25  brand-new Random Drug Testing Unit.  After that, I went to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 235 of 278 PageID #:43879
6-21-18 (Ex 13)
Hickey - direct by Rosen

3210

1    Research & Development where I ended my sworn career.

2         And I -- upon finishing my sworn career, I started

3    working for the police department again as a civilian.  I was

4    assigned to -- over 16 years as a civilian.  I was assigned to

02:51:56    5    three separate divisions, once twice, Research & Development,

6    the Records Division, the Information Services Division, and

7    back to Research & Development, all as the assistant director.

8    Q.  Thank you.

9         Now I want to focus your attention to your job

02:52:20    10    responsibilities in the early 1980s.  At that point in time,

11    say, in 1980-1981, where were you assigned?

12    A.  1980, I was finishing up Area 1 Homicide and then I was

13    assigned to detective headquarters.

14    Q.  Okay.  And is that when you were -- you described earlier

02:52:44    15    being in the administrative branch of the Detective Division?

16    A.  Correct.

17    Q.  Okay.  While you were in the detective administration, did

18    you come to learn about an event that occurred with an

19    individual by the name of George Jones?

02:53:06    20    A.  Yes, I did.

21    Q.  Okay.  And you -- the jury has heard some testimony about

22    Mr. Jones and a class-action lawsuit that was filed called

23    *Palmer*.

24         Do you have firsthand knowledge about some of the

02:53:20    25    events that transpired during that time?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 236 of 278 PageID #:43880
6-21-18 (Ex 13)
Hickey - direct by Rosen

3211

1    A.  I did.

2    Q.  Okay.  And can you briefly tell us -- well, let me back up

3    for a second.

4           Now, Mr. Jones was an individual who was being

02:53:34    5    criminally prosecuted, correct, for a murder?

6    A.  Correct.

7    Q.  And the jury's already heard it, but just so we can get a

8    frame of reference, shortly before he was to start his trial,

9    information came to light from a detective, actually, Frank

02:53:54   10    Laverty, about a memo and a potential alternative suspect,

11    correct?

12    A.  That's correct.

13    Q.  And you're aware, Mr. Hickey, that shortly right after that

14    came to light, a class-action lawsuit was filed called *Palmer*,

02:54:07   15    correct?

16    A.  Yes, ma'am.

17    Q.  Okay.  Can you tell us what happened nearly immediately

18    upon the filing of the class-action lawsuit?

19    A.  I was working for the chief of detectives, and there was an

02:54:27   20    internal meeting, and we strived to do some fact-finding as to

21    how the various six Areas in the Detective Division were

22    maintaining their files, especially their notes and inter-watch

23    memorandum.

24    Q.  Okay.  You said there were six Areas.  Back in 1981 and

02:54:52   25    '82, the Chicago Police Department had six detective Areas; is

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 237 of 278 PageID #:43881
6-21-18 (Ex 13)
Hickey - direct by Rosen

3212

1    that correct?

2    A.   That's correct.

3    Q.   And their responsibility was to oversee the criminal

4    investigations, felony prosecutions over the City of Chicago?

02:55:06   5    A.   Felony and misdemeanor.

6    Q.   Okay.  And the -- it was geographically broken down.  Is

7    that what the Area denotation is?

8    A.   Correct.

9    Q.   Okay.  So once this meeting was held about the

02:55:20   10   fact-finding, what, if anything, did you personally do?

11   A.   I visited -- I conducted a site survey of each of the six

12   different detective Areas, focusing on how files were

13   maintained for violent crime field investigations.

14   Q.   And prior to that point in time, did the City of Chicago

02:55:44   15   have any policies regarding files that contained notes or

16   inter-watch memorandum or to/from memoranda?

17   A.   It did not.

18   Q.   And what did you find during your fact-finding?

19   A.   I found, first of all, there was a lack of uniform

02:56:10   20   terminology to describe what we all thought was basic

21   note-taking and communication between watches.  There was a

22   variety.

23        I also took the opportunity to look at specific files,

24   samplings of different files and observed that some were better

02:56:36   25   written than others.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 238 of 278 PageID #:43882
6-21-18 (Ex 13)
Hickey - direct by Rosen

3213

1  Q.  Okay.  And the files that you were reviewing, were they --

2  well, first of all, going from Area to Area, was there

3  uniformity?

4  A.  There was not.

02:56:49  5  Q.  Okay.  And did any of the Areas have a central location

6  within the Area for storing or maintaining these files?

7  A.  All the Areas maintained an office file.  There was

8  differences in how they managed, they didn't manage various

9  notes and working files, as I refer to them.

02:57:25  10  Q.  Okay.  And the notes and the inter-watch memorandum and the

11  to/from memoranda, the ones that you observed during your

12  fact-finding, did any of those documents have affixed to them

13  the Records Division number for any particular investigation?

14  A.  Mostly, they did not.

02:57:44  15  Q.  Okay.  And the jury's heard some testimony, but the -- can

16  you describe what the Records Division number means in the

17  Chicago Police Department.

18  A.  The Records Division number is the key filing number.  It

19  dates back to 1961.

02:58:04  20        1961, all the incidents reported to the Chicago Police

21  Department began with a letter A, 62, boy, and so on and so

22  forth.  And when they ran out of the alphabet, they started

23  over again.

24  Q.  Okay.  And is -- how does the -- how did the Chicago -- how

02:58:25  25  does the Chicago Police Department use the Records Division

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 239 of 278 PageID #:43883
6-21-18 (Ex 13)
Hickey - direct by Rosen
3214

1   number?

2   A.  It was and continues to be the key bureaucratic filing of

3   all reports submitted under a particular incident.

4   Q.  Okay.  And does each individual Records Division number tie

5   to a particular criminal -- a particular crime?

6   A.  It does.  It can be non-criminal as well.  It could be a

7   lost-and-found case report.

8   Q.  Okay.  So even in that circumstance, there's an RD number?

9   A.  Correct.

10  Q.  Okay.  Now, during the point in time that you were doing

11  your fact-finding, did you have responsibilities in terms of

12  reporting what you found?

13  A.  I reported to the chief of detectives, and I did prepare

14  some memos on that topic.

15  Q.  Okay.  And did you have an understanding of what the

16  purpose of the fact-finding was with -- based on the meetings

17  that you were having and the discussions that you were having

18  about what was going on as a result of the *Palmer* litigation?

19  A.  The Detective Division simply wanted to get a handle on the

20  practices and to establish a more uniform methodology to

21  organize these files.

22  Q.  And while you were doing this fact-finding, was the *Palmer*

23  litigation going on?

24  A.  It was.

25  Q.  Okay.  Do you know whether or not the super -- the then

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 240 of 278 PageID #:43884
6-21-18 (Ex 13)
Hickey - direct by Rosen

3215

1   superintendent of police actually testified in connection with

2   the *Palmer* litigation?

3   A.  In this building, yes.

4   Q.  Okay.  And who was that?

03:00:14   5   A.  Richard Brzeczek.

6   Q.  And did he have some opinions about how the policies should

7   change or not change going forward?

8   A.  He testified that the notes of detectives, including

9   everything, and even if it was on the back of a matchbook,

03:00:38   10   should be preserved.

11   Q.  Okay.  And at that time, did you have an understanding of

12   what other law enforcement agencies' policies and practices

13   were as it related to note-taking?

14   A.  I attempted to find out what the practice was.

03:00:59   15   Q.  Okay.  And this was during this period of time when you're

16   doing your fact-finding and trying to develop a new policy,

17   right?

18   A.  Correct.

19   Q.  And were you hands-on involved in the development of new

03:01:14   20   policies as it related to Detective Division records?

21   A.  I was the drafter of all the drafts on the topic.

22   Q.  Okay.  Up until what period of time?

23   A.  Well, until the final issuance of 83-1, I think is the

24   number.

03:01:34   25   Q.  Okay.  And so up until --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 241 of 278 PageID #:43885
6-21-18 (Ex 13)
Hickey - direct by Rosen
3216

1    A.  82.

2    Q.  -- Special Order 83-1, were there other versions that went

3    into effect?

4    A.  There was one earlier, a few months earlier than that.

03:01:45    5    Q.  Okay.  So tell us about what you tried -- what you found

6    out when you were trying to find out what other law enforcement

7    agencies did as it relates to notes.

8    A.  From the FBI, I did a site visit in the Chicago office

9    here.  I learned that the FBI agents, when preparing their

03:02:06    10    standard report called a 302, took their notes and put them

11    into a sealed envelope and filed the envelope at the time of

12    submission of their report.

13        I also learned that they had a suffix system.  Each

14    and every report had a unique suffix at the end of their

03:02:37    15    numerical identifier, again, whatever the, you know, suffix

16    was.  I can't remember if it was alpha or numeric.

17    Q.  Okay.  With respect to the notes that they put in the

18    envelope, did you find out whether or not those notes were

19    regularly produced in response to requests either in a criminal

03:02:55    20    case or a civil case?

21    A.  I did, and they were not produced.

22    Q.  Okay.  All right.  Did you -- were you able to find out

23    anything about other law enforcement agency practices at that

24    time regarding notes?

03:03:16    25    A.  I telephoned, cold-called a few police departments.  I

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 242 of 278 PageID #:43886
6-21-18 (Ex 13)
Hickey - direct by Rosen
3217

1    really didn't learn much.  I learned that you don't learn much

2    by cold-calling people on the phone and asking how they do

3    their filing on homicide cases.

4            But I can't even remember the cities that I called at

03:03:35  5    that time.

6    Q.  Okay.  And in any event, you then endeavored to write a new

7    policy, correct?

8    A.  Correct.

9    Q.  And did you have input from other members of the police

03:03:45  10   department regarding what the goal was of the policy?

11   A.  I certainly did.  This was not done in a vacuum.  I had

12   supervision.  I had attorneys from the police department,

13   attorneys from the plaintiffs.  Everyone had a crack at it.

14   Q.  Okay.  And when you say attorneys for the plaintiffs, who

03:04:03  15   are you referring to?

16   A.  At that time, there was a group of attorneys

17   representing --

18   Q.  Yeah, go -- I'm sorry.  I didn't mean to interrupt you.

19   A.  By name or --

03:04:13  20   Q.  No, no, no.

21   A.  Oh.

22   Q.  Just what were they -- plaintiffs in what case?

23   A.  Oh.  Well, the *Palmer* case, if you --

24   Q.  Okay.  So when the policies were being drafted, you had

03:04:29  25   input from the Chicago Police Department higher-ups and things

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 243 of 278 PageID #:43887
6-21-18 (Ex 13)
Hickey - direct by Rosen

3218

1   like that?

2   A.  Yes, ma'am.

3   Q.  Okay.  And the plaintiffs' attorneys?

4   A.  Yes.

03:04:37   5   Q.  And was the City of Chicago's Legal Department involved?

6   A.  It was.

7   Q.  Okay.  And so it -- without speaking too -- you know, with

8   specific detail as to the initial policy that was drafted,

9   generally what was required once that first policy was drafted

03:04:55   10   as it relates to files and notes?

11   A.  We strived to implement the policy statement of the

12   superintendent of police, how to preserve the notes that had

13   been generated and anything else pertinent to the case.

14   Q.  Okay.  And then you said eventually, there were drafts of

03:05:20   15   it -- of the policy and then we finally landed on -- I think

16   you said 83.2 was the final version, right?

17   A.  I was wrong.  I said 83-1.  It's -- I'll go with you.

18   Q.  Okay.  I think 83-1 was a predecessor version.

19   A.  Okay.

03:05:35   20   Q.  Can you tell us why the draft of the order kept changing

21   over this, sort of, short period of time?

22   A.  Well, it only changed once, but it's a relatively short

23   period of time, within a year.

24           For organizational speed, that's --

03:05:52   25   Q.  Pretty good?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 244 of 278 PageID #:43888
6-21-18 (Ex 13)
Hickey - direct by Rosen
3219

1    A.   -- fast-track.

2    Q.   Okay.  So let's talk a little bit about 83-2, which is

3    actually Plaintiff's Exhibit 165.

4         MS. ROSEN:  Do you -- defense table 2, please.

03:06:22    5    BY MS. ROSEN:

6    Q.   And taking a look at --

7         MS. ROSEN:  Which, I think, is already in evidence.

8    You guys moved it in.

9         MR. BOWMAN:  I think it is, yes.  No objection, in any

03:06:29    10   event.

11   BY MS. ROSEN:

12   Q.   Taking a look at Detective Division Special Order 83-2, is

13   that the final 1983 version of the Special Order dealing with

14   investigative files?

03:06:42    15   A.   Yes, it is.

16   Q.   Okay.  And just generally, with respect to the Chicago

17   Police Department, they issue all kinds of directives, whether

18   it's a General Order or a Special Order, and those get updated,

19   right, from time to time?

03:06:55    20   A.   They do.

21   Q.   And this particular order, 83-2, was in effect until about

22   1986; is that right?

23   A.   Correct.

24   Q.   Okay.

03:07:06    25   A.   The only distinction I would make is that this is a

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 245 of 278 PageID #:43889
6-21-18 (Ex 13)
Hickey - direct by Rosen
3220

1  Detective Division order.  You had asked if the -- you know,

2  about the Chicago Police Department, which is a larger entity.

3  Q.  Got it.  And we'll talk about that, too.

4        So when we're talking about Special Orders, who do

03:07:20   5  they apply to?

6  A.  Detective Division Special Orders -- okay.  No.

7  Q.  Yeah, no.  You're right.  You corrected me.  I was being

8  too --

9  A.  I'm sorry.

03:07:29   10  Q.  I was being too general.  So you tell me what a Detective

11  Division Special Order is.

12  A.  A Detective Division Special Order applies to everyone

13  within the organizational command of the chief of detectives.

14  Q.  Okay.  And why was it that this order was drafted as a

03:07:49   15  Detective Division Special Order?

16  A.  The responsibility for investigating violent crime field

17  investigations is clearly that of the Detective Division.  They

18  alone have the authority and responsibility to close a case, to

19  maintain its status.  It's their report, which is the final

03:08:19   20  word in the criminal investigation.

21  Q.  Okay.  And, of course, there are other units of the Chicago

22  Police Department that get involved in criminal investigations,

23  right?

24  A.  Correct.

03:08:31   25  Q.  And what are some of those other units?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 246 of 278 PageID #:43890
6-21-18 (Ex 13)
Hickey - direct by Rosen
3221

1   A.  Almost a hundred percent of them start in the Patrol

2   Division.  The men and women in blue are the ones who start

3   writing the reports.

4   Q.  And that first report, what is it called?

03:08:49   5   A.  It's a case report.  It's generally called a case report.

6   Q.  Okay.

7   A.  It's specifically called a general offense case report.

8   Q.  Okay.  And that would be a document that's prepared

9   typically by somebody in the Patrol Division, the beat cop?

03:09:01   10   A.  Correct.

11   Q.  Okay.  And then there are other units, right, within the

12   Chicago Police Department that participate in criminal

13   investigations, right?

14   A.  Correct.

03:09:10   15   Q.  So, for example, in this case, we've heard about Gang

16   Crimes specialists.  They obviously have a role in conducting

17   criminal investigations, correct?

18   A.  Correct.

19   Q.  And this order does not apply to those other types of

03:09:22   20   units, correct?

21   A.  No.  This order was issued by the Detective Division chief.

22   Q.  Okay.  And why --

23   A.  He doesn't have the authority to issue it to another bureau

24   or division outside of his organizational responsibility.

03:09:35   25   Q.  Okay.  And do -- why was -- why is it that only -- this

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 247 of 278 PageID #:43891
6-21-18 (Ex 13)
Hickey - direct by Rosen
3222

1  type of order regarding investigative files applied only to the

2  Detective Division?

3  A.  Well, that was the issue at hand, trying to get a more

4  uniform approach to maintaining our files.

03:10:03  5          And again, it's the Detective Division responsibility.

6  The issue of homicide investigation is the final responsibility

7  of the Detective Division.

8  Q.  Okay.  So, now, let's take a look a little bit at the

9  order.  If we take a look at the Purpose, which is section II.

03:10:32  10          And does that detail -- that section detail the

11  purpose of the order?

12  A.  It does.

13  Q.  And if we take a look at subparagraph A., can you tell us

14  what that says?

03:10:51  15  A.  "Guidelines for the proper retention of official Department

16  reports, notes, memoranda, and miscellaneous documents of

17  potential evidentiary value, accumulated during the course of a

18  particular violent crime field investigation."

19  Q.  And so -- and you actually are the one that wrote this,

03:11:14  20  right?

21  A.  I am.

22  Q.  Okay.  And your intention when writing this was what

23  precisely to convey to the individuals within the Detective

24  Division that this order apply to?

03:11:29  25  A.  That the notes of detectives is not their personal

1    property.  It's the work product of the Chicago Police

2    Department and, therefore, should be preserved.

3    Q.  And prior to this period of time, was there a different

4    view by detectives working in the Detective Division regarding

03:12:01    5    who had proprietary rights over the notes, for lack of a better

6    way to describe it?

7    A.  Notes, the handwritten notes -- there's a couple of variety

8    of notes.

9    Q.  Okay.

03:12:13    10    A.  The handwritten notes were always thought to be that of the

11    detective.  Upon preparation of a supplementary report, they

12    were routinely destroyed.

13    Q.  Okay.  And then as far as typewritten notes, before 83-2

14    went into effect, what was the thinking there?

03:12:35    15    A.  The typewritten notes most often were inter-watch requests

16    for someone else working a different shift to do something, and

17    these notes, if they didn't make the supplemental report, did

18    not make the official RD number file.

19    Q.  Okay.  And in terms of how detectives then -- and even

03:13:05    20    after the promulgation of 83-2 utilized their notes, what was

21    the expectation regarding what they were supposed to -- like,

22    they take the notes and then what were they supposed to use the

23    notes for?

24    A.  I didn't understand the question.

03:13:19    25    Q.  I'm sorry.  It was a bad question.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 249 of 278 PageID #:43893
6-21-18 (Ex 13)
Hickey - direct by Rosen

3224

1    With respect to note-taking that detectives did, what

2    was the -- even before promulgation of 83-2, what was the

3    expectation regarding what the detectives were using those

4    notes for in connection with preparing their supplementary

03:13:38    5    reports?

6    A.  It was their -- to remind them, to refresh their memory as

7    they prepared the official supplementary report.

8    Q.  Okay.  Now, if we take a look at subparagraph G. regarding

9    "instructions for use of the Investigative File Folder," can

03:14:05    10    you describe what the investigative file folder is.

11    A.  First of all, this is brand new.  It really is being

12    introduced.

13    Q.  Okay.

14    A.  It's nothing more than a classic file folder that -- a

03:14:18    15    manila folder, 8 and a half by 11.  It had a two-hole punch in

16    the top of it, and reports and notes that were generated could

17    literally be placed on this clip, this two-hole clip, and then

18    it was organized according to the RD number.

19    Q.  So prior to 83-2 being in effect, that type of folder was

03:14:50    20    not being utilized by anyone in any of the Areas with respect

21    to maintaining notes or memoranda or anything like that?

22    A.  It was not.

23    Q.  Okay.  And the documents that were included in the

24    investigative file folder, was it the expectation that each of

03:15:14    25    those documents would have the RD number on it?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 250 of 278 PageID #:43894
6-21-18 (Ex 13)
Hickey - direct by Rosen
3225

1  A.  No.

2  Q.  Okay.  Was the investigative file folder organized by RD

3  number?

4  A.  Yes, it was.

03:15:30  5  Q.  Okay.  And if we take a -- well, let me just show you

6  what's been marked City Exhibit --

7        MS. CARNEY:  45.

8  BY MS. ROSEN:

9  Q.  -- 45, which is the original investigative file in this

03:15:48  10  case.  Is this the type of folder (holding up document) that

11  you envisioned when you were creating this policy?

12  A.  Yes.

13  Q.  May I take that back?

14        So it's got the two-hole punch at the top and the

03:16:11  15  metal binder that you were describing, right?

16  A.  Correct.

17  Q.  Okay.  Let's talk about subparagraph I., "instructions for

18  the use of the General Progress Report."

19        What is a general progress report?

03:16:40  20  A.  The general progress report is essentially a notepad, but

21  it was filled with a few boxes on the top and then literally

22  85% of the form, if not more, was simply blank lines.  It was

23  designed to facilitate and organize note-taking by detectives.

24        There was the hope, there was the direction that these

03:17:19  25  things would be used by the detectives in the course of their

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 251 of 278 PageID #:43895
6-21-18 (Ex 13)
Hickey - direct by Rosen
3226

1  investigation, whether they are out in the field, in a squad

2  car, or in their office interviewing suspects --

3  Q.  Okay.

4  A.  -- and witnesses.

03:17:35  5  Q.  And that was -- was that a brand-new report that was

6  created with this policy?

7  A.  It was.

8  Q.  And how was it -- is it -- was it single sheets of paper?

9  Was it a pad of paper?  How did that work?

03:17:54  10  A.  It is one single page, but it was printed on a pad of

11  paper, again, with the two-hole punches to facilitate

12  subsequent filing.

13  Q.  Okay.  And you said that the hope was that the detectives

14  would utilize that for all of their note-taking, correct?

03:18:13  15  A.  Yes, ma'am.

16  Q.  And since 83-2 was created, is there a hundred percent

17  compliance with taking all notes on the general progress

18  report?

19  A.  I don't think there's a hundred percent compliance with

03:18:31  20  almost anything.

21  Q.  Okay.  And with respect to the purpose and intent of 83-2,

22  if, for some reason, a detective were to take a note not on the

23  GPR report, what is the expectation with respect to that

24  particular note, whether it's handwritten or typed?

03:18:54  25  A.  The organization would frown but, most importantly,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 252 of 278 PageID #:43896
6-21-18 (Ex 13)
Hickey - direct by Rosen

3227

1    preserve it.  The important thing is to preserve the

2    information, even though it wasn't submitted in the proper

3    format.

4    Q.  Okay.  And why is the most important thing to preserve it?

03:19:11    5    A.  We really are about the business of truth, and we're -- we

6    don't want to throw away something that may be important.

7    Q.  Okay.  And in the first, say, 18 months or so of this new

8    General Order going into effect, do you have any understanding

9    on whether or not there was use of the general progress report?

03:19:44    10    A.  Yes, I do.

11    Q.  And what do you base that knowledge on?

12    A.  I worked in Research & Development.  Research & Development

13    not only drafts orders for the superintendent, we also are in

14    charge of all the printed documents that are used by the

03:20:05    15    Chicago Police Department.

16        On the bottom of the report -- all the reports of the

17    Chicago Police Department -- there's a little number, you know,

18    that -- it includes the date and the month that it was created.

19    And because -- I will get to the answer to your question.

03:20:20    20    Because I was in Research & Development, we also keep track of

21    the printing orders.  All the requests to reprint or print new

22    documents come through Research & Development.

23        And I went out of my way to find out how often the

24    general progress reports were used in the first 15 months, and

03:20:43    25    there was an order -- multiple orders for printing and

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 253 of 278 PageID #:43897
6-21-18 (Ex 13)
Hickey - direct by Rosen

3228

1    reprinting, totaling 140,000 of these general progress reports.

2    Q.  Okay.  And when the *Palmer* class action was first filed and

3    these changes began being made, was there some institutional

4    resistance to the change in the beginning?

03:21:09    5    A.  I don't think there was true organizational --

6    institutional resistance.  I think there was confusion.

7    Q.  And explain.

8    A.  Take, for instance, the superintendent's message about

9    notes, there was actually two on his part.  One was a teletype

03:21:29    10   that he had issued, and subsequent to that was a -- his

11   testimony in federal court.

12          In the teletype he issued, he said, you know, preserve

13   everything, including notes.  I mean, there was genuine

14   confusion about the topic of notes.  Well, I'm pretty sure he

03:21:54    15   means notes that are written on a typewriter or handwritten

16   between watches.  I'm pretty sure he doesn't mean my personal

17   notes.

18   Q.  That was the thinking?

19   A.  I -- by some.

03:22:09    20   Q.  By some?

21   A.  By some.

22   Q.  Okay.

23   A.  So, therefore, I wouldn't say it was resistance.  I would

24   say it was confusion.

03:22:14    25   Q.  Okay.  And there was -- some of the litigation that went on

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 254 of 278 PageID #:43898
6-21-18 (Ex 13)
Hickey - direct by Rosen

3229

1    addressed those kinds of issues, right?

2    A.  It did.

3    Q.  Okay.  And by the time 83-2 was promulgated, that was after

4    input by the people you had talked about, right?  The lawyers

03:22:30    5    from the City's Law Department, the plaintiffs' attorneys in

6    the *Palmer* case, after these hearings had happened, after the

7    superintendent had testified, right?

8    A.  Correct.

9    Q.  Okay.  So by the time we get to 1983 when this Special

03:22:43    10    Order is issued, from the police department's perspective, it's

11    clear that when we say notes, we mean all notes, right?

12    A.  Yes, Ms. Rosen.

13    Q.  Okay.  Now, let's talk about the investigative file

14    inventory sheet, which is subparagraph J.

03:23:05    15            What is that document?

16    A.  This is a document that I designed, I drafted.  I wanted to

17    memorialize the fact that certain items were placed into the

18    care and custody of the investigative file, and I could think

19    of nothing other than actually trying to describe it and, as

03:23:38    20    they are put in chronological order, it would be a living,

21    breathing document, you know, as of what date was something

22    submitted.

23            And it's also kind of an integrity check on the file.

24    If something says it's there, and later on it's not, well,

03:23:55    25    there's legitimate reason to ask why it's not.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 255 of 278 PageID #:43899
6-21-18 (Ex 13)
Hickey - direct by Rosen

3230

1    Q.   Okay.  And when we look at what we -- I showed you before,

2    City 45, on the front page of it is an example, right, of this

3    log, the investigative file inventory?

4    A.   It's a multi-lined inventory control sheet.

03:24:13    5    Q.   Okay.  And then if we just take a look quickly at section

6    III, the Policy, if you could just read that.

7    A.   "It is the policy of the Chicago Police Department to

8    conduct all criminal investigations in an impartial and

9    objective manner and to maintain the integrity of its

03:24:38   10    investigative files to ensure that the due process rights of

11    the accused are not only" -- or, excuse me, "are not

12    compromised during the subject investigation, initial court

13    hearing or any subsequent review.  Additionally, it is the

14    policy of the Chicago Police Department to record" --

03:24:59   15    Q.   If we could go to the next page.

16    A.   -- "and preserve any relevant information obtained by any

17    detective during the course of a violent crime field

18    investigation.

19         "When assigned to violent crime field investigations,

03:25:15   20    detectives will preserve and record information and materials

21    obtained in the course of the investigation to assure not only

22    that information and materials indicating the possible guilt of

23    the accused are preserved, but also that any information and

24    materials that may tend to show his possible innocence or aid

03:25:37   25    in his defense are preserved.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 256 of 278 PageID #:43900
6-21-18 (Ex 13)
Hickey - direct by Rosen
3231

1    "Deviation from this policy adversely impacts on the

2 goals and objectives of the Chicago Police Department and may

3 result in disciplinary action against that Department member."

4 Q. Okay. And what was the purpose of putting that policy

03:25:56 5 statement in the order?

6 A. To establish and send a message that we are the gatherers

7 of information, whether it proves or disproves the guilt or

8 innocence of an individual.

9 Q. And then the remainder part of the order then specifically

03:26:26 10 provides definitions for the various topics that we've talked

11 about, correct?

12 A. Correct.

13 Q. Okay. And then by the time we get to 1986, that order is

14 revised.

03:26:38 15    You didn't rewrite the order, right?

16 A. I did not. I had moved on from the Detective Division.

17 Q. Okay. But it was substantially the same with some minor

18 changes, correct?

19 A. Correct.

03:26:48 20 Q. Do you know what the change was?

21 A. I think there were two changes. I think they dropped the

22 purpose. And second of all, there was a section added about

23 auditing and assigning that responsibility to the exempt

24 commanders.

03:27:04 25 Q. And what's an exempt commander?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 257 of 278 PageID #:43901
6-21-18 (Ex 13)
Hickey - direct by Rosen
3232

1    A.   Exempt commander is a person who's in charge of a specific

2    subunit of the Chicago Police Department; in this case, the

3    Detective Division.  They are appointed by the superintendent

4    of police.

03:27:20    5    Q.   Okay.  And at the conclusion of the *Palmer* case, the *Palmer*

6    litigation was resolved without any findings either way

7    regarding any specific wrongful convictions; is that correct?

8    A.   That is correct.

9    Q.   Okay.  Now, let's switch topics and talk about the Subpoena

03:27:42    10    Service Unit.

11         What is the Subpoena Service Unit of the Chicago

12    Police Department?

13    A.   The Subpoena Service Unit is that one place in the Chicago

14    Police Department that all requests for subpoenas or -- all

03:27:58    15    requests for information, documents, reports, physical

16    evidence, whatever it may be, lands in the same place within

17    our large organization.

18    Q.   Okay.

19    A.   And that is within the Records Division.

03:28:15    20    Q.   And what is the Records Division?

21    A.   The Records Division is the place, the organizational

22    subunit of the Chicago Police Department which stores all

23    official reports, whether they be written or they be mugshots

24    or the arrest reports, the traffic reports, and things like

03:28:39    25    that.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 258 of 278 PageID #:43902
6-21-18 (Ex 13)
Hickey - direct by Rosen

3233

1    Q.   Okay.  And how -- back in the 1980s, early '90s, who

2    staffed the Subpoena Service Unit?

3    A.   The Subpoena Service Unit, from the time I was there, was

4    staffed by both sworn members and civilian, kind of a

03:29:04    5    hodgepodge of, you know, sworn versus civilian members.

6    Q.   Okay.  And do you know what type of training the

7    individuals that worked within the Subpoena Service Unit

8    received?

9    A.   On-the-job training.

03:29:21    10    Q.   And can you describe what that means?

11    A.   Well, by virtue of the fact it's a relatively small group

12    of people, four or five, it's kind of difficult to have formal

13    class settings and the fact that there's very little turnover

14    in a unit like that.  The newest person simply gets trained by

03:29:44    15    those who have been there and also their supervisor who, most

16    of the time, was a sergeant of police.

17    Q.   Okay.  And can you describe the process by which a subpoena

18    comes into the Subpoena Service Unit from, let's say, either a

19    prosecutor or a criminal defendant.  What happens?

03:30:04    20    A.   It lands in the Subpoena Services Unit.  Whether it

21    originally started in the superintendent's office or was

22    dropped off somewhere in a large organization, it's sent to the

23    Records Division, Subpoena Services Unit, which looks at it and

24    tries to determine what is it they're asking for.

03:30:32    25    Q.   Okay.  And how do they make that determination?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 259 of 278 PageID #:43903
6-21-18 (Ex 13)
Hickey - direct by Rosen

3234

1   A.  The nice part is the RD number.  Usually, there's an RD

2   number associated with it, or at least an arrest report number

3   in which they could find the RD number.

4           And it's interesting that the Subpoena Unit is

03:30:58  5   actually the middleman.  The Chicago Police Department does not

6   keep all of its records in one place.  The Polygraph Unit is

7   part of the Crime Lab.  If there was a request for a polygraph

8   report, they would circle the Crime Lab and send it to the

9   Polygraph Unit.  If it was a DUI, they would send it to the

03:31:25  10  Traffic Records section.  Different units.  So it's not

11  one-stop shopping.  If they wanted investigative files, they

12  would send it to the particular Area of an investigative

13  authority.

14          So they would take this subpoena, literally circle the

03:31:48  15  receiving unit, make -- and make as many copies as they need.

16  One subpoena may need information from three different

17  subunits, and they send it out to those units and say, "Respond

18  by" -- it's very date-specific because this information is

19  needed by the prosecutor or the defense attorney by a certain

03:32:16  20  date.  So the date is very important in the processing of these

21  subpoenas.

22  Q.  Okay.  And do the people in the subpoena survey -- Subpoena

23  Service Unit, when they send out these subpoenas, do they then

24  get a response from each of these different units?

03:32:34  25  A.  They do.  And then they take the responses -- and I've seen

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 260 of 278 PageID #:43904
6-21-18 (Ex 13)
Hickey - direct by Rosen

3235

1   them rubber band and collate these -- the package of responding

2   reports and then put them into their date file as to when they

3   will be delivered to the requester.

4   Q.  Do the individuals that work in the Subpoena Service Unit

03:33:00   5   have any responsibilities to review the documents, to cull it

6   for information that they don't deem relevant, or do they

7   simply take what's been provided by the responding unit, put it

8   in their date file, and then produce it?

9   A.  They process the reports.  I don't think very many of them

03:33:22   10   read the reports from cover to cover.

11   Q.  Okay.  All right.  We are going to switch gears one more

12   time and talk about lineup procedures.

13          So taking you back to the 1980s.  The Chicago Police

14   Department had written directives relating to lineup

03:33:48   15   procedures, is that correct?

16   A.  It is.

17   Q.  Okay.  And let me ask you to take a look at what's been

18   marked CX-11, which has already been admitted.

19          And this is General Order as distinct from the

03:34:06   20   Detective Division Special Order that we were talking about

21   before, correct?

22   A.  Correct.

23   Q.  And so what does it mean when it's a General Order?

24   A.  A department General Order is issued by the superintendent

03:34:18   25   of police for all members of the Chicago Police Department.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 261 of 278 PageID #:43905
6-21-18 (Ex 13)
Hickey - direct by Rosen
3236

1  Q.  Okay.  And this particular order is 83-5 that went into

2  effect on March 17th, 1983.  And this is the order that

3  remained in effect until September 24th, 1988; is that correct?

4  A.  Correct.

03:34:38  5  Q.  Okay.  So now let's take a look at just a couple of the

6  provisions of the order.

7      MS. ROSEN:  If we could go to the second page --

8  actually -- I'm sorry.  Could we go back to the first page just

9  for a second?

03:34:58  10  BY MS. ROSEN:

11  Q.  If we look at the first page of the order, at the bottom,

12  section II-G., is that where it instructs the persons that are

13  conducting the lineup about the number of fillers that are

14  required to be in the lineup per suspect?

03:35:18  15  A.  It does.

16  Q.  And does it indicate that if there's one suspect in the

17  lineup, there has to be at least five people total in the

18  lineup?

19  A.  It does.

03:35:32  20  Q.  And does it say if there's more than one suspect in the

21  lineup, the lineup should ideally consist of four non-suspects

22  in a lineup?

23  A.  Correct.

24  Q.  Okay.

03:35:44  25      MS. ROSEN:  Now, if we could switch to the second

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 262 of 278 PageID #:43906
6-21-18 (Ex 13)
Hickey - direct by Rosen
3237

1    page, subsection H.  That -- can we blow that up?  Yeah.

2    BY MS. ROSEN:

3    Q.  So that paragraph describes what's to happen regarding

4    photographing a lineup, correct?

03:36:03    5    A.  Correct.

6    Q.  And is this related to live lineups, this order?

7    A.  Yes, it is.

8    Q.  Okay.  And can you tell us what the instruction is in this

9    order regarding when, at this time, it was required to

03:36:19    10    photograph a live lineup?

11    A.  You want me to read it or just --

12    Q.  If you can just -- you don't have to read the whole thing.

13    A.  Whenever there is an identification of the suspect, an

14    evidence technician, the ones with the camera back in the day,

03:36:37    15    would be requested and directed to respond to the detective

16    area to take a photograph of the positive lineup.

17    Q.  Okay.  And if there were no identification, would there be

18    a photograph taken?

19    A.  There would not.

03:36:51    20    Q.  If there were a filler identification, would there be a

21    photograph taken --

22    A.  No, there would not.

23    Q.  -- back in 19 -- in the 1980s?

24    A.  No, there would not.

03:36:59    25    Q.  Okay.  And let's take a look at now paragraph J.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 263 of 278 PageID #:43907
6-21-18 (Ex 13)
Hickey - direct by Rosen
3238

1      Can you tell us who, pursuant to this order, has

2  responsibility for conducting live lineups?

3  A.  The responsibility is given to the Detective Division and

4  only to the members of the Detective Division.

03:37:27   5  Q.  Okay.  And can you read for us the underlined language in

6  the order.

7  A.  "In no case will a lineup be conducted without a

8  Supplementary Report being completed."

9  Q.  Okay.  And so this order instructed that regardless of the

03:37:48  10  outcome of a lineup, a lineup report had to be created; is that

11  correct?

12  A.  Yes, Ms. Rosen.

13  Q.  A live lineup?

14  A.  Yes, ma'am.

03:37:57  15  Q.  Okay.  Now, with respect to a circumstance where there was

16  no identification made in a lineup, what was the expectation of

17  the Chicago Police Department back in the 1980s?

18  A.  Prepare a report, describe those who were in the lineup,

19  and submit it to your supervisor.

03:38:19  20  Q.  With respect to a live lineup that was conducted in the

21  1980s, if there was a filler identified in the lineup, what was

22  the expectation of the Chicago Police Department back in the

23  1980s?

24  A.  It's the same as a non-identification.  A report is

03:38:38  25  required to be prepared.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 264 of 278 PageID #:43908
6-21-18 (Ex 13)
Hickey - direct by Rosen
3239

1    Q.  So at that time, back in the 1980s, the department did not

2    expect police officers to distinguish a non-identification from

3    a filler identification?

4    A.  Did not require.

03:38:52   5    Q.  Okay.

6            MS. ROSEN:  If I could have just a moment?

7    BY MS. ROSEN:

8    Q.  With respect to the lineup procedures that we were just

9    talking about, today is that different in terms of

03:39:11  10    memorializing a filler identification versus a

11    non-identification?

12    A.  Yes.

13    Q.  And do you know why it's different?

14    A.  Best practices have changed, evolved over the decades.

03:39:25  15    Q.  Okay.  And, now, the best practices are to make that

16    distinguish -- to distinguish that clearly in the reports that

17    are being prepared?

18    A.  Correct.

19            MS. ROSEN:  Thank you.  I have no further questions.

03:39:37  20            THE COURT:  I assume no other defense questions?

21            MR. LEINENWEBER:  No, Your Honor.

22            MR. GIVEN:  None, Your Honor.

23            THE COURT:  Mr. Bowman.

24            MR. BOWMAN:  Thank you, Your Honor.

03:39:44  25                    CROSS-EXAMINATION

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 265 of 278 PageID #:43909
6-21-18 (Ex 13)
Hickey - cross by Bowman

3240

1    BY MR. BOWMAN:

2    Q.  Good afternoon, Mr. Hickey.

3    A.  Hello, Mr. Bowman.

4    Q.  Just briefly, the George Jones case was an eyewitness

03:40:04    5    identification case, right?

6    A.  You know, I don't know.  I mean, I'm sorry, but I -- I

7    don't know the particulars.

8    Q.  Well, for purposes of refreshing your recollection, you

9    remember a witness by the name of Pervy Pointer and an

03:40:22    10    identification of a fellow by the name of George Jones and some

11    information about Pervy Pointer's inability to identify

12    Mr. Jones that was not provided to the criminal justice system,

13    right?  Does not ring a bell?

14    A.  I'm sorry.  It wasn't my case, so -- yeah.

03:40:42    15    Q.  Understood.  In any event, you were aware, along with many

16    others in the Chicago Police Department, generally of the

17    contours of the George Jones matter, right?

18    A.  Absolutely.

19    Q.  This was a case, without knowing the details, in which it

03:41:04    20    was very clear that there was important information that

21    detectives had developed tending to show that George Jones

22    didn't commit the crime that the criminal justice system did

23    not receive, right?

24    A.  It did not receive it at the time of discovery, but it was

03:41:25    25    turned -- or made known to the judge prior -- during the trial

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 266 of 278 PageID #:43910
6-21-18 (Ex 13)
Hickey - cross by Bowman
3241

1   or prior to the trial or -- at some point.

2   Q.  And, in fact, there was a detective by the name of Frank

3   Laverty who came forward in the middle of Mr. Jones' trial and

4   made the information from a street file known to the

03:41:45   5   participants in that case, the judge, the defense lawyers, the

6   prosecutors.  Nobody had been aware of it prior to Mr. Laverty

7   coming forward?

8   A.  Correct.

9   Q.  And the case caused quite a storm in the criminal justice

03:42:04   10  system here in Chicago.

11          MS. ROSEN:  Objection, Judge, relevance to the

12  "storm."

13  BY MR. BOWMAN:

14  Q.  It caused a storm within the Chicago Police Department.

03:42:14   15          MS. ROSEN:  Object to the form.

16          MR. BOWMAN:  Maybe I should ask --

17          THE COURT:  Yes.

18          MR. BOWMAN:  -- a better question.

19          THE COURT:  Yeah.

03:42:20   20  BY MR. BOWMAN:

21  Q.  It was a -- it was a matter of deep concern institutionally

22  to the police department that these events had transpired as

23  they had, right?

24  A.  Correct.

03:42:30   25  Q.  And that's where you come in tasked with getting your arms

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 267 of 278 PageID #:43911
6-21-18 (Ex 13)
Hickey - cross by Bowman
3242

1    around the scope of the issue.

2    A.  Yes, sir.

3    Q.  Yes?  And that's the reason why you did the work that you

4    described when Ms. Rosen was asking questions, going out and

03:42:47    5    finding exactly how detectives were recording information about

6    cases and whether they were preserving the information, right?

7    A.  Correct.

8    Q.  And you learned that there were -- you said this earlier

9    this afternoon.

03:43:05    10    There were various practices and policies and

11    procedures going on in various locations around the police

12    department.  I mean, there was no uniformity.  That's all I'm

13    trying to --

14    A.  There was a lack of uniformity.

03:43:18    15    Q.  And generally speaking, many detectives in the police

16    department had the impression that their notes were their own

17    personal property.

18    A.  That is correct.

19    Q.  And that they were free to destroy them at the end of a

03:43:39    20    case if they chose to do so.

21    A.  I was a detective, and I destroyed mine.

22    Q.  They were free to keep them in their own possession, in a

23    locker, in the trunk of a car, in their basement, and not make

24    them part of the official documentation of the police

03:44:05    25    department.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 268 of 278 PageID #:43912
6-21-18 (Ex 13)
Hickey - cross by Bowman
3243

1   A.   Those notes were never addressed by the Chicago Police

2   Department, so, therefore, the detectives rightfully thought

3   they could do almost anything with them.

4   Q.   That was the culture that was engrained in the department

03:44:20   5   at the time?

6   A.   It was the practice.  I'd like to draw a distinction

7   between culture.

8   Q.   Fair -- fair enough.

9   A.   Okay.

03:44:30   10   Q.   Would you agree with me that it was an engrained,

11   entrenched practice?

12   A.   Yes.

13   Q.   And obviously, this was a problem for the supervisors

14   within the Chicago Police Department that this was occurring,

03:44:49   15   and you set about to correct this process to the best of your

16   ability.  Did I --

17   A.   Yes.

18   Q.   -- load too much into that question?

19   A.   No.  I mean, it -- we were concerned.  I was assigned

03:45:07   20   fact-finding and also came up with, I thought, a procedure that

21   would address the problem.

22   Q.   And to be clear -- and just to back up for a minute, talk

23   just generally about notes.

24           Taking notes, that's part of what detectives do,

03:45:28   25   right?  It's a -- if you're going to be a detective, you're

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 269 of 278 PageID #:43913
6-21-18 (Ex 13)
Hickey - cross by Bowman

3244

1  going to take notes?

2  A.  I don't know how you can do it without taking notes.

3  Q.  Nobody's got a photographic memory.  You talk to somebody.

4  You need to make a record of what they say.

03:45:41  5  A.  Correct.

6  Q.  So the notes are fundamental, right?

7  A.  For most human beings, yes.

8  Q.  And so we all agree -- and you've said this -- that

9  everyone in the criminal justice system is entitled to see

03:45:58  10  notes that detectives make along the course of an

11  investigation.

12  A.  Yes.  That is the policy established by Superintendent

13  Brzeczek.

14  Q.  And indeed, the notes will reflect the progress that an

03:46:16  15  investigation takes over time as detectives go about their

16  work, right?

17  A.  I don't know if it's always progress.  Sometimes it's kind

18  of a plateau, the same story over and over or -- but yes, it

19  certainly records different aspects of different interviews,

03:46:38  20  what we've learned.

21  Q.  Indeed, an investigation may plateau, right, at some point?

22  A.  Correct.

23  Q.  An investigation may start down one direction and then that

24  becomes a dead end, right?

03:46:51  25  A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 270 of 278 PageID #:43914
6-21-18 (Ex 13)
Hickey - cross by Bowman
3245

1  Q.  Or something that seemed innocuous and unimportant at the

2  beginning of an investigation may turn out to be a critical

3  piece of an investigation, right?

4  A.  It may.

03:47:06  5  Q.  And so all of these are reasons why it's important, if

6  you're to have a full picture of an investigation, that

7  everybody gets to see the notes, right?

8  A.  Everything that's been preserved, yes.

9  Q.  That way, you see the tracks of the investigation, right?

03:47:31  10  A.  You see the results of multi -- a multitude of interviews.

11  Q.  And you see the -- a process that might occur of

12  investigating a suspect, eliminating that individual, for

13  example?

14  A.  Yes, sir.

03:47:48  15  Q.  And the problem that *Jones* crystallized was that these

16  tracks, this process of progress was too often not being

17  included in the official record that was produced, and *George*

18  *Jones* exemplified that; is that fair?

19  A.  It occurred.  We were concerned about it.  You know, "too

03:48:17  20  often" is kind of a wide term.  But yes, it did occur.

21  Q.  And to be clear -- I'm not trying to commit you to how

22  often it occurred.

23       We all agree that it should never occur, right?

24  A.  Yes, sir.

03:48:37  25  Q.  And so at the end of your investigation, you authored a

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 271 of 278 PageID #:43915
6-21-18 (Ex 13)
Hickey - cross by Bowman
3246

1  policy that Ms. Rosen asked you a few questions about just a

2  few minutes ago, Detective Division Special Order 83-2.

3  A.  I drafted it.  The chief of detectives issued it.

4  Q.  And that is a very proper clarification.

03:49:09  5  A.  Yes.

6  Q.  Thank you.  But to be clear, you were the author of this.

7  And we've had a lot of testimony about general progress reports

8  in this case.  You are the father of the general progress

9  report, among other things, right?

03:49:25  10  A.  Yes, sir.

11  Q.  So I want to ask you a few questions about the policy that

12  you drafted that was issued by the chief of the Detective

13  Division.

14        The fundamental thrust of 83-2 was that notes that

03:49:52  15  detectives take are no longer personal property of the

16  detectives, right?

17  A.  We are to preserve everything, and we made perfectly clear

18  that those notes previously thought to be personal property are

19  now the work product of the Chicago Police Department.

03:50:12  20  Q.  And they were to be preserved and they were to be placed in

21  a file known as an investigative file, right?

22  A.  Yes, sir.

23        MR. BOWMAN:  And if I could have the Elmo back again?

24  BY MR. BOWMAN:

03:50:37  25  Q.  Your policy contained detailed explanation and requirements

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 272 of 278 PageID #:43916
6-21-18 (Ex 13)
Hickey - cross by Bowman
3247

1  with respect to the investigative file, right?

2  A.  Yes, sir.

3  Q.  You talked about the clips at the top of the file to hold

4  everything in place.

03:50:59  5  A.  Awfully detailed.

6  Q.  And there was a folder that everything was supposed to be

7  in.  Yes?

8  A.  Yes, sir.

9  Q.  And a -- even a document repository so that if a detective

03:51:15  10  collected something that was off-size and didn't fit within the

11  clips, there was a way to make sure that it was preserved and

12  kept, right?

13  A.  Yes, sir.

14  Q.  And then there was an inventory form, which you've talked

03:51:30  15  about, so that everybody would have a record of exactly what

16  was contained in the file.

17  A.  Yes, sir.

18  Q.  Now, in 83-2, is there any provision as to the procedures

19  and the mechanisms for taking the investigative file and

03:52:01  20  producing it to the persons in the criminal justice system who

21  have need of the information, the defense lawyer, the

22  prosecutor, and the judge?

23  A.  I can only think of one thing that might fit what you're

24  asking, and that is the investigative inventory.

03:52:22  25        When an arrest has been made in a violent crime field

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 273 of 278 PageID #:43917
6-21-18 (Ex 13)
Hickey - cross by Bowman
3248

1    investigation, a copy of that inventory of the investigative

2    file is supposed to be sent to the official downtown keeper of

3    records in the RD file, and so that that might provide notice

4    to those who come in the future asking for information to

03:52:52    5    inform them that such a thing exists.

6    Q.  All right.  So what the policy does is it provides in

7    subsection D., as you've just testified, that the investigative

8    file inventory sheet, which we just talked about a few minutes

9    ago, that whenever charges are placed against a person, to

03:53:18    10    ensure notice of existing documents, the investigative file or

11    the inventory form is to be placed in the downtown file, right?

12    A.  Yes, sir.

13    Q.  And another name for the downtown file that we've heard in

14    this case is the permanent retention file, right?

03:53:46    15    A.  For homicides, it's permanent retention.

16    Q.  Right.  And here, of course, we're involved in talking

17    about a homicide case.  So with respect to the case that's in

18    issue in this courtroom, the downtown file would be known as

19    the permanent retention file, right?

03:54:05    20    A.  Yes, sir.

21    Q.  And, of course, it's important that the inventory sheet go

22    into that file for the very reasons you just described, in

23    order to give everyone in the system notice of the contents of

24    the investigative file, yes?

03:54:23    25    A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 274 of 278 PageID #:43918
6-21-18 (Ex 13)
Hickey - cross by Bowman
3249

1  Q.  And if the inventory sheet, for some reason, were not to be

2  placed in the permanent retention file, that would be a --

3  first of all, a deviation from policy, yes?

4  A.  Yes, sir.

03:54:40  5  Q.  And it would also result in the problem that nobody would

6  know what's in the investigative file, right?

7  A.  If it was -- I don't know if it was a deviation of policy.

8  Yes, it's certainly a deviation of procedure.

9  Q.  And just to be --

03:55:05  10  A.  But, but in homicides, there are investigative files.  So

11  in the absence of an inventory sheet in the permanent downtown

12  file, one would have to think there was an investigative file

13  in the detective area.

14  Q.  Right.  And my question is, apart from the inventory sheet,

03:55:30  15  which is mentioned in the provision that we just talked about,

16  is there any procedure or mechanism in the Chicago Police

17  Department's policies as to how the investigative file at the

18  Area is to be produced to the participants in the criminal

19  justice system?

03:55:50  20  A.  Not to my knowledge.

21  Q.  The -- let me just show you, while we're thinking about it,

22  a copy of Plaintiff's Exhibit 20.

23     (Counsel conferring.)

24  BY MR. BOWMAN:

03:56:34  25  Q.  So let me turn to something that you also talked about with

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 275 of 278 PageID #:43919
6-21-18 (Ex 13)
Hickey - cross by Bowman
3250

1   Ms. Rosen.

2       This policy that I've been asking you about is a

3   Detective Division Special Order, right?

4   A.  Yes, sir.

03:56:50   5   Q.  And you said in response to Ms. Rosen that a Detective

6   Division Special Order relates to the Detective Division,

7   right?

8   A.  Yes, sir.

9   Q.  It is not a policy that concerns the entire police

03:57:05   10   department?

11   A.  Correct.

12   Q.  It is, instead, rules and requirements that pertain to the

13   Detective Division alone, right?

14   A.  Yes, sir.

03:57:15   15   Q.  The Detective Division does not encompass Gang Crimes,

16   right?

17   A.  Correct.

18   Q.  And Gang Crimes is, if we were to have a policy relating to

19   Gang Crimes, we would have a Special Order that related to the

03:57:46   20   Gang Crimes, yes?

21   A.  That would be the way, yes.

22   Q.  Now, what that means is that all of these rules as to the

23   preservation of notes, the treatment of notes as the property

24   of the Chicago Police Department that are contained in Special

03:58:11   25   Order -- Detective Division Special Order 83-2, those don't

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 276 of 278 PageID #:43920
6-21-18 (Ex 13)
Hickey - cross by Bowman

3251

1    apply to a Gang Crimes specialist, right?

2    A.  Correct.

3    Q.  So if, for example, there were to be notes that were

4    created by a Gang Crimes specialist who was investigating a

03:58:33    5    crime, those notes would not be governed by 83-2, right?

6    A.  The notes would not, but certainly there's an obligation by

7    all department members, whether they're in Gang Crimes or

8    Narcotics or anywhere else, if they have information, you know,

9    they either prepare a supplementary report with the information

03:58:58    10    they have or pick up the phone, call the local detective area,

11    "This is what I learned."

12    Q.  Right.  And, of course, we all have -- everybody working in

13    the police department has the obligation to abide by

14    constitutional requirements, right?

03:59:16    15    A.  Yes, sir.

16    Q.  But we're talking about your policy, the 83-2, and those

17    restrictions don't apply to Gang Crimes, right?

18    A.  They do not.

19        MR. BOWMAN:  Your Honor, this might be a good place to

03:59:32    20    stop.

21        THE COURT:  Okay.  And it's time.

22        Ladies and gentlemen, again, ten minutes late

23    tomorrow, 9:40.  Have a good evening.  Hopefully, it's not

24    going to keep raining all evening.

04:00:11    25    (Jury out.)

1        THE COURT:  Okay.  Again, let me know.  I'm going to

2   try to get that ruling to you before we start tomorrow.

3        MS. ROSEN:  It will just dictate the length of the

4   testimony, obviously, and so we have to get witnesses lined up.

04:00:24   5        THE COURT:  Right.  But it's --

6        MS. ROSEN:  Yeah, no, I got it.  I --

        THE COURT:  Yeah.

        MS. ROSEN:  Yeah, I appreciate it.  Thanks.

        THE COURT:  It may be brief.  I mean, that may just be

04:00:31   the way we have to deal with it without --

        MS. ROSEN:  The order may be brief?

        THE COURT:  The order may be brief.

        MS. ROSEN:  Yeah, yeah.  Appreciate it.

        THE COURT:  We'll see.

04:00:51      (Adjournment at 4:01 p.m. until 9:40 a.m., 6/22/18.)

6-21-18 (Ex 13)

C E R T I F I C A T E

We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 13-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 21, 2018.

/s/ Nancy L. Bistany, CSR, RPR, FCRR     06/22/18

/s/ Colleen M. Conway, CSR, RMR, CRR     06/22/18

Official Court Reporters        Date
United States District Court
Northern District of Illinois
Eastern Division