# EXHIBIT 55

4722

```
1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3

4    NATHSON E. FIELDS,                    )   Docket No. 10 C 1168
                                           )
5                          Plaintiff,      )
                                           )
6                 vs.                      )
                                           )
7    CITY OF CHICAGO, et al.,              )   Chicago, Illinois
                                           )   December 8, 2016
8                          Defendants.     )   9:40 o'clock a.m.

9

10                   TRIAL TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
11                          VOLUME 16-A

12   APPEARANCES:

13

14   For the Plaintiff:      LAW OFFICE OF H. CANDACE GORMAN
                             BY:  MS. H. CANDACE GORMAN
15                            220 South Halsted Street, Suite 200
                             Chicago, IL  60661
16                            (312) 441-0919

17
                             LOEVY & LOEVY
18                           BY:  MR. JONATHAN I. LOEVY
                                  MR. STEVEN EDWARDS ART
19                                MR. ANAND SWAMINATHAN
                             311 North Aberdeen Street, 3rd Floor
20                           Chicago, IL  60607
                             (312) 243-5900
21

22

23   Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
24                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
25                           (312) 435-5639
```

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 3 of 80 PageID #:23000
Noble - direct by Mr. Burns
4808

1          MR. BURNS:  Thank you.

2                        - - -

3          JEFFREY NOBLE, DIRECT EXAMINATION

4    BY MR. BURNS:

5    Q.  Good morning.

6    A.  Good morning, sir.

7    Q.  Would you kindly tell the ladies and gentlemen of the jury

8    your name and, for the benefit of our record, spell your last

9    name?

10   A.  Jeff Noble, N-o-b-l-e.

11   Q.  And, Mr. Noble, will you tell the ladies and gentlemen of

12   the jury what your profession or occupation is?

13   A.  I am a consultant for police practices.

14   Q.  A consultant for police practices.  Help us out.  What is

15   police practices?

16   A.  I was a police officer for almost 30 years, and as a

17   consultant for police practices, what I do is I consult with

18   police agencies, sometimes with cities, regarding a variety of

19   issues, from internal affairs investigations to disciplinary

20   issues, use of force pursuits, supervision, policies,

21   administrative issues with policing.

22   Q.  As a result of that experience and the work that you do,

23   are you familiar with police practices throughout the country?

24   A.  I am.

25   Q.  And, furthermore, are you familiar in terms of, given your

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 4 of 80 PageID #:23001
Noble - direct by Mr. Burns
4809

1  experience, how different departments will deal with subjects

2  such as working files or investigative files?

3  A.  Yes, sir, I am.

4  Q.  So you told us you were in law enforcement; is that

5  correct?

6  A.  Yes, sir.

7  Q.  Would you tell us a little bit more about your experience

8  in law enforcement.

9  A.  I became a police officer in 1984 in Irvine, California.

10  Irvine is a city that's got a population of about 215,000,

11  about 200 sworn police officers in south Orange County, a

12  little bit south of Disneyland, just inland from Newport

13  Beach.  I began there as a police officer.  I worked as an

14  officer in patrol for about four years.

15        In the late '80s, I was assigned to a narcotics unit.

16  I did narcotics for about four and a half years in an

17  undercover capacity.  Went back to patrol for a short period

18  of time, was promoted to sergeant.

19        As a sergeant, I supervised the patrol unit.  Then I

20  was assigned to a variety of positions.  I was a sergeant for

21  about 10 years.  I was assigned to emergency management.  I

22  was assigned to our training unit for about two years.

23        In our training unit, not only was I responsible

24  to -- for hiring but training all the current officers,

25  ensuring that all of our new officers went to the police

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 5 of 80 PageID #:23002
Noble - direct by Mr. Burns
4810

1   academy, that they were getting qualified.

2          But I was also responsible for the department's

3   policy manual during that period of time, so I reviewed all of

4   our policies, I would write policies.  If the chief wanted to

5   change policies or I wanted to make a recommendation for

6   change in policy, I would do that.

7          I was also as a sergeant in our internal affairs unit

8   for about four years.  I was a SWAT sergeant for seven years,

9   which is a collateral assignment, so I did that in addition to

10  what I was -- my primary assignment of sergeant.

11         I was then promoted to lieutenant.  As a lieutenant,

12  I was a watch commander in a patrol.  I was a lieutenant for

13  about three months before I was promoted to commander.

14         As a commander, the City of Irvine has the chief of

15  police, one deputy chief, and then three commanders.  Each

16  commander was responsible for about a third of the city.  So

17  my area of responsibility for the eight years that I was a

18  commander was what we call the university area, which is the

19  southern portion of the city, which is -- if you're familiar

20  with southern California, it's the area around John Wayne

21  Airport.

22         The University of California, Irvine, is within the

23  city of Irvine.  It actually has its own police department,

24  but I was the liaison.  And because their police department is

25  relatively small, if there were any serious matters that would

Noble - direct by Mr. Burns

4811

1  happen at the university, the Irvine Police Department would

2  come in and take over because it was technically within our

3  city.

4         And then after being a commander for eight years, I

5  was the deputy chief of police for the last two years of my

6  career.

7  Q.  Your experience, you talked a little bit about

8  responsibility for reviewing and developing policies, correct?

9  A.  Yes.

10 Q.  And just so it's clear, how long a period of time were you

11 with the Irvine, California, police department?

12 A.  I was there for 28 years before I retired.

13 Q.  And part of that experience was the review and drafting of

14 policies.  Did those policies include policies relative to

15 investigative notes taken during the course of homicides?

16 A.  No, we didn't have a specific policy regarding

17 investigative notes.

18 Q.  You did not?

19 A.  No, sir.

20 Q.  Okay.  We'll come back to that.

21        Tell me, if you would, beyond the experience in

22 Irvine, your further involvement in law enforcement?

23 A.  For about the last 12 years, even while I was still

24 working with Irvine, I started doing some consulting work that

25 mostly consists of doing expert witness work like I am today

1   but also consists of working with police departments directly.

2   Sometimes I've been hired by cities, like the City of San

3   Francisco and City of Austin, when they would have a major

4   event in their city.

5           And that -- for example, in Austin, it was two

6   officer-involved shootings, in San Francisco, it was the

7   indictment of nine members of their command staff, where

8   internal investigations were conducted, and the city lacked

9   some confidence or had some concerns regarding those

10  investigations.  And I was hired as a consultant to review

11  those investigations to determine the reasonableness of the

12  investigation that was conducted.

13          I've also been hired as a consultant in cities like

14  Seattle based on a consent decree and reviewed all their use

15  of force incidents for a year to look at the reasonableness

16  and the completeness and thoroughness of their use of force

17  investigations as they worked with the monitor that was

18  appointed by the federal court to monitor the City of Seattle.

19  Q.  In cases in which you have acted as an expert -- and you

20  said such as cases as we are here today, correct?

21  A.  Yes.

22  Q.  And on those cases, are you typically just involved on

23  behalf of police departments or law enforcement agencies?

24  A.  No, I have been retained as an expert witness probably in

25  excess of 125 times, and it's a pretty even split between

Noble - direct by Mr. Burns

4813

1  plaintiffs, people suing the police, and police departments.

2  And I've also been retained in criminal trials where police

3  officers are being prosecuted.  And each of those times, I was

4  retained by the prosecutor's office to offer opinions where I

5  felt an officer had done something improperly and they were

6  being criminally prosecuted.

7  Q.  Have you given expert testimony in courts throughout the

8  country?

9  A.  I have.

10  Q.  And is that both in federal and state courts?

11  A.  It is, yes.

12  Q.  Tell us a little bit, if you would, just briefly, about

13  your educational background in addition to your experience in

14  law enforcement.

15  A.  I have a bachelor's degree in criminal justice from Cal

16  State, Long Beach.  While I was working as a police officer, I

17  went to law school.  A university in Irvine offered a program

18  where you went part time.  So I went to law school, I

19  graduated, passed the bar.  I am licensed in the state of

20  California as an attorney.

21          But I really never practiced law.  When I first got

22  out of law school, I worked for a very short period of time on

23  a part-time basis with a law firm to see whether or not I

24  liked it.  That was in the early '90s.  But since then, I

25  haven't practiced law at all.

Noble - direct by Mr. Burns

4814

1   Q.  Tell us a little bit more about your involvement in terms

2   of police practices.  Have you been called upon to give

3   lectures to various groups or entities relative to police

4   practices?

5   A.  Yes.

6   Q.  And where has that been, if you could elaborate --

7   A.  Just -- I made presentations for the International

8   Association of Chiefs of Police, IACP.  They do an annual

9   conference.  It's about 10,000 people.  I've done

10  conferences -- I've taught conferences there three or four

11  times.

12          I've taught for the department -- the federal

13  Department of Justice through COPS office.  I have been

14  retained by the Mexican government to go to Mexico to teach

15  the state and federal police about how to conduct internal

16  affairs investigations.

17  Q.  Have you also contributed to professional literature

18  within your area of discipline and expertise?

19  A.  I have.  I drafted and published about 20 articles for

20  policing magazines; in one case, an academic journal; a couple

21  articles in The Atlantic magazine, it's more for public

22  consumption.

23          I've published a textbook on managing accountability

24  for police about how to conduct an internal affairs

25  investigation, and I published a couple chapters in

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 10 of 80 PageID #:23007
Noble - direct by Mr. Burns
4815

1  college-level textbooks.

2  Q.  As part of your work in dealing with matters such as

3  you're involved here over the past many years -- I think you

4  said last 10 to 12 years; is that correct?

5  A.  Yes.

6  Q.  -- (continuing) have you ever been involved in work on

7  behalf of the Chicago Police Department?  I don't want to get

8  into the specifics of it, but have you been involved with that

9  work?

10  A.  I have.

11  Q.  And over what period of time?

12  A.  The last 12 years.

13  Q.  Are you being compensated for your time here today, your

14  professional time?

15  A.  Yes, I am.

16  Q.  And what is your hourly rate of compensation, sir, if you

17  would share that with us?

18  A.  $295 an hour.

19  Q.  Now, if I may, Mr. Noble, I'd like to direct your

20  attention to approximately June of this year, earlier this

21  year in June.  Were you engaged by my firm to become involved

22  to review certain policies relative to the Chicago Police

23  Department?

24  A.  Yes, sir, I was.

25  Q.  And as part of that engagement, were you provided with

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 11 of 80 PageID #:23008
Noble - direct by Mr. Burns
4816

1  certain materials relative to your review?

2  A.  Yes, I was.

3  Q.  And I don't want to go in -- I know we have your report, I

4  believe there are approximately two pages of material, but

5  could you highlight, in essence, the materials that were

6  provided to you for the ladies and gentlemen of the jury.

7  A.  Sure.  I was provided copies of the policies that are at

8  issue in this case.  I reviewed deposition testimony and trial

9  testimony from Director Hickey, Mr. Brasfield's report,

10  Mr. Brasfield's deposition in this case and some other cases

11  where Mr. Brasfield has testified, I reviewed the depositions

12  of Detectives Brown and Colby, who worked in the subpoena

13  unit.  That's generally the material I've read.

14  Q.  And were you asked to address the issue of the working

15  files or street files, as we've heard that terminology before?

16  A.  Yes.

17  Q.  And beyond that, were you also asked about retention of

18  that information, materials that might have been obtained

19  through working or street files?

20  A.  Yes, I was.

21  Q.  Did you also address the issue of the subpoena unit and

22  how the Chicago Police Department responds to subpoenas in

23  matters in which violent crimes have been charged against

24  individuals and the response by the Chicago Police Department?

25  A.  Yes.

Noble - direct by Mr. Burns

4817

1  Q.  So let's begin then, if we may.  I'd like to direct your

2  attention --

3          MR. BURNS:  And, your Honor, is the computer -- may I

4  have the computer?

5  BY MR. BURNS:

6  Q.  -- (continuing) to Defendants' Exhibit No. 54.

7          MR. BURNS:  Jon, do you have it?  I don't think

8  there's any objection to that.

9          Oh, I'm sorry.  It's 83-1.

10  BY MR. BURNS:

11  Q.  Are you able to see that, sir?

12  A.  Yes.

13  Q.  And this is a detective division Special Order No. 83-1.

14  Do you see that?

15  A.  Yes.

16  Q.  And are you familiar with that, based on your review in

17  this case?

18  A.  Yes, I am.

19  Q.  And when, in fact, was that issued?

20  A.  February 3, 1983.

21  Q.  February -- that's the effective date?

22  A.  Yes.

23  Q.  And immediately to the left, it specifies the date that

24  the order was issued; is that correct?

25  A.  Yes.  That's January 13, 1983.

Noble - direct by Mr. Burns

4818

1  Q.  And that special order was issued by the chief of

2  detectives; is that also correct?

3  A.  Yes, sir.

4  Q.  And that, at the time, was a William Hanhardt?

5  A.  Yes, sir.

6  Q.  What was the subject of 83-1?

7  A.  This was a policy that was written to direct officers to

8  maintain their investigative notes.

9  Q.  So the subject matter was the investigative notes; is that

10 correct?

11 A.  Yes.

12 Q.  Investigative notes, is that all part and parcel of a

13 working file?

14 A.  Well, the Chicago Police Department has three separate --

15 essentially, three separate filing systems, and they go by

16 different names.  So they have a permanent retention file,

17 which contains the original case report and supplemental

18 reports, those formal reports.

19       They have an investigative file, which would contain

20 what this policy is talking about, which are the investigative

21 notes, to/from memorandums, notes that are taken by

22 detectives.

23       And then they have this third thing called a working

24 file, and a working file is nothing more than copies of

25 documents that may be in one of those first two permanent

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 14 of 80 PageID #:23011
Noble - direct by Mr. Burns
4819

1   files.  And the purpose of a working file is so a detective

2   doesn't have to go, you know, to records every time or go to a

3   building that -- you know, you want to refresh your memory

4   about something, about what somebody said or what somebody did

5   or what another detective did who may have taken some notes or

6   wrote a report, it's just copies of a file that you would keep

7   with you at your desk or in your car as you're out conducting

8   your investigation.

9   Q.  So investigative notes that are prepared during the course

10  of an investigation are typically part of a working file; is

11  that correct?

12          MR. LOEVY:  Objection.  Leading, your Honor.

13          THE WITNESS:  Well, it could be --

14          THE COURT:  When you hear an objection, stop.

15          The objection is sustained.

16  BY MR. BURNS:

17  Q.  Let's go back.  Working file, you've told us that working

18  files have also been referred to as street files?

19  A.  Yes, they are.

20  Q.  All right.  Subject of 83-1 is the working or street file;

21  am I correct?

22  A.  Well, it's both the working and street file and the

23  investigative file.

24  Q.  So we have heard, just to explain for the ladies and

25  gentlemen of the jury, something about a murder book.  Do you

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 15 of 80 PageID #:23012
Noble - direct by Mr. Burns
4820

1   remember that terminology?  Have you heard that before in your
2   professional experience?
3   A.  I'm familiar with murder books.
4   Q.  And would you explain to the ladies and gentlemen of the
5   jury what a murder book is.
6   A.  Well, when the investigators are, you know, particularly
7   conducting murder and homicide investigations, they will form
8   what's called a murder book, and a murder book is nothing more
9   than a working file that is copies of all the reports and
10  copies of all the investigative notes.  And, again, that's
11  copies of these files.  It's a working file or a murder book
12  that's kept at your desk to help the detective as they're
13  going through and conducting their investigation.
14  Q.  So in this case with regard to working files, let's talk
15  about notes; specifically, notes that homicide detectives
16  would be taking during the course of investigation.  All
17  right?
18          According to 83-1, what should happen to those notes
19  that detectives would be taking during the course of a
20  homicide investigation?
21  A.  All their notes must be retained and placed as part of the
22  investigative file.
23  Q.  Now, are you familiar with the accepted police practices
24  relative -- throughout this country relative to investigative
25  notes that are obtained by detectives in the course of

Noble - direct by Mr. Burns

4821

1    investigations?

2    A.  Yes.

3    Q.  And how are those investigative notes handled, according

4    to the accepted police practices?

5    A.  Generally accepted police practices, if you take notes on

6    an investigation, you'll use those notes to write your formal

7    report.  The formal report will be maintained, and your notes

8    will be destroyed.

9    Q.  And the notes are destroyed?

10   A.  Yes, sir.

11   Q.  And how does Chicago then differ with that concept?

12   A.  They require that those notes are maintained.

13   Q.  So by maintaining them, does it help you form an opinion

14   as to the special order or policy of the Chicago Police

15   Department with regard to notes, homicide detectives' notes,

16   taken during the course of their investigation?

17   A.  Yes.  Their policy is above and beyond what other agencies

18   across the country require.

19   Q.  All right.  So in the course of this investigation, you've

20   told us what you have done relative to these notes.  In terms

21   of your review and your understanding, what does this policy

22   intend to accomplish?  What is its purpose, as you understood

23   it and set forth in the policy itself?  And I'm going to refer

24   you, if I may, to page 1, purpose, if you see that before you.

25   A.  Yes.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 17 of 80 PageID #:23014
Noble - direct by Mr. Burns
4822

1    Q.  And what does it say, if you look to at least paragraph

2    A --

3              MR. BURNS:  If you'd highlight that, please.

4    BY MR. BURNS:

5    Q.  And would you share that with the ladies and gentlemen of

6    the jury?

7    A.  Sure.  The purpose as specifically written are that, These

8    guidelines are for the proper retention of official department

9    reports, notes, memoranda, and miscellaneous documents of

10   potential evidentiary value accumulated during the course of a

11   particular violent crime field investigation.

12   Q.  And if we would then drop down to the policy itself.  Do

13   you see that?  Is that stated on there as well, sir?

14   A.  Yes, it is.

15   Q.  And it's labeled Roman numeral number III, policy; am I

16   correct?

17   A.  Yes.

18   Q.  If we could highlight that then.  It begins on this page

19   and carries over to the next?

20   A.  Yes, sir.

21   Q.  Would you share that then with the ladies and gentlemen of

22   the jury.

23   A.  Sure.  It's the policy of the Chicago Police Department to

24   conduct all criminal investigations in an impartial and

25   objective manner and to maintain the integrity of this

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 18 of 80 PageID #:23015
Noble - direct by Mr. Burns
4823

1  investigative files to ensure that due process rights of the

2  accused are not compromised during the subject investigation,

3  initial court hearing, or any subsequent reviews.

4     Additionally, it is the policy of the Chicago Police

5  Department to record and preserve any relevant information

6  obtained by any detective during the course of a violent crime

7  field investigation.

8  Q.  Does it go on to set forth what the policy is in terms of

9  what it's trying to keep for the benefit of future review?

10  A.  Yes, sir, it does.

11  Q.  And would you tell and share that with the ladies and

12  gentlemen of the jury?  Would you continue to read what that

13  policy states?

14  A.  Sure.  It continues to state, When assigned to violent

15  crime field investigations, detectives will preserve and

16  record information and materials obtained in the course of the

17  investigation to assure not only that information and

18  materials indicating the possible guilt are preserved but also

19  that any information and materials that may tend to show his

20  possible innocence or aid in his defense is preserved.

21     Deviation from this policy adversely impacts the

22  goals and objectives of the Chicago Police Department and may

23  result in disciplinary action against that department member.

24  Q.  So if I understand, the objective at the end is to keep

25  everything; is that true?

Noble - direct by Mr. Burns

4824

1  A.  Yes, sir.

2  Q.  Now, this policy, when it was implemented in 1983, was

3  there training relative to that policy, as you understand it,

4  based upon your review of this case?

5  A.  Yes.

6  Q.  And would you share with the ladies and gentlemen of the

7  jury your understanding of the training that was provided to

8  the detectives who would be impacted by this policy?

9  A.  It's my understanding that Director Hickey personally

10  taught training classes for every detective that lasted, as I

11  recall, three or four hours regarding this specific policy.

12  Q.  And the specific policy again is to keep all notes

13  relative and other records relative to homicide

14  investigations; is that correct?

15  A.  Yes, that's correct.

16  Q.  Does the policy or any subsequent policies to this -- a

17  special order, is it fair to call that a policy?

18  A.  Yes.

19  Q.  Does this policy or any subsequent policies address the

20  issue of review to ensure compliance?

21  A.  Well, every policy that's written as part of a police

22  manual requires some level of review, so every policy that's

23  enacted, supervisors are responsible to conduct reviews and

24  ensure that their employees are following those policies.

25        Specifically, in another version of this policy that

Noble - direct by Mr. Burns

4825

1   came out in 1986, there was a provision that was specifically

2   added that mandated the exempt members, so people who are in

3   management staff would conduct periodic unscheduled

4   inspections to ensure that this policy is being followed.

5   Q.  And was that also anticipated in the earlier policies that

6   the supervisors would be reviewing to ensure compliance?

7   A.  Right.  Again, as I said before, every policy within a

8   police department's policy manual, supervisors are responsible

9   to ensure compliance.

10  Q.  Now, you talked a little bit about the training that

11  Director -- Assistant Director Hickey was involved with when

12  the policy was developed and implemented, correct?  You just

13  told us about that?

14  A.  Yes, sir.

15  Q.  Is there also, as you understand it, training for men and

16  women of the Chicago Police Department who would be promoted

17  and assigned to the detective division?

18  A.  Yes.  It's my understanding that when you become a

19  detective, you're required to attend a course, I can't recall

20  if it was a week or two weeks long, about how to be a

21  detective, and these policies would be covered during that

22  course.

23  Q.  Are there also -- is there also discussion based upon your

24  review in this case of GPRs?

25  A.  Yes, sir.

Noble - direct by Mr. Burns

4826

1  Q.  And what is a GPR, as you understand it?

2  A.  Well, a GPR, it stands for general progress report, and

3  it's really nothing more than a form to take notes on.

4  Q.  So that form was intended, though, for the police

5  department, members of the detective division, to actually

6  write their notes on a form that says "general progress

7  report"?

8  A.  Yes, that's what it's intended for.

9  Q.  And if someone were to obtain handwritten notes, should

10 they discard those if they are not written on a general

11 progress report, or how is that handled?

12 A.  No.  The goal of the policy is to maintain your notes.  So

13 if the detectives' out in the field and they don't happen to

14 have this form with them, you know, we certainly wouldn't want

15 to discourage them from taking notes.  So they would take

16 notes, whether they used a notepad or a napkin or whatever was

17 convenient, whatever they wrote their notes on; they would be

18 required to maintain that document.

19 Q.  Now, you told us that you compared this policy and its

20 progeny, this special order, and compared it -- tried to

21 compare it with other departments throughout the United

22 States, true?

23 A.  I tried to, yes.

24 Q.  And you said no one seems to have it but Chicago?

25 A.  Well, I didn't say that, yeah, but that's true.  Nobody --

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 22 of 80 PageID #:23019
Noble - direct by Mr. Burns
4827

 1    I did try to compare it, and nobody --

 2           MR. LOEVY:  Your Honor, objection.  If he didn't say

 3    it, then he shouldn't say it now.

 4           THE COURT:  He was just talking about his other

 5    answer, I think.

 6           MR. BURNS:  Yes, sir.

 7           MR. LOEVY:  I apologize.

 8    BY MR. BURNS:

 9    Q.  Would you please complete your answer, sir?

10    A.  I tried to find a comparison.  So this was a policy I had

11    not seen before.  Obviously, this is my field.  I study this a

12    lot.  I attend seminars, I read journals, I read articles.  I

13    had not seen a policy that mandated this.

14           So I started checking.  Many police departments today

15    have their policy manuals available online.  Los Angeles

16    Police Department, Seattle, Austin, I checked those agencies.

17    I've worked on cases in cities like New York and Miami, you

18    know, cities all over the country, Georgia, Tennessee,

19    Memphis, and I've never seen such a policy.

20           So I looked in Mr. Brasfield's report to see whether

21    he gave some indication of an individual policy.

22    Q.  Was there any help by looking at that report Mr. Brasfield

23    authored?

24    A.  No, no, none at all.  He didn't offer any specific

25    examples of any policies similar to this anywhere.  In fact,

Noble - direct by Mr. Burns

4828

1    he said that he worked for the Seattle Police Department, Fort

2    Lauderdale, for the sheriff's department in Washington state

3    and in Fort Lauderdale in the sheriff's department.  He was

4    the policymaker, the chief of police of the sheriff.  He

5    didn't have those policies there.

6    Q.  Let me ask you then relative to that.  You've told us the

7    policy goes above and beyond what are expected by nationally

8    accepted police practices, true?

9    A.  Yes.

10   Q.  What about the policy provisions relative to the audit; in

11   other words, the review of the compliance by the officers or

12   administrators within the Chicago Police Department?

13   A.  Well, obviously, if nobody else has a policy, nobody else

14   will have a policy to audit, you know, a policy that they

15   don't have.

16   Q.  Okay.  If I may, I'd like to change subjects just for a

17   moment.

18        We talked about the subpoena unit of the Chicago

19   Police Department, and you have reviewed this matter relative

20   to that unit; is that correct?

21   A.  Yes, sir.

22   Q.  Tell us, first of all, what's your understanding of the

23   subpoena unit of the Chicago Police Department in terms of how

24   it is staffed?

25   A.  My understanding is that it is led by a police sergeant,

Noble - direct by Mr. Burns

4829

1    that there's one officer, and I believe there are five

2    civilian members of the staff.

3    Q.  So there is a supervisor sergeant?

4    A.  Yes.

5    Q.  Is there any other police personnel other than civilian

6    staff assigned to that unit?

7    A.  One officer.

8    Q.  So you have a sergeant, a police officer, and civilian

9    staff?

10   A.  Yes, sir.

11   Q.  Is civilian staff acceptable within police practices in

12   terms of staffing a subpoena unit?

13   A.  Oh, absolutely.  You know, different departments do things

14   differently.  You know, our goal in policing is to put sworn

15   officers out on the street.  They're trained to be police

16   officers.

17        This is an administrative task.  I can tell you in

18   California, in Irvine, where I was an officer, our records

19   divisions were always staffed completely, including the

20   supervisors, by civilian staff.

21   Q.  So what is the benefit to having police personnel, a

22   sergeant or a patrol officer, assigned to that division?

23   A.  Well, I think in some cases, it could offer some, you

24   know, additional oversight, some different additional

25   knowledge and experience if somebody has a question, but it

Noble - direct by Mr. Burns

4830

1  certainly could be done without that.

2  Q.  What about training; is there a formal training protocol

3  for civilian personnel who work in subpoena units?

4  A.  No.  As you can imagine, because every police department,

5  their records management systems are set up a little bit

6  differently, all those would be trained to be conducted

7  in-house.  It would be on-the-job training.

8  Q.  There's been some criticism in this matter that there is a

9  parallel system of record-keeping in the Chicago Police

10  Department rather than a centralized system of record-keeping.

11  Are you aware of those?

12  A.  Yes.

13  Q.  And what is your opinion relative to the process by which

14  Chicago maintains its homicide investigation reports?

15  A.  I think their system is reasonable and appropriate, I

16  mean, if different organizations set up systems differently.

17  There's no one set of rules that require a mandate

18  centralization of records-keeping.  Many agencies maintain

19  records in different places.  You know, they'll have

20  laboratory reports in one place, photographs, fingerprints.

21  So it's not uncommon in policing to have multiple records

22  systems.

23  Q.  Does the system that the Chicago Police Department has

24  hinder its ability to respond to subpoenas?

25  A.  No.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 26 of 80 PageID #:23023
Noble - direct by Mr. Burns
4831

1  Q.  Would you explain to the ladies and gentlemen of the jury

2  why you believe that.

3  A.  Well, this is their system.  They're training their

4  people, their in-house people, on how to receive subpoenas and

5  how to respond to them.  So they're comfortable with their own

6  system, and they're certainly capable and able to complete

7  that task.

8  Q.  And how is it that the Chicago Police Department responds

9  to a subpoena, it's received by the subpoena unit of the

10  department, to a subpoena?  What do they do with it as it

11  pertains to homicide investigations?

12  A.  My understanding is that all subpoenas go to -- are

13  initially sent to the superintendent's office, and then they

14  are sent down to the -- one would be sent to the records

15  bureau for that permanent file, and then a copy of the

16  subpoena would be sent to the individual district or area

17  where these investigative files are maintained.

18  Q.  And once they are sent out, the requests are made to these

19  other areas, what happens with that information?

20  A.  Well, the subpoena unit would go out and make copies of

21  the files and respond to the subpoena.

22  Q.  And do you make copies of everything, or what portion of

23  the files then are copied?

24  A.  No, they make copies of everything.

25  Q.  And then the response --

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 27 of 80 PageID #:23024
Noble - direct by Mr. Burns
4832

1    MR. LOEVY:  Objection to foundation, your Honor.

2    THE COURT:  Lay the foundation.

3  BY MR. BURNS:

4  Q.  In the course of your review of this case, you have

5  reviewed, you told us, depositions and policies of the Chicago

6  Police Department; is that correct?

7  A.  Yes.

8  Q.  And have you reviewed information relative to the Chicago

9  Police Department and how it responds to subpoenas in this

10  case?

11  A.  Yes.

12  Q.  And are you basing your testimony here on that

13  information?

14  A.  Yes, specifically on the depositions of Detective Colby

15  and Brown.

16    THE COURT:  All right.  The objection is overruled.

17  BY MR. BURNS:

18  Q.  So at that point, what happens when information then has

19  been requested pursuant to a subpoena, the subpoena is sent to

20  the respective -- whether it be the records division or sent

21  over to the area where the homicide occurred, what happens

22  with that information?

23  A.  They make a copy of a file, and they send a copy on to

24  whoever has requested the subpoena.

25  Q.  And then with that information, when it's received, is it

Noble - cross by Mr. Kulwin

4833

1   returned to the subpoena unit?

2   A.  Yes.

3   Q.  And what does the subpoena unit then do with that?

4   A.  They send the copies on to the court or whoever sent the

5   subpoena.

6   Q.  Thank you.

7        MR. BURNS:  May I just have one moment, Judge?

8     (Brief pause.)

9        MR. BURNS:  Thank you, Mr. Noble.

10        Your Honor, no further questions at this time.

11        THE COURT:  Mr. Kulwin, any questions?

12        MR. KULWIN:  Just a couple quick ones, Judge.

13                              - - -

14            JEFFREY NOBLE, CROSS-EXAMINATION

15   BY MR. KULWIN:

16   Q.  Mr. Noble, in your opinion as a policy and police

17   procedures expert, are detectives who are investigating a

18   serious felony always required to take notes when they're

19   interviewing witnesses?

20        MR. LOEVY:  Objection to Rule 26, your Honor.

21        THE COURT:  Sustained, unless you can show me at

22   sidebar.

23        MR. KULWIN:  May I have a moment?

24        THE COURT:  Yes.

25     (Brief pause.)

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 29 of 80 PageID #:23026
Noble - cross by Mr. Kulwin
4834

1    MR. LOEVY:  I tell you what, your Honor.  We'll

2    withdraw the objection.

3        THE COURT:  Go ahead, Mr. Kulwin.  The objection has

4    been withdrawn, Mr. Kulwin.  Go ahead.

5        MR. KULWIN:  Oh.

6    BY MR. KULWIN:

7    Q.  Do you recall the question, sir?

8        THE COURT:  Why don't you put it again.

9    BY MR. KULWIN:

10   Q.  Okay.  Are detectives always required to take notes, in

11   your opinion, when they're investigating a homicide?

12   A.  No, not required.

13   Q.  Okay.  Are there circumstances in which you could

14   ascertain that that would not be done?

15   A.  Yeah, there are certain times.  I mean, some detectives --

16   I mean, I wouldn't, you know, as a practice do it, but some

17   detectives have very good memories, and, you know, they

18   practice -- it's their practice not to take notes.

19        Other times, detectives, you know, feel like if they

20   break out a notepad in front of a witness, it may impede the

21   witness from giving a statement, particularly, you know, if

22   you're in a -- you know, for example, like if you're in a gang

23   neighborhood and, you know, the person doesn't want other

24   people -- if you're out in public and doesn't want other

25   people to see that you're actually giving information to the

Noble - cross by Mr. Loevy

4835

1  police that they're writing down.

2  Q.  And is it -- is it acceptable practice for a detective to

3  interview somebody and then put the information they obtained

4  directly into a typewritten supplemental report or police

5  report?  Is that acceptable?

6  A.  Sure.

7          MR. LOEVY:  Objection.  Rule 26, your Honor.

8          THE COURT:  Sustained.

9          MR. KULWIN:  I have nothing further, Judge.

10          THE COURT:  Mr. Loevy.

11                    - - -

12          JEFFREY NOBLE, CROSS-EXAMINATION

13  BY MR. LOEVY:

14  Q.  Mr. Noble, you have worked for the City of Chicago before,

15  correct?

16  A.  Yes, sir.

17  Q.  In fact, tell the jury, between 2012 and 2016, how much

18  the City of Chicago has paid you in connection with being a

19  consultant expert witness in court cases?

20  A.  Oh, I've probably done at least 12 cases between 2012

21  and 2016.

22  Q.  The question was how much money, sir?

23  A.  Sir, I don't know.

24  Q.  More than $200,000?

25  A.  Probably close to that, yes.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 31 of 80 PageID #:23028
Noble - cross by Mr. Loevy
4836

1   Q.  Does 222,000 sound right?

2   A.  Probably somewhere around that, yes.

3   Q.  And, in fact, prior to 2011, there was another $50,000,

4   correct?

5   A.  I can't recall, but I certainly had cases prior to that,

6   yes.

7   Q.  With this case, you're going to get pretty close to

8   $300,000, aren't you?  When you add up prior to 2011, plus

9   the 222,000 between 2012 and 2016 and this case, it's going to

10  be about $300,000?

11  A.  Yes, sir.

12  Q.  Is that a substantial portion of your income?

13  A.  My expert witness fees are -- were less in the earlier

14  years, but today, it's probably about two-thirds or

15  three-quarters of my income.

16  Q.  All right.  Is that a big chunk of it coming from the City

17  of Chicago?

18  A.  It's certainly a percentage.  I've had about 125 cases and

19  about 17 with Chicago.

20  Q.  All right.  You spent about two and a half hours drafting

21  your report in this case, correct?

22  A.  I'd have to have my billing statements in front of me, but

23  that's probably true.

24  Q.  All right.  How much is your total bill going to come to

25  for your opinions in this case?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 32 of 80 PageID #:23029
Noble - cross by Mr. Loevy
4837

1    A.  I think I billed about $15,000 up until coming here.

2    Q.  So it's going to be about how much total?

3    A.  Probably another 6 or $7,000 between travel time and

4    testifying.

5    Q.  So you're going to be over 20,000 for the opinions today?

6    A.  Yes, sir.

7    Q.  You didn't review any of the files, did you?

8    A.  No, I did not.

9    Q.  So basically drawing on your experience and your

10   knowledge, right?

11   A.  Yes, sir.

12   Q.  All right.  As you've mentioned, you've been hired by the

13   City of Chicago quite a bit, correct?

14   A.  Yes, sir.

15   Q.  Most recently in 2016, the Manzerra (phonetic) case?

16   A.  Yes, sir.

17   Q.  You were asked to give an opinion about the reasonableness

18   of their investigative -- investigations and disciplinary

19   procedures, right?

20   A.  Yes.

21   Q.  And your opinion was that they're great, right?

22   A.  They were reasonable, yes.

23   Q.  And then in the Kluppelberg case, also this year, you were

24   asked to give opinions about street files, right?

25   A.  Yes.

Noble - cross by Mr. Loevy

4838

1   Q.  And your opinions were that Chicago's policies were great,

2   right?

3   A.  Same issues as is involved in this case, yes.

4   Q.  And then in the Ruiz-Cortez case, same year, another

5   wrongful conviction case, your opinion was the City of

6   Chicago's policies were great, right?

7   A.  They were reasonable, yes.

8   Q.  And in Coleman, last year, sufficiency of internal affairs

9   investigations and discipline, you were asked to give an

10  opinion about the City's policies?

11  A.  Yes.

12  Q.  What was your opinion?

13  A.  They were reasonable.

14  Q.  All right.  How about in Lopez, a use of force case,

15  different subject; does the City have excellent policies on

16  that?

17  A.  As I recall, that case was about -- the policies were

18  about internal affairs in this one; but, yes, they were

19  reasonable.

20  Q.  All right.  How about in the Giles (phonetic) case, 2014,

21  officer-involved shootings; are the City of Chicago's --

22          MR. KULWIN:  Judge, I'm going to object.

23          THE COURT:  Overruled.

24  BY MR. LOEVY:

25  Q.  -- City of Chicago's policies and practices regarding

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 34 of 80 PageID #:23031
Noble - cross by Mr. Loevy
4839

1   officer-involved shootings; are those all above average too?

2   A. They were reasonable, yes.

3   Q. Above average or reasonable?

4   A. Basically, when I give an opinion about policies, I make a

5   determination whether they're reasonable and appropriate, not

6   above average. I don't have a way of assessing above average.

7   Q. All right. Are you saying the same thing here today with

8   regard to these policies, that they're acceptable? Not better

9   or worse, just acceptable, is your testimony?

10   A. No. I think in this case, it's different, because in this

11   case, nobody else has these policies, so they're -- they're

12   above.

13   Q. All right. How about in the Furee (phonetic) case

14   in 2013, internal affairs investigations; was Chicago's

15   policies above in that too?

16        THE COURT: You're running up against Rule 403 at

17   this point, Mr. Loevy.

18   BY MR. LOEVY:

19   Q. All right. How many times have you, on different

20   subjects, given opinions that the City of Chicago's policies

21   are -- you've told juries in cases that the City of Chicago's

22   policies are what they should be?

23   A. I think in nearly every -- or I'm certain in every case

24   I've been involved with the City of Chicago where I've

25   reviewed the particular policy, I found it to be reasonable.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 35 of 80 PageID #:23032
Noble - cross by Mr. Loevy
4840

1  Q.  Seventeen times, right?

2  A.  Yes, sir.

3  Q.  And you said "nearly," but you do mean every time you've

4  looked at the City's policies, you found them to be good,

5  right?

6  A.  I found them to be reasonable for those policies that were

7  involved in a particular case.

8  Q.  All right.  You are a lawyer as well, correct?

9  A.  Yes.

10  Q.  All right.  You said that the Chicago's requirement about

11  the GPRs was a unique-type solution, right?

12  A.  Yes.

13  Q.  Okay.  Chicago, at that time, had a unique-type problem,

14  didn't it?

15  A.  Well, there was litigation, from my understanding, at that

16  time, yes.

17  Q.  Chicago had a problem that was unique, wasn't it?

18  A.  Yes, they had litigation.

19  Q.  And the uniqueness of the problem was there was an

20  ingrained practice at the Chicago Police Department to not

21  turn over their notes to the criminal justice system, correct?

22  A.  No, I don't know what the problem was.  All I know is

23  there was litigation.

24  Q.  You have no idea what the litigation was?

25  A.  No.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 36 of 80 PageID #:23033
Noble - cross by Mr. Loevy
4841

1  Q.  For the -- you spent -- $20,000 was how many hours of

2  work?

3          MR. BURNS:  Objection, your Honor.  Argumentative.

4          THE COURT:  That's not argumentative.  Overruled.

5          THE WITNESS:  I don't know.  I would have to --

6  it's 295.  I'd have to do the math and go on my billings.

7  Probably about 20 hours.

8  BY MR. LOEVY:

9  Q.  But in none of the work that you did did you review the

10  Jones problem and the City of Chicago's problems?

11          MR. BURNS:  Objection, your Honor.

12          THE COURT:  Sustained.  You have covered the point.

13  BY MR. LOEVY:

14  Q.  All right.  Would it change your opinions if you knew that

15  the reason Chicago enacted this GPR solution is because they

16  were having a real problem with detectives not wanting to

17  disclose their work product investigation files?

18  A.  No.

19  Q.  All right.  This is -- did you know, as you sit in that

20  chair, that the Jones case involved an entrenched and cultural

21  problem at the Chicago Police Department not turning over

22  investigative material?

23          MR. BURNS:  Objection.

24          THE COURT:  The objection is sustained.  He's

25  testified he doesn't know about those cases.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 37 of 80 PageID #:23034
Noble - cross by Mr. Loevy
4842

1  BY MR. LOEVY:

2  Q.  All right.  The GPR requirement that you said was unique

3  says that detectives have to take notes on a form, right?

4  A.  Yes.

5  Q.  Okay.  Do you have any knowledge either way as to whether

6  they actually followed that policy -- that requirement?

7  A.  No, I did not conduct any review.

8  Q.  All right.  Even leaving aside your review, do you have

9  any knowledge either way whether that was just words on the

10  book or whether they actually did it?

11  A.  The only knowledge I have is Director Hickey testifying he

12  had like 140,000 copies of that form.  That's it.

13  Q.  All right.  If 82 percent of the files that were at issue

14  in this case contained unofficial handwritten notes not on

15  GPRs, that would be a problem for the policy, would it not?

16  A.  Not -- the intent of the policy, as I testified, was that

17  the goal of the policy was to maintain the notes.  Whether it

18  was on that particular form or some other format, I don't

19  think it matters.

20  Q.  Well, sir, doesn't the policy explicitly require that GPR

21  forms are supposed to be used?  That's a yes/no question.

22  A.  Yes.

23  Q.  All right.  So if the policy on the books explicitly

24  requires that the GPR form be used, why doesn't it bother you

25  that in practice in 82 percent of the files, they didn't

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 38 of 80 PageID #:23035
Noble - cross by Mr. Loevy
4843

1   adhere to the policy on the books?

2           MR. BURNS:  Objection.  Form of the question.

3           THE COURT:  Overruled.

4           THE WITNESS:  For two reasons.  First, you know, the

5   goal of the policy is about maintaining these notes, and as --

6   in being engaged in police practices, I recognize that as a

7   police officer, you don't always have a form with you.

8           Second, Director Hickey testified that he felt that

9   that was appropriate and that's the training they do.

10  BY MR. LOEVY:

11  Q.  Now, in Irvine, when you guys had policies on the books,

12  were the police officers required to follow them?

13  A.  Of course.

14  Q.  Were there any examples of widespread disregard of the

15  official written policies in Irvine?

16          MR. BURNS:  Objection.  Argumentative, relevance.

17          THE COURT:  Sustained.  Argumentative.

18  BY MR. LOEVY:

19  Q.  It doesn't do any good to enact a written policy if the

20  detectives aren't going to follow it.  Would you agree with

21  that?

22  A.  No, I think the policy corresponds with training and

23  supervision, and there's a combination.

24  Q.  Would you agree with me that a department can have a

25  culture where if they enact rules and then everybody just

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 39 of 80 PageID #:23036
Noble - cross by Mr. Loevy
4844

1  ignores them, that the problems could be exacerbated?  Would

2  you agree with that?

3          MR. BURNS:  Objection, your Honor.

4          THE COURT:  Overruled.

5          THE WITNESS:  Certainly, if you create rules and

6  nobody follows any of the rules, yeah, that would be a

7  problem.

8  BY MR. LOEVY:

9  Q.  That makes it worse than if you don't have rules at all,

10  doesn't it?

11  A.  It would certainly be a problem, yes.

12  Q.  Now, you said that requiring notes to be maintained you

13  thought was a good step, right?

14  A.  Sure.

15  Q.  All right.  But it's actually worse to have a regime where

16  you require notes to be maintained but you don't put them into

17  official supp reports.  That's A.  Okay?  Are you with me on

18  my A?

19          I'll give you a hypothetical A.  You require the

20  detectives to maintain their notes, but they don't put them

21  into the official police reports.  Okay?  Do you understand A?

22  A.  I understand.

23  Q.  And, B, you let detectives destroy your notes, their

24  notes, but you require them to record the information into

25  official supp reports.  Do you understand the difference?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 40 of 80 PageID #:23037
Noble - cross by Mr. Loevy
4845

1    A.  Yes.

2    Q.  B is actually a better system, isn't it?

3    A.  I don't believe you can compare it as a better system.  I

4    mean, so in B, you're taking notes and you're taking those

5    notes and incorporating them into your report, and that's

6    what -- a generally accepted police practice.

7            So in A, you're taking notes, and, for whatever

8    reason, some of those notes don't get incorporated into a

9    report, to your example.  You're still maintaining those

10   notes, so the notes are accessible.  They're there.  It's like

11   a report.  It's similar.

12   Q.  Notes being there is not a way to get the information to a

13   criminal defendant, correct?

14   A.  Well, in this case, they are, because --

15   Q.  In which case?

16   A.  Here, by these policies, they are, because they're being

17   maintained and the subpoena unit is required to produce them.

18   Q.  All right.  So if the system worked in perfection, then

19   every note would get handed over to a subpoena, right?

20   A.  Absolutely.  That's the purpose.

21   Q.  You have no knowledge as to whether or not there were

22   notes in those investigative files that were found in the

23   basement that weren't getting handed over to subpoenas.  You

24   don't know either way, right?

25            MR. BURNS:  Objection.  Form of the question,

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 41 of 80 PageID #:23038
Noble - cross by Mr. Loevy
4846

 1  foundation.

 2          THE COURT:  Overruled.  It's just a question whether

 3  he has any knowledge.

 4          THE WITNESS:  I have no knowledge.

 5          MR. LOEVY:  Your Honor, this would be a change in

 6  topics.  Could we break for lunch?

 7          THE COURT:  No.

 8          MR. LOEVY:  No?

 9          THE COURT:  Do the other five minutes.

10          MR. LOEVY:  All right.

11  BY MR. LOEVY:

12  Q.  Let's take a look at the other policy in here.  This

13  is 83-2.

14          MR. LOEVY:  Can we have the ELMO, please, your Honor?

15          THE COURT:  Yes.

16  BY MR. LOEVY:

17  Q.  The policy that you thought was good says, D,

18  investigative file inventory sheet.

19          Do you see that?

20  A.  Yes.

21  Q.  And we all know an inventory sheet; that's the index that

22  lists the reports, right?

23  A.  Yes.

24  Q.  And it says -- I'm sorry.

25          I'm going to turn your attention to page 4, 6:

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 42 of 80 PageID #:23039
Noble - cross by Mr. Loevy
4847

1    Whenever a subpoena or discovery motion is received

2  in any case, two copies of the investigative file inventory

3  sheet will be forwarded to the office of legal affairs

4  department in the case of a subpoena or to the criminal

5  division of the State's Attorney's Office in any case of a

6  discovery motion so that one of such copies may be transmitted

7  to the attorney for the defendant.

8    Do you see that?

9  A.  Yes.

10  Q.  Okay.  So the policy on the book required the police

11  department, whenever there was a subpoena in a criminal case,

12  to turn over the inventory, right?

13  A.  The inventory sheet, yes.

14  Q.  And that's a good idea, right?

15  A.  You know, it's more important that the actual documents

16  are there; but, yes.

17  Q.  Well, I'm focused on the inventory.  It's a good idea that

18  the inventory gets turned over, right?

19    Sir, how can you hesitate with that?

20    MR. BURNS:  Objection.

21    THE WITNESS:  Well, I --

22    THE COURT:  The objection is overruled.

23    THE WITNESS:  The inventory sheet is nothing more

24  than a list of what's in the file.  What's important is the

25  file.  What's important are the documents.  The inventory

Noble - cross by Mr. Loevy

4848

1   sheet is just a listing of what's in the file.

2   BY MR. LOEVY:

3   Q.  But if you're ever going to have a dispute whether the guy

4   got everything or didn't get everything, wouldn't you want to

5   turn over the index?

6   A.  If the policy requires them to turn over the index, they

7   should turn over the index.

8   Q.  All right.  And that's a good policy on the books, right?

9   A.  It's certainly reasonable.

10  Q.  Okay.  Do you have any idea whether, in practice, the City

11  of Chicago followed its policy?

12  A.  No, I don't know.

13  Q.  If the City of Chicago in practice didn't follow the

14  policies that you said are good policies, would that change

15  your opinion?

16  A.  Change my opinion as to what?

17  Q.  The opinions you're giving in court today.

18  A.  No, my opinions are about the policy, not about whether

19  they followed it.

20          MR. LOEVY:  Are we at lunch yet, your Honor?

21          THE COURT:  We are.

22          Okay.  We are going to break for lunch.  Don't

23  discuss the case with each other or anyone else.  We will

24  resume at 1:30.

25          I'll be right back.

4849

1    (The jury leaves the courtroom.)

2         THE COURT:  You understand you can't discuss your

3    testimony with anyone?

4         THE WITNESS:  Yes, your Honor.

5         THE COURT:  Okay.

6         So after this witness, what's upcoming?

7         MR. MICHALIK:  After this witness, we'll have our

8    third expert, Judy Roberts.

9         THE COURT:  Roberts.  Okay.  And then after that?

10        MR. MICHALIK:  After that, we may play a video or

11   potentially have a reading --

12        THE COURT:  Davis, and the reading would be Hunter?

13        MR. MICHALIK:  Yes.

14        THE COURT:  Any other live witnesses this afternoon?

15        MR. KULWIN:  I think -- well --

16        MR. MICHALIK:  There may be another reading.  We have

17   to work it out with Mr. Art on Maue.

18        MR. ART:  There's a tiny issue on Maue.  We were

19   going to raise it now --

20        THE COURT:  On Maue.  Just tell me what the issue is.

21        MR. ART:  The issue is, if you'll recall, Maue starts

22   testifying.  He gets the incident wrong.  It's on the video.

23   So there's some testimony, testimony, testimony.  Then there's

24   a sidebar where the Court says, He's not remembering what

25   we're talking about here.

4850

1          MR. LOEVY:  And you struck the testimony --

2          MR. ART:  And then you struck the prior testimony,

3   and we're saying the prior testimony should be struck and he

4   should just read the reading parts about that -- questions

5   that reflects on the video.

6          MR. MICHALIK:  Actually --

7          THE COURT:  That rings only the faintest of bells.

8          MR. MICHALIK:  Well, what happened was on the video,

9   he started to discuss a different incident involving

10  Mr. Fields, and then we had a sidebar, and one of the problems

11  was it was done by video.

12          We have the transcript here.  We have --

13          THE COURT:  Let me look at it.

14          MR. MICHALIK:  This portion that's being read is the

15  part that's objected to.

16          THE COURT:  So this, I'm looking at 3428 through 29.

17          MR. MICHALIK:  And just to orient your Honor, the

18  incident in question was May 6th of 1997, but Mr. Fields was

19  placed into the administrative detention on May 1st of 1997.

20          THE COURT:  Say what you just said again?

21          MR. MICHALIK:  Okay.  The incident --

22          THE COURT:  May 6th, but he was put -- the date he

23  was put in ad seg was 5/1.  Okay.

24          MR. ART:  Right.  So if you're looking at 3428 at

25  line 6, there's a question about whether -- when he gets put

1    in, and there's a correct answer to that.  We're fine with

2    that.

3         But then down the page, he starts testifying about

4    that incident, and all of that testimony, in our view, is when

5    he is confused.

6         MR. LOEVY:  But what are they designating?

7         THE COURT:  What is it you're objecting to?  It's

8    3428, line 19, through 3429, line 25.

9         MR. ART:  Correct.

10        THE COURT:  So is there a contention that this is the

11   incident that Mr. Fields testified about on his examination?

12        MR. MICHALIK:  Yes, your Honor.  This is -- if you

13   remember from the video, there's a portion where the

14   correctional officers, including Mr. Maue, go to -- go to

15   where Mr. Fields is being detained, and they escort him out of

16   there to the shower.  That is what is being discussed at this

17   point.

18        This is the beginning of what you see on the video,

19   and that's why we wanted to include it, just --

20        THE COURT:  Wait a second.  But at the bottom

21   of 3428, there's a question of whether the -- so earlier

22   on 3428, it says he was put into the administrative detention

23   unit on May 1, 1997.

24        The bottom of 3428, Was the tactical unit activated

25   for the transfer of Mr. Fields to the administrative detention

4852

1   unit on May 1.  And he said yes, explains why.

2        And then the question on 3429, page 3, asks about the

3   May 6 incident.  The May 6 incident, is that the one that

4   Mr. Fields testified about?

5        MR. ART:  That's the one that is on the video, but

6   the problem is, if you keep reading, you get to a sidebar.

7   And then on 3434, at 3, the Court says, So this is what I'm

8   going to do.  I'm going to strike the testimony about the

9   matter he just talked about, because he's confusing two

10  different events.  And then after the sidebar, they ask

11  leading questions about the actual events in question.

12       And our contention is after the Court struck the

13  testimony --

14       THE COURT:  Well, the question is what -- when I

15  said --

16       MR. ART:  Right.

17       THE COURT:  -- I struck what he just testified about,

18  the question is how far back does that go.

19       MR. ART:  And, basically, our position is when he's

20  talking about what he thinks is May 6th above the Court's

21  ruling, it isn't.

22       THE COURT:  I see what you're saying.

23       And the yellow on here is the stuff that's

24  designated; is that right?

25       MR. ART:  Yes.

4853

1          MR. MICHALIK:  Yes.

2          THE COURT:  So here's the deal.  You cut it off after

3  line 20 on page 3429 because -- he's clearly present on May

4  the 6th, right?  There is no question that he's present?

5          MR. ART:  Right.

6          THE COURT:  Okay.  So when he -- from 3429, line 3 to

7  line 20, he's basically saying, I was present on May 6th, this

8  is the capacity in which I'm present, this is what my duties

9  and obligations are.

10          312- -- 3429, lines 21 through 25, he starts to talk

11  about a particular incident.  That may be part of what's

12  wrong.  It's not really necessary anyway because it then picks

13  back up on 3435.  So those are the five lines to cut out.

14          MR. ART:  Thanks, Judge.

15          THE COURT:  Maue and what else?  Are there other live

16  witnesses?

17          MR. KULWIN:  After Maue would be Mr. Poulos.  And

18  then once again, Judge, depending on how things go, Mr. Hogan.

19          MR. LOEVY:  Because that could take us to before 4:00

20  o'clock.  Roberts is a short witness.

21          THE COURT:  But Davis is pretty long, right?

22          MR. LOEVY:  No.

23          MR. MICHALIK:  Twenty-five minutes.

24          THE COURT:  Oh, 25?

25          MR. KULWIN:  Twenty-two.

1       THE COURT:  Hunter is longer or shorter than Davis?

2       MS. KATZ:  Longer.

3       MR. LOEVY:  I think --

4       MR. KULWIN:  Longer.

5       MR. ART:  But it's a reading, so --

6       THE COURT:  It's a reading.

7       And Maue, the part that you're reading, seems like

8  it's pretty short?

9       MR. MICHALIK:  Yeah, it looks like 20 minutes or so.

10      THE COURT:  How long is the direct on Roberts,

11  ballpark?

12      MR. MICHALIK:  Twenty minutes to a half an hour.  I

13  don't think it will be all that long.

14      MR. LOEVY:  Our cross is shorter.

15      THE COURT:  Poulos is how long on direct?

16      MR. KULWIN:  Fifteen.

17      MR. NOLAND:  Fifteen minutes, your Honor.

18      MR. LOEVY:  We don't think that long, but that's our

19  position.

20      MR. KULWIN:  That takes you to about 4:00.

21      THE COURT:  And so what are the issues still on the

22  table on Mr. Hogan?

23      MR. KULWIN:  There's a number of them, Judge.

24      THE COURT:  Just laundry list.

25      MR. KULWIN:  Rule 35.  What did he say about the

1   documents that were taken.  What use I can -- we didn't raise

2   this yet, what use I can make of that document.  It's not

3   admissible in evidence, but I want to talk to you about that.

4        You know, we had talked about this Maloney issue, and

5   you had ruled a certain way about it, but I think I was not

6   articulate in what I wanted --

7        THE COURT:  Yeah.

8        MR. KULWIN:  I just want to explain it to you before

9   I get to it because it is different than what you ruled on.  I

10  don't want to go into the whole nine yards, but I can explain

11  it to you later.

12       And that's pretty much it.  He's going to --

13       THE COURT:  Okay.  Afternoon break.

14       MR. KULWIN:  Okay.  Afternoon break?  Okay.

15       THE COURT:  1:30.

16    (The trial was adjourned at 12:35 p.m. until 1:30 p.m. of

17  this same day and date.)

18

19

20

21

22

23

24

25

4856

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3

 4   NATHSON E. FIELDS,                )  Docket No. 10 C 1168
                                       )
 5                      Plaintiff,     )
                                       )
 6              vs.                    )
                                       )
 7   CITY OF CHICAGO, et al.,          )  Chicago, Illinois
                                       )  December 8, 2016
 8                      Defendants.    )  1:30 o'clock p.m.

 9

10                TRIAL TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE MATTHEW F. KENNELLY, AND A JURY
11                       VOLUME 16-B

12   APPEARANCES:

13

14   For the Plaintiff:    LAW OFFICE OF H. CANDACE GORMAN
                           BY:  MS. H. CANDACE GORMAN
15                         220 South Halsted Street, Suite 200
                           Chicago, IL  60661
16                         (312) 441-0919

17

                           LOEVY & LOEVY
18                         BY:  MR. JONATHAN I. LOEVY
                                MR. STEVEN EDWARDS ART
19                              MR. ANAND SWAMINATHAN
                           311 North Aberdeen Street, 3rd Floor
20                         Chicago, IL  60607
                           (312) 243-5900
21

22

23   Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                           Official Court Reporter
24                         219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
25                         (312) 435-5639
```

4857

```
 1   APPEARANCES CONTINUED:

 2   For Defendant
     City of Chicago:        DYKEMA GOSSETT PLLC
 3                           BY:   MR. TERRENCE MICHAEL BURNS
                                   MR. DANIEL MATTHEW NOLAND
 4                                 MR. PAUL A. MICHALIK
                             10 South Wacker Drive, Suite 2300
 5                           Chicago, IL  60606
                             (312) 627-2100
 6

 7

 8   For Defendant          KULWIN, MASCIOPINTO & KULWIN, LLP
     David O'Callaghan:      BY:   MR. SHELLY BYRON KULWIN
 9                                 MS. RACHEL ANNE KATZ
                             161 North Clark Street, Suite 2500
10                           Chicago, IL  60601
                             (312) 641-0300
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 53 of 80 PageID #:23050
Noble - cross by Mr. Loevy
4858

1    (The following discussion was had in open court in the

2    presence and hearing of the jury:)

3              THE COURT:  Everybody can have a seat.

4              You understand you are still under oath?

5              THE WITNESS:  Yes.

6              THE COURT:  Mr. Loevy, you can go ahead.

7              MR. LOEVY:  Thank you, your Honor.

8                             - - -

9              JEFFREY NOBLE, CROSS-EXAMINATION CONTINUED

10   BY MR. LOEVY:

11   Q.  All right.  Mr. Noble, as you understand the Chicago

12   system, they had a three -- a triple-level file system,

13   correct?

14   A.  Yes.

15   Q.  There was a permanent retention file with all the official

16   reports, right?

17   A.  Yes.

18   Q.  But there was also something called the area file, which

19   contained -- well, you tell us what the area file is supposed

20   to contain.

21   A.  I think the proper name is investigative file, and what it

22   contained -- what it was supposed to contain was the

23   investigative notes on the GPR forms.

24   Q.  All right.  And showing you -- what are the area file

25   exhibits.  Showing you the copies of the area files for the

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 54 of 80 PageID #:23051
Noble - cross by Mr. Loevy
4859

1   Smith/Hickman investigation.  Can you identify those as the

2   types of files that were contemplated by the special order?

3   A.  I've never seen these files before.

4   Q.  Those look to be the types of files contemplated by the

5   special order?

6   A.  Well, the first thing I'm seeing is a supplementary

7   report, and that kind of report would really go into a

8   permanent retention file.

9   Q.  All right.  So that probably should have been in a

10  different file, right?

11          MR. BURNS:  Objection, your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  I don't know which file this is.  Are

14  you telling me this is an investigative file?

15  BY MR. LOEVY:

16  Q.  I'm telling you that that's been represented to us that

17  it's the area file as distinct from the permanent retention

18  file.

19          I'm going to tender you a copy of the permanent

20  retention file as well.

21          So based on your understanding of the policies, what

22  are the three files you have in front of you?

23  A.  Well, one of them is stamped permanent retention file.

24  Q.  All right.  So that's --

25  A.  I haven't gone through these, so -- based on the stamps of

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 55 of 80 PageID #:23052
Noble - cross by Mr. Loevy
4860

1   this one file, it appears like it contains supplemental

2   reports and -- so that appears to be a permanent retention

3   file.

4   Q.  All right.  So what do the other things look like?

5         MR. LOEVY:  194, your Honor, is the area file exhibit

6   number.  Permanent retention file is 86.

7         THE COURT:  Okay.

8   BY MR. LOEVY:

9   Q.  All right.  Have you had a chance to thumb through it,

10  Mr. Noble?

11  A.  No.  There's quite a few documents in here.

12  Q.  Keep thumbing.

13  A.  Those two files appear -- they both have inventory sheets

14  that identify them as investigative files.  However, they do

15  have supplemental reports in them, and one of them has some

16  general progress reports in it as well.

17  Q.  So you would agree that the regime that you studied in the

18  general order, the special order, doesn't bear resemblance to

19  the actual file, right?

20        MR. BURNS:  Objection, your Honor.

21        THE COURT:  Overruled.

22        THE WITNESS:  From the general order, the

23  supplemental reports should be in the permanent retention file

24  and the investigative file should have the GPRs.

25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 56 of 80 PageID #:23053
Noble - cross by Mr. Loevy
4861

 1  Q.  So in your understanding of the Chicago protocol, there

 2  should not be what is in front of you, correct?

 3  A.  If this is an investigative file, that's true.

 4  Q.  All right.  So how about, showing you Plaintiff's

 5  Exhibit 1, does this contemplate -- is this contemplated by

 6  the special order, a third file containing investigative

 7  materials?

 8          It's not, right?

 9          MR. BURNS:  Objection.

10          THE COURT:  Overruled.

11          THE WITNESS:  I don't know what it is.  Right now,

12  I'm looking through it.  I've never seen this file before.  It

13  appears it contains some copies of reports and copies of

14  photographs.

15  BY MR. LOEVY:

16  Q.  If it contains original GPRs and original notes and

17  original investigative materials that are not in the other two

18  files, then that's not how it's supposed to be, right?  Right?

19  A.  Well, there is at least one -- again, I didn't spend a lot

20  of time to look at this.  There is an original GPR report that

21  I wouldn't expect to be in an investigative file.

22  Q.  My question was that's not how it's supposed to be, right?

23  A.  Well, I don't know what this is.  Maybe this is an

24  investigative file.  I don't know what this is.

25  Q.  You have two -- three files in front of you, right?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 57 of 80 PageID #:23054
Noble - cross by Mr. Loevy
4862

1  A.  I have four files in front of me.

2  Q.  All right.  You have the permanent retention file, right?

3  A.  Yes.

4  Q.  You have the two area files, which are -- there's a Smith

5  and a Hickman, there's two victims.  That's why there's two

6  area files.

7  A.  Okay.

8  Q.  And you have what's been represented to us as a working

9  file.  And my question to you, sir, is there should not be

10  this third working file that contains original GPRs and

11  investigative materials, correct?

12  A.  There should not be original documents in a working file.

13  Q.  Okay.  And there should not be original GPRs and supp

14  reports in the area file, right?

15        MR. BURNS:  Objection, your Honor.  Asked and

16  answered.

17        THE COURT:  Sustained.

18  BY MR. LOEVY:

19  Q.  All right.  If the files you have in front of you are

20  typical for how the Chicago Police Department made the

21  records, would you agree that the way they were doing things

22  bore no resemblance to what the special orders were?

23  A.  What do you mean by "typical"?  I mean --

24  Q.  Let's say those aren't aberrations.  Let's say that there

25  are other murder cases for which there are GPRs and supp

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 58 of 80 PageID #:23055
Noble - cross by Mr. Loevy
4863

1    reports in the area file and there are working files with

2    investigative materials.  If that was common, then you would

3    have to agree that the special orders as written were not

4    being followed in practice?

5    A.  Well, I would have -- I don't know that I could jump to

6    that.  You know, I would want to see how frequently that's

7    happening.  It's a large agency with a lot of investigations.

8    If it's happening a few times, you know, maybe there's a

9    particular individual that's having a difficulty with it or a

10   problem or a training issue.  I don't know without reviewing

11   all the documents and knowing what the scope of the issue is.

12   Q.  All right.  But that's what the last guy did.  You didn't

13   look at the documents, right?

14            MR. BURNS:  Objection, your Honor.

15            THE WITNESS:  I did not look at the documents.

16            I'm sorry.

17            THE COURT:  Okay.  The answer can stand.  I was going

18   to tell you to rephrase the question, but he answered the

19   question.  I would have had it rephrased.

20   BY MR. LOEVY:

21   Q.  Mr. Burns asked you about 83-1, the special order, and he

22   asked you if it governed the working file, right?  Do you

23   remember he asked you if it governed Plaintiff's Exhibit 1?

24   A.  Yes.

25   Q.  It doesn't, does it?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 59 of 80 PageID #:23056
Noble - cross by Mr. Loevy
4864

1  A.  Does 83-1 talk about a working file?

2  Q.  Right.

3  A.  I believe it did.  I'd have to go back and look at it.

4  Q.  83-1, the policy you're here to talk about today, talked

5  about the area files, right?

6  A.  It specifically -- the purpose of 83-1 is about the

7  investigative file, yes.

8  Q.  And by "investigative file," you mean the area file that's

9  still with you, right?

10  A.  Yes.

11  Q.  All right.  So 83-1, whether it has merits, whether it's

12  good, or whether it's bad, it wasn't really governing these

13  parallel investigative files; isn't that true?

14          MR. BURNS:  Objection again, your Honor.  No

15  foundation.

16          THE COURT:  Overruled.

17          THE WITNESS:  No, my understanding of 83-1 is that,

18  you know, you were allowed to have a working file as long as

19  it was simply copies of documents that were in the

20  investigative file and the permanent retention file.

21  BY MR. LOEVY:

22  Q.  So the system contemplated that if you had a working file,

23  there wouldn't be anything in it that wasn't in the other

24  files, right?

25  A.  That's true.

Noble - cross by Mr. Loevy

4865

1  Q.  So, therefore, there weren't really any rules governing

2  these working files because there was -- it was expected that

3  they were going to have anything important in them other than

4  photocopies, right?

5  A.  Yes.

6  Q.  All right.  I'm going to show you a copy of 83-1 and 83-2,

7  and I'm going to ask you to acknowledge that nowhere in the

8  City's new policies was there any requirement that the working

9  files were supposed to be produced in response to subpoenas;

10 isn't that true?

11 A.  Oh, that's true because they're just copies; they're

12 supposed to be copies.

13 Q.  So that is a little bit of a hole in 83-1, that it didn't

14 require files like Plaintiff's Exhibit 1 to be copied when

15 people sent subpoenas.  Would you acknowledge that's a hole in

16 the system?

17 A.  No, not at all, because the purpose of the working file is

18 it's supposed to be copied so all those documents, it wouldn't

19 be a hole because those documents should be contained in the

20 investigative file or the permanent retention file.

21 Q.  But it would be a hole if detectives were stashing notes

22 and investigative materials in their working files, right?

23 A.  If there were documents that were not contained in the

24 investigative file where they're supposed to be or in the

25 permanent retention file where they're supposed to be, that

Noble - cross by Mr. Loevy

4866

1   would be a concern regarding that particular investigation,

2   yes.

3   Q.  I know it would be a concern that's a complete gap in the

4   written policies, right?

5          MR. BURNS:  Objection.

6          THE COURT:  Sustained.  You've plowed the ground

7   adequately.

8   BY MR. LOEVY:

9   Q.  All right.  In Irvine, you guys had -- you've had no such

10  thing as communicating by informal to/from memos about cases,

11  correct?

12  A.  That's true.

13  Q.  Everything about the case had to be in official reports?

14  A.  In Irvine, yes.

15  Q.  In Irvine, where you worked?

16  A.  Yes.

17  Q.  And you've never seen informal reports like Plaintiff's

18  Exhibit 1-104 containing investigative material in your entire

19  career, correct?

20  A.  Oh, no, I've seen these many times.

21  Q.  You've never seen it where it was not in official

22  documents, that's what I'm getting at, where it was just an

23  unofficial document not part of the supp reports?

24  A.  Right.  If this was -- if this is a to/from memorandum

25  regarding some investigative step or investigative action, it

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 62 of 80 PageID #:23059
Noble - cross by Mr. Loevy
4867

1   should be contained in the investigative file.  I've seen

2   these many times.

3   Q.  Yeah, but you've seen them if the document -- if the

4   information is reflected in a supp report, right?

5   A.  No.  This is -- this was -- even the policy talks about

6   memorandums, a memorandum could be -- should be part of the

7   investigative file.

8   Q.  All right.  Do you remember being asked this question at

9   your deposition?  This is page 241, lines 13 through 21:

10          "QUESTION:  Is it your experience that in Irvine, there

11  would be instances where information about what was being

12  learned during the investigation was being communicated

13  exclusively through documents like correspondence, like

14  internal correspondence?

15          "ANSWER:  No.  I think I said I can't think of a single

16  time where I saw an internal correspondence talking about a

17  case."

18          Did you give that answer?

19  A.  Right.  In my confusion, I thought you were talking about

20  Chicago.  And in Irvine, no, we never -- we did not -- in

21  Irvine, we did not use to/from memorandums at all, ever.

22  Q.  All right.  Because in -- in Irvine, you also -- had a

23  one-file system, right?

24  A.  Yes.

25  Q.  If somebody sent a subpoena, there was one and exactly one

Noble - cross by Mr. Loevy

4868

1    place where all the documents were, right?

2    A.  Yes.

3    Q.  So the file clerk didn't have to gather multiple files

4    from multiple places, right?

5    A.  That's true.

6    Q.  Every single official document was sitting in a file in

7    the records division, right?

8    A.  Yes.

9    Q.  And still you had a protocol in Irvine, a written

10   protocol, that gave instructions to the subpoena staff about

11   how to get that one file to the criminal defendants, correct?

12   A.  It would be something within the records bureau itself

13   that would give instruction, yes.

14   Q.  A formal written protocol, right?

15   A.  Yes.

16   Q.  And in Chicago, no such formal written protocol; isn't

17   that true?

18   A.  That's true.

19   Q.  Now, have you ever -- in Irvine, did you come across a

20   situation where an official Chicago police report went

21   missing?

22           I'm sorry, not Chicago, Irvine; Irvine police report?

23           THE COURT:  That would be a tough question.

24           THE WITNESS:  I am aware of one case when I worked

25   internal affairs where a records clerk came forward -- and

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 64 of 80 PageID #:23061
Noble - cross by Mr. Loevy
4869

1  what would happen in Irvine when that case went to court, we

2  would make what was called -- we wouldn't wait for a subpoena.

3  If a case -- if we were going to be sending a case to court,

4  we would make what's called a court package, which is

5  essentially multiple copies -- we make three copies of all the

6  documents -- one would be for the district attorney, one would

7  be for the defense, and one would be for the court -- where

8  they would all go to the prosecutor's office.

9         I was aware of one case where a set of court copies

10  was found by a records clerk years later in the wrong file,

11  and it turned out that court package never went to the court.

12  BY MR. LOEVY:

13  Q.  And that was a big deal, right?

14  A.  It was.

15  Q.  All right.  But other than that, do you remember -- that

16  was found.  Do you remember one being lost?

17  A.  Not that I'm aware of.

18  Q.  All right.  General progress reports along the lines of

19  Defendant's Exhibit 70, as your understanding of the rules and

20  regulations of the police department, police officers are

21  supposed to take their notes and create supp reports, correct?

22  A.  Yes.

23  Q.  And the policy does not make an exception for that, does

24  it?

25  A.  No.

Noble - cross by Mr. Loevy

4870

1  Q.  And how quickly are police officers supposed to take their

2  notes and turn them into official police reports?

3  A.  Well, there's no clear rule on that.  You know, you take

4  your notes -- sometimes for all sorts of reasons, you may --

5  there may be some delay.  You try to do it as soon as you can,

6  but there's all sorts of reasons why it may wait some period

7  of time.

8  Q.  Well, isn't the presumption as soon as possible to turn it

9  into an official report?

10  A.  That's the goal.

11  Q.  And it's the end of the shift, really, right?

12  A.  You know, that's a goal, but, you know, there's lots of

13  reasons why it doesn't happen the end of the shift.

14  Q.  You aim for end of the shift, right?

15  A.  That's a goal.

16  Q.  And sometimes you even do overtime to get it done by the

17  end of the shift, right?

18  A.  Overtime is expensive.  We discourage that.  Depending on

19  the case, if it's an in-custody, yes.  If it's not an

20  in-custody, no.

21  Q.  All right.  So maybe it would bleed to the next day,

22  right?

23  A.  Or if, you know, the guy was on days off.  I mean, again,

24  there's all sorts of different issues that come into it.

25  Q.  All right.  But you're not supposed to be able to hold

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 66 of 80 PageID #:23063
Noble - cross by Mr. Loevy
4871

1    your notes until you see which way the wind's blowing in the

2    investigation.  Do we agree on that?

3            MR. BURNS:  Your Honor, objection to the form of the

4    question.

5            THE COURT:  Overruled.

6            THE WITNESS:  No.  A lot of times what will happen,

7    when a detective is involved in an investigation, they'll take

8    notes, and if they're continuing their investigation, they may

9    hold their notes for several weeks or longer and then write a

10   more lengthy report based on all their notes.  That's not

11   unusual.

12   BY MR. LOEVY:

13   Q.  All right.  You understand that you and Mr. Brasfield

14   disagree on that, correct?

15   A.  Yes.

16   Q.  All right.  Now, I'm asking you does Chicago's policy

17   permit Chicago police officers to hold back their notes for a

18   few weeks and see which way the investigation is going?

19   A.  I don't recall seeing anything that specifically

20   required --

21   Q.  Well, you're the expert, right?

22   A.  I don't recall seeing anything that required them to

23   complete their -- take their notes into a supplemental report

24   at the end of the shift.

25   Q.  Okay.  Well, then your understanding of Chicago's policy

Noble - cross by Mr. Loevy

4872

1  and practice, is it permitted for detectives to hold their

2  notes, wait and see how things shake out, and only then create

3  a police report, yes or no?

4  A.  I don't think -- well, you're combining issues.  You're

5  saying wait and see how the thing shakes out.  Can they take

6  those notes and hold those notes for a period of time until

7  they write a supp report?  Yes.

8  Q.  That's obviously not universally true in other police

9  departments, correct?

10  A.  Well, you'd have to look at different rules for different

11  departments.  Again, in Irvine, detectives could hold, sure.

12  Q.  All right.  The subpoena unit.  The more files you have,

13  the more you need a system in place.  Would you agree with

14  that?

15  A.  Sure.

16  Q.  And Chicago had no written system governing its subpoena

17  unit, right?

18  A.  That's correct.

19  Q.  And when the file clerks would get a subpoena, there was

20  no protocol, no special order, no document that instructed

21  them on where they were supposed to go to get the various

22  files, correct?

23  A.  That's true.

24  Q.  And when you were saying is it acceptable, not acceptable,

25  do you remember those questions with Mr. Burns?

Noble - cross by Mr. Loevy

4873

1    A.  No, you will have to refresh my memory.

2    Q.  Okay.  Could you acknowledge that that's probably below

3    acceptable, to not have a written protocol on how subpoena

4    people are supposed to go and do their job?

5    A.  No.  I think it's still reasonable.

6    Q.  All right.  Do you know anything about the on-the-job

7    training that the subpoena people received?

8    A.  No.

9    Q.  Do you know how long the training was that the subpoena

10   people received?

11   A.  No.

12   Q.  Do you have any information about what they were told to

13   get their materials for their on-the-job training?

14   A.  Can you repeat that?  I'm sorry.  You slurred your words

15   there.

16   Q.  Sorry.  Do you have any information about what the

17   subpoena people were told about how they were supposed to get

18   their materials for their on-the-job training?

19   A.  Just from the depositions of Detective Brown and Colby

20   where they said that they were simply told to retrieve the

21   file, copy the entire file, and send it along.

22   Q.  All right.  Do you remember giving this answer at your

23   deposition on page 418:

24        "QUESTION:  Do you have any information about what they

25   were told about where to go to get materials in their

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 69 of 80 PageID #:23066
Noble - cross by Mr. Loevy
4874

1  on-the-job training?

2       "ANSWER:  No."

3          Did you give that answer?

4  A.  If you're reading that from my deposition, I'm sure I did.

5  Q.  Do you have any information about who was giving them the

6  training?

7  A.  No.

8          MR. BURNS:  Asked and answered, your Honor.

9          THE COURT:  Are you reading from the deposition

10  again?

11         MR. LOEVY:  Yes, I was reading questions from the

12  deposition.

13         THE COURT:  The objection is overruled.

14  BY MR. LOEVY:

15  Q.  All right.  You have no knowledge as to how well the

16  subpoena people performed in Chicago, correct?

17  A.  That's correct.

18  Q.  For all you know, they copied only even pages.  You don't

19  have any personal knowledge of how they did it, right?

20  A.  I don't know.

21  Q.  You've been told that the subpoena people did what they're

22  supposed to do, right?

23  A.  Yes.

24  Q.  And you don't know either way in the real world and in

25  practice whether they did a good job or a bad job?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 70 of 80 PageID #:23067
Noble - cross by Mr. Loevy
4875

1  A.  I don't know.

2  Q.  All right.  Then how are you able to give an opinion that

3  they had a good written policy if they didn't have a policy?

4        MR. BURNS:  Objection, your Honor.

5        THE COURT:  Rephrase the question.

6  BY MR. LOEVY:

7  Q.  Okay.  If I understand your opinion, it's that Chicago's

8  written policies on the books were good, right?

9  A.  Are you talking about subpoenas?

10 Q.  Yes.

11 A.  No.  They don't have a written policy, so I certainly

12 wouldn't have that opinion.

13 Q.  All right.  How about training on the new special order;

14 in '83, they enacted these special orders, right?

15 A.  Yes.

16 Q.  And would you agree with me the bigger the problem, the

17 more training you need?

18 A.  Yes.

19 Q.  And the more entrenched the culture, the more training to

20 change the culture, correct?

21 A.  It's possible.  It depends on what the issues are.

22 Q.  Isn't it true that you can't really opine whether the

23 training -- the three-hour training that was given to the

24 detectives was sufficient because you have no idea what the

25 problem was it was designed to combat?

Noble - cross by Mr. Loevy

4876

1  A.  All I know is the issue was litigation, and Mr. Hickey

2  didn't give a clear statement of what exactly occurred in that

3  three hours other than he gave training on that policy.

4  Q.  All right.  But you really are not in a position to opine

5  whether one three-hour training is enough to change the

6  culture if you don't know what the problem it was designed to

7  cure is.  Would you agree with that?

8  A.  No, I'm not sure I would.

9  Q.  You just believe the three-hour training was enough

10  without knowing what they were training for?

11  A.  You know, police departments, we change policies and

12  things change all the time.  We get training on them.  This is

13  a pretty straightforward policy that you're going to take your

14  investigative notes, keep them on a particular form, keep your

15  notes, and put them into a file.

16  Q.  All right.  As far as the audits, I believe it was your

17  opinion that the special order is good because it says we're

18  going to audit to see whether it's followed and practiced,

19  right?

20  A.  Well, I think I said it's two things.  I said that in the

21  section -- the '86 version of the policy specifically

22  directed, you know, audits by a member of the department, but

23  also every policy section of the police department's manual

24  requires oversight by police supervision.

25  Q.  Well, isn't it true that the policy didn't mandate that

Noble - cross by Mr. Loevy

4877

1  the audits happen?

2  A.  No.  I think by definition, every policy mandates that

3  supervision oversee it.

4  Q.  All right.  But I'm talking about audits.  The policy

5  specifically said, we're going to make this change, and then

6  we're going to periodically go back and see if it's being

7  followed or if it's not being followed.  That's what an audit

8  is, right?  That's what an audit is?

9  A.  No.  There's different types of audits.  And, again, some

10  audits are done through -- by supervision.  I think anybody

11  who has ever had -- been employed knows that their supervisors

12  may audit their performance by checking in on them, by

13  reviewing their reports, by looking at their work, by talking

14  to them and seeing how things are going.

15        And then there is the process of a formalized audit

16  where there may be different requirements or different levels

17  of audit, depending on what it is you're trying to audit.

18  Q.  All right.  Do you have any evidence at all that there

19  were, subsequent to this policy, periodic unscheduled

20  inspections?

21  A.  No.

22  Q.  As you sit here today, do you have any knowledge at all

23  whether they did do these audits?

24  A.  No, I don't know.

25  Q.  You saw no documents suggesting that there were, correct?

Noble - redirect by Mr. Burns

4878

1   A.  That's true.

2   Q.  And, in fact, you reviewed Mr. Hickey's testimony,

3   correct?

4   A.  Yes.

5   Q.  And he acknowledged that there were no audits, right?

6   A.  I don't recall him saying there were no audits.  I recall

7   him saying that there were no -- there was nothing documented

8   that he was aware of.

9   Q.  All right.  Would you agree with me that it doesn't help

10  to make a special order that mandates good ideas like periodic

11  audits if it's not followed in practice?

12          I guess that's an awkward question; but it only works

13  if it's followed in practice, right?

14  A.  I think that's true for any policy.

15          MR. LOEVY:  Okay.  I have no further questions, your

16  Honor.

17          THE COURT:  Mr. Burns?

18                      - - -

19          JEFFREY NOBLE, REDIRECT EXAMINATION

20  BY MR. BURNS:

21  Q.  Let me clarify.  Your purpose in reviewing this case was

22  to review the policies, to comment on the policies and what

23  they require, true?

24  A.  That's true.

25  Q.  You weren't reviewing records of any sort, were you?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 74 of 80 PageID #:23071
Noble - redirect by Mr. Burns
4879

1  A.  No.

2  Q.  Let's just -- now that they have been brought to your

3  attention, you were given, I think you described, four

4  folders, four groups of documents; is that correct?

5  A.  That's correct.

6  Q.  I think one you told me was the permanent retention file.

7  You told all of us, actually.

8  A.  And I only know that because there's a red stamp on the

9  individual documents that say, Permanent retention file.

10 Q.  And these next two, are they labeled in any way?

11 A.  No.

12 Q.  Do they have any information that's contained on the

13 outside to identify them?

14 A.  Just the numbers 84-44 and 84-45.

15 Q.  Would you accept a representation that's reflective of the

16 homicides of Smith and Hickman?

17 A.  Sure.

18 Q.  And would you look into these -- and I will represent they

19 are the area investigative files.  Would you take a look at

20 those for a moment, just a very brief moment.

21      The original report, supplemental reports, are

22 contained in the permanent retention file?

23 A.  Yes.

24 Q.  Copies are contained in the area investigative file?

25      MR. LOEVY:  Objection.  Leading, your Honor.

4880

1          THE COURT:  Sustained.

2   BY MR. BURNS:

3   Q.  Are these documents which comprise the permanent retention

4   file, are they supplemental reports?

5   A.  They appear to be, yes.

6   Q.  And they are originals?

7   A.  They appear to be, yes.

8   Q.  Are copies of those contained within these two folders?

9   A.  See, I haven't compared them.  I don't know whether

10  there's copies in here, or -- I mean, without taking quite a

11  bit of time to go through these two sets of folders.  I mean,

12  there are certainly supplemental reports in here.  I don't

13  know whether --

14  Q.  Do they appear to be copies rather than originals in 84-44

15  and 84-45, which are the area investigative files?

16  A.  They appear to be copies.

17  Q.  Thank you.

18          And, lastly, this document, which is your 1 -- which

19  is 1, that was the working file; is that -- do you accept that

20  representation that it's the working file?

21  A.  Okay.

22  Q.  And the working files are the working files the

23  investigators, the detectives, use in the course of their

24  investigation?

25          MR. LOEVY:  Objection.  Leading, your Honor.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 76 of 80 PageID #:23073
Noble - redirect by Mr. Burns
4881

 1              THE COURT:  Sustained.
 2    BY MR. BURNS:
 3    Q.  What are working files again?
 4    A.  Working files are the files -- copies of reports and
 5    copies of notes, copies of photographs, copies of things that
 6    a detective will take in the field or keep at his desk while
 7    they're actually working an investigation.
 8    Q.  And that was the purpose, if you will, of the drafting of
 9    the special orders, to deal with the working files, correct?
10              MR. LOEVY:  Objection.  Leading, your Honor.
11              THE COURT:  Sustained.
12    BY MR. BURNS:
13    Q.  What was the purpose of the working file special order
14    83-1?
15    A.  Well, it was to address the fact that there were working
16    files and there were investigative notes, and they wanted to
17    make sure the investigative notes were being retained and
18    discoverable.  So they created a policy that created the
19    investigative files so these notes would go into the
20    investigative files so they could be permanently maintained.
21              At the same time, because they recognized detectives
22    were using working files to conduct their investigations, they
23    allowed it so you can make a copy of those notes and keep it
24    in your working file.
25    Q.  So the end game was to keep all documents?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 77 of 80 PageID #:23074
Noble - redirect by Mr. Burns
4882

 1  A.  Absolutely.

 2  Q.  Now, just very quickly, counsel had asked you about

 3  comparison apparently between Chicago and Irvine, California?

 4  A.  Yes.

 5  Q.  How many police officers comprise that department?

 6  A.  Irvine has about 200.

 7  Q.  200.

 8      Do you know how many officers, at least as of

 9  approximately the mid-1980s, were on Chicago's police

10  department?

11  A.  About 13,000.

12  Q.  In terms of the number of people in your unit, did you

13  have a subpoena unit out in Irvine?

14  A.  Well, we didn't -- it was our records bureau that would do

15  it.  So it wouldn't be specific individuals.  It would be

16  anybody who was working records.

17  Q.  And Chicago is different in what way in terms of having a

18  subpoena unit?

19  A.  Well, they had a unit that was set just for subpoenas, I

20  mean, so, you know, you have much larger organizations, they

21  have a different type of bureaucracy based on their

22  organization.

23          MR. BURNS:  Thank you very much.

24          No further questions, your Honor.

25          THE COURT:  Mr. Kulwin, anything?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 78 of 80 PageID #:23075
Noble - recross by Mr. Loevy
4883

1          MR. KULWIN:  No.

2          THE COURT:  Mr. Loevy, anything new covered?

3                          - - -

4              JEFFREY NOBLE, RECROSS-EXAMINATION

5   BY MR. LOEVY:

6   Q.  You just told Mr. Burns the things in the area file were

7   copies, right?

8   A.  No.  He asked me about some of the supplemental reports.

9   Again, I didn't have the entire file.  I looked at the

10  supplemental on the top.  It appeared that that was a copy.

11  Q.  Some of them are original, though, from your brief peruse,

12  correct?

13  A.  Again, I haven't spent any time with the file.  I mean, I

14  would have to go through it.

15  Q.  Let's take a look at this document.  This is a document

16  with the Ray Ferguson crossed off.  Do you see that?

17          MR. BURNS:  Objection, your Honor.

18          MR. KULWIN:  Judge, objection.  I don't believe I see

19  a copy.

20          THE COURT:  Is that testimony?

21          MR. KULWIN:  I'm sorry, Judge.

22          THE COURT:  The comment is stricken.  The objection

23  is overruled.

24  BY MR. LOEVY:

25  Q.  This is not a photocopy, is it?

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 79 of 80 PageID #:23076
Noble - redirect by Mr. Burns
4884

 1  A.  It's not a photocopy, but it looks like it's a

 2  multiple-part form.

 3  Q.  How about that?

 4          THE COURT:  Which document are you referring to?

 5  BY MR. LOEVY:

 6  Q.  I'm sorry.  This is the supp report dated June 15th --

 7  17th, 1985.

 8  A.  I'd have to -- I'm sorry, my glasses are next to my

 9  papers.

10          It's hard to tell.  It looks like it might be an

11  original, but I'm not positive.

12          MR. LOEVY:  I have no further questions, your Honor.

13          MR. BURNS:  Jon, what did you show him?

14          MR. LOEVY:  It's one of the police reports.

15     (Brief pause.)

16          MR. BURNS:  If I may have one moment, Judge?

17     (Brief pause.)

18          MR. BURNS:  One last area, Judge.

19                        - - -

20          JEFFREY NOBLE, REDIRECT EXAMINATION

21  BY MR. BURNS:

22  Q.  Would you kindly look at the permanent retention file?

23  Would you look at the document that counsel showed you last

24  which was from -- referenced to be a supplemental report?

25  A.  Yes.

Case: 1:12-cv-04428 Document #: 313-156 Filed: 09/19/17 Page 80 of 80 PageID #:23077
Roberts - direct by Mr. Michalik
4885

1   Q.  What do you see?

2   A.  Yeah.  When you're comparing the two, it's clear that the

3   one in the permanent retention file is typed, and you can tell

4   by the signatures that that's clearly not a copy and that is a

5   copy.

6   Q.  So the original is in the permanent retention file?

7   A.  Yes, sir.

8            MR. BURNS:  I have no further questions, your Honor.

9            THE COURT:  No.  You're done.

10           Any questions by the jurors of this witness?

11           I'm seeing none.  You're excused.

12     (Witness excused.)

13           THE COURT:  Please call the next witness.

14           MR. MICHALIK:  Judy Roberts.

15     (Witness sworn.)

16                           - - -

17           JUDITH ROBERTS, DIRECT EXAMINATION

18  BY MR. MICHALIK:

19  Q.  Good afternoon.  Could you please state and spell your

20  name for the record?

21  A.  Good afternoon.  My name is Judith Roberts, R-o-b-e-r-t-s,

22  common Judith.

23  Q.  Can you please tell us what you do for a living?

24  A.  Yes.  I am a managing director at Grant Thornton LLP.  I

25  guess I would call myself a forensic economist.