# EXHIBIT 56

2978

1             IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  JACQUES RIVERA,                ) No. 12 CV 4428
                              )
4           Plaintiff,        )
  vs.                     ) Chicago, Illinois
5                             )
  REY GUEVARA, STEVE GAWRYS, DANIEL NOON,  )
6  JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS,  )
  PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN   )
7  LEONARD, EDWARD MINGEY, RUSSELL WEINGART,  ) June 21, 2018
  ESTATE OF ROCCO RINALDI, CITY OF CHICAGO,  )
8                              )
          Defendants.        ) 9:25 o'clock a.m.
9

                    VOLUME 13 A
10              TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE JOAN B. GOTTSCHALL
11                and a jury

12  APPEARANCES:

13  For the Plaintiff:    LOEVY & LOEVY
                    BY:  MR. JONATHAN I. LOEVY
14                    MR. STEVEN E. ART
                    MR. ANAND SWAMINATHAN
15              311 North Aberdeen Street
               3rd Floor
16              Chicago, Illinois  60607

17              MACARTHUR JUSTICE CENTER
               Northwestern University School of Law
18              BY:  Locke E. Bowman, III
               357 East Chicago Avenue
19              Chicago, Illinois 60611
               (312) 503-0844
20

21
  Court reporter:        Blanca I. Lara
22              Official Court Reporter
             219 South Dearborn Street
23               Room 2504
             Chicago, Illinois 60604
24              (312) 435-5895
             blanca_lara@ilnd.uscourts.gov
25

1    Appearances  (continued:)

2

3

4    For the Individual      THE SOTOS LAW FIRM
     Defendants:             BY:  MR. JEFFREY N. GIVEN
                                  MR. JAMES G. SOTOS
5                                 MS. CAROLINE P. GOLDEN
                                  MR. JOSEPH M. POLICK
6                                 MR. DAVID A. BRUEGGEN
                             550 East Devon Avenue
7                            Suite 150
                             Itasca, Illinois  60143
8

9    For the Defendant       ROCK FUSCO & CONNELLY, LLC
     City of Chicago:        BY:  MS. EILEEN E. ROSEN
10                                MS. CATHERINE M. BARBER
                                  MS. THERESA B. CARNEY
11                           321 North Clark Street
                             Suite 2200
12                           Chicago, Illinois  60654

13

14   For the Defendant       LEINENWEBER BARONI & DAFFADA, LLC
     Guevara:                BY:  MR. THOMAS E. LEINENWEBER
15                                MR. JAMES V. DAFFADA
                             120 North LaSalle Street
16                           Suite 2000
                             Chicago, Illinois  60602

17

18

19

20

21

22

23

24

25

|     | 1  | COURT SECURITY OFFICER:  All rise. |
| --- | 2  | (The following proceedings were had out of the |
|     | 3  | presence of the jury in open court:) |
|     | 4  | THE COURT:  Is everybody here so I can just do two |
| 09:28:10 | 5 | short things that I have? |
|     | 6  | MS. ROSEN:  Actually, no, Judge.  I think there's some |
|     | 7  | issue with plaintiff's counsel getting here on time. |
|     | 8  | MR. SOTOS:  Mr. Loevy is here, but -- |
|     | 9  | MS. ROSEN:  I guess it's Mr. Bowman who is not here. |
| 09:28:22 | 10 | THE COURT:  I think it's enough if Mr. Loevy is here. |
|     | 11 | MS. ROSEN:  Yeah.  Okay.  I think he's out in the |
|     | 12 | hallway. |
|     | 13 | THE COURT:  This is of great consequence what I'm |
|     | 14 | going to say, so .... |
| 09:28:36 | 15 | MS. ROSEN:  I'm sure. |
|     | 16 | (Laughter in the courtroom) |
|     | 17 | THE COURT:  Nobody knows where he is? |
|     | 18 | MS. ROSEN:  Mr. Art went to get him, Your Honor. |
|     | 19 | THE COURT:  Thank you. |
| 09:28:53 | 20 | (Brief pause) |
|     | 21 | MR. SOTOS:  You can just tell us.  We'll tell him. |
|     | 22 | THE COURT:  Right. |
|     | 23 | (Brief pause) |
|     | 24 | THE COURT:  Actually -- |
| 09:29:05 | 25 | MR. SOTOS:  I was kidding, for the record. |

1          THE COURT:  No, actually this is just for you.  It's a

2   just note.

3          MR. SOTOS:  All right.

4          THE COURT:  It's actually for Mr. Leinenweber.

09:29:18    5          MR. SOTOS:  Oh.  Nobody wants to hear that.

6          THE COURT:  No, but it's not bad news.  Just a minor

7   thing.

8          This is really minor, everybody.

9          Mr. Art is here.  So that's good.

09:29:28   10          Okay.  I just want to tell you, No. 1, the CSO got a

11   jury note this morning:

12          "... Judge, the jury cannot see the easel.  Can

13           it be moved."

14          MR. LEINENWEBER:  I'm abandoning the easel, Judge.

09:29:44   15   I'd be happy to accommodate.

16          THE COURT:  All right.  That's No. 1.

17          No. 2 is, we did look at the pretrial conference

18   transcript to see what was said about scope.  And Mr. Polick is

19   speaking, and he says:

09:29:56   20          "Judge, just to circle back for clarification."

21           And we couldn't find what we were circling back to,

22   so --

23          MR. LOEVY:  We did, Your Honor.  We're going to get

24   those pages.

09:30:05   25          THE COURT:  All right.  Well, let me go on.  I don't

1  we need to because I say:

2  "Yes."

3  And Mr. Polick says:

4  "In terms of the order of the examination. So

09:30:14  5  once the witness is up there, just to move this

6  along, we are going to -- each side is going to

7  do their examination and we are going to waive

8  scope objections?"

9  And I just said, "yes." And Mr. Loevy said:

09:30:29  10  "We will waive scope."

11  And then I said:

12  "And waive scope. Thank you. Thank you.

13  Because I cannot keep track of scope when we are

14  doing that."

09:30:38  15  And then we talk about our little jury instructions,

16  so they knew we weren't following the usual rules.

17  So apparently there were no limitations put on that.

18  There was just an agreement. So to that extent, I think what

19  the plaintiffs told me yesterday was correct.

09:30:58  20  I also just want to say that there's been kind of

21  madness in terms of this hostile witness business, because

22  nobody is giving me what I need to make any kind of a finding.

23  So after deciding what I can decide, I listened to the

24  witness and it's really unclear. With Ms. Rosner, I don't

09:31:20  25  think there is any basis for treating her as a hostile witness

1    by any side.  We're going back decades, and she's been like

2    with the EEOC.  So I think that was a little goofy.

3           And then with our current witness, I don't know if the

4    manner of the defense questioning created the hostility, but I

09:31:47    5    certainly don't see any basis for the plaintiff finding that --

6    or arguing that this witness is adverse.

7           So, you know, I can't fix this, though, after the fact

8    very easily.  I mean, I can't fix it at all.  So I'm just going

9    to say, if anybody anticipates wanting to examine a witness as

09:32:07    10    adverse when that is not otherwise acceptable, otherwise not

11    something that's clear, let's put it that way, I need something

12    from you in advance, otherwise I'm just not going to let

13    anybody do that.

14           MR. LOEVY:  Your Honor, but for this witness, can we

09:32:23    15    stay with the same grounds we have been doing with this

16    witness?

17           THE COURT:  Well, I don't know -- what's the rule when

18    one side calls an adverse witness, okay, which you've done.

19           MR. SOTOS:  Correct.

09:32:40    20           THE COURT:  And then the other side cross examines,

21    but then also does their own examination.  I mean, I'm not

22    quite sure what the rules provide for this.

23           MR. SOTOS:  It seems to me, Judge, that if we're

24    proceeding under a scenario in which then the other side is

09:32:54    25    going into an area that's not cross-examination --

1        THE COURT:  That's not within the scope.

2        MR. SOTOS:  Right.  Then they can't lead unless it's

3    an adverse witness.

4        THE COURT:  That makes sense.  And until I find

09:33:03    5    something -- and that's what you've been doing, right?

6        MR. LOEVY:  Well we were leading.  And you gave us

7    permission to lead.  And we'd ask that you don't reverse your

8    decision on that.

9        THE COURT:  Well, I don't think it's right.  I mean,

09:33:14   10   I've seen this witness and he seems to be largely in your

11   corner.

12       MR. LOEVY:  Yes and no.  I mean, he is the guy who

13   participated in the criminal investigation that led to our

14   conviction.

09:33:23   15       THE COURT:  Well --

16       MR. LOEVY:  He's telling the truth about --

17       THE COURT:  -- I'm not going to reverse myself on what

18   you can do when you're within the scope.

19       MR. LOEVY:  All right.

09:33:29   20       THE COURT:  But when you're using him as your witness,

21   I think you better directly examine him.

22       MR. LOEVY:  All right.  Well, Mr. Sotos brought up

23   this issue.

24       THE COURT:  But, as I'm saying, you know, there's law

09:33:38   25   out there, and I don't know it by heart.  And if anybody wants

1    to give me anything, just show me that this ought to be done

2    differently, fine.  But I think we should get the jury.

3            MR. LOEVY:  Well, one other thing, Your Honor, is that

4    we have said that there wasn't going to be attacking in

09:33:53    5    cross-examination, and that has been respected in this trial,

6    but Mr. Leinenweber is going over the same subject that Mr.

7    Sotos went over comprehensively and aggressively.  I didn't get

8    a chance to ask Tom if he intends to keep talking about the

9    Jimenez case, but Mr. Sotos exhausted everything that was to

09:34:06    10   exhaust on the Jimenez case, and then Mr. Leinenweber just

11   started it all over.

12           THE COURT:  Quick.

13           MR. LEINENWEBER:  Judge, I don't believe that's

14   correct.

09:34:14    15           THE COURT:  You're not going to be with him for a long

16   time, anyway.

17           MR. LEINENWEBER:  Honestly, Judge.  You know me, I

18   probably won't be more than 20 minutes or half hour; promise

19   you.

09:34:20    20           MR. LOEVY:  Well, if it's 20 minutes to half hour on

21   what Mr. Sotos just spent 45 minutes on, there's nothing new to

22   talk about there.

23           THE COURT:  I don't know.  This gets very complicated

24   when there are two lawyers with different interests

09:34:30    25   representing clients with different interests.  I'm not sure

1  that this is where I want to jump in and start setting rules,

2  especially when Mr. Leinenweber promises me --

3         And actually you're more reliable than anybody else on

4  this --

09:34:41    5         (Laughter in the courtroom)

6         THE COURT:  -- if you're going to be short.

7         MR. LOEVY:  But Your, Honor, they are aligned on this.

8  Mr. Soto -- it wasn't even Mr. Sotos' issue.  I mean, Mr.

9  Dorsch is making allegation against Mr. Guevara --

09:34:55   10         THE COURT:  You know, I'm not -- let's get the jury.

11         MS. ROSEN:  Judge, can I just ask a scheduling

12  question?

13         THE COURT:  Yeah.  But let's get a jury.

14         MS. ROSEN:  So you still intend to have another jury

09:35:01   15  instruction conference?

16         THE COURT:  We probably will have to.

17         MS. ROSEN:  Yes.  So what we're looking at right now

18  is that we should be done with evidence on Monday.  So I don't

19  know where you want to put that in.

09:35:11   20         THE COURT:  Is that all of you?

21         MS. ROSEN:  That's the defense.

22         THE COURT:  And when on Monday do you anticipate --

23         MS. ROSEN:  Well, it depends on how quickly we move

24  along.  Hopefully Monday noon'ish is the best guess right now.

09:35:27   25         THE COURT:  All right.  So I need to know from you a

1   little in advance how many issues we have to resolve so that I

2   can figure out how much time I should allow.

3          I mean, I can send the jury home early Monday, I can

4   have them come in late on Tuesday.  I can do any of those

09:35:44   5   things.

6          MS. ROSEN:  So you're going to want to do it -- I

7   guess that's the point, you're going to want to do it at the

8   conclusion of the evidence, is what you're envisioning?

9          THE COURT:  Well, I don't want to have to do it twice.

09:35:51   10   If we're ready to do it --

11          MR. LOEVY:  We made a lot of progress, as you recall,

12   at the pretrial conference.  I mean, there wasn't that many

13   unresolved issues.

14          THE COURT:  Yeah, I know that.  I don't know -- I

09:36:00   15   mean, it seems to me, you can tell me if you think I'm wrong,

16   but that it's more efficient to do it at the close of all the

17   evidence but before the arguments.  And to give the jury an

18   amount of time off based on what you tell me about how many

19   issues we have to resolve.  There's no point in the jury

09:36:17   20   sitting, waiting.

21          MR. LOEVY:  Well, it sounds like it's going to break

22   naturally.  On Monday, if we're going to run out of witnesses

23   on Monday --

24          THE COURT:  We're ready.

09:36:23   25          MR. LOEVY:  If we're going to run out of witnesses on

2988

1    Monday, that's when we ought to do it.

2             COURT SECURITY OFFICER:  All rise.

3             (The following proceedings were had in the

4             presence of the jury in open court:)

09:36:42    5             THE COURT:  Good morning, ladies and gentlemen.

6             (Jurors responded.)

7             THE COURT:  You look dryer than I am.  I don't know if

8    it's just the way you appear, right?  Did not bring an

9    umbrella.  Big mistake.

09:36:54   10             Please be seated.  The lawyers have been informed that

11   the easel needs to be turned around so that you can see it.

12   And I think it is turned around so you can see it.  But I

13   appreciate that.  Anytime you are having trouble seeing

14   anything, just let me know.

09:37:10   15             Mr. Leinenweber, I think we just need the witness.

16             MR. LEINENWEBER:  Correct, Judge.

17             (Brief pause)

18             THE COURT:  And, ladies and gentlemen, I have on

19   pretty good authority, based on what I understand, which is

09:37:39   20   never completely certain, that you'll have the case sometime --

21   I can't say it's at the beginning of next week, but early next

22   week.  I'm hoping -- we have to go through closing arguments of

23   which there will be a number, and instructions, and that takes

24   kind of day.  My guess is is that the evidence is probably

09:38:02   25   going take us well into Monday, and then we'll be able to do

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 13 of 278 PageID #:43657
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

2989

1    those other things on Tuesday.

2              (The witness enters the courtroom)

3              THE COURT:  It's my hope that you will have the case

4    on Wednesday.  That is not a complete promise.  And when on

09:38:17    5    Wednesday, I'm not sure, but we're making progress and we're

6    getting there.

7              Counsel, do we have a witness?

8              Ah, Mr. Dorsch.

9              THE WITNESS:  Good morning, Your Honor.

09:38:31    10              THE COURT:  Good morning.

11         WILLIAM DORSCH, DEFENSE WITNESS, PREVIOUSLY SWORN

12                   REDIRECT EXAMINATION (resumed)

13    BY MR. LEINENWEBER:

14    Q.  Good morning, Mr. Dorsch.

09:38:45    15    A.  Good morning.

16    Q.  To make things easier, you'll be happy to know that I'm

17    abandoning the easel since I'm going to use the Elmo.

18              MR. LEINENWEBER:  So, Judge, I'll try not to reinvent

19    the wheel, but I just like to establish a couple of things that

09:38:57    20    we talked about yesterday.

21    BY MR. LEINENWEBER:

22    Q.  We talked about two cases.  We talked about the umbrella

23    case.  And by that, you know, I'm referring to the case where

24    you state that Mr. Guevara basically put the finger on the

09:39:08    25    picture of the witness, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 14 of 278 PageID #:43658
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2990

1    A.  Yes.

2    Q.  When I say "umbrella," that's what I mean.

3    A.  Understood.  And Mingey referred to that case always as the

4    umbrella case.

09:39:18    5    Q.  Correct.  So, but you know what I'm talking about when I

6    saw umbrella, right?

7    A.  Yes, I do.

8    Q.  Okay.  And then second case I believe you were talking

9    about was the Jimenez case.

09:39:26    10          MR. LEINENWEBER:  And if I could approach the witness?

11          THE COURT:  Yes.

12          (Document tendered to the Court and the

13           witness.)

14    BY MR. LEINENWEBER:

09:39:36    15    Q.  Sir, I'm going to show you what's been marked as

16    Defendants' Exhibit 70.  If you could just take a look at that,

17    please.

18          (Brief pause)

19          THE COURT:  I do not have realtime.  Should I --

09:40:48    20          THE COURT REPORTER:  I'll fix it, Judge.

21          THE COURT:  Hold on one second.  A little technical

22    glitch.

23          (Brief pause)

24          THE COURT:  That's fine.  Thank you.

09:40:50    25          Don't wait for me, I'm just plugging things in.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 15 of 278 PageID #:43659
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2991

BY MR. LEINENWEBER:

Q.  That exhibit, that appears to be the part of the criminal file of the Jimenez case, is that fair to say?

A.  Yes.

09:40:57
Q.  And if you look -- I put a little sticker on it to make it easier.  If you look at that page where the sticker is on, you're listed there as the detective and the arresting officer, is that correct?

A.  No, it's for a lineup report.

09:41:09
Q.  But at least your name, your signature is on that document?

A.  Well, my -- it's not my signature.

Q.  But your name is on it?

A.  My name is on it, yes.

Q.  And also your partner at the time, Bill Johnson, is that
09:41:19  correct?

A.  Well, apparently we were working that day on that case.

Q.  Okay.  And I understand you've worked on a lot of cases, and it's been a long time since you've been on the police department.  And no one here expects you to remember every
09:41:37  detail, but seeing your name and your partner's name on that pretty much indicates to you that you were working on that case, correct?

A.  Yes.

Q.  Okay.  And you were one of arresting officers, correct?

09:41:46
A.  Apparently.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 16 of 278 PageID #:43660
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

2992

1  Q.  Okay.  And we can tell by that date, that says the date of

2  the murder.  I think we established yesterday was December 19th

3  of 1991, correct?

4  A.  Right.

09:41:55  5  Q.  Okay.  And then going back to the umbrella case.  You had

6  said yesterday, on further thought, that you believe that that

7  happened around Mother's Day of 1989, correct?

8  A.  Yes.

9  Q.  Now, again, because memory is memory, you said different

09:42:12  10  dates on different occasions, is that fair to say?

11  A.  Oh, sure.

12  Q.  Yeah.  At your deposition you said it may have been '88,

13  may have been '89, may have '90, is that correct?

14  A.  Correct.

09:42:23  15  Q.  Okay.  And at one point you actually had a blurb about this

16  case on your website for your private business, correct?

17  A.  On this case?

18  Q.  No.  No.  On the umbrella case.

19  A.  I don't know that -- I don't know.

09:42:37  20  Q.  Okay.  So I believe you had that on your website and you

21  stated the date of that was 1992.  Does that sound, correct?

22          MR. BOWMAN:  Objection.  Foundation.

23          THE COURT REPORTER:  I'm sorry, who's objecting?

24          MR. LOEVY:  Mr. Bowman.

09:42:51  25          THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 17 of 278 PageID #:43661
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2993

1   BY THE WITNESS:

2   A.  I don't recall that case being on my website.

3   BY MR. LEINENWEBER:

4   Q.  Okay.  Do you remember you gave a deposition on this

09:42:56   5   matter?

6   A.  Yes.  I've given, I think, with court testimony, about 8

7   times.

8   Q.  Right.  But at least in terms of this case, you gave a

9   deposition a couple of years ago, is that right?

09:43:10   10   A.  Well, I think the first people that came out to me were

11   from the Sotos law firm.  They came to my home.

12   Q.  Understood.  Understood.  But you sat down, you were sworn

13   in, you answered --

14   A.  Right.

09:43:13   15   Q.  -- questions, correct?

16   A.  Sure.

17   Q.  Okay.  Same type of oath you took today, to tell the

18   truth --

19   A.  Yes.

09:43:25   20   Q.  - - correct?

21          And you told the truth to the best of your ability, is

22   that correct?

23   A.  Yes.

24          MR. LEINENWEBER:  Counsel, I'm referring to page 350,

09:43:33   25   Lines 1 to 6.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 18 of 278 PageID #:43662
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

2994

1          MR. BOWMAN:  Thank you.

2   BY MR. LEINENWEBER:

3   Q.  Were you asked this question and did you give this

4   answer -- excuse me.  That's the wrong page.

09:43:41    5          MR. BOWMAN:  Page number?

6          MR. LEINENWEBER:  I'm sorry, it's 321, lines 16 to 24.

7          MR. LOEVY:  321?

8          MR. LEINENWEBER:  321, 16-24.

9   BY MR. LEINENWEBER:

09:43:58   10   Q.  And the next paragraph -- at Line 16, 321, this is

11   question:

12          "Question:  The next paragraph starts in 1992

13          while working as a detective in Area 5."

14          And then you went on to describe the case in

09:44:10   15          which you were uncomfortable with

16          identification:

17          "...  the witnesses agreed that they've been

18          paid by a third-party to finger the person who

19          was arrested."

09:44:17   20          Am I right in believing that the case you were

21          describing in your MLIS frequently asked

22          questions is the same murder investigation you

23          were talking about in the post-conviction

24          proceedings?

09:44:27   25          "Answer:  Yes."

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 19 of 278 PageID #:43663
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2995

1          And now I'm on Line 5, on page 322:

2          "Question:  Okay.  So when you created your

3          website page, you knew that or you wrote that

4          the case occurred in 1992, correct?

09:44:40    5          "Answer:  From --"

6           "I asked if --"

7            "Answer:  I wrote that, yes.

8          "Question:  Okay.  Why did you believe when you

9          wrote that that it was in 1992, but in the

09:44:47   10          post-conviction proceedings you said it was the

11          best recollection, '88 or '89.

12          "Answer:  Because I didn't know when Guevara

13          became a detective.

14          "Question:  Okay.  So you were guessing?

09:44:57   15          "Answer:  I was guessing at that time and at

16          that time also."

17            Was that what --

18   A.  That's correct.

19          MR. LOEVY:  Objection.  Not impeaching, Your Honor.

09:45:06   20          THE COURT:  That is true, but -- -

21          MR. LEINENWEBER:  I'm sorry, judge.  I'll keep going.

22   BY MR. LEINENWEBER:

23   Q.  (Reading:)

24          "So when you wrote the web page, you were

09:45:08   25          guessing?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 20 of 278 PageID #:43664
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2996

1          "Answer:  Yeah.

2           "... it was 1992?

3          "Answer:  Yeah."

4           Was that the question and those answers?

09:45:14   5   A.  If you're repeating from that, but I don't -- I'm having

6   difficulty with the web page because that was created so many

7   years ago and I haven't seen it probably since this was

8   created.

9   Q.  Understood.  But you have no reason to doubt that when you

09:45:27   10   have that answer, that you had it on your web page and you

11   wrote it in 1992, correct?

12   A.  I don't recall it on the web page, but I don't disagree

13   with the dates.

14   Q.  Fair enough.  I'll move on.

09:45:38   15           So at least if we go here (indicating).  So I'm not

16   using the paper anymore.  It says date of incident for Jimenez,

17   December 19th, 1991.  The umbrella case 1988, 1989 and 1990,

18   and I forgot to put 1992.

19           And we also know from the questions yesterday that the

09:46:00   20   victim's name in the Jimenez case was, obviously, Jose Jimenez,

21   is that correct?

22   A.  In that case, yes.

23   Q.  But in the umbrella case, we don't know who the name is,

24   correct?

09:46:08   25   A.  I do not recall.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 21 of 278 PageID #:43665
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2997

1   Q.  Okay.  So I had put down "I don't remember," but "I don't

2   recall" is kind of the same thing.

3         And the location of the incident for the Jimenez case

4   was at, I think, Sawyer and Wabansia.  And so that location

09:46:26   5   would be 3231 West Wabansia, correct, for the Jimenez case?

6         And you can check that report, if you'd like.  I think

7   actually it says 1700 North Sawyer.

8   A.  Yes.

9   Q.  Sawyer and Wabansia.

09:46:40   10   A.  Well, wait.  I think it says 1200 here.

11   Q.  I'll take a look.

12   A.  The Jimenez case -- oh, 1700?  Where did I see 1200?

13         This says 1700.  Yes; consistent.

14   Q.  So I'm going to actually change this because I was wrong.

09:47:01   15   I have Wabansia here.

16         But 1700 North Sawyer.

17         And for the umbrella case, it's fair to say, you don't

18   remember where it happened, correct?

19   A.  No, it happened right near the viaduct on Bloomingdale, but

09:47:14   20   I don't remember the exact north/south street, but it was in

21   the area of Kedzie.

22   Q.  Okay.  So Kedzie and Bloomingdale.  I'll put that down.

23   A.  Right.

24   Q.  And the nature of the incident in both cases was, I believe

09:47:28   25   we established yesterday, a drive-by shooting, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 22 of 278 PageID #:43666
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2998

1    A.  It was common.

2    Q.  Okay.  And then I believe you said in the umbrella case,

3    you believed it was a white car in which the shooter was in,

4    correct?

09:47:46    5    A.  I know it was a white car.

6    Q.  Okay.  But in the Jimenez case, it's a yellow car, correct?

7    A.  Correct.

8    Q.  Okay.  So that's a little difference of yellow and white,

9    correct?

09:47:58    10    A.  (No response.)

11    Q.  And there was a passenger in the car in the Jimenez case, a

12    girl named Maureen Clausen.  Does that name sound familiar?

13    A.  Yes.

14    Q.  And she was a 17-year-old girlfriend of Mr. Jimenez,

09:48:16    15    correct?

16    A.  And her name is familiar to me from reviewing the reports,

17    as are the two witnesses.

18    Q.  But in the umbrella case, you don't recall what the girl's

19    name is, correct?

09:48:22    20    A.  Only that she was about 13 years old and she was a cousin

21    of the person driving the car.  And that she was from Puerto

22    Rico.  And after the shooting, the family immediately sent her

23    back to Puerto Rico.  So we were not able to find her and

24    interview her.

09:48:36    25    Q.  Okay.  But Maureen Clausen is the one in Jimenez, unknown

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 23 of 278 PageID #:43667
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
2999

1    person in umbrella, right?

2         MR. LOEVY:  Objection "unknown," Your Honor.  He

3    described the person.

4    BY MR. LEINENWEBER:

09:48:46    5    Q.  You don't know her name, right?

6    A.  I don't know her name.

7    Q.  So it's unknown, correct?

8    A.  It would've been in the report.

9    Q.  Correct.  But you don't know her name, right?

09:48:52    10    A.  Yes.

11    Q.  And I think you said that you believed that the girl in the

12    umbrella case was 13, is that right?

13    A.  She was young.  She was 13, 14 years old.

14    Q.  But Maureen in the Jimenez case, she's 17, correct?

09:49:07    15    A.  That's correct.

16    Q.  Okay.  And I think you just said that after the incident,

17    she moved away to Puerto Rico, the girl in the umbrella case?

18    A.  Well, she didn't move away to Puerto Rico.  She was sent

19    back to Puerto Rico.

09:49:26    20    Q.  She was gone.  She went to Puerto Rico, right?

21    A.  Right.  I never talked to her.  I only remember that from

22    the report.

23    Q.  But in the Jimenez case, Maureen -- Maureen moved to

24    Philadelphia, correct?

09:49:35    25    A.  That's correct.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 24 of 278 PageID #:43668
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3000

1  Q.  Okay.  And in both cases, there were two young teenage

2  witnesses, correct?

3  A.  Yes.

4  Q.  And I think yesterday you agreed with me, you said in both

09:49:53    5  of those cases the two young witnesses were of Hispanic origin,

6  correct?

7  A.  That's correct.

8  Q.  And the witnesses' names, at least in the Jimenez case,

9  were a Mr. Vargas and a Mr. Nelson, correct?

09:50:09   10  A.  In the Jimenez case?

11  Q.  Can you take a look.

12          (Brief pause)

13  BY THE WITNESS:

14  A.  That's correct.

09:50:30   15  BY MR. LEINENWEBER:

16  Q.  And in Jimenez, witness one, Mr. Vargas, picked the suspect

17  out of a photo array and picked a suspect out of a lineup,

18  correct?

19  A.  That's what it says, yes.

09:50:44   20  Q.  And Mr. Nelson, the second witness, he didn't make an ID

21  either from a lineup or from the -- excuse me, from a photo

22  array or a lineup, correct?

23  A.  I would have to review it.

24  Q.  Take a look.

09:50:55   25          (Brief pause)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 25 of 278 PageID #:43669
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3001

1    BY THE WITNESS:

2    A.  You have to forgive me.  Maybe you can help me find it,

3    because -- I apologize, but --

4    BY MR. LEINENWEBER:

09:51:34    5    Q.  I know it's a lot.  Take my word, it's in there.

6    A.  Okay.

7    Q.  And in the umbrella case, Witness No. 1 picked out a photo

8    array, ID'd the defendant -- I mean, the suspect out of the

9    lineup, but Witness No. 2 made neither, is that correct?

09:51:51    10    A.  I'm going on your word, sir.  I told you, I couldn't find

11    it.

12    Q.  That's what you testified to previously, correct?  You said

13    that -- I think actually Mr. Bowman asked you.  You had said

14    that Rey Guevara brings in two witnesses, hustles one over to

09:52:03    15    you, you're doing a photo array, the kid's taking his time, and

16    Rey is like, "Yeah, that's the guy, right there," right?  And

17    then that guy later, witness one, later made up an ID of the

18    lineup, isn't that what you said yesterday?

19    A.  In the umbrella case?

09:52:16    20    Q.  Yes.

21    A.  Yes.

22    Q.  Okay.  So similarly in Jimenez and umbrella, you have one

23    Witness No. 1 does both, picks out of the ID and picks out of a

24    lineup.  Witnesses No. 2, "Nah, can't do it either," right?

09:52:33    25    They're exactly the same?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 26 of 278 PageID #:43670
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3002

1    A.  The same.

2    Q.  And it came to be that you found out, at least in the

3    umbrella case, that these kids had been bribed, right?

4    A.  Yes.

09:52:43    5    Q.  And you know in the Jimenez case that Vargas and Nelson had

6    admitted to being bribed, too, correct?

7    A.  No, I never knew that, sir.

8    Q.  Okay.  Well, let me show you what I've marked as

9    Defendants' Exhibit No. 71.

09:52:56    10         MR. LEINENWEBER:  If I might approach, Judge.

11   BY MR. LEINENWEBER:

12   Q.  You were shown this document from your deposition, correct?

13         (Document tendered to the witness)

14   BY THE WITNESS:

09:53:04    15   A.  Okay.

16   BY MR. LEINENWEBER:

17   Q.  You answered questions about that in your deposition?

18   A.  I don't recall.  I would have to read it to --

19   Q.  Go ahead.  Read it.

09:53:12    20         But while you're reading it, I'll tell you what it

21   says.  It says:

22         "Witness Nelson and Vargas --"

23         MR. LOEVY:  Your Honor, I object to foundation.

24         MR. LEINENWEBER:  Judge, if you want, we can sit here

09:53:19    25   and wait --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 27 of 278 PageID #:43671
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3003

```
         1        THE COURT:  Wait a minute.  Wait.  What's the
         2  objection?
         3        MR. LOEVY:  It's a foundation objection.  This is a
         4  document created by somebody else for a witness interview with
09:53:30 5  somebody else.
         6        THE COURT:  And what are you using it for?
         7        MR. LEINENWEBER:  Impeachment.
         8        MR. LOEVY:  Well, it's for the truth of what's in it,
         9  Your Honor.
09:53:37 10       MR. LEINENWEBER:  No, it's an impeachment, Judge.
        11        THE COURT:  Well, is it possible for me to see it so I
        12  know what you're talking about?
        13        MR. LEINENWEBER:  Sure.
        14        This is a terrible copy.  If I can approach, Judge.
09:53:47 15       THE COURT:  I don't care, as long as I can read it.
        16        MR. LEINENWEBER:  You can sort of read it.
        17       (Document tendered to the Court.)
        18        THE COURT:  Yeah, that does look pretty bad.
        19        MR. LEINENWEBER:  Yeah.
09:54:00 20       THE COURT:  All right.  Hold on a second.
        21       (Brief pause)
        22        THE COURT:  So is there any basis for -- I guess I'm
        23  kind of figuring out, if the witness didn't write this report,
        24  what can be the basis for impeaching him on this report?
09:54:14 25       MR. LEINENWEBER:  That he's answered questions about
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 28 of 278 PageID #:43672
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3004

1  this report.  He's read this report before.  And I believe he

2  knows, having read that report, what these witnesses did.

3          MR. LOEVY:  Your Honor, but they can't impeach him

4  with somebody else's report.

09:54:25  5          THE COURT:  You know, if he testified at his

6  deposition about this report and is saying anything different

7  about the report, I don't see what's wrong with that.

8          But what is the pending question?

9          MR. LEINENWEBER:  The pending question is, did the

09:54:39  10  witnesses, Nelson and Vargas, admit to being bribed.

11          MR. LOEVY:  See, that's the truth.  I mean, if --

12          THE COURT:  Hold on.  Hold on.

13          MR. LOEVY:  Sorry.

14          THE COURT:  So in a deposition, was the witness just

09:54:48  15  testifying to what was in the report?

16          MR. LEINENWEBER:  He was shown the report to refresh

17  his recollection.

18          THE COURT:  So you are asking him whether it refreshes

19  his recollection now?

09:54:58  20          MR. LEINENWEBER:  Correct.

21          THE COURT:  All right.  So you're using it to refresh

22  recollection.

23          So does it refresh your recollection?

24          THE WITNESS:  I've never seen this report.  It's not

09:55:03  25  mine.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 29 of 278 PageID #:43673
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3005

1  BY MR. LEINENWEBER:

2  Q.  You were shown that report at your deposition, correct?

3  A.  Which deposition?

4  Q.  At the deposition in this case, sir.

09:55:10  5  A.  Which time?

6  Q.  There was only one, sir.

7  A.  I've only had one deposition?

8  Q.  You only had one deposition --

9      THE COUR REPORTER:  I'm sorry.

09:55:15  10  BY THE WITNESS:

11  A.  I've given depositions numerous times.

12      THE COURT:  You know, you can't both talk at once.  I

13  mean --

14      THE WITNESS:  I've been in numerous depositions, Your

09:55:23  15  Honor.

16  MR. LEINENWEBER:

17  Q.  You were deposed in this case, correct?  I just asked you

18  some --

19  A.  Yes.

09:55:28  20  Q.  -- questions --

21  A.  Yes, in the Rivera case.

22  Q.  And at that deposition you understood that these witnesses

23  had been bribed, correct?

24      MR. LOEVY:  Objection, Your Honor.  He just --

09:55:37  25      THE WITNESS:  In the Rivera case?  No.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 30 of 278 PageID #:43674
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3006

1    THE COURT:  Sustained.

2  MR. LEINENWEBER:

3  Q.  No, in the umbrella case, sir.

4      In the umbrella case, you said that they were bribed,

09:55:44   5  correct?

6  A.  Yes.

7  Q.  Okay.  And in the Jimenez case, they were bribed, too,

8  correct?

9      MR. LOEVY:  Objection, Your Honor.

09:55:49  10      THE COURT:  Sustained.

11      THE WITNESS:  That is what that report says.

12      THE COURT:  Sustained.

13      THE WITNESS:  Sorry.

14      MR. LEINENWEBER:  If I could have just one moment,

09:56:02  15  Judge.

16      THE COURT:  Sure.

17      (Brief pause)

18  BY MR. LEINENWEBER:

19  Q.  And you understood in the umbrella case, that -- you

09:56:44  20  understood in the umbrella case that the witnesses admitted to

21  you that they had been bribed because the ex-boyfriend wanted

22  to set up the kid, correct?

23  A.  Yes.

24  Q.  Okay.  And, similarly, that's what happened here, too,

09:57:00  25  correct, in the Jimenez case?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 31 of 278 PageID #:43675
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3007

1    A.  That's what it says.

2    Q.  All right.  And we know from the paperwork on the Jimenez

3    case --

4         MR. LOEVY:  Objection, Your Honor.  Same objection.

09:57:17    5    He's still working off the Jimenez paperwork.

6         MR. LEINENWEBER:  That's the one that he was the

7    arresting --

8         THE COURT:  Let me hear the witness.

9    BY MR. LEINENWEBER:

09:57:23    10    Q.  We know from Exhibit 70 in which you said you were the

11    arresting officer in the Jimenez case, right?  That the suspect

12    who was arrested in that case was a man named Robert Ramos,

13    correct?

14    A.  Yes.  From reviewing the reports I see that, yes.  And I

09:57:40    15    recall the names.

16    Q.  Right.  However, in the umbrella case, you do not recall

17    the name of the defendant or suspect, correct?

18    A.  Well, I only recall these names because they were handed to

19    me.  If I would gladly have the other report, it probably would

09:57:52    20    enhance my memory.

21    Q.  Of course.  And if that other report existed, sir, I would

22    give it to you.  You'd be sure of that.  And if I didn't, you'd

23    be sure Mr. Bowman would, correct?

24    A.  At that time --

09:58:01    25    Q.  That's correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 32 of 278 PageID #:43676
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3008

1    A.  Repeat, please.

2    Q.  Sure.  Of course.

3           If that report existed, you would have a copy of it

4    either from us or Mr. Bowman, correct?

09:58:10    5           MR. LOEVY:  Objection.

6           MR. BOWMAN:  Objection.

7           THE COURT:  What is the question?

8           MR. LOEVY:  He should be able to answer.

9           MR. LEINENWEBER:  It's a "yes" or "No" question.

09:58:16    10           THE COURT:  Well, you're not giving him an

11   opportunity, then.

12           MR. LEINENWEBER:  Of course.

13   BY THE WITNESS:

14   A.  Repeat, please.

09:58:19    15   BY MR. LEINENWEBER:

16   Q.  Of course.

17           If that report existed, you would have been given it,

18   correct?

19   A.  It doesn't always happen that way, sir.

09:58:30    20   Q.  Okay.  But you've never seen this report, right?

21   A.  Reports have disappeared numerous times within the Chicago

22   Police Department.

23   Q.  So -- Okay.  But you haven't seen it, correct?

24   A.  I -- '70?

09:58:44    25   Q.  '70 you've seen.  That's the one you were the arresting

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 33 of 278 PageID #:43677
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3009

1   officer on.  The umbrella case, you've never seen a report on

2   that, right?

3   A.  Although I've asking for it.

4   Q.  You've never seen that report, right?

09:58:54   5   A.  No.  Reports were typewritten --

6   Q.  My question, sir, is, you've never seen the report, right?

7   A.  I would've loved to, yes.

8   Q.  My question --

9   A.  I have not seen it.

09:59:03   10   Q.  Correct.  Thank you.

11          So we know Robert Ramos is a suspect.  In Jimenez,

12   umbrella man, we don't know who that suspect is, correct?

13   A.  Correct.

14   Q.  And I think you said you spoke -- yesterday we talked a

09:59:25   15   little bit about it.  You spoke to Mr. Ramos' father, "Good

16   kid.  Wouldn't do this."  He had a previous gun charge, right?

17   A.  I never said I talked to Mr. Ramos' father.

18   Q.  Sorry.  You're correct.

19   A.  We were talking about the umbrella case, sir.

09:59:37   20   Q.  You talked to unknown umbrella guy person, right?

21   A.  That's correct.

22   Q.  We don't know his name either, right?

23   A.  It would've been senior.

24   Q.  All right.  So senior.

09:59:45   25   A.  Father.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 34 of 278 PageID #:43678
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3010

1   Q.  Father.  He comes in, says, "This is a good kid.  He

2   would've done something."  Basically convinces you, correct?

3   A.  Convinced me to take a look at it.  I already had doubts,

4   so I was willing to go that route.

09:59:57   5   Q.  Understood.  Understood.

6           And you found out that umbrella suspect had a gun

7   charge, but the dad explained it, right?

8   A.  And the report explained it, too.

9   Q.  Correct.  And in the Jimenez case, as you answered my

10:00:09   10   question yesterday, you knew that Mr. Ramos had a gun charge

11   that had been dismissed, too, correct?

12   A.  No.

13   Q.  Let's take a look.

14           Excuse me.  Yesterday you said you had, do you

10:00:20   15   remember that question?

16   A.  Oh, if we're talking about Ramos, you brought out the fact

17   that he had a defaced firearm.

18   Q.  Correct.  And it was a gun charge, right?

19   A.  But I wasn't shown any paper.

10:00:31   20   Q.  I didn't show you any paper, correct.

21   A.  Right.

22   Q.  But there was a gun charge, right?  And you admitted it?

23   A.  As you said.

24   Q.  Correct.  So in both umbrella man and Ramos, there's a

10:00:39   25   prior gun charge, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 35 of 278 PageID #:43679
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3011

1  A.  According to what you described for Mr. Ramos, they both

2  would've had gun charges.

3  Q.  And when you investigated umbrella man, you found out he

4  worked at Walgreens, correct?

10:00:52  5  A.  Yes.

6  Q.  And if you look at your report there in Jimenez, Mr. Ramos

7  worked at Walgreens, too, correct?

8  A.  In this report, but I wouldn't have known that at the time.

9  Q.  Right.  But in your report, it says he worked at Walgreens,

10:01:07  10  correct?

11  A.  Yes.

12  Q.  And it also says, umbrella man and Mr. Ramos were both

13  DePaul students, correct?

14  A.  I want to change something.  I would not say "in my

10:01:17  15  report," sir.  I'm going to say, "in this report it says that."

16  Q.  Fair enough.  We obviously know that lots of officers, Gang

17  Crime Specialists, police officers, detectives, they all work

18  on these reports; fair enough?

19  A.  Correct.

10:01:29  20  Q.  Okay.  But those reports indicated that both umbrella man

21  and Mr. Ramos worked at Walgreens and went to DePaul, correct?

22  A.  I believe so.

23  Q.  And in the umbrella case, as you indicated, it was Rey

24  Guevara that brought the witnesses in, correct?

10:01:50  25  A.  Mr. Guevara and Mr. Gawrys.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 36 of 278 PageID #:43680
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3012

1  Q.  But in the Ramos case, the Jimenez case, those witnesses

2  came in on their own, correct?

3  A.  I don't know.

4  Q.  Let's see Exhibit 70 just to make sure you got the right

10:02:15   5  page there.  Just take a look at that, please.

6         (Said item tendered.)

7  BY MR. LEINENWEBER:

8  Q.  I'm going to ask you to look at page 46 -- excuse me.

9         MR. LEINENWEBER:  This is Exhibit 70, Judge, the page

10:02:39  10  is listed as RFCO24682.

11         If I can approach the witness?

12         THE COURT:  Sure.

13         (Document tendered to the witness)

14  BY MR. LEINENWEBER:

10:02:50  15  Q.  Just take a look at that and see if that refreshes your

16  recollection.

17         (Brief pause)

18         MR. LOEVY:  Your Honor, we object to foundation.

19  BY MR. LEINENWEBER:

10:03:08  20  Q.  This is your report, is it not, sir?

21         This is in evidence.

22  A.  This is a report that bares my name, yes.

23  Q.  Correct.

24         MR. LOEVY:  All right.  Then we withdraw the

10:03:15  25  objection, Your Honor.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 37 of 278 PageID #:43681
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3013

1   BY MR. LEINENWEBER:

2   Q.  And in that report where I put in yellow it says:

3           "Vargas heard in the neighborhood that police

4           needed the witness to the offense, and he

5           presented himself along with Nelson to the

6           police station to help."

7            Does that refresh your recollection?

8   A.  No.

9   Q.  It doesn't?

10  A.  No.

11  Q.  Is that what the report says?

12  A.  That's what the report says.

13  Q.  You have no reason to doubt that report?

14  A.  Oh, I have many reasons to doubt the report, sir.

15  Q.  Okay.  Well, at least that's what the report says, though,

16  correct?

17  A.  That's what the report says.

18  Q.  Okay.  So at least according to this report, which you

19  signed, it says:

20          "Witnesses Vargas and Nelson presented

21          themselves to help."

22           Correct?  Isn't that what it says?

23  A.  That's what this report says.

24  Q.  Thank you.

25           So the difference here between umbrella man and

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 38 of 278 PageID #:43682
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3014

1    Jimenez Ramos is, in umbrella man, Rey and Steve Gawrys bring

2    the witnesses in.  In Jimenez, the witnesses volunteer and come

3    in, right?  That's the difference between them two, as you sit

4    there today, correct?

10:04:12    5    A.  That is one of the differences, yes.

6    Q.  At least that's the difference of how the witnesses came to

7    your attention, right?

8    A.  According to the report, yes, that would be the difference.

9    Q.  And I believe you said yesterday, in the umbrella case you

10:04:26   10   eventually went to Branch 66, and you told the state's attorney

11   there to get rid of the case, correct?

12   A.  Yes.

13   Q.  Okay.  And that report indicates that you went to Branch 66

14   for Mr. Ramos, correct?

10:04:37   15   A.  No.

16   Q.  Take a look.

17   A.  Well, we would've gone to Branch 66 for Mr. Ramos several

18   years later on a similar shooting, yes.

19   Q.  But I'm just talking about this shooting.

10:04:50   20   A.  Okay.  This shooting?

21   Q.  Right.

22   A.  Yeah.

23   Q.  You went to Branch 66 on both cases?

24   A.  That's what we would do, yes.

10:05:02   25   Q.  And the assistant state's attorney that's listed in your

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 39 of 278 PageID #:43683
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3015

1   Robert is Donna Nelson, correct?

2   A.  If he's listed, it's in the report.

3   Q.  I think it's a she.

4   A.  Or she.

10:05:11   5   Q.  She's listed in the report as the state's attorney.

6          However, in the umbrella case, as you sit here, you

7   don't know the name of the assistant, correct?

8   A.  There were two, because it was two nights, one for the

9   photo ID's and the second one for a lineup.

10:05:24   10   Q.  But you don't know the names of those state's attorneys,

11   correct?

12   A.  Unfortunately, I do not recall.

13   Q.  So we have Donna Nelson and I don't remember the state's

14   attorney.

10:05:39   15          And then finally, you've seen the Jimenez case file,

16   we've gone through this, but you haven't seen an umbrella man

17   case file, correct?

18   A.  That's correct.

19   Q.  So it appears from my little cheat sheet here, that if we

10:05:59   20   take your date of Mother's Day and we go -- Mother's Day 1989,

21   and we go to a little before Christmas of 1991, that's a span,

22   I think you agreed with me yesterday, that's 30 months,

23   correct?

24   A.  Yes.

10:06:16   25   Q.  So in the span of 30 months while working as a Chicago

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 40 of 278 PageID #:43684
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3016

1    police detective, you had not one, but two cases involving a

2    DePaul student, working at Walgreens --

3           MR. LOEVY:  Objection.  Argumentative, Your Honor.

4           THE COURT:  I think so.  I think it's been

10:06:33    5    established.

6           MR. LEINENWEBER:  Yes.

7    BY MR. LEINENWEBER:

8    Q.  Two very, very, very similar cases, right?

9    A.  At the time that I was a detective --

10:06:41   10    Q.  No, I'm just asking if they're very similar cases.

11    A.  As they appear today, there are similarities and many

12    discrepancies.

13    Q.  Right.  And the biggest discrepancy, I suppose, as you sit

14    there would be, there's a Jimenez file, but there isn't an

10:06:58   15    umbrella file, right?  That's the biggest difference.

16    A.  To me the biggest difference?

17    Q.  Well, let's say --

18    A.  Is that your question?

19    Q.  I'll take that back.

10:07:09   20           That's a big difference, right?

21    A.  That's a big difference.

22    Q.  Yes.

23           MR. LEINENWEBER:  And I'm running against my time,

24    Judge.  I'm almost done, I promise.

10:07:22   25           (Brief pause)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 41 of 278 PageID #:43685
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3017

1    BY MR. LEINENWEBER:

2    Q.  And I think you stated yesterday -- or I know you stated

3    yesterday, that at one point you thought Bill Johnston was your

4    partner on the umbrella case, but on further reflection you

10:07:37    5    said it was John Boyle, correct?

6    A.  In the early conversations about my recall of the events,

7    trying to pinpoint when Guevara was a Gang Crimes specialist,

8    that was the unknown to me.  That's why there was some conflict

9    for me to determine who my partner was at the time.

10:07:56    10    Q.  Sure.  But now after you thought about it, and as you

11    testified yesterday truthfully, it was John Boyle, correct?

12    A.  In '89?  Yes.

13    Q.  In the umbrella case.

14    A.  Yes.

10:08:06    15    Q.  He was your partner?

16    A.  Yes.

17    Q.  And would it surprise you to learn that John Boyle denies

18    this ever happened?

19           MR. LOEVY:  Objection, Your Honor.  Is Mr. Boyle going

10:08:13    20    to come to court?

21           MR. LEINENWEBER:  He is going to come to court.

22           MR. LOEVY:  All right.  We'll hear from Mr Boyle,

23    then.

24    BY MR. LEINENWEBER:

10:08:17    25    Q.  Would it surprise you, sir?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 42 of 278 PageID #:43686
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3018

1    A.  No, it wouldn't surprise me.

2    Q.  Okay.  And I believe you stated that --

3        MR. LEINENWEBER:  If I could have one moment, Judge,

4    if I could?

10:08:30    5        THE COURT:  Sure.

6        (Brief pause)

7        MR. LEINENWEBER:  Judge, a few more questions.  I

8    promise.

9    BY MR. LEINENWEBER:

10:08:56   10   Q.  So, sir, I think you stated your role, at least in Mr.

11   Rivera's case, you don't recall it.  But apparently from like

12   4:30 to 7:30 on the day of September 1988, you did a lineup,

13   correct?

14   A.  Apparently, yes.

10:09:11   15   Q.  Okay.  And the way you do a lineup, we're not going to go

16   through the whole song and dance, but most likely you're in a

17   room with a witness and they're looking at a two-way mirror or

18   two-way glass, right?

19   A.  Correct.

10:09:23   20   Q.  Okay.  So you're in there with the witness, Orlando Lopez,

21   correct?

22   A.  I don't recall which side of the class I would've been on.

23   Q.  Okay.  But it's possible you spoke with Mr. Lopez that day?

24   A.  I'm sure I did.

10:09:34   25   Q.  Okay.  And at the time, I take it, was your hair color a

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 43 of 278 PageID #:43687
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3019

1  different color than it is now?

2  A.  I was 30 years younger, sir.

3  Q.  So was it dark?

4  A.  Yes.

10:09:43  5  Q.  Did you have a mustache at that time?

6  A.  Yes.

7  Q.  And were you wearing glasses at that time?

8  A.  Yes.

9  MR. LEINENWEBER:  Has this been marked (indicating)?

10:10:05  10  (Counsel conferring.)

11  MR. LEINENWEBER:  Judge, if I can approach?

12  THE COURT:  You may.

13  MR. LOEVY:  Is this on the pretrial order?

14  MR. LEINENWEBER:  It's not.

10:10:07  15  MR. LOEVY:  All right.  Then, Your Honor, we object.

16  They're showing an exhibit that is not on the pretrial order.

17  THE COURT:  Okay.  I haven't seen the exhibit.  I

18  don't know what it's being used for.

19  What are you using it for?

10:10:18  20  MR. LEINENWEBER:  It's a picture of this witness from

21  the Chicago police file.

22  THE COURT:  Overruled.

23  MR. LEINENWEBER:  If I can approach, Judge.

24  .  I've marked this as exhibit --

10:10:30  25  What number?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 44 of 278 PageID #:43688
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber

3020

```
 1                   MR. SOTOS:  229.

 2                   MR. LEINENWEBER:  290?

 3                   MR. SOTOS:  2-2-9.

 4    BY MR. LEINENWEBER:

 5    Q.  229.  If you can take a look at that, sir.

 6              (Document tendered to the witness:)

 7    BY MR. LEINENWEBER:

 8    Q.  That's your picture, isn't it?

 9    A.  Yes, it is.

10    Q.  That picture was taken, do you recall when?

11              Sometime in the '80s?

12    A.  Pardon?

13    Q.  Sometime in the '80s?

14    A.  I think it was in an award ceremony.

15    Q.  But it was sometime in the '80s?

16    A.  Yes.

17                   MR. LEINENWEBER:  Judge, I would move that as an

18    exhibit into evidence.

19                   MR. LOEVY:  No objection, Your Honor.

20                   THE COURT:  It's received.

21              (Defense Exhibit 229 was received in evidence)

22    BY MR. LEINENWEBER:

23    Q.  So is it fair to say--I know it's 30 years ago--that you

24    looked approximately like that?

25    A.  Yes.
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 45 of 278 PageID #:43689
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3021

1  Q.  We all get old, but that's what you probably looked like?

2  A.  Yes.

3  Q.  And I think yesterday you had said that you met with Jane

4  Raley from Northwestern.  You asked her about whether you were

10:11:21  5  involved in cases.  She told you about Rey.  And then you

6  offered -- she talked this case that you were involved in,

7  correct?

8  A.  That's not how it went, sir.  And I didn't testify to that.

9  Q.  You met with Jane Raley --

10:11:33  10  A.  Yes.

11  Q.  -- sometime, correct?

12  A.  Yes.

13  Q.  Okay.  And you were meeting her about the -- and I'm going

14  to mispronounce his name, and forgive me, Echeveria (phonetic).

10:11:41  15  A.  Echeveria (phonetic.)

16  Q.  That was a case that you believe the person was innocent

17  from Wisconsin, I think?

18  A.  From where?

19  Q.  Wisconsin?

10:11:49  20  A.  No, it's a Chicago case.  And I'm still working on it, sir.

21  Q.  And that was the reason for your meeting with Ms. Raley was

22  to see if Northwestern would be interested in taking up this

23  person's cause, fair to say?

24  A.  That's right.

10:12:02  25  Q.  And during the conversation, it came up that you asked are

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 46 of 278 PageID #:43690
6-21-18 (Ex 13)
Dorsch - redirect by Leinenweber
3022

1  there any cases that Northwestern was working on that you might

2  be involved in, is that correct?

3  A.  No, I believe she said to me, "Do you know Rey Guevara?"

4  And I said, "Yes, I do."

10:12:18  5  Q.  And you talked about the Guevara case, this case, correct?

6  A.  Yes.  She said she had a case that was his case, and my

7  name was also on that case, and would I have any objection to

8  talking to her at that moment about the case --

9  Q.  And you did --

10:12:32  10  A.  -- and I told her I have no problem.

11  Q.  Okay.  And you did.  Let me ask --

12  THE COURT:  One person at a time.

13  BY MR. LEINENWEBER:

14  Q.  Yeah, let me ask the question, sir.

10:12:36  15  And you did, you told her.  And you said, "Hey, by the

16  way, I got some information on Rey Guevara," correct?  And you

17  told her about the umbrella story, right?

18  A.  We did talk about the umbrella story and --

19  Q.  You talked about the umbrella story --

10:12:47  20  A.  -- we talked about other events.

21  Q.  Okay.  But the umbrella story was a big part of it, right?

22  A.  It was a part of the conversation, sir.

23  Q.  That was the trade, right?

24  A.  That was the what?

10:12:54  25  Q.  That was the trade.  You traded that story, you traded the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 47 of 278 PageID #:43691
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3023

1  umbrella story so you weren't sitting over there (indicating),

2  isn't that fair to say?

3  A.  There was no lawsuit, as I understood.

4  Q.  Fair enough.

10:13:03  5        MR. LEINENWEBER:  Judge, I have no further questions.

6  Thank you, sir.

7        THE COURT:  Let's see.  That's all the defense

8  questioning, right?

9        Who was examining for the plaintiff?

10:13:12  10       MR. LOEVY:  Mr. Bowman, Your Honor.

11       THE COURT:  Okay.  Mr. Bowman, do you have anything

12 else?

13       MR. BOWMAN:  I do.  Thank you.

14                 RECROSS EXAMINATION

10:13:21  15 BY MR. BOWMAN:

16 Q.  Good morning, Mr. Dorsch.

17 A.  Good morning.

18 Q.  You've been asked this morning and yesterday a number of

19 questions about whether the case you recall is the Jimenez case

10:13:33  20 or some other case.

21       MR. BOWMAN:  I'm just setting the stage, Judge.

22 BY MR. BOWMAN:

23 Q.  Just putting aside which case it was.  Just leave that

24 issue aside.

10:13:45  25       Whatever case it was, did what you say Rey Guevara

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 48 of 278 PageID #:43692
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3024

 1  did, did it happen?

 2  A.  Yes.

 3  Q.  You talked yesterday about how the memory works.  And you

 4  said some things stick in a person's mind, some things don't.

10:14:09  5  Is your memory of Rey Guevara putting a finger on a photograph

 6  something that falls in the category of "sticks in the mind" or

 7  something that falls in the other category of what one tends to

 8  forget?

 9  A.  It's vivid in my memory.

10:14:36  10  Q.  You were asked some questions about whether you had seen

11  this old file.  Have you undertaken efforts to look for it?

12  A.  Years of trying to find it.  Asking for it.

13  Q.  Can you tell the jury the steps that you've taken to

14  attempt to find the file that you remember.

10:14:52  15  A.  Well, because I'm not a police officer at the time of my

16  interest in finding the file, I have to take the general steps

17  that normal people take and file FOIA requests, Freedom of

18  Information Act, requesting that not because I didn't know the

19  name of the file, requesting all homicide files by name from

10:15:16  20  the area.

21  Q.  And have those efforts bore fruit?  Were you able to obtain

22  the file from the Chicago Police Department using those

23  channels?

24  A.  No.

10:15:34  25          (Counsel conferring.)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 49 of 278 PageID #:43693
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3025

BY MR. BOWMAN:

1

Q.   Did they give you any files in response to your request?

2

A.   No, but they did send me a chronological event of

3

homicides.

4

10:15:52   5   Q.   And was that helpful to you in locating the file?

6   A.   It wasn't helpful to me in locating the file, but in 1989,

7   and I have it in my file here, it shows that they had 130 named

8   homicide victims.  And they were all named, location and dates,

9   but yet the total for the Area 5 was 129.  So that meant there

10:16:23   10   was one homicide reported but not credited by the police

11   department as one of theirs.

12   Q.   Okay.

13   A.   So there's one missing in my review.

14   Q.   Mr. Dorsch, what is it like for you as a former police

10:16:47   15   officer to step forward and accuse a fellow veteran of the

16   Chicago Police Department of wrongdoing?

17          MR. LEINENWEBER:  Objection, Judge.  Relevance, scope.

18          THE COURT:  Overruled.

19   BY THE WITNESS:

10:16:59   20   A.   It's huge.  I've given testimony on this case, and every

21   case I do no longer as a police officer.  In this case, I've

22   never had an attorney present at depositions that represent me,

23   at a deposition or in a courtroom --

24          MS. ROSEN:  Objection.  Violates a motion in limine.

10:17:19   25   If we could have a sidebar?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 50 of 278 PageID #:43694
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3026

1      THE COURT:  All right.

2          (Proceedings heard at sidebar on the record)

3      MS. ROSEN:  There was a motion in limine on code of

4  silence.  On code of silence, Your Honor.

10:17:34
5      THE COURT:  You mean whether he had an attorney

6  present is a code of silence question?

7      MR. LOEVY:  It was a generalized ruling on code of

8  silence.  You said you were going to see how the evidence goes

9  and see if it becomes relevant.  This code of silence has

10:17:46
10  become injected into the case.  He is a whistleblower.

11      THE COURT:  No, no, no, no.  I think it was the

12  terminology.

13      MR. LOEVY:  Yes.  Not the concept.

14      THE COURT:  So he shouldn't use the terminology --

10:17:59
15      MR. BOWMAN:  I haven't spoken with him about it.  I

16  don't know that -- I don't know what he's going to say, but I

17  don't intend to use it in a question.  My point is just to have

18  him clarify --

19      THE COURT:  Do you have the ruling?  Because normally

10:18:14
20  I don't keep witnesses from saying what they want to say.

21      MR. LOEVY:  It becomes very relevant.

22      THE COURT:  I want to proceed my way, and I've asked

23  for the ruling.

24      MS. ROSEN:  These are the motions and that's the

10:18:37
25  order.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 51 of 278 PageID #:43695
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3027

1      (Document tendered to the Court)

2      THE COURT:  There was no ruling.  It's granted until I

3  reconsider it.  You know, I'm not going to prevent him from

4  saying what he wants to say.  But you better not ask him about

10:18:51   5  that.

6      MR. LOEVY:  Don't use that word.

7      MR. BOWMAN:  I'm not going to use that word.

8      THE COURT:  All right.

9      (Proceedings resumed in open court)

10:19:30  10  BY MR. BOWMAN:

11  Q.  Could you tell the jury, Mr. Dorsch, whether or not it's

12  easy to provide evidence of wrongdoing against a fellow cop?

13  A.  No, it's not.

14  Q.  Can you say why, please?

10:19:41  15  A.  When you're working, it's like a family.  You go to

16  breakfast, you go to lunch, you go to dinner.  You spend

17  endless also hours in courtrooms or waiting to testify at a

18  court hearing.  You work 24, 30 hours straight sometimes with

19  partners.  You trust each other greatly.  You depend on each

10:20:06  20  other greatly.  And basically pretty much all your friends are

21  policemen.

22  Q.  When you came forward with the information that Rey Guevara

23  had committed misconduct, did it affect your relationships

24  within the Chicago Police Department?

10:20:27  25  A.  Well, I wasn't really expecting when I met with Jane Raley

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 52 of 278 PageID #:43696
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3028

1    what the conversation was going to be about, but later when it

2    became known that I had talked about the incident, it greatly

3    affected me.  I mean, I've had threats.

4    Q.  Have you -- have there been affects for you on your

5    personal relationships?

6    A.  Oh, I no longer associate with very many people in the

7    Chicago Police Department, even partners.  I give them space.

8    I don't want them to have to answer.  But mostly when I would

9    run into people, they would want to know what was going on.

10   Q.  Have you been subjected to scorn, Mr. Dorsch, as a result

11   of coming forward with your information against Rey Guevara?

12   A.  Oh, yes --

13            MR. SOTOS:  Objection.  Relevance, Judge.

14            THE COURT:  Overruled.

15   BY THE WITNESS:

16   A.  I even had a ranking officer telling me, "Why aren't you

17   dead yet."

18   BY MR. BOWMAN:

19   Q.  Have you been subjected to ridicule, Mr. Dorsch, because

20   you came forward with information against Rey Guevara?

21   A.  Yeah.  People are misunderstanding.  A lot of people think

22   that I work for Northwestern Law School.  And I never have.

23   I've never been an employee.  Everything I've done has been

24   independent.

25            And I still get cases from Cook County Public

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 53 of 278 PageID #:43697
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3029

1   Defender's Office.  I get cases from the Illinois Appellate

2   Public Defender's Office.  The federal government has retained

3   me on investigations.  But because of that kind of work, now

4   being seen as being on the other side, I'm the bad guy.

10:22:00   5   Q.  Is it easy for you, Mr. Dorsch, to come into this courtroom

6   and be subjected to cross-examination by Mr. Sotos and Mr.

7   Leinenweber the way it was yesterday afternoon and this

8   morning?

9           MR. LEINENWEBER:  Objection, Your Honor.

10:22:15   10           MR. SOTOS:  Objection, your Honor.

11           THE COURT:  Overruled.

12   BY THE WITNESS:

13   A.  I understand their position.  I know what their job is, and

14   I understood from previous court appearances in my career that

10:22:24   15   their job is to -- is on behalf of their client.  I'm the bad

16   guy.

17   BY MR. BOWMAN:

18   Q.  Is that a position you'd prefer to be in, Mr. Dorsch?

19   A.  Well, there was a time when I was considered their guy,

10:22:38   20   when I'm talking about when I was a policeman.  I was trusted

21   to testify.  They considered you an expert witness every time

22   you went up there and gave testimony.  Now they question your

23   qualifications.

24   Q.  Mr. Dorsch, you brought up in one of your answers yesterday

10:22:55   25   afternoon the subject of bravery.  Is there any bravery

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 54 of 278 PageID #:43698
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3030

```
              1    involved in making an accusation against Rey Guevara?

              2         MR. SOTOS:  Objection, Your Honor.  Leading,

              3    relevance.

              4         THE COURT:  Overruled.

10:23:11      5    BY THE WITNESS:

              6    A.  When you're a detective, the sole purpose of your job is to

              7    get to the truth.  Anything short of that is a failure.

              8    BY MR. BOWMAN:

              9    Q.  Does it go against the grain, Mr. Dorsch, for one cop, such

10:23:33     10    as yourself, to make an allegation of wrongdoing against

             11    another cop?

             12         MR. LEINENWEBER:  Objection.  Leading, repetition.

             13         MR. SOTOS:  Objection.  Leading.

             14         THE COURT:  Overruled.

10:23:43     15    BY THE WITNESS:

             16    A.  Against another cop?  People sitting in this courtroom were

             17    my friends.  I am responsible for what I know and what I say.

             18    I have no control of what they will say if they were sitting in

             19    this seat.

10:24:04     20    BY MR. BOWMAN:

             21    Q.  You were asked some questions about who you told about this

             22    and when you told folks.  Did I hear you say you told Sergeant

             23    Mingey.

             24    A.  Well, certainly.  Sergeant Mingey went to the house to pick

10:24:28     25    up the umbrella boy, which is a name he gave to that case, the
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 55 of 278 PageID #:43699
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3031

1  one where we don't know the name, and we don't recall where it

2  was, and he no longer recalls.  He gave it that name.

3  Q.  Did it -- would it surprise you, Mr. Dorsch, to learn that

4  when Ed Mingey was asked in this courtroom about whether you

10:24:53  5  had, in fact, informed him of this incident, that Ed Mingey

6  Fifth Amendment and didn't answer the question?

7  A.  Does it surprise me?  No.

8  Q.  And would it surprise you to learn that before Mr. Mingey

9  started Fifth Amendment, when he was asked in his deposition

10:25:13  10  that he acknowledged that, indeed, you had told him about Rey

11  Guevara's wrongdoing?

12  A.  Ah --

13  Q.  Would that surprise you to learn that?

14  A.  That he told the truth?  No.

10:25:26  15  Q.  Now, you were asked about John Boyle.  And you testified

16  that it wouldn't surprise you either to learn that Mr. Boyle is

17  expected to deny that he was involved in this or that you told

18  him, and that doesn't surprise you?

19  A.  No.

10:25:48  20  Q.  Can you tell the jury why that doesn't surprise you.

21  A.  Well, we're individuals, we all stand-alone.  And for

22  whatever reason, you do what you do, it's your choice.  I can't

23  control his choice.

24  Q.  There were a number of years between the incident and your

10:26:10  25  conversation in 2010 with Jane Raley.  And in those years, can

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 56 of 278 PageID #:43700
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3032

1    you tell us what you were doing.  Were you a Chicago police

2    officer?

3    A.  With Jane Raley?

4    Q.  No.  When did you retire from the Chicago Police

10:26:29   5    Department?

6    A.  I retired in August of 1994.  As soon as I turned 50 years

7    of age I left.

8    Q.  And between 1994 and 2010, where were you?

9    A.  Well, I retired to northern Wisconsin where I built a new

10:26:42  10    home.  And worked part-time for the Sawyer County Sheriff's

11    Department.  Was given a job where I was training police

12    officers for the State of Wisconsin for 2 years.

13          Obtained my private investigator license up there and

14    was working cases in Wisconsin.  And then I eventually returned

10:27:01  15    to Chicago, and got my private investigator license here and

16    began picking up cases from many attorneys that had one time

17    been state's attorneys who were now doing defense work.

18    Q.  Is it fair to say that in that period of time you were

19    moving on, leaving the Chicago Police Department behind?

10:27:20  20    A.  Oh, yes.

21    Q.  Now, you were asked about a conversation that you had with

22    Jane Raley.  Can you tell us what Jane Raley said to you about

23    the interest in Guevara that prompted her to -- that prompted

24    you to provide her this information?

10:27:46  25          MR. GIVEN:  Objection, Your Honor.  Hearsay.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 57 of 278 PageID #:43701
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3033

|       |                                                                      |
|-------|----------------------------------------------------------------------|
| 1     | MR. BOWMAN:  It's for the effect on the witness,                     |
| 2     | Judge.                                                               |
| 3     | THE COURT:  Just hold on one second.                                 |
| 4     | (Brief pause)                                                        |
| 5     | THE COURT:  Okay.  So why is that not hearsay?                       |

10:28:06 — line 5

      6    MR. BOWMAN:  Because the issue, that has been the
      7  subject to a great deal of cross-examination, has been why this
      8  witness didn't tell other people earlier about the
      9  circumstance.

10:28:24
     10    THE COURT:  And what Jane Raley said to him is going
     11  to -- I think I'm going to sustain the objection.
     12  BY MR. BOWMAN:
     13  Q.  Well, the work that Jane Raley was doing was looking at
     14  wrongful convictions, right?

10:28:46
     15  A.  Yes.
     16    UNIDENTIFIED SPEAKER:  Leading.  No foundation.
     17    THE COURT:  Overruled.
     18    MS. ROSEN:  Who is objecting?  I'm sorry.
     19    MR. BOWMAN:  Mr.  Daffada.

10:29:04
     20  BY MR. BOWMAN:
     21  Q.  And did Jane Raley's focus on wrongful convictions
     22  influence your decision to inform her about your information on
     23  Rey Guevara?
     24    MR. SOTOS:  Objection, Your Honor.  Leading.

10:29:16
     25    THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 58 of 278 PageID #:43702
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3034

1    BY THE WITNESS:

2    A.  Well, that wasn't the purpose of why I went there.  I had

3    no idea she was going to bring up Rey Guevara to me.

4    BY MR. BOWMAN:

10:29:26    5    Q.  But she brought it up to you?

6    A.  Yes.

7    Q.  Now, you were asked a number of the questions about

8    testimony that you provided in the years since 2010 yesterday

9    afternoon when Mr. Sotos was asking you questions.  Do you

10:29:44    10    remember that?

11    A.  Yes.

12    Q.  How many times did you say you've testified under oath

13    about this?

14    A.  At trials and in depositions, at least 8 times.

10:29:53    15    Q.  Have you been asked to provide this testimony?

16    A.  Well, I've been subpoenaed to courts and depositions, yes.

17    Q.  And one of the cases that Mr. Sotos asked you about was

18    your testimony in a case called People of the State of Illinois

19    against Armando Serrano and Jose Montanez.

10:30:17    20    A.  Yes.

21    Q.  That was a post-conviction hearing?

22    A.  Yes.

23    Q.  And did you testify in that case on May 15, 2013?

24    A.  Well, I don't recall the date, but I did testify in that

10:30:30    25    case.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 59 of 278 PageID #:43703
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3035

1  Q.  And do you recall that the subject of that case was whether

2  Mr. Guevara had physically abused a witness?

3              MS. ROSEN:  Objection.  Foundation.

4              MR. LEINENWEBER:  Objection.

10:30:44   5              THE COURT:  Okay.  Tell what is the objection.  I

6  think I heard two at the same time.

7              MS. ROSEN:  Foundation as to the content of the

8  question.  How would he know.

9              MR. LEINENWEBER:  Objection also on relevance, Judge.

10:30:54  10              THE COURT:  On what?

11              MR. DAFFADA:  Relevance and scope.

12              THE COURT:  Hold on a second.

13          (Brief pause)

14              MR. DAFFADA:  Relevance, scope, compound.  Violates

10:31:05  15  Rule 404(b).

16              THE COURT:  The question is, did the witness know,

17  right?

18              MR. BOWMAN:  Right.

19              THE COURT:  So the foundation objection is overruled.

10:31:10  20              MR. DAFFADA:  404(b) objection, Your Honor.

21              THE COURT:  I'm sorry what?

22              MR. DAFFADA:  404(b) objection, Your Honor.

23              MR. BOWMAN:  Mr. Sotos brought it up, Judge.

24              THE COURT:  I think it was brought up yesterday.  I

10:31:26  25  don't remember the exact context, but I think counsel can go

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 60 of 278 PageID #:43704
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3036

1  into anything that was opened up.

2  BY MR. BOWMAN:

3  Q.  So to be clear, Mr. Dorsch, do you know that the Serrano

4  and the Montanez case was a case in which the allegation

10:31:47  5  against Mr. Guevara was that he had physically abused a

6  witness?

7       THE COURT:  Well, this is going to be leading.  I

8  don't think you can even ask the question this way.

9       MR. BOWMAN:  Okay.

10:31:58  10  BY MR. BOWMAN:

11  Q.  Do you know what the allegations were against Mr. Guevara

12  in that case?

13       MR. DAFFADA:  Same objection, Judge, 404(b).

14       THE COURT:  Overruled.

10:32:10  15  BY THE WITNESS:

16  A.  I remember being asked in a case, if it was that one, if I

17  ever witnessed or knew of Guevara using physical force against

18  someone.

19  BY MR. BOWMAN:

10:32:24  20  Q.  And do you know what the outcome of that case was?

21       THE COURT:  Let me talk to you at the sidebar.

22       Do you have the question you asked about this

23  yesterday?

24       MR. SOTOS:  I know exactly what it was, Judge.

10:32:47  25       (Proceedings heard at sidebar on the record).

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 61 of 278 PageID #:43705
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3037

1           MR. SOTOS:  I asked him whether he's testified in

2   prior proceedings about this story he's telling.  And --

3           THE COURT:  What story he's telling?

4           MR. SOTOS:  The story about Rey Guevara.

10:32:58   5           THE COURT:  About this incident?

6           MR. SOTOS:  Yes.

7           THE COURT:  Yeah.  Okay.

8           MR. SOTOS:  And I asked him whether he testified in

9   three specific cases involving six specific individuals.

10:33:08   10           THE COURT:  Right.

11           MR. SOTOS:  Whether he did that.  And that's all we

12   talked about.  Now he's asking about the allegations.

13           THE COURT:  Okay.  Correct.  I don't think that opens

14   404(b) up.

10:33:15   15           MR. LOEVY:  All right.  Then what we would like to

16   establish is, and we can leave out the 404(b) at this point --

17           THE COURT:  That would be good.

18           MR. LOEVY:  He brought up the Serrano case, he brought

19   up the Montanez case --

10:33:20   20           And the third case?

21           MR. ART:  Selache (Phonetic.)

22           MR. LOEVY:  Selache (Phonetic).  And he's implying

23   that Mr. Dorsch did this for personal gain to try to get

24   Northwestern to pay him money, you know, that kind of thing.

10:33:34   25   He should just be able to establish what those cases were.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 62 of 278 PageID #:43706
6-21-18 (Ex 13)
Dorsch - recross by Bowman

3038

 1  Those were exoneration cases.

 2          THE COURT:  No, I think that's beyond the pale.

 3          MR. LOEVY:  Your Honor, while we're at sidebar before

 4  we go back, since we're here, there's been a lot of hearsay

 5  about the Jimenez case.  You know, what other people are saying

 6  happened in Jimenez.

 7          THE COURT:  Right.

 8          MR. LOEVY:  So, you know, I think we're done with the

 9  Jimenez subject, but if not, I don't want argue in front of the

10  jury, no more hearsay about Jimenez is our objection.  I don't

11  know if they're intending to do it on redirect, but --

12          MR. SOTOS:  I'm going to ask him about what he knew

13  about the Jimenez case on redirect after that.  I'm definitely

14  going to do that.

15          MR. LOEVY:  You already did that all that, and then he

16  did all that --

17          THE COURT:  Well, it's actually been done twice.

18          MR. LOEVY:  And he asked the questions --

19          MR. SOTOS:  No, Judge.  He just asked him all sorts of

20  questions about what he remembers testifying to.  I want to ask

21  him whether he -- about what my job is on cross-examination to

22  paint him out to be a bad guy, and how what he said as to

23  Jimenez about the umbrella case was the truth, and about how

24  the City appears to be hiding a file, and I want to ask him

25  whether he testified about those things before --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 63 of 278 PageID #:43707
6-21-18 (Ex 13)
Dorsch - recross by Bowman
3039

1    THE COURT:  Well, the objection was to going into a

2  lot of hearsay about Jimenez.

3    MR. SOTOS:  I'm not going to go into the back and

4  forth.

10:34:44   5    THE COURT:  All right.

6    MR. SOTOS:  I'm not going to ask any hearsay

7  questions, Judge.  I won't ask a single hearsay objection.

8    THE COURT:  All right.  So make an objection.

9    (Proceedings resumed in open court)

10:34:51  10  BY MR. BOWMAN:

11  Q.  In any event, Mr. Dorsch, you have had -- you have been

12  called upon under subpoena to testify on multiple occasions

13  about what you know about Rey Guevara, right?

14  A.  Yes.

10:35:38  15  Q.  Has your testimony been truthful?

16  A.  Yes.

17  Q.  Has it been easy for you to be repeatedly placed under

18  subpoena and called upon to provide testimony --

19    MR. DAFFADA:  Objection.  Asked and Answered,

10:35:53  20  cumulative.

21    THE COURT:  It's a little different question, but it's

22  pretty cumulative.

23  BY MR. BOWMAN:

24  Q.  Let me move on to one other subject.  You were shown a

10:36:03  25  photograph of yourself from the late '80s, which you appeared

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 64 of 278 PageID #:43708
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3040

1    to be a much younger man with some different looking glasses

2    and some darker hair and darker mustache.  Do you remember

3    seeing that?

4    A.  Yes, I remember the photo.

10:36:25    5    Q.  So let me put it to you, Mr. Dorsch, are you the guy to

6    whom Orlando Lopez said, "Wrong guy.  Wrong guy.  This isn't

7    the guy"?  Did Orlando Lopez say that to you?

8    A.  Never.

9    Q.  What would you have if he had, sir?

10:36:45    10    A.  Certainly would not have charged anyone.

11            MR. BOWMAN:  That's all I have.

12            THE COURT:  Okay.  Mr. Sotos.

13            MR. SOTOS:  Thank you, Judge.

14                    FURTHER REDIRECT EXAMINATION

10:36:57    15    BY MR. SOTOS:

16    Q.  Good morning, sir.

17            You testified just now that it's our job to make you

18    the bad guy, correct?

19    A.  From experience in the courtroom, yes.

10:37:13    20    Q.  Do you understand that it's our job to probe the truth of

21    the testimony that you give to the jury?

22    A.  Yes.

23    Q.  You understand that it's for the jury to decide whether or

24    not what you're saying is truthful or not.  Regardless of

10:37:32    25    whether you testified repeatedly that it's truthful, it's

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 65 of 278 PageID #:43709
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3041

1    ultimately for the jury to decide whether, in fact, it's true,

2    correct?

3    A.  Most definitely, it is theirs.

4    Q.  So do you understand that the reasons we ask you about the

10:37:47    5    Jimenez file, which was disclosed, is to probe whether or not

6    that was, in fact, the file that you were talking about rather

7    than the umbrella file?

8    A.  I understand why you did the that, yes.

9    Q.  Okay.  And you're certainly aware of many incredible

10:38:07    10    similarities between the two cases, is that true?

11    A.  Oh, yes.

12    Q.  So many similarities that would you agree with me that

13    unless you were sitting in your shoes, it would be very

14    difficult to believe that there was another case that was so

10:38:23    15    similar but still different?

16    A.  I stated that, the first time I read that report.

17    Q.  You were shocked at the similarities?

18    A.  I was astounded.

19    Q.  Still knowing that there was some other case out there --

10:38:35    20    A.  Oh, I knew there were other cases similar.

21    Q.  Right.  But you were shocked when you --

22         MR. LOEVY:  Asked and answered, Your Honor.

23         THE COURT:  Sustained.

24    MR. SOTOS:

10:38:47    25    Q.  You just testified that something about a chronology of

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 66 of 278 PageID #:43710
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3042

1    130 cases that you tried to look at -- before we do that, you

2    testified that you've been trying to find this other file for

3    4 years?

4    A.  Well, over a period of time, yeah.  Yeah.  Various ways.

5    Q.  And you're aware, from your discussions with attorneys,

6    that a lot of people have been looking for this file, correct?

7    A.  That was why it was astounding that it was found 4 years

8    later.

9    Q.  And when Northwestern gave you the file, the Jimenez file,

10   they told you that they had --

11        MR. LOEVY:  Objection.  Hearsay, Your Honor.  "They

12   told you," hearsay.

13        THE COURT:  Well, I have no idea if it's hearsay.

14        Why are you asking it for?

15        MR. SOTOS:  I want to know about his knowledge at the

16   time.  Not about whether or not -- whether it was actually a

17   file.  It's about what he was told about it and what he

18   thought.

19        MR. LOEVY:  Your Honor, hearsay.  Objection.

20        MR. SOTOS:  Not for the truth, Judge.

21        THE COURT:  Let me hear the question.

22        Don't answer the question.

23   BY MR. SOTOS:

24   Q.  When you were -- you were provided the Jimenez file by

25   Northwestern, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 67 of 278 PageID #:43711
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3043

1   A.  Yes.

2   Q.  And they told you that they had found the file you've been

3   talking about?

4          MR. LOEVY:  Same objection, Your Honor.

10:40:13   5          THE COURT:  I don't see why that would be relevant

6   except for the truth.  I'm going to sustain the objection.

7   MR. SOTOS:

8   Q.  In any event, they provided you with the Jimenez file?

9   A.  Yes.

10:40:24   10  Q.  Okay.  And then you looked at it and you were astounded at

11  the similarities?

12         MR. LOEVY:  Objection.  Asked and Answered, Your

13  Honor.

14         THE COURT:  Sustained.

10:40:32   15  BY MR. SOTOS:

16  Q.  You knew at the time you looked at the Jimenez file that

17  the State's Attorney's Office --

18         MR. LOEVY:  Objection to Hearsay.  He's going to start

19  saying the State's Attorney's Office --

10:40:41   20         THE COURT:  I have to hear the question.

21         MR. SOTOS:  He testified --

22         THE COURT:  No, just ask the question.

23  BY MR. SOTOS:

24  Q.  You knew at the time that you reviewed the Northwestern

10:40:49   25  file that the Cook County State's Attorney's Office had

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 68 of 278 PageID #:43712
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3044

1  interviewed the witness in the Jimenez case, correct?

2          MR. LOEVY:  Objection, Your Honor.

3          THE COURT:  So at the time -- the question is, when

4  the witness was provided the Jimenez file, did he know of his

10:41:06  5  own knowledge?

6          MR. SOTOS:  Yes.

7          THE COURT:  Okay.  Overruled.

8          MR. SOTOS:  That was it.

9  BY MR. SOTOS:

10:41:10  10  Q.  So at the time you reviewed the Jimenez file when

11  Northwestern provided it to you, you knew that the Cook County

12  State's Attorney's Office had interviewed the witness who you

13  were claiming Mr. Guevara -- no, that's not a fair question,

14  because he says it's a different case.

10:41:30  15          You knew at the time you were provided the file that

16  the Cook County State's Attorney's Office had interviewed the

17  witness in the Jimenez case, correct?

18  A.  No, I didn't know.

19  Q.  Do you recall giving a deposition in this case?

10:41:47  20  A.  I recall depositions in this case.

21  Q.  Well, let me ask you this, do you remember when you were

22  provided the Jimenez file?

23  A.  (No response)

24  Q.  Do you remember when you were provided the Jimenez file?

10:42:17  25  If I told you it was April 25, 2015, does that make sense to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 69 of 278 PageID #:43713
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3045

1    you?

2    A.  I have no recollection at all when I got it.

3              MR. LOEVY:  Objection.  Foundation, Your Honor.

4              THE COURT:  The question --

10:42:26    5    BY THE WITNESS:

6    A.  I don't remember.

7    BY MR. SOTOS:

8    Q.  You don't remember?

9    A.  I don't remember, no.

10:42:29    10    BY MR. SOTOS:

11    Q.  You remember giving a deposition in the Rivera lawsuit in

12    2015?

13    A.  I'm sure I did.

14    Q.  April 14, 2015?

10:42:42    15    A.  I don't remember the dates.

16    Q.  You take my word for it?

17    A.  Yes.

18    Q.  Do you recall -- page 398, Line 6 -- do you recall being

19    asked in April 2015:

10:42:55    20         "Question:  Have you seen, are you aware

21         that --"

22              MR. LOEVY:  Objection, Your Honor.  This is the

23    hearsay he just wants to read.  There's no foundation for it.

24              MR. SOTOS:  It's not hearsay.  It's about what he was

10:43:07    25    aware of.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 70 of 278 PageID #:43714
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3046

1          THE COURT:  You know, again, you have this, I don't.

2   I don't know what's coming.  You seem to know.  If you want to

3   give me that so I can look at it, maybe I'll have a better

4   idea.

10:43:19   5          MR. LOEVY:  All right.  There's no time frame on the

6   question at all.

7          THE COURT:  There's what?

8          MR. LOEVY:  No timeframe on the question at all.

9          MR. SOTOS:  Your Honor, I said it was a different --

10:43:23  10          MR. LOEVY:  Your Honor --

11          MR. SOTOS:  Can we show the witness --

12          THE COURT:  You know, just stop arguing.

13          So the objection is that there needs to be a

14   timeframe?

10:43:30  15          MR. LOEVY:  No, the objection is, he's just trying to

16   do what he said he wouldn't do at sidebar.

17          THE COURT:  And what I just told you was, I don't

18   know.  So let me see it.

19          MR. SOTOS:  I got it right here.

10:43:38  20          (Mr. Sotos brushing against microphone, loud

21          noise)

22          (Document tendered to the Court.)

23          THE COURT:  Come on, people.  Let's just try to get

24   some kind of professionalism in here.

10:44:07  25          (Brief pause)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 71 of 278 PageID #:43715
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3047

1          THE COURT:  Okay.  So this is in a deposition, and the

2     witness read something?

3          MR. SOTOS:  He had received a Northwestern file.

4          THE COURT:  It doesn't say that.

5          MR. SOTOS:  Well, there's a lot of --

6          THE COURT:  Hold on.

7          (Brief pause)

8          THE COURT:  Look, I'm going to sustain the objection.

9     You're talking about documents from Northwestern, documents

10    from the State's Attorney's Office.  I don't know what you're

11    talking about, and I don't know why it isn't hearsay, but --

12         MR. SOTOS:  Can I answer?

13         THE COURT:  Sure.  Sure.

14         MR. LOEVY:  Could we go to sidebar?

15         THE COURT:  All right.  We'll go to sidebar.

16         (Proceedings heard at sidebar on the record.)

17         MR. SOTOS:  May I?

18         THE COURT:  Yeah.

19         MR. SOTOS:  Because this goes specifically to why he

20    is continuing to -- it goes specifically to why he is trying to

21    claim that the umbrella file is not the Jimenez file because he

22    knew the witness had been interviewed by the Cook County

23    State's Attorney's Office and that he had told the State's

24    Attorney's Office that he was bribed by another person and he

25    was not -- and that Rey Guevara did not do anything --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 72 of 278 PageID #:43716
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3048

1    THE COURT:  This is the witness in the Jimenez case?

2    MR. SOTOS:  Judge, this is -- yes.

3    MR. LOEVY:  Yes.

4    MR. SOTOS:  That the witness in the Jimenez case had

10:45:33   5  been interviewed by the Cook County State's Attorney's Office

6  and had told him that he was bribed by another person and that

7  Rey Guevara did not do anything to him.  And it was because --

8    THE COURT:  And what is the basis for -- I'm getting

9  confused.  He was in the Jimenez case?

10:45:52   10  MR. SOTOS:  Judge, let me explain it to you again.

11  Northwestern gave him the Jimenez file.  I tried to ask him,

12  they told him they thought that was the case.

13    THE COURT:  Right.

14    MR. SOTOS:  He looked at it, and learned that this

10:46:09   15  witness had been interviewed by the State's Attorney's Office

16  in the Jimenez case.

17    THE COURT:  Yeah, but I'm trying to figure out why

18  we're building this whole structure on Jimenez.

19    MR. SOTOS:  Because -- because it explains --

10:46:22   20  MR. LOEVY:  Well, if I can --

21    THE COURT:  Shh.

22    Go ahead.

23    MR. SOTOS:  Because it explains why he is lying about

24  his, his umbrella case not being the Jimenez case.

10:46:36   25  MS. ROSEN:  He did work on it.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 73 of 278 PageID #:43717
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3049

1          MR. SOTOS:  If I could finish!

2          MR. LOEVY:  But he did --

3          THE COURT:  One person at a time.

4          MR. SOTOS:  He now just blamed the Chicago Police

10:46:44    5  Department for hiding one file in the chronology when there is

6  no other file --

7          THE COURT:  Let me.

8          MR. SOTOS:  -- it's the Jimenez file.

9          THE COURT:  Well, let me ask a question --

10:46:50   10          MR. DAFFADA:  To answer your last question, Mr. Dorsch

11  was involved in the Jimenez case.

12          THE COURT:  Yeah, I got that.  I was already told

13  that.

14          Did he make an accusation in the Jimenez case about

10:47:02   15  bribery by Guevara?

16          MR. SOTOS:  No.

17          MR. LOEVY:  That's the point --

18          MR. SOTOS:  The witnesses in the Jimenez case said

19  they were bribed by an individual --

10:47:12   20          THE COURT:  Yeah, I know, but why is this on his

21  doorstep?

22          MR. LOEVY:  It's not, Your Honor.

23          THE COURT:  Could I hear this?  Because I'm doing fine

24  on my own at this point.

10:47:20   25          MR. LOEVY:  All right..

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 74 of 278 PageID #:43718
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3050

1      MR. SOTOS:  What's the question?

2      THE COURT:  My question is, this whole thing is about

3  the fact that there's similar allegations in the Jimenez case.

4  Did he make an accusation in the Jimenez case against Guevara?

10:47:36    5      MR. SOTOS:  No, because he made an accusation about an

6  unknown unidentified file which everybody knows is the Jimenez

7  case.  And he's saying it isn't because of the fact that the

8  witness was interviewed by the State's Attorney's Office and

9  said it never happened, that's why he's lying.

10:47:54   10      THE COURT:  But he never said it happened.

11      MR. SOTOS:  He did.

12      MR. LOEVY:  Your Honor, when am I going to get a turn?

13      THE COURT:  When did he say it happened?

14      MR. SOTOS:  What did he say?

10:48:02   15      THE COURT:  When did he say that Guevara bribed

16  somebody in the Jimenez case?

17      MR. SOTOS:  He said --

18      MR. LOEVY:  He didn't.

19      MR. SOTOS:  No, Judge, he said --

10:48:09   20      MR. LOEVY:  Your Honor, I think you're going to -- you

21  know --

22      MR. SOTOS:  Judge, this is the most serious of error

23  after what he just said about this case and about the Chicago

24  Police Department hiding files.

10:48:22   25      THE COURT:  All right.  Let me hear you.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 75 of 278 PageID #:43719
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3051

10:48:33

1          MR. LOEVY:  What they're trying to do is, Jim wants to

2     tell the jury, "isn't it true that witnesses said things, isn't

3     it true the state's attorney said things."  Bring the witnesses

4     in.  They said they were going to do their rebuttal case.  They

5     want to short-circuit the rebuttal case and just do hearsay.

6     They just want to tell this witness, didn't the state's

7     attorney say this, didn't the witnesses say that.

8          Now I'm yelling.  I'm sorry.

9          THE COURT:  Yeah, you are.

10:48:42

10         MS. ROSEN:  And, Your Honor, if I can --

11         THE COURT REPORTER:  Ms. Rosen, I'm sorry, you're

12    rubbing up against my machine and I can't write.

13         MS. ROSEN:  Sorry!

14         THE COURT REPORTER:  That's Okay.

10:48:48

15         MS. ROSEN:  The chronology is is that he comes forward

16    with this event that he says happened and gives all the

17    descriptives.  So then the City and Northwestern start looking

18    through files to look for the case that matches that.

19         THE COURT:  Yeah.  I got that.

10:49:02

20         MS. ROSEN:  We identified the Jimenez file.

21    Northwestern believes it's the file, the City believes it's the

22    file.

23         THE COURT:  Right.

24         MS. ROSEN:  He is told while this is happening that

10:49:11

25    the State's Attorney's Office has interviewed the witnesses who

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 76 of 278 PageID #:43720
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3052

```
         1   were bribed.
         2           THE COURT:  Right.
         3           MS. ROSEN:  And those witnesses say, "Yes, we were,
         4   but Rey Guevara had nothing to do with that."
10:49:19 5           THE COURT:  Okay.
         6           MS. ROSEN:  So then the point is that once he learns
         7   that, all of a sudden the Jimenez file is not the file that
         8   he's talking about.  It's some other unknown file with no
         9   descriptives.  That's the point that we are trying to make, is
10:49:32 10  that once he's confronted with  --
        11           THE COURT:  Okay.  Let me ask you this, I don't
        12   believe I'm hearing this for the first time, I mean the fact
        13   that there was an allegation of bribery in the Jimenez case.
        14           MR. SOTOS:  There was, Judge.
10:49:48 15          THE COURT:  That didn't involve him.
        16           MR. SOTOS:  It did not involve him.
        17           MR. LEINENWEBER:  And, Judge, if I may.  On my
        18   cross-examination he admitted that he knew that.  He knew it in
        19   both cases.
10:49:55 20          THE COURT:  That's what I thought.  That's what I
        21   thought.  I think we've beat this horse to death.
        22           MR. LOEVY:  So let's move on.
        23           THE COURT:  What are you trying to do now?
        24           MR. LOEVY:  Except for hearsay.
10:50:03 25          MR. SOTOS:  I'm trying to demonstrate that this idea
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 77 of 278 PageID #:43721
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3053

1    that the -- he just testified for the first time that --

2            THE COURT:  You know, all you're allowed to do in

3    examination of a witness is get what you need for closing

4    argument.

10:50:14   5            MR. SOTOS:  Correct.

6            THE COURT:  What more do you want to get than you

7    already have?

8            MR. SOTOS:  I'm trying to impeach his credibility on

9    his testimony that the City of Chicago withheld or buried a

10:50:23   10   file when everybody knows it's not true.

11           MR. LOEVY:  Then ask him about --

12           MR. SOTOS:  That was the file.  So he doesn't have any

13   foundation for saying that.

14           THE COURT:  So if Mr. Leinenweber already established

10:50:34   15   that there was an allegation of bribery in the Jimenez case

16   that -- did you bring out what the state's attorney's position

17   was?

18           MR. LOEVY:  No, Mr. Sotos did.  Mr. Sotos did

19   yesterday.  He did yesterday.

10:50:49   20           MR. SOTOS:  He denied it today, Judge.

21           THE COURT:  Well, if you go over it like 20 times, who

22   knows.  We've spent enough time on this.

23           MR. SOTOS:  Wait.  No, no, no.  No, no.  Judge, he

24   denied it today.  The deposition impeaches what he just said,

10:51:00   25   that he didn't know the state's attorney had interviewed the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 78 of 278 PageID #:43722
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3054

1    witness.

2          MR. LOEVY:  But there's no timeframe on when he knew

3    it.

4          THE COURT:  Wait.  Wait.  Wait.  Wait.

5          Okay.  So if we know that by April of 2015 he had seen

6    the Jimenez file and he knew that the witnesses said what they

7    said.

8          MR. SOTOS:  Yes.  And that's the time we're talking

9    about, the time of the dep.

10         THE COURT:  You know, you can make your point with the

11   date, you can't argue it.  I've heard enough on this subject,

12   make your point --

13         MR. SOTOS:  That's all I want to do.

14         MR. LOEVY:  He already asked him what the date of the

15   deposition was.

16         THE COURT:  Well, I just said what you can do, but I

17   want the question that has the date in it --

18         MR. SOTOS:  Well, can I just ask that question?

19         MR. LOEVY:  And then we move on?

20         THE COURT:  Yeah.  Yeah.  If you make the date clear.

21         MR. LOEVY:  But then, Your Honor, we're not going to

22   hear hearsay about what the investigators --

23         THE COURT:  I don't know what we're going to hear.

24         MR. LOEVY:  Well, Your Honor, we object to opening

25   this can of worms.  I was trying to --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 79 of 278 PageID #:43723
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3055

1        THE COURT:  Well, it's been opened for the whole darn

2    examination.  So we're not opening anything.

3        (Proceedings resumed in open court)

4    BY MR. SOTOS:

10:52:40    5    Q.  Sir, you testified this morning that you were not aware

6    that the State's Attorney's Office had interviewed the witness

7    in the Jimenez?

8        MR. LOEVY:  Objection to timeframe, Your Honor.

9        THE COURT:  Sustained.

10:52:49    10    BY MR. SOTOS:

11    Q.  As you sit here today, are you aware that the Cook County

12    State's Attorney's Office interviewed the witness in the

13    Jimenez case?

14    A.  Am I aware?

10:52:58    15    Q.  Yes.

16    A.  Now I am.

17    Q.  Were you aware of that at the time you reviewed the

18    documents you received from Northwestern?

19    A.  No.

10:53:08    20    Q.  When did you become aware of that?

21    A.  If I did become aware of it, I probably learned it while

22    being at trials or depositions.

23    Q.  Okay.  So were you aware --

24        MR. LOEVY:  Objection, Your Honor.  That's what you

10:53:24    25    allowed us to do.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 80 of 278 PageID #:43724
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3056

                              THE COURT:  Let me hear the question.
                              MR. LOEVY:  It's hearsay, Your Honor.
       BY MR. SOTOS:
       Q.  Were you aware on April 14th, 2015, that the Cook County
10:53:37    State's Attorney's Office had interviewed the witness, Mr.
       Vargas, in the Jimenez case?
       A.  If somebody told me, then I would be aware.  I don't know
       that somebody told me.  I don't know --
       Q.  You --
10:53:53    A.  The State's Attorney's Office never came to me and told me
       they interviewed anybody.
       Q.  Different question, sir.  I'm not asking if the State's
       Attorney's Office told you.  I'm asking you whether at the time
       you gave this deposition in this lawsuit in April 2015, whether
10:54:09    you were aware that the Cook County State's Attorney's Office
       had interviewed the witness in the Jimenez case?
       A.  I do not recall which deposition.
       Q.  If I showed you something from the deposition, would it
       refresh your recollection?
10:54:27    A.  Yes.
                              MR. SOTOS:  What exhibit is this?
                              MS. GOLDEN:  67.
                              (Document tendered to the witness)
       BY MR. SOTOS:
10:54:42    Q.  Sir, I'm showing you what has been marked Defendants'

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 81 of 278 PageID #:43725
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3057

1    Exhibit 67, page 398.  Can you to review the highlighted

2    portion, please.

3             (Document tendered)

4    BY THE WITNESS:

10:55:11    5    A.  Yes.

6    BY MR. SOTOS:

7    Q.  Does that refresh your recollection as to whether you knew

8    at the time of the deposition that the Cook County State's

9    Attorney's Office had interviewed the witness in the Jimenez

10:55:20   10   case?

11   A.  Well, I think it's even unclear to me reading what is my

12   answer.  It says, "I think that was part of what I saw."  "I

13   think."  So do I really know?  "I think."

14   Q.  So you believe, at least at the time you gave your

10:55:32   15   deposition, that the -- that you knew that the Cook County

16   State's Attorney's Office had interviewed the witness --

17            MR. LOEVY:  Objection.  Asked and Answered.

18            THE COURT:  Sustained.

19   BY MR. SOTOS:

10:55:44   20   Q.  Did you know that the witness had told --

21            MR. LOEVY:  Objection, Your Honor.  Now he is

22   testifying.

23            MR. SOTOS:  I'm going to ask him what he knew.  If he

24   knew about this, I'm going to ask him what he knew about it.

10:55:56   25            THE COURT:  He says he thinks.  Okay.  "Knew," there's

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 82 of 278 PageID #:43726
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3058

1    no basis for that.  The witness just said that's what he

2    thought.

3    BY MR. SOTOS:

4    Q.  Do you think he knew --

10:56:08    5         MR. LOEVY:  Objection, Your Honor.  He just wants to

6    testify --

7         THE COURT:  Da-da-da.  This is the question that I

8    thought you were going to ask, and I thought it's just been

9    answered.  So I don't know what else you're going to do.

10:56:20    10        MR. SOTOS:  I want to probe what he actually knew at

11    the time before he started saying that there was another file

12    other that the Jimenez case.  I want to ask him what he knew

13    when he knew.

14        MR. LOEVY:  That's what we talked at sidebar, Your

10:56:30    15   Honor.

16        THE COURT:  So you're going to ask what he knew from

17    other sources at the time of the deposition about this other

18    case?

19        MR. SOTOS:  Right.  To probe why he is saying that the

10:56:42    20   Jimenez file is not --

21        THE COURT:  You know, I think you're going to need to

22    do this some other way.  I'm going to sustain the objection.  I

23    said you could do what you said you wanted to do.  Now I don't

24    know what you're doing.  I'm not going to do another sidebar.

10:56:54    25        MR. SOTOS:  I was just going to ask him about his

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 83 of 278 PageID #:43727
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3059

1   knowledge, Judge.

2          THE COURT:  Yeah, I can't even imagine, but the

3   question has been asked and answered.

4   BY MR. SOTOS:

10:57:05   5   Q.  Well, sir, you testified on direct examination that there

6   was a chronology of -- that you were trying to find the other

7   file that's like the Jimenez case, you were trying to get that

8   from the Chicago Police Department?

9   A.  No, I wasn't trying to find a case that was similar.  I was

10:57:28   10   trying to find the case that I was talking about, sir.

11   Q.  Right.  Right.  Which is different from the Jimenez case?

12   A.  I had no knowledge of the Jimenez case when I was

13   requesting the file to the case I'm talking about.

14   Q.  But you were on Jimenez case, right?

10:57:41   15   A.  Yes.

16   Q.  Right.  So, I mean, you worked that case, too?

17          MR. LOEVY:  Objection.  Asked and Answered, Your

18   Honor.

19          THE COURT:  Overruled.

10:57:46   20   BY THE WITNESS:

21   A.  Yes.

22   BY MR. SOTOS:

23   Q.  All right.  And so you were trying to find the other file,

24   the umbrella file from the Chicago Police Department?

10:57:59   25          MR. LOEVY:  Objection.  Asked and Answered, Your

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 84 of 278 PageID #:43728
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3060

1    Honor.  That subject has been covered.

2         THE COURT:  Yeah.  We covered this for a long time.

3    Let's get on to something new.

4         MR. SOTOS:  No, this was actually just brought up by

10:58:11    5    Mr. Bowman on direct.  And he suggested that the file is

6    missing.  It was a chronology.  He hasn't been crossed on it at

7    all, Judge.

8         THE COURT:  Well, I'm pretty sure I heard it before.

9         MR. SOTOS:  No, it just came up for the first time.

10:58:23    10        THE COURT:  Go ahead.

11        MR. SOTOS:  In fact, let me ask him that.

12   BY MR. SOTOS:

13   Q.  You testified in response to Mr. Bowman's question that

14   there was 129 files listed in the chronology you received from

10:58:37    15   the Chicago Police Department, correct?

16   A.  Yes.

17   Q.  And you said that there were 130 murders committed in that

18   same period, did I get that right?

19   A.  I think we have it backwards, but I have it, if you want to

10:58:52    20   see it.

21   Q.  You have the chronology?

22   A.  What I received.

23   Q.  Okay.  Yeah.  Can you show that?  Can you hand that to me,

24   please?

10:58:59    25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 85 of 278 PageID #:43729
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3061

1  Q.  You have other documents that you brought with you today?

2  A.  No.  Personal documents.

3       Well, actually I have 2 years, '89 and '88, because

4  those were the years I was looking at because Guevara was a

10:59:22  5  Gang Crimes specialist at that time.

6       In '89 with the Chicago Police --

7  Q.  Wait a minute.  Before you start reading it, maybe you

8  better hand it to me so we can figure out what it is.

9  A.  Sure.

10:59:34  10      (Said item tendered)

11  BY MR. SOTOS:

12  A.  Thank you, sir.

13      MR. SOTOS:  Judge, I'll mark this as Defendants'

14  Exhibit 230.

11:00:12  15      THE COURT:  How much do you have, Mr. Sotos?

16      MR. SOTOS:  Well, I'm going to have to explore this

17  area.

18      THE COURT:  I know that, but I'm trying to figure out

19  when to take a break.

11:00:25  20      MR. SOTOS:  We should probably take a break.

21      THE COURT:  All right.  Let's take 10 minutes.

22      COURT SECURITY OFFICER:  All rise.

23      (Recess.)

24      COURT SECURITY OFFICER:  All rise.

11:11:24  25

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 86 of 278 PageID #:43730
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3062

1          (The following proceedings were had out of the

2          presence of the jury in open court:)

3          MR. LOEVY:  Your Honor --

4          THE COURT:  Yes.

11:11:34    5          MR. LOEVY:  -- if we could have permission to

6     complain.  Mr. Bowman's exam was maybe 10 minutes and we've

7     already like tripled that on the re-redirect.

8          THE COURT:  Well, I don't know what to do.

9          MR. SOTOS:  Judge, I've got two things to bring up.

11:11:45   10    First of all, I didn't anticipate all that new stuff coming in

11    about the City.  We just asked that this document that he

12    relied on --

13          THE COURT:  You know, I don't know what he meant to

14    state.

11:11:55   15          MR. SOTOS:  And the other thing is, you know, when I

16    knocked over the microphone, you made a comment about the

17    lawyers being unprofessional.  And the people who were sitting

18    back there thought it was directed at me.  I don't know that it

19    was, but it was right on the heels --

11:12:09   20          THE COURT:  So you want me to say that I didn't mean

21    that knocking over the microphone was unprofessional?

22          MR. SOTOS:  No, I'm just --

23          THE COURT:  I mean, the court reporter can't even

24    figure out who's objecting.  And I can't keep it all straight.

11:12:22   25    You're talking over each other.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 87 of 278 PageID #:43731
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3063

1       MR. SOTOS:  I just felt the need to bring it up

2   because that was the context in which it occurred.

3       THE COURT:  Well, you don't bring it up unless you

4   want me to do something.  Because I'll be happy to do

11:12:31   5   something, but I don't know what it is you want me to do.

6       MR. LOEVY:  Well, hopefully we can get going --

7       THE COURT:  I'd be happy to do something, but I don't

8   think anybody looking at this could possibly think it was

9   anything other than lawyers yelling over each other.  So the

11:12:46   10   court reporter and I can't figure out what's going on.

11       MR. SOTOS:  Maybe if you said something along the

12   lines, you think the attorneys are all being professional and

13   you weren't trying to imply otherwise because of the back and

14   forth that was occurring.

11:13:00   15       THE COURT:  I don't think the lawyers are being

16   professional.  I think everybody is -- it's chaos in here.  But

17   I need to get the court reporter -- I mean, get the CSO because

18   I don't know where he is.

19       (Brief pause)

11:13:18   20       MR. LOEVY:  Judge, here he is.

21       THE COURT:  Oh, here you are.

22       MR. SOTOS:  Judge, we're waiting for your --

23       MR. GIVEN:  I asked your clerk to make some extra

24   copies of he documents.

11:13:29   25       THE COURT:  And he's doing it.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 88 of 278 PageID #:43732
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3064

1           MR. SOTOS:  That's what we need.

2           THE COURT:  Well, I think it takes a little while for

3     the jury to get in here.  We won't start until we have copies.

4           (Brief pause)

11:13:46    5           THE COURT:  And, you know, if everybody just calms

6     down, you'll be making objections that the court reporter can

7     hear, that I can understand, and people won't be tripping over

8     things, because that's all part of the chaos that this has

9     erupted into.

11:14:01   10           MR. SOTOS:  Just when I handed you the paper, Your

11    Honor, and I caught --

12           THE COURT:  Well, everybody just needs to slow down.

13           (Brief pause)

14           THE COURT:  Here he comes.  Everybody is getting their

11:14:14   15    copies.

16           No more speaking objections, but objections ought to

17    have a basis.  I mean, you can't just say "object."  I'm going

18    to ignore that; okay?

19           MR. LOEVY:  We understand.

11:14:45   20           THE COURT:  But I don't need speaking objections, and

21    I don't want them.

22           MR. LOEVY:  While the jury is out, can we make a

23    standing objection that they've already gone twice what Mr.

24    Bowman has redirected and we think it's all been covered during

11:15:01   25    the last exams.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 89 of 278 PageID #:43733
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3065

1        THE COURT:  Okay.  It's not common in this courthouse

2   to want anybody to be bloodied at the end of cross-examination,

3   and I suppose other people have different experiences.

4        MR. SOTOS:  Judge, you know, we have a view on that

11:15:32   5   based on what we believe occurred as part of our motion with

6   respect to Mr. Guevara and Mr. Mingey.  This witness is giving

7   very important testimony, and we think we ought to be able to

8   probe and --

9        THE COURT:  I'm not stopping you.

11:15:47   10        We're ready.  We're ready.  Where is the CSO?

11        (Brief pause)

12        THE COURT REPORTER:  I'll get him, Your Honor.

13        (Brief pause)

14        COURT SECURITY OFFICER:  All rise.

11:16:17   15        (The following proceedings were had in the

16        presence of the jury in open court:)

17        THE COURT:  Please be seated, everyone.

18        Mr. Sotos.

19        MR. SOTOS:  Thank you, Your Honor.

11:16:41   20   BY MR. SOTOS:

21   Q.  Mr. Dorsch, before we talk about the document that you just

22   handed to me, I just wanted to make one thing clear.  After you

23   talked to Ms. Raley in 2010 or 2011, sometime after that Mr.

24   Rivera filed a post-conviction petition.  Are you aware of

11:17:03   25   that?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 90 of 278 PageID #:43734
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3066

1    A.  Nobody kept me informed about Mr. Rivera's case.

2    Q.  So you never testified about this story in connection with

3    any proceedings involving Mr. Rivera until yesterday when Mr.

4    Bowman asked you some questions about it, correct?

11:17:19    5    A.  Correct.

6    Q.  All right.  So now I want to ask you some questions about

7    the document that you just gave me.  And it's been marked as

8    Defendants' Exhibit 230.

9         And before I ask you about the substance of it, I want

11:17:35    10    to ask you, have you shared this with the attorneys for Mr.

11    Rivera?

12    A.  No.

13    Q.  Because you've been trying to find this file for several

14    years now, right?

11:17:47    15    A.  Yes.

16    Q.  And you knew that a lot of people have been trying to find

17    this file, right?

18    A.  No.

19    Q.  You knew that at the time that you were provided the

11:17:56    20    Northwestern file -- I'm sorry, the Jimenez file by

21    Northwestern in 2015, that people had thought they had found

22    the file, right?

23    A.  I had hoped people were looking for the file.  I wanted it

24    found.

11:18:10    25    Q.  But you knew when people gave it to you that people had

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 91 of 278 PageID #:43735
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3067

1    been looking for it?

2         MR. LOEVY:  Objection.  Asked and Answered, Your

3    Honor.

4         THE COURT:  I mean, I don't even -- you can ask the

11:18:21    5    question, but let's make it clearer.

6    BY MR. SOTOS:

7    Q.  When Northwestern gave you the file in 2015, the Jimenez

8    file, you knew that they had been looking for it?

9    A.  I hoped they had.

11:18:34    10    Q.  Right.  And you knew lawyers for the City had been looking

11    for it?

12    A.  I hoped they had.

13    Q.  Because you had given the story about what happened with

14    Mr. Rivera?

11:18:43    15    A.  Well, I was looking for the file myself, yes.  I wanted

16    verification.

17    Q.  And you said you testified about this story on several

18    occasions, as many as 8.

19         MR. LOEVY:  Objection, your Honor.

11:18:57    20         THE COURT:  Sustained.

21    BY MR. SOTOS:

22    Q.  Well, in all the occasions when you did testify about it,

23    some of the attorneys from Mr. Loevy's firm were the lawyers in

24    those case, right?

11:19:07    25    A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 92 of 278 PageID #:43736
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3068

1  Q.  And there were other lawyers from Northwestern who were

2  lawyers, at times, in those cases too, is that correct?

3  A.  Yes.

4  Q.  So were you talking to them during that time about this

11:19:19  5  other file and where it might be?

6  A.  No.

7  Q.  Were they telling you that they were trying to find the

8  file, too?

9  A.  I had asked for help from anyone that could find it,

11:19:32  10  Chicago Police Department or anybody who could help me find the

11  file.

12  Q.  Including the attorneys --

13  A.  Through my own efforts.

14  Q.  Including the attorneys in those other cases that were

11:19:42  15  discussed.

16  A.  No.  No.

17  Q.  You didn't talk to them about --

18       MR. LOEVY:  Objection, Your Honor.  Asked and

19  answered.

11:19:47  20       THE COURT:  Sustained.

21  BY MR. SOTOS:

22  Q.  When you asked people for help, like who did you ask?

23       MR. LOEVY:  Objection.  Asked and Answered, Your

24  Honor.

11:19:59  25       MR. SOTOS:  I didn't ask that.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 93 of 278 PageID #:43737
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3069

 1         THE COURT:  Overruled.

 2   BY MR. SOTOS:

 3   Q.  Who were you asking for help?

 4   A.  Well, I asked, personally, maybe Jane Raley, Karen Daniel.

11:20:13  5   Anybody who can find a file and my own records with FOIA.

 6   Q.  And did any of them -- did anybody ever tell you, the

 7   people that you asked --

 8         MR. LOEVY:  Objection.  Hearsay.

 9         MR. SOTOS:  Just in terms --

11:20:24  10         THE COURT:  I didn't hear the question.

11   BY MR. SOTOS:

12   Q.  Did the people that you were talking to tell you that they

13   were continuing to look for a different file after they had

14   given you the Northwestern file --

11:20:34  15         MR. LOEVY:  Your Honor --

16         MR. SOTOS:  -- the Jimenez file?

17         THE COURT:  And the objection?

18         MR. LOEVY:  Hearsay, Your Honor.

19         THE COURT:  Your Honor, I don't think it's really for

11:20:41  20   the truth.  Overruled.

21         MR. LOEVY:  And relevance, Your Honor.

22         THE COURT:  Overruled.

23   BY THE WITNESS:

24   A.  No, nobody told me.

11:20:46  25   BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 94 of 278 PageID #:43738
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3070

|  | 1 | Q. That they were still looking for another file? |
|---|---|---|
|  | 2 | A. No. |
|  | 3 | Q. All right. But you continued to look? |
|  | 4 | A. No. |
| 11:20:52 | 5 | Q. You stopped looking, too? |
|  | 6 | A. I only had 2 years that I looked at, '88 and '89. |
|  | 7 | Q. Okay. So because that's the years you think that this |
|  | 8 | other incident occurred? |
|  | 9 | A. Those are the years that I knew occurred -- should've |
| 11:21:07 | 10 | occurred. |
|  | 11 | Q. And so this is what I want to get to, so you testified |
|  | 12 | earlier that you got this chronology. So you handed me a |
|  | 13 | document that's been marked as Defendants' Exhibit number 230. |
|  | 14 | And that's a document that you, in fact, have written all over, |
| 11:21:25 | 15 | correct? |
|  | 16 | A. Yes. |
|  | 17 | Q. Okay. |
|  | 18 | MR. SOTOS: Your Honor, we would move to admit |
|  | 19 | Defendants' Exhibit 230 at this time. |
| 11:21:32 | 20 | MR. LOEVY: We would object to relevance, Your Honor. |
|  | 21 | THE COURT: Overruled. I will receive it. |
|  | 22 | (Defendants' Exhibit 230 was received in |
|  | 23 | evidence) |
|  | 24 | MR. SOTOS: Okay. May I publish, Judge? |
| 11:21:41 | 25 | THE COURT: Yes. |

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 95 of 278 PageID #:43739
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3071

BY MR. SOTOS:

Q.  So I'm going to show you the first page of the document.
This is a document that you received from the Chicago Police
Department, is that correct?

11:22:10

A.  No, you can get that off the website by just going for the
Chicago Police Annual Report which will give you a summary.

Q.  Okay.  And you got a "42" up the upper left-hand corner.
What is that?

A.  I believe for that year there were 42 homicides in the 14th

11:22:28

District.

Q.  Okay.  So to try to move through this quickly.  At the
bottom you write, "Report 130 homicide listed 129," correct?

A.  Right.

Q.  All right.  And that's what you testified to in response to

11:22:43

Mr. Bowman, that there was one missing file, right?

A.  That's always been a question in my mind, why would there
be 130 names but the police department only said there were 129
total homicides in Area 5.  And maybe it's not important, but I
just never, in my own mind, could understand why there was a

11:23:04

difference of one.

Q.  So what is the report that says there were 130 homicides?

A.  If you go further on, you'll find the names of homicide
victims that were returned to me from one of my FOIA requests.
One of the only things I got back from Chicago.

11:23:23

Q.  Okay.  And that actually was attached to the same exhibit,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 96 of 278 PageID #:43740
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3072

1 and that is this page (indicating).  This is the first page,

2 those, right?  These are homicide victims from 1989?

3 A.  Correct.

4 Q.  Correct?

11:23:38  5 A.  Yes.  Reported by the police department.

6 Q.  And then some other ones, correct?

7 A.  Right.

8 Q.  And then there's another one.  So you counted up a total of

9 129, is that right?

11:23:57  10 A.  No, from those pages there's 130 names.

11 Q.  130 on these pages.  And so where does the 129 number come

12 from?

13 A.  If you go back to the police summary for districts, you'll

14 find it's broken down in areas.  In the 14th, 15th, 16th, 17th,

11:24:14  15 and 25th districts total 129 homicides.

16 Q.  Okay.  That's this document that was part of the --

17 A.  Right.  You'll see 14th, 15th, 16th, and so on, lists the

18 number of homicides, as the police report for that year coming

19 out to only 129, where there's 130 names.  Maybe it's not

11:24:36  20 important, I don't know.  Maybe I'm misreading it.

21 Q.  By the way, you've never shared this document with anybody

22 prior to you giving it to me this morning?

23 A.  No.

24 Q.  Okay.  So correct me if I'm missing something, and I just

11:24:52  25 read it, but you said there's 130 names, 130 names that are

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 97 of 278 PageID #:43741
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3073

1    listed in these three pages?

2    A.  That's the police listing them, it comes out to 130.

3    Q.  But this report says there's 129.

4    A.  Right.  And that's a summary for the same year.

11:25:13    5    Q.  So there's more names listed than --

6    A.  No, which is --

7    Q.  -- than the index?  It's the opposite?

8    A.  Yeah.  That's why I don't understand it.

9    Q.  But you -- so if had this list, you could go through all

11:25:28    10    130 cases and then find out whether one of these is the case

11    that's just like the Jimenez case?

12    A.  I tried to do that.

13    Q.  You went through them all?

14    A.  Well, from looking at it.

11:25:39    15    Q.  Were any of them the case --

16    A.  Only by location.

17         I don't know.  I would have to get the individual

18    files.

19    Q.  You never --

11:25:47    20    A.  Unless I have success getting returns of anything from the

21    Chicago Police Department from my FOIA's.

22    Q.  All right.  And then, just so we're clear, were you

23    attempting to testify on direct examination that because there

24    was a difference between 129 and 130 of the people listed and

11:26:07    25    the index here, that somebody in the City of Chicago police

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 98 of 278 PageID #:43742
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos

3074

1  department or City itself was trying to hide the other file

2  that the umbrella file that you said that you were involved in?

3  A.  Was that what I was trying to say?  I was trying to

4  understand the difference.  I didn't know what to say.

11:26:29  5  Q.  But you don't think that what you just handed me in any way

6  suggests that anybody who was trying to -- trying to withhold a

7  file from you, right?

8  A.  As I'm not the author of either of those totals, I don't

9  know what it is.

11:26:44  10  MR. LOEVY:  Your Honor, we object.  This topic has

11  been covered scanned.

12  MR. SOTOS:  I'm just about done, Judge.

13  THE COURT:  Overruled.

14  BY MR. SOTOS:

11:26:52  15  Q.  But you would agree with me that you don't have any reason

16  to think that the list of all the people is complete?

17  A.  I don't know what to think.

18  Q.  You don't have any reason to doubt it?

19  A.  No.  No.  I don't know what it means, the difference.  I

11:27:10  20  don't.

21  Q.  You're not trying to say it's incomplete?

22  A.  No.

23  Q.  All right.  So if you wanted to --

24  A.  I'm saying that's what was returned to me per my request

11:27:22  25  for information, because you asked me what attempts did I make

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 99 of 278 PageID #:43743
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3075

1    no find it, that's all.

2    Q.  And you never discussed your list with any of the attorneys

3    here or any other attorneys anywhere --

4         THE COURT:  Definitely asked and answered.

11:27:37    5         MR. SOTOS:  If I could have one minute, Judge.

6         (Brief pause)

7         MR. SOTOS:  I'm done, Judge.  Thank you.

8         THE COURT:  Okay.  Mr. Leinenweber.

9         MR. LEINENWEBER:  One, I promise.

11:27:51    10         THE COURT:  Go ahead.

11                        CROSS EXAMINATION

12    BY MR. LEINENWEBER:

13    Q.  Thanks for your patience, Mr. Dorsch.

14         Just to bring you back to the case we're here for.  I

11:28:04    15    think you said, and you've already said it, you don't really

16    have any memory of the Juan Rivera, your work on the Juan

17    Rivera case, correct?

18    A.  Correct.

19    Q.  And so you have no memory or knowledge of any mistakes or

11:28:15    20    errors made by any of the Chicago police officers in the case,

21    would that be fair to say?

22    A.  Correct.

23    Q.  And I think you were asked by Mr. Bowman, you know, if --

24    if a witness did say to you, "Hey, wrong guy.  Wrong guy," you

11:28:24    25    would remember that and you would have done something about it,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 100 of 278 PageID #:43744
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3076

1    right?

2    A.  You bet.

3    Q.  Okay.  And it wouldn't have been unusual at that time in

4    your work as a police officer, as a detective, for a witness to

11:28:33    5    express fear, correct?

6            MR. LOEVY:  Objection to scope and relevance, Your

7    Honor.

8            MR. LEINENWEBER:  Judge, I think it goes directly

9    to --

11:28:39    10           THE COURT:  You know what?  I can rule on it without

11    help.

12           I'm going to overrule the objection.  It is beyond the

13    scope but we have an issue about that.  Go ahead.

14           MR. LEINENWEBER:  Thanks, Judge.

11:28:46    15   BY MR. LEINENWEBER:

16   Q.  It would've been unusual in your position as a detective

17   when you're dealing to a witness for a witness to express fear,

18   correct?

19   A.  Sure.

11:28:55    20   Q.  And that would be something, I'm assuming, the Chicago

21   police would say, "Don't worry about it, we're going to protect

22   you," is that fair to say?

23   A.  Protect would be -- I would be lying to them if I said we

24   were going to protect them.

11:29:09    25   Q.  You would comfort them, is that fair to say?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 101 of 278 PageID #:43745
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3077

1    A.  Right.  Well, I would try to express the importance of

2    their doing the right thing.

3    Q.  Okay.  And that wouldn't be something you would even note

4    in a report.  I take it witnesses would express trepidation,

11:29:21    5    fear, whatever word, constantly to you right, when you're

6    dealing with them?

7    A.  Well, you would explain that the procedure for a lineup

8    that they were protected by a one-way glass.

9    Q.  Right.  But my question was, if someone did express some

11:29:34    10    anxiety or fear, that's a common occurrence, right?  It happens

11    all right?

12            MR. BOWMAN:  Objection.  Asked and Answered.

13            THE COURT:  Overruled.

14    BY THE WITNESS:

11:29:41    15    A.  Well, it doesn't happen all the time, sir, but it happens

16    on occasion.

17    BY MR. LEINENWEBER:

18    Q.  On occasion.  Okay.

19            And it would happen enough, though, that it's not

11:29:48    20    something you would ever note in a report, correct?

21    A.  I don't think I ever have.

22    Q.  Okay.  And the one last question.  Do you understand that

23    with regard to the umbrella case and the Jimenez case, it's Mr.

24    Mingey's contention that they're the same one; do you

11:30:05    25    understand that?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 102 of 278 PageID #:43746
6-21-18 (Ex 13)
Dorsch - further redirect by Sotos
3078

1    A.  No, I don't.

2    Q.  Okay.  You very much, sir.  Appreciate your patience.

3              MR. LEINENWEBER:  Thank you, Your Honor.

4              MR. BOWMAN:  Nothing further, Your Honor.

5              THE COURT:  Okay.  Thank you, sir.  You may step down.

6    Watch your step.

7              THE WITNESS:  Thank you, Your Honor.

8          (Witness excused)

9              MR. LOEVY:  At this time, Your Honor, we would call

10   Mr. Victorson.

11             THE COURT:  This is the witness who was not able to

12   come before the plaintiff closed.  So we're reopening the

13   plaintiff's case for this one witness.

14             MR. LOEVY:  Thank you, Your Honor.

15             THE WITNESS DORSCH:  Just want to get my umbrella.

16   Sorry, Your Honor.

17             THE COURT:  No, that's fine.

18          (Brief pause)

19           (Witness enters the courtroom.)

20             THE COURT:  Is this the witness?

21             MR. LOEVY:  I believe that is.

22             Okay.  Is this the witness?

23             THE COURT:  Is this the witness?

24             MR. ART:  Yes, Your Honor.

25             THE COURT:  Okay.  Sir, could you step down here,

11:30:14 (line 5)
11:30:22 (line 10)
11:30:53 (line 15)
11:31:18 (line 20)
11:31:21 (line 25)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 103 of 278 PageID #:43747
6-21-18 (Ex 13)
Victorson - direct by Loevy
3079

1    please.

2          (Brief pause)

3          THE COURT:  Please raise your right hand.

4          (Witness duly sworn.)

11:31:33    5          THE COURT:  You may be seated.

6          LARRY VICTORSON, PLAINTIFF'S WITNESS, SWORN

7                DIRECT EXAMINATION

8    BY MR. LOEVY:

9    Q.  All right.  Sir, if you would state your name, please.

11:31:48    10    A.  Larry Victorson.

11    Q.  And what do you do for a living, sir?

12    A.  I'm retired.  I'm in New York City.

13    Q.  All right.  You have kids there?

14    A.  Yes, I do.

11:31:55    15    Q.  What did you do before you retired?

16    A.  I was in private practice here in Chicago.  I was a state's

17    attorney here in Chicago.  I was in private practice in El

18    Paso, Texas.  I was a prosecutor in El Paso, Texas.  And for

19    6 months I was with the federal Justice Department in

11:32:13    20    Washington, D.C., Strike Force.

21    Q.  All right.  And how long were you with the Cook County

22    State's Attorney's Office?

23    A.  25 1/2 years.

24    Q.  And one of cases you prosecuted there was the People of

11:32:23    25    Illinois versus Jacques Rivera, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 104 of 278 PageID #:43748
6-21-18 (Ex 13)
Victorson - direct by Loevy
3080

1    A.  Yes.

2    Q.  All right.  And you haven't probably seen Mr. Rivera in

3    more than 30 years?

4    A.  No.

11:32:30  5    Q.  Do you have any recollection at all about the case?

6    A.  Zero.

7    Q.  To prepare for the deposition, I saw you've been given a

8    transcript?

9    A.  Yes.

11:32:38  10    Q.  Do you remember who gave it to you?

11    A.  The -- whoever that is.  Jim Sotos.

12    Q.  And nothing wrong with that.  He was trying to help you

13    remember, which is perfectly normal, right?

14    A.  Yes.

11:32:48  15    Q.  All right.  In reviewing that transcript, does that bring

16    back any memory of the case?

17    A.  No.

18    Q.  All right.  Having reviewed the transcripts, would you

19    agree that as prosecutions go and murder cases go, this was not

11:33:03  20    a particularly strong case for the state?

21    A.  Absolutely not.

22    Q.  You would agree with me?

23    A.  Yeah.

24    Q.  Because it was single-fingered child?

11:33:09  25    A.  It was.  And I'm sure I tried to get rid of it.  I'm sure I

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 105 of 278 PageID #:43749
6-21-18 (Ex 13)
Victorson - direct by Loevy
3081

1  tried to plea bargain the case, but I don't know -- I don't

2  remember exactly what happened.  But I would not voluntarily

3  wanted to try a case like this.

4  Q.  Well, let me understand your answer.  You're saying when

5  you looked at this file, you would've said to yourself, "Boy, I

6  really wish I could make a deal and not have to go through with

7  this," right?

8  A.  Sure.

9  Q.  All right.  Was Ken Wadas a person that you knew and were

10  friends with?

11  A.  He was.

12  Q.  All right.  Was Mr. Wadas willing to take any deal

13  whatsoever to plead guilty?

14  A.  I don't know.

15  Q.  Well, you do know, don't you?

16  A.  No.

17  Q.  You went to trial.

18  A.  Listen, I'd have to see my file.  The file has disappeared,

19  right?

20  Q.  I see.

21  A.  All right.

22  Q.  But the case did go to trial, right?

23  A.  Yes, it did.

24  Q.  So Mr. Wadas accepted no deals, we know that.

25  A.  We know that for sure.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 106 of 278 PageID #:43750
6-21-18 (Ex 13)
Victorson - direct by Loevy
3082

1    Q.  All right.  You were put on a case.  You put on a witness

2    and Israel Valentin to say that his brother had been shot,

3    right?

4    A.  Yes.

11:34:03    5    Q.  Just to establish death.  He wasn't claiming to be an

6    eyewitness.  He just said, "this is my brother.  He's dead"?

7    A.  I don't think I put him on.  I think Mike Christ put him

8    on.

9    Q.  All right.  Usually there's one witness to prove that the

11:34:12    10    victim is dead, right?

11            MR. SOTOS:  Objection. Leading.

12            THE WITNESS:  Yeah.

13            MR. SOTOS:  Objection.  We talked about the leading.

14            THE COURT:  I think this is an adverse witness.  So I

11:34:20    15    will overrule that objection.

16    BY MR. LOEVY:

17    Q.  All right.  Then came Orlando Lopez, the boy who did point

18    his finger at Jacques, correct?

19    A.  I put him on.  I didn't put the first guy on, I don't

11:34:29    20    believe.

21    Q.  Oh, you had a partner, right?  So maybe that was --

22    A.  Mike Christ.

23    Q.  And he is no longer with us?  He's deceased, I think or --

24    A.  No, he's not.

11:34:36    25    Q.  All right.  My mistake.  I apologize to Mr. Christ.  I got

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 107 of 278 PageID #:43751
6-21-18 (Ex 13)
Victorson - direct by Loevy
3083

1    confused.  I'm glad to hear he's doing well.

2         But he was -- who was the lead, you or Mr. Christ?

3    A.  I was.

4    Q.  All right.  And then basically you put on -- somebody put

11:34:47  5    you on the kid, there was a stipulation, and then you rested,

6    right?

7    A.  Yeah, I put on the kid.

8    Q.  All right.  Then Jacques' lawyer, Ken Wadas, put in a

9    defense, right?

11:34:56  10    A.  Uh-huh.

11    Q.  He put on Mr. Letrich, who was trying to establish that the

12    victim had identified somebody else, right?

13    A.  Yes, he did.

14    Q.  And you know that because you reviewed the transcript,

11:35:07  15    today, right?

16    A.  Right.

17    Q.  And then you put on Jacques who denied the shooting?

18    A.  Yes.

19    Q.  And Jacques actually testified that he had alibi, didn't

11:35:14  20    he?

21    A.  He did.

22    Q.  All right.  And at the end of your case, you had a choice,

23    whether to end it right there or call a rebuttal, right?

24    A.  Right.

11:35:20  25    Q.  And, by the way, just to be clear about alibi.  He put

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 108 of 278 PageID #:43752
6-21-18 (Ex 13)
Victorson - direct by Loevy

3084

| | |
|---|---|
| 1 | himself on, and said, "I wasn't there.  I was home with my |
| 2 | family," right? |
| 3 | A.  Yes.  And he put in his alibi that he was with these |
| 4 | people.  And I figured if he was really with them, he would've |
| 11:35:33  5 | called them as witnesses. |
| 6 | Q.  And, of course, Mr. Wadas said he had so much respect for |
| 7 | you that if he put a witness up there to say, "I remember at |
| 8 | 3:00 o'clock on a random Saturday where I was," you would've |
| 9 | shredded that witness, is that accurate? |
| 11:35:45  10 | A.  I don't know. |
| 11 | Q.  Well, were you good at what you did? |
| 12 | A.  Very. |
| 13 | Q.  If someone came in here and claimed to remember on a benign |
| 14 | day that they remembered exactly what time it was, even though |
| 11:35:53  15 | it was an uneventful day to them, you had a field day with |
| 16 | that, right? |
| 17 | A.  I don't know.  I would've tried. |
| 18 | Q.  All right.  You had a choice when the case ended to put on |
| 19 | a rebuttal case, right? |
| 11:36:03  20 | A.  Yeah. |
| 21 | Q.  And what witness did you put on in rebuttal? |
| 22 | A.  I have to -- you can -- who did I put on?  I put on Guevara |
| 23 | the cop, right? |
| 24 | Q.  Right. |
| 11:36:14  25 | A.  Okay. |

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 109 of 278 PageID #:43753
6-21-18 (Ex 13)
Victorson - direct by Loevy

3085

1          (Counsel conferring.)

2          THE COURT:  The witness answered.  You heard the

3   answer from the witness.

4          MR. LOEVY:  Yeah.

11:36:37   5          THE COURT:  Okay.

6   BY MR. LOEVY:

7   Q.  All right.  What was Guevara called as a witness for?

8   A.  Rebuttal.

9   Q.  Do you remember that he was going to corroborate that the

11:36:43   10   victim saw from behind a gold ponytail, right?

11   A.  In the park, yes.

12   Q.  And I said "victim," I meant witness.

13   A.  He knew him from the park, right.

14   Q.  I'm not asking about he knew him.  I'll get to that.

11:36:51   15   A.  Okay.

16   Q.  The guy claimed to see a gold ponytail, right?

17   A.  Yes -- well, I don't know about a ponytail.  Part of his

18   hair was dyed gold.

19   Q.  All right.  Let's take a look at Mr. Guevara's testimony.

11:37:09   20   This is page 4 of Plaintiff's Exhibit 35.  If we could have the

21   Elmo.

22   A.  Elmo?  Boy oh boy.

23   Q.  This is Mr. Guevara's testimony in rebuttal.  He did put on

24   like a little pigtail dyed in gold, right?

11:37:25   25   A.  Right.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 110 of 278 PageID #:43754
6-21-18 (Ex 13)
Victorson - direct by Loevy
3086

1  Q.  All right.  And that corroborated the kid who also at the

2  trial described that the shooter supposedly had this gold

3  ponytail, right?

4  A.  I think so.

11:37:32  5  Q.  That's good for you as the prosecutor, right?  Now you got

6  some corroboration.

7  A.  Exactly.

8  Q.  Now, there was no police report from back in 1988, 2 years

9  before the trial, that talked about a gold ponytail, correct?

11:37:42  10  A.  I don't know.

11  Q.  All right.  Let me ask you hypothetically, since your

12  memory is, you know -- it's been a long time.

13         Would you have caused some concern if both the kid and

14  Guevara were saying, "Yeah, the shooter had a gold ponytail,"

11:37:54  15  and none of the police reports, none of the notes, nothing that

16  you had said anything about a gold ponytail, would you have

17  inquired about that?

18  A.  Absolutely.

19  Q.  All right.  Would you have asked Mr. Guevara about that?

11:38:04  20  A.  Did I?

21  Q.  You don't remember if you did, but would you have?

22  A.  Whatever I did, I would've done.  I did what I would've

23  done.

24  Q.  And you obviously had to learn from Guevara somehow that he

11:38:18  25  was claiming to remember that Jacques had a gold ponytail

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 111 of 278 PageID #:43755
6-21-18 (Ex 13)
Victorson - direct by Loevy
3087

1  right?

2  A.  If it wasn't in the police reports, I guess I did learn it

3  that way.

4  Q.  All right.  So you would've been discussing this with

11:38:32  5  Guevara before you put him on the witness stand, right?

6  A.  Yes.

7  Q.  Now, did you coach the kid to say that he had a gold

8  ponytail?

9  A.  I didn't coach anybody.  I told him to tell the truth.  I

11:38:46  10  didn't coach anybody.

11  Q.  And I didn't mean to --

12  A.  I'm sure you didn't.

13  Q.  What I'm saying is, when that kid got to you --

14  A.  Uh-huh.

11:38:50  15  Q.  -- was he already saying "gold ponytail"?

16  A.  I'm sure he was.

17  Q.  That's what I'm asking.  So you were not the one who helped

18  him remember gold ponytail?

19  A.  No, I didn't.

11:39:00  20  Q.  Do you know how the kid got to court that day?

21  A.  No idea.

22  Q.  It was not uncommon to have members of the Chicago Police

23  Department to participate in preparing witnesses, correct?

24  A.  Yes, it was.  I never -- I didn't have a cop in with me

11:39:20  25  when I prepare a witness, I don't believe.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 112 of 278 PageID #:43756
6-21-18 (Ex 13)
Victorson - direct by Loevy
3088

1   Q.  All right.  You were present for the interview, right?

2   A.  Right.

3   Q.  So, in other words, when the trial is getting ready, you'd

4   speak with the witness without the cops around, right?

11:39:28   5   A.  I believe so.  Normally, yes.

6   Q.  All right.  But have no personal knowledge either way about

7   what was said before the witnesses were brought to you, right?

8   A.  Of course I don't.

9   Q.  All right.  And sometimes the witnesses would get brought

11:39:40   10   to you by Chicago police officers, right?

11   A.  I don't know.  We had our own investigators who would go

12   out and bring them in, Cook County Sheriff's investigators.

13   Q.  So there really would have been no reason for Chicago

14   police officers to be driving the witnesses if you had your own

11:39:55   15   investigators, right?

16   A.  I don't know who brought them and why.  I don't know.

17   Q.  All right.  Well, you're saying that -- but my question

18   was, there would've been no reason for Chicago police officers

19   to have to transport witnesses if you guys had your own

11:40:04   20   transport, right?

21   A.  Right.

22   Q.  All right.  And if Mr. Guevara testified that he did it

23   routinely--he testified on an earlier proceeding, at a

24   deposition--that they would bring witnesses, would you say you

11:40:17   25   didn't know that, or that's not true, or which way --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 113 of 278 PageID #:43757
6-21-18 (Ex 13)
Victorson - direct by Loevy
3089

1    A.  I don't know.

2    Q.  All right.  You said it was a weak case because it was a

3    kid pointing his finger, right?

4           MR. SOTOS:  Objection, Judge.  Asked and answered.

11:40:32    5           THE COURT:  Sustained.

6    BY MR. LOEVY:

7    Q.  You had more than just the kid, though, you also had a

8    Chicago police officer, right?

9    A.  Guevara?

11:40:39   10    Q.  Right.

11    A.  Yes.

12    Q.  And were you intending to vouch for the credibility of the

13    case by putting a Chicago police officer on the stand?

14    A.  I used them in rebuttal, right?

11:40:49   15    Q.  Yes.

16    A.  All right.

17    Q.  Okay.  You said that you also called Guevara -- you also

18    called Guevara to say something about a park, right?

19    A.  The hair.

11:41:02   20    Q.  No; remember you said about the park, too?  Baseball in the

21    park?

22    A.  Yeah.  He saw him play baseball in the park and he knew him

23    because of the hair.

24    Q.  And do you remember that you called Guevara -- this is the

11:41:13   25    same page I showed you before.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 114 of 278 PageID #:43758
6-21-18 (Ex 13)
Victorson - direct by Loevy
3090

1        MR. LOEVY:  And if I could get the next page.  I'm

2   sorry about that, Anne.

3   BY MR. LOEVY:

4   Q.  But you asked Guevara about summer in the park playing

5   baseball, too, right?

6   A.  Right.

7   Q.  And Guevara confirmed that he had seen Jacques in the park,

8   right?

9   A.  Yes.

10  Q.  So that also helped your case, right?

11  A.  Yeah.  I guess, yes.

12  Q.  Because the idea was, the kid wouldn't have been believable

13  unless he said, "Maybe I've seen this guy armed," right?

14  A.  I'm not going to say that.

15  Q.  All right.  Showing you the next page, page 5.  What

16  Guevara said was:

17          "... did you ever see the defendant in the park?

18          And Guevara said:

19           " Numerous times."

20          Right?

21  A.  Yes.

22  Q.  All right.  So that also helped corroborate the kid that

23  when the kid was asked, "Hey, you're 13, how do you know this

24  23 year old?  Did you see him in the park?"  And maybe he said,

25  "yeah, yeah, I've seen him in the park," then Guevara

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 115 of 278 PageID #:43759
6-21-18 (Ex 13)
Victorson - direct by Loevy
3091

1  corroborates that?

2  A.  Exactly.

3  Q.  All right.  Did you give the closing argument when it was

4  time to give the closing argument?

11:42:14  5  A.  I'm sure I did.

6  Q.  Well, you waived it, sir.  Isn't that a little unusual?

7  A.  No.  It's a bench trial?

8  Q.  Yes.

9  A.  Is that unusual?  No.

11:42:25  10  Q.  But you did waive closing argument?

11  A.  I didn't speak in closing argument?

12  Q.  That's what I'm telling you.  I'll show you.  This is page

13  15 of the criminal trial.

14  A.  Didn't I say just:  Just briefly, this, that, and the

11:42:35  15  other?

16  Q.  Here's how it ended here:

17      "... at this time we would rest our

18      surrebuttal."

19      And then the court asked for an identification,

11:42:39  20      and you said:

21      "We waive opening argument."

22  A.  Exactly.  I made a closing argument.

23      Wait a minute.  Did I make closing argument?

24  Q.  You did.

11:42:48  25  A.  Okay.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 116 of 278 PageID #:43760
6-21-18 (Ex 13)
Victorson - direct by Loevy
3092

1   Q.  And it was about from page 21 to 22, it was about 12 lines

2   here.

3   A.  Maybe -- maybe less.

4   Q.  This is your closing argument here.  It starts about --

11:42:58   5   let's see if I can find where it is.

6       Oh, here.  I apologize, it was longer.  It starts at

7   the top of page 21.  You said, We got the Humboldt Park, he got

8   impeached, and then continue on the next page.  A little more

9   than a page of closing, right?

11:43:17   10   A.  Right.

11       MR. DAFFADA:  Objection, Judge.  There's no question

12   asked.

13       MR. LOEVY:  A little more than closing, a page of

14   closing.

11:43:19   15       THE COURT:  Wait.  Wait.  I can't hear you.  Say

16   again.

17       MR. DAFFADA:  He is not asking a question.  He's

18   testifying.

19       THE COURT:  Well, he's allowed to lead and I don't

11:43:29   20   think that is improper.

21       MR. DAFFADA:  There is no question.

22       MR. LOEVY:  A little more than a page of closing

23   argument, was the question, Your Honor.

24       THE COURT:  Well, you know, maybe part of the problem

11:43:38   25   is you're going so fast.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 117 of 278 PageID #:43761
6-21-18 (Ex 13)
Victorson - direct by Loevy
3093

1       MR. LOEVY:  All right.  I am trying to be respectful

2   of the time.  I will slow down.

3       THE COURT:  Well, that's great, but we need to hear

4   and understand.

11:43:45    5       MR. LOEVY:  Very good.  I will slow down.

6   BY MR. LOEVY:

7   Q.  Mr. Wadas fought vigorously, did he not?

8   A.  Fought vigorously.

9   Q.  In other words, you and him were friends and courtroom

11:44:00   10   adversaries, right?

11   A.  Right.

12   Q.  And you were in the same office together for at least some

13   period of time?

14   A.  Absolutely.

11:44:05   15   Q.  "Absolutely"?  Yes, right?

16   A.  Yes.

17   Q.  All right.  And you knew him to be a good attorney, I take

18   it?

19   A.  Yes.

11:44:09   20   Q.  He was a diligent attorney, was he not?

21       MR. SOTOS:  Objection, Your Honor.  Relevance.

22       MR. LOEVY:  They've asked --

23       THE COURT:  Overruled.

24   BY THE WITNESS:

11:44:17   25   A.  From what I know, sure.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 118 of 278 PageID #:43762
6-21-18 (Ex 13)
Victorson - direct by Loevy
3094

BY MR. LOEVY:

Q.  And he was very passionate in his Defense of Jacques

Rivera, wasn't he?

A.  Yes.

11:44:24  Q.  In fact, he put on more witnesses than you did, didn't he?

A.  I guess he did.

Q.  And he actually put on a surrebuttal case, didn't he?

        Do you remember from the transcript?

A.  If you say he did, he did.

11:44:41  Q.  Do you remember from reading the transcript this morning

that he put on --

A.  No, no.  Tell me who the witness is and what he said and

I'll tell you.

Q.  He brought in after the gold ponytail thing came up, he

11:44:55  went out and found Rivera's a pastor named --

A.  Yes.  Yes.  Yes.  After reading the transcript, I do

remember this.

Q.  And he called another guy, and they both said, "What are

you talking about?  There's no gold ponytail on this guy"?

11:45:08  A.  Yeah.

Q.  All right.  And, in fact, there was no pictures or

photographs or reports about a gold ponytail.

A.  I think there was a picture.

Q.  Do you remember a picture of a gold ponytail?

11:45:15  A.  I don't know.  It would be in the transcript.  If there

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 119 of 278 PageID #:43763
6-21-18 (Ex 13)
Victorson - direct by Loevy
3095

1    was, I would've showed it to somebody.  Did I?

2    Q.  Exactly.  If you had such a photo, you would've used it at

3    trial?

4    A.  Right.

11:45:26    5    Q.  All right.  And if you didn't use it at trial, then you

6    didn't have such a photo?

7    A.  Exactly.

8    Q.  All right.  Mr. Rivera was found guilty, correct?

9    A.  He was.

11:45:33    10    Q.  And the judge gave him 80 years?

11    A.  I don't remember that.

12    Q.  All right.  Take a look at page 8 of the sentencing

13    transcript, and page 13.

14         And the part I've highlighted there with a pen, does

11:46:01    15    that refresh your recollection that the judge said he was

16    sentencing him to, "like a caged animal at the Illinois

17    Department of Corrections"?

18    A.  That's what it says.

19    Q.  And it also looks like, the next page, that Mr. Wadas

11:46:16    20    asked, "Can he see his family and say goodbye?"  And the judge

21    wasn't having that either, right?

22    A.  It says there wasn't enough security in the building, I

23    think.  Right.

24    Q.  All right.  Let's back up a little bit.  You reviewed the

11:46:34    25    kid's testimony for what he said, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 120 of 278 PageID #:43764
6-21-18 (Ex 13)
Victorson - direct by Loevy

3096

1    A.  Yes.

2    Q.  And he told a story about having come out of his house.

3    Saw three shots.  Saw the back of a guy.  Ran to the store a

4    half block away.  Talked to the clerk.  The clerk wasn't going

11:46:49   5    to call the police, so he ran back and hid, and saw the next

6    eight shots.  That was the story you put on at trial, right?

7    A.  If that's what it says, yes.

8    Q.  And you had a chance to review that this morning?

9    A.  Yes.  Yes.

11:47:00   10   Q.  All right.  Were you concerned that that story wasn't

11   reflected in the original police reports?

12   A.  If it wasn't reflected in the original police reports, I

13   would've been concerned, so ....

14   Q.  All right.

11:47:12   15   A.  Well, wait a minute.  Did he change -- I don't know.  Yeah,

16   I would've been concerned if I saw in the police reports.  I

17   didn't see it.

18   Q.  All right.  When the kid came to you, and you said you have

19   a protocol where you go in the room and you talk to the kid

11:47:23   20   without anybody else present, right?

21   A.  Uh-huh.

22   Q.  Right?

23   A.  Yes.

24   Q.  Okay.  Was the kid saying he was by the store or was he

11:47:31   25   saying the story he told at trial?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 121 of 278 PageID #:43765
6-21-18 (Ex 13)
Victorson - direct by Loevy
3097

1   A.  I don't know.

2   Q.  Did you coach him to say --

3   A.  I did not coach him.

4   Q.  All right.  So let me ask it very clearly then.  The story

5   he told at trial, was that the same story he told you when you

6   first talked to him?

7          MS. ROSEN:  Objection, Judge.  Foundation.  He says he

8   doesn't remember.

9          THE COURT:  I think we have to hear that from the

10  witness.

11  BY THE WITNESS:

12  A.  I don't remember.

13  BY MR. LOEVY:

14  Q.  All right.  Would you have helped him to change his story?

15  A.  No, I wouldn't.

16  Q.  All right.  Can you infer, then, that the story he told you

17  the first time you met him is the story he told?

18  A.  Yeah.

19  Q.  Did you coach this kid to say --

20  A.  I did not coach him.

21  Q.  All right.  And you don't know either way whether somebody

22  coached him before he met you?

23  A.  I sure don't.

24  Q.  And when you say you would not coach him, is this something

25  you did not do as a prosecutor?

11:47:40
11:47:52
11:47:55
11:48:06
11:48:14

1    A.  Yeah.  I tell them to tell the truth, you know.

2    Q.  And you have no recollection of your conversation with Mr.

3    Lopez?

4    A.  No.

11:48:28    5    Q.  All right.  In deciding to whether to put the kid on -- you

6    know, he was 13 by the time at trial, but he just turned 12 at

7    the time of the incident, right?

8    A.  Right.

9    Q.  Did you put some faith in the Chicago Police Department

11:48:40    10    that they were bringing you a case that was legit?

11                    MR. SOTOS:  Objection, Judge.

12                    THE COURT:  The basis?

13                    MR. SOTOS:  Argumentative.

14                    THE COURT:  Overruled.

11:48:41    15                    MR. SOTOS:  Bringing a legit case.

16                    THE COURT:  Overruled.

17    BY THE WITNESS:

18    A.  I didn't think either way about it.  I mean, the case was

19    approved by Felony Review.  I got it for trial.  I took it as

11:49:04    20    it was.  I had no reason to think the kid was lying to me.  The

21    state's attorney in Felony Review apparently didn't think so

22    either.

23    BY MR. LOEVY:

24    Q.  All right.  But it's a very serious thing to prosecute a

11:49:13    25    guy for murder, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 123 of 278 PageID #:43767
6-21-18 (Ex 13)
Victorson - direct by Loevy
3099

1    A.  Exactly.

2    Q.  And obviously if you had been told about problems in the

3    case, you would've taken those very seriously, right?

4    A.  Sure.

11:49:20    5    Q.  So, for example, if Mr. Guevara had told you, "You know

6    what?  I gotta be straight with you.  There was a point in time

7    where the kid was saying, the wrong guy.  It's not that guy.

8    It's the wrong guy," how would you have reacted to that?

9            MR. SOTOS:  Objection, Your Honor.

11:49:31    10            THE WITNESS:  I would've made --

11            THE COURT:  What's the objection?

12            MR. SOTOS:  No foundation for any conversation between

13    him and Mr. Guevara about that.

14            MR. LOEVY:  We're saying this conversation didn't

11:49:40    15    happen.

16            THE COURT:  Overruled.  Overruled.

17    BY THE WITNESS:

18    A.  It did not happen.  If that conversation would have

19    happened, yes, I would've done something.

11:49:42    20    BY MR. LOEVY:

21    Q.  All right.  But you can infer that you would've had

22    conversations with Guevara, right?

23    A.  Maybe not about that.  He was a rebuttal witness.

24    Q.  All I'm establishing is, you and Guevara would have been

11:49:54    25    talking about the case at some point in time, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 124 of 278 PageID #:43768
6-21-18 (Ex 13)
Victorson - direct by Loevy

3100

1    A.   Absolutely.

2    Q.   And you are 100 percent sure in your mind that he never

3    told you that the kid ever expressed doubts about Jacques

4    Rivera?

11:50:02    5    A.   Without a doubt, I'm sure.

6    Q.   And if you had learned anything about that, you would have

7    had to disclosed that to the defense, correct?

8    A.   I would have done more.  Yes, I would've.

9    Q.   What do you mean?  Not only would you have disclosed it to

11:50:14    10   the defense, what more would you have done?

11   A.   It probably would've been over.

12   Q.   What do you mean?

13   A.   I would have dismissed it, probably.

14   Q.   If Mr. Guevara had shared with you that there had been a

11:50:28    15   first lineup -- you had an understanding that the kid picked

16   out Jacques at a lineup, right, at some point?

17   A.   Yes.

18   Q.   If he had shared with you that there had been a first

19   lineup, where the kid had pointed his finger at a filler and

11:50:41    20   picked the wrong guy, picked a filler before he picked out

21   Jacques in a different lineup, that would've changed your view

22   of the case, too, would've it have?

23   A.   Yes.

24   Q.   In fact, you would had to disclose that immediately to Ken

11:50:54    25   Wadas?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 125 of 278 PageID #:43769
6-21-18 (Ex 13)
Victorson - direct by Loevy
3101

1    A.  Absolutely.

2    Q.  And regardless of -- it sounds like you're not sure if you

3    would've prosecuted.  You might've?  You might not have?

4            MR. SOTOS:  Objection.  He's testifying for him.

11:51:05    5            THE COURT:  I'm sorry, I can't hear you.

6            MR. SOTOS:  He's testifying for him.  He can ask him

7    questions.

8            MR. LOEVY:  It's a leading question, Your Honor.

9            THE COURT:  It's a leading question.  Overruled.

11:51:07    10   BY MR. LOEVY:

11   Q.  You want me to ask it again?

12   A.  Sure.

13   Q.  I thought I was reading your body language that -- well,

14   you tell us.  Mr. Sotos is right.  If you had learned that he

11:51:14    15   had picked out a kid -- that the kid had picked out a filler at

16   a first lineup, he pointed his finger and got the wrong person,

17   and before he picked out Jacques, would you have gone forward

18   with the prosecution maybe?

19           MR. DAFFADA:  Objection.  Asked and answered.

11:51:30    20           THE COURT:  Overruled.

21   BY THE WITNESS:

22   A.  I don't think so.

23   BY MR. LOEVY:

24   Q.  All right.  But at a minimum, you would've disclosed that

11:51:35    25   to Mr. Wadas, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 126 of 278 PageID #:43770
6-21-18 (Ex 13)
Victorson - direct by Loevy
3102

1    A.  Yes.

2    Q.  And why is that?

3    A.  I think it's the rules.

4    Q.  What's that?

11:51:40    5    A.  I think it's under the rules you do that.  It's called

6    Brady.

7    Q.  All right.  And you're being facetious.  That's an

8    important rule, right?  That's an important rule?

9    A.  Yes, it is.

11:51:50    10    Q.  All right.  Do you remember that contemporaneously, even as

11    far back as September 16th, 1988, Mr. Wadas was complaining

12    that there was a first lineup where he wasn't picked, do you

13    remember that?

14    A.  No.

11:52:02    15    Q.  All right.  Showing you the transcript.  This is page 35 --

16    I'm sorry.  Plaintiff's Exhibit 35, page 4.  There was a bond

17    hearing, right?

18    A.  Right.

19        MR. SOTOS:  Judge, objection.  Foundation, whether he

11:52:13    20    was there at a bond hearing.  He wasn't involved a that point.

21        THE COURT:  Well, do we know if Mr. Victorson was

22    there?

23        MR. LOEVY:  I don't know if he was there.  This is in

24    evidence, Your Honor.

11:52:19    25    BY THE WITNESS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 127 of 278 PageID #:43771
6-21-18 (Ex 13)
Victorson - direct by Loevy
3103

1    A.  But I don't know who this is.  He must have been the

2    state's attorney, but I was not there at a bond hearing.

3         MR. LOEVY:  All right.  Well, it is in evidence and

4    I'd like to show him the relevant parts, Your Honor.

11:52:28    5         THE COURT:  Well, if he wasn't there, I don't know

6    what he can tell us.

7    BY MR. LOEVY:

8    Q.  Was it your understanding that Mr. Wadas was making

9    contemporaneous complaints that, "Hey, there was an earlier

11:52:39    10   lineup and my guy got to let go after that"?

11   A.  I never heard that.

12   Q.  All right.  If Mr. Wadas was asking you, "Where are the

13   reports where my client was not picked," you would've taken

14   that seriously, right?

11:52:50    15   A.  Absolutely.

16   Q.  And what would you have done?

17   A.  I would've given him the reports.

18   Q.  Well, you didn't have the reports, right?

19   A.  Exactly.

11:52:59    20   Q.  So how would you have gone about getting them?

21   A.  I didn't know they existed.

22   Q.  All right.  Did you take steps as the prosecutor --

23        MR. LOEVY:  Can I get Plaintiff's Exhibit 1.

24   BY MR. LOEVY:

11:53:09    25   Q.  Did you take steps as a prosecutor to make sure that you

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 128 of 278 PageID #:43772
6-21-18 (Ex 13)
Victorson - direct by Loevy
3104

1  got the stuff that existed?

2  A.  As far as I know I did.

3  Q.  What was your protocol and procedure to do that?

4  A.  Subpoena all reports, all police reports of the case, this,

11:53:19  5  that, and the other.

6  Q.  But you subpoenaed them?

7  A.  Me and my partner.  Someone did.

8  Q.  All right.  So is it 100 percent clear that the Chicago

9  Police Department was under a subpoena obligation to produce

11:53:31  10  all their records in the case?

11      MS. ROSEN:  Objection.  Foundation.

12  BY THE WITNESS:

13  A.  I'm sure they were.

14      THE COURT:  Overruled.

11:53:36  15  BY MR. LOEVY:

16  Q.  And even without a subpoena, just a request should've been

17  enough, right?

18  A.  I don't know.

19  Q.  I'm trying to understand your answer.  If you said --

11:53:46  20  A.  We always did it by subpoenaed.  We didn't call them and

21  say, "Please send us police reports."  We said, "You're ordered

22  to bring us police reports."

23  Q.  All right.  Well, let me show you a motion for discovery.

24  This is Plaintiff's Exhibit 39.  These were -- this is the

11:54:03  25  motion that Mr. Wadas filed in Mr. Rivera's case.  It's already

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 129 of 278 PageID #:43773
6-21-18 (Ex 13)
Victorson - direct by Loevy
3105

1    in evidence.

2    A.  Okay.

3    Q.  All right.  These were filed rather typically, right?

4    A.  Absolutely.

11:54:10    5    Q.  And this is the criminal defense attorney saying to the

6    state, "Hey, give us everything that exists," right?

7    A.  Absolutely.

8    Q.  And you took these motions seriously, right?

9    A.  I do.

11:54:19    10    Q.  Now, you didn't physically walk over to the police

11    department and empty out their files, did you?

12          MR. SOTOS:  Objection, Judge, to the nature of the

13    question.  You didn't walk over to the police department and

14    empty out their files?

11:54:32    15          THE COURT:  Overruled.  But let's try to be more

16    efficient.

17    BY MR. LOEVY:

18    Q.  So what did you do?

19    A.  I issued a subpoena to the police to send us the files.

11:54:41    20    Q.  All right.  Was it typical for you to make requests to the

21    police department?

22    A.  It was.

23    Q.  Some cases you probably didn't send subpoenas, correct?

24    A.  I don't know of any.

11:54:48    25    Q.  All right.  Now I'm going to show you a police report that

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 130 of 278 PageID #:43774
6-21-18 (Ex 13)
Victorson - direct by Loevy
3106

1   was -- you would've reviewed the police reports before you put

2   on the criminal case, right?

3   A.  Yes.

4   Q.  All right.  I'm going to show you page 2 of Plaintiff's

5   Exhibit 1.

6           And can you see it on your screen, sir?

7   A.  Yeah.

8   Q.  This is a report signed by Mr. Guevara and Mr. Gawrys.  And

9   it says in here that the victim picked out your guy, Jose Rios,

10   who is supposedly a/k/a Jacques Rivera; do you see that?

11   A.  Yes.

12   Q.  All right.  Did Mr. Guevara ever tell you, or Mr. Gawrys,

13   or anybody else, that this was inaccurate?

14   A.  No.

15   Q.  If Mr. Guevara had told you, "You know what?  I gotta be

16   frank with you, Mr. Prosecutor, when we told you that the

17   victim picked out the guy you're prosecuting, actually we meant

18   he didn't pick out the guy you're prosecuting," you would've

19   had a Giglio or a Brady obligation to disclose if that was a

20   false report, correct?

21   A.  Yes.

22   Q.  And explain what that means.

23   A.  I would say, "The cop just told me the report is not

24   accurate."

25   Q.  And Mr. Wadas would've been entitled to that information,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 131 of 278 PageID #:43775
6-21-18 (Ex 13)
Victorson - direct by Loevy
3107

1  right?

2  A.  Absolutely.

3  Q.  And then when Mr. Guevara took the stand, Mr. Wadas

4  would've been able to impeach him with, "Mr. Guevara, you just

11:56:13  5  said that, but isn't it true you also wrote a false report,"

6  right?

7  A.  Right.

8  Q.  Right?

9  A.  Yes.

11:56:17  10  Q.  And in a case like that, that's important and material

11  impeachment evidence, would you agree?

12  A.  Sure.

13  Q.  And that never happened.  He never told you that report was

14  false?

11:56:27  15  A.  He never told me that report was false.

16  Q.  And even though you have no memory, how do you know that?

17  A.  Because if he would've, I would've done something about it.

18  I would've told the defense lawyer.

19  Q.  All right.  Do you have any memory about the scenario that

11:56:42  20  Jacques supposedly got picked out by the victim from looking at

21  photo books?

22  A.  I read it in the transcript.

23  Q.  All right.  If you had been told that prior to the gang

24  book identification on August 29th -- do you see that?

11:57:00  25  A.  Yeah.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 132 of 278 PageID #:43776
6-21-18 (Ex 13)
Victorson - direct by Loevy
3108

1  Q.  If you had been told that Guevara had showed photos of

2  Jacques before the kid randomly went through the book and

3  stopped on Jacques' photos, that would've changed your view of

4  the case, right?

11:57:17
5  A.  Yeah.

6  Q.  Because the theory you put on at trial was, "Hey, you

7  should believe Jacques is guilty because this kid was just

8  looking through books and stopped on Jacques' photo," right?

9           MR. SOTOS:  Objection to the leading, Judge.

11:57:30
10          THE COURT:  The leading is fine.  Overruled.

11  BY MR. LOEVY:

12  Q.  So that would've been material if the kid had seen photos

13  of Jacques before the gang book identification, correct?

14  A.  Yes.

11:57:38
15  Q.  And that would've been something you would've disclosed to

16  Mr. Wadas?

17  A.  Yeah.

18  Q.  And Mr. Wadas is a fine attorney.  He could've made good

19  use of that, wouldn't he have?

11:57:48
20  A.  Yes, he's a fine attorney.

21  Q.  He might've impeached Guevara, impeached the child?

22  A.  He would have.

23          MR. SOTOS:  Judge, objection to this witness

24  testifying what Mr. Wadas might have done with anything.

11:57:57
25  There's no foundation for that.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 133 of 278 PageID #:43777
6-21-18 (Ex 13)
Victorson - direct by Loevy
3109

1       THE COURT:  Well, it's already been answered.  When

2  you make the objection when the question is pending, I will be

3  responsive.

4  BY MR. LOEVY:

11:58:09    5  Q.  All right.  Do you recall that Mr. Wadas was asking you,

6  "Mr. Victorson --"

7       He didn't call you "Mr. Victorson."  What did he call

8  you?

9  A.  Mr. Victorson.

11:58:20   10  Q.  All right.  Did Mr. Wadas ask you, "I'm not getting any

11  GPRs.  Where are all the GPRs?  Where are all the reports"?

12  A.  I absolutely don't remember that.

13  Q.  All right.  Mr. Wadas says you told him, "Look, you've got

14  everything that I have"?

11:58:32   15  A.  I did.

16  Q.  And is that something that you would've said if it wasn't

17  true?

18  A.  No.

19  Q.  Would you explain.

11:58:39   20  A.  What?

21  Q.  Can you explain?

22  A.  You want me to explain that?

23  Q.  Yes.

24  A.  I don't lie.  I don't withhold evidence.  That's my

11:58:48   25  explanation.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 134 of 278 PageID #:43778
6-21-18 (Ex 13)
Victorson - direct by Loevy
3110

1   Q.  So you have every degree of confidence that whatever you

2   had, you gave to Ken Wadas?

3   A.  100 percent.

4   Q.  And whatever you didn't have, you couldn't give to Ken

11:59:00   5   Wadas?

6   A.  Well, let me think.  That's right.  That's right

7   (laughing).

8   Q.  And Mr. Wadas kept his file all these years, and he says

9   there are missing reports.  Are you the one who didn't give it

11:59:10   10   to him?

11   A.  No.

12   Q.  Was there a phone number for records at the Chicago Police

13   Department that you would call and talk to the clerk?

14   A.  Absolutely.

11:59:31   15   Q.  And what was the clerk's name?

16   A.  I don't know the clerk's name, but it was a 744 number.

17   Q.  All right.  So every trial you would call up the clerk and

18   say, "I need the records for my case," right?

19   A.  Yeah.  And we'd also issue a subpoena, too.  Do it by phone

11:59:44   20   and issue --

21   Q.  There were times when you felt like you weren't getting all

22   the investigative materials, right?

23   A.  Never.

24   Q.  All right.  This is your deposition.  Remember giving a

11:59:53   25   deposition in this case?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 135 of 278 PageID #:43779
6-21-18 (Ex 13)
Victorson - direct by Loevy

3111

1    A.  Sure.

2    Q.  This is page 65, lines 15, through 66, lines 2:

3            "Question:  If you had called Ms. Hudson to ask

4            for an investigative file regarding a homicide

12:00:07   5            in 1988, and that file that you received did not

6            contain any GPRs, you would have called Ms.

7            Hudson and asked for them, is that correct?

8            "Answer:  No.  Call the area, call the detective

9            area.

12:00:20   10            "Question:  I see.  And can you tell us how that

11            process would work?

12            "Answer:  I would call the detective who is

13            involved in the case and say, I need your GPRs

14            in the case, do you have them?"

12:00:29   15            Did you give those answers?.

16            MR. SOTOS:  Objection, Judge.  There's nothing

17    impeaching about that.

18            THE COURT:  Overruled.

19    BY MR. LOEVY:

12:00:38   20    Q.  Did you give those answers?

21    A.  Does it say I did?

22    Q.  Yes, it does.

23    A.  Then I did.

24    Q.  But you know that I have to ask that because you're an

12:00:41   25    attorney.  You impeach people, too, right?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 136 of 278 PageID #:43780
6-21-18 (Ex 13)
Victorson - direct by Loevy

3112

1  A.  Just like you.

2      MR. SOTOS:  Objection, Judge.  He wasn't impeached in

3  any way.

4      MR. LOEVY:  That objection was ruled on, Your Honor.

12:00:50  5      THE COURT:  I can go back and figure this out, but --

6      MR. LOEVY:  Let me ask another question.

7      THE COURT:  Yeah.  Go ahead.  I don't think it's a

8  good use of our time.

9  BY MR. LOEVY:

12:01:00  10  Q.  There were times when you'd get the file and you say, "You

11  know what?  There's some GPRs, I don't think I got all the

12  GPRs."  You'd call the detectives and say, "Hey, I want all the

13  GPR's," right?

14  A.  If I knew there were GPRs, absolutely, yes.

12:01:10  15  Q.  All right.  So that would happen from time to time?

16  A.  I'm sure it did.

17  Q.  All right.  In this case, if Mr. Wadas was telling you, "I

18  got zero GPRs, I got no GPRs," you're sure you would've called

19  up and made inquiries, right?

12:01:26  20  A.  If he said, "Hey, there's GPR's here ..."

21  Q.  No, I said there's no GPRs.  Sorry to interrupt you.  He

22  said, "got no GPRs."

23  A.  If he would have said to me, "I have no GPRs, but there are

24  GPRs, call the area," I would've called the area.

12:01:38  25  Q.  What if he was saying, "I got no GPRs, I have no idea if

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 137 of 278 PageID #:43781
6-21-18 (Ex 13)
Victorson - direct by Loevy
3113

1    there's GPRs because I wasn't part of the investigation, all I

2    know is, I got no GPRs."

3    A.  I would've called the area.

4    Q.  All right.  And would you have satisfied yourself that you

12:01:54    5    had exhausted the efforts?

6    A.  Yeah.  If they'd told me there are no GPRs, I wouldn't go

7    there and search myself.

8    Q.  All right.  But it was your job, not Mr. Wadas's job, to

9    make sure the police department was on adequate notice that you

12:02:03   10    needed their records, right?

11    A.  Absolutely.

12    Q.  Did Mr. Wadas have a right to rely on you to do that job?

13    A.  Sure did.

14    Q.  Did you take that responsibility seriously?

12:02:11   15    A.  Yes.

16    Q.  Would it have been diligent of Mr. Wadas to take your word

17    for it that you had exhausted the efforts to get the GPRs?

18    A.  Absolutely.

19         MR. SOTOS:  Objection, Judge, this witness commenting

12:02:27   20    on another's diligence.  Not disclosed for that purpose.

21         THE COURT:  Sustained.

22    BY MR. LOEVY:

23    Q.  From the context of your interactions with Mr. Wadas -- and

24    you had experience with the criminal justice system, correct?

12:02:39   25    A.  I did, yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 138 of 278 PageID #:43782
6-21-18 (Ex 13)
Victorson - direct by Loevy
3114

1    Q.  And with a criminal defense attorney, too?

2    A.  Yes.

3    Q.  All right.  Was it diligent for a criminal defense attorney

4    to rely on what a prosecutor is telling them or does the

12:02:52   5    criminal defense attorney have to assume --

6               MR. SOTOS:  Objection.

7               MR. LOEVY:  -- that the prosecutor is lying?

8               THE COURT:  I think that this ultimate issue is for

9    the jury.  So you can get the facts you need, but let's not do

12:03:03  10    legal conclusions.

11               MR. LOEVY:  All right.

12    BY MR. LOEVY:

13    Q.  You would not have proceeded with this prosecution unless

14    you believed that the police department had given you all the

12:03:11  15    documents, right?

16    A.  Yes.

17    Q.  And that required a measure of trust on your part, right?

18               MR. DAFFADA:  Objection.  Asked and Answered.

19               THE WITNESS:  On my part?

12:03:20  20               THE COURT:  Sustained.  I think we've been over this.

21               MR. LOEVY:  All right.

22    BY MR. LOEVY:

23    Q.  Was it the practice in the courts for Mr. Wadas, if you

24    told him there's no more documents, to file a motion to hold

12:03:36  25    the police department in the contempt?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 139 of 278 PageID #:43783
6-21-18 (Ex 13)
Victorson - direct by Loevy
3115

1    A.  I don't know.

2    Q.  All right.  That wasn't something that you routinely

3    encountered, right?

4         MR. SOTOS:  Judge, objection.  Asked and answered.

12:03:45   5    BY THE WITNESS:

6    A.  No, it's not.

7         THE COURT:  Overruled.

8    BY MR. LOEVY:

9    Q.  And how about filing a motion.  You know, if Mr. Wadas

12:03:52   10   filed a motion for discovery, you told Mr. Wadas, "Ken, you got

11   everything there is," would it be routine practice that Mr.

12   Wadas would accept your word?

13        MR. DAFFADA:  Objection.  Asked and Answered.

14        THE COURT:  Sustained.

12:04:13   15   BY MR. LOEVY:

16   Q.  You have since learned that this was a wrongful

17   prosecution, correct?

18        MR. SOTOS:  Objection, Judge.  Objection --

19        THE COURT:  Overruled.

12:04:20   20        MR. SOTOS:  -- to the phrase --

21   BY THE WITNESS:

22   A.  I know about this lawsuit, right here (indicating).

23        THE COURT:  Okay, wrongful conviction.

24        MR. SOTOS:  If his point is that he was released and

12:04:30   25   he didn't commit the crime, that's one thing, but asking him

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 140 of 278 PageID #:43784
6-21-18 (Ex 13)
Victorson - direct by Loevy
3116

1  whether he learned it's a wrongful prosecution --

2          THE COURT:  Well, that's why i said --

3          MR. LOEVY:  All right.  Maybe I can clarify.

4          THE COURT:  Rephrase it, yes.

12:04:37  5  BY MR. LOEVY:

6  Q.  Your job as a prosecutor is not just to get convictions,

7  right?

8  A.  Yes.

9  Q.  You want to convict the guilty people and not the not

12:04:45  10  guilty people, right?

11  A.  Yes.

12  Q.  And you have some regret that apparently something went

13  wrong in this process?

14  A.  No, I don't have any regret.  I had nothing to do with it

12:04:55  15  if something did.  I have no regrets.  I did the right thing,

16  period.

17  Q.  You did the right thing with the information you had,

18  right?

19  A.  Yes.

12:05:04  20  Q.  And this was not your fault, was it?

21          MR. SOTOS:  Objection, Judge.

22          THE COURT:  Overruled.

23  BY THE WITNESS:

24  A.  No -- or what's not fault?

12:05:12  25  Q.  All right.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 141 of 278 PageID #:43785
6-21-18 (Ex 13)
Victorson - direct by Loevy
3117

1   A.  But what's not my fault?

2   Q.  It was or wasn't?

3   A.  What -- what are you talking about is not my fault?

4           THE COURT:  Are you withdrawing the question?

5           MR. LOEVY:  Yes, Your Honor.

6           THE COURT:  Okay.  The question is withdrawn.

7           THE WITNESS:  Good idea.

8           THE COURT:  Cross-examination.

9           MR. SOTOS:  Judge, I have quite a bit.  I don't know

10  if you want to break, but --

11          THE COURT:  Okay.  Five after 1:00, ladies and

12  gentlemen.

13          COURT SECURITY OFFICER:  All rise.

14          (The following proceedings were had out of the

15              presence of the jury in open court:)

16          MR. GIVEN:  Judge, I do have a copy, a courtesy copy

17  of the motion that was filed.

18          THE COURT:  Excellent.  Thank very much.

19

20          (Luncheon recess taken from 12:06 o'clock p.m.

21              to 1:05 o'clock p.m.)

22

23

24

25

Victorson - direct by Loevy

0

1                    *      *      *      *      *      *      *      *

2

3    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

4         RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

5

6        /s/Blanca I. Lara                    June 20, 2018

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3118

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   JACQUES RIVERA,                        ) No. 12 CV 4428
                                           )
 4              Plaintiff,                  )
                                           )
 5   vs.                                    ) Chicago, Illinois
                                           )
 6   REYNALDO GUEVARA, STEVE GAWRYS,        )
     DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
 7   JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN )
     MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
 8   RUSSELL WEINGART, ESTATE OF ROCCO      )
     RINALDI, CITY OF CHICAGO,              ) June 21, 2018
 9                                          )
                Defendants.                 ) 1:06 o'clock p.m.
10
                          VOLUME 13-B
11              TRANSCRIPT OF PROCEEDINGS - Trial
               BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                        and a jury

13   APPEARANCES:

14   For the Plaintiff:     LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
15                               MR. STEVEN E. ART
                                 MR. ANAND SWAMINATHAN
16                          311 North Aberdeen Street
                            3rd Floor
17                          Chicago, Illinois  60607

18                          MacARTHUR JUSTICE CENTER
                            Northwestern University School of Law
19                          BY:  LOCKE E. BOWMAN III
                            357 East Chicago Avenue
20                          Chicago, Illinois  60611
                            (312) 503-0844
21

22   Court reporter:             Blanca I. Lara
                             Official Court Reporter
23                          219 South Dearborn Street
                                 Room 2504
24                          Chicago, Illinois 60604
                               (312) 435-5895
25                          blanca_lara@ilnd.uscourts.gov
```

3119

```
 1    APPEARANCES:   (Continued)

 2

 3    For the Individual      THE SOTOS LAW FIRM
      Defendants:             BY:   MR. JEFFREY N. GIVEN
 4                                  MR. JAMES G. SOTOS
                                    MS. CAROLINE P. GOLDEN
 5                                  MR. JOSEPH POLICK
                                    MR. DAVID A. BRUEGGEN
 6                            550 East Devon Avenue, Suite 150
                              Itasca, Illinois  60143
 7

 8    For the Defendant       ROCK FUSCO & CONNELLY, LLC
      City of Chicago:        BY:   MS. EILEEN E. ROSEN
 9                                  MS. CATHERINE M. BARBER
                                    MS. THERESA B. CARNEY
10                            321 North Clark Street, Suite 2200
                              Chicago, Illinois  60654
11

12    For the Defendant       LEINENWEBER BARONI & DAFFADA, LLC
      Guevara:                BY:   MR. THOMAS E. LEINENWEBER
13                                  MR. JAMES V. DAFFADA
                              120 North LaSalle Street, Suite 2000
14                            Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    (Jury out.  Proceedings heard in open court:)
 2              COURT SECURITY OFFICER:  All rise.
 3              THE COURT:  Ready?
 4              MS. ROSEN:  Judge, just one thing before we put
 5    Mr. Hickey on.
 6              We discussed the issue about the -- how to deal with
 7    the Palmer -- the conclusion of the Palmer litigation.
 8              THE COURT:  Yes.
 9              MS. ROSEN:  We have reached an agreement.  But for
10    purposes of the record, it's the city's position that they
11    should be allowed to go into the conclusion as we argued in our
12    motions in limine.  But for purposes of dealing with it today,
13    we have --
14              THE COURT:  You reached an agreement?
15              MS. ROSEN:  -- crafted the question, and we'll go
16    forward without waiving the city's original --
17              THE COURT:  Okay.
18              MR. SOTOS:  And -- oh, I'm sorry.
19              MS. ROSEN:  -- without waiving the city's original
20    position.
21              THE COURT:  Okay.  That's helpful.
22              Yes?
23              MR. SOTOS:  Judge, normally we would be moving for
24    directed verdict under Rule 50 -- judgment as a matter of law
25    under Rule 50 after the -- Mr. Victorson testified, because we
```

1    had thought that they were going to close their case after

2    that.

3           But in light of the Court's rulings on scope, I'm not

4    sure that that's still something -- I don't know that their

01:07:26   5    case is ever really closed until all the evidence is in if the

6    Court --

7           THE COURT:  Well, that's an interesting question.  But

8    there aren't going to be any other witnesses called for the

9    plaintiff.

01:07:34   10          MR. LOEVY:  Not --

11          THE COURT:  So unless you're calling witnesses --

12          MR. SOTOS:  We should --

13          THE COURT:  -- because I assume the plaintiffs want

14   to -- is going to want to post some substantive evidence, I

01:07:44   15   think we're done.

16          MS. ROSEN:  Right.

17          MR. SOTOS:  All right.  Then we'll be moving after

18   Mr. Victorson under Rule 50.

19          THE COURT:  Okay.  All right.  We're going to continue

01:07:51   20   with Mr. Victorson, right?

21          MR. SOTOS:  Yes.

22          THE COURT:  And is he here?  Okay.

23          MR. LOEVY:  Mr. Sotos said we're done.  We don't know

24   who their other witnesses are, just so we're clear.

01:07:57   25          MR. SOTOS:  No, no.  We're -- not -- the case isn't

1    done.  But, I mean, usually, you know, we want to move --

2            THE COURT:  Mr. Victorson, you can retake the witness

3    stand.

4        (Witness resumes the stand.)

01:08:04
5            MR. SOTOS:  We want to make a Rule 50 motion, and I'm

6    just --

7            THE COURT:  I understand, but I'm saying that I left

8    the case open for Mr. Victorson.

9            MR. SOTOS:  Right.

01:08:10
10           THE COURT:  It would be nice for us to know who these

11   witnesses are, okay, so we can call this, and you'll know.

12           MR. SOTOS:  We've given them -- given them our

13   witnesses.  Now we're going to add --

14           THE COURT:  Oh, okay.

01:08:19
15           MR. LOEVY:  Oh, I didn't know that was a final list.

16           MS. ROSEN:  No, no, it's not a final --

17           MR. SOTOS:  It's not a final list.  We have to add a

18   couple now as a result of what happened with Mr. Dorsch, but --

19           THE COURT:  Well, I can't -- I can't advise you on

01:08:27
20   what to do with the Rule 50, because I don't know what -- who

21   these witnesses are or what kind of issues they're going to

22   raise or anything.

23           MR. SOTOS:  All right.

24           THE COURT:  But you probably want to make your record,

01:08:41
25   because the Court of Appeals is not as generous with these

```
 1   things as I am, as I'm sure you know.
 2            MR. SOTOS:  Understood, Judge.  Thank you.
 3            THE COURT:  I don't care when you make the motion.
 4   It's mostly because I don't know the rules.
 5      (Discussion off the record.)
 6            THE COURT:  And do we know who is going to examine Mr.
 7   Victorson?  Will it just be you?
 8            MR. SOTOS:  Yes.
 9            THE COURT:  Just you?
10            MR. SOTOS:  Yes, Judge.
11            THE COURT:  Okay.
12            MR. LEINENWEBER:  Judge, I just have, like, two
13   questions.
14            THE COURT:  Okay.  Two of you.  Thank you.
15            MR. SOTOS:  Do you have any questions of
16   Mr. Victorson?
17            MS. ROSEN:  Oh, I'm sorry.  I do not.
18            THE COURT:  Okay.
19            MS. ROSEN:  Not -- well, not at this time.  I suppose
20   something could come up that would change that, but --
21            COURT SECURITY OFFICER:  All rise.
22      (Jury in.)
23            THE COURT:  Please be seated, everyone.
24            Mr. Sotos.
25            MR. SOTOS:  Thank you, Your Honor.
```

01:08:51
01:09:13
01:09:19
01:09:24
01:09:59

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 149 of 278 PageID #:43793
6-21-18 (Ex 13)
Victorson - cross by Sotos

3124

 1      LARRY VICTORSON, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

 2                      CROSS-EXAMINATION

 3   BY MR. SOTOS:

 4   Q.  Good afternoon, Mr. Victorson.

01:10:01   5   A.  Good afternoon.

 6   Q.  I know -- we know you have to be someplace.  We'll do our

 7   best to get you out of here as quickly as possible.

 8   A.  I canceled that appointment.

 9   Q.  Oh, I'm sorry you had to --

01:10:12   10      THE COURT:  Sorry about that.

11   BY MR. SOTOS:

12   Q.  All right.  Let's get to it, then.

13          So during the direct examination, Mr. Loevy asked you

14   whether or not the police brought you a weak case.  And you

01:10:23   15   said something about Felony Review, correct?

16   A.  Right.

17   Q.  Could you explain to the jury what that Felony Review

18   process is?

19   A.  Before this case was approved for -- to be sent to the

01:10:34   20   trial courts -- to the State's Attorney's Office for trial,

21   there's something called Felony Review.  And it's an assistant

22   who is on call and especially for murders, armed robberies,

23   rapes, that type of stuff.

24          Before they charge a case, before it's approved for

01:10:51   25   trial, the felony assistant goes out, talks to the police

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 150 of 278 PageID #:43794
6-21-18 (Ex 13)
Victorson - cross by Sotos

3125

01:11:10

1  officers, talks to the witness, talks to the defendant, if the

2  defendant is willing to talk, then makes a decision and, I

3  guess, whether to approve the case or not, and probably calls

4  the supervisor of Felony Review to run that decision by the

5  supervisor.

6  Q. So it's your --

7       MR. LOEVY:  Your Honor, we move to strike that.  We

8  already heard from Ms. Rosner about Felony Review.

9       THE COURT:  Well, I think unless we're going to do

01:11:20  10  something different from what Ms. Rosner's done --

11       MR. SOTOS:  I was just following up on what he

12  elicited from him on direct.  That's it.  We're not going to go

13  anymore into Felony Review.

14       THE COURT:  Okay.  Because -- because it is

01:11:23  15  repetitive.

16       MR. SOTOS:  Of course.  We're moving right -- right

17  beyond that.

18  BY MR. SOTOS:

19  Q. So the point here is that when you got the case, it had

01:11:30  20  already been approved by the Felony Review Division?

21  A. Correct.

22  Q. Okay.  And so once you get the case, in terms of whether

23  it's a weak case or a strong case or somewhere in the middle,

24  the decision about whether to go forward with that case is a

01:11:49  25  decision that's made by the State's Attorney's Office, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 151 of 278 PageID #:43795
6-21-18 (Ex 13)
Victorson - cross by Sotos

3126

```
 1              MR. LOEVY:  Your Honor, leading.  Objection, leading.

 2              THE COURT:  Sustained.

 3  BY MR. SOTOS:

 4  Q.  So who -- who makes the decision whether or not to go

 5  forward with a prosecution?

 6  A.  The State's Attorney's Office.

 7  Q.  Okay.  And does that apply whether the case is weak,

 8  strong, or somewhere in the middle?

 9  A.  Yes.

10              MR. SOTOS:  And -- and, Your Honor, I thought that the

11  rule on leading was that --

12              THE COURT:  The rule on leading --

13              MR. SOTOS:  -- if they called the witness that --

14              THE COURT:  No.  Let me make it clear, because I think

15  I did, but if I didn't, the rule on leading is that I'm not

16  going to find anybody adverse to one side or the other unless I

17  have a foundation in advance before we get into this process.

18              MR. SOTOS:  Understood, Judge.

19              THE COURT:  So this is your witness, and so you

20  wouldn't lead but --

21              MR. SOTOS:  Okay.

22              THE COURT:  No, no, I'm sorry.  Plaintiff called this

23  witness.

24              MR. SOTOS:  Plaintiff called the witness, Judge.  I

25  thought --
```

01:12:00 (line 5)
01:12:13 (line 10)
01:12:21 (line 15)
01:12:37 (line 20)
01:12:44 (line 25)

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 152 of 278 PageID #:43796
6-21-18 (Ex 13)
Victorson - cross by Sotos

3127

| | | |
|---|---|---|
| | 1 | THE COURT:  I'm sorry.  My mistake. |
| | 2 | No, you may lead. |
| | 3 | MR. SOTOS:  Okay.  Thank you. |
| | 4 | THE COURT:  I'm sorry about that. |
| 01:12:49 | 5 | MR. SOTOS:  That's fine.  Thank you.  I appreciate |
| | 6 | that, Your Honor. |
| | 7 | THE COURT:  Forgot where we were. |
| | 8 | MR. SOTOS:  We've got a lot going on in here. |
| | 9 | THE COURT:  Yeah, we do. |
| 01:12:56 | 10 | BY MR. SOTOS: |
| | 11 | Q.  So the -- so then that's a decision that's made by your |
| | 12 | office -- regardless of the strength of the case, you have to |
| | 13 | decide whether it's strong enough that your office decides to |
| | 14 | prosecute? |
| 01:13:08 | 15 | A.  Correct. |
| | 16 | Q.  And so once you get the case, there's a process that occurs |
| | 17 | that's called the discovery process, right? |
| | 18 | A.  Yes. |
| | 19 | Q.  And in this case, you served on -- typically, there's a |
| 01:13:24 | 20 | motion for discovery that the defendant will file in the case? |
| | 21 | A.  Yes. |
| | 22 | Q.  And then you'll file a response to that? |
| | 23 | A.  Yes. |
| | 24 | Q.  All right.  And I'm going to put up on the screen for you a |
| 01:13:38 | 25 | document that's in evidence as Defendants' Exhibit 23-L. |

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 153 of 278 PageID #:43797
6-21-18 (Ex 13)
Victorson - cross by Sotos
3128

1         And I'm going to represent to you that this is an

2    answer to discovery that was filed in Mr. Rivera's case

3    during -- during the pretrial phase of the case.  It's kind of

4    small.  I don't know if we can get that -- I don't think we

01:14:07   5    really need to.

6         Just to move it along, do you see all of the names

7    that are under No. 2?

8    A.  Yes.

9    Q.  Can you see them?

01:14:13  10    A.  Yes.

11    Q.  All right.  There's a number of individuals, including the

12    witness, Orlando Lopez, correct?

13    A.  Yes.

14    Q.  Several hospital personnel?

01:14:24  15    A.  Yes.

16         MR. LOEVY:  Your Honor, we object.  It's been shown to

17    Mr. Wadas and read to -- by the defense to Mr. Wadas, too.

18    This is cumulative.  We should go to new areas.

19         THE COURT:  Overruled.  I don't know where we're going

01:14:38  20    with this.

21    BY MR. SOTOS:

22    Q.  And several police officers, correct?

23    A.  Correct.

24    Q.  All right.  Mr. Loevy asked you a number of questions

01:14:43  25    during direct examination about what Mr. Wadas did during the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 154 of 278 PageID #:43798
6-21-18 (Ex 13)
Victorson - cross by Sotos
3129

1  case.

2  Do you know whether he interviewed the people on that

3  list or any of the people on the list?

4  A.  No, I don't.

01:14:52  5  MR. LOEVY:  Objection, foundation, Your Honor.

6  THE COURT:  Overruled.

7  BY MR. SOTOS:

8  Q.  You don't know one way or the other?

9  A.  I do not know.

01:14:56  10  Q.  And if he didn't, you don't know why that would be, right?

11  MR. LOEVY:  Same objection, Your Honor.

12  BY THE WITNESS:

13  A.  No.

14  THE COURT:  Overruled.

01:15:05  15  BY MR. SOTOS:

16  Q.  And the purpose of providing this information to the

17  defense is so that the defendants have information -- that the

18  defendant's lawyer has information that he can follow up on if

19  he feels that any of its worth following up on, correct?

01:15:17  20  A.  Yes.

21  Q.  And the discovery process doesn't just involve the answer

22  that you filed to the motion for discovery, correct?

23  A.  No, it's a continuing duty.

24  Q.  It's an ongoing process?

01:15:30  25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 155 of 278 PageID #:43799
6-21-18 (Ex 13)
Victorson - cross by Sotos
3130

1    Q.  A lot of back and forth between the prosecution and the

2    defense lawyer?

3    A.  A lot.

4    Q.  Okay.  Is it uncommon for there to be situations in which

01:15:38    5    it takes more than one attempt or two attempts to get all the

6    information that's needed?

7    A.  It's common.

8    Q.  Okay.  So you're trying to get information from police

9    departments?

01:15:48    10    A.  Anywhere we can get it.

11    Q.  Hospitals?

12    A.  Ab -- yes.

13    Q.  Especially in a murder case, right?

14    A.  Yes.

01:15:55    15    Q.  So you're going to be getting medical reports from

16    hospitals and things of that nature?

17    A.  Yes.

18    Q.  Okay.  And aside from the answer to discovery that's filed,

19    there's a number of police reports that are provided to the

01:16:10    20    defendants as well, correct?

21    A.  Yes.

22    Q.  All right.  I'm going to direct your attention to a couple

23    of those.

24          Have you had a chance to look at any -- I know I gave

01:16:18    25    you the -- I gave you the criminal trial transcript this

1  morning when I first met you outside of court, correct?

2  A.  That's right.

3  Q.  All right.  And have you had a chance to review any police

4  reports beyond that transcript?

01:16:30  5  A.  No.

6  Q.  All right.  So I'm going to show you a couple of documents

7  that were used in the criminal case and ask you a few questions

8  about those.

9          So do you recall Mr. Loevy asking you some questions

01:16:51  10  about if you had known that there was a lineup in which a

11  filler had been identified, would you then have, like, done

12  something different with the case, correct?

13  A.  I'd have told Mr. Wadas for sure.

14  Q.  You would have told him -- pardon me?

01:17:07  15  A.  Mr. Wadas, I would have told the defense --

16  Q.  You would have made sure you let him know if somebody had

17  said that --

18  A.  Yes.

19  Q.  -- Mr. Rivera identified a filler?

01:17:15  20  A.  Yes.

21  Q.  So I'm placing in front of you on the screen Defendants'

22  23-F and ask to turn to the second page.

23          So this is a Supp. Report that the parties agree was

24  in Mr. Wadas' file.  And so if it was in Mr. Wadas' file, you

01:17:39  25  would have had it, too, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 157 of 278 PageID #:43801
6-21-18 (Ex 13)
Victorson - cross by Sotos

3132

1    A.  I better of.

2    Q.  All right.  I'm going to try to move through this quickly

3    so I don't take up too much time with it, but counsel will

4    correct me if -- what it essentially details is a situation two

01:17:52    5    weeks before Mr. Rivera was charged when he was placed into

6    custody along with another individual named Rodriguez, and

7    police attempted to do a lineup and were unable to find a

8    witness.  Do you see --

9    A.  Yes.

01:18:07    10    Q.  Do you see that from your quick review of it?

11    A.  I do.

12        THE COURT REPORTER:  I'm sorry.  I can't hear you.

13    BY THE WITNESS:

14    A.  Yes, I do.  They couldn't find the eyewitness, Lopez.

01:18:15    15    BY MR. SOTOS:

16    Q.  And then after they couldn't find the eyewitness, they

17    decided to try a photo array with the victim who was still --

18    who was still alive in the Cook County Hospital?

19    A.  Right.

01:18:26    20    Q.  And do you see at the bottom of that page where it says,

21    the R/Ds -- and R/Ds stands for reporting detectives, right?

22    A.  Yes.

23    Q.  It says, R/Ds returned to Cook County Hospital with six

24    photos, and then there's an inv. number next to that?

01:18:42    25    A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 158 of 278 PageID #:43802
6-21-18 (Ex 13)
Victorson - cross by Sotos

3133

1  Q.  Do you know what that inv. number stands for?

2  A.  Inventoried those photos under that number.

3  Q.  Okay.  And what does that mean when it says that the photos

4  were inventoried?

01:18:53  5  A.  They put them in an envelope and marked them as the -- the

6  photos that were used for the photo lineup, and they kept them.

7  Q.  All right.  And then if you turn to the next page -- you

8  don't have to turn.  We have to wait for it to get turned here.

9      So do you see where it lists those six individuals?

01:19:20  10  And it says above that that the following is the numerical

11  order and names of the subjects in the photos?

12  A.  I do.

13  Q.  All right.  And with the addresses there, too?

14  A.  Uh-huh, yes.

01:19:31  15  Q.  All right.  So if -- if Mr. Wadas thought it was important

16  enough to follow up on the information in that report, in light

17  of his client having told him that he was in a lineup, he could

18  have interviewed the police officers who were listed on the

19  report, correct?

01:19:48  20  A.  Yes.

21  Q.  And by the way -- well, he also could have interviewed the

22  eyewitness, Mr. Lopez, right?

23      MR. LOEVY:  Your Honor, the only objection we make is

24  that this is a Wasilewski issue, you know, the exact issues.

01:20:02  25      THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 159 of 278 PageID #:43803
6-21-18 (Ex 13)
Victorson - cross by Sotos
3134

1            MR. LOEVY:  Okay.

2    BY MR. SOTOS:

3    Q.  He could have interviewed the eyewitness, too, if he wanted

4    to ask about a prior lineup, correct?

01:20:11    5    A.  He could have, yes.

6    Q.  Or had an investigator interview him, either way?

7    A.  Yes.

8    Q.  And by the way, he had said something about if he would

9    have tried to interview the witness, that you would have

01:20:21    10   blocked him in some way.  Is that --

11   A.  I don't --

12   Q.  Is there any truth to that?

13   A.  I don't -- explain that.  I don't know what you're talking

14   about.  Let me hear that.

01:20:27    15   Q.  So if a defense attorney told you that they wanted to

16   interview an eyewitness in a case that you were prosecuting, is

17   that something that you would try and keep from happening?

18   A.  No, no.

19   Q.  Would you facilitate it if they asked you to?

01:20:43    20   A.  No.

21   Q.  So what would be your position on that?

22   A.  Go out and talk to him.  If he wants to talk to you, he'll

23   talk to you.  If he doesn't -- if he doesn't want to talk to

24   you, he doesn't have to.

01:20:54    25   Q.  Basically his call?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 160 of 278 PageID #:43804
6-21-18 (Ex 13)
Victorson - cross by Sotos

3135

1    A.  Yes.

2    Q.  Okay.  And you see those six people who were listed on that

3    report.  Is there anything, as far as you know, that would have

4    prevented Mr. Wadas from interviewing any of those individuals

01:21:07    5    and asking them whether they were in a lineup?

6    A.  Nothing I would know of.

7        MR. SOTOS:  Can you put Plaintiff's 1 up?

8    BY MR. SOTOS:

9    Q.  So we're going to put in front of you in a second an

01:21:32    10    exhibit that's been entered into evidence as Plaintiff's

11    Exhibit 1.

12        It's a document that Mr. Loevy asked you about during

13    the -- his direct examination?

14    A.  Yes.

01:21:41    15    Q.  And he asked you about the statement on the bottom of that

16    page -- excuse me -- on the second page at the top where it

17    says, "Numerous attempts were made to interview the victim at

18    Cook County Hospital.  R/i's were able to have the victim view

19    the gang photo book where then an identification was made of

01:22:10    20    Jose Rios as the person that shot the victim."

21        Do you see that?

22    A.  I do.

23    Q.  Okay.  Now, you've looked at the trial transcript in the

24    case, correct?

01:22:17    25    A.  I have.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 161 of 278 PageID #:43805
6-21-18 (Ex 13)
Victorson - cross by Sotos

3136

1  Q.  And you've testified on direct that this case was a

2  single-witness identification case, correct?

3  A.  Yes.

4  Q.  So you didn't present any evidence in the criminal

01:22:27  5  prosecution that the victim had ever made an identification?

6  A.  Sure, I did.  I mean, didn't -- didn't the victim say -- or

7  didn't -- wasn't there testimony someone made an identification

8  of this guy?

9  Q.  Yeah.  Maybe we're talking past each other.

01:22:48  10       So the eyewitness made an identification of

11  Mr. Rivera, correct?

12  A.  Right.

13  Q.  And that was basically what the case was that was

14  presented?

01:22:55  15  A.  Absolutely.

16  Q.  That witness, and then I think the -- the victim's father,

17  Israel Valentin, testified very briefly, right?

18  A.  Life and death, right.

19  Q.  That's what you saw from reviewing the transcripts?

01:23:08  20  A.  Right.

21  Q.  All right.  So you didn't present any evidence that there

22  was any other identification of Mr. Rivera that was made by the

23  victim or anybody else?

24  A.  No.  Whatever --

01:23:16  25  Q.  So --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 162 of 278 PageID #:43806
6-21-18 (Ex 13)
Victorson - cross by Sotos
3137

1  A.  No.

2  Q.  So the information that's in this report, that didn't in

3  any way impact on Mr. Rivera's conviction?

4  A.  How do I know that?

01:23:27  5  Q.  Well, because you didn't present the evidence of it, right?

6          MR. LOEVY:  Objection, argumentative, Your Honor.

7          THE COURT:  Overruled.

8  BY THE WITNESS:

9  A.  Repeat the question.

01:23:38  10  BY MR. SOTOS:

11  Q.  Okay.  Let me just ask it more simply.

12          Other than the identification that Mr. -- that the

13  eyewitness, Mr. Lopez, made of Mr. Rivera and the brief

14  testimony of the victim's father who described his life and

01:23:56  15  death, you didn't present any other evidence in the case at

16  trial, correct?

17  A.  No.  Right.  Correct.

18  Q.  All right.  Thank you.

19          And when I met you this morning, I gave you a copy of

01:24:09  20  the transcript of the criminal trial, correct?

21  A.  Correct.

22  Q.  And so were you able to review that during the time you

23  were waiting this morning?

24  A.  I did.

01:24:16  25  Q.  Okay.  It was a very short transcript, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 163 of 278 PageID #:43807
6-21-18 (Ex 13)
Victorson - cross by Sotos
3138

1    A.  It was.

2    Q.  And the whole thing is about 80 pages or so?

3    A.  What -- yes.

4    Q.  You didn't count them?

01:24:26    5    A.  No, I didn't.

6    Q.  Okay.  And -- so I'm going to ask you about that trial in a

7    few minutes.

8         Before we get to that, I want to ask you a couple

9    other questions following up about Mr. Loevy's questions about

01:24:47   10    what Mr. Wadas did and your impression of him as an attorney.

11   Okay?

12   A.  Yes.

13   Q.  I'm not asking you for an opinion.  I just want to ask you

14   about some of the things that occurred in the case.

01:24:58   15   A.  Okay.

16   Q.  We've talked about whether he could have interviewed the

17   witness or the police officers or the people in those pictures.

18        Oh, by the way, when the report disclosed that there

19   were photos that had been inventoried of the people in that

01:25:15   20   photo array, that was also something that Mr. Wadas could have

21   gotten rather easily, correct?

22   A.  Yes.

23   Q.  He could have asked you to get them?

24   A.  Yes.

01:25:26   25   Q.  Or could he have just gotten them himself directly?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 164 of 278 PageID #:43808
6-21-18 (Ex 13)
Victorson - cross by Sotos

3139

1    A.  We'd have gotten them and given them to him.

2    Q.  You would have gotten them for him if he thought they were

3    important and wanted them?

4    A.  Yes, or he could have subpoenaed them, but we get them.  We

01:25:39    5    give them.

6    Q.  Okay.  And Mr. Loevy asked you about a motion to -- a

7    motion to hold somebody in contempt.

8         Short -- short of that, if -- if Mr. Wadas had a

9    belief that there was a lineup that occurred before the lineup

01:26:01    10    at which Mr. Rivera was identified and arrested and that -- as

11    Mr. Loevy said, that in that lineup a filler was picked out,

12    would that have been something that would have allowed him to

13    file a motion to suppress his -- his actual identification on

14    the grounds that it was unreliable?

01:26:21    15         MR. LOEVY:  Objection, Your Honor.

16         THE COURT:  What's the objection?

17         MR. LOEVY:  All right.  We'll withdraw it, Your Honor.

18         THE COURT:  Okay.

19         THE WITNESS:  Repeat it.

01:26:30    20    BY MR. SOTOS:

21    Q.  Is that something Mr. Wadas could have done if he thought

22    that there was --

23         THE COURT:  The witness asked you to repeat the

24    question.

01:26:37    25         MR. SOTOS:  Oh, that's going to be tough.  I'd have to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 165 of 278 PageID #:43809
6-21-18 (Ex 13)
Victorson - cross by Sotos
3140

1    remember it.

2      (Laughter.)

3            THE COURT:  I think the court reporter can find it for

4    us.

01:26:40   5            Can you find it for us?

6            THE COURT REPORTER:  Yes, Judge.

7            MR. SOTOS:  Thank you for your help.

8      (The record was read.)

9            MR. LOEVY:  Your Honor, I remember my objection.

01:27:20   10   Vague and confusing.

11            MR. SOTOS:  Completely.  I hated hearing it back.

12      (Laughter.)

13            MR. SOTOS:  Let me ask another question.

14   BY MR. SOTOS:

01:27:28   15   Q.  A motion to suppress an identification is something that a

16   criminal defense lawyer can file during a case, correct?

17   A.  Correct.

18   Q.  So if he believes that an identification that has been made

19   was unreliable, then he can file the motion to suppress and ask

01:27:42   20   the court to suppress the identification?

21   A.  That's right.

22   Q.  One reason to do that would be to say that in a prior

23   lineup, the eyewitness identified somebody other than my

24   client, correct?

01:27:55   25   A.  Yes, sir.

1    Q.  All right.  And there's nothing that would have prevented

2    Mr. Wadas from filing such a motion if he felt that was worth

3    pursuing, correct?

4    A.  Nothing I know of.

01:28:05    5    Q.  Again, focusing on the fact that this was a

6    single-eyewitness case, do you know whether or not Mr. Wadas

7    interviewed the Felony Review assistant who was present at the

8    police station on the night the charges were approved?

9    A.  I have no idea.

01:28:20    10    Q.  And when that process occurs, the Felony Review process we

11    talked about before, is it -- was it your experience that the

12    Felony Review --

13          MR. LOEVY:  Your Honor, I do object.  He doesn't

14    remember, and we already heard from Felony Review.

01:28:36    15          THE COURT:  Again, I need to hear the question.

16    BY MR. SOTOS:

17    Q.  Was it your experience that when a Felony Review Assistant

18    State's Attorney would interview a witness, they would create

19    what are called Felony Review notes of that interaction?

01:28:48    20    A.  Yes.

21          THE COURT:  Overruled.

22    BY MR. SOTOS:

23    Q.  And to the extent that those notes provide a summary of

24    that conversation, that's something that you commonly disclose

01:29:00    25    to criminal defendants' attorneys during criminal prosecutions,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 167 of 278 PageID #:43811
6-21-18 (Ex 13)
Victorson - cross by Sotos

3142

1    correct?

2    A.  Yes.

3    Q.  So those -- we don't have those notes today 30 days

4    later -- 30 years later, but if at the time that your case was

01:29:15    5    ongoing, if Mr. Wadas wanted to review those notes, is that

6    something he could have asked you for?

7    A.  He'd have had -- he'd have had his own copy of them.  We'd

8    have given him a copy of those notes.

9    Q.  Without any hesitation?

01:29:32    10    A.  Without any hesitation.

11    Q.  And if after reviewing those notes he wanted to talk to the

12    Felony Review assistant who was there that night, would your

13    answer for that be the same as for the witnesses?  That's up to

14    him?

01:29:43    15    A.  Let him go out there and talk.

16    Q.  You wouldn't try and interfere with something like that?

17    A.  No, no.

18    Q.  When you reviewed the transcript this morning, did you see

19    that Orlando Lopez was describing a situation in which he saw a

01:29:58    20    shooter, and then he ran to a store, talked to a store owner,

21    and then ran back and still saw the shooter shooting?

22    A.  Yes.

23    Q.  And it looked like a little corner store, right?

24    A.  I didn't see it.

01:30:12    25    Q.  Okay.  You don't whether or not Mr. Wadas went and talked

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 168 of 278 PageID #:43812
6-21-18 (Ex 13)
Victorson - cross by Sotos
3143

1   to the store owner and asked him whether any of those things

2   occurred, right?

3   A.  I do not know.

4   Q.  But nothing would have prevented him from doing that,

5   correct?

6   A.  Nothing.

7   Q.  And let me ask you about that.

8         You did have a chance to review Orlando -- excuse

9   me -- Orlando Lopez's testimony this morning?

10  A.  I did.

11  Q.  All right.  Is it too much to ask you to kind of just

12  briefly review it for the jury or --

13  A.  You want me to read it to the jury?

14  Q.  Well, you don't have to read it.  Let me know if I'm

15  summarizing it correctly.

16        Did he essentially say that he came out of his

17  apartment and then saw someone shooting at the victim; and then

18  he ran down to a store, talked to a store owner, asked him to

19  call the police; and the store owner blew him off, and then he

20  came back out, went into, like, an area where there's an

21  indentation and then saw the final shot or shots?

22  A.  That's correct.

23  Q.  Okay.  And Mr. Loevy asked you questions during direct

24  examination as to -- about whether or not there was information

25  to -- to impeach that story, whether that would have been

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 169 of 278 PageID #:43813
6-21-18 (Ex 13)
Victorson - cross by Sotos
3144

1    something that would have been useful for Mr. Wadas to have,

2    correct?

3    A.  Absolutely.

4    Q.  Okay.  I'm going to direct your attention to page --

01:31:42    5    MR. SOTOS:  And, you know, before I do that, Judge, we

6    would move for the admission of Defendants' Exhibit No. 5,

7    which is the entire transcript of the criminal trial.

8    THE COURT:  Any objection?

9    MR. LOEVY:  Just subject to any motions *in limine*,

01:31:53    10    Your Honor.  No objections.

11    THE COURT:  Subject to any --

12    MR. LOEVY:  Any motions *in limine*.  No objections,

13    though.

14    THE COURT:  Five is received.

01:32:00    15    (Defendants' Exhibit No. 5 received in evidence.)

16    BY MR. SOTOS:

17    Q.  So I'm going to direct you to page -- it says JR1038.

18    You know what, maybe I should just give you a copy so

19    you can do it that way, and then we can put it up on the screen

01:32:22    20    as well.

21    So I'm handing you Defendants' Exhibit 5 and ask you

22    to turn to page 1038.

23    MR. LOEVY:  I guess our pages are numbered

24    differently.  Which exhibit are you using, Jim?

01:32:30    25    MR. SOTOS:  What?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 170 of 278 PageID #:43814
6-21-18 (Ex 13)
Victorson - cross by Sotos

3145

| | | |
|---|---|---|
| | 1 | MR. LOEVY: Which exhibit number so we can -- |
| | 2 | THE WITNESS: I don't see any page numbers like that. |
| | 3 | MR. LOEVY: Mine don't have page numbers either. |
| | 4 | MR. SOTOS: I think we have two different -- |
| 01:32:37 | 5 | THE WITNESS: Up on top, Robert, right? |
| | 6 | BY MR. SOTOS: |
| | 7 | Q. Yes, it's up on top. |
| | 8 | A. The little numbers. |
| | 9 | MR. LOEVY: Yeah, the same as him. |
| 01:32:44 | 10 | BY THE WITNESS: |
| | 11 | A. 1038? |
| | 12 | BY MR. SOTOS: |
| | 13 | Q. 1038. So do you see there that Mr. Wadas states that |
| | 14 | before he calls his next witness, "I believe we will proceed by |
| 01:32:56 | 15 | stipulation and that if Detective Jack Lerner" -- do you know |
| | 16 | that that's -- name "Lerner" is not typed correctly there? |
| | 17 | A. Probably Jack Leonard. |
| | 18 | Q. You knew Jack Leonard? |
| | 19 | A. Absolutely. |
| 01:33:09 | 20 | Q. Okay. So let's say if detective Jack Leonard were called |
| | 21 | to testify, he would testified that he was one of the |
| | 22 | investigating officers, that he had occasion to interview |
| | 23 | Orlando Lopez, and that he prepared a report that he had with |
| | 24 | Lopez and that his report reads as follows: |
| 01:33:28 | 25 | "After talking to Lopez, Lopez stated to him, not |

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 171 of 278 PageID #:43815
6-21-18 (Ex 13)
Victorson - cross by Sotos

3146

01:33:47

1   verbatim but in essence, that Lopez was coming from the store

2   at the corner of Kimball and Cortland.  Lopez observed the

3   copper colored car coming out of the alley.  The vehicle turned

4   eastbound.  Lopez stated that the vehicle contained two male

5   whites.  The male white began to run.  Lopez noticed a gun."

6   And it goes on to the next page to say that he

7   heard -- believes he heard three shots, but they were not very

8   loud and that Lopez indicated that Lopez saw the victim lean

9   forward into the right in the vehicle which victim had been

01:34:05

10  seated.  He said he could not -- he could identify the shooter

11  because he recognized him as someone who played baseball at

12  Humboldt Park and observed him there on a few occasions.

13  Do you see that?

14  A.  I do.

01:34:17

15  Q.  So I'm going to ask you to take a look at Defendants'

16  Exhibit --

17  MR. BRUEGGEN:  23-J.

18  BY MR. SOTOS:

19  Q.  -- Defendants' Exhibit 23-J.

01:34:31

20  MR. SOTOS:  Can we have a -- can you put it up or give

21  me a clean copy?

22  MR. BRUEGGEN:  I'll put it up.

23  MR. SOTOS:  Okay.  And -- okay.  Can we turn to the

24  next page, please?

01:34:52

25  BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 172 of 278 PageID #:43816
6-21-18 (Ex 13)
Victorson - cross by Sotos

3147

1    Q.  So I've placed in front of you Defendants' Exhibit -- what?

2         MR. BRUEGGEN:  23-J.

3    BY MR. SOTOS:

4    Q.  -- 23-J, which is already in evidence.

01:35:03    5         And I'll just represent to you that this is the

6    document that -- to save time, that Detective Leonard was --

7    that was being read into court during the criminal trial.

8         And that's a Chicago Police Department Supplementary

9    Report, correct?

01:35:22   10    A.  Correct.

11    Q.  And so based on what we've read and what this report says,

12    the story that Mr. Lopez was coming from the store at the

13    moment that he heard the shooting, according to this report

14    that was read into evidence at the criminal trial, that's quite

01:35:41   15    a bit different from what Mr. Lopez actually testified to at

16    the criminal trial, correct?

17    A.  How?  I'm not --

18    Q.  Well, I guess what I'm saying is in the criminal trial he

19    said that he first saw the shooting when he came out of the

01:36:00   20    building, right?

21    A.  Right.

22    Q.  And then he ran all the way down to the store, presumably

23    while the shooting's still going on, goes to the store, talks

24    to the store owner, and then comes back, and he's still seeing

01:36:12   25    the shooting, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 173 of 278 PageID #:43817
6-21-18 (Ex 13)
Victorson - cross by Sotos
3148

1    A.  Yes.

2    Q.  So that's -- that's a bit different from what's in the

3    report that I just showed you where it says Lopez was coming

4    from the store when he first saw things, correct?

01:36:25    5    A.  Yeah, I guess so.

6    Q.  And that was information that Mr. Wadas had available to

7    him in the criminal trial, correct?

8    A.  Yes.

9    Q.  And he was able to use it to impeach Mr. Lopez's testimony

01:36:38    10    by basically saying, "Well, this is what he said today at

11    trial, but the story that he told the police was different" --

12    A.  Correct.

13    Q.  -- correct?

14    A.  That's what we stipulated to, right?

01:36:50    15    Q.  That was -- it was actually stipulated by you --

16    A.  Right.

17    Q.  -- because you had the police report that said that?

18    A.  Yes.

19    Q.  So you were asked a number of questions about GPRs.

01:37:06    20        MR. SOTOS:  You can leave that up there.  Yeah, maybe

21    you can find it.

22    BY MR. SOTOS:

23    Q.  And you were asked questions about whether there were or

24    weren't GPRs in the handwritten documents, correct?

01:37:19    25    A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 174 of 278 PageID #:43818
6-21-18 (Ex 13)
Victorson - cross by Sotos

3149

01:37:34

01:37:48

01:38:03

01:38:17

01:38:34

1    Q.  Okay.  Whether they were in the file.

2         And while they're looking for it, if I told you that

3    there was a GPR that said that the witness was by the store as

4    opposed to coming from the store, in your estimation, does that

5    make any substantial additional difference that could have

6    impeached Mr. Lopez any more than he already was?

7    A.  For what it's worth.

8    Q.  For --

9    A.  For what it's worth.  I mean, he says he saw the shooting.

10   Whether he's coming from the store, going to the store,

11   whatever.  It could -- for what it's worth, it could impeach

12   him a little bit, right?

13   Q.  All right.  So you can -- in terms of impeaching him, is it

14   uncommon in a criminal prosecution where you have witnesses and

15   whether they're prosecution witnesses or defense witnesses,

16   telling stories that vary from stories that they've previously

17   told?

18   A.  Depending on what degree they vary.

19   Q.  But not that unusual, correct?

20   A.  No, little minor things, absolutely not.

21   Q.  And in this case, the judge was able to hear the difference

22   between Lopez's trial story, which is that he saw the shooter,

23   ran to the store, talked to the guy in the store, the store

24   owner blew him off, turned around, came back, ran out, and went

25   and hid in an indentation and then saw the last shots -- the

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 175 of 278 PageID #:43819
6-21-18 (Ex 13)
Victorson - cross by Sotos

3150

01:38:52

1   judge was able to hear that story, correct?

2   A.  If he could hear, yes.

3   Q.  And then they were able to hear that he had told Detective

4   Leonard that he was coming back from the store at the first

5   time that he saw any shooting, correct?

6   A.  If -- yeah, if that's what the stipulation said, yes.

7   Q.  And the difference in those two stories, though

8   significant, wasn't enough to convince the court to not convict

9   Mr. Rivera, correct?

01:39:09

10  A.  I wasn't the court, but apparently not.

11  Q.  All right.  But from your perspective as a prosecutor, you

12  put on the story, and he's told another story and he gets

13  impeached with the prior report, you let the evidence go where

14  it goes, and the judge makes the decision?

01:39:27

15  A.  That's right.

16  Q.  You're not going to dismiss the case because a witness who

17  gets on the stand and describes seeing a shooting has

18  previously said something that's different than what he said on

19  the stand?

01:39:38

20  A.  Well, if he said -- if he previously said "I didn't really

21  see the shooting," that would be big.

22  Q.  That -- that would be enough of a difference where you

23  would say, "Oh, wait a minute here.  If this guy is saying he

24  didn't see the shooting, then this is something I have to do

01:39:53

25  something about," correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 176 of 278 PageID #:43820
6-21-18 (Ex 13)
Victorson - cross by Sotos
3151

1  A.  Yes.  Yes.

2  Q.  Okay.  But in a case like this where you have a witness who

3  describes something one way at trial, but there's a police

4  report that says he described it differently before, that's a

01:40:05  5  matter you leave to the trier of fact, correct?

6  A.  Exactly, yes.

7  Q.  And when I say "the trier of fact," I use that phrase

8  because there can be two different trier of facts in a case,

9  right?

01:40:16  10  A.  Yes.

11  Q.  Sometimes it's the jury who is the trier of fact, correct?

12  A.  Correct.

13  Q.  And sometimes it's the judge?

14  A.  That's right.

01:40:23  15  Q.  And when a jury is present like in this case, the judge has

16  a different function in terms of the overall progress of the

17  trial, correct?

18  A.  Correct, yes.

19  Q.  But in a bench trial, the judge is the sole person who's

01:40:39  20  actually making the decision about what he believes, doesn't

21  believe, and what he's deciding should happen?

22  A.  Correct.

23  Q.  Okay.  And in this case, the reason that you were

24  proceeding before a judge was because Mr. Wadas had opted

01:40:53  25  for -- to proceed before a judge rather than a jury, correct?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 177 of 278 PageID #:43821
6-21-18 (Ex 13)
Victorson - cross by Sotos
3152

01:41:08

1  A.  Mr. Wadas, in conjunction with his client, yes, they

2  decide.

3  Q.  Okay.  And did you view that to be a somewhat unusual

4  decision in a case like this?

5  A.  No.

6  Q.  No?

7  A.  No.

8  Q.  Do you remember the sentencing process in this case?

9  A.  I -- just from what I read.

01:41:20

10  Q.  Because after a -- a defendant is convicted, then there's a

11  separate proceeding at which the judge has to set the sentence,

12  correct?

13  A.  Correct, yes.

14  Q.  So whether it's a bench or a jury trial, the judge is the

01:41:35

15  one who sets the sentence?

16  A.  In Illinois, yes.

17  Q.  It's not like that in other places?

18  A.  Not when I was in Texas.  You had a choice.  Jury could do

19  sentencing, a bifurcated trial.

01:41:46

20  Q.  I wasn't aware of that.

21        MR. SOTOS:  Give me one second.

22  BY THE WITNESS:

23  A.  Maybe no longer.

24        MR. SOTOS:  Give me one second.

01:41:53

25  BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 178 of 278 PageID #:43822
6-21-18 (Ex 13)
Victorson - cross by Sotos
3153

1   Q.  Sir, I'm going to place in front you -- I'm going to hand

2   you a document that's been marked as Defendants' Exhibit 23-M.

3   It's a 15-page -- 17-page document, ask you to take a look at

4   it and let me know when --

01:42:16   5   A.  All right.

6   Q.  Let me know when you're done reading.  And tell us what it

7   is.

8   A.  (Examining document.)

9        Well, the first thing is about a motion to revoke

01:43:09   10   bail, and there's another transcript here.

11   Q.  Well, do you see -- do you see the portion of the exhibit

12   that's related to the sentencing?  You want me to direct you --

13   A.  I'm here.  I'm here.  I haven't read it, but it starts on

14   page 2, right?

01:43:23   15   Q.  Well, maybe I can take you through it more quickly.

16   A.  All right.

17   Q.  Do you see that it's a sentencing transcript from the case

18   that -- in which Mr. Rivera was convicted?

19   A.  I see a Report of Proceedings.  I don't know if it's the

01:43:36   20   sentencing transcript, but it's the sentencing -- it was when

21   he was sentenced, I think.

22   Q.  I did give you the right transcript, didn't I?

23   A.  I hope.  Let's see.

24   Q.  I did?

01:43:46   25   A.  I think you did.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 179 of 278 PageID #:43823
6-21-18 (Ex 13)
Victorson - cross by Sotos
3154

1    Q.  Okay.  So that is the sentencing transcript?

2    A.  Yes.

3    Q.  Okay.

4    A.  But it -- it doesn't say it on there, sentencing

01:43:53    5    transcript, right?

6    Q.  I don't know if it actually says that.

7    A.  All right.  It doesn't.

8    Q.  It's a pretty short document, isn't it?

9    A.  It is.

01:44:00    10   Q.  Okay.  Did you see in looking through that -- and the

11   sentencing transcript is the time when the defendant's

12   lawyer -- lawyer can present evidence in relation to how long

13   of a sentence he's going to get for the crime that he's been

14   convicted of, correct?

01:44:15    15   A.  Yep.  Yes, sir.

16   Q.  All right.  And is that a proceeding that typically a

17   defendant will present witnesses on his behalf?

18   A.  Sometimes, yes; sometimes, no.

19   Q.  Do you see that in this case that Mr. Wadas didn't call any

01:44:31    20   family members of Mr. Rivera to testify at the sentencing?

21          MR. LOEVY:  Objection to relevance, Your Honor.

22          THE COURT:  Overruled.

23   BY THE WITNESS:

24   A.  Well, I'll take your word for it.  I mean --

01:44:43    25   BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 180 of 278 PageID #:43824
6-21-18 (Ex 13)
Victorson - cross by Leinenweber
3155

1  Q.  You don't -- you don't see in the transcript that there's

2  any witnesses that were called?

3  A.  I don't.

4  Q.  And that he made a brief argument of about a page?

01:44:56  5  A.  He made an argument.

6  Q.  And then the judge imposed sentence?

7  A.  Yes.

8  Q.  Okay.  Thank you.

9          MR. SOTOS:  One moment.

01:45:08  10    (Counsel conferring.)

11          MR. SOTOS:  Nothing further.  Thank you, Judge.

12          THE COURT:  Mr. Leinenweber?

13          MR. LEINENWEBER:  Very briefly, Judge.  Thank you.

14                    CROSS-EXAMINATION

01:45:18  15  BY MR. LEINENWEBER:

16  Q.  Good afternoon, Mr. Victorson.

17  A.  Good afternoon.

18  Q.  There were, like, some crime scene photos and some pictures

19  from the lineup taken in this case?

01:45:34  20  A.  I guess --

21  Q.  Would those -- would those documents have been given over

22  to Mr. Wadas?

23  A.  Absolutely.

24  Q.  And similarly, if there were Felony Review notes from a

01:45:44  25  Felony Review prosecutor, you would have turned those over to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 181 of 278 PageID #:43825
6-21-18 (Ex 13)
Victorson - cross by Leinenweber
3156

1   Mr. Wadas, too, correct?

2   A.  Absolutely.

3           MR. LOEVY:  Objection, asked and answered, Your Honor.

4           THE COURT:  Overruled.

01:45:52   5   BY MR. LEINENWEBER:

6   Q.  And finally, you had indicated, I think, that by reviewing

7   the transcript that you had called Officer Rey Guevara in

8   rebuttal in the case; is that correct?

9   A.  Correct.

01:46:04   10   Q.  And I think it's been established that Mr. Lopez, the

11   witness, had testified at the trial that he had seen the

12   defendant, Mr. Rivera, playing baseball in Humboldt Park,

13   correct?

14   A.  That's right.

01:46:22   15   Q.  And then in rebuttal, you had -- you had questioned Mr.

16   Guevara, and he said he spent a lot of time himself in Humboldt

17   Park for work, and Mr. Guevara said he also played softball

18   himself in Humboldt Park.  Do you recall that?

19   A.  I do.

01:46:38   20   Q.  And then on cross-examination, Mr. Wadas asked Mr. Guevara

21   and said, "Had you ever seen Mr. Rivera playing softball?"

22           Do you remember that question?

23   A.  I do.

24   Q.  And Officer Guevara said, no, he'd never, ever seen Jacques

01:46:59   25   Rivera playing baseball.  Do you remember that testimony?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 182 of 278 PageID #:43826
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3157

1  A.  He said he had seen him in the park but didn't remember

2  seeing him play baseball, yes.

3       MR. LEINENWEBER:  Thank you very much, sir.  I have no

4  further questions.

01:47:12  5       Thank you, Judge.

6       THE COURT:  Plaintiffs.

7                    REDIRECT EXAMINATION

8  BY MR. LOEVY:

9  Q.  Sir, Mr. Sotos asked you, it was your decision to proceed,

01:47:16  10  right?

11  A.  Yes.

12  Q.  All right.  But you also said you tried not to proceed,

13  right?

14  A.  I did not.

01:47:22  15  Q.  You did not --

16  A.  I did not say that.

17  Q.  All right.  What steps were you -- available to you to not

18  proceed?

19  A.  If I thought there was -- if I thought the guy wasn't

01:47:30  20  guilty or we couldn't prove the case, I would have dismissed it

21  or I would -- I would have dismissed it.

22  Q.  Or you would have tried to get a plea, right?

23  A.  Yeah.

24  Q.  All right.  And that's what you tried to do, right?

01:47:40  25  A.  I don't know.  I don't have the file.  I don't know.  I

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 183 of 278 PageID #:43827
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3158

1    don't remember.

2    Q.  All right.  Did you say this morning that you're quite

3    confident you would have tried to plead this case out?

4    A.  Absolutely.

01:47:49    5    Q.  All right.  You were shown a police report by Mr. Sotos

6    about representing that we tried to have the lineup, but we

7    couldn't find the kid.

8            Do you remember those questions he asked you?

9    A.  I do.

01:48:01    10    Q.  Okay.  That's what the police reports represented to you,

11    right?

12    A.  Right.

13    Q.  Did you rely on those police reports as truthful?

14    A.  Yes.

01:48:08    15    Q.  Was it reasonable of you to take the Chicago police reports

16    as true?

17    A.  Yes.

18    Q.  Was it reasonable of Mr. Wadas to rely on the Chicago

19    police police reports?

01:48:19    20            MR. SOTOS:  Objection, Your Honor, asked and answered.

21            THE COURT:  Overruled.

22    BY THE WITNESS:

23    A.  Yes.

24    BY MR. LOEVY:

01:48:23    25    Q.  All right.  People didn't in your -- in your time in that

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 184 of 278 PageID #:43828
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3159

1    building, people didn't come into the courtroom assuming that

2    police officers were fabricating and writing untrue things,

3    right?

4    A.  Correct.

01:48:31    5    Q.  Did attorneys all the time rely on what was written in

6    police reports?

7    A.  I'm sure they did.

8    Q.  All right.  Did you interview all the people in the lineup

9    to see if this was true or false?

01:48:40   10    A.  No.

11   Q.  Why not?

12   A.  I don't know.

13   Q.  All right.  Did you rely on -- let me ask you this.

14        Was it unreasonable of you not to interview all the

01:48:51   15   lineup people?

16   A.  No.

17   Q.  All right.  Was it unreasonable of Mr. Wadas not to

18   interview all the lineup people?

19        MR. SOTOS:  Objection, Your Honor.

01:48:56   20        THE COURT:  Overruled.

21   BY THE WITNESS:

22   A.  I don't think so.  If you're talking about the mis -- the

23   lineup where the misidentification was?  Which lineup are you

24   talking about?

01:49:05   25   BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 185 of 278 PageID #:43829
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3160

1   Q.  Well, was it -- did you interview anybody on any lineup?

2   A.  No, I did not.

3   Q.  And the one where the -- supposedly they couldn't find the

4   victim, you didn't interview the people on that lineup either?

01:49:12   5   A.  Not a one of them.

6   Q.  And it was -- it was reasonable for you not to do that?

7   A.  Yes, it was.

8   Q.  And it was reasonable for Mr. Wadas not to do that?

9   A.  Yes, it was.

01:49:19   10   Q.  All right.  This "by the store business," my team has me on

11   a very short leash on this, but I just want to establish a

12   couple quick points.

13          At trial he was coming from the store, right?  That

14   was --

01:49:32   15   A.  I --

16   Q.  -- at least for part of it?

17          In the report, it says "coming from the store."

18   That's what Mr. Sotos read you?

19   A.  Yes.

01:49:39   20   Q.  Now, if you had a contemporaneous note that put him 191

21   feet away at the store, I think you acknowledged to Mr. Sotos,

22   that's some impeachment, right?

23   A.  Yeah, some impeachment.

24   Q.  All right.  Now, in a case where the entire case -- there's

01:49:54   25   no evidence at all except a little boy pointing his finger,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 186 of 278 PageID #:43830
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3161

1  then that impeachment becomes very important, right?

2  A.  It becomes important.

3  Q.  I mean --

4  A.  I don't know very important.

01:50:06  5  Q.  What's that?

6  A.  It becomes important.

7  Q.  All right.  And the reason it's actually very important is

8  because there's literally nothing to convict Jacques Rivera but

9  this kid claiming he wasn't by the store when he saw the

01:50:20  10  shooting, right?

11  A.  What's "by the store" mean?  How many feet?

12  Q.  Well, coming from the -- all right.  I'm past my time.  I'm

13  done.  We're not going to argue about the store anymore.

14  (Laughter.)

01:50:32  15  BY MR. LOEVY:

16  Q.  All right.  At the sentencing, you were -- you were asked

17  about what Mr. Wadas did, right?

18  A.  Yes.

19  Q.  And then showing you page 2 of the same transcript --

01:50:43  20  MR. LOEVY:  If I could have the Elmo, please.

21  BY MR. LOEVY:

22  Q.  -- you -- you didn't do anything at the sentencing

23  saying -- but say, "I'm not going to go over the facts.  You've

24  heard it.  I would just remind the court that this was a

01:50:56  25  shooting, and I believe the nature of the offense, we should

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 187 of 278 PageID #:43831
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3162

1   give him an extended term"?  That's all you said, right?

2   A.  Well, I also said he was shot 10 or 11 times at point --

3   nearly point-blank range while the victim sat in the car.

4   Q.  Right.  I didn't mean to -- I was paraphrasing.

5   But this -- everything you said is between lines 1 and

6   9, right?

7   A.  It is.

8   Q.  All right.  So Mr. Wadas and you obviously had some kind of

9   either implicit or express understanding that you were both

10  going to stand down, right?

11  A.  You're kidding, right?

12  Q.  Sir, you sometimes at sentencing go a lot harder than

13  saying, "Oh, you know, this is a bad shooting.  You know, give

14  him -- give him some years"?  You sometimes go harder than

15  that, right?

16  A.  This is a bench trial.  The judge heard it.

17  Q.  All right.

18  A.  He knows what happened.

19  Q.  All right.  You sometimes go harder than that, right?

20  Never?  Okay.

21  A.  Not --

22  Q.  In any event, if Mr. Wadas would have started calling

23  witnesses, you might have started calling witnesses, right?

24  A.  It would depend on what his witnesses said.

25  Q.  All right.  You don't fault Mr. Wadas for the decisions he

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 188 of 278 PageID #:43832
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3163

1    made in this case, do you?

2            MR. SOTOS:  Objection, Judge.

3            THE COURT:  Overruled.

4    BY THE WITNESS:

01:51:56   5    A.  Listen, I wasn't there when he made whatever decisions he

6    made.  So, no, I don't.

7    BY MR. LOEVY:

8    Q.  All right.  Let's talk about his diligence.

9            Mr. Sotos showed you a list of a whole bunch of people

01:52:10  10    on the list that -- the state discovery, right?

11    A.  Yes.

12    Q.  All right.  Did you interview all those people?

13    A.  Probably not.

14    Q.  All right.  That's a long list, right?

01:52:18  15    A.  Yes, but that's not why -- yes, it's a long list.

16    Q.  All right.  And you had the burden of proof, not Mr. Wadas,

17    right?

18    A.  That's -- yes, yeah.

19    Q.  But you tried to focus on what mattered, right?

01:52:29  20    A.  Right.

21    Q.  All right.  So the stuff that the police report said wasn't

22    as relevant, you didn't focus on that, right?

23    A.  The police report didn't say anything's not relevant.

24    Q.  Well, when you're determining which of the names to look at

01:52:40  25    on Plaintiff's Exhibit 40, where did you decide what was

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 189 of 278 PageID #:43833
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3164

1  relevant?  You either talked to Guevara or you looked at the

2  reports, right?

3  A.  That's right.

4  Q.  The boy didn't know, right?

01:52:49  5  A.  The reports -- I decided who to call because of the

6  reports.

7  Q.  All right.  So you -- you and Mr. Wadas both relied on the

8  police reports to focus on what mattered, right?

9  A.  I did.

01:52:59  10  Q.  All right.

11  A.  I don't know what he did.

12  Q.  Was it unreasonable for him if he did the same thing you

13  did?

14  A.  No.

01:53:02  15      MR. SOTOS:  Objection, Judge, not disclosed for that

16  purpose.

17      THE COURT:  I didn't even hear the answer.

18      MR. SOTOS:  Well --

19      THE COURT:  I just heard an objection.

01:53:09  20      MR. SOTOS:  -- that's why I objected.

21      MR. LOEVY:  Your Honor, the objection was Mr. Sotos

22  did the exact converse.  He kept --

23      THE COURT:  Wait, wait, wait.  Overruled.

24  BY MR. LOEVY:

01:53:15  25  Q.  Okay.  Now, Mr. Sotos asked you, "Hey, all Mr. Wadas had to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 190 of 278 PageID #:43834
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3165

1    do was interview the eyewitness," right?  Remember those

2    questions he was asking you?

3            MR. SOTOS:  Objection, Your Honor.  I don't think I

4    said it that way.

5            THE COURT:  Overruled.

6    BY MR. LOEVY:

7    Q.  Do you remember that line of questioning?

8    A.  No.

9    Q.  All right.  You don't -- Mr. Wadas was in the prosecutor's

10   office for a long time, right?

11   A.  Yes, sir.

12   Q.  All right.  He said that -- and tell me if you agree or

13   disagree -- that, you know what, the prosecutors would try to

14   guard their witnesses, and if at all possible, they preferred

15   that the defense attorneys didn't talk to them.

16           MR. SOTOS:  You know --

17   BY MR. LOEVY:

18   Q.  Was there such a practice?

19           MR. SOTOS:  Objection.  He just made up the testimony.

20   That's not what Mr. Wadas said.

21           MR. LOEVY:  We were all in court, Your Honor.

22           MR. SOTOS:  He said he would have blocked it.

23           THE COURT:  No, no, no.  I don't want any more

24   speaking objections from anybody.

25           And the objection is overruled.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 191 of 278 PageID #:43835
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3166

1          THE WITNESS:  Repeat the question.

2    BY MR. LOEVY:

3    Q.  All right.  Were the prosecutors at the time -- if they had

4    a witness who was an important witness, would they sort of do

5    what they could do to keep the defense attorneys away from that

6    witness?

7    A.  Absolutely not.  We would --

8    Q.  Do you know why -- excuse me.

9    A.  We would tell the witness "You can talk to him if you want

10   to.  You don't have to."

11   Q.  All right.  Maybe I'm focusing on that part.

12         So you made it very clear to the witnesses that they

13   had no obligation to speak to the defense attorney?

14   A.  I have no idea if that came up in this case.

15   Q.  I'm not asking you about this case, because you don't

16   remember this case.

17         I'm saying, isn't it true there was a practice in the

18   State's Attorney's Office at the time, if not today, to

19   strongly encourage prosecution witnesses that, "Hey, you

20   don't -- if Mr. Wadas comes and knocks on your door, you have

21   no obligation to talk to him.  If you slam that door in his

22   face, you're perfectly allowed to do that"?  You tell them

23   that, right?

24   A.  Absolutely not.  I say, "You don't have to talk to him if

25   you don't want to.  Don't slam your door."

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 192 of 278 PageID #:43836
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3167

1    (Laughter.)

2  BY MR. LOEVY:

3  Q.  All right.  The corner store guy, you didn't go interview

4  the guy at the corner store, did you?

01:55:01   5  A.  No.

6  Q.  Was that incompetent of you?

7  A.  I hope not.

8  Q.  All right.  Was it incompetent of Mr. Wadas?

9  A.  I don't know.

01:55:08  10  Q.  You don't think so, do you?

11         MR. SOTOS:  Objection, Judge, asked and answered.

12         THE COURT:  Sustained.

13  BY MR. LOEVY:

14  Q.  All right.  How about filing a motion to suppress, the

01:55:14  15  other question he asked you about, or a motion -- some kind of

16  motion, he could have filed a motion about Orlando Lopez, was

17  the questions he asked you?

18  A.  He could have filed any motion he wanted to.

19  Q.  All right.  What question was Mr. Sotos suggesting --

01:55:25  20  asking you about, do you remember?

21  A.  No.

22  Q.  All right.  Whatever motion it was, was Mr. Wadas

23  incompetent for not filing it?

24         MR. SOTOS:  Objection, Judge, to the opinion.  It's

01:55:33  25  not a --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 193 of 278 PageID #:43837
6-21-18 (Ex 13)
Victorson - recross by Sotos
3168

1          THE COURT:  Sustained.

2    BY MR. LOEVY:

3    Q.  All right.  You -- you thought Mr. Wadas fought valiantly

4    and vigorously and passionately for his client, right?

01:55:47   5    A.  I thought he tried to represent his client.  I don't know

6    if it was valiant, vicious, whatever you said.

7          What's the other word?

8    Q.  I'll ask another one.

9          This isn't Mr. Wadas' fault, is it, sir?

01:55:55   10         MR. SOTOS:  Objection, Judge.

11         THE COURT:  Sustained.

12         MR. LOEVY:  The -- all right.  I have no further

13   questions.

14         THE COURT:  Anything further?

01:56:01   15         MR. SOTOS:  Judge, I have -- actually, I have one

16   other area that I neglected to go into.  It's only going to

17   take three, four minutes, at the most.

18         THE COURT:  Go ahead.

19         MR. SOTOS:  Okay.

01:56:09   20         MR. LOEVY:  And we would object if it's outside the

21   scope, Your Honor.

22         THE COURT:  I haven't heard it, but I'm inclined to

23   overrule it if it's going to be brief.

24                        RECROSS-EXAMINATION

01:56:18   25   BY MR. SOTOS:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 194 of 278 PageID #:43838
6-21-18 (Ex 13)
Victorson - redirect by Loevy
3169

1   Q. When you reviewed the transcript this morning, did you see

2   that an Officer Craig Letrich had also testified for

3   Mr. Rivera?

4   A. Yes.

01:56:26   5   Q. Okay. In relation to a police report that he had prepared

6   that indicated that a man named Rodriguez and a man named

7   Nieves had both been identified by the victim as -- as the

8   shooter or the shooter and the driver?

9   A. If that's what it says, yes.

01:56:45   10   Q. Okay. And so did -- reading the transcript didn't refresh

11   your recollection about that, correct?

12   A. Oh, no, no.

13   Q. But you saw that Letrich testified generally to something

14   involving a Mr. Rodriguez?

01:56:57   15   A. Right.

16   Q. All right. And that wasn't something that caused you to

17   say, "Well, we're not going to go forward with this case"?

18   A. It was not.

19   Q. Okay. And it wasn't something to change the outcome of the

01:57:07   20   trial either, correct?

21   A. I don't -- no.

22         MR. SOTOS: That's all I have, Judge. Thank you.

23         THE COURT: Okay. Anything further?

24               REDIRECT EXAMINATION

01:57:12   25   BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 195 of 278 PageID #:43839
6-21-18 (Ex 13)
Victorson - redirect by Loevy

3170

1  Q.  You didn't investigate that, right?

2  A.  Investigate what?

3  Q.  What Letrich had seen on the street?

4  A.  Did I investigate it?

01:57:21   5  Q.  You didn't do any investigation, right?

6  A.  You mean, did I go out on the street and stuff?

7  Q.  Yeah.

8  A.  No, I didn't.

9  Q.  You relied on the police department to do that, correct?

01:57:28  10  A.  Correct.

11         MR. LOEVY:  I have no further questions, Your Honor.

12         THE COURT:  Anything further?

13         MR. SOTOS:  No, Judge.

14         THE COURT:  Thank you, sir.  You may step down.

01:57:35  15         THE WITNESS:  Thanks.

16         Am I excused?

17         THE COURT:  You are excused.

18    (Witness excused.)

19         MS. ROSEN:  Judge, could we do a quick sidebar?

01:57:56  20         THE COURT:  Okay.

21    (Proceedings heard at sidebar on the record:)

22         MS. ROSEN:  Judge, we just for the record want to move

23   under Rule 50 orally for judgment as a matter of law.  We have

24   written pleadings to file later, but --

01:58:27  25         THE COURT:  Okay.

1    MS. ROSEN:  -- since we're not clear about exactly
2  what the timing is, we just wanted to make sure we're doing
3  it --
4            MR. SOTOS:  All defendants want to preserve the
01:58:34    5  record.
6            THE COURT:  Okay.  That's fine.  And I'm reserving
7  ruling and --
8            MR. LOEVY:  Plaintiff makes the same motion.
9            THE COURT:  Okay.  Also reserving ruling.
01:58:42   10            Why don't we just make an agreement that since there's
11  some ambiguity about this, if you make it at the end of the
12  day, you have a continuing -- I mean, I'd like to have to avoid
13  taking these sidebars after every witness.
14            MR. SOTOS:  Yeah, and we don't want to take up the
01:59:00   15  time arguing it.
16            THE COURT:  Right.
17            MR. SOTOS:  So --
18            THE COURT:  But as I think about it, I don't know what
19  the 27th floor will think, so I don't know.
01:59:03   20            MR. SOTOS:  Me neither, Judge.
21            THE COURT:  Well, why don't --
22            MR. LEINENWEBER:  Judge, I just have a continuing
23  objection -- continuing motion.
24            THE COURT:  Why don't you just say, like, "Same
01:59:11   25  motion," and we don't have to have a sidebar.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 197 of 278 PageID #:43841
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3172

1    MS. ROSEN:  Okay.  Thanks, Judge.

2    (End of sidebar proceedings.)

3    (Witness enters courtroom.)

4    THE COURT:  Sir, you must be the witness?  Yes.

01:59:36    5    THE WITNESS:  Yes.

6    THE COURT:  Could you come up here, please?

7    Please raise your right hand.

8    (Witness duly sworn.)

9    THE COURT:  You may be seated.

10    RAMON LOPEZ, DEFENSE WITNESS, SWORN

11    DIRECT EXAMINATION

12    BY MS. GOLDEN:

13    Q.  All right.  Could you please state your name and introduce

14    yourself to the ladies and gentlemen of the jury.

02:00:07    15    A.  Hi.  My name is Ramon Lopez.

16    Q.  And, Mr. Lopez, where do you live?

17    A.  I live in Elgin.

18    Q.  Okay.  And are you employed?

19    A.  Yes.

02:00:16    20    Q.  You're missing work to be here today?

21    A.  Yes.

22    Q.  Thank you, sir.  You're not alone.

23    I'm going to cut to the chase -- I'm hoping we get an

24    award for the quickest witness today -- and show you on your --

02:00:27    25    on the screen in front of you, we're going to pop up something

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 198 of 278 PageID #:43842
6-21-18 (Ex 13)
R. Lopez - direct by Golden

3173

1    that we're calling Defendants' Exhibit 1.13.

2            And going back to August of 1988 --

3            THE COURT:  Wait a minute.  I don't have anything on

4    my screen.

02:00:48    5            MS. GOLDEN:  I'm going to ask him a few questions

6    until it gets up.

7            THE COURT:  Oh, sorry.

8            MS. GOLDEN:  Defense table 1.

9    BY MS. GOLDEN:

02:00:57    10   Q.  I'm going to take you back to about 30 years, then, to

11   1988.

12           You lived in the Humboldt Park area?

13   A.  Yes.

14   Q.  And what was your address, sir?

02:01:05    15   A.  1424 North Washtenaw.

16   Q.  And you lived there with whom?

17   A.  My father, my mom, and my brothers and sisters.

18   Q.  Okay.  And in this case we've heard -- the jury has heard a

19   lot of testimony about a person by the name of Felix Valentin.

02:01:20    20           Did you know Felix?

21   A.  Yes.

22   Q.  And how did you know him?

23   A.  I went to school with his brothers -- older brothers, and

24   his older brother was my best friend.

02:01:27    25   Q.  Okay.  His brothers' name were?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 199 of 278 PageID #:43843
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3174

1   A.  Israel Valentin, Jr.

2   Q.  And his other brother --

3   A.  And Harry -- Harry Valentin.

4   Q.  And the name that you knew Felix's brother by was?

02:01:37   5   A.  Mo.

6   Q.  Okay.  The two of you were best friends?

7   A.  Yes.

8   Q.  You and Mo?

9   A.  Yes.

02:01:43   10   Q.  And do you remember the day that Felix was shot?

11   A.  Not really.  I'm sorry.

12   Q.  Okay.  Do you remember getting a call from one of the

13   brothers about it?

14   A.  Yes.

02:01:52   15   Q.  Okay.  And did I ask you what your birthday was?

16   A.  No.

17   Q.  Okay.  What's your birthday?

18   A.  9/22/68.

19   Q.  So that's September 22nd?

02:02:05   20   A.  Yes, ma'am.

21   Q.  Okay.  All right.  So now if you can look at the screen,

22   and I'm going to point you, sir, to -- do you see your name on

23   that page -- this is a police report, Supplement -- Chicago

24   Police Department Supp. Report, dated September 1st that the

02:02:21   25   jury has seen before, and ask you, sir, if you see your name on

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 200 of 278 PageID #:43844
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3175

1    the document?

2    A.  Yes, ma'am.

3    Q.  And that's the way you spell your name, Ramon Lopez?

4    A.  Yes.

02:02:29    5    Q.  And you were -- in September of 1988, give or take, you

6    were 19 years old, but it says 20 here, right?

7    A.  I can't understand.  I'm sorry, ma'am.

8    Q.  So how old were you in September of 1988?

9    A.  Oh, I was 20.

02:02:45    10    Q.  Okay.  And your birthday here is September 22nd, 1968?

11    A.  Yes, ma'am.

12    Q.  And this was the address that you were living at in August

13    and September of 1988?

14    A.  Yes.

02:02:55    15    Q.  Okay.

16          MS. GOLDEN:  And can you do a side by side with this?

17    BY MS. GOLDEN:

18    Q.  I'm going to show you what we've marked as Defendants'

19    Exhibit No. 96.  And do you recognize that?

02:03:18    20    A.  Yes.

21    Q.  And what is that?

22    A.  That's a picture of me.

23    Q.  And how old do you look in the picture?

24    A.  Wow.  Probably like 18, 19.  I don't know.

02:03:29    25    Q.  Do you remember when the picture was taken?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 201 of 278 PageID #:43845
6-21-18 (Ex 13)
R. Lopez - direct by Golden

3176

1  A.  Not really, sorry.

2  Q.  Do you remember where it was taken?

3  A.  That was 14th District.

4  Q.  Okay.  And how do you know that?

02:03:37  5  A.  I think.  That was the only place I've been arrested years

6  back.

7  Q.  Okay.  How many times have you been arrested back in the

8  day?

9  A.  Maybe like four or five.

02:03:48  10  Q.  Okay.  All right.

11        MS. GOLDEN:  Can we see Defendants' Exhibit 96 -- I'm

12  sorry -- Defendants' Exhibit 95.

13  BY MS. GOLDEN:

14  Q.  And do you recognize -- showing you what we've marked as

02:04:06  15  Defendants' Exhibit 95 and ask you, Mr. Lopez, if you recognize

16  the person that's shown in this picture?

17  A.  Yes.

18  Q.  And who is that?

19  A.  That's George.

02:04:15  20  Q.  And how -- did you know George back in September and August

21  of 1988?

22  A.  Yes, ma'am.

23  Q.  And how did you know George?

24  A.  We went to school together from grammar to high school, and

02:04:26  25  we grew up in the neighborhood.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 202 of 278 PageID #:43846
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3177

1  Q.  Did you play sports together?

2  A.  Yes, we did.

3  Q.  Okay.  Were you also both gang members?

4  A.  Yes.

02:04:33  5  Q.  Were either of you a member of the Latin Kings?

6  A.  No.  No, ma'am.

7  Q.  And do you remember being present when this picture of

8  George was taken?

9  A.  No.

02:04:46  10  Q.  Let me ask you, sir, are -- so at the time back -- taking

11  you back to the time when Felix was shot, do you remember ever

12  standing in a physical lineup?

13      You know what a physical lineup is, right?

14  A.  Yes.

02:05:02  15  Q.  And that's where you -- well, what is it?

16  A.  A lineup is when they put, like, four or five people in a

17  room, and somebody's behind the window -- I'm sorry -- saying

18  whoever did it.  You know, they point them out like that.

19  Q.  You step forward --

02:05:16  20  A.  Right.

21  Q.  -- sometimes they turn to the side?

22  A.  Right.  They tell you No. 1, No. 2, No. 3, No. 4, come

23  forward.

24  Q.  Have you ever been in a physical lineup with your friend,

02:05:26  25  George Ruiz?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 203 of 278 PageID #:43847
6-21-18 (Ex 13)
R. Lopez - direct by Golden
3178

1   A.  No, never, ma'am.

2   Q.  And George has a nickname?

3   A.  Froggie, yes.

4   Q.  And back in September of 1988, how long had you known

02:05:37   5   Froggie?

6   A.  Oh, since we were, like, maybe eight, nine, ten.  We were

7   kids.

8   Q.  Do you think that you would remember being in a lineup with

9   him?

02:05:52   10  A.  Yes, yes, I would.

11  Q.  Have you ever been in a lineup?

12  A.  Yes.

13  Q.  And how many times?

14  A.  One time in my life.

02:06:00   15  Q.  And what happened after that lineup?

16  A.  They accused me for the -- for the case they were charging

17  me for.

18  Q.  You were arrested after the one lineup you --

19  A.  Yes, I was only 15 years old when that happened.

02:06:12   20  Q.  And so you were arrested after the only one lineup you've

21  ever been in?

22  A.  Yes, that's the only time, yes.

23          MS. GOLDEN:  I don't have any other questions.

24          THE COURT:  Okay.  Anybody else on the defense side

02:06:34   25  have questions?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 204 of 278 PageID #:43848
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3179

1    MR. LEINENWEBER:  No.  Thank you, Judge.

2    THE COURT:  Plaintiff.

3                    CROSS-EXAMINATION

4  BY MR. LOEVY:

02:06:40    5  Q.  Okay.  All right, sir.  You do not know Jacques Rivera,

6  right?

7  A.  Excuse me?

8  Q.  You don't know -- the name Jacques Rivera doesn't mean

9  anything --

02:06:49   10  A.  No, no.

11  Q.  You don't know anything really about what this lawsuit is

12  like?

13  A.  No.

14  Q.  You got a subpoena from the defense, and here you are to

02:06:56   15  testify?

16  A.  I believe so.  I'm here.

17  Q.  All right.  You are not sure how many times in the mid-'80s

18  you were at the police station; is that fair to say?

19  A.  Under -- when I was 20, at least twice -- three times.

02:07:07   20  Three times.

21  Q.  Well, didn't you say four or five?

22  A.  But from 15 years old.  So that's about four or five.

23  Q.  All right.  So -- but in the -- then focusing on the late

24  '80s, it would have been three arrests?

02:07:17   25  A.  Around there, yes.  It's a long -- I mean --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 205 of 278 PageID #:43849
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3180

1  Q.  You mentioned the murder thing.  You had some drugs, some

2  drug stuff, but, yeah, it's been so long you can't remember --

3       MS. ROSEN:  Objection, Judge.  He didn't say anything

4  about a murder.

02:07:28  5       MR. SOTOS:  Objection.

6       MR. LOEVY:  Attempted murder.

7       THE COURT:  Not -- not in this proceeding.

8  BY MR. LOEVY:

9  Q.  No, I thought you said -- I thought you told her that was

02:07:33  10  the lineup.

11       THE COURT:  No, I think you --

12       MR. SOTOS:  Objection.

13       THE COURT:  Sustained.

14  BY MR. LOEVY:

02:07:36  15  Q.  All right.  You were here for a murder --

16       MR. SOTOS:  He's talking about offenses.

17       THE COURT:  Now, wait a minute.  I don't need piling

18  on.

19       MR. SOTOS:  All right.  All right.

02:07:40  20  BY MR. LOEVY:

21  Q.  All right.  What were you in the lineup for?

22       If you didn't answer that question, don't answer that

23  question.

24       Did you tell Mr. Rosen -- Ms. Golden what you were in

02:07:43  25  the lineup for?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 206 of 278 PageID #:43850
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3181

1        MS. GOLDEN:  Well, this is way longer than 10 years.

2        THE COURT:  Wait, wait.  The witness said he wasn't in

3   the lineup.

4        MR. LOEVY:  No, I think he said he was in a lineup.

02:07:51    5        THE COURT:  Oh, on another occasion?

6        MR. LOEVY:  Yes, yes.  And if I missed -- if I

7   missed --

8        THE COURT:  No, no, no, if that's what you're going

9   into, but the question is --

02:07:58    10       MR. LOEVY:  All right.  I'm going to move on, Your

11  Honor.

12       THE COURT:  No, I don't -- all right.  Fine.  I think

13  we're just a little confused.

14  BY MR. LOEVY:

02:08:03    15  Q.  All right.  Fair to say that you're not exactly sure how

16  many times you would have been at the police station in the

17  late '80s, right?

18  A.  Yes.

19  Q.  All right.  Now, I'm going to show you Plaintiff's Exhibit

02:08:13    20  14.

21       MR. LOEVY:  If I could have the Elmo, please.

22  BY MR. LOEVY:

23  Q.  This is the Felix Valentin shooting, this document here.

24  You didn't create this.  Have you seen it?

02:08:26    25  A.  No.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 207 of 278 PageID #:43851
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3182

02:08:35

02:08:43

02:08:52

02:08:56

02:09:05

1  Q.  All right.  You're not Angel Villafane, right?

2  A.  No.

3  Q.  You're not Carlos Olivero?

4  A.  No.

5  Q.  You're not Jacques Rivera?

6  A.  No.

7  Q.  Are you George Ruiz?

8  A.  No.

9  Q.  But you are Ramon Lopez?

10  A.  Yes.

11  Q.  All right.  Do you dispute that you were at the police

12  station on the 31st of August, 1988?

13  A.  Say that again.  I'm sorry?

14  Q.  Do you dispute that you were at the police station that

15  day?

16  A.  That I wasn't in the police station?

17  Q.  You tell us.

18  A.  I wasn't.  Not that day.

19  Q.  You're saying -- in fact, you're here because your claim is

20  you were not taken to a police station, right?

21  A.  Not that day on the lineup with those persons.  I was not

22  there that day.

23  Q.  And you would remember, you say, because Felix was your

24  friend --

25  A.  No, no.  I'm telling the truth because George had told me

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 208 of 278 PageID #:43852
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3183

1   when he got arrested --

2   Q.  Who was saying what?  Okay.  We don't a hearsay.

3   A.  Okay.  I'm sorry.

4           MS. GOLDEN:  Objection.

02:09:14   5           THE COURT:  No, wait.

6   BY MR. LOEVY:

7   Q.  We don't want a hearsay.

8           THE COURT:  Wait a minute.

9           MS. GOLDEN:  Well --

02:09:17   10          THE COURT:  Let's let the witness answer the question,

11  and then you can go back and clarify.

12  BY MR. LOEVY:

13  Q.  All right.  Here's the question.

14          MS. GOLDEN:  Could you ask -- Your Honor, could you --

02:09:20   15          THE COURT:  What?

16          MS. GOLDEN:  -- could you ask Mr. Sloevy -- Mr.

17  Sloevy -- (phonetic) -- Mr. Loevy to slow down just a bit?

18          THE COURT:  That would be helpful.

19  BY MR. LOEVY:

02:09:29   20  Q.  All right, sir.  After Felix was died -- died --

21  A.  Okay.

22  Q.  -- within that week, did you ever get taken to the police

23  station?

24  A.  No.  No, sir.

02:09:39   25  Q.  In two weeks of Felix's death, were you ever in the police

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 209 of 278 PageID #:43853
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3184

1  station?

2  A.  No.

3  Q.  All right.  I'm going to show you some pictures that were

4  allegedly taken on the 31st of August.

02:09:50  5        Do you know this person?

6        MS. GOLDEN:  Object to foundation.

7        THE COURT:  Yeah, is there any --

8        MR. LOEVY:  This is Plaintiffs' Exhibit 62, Your

9  Honor.  This is --

02:09:55  10       THE COURT:  But what is the basis for believing the

11  date that you --

12       MR. LOEVY:  Because Ms. McLaughlin and probably

13  Mr. Gawrys say these are the pictures of the lineup that they

14  tried to take and then couldn't find the victim, and then he

02:10:08  15  was at the hospital.

16       MR. GIVEN:  Objection to --

17       MS. GOLDEN:  There's been other testimony from other

18  witnesses that there were other sources of photo array

19  photographs.

02:10:16  20       MR. LOEVY:  No, this exhibit --

21       THE COURT:  Well, you know, I don't know.

22       This is obviously going to be a big fight unless

23  somebody's got transcripts --

24       MS. GOLDEN:  If he just asked him about the picture, I

02:10:21  25  have no problem with it.  But if he inserts into his question

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 210 of 278 PageID #:43854
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3185

1  the date that --

2       THE COURT:  Yeah, I'm trying to say that.  That's what

3  I was trying to say.

4       MS. GOLDEN:  Correct.

5       THE COURT:  Excuse me.

6  BY MR. LOEVY:

7  Q.  All right.  The police report -- well, all right.  I'm just

8  going to ask the questions.

9       Is this you here with this wall?

10 A.  No, that's not me.

11 Q.  Is that you?

12 A.  Nope.

13 Q.  Is that you?

14 A.  No.

15 Q.  Is that you?

16 A.  No.

17 Q.  Is that you?

18 A.  Yes.

19 Q.  All right.  And you're saying you were not present with

20 these six people being photographed against this same wall on

21 that day?

22 A.  Right.

23 Q.  Is it possible that you just don't remember?

24 A.  No, because I would have remembered.  Trust me, I would

25 have remembered.  If I was in a lineup with those persons, I

02:10:27

02:10:33

02:10:39

02:10:46

02:11:00

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 211 of 278 PageID #:43855
6-21-18 (Ex 13)
R. Lopez - cross by Loevy

3186

1    would have remembered.

2    Q.  Well, it sounds like if you were even in the police station

3    at all you would have remembered, you're saying, right?

4    A.  No, not that day.  I'm telling you I wasn't there that day.

02:11:10    5    Q.  Okay.  And I think you told Ms. Golden you think it was the

6    14th District where that picture was taken of you?

7    A.  It should be.  That's the only police station I've been in.

8    Q.  All right.  Do you recognize the wall as this being the

9    14th District wall, or are you just --

02:11:21    10    A.  I cannot remember.  I cannot tell you that.  I don't --

11    Q.  All right.  But you believe that was taken in the 14th

12    District, not where this investigation happened?

13    A.  I guess.  I believe.

14    Q.  All right.  You said that -- that you actually knew another

02:11:44    15    boy in the lineup.  That's this guy?  Was it this guy or this

16    guy?

17    A.  That one, George.

18    Q.  All right.  Did you -- you knew Little Orlando Lopez,

19    right?

02:11:53    20    A.  Excuse me?

21    Q.  Did you know Orlando Lopez?

22    A.  No.

23    Q.  Wasn't he the brother of Felix?

24    A.  Oh, the little kid?  Yes.

02:11:59    25    Q.  So he knew you?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 212 of 278 PageID #:43856
6-21-18 (Ex 13)
R. Lopez - cross by Loevy
3187

```
 1  A.  Yes.
 2          MS. ROSEN:  Objection.  He's not the brother of Felix.
 3          THE COURT:  I think you misspoke.
 4  BY MR. LOEVY:
 5  Q.  All right.  Orlando Lopez -- oh, all right.  I did
 6  misspeak, and I got confused, and I'm on a wrong track.
 7          THE COURT:  Well, we all -- I think we're all in that
 8  position.
 9  BY MR. LOEVY:
10  Q.  All right.  But you knew the victim, right?
11  A.  Which victim?
12  Q.  And this person knew --
13          THE COURT:  Mr. Loevy, you've got to slow down and
14  just make clear to the witness what you're asking him, please.
15  BY MR. LOEVY:
16  Q.  All right.  This person, did he know the victim?
17  A.  Yes.
18          MS. GOLDEN:  Your Honor --
19  BY MR. LOEVY:
20  Q.  And this person, that's you.  You also knew the victim?
21  A.  Yes.
22  Q.  And you -- you're saying you were not in any lineup that
23  day?
24  A.  That's right.
25          MR. SOTOS:  Objection, Judge, asked and answered
```

02:12:06
02:12:11
02:12:24
02:12:30
02:12:39

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 213 of 278 PageID #:43857
6-21-18 (Ex 13)
Crawford - direct by Carney
3188

1    several times.

2              THE COURT:  Sustained.

3              MR. LOEVY:  All right.  I have no further questions.

4              THE COURT:  All right.  Anything further?

02:12:46   5    MS. GOLDEN:  No, Your Honor.  Thank you, Mr. Lopez.

6              THE COURT:  Thank you very much.

7              THE WITNESS:  Thank you.

8         (Witness excused.)

9              MR. LOEVY:  Thank you, sir.

02:13:14  10   MS. CARNEY:  Your Honor, at this time the defense

11   calls Cathryn Crawford.

12        (Witness enters courtroom.)

13             THE COURT:  Is this the witness?

14             MS. CARNEY:  I believe so.

02:14:58  15   THE COURT:  Could you step down here, please?

16             Please raise your right hand.

17        (Witness duly sworn.)

18             THE COURT:  You may be seated.

19             CATHRYN CRAWFORD, DEFENSE WITNESS, SWORN

02:15:10  20                   DIRECT EXAMINATION

21   BY MS. CARNEY:

22   Q.  Good afternoon, Ms. Crawford.

23             Could you please introduce yourself to the jury and

24   spell your first name for the court reporter.

02:15:20  25   A.  Sure.  My name is Cathryn, C-a-t-h-r-y-n, Crawford.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 214 of 278 PageID #:43858
6-21-18 (Ex 13)
Crawford - direct by Carney
3189

1    Q.  And are -- where do you currently live?

2    A.  I live in Chicago.

3    Q.  So you moved back from Texas, was it?

4    A.  Yes, ma'am.

02:15:33    5    Q.  Okay.  And where are you currently employed?

6    A.  I work for the Lawndale Christian Legal Center.

7    Q.  And how long have you been an attorney?

8    A.  Since -- for 20 -- close to 22 years.

9    Q.  So you got your license around 1996?

02:15:48    10    A.  Yes, ma'am.

11    Q.  And at some point after you became an attorney, did you

12    begin to work for the Northwestern School of Law?

13    A.  Yes, ma'am.

14    Q.  Okay.  And when was that?

02:15:55    15    A.  In 1998.

16    Q.  Can you explain briefly for the jury what some of your job

17    duties were while you were working at Northwestern?

18    A.  So as -- at Northwestern, I was essentially a clinical

19    professor.  I had various titles, depending on what stage of my

02:16:13    20    career I was at, but I basically supervised clinical students

21    in helping represent people in juvenile and criminal court.

22    Q.  At some point were you also -- did you also hold the

23    position of a senior lecturer, or was that all within the

24    global --

02:16:31    25    A.  So I started as a senior lecturer, and I was doing research

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 215 of 278 PageID #:43859
6-21-18 (Ex 13)
Crawford - direct by Carney

3190

1    on an abuse and neglect -- on the abuse and neglect court.  And

2    then I moved into -- I think I was an assistant clinical

3    professor and then an associate clinical professor.

4    Q.  In any of those roles, did you teach any classes?

02:16:53    5    A.  I taught the clinical class, and then I had some -- a

6    seminar every once in a while I'd also teach.

7    Q.  Can you explain to the jury a little bit about what a

8    clinical class is.

9    A.  So a clinical class, usually I had eight students who would

02:17:11    10    assist me in representing juveniles in juvenile court,

11    juveniles in adult court, adults in adult court.

12         We would accept representation, and the students acted

13    as sort of associates in a law firm.  So they would assist me

14    in client counseling, witness interviewing, legal research.

02:17:34    15         The third-year law students had what I liked to call

16    their learner's permit, and so they could go into court with me

17    and perform functions that lawyers would perform under my

18    supervision.

19    Q.  And approximately when did you leave your job at the

02:17:51    20    Northwestern School of Law?

21    A.  So I left permanently in 2011.

22    Q.  Did you leave for a period of time before that?

23    A.  I did.  I had a leave from 2008 to 2010 when I worked at

24    the John D. and Catherine T. MacArthur Foundation.

02:18:13    25    Q.  And that is a separate entity from the Northwestern School

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 216 of 278 PageID #:43860
6-21-18 (Ex 13)
Crawford - direct by Carney
3191

1  of Law, correct?

2  A.  Yes, ma'am.

3  Q.  Okay.  I'm going to jump ahead a little bit.

4      During your tenure as an associate professor and

02:18:25  5  senior lecturer, did you have an occasion to speak with Mr.

6  Jacques Rivera?

7  A.  Yes, ma'am.

8  Q.  Okay.  And how would you describe your relationship with

9  Mr. Rivera while you were working at Northwestern?

02:18:35  10  A.  I am not quite sure I understand that question.

11  Q.  Okay.  Well, let me ask you this.

12      When did you first speak to Mr. Rivera during your

13  tenure at Northwestern?

14  A.  I'm -- I believe it was in 2001 or 2.

02:18:49  15  Q.  And how frequently would you speak with Mr. Rivera while

16  you were working at Northwestern?

17  A.  Well, Mr. Rivera, when I spoke with him, was in prison.  So

18  I know that I went to see him on one occasion.  I don't recall

19  more than one.  And I may have spoken to him on the telephone.

02:19:12  20  Q.  Did you correspond with him at all with letters?

21  A.  Yes, ma'am.

22  Q.  At the time you were working at Northwestern School of Law,

23  would you consider yourself as representing Mr. Rivera?

24  A.  No, ma'am.

02:19:27  25  Q.  Okay.  Then let me try then my first question again.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 217 of 278 PageID #:43861
6-21-18 (Ex 13)
Crawford - direct by Carney

3192

1        So how would you have described your working

2   relationship with Mr. Rivera while you were at Northwestern

3   School of Law?

4   A.  So I was -- I would describe it as I was conducting an

5   investigation into his case.

6   Q.  And when you're conducting an investigation into a case

7   such as Mr. Rivera's, what does that entail, just the basics?

8   A.  As Mr. Rivera's or what I did in Mr. Rivera's case?

9   Q.  If you're comfortable talking about Mr. Rivera's case --

10  A.  I mean, from -- actually, you're right, because it was a

11  really long time ago.

12        So essentially in conducting an investigation of the

13  type that I was conducting in Mr. Rivera's case, it generally

14  involved trying to obtain the records relating to the case,

15  looking at the court opinions that were issued on appeal,

16  trying to get copies of transcripts, any police reports, the

17  file of the defense lawyer, any press or clippings that

18  related -- just anything that existed in the universe that

19  related to his criminal case.

20  Q.  So you had mentioned that you would have tried to get the

21  file of his criminal defense attorney?

22  A.  Yes.

23  Q.  Typically you would have attempted to get the file of the

24  criminal defense attorney.

25        Did you attempt to get the file from Mr. Rivera's

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 218 of 278 PageID #:43862
6-21-18 (Ex 13)
Crawford - direct by Carney

3193

 1   criminal defense attorney?

 2   A.  Yes, ma'am.

 3   Q.  Okay.  And do you know when you first reached out to

 4   Mr. Rivera's criminal defense attorney?

02:21:06   5   A.  I believe it was in February of 2002.

 6               MS. CARNEY:  If I could have one moment, Your Honor.

 7               THE COURT:  Yes.

 8      (Brief interruption.)

 9               MS. CARNEY:  May I approach, Your Honor?

02:21:32  10               THE COURT:  Sure.

11               MS. CARNEY:  DX 26.

12               MR. LOEVY:  Defendants' 26?

13               MS. CARNEY:  26.

14               MR. LOEVY:  Thank you.

02:21:43  15   BY MS. CARNEY:

16   Q.  Ms. Crawford, I've handed you what has been previously

17   marked as Defendants' Exhibit 26.

18               Do you recognize this document?

19   A.  Yes, ma'am.

02:21:51  20   Q.  Okay.  And is that your signature on the bottom?

21   A.  I am not sure if it's my signature or if my secretary

22   signed it.  I had recently gotten married, so I was trying out

23   all sorts of signatures, so -- and her initials are underneath

24   it, but it's one or the other.

02:22:08  25   Q.  I can tell you, I understand that pain.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 219 of 278 PageID #:43863
6-21-18 (Ex 13)
Crawford - direct by Carney
3194

02:22:20

1    The date on this letter is February 6th of 2002.  So
2 when you said it was early February of 2002, you would have
3 reached out to Mr. Wadas who was Mr. Rivera's criminal defense
4 attorney, correct?
5 A.  Yes, ma'am.
6 Q.  Okay.
7    MS. CARNEY:  Your Honor, I'd ask that we admit Defense
8 Exhibit 26.
9    THE COURT:  Any objection?

02:22:28

10    MR. BOWMAN:  No, no objection.
11    THE COURT:  It is received.
12    (Defendants' Exhibit No. 26 received in evidence.)
13    THE WITNESS:  Your Honor, may I have a tissue?
14    THE COURT:  Yes, yes, absolutely.  They're there for

02:22:38

15 you, actually, as is the water.
16    THE WITNESS:  Thank you.
17 BY MS. CARNEY:
18 Q.  So just really quickly in regards to this letter, the first
19 sentence is:  "Per our telephone conversation on Friday,

02:22:47

20 February 1st, 2002, enclosed please find a signed
21 authorization."
22    So would you have first -- was February 1st of 2002,
23 would that have been the first time you reached out to
24 Mr. Wadas?

02:22:56

25 A.  Based on this letter, yes, ma'am.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 220 of 278 PageID #:43864
6-21-18 (Ex 13)
Crawford - direct by Carney
3195

1    Q.  And then your letter says that you've included a signed

2    authorization form.  Can you explain what that is?

3    A.  So on the second page of this exhibit is an authorization

4    for release of information.  And this is essentially Mr. Rivera

02:23:16    5    giving me permission to obtain his file from his prior counsel.

6          We would -- any time you want to get records from a

7    lawyer or a hospital or any place that requires consent from

8    the person whose file it is, you would get one of these signed.

9    Q.  And did you ultimately receive Mr. Wadas' file?

02:23:44    10   A.  Yes, ma'am.

11   Q.  Okay.  And you have no independent recollection of how you

12   went about obtaining the file; is that correct?

13   A.  No, ma'am.

14   Q.  Okay.  So you could have gone -- sent somebody to his

02:23:56    15   office to pick up the original and copied it and returned it to

16   him?

17   A.  Yes, ma'am.

18   Q.  And you also could have gone to his office, picked up a

19   copy, and brought it back?

02:24:07    20   A.  I personally don't think that I would have gone to his

21   office to pick it up, but I think that somebody from my office

22   would -- would have -- that would -- the normal procedure would

23   be our clerk would have gone and picked it up.

24   Q.  Understood.  So you would have sent -- somebody would have

02:24:23    25   gone on your behalf to pick up either the original or some copy

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 221 of 278 PageID #:43865
6-21-18 (Ex 13)
Crawford - direct by Carney
3196

1    of the file?

2    A.  Yes.

3    Q.  Okay.  And you have no memory of how that actually

4    occurred, though, do you?

02:24:34   5    A.  No, ma'am.

6    Q.  Okay.

7         MS. CARNEY:  DX 27.  May I approach, Your Honor?

8         THE COURT:  You may.

9    BY MS. CARNEY:

02:24:55   10   Q.  Ms. Crawford, I'm handing you a copy of what has been

11   marked as DX 27.

12        MS. CARNEY:  And I believe this has been previously

13   admitted, Your Honor.

14        MR. BOWMAN:  I believe it has.  There's no objection

02:25:06   15   in any event.

16        THE COURT:  Okay.  So if it has not been, it will be

17   received.

18     (Defendants' Exhibit No. 27 received in evidence.)

19   BY MS. CARNEY:

02:25:14   20   Q.  Ms. Crawford, do you recognize this document?

21   A.  I recognize it because -- yes, I do.

22   Q.  Okay.  And why do you recognize it?

23   A.  This was shown to me in my deposition.

24   Q.  Okay.  And then we have talked about working on your

02:25:28   25   signature back around 2002, but does that look like what you

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 222 of 278 PageID #:43866
6-21-18 (Ex 13)
Crawford - direct by Carney
3197

1   were attempting to have your signature look like in 2002?

2   A.  Yes, ma'am.

3   Q.  Okay.  And can you explain to the jury a little bit about

4   what this document is?

02:25:40   5   A.  It's called a "Receipt for documents contained in Jacques

6   Rivera's file."

7   Q.  And do you recall -- have any recollection who created this

8   document?

9   A.  I do not.

02:25:52   10   Q.  Would somebody working on your behalf have created this

11   document?

12   A.  It's quite likely.

13   Q.  And would that have been in conjunction with the copying of

14   the file that Mr. Wadas had provided for you?

02:26:03   15   A.  Either if we -- I don't know if we actually copied the file

16   or if we received a copy of the file, so -- but it would have

17   been prepared -- presumably it's a catalog of the different

18   categories of the files' contents.

19   Q.  Okay.  If you were provided a copy of the file, what would

02:26:28   20   the purpose be to have created a receipt after the fact?

21   A.  I -- I could only guess at this point.  I don't actually

22   have an independent recollection of this.

23        There are a whole host of different reasons that you

24   might create an index for -- of a file, which I could -- I

02:26:49   25   could guess some of them, but I don't recall specifically why

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 223 of 278 PageID #:43867
6-21-18 (Ex 13)
Crawford - direct by Carney
3198

1    one was created in this case.

2    Q.  But it's also a possibility that you had Mr. Wadas'

3    original file, and as you -- you or someone on your behalf was

4    copying it, you were counting pages and indexing what was in

02:27:05    5    there so that you can ensure it was all returned to Mr. Wadas,

6    correct?  Is that a possibility?

7    A.  I think it --

8              MR. LOEVY:  Objection, Your Honor.

9              THE COURT:  Sustained.  I think anything is possible.

02:27:16    10              MS. CARNEY:  Understood, Your Honor.

11    BY MS. CARNEY:

12    Q.  Did you provide a copy of this receipt back to Mr. Wadas?

13    A.  I don't have an independent recollection of it, but I would

14    presume that I did.

02:27:27    15    Q.  Okay.  Did you maintain a -- when you were investigating

16    the facts of Mr. Rivera's case back in 2001, 2002 -- do you

17    think it went into 2003 that you were working on Mr. Rivera's

18    case?

19    A.  It might have.

02:27:43    20    Q.  Okay.  What about 2004?

21    A.  I don't think so, but I don't recall.  This was so long

22    ago.

23    Q.  Okay.  Would you have created your own file for

24    Mr. Rivera's case?

02:27:54    25    A.  Yes.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 224 of 278 PageID #:43868
6-21-18 (Ex 13)
Crawford - direct by Carney
3199

1   Q.  And what kind of things, generally speaking, would you have

2   put in such a file?

3   A.  Well, I mean, let me just say it depends on what you mean

4   by a file.  Like everything relating to Mr. Rivera's case would

02:28:07   5   be in a single file --

6   Q.  All right.

7   A.  -- that's correct.

8   Q.  So you would have created one master file.

9        Would it have included things like your correspondence

02:28:15   10   with Mr. Rivera?

11   A.  Yes, it would have correspondence, memos from students

12   on -- about legal issues.  Sometimes the students and I would

13   come up with action items.

14        So anything that either dealt with what we -- action

02:28:31   15   we were going to take on the case, things that we had done on

16   the case, or the results of our investigation.

17   Q.  Okay.  And do you still have a copy of that file?

18   A.  No, ma'am.

19   Q.  When was the last time that you saw your -- what you had

02:28:44   20   put together as your master file for Mr. Rivera's case?

21   A.  I don't remember.

22   Q.  When you -- and I believe you had testified that you kind

23   of moved around Northwestern School of Law in various

24   capacities.  Did that file move with you?

02:28:59   25   A.  Well, I wasn't physically moving.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 225 of 278 PageID #:43869
6-21-18 (Ex 13)
Crawford - direct by Carney
3200

1  Q.  Okay.

2  A.  I mean, when we moved into our new building, I moved, but

3  in general -- and I think we were already in the new building.

4  But I --  the file was always -- belonged to me while I was

02:29:12  5  there.

6  Q.  What happened to the file when you left Northwestern in

7  2011?

8  A.  So all of my files were -- with one exception of a case

9  that I was still working on, all of my files were boxed up and

02:29:26  10  indexed and placed into storage or, you know, somewhere on-site

11  or off-site.

12  Q.  Do you have an index of those files anywhere?

13  A.  I don't have an index of those files.

14  Q.  Did Northwestern ever provide you with an index of what was

02:29:46  15  boxed up and sent to storage?

16  A.  I'm -- I don't know if -- I don't know if -- I don't know

17  if I kept a copy or if they kept the copy there, because from

18  my recollection, my secretary or, you know, people were helping

19  me box things up and then writing on the outside, and -- but I

02:30:07  20  just don't remember.  I'm sorry.

21  Q.  So when do you think the last time that you saw your

22  physical file from Mr. Rivera's case was?

23  A.  I cannot tell you specifically with respect to Mr. Rivera's

24  case.  I can tell you that when I was leaving for Texas, I made

02:30:23  25  sure that everything was boxed up.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 226 of 278 PageID #:43870
6-21-18 (Ex 13)
Crawford - direct by Carney
3201

1   Q.  Okay.  When was the last time that you took any action

2   investigate -- looking into the facts of Mr. Rivera's case?

3   A.  It was in the early 2000s.

4   Q.  So, again, 2003, maybe 2004?

02:30:44   5   A.  Yeah, I don't -- I don't remember specifically.

6   Q.  Okay.

7         MS. CARNEY:  Can I have one moment, Your Honor?

8         THE COURT:  Sure.

9     (Counsel conferring.)

02:31:00   10  BY MS. CARNEY:

11  Q.  And, Ms. Crawford, just if I asked you this already, I

12  apologize.

13         When did you move to Texas?

14  A.  So I moved to Texas in 2012.

02:31:13   15  Q.  2012?

16  A.  Yes, ma'am.

17  Q.  And so when you left Northwestern in 2011, did you have

18  another job in between, or did you take some time off?

19  A.  So I was basically sticking around Chicago for this single

02:31:29   20  case that I was working on involving a juvenile in adult court.

21  And so I was working on that case and literally moved the day

22  after it came -- a hearing came to a conclusion.

23  Q.  And you didn't take any of your files with you to Texas,

24  right?

02:31:47   25  A.  Just that one that I just referred to.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 227 of 278 PageID #:43871
6-21-18 (Ex 13)
Crawford - cross by Bowman
3202

1    MS. CARNEY:  I have no further questions.

2    THE COURT:  Anything further from the defense side?

3    MR. LEINENWEBER:  No, Judge.  Thank you.

4    THE COURT:  Plaintiff.

02:31:57    5    CROSS-EXAMINATION

6    BY MR. BOWMAN:

7    Q.  Good afternoon, Ms. Crawford.

8    You were describing where you currently work.  It was

9    Christian Legal Services, did you say?

02:32:05    10    A.  Lawndale Christian Legal Center.

11    Q.  And what is Lawndale Christian Legal Center?

12    A.  Lawndale Christian Legal Center is a community-based

13    holistic law firm.  We represent people from the Lawndale

14    community, which is on the Chicago's West Side, and we provide

02:32:27    15    what we call holistic defense.

16    So anybody from the neighborhood 24 and under will --

17    who gets in conflict with the law, either in juvenile court or

18    adult criminal court, we -- they get a lawyer and then also a

19    case manager.  So the lawyer addresses their legal needs, and

02:32:44    20    the case manager addresses their social needs.

21    Q.  Thank you.

22    I want to ask you some questions about the obtaining

23    of Mr. Wadas' file.  Okay?

24    A.  Yes.

02:32:58    25    Q.  You're not saying here, are you, that Mr. Wadas gave you

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 228 of 278 PageID #:43872
6-21-18 (Ex 13)
Crawford - cross by Bowman

3203

 1  his original file, right?

 2  A.  No.  No, sir.

 3  Q.  What you're saying is because of the passage of time, you

 4  have no idea what version he gave you?  Was it his original

02:33:17   5  file or -- or a copy of the file, you wouldn't be in a position

 6  to say, correct?

 7  A.  That's correct.

 8  Q.  And, Ms. Crawford, would you defer to Mr. Wadas'

 9  recollection that his original file never left his possession?

02:33:32  10  A.  Absolutely.

11        MS. ROSEN:  Objection, Judge.

12        THE COURT:  It's really too late, because it's been

13  answered.

14  BY MR. BOWMAN:

02:33:42  15  Q.  Ms. Crawford, would you ever destroy a document?

16  A.  No.

17  Q.  Would you ever secret a document?

18  A.  No.

19        MR. SOTOS:  Objection.  Objection.  Nobody is making

02:33:55  20  any such accusations.

21        MR. LOEVY:  All right.  Then we're done.

22        MR. BOWMAN:  Then we're done.  I have no further

23  questions.

24        THE COURT:  All right.  Anything further?

02:34:02  25        MS. CARNEY:  Yeah, I have just a couple short

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 229 of 278 PageID #:43873
6-21-18 (Ex 13)
Crawford - redirect by Carney
3204

1    follow-ups.

2                    REDIRECT EXAMINATION

3    BY MS. CARNEY:

4    Q.  Ms. Crawford, just to follow up on -- in regards to your

5    file and what I believe -- sorry.

6            You would have put a copy of the Wadas file that you

7    received into your file, correct?

8    A.  Yes, ma'am.

9    Q.  Okay.  Are you aware that -- of any searches that have been

10   conducted to find the copy of your file?

11   A.  Yes, ma'am.

12   Q.  Okay.  And those searches have borne no fruit, correct?

13   A.  Yes, ma'am.

14           MS. CARNEY:  Okay.  Thank you.

15           THE COURT:  Anything further?

16           MR. BOWMAN:  No.  Thank you, Judge.

17           THE COURT:  Thank you, Ms. Crawford.  You may step

18   down.

19     (Witness excused.)

20           THE COURT:  And I think it's break time, ladies and

21   gentlemen.

22     (Jury out.)

23           THE COURT:  Ten minutes.

24           Dan, I forgot to tell the jury.  Could you just

25   mention to them that my call at 9:30 is going to take 10

1    minutes tomorrow, so we can start at 9:40.  I'll try to remind

2    them, too.

3              9:40 tomorrow, everybody.  My call is very short.

4              MS. ROSEN:  Judge, I just have one quick question.

5              THE COURT:  Yes.

6              MS. ROSEN:  On Judge -- the Wasilewski motion to

7    reconsider --

8              THE COURT:  Yes.

9              MS. ROSEN:  -- are -- do we -- are we going to expect

10   a ruling?  He's on the list for tomorrow, so --

11             THE COURT:  Oh, okay.  We'll try to have one to you --

12   I don't think -- I don't know that I can promise it tonight,

13   but it's in progress.

14             MR. LOEVY:  And, Your Honor, we would supplement our

15   argument with, a lot of topics he was going to say Mr. Sotos

16   elicited, if we're talking about Wasilewski.

17             THE COURT:  I don't think that's a reason for

18   anything.  I'm ruling on the motion.

19             MS. ROSEN:  Okay.

20             THE COURT:  He's not the first witness?

21             MS. ROSEN:  We can arrange -- we can move it.

22             THE COURT:  Yeah, I think -- I think the best I can do

23   is promise that you'll have it before we start tomorrow

24   morning.

25             MS. ROSEN:  Okay.  Great.  Thanks, Judge.

1           MR. LOEVY:  Thank you.

2           MR. ART:  Thank you, Judge.

3           MR. LOEVY:  Would you call him if that happens or --

4           MS. ROSEN:  Yes.

5           MR. LOEVY:  So we should get ready for him not

6  knowing?  You'll call him if he's in, right?

7           MS. ROSEN:  We're calling him either way.

8   (Recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (Witness enters.  Jury out.)
 2              THE COURT:  Okay.  Are we ready?  Are we ready?
 3              MR. LOEVY:  Yes, Your Honor.
 4              MS. ROSEN:  I believe we are.
 5              MR. LOEVY:  Although, we need Mr. Bowman.
 6              MS. ROSEN:  Oh.  I guess we don't have Mr. Bowman.
 7        Sorry.
 8              THE COURT:  Okay.
 9        (Messrs. Bowman and Art reenter.)
10              THE COURT:  Okay.  We're ready?
11              MR. BOWMAN:  We are, Judge.
12        (Pause.)
13              THE COURT:  Who's next?
14              MS. ROSEN:  Mr. Hickey.  Do you want him to take the
15        stand or --
16              THE COURT:  Sure, if he's here.
17              MS. ROSEN:  Yeah.  If you want to come up?  Save the
18        extra 30 seconds.
19              THE COURT:  Yeah.  I'll swear you in as soon as the
20        jury is in the box.
21              We're ready.
22        (Jury in.)
23              THE COURT:  Please be seated, everyone.
24              And I asked Dan to tell you, but I'll repeat it, since
25        I am remembering, that I have just one brief matter in court
```

02:46:06

02:46:38

02:48:03

02:48:12

02:48:48

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 233 of 278 PageID #:43877
6-21-18 (Ex 13)
Hickey - direct by Rosen
3208

1  tomorrow at 9:30, so we'll be able to start by 9:40 at the

2  latest.

3          Okay, sir.  Would you please raise your right hand.

4    (Witness duly sworn.)

02:49:02   5          THE COURT:  You may be seated.

6          MS. ROSEN:  Do we need to clean up up there a little

7  bit --

8          THE WITNESS:  Yes.

9          MS. ROSEN:  -- for you?  Sorry.

02:49:15  10          THE WITNESS:  Thank you.

11        JAMES K. HICKEY, DEFENDANT CITY'S WITNESS, SWORN

12                      DIRECT EXAMINATION

13  BY MS. ROSEN:

14  Q.  Good afternoon, Mr. Hickey.

02:49:22  15          Could you please introduce yourself to the ladies and

16  gentlemen of the jury.

17  A.  My name is James K. Hickey.

18  Q.  And what is your current occupation?

19  A.  Retired.

02:49:33  20  Q.  What was your former occupation?

21  A.  I was a member of the Chicago Police Department.

22  Q.  Okay.  And, sir, you've been designated, have you not, as a

23  spokesperson for the City of Chicago on certain issues related

24  to this case; is that correct?

02:49:49  25  A.  That is correct.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 234 of 278 PageID #:43878
6-21-18 (Ex 13)
Hickey - direct by Rosen
3209

1  Q.  And so you're able to provide testimony on behalf of the

2  City of Chicago, is that correct?

3  A.  Yes, ma'am.

4  Q.  Okay.  Why don't we talk about -- just a little bit about

02:49:57   5  your background.

6          When did you start with the Chicago Police Department?

7  A.  June 1971.

8  Q.  And just briefly, tell us a little bit about your career

9  through the 1990s.

02:50:12  10  A.  For the first 29 years, I was a sworn member of the Chicago

11  Police Department.  I was a police officer.  I worked in a

12  district.  Subsequently worked in the Youth Division.  Then I

13  made detective.  Then I went to Area 1 Homicide and Sex

14  Investigations Unit.

02:50:34  15          I worked in detective administration for the chief of

16  detectives and then I worked in the crime laboratory of the

17  police department.

18          And I made sergeant and lieutenant along the way, and

19  I worked in -- returned to patrol in the Englewood district.

02:51:02  20  And from there, I went to work for the chief of patrol.

21          And subsequent to that, I started a new unit for the

22  airports.  We consolidated the airport units into one unified

23  command.

24          After that, Superintendent Martin selected me for the

02:51:26  25  brand-new Random Drug Testing Unit.  After that, I went to

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 235 of 278 PageID #:43879
6-21-18 (Ex 13)
Hickey - direct by Rosen

3210

1    Research & Development where I ended my sworn career.

2         And I -- upon finishing my sworn career, I started

3    working for the police department again as a civilian.  I was

4    assigned to -- over 16 years as a civilian.  I was assigned to

02:51:56    5    three separate divisions, once twice, Research & Development,

6    the Records Division, the Information Services Division, and

7    back to Research & Development, all as the assistant director.

8    Q.  Thank you.

9         Now I want to focus your attention to your job

02:52:20   10    responsibilities in the early 1980s.  At that point in time,

11    say, in 1980-1981, where were you assigned?

12    A.  1980, I was finishing up Area 1 Homicide and then I was

13    assigned to detective headquarters.

14    Q.  Okay.  And is that when you were -- you described earlier

02:52:44   15    being in the administrative branch of the Detective Division?

16    A.  Correct.

17    Q.  Okay.  While you were in the detective administration, did

18    you come to learn about an event that occurred with an

19    individual by the name of George Jones?

02:53:06   20    A.  Yes, I did.

21    Q.  Okay.  And you -- the jury has heard some testimony about

22    Mr. Jones and a class-action lawsuit that was filed called

23    *Palmer*.

24         Do you have firsthand knowledge about some of the

02:53:20   25    events that transpired during that time?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 236 of 278 PageID #:43880
6-21-18 (Ex 13)
Hickey - direct by Rosen

3211

1   A.  I did.

2   Q.  Okay.  And can you briefly tell us -- well, let me back up

3   for a second.

4        Now, Mr. Jones was an individual who was being

02:53:34   5   criminally prosecuted, correct, for a murder?

6   A.  Correct.

7   Q.  And the jury's already heard it, but just so we can get a

8   frame of reference, shortly before he was to start his trial,

9   information came to light from a detective, actually, Frank

02:53:54   10   Laverty, about a memo and a potential alternative suspect,

11   correct?

12   A.  That's correct.

13   Q.  And you're aware, Mr. Hickey, that shortly right after that

14   came to light, a class-action lawsuit was filed called *Palmer*,

02:54:07   15   correct?

16   A.  Yes, ma'am.

17   Q.  Okay.  Can you tell us what happened nearly immediately

18   upon the filing of the class-action lawsuit?

19   A.  I was working for the chief of detectives, and there was an

02:54:27   20   internal meeting, and we strived to do some fact-finding as to

21   how the various six Areas in the Detective Division were

22   maintaining their files, especially their notes and inter-watch

23   memorandum.

24   Q.  Okay.  You said there were six Areas.  Back in 1981 and

02:54:52   25   '82, the Chicago Police Department had six detective Areas; is

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 237 of 278 PageID #:43881
6-21-18 (Ex 13)
Hickey - direct by Rosen

3212

1    that correct?

2    A.  That's correct.

3    Q.  And their responsibility was to oversee the criminal

4    investigations, felony prosecutions over the City of Chicago?

02:55:06    5    A.  Felony and misdemeanor.

6    Q.  Okay.  And the -- it was geographically broken down.  Is

7    that what the Area denotation is?

8    A.  Correct.

9    Q.  Okay.  So once this meeting was held about the

02:55:20    10    fact-finding, what, if anything, did you personally do?

11    A.  I visited -- I conducted a site survey of each of the six

12    different detective Areas, focusing on how files were

13    maintained for violent crime field investigations.

14    Q.  And prior to that point in time, did the City of Chicago

02:55:44    15    have any policies regarding files that contained notes or

16    inter-watch memorandum or to/from memoranda?

17    A.  It did not.

18    Q.  And what did you find during your fact-finding?

19    A.  I found, first of all, there was a lack of uniform

02:56:10    20    terminology to describe what we all thought was basic

21    note-taking and communication between watches.  There was a

22    variety.

23         I also took the opportunity to look at specific files,

24    samplings of different files and observed that some were better

02:56:36    25    written than others.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 238 of 278 PageID #:43882
6-21-18 (Ex 13)
Hickey - direct by Rosen

3213

1    Q.   Okay.  And the files that you were reviewing, were they --

2    well, first of all, going from Area to Area, was there

3    uniformity?

4    A.   There was not.

02:56:49    5    Q.   Okay.  And did any of the Areas have a central location

6    within the Area for storing or maintaining these files?

7    A.   All the Areas maintained an office file.  There was

8    differences in how they managed, they didn't manage various

9    notes and working files, as I refer to them.

02:57:25    10   Q.   Okay.  And the notes and the inter-watch memorandum and the

11   to/from memoranda, the ones that you observed during your

12   fact-finding, did any of those documents have affixed to them

13   the Records Division number for any particular investigation?

14   A.   Mostly, they did not.

02:57:44    15   Q.   Okay.  And the jury's heard some testimony, but the -- can

16   you describe what the Records Division number means in the

17   Chicago Police Department.

18   A.   The Records Division number is the key filing number.  It

19   dates back to 1961.

02:58:04    20        1961, all the incidents reported to the Chicago Police

21   Department began with a letter A, 62, boy, and so on and so

22   forth.  And when they ran out of the alphabet, they started

23   over again.

24   Q.   Okay.  And is -- how does the -- how did the Chicago -- how

02:58:25    25   does the Chicago Police Department use the Records Division

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 239 of 278 PageID #:43883
6-21-18 (Ex 13)
Hickey - direct by Rosen
3214

1 number?

2 A.  It was and continues to be the key bureaucratic filing of

3 all reports submitted under a particular incident.

4 Q.  Okay.  And does each individual Records Division number tie

02:58:45  5 to a particular criminal -- a particular crime?

6 A.  It does.  It can be non-criminal as well.  It could be a

7 lost-and-found case report.

8 Q.  Okay.  So even in that circumstance, there's an RD number?

9 A.  Correct.

02:58:57  10 Q.  Okay.  Now, during the point in time that you were doing

11 your fact-finding, did you have responsibilities in terms of

12 reporting what you found?

13 A.  I reported to the chief of detectives, and I did prepare

14 some memos on that topic.

02:59:16  15 Q.  Okay.  And did you have an understanding of what the

16 purpose of the fact-finding was with -- based on the meetings

17 that you were having and the discussions that you were having

18 about what was going on as a result of the *Palmer* litigation?

19 A.  The Detective Division simply wanted to get a handle on the

02:59:41  20 practices and to establish a more uniform methodology to

21 organize these files.

22 Q.  And while you were doing this fact-finding, was the *Palmer*

23 litigation going on?

24 A.  It was.

03:00:00  25 Q.  Okay.  Do you know whether or not the super -- the then

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 240 of 278 PageID #:43884
6-21-18 (Ex 13)
Hickey - direct by Rosen

3215

1  superintendent of police actually testified in connection with

2  the *Palmer* litigation?

3  A.  In this building, yes.

4  Q.  Okay.  And who was that?

03:00:14  5  A.  Richard Brzeczek.

6  Q.  And did he have some opinions about how the policies should

7  change or not change going forward?

8  A.  He testified that the notes of detectives, including

9  everything, and even if it was on the back of a matchbook,

03:00:38  10  should be preserved.

11  Q.  Okay.  And at that time, did you have an understanding of

12  what other law enforcement agencies' policies and practices

13  were as it related to note-taking?

14  A.  I attempted to find out what the practice was.

03:00:59  15  Q.  Okay.  And this was during this period of time when you're

16  doing your fact-finding and trying to develop a new policy,

17  right?

18  A.  Correct.

19  Q.  And were you hands-on involved in the development of new

03:01:14  20  policies as it related to Detective Division records?

21  A.  I was the drafter of all the drafts on the topic.

22  Q.  Okay.  Up until what period of time?

23  A.  Well, until the final issuance of 83-1, I think is the

24  number.

03:01:34  25  Q.  Okay.  And so up until --

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 241 of 278 PageID #:43885
6-21-18 (Ex 13)
Hickey - direct by Rosen
3216

1   A.  82.

2   Q.  -- Special Order 83-1, were there other versions that went

3   into effect?

4   A.  There was one earlier, a few months earlier than that.

03:01:45   5   Q.  Okay.  So tell us about what you tried -- what you found

6   out when you were trying to find out what other law enforcement

7   agencies did as it relates to notes.

8   A.  From the FBI, I did a site visit in the Chicago office

9   here.  I learned that the FBI agents, when preparing their

03:02:06   10   standard report called a 302, took their notes and put them

11   into a sealed envelope and filed the envelope at the time of

12   submission of their report.

13        I also learned that they had a suffix system.  Each

14   and every report had a unique suffix at the end of their

03:02:37   15   numerical identifier, again, whatever the, you know, suffix

16   was.  I can't remember if it was alpha or numeric.

17   Q.  Okay.  With respect to the notes that they put in the

18   envelope, did you find out whether or not those notes were

19   regularly produced in response to requests either in a criminal

03:02:55   20   case or a civil case?

21   A.  I did, and they were not produced.

22   Q.  Okay.  All right.  Did you -- were you able to find out

23   anything about other law enforcement agency practices at that

24   time regarding notes?

03:03:16   25   A.  I telephoned, cold-called a few police departments.  I

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 242 of 278 PageID #:43886
6-21-18 (Ex 13)
Hickey - direct by Rosen

3217

1   really didn't learn much.  I learned that you don't learn much

2   by cold-calling people on the phone and asking how they do

3   their filing on homicide cases.

4           But I can't even remember the cities that I called at

03:03:35   5   that time.

6   Q.  Okay.  And in any event, you then endeavored to write a new

7   policy, correct?

8   A.  Correct.

9   Q.  And did you have input from other members of the police

03:03:45   10   department regarding what the goal was of the policy?

11   A.  I certainly did.  This was not done in a vacuum.  I had

12   supervision.  I had attorneys from the police department,

13   attorneys from the plaintiffs.  Everyone had a crack at it.

14   Q.  Okay.  And when you say attorneys for the plaintiffs, who

03:04:03   15   are you referring to?

16   A.  At that time, there was a group of attorneys

17   representing --

18   Q.  Yeah, go -- I'm sorry.  I didn't mean to interrupt you.

19   A.  By name or --

03:04:13   20   Q.  No, no, no.

21   A.  Oh.

22   Q.  Just what were they -- plaintiffs in what case?

23   A.  Oh.  Well, the *Palmer* case, if you --

24   Q.  Okay.  So when the policies were being drafted, you had

03:04:29   25   input from the Chicago Police Department higher-ups and things

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 243 of 278 PageID #:43887
6-21-18 (Ex 13)
Hickey - direct by Rosen
3218

1    like that?

2    A.  Yes, ma'am.

3    Q.  Okay.  And the plaintiffs' attorneys?

4    A.  Yes.

03:04:37    5    Q.  And was the City of Chicago's Legal Department involved?

6    A.  It was.

7    Q.  Okay.  And so it -- without speaking too -- you know, with

8    specific detail as to the initial policy that was drafted,

9    generally what was required once that first policy was drafted

03:04:55    10    as it relates to files and notes?

11    A.  We strived to implement the policy statement of the

12    superintendent of police, how to preserve the notes that had

13    been generated and anything else pertinent to the case.

14    Q.  Okay.  And then you said eventually, there were drafts of

03:05:20    15    it -- of the policy and then we finally landed on -- I think

16    you said 83.2 was the final version, right?

17    A.  I was wrong.  I said 83-1.  It's -- I'll go with you.

18    Q.  Okay.  I think 83-1 was a predecessor version.

19    A.  Okay.

03:05:35    20    Q.  Can you tell us why the draft of the order kept changing

21    over this, sort of, short period of time?

22    A.  Well, it only changed once, but it's a relatively short

23    period of time, within a year.

24           For organizational speed, that's --

03:05:52    25    Q.  Pretty good?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 244 of 278 PageID #:43888
6-21-18 (Ex 13)
Hickey - direct by Rosen
3219

1    A.  -- fast-track.

2    Q.  Okay.  So let's talk a little bit about 83-2, which is

3    actually Plaintiff's Exhibit 165.

4         MS. ROSEN:  Do you -- defense table 2, please.

03:06:22    5    BY MS. ROSEN:

6    Q.  And taking a look at --

7         MS. ROSEN:  Which, I think, is already in evidence.

8    You guys moved it in.

9         MR. BOWMAN:  I think it is, yes.  No objection, in any

03:06:29    10   event.

11   BY MS. ROSEN:

12   Q.  Taking a look at Detective Division Special Order 83-2, is

13   that the final 1983 version of the Special Order dealing with

14   investigative files?

03:06:42    15   A.  Yes, it is.

16   Q.  Okay.  And just generally, with respect to the Chicago

17   Police Department, they issue all kinds of directives, whether

18   it's a General Order or a Special Order, and those get updated,

19   right, from time to time?

03:06:55    20   A.  They do.

21   Q.  And this particular order, 83-2, was in effect until about

22   1986; is that right?

23   A.  Correct.

24   Q.  Okay.

03:07:06    25   A.  The only distinction I would make is that this is a

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 245 of 278 PageID #:43889
6-21-18 (Ex 13)
Hickey - direct by Rosen
3220

1   Detective Division order.  You had asked if the -- you know,

2   about the Chicago Police Department, which is a larger entity.

3   Q.  Got it.  And we'll talk about that, too.

4          So when we're talking about Special Orders, who do

03:07:20   5   they apply to?

6   A.  Detective Division Special Orders -- okay.  No.

7   Q.  Yeah, no.  You're right.  You corrected me.  I was being

8   too --

9   A.  I'm sorry.

03:07:29   10   Q.  I was being too general.  So you tell me what a Detective

11   Division Special Order is.

12   A.  A Detective Division Special Order applies to everyone

13   within the organizational command of the chief of detectives.

14   Q.  Okay.  And why was it that this order was drafted as a

03:07:49   15   Detective Division Special Order?

16   A.  The responsibility for investigating violent crime field

17   investigations is clearly that of the Detective Division.  They

18   alone have the authority and responsibility to close a case, to

19   maintain its status.  It's their report, which is the final

03:08:19   20   word in the criminal investigation.

21   Q.  Okay.  And, of course, there are other units of the Chicago

22   Police Department that get involved in criminal investigations,

23   right?

24   A.  Correct.

03:08:31   25   Q.  And what are some of those other units?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 246 of 278 PageID #:43890
6-21-18 (Ex 13)
Hickey - direct by Rosen
3221

1  A.  Almost a hundred percent of them start in the Patrol

2  Division.  The men and women in blue are the ones who start

3  writing the reports.

4  Q.  And that first report, what is it called?

03:08:49   5  A.  It's a case report.  It's generally called a case report.

6  Q.  Okay.

7  A.  It's specifically called a general offense case report.

8  Q.  Okay.  And that would be a document that's prepared

9  typically by somebody in the Patrol Division, the beat cop?

03:09:01  10  A.  Correct.

11  Q.  Okay.  And then there are other units, right, within the

12  Chicago Police Department that participate in criminal

13  investigations, right?

14  A.  Correct.

03:09:10  15  Q.  So, for example, in this case, we've heard about Gang

16  Crimes specialists.  They obviously have a role in conducting

17  criminal investigations, correct?

18  A.  Correct.

19  Q.  And this order does not apply to those other types of

03:09:22  20  units, correct?

21  A.  No.  This order was issued by the Detective Division chief.

22  Q.  Okay.  And why --

23  A.  He doesn't have the authority to issue it to another bureau

24  or division outside of his organizational responsibility.

03:09:35  25  Q.  Okay.  And do -- why was -- why is it that only -- this

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 247 of 278 PageID #:43891
6-21-18 (Ex 13)
Hickey - direct by Rosen

3222

1    type of order regarding investigative files applied only to the

2    Detective Division?

3    A.  Well, that was the issue at hand, trying to get a more

4    uniform approach to maintaining our files.

03:10:03   5           And again, it's the Detective Division responsibility.

6    The issue of homicide investigation is the final responsibility

7    of the Detective Division.

8    Q.  Okay.  So, now, let's take a look a little bit at the

9    order.  If we take a look at the Purpose, which is section II.

03:10:32  10           And does that detail -- that section detail the

11   purpose of the order?

12   A.  It does.

13   Q.  And if we take a look at subparagraph A., can you tell us

14   what that says?

03:10:51  15   A.  "Guidelines for the proper retention of official Department

16   reports, notes, memoranda, and miscellaneous documents of

17   potential evidentiary value, accumulated during the course of a

18   particular violent crime field investigation."

19   Q.  And so -- and you actually are the one that wrote this,

03:11:14  20   right?

21   A.  I am.

22   Q.  Okay.  And your intention when writing this was what

23   precisely to convey to the individuals within the Detective

24   Division that this order apply to?

03:11:29  25   A.  That the notes of detectives is not their personal

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 248 of 278 PageID #:43892
6-21-18 (Ex 13)
Hickey - direct by Rosen

3223

1 property.  It's the work product of the Chicago Police

2 Department and, therefore, should be preserved.

3 Q.  And prior to this period of time, was there a different

4 view by detectives working in the Detective Division regarding

03:12:01    5 who had proprietary rights over the notes, for lack of a better

6 way to describe it?

7 A.  Notes, the handwritten notes -- there's a couple of variety

8 of notes.

9 Q.  Okay.

03:12:13   10 A.  The handwritten notes were always thought to be that of the

11 detective.  Upon preparation of a supplementary report, they

12 were routinely destroyed.

13 Q.  Okay.  And then as far as typewritten notes, before 83-2

14 went into effect, what was the thinking there?

03:12:35   15 A.  The typewritten notes most often were inter-watch requests

16 for someone else working a different shift to do something, and

17 these notes, if they didn't make the supplemental report, did

18 not make the official RD number file.

19 Q.  Okay.  And in terms of how detectives then -- and even

03:13:05   20 after the promulgation of 83-2 utilized their notes, what was

21 the expectation regarding what they were supposed to -- like,

22 they take the notes and then what were they supposed to use the

23 notes for?

24 A.  I didn't understand the question.

03:13:19   25 Q.  I'm sorry.  It was a bad question.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 249 of 278 PageID #:43893
6-21-18 (Ex 13)
Hickey - direct by Rosen

3224

1    With respect to note-taking that detectives did, what

2  was the -- even before promulgation of 83-2, what was the

3  expectation regarding what the detectives were using those

4  notes for in connection with preparing their supplementary

03:13:38  5  reports?

6  A.  It was their -- to remind them, to refresh their memory as

7  they prepared the official supplementary report.

8  Q.  Okay.  Now, if we take a look at subparagraph G. regarding

9  "instructions for use of the Investigative File Folder," can

03:14:05  10  you describe what the investigative file folder is.

11  A.  First of all, this is brand new.  It really is being

12  introduced.

13  Q.  Okay.

14  A.  It's nothing more than a classic file folder that -- a

03:14:18  15  manila folder, 8 and a half by 11.  It had a two-hole punch in

16  the top of it, and reports and notes that were generated could

17  literally be placed on this clip, this two-hole clip, and then

18  it was organized according to the RD number.

19  Q.  So prior to 83-2 being in effect, that type of folder was

03:14:50  20  not being utilized by anyone in any of the Areas with respect

21  to maintaining notes or memoranda or anything like that?

22  A.  It was not.

23  Q.  Okay.  And the documents that were included in the

24  investigative file folder, was it the expectation that each of

03:15:14  25  those documents would have the RD number on it?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 250 of 278 PageID #:43894
6-21-18 (Ex 13)
Hickey - direct by Rosen

3225

1  A.  No.

2  Q.  Okay.  Was the investigative file folder organized by RD

3  number?

4  A.  Yes, it was.

03:15:30  5  Q.  Okay.  And if we take a -- well, let me just show you

6  what's been marked City Exhibit --

7        MS. CARNEY:  45.

8  BY MS. ROSEN:

9  Q.  -- 45, which is the original investigative file in this

03:15:48  10  case.  Is this the type of folder (holding up document) that

11  you envisioned when you were creating this policy?

12  A.  Yes.

13  Q.  May I take that back?

14        So it's got the two-hole punch at the top and the

03:16:11  15  metal binder that you were describing, right?

16  A.  Correct.

17  Q.  Okay.  Let's talk about subparagraph I., "instructions for

18  the use of the General Progress Report."

19        What is a general progress report?

03:16:40  20  A.  The general progress report is essentially a notepad, but

21  it was filled with a few boxes on the top and then literally

22  85% of the form, if not more, was simply blank lines.  It was

23  designed to facilitate and organize note-taking by detectives.

24        There was the hope, there was the direction that these

03:17:19  25  things would be used by the detectives in the course of their

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 251 of 278 PageID #:43895
6-21-18 (Ex 13)
Hickey - direct by Rosen
3226

1   investigation, whether they are out in the field, in a squad

2   car, or in their office interviewing suspects --

3   Q.  Okay.

4   A.  -- and witnesses.

03:17:35   5   Q.  And that was -- was that a brand-new report that was

6   created with this policy?

7   A.  It was.

8   Q.  And how was it -- is it -- was it single sheets of paper?

9   Was it a pad of paper?  How did that work?

03:17:54   10   A.  It is one single page, but it was printed on a pad of

11   paper, again, with the two-hole punches to facilitate

12   subsequent filing.

13   Q.  Okay.  And you said that the hope was that the detectives

14   would utilize that for all of their note-taking, correct?

03:18:13   15   A.  Yes, ma'am.

16   Q.  And since 83-2 was created, is there a hundred percent

17   compliance with taking all notes on the general progress

18   report?

19   A.  I don't think there's a hundred percent compliance with

03:18:31   20   almost anything.

21   Q.  Okay.  And with respect to the purpose and intent of 83-2,

22   if, for some reason, a detective were to take a note not on the

23   GPR report, what is the expectation with respect to that

24   particular note, whether it's handwritten or typed?

03:18:54   25   A.  The organization would frown but, most importantly,

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 252 of 278 PageID #:43896
6-21-18 (Ex 13)
Hickey - direct by Rosen

3227

1    preserve it.  The important thing is to preserve the

2    information, even though it wasn't submitted in the proper

3    format.

4    Q.  Okay.  And why is the most important thing to preserve it?

03:19:11    5    A.  We really are about the business of truth, and we're -- we

6    don't want to throw away something that may be important.

7    Q.  Okay.  And in the first, say, 18 months or so of this new

8    General Order going into effect, do you have any understanding

9    on whether or not there was use of the general progress report?

03:19:44    10    A.  Yes, I do.

11    Q.  And what do you base that knowledge on?

12    A.  I worked in Research & Development.  Research & Development

13    not only drafts orders for the superintendent, we also are in

14    charge of all the printed documents that are used by the

03:20:05    15    Chicago Police Department.

16        On the bottom of the report -- all the reports of the

17    Chicago Police Department -- there's a little number, you know,

18    that -- it includes the date and the month that it was created.

19    And because -- I will get to the answer to your question.

03:20:20    20    Because I was in Research & Development, we also keep track of

21    the printing orders.  All the requests to reprint or print new

22    documents come through Research & Development.

23        And I went out of my way to find out how often the

24    general progress reports were used in the first 15 months, and

03:20:43    25    there was an order -- multiple orders for printing and

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 253 of 278 PageID #:43897
6-21-18 (Ex 13)
Hickey - direct by Rosen

3228

1    reprinting, totaling 140,000 of these general progress reports.

2    Q.  Okay.  And when the *Palmer* class action was first filed and

3    these changes began being made, was there some institutional

4    resistance to the change in the beginning?

03:21:09    5    A.  I don't think there was true organizational --

6    institutional resistance.  I think there was confusion.

7    Q.  And explain.

8    A.  Take, for instance, the superintendent's message about

9    notes, there was actually two on his part.  One was a teletype

03:21:29    10    that he had issued, and subsequent to that was a -- his

11    testimony in federal court.

12         In the teletype he issued, he said, you know, preserve

13    everything, including notes.  I mean, there was genuine

14    confusion about the topic of notes.  Well, I'm pretty sure he

03:21:54    15    means notes that are written on a typewriter or handwritten

16    between watches.  I'm pretty sure he doesn't mean my personal

17    notes.

18    Q.  That was the thinking?

19    A.  I -- by some.

03:22:09    20    Q.  By some?

21    A.  By some.

22    Q.  Okay.

23    A.  So, therefore, I wouldn't say it was resistance.  I would

24    say it was confusion.

03:22:14    25    Q.  Okay.  And there was -- some of the litigation that went on

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 254 of 278 PageID #:43898
6-21-18 (Ex 13)
Hickey - direct by Rosen
3229

1    addressed those kinds of issues, right?

2    A.  It did.

3    Q.  Okay.  And by the time 83-2 was promulgated, that was after

4    input by the people you had talked about, right?  The lawyers

03:22:30    5    from the City's Law Department, the plaintiffs' attorneys in

6    the *Palmer* case, after these hearings had happened, after the

7    superintendent had testified, right?

8    A.  Correct.

9    Q.  Okay.  So by the time we get to 1983 when this Special

03:22:43    10    Order is issued, from the police department's perspective, it's

11    clear that when we say notes, we mean all notes, right?

12    A.  Yes, Ms. Rosen.

13    Q.  Okay.  Now, let's talk about the investigative file

14    inventory sheet, which is subparagraph J.

03:23:05    15          What is that document?

16    A.  This is a document that I designed, I drafted.  I wanted to

17    memorialize the fact that certain items were placed into the

18    care and custody of the investigative file, and I could think

19    of nothing other than actually trying to describe it and, as

03:23:38    20    they are put in chronological order, it would be a living,

21    breathing document, you know, as of what date was something

22    submitted.

23          And it's also kind of an integrity check on the file.

24    If something says it's there, and later on it's not, well,

03:23:55    25    there's legitimate reason to ask why it's not.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 255 of 278 PageID #:43899
6-21-18 (Ex 13)
Hickey - direct by Rosen

3230

1    Q.   Okay.  And when we look at what we -- I showed you before,

2    City 45, on the front page of it is an example, right, of this

3    log, the investigative file inventory?

4    A.   It's a multi-lined inventory control sheet.

03:24:13    5    Q.   Okay.  And then if we just take a look quickly at section

6    III, the Policy, if you could just read that.

7    A.   "It is the policy of the Chicago Police Department to

8    conduct all criminal investigations in an impartial and

9    objective manner and to maintain the integrity of its

03:24:38    10   investigative files to ensure that the due process rights of

11   the accused are not only" -- or, excuse me, "are not

12   compromised during the subject investigation, initial court

13   hearing or any subsequent review.  Additionally, it is the

14   policy of the Chicago Police Department to record" --

03:24:59    15   Q.   If we could go to the next page.

16   A.   -- "and preserve any relevant information obtained by any

17   detective during the course of a violent crime field

18   investigation.

19         "When assigned to violent crime field investigations,

03:25:15    20   detectives will preserve and record information and materials

21   obtained in the course of the investigation to assure not only

22   that information and materials indicating the possible guilt of

23   the accused are preserved, but also that any information and

24   materials that may tend to show his possible innocence or aid

03:25:37    25   in his defense are preserved.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 256 of 278 PageID #:43900
6-21-18 (Ex 13)
Hickey - direct by Rosen
3231

1          "Deviation from this policy adversely impacts on the

2     goals and objectives of the Chicago Police Department and may

3     result in disciplinary action against that Department member."

4     Q.  Okay.  And what was the purpose of putting that policy

03:25:56   5     statement in the order?

6     A.  To establish and send a message that we are the gatherers

7     of information, whether it proves or disproves the guilt or

8     innocence of an individual.

9     Q.  And then the remainder part of the order then specifically

03:26:26  10     provides definitions for the various topics that we've talked

11     about, correct?

12     A.  Correct.

13     Q.  Okay.  And then by the time we get to 1986, that order is

14     revised.

03:26:38  15          You didn't rewrite the order, right?

16     A.  I did not.  I had moved on from the Detective Division.

17     Q.  Okay.  But it was substantially the same with some minor

18     changes, correct?

19     A.  Correct.

03:26:48  20     Q.  Do you know what the change was?

21     A.  I think there were two changes.  I think they dropped the

22     purpose.  And second of all, there was a section added about

23     auditing and assigning that responsibility to the exempt

24     commanders.

03:27:04  25     Q.  And what's an exempt commander?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 257 of 278 PageID #:43901
6-21-18 (Ex 13)
Hickey - direct by Rosen
3232

1   A.   Exempt commander is a person who's in charge of a specific

2   subunit of the Chicago Police Department; in this case, the

3   Detective Division.  They are appointed by the superintendent

4   of police.

03:27:20    5   Q.   Okay.  And at the conclusion of the *Palmer* case, the *Palmer*

6   litigation was resolved without any findings either way

7   regarding any specific wrongful convictions; is that correct?

8   A.   That is correct.

9   Q.   Okay.  Now, let's switch topics and talk about the Subpoena

03:27:42    10   Service Unit.

11          What is the Subpoena Service Unit of the Chicago

12   Police Department?

13   A.   The Subpoena Service Unit is that one place in the Chicago

14   Police Department that all requests for subpoenas or -- all

03:27:58    15   requests for information, documents, reports, physical

16   evidence, whatever it may be, lands in the same place within

17   our large organization.

18   Q.   Okay.

19   A.   And that is within the Records Division.

03:28:15    20   Q.   And what is the Records Division?

21   A.   The Records Division is the place, the organizational

22   subunit of the Chicago Police Department which stores all

23   official reports, whether they be written or they be mugshots

24   or the arrest reports, the traffic reports, and things like

03:28:39    25   that.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 258 of 278 PageID #:43902
6-21-18 (Ex 13)
Hickey - direct by Rosen
3233

1    Q.   Okay.  And how -- back in the 1980s, early '90s, who

2    staffed the Subpoena Service Unit?

3    A.   The Subpoena Service Unit, from the time I was there, was

4    staffed by both sworn members and civilian, kind of a

03:29:04    5    hodgepodge of, you know, sworn versus civilian members.

6    Q.   Okay.  And do you know what type of training the

7    individuals that worked within the Subpoena Service Unit

8    received?

9    A.   On-the-job training.

03:29:21    10    Q.   And can you describe what that means?

11    A.   Well, by virtue of the fact it's a relatively small group

12    of people, four or five, it's kind of difficult to have formal

13    class settings and the fact that there's very little turnover

14    in a unit like that.  The newest person simply gets trained by

03:29:44    15    those who have been there and also their supervisor who, most

16    of the time, was a sergeant of police.

17    Q.   Okay.  And can you describe the process by which a subpoena

18    comes into the Subpoena Service Unit from, let's say, either a

19    prosecutor or a criminal defendant.  What happens?

03:30:04    20    A.   It lands in the Subpoena Services Unit.  Whether it

21    originally started in the superintendent's office or was

22    dropped off somewhere in a large organization, it's sent to the

23    Records Division, Subpoena Services Unit, which looks at it and

24    tries to determine what is it they're asking for.

03:30:32    25    Q.   Okay.  And how do they make that determination?

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 259 of 278 PageID #:43903
6-21-18 (Ex 13)
Hickey - direct by Rosen

3234

1    A.  The nice part is the RD number.  Usually, there's an RD

2    number associated with it, or at least an arrest report number

3    in which they could find the RD number.

4              And it's interesting that the Subpoena Unit is

03:30:58   5    actually the middleman.  The Chicago Police Department does not

6    keep all of its records in one place.  The Polygraph Unit is

7    part of the Crime Lab.  If there was a request for a polygraph

8    report, they would circle the Crime Lab and send it to the

9    Polygraph Unit.  If it was a DUI, they would send it to the

03:31:25   10   Traffic Records section.  Different units.  So it's not

11   one-stop shopping.  If they wanted investigative files, they

12   would send it to the particular Area of an investigative

13   authority.

14             So they would take this subpoena, literally circle the

03:31:48   15   receiving unit, make -- and make as many copies as they need.

16   One subpoena may need information from three different

17   subunits, and they send it out to those units and say, "Respond

18   by" -- it's very date-specific because this information is

19   needed by the prosecutor or the defense attorney by a certain

03:32:16   20   date.  So the date is very important in the processing of these

21   subpoenas.

22   Q.  Okay.  And do the people in the subpoena survey -- Subpoena

23   Service Unit, when they send out these subpoenas, do they then

24   get a response from each of these different units?

03:32:34   25   A.  They do.  And then they take the responses -- and I've seen

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 260 of 278 PageID #:43904
6-21-18 (Ex 13)
Hickey - direct by Rosen

3235

1    them rubber band and collate these -- the package of responding

2    reports and then put them into their date file as to when they

3    will be delivered to the requester.

4    Q.  Do the individuals that work in the Subpoena Service Unit

5    have any responsibilities to review the documents, to cull it

6    for information that they don't deem relevant, or do they

7    simply take what's been provided by the responding unit, put it

8    in their date file, and then produce it?

9    A.  They process the reports.  I don't think very many of them

10   read the reports from cover to cover.

11   Q.  Okay.  All right.  We are going to switch gears one more

12   time and talk about lineup procedures.

13          So taking you back to the 1980s.  The Chicago Police

14   Department had written directives relating to lineup

15   procedures, is that correct?

16   A.  It is.

17   Q.  Okay.  And let me ask you to take a look at what's been

18   marked CX-11, which has already been admitted.

19          And this is General Order as distinct from the

20   Detective Division Special Order that we were talking about

21   before, correct?

22   A.  Correct.

23   Q.  And so what does it mean when it's a General Order?

24   A.  A department General Order is issued by the superintendent

25   of police for all members of the Chicago Police Department.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 261 of 278 PageID #:43905
6-21-18 (Ex 13)
Hickey - direct by Rosen
3236

1    Q.  Okay.  And this particular order is 83-5 that went into

2    effect on March 17th, 1983.  And this is the order that

3    remained in effect until September 24th, 1988; is that correct?

4    A.  Correct.

03:34:38    5    Q.  Okay.  So now let's take a look at just a couple of the

6    provisions of the order.

7          MS. ROSEN:  If we could go to the second page --

8    actually -- I'm sorry.  Could we go back to the first page just

9    for a second?

03:34:58    10    BY MS. ROSEN:

11    Q.  If we look at the first page of the order, at the bottom,

12    section II-G., is that where it instructs the persons that are

13    conducting the lineup about the number of fillers that are

14    required to be in the lineup per suspect?

03:35:18    15    A.  It does.

16    Q.  And does it indicate that if there's one suspect in the

17    lineup, there has to be at least five people total in the

18    lineup?

19    A.  It does.

03:35:32    20    Q.  And does it say if there's more than one suspect in the

21    lineup, the lineup should ideally consist of four non-suspects

22    in a lineup?

23    A.  Correct.

24    Q.  Okay.

03:35:44    25          MS. ROSEN:  Now, if we could switch to the second

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 262 of 278 PageID #:43906
6-21-18 (Ex 13)
Hickey - direct by Rosen
3237

1    page, subsection H.  That -- can we blow that up?  Yeah.

2    BY MS. ROSEN:

3    Q.  So that paragraph describes what's to happen regarding

4    photographing a lineup, correct?

03:36:03    5    A.  Correct.

6    Q.  And is this related to live lineups, this order?

7    A.  Yes, it is.

8    Q.  Okay.  And can you tell us what the instruction is in this

9    order regarding when, at this time, it was required to

03:36:19    10    photograph a live lineup?

11    A.  You want me to read it or just --

12    Q.  If you can just -- you don't have to read the whole thing.

13    A.  Whenever there is an identification of the suspect, an

14    evidence technician, the ones with the camera back in the day,

03:36:37    15    would be requested and directed to respond to the detective

16    area to take a photograph of the positive lineup.

17    Q.  Okay.  And if there were no identification, would there be

18    a photograph taken?

19    A.  There would not.

03:36:51    20    Q.  If there were a filler identification, would there be a

21    photograph taken --

22    A.  No, there would not.

23    Q.  -- back in 19 -- in the 1980s?

24    A.  No, there would not.

03:36:59    25    Q.  Okay.  And let's take a look at now paragraph J.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 263 of 278 PageID #:43907
6-21-18 (Ex 13)
Hickey - direct by Rosen
3238

1     Can you tell us who, pursuant to this order, has

2 responsibility for conducting live lineups?

3 A.   The responsibility is given to the Detective Division and

4 only to the members of the Detective Division.

03:37:27   5 Q.   Okay.  And can you read for us the underlined language in

6 the order.

7 A.   "In no case will a lineup be conducted without a

8 Supplementary Report being completed."

9 Q.   Okay.  And so this order instructed that regardless of the

03:37:48  10 outcome of a lineup, a lineup report had to be created; is that

11 correct?

12 A.   Yes, Ms. Rosen.

13 Q.   A live lineup?

14 A.   Yes, ma'am.

03:37:57  15 Q.   Okay.  Now, with respect to a circumstance where there was

16 no identification made in a lineup, what was the expectation of

17 the Chicago Police Department back in the 1980s?

18 A.   Prepare a report, describe those who were in the lineup,

19 and submit it to your supervisor.

03:38:19  20 Q.   With respect to a live lineup that was conducted in the

21 1980s, if there was a filler identified in the lineup, what was

22 the expectation of the Chicago Police Department back in the

23 1980s?

24 A.   It's the same as a non-identification.  A report is

03:38:38  25 required to be prepared.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 264 of 278 PageID #:43908
6-21-18 (Ex 13)
Hickey - direct by Rosen
3239

```
              1   Q.  So at that time, back in the 1980s, the department did not

              2   expect police officers to distinguish a non-identification from

              3   a filler identification?

              4   A.  Did not require.

03:38:52      5   Q.  Okay.

              6        MS. ROSEN:  If I could have just a moment?

              7   BY MS. ROSEN:

              8   Q.  With respect to the lineup procedures that we were just

              9   talking about, today is that different in terms of

03:39:11     10   memorializing a filler identification versus a

             11   non-identification?

             12   A.  Yes.

             13   Q.  And do you know why it's different?

             14   A.  Best practices have changed, evolved over the decades.

03:39:25     15   Q.  Okay.  And, now, the best practices are to make that

             16   distinguish -- to distinguish that clearly in the reports that

             17   are being prepared?

             18   A.  Correct.

             19        MS. ROSEN:  Thank you.  I have no further questions.

03:39:37     20        THE COURT:  I assume no other defense questions?

             21        MR. LEINENWEBER:  No, Your Honor.

             22        MR. GIVEN:  None, Your Honor.

             23        THE COURT:  Mr. Bowman.

             24        MR. BOWMAN:  Thank you, Your Honor.

03:39:44     25                   CROSS-EXAMINATION
```

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 265 of 278 PageID #:43909
6-21-18 (Ex 13)
Hickey - cross by Bowman

3240

1  BY MR. BOWMAN:

2  Q.  Good afternoon, Mr. Hickey.

3  A.  Hello, Mr. Bowman.

4  Q.  Just briefly, the George Jones case was an eyewitness

03:40:04  5  identification case, right?

6  A.  You know, I don't know.  I mean, I'm sorry, but I -- I

7  don't know the particulars.

8  Q.  Well, for purposes of refreshing your recollection, you

9  remember a witness by the name of Pervy Pointer and an

03:40:22  10  identification of a fellow by the name of George Jones and some

11  information about Pervy Pointer's inability to identify

12  Mr. Jones that was not provided to the criminal justice system,

13  right?  Does not ring a bell?

14  A.  I'm sorry.  It wasn't my case, so -- yeah.

03:40:42  15  Q.  Understood.  In any event, you were aware, along with many

16  others in the Chicago Police Department, generally of the

17  contours of the George Jones matter, right?

18  A.  Absolutely.

19  Q.  This was a case, without knowing the details, in which it

03:41:04  20  was very clear that there was important information that

21  detectives had developed tending to show that George Jones

22  didn't commit the crime that the criminal justice system did

23  not receive, right?

24  A.  It did not receive it at the time of discovery, but it was

03:41:25  25  turned -- or made known to the judge prior -- during the trial

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 266 of 278 PageID #:43910
6-21-18 (Ex 13)
Hickey - cross by Bowman
3241

1    or prior to the trial or -- at some point.

2    Q.  And, in fact, there was a detective by the name of Frank

3    Laverty who came forward in the middle of Mr. Jones' trial and

4    made the information from a street file known to the

03:41:45    5    participants in that case, the judge, the defense lawyers, the

6    prosecutors.  Nobody had been aware of it prior to Mr. Laverty

7    coming forward?

8    A.  Correct.

9    Q.  And the case caused quite a storm in the criminal justice

03:42:04    10    system here in Chicago.

11         MS. ROSEN:  Objection, Judge, relevance to the

12    "storm."

13    BY MR. BOWMAN:

14    Q.  It caused a storm within the Chicago Police Department.

03:42:14    15         MS. ROSEN:  Object to the form.

16         MR. BOWMAN:  Maybe I should ask --

17         THE COURT:  Yes.

18         MR. BOWMAN:  -- a better question.

19         THE COURT:  Yeah.

03:42:20    20    BY MR. BOWMAN:

21    Q.  It was a -- it was a matter of deep concern institutionally

22    to the police department that these events had transpired as

23    they had, right?

24    A.  Correct.

03:42:30    25    Q.  And that's where you come in tasked with getting your arms

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 267 of 278 PageID #:43911
6-21-18 (Ex 13)
Hickey - cross by Bowman
3242

1  around the scope of the issue.

2  A.  Yes, sir.

3  Q.  Yes?  And that's the reason why you did the work that you

4  described when Ms. Rosen was asking questions, going out and

03:42:47  5  finding exactly how detectives were recording information about

6  cases and whether they were preserving the information, right?

7  A.  Correct.

8  Q.  And you learned that there were -- you said this earlier

9  this afternoon.

03:43:05  10  There were various practices and policies and

11  procedures going on in various locations around the police

12  department.  I mean, there was no uniformity.  That's all I'm

13  trying to --

14  A.  There was a lack of uniformity.

03:43:18  15  Q.  And generally speaking, many detectives in the police

16  department had the impression that their notes were their own

17  personal property.

18  A.  That is correct.

19  Q.  And that they were free to destroy them at the end of a

03:43:39  20  case if they chose to do so.

21  A.  I was a detective, and I destroyed mine.

22  Q.  They were free to keep them in their own possession, in a

23  locker, in the trunk of a car, in their basement, and not make

24  them part of the official documentation of the police

03:44:05  25  department.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 268 of 278 PageID #:43912
6-21-18 (Ex 13)
Hickey - cross by Bowman
3243

03:44:20

1   A.  Those notes were never addressed by the Chicago Police

2   Department, so, therefore, the detectives rightfully thought

3   they could do almost anything with them.

4   Q.  That was the culture that was engrained in the department

5   at the time?

6   A.  It was the practice.  I'd like to draw a distinction

7   between culture.

8   Q.  Fair -- fair enough.

9   A.  Okay.

03:44:30

10  Q.  Would you agree with me that it was an engrained,

11  entrenched practice?

12  A.  Yes.

13  Q.  And obviously, this was a problem for the supervisors

14  within the Chicago Police Department that this was occurring,

03:44:49

15  and you set about to correct this process to the best of your

16  ability.  Did I --

17  A.  Yes.

18  Q.  -- load too much into that question?

19  A.  No.  I mean, it -- we were concerned.  I was assigned

03:45:07

20  fact-finding and also came up with, I thought, a procedure that

21  would address the problem.

22  Q.  And to be clear -- and just to back up for a minute, talk

23  just generally about notes.

24          Taking notes, that's part of what detectives do,

03:45:28

25  right?  It's a -- if you're going to be a detective, you're

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 269 of 278 PageID #:43913
6-21-18 (Ex 13)
Hickey - cross by Bowman

3244

1    going to take notes?

2    A.  I don't know how you can do it without taking notes.

3    Q.  Nobody's got a photographic memory.  You talk to somebody.

4    You need to make a record of what they say.

03:45:41    5    A.  Correct.

6    Q.  So the notes are fundamental, right?

7    A.  For most human beings, yes.

8    Q.  And so we all agree -- and you've said this -- that

9    everyone in the criminal justice system is entitled to see

03:45:58    10   notes that detectives make along the course of an

11   investigation.

12   A.  Yes.  That is the policy established by Superintendent

13   Brzeczek.

14   Q.  And indeed, the notes will reflect the progress that an

03:46:16    15   investigation takes over time as detectives go about their

16   work, right?

17   A.  I don't know if it's always progress.  Sometimes it's kind

18   of a plateau, the same story over and over or -- but yes, it

19   certainly records different aspects of different interviews,

03:46:38    20   what we've learned.

21   Q.  Indeed, an investigation may plateau, right, at some point?

22   A.  Correct.

23   Q.  An investigation may start down one direction and then that

24   becomes a dead end, right?

03:46:51    25   A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 270 of 278 PageID #:43914
6-21-18 (Ex 13)
Hickey - cross by Bowman
3245

1   Q.  Or something that seemed innocuous and unimportant at the

2   beginning of an investigation may turn out to be a critical

3   piece of an investigation, right?

4   A.  It may.

03:47:06   5   Q.  And so all of these are reasons why it's important, if

6   you're to have a full picture of an investigation, that

7   everybody gets to see the notes, right?

8   A.  Everything that's been preserved, yes.

9   Q.  That way, you see the tracks of the investigation, right?

03:47:31   10   A.  You see the results of multi -- a multitude of interviews.

11   Q.  And you see the -- a process that might occur of

12   investigating a suspect, eliminating that individual, for

13   example?

14   A.  Yes, sir.

03:47:48   15   Q.  And the problem that *Jones* crystallized was that these

16   tracks, this process of progress was too often not being

17   included in the official record that was produced, and *George*

18   *Jones* exemplified that; is that fair?

19   A.  It occurred.  We were concerned about it.  You know, "too

03:48:17   20   often" is kind of a wide term.  But yes, it did occur.

21   Q.  And to be clear -- I'm not trying to commit you to how

22   often it occurred.

23        We all agree that it should never occur, right?

24   A.  Yes, sir.

03:48:37   25   Q.  And so at the end of your investigation, you authored a

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 271 of 278 PageID #:43915
6-21-18 (Ex 13)
Hickey - cross by Bowman
3246

1 policy that Ms. Rosen asked you a few questions about just a

2 few minutes ago, Detective Division Special Order 83-2.

3 A.  I drafted it.  The chief of detectives issued it.

4 Q.  And that is a very proper clarification.

03:49:09   5 A.  Yes.

6 Q.  Thank you.  But to be clear, you were the author of this.

7 And we've had a lot of testimony about general progress reports

8 in this case.  You are the father of the general progress

9 report, among other things, right?

03:49:25   10 A.  Yes, sir.

11 Q.  So I want to ask you a few questions about the policy that

12 you drafted that was issued by the chief of the Detective

13 Division.

14        The fundamental thrust of 83-2 was that notes that

03:49:52   15 detectives take are no longer personal property of the

16 detectives, right?

17 A.  We are to preserve everything, and we made perfectly clear

18 that those notes previously thought to be personal property are

19 now the work product of the Chicago Police Department.

03:50:12   20 Q.  And they were to be preserved and they were to be placed in

21 a file known as an investigative file, right?

22 A.  Yes, sir.

23        MR. BOWMAN:  And if I could have the Elmo back again?

24 BY MR. BOWMAN:

03:50:37   25 Q.  Your policy contained detailed explanation and requirements

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 272 of 278 PageID #:43916
6-21-18 (Ex 13)
Hickey - cross by Bowman

3247

1    with respect to the investigative file, right?

2    A.  Yes, sir.

3    Q.  You talked about the clips at the top of the file to hold

4    everything in place.

03:50:59    5    A.  Awfully detailed.

6    Q.  And there was a folder that everything was supposed to be

7    in.  Yes?

8    A.  Yes, sir.

9    Q.  And a -- even a document repository so that if a detective

03:51:15    10    collected something that was off-size and didn't fit within the

11    clips, there was a way to make sure that it was preserved and

12    kept, right?

13    A.  Yes, sir.

14    Q.  And then there was an inventory form, which you've talked

03:51:30    15    about, so that everybody would have a record of exactly what

16    was contained in the file.

17    A.  Yes, sir.

18    Q.  Now, in 83-2, is there any provision as to the procedures

19    and the mechanisms for taking the investigative file and

03:52:01    20    producing it to the persons in the criminal justice system who

21    have need of the information, the defense lawyer, the

22    prosecutor, and the judge?

23    A.  I can only think of one thing that might fit what you're

24    asking, and that is the investigative inventory.

03:52:22    25            When an arrest has been made in a violent crime field

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 273 of 278 PageID #:43917
6-21-18 (Ex 13)
Hickey - cross by Bowman
3248

1    investigation, a copy of that inventory of the investigative

2    file is supposed to be sent to the official downtown keeper of

3    records in the RD file, and so that that might provide notice

4    to those who come in the future asking for information to

03:52:52    5    inform them that such a thing exists.

6    Q.  All right.  So what the policy does is it provides in

7    subsection D., as you've just testified, that the investigative

8    file inventory sheet, which we just talked about a few minutes

9    ago, that whenever charges are placed against a person, to

03:53:18    10   ensure notice of existing documents, the investigative file or

11   the inventory form is to be placed in the downtown file, right?

12   A.  Yes, sir.

13   Q.  And another name for the downtown file that we've heard in

14   this case is the permanent retention file, right?

03:53:46    15   A.  For homicides, it's permanent retention.

16   Q.  Right.  And here, of course, we're involved in talking

17   about a homicide case.  So with respect to the case that's in

18   issue in this courtroom, the downtown file would be known as

19   the permanent retention file, right?

03:54:05    20   A.  Yes, sir.

21   Q.  And, of course, it's important that the inventory sheet go

22   into that file for the very reasons you just described, in

23   order to give everyone in the system notice of the contents of

24   the investigative file, yes?

03:54:23    25   A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 274 of 278 PageID #:43918
6-21-18 (Ex 13)
Hickey - cross by Bowman
3249

1  Q.  And if the inventory sheet, for some reason, were not to be

2  placed in the permanent retention file, that would be a --

3  first of all, a deviation from policy, yes?

4  A.  Yes, sir.

03:54:40  5  Q.  And it would also result in the problem that nobody would

6  know what's in the investigative file, right?

7  A.  If it was -- I don't know if it was a deviation of policy.

8  Yes, it's certainly a deviation of procedure.

9  Q.  And just to be --

03:55:05  10  A.  But, but in homicides, there are investigative files.  So

11  in the absence of an inventory sheet in the permanent downtown

12  file, one would have to think there was an investigative file

13  in the detective area.

14  Q.  Right.  And my question is, apart from the inventory sheet,

03:55:30  15  which is mentioned in the provision that we just talked about,

16  is there any procedure or mechanism in the Chicago Police

17  Department's policies as to how the investigative file at the

18  Area is to be produced to the participants in the criminal

19  justice system?

03:55:50  20  A.  Not to my knowledge.

21  Q.  The -- let me just show you, while we're thinking about it,

22  a copy of Plaintiff's Exhibit 20.

23     (Counsel conferring.)

24  BY MR. BOWMAN:

03:56:34  25  Q.  So let me turn to something that you also talked about with

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 275 of 278 PageID #:43919
6-21-18 (Ex 13)
Hickey - cross by Bowman
3250

1    Ms. Rosen.

2         This policy that I've been asking you about is a

3    Detective Division Special Order, right?

4    A.  Yes, sir.

03:56:50
5    Q.  And you said in response to Ms. Rosen that a Detective

6    Division Special Order relates to the Detective Division,

7    right?

8    A.  Yes, sir.

9    Q.  It is not a policy that concerns the entire police

03:57:05
10   department?

11   A.  Correct.

12   Q.  It is, instead, rules and requirements that pertain to the

13   Detective Division alone, right?

14   A.  Yes, sir.

03:57:15
15   Q.  The Detective Division does not encompass Gang Crimes,

16   right?

17   A.  Correct.

18   Q.  And Gang Crimes is, if we were to have a policy relating to

19   Gang Crimes, we would have a Special Order that related to the

03:57:46
20   Gang Crimes, yes?

21   A.  That would be the way, yes.

22   Q.  Now, what that means is that all of these rules as to the

23   preservation of notes, the treatment of notes as the property

24   of the Chicago Police Department that are contained in Special

03:58:11
25   Order -- Detective Division Special Order 83-2, those don't

Case: 1:12-cv-04428 Document #: 736-13 Filed: 11/20/18 Page 276 of 278 PageID #:43920
6-21-18 (Ex 13)
Hickey - cross by Bowman
3251

1    apply to a Gang Crimes specialist, right?

2    A.  Correct.

3    Q.  So if, for example, there were to be notes that were

4    created by a Gang Crimes specialist who was investigating a

03:58:33    5    crime, those notes would not be governed by 83-2, right?

6    A.  The notes would not, but certainly there's an obligation by

7    all department members, whether they're in Gang Crimes or

8    Narcotics or anywhere else, if they have information, you know,

9    they either prepare a supplementary report with the information

03:58:58    10    they have or pick up the phone, call the local detective area,

11    "This is what I learned."

12    Q.  Right.  And, of course, we all have -- everybody working in

13    the police department has the obligation to abide by

14    constitutional requirements, right?

03:59:16    15    A.  Yes, sir.

16    Q.  But we're talking about your policy, the 83-2, and those

17    restrictions don't apply to Gang Crimes, right?

18    A.  They do not.

19            MR. BOWMAN:  Your Honor, this might be a good place to

03:59:32    20    stop.

21            THE COURT:  Okay.  And it's time.

22            Ladies and gentlemen, again, ten minutes late

23    tomorrow, 9:40.  Have a good evening.  Hopefully, it's not

24    going to keep raining all evening.

04:00:11    25    (Jury out.)

1          THE COURT:  Okay.  Again, let me know.  I'm going to

2    try to get that ruling to you before we start tomorrow.

3          MS. ROSEN:  It will just dictate the length of the

4    testimony, obviously, and so we have to get witnesses lined up.

04:00:24   5          THE COURT:  Right.  But it's --

6          MS. ROSEN:  Yeah, no, I got it.  I --

THE COURT:  Yeah.

MS. ROSEN:  Yeah, I appreciate it.  Thanks.

THE COURT:  It may be brief.  I mean, that may just be

04:00:31   the way we have to deal with it without --

MS. ROSEN:  The order may be brief?

THE COURT:  The order may be brief.

MS. ROSEN:  Yeah, yeah.  Appreciate it.

THE COURT:  We'll see.

04:00:51       (Adjournment at 4:01 p.m. until 9:40 a.m., 6/22/18.)

C E R T I F I C A T E

We, Nancy L. Bistany and Colleen M. Conway, do hereby certify that the foregoing is a complete, true, and accurate transcript of the Trial proceedings, Volume 13-B, had in the above-entitled case before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of said Court, at Chicago, Illinois, on June 21, 2018.


/s/ Nancy L. Bistany, CSR, RPR, FCRR     06/22/18


/s/ Colleen M. Conway, CSR, RMR, CRR     06/22/18

Official Court Reporters                  Date
United States District Court
Northern District of Illinois
Eastern Division

3253

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   JACQUES RIVERA,                     ) No. 12 CV 4428
                                         )
 4            Plaintiff,                 )
     vs.                                 ) Chicago, Illinois
 5                                       )
     REY GUEVARA, STEVE GAWRYS, DANIEL NOON, )
 6   JOHN GUZMAN, JOSEPH FALLON, JOSEPH SPARKS, )
     PAUL ZACHARIAS, GILLIAN MCLAUGHLIN, JOHN )
 7   LEONARD, EDWARD MINGEY, RUSSELL WEINGART, ) June 22, 2018
     ESTATE OF ROCCO RINALDI, CITY OF CHICAGO, )
 8                                       )
              Defendants.                ) 9:36 o'clock a.m.
 9
                         VOLUME 14 A
10                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOAN B. GOTTSCHALL
11                       and a jury

12   APPEARANCES:

13   For the Plaintiff:     LOEVY & LOEVY
                            BY:  MR. JONATHAN I. LOEVY
14                               MR. STEVEN E. ART
                                 MR. ANAND SWAMINATHAN
15                          311 North Aberdeen Street
                            3rd Floor
16                          Chicago, Illinois  60607

17                          MACARTHUR JUSTICE CENTER
                            Northwestern University School of Law
18                          BY:  Locke E. Bowman, III
                            357 East Chicago Avenue
19                          Chicago, Illinois 60611
                            (312) 503-0844
20

21
     Court reporter:        Blanca I. Lara
22                         Official Court Reporter
                          219 South Dearborn Street
23                               Room 2504
                          Chicago, Illinois 60604
24                             (312) 435-5895
                          blanca_lara@ilnd.uscourts.gov
25
```

1  Appearances  (continued:)

2

3

4  For the Individual          THE SOTOS LAW FIRM
   Defendants:                 BY:  MR. JEFFREY N. GIVEN
5                                   MR. JAMES G. SOTOS
                                    MS. CAROLINE P. GOLDEN
6                                   MR. JOSEPH M. POLICK
                                    MR. DAVID A. BRUEGGEN
7                              550 East Devon Avenue
                               Suite 150
8                              Itasca, Illinois  60143

9  For the Defendant           ROCK FUSCO & CONNELLY, LLC
   City of Chicago:            BY:  MS. EILEEN E. ROSEN
10                                  MS. CATHERINE M. BARBER
                                    MS. THERESA B. CARNEY
11                             321 North Clark Street
                               Suite 2200
12                             Chicago, Illinois  60654

13

14 For the Defendant           LEINENWEBER BARONI & DAFFADA, LLC
   Guevara:                    BY:  MR. THOMAS E. LEINENWEBER
15                                  MR. JAMES V. DAFFADA
                               120 North LaSalle Street
16                             Suite 2000
                               Chicago, Illinois  60602

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | (The following proceedings were had out of the |
| 2 | presence of the jury in open court:) |
| 3 | COURT SECURITY OFFICE:  All rise. |
| 4 | THE COURT:  Is anyone here who could tell me when the |
| 09:37:18  5 | witnesses whose deposition excerpts were filed overnight are |
| 6 | going to be called? |
| 7 | MS. ROSEN:  This afternoon, if there's time.  So we |
| 8 | have -- |
| 9 | I think you have Pastor Bryant? |
| 09:37:39  10 | MR. GIVEN:  Bryant -- |
| 11 | THE COURT:  I have Pastor Bryant and I have Cynthia |
| 12 | Estes. |
| 13 | MS. ROSEN:  Oh, right.  Yes.  If there's time this |
| 14 | afternoon, that will be our plan. |
| 09:37:48  15 | THE COURT:  So when am I supposed to get these -- I |
| 16 | mean, I don't know how many issues there are, and, frankly, we |
| 17 | were doing something else overnight. |
| 18 | MR. SOTOS:  On the Bryant case, the only remaining |
| 19 | issue has to do with the admissibility of the affidavits, |
| 09:38:02  20 | similar to the Orlando Lopez issue that you deal with earlier. |
| 21 | THE COURT:  Can we just argue that and try to get it |
| 22 | resolved on the spot?  We have about 3 minutes. |
| 23 | MR. ART:  Your Honor, our position is that in Pastor |
| 24 | Bryant's affidavit -- |
| 09:38:14  25 | THE COURT:  First of all, Pastor Bryant is being |

1      called by whom?

2               MR. LOEVY:  They're calling him.

3               THE COURT:  And what is basically his relevance to

4      this case?

09:38:24    5               MR. LOEVY:  He is someone who impeached --

6               THE COURT:  Well, let me hear from the deponent.

7               MR. GIVEN:  So Pastor Bryant is someone that in 1998

8      Orlando Lopez went to him as a marriage counselor and told

9      Pastor Bryant about the fact that he had lied many years

09:38:42   10      before.

11               THE COURT:  Okay.

12               MR. GIVEN:  And he told Pastor Bryant several details

13      of that.

14               THE COURT:  Okay.

09:38:49   15               MR. GIVEN:  And it's significant what he told him and

16      he did not tell him.

17               THE COURT:  Okay.

18               MR. GIVEN:  And then Pastor Bryant has, over the

19      course of time, has offered two different written affidavits.

09:39:00   20               THE COURT:  Okay.

21               MR. GIVEN:  And at his deposition in this case he was

22      asked, among other things, about -- questions about his

23      affidavits.

24               MR. SOTOS:  Let me just make it real simple, Judge.

09:39:15   25      In the two affidavits, he said that Orlando Lopez told him,

1    back in 1998, that he didn't see -- he testified against an

2    innocent man.

3              THE COURT:  Okay.

4              MR. SOTOS:  In his deposition, there was a lot more.

09:39:27  5    He said that, "He not only told me he testified against an

6    innocent man --"

7              THE COURT:  Well, let me just say this.  Let's get

8    through this.  The rules of affidavits when you got a live

9    witness -- oh, he's not going to be live?

09:39:39  10             MR. GIVEN:  Correct.

11             MR. SOTOS:  Just like Orlando Lopez, Judge.  It's just

12   like Lopez.

13             THE COURT:  Okay.  So what's your position and what's

14   your position?

09:39:44  15             MR. SOTOS:  Well, so our position is that the

16   affidavits are prior inconsistent statements which impeach him,

17   his current testimony by omission.  Because in his affidavits

18   he didn't say anything about Lopez telling him that he had

19   recanted to the police back in 1988 or '89, but in his

09:40:07  20   deposition testimony he specifically said that, yes, Lopez did

21   tell me that.

22             So the fact that he didn't say that in his affidavits

23   that were submitted at the PC or in his declaration that he

24   first provided to plaintiff's counsel in this case, impeach

09:40:21  25   that later statement by omission.

3258

1          THE COURT:  And what's your position?

2          MR. LOEVY:  Your Honor, most of the testimony that he

3    identified is fine.  Pastor Bryant is going to be examined,

4    "isn't it true that you talked to Orlando Lopez --"

09:40:29    5          THE COURT:  On this issue?

6          MR. LOEVY:  On this issue, Your Honor.  And what

7    Orlando Lopez said to him is the subject of the deposition.

8    He's going to say, Orlando told me this, Orlando told me that,

9    Orlando told me this, Orlando told me that.  What's not

09:40:41   10    admissible is Pastor Bryant's affidavit which is an extra layer

11    of hearsay.

12          You wouldn't bring in an affidavit of a non-witness.

13    His testimony is coming in.  They brought in Orlando Lopez's

14    affidavit because Orlando Lopez is the witness.  This is one

09:40:55   15    step removed from that.

16          THE COURT:  Well, haven't I've been letting these

17    things in kind of consistently?

18          MR. LOEVY:  For Orlando Lopez, Your Honor, who is the

19    person whose statements matter.  This is one step removed.

09:41:06   20    This is not Orlando Lopez's affidavit.  This is Pastor Bryant's

21    affidavit.  Pastor Bryant is going to testify.

22          THE COURT:  Well, I don't know.  I'll have to think

23    about it now that I understand what the issue is.  It seems to

24    me that the best way to deal with this, under the case law that

09:41:22   25    we applied to Orlando Lopez, is it goes to weight.  I mean, I

1    can think of lots of arguments you could make about why it's in

2    one and not the other.  But is it my decision or is it the

3    jury's decision --

4            MR. SOTOS:  That's the only issue --

09:41:34    5            MR. LOEVY:  Your Honor, the only thing to add is,

6    everything there talking about is explained in the testimony.

7    You haven't seen Pastor Bryant's deposition yet but --

8            THE COURT:  So in the deposition he was asked about

9    allegedly inconsistent statements.

09:41:46   10            MR. LOEVY:  On the substance of it, yes.

11            MR. GIVEN:  Judge, he was asked --

12            MR. SOTOS:  Judge, it's really almost identical to

13    Lopez.  He wasn't asked specifically about the difference

14    between the affidavits and what he said; in any event, it's

09:41:59   15    still a prior inconsistent statement.

16            THE COURT:  Well, that I already understand.

17    you're just telling me what I've already --

18            MR. LOEVY:  Actually, that contradicts it, though.  He

19    just he wasn't given the opportunity.

09:42:08   20            THE COURT:  Enough.  Enough.

21            MR. SOTOS:  That's the only issue, Judge, on that,

22    just so you know.

23            THE COURT:  Unless somebody has something new to say,

24    because we have to get the jury.

09:42:14   25            MR. GIVEN:  I do, Judge.  To answer you question, it's

1   also like Ms. Linzer's handwritten note and Ms. Estes' notes.

2             THE COURT:  Well, that's what I've been saying.

3             MR. GIVEN:  Right.

4             THE COURT:  I think it sounds to me like something

09:42:23   5   we've addressed on numerous occasions.

6             MR. GIVEN:  It is.

7             MR. LOEVY:  Except that the position has always been,

8   if they had an opportunity to address it, and Mr. Sotos just

9   acknowledged, Pastor Bryant in his deposition was not given an

09:42:33   10   opportunity to explain the difference in the affidavit.

11            MR. GIVEN:  Oh, that's not true.

12            MR. SOTOS:  I didn't say that.

13            MR. GIVEN:  He didn't say that, and that's not true.

14            THE COURT:  Can I just ask on question before all this

09:42:43   15   lawyer back and forth, which is usefulness and wastes our time.

16  Was he asked in the deposition by anybody about the affidavit

17  and why this issue was not raised in the affidavit?

18            MR. ART:  He was asked if those were his affidavits.

19            THE COURT:  Okay.

09:42:59   20            MR. LOEVY:  But not, can you explain why it wasn't.

21            THE COURT:  Okay.

22            MR. LOEVY:  So that's the problem.

23            THE COURT:  Okay.  And how many issues are there --

24            I think we're ready.  So as soon as the jury is ready.

09:43:09   25            MR. ART:  With the other dep, there's just one issue

3261

1   as well.

2           THE COURT:  Oh, what's that?

3           MR. ART:  I don't know --

4           Do we have that?

09:43:16   5           MR. GIVEN:  They're trying to get a hardcopy.

6           MR. ART:  The issue is just whether -- the defense

7   side would like to designate testimony about whether Cynthia

8   Estes planned to ask Orlando Lopez about Guevara in Ohio.

9           So they have some notes that they've designated where

09:43:34  10   she writes, "Ask ask about Guevara," or selling like that.

11          Our position is, if they want to designate that, we

12   should be able to designate her testimony that explains why she

13   wanted to ask about Guevara.  And we've designated that

14   testimony.  They're saying they should have one but not the

09:43:49  15   other.

16          MR. GIVEN:  Judge, in the quick response.  It winds up

17   being a 404(b) issue.  They say that these notes open the door

18   to tons of things and we say it doesn't.

19          THE COURT:  Let me remember.  You're trying to impeach

09:44:01  20   her testimony that she didn't --

21          MS. ROSEN:  No.

22          MR. SOTOS:  The notes demonstrate that when she went

23   to see Lopez, one of the items on her agenda was to ask about

24   Rey Guevara.  That's what the notes say, "Ask about Guevara."

09:44:15  25          THE COURT:  Okay.

1          MR. SOTOS:  So with respect to Mr. Guevara, it's

2     relevant to the evolution of the story about the "wrong guy,

3     wrong guy," how initially it didn't identify any person and

4     then over the time it did.

09:44:28   5          THE COURT:  So all she says in these notes is, "I

6     wanted to ask Lopez about Guevara"?

7          MR. LOEVY:  Correct.

8          MR. SOTOS:  Before she ever talked to him.

9          MR. LOEVY:  And they make it seem like she's going out

09:44:38  10     there to try to just bring in Guevara.  She should be able to

11     explain --

12          THE COURT:  What page is it on?

13          MR. LOEVY:  And then our designations, the

14     counter-designations explains why she was going to ask about

09:44:48  15     Guevara.

16          THE COURT:  What page is what you want to introduce

17     on?

18          MR. GIVEN:  What page of the deposition?

19          THE COURT:  Yeah.

09:44:55  20          MR. GIVEN:  I don't have it right here.

21          Kevin, do you have the designation.

22          MR. ZIBOLSKI:  It starts at 67 for the notes --

23          (Brief pause).

24          MR. ZIBOLSKI:  It starts at 67 for the notes.

09:45:15  25          THE COURT:  I'm reading it.  Thank you.

1           (Brief pause)

2           MR. LOEVY:  Then what part did we want to designate?

3           MR. ZIBOLSKI:  I believe it's --

4           THE COURT:  Hold on.  Hold on.

09:45:24  5           MR. LOEVY:  You want the dep --

6           THE COURT:  I didn't ask for that.  I asked for this.

7  (Indicating).

8           I'm trying to read it.  And if you keep talking, I

9  can't.

09:45:30  10           (Brief pause).

11           THE COURT:  Now, what does the plaintiff want to

12  designate?

13           MR. LOEVY:  We aren't sure, but we think it's on page

14  145 --

09:45:49  15           MR. ZIBOLSKI:  I think it's 145.

16           THE COURT:  So it's 145?  Because everybody is talking

17  at once.

18           MR. ART:  Yes, Your Honor, 145.

19           MR. ZIBOLSKI:  Yes.

09:46:03  20           THE COURT:  Okay.  Are you done telling me what to

21  read?

22           MR. ART:  So, Your Honor, it starts on 143, Line 1.

23           THE COURT:  Okay.  And it goes to 145?

24           MR. ART:  Yes, Your Honor.

09:46:10  25           THE COURT:  Okay.  We're ready.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 13 of 267 PageID #:43935
6-22-18 (Ex 14)
Hickey - cross by Bowman
3264

```
 1              COURT SECURITY OFFICER:  All rise.

 2              (The following proceedings were had in the

 3           presence of the jury in open court:)

 4              THE COURT:  Good morning, ladies and gentlemen.

09:46:39  5   Please be seated.

 6              You may be seated, sir.

 7              MR. BOWMAN:  May I proceed, Your Honor?

 8              THE COURT:  You may.

 9              MR. BOWMAN:  Thank you.

09:46:49 10        JAMES K. HICKEY, DEFENSE WITNESS, PREVIOUSLY SWORN

11                   CROSS EXAMINATION (resumed)

12   BY MR. BOWMAN:

13   Q.  Good morning, Mr. Hickey.

14   A.  Good morning, sir.

09:46:58 15   Q.  I want to start by shifting gears from where we left off

16   last night and talk with you this morning about lineups, which

17   is the other subject on which you've been designated to testify

18   on behalf of the City; correct?

19   A.  Yes, sir.

09:47:14 20   Q.  Now, when Ms. Rosen was asking you questions yesterday

21   afternoon, you talked about another written policy with a the

22   number 83-5, right?

23   A.  Is that the lineup order?

24   Q.  Yeah.  I happen to have it here.  And I'll place it in

09:47:36 25   front of you just for your benefit.  We'll have it on the
```

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 14 of 267 PageID #:43936
6-22-18 (Ex 14)
Hickey - cross by Bowman
3265

1    screen in a minute.

2         (Brief pause).

3         (Document tendered to the witness).

4    BY THE WITNESS:

09:47:46    5    A.  Thank you.

6    BY MR. BOWMAN:

7    Q.  83-5.

8    A.  Yes, sir.

9    Q.  And this written policy that I've just handed you to be

09:48:00    10   clear, this is the lineup policy that was in effect in August

11   and early September 1988 when Orlando Lopez was viewing lineups

12   in this case, correct?

13   A.  Yes, sir.

14   Q.  Now, Ms. Rosen asked and you mentioned yesterday that this

09:48:21    15   is a general order, right?

16   A.  It is.

17   Q.  So this is not a Special Order 83-5, this is General Order

18   83-5 that applies to the entire Chicago Police Department,

19   right?

09:48:33    20   A.  Correct.

21   Q.  Applicable to detectives?

22   A.  Correct.

23   Q.  And to Gang Crimes Specialists if they should be running a

24   lineup, right?

09:48:43    25   A.  They wouldn't be by procedure.  The order of the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 15 of 267 PageID #:43937
6-22-18 (Ex 14)
Hickey - cross by Bowman

3266

1  superintendent is that only detectives will conduct lineups.

2  Q.  All right.  In any event, whoever is conducting lineups,

3  the policy is department-wide?

4  A.  Correct.

09:49:03  5  Q.  Okay.  Now one thing that the general order does --

6      MR. BOWMAN:  If I could have the Elmo.

7  BY MR. BOWMAN:

8  Q.  -- is that it sets out some requirements on how to conduct

9  a lineup.  Yes?

09:49:30  10  A.  Yes, sir.

11  Q.  For example, it specifies that the fillers who are selected

12  to participate in the lineup should be similar in physical

13  appearance to the suspect?

14  A.  Correct.

09:49:44  15  Q.  It specifies that there should be a sufficient number of

16  fillers to be fair to the suspect, so that there is a range of

17  people that the witness is called upon to look at and to make a

18  selection from, right?

19  A.  Yes, sir.

09:49:58  20  Q.  And then it also specifies that each witness in a case is

21  supposed to look at the lineup separately, right?

22  A.  Yes, sir.

23  Q.  Now, in addition, this policy that we have in front of us

24  specifies how to document a lineup, right?

09:50:18  25  A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 16 of 267 PageID #:43938
6-22-18 (Ex 14)
Hickey - cross by Bowman
3267

1  Q.  And what it says, if we turn to the next page, is that

2  every time a lineup is run, there must be a report of what

3  happened, right?

4  A.  That's correct.

09:50:35  5  Q.  And it actually underlines that proposition in subsection

6  J, which I'm pointing at now (indicating), does it not?

7  A.  Yes.

8  Q.  It says:

9       "In no case will a lineup be conducted without a

09:50:54  10       supplementary report being completed."

11       Right?

12  A.  Yes, sir.

13  Q.  So if a Chicago Police Department officer were to conduct a

14  lineup and were not to prepare a report, that would be a clear

09:51:08  15  violation of policy, right?

16  A.  Yes, sir.

17  Q.  And the other thing that I want to talk with you about on

18  this general order is, the policy also lays out when there is a

19  report of what needs to be included.  Yes?

09:51:25  20  A.  Yes.

21  Q.  And all of this is specified in a list that we have down

22  here (indicating), lower on the page, right?

23  A.  Yes, sir.

24  Q.  Included must be all the names of everybody who

09:51:42  25  participates in the lineup, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 17 of 267 PageID #:43939
6-22-18 (Ex 14)
Hickey - cross by Bowman
3268

1    A.  Yes, sir.

2    Q.  And that would include the suspect and the name of each and

3    every filler who is viewed by the witness, right?

4    A.  Correct.

09:51:54    5    Q.  And you need the date and the time and the place that the

6    lineup happened?

7    A.  Yes, sir.

8    Q.  And the names of the police officers who are involved in

9    administering a lineup, that also needs to be included, right?

09:52:10    10    A.  Yes, sir.

11    Q.  Now, if there is a lineup and the suspect is selected by

12    the witness, what does the policy require the police officer to

13    do in terms of documenting the procedure?

14    A.  Prepare a supplemental report and request that an evidence

09:52:28    15    technician come physically to the area and take a photograph of

16    the lineup.

17    Q.  So two things:  There needs to be a photograph?

18    A.  Yes, sir.

19    Q.  And there needs to be a supplemental report listing the

09:52:44    20    name of the suspect who was identified?

21    A.  Correct.

22    Q.  Now, suppose that something else happens.  That a witness

23    views the lineup and is unable to make a selection.  Says, "You

24    know, looking at these 5, 6 individuals, I can't be sure of

09:53:05    25    whether the perpetrator is among the people I'm looking at,"

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 18 of 267 PageID #:43940
6-22-18 (Ex 14)
Hickey - cross by Bowman
3269

1  what does the policy require be done in that situation?

2  A.  The supplementary report would still be written, but no

3  evidence technician would be requested to take the photograph.

4  Q.  And what would be said in the supplemental report?

09:53:25  5  A.  This is a negative lineup, the witness did not select the

6  suspect, words to that effect.

7  Q.  All right.  Now, there is a third possibility, is there

8  not?

9  A.  Ah, yes.

09:53:45  10  Q.  Right.  And the third possibility is that the witness makes

11  an identification, but the identification that the witness

12  makes is an identification of a filler.  What does the policy

13  require the detective to do in that situation?

14  A.  In 1988 the policy was clear, simply report it as a

09:54:14  15  negative lineup for -- regarding selection of the suspect.

16  Q.  Well, actually what the policy says, and I want to focus

17  you on number 6 in the list of things that ought to be included

18  in the report, the policy says that the report should list the

19  name, and then there is a paren, and asks the name or names of

09:54:43  20  the person or persons identified in the lineup.  That's what

21  the policy clearly says, right?

22  A.  Yes, sir.

23  Q.  And there isn't any ambiguity about that, right?  On the

24  face of the policy?

09:54:59  25  A.  The practice of the Detective Division was not to identify

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 19 of 267 PageID #:43941
6-22-18 (Ex 14)
Hickey - cross by Bowman
3270

1  people who were picked because they were non-suspects or

2  fillers.

3  Q.  Okay.

4  A.  The lineup was only to document what happened regarding the

09:55:20  5  suspect.

6  Q.  All right.  So will you agree with me that there was a

7  difference between what the policy said and what the practice

8  was in 1988?

9  A.  I agree that it could be interpreted if taken in a vacuum.

09:55:47  10  Q.  Now, when the Chicago Police Department would follow the

11  practice in 1988 that you described, and that would be not to

12  identify the name of the filler selected in the report, but

13  simply to say, "no identification was made," the effect of that

14  is to obscure what actually happened, that a filler was

09:56:21  15  selected, right?

16  A.  I disagree.  The focus is on the suspect.  This report is

17  about the suspect, was he selected.

18  Q.  Do you disagree that what the witness does is important?

19  A.  Of course, what the witness does is important.

09:56:49  20  Q.  I mean, it is from the standpoint of the witness, it's

21  fundamentally different when a witness says, "I picked this

22  filler as the perpetrator of the crime," that's fundamentally

23  different than saying, "I'm not sure," right?

24  A.  It is.

09:57:17  25  Q.  I mean, if a witness picks a filler, what the witness is

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 20 of 267 PageID #:43942
6-22-18 (Ex 14)
Hickey - cross by Bowman
3271

1    saying is that that filler there looks more like the

2    perpetrator of the crime than the suspect does, right?  That's

3    what he is saying?

4    A.  It's probably even stronger.

09:57:36    5    Q.  Right.  What he is doing is he is exonerating the suspect,

6    right?

7    A.  No.  No.

8    Q.  Well, isn't he saying, there is a person in the world,

9    namely that person there, who looks more like the perpetrator

09:57:52    10    than the guy you put in the lineup as the suspect, isn't that

11    what he's saying?

12    A.  To the best of his memory, the best of his -- it --

13    lineups, I believe, are difficult, you know.  Unless there's

14    this ha-ha-moment, lineups are difficult.

09:58:10    15    Q.  Right.  It's hard to make an eyewitness identification,

16    isn't it, as a general matter?

17    A.  It is, yes.

18    Q.  Now, the other thing that happens when a witness picks out

19    a filler is that, assume with me that there is a subsequent

09:58:32    20    lineup.  When that witness steps into the room to look at the

21    subsequent lineup, his credibility is -- is -- is impaired,

22    right?  It's trashed?

23    A.  It has been reduced.

24    Q.  Right.  I mean, this -- this witness has already selected

09:59:02    25    an innocent person as the perpetrator of the crime.  And we all

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 21 of 267 PageID #:43943
6-22-18 (Ex 14)
Hickey - cross by Bowman
3272

1    know that's wrong, right?

2    A.  I don't think anyone is malicious about selecting someone.

3    Q.  To be clear, I'm not suggesting any malice at all.  I'm

4    suggesting that eyewitnesses are fallible.  And when they make

09:59:24    5    mistakes, they demonstrate their fallibility, that's all I'm

6    suggesting.  And you agree with that, right?

7    A.  Yes.

8    Q.  So when you have an eyewitness who is known to be fallible,

9    that's exculpatory information, right?

09:59:47    10    A.  Depending on what other evidence there is in the case.

11    There may be videotape, there may be other eyewitnesses.  So on

12    that one misidentification, it may or may not be exculpable.

13    He may still have done it.

14    Q.  Could be.

10:00:06    15    A.  Yes.

16    Q.  Could also be that the only evidence in the case is the

17    evidence of an eyewitness, and there is no other evidence

18    whatsoever against the defendant in the case; that could

19    happen.  Yes?

10:00:21    20    A.  Yes, sir.

21    Q.  That would be called a single-finger ID, right?

22    A.  Yes, sir.

23    Q.  In that scenario, would you agree with me that the fact

24    that a witness has selected a filler in a prior lineup, that's

10:00:35    25    exculpatory?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 22 of 267 PageID #:43944
6-22-18 (Ex 14)
Hickey - cross by Bowman
3273

1   A.  I think it speaks to the witness' inability to positively

2   ID the person.  I don't know if it actually fulfills the

3   definition of exculpable.  You know, individual witness'

4   credibility, I suppose.

10:01:00
5   Q.  Well, you're not a lawyer, and you're not here to weigh in

6   on what does or doesn't qualify as Brady, right?

7   A.  Correct.

8   Q.  Will you agree with me that the fact that an eyewitness

9   previously selected a filler is something that you kind of

10:01:23
10  think the defense lawyer and the defendant want to have the

11  opportunity to know?

12       MS. ROSEN:  Objection, Judge.  He's already said he's

13  not a lawyer.

14       THE COURT:  Overruled.

10:01:34
15  BY THE WITNESS:

16  A.  The selection of the filler did not put the filler in

17  harm's way.  I do believe that it reduces the believability of

18  the witness but -- that's all.

19  BY MR. BOWMAN:

10:02:00
20  Q.  Do you think the defense lawyer should not the information

21  that reduces the believability of the only witness against his

22  client?  Do you think a defense lawyer should know that?

23  A.  If the -- if there was a note taken to that effect, it

24  should be shared.

10:02:22
25  Q.  Right.  The information should be shared, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 23 of 267 PageID #:43945
6-22-18 (Ex 14)
Hickey - cross by Bowman
3274

1    A.  Yes, sir.

2    Q.  Now I want to ask you this, do you agree with the

3    proposition that in terms of the issue we were discussing a few

4    moments ago about the way the general order is worded, that a

10:02:47    5    reasonable police officer looking at that general order and

6    facing the situation where an eyewitness has picked out a

7    filler, that just looking at the policy, leaving everything

8    else aside, that the police officer might reasonably be

9    confused about how to document the fact that the lineup

10:03:14   10   resulted in the identification of a filler?

11   A.  The police department has been conducting lineups for many

12   decades.  Their practice evolves, it goes on.  And occasionally

13   new orders come out, and, frankly, not a lot changes.  They

14   didn't do it, and even though it could be interpreted they

10:03:40   15   should.  In 1983 it simply wasn't done.

16   Q.  Right.  So it's a matter of -- it's a matter of practice as

17   opposed to a matter of what's in the written policy, is that

18   the gist of what you're saying?

19   A.  Right.  And I've written a lot of policies on various

10:04:03   20   issues, and you almost never can write a policy or procedure

21   for every possible scenario.  You know, lineups are viewed for

22   the purpose about the suspect.  It's suspect-focused.  You

23   know, it's not -- a lineup was not written -- the procedures

24   were not written with the intent "what ifs," what if a filler

10:04:32   25   is selected.  So I have great sympathy for those who write

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 24 of 267 PageID #:43946
6-22-18 (Ex 14)
Hickey - cross by Bowman
3275

1    policies and procedures, myself included.

2    Q.  Well, that's fair.  Let me -- let me ask you this question,

3    Mr. Hickey.  To your knowledge, has anybody in the Chicago

4    Police Department ever gone out and collected lineup reports,

5    together with case files, and examined and evaluated how

6    lineups are actually being conducted and documented in

7    practice?  Did that happen at any point prior to 1988, to your

8    knowledge?

9    A.  It did not.

10   Q.  All right.  So at this point, let's go back to the

11   conversation we were having at the end of the day yesterday.

12   And that was on the subject of disclosure of detectives' notes.

13       And we talked about this case called George Jones.

14   And I don't want to go back through stuff that we've talked

15   about before, but I did want to make sure that I was clear on

16   one point.

17       The problem that the George Jones case presented to

18   the police department was a problem of disclosure, right?

19   A.  Yes, sir.

20   Q.  And the thing that occurred, that gave the department

21   concern, was that initially, not in the end, but initially

22   exculpatory information that George Jones and his lawyer had a

23   right to didn't make it into their hands, right?

24   A.  Yes, sir.

25   Q.  And the investigation that you were charged with

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 25 of 267 PageID #:43947
6-22-18 (Ex 14)
Hickey - cross by Bowman
3276

1    conducting, it documented and confirmed that department-wide

2    there were procedural flaws that were resulting in information

3    not being disclosed to participants in the criminal justice

4    system, right?

10:07:04    5    A.  Yes, sir.

6    Q.  And so you would agree with me that when the police

7    department doesn't produce officer records, there is a risk, at

8    least a risk that Brady material, exculpatory material, will

9    not be disclosed?

10:07:21    10   A.  Of course.

11   Q.  So that's the problem that you set out to fix, right?  How

12   to address this risk?

13   A.  Yes, sir.

14   Q.  Now, when you were speaking with Ms. Rosen yesterday

10:07:35    15   afternoon, you talked about something called the Subpoena

16   Response Unit?

17   A.  Subpoena Services Unit, yes.

18   Q.  Subpoena Services Unit.  I better change my note here so I

19   don't make another mistake.

10:07:49    20          And this was a unit that at one point in your career

21   you had command responsibility over?

22   A.  Correct.

23   Q.  And you were well familiar with it, right?

24   A.  Yes, sir.

10:07:59    25   Q.  Now, what you said to Ms. Rosen yesterday afternoon that

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 26 of 267 PageID #:43948
6-22-18 (Ex 14)
Hickey - cross by Bowman
3277

1  whenever there is any kind of request from the Criminal Justice

2  System for police records, one way or another that request ends

3  up in the hands of the Subpoena Response Unit, correct?

4  A.  Correct.

10:08:20  5  Q.  If there's a motion for discovery made by the criminal

6  defendant, the motion for discovery, one way or another, winds

7  it's way to the Subpoena Services Unit for the Subpoena

8  Services Unit to provide the actual disclosure of the

9  documents, right?

10:08:42  10       MS. ROSEN:  Objection.  There is no foundation.  The

11  motion goes to the Subpoena Services Unit.

12       THE COURT:  I'm sorry, say that again.

13       MS. ROSEN:  Sure.  There's no foundation or facts in

14  evidence that the motion itself goes to the Chicago Police

10:08:53  15  Department or the Subpoena Services Unit.

16       MR. BOWMAN:  Let me withdraw it, Judge, and I'll ask a

17  better question.

18       THE COURT:  Yes.

19  BY MR. BOWMAN:

10:09:01  20  Q.  Isn't it right that, either directly or indirectly, the

21  criminal definitives motion for discovery gets brought to the

22  Subpoena Services Unit for that unit to address and provide the

23  disclosure of information to the Criminal Justice System?

24       MS. ROSEN:  Same objection, Your Honor.

10:09:21  25       THE COURT:  You're asking about a motion and not a

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 27 of 267 PageID #:43949
6-22-18 (Ex 14)
Hickey - cross by Bowman
3278

1   subpoena?

2         MR. BOWMAN:  I'm asking about a motion, yes.

3         THE COURT:  Let's have the witness answer.

4   BY THE WITNESS:

10:09:31
5   A.  The Subpoena Services Unit is the clearinghouse, is the

6   place for which requests for information lands.

7   BY MR. BOWMAN:

8   Q.  Whether by motion or by subpoena, that's my point.

9   A.  I don't know the difference between motion and subpoena.  I

10:09:47
10   should, perhaps.

11   Q.  Okay.  Well, it's been a topic over the past few weeks, but

12   suffice it to say that, bottom line, this is a clearinghouse

13   for all requests for information; fair statement?

14   A.  Here to serve; yes.

10:10:06
15   Q.  And so if there is a problem of disclosure of police

16   records to persons outside of the department, would you agree

17   that making sure that the Subpoena Services Unit does its job

18   is essential to fixing that problem?  It's the issue of

19   disclosure.

10:10:34
20   A.  It's part, again the Subpoena Services Unit is the

21   middleman.  And they literally get the request, sometimes

22   specific and sometimes general, and they send it to the units

23   of the Chicago Police Department they believe that can best

24   respond to the request.

10:10:56
25   Q.  Right.  And in fairness to you and to the complexity of the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 28 of 267 PageID #:43950
6-22-18 (Ex 14)
Hickey - cross by Bowman
3279

1    situation, it's not to suggest that the fixing the Subpoena

2    Services Unit alone will solve the problem, because it

3    wouldn't, right?

4    A.  Correct.

10:11:13    5    Q.  But if you're going to make a full and complete fix to the

6    problem, the Subpoena Services Unit has got to be on your radar

7    screen, is that fair?

8    A.  Not all requests for information is a problem.  You know,

9    it's -- but when we do -- yes, all the subunits need to be

10:11:36    10    involved, along with the Subpoena Service Unit.

11    Q.  Now, to be clear, you told us yesterday that in 1988 there

12    was no written rule, policy, directive, procedure, or document

13    to guide the clerks on the Subpoena Services Unit when how to

14    assemble information in response to a criminal definitives

10:12:03    15    request to ensure that exculpatory information was produced.

16    That's, right, isn't it?

17    A.  There was no SOP on that topic.

18    Q.  No safe-checks?

19    A.  Safe-checks, nothing written.

10:12:20    20    Q.  And no -- and no SOP, as you just said, right?

21    A.  Correct.

22    Q.  Now, you said yesterday afternoon that the clerks in the

23    Subpoena Services Unit did have on-the-job training?

24    A.  Yes, sir.

10:12:34    25    Q.  They did not have any formalized training of any kind,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 29 of 267 PageID #:43951
6-22-18 (Ex 14)
Hickey - cross by Bowman

3280

1    right?

2    A.  Correct.

3    Q.  And there were, to be clear, no manuals, no training

4    records of any sort that governed or guided these clerks as to

10:12:53    5    the production of information, the disclosure of information to

6    the Criminal Justice System, right?

7    A.  I'm not aware of any formalized training.

8    Q.  Okay.  Now, I want to shift gears for just a second before

9    we go back to the Subpoena Services Unit and talk with you

10:13:11    10    about a related topic, which is the problem of parallel files.

11    That's an issue that your work made you sensitive to, right?

12    A.  Hopefully it was addressed by the special order of 1983.

13    Q.  Because having parallel files does engender some risk when

14    you're thinking about assembling information and disclosing

10:13:47    15    information to participants in the system, correct?

16    A.  Could you explain to me when you mean by "parallel files"?

17    I mean, I think I know, but could you --

18    Q.  I think I should explain it for everybody.

19          The one file, the file that your Detective Division

10:14:07    20    Special Order created was this investigative file, right?

21    A.  Yes, sir.

22    Q.  And the investigative file was a file that stayed in the

23    detective headquarters, various locations, depending on

24    geography around the City, right?

10:14:23    25    A.  Yes, sir.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 30 of 267 PageID #:43952
6-22-18 (Ex 14)
Hickey - cross by Bowman
3281

1  Q.  And that's the one that had the chips, and the GPRs, and

2  the outsized material, all the stuff in it relating to the

3  investigation that the detectives did in the case, right?

4  A.  Yes, sir.

10:14:35  5  Q.  In addition to that, there was also in, homicide cases,

6  something called a permanent retention file, right?

7  A.  Yes, sir.

8  Q.  And the permanent retention file had the original police

9  report, the so-called general offense case report in it?

10:14:56  10  A.  Yes, sir.

11  Q.  And it had all of the typewritten supplementary reports

12  that we've been talking about in this case.  Those were also in

13  the supplementary file?

14  A.  Or handwritten reports, yes.

10:15:12  15  Q.  And they could, in some circumstances, be handwritten?

16  A.  On the supplementary report, yes.

17  Q.  But 99 percent of the time those reports were typed.  Yes?

18  A.  By the Detective Division, outside units less.

19  Q.  Right.  And in addition, and this goes to this issue of

10:15:34  20  parallel files, in addition to what's in the permanent

21  retention file and the investigative file, in any case, there

22  may be other files outside the Detective Division that could

23  bare on the prosecution of a particular guy, right?  Depending

24  on the circumstances of a particular case?

10:15:51  25  A.  I think "files" might be kind of a strong word for

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 31 of 267 PageID #:43953
6-22-18 (Ex 14)
Hickey - cross by Bowman
3282

1    information which has been gathered by interested policemen

2    throughout the department.

3    Q.  For example --

4    A.  Documents.  Yeah.

10:16:07    5    Q.  Documents.

6    A.  Yes.

7    Q.  So, for example, there could be -- there could be, in a

8    case we might imagine, there could be a traffic issue in the

9    case and there might be something that -- that a patrol officer

10:16:23    10    had prepared relating to a traffic incident that might not be

11    in any other file other than -- or in any other location other

12    than with him, just an example.  Yes?

13    A.  Correct.

14    Q.  So that's the problem that I want to focus this on.  This

10:16:40    15    issue of parallel files creates a problem when you're thinking

16    about how to make sure that everything that the police

17    department has about a case gets turned over to the

18    participants in the Criminal Justice System, right?

19    A.  We have a procedure for information that's gathered and

10:17:05    20    generated by units outside the Detective Division.

21    Q.  Right.  And most definitely there are procedures for

22    preparing that information and keeping it, right?

23    A.  Preparing and disseminating; not keeping.

24    Q.  Well, disseminating within the police department, right?

10:17:31    25    A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 32 of 267 PageID #:43954
6-22-18 (Ex 14)
Hickey - cross by Bowman
3283

1    Q.  Because if we're talking about disseminating it outside of

2    the police department to the criminal defendant, that's where

3    we get back to the Subpoena Services Unit, right?  They're the

4    clearinghouse for that.

10:17:44    5    A.  Yes, sir.

6    Q.  Now, would you agree with me that if somehow, some way you

7    could eliminate all these parallel files and have one central

8    file that had everything in it, that would be nifty and that

9    would make it easier to ensure that when a disclosure is being

10:18:03    10    made, it's got everything in it?

11    A.  Philosophically, yes.  In a practical level, no.

12    Q.  Well, it's beyond our scope to get into the weeds of the

13    practicalities.  But you do agree that the Subpoena Services

14    Unit has a responsibility, in a parallel file system, to look

10:18:29    15    here, and look here, and look here, in order to gather up all

16    the information that's responsive to a discovery motion or a

17    subpoena, right?

18    A.  Both the Subpoena Services Unit and the original requester,

19    if they think they're missing something, they're entitled and

10:18:51    20    they're encouraged, give us a call, we'll look a little deeper,

21    what do you think you're missing.

22    Q.  Right.  And fast forwarding, you had command over the

23    Subpoena Services Unit in the early 2000's, right?

24    A.  That's correct.

10:19:11    25    Q.  So 15 years or so after 1988, the date that matters in this

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 33 of 267 PageID #:43955
6-22-18 (Ex 14)
Hickey - cross by Bowman
3284

1    case.  Yes?

2    A.  Yes, sir.

3    Q.  And, in fact, when you were in charge, you recall that

4    folks outside the police department would sometimes call and

10:19:27    5    complain.  Yes?

6    A.  Yes, sir.

7    Q.  And you recall, do you not, that within the Subpoena

8    Services Unit, to your knowledge, there was confusion about

9    exactly, in any particular case, what should or should not be

10:19:45   10    produced when this discovery request was made to the police

11   department, isn't that right?

12   A.  No; they would get the request, use their best experience

13   and judgment, send the information to the appropriate units,

14   and direct these units to cause a search of their individual

10:20:10   15   records.

16   Q.  Right.  That's -- that's how it's done.

17          And you said in the past that actually accomplishing

18   is a little bit of an art form, right?

19   A.  Yes, it is.

10:20:20   20   Q.  And do you recall that all the way up in 2000, 2005, when

21   you were in command, there were conversations and questions

22   about whether the file that your policy created, the

23   investigative file, the one with the notes and GPR's in it,

24   whether that file actually had to be turned over to in response

10:20:56   25   to a particular request.  You recall those particular

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 34 of 267 PageID #:43956
6-22-18 (Ex 14)
Hickey - cross by Bowman
3285

1    discussions, right?

2    A.  I think the only discussion might be, "If they didn't ask

3    for it, should we give it to them," you know.  In the early

4    days, I think that might've been a conversation or two.

10:21:14   5    Q.  Right.  There were specific conversations that you recall

6    about whether the investigative file had to be turned over or

7    not; you recall that?

8    A.  I do.

9              MS. ROSEN:  Objection.  Asked and Answered.

10:21:31  10              THE COURT:  Overruled.

11    BY MR. BOWMAN:

12    Q.  So let's -- let's talk next about a different subject, the

13    subject of audits.

14              And that came up yesterday afternoon as well, right?

10:21:48  15    A.  Correct.

16    Q.  And what you told us yesterday afternoon was that in 1986,

17    when your policy, your Detective Division special order was

18    revised, one revision that was made was a requirement that

19    there be spot-checks, right?

10:22:12  20    A.  Correct.

21    Q.  And the point of the spot-checks would be to go and look at

22    particular investigative files and ascertain whether or not the

23    detectives were actually complying with what was on the paper,

24    right?

10:22:32  25    A.  Correct.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 35 of 267 PageID #:43957
6-22-18 (Ex 14)
Hickey - cross by Bowman

3286

1    Q.  And you agree with me that that's an important thing to do,

2    right?

3    A.  Auditing is the function of command and all supervisors

4    should practice auditing.

10:22:46    5    Q.  Right.  And the reason is, you could have the most perfect

6    policy in the world on paper, but if it isn't actually being

7    followed and the information isn't actually being produced,

8    that's a problem, right?

9    A.  It can always be a problem.

10:23:06    10    Q.  So that's why the audits need to be performed, right?

11    A.  The -- we change orders every few years.  They evolve.

12    Whether they be lineup procedures or filing procedures,

13    auditing procedures, they just tend to evolve every 3 or

14    4 years.

10:23:29    15    Q.  The --

16    A.  Trying to improve it.

17    Q.  Let me ask you this, before you drafted Detective Division

18    Special Order 83-2, there had been a long-standing practice in

19    the police department of detectives treating notes as their

10:23:52    20    personal property.  We talked about that yesterday, too?

21    A.  Yes, sir.

22    Q.  And you didn't like the word "cultural," so I suggested

23    "entrenched."  It was an entrenched practice, right?

24    A.  Correct.

10:24:06    25    Q.  And, you know, do you not, that when practices are

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 36 of 267 PageID #:43958
6-22-18 (Ex 14)
Hickey - cross by Bowman
3287

1  entrenched, getting people to change their ways of doing

2  things, that's not always simple, right?

3  A.  Correct.

4  Q.  You can't expect the detectives in the Detective Division

10:24:29  5  who've been making notes and putting them in their lockers,

6  throwing them away at the end of the case, you can't expect

7  them necessarily to turn on a dime, right?

8  A.  We required it.

9  Q.  On paper?

10:24:47  10  A.  On paper.

11  Q.  But you didn't confirm, ever, that they were actually doing

12  what the policy required, right?

13  A.  There was no searches of the detectives.

14  Q.  Okay.  Inventory sheets, that's something else that we

10:25:07  15  talked about yesterday.  And you and I talked about how

16  important those case file inventories are for everybody

17  involved, right?

18  A.  Yes, sir.

19  Q.  That's the key.  That tells you what is in the

10:25:21  20  investigative file, right?

21  A.  Correct.  It acts almost like a case index.  A list of

22  things.

23  Q.  Case index.  And you would agree, as a matter of principle,

24  that the defense lawyer, along with everybody else in the

10:25:40  25  Criminal Justice System, needs to see this particular document,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 37 of 267 PageID #:43959
6-22-18 (Ex 14)
Hickey - cross by Bowman
3288

1  right?

2  A.  Correct.

3  Q.  All right.  Would it be a concern to you if I were to tell

4  you that when the examination of 38 public-defender files

10:25:57  5  chosen more or less at random was conducted of investigators

6  for the plaintiff's side in this case found the case file

7  inventory missing 90 percent of the time, would that be a

8  concern?

9  A.  I would be disappointed.

10:26:17  10  Q.  Right.  And you'd agree with me that if the lawyer, at the

11  very least, if the lawyer representing Jacques Rivera did not

12  have the investigative file inventory in his file, that would

13  be an indication that expectation and policy wasn't being

14  followed in practice, right?

10:26:43  15  A.  (No response.)

16  Q.  An indication, at least.

17          MS. ROSEN:  Objection to foundation for this witness.

18          MR. BOWMAN:  I'll move on, Judge.

19          THE COURT:  You're going to rephrase it?

10:26:54  20          MR. BOWMAN:  Let me try it again.

21          THE COURT:  Okay.

22  BY MR. BOWMAN:

23  Q.  If, hypothetically, the case file inventory wasn't in the

24  file of Jacques Rivera's lawyer, that put Jacques Rivera's

10:27:14  25  lawyer in the position of not being able to know what's in the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 38 of 267 PageID #:43960
6-22-18 (Ex 14)
Hickey - cross by Bowman
3289

1  investigative file, right?

2  A.  I think it's simply inconvenience to the lawyer.  It's now

3  5 years after this order has been out there.  All homicides

4  have investigative files.  You didn't send it to me, I'm a

10:27:36  5  little irritated.  I don't think it puts him at a disadvantage.

6  I think it's an inconvenience.  Somebody didn't do their job,

7  again or not.

8  Q.  So you're saying it's on him to -- to go find it?

9  A.  If he didn't ask for it -- the Subpoena Services Unit tries

10:28:05  10  and strives to give the people, give the attorneys what they

11  ask for.

12  Q.  Ah --

13  A.  If he didn't ask for it ....

14  Q.  You're not denying that it's the responsibility of the

10:28:20  15  Chicago Police Department to provide that file inventory in

16  response to a discovery motion, are you?

17          MS. ROSEN:  Objection, Judge.  Foundation.

18          THE COURT:  Well --

19          MS. ROSEN:  Discovery motion for what?

10:28:37  20          MR. BOWMAN:  Maybe I can rephrase the question.

21          THE COURT:  Yeah.

22

23  BY MR. BOWMAN:

24  Q.  Let me put it to you this way.  You're not denying that

10:28:45  25  when a defense lawyer requests all the documents that the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 39 of 267 PageID #:43961
6-22-18 (Ex 14)
Hickey - cross by Bowman
3290

1   police have, that the police department's responsibility is to

2   include the case file inventory with the documents, right?

3   A.  Correct.

4   Q.  Okay.  Now, one last -- or two last subjects and I'll be

5   done.

6          Going back again to the issue of gang crimes and

7   policies that do and don't apply to gang crimes.  We're clear,

8   and we talked about this yesterday, that the Detective Division

9   Special Order, by its terms, cannot and does not apply to the

10  Gang Crimes Specialists, right?

11          MS. ROSEN:  Objection.  Asked and Answered.

12          THE COURT:  Sustained.

13  BY MR. BOWMAN:

14  Q.  In 1988, did the Chicago Police Department have any reason

15  to believe that Gang Crimes investigators were preserving their

16  notes?

17  A.  I -- I don't think so.  I mean, like --

18  Q.  Right.  So --

19  A.  Something didn't come up.

20  Q.  Well, isn't it true that you yourself, Mr. Hickey, raised

21  the concern that the special order that you were drafting might

22  ought to apply beyond just the Detective Division, right?

23  A.  He did ask that rhetorical where he will question.

24  Q.  And the response that you got was that you were -- there

25  was no response, right?

10:29:08
10:29:40
10:29:52
10:30:13
10:30:41

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 40 of 267 PageID #:43962
6-22-18 (Ex 14)
Hickey - cross by Bowman
3291

1  A.  Correct.

2  Q.  And you said about fixing them.  And you were a detective

3  yourself at the time, right?

4  A.  Yes, sir.

10:30:51  5  Q.  And you set about fixing what was before and what you could

6  address in the Detective Division, right?

7  A.  Stay in your lane.  Yes.  Thank you.

8  Q.  And what you could resolve and what you did attempt to

9  resolve did not include the issue of whether the so-called

10:31:19  10  humper reports that existed in the Gang Crimes unit, whether

11  those reports were preserved and kept or whether they were

12  destroyed, right?

13  A.  A humper report is a daily activity report.  It describes a

14  an officer's description of their day, their tour of duty.  It

10:31:50  15  is not about a specific RD number investigation.

16  Q.  It would contain information about specific investigations

17  that a Gang Crimes specialist had engaged in over the course of

18  his day, would it not?

19  A.  It could.  And the form said "attach the reports," the

10:32:12  20  formal reports to supplemental this description you just gave

21  us.  So, again, the emphasizes is on formal, supplementary

22  reports.

23  Q.  Right.  And the problem that you were addressing was what

24  lies beyond the formal supplementary reports, right?

10:32:35  25  A.  In the Detective Division yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 41 of 267 PageID #:43963
6-22-18 (Ex 14)
Hickey - cross by Bowman
3292

1    Q.  In the Detective Division.

2         And you didn't look at what lies beyond formal

3    supplementary reports in the Gang Crimes unit, right?

4    A.  Right.

10:32:49    5    Q.  Nobody at the Chicago Police Department, in 1983 or at any

6    time prior to 1988, ever looked at or addressed that question,

7    right?

8    A.  Not only did we not look at it for Gang Crimes, we didn't

9    look at it for narcotics, or public housing, or gambling,

10:33:12    10    prostitution, all the other units.

11    Q.  All right.  Now, one last point.  I'm going to hand you

12    what is in evidence as Plaintiff's Exhibit 268.

13         (Document tendered to the witness:)

14    BY MR. BOWMAN:

10:33:37    15    Q.  And I will tell you that Exhibit 268 is a collection of

16    documents.  And we're not going to go through them individually

17    in the interest of time, but this is a collection of documents

18    that Jacques Rivera's counsel has testified were not provided

19    to him by the Chicago Police Department.

10:34:03    20         If you take a look at them, and when you're ready,

21    I'll ask you a question.

22         (Brief pause).

23    BY THE WITNESS:

24    A.  Okay.

10:34:21    25    BY MR. BOWMAN:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 42 of 267 PageID #:43964
6-22-18 (Ex 14)
Hickey - cross by Bowman
3293

1  Q.  Okay.  Do you agree with me that the documents in this

2  exhibit I just handed you are things that should have been

3  provided to Jacques Rivera's lawyer?

4        MS. ROSEN:  Objection to the foundation.

10:34:43  5        THE COURT:  Overruled.

6  BY THE WITNESS:

7  A.  Yes, they all appear to be specific.

8  BY MR. BOWMAN:

9  Q.  Right.  And do you agree with me that a policy should, to

10:35:07  10  the greatest extent possible, ensure that the documents in the

11  exhibit that I just handed to you were provided to Jacques

12  Rivera's counsel?

13  A.  I don't think writers of policy can predict any and all of

14  the possible documents that will wind up; so, therefore, it has

10:35:35  15  to be a little bit broad.

16  Q.  Well, then, let's look at this specifically.

17        The exhibit includes the case file inventory, right?

18  A.  Yes, sir.

19  Q.  And we've talked about that at length.  Should be produced

10:35:51  20  by policy?

21  A.  Correct.

22  Q.  And the policy should, to the greatest extent possible,

23  ensure that it is, in fact, produced, right?

24  A.  Correct.

10:35:58  25  Q.  And then there are a number of general progress reports in

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 43 of 267 PageID #:43965
6-22-18 (Ex 14)
Hickey - cross by Bowman
3294

```
 1    here, right?
 2              MR. BOWMAN:  For everybody's benefit, there is --
 3              (Brief pause)
 4    BY MR. BOWMAN:
 5    Q.  Here is a general progress report that we've talked about
 6    in this case.  That's something that the policy should ensure,
 7    to the greatest extent the policy is capable of ensuring, that
 8    it's produced to Mr. Rivera's lawyer, right?
 9    A.  Yes, sir.
10    Q.  And here's another general progress report.  Same question,
11    it's the same answer, right?
12    A.  Yes, sir.
13    Q.  And here's a third general progress report.  That should
14    also, by policy, have been produced to Jacques Rivera's
15    counsel, right?
16    A.  Yes, sir.
17    Q.  And the policy should, to the greatest extent possible,
18    ensure that it actually is produced, right?
19    A.  Yes, sir.
20    Q.  Okay.  Now -- and there -- well, another document from the
21    exhibit is a report relating to Jacques Rivera.  Reports
22    relating to Jacques Rivera should also be produced, right?
23    A.  Yes, sir.
24    Q.  And you don't see anything in this exhibit that, by policy,
25    should not have been produced?
```

10:36:22

10:36:38

10:36:58

10:37:06

10:37:41

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 44 of 267 PageID #:43966
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3295

1  A.  I do not.

2  Q.  And you don't see anything in this exhibit that policy

3  should, to the greatest extent possible, ensure be produced,

4  right?

10:37:55  5  A.  I don't understand that question.  I'm sorry.

6  Q.  By policy, you want to ensure that all this stuff gets

7  turned over to the greatest --

8  A.  By virtue of order of the Superintendent of Police, it

9  should be done.

10:38:09  10  Q.  All right.

11        MR. BOWMAN:  That's all I have.  Thank you, Mr.

12  Hickey.

13        THE COURT:  Ms. Rosen.

14                  REDIRECT EXAMINATION

10:38:20  15  BY MS. ROSEN:

16  Q.  Good morning, Mr. Hickey.

17  A.  Good morning, Ms. Rosen.

18  Q.  Okay.  Let me follow up on a few of the things you were

19  discussing this morning.  Actually, let's start with something

10:38:45  20  that you discussed late yesterday afternoon with Mr. Bowman.

21        You were asked some questions about the Special Orders

22  as they relate to investigative files and whether or not there

23  was any explicit language or direction in the order about the

24  process by which to disclose the information.  Do you remember

10:39:06  25  those questions?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 45 of 267 PageID #:43967
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3296

1    A.  I do.

2    Q.  And that prompted you to talk about the investigative file

3    log as a way that you've described already on a couple of

4    occasions to provide sort of an index of the file, right?

10:39:19    5    A.  Correct.

6    Q.  But, of course, there's nowhere in the order that

7    specifically directs, as you pointed out, the practical process

8    of the production, correct?

9    A.  That's correct.

10:39:32    10    Q.  Now, the Chicago Police Department has lots and lots of

11    documents and lots and lots of things related to criminal

12    investigations, correct?

13    A.  Correct.

14    Q.  And we've been talking about a couple of the orders here

10:39:45    15    today and directives that guide specific things, but the

16    Chicago Police Department has lots and lots of orders, right?

17    A.  Yes, ma'am.

18    Q.  Do any of the other orders in the Chicago Police Department

19    lay out in specific detail; so, for example, Evidence and

10:40:07    20    Recovered Property Section, orders governing that unit?

21    A.  Yes, ma'am.

22    Q.  Any orders that you can think of sitting here today that

23    specifically directs people in that unit on how to actually

24    produce documents pursuant to a file?

10:40:24    25    A.  The Evidence and Recovered Property Section order is

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 46 of 267 PageID #:43968
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3297

1    probably one of our thicker orders, but when it comes to actual

2    step by step how you turn information in or evidence over,

3    there's not a checklist.  There's not that -- we don't dive

4    that deeply.

10:40:45   5    Q.  Okay.  And let's talk a little bit about the questions you

6    were asked today about the Subpoena Service Unit and the fact

7    that there was some confusion, I think, about whether or not to

8    turn over the investigative file in the early days; correct?

9    A.  Correct.

10:41:08  10    Q.  And I think what I heard you say was something about there

11    was confusion on whether to produce it in the circumstance

12    where it wasn't specifically asked for?

13    A.  That is correct.

14    Q.  Okay.  So can you describe, when the Subpoena Service Unit

10:41:21  15    gets a request, can you describe, just generally, what that

16    request looks like.

17    A.  It's a single piece of paper subpoena to the keeper of

18    records, Chicago Police Department:  We would like the traffic

19    accident report, any diagrams, blood tests pertaining to an

10:41:47  20    incident that occurred at 79th and Western, on such-and-such a

21    day, under RD number, records division number, such-and-such.

22    Q.  Okay.  And you've just specifically talked about a

23    subpoena, and there were some questions that Mr. Bowman asked

24    you about a motion for discovery.

10:42:05  25           If I could get the Elmo.  I'm going to show you what's

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 47 of 267 PageID #:43969
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3298

1  been marked as Defendants' 23 C, which I believe is already in

2  evidence.

3          This is a motion for discovery that was actually filed

4  in Mr. Rivera's case.  Did the Subpoena Services Unit get filed

10:42:30  5  motions that were filed in court?

6  A.  I don't recall they're getting these documents.

7  Q.  Okay.  And the subpoena that you're describing, it's your

8  understanding a subpoena is a court order, right?

9  A.  Correct.

10:42:49  10  Q.  And the subpoena actually says "subpoena" across the top of

11  it?

12  A.  It does.

13  Q.  Okay.  And the jury has already seen examples of subpoenas,

14  so I don't want to waste any time doing that, but in the body

10:43:00  15  of the subpoena, it describes the things that you were talking

16  about, right?

17  A.  Yes, ma'am.

18  Q.  Okay.  So now taking it back to a request -- or the

19  confusion about whether or not to produce an investigative file

10:43:16  20  in the early days when the order was brand new, in a -- let's

21  take the example of a homicide case.  If you got a subpoena in

22  a homicide case, and the subpoena said reports related to RD

23  number 12345, without specifying investigative file, can you

24  tell us whether or not that's the thing that caused confusion?

10:43:43  25  A.  Correct.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 48 of 267 PageID #:43970
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3299

1    Q.  And how long of a period of time, after '83 first became

2    promulgated, did that sort of confusion occur?

3    A.  Not too long.

4    Q.  Okay.  And was it your understanding based on the new order

10:44:04    5    and the things that were happening to get the order on line,

6    that the police department was making sure that the

7    stakeholders in the Criminal Justice System were aware of the

8    of fact that there was now this thing called an investigative

9    file in homicides?

10:44:20    10    A.  Yes, we had a -- I think the State's Attorney's Office was

11    also involved in our meetings and explanation of the new

12    procedures.

13    Q.  Okay.  And Mr. Bowman asked you some questions about

14    whether or not it would surprise you that work done by Mr.

10:44:42    15    Rivera's investigators had looked through 38 criminal defense

16    attorney files and had come up with a number of 90 percent

17    --which I'm not entirely sure is accurate, but the jury will

18    know from the prior testimony--that the investigative file, the

19    investigative inventory file log wasn't present in the criminal

10:45:09    20    defense attorney file; do.  You remember those questions?

21    A.  I do.

22    Q.  If in those cases either all or part of the time the file,

23    the log was in the state's attorney file, how would that affect

24    your concern or disappointment?

10:45:24    25    A.  I don't understand.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 49 of 267 PageID #:43971
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3300

1    Q.  Let me try and rephrase that.

2         So just to focus what we're talking about, it's the

3    circumstance that Mr. Bowman described about what was found in

4    the 38 criminal defense attorney files.  And just to put it

5    into context, these are files from back in the 1980's, okay.

6         If the companion state's attorney files to those

7    criminal defense attorney files --

8              MR. LOEVY:  We object.  There's no foundation for

9    that.  We don't have those state's attorney files.  There is an

10   implication that they were in the state's attorney files.

11             THE COURT:  Well, I don't know if there is an

12   implication.

13             You are asking a hypothetical?

14             MS. ROSEN:  Yes.

15             MR. LOEVY:  Well, then there's no foundation --

16             THE COURT:  Wait.  Wait.

17             MR. LOEVY:  Sorry.

18             THE COURT:  If the plaintiff doesn't have them --

19             MS. ROSEN:  They are state's attorney files.

20             MR. LOEVY:  There is no disclosed.  No need to say

21   this.

22             THE COURT:  Well, maybe I'll see you at the side.  If

23   there is a discovery problem in this case, we have to resolve

24   it.

25             MR. LOEVY:  We'll withdraw our objection, Your Honor.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 50 of 267 PageID #:43972
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3301

1    THE COURT:  Okay.  Fine.  Go ahead.

2    BY MS. ROSEN:

3    Q.  So purely hypothetically speaking, if the investigative

4    file logs are in the state's attorney files and for some reason

10:46:36    5    either because of the passage of time or any other reason

6    aren't in the criminal defense attorney file, the concern that

7    you expressed to Mr. Bowman about the policy not working, would

8    that be changed?

9    A.  Yes.

10:46:46    10    Q.  And can you explain.

11    A.  They were copied and sent to the Criminal Justice System

12    and the State's Attorney's Office has it.  And as a matter of

13    discovery, they turn over that which they have.

14    Q.  Okay.  You were asked a series of questions.  Mr. Bowman

10:47:09    15    put the GPRs up here from our case, and you were asked a series

16    of questions about whether or not those documents should've

17    been turn over, correct?

18    A.  Correct.

19    Q.  And you recognized those documents to be documents that are

10:47:24    20    uniquely maintained and stored in an investigative file,

21    correct?

22    A.  Correct.

23    Q.  Okay.  And so if -- if a request was made either by a

24    prosecutor or a criminal defense attorney for the investigative

10:47:36    25    file, you would expect that the entirely of the file would be

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 51 of 267 PageID #:43973
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3302

1    turned over?

2    A.  Correct.

3    Q.  During the course of time that this new policy was put into

4    place, did you ever have any information or did the City have

10:47:56    5    any information that select portions of the file were being

6    withheld and only some of the file was being turned over.  Was

7    that something that was going on that the City was made aware

8    of?

9    A.  I don't recall it, no.

10:48:08    10   Q.  Okay.  You were asked a series of questions by Mr. Bowman

11   about these parallel files that he was talking about in units

12   other than the Detective Division.  And either you or he gave

13   the example of a traffic incident.

14        If a police officer was involved in some sort of

10:48:43    15   investigation related to a traffic accident or incident, what

16   reports would you expect to exist that this police report --

17   that this police officer would have prepared in connection with

18   whatever work he did?

19   A.  If we knew the information from the traffic unit was

10:49:06    20   needed, we would send it to the Patrol Division, the particular

21   district, or the traffic division, whoever wrote the ticket,

22   whoever made the enforcement action, and ask for their citation

23   or reports.

24   Q.  Okay.  And to your knowledge, based on the years that you

10:49:24    25   were at the police department, did like a unit, like traffic,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 52 of 267 PageID #:43974
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3303

1  have a file that was either akin -- that was akin to the files

2  that caused the problem in the Jones case?

3  A.  No.

4  Q.  How about in any other unit of the Chicago Police

10:49:45  5  Department, are there -- setting aside the Detective Division,

6  did it come to your attention during the years that you were a

7  member of the Chicago Police Department that the types of files

8  that were being utilized in the Detective Division that led to

9  the Jones incident existed in other units of the Chicago Police

10:50:09  10  Department?

11  A.  No, ma'am.

12          THE COURT:  Ms. Rosen, unless you're very close, I

13  think we ought to take our morning recess.

14          MS. ROSEN:  Why don't we do that, because I'm going to

10:50:23  15  move to lineups.

16          THE COURT:  Okay.  Let's take our break.

17          COURT SECURITY OFFICER:  All rise.

18          (The following proceedings were had out of the

19          presence of the jury in open court:)

10:50:45  20          THE COURT:  Before you go, I have a question about

21  Estes.  I looked at the part that the plaintiff wants or has

22  designated.  And it seems to me that all she's saying is, "I

23  don't know.  I don't know.  I don't remember."  What is that?

24          MR. LOEVY:  Is this on the affidavit issue?

10:51:04  25          THE COURT:  Well, no, this is about Estes, where the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 53 of 267 PageID #:43975
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3304

 1    defense wants to put in:

 2              "What does your note mean about Guevara?"

 3               And she says:

 4               "You know, I believe I was going to ask if he

 5              recalled."

 6               "And then why were you particularly interested

 7              in this?"

 8               "I don't know.  I know he wasn't a mister."

 9               "Why were you fostering on him?"

10               "I don't know.  I don't know why I wrote this."

11               Blah-blah-blah:

12              "Do you recall how many detectives were involved

13              in the investigation?"

14               "It was more than Guevara."

15               "And you just didn't jot down those other

16              names."

17                Okay.  That's what the defense wants to put in.  Just

18    ask her about the note, about what she remembers.

19               And then the plaintiff wants to put in, it starts

20    asking about this Huaud case, or Huaud case:

21              "...  are you still actively investigating that

22              case?

23               "No."

24               "When did it end?"

25               "Did you take notes?"

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 54 of 267 PageID #:43976
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3305

1          "I'm sure I did."

2          "Do you still have them somewhere?"

3          "Yes."

4          And then what was he convicted of, and they talk

10:52:23   5     about the case for a while.  And then does she still know if

6     litigation is still going on.  She said there was a

7     post-conviction petition, still ongoing.

8          And then:

9          "Question:  Do you remember what the allegations

10:52:38   10          ---"

11          It says "21," I assume allegations.  I don't

12          know what means:

13          "... against Detective Guevara are in that

14          case?

10:52:48   15          "No."

16          "Were you working on that case prior to your

17          work on Jacques Rivera?"

18          "I don't remember."

19          "Do you remember anything about the time frame

10:53:00   20          on Mr. Huaud's case?"

21          She says "no."

22          "Do you know if your notes were requested by

23          the State?"

24          "I don't know if there are notes."

10:53:08   25          I mean, I don't get -- I understand why defense wants

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 55 of 267 PageID #:43977
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3306

1   to put in, that that was on her agenda, but why all this "I

2   don't know" "I don't know" "I don't know" goes in, you're going

3   to have to tell me why.

4           MR. LOEVY:  It sounds she doesn't remember the notes

10:53:21   5   at all.

6           THE COURT:  Sure does.

7           MR. LOEVY:  Oh, does she remember she was going to

8   talk to Guevara?

9           THE COURT:  Well, she establishes that those were her

10:53:27   10   notes.

11          MR. LOEVY:  Right.

12          THE COURT:  And that she said, "talk to Guevara," and

13   then when she's asked about it she remembers nothing, as far as

14   I can tell.

10:53:34   15          MR. LOEVY:  I guess if she doesn't remember why she

16   was talking to Guevara on their designation --

17          THE COURT:  Right.

18          MR. LOEVY:  -- it doesn't count against us that she

19   doesn't remember the particulars of the Guevara investigations.

10:53:46   20          THE COURT:  I don't get that.  I mean, all of this is

21   lawyers testifying, and she says, "no, I don't remember."

22          MR. LOEVY:  Fair enough.

23          THE COURT:  I just don't see that it ought to come in.

24   I'll work on the other deposition and give you an answer as

10:53:59   25   soon as I can.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 56 of 267 PageID #:43978
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3307

1       MR. LOEVY:  Thank you, Your Honor.

2       THE COURT:  So this one, I'm going to allow the

3  defense designation, but not the plaintiff's.

4       MR. LOEVY:  Thank you, Your Honor.

10:55:02  5       (Recess.)

6       COURT SECURITY OFFICER:  All rise.

7       THE COURT:  Ready?

8       (Brief pause).

9       THE COURT:  Nobody is answering me.  Nobody is paying

11:01:47  10  attention.  You must be ready.

11       MR. LOEVY:  Sorry, Your Honor.

12       THE COURT:  We're ready.

13       Before we break for lunch, I want to very quickly have

14  you restate your positions on the Bryant issue, or at least

11:02:05  15  direct me to -- well, you can direct me to key pages while

16  we're waiting for the jury.

17       MR. GIVEN:  Pages?

18       THE COURT:  Well, maybe I better look at the pages.

19       MR. GIVEN:  Okay.  Let me grab it.

11:02:19  20       THE COURT:  I will want that before lunch, if not now.

21       (Brief pause)

22       MR. GIVEN:  Judge, actually the pages are -- do you

23  have the full sheet?

24       THE COURT:  I do.

11:02:34  25       MR. GIVEN:  Because they list the page and line

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 57 of 267 PageID #:43979
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3308

1   numbers right on the objections.

2            THE COURT:  Oh, okay.  So basically -- oh, well that's

3   easy.  There's only one issue and it's right on the first page.

4            MR. GIVEN:  Only one issue.  And actually, Judge, just

11:02:48   5   because it gets a little complicated, on page 2, at the very

6   end, on the right-hand column, there's -- the defendants have

7   a -- if Your Honor rules and sustains the objection to the

8   affidavit, then there were some designations additionally that

9   relate to the affidavits.

11:03:09   10            THE COURT:  We'll go there if we need to.

11            MR. GIVEN:  Right.  Exactly.

12            COURT SECURITY OFFICER:  Ready?

13            THE COURT:  Yes.

14            COURT SECURITY OFFICER:  All rise.

11:03:19   15            (The following proceedings were had in the

16            presence of the jury in open court:)

17            THE COURT:  Please be seated, everyone.

18            Ms. Rosen, as soon as you are ready.

19            MS. ROSEN:  I'm ready.  Thank you, Judge.

11:03:56   20   BY MS. ROSEN:

21   Q.  Before we move to lineups, one other area I want to discuss

22   with you.  Mr. Bowman asked you some questions about whether or

23   not in a perfect world a centralized file would be the way to

24   go.  And you indicated, practically speaking, that's not

11:04:18   25   realistic.  Can you explain what you mean by that?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 58 of 267 PageID #:43980
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3309

1  A.  Information and evidence comes in different sizes.  Filing

2  cabinets are predetermined.  In the course of an investigation,

3  you literally could get someone's personal telephone book.  I'm

4  dating myself, before the contact list.  Other items that come

11:04:46   5  up in investigation.  I mean, the mugshots, family photos;

6  there are different sizes.  And from the practical standpoint,

7  every case will almost be a different size.  You know, bigger

8  than a breadbasket, smaller than, you know, a truck.  It's just

9  a difficult thing.  You know, a polygraph exam report, reams of

11:05:13   10  paper.  It doesn't fold nicely into an 8 1/2 by 11 file, from

11  that practical standpoint.

12  Q.  And the structure of the Chicago Police Department is not

13  centralized, correct?

14  A.  No, it's not.  I wish we had a centralized beautiful place,

11:05:36   15  one-stop shopping, but we don't.

16  Q.  Okay.  With respect to the discussion that you had with Mr.

17  Bowman this morning about humper reports.  Can you tell -- you

18  talked about the different forms that the Chicago Police

19  Department prepares, and things of that nature, and a humper

11:06:06   20  report or the daily activity sheets is one of those reports,

21  correct?

22  A.  Correct.

23  Q.  With respect to all of the forms of the Chicago Police

24  Department, including the daily activity sheet, are there rules

11:06:17   25  governing how long those documents have to be maintained?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 59 of 267 PageID #:43981
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3310

A.   Right.  Some things the police department does very well,
we number our reports.  You know, we have a date, beginning.
And we also at the time of issuance of a new form we establish
a retention schedule; you know, 6 months, 30 days, a year.
And, you know, permanent, whatever the case might be for a
particular form.
Q.   And what governs how long to keep a particular form?
A.   Well, we get the best input we can from the users when the
form is being designed.  And if someone from legal affairs
tells us, oh, no, no, no, save it, save it, save it, we'll save
it.  If not, it's considered to be an administrative report,
and really has not much utility after a certain shelf life and
it takes up space.
Q.   Okay.  Now, let's move to the discussion about lineups.
And Mr. Bowman walked you through a series of hypotheticals as
they related to a circumstance where a particular witness
identified a filler.  You remember that line of questioning?
A.   I do.
Q.   And there was discussion about the utility of the witness
once that particular witness in a particular case identified a
filler.  Do you recall those questions?
A.   I do.
Q.   Based on your experience with the Chicago Police Department
and being a detective, in a circumstance where a witness
identified a filler in a lineup, was that witness utilized in

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 60 of 267 PageID #:43982
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3311

1     other lineups in that particular case?

2     A.  Certainly tended not to be.  Considered them burned out.

3     Q.  Okay.  And with respect to the orders of the Chicago Police

4     Department as it relates -- the order of the Chicago Police

11:08:33    5     Department as it relates to lineups back in the 1980's, you

6     indicated when you were discussing it with Mr. Bowman that it's

7     suspect-focused, right?

8     A.  Correct.

9     Q.  Can you explain what you meant by that.

11:08:47   10     A.  We tend to write orders for a specific purpose.  And a

11     lineup by anyone's definition, you know, where is the suspect.

12     It's about the suspect and being fair.  Others than the suspect

13     should look similar, weight, height, gender, et cetera.  But we

14     tend not to write orders for the exception.  You know, "what

11:09:23   15     if."  Well, you know, those get to be very big orders, and we

16     can never anticipate the terms.

17     Q.  And speaking generally about the orders of the Chicago

18     Police Department, whether their special orders directed to a

19     particular unit or general orders that are applicable to all of

11:09:47   20     the members of the Chicago Police Department, is there any way

21     to write an order, in your experience, that anticipates every

22     particular scenario?

23     A.  Absolutely not.

24     Q.  And is it the expectation of the City of Chicago and the

11:10:08   25     Chicago Police Department that the members of the Chicago

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 61 of 267 PageID #:43983
6-22-18 (Ex 14)
Hickey - redirect by Rosen

3312

1  Police Department will adhere to the orders to the best of

2  their ability?

3  A.  Absolutely.

4  Q.  And as it relates to specifically the special order that

11:10:31  5  govern the investigative files, I think we went over it

6  yesterday, but the order specifically indicated that if the

7  officers didn't comply, they could be subjected to discipline,

8  correct?

9  A.  Right.

11:10:41  10  Q.  Okay.  And so that was something that was made clear back

11  in 1983?

12  A.  Even if it doesn't say you're subject to discipline for

13  disobeying this order, it applies to all orders.  I mean,

14  they're an order by the employer to do this in a certain way.

11:11:04  15  We have to obey or subject ourselves to criticism, discipline,

16  training, whatever the result might be.

17  Q.  Okay.  And certainly, obviously, you know, members of the

18  police department are human beings and sometimes they don't

19  comply with the orders, correct?

11:11:22  20  A.  That's correct.

21  Q.  And there's -- the entity, what is the entity's philosophy

22  about circumstances where orders are not obeyed?

23  A.  Well, it's not immediate dismissal.  It's a range or a

24  continuum of possible corrective activity.  You know, the dirty

11:11:47  25  look for the supervisor, "come on!  Come on, George!  Let's do

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 62 of 267 PageID #:43984
6-22-18 (Ex 14)
Hickey - redirect by Rosen
3313

|  | 1 | better next time.  Use the right form." To all the way up to, |
|  | 2 | "I told you before."  It increases progressive discipline |
|  | 3 | training as needed. |
|  | 4 | Q.  And then when you're talking about -- you know, Mr. Bowman |
| 11:12:03 | 5 | asked you earlier about the cultural, changing the |
|  | 6 | institutional entrenched practices of the Chicago Police |
|  | 7 | Department, is that a way to get people to come into line? |
|  | 8 | A.  It is. |
|  | 9 | Q.  And is another way to train them in terms of what's |
| 11:12:27 | 10 | expected? |
|  | 11 | A.  It helps a lot. |
|  | 12 | Q.  Okay.  And immediately after 83-2 went into effect, was |
|  | 13 | there training? |
|  | 14 | A.  There was training. |
| 11:12:38 | 15 | Q.  Can you describe it? |
|  | 16 | A.  All the members of the Detective Division, detectives, |
|  | 17 | sergeants, lieutenants, the exempt commanders, and members of |
|  | 18 | the youth division who handle homicide suspects, were called in |
|  | 19 | for training on this topic to, face-to-face, give them the new |
| 11:13:06 | 20 | message about their notes are no longer personal, save them, |
|  | 21 | preserve them, this is how you do it, this is how you take |
|  | 22 | notes in the future.  And this training probably 900 people or |
|  | 23 | so. |
|  | 24 | Q.  And that would've been all the members of the Detective |
| 11:13:27 | 25 | Division at that time? |

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 63 of 267 PageID #:43985
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3314

1  A.  It was.  I conducted the training.

2  Q.  Okay.  And then going forward when new detectives, you

3  know, were promoted to being detectives, did they have to go

4  through that training, too?

11:13:39  5  A.  It became part of the established curriculum.

6  Q.  And, of course, for the new detectives, they never operated

7  under the old practice, right?

8  A.  Correct.

9  Q.  And so that cultural was, certainly at least by attrition,

11:13:53  10  changed over time, too?

11  A.  Yes, ma'am.

12       MS. ROSEN:  I don't have any further questions.

13       THE COURT:  Anything more?

14       MR. BOWMAN:  I have a couple of questions, if I may.

11:14:04  15       THE COURT:  Okay.

16              FURTHER RECROSS EXAMINATION

17  BY MR. BOWMAN:

18  Q.  On the subject of training, Mr. Hickey, you told us that

19  you were the person who conducted the training regarding the

11:14:21  20  policy that you had drafted?

21  A.  That's correct.

22  Q.  That was a 3-hour training.

23  A.  You know, I noticed having reviewed all my depositions over

24  the past 30 years on this topic, a couple of times I called it

11:14:38  25  8 hours, and a couple of times I called it 3.  There was

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 64 of 267 PageID #:43986
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3315

```
          1   training.  It was conducted within a shift.  To this moment, I
          2   can't remember exactly how long it was.
          3   Q.  It was -- it was confined to a single day, right?
          4   A.  A little less, yes.
11:14:55  5   Q.  Less than a single day?
          6   A.  Yes.
          7   Q.  Was the superintendent of police involved in this training?
          8   A.  No, he was not.
          9   Q.  Was the chief of detectives involved in this training?
11:15:06 10   A.  No, he was not.
         11   Q.  This was something that you as a detective did?
         12   A.  Correct.
         13   Q.  Do you think that less than a day of training on this
         14   subject is sufficient to transform entrenched practices in the
11:15:27 15   Chicago Police Department?
         16   A.  I think training the first week, it's somewhat contentious.
         17   It's a battle.  You're introducing something new.  But by the
         18   fourth and fifth week, all the participants already got the
         19   message from their fellow workers and, you know, it just
11:15:51 20   becomes training.
         21        Do I think it's sufficient?  Yes, I do.  It was -- it
         22   was highly unusual to call all the detectives in.  They knew it
         23   was something different, times had changed.
         24   Q.  Okay.  One day conducted by you?
11:16:16 25   A.  Correct.
```

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 65 of 267 PageID #:43987
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3316

1  Q.  Now, I want to jump around just a little bit.  I heard you

2  say something in response to Ms. Rosen about burning a witness.

3  A.  Yes, ma'am -- yes, sir.

4  Q.  If a witness picks a filler, the witness is burned, is what

11:16:37  5  you said.

6  A.  I'm sorry?

7  Q.  Sorry.  If a witness picks a filler, the witness is burned,

8  right?

9  A.  Ah --

11:16:46  10  Q.  It's what you just said?

11  A.  Certainly burned out.  I would think twice about using that

12  person again.

13  Q.  Can you explain why?

14  A.  Well, I -- I -- personally, I just think it's -- there's

11:17:08  15  some doubt in my own mind, you know, if you pick someone else.

16  I -- I think we all want to buy in to the fact that it's a

17  positive identification.  You really don't want to have doubts.

18  I mean, it's -- this is important stuff.

19  Q.  Okay.  So your attitude would be, don't use this witness

11:17:31  20  again?

21  A.  I would -- I would be slow to use this witness again.

22  Q.  Now, would you agree with me that the -- that the burning

23  of this witness only happens if the police department makes a

24  record of the selection of the filler and discloses it to the

11:17:54  25  criminal defense lawyer, isn't that right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 66 of 267 PageID #:43988
6-22-18 (Ex 14)
Hickey - further recross by Bowman

3317

1  A.  We complied in 1983, according to the 1983 directive.  The

2  fact that the directive changed subsequent to that has no

3  bearing on this.

4  Q.  Let me ask you my question again.  I'm going to request

11:18:19  5  that you answer my question.

6  A.  Sorry.

7  Q.  Isn't it a fact that the witness only gets burned to the

8  extent that the police department makes a record of it.  So

9  that the burning of the witness can be disclosed to everyone in

11:18:37  10  the system; isn't that true?

11  A.  I -- I -- I see that argument, yes.

12  Q.  All right.  Now, you were talking about the complexity of

13  the police department, the fact that it's a decentralized

14  institution when Ms. Rosen was asking you questions a minute

11:19:04  15  ago, right?

16  A.  Yes, sir.

17  Q.  You also told Ms. Rosen yesterday afternoon that when you

18  were doing your work in 1983 in response to the Jones case,

19  among other things, you had occasion to look at other police

11:19:19  20  departments, right?

21  A.  I -- I try to.

22  Q.  Isn't it true that many police departments, including big

23  police departments, have a centralized file system, a single

24  file system?  Isn't that true?

11:19:39  25  A.  I don't know that to be true.  I truly haven't done enough.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 67 of 267 PageID #:43989
6-22-18 (Ex 14)
Hickey - further recross by Bowman

3318

1  Q.  Okay.  Fair enough.

2       Isn't it true that you yourself in a memorandum that

3  you authored in connection with your work recommended that, in

4  terms of filings, there should be, to the extent practicable, a

11:20:09   5  single file system in the Chicago Police Department?  That was

6  your recommendation, right?

7  A.  That would be my preference as a detective.

8  Q.  Okay.  Quickly, on the subject of compliance with your

9  policy, which you were talking with Ms. Rosen about, to be very

11:20:35  10  clear, the audits that were required by the new special order

11  in 1986, those required audits never happened, right?

12  A.  I don't know that.

13  Q.  You don't have any information that any -- you are not

14  aware of any information that any such audit ever occurred, is

11:21:02  15  that fair?

16  A.  An audit does not have to be a formalized report.  The

17  exempt commanding officers were assigned responsibility to

18  conduct an audit of random cases.  Yeah, I did that.  There was

19  no requirement to formalize it in a report.

11:21:24  20  Q.  You've had occasion, Mr. Hickey, to testify about this

21  many, many times?  Yes?

22  A.  Yes, sir.

23  Q.  And among the occasions was that you were called as a

24  witness in lawsuit in this building called Fields versus the

11:21:45  25  City of Chicago; right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 68 of 267 PageID #:43990
6-22-18 (Ex 14)
Hickey - further recross by Bowman

3319

1    MS. ROSEN:  Objection, Judge.

2    THE COURT:  What is the purpose of this question?

3    MR. BOWMAN:  I'm just laying a foundation for an

4 impeachment.

11:21:55    5    THE COURT:  Okay.  I think we probably should go to as

6 little as possible into some other litigation.

7    MR. BOWMAN:  I'm sorry.  Let me rephrase the question.

8    THE COURT:  Overruled.

9 BY MR. BOWMAN:

11:22:07   10 Q.  You had occasion to testify in another lawsuit in this

11 building on this topic, right?

12 A.  Correct.

13 Q.  And at page 236 of the Fields transcript, were you asked

14 this question and did you give this answer:

11:22:25   15    "Question:  And you are not aware of any,

16    although the prisons provided for audits, you

17    were not aware of any audits that actually

18    happened?

19    Your answer:

11:22:40   20    "Answer:  Correct."

21    MS. ROSEN:  Objection.  Not impeaching.  It's Not

22 impeaching.  He just said the same thing.  He is not aware.

23    THE COURT:  I'm not sure.  I think the jury can make

24 this decision, but I think it's subject to some debate.

11:22:56   25 BY MR. BOWMAN:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 69 of 267 PageID #:43991
6-22-18 (Ex 14)
Hickey - further recross by Bowman

3320

1  Q. One last question, Mr. Hickey, from me.  I'm going to hand

2  you -- well, let me tell you ask you first.  There was some

3  questions from Ms. Rosen about -- about motions for discovery

4  versus subpoenas.  The Subpoena Services Unit from time to time

11:23:19   5  receives subpoenas from prosecutors, right?

6  A. Correct.

7  Q. And those would be complied with in the manner that you

8  testified about, right?

9  A. Yes, sir.

11:23:27   10  Q. To the extent of the unit's ability, right?

11  A. Yes, sir.

12  Q. And from time to time the Subpoena Services Unit would

13  receive subpoenas from defense lawyers, too.  Yes?

14  A. Yes.

11:23:40   15  Q. Let me hand you what's marked for identification

16  Plaintiff's Trial Exhibit 44.

17        (Document tendered to the witness).

18         MS. ROSEN:  Can I see what you're showing him?

19         MR. BOWMAN:  I only have one copy.

11:24:03   20        (Counsel conferring.)

21         MS. ROSEN:  Judge, could we have a sidebar?

22         THE COURT:  Sure.

23

24        (Proceedings heard at sidebar on the record).

11:24:20   25         THE COURT:  Let me just say, before we get into this,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 70 of 267 PageID #:43992
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3321

1  that you caused me to doubt that I thought I had heard, but I

2  think it was impeaching; okay.  Because he had said that it

3  didn't need to be a formal report, he did it himself.

4         MS. ROSEN:  He first said he was unaware of, and then

11:24:38  5  there was follow-up question that got into that part.

6         THE COURT:  Well, I think it was probably impeaching.

7         Okay.  So now what are we doing here?

8         MR. BOWMAN:  This is a subpoena that has a stamp on

9  it, "served," received by the Chicago Police Department.  It's

11:24:54  10  got "People versus Jacques Rivera" on it.

11         THE COURT:  Okay.

12         MR. BOWMAN:  I'm just going to be asking him, "Is this

13  a defense subpoena of the kind that you would respond to in a

14  way that you have testified about."

11:25:09  15         THE COURT:  And what's the objection?

16         MS. ROSEN:  And do you intend to move it into

17  evidence, then?

18         MR. LOEVY:  Yes.

19         MR. BOWMAN:  Yes.

11:25:17  20         MS. ROSEN:  Okay.  So the objection is to -- I mean,

21  they he can show him and ask about it, but to move it into

22  evidence -- the problem with the subpoena is that Mr. DeLeon

23  never represented Mr. Rivera in connection --

24         MR. LOEVY:  But --

11:25:30  25         THE COURT:  Wait.  Wait.  Let me just hear one person,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 71 of 267 PageID #:43993
6-22-18 (Ex 14)
Hickey - further recross by Bowman

3322

1    okay.

2              MS. ROSEN:  So Mr. DeLeon never represented Mr.

3    Rivera.

4              THE COURT:  Right.

11:25:38    5              MS. ROSEN:  We asked Mr. Wadas about it not at trial,

6    but at his deposition, he had to idea whether or not -- why the

7    subpoena would have been issued by Mr. DeLeon.

8              THE COURT:  Wasn't Wadas in DeLeon's firm?

9              MS. ROSEN:  No.  Different guy.  It was Dijon.

11:25:54   10              THE COURT:  Oh, Dijon.  Okay.  Sorry.

11              MS. ROSEN:  So the point would be that -- and we

12    interviewed Mr. DeLeon.  And he has no recollection of this,

13    and no explanation for why he would have it, and no idea with

14    whether or not the Chicago police would have responded to it

11:26:13   15    and gave him everything.

16              So they're going to try and interject that there was a

17    subpoena issued by Mr. -- on behalf of Mr. Rivera when nobody

18    can connect Mr. Rivera to Mr. DeLeon.

19              THE COURT:  Well, you said one thing that disturbs me.

11:26:30   20    This is obviously someone on behalf of Mr. Rivera.  The

21    question you're raising that concerns me is, is it possible

22    that Mr. DeLeon got documents in response to this that Mr.

23    Wadas didn't get.

24              MR. GIVEN:  Your Honor, we subpoenaed Mr. DeLeon, and

11:26:49   25    he responded that he had no memory of Mr. Rivera --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 72 of 267 PageID #:43994
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3323

1      THE COURT:  Of course.

2      MR. GIVEN:  -- and no documents.  He had no file

3  relating to Mr. Rivera and no documents connected to this.

4      THE COURT:  All right.

11:26:58  5      MS. ROSEN:  So this injects speculation into all of

6  this about whether or not the police department -- because

7  they're going to try and argue in closing that, in fact,

8  somebody on Mr. Rivera's behalf issued a subpoena and he still

9  didn't get the documents.  But there's --

11:27:11  10      THE COURT:  I got it.

11      MR. BOWMAN:  The suggestion has been made that because

12  there was no subpoena, that things didn't go down

13  appropriately, that it was not reasonably diligent to have

14  subpoenaed the department.

11:27:26  15      Here is the subpoena that is stamped "served."  It's

16  stamped "Chicago Police Department's Records Division," it's in

17  the police department's permanent retention file.  And it is

18  relevant to dispel the suggestion that because there was no

19  subpoena submitted by Wadas, that somehow the department would

11:27:45  20  have treated the matter differently.

21      So it's a subpoena, they got a subpoena, and we want

22  to address it.

23      MR. GIVEN:  Judge, may I add one more thing about the

24  subpoena?

11:27:53  25      THE COURT:  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 73 of 267 PageID #:43995
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3324

1     MR. GIVEN:  It's returnable to 26th Street, but Mr.

2  Rivera's case was in Skokie.  This whole subpoena is very, very

3  highly suspicious.

4     MR. SOTOS:  And Mr. Wadas said that Mr. DeLeon had

11:28:09  5  nothing to do with the case specifically in his deposition.

6     THE COURT:  Well, it's pretty mysterious, because

7  obviously Mr. DeLeon is a defense lawyer, right?

8     MR. GIVEN:  Yes.

9     MS. ROSEN:  Yes.

11:28:19  10     THE COURT:  And it's in Mr. Rivera's case.  It's

11  returnable --

12     MS. ROSEN:  To a different courtroom.

13     THE COURT:  -- to the wrong.

14     MR. LOEVY:  Is it returnable to the State's Attorney's

11:28:31  15  Office, Your Honor?

16     MS. ROSEN:  No, it's returnable to this judge at 26th

17  and California.

18     THE COURT:  A judge presiding at 26th and California.

19     MS. ROSEN:  Yes.

11:28:38  20     MR. GIVEN:  And also --

21     MR. BOWMAN:  It's Branch 25, Judge.

22     THE COURT:  You know, I'm going to do this.  You know,

23  I've got to think about this because this is a mess.  But if

24  you want to get -- if you want -- I don't know what you're

11:28:55  25  going to do.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 74 of 267 PageID #:43996
6-22-18 (Ex 14)
Hickey - further recross by Bowman
3325

```
            1          MR. LOEVY:  Could we ask him, without showing the
            2   jury, is this the kind of document that would have triggered a
            3   response from the Subpoena Services Unit?
            4          THE COURT:  I think that's okay, and then we can worry
11:29:02    5   about this later, because I don't know what we ought to do with
            6   it.
            7          (Proceedings resumed in open court).
            8   BY MR. BOWMAN:
            9   Q.  Mr. Hickey, did I hand you the exhibit before we broke?  Do
11:29:40   10   you have it in front of you?
           11   A.  You did.
           12   Q.  Okay.  This is, without saying anything about the
           13   circumstances, this is a subpoena issued by a defense lawyer.
           14   Appears to be on its face, right?
11:29:56   15   A.  Yes, sir.
           16   Q.  Is this the kind of document that would trigger a response
           17   from the Subpoena Services Unit when it was received?
           18   A.  Yes.
           19   Q.  Okay.
11:30:08   20          MR. BOWMAN:  That's all I have, Your Honor.
           21          THE COURT:  Anything further, Ms. Rosen?
           22          MS. ROSEN:  No.
           23          THE COURT:  Okay.  Thank you, sir.  You may step down.
           24   Watch your step.
11:30:24   25          (Witness excused.)
```

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 75 of 267 PageID #:43997
6-22-18 (Ex 14)
Spratte - direct by Rosen
3326

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
|          | 1  | (Brief pause).                                                           |
|          | 2  | THE COURT:  Sir, could you come up here, please.                         |
|          | 3  | (Brief pause).                                                           |
|          | 4  | THE COURT:  Please raise your right hand.                                |
| 11:30:43 | 5  | (Witness duly sworn.)                                                    |
|          | 6  | THE COURT:  You may be seated.                                           |
|          | 7  | THE WITNESS:  Thank you.                                                 |
|          | 8  | JAMES SPRATTE, DEFENSE WITNESS, SWORN                                    |
|          | 9  | DIRECT EXAMINATION                                                       |
| 11:30:49 | 10 | Q.  Good morning, Mr. Spratte.                                           |
|          | 11 | Could you please identify yourself for the ladies and                   |
|          | 12 | gentlemen of --                                                         |
|          | 13 | A.  My name is James Spratte.                                            |
|          | 14 | Q.  And you have been designated by the City of Chicago to              |
| 11:30:56 | 15 | speak on certain issues as it relates to the operations of the          |
|          | 16 | Gang Crimes Unit back in the 1980's; you understand that?               |
|          | 17 | A.  Yes, ma'am.                                                         |
|          | 18 | Q.  Okay.  So why don't you give us a little bit about your             |
|          | 19 | background.                                                              |
| 11:31:10 | 20 | A.  I was hired by the police department in February of 1978.           |
|          | 21 | I went through training and was assigned to the 7th District on         |
|          | 22 | the south side, also known as Englewood.                                |
|          | 23 | I worked there for about a year.  Was asked to go to                     |
|          | 24 | tactical team, which is plainclothes, like a street-crime team,         |
| 11:31:31 | 25 | for about 31/2 years.                                                   |

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 76 of 267 PageID #:43998
6-22-18 (Ex 14)
Spratte - direct by Rosen
3327

11:31:48

1    I went to the 22nd District, which is a little further

2    southwest.  And I worked on a tactical team there for 2 years.

3    And I had been approached, and I went to Gang Crimes

4    West.  I worked as a tactical officer in Gang Crimes West for

5    about a year and I was promoted to Gang Specialist.

6    Q.  Okay.  So let's talk about the Gang Crimes Unit.

7    You said you were in Gang Crimes West, correct?

8    A.  Yes, ma'am.

9    Q.  How was the Gang Crimes Unit organized?

10   A.  There were three units, one commander.  It was a Gangs

11   North, a Gangs South, and a Gangs West.  Gangs West was the

12   smallest of the three manpower-wise.  Each unit had a number of

13   Gang Specialists that were paid at a higher rate.

14   I believe at Gangs West we had 22 or 23, at one point.

15   Gangs North and Gangs South were larger.  They had

16   more Gang Specialists.

17   And it was complimented by a number of tactical

18   officers.  Probably in Gangs West, in the area of 100 to 130.

19   Q.  And back in the 1980's, around, say, between 1985 and 1990,

20   what was the mission of Gang Crimes?

21   A.  Well, they -- they -- the Gang Specialists were

22   intelligence-driven.  They were assigned a gang, or a number of

23   gangs, depending on the size of each gang.  And their -- their

24   entire assignment was monitor the activities of these gangs,

25   gang or gangs.

11:32:03

11:32:29

11:32:50

11:33:18

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 77 of 267 PageID #:43999
6-22-18 (Ex 14)
Spratte - direct by Rosen
3328

1      I was on the west side.  I had six smaller Hispanic

2   gangs.  And my responsibility was monitor the activities,

3   basically gather the intelligence from the assigned gangs.

4      The tactical officers, for the most part, worked in

11:33:35    5   unison with us, but they were driven, they were

6   intelligence-driven.  If we had -- if we had a shooting or

7   several shootings and we expected retaliation, the watch

8   commander of that unit would assign one or two tactical teams

9   to that area, either in plainclothes or in uniform.

11:33:53   10   Q.  Now, you described if there was a shooting, you know, or a

11   couple of shootings, you expected retaliation.  Was the mission

12   of Gang Crimes to solve the shootings or to deal with the

13   retaliation?

14   A.  It would be -- it would be more retaliation, yes.  The --

11:34:11   15   the -- they wanted to know what was going on on the streets.

16   They wanted to know -- they -- they liked the anticipation.

17      And, you know, the gang guys, the Specialists, for the

18   most part, they were 8 hours a day out on the streets working

19   -- I wouldn't say work for, but you're working the streets, you

11:34:31   20   got to know the gang members, you got to know the girlfriends,

21   the hangers-on, and that would drive your intelligence.

22      We knew who was -- who was at war with whom, who was

23   alive with whom, and that changed from time to time.

24   Q.  In the course of the work that you did as a Gang Crimes

11:34:49   25   Specialist, did they have occasion to work with the detectives

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 78 of 267 PageID #:44000
6-22-18 (Ex 14)
Spratte - direct by Rosen

3329

1    in the detective divisions that were -- or the area that

2    encompassed your particular assignment?

3    A.  Yes, ma'am.  Quite often.

4    Q.  And how would you describe the relationship between the

11:35:06    5    Gang Crimes Specialists and the detectives that you sometimes

6    worked with?

7    A.  It was -- I would say it was a great relationship.  We were

8    their eyes and ears on the street, so to speak.  We -- there

9    were a number of days, not every day, but a number of days

11:35:24    10    during the week I'd start work at 5:30.  And I'd come in at

11    5:30 and there would be a homicide detective waiting outside

12    the offices of Gangs West:  Do you know so-and-so.  You know,

13    they'd have a nickname.  Could be a witness.  And just try to

14    identify the nickname.

11:35:38    15          So they -- they handled the investigation of each

16    case, and we did more the intelligence.  We knew the players,

17    so we were easier -- it was easier for us to find them and

18    identify them.

19    Q.  So would you in the example that you described where you

11:35:52    20    had a detective who was working in a homicide and he came up to

21    you when you came to work and said, "do you know this

22    particular individual," what would you do when you received

23    that kind of a request?  If you got like the nickname, let's

24    say.

11:36:09    25    A.  If I knew him, I'd identify him for the detective.  "Do you

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 79 of 267 PageID #:44001
6-22-18 (Ex 14)
Spratte - direct by Rosen
3330

1    need him?"  You know, it was easier -- we knew -- we'd have an

2    idea of where they would be, a better idea than a detective,

3    exactly where to find him.

4    Q.  And when you say you knew where to find him, what do you

5    mean?

6    A.  We knew the turf.  We knew where a lot of them lived.  We

7    knew their girlfriends, we knew where they hung out.  In a lot

8    of cases, if they held a job, we knew where they worked.

9         So they were much easier for us.  And we knew them on

10   sight rather than trying to -- to look at them and look at a

11   photo and, "That might be him.  That might be him."  A lot of

12   the players, we knew.

13   Q.  Okay.  And during the course of your job as a Gang Crimes

14   officer, did Gang Crimes officers utilize something that the

15   jury has heard about in this case, books that have photographs

16   of gang members?

17   A.  Yes, we did.

18   Q.  And how did you utilize those gang books?

19   A.  They were utilized by everybody:  Tactical teams, the

20   detectives, other gang tach officers, Gang Specialists.

21        The Gang Specialists were assigned a gang or gangs.

22   Yearly, they were responsible for a synoptic report, which is

23   what's going on currently, identifying any new leadership, any

24   new members.

25        Oh, I just lost my train of thought.  I'm sorry.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 80 of 267 PageID #:44002
6-22-18 (Ex 14)
Spratte - direct by Rosen

3331

1  Q.  You were talking about synoptic reports.

2  A.  Oh, synoptic reports.  In addition to that, you had to

3  update the photo books.  So anybody that we had in our

4  synoptic, we would also have, for better word, a mugshot in the

11:37:50  5  book.  And we would have it referenced, depending on how the

6  gangs -- each individual Gang Specialist did it.  It could be

7  alphabetical order, it could be numerical number by their

8  booking number.  There was no set way of doing it.  It was just

9  everybody put these books together.

11:38:05  10  Q.  Okay.  And how did you utilize the books in connection

11  with, let's say, helping a detective in a particular criminal

12  investigation?

13  A.  The detective might ask to borrow the books.  Or "can I

14  bring somebody down if you got nothing going on?  Let them look

11:38:23  15  through the books."  "We've got a -- we've got a shooter we

16  suspect is a Latin King, can we look at your King books?"

17       Do you know Little rusty?  I know Little Rusty to be

18  so-and-so.  Have you got anybody upstairs that's talking about

19  Little Rusty can identify him.  Let's go to the gang book, see

11:38:51  20  if he can pick someone so we know we're talking about the same

21  individual.

22  Q.  Okay.  You talked about preparing synoptic reports.  So

23  let's talk about a little bit.

24       Did you say that's a report you had to do yearly?

11:39:00  25  A.  Gang Specialists had to do it yearly, and in 6 months after

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 81 of 267 PageID #:44003
6-22-18 (Ex 14)
Spratte - direct by Rosen
3332

1    the synoptic you did an update, which would just be in a simple

2    to-form report.  Any new members you had identified, any

3    changes in leadership through imprisonment, death,

4    incapacitation in any way, shape, or form.  Who currently was

5    calling the shots.

6    Q.  Were synoptic reports driven -- the information that was

7    contained in the synoptic reports, were they driven by specific

8    crimes or were they driven by something else?

9    A.  They were driven by specific gangs.

10   Q.  By gangs?

11   A.  Yes, ma'am.

12   Q.  Okay.  And so, for example, if you were writing a synoptic

13   report about a gang that you were responsible for, a Latin King

14   for example, what type of information would be in your synoptic

15   report?

16          MR. LOEVY:  Objection to relevance, Your Honor.

17          THE COURT:  Overruled.

18   BY THE WITNESS:

19   A.  Would you repeat that, please.

20   BY MS. ROSEN:

21   Q.  Sure.  If you are preparing a synoptic report and you're

22   addressing, for example the Latin King street gang because

23   that's a gang that you were responsible for, what generally

24   types of information would be in that?

25   A.  As I remember, it was a two-page form set.  So you had

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 82 of 267 PageID #:44004
6-22-18 (Ex 14)
Spratte - direct by Rosen

3333

1   limited space to fill in leadership, a limited space for a

2   narrative, what's going on, what's new, any new alliances, and

3   stuff, and then you would continue it by just a piece of paper.

4   If you identified any new members, it would normally be name,

11:40:34  5   address, height, weight, sex, race, date of birth, and I

6   believe IR number.

7   Q.  Okay.  Other types of -- well, let me ask you this, if you

8   get involved in a criminal investigation because a detective

9   brings you in for assistance--use of the mugshot, finding a

11:40:55  10  witness--and you develop information regarding the criminal

11  investigation, what reporting responsibilities did you have as

12  a Gang Crimes specialist?

13  A.  I would check with the detective.  Let them know what I had

14  discovered as they were -- they were the driving force behind

11:41:15  15  investigations.  The detectives were the primary investigators,

16  any criminal investigation in the city.

17        So I'd notify them what I had heard.  If I had heard

18  it from somebody on the street, I'd tell them, Come on, let's

19  take a ride, let's go in and talk to the detectives.

11:41:28  20        If it was something I didn't know it was pertinent,

21  whether or not it was pertinent, and I might leave that subject

22  on the street knowing I could find him later, I'd go in.  And

23  if the detective thought it was pertinent, they might direct me

24  to submit a supplementary report.

11:41:42  25  Q.  Okay.  And if you were directed to prepare a supplementary

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 83 of 267 PageID #:44005
6-22-18 (Ex 14)
Spratte - direct by Rosen
3334

1  report, what information would you put in the supplementary

2  report?

3  A.  It would -- it would depend on what we had developed.  If

4  we had developed information, if we had made an arrest, if we

5  had conducted a photo lineup, assisted in any criminal

6  investigation that they deemed it was pertinent to that

7  investigation we would reduce it to writing and submit it, a

8  Patrol Division Supplementary Report.

9  Q.  Okay.  And there has been some testimony about the daily

10  activity sheets or humper reports that are prepared by Gang

11  Crimes Specialists.  Can you describe what that report is?

12  A.  Again, it's been a long time.  It was a single sheet of

13  paper --

14  Q.  Actually, you know, we have the exhibit.  So maybe we

15  should show you the exhibit.

16          MS. ROSEN:  Can we get the defense table 2, please.

17          (Counsel conferring.)

18          MS. ROSEN:  This is number 32.

19  BY MS. ROSEN:

20  Q.  We're going to ask you to take a look at Exhibit 32.  Look

21  at it on your screen there.

22          Is that the daily activity sheet that you remember?

23  A.  Yes, ma'am.

24          MS. ROSEN:  At this time the City seeks to admit City

25  Exhibit Number 32.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 84 of 267 PageID #:44006
6-22-18 (Ex 14)
Spratte - direct by Rosen

3335

11:43:20

11:43:30

11:43:54

11:44:12

11:44:27

 1      MR. LOEVY:  No objection, Your Honor.

 2      THE COURT:  It is received.

 3      (City Exhibit Number 32 was received in

 4      evidence).

 5      MS. ROSEN:  If we could publish that to the jury?

 6      THE COURT:  Sure.

 7  BY MS. ROSEN:

 8  Q.  Okay.  So this is the Gang Crimes Specialists daily

 9  activity summary.  Do you see that there?

10  A.  Yes, ma'am.

11  Q.  And it's sometimes referred to as a humper report?

12  A.  Yes.

13  Q.  And if we take a look at the descriptive where it says

14  "activity," does that instruct the Gang Crimes Specialists what

15  type of information is to include in the humper report?

16  A.  Yes.

17  Q.  And does it specifically instruct the Gang Crimes

18  Specialists that this report should not include information

19  normally contained on an official department reporting

20  document, and that any copies of initiated reports have to be

21  submitted to the supervisor at the conclusion of the tour of

22  duty?

23  A.  Yes, ma'am.

24  Q.  Okay.  And so in terms of the way that this daily activity

25  summary was utilized, what -- how often did you prepare a daily

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 85 of 267 PageID #:44007
6-22-18 (Ex 14)
Spratte - direct by Rosen
3336

1    activity sheet?

2    A.  Daily.

3    Q.  Daily?

4    A.  Every day we worked.  Yes, ma'am.

11:44:36    5    Q.  And when is it expected that this daily activity sheet is

6    prepared?  Like at what point --

7    A.  It was done -- it was normally done when you were on your

8    way out the door.

9    Q.  Okay.

11:44:51    10    A.  The last several minutes of your tour of duty, you would

11    just run this thing.  Most often it was handwritten, and just

12    boom, boom, boom.  Because you knew what time you get off work,

13    you'd come in 5 minutes before, sit down, do this, hand it in,

14    and gone.

11:45:04    15    Q.  And what type of information would you put it in?

16    A.  Basically what we had done that day.  You know what?  Mine

17    probably -- I probably have several hundred monitored

18    activities of assigned gangs in the 10th and 12th District.

19    Q.  If you made an arrest, would you note that in the report?

11:45:20    20    A.  Yes.

21    Q.  How would you note that in the report?

22    A.  One arrest for whatever charge is, either RD number or the

23    incident file.

24    Q.  Okay.  And when you are referring to the RD number, that's

11:45:31    25    the RD number related to that particular crime and that

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 86 of 267 PageID #:44008
6-22-18 (Ex 14)
Spratte - direct by Rosen
3337

1  particular arrest?

2  A.  Each -- each case report is assigned an RD number or

3  records division number in that.  It's unique to that report,

4  yes, ma'am.

11:45:43  5  Q.  Okay.  So the reporting about that particular arrest, the

6  circumstances of it, would be contained in the documents that

7  are being referenced, correct?

8  A.  Yes.  In the reports that were submitted regarding the

9  arrest.

11:45:58  10  Q.  Okay.  And then what did you do with this daily activity

11  sheet once it was prepared every day?

12  A.  Turn it in to our supervisor.

13  Q.  And do you know what would happen to it after that?

14  A.  I have no idea.

11:46:10  15  Q.  Okay.  Did Gang Crimes Specialists in the '80s maintain

16  case files, files that were pertaining to a particular

17  investigation?

18  A.  No.

19  Q.  Okay.  Did Gang Crimes Specialists prepare what's known in

11:46:40  20  the Detective Division as General Progress Reports?

21  A.  No, ma'am.

22  Q.  Was there any equivalent to a general progress report that

23  was designed to be utilized by Gang Crimes Specialists back in

24  the 1980's?

11:46:54  25  A.  No, ma'am, there was not.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 87 of 267 PageID #:44009
6-22-18 (Ex 14)
Spratte - direct by Rosen
3338

```
         1    Q.  Did you ever have occasion, when you're working as a Gang
         2    Crimes specialist, to have to write down information on a note?
         3    A.  On a note?  Yes.
         4    Q.  Okay.  And can you describe what type of note you would
11:47:09 5    write?
         6    A.  Ah, it could be a license plate of a car.  If I saw
         7    somebody driving a car that I recognized, I recognized a car.
         8    Could be somebody's name, address, and date of birth of
         9    somebody i stopped.  Those are the two that immediately come to
11:47:28 10   mind.
        11          You know, we were stopping people.  We stopped a lot
        12   of people during the course of an 8-hour tour.  And we get a
        13   lot of information.  You find a lot of times you're stopping
        14   the same people because you're in the same area.
11:47:40 15         So you developed a little more information every time
        16   you stop -- stop 'em.  They get a little more familiar to you
        17   and their -- sometimes they'll be a little more truthful and
        18   they won't tell you as many lies when they're talking to you.
        19         And during the course, if I'm talking to somebody and
11:47:55 20   it comes out he's working, "Oh, you got a job.  Where are you
        21   working?  Well, I work out at so-and-so out in Franklin Park.
        22         Well, you know, I jot that.  I wouldn't let them see
        23   me jot it down, but I jot that down on the back of whatever I
        24   had.  On an incident card, sometimes on back of my hand, until
11:48:12 25   I get it and put it on piece of paper.  And I kept files like
```

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 88 of 267 PageID #:44010
6-22-18 (Ex 14)
Spratte - direct by Rosen
3339

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
|          | 1  | that for myself for each individual gang.                            |
|          | 2  | Q.  Okay.  And then did you utilize that information to prepare       |
|          | 3  | your synopsis?                                                       |
|          | 4  | A.  Yes, I did.                                                      |
| 11:48:25 | 5  | Q.  Okay.  And if the information that you developed, let's say       |
|          | 6  | a license plate number or a name and address had something to        |
|          | 7  | do with a particular investigation, what would you do with the       |
|          | 8  | information on that note, like the license number or the --          |
|          | 9  | A.  Can you rephrase that.  I think I lost you.                      |
| 11:48:42 | 10 | Q.  Sure.  I went a little fast.                                     |
|          | 11 |     If you wrote a note about a license plate number or a            |
|          | 12 | name and address that was relevant to a particular                   |
|          | 13 | investigation that you had been asked to assist in from a            |
|          | 14 | detective, what would you do with that?                             |
| 11:48:59 | 15 | A.  I'd let the detective know immediately, and let him              |
|          | 16 | determine if it needed to be reduced to a report.                   |
|          | 17 | Q.  Okay.  Did you ever have occasion when you -- did Gang           |
|          | 18 | Crimes Specialists, as part of your their responsibilities,         |
|          | 19 | conduct witness interviews regarding a particular                    |
| 11:49:22 | 20 | investigation?                                                      |
|          | 21 |     For example, a witness to a shooting, would you sit             |
|          | 22 | down with a witness and talk to them about what they saw, what      |
|          | 23 | they did, separate and apart from what detectives would do?         |
|          | 24 | A.  If -- if you saw them on the street, I might -- if I knew        |
| 11:49:38 | 25 | the detectives were looking for him, I might have a brief           |

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 89 of 267 PageID #:44011
6-22-18 (Ex 14)
Spratte - direct by Rosen

3340

 1   conversation with them, "Hey, the detectives want to talk to

 2   you."  "What's it about?"  I might say, you know, there was a

 3   shooting the other night and your name popped up, come on,

 4   let's go take a talk -- let's go talk.  Okay, we're going.

11:49:53   5   And I tell them, most of the time I tell them, "Save

 6   yourself from repeating this twice."  "You know, don't ask me

 7   any questions until you get in there, because the detectives

 8   are going to want to hear everything over again anyway."

 9   And so we'd bring them in.  But we would have

11:50:06  10   conversations with them.  People would stop us on the street

11   that we didn't know were witnesses that knew us.

12   We got a number -- with the nature of our assignment,

13   we developed a number of informants.  Every Gang Specialist had

14   a pretty intensive number of very good informants.  Through the

11:50:24  15   years you met them.  And a lot of times you meet find out

16   something different.

17   (Witness brushes against exhibit book.)

18   BY THE WITNESS:

19   A.  Excuse me.  I'm sorry.

11:50:30  20   You might find out a little something different than

21   the way the initial investigation is going.  So we would talk

22   to the detectives.  "You know what?  This is what we're

23   getting."  "Put that in a Supp. who you got that from."  So.

24   At that point I would -- I would put it, you know, put it in a

11:50:42  25   supplementary.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 90 of 267 PageID #:44012
6-22-18 (Ex 14)
Spratte - direct by Rosen
3341

1      The detectives were primary investigators.  They had

2 all control of every investigation with the exception of

3 narcotics.

4 Q.  Okay.  As a Gang Crimes specialist, did you ever conduct a

11:50:54    5 lineup?

6 A.  A physical lineup?

7 Q.  Yeah.

8 A.  I never conducted one, no.

9 Q.  Were Gang Crimes Specialists expected to conduct physical

11:51:03   10 lineups?

11 A.  No.

12 Q.  Okay.  Were there times that Gang Crimes Specialists

13 assisted detectives in conducting lineups?

14 A.  Yes.

11:51:14   15 Q.  Okay.  And describe what it means to assist in conducting a

16 lineup.

17 A.  If -- if they were short and we were up in area

18 headquarters and they were going to do a lineup, they might ask

19 you, "would you handle the lineup."  Whereas, I would be the

11:51:32   20 one that would be in the room with the subjects being viewed by

21 the victim and witnesses.

22      The detective would remain with the victim and

23 witnesses, and I would just, you know, 1, 2, 3, 4, 5, number 1

24 step forward, turn to the right, turn to the left, step back in

11:51:50   25 line, and I would do that part of it.  But as far as sitting in

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 91 of 267 PageID #:44013
6-22-18 (Ex 14)
Spratte - direct by Rosen
3342

1    with the witnesses and conducting it, no, I've never done a

2    lineup.

3    Q.  With respect to photo arrays, that's another way to do a

4    lineup.  Would you as a Gang Crimes specialist from time to

5    time, was that part of your responsibilities to conduct photo

6    arrays?

7    A.  Yes.

8    Q.  And what were your reporting requirements regarding

9    conducting a photo arrays?

10   A.  Ah, you know what?  It -- it -- at one point they tightened

11   it up, but at one point there weren't a lot of requirements for

12   us as Gang Crimes Specialists because we were not in the

13   Detective Division.

14          So if -- if I -- you know, most of the time if it was

15   something like that, either detective would ask me, "Do you

16   have photos of this guy?"  "Yeah, we do, we have them

17   downstairs."  And a lot of times a detective would come with

18   us.  Once in a while, if he didn't come down, there was an

19   identification and you'd submit -- at some point you'd submit a

20   supplementary report to that case.

21   Q.  Okay.  And another report I want to talk to you about, the

22   jury has heard about a major incident report.  Did Gang Crimes

23   Specialists ever prepare major incident reports?

24   A.  You know, that came about, and I don't -- I don't remember

25   when, but probably -- either there had been a rash of

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 92 of 267 PageID #:44014
6-22-18 (Ex 14)
Spratte - direct by Rosen
3343

1    shootings, or there was a change in the hierarchy in Gang

2    Crimes command, but that came about and we did do -- if one of

3    our assigned gangs was shot, basically, we would prepare a

4    major incident case report.  Just a brief synoptic of what had

11:53:40   5    transpired, and that would be forwarded to the Gang Crimes

6    headquarters, is my understanding.

7    Q.   And where is Gang Crimes headquarters?

8    A.   At that time it was 1121 South State.

9    Q.   Okay.  And that was headquarters for the Chicago Police

11:53:50   10   Department?

11   A.   Yes, ma'am.

12   Q.   And what information -- where did you get the information

13   to put in the major incident reports?

14   A.   We responded to whatever district of occurrence the

11:53:59   15   shooting had transpired, and then we would get a copy of the

16   original case report.  And we would generate this major

17   incident report from whoever submitted the general offense case

18   report.

19   Q.   And was that a document that was prepared like immediately

11:54:11   20   upon the event happening, like that day?

21   A.   You know what?  If the notification was made to gangs.  If

22   the notification -- the initial investigating officer is the

23   preliminary investigator, the patrolman on the street.  If they

24   didn't make a notification, then we might not be aware of it

11:54:26   25   for a day or two, at which point the watch commander would say,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 93 of 267 PageID #:44015
6-22-18 (Ex 14)
Spratte - direct by Rosen
3344

1    "Hey, one of you guys get clipped the other night, would you go

2    over and get a major done on this."

3    Q.  Okay.  So if the notification was made to Gang Crimes on

4    the day of the shooting, then that report would be prepared

11:54:44  5    that day?

6    A.  Yes.

7    Q.  And the information was derived from the general offense

8    case report?

9    A.  Yes, ma'am.

11:54:51  10    Q.  And then if for some reason the notification came a day or

11    two later, then that would be the point in time that that

12    report would be written?

13    A.  Yes.

14    Q.  Okay.  You talked about your own experience becoming -- you

11:55:07  15    were invited into the Gang Crimes Unit, and I think you were a

16    Gang Crimes officer and then you became a Gang Crimes

17    Specialist?

18    A.  Yes.

19    Q.  When did you become a Gang Crimes specialist?

11:55:17  20    A.  Roughly a year after I was -- I -- I had been informed that

21    they -- they requested me to submit a -- a to-from report

22    requesting an assignment to gangs.

23            Then I went through a three-person interview.  I

24    believe it was two sergeants and a lieutenant from Gang Crimes.

11:55:39  25    At the end of that interview, then they made a determination on

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 94 of 267 PageID #:44016
6-22-18 (Ex 14)
Spratte - direct by Rosen

3345

1   the list of who they wanted to promote.

2           I was called several months after I had taken the oral

3   interview and said I'd done very well, that I was going to be

4   promoted to Gang Specialists, but they would like to promote me

11:55:57   5   from within, would I consider coming to Gang Crimes, and I said

6   yes.

7   Q.  Upon your promotion to a Gang Crimes Specialist, did you

8   receive any specialized training?

9   A.  No.

11:56:09   10   Q.  Okay.  So you didn't go -- we've heard how detectives go to

11   detective school and things like that.  That didn't happen for

12   you?

13   A.  No, ma'am.

14   Q.  What type of training, though, did you get once you became

11:56:23   15   a part of the Gang Crimes Unit?

16   A.  Basically you learned from other Gang Specialists.  And it

17   would be just the out of the humper, the major activity

18   reports.  When it was time for the synoptics, or the updates,

19   what was required.

11:56:38   20           It was kind of -- Gang Crimes in the '70s and '80s was

21   kind of in the forefront nationwide as far as what we were

22   doing with the street gangs.  So we kind of learned as we went

23   along.

24   Q.  When you say Gang Crimes was at the forefront, you mean

11:56:56   25   within the Chicago Police Department?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 95 of 267 PageID #:44017
6-22-18 (Ex 14)
Spratte - direct by Rosen
3346

1    A.  I mean, we -- there were an number of Gang Specialists that

2    were requested that went all around the country doing training

3    for other municipal police departments, federal law enforcement

4    agencies, stuff like that, because they -- the street gangs,

11:57:15    5    while they have been in Chicago since probably earlier -- the

6    first documented gangs that are still in existence today go

7    back to the late '40s early '50s.  And Chicago was one of the

8    most major municipalities to address their gang issues, and

9    they formed the gang intelligence section back in '60s.  And

11:57:36    10    that morphed through the years to Gang Crimes, which is what

11    we're talking about in the period of the '80s.

12    Q.  Was there a time where Gang Crimes Specialists from the

13    Chicago Police Department were asked to develop a training

14    program for certification for Gang Crimes officers in the State

11:57:56    15    of Illinois?

16    A.  Yes.  We were approached by the Northeastern Metropolitan

17    Regional Training Center.  And they do in-service training for

18    other Illinois police agencies.  And they asked us to put

19    together a 40-hour class, at which point whoever graduated that

11:58:15    20    class successfully would be considered for a Gang Specialist in

21    the State of Illinois.

22            MS. ROSEN:  If I could just have a moment.

23            THE COURT:  Sure.

24          (Brief pause)

11:58:24    25            MS. ROSEN:  I have no further questions.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 96 of 267 PageID #:44018
6-22-18 (Ex 14)
Spratte - cross by Loevy
3347

1         THE COURT:  Okay.  Mr. Loevy.

2              CROSS EXAMINATION

3  BY MR. LOEVY:

4  Q.  Mr. Spratte, it's fair to say that Gang Crimes Specialists

11:58:36  5  were doing some functions of detectives, right?

6  A.  Ah, I -- you know, counsel, I don't like the word "fair."

7  Q.  Well, let me ask it this way.  Gang Crimes Specialists were

8  police officers, right?

9  A.  Yes, sir.

11:58:50  10  Q.  They were trying to solve crimes, right?

11  A.  Yes, sir.

12  Q.  If a shooting happened, they wanted to go out, talk to

13  witnesses, see if they could learn information about the

14  shooting, right?

11:58:59  15  A.  Yes, sir.

16  Q.  All right.  And if a shooting happened, they might want to

17  try to gather Intel about that shooting, right?

18  A.  Yes, sir.

19  Q.  With the goal of solving the crime, right?

11:59:07  20  A.  Well, if the shooting already happened, it wouldn't be a

21  goal of stopping the crime, it would be --

22  Q.  No.  I said solving the crime.

23  A.  Solving the crime, yes.

24  Q.  Yes.  All right.  So that is -- that is a function similar

11:59:17  25  to what detectives do, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 97 of 267 PageID #:44019
6-22-18 (Ex 14)
Spratte - cross by Loevy
3348

1    A.  Ah, no.

2    Q.  All right.

3    A.  Not in the least bit.

4    Q.  Not the least bit.

11:59:23    5    A.  No.  Detectives are much more report-driven.

6    Q.  Well, that's true.  The big difference is, the detectives

7    had all that paperwork, right?

8    A.  Yes, sir.

9    Q.  And you, the Gang Crimes Specialists, you basically did the

11:59:34    10    same thing, but none of those rules about paperwork applied to

11    you, right?

12    A.  We didn't do the same thing, counsel.

13    Q.  All right.  Let's talk about that, about whether you did do

14    the same thing.

11:59:44    15        Do you know Investigator Guevara?

16    A.  I vaguely do, yes.

17    Q.  All right.  And would it be unusual that -- he had the same

18    position that you've been talking about, Gang Crimes

19    Specialists, right?

11:59:54    20    A.  Yes, sir.

21    Q.  So his job would be out there trying to solve crimes,

22    right?

23    A.  We were intelligence-driven, counsel.  Our -- our job, our

24    primary function was intelligence.

12:00:02    25    Q.  All right.  But --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 98 of 267 PageID #:44020
6-22-18 (Ex 14)
Spratte - cross by Loevy
3349

1  A.  We were -- we assisted not only the Detective Division, we

2  assisted a number of federal and state law enforcement

3  agencies.  And we assisted in investigations, and we assisted

4  in those investigations through the intelligence that we had.

12:00:18  5  Q.  All right.  And we lost the thread there ....

6       But you used the intelligence to solve crimes,

7  right?

8  A.  We used the intelligence to assist in the solving of

9  crimes, yes.

12:00:28  10  Q.  All right.  When you would go out, part of the job would be

11  to take notes, right?

12  A.  That -- that was primarily up to each individual Gang

13  Specialist.  I did.

14  Q.  All right.  And you would go out and you'd talk to

12:00:44  15  witnesses, right?

16  A.  Well, now, the first question, you are asking me a

17  question, when I take notes.  Yes, I did take notes when I was

18  out on the street.

19       Now, the next question is, when I would talk to

12:00:54  20  witnesses?

21  Q.  No, I just asked you, you would talk to witnesses.

22       I got to do it one question at a time.

23       You would that to witnesses.  When the detectives

24  called you and said, "Hey, we got a shooting on Cortland," your

12:01:05  25  job would be to go that to witnesses, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 99 of 267 PageID #:44021
6-22-18 (Ex 14)
Spratte - cross by Loevy
3350

```
              1    A.  No, the detectives would talk to witnesses.  They would

              2    identify witnesses.  If they couldn't find somebody, they would

              3    identify witnesses.  They might say, "Hey, Jimmie, you know,

              4    these are your gangs, can you see what you can find out about

12:01:19      5    it?  It's a mystery."

              6    Q.  All right.  I think we might've missed each other there.  I

              7    was saying the same thing you are.

              8    A.  Well, then I'm not understanding your question, counsel.

              9    I'm sorry.

12:01:26     10    Q.  I'll try to ask it better.

             11         Sometimes the detectives would call you and say,

             12    "We've got a shooting on Cortland.  You guys seem to be in

             13    touch with the community there, can you go find us some

             14    witnesses?"

12:01:36     15    A.  It was never -- I was never asked to go find witnesses in

             16    that -- in that -- in that way.  I was -- if -- they might say,

             17    "Would you see what you can find out about it."

             18    Q.  Right.  Because if someone --

             19    A.  If they asked me to locate a witness, they would tell me

12:01:52     20    which specific witnesses they wanted located.

             21    Q.  Let's focus on that part, "Can you see what you can find

             22    about it."

             23         Let's say you're a detective, and there's a shooting

             24    on Cortland and it's assigned to you, and you don't know any of

12:02:02     25    the players.  They would want you, the Gang Crimes person, to
```

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 100 of 267 PageID #:44022
6-22-18 (Ex 14)
Spratte - cross by Loevy

3351

1  sort of develop the leads, right?

2  A.  They could be.  They could say, "See what you could find

3  out about it," yes.  But as far as developing the leads, the

4  direction of each individual investigation was directed by the

12:02:19  5  assigned detectives.

6  Q.  All right.  That answer could have been "yes," right?

7  A.  Well, you're putting words in my mouth, counsel.  I'm

8  trying to answer as best I can, but if I'm not giving the

9  answer, then you -- I don't know.

12:02:30  10      I -- I -- I try to answer the questions that you asked

11  me to best of my ability the way I understand them.  And I'm

12  sorry if we're on different pages.

13  Q.  All right.  When you would try to develop leads -- and you

14  did or didn't try to develop leads for the detectives?  Can you

12:02:45  15  answer that "yes" or "no"?

16  A.  And on a regular basis, no.

17  Q.  All right.  Did you sometimes try to develop leads for the

18  detectives?

19  A.  If they asked us to, yes.

12:02:53  20  Q.  All right.  As part of that part of your job, would you

21  take notes?

22  A.  You're going to have to be more specific with that,

23  counsel.

24  Q.  In your job you would take notes, right?  We've established

12:03:06  25  that?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 101 of 267 PageID #:44023
6-22-18 (Ex 14)
Spratte - cross by Loevy
3352

1    A.  Yes.

2            MS. ROSEN:  Objection.  Asked and answered.

3            THE COURT:  Overruled.

4    BY MR. LOEVY:

12:03:08   5    Q.  You would keep your notes in a notebook, right?

6    A.  Well, not necessarily.  Sometimes, yes.

7    Q.  All right.  Do you remember being asked these questions at

8    your deposition on page 40.

9            MR. LOEVY:  This is line 22 through 24:

12:03:20  10    Q.  (Reading:)

11            "Question:  Any other files you said you took

12            notes in a notebook, is that right?

13            And your answer was, "yes," right?

14    A.  On occasion, yes.

12:03:31  15    Q.  All right.  And you did make notes every day as part of

16    your job, right?

17    A.  Not necessarily, but more days than not, yes.

18    Q.  All right.  Most days?

19    A.  More days than not.

12:03:43  20    Q.  All right.  Because that's what investigators do.  They

21    can't remember everything.  They have to write it down,

22    right?

23    A.  I -- I wasn't making notes on investigations.  I was making

24    notes on intelligence I had gathered, on street gang members I

12:03:58  25    identified who they were with.  It was always very handy to

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 102 of 267 PageID #:44024
6-22-18 (Ex 14)
Spratte - cross by Loevy

3353

1    find out who was hanging with who in a particular gang.

2    Q.  I think I understand you're saying you would make notes on

3    the Intel, you would agree with that, right?

4    A.  Yes.

12:04:09  5    Q.  All right.  Now I'm going to ask you about when the

6    detectives tried to involve you in crimes needed solving.

7           Surely you made notes about that, too, right?

8    A.  Very rarely.

9    Q.  Were you told by somebody, "You know what?  When you're

12:04:20 10    trying to solve crimes, you shouldn't write stuff down"?

11    A.  No.

12    Q.  Well, then, if it was your practice to make notes, why

13    would you not do it when you were investigating crimes?

14    A.  Because the only way I was investigating a crime, or a

12:04:31 15    particular crime, was at the specific request of the detective

16    assigned to that crime.

17           Any -- anything I developed, I would immediately bring

18    it in to him and let him -- and let him determine do we need a

19    Supp.  "This is what this guy said to me."  "Tell him what you

12:04:47 20    said to me."  "He said the same thing."  "Do you need me?"

21    "No."  "You're going to have a nice day with the witnesses, I'm

22    out of here."

23    Q.  All right.  Sir, so it sounds like what you're saying, your

24    understanding when you worked with detectives to solve crimes,

12:04:57 25    the practice as you understood it was," don't write stuff down,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 103 of 267 PageID #:44025
6-22-18 (Ex 14)
Spratte - cross by Loevy
3354

1    just do it orally with the detectives," is that what you're

2    saying?

3    A.  I'm saying that was my practice, counsel.

4    Q.  All right.  But you were designated by the City to speak

5    for Gang Crimes practices, right?

6    A.  But then you asked me specifically -- you asked me a

7    specific question on what I would do, and I answered what I

8    would do.

9    Q.  All right.  Are you here today -- I mean, you were not

10   involved in this investigation, right?

11   A.  Not at all.

12   Q.  And Ms. Rosen asked you, you've been designated by the City

13   to talk about the practices of the Gang Crimes Specialists,

14   right?

15   A.  Correct.  Yes.

16   Q.  All right.  Was it the practice of Gang Crimes Specialists

17   to take notes when the detectives asked them to develop leads

18   and find witnesses?

19   A.  Not that I'm aware of.

20   Q.  Now, the Gang Crimes Specialists basically got the same pay

21   as the detectives, correct?

22   A.  Yes.

23   Q.  By the way, if they weren't taking notes, then they -- I'll

24   move on from that.

25          In the early 2000's they dissolved the Gang Crimes

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 104 of 267 PageID #:44026
6-22-18 (Ex 14)
Spratte - cross by Loevy
3355

1    Unit and basically the Gang Crimes experiment they became

2    detectives, right?

3           MS. ROSEN:  Object to the form of the question.  I

4    don't understand the "Gang Crimes experiment."

5           MR. LOEVY:  I'll break it up.

6           THE COURT:  Okay.

7    BY MR. LOEVY:

8    Q.  It sounds like you said Chicago was in the forefront with

9    making this unit of people who did what you've described that

10   weren't really subject to detective rules, that Chicago was the

11   leader in that, right?

12   A.  It's said that we weren't subject to detective rules.  We

13   were in the Patrol Division, which is -- we were subject to

14   Patrol Division rules, not detective rules.

15   Q.  Sir, you were not subject to detective rules, right?

16   A.  Well, we were subject -- but you made it sound like we were

17   subject to no rules, but we were subject to the division we

18   were in, those rules.

19   Q.  Sir, there were no rules that governed Gang Specialists

20   specifically, correct?

21   A.  Not that I'm aware of.

22   Q.  All right.  And at some point the experiment ended in the

23   early 2000's of this Gang Crimes Unit, right?

24          MS. ROSEN:  Object to the form of the question.

25   Experiments?

12:06:07 (line 5)
12:06:16 (line 10)
12:06:29 (line 15)
12:06:43 (line 20)
12:07:01 (line 25)

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 105 of 267 PageID #:44027
6-22-18 (Ex 14)
Spratte - cross by Loevy

3356

1       MR. LOEVY:  Because they were at the forefront, Your

2   Honor.

3       THE COURT:  Oh, oh.  Is the word "experiment"?

4       MS. ROSEN:  Yes.

12:07:06    5       MR. LOEVY:  All right.  Fine.

6   BY MR. LOEVY:

7   Q.  In the early 2000's all the Gang Crimes people, they just

8   called detectives, right?

9   A.  I don't know when they did it.  I was no longer in gangs at

12:07:14   10   that time.

11   Q.  All right.  There's all different kinds of detectives in

12   Chicago, right?

13   A.  Yes, sir.

14   Q.  Narcotics detectives, violent crime detectives, vice

12:07:27   15   detectives, and Gang Specialists detectives, right?

16   A.  No.

17   Q.  All right.  Isn't it true that the only difference between

18   what you've been describing as your role in interacting with

19   witnesses, developing leads, between what the Gang Crimes

12:07:39   20   people do and what the detectives do is that the people in your

21   unit don't have to follow the detective rules?

22   A.  That's not at all the different.  We have completely

23   different assignments.

24   Q.  All right.  There were very few restrictions on Gang Crimes

12:07:52   25   officers in those days, would you agree with that, sir?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 106 of 267 PageID #:44028
6-22-18 (Ex 14)
Spratte - cross by Loevy
3357

1   A.  Define "restrictions."

2   Q.  Do you remember testifying at your deposition that Gang

3   Crimes officers had very few restrictions back then?

4           MS. ROSEN:  Objection, Judge.  Context.

12:08:03   5           THE COURT:  Well, if there's a rule of completeness

6   problem, you can let me know about it, but I don't have the

7   transcript in front of me.  So far I think --

8           MS. ROSEN:  Is there a page?

9           MR. LOEVY:  This is page 56.

12:08:15   10  BY MR. LOEVY:

11  Q.  But I'm asking you if you recall --

12          MR. LOEVY:  Page 56, lines 4 through 14.

13  BY MR. LOEVY:

14  Q.  Do you recall testifying that there's very few restrictions

12:08:23   15  on Gang Crimes Specialists, right?

16  A.  Without knowing in what context it was taken, counsel, I

17  can't -- I can't confirm that.

18  Q.  All right.  You don't know of any policies --

19  A.  I can't --

12:08:30   20  Q.  You don't know of any policies that govern Gang Specialists

21  at all, correct?

22  A.  I don't believe --

23          MS. ROSEN:  Objection.  Asked and Answered.

24          THE COURT:  Overruled.

12:08:38   25  BY THE WITNESS:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 107 of 267 PageID #:44029
6-22-18 (Ex 14)
Spratte - cross by Loevy
3358

1    A.  We were -- we were -- we were subject to the policies of

2    the Patrol Division.

3    BY MR. LOEVY:

4    Q.  But their --

12:08:47    5    A.  Those rules and regulations, those policies and procedures.

6    Q.  All right.

7    A.  Their foremost, their case reporting, everything as the

8    Detective Division did it.  The detective division had separate

9    reports from us.

12:08:54    10    Q.  All right.  The patrol people would write parking tickets,

11    they would, you know, make arrests, they would patrol, right?

12    A.  Uh-huh.

13    Q.  And the detectives had a separate set of rules because the

14    detectives were the ones that were responsible for making sure

12:09:07    15    that the information got to the Criminal Justice System,

16    right?

17    A.  The detectives were under the guidance of the investigation

18    division, which was a separate, complete separate entity from

19    the Patrol Division within the police department, yes.

12:09:19    20    Q.  And you guys didn't -- all right.  There was no written

21    guidance at all to Gang Crimes officers about how they were

22    supposed to do what they were supposed to do in the '80s, is

23    that true, sir?

24    A.  We had to abide by, of course, the rules and regulations of

12:09:34    25    the police department, and the general orders, department

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 108 of 267 PageID #:44030
6-22-18 (Ex 14)
Spratte - cross by Loevy
3359

1    order, special orders of the Patrol Division.

2    Q.  All right.  Do you remember in the Jones/Palmer situation?

3         Do you remember about Jones/Palmer?

4    A.  No, sir.

12:09:42    5    Q.  There was a problem that the general orders of the police

6    department --

7         MS. ROSEN:  Objection.  Foundation.  He said he

8    doesn't know anything about it.

9         THE COURT:  Sustained.

12:09:50    10   BY MR. LOEVY:

11   Q.  Do you remember in the mid '80s -- you were a police

12   officer in the mid '80s, right?

13   A.  Yes, I was.

14   Q.  Do you remember there was a problem that the police

12:10:01    15   department was called out by the courts for not turning over

16   information to the Criminal Justice System?  Does that ring any

17   bells with you as a police officer in the mid '80s?

18   A.  Vaguely.

19   Q.  All right.  Did that affect anything you had to do as a

12:10:12    20   Gang Crimes Specialist?

21   A.  I don't believe it did.

22   Q.  And specifically on policies, although you were subject to

23   the general orders that applied to the whole police department,

24   there were no policies for Gang Crimes Specialists in the '80s

12:10:33    25   governing your participating in homicide investigations,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 109 of 267 PageID #:44031
6-22-18 (Ex 14)
Spratte - cross by Loevy

3360

1  correct?

2  A.  We were -- the entire police department is trained that the

3  preliminary investigator is the investigator that handles the

4  original incident.  For a number of other different

5  investigations, the primary -- it we go forward to a primary

6  investigator, and that primary investigator was the detective.

7  Q.  All right.  There was no policy --

8  A.  We were never primary investigators.  If we -- if I -- if I

9  viewed a shooting on the street and I witnessed everything,

10  I've got the good guy down, the bad guy in handcuffs, a gun

11  recovered, I still called the detectives in to handle that

12  investigation.

13  Q.  How is that in any way responsive to the question which I

14  asked you, which is just there were no policies governing your

15  participation, right?

16  A.  Well, there were policies.

17  Q.  All right.  There was no policy requiring the Gang Crimes

18  Specialist to preserve their notes, do you agree with me?

19  A.  Yes.

20  Q.  "Yes," you would agree?

21  A.  Yes, I agree with you.

22  Q.  And there was no policy that prevented Gang Crimes

23  Specialists from destroying notes at their discretion if they

24  didn't want anybody to see them?

25  A.  Ah, I'm -- I can't answer that question because it wasn't

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 110 of 267 PageID #:44032
6-22-18 (Ex 14)
Spratte - cross by Loevy
3361

1   -- it wasn't destruction.  When you were done with them, you

2   just, you know --

3   Q.  Let's say you had a note, it was like somebody gave you

4   some Intel that somebody committed a crime and you decided,

12:11:58   5   "you know what?  I don't want this note to exist anymore," you

6   have complete discretion to destroy the note, right?

7   A.  If I received Intel that somebody committed a crime, I

8   would see the Detective Division responsible for that.  And if

9   there had not been a crime that anybody was aware of yet, I

12:12:13   10   would've submitted an information report through the patrol

11   division.

12   Q.  Sir, none of that is responsive to my question.

13   A.  It is exactly your question --

14   Q.  My question is --

12:12:20   15   A.  Your question I answered --

16            MS. ROSEN:  Objection, Judge.

17            MR. LOEVY:  I'm asking --

18            MS. ROSEN:  Objection.

19            MR. LOEVY:  Your Honor --

12:12:21   20            THE COURT:  Why don't you put another question or

21   repeat the question.

22   BY MR. LOEVY:

23   Q.  There was no policy that instructed you that you couldn't

24   destroy your notes, correct?

12:12:29   25   A.  Correct.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 111 of 267 PageID #:44033
6-22-18 (Ex 14)
Spratte - cross by Loevy
3362

1  Q.  Now, you were permitted to keep personal files as a Gang

2  Crimes Specialist, correct?

3  A.  Yes.

4  Q.  And you said that you had a lot of Intel, right?

5  A.  Correct.

6  Q.  And you never know if on the 1st of January the information

7  you got turns out to be important on the 10th of September,

8  right?

9  A.  No.

10  Q.  That's why you take notes?

11  A.  Yes.

12  Q.  And you take notes about people, right?

13  A.  Yes.

14  Q.  And you take notes about events, right?

15  A.  No.

16  Q.  All right.  Let's say there was a gang shooting, an IG

17  shoots a Campbell Boy on February 10th and your job is to be

18  apprised of that, why wouldn't you take notes?

19        MR. SOTOS:  Objection.

20        THE COURT:  I'm sorry, what is the objection?

21        MR. SOTOS:  The objection is to the form of the

22  question.  "IG shoots Campbell Boy."

23        THE COURT:  It's a hypothetical, right?

24        MR. LOEVY:  Yes, Your Honor.

25        THE COURT:  Overruled.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 112 of 267 PageID #:44034
6-22-18 (Ex 14)
Spratte - cross by Loevy

3363

BY MR. LOEVY:

Q.  Your job is to take notes, right?

A.  Would you repeat the whole question, please?

Q.  Sure.  Isn't it true that when you were gathering

information that you gathered, you would take notes about

events that happened, shootings, et cetera?

A.  I did not take notes of events that happened.  I took notes

that were of intelligence-driven people, vehicles, work issues,

things like that.

        Anything that was part -- part and parcel to an

investigation, I would let the detectives know.  And if they

deemed a supplementary report was necessary, I would include

that in a supplementary report.

Q.  All right.  So it sounds like you said if a guy had a job

in Franklin Park, you'd make a note, you'd make a file,

right?

A.  I probably would already have a file and I would add that

to his file.

Q.  All right.  But if someone said, "Hey, remember that

shooting that happened back on that block on that date?  I

think Jose did it."  You're saying pen does not go to

paper?

A.  I have no reason to put it in paper unless the detective --

Q.  All right.

A.  -- unless the detective who is handling that shooting

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 113 of 267 PageID #:44035
6-22-18 (Ex 14)
Spratte - cross by Loevy

3364

1    directs me to.

2    Q.  And that was the policy and the practices of the police

3    department.  If a guy on the street said, "I think Jose was

4    involved in that shooting," pen doesn't touch paper if you're a

12:14:21    5    Gang Crimes Specialist?

6    A.  Not until you confirm it with the detective.

7            MR. LOEVY:  All right.  I have no further questions

8    until lunch.  I mean, I shouldn't phrase it that way.  I'm not

9    going to finish before lunch, Your Honor.

12:14:28    10           THE COURT:  Okay.  Let's take a lunch break.  It's

11    time.  1:15 ladies and gentlemen.

12           COURT SECURITY OFFICER:  All rise.

13           (The following proceedings were had out of the

14           presence of the jury in open court:)

12:14:52    15           THE COURT:  Okay.  1:15 everybody.

16           If the lawyers are back at 1:10, I will have the

17    remaining ruling for you.  I'm not sure that we're going to get

18    the -- I don't know about Wasilewski.  Maybe at the end of the

19    day, but I'm not sure we'll get it done before the end of the

12:15:15    20    day.

21           MS. ROSEN:  Judge, I'm sorry.  Say that again?  I

22    didn't hear you.

23           THE COURT:  I'm saying Wasilewski, maybe not till the

24    end of the day.

12:15:19    25           And I really appreciate your note telling me that

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 114 of 267 PageID #:44036
6-22-18 (Ex 14)
Spratte - cross by Loevy

3365

1    didn't have to stay up all night.

2           MS. ROSEN:  Yes.

3           THE COURT:  I appreciate that.

4           MS. ROSEN:  Sure.

12:15:26    5           THE COURT:  I think Mr. Given also sent me a note

6    saying something was resolved.  I also appreciated that.

7

8           (Luncheon recess taken from 12:15 o'clock p.m.

9            to 1:15 o'clock p.m.)

10

11               *     *     *     *     *     *     *     *

12

13

14   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

15          RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

16

17

18

19          S/Blanca I. Lara              June 22, 1028

20

21

22

23

24

25

3366

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   JACQUES RIVERA,                    ) No. 12 CV 4428
                                        )
 4              Plaintiff,              )
                                        )
 5   vs.                                ) Chicago, Illinois
                                        )
 6   REYNALDO GUEVARA, STEVE GAWRYS,    )
     DANIEL NOON, JOHN GUZMAN, JOSEPH FALLON, )
 7   JOSEPH SPARKS, PAUL ZACHARIAS, GILLIAN )
     MCLAUGHLIN, JOHN LEONARD, EDWARD MINGEY, )
 8   RUSSELL WEINGART, ESTATE OF ROCCO  )
     RINALDI, CITY OF CHICAGO,          ) June 22, 2018
 9                                      )
                Defendants.             ) 1:16 o'clock p.m.
10
                          VOLUME 14-B
11              TRANSCRIPT OF PROCEEDINGS - Trial
              BEFORE THE HONORABLE JOAN B. GOTTSCHALL
12                       and a Jury

13   APPEARANCES:

14   For the Plaintiff:    LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
15                              MR. STEVEN E. ART
                               MR. ANAND SWAMINATHAN
16                         311 North Aberdeen Street
                           3rd Floor
17                         Chicago, Illinois  60607

18                         MacARTHUR JUSTICE CENTER
                           Northwestern University School of Law
19                         BY:  LOCKE E. BOWMAN III
                           357 East Chicago Avenue
20                         Chicago, Illinois  60611
                           (312) 503-0844
21

22   Court reporter:           Blanca I. Lara
                            Official Court Reporter
23                         219 South Dearborn Street
                                  Room 2504
24                         Chicago, Illinois 60604
                               (312) 435-5895
25                     blanca_lara@ilnd.uscourts.gov
```

```
 1    APPEARANCES:   (Continued)

 2

 3    For the Individual      THE SOTOS LAW FIRM
      Defendants:             BY:  MR. JEFFREY N. GIVEN
 4                                 MR. JAMES G. SOTOS
                                   MS. CAROLINE P. GOLDEN
 5                                 MR. JOSEPH M. POLICK
                                   MR. DAVID A. BRUEGGEN
 6                            550 East Devon Avenue, Suite 150
                              Itasca, Illinois  60143
 7

 8    For the Defendant       ROCK FUSCO & CONNELLY, LLC
      City of Chicago:        BY:  MS. EILEEN E. ROSEN
 9                                 MS. CATHERINE M. BARBER
                                   MS. THERESA B. CARNEY
10                            321 North Clark Street, Suite 2200
                              Chicago, Illinois  60654
11

12    For the Defendant       LEINENWEBER BARONI & DAFFADA, LLC
      Guevara:                BY:  MR. THOMAS E. LEINENWEBER
13                                 MR. JAMES V. DAFFADA
                              120 North LaSalle Street, Suite 2000
14                            Chicago, Illinois  60602

15

16

17

18

19

20

21

22

23

24

25
```

1      (Jury out.  Witness in.  Proceedings heard in open court:)

2           THE COURT:  Okay.  A couple things.

3           Quickly on Bryant, I am going to rule, I think,

4    consistently with the ruling on Lopez, which is to allow

5    impeachment by -- it's the affidavit, right?

6           Okay.  That's No. 1.  No. 2, I think the subpoena is

7    just going to get this jury into all kinds of confusion and

8    speculation.  I don't have enough of an explanation to feel

9    like anybody can use this for any purpose that is not going to

10   be in outer space, so I am going to exclude that.

11          And No. 3, Wasilewski on --

12          MR. GIVEN:  Reasonable diligence.

13          THE COURT:  -- reasonable diligence.  I am not going

14   to permit him to testify on that.  And there will be an

15   opinion, and we hope to get it to you before the end of the day

16   today.  But that is the way it's going.

17          I gather he's going to be able to testify on other

18   things, right?  It's just that?

19          MS. ROSEN:  Right.

20          THE COURT:  I also think, for whatever it's worth,

21   that the prosecutor basically established that all these

22   options were available under Illinois law, so I think that it

23   can be argued.  But there's something about the opinion, which

24   I am going to try to describe in the opinion we're trying to

25   get out, that I think will state my reasoning.

1          So that's that.  And I think with that, we're -- no,
2     we're not ready?
3          MR. BOWMAN:  I'm sorry, Judge.  I have an issue to
4     raise that pertains to the witness on the stand, and that is
5     that we came into --
6          MR. ART:  Hey, Locke, do you want the witness out of
7     the courtroom?
8          MR. LOEVY:  I don't think we -- we don't care.
9          MR. SOTOS:  No.  He should be out.  He should be
10    out --
11         MR. LOEVY:  Either way.
12         MR. SOTOS:  -- of the courtroom, Your Honor.
13         THE COURT:  Okay.
14         MR. SOTOS:  Thanks.
15    (Witness exits.)
16         MR. BOWMAN:  What it is is an affidavit of someone
17    named Michael Spaargaren, and it contains allegations against
18    Mr. Spratte with respect to his reaction when he was informed
19    of serious misconduct being committed by an officer named
20    Watts, who is notorious for engaging in extreme criminal
21    misconduct.
22         And the affidavit describes an explosive, profane
23    reaction that this witness had when he was informed that --
24         THE COURT:  What's his relation to this accused
25    person?  Was he a supervisor or something?

1          MR. LOEVY:  Yes.

2          MR. BOWMAN:  He was a supervisor, yes.  He was the

3    sergeant --

4          THE COURT:  Okay.  So he's the supervisor of who?

5    Sparks?

6          MR. LOEVY:  Ronald Watts.

7          MR. BOWMAN:  He's -- Ronald Watts, who --

8          THE COURT:  Ronald Watts, who's a police officer.

9          MR. BOWMAN:  Who is a police officer who is disgraced

10   because he was --

11         THE COURT:  Yeah, I am just trying to get the context.

12         So Watts is, what, accused?  Convicted?  What?

13         MR. LOEVY:  Convicted, federal prison.

14         MR. BOWMAN:  Convicted.

15         THE COURT:  Convicted of some terrible things.

16         MR. BOWMAN:  Yes.  And --

17         THE COURT:  And --

18         MR. LOEVY:  Involving his police powers.

19         THE COURT:  And under what circumstances is the

20   witness apprised of this?

21         MR. BOWMAN:  The witness is apprised of this by a

22   colleague of Watts'.  The affiant in this affidavit that I have

23   in my hands was concerned about arrests not being made and

24   money disappearing.  Initially confronted Watts, and Watts

25   didn't provide an acceptable explanation.

1          The affiant then went to Mr. Spratte, who was then the

2     sergeant in charge of everything, and Mr. Spratte essentially

3     responded that it was in -- just sanitizing it, that it was

4     inappropriate to report the matter, that the matter should

5     never be reported --

6          THE COURT:  Is that it?

7          MR. BOWMAN:  Yes, it is.

8          MR. LOEVY:  That is the affiant.

9          MR. BOWMAN:  Yes.

10     (Document tendered to Court.)

11          THE COURT:  Why don't I just read it to --

12          MR. BOWMAN:  For us?

13          THE COURT:  -- save some time.

14          MR. SWAMINATHAN:  Starts in around paragraph 10.  And

15     he starts --

16          THE COURT:  Hold on, hold on.

17          And what is the -- this is before the conviction or

18     after the conviction or what?

19          MR. BOWMAN:  This is before.

20          THE COURT:  Okay, okay.

21          MR. BOWMAN:  When Spratte is Watts' supervisor.

22          THE COURT:  Okay.

23     (Court reading document.)

24          THE COURT:  Okay.  And the affiant is Spaargaren.  And

25     he gets in a fight with Watts.

1          MR. BOWMAN:  Right.

2          THE COURT:  And then --

3          MR. BOWMAN:  Goes to Spratte.

4          THE COURT:  Then Watts tells Spaarbargen, or whatever

5     he is, that Spratte wants to talk to him.

6          MR. LOEVY:  Right.

7          THE COURT:  And I gather Watts has already talked to

8     Spratte?  He says -- or he has not?  How does --

9          MR. BOWMAN:  I'm not sure that that's a critical part

10    of the --

11          THE COURT:  Okay, okay.

12          MR. BOWMAN:  -- story line.

13          THE COURT:  Okay, okay.  All right.

14    (Court further reads document.)

15          THE COURT:  Okay.  And what do you think this proves

16    that is relevant to this case?

17          MR. BOWMAN:  Well, what this tends to show is that the

18    testifying witness has a motive, a bias, a predisposition to

19    protect the police department against disclosure of misconduct,

20    including the most egregious misconduct, and is prepared to go

21    to the length of abusing his authority in order to accomplish

22    that end.

23          THE COURT:  Okay.

24          MR. BOWMAN:  And --

25          THE COURT:  Could you tell the jury we'll be five

1    minutes?  Thank you.

2          Yeah, go ahead.

3          MR. BOWMAN:  And after talking about this with Mr.

4    Loevy, our position is that we do not intend to raise this in

5    front of the jury unless the door is open.  And our purpose --

6          THE COURT:  Oh.

7          MR. BOWMAN:  -- in having this discussion now --

8          THE COURT:  Okay.  What would open the door?

9          MR. BOWMAN:  What would open the door would be Spratte

10    suggesting some absence of bias or some intention to be

11    entirely forthcoming with respect to these matters.  I mean, I

12    don't know exactly what --

13          THE COURT:  Okay.

14          MR. BOWMAN:  -- could open the door.

15          THE COURT:  What -- respond.

16          MS. ROSEN:  Yeah.  Well, number one, we were handed

17    this two minutes before --

18          THE COURT:  Yeah.  Well, you know, you were handed it

19    before I was.  Okay.

20          MS. ROSEN:  Yeah.  So -- and the affidavit's been in

21    existence since 2015, which was actually before Mr. Spratte's

22    deposition.

23          But setting that particular issue aside, the

24    allegations are based on complete hearsay.  We don't have this

25    witness here.  We don't know anything about the events or

1    what -- you know, any -- I mean, it's just hearsay.

2            So setting that aside --

3            THE COURT:  Well, that's --

4            MS. ROSEN:  -- with --

5            THE COURT:  That can be avoided by asking the witness,

6    "Didn't you say on some occasion when somebody brought

7    something to your attention," blah, blah, blah, blah, yeah.

8            MS. ROSEN:  Okay.

9            THE COURT:  Okay.

10           MS. ROSEN:  So the other thing is this witness is

11   designated as a 30(b)(6) witness to speak on specific issues as

12   it relates to the operations of Gang Crimes.  He's not here to

13   speak about IAD or discipline matters.

14           THE COURT:  Well, I guess what I am trying to get at

15   is it seems to me that the easiest way is if the door isn't

16   opened.

17           MS. ROSEN:  And I'm not -- if we get to that point, I

18   don't understand how the door could be opened.  If he's asked a

19   question about, "Isn't it true you're biased in favor of the

20   Chicago Police Department," well, that's sort of begging him to

21   open the door, so -- and, of course, he doesn't know anything

22   about this.  He doesn't even know that it's out there.

23           THE COURT:  Well, so that's why I am wondering.

24           MR. LOEVY:  You know, we didn't want to bring this in

25   front of the jury and have a sidebar.

1    THE COURT:  No, and I appreciate that, but I also want

2    to get the jury in the box sooner or later.

3    MR. LOEVY:  All right.  You know, they -- the City, as

4    Eileen pointed out, had this before they designated him as a

5    witness.

6    THE COURT:  Yeah, yeah, yeah, yeah, yeah.  Okay.

7    MS. ROSEN:  We didn't --

8    MR. LOEVY:  My point is, my point is why would they

9    designate a witness to be the spokesman for the City with this

10   kind of stuff that the City knew about?

11   THE COURT:  Well, maybe --

12   MR. LOEVY:  So they made their own bed.

13   THE COURT:  Maybe he was having a bad day, you know.

14   Maybe.  Who knows.

15   MR. LOEVY:  All right.  Well, we can press forward.

16   We won't say anything in front of the jury -- let's not lose

17   any more time -- and you'll decide.

18   THE COURT:  Okay.  And, you know, if you think the

19   door -- you are not going to open the door.

20   MR. LOEVY:  No.

21   THE COURT:  If the --

22   MR. SOTOS:  So this --

23   THE COURT:  If Ms. Rosen opens the door -- if you

24   think Ms. Rosen opens the door, why don't you make an

25   objection.

1          MR. LOEVY:  I will.  And I won't say anything that

2    will inflame.

3          THE COURT:  Okay.  Because this is really down -- this

4    is really going to take us down another very unpleasant route,

5    which I will --

6          MR. LOEVY:  All right.

7          MR. GIVEN:  Judge?

8          THE COURT:  Yeah.

9          MR. GIVEN:  I know you want to bring the jury back, so

10   I just want to put it on your plate, and I can raise it at the

11   next break.

12         THE COURT:  That'd be great.

13         MR. GIVEN:  I do want to raise something that Mr.

14   Loevy said that I want to bring up in the context of the

15   pending motion to reconsider Nieves.  So I --

16         THE COURT:  Oh.  Bring it up at the break.  I can't --

17         MR. GIVEN:  Right.

18         THE COURT:  -- take that now, yeah.

19         MR. GIVEN:  I understand.  I'll make it short.  I

20   promise.

21         THE COURT:  I've heard more about Nieves than I ever

22   want to hear about in my entire life.

23         MR. GIVEN:  Well, actually, Judge, I have to tell you

24   that what he's doing, he's in the middle of a hypothetical

25   about an Imperial Gangster shooting a Campbell Boy whose name

1  is --
2         THE COURT:  Rodriguez.  We've been hearing nothing --
3         MR. GIVEN:  And his name is Jose.
4         MR. LOEVY:  Rodriguez, Jose Rodriguez.
5         THE COURT:  Oh, come on.
6         MR. GIVEN:  So he's --
7         MR. LOEVY:  Rodriguez's name is Jose Rodriguez -- Jose
8  Rios.
9         THE COURT:  You can tell me at the break, because I
10  am --
11         MR. GIVEN:  I will tell you at the break.
12         THE COURT:  You don't want to tell me now, because I
13  am going to have a reaction like the witness did.
14    (Court waving document.  Laughter.)
15         THE COURT:  All right.
16         MR. LOEVY:  Do you guys want to get your guy?
17         THE COURT:  All right.
18    (Ms. Rosen exits.)
19         MR. LOEVY:  Your Honor, there has been complaints
20  about interrupting, and from our side, the book end of that,
21  he's not really doing a good job of answering the question.
22  Hopefully, we'll get into a better groove.  But to us, he seems
23  to veer off, not responding to the question in an unfair way.
24    (Ms. Rosen reenters with witness.)
25         MS. ROSEN:  Did you say -- is this addressing the

 1  witness --

 2         MR. SOTOS:  Yes, he is.

 3         MS. ROSEN:  -- that you just sent me to go get?

 4         THE COURT:  Yeah, the witness --

 5         MR. LOEVY:  I am --

 6         THE COURT:  -- can come back.  Let me --

 7         MR. SOTOS:  He is instructing that way.

 8         THE COURT:  The witness can take the witness stand.

 9         Let me just tell you that if at any time you need me

10  to suggest that the witness answer the question, I am here and

11  I can do that.

12         MR. LOEVY:  Fine.  Well, I'm sorry.  That wasn't --

13  Eileen, what I said was it feels like I'm asking questions,

14  he's going off in a different direction.  I'm trying not to

15  interrupt him.  If he answers the questions, it will be easier.

16         THE COURT:  We're ready.

17  (Jury in.)

18         THE COURT:  Without suggesting anything about anything

19  that we were talking about, let me just say that I can do what

20  I said I can do, and sometimes lawyers don't even want me to.

21  So whatever.

22         Please be seated, ladies and gentlemen.

23    JAMES SPRATTE, DEFENDANT CITY'S WITNESS, PREVIOUSLY SWORN

24               CROSS-EXAMINATION (Resumed)

25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 128 of 267 PageID #:44050
6-22-18 (Ex 14)
Spratte - cross by Loevy
3379

1    Q.  All right.  Sir, when we broke, you were saying that if

2    you're out on the street and someone gives you important

3    information, you wouldn't take -- on an event, you wouldn't

4    take notes because the idea would be, "Stop talking, stop

5    talking.  I don't want you to have to tell it twice.  I'm going

6    to bring you to talk to the detective."

7            Did I understand your -- the gist of it?

8    A.  That's one scenario, yes.

9    Q.  All right.  And so let's say you're on the street and you

10   got a guy in a frame of mind that he's being forthcoming.  He's

11   -- for whatever reason, he feels comfortable with you.  Maybe

12   he's been drinking.  Just he's in a real good talking frame of

13   mood, and he says, "Listen, Mr. Spratte, I got to tell you, I

14   know something about the shooting on Cortland."  All right?

15           You're saying you would say, "Sir, I need you to not

16   tell me any further, because what we need to do is we need to

17   put you in a police car, get you to the detective, and you can

18   tell it to the detective so you don't have to tell it twice"?

19   A.  On some scenarios, that could be the case, yes, but

20   you're -- if you're speaking in generalities, I would ensure

21   that whatever he told me was memorialized.

22   Q.  Sir, I asked you if you would bring him to the detective.

23   Now you're talking about memorializing.

24   A.  Well, you're talking -- are you talking about a specific

25   instance, sir, or are you talking about generalization or as a

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 129 of 267 PageID #:44051
6-22-18 (Ex 14)
Spratte - cross by Loevy
3380

1    representative of the City?  That's what I don't understand.

2    Q.  Well, maybe we can get some clarity on that, sir.

3          Are you testifying in that chair as someone who's

4    telling us about the City's practices or yourself?

5    A.  I'm talking about the City's practices.  But a number of

6    the questions I'm interpreting you're asking me are about

7    myself.

8    Q.  All right.  So you're not --

9    A.  So that's why I'm confused.

10   Q.  All right.  And I am, too, because you're not a party in

11   the case, you have nothing to do with these events.  My

12   understanding is the only reason you're here is because you're

13   going to tell us what the City's practices are.

14   A.  Practices were, yes.

15   Q.  All right.  So the practice is you would ask this person

16   who was in a forthcoming mood if they will get into your car

17   and drive to the police station?

18   A.  Practice is that's not necessarily the case.

19   Q.  All right.  Is the practice that you would ask the guy on

20   the street, "Okay.  Tell me.  Tell me more about that event,

21   the shooting on Cortland"?

22   A.  Yes.

23   Q.  All right.  But you still wouldn't make notes?

24   A.  As we were -- as he was -- at the initial interview with

25   him when he's telling about that?  No, sir, I wouldn't.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 130 of 267 PageID #:44052
6-22-18 (Ex 14)
Spratte - cross by Loevy
3381

1   Q.  All right.  Then how about later for your file?  Would you
2   make notes?
3   A.  I kept no files regarding something like that.
4   Q.  And it was your understanding that was the practice of the
5   police department?  Some guy on the street says, "Listen,
6   Officer Spratte, I trust you.  I'd like to tell you about the
7   shooting on Cortland."  Your practice and the practice of the
8   police department was Gang Crimes specialists don't take notes
9   on stuff like that?  That's the practice?
10  A.  Well, I think -- again, I think you're generalizing.  I'm
11  not stating that that is 100% the case because it's on -- it's
12  on an individual basis, counselor.  It -- first and foremost,
13  is it pertinent?  If it's pertinent to the case, then how do
14  you know if it's pertinent to the case unless you talk to the
15  detectives that are assigned to the case?
16  Q.  All right.
17  A.  At that point, the detective may say, "Would you
18  memorialize this."
19  Q.  Memorialize it.  Would any -- you had permission to take
20  notes if the detective gave you permission to take notes?
21  A.  No.  Memorializing would be reduce it to a form on a
22  general -- on a supplementary case report.
23  Q.  So under no circumstances would you take notes, and you'd
24  leave it up to the detective whether or not you made a report?
25  A.  I would -- under the circumstances.  If you're not talking

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 131 of 267 PageID #:44053
6-22-18 (Ex 14)
Spratte - cross by Loevy
3382

1    an in-depth, any type of in-depth interview would be done in

2    the Area, in the Detective Division headquarters.

3    Q.  I guess that's what I'm asking about.

4         So a guy says, "Listen.  I really gotta tell you about

5    the shooting on Cortland.  There's something I gotta tell you."

6    Maybe you got -- you know, whatever reason, he wants to talk to

7    you, you are not talking to him on the street.  You're saying,

8    "Sir, we got to go to the Area"?

9    A.  I -- he can talk to me on the street, but we're going to

10   the Area, yes, sir.

11   Q.  All right.  But isn't it -- if you are a gang member,

12   getting into a police car and driving to the Area, that would

13   create risk to that person, right?

14   A.  They -- they were getting into our cars on a daily basis.

15   Q.  All right.  So all things being equal, someone who was a

16   gang member cooperating about a shooting probably wouldn't want

17   to be seen getting into a police car, driving to the police

18   station about an investigation, right?

19   A.  I don't think that that's the case, no, sir.

20   Q.  All right.  Don't -- do you acknowledge that it's

21   implausible that you wouldn't have actually tried to elicit the

22   information on the street and written it down?  That's not

23   implausible to you?

24   A.  I -- it's implausible that I would let a viable witness to

25   a crime like that slip between my fingers, yes, sir.  If I had

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 132 of 267 PageID #:44054
6-22-18 (Ex 14)
Spratte - cross by Loevy
3383

1  him, he's going into the Area.

2  Q.  He's going to the Area?

3  A.  Yes, sir.

4  Q.  All right.  All right.  Because I thought the idea was you

5  would want to build trust with these guys, right?

6  A.  I've already --

7  Q.  Build relationships.

8  A.  Whatever trust is there has been established over a long

9  period of time.  A five-minute encounter on the street isn't

10  going to do one thing or the other.

11  Q.  No, I thought over time, you're trying to develop trust

12  with the guys you're trying to get intel from, right?

13          MS. ROSEN:  Objection, asked and answered.

14          THE COURT:  Overruled.

15  BY THE WITNESS:

16  A.  I am not as concerned about the trust as I am about the

17  intel.

18  BY MR. LOEVY:

19  Q.  All right.  You are not trained to do homicide

20  investigations.  We agree about that, right, sir?

21  A.  That's absolutely correct.

22  Q.  As a Gang Crimes specialist, you don't conduct homicide

23  investigations -- we don't conduct homicide investigations, we

24  are not homicide investigators, we are not trained in

25  conducting any type of investigation.  Would you agree?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 133 of 267 PageID #:44055
6-22-18 (Ex 14)
Spratte - cross by Loevy
3384

 1   A.  That -- in the 1980s, that was, indeed, the case.

 2   Q.  And speaking as the Chicago's designee, that was true of

 3   Gang Crimes specialists, right?

 4   A.  There were several gang specialists that I know of that

 5   were trained as homicide detectives.

 6   Q.  If they were prior trained.

 7   A.  Prior-trained homicide detectives, but they came over to

 8   the Gang --

 9   Q.  Right.

10   A.  -- Gang Crimes unit as gang specialists.  And as such, they

11   were not the primary investigators on any crime of violence.

12   Q.  All right.  Leave aside, then, people who came to Gang

13   Crimes after previously being detectives.  Nobody in our case

14   has that qualification.  Okay?  So I'd just like to ask you

15   about people who started as Gang Crimes people, like, for

16   example, Mr. Guevara.

17          Speaking as the City's designee, you guys -- those

18   times, the Gang Crimes people don't conduct homicide

19   investigations, are not homicide investigators, and are not

20   trained in conducting any type of investigation, correct?

21   A.  Yes.

22   Q.  All right.  So hypothetically, if a Gang Crimes detective

23   or -- I'm sorry -- Gang Crimes specialist learned about a

24   shooting, used his contacts on the street to develop a witness,

25   an eyewitness, got an I.D. from a photo book, interviewed the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 134 of 267 PageID #:44056
6-22-18 (Ex 14)
Spratte - cross by Loevy
3385

1    victim at the hospital, did an I.D. procedure at the hospital,

2    arrested the suspect, testified at the grand jury and testified

3    at trial, my first question is that would sound like he's

4    investigating a homicide, right?  That hypothetical?

5    A.  That would sound like he's in conjunction with somebody,

6    because he couldn't investigate it on his own.

7    Q.  All right.  So if somebody like Guevara -- somebody who did

8    the steps I just described was basically being rogue, right?

9    He's had --

10   A.  No, that's not what I said.  And you're speaking -- first

11   of all, you're -- the thing that bothered me immediately, the

12   first part of your question was "hypothetically."

13   Q.  Right.  Let me --

14   A.  And hypothetically, I don't under -- I -- the big words

15   confuse me, counselor.  So I don't necessarily mean -- but

16   "hypothetically" to me means, well, "what if" type of deal.

17   Q.  You were chosen by the City of Chicago -- probably 10,000

18   police officers -- to sit and represent the City, right?

19   A.  Yes, sir.

20   Q.  Do you understand the words of my questions?

21   A.  I am not sure of some of the words.  I don't have the

22   benefit of the education you do.  That's why I'm asking you to

23   reduce it to something that I can understand.

24   Q.  All right.  I will --

25   A.  Thank you.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 135 of 267 PageID #:44057
6-22-18 (Ex 14)
Spratte - cross by Loevy
3386

1   Q.  In a hypothetical -- you know what -- I don't want to, you

2   know --

3   A.  Well, I --

4   Q.  -- patronize you.

5   A.  Define "hypothetical" for me, would you, please.

6   Q.  All right.  Don't assume this is true.

7       With the facts I just gave you -- and I'm not going to

8   repeat them all -- that sounds like an investigation, right?

9   A.  It couldn't have been done without conjunction with the

10  detectives assigned to the case.

11  Q.  So you're not going to answer my question?

12  A.  I -- I did answer your question.  It might not be the

13  answer you look for, counselor, but I can only give you the

14  ones that are the most honest in my opinion.

15  Q.  All right.  If a Gang Crimes specialist did the things in

16  my hypothetical, it sounds like he would be basically acting

17  rogue.

18  A.  That -- not the case whatsoever.

19  Q.  But homicide -- but Gang Crimes specialists, you said,

20  don't do things like interview witnesses themselves, get

21  identifications themselves --

22  A.  I said they could, I said, but the ultimate responsibility

23  for that is the primary investigator, which is the Detective

24  Division.

25  Q.  All right.  If --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 136 of 267 PageID #:44058
6-22-18 (Ex 14)
Spratte - cross by Loevy
3387

1   A.  A homicide -- a Gang Crimes specialist cannot call Felony

2   Review and ask for felony charges.

3   Q.  Thank you.

4   A.  It has to go through a detective.

5   Q.  Can a Gang Crimes specialist call Felony Review and ask for

6   charges?

7   A.  On narcotics cases, sometimes with possession of a stolen

8   motor vehicle, and normally with a firearm recovered from the

9   street.

10  Q.  All right, sir.  Regarding the steps I told you in my

11  hypothetical, fair to say that if a Gang Crimes specialist did

12  do those things, he is not subject to the same rules as

13  detectives, right?

14  A.  Could you rephrase that?

15  Q.  Sure.

16  A.  I'm completely lost.  I'm sorry.

17  Q.  All right.  I'll give you the hypothetical again.

18          Hypothetically, let's say a Gang Crimes specialist

19  uses his contacts on the street to develop an eyewitness, does

20  identification photo procedures with that eyewitness, talks to

21  the victim in the hospital, interviews him, gets an

22  identification from the victim in the hospital, arrests the

23  suspect, does all those things without any involvement of a

24  detective, completely on his own.  Right?  Are you with me?

25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 137 of 267 PageID #:44059
6-22-18 (Ex 14)
Spratte - cross by Loevy
3388

1   Q.  That sounds like detective work, right?

2   A.  That's -- that's not what is delineated by order as

3   detective work, no.  It's -- they're going above and beyond the

4   call of duty.  It's -- in my mind, it's good police work.

5   Q.  All right.  If they do do that, though, they are not

6   subject to the rules -- any rules that govern detectives,

7   right?

8   A.  They are -- they're subject to Patrol Division orders.

9   Q.  Okay.  And that's about Patrol Division, and I -- I'm just

10  asking about detective.  Okay?  They are not subject to the

11  detective rules, right?

12  A.  No.

13  Q.  And, in fact, the patrol officers -- there's no rules that

14  say the patrol officers have to respect -- produce things to

15  the criminal justice system, use GPRs, turn over their

16  investigative files.  There's no rules for the Patrol Division.

17  A.  Not in the 1980s.  There were none, no, sir.

18  Q.  All right.  And back to the Gang Crimes specialists.  They

19  did not use GPRs, right?

20  A.  No, sir.

21  Q.  So when they changed the rule and required detectives to

22  write everything down on GPRs, that didn't apply to Gang Crimes

23  specialists, right?

24  A.  Correct.

25  Q.  And they -- Gang Crimes specialists were permitted to keep

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 138 of 267 PageID #:44060
6-22-18 (Ex 14)
Spratte - cross by Loevy
3389

1   their own personnel -- personal files, right?

2   A.  At that time, yes, sir.

3   Q.  Even after the detectives were prohibited from doing it,

4   they still let the Gang Crimes people do it, right?

5   A.  Yes.

6   Q.  And sometimes the Gang Crimes people would communicate with

7   each other by to/from memos, informal communications, say,

8   between shifts or between specialists, right?

9   A.  I can't think of an example where I left a to/from for

10  another gang specialist.

11  Q.  All right.

12  A.  We might leave a little note in a mailbox.

13  Q.  Yeah.

14  A.  Most of the time --

15  Q.  All right.  Let's not --

16  A.  Most of the time -- the incredible amount of time -- most

17  of the time was you would meet the oncoming shift as you were

18  going off.  If they had some knowledge of the gangs involved,

19  you would relay the information to them, as you would the

20  detectives.

21  Q.  All right.  Leaving aside the term "to/from memo,"

22  sometimes Gang Crimes specialists would communicate with each

23  other in writing about things they were working on, right?

24  Didn't you just say that?

25  A.  I suppose, I suppose.  Back of a contact card or, you know,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 139 of 267 PageID #:44061
6-22-18 (Ex 14)
Spratte - cross by Loevy
3390

1  face to face, yes.  It was --

2  Q.  All right.

3  A.  It was unusual for a note, to receive a note from any other

4  gang specialist.  Normally --

5  Q.  All right.

6  A.  -- it was face to face or they'd call you.

7  Q.  Sir, all I asked is it sometimes happens, right?

8  A.  I'm assuming it did.

9  Q.  All right.  And those were not retained and they were not

10  made part of discovery in criminal cases, right?

11  A.  To my knowledge, no.

12  Q.  All right.  After -- on -- you -- I don't have clarity

13  about when the street file problem became known, the *Palmer* and

14  *Jones* cases in the mid-'80s.

15      You don't recall it or you did know about it or you

16  didn't know about it?  Can you clarify?

17  A.  I've -- I know there was a case from out south regarding

18  detectives with their investigatory notes of a -- if that's the

19  one and the same.  I don't know the name of the case.

20  Q.  All right.  We might be talking about the same case.

21      There was a lot of public hearings, and the police

22  department was called out for letting the detectives keep

23  personal parallel files, and the practice got banned.

24      Do you remember that time?

25  A.  I remember that's when they came up with the GPRs for the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 140 of 267 PageID #:44062
6-22-18 (Ex 14)
Spratte - cross by Loevy
3391

1   Detective Division, yes, sir.

2   Q.  Right.  Now, you were a Gang Crimes specialist at the time,

3   right?

4   A.  Yes, sir.

5   Q.  And when they made those changes, those Special Orders for

6   the detectives, they exempted the Gang Crimes people, right?

7   A.  By not making a Patrol Division Special Order or General

8   Order, we would not be bound to it.

9   Q.  All right.  Did you guys read them?  Read those new rules?

10  A.  Those came out to the Detective Division.  I don't recall

11  ever seeing one.

12  Q.  All right.  And you guys -- and by you guys -- by the way,

13  were they all men in the Gang Crimes or were there some women,

14  too?

15  A.  I'm sorry?

16  Q.  Were they -- was there some women in the Gang Crimes unit?

17  A.  Yes.

18  Q.  All right.  And approximately how many during this time

19  period?

20  A.  I -- I couldn't tell you --

21          MS. ROSEN:  Objection, relevance.

22  BY THE WITNESS:

23  A.  -- from North.

24          THE COURT:  Overruled.

25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 141 of 267 PageID #:44063
6-22-18 (Ex 14)
Spratte - cross by Loevy
3392

1   Q.  Somewhere between 60 and a hundred?  Was that an estimate?

2   A hundred and a quarter?  What do you think?

3   A.  I -- I have no idea.

4   Q.  All right.  As a --

5   A.  I have no idea.  There was -- I'm trying to think.  In Gang

6   Crimes West -- I can think of five or six, but I don't know if

7   they were there the entire time or if they overlapped.

8   Q.  We might be --

9   A.  There were no --

10  Q.  -- misunderstanding --

11  A.  There was only -- I don't know if there were any female

12  gang specialists.

13  Q.  All right.  I was off the female.  There may or may not

14  have been female gang specialists, you're saying?

15  A.  I don't recall any.  I'm not saying there weren't, but I

16  don't recall any.

17  Q.  Fair enough.  I was asking -- I wasn't clear in my

18  question.  I was asking total number of gang specialists during

19  this time period.  Somewhere between about 60 and 120?

20  A.  Yes.

21  Q.  All right.

22  A.  I think they were budgeted -- I believe at one time, they

23  were budgeted for 125.  I don't believe they ever had anywhere

24  near that number.

25  Q.  All right.  You said you developed training years later for

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 142 of 267 PageID #:44064
6-22-18 (Ex 14)
Spratte - cross by Loevy
3393

1    Gang Crimes specialists?

2    A.  In the late '80s, yes.  I --

3    Q.  That was in the late '80s, sir?

4    A.  Yes, sir.

5    Q.  Do you have those documents?

6    A.  No.

7    Q.  Do you have any way to prove that it was in the late '80s?

8    A.  I would imagine --

9            MS. ROSEN:  Objection, Judge, to the form --

10           THE COURT:  Sustained.

11           MS. ROSEN:  -- of the question.

12           THE COURT:  Sustained.

13   BY MR. LOEVY:

14   Q.  All right.  Isn't it true that when you were a Gang Crimes

15   specialist, there was no training for Gang Crimes specialists?

16           MS. ROSEN:  Objection, asked and answered.

17           THE COURT:  Sustained.

18           MR. LOEVY:  Well, he just said he developed the

19   training, Your Honor.

20           THE COURT:  In the late '80s.

21           MR. LOEVY:  Yeah.

22   BY MR. LOEVY:

23   Q.  There was no training?

24   A.  There was not for Chicago Gang side.  There was a statewide

25   gang specialists Northeastern Metropolitan Regional Training

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 143 of 267 PageID #:44065
6-22-18 (Ex 14)
Spratte - cross by Loevy
3394

1    asked us to develop.

2    Q.  All right.  But each --

3    A.  I would imagine they would have record of it.

4    Q.  In Chicago, there was no training for Gang Crimes

5    specialists, correct?

6    A.  Correct.

7              MS. ROSEN:  At what point in time?

8              THE COURT:  Yeah.  At what point in time?

9    BY MR. LOEVY:

10   Q.  From any time from 1980s to 1990.  That whole decade, there

11   was no training, correct?

12   A.  Not that I'm aware of, yes, sir, correct.

13   Q.  And for all of my questions, I'll just ask you about the

14   '80s, unless I specify otherwise.  Okay?

15   A.  Okay.

16   Q.  When you became a Gang Crimes specialist, there's no -- you

17   know, there's no formal or written materials or any formal

18   training, right?

19   A.  Not that I recall, no.

20   Q.  But you did say with Ms. Rosen that there's sort of

21   on-the-job training?  You watched other people do it?

22   A.  Yes.

23   Q.  All right.  But these -- in fairness, that is, you, an

24   untrained person, watching other untrained people do things

25   that they weren't trained to do.  That's accurate, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 144 of 267 PageID #:44066
6-22-18 (Ex 14)
Spratte - cross by Loevy

3395

1  A.  I -- I can't agree with that question, because you lost me

2  about midway through it, counsel.  I'm sorry.

3  Q.  All right.  Nobody was trained, right?

4  A.  I'm sorry?

5  Q.  Nobody was trained, right?

6  A.  I don't believe there was any formal training that I was

7  aware of in the '80s.

8  Q.  All right.  So taking you back to the second half of my

9  question.  If there was on-the-job training, it was by people

10  who themselves weren't trained, right?

11  A.  Yes.

12  Q.  All right.  And there was a lot of disparity, a lot of

13  differences in how people did things in the Gang Crimes.

14      That would be accurate, right?

15  A.  Yes.

16  Q.  And that was by design.  The system permitted people to do

17  things their own way.

18  A.  They were -- yes, as long as they -- you know, what they --

19  they monitored your activities, made sure that you were up on

20  your assigned gangs, and, yes, they pretty much, you know, let

21  everybody develop their own style.

22  Q.  All right.  And that included no training on *Brady versus*

23  *Maryland*, the obligation to disclose exculpatory information,

24  right?

25  A.  I am unfamiliar with that case, counsel.  I --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 145 of 267 PageID #:44067
6-22-18 (Ex 14)
Spratte - cross by Loevy
3396

1    Q.  Are you familiar with the concept?

2    A.  I don't understand it.  I don't understand what you're

3    talking about.

4    Q.  All right.  How many years were you a Chicago police

5    officer?

6    A.  33 years.

7    Q.  Did you come across the concept that criminal defendants

8    are entitled to information that would help them show that

9    they're innocent?

10   A.  Oh, yes.

11   Q.  All right.

12   A.  Discovery processes.  Is that what we're talking about?

13   Q.  That's what we're talking about.

14   A.  Okay.

15   Q.  So isn't it true that the Gang Crimes specialists in the

16   decade we're talking about received no training at all about

17   what we just mentioned, this *Brady v. Maryland* obligation?

18   A.  Not -- not in particular to this.  If they -- if they

19   developed something for the Patrol Division, then we would have

20   been part and parcel to it.

21   Q.  Well --

22   A.  But nothing -- nothing specifically for the Gang Crimes

23   unit in the '80s.

24   Q.  And the detectives, obviously, would have got training on

25   *Brady*, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 146 of 267 PageID #:44068
6-22-18 (Ex 14)
Spratte - cross by Loevy
3397

1   A.  I would assume so.  I don't know.

2   Q.  And there wouldn't have been any training for the Patrol

3   Division because they don't participate in those kind of

4   investigations, right?

5   A.  Well, you've got -- you've got a number of different

6   divisions in Patrol Division, and some of them were as active

7   with the homicides and the shootings as Gangs were.

8   Q.  All right.  You got no training, you yourself?

9   A.  I received no training.

10   Q.  On that subject?

11   A.  No.  My first training I received from the City of Chicago

12   regarding gang specialists was in January 1993.

13   Q.  All right.  And that was after you had designed your

14   training?

15   A.  Oh, long after.

16   Q.  All right.  You said that the -- you also got no training

17   on how to document developments on a homicide investigation,

18   correct?

19   A.  Again, I don't understand the question.  Could you reduce

20   it to simpler terms for me, please.

21   Q.  All right.  You got no training in how to document

22   developments in homicide investigations, correct?

23   A.  Document development in homicide investigations.  Any

24   information that I gleaned immediately --

25   Q.  Well, just training.  Just focus on the training and then

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 147 of 267 PageID #:44069
6-22-18 (Ex 14)
Spratte - cross by Loevy
3398

1    we'll -- you know, we've already talked about --

2    A.  My training -- I had in the police academy general offense

3    report -- the case-reporting system.  We were trained on that

4    extensively in the -- by the Patrol Division when we came on

5    the job, and that covered all reports and need-be reports

6    utilized by the Patrol Division.

7         So at that point, they told us what needed to go on a

8    supplementary report regarding any type of investigation.  They

9    told you, you know, check with the detectives.  The detectives

10   are primary.  Always drilled in your head secondary

11   investigator -- or preliminary investigator, which is the car

12   on the scene.  The primary investigator is the detective or

13   detectives assigned to that investigation.

14        And in 1978 when I came on the job, we spent enormous

15   block of hours on field reporting, and that dictated to the --

16   that mandated us how we reduced what to which report.

17   Q.  All right.  Do you remember giving this answer at your

18   deposition?  A little tighter, but -- page 290, lines 15

19   through 19.

20        "Did you get any training about what information would

21   be considered important for purposes of a homicide

22   investigation as a Gang Crimes specialist?"

23        Your answer was:  "We had no training whatsoever."

24   A.  As a Gang Crimes --

25   Q.  Did you give that answer?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 148 of 267 PageID #:44070
6-22-18 (Ex 14)
Spratte - cross by Loevy
3399

1    A.  As a Gang Crimes specialist.

2    Q.  All right.  That was a shorter answer than the one you gave

3    in court, though, right?

4    A.  Well, it was -- yes.

5    Q.  All right.  Let's talk about reports.

6          Would it be fair to say that Gang Crimes specialists

7    generally did not make reports?

8    A.  No.

9    Q.  All right.  Do you remember being asked this question?

10         MR. LOEVY:  This is page 314, lines 6 through 19?

11   BY MR. LOEVY:

12   Q.      "I do not, under normal circumstances, generate any

13   type of report on something like that because I don't learn

14   enough information that the detectives don't already know and

15   won't know immediately.  That's the case.  That's the way it

16   worked.

17         "Now, were there -- were there gang specialists that

18   liked that aspect of the investigation?  I'm sure they were.

19         "And they would -- "And would they submit subsequent

20   to that?

21         "I'm sure they did."

22         THE COURT REPORTER:  I'm sorry.  Was that a

23   question --

24         MS. ROSEN:  Objection, Judge.

25         MR. LOEVY:  If I could just finish?  The problem with

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 149 of 267 PageID #:44071
6-22-18 (Ex 14)
Spratte - cross by Loevy
3400

1  the deposition --

2          THE COURT:  Well, I think that --

3          MR. LOEVY:  -- his answers went on for two pages.

4          THE COURT:  I think that -- well, I think -- let's

5  have you finish with the question at a pace that -- where the

6  court reporter can get it.

7          MR. LOEVY:  I will -- I'm not going to try to read his

8  whole answer, Your Honor.

9          THE COURT:  Okay.

10 BY MR. LOEVY:

11 Q.  There was no practice of documenting information.  I think

12 we've established that, right?

13 A.  I don't think we've established that whatsoever, counsel.

14 It was everybody -- if you received pertinent information,

15 you -- you documented it.  I have not said you didn't document

16 information that was pertinent to this.

17 Q.  All right.  I thought you said if you're on the street and

18 somebody's trying to tell you about Jose taking -- did the

19 shooting, you said, "I don't write things down about events."

20 A.  I wouldn't -- in that case, I wouldn't.  I'd bring him in

21 to the detective and let the detective mandate --

22 Q.  All right.

23 A.  -- do I need to write -- do I need to include this in a

24 supplementary report or the detective would include it in his,

25 which would be -- his report to this would be much more

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 150 of 267 PageID #:44072
6-22-18 (Ex 14)
Spratte - cross by Loevy

3401

1   intense, much more in-depth than mine.

2   Q.  All right.  But --

3   A.  So if the detective [sic], you know, "Hey, I know something

4   about this shooting.  What do you know about the shooting?

5   Come on, let's go in, let's talk to the detectives," I'd sit

6   with him with the detective.  "Tell him what you told me."

7   Then I was out of there.  Do you need a supp?  Yes.

8            MR. LOEVY:  Your Honor --

9   BY THE WITNESS:

10  A.  Do you need a supp?  No.

11           MR. LOEVY:  -- at some point -- you know, I don't know

12  what to do here.  He just keeps talking.

13           THE COURT:  Overruled.

14           MR. LOEVY:  All right.

15           THE WITNESS:  I'm trying to answer the question, Your

16  Honor.  I'm sorry.

17           THE COURT:  No.  I told the lawyer that you were

18  answering questions.  So --

19           THE WITNESS:  Oh, okay.

20           THE COURT:  -- let's go on.

21           THE WITNESS:  Thank you.

22  BY MR. LOEVY:

23  Q.  All right, sir.  Gang Crimes specialists, they were free

24  during that time period to sort of do it how they wanted to do

25  it.  Is that a fair summary?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 151 of 267 PageID #:44073
6-22-18 (Ex 14)
Spratte - cross by Loevy
3402

1          MS. ROSEN:  Objection, asked and answered.

2          MR. LOEVY:  All right.  I'll withdraw that question.

3     BY MR. LOEVY:

4     Q.  Isn't it true that other than the arrest reports at the end

5     of an investigation and the evidence inventories, Gang Crimes

6     specialists really weren't making too many police reports at

7     the time?  That's accurate, is it not?

8     A.  It depends on the type of arrests.  If you're talking an

9     arrest situation.

10    Q.  Well, you guys did make arrest reports, right?

11    A.  Yes, we did.

12    Q.  And you did make inventory reports when evidence was

13    inventoried, right?

14    A.  We did.

15    Q.  But other than that, that was basically the kinds of

16    reports you guys were making back in those days?

17    A.  That's not correct.

18    Q.  What other kinds of reports?

19    A.  General offense case report, if we had something on view.

20    If it was in regards to an investigation detectives were doing,

21    we'd do a supplementary case report documenting the arrest.

22    Q.  Supps weren't done until after the case was completed,

23    correct, sir?

24    A.  Not -- not -- not 100% of the time, no.

25    Q.  Most of the time, though, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 152 of 267 PageID #:44074
6-22-18 (Ex 14)
Spratte - cross by Loevy
3403

1    A.  Supps weren't done -- supps were done -- well, that's --

2    again, that was up to the individual officer and the individual

3    detective.

4    Q.  All right.  Do you remember --

5    A.  I can't tell you --

6    Q.  -- giving this answer --

7    A.  -- when they were done.

8    Q.  I'm sorry.  Were you finished?

9    A.  I am trying to, yes.

10   Q.  All right.  Continue.

11   A.  I can't tell you when -- what each officer's practice was

12   when they were done with that investigation.

13          If I made an arrest, and it was an on-view arrest, if

14   I saw something on the street, that arrest included complaints,

15   general offense case reports, arrest report, any inventories.

16   And if it was narcotics or an auto theft case, felony 101s or a

17   felony gun case.

18          If I -- if I made an arrest for a murder or for an

19   aggravated battery or for an armed robbery or something

20   previously documented, and there's a detective assigned to it,

21   then rather than the case report that we had on-viewed, I would

22   submit a supplementary report to the original case --

23   Q.  Okay.  Do you remember giving this deposition --

24   A.  -- documenting --

25   Q.  I'm sorry.  You weren't done?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 153 of 267 PageID #:44075
6-22-18 (Ex 14)
Spratte - cross by Loevy
3404

1   A.  Documenting the arrest and what had gone on with the

2   arrest.

3   Q.  Anything else?

4   A.  No, sir.

5   Q.  Remember giving this answer at your deposition?

6           MR. LOEVY:  This is page 243, lines 3 through 6.

7           MS. ROSEN:  Can you wait till I get there, please?

8           MR. LOEVY:  Sure.  Let me know, Ms. Rosen, please.

9           MS. ROSEN:  Okay.  I would --

10          MR. LOEVY:  It's only four lines, Your Honor.

11          MS. ROSEN:  I know, but it's completely out of

12   context, so I'm reading what is before.

13          Okay.  Go ahead.

14   BY MR. LOEVY:

15   Q.      "Question:  And what would you do then?

16          "Answer:  A lot of those supps weren't done until

17   after the case was complete in those days."

18          Did you give that answer?

19   A.  I -- I probably did if it's at a deposition, yes.

20   Q.  Was it true?

21   A.  Depending on the type of case, yes.

22   Q.  All right.  Let's talk about the mug books.

23          The detectives got training on how to do photo array

24   procedures, correct?

25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 154 of 267 PageID #:44076
6-22-18 (Ex 14)
Spratte - cross by Loevy
3405

1  Q.  And as far as the Gang Crimes specialists, though, during

2  the time period we're talking about, they -- there were no

3  policies about those gang books, correct?

4  A.  Policies regarding what, sir?

5  Q.  Do you remember being asked this question at your

6  deposition?

7          MR. LOEVY:  This is page 159, 9 through 160, line 10.

8          MS. ROSEN:  Can you wait, please?

9          MR. LOEVY:  Sure.

10         MS. ROSEN:  He just asked for clarification.  I don't

11 know how you can impeach him when he's asking for

12 clarification.

13         MR. LOEVY:  Your Honor, he was able to answer the

14 question at his deposition.

15         THE COURT:  Well, hold on a minute.  I don't know

16 where we are, to tell you the truth, at this point, so could

17 you begin the question again?

18         MR. LOEVY:  Sure.  All right.

19 BY MR. LOEVY:

20 Q.  Do you know what I mean by "policies," sir?

21 A.  Do I know what you mean by "policies"?

22 Q.  Yeah.  I mean, you're here to talk about policies.

23 A.  Chicago Police Department policies?  Yes.

24 Q.  All right.  We're talking about things like General Order,

25 Special Orders, department notices, those kinds of things,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 155 of 267 PageID #:44077
6-22-18 (Ex 14)
Spratte - cross by Loevy
3406

1    right?

2    A.  Yes, sir.

3    Q.  All right.  Isn't it true that back in the '80s, there were

4    no policies that governed Gang Crimes specialists doing the

5    gang-book thing?

6    A.  Not that I'm aware of, no.

7    Q.  All right.  And the only thing that everybody knew is you

8    can't show the witness just one single photo, right?

9    A.  That was stuff that we learned in the academy, yes, going

10   through -- you can't show one photo.

11   Q.  Everybody knows that, right?

12   A.  Yes.

13   Q.  In fact, you used the word "illegal" to describe that,

14   right?

15   A.  I -- you -- I don't -- did I use "illegal"?  I may have

16   used "illegal."  I may have used "immoral" in my mind.

17   Q.  All right.

18   A.  I don't recall what all was said.  There were some

19   inconsistencies with the original deposition.  I never signed a

20   copy of it.

21   Q.  Can you explain what you mean?

22   A.  There were some -- there were some errors, I thought, in

23   the dep -- the way the deposition was transcribed, and I didn't

24   agree with everything that was said in the transcript.

25   Q.  So, in other words, at the deposition, there was a reporter

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 156 of 267 PageID #:44078
6-22-18 (Ex 14)
Spratte - cross by Loevy
3407

1 like we have in court here?

2 A. Yes.

3 Q. And she typed up what you said, and then you read it, and

4 you said she typed your answers wrong?

5 A. There were several answers that I thought were wrong, yes.

6 Q. All right. And then --

7 A. And several --

8 Q. -- you had --

9 A. -- statements that I thought were misconstrued.

10 Q. All right. But you had a right to correct it. Did you

11 talk about that with Ms. Rosen?

12 A. I just --

13    MS. ROSEN: Objection, Your Honor, regarding what he

14 talked about with Ms. Rosen.

15    THE COURT: Yes. That's sustained.

16    MR. LOEVY: All right. That's fair.

17 BY MR. LOEVY:

18 Q. Did you know there were -- in any -- did you know there's a

19 capacity to correct wrong answers at depositions?

20 A. I assume at some point, I would've had a chance to correct

21 it when I received it. I read it. There were some things that

22 I didn't wholeheartedly agree with in that deposition, but I --

23 the opportunity never arose to correct it.

24 Q. All right. There was -- back to the topic, though.

25    In addition to being no policies, there was also no

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 157 of 267 PageID #:44079
6-22-18 (Ex 14)
Spratte - cross by Loevy
3408

1    training for Gang Crimes specialists on the subject of these

2    mug book identifications, correct?

3    A.  No training other than what we had been trained in the

4    academy as patrol officers, no.

5    Q.  And when a Gang Crimes specialist wanted to take one of

6    these mug books out of the office, a record would be made,

7    correct?

8    A.  That depends on the Area.  It was run different ways in

9    different areas, North, South, and West.

10   Q.  How about where you worked?  If you wanted to check out a

11   gang book, there would be a log saying on this date --

12   A.  If -- yes.

13   Q.  -- at this time --

14   A.  That's correct, that's correct.

15   Q.  -- this gang book left the police station, right?

16   A.  Well, if it was my gangs, I didn't have to log out my gang

17   books.  But other than that, yes.  If it was going to leave the

18   gang office, it should be documented.

19   Q.  So it sounds like you mean you had some personal photos of

20   your own that you --

21   A.  No.  If I -- you know what?  Photos -- a lot of people had

22   access to those things that -- and they were in a well-traveled

23   area of our office.  And from time to time, photos would end up

24   missing that were in these books.  So I would take -- whenever

25   I ordered photos once a year to update the synoptics, I would

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 158 of 267 PageID #:44080
6-22-18 (Ex 14)
Spratte - cross by Loevy
3409

1    order extra photos.

2    Q.  And you kept those?

3    A.  And I would have those.  And once in a while, if I noticed

4    there were three or four photos missing, I'd take the book

5    downstairs in my locker and I'd find the photos that were

6    missing and put them back in the book.

7    Q.  All right.  So those books were fluid.  The book might look

8    different on Tuesday than it looked on Thursday, right?

9    A.  It's possible, yes.

10   Q.  All right.  In any event, there would be a way to prove

11   that -- at least in your police station that if a book left the

12   station on a certain date at a certain time, you could look at

13   the log?

14   A.  It was supposed to have been done.  But, again, the person

15   that was in charge of it was the desk guy in the office, and he

16   had radio responsibility, he had -- he issued the incident

17   numbers.  He had a lot going on.  So is it -- was it foolproof?

18   No.  Could those books have walked out of the office?  They did

19   on a regular occasion.  But the procedure in Gangs was that

20   there was a log to be signed.

21   Q.  All right.  Do you have any understanding of why pictures

22   would get taken out of the books and go missing?

23   A.  Some things that come to mind.  One of the tac guys looking

24   for a -- developing information on somebody carrying a gun or

25   something and looked for the nickname and would pull that photo

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 159 of 267 PageID #:44081
6-22-18 (Ex 14)
Spratte - cross by Loevy
3410

1    out so if he saw them on the street, he could compare and find

2    the guy on the street.

3           It happened -- it happened, unfortunately, too many

4    times, but it happened --

5    Q.  All right.

6    A.  -- a great deal.

7    Q.  Now, one of the practices of the Gang Crimes specialists

8    with the mug books is if you're sitting with a witness, you

9    could take photos out of the books -- maybe six photos out of

10   the books.  So you got the book and you focus on six and put

11   them on the table?  That happens sometimes, right?

12   A.  I'm sure it did, yes.

13   Q.  And when you say you're sure it did, because that was the

14   practice, right?

15   A.  Most of the time, you'd just hand them the gang book and

16   look through here and see if you can find the guy you're

17   looking for.

18   Q.  But sometimes they're just looking at a limited set of

19   photos in the gang book?

20   A.  Yes, yes.

21           MS. ROSEN:  Objection, asked and answered.

22           THE COURT:  Overruled.

23   BY MR. LOEVY:

24   Q.  Now, if a witness looked at the photos -- say they're doing

25   this gang book I.D. and the detective, the specialist takes out

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 160 of 267 PageID #:44082
6-22-18 (Ex 14)
Spratte - cross by Loevy
3411

1    four photos, puts them on the desk.  And let's say the witness

2    doesn't pick any of those four people.  Says, "No.  Can't

3    recognize anybody."  No report gets created, right?

4    A.  If the detective was there, I believe detective --

5    Q.  I'm sorry.  I meant -- and I'm sorry to interrupt you.  But

6    leave the detectives aside.  Let's just talk Gang Crimes

7    specialists.  Okay?

8    A.  Okay.  I thought you asked me the question with detective

9    in there.

10   Q.  I did, and I apologize.

11   A.  Okay.

12   Q.  Say it's a Gang Crimes specialist doing it.  Puts the four

13   photos on the table.  And he's got a suspect there.  And the

14   kid or the witness looks at it and says, "Uh, I can't really be

15   sure."  There's no requirement to record that, is there?

16   A.  I don't believe there was in those days.

17   Q.  Wouldn't that have been exculpatory information?  Wouldn't

18   that have been information that a criminal defendant should

19   have been entitled to if he was in such a procedure?

20           MS. ROSEN:  Objection, Judge.

21           THE COURT:  I think that part of -- I don't think it's

22   a full question.  I mean, we didn't even establish that there

23   was --

24           MR. LOEVY:  All right.

25           THE COURT:  -- a suspect.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 161 of 267 PageID #:44083
6-22-18 (Ex 14)
Spratte - cross by Loevy
3412

1  BY MR. LOEVY:

2  Q.  Hypothetically, if a person was showing the gang books to a

3  witness and said, "Let's make this short.  I'm gonna take four

4  photos out of this book" -- and I'm talking about a Gang Crimes

5  specialist -- "and I'm gonna put them on the table.  Any of

6  these guys look familiar?  How about that guy?  Do any of these

7  guys look familiar?"

8          Are you with me on the hypothetical so far?  If you're

9  with me so far, I'm going to ask a little more.

10  A.  Okay.  I have a couple problems.  I would never say, "How

11  about that guy," first of all.  Second of all, I never use less

12  than five photos.

13  Q.  All right.  We'll make it five photos, and we won't do the

14  inappropriate part about, "How about that guy?"

15  A.  That'd be nicer.  Yes.

16  Q.  So all five are on the table, including the suspect.  If

17  the witness says, "You know what?  I don't know if any of those

18  look familiar."  Your understanding of the Gang Crimes

19  specialist rules were no record gets created, then?

20  A.  That would be up to the gang specialist at that point.  It

21  depends.  There's a lot more that could -- that would go into

22  that question, counselor.  Is the detective aware that you were

23  doing that?

24  Q.  All right.  And --

25  A.  If the detective is aware of you doing that, then the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 162 of 267 PageID #:44084
6-22-18 (Ex 14)
Spratte - cross by Loevy
3413

1   detective would document that in his supp.

2   Q.  And if he wasn't aware, then he wouldn't, right?

3   A.  That's -- yes.

4   Q.  All right.  And that would -- wouldn't that burn the

5   witness?  Is that a term you guys used?  That witness was

6   burned if he passed on the suspect's photo?

7   A.  Not necessarily, because the --

8   Q.  Well, starting with -- is that a term you used?

9           THE COURT:  Yeah, you're --

10  BY THE WITNESS:

11  A.  Again, you're interrupting me, counsel.  I'm sorry.  I'm

12  trying to keep one train of thought at a time.

13  BY MR. LOEVY:

14  Q.  And I probably asked you a few questions, so I'd rather

15  focus on my first one.

16          The question, burning a witness, is that a term you

17  used?

18  A.  No.

19  Q.  All right.  Do you know what I mean when I say, "Hey, that

20  witness was burned"?

21  A.  Yes.

22  Q.  Because they -- okay.  Now you want to answer the other

23  question?

24  A.  I don't remember the other question.

25  Q.  Neither do I.  Sorry.  Let's move on.  All right.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 163 of 267 PageID #:44085
6-22-18 (Ex 14)
Spratte - cross by Loevy

3414

1          The word "illegal" was a word that you used if you

2    showed just one photo, right?  This is your deposition.

3          MS. ROSEN:  What page?

4          MR. LOEVY:  Page 203, lines 16 through 19.

5          THE COURT:  Well, wait.  I think -- are you

6    impeaching?  Because I --

7          MR. LOEVY:  Yeah.

8          THE COURT:  Because I think the witness may have just

9    said that.

10          MR. LOEVY:  All right.

11    BY MR. LOEVY:

12    Q.  Do you agree with me that if a person -- a Gang Crimes

13    specialist showed a witness just one single photo as an array

14    procedure, that would be illegal?

15    A.  Improper for sure, if not illegal, yes.

16    Q.  All right.  This is --

17    A.  Never known of it done that way.

18    Q.  Yeah.  That would be highly improper, right?  Tell the jury

19    why that would be suggestive.

20    A.  Because you're -- you're looking at -- you want to make

21    sure that the person is identifying the right subject.  If

22    he's -- same thing as a physical lineup.  If you don't have

23    other people that -- in there, then you're pretty much honing

24    in on the one person, which, in my mind, is not a fair way of

25    doing things.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 164 of 267 PageID #:44086
6-22-18 (Ex 14)
Spratte - cross by Loevy
3415

1   Q.  All right.  Let's talk about files.

2        You said that -- you did keep some files, some

3   personal files?

4   A.  On the intel I gathered, yes.

5   Q.  All right.  But only about if a guy works at Franklin Park,

6   not about events, right?

7   A.  Nothing about events.  Maybe he was seen in this car, he

8   was seen in the company of so-and-so, if you consider that an

9   event.  But nothing as far as a criminal investigation, no,

10  sir.

11  Q.  Now, the Gang Crimes people did have, back at the Gang

12  Crimes headquarters, something called incident folders, right?

13  A.  Yes, sir.

14  Q.  Incident folders are files, right?

15  A.  Yes, sir.

16  Q.  And those files were kept in file cabinets, right?

17  A.  Originally, they were, yes.

18  Q.  All right.  So those incident folder files related to

19  incidents, right?

20  A.  Yes.

21  Q.  That's why we call them incident folders, right?

22        And an incident might be a shooting, like the Valentin

23  shooting, right?

24  A.  An incident would be an arrest or a recovery.

25  Q.  Well, could an incident be a shooting?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 165 of 267 PageID #:44087
6-22-18 (Ex 14)
Spratte - cross by Loevy
3416

1   A.  I don't believe -- if there was no arrest, I don't believe

2   we got an incident for a shooting.

3   Q.  Why would you need to create a file if there was an arrest?

4   A.  Because it was a copy of all the paperwork that we had done

5   so they had -- the unit had it and we had it for court

6   purposes.

7   Q.  So if I understand what you're saying, then, is you kept

8   the paperwork outside the file until you arrested the suspect

9   and then you created a file after the arrest?

10  A.  That's --

11          MS. ROSEN:  Objection, Your Honor.

12  BY MR. LOEVY:

13  Q.  Is that what you're saying?

14          MS. ROSEN:  Your Honor?

15  BY THE WITNESS:

16  A.  That's not what I'm saying.

17          THE COURT:  Sustained.

18  BY MR. LOEVY:

19  Q.  Well, how did you know what to put in the file after the

20  arrest?

21  A.  I just made a copy of it.  After we arrested somebody, we

22  obtained an incident number, and I got a copy of the arrest

23  report, the case report, inventories.  Anything that I had

24  generated as a result of that arrest went into that file.

25  Q.  All right.  Are you saying you remembered definitely that

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 166 of 267 PageID #:44088
6-22-18 (Ex 14)
Spratte - cross by Loevy
3417

1    these incident files that were at the Gang Crimes headquarters

2    did not relate to ongoing investigations, sir?

3    A.  Yes, sir, I am, to the best of my knowledge.  I don't know

4    of any such time when that occurred.

5    Q.  Okay.  Well, why didn't Gang Crimes keep ongoing files of

6    unsolved crimes?

7    A.  We weren't the primary investigators.

8    Q.  All right.  But you were doing an investigation, right?

9    A.  We were doing -- we were assisting in investigations.  We

10   weren't conducting an investigation.  And our investigations

11   were in organized crime.  They weren't in violent crimes.

12   Q.  And not to argue with you, but if you're not investigators,

13   then why are you making files for arrests?

14          MS. ROSEN:  Objection, Judge.

15          THE COURT:  Sustained.

16   BY MR. LOEVY:

17   Q.  Why -- I'll leave out the qualifier.

18          What's the purpose of Gang Crimes making files for

19   people who get arrested if that's not your function?

20          MS. ROSEN:  Objection, asked and answered.

21          THE COURT:  Overruled.

22   BY THE WITNESS:

23   A.  Repeat the question, please.

24   BY MR. LOEVY:

25   Q.  If you guys made files and you're telling us it's only

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 167 of 267 PageID #:44089
6-22-18 (Ex 14)
Spratte - cross by Loevy
3418

 1    after someone was arrested, and I want to know why.

 2    A.  What we were told to do.  I imagine that's -- that there

 3    would be a record in the office.  If the state's attorney

 4    called or somebody called, wanted to know about an incident,

 5    you know, OPS, Internal Affairs, whatever, they would have a

 6    case that was a -- it was a file of any report that we

 7    generated for an arrest.

 8    Q.  And notes, too, right?

 9    A.  Now, if we --

10    Q.  Notes, too?

11    A.  Pardon me?

12    Q.  Notes, too, right?

13    A.  We had no notes.

14    Q.  Okay.  But if you had notes, the logical place to put them

15    would be in the file, right?

16    A.  That's not a question I could answer because our notes did

17    not exist.

18    Q.  All right.  The Gang Crimes people in the 1980s, notes did

19    not exist?

20              MS. ROSEN:  Objection, Judge.

21              THE COURT:  Asked and answered?

22              MR. LOEVY:  All right.

23              MS. ROSEN:  Yes.

24              THE COURT:  Sustained.

25    BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 168 of 267 PageID #:44090
6-22-18 (Ex 14)
Spratte - cross by Loevy
3419

1    Q.  So no effort was made to get these files to the criminal

2    justice system, correct?

3              MS. ROSEN:  Objection, Judge.

4              MR. LOEVY:  He's the City's designee, Your Honor.

5              MS. ROSEN:  Well, what are we -- I'm lost in the

6    question, then, I guess.

7              MR. LOEVY:  Well, I'll try to make it slower here.

8    BY MR. LOEVY:

9    Q.  There were a set of incident files that the Gang Crimes

10   specialists maintained, correct?

11   A.  Anybody in Gangs West.

12   Q.  That's a yes or no question.

13   A.  Especially the tac guys.  Any time they made an arrest,

14   they created an incident.

15   Q.  Okay.  There was -- I'll ask it again.  There was a set of

16   -- because we don't want to get confused.

17              There was a set of incident files in the Gang Crimes

18   offices, right?

19   A.  Yes.

20   Q.  And those incident files, the Gang Crimes specialists' unit

21   made no effort to get those files to the criminal justice

22   system, correct?

23   A.  The original copies went to the criminal justice system.

24   Q.  How do you know that, sir?

25   A.  Because it went up through the -- up through the channels

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 169 of 267 PageID #:44091
6-22-18 (Ex 14)
Spratte - cross by Loevy
3420

1    of the Patrol Division.

2    Q.  Do you have any foundation or any knowledge of that?

3    A.  Every time I went to court, they had a copy of everything

4    in those files.

5    Q.  That's interesting.  Have you ever seen a humper in court

6    in your entire career?

7    A.  I don't know.  I don't remember.

8    Q.  No.  Because they never did get to the criminal justice

9    system, did they?

10          And you know that those were designed to stay outside

11   the criminal justice system, don't you?

12   A.  Those were just a synopsis of what you had done for the

13   day.  There were no notes included on those things.

14   Q.  All right.  Do you remember being asked this question

15   about --

16          MS. ROSEN:  Page?

17   BY MR. LOEVY:

18   Q.  -- whether any effort was made to get the gang files to the

19   criminal defendants and giving these answers?

20          MR. LOEVY:  This is page 383, line 22 through 384,

21   line 6.

22          MS. ROSEN:  Can you wait until I get to the page?

23          MR. LOEVY:  Sure.

24          MS. ROSEN:  What were the lines?

25          MR. LOEVY:  I'm going to read 382, lines 11 through

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 170 of 267 PageID #:44092
6-22-18 (Ex 14)
Spratte - cross by Loevy
3421

1    17.

2              MS. ROSEN:  There's no question there.

3              MR. LOEVY:  On 11?

4              MS. ROSEN:  Oh, I'm sorry.  I'm on the wrong page.

5              MR. LOEVY:  All right.  I am going to move on, Your

6    Honor.

7    BY MR. LOEVY:

8    Q.  If the Felix Valentin file in the Felix Valentin murder was

9    in -- it would have been in Gang Crimes offices at some time,

10   right?

11             MS. ROSEN:  Objection, Judge.

12             THE COURT:  What's the objection?

13             MS. ROSEN:  About -- the foundation for this

14   particular case in this particular file.

15             THE COURT:  Well -- oh, does the --

16             MR. LOEVY:  The practice.

17             THE COURT:  Does the witness know -- no.  Does the

18   witness know about this case?  I don't --

19             MR. LOEVY:  Let me -- I'll ask it better, then.

20             THE COURT:  All right.

21   BY MR. LOEVY:

22   Q.  Let's say there was a shooting and a person was arrested

23   and he was prosecuted, and the name of the victim was Felix

24   Valentin.  Okay?

25   A.  Okay.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 171 of 267 PageID #:44093
6-22-18 (Ex 14)
Spratte - cross by Loevy
3422

1   Q.  Somewhere in Gang Crimes, either headquarters or Gang

2   Crimes, there would be such a file, right?

3           MS. ROSEN:  Objection to the form, such a file.  What

4   file are we talking about?

5           MR. LOEVY:  The one I just described.  An incident

6   folder.

7           THE COURT:  We're calling it an incident file, right?

8   BY MR. LOEVY:

9   Q.  An incident folder for this thing that I just told you

10  about, right?

11  A.  This thing would be reduced to a number.  It would not --

12  Q.  All right.

13  A.  -- have the name "Valentin" on it.  It would have a number.

14  Q.  All right.  But that --

15  A.  It would be a -- if I may expound a little bit?

16          It was -- the first three digits would be a 710, a

17  740, or a 760.  That denoted if it was Gangs South, Gangs West,

18  or Gangs North.

19          The second two numbers would be an 88, which would

20  denote the year, 1988.  And the last four numbers would start

21  at 0001, and they would go up.  And that was how the numbers

22  were assigned in Gangs.

23          Any time there was an arrest or wherever you were,

24  whatever district you were in, you called and you got an

25  incident number, and you included the incident number on your

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 172 of 267 PageID #:44094
6-22-18 (Ex 14)
Spratte - cross by Loevy

3423

1  case report and you took -- you Xeroxed copies of your reports

2  that you submitted in that case, and you put it in the incident

3  file.

4  Q.  Now, what did it physically look like, this Gang Crimes

5  incident file?

6  A.  A manila folder with a piece of paper stapled on top.

7  Q.  All right.  All I'm trying to establish, though, is those

8  folders, whatever was in them, when it came time to prosecute,

9  those folders stayed in Gang Crimes, right?

10  A.  I don't know what happened to them.  I have no idea what

11  happened to them.

12  Q.  Well, one day, they were gone, right?  Those file cabinets?

13          MS. ROSEN:  Objection, foundation.

14          MR. LOEVY:  He knows, Your Honor.

15          THE COURT:  Well, the witness should say he doesn't

16  know if he doesn't know.  If he knows, he can answer.

17  BY MR. LOEVY:

18  Q.  They got moved?

19  A.  What --

20  Q.  One day, the file cabinets --

21  A.  File cabinets eventually were moved somewhere, yes.

22  Q.  Where were they moved to?

23  A.  I'm not sure.

24  Q.  Maxwell Street?  Isn't that what you said?

25  A.  I said I --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 173 of 267 PageID #:44095
6-22-18 (Ex 14)
Spratte - cross by Loevy
3424

1          MS. ROSEN:  At what point in time, Judge?

2     BY MR. LOEVY:

3     Q.  You tell us, sir.  When did the files get moved to Maxwell

4     Street?

5     A.  In 19 -- in January 1993, they did away with Gang Crimes as

6     it was.  They combined the gang specialists from Gangs North,

7     Gangs South, Gangs West.  They brought us into the Bureau of

8     Organized Crime, and we became Gang Investigations Section.

9          The three or four hundred tactical officers -- it

10    might have been more -- that had been assigned to the three

11    Areas were then disbursed to the districts.

12    Q.  The files.

13    A.  And --

14    Q.  The files.  Where did the files go?  That was the question

15    I asked you.

16    A.  I'm trying --

17    Q.  Okay.  Continue, then.

18    A.  -- to explain it --

19    Q.  Okay.

20    A.  -- so everybody can understand it.

21          Everything ultimately got moved.  I'm assuming the

22    files from Gangs West went to Maxwell Street because I saw file

23    cabinets that were being moved in there.  I don't know to this

24    day what was --

25    Q.  That was --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 174 of 267 PageID #:44096
6-22-18 (Ex 14)
Spratte - cross by Loevy
3425

1  A.  -- in those files.

2  Q.  -- my next question.  No, that was the next question.

3       Where are those files today?

4  A.  No idea.  I don't even know what was in them.  All I saw

5  was the cabinets moved.

6  Q.  You just know they were files with numbers on them, the

7  files you described, and one day they're all gone?

8  A.  They were gone.  I don't think they retained them in the

9  Area for more than a year.  I'm not sure.  But the -- the

10 administrative people always had a schedule, retention of

11 paperwork.

12 Q.  All right.  So they might have gotten purged every year?

13 A.  I -- purged or moved.  I have no -- I couldn't tell you.

14 Q.  All right.  You -- just a few more questions, then, sir.

15      You kept the notes that you took during your shifts,

16 right?

17 A.  Yes.

18 Q.  And you obviously were under no obligation to turn them

19 over to the police department, was your understanding during

20 the '80s, right?

21 A.  Yes.

22 Q.  Where did you keep them?

23 A.  I would reduce them to -- I kept a notebook with me.

24 Q.  Where did you keep the notes?  Yeah, sorry.

25 A.  I would reduce them into a notebook that I kept.  Anything

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 175 of 267 PageID #:44097
6-22-18 (Ex 14)
Spratte - cross by Loevy

3426

1    that I didn't have -- if I didn't have a notebook with me, I'd

2    write it on a back of a card.  I'd write it anywhere.  And when

3    I'd get into the -- when I'd get back at the end of the night,

4    I would transpose it in the notebook I kept on each gang.

5    Q.  And you kept those in a drawer in your desk at home, right?

6    A.  Kept a -- I kept a notebook in my locker.

7    Q.  All right.  At what -- at any time did they get into a

8    drawer in your desk at home?

9    A.  I -- at my -- at one point, there might have been a copy

10   there.

11   Q.  All right.  This is page 97 of your deposition, lines 3

12   through 7.

13           "But my stuff, I didn't take it" --

14           MS. ROSEN:  Wait, wait.  I'm sorry.  Wait a second.

15   That's not a question.

16           MR. LOEVY:  It's statement by a party.  He's

17   designated by the City.

18           THE COURT:  Do you have it?

19           MS. ROSEN:  But it's out of context.

20           MR. LOEVY:  Your Honor, if I could read his statement?

21           THE COURT:  Well --

22           MR. LOEVY:  He --

23           THE COURT:  -- there's some objection, and I don't

24   have the transcript.

25           MR. LOEVY:  All right.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 176 of 267 PageID #:44098
6-22-18 (Ex 14)
Spratte - cross by Loevy
3427

        1          THE COURT:  So very hard for me to do what I have to

        2   do.

        3          MR. LOEVY:  Here you go, Your Honor.  Handing you

        4   several pages of deposition.

        5          THE COURT:  Okay.  And you want me to go to what page?

        6     (Document tendered to Court.)

        7          MR. LOEVY:  Page 97, lines 3 through 7 is the

        8   statement I would like to read.

        9          THE COURT:  Okay.

       10          MR. LOEVY:  Anand, could I get another copy of those

       11   pages?  Thanks.  Would you like me to --

       12          THE COURT:  That's fine.

       13          MR. LOEVY:  -- back him?

       14          THE COURT:  That's fine.

       15          MR. LOEVY:  Yeah.  All right.

       16   BY MR. LOEVY:

       17   Q.      "But my stuff, I didn't take it, because I didn't keep

       18   it in the office anyway.  It was in a desk -- it was in a

       19   drawer in my desk at home.  So I didn't have to take it because

       20   it was still in my possession."

       21          Did you give that answer, sir?

       22   A.  And what was the question that the answer was to?

       23   Q.  All right.  Backing up, when you went --

       24          MR. LOEVY:  This is on page 96, lines 15 onward.

       25   BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 177 of 267 PageID #:44099
6-22-18 (Ex 14)
Spratte - cross by Loevy
3428

1  Q.          "When you went from Gang Crimes West over to

2  Maxwell Street, did you take whatever files you had related to

3  your work with you or did you leave your stuff behind?"

4          And then there are some objections by Ms. Rosen and

5  Mr. Given, and then you said:  "Anything I had that was

6  personal I took.  Anything that was part of the department or

7  gang" -- or "part of Gang Crimes West, they brought over there.

8  But my stuff, I didn't take it because I didn't keep it in the

9  office anyway.  It was in a drawer in my desk at home.  So I

10  didn't have to take it because it was still in my possession."

11  A.  I know how --

12  Q.  Did you give that answer, sir?

13  A.  I know how -- I had a locker at Area 4, because they moved

14  us to Maxwell Street, so I brought everything home.

15  Q.  And then you kept it in your garage -- or your basement,

16  sorry, for a while, right?

17  A.  I would -- I didn't use that stuff anymore, so, yeah, it

18  ultimately did go to my basement, yes, and get thrown out.

19  Q.  All right.  And one day, you threw it all away?

20  A.  Yes.

21  Q.  All those files?  All those notes?  And --

22          MS. ROSEN:  Objection to files and notes.

23          THE COURT:  Well --

24          MR. LOEVY:  Personal files.

25          THE COURT:  -- if that's a question, it's one thing.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 178 of 267 PageID #:44100
6-22-18 (Ex 14)
Spratte - cross by Loevy
3429

1   If it's a statement, it's stricken.  Is that --

2        MR. LOEVY:  Mine?  All right.

3   BY MR. LOEVY:

4   Q.  You did have files and notes, right?

5   A.  I didn't.  I don't -- what did -- maybe we're on a

6   different page here.  What -- define file as opposed to notes.

7   Q.  All right.  Let's -- you, sir, are the designee of the

8   City, right?

9   A.  We've gone over that.  Yes, sir, I am.

10  Q.  And it was, in fact, the practice of the City to allow Gang

11  Crimes specialists to keep their notes as their personal

12  property in their basement, in their drawer, in their garbage

13  can throughout the 1980s, correct?

14  A.  I don't even know if the City was aware that we did it, but

15  yes, we did it.

16  Q.  And, in fact --

17  A.  The gang specialists did it.

18  Q.  -- that -- that created a great risk of constitutional

19  violations because not all the relevant information was getting

20  turned over, would you agree?

21       MS. ROSEN:  Objection, Judge.

22       THE COURT:  Sustained.

23       MR. LOEVY:  All right.  I have no further questions,

24  Your Honor.

25       THE COURT:  Okay.  Ms. Rosen?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 179 of 267 PageID #:44101
6-22-18 (Ex 14)
Spratte - redirect by Rosen
3430

1              MS. ROSEN:  I just have a few.

2                          REDIRECT EXAMINATION

3    BY MS. ROSEN:

4    Q.  I just want to ask you just a couple questions.

5              You were talking about personal files.

6    A.  Yes.

7    Q.  The Gang Crimes specialists maintained personal files.

8              What was in the personal files?

9    A.  Names of gang members, how I identified them as being gang

10   members.  I kept a record of tattoos, if I saw tattoos.  I kept

11   a record of cars that they drove.  I kept a record of who they

12   were with when I stopped them.  Height, weight, nicknames,

13   things like that.

14   Q.  And did you use those files for purposes of the

15   intelligence-gathering that you've talked about?

16   A.  Yes.

17   Q.  The incident files or the incident folders that were at --

18   maintained at Gang Crimes, was there any original document in

19   that file?

20   A.  No.

21   Q.  Were they all copies?

22   A.  They were all Xeroxed copies.

23   Q.  Copies of what?

24   A.  The general offense case report or the supplementary case

25   report for the incident reporting, the arrest report, any

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 180 of 267 PageID #:44102
6-22-18 (Ex 14)
Spratte - redirect by Rosen
3431

1    complaints.  If we obtained felony 101s, the felony 101s.

2    Maybe a -- it depended.  Whatever else that we had that we

3    included in the court file that went with the arrestee into the

4    lockup went into the incident file as well.

5    Q.  So where did the original documents that you're describing

6    go?

7    A.  They were attached -- if there was an arrest, they were --

8    the copies -- the original copies were attached with the

9    arrestee, to the arrest report, and he was put into the lockup.

10   Q.  And that original arrest report would go with him into the

11   lockup?

12   A.  Yes.

13          MR. LOEVY:  Objection, leading, Your Honor.

14          MS. ROSEN:  I'm just --

15          THE COURT:  Just repeating what the witness had said.

16   BY MS. ROSEN:

17   Q.  And then do you know what would happen with that original

18   report that went with the arrestee in the lockup?

19   A.  I know there were copies sent down to the Records Division.

20   There was copies sent to the -- included in the court case and

21   the court docket.  There were copies sent -- depending on the

22   nature of arrests, there were copies sent to the coordinating

23   Detective Division.

24          MS. ROSEN:  I have no further questions.

25          THE COURT:  Mr. Loevy, anything else?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 181 of 267 PageID #:44103
6-22-18 (Ex 14)
Spratte - recross by Loevy

3432

```
 1              MR. LOEVY:  Just very briefly.
 2                        RECROSS-EXAMINATION
 3   BY MR. LOEVY:
 4   Q.  The files that you kept in your basement had your intel,
 5   right?  The stuff like license plates and people working in
 6   Franklin Park?  That's what you just told Ms. Rosen, right?
 7   A.  Yes.
 8              MS. ROSEN:  I didn't ask about --
 9   BY MR. LOEVY:
10   Q.  But you are --
11              MS. ROSEN:  -- anything in his basement.
12              MR. LOEVY:  Or the files, the personal files.
13              THE COURT:  Overruled.
14   BY MR. LOEVY:
15   Q.  But you're saying you're positive that none of those files
16   you had had intel about things like, "Hey, Jose says that
17   shooting that happened back in August, Bob did it"?  That had
18   nothing like that --
19   A.  I'm absolutely positive of that, counsel.  Nothing.
20   Q.  No intel like that?
21   A.  No, sir.
22              MR. LOEVY:  All right.  No further questions.
23              THE COURT:  Anything else?
24              MS. ROSEN:  No, Judge.
25              THE COURT:  Thank you, sir.
```

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 182 of 267 PageID #:44104
6-22-18 (Ex 14)
Noble - direct by Rosen

3433

 1              THE WITNESS:  Thank you, Judge.

 2              THE COURT:  You may step down.  Watch your step.

 3     (Witness excused.)

 4              MS. ROSEN:  Do you want to break or call the next

 5     witness?

 6              THE COURT:  I think we probably ought to get -- go

 7     ahead with the next witness --

 8              MS. ROSEN:  Okay.

 9              THE COURT:  -- for 15 minutes or so.

10              MS. ROSEN:  Okay.

11     (Pause.)

12              MS. ROSEN:  Sorry.  We're using Judge Norgle's witness

13     room.

14     (Witness enters.)

15              THE COURT:  Sir, would you please raise your right

16     hand.

17     (Witness duly sworn.)

18              THE COURT:  Please be seated.

19           JEFF NOBLE, DEFENDANT CITY'S WITNESS, SWORN

20                      DIRECT EXAMINATION

21     BY MS. ROSEN:

22     Q.  Hello, Mr. Noble.  Could you please identify yourself for

23     the ladies and gentlemen of the jury.

24     A.  My name's Jeff Noble, N-o-b-l-e.

25     Q.  And can you tell us what your occupation is.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 183 of 267 PageID #:44105
6-22-18 (Ex 14)
Noble - direct by Rosen
3434

1    A.  I'm a consultant in the field of police practices.

2    Q.  And are you here today to testify as an expert on behalf of

3    the City of Chicago?

4    A.  I am.

5    Q.  Okay.  Let's talk a little bit about your background.

6         Can you describe your background to the ladies and

7    gentlemen of the jury.

8    A.  I became a police officer in 1984 in the City of Irvine.

9    Irvine's a city in south Orange County, California of about

10   200,000 people.  I was a police officer there from 1984 to

11   2012.  I served for about 28-and-a-half years.

12        I worked through the ranks.  I was a patrol officer, a

13   narcotics detective for about four-and-a-half years.  I worked

14   as a sergeant.  As a sergeant, I worked in a number of

15   different assignments, including our Training Division,

16   Internal Affairs, on our SWAT team.

17        I was a lieutenant in my department.  A lieutenant is

18   a patrol watch commander.  I was a watch commander for a very

19   short period of time before being promoted to the rank of

20   commander.

21        In the City of Irvine, we had the city divided.  We

22   called it geographic policing where the city is divided into

23   three separate areas.  So as a commander, I was responsible for

24   all the operations, so patrol officers, traffic officers,

25   anybody that would have detectives, anybody that would have

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 184 of 267 PageID #:44106
6-22-18 (Ex 14)
Noble - direct by Rosen
3435

1    field contact in the area of the city, we called the University

2    area, which is -- includes the University of California at

3    Irvine, in the area next to the John Wayne Airport, with a

4    residential population of about 70,000 and a large business

5    population as well.

6         In the last two years of my career, I was the deputy

7    chief of police.  We had one chief and one deputy chief.  And I

8    was responsible for all operations for the entire city.  So,

9    again, everything that was field-related, basically everything

10   the police department except for things like records and

11   property and our dispatch unit.

12   Q.  Okay.  And when did you retire from the Irvine Police

13   Department?

14   A.  In 2012.

15   Q.  And then what did you do after that?

16   A.  I actually began -- before that, I began doing consulting

17   work.  I've been consulting work for about 15 years.

18        The majority of my consulting work is testifying in

19   cases like this one all across the country.  About half of my

20   cases are for the plaintiff, half for the defense.  I have had

21   a few criminal cases where I've testified against officers,

22   where I believe police officers actually committed crimes,

23   cases like Tamir Rice and Philando Castile.

24        I also went back -- after I retired, I was hired by

25   the Westminster Police Department, which is a smaller agency

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 185 of 267 PageID #:44107
6-22-18 (Ex 14)
Noble - direct by Rosen
3436

1   also in California, for a temporary assignment, about a

2   nine-month assignment to help assess -- they were having a

3   number of internal problems and to help assess the department

4   and to train some of their leadership.

5   Q.  Can you describe your educational background a little.

6   A.  I have a Bachelor's degree in criminal justice from Cal.

7   State University of Long Beach with an emphasis on

8   administration, and I have a law degree from Western State

9   University.

10          I passed the bar in California in 1993.  I've been a

11   licensed attorney in California ever since then, but I've never

12   really practiced law.

13   Q.  Okay.  And this isn't the first time that you've been hired

14   by the City of Chicago, correct?

15   A.  That's true.

16   Q.  How many times do you think you've been hired by the City

17   of Chicago to provide opinions?

18   A.  I think it's 24 or 25 times.

19   Q.  Okay.  And the jury heard from Mr. Brasfield a week or two

20   ago, and he described the fact that when he did the work in

21   this case, which he described as *Monell* work, as that's very

22   time-consuming work.  Would you agree with that?

23   A.  Oh, absolutely.

24   Q.  Okay.  And in the -- did you say 24 cases that you've done

25   for the City of Chicago, how many of them have been *Monell*-type

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 186 of 267 PageID #:44108
6-22-18 (Ex 14)
Noble - direct by Rosen
3437

1  claims?

2  A.  All but one.

3  Q.  Okay.  And just for clarity, a *Monell* claim looks at the

4  practices of a police department, right?

5  A.  Yes.

6  Q.  So it's not specific to a particular incident?

7  A.  That's true.

8  Q.  Okay.  And when did you start giving opinions on behalf of

9  the City of Chicago?  How long ago?

10  A.  14 or 15 years ago.

11  Q.  Okay.  So in that 14- or 15-year period of time -- well,

12  let me back up for a second.

13      The practices that you've looked at -- we know today

14  that we're talking about, you know, the practices that are at

15  issue in this case and your -- we'll get specifically to what

16  you're going to opine about.  But the practices that you've

17  looked at for the City, they're varying practices; is that

18  right?

19  A.  Yes.

20  Q.  Okay.  So in terms of -- for the last 15 years that you've

21  been looking at different practices of the City of Chicago and

22  its police department, approximately how much money have you

23  made?

24  A.  Around $400,000.

25  Q.  Okay.  And how many cases -- we know there's 24 related to

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 187 of 267 PageID #:44109
6-22-18 (Ex 14)
Noble - direct by Rosen
3438

 1    the City of Chicago.  How many other cases have -- do you have?

 2    Do you know that number?  Not related to the City of Chicago.

 3    Around the country.

 4    A.  At this point, I've had about 200 cases in total.

 5    Q.  Okay.  Now, in the context of this case, we asked you to

 6    provide opinions, correct?

 7    A.  Yes.

 8    Q.  And some of the opinions we asked you to provide are no

 9    longer relevant, right?  You've been told that.

10    A.  That's my understanding, yes.

11    Q.  Okay.  So we're going to just talk about the ones that are

12    relevant.

13           But in terms of the amount of work that you did in

14    this case, how much have you been paid?

15    A.  About $12,000.

16    Q.  Okay.  And that would include the relevant portions and the

17    portions that we're not going to talk about anymore, right?

18    A.  Yes, that's true.

19    Q.  Is there any way for you to distinguish between the two?

20    A.  No.

21    Q.  Okay.  So in this case -- well, let me back up for a

22    second.

23           In addition to this case where we're talking about the

24    City's policies and practices as it relates to investigative

25    files, have you provided opinions in other cases on the same

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 188 of 267 PageID #:44110
6-22-18 (Ex 14)
Noble - direct by Rosen
3439

1    topic?

2    A.  Yes.

3    Q.  What were the names of those cases?

4    A.  *Fields* and *Kluppelberg*.

5    Q.  Okay.  And the jury heard from Mr. Brasfield last week or

6    the week before that he, too, gave opinions in the *Kluppelberg*

7    case and the *Fields* case; is that correct?

8    A.  Yes.

9    Q.  And your role is to address some of Mr. Brasfield's

10   opinions, right?

11   A.  Yes, that's true.

12   Q.  Okay.  So today, we're going to talk about specifically the

13   City's policies as it relates to the investigative files.

14          And can you tell the jury what specific policy you're

15   going to be talking about here today?

16   A.  86-3.

17   Q.  And what is 86-3?

18   A.  86-3 is a policy that identified what an investigative file

19   is and what materials should be contained in those

20   investigative files.

21   Q.  And just so that everybody's clear on your role, you are

22   not going to be discussing the practices that came out of those

23   policies, right?  You didn't do -- the jury heard that Mr.

24   Brasfield did a comprehensive, somewhat, review of files and

25   certain files.  You didn't do that, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 189 of 267 PageID #:44111
6-22-18 (Ex 14)
Noble - direct by Rosen
3440

1  A.  No, I did not review any files.

2  Q.  Okay.  So you're just here to speak to the written

3  policies?

4  A.  Yes, that's true.

5  Q.  Okay.  And when you are assessing written policies of a

6  police department, what standard do you use to assess those

7  policies?

8  A.  The standard I always apply is reasonableness.

9  Q.  And let's talk for a minute about 86-3.

10       You looked at that -- obviously that order, right?

11  A.  Yes.

12  Q.  And you're aware -- well, let me ask you this.

13       Do you have an understanding of whether or not the

14  Chicago Police Department uses a centralized filing system?

15  A.  I am aware -- I am familiar with their filing system, yes.

16  Q.  Okay.  And can you tell us what their filing system is?

17  A.  So they have a filing system that is not centralized.  A

18  centralized filing system essentially refers to a system where

19  there is a single repository for all records.

20       So in the City of Chicago, they have multiple filing

21  systems.  So they have what is a called permanent file system

22  which contains those formal reports, the actual initial case

23  report, investigation report that's maybe completed by a patrol

24  officer, and then supplement reports, reports that will be

25  typed up and completed either by patrol officers or detectives.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 190 of 267 PageID #:44112
6-22-18 (Ex 14)
Noble - direct by Rosen
3441

1    And those official reports go into what's called, you know,

2    into records or that permanent file.

3         Then they have other systems as well.  So for

4    detectives that work violent crimes, they have what's called an

5    investigative file.  In that investigative file, they will --

6    those files will contain what's called general -- GPRs or

7    general progress reports that are, in essence, the officers'

8    notes that they will complete on a form.  Sometimes they may

9    contain other notes or memorandums as well.

10        The -- there are other filing systems within the

11   Chicago Police Department.  So, for example, their traffic

12   bureau keeps files on traffic collisions and drunk drivers.

13   Their forensics unit, you know, if they're examining a firearm,

14   will keep a filing system on that.  So there are multiple

15   filing systems within the City of Chicago or the police

16   department.

17   Q.  Is it unusual to have a decentralized file system like

18   Chicago has?

19   A.  No.  Many police departments have that.

20   Q.  Okay.  And that's true even today, correct?

21   A.  Yes.

22   Q.  Okay.  And we're talking about the policies in this case

23   back in the 1980s, right?

24   A.  Yes.

25   Q.  Back in the 1980s, was it unusual to have this

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 191 of 267 PageID #:44113
6-22-18 (Ex 14)
Noble - direct by Rosen
3442

1    decentralized file system?

2    A.  No.

3    Q.  Okay.  And during the course of your review of the order in

4    this case and your opinions, have you reviewed model policies?

5    A.  Yes.

6    Q.  What are model policies?

7    A.  So in policing, there are a couple of organizations that

8    put out what we call model policies.  Essentially, they're

9    examples, they're templates.  They're something that if you're

10   creating a policy, you can look at to help you to write a

11   particular policy.

12          So the International Association of Chiefs of Police,

13   you know, commonly referred to AICP, they publish some model

14   policies.  A group called the Police Executive Research Forum,

15   they produce reports where -- they don't produce a document

16   that actually calls itself a model policy, but, rather, they

17   produce reports.  And then certainly through the Department of

18   Justice and other, you know, more official writings there and

19   research, they will be -- you know, research that helps us to

20   draw -- to define what policies should be.

21   Q.  And have you had occasion to look at those types of model

22   policies to discern whether or not any of those model policies

23   say that centralized -- a centralized file-keeping system is

24   the best practice?

25   A.  No.  I was not able to locate any model policy that

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 192 of 267 PageID #:44114
6-22-18 (Ex 14)
Noble - direct by Rosen
3443

1   suggested that.

2   Q.  And you talked about GPRs, the general progress reports.

3        What's your understanding of the general progress

4   report and when it was created?

5   A.  Well, the general progress report was created to create

6   simply a form.  It's nothing more than a form.  And it was

7   created in order to have a standardized system for

8   note-keeping.

9   Q.  And in the model policies that you've talked about, did you

10  review those model policies for guidance on whether or not

11  standardized forms for note-keeping is the best practice?

12  A.  I -- I did, and I did not locate anything that suggested

13  that, nor have I ever, in my experience, seen anything other

14  than in Chicago about that.

15  Q.  Oh, why don't you talk about that a little bit.

16       What do you mean?

17  A.  I've worked with police departments all across the country.

18  Generally, if you're taking notes, you'll use a steno book or

19  some kind of notepad.  You'll write your notes, and then after

20  you've taken your notes, and when you go to write your report,

21  you'll use your notes to help you write a brief report, your

22  formal report.  You'll file the formal report and then you'll

23  destroy your notes.

24  Q.  And is that a practice that continues even to today?

25  A.  Yes.  It's a very widespread practice across the country.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 193 of 267 PageID #:44115
6-22-18 (Ex 14)
Noble - direct by Rosen

3444

1           MS. ROSEN:  Okay.  All right.  Maybe this is a good

2   place to break, yeah.

3           THE COURT:  Fine.  So ten minutes, ladies and

4   gentlemen.

5     (Jury out.)

6           THE COURT:  Mr. Given, you're going to have to write

7   down anything on that Nieves issue.  I have considered this so

8   many times, and I heard nothing, but what you -- it does not

9   need to be a fancy brief.  Just write something down so I know

10  what your -- what was said that you're relying on.

11          MR. GIVEN:  Got it.  Okay.  And I'll file that

12  sometime this evening.

13          THE COURT:  You know, if -- you can file it whenever,

14  but maybe stick it in my hand -- well, you're going to need to

15  write it.  Yeah, file it anytime tonight.

16          MR. GIVEN:  I'll handwrite it, but you won't be able

17  to read it, I promise.

18          THE COURT:  Do you know somebody who can take the

19  dictation?

20          MR. GIVEN:  I'll try.  I'll see what we come up with.

21          THE COURT:  No, that's okay.  Anytime tonight.

22    (Recess 2:32 p.m. until 2:44 p.m.)

23          THE COURT:  Are we ready?

24          MS. ROSEN:  Yeah.

25    (Pause.)

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 194 of 267 PageID #:44116
6-22-18 (Ex 14)
Noble - direct by Rosen
3445

 1        THE COURT:  I'm hoping by next Friday, things will

 2   be --

 3        MS. ROSEN:  Done?

 4        MR. LOEVY:  Come on, Judge.  We're hoping -- we're

 5   still hoping Monday.

 6        THE COURT:  Well, I know, but then we have all kinds

 7   of things we have to do.

 8        How many -- do we know how many instructions issues we

 9   have left?

10        MR. LOEVY:  Like I said, my memory is we've made some

11   pretty good progress before the trial.

12        MR. ART:  I think we have about six instructions to

13   talk to you about.

14        THE COURT:  All right.  So --

15        MR. GIVEN:  There were -- I would also agree there's

16   about six, but they're fairly significant, and you've had a lot

17   of submissions about them.

18        THE COURT:  Do you think there's a way that I -- I'm

19   sure I could find it somewhere, but that if you -- can you put

20   your hands --

21        MR. ART:  Yes.

22        THE COURT:  -- on what's left?

23        MS. ROSEN:  Sure.

24        MR. ART:  And we can resubmit the -- so before trial,

25   we submitted a, sort of, "where we're at," kind of, agreed

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 195 of 267 PageID #:44117
6-22-18 (Ex 14)
Noble - direct by Rosen
3446

1   thing based on the Court's prior rulings.

2           THE COURT:  Yeah.

3           MR. ART:  So we could submit that again, plus what's

4   still at issue.

5           THE COURT:  What's still in issue, yeah.  And if I get

6   that -- he knows we're ready, right?

7           I am trying to figure it out when we should have this

8   conference to figure out what's left.  What do you anticipate

9   about evidence in terms of when we'll be finished?

10          MS. ROSEN:  For sure, we're going to take -- now going

11  to take the day on Monday.  I mean, we still have -- I'm hoping

12  to be done Monday.

13          THE COURT:  We're ready.

14          MS. ROSEN:  Yeah.

15          THE COURT:  So maybe sometime --

16          THE COURT SECURITY OFFICER:  All rise.

17          THE COURT:  Maybe we could quit early Tuesday or

18  something like that?

19          MR. ART:  Right, yeah.

20          THE COURT:  Yeah.  Okay.

21    (Jury in.)

22          THE COURT:  Please be seated, ladies and gentlemen.

23          Ms. Rosen, whenever you're ready.

24          MS. ROSEN:  Thank you, Judge.

25  BY MS. ROSEN:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 196 of 267 PageID #:44118
6-22-18 (Ex 14)
Noble - direct by Rosen
3447

1  Q.  Okay.  So let's talk a little bit about the policy itself.

2       What was the purpose of the policy?

3  A.  The purpose of the policy is to ensure that all -- not only

4  all evidence that may tend to show that a particular suspect

5  had committed a crime, but also evidence that may show that the

6  person did not commit a crime and that these -- primarily that

7  these notes are maintained.

8       So if somebody took some notes in a field and then

9  wrote a report, we could go back and look at their notes and

10  look for some level of consistency between their notes and the

11  actual report.

12  Q.  Okay.  And in the body of the order itself, is there any

13  specific instruction about procedurally how that file is to be

14  provided to the criminal justice system?

15  A.  No.

16  Q.  Is that deficient in any way or unusual?

17  A.  No.

18  Q.  Why not?

19  A.  Because they -- they are aware it's their system so that

20  their people, their subpoena team that responds to these

21  subpoenas, they know that the file exists, and they're trained

22  to give -- make copies of the file and to provide it.

23  Q.  Okay.  With respect to the purpose of the order, does it

24  matter if sometimes notes are not actually taken on the actual

25  standardized form that was created, but was created on some

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 197 of 267 PageID #:44119
6-22-18 (Ex 14)
Noble - direct by Rosen
3448

1    other document so long as that note is maintained?

2    A.  The goal is to maintain a note.  So they created a form,

3    but policing is field work.  So they get called out in the

4    middle of the night.  Sometimes they get called in from home.

5    These are generally homicide cases.  These are big cases where

6    detectives are going out.

7         So what we really want is the note.  So if they put it

8    on a napkin or a matchbook cover or scrap -- piece of scrap

9    paper, you know, we want that, whatever they had made that

10   original note on, that's what's most important.

11        So to take a -- you know, if you scratched it on a

12   piece of scratch paper, to take that note and then put it onto

13   on a GPR, you would be facing this -- you know, you would still

14   have this -- you'd have the same concern, is that you don't

15   know what's in the original note.

16        So you want to keep the original note.  That's what's

17   most important.

18   Q.  Okay.  Mr. Brasfield described something called a murder

19   book, and it was his testimony that the ideal best practice is

20   that a murder book should be created.  And that's what -- in

21   homicide investigations, and that's what his understanding is

22   of what law enforcement agencies across the country utilize.

23        Are you familiar with the term "murder book"?

24   A.  Oh, yes.

25   Q.  And what is your understanding of what a murder book is?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 198 of 267 PageID #:44120
6-22-18 (Ex 14)
Noble - direct by Rosen
3449

1    A.  So oftentimes, homicide investigations are more complicated

2    and they take time.  So a murder book is nothing more than a

3    working file.  So it may -- it would contain copies of those

4    original reports.  It may contain copies of your notes or the

5    GPRs for the City of Chicago.  It may contain copies of other

6    things.  Because you want to have those notes with you as the

7    detective.  You go back in the field, you go to interview

8    somebody, you want to be able to quickly refer to somebody

9    else's interview as you're questioning somebody.  You can't go

10   back to the Records unit every time you want to go back and

11   double-check.

12           So detectives, particularly homicide detectives, are

13   trained to keep either what's called a working file or a murder

14   book that generally has copies to help them, to assist them

15   with their investigation.

16   Q.  So the murder books that you're familiar with are not the

17   original documents that are created during the scope of a

18   homicide investigation.  Is that your understanding?

19   A.  That's true.

20   Q.  Now, you're familiar with Mr. Brasfield's testimony about

21   the practices in Seattle when he was there, correct?

22   A.  Yes.

23   Q.  And do you have an opinion regarding whether or not the

24   Chicago practices, as established in 1983 and its progeny, as

25   compared to the Seattle practices, which practice is better?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 199 of 267 PageID #:44121
6-22-18 (Ex 14)
Noble - direct by Rosen
3450

1          MR. LOEVY:  Objection to relevance, Your Honor.

2          THE COURT:  Why is a comparison to Seattle relevant?

3          MS. ROSEN:  Because he testified that in his

4   experience ever -- the Chicago is an aberration, and everybody

5   else was better, so --

6          THE COURT:  I don't think that was just a comparison

7   to Seattle.  I am going to sustain the objection.

8          MS. ROSEN:  Okay.

9   By MS. ROSEN:

10  Q.  Are you aware of what Mr. Brasfield's personal practices

11  were when he was in Seattle?

12         MR. LOEVY:  Objection to relevance, Your Honor.

13         THE COURT:  Overruled.

14  BY THE WITNESS:

15  A.  Yes.

16  BY MS. ROSEN:

17  Q.  And what were those as it related to his note-taking?

18  A.  He would take notes and use his notes to write his formal

19  report and then he'd destroy his notes.

20  Q.  With respect to the policies that we are talking about here

21  today, the ones related to investigative files -- you've

22  already told us about the International Association of Chiefs

23  of Police as a model policy and the Police Executive Forum.

24         Is there something called Lexipol?

25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 200 of 267 PageID #:44122
6-22-18 (Ex 14)
Noble - direct by Rosen
3451

1  Q.  What is Lexipol?

2  A.  Lexipol is a company that was formed around -- probably

3  about 15 years ago and for -- you have to understand, in the

4  United States, there's about 17,000 police agencies.  The vast

5  majority of them are very small.

6          So for a smaller or a mid-size agency to create its

7  own policy manual is difficult, because you have to have people

8  full time who know what they're doing to create these manuals.

9  So Lexipol kind of came in and they filled that void, and they

10 create police manuals for police agencies that -- you know,

11 many policies, like use of force policies, can be the same for

12 everybody and then they can customize policies for the unique

13 needs of particular agencies.

14         Lexipol -- I don't know their exact numbers.  I know

15 they're widely used in California.  I know that, like, major,

16 large departments, like the Austin Police Department, has a

17 Lexipol policy.  Really across the Western United States and

18 it's working its way East.

19 Q.  And did you review the Lexipol policies in connection with

20 your opinions in this case?

21 A.  I did.

22 Q.  And did you consult with Lexipol regarding this idea of a

23 centralized filing system versus a non-centralized filing

24 system?

25 A.  Yeah.  There's no policy in Lexipol that requires a

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 201 of 267 PageID #:44123
6-22-18 (Ex 14)
Noble - direct by Rosen
3452

1   centralized filing system.

2   Q.  And did you consult Lexipol about the idea of note-taking

3   and what to do with your notes after the note-taking?

4   A.  There's no policy in Lexipol requiring note-taking.

5   Q.  Okay.  And I assume there's nothing about general progress

6   reports in Lexipol either?

7   A.  Well, general progress reports are definitely unique to the

8   City of Chicago.

9   Q.  And in connection with your opinions in this case, did you

10  review the L.A. Police Department's current policies on notes?

11  A.  Yeah.  I looked at the number of large agencies, including

12  LAPD -- it's available online -- and they don't have any policy

13  on notes.

14  Q.  Now, you know -- going back to the 86-3.  That has an audit

15  provision, correct?

16  A.  Yes.

17  Q.  And do you have opinions about the adequacy of the audit

18  provision?

19  A.  Well, every policy within a police department, by

20  definition, those policies get audited by their supervisors.

21       So that's one portion of the audit.  It's not formally

22  written, but it's always there.  And then they actually have

23  formally written in the policy that unit commanders will

24  periodically, and in unscheduled ways, they will inspect the

25  investigative files to ensure compliance.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 202 of 267 PageID #:44124
6-22-18 (Ex 14)
Noble - direct by Rosen
3453

1  Q.  And is the audit requirement, as set forth in the written

2  policy, reasonable?

3  A.  Yes.

4  Q.  Okay.  Now, with respect to note-taking and the information

5  that should be put in notes or reports, does the policies speak

6  to the types of information that a detective should be

7  memorializing in some way?

8  A.  Yeah, it basically tells them to put relevant information

9  into their notes.

10  Q.  Okay.  And what is relevant information?

11  A.  Well, the policy doesn't define the term -- the word

12  "relevant," but "relevant" means closely related.

13        For policing, everything we do is we conduct

14  investigations.  So a police officer would know what's relevant

15  based on their training, education, and experience as they're

16  going through any particular case of what may be reasonably

17  related to their investigation, what would be important to

18  include in their notes.

19  Q.  Mr. Brasfield has expressed the opinion that that

20  particular portion of the report -- of the order is

21  insufficient because what really should be there is a checklist

22  for the detectives on -- to tell them specifically what types

23  of information is relevant.

24  A.  That's just absurd.  I mean, how could you possibly do

25  that?  Every case is different.  You know, your checklists

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 203 of 267 PageID #:44125
6-22-18 (Ex 14)
Noble - direct by Rosen
3454

 1   would be hundreds, if not thousands, of pages long over what

 2   may be relevant in one case or may be important versus another.

 3        And ultimately, you know, we train our police

 4   officers.  Police officers take reports every day for all sorts

 5   of investigations.  They get additional training when they

 6   become homicide investigators.  That -- you know, this is sort

 7   of a term of art of what police officers do, is they write

 8   reports and they conduct investigations.

 9   Q.  Is it appropriate to leave decisions regarding the content

10   of the reports and what constitutes relevant information to the

11   discretion of a particular detective?

12   A.  Absolutely.  We entrust our police officers with guns and

13   the ability to use force and the ability to conduct

14   investigations.  Police officers don't work in an office where

15   they have a supervisor immediately available to them.  We have

16   -- police officers have a wide range of discretion that's

17   consistent all across the country in policing and is entirely

18   reasonable.

19   Q.  And then one last area.

20        You're aware, are you not, during the course of your

21   review of the materials in this case that when the City first

22   enacted its policies regarding investigative files, that was a

23   significant change, correct?

24   A.  Yes.

25   Q.  And you're aware that there was some training that went on

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 204 of 267 PageID #:44126
6-22-18 (Ex 14)
Noble - cross by Loevy
3455

1    at the time of the change, correct?

2    A.  Yes.

3    Q.  Can you describe the training as you understand it?

4    A.  My understanding is Director Hickey at the time went

5    through and personally trained every detective who worked in

6    the particular area of crimes against persons where the policy

7    applied, and he put on a four-hour training session.

8    Q.  And in your opinion, based on what you know about the

9    pre-1983 practices and then the new order, was that sufficient

10   training to let the detectives know that this new policy was in

11   place?

12   A.  Oh, absolutely.  This is a training.  This isn't a skills

13   training that, you know, needs repetition.  This is a training

14   on a policy.  And four hours is certainly sufficient to cover

15   what's in a policy and how to follow the policy.

16            MS. ROSEN:  If I could just have a minute?

17            THE COURT:  Sure.

18            MS. ROSEN:  I don't have any further questions.

19            MR. LOEVY:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21   BY MR. LOEVY:

22   Q.  Good afternoon, Mr. Noble.

23   A.  Good afternoon, Mr. Loevy.

24   Q.  You are a professional witness, correct?

25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 205 of 267 PageID #:44127
6-22-18 (Ex 14)
Noble - cross by Loevy
3456

1  Q.  That's basically what you do for a living.  You come to

2  courts and you testify, right?

3  A.  I do.

4  Q.  Last four years, you've made more than a million dollars

5  doing that?

6  A.  Yes.

7  Q.  And you hope to continue to make a lot of money being a

8  professional testifier, correct?

9  A.  I enjoy my work.  I hope to continue working, yes.

10  Q.  All right.  A big chunk of your income comes from defending

11  the policies and practices of the City of Chicago, is that fair

12  to say?

13  A.  Like I talked about, over 15 years has been $400,000.

14  Q.  All right.  And in this case, you didn't review any files

15  at all, right?  You just gave your thoughts and opinions on the

16  policies?

17  A.  Yes.

18  Q.  You spent, what, you know, I think six hours writing the

19  report?  About something like that?

20  A.  I don't have my billing fee in front of me.

21  Q.  All right.  But about half of that was related to what you

22  talked to in court today?  Or what percentage would you say of

23  those hours?

24  A.  I couldn't break it down because I was -- you know, there

25  were a large number of areas that I wrote in my initial report

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 206 of 267 PageID #:44128
6-22-18 (Ex 14)
Noble - cross by Loevy
3457

1   about.

2   Q.  And a lot of your report was cut-and-pasted from the report

3   you wrote in the *Fields* case, right?

4   A.  Yes.

5   Q.  And the *Fields* case was another wrongful conviction case

6   that looked at the City's policies and practices regarding

7   street files back in the '80s, right?

8           MS. ROSEN:  Judge, with respect to the description, I

9   think that --

10          THE COURT:  Yeah.  I don't think we need to go into

11  the substance of the *Fields* case.

12  BY MR. LOEVY:

13  Q.  You gave the same opinions in the *Fields* case, right?

14  A.  As far as the centralized files and the investigative

15  files, yes, absolutely.

16  Q.  It is the same type of dispute, right?

17  A.  I don't know anything about the underlying dispute.  I know

18  about it's the same as far as the files and the -- yes.

19  Q.  All right.  You said you've been -- represented some

20  sympathetic people.  You talked about Tamir Rice and et cetera,

21  correct?

22          MS. ROSEN:  Objection, Judge.

23          MR. LOEVY:  Your Honor, he specifically mentioned

24  Tamir Rice.

25          THE COURT:  Well, I think the characterization is --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 207 of 267 PageID #:44129
6-22-18 (Ex 14)
Noble - cross by Loevy
3458

1          MR. LOEVY:  All right.

2          THE COURT:  Sustained.

3     BY MR. LOEVY:

4     Q.  You've represented some less unsympathetic people at the

5     City of Chicago, too, haven't you?

6          MS. ROSEN:  Objection, Judge.

7          THE COURT:  Sustained.

8          MR. LOEVY:  Your Honor --

9     BY MR. LOEVY:

10    Q.  Isn't it true that you've also been defending the City of

11    Chicago's policy in claims with wrongful convictions, coerced

12    confessions, physical abuse?

13         MS. ROSEN:  Objection, Judge.

14         MR. LOEVY:  He deliberately --

15         THE COURT:  Well, wait a minute, wait a minute, wait a

16    minute.  I -- overruled.  That's overruled.

17    BY MR. LOEVY:

18    Q.  Right?

19    A.  In each of those cases -- well, I've represented the City

20    for a number of cases.  In the cases that I've represented the

21    City, it was generally -- with the exception of one shooting

22    case, I've never represent -- or I've never given opinions

23    about underlying facts; rather, the reasonableness of Internal

24    Affairs investigations, disciplinary systems, and policies and

25    procedures.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 208 of 267 PageID #:44130
6-22-18 (Ex 14)
Noble - cross by Loevy
3459

1   Q.  All right.  For example, you were involved in some cases

2   from the '80s involving suspects who were tortured back in the

3   '80s, right?

4         MS. ROSEN:  Objection.

5   BY MR. LOEVY:

6   Q.  And you defended the City's policies?

7         THE COURT:  Mr. Loevy, we are not going into the

8   substance of other cases.

9         MR. LOEVY:  All right.

10  BY MR. LOEVY:

11  Q.  Well, speaking of -- how many times did you say you've

12  represented the City?

13  A.  24, 25 times.

14  Q.  All right.  Because there's only 22 listed on the materials

15  you provided, right?

16  A.  I have no idea.

17  Q.  Are there some new ones?  What are the most recent ones

18  you've done with the City of Chicago?

19        MS. ROSEN:  Objection, Judge.  To the extent that he's

20  not disclosed, that violates rules.  So I don't know the answer

21  to the question, but --

22        THE COURT:  Wait.  Are you asking for a description of

23  the cases?  Because I don't think that that's really relevant

24  here.

25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 209 of 267 PageID #:44131
6-22-18 (Ex 14)
Noble - cross by Loevy

3460

1   Q.  Well, the City has paid you recently to defend their

2   policies in other cases, right?  We're up to 25 now?

3   A.  Yes.  I -- I don't know what the list is that you have, but

4   I -- I believe there's 24, 25 cases.

5   Q.  Ms. Rosen's firm defend -- hired you to defend the City's

6   policies in the *LaPorta* case, right?

7   A.  Yes.

8   Q.  And that was -- involved an off-duty police shooting?

9           MS. ROSEN:  Objection, Judge.

10          THE COURT:  Sustained.

11          MR. LOEVY:  Your Honor --

12  BY MR. LOEVY:

13  Q.  No matter what the City's policies were, you always say

14  that they're reasonable, right?

15          MS. ROSEN:  Objection, Judge.

16          MR. LOEVY:  I'd like to do it individually.

17          THE COURT:  Well, that's -- no.  Wait.  We're not

18  going into the substance of other cases, but that objection to

19  that question is overruled.

20  BY MR. LOEVY:

21  Q.  For example, in the *Manzarra* case, you looked at

22  administrative investigations and you concluded those policies

23  were reasonable?

24          MS. ROSEN:  Objection, Judge.  You just told him not

25  to go --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 210 of 267 PageID #:44132
6-22-18 (Ex 14)
Noble - cross by Loevy

3461

 1          THE COURT:  No, we're not going into the substance of

 2    the cases, and that question did not.  Overruled.

 3    BY THE WITNESS:

 4    A.  In almost all the cases, they were related to --

 5    BY MR. LOEVY:

 6    Q.  How about that one?  How about that one?  The *Manzarra*

 7    case?  You looked at administrative investigations, and you

 8    concluded that the City's policies were great, right?

 9    A.  I concluded the policies were reasonable.

10    Q.  And in the *Giles* case involving a police-officer-involved

11    shooting --

12          THE COURT:  That's what we're not going to do.  You

13    can name the case.  You know, if we need to --

14          MR. LOEVY:  All right.

15    BY MR. LOEVY:

16    Q.  On all these subjects for the City of Chicago, you always

17    conclude that their policies are great, right?

18          MS. ROSEN:  Objection, Judge.

19          MR. LOEVY:  That's why I want to do it individually.

20          THE COURT:  Overruled.

21    BY THE WITNESS:

22    A.  Almost all the cases involved similar -- the same policies

23    that were related to Internal Affairs investigations and

24    discipline, and my pol -- and my -- and I've consistently

25    believed that those policies and their procedures were

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 211 of 267 PageID #:44133
6-22-18 (Ex 14)
Noble - cross by Loevy
3462

  1    reasonable, yes.

  2    BY MR. LOEVY:

  3    Q.  That the City of Chicago's policies for disciplining its

  4    police officers are reasonable?

  5    A.  The policies, yes.

  6    Q.  And -- but the *Giles* case involved police shootings, and

  7    you said those policies were reasonable, too, right?

  8              MS. ROSEN:  Objection, Judge.

  9              THE COURT:  Well, that sort of skirts the line.  I'm

 10    going to overrule the objection to that.

 11              Policies about what?

 12    BY MR. LOEVY:

 13    Q.  Tell us, sir.

 14    A.  In the *Giles* case, I testified about both the Manilla

 15    [sic] action, the policies and procedures, and the actual use

 16    of force.

 17    Q.  You said it was reasonable, right?  Everything was good?

 18    A.  Yes.

 19    Q.  You testified for the City in the *Obrycka* case where that

 20    woman bartender got beat up on videotape?

 21              MS. ROSEN:  Objection.

 22              MR. SOTOS:  Objection.  Now it goes --

 23              THE COURT:  All right.  We're going to stop this.

 24              MR. SOTOS:  What's wrong with the --

 25              THE COURT:  If you can't follow -- there are ways of

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 212 of 267 PageID #:44134
6-22-18 (Ex 14)
Noble - cross by Loevy
3463

 1    asking about the nature of the policy that Mr. Noble was

 2    looking at without getting into the facts of the case.  So not

 3    going to go --

 4              MR. LOEVY:  All right.

 5              THE COURT:  -- into the facts of all these cases.

 6    BY MR. LOEVY:

 7    Q.  Do you care what the facts of the case are, sir, when you

 8    do your -- when the City hires you?

 9    A.  It depends on the case.

10    Q.  All right.  But every time they've hired you, you've

11    answered their call, right?

12              MS. ROSEN:  Object to the form, "answered their call."

13              THE COURT:  Sustained.

14    BY MR. LOEVY:

15    Q.  All right.  In all 25 times they hired you, were there

16    opinions -- was your opinion that the City of Chicago's

17    policies were super?

18    A.  In all the 25 cases where I was asked about the policies,

19    which were generally the same policies, it was my opinion that

20    their policies were reasonable.

21    Q.  All right.  Now, actually, because you've done so much work

22    for the City of Chicago, you are conflicted out of testifying

23    against the City of Chicago; isn't that true?

24    A.  I think anytime when I'm being retained by one side or

25    another that -- yeah, if I've got an open case with the City,

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 213 of 267 PageID #:44135
6-22-18 (Ex 14)
Noble - cross by Loevy
3464

1    no, I wouldn't take a plaintiff's case.  But I've also never

2    been asked.

3    Q.  All right.  So if someone called you and said, "I'd like

4    you to look at a City of Chicago policy, and tell me if you

5    think it's a bad policy," you'd have to tell them, "Sorry.

6    Professionally, I cannot take that opinion"?

7          THE COURT:  I think you misspoke.

8          MR. LOEVY:  All right.  Let me ask it again.

9    BY MR. LOEVY:

10   Q.  If someone called you and said, "I want to sue the City of

11   Chicago.  I think they've got a bad policy on snow-shoveling,"

12   or whatever it is, and they said, "Mr. Noble, I want you to

13   take a look at it, see if you think it's a good policy or bad

14   policy," you'd have to say, "I literally cannot give an opinion

15   that the City of Chicago has a bad policy because I'm

16   conflicted out"?

17   A.  I would definitely be conflicted out.

18   Q.  No matter what the subject, you are not allowed, in your

19   mind, to say that the City has a bad policy?

20         MS. ROSEN:  Objection, asked and answered.

21         THE COURT:  Sustained.

22   BY MR. LOEVY:

23   Q.  All right.  You are also a lawyer, you mentioned to Ms.

24   Rosen, correct?

25   A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 214 of 267 PageID #:44136
6-22-18 (Ex 14)
Noble - cross by Loevy
3465

1  Q.  And have you been a homicide detective?

2  A.  No.

3  Q.  In this case, I'm going to show you plaintiff --

4  Defendants' Exhibit 11, the policy regarding lineups.

5       MR. LOEVY:  This is already in evidence, Your Honor.

6  If we could have the Elmo?

7       THE COURT:  Sure.

8  BY MR. LOEVY:

9  Q.  Now, is it your understanding that back in the '80s, the

10  City of Chicago had a policy that if a witness looked at a

11  lineup and picked the filler, that the police were supposed to

12  write down the name of the filler?

13       MS. ROSEN:  Objection, Judge, foundation.  Beyond the

14  scope of his opinions.

15       THE COURT:  Well, that's -- my question is, did

16  Mr. Noble opine on that policy?

17       MS. ROSEN:  No.

18       MR. LOEVY:  No.  But I'd like to --

19       THE COURT:  If it is a policy.

20       MR. LOEVY:  -- cross-examine.  It is a policy, and I'd

21  like to cross-examine on this subject.

22       THE COURT:  I don't -- I can talk to you at the

23  sidebar, but I don't see how anyone gets to do that when an

24  expert report is limited to certain areas.

25  BY MR. LOEVY:

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 215 of 267 PageID #:44137
6-22-18 (Ex 14)
Noble - cross by Loevy

3466

1  Q.  Would you be willing to give an opinion -- you couldn't

2  give an opinion that it's a bad policy, could you?  You're

3  conflicted?

4          MS. ROSEN:  Objection, Judge.

5          THE COURT:  Sustained.

6          MS. ROSEN:  That's --

7          MR. LOEVY:  All right.  So I cannot ask questions

8  about the lineup policy?

9          THE COURT:  Well, not unless you've got something to

10  show me that when somebody has given an opinion on a certain

11  policy, that then you can question on all kinds of policies.

12          MR. LOEVY:  Okay.

13          THE COURT:  Because I don't know that that's the case.

14  BY MR. LOEVY:

15  Q.  Let's talk about the policies for getting information to

16  the criminal justice system.  That's very important, right?

17  A.  Yes.

18  Q.  Because criminal suspects accused of crimes have an

19  absolute constitutional right to all the information, not just

20  the stuff that makes them look guilty, but also the stuff that

21  helps them prove their innocence, right?

22  A.  They have the right to that information that's collected,

23  they're known by the police department.

24  Q.  All right.  Do you have a problem with how I characterized

25  it?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 216 of 267 PageID #:44138
6-22-18 (Ex 14)
Noble - cross by Loevy
3467

1  A.  Well, I think I do, and I have to look at exactly -- when

2  you said that -- you know, I mean, there always may be

3  something that, you know, a police officer may not recognize as

4  important at the time, but may become important later.  So it's

5  something that the officer has to know about.

6  Q.  Let me say it again, see if you can live with this

7  characterization, sir.

8        When someone is accused of a crime, they have a right

9  to all the information, whether it makes them look guilty or

10  whether it makes them look innocent.  You accept that

11  proposition, right?

12  A.  They're entitled to all the information that the police

13  officers have.  So there may be other information or there may

14  be some other thing that an officer may not have known to be --

15  or thought to be important at the time and he didn't write

16  about it.

17  Q.  What if a Chicago police officer has information that maybe

18  another suspect did?  Okay?  So in my hypothetical, maybe a

19  police officer has reason to believe that Jose Rodriguez

20  committed this crime.

21        Are you with me on the hypothetical?

22        MS. ROSEN:  Objection, Judge.

23        MR. SOTOS:  Objection, Judge.

24        MR. LOEVY:  Why is this objectionable, Your Honor?

25        MR. SOTOS:  It's objectionable.  Could we have a

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 217 of 267 PageID #:44139
6-22-18 (Ex 14)
Noble - cross by Loevy
3468

1    sidebar, Judge?

2         MR. LOEVY:  Your Honor, if they don't want Jose

3    Rodriguez, I'll just move forward.  I'll use a different type

4    of --

5         MR. SOTOS:  Oh, okay.  Judge --

6         THE COURT:  I think that -- I think that --

7         MR. SOTOS:  He's making speeches about the same

8    person.

9         THE COURT:  I'm sorry.  What?

10        MR. SOTOS:  Making speeches about the same person.

11        MR. LOEVY:  Your Honor, should we go to sidebar?  I

12    mean --

13        THE COURT:  I don't have any idea, because now I am

14    getting speeches that don't seem to relate to the objection.

15    So now I am a little confused.  Maybe -- if you --

16        MR. SOTOS:  You know, Judge?  Let him go on.  That's

17    fine.

18        THE COURT:  All right, all right.

19    BY MR. LOEVY:

20    Q.  Let's say hypothetically a police officer in a case learns

21    about information about an alternate suspect.  Okay?  Are you

22    with me?

23    A.  Yes.

24    Q.  And that police officer says, "You know what?  I'm going to

25    use my discretion.  I don't think that would be so helpful to

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 218 of 267 PageID #:44140
6-22-18 (Ex 14)
Noble - cross by Loevy
3469

1    Jacques.  I think I'd like to exercise my discretion against

2    disclosure."

3          Does the City of Chicago's policy allow him to do

4    that?

5    A.  So it depends.  It depends on what it is -- what's known to

6    the police officer.

7    Q.  Well, then let me give you the hypothetical very clearly.

8          The police officer believes that Jacques Rivera has

9    committed a murder, and he learns that the victim may have

10   identified another man.  And then he talks to the other man,

11   and maybe he satisfies himself that the other man's probably

12   innocent.

13         All I'm asking you, sir, is, does the detectives,

14   under the City's policy, have the discretion to decide to

15   withhold that?

16   A.  I think they have the discretion if they believe that the

17   lead is not workable or not accurate that they don't need to

18   write a report about that.

19   Q.  All right.  And that's your -- that is your expert opinion

20   that that's what the City of Chicago's policy says?

21   A.  I -- I think when you apply to what's relevant, yes.

22   Q.  Okay.  Isn't that a terrible policy?

23   A.  No.

24   Q.  What if -- why should the police officer get to exercise

25   discretion?  Why shouldn't the prosecutor or the criminal

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 219 of 267 PageID #:44141
6-22-18 (Ex 14)
Noble - cross by Loevy
3470

1    justice system or Mr. Rivera's criminal defense attorney decide
2    whether it's important or not?
3    A.  Because police officers are conducting investigations in
4    the field and is -- you know, it's very frequent that you get
5    initial information, that you quickly follow up on the
6    information.  It doesn't pan out and then that information
7    leads someplace else.  That's just a routine part of policing,
8    conducting an investigation.
9    Q.  You were a police officer, right?
10   A.  Yes.
11   Q.  All right.  Isn't it true that you are supposed to, as a
12   police officer, write it all down, give it to the courts, and
13   let the accused lawyer decide if it's relevant or not?
14   A.  No.  Again, you're saying -- talking about writing it all
15   down.  We write down what we believe -- what a reasonable
16   officer would believe to be relevant information.
17   Q.  All right.  You're not saying that every police department
18   in the country gives officers discretion to not turn over
19   things like that, right?
20   A.  I'm saying that every police officer in the -- every police
21   department in the country gives its officers discretion about
22   how to conduct an investigation, yes.  They have to.
23   Q.  All right.  But I didn't ask you about discretion about how
24   to conduct their investigation.  I'm saying surely there are
25   some police departments in America that the scenario I just

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 220 of 267 PageID #:44142
6-22-18 (Ex 14)
Noble - cross by Loevy
3471

1  gave you, they would require that to be produced to the

2  criminal justice system.

3          Do we agree about that?

4  A.  No.  I don't know that that's true.

5  Q.  How about in Irvine, California?  If you learn that there

6  was reason to suspect another murder suspect had committed the

7  crime, the police officer can just decide not to turn it over?

8  A.  No.  That's not -- that's not how you phrased the question

9  initially.  Again, if --

10 Q.  Well, let's phrase it that way.

11 A.  No, sir.  Okay.

12          MS. ROSEN:  Judge, could we allow him to answer the

13 question?  He just cut him off.

14          MR. LOEVY:  I apologize, Your Honor.

15 BY THE WITNESS:

16 A.  Again, it depends on the situation.  It depends on -- you

17 know, if this was a suspect where they did a lot of work on and

18 they did a lot of follow-up -- it just depends on the

19 situation.

20          Oftentimes, you know, when officers are pointed out,

21 you know, "That's the guy," they quickly follow up and, you

22 know, it's not even close.  The person's not related, and you

23 figure it out.  You have to move on and conduct your

24 investigation.  You don't stop and write down everything on

25 every step.  It's just not possible.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 221 of 267 PageID #:44143
6-22-18 (Ex 14)
Noble - cross by Loevy
3472

1    BY MR. LOEVY:

2    Q.  Sure.  All right.  But how about Gang Crimes officers in

3    Chicago?  Did you look at the Gang Crimes specialists?

4    A.  No.  I really didn't review the Gang Crimes specialists,

5    no.

6    Q.  They do -- do you know what a Gang Crimes specialist is?

7    A.  Generally, yes.

8    Q.  They do detective-type work, interviewing witnesses,

9    locating witnesses, showing photos, get I.D.s, solve crimes.

10          Those are the kinds of things Gang Crimes specialists

11   do, right?

12   A.  All police officers do those things.

13   Q.  All right.  So did Ms. Rosen show you any policies that

14   govern Gang Crimes specialists in their obligation to turn over

15   their notes and their files?

16          MS. ROSEN:  Objection, Judge, to the form of the

17   question, and it's beyond the scope of his 26(a) disclosure.

18          MR. LOEVY:  No, Your Honor.  This is not beyond the

19   scope.

20          THE COURT:  Well, I don't have the report.  I am

21   seeing if we can get the report.  So I don't know what were the

22   subjects covered in the report.

23          MR. LOEVY:  This is --

24          MS. ROSEN:  Judge --

25          MR. LOEVY:  He says that there is a policy -- that the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 222 of 267 PageID #:44144
6-22-18 (Ex 14)
Noble - cross by Loevy
3473

1    City of Chicago's policy for turning over materials --

2          THE COURT:  Let's talk at the side.

3          MR. LOEVY:  Yeah.

4      (Proceedings heard at sidebar on the record:)

5          THE COURT:  I am just trying to go over what he

6    testified to.  He testified about the policy applicable to

7    detectives, right?

8          MS. ROSEN:  Yes.

9          MR. LOEVY:  Well, Your Honor, I find that to be an

10   artificial distinction.

11         THE COURT:  Well, wait a minute.  I am -- but, I mean,

12   I think you can bring out that, does he know it's related

13   that -- it didn't relate to detectives.

14         MR. LOEVY:  And I'd like to ask him about, "You say

15   that this is a great policy ahead of its time, a super policy.

16   Isn't it a problem that it exempts Gang Crimes specialists?"  I

17   mean, that's like my whole cross.

18         THE COURT:  Well, you can -- I think that's okay.

19         MR. LOEVY:  Of course.

20         THE COURT:  Because they --

21         MS. ROSEN:  Well --

22         THE COURT:  -- have to define what -- the jury's not

23   going to know what the definitions of -- the limits of his

24   opinion are.

25         MS. ROSEN:  No.  But my point is if he didn't look at

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 223 of 267 PageID #:44145
6-22-18 (Ex 14)
Noble - cross by Loevy
3474

1    Gang Crimes specialists and he hasn't evaluated that, then --

2    and it's not a part of his opinions or his review --

3          THE COURT:  Well --

4          MS. ROSEN:  -- then -- I mean, he's -- his --

5          MR. LOEVY:  I mean, this is his opinion --

6          MS. ROSEN:  His opinion --

7          MR. LOEVY:  -- is that they got a great system.

8          THE COURT:  Hold on, hold on, hold on.

9      (Court reading document.)

10         THE COURT:  Well, we're not going to go in a direction

11   where there's nothing but bloodshed left on the field, I think

12   is the direction we're going in.

13         MR. LOEVY:  All right.

14         THE COURT:  But I think if you want to have him make

15   assumptions based on what he testified to --

16         MR. LOEVY:  Right.

17         THE COURT:  -- and ask him if his opinion covers

18   that --

19         MR. LOEVY:  Your Honor, what I'd like to do is say,

20   "Look, you just told us that Chicago's got a great policy ahead

21   of its time.  Isn't it true it's a bad idea to exempt Gang

22   Crime officers?  Isn't it true that it's not going to work if

23   you let other units be exempt from it?"  That's like -- that's

24   my whole cross here.

25         THE COURT:  Well, I think that's okay.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 224 of 267 PageID #:44146
6-22-18 (Ex 14)
Noble - cross by Loevy
3475

1    MR. LOEVY:  Thank you.

2         THE COURT:  But not -- but we're not going --

3    MR. LOEVY:  No bloodshed.

4  (Laughter.)

5         THE COURT:  Yes.  Well -- yeah.  And no facts of other

6  cases.

7         MR. LOEVY:  All right.  Thank you.

8  (End of proceedings at sidebar.)

9  BY MR. LOEVY:

10  Q.  All right, sir.  If I understand your testimony, you've

11  opined that the City of Chicago's policies for disclosing

12  information to the criminal justice system are good policies,

13  right?

14  A.  I think they're reasonable.

15  Q.  Okay.  Isn't it a -- you're not saying they're good.

16  You're saying they're reasonable?

17  A.  I think that's the standard we look at.  We look at whether

18  they're reasonable.  I don't know how you differentiate between

19  reasonable, good, great, super, and the other terms you've

20  used.

21  Q.  All right.  Let me get to my question.

22         Isn't it a bad policy if it exempts Gang Crimes

23  specialists from all the requirements?

24  A.  Well, I mean, you're going to have to go back.  What is

25  it -- which part -- are they -- they're only exempted -- they

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 225 of 267 PageID #:44147
6-22-18 (Ex 14)
Noble - cross by Loevy
3476

1    don't keep their notes.  Is that what you're saying?  Are you

2    asking if that's a bad policy?

3    Q.  I'm asking you, do you know anything about what I'm talking

4    about?  Gang Crime officers and what they're required to do in

5    the City of Chicago?

6    A.  Yes.  I'm aware of what gang officers are required to do.

7    I'm aware that this particular policy did not apply to the gang

8    officers.

9    Q.  And you're also aware, are you not, that no policies apply

10   to Gang Crime officers?  Are you learning that for the first

11   time right now?

12   A.  No, sir.  Their entire policy manual applies to gang

13   officers, just like it applies to every other police officer in

14   the department.

15   Q.  The City of Chicago's policy manual had a problem, right?

16   That was the *Jones*/*Palmer* problem, right?

17   A.  I don't identify that as a problem.  They had -- certainly

18   had a concern and an issue that was brought forward.

19   Q.  All right.  Well, I'm sorry I went out of order, but all

20   I'm asking you, sir, is if the department -- City of Chicago

21   wanted to fix its problems and make the detective Special Order

22   ensure that all information was getting to the criminal

23   defendants, can you agree with me that they should have

24   included Gang Crimes in it?

25   A.  Well, again, we disagree on whether or not there was a

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 226 of 267 PageID #:44148
6-22-18 (Ex 14)
Noble - cross by Loevy
3477

 1    problem.  We disagree on -- and I certainly disagree.  I mean,

 2    the issue was related to homicide investigations.

 3            And again, you have thousands of other police officers

 4    who are taking notes throughout the department that is

 5    consistent with what police officers do all across the country.

 6    Q.  If they had hired you not to be an advocate but to be a

 7    consultant, okay, and they said, "Sir, we'd like to design a

 8    policy.  We're thinking about applying it to just the

 9    detectives.  And the Gang Crime people, we're thinking about

10    exempting the Gang Crime people," what would have been your

11    advice to them?

12            MS. ROSEN:  Objection, Judge.

13            THE COURT:  Overruled.

14    BY THE WITNESS:

15    A.  So, first of all, they don't hire me to be an advocate.

16    They hire me for an opinion based on my training and

17    experience.

18            Second of all, if they had asked me, I would have told

19    them that generally-accepted police practices do not -- would

20    not require a policy in this area at all.

21            If you want to create a policy, it would be well

22    beyond what's required for all of the police departments.  And

23    if you feel that you have some issue or some concern in one

24    particular area of your department, and you want to create a

25    policy for that area, that that would be perfectly acceptable

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 227 of 267 PageID #:44149
6-22-18 (Ex 14)
Noble - cross by Loevy
3478

1   because nobody else is falling below the standard by not having

2   that policy.

3   BY MR. LOEVY:

4   Q.  All right.  I'm going to ask it again, and I'm going to ask

5   you to answer it, if you would.

6           If you were consulting the City of Chicago on

7   designing their policy, and they were going to make policies

8   that applied to detectives, would you recommend that they

9   exempt Gang Crime people or that they cover Gang Crime people?

10          MS. ROSEN:  Asked and answered.

11          MR. LOEVY:  He didn't answer, Judge.

12          THE COURT:  Overruled.

13  BY THE WITNESS:

14  A.  You know, you know, I'll give you the exact same answer.  I

15  would recommend that, you know, based on what their concern was

16  that it would be perfectly acceptable to exempt Gang Crime and

17  other specialized units in patrol.

18  BY MR. LOEVY:

19  Q.  All right.  When you testified in the *Fields* case, you

20  didn't know what the concern was, right?

21          MS. ROSEN:  Objection, Judge.

22          THE COURT:  Overruled.

23  BY THE WITNESS:

24  A.  No.  When I testified in *Fields*, as I recall, I testified I

25  had never read the *Jones* case, and I still have not, that I had

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 228 of 267 PageID #:44150
6-22-18 (Ex 14)
Noble - cross by Loevy
3479

1    read an appellate decision on the *Palmer* case.

2    Q.  All right.  Are you now familiar that in the mid-'80s, the

3    City of Chicago had a big problem because it became public that

4    there was a parallel set of files that wasn't making it into

5    the criminal justice system, there were public hearings, there

6    were court proceedings, and the City set out to solve that

7    problem?  Do you know about that?

8    A.  Again, I -- I understand that there was a concern that led

9    to a temporary restraining order.  I am also aware that in this

10   appellate holding that these files were kept for a period of

11   time, that they were examined by the plaintiffs in that case,

12   and, in essence, the court found that there was no there there.

13   There was no issue.

14   Q.  Well, did you actually know that nobody looked at the files

15   to determine whether or not there was or wasn't exculpatory

16   information?

17   A.  Again, all I know is what I read in the appellate decision.

18   Q.  All right.  Let's focus back on what I was asking you

19   about.

20           It sounds like you're not comfortable with the

21   characterization that the City of Chicago had a problem in the

22   mid-'80s that when the whistleblower, Frank Laverty -- or the

23   whistle about this parallel set of street files, that everybody

24   said, "Oh, my gosh.  The City of Chicago's got a problem."

25   You're not comfortable with that characterization?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 229 of 267 PageID #:44151
6-22-18 (Ex 14)
Noble - cross by Loevy
3480

 1  A.  No, I'm not comfortable with the use of the word "problem."

 2  Q.  All right.  Well, there were hearings in this building,

 3  right?

 4          MS. ROSEN:  Objection, Judge, asked and answered.

 5          MR. LOEVY:  No.

 6          THE COURT:  Overruled.

 7  BY THE WITNESS:

 8  A.  I don't know.

 9  BY MR. LOEVY:

10  Q.  All right.  And did you know, then, that high-ranking

11  Chicago officials testified that, "Yes, you know what?  There

12  are parallel sets of files that we're keeping, there are

13  parallel sets of files" -- "street files that we aren't turning

14  over, and we are going to change the system"?  Is that

15  information you had no idea about?

16  A.  I have not read the underlying *Jones* or *Palmer* case, and I

17  do not -- I'm not aware of what occurred in those cases.

18  Q.  All right.  If you're opining on the reasonableness of 86.1

19  and 83.1 and 2, isn't it hard to give an opinion if the

20  solution is reasonable if you didn't even understand the

21  problem?

22  A.  No, because, again, I read the outcome of the case where

23  they basically said that there really wasn't a problem.

24  Q.  Have you read Mr. Hickey's depositions?

25  A.  Ickey?  No.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 230 of 267 PageID #:44152
6-22-18 (Ex 14)
Noble - cross by Loevy
3481

1   Q.  You've never read any depositions by Mr. Hickey in

2   preparing --

3   A.  Oh, Hickey.  I thought you -- you mispronounced it, or I

4   misheard it.  I apologize.

5   Q.  My fault.

6   A.  Yes.

7   Q.  If he said there's a problem -- there was a problem, and he

8   set out to understand the problem, he set out to try to make a

9   General Order, Special Order to address the problem, right?

10  A.  I don't know if he used the word "problem."  He may have.

11  I've always taken it as a concern because, again, there was a

12  temporary restraining order that was ultimately lifted.

13  Q.  All right.  It was ultimately lifted because they enacted

14  these policies and they said they would do better, right?

15  A.  I don't know why the restraining order was lifted.  What I

16  read in the thing was that the files were kept, they were

17  reviewed, and that there was no substance to the issues that

18  were brought forward that created the need for the temporary

19  restraining order.

20  Q.  Then would it change your opinion if, in fact, the facts

21  were nobody examined those files, nobody compared them to the

22  official files, and nobody determined whether or not there was

23  exculpatory information?  Would that change your opinion if you

24  learned that additional fact?

25  A.  No, it still wouldn't change my opinion because, again, the

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 231 of 267 PageID #:44153
6-22-18 (Ex 14)
Noble - cross by Loevy
3482

1    generally-accepted police practice is not to maintain these

2    notes.

3    Q.  All right.  Would you agree with me that if the City of

4    Chicago did have a system where there was a parallel set of

5    files that wasn't getting turned over to the criminal justice

6    system, if they did have that situation where the detectives,

7    the Gang Crimes people, they were allowed to keep working files

8    that were outside the official channels, can we use the word

9    "problem" for that?

10   A.  No, because, again, essentially what you're talking about

11   is these files are a compilation of notes.  So in every other

12   police jurisdiction, they take their notes and they destroy

13   their notes.  So here, they -- it sounds like they -- or they

14   kept their notes or else they simply destroyed them.

15   Q.  Well, it sounds like you haven't done a lot of digging into

16   the *Jones* scenario, right?

17   A.  No, I have not read the case.

18   Q.  All right.  Let me tell you -- would it change your opinion

19   if you learned that it wasn't just that the City of Chicago was

20   keeping their notes that turned into supp. reports?  What

21   they're really doing was keeping their notes with alternate

22   theories of the case, alternate suspects, things that they

23   weren't putting into police reports, they were keeping in a

24   parallel file system?  If you were to assume that

25   hypothetically, then surely you'd agree with me that it is a

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 232 of 267 PageID #:44154
6-22-18 (Ex 14)
Noble - cross by Loevy
3483

1    problem, right?

2    A.  It would really depend on what the information was and if

3    they were withholding information that was needed to be in a

4    report.  I'd have to be able to see the actual file.

5    Q.  All right.  Then maybe we can go that far.

6           Would you agree with me, sir, if the City of Chicago

7    had a street-file problem where they were withholding

8    exculpatory information in a parallel set of files and not

9    turning them over to the criminal justice system, I think we

10   can agree that's a problem, right?

11   A.  If it was obviously exculpatory to the officers,

12   withholding exculpatory information would be a problem.

13   Q.  All right.  And, in fact, it would be a constitutional

14   problem, would it not?

15   A.  If the police -- anytime the -- police officers are

16   required to provide exculpatory information if they're aware of

17   it.  So if they're aware of it and they know it's exculpatory,

18   they know may lead to someone being found not guilty or

19   clearing their name, they are, indeed, required to turn it

20   over.

21   Q.  All right.  Then back to my question about Gang Crimes.

22          If the City of Chicago in the '80s had an environment

23   and a system and a process where anybody doing investigations

24   who was a Gang Crimes specialist was completely exempt from the

25   obligation to create investigative files and turn them over to

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 233 of 267 PageID #:44155
6-22-18 (Ex 14)
Noble - cross by Loevy
3484

1   the criminal justice system, that would be a problem, right?

2   A.  No.  Again, because what those investigative files -- the

3   investigative files are the general progress reports, which are

4   nothing more than notes.  The generally-accepted police

5   practice is you can destroy your notes.

6   Q.  Did you know that Gang Crime specialists actually don't use

7   general progress reports?

8   A.  Yeah, I'm very -- the requirement for general progress

9   reports is only for homicide investigators.

10  Q.  All right.  You mentioned a centralized file system.

11          In Irvine where you were a police officer, you guys

12  had a one-file centralized file system, right?

13  A.  For the most part.  There were some records that were --

14  some crime scene records.  But for the most part, it was one

15  file, yes.

16  Q.  All right.  And so if someone sent a subpoena to your

17  police department, all the clerk had to do was go one place,

18  could turn over everything, right?

19  A.  Yeah.  We destroyed our notes, so there wouldn't be any

20  other file with notes in them.

21  Q.  But what I asked is true, right?  If someone sent a

22  subpoena to the Irvine Police Department, the clerk would not

23  have to go to different places.  They would all be in one

24  place, right?

25  A.  Yes.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 234 of 267 PageID #:44156
6-22-18 (Ex 14)
Noble - cross by Loevy
3485

1  Q.  And, in fact, even with that very simple process in Irvine,

2  you had written protocols that governed how the subpoena clerk

3  is supposed to respond, right?

4  A.  They were very simple, but yes.

5  Q.  All right.  And the City of Chicago has no written

6  protocols or, during the relevant time period, telling subpoena

7  clerks what they're supposed to do.

8  A.  That's true.

9  Q.  All right.  Is that a problem?

10  A.  No.

11  Q.  Okay.  Now, Mr. Brasfield didn't say that you have to have

12  a one -- a centralized file system, right?

13  A.  My memory of his deposition testimony as reported is that

14  that was the system that he believed you should have.

15  Q.  Well, isn't it true what he said was:  Look, some police

16  departments have centralized, one-file systems, some have

17  multiple, but if you have a decentralized system, if you choose

18  to go with a decentralized system, you've got to make a process

19  that works?  If that was Mr. Brasfield's opinion, would you

20  disagree with that opinion?

21  A.  No, as long as there's a process that works.

22  Q.  All right.  And if the City of Chicago is going to choose

23  to have a system that's extremely decentralized -- and they do,

24  right?

25  A.  They have a -- I don't know about extremely.  I mean, I --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 235 of 267 PageID #:44157
6-22-18 (Ex 14)
Noble - cross by Loevy
3486

1    it's consistent with other agencies I've worked with.  So they

2    do have a decentralized system.

3    Q.  They got documents at ERPS, they've got documents at the

4    Polygraph Section, they got documents at the Area, they got

5    files downtown, they got files in the basement, they got files

6    on the pallets, they got files at the Gang Crimes area, Gang

7    Crimes headquarters, they got tactical files.

8         They got a lot of files at the City of Chicago, right?

9    A.  I don't know about half of those files that you just named

10   off, but I'm very aware that they have files in different

11   locations.

12   Q.  All right.  If you're going to have a system that's that

13   disorganized, then you have a constitutional obligation to

14   design a solution that ensures that the City's going to be able

15   to turn everything over.

16        Would you agree with that?

17        MS. ROSEN:  Objection to the form of the question.

18        THE COURT:  Sustained to the words used.

19        MR. LOEVY:  All right.

20   BY MR. LOEVY:

21   Q.  There -- you probably have a problem with the fact that

22   there is no written policy at all telling the Subpoena Services

23   Unit how it's supposed to go about gathering the documents from

24   all these different places?  Can we agree that's not so good?

25   A.  No.  No, we can't agree.  I mean, this is -- you know, for

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 236 of 267 PageID #:44158
6-22-18 (Ex 14)
Noble - cross by Loevy
3487

1    clerks, for people who work in different bureaucratic

2    assignments, there's tons of things they do.  They're trained.

3    Q.  All right.  When you say they're trained, isn't it true

4    there were no -- there was no job training for subpoena people?

5    A.  No, that's not true.  They had a supervisor.  There was a

6    sergeant assigned, and the sergeant would oversee them and

7    train them.  I mean, this -- people weren't going in blind just

8    aimlessly running around.  They were getting trained.

9    Q.  Do you remember these questions at your *Fields* testimony?

10            MR. LOEVY:  This is page 48, 73.

11   BY MR. LOEVY:

12   Q.      "All right.  Do you know anything about the on-the-job

13   training that the Chicago subpoena people received?

14            "Answer:  No.

15            "Question:  Do you know how long the training was that

16   the subpoena people received?

17            "Answer:  No.

18            "Question:  Do you have any information about what

19   they were told, where to go to get the materials in their

20   on-the-job training?

21            "Answer:  No.

22            "Question:  Do you have any information about who was

23   giving them the training?

24            "Answer:  No."

25            Did you give those answers, sir?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 237 of 267 PageID #:44159
6-22-18 (Ex 14)
Noble - cross by Loevy

3488

1    A.  Honestly, I don't recall.  I mean, I -- from your

2    statement, it sounds like I was talking about formalized

3    training versus, you know, supervisor training.

4    Q.  All right.  Well, the question I asked you was, did you

5    give those answers at the *Fields* testimony, to perfect the

6    impeachment?

7    A.  I don't recall.  It's been quite some time.

8    Q.  All right.  And, in fact, you have no idea how well the

9    subpoena people performed in Chicago, right?

10   A.  That's true.  I had -- did not conduct any kind of

11   inspection.

12   Q.  All right.  You've been told that the subpoena people did a

13   good job, right?

14   A.  I don't think I've been told one way or the other.

15   Q.  All right.  And you haven't looked at, actually, the

16   practices about whether they did or didn't do a good job of

17   getting stuff turned over.  That's outside what you're looking

18   at, right?

19   A.  That's true.

20   Q.  That's one of the things Mr. Brasfield did, right?  He

21   looked at the actual files and compared them.  You didn't do

22   any such exercise?

23   A.  I did not do that.

24   Q.  All right.  You cannot give an opinion on the City of

25   Chicago's policy -- written policy for disseminating

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 238 of 267 PageID #:44160
6-22-18 (Ex 14)
Noble - cross by Loevy
3489

1    information to the criminal justice system because there is no

2    written policy, right?

3    A.  As far as a written policy of what the subpoena clerks were

4    supposed to do?  No, there is no written policy.

5    Q.  So you can't give an opinion either way on that subject,

6    right?

7    A.  No.

8    Q.  Are you aware that Mr. Hickey actually wrote a memo

9    proposing a one-file system?  Did you see that, sir?

10   A.  I don't recall that.

11   Q.  Would it change your opinion if that was Mr. Hickey's

12   recommendation after he did his survey?

13   A.  No.

14   Q.  All right.  I think you were telling Ms. Rosen that you

15   thought it was absurd, was the word you used, that Mr.

16   Brasfield said there should be written guidelines advising the

17   officers about what's relevant and what's not relevant.  A

18   checklist, didn't you say was absurd?  What did I

19   misunderstand?

20   A.  Yeah, I think if -- he said that there had to be some sort

21   of checklist of going through on -- that would apply to every

22   possible case that a homicide investigator would investigate, a

23   checklist that'd tell him what's relevant.  That's -- it's not

24   possible.  That is absurd.

25   Q.  All right.  So what if his opinion was really just, you

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 239 of 267 PageID #:44161
6-22-18 (Ex 14)
Noble - cross by Loevy
3490

1  know, there should be some written guidance to detectives about

2  what's relevant and what's not so that they will have less

3  confusion, more guidance?  That wouldn't be absurd, right?

4  A.  I --

5  Q.  It wouldn't be absurd, right?

6  A.  I'm sorry?

7  Q.  Can you answer it yes or no?  That wouldn't be absurd,

8  right?

9  A.  You're going to have to rephrase the question.  I'm not

10 sure I can answer that yes or no.

11 Q.  All right.  You can only do the best you can, right?

12         All right.  Audits.  The policies provide for audits,

13 right?

14 A.  86-3 did, yes.

15 Q.  All right.  And that's a good idea, right?

16 A.  Sure.

17 Q.  But it's not a good idea if they didn't actually do the

18 audits, right?

19 A.  That would be true.

20 Q.  Because while the policy is saying, "Hey, let's see if this

21 is working.  Let's see if the information's getting to where

22 it's supposed to go," if you don't actually follow up, then

23 that's bad, right?

24 A.  Right.  You should -- you know, supervisors should conduct

25 general periodic audits.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 240 of 267 PageID #:44162
6-22-18 (Ex 14)
Noble - cross by Loevy
3491

1   Q.  And the inventories -- well, you didn't -- did you talk

2   about the inventories with Ms. Rosen?

3   A.  No.

4   Q.  Okay.  Then I will skip that, too.

5          You said the GPR was a unique solution.  Is that the

6   word you used, "unique"?  I thought you said "unique."

7   A.  I didn't think I said that.

8   Q.  All right.

9   A.  I just said it was a unique form, a special form of the

10  City.

11  Q.  Okay.  The City had a unique problem, though, didn't they?

12  A.  Again, again, I --

13  Q.  You don't --

14  A.  I disagree.

15  Q.  -- like the word "problem"?

16  A.  No, I don't.

17  Q.  Okay.  All right.  Would you agree that police departments

18  as organizations are sometimes resistant to change?

19  A.  I think that's true for all organizations.

20  Q.  And maybe -- Mr. Brasfield thought maybe more so for police

21  departments.  Do you agree or disagree?

22  A.  You know, I haven't -- you know, both Mr. Brasfield and I

23  have been police officers throughout our careers.  Those are

24  organizations we know.  So I can't compare it to, you know,

25  other kinds of organizations.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 241 of 267 PageID #:44163
6-22-18 (Ex 14)
Noble - cross by Loevy
3492

1  Q.  All right.  Do you have any understanding whether Mr.

2  Hickey or others concluded that the Chicago Police Department

3  had an entrenched problem?  Detectives were used to treating

4  their notes as their work product.  They weren't used to having

5  to give them up and have other people see their ideas and their

6  thought processes.  And that when the *Palmer* hearings happened

7  and the policy changed, there was resistance to that.

8        My question to you is, do you have any understanding

9  that that was true?

10  A.  I don't know whether that's true or not.

11  Q.  All right.  Would it change your opinion that this was a

12  sufficient solution if that was true?

13  A.  No, it wouldn't change my opinion.

14  Q.  All right.  Would anything change your opinion, sir?

15  A.  Well, I would have to hear something -- you know, I have no

16  idea.

17  Q.  All right.  I'll keep asking the questions, then.

18        Now, the training, Mr. Hickey, he thought it was four

19  hours.  Sometimes he thought it was three hours.  Sometimes he

20  thought it was longer.  But that's not a lot of training for a

21  sea change in a policy, is it?

22  A.  Actually, I thought it was an overwhelming amount of

23  training for a policy that amounts to two or three pages in

24  length.  Again, this isn't some kind of skills training.

25  Q.  All right.  Well, all I'm saying, sir, is if the City of

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 242 of 267 PageID #:44164
6-22-18 (Ex 14)
Noble - cross by Loevy
3493

1    Chicago had some old-time detectives who were used to doing it

2    their way, and they now were being told by brass, "Here's a new

3    order.  Read it.  You got to turn everything over," it's going

4    to take a little more than three or four hours of training.

5    Would you agree with that, sir?

6    A.  No, not at all.

7    Q.  All right.  The policy that you say is a really good system

8    is 86.3, right?

9    A.  Again, I believe 86.3 to be a reasonable policy --

10   Q.  All right.

11   A.  -- and beyond that of what generally-accepted police

12   officers -- police departments all across the country use.

13   Q.  All right.  So in fairness, then, I think you're much more

14   comfortable with "reasonable" than "good."  Is that accurate?

15   A.  Yes, as we've discussed.

16   Q.  Okay.  It's -- the policy provides that this investigative

17   file is going to be institutionalized, right?

18   A.  That -- for that -- for that particular unit, yes.

19   Q.  And the jury's heard about it, but the policy says the

20   street files, these parallel files, we're going to put two-hole

21   punches in them, we're going to keep them at the Area, we're

22   going to make an inventory, and we're going to formalize it,

23   right?

24            MS. ROSEN:  Object to the form of the question, street

25   files, parallel files.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 243 of 267 PageID #:44165
6-22-18 (Ex 14)
Noble - cross by Loevy
3494

1     THE COURT:  Overruled.

2  BY THE WITNESS:

3  A.  The policy recognized that -- or Mr. Hickey recognized that

4  there were different terms for these files and where the

5  officers were keeping their notes.  Sometimes they called them

6  street files, working files.  So they created this policy to

7  identify what an investigative file was and where these files

8  should be kept now, they should be maintained.

9  BY MR. LOEVY:

10  Q.  And they made a bunch of rules about them, right?

11  A.  Yes.

12  Q.  Like the GPRs are supposed to go in them, right?

13  A.  Yes.

14  Q.  All right.  Now, isn't it a problem that the policy forgot

15  to say that:  By the way, these investigative files are

16  supposed to be produced to the criminal justice system?

17  A.  No.

18  Q.  All right.  I'm going to show you a copy of Defendant --

19  looks like Defendants' Exhibit 34.

20     You've seen this policy.  You're very familiar with

21  it, right?

22  A.  Yes.

23  Q.  All right.  And it provides that at the Area, you're going

24  to keep this Area file.  You're going to put your notes in it,

25  your GPRs, your memos, and it's going to be at the Area, right?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 244 of 267 PageID #:44166
6-22-18 (Ex 14)
Noble - cross by Loevy
3495

1    A.  Yes.

2    Q.  Okay.  Show -- tell us where in the policy it says:  And,

3    by the way, the criminal defendants make a request in discovery

4    we're going to start turning over these files, unlike what we

5    did before *Jones* and *Palmer.*

6    A.  II under Policy.

7    Q.  Let me put that up, if I could.

8        "It is the policy of the Chicago Police Department to

9    conduct all criminal investigations in an" -- is this the

10   paragraph you want or the second paragraph?

11   A.  It's the second paragraph.

12   Q.  "When assigned to an investigation, Division members will

13   preserve and record information and materials obtained in the

14   course of their investigation to ensure not only that

15   information and material incriminating the accused are

16   preserved, but that information and material that might aid in

17   the defense of the accused are preserved as well."

18        That doesn't say that the police department is now

19   required turning over the investigative files to the criminal

20   justice system, does it?

21   A.  I think it does.  It absolutely does.  It's talking about

22   exculpatory evidence.  And police officers who are generally

23   trained, we know that exculpatory -- that that type of evidence

24   has to be turned over, and they developed procedures to do

25   that.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 245 of 267 PageID #:44167
6-22-18 (Ex 14)
Noble - cross by Loevy
3496

1   Q.  Well, the procedures to do that is what they didn't write

2   down, though, right?

3   A.  That's true.

4   Q.  And they -- that's not reasonable, wouldn't you agree?

5   A.  No.  That as long as it's being produced, as long as

6   there's a system and it's -- information is being produced.

7   Q.  All right.  But you don't know if it was being produced

8   because you haven't looked, right?

9   A.  No.  I'm just talking about the policies.

10  Q.  All right.  But if the City had a problem with turning

11  stuff over and then they didn't make any written policies that

12  it would ensure the stuff would get over -- turned over, isn't

13  that unreasonable?  Would that change your mind?

14  A.  No.

15  Q.  All right.  At best, wouldn't you say that this paragraph

16  that you're relying on, that might create confusion among file

17  clerks about whether they got to turn over these files, right?

18  A.  No.

19          MR. LOEVY:  May I have a moment, Your Honor?

20          THE COURT:  Sure.

21    (Counsel conferring.)

22          MR. LOEVY:  Nothing further, Your Honor.

23          THE COURT:  Okay.  Ms. Rosen?

24          MS. ROSEN:  I don't think I have any more questions.

25  Thank you.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 246 of 267 PageID #:44168
6-22-18 (Ex 14)
Noble - cross by Loevy
3497

1          THE COURT:  Thank you, sir.  You may step down.

2          THE WITNESS:  Thank you.

3     (Witness excused.)

4          MS. ROSEN:  So -- yeah.  So the next witness will be a

5     deposition transcript that we're going to have somebody sit --

6     read and --

7          THE COURT:  Okay.

8          MS. ROSEN:  Yeah.

9          THE COURT REPORTER:  Could I have the names of the

10    readers, please?

11         THE COURT:  Oh, sure.  The court reporter would like

12    the names of the readers.

13         MS. ROSEN:  Okay.

14         READER RAHE:  My name is Austin Rahe, R-a-h-e.

15         READER STORTZ:  My name is Jake Stortz, S-t-o-r-t-z.

16         THE COURT REPORTER:  Thank you.

17         THE COURT:  Thanks.

18         READER RAHE:  Are we ready?

19         THE COURT:  As soon as -- are we all ready?  Yes, yes.

20              AUSTIN RAHE and JAKE STORTZ

21    called as readers herein, to read all questions by Mr. Shapiro

22              and answers given by Mr. Machain:

23         DEPOSITION TESTIMONY OF STEPHEN MACHAIN

24                   "EXAMINATION

25    "BY MR. SHAPIRO" (read by Mr. Rahe):

1   Q.   "Would you please state your name and spell it for the

2   record.

3   A.   (Read by Mr. Stortz) "Stephen Machain, S-T-E-P-H-E-N

4   M-A-C-H-A-I-N.

5   Q.   "And could you talk me through the progression of your

6   career and any further education after high school, just

7   positions, organizations, ranks, years, if you could, as best

8   as you can recall."

9          READER STORTZ:  What page are you on?

10         MR. LOEVY:  Line 8, it looks like.

11         READER STORTZ:  Line 8?

12         MR. LOEVY:  On page 7.

13         READER STORTZ:  Oh.  I'm two pages ahead of you.

14  BY THE WITNESS (read by Mr. Stortz):

15  A.   "Graduated from high school in '73, started college in the

16  same year, had several jobs while I was going to college.

17  1976, started on the Kane County Sheriff's Police Department,

18  Kane County, Illinois.  I was there for five years.  I left

19  there in the spring of '81 and started at the Chicago Police

20  Department where I remained until December of 2010, when I

21  retired.

22  Q.   "And when you began work in 1981 at the Chicago Police

23  Department, what position did you hold?

24  A.   "Patrolman.

25  Q.   "Could you summarize the duties that you had during the

1    period that you were a patrolman for the Chicago Police

2    Department?

3    A.  "I was assigned to Patrol, where I remained.  I also

4    performed the function as -- I was a Gangs officer in the

5    district where I was assigned.  And I performed in those

6    capacities.

7    Q.  "What districts did you work in while you were in Patrol?

8    A.  "I worked in the 14th District; I worked in the 25th

9    District.  I did some time in Cabrini Green and also the Taylor

10   homes.

11   Q.  "Do you remember the approximate years when you were

12   working at the various districts and locations that you just

13   mentioned?

14   A.  "I worked in 14, ballpark, throughout my first ten years

15   and did some intermittent time at Cabrini during that time.

16   And then for the next five years, I worked for the 25th

17   District.  And then the last maybe 15 years, I worked back in

18   14.  I did some time at the Taylor Homes intermittently, maybe

19   the first ten years.

20   Q.  "Which district or districts were you working as a Gangs

21   officer?

22   A.  "I worked in the 14th District in that capacity for a

23   little bit, and I also did the same in 25.

24   Q.  "Approximately during what years were you working in the

25   14th District in the capacity as a Gangs officer?

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 249 of 267 PageID #:44171
6-22-18 (Ex 14)
Deposition of Stephen Machain

3500

1   A.  "Approximately, from what I recall, '89 through '90.

2   Q.  "Did you work with officers or detectives who were assigned

3   to Gang Crimes North?

4   A.  "I'm not exactly sure what you're asking.  Did I work in

5   the same car?

6   Q.  "Did you work on cases with them?

7   A.  "No.

8   Q.  "Okay.  And were you part of Gang Crimes North?

9   A.  "No.

10  Q.  "Do you have any recollection of the events surrounding the

11  Valentin murder?

12  A.  "Not really, no.

13  Q.  "Okay.  And you don't have any recollection of talking to

14  any witnesses?

15  A.  "No, I really don't.  From looking at the case report, the

16  only thing that I remember, it was something -- it was about

17  the -- there's a line in there about a yellow baseball cap, and

18  I remember that part of it.  But that's really all I can

19  remember.

20  Q.  "Fair enough.  Is there anything you can recall about the

21  case that is not included in the case report?

22  A.  "No.

23  Q.  "Were you working as a Gangs officer at the time of the

24  Valentin shooting?

25  A.  "No.

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 250 of 267 PageID #:44172
6-22-18 (Ex 14)
Deposition of Stephen Machain

3501

1   Q.  "What information would you typically want to include in a

2   case report?

3   A.  "You'd want to get the location of the occurrence, victim's

4   name, the possible witnesses, individuals that may have seen or

5   heard part of it or been aware of something that occurred. You

6   have a crime scene there that may or may not have to be

7   protected. It depends.

8         "You do your case report. It depends. It all depends

9   on the situation. If it's something that already occurred, you

10  would do the case report and write down the information on the

11  report as you're doing it. Sometimes you might not jot it

12  down, you know, on the back of a ticket book, just a couple of

13  notes and stuff, so that you can transfer it to a report later.

14  There's different ways to do it depending on the circumstances.

15  Q.  "In other words, if there's important information about a

16  crime, you would include it in a case" -- "in the case report,

17  right?

18  A.  "That's correct.

19  Q.  "And if you talked to a witness, that would be included in

20  the case report, right?

21  A.  "Generally, yes.

22  Q.  "What are the circumstances in which talking to a witness

23  might not be included in a case report?

24  A.  "Sometimes you -- a witness doesn't want to be interviewed

25  at the scene because they live in a particular neighborhood,

1    they don't want to be identified for possible identification or

2    retaliation.  So you might just get their name and a follow-up

3    unit would talk to them at a later date.

4           "Sometimes you might have information as far as a

5    witness that so-and-so saw it, but they're not on the scene.

6    So you might have a name, a nature or generalization of who was

7    there that might be a witness.  So you might not talk to them,

8    but you put it in the report, and the follow-up units would

9    conduct it.  They would interview that particular person or

10   persons.  And whether, in fact, they are a real witness or if

11   they weren't a witness, or they don't want to be a witness,

12   that could happen, too.

13   Q.  "If you conducted an interview of a witness and learned

14   information from him or her, would you include that in your

15   report?

16   A.  "Generally, yes.

17   Q.  "What are the circumstances in which you would learn

18   information from a witness but not include any mention of it in

19   the report?

20   A.  "For example, it has occurred on occasion where something

21   would happen, a violent crime, and someone would pass you,

22   someone that knows an officer, in my case me, from the

23   neighborhood, they saw it, they have information on it.  But

24   they can't sit there and talk to you, or they can't give

25   that -- they can't sit there and be interviewed so that they

1   can be identified.  So they might pass you, and it would seem

2   they're just walking past you, and they would whisper to you,

3   'Get ahold of me later,' or have a particular officer that they

4   know from a unit talk to them, or, 'Meet me at the corner,'

5   that type of thing, at a later date, another time.

6   Q.  "Are there situations in which a witness would provide

7   substantive information that you wouldn't include in a case

8   report?

9   A.  "No.  If I have the information from the witness, it would

10   be there in the case report.

11   Q.  "If a victim provided you with a description of a

12   perpetrator, that would be included in the case report, right?

13   A.  "Yes.

14   Q.  "And you would include all of that information about the

15   perpetrator that the witness gave you in the report, right?

16   A.  "Which report are we talking about?

17   Q.  "Well, if a witness gave you information about a

18   perpetrator, would you memorialize it all" -- "would you

19   memorialize all of that information in at least some report?

20   A.  "Yes.

21   Q.  "Okay.  Mr. Machain, I'm showing you a document that's

22   marked as Exhibit 1" --

23         READER RAHE:  Which is marked as Defendants' Exhibit

24   3-B.  3-B?

25         MS. GOLDEN:  3-B.

1          READER RAHE:  3-B in this case.

2    BY MR. SHAPIRO (read by Mr. Rahe):

3    Q.  "Would you take a moment and review it and let me know if

4    this is the document that you mentioned that you reviewed in

5    order to prepare for today's deposition.

6    A.  "Yeah.  I glanced at it, correct.

7    Q.  "I also want to show you a document that's also in front of

8    you that's been marked as Exhibit 2."

9          READER RAHE:  Which is marked as Defendants' Exhibit

10   1.16 in this case.

11   BY MR. SHAPIRO:

12   Q.  "And I'll give you a minute to look at the two of them.

13   But just to let you know where I'm going with this, I mean, it

14   appears to me that Exhibit 1," which is 1-B in this case --

15   34-B in this case.  My apologies.

16   BY MR. SHAPIRO (read by Mr. Rahe):

17   Q.  -- "is a version of Exhibit 2" --

18          READER RAHE:  Which is 1.14 in this case.

19   BY MR. SHAPIRO (read by Mr. Rahe):

20   Q.  -- "that has additional information added to it; in other

21   words, Exhibit 1 is a fuller version of Exhibit 2, with

22   information added.  So that's what I'm going to ask you once

23   you've had a chance to look at the two exhibits.

24          "Okay.  What's the relationship between the document

25   shown as Exhibit 1" --

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 254 of 267 PageID #:44176
6-22-18 (Ex 14)
Deposition of Stephen Machain

3505

1          READER RAHE:  a/k/a 3-B, Defendants' Exhibit 3-B.

2    BY MR. SHAPIRO (read by Mr. Rahe):

3    Q.  -- "and Exhibit 2" --

4          READER RAHE:  a/k/a Defendants' Exhibit 1.16.

5    BY THE WITNESS (read by Mr. Stortz):

6    A.  "Well, the first -- the first set of reports you gave me

7    is" --

8    BY MR. SHAPIRO (read by Mr. Rahe):

9    Q.  "Exhibit 1.

10   A.  "-- Exhibit 1.  And what it reflects is the page 1 of 2 and

11   2 of 2.  This is the case report.  Exhibit 2 that you gave me

12   is missing two pages.  It's the same report, but you're missing

13   two pages.  Exhibit 1 is the complete report.  Exhibit 2,

14   you're missing two of the pages.  It's the same report.

15   Q.  "So what is the relationship between the documents shown in

16   Exhibit 2 and Exhibit 1?

17   A.  "Well, essentially, it's the same.  This is the completed

18   report.  It has all of the information.  It's been signed off

19   by the sergeant.

20   Q.  "You're referring to Exhibit --

21   A.  "1.

22   Q.  "-- 1.

23   A.  "Exhibit 2 is essentially the first two pages, which are

24   included in Exhibit 1.  So it's not signed off by a sergeant,

25   and there's gaps in information that are on this one.  So where

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 255 of 267 PageID #:44177
6-22-18 (Ex 14)
Deposition of Stephen Machain

3506

1   that came one came from, I don't know.  I couldn't tell you.

2   But this is the completed one, because our signatures are" --

3   "are an on here along with the approval and the sergeant and

4   all the information.

5   Q.  "And you're referring to Exhibit 1 when you say that,"

6   correct?

7   A.  "Right."

8           READER RAHE:  Defendants' Exhibit 3-B.

9   BY THE WITNESS (read by Mr. Stortz):

10  A.  "Right.  And when I say" -- "when I look at Exhibit 2, it's

11  essentially the same report, but the information, complete

12  information is located in that one" -- "in Exhibit 1.  In

13  Exhibit 2, there are gaps in this.  So I don't know if this

14  is -- I don't know what it is.  It could have been the

15  beginning, or a copy might have been made.  I can kind of --

16  what happens is, in a situation like this, everybody is trying

17  to get a copy of the case report as quick as they can.  So what

18  might have happened is we might have just banged one -- I'm

19  just guessing -- but we might have banged this one out to make

20  a copy for a follow-up unit so they could work it from here,

21  this information.  But we continued to work it and complete the

22  report.  Sometimes that happens.  I can't tell you for sure,

23  but that's what it looks like probably happened.  Somebody was

24  trying to get a copy of the case report so they could conduct a

25  follow-up with the basic information, the basic offender

1    information, and we probably made a copy and handed it off to

2    the unit somewhere" --

3                MR. SOTOS:  Excuse me, Judge.  Could I stop him for

4    just a second?

5                THE COURT:  Yes.

6                MR. SOTOS:  We could put the two different reports

7    side by side so Carrie doesn't have to keep going with this.

8                MS. GOLDEN:  Okay.  That'd be great.

9                MR. SOTOS:  Can we do that?

10               THE COURT:  Sure.

11               MR. SOTOS:  Just hold on for one second.

12               MS. GOLDEN:  We need Defense Exhibit 1.

13               MR. SOTOS:  Same exhibits are up now.

14               MS. GOLDEN:  Okay.

15               MR. SOTOS:  So you can see them side by side.

16               THE COURT:  All right.

17   BY THE WITNESS (read by Mr. Stortz):

18   A.  -- "and we probably made a copy and handed it off to a unit

19   somewhere -- could have been a Gang unit, could have been a

20   detective, could have been a tac team -- for their information,

21   and somehow it would have ended up with your pile.  That's

22   probably what happened.

23   BY MR. SHAPIRO (read by Mr. Rahe):

24   Q.  "Okay.  And Exhibit 1 is a fuller, more complete version of

25   Exhibit 2, right?

1   A.  "Well, Exhibit 1, that's the report.  That's the one that

2   was turned in.

3   Q.  "But I think we're saying the same thing.  Exhibit 2 is an

4   earlier incomplete version of Exhibit 1?

5   A.  "Yeah.  Like I said, we probably made a copy.  And I can't

6   say for certain, but what happens is we probably made a copy

7   for a unit to do a follow-up and then handed it off to them,

8   and then we finished our report.  That's probably what

9   happened.

10  Q.  "If you look on Exhibit 1, page 1, under the Narrative,

11  you'll see it begins, 'In Summary.'  Whose handwriting is, if

12  you know, the portion of the report in that Narrative box?

13  A.  "The words 'In Summary' and 'victim and witness' are" [sic]

14  and the number 1, that was written by Teddy Crawford.

15  Q.  "Okay.  And --

16  A.  "And the Narrative part was written by me.

17  Q.  "So Crawford was your partner?

18  A.  "That's correct.

19  Q.  "Any particular reason that Officer Crawford wrote certain

20  portions of this and you wrote other portions?

21  A.  "No.  Not at all.

22  Q.  "Okay.  You guys were partners, so sometimes you would

23  write reports together?

24  A.  "Yes.  We were partners for quite a long time.

25  Q.  "Is it fair to say that any important information you

1   learned during your work in the Valentin shooting would be

2   included in the report shown in Exhibit 1?

3   A.  "Yes.

4   Q.  "So if you interviewed a witness, that would be documented

5   in Exhibit 1, right?

6   A.  "Yes.

7   Q.  "And if you got a full" [sic] --

8           READER RAHE:  I'm sorry.

9   BY MR. SHAPIRO (read by Mr. Rahe):

10  Q.  "And if you got a description of a perpetrator, the full

11  description would be included in Exhibit 1, right?

12  A.  "As much as I could get.

13  Q.  "Everything that was conveyed to you about the description

14  you would put in Exhibit 1?

15  A.  "At that moment, yes.

16  Q.  "And there's nothing regarding the Valentin shooting that

17  you recall that isn't memorialized in Exhibit 1, right?

18  A.  "That's correct.

19  Q.  "And this report shown in Exhibit 1 is dated August 27th,

20  1998" -- "1988, right?

21  A.  "Correct.

22  Q.  "So you didn't have any involvement in the investigation of

23  the Valentin shooting subsequent to August 27, 1988, correct?

24  A.  "Correct.

25  Q.  "In other words, you were only involved in this case for

1    one day, right?

2    A.   "Yes.

3    Q.   "I want to go through the Narrative description sentence by

4    sentence just to make sure I've got all of it.

5         "And since it's your handwriting -- well, most of it's

6    your handwriting, if you could read along with me just to make

7    sure I'm right as I'm going.

8         "It begins with Crawford's handwriting in:  'In

9    Summary:  Victim and witness #1,' and your handwriting then

10   says:  'Valentin, Israel, went to above address to pick up

11   witness Valentin's girlfriend, as they were going to go to a

12   wedding.  Witness Valentin went upstairs to pick up his

13   girlfriend.  Victim waited in car behind steering wheel, in

14   driver's seat.'

15   A.   "Correct so far.  Keep going.

16   Q.   "Actually, do you want to pick it up?  You're probably

17   better at it since it's your writing.  Pick up at 'Witness.'

18   A.   "It's a little smudged, but it looks like it says:

19   'Witness Valentin went downstairs and could not see his

20   brother, could not see his brother in the car.  Approached and

21   observed his brother slumped across the seat bleeding.  Victim

22   was sprawled across the seat stating, 'They shot me, they shot

23   me,' and began screaming.  Witness Valentin pushed his brother

24   across the seat and drove him to Norwegian Hospital.  While en

25   route, Witness Valentin struck three parked motor vehicles in

Case: 1:12-cv-04428 Document #: 736-14 Filed: 11/20/18 Page 260 of 267 PageID #:44182
6-22-18 (Ex 14)
Deposition of Stephen Machain

3511

1    the 12 and 1300'" -- "'in the 12 and a 1300 blocks of North

2    Kedzie.  Passerby in another motor vehicle came by and drove

3    victim and Witness Valentin to Norwegian.  Victim treated at

4    Norwegian, to be transferred to Northwestern Hospital.  R/Os

5    were able to somewhat communicate with victim and learned

6    following:  Suspect auto is an older model brown two-door,

7    possibly a hatchback Toyota, clear windows, Puerto Rican flag

8    hanging from the rear-view mirror.  Suspect offender No. 1 is a

9    male/white Hispanic, Latin King gang affiliation, driver of the

10   car.  No further description at this time.  No. 2, male/white

11   Hispanic, Latin King affiliation, passenger in above auto last

12   seen wearing yellow baseball hat, light to medium complexion,

13   16 to 18 years of age, armed with an unknown type handgun.  No

14   further description at this time.'

15   Q.  "Okay.  The description of the automobile used in the

16   shooting and the suspects is the full description you had at

17   this time, right?

18   A.  "Yes.

19   Q.  "Okay.  And that's, indeed, what's conveyed by the

20   notation, 'NFD at this time,' right?

21   A.  "Yes.  No further description.

22   Q.  "It says on the second page of the exhibit" --

23          READER RAHE:  Which is -- I'm guessing that's a Bates

24   number WRON00023, in quotes.

25   BY MR. SHAPIRO (read by Mr. Rahe):

1   Q.   "'Reporting officers were able to somewhat communicate with

2   victim' --

3   A.   "'And learned the following.'

4   Q.   "-- 'and learned the following,' colon, and then it's

5   followed by a description?

6   A.   "Correct.

7   Q.   "So based on that, the description that's provided here

8   came from the victim, Mr. Valentin, correct?

9   A.   "That's correct.

10  Q.   "Okay.  And I take it you don't have any recollection of

11  speaking with Mr. Valentin or what condition he was in at the

12  time or anything like that?

13  A.   "No, I don't.

14  Q.   "So why don't we continue with your reading on to page 3 of

15  the exhibit, which is also marked WRON00024.

16  A.   "Okay.  'Passenger offender exited auto, walked up to

17  victim as he sat in auto and began firing.  Victim struck 5

18  times in neck and chest.  Victim sat in a red, two-door '76

19  Mazda, Illinois plate,' you know, VIN number is included there.

20  'That was decorated with pink carnation type paper in

21  preparation for a wedding.'

22  Q.   "And why don't you continue reading on the last page of

23  Exhibit 1, labeled WRON00025.

24  A.   "'Gang Crimes North was notified - Sherman and Noon.

25  Evidence tech notified, 14 desk notified - 13 notified.  Beat

1   1420 notified.  The zone was notified - also to have a car

2   protect the crime scene and the victim's auto at 1253 North

3   Kedzie.

4           "'Gang Crimes North Investigator Noon 14 for follow-up

5   investigation related RD No. King 875-233 - traffic accident.

6   1253 North Kedzie.  Gang affiliation Witness Valentin, he's a

7   Campbell Boy.'

8   Q.  "Why did you notify Sherman and Noon at Gang Crimes North

9   about the shooting?

10  A.  "We were led to believe it was a gang-related shooting, so

11  one of our protocols was to notify Gang Crimes at the time

12  there's a gang-related incident.

13  Q.  "And what information would you have conveyed to Gang

14  Crimes North when you notified them?

15  A.  "We would have given them the location, they wanted the

16  report number, whatever information that we had in hand, the

17  victim's name, witnesses, what condition the victim was in,

18  where the victim was transported to, and then anything related

19  to the" -- "anything that would" -- "anything that related that

20  was pertinent to the incident.  And they would send cars right

21  out, investigators, gang specialists out.  And they would

22  conduct a follow-up investigation.  They would either meet us

23  at the crime scene or go to the hospital.  And, like I said

24  before, one of the things they try to do is get a copy of the

25  case report -- that's often not" -- "that's often not

1  completed.  So they grab one and take off with it.  So they can

2  work from there.  That's how they conduct the follow-ups, go to

3  the hospitals, canvass the area, talk to their contacts where

4  this might have occurred.

5  Q.  "So the individuals or entities that were notified,

6  according to your report, were Gang Crimes North, the 14th and

7  13th District, and an evidence tech, right?

8  A.  "Evidence tech, right.

9  Q.  "And after" --

10        THE COURT:  We are getting close to -- we are actually

11  almost at the end of the day.  How much more do you have?

12        MR. GIVEN:  Five minutes, probably, Your Honor.

13        READER RAHE:  Yeah.  We are on page 44 right now, and

14  it goes to 52, so very close.  And it's only little portions of

15  each page, too.

16        THE COURT:  I --

17        MS. ROSEN:  It's up to you, Judge.

18        THE COURT:  What?

19        MS. ROSEN:  It's up to you.

20        MR. SOTOS:  I mean, Judge --

21        THE COURT:  Yeah.  I think we probably ought to stop.

22        READER RAHE:  Okay.

23        THE COURT:  I don't know who's got what kind of

24  commitment.

25        So we'll see everybody on Monday morning.  Ladies and

```
 1   gentlemen, we are on track consistent with what I told you.  I
 2   think we're going to be in session all day Monday.  We're
 3   probably going to have some evidence that goes into Tuesday.
 4   Then we're going to have to do closing arguments and
 5   instructions, but I am very hopeful that the case will be in
 6   your hands soon.
 7          Have a good weekend.
 8     (Jury out.)
 9          THE COURT:  Okay.  So --
10          MR. GIVEN:  Judge, I do have, through the miracle of
11   modern technology --
12          THE COURT:  Excellent.
13          MR. GIVEN:  -- a very short submission for Your Honor.
14   It's a courtesy copy.
15          THE COURT:  Okay.  Good.  And you're filing it, right?
16          MR. GIVEN:  It's been filed.
17     (Document tendered to Court.)
18          THE COURT:  Okay.  Good.  You are going to try to do
19   what you can in terms of getting the instructions issues --
20          MR. LOEVY:  Narrowed.
21          MR. BOWMAN:  Yes.
22          THE COURT:  -- narrowed, focused so we can hopefully
23   not have to take a lot of time to get that resolved?
24          MR. LOEVY:  On the same subject, you know, this
25   deposition we really pushed hard to stipulate to, because it
```

3516

1    just doesn't make sense to me why we're reading this to the

2    jury.

3            THE COURT:  I don't understand why we're reading it to

4    the jury either, actually.

5            MR. LOEVY:  And maybe we can stipulate to the other

6    depositions, too, because I think it's going to be a repeat.

7            THE COURT:  Well, you know, obviously, it will be

8    fabulous if we could shorten things, but I don't know.  I

9    don't -- this one is unclear to me, but, you know, I don't know

10   as much about the case as all of you do.

11           Is there some -- well, we're almost -- close to done.

12           MR. SOTOS:  We'll be done in five minutes, Judge.

13           MR. LOEVY:  I think she's asking if there's a point.

14           THE COURT:  Well, with five more minutes, I guess the

15   question is --

16           MR. GIVEN:  Actually, Judge, if you want the answer,

17   it's because this is the man who took the initial report where

18   significant important information was written into the

19   document.  And there's been a question raised about why there

20   is two different sets --

21           THE COURT:  Oh, oh, oh, oh.  Okay.

22           MR. GIVEN:  -- and he explained that.

23           THE COURT:  Okay, okay.  All right.  Given that you

24   know what the ruling is going to be on Wasilewski, it may be

25   Sunday before you get the opinion.  Okay?

1          MR. LOEVY:  Thank you, Your Honor.

2          MR. POLICK:  Thanks, Judge.

3          MR. GIVEN:  Thank you, Your Honor.

4     (Adjournment at 4:03 p.m. until 9:30 a.m., 6/25/18.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T E

2

3

4

5           I, Colleen M. Conway, do hereby certify that the

6   foregoing is a complete, true, and accurate transcript of the

7   Trial proceedings, Vol. 14-B, had in the above-entitled case

8   before the HONORABLE JOAN B. GOTTSCHALL, one of the Judges of

9   said Court, at Chicago, Illinois, on June 22, 2018.

10

11

12        _/s/ Colleen M. Conway, CSR, RMR, CRR_          _06/23/18_

13             Official Court Reporter                     Date
               United States District Court
14           Northern District of Illinois
                  Eastern Division
15

16

17

18

19

20

21

22

23

24

25